1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15

16                        ---o0o---

17

18                  REPORTER'S TRANSCRIPT

19        RE:  EXCERPT OF EVIDENTIARY HEARING - DAY 3

20                    JUNE 21ST, 2013

21

22                        ---o0o---

23

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                    (916) 446-6360

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
 6             SAN FRANCISCO, CALIFORNIA  94104

 7             BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8             BY:  LORI RIFKIN, ATTORNEY AT LAW

 9             BY:  TOM NOLAN, ATTORNEY AT LAW

10             BY:  AARON J. FISCHER, ATTORNEY AT LAW

11             BY:  MARGOT MENDELSON, ATTORNEY AT LAW

12

13

14    FOR THE DEFENDANTS:

15              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
16              130O I STREET
                SACRAMENTO, CALIFORNIA  95814
17
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
               BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
               BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
20
               BY:  PATRICK MCKINNEY, II, DEPUTY ATTORNEY GENERAL
21
               BY:  WILLIAM DOWNER, DEPUTY ATTORNEY GENERAL
22

23

24

25                          ---o0o---
```

```
 1                        EXAMINATION INDEX

 2                           ---o0o---

 3    FOR THE DEFENDANTS:

 4        EXAMINATION:                            PAGE

 5

 6     DR. ARIEL TRONCOSO

 7         Direct Examination by Mr. Russell        2
           Cross-Examination by Ms. Rifkin         48
 8         Redirect Examination by Mr. Russell     83

 9

10     RANDOLF GROUNDS

11         Direct Examination by Mr. Sharma        87
           Cross-Examination by Mr. Fischer       110
12

13

14

15

16

17                           ---o0o---

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2                         ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO           DESCRIPTION              EVD
 5

