1                  IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF CALIFORNIA

3                              ---OO0---

4        BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     RALPH COLEMAN, et al.,

7            Plaintiffs,

8     Vs.                             CASE NO. CIV. S-90-0520 LKK

9     EDMUND G. BROWN JR., et al.,
      et al.,

10

11           Defendants.

12     _____/

13

14

15

16                              ---o0o---

17

18                        REPORTER'S TRANSCRIPT

19               RE:  EVIDENTIARY HEARING - DAY 4

20                    MONDAY, JUNE 24TH, 2013

21

22                              ---o0o---

23

24

25     Reported by:            CATHERINE E.F. BODENE,
                               CSR. No. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                    (916) 446-6360

```
 1                        APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  LORI RIFKIN, ATTORNEY AT LAW

 9            BY:  TOM NOLAN, ATTORNEY AT LAW

10            BY:  AARON J. FISCHER, ATTORNEY AT LAW

11            BY:  MARGOT MENDELSON, ATTORNEY AT LAW

12

13

14    FOR THE DEFENDANTS:

15            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
16            1300 I STREET
              SACRAMENTO, CALIFORNIA  95814
17
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
              BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
20
              BY:  PATRICK MCKINNEY, II, DEPUTY ATTORNEY GENERAL
21
              BY:  WILLIAM DOWNER, DEPUTY ATTORNEY GENERAL
22

23

24

25                          ---o0o---
```

1                         EXAMINATION INDEX

2                            ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6      WARDEN RANDOLF GROUNDS (PREVIOUSLY SWORN)

7          Cont'd Cross-Examination by Mr. Fischer        1
           Redirect Examination by Mr. Sharma            20
8

9
10     KATHRYN RADTKEY-GAITHER

11         Direct Examination by Mr. McKinney            25
           Cross-Examination by Mr. Bien                 51
12         Redirect Examination by Mr. McKinney         108
           Further Redirect Exam. by Mr. McKinney       176
13         Recross-Examination by Mr. Bien              180

14
15     GEORGE MAYNARD

16         Direct Examination by Ms. Vorous             115
           Cross-Examination by Mr. Fischer             123
17

18     DANTE KARAS

19         Direct Examination by Mr. McKinney           135
           Cross-Examination by Ms. Rifkin              148
20         Redirect Examination by Mr. McKinney         171

21

22                           ---o0o---

23

24

25

1                    PROCEEDINGS INDEX

2                        ---o0o---

3

4       PROCEEDINGS:                              PAGE

5

6          Closing Arguments                      184

7

8

9

10

11

12

13

14

15                       ---o0o---

16

17

18

19

20

21

22

23

24

25

```
1                            EXHIBIT INDEX

2                              ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
5

6       13                   Document               22

7       15                   Docment                12

8       16                   Document               18

9       17                   Document               66

10      18                   Docment               108

11      19                   Document              108

12      20                   Document              108

13      21                   Docment               175

14      22                   Document              171

15      23                   Document              183

16

17

18

19

20

21

22

23

24                            ---o0o---

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3

 4    DEFENDANTS'
      EXHIBIT NO           DESCRIPTION            EVD
 5

 6      C                  Document                29

 7      D                  Docment                 33

 8      E                  Document                36

 9      F                  Document                40

10      G                  Docment                148

11      H                  Document               144

12      I                  Document               147

13      J                  Docment                147

14      K                  Document               147

15      L                  Document               147

16      M                  Document               147

17

18

19

20

21                          ---o0o---

22

23

24

25
```

1

1    SACRAMENTO, CALIFORNIA

2    MONDAY, JUNE 24TH, 2013 - 9:15 A.M.

3    ---o0o---

4    THE CLERK:  Calling Civil S-90-520, Coleman, et al.,

5    v. Brown, et al.

6    THE COURT:  Counsel.

7    (HAVING BEEN PREVIOUSLY SWORN, WARDEN RANDOLF GROUNDS

8    RESUMES THE WITNESS STAND.)

9    THE WITNESS:  Your Honor, before we get started this

10   morning, I would like to correct something regarding my

11   testimony on Friday as relates to the March 21st memorandum.

12   It was not the intent of the Department of Adult

13   Institutions to override the Memorandum of Understanding as

14   it relates to DSH Department Manual, as it relates

15   specifically to ten business days.

16   It was not the intent of DAI to rewrite that portion.

17   It was my misunderstanding.

18   THE COURT:  You may proceed, Counsel.

19   CONTINUED CROSS-EXAMINATION

20   BY MR. FISCHER:

21   Q.    Good morning, Warden Grounds.

22   Just to clarify your correction on the record, the

23   policy continues to be ten business days before the ICC

24   custody review must be completed; is that correct?

25   A.    That's correct.

1    Q.    And that's in contrast to the expected timeline for

2    segregation prisoners which continues to be ten calendar

3    days; is that correct?

4         MR. SHARMA:  Objection, Your Honor.  Misstates the

5    witness' testimony.

6         THE COURT:  He just asked him.  He didn't testify at

7    all.  You may answer, sir.

8         THE WITNESS:  Yes.  It is ten calendar days for

9    ASU.

10    Q.    Warden, on Friday we were talking about the various

11    reasons for the need for this period of time to do the

12    custody review.

13         Do you remember that?

14    A.    Correct.

15    Q.    I'm going to refer you back to Plaintiffs' Exhibit 14

16    which I think is in front of you.

17         This is Exhibit K to the Reply Declaration of Tim

18    Belavich, Docket 4472.

19         THE COURT:  I'm sorry.  What number do you want?

20         MR. FISCHER:  Plaintiffs' 14.

21         THE COURT:  Okay.

22    BY MR. FISCHER:

23    Q.    Do you have that there, Warden?

24    A.    Yes, I do.

25    Q.    On page 3 of the exhibit, page 34 of 48 at the top of

3

1    Docket 4472-1, page 2 of the memorandum, on Friday you were

2    discussing that -- you testified that the provision of

3    information about enemies prior to transfer would allow your

4    staff to do the custody review in a more timely manner.

5         Do you recall that?

6    A.    Yes, I do.

7    Q.    Would the same go for information on pending casework

8    with respect to things like Rules Violation Reports?

9    A.    The timeliness of any information will affect the

10   ability of the caseworker to move forward.

11   Q.    In a more timely way?

12   A.    Correct.

13   Q.    On page 2 of this policy, in the second-to-bottom

14   paragraph, the paragraph starting, "The sending

15   C&PR/designee...," that paragraph discusses the provision of

16   pending -- information on pending casework prior to transfer

17   as well.

18        Do you see that?

19   A.    Yes.

20   Q.    In your experience has this been happening on a

21   consistent basis?

22   A.    I can't speak to -- I can't speak to that

23   specifically.  I would say as a general rule it was, but I

24   can't say that it is consistent 100 percent.

25   Q.    If it were more consistent it would make it easier

4

1   for your staff to complete the custody review in a more

2   timely manner; is that correct?

3   A.      Of course.

4   Q.      Moving forward two pages to Docket 4472-1, page 36 of

5   48, it's page 4 of the memorandum, in the middle of the page

6   the paragraph starting "It is the expectation..."

7           Do you see that?

8   A.      Yes, I do.

9   Q.      Just to clarify your testimony from earlier, this is

10  where it defines that prisoners coming from segregation will

11  have their custody review within ten days, but it remains up

12  to 14 days or ten business days for DSH patients; is that

13  correct?

14  A.      That's the way it reads.

15  Q.      In that paragraph do you also see that it requires

16  that the Institutional Classification Committee, the custody

17  committee, shall perform a thorough case file review prior to

18  transfer of the patient?

19  A.      Yes, I do.

20  Q.      Has that been happening consistently at your

21  institution?

22  A.      This is speaking to a thorough case review.

23          (Reading:)

24          The initial Unit Classification Committee or

25          Institutional Classification Committee shall perform

5

 1              a thorough case file review to include review of

 2              the CDCR Form 128-B --

 3              (Court Reporter requests clarification.)

 4              THE COURT:  Form 128-B.

 5              THE WITNESS:  (Reading continued:)

 6              -- completed by the sending institution.

 7              (Reading concluded.)

 8              I can't speak to that because I'm not the sending

 9    institution.  I'm the receiving institution.  And we do our

10    own workup and we inspect the documents ourselves.

11              THE COURT:  But this document requires the sending

12    institution to do that work?

13              THE WITNESS:  Correct.  According to this memorandum.

14              THE COURT:  Is it your testimony that when you

15    receive them, they have not done this work?

16              THE WITNESS:  It is my testimony that portions of the

17    C-File, that I spoke to already, have uncompleted casework in

18    it.

19              THE COURT:  I'm certain that somebody screws up

20    sometime somewhere.  I don't think that's Plaintiffs'

21    argument or issue.

22              Actually, you should be asking these questions.  Not

23    me.  Although, it is my concern.

24              Go ahead.

25              THE COURT:  I mean, how often -- never mind.

6

1          No, I will ask.

2          I mean, what is being suggested, and I'm sure you

3   don't mean to -- well, I don't know -- is at least in other

4   institutions they're not acting responsibly in accordance

5   with the orders.

6          THE WITNESS:  That's not what I'm saying, Your

7   Honor.

8          THE COURT:  I didn't think so.  So how do you balance

9   those two things?

10          THE WITNESS:  I would reiterate what I've already

11   testified to, that there are 115s or Rules Violations Reports

12   that aren't completed.  There are security housing unit terms

13   that aren't completed.  And that sometimes, as you stated,

14   Your Honor, there are times when people make mistakes.

15          THE COURT:  Sure.  People make mistakes because we're

16   all human.  That's not the issue.

17          Maybe it is the issue.

18          But it doesn't appear to be -- I would assume -- and

19   tell me whether this assumption is wrong -- I would assume

20   that people, generally speaking, make an effort to obey the

21   regulations that bind them.

22          THE WITNESS:  Exactly.

23          THE COURT:  Well, I think that anything else beyond

24   that is just more confusion.

25          You may proceed.

7

1          THE WITNESS:  Within the context of this memorandum,

2     I think it speaks to the fact that there can be pending 115s

3     and security housing unit terms.

4          THE COURT:  You may proceed.

5     BY MR. FISCHER:

6     Q.     Warden, that information should be provided to your

7     institution prior to transfer; is that correct?

8     A.     What information?

9     Q.     The information you just described, if there is any

10     115 Rule Violation Reports or other relevant information from

11     the case file, that should be provided -- it is your

12     understanding that should be provided to your institution

13     prior to the patient's transfer?

14     A.     We should see it within the context of the case file

15     when we receive that file.

16     Q.     Pursuant to the memorandum that should happen prior

17     to the patient's arrival at your institution?

18          THE COURT:  It speaks for itself, Counsel.

19          You may proceed.

20     BY MR. FISCHER:

21     Q.     Warden, isn't it also true that sometimes you are

22     both the sending institution and the receiving institution?

23          By that I mean that a DSH patient is being

24     transferred from a Salinas Valley State Prison non-DSH unit

25     to one of the DSH units in your institution?

8

1   A.      That's correct.

2   Q.      In that case you're responsible both for the thorough

3   case file review prior to the transfer and the review once

4   the patient arrives at the DSH program, correct?

5   A.      That's correct.

6   Q.      In those -- have you had -- you've had certain

7   patients like that, correct?

8   A.      Correct.

9   Q.      For those individuals, your staff has already done

10  some sort of custody review when they first arrived at

11  Salinas Valley State Prison, correct?

12  A.      That's correct.

13  Q.      But those individuals are also subject to the

14  orientation status period prior to the custody review,

15  correct?

16  A.      That's correct.

17  Q.      Is there any reason that your staff isn't able to

18  expedite that process for those individuals?

19  A.      I wouldn't say that they are not expediting the

20  process.  I would just say they're going through that process

21  like any other case.  And there's a period of orientation

22  that we respectfully acknowledge because of the transition

23  from one program to another, and the case factors that are

24  accentuated through behavior or emotional or violence that

25  are present within a particular case file.  And they're all

9

1   different.

2   Q.      But the issues within the case file is information

3   that you have prior to the transfer to the DSH unit, correct?

4   A.      That's true.

5   Q.      And the clinical factors are factors that are

6   considered at the 72-hour treatment team meeting upon

7   arrival, correct?

8   A.      That's true.  Some cases will be more expeditious

9   than others.

10  Q.      There's been testimony in this case that at the

11  Vacaville Psychiatric Prison there's a similar orientation

12  status policy.

13          Are you aware of that policy?

14  A.      What policy?

15          MR. SHARMA:  Objection.  Outside the direct.

16          THE COURT:  I don't remember who testified as to what

17  was going on in Vacaville.

18          MR. FISCHER:  I believe Miss Ahlin said it was her

19  understanding there was a similar orientation.

20          THE COURT:  I'm going to have to review this file --

21  the transcript in any event.

22          I will permit the question.  I mean, clearly it is

23  not irrelevant because it deals with the whole question of

24  whether the process is sufficiently expeditious.

25          You may proceed.

10

1   BY MR. FISCHER:

2   Q.      Are you aware that the Vacaville Psychiatric Program

3   has a similar orientation status?

4   A.      Yes, I am.

5   Q.      And the Salinas Valley Psychiatric Program at your

6   institution will sometimes accept patients directly from the

7   Vacaville program; is that correct?

8   A.      That's correct.

9   Q.      So for -- and those individuals will also need to be

10  put on orientation status at the Salinas Valley Program; is

11  that correct?

12  A.      That's correct.

13  Q.      So that I understand, these are hospitalized patients

14  who have had to go through an orientation status of up to ten

15  business days at Vacaville Psychiatric Prison -- or Program;

16  is that correct?

17  A.      I don't know what the average process is there.

18  Q.      Some period of orientation?

19          THE COURT:  He says up to ten days?

20          THE WITNESS:  Correct.

21  BY MR. FISCHER:

22  Q.      Then again, when they are moved to the Salinas Valley

23  Program; is that correct?

24  A.      That would be correct.

25  Q.      Does your staff have a policy of expediting the

11

1   reviews for those patients or are they treated just like the

2   other patients coming into the program?

3   A.      Each case is different, depending on the workload.

4   You know, obviously we're working on being, as I stated

5   before, as efficient as we possibly can be.  And I think the

6   record reflects we're bringing those days down.

7   Q.      But there is no written policy to prioritize the

8   individuals who have already gone through orientation status?

9           THE COURT:  Whether there is a written policy or not,

10  is there a general procedure that those people who've already

11  undergone the process at Vacaville, as an example, should be

12  handled expeditiously or are they handled like everybody else

13  that comes through the program?

14          THE WITNESS:  No.  They would be handled the first

15  day that they come through the program.  The counselor is

16  going to meet with that person and start on the casework

17  right then.  They don't wait to start on casework.  They get

18  started immediately.

19          So, you know, it's just some casework takes longer

20  than others.

21  BY MR. FISCHER:

22  Q.      When you testified on Friday I believe that -- you're

23  familiar with the difference in the program for patients in

24  the Salinas Valley Psychiatric Program on orientation status

25  as opposed to when they're in the subsequent stages, correct?

                                                              12

1    A.        Restate your question again, please?

2    Q.        I just --

3              THE COURT:  You're familiar with the program at the

4    psychiatric hospital as contrasted with the rest of the

5    prison; is that right?

6              THE WITNESS:  Correct.

7    BY MR. FISCHER:

8    Q.        As contrasted between orientation status and

9    subsequent stages in that same program?

10   A.        Correct.

11             (Exhibit handed to witness.)

12             MR. FISCHER:  I've marked for identification as

13   Plaintiffs' Exhibit 15 a document, "Salinas Valley

14   Psychiatric Program Intermediate Inpatient Treatment Facility

15   Program Manual, Policy Number 3.09."

16             This is a document that the parties have stipulated

17   to its authenticity.

18             THE COURT:  Are you moving it into evidence?

19             MR. FISCHER:  Move to admit.

20             THE COURT:  Received.

21                  (Whereupon, Plaintiffs' Exhibit 15 received into

22                   evidence.)

23   BY MR. FISCHER:

24   Q.        Warden, I want to direct your attention to the second

25   page, page 70 of the document, and the third page, page 71 of

13

1   the document.

2          On page 70 of the Policy Manual, second page of the

3   exhibit, it describes the program privileges and possessions

4   during the orientation phase.

5          Do you see that there?

6   A.     Yes, I do.

7   Q.     And on page 71, or the third page of the exhibit, it

8   describes the same for Stage 1, the following stage of the

9   program.

10          Do you see that?

11  A.     Yes, I do.

12  Q.     You can review it briefly and tell me if it is

13  consistent with your understanding of the differences between

14  the programs?

15  A.     That follows.

16  Q.     And under the orientation phase, it talks about the

17  limitation of possessions, correct?

18  A.     Correct.

19  Q.     And use of handcuffs?  Yes?

20  A.     Correct.

21  Q.     And patients being seen at cell front, correct?

22  A.     Correct.

23  Q.     And on the following page, under Stage 1, part

24  capital A, that's where it says:

25          (Reading:)

14

1          Participate in treatment activities as identified by

2          the IDTT Treatment Team and Master Treatment Plan.

3          (Reading concluded.)

4          MR. SHARMA:  Objection, Your Honor.  Relevance.  And

5    the document speaks for itself.

6          THE COURT:  I agree, the document speaks for itself.

7    Relevance is overruled, but the document speaks for itself.

8    BY MR. FISCHER:

9    Q.     Warden Grounds, has DSH ever brought to your

10   attention the need to implement the IDTT Treatment Plan prior

11   to the custody review for a particular patient?

12   A.     No.  But if I could clarify that?

13         Even though we haven't had that discussion with me

14   personally, I delegate so many things that come through my

15   office that it doesn't mean a discussion did not happen with

16   an associate warden or somebody like that.

17         THE COURT:  The answer is your best recollection is

18   no, but anything is possible.

19         THE WITNESS:  That's correct.

20   BY MR. FISCHER:

21   Q.     And is it your understanding that under the current

22   policy -- would the current policy allow the DSH Treatment

23   Team to request a waiver of orientation status to begin

24   implementation of a treatment plan before the custody review

25   is complete?

15

1    A.        Excuse me.  Repeat that again.

2    Q.        I'll try and be briefer.

3              Would the current policy permit the DSH Treatment

4    Team to request a waiver of the orientation status, the cuff

5    status, prior to completion of the custody review for a

6    particular patient if clinically indicated or otherwise?

7    A.        Not at this time.  It's a collaborative effort as far

8    as in relation to cuff status.

9    Q.        What do you mean by "collaborative effort"?

10   A.        I mean that we have a system in place for orientation

11   that allows for custody to do their side of the research, as

12   well as the medical side to do their research with regards to

13   the patient.

14             And then if there was going to be an expedited need,

15   we would meet after IDTT/ICC and then move forward with the

16   program at that point.

17             And then IDTT would meet for a second time to

18   establish that program.  As far as expeditiousness, if there

19   was a special need, that would be something that would have

20   to be discussed because we do these on a weekly basis,

21   sometimes twice a week, I believe.

22             THE COURT:  To your knowledge has there ever been a

23   waiver such as described by plaintiffs' counsel?

24             THE WITNESS:  No.

25             THE COURT:  Thank you, sir.

16

BY MR. FISCHER:

Q.      Warden, you testified on Friday, and also in your
declaration, that it is your understanding that there are
clothes and other linens available somewhere in your
institution for all prisoners; is that correct?

A.      That's correct.

Q.      Are you aware of any shortages at any time in the
last year of any of those supplies?

A.      No.

Q.      Are you familiar with how those supplies are
distributed across your institution in all programs?

A.      I can't say specifically, no.

Q.      You don't know the process for how it gets from that
warehouse?

A.      A general request is made.  But as far as who handles
it, I can't get specifically with that.  I just know that a
request is made, and it's communicated, usually Via writing.
There is an ordering process, and then the warehouse makes
delivery.

Q.      In the non-DSH programs, do you know what the
standard issue of -- are you familiar with the standard issue
of clothing for prisoners in the non-DSH programs is?

A.      The standard issue for orientation would just be bare
minimal as far as their clothing.

          THE COURT:  Once they're in the prison -- once in the

17

1    prison, what is the standard -- is there a standard for

2    distribution of clean clothing?

3         THE WITNESS:  There is.  There is.  Yes.

4    BY MR. FISCHER:

5    Q.     So for example, do you know how many pairs of

6    underwear a general population prisoner would get?

7    A.     I would think that it would be a one-for-one

8    exchange.  You know, probably two pairs of underwear.

9    Probably, you know, sheets are exchanged one-for-one

10   exchange.

11        So whatever that particular inmate is giving, he'll

12   get in receipt.  But as far as the exact numbers of

13   everything, I couldn't tell you specifically.

14   Q.     As a general matter, is it your understanding that

15   prisoners in the institution will have more than one pair of

16   underwear at a time so they have something to change into?

17   A.     I believe that's the case, yes.

18   Q.     Okay.

19   A.     But that's not orientation status.  Okay.  That's

20   minimal.  As far as the general population inmate, they have

21   more property than others.

22        MR. FISCHER:  May I approach, Your Honor?

23        (Exhibit handed to witness.)

24        MR. FISCHER:  Your Honor, I've passed the witness a

25   document marked Plaintiffs' Exhibit 16 for identification.

18

1          This is the "Salinas Valley Psychiatric Program

2     Intermediate Inpatient Treatment Facility Program Manual

3     Procedure 6.15."

4          This is also stipulated to authentication by the

5     parties, and I move to admit.

6          THE COURT:  Received.

7              (Whereupon, Plaintiffs' Exhibit 16 received into

8               evidence.)

9     BY MR. FISCHER:

10    Q.     Warden, this document describes the patient property

11    for patients in your institution in the DSH program.

12         I want to direct your attention to the second page of

13    the exhibit, page 176, where it says "Orientation/Stage 1,"

14    "Allowable Patient Property."

15         Do you see that?

16    A.     Yes, I do.

17    Q.     Just down the page where it says number 7, "State

18    Issued Clothing," it provides for one pair of socks, one

19    undershirt, one underwear, one of a number of other clothes.

20         Do you see that?

21    A.     Yes, I do.

22    Q.     That's consistent with your understanding of the

23    property limitation for patients on orientation status in the

24    DSH program?

25    A.     That's what's indicated.

19

1    Q.        As you testified, I think, that as they move later

2    into the program, off orientation or cuff status, they'll be

3    provided with more clothing; is that correct?

4    A.        I don't know that I agree because I do not know the

5    number of clothes that they issue in DSH.

6    Q.        Okay.  So just to clarify the record, on the

7    following page, page 177 of the document, at the bottom under

8    Stage 3, it provides for personal clothing, three pairs of

9    socks, three undershirts -- onto the next page -- three

10   underwear.

11   A.        Thank you.

12   Q.        Stage 3 is a post-orientation status?

13            THE COURT:  The witness has already stated that he

14   doesn't know what the specific distribution is at DSH.  The

15   document speaks for itself.

16            That's all I'm going to say at the moment, though I

17   must say both sides are trying the Court's patience.

18            You may proceed, sir.

19   BY MR. FISCHER:

20   Q.        Has any staff at your institution, whether DSH or

21   CDCR, brought to your attention the problem of individuals

22   with just one pair of clothing, having soiled clothing and

23   not having something to change into?

24   A.        I have been aware of that.

25   Q.        You have been aware of that problem?

20

1    A.      I've been aware of that.  I've had discussions, as I

2    indicated already, with Miss Pamela Ahlin.  And she came up

3    with a process to ensure that occurs expediently.

4    Q.      Has there been any discussion about providing

5    additional property to individuals on orientation or cuff

6    status as a solution to this problem?

7    A.      Not to my knowledge.

8    Q.      Just one moment.

9           (Cocounsel confer.)

10          MR. FISCHER:  Thank you, Warden.

11          No further questions.

12          THE COURT:  Redirect?

13          MR. SHARMA:  Yes, Your Honor.

14                        REDIRECT EXAMINATION

15   BY MR. SHARMA:

16   Q.      Good morning, Warden Grounds.

17   A.      Good morning.

18   Q.      Warden Grounds, you previously testified that you

19   have participated in the ICC processes throughout CDCR; is

20   that correct?

21   A.      That's correct.

22   Q.      And you've also participated in the ICC process for

23   inmates who are being admitted to the DSH program at the

24   Salinas Valley Psychiatric Program?

25   A.      Yes, I have.

21

1   Q.      I believe you testified that there are some

2   differences in the ICC process for an inmate being admitted

3   into DSH; is that correct?

4   A.      That's correct.

5   Q.      Could you please describe those differences?

6   A.      I would say mainly you're dealing with an individual

7   that has large amounts of data to go over.  The C-File is a

8   lot more convoluted in most cases.  You're dealing with a

9   person that's behaviorally and emotionally extremely

10  challenged.  I think it was indicated in testimony that

11  they're some of the more challenged in the State of

12  California.

13          And there's a time factor that they need to have as

14  far as a chance to observe them on their medication, adjust

15  their medication, as well as develop those case factors so

16  that when we meet as the ICC, we have accurate information.

17          I would say that, generally speaking, there is

18  probably more people on the ICC compared to an ICC for

19  administrative segregation.  Generally speaking, a quorum is

20  three, but you'll generally have more people in a DSH ICC.

21          And it involves the same case factors.  It is just

22  you've got more data to go over.  And you've got an issue in

23  regards to behavior and when is the right time to put this

24  person into that next stage off orientation status.

25  Q.      Thank you, Warden.

22

1          MR. SHARMA:  Your Honor, may I approach the witness?

2          (Exhibit handed to witness.)

3     BY MR. SHARMA:

4     Q.    Warden, I've handed you what's previously been marked

5     as Plaintiffs' Exhibit 12.

6          THE COURT:  So that we don't have a problem later on,

7     do both sides stipulate that all of the exhibits offered so

8     far may be received into evidence.

9          Plaintiff?

10         MR. FISCHER:  We do.

11         THE COURT:  Defendant?

12         MS. VOROUS:  We do.

13         (Whereupon, Plaintiffs' Exhibit 13 received

14         into evidence.)

15         THE COURT:  You may proceed, sir.

16         MR. SHARMA:  Thank you, Your Honor.

17    BY MR. SHARMA:

18    Q.    Warden, do you recognize Plaintiffs' Exhibit 12?

19    A.    Yes, I do.

20    Q.    And do you recall giving testimony about Plaintiffs'

21    Exhibit 12 on Friday?

22    A.    Yes, I do.

23    Q.    I believe, Warden, that during your testimony you

24    indicated there were three individuals on this list where the

25    data may not accurately reflect the time it took to complete

23

1    the ICC process for those three individuals?

2    A.      Yes, I do.

3    Q.      On the first page -- I'm sorry, Your Honor.

4            Could you please describe, and again because the

5    information on this sheet is covered by a protective order,

6    without stating inmate names, why you have become aware the

7    information on this sheet may not accurately reflect the time

8    completed to conduct the ICC?

9    A.      Sure.  One of the three had incorrect data in regards

10   to when he was seen in ICC.  The other two reflected, I

11   believe, 11 business days when in actuality it was ten

12   because of, I believe, it was Presidents Day.

13   Q.      Thank you.

14           And Warden, you previously testified that information

15   from the IDTT process, the Interdisciplinary Team process, is

16   used to conduct the ICC for DSH inmates?

17   A.      Correct.

18   Q.      And is it your opinion -- sorry.

19           Withdraw, Your Honor.

20           How valuable is the information from that IDTT

21   process to the ICC process for DSH inmates?

22   A.      I think it is very valuable.  Even though specific

23   medical detail may not be brought into the ICC, a

24   spokesperson -- a committee member from the medical mental

25   health side is present and has a contribution opportunity to

24

1    speak.

2    Q.      And is it your opinion then that conducting the ICC

3    process before the IDT process is completed for DSH inmates

4    would compromise the value of the ICC process?

5              THE COURT:  Would you like to lead the witness?

6              MR. SHARMA:  Withdraw, Your Honor.

7              A moment, Your Honor.

8              (Cocounsel confer).

