KAMALA D. HARRIS
Attorney General of the State of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS - 166884
PATRICK McKINNEY - 215228
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-5843
Email: Patrick.McKinney@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
WALTER R. SCHNEIDER - 173113
SAMANTHA D. WOLFF - 240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et. al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>    Defendants. | CASE NO. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>    Defendants. | CASE NO. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' STATUS REPORT IN RESPONSE TO JUNE 30, 2011, APRIL 11, 2013, AND JUNE 20, 2013 ORDERS** |

The State submits this status report on the state prison population as required by the Court's June 30, 2011, April 11, 2013, and June 20, 2013 orders. Exhibit A sets forth the current design bed capacity, population, and population as a percentage of design bed capacity for each state prison and for all state prisons combined.[1] Exhibit A shows that as of July 10, 2013, 119,117 inmates were housed in the State's 33 adult institutions, which amounts to 149.4% of design bed capacity.[2] Defendants have successfully reduced the population in the State's 33 institutions by 25,071 inmates since October 2011 when the State implemented public safety realignment under Assembly Bill 109, and by 42,994 inmates since November 2006 when Plaintiffs moved to convene this Court. (*See* Defs.' Oct. 14, 2011 report, ECF 2407-1/4099-1 & Decl. J. Beard Supp. Defs' Mot. Vacate or Modify Pop. Reduction Order ¶ 3, ECF 2544/4346.)

## COURT-ORDERED AMENDED POPULATION REDUCTION PLAN

### I.  MEASURES IN THE COURT'S AMENDED PLAN

#### A.  New Construction

As discussed in the July 3, 2013 report, Defendants expect to begin admitting patients to the California Health Care Facility in Stockton on July 22, 2013. (Decl. Jeffrey Beard Supp. July 3 Status Report (July 3 Beard Decl.) ¶ 2.)

#### B.  Expanding Fire Camp Capacity

This measure has been accomplished. The budget for fiscal year 2013-14 includes an increase of $15.4 million to fund the participation of 3,800 state prison inmates in fire camps. (*See* http://www.ebudget.ca.gov/ 2013-

---

[1] Although Exhibit A reports design capacity and actual population in the aggregate and by institution, Defendants note that the Supreme Court recognized that the Court's order affords "the State flexibility to accommodate differences between institutions" and there is "no requirement that every facility comply with the 137.5% limit." *Brown v. Plata*, 563 U.S. ___, 131 S. Ct 1910, 1940-41 (2011).

[2] The data in Exhibit A is taken from CDCR's July 15, 2013 weekly population report, available on CDCR's Web site at http://www.cdcr.ca.gov/Reports_ Research/Offender_ Information_ Services_Branch/Population_ Reports.html.

14/pdf/Revised/BudgetSummary/CorrectionsandRehabilitation.pdf.) The Blueprint contemplated reducing fire camp capacity to 2,500 inmates by June 27, 2013 but, due to the budget increase and CDCR's efforts to screen and evaluate additional inmates for fire camp eligibility, CDCR currently houses 3,923 inmates in fire camps. (July 3 Beard Decl. ¶ 3.) CDCR will continue to house at least 3,800 inmates in fire camps consistent with the Court's Amended Plan. (*Id.*)

### C. Increasing Prison Credits

Defendants submitted draft statutory language to the Legislature for the measures in the Court-ordered plan that Defendants lacked authority to enact, including a number of proposed amendments that would increase prison credits. (Beard Decl. ¶ 4.) On June 20, 2013, the Court directed Defendants to implement credits retroactively, but permitted Defendants to make other substitutions that would effectuate the release of the same number of prisoners. (ECF 2659/4662 at 49-50.) Defendants are assessing the Court's order to implement credits retroactively, as well as potential alternative measures to achieve the same level of reductions. (Beard Decl, ¶ 5.) As part of that assessment, Defendants have also begun identifying and addressing technical considerations for the implementation of credits program. (*Id.*)

