1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   JAY C. RUSSELL
    Supervising Deputy Attorney General
4   DEBBIE VOROUS, State Bar No. 166884
    PATRICK R. MCKINNEY, State Bar No. 215228
5   JESSICA KIM, State Bar No. 257766
    MANEESH SHARMA, State Bar No. 280084
6   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA  94102-7004
      Telephone:  (415) 703-3035
8   Fax:  (415) 703-5843
      E-mail:  Patrick.McKinney@doj.ca.gov
9   *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>        v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DEFENDANTS' OPPOSITION TO MOTION RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES**<br><br>Date:          TBD<br>Time:          TBD<br>Dept:          4<br>Judge:         The Honorable Lawrence K. Karlton<br><br>Action Filed:  1990 |

1

# TABLE OF CONTENTS

2

Page

3   Introduction. .................................................................................................................. 1

4   Relevant Factual Background ........................................................................................ 2

5   I.   California Has a Comprehensive Use-Of-Force Policy and System To Ensure that Staff Apply Force in Good Faith and Not Maliciously and Sadistically for the Purpose of Causing Harm. ............................................... 2

6       A.   CDCR's Court-Approved Statewide Use-of-Force Policy. ...................... 3

7       B.   The State's Comprehensive, Multi-Tiered System for Reporting, Reviewing, and Investigating Use-Of-Force Incidents. ............................. 4

8            1.   CDCR's Mandatory Reporting Requirements. .............................. 4

9            2.   CDCR's Process for Reviewing Use-of-Force Incidents and Imposing Corrective Action. .......................................................... 5

10
            3.   CDCR's Office of Internal Affairs Investigates Staff Use-of-Force and CDCR Imposes Discipline for Misconduct. ................... 6
11
            4.   CDCR Tracks All Use-of-Force Incidents. .................................... 7
12
        C.   The Office of Inspector General's Oversight of Use-of-Force Incidents Within CDCR. ............................................................................ 7
13

14   II.   CDCR Provides Extensive Training to Its Staff to Ensure That Force is Not Used Maliciously and Sadistically for the Purpose of Causing Harm. ................... 8

15   III.   Defendants' Court-Approved Disciplinary Processes Appropriately Accommodate Inmates' Mental Health Conditions. ............................................... 9

16   IV.   Evidentiary Issues. ............................................................................................ 10

17       A.   The Court Must Fully Consider All of the Reports Submitted by Defendants' Expert, Steve Martin. ........................................................ 10

18       B.   The Opinions of Plaintiffs' Expert Eldon Vail Should be Accorded Little Weight. ........................................................................................ 11

19   Legal Standards Applicable to Requests for Injunctive Relief .................................... 12

20   I.   The Standard for Obtaining Prospective Injunctive Relief Under the Prison Litigation Reform Act. ..................................................................................... 12

21   II.   Plaintiffs Failed to Meet their Burden of Proving that Current and Ongoing Constitutional Violations Require More Injunctive Relief. ................................. 13

22

23   Legal Argument ........................................................................................................... 14

24   I.   There is No Pattern or Practice that CDCR Systemically Applies Force Maliciously and Sadistically Against the Coleman Class to Cause Harm. ........... 14

25       A.   Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use of Force. ........................................................................ 16

26       B.   The Statewide Use-of-Force Policy Provides Heightened Safeguards for Inmates with Serious Mental Illness. ........................... 17

27       C.   Plaintiffs Failed to Demonstrate that Unnecessary or Excessive Force Disproportionately Affects Mentally Ill Inmates. ......................... 19

28

i

**TABLE OF CONTENTS**
(continued)

Page

D.  Plaintiffs Failed to Demonstrate Any Pattern or Practice of Unnecessary or Excessive Force with Respect to Use of the Expandable Baton or Oleoresin Capsicum (OC) Spray. ......................... 20

1.  Plaintiffs' Contentions Regarding Use of the Expandable Baton Are Contrary to their Own Evidence. ................................. 20

2.  Plaintiffs Failed to Establish a Pattern or Practice of Malicious and Sadistic Intent with Respect to the Use of Pepper Spray. ..................................................................... 22

E.  Plaintiffs Failed to Present Evidence Establishing a Pattern or Practice of Unreasonable or Unnecessary Use of Immediate Force Amounting to Malicious and Sadistic Intent. ............................. 24

1.  Plaintiffs Failed to Demonstrate that CDCR Inappropriately Uses Force Against Inmates Who Refuse to Relinquish Control of their Food Port. .............................................. 24

2.  The Statewide Policy for Recording Use-of-Force Incidents is Appropriate. ................................................................. 25

F.  CDCR Extensively Trains Staff on Use-of-Force, Including Training on Use of the Expandable Baton. ............................... 26

G.  The State's System for Reviewing and Monitoring Use-of-Force Incidents is Thorough and Comprehensive. ............................... 26

H.  Plaintiffs' Arguments Concerning the Use-of-Force Investigation Process are Misleading. ............................................. 27

I.  CDCR Imposes Meaningful and Appropriate Discipline on Staff for Unreasonable Uses of Force. ............................................. 28

II.  Plaintiffs Failed to Demonstrate Any Pattern or Practice within the Disciplinary Process that Violates the Rights of Mentally Ill Inmates. ............... 29

A.  Plaintiffs Failed to Demonstrate that Rules Violation Reports are Disproportionately Issued Against Mentally Ill Inmates. ........................ 30

B.  Plaintiffs' Evidence Regarding Rules Violation Hearings Demonstrates that Defendants' Accommodate Mental Health Conditions During the Disciplinary Process. ............................. 31

C.  Plaintiffs' Allegations Regarding Management Status are Incorrect. ........ 32

III.  No Law or Facts Support Plaintiffs' Contentions that Court-Approved Use of Force and Rules Violation Report Policies Should be Rewritten. .................... 33

A.  Plaintiffs' Proposed Orders Regarding Use-of-Force Policy Changes are Not Based on Admissible Evidence and Would Violate the PLRA. ............................................................. 34

B.  Plaintiffs' Proposed Orders Regarding Disciplinary Policy Changes Are not Based on Admissible Evidence and Would Violate the PLRA. ............................................................. 35

ii

**TABLE OF CONTENTS**
(continued)

Page

    C.    There Is no Basis for Ordering Plaintiffs' Request for Relief, Which
Consist of Best Practice Recommendations, not Constitutional
Requirements.......................................................................................... 35

Conclusion ............................................................................................................... 36

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

5
*Armstrong v. Schwarzenegger*
   622 F.3d 1058 (9th Cir. 2010).............................................................................. 13

6
*Bell v. Wolfish*
   441 U.S. 520 (1979)................................................................................. 14, 33
7

8
*Biselli v. County of Ventura*
   2012 U.S. Dist. LEXIS 79326 (C.D. Cal. June 4, 2012) ....................................... 30

9

10
*Coleman v. Wilson*
   912 F. Supp. 1282 (E.D. Cal. 1995)................................................................ 15, 18

11
*Gilmore v. California*
   220 F.3d 987 (9th Cir. 2000).............................................................................. 12
12

13
*Gomez v. Vernon*
   255 F.3d 1118 (9th Cir. 2001)...................................................................... 12, 13
14

15
*Hallett v. Morgan*
   296 F.3d 743 (9th Cir. 2002).............................................................................. 13

16
*Hayward v. Procunier*
   629 F.2d 599 (9th Cir. 1980).............................................................................. 33
17

18
*Hoptowit v. Ray*
   682 F.2d 1237 (9th Cir. 1982)............................................................................ 13

19

20
*Hudson v. McMillian*
   503 U.S. 1.................................................................................... 12, 14, 16, 20

21
*Jordan v. Gardner*
   986 F.2d 1521 (9th Cir. 1993)............................................................................ 15
22

23
*LeMaire v. Maass*
   12 F.3d 1444 (9th Cir. 1993).............................................................................. 15

24

25
*Madrid v. Cate*
   No. C 90-3094 TEH (N.D. Cal.) ................................................................... *passim*

26
*Mayweathers v. Newland*
   258 F.3d 930 (9th Cir. 2001).............................................................................. 13
27

28

**TABLE OF AUTHORITIES (continued)**

**Page**

*Olmstead v. L.C. ex rel. Zimring*
    527 U.S. 581 (1999) ............................................................................................. 30

*Rhodes v. Chapman*
    452 U.S. 337 (1981) ............................................................................................. 13

*Rizzo v. Goode*
    423 U.S. 362 (1976) ............................................................................................. 13

*Robins v. Meecham*
    60 F.3d 1436 (9th Cir. 1995) ............................................................................... 21

*Soto v. Dickey*
    744 F.2d 1260 (7th Cir. 1984) ............................................................................. 16

*Thomas v. Bryant*
    614 F.3d 1288 (11th Cir. 2010) ........................................................................... 15

*White v. Roper*
    901 F.2d 1501 (9th Cir. 1990) ............................................................................. 14

*Whitley v. Albers*
    475 U.S. 312 (1986) ............................................................................................. 14

*Wilkins v. Gaddy*
    559 U.S. 34 (2010) ............................................................................................... 14

*Williams v. Benjamin*
    77 F.3d 756 (4th Cir. 1996) ................................................................................. 15

*Wilson v. Seiter*
    501 U.S. 294 (1991) ............................................................................................. 14

CONSTITUTIONAL PROVISIONS

United States Constitution
    Eighth Amendment ................................................................................... 14, 15, 21

STATUTES

United States Code, Title 18
    § 3626 .............................................................................................................. 12, 13

v

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

**TABLE OF AUTHORITIES (continued)**

**Page**

California Code of Regulations, Title 15
  § 3268.............................................................................................................. 3, 4, 24, 34
  § 3268.1.................................................................................................................. 5, 6, 25
  § 3268.3........................................................................................................................... 27

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| **CCCMS** | Correctional Clinical Case Management System |
| **CDCR** | California Department of Corrections and Rehabilitation |
| **D.O.M.** | Department Operations Manual |
| **DAI** | Division of Adult Institutions |
| **EOP** | Enhanced Outpatient Program |
| **IERC** | Institutional Executive Review Committee |
| **OC** | Oleoresin Capsicum |
| **OIA** | Office of Internal Affairs |
| **OIG** | Office of Inspector General |
| **RVR** | Rules Violation Report |
| **SHO** | Senior Hearing Officer |
| **UOF** | Use of Force |

# INTRODUCTION.

There is no pattern or practice of force being used by CDCR staff maliciously and sadistically to cause harm against *Coleman* class members, or any pattern or practice that force is used without accounting for class members' mental health status. Under the guidance of the court and special master in *Madrid v. Cate,* CDCR developed and implemented comprehensive statewide use-of-force policies and procedures, and has demonstrated compliance with its policies through the following:

- Heightened safeguards—including verbal persuasion, a "cooling off" period, and clinical intervention before staff use force—to ensure that staff consider whether an inmate's behavior was caused by mental illness and the effect any use of force may have had on that inmate;

- Mandatory reporting of use-of-force incidents;

- A multi-tiered review process for every use-of-force incident;

- Effective training (both pre-service and in-service) for all correctional staff on the proper use of force and the proper reporting on the use of force;

- Effective and appropriate investigation of use-of-force incidents through CDCR's Office of Internal Affairs;

- Meaningful disciplinary measures imposed on those staff who violate use-of-force policies and procedures; and

- Independent and effective oversight of the system by the Office of Inspector General.

Plaintiffs now seek to unravel these carefully crafted policies and procedures blessed by the *Madrid* court based on expert testimony that lacks in foundation or even a basic understanding of governing legal principals. Their request that the Court make wide-ranging systemic changes based on incomplete information from a handful of isolated incidents (which in any event do not support their argument) must be rejected. All admissible evidence shows that CDCR staff use force in good-faith efforts to maintain or restore order, and Plaintiffs have presented no evidence—systemic or otherwise—that staff use force maliciously and sadistically, or with the sole purpose of inflicting pain or punishment.

The State also appropriately considers and accommodates mental health in the disciplinary process. CDCR has policies and procedures that are consistently applied, and a well-defined system for referring and completing mental health assessments by a trained clinician prior to a

1

1    disciplinary hearing.  CDCR's hearing officers consider the clinician's assessment and mitigate

2    sanctions when appropriate.  Like their faulty attempt to reconfigure the State's comprehensive

3    system to minimize and control unreasonable and excessive use of force, Plaintiffs' critique of

4    CDCR's disciplinary system is lacking in analysis or evidence.  Even the handful of cases

5    presented by Plaintiffs demonstrate that staff consider and accommodate inmates' mental health

6    conditions in disciplinary proceedings.  Plaintiffs have failed to demonstrate that the State's

7    disciplinary process is lacking in any constitutional sense.

