KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
JESSICA KIM, State Bar No. 257766
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-3035
  Fax: (415) 703-5843
  E-mail: Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DECLARATION OF STEVE J. MARTIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES**<br><br>Date: TBD<br>Time: TBD<br>Dept: 4<br>Judge: The Honorable Lawrence K. Karlton<br><br>Action Filed: 1990 |

I, Steve J. Martin, declare as follows:

1. I am a corrections consultant, with over forty years of experience in the field of corrections as an officer, administrator, legal counsel, court expert, and court monitor. I have been qualified as an expert in the field of corrections and testified as such on more than forty occasions. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion Related to Use of Force and Disciplinary Measures.

**January 4, 2013 Report**

2. On January 4, 2013 I submitted an expert report on behalf of the defendants in this matter. In my report I examined use of force in California prisons with respect to inmates with mental illness and I concluded that the California Department of Corrections and Rehabilitation (CDCR) has in place heightened system wide safeguards to ensure that inmates with mental illness are not subjected to unnecessary and excessive use of force. I further concluded that, in general, when CDCR staff is required to use force, tactics are employed in a good faith effort to control, neutralize, or immobilize inmates who are actively engaged in threats of harm to each other, staff, or the good order of the facility. I also examined whether the rule violation hearing process reasonably accommodates inmates' mental conditions and concluded that CDCR has in place a well-defined, valid, and predictable process to reasonably accommodate inmates whose mental status requires/merits consideration when adjudicating rule violation offenses.

3. I have reviewed the Court's April 5, 2013 order, which struck my January 4, 2013 report as evidence. On page 22, the Court stated "Martin's report makes no reference to his interviews with inmates." (Order at 22.) The reason my report makes no such reference is because I did not rely on any interviews with inmates to support the conclusions and/or opinions in my report.

4. After reading the Court's order, I reviewed my notes from the 11 site visits I conducted between February and November 2012, and confirmed that I interviewed only two inmates at a single facility. These interviews related to two specific use of force incidents that I had reviewed on-site at the R.J. Donovan Correctional Facility. I did not interview any inmates

1

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

concerning the rule violation hearing process. Moreover, neither of the two interviews were used to form the basis for any of the systemic opinions in my report. A copy of my January 4 report, which was filed as Exhibit 2 to the January 7, 2013, Declaration of Debbie Vorous, is attached as Exhibit A for the Court's convenience and incorporated by reference as though fully stated in this declaration.

**March 22, 2013 Declaration**

5. On March 22, 2013, I submitted a declaration in support on behalf of the defendants in this matter. This declaration, a copy of which is attached as Exhibit B for the Court's convenience and incorporated by reference as though fully stated in this declaration.

6. In my March 22 declaration, I responded to the opinions of plaintiffs' expert, Eldon Vail, on the following topics, which I do not repeat here: (a) use of force (¶¶ 5-10), (b) use of the expandable baton (¶ 11), (c) use of OC spray (¶¶ 12-13), (d) documentation of consultation with medical staff before controlled use of force incidents (¶¶ 14-16), (e) CDCR's adequate accommodation of inmates' mental illness while adjudicating rules violations (¶¶ 17-20), and (f) Mr. Vail's recommendations (¶ 21).

**Declaration of Eldon Vail In Support of Motion Related to Use of Force**

7. I have reviewed the Expert Declaration of Eldon Vail in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures (Vail Expert Declaration). I have also reviewed many of the documents and materials that were produced by the State and provided to Mr. Vail that form the foundation for the opinions set out in the Vail Expert Declaration. I have not yet had the opportunity to review each use of force video referred to in the Vail Expert Declaration, such as the video referred to in Paragraph 19, but I will review any remaining videos before my deposition and will provide additional testimony, if necessary, in a supplemental declaration or at the evidentiary hearing.

8. My review of these additional materials has again strengthened and affirmed the conclusions set forth in my earlier report and declaration. Further, based on my review of the Vail Expert Declaration and the documents submitted for his review, it continues to be my

2

opinion that the conclusions proffered by Mr. Vail are not supported by a thorough evidentiary record and display a lack of reasoned and substantive analysis.

