# Exhibit 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
            vs.                           )S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____       )



DEPOSITION OF

ROBERT A. BARTON

THURSDAY, JULY 11, 2013,  9:37 A.M.

SACRAMENTO, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Robert A. Barton                                                    July 11, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                    Plaintiffs,        )
                                         )CASE NO.:
 6           vs.                         )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                    Defendants.        )
     _____)
 9

10

11

12

13

14           The Deposition of ROBERT A. BARTON, taken on

15   behalf of the Defendants, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:37 a.m., Thursday, July 11, 2013, at the

19   Attorney General's Office, 1300 I Street, 10th Floor,

20   Sacramento, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                                July 11, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3              BY:   JEFFREY L. BORNSTEIN, ESQ.
                     MEGAN F. CESARE-EASTMAN, ESQ.
 4              K&L GATES LLP
                FOUR EMBARCADERO CENTER, SUITE 1200
 5              SAN FRANCISCO, CALIFORNIA 94111
                415.882.8086
 6              415.882.8220 FAX
                JEFF.BORNSTEIN@KLGATES.COM
 7              MEGAN.CESARE-EASTMAN@KLGATES.COM

 8

 9   FOR DEFENDANTS:

10              BY:   PATRICK R. McKINNEY, ESQ.
                OFFICE OF THE ATTORNEY GENERAL
11              STATE OF CALIFORNIA
                455 GOLDEN GATE AVE., SUITE 11000
12              SAN FRANCISCO, CALIFORNIA  94102-7004
                415.703.3035
13              415.703.5843 FAX
                PATRICK.MCKINNEY@DOJ.CA.GOV
14

15   FOR ROBERT A. BARTON:

16              BY:   JAMES CASEY SPURLING, ESQ.
                OFFICE OF THE INSPECTOR GENERAL
17              10111 OLD PLACERVILLE ROAD, SUITE 110
                SACRAMENTO, CALIFORNIA 95827
18              916.255.1102
                SPURLINGJ@OIG.CA.GOV
19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                           July 11, 2013

```
 1   of that team that I talked about, those three attorneys.
 2   You have representatives of internal affairs that are
 3   assigned specifically as either presenters or committee
 4   decision makers.  And those are usually senior internal
 5   affairs agents.  And then you have representatives from
 6   Office of Legal Affairs.  And they're there as well to
 7   advise the department on going forward on particular
 8   investigations.
 9              And then you also have -- I'm sorry.  You also
10   have representatives from the receivers.  I believe -- I
11   know medical is there.  And if there's a case involving
12   mental health, I believe they have a representative
13   either there or on the phone as well.
14        Q.   That would be the department's mental health
15   staff?
16        A.   Yes.  Because the hiring authority's for
17   medical staff that are going to be investigated is like
18   the CEO at the prison.  It's not the warden necessarily.
19        Q.   And when allegations are sustained in any part
20   of the process, what types of actions are taken?
21        A.   Well, it can be anything from training --
22              MR. BORNSTEIN:  I'm going to interrupt.  I'm
23   going to impose an objection.  That question, it's vague
24   and lacks foundation.
25              Go ahead.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                          July 11, 2013

