**Exhibit 5**

Robert A. Barton                                                July 16, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,            )
                                  )
            Plaintiffs,           )
                                  ) CASE NO.:
      vs.                         ) S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
            Defendants.           )
_____)

DEPOSITION OF

ROBERT A. BARTON

TUESDAY, JULY 16, 2013,  9:57 A.M.

SAN FRANCISCO, CALIFORNIA

VOLUME II

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF CALIFORNIA
 3
 4   RALPH COLEMAN, ET AL.,        )
                                   )
 5                  Plaintiffs,    )
                                   )CASE NO.:
 6              vs.                )S 90-0520 LKK-JFM
                                   )
 7   EDMUND G. BROWN, JR., ET AL., )
                                   )
 8                  Defendants.    )
                                   )
 9
10
11
12
13
14          The Deposition of ROBERT A. BARTON, taken on
15   behalf of the Defendants, before Megan F. Alvarez,
16   Certified Shorthand Reporter No. 12470, Registered
17   Professional Reporter, for the State of California,
18   commencing at 9:57 a.m., Tuesday, July 16, 2013, at
19   K&L GATES LLP, Four Embarcadero Center, Suite 1200,
20   San Francisco, California.
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3           BY:   JEFFREY L. BORNSTEIN, ESQ.
                   MEGAN F. CESARE-EASTMAN, ESQ.
 4           K&L GATES LLP
             FOUR EMBARCADERO CENTER, SUITE 1200
 5           SAN FRANCISCO, CALIFORNIA 94111
             415.882.8086
 6           415.882.8220 FAX
             JEFF.BORNSTEIN@KLGATES.COM
 7           MEGAN.CESARE-EASTMAN@KLGATES.COM
 8           BY:   STEVEN FAMA, ESQ.
             PRISON LAW OFFICE
 9           GENERAL DELIVERY
             SAN QUENTIN, CALIFORNIA 94964
10           510.280.2621
             510.280.2704 FAX
11           SFAMA@PRISONLAW.COM
12
     FOR DEFENDANTS:
13
             BY:   PATRICK R. McKINNEY, ESQ.
14           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
15           455 GOLDEN GATE AVE., SUITE 11000
             SAN FRANCISCO, CALIFORNIA  94102-7004
16           415.703.3035
             415.703.5843 FAX
17           PATRICK.MCKINNEY@DOJ.CA.GOV
18
     FOR ROBERT A. BARTON:
19
             BY:   JAMES CASEY SPURLING, ESQ.
20           OFFICE OF THE INSPECTOR GENERAL
             10111 OLD PLACERVILLE ROAD, SUITE 110
21           SACRAMENTO, CALIFORNIA 95827
             916.255.1102
22           SPURLINGJ@OIG.CA.GOV
23
24
25
```

1       A.   Not at this point of this picture, but I don't
2  know where they came from or where they're going.
3       Q.   Isn't that more -- having the baton at the
4  ready, doesn't that suggest offensive use of the baton?
5            MR. McKINNEY:  Objection.  Lack of personal
6  knowledge.  Calls for speculation.  Incomplete
7  hypothetical.
8            THE WITNESS:  And I would say no.  I've been
9  in a lot of situations where I've had my baton out for
10 that very reason.  You don't want to lose that
11 split-second reaction time, and yet I wasn't planning on
12 using it offensively.
13 BY MR. BORNSTEIN:
14      Q.   You've escorted prisoners with a baton?
15      A.   Yes.
16      Q.   In CDCR?
17      A.   No.  In the Fresno Sheriff's Department.
18      Q.   And you would have the same kind of expandable
19 baton we're talking about?
20      A.   We had PR24s which were the side handle --
21      Q.   Wooden ones, right?
22      A.   No.  They were metal, but they were fixed very
23 similar in terms of overall length and use.
24           So you either have them in a circle on your
25 belt or what we would do is if we had a high risk

1  inmate, especially if we were concerned about assaulting
2  officers, we would have that out, basically, up against
3  our arms the way you would hold it and have the side
4  handle.  But you don't want to wait and have to draw it
5  and take that time if you're being assaulted.
6      Q.  So you're saying that having that thing ready,
7  where you're walking with somebody, is not an offensive
8  use of the weapon?  You're not preparing to use it
9  offensively.
10          MR. McKINNEY:  Objection.  Incomplete
11 hypothetical.  Calls for speculation.
12          THE WITNESS:  I would say not necessarily.
13 You could be preparing to use it defensively.  I mean,
14 if the inmate turns on you or attacks your partner, you
15 could then use it defensively.  To me, using something
16 offensively is -- would be unnecessary because there's
17 no reason to use it offensively.
18 BY MR. BORNSTEIN:
19     Q.  So you basically disagree with the State's
20 expert as to it relates to what he says in No. 2?
21         MR. McKINNEY:  Objection.  Misstates
22 testimony.
23         THE WITNESS:  No.  What I believe I stated
24 is -- and I don't see the two as being the same thing;
25 because, again, in this picture I don't know everything

Robert A. Barton                                                July 16, 2013

1    Q.   Okay.  And in paragraphs 14 through 37 of
2  Mr. Vail's declaration, he reports on 13 examples that
3  form the basis for his opinions.
4         In your opinion, is that an adequate sample to
5  form systemic opinions about use of force?
6         MR. BORNSTEIN:  Objection.  Misstates the
7  evidence.  It also -- you're asking him to comment on
8  things that he's already expressed that he has no
9  opinion on, because he has not studied use of force
10 incidents as it relates to mental health inmates.
11        THE WITNESS:  And I don't really understand
12 the question.
13 BY MR. McKINNEY:
14   Q.   Do you think 13 examples are -- and I'll
15 represent to you that they were cherry-picked, to use
16 earlier testimony, from Mr. Martin's file -- is a
17 sufficient sample size to form systemic opinions about
18 use of force in California?
19        MR. BORNSTEIN:  Objection.  Misstates the
20 foundation.  And same objection; it's calling for this
21 witness's opinions in an area that he's already
22 expressed that he has not studied and has no basis to
23 opine on.
24        THE WITNESS:  And leaving out the mental
25 health aspect of it but just pure giving an opinion, as

