# Exhibit 7



# Office of the Inspector General

Robert A. Barton

*Inspector General*

State of California

# Initial Report on Use of Force within the California Department of Corrections and Rehabilitation

November 2011

# EXECUTIVE DIGEST

## Summary

In *Madrid v. Hickman* (filed over a decade ago), subsequently re-designated *Madrid v. Cate*, the federal court found that Department of Corrections and Rehabilitation (department) officials had permitted and condoned the use of excessive force against inmates in violation of the Eighth Amendment of the United States Constitution. The court further found that department internal affairs investigations into alleged staff misconduct were pursued not to ascertain the truth, but to avoid finding officer misconduct as often as possible. As a result of those findings, in 2007 the federal court asked the Office of the Inspector General (OIG) to monitor the department's use-of-force review process. Since that time, the department has made significant progress in appropriately addressing use-of-force issues, resulting in the federal court removing its oversight of the department and officially dismissing the *Madrid* case in 2011. In doing so, however, the court expressed concerns about potential regression to the prior unconstitutional practices and encouraged the department to honor its commitment to reform and continue OIG oversight of the department.

This report provides an analysis of the department's use-of-force practices from September 2010 through June 2011. To create this use-of-force report, the OIG obtained relevant data concerning incidents involving force. The OIG also conducted a comprehensive analysis of the department's use-of-force review process by attending use-of-force review committee meetings at adult institutions and parole regions, as well as, through document-based structured reviews of use-of-force incidents.

In August 2010, the department, with OIG input, implemented a new use-of-force policy, conducted statewide use-of-force training, and focused significant resources to make the new policy work. Although this report indicates that the department's use-of-force review process is plagued with delays, sometimes experiences incomplete reviews, and has some inefficiencies, the institutions' review committees determined that 91 percent of the incidents reviewed were in compliance with the <u>new</u> use-of-force policy. For all incidents considered, the OIG concurred with the committees' final decision 90 percent of the time. Overall however, the data and observations contained in this report demonstrate the need for continued improvements in policy, uniform application of policy, and continued oversight related to the execution of the process.

## Results in Brief

There were over 6,300 reported use-of-force incidents which occurred in the department during the reporting period. Although in most cases the OIG concurred with the department's use-of-force committee in finding the use-of-force appropriate, in a number of instances improper conduct by department staff created or contributed to the incident necessitating the use of force. A sampling of other significant results from the monitoring data include: incident commanders in three quarters of the institutions did not request clarification for at least half of the incidents reviewed; one adult parole region did not hold any use-of-force review committee meetings despite having reported use-of-force incidents; the overall average time for reviewing a use-of-force incident was 51 days, which was outside the department policy of 30 days; and, on average the department complied with the policy regarding video taped interviews with inmates alleging unnecessary or excessive use of force only 70 percent of the time.

*Conclusion and Recommendations*

Through analysis of the available use-of-force data and observations while performing contemporaneous monitoring, the OIG provides the following five conclusions and recommendations for the department to consider further improving and refining the department's use-of-force practices and policies:

1. THE DEPARTMENT SHOULD DISTINGUISH BETWEEN NON-COMPLIANCE WITH THE USE-OF-FORCE POLICY VERSUS NON-COMPLIANCE IN OTHER DEPARTMENT POLICIES.

   Use-of-force critiques often conclude that staff actions were out of policy for reasons unrelated to the use-of-force policy. As a result, the OIG observed inconsistent decisions not only between institutions, but within the levels of review within the same institution.

   ➢ *The OIG recommends that the department reviewers continue to identify and address issues arising during a use-of-force incident related to other policies and procedures within the department, but distinguish between non-compliance with use-of-force policy and non-compliance with other department policies.*

2. THE DEPARTMENT SHOULD ENSURE ALL USE-OF-FORCE REPORTS ARE COMPLETE, ACCURATE, AND DOCUMENTS ARE SUBMITTED TIMELY PRIOR TO FINAL REVIEW DECISIONS.

   Almost all of the institutions and facilities made policy decisions based on inadequate reports. Thus, in most incidents involving force, the department made determinations about whether uses of force complied with policies, regulations and applicable laws without complete information.

   ➢ *The OIG recommends that the department provide better training for report writing and insist on greater accountability for its reviewers. In particular, the department should focus on the first level manager review as the data suggests these managers consistently failed to request clarifying information needed to determine policy compliance.*

3. THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE EXECUTIVE REVIEW COMMITTEES ARE HELD IN COMPLIANCE WITH DEPARTMENT POLICIES.

   Adult parole regions I and II held limited use-of-force review meetings, while the Richard J. Donovan Correctional Facility did not have its use-of-force review committee evaluate each use-of-force incident.

   ➢ *The OIG recommends that all parole regions be required to hold use-of-force meetings. Further, the department should either require all institutions to review each incident as the use-of-force policy requires, or amend the policy to allow lower levels of force a more efficient review.*

4.  <u>THE DEPARTMENT SHOULD ENSURE THAT USE-OF-FORCE VIDEO RECORDED INTERVIEWS BE CONDUCTED IN A MANNER THAT IS CONSISTENT WITH POLICY.</u>

In instances where a video recording was required by department policy, a recording was conducted pursuant to policy on average only 70 percent of the time.

> ➢ *The OIG recommends the department make efforts to increase its compliance with the use-of-force video recording policy. In particular, the department should address the complete lack of compliance with this policy at more than one adult institution.*

5.  <u>THE DEPARTMENT SHOULD ENSURE APPROPRIATE TRAINING FOR PEPPER SPRAY USE DURING CELL EXTRACTIONS, INCLUDING GUIDELINES FOR ASSESSING EXPOSURE ELEMENTS, TIME, AND EFFECTIVENESS.</u>

Great disparities exist within the department related to the use of pepper spray for cell extractions. Although current training requires officers to use only the amount of chemical agents reasonable to gain compliance, the department does not have clear guidelines establishing what is a reasonable amount of pepper spray or a reasonable amount of time between pepper spray applications.

