# Exhibit 8



# OFFICE OF THE INSPECTOR GENERAL
## Robert A. Barton, Inspector General

### State of California

## Use-of-Force within the
## California Department of Corrections and Rehabilitation
## July – December 2011

© CDCR 2008

**May 2012**

# EXECUTIVE SUMMARY

In 2011 the Office of the Inspector General (OIG) expanded its regional discipline monitoring units (DMU) to include use-of-force monitoring as well as our traditional monitoring of serious internal affairs investigations and employee disciplinary processes. This restructuring allows even more frequent contact between our OIG monitors and the prisons in their regions. In addition, our regional teams now interact with the local prisons on use-of-force complaints processed by our statewide intake team that require follow up reviews. In preparing this report, feedback was obtained from the department indicating they are currently implementing some of the recommendations contained in this report. Implementation status for the current recommendations will be provided in the January-June 2012 report.

## Report Highlights

In the six-month period from July through December 2011, the Department of Corrections and Rehabilitation (CDCR or department), reported a total of 4,005 incidents involving force at institutions housing adult inmates. Of these incidents, the OIG monitored 1,422 incidents, or 36 percent, by attending use-of-force review committee meetings and completing structured reviews. Specifically, the OIG attended 101 use-of-force meetings, where a total of 639 incidents were evaluated, and additionally completed 783 structured reviews.

> The OIG's participation in the review process influenced the outcome for 288 of these incidents by requesting clarifications, investigations, or recommending employee training.

In its own review process, the department found an 83 percent compliance rate with departmental policy in use-of-force incidents. The OIG concurred with the department's assessments in 1,223 of these cases (94 percent of 1,301 department determined cases). Seventy-four percent of the 4,005 total use-of-force incidents occurred within the high security (44 percent) and reception center (30 percent) institutions, and 20 percent in the general population, while only 6 percent of the total incidents occurred in female offender institutions.

## Unreasonable Use of Force

Allegations of unreasonable use of force increased by 5 percent in the current reporting period, but we note an 11 percent decrease in failure to report use of force witnessed and a 6 percent decrease in use of unreasonable force likely to cause injury. This indicates a positive trend in reporting and fewer instances of unreasonable force likely to cause injury.

## Types and Frequency Distribution of Application of Force

During this reporting period, the OIG conducted structured reviews of 783 incidents that included 2,773 separate applications of force. Regardless of the mission, and consistent with the past reporting period, chemical agents and physical force are used most often. In this reporting period, the use of physical force decreased almost 10 percent, while the use of chemical agents increased slightly by 2 percent.

**Use-of-Force Incident Reports and Reviews**

Overall, the incident reports continue to adequately describe the need to use force; however, some still lack the appropriate descriptions of the actual force used.

**Timeliness of Reviews**

Of the 783 structured reviews the OIG conducted, the overall average time for review from the time of incident to the time of completion at the executive level was 54 days, with most of that time spent at the final level of review. During this reporting period, only five adult institutions averaged complete reviews within the 30 day threshold.

**Video-Recorded Interviews**

Of the 783 incidents for which the OIG conducted structured reviews, 96 incidents were identified as requiring and receiving video-recorded interviews. We reviewed the video-recorded interviews and found 74 recordings were conducted according to policy guidelines, a compliance rate of 77 percent. This 7 percent increase in compliance during this reporting period reflects the department's efforts at addressing this recommendation from our previous Use-of-Force Report.

**Addressing Inmate Allegations of Unreasonable Force**

The OIG noted the majority of institutions are not following required policy on addressing inmate allegations of unreasonable force. The OIG evaluated 268 allegations of unreasonable force occurring during the 2011 calendar year at 29 institutions and found only 55 percent of those allegations were reviewed by an executive review committee. The OIG also found inconsistencies in how each institution ensures its use-of-force coordinator receives the allegation package for logging, tracking, and presentation to the executive review committee.

**Division of Adult Parole Operations**

The OIG attended eight committee meetings and completed structured reviews of 36 use-of-force incidents occurring throughout the four parole regions. Within the total number of incidents reviewed, there were 126 applications of force. The structured reviews revealed that 92 percent of parole agents' use-of-force reports adequately described the need to use force. However, only 50 percent provided an appropriate description of the force used.

**Status of Prior Recommendations**

In our November 2011 Use-of-Force Report, the OIG made five recommendations to the department. The department's 2011 Corrective Action Plan, which is updated annually, indicates four recommendations will be substantially implemented in 2012. The department believes the last recommendation regarding training for pepper spray use is already sufficiently covered in the use-of-force policy.

**Recommendations from this Report**

This report makes additional recommendations to address the timeliness and adequacy of report review, process improvements to streamline review, and recommendations to increase adherence to departmental policy regarding use-of-force processes for documenting, video recording, audio recording, and reporting.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

USE-OF-FORCE PROCESS OVERVIEW ................................................................................. 1

OIG MONITORING METHODOLOGY .................................................................................... 2
    Attendance at Use-of-Force Review Committee Meetings ............................................. 2
    Structured Reviews ......................................................................................................... 3
    Independent Oversight .................................................................................................... 3

DIVISION OF ADULT INSTITUTIONS ................................................................................... 4
    Unreasonable Use of Force ............................................................................................ 5
    Types of Force ............................................................................................................... 6
    Frequency Distribution of Application of Force by Mission Group ............................... 6
    Use-of-Force Incident Reports ....................................................................................... 8
    Institutional Use-of-Force Reviews ................................................................................ 9
    Timeliness of Reviews .................................................................................................. 11
    Video-Recorded Interviews .......................................................................................... 12

DIVISION OF ADULT PAROLE OPERATIONS ..................................................................... 14

ADDRESSING ALLEGATIONS OF UNREASONABLE FORCE .............................................. 16
    Allegation Review Process ........................................................................................... 16
    Tracking of Allegations ................................................................................................ 16
    Allegations Referred for Committee Review ................................................................ 17
    Training and Listing of Staff Conducting Administrative Interviews ............................ 18

STATUS OF PRIOR RECOMMENDATIONS .......................................................................... 19

RECOMMENDATIONS FROM THIS REPORT ....................................................................... 20

    *Recommendation 1:* The department should consult with the OIG and consider
    adopting the internal policy revision currently under review to streamline and
    make the use-of-force committee process more efficient and effective ........................... 20

    *Recommendation 2:* The department should provide additional training or policy
    memos to ensure video-recorded interviews are conducted for all allegations of
    use-of-force. The department should also clearly establish who can conduct and
    participate in video-recorded interviews, and ensure staff members involved in the
    incident do not take part in video recording the interviews ........................................... 20

    *Recommendation 3:* The department should establish a single designated reporting
    point for tracking allegations of force .......................................................................... 20

    *Recommendation 4:* Each of the four adult parole regions should identify and
    train a use-of-force coordinator to manage the use-of-force incident review
    process ......................................................................................................................... 21

*Recommendation 5: The institutional appeals coordinator should notify the use-of-force coordinator of all inmate appeals containing a use-of-force allegation* .....21

*Recommendation 6: All allegations of force examined through a Report of Findings or Appeal Inquiry should specify any research conducted to locate related incident reports and video recordings, and document any witness statements, interviews, e-mails, videos, or other evidence relied upon to support the findings and conclusion* ................................................................................21

*Recommendation 7: The department should provide training to supervisory and managerial staff who conduct administrative interviews, and each institution should maintain an updated list of trained instructors/interviewers.* ............21

**APPENDICES**

Appendix A: Acronyms for Adult Institutions .................................................. 22
Appendix B: Incidents Involving Force – Adult Institutions ........................... 23
Appendix C: Timeliness of Reviews – Adult Institutions ............................... 24
Appendix D: Statewide Review Summary – Adult Institutions ...................... 25

# INTRODUCTION

This is the Office of the Inspector General's (OIG) second Use-of-Force Report covering adult institutions and parole operations within the California Department of Corrections and Rehabilitation (CDCR or the department). This report covers the OIG's monitoring of the department's use-of-force process from July through December 2011. The majority of the department's use-of-force incidents occur in its institutions which, during this reporting period, housed over 148,000 inmates and employed approximately 30,000 peace officers authorized by law to use force. In addition, parole agents must occasionally engage in the use of force with the adult parolees they supervise.



