# Exhibit 11

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,            )
                                  )
            Plaintiffs,           )
                                  )CASE NO.:
       vs.                        ) S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
            Defendants.           )
                                  )

DEPOSITION OF

ELDON VAIL

TUESDAY, MARCH 19, 2013,  9:10 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1  clear that they were going to retain me and were
2  planning to send me different documents.
3       Q.   During this conversation, did you state that
4  you agreed to consult with the attorneys?
5       A.   Yes.
6       Q.   What was it -- what made you decide that you
7  would consult with them in this case?
8       A.   I've done this work for a long time, and I
9  have strong feelings about the profession. And in some
10 ways it's a very primitive profession, but in the
11 last -- I don't know -- 20 years, there's been an
12 emerging body of knowledge about what works.
13          And I think it's important that systems
14 embrace that approach and respect the charge that
15 they've been given to incarcerate other human beings.
16 It's an extraordinary relationship where the State says
17 to us as State employees that we are responsible for the
18 body of other human beings. And we put them in an
19 environment that basically is very difficult to live in.
20 And we put them there as a punishment, but our
21 responsibility is, as well as to keep them confined, is
22 to do everything we can to not make them worse. And if
23 we do things correctly at the aggregate level, we can
24 make a difference in community safety.
25          Corrections is a profession of aggregates.

```
 1   There's no x-ray machine that will tell me that a
 2   certain inmate's leg is broken and, if I fix it, they
 3   won't commit another crime.  But there is a body of
 4   research that says if I put X number through this
 5   program, we'll see less crime at the aggregate level at
 6   the end of that experience than if we don't.
 7              So I was motivated to do it because it was of
 8   interest to me because I think that's a philosophy that
 9   California could profit from.  And they did hit me at a
10   moment where I could push some other things aside and
11   have the time to work on the case.
12       Q.   At this point in the process, you had already
13   reached the conclusion that California was a very
14   troubled system, correct?
15       A.   Generally speaking, yes.  I think that the
16   amount of litigation that this state has experienced is
17   extraordinary.
18              But as regards this case, no.  Both Mr. Bien
19   and Mr. Goldstein have been very consistent throughout
20   my interactions with them that it's important that I
21   form my own opinions about the facts in this case, and
22   that's what I've done.
23       Q.   And my understanding from your earlier --
24   well, let me withdraw that.
25              You had talked about the responsibility that's
```

```
 1              I think I might have also said I needed to see
 2      their use of force and inmate discipline policies.  That
 3      would be typical.
 4          Q.  The three-judge panel report, which report is
 5      it that you meant?
 6          A.  That the panel wrote itself, that came from
 7      the judges.
 8          Q.  Okay.  As part of your familiarity with the
 9      California system prior to this time, did you ever have
10      any conversations with anyone from California concerning
11      a lawsuit called Madrid?
12          A.  I'm aware of the Madrid lawsuit a little, but
13      I don't recall any specific conversations with
14      California officials.
15          Q.  Are you aware of any of the outcomes from that
16      litigation?
17          A.  I'm trying to remember.  I believe -- yeah, I
18      would -- you asked me not to guess.
19          Q.  Okay.
20          A.  So if there are outcomes and you tell me what
21      they were, I might say, "Yeah, I might remember that,"
22      but anything else at this point would be a guess.
23          Q.  Are you aware that one of the outcomes of the
24      Madrid litigation was the creation and implementation of
25      a statewide use of force policy?
```

```
 1        A.    No.
 2        Q.    I'd like to go back and explore a little bit
 3   of your background with the Washington State Department
 4   of Corrections.
 5              When did you begin working with Washington?
 6        A.    I started in the juvenile system in 1974,
 7   which was actually a different agency at the time.  I'm
 8   still a different agency.
 9              So I guess that answers your question.
10        Q.    What was your role when you started?
11        A.    I was a line counselor/officer.  It was a bit
12   of a different organizational structure than you find in
13   some facilities.  But we worked the floor in the living
14   unit with court-committed juveniles, but we were all,
15   you know, college graduates and we had a small case load
16   that we worked pretty intensely with.  So it was a bit
17   of a hybrid job.
18        Q.    What is your college degree in?
19        A.    I went to the Evergreen State College in --
20   and it had opened the -- couple years before I graduated
21   from there.  And it doesn't have majors.
22              So it's a bachelor's of arts degrees, and --
23   I'm sorry -- bachelor's of art degree and probably best
24   characterized as general studies.
25        Q.    Prior to beginning with the Washington State
```

