# Exhibit 12

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,            )
                                  )
                  Plaintiffs,     )
                                  )CASE NO.:
         vs.                      )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                  Defendants.     )
                                  )

DEPOSITION OF

ELDON VAIL

THURSDAY, JUNE 27, 2013, 9:06 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY: MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1   Q.   On what do you base that?
2   A.   On watching the video. It's pretty
3   compelling.
4   Q.   So from what I understand, your assessment of
5   the excessive use of force is based upon the amount of
6   pepper spray that was deployed in this video?
7   A.   Yeah. If you watch the video, it's almost
8   like pouring something flammable on the inmate. He gets
9   worse more and more disoriented with each spray.
10  Q.   Do you have any information regarding the
11  condition of the inmate's cell from having reviewed that
12  video?
13  A.   What do you mean by "condition of his cell"?
14  Q.   Whether or not there was anything within his
15  cell that presented any kind of a threat to the inmates
16  responding or -- excuse me -- to the officers
17  responding?
18  A.   I do not know that.
19  Q.   Since the day of our last deposition, have you
20  gone back and reviewed the Hudson vs. McMillian case?
21  A.   No.
22  Q.   Do -- I think we talked about this a little
23  bit earlier. In order to be able to make an assessment
24  of whether or not force used in a particular incident
25  was excessive, it's necessary to determine the threat or

```
 1        A.   Can I clarify one thing?  I want to go back to
 2   one thing.
 3        Q.   Yes.
 4        A.   We were talking about the numbers that are at
 5   the first part of this declaration, and I think you
 6   characterized those as being produced by CDCR.  And they
 7   are kind of, but not.  I mean, there's two pieces of
 8   information that I had to look at together in order to
 9   understand.
10             There are the frequency of events that is
11   reported to the special master, but that's not tied to
12   the daily population reports.
13             So as I got into this and tried to understand
14   this sort of percentile relationship, I found it very
15   difficult.  And the attorneys involved in the case
16   helped run of the data or matched the numbers up, but
17   that's where that come from.  That's not purely reported
18   by CDCR; it took some work to get there.  Or at least if
19   it is reported, that's not data that I had access to.
20   We had to combine two data sources.
21        Q.   So this is the information you're talking
22   about in paragraphs 9 through 11?
23             MS. CESARE-EASTMAN:  Yes.
24             THE WITNESS:  Yes.
25
```

```
 1   BY MR. RUSSELL:
 2        Q.   Okay.  So from what I understand you to be
 3   saying, it's not derived solely from the information
 4   that the institutions report to the special master, but
 5   it also involved other input -- I mean, you were
 6   essentially provided -- if I understand correctly, you
 7   were essentially provided these numbers by plaintiffs'
 8   counsel; is that correct?
 9        A.   No.  I mean, I got at some of it.  But, I
10   mean, it's a matter of what people can pay for.  And I'm
11   not a statistician or not all that good with numbers.
12   It might have taken me a long time to reach all this.
13   But once we talked about it, then they went -- they took
14   the ball and came back with the numbers and I looked at
15   them and said, "Yeah, that's what I meant."
16             So all I'm trying to say is that there's two
17   data sources there.  They weren't melded together by
18   CDCR.  We did that.
19             You've got your stuff reported to the special
20   master, and you've got your stuff in the daily
21   population reports that I think are available online.
22        Q.   Well, then, let me ask it this way:  Looking
23   at the first of these numbers where you say, for
24   example, at CIM, 63 percent of the total use of force
25   incidents during the reporting period occurred against
```

CERTIFICATE OF REPORTER

I, MEGAN F. ALVAREZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the events of this cause, and that I am not related to any of the parties hereto.

DATED: July 10, 2013

_____

MEGAN F. ALVAREZ
RPR, CSR 12470