1    KAMALA D. HARRIS
     Attorney General of California
2    JAY C. RUSSELL
     Supervising Deputy Attorney General
3    DEBBIE J. VOROUS, State Bar No. 166884
     PATRICK R. McKINNEY, State Bar No. 215228
4    JESSICA KIM, State Bar No. 257766
     MANEESH SHARMA, State Bar No. 280084
5    Deputy Attorneys General
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 324-5345
      Fax: (916) 324-5205
8     E-mail: Debbie.Vorous@doj.ca.gov
     Attorneys for Defendants

9

10                 IN THE UNITED STATES DISTRICT COURT

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12                        SACRAMENTO DIVISION

13

14

15   RALPH COLEMAN, et al.,                2:90-cv-00520 LKK JFM PC

                              Plaintiffs,  **DEFENDANTS' OPPOSITION TO**
16                                         **PLAINTIFFS' MOTION RELATED TO**
                                           **HOUSING AND TREATMENT OF**
17        v.                               **SERIOUSLY MENTALLY ILL**
                                           **PRISONERS IN SEGREGATION**
18   EDMUND G. BROWN JR., et al.,
                                           Judge:  Hon. Lawrence K. Karlton
19                            Defendants.   Date:   July 24, 2013
                                           Crtrm:  4
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

RELEVANT FACTUAL BACKGROUND..........................................................................2

LEGAL STANDARD...........................................................................................................3

    I.    The Standard for Obtaining Prospective Injunctive Relief Under the Prison Litigation Reform Act...............................................................................................3

    II.   Plaintiffs Failed to Meet Their Burden of Proving That Current and Ongoing Constitutional Violations Require More Injunctive Relief.......................4

ARGUMENT........................................................................................................................5

    I.    There Is Insufficient Data to Conclude That CDCR's Use of Segregated Housing Causes or Exacerbates Mental Illness. ....................................................6

    II.   CDCR Adheres to American Psychiatric Association Guidelines. .........................8

    III.  Plaintiffs Fail to Present Evidence Justifying a Restrictive Order Limiting the Lengths of Stay in Segregation ......................................................................9

    IV.  Plaintiffs Fail to Present Evidence Justifying a Restrictive Order Limiting the Use of Administrative Segregation for Non-Disciplinary Purposes...............11

           A.    Placement of Inmates in Administrative Segregation for Their Own Safety Is Appropriate. ...........................................................................11

           B.    Plaintiffs Fail to Present Evidence That Justifies a Restrictive Order Pertaining to the Alleged "Lack Of Beds.".........................................14

    V.    Plaintiffs Failed to Demonstrate That Any Further Relief Is Warranted in Connection with Placing Mentally Ill Inmates in Segregated Housing Units.....................................................................................................................15

           A.    Inmates Discharged from Psychiatric Hospitalization Are Not Exposed to Unreasonable Risks of Suicide or Psychological Harm. ........16

           B.    Defendants Ensure Adequate Mental Health Screening for All Prisoners Entering Segregation and No Categorical Exclusion Is Appropriate or Necessary. ......................................................................19

           C.    The Madrid Pelican Bay Exclusion Order Should Not be Extended to All Security Housing Units..........................................................21

           D.    A "Sweep" of All Segregated Units to Identify Inmates That Face an Unreasonable Risk Is Nonsensical and Unnecessary............................24

    VI.  No Violations are Caused by Alleged Inadequate Access to Treatment, Unnecessarily Harsh Conditions, and Insufficient Safety Measures in Segregation. ........................................................................................................25

           A.    Plaintiffs Have Failed to Meet Their Burden in Requesting Additional Affirmative Orders Relating to Access to Treatment In Segregation Units.......................................................................................25

           B.    Neither Law nor Fact Support Plaintiffs' Demand That Searches be Prohibited in Administrative Segregation Units........................................28

i

# TABLE OF CONTENTS
(continued)

Page

C.  Using Therapeutic Treatment Modules Enable CDCR To Safely Provide Therapy to Inmates in Administrative Segregation and the Special Master Supports Their Use. .........................................................32

D.  The Coleman Program Guide Authorizes the Use of Holding Cells for Mentally Ill Prisoners Pending Mental Health Crisis Bed Admission. ....................................................................................................36

E.  Plaintiffs Fail to Present A Constitutional Violation Regarding Defendants' Policy to Provide for Extended "Welfare Checks" when Clinically Necessary......................................................................36

CONCLUSION............................................................................................................40

ii

1
# TABLE OF AUTHORITIES

2
                                                                    **Page**

3
**CASES**

4

5
*Anderson v. County of Kern*
    45 F.3d 1310 (9th Cir. 1995) .................................................................................9, 13

6

7
*Armstrong v. Schwarzenegger*
    622 F.3d 1058 (9th Cir. 2010) ...................................................................................4, 5

8
*Balla v. Idaho State Bd. of Corrs.*
    595 F. Supp. 1558 (D. Idaho 1984) ............................................................................38

9

10
*Belcher v. Oliver*
    898 F.2d 32 (4th Cir. 1990) .........................................................................................37

11

12
*Bell v. Wolfish*
    441 U.S. 520 (1979).............................................................................................11, 30

13
*Bull v. City & Cnty. of San Francisco*
    595 F.3d 964 (9th Cir. 2010) .......................................................................................30

14

15
*Clouthier v. County of Contra Costa*
    591 F.3d 1232 (9th Cir. 2010) .....................................................................................39

16

17
*Gilmore v. California*
    220 F.3d 987 (9th Cir. 2000) .........................................................................................3

18
*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001) ...................................................................................4, 5

19

20
*Hallett v. Morgan*
    296 F.3d 743–745 (9th Cir. 2002) .................................................................................4

21

22
*Hoptowit v. Ray*
    682 F.2d 1237 (9th Cir. 1982) .......................................................................................4

23
*Hudson v. McMillian*
    503 U.S. 1 (1992).........................................................................................................31

24

25
*In re Long Term Administrative Segregation of Inmates Designated As Five Percenters*
    174 F.3d 464 (4th Cir. 1999) .........................................................................................5

26

27
*Jordan v. Gardner*
    986 F. 2d 1521 (9th Cir. 1993) (en banc) ...................................................................30

28

iii

Defs.' Opp. to Mot. Rel. to Housing & Treat. Mentally Ill Prisoners is Segregation
(2:90-cv-00520 LKK JFM PC)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Madrid v. Gomez*
  889 F. Supp. 1146 (N.D. Cal. 1995) ........................................................................ 5, 21, 22

*Manarite v. City of Springfield*
  957 F.2d 953 (1st Cir. 1992) ..................................................................................... 37

*Mayweathers v. Newland*
  258 F.3d 930 (9th Cir. 2001) ..................................................................................... 4

*Michenfelder v. Sumner*
  860 F.2d 328 (9th Cir. 1988) ..................................................................................... 31

*Norfolk & W. Ry. Co. v. Ayers*
  538 U.S. 135 (2003) ................................................................................................... 10

*Orr v. Larkins*
  610 F.3d 1032 (8th Cir. 2010) ................................................................................... 5

*Plata v. Brown*
  131 S. Ct. 1910 (2011) (Alito, J. dissenting) ........................................................... 27

*Rellergert v. Cape Girardeau Cty, Missouri*
  924 F.2d 794 (8th Cir. 1991) ..................................................................................... 20

*Rickman v. Avaniti*
  854 F.2d 327 (9th Cir. 1988) ..................................................................................... 31

*Tittle v. Jefferson Cty. Comm'n*
  10 F.3d 1535 (11th Cir. 1994) ................................................................................... 39

*Turner v. Safley*
  482 U.S. 78 (1987) ..................................................................................................... 30

*Whitley v. Albers*
  475 U.S. 312 (1986) ................................................................................................... 30, 31

*Wilson v. Seiter*
  501 U.S. 294 (1991) ................................................................................................... 5, 31

**STATUTES**

18 U.S.C. § 3626(a)(1) ................................................................................................ 3

18 U.S.C. § 3626(a)(1)(A) ........................................................................................... 4

42 U.S.C. § 12132 ....................................................................................................... 31, 35

iv

1

## TABLE OF AUTHORITIES
(continued)

2

**Page**

3

CONSTITUTIONAL PROVISIONS

4

Eighth Amendment ..................................................................................................5, 30, 31, 34

5

Fourth Amendment ..........................................................................................................30, 31

6

OTHER AUTHORITIES

7

28 C.F.R. 35.130 ............................................................................................................31, 35

8

28 C.F.R. 35.130(d) ..............................................................................................................31

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Opp. to Mot. Rel. to Housing & Treat. Mentally Ill Prisoners is Segregation
(2:90-cv-00520 LKK JFM PC)

# INTRODUCTION

The California Department of Corrections and Rehabilitation (CDCR) provides appropriate mental health care to inmates in segregated housing with mental health care needs. In fact, CDCR adheres to the American Psychiatric Association guidelines for delivering psychiatric services in a prison segregation setting. Before any placement in segregated housing, CDCR screens each inmate, and considers and accommodates the inmate's mental health condition in the disciplinary process. And when an inmate's mental health condition requires a transfer to another type of housing unit, CDCR has systems in place to identify those needs and make the appropriate transfer. CDCR also continues to take aggressive and comprehensive steps to identify inmates in segregated housing at risk for suicide and provide them the treatment and monitoring they need. Plaintiffs' motion should be denied because there is no evidence that inmates in segregated housing are suffering from a constitutional deprivation of appropriate mental health care.

Moreover, CDCR's use of segregated housing is necessary to maintain safety and order in state prisons. To maintain a safe and secure prison system, CDCR must be able to take the following measures: (1) separate inmates from the general population when they violate prison rules, or otherwise present a risk to the safety of others or themselves; (2) search inmates for contraband such as weapons and drugs; and (3) take other necessary measures, such as placement in therapeutic treatment modules, to protect the safety of inmates and staff. These measures are essential for mentally ill and non-mentally ill offenders alike because a prison's primary objective is to ensure the safety of the public, the inmates, and staff.

In their motion for affirmative relief, Plaintiffs seek to supplant State prison officials' judgment regarding the safety and security of the institution with their own. Plaintiffs rely on non-scientific studies that suggest placement in isolated confinement may psychologically harm some inmates. But scientific studies do not substantiate Plaintiffs' claim. To the contrary, study results show that placement in segregation does not cause the type or severity of psychological harms described by Plaintiffs. Plaintiffs' suggestions on limiting and in some cases excluding the use of segregation settings create an unacceptable risk to the safety of the public, the inmates, and

///

1

1   staff.  Aside from the unsettled academic literature, Plaintiffs rely on a handful of cases that fail to

2   demonstrate placement in segregation causes harm.

3        Inmates are not housed in segregated units with inadequate access to treatment,

4   unnecessarily harsh conditions, or insufficient safety measures, as Plaintiffs assert.  Plaintiffs

5   make generalizations about access to treatment on limited information and best practice scenarios.

6   Moreover, there is no evidence that Defendants' search policy is deterring inmates from

7   therapeutic activity on a class-wide basis.  Plaintiffs even criticize CDCR's use of Therapeutic

8   Treatment Modules as a means to provide mental health care to inmates in segregation, despite

9   the fact that CDCR's use of these modules was endorsed by the court-appointed Special Master's

10  mental health expert.  Last, CDCR's welfare-check system in segregated housing is appropriate

11  and does not raise constitutional concerns.

12       CDCR takes each inmate's mental health condition into account in making decisions

13  regarding segregated housing placements.  Inmates with mental health care conditions in

14  segregated housing receive appropriate mental health care just as the inmates in the general

15  population do.  Granting the relief Plaintiffs seek would lead to problematic secondary effects

16  throughout the prison system, and limit CDCR's ability to construct effective, flexible, and

17  sustainable programs to meet the needs of its inmate population.  Plaintiffs present no evidence of

18  any current and ongoing constitutional violations against the *Coleman* class with respect to

19  CDCR's segregation units and the relief they request is beyond the power of this Court.

20  Accordingly, Plaintiffs' motion must be denied.

21                    **RELEVANT FACTUAL BACKGROUND**

22       Plaintiffs ask the Court to issue numerous affirmative orders that relate to segregation

23  units operating within CDCR prisons, as well as housing for the condemned inmates at San

24  Quentin State Prison.  CDCR operates four types of segregation units within its prisons:

25  Administrative Segregation Units; Enhanced Outpatient Program-Administrative Segregation

26  Units; Security Housing Units; and Psychiatric Services Units.  (Declaration of Kathleen Allison

27  in Supp. Defs.' Opp'n to Pls.' Mot. ("Allison Decl.") ¶ 6.)

28       The CDCR Mental Health Services Delivery System Program Guide (2009 Revision)

1  provides that inmates at the Correctional Clinical Case Management System level of care may be

2  placed in an Administrative Segregation Unit or in one of four Security Housing Units.

