KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
JESSICA KIM, State Bar No. 257766
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 1300 I Street
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et al., <br><br> Defendants. | 2:90-cv-00520 LKK JFM PC <br><br> **DECLARATION OF DR. TIM BELAVICH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION RELATED TO HOUSING AND TREATMENT OF MENTALLY ILL PRISONERS IN SEGREGATION** |

I, Tim Belavich, declare as follows:

1. I am both Acting Deputy Director of the Statewide Mental Health Program and Director of Division of Health Care Services for the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motion relating to the Housing and Treatment of Mentally Ill Prisoners in Segregation.

1

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK JFM PC)

2. I was appointed as CDCR's Acting Director, Division of Health Care Services in February 2013. Some of my duties as Director include responsibility for and supervision of the Department's statewide mental health program and statewide dental program. I am familiar with current processes in place at headquarters to address quality management and improvement and suicide prevention. In addition, I am familiar with the extensive policies and procedures that govern the prison mental health care delivery system at the institutional level and have visited and evaluated the majority of prisons with mental health care programs.

3. In addition, I was appointed on March 12, 2012, as CDCR's Acting Statewide Mental Health Program Deputy Director. As Acting Deputy Director, I am responsible for and supervise the Field Operations Unit, Policy and Clinical Support Unit, Health Care Placement Oversight Program, and compliance with Coleman mandates. Prior to that appointment, I served as Chief Executive Officer (CEO) at California State Prison, Los Angeles County. In that capacity, I was responsible for the entire health care delivery system at the prison, which included medical, pharmacy, nursing, mental health, and dental services. Prior to my appointment as the CEO, I served in the capacities of Staff, Senior and Chief Psychologist and as the Health Care Manager at California State Prison, Los Angeles County and/or San Quentin.

4. I hold degrees in Clinical Psychology and Health Care Administration, and am certified as a Correctional Health Professional by the National Commission on Correctional Healthcare.

5. In their motion, Plaintiffs have proposed several unnecessary changes to be applied to CDCR's segregated housing. These points are addressed more specifically below. However, CDCR mental health staff takes very seriously the provision of mental health treatment to mentally ill inmates placed in segregated housing. In providing treatment to segregated inmates, CDCR must strike a balance between providing appropriate and constitutional mental health care to inmates while also providing for the safety and security of the staff and inmate population at the institution.

///

///

2

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK JFM PC)

**Mental Health Services Provided to Inmates in Segregation**

6. Inmates at the Correctional Clinical Case Management System level of care in segregated housing units are, at a minimum, seen with increased frequency including daily monitoring by Licensed Psychiatric Technicians, weekly clinical rounds, quarterly treatment teams meetings, and medication management. The Court-ordered Program Guide contemplates that inmates at this higher functioning level of care will not require group treatment unless individually assessed to need it by their treating clinician. In such a case, the inmate will receive self-help therapeutic activities, group treatment, and other supportive care. For example, in April 2013, CDCR offered 447 inmates housed in administrative segregation at the Correctional Clinical Case Management System level of care approximately 2,100 hours of group treatment.

7. Enhanced Outpatient Program services for inmates in administrative segregation include, at a minimum, weekly individual clinical contacts, quarterly interdisciplinary treatment team appointments, medication management, structured therapeutic activities, and crisis intervention. Other treatment, such as medication education and recreation therapy, is provided as deemed necessary by mental health professionals.

8. Inmates housed in Psychiatric Services Units receive an initial mental health evaluation, interdisciplinary treatment team appointments, weekly clinician contacts, psychiatrist evaluation at least monthly, and structured therapeutic activities.

9. Moreover, on a system-wide basis, CDCR is presently meeting Program Guide requirements for treatment hours. For example, although the required number of treatment hours CDCR must offer each week to segregated inmates at the Enhanced Outpatient Program level of care is 10 hours, our data for the period of June 1, 2013, through June 28, 2013, indicates that the average number of treatment hours offered system-wide is 11.97 hours per week to inmates in each of our segregation units and 10.95 hours per week to inmates in each of our three Psychiatric Services Units. The average number of structured Enhanced Outpatient Program treatment is monitored weekly. Attached as Exhibit 1 is a chart reflecting structured treatment data for June 1, 2013 to June 28, 2013. When treatment hours fall below the 10 hours of required treatment, the

3

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK JFM PC)

regional mental health administrator contacts the institutions' Chief of Mental Health, and either one of my designees or me contact the Chief Executive Officer.

10. For Correctional Clinical Case Management System inmates housed in a Security Housing Unit, the Court-ordered Program Guide requires monthly primary clinician contacts. Groups are offered to inmates if deemed clinically necessary. My review of the data from MHTS.net showed that inmates housed in Security Housing Units receive the level of care required by the Program Guide and exceed it in many cases. For instance, at Corcoran, 114 inmates attended a combined 856.75 hours of group therapy between January 1, 2013 and June 30, 2013. In addition, at California Correctional Institution, 86 inmates attended 471.25 hours of group therapy in the same time frame.

