KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF KATHLEEN ALLISON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION  RELATED TO HOUSING AND TREATMENT OF MENTALLY ILL PRISONERS IN SEGREGATION AND MOTION RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |

I, Kathleen Allison, declare as follows:

1. I am the Deputy Director of the Division of Adult Institutions, Facilities Support, for the California Department of Corrections and Rehabilitation (CDCR).  I submit this declaration in support of the Defendants' Opposition to Plaintiffs' Motion Related to the Housing and Treatment of  Mentally Ill Inmates in Segregation and Motion Related to Use of Force and

Disciplinary Measures.  I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify.

2.  I began working for CDCR in 1987 as a Medical Technical Assistant and promoted to a Senior Medical Technical Assistant in 1993.  I became a community resources manager in 1996, where I managed various inmate programs including religion, Arts in Corrections, Inmate/Family Services, and substance abuse programs such as Alcoholics Anonymous.  I served one year as the Litigation Coordinator at Avenal State Prison.  In 2002, I became a Correctional Health Services Administrator II at the California Substance Abuse and Treatment Facility, with responsibility for health care budgets, contract management, personnel, and disciplinary matters.  I also acted as health care manager at that institution, overseeing delivery of health care to inmates.

3.  In 2004, I became an Associate Warden, originally assigned to Health Care.  I subsequently moved and became an Associate Warden over housing, overseeing the custody staff and operations on Level II General Population yards, a Sensitive Needs Yard, and Administrative Segregation units; managing various litigation compliance efforts; and overseeing areas including Case Records and Religious Services.  In 2007, I became Chief Deputy Warden, at which time my duties expanded to include oversight of all staff in the institution, with primary coordination of all clinical services and custodial functions of the institution.  In 2009, I was appointed Warden and became responsible for the safety and security of all the inmates, staff, and visitors to the institution.  Among my duties was coordination with staff in the handling of the care, discipline, custody, and employment of inmates.  In November 2011, I was named Associate Director for the Division of Adult Institutions.  My duties included providing managerial direction to wardens who reported to me, implementing the Alternative Custody Program, and managerial direction of various community-based programs providing services to offenders and their children.  I promoted to Deputy Director in approximately April 2012.

4.  Some of my current duties as Deputy Director for the Division of Adult Institutions include oversight of the following: inmate case records administration; inmate classification unit;

budgeting; statewide inmate transportation unit; prison bed management; fiscal planning and development; staffing standardization; institutional audits; and policy and procedure standardization. The Policy and Procedure Standardization Unit is primarily responsible for CDCR headquarters review of Coleman compliance for DAI.

5.   Plaintiffs have proposed several unnecessary and unworkable changes to CDCR's segregated housing that are dangerous to the inmate population and institutional staff. These points are addressed more specifically below. CDCR takes the issue of housing mentally ill inmates in segregated housing very seriously. CDCR must strike a balance between providing appropriate and constitutional mental health care to the inmate while also providing for the safety and security of the staff and inmate population at the institution. Additionally, Plaintiffs improperly criticize CDCR for ignoring issues that it takes seriously and regularly works to improve.

**CDCR'S Segregation Units.**

6.   CDCR operates four types of segregation units within its prisons: Administrative Segregation Units; Enhanced Outpatient Program-Administrative Segregation Units; Security Housing Units; and Psychiatric Services Units. The CDCR Mental Health Services Delivery System Program Guide (2009 Revision) provides that inmates at the Correctional Clinical Case Management System level of care may be placed in an Administrative Segregation Unit or in one of four Security Housing Units. These Security Housing Units are located at California Correctional Institution; California Institution for Women; California State Prison, Corcoran; and California State Prison, Sacramento.

