# EXHIBIT 2

SEGREGATION                    SÉGRÉGATION

# The psychological effects of 60 days in administrative segregation

**Ivan Zinger**
*Correctional Service of Canada and Carleton University*
*Ottawa, Ontario*
**Cherami Wichmann**
*Carleton University*
*Ottawa, Ontario*
and
**D.A. Andrews**
*Carleton University*
*Ottawa, Ontario*

*Les participants dans cette étude sont 60 détenus canadiens des pénitenciers de Kingston, de Collins Bay et de Millhaven qui (a) avaient été placés en ségrégation à leur propre demande ou involontairement et y avaient passés 60 jours, ou (b) avaient été choisis au hasard dans la population carcérale générale et y étaient demeurés pour au moins 60 jours. Les participants ont dû compléter des tests psychologiques et être interviewés pour déterminer leur santé mentale et leur fonctionnement psychologique. Ce processus d'évaluation a été répété après 30 jours et après 60 jours. Les détenus en ségrégation avaient les mêmes niveaux académiques, les mêmes histoires criminelles et les mêmes besoins que les détenus de la population carcérale générale. Les détenus en ségrégation, toutefois, avaient des personnalités différentes et étaient considérés plus dangereux que les détenus de la population carcérale générale. De façon générale, ils ont une santé mentale plus détériorée et ils fonctionnaient moins bien. Par ailleurs, il n'y avait pas d'indication à l'effet que la période en ségrégation avait détérioré de façon marquante leur santé mentale ou leur fonctionnement psychologique.*

*Participants in this longitudinal study included 60 Canadian inmates from Kingston, Collins Bay, and Millhaven Penitentiaries who had either been (a) voluntarily or involuntarily placed in administrative segregation and remained in segregation for 60 days, or (b) randomly selected from the general inmate population and remained in the general inmate population for 60 days. Participants initially completed written*

Canadian Journal of Criminology          47 to 83
Revue canadienne de criminologie         January/janvier 2001

Copyright© 2001. All rights reserved.

*psychological tests and took part in a structured interview that assessed their overall mental health and psychological functioning. The same procedure was undertaken 30 days later, and again 60 days later. Segregated prisoners had similar education levels, offence histories and criminogenic needs than non-segregated prisoners. Segregated prisoners had distinct personalities, however, and were higher risk cases than non-segregated prisoners. Overall, segregated prisoners had poorer mental health and psychological functioning. There was no evidence, however, that, over a period of 60 days, the mental health and psychological functioning of segregated prisoners significantly deteriorated.*

In Canada, the percentage of segregated prisoners has more than doubled in the last ten years, now representing approximately 5.5% of federally sentenced prisoners (Pierson 1988; Kane 1997). However, little research has been conducted on these prisoners. Moreover, many scholars have assessed the literature on penal segregation as sparse, conflicting, rife with speculations, and based upon far-fetched extrapolations and generalizations (Barak-Glantz 1983; Brodsky and Scogin 1988; Suedfeld, Ramirez, Deaton, and Baker-Brown 1982; Wormith, Tellier, and Gendreau 1988).

Notwithstanding the inadequacy of the existing research, two conflicting perspectives on the effects of segregation on prisoners have emerged. Some researchers describe segregation as "cruel and unusual punishment" and psychologically damaging (Benjamin and Lux 1975; 1977; Grassian 1983; Immarigeon 1992; Jackson 1983; Korn 1988; Luise 1989; Martel 1999), whereas others provide evidence that segregation has little, if any, negative psychological effect on prisoners (Bonta and Gendreau 1995; Ecclestone, Gendreau, and Knox 1974; Gendreau, Freedman, Wilde, and Scott 1972; Gendreau and Bonta 1984; Suedfeld *et al.* 1982).

Resolving the question of the impact of segregation carries important policy implications for areas such as: (a) the level and frequency of monitoring and assessment required for prisoners in segregation (mandatory vs. upon request); (b) programming to reduce mental health deterioration (need for, and type of, intervention programs); and (c) the adequacy of current assessment strategies (what aspects of psychosocial functioning are important to assess, and which are less affected by segregation).

Copyright © 2001. All rights reserved.

This article contains two sections. First, a review of methodological issues highlights the current unsatisfactory state of the literature on the effects of segregation. This review shows that supporters of one view often fail to appreciate the findings of the opposing view, as well as to recognize the limitations of their own findings when drawing their conclusions. The ability to generalize the results of these studies is affected to varying degrees by improper attention to methodological shortcomings of the research conducted. Second, the findings of a research project which addressed the shortcomings of the existing literature is presented.

## Part I: Evaluation of existing research on segregation: A review of methodological shortcomings

### 1. Reliance on qualitative data (casual observations, interviews and anecdotes)

Many authors use anecdotal evidence to support their claims (Benjamin and Lux 1975, 1977; Brodsky and Scogin 1988; Grassian 1983; Jackson 1983; Korn 1988; Martel 1999). These authors often take selected but powerful excerpts from interviews of segregated prisoners or mental health professionals with experience with segregated prisoners to provide general evidence of the harmful effects of segregation. Some authors rely on testimony on the use of isolation in the 19th century to produce corroborative evidence of the harmful effects of segregation in today's correctional context (Grassian 1983; Immarigeon 1992; Luise 1989). Others cite human rights violation litigation to depict the general conditions of confinement and treatment of segregated prisoners, as well as the psychological and physical harm that ensues (Benjamin and Lux 1977; Birkinshaw 1981; Jackson 1983; Luise 1989).

The evidence of the damaging effects of segregation on prisoners adduced by these authors is very disturbing, and cannot be ignored. Because of the nature of the methodology, it is often unclear whether the pathologies displayed by some segregated prisoners were directly attributable to the conditions of confinement in segregation or whether these prisoners

Copyright © 2001. All rights reserved.

displayed similar pathologies in the general prisoner population or in the community, prior to being segregated (Gendreau and Bonta 1984).

In addition, Suedfeld *et al.* (1982) found that some authors inappropriately use findings from case studies of persons who experienced severe abuse and sensory deprivation to illustrate the damaging effects of segregation. Testimony of tortured political and war prisoners who were denied food, clothing, medical assistance and procedural fairness are at times relied upon to establish the damaging effects of segregation in contemporary North American correctional settings (Benjamin and Lux 1975; Korn 1988). The generalization of the findings of these case studies has been questioned (Gendreau and Bonta 1984; Suedfeld *et al.* 1982). Isolation in a political or war camp is not comparable to the highly regulated and formalized procedures for imposing segregation on prisoners in North American penitentiaries. Conditions of confinement, procedural safeguards, and the level of safety and security provided to the prisoners differ to such an extent that a comparison may well be inappropriate (Gendreau and Bonta 1984; Suedfeld *et al.* 1982).

## 2.   Conditions of confinement

One of the problems with segregation research stems from difficulties in defining the constructs being evaluated. Many terms, such as administrative segregation, dissociation, isolation, seclusion, protective custody, and solitary confinement are used, often interchangeably, to describe various restrictive environments. These terms encompass a wide range of conditions of confinement in which the number of restrictions on freedom of association and freedom of movement may vary, and in which levels of perceptual deprivation, sensory deprivation, and social isolation may also vary. There is such a diversity in the nature of conditions of confinement used in segregation research that aggregating all studies under the same "solitary confinement" label has been described by some as inappropriate (Suedfeld *et al.* 1982).

Many authors recognize the importance of the environment with respect to its impact upon the segregation experience and the difficulty associated with generalizing results (Grassian 1983). Conditions of confinement and daily routine vary so greatly

Copyright © 2001. All rights reserved.

among correctional institutions (Kane 1997; Vantour 1975) that results derived from one institutional setting may not be applicable to others. For example, the frequency and quality of interactions with staff or other prisoners, the physical layout of segregation cells (e.g., solid doors, cell size. etc.), the size of the exercise yard, the availability of recreational equipment and hobby items, and the access to personal effects, programs, and services, may all affect the segregation experience. As a result, the majority of studies describe, at great length, the conditions of confinement and the daily routine of segregated prisoners being studied.

Many authors have reviewed the proliferation of control units in the United States and abroad in an attempt to determine their effects on prisoners' mental and physical health (Birkinshaw 1981; Coyle 1987; Dowker and Good 1993; Korn 1988; Immarigeon 1992). The establishment of control units in the United States originated in 1963 when a penitentiary in Marion (Illinois) was built to replace Alcatraz (Coyle 1987). Since then, more than 33 States have comparable Marion-like facilities (Immarigeon 1992). Control units provide a good illustration of the difficulty in defining the constructs being evaluated. Although control units are not formally recognized by correctional authorities as segregation units, and although they sometimes impose fewer restrictions on prisoners than in traditional segregation units, they often impose many similar conditions of confinement (Coyle 1987; Dowker and Good 1993; Immarigeon 1992; Korn 1988). For example, Dowker and Good (1993) describe some of the defining features of these institutions. Prisoners are confined in small cells for 22 or 23 hours per day. The cells are often equipped with solid steel doors, which prevent any communication between prisoners. Further, these institutions are often equipped with remote electronic sliding doors, which minimize, if not eliminate, most contact with correctional staff. There are no communal dining, exercise, or religious services, and few, if any, work opportunities.

