# EXHIBIT 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,               )
                                     )
                Plaintiffs,          )
                                     )CASE NO.:
          vs.                        )S 90-0520 LKK-JFM
                                     )
EDMUND G. BROWN, JR., ET AL.,        )
                                     )
                Defendants.          )
_____  )


DEPOSITION OF

CRAIG HANEY, PH.D.

WEDNESDAY, JULY 10, 2013,  9:05 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,              )
                                          )
5                      Plaintiffs,        )
                                          )CASE NO.:
6            vs.                          )S 90-0520 LKK-JFM
                                          )
7    EDMUND G. BROWN, JR., ET AL.,        )
                                          )
8                      Defendants.        )
     ─────────────────────────────────────)
9

10

11

12

13

14           The Deposition of CRAIG HANEY, PH.D., taken on

15   behalf of the Defendants, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:05 a.m., Wednesday, July 10, 2013, at

19   the Attorney General's Office, 455 Golden Gate Avenue,

20   11th Floor, San Francisco, California.

21

22

23

24

25
```

Craig Haney, Ph.D.                                                July 10, 2013

1    not.  That's why I brought mine.

2         Q.   We'll just give these back to the court

3    reporter, then.

4              Take a look at Exhibit 2, which is your

5    March 20, 2013, declaration.  Take a look at your resume

6    which is Appendix A.

7         A.   Uh-huh.

8         Q.   Is this your current CV as of March 2013?

9         A.   Yes.  It appears to be, yes.

10        Q.   Have you updated your CV since March 2013?

11        A.   No, I don't think I have.  I think this is the

12   most current one I have.  I can't say for sure there

13   hasn't been an article or two added, but I don't think

14   there has.

15        Q.   So, Dr. Haney, based on your CV, you're

16   currently a professor of psychology at the University of

17   California at Santa Cruz; is that correct?

18        A.   Yes, it is.

19        Q.   And is that -- if I'm using the terms

20   correctly and I -- I hope -- are you a professor of

21   social psychology?

22        A.   No.  I'm a professor of psychology.

23        Q.   Is there a different between social psychology

24   and clinical psychology?

25        A.   Yes.

1      Q.    What is that difference?

2      A.    Well, clinical psychology is typically the

3    study of psychopathology.  It can involve diagnosis.  It

4    can involve treatment.  But the focus tends to be on

5    psychopathology.

6           Social psychologists focus on a broader range

7    of behavior.  They focus on behavior of people in a wide

8    range of social settings, social interactions in social

9    groups, social institutions.  It's more generally.  So

10   it's not focused specifically on psychopathology but,

11   rather, a broader range of human behavior.

12     Q.    Do you teach both social and clinical

13   psychology?

14     A.    No, I don't.  No.

15     Q.    What classes do you currently teach?

16     A.    I teach courses on -- graduate courses of

17   psychological theory.  Typically, also courses on

18   research methodology.  There are a variety of those,

19   also at graduate level.  I teach undergraduate courses

20   in the psychology in law, usually two versions of that

21   class, a kind of introductory version and advanced

22   version of class.

23          Before I had undertaken administrative

24   responsibilities, I also taught a course on advanced

25   social psychology and sometimes a course on the social

Craig Haney, Ph.D.                                                July 10, 2013

1    psychology of institutions.
2         Q.   So have you ever taught a class on clinical
3    psychology?
4         A.   No.  I'm not a clinical psychologist.
5         Q.   As your role as a professor at the university,
6    do you perform research?
7         A.   I do.
8         Q.   Explain to me what type of research you
9    perform.
10        A.   Sure.  I do research on a variety of different
11   issues.  A lot of that research involves studying the
12   way people react in small group settings, juries, for
13   example, and jury behavior.
14             I do research on prison-related issues.  I've
15   done -- published research on psychological effects of
16   solitary confinement, for example, and research on how
17   people react to and are affected by prison conditions of
18   various types:  Overcrowding, prison in general,
19   isolated conditions of confinement.
20        Q.   Have you ever researched prison populations in
21   California?
22        A.   Yes.  I have in the sense that -- I've written
23   about work that I've done oftentimes in conjunction with
24   legal cases, but interviews that I've conducted with
25   people who are confined in California prisons.

Craig Haney, Ph.D.                                          July 10, 2013

1    different prison systems.

2         Q.    Okay.  Can you -- what prison systems are you

3    going to be covering in what you're working on now?

4         A.    Well, this would include data collected in the

5    state of Texas.

6         Q.    Do you have an expectation when you'll publish

7    that work?

8         A.    I wish I did.