 6      8                  Document                   86

 7      9                  Docment                    86

 8     10                  Document                   86

 9     11                  Document                   86

10     12                  Docment                   119

11     14                  Document                  139

12

13

14

15

16    DEFENDANTS'
      EXHIBIT NO           DESCRIPTION              EVD
17

18      B                  Document                   44

19

20

21

22

23

24

25                         ---o0o---
```

1

1        SACRAMENTO, CALIFORNIA

2        FRIDAY, JUNE 21ST, 2013

3                ---o0o---

4        (Excerpt from evidentiary hearing.)

5        (On the record at 11:05 a.m.)

6        THE CLERK:  You may remain seated.

7        Court is now in session.

8        THE COURT:  Call your next witness.

9        MR. RUSSELL:  Thank you, Your Honor.

10       Defendants call Dr. Troncoso.

11       THE COURT:  I'm sorry.  Counsel, what is your name?

12       MR. RUSSELL:  My name is Jay Russell.

13       THE CLERK:  Please, remain standing and raise your

14   right hand.

15                       ARIEL TRONCOSO,

16   was thereupon called as a witness herein by the Defendants,

17   and having been sworn to tell the truth, the whole truth and

18   nothing but the truth, was thereupon examined and testified

19   as follows:

20       THE CLERK:  Thank you.  Take a seat.  State your

21   full name for the record and spell it.  Please, speak into

22   the microphone.

23       THE WITNESS:  Ariel, A-r-i-e-l, Troncoso, spelled

24   T-r-o-n-c-o-s-o.

25   ////

                                                                    2

1                    DIRECT EXAMINATION

2    BY MR. RUSSELL:

3    Q.        Good morning, Dr. Troncoso.

4    A.        Good morning, sir.

5    Q.        Are you presently employed by the California

6    Department of State Hospitals?

7    A.        I am.

8    Q.        What is your present position with DSH?

9    A.        Senior supervising psychiatrist.

10   Q.        Where do you work?

11   A.        At DSH Salinas Valley.

12   Q.        The Salinas Valley Psychiatric Program?

13   A.        Yes.

14   Q.        How long in your current position have you been at

15   Salinas Valley Psychiatric Program?

16   A.        Well, I'm not sure I understand.  I've been at

17   Salinas Valley Psychiatric Program for four and a half years.

18   Then I had a small hiatus of six weeks and then I returned.

19   Q.        So there was a period of time in which you left?

20   A.        Correct.

21   Q.        When did you return?

22   A.        June 17th.

23   Q.        So that was on Monday?

24   A.        Correct.

25   Q.        Before I get into your position with the Department

3

1    of State Hospitals I'd just like to talk about your

2    background a little bit.

3            You graduated from medical school?

4    A.      Yes, sir.

5    Q.      What school did you graduate from?

6    A.      I went to Stanford.

7    Q.      And when did you graduate?

8    A.      1973.

9    Q.      And after that, what field did you practice in?

10   A.      I practiced in plastic surgery, reconstructive

11   surgery, hand surgery.

12   Q.      At some point did you receive training in psychiatry?

13   A.      I did, but that was as like my second career.

14   Q.      When did that occur?

15   A.      2003 to 2006.

16   Q.      Did you re-attend medical school for those purposes?

17   A.      No.

18   Q.      Are you board-certified?

19   A.      Yes.

20   Q.      In what fields are you board-certified?

21   A.      I am board-certified in plastic surgery, board

22   certified in general psychiatry, and certified in forensic

23   psychiatry.

24   Q.      When did you first start with the Department of State

25   Hospitals?

4

1   A.       It would be August of -- let me see -- 2008.

2   Q.       And where did you go to work when you went to work

3   with DSH?

4   A.       The Salinas Valley Psychiatric Program.

5   Q.       What was your position beginning in 2008?

6   A.       Staff psychiatrist.

7   Q.       How long did you remain in the position of staff

8   psychiatrist?

9   A.       Approximately four years.

10  Q.       Until approximately 2012?

11  A.       Correct.

12  Q.       And what did your position change to in 2012?

13  A.       September 2012 I was the acting senior psychiatrist.

14  Q.       What does a senior psychiatrist do?

15  A.       Well, at Salinas Valley the senior psychiatrist

16  basically is in a supervising position.  He or she might, for

17  example, arrange for the on-call schedule or coverage of the

18  different psychiatric units during the day, as well as maybe

19  on-call coverage after hours.

20           I carried a caseload as well, so I was kind of a

21  working senior supervisor.

22  Q.       As of September 2012 you say you were a working

23  senior psychiatrist, what was your caseload at that time?

24  A.       About 1 to 36.

25  Q.       Can you describe for the Court what the primary

5

1    duties are of, I'll say, as a staff psychiatrist, knowing
2    that you were a working senior psychiatrist.  What were your
3    duties as a staff psychiatrist?
4    A.    My duties as a staff psychiatrist would be to attend
5    to the patients that were under my care.  I would make
6    diagnoses and make treatment recommendations with an
7    interdisciplinary team.  I would follow up on treatment and
8    monitor the patient throughout their stay at DSH Salinas
9    Valley.
10   Q.    Were you responsible for medication management?
11   A.    Yes.
12   Q.    What does that entail?
13   A.    That entails making as accurate a diagnosis as you
14   can and tailoring the pharmacology to meet the patient's
15   needs.
16   Q.    When you're acting as a staff psychiatrist at Salinas
17   Valley Psychiatric Program, was it your practice to see the
18   patients on your caseload every single day?
19   A.    Not necessarily every single day, but we saw them at
20   regular intervals.  We saw them as they came into the
21   facility, kind of a meet and greet and do our initial
22   assessment.  They were seen at 72 hours, ten hours, and then
23   within every 30 days.
24         However, in between there, there were contacts that
25   were informal.  Perhaps they may have had a need for

6

1    understanding of their medications or how the process works

2    at Salinas Valley, and I would respond to those requests.

3         There were times where I actually had one-to-ones

4    with patients, and I pulled them out and discussed their case

5    in more detail or discussed the pharmacology in more detail.

6    Those are very valuable sessions that we would have with the

7    patients.

8    Q.    Before we move on, you talked about the

9    Interdisciplinary Treatment Team or the IDTT.  You, as the

10   staff psychiatrist, are a member of that team, correct?

11   A.    Correct.

12   Q.    Who else is on that team?

13   A.    We have a psychologist.  We have a licensed clinical

14   social worker or the equivalent.  We have a recreational

15   therapist, as well as an RN.

16   Q.    What's the function of the Interdisciplinary

17   Treatment Team?

18   A.    Well, the Interdisciplinary Treatment Team is a very

19   important function, and that's because we all direct our

20   knowledge, our resources, our thinking and our treatment

21   planning in that interdisciplinary team.

22        There is no one member that is greater than the

23   others.  Everybody contributes a portion of their knowledge,

24   their experience, their observations to the treatment to

25   formulate a treatment plan individually to that -- tailored

7

1    to that patient.

2    Q.      In addition to the work of the -- I believe you said

3    that the Interdisciplinary Treatment Team meets on an

4    every-30-day basis; is that correct?

5    A.      Correct.

6    Q.      But even before that occurs, I think you had

7    mentioned that you see the patients when they arrive at the

8    facility; is that correct?

9    A.      I see the patients when they arrive.  I see them as

10   frequently as I can.  For example, if I have someone that

11   requests for me to go and talk to them, I talk to them.  But

12   if I'm on a wing, I may have three or four different people

13   on that wing that ask me to talk to them as well.  So there

14   is a lot of informal contact during the whole day.

15   Q.      Going back to the admission process, what is the role

16   of the staff psychiatrist in the admission process?

17   A.      Well, it's a complicated role because we basically

18   admit the patient with whatever information we have

19   available, and at least decide whether or not this patient is

20   safe to be in our program.

21           If we deem that they're safe, we go ahead and admit

22   them.  The medical doctor clears them, but I'm responsible

23   for the initial treatment plan, as well as the

24   psychopharmacology.

25   Q.      What does the initial treatment plan entail?

8

1    A.      It entails -- again, it goes on a five-axis

2    diagnostic scheme, it is the DSM-4-TR.  Now it is the new

3    DSM-5.  It just came out in May.

4    Q.      That's the diagnostic and statistical manual?

5    A.      Correct.

6    Q.      As part of the initial process, do you examine the

7    patient?

8    A.      I do not examine them physically.  That's done by a

9    primary care physician.

10    Q.      Generally, as a staff psychiatrist, was it your

11    policy to see the patient within the first few hours or days

12    in which they reached the facility?

13    A.      As soon as they hit our facility they would be

14    escorted from receiving and release, brought to our facility,

15    and there I would see them, usually in the clinical treatment

16    room because it was a little more open and less restrictive.

17    Q.      During these proceedings we've been talking about

18    what is called orientation status.

19            Do you know what orientation status is?

20    A.      Orientation status is a period of time between the

21    admission and the time they really start programming.  It is

22    like an introduction to the program.  It is pretty detailed,

23    and actually they're given handouts to help them understand

24    what the program is like.

25            Likewise, the nurse meets with them as well and takes

9

1    information from the patient, again to be used by the IDTT

2    team, and to just screen the patient medically.

3         They're also seen by an internist who does the

4    physical part of the examination.  I do the mental status and

5    the pharmacology.

6    Q.    Do you consult with patients when they are on

7    orientation status?

8    A.    I do.

9    Q.    What do you do in that --

10         THE COURT:  Let me interrupt for a moment because I

11   think I just don't -- I don't know something.

12        The patient has been referred to the hospital by a

13   psychiatrist?  Asking, not telling.  Is that correct?

14        THE WITNESS:  Correct.

15        THE COURT:  And that psychiatrist ordinarily -- no,

16   I'm telling you.  I don't want to.

17        When the psychiatrist refers, what information is

18   provided to the staff psychiatrist at Salinas?

19        THE WITNESS:  What's provided is what we call

20   collateral information, information that has to do with the

21   treatment of that patient.

22        THE COURT:  Back in --

23        THE WITNESS:  Back in CDCR.  We receive that

24   information.  We receive a printout of the medications.  We

25   receive any other collateral data we can collect.

10

1          THE COURT:  Do you get a -- either a history or at

2     least a diagnosis as to why the patient was referred to you?

3          THE WITNESS:  Yes, we do.

4          THE COURT:  Okay.  But you do your own?

5          I don't mean to interrupt.  I'm trying to

6     understand.

7          MR. RUSSELL:  I appreciate that, Your Honor.

8          THE COURT:  You do your own diagnostic tests in order

9     to verify or make a judgment about what is appropriate; is

10     that right or wrong?

11          THE WITNESS:  That's true.  And as they come from

12     another facility, we also do a suicide risk assessment to

13     make sure they're safe.  So that's part of your initial

14     evaluation, sir.

15          THE COURT:  Thank you, sir.

16          You may proceed.

17     BY MR. RUSSELL:

18     Q.     As you're doing that initial evaluation, I think you

19     had said that you also generally see those patients; is that

20     correct?

21     A.     I do see -- I see all the admissions.

22     Q.     And what is the purpose of your examination during --

23     when they're in orientation status?

24          THE COURT:  I don't know what that means.

25          As a staff psychiatrist you see every patient that

11

1   comes in, or just patients who are going to be on your

2   workload?

3          THE WITNESS:  The patients that are going to be on my

4   workload.  But if I'm the only psychiatrist there, I see

5   everybody.

6          THE COURT:  Okay.

7          THE COURT:  As a supervising psychiatrist, do you see

8   everybody or just get reports or what do you do?

9          THE WITNESS:  No, I don't get reports.  I follow -- I

10  have a caseload so I see those --

11         THE COURT:  Just that portion.

12         THE WITNESS:  -- individually.

13         THE COURT:  Okay.  Thank you, sir.

14  BY MR. RUSSELL:

15  Q.     Do other staff also see the patient while they're on

16  orientation status?

17  A.     It's amazing, but there is a lot of staff that really

18  see the patient almost continuously.  From the time they

19  arrive in our facility, from the MTAs that escort our patient

20  from the receiving and release unit to our unit, staff

21  interacts with that patient constantly.

22         And by constantly, it seems like they have eyes on

23  these patients 24/7.  I'm not the only person that sees the

24  patient.  There is the registered nurse.  There is the

25  psychologist, the social worker who has a caseload, the

12

1    recreational therapist and others, like psych-techs, for

2    example, that really have created a milieu, so to speak, a

3    therapeutic milieu in which the patient is immersed in.  So

4    I'm not the only one.

5    Q.      What is your understanding of the orientation status,

6    what the patient -- well, what is your understanding of the

7    orientation status?

8    A.      It's a time period where they're given an opportunity

9    to adjust to a new program.  They may have come from another

10   type of care in CDCR.  And if they're, for example, EOP, they

11   go to our intermediate facility, and they need a period of

12   adjustment, so to speak.

13          We get to know the patient.  They get to know us.

14   And it is almost like a handshaking type of encounter.

15          THE COURT:  Except they're in handcuffs.

16          THE WITNESS:  Except they're in handcuffs.  But we

17   have a Level IV maximum security prison so we have that

18   component to sort of contend with.

19   BY MR. RUSSELL:

20   Q.      Your Honor anticipated my question.  The inmates

21   remain in cuffs during orientation status?

22   A.      They do.

23   Q.      They're in cuffs when outside of their cell, correct?

24   A.      Only outside of their cell.

25   Q.      During orientation status are patients prohibited

13

1    from being seen by staff?

2    A.        Not necessarily.  They can be taken out, for example,

3    to go to day room and watch television.  If it is football

4    season, maybe they'll pick up a game or something, or

5    basketball the same thing.  But they are let out as often as

6    circumstances allow.

7    Q.        Beginning in September of 2012, you earlier said that

8    you became the senior psychiatrist?

9    A.        Correct.

10   Q.        What are your duties?

11             In addition to being a working staff psychiatrist,

12   what were your duties as the senior psychiatrist?

13   A.        Well, there are a myriad of duties.  I would, for

14   example, view the referrals coming from CDCR and evaluate

15   them for appropriateness for our program.

16             I was also chairman of the Utilization Review

17   Committee.  We handled the admissions, for example, that were

18   between six to nine months in duration.

19             And at times I was also on the therapeutic -- the

20   Medication Therapeutics Committee which met both in our unit,

21   as well as CDCR.

22             And then there were other administrative type of

23   duties like, for example, arranging for coverage on the other

24   units as well as making the on-call schedule.

25   Q.        Did you supervise the activities and the duties of

14

1    other psychiatrists?

2    A.        As best I could.

3    Q.        While you were the senior psychiatrist did you

4    supervise Dr. Joel Badeaux?

5    A.        Yes, I did.

6    Q.        In your experience how long does this orientation

7    status that we've been discussing last?

8    A.        Ten days.

9    Q.        And after that what happens?

10   A.        After that a decision is made whether or not they can

11   come out of cuffs.  That decision is made by the ICC, the

12   Institutional Classification Committee.

13   Q.        Does clinical staff have any role in the decisions

14   that are made regarding orientation status by the

15   Institutional Classification Committee?

16   A.        Yes.

17   Q.        What is their role?

18   A.        Well, they represent the clinical part and the

19   correctional part.  The clinical part is melded to the

20   correctional part.  Usually a social worker or psychologist

21   would go to those ICC meetings.

22   Q.        And when they go to those meetings, what do they do?

23             MS. RIFKIN:  Objection, Your Honor.  Foundation.

24             THE COURT:  I don't understand.  I mean, he was a

25   psychiatrist.

15

1              I see, psychiatrists ordinarily don't go to the ICC?

2              THE WITNESS:  That's true, Your Honor.

3              THE COURT:  Okay.  But is it your duty to assign

4     people to the ICC?

5              THE WITNESS:  Yes.

6              THE COURT:  And in doing that do you have an

7     understanding of what it is that they do there?

8              THE WITNESS:  Yes.

9              THE COURT:  The objection is overruled.

10             You may answer.

11    BY MR. RUSSELL:

12    Q.      What do they do there?

13    A.      Well, it's a correctional environment.  We have the

14    representatives from the warden's office.  We call them

15    Correctional Counselors 1 and 2.  They meet there with the

16    representative of the warden's office.  They review the

17    C-File for example, the Central File.

18             And the clinician, already having met with the

19    patient, will present what they know of the patient and how

20    that may influence the correctional decisions.

21    Q.      In your experience as the senior psychiatrist, with

22    people reporting back to you as to what happens in

23    Institutional Classification Committee meetings, were there

24    instances that you heard of in which the recommendation of

25    clinical staff was overridden by correctional staff?

16

1    A.        Yes.

2    Q.        How many times did that happen?

3    A.        Not often, but it happened.

4    Q.        And why would that happen?

5    A.        Well, for one reason, maybe, for example, when

6    patients come in, they are classified by CDCR as having point

7    scores.  Maybe they have a point score of 600.

8             To give you an example, Atascadero won't have a

9    patient with a point score that is over 50.  So we get them

10   around 300, 400, 600, which means they have a very violent

11   past, and they could present a danger to either themselves,

12   to others or to the institution.

13            So that correctional component was very important to

14   assure the security of the institution.

15   Q.        So from what I understand, although the clinical

16   staff might have a perspective, there is also the perspective

17   of correctional staff who are responsible for the safety and

18   security of the facility?

19   A.        Yes.

20   Q.        Once a patient is released from orientation status,

21   what is the psychiatrist's role after that point in treating

22   the patient?

23   A.        Again, we monitor the treatment plan.  We make sure

24   that the deadlines are met for meeting with the patient at a

25   minimum.

17

1   Q.      And what are the deadlines for meeting with a patient

2   at a minimum?

3   A.      Well, 72 hours, ten days and 30 days.  Then 30 days

4   after that.  However, there are circumstances where we do

5   have to meet a patient outside of those parameters.  Maybe

6   something has come up behaviorally that had to be addressed.

7           Give you an example.  When they have indecent

8   exposure, they expose themselves to, let's say, female staff,

9   we do meet with them to address that kind of behavior.

10  That's independent of the scheduled IDTTs.

11  Q.      So the IDTT, the Interdisciplinary Treatment Team, is

12  required to meet on, at a minimum, once every 30 days after

13  orientation status?

14  A.      That's correct.

15  Q.      So does the meeting of the IDTT represent the minimum

16  number of times that a psychiatrist would meet -- would

17  actually physically meet with a patient?

18  A.      That is the minimum.

19          THE COURT:  I'm sorry.  Now I am getting confused

20  again.

21          The psychiatrist on the team is the staff

22  psychiatrist who is responsible, that the patient is on his

23  patient load; is that right?

24          THE WITNESS:  Correct.