9              MR. SHARMA:  Nothing further, Your Honor.

10             THE COURT:  Redirect?

11             MR. FISCHER:  No recross, Your Honor.

12             THE COURT:  May the witness be released?

13             MR. FISCHER:  He may.

14             MR. SHARMA:  Yes, Your Honor.

15             THE COURT:  You are free to step down.  You are free

16   to stay or go, as you choose.

17             MR. SHARMA:  Your Honor, may I approach the stand to

18   retrieve the document, Exhibit 12?

19             THE COURT:  Yes.

20             MR. MCKINNEY:  Good morning, Your Honor.  Patrick

21   McKinney.

22             At this time the defendants would like to call

23   Kathryn Radtkey-Gaither.

24             THE CLERK:  Please, raise your right hand.

25   ///

25

```
1                 KATHRYN RADTKEY-GAITHER,
2    was thereupon called as a witness herein by the Defendants,
3    and having been sworn to tell the truth, the whole truth and
4    nothing but the truth, was thereupon examined and testified
5    as follows:
6              THE CLERK:  Please, take a seat.  State your name and
7    spell your last name.  Speak directly into the microphone.
8              THE WITNESS:  Kathryn, K-a-t-h-r-y-n,
9    Radtkey-Gaither.  R-a-d-t-k-e-y, hyphen, G-a-i-t-h-e-r.
10             THE COURT:  You may proceed, counsel.
11                         DIRECT EXAMINATION
12   BY MR. MCKINNEY:
13   Q.     Good morning.
14   A.     Good morning.
15   Q.     State who your current employer is.
16   A.     Department of State Hospitals.
17   Q.     How long have you been employed by the Department?
18   A.     About two and a half years.
19   Q.     And what is your current position?
20   A.     Chief deputy director.
21   Q.     And have you held other positions with the Department
22   of State Hospitals?
23   A.     No.
24   Q.     Can you just briefly describe your educational
25   background?
```

26

1    A.      I have a bachelor's in business administration from

2    California State University Sacramento.  And a master's in

3    public administration from the University of Southern

4    California.

5    Q.      Can you please describe your duties as the chief

6    deputy director for the Department?

7    A.      Essentially, I am the number two in the directorate.

8    I am responsible for all the day-to-day operations and policy

9    decision-making for the entire department, which includes all

10   of its hospitals.

11   Q.      And the department recently underwent a restructure?

12   A.      That's correct.

13   Q.      Can you describe that process?

14   A.      About two years ago the governor proposed to realign

15   community mental health to the counties, and the department

16   at that time was named the Department of Mental Health.  So

17   we restructured by removing everything related to community

18   mental health and distributing it to other state agencies or

19   to the counties.  So essentially what remained were the

20   responsibilities only for the hospitals and psychiatric

21   programs.

22          THE COURT:  You mean the state hospitals and state

23   psychiatric programs?

24          THE WITNESS:  Yes.

25   BY MR. MCKINNEY:

27

1    Q.      Can you describe those hospitals and psychiatric

2    programs?

3    A.      There are five freestanding hospitals; Metropolitan,

4    Patton, Atascadero, Coalinga and Napa.  And there are two

5    psychiatric programs co-located with a prison, Salinas Valley

6    and Vacaville.

7            And there is one that will be opened in July, which

8    is a medical facility that is joint medical and psychiatric.

9    That will be co-operated with CDCR in Stockton.

10   Q.      Are you familiar with the activation plan for the

11   Stockton facility?

12   A.      Yes.

13   Q.      Do you know when that is scheduled to come online?

14   A.      Yes.

15   Q.      When is that?

16   A.      July 22nd.

17   Q.      Are you aware of any court order that would require

18   you to submit the plan -- or DSH to submit the plan for

19   activation of the Stockton facility?

20   A.      No.

21   Q.      Have plaintiffs ever requested the plan from the

22   Department of State Hospitals?

23   A.      No, not to my knowledge.

24   Q.      And are you aware of what is submitted with

25   respect -- that activations are submitted to the Special

28

1    Master in this case?

2    A.      Yes.

3    Q.      That includes the Stockton facility?

4    A.      Yes.

5    Q.      A copy of that is provided to plaintiffs; is that

6    your understanding?

7    A.      Yes.

8    Q.      Are you familiar with staffing at the Salinas

9    program?

10   A.      Yes.

11   Q.      There has been testimony earlier about a staffing

12   ratio of one psychiatrist to every 25 patients.

13          What is the source of that ratio?

14   A.      I believe the references that I've heard plaintiffs

15   make to that ratio all relate to a prior ratio that was

16   included as part of the department's enhancement plan under a

17   separate federal court order.

18   Q.      Which facilities were subject to that court order?

19   A.      There were four of the five freestanding hospitals

20   that were subject to that court order; Metropolitan, Patton,

21   Atascadero and Napa.

22   Q.      Was the Salinas Valley Psychiatric Program subject to

23   that order?

24   A.      No.

25          MR. MCKINNEY:  May I approach, Your Honor?

29

```
 1              (Exhibit handed to witness.)

 2    BY MR. MCKINNEY:

 3    Q.     Miss Gaither, I've handed you a document that's been

 4    marked as Defendants' Exhibit 3 -- I'm sorry -- Exhibit C.

 5           Do you recognize this document?

 6    A.     Yes.

 7    Q.     What is it?

 8    A.     This is a document that relates to the prior federal

 9    court order that I was referencing a little bit ago, the case

10    that was brought against the Department of Mental Health by

11    the U.S. Department of Justice.

12           MR. MCKINNEY:  Your Honor, at this time I request the

13    document marked Exhibit C being admitted into evidence.

14           MR. BIEN:  No objection.

15           THE COURT:  Received.

16               (Whereupon, Defendants' Exhibit C received into

17                evidence.)

18           THE COURT:  I note that at least my copy does not

19    have an exhibit sticker.  I'm not going to stop to have that

20    happen, but in the future please -- Thank you.

21           MR. MCKINNEY:  My mistake, Your Honor.

22           THE COURT:  Go ahead.

23    BY MR. MCKINNEY:

24    Q.     Turning to page 2 of this document, do you see which

25    hospitals are subject to the order?
```

30

1    A.      Yes.

2    Q.      Which are those?

3    A.      Metropolitan, Patton, Atascadero and Napa.

4    Q.      If you can, also look at page 9 of this order.

5            Focus on subparagraph i.

6            Can you explain what's described there with respect

7    to staffing ratios?

8    A.      It is discussing the treatment team ratios for

9    admission teams at 1 to 15 and for intermediate care at 1 to

10   25.

11           Well, it doesn't say intermediate care.  It says

12   admission at 1 to 15 and all others at 1 to 25.

13   Q.      What's your understanding of what that would include?

14   A.      That would include the treatment team, which is the

15   psychiatrist, the psychologist, rehabilitation therapist,

16   sometimes a registered nurse or psychiatric technician, and a

17   clinical social worker.

18   Q.      Again, your testimony is that the Salinas program has

19   never been subject to this ratio, correct?

20   A.      That's correct.

21   Q.      Can you describe the differences between the state

22   hospitals that are subject to this order and the setting at

23   the Salinas program?

24   A.      The most significant difference is that Salinas,

25   Vacaville and Stockton, which will be open soon, all have

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

31

1    locked rooms so the patients are essentially in a secure

2    room.  They are not able to move freely about the facility.

3          At the other five freestanding hospitals, all

4    patients are able to move about.  They are not restricted to

5    their room in any way.

6    Q.      And the department recently issued a model that

7    requires particular staffing ratios; is that correct?

8    A.      That's correct.

9    Q.      When did that occur?

10   A.      That occurred in December 2011.

11   Q.      Can you describe that model?

12   A.      We changed the average staffing ratio for the

13   nonadmission units to 1 to 35 for the treatment teams.

14   Q.      And that would include psychiatrists; is that

15   correct?

16   A.      Correct.  Again, psychiatrist, psychologist, social

17   worker, rehabilitation therapist, and a nurse or psychiatric

18   technician.

19   Q.      Do you know the current status of the CRIPA

20   proceeding that was the subject of the Exhibit C that is in

21   front of you currently?

22   A.      All of the hospitals have been released from that

23   consent decree, other than Napa, which remains under court

24   supervision for one issue only which is the issue of prone

25   restraint.

32

1  Q.      And what is your understanding as to the status of

2  Napa with respect to that one issue?

3  A.      In the last visit by the court monitor, he found we

4  were in compliance.  And we expect to be released from court

5  supervision in July.

6          MR. MCKINNEY:  May I approach, Your Honor?

7          (Exhibit handed to witness.)

8  BY MR. MCKINNEY:

9  Q.      Miss Gaither, looking at the document that's been

10 marked as Defendants' Exhibit D, do you recognize this

11 document?

12 A.      Yes.

13 Q.      What is it?

14 A.      It's a document also associated with the same court

15 case we've been discussing.

16 Q.      And focusing on page 2, line 14, can you describe

17 which facilities were terminated from this proceeding?

18 A.      Metropolitan.  And it also references that Patton and

19 Atascadero also were no longer subject.  That was from a

20 previous termination order.

21         So Metropolitan, Atascadero and Patton are dismissed

22 as defendants.

23 Q.      Looking at the last paragraph on that page, this is

24 consistent with your testimony regarding Napa; is that

25 correct?

33

1   A.      That's correct.  It requires Napa to modify its

2   policies for the use of prone restraints.

3          MR. MCKINNEY:  Your Honor, at this time I request

4   Defendants' Exhibit D be moved into evidence.

5          THE COURT:  Received.

6               (Whereupon, Defendants' Exhibit D received into

7                evidence.)

8   BY MR. MCKINNEY:

9   Q.      Miss Gaither, one of the many allegations by

10  plaintiffs is the department has intentionally changed

11  staffing ratios in order to cut costs.

12          Is there any truth to that allegation?

13  A.      It is true that the staffing ratio for the other

14  hospitals was changed to reduce costs, and it was done in

15  conjunction with a number of other cost-cutting measures.

16          In the December proposal, the department had a

17  200-million-dollar budget deficit.  And we needed to erase

18  that deficit.

19          We met jointly with our executive team, including the

20  clinical executives of the hospitals, and arrived at a

21  staffing ratio that they felt would still allow them to

22  maintain adequate care because we would also be removing some

23  of the more redundant reporting and documentation

24  requirements that had been put in place.

25          We mentioned all of these changes to the court

34

1    monitor for the federal court case as we were still at that

2    time under supervision for two of the hospitals.  And the

3    court monitor --

4              MR. BIEN:  Objection.  Calls for hearsay.

5              THE COURT:  Counsel?

6              MR. MCKINNEY:  She's testifying as to her

7    understanding, Your Honor.  It is not offered -- it is

8    offered for the effect on Miss Gaither.

9              MR. BIEN:  There is no foundation she was part of the

10   conversation.

11             THE COURT:  The objection is sustained.

12             You may proceed.

13   BY MR. MCKINNEY:

14   Q.      Focusing on the Salinas program --

15             THE COURT:  But is it your understanding -- well, I

16   see.  No matter what we say it is going to be hearsay.

17             Go ahead.

18   BY MR. MCKINNEY:

19   Q.      Let's focus on the Salinas program.

20             Is it accurate to say there was a change to the

21   staffing ratio at that program?

22   A.      It did not change at Salinas.

23   Q.      It was never 1 to 25; is that correct?

24   A.      That's correct.

25             MR. MCKINNEY:  May I approach, Your Honor?

35

1           (Exhibit handed to witness.)

2    BY MR. MCKINNEY:

3    Q.      Showing you now a document that's been marked as

4    Defendants' Exhibit E, do you recognize this document?

5    A.      Yes.

6    Q.      What is it?

7    A.      This is a document that shows the expenditure history

8    for the Salinas Valley Program for the past three fiscal

9    years.

10   Q.      How was this document prepared?

11   A.      I requested it from our chief financial officer, and

12   she sourced it from the state controller's records and from

13   our accounting records.

14           MR. MCKINNEY:  Your Honor, at this time I request

15   Defendants' Exhibit E be moved into evidence.

16           MR. BIEN:  Objection, Your Honor.  There is no

17   foundation for what's here.

18           MR. MCKINNEY:  Miss Gaither testified as to the

19   source.

20           THE COURT:  I know what she testified to, sir.  The

21   problem is that all she can say is I asked somebody else to

22   do it and this is what they produced.

23           Miss Gaither, your general responsibilities would

24   require you, even if not to know the specific numbers, to

25   have a general understanding of what the expenditures are at

36

1    each hospital; is that right or wrong?

2           THE WITNESS:  That's correct.

3           THE COURT:  And are the figures reflected in E

4    essentially what you recall or believe that to be accurate?

5           THE WITNESS:  Yes.

6           THE COURT:  The objection is overruled.

7           The document is received.

8                  (Whereupon, Defendants' Exhibit E received into

9                  evidence.)

10   BY MR. MCKINNEY:

11   Q.      Miss Gaither, can you describe what's reflected on

12   this document?

13          THE COURT:  It says what it says.

14          Go ahead.

15          Somehow or other he wants you to say something else.

16   I don't know what.

17   BY MR. MCKINNEY:

18   Q.      Miss Gaither, what were the final expenditures for

19   fiscal year 2010-2011?

20   A.      Approximately $60,000,000.

21   Q.      What about the following year, fiscal year 2011-2012?

22   A.      Approximately 65,000,000, an increase of $5,000,000.

23   Q.      And the numbers reflected on the third line for

24   fiscal year 2012-13, are those final numbers?

25   A.      Those are projected numbers.  And while they are in

37

1    slight decline from last year, it is solely reflective of the

2    furlough paycut that every state employee is subject to, the

3    5 percent furlough.

4    Q.       Miss Gaither, if I can focus you on a prior exhibit,

5    Plaintiffs' Exhibit 5, which should be in the stack of

6    documents in front of you there.

7    A.       (Witness locates exhibit.)

8    Q.       Do you have that document?

9    A.       Yes.

10   Q.       If you could, turn to page 158 of the document.

11            In fact, it is one of the fold-out pages towards the

12   back.

13            Are you familiar with this document?

14   A.       Yes.

15   Q.       What's reflected on this document?

16   A.       This is a document that was prepared at the request

17   of our labor unions to show them the final reduction plan for

18   our December 2011 budget reduction.

19   Q.       Turning to the column for SVPP -- Are you there?

20   A.       Yes.

21   Q.       Under Dollars Achieved, this reflects -- there's a

22   9.79 there?

23   A.       Correct.

24   Q.       What does that mean?

25   A.       If it were a correct number, it would mean that

38

1    Salinas had a reduction of 9.79 million.

2    Q.       Did that savings actually occur?

3    A.       No.

4    Q.       And can you explain why this plan reflects a savings

5    when that did not actually occur?

6    A.       Because the executive director at the time made an

7    error in reporting her budget, and we did not catch the error

8    until after it had been publicly released in this document.

9    So the reduction that is shown here never occurred, which was

10   demonstrated by the expenditure figures we just discussed.

11   Q.       And in the column next to the column we were just

12   looking at, it reflects a number of 170 under Positions

13   Achieved.

14           What's your understanding of what is meant by that

15   column?

16   A.       That also, if it were correct, would have indicated

17   that those positions were being reduced as associated with

18   the staffing ratio reduction.  But again, it was an error,

19   and it never occurred.

20   Q.       Can you explain how funding for DSH positions

21   currently operates?

22   A.       Currently, for treatment team positions, we do not

23   have actual positions listed in the budget.  At the May

24   revision for the 2012-13 budget, which is last May, the

25   Department of Finance requested that we take a number of

39

1    positions out of our budget and put them in what's called the

2    "Blanket," which is -- essentially it's a dollar amount

3    that's available then to us for either contracts or hiring

4    positions.

5            It's to allow us to have more flexibility so that if

6    we have a facility, like Salinas, where we may have some

7    vacancies, and we need to instead hire contractors, those

8    dollars are there, but we're not constantly reporting vacant

9    positions.

10           So it creates a dollar pool that is more flexible in

11   its use.  So all positions for treatment team across our

12   entire system are now out of our budget, and are, instead, in

13   what's called the Temporary Help Blanket.

14   Q.       When did that change occur?

15   A.       It occurred beginning July 1st of 2012.

16           MR. MCKINNEY:  May I approach the witness, Your

17   Honor?

18           (Exhibit handed to witness.)

19   BY MR. MCKINNEY:

20   Q.       Miss Gaither, showing you what's been marked as

21   Defendants' Exhibit F, do you recognize this document?

22   A.       Yes.

23   Q.       What is this document?

24   A.       This is a document that I requested our chief

25   financial officer to prepare.  The source is the salaries and

40

1   wages supplement to the governor's budget.

2   Q.      Are you familiar with that salaries and wages

3   document?

4   A.      Yes.

5   Q.      Do you have any reason to believe that this document,

6   marked as Exhibit F, is in any way inaccurate?

7   A.      No.

8          MR. MCKINNEY:  Your Honor, at this time I request

9   Exhibit F be moved into evidence.

10         THE COURT:  Hearing no objection, it is received.

11             (Whereupon, Defendants' Exhibit F received into

12              evidence.)

13  BY MR. MCKINNEY:

14  Q.      Miss Gaither, will you please describe what is

15  reflected in this document?

16  A.      What's shown here are the actual temporary help

17  expenditures for fiscal years 2010 and 2011 and proposed

18  Temporary Help Blanket expenditures for fiscal years 2012 and

19  2013.

20         And there is a $20 million increase, more than

21  doubling the number, so this is to document that our

22  treatment team dollars are now in the blanket rather than as

23  specific positions within the budget.

24  Q.      Can I have you turn now to Plaintiffs' Exhibit 4 in

25  this proceeding.

41

1          Do you have that in front of you?

2     A.     Yes.

3     Q.     Do you know -- do you recognize what this document

4     is?

5     A.     Yes.

6     Q.     What is this document?

7     A.     This is the salaries and wages supplement to the

8     proposed governor's budget for the 2012-13 budget year.

9     Q.     Do you have an understanding of when this document

10    would be prepared?

11    A.     It would be prepared in January of 2012.

12    Q.     This also appears to be a partial document.  It

13    starts at page 118.

14           Is that your understanding?

15    A.     That's correct.

16    Q.     What is the full document this would be part of?

17    A.     The full document includes a list like this for every

18    department in state government, and it's probably a few

19    thousand pages.

20    Q.     Is this a final budget document?

21    A.     This is not.  This is included as part of the

22    governor's proposal in January.  And it then changes at the

23    May revision with a subsequent proposal, although this

24    document is never revised.  And it is further changed with

25    legislative adoption in hopefully June of each year.

42

1    Q.      So this does not show what actually occurred in the

2    2012-2013 fiscal year; is that your understanding?

3    A.      That's correct.  The only actual number on here is

4    for the fiscal year 2010-11, which would be past year actual.

5    Q.      Now, let's take a look at that with respect to the

6    Salinas Valley Program.

7            If I could have you turn to page 166 of this

8    document.

9            Do you have that page in front of you?

10   A.      Yes.

11   Q.      Thank you.

12           Focusing on the line about two-thirds of the way down

13   the page -- first of all, do you understand which program

14   this particular page applies to?

15           You might have to turn back.

16   A.      Yes.  The Salinas Valley Psychiatric Program.

17   Q.      Back on page 166 under "Staff Psychiatrist," do you

18   see that line?

19   A.      Yes.

20   Q.      There was earlier testimony about the number of

21   filled positions there.  And do you see that number?

22   A.      Yes.  5.1.

23   Q.      Correct.

24           And does that accurately reflect the number of

25   psychiatrists employed at the program in fiscal year

43

1    2010-2011?

2    A.      Probably not because this would not include

3    contractors.

4    Q.      Any other types or categories of employee that would

5    not be included on this document?

6    A.      If they were in use, it also would not include second

7    positions or any psychiatrists on loan from another facility.

8    Q.      So does this 5.1 number accurately reflect the number

9    of psychiatrists working at the Salinas Valley Program?

10   A.      No.

11   Q.      During this proceeding several of the executive staff

12   at the Salinas Valley Program have testified.

13          That team started in May of this year; is that

14   correct?

15          THE COURT:   What did?

16   BY MR. MCKINNEY:

17   Q.      The executive team started in May of this year; is

18   that correct?

19   A.      That's correct.

20   Q.      How was this team put together?

21   A.      The director and I looked throughout our department

22   for the strongest and most experienced executives who had

23   prior experience running a facility in order to create an

24   interim team that could move Salinas through the Stockton

25   migration and some of the other challenges it was facing.

44

1   Q.      Can you describe some of those challenges that you

2   just testified to?

3   A.      The biggest challenge, of course, was the staffing

4   change that was coming as part of the CDCR bed plan with the

5   migration of a number of patients to Stockton and a

6   corresponding reduction in staff at Salinas.

7           This had the effect of creating some serious morale

8   problems with the staff.  They were uncertain as to how many

9   of them would stay or go.

10          In addition, I think we've all heard that in February

11  of this year there was some concern being expressed by the

12  psychiatrists that there were not -- there was not being --

13          THE COURT:  There weren't enough guys to do the

14  work.

15          THE WITNESS:  And they felt that -- they felt --

16          THE COURT:  Is that right, ma'am?

17          THE WITNESS:  That is what they said in their letter,

18  but I think we also heard that they were quite concerned that

19  it did not appear that the current executive team was taking

20  action to resolve that issue.

21          THE COURT:  It's 10:30.  We'll take a 15-minute

22  recess.

23          MR. MCKINNEY:  Thank you.

24          (Off the record at 10:30 a.m.)

25          (On the record at 10:48 a.m.)

45

```
1            THE CLERK:  Please, remain seated.

2            Court is now in session.

3            THE COURT:  Mr. McKinney.

4    BY MR. MCKINNEY:

5    Q.      Miss Gaither, one other preliminary matter that I

6    left off, prior to working at the Department of State

7    Hospitals, where were you employed?

8    A.      I was employed at the Governor's Office of Education

9    for two years, and prior to that at the California State

10   University in the Chancellor's Office for three years.

11           Prior to that I was at the Department of Finance for

12   20 years.

13   Q.      What were your responsibilities or titles at the

14   Department of Finance?

15   A.      I had a variety of titles, all the way from associate

16   budget analyst up to chief operating officer.

17   Q.      So it's safe to say you're familiar with finance

18   documents prepared by that department; is that correct?

19   A.      Correct.

20   Q.      Now, before the break we were talking about the

21   executive staff put in place, and you mentioned staff

22   departures.  What were the various reasons for the staff

23   departures?

24   A.      Many of the staff leave for normal reasons.  They

25   retire.  They take a job that is closer to where they're
```

46

1   living or where their family is living.  They may leave state

2   service all together.  So I think it's the normal reasons.

3           I think we had an unusual number of departures all at

4   the same time, which is what seems to have prompted the

5   concern -- the appropriate concern by the psychiatrists.

6   Q.      Is it typical to see a higher number of departures at

7   the end of any particular year?

8   A.      It is.  December is the most typical month for state

9   employees to retire.  It has to do with when the cost of

10  living adjustments are calculated a year later.  And in

11  addition, there was a pension change that was coming January

12  1st which, although it didn't apply to existing employees,

13  appeared to have some effect on employees making a decision

14  to leave state service.

15  Q.      What has been done to address the staffing issues at

16  the Salinas Valley Program?

17  A.      We have hired several recruitment firms who are

18  recruiting for us nationally.  We went to the Governor's

19  Office and got approval to use second positions so that we

20  could ask either existing psychiatrists in our department or

21  in other departments to give us some of their time after they

22  had completed their other position work.

23          Many psychiatrists work four tens so it is relatively

24  easy for them to add a day onto the week, or even two days if

25  they work a weekend.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

47

1          So we did everything administrative that we could.

2     We borrowed psychiatrists from our other state hospitals who

3     could afford to have them go, and we borrowed some of the

4     psychiatrists from Stockton as it was beginning to hire.

5          That actually served a double purpose because not

6     only were they able to provide caseload coverage for Salinas,

7     they could see the patients who would very soon become their

8     patients at Stockton.

9          In addition, we have recruited at the American

10    Association Conference.  I think Dr. Warburton is going to a

11    national conference in Colorado in a couple of months, and we

12    plan to do out-of-state recruitments in the residency

13    programs next January.

14    Q.     Do you know how many psychiatrists are currently

15    employed at the Salinas Valley Psychiatric Program?

16    A.     There are 10.25 full-time equivalents.

17    Q.     Is the Department of State Hospitals in any way

18    refusing to hire more psychiatric staff?

19          MR. BIEN:  Objection.  Leading.

20          THE WITNESS:  No.

21          MR. MCKINNEY:  The answer was "yes" or "no," Your

22    Honor?

23          THE COURT:  Is there an objection?

24          MR. BIEN:  I said it was leading.

25          THE COURT:  You may answer.

48

1          THE WITNESS:  No.  We are not refusing to hire.

2   BY MR. MCKINNEY:

3   Q.      Has the department in any way neglected the staffing

4   issue?

5   A.      No, we have not.

6          MR. BIEN:  Objection.  Leading.

7          THE COURT:  Sir?

8          MR. BIEN:  Also leading.

9          THE COURT:  No.  You may answer that as well.

10          THE WITNESS:  No.  I don't believe we have neglected

11   the issue.

12   BY MR. MCKINNEY:

13   Q.      Currently is there any directive to close any program

14   at Salinas Valley?

15   A.      No, there's not.

16   Q.      Is there any directive to under-resource the program

17   at Salinas Valley?

18   A.      No, there is not.

19   Q.      Can you describe the -- as part of the transition

20   plan to Stockton, which you testified to earlier, the plan

21   for the C-5 and the C-6 unit?

22   A.      Those are the two units that are currently considered

23   to be the temporary units at Salinas.  Those are the patients

24   that will be transferring first to Stockton beginning July

25   22nd.

49

1            And I believe there is already a court order that

2     says we can't close any units until the court agrees that

3     there is adequate space for our patient load.  So we will not

4     be closing them until we all know that and agree to that.

5     Q.      Last week Dr. Troncoso testified that discharge

6     decisions are made by the interdisciplinary team.

7            Is that consistent with your understanding of

8     discharge?

9            MR. BIEN:  Objection.  Foundation.

10           THE COURT:  That objection is sustained.

11    BY MR. MCKINNEY:

12    Q.      Do you have an understanding of how discharges occur

13    in the Department of State Hospitals from the Salinas

14    program?

15    A.      It's my understanding that --

16           THE COURT:  No.  The question is whether you have an

17    understanding.  The next question is going to be how you

18    developed that understanding and only then will you be able

19    to say what your understanding is.

20           THE WITNESS:  Thank you.

21           Yes, I have an understanding.

22           THE COURT:  Now ask her how she developed it.

23           Come on, fellows.  Let's go.

24           MR. MCKINNEY:  Your Honor, I was going to ask that

25    question.

50

1    BY MR. MCKINNEY:

2    Q.      How did you develop that understanding?

3    A.      I have been told by --

4            MR. BIEN:  Objection.  Hearsay.

5            MR. MCKINNEY:  Okay.

6            THE COURT:  There is no objection to the fact she's

7    been told.  The next question is going to develop an

8    objection, if it is asked in face of the fact.

9            Ma'am, is your understanding based primarily upon

10   conversations with people?

11           THE WITNESS:  That's correct.  But that's part of my

12   job.

13           THE COURT:  I have no doubt.

14   BY MR. MCKINNEY:

15   Q.      What is your understanding of the process?

16           MR. BIEN:  Objection.  Hearsay.

17           THE COURT:  Sustained.  Go ahead.

18           MR. MCKINNEY:  Your Honor, I'm asking about her

19   understanding.

20           THE COURT:  Her understanding is irrelevant.

21           I don't mean that disrespectfully, ma'am.

22   BY MR. MCKINNEY:

23   Q.      Let's go about it another way.

24           Do you understand there is a utilization review

25   committee at the Department of State Hospitals?

51

1    A.      Yes.

2    Q.      Do you understand the function of that committee?

3    A.      Yes.

4    Q.      What is the function?

5    A.      The function is to review patients' cases who have

6    been in one of our programs for a long time, and to ensure

7    that they haven't simply been overlooked as potentially able

8    to move to a different level of treatment or to be

9    discharged.