As explained in Defendants' request for clarification filed on July 10th, several provisions of article I, section 28 of the California Constitution prohibit implementation of these credit measures. (ECF 2674/4686 at 2.) Accordingly, Defendants have requested clarification that the Court has in fact waived these state constitutional provisions so that these measures could be implemented. (*See id.*)

### D. Expanding Criteria for Medical Parole

On June 21, 2013, Defendants submitted draft legislative language to the Legislature to amend section 3550 of the Penal Code to expand criteria for medical parole. (Beard Decl. ¶ 4.) Following the Court's June 20th Order waiving all state and local laws and regulations that prevented Defendants from implementing the Court's Amended Plan, Defendants have worked with the Receiver to obtain a preliminary list of

1  potentially eligible candidates for medical parole under the expanded criteria. (Beard
2  Decl. ¶ 6.) Defendants continue to work with the Receiver's Office and the Board of
3  Parole Hearings (the Board) to develop a schedule and process for implementing this
4  measure for eligible inmates. (*Id.*; *see also* Decl. Jennifer Shaffer Supp. Defs.' July 18,
5  2013 Status Report (Shaffer Decl.) ¶ 13.) To that end, on July 12, 2013, Defendants met
6  with the Receiver and the Board to discuss criteria for prioritizing eligible candidates on
7  the list, establishing processes and timelines for the Receiver's Office to submit medical
8  packets, and discuss how to manage post-release issues, such as placement and
9  transportation for paroled inmates. (Beard Decl. ¶ 6.)

As explained in Defendants' request for clarification filed on July 10th, several provisions of article I, section 28 of the California Constitution prohibit implementation of this measure. (ECF 2674/4686 at 2.) Defendants also explained that article XVI, section 7 of the state constitution, as well as specified statutory provisions, prohibit Defendants from expending the state funds needed to implement this measure without a legislative appropriation. (*Id.* at 1-2.) Accordingly, Defendants have requested clarification that the Court has in fact waived these state constitutional and statutory provisions, so that this measure could be implemented. (*See id.*)

### E.  Establishing New Parole Process for Low-Risk Elderly Inmates

Following the Court's June 20th Order, Defendants are working to identify potentially eligible candidates for elderly parole. (Beard Decl. ¶ 6.) On June 21, 2013, Defendants submitted draft legislative language to the Legislature that would establish a parole process for low-risk elderly inmates. (Beard Decl. ¶ 4.) Defendants continue to work with the Board of Parole Hearings to develop a process for implementing this measure. (*Id.*) CDCR's Division of Internal Oversight and Research is currently working to identify, screen, and evaluate inmates who would be eligible. (Beard Decl. ¶ 7.) Inmates who are 60 years old or older, have served 25 years in custody, and who are not serving a condemned sentence or term of life without the possibility of parole are preliminarily eligible. (*Id.*) To the extent this population of elderly inmates overlaps with

those inmates being considered for medical parole, Defendants are developing a process to address such overlap. (*Id.*) Further, the Board is exploring how it will conduct comprehensive risk assessments for these individuals as part of the elderly parole suitability review, consisting of an in-person interview between the inmate and a psychologist. (Shaffer Decl. ¶ 21.)

As explained in Defendants' request for clarification filed on July 10th, several provisions of article I, section 28 of the California Constitution prohibit implementation of this measure. (ECF 2674/4686 at 2.) Defendants also explained that article XVI, section 7 of the state constitution, as well as specified statutory provisions, prohibit Defendants from expending the state funds needed to implement this measure without a legislative appropriation. (*Id.* at 1-2.) Accordingly, Defendants have requested clarification that the Court has in fact waived these state constitutional and statutory provisions, so that this measure could be implemented. (*See id.*)

### F. Slowing the Rate of Returning Inmates to California

To comply with the Court's June 20, 2013 Order and Amended Plan, Defendants have extended their contracts to house inmates in other states for up to three years, contingent on the Court's clarification that it has waived the constitutional and statutory provisions that bar the State from spending State funds without a legislative appropriation. (Beard Decl. ¶ 8; *see also* ECF 2674/4686 at 1-2.) Defendants housed 8,982 inmates in other states as of July 10, 2013, and endorsed and sent inmates for participation in the out-of-state program prior to June 30, 2013. (Beard Decl. ¶ 8.)