8         Finally, Plaintiffs mischaracterize and confuse best-practice recommendations with

9    constitutional requirements.  The list of additional requirements Plaintiffs seek are no more than

10   professional preferences, and the State has exercised its judgment in adopting some of the

11   recommendations while determining that others are unnecessary or even reflect unsound

12   correctional practices.  Plaintiffs present no evidence of any current and ongoing constitutional

13   violations against the *Coleman* class with respect to staff use-of-force or the inmate disciplinary

14   process, and the relief they request is beyond the power of this Court.  Simply, Plaintiffs' request

15   is not narrowly tailored to correct constitutional violations (of which none have been identified).

16   No further orders are necessary or appropriate.

17               **RELEVANT FACTUAL BACKGROUND**

18   **I.   CALIFORNIA HAS A COMPREHENSIVE USE-OF-FORCE POLICY AND SYSTEM TO
          ENSURE THAT STAFF APPLY FORCE IN GOOD FAITH AND NOT MALICIOUSLY AND
19        SADISTICALLY FOR THE PURPOSE OF CAUSING HARM.**

20        California has "both department and local use of force regulations that are consistent with

21   sound correctional practice and model policies and procedures governing staff use of force."

22   (Martin Exp. Rpt. 11, ECF 4279.)  Those regulations "establish heightened safeguards for inmates

23   with mental illness."  (*Id.*)  Plaintiffs spend nearly five pages of their motion documenting the

24   Magistrate Judge's 1994 findings, reports of the special master filed between 2001 and 2005, and

25   arguments they made in a motion filed in 2007.  (Mot. 8-12.)  None of this dated information is

26   relevant to conditions existing today.  Plaintiffs ignore the critical facts occurring between 2007

27   and 2013, which resulted in the comprehensive, court-approved statewide use-of-force policy and

28   oversight by the Office of Inspector General.  This omission is particularly glaring because the

2

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1  State's implementation of that policy in 2010 caused the court in *Madrid v. Gomez*, C-90-3094

2  TEH (N.D. Cal.), to dismiss that case.  (*See* Declaration of Michael Stainer ¶ 4; Declaration of

3  Maneesh Sharma Exs. 1-3.)  California's multi-faceted use-of-force policy, which includes

4  heightened safeguards to ensure that inmates with mental illness are not subjected to unnecessary

5  or excessive use of force, is discussed below.

6      **A.   CDCR's Court-Approved Statewide Use-of-Force Policy.**

7      CDCR most recently revised its statewide use-of-force policy in August 2010, and the

8  revisions were approved by the federal district in *Madrid*.  (Declaration of John Day ¶ 4.)  In

9  March 2011, upon implementation of the statewide use-of-force policy and without opposition

10  from the Plaintiffs, the *Madrid* Court terminated the case.  (*Id.*; Sharma Decl., Exs. 1 [3/21/11

11  Madrid Termination Order], 2 [Pls.' 1/21/11 Resp. to OSC] & 3 [1/21/11 Fama Decl.].)

12      CDCR's policy is "to accomplish the departmental functions with minimal reliance on the

13  use of force."  15 Cal. Code Regs., § 3268(b); Department Operations Manual (D.O.M.) §

14  51020.1.[1]  Officers are authorized to use "reasonable force," defined as "the force that an

15  objective, trained, and competent correctional employee, faced with similar facts and

16  circumstances, would consider necessary and reasonable to subdue an attacker, overcome

17  resistance, effect custody, or gain compliance with a lawful order."  15 Cal. Code Regs., §§

18  3268(a)(1) & 3268(b); D.O.M. §§ 51020.1 & 51020.4.  The policy further defines "unnecessary

19  force" as "the use of force when none is required or appropriate," and "excessive force" as "the

20  use of more force than is objectively reasonable to accomplish a lawful purpose."  *Id.*

21      The policy does not require officers to use force in any particular sequence, but does require

22  officers, whenever possible, to use verbal persuasion or other orders before resorting to force.  15

23  Cal. Code Regs., § 3268(c); D.O.M. § 51020.5.  As discussed in Section I.D.2 of the Legal

24  Argument, CDCR staff attempt alternatives, including verbal persuasion, intervention by clinical

25  staff, and a "cooling off" period, before using force.  (*See also* Martin Decl. ¶¶ 16-22.)  Once

26  alternatives have been exhausted, use-of-force options include but are not limited to: (1) chemical

27          [1] A copy of the relevant sections of the Department Operations Manual (Chapter 5, Article
2 – Use of Force) is attached as Exhibit A to the Declaration of Michael Stainer.

28

3

1   agents, (2) hand-held batons, (3) physical strength and holds, (4) less-lethal weapons, and (5)

2   lethal weapons.  *Id.*

3       Both department and local use-of-force regulations establish "heightened safeguards for

4   inmates with mental illness."  (Martin Exp. Rpt. 11, ECF 4279.)  Those safeguards apply to any

5   inmate housed in an Enhanced Outpatient Program or Psychiatric Services Unit, or any inmate at

6   the Enhanced Outpatient Program level of care.  D.O.M. §§ 51020.12.2, 51020.15.1, 51020.14 &

7   51020.14.1.  For inmates in the Enhanced Outpatient Program, Psychiatric Services Unit,

8   departmental hospitals, infirmaries, or Correctional Treatment Centers, controlled uses of force

9   require the following:

- consultation with a licensed health care practitioner before using chemical agents;

- clinical intervention.  Intervention is mandatory, and shall be provided by a mental health provider unless circumstances do not permit; and

- the clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force.

14  *Id.* § 51020.12.2.  Similarly, the policy requires consultation and a written recommendation from

15  health care staff before chemical agents are deployed against any inmate in the Enhanced

16  Outpatient Program or Psychiatric Services Unit.  *Id.* at § 51020.15.1.  If chemical agents are

17  used, staff must ensure that proper medical equipment and trained health care staff are available

18  during and after the application of the agents to treat the inmate for any adverse reaction.  *Id.*  The

19  policy further prohibits the use of 37mm and 40mm launchers in controlled use-of-force

20  situations against Enhanced Outpatient Program inmates in a housing unit, except in carefully

21  prescribed circumstances.  *Id.* at §§ 51020.14 & 51020.14.1.  As discussed in this opposition and

22  the accompanying declaration of Steve Martin, the evidence submitted by Plaintiffs demonstrates

23  that CDCR adheres to these policies.

24      **B.   The State's Comprehensive, Multi-Tiered System for Reporting, Reviewing, and Investigating Use-of-Force Incidents.**

25      **1.   CDCR's Mandatory Reporting Requirements.**

26

27      "Any [CDCR] employee who uses force or observes a staff use of force shall report it to a

28  supervisor as soon as practicable and submit the appropriate documentation, prior to being

4

1   relieved from duty." 15 Cal. Code Regs., § 3268.1(a)(1); D.O.M. § 51020.17 (describing specific

2   requirements for contents of written reports).  All staff involved in the incident must write a

3   report by the end of their shift.  (Stainer Decl. ¶ 6; Day Decl. ¶ 5; D.O.M. § 51020.18.1.)  The

4   reporting requirements are very detailed and specific about the type of information that must be

5   documented.  (Stainer Decl. ¶ 6; D.O.M. §§ 51020.17.1 & 51020.17.6 [reporting requirements for

6   health care staff].)  The State's expert reviewed hundreds of use-of-force incident packets and

7   found them adequately detailed and timely to "provide sufficient information to conduct quality

8   reviews."  (Martin Exp. Rpt. 11, ECF 4279.)

9                    **2.     CDCR's Process for Reviewing Use-of-Force Incidents and Imposing
                            Corrective Action.**

10

11          The supervisory review structure for use-of-force incidents "is multi-tiered and

12   comprehensive."  (Martin Exp. Rpt. 12, ECF 4279; *see also* Sharma Decl. Exs. 4 [Barton Depo.]

13   54:16-56:16 & 6 [April 2013 OIG Report] 197 ["After the report is submitted, a multi-tiered

14   review process begins."]; Stainer Decl. ¶¶ 5-14; Day Decl. ¶¶ 5-12 & 14.)  Every incident

15   involving force is reviewed by the incident supervisor prior to the reporting employee being

16   relieved from duty.  (Stainer Decl. ¶ 7; Day Decl. ¶ 5; 15 Cal. Code Regs., § 3268.1(e)(2) &

17   D.O.M. § 51020.19.1.)  First level and second level managers must then each determine "whether

18   the force used was in compliance with policy, procedure, and applicable law."  D.O.M. §§

19   51020.19.2 & 51020.19.3; 15 Cal. Code Regs., § 3268.1(e)(2).  The first level of managerial

20   review is conducted by a Captain or higher-ranking individual, who ensures that the incident is

21   properly documented, and focuses on events which happened before, during, and after the use-of-

22   force event, including issues which necessitated the force.  (Stainer Decl. ¶ 8; Day Decl. ¶ 6.)

23   The second level of managerial review is conducted by an Associate Warden (Correctional

24   Administrator) or higher, who is several levels removed from those involved in an incident.

25   (Stainer Decl. ¶ 9; Day Decl. ¶ 7.)  At each level, the reviewer can interview or seek written

26   clarification from those involved, or seek additional information.  (Day Decl. ¶ 8.)

27          Once the determination is made by the second level manager, the reports are sent to the

28   Use of Force Coordinator, who schedules all use-of-force cases for review by the Institutional

5

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1   Executive Review Committee within 30 days.  15 Cal. Code Regs., § 3268.1(e)(2)(D); D.O.M. §

2   51020.19.4.  Each institution has a Use of Force Coordinator.  (Day Decl. ¶ 9; Sharma Decl. Ex. 4

3   [Barton Depo.] 56:2-9.)  The Institutional Executive Review Committee, which reviews all use-

4   of-force incidents, includes: the Warden or Chief Deputy Warden; at least one manager; the in-

5   service training manager; one health care practitioner or clinician; and the Use of Force

6   Coordinator.  (Day Decl. ¶ 9; 15 Cal. Code Regs., § 3268.1(e)(2)(E); D.O.M. § 51020.19.5.)  A

7   Special Assistant Inspector General or representative from the Inspector General's Bureau of

8   Internal Affairs may, and frequently does, attend the committee meetings.  (Sharma Decl. Ex. 4

9   [Barton Depo.] 75:17-24, 120:7-11 & 153:4-19; Day Decl. ¶ 9.)  The Institutional Executive

10  Review Committee reviews all materials, including videos, related to every incident, and

11  determines whether the use of force was reasonable and complied with policy, procedures, and

12  training.  (Stainer Decl. ¶ 11; Day Decl. ¶ 10.)  Any employee suspected of misconduct or other

13  serious policy violation may be referred to the Office of Internal Affairs by the Warden for

14  investigation or approval of adverse action.  (Day Decl. ¶ 10.)