9. Mr. Vail has opined that "the CDCR, as a matter of practice and sometimes by policy, engages in unnecessary and excessive use of force with mentally ill inmate patients." In support of this opinion he cites thirteen examples of use of force incidents at five CDCR facilities occurring over a period of approximately eighteen months between 2011 and 2013 and concludes that "these examples are not outliers of the use of force practice with mentally ill inmates, but are typical of what I observed in California prisons."

10. I have been provided documents and materials related to each of these thirteen incidents. The typical packet of materials provided for each of these use of force events included the Incident Report packet (Parts A-C) and the IERC Institutional Executive Review of Use of Force Critique and Qualitative Evaluation Analysis.

11. Mr. Vail through his review and analysis of documents and materials related to these thirteen incidents was able in each case to arrive at a definitive conclusion that the particular application of force was unnecessary or excessive. While I am not privy to the documents and materials he utilized in each case, he does not purport to have conducted independent investigations of any single incident.

12. I likewise have not conducted independent investigation of any particular incident. I have, however, reviewed the documents and materials I was provided and have identified additional relevant evidence Mr. Vail failed to include in the analyses of his thirteen examples. It is his failure to include or cite relevant evidence that seriously undermines his conclusions. In some cases, his conclusions have been rendered without a proper evidentiary foundation. In other cases, his analyses are incomplete. Finally, in some cases, his analyses are premised on faulty assumptions. There are even some cases in which he uses as a foundation for his opinion conjecture and speculation rather than relevant objective factors.

13. It is evident that Mr. Vail consistently failed to identify objective factors related to the level of inmate **resistance** [emphasis added] presented by the inmate(s), thus limiting his analyses

3

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

almost exclusively to officer **response** [emphasis added]. It is axiomatic that an analysis of a use of force incident must include, among other things, a consideration of the quantum of force applied relative to the level of threat presented, i.e., the relationship between the need (resistance) and the amount used (response). In none of the thirteen cases does Mr. Vail provide objective evidence that officers used force for the very purpose of causing harm to the inmate. In every use of force incident cited by Mr. Vail, there were varying levels of inmate resistance that precipitated the consideration of whether force was necessary. Admittedly, in hindsight, the degree and amount of force can be questioned in a number of incidents Mr. Vail reviewed. However, that number is exceedingly small given the total number of use of force incidents that occur on a daily basis in a system that includes approximately 120,000 inmates housed in over thirty facilities that comprise the CDCR. Moreover, what is starkly and objectively absent in our review (both Mr. Vail and I) of hundreds of use of force incidents occurring in more than fifteen prisons over eighteen months, is any pattern of serious injuries normally associated with those systems or institutions found to have engaged in a pattern and practice of excessive and unnecessary staff use of force. I can attest to evidence of such a pattern in **every** [emphasis added] case with which I have been associated during the past thirty-two years as a court expert, court monitor, plaintiffs' expert, defendants' expert, and expert for both the U.S. Department of Justice and the Department of Homeland Security.

14. In summary, of the thirteen incidents cited by Mr. Vail, six of the thirteen came to his attention as a result of my reviews. Of the seven incidents he reviewed independently, he relied almost solely on his review of the videos; and in every instance, as will be seen below, failed to include in his assessments relevant evidence contained in the incident review packets or the IERC reviews. It appears he has reached his conclusion of a systemic pattern and practice of unnecessary and excessive force primarily based on his independent review of seven incidents at three institutions utilizing video evidence alone while ignoring a storehouse of relevant evidence contained in the incident packets and IERC reviews related to the seven incidents. By way of comparison, I provided a lengthy declaration in *Madrid v. Gomez* in which I opined that there was

4

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

a pattern and practice of unnecessary force at the Pelican Bay State Prison. In support of that opinion, among other things, I provided forty-two summaries of use of force incidents illustrative of this pattern at this single institution selected from a comprehensive review of thousands of documents and other materials, in contrast to Mr. Vail offering seven partially assessed incidents at three institutions.

15. In support of my observations, I hereafter cite specific relevant evidence in the thirteen incidents that if incorporated into Mr. Vail's analyses would at the very least alter his conclusions; and in some instances, reverse his conclusions entirely. Unlike Mr. Vail's analysis, my analyses included a review of **both** [emphasis added] the inmate(s)' resistance and the CDCR response. Mr. Vail's thirteen examples are addressed *seriatim* below.