```
 1          THE WITNESS:  Okay.  So it can be anything
 2    from training that's recommended.  It can also be all
 3    the way up through termination.
 4          So, within the state, there is a range of
 5    penalties that are typically referred to as adverse
 6    action, and there are also corrective actions that are
 7    short of adverse action.  In other words, they don't
 8    affect your personnel file permanently, they're not
 9    going to fine you, take money from you, or demote you.
10          So you may have things within the Department
11    of Corrections -- and I've read all of these various
12    types of actions -- from a letter of instruction, to a
13    letter of counseling.  Sometimes they give them a memo
14    of expectations, depending on the rank of the person
15    involved.
16          And then you cross over into the adverse
17    actions, which the lowest would be a letter of reprimand
18    going in someone's personnel file.  And then you have
19    whole range of suspensions which are, you know, what you
20    would think they are:  One-day suspension, one-week
21    suspension, two-week suspension.
22          Those can also be applied, and typically are
23    within CDCR, as rather than being suspended a whole day
24    and using that to punish the employee or to correct
25    their conduct and losing that -- the use of that
```

Robert A. Barton                                              July 11, 2013

1    employee, they will allow them to convert it to, say,

2    5 percent for 12 months salary reductions.

3              So suspensions or salary reductions sometimes

4    are interchangeable.  All the way up through demotion

5    and termination, depending on the offense.

6              And the department, again as a result of

7    Madrid, actually one of the concerns was that they were

8    not being uniform or consistent in applying penalties to

9    staff either at institutions or from person to person.

10   So they created a penalty matrix -- which is what they

11   call it; it's actually in their procedures -- that gives

12   recommendations to wardens of ranges for various

13   offenses.  And the wardens use that as a guide.  And

14   then obviously we use it as a guide, too.

15             So if you're going to deviate substantially

16   from that matrix, you have to articulate good reason to

17   do so, whether it be up or down.

18             And so that's another thing that we monitor.

19   BY MR. McKINNEY:

20        Q.   And do you see fully realized adverse actions

21   coming out of use of force incidents?

22        A.   Yes.

23        Q.   Can you -- do you have a sense of the

24   frequency?

25        A.   Well, I looked at our last report and one of

Robert A. Barton                                          July 11, 2013

1    think, are positive effects or outcomes of our

2    involvement in the oversight process.

3        Q.    And how frequent is the contact between your

4    inspectors in a prison?

5        A.    They're out there for sure on a weekly basis.

6    Because they're all assigned to two or three prisons

7    each, they might be out at a prison two or three days a

8    week.  You know, it varies from region to region, from

9    prison to prison.

10           You know, we have some prisons that have

11   relatively few instances of use of force or discipline

12   because of the nature of the prison.  It's Level 2 or,

13   you know, something like that.  And then we have others

14   that they're out there all the time because there's a

15   lot more happening at that prison.

16       Q.    And are you familiar with CDCR's process for

17   reviewing use of force incidents?

18       A.    Very.

19       Q.    First of all, what is -- do you have an

20   understanding of what's meant by "review"?

21           MR. BORNSTEIN:  Vague and ambiguous.  Object

22   to the form of the question.

23           THE WITNESS:  Well, my understanding of it --

24   I don't know if I have the same understanding as you --

25   is the first-line supervisor, the second-line manager,

Robert A. Barton                                                July 11, 2013

```
 1   and then the ultimate committee member that's reviewing

 2   it.  That's what I'm thinking of as review.  I'm not

 3   sure what you're thinking of.

 4   BY MR. McKINNEY:

 5        Q.   Well, I think you've described the structure

 6   for review within CDCR.  Is that what you just

 7   described?

 8        A.   Well, that's what happens before it goes to

 9   committee.

10             Once that committee, all the people at the

11   table, the various captains of the various units, AW if

12   they're involved, chief deputy perhaps might be

13   involved.  Like I said, there's supposed to be someone

14   there from medical.  There may be someone there from

15   mental health.  All of those people look at the packets,

16   look at the assessments done.

17             And if you read our reports, you know, we've

18   criticized the department for their lower level reviews

19   and inability for those folks doing those reviews to

20   catch a lot of things, but -- and maybe that's why they

21   have the redundancy that they have.  Because by the time

22   it gets to committee, the hope is that all the

23   clarifications have been requested and et cetera.  So

24   that's the process that I'm familiar with it.

25        Q.   Does each institution have an executive review
```

Robert A. Barton                                        July 11, 2013

```
 1   committee?
 2        A.   Yes.   They're required to, and they're all
 3   required to have a use of force coordinator that made
 4   sure all the packets are moving through the process and
 5   get to the committee.
 6        Q.   And do you know whether each institution has a
 7   use of force coordinator at this point?
 8        A.   Well, unless they have a temporary staffing
 9   vacancy, they all do.
10        Q.   What's the function of the committee, in your
11   understanding?
12        A.   Well, my understanding is that the committee
13   is to look at, again, the adherence of all staff to
14   policy within that use of force incident and to
15   recommend action, if any, whether it be training or
16   additional investigation.
17             We find that when -- for example, in our
18   critical incidents, a lot of those don't get to
19   committee because if it's obvious at the outset that
20   there was excessive force or that there was misconduct,
21   that review committee process gets put on hold.   It's
22   put in abeyance until the misconduct investigation is
23   completed.
24             So they don't want, for example, it going to
25   committee and having a committee saying something
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Robert A. Barton                                                July 11, 2013

1    at RJD which we told them, "You realize this practice is

2    out of policy; however, we think it's not a bad idea.

3    Why don't you take it up to headquarters, propose it."

4            And I don't know that they've named it

5    anything.  I refer to it as a fast-track process, sort

6    of similar to the consent calendar in central intake.