```
 1   far as systemic issue statewide, it seems to me that 13
 2   would be not enough for an opinion on a statewide
 3   problem.
 4   BY MR. McKINNEY:
 5       Q.   And if those incidents came from only four or
 6   five prisons within the system, would that be a big
 7   enough sample size, in your opinion, to form a systemic
 8   opinion about use of force?
 9            MR. BORNSTEIN:  Same objection.
10            THE WITNESS:  Depends.  If those four or five
11   were all women's institution and you were opining on
12   women's institutions, it might very well be.
13   BY MR. McKINNEY:
14       Q.   Assuming that not to be the case, is four or
15   five institutions enough to form a systemic opinion
16   about the entire system?
17            MR. BORNSTEIN:  Lack of foundation.  Calls for
18   speculation.  Incomplete hypothetical.
19            THE WITNESS:  And there are 33 prisons in the
20   state of California all with different missions.  There
21   are now two of them that house women, not counting the
22   Folsom Women's Facility.  So -- not to mention the
23   various minimum level up to high security.
24            So, again, 13 statewide seems like an
25   inadequate number to me to form opinions for the entire
```

```
 1   state, all those missions, all those populations.
 2   BY MR. McKINNEY:
 3       Q.   There was testimony earlier about the -- the
 4   recommendations in the inspector general's report.  In
 5   addition to sitting in on the IERC meetings, your office
 6   does structured reviews; is that correct?
 7       A.   We did up until last year, and then this last
 8   12-month period we did not.  Again, because we kept
 9   anticipating that we were going to be reviewing, for
10   lack of a better term, all of the paper on the consent
11   cases or the streamline cases or whatever.
12       Q.   But for the first three reports you did that,
13   your staff did those reviews, correct?
14       A.   For the first reports.  And then, as I said,
15   the last two we've only attended the committee meetings,
16   not done the additional structured paper reviews.
17           MR. BORNSTEIN:  Asked and answered repeatedly
18   over the last two days.
19   BY MR. McKINNEY:
20       Q.   Your earlier testimony was that during the
21   committee meetings you make recommendations as to
22   whether or not force was reasonable or excessive.
23           Is the same true with respect to the
24   structured reviews?
25           MR. BORNSTEIN:  Object to the form of the
```