> ➢ *The OIG recommends that the department provide additional guidelines regarding the use of pepper spray during cell extractions. These guidelines should include: how to assess whether or not the inmate received an adequate exposure to pepper spray; the amount of time to let the pepper spray take effect once adequate exposure has been achieved before initiating additional applications; and how to determine when pepper spray is ineffective and another use-of-force option should be considered.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

USE-OF-FORCE PROCESS OVERVIEW ....................................................2

MONITORING METHODOLOGY ...................................................................3
*Institutional and Facility Use-of-Force Review Committee Attendance*....................3
*Structured Reviews* .............................................................................................3
*Regulation and Policy Review* ............................................................................4

DIVISION OF ADULT INSTITUTIONS............................................................4
*Unreasonable, Unnecessary, or Excessive Use of Force* ..........................................5
*Deadly Force* ......................................................................................................6
*Types of Force*....................................................................................................6
*Effectiveness of Use of Force*................................................................................7
*Use-of-Force Reports*...........................................................................................8
*Institutional Use-of-Force Reviews*........................................................................8
*Timeliness of Reviews*..........................................................................................10
*Video Recorded Interviews*...................................................................................10

DIVISION OF ADULT PAROLE OPERATIONS ............................................10

RECOMMENDATIONS......................................................................................11
    *Recommendation 1: The department should distinguish between compliance with the use-of-force policy versus non-compliance in other department policies* ...........11

    *Recommendation 2: The department should ensure use-of-force reports are complete, accurate, and documents are submitted timely prior to final review decisions*...............................................................................................................12

    *Recommendation 3: The department should ensure use-of-force executive review committees are held in compliance with department policies*...................................13

    *Recommendation 4: The department should ensure that video recorded interviews be conducted in a manner that is consistent with policy*...........................................13

    *Recommendation 5: The department should ensure appropriate training for pepper spray use during cell extractions, including guidelines for assessing exposure elements, time, and effectiveness* ...........................................................................13

APPENDICES
    *Appendix A: Acronyms for Adult Institutions*.................................................... 14
    *Appendix B: Incidents Involving Force - Adult Institutions*........................................ 15
    *Appendix C: Effective Use of Force - Averages by Types of Force* ........................ 16
    *Appendix D: Timeliness of Reviews – Adult Institutions*............................................ 18
    *Appendix E: Statewide Review Summary – Adult Institutions*.................................. 19

**INTRODUCTION**

In 1990 a group of inmates incarcerated at Pelican Bay State Prison filed a class action civil rights lawsuit, *Madrid v. Cate*. Subsequently, in 1995 United States District Court Judge Thelton E. Henderson found that department officials had permitted and condoned the use of excessive force against inmates in violation of the Eighth Amendment of the United States Constitution. The court further found that department internal affairs investigations into alleged misconduct were pursued not to ascertain the truth, but to avoid finding officer misconduct as often as possible. As stated by Judge Henderson, "[a] meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, the prison's policies and procedures become dead letter."

> "A meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, the prison's policies and procedures become dead letter."
>
> *Honorable Thelton Henderson*

During the 1990s, the department's use-of-force policies and practices fell under heavy scrutiny by the courts and the Legislature because of the significant number of inmates that had been shot and killed by correctional officers in the California state institutions. Between 1989 and 1994, California correctional officers shot and killed more than 30 inmates, as compared to only six inmates who were shot and killed in all other state and federal prisons combined. In some cases, inmates engaging in fist fights without weapons were shot, while in other cases officers shot victims or bystanders rather than the perpetrators. During Senate hearings in 1998, which included an independent review panel of deadly force experts, legislators concluded that department management had failed to appropriately address the situation.

As the court noted in *Madrid*, custody personnel are in constant contact with a difficult and often openly hostile inmate population. Officers have a myriad of weapons and significant manpower at their disposal, and are required to exercise effective control over the inmates under their supervision. In addition, the physical environment within penal institutions "reinforces a sense of isolation and detachment from the outside world, and helps create a palpable distance from ordinary compunctions, inhibitions, and community norms."

As a result of these findings, in 2007 the federal court requested that the OIG's Bureau of Independent Review attend the department's use-of-force review committee meetings to: provide public transparency; assure the court and the public that use-of-force reviews are adequate; and, when appropriate, ensure cases are forwarded to the department's Office of Internal Affairs for investigation or approval to take action without further investigation. Since the OIG's use-of-force monitoring commenced, the department has, with OIG input and court approval, revised and updated its use-of-force regulations and some corresponding policies beginning in August 2010.

This report covers the OIG's monitoring of the department's use-of-force process from September 2010 through June 2011. Force is most often used by the department in the adult institutions which, at the end of this reporting period housed over 160,000 inmates and employed approximately 30,000 peace officers authorized to use force. Further, at times, parole agents supervising adult parolees engage in the use of force. This report addresses the use-of-force review process only for the adult programs and parole. The report does not address use-of-force in the Division of Juvenile Justice because that process is currently being reviewed by court appointed experts.

**USE-OF-FORCE PROCESS OVERVIEW**

The department is tasked with maintaining the safety and security of staff, inmates, wards, and visitors. At times, this responsibility results in the reasonable use of force by officers. On many occasions, the use of force is justified and necessary. For example, force may be necessary to stop an inmate from attacking another inmate or staff member, to stop a riot, or to take a parolee into custody.

The department defines language usage in the use-of-force policy in the following way:

- <u>Reasonable Force</u> – Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.
- <u>Unnecessary Force</u> – Unnecessary force is the use of force when none is required or appropriate.
- <u>Excessive Force</u> – Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.

Department policy requires that, whenever possible, verbal persuasion or orders be attempted before resorting to force. When verbal persuasion is ineffective, staff may use force. Use-of-force options are not executed in any particular sequence; rather staff chooses the force options he or she reasonably believes will stop the particular threat. Staff is only authorized to use reasonable force.

Any department employee who uses force, or observes another employee use force, is required to report the incident to a supervisor *and* submit a written report prior to being relieved from duty. After the report is submitted, the review process begins. This is multi-tiered and also seeks to identify any necessary follow-up action regarding the incident. If deadly force is used, or if any force is used that could have caused death or great bodily injury, the incident is reviewed by the department's Deadly Force Review Board (DFRB) and monitored by the OIG. During the time the DFRB review is pending, all other reviews specific to the case cease until the DFRB process has been completed. Moreover, certain use-of-force incidents are also reviewed at the division and executive level of the department.

Per department policy, use-of-force options include but are not limited to the following:

(a) Chemical agents

(b) Hand-held batons

(c) Physical strength and holds: A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.

(d) Less-than-lethal weapons: A less-than-lethal weapon (figure 1) is any weapon not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon.



Figure 1

(e) Lethal weapons: A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.

## MONITORING METHODOLOGY

The OIG reviews identified use-of-force incidents utilizing two primary methods: attendance at select use-of-force review committee meetings and document based structured reviews. The OIG participates as an active stakeholder in, and monitors, the department's promulgation of new use-of-force regulations and policies.

### *Institutional and Facility Use-of-Force Review Committee Attendance*

OIG representatives attend select use-of-force review committee meetings at all adult institutions statewide. Prior to attending these meetings, the department provides the OIG with the incident package, which includes the report of the incident, the staff reports regarding the incident, and any medical evaluations of inmates, and in limited circumstances, staff involved in the incident. The OIG evaluates all departmental reviews completed prior to the meeting and makes independent conclusions as to the appropriateness of the use of force. During the meeting, the OIG observes the review process and engages in contemporaneous oversight by raising concerns about the incidents, asking for clarifications if reports were inconsistent or incomplete, and engaging in discussions with the committee about the incidents. Through this process, the OIG draws independent conclusions about whether the force used was in compliance with policies, procedures, and applicable laws and whether the review process is thorough and meaningful. When appropriate, the OIG recommends that an incident be referred to the department's Office of Internal Affairs for investigation or approval to take action based on the information already available. In the event that the OIG has a significant disagreement with the decision made by the institution, or parole region, the OIG may elevate the issue to higher level department managers.