The OIG is committed to attending the department's use-of-force review committee meetings to provide public transparency, and when appropriate, ensure cases are forwarded to the department's Office of Internal Affairs (OIA) for investigation or approval to take direct disciplinary action.

In August 2010, the department implemented a new use-of-force policy based, in part, on recommendations from the OIG. The department's implementation of the new policy included conducting statewide use-of-force training and focusing significant resources to make the new policy work. Among its more significant changes, the new policy requires institutions' use-of-force review committees to evaluate and review all allegations of unreasonable force.

The OIG has further committed to report semi-annually on our monitoring and make recommendations to the department to continue to improve use-of-force training and reporting. This report details our observations, analysis, and evaluation of the department's use-of-force practices from July 1 through December 31, 2011. The OIG worked collaboratively with the department to compile relevant data on incidents involving force.

# USE-OF-FORCE PROCESS OVERVIEW

The department is tasked with maintaining the safety and security of staff, inmates, visitors, and the public. At times, this responsibility requires the use of force by peace officers. In doing so, officers are authorized to use only "reasonable force," defined as "the force that an objective, trained, and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance,

effect custody, or gain compliance with a lawful order." The use of greater force than justified by this standard is deemed "excessive force," while using any force not required or appropriate in the circumstances is "unnecessary force." Both unauthorized types of force are categorized as "unreasonable."

Departmental policy requires that, whenever possible, verbal persuasion or orders be attempted before resorting to force. In situations where verbal persuasion fails to

achieve desired results, a variety of force options are available. The department's policy does not require these options be employed in any predetermined sequence. Rather, officers select the force option they reasonably believe will stop the perceived threat.

Per departmental policy, use-of-force options include, but are not limited to, the following:

a) Chemical agents such as pepper spray and tear gas,

b) Hand-held batons,

c) Physical force such as control holds and controlled take downs,

d) Less-lethal weapons (weapons not likely to cause death).

> Examples include a 37mm or 40mm launcher used to fire rubber, foam, or wooden projectiles, and tasers (pilot program utilized by the Division of Adult Parole), and

e) Lethal (deadly) force. This includes any use-of-force that is likely to result in death, and any discharge of a firearm (other than during weapons qualification, training, or legal recreational use).

Any department employee who uses force, or who observes another employee use force, is required to report the incident to a supervisor and submit a written report prior to being released from duty. After the report is submitted, a multi-tiered review process begins. Every use of deadly force by staff is reviewed by the department's Deadly Force Review Board (DFRB) and monitored by the OIG. Whenever an employee uses deadly force, the OIA Deadly Force Investigation Team (DFIT) reviews and/or investigates the event. The DFIT report is reviewed by the independent DFRB. During the time the DFRB review is pending, all other reviews specific to the case cease, pending completion of the DFRB process. Certain use-of-force incidents are also reviewed at the division and executive level of the department.



## OIG MONITORING METHODOLOGY

The OIG reviews use-of-force incidents utilizing two primary methods: attendance at use-of-force review committee meetings and document-based structured reviews. The OIG also provides oversight and makes recommendations to the department in their development of new use-of-force policies and procedures.

**Attendance at Use-of-Force Review Committee Meetings**

OIG representatives attend use-of-force review committee meetings at all adult institutions and parole regions statewide, working to visit each institution at least six times annually on alternating months. Generally, each committee meeting evaluates 5 to 15 incidents involving force. The OIG also evaluates all departmental reviews completed prior to the meeting. During the meeting, the OIG observes the review process and engages in contemporaneous oversight by raising concerns about the incidents, asking for clarifications if reports are inconsistent or incomplete, and engaging in discussions with the committee about

the incidents. Through this process, the OIG draws an independent conclusion about whether the force used was in compliance with policies, procedures, and applicable laws and whether the review process was thorough and meaningful. When appropriate, the OIG recommends an incident be referred to CDCR's Office of Internal Affairs for investigation (or approval to take direct disciplinary action). In the event the OIG does not concur with the decision made by the local hiring authority (i.e. the warden or parole administrator), the OIG may confer with higher level department managers or OIA directly.

## Structured Reviews

The OIG performs structured reviews of use-of-force incidents by evaluating video recordings, officer reports, and the conclusions reached by the department's review process. These structured reviews take place in addition to the OIG's attendance at use-of-force committee meetings. The OIG evaluates staff compliance with use-of-force policies before, during, and after each incident. In addition, the OIG evaluates each application of force and determines if staff actions contributed to the need to use force. If the OIG discovers a problem during a structured review, the OIG alerts the responsible department manager and

seeks an appropriate resolution.[1] As a result of the OIG's structured reviews, certain incidents may be placed back on the use-of-force review committee calendar for reconsideration. If the OIG still believes the issue was not properly addressed, the OIG may elevate the case to higher level department management or OIA directly.

## Independent Oversight

In addition to monitoring the department's use-of-force review process, the OIG monitors and participates as an active stakeholder in the department's development of new regulations and policies governing the use of force.

---

1 Because the OIG performed structured reviews of the 18 use-of-force incidents from Parole Region I after the end of the reporting period, contemporaneous discussion of those cases did not occur.



# DIVISION OF ADULT INSTITUTIONS

In the six-month period from July through December 2011, the department reported a total of 4,005 incidents involving force at institutions housing adult inmates. Of these incidents, the OIG monitored 1,422 incidents, or 36 percent, by attending use-of-force review committee meetings and completing structured reviews. Specifically, the OIG attended 101 use-of-force meetings, where a total of 639 incidents were evaluated, and additionally completed 783 structured reviews.

In its own review process, CDCR found an 83 percent compliance rate with departmental policy. The department found the use of force employed by staff complied with departmental policies in 1,179 of the 1,422 monitored incidents, and staff did not comply with departmental policies in 122 of the incidents. Of these 1,301 incidents where the department rendered a finding, the OIG concurred with the department's assessments in 1,223 of these incidents (94 percent). In the remaining 121 incidents, the committee had not yet reached a determination, primarily because of pending unanswered questions necessary to clarify incomplete or conflicting reports that could not be provided before the 30-day review period. It is possible that these incidents may have been prematurely submitted in the hopes that information would be available at the time of the committee meeting, or it just may be that some of the reports were not up to the committee's standards.

The OIG found staff actions contributed to the need to use force in 43 of the monitored incidents occurring at the adult institutions. For example, policy violations such as improper application of restraints or allowing inmates to enter restricted areas resulted in the need to use force. Some incidents resulted in disciplinary actions against employees for policy violations. The OIG's active participation in the review process influenced the outcome of 288 of the incidents monitored by requesting clarification, investigations, or recommending employee training.