1    A.   The cultures are built differently, and people
2  respond in the context of the culture that they live in.
3  Oftentimes that's attention-seeking behavior.  So if
4  there's other ways for which people could get that
5  attention, they're less likely to pick up a razor blade
6  and say, "I'm going to kill myself."
7       I mean, it's a long-winded answer to your
8  question, but it happens.  I've seen it happen.  I know
9  that it happens.  It just seems to happen with a lot of
10 frequency here.
11      Q.   Well, use of force, at least within a
12 California, is defined apart from just the use of pepper
13 spray, correct?
14      A.   It is.
15      Q.   So, for example, if an officer enters into a
16 cell and physically prohibits somebody from cutting
17 themselves, that would be reported in a use of force
18 incident, correct?
19      A.   It should be.
20      MS. CESARE-EASTMAN:  I think your initial
21 question in this line of questioning was a little
22 unclear.  Were you asking him whether force is only used
23 to prevent incidents of self-harm?
24      MR. RUSSELL:  No.
25      MS. CESARE-EASTMAN:  Okay.  Then I'm sorry I

```
 1  misunderstood you.
 2  BY MR. RUSSELL:
 3      Q.   And in some of those incidents, I mean, is it
 4  your experience that that intervention can sometimes be
 5  violent, deemed to be violent; isn't that correct?
 6      A.   Let me make sure I understand.  That the
 7  intervention of using hands-on physical force can be
 8  perceived as being violent?
 9      Q.   Correct.
10      A.   Can be.
11      Q.   And that a -- is it your experience that a
12  small number of mentally ill offenders can generate a
13  high number of use of force incidents in a correctional
14  setting?
15      A.   Yes, it is.
16      Q.   And that when those occur, that increases the
17  rate of reported use of force incidents, correct?
18      A.   Well, it depends on who you report it.  You
19  can sort that out.
20           And I -- that is work that I've done, to sort
21  out, you know, when you've got frequent flyers in the
22  use of force arena.  You know, if you track that
23  information, that tells you something different than if
24  you track it for a greater number of people who maybe
25  only have one or two in their incarceration career.
```

1  force rather than pepper spray; is that correct?
2      A.   No, I wouldn't say it's my preference.  I
3  would say that overreliance on any one tactic is
4  probably a mistake, and there needs to be a
5  determination based upon the specific incidents.
6          But you also need to be ready to shift if it
7  doesn't work.  And a couple of those circumstances are
8  situations where it finally shifted but only after
9  inmates were subjected to more pain and suffering than
10 they should have been subjected to.  Sometimes it makes
11 sense to go in with a shield; sometimes it doesn't.  If
12 you know your population, you have a pretty good sense
13 of who's who and when you should use which technique.
14     Q.   Are you familiar with the -- well,
15 "guidelines" is not the proper way of putting it.
16         Are you familiar with the analysis for the
17 constitutional use of force that's stated in the Hudson
18 opinion?
19     A.   I am not.
20     Q.   And that's a Supreme Court opinion that talked
21 about balancing the need of -- for use of force against
22 the perceived threat.
23         Have you done any kind of analysis for what
24 you have seen here with regard to the use of OC, pepper
25 spray, or the use of batons, doing that kind of