3  (Declaration of Debbie Vorous in Supp. Defs.' Opp'n to Pls.' Mot. ("Vorous Decl.") Ex. 4

4  [Program Guide] 12-7-1 to 12-7-15 & 12-8-1 to 12-8-13; Allison Decl. ¶ 6.)[1]  By comparison,

5  inmates at the Enhanced Outpatient Program level of care may be placed in one of eleven

6  Enhanced Outpatient Program-Administrative Segregation Unit hub institutions or at one of three

7  Psychiatric Services Unit institutions.  (*Id.,* [Program Guide] 12-9-1 to 12-9-14].)[2]  As detailed in

8  the Program Guide, Enhanced Outpatient Program and Correctional Clinical Case Management

9  System inmates are judged to have differing mental health needs and correspondingly, are

10  provided with different levels of mental health care depending on their segregation placement.

11  Moreover, in each of these settings, CDCR clinicians appropriately meet inmates' mental health

12  needs.  (Declaration of Tim Belavich in Supp. Defs.' Opp'n to Pls.' Mot. ("Belavich Decl.") ¶¶

13  6–13 & 15–19.)

14

## LEGAL STANDARD

15

16  **I.    THE STANDARD FOR OBTAINING PROSPECTIVE INJUNCTIVE RELIEF UNDER THE PRISON LITIGATION REFORM ACT.**

17

18        Congress enacted the Prison Litigation Reform Act (PLRA) to lessen the federal court's

19  role in prison inmate civil rights cases, specifically restricting the availability and scope of

20  prospective relief.  18 U.S.C. § 3626(a)(1); *see Gilmore v. California,* 220 F.3d 987, 998-99 (9th

21  Cir. 2000).  Accordingly, before granting prospective injunctive relief, the district court must

22        [1] These Security Housing Units are at California Correctional Institution; California Institution for Women; California State Prison, Corcoran; and California State Prison, Sacramento.  (Allison Decl. ¶ 6.)  Although Pelican Bay State Prison also has a Security Housing Unit, the *Madrid* exclusionary order necessarily excludes almost all inmates at the Correctional Clinical Case Management System level of care from that unit.

23

24        [2] These eleven institutions are:  California State Prison, Sacramento; Richard J. Donovan Correctional Facility; California Men's Colony; California State Prison, Los Angeles County; Salinas Valley State Prison; California Medical Facility; California State Prison, Corcoran; Mule Creek State Prison; San Quentin State Prison; California Institution for Women; and Central California Women's Facility. The three Psychiatric Services Units are located at California State Prison, Sacramento; Pelican Bay State Prison; and California Institution for Women.  (Allison Decl. ¶ 7.)

25

26

27

28

3

1   make the findings mandated by the PLRA. 18 U.S.C. § 3626(a)(1)(A); *Gomez v. Vernon,* 255

2   F.3d 1118, 1129 (9th Cir. 2001). Specifically, the court must find that the relief is narrowly

3   drawn, extends no further than necessary to correct the violation of a federal right, and is the least

4   intrusive means necessary to correct the violation. 18 U.S.C. § 3626(a)(1)(A); *Gomez,* 255 F.3d

5   at 1129. The court must also "give substantial weight to any adverse impact on public safety or

6   the operation of a criminal justice system caused by the relief." (*Id.*)

7        In addition, there must be sufficient evidence justifying the relief being ordered. *See, e.g.,*

8   *Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1074 (9th Cir. 2010) (finding that plaintiffs

9   presented insufficient evidence to justify the system-wide relief ordered by the district court).

10  "The function of a court is limited to determining whether a constitutional violation has occurred .

11  . . and to fashion a remedy that does no more and no less than correct that particular constitutional

12  violation." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982) (citing *Rhodes v. Chapman,*

13  452 U.S. 337 (1981)). When a government agency is involved, that agency must be granted "the

14  widest latitude in the dispatch of its own internal affairs." *Gomez,* 255 F.3d at 1128 (quoting

15  *Rizzo v. Goode,* 423 U.S. 362, 378–79 (1976) (internal quotation marks omitted).) That

16  consideration is heightened when a state agency is involved because of federalism concerns.

17  *Gomez,* 255 F.3d at 1128.

18  **II.   PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING THAT CURRENT AND**
19  **ONGOING CONSTITUTIONAL VIOLATIONS REQUIRE MORE INJUNCTIVE RELIEF.**

20       The PLRA places the burden on plaintiffs to demonstrate that they are entitled to the relief

21  they seek in a motion for prospective relief. *Hallett v. Morgan,* 296 F.3d 743, 745 (9th Cir. 2002)

22  (affirming denial of motion to extend relief absent proof of current and ongoing violation of a

23  federal right); *Mayweathers v. Newland,* 258 F.3d 930, 936 (9th Cir. 2001) (requiring the party

24  seeking prospective relief to prove current and ongoing constitutional violation). In addition,

25  injunctive relief against a state agency should only be granted when "irreparable injury" is

26  threatened, and any injunctive relief awarded must avoid unnecessary disruption to the state

27  agency's "normal course of proceeding." *Gomez,* 255 F.3d at 1128–29. To satisfy the irreparable

28  injury requirement, a "plaintiff must demonstrate a real or immediate threat that they will be

4

1    wronged again—a likelihood of substantial and immediate irreparable injury." *Id.* (internal

2    quotation marks omitted); *see also Armstrong,* 622 F.3d at 1070.

3                   **ARGUMENT**

4          The State has developed and implemented procedures for placing and retaining inmates

5    with mental health needs in Administrative Segregation Units, Security Housing Units, and

6    Psychiatric Services Units, and ensuring that the needs of those inmates are appropriately met.

7    Plaintiffs have failed to meet their burden of proving Constitutional violations regarding CDCR's

8    housing and treatment of inmates in segregation.

9          Under the Eighth Amendment, inmates have the right to be free from "cruel and unusual

10   punishment". *Wilson v. Seiter,* 501 U.S. 294, 297 (1991).  But in the context of mental health

11   care, no Court has mandated a blanket exclusion of mentally ill inmates from prison disciplinary

12   systems or security settings designed to preserve safety and order, provided that these measures

13   do not interfere with the necessary mental health care. *See Madrid v. Gomez,* 889 F. Supp. 1146,

14   1267 (N.D. Cal. 1995); *Orr v. Larkins,* 610 F.3d 1032, 1035 (8th Cir. 2010) (dismissing Eighth

15   Amendment claim by mentally ill inmate kept in administrative segregation for nine months

16   where inmate received treatment and antipsychotic medication); *In re Long Term Administrative*

17   *Segregation of Inmates Designated As Five Percenters,* 174 F.3d 464, 472 (4th Cir. 1999) (no

18   violation where administrative segregation procedures provided for periodic visits by medical

19   personnel of inmates displaying mental health problems).

20        Plaintiffs fail to show that CDCR's segregation units interfere with the necessary mental

21   health care provided to inmates housed in those units.  Instead, Plaintiffs erroneously portray the

22   Court's rejection of the motion to terminate as containing findings that constitutional violations

23   continue to exist with respect to housing class members in segregated settings.  (Pls.' Mot. at 13–

24   17.)  But in fact the Court merely recognizes the Special Master's 25th round report findings that

25   there was an "ongoing need for improvement in treatment provided to inmates needing an

26   Enhanced Outpatient Program (EOP) level of care who are placed into administrative segregation

27   units." (Order Denying Term. Mot. at 45, ECF No. 4539.)  Contrary to Plaintiffs' assertion,

28   Defendants have developed and implemented multiple plans to address the provision of mental

5

1    health care within segregated housing units. (*See* Declaration of Charles Scott M.D. in Supp.

2    Defs.' Opp'n to Pls.' Mot. ("Scott Decl.") ¶¶ 28–31; Belavich Decl. ¶¶ 6–19; Allison Decl. ¶¶ 8–

3    30, 32–38; Declaration of Joe Stein in Supp. Defs.' Opp'n to Pls.' Mot. ("Stein Decl.") ¶¶ 4–18.)

4    Moreover, the Court's April 5, 2013 order did not find, and Plaintiffs have failed to

5    present any evidence, that Correctional Clinical Case Management System inmates are not

6    receiving constitutional levels of care in Administrative Segregation Units or Security Housing

7    Units, that Enhanced Outpatient Program inmates are not receiving constitutional levels of care in

8    Psychiatric Services Units, or that inmates in the condemned unit at San Quentin State Prison are

9    not receiving constitutional levels of care.

10    Because Plaintiffs present no evidence of any current and ongoing Constitutional

11    violations against the *Coleman* class members with respect to CDCR's use of segregated housing,

12    no further orders are necessary or appropriate.

13

14    **I.    THERE IS INSUFFICIENT DATA TO CONCLUDE THAT CDCR'S USE OF SEGREGATED HOUSING CAUSES OR EXACERBATES MENTAL ILLNESS.**

15    Plaintiffs premise much of their motion on the belief that conditions in segregation units

16    cause or exacerbate psychological harm. They rely on their own expert Dr. Craig Haney—a

17    social psychologist who has never treated mentally ill inmates—to argue that there is "clear

18    evidence" that segregation units cause psychological harm. (Pls.' Mot. at 2:15, citing to Haney

19    Decl. Re: Segregation Housing Units ¶¶ 6–29; Vorous Decl., Ex. 5 [Haney Depo.] 18:23–20:4,

20    22:21–23:08.)[3]  But Dr. Haney's opinions are derived from studies that do not stand up to modern

21    scientific scrutiny. (Scott Decl. ¶¶ 7–27 (Longitudinal research that employs a more scientific

22    methodology has not substantiated the negative impact on individuals previously described in

23    descriptive and less rigorous studies.).)

24

25

26    [3] Plaintiffs also rely on their expert Dr. Kaufman's opinion that there are harmful effects from long-term placement of mentally ill inmates in segregation. (Pls.' Mot. at 19:2–5.)

27    However, Dr. Kaufman admits that he has not reviewed studies or literature regarding the impact of segregation on mentally ill inmates since the 1970s. (Vorous Decl., Ex. 7 [Kaufman Depo.]

28    158:20–159:12.)

The literature that Dr. Haney cites in his declaration "collectively suggests that placement in isolated confinement may psychologically harm some inmates." (*See* Scott Decl. at ¶ 12.) But these studies are "insufficient to establish a causal connection between the segregated prison setting and the behaviors observed with a reliable degree of medical or scientific certainty." (*Id.* ¶ 13.)   In fact, Dr. Haney's basis for concluding that segregated housing causes psychological harm is entirely reliant on research that incorporates few if any accepted scientific standards of evidence. (*Id.*)  At his deposition, Dr. Haney concedes that no experimental studies have demonstrated a casual relationship between conditions in segregated housing and psychological deterioration. (Vorous Decl., Ex. 5 [Haney Depo.] 130:13–20, 139:8–17, 146:1–5.)

In contrast to Dr. Haney's opinions that rely on non-scientific methodologies, longitudinal studies collect data about the same group of individuals over time to measure the potential impact of an environment or intervention to come. (Scott Decl. ¶¶ 13–20.) As Defendants' expert Dr. Scott—a licensed psychiatrist with significant experience in providing mental health services to inmates in a correctional type setting—explains in his declaration, using a scientific methodology is important to establish casualty. (*Id.* ¶¶ 1–12.)  In fact, several longitudinal studies that use a baseline measurement of functioning before and after placement into segregated correctional environments indicate that segregation does not cause the type or severity of psychological harms described by Haney. (*Id.* ¶¶ 15–26; *see also* Vorous Decl., Ex. 1, O'Keefe, ML:  A longitudinal study of administrative segregation. J Am Acad Psychiatry Law 4:49–60, 2013); Ex. 2, Zinger I, Wichman C, Andrews DA:  The psychological affects of 60 days in administration segregation. Can J Criminol 43:47–83, 2001.)

Most recently, in the O'Keefe longitudinal study in the Colorado state prison system that compared mentally ill and non-mentally ill inmates in long-term administrative segregation to inmates in the general population, the research results contradicted the hypothesis that segregated prison settings cause psychological deterioration. (*Id.* ¶¶ 24–27; Vorous Decl., Ex. 1, O'Keefe (2013).)[4]  The "results showed that placement in segregation did *not* result in the onset or

---

[4] O'Keefe defines "administrative segregation" as "long-term administrative segregation" that "generally involves locking an inmate in a cell for 23 hours per day, with out-of-cell time

(continued...)

1   worsening of psychological symptoms or cognitive impairment for mentally ill and non-mentally

2   ill inmates, nor did inmates with mental illness fare worse in segregation than their non-mentally

3   ill peers." (Scott Decl. ¶ 26) (emphasis added).)   Nor did the research findings support the

4   "assertion that individuals worsen over time with increased exposure to segregation

5   environments." (*Id.* ¶ 27.)   Moreover, "a lot of people in segregation don't want to step down.