11. CDCR has systems in place for clinical staff, custodial staff, and even inmates to identify persons who may be in need of additional assistance. Specifically, all inmates are screened for mental health issues upon entry in administrative segregation. CDCR also continuously trains both clinical and correctional staff to recognize the signs and symptoms of mental illness among inmates. Moreover, both clinical and custodial staff may refer an inmate for further evaluation at any time using the CDCR Form 128-MH-5. Additionally, inmates can self-refer via CDCR Form 7362 or notify a staff member if they have concerns regarding another inmate. The success of these processes was clearly demonstrated by the abbreviated 2011 Mental Health Assessment and Referral Process tour during which the Special Master and his staff identified only 44 inmates from a review of over 900 cases for whom a follow-up evaluation was recommended. (See Docket No. 4132 at 21.) Once identified, CDCR has a process for referring these identified inmates to a higher level of care, more commonly known as the "Sustainable Process." Through this process, inmates are routinely assessed regarding several objective and subjective standards to determine whether they may require a higher level of intervention to meet their mental health needs. Notably, since the 2011 tour discussed above in this paragraph, CDCR's sustainable process has been fully implemented, monitored, and further improved, as recognized by the Special Master and his monitors. (See Special Master's 25th Round Monitoring Report, Dkt. 4298, noting the "overall progress among the institutions with use of the

4

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK JFM PC)

sustainable process for identifying and referring inmates in need of inpatient care.") Through these two systems, CDCR routinely identifies inmates who may be in need of additional services and refers them accordingly.

12. CDCR continues to recruit new staff and retain existing staff. First, CDCR has made alterations to recruitment posters and flyers to better highlight the benefits of state employment. Second, CDCR began specifically targeting the psychiatrist classification by engaging in outreach to universities as well as attending National Commission on Correctional Health Care and American Psychiatric Association conferences. These recruitment efforts are currently in the process of being applied to the social worker classification. Through these efforts, between January 1, 2013, and May 29, 2013, CDCR has hired 45 new psychiatrists statewide and is in the process of hiring another 44. Additionally, a net gain of 31 social workers has been added to CDCR's staffing statewide since September 2012.

13. Regarding confidentiality, inmates are not deprived of access to confidential meeting space if requested. To the contrary, every prison is equipped with confidential meeting space that can be used whenever requested.

**Pre-Placement Screenings of Inmates in Segregation**

14. On page 32, beginning line 21 of their May 6, 2013 motion, Plaintiffs discuss CDCR's 31-item questionnaire used to screen new arrivals in administrative segregation units. On page 33, lines 9-10, plaintiffs go on to state that "Defendants have long known that their current screening tool is inadequate, yet they have failed to replace or revise this tool." Although headquarters mental health staff did decide to improve the screening tool, it is inaccurate to state that they "have long known" that the tool "is inadequate." Dr. Robert Canning developed a new proposed screening tool, which is a combination of two instruments that together form a shorter and more targeted questionnaire. Based on his recommendations, the plan for replacement of the current screening measure was also developed in 2012. A pilot of the new proposed screening tool was authorized in February 2013. To test the new tool, CDCR developed a series of steps to evaluate the new screening questionnaire: (1) Mental Health worked with nursing administration at headquarters to facilitate the piloting of the new tool in four institutions. Nursing

5

administration agreed to be part of the pilot and work with the local nurse educators to train licensed psychiatric technicians in administering the new tool. (2) Chiefs of Mental Health at the pilot institutions have agreed to continue with administrative segregation supervisors and/or line clinicians administering the current 31-item questionnaire while the psychiatric technicians administer the new piloted tool. This will both ensure we maintain our current screening with all new arrivals in an Administrative Segregation Unit and provide a comparison to test the effectiveness of the new piloted tool. (3) Training on the project and administering/scoring the new screener for nurse educators and mental health clinicians in segregation units will be completed in the next few months. (4) Once training has been completed, the pilot will commence within two weeks and proceed until 100 new screens have been delivered in each of the test institutions. (5) Data will be collected on scoring, ease of use, referrals made from both the current and piloted screening tools, and outcomes of any further evaluations. (6) This data will then be analyzed and a decision made whether to proceed. The decision will be based on ease of use, appropriate referral criteria, and referral rate compared with the current screening tool.

### Suicide Prevention Measures in Segregation

15. CDCR has taken numerous steps to abate suicide risk in segregated housing. For example, multiple proactive measures exist in Administrative Segregation Units to prevent suicides, including double-celling inmates when safe, and providing electronic appliances, when feasible. Additionally, all correctional officers receive training by mental health staff on how to recognize the signs and symptoms of suicide, respond appropriately to suicide gestures and attempts, and identify possible actions that could indicate the need for a mental health evaluation. In 2009, the Department completed a project to construct new small management yards. It also replaced ventilation screens (to minimize tie-off points) and retrofitted intake cells to eliminate attachment or tie-off points for inmates newly admitted to administrative segregation. Moreover, the Department requires nursing staff to conduct daily clinical rounds, custody and clinical staff to conduct daily morning "check in" meetings, and custody to conduct 30-minute welfare checks of every inmate during their first three weeks in segregation or longer if needed. Mental Health

6

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation  (2:90-cv-00520 LKK JFM PC)

also collaborated with the Division of Adult Institutions to implement an electronic check system to better effectuate and monitor the custody welfare checks. Suicide prevention and response improvement teams exist both at headquarters and at each prison. These teams train prison staff on suicide prevention, response, reporting, and suicide review. Each prison's suicide prevention committee is required to amend and implement local operating procedures when necessary.