7.   By comparison, inmates at the Enhanced Outpatient Program level of care may be placed in one of eleven Enhanced Outpatient Program-Administrative Segregation Unit hub institutions or at one of three Psychiatric Services Unit institutions. The eleven hub institutions are: California State Prison, Sacramento; Richard J. Donovan Correctional Facility; California Men's Colony; California State Prison, Los Angeles County; Salinas Valley State Prison; California Medical Facility; California State Prison, Corcoran; Mule Creek State Prison; San

Quentin State Prison; California Institution for Woman; and Central California Women's Facility. The three Psychiatric Services Units are located at California State Prison, Sacramento; Pelican Bay State Prison; and California Institution for Women.

**Length of Stays in Segregation Units.**

8. Plaintiffs request that the Court order strict time limits for placement of *Coleman* class members in segregation units. For inmates at the Enhanced Outpatient Program level of care, Plaintiffs propose capping their length of stays in Administrative Segregation Units or Psychiatric Services Units at 30 days. For inmates at the Correctional Clinical Case Management System level of care, Plaintiffs propose capping their length of stays in Administrative Segregation Units and Security Housing Units at 60 days   For both proposals, Plaintiffs propose that where the unit is unable to provide a "minimally adequate treatment program," the inmate will serve no more than 72 hours in the segregation unit for their rules violation or criminal offense. (Pls.' Mot. at 17–19.) Plaintiffs' proposal ignores established due process guidelines and is incredibly dangerous. The timelines do not allow for rules violation hearings and encourage arbitrary releases based solely on lengths of stay.

9. Lumping together the Administrative Segregation Units, the Security Housing Units, and the Psychiatric Services Units for purposes of reducing length of confinement in those housing units, categorically ignores the fundamental differences between these segregation units. Administrative Segregation Units are generally temporary segregation housing units which, as the name implies, are to administratively review the need for segregation, whereas Segregated Program Housing, such as the Security Housing Units and the Psychiatric Services Units, are designed for extended term programming. In rare occasions, inmates may remain in an Administrative Segregation Unit longer than anticipated if he or she is awaiting trial in a particular county, is pending a gang debrief, or is awaiting a Segregated Housing Unit bed.

10. Inmates are not placed in segregated housing due to having a mental illness. Generally, segregated housing is used to house inmates who violate the rules of the institution. Inmates housed in those facilities violate a variety of criminal offenses committed while

incarcerated including assault, battery, attempted murder, possession of a weapon, drug trafficking, and homicide. Plaintiffs propose that by simply being in the Mental Health Services Delivery System, inmates should have their sentences capped at 30 to 60 days. For instance, an inmate at the Correctional Clinical Case Management System level of care could murder his cell mate or a correctional officer, yet could only be placed in segregated housing for 60 days after which point the inmate would be released onto the yard.

11. In addition, if an inmate is found guilty of certain serious offenses such as murder, attempted murder, assault on inmates or staff, or possession of a weapon, the inmate will have their case reviewed by the Institutional Classification Committee who may establish a determinate period of confinement in a Security Housing Unit or Psychiatric Services Unit. The clinical assessment is considered during the Institutional Classification Committee to ensure that the inmate's mental health is considered prior to any committee action. Moreover, the committee solicits input from the clinician in attendance at the hearing on the appropriateness of placement or length of term in a Security Housing Unit or Psychiatric Services Unit. This deliberative and collaborative dialogue encompasses all relevant case factors, such as mental illness, seriousness of the misconduct, and past conduct. Plaintiffs propose supplanting this dialogue and its numerous due process safeguards afforded to the inmate with an arbitrary release of a dangerous individual based solely on one criterion – length of stay.

12. Plaintiffs assert that CDCR has not complied with the Court's 2007 order to "examine more effective ways for reducing the lengths of stay of EOP inmates in administrative segregation"). (Pls. Mot. at 17:6–7.) They also assert that "Defendants underreport the length of stay in segregated housing for many class members. (*Id.* at 7 n.4.) Neither is true. Previous administrative segregation population reporting systems were individualized at each institution and the institutions reported their average length of stays to headquarters. However, since the establishment and implementation of the Administrative Segregation Unit tracking log in March of 2011 the reporting of length of stay is accessible at headquarters via the tracking system. The administrative segregation length of stay is continuous unless the inmate is released from an

Administrative Segregation Unit and readmitted for a different offense or reason. For example, an inmate that is temporarily transferred to a Mental Health Crisis Bed will remain in the administrative segregation tracking system under their date of original administrative segregation placement - not the date they return from the crisis bed. By comparison, length of stay in a Security Housing Unit is calculated when an inmate is housed in an identified bed.