## 3.  Relevance of field and laboratory experiments on sensory deprivation

Most of the experimental studies on the effects of segregation come from the field of sensory deprivation. Gendreau and his

Copyright © 2001. All rights reserved.

*Revue canadienne de criminologie*        janvier 2001

colleagues have generated and evaluated many theories and hypotheses on sensory deprivation in the correctional context. For example, Gendreau and colleagues examined whether: isolated prisoners show higher arousal potential because of a lower arousal level induced by solitary confinement (Gendreau *et al.* 1972); segregation enhances learning (Gendreau, McLean, Parsons, Drake, and Ecclestone 1970); isolated subjects desire a lower level of stimulation (visual and auditory sensory input) after a deprivation experience (Gendreau, Freedman, Wilde, and Scott 1968); and stress levels, as indicated by adrenocortical activity, can detect whether solitary confinement is harmful (Ecclestone *et al.* 1974).

Others have commented upon or tested theories and hypotheses of sensory deprivation in the correctional context as well. For example, Benjamin and Lux (1977) argue that segregation is harmful because it dramatically reduces levels of needed stimulation. Dowker and Good (1993) believe that prisoners who are segregated for long periods of time may be deprived of necessary meaningful human contacts, and, as a result, these prisoners have difficulties in coping with normal social situations again.

Suedfeld *et al.* (1982) argue that the comparison between field or laboratory experiments on isolation and stimulus reduction and today's typical North American segregation environment is inappropriate. They contend that it is highly questionable whether the typical segregation unit in fact imposes much reduction in stimulus input. They state that most segregated prisoners can communicate with guards and other prisoners and have access to reading material, mail, lawyers, other visitors, and frequently possess radios and television sets. Gendreau and Bonta (1984) argue that the conditions of confinement in many of the sensory deprivation and isolation experiments are more severe than those found in today's segregation units. They argue that, since these field and laboratory experiments show little support for the position that sensory deprivation and isolation are psychologically damaging, the conclusions drawn from these studies are especially informative and relevant.

Copyright © 2001. All rights reserved.

Case 2:90-cv-00520-KJM-SCR    Document 4714-2    Filed 07/24/13    Page 8 of 38

## 4.   Selection of subjects

**4.1 Use of Volunteers.** Experimental studies on segregation rely primarily on volunteers who agree to be segregated for a fixed period of time. Some authors have been reluctant to accept results of studies which have relied on volunteers (Arbour 1996; Jackson 1983; Vantour 1975). Walters, Callagan, and Newman (1963) believe that the problem with using volunteers is that they are apparently not too frightened by the prospect of facing a few days of isolation, and they may have personality characteristics and past experiences which enable them to cope with, and remain unaffected by, segregation.

In Canada, approximately half of all prisoners placed in segregation are confined against their will (Kane 1997). In addition, it is questionable whether "voluntary" segregation is truly voluntary. Arguably, most prisoners would prefer to remain in the general prisoner population if the threat to their personal safety was to be removed. Nonetheless, some authors claim that, based on their "clinical experience", prisoners who initially strongly object to being placed in segregation appear to adapt as well as prisoners who voluntarily request isolation (Ecclestone *et al.* 1974; Gendreau *et al.* 1972).

In addition to the issue of using volunteers, the use of alternative populations may also lead to limited generalization of findings. For example, the use of university students who, in general, exhibit good adjustment, stable personality, and higher levels of intelligence, education, and socioeconomic status may not lead to accurate comparisons with the segregated prisoner population. Suedfeld *et al.* (1982) argue that attempting to use findings from these sources as an indication of what one can expect from prisoners in segregation is inappropriate because it is not relevant to the phenomenon being evaluated. The high prevalence of severe mental disorders among segregated prisoners (Hodgins and Cote 1991) makes any comparison with university student samples somewhat questionable.

**4.2 Use of prisoners involved in human rights violation litigation.** Some studies on the negative effects of segregation have relied on segregated prisoners who were involved in lawsuits alleging violations of their constitutional rights (Brodsky and

Copyright © 2001. All rights reserved.

Scogin 1988; Grassian 1983). Subjects involved in human rights violation litigation may have a special interest in demonstrating that their conditions of confinement have negative psychological and physiological effects. Therefore, the results of studies which rely on such prisoners will always remain questionable. Further, Suedfeld et al. (1982) suggest that prisoners engaged in litigation are perhaps not representative of average prisoners; their reactions to segregation may not be the norm.    Similarly, Gendreau and Bonta (1984) question the reliability of information of case studies performed by Jackson (1983). They suggest that many of Jackson's interviewed prisoners were notorious, far from representative, and had filed an inordinately large number of grievances, legitimate or otherwise, against the prison system.

**4.3 Screening out subjects with psychiatric history.**  A significant proportion of segregated prisoners have a psychiatric history (Hodgins and Cote 1991; Motiuk and Blanchette 1997). Some studies purporting to examine the impact of segregation have screened-out such subjects (Ecclestone et al. 1974; Gendreau et al. 1972). As a result, findings from these studies may be difficult to apply to the population of segregated prisoners.

Hodgins and Cote (1991) report that, in their sample of 32 long term segregated prisoners, 31% suffered from some kind of severe lifetime mental disorder (25% schizophrenia, 3.1% major depression, and 3.1% bipolar disorder). The rate of schizophrenia among this sample was more than three times the rate of the disorder among non-segregated prisoners.    The rate of major depression in their sample was lower than the rate in the general prisoner population. This suggests that non-disruptive mentally-ill prisoners may remain in the general prisoner population, whereas prisoners who are "disturbed and disruptive" are isolated from the general prisoner population.

Wormith et al. (1988) evaluated the attributes of prisoners in protective custody (PC) in a provincial institution.  PC prisoners typically can associate among themselves but do not have access to the same level of programs, services, and privileges offered to the general prisoner population. They found that PC prisoners were more likely to have a history of psychiatric problems. They suggest that PC prisoners' psychological weaknesses and idiosyncratic behaviours may not be well tolerated by the general

Copyright © 2001. All rights reserved.

Case 2:90-cv-00520-KJM-SCR   Document 4714-2   Filed 07/24/13   Page 10 of 38

prisoner population, and it appears that inappropriate behaviours are often punished regardless of the underlying basis for the conduct (Carriere 1989; Gendreau, Tellier, and Wormith 1985; Rold 1992). Consequently, numerous prisoners with mental disorders are segregated (Gendreau *et al.* 1985; Rold 1992).

Little research has focused on the effects of segregation on prisoners with psychiatric conditions. Many authors argue that segregation can exacerbate some existing psychiatric conditions (Haney 1993; Hodgins and Cote 1991; Wadeson and Carpenter 1976). For example, Wadeson and Carpenter (1976) concluded that segregation stimulates hallucinatory activity and provokes paranoia among some mental health patients.

The existence of psychiatric problems may very well be a defining characteristic of the population of segregated prisoners. Moreover, findings from the studies reviewed above underline the importance of not restricting research samples to those without a history of psychiatric disorders.

## 5.   Reasons for segregation

Prisoners may voluntarily request segregation or be involuntarily segregated for a multitude of reasons (Kane 1997; Gendreau *et al.* 1985; Wormith *et al.* 1988). The most common reasons given by prisoners for seeking various forms of PC and segregation include: conflicts in the general population (e.g., gambling and drug debts); the nature of the prisoner's offense; whether the prisoner is suspected of being an informant; the existence of personality problems; the presence of phobias (including fear of gays); being the target of sexual aggression; and escaping the crowded and often violent atmosphere of maximum security (Gendreau *et al.* 1985).

As noted above, approximately 50% of segregation placements are involuntary in nature (Kane 1997). Research on segregation thus far has failed to assess the effects of long term segregation on these prisoners. Such an omission has rendered generaliza-tion of findings even more difficult. For example, the underlying reasons for segregating prisoners may influence their abilities to cope with the experience (Weinberg 1967). Whether they view their placement in segregation as a result of their own behaviour

Copyright © 2001. All rights reserved.

or as the result of being an innocent victim of circumstances beyond their control may influence their ability to cope with the more restrictive regime of segregation.