9         Q.    Okay.

10        A.    That's a more loaded question than you

11   intended it to be.  My anxiety level just went up very

12   high.

13        Q.    Was the study that you conducted in connection

14   with the Pelican Bay State Prison secured housing unit

15   published?

16        A.    Yes.  It was part of an article that was

17   published in 2003.

18        Q.    Is that one of the articles that you listed in

19   your declaration on the secured housing unit?

20        A.    Yes.  I'm sure it was.

21        Q.    As a psychologist, have you ever treated

22   patients?

23        A.    No.

24        Q.    I'm assuming you've never been licensed to

25   treat patients, as well.

Craig Haney, Ph.D.                                      July 10, 2013

1       A.    No.   Exactly.   I don't do treatment or

2   diagnosis.   It's not something I'm trained in or am

3   experienced in or licensed to do.

4       Q.    Okay.   Have you ever worked inside of a

5   correctional setting?

6       A.    No.   Not in a formal capacity.   I've been a

7   consultant at times but not actually an employee of the

8   prison system.

9       Q.    So I also noted from your resume that you

10  received your JD at Stanford Law School; is that

11  correct?

12      A.    Yes, it is.

13      Q.    Have you -- are you currently licensed as an

14  attorney?

15      A.    No.

16      Q.    Okay.

17      A.    I don't practice law.   I haven't practiced

18  law.

19      Q.    As an expert witness, how many times have

20  you -- start with, I guess, just testified for

21  plaintiffs?   Do you know?   Do you have a recollection of

22  the number of times?

23      A.    It would be a rough estimate.   Maybe 10 or 15

24  times.

25      Q.    Other than the Coleman case, what other cases

Craig Haney, Ph.D.                                          July 10, 2013

1    status in the system.  And it certainly interacts with

2    his mental health condition to place him at grave risk

3    of harm because the department doesn't have the bed that

4    he, as both an SNY and mentally ill prisoner, requires.

5         Q.   Do you know -- I mean, do you know how many

6    EOP inmates are currently waiting in an ad seg program

7    for a special needs yard bed?

8         A.   It's a calculation I didn't make.  I ran into

9    these folks on a number of different occasions, both

10   them and the other -- the CCCMS prisoners who are

11   waiting for similar kinds of transfers.  I haven't

12   calculated the number.  They exist.  I interviewed them.

13        Q.   So is it your opinion, then, if -- even if an

14   EOP inmate is in an ad seg unit waiting for a special

15   needs yard, that that's an inappropriate bed despite the

16   fact they would be receiving or could be receiving

17   appropriate mental health care in that unit?

18        A.   Except that they're not.  Except that they're

19   not receiving appropriate mental health care in that

20   unit, and that they're in that unit not because they

21   have been judged to have committed a disciplinary

22   infraction but, rather, simply because the department

23   doesn't have a bed in which to place them.

24             So the conditions of confinement in

25   administrative segregation in and of themselves place

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                          July 10, 2013

1  mentally ill prisoner at risk.  Whether or not they're

2  receiving appropriate -- appropriate levels of care,

3  which, frankly, in my experience in these four

4  institutions they rarely, if ever, are.

5        But even if they aren't, subjecting a mentally

6  ill prisoner to the rigors and potential risks of an

7  isolated confinement like administrative segregation

8  simply because there's not an appropriate bed elsewhere

9  is, in my opinion, extremely problematic and constitutes

10  a bad bed.

11        Q.   So I think I heard you say two things, and

12  correct me if I'm wrong on this.  But I think one is

13  that during your inspections of the four prisons, you

14  interviewed inmates that you felt were not receiving

15  appropriate mental health care while they were in ad seg

16  waiting for an SNY bed.

17        And then, second, I believe what you said was

18  that it wouldn't matter even if they were receiving

19  appropriate mental health care; it's the placement in

20  the ad seg itself that's problematic?

21        MR. FISCHER:  Objection.  Misstates the

22  testimony.

23        You can answer.

24        THE WITNESS:  So what I meant to say -- and if

25  I didn't say it clearly I will try to.  Their provision

1    place prisoners in restraints around a table and which

2    they have groups where they place prisoners in

3    restraints in a clinical office setting but not in a

4    cage.

5            So this is not the only way that it can be

6    done.  In fact, California is unusual in the sense that

7    it uses, in my experience, that these cages are so --

8    almost now ubiquitous in the system, certainly in the

9    ad seg and secured housing units.

10       Q.    With respect to the group treatment and -- do

11    you understand that in ad seg units, say, for instance,

12    that it's common to have a group setting where the

13    inmates are placed in the therapeutic treatment modules,

14    correct?

15            So is there any other prison system that

16    you're aware of that provides group treatment to inmates