25          THE COURT:  Does he meet with the patient in addition

18

1    to the period of time that you have specified that the team

2    meets?

3            THE WITNESS:  Yes.  We meet with them on different --

4    under different circumstances.

5            THE COURT:  Right.

6            THE WITNESS:  Let me give an example if I may?

7            A patient fills out a form called an Interview

8    Request form.  In other words, they are asking us to come and

9    see them, for whatever circumstances they're experiencing.

10   So we will go and direct ourselves to that patient and

11   address them.

12           THE COURT:  Look, I mean, you are getting very sick

13   people.  They're not people who are ordinarily able to deal

14   with the world the way other folks could.

15           Is that true?

16           THE WITNESS:  They're very sick.

17           THE COURT:  Very sick.

18           The expectation that they're going to be able to fill

19   out a form, is that realistic, as an example -- using that as

20   an example?

21           THE WITNESS:  Yes, it is.  Because if they can't fill

22   out the form to contact an MTA, the MTA will write out the

23   form for them.  So we get communication from them if they

24   need it.

25           THE COURT:  I mean, it's obvious I don't understand

19

1    something because I'm assuming that they're really sick

2    people.

3            Expecting them to fill out a form is, I would assume,

4    frequently unreasonable -- not a reasonable expectation?

5            THE WITNESS:  Well, they don't necessarily have to

6    fill out a form, Your Honor.  They can communicate to

7    somebody else that they need to be seen.

8            THE COURT:  To see people who are, I gather -- I

9    mean, we've heard testimony that you see people who are

10   essentially catatonic.

11           THE WITNESS:  Well, I have to differ.  We don't see

12   the people with catatonia.  That is more of an acute

13   situation that has to be addressed at a higher level of

14   care.

15           THE COURT:  Okay.  Let's say you're a Level IV and

16   you're catatonic.  Where do you go?  Where do they send you?

17           THE WITNESS:  You would go to Vacaville.

18           THE COURT:  Okay.  Okay.  So you have people who are

19   intermediate, but they're still quite sick.

20           Try and tell me, I know that there is no typical, but

21   as a general matter can you describe the nature of the

22   problems that have sent the patient to your hospital?

23           THE WITNESS:  Well, the problems that we have sent to

24   our hospital are quite different.  We have the maximum

25   security component, but we also have some of the sickest

20

 1   people in the state hospital system, as well as in CDCR.

 2        These patients present with major psychiatric

 3   disorders.  For example, psychotic disorders, mood disorders

 4   and major anxiety disorders.  So we come across a wide

 5   spectrum.  They are usually medicated, some of them not.

 6   And -- I'm sorry.

 7        THE COURT:  No.  No.  I was afraid that the lawyer

 8   was about to interrupt you.  I was trying to stop him.

 9        Go ahead.

10        THE WITNESS:  With those major categories, like take

11   schizophrenia for example, we see all types of

12   schizophrenia.

13        THE COURT:  So you see people with schizophrenia.

14   They may not even recognize where they are?

15        THE WITNESS:  In rare cases.  If they are gravely

16   disabled, that may be so.

17        THE COURT:  In any event, being schizophrenia --

18   asking you, not telling you.  I can hear myself as if I'm

19   telling you, and I don't mean to.

20        Whatever the level is, they are probably not able to

21   accurately evaluate where they are and what's happening to

22   them?

23        THE WITNESS:  They're well aware of where they are

24   because we check for that on initial assessment.  We also

25   make room for things that -- for instances where they are

21

1    gravely disabled and maybe they can't really communicate as

2    well.

3         But we try to reach them effectively with

4    communication and we ask them a lot of questions so that they

5    can reflect back to us how they feel or how they are doing.

6    And we won't stop until we basically understand them.

7         THE COURT:  My questions were invited -- I don't mean

8    invited, but arose because of your indication to counsel that

9    you will seek -- maybe it was to me -- that you will see the

10   patient if he indicates that something requires that he speak

11   to you.

12        But I would have thought, but apparently I'm wrong,

13   that you have to be aware that a significant percentage of

14   your patients are not capable of meaningful communication,

15   either because they can't communicate or because they can't

16   assess the reality around them.

17        THE WITNESS:  Well, they are mentally ill.  And most

18   of them are moderately to severely mentally ill.  But on the

19   other hand, we do know that they communicate with us.

20        Even the most rudimentary person can communicate with

21   the yes or no.  For example, staff will make observations

22   that this person has been responding to internal stimulation,

23   they sit there and talk to themselves.  We make room for all

24   of those.  We accommodate those.  Those we see more

25   frequently as part of your treatment plan.

22

1          THE COURT:  You may proceed, Counsel.

2    BY MR. RUSSELL:

3    Q.      Doctor, in having worked with the Department of State

4    Hospitals, are you -- do you at least have a familiarity of

5    the program at Vacaville State Prison or the Vacaville

6    Psychiatric Program?

7    A.      I only know it by the referrals we make to Vacaville.

8    Q.      What I'm driving at is can you explain for the Court

9    the difference between the acute care program at Vacaville

10   Psychiatric Program and intermediate care program at Salinas

11   Valley?

12   A.      Well, I think the Vacaville program is a higher level

13   of care, the highest acuity you can have.  We have moderate

14   acuity.  But sometimes we have very severely mentally ill

15   people.

16          And when it appears to us that they have reached a

17   point where we cannot meet their needs as an institution,

18   then we make a referral to Vacaville Acute Psychiatric

19   Hospital, and Vacaville generally will take them and work

20   with them.

21   Q.      When you say "moderate acuity," can you explain that

22   for me?

23   A.      Let me give you an example of high acuity.  A patient

24   that is persistently suicidal, self-injurious or maybe

25   treatment refractory.

23

1          In other words, there's -- we can't get the right

2     treatment tailored to that patient, and they need a higher

3     level of care.  So I only know of Vacaville by referral.  We

4     send those people to Vacaville.

5     Q.     Who are the people that you keep that, as you say,

6     have moderate acuity?

7          Again, can you explain what you mean by that and the

8     kind of patients that you are treating in layman's terms?

9     A.     The patients that we treat are patients that are

10    severely mentally ill.  You know, if you look at a bell

11    curve, there is going to be some outliers on the tail end of

12    the curve on both ends.

13         That tail end of the curve going forward represents

14    people who are severely mentally ill and that need a higher

15    level of care.

16         And sometimes they come from CDCR with that level of

17    care, and we recognize it early, we make a referral early.

18         When we work with them and we establish that their

19    diagnosis, for example, may not be the clearest, or they need

20    more attention because they're chronically suicidal, then we

21    sends them to Vacaville.

22    Q.     Now, going back to the IDTT, the Interdisciplinary

23    Treatment Team, they meet on a formal basis every 30 days,

24    correct?

25    A.     Correct.

24

1  Q.     That's not the only time in which the patient is

2  seen; is that correct?

3  A.     No.  I gave you examples of when we see them outside

4  of the IDT.

5  Q.     In addition to you as the staff psychiatrist, who

6  else treats the patients?

7  A.     The whole milieu.

8  Q.     Can you describe what that milieu is?

9  A.     Well, a therapeutic environment.  The environment

10  that starts from the moment they're in reception -- receiving

11  and release.  There are two MTAs that bring them to our

12  facility.  That's the start of the therapeutic milieu.

13       Then when they come to our unit, they are essentially

14  immersed in a therapeutic environment.  Every contact with

15  them is therapeutic in nature, from the MTAs, from the

16  nursing staff, the psych-techs, the med nurse, and so on so

17  forth, even down to the cleaning people.  That's part of the

18  therapeutic milieu.  They are immersed in that.

19       So we have a multitude of people actually

20  contributing to that milieu.  Very therapeutic.  You may not

21  think that the guy that cleans the floor is therapeutic, but

22  he cleans the cell of some of our patients, and he can tell

23  us a lot of information about what they find in the cell that

24  helps us direct our treatment.

25       Or the cook, for example, has special diets that

25

1    these patients are on, whether for religious or medical

2    reasons.  The cook plays a part in all of this.

3          So there is a hierarchy of people that contribute to

4    this therapeutic milieu.

5    Q.    As part of the treatment that is offered by you as

6    one of the staff psychiatrists, you mentioned that you see

7    patients on an individual basis.

8          Do you see them at their cell front?

9    A.    Sometimes.

10   Q.    When do you do that?

11   A.    Well, for example, maybe they don't want to come out

12   for some reason, then it is either myself or the whole team

13   that actually goes to the cell front and tries to encourage

14   the patient to come out and meet with us.

15   Q.    Are there instances in which -- well, let me back up.

16         Are you, as a staff psychiatrist, able to provide

17   what you consider to be effective care when you meet with a

18   patient at their cell front?

19   A.    It's not the most ideal of circumstances because

20   there's a lack of confidentiality that goes with a cell front

21   meeting, but it is sufficient enough to get an idea of where

22   they are.

23   Q.    If you do not believe that is sufficient, what do you

24   do?

25   A.    Then we ask them to come out again and repeatedly

26

1    until they do or they don't.

2    Q.      And if they do, what's the process then?

3    A.      The process is they meet one-to-one with me, for

4    example, or one-to-one with myself and a nurse.

5    Q.      And where do those meetings take place?

6    A.      We have a treatment -- we have a conference room

7    where we meet our patients.

8    Q.      At least going to the period of time in which you

9    were the senior staff psychiatrist, so that was beginning, I

10   guess, in September of 2012, did you have a particular unit

11   on which you worked?

12   A.      I worked on Treatment Center 2.

13   Q.      And where did you -- did you have an office?

14   A.      I had an office, yes.

15   Q.      Is the office right there within Treatment Center 2?

16   A.      No.

17   Q.      Where is your office?

18   A.      It's adjacent -- in an adjacent building, a short

19   walk to the treatment center.

20   Q.      I want to go back to the first stage, the orientation

21   stage we talked about a little bit before.  I apologize.  I'm

22   going back.

23           You had said that the inmates remain in cuffs when

24   outside their cell during that period?

25   A.      That's correct.

27

1    Q.      As a staff psychiatrist, are you able to provide what

2    you believe to be effective care to patients while on

3    orientation status?

4    A.      Yes.

5    Q.      Do you find that them being in handcuffs outside

6    their cell is a barrier to providing effective treatment?

7    A.      It has not been.

8    Q.      And in your experience have you found that patients

9    being on orientation status, meaning they are placed into

10   cuffs whenever they're outside their cells, has a deleterious

11   effect or bad impact on their clinical presentation?

12   A.      No.

13   Q.      I think you mentioned this earlier, but the -- and it

14   has been testified to here earlier today, that the -- strike

15   that.

16           Do you also as a staff psychiatrist, do you also have

17   a role in the discharge of patients?

18   A.      Yes.

19   Q.      What is the staff psychiatrist's role in discharge?

20   A.      The mechanism for discharge is IDTT, the

21   Interdisciplinary Treatment Team.  What we do is we meet and

22   we consider and go over the treatment plans from the previous

23   month and the month before that and make an assessment as to

24   where the patient is in terms of their clinical process -- or

25   progress.

28

1          And we meet with the patient, and we have a

2    discussion about whether or not we feel they're ready for

3    discharge.

4          If it is the conclusion of the treatment team to

5    discharge the patient, then we start the discharge process.

6    Q.     When does that occur?

7    A.     It occurs at six months, nine months, in some case

8    even longer.

9    Q.     And who makes the determination as to whether or not

10   a patient is discharged from the program?

11   A.     The treatment team makes that decision.

12   Q.     Is there anyone who signs off on that discharge or

13   essentially approves that discharge?

14   A.     Yes.

15   Q.     Who is that?

16   A.     The psychiatrist.

17   Q.     And so you have done that as a staff psychiatrist,

18   correct?

19   A.     Yes.

20   Q.     What are the criteria for you to discharge a patient?

21   A.     Well, they have to be, hopefully, medication

22   compliant, and their progress has been substantial or maybe

23   not so substantial.  It depends.  When they're ready for

24   discharge, we know when they're ready.

25          They're making, for example, group attendance.

29

1  They're making the majority of their meetings in group, and

2  they're actually functioning and engaged in their mental

3  healthcare.

4          So those are just some markers.  There's a multitude

5  of others.

6          If there is violence involved, that the level of

7  violence has been reduced.  Or if there's a matter of, let's

8  say, depression, the depression's remitted to the point where

9  they can function better.  Or if it is schizophrenia, look

10  for a response.

11  Q.     Is there a level a patient is supposed to reach of

12  functionality before discharge is considered?

13  A.     It depends.  It depends.  Some people come in after

14  substantial neurotoxic drug use.  Other patients, for

15  example, are developmentally disabled, and they may have a

16  low baseline for an untreated psychotic process for many

17  years.  So that baseline could be rather low and our

18  expectations would be adjusted.

19  Q.     When you were acting as the senior staff

20  psychiatrist, beginning in September until April of --

21  September of 2012 to April of 2013, did anybody ever tell you

22  that you had to discharge a patient?

23  A.     No.

24  Q.     Were you ever pressured to discharge patients by

25  anyone?

30

1   A.      No.  We had a Utilization Review Committee.  I was

2   chair of that committee.

3   Q.      What does the Utilization Review Committee do?

4   A.      They basically look at the length of stay at around

5   six months.  The committee will review the case, again with

6   the psychiatrist or his representative or her representative

7   there, and make an estimation, are they ready for discharge

8   or are they not.  If not, then why not?

9        Now there are a variety of reasons why they may

10  not -- that may not be so.  But then we decide, okay, as a

11  committee we make the recommendation, okay, you have more

12  time and work on this patient some more.

13       Or maybe the patient has reached a maximum benefit

14  from our program, and maybe they need to either go back to

15  the institution if they're sufficiently recovered, or maybe

16  to a higher level of care.  It depends.

17  Q.      Were you ever advised of a specific number of

18  discharges that you had to order as a staff psychiatrist?

19  A.      Not myself.

20  Q.      As the senior staff psychiatrist I think you had

21  earlier testified that among others you supervised the work

22  of Dr. Joel Badeaux; is that correct?

23  A.      Yes, I did.

24  Q.      Do you recall anything concerning Dr. Badeaux's work

25  that stands out in particular while at Salinas Valley?

31

1    A.      No.

2    Q.      Do you know what Dr. Badeaux's background was?

3    A.      Well, he was trained as a general psychiatrist, and

4    he worked at Napa for a little while.  I believe he was in

5    the 1370 program there for a little while.  Then he

6    transferred over to our facility because I think he was

7    losing a job at Napa.

8    Q.      And is the work -- would that work be comparable with

9    the work -- the work that was being done with 1370 -- that

10   is Penal Code Section 1370 patients, correct?

11   A.      Correct.

12   Q.      Is that work comparable to the work done at Salinas

13   Valley Psychiatric Program?

14           MS. RIFKIN:  Objection, Your Honor.  Foundation.

15           THE COURT:  Overruled.  You may answer.

16           THE WITNESS:  No.

17   BY MR. RUSSELL:

18   Q.      How do those differ?

19   A.      Well, the correctional environment is different.  I

20   think a person that really wants to be effective in that

21   arena needs to have really special training.

22           If you do a fellowship, let's say, in forensic

23   psychiatry like I did, you have a correctional mental health

24   track that goes with the fellowship.

25           In my example I trained at USC L.A. County Medical

32

1   Center, and we actually were attendees at the Twin Tours

2   Correctional Facility.

3          So we had that experience, and going forward from

4   that experience it's been very valuable for me to adjust to

5   different prisons and different circumstances, like DMH or

6   DSH Salinas Psychiatric Program.

7   Q.     I think you earlier testified that you're

8   board-certified in forensic psychiatry, correct?

9   A.     That's correct.

10  Q.     Again, for a layperson, what is forensic psychiatry?

11  A.     Well, forensic psychiatry is the liaison of

12  psychiatric addressing psychiatric legal questions that the

13  court may present or want advice on.  So part of that was

14  report writing.

15         The other part of it was correctional mental health,

16  where we actually did reports, for example, on people who

17  were incompetent to stand trial; people who, just as an

18  example, the criminal arena, PC 1370s, incompetent to stand

19  trial; NGRI, not guilty by reason of insanity; or even

20  testamentary capacity for a will.

21         We handled all of those things, plus the correctional

22  environment, the correctional environment being the

23  management of patients there that are severely mentally ill

24  in correctional facilities.

25         I hope that answered your question.

33

1    Q.    I think it does.  Thanks.

2          Where are the patients from -- the patients that come

3    to Salinas Valley Psychiatric Program, where are they coming

4    from?

5    A.    They come from all 33 CDCR prisons, plus the other

6    DSH facilities.

7    Q.    And what level of -- well, the patients that come to

8    the Salinas Valley Psychiatric Program, if they are coming

9    from correctional facilities, do they have a particular

10   correctional level?

11   A.    Well, they generally are -- like I mentioned, the

12   placement scores, the cutoff for Atascadero may be 50 points,

13   we generally get them in the neighborhood of 200 to 600

14   points.  So they're high security type of environments.

15         They come from CDCR through the mental health crisis

16   beds, the EOP programs and from the other state hospitals.

17   They refer their most refractory patients to us as well.

18   Q.    And what does "most refractory" mean?

19   A.    Well, for one reason or another they can't be treated

20   in their facility without some form of danger to self or

21   others or grave disability.

22   Q.    So when you say inmates from correctional -- or have

23   points of 200 to 600, these are the highest security levels

24   in correctional facilities?

25   A.    Yes.

34

1    Q.      Now, Dr. Badeaux (sic), I think that you talked about

2    a hiatus you took from the Salinas Valley Psychiatric

3    Program?

4            THE COURT:  He's not Dr. Badeaux.

5            MR. RUSSELL:  I'm sorry.  I apologize, Dr. Troncoso.

6    BY MR. RUSSELL:

7    Q.      Dr. Troncoso, you talked about -- I think the word

8    you used was a "hiatus" you took from the Salinas Valley

9    Psychiatric Program; is that right?

10   A.      Correct.

11   Q.      When did that occur?

12   A.      That occurred in May.  May 1st I started with CDCR

13   Salinas Valley.

14           THE COURT:  I'm sorry.  When did you leave?

15           THE WITNESS:  I left in the end of April 2013.

16           THE COURT:  '13?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  So you left in April and came back in

19   May?

20           THE WITNESS:  No.  I came back in June.

21           THE COURT:  In sorry.  June.

22           THE WITNESS:  Six weeks.

23   BY MR. RUSSELL:

24   Q.      What prompted you to leave Salinas Valley Psychiatric

25   Program?

35