10          It is not in any way a mechanism that requires

11   discharge or movement to a different treatment level.  It is,

12   instead, a review to make certain everyone is still in

13   agreement that the patient is receiving the appropriate

14   treatment level.

15   Q.      Is there any directive in the department to

16   clinicians that requires discharge of a patient at any

17   particular point in time?

18   A.      No, there is not.

19          MR. MCKINNEY:  One moment, Your Honor.

20          (Cocounsel confer.)

21          MR. MCKINNEY:  No further questions for this witness.

22                          CROSS-EXAMINATION

23   BY MR. BIEN:

24   Q.      Miss Radtkey, will C-5 and C-6 accept new patients

25   once the patients are migrated to Stockton?

52

1  A.      I think we won't know that until Stockton is full.

2  Q.      So your plan is --

3         THE COURT:  I don't understand your question.

4         Stockton opens July 22nd, or whatever it is, and you

5  expect to move people like five at a time or ten at a time.

6         When those ten beds come open, will you be filling

7  them?

8         THE WITNESS:  Our current plans are to fill the beds

9  at Stockton and to monitor the referral list and ensure that

10  we are keeping up with the referral list.

11         We will place patients if they need to be placed

12  wherever we have space.

13         THE COURT:  Right now there are a significant number

14  of patients waiting 30 days to get into a hospital.  Is it

15  your hope -- well, I don't care about your hope.

16         Is it the department's expectation that number will

17  be reduced because you'll be filling beds that will become

18  available because of transfers to Stockton?

19         THE WITNESS:  Actually, Your Honor, I'm sorry, but my

20  understanding is that we don't have any intermediate care

21  patients over 30 days.

22         THE COURT:  Not over 30.  Up to 30.

23         THE WITNESS:  It is our goal to not have any patient

24  ever exceed 30 days.

25         THE COURT:  Ma'am, that's not responsive to my

53

1    question.  I'll try again.

2              THE WITNESS:  I'm sorry.

3              THE COURT:  My fault.

4              Right now there are patients who have been referred

5    for hospitalization waiting 30 days to get into a hospital.

6              Do you agree with that?

7              THE WITNESS:  Up to 30, yes.

8              THE COURT:  When you move five patients, or however

9    many you're going to move at a time, to Stockton, you'll open

10   five to ten beds, whatever it is going to be, is it your

11   expectation that you'll be moving those people who have been

12   waiting for a bed into T-5 (sic) and T-6 (sic)?

13             THE WITNESS:  We will, for the near term, admitting

14   off the list into Stockton, not into Vacaville or Salinas.

15             And that is our plan until we run out of Stockton

16   beds.  Then we will reassess whether we will continue

17   admissions to Salinas and Vacaville.

18             THE COURT:  So I understand you to be saying, and I

19   may be wrong, but I understand you to be saying that the T-5

20   and T-6 beds that will become available will not be used for

21   people who have been waiting up to 30 days?

22             THE WITNESS:  Unless we need them.

23             THE COURT:  You may proceed, sir.

24   BY MR. BIEN:

25   Q.      Are you going to be issuing layoff notices to staff

54

1    at C-5 and C-6?

2         Assuming that you open Stockton on July 22nd for

3    patients, are you going to start laying staff off?

4    A.    We currently have a reduction plan that is part of

5    the approved budget.

6    Q.    And that includes layoffs?

7    A.    It includes staffing reductions.  Layoffs may or may

8    not occur, depending on whether the staff move to other

9    locations.

10         THE COURT:  But you're reducing the staff at

11    Vacaville -- at Salinas as you migrate people?

12         THE WITNESS:  We have full staffing for all units

13    through December 31st.  That is the current budget plan.  And

14    then we will reassess in January once the migration to

15    Stockton is complete for both acute and intermediate.

16         We will reassess whether there's still a need to

17    retain any of the temporary units, at which time our staffing

18    plan would also be reassessed.

19    BY MR. BIEN:

20    Q.    I'm not sure I understand your answer so let me try

21    to break it down.

22         Let's assume that your activation plan, which is

23    beginning July 22nd, moves forward as planned.

24         I understand that's 20 patients a week from C-5 and

25    C-6?

55

1   A.       Correct.  One patient per day per unit.

2   Q.       Is that 20?

3   A.       There are 20 intermediate, yes.

4   Q.       Are there also acute patients being moved from CMF?

5   A.       There will be July 22nd.  Two acute units at Stockton

6   will also be opened.

7   Q.       Okay.  And same question, are you going to start --

8   are you going to accept additional acute patients to the CMF

9   acute unit after July 22nd?

10  A.       Our current plan is for Stockton to accept patients

11  directly off the referral list beginning July 22nd, leaving

12  the patients who are currently in Vacaville there.

13           Vacaville will also be continuing to admit acute

14  patients as needed.

15  Q.       I'm going to try to ask you a "yes" or "no."

16           Is your current plan, beginning on July 22nd, to

17  continue to accept new acute patients to CMF's acute unit?

18  A.       Yes.

19  Q.       Okay.  So there is no restriction, as many acute --

20  we can keep all the beds open at the CMF acute unit?

21  A.       Currently, yes.

22  Q.       As of -- I'm talking about your plan.

23           Is the plan to continue to accept new acute patients

24  to the CMF acute unit after you open Salinas (sic) acute unit

25  on July 22nd?

56

1  A.    Yes.

2  Q.    Okay.  You keep on looking over there.  I'm sorry.

3  Do you not know the plan?

4  A.    I'm not looking at anyone.

5  Q.    Okay.  So this is a different plan for CMF than for

6  Salinas Valley?

7  A.    Yes.

8  Q.    Okay.  Explain how it is different.

9  A.    It is different in that we will still continue to

10 admit patients from the referral list to Vacaville.

11 Q.    Is that because there's a very significant waitlist

12 for acute patients that exists right now today?

13       MR. MCKINNEY:  Objection.  Argumentative.

14       THE COURT:  Overruled.

15       I don't know what "significant" means, but, you know,

16 you put the word "significant" for the witness to define so I

17 suppose she will.

18       Forget significant.

19       As far as you know is there a -- I was about to say

20 the same thing, significant.

21       Is there a large number of acute patients awaiting

22 hospitalization?

23       THE WITNESS:  There are patients who are waiting for

24 placement.  But that's not the reason we will continue to

25 admit patients at Vacaville.  He asked me the reason that it

57

1   was different.

2          THE COURT:  He's now asking you a different set of

3   questions.

4   BY MR. BIEN:

5   Q.     Is there today a waitlist for the acute program at

6   Vacaville?

7   A.     There is.

8   Q.     Okay.  And does that include patients that have been

9   there more than the guidelines of ten days?

10          In other words, they've been waiting for more than

11  ten days?

12  A.     There are.

13  Q.     How many are there today that are waiting more than

14  ten days?

15  A.     I don't have that information.

16  Q.     You don't have that information?

17  A.     I don't have today's information.

18  Q.     What's your best estimate as the person responsible

19  for the day-to-day operation of the Department of State

20  Hospitals?

21          MR. MCKINNEY:  Objection.  Calls for speculation.

22          THE COURT:  No.  It asks for her estimate.

23          I would assume that, you know, she knows what it was

24  yesterday and the day before, and from that she can draw an

25  estimate, if you can.  I don't know.  Maybe you can't.

58

1           THE WITNESS:  Your question is how many are --

2           THE COURT:  Your best estimate of how many.

3           THE WITNESS:  -- on the list in excess of ten days.

4       I would estimate that it's around 25.

5   BY MR. BIEN:

6   Q.      There are 25?

7   A.      That's my estimate, but I don't know the actual

8   number.

9           THE COURT:  We understand, ma'am.

10  BY MR. BIEN:

11  Q.      So you testified that you're going to treat

12  Vacaville's acute program differently than you are going to

13  treat the Salinas Valley ICF; is that correct?

14  A.      In the near term, that's correct.

15  Q.      And you say it wasn't because of the waitlistWhat's

16  the reason for the differences?

17  A.      The reason is that there are fewer beds available in

18  total for acute patients than for intermediate care patients.

19  And so in terms of a plan, it makes the most sense to admit

20  patients directly off the list to Stockton's acute beds while

21  still admitting into Vacaville for acute at the rate that

22  they currently can, which is approximately 12 a week.

23  Q.      Twelve a week is what?

24  A.      That is their approximate discharge and admit rate at

25  Vacaville currently.

59

1   Q.      At what -- what happens at C-5 and C-6?

2           Let's turn to those programs.

3           Is it your testimony here today that you'll continue

4   to fully staff those units with the same number of doctors,

5   the same number of nurses, the same number of psychologists,

6   all the way through December 31, working those units even if

7   they're empty?

8   A.      We have sufficient funding to do that, yes.  However,

9   I think we will attempt to staff based on our patient census,

10  which is what we typically try to do in all our facilities.

11  Q.      So if the patient census goes down, you would reduce

12  your staffing census?

13  A.      We would not hire additional staff unless the patient

14  census went up.

15  Q.      Would you agree your staffing is pretty short at

16  Salinas Valley Psychiatric Program right now?

17  A.      No.  I would not agree.

18  Q.      So you're not hiring staff right now?

19  A.      We are hiring staff.  That doesn't mean that we are

20  short.

21  Q.      You're hiring for why?  What reason?

22  A.      We're hiring to replace people who are leaving, and

23  we're hiring to replace people who are there on contract, on

24  loan or in second positions.

25  Q.      Okay.  Let's assume that -- have you taken into

60

1  account in your plan for activating Stockton the demand for

2  ICF care that's been projected by the Department of

3  Corrections?

4  A.      Can you repeat the question?

5  Q.      Have you taken into account in your planning for

6  Stockton and the deactivation of units and the activation of

7  new units the projected need for ICF care for male patients?

8         MR. MCKINNEY:  Objection.  These questions are beyond

9  the scope of direct examination.

10        THE COURT:  Overruled.  You may answer.

11        THE WITNESS:  CDCR's bed plan is what is currently

12  driving the number of units that are intended or projected to

13  be available.

14        My understanding of our role at DSH is to treat

15  patients.  My understanding is also that if we reach some

16  period late in 2013, if it becomes apparent that we need to

17  retain some of those beds, rather than requesting that they

18  be decommissioned, we will instead retain them.

19        But that is something that none of us will know until

20  we reach that time point.

21        THE COURT:  Part of the problem that I'm having

22  because I think I just don't understand, there is a standard

23  that people on the waitlist not exceed 30 days.  And I've

24  accepted that as the real world because we didn't have any

25  place to put them.

61

1              I would -- Never mind what I would assume.

2              Would it not be desirable that people who need

3     hospitalization get it now rather than 30 days from now?

4              THE WITNESS:  I assume it would be desirable, yes.

5              THE COURT:  You know, it's not a really difficult

6     question to answer.  Common sense suggests that.

7              And I think what counsel is concerned with, although

8     he's -- Never mind what he's doing.

9              The real question is with the opening of Stockton, is

10    there an aim, I suppose, to reduce the number of people who

11    are waiting up to 30 days because -- well, is that one of the

12    expectations of DSH?

13             THE WITNESS:  It has always been our expectation and

14    hope that we could have as few people as possible waiting

15    under 30 days.  In fact, we currently do not have anyone

16    waiting over 30 days.

17             THE COURT:  I understand it is not over 30, but there

18    are people waiting up to 30 days.  And, you know, somebody

19    has said -- some doctor, who has been treating the person,

20    says that this person needs hospitalization.

21             And we have -- well, this Court has tolerated keeping

22    people out of the hospitals for up to 30 days because there

23    weren't any beds.

24             Now one of the things that's going to happen in

25    Stockton is there are going to be a significant number of

62

1    beds.  The concern is that we're going to close beds as we

2    open beds in Stockton.

3         Do you understand what I'm saying?

4         THE WITNESS:  I understand.

5         THE COURT:  And the question is, is your plan to keep

6    the beds open so that we are reducing the number of people

7    and reducing the time that they're on the waitlist?

8         THE WITNESS:  My understanding is that the CDCR bed

9    plan envisions the temporary beds being restored to CDCR for

10   other purposes.

11        However, I also understand that if we reach, late in

12   2013, and it becomes apparent that we do not have an adequate

13   number of beds if those beds are returned to CDCR, that there

14   will be reconsideration and reassessment of both the bed plan

15   and the staffing.

16   BY MR. BIEN:

17   Q.    So the plan is to wait and see what happens with

18   Stockton, and then decide whether to keep any of these

19   programs open?

20   A.    I think the plan is currently to return them to CDCR.

21   However, if it becomes apparent that we cannot meet the need

22   without them, then there will be a reassessment.

23        In any case, we're not allowed to close any beds or

24   decommission beds without presenting it to the court.

25   Q.    Well, there's testimony in this proceeding that

63

1   effective when you start transferring patients from C-5 and

2   C-6 to Stockton, you're no longer going to accept new

3   patients into those units.

4           Is that your understanding of the plan?

5           MR. MCKINNEY:  Objection.  Misstates prior testimony.

6           THE COURT:  Forget whether it was prior testimony or

7   not.  Put the question directly.

8   BY MR. BIEN:

9   Q.      Is it your understanding of the plan that new

10  patients will not be accepted to C-5 and C-6 after July 22nd

11  of 2013?

12  A.      In the near term, that is correct.

13  Q.      Are you aware that in May 2013, CDCR published a new

14  mental health bed projection for need for ICF beds?

15  A.      No, I was not aware.

16  Q.      You regularly receive the mental health bed need

17  study from McManis Consulting as part of your work?

18  A.      No, I do not.

19  Q.      Are you informed that CDCR does bed planning and

20  long-range projections for its bed needs?

21  A.      Yes.

22  Q.      Okay.  And you have never been shared that

23  information?

24  A.      Those are CDCR plans and CDCR projections.

25  Q.      That wasn't my question.

64

1      THE COURT:  We all understand that.  The question is

2  when they have done a study and said, "Gee, we need X number

3  of beds," is that shared with DSH?

4      The answer is "no"?

5      THE WITNESS:  I have not seen it.

6  BY MR. BIEN:

7  Q.    Have you ever seen -- these come out twice a year.

8      Have you ever seen a bed need study issued by CDCR

9  that's provided in Coleman to all parties?

10  A.    I have not.

11  Q.    Has anyone informed you that the most recent bed need

12  study shows a 10 percent increase in demand for male ICF beds

13  between fall of 2012 and the spring of 2013?

14      In other words, the most recent study shows a 10

15  percent increase?

16      MR. MCKINNEY:  Objection.  Lack of personal

17  knowledge.  Calls for speculation.

18      THE COURT:  He's asking whether she has been

19  informed.

20      The answer is going to be "no" and we can get on with

21  it.

22      Is that right?

23      THE WITNESS:  You are correct.  My answer is no.

24  BY MR. BIEN:

25  Q.    And no one has told you at all --

65

1          THE COURT:  Sir --

2          MR. BIEN:  Okay.  Okay.

3   MR. BIEN:

4   Q.     You testified that one way you have addressed the

5   staffing -- I can't use the word shortage -- the staffing

6   challenges at Salinas Valley Psychiatric Program is by

7   borrowing from other DSH hospitals; is that correct?

8   A.     That's correct.

9          MR. BIEN:  Let me mark as the next exhibit

10  Plaintiffs' Exhibit 17.

11         I'll show you a -- this is a two-page document, a

12  letter from the psychiatrists at Atascadero State Hospital to

13  Linda Persons, executive director of hospital, dated April

14  19th, 2013.

15         (Exhibit handed to witness.)

16  BY MR. BIEN:

17  Q.     Have you seen this letter before?

18  A.     Yes, I have.

19  Q.     Is it correct that the psychiatrists at Atascadero

20  have also raised concerns about the staffing?

21         THE COURT:  That's what the document says.  I'll bet

22  you she'll say, "Gee, whiz, yes, that's true."

23         Am I right, ma'am?

24         THE WITNESS:  You're correct.

25  BY MR. BIEN:

66

1   Q.      If you look at the second page of the document, does

2   that reflect a list of the psychiatrists at Atascadero?

3   A.      I don't know.  It seems to reflect a list of people

4   who signed the letter, but I don't know if this is a list of

5   every psychiatrist at Atascadero.

6           THE COURT:  You want to move it into evidence, sir?

7           MR. BIEN:  Yes, please.

8           THE COURT:  Received.

9           MR. MCKINNEY:  Objection, Your Honor, hearsay.

10          THE COURT:  Overruled.

11              (Whereupon, Plaintiffs' Exhibit 17 received into

12               evidence.)

13  BY MR. BIEN:

14  Q.      The ratio for staffing for treatment teams was

15  changed at Atascadero State Hospital; isn't that correct?

16  A.      That's correct.

17  Q.      And Atascadero State Hospital takes care of several

18  hundred Coleman class members?

19          THE COURT:  Is that correct, ma'am?

20          THE WITNESS:  I don't know if it is several hundred.

21  I think it's somewhat south of 200, but yes, some Coleman

22  patients.

23  BY MR. BIEN:

24  Q.      Approximately 200, can we use that for an estimate?

25  A.      Sure.  Stipulating that I don't know the exact

67

1    number.

2    Q.       And did Department of State Hospitals approach the

3    Coleman Special Master or this Court to discuss changing the

4    ratio for the treatment teams at Atascadero State Hospital?

5            MR. MCKINNEY:  Objection.  Lack of foundation.  Calls

6    for speculation.

7            THE COURT:  She's the chief of operations.

8            You may answer, ma'am, unless there is something I

9    don't understand.

10           Is there something?

11           THE WITNESS:  There's no requirement we do so.

12   BY MR. BIEN:

13   Q.       That wasn't my question.  Did you?

14   A.       We did not as there was no requirement that we do so.

15   Q.       You only do things when there is a specific

16   requirement?

17           MR. MCKINNEY:  Objection.  Argumentative.

18           THE COURT:  Sustained.

19   BY MR. BIEN:

20   Q.       The United States Department of Justice Consent

21   Decree governing Atascadero ended in November of 2011; is

22   that correct?

23   A.       I believe so.

24   Q.       And you implemented this new staffing model effective

25   in January of 2012?

68

1    A.        That's correct.

2              THE WITNESS:  Can I add something to that answer?

3              THE COURT:  Ma'am, you want to add something?

4              Yes.

5              THE WITNESS:  Yes.  We were still under federal court

6    supervision for other hospitals that also had that same

7    staffing ratio.

8    BY MR. BIEN:

9    Q.        What's the Clinical Oversight Advisory Council?

10   A.        The Clinical Oversight Advisory Council is a group

11   of -- a representative of each discipline within our state

12   hospital system.  And it was created as part of our

13   reorganization when we made a commitment that going forward

14   we would not make policy decisions affecting clinical

15   treatment without the voice of clinicians.

16             So our new medical director, who is a forensic

17   psychiatrist, we worked together with her to create this

18   council whose -- one of -- one of whose responsibilities is

19   to work with all of our hospitals and psychiatric programs in

20   identifying standards, clinical standards and treatment

21   outcomes, so that we can build a sustainable quality

22   improvement process within our hospital system.

23   Q.        Does the Clinical Oversight Advisory Council have any

24   responsibility for -- did they have any responsibility for

25   reviewing and approving the change from 1 to 35 to 1 to 25

69

1    for treatment teams?

2    A.      They did not exist at that time.

3    Q.      Have you ask asked them to study that issue and

4    create a report?

5    A.      We have not.

6    Q.      Who reviews deaths in Department of State Hospital

7    facilities?

8            MR. MCKINNEY:  Objection.  Beyond the scope of

9    direct.

10           THE COURT:  That appears to be so.

11           MR. BIEN:  Your Honor, if we're including in the

12   direct the declarations, this witness testified about the

13   adequacy of clinical treatment at the Salinas Valley

14   Psychiatric Program.

15           MR. MCKINNEY:  Your Honor, if I may respond, we

16   offered a number of other witnesses to testify to the

17   clinical aspects in the declaration.  We are trying to

18   streamline the proceeding.  There is no need to duplicate

19   that evidence.  It has been received.

20           THE COURT:  I appreciate your concern because it is

21   certainly the Court's, but it is actually not beyond the

22   scope because you tendered the affidavit.

23           You may proceed, Mr. Bien.

24           I'm sure you don't have the question in mind.

25   ///

70

BY MR. BIEN:

Q.      Is there a headquarters review of deaths in
Department of State Hospital facilities?

        MR. MCKINNEY:  I'm going to renew the objection that
was sustained a moment ago.

        THE COURT:  No.  No, it wasn't.  You may answer the
question.

        Is there such a review and whose responsibility is
it, if you know?

        THE WITNESS:  It's my understanding that when there
is an unexpected death in one of our hospitals that is not
co-located with the prison, an unexpected death is very often
reviewed by the local coroner, et cetera.

        There is also an internal review, a medical review
committee, I believe, something that is pretty standard in
every hospital when there's an unexpected death.

        If there is a suspected suicide or homicide or some
death of that sort, obviously local authorities are involved
in those investigations.

        If it is a death that is inside one of our co-located
facilities, like Salinas, Vacaville or Stockton, because they
are inmates, or in fact if it involves -- if it is one of our
other hospitals, if the death were one of an inmate being
treated by us, but CDCR is responsible if it is a suicide,
for doing a suicide review.

71

1          If it is some other death, then it would be a normal

2    medical review, such as is done in any other hospital.  So

3    only in cases where there is something unusual or unexpected

4    or criminal or something of that nature is an external

5    investigator brought in.

6          MR. BIEN:  I need to ask my question again.

7          MR. MCKINNEY:  Your Honor, if I may interject, if I

8    can have an offer of proof.  I don't believe there is any

9    mention of death review in either declaration --

10          THE COURT:  Okay.

11          MR. MCKINNEY:  -- of this witness.

12          THE COURT:  I don't know that.

13          Counsel, do you have some specific place in the

14    affidavit that speaks about death reviews?

15          MR. BIEN:  There was prior testimony in the hearing

16    that the headquarters was doing a death review.

17          There is also references to the suicides, I think, in

18    her declarations.  But she also talked about a quality

19    improvement process in the direct.  That's all I was asking

20    about.

21          THE COURT:  I'm sorry.  No.  I will not permit that.

22          If there is specific testimony that this witness has

23    rendered that justifies the question, I will permit it.

24    Otherwise, we must end this some day before I retire.

25          MR. BIEN:  I'll come back to it if we find it, Your

72

1    Honor.

2           THE COURT:  Fine.

3    BY MR. BIEN:

4    Q.    Miss Gaither, do you still have Plaintiffs' Exhibit 5

5    in front of you?  It was part of direct this morning.

6           Ms. Gaither, do you have that there?

7    A.    Yes.

8    Q.    Who is responsible for the $9,000,000 error in the --

9    on page 158 about Salinas Valley?

10          MR. MCKINNEY:  Objection.  Argument.

11          THE COURT:  Overruled.  Someone has to be

12   responsible.  Well, I would assume someone is responsible.

13   Do you know?

14          THE WITNESS:  The former executive director of

15   Salinas Valley Psychiatric Program, Cindy Lusch, presented

16   this recommendation to our budget office, and we entered it

17   into our documents without being aware that it was an error.

18          And it stayed there through the proposal process.

19   And once we realized that it was an error, we immediately

20   took steps to not initiate any reductions, but the documents,

21   of course, had already been released publicly.

22   BY MR. BIEN:

23   Q.    Have you issued any correction publicly?

24          I'll tell you, I have looked on your website.  I

25   don't see anything other than this document which is where I

73

1   found it on your website.

2          MR. MCKINNEY:  Objection.  Move to strike the

3   testimony of counsel.

4   BY MR. BIEN:

5   Q.      Have you publicly corrected this document posted on

6   your website?

7   A.      No, I don't believe we have.

8   Q.      And you understand that Plaintiffs' Exhibit 5 was a

9   communication from me, plaintiffs' counsel in Coleman, to the

10  Special Master and the Attorney General's Office, and

11  included this document as an exhibit and asked questions

12  about this very issue?

13         Do you understand that?

14  A.      I don't think I was aware of that.

15  Q.      Have you ever provided a correction to this

16  information to anyone in the Coleman case to your knowledge?

17  A.      No.  I don't think we ever corrected the document at

18  all.

19         THE COURT:  No.  Did you supply any information that

20  the document was in error to anybody in the Coleman case?

21         As far as you know?

22         THE WITNESS:  I don't believe we were asked until

23  today.

24  BY MR. BIEN:

25  Q.      So no one has ever discussed with you the fact that

74

1   this information that was provided in December 2012 in

2   advance of a Coleman meeting that included reference to the

3   suicide in November of 2012, and alleged there was an

4   understaffing problem, no one ever discussed that issue with

5   you?

6           MR. MCKINNEY:  Objection.  Compound.  Vague.

7           THE COURT:  Overruled.  You may answer.

8           THE WITNESS:  I don't understand your question.

9           THE COURT:  The question is, were you ever told that

10  this information had been supplied to the Coleman people for

11  whatever reason?

12          THE WITNESS:  No, I was not.

13          THE COURT:  Were you ever told there was an inquiry

14  by the Coleman people concerning this document?

15          THE WITNESS:  No, I was not.

16          THE COURT:  Did you ever supply -- did you ever tell

17  anybody in the Attorney General's Office there was an error?

18          THE WITNESS:  Not until just now.

19          THE COURT:  All right.

20  BY MR. BIEN:

21  Q.     How many psychiatrists are today -- we're now in June

22  2013 -- how many psychiatrists are you authorized to hire at

23  Salinas Valley Psychiatric Program?

24  A.     We are authorized to hire however many we need to

25  treat our census.  That is the nature of blanket funding.

75

1    Q.    So there is no authorized number that you're aware of

2    in any public document about the number of positions for this

3    program?

4    A.    That's correct.  If you look at the current salaries

5    and wages document, you would see zeros for the proposed

6    number of psychiatrists.

7    Q.    So I'll ask you again, how many positions are you --

8    you understand that there's a court order in this case

9    that -- I'm sorry.  I Interrupted.

10         THE COURT:  My fault.  I interrupted you.

11         Tomorrow you decided you wanted 25 more psychiatrists

12   at Salinas because you made a mistake, but you decided 25.

13   Could you hire them?

14         THE WITNESS:  If we had sufficient funding in the

15   budget, yes, we could.

16         THE COURT:  So the question really is how many -- how

17   much in the budget has been allocated for psychiatrists at

18   Salinas Valley?

19         THE WITNESS:  Salinas Valley, like our other

20   programs, is generally allocated funding for an average of 1

21   to 35 for nonacute or nonadmission units.  And that average

22   is important because our agreement with the clinicians was

23   that we would use an average so that we would staff at the

24   appropriate acuity of the patients.

25         So sometimes it is higher.  Sometimes it is lower.

76

1   It depends on the patients and what is required for those

2   patients.

3            THE COURT:  Your testimony is that, as best you can

4   describe it, you are allocated funds sufficient for Salinas

5   Valley, never mind any other hospital, to maintain a ratio of

6   1 to 35; is that correct?

7            THE WITNESS:  That's correct.

8            THE COURT:  All right.

9   BY MR. BIEN:

10  Q.     And that's without regard to the fact that there's no

11  admissions unit at Salinas Valley?

12  A.     That's correct.

13  Q.     Why isn't there an additional allocation for Salinas

14  Valley to deal with admissions?

15  A.     Salinas Valley is inherently different than the other

16  hospitals.  The other hospitals have actual units that are

17  separate admission units, and they are there for their

18  initial 30-day period or however long their admission takes.

19           I think in Salinas and Vacaville the patients are not

20  in units like that.  They are in individual rooms.  And it is

21  a different process entirely from that perspective.

22           The reason the staffing is different is because of

23  the locked doors largely, and the different nature of the

24  patient population from that respect.

25  Q.     So the locked doors and the different nature of the

77

1    population result in a lower staffing ratio for the two

2    prison hospital programs?

3    A.      They don't have admission units.  They have treatment

4    units.  And their assessment, evaluation and treatment is all

5    done on the same unit.