### G. Pursuing Contracts with Counties with Available Jail Capacity

The Court did not credit Defendants with any population reduction resulting from this measure based on the understanding that it would not achieve any specific population reduction by December 31, 2013. (ECF 2659/4662 at 29.) In the court-ordered plan, Defendants estimated "that the prison population could be reduced by approximately 1,600 inmates by December 31, 2013" by increasing use of contacted jail capacity. (ECF 2609/4572 at 6 & 33.) On June 21, 2013, Defendants submitted draft

legislative language to the Legislature to amend section 2910 of the Penal Code to contact for up to 1,600 jail beds from counties with available capacity. (Beard Decl. ¶¶ 4, 9.) Defendants are continuing to pursue the viability of this option. (*Id.* at ¶ 9.) As with the other options requiring the expenditure of state funds, it is contingent on the Court's clarification that it has waived the constitutional and statutory provisions that bar the State from spending State funds without a legislative appropriation. (ECF 2674/4686 at 1-2.)

## II.     DEVELOPMENT OF A COURT-ORDERED EARLY RELEASE SYSTEM

As required by the Court's April 11 and June 20, 2013 orders, Defendants are making diligent and concerted efforts "to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release." (June 20, 2013 Order, ECF 2659/4662 at 41; Beard Decl. ¶ 10.) The system is taking shape but is not yet complete. (Beard Decl. ¶ 10.) Defendants' best estimate is that the system will be finalized in approximately 30 days. (*Id.*) Defendants have conducted, and continue to conduct, numerous deliberation meetings, reviews, and assessments of the current offender population, and will advise the Court of any changes to Defendants' estimated timeline to finalize the system. (*Id.*) Several provisions of article I, section 28 of the California Constitution prohibit Defendants from releasing inmates early. (ECF 2674/4686 at 2.) Accordingly, the Court must clarify that it has in fact waived these state constitutional provisions before this system could be implemented. In addition, several of the factors that make development of the system difficult and time consuming are outlined below.

First, even inmates with a "low risk" rating under the California Status Risk Assessment are not "unlikely to reoffend." (Beard Decl. ¶ 11.) Between 2007 and 2010, 41% of inmates released with a low risk score were returned to prison within 3 years after being rearrested for either violating their parole or committing a new crime. J. Petersilia & J. Greenlick Snyder, *Looking Past the Hype: 10 Questions Everyone Should Ask About California's Prison Realignment*, 5(2) Cal. J. Pol. Pol'y 266, 295 (2013). Of those CSRA-defined "low risk" offenders who recidivated, 11% were rearrested for a violent felony. *Id.*

Second, contrary to the mistaken notion that "moderate changes to the good time credit program could result in the release of an adequate number of prisoners to meet the December 31, 2013 benchmark of 137.5% without the release of violent offenders," (*see* 6/20 Order at 40-41), there are simply not enough low-risk, non-violent, non-serious, non-registerable sex offense inmates suitable for early release. (Beard Decl. ¶ 11.) In June 2007, when the Expert Panel on Adult Offender Recidivism Reduction Programming's Report to the California State Legislature was released, CDCR housed 32,397 inmates serving prison time for non-violent, non-serious, and non-registerable sex offenses. (Declaration of Jay Atkinson in Support of Defendants' July 18, 2013 Status Report (Atkinson Decl.), ¶ 3 & Ex. A.) Over a year later, in November 2008 when the Three-Judge Panel trial began, there were approximately 30,128 such inmates. (Atkinson Decl. ¶ 4 & Ex. A.) That number has dramatically decreased as a result of Realignment which, as of October 1, 2011, requires lower-level offenders to serve their sentences in county jails. A.B. 109, 2011 Leg. (Cal. 2011), Ch. 15. Thus, today the remaining prison population of inmates serving time for non-violent, non-serious, and non-registerable-sex offenses (and without any such prior offenses) has been reduced to just 9,077. (Atkinson Decl. ¶ 5 & Ex. A.)