15          During the review process, CDCR identifies issues in staff use of force and requires

16  training or other corrective action.  (Stainer Decl. ¶ 12; Day Decl. ¶ 3; Mar. 22, 2013 Decl. Kathy

17  Allison ("Allison Reply Decl.") ¶ 20, ECF 4478; Sharma Decl. Ex. 4 [Barton Depo.] 32:19-34:18.)

18  In 2012, CDCR imposed formal corrective action in 67 cases, informal corrective action in 118

19  cases, and provided training in 4,066 cases.  (Allison Reply Decl. Ex. F.)  In 2011, CDCR

20  imposed formal corrective action in 84 cases, informal corrective action in 133 cases, and

21  provided training in 4,348 cases.  (*Id.*)

22          **3.    CDCR's Office of Internal Affairs Investigates Staff Use-of-Force and
                    CDCR Imposes Discipline for Misconduct.**

23

24          CDCR's Office of Internal Affairs conducts administrative and criminal investigations

25  into allegations of staff misconduct.  (Day Decl. ¶ 2.)  These investigations include allegations of

26  unreasonable or unnecessary force against inmates and the use of deadly force by employees.  (*Id.*;

27  *see also* 15 Cal. Code Regs., § 3268.1(f); D.O.M. §§ 31140.1 *et seq.* & 51020.20.)  The Office of

28  Internal Affairs reviews every allegation of employee misconduct reported to it.  (Day Decl. ¶ 11.)

6

1   Each case is analyzed and presented to a central intake panel comprised of staff from the Office

2   of Internal Affairs, CDCR attorneys, and attorneys from the Office of Inspector General (*Id.*)  The

3   Office of Internal Affairs undertakes a rigorous investigation of the use-of-force incident and

4   allegations of misconduct in all cases accepted for investigation.  (*Id.* at ¶ 12.)  Investigation

5   results are referred to the hiring authority, who is then authorized to take corrective or punitive

6   actions against staff if the investigation indicates that misconduct occurred.  (*Id.*)

7        In 2012, hiring authorities, such as wardens, referred 107 cases to the Office of Internal

8   Affairs alleging employee misconduct related to use of force.  (Day Decl. ¶ 2.)  The Office of

9   Internal Affairs determined that 29 of those cases required no further investigation because it was

10   evident that misconduct had occurred, and referred those cases back to the hiring authority for

11   discipline.  (*Id.*)  The Office of Internal Affairs investigated 57 of the referred cases, although all

12   investigations are not complete, and sustained allegations of misconduct in 31 cases, including 9

13   cases which resulted in termination.  (*Id.*)

14            **4.    CDCR Tracks All Use-of-Force Incidents.**

15        The Use of Force Coordinator at each institution, with oversight from the Division of

16   Adult Institutions, tracks every use-of-force incident.  (Stainer Decl. ¶ 10; Day Decl. ¶ 13; D.O.M.

17   § 51020.19.4.)  Each case of employee misconduct is similarly tracked by the Office of Internal

18   Affairs from the time an investigation is requested until case closure.  (Day Decl. ¶ 13.)

19        **C.   The Office of Inspector General's Oversight of Use-of-Force Incidents
            Within CDCR.**

20

21        In 2007, the *Madrid* court requested that the Office of Inspector General attend CDCR's

22   use-of-force review committee meetings to provide public transparency, assure the court and the

23   public that use-of-force reviews are adequate, and, when appropriate, ensure cases are forwarded

24   to CDCR's Office of Internal Affairs for investigation or approval to take action without further

25   investigation.  (Sharma Decl. Ex. 7 [Nov. 2011 OIG Report] 1.)

26        The Office of Inspector General has issued four reports on use of force within CDCR.

27   The Office of Inspector General attends Institutional Executive Review Committee meetings and

28   completes structured reviews of use-of-force incidents.  (*Id.* Ex. 4 [Barton Depo.] 72:11-18.)

7

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1   Since September 2010, the Office of Inspector General has evaluated thousands of use-of-force

2   incidents.  (*Id.* Exs. 6 [Apr. 2013 OIG Report] at 197, 7 [Nov. 2011 OIG Report] at 4, 8 [May

3   2012 OIG Report] at 4, & 9 [Oct. 2012 OIG Report] at 3.)  Contrary to what Plaintiffs allege in

4   the motion, the Office of Inspector General substantively monitors whether use-of-force incidents

5   are unnecessary or excessive.  (*Id.* Ex. 4 [Barton Depo.] at 89:18-91:16.)  The Office of Inspector

6   General also monitors and actively participates in the department's development of new

7   regulations and policies governing the use of force.  (*Id.* Ex. 8, at 3.)

8        The State's court-approved procedure for identifying, reporting, investigating, and acting

9   upon use-of-force incidents is comprehensive and complete.  For Plaintiffs to assert, based on Mr.

10  Vail's review of a handful of use-of-force incident reports, that the State's investigation process is

11  "inadequate and underinclusive" is wholly unsubstantiated.

12  **II.    CDCR PROVIDES EXTENSIVE TRAINING TO ITS STAFF TO ENSURE THAT FORCE IS NOT
13         USED MALICIOUSLY AND SADISTICALLY FOR THE PURPOSE OF CAUSING HARM.**

14       Correctional officers and supervisors receive comprehensive training on staff use of force,

15  including training on recognizing signs and symptoms of mental illness, verbal persuasion, and

16  exploring alternatives to force.  (Stainer Decl. ¶¶ 15-19; Martin Exp. Rpt. 11; Sharma Decl. Ex. 4

17  [Barton Depo.] 113:3-21; *see also* D.O.M. §§ 32010.14.2, 32010.19.2 & 32010.19.11.)  All

18  custody staff receive training at the academy, which includes extensive training related to use-of-

19  force: (1) 60 hours on defensive tactics without weapons; (2) 6 hours on the application of

20  restraint gear; (3) 7 hours on cell extractions; (4) 10 hours on chemical agents; (5) 20 hours on

21  use of the expandable baton; (6) 16 hours on managing effective interaction and conflict with

22  inmates; (7) 2.5 hours on recognizing signs and symptoms of mental illness; and (8) 8 hours on

23  use of force.  (Stainer Decl. ¶ 16.)

24       Staff also receive ongoing training related to use of force.  All staff designated to use or

25  authorized to use expandable batons or 40-mm impact munitions receive training for annual

26  recertification and qualification.  (Stainer Decl. ¶ 17; D.O.M. §§ 32010.14.2, 32010.19.2 &

27  32010.19.11.)  In 2013, officers each receive 40 hours of formal training, including 2 hours on

28  "Chemical Agents," 2 hours on "Expandable Baton Proficiency," 2 hours on "Expandable Baton

8

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1   Requalification," 2 hours on "Impact Munitions," 3 hours on "Range (Annual Firearms

2   Qualification)", and 2 hours on "Use of Force."  (Allison Reply Decl. Ex. E, ECF 4478.)

3   Lieutenants are trained on reviewing incident reports, and Sergeants are trained on writing and

4   reviewing incident reports.  (*Id.*; Stainer Decl. ¶ 18.)  CDCR requires additional training on

5   chemical agents as part of its 80-hour curriculum for all officers, which requires officers to pass

6   two written exams and exposure to chemical agents.  (Stainer Decl. ¶ 19.)  CDCR also offers a

7   three-day training on use of the expandable baton for all staff who act as instructors.  (*Id.* ¶ 17.)

8   **III.   DEFENDANTS' COURT-APPROVED DISCIPLINARY PROCESSES APPROPRIATELY
            ACCOMMODATE INMATES' MENTAL HEALTH CONDITIONS.**

9

10   Plaintiffs' discussion on the development of the current rules violation process omits key

11   facts.  First, the process for completing mental health assessments was the result of agreement

12   between Defendants and Plaintiffs, and approved by the *Coleman* Special Master in the Twenty-

13   Third Round Monitoring Report.  (ECF No. 4124 27-28; *see also* Declaration of Joseph Stein ¶¶

14   4-10.)  Plaintiffs also provided comments and input while CDCR was designing the training

15   model for the current rules violation report policy, which were incorporated in the training

16   module.  (Stein Decl. ¶ 5, Ex. B.)  This training was conducted collaboratively with mental health

17   and custody staff, and observed by Plaintiffs and members of the Special Master's team.  (*Id.* at ¶

18   7.)  The training module also focused extensive attention on identifying mental health symptoms

19   that would warrant a discretionary mental health assessment in situations where the assessment is

20   not mandatory.  (*Id.* ¶¶ 11-13.)

21   Second, the motion fails to properly distinguish between disciplinary processes for

22   inmates at the Enhanced Outpatient Program and Correctional Clinical Case Management System

23   levels of care.  Inmates at the Enhanced Outpatient Program level of care automatically receive a

24   mental health assessment for any rules violation report.  (*Id.* ¶ 12.)

25   Third, Plaintiffs incorrectly assert that inmates at the Correctional Clinical Case

26   Management System level of care are only provided with a mental health assessment at the

27   custodial officer's discretion.  Actually, Defendants require that staff automatically complete

28   mental health assessments for all inmates receiving rules violation reports for Division A, B, or C

9

offenses—the most serious offenses including crimes such as murder, assault, battery, arson, and escape attempts, and for any rule violation report that may result in a Security Housing Unit term. (*Id.*)

Fourth, Plaintiffs ignore and omit key facts regarding the range of disciplinary penalties available to custody staff.  Senior hearing officers are authorized by law to assess a number of different penalties upon finding an inmate guilty of a rule violation.  (*Id.* ¶ 15.)  The penalties include the denial of privileges, such as yard time, phone privilege, televisions, and loss of credits.  (*Id.*)  Hearing officers are trained on proper mitigation techniques when adjudicating a rules violation committed by an inmate with mental illness, for example by electing to forego a penalty such as suspending phone privileges where the inmate relies on positive outside contact for treatment.  (*Id.* at ¶¶ 14-16.)  Defendants' expert Steve Martin—unlike Plaintiffs—thoroughly familiarized himself with the range of penalties that can be assessed by hearing officers.  (Martin Reply Decl. ¶ 17.)  And on the basis of his review of over 440 rule violation packets concluded that CDCR's hearing officers appropriately modify sanctions to accommodate mental health conditions.  (*Id.*; Martin Exp. Rpt. 13-15; Sharma Decl. Ex. 10 [Martin Depo.] 172:20-23.)

## IV.   EVIDENTIARY ISSUES.

### A.   The Court Must Fully Consider All of the Reports Submitted by Defendants' Expert, Steve Martin.

On January 7, 2013, the State's expert submitted a report in this matter.  (D. Vorous Decl. Ex. 2, ECF 4279.)  Mr. Martin's report examined use of force in California prisons with respect to inmates with mental illness, and concluded that CDCR has in place heightened system wide safeguards to ensure that inmates with mental illness are not subjected to unnecessary and excessive use of force.  (Martin Exp. Rpt. 10-13.)  He further concluded that when CDCR staff is required to use force, tactics are employed in a good faith effort to control, neutralize, or immobilize inmates who are actively engaged in threats of harm to each other, staff, or the good order of the facility.  (*Id.*)  He also examined whether the rule violation hearing process reasonably accommodates inmates' mental conditions, and concluded that CDCR has in place a well-defined, valid, and predictable process to reasonably accommodate inmates whose mental

10

1    status requires/merits consideration when adjudicating rule violation offenses.  (*Id.* at 13-15.)

2         In its April 5, 2013 order denying the State's termination motion, the Court stated that

3    "Martin's report makes no reference to his interviews with inmates."  (Order at 22.)  The Court

4    nevertheless struck Mr. Martin's report.  (*See id.*)  Mr. Martin subsequently reviewed his notes

5    from the 11 site visits he conducted between February and November 2012, and confirmed that

6    he spoke to only two inmates at a single facility.  (Martin Decl. ¶ 4.)  Those discussions related to

7    two specific, isolated use-of-force incidents.  (*Id.*)  Mr. Martin did not speak with any inmates

8    concerning the rule violation hearing process.  (*Id.*)  Moreover, neither of the two discussions

9    formed the basis for any of the systemic opinions in his January 4, 2013 report.  (*Id.*)  Because the

10   Court did not identify any basis for striking Mr. Martin's report in its April 5 order, and the facts

11   demonstrate that the report should not have been stricken, the State requests that the Court

12   reconsider its decision, reinstate Mr. Martin's report, and give it full evidentiary weight.

13        Ironically, if the Court affirms its prior decision striking Mr. Martin's report, it must

14   dismiss Plaintiffs' motion based on lack of evidence.  Plaintiffs' expert relies heavily on isolated

15   use-of-force incidents identified and questioned by Mr. Martin while developing his initial report.

16   (*See* Martin Opp. Decl. ¶ 14.)  If the Court believes this evidence is somehow tainted, then neither

17   party should be permitted to rely on it.

18        **B.   The Opinions of Plaintiffs' Expert Eldon Vail Should Be Accorded Little Weight.**

19        Many of the statements in the declaration submitted by Plaintiffs' expert Eldon Vail are

20   false and misleading because they are based on incomplete information or reach speculative

21   conclusions.  These critical omissions, which are discussed in detail in this opposition, seriously

22   undermine Mr. Vail's testimony.

23        Discovery in both the termination proceedings and for this motion revealed that Mr. Vail

24   lacks foundation for his testimony.  Mr. Vail (who has never been qualified to testify as a use-of-

25   force expert in any federal court) filed his first expert report on use-of-force issues without even

26   reviewing the State's use-of-force policy and was unaware of the outcome in *Madrid v. Gomez*,

27

28

11

1  which resulted in the statewide policy.  (Sharma Decl., Ex. 11 [Vail Depo.] at 29:23-30:1.)[2]

2  Further, rather than undertaking an independent and objective assessment, Mr. Vail simply

3  concluded that California's prison system was "very troubled."   In fact, he offered to testify

4  against the State before reviewing a single item of evidence.  (*Id.* at 23:6-24:11.)