16. Paragraph 14 Vail Expert Declaration. Mr. Vail, in describing the cell entry to secure the inmate, notes that "the inmate and the floor of the cell are soaked from the massive amount of spray that officers deployed. All parties immediately slip and end up in a pile on the floor...This was a disorganized, ill planned, and poorly executed use of pepper spray on a decompensating inmate patient." What Mr. Vail failed to note is that staff reports indicate that the inmate had flooded his cell and just prior to the cell extraction was "standing in inches of water that contained feces." Staff also reported that the inmate had feces on his body. In his sworn testimony when queried about this incident, Mr. Vail acknowledged that he was able to reach this conclusion of excessive force based solely on the video and that was all he needed to reach such a conclusion (see Vail deposition, June 27, 2013, at page 49). While the extraction was not executed with tactical precision, Mr. Vail's incomplete and distorted view of the extraction would at first blush appear to support his view that the extraction was "disorganized" and "ill planned." However, the reporting packet clearly establishes that the cell entry was in fact organized as required by procedures with each member of the team having specific assignments upon entry. The cell entry was preceded by a cooling-off period with clinical intervention attempted in an effort to avoid use of force. Cell extractions by their very nature are fluid and dynamic events with officers often having to react instantly to changing conditions. What Mr. Vail describes as a

5

"scuffle" was in fact an inmate actively resisting repeated commands to be secured in order to neutralize the threat he represented to staff. That the subject was a "decompensating inmate patient" did not obviate the compelling need to neutralize his active resistance to staff.

17.   Paragraph 15 Vail Expert Declaration. According to Mr. Vail this inmate was placed in a holding cell on "Management Status" for disruptive behavior. Mr. Vail described this housing move as a summary punishment. The inmate, who was asthmatic, refused to present himself for cuffing and was subjected to multiple applications of OC. Mr. Vail concluded that the inmate "presented no real threat or immediate threat to facility security and OC was used unnecessarily and gratuitously to inflict immediate punishment on an inmate who was only verbally defiant to the staff." Staff reports indicate that this inmate was placed in the holding cell pending a mental health evaluation after he had covered his cell window accompanied by his threats of suicide. After the evaluation, he was to be re-housed but refused to present himself for cuffing. After a 90 minute cooling off period with clinical intervention, he continued to resist orders, covered himself with clothing, and squatted down in the cell. At this point officers noted that they no longer had a clear view of this inmate and administered the OC prior to a planned cell entry. The officers' documented attempts to exhaust alternatives to force (cooling off period of 90 minutes and clinical intervention), after which the inmate actively and persistently resisted lawful orders, is objectively inconsistent with Mr. Vail's conclusion that force was applied "gratuitously to inflict immediate punishment." Had this inmate been placed in a holding cell for punishment and thereafter immediately subjected to a chemical agent with no documented resistance in total disregard of his medical condition, I too, would conclude that such force was both gratuitous and would constitute summary corporal punishment. However, a comprehensive review of both the Incident Report packet and the IERC review provide a substantial record that officers acted in accord with their own policies. More importantly, there is no evidence whatever that these officers utilized force for the singular purpose of inflicting pain and punishment on this inmate.

6

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

18. Paragraph 16 Vail Expert Declaration. This was an inmate who was to be moved to a crisis bed where he could be evaluated by health care staff. The inmate persisted in his refusal to be moved from his cell. After a substantial cooling off period had expired with clinical intervention and efforts by supervisors to create a dialog with the inmate, the inmate yelled at officers saying "don't waste your time, I ain't coming out." Prior to the actual cell entry, the inmate barricaded himself behind the cell door with his mattress. He was also observed holding a "milk carton filled with a substance believed to be feces." Despite this evident record of serious active resistance by the inmate, Mr. Vail speculates that had staff recognized the "inmate's cues" that this inmate "could have been coaxed out of his cell, without using OC a total of five times." Based on his conjecture and speculation, Mr. Vail concludes that the amount of force used was excessive. Notably, Mr. Vail does not identify what "cues" the staff failed to recognize nor through his hindsight does he provide information on how this inmate could have been "coaxed" from his cell. Mr. Vail either through oversight or convenience fails to mention in his analysis that this inmate was barricaded and armed with a possibly dangerous projectile of fecal matter. Such evidence is clearly relevant to an objective assessment of this event. In his sworn testimony when queried about this incident and relevant evidence he did not consider, he responded as follows:

<u>Vail June 27, 2013 Deposition at page 77</u>:

Q. But you don't know one way or the other whether any intervention was undertaken before the video was started, correct?