7    That's not their word for it; that's just what I've

8    coined it.  I'm not sure they've called it anything.

9            But as with anything else within CDCR, it

10   takes them a long time to change anything.

11           So what we did up until that point was a

12   combination of what we call structured paper reviews,

13   which you can read in our first couple use of force

14   reports, coupled with in-person committee reviews.  At

15   the time, we were not staffed to go to every single

16   committee hearing at every single prison.  So when he

17   came on board, I told them at a minimum you have to go

18   to one a month.

19           Well, at some prisons that's 100 percent

20   because they only have one a month based on the

21   frequency of incidents.  However, at some, they have

22   more than one per month, and so we tried to review the

23   other cases on paper.  Asking the same questions that we

24   would have asked if we were in the committee in terms of

25   what led up to it, could it have been avoided, were

1          When we were asked by the special master to

2    get involved in use of force, we were never tasked with

3    that part of it.  You know, Coleman was separate from

4    Madrid.  And even though we were looking at use of force

5    overall, just as we have in Madrid, just as we have in

6    Plata, we, the IG's office, would be more than happy to

7    sit down with Coleman litigants, both sides, and the

8    court, and say we think there should be, for example,

9    one of the recommendations, a mental health person.

10         Now, I know about mental health assessments

11   and I had some of the same observations made by both

12   those experts I previously mentioned regarding those

13   assessments and whether or not they get full value, not

14   only in the mitigation aspect of a rules violation but

15   also in a review at the level of the executive committee

16   review level in use of force.

17         But what our folks have done since they

18   started working on this pilot project is we no longer --

19   we put on abeyance the structured paper reviews.  But

20   what we found is our folks had more time, then, to go to

21   committees.

22         So even though we aren't hitting 100 percent

23   at every single prison, I would say we roughly hit 70 to

24   80 percent of all use of force incidents, we take a look

25   at currently just by going to committees.

Robert A. Barton                                    July 11, 2013

```
 1              MR. BORNSTEIN:  Okay.

 2              THE WITNESS:  Yes.  I mean, that -- that's

 3    exactly what I was talking about.

 4    BY MR. McKINNEY:

 5        Q.   And when you -- it says has urged this

 6    recommendation.  Does that mean it was made in a prior

 7    report as well?

 8        A.   Yes.

 9        Q.   Okay.  And moving down to the next sentence,

10    it starts:  "The revision suggestion" --

11        A.   Right.

12        Q.   -- "originated from an institution."

13              You just testified to that?

14              MR. BORNSTEIN:  Sorry?  Where are you saying?

15              MR. McKINNEY:  The following sentence.

16              MS. CESARE-EASTMAN:  Can we read it into the

17    record?

18              MR. McKINNEY:  Sure.  I'll read it.

19    BY MR. McKINNEY:

20        Q.   "The revision suggestion originated from an

21    institution adopting its review process to handle many

22    of the low-level use of force incident reviews outside

23    the formal committee process."

24        A.   Correct.

25        Q.   And which institution was that?
```

Robert A. Barton                                        July 11, 2013

1        A.    That was RJD, R.J. Donovan.  That was the one
2    I -- I think I alluded to previously just a little while
3    ago.
4        Q.    Right.  And so the recommendation is to take
5    that process started at RJD and make it systemwide,
6    correct?
7        A.    Correct.
8        Q.    Now, in the next paragraph, if you can read
9    that first sentence in the next paragraph.
10       A.    Yes.  On the second column?
11       Q.    Yes.
12       A.    "While the OIG recognized and even commended
13    the institutions' intent to improve the review process,
14    at the time its process did not comply with their policy
15    and lacked transparency."
16             How far do you want me to read?
17       Q.    Just stopping at that sentence.
18             First of all, this is just referring to that
19    process at RJD, correct?
20       A.    Correct.
21       Q.    And I think you testified to this earlier, but
22    what did you mean in there when you said "lacked
23    transparency"?
24       A.    What I meant was it was being done in-house
25    and was not necessarily involving us in every single

Robert A. Barton                                    July 11, 2013

1    case.

2            So some of those we saw because when we were

3    doing that structured paper review, we would just pull

4    randomly or a whole sample of cases.  That's how we

5    first realized they were doing it.  Because all of a

6    sudden we saw these cases that were signed off that were

7    not going through committee.  We raised that issue with

8    them, and that's how this all came about.

9        Q.    And where -- it says it did not comply with

10   policy.