```
 1   question.  Misstates his testimony.  His testimony is
 2   what it is.  And that's not accurate, and I -- so I
 3   object to the form of the question.
 4              THE WITNESS:  We would do so in both contexts.
 5   In the committee context, it's done, to use a term we
 6   used earlier, in realtime at the time the committee is
 7   making a decision.
 8              In the structured reviews, it sometimes was
 9   done after a committee had taken action or decided on
10   action, where we then had to go back to the hiring
11   authority, typically, within a month and suggest those
12   recommendations.
13   BY MR. McKINNEY:
14       Q.   There was also testimony earlier about -- when
15   we were looking at those pyramid charts -- about reviews
16   being incomplete.
17              What are the types of things that might be
18   missing from a report that would make it incomplete?
19       A.   Oh, we could be here for a long time.
20              Any number of things from things that are very
21   serious, like the name of someone who actually witnessed
22   it, all the way down to, you know, not putting in the
23   time that something occurred.
24       Q.   Can you give a rough number of how many things
25   could be possibly deemed incomplete?
```

Robert A. Barton													July 16, 2013

1   A.   No, because every case is different, and the
2   committee, as well as my people in their monitoring, are
3   looking at the whole picture and what would you expect
4   to be here.  So every case being different, something
5   could be missing that's different in 20 different cases.
6   Q.   But any one of those things would cause the
7   reviewer to a mark box incomplete, correct?
8   A.   Correct.
9   Q.   And the same thing with respect to your
10  recommendation regarding videos.
11      What are the types of things that would cause
12  a video to be considered not according to policy, I
13  think was the testimony earlier?
14  A.   And I think we go through and give a laundry
15  list in our report.  It's everything from what counsel
16  suggested, which is not stating their name, all the way
17  up to not allowing the inmate to finish an answer or
18  cutting him off or, you know, things of that nature that
19  would be more serious.
20  Q.   So it ranges from what I think you earlier
21  described as ministerial to things you described as
22  substantive, right?
23  A.   And potential misconduct.  Yes.
24      MR. BORNSTEIN:  It's been asked and answered.
25  BY MR. McKINNEY:

```
 1        Q.   And any one of those items would cause the
 2   report to be an -- be incomplete for that particular
 3   incident, right?
 4        A.   Yes.
 5        Q.   So it's a pretty tough grading system.  If
 6   there's any small issue that in the reviewer's opinion
 7   is not according to policy, it's marked as such, right?
 8        A.   Yes, because that's the only way we can
 9   maintain the objectivity of matching what policy
10   requires to what they are doing.  Otherwise, if we pick
11   and chose what policy violations, we would be accused of
12   some kind of subjective, you know, manipulation.
13        Q.   And if I could have you look at Exhibit 13,
14   which is the excerpt from the comparative report
15   published yesterday.
16             MR. BORNSTEIN:  We don't have it.
17             MR. McKINNEY:  Should I give you a moment?
18   BY MR. McKINNEY:
19        Q.   Mr. Barton, on the second page of this
20   excerpt, can you describe what's depicted on the table?
21        A.   Yes.  You have all of the prisons listed down
22   the left side.  You have various components listed
23   across the top.  And then you have checkmarks that
24   represent scores of less than 75 percent, not on the
25   entire component, but on at least one question.
```

```
 1                      CERTIFICATE OF REPORTER
 2
 3          I, MEGAN F. ALVAREZ, a Certified Shorthand
 4   Reporter, hereby certify that the witness in the
 5   foregoing deposition was by me duly sworn to tell the
 6   truth, the whole truth and nothing but the truth in the
 7   within-entitled cause;
 8          That said deposition was taken down in
 9   shorthand by me, a disinterested person, at the time and
10   place therein stated, and that the testimony of the said
11   witness was thereafter reduced to typewriting, by
12   computer, under my direction and supervision;
13          I further certify that I am not of counsel or
14   attorney for either or any of the parties to the said
15   deposition, nor in any way interested in the events of
16   this cause, and that I am not related to any of the
17   parties hereto.
18
19
20                  DATED:  July 22, 2013
21
22                          _____
23                          MEGAN F. ALVAREZ
24                          RPR, CSR 12470
25
```