### *Structured Reviews*

The OIG performs random structured reviews for incidents where the OIG did not attend the use-of-force committee meetings but evaluated video recordings, officer reports, and the documented conclusions of the department's review process. The OIG evaluates staff compliance with use-of-force policies before, during, and after the incident. In addition, the OIG evaluates whether or not each application of force effectively stopped the threat that led to the need for force, and whether staff actions contributed to the need to use force. If the OIG discovers an issue during a structured review, the OIG alerts the institution or parole region and seeks further review of the incident. As a result of the OIG's structured reviews, certain incidents are placed back on the use-of-force review

committee calendar to address issues raised by the OIG. If the OIG does not consider the issue resolved, it may be elevated to higher level management.

*Regulation and Policy Review*

In addition to monitoring the use-of-force review process in the department, the OIG participates as an active stakeholder in, and monitors, the department's promulgation of new use-of-force regulations and policies. In this capacity, the OIG has reviewed amendments to the department's regulations and Operations Manual regarding the Division of Adult Institutions and continues to review proposed policies for the Division of Adult Parole Operations. The OIG monitors the department's ongoing effort to promulgate regulations specific to the use of deadly force by the department in its institutions and out in the community.

**DIVISION OF ADULT INSTITUTIONS**

In the ten month reporting period, the department, through the Daily Information Reporting System (DIRS), reported a total of 6,295 incidents involving force at institutions housing adult inmates. Of these 6,295 incidents, the OIG monitored 34 percent of the incidents by attending use-of-force review committee meetings and completing structured reviews. Specifically, the OIG attended 176 use-of-force meetings, where a total of 995 incidents were evaluated and further completed 1,173 structured reviews for a total of 2,168 incidents evaluated by the OIG.

The department found the use of force employed by staff complied with department policies in 1,816 of the 2,168 incidents and that staff did not comply with department policies in 182 of the incidents. Many of the remaining 170 incidents were brought to committee in order to meet the 30-day requirement for review, but were not actually ready for review.

In 106 incidents the OIG monitored, staff actions created or contributed to the need to use force. For example, policy violations related to the use of restraints or unauthorized inmates allowed to enter restricted areas resulted in the need to use force. Some incidents resulted in adverse actions if a policy was violated and serious injury resulted. The OIG also influenced the committees' recommendation to the warden for 259 of the incidents by requesting clarification, investigations, or employee training. When performing reviews, the OIG concurred with the department's committee decision 90 percent of the time.

> The OIG influenced the committees' recommendation to the warden for 259 of the incidents by requesting clarification, investigations, or employee training.

The department groups the adult institutions into primary missions: female programs, which classifies and houses all female inmates; reception centers, which evaluate and classify incoming male inmates; high security-males, which house the most dangerous male inmates; and general population-males, which provide dormitory and in-cell housing for lower security male inmates. 4,692 total use-of-force incidents occurred within the high security and reception center missions, while only 374 incidents occurred in the female programs mission.

Female programs and general population missions present lower percentages of use-of-force incidents compared to reception centers and high security missions when considering statewide inmate population. With an average population of 9,309 inmates per month, female programs mission comprised 6 percent of the statewide average monthly inmate population as well as 6 percent of the reported use-of-force incidents. General population missions averaged 56,757 inmates per month and comprised 39 percent of the statewide inmate population with only 20 percent of the reported use-of-force incidents.



Figure 2a

When comparing these missions with the high security and reception center missions, the data suggests a disparate difference. High security mission institutions averaged 47,506 inmates per month and comprised 32 percent of the statewide inmate population with 42 percent of the reported use-of-force incidents. Reception center mission institutions averaged 34,230 inmates per month and comprised 23 percent of the statewide inmate population with 32 percent of the reported use-of-force incidents.



Figure 2b

Figures 2a and 2b illustrate average inmate population and reported use-of-force incidents in each mission.

_Unreasonable, Unnecessary, or Excessive Use of Force_

The department's Office of Internal Affairs received 89 requests for investigation from the adult institutions related to use-of-force incidents. Of the 89 requests, there were allegations of misconduct against 200 officers. 63 of the allegations were alleged to be unreasonable uses of force. Other significant allegations included the failure to report the use of force and unnecessary or excessive force causing injury. On the following page, figure 3 provides a table summarizing the types of allegations received for investigation.

| Allegation | Total | Percentage |
|---|---|---|
| Unreasonable use of force | 63 | 26% |
| Failure to report use of force witnessed | 87 | 35% |
| Failure to report own use of force | 47 | 19% |
| Unnecessary/excessive force likely to cause injury | 27 | 11% |
| Undetermined/ other | 22 | 9% |
| *Total Allegations included in 89 Requests* | *246* | *100%* |

Figure 3

*Deadly Force*

In addition to evaluating allegations of unnecessary or excessive force, the department Office of Internal Affairs takes preliminary charge of investigations involving the use of deadly force, and any use of force resulting in death or great bodily injury. In this reporting period, the department referred eight allegations to the Deadly Force Investigation Team (DFIT), which subsequently conducted criminal and administrative investigations. These DFIT investigations are, by policy, required for every use of deadly force because of the severity of the potential consequences.

*Types of Force*

An incident requiring the use of force may involve more than one application of force and the use of different types of force. For example, during a riot, officers may use chemical agents, expandable batons, and less-than-lethal force to address different threats as the riot escalates. The 1,173 incidents monitored in the structured review process by the bureau included 3,271 separate applications of force.

In the reporting period, adult institutions used chemical agents in 46 percent of the applications of force, while physical force was used in 36 percent of the applications of force. All other types of force were each used in less than 10 percent of the applications of force, for a cumulative total of 18 percent.

Types of Force
(Structured Reviews)

Less-Lethal Force 9%
Expandable Baton 8%
Deadly Force 1%
Physical Force 36%
Chemical Agents 46%

Figure 4 illustrates the relative percentage of types of force used in the adult institutions from bureau monitored structured reviews.