The OIG also found the number of use-of-force incidents varied depending on the institution's primary purpose or mission. The department categorizes its adult institutions into primary mission groups: female offender institutions, which classify and house all female inmates; reception center institutions, which evaluate and classify incoming male inmates; high security institutions, which house the most violent and dangerous male inmates; and general population institutions, which provide dormitory and in-cell housing for male inmates.

Over 70 percent of the 4,005 use-of-force incidents occurred within the high security and reception center institutions combined, while only 6 percent of the total incidents occurred in female offender institutions, with the remaining 20 percent in the general population.

Figure 1 illustrates the distribution of use-of-force incidents in each mission group from July through December 2011.

> The OIG's active participation in the review process influenced the outcome for 288 of these incidents by requesting clarifications, investigations, or recommending employee training.

**July-Dec 2011 Use-of-Force Incidents**
**(Adult Institutions)**



Figure 1

Over 70 percent of the use-of-force incidents occurred at high security and reception center institutions.

**Unreasonable Use of Force**

During this six-month reporting period, CDCR's Office of Internal Affairs received 53 requests for investigation from the adult institutions related to the use of force. Allegations of misconduct were made against 102 officers. Although the previous reporting period covered ten months, we compared the use-of-force allegations between the two periods on a percentage basis. Allegations of unreasonable use of force increased by 5 percent in the current reporting period, but we note an 11 percent decrease in allegations of failure to report use of force witnessed and 6 percent decrease in allegations of use of unreasonable force likely to cause injury. This indicates a positive trend in reporting and less instances of unreasonable force likely to cause injury.

Figure 2 provides a comparison table summary of the types of allegations the Office of Internal Affairs received for investigation during the current and previous reporting periods.

| Requests for Investigation of Use-of-Force by Allegation Reporting Period Comparison | | | |
|---|---|---|---|
| **Allegation** | **Current Reporting Period Jul-Dec 2011** | **Previous Reporting Period Sept 2010-June 2011** | **Increase/ Decrease** |
| Unreasonable use of force | 31% | 26% | +5% |
| Failure to report use of force witnessed | 24% | 35% | -11% |
| Failure to report own use of force | 20% | 19% | +1% |
| Unreasonable force likely to cause injury | 5% | 11% | -6% |
| Other minor policy violations | 20% | 9% | +11% |

Figure 2

**Types of Force**

A single incident requiring the use of force may involve more than one application of force, and may require use of different types of force. For example, during a riot, officers may use chemical agents, expandable batons, and less-lethal force to address varying threat scenarios as the riot progresses. During this reporting period, the OIG conducted structured reviews of 783 incidents that included 2,773 separate applications of force. During the previous 10-month reporting period, the OIG monitored 1,173 incidents that included 3,271 separate applications of force.



Figure 3

**Frequency Distribution of Application of Force by Mission Groups**

As detailed in the following chart, the prevailing type of force used varies by institution mission. However, regardless of the mission, and consistent with the past reporting period, chemical agents and physical force are used most often. During the current reporting period, adult institutions used chemical agents in 48 percent of the applications of force, a slight increase from the 46 percent in the previous reporting period; while physical force comprised 27 percent of the applications of force, a measurable decrease from the 36 percent in the previous reporting period. Nevertheless, the two minimal types of force, physical and chemical agents, continue to account for the highest percentages of application: 75 percent this reporting period and 82 percent in the previous reporting period. These numbers indicate the department is utilizing the minimal force required in most instances.



| Types of Force | Current Reporting Period (6 months) | Previous Reporting Period (10 Months) | Comparative percentage +/- |
|---|---|---|---|
| Physical Force | 27% | 36% | -9% |
| Chemical Agents | 48% | 46% | 2% |
| Baton | 12% | 8% | 4% |
| Less-Lethal | 13% | 9% | 4% |
| Deadly Force | 0% | 1% | -1% |

Use-of-force committees do not analyze the types of force used. The primary focus of committee review is to evaluate the determination on whether use-of-force policy and other policies such as decontamination of inmates, proper video-recorded interviews, escorting inmates post-incident, completion of log entries, etc., were followed.

The following three graphs provide a summary of the data for these 2,773 applications of force by institution mission groups and provide a comparison to the 3,271 applications of force from the previous reporting period.

**Frequency Distribution of Applications of Force Monitored by OIG**

| Program | Sep 2010-June 2011 Physical Force | July-Dec 2011 Physical Force | Sep 2010-June 2011 Chemical Agents | July-Dec 2011 Chemical Agents | Sep 2010-June 2011 Baton | July-Dec 2011 Baton | Sep 2010-June 2011 Less-Lethal Force | July-Dec 2011 Less-Lethal Force | Sept 2010-June 2011 Deadly Force | July-Dec 2011 Deadly Force |
|---|---|---|---|---|---|---|---|---|---|---|
| Reception Center | **43.82%** | 29.53% | 36.33% | **42.75%** | 10.45% | **18.87%** | **9.08%** | 8.73% | **0.32%** | 0.13% |
| Female Offender | 41.27% | **46.61%** | **53.97%** | 46.61% | 4.76% | **5.93%** | 0.00% | **0.85%** | 0.00% | 0.00% |
| General Population | **37.38%** | 31.23% | 47.20% | **54.78%** | 7.13% | **9.39%** | 8.06% | 4.61% | **0.23%** | 0.00% |
| High Security | **29.66%** | 21.55% | **51.49%** | 48.53% | 6.89% | **8.60%** | 10.80% | **20.85%** | **1.17%** | 0.47% |

Figure 4





A list of the adult institutions and their acronyms can be found in Appendix A. For a comprehensive list of the types of force used during the reporting period at each of the department's adult institutions, please refer to Appendix B.

## Use-of-Force Incident Reports

As part of its structured reviews, the OIG examined correctional staff reports to evaluate the adequacy of the description of circumstances leading to the use of force and for the sufficiency of the description of the force used. The OIG evaluated 783 incidents and found 92 percent of the related reports adequately described the *need* to use force, a slight decrease from the 96 percent of 1,173 incidents in the previous reporting period. However, only 67 percent of the 783 incidents appropriately described the *actual* force used during the incident. This is up only 1 percentage point from 66 percent in the previous reporting period.

Individual institutions exhibited varying degrees of accuracy in describing the actual force used. For example, at Salinas Valley State Prison, 100 percent of the reports we reviewed adequately described the need for force, but only 56 percent adequately described the force used during the incidents. Similar documentation patterns were found at High Desert State Prison, Kern Valley State Prison, the Substance Abuse Treatment Facility, and Corcoran State Prison. More favorable results were found at Chuckawalla Valley State Prison with 100 percent of the reports adequately describing the need for force and 100 percent appropriately documenting the force used. There were similarly favorable documentation patterns at the California Conservation Center, the California Institution for Men, and the California Rehabilitation Center.

## Institutional Use-of-Force Reviews

At each level of review, the CDCR reviewer  is tasked with evaluating reports, requesting necessary clarifications, identifying deviations from policy, and determining whether the use of force was within policies, procedures, and applicable laws. The review process begins with an initial review conducted by the incident commander. Unresolved issues progress to the first-level management review conducted by a captain, the second-level management review conducted by an associate warden, and the final-level of review

where the incident is reviewed by the use-of-force review committee.