1   analysis, you know, similar to what was done in Hudson,
2   evaluating the need against the threat?
3       A.   Well, since I don't know Hudson, I can't make
4   that comparison.
5            But throwing that piece of it out and talking
6   about the need versus the threat, I think that
7   oftentimes the amount of force needed to control a
8   situation is more than the threat presented from what
9   I've seen of not just videos but also the video
10  interviews of inmates, the subsequent investigations
11  that happened after those videos and from the use of
12  force reports.
13      Q.   So if I understand correctly, you're saying
14  that from what you've observed -- generally what you're
15  saying is that the need for force or that -- well, the
16  need for force does not rise to the threat that's
17  presented by the situation?
18      A.   I think that that's a frequent occurrence.
19  California is very quick to use force.  Much quicker
20  than I think is necessary.
21           What that does is create a cycle of distrust.
22  It erodes the legitimacy of their authority and their
23  charge to run the institution safely, and it causes more
24  incidents of use of force.
25      Q.   And what systems are you comparing California

1   quickly. And they use methods of force that don't
2   connect with the needs and the threat presented in
3   individual situations. That's how I'd say it.
4           MR. RUSSELL: Could you read that back for me?
5           (Record read as follows:
6           "QUESTION: I think that California
7               uses force too quickly. And they use
8               methods of force that don't connect
9               with the needs and the threat presented
10              in individual situations. That's how
11              I'd say it.")
12  BY MR. RUSSELL:
13      Q.  And you would say that it uses force too
14  quickly and in methods that don't connect to its need on
15  a systemic basis, correct?
16      A.  Or the threat presented, yes.
17      Q.  And you do that on the basis of the work that
18  you've done obviously, your review of the use of force
19  incident reports, the RVRs, and the use of force videos,
20  both controlled use of force and in inmate interviews?
21      A.  All of the work that I did for this case, yes.
22      Q.  And so essentially you disagree with
23  Mr. Martin when he finds that he reviewed the same
24  material and saw incidents of excessive use of force or
25  unnecessary use of force but did not -- could not find

1  that that's being done on a systemic basis, correct?
2      A.   It's very clear that Mr. Martin and I reached
3  different conclusions based on the material that we
4  reviewed.  We reviewed some of the same material, some
5  different material.  I didn't have access to what he
6  looked on when he was on-site at institutions, and he
7  didn't have access to what was made available to me that
8  happened since he toured facilities.
9      Q.   And you -- incidentally, when you were doing
10 your tours, you had -- I think you described you had
11 access to and spoke with inmates; is that correct?
12     A.   Yes.
13     Q.   And you were able to do that on essentially a
14 confidential basis without any of defendants' -- you
15 know, defendants' staff or staff counsel present?
16     A.   We moved to that.  We had to back people off
17 when we were trying to talk to folks in a -- you know,
18 in a day room environment or a cell front.
19          But we moved to, as we got farther into the
20 tours, simply calling them out and insisting that we
21 have a confidential office so that we could remove that
22 issue.
23     Q.   Okay.  And that was provided to you on these
24 tours when you asked for it?
25     A.   It was.

Eldon Vail                                                      March 19, 2013

1                       CERTIFICATE OF REPORTER
2
3        I, MEGAN F. ALVAREZ, a Certified Shorthand
4   Reporter, hereby certify that the witness in the
5   foregoing deposition was by me duly sworn to tell the
6   truth, the whole truth and nothing but the truth in the
7   within-entitled cause;
8        That said deposition was taken down in
9   shorthand by me, a disinterested person, at the time and
10  place therein stated, and that the testimony of the said
11  witness was thereafter reduced to typewriting, by
12  computer, under my direction and supervision;
13       I further certify that I am not of counsel or
14  attorney for either or any of the parties to the said
15  deposition, nor in any way interested in the events of
16  this cause, and that I am not related to any of the
17  parties hereto.
18
19
20                  DATED: March 21, 2013
21
22                         _____
23                         MEGAN F. ALVAREZ
24                         RPR, CSR 12470
25