6   The notion that everybody hates segregation is incorrect.   Some people feel safer there." (Vorous

7   Decl., Ex. 6 [Dvoskin Depo.] 13:4–7.)

8   **II.    CDCR ADHERES TO AMERICAN PSYCHIATRIC ASSOCIATION GUIDELINES.**

9       Although the various longitudinal studies described by Dr. Scott indicate that segregation

10  does not cause the type and severity of psychological harm asserted by Plaintiffs, CDCR

11  nevertheless recognizes the concern that segregated environments may negatively impact

12  individuals with and without mental illness.   (Scott Decl. ¶ 28; Belavich Decl. ¶ 17.)   CDCR

13  already has in place a system to identify and treat mentally ill individuals in segregation.   (Scott

14  Decl. ¶¶ 29–31; Belavich Decl. ¶¶ 6–19.)   That system is not only governed by the *Coleman*

15  Program Guide but is consistent with the American Psychiatric Association guidelines for

16  delivering psychiatric services in a prison segregation setting.   (*Id.*)   The guidelines acknowledge

17  that inmates with mental illness may be safely housed in prison segregation units when certain

18  principles are followed.   (*Id.*)   CDCR meets these guidelines.   It:

19      • conducts administrative review hearings to prevent the placement of inmates in

20          segregation when mental illness caused the rule-violating behavior (Scott Decl. ¶¶ 29–

21          30;  Stein Decl. ¶¶ 4–19);

22      • timely screens inmates for mental illness before placement in segregation (Scott Decl.

23          ¶¶ 29–30; Belavich Decl. ¶¶ 14 & 18–19);

24      • provides access to mental health services while in segregated housing that meets or

25          exceeds Program Guide requirements (Scott Decl. ¶¶ 29–30; Belavich Decl. ¶¶ 6–13

26  _____

27  (…continued)
    occurring with significant security restrictions (e.g., hands and ankles cuffed) and escort by two
    correctional officers."  (O'Keefe (2013) at 49.)

28

8

& 17–19);

- removes inmates from segregated housing when appropriate (*id.*); and

- assesses and responds to inmates known to have serious mental health needs.  (*Id.*)

III.  **PLAINTIFFS FAIL TO PRESENT EVIDENCE JUSTIFYING A RESTRICTIVE ORDER LIMITING THE LENGTHS OF STAY IN SEGREGATION**

In arguing that the Court should issue an order capping the length of time that *Coleman* class members may be housed in segregation units, Plaintiffs urge the Court to displace the judgment of correctional officials and ignore clear case law holding that "prison officials have a legitimate penological interest in administrative segregation, and they must be given 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995) (citation omitted).  This the Court cannot do.  Plaintiffs' proposal ignores established due process guidelines and is incredibly dangerous. (Allison Decl.  ¶¶ 8–15 [Plaintiffs' proposed time lines do not allow for appropriate rules violation hearings or District Attorney Referrals and encourage arbitrary releases based solely on one criteria—length of stay].)

Ironically, Plaintiffs rely heavily on select portions of Defendants' experts' report.  In its April 5, 2013 order denying the State's termination motion, the Court struck Defendants' experts' reports. (Order at 22.)  Specifically, Plaintiffs rely on select portions of Defendants' expert report that notes segregation units as "generally non-therapeutic... even when EOP level of care is provided" and that placements should be "as brief as possible." (Pls.' Mot. at 10.)  But these comments were made in the context of inmates pending transfer to a hub institution and with respect to inmates placed in segregation for safety reasons. (ECF No. 4275–5 at 17–18 & 22–23.)  Moreover, they wholly neglect to recognize the experts' overall opinion that "the CDCR Mental Health Services Delivery System appropriately meets the mental health needs of inmates assigned to an EOP-ASU Hub." (*Id.* at 22.)

Further, Plaintiffs repeatedly misstate and misinterpret evidence related to suicides.  For example, Plaintiffs mischaracterize a spreadsheet listing all suicides in administrative segregation

9

1   and security housing units from 2007 to 2013 as an "analysis," in an attempt to argue that lengths

2   of stay have a direct impact on suicides.[5]  Plaintiffs' reliance on this document is misplaced.  It is

3   a well known statistical truism that "[c]orrelation is not causation." *Norfolk & W. Ry. Co. v.*

4   *Ayers,* 538 U.S. 135, 173 (2003).  And Plaintiffs present no compelling evidence or analysis that

5   would demonstrate that these suicides were caused by the length of stay in segregated housing.

6   Instead, Plaintiffs cite to best practice recommendations from the Defendants' experts and vague

7   court holdings stating that "prolonged" segregation "may cause harm."  Moreover, evidence

8   demonstrates the fallacy of relying on Plaintiffs' simplistic efforts to tie suicides to lengths of

9   stay. (*See, e.g.,* 2012 Special Master Suicide Report, ECF No. 4376, Appendix H at 68-71

10  describing case of Inmate L who committed suicide after being informed he would be released

11  from segregated housing after two months and finding that the suicide was directly related to

12  notice that he would be released from segregation and transferred to another facility.)

13          Last, Plaintiffs argue that Defendants have failed to address prior court orders relating to

14  segregated housing.  Plaintiffs state that CDCR has not enforced the transfer time lines related to

15  administrative segregation hubs, but that is not accurate. (Pls.' Mot. at 5:19–20; *see* Allison Decl.

16  ¶ 12–15 [no inmates waiting beyond 30 day transfer time line].)  Contrary to Plaintiffs'

17  accusations, Defendants have and continue to address lengths of stay in administration

18  segregation (Allison Decl. ¶ 12–15.)  Moreover, inmates have access to reading materials and

19  electrical appliances in segregation units.  (¶¶ 16–17.)

20          Plaintiffs' proposed time limits and other requested orders associated with placement in

21  administrative segregation or security housing units are wholly without legal or clinical

22  justification and would unnecessarily restrict the judgment and experience of correctional

23  officials and trained mental health practitioners.

24

25

26

27          [5] Plaintiffs' misleadingly refer to this document as an "analysis," but the document does
    not purport to have conducted any analysis as to the cause of death.

28

Defs.' Opp'n to Pls.' Mot. Related to Housing and Treatment of Mentally Ill Inmates in Segregation
(2:90-cv-00520 LKK JFM PC)

IV. **PLAINTIFFS FAIL TO PRESENT EVIDENCE JUSTIFYING A RESTRICTIVE ORDER LIMITING THE USE OF ADMINISTRATIVE SEGREGATION FOR NON-DISCIPLINARY PURPOSES.**

Plaintiffs' request for an order prohibiting the use of administrative segregation for non-disciplinary reasons is similarly flawed. Plaintiffs rely on the Americans with Disability Act (ADA) in support of this request, although they acknowledge the ADA "does not permit segregation imposed **due to** an individual's disability." (Pls.' Mot. at 20:16 (emphasis added).) Plaintiffs' present no evidence that *Coleman* class members placed in segregated housing for their own safety are "being housed in ASU by reason of their mental health disability. . . ." (*Id.* at 21:23.)

A. **Placement of Inmates in Administrative Segregation for Their Own Safety is Appropriate.**

Plaintiffs seek to displace the judgment and professional experience of correctional officials and urge the Court to disregard the Supreme Court's holding that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Indeed, Plaintiffs and their experts appear instead to believe that even though it may be safer to place a mentally ill inmate into segregated housing for their protection or the protection of other inmates or prison staff, mentally ill inmates should never be placed into segregated housing. (Pls.' Mot. at 24:14–20; *see* Vorous Decl., Ex. 7 [Kaufman Depo.] 171:14–19 ["should be avoided whenever possible."], Ex. 5 [Haney Depo.] 47:24–48:2 ["So the conditions of confinement in administrative segregation in and of themselves place mentally ill prisoners at risk. Whether or not they're receiving appropriate – appropriate levels of care."], 85:10-16 [opinion that someone who is mentally ill should never be placed in administrative segregation for an extended period of time].) By this logic, Plaintiffs—not Defendants—create an unacceptable risk that mentally ill inmates will be harmed.

CDCR has a duty to keep inmates safe. As a part of that duty, CDCR must sometimes place inmates who voice safety concerns in administrative segregation. (Allison Decl. ¶ 19.) Inmates with safety concerns are not automatically placed in administrative segregation. (*Id.*) Thus, an inmate with safety concerns is placed in administrative segregation for his or her own

11

1    protection, not as punishment. (*Id.*)

2        Plaintiffs claim that inmates placed in administrative segregation for their own safety are

3    "particularly vulnerable to suicide." (Pls.' Mot. at 22:18–19.) Plaintiffs' support for this

4    allegation is riddled with the same statistical and logical fallacies that characterized their request

5    for a restrictive order capping the time inmates may be housed in segregated housing. Plaintiffs

6    again rely on a spreadsheet listing all suicides in administrative segregation and security housing

7    units since 2007, but present no evidence that placement in administrative segregation was the

8    driving force behind their suicides. And again, it is specious to assume that these inmates who

9    fear for their own safety chose to take their own lives due to their housing placement. For

10   example, Inmate L in the 2012 Suicide Report at 65-72 was "told that he would be transferred to

11   another institution because of enemy concerns once he was released from the ASU; the inmate

12   was unhappy and upset about the news regarding his transfer." (2012 Special Master Suicide

13   Report, ECF No. 4376, Appendix H at 70.) The inmate took his life later that day. (*Id.* at 71

14   (noting "his suicide, however, appears to have been an impulsive act directly relating to his

15   receiving what was for him 'bad news' that he would be transferred to another facility".) Inmate

16   N from the 2012 Suicide Report was "transferred from the general population yard at ASP to

17   administrative segregation for safety reasons at his request on 6/27/12 at 1500 hours after being

18   interviewed by the yard lieutenant." (*Id.* at 80.) Early the next morning, staff found him

19   unresponsive in his cell. (*Id.* at 81.) This suicide was unrelated to having spent only some hours

20   in segregated housing.

21       Plaintiffs similarly misplace reliance on Lindsay Hayes's deposition testimony regarding a

22   2006 conference with CDCR officials. Notably, Mr. Hayes's testimony demonstrates that the

23   causes of suicides are varied and the use of administrative segregation for non-disciplinary

24   purposes "**could perhaps** be one of the reasons" for suicides in segregated housing in 2006 or

25   prior years. (Pls.' Mot at 23:15 (citing deposition testimony of Hayes (emphasis added)).)

26   Plaintiffs also incorrectly assert that Defendants have not taken action to protect inmates in

27   segregated housing since 2006. (Pls.' Mot at 23:17-18.) The State has implemented extensive

28   measures designed to help prevent inmate suicides in segregated housing units since 2006. (*See*

12

1    Corrected Reply to Motion to Terminate Section V.G, ECF No. 4529 at 40–65; Belavich Decl. ¶¶

2    15–16.)[6]

3           Plaintiffs also distort the deposition testimony of the State's expert, Steve Martin, which

4    was based on a broad and undefined hypothetical. Mr. Martin testified that the use of segregation

5    for an inmate's own protection could be an "issue" if there are "onerous or punitive conditions."

6    (Pls.' Mot. at 23:19–25.) But Mr. Martin did not opine that the current conditions in CDCR's

7    segregation units are onerous or punitive. (Kahn Decl. Ex. 16 [Martin Depo.] 45:15–47:01.)

8    Conversely, "administrative segregation . . . is within the terms of confinement ordinarily

9    contemplated by a sentence." *Anderson*, 45 F.3d at 1316 .

10          Defendants' experts' recommendation that inmates housed in administrative segregation

11   for their own protection be placed to the top of any waiting list concerned a proposed best

12   practice. Further, Plaintiffs mislead the Court by representing that Defendants "rejected" this

13   recommendation. (Pls.' Mot. at 24:11.) CDCR's "Health Care Transportation Scheduling

14   Priorities" was "presented to the Coleman Special Master and have been presented under

15   deposition to the Three Judge Panel on Prison Overcrowding." (Vorous Decl. Ex. 15.) This pre-

16   existing schedule creates a seven-tier priority transfer list, and acknowledges the urgency of

17   transferring Enhanced Outpatient Program inmates from administration segregation units and

18   reception centers. (*Id.*)

19          Last, and contrary to Plaintiffs' assertion that "Defendants also refused to consider a 'non-

20   disciplinary segregation' unit," CDCR is examining the creation of a non-disciplinary unit.

21   (Allison Decl. ¶ 20.) This unit would be for inmates who are viewed as less of a threat to

22   administrative segregation unit security. Non-disciplinary unit inmates would be allowed limited

23   telephone privileges, greater canteen purchase limits, more frequent personal property packages,

24   and retention of personal property more consistent with pre-segregation allowances. (*Id.*)

---

25          [6] The State recognizes that the Court recently issued an order regarding Defendants'
     suicide prevention processes. (ECF No. 4693, filed 7/12/13.) Defendants, nonetheless, believe
26   that their suicide prevention processes meet constitutional standards. Regardless, the Court has
     already issued an order designed to address suicide prevention measures in administrative
27   segregation units. For that reason alone, no further orders premised on Plaintiffs' arguments
     related to suicides are necessary or appropriate.