16. In addition, the Department continues in its efforts to develop new strategies to reduce suicide. CDCR chartered a workgroup to analyze segregated housing issues, including suicide risk factors in administrative segregation housing. This workgroup is developing quality improvement measures to reduce the lengths of stay in these units. CDCR also chartered a weekly Suicide Prevention Workgroup, which discusses new strategies to reduce the risk of suicide throughout our institutions and provides its recommended solutions to management for consideration and implementation.

**CDCR Adheres to the American Psychiatric Association Guidelines.**

17. In my capacity as CDCR's Acting Director, Division of Health Care Services, I can state that CDCR recognizes the risk that segregated environments may negatively impact individuals with and without mental illness. Therefore, as highlighted above, CDCR has designed a system to identify and provide care to mentally ill individuals in a segregated environment. In addition, CDCR's system adheres to the American Psychiatric Association guidelines for providing mental health care to inmates in segregation units.

18. The American Psychiatric Association guidelines for providing psychiatric care in prison segregation units acknowledge that inmates with mental illnesses may be safely housed in prison segregation units when certain principles are followed, including: (1) prohibiting placement of an inmate solely because the inmate exhibits symptoms of mental illness, unless there is an immediate and serious danger for which there is no other reasonable alternative; (2) ensuring that inmates in segregated housing have access to services that meet the inmates' medical and psychiatric needs; (3) removing inmates who are suffering a severe psychiatric crisis, including psychosis and suicidal depression, and not returning them until they are psychologically able to tolerate that setting; and (4) assessing inmates who are known to have

7

serious mental health needs, especially those with a known history of serious and persistent mental illness, on a regular basis by qualified mental health practitioners, to identify and respond to emerging crises at the earliest possible moment. (American Psychiatric Association, Psychiatric Services in Jails and Prisons (2000) at 4-5.)

19. CDCR meets these guidelines. It: (1) conducts administrative review hearings to identify the contribution, if any, of mental illness to rule violations and to prevent placing inmates in segregation when mental illness caused the rule-violating behavior; (2) timely screens inmates for mental illness before placing them in segregation; (3) provides access to mental health services while in segregated housing that meets or exceeds Program Guide requirements; (4) removes inmates from segregation who exhibit severe psychiatric crises to a Mental Health Crisis Bed and/or Department of State Hospital operated program, when appropriate; and (5) assesses and responds to inmates known to have serious mental health needs on a regular basis.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on July 24, 2013.

                 /s/ Tim Belavich, Ph.D.

                 Tim Belavich, Ph.D.
                 Director of Health Care Services (A)

**(original signature retained by attorney)**

8

Decl. T. Belavich Supp. Defs.' Opp'n. to Pls.' Mot. Rel. to Housing & Treat. Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK JFM PC)

# EXHIBIT 1

DIVISION OF HEALTH CARE SERVICES
Statewide Mental Health Program

| Structured Treatment Data from June 1, 2013 - June 28, 2013 | | | | | |
|---|---|---|---|---|---|
| EOP ASU | | | | | |
| Institution | Scheduled | Offered | Attended | Refused | Cancelled |
| CMC | 14.06 | 11.18 | 6.05 | 5.13 | 2.88 |
| CMF | 11.39 | 10.91 | 8.44 | 2.47 | 0.48 |
| CIW | 15.81 | 11.95 | 7.38 | 4.57 | 3.86 |
| COR | 15.27 | 14.36 | 7.66 | 6.70 | 0.91 |
| LAC | 11.38 | 10.79 | 7.73 | 3.06 | 0.60 |
| MCSP | 17.46 | 10.86 | 5.66 | 5.20 | 6.60 |
| RJD | 11.35 | 10.77 | 6.11 | 4.66 | 0.58 |
| SAC | 12.05 | 11.63 | 4.86 | 6.70 | 0.42 |
| SQ | 17.17 | 16.98 | 14.79 | 2.20 | 0.19 |
| SVSP | 10.79 | 10.31 | 5.17 | 5.14 | 0.48 |
| EOP PSU | | | | | |
| Institution | Scheduled | Offered | Attended | Refused | Cancelled |
| PBSP | 11.59 | 9.52 | 7.05 | 2.47 | 2.07 |
| CIW | 13.52 | 10.91 | 9.67 | 1.24 | 2.61 |
| SAC | 13.83 | 12.42 | 8.99 | 3.44 | 1.41 |