13. It is CDCR's policy that, in all cases, inmates are housed and maintained in the least restrictive housing possible, and that placement in segregated housing shall be for no longer than the minimum time necessary to provide for the protection of staff, inmates, and security. To that end, administrative segregation population and lengths of stay are reported to Headquarters and cross referenced in the Administrative Segregation Unit tracking system as part of a comprehensive institution performance review. These reports identify all inmates who have remained in administrative segregation for greater than 90 days. In addition, from the tracking system, CDCR runs several drills requesting institutions to explain continued placements of these individuals. The drills evolved to focus on timeliness of administrative segregation processes that affect the length of stay. I review these reports personally and set up a conference call with the associate director, warden, and myself so that the institution can explain the reasons for the length of stay. The majority of cases we review are pending gang assessment cases. These reviews allow the Division of Adult Institutions to verify tracking data and determine whether additional resources are needed at the institution.

14. In addition to the above steps, CDCR formed an Administrative Segregation Unit Stakeholder Workgroup that meets monthly and discusses policies and proposals for improving the Administrative Segregation Unit system. This group consists of headquarters representatives from numerous stakeholders regarding administrative segregation policies and procedures, including the Division of Adult Institutions, the Division of Health Care Services, Population Management and Health Care Population Oversight, Legal Affairs, Classification Services, and other subject matter experts. I am one of the co-facilitators of this group. The original charter of the workgroup was to reduce suicide rates and develop strategies for CDCR to better manage

populations for Enhanced Outpatient Program inmates housed in administrative segregation. Our more recent focus has been on reducing the length of stay in administrative segregation units. As of July 24, 2013, the average state-wide length of stay for inmates housed in administrative segregation is 125 days. This average length of stay for inmates at the Correctional Clinical Case Management System level of care is 115 days and for inmates at the Enhanced Outpatient Program level of care 105 days.

15.   At the present time, no inmates pending placement into an Enhanced Outpatient Program Administrative Segregation Unit hub institution have been waiting beyond Program Guide required timelines. As a result of increased monitoring of Enhanced Outpatient Program Administrative Segregation Unit hub transfer cases, coupled with numerous training sessions provided to the institutions, the list decreased from 185 inmates in December 2011 to zero inmates on the Enhanced Outpatient Program Administrative Segregation Unit hub waitlist in May 2012.

**Availability of Reading Materials and Appliances to Inmates Housed in Segregation Units**

16.   Plaintiffs complain that access to "reading materials, radio, television, or other stimulation is extremely limited in most segregation units." (Pls. Mot. at 8:5–6.) This is inaccurate. With respect to administrative segregation units, all units except those without electrical capabilities authorize inmates to possess at least one entertainment device. CDCR issued a memorandum to the field as of March 20, 2013, titled "Administrative Segregation Unit Requirements Regarding Clustering and Entertainment Appliances." This memorandum is attached as Exhibit A. The purpose of this memorandum is to remind institutions that CDCR authorized inmates in administrative segregation to possess one entertainment appliance. With respect to Security Housing Units and Psychiatric Services Units, all units have electrical capacity and inmates are allowed electrical appliances.

17.   In all segregation units, inmates are provided reading materials. A one-for-one book exchange is available in all segregation units.

18. Plaintiff's also claim that California Medical Facility's Willis Unit was "newly refurbished" and "renovated" without installing electrical capacity. That is not correct. The purpose of the construction that Plaintiffs reference was to replace old cell doors that CDCR could not find replacement parts for. Air conditioning was upgraded at that time as well. A complete "renovation" was never contemplated and thus did not occur.