## 6.  Attrition

Some segregation studies reported attrition among subjects participating in the experimental condition (i.e., segregation), and provided little, if any, explanations (Ecclestone *et al.* 1974; Walters *et al.* 1963; Weinberg 1967; Zubek, Bayer, and Shephard 1969). For example, Ecclestone *et al.* (1974) reported a 32% attrition rate, and Weinberg (1967) reported a 68% attrition rate. Even when more than adequate monetary incentives are provided, attrition has been reported (Bexton, Heron, and Scott 1954; Zubek *et al.* 1969).

Attrition is a major drawback to psychological research in general. The problem with attrition is especially relevant to the evaluation of the psychological effects of segregation. Subjects who decide no longer to participate in the experiment may be the same individuals who would not cope well with the conditions of segregation and would be negatively affected by them.

## 7.  Reliance on cross-sectional research

Cross-sectional research is inadequate for evaluating the effects of segregation. The results of cross-sectional segregation research are limited to the identification of differences between groups (segregated and non-segregated). The results of this type of research do not permit inferences concerning the causes of these differences (Suedfeld *et al.* 1982). Nevertheless, after conducting a cross-sectional study and observing poorer mental and physical health among segregated prisoners than among non-segregated prisoners, some authors have attributed the cause of such poorer health to segregation (Brodsky and Scogin 1988; Miller and Young 1997). The possibility that segregated prisoners already were of poorer mental and physical health prior to their segregation must at least be considered as an alternative explanation in cross-sectional studies.

## 8.  Duration and indeterminate nature of stay

Another problem with current experimental studies on segregation surrounds the issue of the length and indeterminate

Copyright © 2001. All rights reserved.

nature of the stay (Jackson 1983; Suedfeld *et al.* 1982). In previous experimental research, the length of stay is limited to ten days or less (e.g., 2 days: Gendreau *et al.* 1970; 4 days: Walters *et al.* 1963; 5 days: Weinberg 1967; 7 days: Gendreau *et al.* 1972; Gendreau *et al.* 1968; Gendreau, Horton, Hooper, Freedman, and Scott 1968; Zubek *et al.* 1969; 10 days: Ecclestone *et al.* 1974). Moreover, volunteers for these studies know exactly when the experiment will end, and that they can end their participation at will.

The reality of segregation is that the length of stay is always unknown, and more than 80% of prisoners spend more than 10 days in segregation at any one time (Kane 1997). Suedfeld *et al.* (1982) argue that making general statements on the effects of segregation without qualifying the length of stay is inappropriate. Bonta and Gendreau (1995) specifically state that their conclusion that segregation is not detrimental only applies to periods of segregation of 10 days or less. As these studies confirm, generalizing the results of experimental studies beyond 10 days is questionable.

## 9.  Lack of comparison group

Some studies utilizing structured and non-structured interviews with segregated prisoners have failed to include a comparison group of non-segregated prisoners (Brodsky and Scogin 1988; Grassian 1983; Martel 1999). Brodsky and Scogin (1988) interviewed 45 segregated prisoners about their confinement in solitary confinement but did not include a control group. Although they reported disturbing negative psychological and physiological effects, since no comparison group was included, the results are of little value because it remains undetermined whether prisoners in the general prisoner population would have reported similar effects about their confinement in the general prisoner population.

## 10.  Prisoner/staff interaction and the punitive reality of segregation

Several authors have suggested that the relationship between staff and prisoners is an important factor which may affect how prisoners cope with segregation (Benjamin and Lux 1977; Bonta

Copyright © 2001. All rights reserved.

58          *Canadian Journal of Criminology*          January 2001

and Gendreau 1995; Carriere 1989; Gendreau and Bonta 1984; Korn 1988; Suedfeld *et al.* 1982; Vantour 1975; Wormith *et al.* 1988). Prisoners may be more affected by the way they are treated by correctional staff than by the conditions of confinement typically found in North American segregation units (Bonta and Gendreau 1995; Gendreau and Bonta 1984; Vantour 1975).

Bonta and Gendreau (1995) argue that there is some evidence that, when prisoners are treated capriciously by management or correctional staff, psychological stress can result even in the most humane of prison environments. Harassment, physical violence, enforcement and non-enforcement of rules, and unpredictable withholding of privileges may play a greater role than complaints about physical conditions, the social isolation and the sensory deprivation associated with segregation (Suedfeld *et al.* 1982).

Many authors have found that contrary to legislative and policy provisions, the management of administrative segregation is based on a punitive philosophy, and that segregated prisoners have fewer rights, privileges, and access to programs and services than prisoners in the general prisoner population (Arbour 1996; Carriere 1989; Gendreau *et al.* 1985; Kane 1997; Tellier, Wormith, and Gendreau 1989; Vantour 1975). For example, Arbour (1996: xiii) concluded that the Correctional Service of Canada's management of administrative segregation was not in accordance with the law and its policies, and demonstrated a systemic "prison culture which did not value individual rights".

Wormith, Tellier, and Gendreau (1988) reported that correctional employees often have negative views towards, and discriminate against, segregated prisoners. They found that PC prisoners complained about the attitudes of correctional staff towards them and the adverse psychological effects of being in PC, whereas prisoners in the general population were more likely to complain about institutional living conditions, rules and regulations. Similarly, Carriere (1989) states that PC prisoners are often treated in a demeaning manner by correctional staff. Further, he contends that segregated prisoners are treated as maximum security prisoners regardless of the security risk they pose.

Copyright © 2001. All rights reserved.

For generalization purposes, the evaluation of the effects of segregation must include real interactions between staff and prisoners, and should not be limited to courteous interactions typically found in laboratory experiments.

## 11. Personality

The prisoners' personality or temperament may play a role in how they will be affected by segregation. Some personality characteristics may reduce tolerance for segregation, while other characteristics may enhance it (Suedfeld *et al.* 1982; Walters *et al.* 1963). Little, if any, research on the effects of segregation has focused on personality. Assessment of personality must be included in segregation research in order to identify prisoners' abilities and predispositions to cope with segregation.

## 12. Other factors

Segregation may have a detrimental impact on prisoners' chances of parole, reduce their chances of being admitted to a half-way house, and affect their security classification (Carriere 1989; Gendreau *et al.* 1985; Tellier, Wormith, and Gendreau 1989). Knowledge of these consequences may negatively affect how prisoners adapt to segregation. Further, a prisoner who was housed in a single cell prior to segregation may be reassigned to a "double-bunked" cell after a placement in segregation. This future loss of privacy may also affect how prisoners cope with the experience of segregation.

Complaints about other issues such as cold food and delayed response to requests for assistance (e.g., medication, telephone calls, counselors, reading material, etc.) may also influence the segregation experience (Suedfeld *et al.* 1982). In the segregation environment, these complaints cannot be viewed as trivial because they are often the only distractions available to break the monotony of the segregation experience.

Copyright © 2001. All rights reserved.

# Part II: Longitudinal study on the psychological effects of 60 days in administrative segregation

## Method

## Design and procedures

### Participants

Participants included prisoners from Kingston, Collins Bay, and Millhaven Penitentiaries who had either been (a) placed in administrative segregation and remained in segregation for 60 days (quasi-experimental group), or (b) randomly selected from the general prisoner population and remained in the general prisoner population for 60 days (comparison group). Data were collected over an eight month period beginning in October 1997.

### Testing and procedures

Senior psychologists at the selected institutions supervised the data collection. The psychologists selected and trained/ oriented three research assistants (RA's) concerning institutional security protocols and the use of the psychological testing instruments. The RA's were graduates or students of psychology (one 4th year student, one M.A. candidate, and one M.A.).

Prisoners who were just placed (voluntarily and involuntarily) in administrative segregation and provided their informed consent were asked to complete written psychological tests and take part in a structured interview. After each session, participants were debriefed. The same procedure was undertaken 30 days later and again 60 days later if the prisoners remained segregated. Non-segregated prisoners were selected at random and underwent the same testing procedures at the same intervals.

### Measures

The initial testing session (session one) lasted approximately two hours. In addition to the battery of tests which were utilized at each session, the initial session included a general measure of intelligence and a short personality inventory. Because

Copyright ©2001. All rights reserved.

performance on these additional instruments was not expected
to fluctuate over 60 days, these measures were administered
only once. The follow-up assessments conducted at 30 days
(session two) and 60 days (session three) were therefore shorter,
each lasting approximately one hour. The comparison group
underwent the same testing procedure as the segregated group.

The measures which were selected for use in this study were
chosen based on several criteria. Measures were selected which
possessed acceptable psychometric properties, had a short
administration time, and had been previously used with prisoner
samples. Consideration was also given to measures which had
been used in previous segregation research. Table 1 illustrates
the list of measures which were selected for use in this study
and their respective alphas (reliability estimates which measure
internal consistency).