17    that are in administrative segregation units?

18       A.    Sure.  I was in Colorado a couple months ago,

19    and they have a program there called a residential

20    treatment program.  These are prisoners who are in,

21    essentially, an administrative segregation-type

22    situation but they're mental patients.  They're what we

23    would consider to be our case load and prisoners.

24            And they engage in group therapy, in group

25    activities around a table, not unlike this one, in which

1    they're tethered to the table so they can't freely move

2    around, but, nonetheless, in which they're not separated

3    by bars or cagelike apparatus.  And they engage in a

4    kind of group, a group therapy or group activity

5    sometimes.  It's not always therapy; it could be an

6    educational process, et cetera.

7        Q.    In your experience, is it common for prison --

8    prisons outside of California to provide actual group

9    therapy programs to inmates that are in administrative

10   segregation units or is Colorado an outlier, for

11   instance?

12       A.    I don't think it's an outlier.  I haven't done

13   a systematic study of how states provide treatment to

14   mentally ill prisoners.  I can tell you that there's a

15   growing national consensus that the placement of

16   prisoners who are mentally ill in administrative

17   segregation is disfavored.  As you probably know, the

18   American Psychiatric Association has come out foursquare

19   against it.

20           So I think there are -- California may be an

21   outlier in terms of the number of mentally ill people we

22   have in administrative segregation, but I don't know

23   exactly how each and every state -- I haven't done a

24   study of how each and every state approaches this.  You

25   asked me if I knew of other ways to do it, and I gave

1  you Colorado as an example.

2      Q.   Beyond Colorado, do you know of any other ways

3  that group is offered to mentally ill inmates that are

4  in a segregation housing unit?

5      A.   Again, I mean, for example, in the state of

6  Washington, the most recent time I was there, there were

7  segregation units in Washington that did not use the

8  caging but, rather, had a kind of restraint process at a

9  table both for individual as well as some -- some

10 limited group kinds of therapeutic activity.

11             I've seen in Massachusetts, again, a -- an

12 architectural or furniture arrangement in which

13 prisoners were in group settings in which they were not

14 in cages but were rather in an environment where they

15 were around a table; they were restrained so they didn't

16 have complete freedom of movement, but they weren't

17 in -- they weren't in a cage and they weren't separated

18 from one another with cagelike apparatus.

19      Q.   In those cases you've just described, did the

20 inmates express any concerns with safety, the fact that

21 they're sitting so close, for instance, to another

22 inmate?

23      A.   Well, no.  I would assume and in the systems

24 with which I'm familiar, those kind of issue are

25 addressed beforehand.  And so -- and so there is care

1    which is exercised in terms of who is in the group.

2    Obviously if prisoners who have problems in groups or

3    cause problems in groups, case-by-case decisions have to

4    be made about how and whether they will be handled in

5    group in that way.

6        Q.   So Corcoran used -- and I believe this was

7    occurring when you were down there, I might be incorrect

8    on this -- used an alternative means to provide group by

9    means of what they called an ATOM, A-T-O-M.  And I

10   apologize.  I don't know the name of that.  I can't

11   remember what the acronym means.

12        Did you talk to any of the inmates that

13   participated in groups using the ATOM chair?

14        A.   Yes.

15        Q.   What was their feeling about it?  Did they

16   prefer that over a treatment module?

17        A.   Some preferred one and some the other.

18        They all, though, generally agreed that those

19   chairs were uncomfortable.  And to the extent to which

20   they preferred the cages, they preferred them in part,

21   as they voiced it, because the chairs themselves were

22   quite uncomfortable and they were restrained in the

23   chairs in ways that made them uncomfortable.

24        I sat in the chairs.  I can vouch for the fact

25   that they are uncomfortable.

1    appreciably moderated by being placed in what many of

2    them regard as a cage or a dog run.

3        They don't experience it as yard time as

4    something which alleviates the mental health problems

5    with which -- from which they are suffering but rather

6    as being put in a seat -- excuse me -- being put in a

7    kennel without a seat.

8        So part and parcel of the whole set of

9    conditions of confinement that exist in these units.

10       Q.   Is it your opinion that someone who's mentally

11   ill should never be placed in administrative

12   segregation?  And, again, I'm referring to the

13   administrative segregation versus a secured housing

14   unit.

15       A.   I think that they should never be placed in

16   those environments for an extended period of time.

17       And that if they are in those environments,

18   that efforts have to be made both to carefully evaluate

19   their possible suicidality and also to provide them with