```
1   A.      What prompted me to leave was a sense of frustration,
2   a sense of anger, maybe a feeling we weren't being heard.
3           There were issues with the staffing that the
4   management team didn't seem to be able to address those
5   appropriately or bring resources to bear.
6           On the other hand, we've had visits from
7   headquarters, and we've had some -- actually I've learned
8   during that six weeks, as well as now, that there is very
9   forward-looking advances that are being made in, for example,
10  staffing.
11          We had bare staffing at one time.  But now
12  Miss Gaither, Dr. Warburton, Dr. Dardashti, they called in
13  resources from the whole state hospital system to staff, for
14  example, so now all the units are staffed.  And that's one
15  change.
16          I think the management team before them was rather
17  green and really couldn't respond to the challenges that they
18  were facing.  So she brought in another new treatment team --
19  or new executive team.  And that executive team seems to be
20  very forward looking and producing some progressive changes.
21  That's why I came back.
22  Q.      You, I believe, signed at least two letters that were
23  presented to executive staff, correct?
24  A.      Yes.
25  Q.      And what was your purpose for having signed those
```

36

1    letters?

2    A.       Well, you could call them a cry for help.  We wanted

3    some attention.  We wanted the problems that we were having

4    addressed.  And they didn't seem to be making any headway

5    with that management team.

6    Q.       Did you actually draft those letters?

7    A.       No.

8    Q.       Do you know who did?

9    A.       Dr. Badeaux.

10   Q.       When you say that you were frustrated and upset with

11   the staffing level, what do you mean by that?

12   A.       Well, for example, on TC-2, at that time, for

13   example, I was working with Dr. Gaines.  We were both on the

14   same unit.  We carried loads of about 36, 37 patients.

15            Dr. Gaines decided to go, and, for example, do

16   telepsychiatry at CMC.  So she left during that time period.

17   I was in charge of 73 patients.

18   Q.       So at least for a period of time, your caseload was

19   one physician to 73 patients?

20   A.       Correct.

21   Q.       During that period of time were you able to provide

22   effective care to those patients?

23   A.       It was a lot of hard work and long hours, but yes.

24            THE COURT:  We've reached noon.  We'll reconvene at

25   1:30.

37

1          (Off the record at 12:00 p.m.)

2          (On the record at 1:30 p.m.)

3          THE CLERK:  Please, remain seated.

4          Court is now in session.

5          THE COURT:  You may proceed, sir.

6          MR. RUSSELL:  Thank you, Your Honor.

7    BY MR. RUSSELL:

8    Q.     Good afternoon, Dr. Troncoso.

9    A.     Good afternoon, sir.

10   Q.     When we broke for lunch, I was asking you about your

11   caseload at Salinas Valley Psychiatric Program.  And you had

12   indicated that for a period of time your caseload was, I

13   believe, approximately 72 patients; is that correct?

14   A.     73.

15   Q.     73.  How long did that -- how long were you

16   responsible for that number of patient?

17   A.     A couple of months.

18   Q.     And do you know how that arose -- how that situation

19   arose?

20   A.     Yes.

21   Q.     How did it come about?

22   A.     Well, initially we had the unit between myself and

23   Dr. Gaines.  We split the clinical load in half.  But then

24   Dr. Gaines was leaving to take up a telepsychiatry job at

25   CMC -- or CMC East.  So when she left, I inherited her share

38

1   of the patients.

2   Q.      And I think I asked you this question before we

3   broke, were you able to provide adequate care to those

4   patients?

5   A.      Long hours and a lot of work, yes.

6   Q.      I want to ask you another question that relates to

7   that to some degree.

8           You had talked earlier about a treatment plan that's

9   developed for each of the patients at Salinas Valley

10  Psychiatric Program.  Can you describe for us a bit more what

11  a treatment plan is?

12  A.      Well, a treatment plan basically starts with a

13  diagnostic evaluation.  We fill in the five major axes of

14  mental disorders, Axis 1 through 5, and we study the

15  pharmacology of the patient that had already been sent with

16  them.

17          And then we have the input of the recreational

18  therapist, the psychologist who plans a ten-day master

19  psychological report, and the social worker provides her

20  input, his input.  Same with the recreational therapist.

21  It is all melded into the treatment plan.

22          For example, when we come to a point where we discuss

23  what kind of groups the patient would benefit from.  So those

24  are described inside the treatment plan.

25          How often, for example, a patient should be visited

39

1    by the psychiatrist or psychologist is also part of the

2    treatment plan.

3           THE COURT:  I'm sorry.  I missed a point.  Are

4    psychiatrists doing rounds?

5           THE WITNESS:  We make rounds usually on the patients

6    that are most critical.

7           THE COURT:  Okay.  You may proceed.

8           I take it that you don't make rounds on the balance

9    because they're all sick, and they're all seriously sick,

10   they wouldn't be in the hospital, but you don't have the time

11   to do the rest of them?

12          THE WITNESS:  No.  I couldn't divide my time into one

13   73rd.

14          THE COURT:  I'm talking about even now.

15          THE WITNESS:  Even now.

16          THE COURT:  Of course.  Go ahead.

17   BY MR. RUSSELL:

18   Q.     Doctor, so the treatment team that's put together,

19   that's overseen by the psychiatrist?

20   A.     Yes.

21   Q.     Does the treatment team provide for visits by

22   psychologists?

23   A.     Yes.

24   Q.     And generally is there -- can you generally describe

25   for me what the treatment plans provide for with visits by

40

1    psychologists, as well as other clinical staff?

2            MS. RIFKIN:  Objection.  Leading the witness.

3            THE COURT:  The objection is sustained.  But you may

4    answer the question anyhow.  He's an expert.

5            You may answer, sir.

6            THE WITNESS:  What was your question again?

7    BY MR. RUSSELL:

8    Q.      I'll try to phrase it differently.

9            Who puts together -- who oversees the treatment plan?

10   A.      The psychiatrist is in charge of the treatment plan.

11   Q.      Does the treatment plan overseen by the psychiatrist

12   provide for visits by other clinical personnel?

13   A.      Yes.

14   Q.      And which clinical personnel are generally prescribed

15   in the treatment plan to visit the patients?

16   A.      Well, all the specialties; for example, the

17   psychologist, the social worker, the recreational therapist.

18   MTA staff is also involved.

19           There are certain circumstances, like if we need a

20   behavioral modification plan, that's also conducted by the

21   psychologist.

22           So all of us have a share in formulating the

23   treatment plan.  It basically gives us a way of managing all

24   of the patient's needs at one time.

25   Q.      The treatment plan that's put together by the

41

1   psychiatrist, is that generally --

2           THE COURT:  He just finished saying it is not put

3   together by the psychiatrist.  It is put together by

4   everybody on the team.

5           Am I correct?

6           THE WITNESS:  Yes, Your Honor.

7   BY MR. RUSSELL:

8   Q.      The treatment plan, does it generally provide for the

9   psychiatrist to see patients on a daily basis?

10  A.      No.

11  Q.      What dictates when a psychiatrist will see a patient?

12  A.      Well, the needs of the patient, first and foremost.

13  If they need to be seen more often, then we see them more

14  often.

15  Q.      And during your work at Salinas Valley Psychiatric

16  Program, you did that.  Were you able to see patients when

17  they were needed?

18  A.      Yes.

19  Q.      You did that even when you were carrying a caseload

20  of 73 patients?

21  A.      Yes.

22          MS. RIFKIN:  Objection, Your Honor.  Leading.

23          THE COURT:  You may proceed.

24  BY MR. RUSSELL:

25  Q.      Earlier you had mentioned that your office was

42

1    outside of Treatment Center 2, correct?

2    A.      Yes.  In the next building.

3    Q.      Where do you spend most of your time when you are at

4    Salinas Valley Psychiatric Program?

5    A.      On the unit.

6    Q.      What are you doing when you're on the unit?

7    A.      There is a lot of things to do.  Seeing patients.

8    Going to IDT team meetings.  Studying lab results.  There's a

9    whole variety of duties that go with it.

10           Seeing patients, for example, that are in isolation.

11   Doing evaluations for suicide risk.  So it is busy.

12   Q.      Were you working at Salinas Valley Psychiatric

13   Program when it was visited by Dr. Pablo Stewart earlier this

14   year?

15   A.      Yes.

16   Q.      Where were you working when he came?

17   A.      He came with entourage on TC-2.

18   Q.      How long did he spend at TC-2?

19   A.      It seemed like maybe ten, 15 minutes at the most.

20   Q.      What was he doing while there at TC-2?

21   A.      Nothing.  I couldn't tell what he was doing.  He was

22   basically walking from one part of the facility to another

23   part.  He asked me one question.  And the question was

24   whether or not we drew levels -- blood levels of

25   antipsychotic medications on admission.

43

1          My answer was that no, we use that on a selected

2     basis.

3     Q.     Did he ask you any other questions?

4     A.     Not that I remember.

5     Q.     When you are in the unit doing your work, do you see

6     group sessions being held at TC-2?

7     A.     Yes.

8     Q.     Where are the group sessions held?

9     A.     The group sessions are held in separate rooms.

10    They're usually groups going on at several times -- there are

11    usually group sessions going on all the time.

12    Q.     If somebody went to TC-2 for a ten-minute period of

13    time, and didn't see a group being held, do you have an

14    explanation as to why that may have occurred?

15    A.     No.

16    Q.     Is it possible that somebody could go --

17          THE COURT:  Anything is possible, Counsel.

18          MR. RUSSELL:  Your Honor, may I approach the witness?

19          (Exhibit handed to witness.)

20          THE COURT:  I'm sorry.  Has this been marked as an

21    exhibit?

22          MR. RUSSELL:  It has.  I gave the marked copy to

23    Dr. Troncoso.

24          THE COURT:  What is the exhibit number -- letter,

25    Doctor?

44

1          MR. RUSSELL:  This would be Defendants' Exhibit B.

2          THE WITNESS:  Looks like Defendants' B.

3          THE COURT:  B as in boy.

4          THE WITNESS:  Correct.

5    BY MR. RUSSELL:

6    Q.      Dr. Troncoso, what is this?

7    A.      This is a discharge summary dictated by myself for

8    this particular patient.

9    Q.      And turning to the last page, is that your signature

10   on the discharge summary?

11   A.      It is.

12   Q.      So this is a discharge summary you prepared?

13   A.      Correct.

14         MR. RUSSELL:  First of all, Your Honor, I would like

15   to move this into evidence.

16         THE COURT:  Hearing no objection, it is received.

17         MS. RIFKIN:  Your Honor, we note that this would be

18   subject to the protective order in this case.  It contains

19   confidential inmate information.

20         THE COURT:  That will be the order.

21              (Whereupon, Defendants' Exhibit B was received

22               into evidence.)

23         Exhibit B.

24   BY MR. RUSSELL:

25   Q.      That's correct, Dr. Troncoso.  We have a protective

45

1    order in this case so I'm going to warn you that to that

2    extent we cannot mention the name of this patient-inmate when

3    we're talking here today.

4            Okay?

5    A.      Yes.

6    Q.      I will also represent to you that based upon

7    documents we've been provided by plaintiffs' counsel, that

8    the patient who's described in this discharge summary has

9    been identified by plaintiffs on a confidential basis as

10   Prisoner RR.

11           How long -- is this a patient who had been under your

12   treatment?

13   A.      Yes.

14   Q.      How long had you been treating this patient?

15   A.      Well, I had treated this patient approximately for a

16   year before he was transferred to Atascadero State Hospital.

17   Then they transferred him back to us.

18   Q.      And on that second admission, how long did you treat

19   this patient?

20   A.      Nine months.  Over nine months.

21   Q.      And can you describe on a general -- in a general way

22   what this patient's treatment regimen was?

23   A.      Well, this patient was admitted to our facility

24   because he had been at ASH.  At ASH they took him off his

25   main antipsychotic, which was Clozaril.

46

1    Q.        ASH is Atascadero State Hospital?

2    A.        And he immediately decompensated.  He hit a

3    psychologist.  He exposed himself to female staff, and then

4    he tried to escape from the facility.

5            They immediately put him back on Clozaril, and he

6    gained enough stability to be sent to our facility.

7    Q.        And what was the treatment regimen at your facility?

8    A.        The treatment regimen at our facility was to manage

9    his medications, as well as to provide him with the best

10   psychosocial functioning we could possibly get.

11   Psychoeducation and psychofunctioning were important for him.

12           This patient also had a DD2 status.  He was

13   developmentally disabled, and he had what we call a pretty

14   low baseline, which means that his level of functioning

15   really was kind of minimal.

16           From experience with this patient, the best we could

17   do with him, even after all that we had tried, was to get him

18   to shower, shave, occasionally come out of his facility --

19   out of his cell, and take his medications and be able to

20   cooperate with staff to the degree that nobody was in danger.

21   He was highly assaultive and violent, and without medication

22   he was unmanageable.

23   Q.        And what was this patient's clinical outcome?

24   A.        Well, we got him to the point where he was able to

25   cooperate with staff, take medication, shower and shave and

47

1    eat, but he still had residual psychosis.

2    Q.        Earlier in this proceeding Dr. Stewart opined that

3    Patient RR should not have been discharged from Salinas

4    Valley Psychiatric Program.

5             Do you agree with that opinion?

6    A.        No.

7    Q.        Why not?

8    A.        Well, I had this patient for a year before, and then

9    I had him for nine months.  Like I said, sometimes the best

10   we can do are small things.

11            We have these patients that come at the end of their

12   mental health treatment with long durations of untreated

13   psychosis that basically burn out -- burn out gray matter in

14   the brain.  And the result is that they don't respond to

15   medications as well as they should, especially if they're

16   developmentally disabled or have traumatic brain injury.

17            So in this case the best outcome was that he was able

18   to put on his clothes, change them regularly, go to the

19   shower, shave, consume food and fluids at appropriate levels.

20   And as he developed relationships with others, he would do

21   more.  With some he was selectively mute, with other people

22   he would respond to the requests.

23            That's why that staff interaction was so important in

24   his case because if you didn't have a relationship with him,

25   he wouldn't respond.

48

1    Q.      And when you say "relationship with other people,"

2    who are those other people?

3    A.      For example, the MTAs that were on the unit.  They

4    could get him to take his medications on time.  They could

5    help him get the necessary blood draws for the Clozaril,

6    which is a very potent antipsychotic, and just basic day

7    care.

8    Q.      Doctor, I believe you earlier testified that you have

9    returned to Salinas Valley Psychiatric Program this week; is

10   that correct?

11   A.      That's correct.

12   Q.      And what will your caseload be now that you have

13   returned to the Salinas Valley Psychiatric Program?

14   A.      One to 36.

15   Q.      And what unit will you be working at at Salinas

16   Valley?

17   A.      TC-2.

18           MR. RUSSELL:  Dr. Troncoso, I don't have any other

19   questions right now.

20           Thank you very much.

21           THE WITNESS:  You're welcome.

22                         CROSS-EXAMINATION

23   BY MS. RIFKIN:

24   Q.      Good afternoon, Dr. Troncoso.

25   A.      Good afternoon.

49

1   Q.      You're one of the ten psychiatrists currently

2   employed at Salinas Valley; is that right?

3   A.      If that's the ratio, yes.

4   Q.      You started work again at Salinas Valley on Monday,

5   that's right?

6   A.      Correct.

7   Q.      How many hours were you on the unit that day?

8   A.      No.  I'm sorry.  June 17th was my last day at CDCR.

9   Q.      This Monday was your last day at CDCR; is that right?

10  A.      Correct.

11  Q.      Have you been on the unit at Salinas Valley yet?

12  A.      No.

13  Q.      When will your first day on Salinas Valley be?

14  A.      When we finish here.  I would rather be treating

15  patients.

16  Q.      Have you been back inside the TC-2 unit since you

17  resigned?

18  A.      No.  No.  I didn't resign.  I just went to work next

19  door.

20  Q.      You didn't resign from Salinas Valley?

21  A.      I went to work next door at CDCR.

22  Q.      You resigned your position as senior psychiatrist at

23  Salinas Valley Psychiatric Program?

24  A.      That's correct.

25  Q.      What date did you resign?

50

1    A.        End of March.

2    Q.        At the time you resigned, your caseload was 1 to 73;

3    is that right?

4    A.        Correct.

5    Q.        How do you know your caseload when you return will be

6    1 to 36?

7    A.        I know because Dr. Gaines is working on the unit

8    currently.

9    Q.        When did Dr. Gaines return?

10   A.        I don't know.

11   Q.        Does Dr. Gaines ever take any days off; do you know?

12   A.        She did.

13   Q.        Will she ever take any days off while she's on?

14   A.        I'm sorry?

15   Q.        While she's working, are there any days she'll be

16   taking off during the week?

17   A.        I don't know.

18   Q.        So Dr. Troncoso, you haven't personally observed

19   conditions back in Salinas Valley Psychiatric Program since

20   you left; is that fair?

21   A.        That's fair.

22            MS. RIFKIN:  Your Honor, may I approach the witness?

23            THE COURT:  You may.

24            (Exhibit handed to witness.)

25   BY MS. RIFKIN:

51

1    Q.       Dr. Troncoso, I've handed you two letters which are

2    marked Plaintiffs' Exhibit 9 and Plaintiffs' Exhibit 10

3    respectively.

4            Plaintiffs' Exhibit 9 is a letter dated January 23rd,

5    2013, directed to Executive Director DaSilva signed by the

6    psychiatry team at Salinas Valley Psychiatric Program.

7            Plaintiffs' Exhibit Number 10 is a letter dated

8    February 12, 2013, directed to Executive Director DaSilva

9    signed by members of the Salinas Valley psychiatric team.

10           Those two letters are before you?

11   A.       Yes.

12   Q.       Directing your attention to Plaintiffs' Exhibit 9,

13   the letter dated January 23rd, 2013; do you see that?

14   A.       Yes.

15   Q.       Turning to the second page of that letter, among the

16   signatories that's your signature, right?

17   A.       Correct.

18   Q.       This is a letter stating that the psychiatrists

19   united in your belief that the staffing shortage created a

20   safety risk for patients and staff; is that right?

21   A.       All the staff psychiatrists signed it.

22   Q.       In this letter, which you signed, the staff

23   psychiatrists describe a staffing shortage at SVPP; is that

24   right?

25   A.       Yes.

52

1          And in this letter, which you signed, the

2     psychiatrists communicated that:

3          (Reading:)

4          ...we are united in our belief that the level of

5          staffing currently present --

6          (Reading interrupted.)

7     A.    I don't see where it says "united."  Can you help me

8     there?

9     Q.    Sure.  Look at the third large paragraph on the first

10    page beginning with "As psychiatrists."

11    A.    Okay.

12    Q.    It says:

13         (Reading:)

14         As psychiatrists, we are united in our belief that

15         the level of staffing currently present is not safe

16         or appropriate for an ICF level of patient care.

17         (Reading concluded.)

18         Is that right?

19    A.    That's what it says.

20    Q.    And later on in that paragraph the psychiatry team

21    notes that in November 2012 Salinas Valley had its first

22    completed suicide.

23         It's the same paragraph.

24    A.    Yes.

25    Q.    And on page 2 of this letter the signatories of this

53

1    letter, including you, stated that they would be working in a

2    state of protest regarding their caseload and the rate of

3    admissions.

4            Is that right?

5    A.      That's what it says.

6    Q.      And the psychiatry team asks for a reduction in

7    admissions; is that correct?

8    A.      They said it would be a tremendous help, yes.

9    Q.      When you say "they," you were part of this group that

10   wrote the letter and signed the letter; is that correct?

11   A.      Correct.

12   Q.      And the reduction in admissions didn't happen, did

13   it?

14   A.      No, unfortunately what happened is we had even more

15   admissions.  And that was driven by almost a millstone around

16   our neck.  And that millstone was the Coleman waiting list.

17   They insisted on admissions and discharges at a rate that was

18   unsustainable with the current level of staffing.

19   Q.      When you said "they," who are you talking about?

20   A.      Whoever the Coleman people are at headquarters.

21   Q.      So people at headquarters told you you had to admit

22   people and discharge people at a high rate?

23   A.      Well, through our management team, that's what we

24   were told.

25   Q.      Who told you that?

54

1  A.      Well, our executive director.

2  Q.      Your executive director told you that you needed to

3  admit and discharge people at a high rate?

4  A.      No.  Not a high rate.  At a rate that would reduce

5  the waitlists.

6  Q.      Did you feel pressured by that statement?

7  A.      Not me personally.

8  Q.      Did any -- you were the supervising psychiatrist at

9  this time, correct?

10  A.      Part of the time.

11  Q.      Did any of the psychiatrists you were supervising

12  inform you that they felt pressure to discharge patients?

13  A.      Some of them did.

14  Q.      Did you investigate that?

15  A.      I looked at the ratios of people coming in and

16  leaving, yes.

17         Patients.

18  Q.      What did you conclude?

19  A.      Well, that we had an average type of environment

20  where there were admissions to some yards one week that were

21  higher than other yards.

22         Whenever beds were available, then that's when he

23  filled them.

24  Q.      What did you conclude about discharges and whether

25  the psychiatrists were being pressured to discharge?

55

1  A.       I don't think they were pressured.  I think they were

2  encouraged.

3  Q.       By whom?

4  A.       Some overzealous administrative staff.

5  Q.       Including the executive director?

6  A.       Well, below him.

7  Q.       Including the interim assistant executive director?

8  A.       I don't think so.

9  Q.       You said that this directive came from headquarters.

10  Who did it come from?

11  A.       Well, I think the pressure came through our executive