6           In the other hospitals, they are admitted unstable

7    and potentially, you know, violent and unable to be

8    controlled into a unit where the ratio is a higher staffing

9    ratio because those patients are free to move about freely.

10   And if they are unstable and violent, then you need more

11   people around because they're not locked in a room.

12   Q.      The admissions process involves additional tasks by

13   psychiatrists, for example; isn't that correct?

14   A.      I believe so, yes.  Psychiatrists.  Psychologists.

15   The entire treatment team, yes.

16   Q.      Right.  And are you saying that those tasks are

17   somehow lesser in locked units than they are in unlocked

18   units?

19   A.      I don't believe the tasks are different.  I don't

20   think the assessment and evaluations are different.  I think

21   the ability to control the environment is different.

22   Q.      Okay.  Can you -- have you -- are you aware -- I know

23   you're not a clinician; is that correct?

24   A.      Correct.

25   Q.      And you're not capable of doing a program evaluation

78

1   of a mental health program, correct?

2   A.      I don't know if I would agree with that, but go

3   ahead.

4   Q.      Okay.  Have you performed -- maybe you are.

5           Have you performed a program evaluation of the

6   Salinas Valley Program to see whether or not a 1 to 35 ratio

7   for psychiatrists is appropriate?

8   A.      We have not.

9   Q.      And you haven't personally?

10  A.      I have not.

11          THE COURT:  But I'm -- because I think -- never mind

12  why.

13          In addition to the 1 to 35 ratio, the doctors at

14  Salinas are doing essentially the same task that

15  psychiatrists -- that separate psychiatrists are doing at

16  other state hospitals.

17          Is that fair to say?

18          THE WITNESS:  It is.  However, in the hospitals the

19  doctors on an admissions unit are only doing admissions.  And

20  at Salinas and Vacaville they have a few admissions, but are

21  largely treating ongoing patients.  And so it is -- it is not

22  the same for each individual clinician as it is at a regular

23  hospital.

24          THE COURT:  We have heard a lot of testimony about

25  how long it takes to get people oriented, which is to say get

79

1    them to a place where they can be admitted.

2            The fact of the matter is, is it not, that

3    psychiatrists, in addition to having a patient load of 1 to

4    35, are doing -- are participating in the orientation program

5    which is, in some sense, equivalent to what the 1 to 15

6    doctors are doing in other state hospitals?

7            THE WITNESS:  For some portion of their time, yes.

8    But not 100 percent of their time.

9            THE COURT:  Of course not.

10   BY MR. BIEN:

11   Q.      You testified that the one characteristic that makes

12   the Salinas Valley Psychiatric Program and the CMF SVPP

13   program different is that the patients are in locked rooms;

14   is that correct?

15   A.      Correct.

16   Q.      Okay.  And being in locked rooms means they don't

17   have access to day rooms, and they don't --

18           THE COURT:  I've heard so much testimony about that.

19   Even if there weren't an objection, it is cumulative.  I'm

20   raising the objection.

21           You may go on.  I promise you, if we ever get to the

22   end, you folks will be able to argue because that's all

23   you're doing now.

24   BY MR. BIEN:

25   Q.      Do you have Plaintiffs' Exhibit 6 there, which is

80

1    your declaration dated May 9th, 2013?

2            If you turn to page 8, paragraph 14, at that time,

3    May 9th, 2013, there were 8.25 psychiatrists at Salinas

4    Valley Psychiatric Program; is that correct?

5    A.      That's correct.

6    Q.      If you go down to lines 19 to 22, isn't it correct

7    that your testimony was that the 8.25 psychiatrists provided

8    medically appropriate staffing?

9            Let me correct that.

10           THE COURT:  Or other disciplines.

11   BY MR. BIEN:

12   Q.      I misspoke.  I withdraw that sentence.

13           Let me just ask it this way.  Ms. Radtkey-Gaither,

14   was 8.25 psychiatrists sufficient to provide appropriate

15   treatment at Salinas Valley Psychiatric Program on May 9th,

16   2013?

17           MR. MCKINNEY:  Objection.  Cumulative of the

18   testimony of Dr. Troncoso.

19           THE COURT:  No.  He's asking this witness's opinion.

20   I'm not sure even that Dr. Troncoso said anything.

21           You may answer, ma'am.

22           THE WITNESS:  Yes.  We believed that it allowed us to

23   substantially comply with our goal of 35 patients per

24   clinician.  The ratio was approximately 40, which is not

25   substantially different than 35.

81

1    BY MR. BIEN:

2    Q.      So 8.25 is okay?

3    A.      It's not ideal, no.  And I think what we said was we

4    were expecting to have more in June and, indeed, we do.  We

5    currently have 10.25.

6    Q.      In March you had 12.75 psychiatrists; isn't that

7    correct?

8    A.      Possibly.  I would have to look at the numbers.  I

9    don't recall.

10   Q.      Take a look at Plaintiffs' Exhibit 11, which is your

11   other -- or is it the same -- your March 22nd declaration.

12           Do you have Plaintiffs' Exhibit 11 there?

13   A.      Yes.

14   Q.      On page 5, paragraph 7, there was 12 and

15   three-quarters psychiatrists present as of March 22nd; is

16   that correct?

17   A.      Yes.

18   Q.      Why are the staffing numbers that you're reporting to

19   this Court still not fixed?

20   A.      Because they change.

21   Q.      Why are the monthly staffing reports of DSH staffing

22   still not fixed?

23   A.      Are you referring to something other than this

24   document?

25   Q.      Yes.  I'm referring to the monthly staffing reports

82

1  that you sent to this Court and to the Special Master.

2  A.      I believe that there have been some efforts for the

3  past several months to change the format of those reports.

4  Q.      Why are they not fixed?

5  A.      I don't know why they're not yet fixed.  One of the

6  major problems with those reports, of course, is it is

7  picking up authorized position numbers, which, as we

8  discussed today several times, we no longer have positions

9  authorized.  They're in the blanket.  So those reports do not

10 contain contractors.  They don't contain second positions.

11 They don't contain loaned positions.  And that's my

12 understanding of some of the major problems with those

13 reports.

14         I believe there are a number of parties that have to

15 agree to a change in format for those reports, and to my

16 understanding that has not yet occurred.  I can't tell you

17 why it hasn't occurred.  It just hasn't occurred.

18 Q.      One of the errors in the reports that you're sending

19 to the Court is an error in reporting the authorized

20 positions.

21         Is that correct?

22         MR. MCKINNEY:  Objection.  Lack of foundation.

23         THE COURT:  He's asking.  She's the operating --

24         MR. MCKINNEY:  He's referring to a document

25 without --

83

1        THE COURT:  Overruled.  You may answer if you can.

2        I've forgotten what the question is.

3        THE WITNESS:  My understanding is that one of the

4   problems with that report is not that the report doesn't

5   accurately reflect the authorized position, it's that the

6   format of the report does not reflect our current budgeting

7   methodology which is unrelated to authorized positions in the

8   budget as we've discussed already today.

9   BY MR. BIEN:

10  Q.        So as I understand what's happened, it was the

11  Department of Finance who made this decision to take away

12  specific authorized positions for those programs and replace

13  it with a lump sum?

14  A.        That's correct.

15  Q.        It wasn't something Department of State Hospitals

16  wanted to do?

17  A.        No.

18  Q.        Okay.  And as a result of that change, you are no

19  longer able to specify a specific number of authorized

20  positions for any category at Salinas Valley Psychiatric

21  Program?

22  A.        I don't think that's the case.  I think -- as I

23  understand it, the report is sourced to a place that picks up

24  authorized positions from the budget.  And because there are

25  no authorized positions or perhaps those numbers are not

84

1   accurately reflected anymore, it is picking up something

2   other than our actual number of budgeted positions because of

3   the methodology change.

4        That's why I believe we need to change the formats of

5   the report, and we need to change the sourcing of the report.

6   And I can't tell you all the details of that.

7        I don't know who all the people are that are

8   involved.  I just know there are multiple people who need to

9   agree on that change, perhaps even including yourselves.  I

10  don't know who is involved.  But all of those parties must

11  agree before that report can be changed.

12       THE COURT:  Do you think that the Court might be a

13  little bit distressed to learn what I'm learning here only

14  because there's a hearing that nobody has bothered to tell

15  the Court that all of the information that I have been

16  relying on may not be accurate?

17       THE WITNESS:  My understanding is that this was

18  brought up by our chief counsel to the Special Master at one

19  of the status meetings or some meeting.  So I think we have

20  been attempting for months to get this report corrected.

21       THE COURT:  We'll talk about that later.

22       Go ahead.

23  BY MR. BIEN:

24  Q.   Do you know when plaintiffs first raised inaccurate

25  reporting by Department of State Hospitals in their numbers

85

1    to the Coleman Special Master and defendants and your

2    lawyers?

3    A.      No, I don't.

4    Q.      Okay.  You not only have legal representatives, but

5    you have actual staffing represents that attend Coleman All

6    Parties Meetings; isn't that correct?

7    A.      I know we have legal representatives.  I think we

8    very seldom have staff attend those meetings.

9    Q.      You don't get a regular report from staff about what

10   happens at the Coleman All Parties Meetings, the policy

11   meetings?

12   A.      We get summaries of some of the discussions, but no,

13   we don't get regular reports.

14          My understanding is many of the items and issues

15   discussed relate to CDCR and not to DSH as what we do is

16   not -- we provide the treatment, but we don't have a number

17   of processes and things like that that are under supervision

18   by the courts.  So essentially, most of the discussion at

19   those meetings surround CDCR processes and procedures.

20   Q.      Okay.  Is it your understanding that no -- you're

21   free to change staffing at Salinas Valley Program or the CMF

22   DSH program without approval of the Court?

23   A.      My understanding is there are no restrictions, that

24   our charge is to provide appropriate clinical care, which we

25   do.

86

1    Q.      How do you know that?

2    A.      Because my clinicians tell me so.

3    Q.      Okay.  What staffing ratio are you going to use for

4    the Stockton DSH programs?

5           MR. MCKINNEY:  Objection.  Beyond the scope of direct

6    testimony.

7           Irrelevant to this proceeding, Your Honor.

8           THE COURT:  Oh, no.  That is -- I don't find that.

9           THE WITNESS:  I would have to check.  I don't have

10   the Stockton budget here in front of me.

11          THE COURT:  Okay.

12          THE WITNESS:  And the Stockton budget was developed

13   some number of years ago jointly with CDCR so it may have

14   some of the same problems that the Salinas and Vacaville

15   budgets had that we have only recently discovered.

16   BY MR. BIEN:

17   Q.      What are those problems?

18   A.      That they were not budgeted correctly.  So part of

19   what we've been doing the past two years since taking over is

20   fixing a number of problems that appear to have existed for

21   some time.

22   Q.      Was one of the problems that you had too many

23   clinicians for the patients?

24   A.      I'm sorry.  I don't understand.

25   Q.      One of the things that's happened in the two years

87

1    since you've been there is there's been a reduction in the

2    treatment ratios for ICF programs; is that correct?

3         MR. MCKINNEY:  Objection.  Misstates direct

4    testimony.

5         THE COURT:  Overruled.  You may answer.

6         THE WITNESS:  I don't think that we would have seen

7    that as a problem, no.  It was a change that we made where we

8    changed -- we took away many of the documentation and

9    paperwork requirements from our clinicians that were required

10   under the previous federal court supervision.

11        By removing all of those paperwork and documentation

12   and audit requirements, we freed up more of their time for

13   direct patient care.

14        Therefore, the clinicians felt that they could absorb

15   an increased caseload because they were no longer having to

16   do as much paperwork.

17   BY MR. BIEN:

18   Q.   Did you do any kind of staffing analysis by any

19   independent entity to see whether or not the ratios that the

20   Department of Justice and the State of California had agreed

21   to could be changed in the way you changed it?

22   A.   We did not, but it was my understanding that the 1 to

23   25 is something that was suggested by the department and the

24   Court agreed.

25        Therefore when we changed it, the Court's concern was

88

1   largely clinical outcomes rather than staffing.  So they

2   didn't really have a concern.

3          THE COURT:  You know, there is no relationship.

4   We've reached the noon hour.

5          Before we go, I'm curious because I think I don't

6   understand.  You have indicated that you can't close a

7   hospital without -- close beds without court approval.

8          Am I correct?

9          THE WITNESS:  That's my understanding.

10          THE COURT:  But you're not going to take any more

11   patients in T-5 or after migrating patients to Stockton, and

12   you're going to return those beds, as I understand what you

13   are saying, to CDCR.

14          Is that correct?

15          THE WITNESS:  In the near term, it is correct that we

16   will not be admitting to those beds.  The CDCR bed plan, I

17   believe, has been presented to the court.  And I think there

18   is a notice requirement prior to taking away any beds, and

19   that notice to the Court requires that we have determined

20   that we don't need those beds for patients.

21          THE COURT:  I am the soul of patience, as this

22   hearing clearly demonstrates, so I'm going to ask you again.

23          You are not going to fill beds after you migrate

24   people, at least that's your preplan; is that right?

25          THE WITNESS:  That's correct.

89

```
 1            THE COURT:  But you don't think that that requires

 2     Court approval; is that correct?

 3            THE WITNESS:  That's correct.

 4            THE COURT:  Thank you, ma'am.

 5            MS. VOROUS:  Your Honor, may I address that?

 6            THE COURT:  Ma'am?

 7            MS. VOROUS:  May I address that briefly?

 8            THE COURT:  Yes.

 9            Why don't you come to the microphone.

10            MS. VOROUS:  Your Honor, in the context of presenting

11     the bed plan last June in the proposed order that was

12     provided to the Court after discussions with plaintiffs'

13     counsel, was that the state not be allowed to decommission

14     any temporary beds until the state determined that there was

15     adequate capacity within the system, and then a notice be

16     provided to the Special Master and plaintiffs within 30 days.

17            That's the current status of the Court's order.  I

18     think that the witness, not being a lawyer obviously, may not

19     be aware of what the content of that order is.

20            THE COURT:  It's your assertion that her

21     understanding is in error?

22            MS. VOROUS:  Yes, it is.

23            THE COURT:  I don't know.  We'll have to find that

24     out as well, all of which demonstrates why we will have to

25     take certain steps at the end of this hearing, if it ever
```

90

1    does end.

2            Thank you, folks.  We'll see you at 1:30.

3            (Off the record at 12:00 p.m.)

4            (On the record at 1:30 p.m.)

5            THE CLERK:  Please, remain seated.

6            Court is in session.

7            THE COURT:  Mr. Bien.

8            MR. BIEN:  Can you tell me what the next exhibit

9    number in order is?

10           THE CLERK:  18.

11           MR. BIEN:  18.  Thank you.

12           (Exhibit handed to witness.)

13   BY MR. BIEN:

14   Q.     Ms. Radtkey-Gaither, Plaintiffs' Exhibit 18 is the

15   activation schedule provided by defendants each month to the

16   Coleman Special Master and plaintiffs' counsel.

17           The top is an email to my office from Miss Vorous.

18   Then attached to it are a series of exhibits.

19           Have you seen -- if you turn to page 2, have you ever

20   seen the activation schedule?

21   A.     Have I personally seen it?  No.

22   Q.     You have never seen any of these activation

23   schedules?

24   A.     No.

25   Q.     When you testified on direct about the activation

91

schedule, how did you know there even was an activation

schedule?

A.    I had been informed that we do provide an activation

schedule, but I have never seen it.  I believe this is

something that's done by CDCR.

Is that correct?

I don't know, but I'm assuming it is.

Q.    As part of your responsibilities, you personally

don't have any participation in providing an activation

schedule in the Coleman case?

A.    Me personally, no.

Q.    Does anyone to your knowledge in Department of State

Hospitals have any responsibility for providing this document

to the Coleman Special Master?

A.    I would think that Sterling Price, who is the

executive director at the Stockton facility, would be

participating, along with CDCR in the planning for this

activation schedule.  But everything else on this list

appears to be a CDCR project.  And so Sterling -- the

executive director at Stockton would be the only staff

person, I think, who would be involved, Sterling and his

staff I should say.

Q.    Who's Ana J. Matosantos?

A.    She's the director of the Department of Finance.

Different department than ours.

92

1    Q.      Okay.  Can you turn to page 23, Exhibit 7 of this

2    document, which refers to the Consolidated Care Center

3    California Health Care Facility, the Stockton program?

4            THE COURT:  I'm sorry?

5            THE WITNESS:  Interestingly, this document doesn't

6    have a page 23.

7    BY MR. BIEN:

8    Q.      It's on the bottom right.

9    A.      It goes from 22 to 24.

10   Q.      Okay.  Mine was printed --

11   A.      I looked on the back.  It doesn't appear to be on the

12   back either.

13   Q.      Let me see if I can find one more clean copy.

14           THE COURT:  What page did you want her on, sir?

15           MR. BIEN:  The Stockton facility begins on page 23,

16   which says Exhibit 7 on my copy, then there's page 24, 25 and

17   26.

18           THE COURT:  All right.

19           THE WITNESS:  So page 24.

20   BY MR. BIEN:

21   Q.      There is a 24 in yours?

22   A.      There is a 24.

23   Q.      Is there a 25 on the back?  It is two-sided?

24   A.      Yes.

25   Q.      Okay.  So you have it.  You do have the right thing.

93

1          So if you look on the bottom of page 25, do you see
2     "Activation"?
3     A.       I see the row, yes.
4     Q.       On the far right is -- the first couple of columns
5     are the original plan, then the far right is the current
6     status as of the most recent document.
7          Then if you go to the next page, the final 26, do you
8     have that there?
9     A.       Yes.
10    Q.       Okay.  Is there stuff printed on your copy?
11    A.       There is.
12    Q.       Okay.  And that talks about patient admissions.  And
13    you go to the far-right column?
14    A.       Yes.
15    Q.       It says the revised patient admission start date will
16    change from March 13, '13 to July 22nd, '13.
17         That's consistent with what you have told us here
18    today, right?
19    A.       The July 22nd date is consistent.  I was never aware
20    that we were going to admit patients in March.  That has
21    never been part of my understanding.
22    Q.       Okay.  It says that the targeted date for completion
23    of mental health patients admissions is December 31, '13.
24         That's consistent with your understanding?
25    A.       That's correct.

94

1    Q.    The last sentence is called "DSH Note."

2          (Reading:)

3          DSH will make every effort to comply with proposed

4          timelines, but success is dependent on recruitment

5          and staffing.

6          (Reading concluded.)

7    A.    That seems --

8    Q.    Is that -- do you agree with that statement?

9    A.    Seems reasonable, yes.

10   Q.    Going back to "Key Sub-Tasks" --

11   A.    Which is where?

12   Q.    One column to the left on page 26, third sentence:

13         (Reading:)

14         DHS expects to admit five inmate-patients for each

15         week for each licensed unit that is completely

16         staffed due to clinical and safety reasons.

17         (Reading concluded.)

18         Is that consistent with your understanding of the

19   plan?

20   A.    Yes.  One per day per unit.

21   Q.    And how many units are there at Stockton?

22   A.    I don't know how many units there are.  I think in my

23   declaration I had how beds there would be, but I don't know

24   how to translate that to units in my head.

25   Q.    Is there something more detailed or a written plan

95

1    about activation that's more than just what's written here in

2    this document?

3    A.    We have an internal planning document, of course.

4    Q.    Okay.  I don't know of course or not.

5          Do you have an objection to providing that document

6    to the Special Master and plaintiffs' counsel to review?

7          MR. MCKINNEY:  Objection, Your Honor.

8          One, it is beyond the scope of direct.  It's not an

9    appropriate question.

10         THE COURT:  The objection that it is beyond the scope

11   will be denied.

12         But the reality, sir, is what difference does it make

13   if she objects?  If it is properly discoverable, you can get

14   it.

15         You might want to talk to the Attorney General about

16   getting it in an informal way.  If necessary, you can go get

17   an order.

18         MR. BIEN:  The issue is whether or not there is --

19   whether the operations people perceived some problem with

20   providing information in the Coleman case concerning their

21   operations.

22         There is an implication that somehow under the PLRA

23   or other standards that operation staff are somehow being

24   burdened or inconvenienced by cooperating.

25         THE COURT:  I suppose there are two things to say to

96

1    that.  One, I don't know if that's really the position of the

2    operations people, but even if it is, so what?

3         I mean, the Court will order whatever it is that is

4    appropriate in the case.  And whether there's even -- if

5    there's an objection -- I mean, if you want to tell me that

6    there is general resistance to the Special Master, or even

7    the Court, that's obvious.  We wouldn't be here if there

8    weren't because, I mean, essentially you've only asked that

9    the Special Master start closer supervision of the prison.

10        I don't know what you are doing, in other words, is

11   what I am saying.

12        Not the prison.  The prison hospital.

13        Go ahead.

14   BY MR. BIEN:

15   Q.    As you sit here today, are any units at Stockton that

16   DSH is responsible for licensed?

17   A.    I don't know.  I know that the plan is for all of the

18   units to be licensed, but I don't have at my fingertips the

19   exact licensing schedule they will be licensed prior to July

20   22nd.

21   Q.    So as you sit here today, you don't know whether or

22   not they're licensed?

23   A.    I do not.

24   Q.    How do you know that they're going to pass licensing

25   standards?

97

1          MR. MCKINNEY:  Objection.  Calls for speculation.

2          MR. BIEN:  I agree.

3          THE COURT:  Oh, I thought you agreed.

4          MR. BIEN:  Well --

5    BY MR. BIEN:

6    Q.     On what basis are you confident that these units meet

7    licensing standards?

8    A.     Because we intend for them to meet licensing

9    standards so therefore they will.  And if they don't upon the

10   initial licensing review, they will upon the second.

11         It's not a mystery.  Licensing is a process that

12   everyone goes through for hospital units.  We do it at all of

13   our hospitals.  Licensing comes in, I think, pretty regularly

14   to all of our facilities.

15   Q.     And how many new units have you activated personally?

16   A.     Me personally, none.

17   Q.     How many units have been activated since you've been

18   in charge of operations?

19   A.     I would have to get that information from someone.

20   Q.     How many staff are currently employed in Stockton?

21   A.     I don't have that number with me.

22   Q.     Have you -- are your staffing -- who is in charge of

23   staffing in Stockton?

24   A.     In what sense?

25   Q.     Who's in charge of hiring the people necessary to

98

1    open the psychiatric hospital units at Stockton?

2    A.      The executive team at Stockton has been conducting

3    interviews since last -- late last year I believe.  So they

4    are in the process of hiring, along with assistance from the

5    human resources department, et cetera.

6    Q.      Who's in charge?

7    A.      Who's in charge?  Of everything?

8    Q.      Who's in charge of the hiring process at Stockton?

9    A.      The executive team at Stockton.

10   Q.      Are there human beings there?

11           What are their names?

12   A.      Sterling Price is the executive director.  Sharon

13   Zamora is the hospital administrator.  Dr. Argullo is the

14   medical director.  The name of the clinical administrator

15   escapes me, but I know there is one.  And there's also a

16   nursing administrator, I believe, whose name also escapes me.

17   Q.      Have you received any reports from the executive team

18   at Stockton concerning their ability to hire staff necessary

19   to open and license the units for July 23rd?

20   A.      Yes.

21   Q.      Okay.  What have you -- what's been reported to you?

22   A.      What has been reported to me is that hiring is going

23   well, things are on track, they're on schedule, and that

24   there will be no anticipated delays.

25           MR. BIEN:  May I approach, Your Honor?

99

1           (Exhibit handed to witness.)

2    BY MR. BIEN:

3    Q.      Ms. Gaither, Plaintiffs' Exhibit 19 is an email that

4    you sent on or about April 23rd, 2012; is that correct?

5    A.      Yes.

6    Q.      Okay.  This was attached to your May 9th declaration

7    in this case?

8    A.      Yes.

9    Q.      And beginning in May -- beginning in April of 2012

10   you started providing information to Department of State

11   Hospital employees about the anticipated migration of

12   patients and staff from SVPP and VPP to Stockton; is that

13   correct?

14   A.      Yes.

15   Q.      Okay.  And if you look at one, two, three -- the

16   fourth bullet point down on the first page of Exhibit 19, the

17   second sentence:

18           (Reading:)

19           This migration involves 450 patients and 552

20           level of care and non-level of care positions

21           (346 positions at VPP and 206 positions at SVPP).

22           (Reading concluded.)

23           That's what you wrote in April of 2012; is that

24   correct?

25   A.      That's correct.

100

1   Q.      Okay.  And you also, beginning in April of 2012,

2   began an effort to have town meetings at your hospitals to

3   describe this plan in more detail; isn't that correct?

4   A.      Yes.

5   Q.      And you've testified in one of your declarations that

6   one effect of these town meetings and this information that

7   you provided was, understandably, a degree of uncertainty

8   about staff, about their future prospects at the Salinas

9   Valley Psychiatric Program particularly?

10  A.      I don't believe I said the result of the meetings was

11  uncertainty.  I think it was the result of the potential

12  position reduction that created the uncertainty.

13  Q.      Right.  You told them, which was the plan at the

14  time, right, you informed them that more than half of the

15  positions at their facility would be eliminated?

16  A.      Potentially.  We weren't certain yet.

17  Q.      Weren't certain about what?

18  A.      How many positions.  This was the estimate at that

19  time, and our commitment to our employees since coming in has

20  been transparency and to communicate to them as early and

21  often as possible.

22          My experience as an executive would tell me that if

23  we had not told them anything at all, the morale would have

24  been even worse.

25  Q.      Isn't it correct that you also told them that the

101

1  final details as to how many positions would be eliminated

2  and which positions would be eliminated wouldn't be known

3  until the May revise was approved in 2013, more than a year

4  after this initial email?

5  A.    That's correct.

6  Q.    Would you agree that the uncertainty created by this

7  information has made it more difficult to recruit and retain

8  staff for the Salinas Valley Psychiatric Program?

9  A.    The bed plan was a known and public document.  It was

10  discussed widely in the press.  It would have been

11  irresponsible of me not to communicate with my staff.

12        We communicated with them.  We provided assistance to

13  them from their unions, from human resources.  We told them

14  that we would keep them informed every step of the way, which

15  we did, and we released final staffing figures in May of this

16  year which are significantly lower reductions than these

17  numbers.

18  Q.    Another factor that you mentioned in your direct as a

19  difficulty in hiring psychiatrists was a change in state

20  pension law; is that correct?

21  A.    I have been told that by some psychiatrists, yes.

22  Q.    You're aware that California changed its public

23  employee retirement plan for persons hired after January 1,

24  2013?

25  A.    I am.

102

1    Q.      Would you look on the last bullet point on Exhibit

2    19.  It says that you plan to set up a website for employees

3    to look at about your plans.

4            Do you see that on Exhibit 19?

5    A.      Yes.

6    Q.      And in fact, DSH did set up a website about its

7    plans; is that correct?

8    A.      Yes.

9            (Exhibit handed to witness.)

10   Q.      This is Plaintiffs' Exhibit 20 which was downloaded

11   the last couple of days from the Department of State Hospital

12   website.

13           Do you recognize the first page as coming from your

14   website?

15   A.      Yes.

16   Q.      And then if you look in the middle of the page, you

17   see details of migration of beds from Salinas Valley, then

18   details from Vacaville Psychiatric Program.

19           These are an active link which didn't always work,

20   but we were able to locate the next two documents which

21   appear to be those two documents about the details of the

22   migration plan.

23           That's attached, the two separate documents that

24   we've included.  The first is from Salinas Valley and the

25   second from Vacaville.

1    Have you seen these documents before?

2    A.    Yes.

3    Q.    Okay.  If you turn to the first page of Exhibit 20?

4    A.    The first page.

5    Q.    Yes.  Just the webpage.  The cover page.

6          I'm going to skip that question.  I'm sorry.

7          Let's go to the Salinas Valley page, which is the

8    document, I guess the third page in, "Details of Migration to

9    Salinas Valley"?

10   A.    Okay.

11   Q.    The second bullet talks about closure of not only the

12   C-5, C-6, but also D-5 and D-6 and the ten beds in TC-2.

13         Is that the current plan?

14   A.    I think this must have come from the CDCR bed plan a

15   year ago.  I don't actually know if it's the current plan.