Much of this population, however, bears considerable risks for early release. (*See* Atkinson Decl. ¶ 5.) Over three-quarters of these inmates have "moderate" and "high" risk of recidivism scores under the CSRA—meaning that there exists a far greater likelihood that these inmates will reoffend upon release. (Atkinson Decl. ¶ 5.) Of inmates released in 2007-2008, 57% of inmates defined as medium risk under the CSRA and 74% of those defined as high risk were arrested and returned to prison for violating their parole or committing a new crime within three years of their release. J. Petersilia & J. Greenlick Snyder, *Looking Past the Hype: 10 Questions Everyone Should Ask About California's Prison Realignment*, 5(2) Cal. J. Pol. Pol'y 266, 295 (2013).

This population of 9,077 non-serious, non-violent, non-registerable sex offenders also includes inmates who pose a substantial risk to the community based on their in-

prison behavior or amount of time served. (Atkinson Decl. ¶ 6.) For example, it includes inmates who have committed serious in-prison felonies[3] or who are validated prison gang-members. (Atkinson Decl. ¶ 6.) It is well established that recent institutional misconduct reflecting non-compliance with correctional intervention and lack of impulse control is highly probative of an individual's current dangerousness. (Shaffer Decl. ¶ 21.) Further, release of inmates with fewer than twelve months left to serve on their sentence, while not without risk, poses a lower relative risk to public safety. (Beard Decl. ¶ 12.)

In short, of the 9,077 inmates currently serving time for non-violent, non-serious, non-registerable sex offenses, only 1,205 inmates are defined by the CSRA as having a low risk to recidivate, have not been validated as a prison gang member, have not committed in-prison felonies within the past 10 years, and have less than a year to serve on their sentence. (Atkinson Decl. ¶ 7.) Even excluding the time-left-to-serve constraint yields a population of approximately 1,777 inmates. (*Id.*) Stated another way, over three-quarters of the inmates serving a current term for a non-violent, non-serious, and/or non-registerable sex offense are at a high or medium risk of reoffending upon release, and/or committed a serious in-prison felony or has been validated as a gang member. (*Id.*)

Because there are not enough low-risk, nonviolent offenders sufficient to meet the gap of 4,170 identified by the Court (6/20 Order at p.29), development of the early-release system requires evaluation of offenders who have committed violent crimes as well as offenders with elevated risk scores under the CSRA. (Beard Decl. ¶ 12.) These evaluations and decisions are not quick, clear, or easy. (*Id.*)

---

[3] Serious in-prison felonies are enumerated in Section 3323 of Title 15 and include, among other crimes, murder, attempted murder, manslaughter, battery causing serious injury, assault or battery with a deadly weapon, rape, taking a hostage, escape or attempted escape with force or violence, arson, and battery on a peace officer. Cal. Code Regs. tit. 15, § 3323 (2008).

| | | |
|---|---|---|
| 1 | DATED: July 18, 2013 | HANSON BRIDGETT LLP |
| 2 | | |
| 3 | | By: /s/ *Paul B. Mello* |
| 4 | | PAUL B. MELLO<br>Attorneys for Defendants |
| 5 | DATED: July 18, 2013 | KAMALA D. HARRIS<br>Attorney General of California |
| 6 | | |
| 7 | | |
| 8 | | By: /s/ *Patrick R. McKinney*<br>PATRICK R. McKINNEY<br>Deputy Attorney General |
| 9 | | Attorneys for Defendants |