5       Mr. Vail's deficient work continues in the context of this motion.  Mr. Vail offers broad,

6  systemic opinions based on thirteen isolated incidents at five CDCR facilities occurring over a

7  period of approximately 18 months.  (*See* Vail Exp. Report ¶¶ 13-37.)  In many of these

8  instances, Mr. Vail reviewed only the video recording but not the underlying written reports,

9  which caused him to reach incomplete and incorrect conclusions.  (Martin Decl. ¶¶ 12-29;

10  Sharma Decl. Ex. 4 [Barton Depo.] 170:8-10.)  Moreover, Mr. Vail offers his opinions without

11  reference to or consideration of the controlling legal principles articulated in *Hudson v.*

12  *McMillian*, 503 U.S. 1 (1992), which require consideration of the threat or resistance by the

13  inmate necessitating the use of force.  (Sharma Decl. Exs. 11 [Vail Depo. I] 99:16-100:4 & 12

14  [Vail Depo. II] 51:19-21.)  Mr. Vail's conclusions—based on an exceedingly small number of

15  individual cases coupled with his failure to consider the complete evidentiary record in those

16  cases—should be disregarded by the Court.

17  **LEGAL STANDARDS APPLICABLE TO REQUESTS FOR INJUNCTIVE RELIEF**

18  **I.   THE STANDARD FOR OBTAINING PROSPECTIVE INJUNCTIVE RELIEF UNDER THE PRISON
       LITIGATION REFORM ACT.**

19

20       Congress enacted the Prison Litigation Reform Act (PLRA) to lessen the federal court's

21  role in prison inmate civil rights cases, specifically restricting the availability and scope of

22  prospective relief.  18 U.S.C. § 3626(a)(1); *see Gilmore v. California*, 220 F.3d 987, 988-99 (9th

23  Cir. 2000).  Accordingly, before granting prospective injunctive relief, the district court must

24  make the findings mandated by the PLRA.  18 U.S.C. § 3626(a)(1)(A); *Gomez v. Vernon*, 255

25  F.3d 1118, 1129 (9th Cir. 2001).  Specifically, the court must find that the relief requested is

26  narrowly drawn, extends no further than necessary to correct the violation of a federal right, and

27       [2] The State's expert, Steve J. Martin, was the *Plaintiffs' expert* in *Madrid*.  (Martin Exp.
       Rpt. at 2.)

28

12

1   is the least intrusive means necessary to correct the violation.  18 U.S.C. § 3626(a)(1)(A); *Gomez*,

2   255 F.3d at 1129.  The court must also "give substantial weight to any adverse impact on public

3   safety or the operation of a criminal justice system caused by the relief."  *Gomez*, 255 F.3d at

4   1129.

5          In addition, there must be sufficient evidence to justify the relief being ordered.  *See., e.g.*,

6   *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (finding that plaintiffs

7   presented insufficient evidence to justify the system-wide relief ordered by the district court).

8   "The function of a court is limited to determining whether a constitutional violation has

9   occurred . . . and to fashion a remedy that does no more and no less than correct that particular

10  constitutional violation."  *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citing *Rhodes v.*

11  *Chapman*, 452 U.S. 337 (1981)).  When a government agency is involved, that agency must be

12  granted "the widest latitude in the dispatch of its own internal affairs."  *Gomez*, 255 F.3d at 1128

13  (quoting *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotation marks omitted)).  That

14  consideration is heightened when a state agency is involved because of federalism concerns.

15  *Gomez*, 255 F.3d at 1128.

16  **II.    PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING THAT CURRENT AND
        ONGOING CONSTITUTIONAL VIOLATIONS REQUIRE MORE INJUNCTIVE RELIEF.**

17

18         The PLRA places the burden on Plaintiffs to demonstrate that they are entitled to the relief

19  they seek.  *Hallett v. Morgan*, 296 F.3d 743, 745 (9th Cir. 2002) (affirming denial of motion to

20  extend relief absent proof of current and ongoing violation of a federal right); *Mayweathers v.*

21  *Newland*, 258 F.3d 930, 936 (9th Cir. 2001) (requiring the party seeking prospective relief to

22  prove current and ongoing constitutional violation).  In addition, injunctive relief against a state

23  agency should only be granted when "irreparable injury" is threatened, and any injunctive relief

24  awarded must avoid unnecessary disruption to the state agency's "normal course of proceeding."

25  *Gomez*, 255 F.3d at 1128-29.  To satisfy the irreparable injury requirement, a "plaintiff must

26  demonstrate a real or immediate threat that they will be wronged again—a likelihood of

27  substantial and immediate irreparable injury."  *Id.* at 1129 (internal quotation marks omitted); *see*

28  *also Armstrong*, 622 F.3d at 1070.

13

# LEGAL ARGUMENT

## I.   THERE IS NO PATTERN OR PRACTICE THAT CDCR SYSTEMICALLY APPLIES FORCE MALICIOUSLY AND SADISTICALLY AGAINST THE *COLEMAN* CLASS TO CAUSE HARM.

There is no pattern or practice in CDCR of unreasonable or excessive force—which is legally defined as force applied maliciously or sadistically to cause harm—against the *Coleman* class.  (7/17/13 Decl. Steve J. Martin ¶¶ 2-29; 3/22/13 Martin Decl. ¶¶ 2-16, ECF 4483; 1/4/13 Martin Exp. Rpt. 10-13, ECF 4279.)  Under the Eighth Amendment, inmates have the right to be free from "cruel and unusual punishment."  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  In the context of use-of-force allegations, the Eighth Amendment prohibits the unnecessary and wanton infliction of pain against prisoners.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The core judicial inquiry is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citing *Hudson v. McMillian*, 503 U.S. at 7).  To make this determination, the Court should consider: (1) the extent of injury suffered by the plaintiff; (2) the need for the application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) whether officials made efforts to temper the severity of the response.  *Hudson*, 503 U.S. at 12.

When using force, prison officials must balance competing interests such as the need to restore order, the very real threat the disturbance poses to others, and the possible harm to inmates against whom force is used.  *Whitley*, 475 U.S. at 320.  However, such decisions are "necessarily made in haste, under pressure, and frequently without the luxury of a second chance."  *Id.* "Prison administrators . . . should be accorded wide-ranging deference in their adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

"Courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives."  *Whitley*, 475 U.S. at 322.  For example, the use of force to subdue an inmate who refuses to follow orders is not excessive.  *White v. Roper*, 901 F.2d 1501, 1506-07 (9th Cir. 1990).  As

14

1    noted by the Ninth Circuit: "[The inmate] is the master of his own fate.  As long as he engages in

2    violent and disruptive behavior, prison officials are authorized and indeed required to take

3    appropriate measures to maintain prison order and discipline and protect staff and other prisoners

4    from such violent inmates."  *LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993).

5         Plaintiffs make no attempt to analyze use of force within CDCR under these applicable

6    standards, but instead claim that the "deliberate indifference standard applies to systemic claims

7    that use of force policies, procedures, and practices violate the Eighth Amendment."  (Mot. 26.)[3]

8    The Ninth Circuit has rejected application of the deliberate indifference standard to use-of-force

9    claims.  *LeMaire*, 12 F.3d at 1452-53 (9th Cir. 1993) (applying malicious and sadistic

10   "heightened state of mind" standard); *Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) (en

11   banc) (a "greater showing" than deliberate indifference is required "in the context of a prison-

12   wide disturbance or an individual confrontation between an officer and prisoner" when

13   "corrections officers must act immediately and emphatically to defuse a potentially explosive

14   situation")).

15        Plaintiffs also selectively quote and misapply cases from other circuits.  (Mot. 26-27.)

16   Two of the cases cited by Plaintiffs require district courts to apply the "malicious and sadistic"

17   standard.  *See Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010) ("Eighth Amendment

18   claims alleging excessive force require a showing that the defendant acted 'maliciously and

19   sadistically for the very purpose of causing harm.'"); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th

20   Cir. 1996) (internal citation omitted) (for use-of-force claims, "a prisoner must demonstrate that

21   officials applied force maliciously and sadistically for the very purpose of causing harm").  In the

22   pages of *Thomas v. Bryant* cited by Plaintiffs, the Court applied a deliberate indifference standard

23   because the defendants waived application of the "malicious and sadistic" standard, a fact

24   Plaintiffs omit.  *See Thomas*, 614 F.3d at 1304-06.  Defendants make no such waiver of the

25   _____

26   [3] Plaintiffs rely on this Court's application of the deliberate indifference standard to use-
     of-force claims back in 1995, but the Court applied this standard because "Defendants did not
     present [the 'malicious and sadistic' standard] to the magistrate judge in either pre- or post-trial
27   briefing."  *Coleman v. Wilson*, 912 F. Supp. 1282, 1321 & n.5 (E.D. Cal. 1995).  Defendants
     present the correct standard here, which governs resolution of Plaintiffs' motion here.

28

                                                    15

1   applicable "malicious and sadistic" standard here.  The third case pre-dates the Supreme Court's

2   decision in *Hudson*, but nevertheless stated that courts must consider "whether force was applied

3   in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very

4   purpose of causing harm."  *Soto v. Dickey*, 744 F.2d 1260, 1268 (7th Cir. 1984).

5          The consistent flaw in Plaintiffs' analysis is that their motion focuses solely on the amount

6   of the force used without looking at the totality of circumstances, including "the need for

7   application of force" and the threat "reasonably perceived by the responsible officials."  *Hudson*,

8   503 U.S. at 7.  As noted above, Plaintiffs' expert was not even aware of *Hudson* when he formed

9   his opinions in this case, and had not read *Hudson* prior to his second deposition in this case on

10  June 27, 2013.  (Sharma Decl. Exs. 11 at 99:16-100:4 & 12 at 51:19-21.)

11         **A.    Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use of**
            **Force.**
12

13         The State's expert, after conducting a thorough analysis, concluded that CDCR has fully

14  incorporated all essential components of a system for administering staff use of force in a

15  correctional setting.  (Martin Exp. Rpt. 10-11).  In his review, Defendants' expert found "no

16  instances in which force was inflicted maliciously or sadistically for the very purpose of causing

17  harm."  (*Id.* at 12.)  Similarly, the California Inspector General, who extensively monitors use-of-

18  force in CDCR, testified that there is no pattern or practice of unnecessary or excessive force in

19  CDCR.  (Sharma Decl. Ex. 4 [Barton Depo.] 181:8-182:17.)  The Inspector General further

20  testified that there is no systemic evidence that force is used to inflict pain without penological

21  justification, or for malicious and sadistic purposes.  (*Id.* 182:18-183:10.)

22         Plaintiffs present no meaningful evidence that staff systemically use force against inmates

23  maliciously and sadistically to cause harm.  Instead, they base their argument on 13 instances at 5

24  CDCR institutions occurring over a period of approximately 18 months.  (Vail Decl. ¶¶ 14-36,

25  ECF 4638-1.)  Six of those instances came to Plaintiffs' attention as a result of the work of the

26  State's expert (Martin Opp. Decl. ¶ 14), and reflect a misguided attempt to second-guess what Mr.

27  Martin determined to be appropriate systemic correctional practices.  In seven instances,

28  Plaintiffs' expert "relied almost solely on his review of the videos" and "ignored a storehouse of

                                                    16

1  relevant evidence contained in the incident packets and IERC reviews related to the seven

2  incidents." (*Id.*) As the Inspector General noted, it is not possible to reach an informed opinion

3  about the reasonableness of force by reviewing only the videos. (Sharma Decl. Ex. 4 [Barton

4  Depo.] 170:2-172:13.) In short, thirteen incidents are simply insufficient to form systemic

5  opinions about use of force in CDCR. (*Id.*, Ex. 5, 506:1-508:1.)

6        In addition to the cursory nature of the review, Plaintiffs and their expert failed "to include

7  or cite relevant evidence that seriously undermine [their] conclusions." (Martin Opp. Decl. ¶ 12.)