A. What I know is what was on the video.

Q. Okay. And that would be important to know for purposes of evaluation whether the force was excessive, correct?

A. It might be, it might not be.

This colloquy demonstrates Mr. Vail's pattern of arriving at definitive conclusions/opinions without a comprehensive review of all available evidence. How can Mr. Vail make a determination that certain evidence "might be or might not be" relevant if he does not actually

7

review all of the available evidence in order to validate that assessment? If an investigation is a search for the truth by careful and accurate examination of evidence, can it be said that Mr. Vail's approach is a sound one? In sum, speculative second guessing of officers who were confronted with a barricaded inmate possibly armed with a projectile of fecal matter does not in my view constitute an evidentiary basis upon which to render an ultimate opinion that excessive force was used.

  19. Paragraph 17 Expert Vail Declaration. This was an inmate who was scheduled to be transported to a Mental Health Enhanced Out Patient (EOP) hub for further mental health care. The inmate persistently refused staff orders to be secured in cuffs. Mr. Vail describes this situation as follows: "In another video I viewed at Kern Valley, an inmate refused to exit his cell because he was refusing a transfer to another prison. There was no documented attempt on camera to de-escalate the situation. Officers quickly deployed OC spray." Such a recitation of this event creates the impression that officers began their application of force in a highly precipitous fashion with no attempts to exhaust alternative measures. The reporting packet contained the following time line related to this event:

- 0630 hours Correctional Sergeant T. Sheldon ordered Inmate Mchenry to exit the cell.
- 0712 hours Licensed Vocational Nurse (LVN) S.Akpan, cleared Inmate Henry for OC Pepper Spray.
- 0830 hours Psychologist J. Howard conducted Psych Intervention with Inmate Mchenry.
- 0845 hours cool-down started.
- 0959 hours on camera introduction of extraction team.
- 1001 hours Correctional Lieutenant admonished Inmate Mchenry at cell front. Inmate Mchenry stated "I'm refusing."

Given the extraordinary length of time from the initial refusal to the actual application of force, Mr. Vail's rendering of these events at the very least provides an incomplete picture, and at the very worse, a plainly distorted view. Finally, Mr. Vail is critical of the inmate having been

8

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1  escorted "naked, to an outside yard for decontamination." It should be noted that the IERC
2  Critique of this event noted this violation and initiated corrective action as a result.

   20. Paragraph 18 Expert Vail Declaration. Once again, Mr. Vail through his recitation creates the impression that officers acted precipitously in using chemical agents when he states: "The de-escalation attempt lasted less than 15 seconds." Records indicate that the inmate's refusal to present himself for cuffing occurred at 4:00 p.m. At 9:00 p.m., an extraction team was assembled after mental health staff attempted to speak with the inmate who persisted in his refusal and subsequently barricaded himself behind his mattress.

   21. Paragraph 19 Expert Vail Declaration. Mr. Vail introduced his commentary of this incident by characterizing the behavior of two inmates in Administrative Segregation at Lancaster as "protesting." He failed to include that they had broken a cell window, destroyed plumbing, and then barricaded themselves behind their cell door. Mr. Vail went on to note that there was no intervention by mental health staff even though the Controlled Use of Force Manager/AOD Report indicated that such intervention was provided. Finally, notwithstanding that Mr. Vail acknowledges that "it was impossible to view what happened in the cell," he concludes "from what I could see from this event on camera, the amount of force used in this situation was excessive."

   22. Paragraph 21 Expert Vail Declaration. This was an incident involving two inmates housed in the same cell on the SHU at Corcoran. Mr. Vail notes that "there was only a cursory attempt at de-escalation prior to proceeding to use of force." Records indicate that the inmates' threatening behavior began at 3:50 p.m., clinical intervention attempted at 5:20 p.m., and force initiated at 6:20 p.m. More importantly, had Mr. Vail reviewed the incident packet he would have seen that the Sergeant did speak with the inmates in an attempt "to establish communication with both [inmates] with negative results." In describing the amount of chemical agents utilized in this event, which Mr. Vail found excessive, he fails to note the following relevant circumstances that certainly impacted the amount of OC utilized, and without question, should have been included in an objective rendering of the event: 1) the inmates were barricaded, 2) the

9

cell window was covered, 3) the cell was darkened, 4) the inmates were possibly intoxicated, and 5) the inmates claimed to have been armed with a weapon. Such a set of circumstances in a maximum security setting quite simply represent extreme risks of harm for officers who are required to execute a cell extraction. Given the extreme risks present in this event, I am not prepared to reach a definitive conclusion that the amount of chemical agent disbursed constituted unnecessary or excessive force.