11       A.    Right.

12       Q.    What's meant by that?

13       A.    Well, their policy is that every case goes to

14   committee.  And the fact that they were low level, while

15   we understood their justification for it, it was not

16   allowed within their policy.

17       Q.    But the OIG's recommendation is that this

18   process was a good one that should be made broader?

19       A.    Well, in essence, the intent of it is good.

20   RJD was different at the time than it is now.  And it's

21   different than some other institutions.  So we

22   recommended that they meet with us, and we assigned one

23   of our in-house people to actually coordinate with their

24   committee -- I don't know if it was a committee, but the

25   group that was putting together the proposal.

Robert A. Barton                                        July 11, 2013

1           So we had input, for example, on which kind of
2    cases could be pulled.  And, again, you know, I think a
3    good point was made that mental health is perhaps one of
4    those that we should consider as -- you know, in this
5    new process.  Whether or not those cases should
6    automatically go to a committee or if a mental health
7    clinician should be involved in reviewing those even if
8.   they were low level.
9           So those are suggestions that the time is
10   right, I think, now to be injected into the process.
11   But, yeah, at its heart -- and I'm not going to
12   speculate.
13          So we may have had some cases where we had an
14   issue and we recommended action taken, you know, because
15   some supervisor handled a case this way.  But my
16   recollection is that the majority, if not all of them,
17   when we did review, we saw that they were low level.
18   You didn't have inmate complaints on them.  You didn't
19   have injuries.  And that's what made us think, you know,
20   this isn't a bad idea.
21          So that's how it all came about.
22      Q.   And the addition to that would be the OIG
23   would add oversight to the process of not looking at
24   every instance?
25      A.   Correct.  So that we could ensure that, A --

1   and when I've talked to my staff actually, I have one of

2   my senior inspectors who's not only got a law degree but

3   he's also handled a lot of use of force incidents and

4   been a peace officer himself, was not -- I didn't want

5   them to look at, when they review these cases if this

6   the process starts, not just does it meet the criteria,

7   but I expect them to also do a qualitative analysis on

8   the outcome.

9           So just because somebody met the criteria for

10  it to go through this fast-track process doesn't mean

11  that we're going to agree with what the department says

12  the outcome was.  Could be a low-level review, but there

13  could still be poor practice or poor training or

14  whatever that needed to be addressed.  So it's not just,

15  okay, this meets criteria, no injuries, no complaint,

16  and we're not going to read it.  They're still required

17  to read it because, as I told them, anything that raises

18  a red flag, I expect them to pull and put on the

19  committee agenda.

20      Q.    And who would have authority at the department

21  level -- is that the use of force coordinator? -- to do

22  the screening of the first instance or the someone else?

23      A.    No.   The manager.

24          So the idea is that the use of force

25  coordinator -- it would come, you know, from that

1   first-level supervisor who does it now.  They would

2   review it.  If they thought -- in fact, I've seen the

3   proposed form.

4           The only difference in the review process, it

5   will still go through the first-level supervisor, then

6   the manager, whether it's a captain or AW.  And then a

7   final decision maker from the committee, whether it's

8   chief deputy, again, associate warden, or warden, will

9   still sign off on what we call the use of force packet

10  which is all the 837Cs, the reports.  That's the number

11  the department gives their incident reports.  Any 7219s,

12  which are the medical records.  Any 602s, which is an

13  inmate appeal that is associated with that incident.  Of

14  course, that would automatically, in my mind, knock it

15  out anyway.

16          But the idea is that it would go through the

17  same process it otherwise would have gone through, same

18  eyes looking at it, including us, 100 percent of the

19  time.

20          The only difference would be, when it comes

21  time to have the committee meeting, those will already

22  have been decided because at the end of the committee

23  meeting, if everybody is in agreement, the chair of the

24  committee basically signs off on, you know, no action

25  taken or training or policy or investigation or

1   whatever.

2           The only difference would be that wouldn't be

3   presented to the whole committee.  But the same eyes

4   that would have been on it otherwise, with the exception

5   of the other captains and AWs at the table at the

6   committee, would still see -- we would just save the

7   time in the actual committee itself from having to read

8   that case for all the reasons I said before.

9           So that's the proposal anyway.

10          MR. McKINNEY:  Okay.  Let me show you another

11  document here in a moment.

12          (Defendants' Exhibit 2 was marked for

13          identification.)

14  BY MR. McKINNEY:

15      Q.   I'd assume you have seen this document.  Have

16  you seen this document before?

17      A.   Yes, I have.

18      Q.   Is this what you refer to as the Rifkin

19  document or -- if you look at the last page, her

20  signature is on the back.