Figure 4

When each mission is examined separately, the most prevalent type of force is different depending on mission. Physical force and chemical agents are used most often in the adult institutions, regardless of the mission. There are minor variations depending on mission. Significantly, there were no instances of deadly force or less-than lethal force in female programs. Figure 5 includes data of instances monitored and illustrates the types of force used in each mission.



| | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
|---|---|---|---|---|---|
| ☐ Reception Centers | 43.82% | 36.33% | 10.45% | 9.08% | 0.32% |
| ☐ Female Programs | 41.27% | 53.97% | 4.76% | 0.00% | 0.00% |
| ☐ General Population - Males | 37.38% | 47.20% | 7.13% | 8.06% | 0.23% |
| ☐ High Security - Males | 29.66% | 51.49% | 6.89% | 10.80% | 1.17% |

Figure 5

A list of the adult institutions, along with their acronyms can be found in <u>Appendix A</u>. For a comprehensive list of the types of force used in the reporting period at each of the department's adult institutions, please refer to <u>Appendix B</u>.

*Effectiveness of Use of Force*

Along with the types of force, the OIG examined the effectiveness of each application of force. To do so, the officer's description of the need for force was compared with the inmate's reaction to the force. The OIG then determined whether the use of force was effective in stopping the threat that justified the use of force. If more than one officer simultaneously used force on an inmate and the threat stopped, the force was considered effective for each application of the simultaneous force. If the goal of gaining compliance from the inmate was not met, the force was considered ineffective for all applications of the simultaneous force. The reason effectiveness must be considered is to determine whether subsequent applications of force were necessary.

The OIG evaluated 3,271 applications of force incidents and found physical force the most effective 78 percent of the time. Chemical agents were effective 61 percent of the time, while less-lethal force and use of the baton were only effective 40 percent of the time. Deadly force was effective 60 percent of the time. Two examples of instances where deadly force is not effective are:

1. The officer fired a shot which did not hit any person and the threat that required deadly force continued; or

2. The officer shot the intended target, but the threat continued because the injury was not sufficient enough to stop the suspect's actions.

Figure 6 illustrates the statewide relative averages for effectiveness for the five types of force.



Figure 6

Monitoring revealed a disparity in the techniques applied in the use of chemical agents, specifically pepper spray, when forcibly removing inmates from cells. The department is inconsistent in their use of pepper spray for cell extractions. In reviewing several cell extractions with similar case factors, the use of pepper spray ranged from a single application with a waiting period to numerous applications of pepper spray over a short period of time. According to department training, the amount of pepper spray, and the amount of time between applications has an impact on the effectiveness of this type of force. However, the amount used and the time waited before finding it ineffective varied widely amongst the reviewed incidents. For a comprehensive list of the effectiveness of the types of force used during the reporting period at each of the department's adult institutions, please refer to Appendix C.

### Use-of-Force Reports

As part of its structured reviews, staff reports were evaluated for an adequate description of the circumstances that led to force and a sufficient description of the force used. Staff reports for 1,173 incidents were evaluated. The OIG found that on average 96 percent of all reports reviewed adequately described the *need* for force, but only 66 percent appropriately described the *actual* force used during the incident. For example, at Folsom State Prison, 100 percent of the reports reviewed adequately described the need for force, but only 37 percent adequately described the force used during the incidents. More favorable results were found at the California Chuckawala Valley State Prison, with 100 percent of the reports adequately describing the need for force and 92 percent appropriately documenting the force used.

### Institutional Use-of-Force Reviews

At each level of review, the reviewer is tasked with evaluating reports, requesting necessary clarifications, identifying deviations from policy, and determining whether the use of force was within policies, regulations, and applicable laws. The levels of review are: the initial review conducted by the incident commander; the first level management review conducted by a captain; the second level management review conducted by an associate warden; and the final level of review where the incident is reviewed by the use-of-force review committee, with the ultimate determination made by the institution head or designee.

Of the 1,173 incidents for which structured reviews were conducted, the OIG found failures to identify issues at every level of the review process.

The incident commander is responsible for evaluating all officer reports for quality, accuracy, content, and request clarifications when reports have missing or conflicting information. The incident commander determines compliance with policy, procedure, and applicable law. The incident commander, at the initial review, found 531 incidents had missing or conflicting information at the time of determination regarding policy compliance. Of the 531 incidents, the incident commander requested clarification for 28 percent of the incidents. After requesting clarifications, the incident commander addressed deviations in 22 percent of the incidents reviewed. Overall, incident commanders in most of the adult institutions failed to address clarifications or policy deviations at least half of the time. A complete failure to request clarifications at this initial level of review was evident at Folsom State Prison, where incident commanders requested necessary clarifications in none of the incidents the OIG reviewed. On the other hand, Pelican Bay State Prison incident commanders requested clarifications in almost all of the reports with missing or conflicting information.

> Incident commanders in most of the adult institutions **_did not_** address clarification or policy deviations at least half of the time.

Within the first level management review, the quality of reports is evaluated to ensure the use of force was properly documented and reviewed. First level management review requires an in-depth analysis to determine if the force described in the incident package was within policy. At the initial first level management review, deviations were addressed in 27 percent of the incidents reviewed. At this level, reviews identified issues missed in a third of the cases reviewed. The second level management review is the final level of review before the completed incident package is sent to the use-of-force coordinator. This level of review includes an in-depth analysis to determine if the force used was in compliance with policy, procedure, and applicable law. After this level review, incidents are referred for investigation, when applicable. At the second level management review, there were identified missed problems in over a quarter of the cases. This cumulative average for the second level management review was significantly impacted by 7 of the 33 adult institutions not addressing any issues. Within first and second level management reviews, problems were addressed on average in 21 percent of the cases for incidents at all institutions.

By the time the incident package reached the use-of-force review committee and institution-head level review, 25 percent of the incidents reviewed by the OIG still had issues not previously addressed by the review process. This final level of review only addressed outstanding issues in a third of the incidents where issues still existed. This statewide average was impacted by eight institutions where reviewers at this level identified less than 20 percent of the missed policy deviations or the need for clarifications. In five institutions, managers identified all of the clarifications or policy deviations not previously addressed by the time the last review was conducted.

> In five of the institutions, managers identified all of the clarifications or policy deviations not previously addressed by the time the last review was conducted.

The OIG found inconsistent standards utilized by the various reviewers to determine whether a use-of-force incident complied with department policy. Some reviewers found a use-of-force

incident not in compliance if any department policy was violated, while other reviewers found an incident to violate policy only if the use-of-force policy was implicated.

*Timeliness of Reviews*

According to the department's Operations Manual, use-of- force incidents should normally be reviewed within 30 days. This includes all levels of the review process, as well as obtaining any necessary clarifications. For the 1,173 structured reviews the OIG conducted, the overall average time for review from the time of incident to the time of completion at the institutional head level was 51 days. Total average review time exceeded 80 days at several of the adult institutions with only three institutions meeting the 30 day threshold. Delays can compromise the department's ability to take disciplinary action. If misconduct is not timely identified, the department is precluded from taking disciplinary action regardless of the egregiousness of the misconduct. For a list of all adult institutions regarding the timeliness of reviews, please refer to Appendix D, and for a statewide review summary, please refer to Appendix E.