In the 783 structured reviews of incidents conducted during this reporting period, the OIG noted that every level of the department's review process made errors in identifying deficiencies in use-of-force reports. Of the incidents we reviewed, 248 contained reports with missing or conflicting information after institutional incident commanders performed the initial level of review. Thus, incident commanders collectively moved reports with incomplete or conflicting information forward for management review in 32 percent of the incidents. This is a significant improvement from the previous reporting period in which it was noted that incident commanders in most of the adult institutions failed to address clarification or policy deviations in 78 percent of the incidents (Figure 5 below).

The OIG further evaluated how first-level management reviewers addressed policy deviations or inadequate reports in the 248 use-of-force incidents containing issues not addressed by the incident commanders. We found first-level management reviewers failed to address clarification or policy deviations in 66 percent of the incidents, an improvement from 73 percent unaddressed incidents in the previous reporting period. First-level management reviewers in 19 institutions still failed to address over half of the clarifications

**Incident Reports with Missing or Incomplete**
**Information at Each Level of Review**
**Jul-Dec 2011**



- ■ Incidents cleared without complete information 22%

- ☐ Incomplete Review: Executive-level UOF Committee 46%

- ☐ Incomplete Review: 2nd-level management 73%

- ▦ Incomplete Review: 1st-level management 66%

- ▨ Incomplete Review: Incident Commander 32%

Figure 5

**Incident Reports with Missing or Incomplete**
**Information at Each Level of Review**
**Sep 2010-June 2011**



- ■ Incidents cleared without complete information 17%

- ☐ Incomplete Review: Executive-level UOF Committee 67%

- ☐ Incomplete Review: 2nd-level management 44%

- ▦ Incomplete Review: 1st-level management 73%

- ▨ Incomplete Review: Incident Commander 78%

or policy deviations left undetected by the incident commanders' initial review.

Upon reaching the second-level managers' review, 163 unaddressed issues remained. The second-level managers' reviews in all institutions addressed only 44 issues (27 percent) of the 163 issues previously undetected by first-level managers. Second-level reviewers failed to address 119 issues leaving 73 percent of the first-level issues unresolved. This cumulative average was primarily impacted by 12 of the adult institutions' second-level managers failing to address <u>any</u> issues. This is a significant increase in undetected issues at the second-level review from the prior reporting period of 44 percent unaddressed.

At the use-of-force executive review committee and institution-head level of review, 119 issues (48 percent) originally noted by the OIG still remained unaddressed by previous review levels. This final executive level of review addressed 64 of the outstanding issues - failing to address 46 percent of the issues - leaving 55 of the original 248 issues unresolved after all levels of review. Thus, after all levels of review, 22 percent of the incidents were cleared without appropriate information, compared to 17 percent in the previous reporting period. This indicates the department made efforts with first-level reviewers, but overall, more training and emphasis on complete reviews is still needed.

**Timeliness of Reviews**

Pursuant to CDCR policy, use-of-force incidents should normally be reviewed within 30 days from the date of the incident. This includes all levels of the review process, as well as obtaining any necessary clarifications.

For the 783 structured reviews the OIG conducted, the overall average time for review from the time of incident to the time of completion at the executive level was 54 days, with most of that time spent at the final level of review.

At several of the adult institutions, total average review time equaled or exceeded 60 days. Valley State Prison for Women averaged 192 days to complete their use-of-force review process, while both Kern Valley State Prison and California State Prison, San Quentin exceeded the required time by averaging 107 and 99 days, respectively. This delay can significantly impact potential employee misconduct cases since the hiring authority has only one year to identify misconduct, complete an investigation, and impose discipline if appropriate. During the reporting period, only five adult institutions fell within the 30 day threshold for completing the use-of-force review process. These institutions are Avenal State Prison, California Rehabilitation Center, Chuckawalla Valley State Prison, Deuel Vocational Institution, and Folsom State Prison.

The department should consult with the OIG and consider adopting the internal policy revision currently under review to streamline and make the use-of-force committee process more efficient and effective. It is clear from the data in both the first, and now this second report, that the bulk of the use of force incidents occur at high security and reception center prisons. These same prisons struggle to meet the 30 day requirement for committee review, even though they spend more time in committee and hold committee reviews more frequently. This sometimes results in preliminary "reviews" of incidents that are incomplete when they reach committee in

order to claim compliance with policy.

The OIG noted that at least one prison was adapting its process to handle many of the use-of-force reviews outside of the formal committee process. They had established in-house criteria defining low-level incidents with minimal staff or inmate involvement, and without injury or misconduct allegations, for a "paper review" only, by a member of the committee. This enabled them to spend committee time on those incidents that were more serious, complicated, or problematic. The OIG recognized and even commended the fact that they were trying to improve the system. However, the process does not comply with policy and lacks transparency. The OIG suggested the process be formulated to include a component with the OIG as a reviewer and submitted to management for formal adoption. Such a process would still provide transparency and the opportunity to request a matter be put before the committee if there was an issue. It would also save countless hours of high-level employee time and increase the scrutiny on the incidents that require more discussion.

This process would be similar to the "consent calendar" used by OIA's Central Intake Committee to handle the majority of the straightforward, lower-level requests for investigation. This process has been thoroughly accepted and adopted by the department and the stakeholders. The OIG was informed that the recommendation was going to be formally sent up the chain of command for consideration over six months ago. At the time of this second report, there has still been no action taken or even consultation requested with the OIG to consider the inter-departmental process recommendation. When inquiring, the OIG was informed that the recommendation is still under consideration. In the current fiscal

climate, it would seem that a good suggestion such as this, submitted from within their own agency, should not only be considered but commended. The OIG is willing to consult on the criteria to be used and the process to be followed and provide the required third party transparency.

To compare the timeliness of reviews for the adult institutions, please refer to Appendix C, and for a statewide review summary, please refer to Appendix D.

### Video-Recorded Interviews

The department's use-of-force policy requires video recorded interviews if an inmate alleges unreasonable force or has sustained serious or great bodily injury that could have been caused by the use of force. The video recording should be conducted within 48 hours of discovery of the injury or allegation. If the inmate refuses to be video-recorded, CDCR policy requires staff to record the inmate confirming his or her refusal to be interviewed. However, the current practice for conducting video-recorded interviews of inmates involved in a use-of-force incident varies among the adult institutions.

Incident commanders are not consistently interviewing identified inmate witnesses or documenting all relevant facts in their Report of Findings or Appeal Inquiry memo. The OIG noted incidents where the inmate provided names of inmate witnesses on the video recording, yet the incident commander did not list those witnesses on the Report of Findings, nor were the witnesses interviewed. There were also instances where the incident commander listed the names of inmate witnesses on the Report of Findings, but did not conduct interviews with them. Additionally, staff did not make the effort to identify and interview potential additional witnesses when an interviewed inmate could

identify those other witnesses only by their assigned cell number or bed assignment.

Video recorded interviews with inmates, or their refusals to be interviewed, did not consistently document required information. The OIG found that some interviewers did not adequately identify themselves, the date, the time, the incident log number, or sufficiently document the inmate's injuries. Additionally, when recording inmates' refusals to be interviewed, staff did not ask the inmates to identify themselves on record.