28

Defs.' Opp'n to Pls.' Mot. Related to Housing and Treatment of Mentally Ill Inmates in Segregation
(2:90-cv-00520 LKK JFM PC)

   **B.    Plaintiffs fail to present evidence that justifies a restrictive order
           pertaining to the alleged "lack of beds."**

Plaintiffs allege, without citation, that their experts found "scores" of inmates held in

segregation because of unavailable housing.[7]  Plaintiffs greatly overstate this perceived issue and

confuse it with the circumstance where an inmate's custody classification is changed and transfer

to a Special Needs Yard is required. (Allison Decl. ¶ 21.)  As of July 23, 2013, there were only

50 inmates in administrative segregation waiting for a bed to open on a yard. (*Id.*)  Of those 50

inmates, only 24 are class members. (*Id.*)  19 of those 24 inmates are at the Correctional Clinical

Case Management System level of care. (*Id.*)  Five of the 24 inmates are at the Enhanced

Outpatient Program level of care; four are housed at an Administrative Segregation Unit hub

institution and one is in a Mental Health Crisis Bed. (*Id.*)

Plaintiffs' experts relied solely on statements made by inmates during brief interviews in

asserting that particular individual inmates were being held in segregation for non-disciplinary

reason.[8]  (*See, e.g.,* Vorous Decl. Ex. 5 [Haney Depo.] 98:5–13 (Dr. Haney did not follow up with

correctional officers to verify the reason for inmate placements).)  But Defendants presented

evidence that in numerous instances these individual inmates alleged to be housed in

administrative segregation for non-disciplinary reasons were in fact appropriately segregated

because of violence towards staff or other inmates and other prison rule violations. (*See, e.g.*

Holland Reply. Decl. Supp. Term. Mot. ¶ 12 [noting that Prisoner TT cited by Haney was placed

in ASU for participation in a riot and multiple rule violations], ECF No. 4438; Colley Reply.

Decl. Supp. Term. Mot. ¶ 4 [noting Prisoner A cited by Haney is in ASU for threatening staff],

ECF No. 4482; Walsh Reply Decl. Supp. Term. Mot. ¶ 23 [noting Prisoner LL cited by Haney

---

   [7] Although Plaintiffs state "scores" of inmates are hold in administrative segregation
because of unavailable housing, Plaintiffs' expert Dr. Haney admitted that he did not calculate
how many Enhanced Outpatient Program or Correctional Clinical Case Management System
inmates are currently waiting in an administrative segregation program for a Special Needs Yard
bed.  He could only state that "They exist." (Vorous Decl., Ex. 5 [Haney Depo.] 47:5–12.)
   [8] Notably, one of Plaintiffs' experts did not take any notes during the course of his entire
evaluation. (Vorous Decl., Ex. 8 [Stewart Depo.] at 12:05–13:25, 15:14–16, 228:07–09, 240:15–
19.)

14

1  was retained ASU for possession of deadly weapon], ECF No. 4439; Gipson Reply. Decl. ¶¶ 21-

2  22 [noting Prisoner HH cited by Haney is in ASU for indecent exposure and Prisoner J cited by

3  Dr. Kaufman placed in ASU after being investigated for an in-cell sexual assault], ECF No.

4  4430.)

5      Plaintiffs' mistaken allegation that there are "scores" of lack-of-bed inmates stems

6  primarily from their visit to one administrative segregation unit at the California Institution for

7  Men.  Plaintiffs visited a housing unit, Cypress Hall, which houses both administrative

8  segregation and reception center inmates.  (Allison Decl. ¶ 22.)  However, Plaintiffs and their

9  experts failed to note that the reception center inmates are granted the normal privileges permitted

10  to non-segregation inmates and are allowed "to go to clinics, yard and other programs

11  unescorted."  (Id.; Am. Jordan Reply Decl. Supp. Term. Mot. ¶ 24, ECF No. 4507.)  Plaintiffs

12  mischaracterize Dr. Dvoskin's deposition testimony on this point.  (Pls.' Mot. at 26:3.)  Dr.

13  Dvoskin testified that some of the inmates he observed at California Institution for Men were

14  granted normal privileges.  (Vorous Decl., Ex. 6 [Dvoskin Depo.] 260:2–261:10.)

15      Because there are valid penological reasons for placement of an inmate into administrative

16  segregation, the Court should deny Plaintiffs' request to remove class members placed in

17  segregation for non-disciplinary reasons.  Moreover, because inmates housed in administrative

18  segregation pending placement on a yard are not subject to all the restrictions applicable to

19  segregated housing, an order restricting their temporary placement is unnecessary.

20  **V.    PLAINTIFFS FAILED TO DEMONSTRATE THAT ANY FURTHER RELIEF IS**

21  **WARRANTED IN CONNECTION WITH PLACING MENTALLY ILL INMATES IN**
   **SEGREGATED HOUSING UNITS.**

22      Plaintiffs seek sweeping court orders that would seriously impair the State from efficiently

23  preserving safety, order, and discipline by using various forms of segregated housing to separate

24  certain inmates from the general population.  No authority or evidence entitles Plaintiffs to the

25  drastic relief they seek.

26      Conversely, the evidence shows that the State has adequate processes and practices to (1)

27  screen and identify inmates who need mental health attention or treatment; and (2) ensure that

28

15

1  inmates have access to the level of care they need—regardless of the setting in which they are

2  kept.  Nothing further is required.

3  **A.    Inmates Discharged from Psychiatric Hospitalization Are Not Exposed to**
       **Unreasonable Risks of Suicide or Psychological Harm.**

4

5       Plaintiffs seek orders directing the State to cease discharging inmates from psychiatric

6  hospitalization to segregated housing without an affirmative clinical determination that placement

7  in segregated housing poses no risk to inmates' mental health.  In support of their request,

8  Plaintiffs contend that the State's psychiatric hospitalization discharge policy unreasonably

9  endangers class members by mandating that inmates transferred from a segregated setting be

10  returned to that setting upon discharge.

11       CDCR does not categorically return segregation inmates who discharge from inpatient

12  care back to the segregation unit they originated from.  (Allison Decl. ¶ 24.)  Inmates discharged

13  from inpatient care are only retained in administrative segregation if the inmate presents an

14  immediate threat to the safety of self or others, endangers institutional security, or jeopardizes the

15  investigation of alleged serious misconduct or criminal activity.  (*Id.*)[9]  In addition, for those

16  inmates transferring from an inpatient program to a Security Housing Unit or Psychiatric Services

17  Unit, a correctional counselor engages in a case-by-case evaluation to determine the least

18  restrictive housing and, if appropriate, refers the inmate to an Institutional Classification

19  Committee to consider suspension of the remainder of the segregation term.  (*Id.*)  Plaintiffs'

20  proposal to categorically bar the use of segregation units is unnecessary, and undermines the

21  State's legitimate penological interest of preserving inmate and staff safety and order.  The

22  decision regarding where CDCR may safely place an inmate due to his or her custody designation

23

24       [9] Plaintiffs quibble about the clarity of CDCR's policy memorandum dated March 21,
2013, stating that it appears to require discharges from inpatient care to segregation.  They note

25  that the memorandum states that "Inmate-patients discharged from DSH treatment with a SHU
term, or have case factors that require ASU placement . . . shall be transferred to the

26  originating/sending institution's primary ASU Hub" but Plaintiffs fail to note that the very next
sentence states that "Inmate-patients transferred to an EOP ASU hub shall only be placed in the

27  ASU if the inmate-patient presents an immediate threat to safety of self or others, endangers
institutional security, and/or jeopardizes the integrity of an investigation of alleged serious

28  misconduct or criminal activity." (Allison Decl. ¶ 24 Ex. B.)

16

1    is rightly with correctional officers, and not with mental health clinicians as Plaintiffs suggest.

2    (*Id.* ¶ 25.)

3         Plaintiffs' criticism that Defendants have only recently implemented these policies is

4    without merit.  CDCR's memorandum regarding psychiatric and return policies issued March 21,

5    2013, simply reinforced policies that have been in place for years.  (*See* Allison Decl. ¶ 24, Ex. B)

6    (noting that policies outlined in the March 21, 2013 memorandum shall be implemented in

7    conjunction with existing policies and then listing specific policy memoranda).

8         Plaintiffs string together six instances spanning the past three years in which inmates have

9    allegedly decompensated or have committed suicide after being discharged to segregated housing

10   following psychiatric hospitalization.  But none of these examples contain facts or clear evidence

11   to support their contention that Defendants' policy poses risk to inmates' mental health.

12        Plaintiffs offer the misleading example of an inmate who died at Salinas Valley State

13   Prison in January 2013, to contend that his placement in administrative segregation under the

14   psych and return policy caused his death.  (Pls.' Mot. at 29:27-30:5.)  But Plaintiffs provide no

15   evidence that this inmate's placement in segregated housing was clinically contraindicated.  The

16   discharge summary that Plaintiffs produced under seal contains the inmate's report that he

17   became depressed when placed in administrative segregation, but nowhere does the report state—

18   as Plaintiffs claim—that his "pre-hospitalization segregation stay was responsible for symptoms

19   that led to his [psychiatric hospitalization]."  (*See* Kahn Termination Opp. Under Seal Decl. Ex.

20   46; Warburton Reply Decl. Supp. Term. Mot. ¶¶ 3–4, ECF No. 4444.)

21        Plaintiffs further contend that an inmate committed suicide in 2011 because he was placed

22   in segregated housing after discharging from a mental health crisis bed.  (Pls.' Mot. at 30:5-10

23   *citing* 2011 Suicide Report at 142-151 (Inmate N).)  But again, Plaintiffs provide no clinical

24   evidence that inmate N's placement in segregated housing caused or contributed to his suicide.

25   Rather, the evidence shows that the inmate received several suicide risk evaluations and clinical

26   contacts in the weeks before his death that revealed no unreasonable risk of harm associated with

27

28

                                    17

1  retention in segregated housing. (2011 Suicide Rpt. at 146-47.)[10]

2       Plaintiffs also discuss their expert's observations regarding three inmates that had been

3  discharged from inpatient or crisis care to segregated housing. (Pls'. Mot. at 30:16-23.)  In

4  particular, Dr. Haney observed that: (1) inmate B was discharged from suicide observation to

5  segregated housing at Mule Creek; (2) inmate W was "cycling" between segregated housing and

6  a crisis care; and (3) inmate JJ "cycled" between segregated housing and crisis care, reported

7  feeling suicidal and homicidal, and his clinician debated about whether he had been in

8  administrative segregation too long and needed to be hospitalized.[11]  Yet these observations fail to

9  show that placing these inmates in segregated housing was clinically contraindicated.  And

10  Haney's observations suggesting deficient care were factually rebutted in declarations supporting

11  Defendants' Reply. (*See* Colley Reply Decl. ¶ 5; Am. Jordan Reply Decl. ¶ 47; Fischer Reply

12  Decl. Supp. Term. Mot. ¶ 34, ECF No. 4429.)

13       Moreover, Defendants dispute Plaintiffs' claim that inmates B, W, or JJ were exposed to

14  an unreasonable risk of harm.  Inmate B had no Axis I diagnosis of mental illness that required

15  psychotropic medication, and he wanted to remain in administrative segregation for his own

16  safety. (Colley Reply Decl. ¶ 5 [letter thanking Warden for ensuring safety]).  Indeed the clinical

17  decision to avoid prescribing unnecessary, and potentially harmful, drugs, and the custody

18  decision to retain Inmate B in segregated housing to preserve his safety reflect the opposite of

19  deliberate indifference.  Further, the fact that Inmates W and JJ "cycled" between crisis care and

20  segregated housing establishes no clinically causal connection between conditions in segregated

21  [10] Plaintiffs' reliance on such evidence both in their opposition to Defendants' motion to
22  terminate and this motion for affirmative relief demonstrates the lack of a systemic problem that
warrants a class-remedy.  These examples establish no defective pattern embedded in a faulty
23  system that impacts inmates.  Indeed, if there be any defects at all, they are idiosyncratic, and
therefore not the type of problem that should be addressed through a sweeping injunction in a
class-action, but through an individual lawsuit.
24  [11] Haney concedes that he has limited knowledge of the treatment that Prisoners W and B
received.  Haney admits that he did not know what kind of treatment Prisoner W was receiving in
25  administrative segregation, but that he knew that he was receiving some treatment. (Vorous
Decl., Ex. 5 [Haney Depo.] 202:23–203:11.)  Haney also acknowledges that Prisoner W's
26  situation of being placed in administrative segregation for safety reasons was a "somewhat
different situation" than the usual psych and return policy he criticizes. (*Id.* at 198:2–19.)  Haney
27  admits that he did not talk to Prisoner B's treating clinicians and he did not recall if he looked at
Prisoner B's mental health records. (*Id.* at 180:23–181:9.)
28

1   housing and diminished care. Moreover, Inmate JJ's clinician's deliberation about whether he

2   was in segregation too long or needed inpatient hospitalization only shows that the clinician was

3   considering moving Inmate JJ—not that Inmate JJ was being improperly retained in segregated

4   housing against clinical judgment.

5       Last, Plaintiffs contend that a subsection of class members are particularly vulnerable to

6   harm if returned to a segregated setting after hospitalization, but they fail to identify which

7   inmates are vulnerable, what clinical observations can establish such a vulnerability, or whether

8   provision of mental health services that meet their needs within a segregated setting is sufficient

9   to ameliorate the enhanced risk that this group of inmates face in segregated settings. Even

10  Plaintiffs' own expert Dr. Haney could not define which inmates he believed were more

11  vulnerable to deterioration in segregated housing than others when asked at his deposition.