**Use of Administrative Segregation to Address Inmates' Safety Concerns.**

19. When an inmate's presence in an institution's general population presents an immediate threat to the safety of the inmate, CDCR has the duty to protect him or her by providing alternative housing. (See 15 CCR § 3335.) Thus, it is common practice for inmates to be moved to a different facility or program at an institution for safety reasons that are specific to a particular yard. It is generally the inmate's articulation of his or her inability to house in alternate general population yards at the institution of endorsement that prompts placement in administrative segregation. Inmates with safety concerns are not automatically placed in administrative segregation. Thus, CDCR uses administrative segregation as a placement of last resort when safety concerns are present, not as punishment.

20. CDCR is currently in the process of establishing a non-disciplinary segregation unit through the California regulatory process. This unit would be for inmates who are viewed as less of a threat to administrative segregation unit security. Non-disciplinary unit inmates would receive more privileges than inmates classified as administrative segregation inmates. They would be allowed limited telephone privileges, greater canteen purchase limits, more frequent personal property packages, and retention of personal property more consistent with pre-segregation allowances.

**CDCR Does not Use Administrative Segregation for "Lack of Bed."**

21. Plaintiffs claim there are "scores" of inmates housed in administrative segregation due to "lack of beds." Plaintiffs greatly overstate this perceived issue and confuse it with the circumstance where an inmate's custody classification is changed and transfer to a Special Needs Yard is required. As of July 23, 2013, there are only 50 inmates in administrative segregation

who were waiting for a bed to open on a yard. The overall administrative segregation population is over 6600 inmates. Of those 50 inmates, only 24 are class members. 19 of those 24 are Correctional Clinical Case Management System level of care inmates. Four are Enhanced Outpatient Program inmates housed in an Administrative Segregation Unit hub institution hub and one is an Enhanced Outpatient Program inmate currently housed in a Mental Health Crisis Bed. Any classification that an inmate is being held in administrative segregation while waiting for a different bed to open is a custody classification only. This designation does not impact the requirement to provide 30 minute welfare checks to inmates housed in administrative segregation.

22. Plaintiffs' mistaken view that there are "scores" of lack-of-bed inmates stem from their observations at California Institute for Men. Plaintiffs visited a housing unit, Cypress Hall, which houses both administrative segregation and reception center inmates. However, reception center inmates housed in Cypress Hall are not subject to the same restrictions placed on segregation unit inmates. Reception center inmates receive full reception center privileges including mail, clergy, library, health care, access to dining hall ,visiting, phone calls, yard, showers, and canteen. Although this housing location is for Reception Center Overflow, Correctional officers colloquially have labeled the non-administrative segregation unit inmates in Cypress Hall as lack of bed, or "LOB."

**CDCR Appropriately Discharges Inmates from the Inpatient and Mental Health Crisis Beds to Segregation.**

23. Plaintiffs seek an order stopping Defendants from placing prisoners discharging from a Department of State Hospital inpatient program or a Mental Health Crisis Bed into a segregation setting absent written permission from the Prisoner's mental health provider. Plaintiff's request creates a serious safety concern.

24. CDCR does not categorically send segregation inmates who discharge from inpatient care (Department of State Hospitals or Mental Health Crisis Bed) back to the segregation unit