## Additional data collection.

**Physical conditions.**   Research assistants gathered
information on the physical layout of the segregation units.

**Prisoner intake assessment.**   All prisoners sentenced to
penitentiaries (i.e., for prison terms exceeding two years) must
complete the Offender Intake Assessment (OIA) prior to their
penitentiary placement. In most instances, the OIA lasts eight
weeks, and allows Correctional Service Canada (CSC) to render
informed decisions with respect to placement, classification, and
programming.   During the OIA, information on prisoners is
collected and stored on the computerized Offender Management
System (OMS).

OIA information was retrieved on prisoners' current and past
criminal history and the seven need domains (Employment,
Marital/Family, Associates, Substance Abuse, Community
Functioning, Personal/Emotional, and Attitude). Prisoners'
scores on the Statistical Information on Recidivism (Nuffield
1982; SIR Scale) were also retrieved. The SIR score provides an
estimate of the probability that an individual will re-offend within
three years after release. Each prisoner's total score on the SIR
Scale can range from -30 (very poor risk) to + 27 (very good risk).

Copyright © 2001. All rights reserved.

**Table 1**
Measures used and respective Alphas

| Measures (initial assessment only) | Alpha* |
|---|---|
| Interview assessment | n/a |
| NEO Personality Inventory (short form) | |
|     Neuroticism | .84 |
|     Extraversion | .70 |
|     Openness | .61 |
|     Agreeableness | .71 |
|     Conscientiousness | .80 |
| Shipley | n/a |

| Measures (all three sessions) | Alpha* |
|---|---|
| Aggression questionnaire | .89 |
| Balanced Inventory of Desirable Responding (short form) | 69** |
| Beck Depression (abbreviated) | .89 |
| Brief Symptom Inventory | |
|     Somatization | 86 |
|     Obsessive-compulsive | .83 |
|     Interpersonal | .79 |
|     Depression | 84 |
|     Anxiety | .83 |
|     Hostility | .85 |
|     Phobic anxiety | .80 |
|     Paranoid ideation | .80 |
|     Psychoticism | 66 |
| Holden Psychological Screening Inventory | 84 |
| Hopelessness scale | 89 |
| Interview assessment | n/a |
| State-trait Anxiety Inventory (State-short form) | .83 |
| WAIS Sub-test: Digit Span | n/a |
| WAIS Sub-test: Digit Symbol | n/a |

Note:   * Reliability estimates which measure internal consistency; * Items 4, 7 and 9 were removed to improve psychometric properties

# Results

## Descriptive findings

### Conditions of confinement

Information on the conditions of confinement of segregation units at Collins Bay, Kingston, and Millhaven penitentiaries was collected. Table 2 describes the physical conditions at each

Copyright © 2001. All rights reserved.

penitentiary. Conditions of confinement at Kingston Penitentiary are divided into two sections because one of the segregation units is noticeably different from the others.

**Table 2**

Conditions of confinement in segregation at Collins Bay, Kingston, and Millhaven Penitentiaries

| | Institutions | | | |
| Characteristic | Collins Bay | Millhaven | K.P. 1 | K.P. 2 |
|---|---|---|---|---|
| Cell size (sq.ft) | 80.6 | 57.2 | 56 | 46 |
| Ceiling height (ft./in.) | 7'10" | 11'8" | 9' | 11'5" |
| Number of cells per range | 19 | 16 | 20 | 37 |
| Solid door | Yes | Yes | Yes | No |
| Yard size (sq.ft.) | 750 | 1200 | 1500 | 1500 |
| Concrete wall around yard | Yes | Yes | Yes | Yes |
| Yard covered overhead with wired fence | Yes | Yes | Yes | Yes |

## Participation and attrition

The refusal rate for participating in this study was 44% for segregated and 40% for non-segregated prisoners. Table 3 illustrates the number of completed sessions broken down by Group (i.e., segregated vs. non-segregated) and institutions. It shows that 83 segregated prisoners and 53 non-segregated prisoners participated in this study. Complete data for all three sessions (60 days) were only available for 23 segregated and 37 non-segregated prisoners.

The loss of participants from the segregated group was primarily due to releases to the general prisoner population or transitional units (i.e., protective custody), or transfers to other institutions. True attrition, the refusal to participate in a subsequent session, occurred in nine cases (10.8%). It should be noted that true attrition included cases in which prisoners expressed their intent to participate in the study but their conduct jeopardized the personal safety of the RA's (e.g., threats, and one incident in which a prisoner attempted to grab an RA). The average elapsed time after placement in segregation for session one, two and three was 3.6, 29.8 and 57.8 days respectively.

Copyright © 2001. All rights reserved.

For non-segregated prisoners, the loss of participants was mainly due to transfers to other institutions and placement in segregation. True attrition occurred in only two cases (3.8%).

**Table 3**
Number of completed sessions (S.1, S.2, and S.3) broken down by group and institutions

| Institution | Segregated (n=83) | | | Non-Segregated (n=53) | | |
|---|---|---|---|---|---|---|
| | S.1 | S.2 | S.3 | S.1 | S.2 | S.3 |
| Collins Bay | 31 | 8 | 7 | 19 | 16 | 16 |
| Kingston | 19 | 12 | 11 | 20 | 17 | 14 |
| Millhaven | 33 | 12 | 5 | 14 | 13 | 7 |
| Total | 83 | 32 | 23 | 53 | 46 | 37 |

Initially (i.e., upon placement), 39% (n = 32) of segregated prisoners were voluntary cases whereas 61% (n = 51) were involuntary cases. Moreover, voluntary cases were all seeking protection, whereas the majority of involuntary cases (71%, n = 36) were legally placed in administrative segregation for jeopardizing the safety of other prisoners, staff, or the security of the institution. After 60 days the percentage of voluntary cases increased to 57% (n = 13) and the percentage of involuntary cases decreased to 43% (n = 10).

## Demographics

**Age.** Using t-tests, segregated prisoners were found to be younger (M = 28.9) than non-segregated prisoners (M = 32.20, t (134) = 2.66, p < .01). The age of segregated and non-segregated prisoners ranged from 20 to 54 years old. Bivariate correlation analyses showed that Age was not significantly correlated with any measure (i.e., dependent variable).

**Race.** The Offender Intake Assessment (OIA) was used to provide background information on the prisoners. OIA information on race was available on 119 prisoners: 66% of prisoners were Caucasian, 25% black, 7% aboriginal, and 3% from other visible minority groups. Among segregated prisoners (n = 73), the percentage of Caucasians, blacks, aboriginal, and other visible minority groups was 64%, 27%, 7%, and 1% respectively.

Copyright © 2001. All rights reserved.

**Education.** OIA information was used to assess the educational background of prisoners. Using chi-square analyses, segregated and non-segregated offenders did not significantly differ in educational background.

**Criminal history.** OIA data also provided criminal history information for 131 prisoners. No significant difference between segregated and non-segregated prisoners on past and current offence history was found. Similar non-significant findings were obtained on history of disciplinary infractions ($\chi^2$ (1, $N = 84$) = 1.93, $p = 0.17$), escape/UAL ($\chi^2$ (1, $N = 91$) = 0.95, $p = 0.33$), and failure on conditional releases ($\chi^2$ (1, $N = 91$) = 0.95, $p = 0.39$).

With respect to session one segregated prisoners ($n = 83$), nine were serving life sentences (11%). The average sentence length (excluding life sentences; $n = 74$) imposed by the courts for their index offence was 6.97 years.

Of the 53 session one non-segregated prisoners, 13 prisoners were serving life sentences (25%). The average sentence length (excluding life sentences; $n = 40$) imposed by the courts for their index offence was 5.98 years.

**Case needs.** Segregated and non-segregated prisoners did not significantly differ on any of the OIA need domains (Employment, Marital/Family, Associates, Substance Abuse, Community Functioning, Personal/Emotional, and Attitude).

**SIR Scale.** Using t-tests, segregated prisoners were found to be higher risk of recidivism ($M = -8.26$) than non-segregated prisoners ($M = -1.07$. $t$ (110) = 4.70, $p < .001$).

**I.Q.** Estimates of I.Q. from the Shipley Institute of Living Scale-Revised (Shipley 1940) were compared for segregated and non-segregated prisoners. Non-segregated prisoners ($M = 97.25$) possessed higher estimates of I.Q. than segregated prisoners ($M = 89.70$, $t$ (131) = 2.93, $p < .01$).

**Personality.** Table 4 shows the differences between segregated and non-segregated prisoners on the "big five" personality constructs as assessed by the NEO Personality Inventory (NEO-FFI; Costa and McCrae 1992). Segregated prisoners scored higher

Copyright © 2001 All rights reserved.

on Neuroticism ($t$ (125) = 3.73, $p < .001$), and lower on Extraversion ($t$ (129) = 2.26, $p < .05$), Openness ($t$ (127) = 3.09, $p < .01$), Agreeableness ($t$ (121) = 2.99, $p < .01$) and Conscientiousness ($t$ (127) = 3.54, $p < .001$) than non-segregated prisoners.