20   enhanced -- enhanced opportunities for therapeutic

21   contact because of their risk of harm which inheres to

22   those kind of environments.

23       Q.   How would you define the time for -- and I

24   apologize, I don't remember exact term you used -- but

25   the terms of how not for an extended period of time, I

Craig Haney, Ph.D.                                              July 10, 2013

1   question.  But if not, is it also your opinion that

2   inmates with mental illness are at greater risk of

3   deterioration or harm if they're placed in a segregated

4   housing unit?

5        A.   Yes.

6        Q.   Same question:  How did you reach that

7   opinion?  Is it similar to the answer that you just gave

8   me?

9        A.   Yes.  I also want to say that it's certainly

10  consistent with the large literature.  The American

11  Psychiatric Association came to this conclusion based on

12  the accumulated wisdom of people who studied this issue.

13        There is a literature on this issue.  And it

14  is -- there are international as well as domestic

15  studies of this issue, and I've certainly relied that.

16  I mean, I'm -- I haven't operated in a vacuum on this --

17  on this issue, so I've certainly acknowledged the

18  analysis of this issue by my colleagues who, as I've

19  said, appear now to have reached consensus as well.

20        Q.   So, in your opinion, why is it that some

21  inmates with mental illness are more vulnerable to

22  deterioration in segregated housing than others?

23        A.   Well, it -- I think, in my experience, it

24  comes about as a variety of different -- for a variety

25  of different reasons having to do with the -- some of it

1    having to do with personal characteristics and what

2    psychologists sometimes call resiliency.  There are

3    certain people, even mentally ill persons, who are,

4    although they are vulnerable because of their mental

5    illness, have other systems of resiliency that they can

6    draw on that allow them to withstand additional levels

7    of stress and stress that comes about as a result of

8    isolation.

9              Some of them have -- some prisoners who are

10   able to withstand this have external support systems

11   that -- that provide sort of externally what personal

12   resiliency might provide to somebody internally.

13             Others of them happen to be in environments

14   where they're given a particular kind of treatment.

15   They're given extensive amounts of treatment.  And that

16   treatment helps them to manage the mental illness which

17   they have despite the pressures that otherwise might

18   create deterioration.

19             Some of it has to do with the conditions of

20   the confinement.  We're talking about administrative

21   segregation and security housing unit and isolation and

22   super max.  At times, it's easy to lump them together.

23   They're not the same.  So the different prison systems

24   handle these kinds of conditions very differently.  So

25   sometimes people, mentally ill prisoners, can handle the

Craig Haney, Ph.D.                                    July 10, 2013

1     environment, a higher percentage of them, because the
2     nature of the environment itself is very difficult.  The
3     amount of out-of-cell time is different.  The amount of
4     therapeutic contact they get is different.  The
5     environments themselves are created, built in such a way
6     that's different and so on.
7              So there are a lot of reasons why different
8     people can survive this differently.
9              I should also say the nature of the mental
10    illness may make a big difference.  So not all mentally
11    ill prisoners, in my experience, are equally vulnerable
12    to -- because of the nature of the mental illness.
13    There are varying degrees of vulnerability.
14             Q.   Do you know how many prison systems in the
15    U.S. use some form of a super max or security housing
16    unit?
17             A.   I think most do.  If we include in that -- and
18    I'm guilty of this, not you.  If you include in that
19    what is oftentimes in other systems and in California
20    called administrative segregation.  Some system don't
21    use the designation super max.  They don't use the
22    designation security housing unit.  They use
23    administrative segregation.  Or in Florida it's called
24    close management.  Texas has something called high
25    security.

Craig Haney, Ph.D.                                    July 10, 2013

1    the segregation unit?

2         A.    Yes.  Again, same answer.  I think most of the

3    time I did.  It would come up naturally in the course of

4    my interview.  But I can't say literally every time.

5         Q.    Okay.  Did you ever speak with any of the

6    custody staff about the security risks that were

7    associated with any of the inmates that you interviewed?

8         A.    Sometimes.  I mean, I -- I remember asking

9    certainly, I think, with respect to one of the people in

10   the management cell, why he was there.  And another

11   instance in SHU unit, I asked a custody officer that

12   question.  I didn't do it -- it didn't happen literally

13   every time but there were times when I did.

14        Q.    We talked a little bit earlier about clinical

15   contacts that occur at cell front.

16        A.    Yes.

17        Q.    In your opinion, is there ever a time where