12  director.  He must have been feeling some pressure from the

13  waitlists.  I don't know.

14  Q.       Do you know how big the waitlists for intermediate

15  care was at that time?

16  A.       No.

17  Q.       Turning your attention to Plaintiffs' Exhibit Number

18  10, the letter that's marked -- dated February 12, 2013, do

19  you see that?

20           Do you see that, Mr. Troncoso?

21  A.       Yes.

22  Q.       You have the letter before you?

23  A.       Uh-huh.

24  Q.       Looking down to the signatories, is that your

25  signature?

56

1    A.        That's correct.

2    Q.        And this letter expressed the concerns of the

3    psychiatrists that the staffing shortage was now at a crisis

4    level; is that right?

5    A.        That's what the letter says.

6    Q.        And the letter says that the team had participated in

7    extensive discussion and consideration of this issue; is that

8    right?

9    A.        We had a weekly meeting on Tuesdays, and yes, we did

10   discuss this.

11   Q.        And you, as the senior -- as the supervising

12   psychiatrist ran that meeting; is that right?

13   A.        Yes.

14   Q.        And the outcome of that extensive discussion and

15   consideration reported in this letter is that the psychiatry

16   staff unanimously determined that they could not safely

17   manage more than 40 patients per psychiatrist; is that right?

18   A.        That's what the letter says, but I think there is a

19   background to this.

20   Q.        I'm talking about what the letter you signed on to

21   states.

22   A.        I understand.

23   Q.        It states, right, that the psychiatry staff --

24             THE COURT:  I can read the letter, ma'am.

25             I'm sorry.  I didn't mean to speak sharply, but there

57

1  is no point in arguing with the witness.

2  BY MS. RIFKIN:

3  Q.    The conclusion that the psychiatry team came to is

4  that they could only provide emergency psychiatry services

5  for additional patients beyond 40.

6      Is that right?

7  A.    That's what it says, but it is wrong.

8  Q.    Why didn't you correct the letter at the time,

9  Dr. Troncoso?

10  A.    It is wrong because we, as physicians, have not only

11  an ethical, but also a professional duty to attend to all our

12  patients under our care, whether it is 30 or 15 or 73.

13      Never did we ever abandon or triage these patients.

14      THE COURT:  The question was, why didn't you correct

15  it at the time?

16      THE WITNESS:  I just didn't.  I don't know why.

17  BY MS. RIFKIN:

18  Q.    Is it fair to say that in signing this letter,

19  Dr. Troncoso, you felt enormously frustrated?

20  A.    I was angry and frustrated.

21  Q.    Did you feel like you were being asked to perform a

22  job that might conflict with those professional and ethical

23  considerations you just described?

24  A.    I think the workload was enormous.

25  Q.    Dr. Troncoso, when did you say you resigned as the

58

1  supervising senior psychiatrist?

2  A.      End of March.

3  Q.      That was after you hadn't received a response to

4  these letters; is that right?

5  A.      Well, a lot of things happened in March.  In March we

6  had the visit of the COAC team, or Clinical Oversight

7  Advisory Committee from the Department of State Hospitals,

8  and we had our medical director, Dr. Kate Warburton, along

9  with Dr. Dardashti from the COAC team, as well as

10  Miss Gaither, who came down and helped us to appreciate that

11  there were things going on to help us with the situation.

12          They said that they were recruiting more physicians

13  and getting them.  Even if they had to borrow them from other

14  state hospitals, they were going to change the staffing.

15  Q.      That meeting happened before your resignation?

16  A.      Yes.

17          MS. RIFKIN:  May I approach the witness, Your Honor?

18          (Exhibit handed to witness.)

19  BY MS. RIFKIN:

20  Q.      I've handed you what's been marked as Plaintiffs'

21  Exhibit 11, which is the Reply Declaration of Kathryn

22  Radtkey-Gaither in Support of Defendants' Motion to Terminate

23  Under the Prison Litigation Reform Act, Document 441 in this

24  record, and filed on March 22nd, 2013.

25          If you turn to page 3, Doctor, paragraph 5, do you

59

1    see where in paragraph 5, the first sentence -- or I'm

2    sorry -- the last sentence Miss Radtkey-Gaither says:

3            (Reading:)

4            As a result of DSH's efforts, SVPP currently has the

5            equivalent of 12 and three-quarters full-time

6            psychiatrists.

7            (Reading concluded.)

8            You were employed at that time, right?

9            You were employed at SVPP at that time, March 22nd,

10   2013?

11   A.      March 22nd?  I'm not sure.  I was there until the end

12   of March, but I have never seen this.

13   Q.      But you were working at Salinas Valley Psychiatric

14   Program at the end of March -- or as of March 22nd?

15   A.      Yes.

16   Q.      Is it your recollection that there were 12 and

17   three-quarters full-time psychiatrists there?

18   A.      I knew more were coming.  I don't know if we had ten

19   and three-quarters full-time.  I don't know.

20   Q.      Twelve and three-quarters?

21   A.      Twelve and three-quarters.  No, I have no idea.

22   Q.      You have no idea?

23           You testified earlier that when you left, you left

24   out of enormous anger and frustration at the staffing

25   situation which Miss Radtkey-Gaither said was 12 and

60

1   three-quarters.

2        Now your understanding is that the staffing situation

3   that you're returning to is 10.25 psychiatrists; is that

4   right?

5   A.    If that's the number that was given.

6   Q.    While you were the senior psychiatrist you testified

7   that you carried a caseload in addition to your

8   administrative duties, right?

9   A.    Yes.

10  Q.    How many hours a week did you -- how many hours a

11  week did your regular caseload take you?

12  A.    I don't measure.

13  Q.    Do you know how many extra hours your administrative

14  duties entailed?

15  A.    No idea.

16        THE COURT:  I do want to ask you a question.  I think

17  the answer is obvious, but I don't know.

18        You were the supervising -- on March the 22nd you

19  were the supervising psychiatrist?

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  Wasn't one of your responsibilities to

22  know how many folks you were supervising?

23        THE WITNESS:  At that time I was making preparation

24  to leave to CDCR.  I had stopped tracking the in-and-out

25  movements of psychiatrists or staff through our facility.

61

1        THE COURT:  You may proceed, ma'am.

2   BY MS. RIFKIN:

3   Q.      I'm a little confused about the timeline here,

4   Dr. Troncoso, so I may ask you a question that's been asked

5   before.

6        You said that you were gone from the Salinas Valley

7   Psychiatric Program facility for six weeks; is that right?

8   A.      Correct.

9   Q.      You're returning this week -- the week -- this week;

10  is that right?

11  A.      Yes.

12  Q.      So you left -- that would mean you left sometime at

13  the end of April; is that right?

14  A.      Correct.

15  Q.      And you just said that as of March 22nd you had

16  stopped tracking the staff coming in and out of the facility?

17  A.      Basically, yes.

18  Q.      You were preparing to leave as of March 22nd?

19  A.      Even before.

20  Q.      Even before?

21  A.      Yes.

22  Q.      That would be at least a month before you actually

23  left the facility?

24  A.      Correct.

25  Q.      Is there anything else you stopped doing when

62

1    preparing to leave?

2    A.      No.

3    Q.      Dr. Troncoso, I would like to ask you some questions

4    about treatment.  And since you haven't been back inside the

5    facility, I would like you to understand I'm asking you about

6    conditions that occurred while you were a treating

7    psychiatrist at Salinas Valley.

8            Did you ever do a one-on-one cell-side clinical

9    contact?

10   A.      Yes.

11   Q.      Is that a regular occurrence?

12   A.      It occurred with frequency, yes.

13   Q.      Do you have an estimate of how often it occurred?

14   A.      No idea.

15   Q.      I think you were in the courtroom and heard

16   Dr. Badeaux testify that sometimes he would request to see a

17   patient in a confidential setting, but MTAs weren't available

18   to pull that patient out at that time.

19           Do you remember that?

20   A.      Yes.

21   Q.      Did that ever happen to you?

22   A.      I had no trouble getting people out to be seen on my

23   unit.

24   Q.      Is seeing a patient cell side the standard of care

25   for a psychiatric clinical contact, Doctor?

63

1          MR. RUSSELL:  Objection, Your Honor.  Assumes facts
2     not in evidence.
3          THE COURT:  What facts are not in evidence?
4          MR. RUSSELL:  As to what the standards of care would
5     be regarding psychiatric treatment, whether or not there is a
6     standard of care for psychiatric treatment.
7          THE COURT:  Are you suggesting that the Doctor
8     doesn't know what the standards of care that govern his
9     profession are?
10         MR. RUSSELL:  No, I'm not.
11         THE COURT:  Then you may be seated.  The objection is
12    overruled.
13         You may answer.
14         THE WITNESS:  Question again?
15    BY MS. RIFKIN:
16    Q.     Does a cell-side clinical visit meet the standard of
17    care for a psychiatrist's clinical visit?
18    A.     The standard of care is to meet the patient wherever
19    they are.  There are instances where a patient cannot be seen
20    other than cell front.
21         There may, for example, be -- if I may?
22         If I may, for example a patient may not come in or
23    may not want to participate in a one-to-one.  In that
24    instance I go to the cell front, speak to the patient and try
25    to find out why.

64

1          I'll give you an example.  We had a situation where

2     we had a patient that refused to come out for the IDT.  I

3     went to the cell front and asked him why he didn't want to

4     come out.  He said that he was too sleepy.

5          Ah.  Okay.  That makes sense.  Why don't we move your

6     medication from the morning to the nighttime so that you're

7     not as sleepy in the morning.  After that he came to our

8     IDTs.

9          So yes, it is a valuable way of meeting a patient

10    wherever they are.

11         THE COURT:  Well, meeting a patient and having those

12    kind of discussions, I assume, but if I'm wrong, just tell

13    me, is different than a clinical consultation that you would

14    have ordinarily with a patient?

15         THE WITNESS:  It's different, yes, Your Honor.  It is

16    a modification.

17         THE COURT:  The question I think was, but let me

18    check -- that's too far back.  I'm not going to bother.

19         You may state your question, ma'am.

20         Or if you are satisfied, go on with the next.  I

21    don't care.

22         MS. RIFKIN:  All right.

23    BY MS. RIFKIN:

24    Q.   So every time in your experience at Salinas Valley

25    Psychiatric Program that you were not able to see the patient

65

1    in a confidential setting and had to do a one-on-one, that

2    was because the patient chose not to come out; is that right?

3    A.      Sometimes.

4    Q.      What about the other times?

5    A.      Different reasons.

6    Q.      Can you explain those reasons, please.

7    A.      Well, sometimes they just don't want to come out,

8    period.  They don't want to engage in their mental health

9    treatment.

10            THE COURT:  The only time you had a cell side --

11    cell-front meeting with a patient was because the patient

12    wouldn't come out to a confidential setting; is that right?

13            THE WITNESS:  That's correct.

14            THE COURT:  Okay.  Okay.

15    BY MS. RIFKIN:

16    Q.      During the time you were the senior psychiatrist

17    supervising the psychiatry team, were you aware of any

18    problems that the other psychiatrists were having with

19    getting their patients pulled out for confidential clinical

20    visits?

21    A.      I only heard complaints.  I was not aware of any

22    problems that may have developed because of that.  The

23    statement in these letters originated from people that

24    obviously -- and myself included -- that were frustrated.

25    Q.      So --

66

1      THE COURT:  But you're not suggesting that their

2   frustration was so high they misrepresented what was going

3   on?

4      THE WITNESS:  No.

5      THE COURT:  Of course not.

6   BY MS. RIFKIN:

7   Q.      When you say you heard complaints, are you saying

8   that you heard complaints from the psychiatrists you

9   supervised that they were not able to pull their patients out

10  for confidential clinical visits?

11  A.      No.  The complaints were more of the clinical load.

12  Q.      Were they saying that their clinical load was too

13  high to allow them time to pull patients out to see them in a

14  confidential setting?

15  A.      None were higher than mine.  I had 1 to 73, which was

16  the highest of all the units, and yet we had time to pull out

17  our patients for IDTs three out of four days.

18  Q.      Only for IDTTs?

19  A.      Also for whatever one-to-ones we needed.

20  Q.      So what I asked you was, the complaints that you

21  referred to, were those the psychiatrists you supervised

22  saying that they didn't have enough time to pull their

23  patients on their caseload out for one-to-one clinical

24  contacts?

25  A.      Complaints were about the admissions and discharges

67

1    and the caseloads.

2    Q.      Dr. Troncoso, do you have Plaintiffs' Exhibit 8 in

3    front of you?

4            It was one used previously.  It may be in the stack

5    next to you.

6            There is 9.  There is 10.

7    Q.      It may be in the stack next to you.

8            (Clerk locates exhibit.)

9            THE COURT:  Do you now have it, Doctor?

10           THE WITNESS:  Yes, sir.

11   BY MS. RIFKIN:

12   Q.      Doctor, before we talk about the document, I want to

13   remind you that this document contains inmate names so it is

14   subject to protective order in this case.  I ask you to try

15   not to use the inmate names in your answers please.

16           Dr. Troncoso, this is a suicide report from an inmate

17   who engaged in a suicidal act at Salinas Valley in November

18   2012.

19           Have you seen this report before?

20   A.      No, I haven't seen this report or others.

21   Q.      Dr. Troncoso, you were supervising -- you were the

22   senior supervising psychiatrist on February 19th, 2013; is

23   that right?

24   A.      Correct.

25   Q.      And there was no chief psychiatrist, was there?

68

1    A.        No.

2    Q.        So you were the most senior person to the psychiatry

3    team at that point; is that right?

4    A.        Correct.

5    Q.        Did anyone ever discuss with you the suicide of the

6    first patient at Salinas Valley in ten years?

7    A.        There was a headquarters review.  That's all I knew

8    about.

9    Q.        Did the folks from headquarters ever come to talk to

10   you about that suicide?

11   A.        I have no knowledge of it.

12   Q.        Dr. Troncoso, if you could, turn to the last page of

13   this exhibit.

14            Are you at the last page, Doctor?

15   A.        Yes.

16   Q.        This is the Initial Inmate Death Report.  And there

17   is a Physician Completing Form signature.

18            Is that your signature, Doctor?

19   A.        Yes.  That's my signature on the inmate's death

20   report.

21   Q.        Doctor, why did you fill out this form?

22   A.        Well, it is required, I suppose, on this unfortunate

23   event.  That's why I filled it out.

24   Q.        If you had no knowledge of this suicide, Doctor, why

25   would you fill this form out?

69

1   A.      Well, I had no knowledge of reports concerning the

2   suicide.  This was my form to fill out as the senior.  As you

3   indicated, or have not, a lot of these circumstances are

4   "Unknown to this author," "Unknown by this author," "Unknown

5   to this author," "Unknown to this author," "Taken to Salinas

6   Valley Medical Center," "Unknown to this author."

7           So I don't know how much I knew except "unknown" to

8   this signer or author.

9   Q.      Dr. Troncoso, if you will turn a couple of pages

10  back, to the page that has Initial Inmate Death Report at the

11  top.  It is CDCR 7229B-Inmate Suicide.  It has a number list

12  1 through 20.

13  A.      I'm sorry.

14          THE COURT:  I have A.  I don't have B.

15  BY MS. RIFKIN:

16  Q.      I'm sorry.  The pages are not numbered.  The third

17  page from the end, it has a number list, 1 through 20?

18          THE COURT:  I want you to know that ours is arranged

19  differently.  I don't know what yours looks like, Doctor.

20          I believe that's what she is talking about.

21          MS. RIFKIN:  May I approach the bench?

22          THE COURT:  Yes.  That's a good thing to do.

23          (Page shown to Court and witness.)

24          THE WITNESS:  I have it now.

25          THE COURT:  I think I have it too.

70

1    BY MS. RIFKIN:

2    Q.       Dr. Troncoso, that's also your signature at the

3    bottom of this page; is that right?

4    A.       Correct.

5    Q.       And there is a number of questions about the inmate

6    on this page; is that right?

7    A.       Yes.

8    Q.       Including past history of suicide attempts at Number

9    10; is that right?

10   A.       Yes.

11   Q.       And you list some of the past suicide attempts of

12   that patient; is that right?

13   A.       There was only one I listed under item 10.

14   Q.       Where did you get this information for this patient,

15   Doctor?

16   A.       I got this information from whatever was available of

17   the chart because the chart, I think, was immediately sealed,

18   and some of it from interview -- interview of personnel that

19   were involved.

20   Q.       Was that your job as the senior psychiatrist?

21   A.       Well, not really.

22   Q.       Why did you fill out this form, Doctor?

23   A.       Well, they gave it to me to fill out.  I filled it

24   out to the best of my ability based on what little I knew.

25   Q.       Who is "they"?

71

1    A.        Nursing staff.

2    Q.        If you know, why did they give it to you?

3    A.        I don't know.

4    Q.        As the senior psychiatrist, did you investigate any

5    of the facts leading to the suicide?

6    A.        I was not privy to any facts related to the suicide

7    other than what you see here.

8    Q.        You reviewed the chart of this patient; is that

9    right, Doctor?

10   A.        No, I didn't.

11   Q.        Whose job would it have been to review the chart of

12   an inmate who committed suicide in this unit?

13   A.        I don't know.  All I know is that headquarters does a

14   review, and the chart was sealed immediately so I had no

15   access to the chart.

16   Q.        And nobody ever provided you with this suicide

17   review?

18   A.        No.  If this is your document --

19   Q.        The document before you?

20   A.        No.  I have never seen this.

21   Q.        Did psychiatry team ever have a meeting to discuss

22   the circumstances of the suicide?

23             MR. RUSSELL:  Objection, Your Honor.  Exceeds the

24   scope of direct examination.

25             THE COURT:  Overruled.

72

1          THE WITNESS:  No.

2    BY MS. RIFKIN:

3    Q.     Were you aware of any recommendations coming out of

4    the review of this suicide, Doctor?

5    A.     No.

6    Q.     Doctor, if you can, turn to what's marked page 9 of

7    this exhibit, please.

8          THE COURT:  Again, ours is --

9          MS. RIFKIN:  Marked at the top, Your Honor.

10          THE COURT:  Okay.

11          MR. RUSSELL:  Your Honor, I apologize.  Which page

12    are we referring to?

13          THE COURT:  Page 9.

14          MR. RUSSELL:  Okay.

15    BY MS. RIFKIN:

16    Q.     Doctor, were you aware that this inmate who committed

17    suicide spent three weeks on cuff status at the Salinas

18    Valley Psychiatric Program?

19    A.     I learned that afterwards.

20    Q.     At the bottom of this page, on page 9, the review

21    committee states:

22          (Reading:)

23          On November 21st, 2012, the inmate cut one of his

24          arms because of frustration about still being on

25          Level I and confined to his cell.

73

1           (Reading concluded.)

2    A.      Wait a minute.  Where are you reading?

3    Q.      Bottom of page 9.

4            (Reading:)

5            The inmate cut one of his arms because of frustration

6            about still being on Level I and confined to his

7            cell.

8            (Reading concluded.)

9            Were you aware of complaints by this inmate about

10   being on cuff status for this period of time?

11   A.      No.

12   Q.      In your experience, was it common for inmates to be

13   frustrated about being on cuff status?

14   A.      Some of them would be, yes.

15   Q.      And in this suicide review, continuing onto the next

16   page, this inmate had to be -- after the suicide attempt had

17   to be taken to the emergency room.

18           Is that right?

19   A.      Yes.

20   Q.      And he was returned to Salinas Valley the next day?

21   A.      That's what it says.

22   Q.      And he was returned to cuff status the next day?

23   A.      I don't know.

24   Q.      The next paragraph says:

25           (Reading:)

74

1          On November 28th he was seen by the Facility C ICC

2          and cleared for full programming.

3          (Reading concluded.)

4          So prior to that date, November 28, he would have

5    still been on cuff status; is that right?

6    A.          I don't know that for a fact.

7    Q.          But if he hadn't been cleared by ICC yet, he would

8    still be on cuff status; is that right?

9    A.          It says November 28th, 2012, he was seen by the

10   Facility ICC and cleared for full programming.

11   Q.          So prior to that date he wouldn't have been cleared

12   from cuff status; is that correct?

13   A.          That's correct.

14   Q.          So after this inmate had a serious suicide attempt,

15   and had to be taken to the emergency room out of frustration

16   at being placed on cuff status, he was returned to the

17   psychiatric program where he was once again placed on cuff

18   status; is that correct?

19   A.          I would assume so.

20   Q.          And this report states that the ICC meeting that

21   cleared him was at least one week overdue when it was held;

22   is that right?

23   A.          That's what the report says.

24   Q.          And this inmate was admitted on November 7th, 2012,

25   so two -- 10 business days or two weeks later would have been

75

1    the last -- would have been the furthest date out that the

2    ICC should have been held; is that right?

3    A.      Usually within ten days.

4    Q.      Ten business days?

5    A.      Ten business days.

6    Q.      So ten business days are approximately two weeks from

7    the date of admission.  November 7th would have been November

8    21st; is that right?

9    A.      I don't have a calendar in front of me.

10   Q.      November 21st is two weeks after November 7th; is

11   that right?

12   A.      That's an approximation.

13   Q.      So the date that this inmate cut his arms out of

14   frustration of still being on Level I status was the maximum

15   date that his ICC should have been held?

16           MR. RUSSELL:  Objection, Your Honor.  That assumes

17   facts not in evidence and also calls for speculation.

18           THE COURT:  Overruled.  You may answer, Doctor.

19           THE WITNESS:  Question again?

20   BY MS. RIFKIN:

21   Q.      November 21st, the date --

22           THE COURT:  That's all right.  She's just arguing

23   with you, giving her final argument in the course of this

24   thing.

25           If you want to tell me that, I'm pretty sure I

76