16   The ten beds in TC-2, I'm uncertain about that part.

17   Q.    What about the Delta unit, D-5, D-6?

18   A.    I think those have always been designated as

19   temporary beds.  And they are in the bed plan as temporary,

20   so right.

21   Q.    It is your understanding those would be treated the

22   same way you talked about C-5 and C-6?

23   A.    C and D are both temporary, right?  Right.

24   Q.    So as you -- as you empty those beds, if the

25   migration goes as planned to Stockton, as you empty the beds,

104

1   you again will not accept new patients into D-5, D-6?

2          MR. MCKINNEY:  Objection.  Misstates prior

3   testimony.

4          THE COURT:  Overruled.

5          THE WITNESS:  I think I said earlier that in the near

6   term we would not be accepting patients into C and D, that we

7   would wait until Stockton was fully migrated.

8          My understanding of the number of beds at Stockton is

9   that there will be a surplus of 50 intermediate care beds

10  even once all of these patients have transferred, as well as

11  all of the temporary beds from Vacaville have transferred.

12         So there may not be a need to continue admissions

13  into C and D.  That is something that we will not know as a

14  certainty until December when the migration is complete.  I

15  think I said that earlier as well.

16  Q.     So my question was, you're going to treat D-5 and D-6

17  the same as C-5 and C-6?

18  A.     I would assume we would treat them all equally, yes.

19  Q.     Okay.  If you go to the next page, it's now June

20  24th.  Do you know if Stockton has 83 positions filled?

21  A.     I don't know.  I think I said that earlier also.

22  Q.     Okay.  Turning to the next page, the migration plan

23  for the Vacaville psychiatric facility, the second bullet

24  refers to the closure of L-Wing and P-Wing units at VPP.

25         P-Wing includes temporary APP beds and ICF beds; is

1    that correct?

2    A.        I believe so.

3    Q.        If you go to the next sentence it might refresh your

4    recollection.

5              (Reading:)

6              This proposal will affect 68 Acute Program patients

7              on P-1 and P-2, 30 High Custody ICF patients on P-3

8              and up to 110 L-Wing patients.

9              (Reading concluded.)

10             So the current plan is to migrate the APP and 30 of

11   the ICF beds on P-3 to Stockton plus the L-Wing?

12   A.        That is the intention of the CDCR bed plan.  I think

13   you asked me earlier, and I said that what we would be doing

14   in July was admitting acute patients directly off the

15   referral list to Stockton, and that we would still continue

16   to admit patients to Vacaville in the near term until things

17   are sorted out near the end of the year.

18             And near the end of the year, when we know how many

19   acute patients we have, and how many ICF patients we have, we

20   will do a reassessment of the bed plan at that time.

21   Q.        How are you going to treat the ICF -- temporary ICF

22   programs at CMF?

23             Are you going to be treating them like C-5 and C-6 at

24   Salinas Valley?

25   A.        Stockton will be admitting from the ICF referral

106

1  list, as well as migrating from Salinas first, and then

2  Vacaville.

3  Q.    So when you start migrating patients from Vacaville,

4  who are ICF, so from the P-Wing and the L-Wing ICF programs,

5  will you continue to accept new patients into those beds?

6  A.    That won't be until this fall, but at that time we'll

7  assess whether we should or not based on the current referral

8  list.

9        At this time, based on the referral list and the

10 number of beds that are available in Stockton, there doesn't

11 appear to be a need to continue to admit to Vacaville.

12 Q.    Right now we don't have any beds in Vacaville -- I'm

13 sorry -- in Stockton available, right?

14       That's all in the future?

15 A.    But you asked me once we started migrating what would

16 be our plan.  And that was what I was attempting to answer,

17 is once we begin migrating, Stockton will have been accepting

18 patients off the referral list, as well as migrating patients

19 from Salinas.

20       When they begin migrating from Vacaville, we will

21 assess the referral list at that time to determine whether we

22 should continue to admit to Vacaville.

23       It is likely -- if the current trend continues, it is

24 likely that instead we will continue admitting directly to

25 Stockton from the referral list while we migrate intermediate

107

1    patients from Vacaville.

2            The current plan includes a surplus of 50 beds.  By

3    the time we've moved everyone, and based on our current

4    referral list, that appears to be more than sufficient.

5    Q.      That assumes you're able to hire all the staff that

6    you need for Stockton on the schedule that you have; is that

7    correct?

8    A.      That's correct.

9    Q.      Do you know how many years it took to open the full

10   Coalinga facility?

11   A.      I do not.

12   Q.      How about how many years it took to open the Salinas

13   Valley Program, the first one?

14   A.      I do not.

15   Q.      Are the Stockton beds high-security ICF beds?

16   A.      I believe so, yes.

17   Q.      And is it your understanding they're going to have

18   the same policies and procedures in place as the other

19   high-security programs?

20   A.      Given that it is a CDCR-run facility, I would assume

21   so, yes.

22   Q.      Actually the programs are run by DSH; isn't that

23   correct?

24   A.      The programs inside the building are run by DSH.  But

25   custody and security are run by CDCR.

108

1    Q.      So as you sit here today, your understanding is that

2    whatever policy exists at Salinas Valley high-custody ICF for

3    orientation status would apply also at Stockton?

4    A.      I would assume so, yes.

5            MR. BIEN:  Thank you, Your Honor.

6            No more questions.

7            MR. BIEN:  We would move those exhibits into

8    evidence.

9            THE COURT:  All exhibits that have not been received

10    heretofore are received into evidence.

11              (Whereupon, Plaintiffs' Exhibits 18, 19 and 20

12                 received into evidence.)

13            Redirect, sir.

14            MR. MCKINNEY:  Briefly, Your Honor.

15                    REDIRECT EXAMINATION

16    BY MR. MCKINNEY:

17    Q.      Miss Gaither, you testified about the plan regarding

18    the temporary programs at Salinas Valley.  What about the

19    remaining beds at -- the permanent beds at Salinas Valley?

20    What is the plan for those beds?

21    A.      They will continue to be staffed and operated.

22    Q.      What about at the Vacaville Psychiatric Program?

23    A.      The same.  They will continue to be staffed and

24    operated.

25    Q.      At this point you don't know one way or the other

109

1    whether or not you'll need to maintain the temporary beds at

2    Salinas Valley; is that correct?

3    A.      That's correct.

4    Q.      Or whether it will be necessary to lay off staff?

5    A.      That's correct.

6    Q.      And is the same thing true with respect to the

7    Vacaville program?

8    A.      Yes.

9    Q.      Plaintiffs' counsel asked you a number of questions

10   about whether you personally reviewed population projections,

11   bed plans.

12           Did you mean to imply in that testimony that no one

13   on your staff reviewed those documents?

14   A.      No, I did not.  The question was where I received the

15   reports.

16   Q.      By the way, how many staff are there in Department of

17   State Hospitals?

18   A.      Approximately 11,000.

19   Q.      If an issue arose with respect to -- if an issue

20   arose with respect to a document, how would that be raised to

21   your attention?

22   A.      It would be raised to me as something that needed

23   attention.  So generally what I hear about are things that

24   aren't right or have a problem or need correcting.

25   Q.      Did you hear those types of concerns about the bed

110

1    projections or the bed plan?

2    A.       Not with respect to intermediate care beds.  I think

3    there is still an outstanding question relative to acute.

4    Q.       Can you clarify what that question is?

5    A.       I think we -- we know that irrespective of the

6    population projections, we deal in realtime.  So we deal with

7    a referral list, as well as the beds that are open at this

8    moment.  And we look ahead to July, August, September,

9    et cetera.  And given our current referral list for acute

10   patients and the current number of beds that will be

11   available after the migration, which will result in a net

12   increase of 14 beds, I believe once all of the -- if the bed

13   plan went forward as currently written, there would be 14

14   additional acute beds.

15            We know that we have a referral list that exceeds

16   that currently.  So that is the concern.  Whether it's raised

17   with respect to the projections or whether it is raised with

18   respect to physical capacity, that's something that we are

19   watching for the moment.  And that's why I have said, a

20   couple of times, that we would reassess in late 2013 what

21   would happen with any temporary beds because we don't know

22   what the number of patients or what the demand will be at

23   that time.

24   Q.       One option would be to maintain some of those

25   temporary beds; is that correct?

111

1    A.        That's correct.

2    Q.        There was some questions about the 30-day time frame

3    for referrals to intermediate care.

4              Is it correct that it takes some time to process any

5    inmate that's been transferred to the Department of State

6    Hospitals?

7    A.        An inmate that's been referred?  It does.  I think --

8    I think there are a number of logistical things that have to

9    happen.  A, there has to be a complete packet.  There has to

10   be complete court documents.  There has to be -- like whether

11   they're out to court or some other interference with their

12   ability to move, there has to be transportation arranged.

13   And most importantly, there has to be an empty bed.

14   Q.        If there is an empty bed, and a patient has been

15   accepted for transfer, do you wait the full 30 days?

16   A.        Not necessarily.  I think our goal is to bring them

17   as quickly as possible.

18   Q.        Currently how many patients are there waiting more

19   than 30 days for intermediate care?

20   A.        For intermediate, zero.

21   Q.        If you could turn briefly to Exhibit 5 -- Plaintiffs'

22   Exhibit 5.

23             If you could, just turn to the second page.

24             You see that the letter is dated December 10th, 2012;

25   is that correct?

1    A.        Correct.

2    Q.        You earlier testified you have not personally seen

3    this letter?

4    A.        Correct.

5    Q.        Again, you didn't mean to imply no one on your staff

6    saw the letter; is that right?

7    A.        That's correct.

8    Q.        You don't know one way or the other?

9    A.        I don't know one way or the other.

10   Q.        And if you look at the first paragraph of the letter,

11   the cover letter, it states that this is an item to be

12   discussed as part of the agenda for the meeting scheduled

13   December 14, 2012.

14             Do you see that?

15   A.        I see that.

16   Q.        Do you know one way or another whether or not that

17   issue was presented by the plaintiffs at that meeting?

18   A.        I do not.

19   Q.        If I could turn your attention to Exhibit 18 --

20   Plaintiffs' Exhibit 18, the activation schedule.

21   A.        Okay.

22   Q.        And if you could, turn to page 25 of the document.

23             Do you see the row that states "Licensing Application

24   & Approval" on that page?

25   A.        Yes.

113

1    Q.      If I could direct your attention to the final

2    sentence under "Status" of that row where it says:

3            (Reading:)

4            Licensing of mental health buildings will be

5            coordinated to commence mental health patient

6            admissions by July 22nd, 2013.

7            (Reading concluded.)

8            Is that consistent with your understanding of how the

9    licensing will occur?

10   A.      Yes.

11   Q.      Ms. Gaither, do you understand in the past the

12   Department of State Hospitals was required to submit staffing

13   reports to this Court?

14   A.      Yes.

15   Q.      Do you have an understanding of the reasons for why

16   those reports were to be submitted?

17           MR. BIEN:  No foundation, Your Honor.

18           THE COURT:  Well, it's very difficult to know.  This

19   is the operations chief.  She should have some understanding

20   of why things are done.

21           I will permit the question to remain.

22           You may answer, ma'am.

23           THE WITNESS:  My understanding is that they commenced

24   during a time when there were pay differences and a high

25   number of vacancies at the Department of Mental Health at the

114

1    time.  And so there was a concern by the Special Master that

2    we were not able to staff sufficiently because of the pay

3    differences.  And so the reports were ordered on a monthly

4    basis largely to track vacancies.

5    BY MR. MCKINNEY:

6    Q.    And do those pay period issues exist or have they

7    been resolved?

8    A.    They have been resolved.

9         MR. MCKINNEY:  One moment, Your Honor.

10        (Cocounsel confer.)

11        MR. MCKINNEY:  Thank you, Ms. Gaither.

12        No further questions.

13        THE COURT:  Recross?

14        MR. BIEN:  No further questions, Your Honor.

15        THE COURT:  May the witness be released?

16        MR. MCKINNEY:  Yes, Your Honor.

17        THE COURT:  Mr. Bien, may the witness be released?

18        MR. BIEN:  Oh, yes.  I'm sorry.

19        THE COURT:  You may step down, ma'am.  You are free

20   to go or stay, as you choose.

21        MS. VOROUS:  Defendants call Mr. George Maynard to

22   the stand please.

23        THE CLERK:  Remain standing and raise your right

24   hand.

25   ///

115

1                        GEORGE MAYNARD,

2    was thereupon called as a witness herein by the Defendants,

3    and having been sworn to tell the truth, the whole truth and

4    nothing but the truth, was thereupon examined and testified

5    as follows:

6              THE CLERK:  Please, take a seat.  State your name and

7    spell your last name and speak directly into the microphone.

8              THE WITNESS:  George Maynard, M-a-y-n-a-r-d.

9                        DIRECT EXAMINATION

10   BY MS. VOROUS:

11   Q.       Good afternoon, Mr. Maynard.

12   A.       Good afternoon.

13   Q.       Mr. Maynard, who is your current employer?

14   A.       The Department of State Hospitals.

15   Q.       What is your current title in your role working for

16   the Department of State Hospitals?

17   A.       I'm currently the Interim Assistant Executive

18   Director at Salinas Valley Psychiatric Program.

19   Q.       When did you move into that position?

20   A.       Approximately, six weeks ago.

21   Q.       Prior to that position, what was your title?

22   A.       The Assistant Deputy Director for Hospital Strategic

23   Planning and Implementation.

24   Q.       Again, with the Department of State Hospitals?

25   A.       Yes.  Department of State Hospitals.

116

1    Q.      Would you describe your duties as the assistant

2    deputy director for Department of State Hospitals?

3    A.      As assistant deputy director in the strategic

4    planning role, our department looks at enterprise-wide

5    solutions and problem solving.

6            The strategic planning specifically is a process that

7    we've been developing to bring the employee participation

8    into the new department that was created in July of 2012.

9            Our group works with the consulting company -- or

10   actually the Sacramento State consulting group to develop a

11   strategic plan which consists of employee surveys,

12   stakeholder surveys, meetings with employees, executive team

13   supervisors, rank and file, to develop key business plans for

14   each facility, while keeping an enterprise-sustainable

15   approach in mind.

16   Q.      Did your duties involve visits to the inpatient

17   programs within the CDCR prisons?

18           THE COURT:  I'm having some problem hearing you,

19   ma'am.

20   BY MS. VOROUS:

21   Q.      Did your duties involve visits to the inpatient

22   programs within the CDCR prisons?

23   A.      Yes.

24   Q.      Describe what those visits entailed.

25   A.      On multiple occasions we visited each of the state

117

1  hospital facilities and the psychiatric programs to visit

2  with staff that were interested in being part of the

3  strategic planning process in identifying and developing

4  plans for those issues that were of most importance to the

5  employees and the executive teams of each facility.

6        It included tours of the inpatient areas of the

7  facility, the administration areas, meeting staff, in some

8  cases meeting patients or inmate prisoners at the various

9  locations and gaining an overall understanding of the

10  operation so we could assist in the development of strategic

11  planning for the department.

12  Q.    You mentioned that in some cases your work would

13  involve meeting with the patients; is that correct?

14  A.    Yes.  On multiple occasions when I toured the

15  facility, on some occasions we were taken into the housing

16  units and observed groups.

17        In a couple of instances we were allowed to visit and

18  speak to mentor patients who were conducting groups within

19  the facility.  And we had an opportunity to interview and ask

20  questions of the inmate-patients regarding their living

21  environments there in the facility.

22  Q.    If you can, what would be the time period that you

23  were -- Let me back up and ask that question.

24        With respect to the visits that involved interactions

25  with patients, do you recall when those occurred?

118

1          THE COURT:  You mean at Salinas Valley or generally?

2     BY MS. VOROUS:

3     Q.       At Salinas Valley?

4     A.       Approximately the months of October and November, in

5     that area, of 2012.

6     Q.       At any point during your discussions and meetings

7     with the patients, did the patients raise any concerns or

8     complaints with you?

9     A.       The only negative comment was, as we heard at most

10    facilities, is the food isn't the best.

11          I did hear many positive comments though on aspects

12    of the program.

13    Q.       Prior to your position as an assistant deputy

14    director of the Department of State Hospitals, were you

15    working in another Department of State Hospital role?

16    A.       Yes.  I was a hospital administrator at Coalinga

17    State Hospital for approximately four years.

18    Q.       And prior to your work at Coalinga State Hospital,

19    were you employed?

20    A.       Yes, I was.  I was employed with the local community

21    of Coalinga for 21 years.

22    Q.       What was your position with the community of

23    Coalinga?

24    A.       I worked in the administrative division.  I was an

25    information systems administrator in the finance department.

119

1   Q.      What was your motivation in going to the Salinas

2   Valley Psychiatric Program as the interim assistant executive

3   director?

4   A.      In our current role in strategic planning, we've been

5   asked on multiple occasions to look at areas of the

6   enterprise that might need some attention, a little extra

7   effort or resources.

8           When the executive team needed assistance in Salinas

9   Valley, we were asked to come and assist in mentoring and

10  providing resources and leadership to the team.  And as part

11  of our enterprise, we look forward to doing that.

12  Q.      Mr. Maynard, would you please describe your duties as

13  the interim assistant director at the Salinas Valley

14  Psychiatric Program?

15  A.      At Salinas Valley I typically -- I work directly for

16  the executive director, and I work as a liaison to all of the

17  executive team members, both permanently appointed and the

18  other interim members, to provide knowledge, resources,

19  connection to our Sacramento headquarters divisions, for

20  fiscal resources.

21          I work very closely with the other hospitals so I

22  have a good working knowledge of the administrators, the

23  resources available outside of just the Salinas Valley

24  facility, but other facilities within the state system, and

25  to work on reviewing and making sure that there are

120

1  sustainable processes in place, that there are formal

2  policies for the things that are done at the facility.

3  Basically act as resource to the executive director and the

4  team.

5  Q.      Do you have any role in staffing at Salinas Valley

6  Psychiatric Program?

7  A.      Preliminarily in a consultive role in working in

8  coordinating contracts and staffing ideas with the HR

9  Department on recruitment issues and where to recruit.

10  Making sure our online systems are up-to-date, that we have

11  accurate information for employees, working with the

12  Sacramento web team to make sure the employee internets are

13  up and available so they can see vacancies and employee

14  positions within both Salinas Valley and other state

15  hospitals.

16  Q.      In your role as the assistant executive director, are

17  you aware -- are you aware of the fact that the program

18  offers group treatment to patients that are housed in the

19  psychiatric program?

20  A.      Yes, I am aware.

21  Q.      Do you have an understanding of -- strike that

22  question.

23          Do you know whether the program currently tracks

24  treatment hours that are provided to -- group treatment hours

25  that are provided to patients in the program?

121

1    A.        Yes, they do track treatment hours in a manual way.

2    Q.        Can you explain what that means?

3    A.        There are no currently in place automated systems at

4    Salinas for tracking group and treatment hours, that track

5    patient-inmate participation, the number of hours.

6              It's tracked on paper, both with the rehab therapist

7    and the other therapists, written documentation, as well as

8    the patient's chart.

9              There is not currently a system in place for

10   automating the reporting and tracking of that.

11   Q.        Is there a -- is there currently a plan in place to

12   implement an electronic reporting process to track group

13   treatment hours?

14   A.        Yes, there is.

15   Q.        Can you explain what that plan is?

16   A.        Yes.  Several years ago there were systems developed

17   in use at the state hospitals for tracking many elements of

18   treatment and hospital operations.  And with the

19   implementation of the Stockton facility, there currently is a

20   program that's been developed and put in place to track

21   similar program hours, incident reporting, treatment planning

22   for the Salinas, Vacaville and Stockton psychiatric programs.

23             And it's expected that will be in place in the

24   Stockton facility when it opens.  And it is also being

25   implemented at Salinas Valley and Vacaville.

122

1    Q.        When will it be implemented in Salinas Valley?

2    A.        It is actually in testing phase right now.  We've

3    been training subject matter experts at the facility.  And it

4    will be rolled out within the next 30 to 45 days.

5    Q.        Why is having this type of process available to

6    Salinas Valley important?

7    A.        Based on our experience we've found that having good

8    data makes us -- gives us the ability to make better

9    decisions, planning and forecasting where to put resources,

10   where to apply different management techniques, determine how

11   well a particular class or program or group is working, track

12   treatment progress for individuals and see how they're

13   progressing through our different treatment phases or

14   treatment that applies to their particular discharge

15   criteria.

16           We've used it to identify many aspects of program

17   management.  And it's just an excellent tool for both a

18   planning document, as well as a realtime picture of what is

19   going on in the facility.

20           MS. VOROUS:  Just a moment, Your Honor.

21           (Cocounsel confer.)

22           MS. VOROUS:  No further questions, Your Honor.

23           THE COURT:  Cross-examination, if any?

24   ///

25   ///

123

1                          CROSS-EXAMINATION

2    BY MR. FISCHER:

3    Q.       Good afternoon, Mr. Maynard.

4    A.       Good afternoon.

5    Q.       If you can't hear me, please let me know.

6    A.       Okay.  Thank you.

7    Q.       You said that in the fall of 2012 you had meetings

8    with patients at Salinas Valley; is that correct?

9    A.       Yes, I did.

10   Q.       About how many patients did you meet with?

11   A.       I believe there was approximately four in each group.

12   One group in one of the treatment centers, and the other

13   group was in one of the pods.  I'm not sure, whether C-pod or

14   D.

15   Q.       Two groups of four?

16   A.       Yes.

17   Q.       Okay.  How long did those meetings last?

18   A.       Approximately 20 minutes, 20 to 30 minutes each.

19   Q.       These were DSH inpatients at the Salinas Valley?

20   A.       Yes.

21   Q.       These are individuals in their group treatment

22   session?

23   A.       These were individuals that agreed to meet with us

24   and discuss the mentoring program and the overall psychiatric

25   program.

124

1    Q.      Were any of these patients on orientation/cuff status

2    when they met with you?

3    A.      No.  I don't believe they are privileged for

4    mentorship at that stage.

5    Q.      So --

6           THE COURT:  So it follows they weren't.

7           Please, get on with it.

8           THE COURT:  I know that you think the Court is stupid

9    and you have to say A, B and C, but I want you to know I

10   resent it.

11          You may proceed.

12          MR. FISCHER:  Okay.

13   BY MR. FISCHER:

14   Q.      Mr. Maynard, you said that among your duties was

15   working on various tasks related to staffing, correct?

16   A.      Correct.

17   Q.      And that included recruitment and identifying new

18   staff at the DSH facility?

19   A.      Not so much identifying new staff, but working with

20   the HR departments to understand how contracts can be

21   utilized and what resources are there for them.

22   Q.      You're also involved in the posting for new

23   positions, correct?

24   A.      Not on the website itself, but actually for assisting

25   in the development of the local Internet so all employees

125

1    have access.

2    Q.      Were the postings on the website the same on the

3    Internet?

4    A.      There are links to the postings, yes.

5    Q.      And are you aware of recent job postings for Salinas

6    Valley ICF psychiatrists that identify a hiring freeze for

7    those positions?

8    A.      Yes, I am.  I'm aware there were incorrect postings

9    left from the previous hiring freeze.  Yes.

10   Q.      Was that in the last month?

11   A.      Approximately a month to two months, yes.

12   Q.      And have those postings been corrected?

13   A.      Yes, they have.

14   Q.      So are those postings now for full-time permanent

15   staff?

16   A.      Yes.

17   Q.      Okay.

18           MR. FISCHER:  Are we on Exhibit 21?

19           (Exhibit handed to witness.)

20   BY MR. FISCHER:

21   Q.      Okay.  I've marked for identification Plaintiffs'

22   Exhibit 21.

23           This is two separate hiring postings for Salinas

24   Valley Psychiatric Program positions.  The first is for

25   senior psychiatrist and the second is for a psychologist.

126

1      Are these the sorts of postings that you just

2  mentioned, Mr. Maynard?

3  A.      Yes.  These postings are actually on the state's

4  personnel sites, and then there are links through DSH and

5  other agency sites to the vacancies.

6  Q.      These would also be posted on the Internet you worked

7  on?

8  A.      Not technically.  The website is hosted by the

9  Personnel Board.  And our staff provide information to that

10  for postings.  Then the Internet website I referred to is an

11  employee-only site that then gains access to external links

12  like this one.

13  Q.      On the second posting for psychologist at Salinas

14  Valley Psychiatric Program, it says it was posted 1-20-2012.

15  At the bottom the site was printed on 6-11-2013.

16      The second line from the bottom where it says "Due to

17  state hiring freeze restriction" and it goes on, is this an

18  example of the mistake as far as hiring freeze that you were

19  talking about?

20  A.      Yes, it is.

21  Q.      Are you aware if this posting has been corrected in

22  the last two weeks?

23  A.      I'm aware the postings that we found to be incorrect

24  were, in fact, corrected.  Whether or not this one particular

25  one was saved and printed today or two weeks ago, it was my

127

1   understanding that all of them had been updated.

2   Q.      Okay.  Turning to the first posting, this is for

3   Salinas Valley Psychiatric Program Senior Psychiatrist.

4           At the beginning of the job description in capital

5   letters it says:

6           (Reading:)

7           DSH Salinas Valley is attempting to fill these

8           vacancies on a full-time, limited-term, intermittent

9           basis.

10          (Reading concluded.)

11          Do you see that?

12  A.      Yes, I do.

13  Q.      Is that consistent with the plan for this position?

14  A.      No.  It would not be consistent with the corrected

15  versions.

16  Q.      So this is also an incorrect posting from June 11th,

17  2013?

18  A.      Well, it appears that it was printed on June 11th,

19  but I would have to look at the actual link to determine the

20  validity of it.

21          THE COURT:  Assume that it is, that they're not

22  lying, it was really --

23          THE WITNESS:  I'm not assuming that, Your Honor.  I'm

24  just saying --

25          THE COURT:  I'm assuming.  I say I want you to assume

128

1    that they didn't print this up themselves, but they got it

2    off the Internet 6-11.  When will it have been -- when would

3    it have been corrected?

4            THE WITNESS:  It was to have been corrected at least

5    more than probably 30 days ago and had been validated

6    corrected.

7            So the reason I asked about the printing date is that

8    typically many of these postings are available as a PDF file

9    and can be saved and printed at any given time.  So I was not

10   questioning the validity of the document, but --

11           THE COURT:  You may proceed, sir.

12           Never mind.  Go ahead.

13   BY MR. FISCHER:

14   Q.      You said that you're in charge of the process to

15   automate the tracking of group treatment hours at the DSH

16   program?

17   A.      No, I didn't say I was in charge of it.  I'm aware of

18   it.  I'm acting as a resource.

19   Q.      You're contributing to that effort?

20   A.      I am contributing, yes.

21   Q.      Currently you said it is all done handwritten,

22   manually, the tracking of group treatment hours?

23   A.      Between that and possibly any spreadsheets staff may

24   be using to track their own schedules.

25   Q.      But it's more so --

129

1          (Court Reporters requests the parties speak on at a

2          time.)

3    BY MR. FISCHER:

4    Q.      The tracking that is being done now is on a

5    staff-person-to-staff-person basis; is that correct?

6    A.      Generally, yes.  There are documentation that are

7    used, standard files, the patient files.  But some staff may

8    track theirs also on to spreadsheets.

9    Q.      To your knowledge has this been the situation as long

10   as the Salinas Valley Program has been open?

11   A.      I couldn't say.  I've only been there six weeks.

12   Q.      Are you aware if at any time there was an automated

13   system to track group treatment hours?

14   A.      Again, I do not.  I have been there six weeks.

15   Q.      As part of your duties you mention that you look at

16   resource management and program management; is that correct?

17   A.      Yes.

18   Q.      As part of that do you track the waitlist for Salinas

19   Valley Psychiatric Program patients?

20   A.      No, I do not.

21          MS. VOROUS:  Objection.  Beyond the scope of

22   direct.