8  As the State's expert observed:

9              It is evident that Mr. Vail consistently failed to identify objective
            factors related to the level of inmate **resistance** [emphasis added]
10           presented by the inmate(s), thus limiting his analyses almost
            exclusively to officer **response** [emphasis added]. It is axiomatic
11           that an analysis of a use of force incident, must include, among
            other things, a consideration of the quantum of force applied
12           relative to the level of threat presented, i.e., the relationship
            between the need (resistance) and the amount used (response). In
13           none of the thirteen cases does Mr. Vail provide objective evidence
            that officers used force for the very purposes of causing harm to the
14           inmate. In every use of force incident cited by Mr. Vail, there were
            varying levels of inmate resistance that precipitated the
15           consideration of whether force was necessary. Admittedly, in
            hindsight, the degree and number is exceedingly small given the
16           total number of use of force incidents that occur on a daily basis in
            a system that includes approximately 120,000 inmates housed in
17           over thirty facilities that comprise the CDCR.

18  (*Id.* ¶ 13.) Moreover, Plaintiffs failed to identify "any pattern of serious injuries normally

19  associated with those systems or institutions found to have engaged in a pattern and practice of

20  excessive and unnecessary staff use of force." (*Id.*)

21        **B.    The Statewide Use-of-Force Policy Provides Heightened Safeguards for Inmates
              with Serious Mental Illness.**
22

23        CDCR's use-of-force policy requires staff to consider mental health issues before using

24  force. (*See* D.O.M. §§ 51020.12.2, 51020.15.1, 51020.14 & 51020.14.1; *see* Mot. 13 n.5.)

25  Section 51020.12.2 of the Operations Manual ("Controlled Use of Force Involving the Mentally

26  Ill") states (emphasis added):

27           When inmates are housed in departmental hospitals, infirmaries,
            Correctional Treatment Centers (CTC), *Enhanced Outpatient*
28           *Program Units (EOP), or Psychiatric Services Units (PSU), or*

17

*have an EOP level of care designation*, the controlled use of force shall occur as follows:

- A licensed health care practitioner designated by the Health Care Manager shall be consulted prior to the use of chemical agents (see Chemical Agents Restrictions).

- Clinical intervention by a licensed practitioner shall be attempted. *Clinical intervention shall also precede the extraction of any inmate who is being extracted upon the written order of a medical doctor, psychiatrist, or psychologist to facilitate a change in housing for treatment purposes.*

- The clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. These efforts shall continue during the cool down period.

- Whenever circumstances permit, the clinician shall be a mental health provider, i.e., Psychiatric Technician, Licensed Clinical Social Worker, Psychologist, or Psychiatrist.

Similarly, the policy requires consultation and a written recommendation from health care staff prior to the use of chemical agents against any inmate in the Enhanced Outpatient Program or Psychiatric Services Unit. (*Id.* at § 51020.15.1.) If chemical agents are used, medical staff must ensure that proper medical equipment and trained health care staff are available during and after application of the application of the agent to treat the inmate for any adverse reaction due to exposure. (*Id.*) The policy further prohibits the use of 37mm and 40mm launchers in controlled use-of-force situations against Enhanced Outpatient Program inmates in a housing unit, except in carefully prescribed circumstances. (*Id.* §§ 51020.14 & 51020.14.1.)

This detailed consideration of mental health issues prior to the application of force, and the application of heightened safeguards governing the use of force, have addressed the Court's 1995 finding that "[i]nmates who act out are also subject to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition." *Coleman v. Wilson*, 912 F. Supp. at 1321. Moreover, as discussed in Section D.2 below and the declaration from the State's expert, Plaintiffs' own evidence demonstrates that *Coleman* class members are not subjected to force without clinical intervention from a mental health professional and a cooling off period where efforts are made to restore order without force.

18

## C. Plaintiffs Failed to Demonstrate that Unnecessary or Excessive Force Disproportionately Affects Mentally Ill Inmates.

Plaintiffs made no attempt to demonstrate a pattern or practice of unreasonable force against the *Coleman* class which amounts to malicious and sadistic behavior.  Plaintiffs failed to investigate whether or not force was actually used against mentally ill inmates involved in use-of-force incidents.  (Declaration of Kathy Allison in Opposition to Motion ("Allison Opp. Decl.") ¶¶ 43-44.)  Instead, Plaintiffs misinterpret data sent by CDCR to the Special Master.  (Vail Decl. ¶¶ 9-11.)  The data reported to the Special Master counts all inmates involved in a particular incident, but that does not mean force was used against every inmate counted in the report.  (Allison Opp. Decl. ¶ 44.)  For instance, a general population inmate could attack an Enhanced Outpatient Program inmate, causing correctional staff to step in and use force against the general population inmate.  (*Id.*)  The event is recorded as a single use of force incident involving two inmates – one of which is a class member.  (*Id.*)  Thus, although the inmate with mental illness was the victim, he or she is counted in Plaintiffs' calculation.  (*Id.*)[4]  To determine the actual number of inmates with mental illness that were the subject of force, Plaintiffs would need to review each use-of-force incident.

Plaintiffs and their expert did not conduct this review and have not drawn sound conclusions from this data.  As noted by the State's expert, Steve Martin, who has decades of experience evaluating this issue with multiple correctional systems across the United States, it is an unfortunate, but often simply unavoidable, fact that use-of-force incidents nationwide are statistically higher among inmates with serious mental illness.  (Martin Mar. 22, 2013 Reply Decl. ¶¶ 6-7, ECF 4483.)  This occurs for a variety of reasons, including the need for officers to intervene in instances of self-harm to protect inmates, violent or threatening behaviors by mentally ill inmates which lead to necessary staff use of force, and the problem of a few

---

[4] Plaintiffs' inflated calculation can also be demonstrated in the aggregate.  For example, between January 1, 2013, and June 30, 2013, Wasco State Prison had 230 separate use-of-force incidents involving 306 inmates.  120 of those inmates were inmates with mental illness, meaning that 39% of the use-of-force incidents involved an inmate with mental illness.  (Allison Opp. Decl. ¶ 44.)  As explained above, the fact that 120 such inmates were involved in these incidents does not in any way support Plaintiffs' claim that staff used force against each of them.  (*Id.*)

1  particularly unstable inmates being repeatedly involved in use-of-force incidents.  (*Id.*)  Plaintiffs'

2  expert admits that instances where officers physically prevent mentally ill inmates from harming

3  themselves are included in the State's use-of-force totals, and that small numbers of unstable

4  inmates can drive up the total.  (Sharma Decl. Ex. 11 [Vail Depo.] 69:15-19 & 70:11-15.)

5       Plaintiffs misplace focus on raw percentages, when the critical inquiry in any use-of-force

6  incident involving an inmate with serious mental illness or otherwise is whether the application of

7  force was necessary and appropriate.  (*Id.* Ex. 10 [Martin Depo.] 66:13-67:18.)  Plaintiffs provide

8  no evidence or analysis that demonstrates the statistical overrepresentation they identify is the

9  result of a pattern or practice that victimizes the seriously mentally ill.  Nor do they (or could

10  they) present evidence that staff single out or systemically use force excessively or unnecessarily

11  against inmates with serious mental illness.  Mr. Martin's more thorough and extensive review—

12  conclusively finding no pattern or practice of excessive or unnecessary use of force against

13  inmates with serious mental illness—should be adopted by the Court.  (Martin Exp. Rpt. at 12-13;

14  Martin Reply Decl. ¶ 5; Martin Opp. Decl. ¶ 8.)

15
16
   **D.    Plaintiffs Failed to Demonstrate Any Pattern or Practice of Unnecessary or Excessive Force with Respect to Use of the Expandable Baton or Oleoresin Capsicum (OC) Spray.**

17       Plaintiffs' critique of the use of expandable batons and Oleoresin Capsicum pepper spray

18  is unsupported by the evidence and fails to analyze the issue under constitutional standards.

19  Plaintiffs argue that the mere provision of expandable batons and pepper spray to officers is

20  improper.  (Mot. 27-28.)  Plaintiffs' position is contrary to the Supreme Court's analysis in

21  *Hudson*, and they fail to establish that CDCR staff systemically use either expandable batons or

22  pepper spray maliciously and sadistically to cause harm.

23
24
   **1.    Plaintiffs' Contentions Regarding Use of the Expandable Baton Are Contrary to Their Own Evidence.**

25       Plaintiffs' contention that "CDCR officers use the baton 'with disturbing frequency'"

26  (Mot. 36; Vail Decl. ¶ 41) is not supported by evidence.  The Inspector General found that

27  between July and December 2012, there were zero incidents where either a baton or 40mm

28  rounds were intentionally used against inmates.  (Sharma Decl. Exs. 4 [Barton Depo.] 165:6-21 &

20

1    6 [April 2013 Report] at 203.)  During this same reporting period, there were only two instances

2    involving an unintentional baton strike to a potentially lethal zone on an inmate.  (*Id.*)  To argue

3    that batons are used infrequently and not intentionally willfully ignores the facts.

4         Plaintiffs support their expert's conclusory statement by citing only *two* examples.  (*See*

5    Vail Decl. ¶¶ 31-32.)  Setting aside the fact that two examples cannot sustain a systemic

6    constitutional violation, the individual examples do not support Plaintiffs' claim.  In the example

7    described in Paragraph 32 of Mr. Vail's declaration, the incident report states that the baton was

8    used to stop an assault on an officer.  (Martin Decl. ¶ 24.)  Mr. Vail omitted from his report that

9    the inmate "scissor locked both legs around Correctional Officer P. Kul's waist and resisted staff

10   as they attempted to place his hands behind his back."  (*Id.*)  Mr. Vail omitted the critical

11   information that directly contradicts his conclusion that "[t]his was not a defensive use of the

12   weapon."  (Vail Decl. ¶ 32.)

13        The second incident, described in Paragraph 31 of Mr. Vail's declaration, involved an

14   attempt to stop an inmate-on-inmate assault where officers unsuccessfully intervened with

15   chemical agents.  (Martin Decl. ¶ 23.)  The good faith use of an expandable baton in these

16   circumstances does not constitute excessive and unnecessary force.  (*See id.* & Mar. 22, 2013

17   Martin Decl. ¶ 11.)  To the contrary, had the officers not intervened, it may have given rise to an

18   Eighth Amendment claim for failure to intervene to protect that inmate from a constitutional

19   violation.  *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995).

20        The only other evidence Plaintiffs cite is their expert's personal observation on one

21   occasion of officers responding to an alarm.  (Mot. 29; Vail Decl. ¶ 42.)  He notes that officers

22   "were posed and ready to use their batons" (*id.*), but never indicates that an officer ever used the

23   baton.  At best, Mr. Vail's conclusion that this was not a defensive posture is speculative and has

24   no basis.  (*See* Martin Reply Decl. ¶ 11 ["it is my considered opinion that the good faith use of an

25   expandable baton in a tactically appropriate manner to stop an inmate-on-inmate attack does not

26   constitute excessive and unnecessary use of force"]; Sharma Decl. Ex. 5 [Barton Depo.] 378:3-

27   379:17.)

28

                                                21

2.     **Plaintiffs Failed to Establish a Pattern or Practice of Malicious and Sadistic Intent With Respect to the Use of Pepper Spray.**

Plaintiffs present no evidence that officers utilize force of any type in a malicious and sadistic way, or for the sole purpose of inflicting pain and punishment on inmates.  Plaintiffs' criticism of the use of pepper spray relies on drawing unsupported inferences about systemic issues from only a handful of isolated, sporadic incidents.  (Vail Decl. ¶¶ 14-21.)  As discussed in detail in Paragraphs 16-29 of Mr. Martin's declaration, Plaintiffs' omission of important facts in each incident casts grave doubt on their expert's conclusions.  A complete examination of the facts shows that Plaintiffs' arguments that CDCR is not adhering to policy—including attempting alternatives to force, intervention by clinical staff, and a "cooling off period" (*see* Mot. at 13-15)—are false:

- In the incident cited in Paragraph 14 of Mr. Vail's declaration, Mr. Vail reached his conclusions by viewing only the video of the incident but not the underlying reports.  Mr. Vail failed to note that the floor was wet because the inmate had flooded his cell and just prior to the cell extraction was "standing in inches of water that contained feces."  The inmate also had feces on his body.  Contrary to Mr. Vail's account, the cell entry was organized as required by policy, and was preceded by a cooling-off period with clinical intervention attempted to avoid use of force.  (Martin Decl. ¶ 16.)