23. Paragraph 30 Expert Vail Declaration. This was an incident that I presume came to Mr. Vail's attention as a result of my on-site review conducted at Corcoran in April 2012. Within a week of my review of this incident, I provided my assessment of this incident in order that my concerns be transmitted to high ranking officials within the CDCR. While I concluded that the amount of chemical agents utilized during this application of force was excessive, my greater concern was that it had not been referred for investigation by the IERC. This incident was a very fluid and dynamic event that unfortunately escalated by actions of both the inmate and staff. In reaching a definitive conclusion on whether the amount of OC was excessive, a reviewer would necessarily want to consider at the very least, among other factors, that this inmate throughout this incident was engaged in persistent and active resistance, was in possession of weapons stock, had armed himself with a projectile (milk carton filled with unknown liquid), and had destroyed property inside his cell. I specifically expressed my concern with the continued use of the chemical agent after it had been determined to be ineffective. I also repeatedly referenced this incident in urging CDCR officials to refine/revise their criteria for referral of incidents for investigation. I would note however, that this use of force incident was an extremely isolated event not representative of the hundreds of use of force incidents I have reviewed in this matter.

24. Paragraph 31 Expert Vail Declaration. This was another incident that came to Mr. Vail's attention as a result of my on-site work at Corcoran. I likewise transmitted my concern with the manner in which the expandable batons were employed by officers. While I had serious concerns with the use of the batons during the course of this isolated event, I did not reach a definitive conclusion that the officers' actions constituted unnecessary or excessive force. First, I

10

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

was not in a position to fully investigate the incident. Second, it was reported that these two inmates were engaged in mutual combat on an open yard that involved repeated and violent hard impact strikes to each other to the "upper torso, head and abdominal area . . . ." Staff attempted to intervene with chemical agents but without success. In an attempt to force compliance with their orders and after having exhausted a lesser means of intervention force, the officers employed baton strikes to non-vital areas of their bodies. Mr. Vail concludes without qualification that the batons were improperly used based on his blanket application of the principle that batons "should only be used for defensive purposes." He seems to support this proposition by stating that "the report gives no indication that the officers felt threatened by the situation." That the officers did not expressly note that they "felt threatened by the situation" certainly should not be used to infer that an ongoing violent assault between two inmates was not a potentially very serious threat to the safety of all concerned. I certainly did not see any evidence that the officers used the force for the sole or express purpose of causing harm to these two inmates.

25. Paragraph 32 Expert Vail Declaration. This was a cell extraction in which Mr. Vail notes the following: "They used OC spray when the cell door was open, and the inmate charged the officers. He was taken down with the use of the shield but it was a struggle to get handcuffs on him. One of the officers reported that he struck the inmate three times in the ribs with his baton to gain compliance. This was not a defensive use of the weapon." It is unknown whether Mr. Vail inadvertently failed to review all the reports, or simply elected not to include the following information from the incident report; however, it is clearly relevant evidence to any determination of whether the baton in this instance was used for defensive purposes. "As Correctional Officer P. Kul attempted to pin Harris to the back of the cell wall, Inmate Harris **scissor locked both legs around Correctional Officer P. Kul's waist** [emphasis added] and resisted staff as they attempted to place his hands behind his back. Staff utilized physical force and the MED to subdue the attacker."