21      A.   I believe it is.  But if she's done other

22  filings, I don't know if she's done more than one.

23      Q.   Okay.  But you have reviewed this document?

24      A.   Yes.

25      Q.   And if I could have you turn to page 38.

Robert A. Barton                                    July 11, 2013

```
 1        A.    Correct.
 2        Q.    Looking at the sentence starting with "OIG
 3   suggested."
 4        A.    Uh-huh.
 5        Q.    What is the process that this report is --
 6   that this sentence is referring to?
 7        A.    Well, that's a good question.  I don't know
 8   what was in Ms. Rifkin's mind.  I know what was in our
 9   mind when we wrote the recommendation.  It was this
10   revised streamline process should include us as a
11   reviewer to provide transparency.  We had already, since
12   the start of -- certainly since I've been the IG, we had
13   already been reviewing use of force incidents and
14   providing transparency.
15        Q.    And then the current status of this
16   recommendation, I think you mentioned it was on hold?
17        A.    Yes.  So I was told by -- again, by my staff
18   member who was assigned to be part of that working
19   committee that they were holding off on going forward.
20   They originally had told us they were going to go
21   forward either across the board or pick one or two
22   institutions in each region starting in July, which
23   would be now, to try this streamline process.
24              But all of these filings took place and they
25   felt -- at least what we were told -- that they were
```

```
 1   holding off to see what the outcome was because if
 2   they're going to revise the policy to include other
 3   things, there's no sense doing it twice.
 4        Q.   Okay.  Sorry to jump around, but since you had
 5   testified to those recommendations, I thought we'd take
 6   a look at that one.
 7        A.   Sure.
 8             MR. McKINNEY:  Let me mark another document
 9   now which is the copy of the policy.
10             (Defendants' Exhibit 3 was marked for
11              identification.)
12   BY MR. McKINNEY:
13        Q.   Mr. Barton, if you can take a look at this
14   document for a moment.
15        A.   It's Title 15.
16        Q.   And we took an excerpt starting with
17   Section 3268.  Does that -- are you familiar with these
18   regulations?
19        A.   Yes.  I think we quote them in most, if not
20   all, of our use of force reports.
21        Q.   So, for example, in this first provision, if
22   you take a look at the definitions of reasonable force,
23   unnecessary force, et cetera, are those consistent with
24   what you what's used in your reports?
25        A.   Yes.  And that's what I alluded to before as a
```

Robert A. Barton                                    July 11, 2013

1    mischaracterization.  We do look at whether or not the
2    incident involved unnecessary or excessive force.  And I
3    don't know if it's in Exhibit No. 1 or not, but I know
4    in the preface to other ones, certainly in the most
5    recent one we've authored from our office, the most
6    recent use of force one, I think we actually say that in
7    our introduction; that, you know, the department's
8    allowed to use reasonable force, here's how they define
9    it, here's what unreasonable force is.  And, you know,
10   that's one of the things that we look at.
11            And so I don't know where it is in her
12   pleadings.  Somewhere -- I think it was a footnote
13   somewhere -- she said that we were underinclusive or
14   something because we don't look at whether or not cases
15   involved unreasonable force.  We absolutely do.
16        Q.   Looking, for example, at Section 3268(b),
17   which is on page 119 of this document.
18            That section authorizes CDCR employees to use
19   reasonable force as required in performance of their
20   duties, but unnecessary excessive force shall not be
21   used.
22            Is that part of what the OIG monitors?
23        A.   Right.  When I said we monitor their adherence
24   to policy, this is what I'm referring to, is their use
25   of force policy.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                    July 11, 2013

1              So all of my inspectors are required to read

2       this policy to -- to be able to assess cases and whether

3       or not this policy is being violated.

4              MR. BORNSTEIN:  I'm sorry.  If you're

5       referring to Section B, you only read one sentence of

6       it.  I'd like you to put it in context for him and give

7       him the whole policy if you're going to have him opine

8       on it.

9              MR. McKINNEY:  Well, the witness has the

10      policy in front of him.  I think --

11             MR. BORNSTEIN:  I think you should read it in

12      into the record.

13             MR. McKINNEY:  Counsel, you'll have an

14      opportunity to ask questions.

15             MR. BORNSTEIN:  I think you're taking it out

16      of context and you're making it misleading and it's not

17      fair to the witness.

18      BY MR. McKINNEY:

19         Q.   Read the second sentence.

20             MR. BORNSTEIN:  He should read the whole

21      thing.