*Video Recorded Interviews*

Video recorded interviews are required by the department's use-of-force policy if the inmate has alleged unnecessary or excessive use of force or if the inmate has sustained serious bodily injury that could have been caused by a use of force. The video recording should be completed within 48 hours of discovery of the injury or allegation. If the inmate refuses to be video recorded, the department's Operations Manual requires staff to record the refusal.

In the structured reviews, 165 incidents were identified as requiring video recorded interviews. The OIG found 115 incident recordings were conducted according to policy guidelines. Although the statewide average for compliance with the video recording policy was 70 percent, only 11 institutions conducted video recordings according to policy 100 percent of the time. At two of the institutions, none of the video recordings met policy requirements.

## DIVISION OF ADULT PAROLE OPERATIONS

The Division of Adult Parole Operations is divided into four regions and responsible for supervising over 100,000 parolees. The adult parole regions reported 74 incidents statewide involving the use of force. In parole regions I and II, there were 43 incidents involving force and in parole regions III and IV, there were 31 incidents. Although with the highest number of use-of-force incidents, only one use-of force review meeting was held in parole region II, while parole region I held no meetings. At the OIG's urging that these important meetings take place, parole regions I and II have asserted that they will now conduct the required use-of-force review meetings.

The OIG attended 19 meetings and completed structured reviews of all 74 use-of-force incidents occurring in the parole regions. Within 74 incidents, there were 271 applications of force. The OIG found that the two reviewed incidents involving use of the baton and one incident of deadly force by parole agents were found to be 100 percent effective. The OIG found that physical force was 78 percent effective, while chemical agents were effective only half of the time.

Figure 7 provides a summary of the type and effectiveness of the force used in the parole regions.

The structured reviews revealed that 98 percent of parole agents' use-of-force reports adequately described the need to use force. However, only 74 percent of parole agents' use-of-force reports provided an appropriate description of the force used.



| | Physical Force | Chemical Agents | Expandable Baton | Deadly Force |
|---|---|---|---|---|
| Not Effective UOF | 55 | 8 | 0 | 0 |
| Effective UOF | 196 | 8 | 2 | 1 |
| Percent Effective | 78% | 50% | 100% | 100% |

Figure 7

Statewide, unit supervisors failed to request clarifications for inadequate reports in three quarters of the incidents while only addressing 15 percent of missed issues and policy deviations. The next level of reviewers addressed the remaining deficiencies in only 18 percent of the incidents. The final level of reviewers in the parole regions failed to address issues in more than 23 percent of incidents they reviewed, with a total of 15 incidents left unaddressed after the final review.

Figure 8 illustrates the results of the adequacy of reports initially submitted by parole agents and the percentage of incidents for which supervisors and managers addressed inadequate reports or policy deviations. The table also includes the total days the review process took from the date of the incident to the date the last reviewer signed his or her review.

| | Parole Agent Reports | | Requested Clarification | Clarifications or Policy Deviations Addressed | | |
|---|---|---|---|---|---|---|
| Parole Region | Incidents Evaluated | All Reports Adequate | Unit Supervisor | District Administrator | Hiring Authority | Total Days for Review |
| Region I | 22 | 88% | 22% | 8% | 0% | 49 |
| Region II | 21 | 94% | 33% | 25% | 0% | 19 |
| Region III | 11 | 35% | 0% | 10% | 27% | 102 |
| Region IV | 20 | 78% | 40% | 50% | 0% | 168 |
| *Statewide* | *74* | *74%* | *24%* | *23%* | *7%* | *85* |

Figure 8

## RECOMMENDATIONS

The OIG makes the following recommendations:

1. THE DEPARTMENT SHOULD DISTINGUISH BETWEEN NON-COMPLIANCE WITH THE USE-OF-FORCE POLICY VERSUS NON-COMPLIANCE IN OTHER DEPARTMENT POLICIES.

   Use-of-force critiques often conclude that staff actions were out of policy for reasons unrelated to the use-of-force policy. As a result, inconsistent decisions were made not only between institutions, but within the levels of review within the same institution. The OIG recommends that the department provide instruction to use-of-force reviewers, and clarify the

use-of-force review questions to ensure decisions are made utilizing a department-wide standard focusing on the use-of-force policy. The OIG also believes that it is important for the department reviewers to identify and address issues arising during a use-of-force incident related to other policies and procedures within the department. However, there should be a clear distinction between determining compliance with the use-of-force policy and identifying issues related to compliance with other department policies and procedures. Figure 9 provides an example of how the same facts are applied differently and result in a different compliance finding.

| QUESTIONS | ANSWER EXAMPLE A | ANSWER EXAMPLE B |
|---|---|---|
| 1. *Were staff actions PRIOR to the use of force in compliance with departmental standards and policy?* | **No**, staff actions were out of policy because an officer used his radio instead of activating his personal alarm device. In addition, an officer failed to properly apply handcuffs. | **Yes**, staff actions were in compliance to the use of force policy. However, an officer used his radio instead of activating his personal alarm device. In addition, an officer failed to properly apply handcuffs. |
| 2. *Were staff actions DURING the use of force in compliance with departmental standards and policy?* | **No**, the control booth officer violated policy by opening the fire doors creating an unsafe condition. | **Yes**, officers used a reasonable amount of force to address the threat and affect custody. However, the control booth officer created an unsafe condition by opening the fire doors. |
| 3. *Were staff actions AFTER the use of force in compliance with departmental standards and policy?* | **No**, staff failed to record 15 minute welfare checks on the holding cell log while the inmate was in the holding cell pending a new housing assignment. | **Yes**, staff actions were in compliance with the use of force policy. However, staff failed to record 15 minute welfare checks on the holding cell log while the inmate was in the holding cell pending a new housing assignment. |

Figure 9

2. <u>THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE REPORTS ARE COMPLETE, ACCURATE, AND DOCUMENTS ARE SUBMITTED TIMELY PRIOR TO FINAL REVIEW DECISIONS.</u>

The vast majority of the institutions and facilities made policy decisions based on inadequate reports and staff reports frequently omitted important descriptions of how the force was applied. Staff in a position to witness force often did not initially submit a report with their observations as required by policy. Thus, in most incidents involving force, the department made determinations about whether uses of force complied with policies, regulations and applicable laws without complete information. As the reasonableness of the use of force is fact sensitive to each situation, it is imperative that complete information be obtained and that reviews address any inconsistent or incomplete information in the use-of-force incident documentation. Therefore, the OIG recommends that the department provide better training for report writing and insist on greater accountability for its reviewers. In particular, the department should focus efforts on first level review as the data suggests that managers consistently failed to request further information needed to determine policy compliance.

3. THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE EXECUTIVE REVIEW COMMITTEES ARE HELD IN COMPLIANCE WITH DEPARTMENT POLICIES.