The OIG found that no video recording was conducted for 31 percent of inmate appeals involving allegations of force. The OIG also found many institutions allow correctional officers to act as video camera operators; thus, officers are present while an inmate is making allegations against other officers or supervisors. In one instance, a correctional officer was interviewed as a witness to an allegation of force but later acted as the camera operator during the inmate's interview describing his account of the force. This practice may inhibit some inmates from making allegations due to the potential of staff retaliating against the inmate. Correctional officers should not be placed in a position to learn of alleged staff misconduct, especially when it may result in an internal affairs investigation or disciplinary action.

Of the 783 incidents for which the OIG conducted structured reviews, 96 incidents were identified as requiring and receiving video recorded interviews. We reviewed the video recorded interviews and found 74 recordings were conducted according to policy guidelines, a compliance rate of 77 percent. North Kern State Prison, responsible for 13 of the 96 incidents requiring video-recorded interviews, was a notable exception to the statewide average, with a 100 percent compliance rate.

In our November 2011 Use-of-Force Report we recommended the department make efforts to increase compliance with the use-of-force video recording policy. The 7 percent increase in compliance during this reporting period reflects the department's efforts to implement this recommendation. The department indicated in its 2011 Corrective Action Plan that this recommendation will be fully implemented by the end of 2012. The department should also establish who can conduct and participate in interviews, provide training and/or procedure memos to ensure recordings are consistently completed, and prohibit staff members involved in the incident from participating in video recording the inmate interview.



# DIVISION OF ADULT PAROLE OPERATIONS

The Division of Adult Parole Operations (DAPO) is divided into 4 parole regions and in 2011 was responsible for supervising over 100,000 parolees. During that year, the adult parole regions reported 36 incidents statewide involving the use of force. Parole Regions III and IV conducted regular use-of-force committee meetings during this reporting period, and Parole Region II conducted meetings on an "as-needed basis" due to infrequency of incidents involving force. Parole Region I managers, in lieu of committee meetings, reviewed each use-of-force incident independently as incidents progressed through the successive levels of review. DAPO has indicated that it is currently in the process of amending its policy to incorporate a regional review committee meeting component.

The OIG attended eight committee meetings and completed structured reviews of 36 use-of-force incidents occurring throughout the four parole regions. Within the total number of incidents reviewed, there were 126 applications of force. The structured reviews revealed that 92 percent of parole agents' use-of-force reports adequately described the need to use force. However, only 50 percent provided an appropriate description of the force used. Figure 6 provides a summary of the types of force used in the parole regions from July through December 2011.

Throughout all parole regions, the unit supervisors, who perform the initial reviews, did not request clarifications for inadequate reports in any of the 36 incidents reviewed by the OIG despite the fact that over half (19 of 36) the incidents required clarification. Additionally the next levels of review addressed only two policy deviations or clarifications. Finally we noted during our review that parole agents who were witnesses to other agents' use of force did not consistently prepare written reports of what they witnessed.

The following tables illustrate the adequacy of reports initially submitted by parole agents and the number of incidents for which supervisors and managers addressed inadequate reports or policy deviations. These tables also include the average days the review process took from the date of the incident to the date the previous reviewer signed his or her review. Compared to the prior reporting

**Types of Force Used in Parole Regions, July-Dec 2011**



Figure 6

    *No instances of less-lethal or deadly force were used in parole
    regions during this reporting period.

period, the number of complete reports increased to 50 percent, an improvement of 25 percent from the previous reporting period. The sufficiency of report review decreased, however, and the unit supervisor failed to request clarification or review of any incident reports, and only one clarification or policy deviation was addressed at the executive review level.

**Jul-Dec 2011 Insufficient Incident Reports and Management Review**

| | Parole Agent Reports | | Clarification Requested | Clarifications or Policy Deviations Addressed | | |
|---|---|---|---|---|---|---|
| Parole Region | Incidents Evaluated | Reports Needing Clarification | By Unit Supervisor | By District Administrator | By Hiring Authority | Average Total Days for Review |
| Region I | 18 | 50% | 0 | 0 | 11% | 26 |
| Region II | 7 | 43% | 0 | 0 | 0 | 6 |
| Region III | 3 | 67% | 0 | 0 | 0 | 44 |
| Region IV | 8 | 63% | 0 | 20% | 0 | 57 |
| **Statewide Average** | **36 *total** | **50%** | **0** | **20%** | **11%** | **33.25** |

**Figure 7**

**Sep 2010 -June 2011 Insufficient Incident Reports and Management Review**

| | Parole Agent Reports | | Clarification Requested | Clarifications or Policy Deviations Addressed | | |
|---|---|---|---|---|---|---|
| Parole Region | Incidents Evaluated | Reports Needing Clarification | By Unit Supervisor | By District Administrator | By Hiring Authority | Average Total Days for Review |
| Region I | 22 | 88% | 22% | 8% | 0% | 49 |
| Region II | 21 | 94% | 33% | 25% | 0% | 19 |
| Region III | 11 | 35% | 0% | 10% | 27% | 102 |
| Region IV | 20 | 78% | 40% | 50% | 0% | 168 |
| Statewide Average | 74 *total | 74% | 24% | 23% | 7% | 85 |

# ADDRESSING ALLEGATIONS OF UNREASONABLE FORCE

Incident reports by officers who use force against inmates or parolees are not the only source through which review committees become aware of use-of-force incidents. Inmates use the appeal process to allege that they were victims of unreasonable force, or may report unreasonable force to medical personnel treating their injuries. Other reporting sources include correctional staff or visitors who may witness unreasonable force. All such allegations that come to the attention of institution management must, after investigation, be reviewed by the appropriate executive review committee.

## Allegation Review Process

Allegations of unreasonable force are processed in two ways:

1. If an inmate verbally alleges they were a victim of unreasonable use-of-force, the allegation is evaluated in the same way as all other use-of-force incidents, culminating with a final review by the institution's executive review committee.

2. If anyone (including an inmate) claims, verbally or in writing, to have witnessed unreasonable use-of-force, or if an inmate submits a written appeal (CDCR Form 602) claiming to have been a victim of unreasonable use-of-force, the institution conducts an Appeal Inquiry and the findings are required to be reviewed by the executive review committee.

## Tracking of Allegations

The Department's use-of-force policy requires each institution's executive review committee to review all allegations of force. The policy also requires the use-of-force coordinator to log and track all use-of-force incidents and all allegations including those brought forth by the inmate appeal process. In addition, the incident commander or appeals coordinator must video record an interview with any inmate filing an allegation, within 48 hours from the time of discovery; conduct and document interviews of the subjects

and witnesses; review medical reports; and prepare a Report of Findings or Appeal Inquiry.

The OIG noted the majority of institutions are not following the policy requirements described above. The OIG evaluated 268 allegations of unreasonable force occurring during the 2011 calendar year at 29 institutions and found only 55 percent of those allegations were reviewed by an executive review committee. The OIG also found inconsistencies in how each institution ensures its use-of-force coordinator receives the allegation package for logging, tracking, and presentation to the executive review committee. Additionally, the OIG found that only 69 percent of required video-recorded interviews with inmates were completed, and that many of those were conducted after the 48-hour deadline.