12  (Vorous Decl., Ex. 5 [Haney Depo.] 92:20–94:13.)

13

14      **B.**    **Defendants Ensure Adequate Mental Health Screening for All Prisoners Entering Segregation and No Categorical Exclusion is Appropriate or Necessary.**

15

16      Plaintiffs next seek to alter the State's administrative segregation screening process

17  without introducing any evidence that the current process is insufficient to protect inmates from

18  unreasonable risk of harm. Specifically, Plaintiffs want orders requiring the State to (1) conduct

19  "a mental health history file review to identify prior segregation placements that resulted in

20  MHCB/DSH placements, self-harm, suicide attempts, or other signs of decomposition," in

21  addition to the exhaustive screening process already performed, and (2) prohibit placing inmates

22  "found to 'have a likelihood of decompensation if placed or retained in ASU'" in administrative

23  segregation. (Pls.' Mot. 34:4-9.)   The Court should reject Plaintiffs' proposed modifications

24  under the PLRA because:

25      •  The State adequately screens and evaluates inmates before and after placing them in

26          administrative segregation, using screening devices that were formulated with input from

27          Plaintiffs' counsel and the Special Master, and imposed via court order.

28

1    • Plaintiffs introduce no evidence showing that the current screening processes are so

2        flawed that they are insufficient to protect class members from unreasonable risks of harm

3        such that a new remedy is needed.

4    • Plaintiffs' proposed remedy is vague, overbroad, impractical, and does not address the

5        internal criticisms cited in support of the request.

6    The State has successfully implemented systems that screen and evaluate inmates at

7    critical intervals of their incarceration, including before and after an inmate is placed in

8    administrative segregation. (Termination Mot. at 16-17, ECF No. 4275–1; Belavich Decl. ¶ 11.)

9    In particular, the administrative segregation screening devices were part of a court-ordered

10    process developed with input from Plaintiffs' counsel and the Special Master. (Defs.' Plan to

11    Address Suicides in Segregation Units, filed 10/2/06 at 5, ECF No. 1990; Defs.' Am. Plan, filed

12    12/1/06 at 2, ECF No. 2061; Order Implementing Plan, filed 2/12/07, ECF No. 2139.)

13    Plaintiffs present no evidence showing that the State's administrative segregation

14    screening process is deficient. Instead they conflate Defendants' internal critiques and efforts at

15    improving their system with evidence that the system in place is deficient. Specifically, Plaintiffs

16    argue that because CDCR has not immediately implemented suggestions for innovating the

17    administrative segregation suicide risk assessment, they are deliberately indifferent. (Pls.' Mot. at

18    32:21–33:12.) But Plaintiffs have introduced no evidence showing that the proposed

19    improvements to the prescreening process will reduce suicide rates. And in any event, a pilot of a

20    new screening tool was authorized in February 2013 and CDCR in conjunction with the *Plata*

21    Receiver has developed a series of steps to evaluate it. (Belavich Decl. ¶ 14.)

22    Moreover, Defendants' self criticism or continuous evaluation of their systems is not

23    evidence that the current system poses unreasonable risks or that the State is indifferent to

24    potential risks. *See Rellergert v. Cape Girardeau Cty, Missouri*, 924 F.2d 794, 797 (8th Cir.

25    1991) (taking deliberate steps to prevent suicide cannot "have been both deliberately cautious

26    about [inmate's] risk as a suicide and deliberately indifferent about it. Indifference is apathy or

27    unconcern. The policy demonstrates the opposite."). CDCR's effort to be self-critical and

28    constantly improve its mental health system is manifest evidence that state officials are not

20

1    deliberately indifferent to inmates' needs.

2          Plaintiffs further claim that six suicides in 2011 and one in 2012 show that the State failed

3    to prevent inmates with a history of decompensation in segregated housing from being returned to

4    segregated housing. (Pls.' Mot. 33:21-25.) But these reports contain no findings or evidence

5    showing that (1) placement in segregated settings posed unreasonable risks of psychological

6    deterioration or suicide; (2) placement in a segregated setting caused them to commit suicide or

7    even subjected those inmates to unreasonable risks of suicide; or (3) the screening device was so

8    deficient that it unreasonably exposed them to risks of harm when placed in administrative

9    segregation. Indeed, of the six suicides referenced in 2011, only one inmate allegedly expressed

10   any suicidal ideation if returned to a segregated setting. (*See, e.g.,* 2011 Suicide Report.)

11   Likewise, Plaintiffs' speculation that because Inmate K received bad news during a prior

12   placement in segregation, it was likely that he would commit suicide if later returned to

13   segregation on a new charge is just that, speculation. (Pls.' Mot. at 33.)

14

15   **C.    The *Madrid* Pelican Bay Exclusion Order Should Not be Extended to all
             Security Housing Units.**

16          Provision of mental health services within a Security Housing Unit is part of the Mental

17   Health Services Delivery System. (Vorous Decl., Ex. 4 [Program Guide] 12-8-1 to 12-8-13.)

18   Mental health services within a Security Housing Unit are provided to all inmates in accordance

19   with the inmate's treatment needs and level of care. (*Id.*) Further, inmates who are serving an

20   established Security Housing Unit term and require an Enhanced Outpatient Program level of

21   care, are referred and transferred to a Psychiatric Services Unit program. (*Id.* 12-8-10.) Inmates

22   whose clinical needs cannot be met through a Psychiatric Services Unit are transferred to a

23   Mental Health Crisis Bed or inpatient program operated by the Department of State Hospitals.

24   (*Id.* at 12-8-11.)

25          In its order denying Defendants' termination motion, this Court stated that the degree to

26   which "defendants are complying with the Revised Program Guide is an appropriate way to

27   assess whether defendants are meeting their constitutional obligations." (ECF No. 4539 at 30

28   n.30.) To that end, Plaintiffs present no evidence that Defendants are neglecting to provide

                                            21

1    Program Guide required care to inmates in Security Housing Units or failing to transfer them to a

2    higher level of care when appropriate.  At best, Plaintiffs' experts' opinions simply parrot

3    Plaintiffs' long-standing wish that all mentally ill inmates be excluded from segregated housing

4    units, *even* if they receive care consistent with the *Coleman* Program Guide requirements.  On the

5    other hand, the evidence is that CDCR is providing care consistent with Program Guide

6    requirements. (Belavich Decl. ¶¶ 6–13 & 17–19.)

7         Plaintiffs' experts' opinions regarding the inmates they interviewed in two Security

8    Housing Units at California State Prison, Corcoran and California Correctional Institution, do not

9    establish that the care provided to inmates in those units is below a constitutional level sufficient

10   to expand the *Madrid* exclusionary criteria throughout the state.  Moreover, their primary

11   compliant is an alleged insufficient number of groups for inmates housed in the two units.  But

12   Defendants' evidence is that groups for inmates at this level of care is not a constitutional issue.

13   (Vorous Decl., Ex. 6 [Dvoskin Depo.] at 276:6 to 277:16 (testifying that groups for inmates at the

14   Correctional Clinical Case Management System level of care is not a constitutional issue).)

15        The handful of inmates that Dr. Haney interviewed expressed dissatisfaction with their

16   treatment, but Dr. Haney conceded during his July 10, 2013 deposition that (except for his

17   dissatisfaction with an alleged insufficient number of groups) he had no knowledge as to whether

18   the inmates were receiving care consistent with a Correctional Clinical Case Management System

19   level of care.  (Haney Decl. Supp. Opp'n to Term. Mot. ¶¶ 207–213, 259–63 & 267; Vorous

20   Decl., Ex. 5 [Haney Depo.]  207:15–22, 214:23–215:21.)   Moreover, mental health clinicians at

21   California State Prison, Corcoran and California Correctional Institution confirm that these

22   inmates receive the required care.  (Fisher Reply Decl. ¶¶ 30–31; Walsh Reply Decl. ¶¶ 25–28.)

23        Plaintiffs rely on a 2006 article by Drs. Dvoskin and Metzner to describe the "dangers of

24   these harsh units for mentally ill prisoners." (Pls.' Mot. at 37.)  What Plaintiffs fail to note,

25   however, is that this article, which discusses the danger of placing seriously mentally ill inmates

26   in "supermax" prisons, also acknowledges that California *already* "excludes inmates with serious

27   mental illness from admission to supermax facilities." (Kahn Decl. Ex. 12, at 763.)  In other

28   words, the structure of CDCR's mental health program, via the Program Guide and American

22

1   Psychiatric Association guidelines, is such that to the extent an inmate's mental illness cannot be

2   managed in a Security Housing Unit, they are transferred to a Psychiatric Services Unit.

3   Moreover, Dr. Dvoskin when asked about the recommendations in his article, testified:

**Q.      Did you recommend at any time during your work here in California that California consider excluding greater numbers of mentally ill from its SHU program than it currently does?**

...

A.      No. The overarching goal or the overarching recommendation is that nobody, mentally ill or not, should be in SHU unless there's a compelling reason for them to be there. So that would be just as true of somebody with mental illness as it would be without mental illness. If somebody's mental illness was not manageable in SHU, then that is my understanding of the purpose of the PSU, when they should be transferred to a PSU. If they're – so the CCCMS people are people who are stable, taking medication. In most cases, they are taking medication. But if they're not stable and they need a higher level of care, then they're supposed to be moved to the PSU.

11   (Vorous Decl., Ex. 6 [Dvoskin Depo.] 68:9–69:3.)

12          Consistent with Dr. Dvoskin's recommendation, CDCR places inmates in Security

13   Housing Units to ensure the safety and security of the institution, the inmate population, and the

14   staff. (Allison Decl. ¶¶ 8–11 & 27–28.) That is why CDCR only assesses security housing terms

15   to inmates found guilty of serious violations of the rules or criminal offenses, some of which are

16   heinous, such as attacks on staff and other inmates including murder. (*Id.* ¶¶ *27–28*) Moreover,

17   often inmates commit repeated violations of the rules leading to their security term. (*Id.*) A

18   blanket exclusion for Correctional Clinical Case Management System inmates would therefore

19   greatly diminish the deterrent effect of the Security Housing Unit. For instance, an inmate's

20   previous "brief psychotic," episode, whether valid or not, would exempt an inmate from ever

21   receiving a Security Housing Unit term, as Plaintiffs' posit. Nonetheless, CDCR's other Security

22   Housing Units do not operate in the same manner as the Pelican Bay State Prison unit. Other

23   Security Housing Units have natural light, unlike Pelican Bay's unit that does not have windows.

24   (*Id.* ¶ 26.) Nor are the other units' exercise yards as restrictive as the Pelican Bay yards. (*Id.*)

25   And all inmates in the Security Housing Units have the ability to keep electrical appliances, such

26   as television sets or radios in their cells. (*Id.*)

27          Finally, Plaintiffs rely on their expert Dr. Haney who opines that the "Pelican Bay

28   Exclusion Order should be applicable in all SHUs in CDCR's system" because the "features of

23

the SHU are extremely harmful and dangerous for mentally ill individuals" and are "vulnerable to psychological decompensation of various forms when placed into these units." (Haney Decl. Re Segregated Housing Units ¶¶ 25–26.)

But, as discussed above, there is increasing data to suggest that segregation does not cause the type and severity of psychological harm Dr. Haney describes. (Scott Decl. ¶¶ 13–28.)  In the O'Keefe study of the Colorado prison system, Dr. Maureen O'Keefe and colleagues sought to determine the "psychological domains" affected by placement in administrative segregation. (*Id.*; Vorous Decl. Ex. 1.)  In Colorado, the conditions of confinement in administrative segregation appear equivalent to the conditions present in "supermax" correctional housing like CDCR's SHUs. (*Id.*)  The results, contrary to the researcher's hypothesis, indicated that placement in a "supermax" correctional setting did not result in the onset of psychological symptoms or cognitive impairment for mentally ill and non-mentally ill inmates, nor did inmates with mental illness fare worse in segregation than their non-mentally ill peers. (*Id.*)

**D.    A "Sweep" of all Segregated Units to Identify Inmates that Face an Unreasonable Risk is Nonsensical and Unnecessary.**

Plaintiffs argue that a "sweep" of inmates currently is segregation housing over 90 days is necessary because there is a possibility that inmates with lengthy stays who may have developed mental illness are falling through the cracks. (Pls.' Mot. at 40–41.)  But a possibility of harm voiced by the Plaintiffs' experts is not the appropriate standard for affirmative relief under the Prison Litigation Reform Act.  Although Dr. Haney makes such a recommendation, he does not support it with any evidence. (Haney Decl. Supp. Opp'n to Term. Mot. ¶ 289.)  Likewise, Plaintiffs' expert Jeanne Woodford's statement that there is "no adequate mental health screening mechanism in place on death row" is wrong. (Woodford Decl. Supp. Opp'n to Term. Mot. ¶ 34.) San Quentin State Prison has multiple measures in place to ensure condemned inmates are routinely evaluated for mental health treatment, ranging from regular staff interaction and ongoing rounds to custody referrals for care. (Monthei Reply Decl. Supp.Term. Mot. ¶ 23, ECF No. 4436.)  Moreover, the Special Master monitors segregation units as part of his regular monitoring activities. (*See, e.g.,* Special Master's 25th Report at 11, 34–28, ECF No. 4298.)