they originated from. CDCR attempts to resolve an inmate's segregation issues prior to discharge from the Department of State Hospitals. Thus, if an inmate would be time-served on his Segregated Housing Unit or Administrative Segregation Unit term upon discharge from an inpatient unit, case workers make sure that the inmate's classification is properly adjusted prior to discharging from the inpatient unit in order to avoid unnecessarily returning to segregation. However, if the inmate discharging from inpatient care has unresolved segregation issues and has been discharged at the Enhanced Outpatient Program level of care, the inmate is not returned to the original administration segregation unit and, instead, is discharged to an Enhanced Outpatient Program Administrative Segregation Unit Hub when the inmate presents an immediate threat to the safety of self or others, endangers institutional security, or jeopardizes the investigation of alleged serious misconduct or criminal activity. (See Exhibit B, Psychiatric and Return memorandum issued March 21, 2013, for Department of State Hospital Acute and Intermediate care Facility Inmate-Patients, reinforcing policies that have been in place for years.) Furthermore, if a discharging inmate originally transferred from a Security Housing Unit or Psychiatric Services Unit, the Correctional Counselor engages in a case-by-case evaluation to determine the least restrictive housing necessary and if appropriate refers the inmate to an Institutional Classification Committee to consider suspension of the remainder of the segregated term.

25. Taking away the custodial aspect of this process, as Plaintiffs' request, would therefore create a grave security risk for staff and prisoners alike. The decision regarding where CDCR may safely place an inmate due to his or her custody designation is rightly with correctional officers, and not with mental health clinicians.

**The Court Should Not Expand the Pelican Bay State Prison Security Housing Unit Exclusion to All CDCR Security Housing Units.**

26. Plaintiffs' assumption that the other CDCR Security Housing Units operate in the same manner as the Pelican Bay State Prison is incorrect. Other Security Housing Units have

natural light unlike Pelican Bay's Security Housing Unit that does not have windows. Nor are the other units exercise yards as restrictive as the Pelican Bay yards. All inmates in the Security Housing Units are allowed electrical appliances, such as television sets or radios, in their cells.

27. Inmates are housed in a Security Housing Unit after being found guilty of a serious rule violation or criminal offense committed while incarcerated. Therefore, a blanket exclusion for all mentally ill inmates from the Security Housing Units would greatly diminish the deterrent effect of the unit.

28. The Security Housing Units house inmates who have committed a variety of offenses, some of which are heinous. These offenses include attacks on staff and other inmates including murder. Inmates often commit repeated violations of the rules leading to their security term. Moreover, inmates often do not cease this behavior once housed in a Security Housing Unit. I have reviewed several Security Housing Unit profiles for inmates at the Correctional Clinical Case Management System level of care. One such inmate received 18 rule violations, including battery and obstructing a peace officer, in the five years leading up to his July 2000 Security Housing Unit term. Since that time, he has amassed another 106 rules violations including battery on a peace officer, indecent exposure, threatening sexual assault, attempted battery, resisting staff, and destruction of state property. Similarly, another inmate entered the Security Housing Unit in 2006 and since that time has committed 23 rule violations including multiple batteries on a peace officer, aggravated battery on a peace officer, and threatening staff. A third inmate has had 36 separate Security Housing Unit terms since 1999. During his various terms he has continued to commit crime by battering staff, possessing weapons, threatening inmates, attempting to murder a peace officer, and possessing contraband.

**A Comprehensive Sweep of all Inmates in Segregation Over 90 Days in Unnecessary and Dangerous.**

29. Custody takes a very active role in monitoring inmates who may need mental health treatment while housed in a segregation unit. For instance, daily morning "check-in" meetings

occur between custody and clinical staff to review the inmates housed in the unit. In addition, the Institutional Classification Committee, generally chaired by the warden or chief deputy warden, reviews an inmate's placement in administrative segregation within ten days of the inmate's placement in the unit. (15 CCR § 3335, subd. (c).) An inmate's case is generally followed up within 30 days if the inmate is placed in administrative segregation for purposes of an investigation. The case is generally reviewed within 90 days if the inmate was placed in administrative segregation for a Rules Violation Report and is generally reviewed within 180 days if placed in administrative segregation due to a District Attorney referral. In addition, any staff member, including correctional officers, who observes possible signs or symptoms of a serious mental disorder "shall refer an inmate for clinical evaluation by completing a CDCR 128-MH5, Mental Health Referral Chrono." (Program Guide 12-7-3.) Moreover, inmates in administrative segregation receive daily contact with the licensed psychiatric technicians and may request a clinical interview to discuss their mental health needs.