**Table 4**
NEO-FFI sub-scores for segregated and non-segregated prisoners

|  | Seg. (n=83) | Non-seg. (n=53) | $t$ (df) |
|---|---|---|---|
| Factors (T-Scores) | M | M |  |
| Neuroticism*** | 54.9 | 48.4 | 3.73 (125) |
| Extraversion* | 45.9 | 50.0 | 2.26 (129) |
| Openness** | 49.0 | 53.5 | 3.09 (127) |
| Agreeableness** | 41.6 | 47.4 | 2.99 (121) |
| Conscientiousness*** | 45.2 | 51.2 | 3.54 (127) |

Note. *$p <.05$, **$p < .01$, ***$p < .001$

**Social desirability.** A between/within-subject repeated measures univariate analysis was performed on the sample of 60 prisoners who completed all three sessions (segregated ($n = 23$) and non-segregated prisoners ($n = 37$)) using the Balanced Inventory of Desirable Responding (BIDR, short form; Paulhus 1984) as a dependent variable (DV). Non-segregated prisoners showed significant higher scores of impression management and self-deception than segregated prisoners ($F(1, 58) = 11.36$, $p < .001$, $\eta^2 = .16$).

Segregated and non-segregated prisoners displayed significantly increased scores on impression management and self-deception across time ($F(2, 116) = 3.68$, $p < .05$, $\eta^2 = .06$). The ANOVA, however, revealed no significant Time (i.e., session 1, 2 & 3) by Group interaction.

## Mental health and psychological functioning: Prisoners who completed three sessions

Between/within-subject repeated measures univariate analyses were performed on the sample of 60 prisoners who completed all three sessions (segregated ($n = 23$) and non-

Copyright © 2001. All rights reserved.

segregated prisoners ($n$ = 37)) using the eight measures as dependent variables (DV's). Table 5 presents the means and respective standard deviations for each of the eight measures for all three sessions.

**Table 5**

Session means of measures for segregated ($n$ = 23) and non-segregated ($n$ =37) prisoners who completed all three sessions (S.1, S.2, and S.3)

| DV | Group | Means (SD) | | |
|---|---|---|---|---|
| | | S 1 | S.2 | S.3 |
| Aggression | Seg. | 77.6 (14.2) | 71.5 (17.7) | 72 1 (21 2) |
| Questionnaire | Non-seg. | 68 2 (14.2) | 66.9 (18.6) | 65.5 (20.0) |
| Beck | Seg. | 8.8 (7 3) | 6.3 (6.0) | 6.6 (5 5) |
| Depression | Non-seg. | 5.5 (5.6) | 4.6 (5.8) | 3 9 (5 0) |
| Brief Symptom | Seg. | 0 92 (0 18) | 0 62 (0 39) | 0.62 (0.44) |
| Inventory | Non-seg. | 0 58 (0.46) | 0.44 (0.42) | 0.38 (0.40) |
| HPSI | Seg. | 52.4 (15.6) | 46.7 (11.6) | 49 3 (11.2) |
| | Non-seg. | 40.9 (12.1) | 39 2 (10 5) | 37 8 (12.6) |
| Hopelessness | Seg. | 5.3 (4.6) | 3.6 (3.6) | 4 3 (4.3) |
| Scale | Non-seg. | 4.3 (4.3) | 3.1 (4.4) | 2 8 (4.3) |
| State-trait | Seg. | 13.4 (4.4) | 12.1 (4.0) | 13.1 (4.5) |
| Anxiety Inventory | Non-seg. | 12.0 (3 4) | 9.8 (3 5) | 9 6 (3.3) |
| WAIS | Seg. | 8.7 (2.9) | 9.5 (2.8) | 8 5 (3.1) |
| Digit Span[1] | Non-seg | 9 6 (2 5) | 9.5 (2.6) | 10 1 (2.3) |
| WAIS | Seg | 7.8 (2.4) | 9 0 (3 1) | 8 4 (3.3) |
| Digit Symbol[1] | Non-seg. | 8.7 (2.3) | 9.9 (3 0) | 10 5 (2.9) |

Note [1] Indicates scaled scores.

**Aggression Questionnaire (AQ).** The Analysis of Variance (ANOVA) on the AQ (Buss and Perry 1992) revealed no significant main effect or interaction.

**Beck Depression Inventory - Short Form (BDI).** Both segregated and non-segregated prisoners reported significantly fewer depressive symptoms across time ($F(2, 116)$ = 8.3, $p$ < .001,

Copyright © 2001. All rights reserved.

Case 2:90-cv-00520-KJM-SCR    Document 4714-2    Filed 07/24/13    Page 23 of 38

$\eta^2 = .13$) on the BDI (Beck and Beck 1972). The ANOVA revealed no significant interaction (Time by Group).

**Brief Symptom Inventory (BSI).** Segregated prisoners reported significantly more depressive symptoms than non-segregated prisoners ($F(1,58) = 5.67$, $p < .05$, 2 = .09) on the BSI (Derogatis 1992). In addition, both segregated and non-segregated prisoners reported significantly fewer depressive symptoms across time ($F(2,116) = 19.57$, $p < .001$, $\eta^2 = .25$). The ANOVA revealed no significant interaction.

**Holden Psychological Screening Inventory (HPSI).** Segregated prisoners reported significantly more problems in psychosocial adjustment than non-segregated prisoners ($F(1,58) = 11.40$, $p < .001$, $\eta^2 = .16$) on the HPSI (Holden, Mendonca, Mazmanian, and Reddon 1992). As well, segregated and non-segregated prisoners reported significantly fewer problems in psychosocial adjustment across time ($F(2,116) = 6.27$, $p < .01$, $\eta^2 = .10$). The ANOVA revealed no significant interaction.

**Hopelessness Scale (HS).** Segregated and non-segregated prisoners did not significantly differ on the HS (Beck and Steer 1988). Segregated and non-segregated prisoners indicated significantly less hopelessness across time ($F(2,116) = 10.19$, $p < .001$, $\eta^2 = .15$). The ANOVA revealed no significant interaction.

**State-Trait Anxiety Inventory (STAI).** Segregated prisoner displayed significantly more state anxiety than non-segregated prisoners ($F(1,58) = 8.09$, $p < .01$, $\eta^2 = .12$) on the STAI (Spielberger 1983). Further, segregated and non-segregated prisoners displayed significantly less state anxiety across time ($F(2,116) = 7.63$, $p < .001$, $\eta^2 = .11$). The ANOVA revealed no significant interaction.

**WAIS Digit Span and Digit Symbol.** Performance on the Digit Symbol improved significantly across time ($F(2,116) = 5.44$, $p < .01$, $\tau^2 = .09$). The ANOVA revealed no significant interaction. Performance on the Digit Symbol improved significantly across time ($F(2,116) = 22.56$, $p < .001$, $\eta^2 = .28$). The ANOVA revealed no significant interaction.

Copyright © 2001. All rights reserved.

## Segregated prisoners who completed three sessions versus segregated prisoners who completed one or two sessions

It was hypothesized that prisoners who remain in segregation for longer periods of time would display more mental health and psychological functioning problems than those who are more quickly reintegrated into the general prisoner population. Therefore, using the eight measures as DV's, t-tests were performed to evaluate whether prisoners who stayed in segregation for all three sessions ($n = 23$) differed from segregated prisoners who were released or transferred after session one or two ($n = 51$). True attrition cases ($n = 9$) were removed from the analyses because they could have been part of the group of prisoners who stayed in segregation for all three sessions.

No significant difference was found between prisoners who stayed in segregation for all three sessions ($n = 23$) and segregated prisoners who were released or transferred after session one or two ($n = 51$).

**Voluntary versus involuntary cases.** Using the eight measures as DV's, t-tests were completed to evaluate whether voluntary ($n = 32$) and involuntary ($n = 51$) cases differed in mental health and psychological functioning. Again, no significant difference was found between voluntary and involuntary cases.

### Interview assessment

**Suicide ideation.** Prisoners were asked questions on suicide ideation. Prisoners who completed all three sessions ($n = 60$) were asked if they ever *thought* of committing suicide. At session one, 40% ($n = 9$) of segregated and 33% ($n = 12$) of non-segregated prisoners responded "yes". When asked if they had ever *attempted* suicide, 22% ($n = 5$) of segregated and 29% ($n = 11$) of non-segregated prisoners said "yes".