18   that type of contact would be appropriate, clinical

19   contact?

20        A.    Well, I guess it depends on what you mean by

21   "appropriate."  I think there are very significant

22   limitations to cell front contact and they take a

23   variety of different forms.

24             One is if you're talking about a prisoner

25   who's double-celled, then it requires that prisoner to

Craig Haney, Ph.D.                                        July 10, 2013

1   participants in an experiment with the understanding

2   they will produce data for you in the needed or required

3   ways.

4          That model is not a model that we can almost

5   ever use in the real world.  We can almost never use it

6   in clinical science.  The whole field of psychiatry, for

7   example, is without the opportunity to do that.  You

8   can't give people some mental illness and other people

9   not.  You can't expose them to things that you think

10  cause mental illness.  You have to approach this in a

11  much more complicated and nuanced way along the lines I

12  described earlier.

13         Q.   So setting aside real world and looking at

14  prison environment, do you have the same opinion that it

15  would be problematic to use the, you know, causal-type

16  models in a prison environment?

17         A.   Well, I -- it's -- it's impossible to -- to do

18  it -- to use the simplistic pure form of causal study

19  for obvious reasons.  And so people don't do it.  Can't

20  do it.

21         And so that's why you approach the issue of

22  reaching causal conclusions in this much more elaborate

23  way which requires you look at all these other things.

24         Q.   Okay.  And what are the obvious reasons?  I

25  just want to make sure I have the same reasons you're

1   grave risk of psychological harm to which prisoners in

2   isolated confinement are subjected."

3         Do you see that?

4   A.   Yes.

5   Q.   What do you mean by the term "documents"?

6   A.   That describes, provides factual evidence or

7   support for, empirically confirms.

8   Q.   Okay.  And is it your opinion that the large

9   body of literature that you're referring to in

10  paragraph 8 establishes that segregated conditions cause

11  psychological harm?

12  A.   Yes, it does in that complicated way that I

13  described before lunch.  There is no experimental study

14  of this for all these reasons.  But for all the reasons

15  that I discussed earlier, it's possible to reach a

16  conclusion about what these studies mean and what they

17  show with respect to the harm that's created.

18  Q.   Are you making a distinction between

19  experimental studies and causality studies?

20  A.   I'm not sure what you mean by that.  The --

21  I -- I described earlier the most widely accepted way of

22  establishing causality is through experimental research

23  for all the reasons that I described that.  You can

24  control, it's simple if something changes, you know, why

25  it changed and so on.

Craig Haney, Ph.D.                                      July 10, 2013

1      Q.   So looking at the various studies that are in

2   Footnote 8, do any of these studies involve -- or employ

3   an experimental-type methodology as we've been talking

4   about?

5      A.   No.

6      Q.   Okay.

7      A.   Just to clarify, Footnote 8 really refers to

8   other reviews.  So these are not necessarily primary

9   studies but they review, as I did in several of my

10  studies, they review the literature which does cite --

11  the review cites to primary studies.

12           The -- the later part of this footnote does

13  talk about two studies which are primary studies, the

14  studies which report direct data.  But the first part of

15  that footnote talks about reviews of the various

16  literature to which I refer.

17     Q.   And the last -- the last two studies, I'm

18  assuming you're referring to findings -- I would refer

19  to it as, I guess, as the Zinger study.  I'm not sure if

20  that's correct.  It's 2001.  And then an O'Keefe study;

21  is that correct?

22     A.   Yes.

23     Q.   And why are you referring to them as primary

24  studies?

25     A.   Because they -- those two articles report --

1    why and how overcrowding affects delivery of mental

2    health care services at Mule Creek.  It's pretty

3    dramatic.

4        Q.   I think you've explained the basis for your

5    statement.  I think you may have moved back past the

6    paragraph I was going to ask you about.  If you could

7    turn back to paragraph 80.

8            In paragraph 80 you're referring to inmate --

9    excuse me -- a Prisoner B that you interviewed; is that

10    correct?

11       A.   Yes.

12       Q.   In this paragraph, you mention that the

13    prisoner was claiming that he was begging for help or

14    treatment and not getting it?

15       A.   Yes.

16       Q.   Is this one of the prisoners that you looked

17    at medical records for, if you recall?

18       A.   I believe I did, I think, because I referred

19    up top to the fact that he came to -- he came to the

20    institution as an SNY sometime earlier, and I believe I

21    was able to confirm that by looking at his custody

22    records.

23       Q.   Do you recall if you looked at his medical or

24    mental health records?

25       A.   I don't recall.

Craig Haney, Ph.D.                                            July 10, 2013