```
1   couldn't figure it out by myself, which is not unreasonable,

2   do it at the end of this hearing which I expect will be no

3   more than a year from today.

4         You may proceed.

5   BY MS. RIFKIN:

6   Q.      Turning to page 11 of this exhibit, Doctor, under

7   Roman Number VII Significant Pre-Suicidal Events --

8         THE COURT:  You know, I'm going to say again, this

9   Doctor says he never saw this report.

10        Am I correct, Doctor?

11        THE WITNESS:  You're correct, Your Honor.

12        THE COURT:  So what is it that you --

13        MS. RIFKIN:  This.

14        THE COURT:  Go ahead.  I'll object because I don't

15  know what you are doing, but that's my problem.

16        We're on page 11.  Go ahead.

17  BY MS. RIFKIN:

18  Q.      There is a chart, Significant Pre-Suicidal Events.

19  Do you see that?

20  A.      Under Roman VII?

21  Q.      That's right.

22  A.      Okay.

23  Q.      It lists that on July 19th, 2012, this inmate had a

24  suicide attempt?

25  A.      Yes.
```

77

1    Q.      He was referred to the intermediate care program

2    following that suicide attempt?

3    A.      I don't see that.  I see a referral from Sacramento

4    to the mental health crisis bed in San Quentin.

5    Q.      Then the next line?

6    A.      DSH Intermediate Care Program.  Referral to the

7    program was made.

8    Q.      You testified earlier about the kinds -- the acuity

9    of the patients who come into the ICF program.  Is it fair to

10   say that after serious suicide attempts, inmates who are

11   seriously suicidal is one type of inmate referred to your

12   program?

13   A.      Yes.

14   Q.      That inmate might be considered a serious risk to

15   himself or others?

16   A.      Yes.

17   Q.      After this suicide, while you were at the Salinas

18   Valley Psychiatric Program, was there any discussion that you

19   were privy to about changing the process of cuff status?

20   A.      No discussion.

21   Q.      Were any changes to the orientation status made?

22   A.      No.

23   Q.      Were any additional clinical monitoring obligations

24   added to cuff status?

25   A.      No.

78

1    Q.      You described cuff status earlier as kind of a

2    handshake when the inmate gets to the institution; is that

3    right?

4    A.      Yes.

5    Q.      Are you aware of how many yard hours an inmate on

6    cuff status gets on average?

7    A.      Not really.

8    Q.      Are you aware of how many day room hours an inmate on

9    cuff status gets on average?

10   A.      No.

11   Q.      And it's correct that an inmate on cuff status

12   doesn't get to participate in group treatment?  That's right?

13   A.      No group treatment.  No.

14   Q.      And the IDTT treatment team meeting you described

15   earlier where the treatment plan is developed for the inmate,

16   that occurs at 72 hours after admission; is that right?

17   A.      Yes.

18   Q.      But if group treatment was prescribed in that

19   treatment plan at that 72 hour day -- at the 72-hour mark or

20   three-day mark, an inmate wouldn't -- the earliest an inmate

21   would be able to participate in groups is when cleared from

22   cuff status; is that rights?

23   A.      That's true.

24   Q.      Which could be --

25           THE COURT:  Yes, it could.

79

1          Proceed.

2          I'm sorry.  I don't mean to cut you off, but proceed.

3    BY MS. RIFKIN:

4    Q.      You were senior supervising psychiatrist when there

5    was a death due to water intoxication at Salinas Valley; is

6    that right?

7    A.      No.

8    Q.      You were working as a psychiatrist at Salinas Valley

9    when that occurred?

10   A.      No.

11          Wait a minute.  When did it occur?

12   Q.      I believe it occurred in March 2013?

13   A.      I was still there, yes.

14   Q.      Were you a part of any discussions about that death?

15   A.      No.

16   Q.      Were you treating that patient?

17   A.      No.

18   Q.      Were you aware of any recommendations arising from

19   the death of that patient?

20   A.      No.

21   Q.      In the treatment plan that you described, would an

22   element such as custodial escort be an element of that

23   treatment plan?

24   A.      I don't know what you mean.

25   Q.      Would one of the therapeutic modes of delivering

80

1   therapy described in that treatment plan be custodial

2   escorts?

3   A.       That is something that is handled by corrections.

4   Q.       You testified earlier that when MTAs escort patients

5   on cuff status, that's part of the therapeutic milieu; is

6   that right?

7   A.       I'll tell you why.

8            THE COURT:  No.  She just asked you whether that was

9   right.

10           THE WITNESS:  Yes.

11  BY MS. RIFKIN:

12  Q.       You said that there are eyes on a patient in cuff

13  status 24/7?

14  A.       Correct.

15  Q.       Are there on suicide watch?

16  A.       No.

17  Q.       Someone sitting outside their door the whole time?

18  A.       No.

19  Q.       Have you worked at any other state hospitals in

20  addition to Salinas Valley?

21  A.       No.

22  Q.       The inmate you described earlier, that's been

23  identified as Inmate RR, who you discussed with Mr. Russell,

24  had you referred him to a higher level of care?

25  A.       No.

81

1   Q.      So you never referred him to the acute level of care?

2   A.      No.

3   Q.      You concluded that he benefited -- he had received

4   the maximum benefit from the intermediate care facility and

5   he should be discharged back to a general EOP unit?

6   A.      I don't know if he was discharged to a general EOP,

7   but he was discharged.  Maybe I should check the discharge

8   summary.

9   Q.      Are you aware of any level of care provided in CDCR

10  that is higher than an EOP?

11  A.      Mental health crisis bed.

12  Q.      Do you know that a mental health crisis bed is

13  temporary, not to stay, not to exceed ten days?

14  A.      Correct.  The length of stay is about ten days.

15  However, it can exceed that.

16  Q.      So was it your intention, Doctor, to discharge this

17  patient back to a mental health crisis bed?

18  A.      No.

19  Q.      What kind of treatment environment did you think he

20  should be in?

21  A.      Well, at this point I felt that he could benefit from

22  being back to where he came to us from, which was Sac. State,

23  probably EOP.

24  Q.      Why could he benefit from that?

25  A.      From what?

82

1    Q.      Why would he benefit from that?

2    A.      I don't understand.

3    Q.      You just testified that you determined he would

4    benefit from being returned back to the EOP unit?

5    A.      With him we achieved a certain level of

6    therapeutic -- we did the best we could with him.  And when

7    he came to us, he was far worse than when he left.  So upon

8    improvement, we sent him back to his CSP Sac., I believe.

9            He came to us from ASH where he had been taken off

10   his medication.  They had to take him and put him back on his

11   medication.  Then he was transferred to us on that

12   medication.

13           So we continued to monitor his medication, continued

14   to monitor his progress, and do the best we could with our

15   psychosocial programming.

16           This gentleman had a pretty low baseline to start

17   with.  The best we could do with our medication is improve

18   him, but not perfect him.  He was selectively mute.  However,

19   if you developed a relationship with him, he would respond.

20           He responded to the degree he could shower, shave,

21   present his clothing for exchange, feed himself, maintain his

22   body with showers and soap.  And that was -- and take his

23   medication.  Those were the big things.  Besides that, we

24   couldn't do much more.

25   Q.      Did you ever investigate what happened to this

83

1   patient after he was discharged from your care?

2   A.      No.

3   Q.      Do you ever look at what happens to patients after

4   they're discharged from your care and returned back to EOP?

5   A.      We rarely get feedback.

6   Q.      Sometimes do you get the patient back?

7   A.      I'm sorry.

8   Q.      Do you sometimes get the patients back?

9   A.      That can happen, yes.

10  Q.      Have you since reviewed the file of this inmate,

11  Doctor?

12  A.      No.

13  Q.      Doctor, you provided a professional recommendation

14  for Dr. Badeaux; is that correct?

15  A.      Perhaps I did.  I don't remember.

16  Q.      You have no reason to question Dr. Badeaux's skills

17  as a psychiatrist, do you?

18  A.      I thought he was an adequate psychiatrist.

19          MS. RIFKIN:  No further questions.

20          THE COURT:  Redirect?

21                      REDIRECT EXAMINATION

22  BY MR. RUSSELL:

23  Q.      Doctor Troncoso, you were asked questions about the

24  personnel with whom inmates come in contact while at Salinas

25  Valley, including MTAs who escort people on cuff status.

84

1          Do you recall that testimony?

2    A.     Yes.

3    Q.     And you had -- you stated that you considered the

4    MTAs to be -- who do that escorting to be part of the milieu

5    of what occurs within -- certainly within TC-2.

6          Why do you say that?

7    A.     The reason I say that, and I referred to that time

8    period as a handshake, is because they get an introduction to

9    the staff at Salinas Valley Psychiatric Program.  And that

10   starts when they're in receiving and release.

11         They go and escort the patient.  They learn a little

12   bit more about the patient.  Then they bring the patient to

13   us.  And then we see the patient as the admitting

14   psychiatrist and do what we have to do.

15         During that escort, that escort, I think, is

16   important because it establishes a certain degree of trust

17   with this patient.  That's the beginning.  And the beginning

18   of trust is a foundation that we build on throughout the

19   programming at Salinas Valley Psychiatric Program.

20         Those inmates are scared.  Sometimes they're hungry.

21   Sometimes they are without their medications.  But we learn

22   those things just with those two MTAs escorting the patient

23   to our facility.  So those are important things to know.

24   Q.     And when the treatment plan is being put together for

25   these inmates, are the -- is the input of MTAs, such as those

1   you described, included when developing that treatment plan?

2   A.      Yes.  And the reason we share that information is

3   because we have two meetings every day on our unit, one at

4   7:30 all the patients are reviewed in detail, and then at

5   two o'clock we review them again.

6           So twice during the day we have treatment team -- not

7   treatment team, but group meetings where we discuss our

8   patients and the admissions.

9           THE COURT:  I think now I'm certain I didn't

10  understand.

11          I thought a group meeting was something that you did

12  with the patients.  Is that right or wrong?

13          THE WITNESS:  The group meeting occurs with -- the

14  7:30 and two o'clock group meeting is with just staff alone.

15  We all meet to discuss the patient.  That is separate from --

16          THE COURT:  But there are group meetings with the

17  patients -- group therapy sessions?

18          THE WITNESS:  There are group therapy sessions, yes,

19  Your Honor.

20          THE COURT:  But that is different than what you are

21  talking about now?

22          THE WITNESS:  Correct.  I'm talking about the

23  day-to-day management of our patients.

24          THE COURT:  All right.

25          MR. RUSSELL:  Thank you, Doctor.

86

1            I don't have any other questions.

2            THE COURT:  Recross?

3            MS. RIFKIN:  Your Honor, plaintiffs only -- we would

4    move to admit Exhibits 8, 9, 10 and 11.

5            THE COURT:  Received.

6                (Whereupon, Plaintiffs' Exhibits 8, 9, 10 and 11

7                 received into evidence.)

8            THE COURT:  The witness may be released?

9            MS. RIFKIN:  Yes.

10           MR. RUSSELL:  Yes, Your Honor.

11           THE COURT:  Thank you, sir.

12           You are free to go or stay, as you choose.

13           Do you have any more witnesses?

14           MR. RUSSELL:  We do, Your Honor.

15           THE COURT:  Actually, why don't we take our afternoon

16    recess, 15 minutes.

17           (Off the record at 2:45 p.m.)

18           (On the record at 3:00 p.m.)

19           THE CLERK:  Please, remain seated.

20           Court is now in session.

21           THE COURT:  You may call your next witness.

22           MR. SHARMA:  Thank you, Your Honor.

23           Defendants call Randolf Grounds.

24           THE COURT:  Counsel, what is your name, sir?

25           MR. SHARMA:  Maneesh Sharma.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

87

1          THE COURT:  Thank you.

2          THE CLERK:  Please, remain standing.  Raise your

3     right hand.

4                    WARDEN RANDOLF GROUNDS,

5     was thereupon called as a witness herein by the Defendants,

6     and having been sworn to tell the truth, the whole truth and

7     nothing but the truth, was thereupon examined and testified

8     as follows:

9          THE CLERK:  Thank you.  Take a seat.

10          State your name and spell your last name.  Speak

11     directly into the microphone please.

12          THE WITNESS:  My name is Randolf Grounds

13     R-a-n-d-o-l-f, G-r-o-u-n-d-s.

14                    DIRECT EXAMINATION

15     BY MR. SHARMA:

16     Q.     Mr. Grounds, who is your current employer?

17     A.     California Department of Corrections and

18     Rehabilitation.

19     Q.     And what is your current position with the Department

20     of Corrections?

21     A.     I'm the warden for Salinas Valley State Prison.

22     Q.     And how long have you been the warden at Salinas

23     Valley State Prison?

24     A.     Eleven months.

25     Q.     And how long have you been employed by the Department

88

1    of Corrections?

2    A.        About 22 years.

3    Q.        And before you were the warden at Salinas Valley

4    State Prison, what was your position with the department?

5    A.        I was a chief deputy warden.  Prior to that I was

6    also a warden at CTF Soledad, right next door.  And I can go

7    back extensively if you would like me to.

8              THE COURT:  I think that's enough.

9              You may proceed, Counsel.

10             MR. SHARMA:  Thank you, Your Honor.

11   BY MR. SHARMA:

12   Q.        Warden Grounds, do you know what the Institutional

13   Classification Committee is?

14   A.        Yes, sir, I do.

15   Q.        Could you please describe what that is?

16   A.        It's basically the warden or warden's designee

17   committee, whereby you see an inmate and ascertain reasons,

18   in the case of administrative segregation or DSH, what that

19   program should be.

20             It's a due process issue where you examine the

21   reasons for retention in Ad. Seg. or the reasons for

22   placement in a DSH program.

23             It involves multiple classifications, the warden or

24   the warden's designee, it involves case workers, correctional

25   counselors.  It involves medical staff, psychologists,

89

licensed social workers.  It involves a staff assistant,

which is a Correctional Counselor 1.  It can involve

education staff.  It's depending what you are looking at, as

well as DSH staff in the case of DSH.

Q.      Have you participated in an Institutional

Classification Committee as a warden?

A.      Yes, I have.

Q.      Have you participated in an ICC in any other capacity

during your career with the department?

A.      Yes, I have.  I've probably been on a couple of

thousand ICCs in one capacity or another, as a Correctional

Counselor 1, Correctional Counselor 2, I've been a CMPR,

which is a Classification and Parole Representative.  Then

I've audited those out of Sacramento for about a period of

two years.

Q.      When you say that you have audited those cases out of

Sacramento, can you describe that in more detail?

A.      Sure.  My classification was Classification Staff

Representative.  I worked for the Classification Services

Unit, which is an auditing unit, that goes around and

inspects the cases for various committees and reviews the

cases prior to transfer to ensure things were done correctly

or incorrectly.  I've got various options depending what I

find.  We check for enemies, things like that, just to assure

the transfer is solid.

90

1    Q.      And when you say that you've audited for different --

2    so you have seen Institutional Classification Committees for

3    different institutions in the department?

4    A.      That's correct.  Approximately 29 out of the 33.

5    Q.      And Warden, what level of security is Salinas Valley

6    State Prison designated?

7    A.      It's a Level IV, which is a maximum security prison.

8    Q.      And I believe you had previously testified that you

9    had been warden at the Correctional Training Facility?

10   A.      That's correct.

11   Q.      And what level is the Correctional Training Facility?

12   A.      Level III, Level II and Level I.

13   Q.      And in your experience, is there a difference between

14   the inmates who are housed in a Level IV facility and the

15   inmates housed in a Level I, II or III facility?

16   A.      Yes.

17   Q.      Can you describe those differences?

18   A.      The differences would be -- you know, what a case

19   worker might look at might be similar, but the paperwork that

20   surrounds those particular individuals drastically differ

21   between the Level I and Level IV.

22           It could differ for reasons of arrest history,

23   commitment offense, time to serve, escape patterns.

24           Basically, it has to do with commitment offense as to

25   where someone is going to be placed, and that is as a result

91

1    of the classification system.

2    Q.        Thank you.

3              And Warden, if we could -- if I could ask you a few

4    more questions about the Institutional Classification

5    Committee process.

6              Are there certain factors that a Correctional

7    Counselor 1 looks at during the ICC process?

8    A.        Yes.  And I don't want to drag this on, but they're

9    extensive.  There is basically nine areas or branches that

10   you look at.  You look at your legal factors.  You look at

11   your court factors in making sure those mirror and line up.

12             You look at your classification factors, which is all

13   your classification history, any departmental review board

14   history.

15             You look at your critical case factors, like enemies,

16   any security threat group information, any validation along

17   those lines, you run that out.

18             What I mean by that is that you would source -- look

19   at the source documents to make sure they line up and

20   corroborate.  You run on SOMS where each offender is

21   currently so, you know, you don't have a clash or a potential

22   enemy situation.

23             You review all of those documents.  Then you have a

24   disciplinary side that you go through.  That can be quite

25   extensive with a Level IV inmate.  It's quite possible,

92

1    because you can get there because of commitment offense to a

2    Level IV, but you can also get to a Level IV because of

3    repeated disciplinaries.

4        You also have a miscellaneous area that you -- the

5    counselor would look at and spend time looking at medical,

6    dental, mental health, various chronos.  They could be

7    adverse or laudatory.

8        You look at your miscellaneous section.  That could

9    be next of kin notification and making sure -- a lot of

10   Level IVs will not put somebody down to contact in the event

11   that there is a problem.  So we usually have to interview for

12   that.

13       We look in the BPH area, Board of Prison Hearings.

14   That's a critical area because if you don't look there, you

15   can find a good cause finding for numerous situations that

16   could affect what kind of a program you're going to give that

17   particular inmate.

18       You're going to look at the classifications area.

19   That can be extensive in a Level IV.  You're looking at

20   critical case factors there.  You're reviewing the documents

21   thoroughly because at the conclusion of all this case work,

22   it is going to that job I used to do, the person that is

23   going to review that case and look at it with a fine-toothed

24   comb and assure that the classification was proper and we

25   didn't miss anything.

93

1          But if I could step back and paint a picture.  A

2    Level I C-File, about that big.  A Level IV C-File, about

3    like that.  You can have --

4    Q.      Sorry, Warden.  I don't mean to interrupt.  Just for

5    purposes of the record, the court reporter can't really take

6    down your gestures.

7    A.      Excuse me.  My apologies.  Thank you.

8          Ten to 12 inches, three or four boxes in some cases

9    of files.  A person can have one of three or one of four.  It

10   can be boxes that a case worker has to go through.

11         Now we're going into SOMS right now and some of those

12   are electronic.  But we have to meticulously go through those

13   documents.

14   Q.      What you described as three to four boxes, or ten to

15   12 inches, that's for a Level IV inmate?

16   A.      It's atypical, but it is very realistic.  We have

17   those cases.  Usually the files are significant.

18         The bottom line, the picture I'm trying to paint is

19   that there is more paperwork that surrounds a Level IV inmate

20   versus a Level I inmate.

21   Q.      And Warden, do you know what the Salinas Valley

22   Psychiatric Program is?

23   A.      Yes, I do.

24   Q.      Can you describe it briefly?

25   A.      It's with the Department of State Hospitals.  And we

94

1    have -- it's our ultimate tier for treating mental health

2    patients.

3              We have a tier on the CDCR side that refers to 3-CMS

4    or Correctional Clinical Case Management System.  And that

5    can be up to an enhanced outpatient program.

6              And then finally, through the Department of State

7    Hospitals.  Or we have a crisis bed option that we can

8    utilize in the event for a quick turnaround kind of acute

9    care.  Then the DSH is another level that is beyond and above

10   that.

11   Q.      And Warden, I believe you previously testified that

12   the Institutional Classification Committees occur for DSH

13   admits at the Salinas Valley Psychiatric Program?

14   A.      That's correct.

15   Q.      And do those Institutional Classification Committees

16   differ from Institution Classification Committees for inmates

17   who are not being admitted to a DSH program?

18   A.      They do.

19   Q.      And could you explain how they differ, please.

20   A.      Obviously, the placement of an inmate-patient would

21   be -- they're not all inmate-patients.  We have some that are

22   sent there via DRB that are not a part of CDCR, but they're

23   placed --

24              THE COURT:  What is DRB, sir?

25              THE WITNESS:  Excuse me, Judge.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

95

1          Departmental Review Board.  That is like the ultimate

2     committee that reviews cases on the department side.  It

3     consists of the director and somebody out of classification

4     services.

5          THE COURT:  Okay.

6     BY MR. SHARMA:

7     Q.     Warden, are you familiar with what's been called the

8     orientation status at the Salinas Valley Psychiatric Program?

9     A.     Excuse me?

10    Q.     Are you familiar with what's been called the

11    orientation status at the Salinas Valley Psychiatric Program?

12    A.     Yes, sir, I am.

13    Q.     And could you please just briefly describe what that

14    the orientation status is?

15    A.     Orientation status is a time at the psychiatric

16    hospital where they would wait, it's kind of like a time

17    period where it allows us to do some research on their files,

18    which kind of piggybacked on the previous question that I

19    really didn't get a chance to answer relative to the

20    difference of ICCs.

21          But there is kind of a two-prong approach.  When an

22    inmate-patient gets there, there's -- you know, you've got a

23    host of paperwork you have to do because your immediate

24    concern obviously is the mental health portion of that.

25          So they'll, in all likelihood, send somebody to that

96

1    program that has case work concerns that are not complete,

2    yet we have to bring that closure as an ICC.

3          So we'll have numerous SHU terms that we have to

4    assess and commute in this case if we elect to do that.  Some

5    of those SHU terms have been completely -- you know, are a

6    couple of decades away, that are serious.

7          Numerous 115s, disciplinaries, violent offenses.  A

8    lot of those particular disciplinaries have not been fully

9    heard.  And we have to coordinate with the sending

10   institution which sometimes can be problematic because some

11   of these patients have been bounced around.

12         And so we try and hunt that paperwork down and bring

13   closure or at least a status update to where we can present

14   it before ICC in a systematic and factual way.  And sometimes

15   getting that information is -- it is not all in the C-File.

16         I think I answered your first question.  Ask me the

17   second one again, please.

18   Q.    If you could briefly describe what the orientation

19   status is at the Salinas Valley Psychiatric Program?

20   A.    It's a period of time to where the correctional

21   counselor, the inmate-patient can get oriented to that

22   program.

23         It gives the correctional counselor a chance to get

24   the needed paperwork together in preparation for the ICC.  It

25   is also a time where the medical staff can do their prong,

97

1    which is to -- you know, the inmate-patient is seen by a

2    nurse, psychologist, a psychiatrist, a licensed clinical

3    social worker.

4         It gives them a chance to formulate what they're

5    going to do and then meet in the context of an

6    Interdisciplinary Treatment Team or IDTT, and then formulate

7    their recommendation for ICC.

8         And then ICC meets.  This is orientation at this

9    point, and makes a determination.  And then the IDTT or the

10   Interdisciplinary Treatment Team will meet subsequent to that

11   and formulate the program.

12        So that's orientation.