23          THE WITNESS:  No, I do not have any monitoring or

24   tracking of the clinical programs.  My work is administrative

25   in nature.  I'm not a clinician.

130

1    BY MR. FISCHER:

2    Q.       But you would agree part of your duties are to make

3    sure patients who need to get into the program are entitled

4    to get admitted into the program?

5            THE COURT:  Is that right?

6            THE WITNESS:  In my role as administrative, under the

7    tasks assigned to me, that would be outside the scope.  The

8    clinical administrator manages the intake and outtake of the

9    patients.

10    BY MR. FISCHER:

11    Q.       The clinical administrator manages that?

12    A.       Correct.

13    Q.       Is that Mr. Karas?

14    A.       Yes, it is.

15    Q.       Part of your duties that you testified to are working

16    with staff and doing employee surveys and understanding their

17    needs; is that correct?

18    A.       Correct.

19    Q.       And if there are problems, your job is to follow up,

20    to address or find out, get to the bottom of those problems?

21    A.       Actually, our job is to develop a process where we

22    can track and monitor and utilize the executive teams at each

23    facility to follow up on those problems.  Then we will be

24    acting as monitors over the business plans that are

25    implemented.

131

1    Q.       So as a member of the current executive team -- the

2    interim executive team at Salinas Valley, that is your job

3    currently for Salinas Valley?

4    A.       Yes.  We will be taking on that role.

5    Q.       In the six weeks you've been there, you've become

6    aware of psychiatrists' concerns about pressure to discharge;

7    is that correct?

8              MS. VOROUS:  Objection.  Beyond the scope of

9    direct.

10             MR. FISCHER:  These are among his duties that he

11   talked about.

12             THE COURT:  Overruled.  You may answer.

13             THE WITNESS:  I don't believe I testified to that.

14             THE COURT:  Whether you testified to it or not, is it

15   true that you have become aware that at least some

16   psychiatrists have expressed concern about being pressured to

17   release inmates early?

18             THE WITNESS:  I have only become aware of that

19   through the depositions or the testimony on behalf of the

20   plaintiffs.

21   BY MR. FISCHER:

22   Q.       Well, you attended the deposition of Dr. Brim,

23   correct?

24   A.       Yes, I did.

25   Q.       He was a staff person at the time?

132

1    A.        No, I don't believe he was.

2    Q.        He was a psychiatrist in the program?

3    A.        I don't believe that he was working there at the

4    time.

5    Q.        He was at some point in recent months a psychiatrist

6    in the program?

7    A.        Is that a question?

8    Q.        Yes.  Is that correct?

9    A.        I don't know if that is correct or not.

10   Q.        You don't know if he was a psychiatrist there?

11   A.        No.  The deposition of Dr. Brim was prior to my being

12   assigned to SVPP.

13   Q.        You also attended Dr. Badeaux's --

14   A.        Yes, I did.

15   Q.        -- deposition?

16   A.        Yes.

17   Q.        And also reviewed his declaration?

18   A.        I have not seen his declaration.

19   Q.        Okay.  In his deposition he discussed concerns about

20   pressure to discharge patients at a certain rate?

21   A.        Yes.  I believe he implicated that the Coleman court

22   was pressuring for discharges, yes.

23   Q.        The Coleman court was pressuring for discharges?

24   A.        I believe that was his testimony.  And to reduce the

25   waitlist.

133

1    Q.      Have you followed up with Dr. Bandeaux at all to get

2    to the bottom of his concerns and find out where they came

3    from?

4    A.      I believe Dr. Bandeaux works for another agency at

5    this point.  It would be inappropriate for me to discuss

6    staffing or anything within DSH during litigation, I believe.

7    Q.      Do you recall that he also testified he received an

8    email about discharging three patients per week?

9    A.      I did hear him testify to that.  I did not see the

10   email.  I did not see him produce it at the deposition.

11   Q.      Did you follow up with him or any other psychiatrist

12   about what email that might be referring to?

13   A.      No, I have not.  The psychiatrists are under the

14   direction of the medical director.

15   Q.      Given the perception of psychiatrists that you were

16   aware of, did you do anything to direct them otherwise, that

17   there was no such expectations of discharges?

18   A.      I was not in any power of authority over them at any

19   given time.  The psychiatrists that are currently working

20   there that I have spoken to have not ever expressed that to

21   me.

22   Q.      Do you know if anyone on the interim executive team

23   has issued a memo or otherwise directed staff that there is

24   not expectations as to the number of discharges?

25   A.      I have never seen a memo or heard of anyone providing

134

1    a memo with any expectation.

2            MR. FISCHER:  Just a moment, Your Honor.

3            MS. VOROUS:  No redirect.

4            I'm sorry.  I thought he was done.

5            (Cocounsel confer.)

6            MR. FISCHER:  Thank you, Mr. Maynard.

7            No further questions.

8            THE COURT:  Before you say there is no redirect, sir,

9    I want you to look at Plaintiffs' Exhibit 9 and tell me

10   whether you have ever seen it.

11           THE WITNESS:  Yes, Your Honor, I believe I have.

12           THE COURT:  And you saw that, I assume, when you were

13   involved in strategic planning?

14           THE WITNESS:  I saw that when I was asked to attend

15   the deposition of Dr. Brim.

16           THE COURT:  So you never saw it in your position

17   involving strategic planning and finding out what staffs were

18   feeling and so forth?

19           THE WITNESS:  No, I did not.

20           THE COURT:  Thank you, sir.

21           MS. VOROUS:  No further questions.

22           THE COURT:  May the witness be released?

23           MR. FISCHER:  Yes, Your Honor.

24           MS. VOROUS:  Yes, Your Honor.

25           THE COURT:  You may step down.

135

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Fifteen minutes.

 3              (Off the record at 2:45 p.m.)

 4              (On the record at 3:02 p.m.)

 5              THE CLERK:  Please, remain seated.

 6              Court is now in session.

 7              THE COURT:  Call your last witness.

 8              MR. MCKINNEY:  Defendants call Dante Karas.

 9              THE CLERK:  Raise your right hand.

10                          DANTE KARAS,

11    was thereupon called as a witness herein by the Defendants,

12    and having been sworn to tell the truth, the whole truth and

13    nothing but the truth, was thereupon examined and testified

14    as follows:

15              THE CLERK:  State your name and spell your last name

16    for the record.  Speak directly into the microphone.

17              THE WITNESS:  My name is Dante Karas, K-a-r-a-s.

18                        DIRECT EXAMINATION

19    BY MR. MCKINNEY:

20    Q.      Good afternoon, Mr. Karas.

21    A.      Good afternoon.

22    Q.      Can you please state your employer?

23    A.      Department of State Hospitals.

24    Q.      How long have you been employed by the Department of

25    State Hospitals?
```

136

1    A.       Sixteen years.

2    Q.       What is your current position?

3    A.       Currently I am the interim clinical administrator at

4    the Salinas Valley Psychiatric Program.

5    Q.       Prior to that position, what position did you hold

6    for the department?

7    A.       I worked at Atascadero State Hospital as program

8    director.

9    Q.       Did you work at Atascadero prior to being appointed

10   program director?

11   A.       Yes.  I worked there as a rehab therapist, music

12   therapist.  I promoted to program assistant.  I worked as a

13   risk manager, assistant mall director, program assistant.

14            THE COURT:  Mall, m-a-l-l?

15            THE WITNESS:  Yes.

16   BY MR. MCKINNEY:

17   Q.       Can you describe what that position is?

18   A.       During when we had the consent decree in the state

19   hospitals.  We started a treatment mall, and I was the

20   assistant of mall director.

21            We came up with treatment modalities to treat all the

22   patients we had at the state hospital.

23   Q.       How many years in total did you work at Atascadero?

24   A.       Oh, 15 and a half, like 15 years, almost 16 years

25   now.

137

1   Q.      How long have you been the interim clinical

2   administrator at Salinas Valley?

3   A.      Approximately six weeks.

4   Q.      What are your duties in that position?

5   A.      I tried to organize the overall treatment program at

6   the Salinas Valley Psychiatric Center, work closely with the

7   medical director, the chief psychologist, the executive

8   director, the hospital administrator, and part of the

9   executive team at the Salinas Valley Psychiatric Program.

10          I work closely with all the various resources we

11  have.  Part of my job is also to manage the resources when it

12  comes to level of care staff and also clinical staff and to

13  monitor some of the treatment going on there and come up with

14  a treatment schedule that will help the facility.

15  Q.      You mentioned you previously worked as a

16  rehabilitation therapist and a music therapist, but are you

17  working in a clinical capacity now?

18  A.      Currently I'm an administrator.

19  Q.      What is your role as an administrator in working with

20  the clinical staff?

21  A.      So I will -- there is a lot of moving parts, I call

22  them, within the state system.  We have the

23  admission/discharge unit, the health information department.

24          I have to understand how everything works, and then I

25  work with the clinical staff to try to make everything come

138

1    together.

2         An example I would use is as a social worker.  I'm

3    not a social worker, but I would work with the chief of

4    social work, say:  Hey, we need an initial social history

5    completed by day number -- tenth day of admission.

6         This is just an example.

7         So I would give the time frame, but I will not give

8    the content that needs to be involved in that because I'm not

9    a social worker.  That would go through the medical director.

10   Q.    Are you familiar with the treatment provided to

11   patients as the Salinas Valley Psychiatric Program?

12   A.    Yes.

13   Q.    Can you describe generally the types of treatment

14   that are given?

15   A.    We do both group and one-to-one treatment.  Current

16   treatment groups, we provide a variety of modalities.  Most

17   are didactic in nature.

18        The clinicians do symptom management, medication

19   management, thinking for a change.  It is an evidenced-based

20   model by Dr. Samenow.

21        We do -- the rehab therapists provide some

22   leisure-type groups, more of a nonthreatening environment

23   where guys can come out.  Maybe they could express aggression

24   through a different modality that is appropriate.

25        There is an art therapist on staff, a dance therapist

139

1  on staff, a recreation therapist, a music therapist.

2         Some of the music therapists do song analysis or they

3  help the guys write -- they might write a song to help

4  express their feelings for that day or how they have been

5  feeling in the past.

6  Q.     In addition to the group therapy and the one-on-one

7  therapy you have described, what other activities are

8  available to --

9         THE COURT:  He just described them.

10  BY MR. MCKINNEY:

11  Q.     In addition to those, what he's described.

12         What other activities are provided at the program?

13  A.     We have a law library.  Patients on the weekend, they

14  can request to have access to the library.

15         Another important part is the MTAs, the medical

16  technical assistants.  There are also either licensed

17  vocational nurses, psychiatric technicians or registered

18  nurses.  They complete constant rounds we call them.  Every

19  15 minutes they check on the welfare of everybody in that

20  facility to make sure everybody is doing well.

21         So those give the inmate-patient an opportunity, if

22  they have a request, every 15 minutes they'll see somebody.

23  They could at that point, if they want to see their

24  psychiatrist, request the MTA staff that I would like to see

25  my psychiatrist.  They can put their name down in the med

140

1    line booklet.

2    Q.      And are you familiar with the number of treatment

3    hours provided to the patients at the Salinas Valley Program?

4    A.      Generally, yes.

5           MR. MCKINNEY:  Your Honor, may I approach?

6           (Exhibit handed to witness.)

7    BY MR. MCKINNEY:

8    Q.      Mr. Karas, showing you this document marked as

9    Defendants' Exhibit G, are you familiar with this document?

10   A.      Yes.

11   Q.      What is this document?

12   A.      This document is -- Mr. Maynard mentioned a hand

13   tally of the groups that were held during specified time

14   frames.  This was put together by the staff manually.  They

15   would go through the rosters to see which groups were held

16   and track them weekly according to this spreadsheet in front

17   of us.

18   Q.      And what time period does this document cover?

19   A.      I believe it goes through March through the end of

20   May.

21   Q.      And just focusing on -- let's take the month of

22   April, for example.

23           Can you describe what's reflected under the weekly

24   totals column on this document?

25           MS. RIFKIN:  Objection, Your Honor.  Foundation.

141

1          THE COURT:  Well, you know -- Well, I ask you rather,

2     this is a document kept in the regular course of business; is

3     that correct?

4          THE WITNESS:  Yes.

5          THE COURT:  And one of your responsibilities is to

6     review it?

7          THE WITNESS:  Yes.  Make sure it is completed, yes.

8          THE COURT:  Objection overruled.

9          You may answer.

10         THE WITNESS:  If we take, for example, where it says

11    March 31st to April 1st, the totals, all units combined would

12    be the 93 groups 110 one-to-one hours.

13         THE COURT:  I'm obviously looking at the wrong place.

14         Where are you?

15         THE WITNESS:  I'm on page 2.  April, the left-hand

16    column.

17         THE COURT:  Right.

18         THE WITNESS:  So the far right "Totals," then it says

19    "All Units," "Combined.

20         THE COURT:  Totals all units.  I see.

21         THE WITNESS:  Total group hours for that specified

22    week were 93 with 110 1-to-1s combined for 203.

23         Below it it gives an average.

24         THE COURT:  Just stop because I want you to point out

25    to me, because I'm obviously not looking at the right part.

142

1              (Indicated on document.)

2              Thank you.

3              THE WITNESS:  And below it then we average out those

4    numbers.

5    BY MR. MCKINNEY:

6    Q.       So in April what was the average number of hours of

7    group provided?

8    A.       13.29 group.

9    Q.       And that's for -- is that every day?

10   A.       Divided by the number of days and the total groups it

11   is 13 -- a little over 13 hours per groups each day.

12   Q.       What types of activities are included under the

13   1-to-1 category?

14   A.       The 1-to-1 hours, you can see they change depending

15   on the patient's needs.  Sometimes we need to provide more

16   1-to-1 hours for individuals depending on the clinical

17   picture they present.

18              Typically the psychologist or the social worker will

19   meet with them individually to -- they might discuss

20   treatment goals, different issues they have to review with

21   him.

22              Some might be on a behavior treatment plan so the

23   psychologist or social worker will discuss with him his

24   behavioral treatment plan, how he is doing or if we need to

25   change it.

143

1    Q.      Does that category include all 1-to-1 contacts or are

2    there additional contacts not included?

3    A.      Additional contacts that are not included there,

4    there's some we call impromptu 1-to-1s.  As early -- as I

5    said earlier, the MTA, medical tech assistant, is doing

6    rounds, the patient requests to meet with the clinician, the

7    MTA can seek the clinician and they can meet in front -- cell

8    front with that patient or might pull him out to meet with

9    that patient.

10   Q.      So this really reflects scheduled 1-to-1 activity?

11   A.      Exactly, yes.

12   Q.      And focusing on the third page of the document,

13   towards the end of the month of May it looks like the hours

14   are slightly lower; is that correct?

15   A.      Yes.  That's correct.

16   Q.      Why is that?

17   A.      When we set our treatment groups, we try do it

18   similar to a college where we have a 12-week term.  We refer

19   to it as a quarter.  And during those two-week periods we

20   assess the patient needs that we currently have.  We might

21   have to change groups.  We might be providing five groups

22   that only two guys are going to so we're going to maybe

23   change groups and provide more based on the individual

24   clinical needs of the patient.

25          MR. MCKINNEY:  May I approach the witness, Your

144

1   Honor?

2           (Exhibit handed to witness.)

3   BY MR. MCKINNEY:

4   Q.      Mr. Karas, showing you what's been marked as

5   Defendants' Exhibit H, do you recognize -- are you familiar

6   with this document?

7   A.      Yes, I am.

8   Q.      And are you familiar with how this document is

9   prepared?

10  A.      Yes, I am.

11  Q.      Were you involved in the preparation of this

12  document?

13  A.      Yes.  It was provided to me for the final overview.

14          MR. MCKINNEY:  Your Honor, at this time I would like

15  to move Exhibit H into evidence.

16          THE COURT:  Received.

17              (Whereupon, Defendants' Exhibit H received into

18               evidence.)

19  BY MR. MCKINNEY:

20  Q.      Mr. Karas, can you describe what's shown on this

21  exhibit?

22  A.      This is one area, C-5, the treatment schedule for the

23  months of June through August.  Due to various reasons at the

24  facility, we try to set up a very regimented schedule to

25  allow clinicians to meet with patients one-on-one, provide

145

1    solo activities where indicated and RN treatments can occur,

2    treatment team is scheduled in here.

3            It gives a picture of everything that is going on

4    during the course of the day, showers, dinner, when we feed

5    them.  And this is for patients and the staff so they can see

6    what is going on at any given time.

7    Q.      What is the time period this document covers?

8    A.      Started early June and ends August of 2013.

9    Q.      When was this schedule developed?

10   A.      During the May 20th, during that break we referred to

11   earlier.  We spent about a week developing the schedule.

12   Q.      And just focusing on C-5 for the moment, how would

13   you describe the level of activity on this unit?

14   A.      During any given hour there's approximately two

15   groups going on in some cases.  For example, at the eight

16   o'clock hour, that's where the psychiatrist has a chance, if

17   they have to renew orders, look at medication orders, that is

18   their time to do so.

19           Again, this is the schedule where if a behavior

20   incident is occurring, things will -- we will take care of

21   emergencies even though the schedule is here.

22           The treatment groups at nine and ten o'clock hours

23   are more of our -- we're doing approximately two groups every

24   hour.  But the clinicians are leading those groups, RTs and

25   social workers mainly.

146

1    Q.      Is the same true with respect to Charlie-6 yard?

2    A.      Yes.  Charlie-6, TC-1, TC-2, Delta-5 Delta-6, yes.

3            MR. MCKINNEY:  Your Honor, I have similar schedules

4    for each of the programs.  I would like to have those entered

5    into evidence.  They're similar to this.  I'm happy to walk

6    through each of those exhibits, but I would like to if I can

7    distribute those.

8            THE COURT:  You can.

9            (Exhibits handed to witness.)

10           THE COURT:  Sir, we're going to spend a lot of time.

11   You can do that after court and we'll just distribute it to

12   everybody.

13           MR. MCKINNEY:  Very well, Your Honor.

14           They are all premarked.

15           THE COURT:  All right.  That's fine.

16           But the problem is you got to get them straightened

17   out and so forth.

18           Please, get on with the questioning.

19   BY MR. MCKINNEY:

20   Q.      If you can describe the documents that have been

21   presented to you and presented to the Court while I hand the

22   plaintiffs and the Special Master a copy?

23   A.      Very similar to what we described on Charlie-5.  Each

24   area has its own treatment schedule that we put together.  We

25   meet the clinicians, the chiefs of rehab therapy, social

147

```
1   work, psychology.  We talk about treatment needs, just come

2   up with a treatment schedule similar to the one in front of

3   you for each area.

4            The team is also listed on there, when showers --

5            THE COURT:  Sir, you will stop.

6            Thank you.

7            I'm sorry.  I didn't mean to interrupt you.

8            You may ask your next question, sir.

9   BY MR. MCKINNEY:

10  Q.      These exhibits that have been marked, Mr. Karas, do

11  they accurately reflect the treatment scheduled?

12           Let's start with C-6.

13           MR. BIEN:  We stipulate to all of these being future

14  treatment hours.

15           THE COURT:  Received.

16               (Whereupon, Defendants' Exhibits I, J, K, L and M

17               received into evidence.)

18  BY MR. MCKINNEY:

19  Q.      Mr. Karas, do these documents reflect current

20  treatment hours?

21  A.      Yes.

22           MR. MCKINNEY:  Your Honor, at this time we ask they

23  be admitted.

24           THE COURT:  They've been received.

25           Tell her, if you will, the letters, Mr. McKinney.
```

148

1          MR. MCKINNEY:  I'm sorry.  I believe we're I through

2     M.

3          THE COURT:  Thank you.

4          MR. MCKINNEY:  Just a moment, Your Honor.

5          Your Honor, just one cleanup question.  I want to

6     make sure the summary of treatment hours document has been

7     admitted into evidence.  We did offer the first one.

8          THE COURT:  They're received into evidence.

9               (Whereupon, Defendants' Exhibit G received into

10               evidence.)

11          MR. MCKINNEY:  I have no further questions for this

12     witness.

13                        CROSS-EXAMINATION

14     BY MS. RIFKIN:

15     Q.     Good afternoon, Mr. Karas.

16     A.     Good afternoon.

17     Q.     You said you have been at Salinas Valley six weeks;

18     is that right?

19     A.     Correct.

20     Q.     Do you know the approximate date you started in May?

21     A.     May 1st.

22     Q.     Who did you replace?

23     A.     Miss Karen Bautista.

24     Q.     How long had she been there?

25     A.     I'm not sure.

149

1   Q.      Do you have any idea?

2   A.      In her capacity as clinical administrator?

3   Q.      As clinical administrator, yes.

4   A.      Maybe six months or less.

5   Q.      And you have an end date for your appointment?

6   A.      We're working together to try to improve the -- what

7   we're doing, and once that's over, we'll reevaluate and see

8   what the future holds.

9   Q.      Do you know why the person before you left?

10  A.      I don't know the specific details, no.

11  Q.      Did she leave voluntarily?

12  A.      I'm not sure.

13  Q.      Turning to what's been marked Defendants' Exhibit

14  G --

15  A.      Okay.

16  Q.      How long has a document like this existed for the

17  Salinas Valley Programs?

18  A.      I believe they started this in March.

19  Q.      In March?

20  A.      This year.

21  Q.      Do you know if it was kept in the regular course of

22  business or whether it was created for this litigation?

23  A.      I'm not aware.

24  Q.      This document is based upon the scheduled hours of

25  treatment provided; is that right?

150

1   A.      The hours held.

2           THE COURT:  I'm sorry.

3           THE WITNESS:  The hours held.  The hours which

4   actually were provided, yes.

5   BY MS. RIFKIN:

6   Q.      What documents is it based on?

7   A.      We have what we refer to as PST, Planned Schedule

8   Treatment sheets, attendance rosters.  When a clinician does

9   group, they have an attendance roster.  They take attendance.

10  Then we use that to tabulate the spreadsheet.

11  Q.      Who regularly does this at Salinas Valley?

12          THE COURT:  Who regularly does what?

13  BY MS. RIFKIN:

14  Q.      Who regularly tallies the number of hours and

15  prepares this document?

16  A.      I assign it to my program director.

17  Q.      When did you do that?

18  A.      Oh, probably about six weeks ago we started.  I asked

19  what's she's been doing.  She told me, and we continued it.

20  Q.      Do you have Plaintiffs' Exhibit 6 in front of you?

21  A.      I will check.

22          Yes, I do.

23  Q.      Plaintiffs' Exhibit 6 is the Declaration of

24  Miss Radtkey-Gaither in support of the department's

25  opposition to this motion filed May 9th, 2013.

151

1        If you can, turn to paragraph -- page 9, paragraph

2   19, please.

3   A.       Okay.

4   Q.       In this paragraph Miss Radtkey describes how staff

5   calculated, at her request, the program group hours.  And

6   subsequent to her declaration, plaintiffs' counsel was

7   provided with a document that looks like this document that

8   has been marked Defendants' Exhibit G.

9        Can you clarify whether this document was first

10  created at Miss Radtkey-Gaither's request or whether this was

11  a document regularly kept in the course of business?

12  A.       I cannot.  When I went to Salinas Valley, it was

13  already there and we continued to do so.

14  Q.       Have you personally reviewed any of the underlying

15  documents that this summary document is based on?

16  A.       You mean, the actual rosters, I'm assuming?

17  Q.       That's right.

18  A.       Well, yes, I reviewed a few of them.  Not all of

19  them, no.

20  Q.       Do you find that they're regularly kept up?

21  A.       Yes.  We track them daily.  We'll send emails out if

22  we're missing rosters.  We want to make sure we get them back

23  in a timely fashion.

24  Q.       Looking at these -- at the same document, Defendants'

25  Exhibit G, where it tracks one-to-one clinical contacts, it

152

1    is your testimony that this doesn't accurately reflect

2    one-to-one clinical contacts that occur; is that right?

3              MR. MCKINNEY:  Objection.  Misstates the testimony.

4              THE COURT:  She says "is that right."  If it is not,

5    he'll say so.

6              THE WITNESS:  I think first by defining one-to-ones,

7    so one-to-ones are prescribed through the treatment team.

8    Q.       How are the one-to-ones reflected in this document

9    defined?

10   A.       These would be the ones that the team requests the

11   patient may see the psychologist or social worker in a

12   one-to-one setting.

13   Q.       Does this document reflect whether those clinical

14   contacts were held cell side or in a confidential setting?

15   A.       Could you clarify that?

16   Q.       Does this document track whether these contacts were

17   held in a confidential setting?

18   A.       No, it does not.

19   Q.       Do you have any document that does reflect that?

20   A.       An IDN would, an interdisciplinary note.

21   Q.       Where would that be found?

22   A.       In a medical record.

23   Q.       So do you have any document that tracks how many of

24   the clinical contacts occur cell side versus in clinical

25   confidential settings?

153

1          MR. MCKINNEY:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3          Do you have such a document?

4          THE WITNESS:  No.  Not that I'm aware of.

5          THE COURT:  I'm confused.  Did I understand you to

6    say these one-to-ones were a result of requests by the

7    patient?

8          THE WITNESS:  The treatment team.  The treatment team

9    filled that this patient needs a one-to-one currently.

10   Something might have occurred.

11         THE COURT:  I'm sorry.  I don't want to interrupt

12   you, but I have no idea what is going on.

13         We have heard, on more than one occasion, that if the

14   patient requests a psychiatrist or psychologist, whatever,

15   they will respond.

16         Is that what is being reflected in this one-to-one on

17   this chart?

18         THE WITNESS:  This one that reflects all of those,

19   no.

20         THE COURT:  Is it supposed to?

21         THE WITNESS:  No.

22         THE COURT:  So this is contacts one-to-one which are

23   distinguished from the requests?

24         THE WITNESS:  They might have specific goals they're

25   trying to achieve for the one-to-one, yes.

154