- In Paragraph 15 of Mr. Vail's declaration, Mr. Vail again relied exclusively on the video without reviewing the reports.  The reports indicate that this inmate was placed in a holding cell pending a mental health evaluation after he had covered his cell window and had threatened suicide.  The cell entry was preceded by a 90 minute cooling off period with clinical intervention, but the inmate continued to resist lawful orders, covered himself with clothing, and squatted down in the cell.  Mr. Vail's conclusion that force was applied "gratuitously to inflict immediate punishment" (Vail Decl. ¶ 15) is objectively false.  (Martin Decl. ¶ 17.)

- In Paragraph 16, Mr. Vail presents an incomplete, misleading account based on his decision to review only the video of the incident.  The reports indicate that the inmate persistently refused to be moved from his cell.  The cell entry was preceded by an extensive cooling off period including intervention by clinicians and custody staff.  The inmate barricaded himself behind the cell door with his mattress.  He was also observed holding a "milk carton filled with a substance believed to be feces."  Mr. Vail's account is woefully incomplete, and his "speculative second guessing of officers who were confronted with a barricaded inmate possibly armed with a projective of fecal matter does not  . . . constitute an evidentiary basis on which to render an ultimate opinion that excessive force was used."  (Martin Decl. ¶ 18.)

- Mr. Vail once again misrepresents facts in the incident cited in Paragraph 17 of his declaration based on his review of the video alone.  The reports establish that more than 3 1/2 hours elapsed from the time the inmate was ordered to exit the cell and any application of force.  During that time, the inmate was interviewed by a psychologist and the cell entry was preceded by an extensive cooling off period.  (Martin Decl. ¶

22

19.)

- In Paragraph 18, Mr. Vail's statement that the "de-escalation attempt lasted less than 15 seconds" is false.  The reports show that more than five hours passed between the inmate's refusal to comply and cell entry, and mental health staff attempted to intervene.  (Martin Decl. ¶ 20.)

- In Paragraph 19, Mr. Vail omits key facts concerning the threat presented: the inmates had broken a cell window, destroyed plumbing, and then barricaded themselves behind their cell door.  Mr. Vail also falsely claims that mental health staff did not intervene, which is directly contradicted by the reports.  Mr. Vail further admits that "it was impossible to view what happened in the cell," but nevertheless concludes that the force used was "excessive."  Mr. Vail's conclusion has no basis in fact.  (Martin Decl. ¶ 21.)

- In Paragraph 21, Mr. Vail again misstates or omits critical facts, including the attempt to de-escalate the situation.  The reports indicate that 2 1/2 hours passed between the beginning of the inmates' threatening behavior and application of force.  The sergeant also attempted to establish communication with the inmates.  Ultimately, force was used based on the following facts: (1) the inmates were barricaded, (2) the cell window was covered, (3) the cell was darkened, (4) the inmates were possibly intoxicated, and (5) the inmates claimed to be armed.  Mr. Vail omits these facts, which "represent extreme risks of harm for officers . . . ."  (Martin Decl. ¶ 22.)

- The incident discussed in Paragraph 30 of Mr. Vail's declaration was cherry-picked from Mr. Martin's file.  (Martin Decl. ¶ 23.)  This incident raised concerns for Mr. Martin about whether further investigation was warranted, and he discussed the incident with CDCR officials at the time of his review.  (*Id.*)  As Mr. Martin notes, this "was an extremely isolated incident not representative of the hundreds of use of force incidents [he] reviewed in this matter."  (*Id.*)

These examples demonstrate that the evidence presented by Plaintiffs is incomplete in material respects.  A complete review of the evidence demonstrates that staff acted in accordance with CDCR's use-of-force policies and procedures, including using verbal persuasion, a "cooling off" period, and clinical intervention to attempt to avoid use of force.

Because there is no basis for Plaintiffs' allegation that the use of pepper spray results in systemically excessive use of force, there is no legal basis for ordering changes to CDCR's statewide use-of-force policy.  As Plaintiffs acknowledge on page 35 of the motion, CDCR continues to provide guidance and training to the field on the appropriate use of pepper spray.  (*See also* Stainer Decl. ¶¶ 17-19.)  CDCR will continue to evaluate recommendations from the Inspector General and other consultants but, based on the facts, there is no evidence that the current policy does not adequately control the use of pepper spray.

23

### E.   Plaintiffs Failed to Present Evidence Establishing a Pattern or Practice of Unreasonable or Unnecessary Use of Immediate Force Amounting to Malicious and Sadistic Intent.

The statewide use-of-force policy authorizes the use of reasonable force, including immediate force, which the policy defines as the "force used to respond without delay to a situation or circumstance that constitutes an imminent threat to security or the safety of persons." 15 Cal. Code Regs., §§ 3268(a)(1), (a)(4) & (b); D.O.M. §§ 51020.4 & 51020.10. "When immediate force is necessary for inmates confined in their cells, Oleoresin Capsicum (OC) is the preferred option for carrying out the immediate use of force.  A verbal warning shall be given before force is used unless the circumstances require immediate force that precludes a verbal warning." D.O.M. § 51020.11.  For inmates who refuse to relinquish control of their food port, the policy specifically directs the officer to order the inmate to relinquish control of the food port, and warn the inmate that pepper spray will be used if he/she does not comply.  D.O.M. § 51020.11.2.  If the inmate refuses to relinquish control of the food port after the warning, the officer is only then authorized to use pepper spray to secure the port. *Id.*

Plaintiffs ignore the policy (other than the definition in Section 51020.4 in the Operating Manual) and present no evidence that immediate force is employed inappropriately or is inconsistent with policy.  (Mot. 32-33.)

### 1.   Plaintiffs Failed to Demonstrate that CDCR Inappropriately Uses Force Against Inmates Who Refuse to Relinquish Control of Their Food Port.

As discussed above, the statewide use-of-force policy provides specific guidance for inmates who refuse to relinquish control of their food port.  Plaintiffs' allegation that CDCR staff "routinely employ 'immediate' force against class members locked in their cells who commit minor infractions" (Mot. 16) is unsupported by evidence.  Plaintiffs cite three isolated examples to support this allegation, but none of them establishes a pattern and practice of force used maliciously and sadistically, or for the sole purpose of inflicting pain and punishment on inmates:

- Plaintiffs' characterization of the incident discussed in Paragraph 34 of Mr. Vail's declaration as "minor" mischaracterizes the facts.  (Mot. 16; Vail Decl. ¶ 34.)  The officer summoned the sergeant as requested by the inmate, but the inmate escalated the incident by taking "the magnetic signs from the front of her door and [threw] them

24

in the dayroom of the Unit 504."  The officer responded immediately to stop the inmate's active resistance and potential destruction of property.  (Martin Decl. ¶ 27.)

- Plaintiffs omit critical facts from the incident discussed in Paragraph 35 of Mr. Vail's declaration. (Mot. 16).  While Plaintiffs acknowledge that the inmate threw his food tray and struck an officer, they fail to state that the inmate "then reached down and appeared to pick up an unknown object from the floor." (Martin Decl. ¶ 28.)  The officer ordered the inmate to release the food port but the inmate refused, and the officer deployed OC spray to stop this imminent threat.  (*Id.*)  Plaintiffs cite the inmate's mental health issues, but fail to mention that there is no evidence the inmate was experiencing mental health issues or was "out of touch with reality" at the time of the incident; the assessment by the psychologist on which Plaintiffs base their conclusion occurred five days after the incident.  (*Id.*)

- The incident discussed in Paragraph 36 of Mr. Vail's declaration was cherry-picked from Mr. Martin's file.  (Martin Decl. ¶ 29.)  After reviewing and questioning this incident, Mr. Martin concluded that the single burst of OC spray in this instance avoided the need for a potentially high-risk cell extraction.  (*Id.*; *see also* Stainer Decl. ¶ 24.)[5]

## 2.   The Statewide Policy for Recording Use-of-Force Incidents Is Appropriate.

The statewide use-of-force policy requires a video recording for all controlled use-of-force incidents.  15 Cal. Code Regs., § 3268.1(d)(1); D.O.M. §§ 51020.12, 51020.12.1 (describing specific requirement for recording use of force incidents) & 51020.13.  For immediate uses of force, video recordings are required for any incident resulting in serious bodily injury or great bodily injury to the inmate, or when an inmate alleges unnecessary or excessive use of force.  15 Cal. Code Regs., §§ 3268.1(d)(1) & (d)(2); D.O.M. § 51020.17.3.  The Office of Inspector General reports that, although the recordings were not always perfect, "[t]he department complied with policy by recording interviews" in all incidents identified as requiring an interview.  (Sharma Decl. Ex. 9 [Oct. 2012 OIG Report] 9.)

Plaintiffs argue that the policy should be expanded to require officers to videotape immediate uses of force.  (Mot. 32-33.)  Since Plaintiffs have presented no evidence of a constitutional violation with respect to use of force, the request should be denied.  Plaintiffs should be required to explain how an officer can be expected to operate a video camera while attempting to stop an inmate-on-inmate assault or an assault on that officer.  The existing policy,

---

[5] Plaintiffs cite a fourth isolated example from a Rules Violation Report attached as Exhibit 3 to the Declaration of Lori Rifkin.  Plaintiffs do not attach the use of force packet and their expert does not express an opinion on this incident.  (*See* Vail Decl.)  The facts are insufficient to draw any conclusions, other than that this was an isolated incident.

which requires a video recording for any immediate use of force if an inmate alleges unreasonable force or has sustained serious or great bodily injury that could have resulted from the use of force, strikes the appropriate balance.

**F.    CDCR Extensively Trains Staff on Use-of-Force, Including Training on Use of the Expandable Baton.**

Correctional officers and supervisors receive comprehensive training on staff use of force. (Martin Exp. Rpt. 11, ECF 4279; Barton Depo. 103:8-22 & 113:3-21.)  All officers, sergeants, lieutenants, and captains designated to use or authorized to use expandable batons or 40-mm impact munitions receive initial training and annual recertification or qualification.  (Stainer Decl. ¶ 17; D.O.M. §§ 32010.14.2, 32010.19.2, & 32010.19.11.)  Mandatory training includes training on weapons' policy, use and effects of force, discretionary decision-making, emergency situation tactics, baton recertification, and life fire requalification with the appropriate weapons.  (D.O.M. § 32010.19.4.)  In 2013, officers receive 40 hours of training, including 2 hours on "Chemical Agents," 2 hours on "Expandable Baton Proficiency," 2 hours on "Expandable Baton Requalification," 2 hours on "Impact Munitions," 3 hours on "Range (Annual Firearms Qualification)," and 2 hours on "Use of Force."  (Allison Reply Decl. Ex. E, ECF 4478.)  In addition, officers receive on-the-job training, including 1 hour of training on "Report Writing," as recommended by the Office of Inspector General.  (*Id.*)

Other than a conclusory statement by their expert in Paragraph 12 of his declaration, Plaintiffs cite no evidence that CDCR's current training program is in any way inadequate.

**G.    The State's System for Reviewing and Monitoring Use-of-Force Incidents Is Thorough and Comprehensive.**

As discussed above, CDCR's supervisory review process for use-of-force incidents is multi-tiered and comprehensive.  The Office of Inspector General describes the four-level process for *every* use-of-force incident as follows:

> At each level of review, the CDCR reviewer is tasked with evaluating reports, requesting necessary clarifications, identifying deviations from policy, and determining whether the use of force was within policies, procedures, and applicable laws.  The review process begins with an initial review conducted by the incident

26

commander.  After the first review, the incident packages are forwarded to the first-level management review conducted by a captain, the second-level management review conducted by an associate warden, and the final level of review where the incident is reviewed by the use of force review committee chaired by the warden or chief deputy.  Each level examines the incident package for issues that may have been missed at previous levels of review.

(Sharma Decl. Ex. 9 [OIG Oct. 2012 Report] 9; *see also* Day Decl. ¶¶ 5-12 & 14.)  The Office of Inspector General provides oversight and monitoring of this review process.  (*See id.*)

Plaintiffs do not meaningfully question CDCR's review process.  (Mot. 37-38.)  Instead, Plaintiffs argue that the Office of Inspector General identifies errors and deficiencies by CDCR's reviewers in the review process in its reports.  (*Id.* at 37.)  But this argument is misleading, since Plaintiffs discuss only the initial level, and ignore the three subsequent levels of review.  (*Id.* at 37:24-28.)  In the example cited by Plaintiffs, only "[f]orty-seven of the original 222 issues remained unresolved after all levels of review."  (Oct. 2012 OIG Report 6.)  Moreover, the types of missing or conflicting information identified by the Inspector General include a laundry list of items ranging from the substantive to the trivial, and any single item will result in a deficiency noted in the report.  (Sharma Decl. Ex. 5 [Barton Depo.] 509:17-511:12.)  While this presents opportunities for training and improvement, it is not evidence that CDCR is using force for the sole purpose of inflicting pain and punishment on inmates.