26. Paragraphs 33–37 Expert Vail Declaration. These paragraphs address the management of inmates who refuse to allow staff to close and lock the food port on their cell

11

doors. Mr. Vail introduces this issue as follows (Paragraph 33): "From the reports I have reviewed, a common practice in the CDCR is to administer OC as an immediate use of force when inmates refuse to close the food ports in their cells." He then cites three incidents in support of his conclusion that "CDCR's policy needs to change" (Paragraph 37). The particular regulation at issue may be found at 51020.11.2 (Food Ports) of the CDCR Operations Manual. The officer indeed is given a degree of discretion as to when he/she may apply a chemical agent but only when the inmate has refused "to **relinquish control** [emphasis added] of the food port and allow staff to secure it." The operative language of the regulation is not as Mr. Vail cites, refusal to close the food port, but rather refusal to relinquish control of the food port so that the officer may close the food port. Inmates don't close food ports, officers do. If the inmate is passively obstructing closure of the food port, the officer should most certainly consider moving to a controlled use of force. However, if the inmate is engaged in targeted resistance, i.e., using the opening to throw projectiles, there may be a compelling security need (enforcement necessity) to immediately act to secure the door. While I agree that the regulation could benefit from revisions that would better clarify this distinction, I do not believe a fair and impartial reading permits officers the unfettered discretion to, according to Mr. Vail, "inflict unnecessary pain and suffering on mentally ill patients." The three examples Mr. Vail cites as support for his conclusion that "these situations present no immediate or pressing threat" and therefore should have been defined as "controlled," upon close examination, are not as clear-cut as he suggests.

27. Paragraph 34 Vail Expert Declaration. This was an incident in which an inmate had placed her arm in the food port with a demand to speak to a sergeant. The officer rather than deploy OC summoned the sergeant. The inmate escalated the event from passive resistance to active resistance when through the food port she was able to take "the magnetic signs from the front of her door and throw them in the dayroom of the Unit 504." I had previously reviewed this report during the course of my on-site work and noted it as possibly problematic. However, I was reluctant, and remain so, to definitively conclude that the officers should have allowed her further

12

Decl. Steve J. Martin Supp. Defs.' Opp. to Motion Related to Use of Force & Disciplinary Measures
(2:90-cv-00520 LKK JFM PC)

1 opportunities to engage in property destruction and actively threatening behaviors. I certainly had no basis to conclude that the OC was used for the sole purpose of causing harm to the inmate.

28. Paragraph 35 Vail Expert Declaration. This was an incident in which an inmate threw his food tray through the food port striking an officer in his lower abdomen. According to a staff report, the inmate "then reached down and appeared to pick up an unknown object from the floor." The officer ordered the inmate to release the food port but the inmate refused, at which time OC was deployed. Could the officer have delayed deployment in order to summon support for a controlled operation? I could speculate that had the officer done so, OC would have been unnecessary with use of effective verbal strategies. I could just as easily speculate that the inmate could have harmed staff with the unknown object he appeared to have picked up from the floor. Mr. Vail notes that this inmate was found by a psychologist to be "severely mentally ill," "out of touch with reality" with "distorted perceptions." What Mr. Vail fails to note is that this assessment was made five days after the event; consequently, the officers who were confronted with this inmate's threatening behavior were required to manage an ongoing and immediate threat presented by this regrettably impaired offender without benefit of such knowledge.

29. Paragraph 36 Vail Expert Declaration. I reviewed this incident during my on-site work and presumptively concluded that this event could have been managed as a controlled use of force. However, it should be noted in an objective assessment of this event, that this was a maximum custody inmate who persisted in obstructing the food port despite having been given multiple orders to cease the behavior. Had the inmate refused to relinquish control of the food port, and the single burst of OC spray not been used, a controlled cell extraction ultimately may have been utilized pursuant to the aforementioned regulation, involving a potentially higher risk of harm. As a result of the application of a single burst of OC, such a potentially high-risk cell extraction was avoided. While I have questions about this incident, I cannot definitively conclude that the force used was unnecessary or excessive.

**The Inmate Disciplinary Process**

30. At page 34 of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief to Use of Force and Disciplinary Measures, six RVR examples are cited to support

13

plaintiffs' allegation that "Defendants' approach to discipline and mental illness continues to be primarily punitive, focusing on punishment for rules violations rather than considering whether additional treatment or a different intervention incorporating meaningful mental health input would be more appropriate and effective." I have reviewed the RVR packets for each of these cited examples and confirmed that in every instance CDCR clinicians completed the Mental Health Assessment Requests and that the hearing officers thereafter provided appropriate consideration of the assessments in order to accommodate the inmates' mental health conditions. These RVR dispositions are consistent with my findings as set out in both my January 4, 2013 Report and my March 22, 2013 Declaration.

I declare under penalty of perjury under the laws of the State of California and the United State of America that the foregoing is true and correct. Executed in Austin, Texas on July 17, 2013.

_____
Steve J. Martin