22             MR. McKINNEY:  You can do that, Counsel.

23      BY MR. McKINNEY:

24         Q.   Reading the second sentence, Mr. Barton, is

25      this all part what of the Office of Inspector General

```
 1   reviews or monitors?
 2       A.   Right.   If I'm following you:   "Employees may
 3   use reasonable force as required in the performance of
 4   their duties, but unnecessary or excessive force shall
 5   not be used."
 6           So the way I see it is that the department
 7   differentiates between unnecessary and excessive, but
 8   both of those fall under the category of unreasonable.
 9   And that's how we train our staff.
10           MR. BORNSTEIN:   How about the first sentence?
11           THE WITNESS:   "It is the policy of the
12   department to accomplish the department functions with
13   minimal reliance on use of force."   Exactly.
14           MR. BORNSTEIN:   You do that, too?   You look at
15   that, too?
16           THE WITNESS:   We do, too.
17           In fact, if we see an incident where we say,
18   you know, there was no need -- in fact, I just read one
19   of those the other day on a use of force case that we
20   were monitoring where they said, you know, "This person
21   was in their cell.   They were contained.   There was no
22   need for a use of force.   You could have waited them
23   out.   You could have done X, Y, and Z, and you chose not
24   to."
25           And, again, a lot of times those come up in
```

Robert A. Barton                                                July 11, 2013

```
 1   numbered 1, 2, 3, you're supposed to go 1, 2, 3, that's
 2   not the case.  And I have not seen a policy that says,
 3   nor am I familiar with a policy that says, you start at,
 4   I don't know, hands on and then you go to OC and then
 5   you go to baton.  Because if you've ever been in those
 6   situations, they're fluid, things change, every
 7   circumstance is different.
 8        Q.   You mentioned a couple of examples.  What is a
 9   situation where it might be reasonable for an officer to
10   go right to a baton?
11        A.   So if he is, for example, assaulting another
12   officer or you've got accompanying officers and you
13   trying to stop a threat, you don't want to spray the
14   accompanying officers, you know, and the threat is such
15   that you have a portion of the body that's exposed that
16   you are allowed to strike.
17             So, again, they're trained in use of baton for
18   not to strike certain areas, the head, for example, the
19   groin.  But if you've got a person who you can make
20   contact with their leg, for example, and gain
21   compliance, that might be a situation where you'd want
22   to use a baton.
23             By the same token, if you have somebody who
24   is, you know, in a corner away from people, you know,
25   and doesn't want to let go of, you know, another inmate
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                          July 11, 2013

1   we've made and then gives the numbers of how many went

2   on for investigation, et cetera.

3       Q.   Are you familiar with training on

4   implementation of the use of force policy within the

5   department?

6       A.   Yeah.  As I said before, I believe there is

7   academy training and then ongoing training.

8       Q.   What's ongoing, as far as you know?

9       A.   Well, I know there's annual training that's

10  required.  The department has training requirements -- I

11  refer to it as block, B-L-O-C-K, because I think they

12  have to rotate staff in and out of it, so you have to

13  allot for their space and so on.  And so they have it

14  scheduled for different shifts, et cetera.

15           I've attended -- it's been a while.  It was

16  back in 2005 when I started.  I've attended some of that

17  training, including use of force training, that the

18  department gives because if we're going to monitor it,

19  we want to know what it is.  We have our inspectors do

20  the same thing, not as actual participants in the class

21  but as observers.

22      Q.   Let's take a look at the most recent report.

23           I don't think we discussed this yet but --

24      A.   We changed to a new format.  So we have

25  Volume I and Volume II of our semiannual report.

Robert A. Barton                                                July 11, 2013

1    with reading all of those streamline cases which, for

2    me, it's a staffing issue.

3            So if you tell someone you have to spend so

4    many hours reading these and making sure they meet the

5    criteria and they're being handled properly or making

6    decision to pull them to committee, that takes time.

7            In the absence of having to do that and having

8    to do structured paper reviews, we've told them instead

9    of one committee every other month, we wanted them to go

10   to at least one committee meeting a month.  That's what

11   we did last year.  So we upped our committee attendance.

12           At this point, I really haven't given it much

13   thought, haven't had a chance, really, to sit down and

14   talk with my supervisors about either workload or -- I

15   personally have not had a chance to talk to CDCR

16   administrators about their intent of going forward.

17           So I can't really answer that question because

18   I haven't gotten to the answer myself.

19       Q.   Okay.  On the same page in the last sentence

20   on the last paragraph, it says:  "In the cases reviewed,

21   the department found the actual force used was within

22   policy 90 percent of the time" -- "97 percent of the

23   time at adult institutions."

24       A.   I don't know where you're at.

25       Q.   This is the bottom of 197 over to 198.

Robert A. Barton                                              July 11, 2013