Adult parole regions I and II combined held limited use-of-force review meetings. Appropriately reviewing whether each use of force complies with department policy is critical to effectively manage use-of-force by the department and to identify potential misconduct by staff. The OIG recommends that these parole regions be required to hold meetings for all incidents of force.

Richard J. Donovan Correctional Facility does not have its use-of-force review committee evaluate each use-of-force incident. Instead the vast majority of incidents are simply signed off by supervisors and managers. The OIG recommends that the department either require all institutions to review each incident as the use-of-force policy requires or amend the policy to allow certain incidents to be finalized through management review, and provide appropriate criteria with OIG input.

4. THE DEPARTMENT SHOULD ENSURE VIDEO RECORDED INTERVIEWS BE CONDUCTED IN A MANNER THAT IS CONSISTENT WITH POLICY

Video recording was conducted only 70 percent of the time where it was required by department policy. As the purpose of video recordings is to preserve critical evidence related to allegations of use-of-force, the OIG recommends the department make efforts to increase its compliance with the video recording policy. In particular, the department should address the complete lack of compliance with this policy at more than one adult institution.

5. THE DEPARTMENT SHOULD ENSURE APPROPRIATE TRAINING FOR PEPPER SPRAY USE DURING CELL EXTRACTIONS AND SHOULD INCLUDE GUIDELINES FOR ASSESSING EXPOSURE ELEMENTS, TIME, AND EFFECTIVENESS

Pepper spray is a chemical agent that causes tearing of the eyes, impaired vision, coughing, difficulty breathing, burning sensation, and inflammation of the skin. When used to remove an inmate from a cell, the use of pepper spray may avoid the need to use physical force against the inmate. Although current training requires officers to use only the amount of chemical agents reasonable to gain compliance, the department does not have clear guidelines establishing what is a reasonable amount of pepper spray or a reasonable amount of time between pepper spray applications. In reviewing use-of-force incidents, we discovered great disparities in the use of pepper spray for cell extractions during which the department forcibly removes an inmate from a cell. The OIG recommends that the department provide additional guidelines regarding the use of pepper spray during cell extractions. These guidelines should include: how to assess whether or not the inmate received an adequate exposure to pepper spray; the amount of time to let the pepper spray take effect once adequate exposure has been achieved before initiating additional applications; and how to determine when pepper spray is ineffective and another use-of-force option should be considered.

**APPENDIX A:  Acronyms for Adult Institutions**

| | Adult Institutions Location | City |
|---|---|---|
| **ASP** | Avenal State Prison | Avenal |
| **CCC** | California Correctional Center | Susanville |
| **CCI** | California Correctional Institution | Tehachapi |
| **CIM** | California Institution for Men | Chino |
| **CIW** | California Institution for Women | Frontera |
| **CMF** | California Medical Facility | Vacaville |
| **CMC** | California Men's Colony | San Luis Obispo |
| **CRC** | California Rehabilitation Center | Norco |
| **COR** | California State Prison, Corcoran | Corcoran |
| **LAC** | California State Prison, Los Angeles County | Lancaster |
| **SAC** | California State Prison, Sacramento | Represa |
| **SQ** | California State Prison, San Quentin | San Quentin |
| **SOL** | California State Prison, Solano | Vacaville |
| **SATF** | Substance Abuse Treatment Facility & State Prison at Corcoran | Corcoran |
| **CAL** | Calipatria State Prison | Calipatria |
| **CEN** | Centinela State Prison | Imperial |
| **CCWF** | Central California Women's Facility | Chowchilla |
| **CVSP** | Chuckawalla Valley State Prison | Blythe |
| **CTF** | Correctional Training Facility | Soledad |
| **DVI** | Deuel Vocational Institution | Tracy |
| **FOL** | Folsom State Prison | Represa |
| **HDSP** | High Desert State Prison | Susanville |
| **ISP** | Ironwood State Prison | Blythe |
| **KVSP** | Kern Valley State Prison | Delano |
| **MCSP** | Mule Creek State Prison | Ione |
| **NKSP** | North Kern State Prison | Delano |
| **PBSP** | Pelican Bay State Prison | Crescent City |
| **PVSP** | Pleasant Valley State Prison | Coalinga |
| **RJD** | Richard J. Donovan Correctional Facility | San Diego |
| **SVSP** | Salinas Valley State Prison | Soledad |
| **SCC** | Sierra Conservation Center | Jamestown |
| **VSPW** | Valley State Prison for Women | Chowchilla |
| **WSP** | Wasco State Prison | Wasco |

**APPENDIX B:  Incidents Involving Force - Adult Institutions**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Applications of Force** | | | | | | | |
| **Adult Institutions** | | | | | | | |
| **Institution** | **Mission** | **Incidences of Force** | **Physical Force** | **Chemical Agents** | **Expandable Baton** | **Less-Lethal Force** | **Deadly Force** |
| CCWF | Female Offenders | 72 | 29.17% | 66.67% | 4.17% | 0.00% | 0.00% |
| CIW | Female Offenders | 55 | 38.18% | 54.55% | 7.27% | 0.00% | 0.00% |
| VSPW | Female Offenders | 62 | 58.06% | 38.71% | 3.23% | 0.00% | 0.00% |
| ASP | General Population | 49 | 42.86% | 57.14% | 0.00% | 0.00% | 0.00% |
| CCC | General Population | 45 | 42.22% | 42.22% | 4.44% | 8.89% | 2.22% |
| CMC | General Population | 153 | 60.13% | 33.99% | 5.88% | 0.00% | 0.00% |
| CMF | General Population | 68 | 39.71% | 58.82% | 1.47% | 0.00% | 0.00% |
| CRC | General Population | 84 | 58.33% | 36.90% | 4.76% | 0.00% | 0.00% |
| CTF | General Population | 46 | 50.00% | 43.48% | 0.00% | 6.52% | 0.00% |
| CVSP | General Population | 27 | 25.93% | 51.85% | 22.22% | 0.00% | 0.00% |
| FOL | General Population | 125 | 12.00% | 64.00% | 6.40% | 16.80% | 0.80% |
| ISP | General Population | 73 | 1.37% | 57.53% | 21.92% | 19.18% | 0.00% |
| PVSP | General Population | 76 | 50.00% | 26.32% | 9.21% | 14.47% | 0.00% |
| SCC | General Population | 23 | 34.78% | 52.17% | 0.00% | 13.04% | 0.00% |
| SOL | General Population | 87 | 22.99% | 52.87% | 9.20% | 14.94% | 0.00% |
| CAL | High Security | 87 | 18.39% | 63.22% | 2.30% | 14.94% | 0.00% |
| CCI | High Security | 76 | 48.68% | 30.26% | 11.84% | 9.21% | 0.00% |
| CEN | High Security | 112 | 11.61% | 60.71% | 9.82% | 14.29% | 3.57% |
| COR | High Security | 182 | 43.41% | 51.65% | 1.65% | 3.30% | 0.00% |
| HDSP | High Security | 107 | 15.89% | 56.07% | 0.00% | 18.69% | 9.35% |
| KVSP | High Security | 183 | 32.79% | 45.90% | 5.46% | 15.85% | 0.00% |
| MCSP | High Security | 84 | 13.10% | 50.00% | 23.81% | 13.10% | 0.00% |
| PBSP | High Security | 143 | 24.48% | 62.94% | 4.20% | 7.69% | 0.70% |
| SAC | High Security | 144 | 47.92% | 33.33% | 9.72% | 9.03% | 0.00% |
| SATF | High Security | 94 | 30.85% | 43.62% | 13.83% | 11.70% | 0.00% |
| SVSP | High Security | 67 | 19.40% | 79.10% | 0.00% | 1.49% | 0.00% |
| CIM | Reception Centers | 125 | 25.60% | 57.60% | 2.40% | 13.60% | 0.80% |
| DVI | Reception Centers | 143 | 52.45% | 31.47% | 16.08% | 0.00% | 0.00% |
| LAC | Reception Centers | 99 | 52.53% | 27.27% | 9.09% | 11.11% | 0.00% |
| NKSP | Reception Centers | 158 | 42.41% | 27.22% | 14.56% | 14.56% | 1.27% |
| RJD | Reception Centers | 183 | 58.47% | 27.87% | 8.74% | 4.92% | 0.00% |
| SQ | Reception Centers | 90 | 26.67% | 51.11% | 11.11% | 11.11% | 0.00% |
| WSP | Reception Centers | 149 | 38.93% | 40.27% | 10.07% | 10.74% | 0.00% |
| **SUMS** | | **3,271** | | | | | |