The OIG examined 268 allegations of unreasonable force reported through the adult institutions' inmate appeal process or through written or oral complaints from staff, members of the public, or inmates. Nearly half (121) of the allegations of unreasonable force in our examination escaped executive committee review, and institutions' practices with respect to tracking these allegations varied. The OIG found various methods employed for processing and tracking staff

misconduct complaints among the 30 adult institutions we contacted. We further noted multiple methods for tracking allegations and logging complaints within individual institutions. These include a general TIC (taken into consideration) assignment tracking database maintained in the warden's office; a log book kept by the Investigative Services Unit; logs maintained in the inmate appeals office; use-of-force coordinators' logs; the delegated assignment tracking system (DATS); the citizens complaint log (CDCR Form 2142); and the internal affairs allegation log (CDCR Form 2140). Without a single designated reporting point for tracking use-of-force allegations, effective review cannot be ensured.

**Allegations Referred for Committee Review**

Nearly half of the inmate appeals we examined involving use-of-force allegations were not properly referred for committee review, largely due to poor tracking and lack of notification to the use-of-force coordinator. In order to effectively address use-of-force allegations, coordination between the appeals coordinator and the use-of-force coordinator must be established, and should include: implementation of a single designated

reporting point for tracking use-of-force allegations, research of any related incident reports, and notification by the appeals coordinator to the use-of-force coordinator of all Appeal Inquiries stemming from a use-of-force allegation. The current use-of-force policy does not direct the appeals coordinator to contact the use-of-force coordinator when an appeal alleging force is received. Consequently, the OIG found that not all completed reports on such appeals are forwarded to the use-of-force coordinator for review by the executive review committee.

The reports that are forwarded may stall at the use-of-force coordinator's office. For example, one use-of-force coordinator has not presented any inmate allegations of force to the executive review committee through the end of calendar year 2011. The institution only began using the executive review allegation review form in November 2011, 15 months after the policy became effective, and had seven allegations awaiting completion from the appeals coordinator. The OIG had previously notified that institution's use-of-force coordinator and warden on four previous occasions (most recently in October 2011) about this policy requirement.

This lack of internal coordination may allow



the executive review committee to render separate, and perhaps different, conclusions than those reached in the Appeal Inquiry, and allows some reports to escape executive review committee evaluation altogether. For instance, at one institution, the OIG requested the reviews for eight inmate appeals in which the inmates claimed to have been victims of force in incidents dating from March through October 2011. However, even at the time of our field visit to the institution in January 2012, the institution could confirm that only two of the eight appeals were ever presented to the executive review committee.

## Training and Listing of Staff Conducting Administrative Interviews

The OIG learned that when an institution conducts an Appeal Inquiry, the individual may not have received training on how to conduct administrative interviews. In April 2006, the department distributed to all institutions a training module for conducting administrative interviews in accordance with Administrative Bulletin 05/03.

The institutions' in-service training (IST) managers were directed to document this training in each employee's training file and maintain a list of supervisors and managers trained and qualified as administrative interviewers for staff complaints received through inmate appeals.

However, after contacting appeals coordinators and IST staff at the institutions, the OIG noted that Administrative Bulletin 05/03 is obsolete and that most institutions have not developed a replacement training program for interviewers, nor are they maintaining a list of staff qualified to conduct administrative interviews. We did find one institution, the California Men's Colony, which had created a one-hour training module, "Administrative Interview Process (Staff Complaint 2011)," to provide training to those conducting administrative interviews.



# STATUS OF PRIOR RECOMMENDATIONS

In the OIG's November 2011 Use-of-Force Report, the OIG made five recommendations to the department. The department's 2011 Corrective Action Plan, which is updated annually, includes the following implementation status for the five recommendations:



1. The department should distinguish between non-compliance with the use-of-force policy versus non-compliance in other department policies,

   *1. The department indicates substantial compliance by 2012.*

2. The department should ensure all use-of-force reports are complete and accurate, and documents are submitted timely prior to final review decisions,

   *2. The department indicates full implementation of training for report writing and accountability for first-line reviewers in 2012.*

3. The department should ensure use-of-force executive review committees are held in compliance with department policies,

   *3. The department indicates this has been fully implemented at the institutions and DAPO is incorporating a regional review committee meeting component.*

4. The department should ensure that use-of-force video-recorded interviews are conducted in a manner that is consistent with policy, and

   *4. The department indicates substantial compliance by 2012 through issuance of a training memorandum, quarterly internal audits, and accountability measures.*

5. The department should ensure appropriate training for pepper spray use during cell extractions, including guidelines for assessing exposure elements, time, and effectiveness.

   *5. The department contends the current use-of-force policy adequately controls the use of pepper spray.*

# RECOMMENDATIONS FROM THIS REPORT

Analysis of available 2011 use-of-force data and observations made during contemporaneous monitoring activities is the basis for the following recommendations to improve the use-of-force incident review process.

1.  THE DEPARTMENT SHOULD CONSULT WITH THE OIG AND CONSIDER ADOPTING THE INTERNAL POLICY REVISION CURRENTLY UNDER REVIEW TO STREAMLINE AND MAKE THE USE-OF-FORCE COMMITTEE PROCESS MORE EFFICIENT AND EFFECTIVE

The policy revision currently under review is similar to the "consent calendar" used by OIA's Central Intake Committee to handle the majority of the straightforward, lower-level requests for investigation. The OIG suggested the process be formulated to include a component with the OIG as a reviewer and submitted to management for formal adoption. Such a process would still provide transparency and the opportunity to request a matter be put before the committee if there was an issue. It would also save countless hours of high-level employee time and increase the scrutiny on the incidents that require more discussion. The OIG is willing to consult on the criteria to be used and the process to be followed and provide the required third party transparency.

2.  THE DEPARTMENT SHOULD PROVIDE ADDITIONAL TRAINING OR POLICY MEMOS TO ENSURE VIDEO-RECORDED INTERVIEWS ARE CONDUCTED FOR ALL ALLEGATIONS OF USE-OF-FORCE.  THE DEPARTMENT SHOULD ALSO CLEARLY ESTABLISH WHO CAN CONDUCT AND PARTICIPATE IN VIDEO-RECORDED INTERVIEWS AND ENSURE STAFF MEMBERS INVOLVED IN THE INCIDENT DO NOT TAKE PART IN VIDEO RECORDING THE INTERVIEWS

The current practice for conducting video-recorded interviews of inmates involved in a use-of-force incident varies among the adult institutions. Incident commanders are not consistently interviewing identified inmate witnesses or documenting all relevant facts in their Report of Findings or Appeal Inquiry memo. Of the 783 incidents for which the OIG conducted structured reviews, 96 incidents were identified as requiring and receiving video-recorded interviews. We reviewed the video recorded interviews and found 74 recordings were conducted according to policy guidelines, a compliance rate of 77 percent. 

3.  THE DEPARTMENT SHOULD ESTABLISH A SINGLE DESIGNATED REPORTING POINT FOR TRACKING ALLEGATIONS OF FORCE

Allegations of employee misconduct may be logged at various recording points within an institution and tracking and accountability for investigating those complaints is fragmented. Furthermore, allegations of unreasonable force not ultimately tracked by an institution's use-of-force coordinator may escape presentation to the use-of-force review committee. CDCR policy provides that each hiring authority is responsible for "[e]nsuring each allegation of employee misconduct is logged (regardless of whether the allegation is referred for investigation), receives prompt attention, and is addressed appropriately."