24

1      Plaintiffs' request is unnecessary. As already discussed, CDCR officials actively monitor

2   inmates who may need mental health treatment while housed in segregation, and monitor inmates

3   who have been housed in a segregation unit over 90 days or, in some cases, 180 days. (Allison

4   Decl. ¶¶ 29–30.)  CDCR continuously trains both clinical and custody staff to recognize the signs

5   and symptoms of mental illness among inmates and can refer an inmate for mental health

6   evaluation at any time.  (Belavich Decl. ¶ 11; *see also* Stein Decl. ¶¶ 4–13.)   Moreover, several

7   other court-ordered requirements exist to provide mental health services for inmates who need it.

8   (Vorous Decl. Ex. 4, [Program Guide] 12-7-5 [requiring Licensed Psychiatric Technician rounds

9   seven days a week in all segregation units to attend to the mental health needs of all inmates and

10  morning "check-in" meetings between custody and clinical staff to discuss, among other things,

11  current behavioral issues and concerns]; 12-7-11 [requiring LPT rounds and referral of inmates to

12  mental health in stand-alone segregation units]; 12-8-7 [LPT to make rounds of non-mental health

13  inmates in Security Housing Unit every other week and make referrals to mental health as

14  appropriate].)

15  **VI.  NO VIOLATIONS ARE CAUSED BY ALLEGED INADEQUATE ACCESS TO TREATMENT,**
16      **UNNECESSARILY HARSH CONDITIONS, AND INSUFFICIENT SAFETY MEASURES IN**
        **SEGREGATION.**

17      **A.    Plaintiffs Have Failed to Meet Their Burden in Requesting Additional**
18            **Affirmative Orders Relating to Access to Treatment in Segregation Units.**

        Plaintiffs maintain that Defendants fail to "bring appropriate clinical treatment to class
19
    members" housed in segregated housing units. (Pls.' Mot. at 43.)  But Plaintiffs' assertions
20
    regarding treatment space are unsupported by facts, their premise concerning required treatment
21
    hours is factually and legally flawed, and their presupposition that all mental health proceedings
22
    must be held confidentially is legally flawed.
23
        First, the assertion that there is inadequate "space" to treat Enhanced Outpatient Program
24
    inmates in administrative segregation is unsupported by the evidence.  Plaintiffs' experts
25
    complain that the alleged "lack of adequate treatment space" at the Enhanced Outpatient Program
26
    Administrative Unit hubs at four prisons—Richard J. Donovan Correctional Facility; California
27
    State Prison, Los Angeles County; San Quentin State Prison; and Mule Creek State Prison—
28
                                              25

1    significantly impacts the quality of treatment that is provided. (Pls.' Mot. at 44:14–23, citing

2    Stewart Decl. ¶¶ 112 [RJD treatment on dayroom floor], 113 [LAC treatment on dayroom floor]

3    & 342 [SQ – treatment in small office space]; Haney Decl. ¶¶ 56 & 74–76 [MCSP - treatment on

4    dayroom floor].)

5          Although the described treatment space might not be ideal by Plaintiffs' standards, the

6    evidence presented does not establish that challenges with the current space equate to an

7    unconstitutional level of care. (See, e.g., Telander Reply Decl. Supp. Term. Mot. ¶¶ 7 & 8, ECF

8    No. 4480 [care taken to arrange space and treatment areas to provide meaningful therapy and

9    privacy at MCSP]; Cornell Reply Decl. Supp. Term. Mot. ¶ 12, ECF No. 4453 [space available in

10   program where every patient is offered opportunity for meeting in private].) And with respect to

11   San Quentin State Prison, treatment space is available in the new Central Health Services Facility,

12   a five-story, $128.3 million, 135,000 square foot correctional health care center opened in 2009.

13   (Monthei Reply Decl. ¶ 18 [noting offer to use confidential treatment space off unit, but Dr.

14   Stewart declined offer].) In addition, construction of new treatment and office space for

15   Enhanced Outpatient Program inmates in administrative segregation is being completed at

16   Richard J. Donovan, Mule Creek State Prison, California State Prison, Los Angeles County,

17   California Men's Colony, and California Institution for Women. (Declaration of Deborah Hysen

18   Supp. Defs.' Opp. to Pls.' Mot. ("Hysen Decl.") ¶¶ 7 & 10–13.)[12] Therefore, any assertion that

19   construction is either not being completed, or is somehow inadequate to provide treatment, is

20   untrue. (Id. ¶¶ 5–13.)

21         In addition, there is no evidence that inmates are deprived of access to confidential

22   treatment if requested. Plaintiffs' experts' observations and descriptions of treatment are

23   significantly flawed, likely due to their limited review of how treatment is provided. As an

24   example, Dr. Kaufman's claim that the Central California Women's Facility had high incidence

---

[12] Construction of new treatment and office space for Enhanced Outpatient Program
inmates in administrative segregation has recently been completed at two additional prisons:
California Medical Facility and California State Prison, Corcoran. (Hysen Decl. ¶¶ 6 & 8.)
Moreover, the new Dewitt Nelson Correctional Annex project will add housing and treatment and
office space for 50 administrative segregation unit inmates at the Enhanced Outpatient Program
level of care. (Id. ¶ 5.)

26

1  of cell front clinical contacts is simply untrue. (Pls.' Mot. at 44, citing to Kaufman Decl. Opp'n

2  Term. Mot. ¶ 32.)[13]  Rather, 83% of clinical encounters at this facility between September 2012

3  and February 2013 occurred in a confidential setting. (Williams Reply Decl. Supp. Term. Mot. ¶¶

4  6 & 7, ECF No. 4446.)  Confidential treatments spaces existed at the time of his visit. (*Id.*)  And

5  there is no evidence that inmates are deprived of access to confidential treatment if they request it.

6  To the contrary, every prison is equipped with confidential space that can be used whenever

7  requested. (Belavich Decl. ¶ 13.)

8         Moreover, Plaintiffs' assertions are premised on the assumption that every single clinical

9  encounter—including group therapy sessions—must always be in a "strictly confidential" setting,

10  i.e. behind a closed door. (Pls. Mot. 44-45.)  But no legal precedent, and no mental health

11  policies or procedures—and certainly nothing in the Constitution—mandates that all clinical

12  contacts and therapeutic groups occur in confidential settings.  Defendants further object to any

13  implication that confidentiality is clinically necessary for every clinical contact or group

14  meeting.[14]  (*See* Dvoskin Comments at 4, ECF No. 4312–1 ["I disagree with the premise that all

15  clinical contacts and/or therapeutic groups must occur in confidential settings."]; *Plata v. Brown*,

16  131 S. Ct. 1910, 1964 (2011) (Alito, J. dissenting) ("this court has never suggested that the failure

17  to provide consultation rooms in prisons amounts to cruel and unusual punishment").)

18         Plaintiffs also allege that Enhanced Outpatient Program inmates in administrative

19  segregation are not receiving a "sufficient amount" of treatment, premised on the assumption that

20  patients must be offered no less than ten hours per week of structured therapeutic activities

21  (individual and group therapy). (Pls.' Mot. at 45-46, citing to Special Master 25th Round Report

22  at 37 ["ten of the 11 hubs failed to offer at least ten hours per week of structured therapeutic

23  activity per week [as required by the Program Guide]".)  The *Coleman* Program Guide states that

24  Enhanced Outpatient Program inmates housed in segregation "shall be provided care consistent

25  come. □ ADDIN BA \xc <@rec> \xl 23 \s HYQRMX000055 \xpl 1 \l "(Scott Decl. ¶¶ 13–20.)"

---

[13] Dr. Kaufman admits that he did not personally observe a cell-front contact and he is not aware of what happens during cell-front clinical contacts. (Vorous Decl., Ex. 7 [Kaufman Depo.] 82:13–83:04.)

[14] Defendants question how confidentiality is ever maintained in a group setting.

27

1   week of *scheduled* structured therapeutic activities." (Vorous Decl., Ex. 4 [Program Guide] 12-7-

2   10 (emphasis added).)

3          But again, Plaintiffs' assertions are supported by neither law nor clinical finding.  No case

4   law, or even clinical findings, shows that ten hours per week of structured therapeutic activity is

5   clinically necessary for all Enhanced Outpatient Program inmates living in administrative

6   segregation hubs.[15]  Rather, the need for structured therapeutic activity, including group therapy,

7   is determined clinically on a case-by-case basis.  Although ten hours per week of structured

8   therapeutic activity may be clinically optimal, providing such treatment is not a constitutional

9   mandate.  (*See* Dvoskin Comments at 4, ECF No. 4312–1.)  Even so, all Enhanced Outpatient

10  Program-Administrative Segregation Units between June 1, 2013 and June 28, 2013, offered

11  system-wide, on average, 11.97 treatment hours per week to inmates and offered system-wide, on

12  average, 10.95 hours per week to inmates in each of the Psychiatric Services Units.  (Belavich

13  Decl. ¶ 9.)  And, as already discussed, Defendants are providing Program Guide required care to

14  Correctional Clinical Case Management System inmates housed in Security Housing Units.  (*Id.*

15  ¶ 10.)[16]

16      **B.    Neither Law Nor Fact Support Plaintiffs' Demand that Searches Be**
            **Prohibited in Administrative Segregation Units.**
17

18          Plaintiffs argue that all body searches of mentally ill inmates must cease, on the grounds

19  that they are punitive and somehow "undermine the delivery of appropriate mental health care."

20  (Pls.' Mot. at 47.)  But Plaintiffs fail to offer persuasive evidence that administrative segregation

21  searches are somehow inhibiting Defendants from providing care to inmates, or that the *Coleman*

22  ─────────────────────

23          [15] Plaintiffs' expert Dr. Kaufman admits that he knows of no other jurisdiction in the
    United States that provides ten to fifteen hours of treatment.  (Vorous Decl., Ex. 7 [Kaufman

24  Depo.] 48:10–13.)  Dr. Stewart admits that he knows of only one other jurisdiction that requires
    ten hours of treatment, but he is unsure if that jurisdiction is actually providing ten hours.  (*Id.*,
    Ex. 8 [Stewart Depo.] 62:2–63:3.)

25          [16] In their motion and [proposed] order, Plaintiffs seek an order requiring that the Special

26  Master report on whether the segregation units provides a "minimally adequate mental health
    treatment programs," to include sufficient mental health and custody staff and the provision of at

27  "least 10 hours of other out-of-cell time (e.g., for exercise) per week."  (Pls.' Mot. at 46–47 &
    Pls.' [Proposed] Order at 4.)  Because Plaintiffs present no evidence whatsoever regarding any
    alleged inadequate staffing or "other out-of-cell time," the Court should disregard these requests.

28
                                                28

1  class is avoiding treatment because of the searches.[17]  Although Plaintiffs speculate that, as stated

2  by former San Quentin Warden Jeanne Woodford (Woodford Decl. Supp. Opp'n to Term Mot. ¶

3  56), searches "may" deter inmates from leaving their cells for therapeutic activity, there is utterly

4  no evidence in the record that this is occurring on a class-wide basis.

5      Plaintiffs overstate the conclusions of their own expert regarding searches in administrative

6  segregation.  Plaintiffs quote Dr. Kaufman's opinion that searches discourage patients from

7  taking advantage of therapy. (Pls.' Mot. at 49.)  However, Plaintiffs fail to mention that Dr.

8  Kaufman was specifically opining about search policies in the Administrative Segregation at

9  Corcoran, not CDCR's administrative segregation search policies as a whole. (Kaufman Decl.

10  Supp. Opp'n Term. Mot. ¶ 164.)  Similarly, Plaintiffs rely on one sentence in the Special Master's

11  21st Round Monitoring Report that was critical only of Corcoran's search policies. (Pls.' Mot. at

12  48, citing the Special Master's 21st Round Monitoring Report, ECF No. 3638, July 31, 2009, at

13  163.)

14      Inmates in administrative segregation are searched only upon leaving and entering the unit

15  because of the pervasive and constant threat of inmates secreting contraband and weapons into

16  administrative segregation units. (Allison Decl. ¶ 31.)  Indeed, efforts to secret contraband and

17  weapons into these units have traditionally been attempted by inmates coercing innocent inmates

18  in administrative segregation to act as couriers. (Id.)  By searching all administrative segregation

19  inmates, the goal is to avoid the threats that the inmates who are not searched might face if they

20  refused to assist in bringing contraband into the units. (Id.)  The uniform search of all inmates in

21  administrative segregation has the dual purpose of avoiding that coercion while also protecting

22  the safety and security of other inmates, staff, and the administrative segregation units as a whole.

23  (Id.)  These purposes would not be served if Plaintiffs' proposal of searches based on

24  individualized assessment were adopted.

25      Although the searches may be, as described by one inmate, "unpleasant," such is not the

26  _____

27  [17] In their motion, Plaintiffs cite *three* inmates who "did not like" to be searched and
   found it "unpleasant." (*See* Haney Decl. Supp. Opp'n Term. Mot. ¶ 255; Kaufman Decl. Supp.
   Opp'n Term. Mot. ¶¶ 163-165.)