30. CDCR is also already actively monitoring inmates housed in segregation units over 90 days. For Enhanced Outpatient Program inmates housed in administrative segregation, their length of stay is reviewed every 30 days outside of the Institutional Classification Committee process by the Facility Captain or Correctional Counselor II. In addition, Enhanced Outpatient Program inmates housed in administrative segregation for more than 90 days who postpone a Rules Violation hearing pending referral to the District Attorney are reviewed for alternative housing.

**CDCR's Strip Search Policies and Procedures are Appropriate and Necessary.**

31. Inmates in segregation are searched only upon leaving or entering their housing unit because of the pervasive and constant threat of inmates secreting weapons, drugs, and other contraband into administrative segregation units. Indeed, efforts to secret contraband and weapons into these units have traditionally been attempted by inmates coercing innocent inmates in segregation to act as their couriers. By searching all segregation inmates, the goal is to avoid the threats that the inmates who are not searched might face if they refused to assist in bringing in

contraband into the units. Thus, the uniform search of all inmates in segregation has the dual purpose of avoiding the coercion while also protecting the safety and security of other inmates, staff, and the segregation unit as a whole.

**CDCR's Use of Therapeutic Treatment Modules in Segregation Units Provides a Safe and Secure Environment for Inmate Treatment.**

32. CDCR uses Therapeutic Treatment Modules to strike a balance between providing security for the inmates and staff at a prison and providing adequate mental health care for class members. Inmates are placed in treatment modules during group and one-on-one contact with staff and clinicians. Groups and clinical contacts take place without correctional officers to encourage participation. Thus, without Therapeutic Treatment Modules, CDCR would have to provide correctional officers during routine clinical visits or group sessions.

33. Inmates with safety concerns may be at risk from assault from other inmates during group therapy sessions if they are not placed in therapeutic treatment modules. Thus, inmates housed in administrative segregation for safety concerns must have therapy in therapeutic treatment modules for their own safety. Therapeutic Treatment Modules thus facilitate confidential and safe treatment of inmates in segregation.

34. California Correctional Institution uses non-contact visiting rooms for some clinical contacts. However, these rooms are small and completely walled off via glass from the clinician. Communication takes place over a phone line instead of face to face. Thus, using a non-contact visiting room for segregation clinical contacts offers no realistic advantage over a therapeutic treatment module. In addition, the non-contact visiting rooms are not used for group therapy.

35. Nonetheless, CDCR is exploring alternatives to the treatment modules. A two year pilot program is in effect for the Alternative Treatment Option Module chair, which is similar to

an educational desk used in correctional facilities in New York. The pilot began at California State Prison, Corcoran and is now being finished at California State Prison, Sacramento.

36. Although the pilot program is ongoing, early surveys indicate that inmates and staff prefer to use the treatment modules over the alternative chairs by a two to one ratio. Inmates prefer the treatment modules due to the safety they provide as well as the ability to move around them instead of being chained to a desk. Group sessions utilizing treatment modules tend to last longer than those using the alternative chair.

**Welfare and Security Checks.**

37. Custody staff completes administrative segregation unit welfare checks on inmates during the first 21 days of administrative segregation at intervals not exceeding 30 minutes. Nonetheless, because CDCR continues to take all suicide risk seriously, Secretary Beard directed three policy changes effective May 28, 2013. First, CDCR will conduct three welfare checks per hour at staggered intervals not to exceed 30 minutes. Second, clinical staff may continue welfare checks beyond 21 days on inmates in administrative segregation when deemed necessary. Third, correctional officers complete security checks at least every 30 minutes to ensure that all inmates are accounted for within their assigned segregated housing units. A true and correct copy of the memorandum directing these three policy changes is attached as Exhibit C.