At each session, prisoners were asked if they had thought of committing suicide within the last week: 17% ($n = 4$) of segregated prisoners answered "yes" at session one, 4% ($n = 1$) at session two, and 4% ($n = 1$) at session three. As for non-segregated prisoners, 14% ($n = 5$), 11% ($n = 4$) and 3% ($n = 1$) answered "yes" respectively.

Copyright © 2004 - All rights reserved

**Segregation experience.** Prisoners who completed all three sessions ($n = 60$) were asked if they have ever been placed in segregation in the past. The vast majority of segregated (96%, $n = 22$) and non-segregated prisoners (87%, $n = 32$) reported having being in segregation before. When asked how many times they have been placed in segregation, segregated prisoners ($M = 11.5$) reported almost twice as many times than non-segregated prisoners ($M = 6.3$).

## Discussion

### Generalization issues

This study represents the most comprehensive empirical review of the psychological effects of administrative segregation in today's Canadian federal correctional context. To begin with, this study applied the rigour of an experimental longitudinal design to a "real" segregation environment. Participants were actual inmates and not volunteers who agreed to be segregated for a fixed period of time. As such, the sample included actual inmates (some with existing psychiatric conditions and others who feared for their personal safety) who were voluntarily or involuntarily placed for periods up to 60 days in administrative segregation pursuant to the current Canadian federal administrative segregation process. They were segregated under "real" conditions of confinement, which included partial isolation and sensory deprivation. In addition, the participants were confronted with all of the uncertainties surrounding their segregation, such as (a) when the segregation period would end, (b) whether they would be transferred to another institution or returned to the general inmate population, and (c) whether their stay in segregation would affect their security classification, chances for parole, or cell assignment. As well, some prisoners may have been confronted with correctional employees who may have had a punitive approach to managing segregated inmates. All these factors potentially affect the experience of segregation and were not considered by studies using students or inmates who voluntarily agreed to be segregated for a fixed period of time. This study, therefore, examined the psychological effects of today's administrative segregation in Canadian federal corrections, and its results cannot be construed as unrealistic extrapolations of scenarios which are too remote from the "real" experience.

Copyright © 2001. All rights reserved.

Surprisingly, although various forms of administrative segregation have been used for decades (if not centuries), there has been only one longitudinal study previously conducted using an approximation of the empirical approach used in this study. Weinberg (1967) assessed the effects of segregation on 20 inmates who were involuntary placed in administrative segregation. The study was, however, limited to a segregation period of only five days, and reported a 68% attrition rate among the experimental group. Again, no other longitudinal study has been completed using prisoners in a "real" segregation context.

The fact that the current longitudinal study was conducted with prisoners who were subjected to "real" segregation conditions of confinement clearly enhance its ability to be generalized. Other factors should also be considered when assessing the issue of generalization of findings. First, this study was conducted at several sites, thereby enhancing the degree of external validity.

Second, the penitentiaries selected have historically been perceived as some of the toughest in Canada. These institutions have some of the largest segregation units and heavily rely on administrative segregation to manage their inmate populations. It was therefore expected that segregated prisoners in those penitentiaries would be more likely to be affected by the harsher realities of some of Canada's toughest penitentiaries.

Third, the participation rate in this study was comparable to studies that employed inmates for subjects and which do not offer any incentive for participation (e.g., money). The true attrition rate among the segregated group was also relatively low (10.8%) for a longitudinal study. It is important to note that none of the attrition was attributable to prisoners being incapable of participating in the study because of episodes of delusion or hallucination or suicide attempts. Although always a concern, the rate and nature of the attrition in this study does not significantly undermine its ability to be generalized.

Fourth, this study relied on multiple assessments of mental health and psychological functioning of prisoners (i.e., externalizing/aggression, internalizing/interpersonal distress, psychiatric symtomatology, and cognitive ability). This approach provided a more comprehensive assessment of potential

Copyright © 2001. All rights reserved.

psychological effects of administrative segregation, and is consistent with preferred contemporary psychological and psychiatric assessment practices (DSM-IV 1994).

Finally, non-segregated prisoners scored significantly higher on a measure of impression management than segregated prisoners. Arguably, since segregated prisoners did not show significant signs of mental health and psychological deterioration and were more accurate in their responses than non-segregated prisoners, the results of this study are more convincing.

The above factors enhance the level of confidence in the results of this research. There are, however, clear limitations to this study which may reduce the generalizability of the findings. First, a large number of prisoners in both segregated (96%) and non-segregated (87%) groups had previously experienced segregation. Arguably, a previous stay in segregation may have already negatively affected the mental health and psychological functioning of the prisoners in the comparison group. General inmate population prisoners who have never been segregated before in the three selected penitentiaries are rare. Moreover, these prisoners may arguably possess special coping abilities and attributes and be atypical of the general inmate population, making them a poor choice for comparison purposes. Second, the findings are limited to 60 days in administrative segregation, and any extrapolation to lengthier stays would be inappropriate. It is important to note, however, that statistical data collected by the Correctional Service of Canada (Laplante 1998) indicate that during the period of June 1997 to May 1998, 93% of involuntary cases and 69% of voluntary cases were released prior to the 60 day regional review. This fact suggests that a majority of prisoners are segregated for periods of less than 60 days; therefore, the findings of this study are very relevant to the Canadian federal context.

Third, as stated above, the three penitentiaries selected in this study are among the toughest medium and maximum-security institutions in the country. These penitentiaries rely heavily on administrative segregation to control their inmate populations, which are composed of high-risk and high-need federally sentenced prisoners. The applicability of the results from this study should be limited to such inmate populations.

Copyright © 2001. All rights reserved.

Further, the findings of this study may be less applicable to other jurisdictions, such as the United States, in which segregated prisoners typically remain in administrative or disciplinary segregation for much longer periods of time, and often under harsher conditions of confinement (Coyle 1987; Dowker and Good 1993; Immarigeon 1992; Korn 1988). Finally, it would also be inappropriate to extend the findings of this study to aboriginal (Bertrand 1996) and women prisoners (Korn 1988; Martel 1999). The realities and experiences of women and aboriginal prisoners may affect their ability to adapt and cope with segregation.

## Personality

It was expected that certain personality types would react to the segregation experience differently. Although no deterioration was found, differences in personality between segregated and non-segregated prisoners were found. These differences have been suggested in the PC and segregation literature, but have seldom been assessed using standardized measures, such as the NEO Personality Inventory (Gendreau *et al.* 1985; Hodgins and Cote 1991; Rold 1992).

The NEO was developed to operationalize the five-factor model of personality, a representation of the structure of traits developed over the last forty years (Digman 1990). Costa and McRae (1990) found that since 1985, research using the NEO has demonstrated that the five factors can account for the major dimensions in personality questionnaires designed to measure, *inter alia*, the DSM-III-R personality disorders. Segregated prisoners were found to score higher on Neuroticism (N) than non-segregated prisoners. Costa and McCrae (1992: 14) explained that "the general tendency to experience negative affects such as fear, sadness, embarrassment, anger, guilt, and disgust is the core of the N domain". They also suggest that neurotic individuals tend to cope more poorly with stress than others. Although segregated prisoners were found to score higher on Neuroticism and may, therefore, be ill equipped to cope with the stress associated with segregation, the findings of this study suggest that they nonetheless adapted and coped well with the segregation experience.

Segregated prisoners scored significantly lower on Extraversion (i.e., less sociable, likely to prefer large groups,

Copyright © 2001. All rights reserved.

assertive, active, and less talkative), Openness (i.e., less active imagination, sensitivity, attentiveness to inner feelings, intellectual curiosity, and independence of judgment), Agreeableness (i.e., less altruistic and sympathetic to others and eager to help them, and more egocentric, skeptical of others' intentions, and competitive rather than cooperative), and Conscientiousness (i.e., less strong-willed and determined) than non-segregated prisoners. Arguably, these trait patterns depict individuals which have personalities that may bring them at odds with non-segregated prisoners as well as correctional staff. The general inmate population may not tolerate prisoners with such personality patterns. Due to their lack of assertiveness, general tendency to experience negative affects, and overall poorer mental health and psychological functioning, segregated prisoners may be more easily victimized or less apt at adapting and coping with prison life.

## Psychological effects

Overall, *both* segregated and non-segregated prisoners reported better mental health and psychological functioning over time. This finding is common in studies which rely on repeated-measures designs and has been primarily attributed to practice effects (Pedhazur 1982). Participants lose interest in answering repeatedly to identical questions and tend to report less problems overtime.