```
 1        A.    Yes.
 2        Q.    And he was in ad seg for safety reasons; is
 3   that right?
 4              Is this a situation that you would offer --
 5   you would consider a dangerous psych and return policy,
 6   someone going between mental health crisis bed and
 7   ad seg?
 8        A.    Well, yes, certainly the pattern he describes
 9   of somebody who's deteriorating, goes back to his yard,
10   has -- I mean, in this -- it's a somewhat different
11   situation in that he's not being returned necessarily to
12   administrative segregation unit but he's returning to a
13   place where he feels at risk and then ends up in ad seg
14   because they have nowhere else to put him.  It's -- I
15   mean, the wrinkle here is that he goes back to his yard
16   first perhaps -- I'm not sure that happened every
17   time -- but then, nonetheless, ends up in a situation
18   where he's in an ad seg unit after having been
19   repeatedly placed in a mental health crisis bed.
20        Q.    If he was being placed in ad seg for safety
21   reasons, how is having him going to a mental health
22   crisis bed unit for suicidality, for instance, being
23   sent back to his yard, and then needing to go into
24   ad seg for safety reasons -- I mean, how is that a
25   dangerous psych and return policy?
```

1  the OHU at CIC.

2          MR. FISCHER:  CCI.

3          THE WITNESS:  Sorry.  CCI.

4          MS. VOROUS:  Every other place that he

5  mentioned CIC, supposed to be CCI.

6          That's okay.  I just let it go.

7          THE WITNESS:  Sorry.

8          MR. FISCHER:  We all knew what you're talking

9  about.

10          THE WITNESS:  I used to say Tehachapi.  I

11  don't know even why I tried to get those initials right.

12          You know, I'm pretty sure that in -- I think

13  it was OHU in Tehachapi that I saw -- that I saw a

14  prisoner who had been brought from a mainline general

15  population unit to the OHU, receiving treatment in a

16  treatment cage.

17          I don't know that I saw it at CIM.  Let me

18  make sure.

19          So I don't know -- no, I don't think so, and I

20  don't think I saw it elsewhere in a mental health crisis

21  bed.

22  BY MS. VOROUS:

23     Q.  Just back -- real quick back to Prisoner W

24  that we were just discussing.  Beyond what he told you,

25  do you have any independent knowledge of what mental

1   health treatment he was actually receiving while he was

2   in the ad seg unit?

3       A.    No.   He was receiving some because he referred

4   to it.   He was receiving it in the treatment cage

5   because he referred to that.   His records confirm there

6   were multiple MHCB admissions.   And I think there was

7   also a discussion of his high level of suicidality in

8   the records.

9            But I don't know specifically what kind of

10  treatment he was referring while he was in the ad seg

11  unit.

12      Q.    Okay.   Skip ahead to paragraph 201.

13           That paragraph relates to your visit at

14  Corcoran; is that correct?

15      A.    Yes.

16      Q.    Paragraph 201, first sentence, you state:

17  "EOP ASU treatment is also deeply lacking."

18           Explain the basis for making that statement.

19      A.    Well, I mean, part of the basis, in the

20  preceding paragraph, the correctional captain in charge

21  of access to treatment who accompanied us said, "We

22  schedule for 10 hours.   We get a he wide range, but we

23  rarely make 10 hours or even get close."

24           Well, even getting -- not even getting close

25  is evidence in my mind of deeply lacking treatment.

Craig Haney, Ph.D.                                              July 10, 2013

1       A.    Yes.  I may have been mistaken about where the

2   group was that I observed.

3           I think -- we went into the room where these