13        In the interim, the patient is seen on a numerous set

14   of fronts, whether it be with the people that I've already

15   listed, or the correctional counselor, or the staff

16   assistant, which I didn't mention, or just the every 15

17   minutes, the LVN or MTA, the medical technical assistant,

18   that goes around and does the 15-minute checks.  Every 15

19   minutes that patient is viewed.

20        Okay.  That's the orientation status.

21        Now, there is also a period of time there where we've

22   talked about cuff status.  Because of the dynamic of the

23   individual that is coming into that program and the program

24   itself, there is a precautionary security measure that is

25   implemented when that inmate-patient is moved, that they're

98

1    placed in cuffs to assure the safety of that inmate, those

2    inmates around him -- inmate-patients around him and the

3    staff.

4    Q.        Warden, you mentioned the IDTT, which is the

5    Interdisciplinary Treatment Team.  And I believe you were in

6    the courtroom during the testimony of Dr. Troncoso?

7    A.        Correct.

8    Q.        Do you recall Dr. Troncoso saying that the IDTT, the

9    initial IDTT occurs within 72 hours?

10   A.        That's correct.

11   Q.        And is that information from the IDTT used in the

12   Institutional Classification Committee process?

13   A.        Yes, it is.

14   Q.        Warden, I believe you also mentioned that certain

15   information used in the Institutional Classification

16   Committee process is not in the C-File?

17   A.        You know, let me back up to your first question

18   before I answer that.

19           It's utilized in the context that you have a

20   representative from that team there so that they can make

21   pointed comments when it is necessary for case work issues

22   and moving forward.

23           It's not utilized in the context of laying out the

24   medical history, something like that.  But certainly if there

25   is a caution, the representative from the medical/mental

99

1   health side is available to make comment.  Okay.

2           The next question please.

3   Q.      Thank you.

4           I believe you also mentioned that in certain

5   instances there is information for the Institutional

6   Classification Committee not found in the C-File?

7   A.      That's correct.

8   Q.      What type of information might that be?

9   A.      You know, just the past couple of days we had a nurse

10  that was assaulted down at Lancaster in the EOP program.  And

11  we found that person on our -- in our facility by that

12  afternoon.  That person's head had been stomped on the

13  ground.  We didn't have any context of what --

14          MR. FISCHER:  Objection.  Nonresponsive, Your Honor.

15          THE COURT:  Yeah.  The objection is sustained.

16          As a general matter, I had understood, but obviously

17  I'm wrong, that everything was supposed to be in the C-File,

18  that it was the repository of the entire history of the

19  inmate from receipt to whenever you're reviewing it.

20          That's wrong?

21          THE WITNESS:  You're correct, Your Honor.  But the

22  timely depositing of that information isn't always realtime.

23          THE COURT:  So is it correct to say then that, yes,

24  the C-File will contain everything, but the most recent

25  things may not have gotten into the C-File?

100

1          THE WITNESS:  That's correct.  But it is also correct
2     to say that sometimes there is missing documents.
3          THE COURT:  Of course.  Sometimes, you know, human
4     beings make mistakes.
5          Is it your understanding that that happens frequently
6     enough so that a significant amount of time and effort has
7     got to be put into trying to ensure that the C-File is what
8     it is supposed to be?
9          THE WITNESS:  Yes, Your Honor.
10         THE COURT:  When I say "significant time and energy,"
11    give me your best -- I understand it is an average -- your
12    best judgment how long that is going to take.
13         THE WITNESS:  We, thus far, have been successful at
14    about 7.2, 7.4 business days in getting all that information
15    on an average.
16         THE COURT:  Okay.
17         MR. FISCHER:  Your Honor, I move to strike the
18    witness' testimony prior to this previous colloquy.
19         THE COURT:  Overruled.
20    BY MR. SHARMA:
21    Q.    Warden, in the context of Institutional
22    Classification Committee that's conducted for DSH admits to
23    the Salinas Valley Psychiatric Program, has it been your
24    experience that information can also be gleaned from the
25    inmate which may not be in the C-File?

101

1    A.      That's correct.  And as Dr. Troncoso talked about,

2    you can get information from numerous sources to contribute

3    to that Institutional Classification Committee.

4    Q.      Thank you.

5            Warden Grounds, I may have asked this already so I

6    apologize, but do you know what the typical custody level for

7    inmates coming into the DSH Salinas Valley Psychiatric

8    Program --

9            THE COURT:  He said IV.

10           MR. SHARMA:  I apologize, Your Honor.

11   BY MR. SHARMA:

12   Q.      Warden Grounds, are you familiar with the typical

13   custody level for inmates at San Quentin Prison?

14   A.      Yes, I am.

15   Q.      What is that custody level?

16   A.      That custody level is a Level III, Level II, Level I.

17   Right in there.  Then you have a condemn row.  But in the

18   context of the reception center, you get a sprinkling across

19   the board.

20   Q.      And based on your experience, Warden, is it your

21   opinion that ICC reviews for Level IV inmates takes longer

22   than ICC reviews for inmates who are of a lower custody

23   level?

24   A.      Most definitely.  Then when you throw in the mental

25   health component, it extenuates the situation, it takes

102

1   longer.

2   Q.      Warden, were you present when Miss Jeanne Woodford,

3   or Jan Woodford -- I apologize if I'm getting her name

4   wrong -- was testifying?

5   A.      Yes, sir, I was.

6   Q.      And do you recall Miss Woodford's opinion as to how

7   quickly the ICC process could be completed?

8   A.      Yes, I do.

9   Q.      Do you agree with Miss Woodford's opinion?

10  A.      No.  You know, I can't speak for Miss Woodford

11  because that's her experience.  I can just say at a Level IV,

12  which is a different institution than where she was at, I

13  would differ as far as the time it takes to bring these case

14  factors together and do it in a manner that's accurate.

15  Q.      And Warden, based on your experience, it is your

16  opinion that shortening the ICC period for SVP -- sorry --

17  for the Salinas Valley Psychiatric Program would pose a risk

18  to security and safety?

19  A.      Yes, I do.

20  Q.      Warden, I want to ask you a few more questions about

21  the Salinas Valley Psychiatric Program.

22          Could you briefly describe the kind of physical plant

23  at the Salinas Valley Psychiatric Program?

24  A.      Yes.  You've got a treatment center.  You've got TC-1

25  and TC-2 which are kind of -- they're different.  They have

103

1    wings.  They're one story.

2         TC-1 you've got smaller wings as far as the cell

3    availability, bed availability.  TC-2 you might have up to 16

4    beds on a wing.  TC-1 has three.  TC-2 has four wings, I

5    believe.

6         And then you also have on Charlie facility,

7    C-Facility, Salinas Valley State Prison, in buildings 5 and

8    6, a conversion to a DSH program which holds approximately

9    108 inmate-patients.  And the same is true, it is mirrored at

10   Delta facility in buildings 5 and 6 also.

11   Q.      Warden, I believe you previously testified that some

12   inmates who are referred to the DSH program at Salinas Valley

13   Psychiatric Program are coming from an Ad. Seg. environment

14   or secured housing environment?

15   A.      The majority.

16   Q.      And from a custody control level, is the environment

17   at the Salinas Valley Psychiatric Program different than at

18   an administrative segregation unit or secured housing unit?

19   A.      Yes, it is.

20   Q.      Would you say that the Salinas Valley Psychiatric

21   Program has fewer custody restrictions than a secured housing

22   unit?

23   A.      I would say yes, because it is therapeutically

24   oriented, but we still have a custody presence there.  But it

25   is not the same level as you would find in an administrative

104

1    segregation or a security housing unit.

2         THE COURT:  I'm sorry.  I don't know the answer to

3    this.  Are you responsible for security in the psychiatric

4    unit?

5         THE WITNESS:  On the officers' portion, yes, I am.

6         THE COURT:  Okay.  So you provide the MTAs, as an

7    example?

8         THE WITNESS:  No, sir, I don't.  That would be on the

9    medical silo, if you will.

10        As the warden, you know, I accept responsibility for

11   the entire operation, but we have uplines or different hiring

12   authorities for mental health, for medical, for the custody

13   side.

14        I would be the hiring authority for --

15        THE COURT:  Help me here.  I'm really not clear as to

16   what we are talking about.

17        You have custody personnel distinct from medical

18   personnel, including even MTAs who move people around; is

19   that right?

20        THE WITNESS:  That's correct, sir.

21        THE COURT:  What do the -- I don't think it has much

22   to do with this case, but I don't understand it.  So what do

23   the custody people who are -- maybe I'm even wrong about

24   that.

25        Are the custody people in the psychiatric unit

105

1    essentially assigned there permanently, or are they rotated

2    in and out?

3            THE WITNESS:  There's post assignments.  There are.

4            THE COURT:  Okay.  What do they do?

5            I mean, give me an example of what a custody person

6    does as against a medical person.

7            THE WITNESS:  They're there to assist for custody

8    persons.  The MTAs would traditionally have a dual role of a

9    custody as well as an RN or nurse.  And they would respond,

10   say, to a situation first, if need be.  The custody staff,

11   the officers, the sergeant would assist if there was an

12   incident required.

13           THE COURT:  So you have -- I think from what you

14   said, I'm not putting words in your mouth, tell me if I'm

15   wrong, I'm wrong.  You have a much more limited number of

16   custody personnel in the psychiatric unit than you do out in

17   your regular prison?

18           THE WITNESS:  You know, I would say that would be the

19   case for the administrative segregation or the security

20   housing unit.  But as far as general population, the

21   assignments to -- custody assignments to various buildings

22   would be similar, but we also have a series of support staff

23   that can come in the event of a riot or something like that.

24           THE COURT:  I think I understand now.  Go ahead.

25           MR. SHARMA:  Thank you, Your Honor.

106

1    BY MR. SHARMA:

2    Q.        Warden, are you aware of an inmate suicide that

3    occurred at the Salinas Valley Psychiatric Program in

4    November 2012?

5    A.        Yes, I am.

6    Q.        And following that suicide, did you take any action?

7    A.        Yes, I did.

8    Q.        And what was that action?

9    A.        I got with my staff.  I basically stated that this is

10   not acceptable.  I put out a memo.  I said that we're going

11   to make a change here.  I looked at my ICC for that

12   particular case and got with them and started measuring that

13   and let them know what my expectations were.

14           I periodically check that in an effort to bring our

15   system tighter.  I got with my CEO or, you know, the hiring

16   authority over medical, as well as the Department of State

17   Hospitals, as well as mental health professionals there on

18   the CDCR side.  I said we need to develop and push down and

19   come up with a plan as to how we can better address these

20   issues.

21           But my purpose for my memo was to -- to all my staff,

22   was to say zero tolerance basically, that we want to move

23   forward with an ICC that happens within time frames.  To do

24   everything we can possibly do.

25           I know we have a population that is fragile or

107

1    violent, but I wanted my staff to know that they have done

2    everything they possibly could do.  In the event that a

3    suicide occurred, we were very proactive.  And so we were

4    looking at everything.  And we still are.  We are still

5    drilling down.  And as you're aware, we had six suicides last

6    year and this year we had one.

7         My hope is to bring that number way down.  And I

8    think we can do that through that collaborative team approach

9    we've talked about and heard mentioned already by

10   Dr. Troncoso.

11   Q.    Warden, in your role as warden for the Salinas Valley

12   State Prison, and based on the testimony you may have heard

13   during this matter, are you aware of any issues regarding the

14   provision of basic necessities, such as blankets or soap, to

15   inmates housed in the Salinas Valley Psychiatric Program?

16   A.    Yes, I am.

17   Q.    And could you please explain how the responsibility

18   for getting basic necessities to inmates who are housed in

19   the Salinas Valley Psychiatric Program works?

20   A.    Basically, all they have to do is ask.  If they have

21   a need, they can get with me, and our warehouse has the

22   supplies.  And we'll get them over there to them.

23         You know, we've got the supplies.  They're in the

24   warehouse.  There just needs to be a request made, and we'll

25   get it to them.

108

1    We never had an issue with not having the items, but

2    if we did, we do a petty cash advance immediately and go out

3    and buy it.  But we're fully, you know, staffed, as well as

4    got our supplies in our warehouse.

5    Q.    Just to clarify for the record, for the Court, your

6    knowledge of any complaints regarding basic necessities, did

7    you have any personal knowledge of any inmate who wasn't

8    receiving basic necessities at the Salinas Valley Psychiatric

9    Program?

10   A.    No, I didn't.  I just knew that the complaints had

11   been there.  And I talked with Pam Ahlin, and Pam Ahlin did a

12   good job as far as following up and coming up with a policy

13   for delivery that I had a chance to review and to share that

14   tightness of that process.

15   Q.    Warden, you also mentioned that you had been

16   reviewing data on the Institutional Classification Committee

17   timelines for inmates at the Salinas Valley Psychiatric

18   Program?

19   A.    That's correct.

20   Q.    Do you have a rough sense of what the average

21   timeline is?

22   A.    The average timeline --

23   Q.    To complete the institutional classification process

24   for inmates at the DSH program?

25   A.    Yes, it is roughly 7.2 to 7.44 business days before

109

1   ICC has occurred.  That was up to March 21st.  I believe it

2   is a little sooner now.

3        You know, I know that they're seeing patients today,

4   and they'll be seen in ICC the following Friday.  So 7.2,

5   7.44.  I base that on some data I got that I believe was

6   current and correct.  I was informed that there was a

7   discrepancy and that we had one that was overdue by one

8   business day.

9   Q.        I'm sorry.  When you say "overdue," what do you mean?

10  A.        It went to ICC on the 11th day versus within the ten

11  business days.

12  Q.        So based on your testimony, Warden, you're stating

13  that you believe that the goal -- sorry.  I'll withdraw, Your

14  Honor.

15       Warden, what is -- what's the expected timeline to

16  complete the ICC process for the Salinas Valley Psychiatric

17  Program?

18  A.        You know, I want to be as streamlined as I can

19  possibly be, as efficient as I can possibly be.  I think that

20  is something that really needs to be extenuated by leaders.

21  But I have ten business days up until March 21st.  Then my

22  director came out with ten calendar days at that point, and

23  that's what we're doing so... But we've got an average of 7.2

24  business days.

25  Q.        And based on your earlier testimony, you're saying

110

1   that you're only aware currently of one inmate who went over

2   the ten business days?

3   A.      That's correct.  That's correct.

4           MR. SHARMA:  Brief moment, Your Honor.

5           (Cocounsel confer.)

6   BY MR. SHARMA:

7   Q.      Warden, I want to also return to your testimony about

8   the inmate suicide that occurred in November of 2012.

9           Is it your understanding that that suicide reflected

10  any sort of systemic problem at the Salinas Valley

11  Psychiatric Program?

12  A.      Well, I wasn't aware of that.  As we looked at that,

13  we didn't see the two related, I mean between DSH and CDCR.

14  But I wanted to start something proactive to address the

15  issue as best we could.

16          So to answer your question, no, I didn't see any

17  interrelation between that and what we had experienced the

18  previous year.

19          MR. SHARMA:  Thank you.

20          Nothing further at this time, Your Honor.

21          MR. FISCHER:  For the record, Aaron Fischer for

22  plaintiffs.

23                          CROSS-EXAMINATION

24  BY MR. FISCHER:

25  Q.      Good afternoon, Warden.

111

1   A.      Good afternoon.

2   Q.      Warden, you filed a declaration -- signed a

3   declaration on the motion now being heard today; is that

4   correct?

5   A.      That's correct.

6           MR. FISCHER:  May I approach, Your Honor?

7   BY MR. FISCHER:

8   Q.      Warden, I'm going to hand you your declaration just

9   as a reference as we go through this.

10          (Declaration handed to witness.)

11          Warden, when an inmate is on orientation status, you

12  understand he's in cuffs whenever he's out of his cell?

13          You testified to that, correct?

14  A.      That's correct.

15  Q.      And that he gets cell-front clinical contact,

16  correct?

17  A.      I'm aware that he gets cell front.  And it sounds

18  like through some of the testimony sometimes he's removed for

19  possibly solo program on occasion, and he's also checked by

20  the LVNs or MTAs on a regular basis.

21  Q.      And also when the patient is on orientation status,

22  he has limited property; is that your understanding?

23  A.      You know, I don't know what the property restrictions

24  would be, but that would be consistent, yeah.

25  Q.      Would that include clothing?

112

1        MR. SHARMA:  Objection.

2   BY MR. FISCHER:

3   Q.      If you know?

4   A.      I have never seen somebody that wasn't clothed.

5        THE COURT:  Wait.  There is an objection.

6        The objection appears well-taken.  The witness says

7   he doesn't know precisely what the restrictions are.

8        Well, I suppose you can ask him.  You may ask him.

9   BY MR. FISCHER:

10  Q.      Do you know if there are any restrictions on a

11  patient's property?

12  A.      No.

13  Q.      Do you know that a patient's full treatment plan is

14  not implemented during the course of his orientation status?

15  A.      You know --

16       MR. SHARMA:  Objection.  Assumes facts not in

17  evidence.

18       THE COURT:  Overruled.  That is clearly in evidence.

19       THE WITNESS:  There is different phases of that

20  program.  I believe orientation is part of their program.

21  BY MR. FISCHER:

22  Q.      But the full IDT Treatment Team Plan?

23       THE COURT:  Let me ask you a question which may cut

24  short some of this.

25       You're the warden of the entire prison.  The prison

113

1    has a DSH.  What is your responsibility, if any -- I don't

2    mean you personally, I mean the custodial -- what is your

3    responsibility relative to the conduct of the DSH program?

4            THE WITNESS:  My responsibility would be, if I knew

5    that there was an issue or that things are well-communicated,

6    that we're working well together, that's my responsibility.

7    But I am not in charge of that program.

8            THE COURT:  Thank you, sir.

9            Does that take care of the problem?

10           MR. FISCHER:  Sure.  I'll proceed.

11   BY MR. FISCHER:

12   Q.      You testified that at your institution inmates who

13   are in the segregation unit and in DSH are put on this

14   orientation status; is that correct?

15   A.      That's correct.

16   Q.      Okay.  And is the period of time expected for ICC the

17   same for segregation and DSH?

18   A.      No.  The period of time now for ICC is ten calendar

19   days, and it is now the same for DSH for us.

20           But we were talking about pre-March 21st, which I

21   talked about the memo from my director.  That was ten

22   business days at that point.

23           I'm talking about an expectation from my director

24   relative to classification.

25   Q.      So prior to March 21st, the orientation status period

114

1    for segregation was ten calendar days, correct?

2    A.       It was ten business days.

3    Q.       Ten business days.  Also for DSH?

4    A.       Excuse me?

5    Q.       The same for DSH?

6    A.       Excuse me.  I misunderstood your question.

7    Q.       For DSH, prior to March 21st, the period of

8    orientation status was 14 business days, correct?

9    A.       Not correct.

10   Q.       That was the expectation for ICC?

11   A.       The expectation for ICC prior to March 21st is ten

12   business days.

13   Q.       Ten business days?

14            In the ASU at SVPP, what is the expected period for

15   ICC?

16   A.       Ten calendar days.

17   Q.       So they were the same prior -- so they were different

18   prior to March 21st; is that correct?

19   A.       Thank you.  That's correct.

20   Q.       So it was longer for individuals who were being

21   placed into DSH than for segregation?

22   A.       At this point, yes.

23   Q.       You have testified since March 21st the new policy

24   puts them on equal footing in terms of expectation for ICC?

25   A.       That's correct.

115

1    Q.      Now, you have other mental health programs at Salinas

2    Valley State Prison; is that correct?

3    A.      That's correct.

4    Q.      You have an EOP program?

5    A.      Correct.

6    Q.      In the EOP program there is not the ten-calendar-day

7    requirement for the ICC; is that correct?

8            THE COURT:  If there's an ICC, all you are doing is

9    moving somebody who is sick from the general population to

10   the EOP program.

11           Is there an ICC even if you are doing that?

12           THE WITNESS:  No, there's not, unless some case

13   factor came up.

14           THE COURT:  Right.  I mean, the ordinary thing is you

15   would not do an ICC if a guy was being taken out of general

16   population and put into the EOP because he was acting nuts.

17           THE WITNESS:  But the problem is, there is a lot of

18   times when they're -- that their behavior is indicative of

19   EOP program, they're placed into Ad. Seg. for their own

20   safety, and then ICC happens and they're moved.  Or they can

21   be housed right on the GP.  Both can occur.

22           THE COURT:  Okay.  You have an ICC if you're going to

23   move somebody into administrative segregation whether or not

24   it is because he's mentally ill or as a punitive measure,

25   correct?

116

1            THE WITNESS:  Basically into Ad. Seg. is for safety

2    and security of the institution, behavior investigation or

3    lack of bed space.

4            THE COURT:  I think this is really pretty simple, but

5    it seems to be getting very complicated.

6            If you're moving somebody into ICC -- into Ad. Seg.,

7    you're going to have an ICC?

8            THE WITNESS:  Correct.

9            THE COURT:  That's true whether it is for the

10   prisoner that has got problems which are -- appear to be a

11   mental character, but are a danger to the safety of the

12   community or because he's just being rowdy?

13           THE WITNESS:  Correct.

14           THE COURT:  There is no difference?

15           THE WITNESS:  The timelines -- the due process would

16   be the same.

17           THE COURT:  Okay.  I don't remember how we got

18   started on this issue.  Oh, right.  But you aren't doing an

19   ICC for somebody who is moving from general population into

20   the EOP?

21           THE WITNESS:  That's correct.

22           THE COURT:  Okay.  Go ahead.

23   BY MR. FISCHER:

24   Q.    Warden, you mentioned since the March 21st memo came

25   out your understanding is that just one individual has

117

1    been -- has had to wait in the DSH unit more than ten

2    calendar days; is that correct?

3    A.      I believe that was prior to that memo when that

4    occurred.

5    Q.      That one individual?

6    A.      Correct.  That's my understanding.

7            MR. FISCHER:  May I approach?

8            THE COURT:  Yes.  Yes.  Go ahead.

9            (Exhibit handed to witness.)

10   BY MR. FISCHER:

11   Q.      I've marked for identification Plaintiffs' Exhibit

12   12.  This is an email sent by defendants' counsel to

13   plaintiffs' counsel on June 15th.

14           I'll just represent it contains information

15   underlying the information provided in certain declarations

16   on this motion from defendants.

17           There's also an attachment -- a two-page attachment.

18   I apologize for the chart having small writing.

19           Do you see that, Warden Grounds?

20           THE COURT:  You can see it.  Can you read it?  That's

21   the more pertinent question.

22           THE WITNESS:  I think the glasses are working, Your

23   Honor.

24           Go ahead.

25   BY MR. FISCHER:

118

1   Q.      Warden, before you turn to the chart on page 1 of the

2   exhibit, at the bottom it says Declaration of Randolf

3   Grounds, Docket Number 4604.  Below that, one report for

4   January through April 2013 Reflecting Average Days to

5   Complete ICC Meetings at SVPP.

6           Do you see that, Warden?

7   A.      Yes, I do.

8   Q.      And this two-page attachment, does that look like it

9   is that document?

10  A.      It looks like the document.  I don't know if it is

11  the same document, but it looks like the format, yes.

12  Q.      Is this the document that you relied on for your

13  declaration?

14  A.      I don't know if it was the exact same document, but

15  it is the same format.

16  Q.      Okay.  Warden, this document also contains patients'