```
1         THE COURT:  And these are dictated by the treatment
2    team?
3         THE WITNESS:  Yes.
4         THE COURT:  And the treatment team decides what's
5    needed how?
6         THE WITNESS:  In the IDT setting, the
7    interdisciplinary team setting they will discuss it.
8         THE COURT:  Go ahead.
9    BY MS. RIFKIN:
10   Q.      Do you know how many one-to-one clinical contacts
11   occur cell front at Salinas Valley?
12   A.      Not off the top of my head, no.
13   Q.      Do you track those?
14   A.      On the cell front there is a sheet that has --
15   they're supposed to sign.
16   Q.      I'm sorry.  Can you explain?
17   A.      There is a lot of impromptu one-to-ones that occur.
18   As I said earlier, the patient can request a one-to-one, if
19   somebody is walking by, "I need to talk to so-and-so."
20         So it is not really an official one-to-one, but they
21   might want to talk to the psychiatrist about medications.
22         What I'm referring to is prescribed.  They are
23   scheduled treatment one-to-ones.
24   Q.      So that contact, where a patient asks to speak to a
25   psychiatrist about medications, that is not considered a
```

155

1   clinical contact as part of the program?

2   A.      It's a clinical contact, but it is more of an

3   impromptu instead of a scheduled one-to-one.

4          THE COURT:  So it is not on the program sheet?

5          THE WITNESS:  Right.

6   BY MS. RIFKIN:

7   Q.      Do impromptu one-to-ones such as that occur in

8   confidential settings?

9   A.      If requested they can.

10  Q.      If requested by the patient?

11  A.      By the patient or the clinician.

12  Q.      Are you aware of how many of those contacts actually

13  occur in confidential clinical settings?

14         MR. MCKINNEY:  Objection.  Repetitive.  Asked and

15  answered.

16         THE COURT:  It's certainly been asked.  You may

17  answer, sir, if you can.  If you can't, that's okay.

18         THE WITNESS:  No, not at this time.

19  BY MS. RIFKIN:

20  Q.      Do you have any document that tracks the number of

21  groups each patient actually receives per week?

22  A.      Through the PST sheet, the Plan Schedule Treatment

23  sheet, that would.  And as Mr. Maynard testified earlier,

24  with the PaWSS system coming on board, that's our goal that

25  we're getting to, that we will have that information, yes.

156

1    Q.       To clarify, I'm going to ask about what is happening

2    currently at the program.

3          The sheets -- I'm sorry.  Can you repeat the name of

4    the sheet you were referencing?

5    A.       PST, Plan Schedule Treatment.

6    Q.       Is that a sheet that's found in each patients'

7    individual file?

8    A.       No.  It's on the -- the clinician fills it out, and

9    the clinician is supposed to do a note in the chart to say

10   the patient attended the group or did not attend group, and

11   if he's meeting his goals and objectives in the group.

12   Q.       In which chart?

13   A.       His medical record.

14   Q.       So that would be recorded in each patients' medical

15   record?

16   A.       Yes.

17   Q.       But you, as the clinical administrator, don't track

18   the number of hours of group treatment each patient receives?

19   A.       Currently I do not.

20   Q.       Do you track the number of one-to-ones each patient

21   receives?

22          THE COURT:  Not the impromptu, but the clinically

23   determined one, whatever the team has determined?

24   BY MS. RIFKIN:

25   Q.       Start with that one.

157

1   A.      Through this sheet only, yes, currently.

2   Q.      Where does the sheet show how many of these

3   one-to-ones occurred for each patient?

4   A.      Well, the one-to-ones would be per patient.

5   Q.      So none of them would be duplicative?

6   A.      They may be, yes.

7   Q.      So this sheet doesn't actually reflect how many

8   one-to-ones each patient has received per day, per week or

9   per month?

10  A.      No.

11  Q.      The standards for the provision of care in the

12  Salinas Valley Program, do they prescribe care per patient or

13  per unit?

14  A.      Per patient individually.

15  Q.      So why don't you track the amount of care provided

16  per patient?

17  A.      We are getting to that, yes.

18  Q.      You are getting to that?

19          How long has this program been running?

20  A.      I believe it opened in 2003.

21  Q.      Do you know why they weren't tracking it before now?

22  A.      I cannot answer that.

23          In IDTT, the interdisciplinary team, the team does

24  discuss attendance.  They discuss one-to-ones within the team

25  setting, who is doing what, what is going on.  I observe

158

1    teams.

2    Q.      Turning to the exhibits -- defendants' exhibits that

3    have been marked G through -- I'm sorry -- H through I'm not

4    sure --

5           THE COURT:  To the end.

6    BY MS. RIFKIN:

7    Q.      -- to the end.  Turning to those exhibits, when were

8    these exhibits -- when were these documents created?

9    A.      I do not have the exact date, but it was late May.

10   Q.      Who were they created by?

11   A.      The program director and the program assistant and

12   the clinicians.

13   Q.      Who actually created this spreadsheet?

14   A.      The program assistant puts it together.

15   Q.      And these documents -- sorry -- these documents don't

16   reflect whether or not these groups have actually occurred

17   because they're future -- they're about future dates; is that

18   correct?

19   A.      No.  They're not future dates.  This is the current

20   treatment schedule for each area.

21   Q.      Where for the June dates in this document does this

22   document reflect whether or not these groups were actually

23   held?

24   A.      They're not in the June that you reviewed, no.

25   Q.      I'm sorry?

159

1    A.      They're not in your -- the report here in G.  They're

2    not in there, no.

3    Q.      I'm talking about H through the end.

4            The schedules you provided, where does it show which

5    groups were actually held?

6    A.      It would be tallied and put into a spreadsheet

7    somewhere to Exhibit G.

8    Q.      Does that document exist for June?

9    A.      Yes, it is started.  Yes.

10   Q.      And turning to Exhibit H, which is C-5, let's look at

11   Monday, B-pod, Rec. Therapy.  How many in B-pod?

12   A.      Eighteen.

13   Q.      Do all of them attend this group?

14   A.      No.

15   Q.      How many attend this group?

16   A.      I would be guessing if I told you a number.

17   Q.      Okay.  Let's go to Tuesday, B-pod, how many attend

18   the PBST group?

19   A.      Again, I don't have those actual numbers in front of

20   me.

21   Q.      Does every inmate in B-pod attend PBST?

22   A.      It is based upon individual clinical needs.

23   Q.      So this document doesn't actually reflect the number

24   of treatment hours -- of treatment hours being offered to

25   each inmate; is that correct?

160

1    A.       This is the treatment schedule provided as a whole.

2    Q.       Right.  But it doesn't -- it just shows the treatment

3    hours available to the unit.  But not every patient on each

4    unit can attend each of these groups; is that right?

5    A.       Correct.

6    Q.       So this document also doesn't reflect how many

7    treatment hours each patient at Salinas Valley is actually

8    receiving?

9    A.       Correct.

10   Q.       So you just said that you're working on a tracking

11   system that will actually track per patient.

12           Where is that document?

13   A.       It's in the PaWSSsystem.  I don't have a document.

14   It is automation.

15           THE COURT:  It is not yet in effect?

16           THE WITNESS:  Right.  No.

17   BY MS. RIFKIN:

18   Q.       It is not yet in effect.

19           I'm looking on the schedule.  I just received these

20   so perhaps I haven't yet had a chance to see it, but where is

21   the scheduled time for those inmates on cuff status reflected

22   in any of these documents?

23   A.       Just looking at Charlie-5?

24   Q.       Yeah.

25   A.       11:30 to 12:30, solo activities.

161

1              12:30 to 1:30 solo activities.

2              THE COURT:  What does "solo activity" mean to you?

3              THE WITNESS:  The patients who are on cuff status,

4    the yard is open in Charlie at that time so inmates or

5    patients are out in the yard.  So at that time the pod could

6    be closed, and the patients who are on cuff status could come

7    out to the pod area.

8    BY MS. RIFKIN:

9    Q.      Can all of them come out together?

10   A.      No.

11   Q.      So only one of them at a time?

12   A.      Yes.

13   Q.      So looking at C-5, it appears there's one hour -- two

14   hours per day that are designated for solo activities; is

15   that right?

16   A.      Yes.

17   Q.      So that's a maximum two-hour window where it would be

18   possible for patients on cuff status to come out of their

19   cells?

20              THE COURT:  One at a time.

21              THE WITNESS:  If you turn the page, there is more

22   solo activities in the evening also.

23   BY MS. RIFKIN:

24   Q.      So during those times, all the other inmates are

25   locked in their cells?

162

1   A.      They will not be in the general vicinity, correct.

2   Q.      So in order for a patient on cuff status to get

3   dayroom, all the other patients have to be locked down; is

4   that right?

5   A.      I wouldn't say locked down.  They might be doing

6   other activities.

7           For example, during the day, patients, they go to the

8   unstructured yard.  So not all the patients are in the pod.

9   So no, they don't have to be locked down, no.

10          THE COURT:  Do you have any idea -- if not, that's

11  okay -- about how many patients are on cuff status on any

12  given day?  What's the average?

13          THE WITNESS:  My guesstimate would be probably 25.

14          THE COURT:  Okay.

15          THE WITNESS:  Currently.

16  BY MS. RIFKIN:

17  Q.      So 25 on any given day?

18  A.      About -- well, that's given orientation/cuff status.

19  We admit roughly 12 patients a week.

20  Q.      Do you have 25 free hours in this schedule for each

21  of them to come out?

22          THE COURT:  He's indicated that's not how it works.

23  They have two hours for the 25 people to come out; is that

24  correct?

25          THE WITNESS:  There's six areas.

163

1  BY MS. RIFKIN:

2  Q.      But when one person on cuff status is in an area,

3  that's the only person that can be in that area, right?

4  A.      No, I did not say that.

5  Q.      Can multiple -- can you explain?

6  A.      Some inmates or patients will be out in a different

7  area.  So this inmate-patient who is on cuff status could be

8  in the dayroom with two MTAs, could be watching TV.  And a

9  patient may be in the shower, yes.  So there would be no

10  interaction if that's what you're asking, no, for safety

11  reasons.

12  Q.      But if other patients are in the dayroom, someone on

13  cuff status can't be the in dayroom, right?

14  A.      From what I understand.

15  Q.      If other patients are on yard, a patient on cuff

16  status can't be out on yard?

17  A.      Correct.

18  Q.      And two patients on cuff status can't be in the

19  dayroom together, right?

20  A.      To the best of my knowledge, yes.  I'm still learning

21  so...

22  Q.      So in order for all 25 people in cuff status to get

23  out during the day, they'd each have to be able to go to a

24  separate area by themselves where nobody else was; is that

25  fair?

164

```
 1   A.      Yes.  But we have six units.  And if you have four
 2   patients per unit, that would be four hours per area.  That
 3   is provided within the schedule.
 4   Q.      I believe you said that as part of your job as
 5   clinical administrator, one of your jobs is to track the
 6   waitlist number of people who are waiting to get into care?
 7   A.      Yes.
 8   Q.      Is that right?
 9   A.      I review it, yes.
10   Q.      And how many people are currently on the ICF
11   waitlist?
12   A.      Last time I checked I believe it was 41.
13   Q.      When was the last time you checked?
14   A.      Thursday or Friday of last week.  That number has
15   probably changed.  It fluctuates.  It changes daily.
16   Q.      How many people have been waiting over 30 days?
17   A.      None.  If there were -- if there was one or two,
18   there was a reason why in the comment section.
19   Q.      How many of them had been waiting over 30 days?
20   A.      Zero.
21   Q.      I want you to include any who may have had a reason
22   to be waiting over the 30 days.
23           How many were waiting over 30 days?
24           MR. MCKINNEY:  Objection.  Asked and answered.
25           THE COURT:  You may answer, sir.
```

165

1        THE WITNESS:  To the best of my knowledge there was

2   zero.

3        MS. RIFKIN:  Permission to approach, Your Honor?

4        (Exhibit handed to witness.)

5   BY MS. RIFKIN:

6   Q.    Mr. Karas, I've handed you what's been marked for

7   identification as Plaintiffs' Exhibit Number 22.  This

8   document is a document that was sent from defendants' counsel

9   to plaintiffs' counsel and contains the waitlist the Bed

10  Utilization Report from the Department of State Hospitals as

11  of May 31st, 2013.

12       If you turn in the document -- again, I apologize,

13  the pages are not consecutively numbered -- but about halfway

14  through the document there's a chart that begins to show

15  patients name by name.  It looks like this?

16  A.    Page 1 at the bottom?

17  Q.    Page 1 at the bottom.  That's right.

18       Got that chart?

19  A.    Yes.

20  Q.    Okay.  And then I'm going to ask you, once we're on

21  that same page, to flip to what's marked page 22 of that

22  chart.

23       Are you familiar with this type of bed utilization

24  list, Mr. Karas?

25  A.    Mine's a little different, but yes, a general

166

1    understanding.

2    Q.      On page 22 this includes patients listed person by

3    person who are waiting to be admitted to Salinas Valley

4    Psychiatric Program as of May 31st, 2013; is that right?

5    A.      Yes.

6            MR. MCKINNEY:  Objection.  Lack of personal

7    knowledge.  I think the witness just testified he's not

8    familiar.

9            THE COURT:  This document reflects that; is that

10   correct, sir?

11           THE WITNESS:  That's what it looks like, yes.

12   BY MS. RIFKIN:

13   Q.      Mr. Karas, Mr. Maynard testified that you are

14   responsible for tracking the waitlist.

15           Is there anybody else at Salinas Valley who is

16   responsible for tracking the waitlist?

17   A.      It's a coordination.  It is not just one person.  I

18   work with the medical director and the admission/discharge

19   unit.

20   Q.      Who gathered the information to produce this to the

21   Special Master and plaintiffs' counsel as of May 31st, 2013,

22   if you know?

23           MR. MCKINNEY:  Objection.  Lack of personal

24   knowledge.

25           THE COURT:  She said "if you know."  Stop it.

167

1        If you know?

2        THE WITNESS:  I'm not aware.

3        THE COURT:  Thank you, sir.

4  BY MS. RIFKIN:

5  Q.    All right.  Looking at this document -- and please

6  don't mention any inmate names.  This is subject to the

7  protective order in this case.

8        There are charts that say "Date of Referral" -- or in

9  this chart there's several dates listed.  There is a date

10 listed that says "Date of Referral."  For patient 968, that's

11 the first one after the big black line, the Date of Referral

12 says April 3rd, 2013.

13       THE COURT:  What page are you on?

14       MS. RIFKIN:  Page 22, Your Honor.

15 BY MS. RIFKIN:

16 Q.    Okay.  So there is a Date of Referral for this

17 patient which says April 3rd, 2013.

18       Then there's "Date Received at DSH," April 18th,

19 2013.

20       Now, that's not the date the patient was received at

21 DSH; is that right?

22 A.    Correct.

23 Q.    That's the date the referral -- the actual referral

24 package was received?

25       THE COURT:  Now I will stop.

168

1          Sir, you have seen this document -- have you ever

2     seen it before today?

3          THE WITNESS:  Not this specific document, no.

4          THE COURT:  Have you seen a document similarly

5     structured?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  I mean, he didn't do this

8     document.  He says it is similar.

9     BY MS. RIFKIN:

10    Q.    You understand what these columns mean?

11         It's the same kind -- it's the same kind of

12    information you use when tracking?

13    A.    It's similar.

14    Q.    So if you -- if I'm asking you a question, if you

15    know the answer, let me know.  If you don't know the answer

16    because it is different, please let us know.

17         So do you understand what's meant by "Date of

18    Referral" on this document?

19    A.    Yes.

20    Q.    What is that?

21    A.    From what I understand, it's when the CDCR

22    institution refers the patient for treatment to a state

23    hospital.

24    Q.    Okay.  Do you understand what "Date Received at DSH"

25    means in this document?

169

1    A.      From what I understand, it's when we get the

2    completed packet.

3    Q.      And moving over to "Date of Acceptance," what does

4    that mean, if you know?

5    A.      That a clinician or someone reviewed the packet to

6    determine if it met the criteria for admission.

7    Q.      And then the "Date of Admission," the next column

8    over?

9    A.      The date they were admitted.

10   Q.      The date the patient is actually admitted?

11           When you count the number of days someone has been

12   waiting to be admitted into the Salinas Valley Psychiatric

13   Program, which of these dates do you use as your starting

14   date for counting purposes?

15   A.      The date we receive.

16   Q.      From the date DSH receives the packet.

17           So looking at this example, Number 968, April 3rd,

18   2013, would be the date that somebody at CDCR finished

19   putting together the packet and referred it over to DSH?

20   A.      No.

21   Q.      That would be the date someone at CDCR identified

22   that this person needs inpatient treatment; is that more

23   accurate?

24   A.      Yes.

25   Q.      Okay.  So as of May 31st, 2013, from the date someone

170

1  at CDCR said this patient needs inpatient care, that would be

2  measured from April 3rd to May 31st and would be almost two

3  months; is that correct?

4  A.      Yes.  The date received, April 18th.

5  Q.      But when DSH reports its waiting list, DSH is

6  counting from the April 18th date?

7  A.      That one -- I did not prepare this report so I don't

8  know what they used to calculate it.

9  Q.      Let's talk in more general terms then.

10         When DSH says somebody has been waiting 30 days --

11  not more than 30 days, you're talking about the date that the

12  packet was received at DSH; is that correct -- 30 days from

13  the date the package was received at DSH?

14  A.      From what I understand, yes.

15  Q.      And CDCR could have referred that person earlier?

16  A.      Correct.

17  Q.      Okay.  So it is safe to say it doesn't measure the

18  number of days that person has actually --

19         THE COURT:  Thank you very much for your argument.

20         You may proceed.

21         MS. RIFKIN:  Okay.

22  BY MS. RIFKIN:

23  Q.      Turning your attention to Defendant's Exhibit A --

24  let me ask you a question first.

25         As part of your duties as clinical administrator, is

171

1    it your job to track the staffing hours at Salinas Valley

2    Psychiatric Program for clinical staff?

3    A.    How would you define "staffing hours"?

4    Q.    Is it your job to help schedule clinical staff?

5    A.    Yes.  My initial resources.

6    Q.    So it is your job to help schedule clinical staff?

7    A.    Yes.

8    Q.    Turning to Defendants' Exhibit A --

9    A.    I don't -- is it up here?

10         MS. RIFKIN:  That's okay.  No further questions.

11         THE COURT:  Redirect?

12                    REDIRECT EXAMINATION

13   BY MR. MCKINNEY:

14   Q.    Mr. Karas, just turning back to the document that was

15   just marked -- I'm sorry.  I don't have the number.  The last

16   exhibit that was marked by plaintiffs?

17         MR. BIEN:  Exhibit 22.

18         MR. MCKINNEY:  Thank you.  Exhibit 22.

19         THE COURT:  I'm not sure it has been received.

20         MS. RIFKIN:  I'm sorry.  Plaintiffs would offer that

21   exhibit into evidence, Your Honor.

22         THE COURT:  Received.

23              (Whereupon, Plaintiffs' Exhibit Number 22

24               received into evidence.)

25   BY MR. MCKINNEY:

172

1    Q.      Mr. Karas, you have not actually seen this chart

2    before today; is that correct?

3    A.      Correct.

4    Q.      There were a number of questions asked about tracking

5    of individual patient hours and treatment.

6            Where is that information tracked?

7    A.      In the medical record.

8    Q.      Who tracks that information?

9    A.      The treatment team.

10   Q.      There's also some testimony about informal contacts

11   not being reflected on the summary chart that has been

12   entered as an exhibit here.

13           Can you just describe the number of informal contacts

14   that may happen and how those occur --

15           THE COURT:  He doesn't mean --

16           MS. RIFKIN:  Objection.  Sorry.

17   BY MR. MCKINNEY:

18   Q.      -- that do happen --

19           THE COURT:  Is there any way of knowing how often

20   those occur?

21           THE WITNESS:  As I speak to clinicians on the units,

22   they happen quite a bit on the units.  Patients have

23   questions so...

24           THE COURT:  Do you have any idea of -- I don't know

25   what you want -- hours?

173

1    BY MR. MCKINNEY:

2    Q.      Just contacts.  One or the other.

3    A.      I will be safe to say at least once a week each

4    patient is meeting with one of the team members in an

5    impromptu one-to-one contact.

6    Q.      And a patient can pull aside a clinician at any time

7    and ask for assistance or to see a clinician; is that right?

8    A.      Yes.

9    Q.      Would it be realistic to track every single one of

10   those contacts?

11   A.      Not really, no.

12   Q.      So in fact, there's a whole number of additional

13   contacts that happen in addition to what was reflected?

14          MS. RIFKIN:  Objection.  Misstates the evidence.

15          THE COURT:  Overruled.  You may proceed.

16   BY MR. MCKINNEY:

17   Q.      Is that correct?

18          THE COURT:  I'm going to say to you what I said to

19   Miss Rifkin, I know that you think I'm stupid and you have to

20   say it over and over again, but I really got it.

21          MR. MCKINNEY:  Very well, Your Honor.

22          THE COURT:  I don't know if I said it to Miss Rifkin

23   or some other lawyer.

24          Go ahead.

25   BY MR. MCKINNEY:

174

1    Q.    With respect to downtime in between when the

2    schedules are created, are you familiar with the types of

3    activity that take place with the patients during those

4    weeks?

5    A.    During those two weeks typically they do more what we

6    refer to as supplemental activities or leisure groups.  They

7    might show an educational movie.  They may have Wii.  They

8    may do a variety of -- bingo may be played, activities such

9    as that.

10   Q.    So the treatment doesn't stop when the curriculum is

11   being modified or edited; is that right?

12   A.    Correct.

13        MR. MCKINNEY:  One moment, Your Honor.

14        (Cocounsel confer.)

15        Your Honor, we have to further questions for the

16   witness, Your Honor.

17        MS. RIFKIN:  No further questions, Your Honor.

18        THE COURT:  May the witness be released?

19        MS. RIFKIN:  Yes, Your Honor.

20        THE COURT:  May the witness be released?

21        MR. MCKINNEY:  Yes, Your Honor.

22        THE COURT:  You are free to step down, sir.  You are

23   free to stay or go, as you choose.

24        MR. MCKINNEY:  Your Honor, at this time we would like

25   to recall Miss Gaither.

175

1            MR. BIEN:  Objection, Your Honor.

2            THE COURT:  Your objection is because you don't like

3      it?

4            MR. BIEN:  She was released.

5            THE COURT:  While we're waiting, why are you

6      recalling Miss Gaither, and why is it appropriate?

7            MR. MCKINNEY:  Your Honor, simply to clear up the

8      testimony regarding the last exhibit reflecting the referral

9      dates.

10           THE COURT:  You certainly may.

11           Just so we can get rid of any question, because my

12     courtroom deputy has indicated some question, I'm receiving

13     every exhibit that has been marked and has been received into

14     evidence.

15           Is that correct from the plaintiffs' point of view?

16           MR. BIEN:  Yes, Your Honor.

17           THE COURT:  Is that correct from defendants' point of

18     view?

19           MS. VOROUS:  Yes, Your Honor.

20              (Whereupon, Plaintiffs' Exhibit 21 received into

21               evidence.)

22           THE COURT:  You may proceed.

23           Miss Gaither, come back around.

24           (HAVING BEEN PREVIOUSLY SWORN, KATHRYN

25            RADTKEY-GAITHER RESUMES THE WITNESS STAND.)

176

1          THE COURT:  I remind you, ma'am, you are still under

2     oath.

3                    FURTHER REDIRECT EXAMINATION

4     BY MR. MCKINNEY:

5     Q.      Miss Gaither, if I can ask you to take a look at

6     Plaintiffs' Exhibit Number 22, and that is -- the cover is a

7     letter dated June 17, 2013.

8              Do you have that document?

9     A.      Yes.

10    Q.      And this is actually a compilation of documents.  If

11    you can turn about halfway through the packet, there is a

12    document that starts Department of State Hospitals Bed

13    Utilization Report.

14             There is a page 1?

15             Yes.

16             Just for the record, the witness held the document

17    up.

18             Miss Gaither, are you familiar with this document?

19    A.      I'm familiar with the existence of this document.  I

20    have never actually reviewed the document.

21    Q.      What's your familiarity?

22    A.      My familiarity is that we have a -- we have a unit

23    that prepares this document to report on the referral and

24    acceptance and admission of patients into Salinas Vacaville,

25    et cetera.

177

1   Q.      And looking at the date --

2          MR. BIEN:  Objection, Your Honor.  No foundation that

3   she can explain anything about the document.

4          THE COURT:  Actually, that appears to be the case.

5   No disrespect, but as she says, she has never seen the

6   document until today.

7          MR. MCKINNEY:  Your Honor, if that's the case, then

8   no one has sponsored this document and it should not be

9   admitted into evidence.

10         THE COURT:  Overruled because it was received.

11  BY MR. MCKINNEY:

12  Q.      Miss Gaither, do you have understanding what "Date of

13  Referral" means?

14  A.      I do.

15  Q.      What is your understanding?

16  A.      That is the date that CDCR refers the patient to

17  Department of State Hospitals.

18         THE COURT:  What makes you say that, ma'am?

19         THE WITNESS:  I've been told that by my staff.

20         MR. BIEN:  Same objection, Your Honor.

21         THE COURT:  Same ruling.  It is stricken.

22         You're not going to get it in, Mr. McKinney.

23         MR. MCKINNEY:  I'll call another witness if we need

24  to.

25         THE COURT:  That is up to you.

178

1          MR. MCKINNEY:  Again, no one has sponsored this

2     document at this point.

3          THE COURT:  The document was forwarded by

4     Miss Vorous -- by Miss Vorous's secretary to Mr. Galvan, and

5     as such has appropriately been introduced.

6          MR. BIEN:  It has also been filed under seal with

7     this Court every month.

8          THE WITNESS:  It is under my purview.

9     BY MR. MCKINNEY:

10    Q.     Miss Gaither, do you have an understanding of how the

11    referral timelines are measured with respect to Department of

12    State Hospitals' patients?

13    A.     Without respect to this document?

14    Q.     Yes.

15    A.     My understanding of how the referral timelines are

16    measured is that when the packet is complete, and it has all

17    of the information in it, we then have 72 hours to accept the

18    patients or not.  And upon acceptance, we start our clock.

19    Q.     Is the packet typically complete on the Date of

20    Referral?

21         MR. BIEN:  Objection.  No foundation.

22         THE COURT:  I don't know how else -- I mean, well she

23    might know that as a personal matter.

24         Do you know that answer as a personal matter?

25         THE WITNESS:  Have I inspected packets myself?

179

1          No, I have not.

2     BY MR. MCKINNEY:

3     Q.      Do you have an understanding of what the difference

4     is between when a patient is referred and when a packet is

5     considered complete from the perspective of the Department of

6     State Hospitals?

7     A.      Yes, I do.

8     Q.      What is that understanding?

9     A.      My understanding is that to be complete, a packet

10    must include all of the relevant medical records, as well as

11    the mental health records, as well as anything that's

12    currently going on with the patient.

13          For instance, a patient could be very fragile

14    medically, and thus not suitable for one of our facilities.

15    But we need that medical chart information in order to make

16    that determination.

17    Q.      And for an intermediate care patient, when does the

18    time start to run -- from what period does the time start to

19    run for admission to a program?

20    A.      Once we have accepted the patient.

21    Q.      Is the same true for acute care patients?

22    A.      Yes.

23          MR. MCKINNEY:  One moment.

24          (Cocounsel confer.)

25          No further questions for this witness, Your Honor.

180

                        RECROSS-EXAMINATION

1

2   BY MR. BIEN:

3   Q.     Miss Gaither, are you familiar with the Program Guide

4   governing the Coleman case psychiatric care?

5   A.     I haven't read the Program Guide, but I know that a

6   Program Guide exists.

7          MR. BIEN:  Can I approach?

8          (Exhibit handed to witness.)

9   BY MR. BIEN:

10  Q.     Miss Gaither, we've marked as Plaintiffs' Exhibit 23

11  a page from the Program Guide governing referral timelines.

12         Are you aware that the Program Guide includes

13  timelines for each patient to get to the next level of care?

14  A.     Yes.

15  Q.     And have you ever seen this?

16         I know you said you haven't read the whole Program

17  Guide.  Has anyone ever discussed with you the referral

18  timelines that govern patient psychiatric care?

19  A.     We have discussed it.  I have not seen this page.

20  Q.     Has anyone told you that in the Program Guide, and if

21  you look down to ICF, it says that within 30 days of referral

22  a patient should be transferred.

23         Is that correct?

24         MR. MCKINNEY:  Objection.  That's an incomplete

25  reading of that statement.

181

```
 1              THE WITNESS:  I haven't found "ICF" on here.
 2    BY MR. BIEN:
 3    Q.        It is the fifth row down:
 4              (Reading:)
 5              Any Institution/level of care to Any Intermediate
 6              Care DMH placement.
 7              (Reading concluded.)
 8              Do you see that?
 9              Then you go to the right side and it says, "Timeline
10    For Transfer."
11              Do you see that, Miss Gaither?
12    A.        I see that.
13    Q.        Okay.  It says, "Within 30 days of referral, if
14    accepted to DMH."
15    A.        Correct.
16    Q.        Okay.  So were you aware that the timeline that's
17    measured under Coleman standards begins with the referral?
18              MR. MCKINNEY:  Objection.  Misstates the document.
19              THE COURT:  I think -- I don't understand why you say
20    it misstates the document.
21              MR. MCKINNEY:  The document says, "referral, if
22    accepted BY DMH."
23              MR. BIEN:  If the person is not accepted, then
24    obviously they wouldn't be transferred.  They would be
25    rejected.
```

182

1          MR. MCKINNEY:  Someone can be referred, yet not

2     accepted.  So there's a time period that runs --

3          THE COURT:  I'll be glad to hear all of this if we

4     ever get to argument.

5          MR. MCKINNEY:  Your Honor, this is all very

6     argumentative in the first instance, so I object on that

7     basis.

8          THE COURT:  Overruled.

9          I don't know whether there is a question.

10          I mean, it is what it says.  You don't need this

11     witness to refer.

12     BY MR. BIEN:

13     Q.    Miss Gaither, were you involved in the decision to

14     change the way the Department of State Hospitals reported to

15     this Court and to the Special Master how the waitlist was

16     going?

17     A.    I'm not aware that we changed how we report.

18     Q.    I'll represent to you that before some point in 2012

19     the Department of State Hospitals changed its reporting --

20          THE COURT:  I will have you sworn and you may

21     testify.

22          MR. BIEN:  Okay.

23     MR. BIEN:

24     Q.    Are you not aware of any change in how Department of

25     State Hospitals reported to this Court?

183

1   A.      I am not aware of any change, no.

2   Q.      No one consulted with you about whether they should

3   change standards?

4   A.      If they did, I don't recall.

5           MR. BIEN:  I have no further questions, Your Honor.

6           MR. MCKINNEY:  No further questions, Your Honor.

7           THE COURT:  You may step down, ma'am.

8           See, when I say you are free to leave, it is a good

9   idea that you do so.

10          All right.  But you know, whatever.

11          THE WITNESS:  I'm trying to stick up for my people,

12  Judge.

13          THE COURT:  Whatever turns you on.

14          Miss Vorous, is there more?

15          MS. VOROUS:  Yes, Your Honor.  If you can give me

16  just a moment, I'm trying to find a document.

17          THE COURT:  You are moving the last document in,

18  Mr. Bien?

19          MR. BIEN:  Yes, please.

20          THE COURT:  Received.

21              (Whereupon, Plaintiffs' Exhibit 23 received into

22               evidence.)

23          MS. VOROUS:  Your Honor, one of the plaintiffs'

24  objections with respect to defendants' opposition in the

25  context of this mission was that the Declaration of

184

1    Miss Bachman that was filed electronically did not contain a

2    date.  So we wanted to just file with the Court the original

3    so you would have the date.

4            MR. BIEN:  Without objection, Your Honor.

5            MS. VOROUS:  May I approach?

6            THE COURT:  Received.

7            Are we done?

8            MS. VOROUS:  Yes.

9            THE COURT:  Mr. Bien, Miss Vorous, I would like to

10    have argument if it can be completed by quarter to 5:00 or

11    so.

12            Mr. Bien, what's your view?  Is it possible or should

13    we go over to tomorrow afternoon?

14            MR. BIEN:  I think we can do it.  We're brief.  I

15    promise.

16            THE COURT:  Miss Vorous, what is your view?

17            MS. VOROUS:  I believe so, Your Honor.

18            THE COURT:  All right.

19            Mr. Bien, come forward or whoever argues for

20    plaintiff.

21            Before you start telling me what the evidence is,

22    tell me, because I haven't looked at it for a while,

23    precisely what you want.

24            MR. BIEN:  Your Honor, we've requested that the

25    Special Master investigate and report --

185

```
 1              THE COURT:  Got that.  What else?