## H.  Plaintiffs' Arguments Concerning the Use-of-Force Investigation Process Are Misleading.

CDCR's Office of Internal Affairs conducts criminal and administrative investigations into allegations of unreasonable or unnecessary force against inmates and the use of deadly force by employees.  (Day Decl. ¶¶ 2 & 16.)  The scope of investigation is thus broader than what policy requires.  (*Id.*; *see also* 15 Cal. Code Regs., § 3268.3(f); D.O.M. §§ 51020.20 *et seq.*)  Plaintiffs argue that the statewide use-of-force policy should be expanded to require investigation of additional types of evidence.  (Mot. 38-40.)  Plaintiffs cite a tiny sample of isolated cases at two institutions where they believe the interviews should have been conducted in a different way.  (*Id.* at 38; Vail Decl. ¶¶ 22-28.)  Defendants dispute Plaintiffs' claim that CDCR's use-of-force investigators lack investigative skill.  (Day Decl. ¶ 15.)  Moreover, Plaintiffs' cursory critique of

27

1  interview techniques is irrelevant, particularly in light of the undisputed evidence that there is no

2  pattern or practice of unnecessary or excessive force against the *Coleman* class.

3       Plaintiffs also misrepresent statements and recommendations by the Office of Inspector

4  General that have nothing to do with the investigation process.  Contrary to Plaintiffs' argument,

5  the OIG never "concluded that CDCR investigations of force are unreliable and that the process

6  'did not comply with policy and lacked transparency.'"  (Mot. 38 & 40; Sharma Decl. Ex. 4

7  [Barton Depo.] 79:20-85:8.)  Plaintiffs' argument is wrong in several respects.  First, this

8  statement refers to CDCR's internal review process and has nothing to do with investigating use-

9  of-force incidents.  (Sharma Decl., Ex. 4, 80:12-20.)  Second, the statement is not systemic; it

10 refers to a single institution that stopped the review of every use-of-force incident by the

11 Institutional Executive Review Committee, which was contrary to the policy requiring review of

12 every incident.  (*Id.* at 80:18-81:16.).  Third, the OIG endorsed the institution's decision to not

13 have the entire committee review every incident, and recommended that CDCR revise its overall

14 policy "to streamline and make the use-of-force committee process more efficient and effective."

15 (*Id.* at 81:17-83:19 & Ex. 9 [Oct. 2012 OIG Report] 13.)  CDCR was prepared to implement this

16 recommendation, but Plaintiffs filed the instant motion and CDCR determined it would be

17 prudent to not create a process that might need to be changed or rewritten depending on the

18 outcome of the motion.  (Sharma Decl. Ex. 4 [Barton Depo.] 87:15-88:3; Stainer Decl. ¶ 21.)

19      Finally, Plaintiffs note that the experts recommended expanding the investigation referral

20 criteria.  CDCR already investigates many of the categories requested by Plaintiffs (Day Decl. ¶

21 16), and the decision to change policy is best left to the officials in charge of the prison system

22 when Plaintiffs have failed to present any evidence that force is being applied for the sole purpose

23 of inflicting pain and punishment on inmates.

24      **I.   CDCR Imposes Meaningful and Appropriate Discipline on Staff for
          Unreasonable Uses of Force.**

25

26      CDCR investigates excessive and unnecessary force by staff, and imposes discipline when

27 appropriate.  (Day Decl. ¶¶ 2-3; Allison Reply Decl. ¶ 20 & Ex. F; Sharma Decl. Ex. 4 [Barton

28 Depo.] 32:19-34:22.)  The penalties include training, informal corrective action, and formal

                                              28

1  corrective action, including termination or demotion.  (Allison Reply Decl. ¶ 20.)  In 2012, the

2  Office of Internal Affairs referred 29 cases back to CDCR for discipline, investigated 57

3  additional cases, and sustained allegations of misconduct in 31 of these cases. (Day Decl. ¶ 2.)  In

4  2012, CDCR imposed formal corrective action in 67 cases, informal corrective action in 118

5  cases, and provided training in 4,066 cases.  (Allison Reply Decl. Ex. F.)  In 2011, CDCR

6  imposed formal corrective action in 84 cases, informal corrective action in 133 cases, and

7  provided training in 4,348 cases.  (*Id.*)

8        The Office of Inspector General monitors and reports on use-of-force investigations

9  through the entire process.  (Sharma Decl. Ex. 4 [Barton Depo.] 32:19-34:22.)  Between July and

10  December 2012, the OIG reported on 28 completed investigations, which resulted in the

11  imposition of adverse or corrective actions, or a finding that the allegations were not sustained.

12  (*Id.* Ex. 13 [OIG Semi-Annual Report, Vol. I, April 2013] 77, 79, 82, 92, 103, 109, 112-13, 115,

13  120, 125, 129, 131-32, 136, 143, 146, 148-49, 167-68, 172-73, 184 & 189.)  The OIG similarly

14  reported on 24 completed investigations between January and June 2012, and 26 completed

15  investigations between July and December 2011.  (*Id.* Exs. 14 [OIG Semi-Annual Report, Oct.

16  2012] 90, 100, 102, 104, 121, 123, 132-32, 146, 154, 157-58, 161, 169, 179, 184, 188-89, 193,

17  206, 228 & 230; & 15 [OIG Semi-Annual Report, April 2012] 59, 79, 96, 106-07, 110, 112, 116,

18  122, 143, 146-47, 152, 155, 158, 162, 165-66, 168, 172-73, 176, 179, 192 & 204.)

19        Plaintiffs present no evidence to the contrary.  Instead, they argue that the "employee

20  discipline system is badly broken and ineffective" (Vail Decl. ¶ 72), apparently based on the

21  mistaken belief that CDCR has not initiated investigations or imposed discipline on staff for

22  excessive or unnecessary use-of-force.  (Mot. 40.)  This perception is inaccurate and unsupported

23  by the evidence.

24  **II.     PLAINTIFFS FAILED TO DEMONSTRATE ANY PATTERN OR PRACTICE WITHIN THE
        DISCIPLINARY PROCESS THAT VIOLATES THE RIGHTS OF MENTALLY ILL INMATES.**

25

26        CDCR appropriately considers mental health conditions during the disciplinary process

27  and, when appropriate, staff mitigate penalties to accommodate these conditions.  (Martin Exp.

28  Rpt. 10 & 13-15.)  Plaintiffs and their expert present no evidence that CDCR fails to take an

29

1    inmate's mental illness into account when assessing discipline, which is all the law requires.

2          Plaintiffs present no case law to support their allegation that the disciplinary process

3    violates the Constitution.  And Plaintiffs' reliance on this Court's 1995 findings is misplaced.

4    The evidence, including the Special Master's reports, demonstrate that the disciplinary process

5    bears no resemblance to the process in 1995.  As noted above, the Special Master approved

6    Defendants' current disciplinary process in 2011, and has not reported negatively since.  (*See*

7    *generally* Special Master rpts. 24 and 25.)

8          The cases cited by Plaintiffs do not support their assertion that CDCR's disciplinary process

9    violates the ADA.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), did not involve

10    prisoners, but rather concerned the treatment of mentally ill patients voluntarily admitted to

11    hospitals.  And *Biselli v. County of Ventura*, 2012 U.S. Dist. LEXIS 79326 (C.D. Cal. June 4,

12    2012), is factually distinct from the facts before this Court.  In *Biselli*, the Court denied summary

13    judgment based on a complete lack of mental health input into segregated housing placements,

14    the finding that segregated housing was used solely for punitive reasons, and evidence that the

15    inmate was decompensating.  *Id.*  Here, unlike *Biselli*, Defendants incorporate and consider

16    mental health input during the disciplinary process, and, as explained below, Plaintiffs have

17    presented no evidence Defendants' disciplinary procedures place inmates into segregated housing

18    solely for punitive reasons or because of their mental illness.

19          **A.**    **Plaintiffs Failed to Demonstrate that Rules Violation Reports Are**
                 **Disproportionately Issued Against Mentally Ill Inmates.**
20

21          Plaintiffs have not shown that there is a pattern or practice of rules violation reports being

22    disproportionately issued against *Coleman* class members.  Instead, Plaintiffs present fabricated

23    statistics from just two institutions.  Plaintiffs and their expert assert that 99% of all of rules

24    violation reports issued at Kern Valley State Prison and 84% of all rules violation reports at Los

25    Angeles County were issued to inmates with mental illness.  (Vail Supp. Decl. ¶ 47.)  During his

26    deposition, Mr. Vail acknowledged that the statistics cited by Plaintiffs were not obtained from

27    CDCR, but were prepared by Plaintiffs' attorneys.  (Sharma Decl. Ex. 12 [Vail Depo.] 118:15-

28    20.)  Mr. Vail did not or could not clearly explain how exactly these statistics were calculated

30

1   noting "I'm not a statistician or all that good with numbers . . . [Plaintiffs' counsel] took the ball

2   and came back with the numbers." (*Id.* 119:10-14.)  In fact, the record demonstrates that during

3   the reporting period, 40% (644 out of 1,621) of all rules violation reports issued at Kern Valley

4   were issued to inmates with mental illness, and 55% (725 out of 1,314) of all rules violation

5   reports issued at Los Angeles County were issued to inmates with mental illness.  (Allison Opp.

6   Decl. ¶ 41.)  Moreover, system-wide data demonstrates that rules violation reports are not

7   disproportionately issued to inmates with mental illness.  (*Id.* at ¶ 42 [roughly 29% of rules

8   violation reports were issued to inmates with mental illness, who make up 27% of the CDCR

9   population].)

10      Further, even though Plaintiffs' statistics regarding the issuance of rules violation reports to

11  mentally ill inmates are false, Plaintiffs and their expert failed to engage in analysis to draw sound

12  conclusions from even their own flawed data.  For example, Mr. Vail presents no analysis on

13  what percentage, if any, of the rules violation reports he reviewed were issued inappropriately.

14  Mr. Martin's more thorough and extensive review conclusively found no pattern or practice of

15  discrimination against inmates with serious mental illness in the disciplinary process.  (Martin

16  Exp. Rpt. at 12-13; Martin Reply Decl. ¶ 5; Martin Opp. Decl. ¶ 8.)

17
18      **B.      Plaintiffs' Evidence Regarding Rules Violation Hearings Demonstrates that
                Defendants' Accommodate Mental Health Conditions During the Disciplinary
                Process.**

19      Plaintiffs base their request for systemic relief based on a miniscule sample of six rules

20  violation reports.  None of the six reports support even an individual constitutional violation,

21  much less violations of systemic proportions.  Of the six reports, three show that the Senior

22  Hearing Officers affirmatively considered the inmates' mental health condition and mitigated the

23  penalty; in the other three, no penalty was enforced against the inmates.

24      • In Plaintiffs' first example, an inmate was charged with Battery on a Peace Officer
          with a Weapon after aggressively throwing and striking an officer with a food tray.
25        (Rifkin Decl. ¶ 5, Ex. 4, ECF 4638-2.)  The rules violation report shows that the
          Senior Hearing Officer "due to the Subject mental health status…elect[ed] to mitigate
26        the penalties by **not imposing the loss of privileges** and assessed the low end of credit
          forfeiture." (*Id.* at ECF page number 75.)  Additionally, the Senior Hearing Officer
27        did not find the inmate guilty of the charge, which would have mandated a longer
          credit forfeiture, but rather the lesser included charge of Battery on a Peace Officer.

28

31

- In Plaintiffs' second example, the inmate kicked a nurse administering a shot, and was charged with and found guilty of Battery on a Non Prisoner.  (Rifkin Decl. ¶ 6, Ex. 5, ECF 4638-2.  As acknowledged by Plaintiffs, the hearing officer "issued the lowest possible forfeiture of credit" for this violation.  (Rifkin Decl. ¶ 6.)  The rules violation report also documents that the penalty was mitigated due to the inmate's Enhanced Outpatient Program status and the recommendation of the clinician who completed the inmate's mental health assessment.