```
 1    previously testified to.
 2              So I would disagree with her characterizations
 3    of our focus.
 4         Q.   During committee meetings, are your staff
 5    discussing with department staff whether a particular
 6    incident might require further investigation?
 7         A.   Yes.
 8         Q.   Do they assist with making determinations to
 9    whether a particular incident of force might be
10    unnecessary?
11         A.   Yes.
12              MR. BORNSTEIN:   I'm going to object to both
13    questions.   Move to strike.   Leading the witness.
14    BY MR. McKINNEY:
15         Q.   Similarly, do your staff discuss with
16    department staff at the meetings, executive review
17    committee meetings, whether a particular incident of
18    force was excessive?
19         A.   Yes.
20         Q.   And during the structured reviews that your
21    staff have conducted, do staff look at whether a
22    particular incident of force might require further
23    investigation?
24         A.   Yes.   And we will recommend it.   So we're not
25    just looking at it; we're actually making those
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                         July 11, 2013

```
 1    those investigations.  We think they're that important.
 2    BY MR. McKINNEY:
 3         Q.   So you focused on the recommendation piece of
 4    this.  But just looking at the numbers --
 5         A.   Right.
 6         Q.   So there was zero intentional uses of
 7    nonlethal force, right?
 8         A.   In a lethal manner during that period,
 9    correct.
10         Q.   And then I think the second full paragraph
11    discusses that second category you're talking about.  Am
12    I correct about that?
13         A.   Yes.
14         Q.   And it says total of two baton strikes?
15         A.   Yes.
16         Q.   That were unintentional but struck a target
17    zone; is that --
18         A.   There were two instances involving batons, but
19    I think they were more involving the 40-millimeter.
20         Q.   Just on the batons?
21         A.   Two.
22         Q.   And then go ahead and address the numbers on
23    the 40-millimeter.
24         A.   So the two with the batons is a situation
25    where everything indicates he's swinging for the
```

Robert A. Barton                                      July 11, 2013

```
 1   BY MR. McKINNEY:
 2       Q.   Let me ask you a general question.  Do your
 3   inspectors review videos of incidents?
 4       A.   Yes.  Yes.  Any use of force incident that we
 5   monitor that requires a video, we would review the
 6   video.  Well, even if it didn't require a video, if a
 7   video existed, we would review the video.
 8       Q.   And can you make a determination about the
 9   reasonableness of force based on the video alone?
10       A.   No.
11       Q.   What else would you need?
12       A.   Well, you'd need the testimony of the people
13   involved.  You would need to know what happened, because
14   the videos that we're talking about are not a video of
15   the force.  The videos we're talking about are videos of
16   the victim usually or the inmate or the, you know,
17   person that force was used against.
18       Q.   Well, that's one example.  What about, say, a
19   control use of force, a cell extraction?
20       A.   Okay.  Yeah.
21       Q.   What about in that situation?
22       A.   So then you actually have a video of the force
23   as it's being used because department policy requires
24   that they roll a video in a controlled use of force.
25            From that, again, I don't think you'd have a
```

1    100 percent picture of what's happening.  As we all know

2    in this age of technology, the video shows a portion of

3    that picture; but if you stand 3 feet behind the

4    videographer, you may be seeing things on the periphery,

5    you may be hearing things, there are other things that

6    may not be captured on that video.  So I don't think

7    they are 100 percent dispositive of what's going on.

8         Q.   What else would you need to review?  Or what

9    else is available?

10        MR. BORNSTEIN:  I'm going to object and ask

11   the last question and answer be stricken.  Lacks

12   foundation that he's ever looked at any of those videos

13   or knows if they have been looked at.