**APPENDIX C:  Effective Use of Force – Averages by Type of Force**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Averages by Type of Force** | | | | | | |
| **Adult Institutions** | | | | | | |
| Institution | Instances Evaluated | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
| ASP | 49 | 21 | 28 | 0 | 0 | 0 |
| Effective | | 62% | 89% | | | |
| CAL | 87 | 16 | 55 | 2 | 13 | 0 |
| Effective | | 87% | 47% | 50% | 15% | |
| CCC | 45 | 19 | 19 | 2 | 4 | 1 |
| Effective | | 84% | 90% | 0% | 50% | 100% |
| CCI | 76 | 37 | 23 | 9 | 7 | 0 |
| Effective | | 72% | 78% | 67% | 29% | |
| CCWF | 72 | 21 | 48 | 3 | 0 | 0 |
| Effective | | 91% | 85% | 33% | | |
| CEN | 112 | 13 | 68 | 11 | 16 | 4 |
| Effective | | 100% | 63% | 73% | 31% | 25% |
| CIM | 125 | 32 | 72 | 3 | 17 | 1 |
| Effective | | 69% | 51% | 100% | 30% | 0% |
| CIW | 55 | 21 | 30 | 4 | 0 | 0 |
| Effective | | 100% | 53% | 25% | | |
| CMC | 153 | 92 | 52 | 9 | 0 | 0 |
| Effective | | 47% | 52% | 11% | | |
| CMF | 68 | 27 | 40 | 1 | 0 | 0 |
| Effective | | 93% | 55% | 100% | | |
| COR | 182 | 79 | 94 | 3 | 6 | 0 |
| Effective | | 79% | 35% | 33% | 83% | |
| CRC | 84 | 49 | 31 | 4 | 0 | 0 |
| Effective | | 78% | 64% | 0% | | |
| CTF | 46 | 23 | 20 | 0 | 3 | 0 |
| Effective | | 96% | 55% | | 100% | |
| CVSP | 27 | 7 | 14 | 6 | 0 | 0 |
| Effective | | 86% | 64% | 67% | | |
| DVI | 143 | 75 | 45 | 23 | 0 | 0 |
| Effective | | 84% | 49% | 13% | | |
| FOL | 125 | 15 | 80 | 8 | 21 | 1 |
| Effective | | 93% | 59% | 25% | 33% | 100% |
| HDSP | 107 | 17 | 60 | 0 | 20 | 10 |
| Effective | | 82% | 68% | | 25% | 60% |
| ISP | 73 | 1 | 42 | 16 | 14 | 0 |
| Effective | | 100% | 83% | 62% | 43% | |
| KVSP | 183 | 60 | 84 | 10 | 29 | 0 |
| Effective | | 57% | 63% | 40% | 38% | |

| Averages by Type of Force (continued) | | | | | | |
|---|---|---|---|---|---|---|
| **Adult Institutions** | | | | | | |
| Institution | Instances Evaluated | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
| LAC | 99 | 52 | 27 | 9 | 11 | 0 |
| *Effective* | | *96%* | *74%* | *22%* | *73%* | |
| MCSP | 84 | 11 | 42 | 20 | 11 | 0 |
| *Effective* | | *64%* | *79%* | *15%* | *46%* | |
| NKSP | 135 | 67 | 43 | 23 | 23 | 2 |
| *Effective* | | *79%* | *44%* | *44%* | *39%* | *100%* |
| PBSP | 143 | 35 | 90 | 6 | 11 | 1 |
| *Effective* | | *89%* | *34%* | *17%* | *36%* | *100%* |
| PVSP | 76 | 38 | 20 | 7 | 11 | 0 |
| *Effective* | | *79%* | *50%* | *43%* | *64%* | |
| RJD | 183 | 107 | 51 | 16 | 9 | 0 |
| *Effective* | | *78%* | *71%* | *75%* | *68%* | |
| SAC | 144 | 69 | 48 | 14 | 13 | 0 |
| *Effective* | | *84%* | *77%* | *21%* | *23%* | |
| SATF | 94 | 29 | 41 | 13 | 11 | 0 |
| *Effective* | | *76%* | *63%* | *23%* | *55%* | |
| SCC | 23 | 8 | 12 | 0 | 3 | 0 |
| *Effective* | | *100%* | *92%* | | *33%* | |
| SOL | 87 | 20 | 46 | 8 | 13 | 0 |
| *Effective* | | *80%* | *59%* | *50%* | *23%* | |
| SQ | 90 | 24 | 46 | 10 | 10 | 0 |
| *Effective* | | *96%* | *72%* | *80%* | *50%* | |
| SVSP | 67 | 13 | 53 | 0 | 1 | 0 |
| *Effective* | | *100%* | *70%* | | *0%* | |
| VSPW | 62 | 36 | 24 | 2 | 0 | 0 |
| *Effective* | | *83%* | *58%* | *100%* | | |
| WSP | 149 | 58 | 60 | 15 | 16 | 0 |
| *Effective* | | *71%* | *70%* | *40%* | *69%* | |
| **SUM** | 3271 | 1192 | 1508 | 257 | 293 | 20 |
| **Averages** | | 78.19% | 60.94% | 40.07% | 41.29% | 60.00% |