4. EACH OF THE FOUR ADULT PAROLE REGIONS SHOULD IDENTIFY AND TRAIN A USE-OF-FORCE COORDINATOR TO MANAGE THE USE-OF-FORCE INCIDENT REVIEW PROCESS

The OIG recommends that each of the four adult parole regions identify and train a use-of-force coordinator in each region to manage the use-of-force incident review process. A single use-of-force point of contact for each parole region will facilitate a consistent process for policy updates, information sharing, and report oversight.

5. THE INSTITUTIONAL APPEALS COORDINATOR SHOULD NOTIFY THE USE-OF-FORCE COORDINATOR OF ALL INMATE APPEALS CONTAINING A USE-OF-FORCE ALLEGATION

The OIG found that nearly half of the inmate appeals we examined (121 out of 268) involving allegations of force escaped committee review, largely due to poor tracking of allegations and inadequate coordination between the appeals coordinator and the use-of-force coordinator. The OIG found some institutions have not implemented a local procedure to ensure all use-of-force appeals are adequately tracked and forwarded to the use-of-force coordinator for review by the executive review committee. Consequently, the OIG found that not all completed reports on such appeals are forwarded to the use-of-force coordinator for review by the executive review committee. Improved coordination is necessary to avoid multiple reviews or duplication of effort by the executive review committee for instances in which an inmate submits an appeal near the end of the use-of-force coordinator's 30-day deadline.

6. ALL ALLEGATIONS OF FORCE EXAMINED THROUGH A REPORT OF FINDINGS OR APPEAL INQUIRY SHOULD SPECIFY ANY RESEARCH CONDUCTED TO LOCATE RELATED INCIDENT REPORTS AND VIDEO RECORDINGS, AND DOCUMENT WITNESS STATEMENTS, INTERVIEWS, E-MAILS, VIDEOS, OR OTHER EVIDENCE RELIED UPON TO SUPPORT THE FINDINGS AND CONCLUSION

Incident commanders are not consistently documenting all relevant facts in their Report of Findings or Appeal Inquiry memo or interviewing identified inmate witnesses. Staff members tasked with investigating allegations should document their research and analysis of all critical information used to support the findings and conclusions made in their final reports.

7. THE DEPARTMENT SHOULD PROVIDE TRAINING TO SUPERVISORY AND MANAGERIAL STAFF WHO CONDUCT ADMINISTRATIVE INTERVIEWS, AND EACH INSTITUTION SHOULD MAINTAIN AN UPDATED LIST OF TRAINED INSTRUCTORS/INTERVIEWERS

The OIG found that most institutions assign staff to conduct Appeal Inquiry interviews without ensuring they have received training to conduct administrative interviews. Typically, a department head (e.g. associate warden) acts as a "reviewer" of the Appeal Inquiry and assigns a lieutenant or sergeant to conduct the administrative interview. Without a listing of qualified interviewers, it is unknown whether the assigned lieutenant or sergeant has been trained to properly complete the administrative interview.

**APPENDIX A:  Acronyms for Adult Institutions**

| | Adult Institutions and Locations | City |
|---|---|---|
| ASP | Avenal State Prison | Avenal |
| CCC | California Correctional Center | Susanville |
| CCI | California Correctional Institution | Tehachapi |
| CIM | California Institution for Men | Chino |
| CIW | California Institution for Women | Frontera |
| CMF | California Medical Facility | Vacaville |
| CMC | California Men's Colony | San Luis Obispo |
| CRC | California Rehabilitation Center | Norco |
| COR | California State Prison, Corcoran | Corcoran |
| LAC | California State Prison, Los Angeles County | Lancaster |
| SAC | California State Prison, Sacramento | Represa |
| SQ | California State Prison, San Quentin | San Quentin |
| SOL | California State Prison, Solano | Vacaville |
| SATF | Substance Abuse Treatment Facility & State Prison at Corcoran | Corcoran |
| CAL | Calipatria State Prison | Calipatria |
| CEN | Centinela State Prison | Imperial |
| CCWF | Central California Women's Facility | Chowchilla |
| CVSP | Chuckawalla Valley State Prison | Blythe |
| CTF | Correctional Training Facility | Soledad |
| DVI | Deuel Vocational Institution | Tracy |
| FOL | Folsom State Prison | Represa |
| HDSP | High Desert State Prison | Susanville |
| ISP | Ironwood State Prison | Blythe |
| KVSP | Kern Valley State Prison | Delano |
| MCSP | Mule Creek State Prison | Ione |
| NKSP | North Kern State Prison | Delano |
| PBSP | Pelican Bay State Prison | Crescent City |
| PVSP | Pleasant Valley State Prison | Coalinga |
| RJD | Richard J. Donovan Correctional Facility | San Diego |
| SVSP | Salinas Valley State Prison | Soledad |
| SCC | Sierra Conservation Center | Jamestown |
| VSPW | Valley State Prison for Women | Chowchilla |
| WSP | Wasco State Prison | Wasco |

**APPENDIX B:** Incidents Involving Force - Adult Institutions

| | Incidents Involving Force | | | | | | |
|---|---|---|---|---|---|---|---|
| | Adult Institutions | | | | | | |
| Institution | Mission | Incidents Involving Force | Physical Force | Chemical Agents | Expandable Baton | Less-lethal Force | Deadly Force |
| ASP | General Population | 50 | 28% | 64% | 8% | 0% | 0% |
| CAL | High Security | 61 | 16% | 61% | 0% | 16% | 7% |
| CCC | General Population | 23 | 13% | 83% | 4% | 0% | 0% |
| CCI | High Security | 94 | 26% | 48% | 9% | 18% | 0% |
| CCWF | Female Offender | 53 | 49% | 51% | 0% | 0% | 0% |
| CEN | High Security | 52 | 15% | 69% | 8% | 8% | 0% |
| CIM | Reception Center | 125 | 14% | 83% | 1% | 1% | 1% |
| CIW | Female Offender | 42 | 26% | 57% | 17% | 0% | 0% |
| CMC | General Population | 60 | 65% | 28% | 7% | 0% | 0% |
| CMF | General Population | 47 | 49% | 47% | 4% | 0% | 0% |
| COR | High Security | 64 | 28% | 50% | 14% | 8% | 0% |
| CRC | General Population | 53 | 30% | 43% | 26% | 0% | 0% |
| CTF | General Population | 27 | 33% | 52% | 4% | 11% | 0% |
| CVSP | General Population | 28 | 25% | 61% | 14% | 0% | 0% |
| DVI | Reception Center | 134 | 22% | 16% | 61% | 1% | 0% |
| FOL | General Population | 71 | 14% | 66% | 4% | 15% | 0% |
| HDSP | High Security | 148 | 7% | 48% | 27% | 17% | 1% |
| ISP | General Population | 69 | 7% | 61% | 23% | 9% | 0% |
| KVSP | High Security | 168 | 14% | 48% | 4% | 33% | 0% |
| LAC | Reception Center | 70 | 59% | 30% | 4% | 7% | 0% |
| MCSP | High Security | 54 | 11% | 54% | 17% | 19% | 0% |
| NKSP | Reception Center | 89 | 17% | 49% | 18% | 16% | 0% |
| PBSP | High Security | 148 | 9% | 83% | 3% | 5% | 0% |
| PVSP | General Population | 76 | 53% | 32% | 7% | 9% | 0% |
| RJD | Reception Center | 143 | 36% | 37% | 15% | 12% | 0% |
| SAC | High Security | 317 | 22% | 35% | 8% | 35% | 0% |
| SATF | High Security | 104 | 78% | 9% | 2% | 12% | 0% |
| SCC | General Population | 30 | 10% | 90% | 0% | 0% | 0% |
| SOL | General Population | 52 | 27% | 71% | 2% | 0% | 0% |
| SQ | Reception Center | 106 | 40% | 34% | 8% | 18% | 0% |
| SVSP | High Security | 80 | 18% | 64% | 5% | 14% | 0% |
| VSPW | Female Offender | 23 | 78% | 17% | 0% | 4% | 0% |
| WSP | Reception Center | 112 | 29% | 48% | 13% | 10% | 0% |
| TOTAL | | 2,773 Incidents | 29% Overall Average | 51% Overall Average | 10% Overall Average | 9% Overall Average | <1% Overall Average |