28

1    standard for finding a constitutional violation supporting the remedial orders demanded by

2    Plaintiffs. Rather, the Eighth Amendment forbids the "unnecessary and wanton infliction of pain

3    . . . [that] constitutes cruel and unusual punishment". *Whitley v. Albers*, 475 U.S. 312, 319

4    (1986). Here, there is no evidence that a search of these inmates—including female inmates who

5    are required to disrobe behind a partial screen but are not physically touched by female officers—

6    constitutes the "unnecessary and wanton infliction of pain." *But see Jordan v. Gardner*, 986 F.

7    2d 1521, 1525-26 (9th Cir. 1993) (en banc) (cross gender body search of female inmates by male

8    guards involving physical touching held to violate Eighth Amendment).

9        Plaintiffs' request regarding searches relies primarily on the dissenting opinion in *Bull v.*

10   *City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (Thomas J., dissenting). But

11   Plaintiffs' reliance on the dissent in *Bull*, while trying to distinguish the majority opinion is

12   disingenuous. In *Bull*, the Ninth Circuit held that San Francisco jails' policy of conducting strip

13   searches of all arrestees introduced into custodial housing did not violate the Fourth Amendment.

14   *Id.* at 966. The majority opinion recognized that "A detention facility is a unique place fraught

15   with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all

16   too common an occurrence. Indeed, attempts to introduce drugs and other contraband into

17   [prison] premises ... is one of the most perplexing problems of prisons." *Id.* (internal citations and

18   quotations omitted.) The Ninth Circuit found that the purpose of San Francisco's search policy

19   was to further institutional security goals and thus analyzed the constitutionality of the search

20   with the guidance of *Bell v. Wolfish*, 441 U.S. 520 (1979) and *Turner v. Safley*, 482 U.S. 78

21   (1987). *Bull*, 595 F.3d at 971.

22       Applying *Bell*, the Ninth Circuit found that upon weighing the need for San Francisco's

23   strip search policy with the intrusion to the inmate's privacy, the balance should be resolved in

24   favor of the jail. (*Id.* at 975.) After analyzing the *Turner* factors, the Ninth Circuit also held that

25   the strip search policy did not violate the Fourth Amendment because it was reasonably related to

26   the penological interest of the jail in preventing contraband smuggling. (*Id.* at 977.)

27   The Supreme Court has recognized that the need for prison officials to prevent the smuggling of

28   contraband is a significant and legitimate security interest. *See Bell*, 441 U.S. at 559-60 (holding

30

1  that visual body-cavity inspections are constitutional because legitimate security interests

2  outweigh the privacy interest of inmates).  The Ninth Circuit has also held that visual strip and

3  body cavity searches of inmates in administrative segregation units are consistent with the Fourth

4  Amendment given a prison's need to maintain high security in administrative segregation and the

5  need to prevent contraband.  *Rickman v. Avaniti*, 854 F.2d 327, 328 (9th Cir. 1988); *Michenfelder*

6  *v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988).

7        Plaintiffs challenge CDCR's uniform administrative segregation search policy under the

8  Eighth Amendment instead of the Fourth Amendment.  Yet, any analysis of the constitutionality

9  of this search policy must take into consideration the reasons why CDCR adopted this policy,

10  because proof of deliberate indifference requires a sufficiently culpable state of mind.  *Wilson v.*

11  *Seiter*, 501 U.S. 294, 299 (1991); *Whitley v. Albers*, 475 U.S. 312, 313 (1986); *Hudson v.*

12  *McMillian*, 503 U.S. 1, 5-6 (1992).  Thus, the Eighth Amendment analysis requires giving weight

13  to the legitimate penological reasons that spurs CDCR to search inmates in administrative

14  segregation.

15        CDCR officials search inmates in administrative segregation in order to prevent the

16  smuggling of weapons, drugs, and other contraband.  (Allison Decl. ¶ 31.)  Thus CDCR officials

17  do not disregard any alleged harm from these searches, instead they choose to continue these

18  searches because of the pressing need to prevent contraband smuggling.  Moreover, Plaintiffs

19  have not submitted persuasive evidence that these searches have caused harm to mentally ill

20  inmates, yet alone shown that prison officials were aware of and disregarded this harm.

21        Finally, citing 42 U.S.C. § 12132 and 28 C.F.R. 35.130(d), Plaintiffs allege that CDCR's

22  administrative segregation search policies "implicates" federal law prohibiting discrimination

23  based on an individual's disability.  (Pls.' Mot. at 51.)  Plaintiffs' motion does not explain how

24  the search policies "implicate" federal disability law.  Moreover, 42 U.S.C. § 12132 and 28

25  C.F.R. 35.130 state that disabled individuals should not be discriminated against by public

26  entities or excluded from participation in services or programs provided by public entities.  Here,

27  the searches of inmates housed in administrative segregation are uniformly applied.  Mentally ill

28  inmates are not treated differently.  Thus, the searches do not violate federal disability law.

31

C.    **Using Therapeutic Treatment Modules Enable CDCR to Safely Provide Therapy to Inmates in Administrative Segregation and the Special Master Supports Their Use.**

Plaintiffs argue that "[w]ith the experiment of installing these [therapeutic treatment modules] across California's system, it is clear that their use does direct and serious harm to the mental well-being of mentally ill prisoners. . . ." (Pls.' Mot. at 53.)  For that reason, Plaintiffs urge this Court to issue an order "prohibiting the use of 'therapeutic treatment modules' for group or individual mental health treatment." (Pls.' [Proposed] Order at 5:7–8.)

But, the therapeutic treatment modules are not "simply" an experiment as Plaintiffs allege.  Rather, Plaintiffs' objections to the therapeutic treatment modules are misguided in light of the fact that the Special Master approved their use.  Between 2005 and 2007, CDCR cooperated with Court-appointed expert Dr. Jeffrey Metzner to develop a prototype for new therapeutic treatment modules.  (Vorous Decl., Ex. 11 [email dated December 29, 2005, from Tim Fishback to Jeffrey Metzner]; Vorous Decl., Ex. 12 [email dated February 27, 2007, from Jeffrey Metzner to Lisa Tillman with two attachments].)  On the suggestion of Dr. Metzner, CDCR implemented several modifications to their therapeutic module prototype including changes that increased a prisoner's ability to see and hear clearly from the modules.  (*Id.*)  The Special Master approved the modified therapeutic treatment modules in March 2007.  (Vorous Decl., Ex 13 [email dated March 8, 2007 from Lisa Tillman to Doug McKeever]; Vorous Decl., Ex 14 [email dated April 19, 2007, from Doug McKeever to William White, with several attachments including emails dated March 9, 2007].)  CDCR then began to build and use the approved therapeutic treatment modules.  (*Id.*)

Dr. Metzner's support for the therapeutic modules is further expressed in the 2006 article he co-authored with Defendants' expert Dr. Joel Dvoskin:

> These cells are similar in shape to an old-fashioned telephone booth, but when properly constructed are about twice the size, with ample lighting, a seat, a shelf, adequate ventilation, and good visibility for purposes of group therapeutic activities in a setting with adequate sound privacy... Typically, 6 to 10 cells are placed in a semicircular fashion to allow appropriate group interaction during scheduled therapeutic activities.  Inmates are not cuffed while in these cells, which allows for active participation in various therapies, such as art, music, and journaling, as well as increased physical comfort (in contrast to being cuffed during 1 to 2 hours of continuous therapy).  It has been the experience by one of these authors [Jeff Metzner] that these programming cells, when properly constructed and used, have been well accepted by most inmates using them.

32

(Kahn Decl. Ex. 12, Metzner & Dvoskin (2006) at 764, ECF No. 4582.)

Therapeutic treatment modules allow CDCR to provide mental health treatment to inmates housed in segregation, including group and one-on-one therapy, while protecting the safety of inmates and staff. (Allison Decl. ¶ 32.) By using therapeutic treatment modules, routine group and one-on-one therapy can take place without the presence of correctional officers. (*Id.*) "[I]t would not be appropriate for custody staff to require the presence of a correctional officer in the room during therapy sessions if such sessions could be safely done without them present." (Metzner & Dvoskin (2006) at 764.) Therapeutic treatment modules thus facilitate confidential and safe treatment of inmates in administrative segregation. (*See* Allison at ¶ 33.)

In fact, therapeutic treatment modules enable CDCR to provide treatment to prisoners housed in segregation units above and beyond the treatment provided for prisoners in other states. California is one of the few states that provide group therapy to mentally-ill prison inmates in administrative segregation. (*See* Metzner & Dvoskin (2006) at 761-72; *see also* Vorous Decl., Ex. 5 [Haney Depo. at 55:15-57:18.] [When asked whether he knew of any other states that provide group therapy to inmates in Administrative Segregation, Plaintiffs' expert could only name Colorado, Washington, and Massachusetts].)

Plaintiffs quote from the deposition of Nurse Moore. Plaintiffs attempt to use Nurse Moore's testimony to show that State's use of therapeutic modules makes it an "outlier." (Pls.' Mot. at 54.) However, they fail to mention that although Nurse Moore testified that the use of therapeutic modules were uncommon, she further testified that other states she was familiar with did not have the same emphasis on group therapy that California does. (Vorous Decl., Ex. 9 [Moore Depo.] 153:13-155:2.) Thus, California has the need for therapeutic modules that other states do not because they are an "outlier" in providing group therapy to prisoners in Administrative Segregation.

Plaintiffs rely on their experts' observations of three inmates who expressed a distaste for the treatment modules, using those anecdotes to reach the categorical conclusion that the therapeutic treatment modules discourage every mental health inmate-patient's participation in

33

1    treatment. (Decl. Haney Supp. Opp'n to Term. Mot. ¶¶ 83, 149 & 179.)[18] The personal

2    preferences of a handful of inmates is not a compelling reason to jettison a tool that enables

3    California to provide therapy to prisoners in Administrative Segregation.  Plaintiffs' alleged

4    evidence is far from sufficient to show that use of the treatment modules violates the

5    "fundamental purpose and protection of the Eighth Amendment," as they alleged. (Pls.' Mot. at

6    54:3–4.)

7         Plaintiffs fail to propose a feasible alternative that would balance the need for providing

8    treatment to prisoners in segregation with the need to protect inmates and staff.  The only

9    alternative to therapeutic models suggested in Plaintiffs' motion are non-contact booths. (Pls.'

10   Mot. at 54 n. 16.)  Plaintiffs note that California Correctional Institution stopped using

11   therapeutic treatment modules for one-on-one clinical contacts with prisoners in administrative

12   segregation, and instead use non-contact booths. (*Id.*)  Plaintiffs' assertion that non-contact

13   booths are a feasible alternative to therapeutic treatment modules is incorrect. (*See* Allison Decl.

14   ¶ 34.)  The non-contact visiting rooms at California Correctional Institution are small and

15   completely walled off via glass from the clinician. (*Id.*)  Communication takes place over a

16   phone line instead of face to face. (*Id.*)  Thus, non-contact visiting rooms have no advantage over

17   therapeutic treatment modules for one-on-one clinical contacts. (*Id.*)  Further, non-contact

18   visiting rooms are not used for group therapy. (*Id.*)

19        CDCR has, and is, exploring alternatives to therapeutic treatment modules. (Allison Decl.

20   ¶ 35.)  A two year pilot program is in effect for the Alternative Treatment Option Module chair,

21   which is similar to an educational desk used in correctional facilities in New York. (*Id.*)  The

22   pilot began at Corcoran and is now being finished at California State Prison, Sacramento. (*Id.*)

23   Although the pilot program is ongoing, early surveys indicate that inmates and staff prefer to use

24   Therapeutic Treatment Modules over the alternative chairs by a two to one ratio. (*Id.* ¶ 36.)

25   Inmates prefer the treatment modules due to the safety they provide as well as the ability to move

26   _____

     [18] Although Plaintiffs also cite Paragraph 133 of Dr. Haney's declaration for their
27   assertion, here Dr. Haney was discussing the alleged failure of inmates to attend IDTT meetings.
     Although Plaintiffs attempt to link this failure to appear at these meetings to use of therapeutic
28   treatment modules, there are no facts to do so.

                                        34

1   around them instead of being chained to a desk. (*Id.*) Group sessions utilizing the treatment

2   modules tend to last longer than those using the alternative chair. (*Id.*)

3       Indeed, at deposition, Plaintiffs' own expert testified that both clinicians and inmate-

4   patients prefer the therapeutic treatment modules over the alternative chairs. (Vorous Decl., Ex. 7

5   [Kaufman Depo.] 109:16-23; *see also* Fischer Reply Decl. ¶¶ 11-14 [at Corcoran, inmates and

6   clinicians prefer therapeutic treatment modules to the Alternative Treatment Option Module chair

7   because inmates and clinicians feel safer and inmates are able to stand and move more freely in

8   the modules]; Gipson Reply Decl. [Corcoran] ¶¶ 11-16; Vorous Decl., Ex. 5 [Haney Depo.]