38. Moreover, to address concerns raised by the special master related to the staggering of the 30 minute welfare checks, CDCR acquired an electronic monitoring system called Guard One consisting of an electronic recording device to digitally record the correctional officers check time to all pre-assigned individual cell locations. This tracking system will electronically and automatically store each welfare check conducted by an officer. Upon completion of the correctional officer's shift, the data, including the timing and results of the welfare checks, will be electronically transferred to a software system located on the department's network. This system will allow better tracking by CDCR headquarters. This system, which was previously piloted at Centinela State Prison, is currently being installed at all other 32 prisons.

**Rules Violation Statistics.**

39. Plaintiffs, in their motion regarding inmate discipline, allege that CDCR does not track Rules Violation Reports. In fact, CDCR has the ability to regularly access the data. Primarily, Plaintiffs make allegations regarding two institutions' rules violation rates. Plaintiffs allege that Kern Valley State Prison's rate to mentally ill inmates is 99% versus 34% of its population. According to data recently generated in July 2013, Kern Valley gave out 1458 rules violation reports to inmates between January 1, 2013, and June 30, 2013. Of those 1458 violation reports only 550 of them were given to mentally ill inmates. Kern Valley's current average population is 3732 inmates, of which 1330 of them are mentally ill. Kern Valley's population is 36% mentally ill and 38% of the rules violation reports issued at the prison were to mentally ill inmates. This is hardly a significant difference.

40. At California State Prison, Los Angeles County, in which Plaintiffs allege that 84% of the rules violation reports are given to mentally ill inmates, accurate data generated in July 2013 indicates that this is not the case. From January 1, 2013, to June 30, 2013, California State Prison, Los Angeles County gave out 1888 rules violation reports. Of those 1888 violation reports, 779 were given to mentally ill inmates. During that same time period, the prison's average population was 3744 inmates, of which 1703 are mentally ill. Thus, while the prison's population is made up of 45% mentally ill inmates, only 41% of the violation reports were given to mentally ill inmates.

41. Plaintiffs appear to have miscalculated the data provided in connection with the Special Master's 25th Round Report. In fact, the data demonstrates that during the reporting period, 40% (644 out of 1,621) of all rules violation reports issued at Kern Valley were issued to inmates with mental illness, and 55% (725 out of 1,314) of all rules violation reports issued at Los Angeles County were issued to inmates with mental illness.

42. In fact, system-wide, CDCR does not disproportionately issue rules violation reports to mentally ill inmates. I reviewed our statistics on the issuance of rules violation reports. Between January 1, 2013, and June 30, 2013, roughly 29% of the 34643 rules violations issued in

that time period were given to mentally ill inmates. Compared to the fact that, between those same dates, mentally ill inmates made up only 27% of the CDCR population, it can hardly be said that CDCR is disproportionately targeting mentally ill inmates with rules violations.

**Plaintiff's Use of Force Statistics Are Inherently Flawed.**

43. Plaintiffs rely on the 25th Round Management Reports in making assertions regarding the rate of use of force events against mentally ill inmates. Plaintiffs assert that the data indicates that use of force is used disproportionately against mentally ill inmates. However, the data does not actually reflect Plaintiffs' assertion.

44. When a use of force incident is recorded, it records all the inmates involved in the particular incident. For instance, a general population inmate could be battering an Enhanced Outpatient Program inmate, causing correctional staff to step in and use force against the general population inmate. The event is recorded as a single use of force incident involving two inmates – one of which is mentally ill. Thus, the fact that a mentally ill inmate was involved in a use of force incident does not mean force was used against the inmate. For instance, between January 1, 2013, and June 30, 2013, Wasco State Prison had 230 separate use-of-force incidents involving 306 inmates. 120 of those inmates were mentally ill, meaning that 39% of the use of force incidents involved mentally ill inmates. Simply being involved in a use of force incident, however, does not mean force was used against the inmate.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on July 24, 2013.

    /s/ Kathleen Allison
Kathleen Allison
Deputy Director of the Division of Adult Institutions

*(original signature retained by attorney)*