It was hypothesized that as a group, segregated prisoners overall would report greater mental health and psychological functioning problems than non-segregated prisoners. This hypothesis was supported by the fact that segregated prisoners indicated significantly more internalized problems, interpersonal distress and psychiatric symptoms than non-segregated prisoners. Segregated prisoners also displayed significantly more depressive symptoms, problems in psychosocial adjustment, and transient anxiety than non-segregated prisoners. These results are consistent with many cross-sectional and qualitative studies (Brodsky and Scogin 1988; Grassian 1983; Hodgins and Cote 1991; Wormith *et al.* 1988; Rold 1992). It is important to reaffirm that these between group differences may not be attributed to placement in administrative segregation.

Copyright © 2001. All rights reserved.

The most important questions raised in this study were whether the poor mental heath of segregated prisoners was attributable to segregation or whether segregated inmates already were of poorer mental heath prior to their segregation. The hypothesis that the mental health and psychological functioning of segregated inmates would deteriorate over a period of 60 days in segregation was not supported. The ANOVA's performed on each of the eight measures did not reveal any deterioration. These results can be interpreted in two ways: (a) segregated prisoners generally adapted and coped well with the conditions of today's Canadian federal administrative segregation; or (b) the segregated inmates did not perceive the conditions of their confinement as threatening or stressful and therefore were not affected by them.

On one hand, there is no shortage of researchers, ourselves included, who have observed or reacted strongly to the difficult conditions of confinement placed upon segregated prisoners (e.g., 23 out of 24 hours of cell confinement, small yard size, lack of programs and services, constant state of idleness, etc.). On the other hand, other researchers have commented on all the distractions, programs, and services that are available in segregation units in Canadian penitentiaries (e.g., TV, radios, books, computers, exercise period often with the company of other prisoners; Suedfeld *et al.* 1982). Moreover, the Task Force Reviewing Administrative Segregation (Kane 1997) was confronted with many correctional staff who thought segregation units were "too comfortable" for prisoners. They often suggested, contrary to current legal and policy provisions, that the conditions of confinement should be made more harsh in order to discourage prisoners from requesting segregation and to provide an "incentive" for segregated inmates to reintegrate into the general inmate population.

Another explanation to account for these results could be that the environment that prisoners were in before segregation was such that it was viewed more negatively than the conditions of confinement in segregation. If that is the case, it suggests that the correctional authorities must take further steps to ensure that the general inmate population is safe and secure.

Nonetheless, regardless of the possible explanations to account for the lack of deterioration, this study is somewhat

Copyright © 2001. All rights reserved.

encouraging because it provides evidence that segregation for 60 days as currently administered in Canadian penitentiaries does not negatively affect prisoners' mental health and psychological functioning.

## Policy issues

It was anticipated that this research would have important policy implications in areas such as: (a) the level and frequency of monitoring and assessment required for inmates in segregation (mandatory *vs.* upon request); (b) programming to reduce mental health deterioration (the need for, and type of, intervention programs); and (c) the adequacy of current assessment strategies (what aspects of psychosocial functioning are important to assess, and which are less affected by segregation). Since detrimental effects were not found, the policy implications are somewhat less significant than anticipated.

First, with regard to monitoring and assessment of Canadian federally sentenced segregated prisoners, psychologists are required by policy to assess segregated prisoners every 30 days, and health care workers and wardens are required by law to make daily visits to segregation units. Although this study revealed no evidence of detrimental effects, the 30-day requirement should be preserved, as well as the daily visits by health care workers and wardens. Arguably, reducing the few contacts segregated prisoners currently enjoy could have negative consequences. It could be that regular contact itself is an important factor reducing the likelihood of deterioration. Moreover, this research only suggests that the possibility of negative effects is likely to be an exception rather than the norm. Since the findings of this study do not preclude in any way the possibility that some prisoners may in fact be negatively affected by segregation, close monitoring should continue.

Due to their overall poorer mental health and psychological functioning, it may be appropriate as a "best practice" for psychologists to meet with all prisoners upon their placement in segregation. This could serve to establish a baseline for subsequent evaluations of mental health and psychological deterioration and to provide support for segregated inmates at times of crisis. In addition, since segregated prisoners were found

Copyright © 2001. All rights reserved.

to have poorer mental health and psychological functioning, employees working with segregated prisoners may benefit from special training on mental health issues.

Second, it was expected that this research would provide specific areas of mental health and psychological functioning which needed particular attention when conducting assessment and monitoring of segregated prisoners. But again, since this study did not detect detrimental effects, little can be said in the way of policy on what aspects of mental health and psychological functioning should be carefully scrutinized. Some general comments can be made regarding psychological assessments, however.

Currently, psychologists utilize a standard form which highlights general mental health issues (e.g., risk of suicide or self-injury, depression, anxiety, aggression, psychosis, mania) when completing their 30-day assessments. How to assess each component is left to the psychologist's discretion. Typically, psychologists conduct a brief semi-structured interview with the segregated prisoner. It may be appropriate as a "best practice" to conduct more elaborate assessment procedures to ensure that minor or perhaps less obvious deterioration can be detected and documented.

Finally, the findings of this study have programming implications for segregated prisoners. Since segregated prisoners were found to be higher risk cases than non-segregated prisoners, programs delivered to segregated prisoners should be intensive to maximize success (Andrews, Zinger, Hoge, Bonta, Gendreau, and Cullen 1990). Although the primary concern with providing programs to segregated prisoners is to facilitate their reintegration into the general inmate population, if such reintegration cannot occur quickly, intensive treatment programs that target variables that are known to be linked to criminal conduct should be introduced (Andrews and Bonta 1994). The distinct personality patterns of segregated prisoners may be important to consider and assess when delivering treatment programs to them (Andrews *et al.* 1990).

It is obvious that research evaluating the effects of segregation beyond 60 days is needed. Once again, it would be ill advised to

Copyright © 2001. All rights reserved.

attempt to extrapolate the findings of this study (a) beyond 60 days of administrative segregation, and (2) to other jurisdictions. For example, the findings of this study are somewhat irrelevant to current segregation practices in the United States where prisoners can sometimes be segregated for years for disciplinary infractions with virtually no distractions, human contacts, services, or programs.

The difference between the personality of segregated and non-segregated prisoners is an important finding. Although many have suggested that segregated prisoners' psychological weaknesses and idiosyncratic behaviours were not well tolerated by the general inmate population (Carriere 1989; Gendreau et al. 1985; Roid 1992; Wormith et al. 1988), the personality of segregated prisoners had seldom been assessed. Whether a distinct personality profile may increase a prisoner's risk of being placed in administrative segregation should be further examined using more comprehensive measures of personality.

Although this research revealed no evidence that administrative segregation for periods of up to 60 days was damaging, the findings of this study should not be used to legitimize the practice of administrative segregation. Administrative segregation remains a management tool which is grossly overused in Canadian penitentiaries. Regardless of whether prisoners adapt and cope well with the segregation experience, it is not healthy for anyone to idle aimlessly in a cell for 23 out of 24 hours a day; it simply is not a constructive way of serving a sentence; and, it is likely to impede attempts to rehabilitate and safely reintegrate prisoners into society.

Although it will always remain a legitimate management tool to deal effectively with problematic situations and individuals, its current use is perhaps symptomatic of correctional authorities' inability to reduce tensions and resolve conflicts in the prison context. Administrative segregation has clearly become the number one way of managing inmates and "doing business". For example, the Correctional Service of Canada (1999) reported that during fiscal year 1998/99, out of an inmate population that averaged 13,131 federally sentenced prisoners, 7,942 placements in administrative segregation took place. Such high reliance on the use of segregation needs to be carefully examined. Moreover,

Copyright © 2001. All rights reserved.

the costs associated with processing these prisoners in accordance with due process requirement are extraordinary (i.e., paperwork, enhanced security and staffing, and reviews by wardens, Segregation Review Boards and Regional Headquarters, etc.). Clearly, it is time to rethink conflict resolution in Canada's penitentiaries.

Implementing alternative/appropriate dispute resolution processes on a large scale is the most promising initiative to reduce the disproportionate number of segregation cells and units in Canada's federal correctional system. Providing the tools to resolve conflicts and fostering a correctional environment respectful of human rights is the only way to break down this over-reliance on administrative segregation for managing prisoners.

## References

Andrews, D.A., and J. Bonta
1994    The Psychology of Criminal Conduct. Cincinnati: Anderson Publishing.

Andrews, D.A., I. Zinger, R.D. Hoge, J. Bonta, P. Gendreau, and F.T. Cullen
1990    Does correctional treatment work? A psychologically informed meta-analysis. Criminology 28: 369-404.

Arbour, L. (Commissioner)
1996    Commission of Inquiry into Certain Events at Prison for Women in Kingston. Ottawa: Queen's Printer.

Barak-Glantz, I.L.
1983    Who's in the "hole"? Criminal Justice Review 8: 29-37.

Beck, A.T. and R.W. Beck
1972    Screening depressed patients in family practice: A rapid technique. Postgraduate Medicine 52: 81-85.