4   groups would ordinarily take place, but we were unable

5   to actually observe one because they were all scheduled

6   for Mondays and we were there on a Tuesday.  But we did

7   go into the area, and then I subsequently was able to

8   interview several prisoner about the groups that were

9   being offered.

10      Q.    You're generally familiar with the program

11  guide requirements for mental health care to CCCMS

12  inmates that are in a security housing unit; is that

13  correct?

14      A.    Yes.

15      Q.    So with respect to the inmates that you

16  interviewed in the Corcoran SHU, do you have any reason

17  to believe that they were not receiving program guide

18  requirement level of care?

19      A.    Well, only in the sense that they were -- that

20  they talked regularly about not getting groups and

21  wanting groups and feeling as though they needed groups

22  but not being able to have them.  And they talked about

23  the case managers telling them, the prisoners, that they

24  were understaffed, that the case loads were too high so

25  that they couldn't actually conduct the groups.

 1    don't have the numbers in front of me obviously, so it

 2    would be hard to -- it's hard for me to say so...

 3        Q.    And that would be data that you obtained

 4    during the site visit?

 5        A.    Yes, the population data and certainly the

 6    treatment hours.  This was information handout that we

 7    were given at the facility.

 8        Q.    In paragraph 243 you talk about, once again,

 9    the use of bad beds due to lack of appropriate beds?

10        A.    Yes.

11        Q.    And you also note that:  "For the week of

12    February 11th, 2013, more than half (28 of 54 men) were

13    waiting to transfer to an appropriate bed at Kern Valley

14    State Prison."

15              Do you see that?

16        A.    Yes.

17        Q.    Do you know why they were waiting, what the

18    circumstances were of their needing to transfer?

19        A.    I don't know offhand specifically for each of

20    them, only that they were endorsed to go to Kern Valley

21    and they were waiting for a bed to open up so that they

22    could do so.

23        Q.    And while they were waiting, you have no

24    reason to believe they were not receiving program guide

25    levels of -- required levels of care for CCCMS inmates,

Craig Haney, Ph.D.                                          July 10, 2013

```
1    do you?
2         A.    Well --
3              MR. FISCHER:  Objection.  Vague.  The program
4    guide requirement for CCCMS is clinically appropriate
5    treatment that we've been using.  Are you able to define
6    for Dr. Haney what you mean by that?  Is that what
7    you're referring to, clinically appropriate?
8              MS. VOROUS:  Yes, taking out group treatment.
9    A clinical context is what I'm asking for.  Whether they
10   were receiving their clinical contact outside of what
11   may be appropriate for purposes of group treatment.
12             MR. FISCHER:  So not including group
13   treatment?
14             MS. VOROUS:  Yes.  Yes.
15             MR. FISCHER:  Okay.  Were they receiving some
16   clinical contact?
17             MS. VOROUS:  That's correct.
18             MR. FISCHER:  If you remember.
19             THE WITNESS:  Yeah, I can -- I don't -- I
20   don't know how much clinical contact they were
21   receiving.  This is a facility that is significantly,
22   grievously understaffed.  And so I don't know, you know,
23   where there were issues about case loads and so on, so
24   forth that came up in the course of subsequent
25   interviews that I did.
```

Craig Haney, Ph.D.                                                July 10, 2013

```
1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20              DATED:   July 16, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```