17  names and is subject to the protective order.  So as we go

18  through it I ask that you not use the patient names as we

19  discussed --

20  A.      Yes, sir.

21  Q.      -- and that the document be -- remain confidential.

22          MR. FISCHER:  Your Honor, I move to admit Exhibit 12.

23          THE COURT:  Yes.  You may proceed.

24          Are you moving it?

25          MR. FISCHER:  I am, sir.

119

1          THE COURT:  Received.

2                  (Whereupon, Plaintiffs' Exhibit 12 received into

3                   evidence.)

4    BY MR. FISCHER:

5    Q.      On the two-page exhibit, Warden -- or the two-page

6    attachment, in the left-hand column those are patient names

7    for Salinas Valley Psychiatric Prison patients; is that

8    correct?

9    A.      That's correct.

10   Q.      And on the right side there are two columns.  The

11   second column from the right is entitled "Business Days

12   Before ICC," correct?

13   A.      Correct.

14   Q.      The document (sic) on the far right is entitled

15   "Calendar Days Before ICC."

16          Is that correct?

17   A.      Correct.

18   Q.      Going down first the "Business Days Before ICC"

19   column, about two-thirds of the way down the page you see

20   that there's 11 business days and 15 calendar days.

21          Do you see that patient?

22   A.      Yes.  Yes, I do.

23   Q.      That's dated March 15, 2013.

24          Going across the patient had an ICC date of March

25   15th, 2013; is that correct?

120

1   A.      That's incorrect.  I mean, it is correct, that's what

2   it says here.  But it is incorrect data.

3   Q.      This is incorrect data?

4   A.      Correct.

5   Q.      Okay.  So you were relying on this in your

6   declaration, and now you are saying it is incorrect data?

7   A.      That's correct.

8   Q.      Okay.

9   A.      But I'm just testifying to the fact that I know that

10  it is incorrect.

11  Q.      Okay.  Moving down the page six patients, it says 12

12  business days before ICC and 16 calendar days before ICC?

13  A.      Correct.

14  Q.      Do you see that?

15          Going across, that also has an ICC date of March 15,

16  2013.

17          Do you see that?

18  A.      Yes, I do.

19  Q.      Okay.  Going on to page 2, the fifth name down with

20  the ICC date of February 2nd, 2013, it says 11 calendar days.

21          Do you see that?

22  A.      Yes, I do.

23  Q.      I'm sorry.  It's 15 calendar days.  Do you see that?

24  In the far-right column?

25  A.      Right.

121

1   Q.      And 11 business days in the second-to-far-right

2   column, correct?

3   A.      I see that, but it is incorrect.

4   Q.      This is also incorrect?

5           And then about 12 names down from that, an ICC date

6   of February 21st, 2013?

7   A.      Yes.

8   Q.      It says 11 business days to ICC?

9   A.      Correct.

10  Q.      And 15 calendar days ICC?

11  A.      That's correct.  But that data is incorrect also.

12  Q.      This data is also incorrect.  Okay?

13  A.      If I could explain?

14  Q.      You'll have a chance when your attorney asks you

15  questions.

16  A.      Very good.

17  Q.      Warden Grounds, in response to the November 12, 2012,

18  suicide, you said you stressed your expectations to your

19  staff that the expectation of meeting within the expected

20  timelines was extremely important, correct?

21  A.      Correct.

22  Q.      Yet you were concerned about this because of the

23  suicide; is that correct?

24  A.      I was concerned because of the suicide, and I'm

25  concerned across the board as far as due process.

122

1    Q.      Also because these are extremely sick patients who

2    need to get to their treatment program as soon as possible;

3    is that correct?

4    A.      I just want to make sure we're as efficient as

5    possible.

6    Q.      Part of the concern is that these inmate-patients are

7    extremely sick and are in need of inpatient hospitalization;

8    is that correct?

9    A.      Due process is ensured to all inmates or patients

10   across the board.  It was a component of what I discovered,

11   and I wanted to address it.

12           Of course we're concerned about the patients and that

13   they have everything that they have coming to them.  And then

14   part of that is due process.  And we were -- we were not in

15   compliance on that particular case.

16   Q.      You said March 21st there was a policy memo

17   distributed from one of your superiors regarding the ICC

18   process for inpatient care, correct?

19   A.      Correct.

20   Q.      You said at that time the expectation was for an ICC

21   meeting to occur within ten calendar days rather than ten

22   business days, correct?

23   A.      That's correct.

24   Q.      So as to come into line with the segregation unit ICC

25   process, correct?

123

1   A.        That's correct.

2   Q.        I want to refer you back to Exhibit 12.

3             Page 1 of the two-page exhibit.

4             Do you see the first 20 or 25 patients on here were

5   admitted to Salinas Valley Psychiatric Prison after March

6   21st?

7   A.        Yes, I do.

8   Q.        And going across, do you see that several of them had

9   to wait between 11 and 14 days for the ICC?

10  A.        That's true.

11  Q.        About 12 inmates after March 21st, 2013, had to wait

12  between 11 and 14 days for their ICC meeting; is that

13  correct?

14  A.        Restate that, please?

15  Q.        The data shows approximately ten or 11 patients had

16  to wait between 11 and 14 calendar days before their ICC?

17  A.        You are looking at that 3 -- that first group there?

18  Q.        I'm looking at the first names with admit dates after

19  March 21st.  That's the third column on the chart.

20  A.        Right.

21  Q.        Then going across to number of calendar days before

22  ICC on the far right?

23  A.        Correct.

24            So we've got 7, 9, 9, 14, 11, 5, 6, 6, 6, 6, 6, 6, 13

25  and 13, 7, 14, 12, 13, 14 and 13.  Is that what you're

124

1    referring to?  Then 7.

2    Q.      Yes.  And it continues on down to --

3    A.      So 7, 7, 9, 9,  6, 8.  Yes, I see that.

4    Q.      And 13, 13 and 13?

5    A.      That's correct.

6    Q.      So a number of those individuals had to wait more

7    than the ten calendar days, the expectation post-March 21st;

8    is that correct?

9    A.      That's correct.

10   Q.      You said that you had stressed your expectation there

11   be zero tolerance?

12   A.      I stressed my expectation that we would be in

13   compliance.  My issue was 10.3.  I mean ten business days,

14   when I put that memo out, which was back in December -- I

15   believe December or January when that suicide occurred.

16   Q.      At that point you testified that there would be zero

17   tolerance because the expectation was we're going to get

18   things done?

19   A.      We're going to get it done.  That's right.

20   Q.      Has that continued post-March 21st with respect to

21   the new policy?

22   A.      It -- obviously we've made it in some circumstances,

23   but we haven't on others.

24   Q.      Prior to those ICC meetings, it is your understand

25   all those inmates are on orientation status, correct?

125

1    A.       All the inmates that are going to initial

2    classification are on orientation.

3    Q.       So up until the time of those ICC meetings, it is

4    your understanding all those individuals are on orientation

5    status?

6    A.       That's correct.

7    Q.       One final thing on the exhibit and I'll let you put

8    it aside.

9            The most recent admit date on this chart is April

10   10th, 2013.  So we don't know what the data is after that?

11   A.       That's correct.

12   Q.       Do you know why the March 21st memo was issued?

13   A.       I believe, you know, just hand-in-glove with the

14   Department of State Hospitals, to clarify what the

15   expectation was.

16   Q.       Did anyone speak with you about the reason the

17   memorandum came -- was issued at that point in time?

18   A.       The memo was issued because obviously we're moving

19   towards doing the best we can in regards to our mental health

20   population.

21   Q.       When those ten calendar days have not been met, do

22   you take steps to identify what the problem is?

23   A.       You know, I do.  You know, my understanding was our

24   average was 7.2, 7.4, that we're on target.  But obviously we

25   got a few issues here that we've got to tighten up on.

126

1   Q.      In following up, has any of your staff been

2   disciplined for not taking steps to meet the expectations?

3   A.      Not at this point.

4   Q.      You testified that you're aware there is an IDTT team

5   meeting within 72 hours of a patient's arrival in the SVPP,

6   correct?

7   A.      Correct.

8   Q.      At that time a treatment plan is developed by the

9   treatment team?

10  A.      That's correct.

11  Q.      But as you testified, at that time the treatment plan

12  cannot be fully implemented until the ICC has completed its

13  process, correct?

14  A.      ICC takes -- occurs after the IDTT, correct.

15  Q.      And the treatment plan cannot be fully implemented --

16          THE COURT:  I heard that now at least five or six

17  times.

18  BY MR. FISCHER:

19  Q.      Warden Grounds, were you -- prior to being a warden

20  at Salinas Valley, were you associate warden at Salinas

21  Valley?

22  A.      Yes, I was.

23  Q.      What was the time period for that?

24  A.      Two years.

25  Q.      Do you know the start and end dates?

127

1    A.        Probably 2006, 2008.  Somewhere in there.

2    Q.        So you were the associate warden for some period in

3    2008?

4    A.        No.  I believe I was a chief deputy at that point.

5    Q.        Chief Deputy Warden?

6    A.        No.  Not at Salinas Valley.  At CSP Solano.

7    Q.        Do you know when you moved to CSP Solano?

8    A.        I want to say it was probably early 2009.  So during

9    2008 I would have been a warden -- associate warden there.

10   Q.        At Salinas Valley?

11   A.        I believe so.

12   Q.        During that time were you involved in the ICC

13   process?

14   A.        Yes, I was.

15   Q.        Were you involved in the ICC process for patients in

16   DSH units?

17   A.        No.  That is usually delegated to the associate

18   warden over healthcare, but I was involved on a few

19   occasions.

20   Q.        So you had some familiarity with the process?

21   A.        Correct.

22   Q.        And during that time you, of course, were

23   communicating with the executive director of DSH to make that

24   process as smooth as possible?

25   A.        You know, I haven't communicated --

128

1          MR. SHARMA:  Objection, Your Honor.  Relevance.

2          THE COURT:  Hang on.

3          MR. FISCHER:  Of course the ICC process is part DSH

4     and part CDCR.  I'm establishing the communication he had

5     with the executive director.  And I have an exhibit that I

6     think will clarify.

7          THE COURT:  I'm sorry?

8          MR. FISCHER:  I think I have an exhibit that will

9     clarify.

10          THE COURT:  The objection is overruled.

11          THE WITNESS:  Go ahead and ask your question.

12          THE COURT:  I don't blame you.

13          MR. FISCHER:  Can you read back the question?

14          (Whereupon, the record was read back as requested.)

15          THE WITNESS:  I can't recall having any conversations

16     with, I believe it was, Vic Brewer at that time.  I don't

17     recall that.

18     BY MR. FISCHER:

19     Q.    Did you have any conversations with any of the staff

20     at DSH about the ICC process, if you remember?

21     A.    No.  I just remember attending a few of them where I

22     would be the warden's delegate.

23          MR. FISCHER:  One moment, Your Honor.

24          (Brief pause.)

25     BY MR. FISCHER:

129

1    Q.    Warden, were you aware of any discussions during your

2    period as associate warden at SVSP in 2008 of making the

3    determination as to cuffs or orientation status at the

4    initial IDT meeting?

5            MR. SHARMA:  Your Honor, I -- defendants renew the

6    objection of relevance.  We're talking about a time period of

7    2008.

8            THE COURT:  I don't disagree with you.

9            What is --

10           MR. FISCHER:  This is the same policy we are talking

11   about today, this policy of orientation status.  So I want to

12   know if the warden, in his capacity with the ICC process, had

13   any communication at that time or any time.

14           THE COURT:  I'm sure you want to know that.  So what?

15   It is 2008.  We're talking about '12 and '13, I believe.

16           MR. FISCHER:  The relevance is just that this is an

17   issue that DSH and CDCR have been in communication on for

18   some time, the need to adjust this policy.

19           THE WITNESS:  I. --

20           THE COURT:  Hang on.  There is no question.  I'm just

21   trying to think about whether there is any reason to be --

22           MR. FISCHER:  I have an exhibit.  I'll keep it brief.

23           THE COURT:  Nothing in this case is kept brief.

24           Let's say you demonstrate that there has been

25   communication in 2008.  What in heaven's name does it have to

130

1    do with anything?

2           MR. FISCHER:  The relevance, Your Honor, if I can

3    proffer the exhibit, but the executive director of DSH at the

4    time made the recommendation that it was extremely important

5    to have this orientation status conducted at the IDTT -- at

6    the time of the 72-hour IDTT.

7           THE COURT:  I can't imagine that anyone would

8    disagree with that.  If you somehow or other think that is an

9    important issue to prove, the objection is -- it will take

10   longer to resolve this issue.

11          Go ahead.

12          MR. FISCHER:  Okay.  May I approach?

13          THE COURT:  Yes.

14          (Exhibit handed to witness.)

15   BY MR. FISCHER:

16   Q.     This is a document, "California Department of Mental

17   Health Salinas Valley Psychiatric Program," dated January

18   31st, 2008.

19          It is a memo from Victor F. Brewer, Executive

20   Director.

21          Warden --

22   A.     Do you have a signed copy, sir?

23   Q.     A signed copy?

24          This is the exhibit.

25          Warden, in your time working with DSH, would you

131

1   periodically exchange memoranda?

2   A.      Could I get a moment to read this?

3   Q.      Could you answer the question?

4   A.      Could I get a moment to read this?

5   Q.      Sure.

6               (Brief pause.)

7           MR. FISCHER:  While the witness is reading this, the

8   exhibit is marked as 13 for identification.

9               (Brief pause.)

10          THE COURT:  I have briefly reviewed this matter, and

11  I completely don't understand what it is that you are trying

12  to prove.

13          MR. FISCHER:  The relevant section, Your Honor, is on

14  the final page, page 4.

15          MR. SHARMA:  Your Honor, before review of the

16  document, defendants renew their objection.

17          There has been no foundation for this document, no

18  authentication of the document.

19          THE COURT:  I quite agree with that.

20          MR. FISCHER:  I'm working on that, Your Honor.

21          THE COURT:  I'm sorry?

22          MR. FISCHER:  I'm hoping, once the warden has a

23  chance to review it, to continue that process.

24          THE COURT:  Okay.  Well, maybe.

25  BY MR. FISCHER:

132

1    Q.       Warden, have you had the opportunity to review the

2    document?

3    A.       I'm a slow reader.  Sorry.

4             (Witness reviews exhibit.)

5             Okay.

6    Q.       Have you --

7             THE COURT:  Have you ever seen this document before?

8             THE WITNESS:  No, sir.

9    BY MR. FISCHER:

10   Q.       Warden, are these type of memoranda ever exchanged

11   with CDCR --

12            THE COURT:  He says he has never seen this before.

13            MR. FISCHER:  I'm asking if this is the type of

14   memoranda that does get exchanged.

15            THE COURT:  The objection is sustained.

16            You may proceed.

17            MR. FISCHER:  Okay.

18   BY MR. FISCHER:

19   Q.       Warden, you testified there are a number of areas

20   that the ICC looks at in its review; is that correct?

21   A.       Correct.

22   Q.       Okay.  For patients that come into, say, the EOP at

23   SVP, the list is different of what a custody committee

24   reviews, correct?

25            MR. SHARMA:  Objection, Your Honor.  Outside the

133

scope of direct.  Relevance.

1

2          THE COURT:  The objection of outside the scope is

3   denied, but --

4          MR. FISCHER:  I'll withdraw.

5   BY MR. FISCHER:

6   Q.      You testified to a number of items that the ICC

7   reviews prior to the ICC meeting for DSH patients, correct?

8   A.      Correct.

9   Q.      That includes the placement score?

10  A.      A host of classification issues.

11  Q.      Enemy issues, correct?

12  A.      Correct.

13  Q.      Past disciplinary history, correct?

14  A.      Correct.

15  Q.      Security threat, group concerns you mentioned?

16  A.      Correct.

17  Q.      And a host of others you said, correct?

18  A.      Correct.

19  Q.      And you testified that generally that information is

20  in the Central File, correct?

21  A.      Correct.

22  Q.      And that a correctional counselor reviews that

23  information prior to the ICC?

24  A.      Correct.

25  Q.      Is there a certain amount of time budgeted for that

134

1    review to be done in hours?

2    A.        Across the board the time or the constraint is what

3    I've already stated, which was the ten calendar days.

4    Q.        Is there an expectation of the number of hours

5    that --

6    A.        No.  It can be -- you know, if it was a small file,

7    it could be minimal.  If it was a large file, like when I was

8    a classification staff representative -- I knew one what they

9    called CSRs that probably did seven or eight cases in a week

10   just reviewing Level IV cases.

11   Q.        And how many hours would it take to review a single

12   case?

13   A.        Roughly -- I mean, you do the math, you probably are

14   looking at short of eight hours per case, you know, so maybe

15   six.

16   Q.        For the more complex cases between six and eight

17   hours?

18   A.        No.  No.  Then we're talking apples and oranges here.

19            This is a review of a case that is taking six hours

20   with everything in it.  What this counselor has to do is

21   obtain possibly a teletype from headquarters, has to get

22   information from another institution in many cases, has to

23   bring that information together, then discern it.

24   Q.        My question is, how long is the review once the

25   documents are -- the information is collected?  How long does

135

1   that review take?

2   A.      I cannot tell you.  I just know that we have to get

3   it done within that time period.  And some are more -- as you

4   can see from the record, some -- we can get the ICC done in a

5   short period of time or later.

6           But as far as quantitatively, looking at

7   communicating with other institutions, other staff, some of

8   the information will come together quicker than at other

9   times.

10  Q.      Warden, my question is, once all the information is

11  collected, to do the paper review --

12  A.      Right.

13  Q.      -- how many hours would that typically take?

14  A.      I think probably half.  Somewhere between three and

15  six probably.

16  Q.      Three and six hours to complete the review?

17  A.      Once you have everything together.

18  Q.      Once you have the information?

19  A.      Correct.

20  Q.      Warden, you're aware once a patient is referred for

21  ICF care, it takes several weeks for them to be admitted,

22  correct?

23          MR. SHARMA:  Objection.  Outside the scope of direct.

24          THE COURT:  What's your answer?  The objection --

25          MR. FISCHER:  The answer is I'm asking him if he's

136

1    aware that there is a period of time --

2          THE COURT:  No.  There is an objection it is outside

3    the scope of direct.  That's the objection.  Now you have to

4    explain to me why it isn't outside the scope of direct.

5          MR. FISCHER:  On direct the warden testified as to

6    ICC process, when it takes place and how it takes place.

7          THE COURT:  Yes.

8          MR. FISCHER:  And he testified as to that it requires

9    up to ten business days to complete.

10          THE COURT:  Yes.

11          MR. FISCHER:  I'm trying to establish the window of

12    opportunity during which that review can take place.

13          THE WITNESS:  The window of opportunity --

14          THE COURT:  There is nothing -- there is nothing

15    pending.

16          THE WITNESS:  Thank you.

17          THE COURT:  The objection is overruled.

18          You may answer -- you may ask that question.

19          Did you get the question, or is it so long ago it's

20    out of your mind?

21          All right.  Reask your question.

22    BY MR. FISCHER:

23    Q.    The question is, are you aware that once a patient is

24    referred for ICF care, it can take several weeks for them to

25    be admitted to the program?

137

1   A.      According to the testimony that I heard here, I know

2   that it can take -- a person can arrive quickly or it can

3   take a number of weeks.  That's what I've heard from the

4   testimony thus far.

5   Q.      Okay.

6   A.      But I'm not a part of that process so I really

7   couldn't speak with accuracy.

8   Q.      Is there anything that the ICC does at Salinas Valley

9   State Prison prior to an inmate's arrival to prepare for the

10  ICC meeting?

11  A.      You know, I mentioned ERMS, which is our new computer

12  program that we have.  In some cases we have that ability to

13  look at some of the case factors.

14          Once they've arrived, we know who we have, we can get

15  in and do research through there.  But we're still waiting

16  for the C-File and all of the related data so...

17  Q.      So once the information arrives, would the ICC be

18  able to immediately begin that review?

19  A.      I think there is a tension point I would like to talk

20  about because of the safety and security issues that we have

21  here.

22          It is possible to rush something so quickly that you

23  make a mistake in regards to safety and security.

24  Q.      Warden, my question is just whether the review would

25  begin as soon as the information arrives?

138

1    A.        Of course.

2    Q.        Are you aware there are requirements for C-File

3    information to arrive prior to the inmate's admission into

4    the SVP program?

5    A.        As far as the requirements are concerned, or the

6    reality as far as how information is shared classically, that

7    might be the case, but in reality as far as how information

8    comes to that correctional case, it is not as clean as that,

9    sir.

10   Q.        So in your experience, information could be shared

11   sooner, but in practicality it is not?

12            MR. SHARMA:  Objection.  Misstates the testimony.

13            THE COURT:  Overruled.  You may answer.

14            THE WITNESS:  Information is shared, but the time

15   process for compiling all the information is not as clean all

16   the time depending on what we have to locate at another

17   institution.

18            For instance, there might be someone that has bounced

19   around from a few different institutions, and it is not as

20   clean.

21   BY MR. FISCHER:

22   Q.        Are you aware that there is a policy requirement to

23   have that information provided to your institution for an

24   incoming SVP patient prior to arrival?

25   A.        It would make sense that would be the case, but I'm

139

1   not aware of the policy.

2          (Exhibit handed to witness.)

3          MR. FISCHER:  I marked for identification Plaintiffs'

4   Exhibit 14.

5          This is the Reply Declaration of Tim Belavich in

6   Support of Defendants' Motion to Terminate Under the Prison

7   Litigation Reform Act and to Vacate the Court's Judgment and

8   Orders Under Federal Rule of Civil Procedure 60(b)(5), filed

9   at Docket Number 4472 on March 22nd, 2013.

10         And attached is Exhibit K.  It runs from page --

11  Docket Number 4472-1, which runs from pages 33 through 42.

12         This is already in the record.  I move to admit it

13  for purposes of this hearing though.

14         (Brief pause.)

15         Your Honor, I move to admit.

16         THE COURT:  I'm sorry.  I didn't hear you.

17         Received.

18             (Whereupon, Plaintiffs' Exhibit 14 received into

19             evidence.)

20  BY MR. FISCHER:

21  Q.     The exhibit to the declaration, Warden Grounds, is

22  dated March 21st, 2013.

23         Is this the memorandum that you were referring to

24  earlier?

25  A.     Yes, it is.

140

1    Q.       So you've reviewed this document?

2    A.       Yes, I have.

3    Q.       At the bottom of page 1 of the exhibit, it is page 33

4    of 48 of Docket Number 4472-1, at the bottom of the page

5    where it says "Initial Referral of DSH Placement," Warden,

6    are you aware of the requirement in the first paragraph of

7    this section that any information about the placement

8    screening sheet, including critical information about

9    confidential enemies, must be provided to the receiving

10   institution for a DSH patient prior to the inmate-patient's

11   arrival?

12   A.       Yes, I am.  Right here.  It says that.

13   Q.       Were you aware of this prior to reading this?

14   A.       You know, I focused in on the time frame, is what

15   I've done.

16   Q.       But you understand that this is a requirement for

17   your institution to get this information prior to the

18   patient's arrival?

19   A.       Yes, I do.

20   Q.       Would that be helpful for your ICC team to complete

21   their review in a timely manner?

22   A.       Of course.  It would be helpful.

23            THE COURT:  It is 4:30.  We will resume, Madam Clerk?

24            THE CLERK:  Monday at 9:15.

25            THE COURT:  We've moved everything to get this case

141

1    done.  I expect it to be done.

2              (Off the record at 4:30 p.m.)

3                    ---o0o---

142

1                    REPORTER'S CERTIFICATE

2                          ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5


6          I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25