 2              MR. BIEN:  I think --

 3              THE COURT:  If anything.

 4              MR. BIEN:  Well, so in terms of -- because of what's

 5      come out in the hearing and we think in the evidence

 6      submitted before you, we think the scope should include both

 7      SVPP, CMF programs, Stockton, and we also think there's

 8      issues now as to the Coleman programs at Coalinga and ASH

 9      which seems to have been reduced.

10              So I guess that's one issue, is the scope of the

11      Special Master's investigation.

12              Number 2 -- so that would include is the staffing

13      appropriate.

14              THE COURT:  Is it maintained.

15              MR. BIEN:  Is it maintained.

16              THE COURT:  Will they continue to receive, and all

17      the questions that have been raised not only in this

18      hearing.

19              MR. BIEN:  Yes, Your Honor.

20              THE COURT:  All right.

21              MR. BIEN:  In addition, we request the Court issue

22      new specific and more detailed orders concerning reporting

23      since the defendants are taking the position that there is no

24      effective order and that the existing order seems not to work

25      for staffing.
```

186

1              As to the issue of custody status, we've actually

2      asked that -- in our proposed order we ask that they stop

3      using this practice and that it be made on an individualized

4      determination.

5              The order includes language about that, but we also

6      ask the Special Master address and make recommendations about

7      what should happen.

8              Unfortunately, we also would request that the Special

9      Master review and report on or that the defendants be

10     required to provide additional reports on the provision of

11     basic needs for patients.

12             THE COURT:  Mr. Bien, let me tell you, the Court is

13     quite disturbed.  I hope Miss Vorous will clear it up for me,

14     but it appears to me there are serious problems which I can't

15     even account for about the accuracy of documents that have

16     been delivered to you or delivered to the Court, why they are

17     inaccurate.  I just don't quite understand.

18             There's a $6,000,000 asserted error in the proposed

19     budget.  Apparently the defendants learned of it at some

20     time, and they have informed nobody except in this trial.

21             I have severe -- I don't know why I'm talking to you.

22     I really want to talk to Miss Vorous because I hope she can

23     explain to me why I shouldn't be as concerned as I am that

24     there's -- there appears to be a serious lack of discipline

25     in the reporting process.

187

1          I think I don't want to talk to you right now.

2          MR. BIEN:  May I finish the other issues?

3          THE COURT:  Of course.

4          MR. BIEN:  Just in the order, as you asked, Your

5     Honor, we think that there's still -- we request that there

6     also be an investigation going to the issue of discharges and

7     whether or not there is inappropriate pressure.

8          There's been some blame on all of us as to some

9     reason for it, but I think that it is important to evaluate

10     whether or not there's undue pressure.

11          I think the opening of the Stockton facility raises

12     some serious concerns in terms of balancing the need for ICF

13     care and APP care with the closure of these units and the

14     layoffs.  So again, while I -- given the inaccuracy of the

15     reporting of the staffing and other information and the, at

16     least what we think, is the fact they cut back on their

17     ratios, I think it is important to know are these units

18     actually appropriately staffed before people go into them,

19     and what is appropriate staff at Stockton.

20          In addition, given the projections of increased need

21     for ICF beds, we would request appropriate orders from the

22     Court that these staff not be laid off, that these programs

23     not be decommissioned until we really have a better handle on

24     how many beds we need.

25          We are not asking the Court to keep each and every

188

1    program open if it is not needed, but we need a more

2    appropriate method of supervising this.  I think we would

3    have to ask the Court and Special Master to be involved in

4    that.

5         I guess the other thing was about basic needs,

6    whether the wardens or the directors could solve that

7    problem.  It doesn't seem to be an insolvable problem, but

8    from what we heard today, I'm not confident that the

9    appropriate laundry and clothing is yet being provided.  It

10   shouldn't be that hard to do.

11        And I guess I'll wrap up pretty quickly, that what

12   came out here in this trial is, unfortunately, much worse

13   than I expected when I originally filed the motion in terms

14   of the level of dysfunction and disarray in this agency,

15   which we've all put a lot of hope in.

16        And it's a bit shocking because we've been trying to

17   create more beds and get them open and then to see the level

18   of problems in its own operation.

19        I suspect this is relatively recent.  I hope it is

20   relatively recent, in the last year or so, but it seems to

21   have been a severe change, perhaps related to the Justice

22   Department leaving its position.

23        I don't know why, but there's also a lot of budget

24   pressure on the agency.  And I'm sure they had to react to

25   that budget pressure.

189

1           For whatever reason, we think that we've established

2     that there's a severe risk to the patients that are currently

3     in these programs, there's already been two deaths as we

4     know, and there's grounds for the modest step forward that

5     we're asking this Court to take, which is additional

6     supervision of the agency.

7           And apparently it needs to include Department of

8     Finance, which is playing around with the budget again, not a

9     new thing in this case.  We need to know how many positions

10    are there at these places, and we need to know that the --

11          THE COURT:  There is no answer to that question.

12          MR. BIEN:  I think there needs to be.

13          THE COURT:  It is a wonderful system.  We budget for

14    a certain number that are going to be fixed, then everything

15    goes under a blanket.

16          That's a well-chosen topic because if you go under

17    the blanket, of course nobody can see what's there.  Which

18    is -- you see, what we have here -- I don't know what we have

19    here.  But common sense suggests to you is that working in a

20    prison hospital cannot be, despite your witness's statement

21    that, "Gee, the cases are so interesting psychiatrists will

22    flock to the job," I take that with, to say the least, a

23    grain of salt.

24          These are very difficult positions, very difficult to

25    fill.  I have great sympathy with the defendants attempting

190

1  to fill need by hiring people part-time and so forth.  And

2  apparently the way -- why I'm not sure -- but the way the

3  budget system works is we can't decide how many of those are

4  appropriate and appropriate money so we put it under the

5  blanket.

6        The need is real and the solution, while hardly

7  adequate, may be the only realistic solution.  But what it

8  does is confuse in a very dramatic way how many people are --

9  can't say even authorized because they're not authorized,

10 they're blanketed somehow.  And it is very difficult to know

11 how the department even knows.

12        It says 1 to 35 so we can figure that out, but the

13 other testimony is that that is a fluctuating number.  I

14 mean, the whole thing seems to me very, very difficult to get

15 your arms around, even get your hands on.

16        But thank you, sir.  I really don't need anything

17 further.  I really need to talk to you, Miss Vorous.

18        Please, come forward.

19        I want to say three things so I can get you not to

20 talk about stuff that isn't going to help.

21        I understand your position that I have never found

22 the department to be violative of constitutional standards,

23 and therefore your view that I can't enter into the order

24 suggested by the plaintiff, I know that argument, I don't

25 need to hear it.  I respectfully disagree with you about it.

191

1    But you'll see why if and when I can get an order written.

2          I'm going to tell you something that I know my

3    Special Master would like me not to say.  I have told my

4    Special Master -- and now I recognize that I was wrong --

5    that we're really a year, maybe at most two years, away from

6    termination.  Because I really believed that there were three

7    major things that had to be done, they could be done

8    easily -- not easily, but done and we would be done.

9          Unfortunately, today's testimony indicates to me that

10   I have not understood how serious the problems have been at

11   Salinas Valley and perhaps elsewhere.  And that is, I

12   think -- my hope, maybe my unrealistic hope, that we would

13   terminate is demonstrated to be wrong.

14         I tell you that just so you know how serious what I

15   heard today is.

16         But more importantly, and this I say to you because

17   after hearing everything today, I am convinced of two things:

18   One, the documents and records -- I don't say that people

19   have been lying or anything else, but it is out of control.

20   There appears to be almost -- I don't know how to say it.

21         I mean, just the records are all subject to, "Well,

22   maybe this is an error," "Maybe that's an error."  That's got

23   to be brought under control.  That's got to be.  Just no

24   argument about it.

25         But I'm more than willing to hear you explain why

192

1    that doesn't require outside help.  I suspect that -- Okay.

2    I told you why I'm concerned.

3         And the fact that there is such a large turnover in

4    psychiatrists, I sort of understand that.  I don't know

5    whether that's true elsewhere because we haven't had

6    testimony about the other hospitals -- the prison hospitals.

7    But what happened with Dr. Troncoso saying he had 70-some odd

8    patients, I mean, I don't know what can be done about it.

9    That's a different question.  But something has to be done.

10        I admire the effort of the department after this

11   motion was filed to put new administrators in, people who

12   apparently, although frequently talk in bureaucratize -- I

13   was about to say something inappropriate.  But nonetheless,

14   these are people who appear to be serious about trying to

15   straighten out a terrible mess.

16        But, you know, they're all senior people who have

17   been reassigned because of the problem, and some day they're

18   going to go back to their jobs.  Who knows what is going to

19   happen next.

20        Okay.  I told you why I'm concerned.  Now tell me

21   what you think.

22        MS. VOROUS:  So let me start with the staffing

23   report, and maybe I can help out by just explaining a little

24   bit of history on that and point the Court to some of the

25   documents that have been filed that explain that.

193

1        As Miss Gaither testified, there was an original

2   order that was issued with respect to staffing reports some

3   time ago.  And this is an order that was issued on February

4   7th, 2007.  It's Document Number 2134.

5        In this order the Court required that defendants

6   submit monthly reports to the Special Master on staffing and

7   staffing vacancies in all DMH hospitals with programs

8   providing mental health services to CDCR inmates until such

9   time as the pay differential issue has been resolved.

10        Defendants, Department of State Hospital has

11   continued to provide reports even though, from their

12   perspective, the pay differential was resolved some time ago.

13   And beginning in December, after there was a -- I'm sorry.

14   Let me back up.

15        As Miss Gaither testified, there was a change in how

16   staffing was reported beginning July 2012 in terms of how --

17   you know, as you mentioned, staffing positions went from

18   authorized into the blanket.  And there was just a change in

19   the entire budget process and how staff were going to be

20   handled for purposes of Salinas Valley Psychiatric Program.

21        Beginning in December, as Mr. Cook, in his

22   declaration testified, and I know he's not here today, but we

23   did file his declaration.  And that declaration is Docket

24   Number 4957, May 9, 2013.

25        It talks about how beginning in December 2012 he

194

1    started looking at this information and discovered that, yes,

2    in fact, the information was not being accurately captured

3    because of the various changes in data measurement.

4         And in addition, as Mr. Bien has indicated in this

5    proceeding, and in fact in his motion that was filed, and

6    this is -- was filed on April 11, 2013, Docket Number 4543,

7    Mr. Bien indicates in footnote 4 on page 11, that the

8    defendants have themselves indicated that this data isn't

9    accurate and is unreliable.  That is his words.  Then he

10   cited to a declaration filed in opposition to the plaintiffs'

11   motion to -- the defendants' motion to terminate.

12        And there was also testimony from Miss Gaither that

13   this was discussed during a prior policy meeting.  And I

14   don't have the brief -- or I don't have a copy of Mr. Bien's

15   declaration here, but my recollection was is that he was

16   expressing concern that was raised by the Department of State

17   Hospitals' chief legal counsel at that time during the

18   December policy meeting about the inability of the current

19   staffing report to track data.

20        So defendants have conveyed this information.

21   There's been a commitment to revise the report, figure out a

22   way to accurately reflect the data, and all with the

23   commitment to continue to providing the data despite the fact

24   that if you read the Court's order literally from 2007 there

25   was no requirement.

195

1          So it is not anything that's been hidden.  Once the

2     discovery was made --

3          THE COURT:  Nobody -- I want to tell you again, I am

4     not suggesting that there was some nefarious plot.  I don't

5     believe that.

6          That doesn't in any way relieve us of the fact that

7     the information that was supplied was inaccurate for a

8     variety of reasons which I, frankly, understand.

9          You know, the irony of all of this -- I don't know if

10    it is the only irony -- but an irony is in attempting to fill

11    slots, which are very difficult to fill, you've gone to

12    part-timers, to people coming from other departments and so

13    forth, none of which can be -- none of which has been

14    accurately revealed.

15         That doesn't change the fact that, one, you had to do

16    what you are doing.  And I believe that.  I don't know

17    whether plaintiffs do or not.  I believe that.

18         But two, it's resulted in what appears to me to be

19    close to chaos.  And I will tell you, from my point, I know

20    my Special Master doesn't need any additional work.  And I

21    could almost hear what he is going to tell me when we go back

22    into chambers.  But the reality, it seems to me, is there has

23    got to be some way -- and the Court is not going to do it.  I

24    don't have time.

25         I know sometimes I think the plaintiffs don't

196

1    understand I have cases besides Coleman.  At least one or

2    two.  But, you know, I've got to use the Special Master

3    because there is no other way for me to feel any assurance

4    that things are going on.

5         I'll tell you another thing that I'm sure my Special

6    Master doesn't want you to know, and that is he sees himself

7    as in the business of trying to keep away from me the details

8    of the problem and just to give me an overview and he'll take

9    care of it all by negotiating with you guys.

10        And, you know, I don't think that's wrong.  But what

11   happens is I have one of these hearings, and I am startled by

12   how much difficulty the department has and CDCR has.  And I

13   just don't know anything else to do but to give him another

14   terrible burden, but I just don't know what else to do.

15        Go ahead.  I'm sorry.  I'm thinking out loud.  But

16   you ought to have the benefit of it so you don't waste your

17   time and understand what my concerns are.

18        MS. VOROUS:  I do, Your Honor.  I appreciate that.

19        I think Miss Ahlin testified that the department is

20   moving in the direction of bringing on as many full-time

21   civil servant employees to try to move away from the

22   challenges that they've had since they started experiencing

23   staffing challenges in December, January of this year.

24        And there's going to be, you know, a continued effort

25   to meet all of their needs in the permanent 128 beds with

197

1    full-time civil service.

2           Now, I can't guarantee that obviously.

3           THE COURT:  Obviously.

4           MS. VOROUS:  But the intent is to do that.  And the

5    intent is to come up with a solution to presenting what makes

6    sense today.

7           The categories that were developed and the reporting

8    that was put in place back in 2007 clearly does not work

9    today.  We have a change in the budget.  We have a change in

10   the programs.  And there's positions that are listed, for

11   instance, that are not even used anymore.

12          And the commitment has been made to do that.  The

13   department is committed, and the department is committed to

14   continue to provide those.

15          Since December, just because the case is in

16   litigation and I understand that, there has been -- there has

17   been testimony, there has been declarations that have been

18   provided that talk about the number of staff, the

19   fluctuations, the efforts that have been made by the

20   department prior to even receipt of the psychiatrists'

21   letter.

22          In the declarations we submitted with the opposition

23   papers, for instance, Miss Gaither talks about all of the

24   challenges that came about in announcing, use that term, the

25   migration plan associated with the new Stockton facility.

198

1        And this, as everyone knows, is a big project, this

2    is something that has not been part of this case before, and

3    it has created challenges with employee morale.  Staff, you

4    know, understandably deciding to leave because of the new

5    program.  But yet they have continued to maintain, at least

6    according to what Dr. Troncoso testified.

7        And Dr. Troncoso, you're correct, at the time he was

8    testifying there was a two-month period where his caseload

9    was very high.  I don't think anyone disagrees with that.

10   But at the same time he also testified that during that same

11   time period he worked very hard, all of his patients received

12   treatment, there was no harm.  So we're hoping to be beyond

13   that.

14       THE COURT:  I want to say to you, while I have a

15   great deal of respect for that witness, his evaluation of how

16   hard he worked -- and I believe he worked very hard -- but it

17   doesn't follow from that that every patient's needs were met.

18       I don't mean that disrespectfully.  I mean, that's

19   what happened.  With 70 patients, I mean, it is just

20   impossible.

21       You know, everybody talks about the treatment teams,

22   the psychologists and the social workers and everybody, you

23   know it almost reduces the psychiatrist to the guy who

24   decides what medications are being given.

25       And I don't mean -- I can hear myself, and I can hear

199

1    people thinking I'm criticizing.  I'm not.  It's just a

2    hopeless -- I hope that's not true -- a very difficult

3    situation.

4         Well, I'm sorry.  We're having a conversation instead

5    of your arguing.  I apologize.  Go ahead.

6         MS. VOROUS:  Judge, Dr. Troncoso, as well as

7    Dr. Bandeaux, both testified that, you know, despite the

8    challenges that were taking place during that time period,

9    they provided more than basic medication management.

10        They both testified that they were heavily involved

11   in the initial admission process, involved in treatment, team

12   meetings, development of the patient's treatment plan, they

13   were able to see their patients when the patients were

14   scheduled to be seen and be able to respond -- at least

15   Dr. Troncoso responded to requests from patients to see

16   him.

17        You know, what else I would like to point out, and I

18   know Your Honor is aware of this, that the psychiatrists were

19   not the only part of this treatment team.

20        When you look at the full broad spectrum of all of

21   the care that is being provided, the patients were receiving

22   and are continuing to receive group hours.

23        There was testimony today group hours are provided.

24   A group is provided every day.  There's -- I think the

25   testimony, just looking at one week, was 19 or 20 hours per

200

1   average per unit per week.

2          That's very different than the picture that was

3   painted in terms of treatment.  And I think that the

4   testimony has established that the inmates were at the point

5   in time that we were talking about and are continuing today

6   to receive appropriate care.

7          The fact that there was a challenge with staffing in

8   and of itself is not deliberate indifference.

9          THE COURT:  I absolutely agree.  But we have the

10  state's view and my view about this problem, as I have tried

11  to indicate in the order, relative to termination is

12  different.

13         I don't know that the plaintiff agrees with me.

14  Deliberate indifference is a question of whether or not there

15  is an initial failure of such character to constitute a

16  constitutional violation.  Once found, everything else that

17  follows is remedial in nature.

18         The essential need is to address the failures which

19  arose by virtue of the violation of the constitution.

20  Whatever else Mr. Lope's job is, it is clear he's got a job

21  of making sure people are no longer deliberately indifferent.

22         What was so sad about the termination proceeding was

23  to demonstrate that despite Mr. Lope's -- and I know you

24  disagree, but that's for the Court of Appeals ultimately to

25  resolve -- that despite Mr. Lope's efforts and his team,

1  there was continued actual deliberate indifference.  It was

2  not -- I was surprised.

3       So I mean, we have a basic disagreement as to what's

4  happened subsequent and whether or not at every stage the

5  question that I have to answer is deliberate indifference.

6       No.  The question I have to answer is whether or not

7  we have resolved the problem.  And that is why the

8  termination was denied.  And I just don't see how I can

9  possibly do my job without my Special Master's help because I

10  can't be in the institution.

11      I can't have -- I mean, the Special Master has

12  experts who go in.  One of the questions is:  Well, look,

13  we've got this treatment team, and this treatment team is

14  ensuring adequate care.  And that may be true.  But I have no

15  way of knowing that.

16      Your witnesses, and I don't mean this critically -- I

17  suppose I do, but, you know, like every person you come to

18  identify -- I sometimes say, when I describe my experience in

19  the Army, you get to say that my concentration camp is better

20  than your concentration camp.  People come to identify with

21  their institution.  It is just inevitable.

22      I believe I need an outside expert to tell me:  Yes,

23  Judge, they're doing an all right job.  Leave them alone.

24  Or:  No, Judge, we need to do some work.

25      I have no way of doing that.  As I say, I have one or

202

1    two cases besides Coleman.

2         You know, I don't want to torture you.  Tell me --
3    I'm sorry I keep interrupting you, but I'm trying to explain
4    to you why I think I know what I'm going to do.

5         Go ahead.

6         MS. VOROUS:  Well, Your Honor, I do respect your
7    opinion on what standards apply to this case.  I wasn't
8    intending to recite those as well.  But what I would like to
9    say is that when looking at whether or not to grant the
10   relief that the plaintiffs are requesting, that Your Honor go
11   back and review the actual evidence the plaintiffs presented
12   as to inadequate care.

13        The only testimony that directly related to care was
14   from Dr. Stewart and Dr. Bandeaux.  And we've already talked
15   about what Dr. Badeaux's testimony was.

16        He agreed he was able to provide his patients the
17   care that they needed.

18        Dr. Stewart, in looking at the Department of State
19   Hospital program for approximately an hour -- looked at the
20   program for approximately an hour and based his opinion on
21   that review, as well as his review of seven patients that he
22   considered, quote, "premature discharges."

23        Dr. Troncoso, who was one of the treating providers,
24   provided the Court with a credible explanation of the
25   rationale and reasons why he discharged the patient.

203

1          Dr. Stewart never looked at the mental health

2     treatment records the Department of State Hospital maintained

3     for any of those patients.

4          You know, defendants propose that level -- that level

5     of evidence is insufficient to justify any further orders in

6     this Court or any oversight by the Special Master with

7     respect to the Department of State Hospitals care within

8     their hospitals.

9          I wanted to go back quickly, because I know I'm

10    running out of time here given your limitation, to talk just

11    briefly about the other report that you mentioned concern

12    with.  This was the report that had been prepared in response

13    to a request by the union where the Salinas Valley

14    Psychiatric Program executive director at that time submitted

15    information on staffing reductions and cost savings.

16         And yes, it is accurate that that information was

17    then uploaded to the department's website, but what did

18    not -- but what else was explained was that information was

19    then changed through the budget process.  And it was changed

20    as part of the governor's proposed budget in going forward.

21         And that information is available.  It is public.  It

22    is not in -- it was not presented as evidence during this

23    proceeding, but it is information that's publicly available.

24         And so because this information was put up there --

25    was creating the error, and put up in response to a union

204

1   request, that should not lead Your Honor to conclude that the

2   budget request, the documents that the Department of State

3   Hospitals is providing in the context of their budget are in

4   any way inaccurate or contain errors.

5          I mean, I think that has been established through

6   this hearing.

7          THE COURT:  I'm sorry.  I really don't understand

8   what you have just said.  I'm leafing through these

9   documents.  I can't believe I can't put my hands right on it.

10         What is the document?

11         MS. VOROUS:  I believe it was Exhibit 5.  There was a

12  pull-out.

13         THE COURT:  No.  No.  I'm looking for something else.

14  I'm looking for the letter that was signed by all the

15  psychiatrists at Salinas Valley.

16         MS. VOROUS:  That letter, I believe, was Exhibit 9.

17         THE COURT:  You know, that's what I thought, but

18  maybe I just went over it.

19         Hang on a second.

20             (Brief pause.)

21         MR. BIEN:  Your Honor, it is 9 and 10 were the two

22  letters.  Plaintiffs' 9.

23         THE COURT:  Oh, I must have just overlooked it.

24         Hang on a second.

25             (Brief pause.)

205

1          Well, the letter says what the letter says.  I must

2    respectfully say it appears to contradict Dr. Troncoso --

3    Dr. Troncoso's testimony.  But be that as it may, we'll see.

4          Anything else that we need to --

5          MS. VOROUS:  Yes.  Can I have a couple more minutes?

6          THE COURT:  Sure.  I will tell you this is important

7    enough that even though I told you when we have to quit,

8    we've already exceeded that so go ahead.

9          MS. VOROUS:  With respect to the scope of the request

10   for relief that the plaintiffs have mentioned, there has not

11   been any evidence presented whatsoever with respect to any

12   mismanagement of the Stockton migration plan.  There has been

13   no evidence at all with respect to VPP.

14         THE COURT:  I think that's right.  But what the

15   plaintiff has suggested, and what seems to me to be not

16   inappropriate, is concern about how -- not about Stockton,

17   but about how Stockton is going to affect Salinas Valley and

18   apparently the other prison hospital as well.

19         And it is the interrelationship of Stockton and the

20   other hospitals that is a concern.  In any event, I assume

21   the Special Master believes, and if he doesn't I'll tell him,

22   that one of his responsibilities is to be monitoring what

23   happens at Stockton.  Not because we're worried about

24   mismanagement, but because it is a major task that I don't

25   believe anybody has -- I agree with the defendants' testimony

206

1   that it is a major task, requiring significant planning, and

2   who knows how it is going to work.  And I've just got to know

3   what's going on.  And I assume that the Special Master

4   doesn't need any particular instruction about that.

5           Ma'am, I don't want to waste your time.  I will tell

6   you, I have significant concerns.  And my real question is

7   what to do about them.  And I don't really think that further

8   argument is going to help me.  I'm just going to have to go

9   back.

10          I said I was going to have to go back and read all

11  the transcripts, but actually I don't know that I have to do

12  that -- I mean the transcript of this hearing.

13          But actually, as I sit here now thinking about it, I

14  may not have to do that because what I feel relatively

15  confident about -- although, I may do it anyhow because it is

16  so important -- but what I really feel mainly is there are

17  serious questions which I need the guidance -- I need the

18  information of the Special Master about.

19          I don't think I want you to waste any more of your

20  energy or time.

21          You know, unless you have some great need to respond,

22  I really don't need anything more from the plaintiff either.

23          Mr. Bien?

24          By golly, he has more.

25          MR. BIEN:  Only on one issue, whether we introduced

207

1    evidence concerning the other programs.

2         We did, because the staffing ratio is going to apply

3    to all the ICF programs, the cuffing policy and the

4    orientation policy.  And so I think those are the issues.

5    We're not saying -- those are the issues that need to be

6    addressed.

7         Thank you, Your Honor.

8         THE COURT:  Thank you.

9         I want to say that in some ways this hearing has been

10    quite painful, and I have, I think, spoken quite sharply to

11    lawyers on both sides.  For that I apologize.  I will do the

12    best I can.

13         Thank you very much.

14         The matter will stand submitted.

15         (Off the record at 4:50 p.m.)

16                         ---o0o---

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10              IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25