- In Plaintiffs' third example, the inmate was charged with Disrespect Towards Staff for repeatedly telling a female nurse to "give me head."  (Rifkin Decl., Ex. 6, ECF 4638-2.)  The inmate pled guilty to the charge.  (*Id.*)  Despite the plea, the Senior Hearing Officer affirmatively considered the mental health assessment and documented "[t]his SHO finds the evidence of mental illness, insufficient to exonerate."  (*Id.*)

- In Plaintiffs' fourth example, the inmate was issued a rules violation report for Refusal to Sign Condition of Parole.  (Rifkin Decl., Ex. 7, ECF 4638-2.)  The inmate paroled and Plaintiffs present no evidence of disciplinary action.  (*Id.*)

- In Plaintiffs' fifth example, the inmate was charged with Refusal to Obey Orders for repeatedly disrupting group treatment.  (Rifkin Decl., Ex. 8, ECF 4638-2.)  The psychiatric technician conducting the group redirected the inmate to the topic and appropriate volume for the group.  The inmate continued his disruptive behavior and the psychiatric technician warned him that a rules violation report would be issued if the disruption did not stop.  The inmate continued his disruptive behavior and received a rules violation report, but again Plaintiffs present no evidence that any penalty was imposed.

- In Plaintiffs' sixth example, the inmate was charged with Willfully Obstructing Staff in the Performance of Duties.  (Rifkin Decl., Ex. 9, ECF 4638-2.)  Again, this rules violation report contains no evidence that any disciplinary penalty was enforced against the inmate.

Plaintiffs' evidence consists of three examples where an inmate was found guilty of a rule violation.  But in each of those cases, the hearing officer considered the mental health condition and mitigated the penalty.  Plaintiffs' evidence not only fails to demonstrate that Defendants do not take mental health into consideration during the disciplinary process, but rather supports the findings and conclusions of the State's expert.  (Martin Reply Decl. ¶ 17.)  Regardless, Plaintiffs' sample of only 3 rules violation reports is not sufficient evidence that CDCR is systemically violating class members rights' in implementing disciplinary measures.

### C.    Plaintiffs' Allegations Regarding Management Status Are Incorrect.

Plaintiffs' critique of "management status" is based on their misunderstanding of how the process works and its purpose.  CDCR does not use management status in lieu of the rules violation report process, but as a temporary procedure to immediately stop and deescalate an inmate's persistent disruptive, destructive, or dangerous behavior and restore safety and security.

32

1    (Stainer Decl. ¶ 27.)  The use of management status is limited to inmates housed in administrative

2    segregation and secure housing units.  (*Id.*)  CDCR follows multiple procedures to monitor and

3    safeguard the use of management status, including urgent or emergent referral of cases to mental

4    health, regardless of the inmate's mental health delivery system status; approval and daily

5    monitoring by high level correctional officers; and limiting management status to a maximum of

6    ten days.  (*Id.* at ¶¶ 29-31.)  Even under their incorrect understanding of management status,

7    Plaintiffs present no evidence that this practice violates the Constitution.  Prison officials are

8    entitled to deference in measures taken to preserve the security and safety of the institution, staff,

9    and other inmates.  *Bell v. Wolfish*, 441 U.S. at 552.  And temporary, time limited security

10   measures have been held to not violate the Constitution.  *See Hayward v. Procunier*, 629 F.2d

11   599, 603 (9th Cir. 1980) (holding lockdown of up to 30 days did not violate due process or

12   constitute cruel and unusual punishment).

13   **III.    NO LAW OR FACTS SUPPORT PLAINTIFFS' CONTENTIONS THAT COURT-APPROVED
            USE OF FORCE AND RULES VIOLATION REPORT POLICIES SHOULD BE REWRITTEN.**

14

15          Plaintiffs rely on Mr. Vail's testimony to suggest that various changes and additions be

16   made to Defendants' state-wide use-of-force and disciplinary policies.  (Mot. 41-43 & 50-54.)

17   But as shown above, Mr. Vail's testimony is based upon a cursory and faulty review of partial

18   information concerning a handful of use-of-force incidents, and is insufficient to support a new

19   injunction requiring a wholesale redrafting of Defendants' policies.  And, more importantly,

20   Defendants' use-of-force policies were drafted and adopted with the consent of the United States

21   District Court in *Madrid*, after which that litigation was dismissed with prejudice.  (Mar. 20, 2011

22   Order Terminating Force-Related Orders and Dismissing Case, *Madrid v. Cate*, No. C 90-3094,

23   ECF No. 2200.)[6]

24

25   _____

26          [6] To the extent that Plaintiffs seek reconsideration of the order acknowledging
     implementation of the use-of-force policies, revision of individual post orders, and the finding
     that the State's investigation and discipline systems are "effective," they essentially seek
27   reconsideration of the *Madrid* court's termination order.  Doing so via the instant motion is
     improper and should be rejected by this Court.

28

                                                    33

**A.   Plaintiffs' Proposed Orders Regarding Use-of-Force Policy Changes Are Not Based on Admissible Evidence and Would Violate the PLRA.**

A review of Plaintiffs' suggested policy changes show either that they are not based on admissible fact, or otherwise exceed what in any way could be considered a narrowly drawn, least intrusive means to remedy alleged excessive use of force.  For example, Mr. Vail suggests that Defendants be "prohibited from using corporal punishment on class members who commit minor violations which do not present an imminent threat to institutional safety." (Mot. 42.)  Aside from argumentatively assuming that Defendants engage in "corporal punishment" for minor rules violations without any basis in fact, Mr. Vail's suggestion would require a significant revision to the court-approved use-of-force policy acknowledging that immediate force may be used in situations constituting "an immediate threat to security."  15 Cal. Code Regs., § 3268.  That provision was vetted and approved by the *Madrid* court and made part of California law and CDCR's Department Operations Manual.  Plaintiffs should be equitably—if not legally— prohibited from arguing that, on the basis of Mr. Vail's anecdotal comments, these provisions should be revised to prohibit the use of immediate force, and non-lethal measures, except when "circumstances call for extreme measures" or when "there is a risk of death or serious bodily harm to staff or another inmate." (Mot. 41-42.)

Similarly, Plaintiffs seek reconsideration of the *Madrid* court's finding—and Plaintiffs' counsel's acknowledgement—that Defendants' staff had undertaken a four-phase training plan concerning use of force. (*See* Sharma Decl. Ex. 2, at 2.)  Now, based on Mr. Vail's factually unsupported assertion that staff are unable to recognize mental illness and "de-escalate" potentially volatile situations, Plaintiffs submit that Defendants should be ordered to "develop criteria for training and assigning" custody staff and "provide training to all custody staff." (Mot. 43.)  The evidence is contrary to Mr. Vail's conclusion—custody staff are trained in the recognition and potential accommodation of mental impairment, and the court-approved use-of- force policy provides for recognition of mental impairments. (*See* Stainer Decl. ¶ 16; D.O.M. § 51020.14.1.)  And Mr. Vail's demand for a "meaningful investigative process" again ignores the *Madrid* court's finding that the Office of Inspector General "oversees CDCR's personnel

34

1  investigations and discipline," and that this oversight "helped change the conditions" that had

2  prompted court intervention in 1995.  (Order Terminating Force-Related Orders and Dismissing

3  Case, *Madrid v. Cate*, ECF No. 2000 at 2-3.)  Mr. Vail's recommendations further ignore the

4  comprehensive investigative process codified in regulations and CDCR's operating manual and

5  discussed above which require and exhaustive investigation in *every* instance in which force is

6  used.

7      In sum, Plaintiffs offer neither evidentiary nor legal support for their argument that this

8  Court should reconsider the findings and orders in *Madrid*.  Defendants have promulgated,

9  implemented, and are enforcing policies concerning the use of both immediate and controlled

10  force that comply with the Constitution, and Plaintiffs' motion must be denied.

11      **B.   Plaintiffs' Proposed Orders Regarding Disciplinary Policy Changes Are
          Not Based on Admissible Evidence and Would Violate the PLRA.**
12

13      Each of Plaintiffs' proposed orders regarding disciplinary policies are not supported by

14  any evidence and exceed the PLRA's requirements.  As discussed above, Defendants'

15  disciplinary process has been approved by the Court and Plaintiffs.  In seeking intrusive orders

16  requiring wholesale changes to this system, Plaintiffs have not met their burden to demonstrate a

17  violation of inmates' Constitutional rights.  For instance, Plaintiffs request that Defendants be

18  barred from issuing rules violation reports to inmates and from referring inmates who have

19  committed crimes to the local authorities for prosecution.  But Plaintiffs present no case law or

20  evidence to support their conclusory claims that the act of issuing a rules violation report or

21  reporting a crime constitutes cruel and unusual punishment.

22      **C.   There Is No Basis for Ordering Plaintiffs' Request for Relief, Which Consist of
          Best Practice Recommendations, Not Constitutional Requirements.**
23

24      As shown above, Plaintiffs and their expert, Eldon Vail, offer no meaningful evidence of

25  systemic constitutional violations against mentally ill inmates with respect to custodial practices,

26  use of force, and disciplinary measures.  Instead, they focus on a few isolated, sporadic instances

27  that may possibly demonstrate violations and rely primarily on anecdotal evidence.  Moreover,

28  the conclusions set forth by Mr. Vail are rife with inaccuracies and are the result of unjustifiable

35

1  assumptions that he reached by reviewing the same evidence that Defendants' expert, Steve

2  Martin, reviewed to find that Defendants' mental health system was constitutionally adequate.

3  (Sharma Decl. Ex. 11 [Vail Depo. I] 180:22-181:8.)

4       Plaintiffs' motion mischaracterizes and confuses best practice recommendations with

5  constitutional requirements.  The intrusive list of requirements that Mr. Vail purports be

6  minimum requirements, are "at most, best practice policy preferences, and in some cases overly

7  restrictive that could cause harm to staff and inmates."  (Martin Reply Decl. ¶ 21, ECF 4483.)

8  Plaintiffs' confusion over best practices as opposed to constitutional requirements is evident in

9  their characterization of Mr. Martin's expert report and conclusions.  Mr. Martin concluded (1)

10  that the State has in place a system to minimize and control unnecessary and excessive use of

11  force on inmates and (2) that the State has in place a valid process to accommodate inmates

12  mental illness when adjudicating rule violation offenses.  (Martin Rpt. at 10; Martin Decl. ¶¶ 8 &

13  30.).  Mr. Martin's recommendations regarding guidelines for use of batons and pepper spray, and

14  revisions to the rules violation report process were "best-practice" recommendations that, while

15  not constitutionally required, would improve the State's extensive safeguards.  Plaintiffs further

16  try to mischaracterize the conclusions set forth by Mr. Martin by citing to sections of deposition

17  testimony that rely on incomplete and inaccurate hypotheticals and mischaracterizing the content

18  of Mr. Martin's deposition testimony.  There is no of evidence any ongoing and current systemic

19  violation of mentally ill inmates' constitutional rights with respect to custodial practices, use of

20  force, and disciplinary practices.  (*See* Martin Exp. Rpt. & Martin Decls.)

21                                    **CONCLUSION**

22       Plaintiffs present no evidence of current and ongoing constitutional violations to support the

23  intrusive orders they seek.  Instead, the evidence demonstrates that Defendants employ a

24  comprehensive and extensive system to minimize and control unreasonable staff use-of-force,

25  including heightened systemic safeguards to ensure that inmates with mental illness are not

26  subjected to unnecessary or excessive staff use-of-force.  Plaintiffs present no evidence that staff

27  use force against the *Coleman* class maliciously and sadistically for the purpose of causing harm.

28  CDCR has also implemented a well-defined, valid, and predictable process to reasonably

                                          36

1   accommodate mental health needs in the disciplinary process.  This Court must deny the motion,

2   and reject Plaintiffs' invitation to impose their often unsound best practice preferences into these

3   processes.

4   Dated:  July 24, 2013                                       Respectfully Submitted,

5                                                               KAMALA D. HARRIS
                                                                Attorney General of California
6                                                               JAY C. RUSSELL
                                                                Supervising Deputy Attorney General
7

8                                                               /s/ Patrick R. McKinney

9                                                               PATRICK R. MCKINNEY
                                                                Deputy Attorney General
10                                                              Attorneys for Defendants

11  CF1997CS0003
    20714005.docx
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)