14        THE WITNESS:  So --

15   BY MR. McKINNEY:

16        Q.   You can go ahead and answer.

17        A.   That's fine.

18             In the ones that I viewed, of which there have

19   been many, and the ones that I know my staff has

20   reviewed, of which there have been many, of controlled

21   force cell extractions, and those that I've been

22   involved in, I've actually physically witnessed

23   controlled cell extractions while they were being

24   videoed within the prisons, you'd need to have reports

25   from all of those parties that were involved, all

```
 1    parties that witnessed, you know, obviously the video
 2    itself, testimony from any other witnesses that are
 3    there.  Oftentimes you have nonsworn staff such as
 4    mental health or medical that are required to be on
 5    scene.  Obviously the people within the cell and their
 6    testimony.
 7              So the best way to look at what happened is to
 8    have all that information available to you.
 9       Q.   And conversely, is it possible to get a full
10    picture of an incident without reviewing the written use
11    of force reports?
12              MR. BORNSTEIN:  Objection.  Lacks foundation.
13              THE WITNESS:  I would say no.
14    BY MR. McKINNEY:
15       Q.   Looking at Mr. Vail's report in front of you.
16    Turn to paragraph 43.  I would like you to review that.
17              MR. BORNSTEIN:  I think he should review the
18    whole thing.
19              MR. McKINNEY:  That's his choice.
20              MR. BORNSTEIN:  Well, if he wants to, I think
21    you should give him the opportunity to review the whole
22    thing and not just pull something out.
23              THE WITNESS:  I actually have read this one.
24    Again, I don't know if I read it in this document or in
25    another pleading.  But I do remember reading the
```

```
 1                  MR. BORNSTEIN:  Well --
 2                  THE WITNESS:  -- most of our reports.
 3                  MR. BORNSTEIN:  The reports speak for
 4      themselves.
 5                  THE WITNESS:  Right.  I think the initial one
 6      was under 90.
 7      BY MR. McKINNEY:
 8          Q.   Do you have an opinion whether there's a
 9      pattern or practice of excessive force in CDCR?
10                  MR. BORNSTEIN:  Same objection.  Lacks
11      foundation.
12                  THE WITNESS:  Based upon our reports and,
13      granted, we don't monitor 100 percent of the cases, but
14      the ones that we do monitor, I would not say there's a
15      pattern of practice of excessive force.  I would say
16      there are instances.  And I would say that's the whole
17      reason why it's important to have oversight, why it's
18      important to have a transparent process and a robust
19      internal review process which the department has and
20      we're constantly encourage them to improve on.
21                  So that's the only answer I can give you.
22      BY MR. McKINNEY:
23          Q.   Same question with respect to whether you have
24      an opinion if there's a pattern or practice of
25      unnecessary practice --
```

```
 1              MR. BORNSTEIN:  Same objection.  Lack of
 2     foundation.
 3     BY MR. McKINNEY:
 4         Q.    -- in the CDCR?
 5         A.    And, again, I view unnecessary and excessive
 6     force as subcategories of unreasonable force.
 7              So it would be the same answer.  I think there
 8     are instances of that.  I think one of the values we
 9     have is bringing those instances to the forefront,
10     pushing the department to act on them.
11              And having said that, if you look at the
12     statistics, the committees and the reviewers do a pretty
13.    good job of identifying unnecessary and excessive force
14     as well.  But there are still instances where we
15     disagree and have to push them harder to investigate
16     things or to get clarifications.  And all those numbers
17     are in our reports.
18         Q.    Do you have an opinion as to whether CDCR
19     staff use force to inflict pain without penological
20     justification?
21              MR. BORNSTEIN:  Same objection.  Lack of
22     foundation.
23              THE WITNESS:  Not as a pattern or practice,
24     but I know of individual cases where that's been our
25     opinion.
```

Robert A. Barton                                              July 11, 2013

```
 1   BY MR. McKINNEY:
 2       Q.   And do you have an opinion or is there any
 3   evidence that force is systemically used for sadistic
 4   and malicious purposes against inmates?
 5            MR. BORNSTEIN:  Same objection.  Lack of
 6   foundation.
 7            THE WITNESS:  Again, based upon all the
 8   reports I've read, our compiled reports, and information
 9   from my staff who are out there daily monitoring those
10   issues, I don't believe it is systemic.
11   BY MR. McKINNEY:
12       Q.   And you talked a little bit about what's
13   happened since Madrid, but can you compare the state of
14   use of force in CDCR currently compared with the time of
15   Madrid?
16       A.   I can only compare from 2005 to the present
17   because that's when I started with the office.  And, you
18   know, if you're talking about Madrid, I think it
19   preceded 2005 by a little bit.
20            But my own personal observations having
21   attended a use of force committee as recently as last
22   year and one that I attended in early 2005, I would say
23   the department's come a long way on improving those
24   things.  Plus, if you look at our reports, you see that
25   there are incremental improvements based in part on our
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com