**APPENDIX D: Timeliness of Reviews – Adult Institutions**

| Timeliness of Reviews | | | | | |
|---|---|---|---|---|---|
| Adult Institutions | | | | | |
| Institution | Incidents Evaluated | Incident Commander | 1st Level Manager | 2nd Level Manager | Institution Head/ IERC | Total Days for Review |
| ASP | 30 | 5 | 7 | 12 | 14 | 38 |
| CAL | 31 | 4 | 9 | 4 | 17 | 33 |
| CCC | 19 | 3 | 6 | 6 | 49 | 63 |
| CCI | 27 | 1 | 7 | 5 | 28 | 41 |
| CCWF | 29 | 1 | 10 | 7 | 32 | 49 |
| CEN | 38 | 3 | 7 | 6 | 25 | 41 |
| CIM | 34 | 2 | 14 | 1 | 24 | 41 |
| CIW | 22 | 3 | 9 | 10 | 27 | 54 |
| CMC | 30 | 3 | 21 | 10 | 25 | 59 |
| CMF | 30 | 6 | 18 | 8 | 18 | 49 |
| COR | 43 | 3 | 10 | 7 | 16 | 37 |
| CRC | 28 | 1 | 6 | 4 | 15 | 26 |
| CTF | 23 | 1 | 4 | 4 | 23 | 31 |
| CVSP | 13 | 1 | 5 | 2 | 19 | 26 |
| DVI | 46 | 1 | 3 | 3 | 21 | 27 |
| FOL | 40 | 1 | 6 | 4 | 27 | 38 |
| HDSP | 38 | 8 | 9 | 2 | 23 | 43 |
| ISP | 35 | 1 | 10 | 6 | 61 | 78 |
| KVSP | 62 | 2 | 15 | 8 | 51 | 77 |
| LAC | 37 | 1 | 9 | 5 | 66 | 80 |
| MCSP | 27 | 1 | 8 | 5 | 34 | 48 |
| NKSP | 47 | 2 | 9 | 8 | 21 | 40 |
| PBSP | 52 | 15 | 7 | 7 | 27 | 58 |
| PVSP | 28 | 4 | 9 | 14 | 37 | 64 |
| RJD | 71 | 2 | 9 | 11 | 66 | 87 |
| SAC | 43 | 1 | 9 | 5 | 23 | 39 |
| SATF | 39 | 1 | 9 | 13 | 26 | 49 |
| SCC | 16 | 1 | 7 | 6 | 46 | 60 |
| SOL | 32 | 2 | 20 | 10 | 47 | 79 |
| SQ | 43 | 1 | 9 | 5 | 70 | 85 |
| SVSP | 37 | 2 | 9 | 4 | 71 | 85 |
| VSPW | 26 | 1 | 6 | 8 | 21 | 36 |
| WSP | 57 | 2 | 10 | 7 | 14 | 33 |
| SUM / AVGS | 1173 | 3 | 9 | 7 | 33 | 51 |

*(Timelines were rounded to the nearest day)*

**APPENDIX E: Statewide Review Summary – Adult Institutions**

| Statewide Review Summary | | | | | | |
|---|---|---|---|---|---|---|
| Adult Institutions | | | | | | |
| | Officer Reports | | Requested Clarifications | Clarifications or Policy Deviations Addressed | | |
| Institution | Incidents Evaluated | All Reports Adequate | Incident Commander | 1st Level Manager | 2nd Level Manager | Institution Head |
| ASP | 30 | 64.3% | 30.0% | 0.0% | 33.3% | 100.0% |
| CAL | 31 | 70.1% | 40.0% | 20.0% | 11.1% | 22.2% |
| CCC | 19 | 84.2% | 0.0% | 0.0% | 0.0% | 100.0% |
| CCI | 27 | 55.6% | 17.6% | 84.6% | 50.0% | 100.0% |
| CCWF | 29 | 72.4% | 12.1% | 0.0% | 30.0% | 16.7% |
| CEN | 38 | 36.8% | 8.3% | 12.1% | 4.5% | 38.1% |
| CIM | 34 | 73.5% | 33.3% | 62.1% | 0.0% | 25.0% |
| CIW | 22 | 60.0% | 50.0% | 0.0% | 20.0% | 50.0% |
| CMC | 30 | 50.0% | 12.1% | 46.2% | 14.3% | 22.2% |
| CMF | 30 | 79.3% | 62.1% | 58.3% | 44.4% | 87.1% |
| COR | 43 | 44.2% | 8.3% | 13.6% | 22.2% | 62.1% |
| CRC | 28 | 67.9% | 22.2% | 18.2% | 0.0% | 0.0% |
| CTF | 23 | 65.2% | 0.0% | 0.0% | 0.0% | 12.1% |
| CVSP | 13 | 92.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| DVI | 46 | 95.5% | 92.6% | 16.7% | 20.0% | 33.3% |
| FOL | 40 | 37.1% | 0.0% | 3.8% | 0.0% | 8.0% |
| HDSP | 38 | 50.0% | 47.4% | 33.3% | 50.0% | 50.0% |
| ISP | 35 | 48.6% | 26.3% | 53.8% | 16.7% | 33.3% |
| KVSP | 62 | 56.5% | 3.4% | 11.5% | 0.0% | 64.3% |
| LAC | 37 | 70.3% | 16.7% | 37.1% | 20.0% | 33.3% |
| MCSP | 27 | 59.3% | 9.1% | 9.1% | 10.0% | 30.0% |
| NKSP | 47 | 57.4% | 34.8% | 85.7% | 83.3% | 50.0% |
| PBSP | 52 | 95.7% | 90.9% | 40.0% | 25.0% | 50.0% |
| PVSP | 28 | 59.3% | 8.3% | 45.5% | 66.7% | 50.0% |
| RJD | 71 | 54.9% | 8.8% | 2.9% | 2.9% | 5.9% |
| SAC | 43 | 48.8% | 13.0% | 13.0% | 10.0% | 5.3% |
| SATF | 39 | 56.4% | 0.0% | 16.7% | 6.7% | 26.7% |
| SCC | 16 | 43.8% | 11.1% | 44.4% | 20.0% | 100.0% |
| SOL | 32 | 71.9% | 57.1% | 33.3% | 12.1% | 0.0% |
| SQ | 43 | 86.0% | 30.8% | 7.7% | 30.8% | 46.2% |
| SVSP | 37 | 100.0% | 80.0% | N/A | 100.0% | 66.7% |
| VSPW | 26 | 80.8% | 0.0% | 50.0% | 75.0% | 100.0% |
| WSP | 57 | 59.6% | 30.4% | 66.7% | 33.3% | 75.0% |
| AVGS | 1173 | 64.19% | 27.87% | 26.68% | 16.35% | 33.33r% |