**APPENDIX C: Timeliness of Reviews – Adult Institutions**

| Timeliness of Reviews (average number of days for review at each level) | | | | | | |
|---|---|---|---|---|---|---|
| Adult Institutions | | | | | | |
| Institution | Incidents Evaluated | Incident Commander | 1st Level Manager | 2nd Level Manager | Institu-tion Head/ IERC | Average Total Days for Review |
| ASP | 22 | 2 | 7 | 5 | 10 | 24 |
| CAL | 17 | 2 | 10 | 4 | 17 | 33 |
| CCC | 12 | 4 | 5 | 4 | 23 | 36 |
| CCI | 34 | 1 | 6 | 5 | 24 | 36 |
| CCWF | 14 | 1 | 9 | 4 | 66 | 80 |
| CEN | 24 | 2 | 7 | 4 | 73 | 86 |
| CIM | 25 | 2 | 13 | 2 | 16 | 33 |
| CIW | 13 | 1 | 14 | 3 | 28 | 46 |
| CMC | 17 | 4 | 22 | 8 | 26 | 60 |
| CMF | 16 | 5 | 6 | 5 | 18 | 34 |
| COR | 23 | 1 | 13 | 8 | 23 | 45 |
| CRC | 20 | 1 | 5 | 5 | 17 | 28 |
| CTF | 16 | 1 | 5 | 4 | 37 | 47 |
| CVSP | 17 | 1 | 4 | 1 | 18 | 24 |
| DVI | 27 | 2 | 3 | 2 | 21 | 28 |
| FOL | 20 | 1 | 7 | 4 | 16 | 28 |
| HDSP | 28 | 9 | 6 | 2 | 30 | 47 |
| ISP | 21 | 3 | 7 | 11 | 42 | 63 |
| KVSP | 39 | 1 | 31 | 18 | 57 | 107 |
| LAC | 26 | 1 | 7 | 3 | 40 | 51 |
| MCSP | 20 | 1 | 6 | 8 | 34 | 49 |
| NKSP | 37 | 3 | 12 | 9 | 16 | 40 |
| PBSP | 36 | 13 | 10 | 8 | 33 | 64 |
| PVSP | 22 | 1 | 14 | 9 | 40 | 64 |
| RJD | 51 | 2 | 8 | 9 | 38 | 57 |
| SAC | 35 | 3 | 8 | 4 | 43 | 58 |
| SATF | 26 | 1 | 11 | 9 | 29 | 50 |
| SCC | 11 | 1 | 5 | 6 | 57 | 69 |
| SOL | 19 | 2 | 10 | 7 | 18 | 37 |
| SQ | 25 | 3 | 23 | 9 | 64 | 99 |
| SVSP | 25 | 1 | 14 | 4 | 19 | 38 |
| VSPW | 10 | 1 | 11 | 42 | 138 | 192 |
| WSP | 35 | 2 | 11 | 9 | 16 | 38 |
| TOTAL/ AVG | 783 | 2 | 10 | 7 | 35 | 54 |

*(Days for review were averaged and rounded to the nearest day)*

## APPENDIX D: Statewide Review Summary – Adult Institutions

| | Statewide Review Summary | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Adult Institutions** | | | | | | |
| | Clarifications or Policy Deviations Addressed at Each Level | | | | | | |
| **Institution** | **Missed by Incident Commanders** | **Addressed at 1st Manager Level** | **Percent Missed at 1st Manager Level** | **Addressed at 2nd Level Manager Level** | **Percent Missed at 2nd Manager Level** | **Addressed at Institution Head Level** | **Percent Missed at Institution Head Level** |
| ASP | 7 | 2 | 71% | 2 | 60% | 3 | 0% |
| CAL | 6 | 3 | 50% | 0 | 100% | 0 | 50% |
| CCC | 0 | 0 | N/A | N/A | N/A | N/A | N/A |
| CCI | 8 | 1 | 88% | 6 | 14% | 1 | 0% |
| CCWF | 1 | 0 | 100% | 1 | 0% | 0 | 0% |
| CEN | 7 | 3 | 57% | 0 | 100% | 1 | 43% |
| CIM | 2 | 1 | 50% | 0 | 100% | 0 | 50% |
| CIW | 5 | 1 | 80% | 0 | 100% | 4 | 0% |
| CMC | 5 | 0 | 100% | 3 | 40% | 1 | 20% |
| CMF | 8 | 5 | 38% | 1 | 67% | 2 | 0% |
| COR | 12 | 2 | 83% | 0 | 100% | 8 | 17% |
| CRC | 6 | 1 | 83% | 3 | 40% | 1 | 17% |
| CTF | 3 | 1 | 67% | 1 | 50% | 0 | 33% |
| CVSP | 0 | 0 | N/A | N/A | N/A | N/A | N/A |
| DVI | 5 | 3 | 40% | 1 | 50% | 1 | 0% |
| FOL | 4 | 0 | 100% | 1 | 75% | 1 | 50% |
| HDSP | 6 | 5 | 17% | 0 | 0% | 1 | 0% |
| ISP | 7 | 2 | 71% | 2 | 60% | 3 | 0% |
| KVSP | 32 | 8 | 75% | 7 | 71% | 7 | 31% |
| LAC | 10 | 5 | 50% | 0 | 100% | 5 | 0% |
| MCSP | 5 | 3 | 40% | 0 | 100% | 0 | 40% |
| NKSP | 15 | 8 | 47% | 5 | 29% | 1 | 7% |
| PBSP | 6 | 1 | 83% | 3 | 40% | 1 | 17% |
| PVSP | 8 | 4 | 50% | 3 | 25% | 0 | 13% |
| RJD | 14 | 0 | 100% | 0 | 100% | 3 | 79% |
| SAC | 15 | 7 | 53% | 1 | 88% | 2 | 33% |
| SATF | 13 | 7 | 46% | 1 | 83% | 5 | 0% |
| SCC | 1 | 0 | 100% | 1 | 0% | 0 | 0% |
| SOL | 4 | 0 | 100% | 0 | 100% | 1 | 75% |
| SQ | 9 | 1 | 89% | 1 | 88% | 7 | 0% |
| SVSP | 8 | 0 | 100% | 0 | 100% | 1 | 88% |
| VSPW | 5 | 4 | 20% | 0 | 0% | 1 | 0% |
| WSP | 11 | 7 | 36% | 1 | 75% | 3 | 0% |
| **TOTALS** | **248** | **85** | **67%** | **44** | **67%** | **64** | **25%** |

**Use-of-Force within the**
**California Department of Corrections and Rehabilitation**
**July – December 2011**

**May 2012**