9   58:06–19 [admitting that some inmates prefer the therapeutic treatment modules to the

10  Alternative Treatment Option Module chair].)

11      Finally, Plaintiffs' proposal that prisoners who are housed in Administrative Segregation

12  for safety concerns should not receive therapy in therapeutic treatment modules (Pls.' Mot. at 55-

13  57) is not workable. Inmates with safety concerns may be at risk from assault from other inmates

14  during group therapy sessions if they are not placed in therapeutic treatment modules. (Allison

15  Decl. ¶ 33.) Thus, inmates housed in administrative segregation for safety concerns must have

16  therapy in therapeutic treatment modules for their own safety. (*Id.*) In addition, as Plaintiffs

17  admit, this request was previously rejected by the Special Master and the Court. (Pls.' Mot. at

18  56:13–57:8.)

19      In addition, Plaintiffs' allegation that CDCR's use of treatment modules violates federal

20  disability law (Pls.' Mot. at 55-56) does not make sense. As noted above, federal disability law

21  prohibits public entities from discriminating against disabled individuals or excluding them from

22  services and programs. 42 U.S.C. § 12132 and 28 C.F.R. 35.130. Here, the treatment modules

23  actually enable mentally ill prisoners to participate in CDCR's program of mental health therapy.

24  Thus, the treatment modules are a means for CDCR to provide a program for disabled individuals

25  not a means of exclusion.

26

27

28

35

**D.    The *Coleman* Program Guide Authorizes the Use of Holding Cells for Mentally Ill Prisoners Pending Mental Health Crisis Bed Admission.**

Only one section in Plaintiff's brief mentions holding cells, the section entitled "Harsh Conditions in Segregation: Defendants Must End the Use of Cages for 'Holding' or Treating Mentally Ill Prisoners in Segregation Units." (Pls.' Mot. at 52.) In this section, Plaintiffs confuse and mistakenly merge two distinct practices: (1) the utilization of therapeutic treatment modules in administrative segregation during one-on-one and group therapy; and (2) the practice of placing inmates in holding cells for a limited period of time while they are awaiting admission to a Mental Health Crisis Bed.   The majority of Plaintiffs' arguments and evidence in this section applies only to therapeutic treatment modules and not holding cells.  Yet, Plaintiffs propose an order to prohibit the use of "caged holding cells outside CTC's and in housing units for holding mentally ill prisoners identified as at risk of self-harm or suicide or awaiting clinical evaluation or treatment." (Pls.' [Proposed] Order at 5.)

Plaintiffs' proposed order regarding holding cells should be rejected because the *Coleman* Program Guide authorizes the placement of mentally ill prisoners in holding cells while they are pending admission to a Mental Health Crisis Bed.  (Vorous Decl., Ex 4 [Program Guide] 12-5-5].)  The Program Guide states that mentally ill prisoners pending MHCB transfer may be placed in holding cells if other preferred locations are not available.  (*Id.*)  CDCR has issued a memorandum that reinforces this policy to staff.  (Belavich Decl. Supp. Defs.' Term. Mot., Ex. 3, ECF No. 4277–3.)

**E.    Plaintiffs Fail to Present a Constitutional Violation Regarding Defendants' Policy to Provide for Extended "Welfare Checks" When Clinically Necessary.**

Plaintiffs urge this Court to find the State is acting with deliberate indifference to the needs of mentally ill inmates in segregated housing because they do not conduct 30 minute welfare checks for all inmates in administrative segregation for the duration of their segregation placement. (Pls.' Mot. at 57-61.)  They cite no legal authority that would require this measure as a matter of constitutional law.  Instead, Plaintiffs argue that the Court should order Defendants to adopt the American Correctional Association's best-practice standard of conducting 30 minute

36

1    welfare checks for all inmates for the duration of their segregation. (*Id.* at 57.)

2            Compliance with this American Correctional Association's standard is not mandatory; the

3    Association has accredited three California institutions so far while expressly acknowledging the

4    existing procedure for welfare checks. (*See* ECF No. 4417–3 at 35 [page 7 of ACA Accreditation

5    Report for Central California Women's Facility, which accredited facility despite finding that

6    "Cell check logs documented hourly checks on some inmates in segregation instead of the

7    minimum checks at 30 minutes as required by ACA standards"]; Vorous Decl., Ex. 10 [Beard

8    Dep.] 243:19–22.) But where officials have "promulgated common place suicide-prevention

9    policies," courts have rejected deliberate indifference claims, "even if offenders did not always

10   follow the department's policy and even if other, better policies might have diminished suicide

11   risk." *Manarite v. City of Springfield,* 957 F.2d 953, 957 (1st Cir. 1992). *See, e.g., Belcher v.*

12   *Oliver,* 898 F.2d 32, 34–36 (4th Cir. 1990) (no liability for suicide despite court's

13   acknowledgement that better screening procedures might have identified an inmate as a special

14   suicide risk).

15           Plaintiffs note their disagreement with Defendants' decision not to adopt the ACA

16   standard and state that in February 2007 the Court "provisionally approved Defendants' plan."

17   (Pls.' Mot. at 58:12–23.) But the Court's provisional approval of Defendants' plan related only to

18   a "further report of the special master" as required by the order. (ECF No. 2139 at 2.) The

19   special master filed his further report in May 2007, but did not recommend that Defendants

20   change their plan. (*See* ECF No. 2210 at 10.) Therefore, the Court should reject Plaintiffs'

21   inference that because the Court only "provisionally" approved their plan before, it should change

22   it now.

23           Plaintiffs argue that Defendants' provision of welfare checks for "only 21 days... has had

24   fatal consequences." (Pls.' Mot. at 58:24–25.) But none of the evidence they rely on casually

25   links their criticism to any completed suicides or harm to a *Coleman* class member. Even if

26   CDCR is an "outlier" among U.S. prisons system—which it does not concede—the American

27   Correctional Association's standard is a best practice recommendation that is beyond this Court's

28   power to order. In addition, and as already discussed, recent longitudinal studies indicate that

37

1  segregation does not cause the type and severity of psychological harm Plaintiffs' experts

2  describe. (Scott Decl. ¶¶ 13–28 & 31.) Moreover, "a lot of people in segregation don't want to

3  step down. The notion that everybody hates segregation is incorrect. Some people feel safer

4  there." (Vorous Decl., Ex. 6 [Dvoskin Depo.] 13:4–7.) Although Defendants' expert Nurse

5  Moore opined that it was her opinion that welfare checks should exceed 21 days, she did not offer

6  any opinion on whether this continuous watch would "save lives," as Plaintiffs assert. (Kahn

7  Decl. Ex. 17 (Moore Depo. at 223:14–224:25).) Likewise, the deposition testimony of Hayes and

8  the Stewart declaration only reflect their opinions that the checks should continue beyond 21

9  days. (Id. Ex. 15 (Hayes Depo. at 41:2–14); Stewart Expert Decl. Supp. Opp'n Mot. Term. ¶

10  183.)

11      Plaintiffs rely on the testimony of Dr. Joel Dvoskin that theoretically lives "could be

12  saved" by expanding the 30 minute welfare check. (Pls.' Mot. at 59:24, citing to Dvoskin Depo.

13  at 247:22–248:1.) But Plaintiffs fail to also highlight his testimony that the ability of the 30-

14  minute welfare check in and of itself to save lives is unlikely:

15

16  **Q.    The point is that for suicide prevention, one of the tools you can use in ad seg is identifying people in the act of attempting suicide and hopefully interrupting them.**

17

18  A.    That is very unlikely with one-hour or 30-minute checks, to be honest with you. It's – people say to do it, but its probably not going to stop very many suicides. It's just a matter of luck. You know, it's a two-minute process, if you

19  can tell by looking at the person that – if they're hanging, you can tell. And then you – it's a – the luck of the draw of whether you happen to catch them at the

20  moment....I'm not really sure how many suicides it would ever prevent.
    ...

21  **Q.    Would you agree that it might save more lives if California did 30-minute welfare checks for everyone in ad seg?**

22    ...

23  A.    It might.

24  (Vorous Decl., Ex. 6 [Dvoskin Depo.] 245:16–246:6 & 248:12–17.)

25  Theoretically, anything "could" or "might" save an inmate's life. This, however, is not

26  the standard for deliberate indifference. *Balla v. Idaho State Bd. of Corrs.*, 595 F. Supp. 1558,

27  1577 (D. Idaho 1984) (Prisons are required to establish no more than a "basic program for the

28  identification, treatment, and supervision of inmates with suicidal tendencies."); *Clouthier v.*

38

1   *County of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (rejecting deliberate indifference

2   claim where county jail "had reasonable and well-established written policies" for handling

3   detainee's mental health needs, and the county "invested considerable resources in developing its

4   polices and training its employees" on these issues); *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d

5   1535, 1537 (11th Cir. 1994) (upholding county's suicide prevention policies which included basic

6   screening questionnaire and policy of suicide watch for inmates with suicidal tendencies).

7          Plaintiffs cite to the Special Master's findings relating to three suicides that occurred in

8   2011 in administrative segregation. (Pls.' Mot. at 59:8–14.)  According to the Special Master's

9   report, two inmates (identified as G and EE) were housed in administrative segregation and one

10  inmate (identified as AA) was housed in the condemned unit at San Quentin at the time of their

11  death. (ECF No. 4308 at 2–3, 95, 241 & 267.)[19]  Although Plaintiffs correctly note that the

12  suicide report states that inmate EE was found in full rigor, the Special Master's expert found this

13  suicide *neither* foreseeable nor preventable. (ECF No. 4308 at 269.)  He also determined that this

14  suicide was "well-planned" and not impulsive. (*Id.* at 269.)  Thus, it is highly speculative that a

15  30 minute welfare check would have prevented this inmate's death.  Inmate G took his life within

16  21 days in administrative segregation and inmate AA was housed in the condemned unit at San

17  Quentin, not in administrative segregation. (ECF No. 4308 at 95 & 241; *see also* Allison Decl. in

18  Supp. of Defs.' Obj. to 2011 Suicide Rep. ¶ 10, ECF No. 4326–1 (describing correctional action

19  taken in response to San Quentin suicide).)  Thus, these two suicides do not support a request to

20  extend the 30 minute welfare check either.

21         Nonetheless, because CDCR continues to take all suicide risk seriously, Secretary Beard

22  directed three policy changes effective May 29, 2013.[20]  First, CDCR will conduct three welfare

23  

24  ────────────────
[19] The other two inmates identified as R and X were not housed is segregation. (ECF No. 4308 at 185, 224–25.)

25  [20] Plaintiffs' questions concerning CDCR's March 20 memorandum that became effective on May 29 make no sense in light of their knowledge—indeed, their creation—of most

26  components of the State's prison mental health system.  Any treating clinician may state that continuing welfare checks are clinically indicated based upon their professional opinion, whether

27  based on observed behavior or not.  And Plaintiffs' attempt to expand this litigation to all CDCR inmates—rather than those within the Mental Health Services Delivery System—must be

28  rejected.

1  checks per hour at staggered intervals not to exceed 30 minutes. (Allison Decl. ¶ 37.)  Second,

2  clinical staff may continue welfare checks beyond 21 days on specific inmates in administrative

3  segregation when deemed necessary.  (*Id.*)  Third, correctional officers complete security checks

4  at least every 30 minutes to ensure that all inmates are accounted for within their assigned

5  housing units. (*Id.*)

6      Moreover, to address concerns raised by the special master related to the staggering of the

7  30 minute welfare checks, CDCR acquired an electronic monitoring system called Guard One

8  consisting of an electronic recording device to digitally record the correctional officers check time

9  at all pre-assigned individual cell locations. (Allison Decl. ¶ 38.)  This tracking system will

10  electronically and automatically store each welfare check conducted by an officer. (*Id.*)  Upon

11  completion of the correctional officer's shift, the data, including the timing and results of the

12  welfare checks, will be electronically transferred to a software system located on the department's

13  network. (*Id.*)  This system will allow better tracking by CDCR headquarters. (*Id.*)  This system,

14  which was previously piloted at Centinela State Prison, is currently being installed at all other 32

15  CDCR prisons. (*Id.*)

16  **CONCLUSION**

17      Plaintiffs fail in their burden to prove ongoing constitutional violations supporting further

18  orders related to CDCR's segregation units, and cannot show Defendants are acting with

19  deliberate indifference to inmates' mental health needs.  Conversely, Defendants continue to

20  provide appropriate mental health care to inmates in those settings.

21  / / /

22  / / /

23  / / /

1       Therefore, this Court must reject Plaintiffs' invitation to supplant State prison officials'

2  judgment regarding the safety and security of CDCR's institutions with their own, and deny their

3  motion.

4  Dated:  July 24, 2013                Respectfully Submitted,

5                             KAMALA D. HARRIS
                                 Attorney General of California

6                             JAY C. RUSSELL     .
                                 Supervising Deputy Attorney General

7                             /s/ Debbie J. Vorous

8

9                             DEBBIE J. VOROUS
                                 Deputy Attorney General
                                 *Attorneys for Defendants*

10

11  CF1997CS0003
   31733163.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Opp'n to Pls.' Mot. Related to Housing and Treatment of Mentally Ill Inmates in Segregation
(2:90-cv-00520 LKK JFM PC)