Beck, A.T. and R.A. Steer
1988    Manual for the Beck Hopelessness Scale. New York: Psychological Corporation.

Benjamin, T.B. and K. Lux
1977    Solitary confinement as punishment. California Western Law Review 13: 265-296.

Benjamin, T.B. and K. Lux
1975    Constitutional and psychological implications of the use of solitary confinement: Experience at the Maine State Prison. Clearinghouse Review 9: 83-90.

Copyright © 2001. All rights reserved.

Bertrand, M.-A.
    1996    Women in prison, a comparative study   Caribbean Journal of
            Criminology and Social Psychology 1(1): 38-58.

Bexton, W.H., W. Heron, and T.H. Scott
    1954    Effects of decreased variation in the sensory environment
            Canadian Journal of Psychology 8. 70-76.

Birkinshaw, P.
    1981    The control unit regime: Law and order in prison.  Howard
            Journal 20· 69-80.

Bonta, J. and P. Gendreau
    1995    Reexamining the cruel and unusual punishment of prison life.
            In T.J. Flanagan (ed.). Long-term Imprisonment: Policy, Science,
            and Correctional Practice. Thousand Oaks. CA: Sage.

Brodsky, S.L. and F.R. Scogin
    1988    Prisoners in protective custody: First data on emotional effects.
            Forensic Reports 1: 267-280

Buss, A. H. and M. Perry
    1992    The aggression questionnaire. Journal of Personality and Social
            Psychology 63: 452-459.

Carriere, K.D.
    1989    Protective custody in Canada: A review of research and policy
            responses. Canadian Criminology Forum 10: 17-25.

Correctional Service of Canada
    1999    Performance Report: Estimates   Ottawa: Correctional Service
            of Canada.

Costa, P.T., Jr. and R.R. McCrae
    1990    Personality disorders and the five-factor model of personality
            Journal of Personality Disorders 4: 362-371.

Costa, P.T., Jr. and R.R. McCrae
    1992    Revised NEO Personality Inventory and NEO Five-factor Inventory
            Professional Manual.  Odessa, FL: Psychological Assessment
            Resources.

Coyle, A.G.
    1987    The management of dangerous and difficult prisoners. Howard
            Journal 26: 139-152.

Derogatis, L.R.
    1992    The Brief Symptom Inventory (BSI)· Administration, Scoring, and
            Procedures Manual II.  Towson, MD: Clinical Psychometrics
            Research.

Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)
    1994    Washington: American Psychiatric Association.

Copyright © 2001. All rights reserved.

Digman, J.M.
   1990    Personality structure: Emergence of the five-factor model. Annual Review of Psychology 41: 417-440

Dowker, F. and G. Good
   1993    The proliferation of control unit prisons in the United States. Journal of Prisoners on Prisons 4: 95-110.

Ecclestone, C.E.J., P. Gendreau, and C. Knox
   1974    Solitary confinement of prisoners: An assessment of its effects on prisoners' personal constructs and andrenocortical activity. Canadian Journal of Behavioral Science 6: 178-191.

Gendreau, P. and J. Bonta
   1984    Solitary confinement is not cruel and unusual punishment: People sometimes are! Canadian Journal of Criminology 26: 467-478

Gendreau, P.E., N. Freedman, G.J.S. Wilde, and G.D. Scott
   1968    Stimulation-seeking after seven days of perceptual deprivation. Perceptual and Motor Skills 26: 547-550.

Gendreau, P.E., N. Freedman, G.J.S. Wilde, and G.D. Scott
   1972    Changes in EEG alpha frequency and evoked response latency during solitary confinement. Abnormal Psychology 79: 54-59.

Gendreau, P.E., J.G. Horton, D.G. Hooper, G.J.S. Freedman, and G.D. Scott
   1968    Perceptual deprivation and perceptual skills: Some methodological considerations. Perceptual and Motor Skills 27: 57-58.

Gendreau, P., R. McLean, T. Parsons, R. Drake, and J. Ecclestone
   1970    Effect of two days' monotonous confinement on conditioned eyelid frequency and topography. Perceptual and Motor Skills 31: 291-293.

Gendreau, P., M.-C. Tellier, and J.S. Wormith
   1985    Protective custody: The emerging crisis within our prisons. Federal Probation 44: 55-63.

Grassian, S.
   1983    Psychopathological effects of solitary confinement. American Journal of Psychiatry 140: 1450-1454.

Haney, C.
   1993    "Infamous punishment": The psychological consequences of isolation. National Prison Project Journal 8: 3-7, 21.

Hodgins, S. and G. Cote
   1991    The mental health of penitentiary prisoners in isolation. Canadian Journal of Criminology 33: 175-182.

Copyright © 2001. All rights reserved.

Holden, R. R., J.D. Mendonca, D. Mazmanian, and J.R. Reddon
    1992    Clinical construct validity of the Holden Psychological Screening
            Inventory (HPSI). Journal of Clinical Psychology 48: 627-633.

Immarigeon, R.
    1992    The marionization of American prisons. National Prison Project
            Journal 7: 1-5.

Jackson, M.
    1983    Prisoners of Isolation: Solitary Confinement in Canada. Toronto:
            University of Toronto Press.

Kane, D. (Chair)
    1997    Commitment to Legal Compliance, Fair Decisions and Effective
            Results. Ottawa: Correctional Service Canada.

Korn, Richard
    1988    The effects of confinement in the high security unit at Lexington.
            Social Justice 15(1): 1-20.

Laplante, J
    1998    Paper presented at the Conference entitled The Reasonable
            Alternative. Kingston: Correctional Service of Canada.

Luise, Maria A.
    1989    Solitary confinement: Legal and psychological considerations.
            New England Journal on Criminal and Civil Confinement 15:
            301-324.

Martel, J.
    1999    Solitudes and Cold Storage: Women's Journeys of Endurance in
            Segregation. Edmonton: Elizabeth Fry Society of Edmonton.

Miller, H.A. and G.R. Young
    1997    Prison segregation: Administrative detention remedy or mental
            health problem. Criminal Behaviour and Mental Health 7: 85-
            94.

Motiuk, L.L. and K. Blanchette
    1997    Case Characteristics of Segregated Prisoners in Federal
            Corrections. Ottawa: Correctional Service of Canada.

Nuffield, J.
    1982    Parole Decision-making in Canada: Research towards Decisions
            Guidelines. Ottawa: Ministry of Supply and Services Canada.

Paulhus, D.L.
    1984    Two-component models of socially desirable responding. Journal
            of Personality and Social Psychology 46: 598-609.

Pedhazur, E.J.
    1982    Multiple Regression in Behavioral Research. New York: Harcourt
            Brace College Publishers.

Copyright © 2001. All rights reserved.

Pierson, T.A.
  1988    Use of protective custody: How different systems respond.
          Corrections Today 50: 150, 152, 154.

Rold, W.J.
  1992    Consideration of mental health factors in prisoner discipline.
          Journal of Prison and Jail Health 11: 41-49.

Shipley, W.C.
  1940    A self-administering scale for measuring intellectual impairment
          and deterioration. Journal of Psychology 9: 371-377.

Spielberger, C.D.
  1983    Manual for the State-Trait Anxiety Inventory STAI (Form Y). Palo
          Alto, CA: Consulting Psychologist Press.

Suedfeld, P., C. Ramirez, J. Deaton, and G. Baker-Brown
  1982    Reactions and attributes of prisoners in solitary confinement.
          Criminal Justice and Behavior 9(3): 303-340.

Tellier, C., S. Wormith, and P. Gendreau
  1989    Protective Custody: The Emerging Crisis Within the Prison
          System (Working Paper) Ottawa: Solicitor General Canada.

Vantour, J.A.
  1975    Report of the Study Group on Dissociation Ottawa: Solicitor
          General Canada.

Wadeson, H. and W.T. Carpenter
  1976    Impact of seclusion room experience. Journal of Nervous Mental
          Disease 163: 318-328.

Walters, R.H., J.E. Callagan, and A.F. Newman
  1963    Effect of solitary confinement on prisoners. American Journal
          of Psychiatry 119: 771-773.

Weinberg, M.M.
  1967    Effects of Partial Sensory Deprivation on Involuntary Subjects.
          Unpublished doctoral dissertation, Michigan State University.

Wormith, J.S., M.-C. Tellier, and P. Gendreau
  1988    Characteristics of protective custody prisoners in a provincial
          correctional centre. Canadian Journal of Criminology 30: 39-
          58.

Zubek, J.P., L. Bayer, and J.M. Shephard
  1969    Relative effects of prolonged social isolation and confinement:
          Behavioral and EEG changes. Journal of Abnormal Psychology
          74: 625-631.

Copyright © 2007. All rights reserved.