# EXHIBIT 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,              )
                                    )
            Plaintiffs,             )
                                    ) CASE NO.:
      vs.                           ) S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
            Defendants.             )
                                    )

DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013, 9:14 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY: MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
1                  UNITED STATES DISTRICT COURT
2                  EASTERN DISTRICT OF CALIFORNIA
3
4   RALPH COLEMAN, ET AL.,           )
                                     )
5                  Plaintiffs,       )
                                     )CASE NO.:
6              vs.                   )S 90-0520 LKK-JFM
                                     )
7   EDMUND G. BROWN, JR., ET AL.,    )
                                     )
8                  Defendants.       )
                                     )
9   _____)
10
11
12          The Deposition of JOEL DVOSKIN, PH.D., ABPP,
13   taken on behalf of the Plaintiffs, before Megan F.
14   Alvarez, Certified Shorthand Reporter No. 12470,
15   Registered Professional Reporter, for the State of
16   California, commencing at 9:14 a.m., on Wednesday,
17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,
18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,
19   California.
20
21
22
23
24
25
```

1  release people from segregation directly to main
2  street?" And the State thought that was sensible.
3     Q.   So it was a step-down kind of program?
4     A.   Kind of. You have to understand, a lot of
5  people in segregation don't want to step down. The
6  notion that everybody hates segregation is incorrect.
7  Some people feel safer there. There's a lot of
8  different people in segregation, different kinds of
9  people.
10          Some of them were quite resistant to leaving
11 their cell at all, but they were -- I don't want to say
12 coerced, but there were incentives given to coming out
13 for like an hour by yourself, then two hours by
14 yourself, then maybe an hour with -- one other inmate.
15 It was very -- kind of a baby-step program to get them
16 to have some more socialization prior to their release
17 from prison.
18    Q.   The hope being that they would be safer when
19 they went out. One of the goals?
20    A.   Sure.
21    Q.   The other goal would be that they could
22 reintegrate into the prison population and behave?
23    A.   No. They -- a lot of these guys didn't go
24 back to population. Some of them -- what a lot of them
25 said to me was, "Look, if I go back to population, I'm

1    A.   I don't remember the number, but there was a
2  few.
3    Q.   You understand that while California has a
4  policy of excluding virtually all mentally ill from the
5  Pelican Bay SHU, it does not have that policy in place
6  as to the Corcoran SHU or the Tehachapi SHU or the
7  Sacramento SHU or the Women's SHU?
8    A.   Yes.
9    Q.   Okay.  Did you recommend at any time during
10 your work here in California that California consider
11 excluding greater numbers of the mentally ill from its
12 SHU program than it currently does?
13         MS. VOROUS:  Objection.  Vague and ambiguous.
14         THE WITNESS:  No.  The overarching goal or the
15 overarching recommendation that nobody, mentally ill or
16 not, should be in SHU unless there's a compelling reason
17 for them to be there.  So that would be just as true of
18 somebody with mental illness as it would be without
19 mental illness.
20         If somebody's mental illness was not
21 manageable in SHU, then that is my understanding of the
22 purpose of the PSU, when they should be transferred to a
23 PSU.
24         If they're -- so the CCCMS people are people
25 who are stable, taking medication.  In most cases,

```
 1  they're taking medication. But if they're not stable
 2  and they need a higher level of care, then they're
 3  supposed to be moved to the PSU. That could be at
 4  Pelican Bay.
 5              I think that the prohibition is an outgrowth
 6  of a lawsuit that only affected Pelican Bay. At first I
 7  thought it made no sense, but the one reason it does
 8  make some sense is that Pelican Bay has had more
 9  difficulty than other places recruiting psychiatrists.
10  That's going to get better soon from telepsychiatry.
11  But I think that may have been part of the reason that
12  that made sense at Pelican Bay more than it did at other
13  place.
14              But generally, I think nobody should be in
15  segregation who doesn't need to be there. If you really
16  need to be there, then -- then the system has to bring
17  treatment to the person.
18  BY MR. BIEN:
19       Q.   As your -- were you aware that there are no
20  time limits on housing of people in SHU in California?
21       A.   I'm not sure what you mean by that.
22       Q.   That people can be there an indeterminate
23  amount of time.
24       A.   I think that some people have indeterminate
25  and some people actually get like a SHU sentence, but
```

1  people who mistake lividity for rigor mortis.  If you're
2  hanging especially, your muscles become hard from the
3  pooling of blood.  But rigor mortis is joints, not
4  muscle.
5          So often when you see rigor mortis set in,
6  what they're really describing is lividity.  The reason
7  that matters is lividity can be much earlier than
8  rigor mortis.
9      Q.   Okay.
10     A.   However, in at least one of the cases -- I
11 think several of them -- there was other evidence that
12 would indicate that Dr. Patterson's conclusions was
13 right, whether it was rigor mortis or not, that it had
14 been -- that people hadn't been doing the checks.
15          So I did say that, yeah.
16     Q.   The point is that for suicide prevention, one
17 of the tools you can use in ad seg is identifying people
18 in the act of attempting suicide and hopefully
19 interrupting them.
20     A.   That's very unlikely with one-hour or
21 30-minute checks, to be honest with you.  It's -- people
22 say to do it, but it's probably not going to stop very
23 many suicides.  It's just a matter of luck.  You know,
24 it's a two-minute process, if you can even tell by
25 looking at the person that -- if they're hanging, you

```
 1   can tell.  And then you -- it's a -- the luck of the
 2   draw of whether you happen to catch them at the moment.
 3              So it's not a suicide watch, and it's --
 4   it's-- people say to do it because it seems like a more
 5   diligent thing to do.  I'm not really sure how many
 6   suicides it would ever prevent.
 7              I think Lindsay thinks more highly of that
 8   than I do, to be honest with you.  It's not a big
 9   difference of opinion, but doesn't mean you shouldn't do
10   it.
11              The main purpose of the checks or main value
12   of the checks for suicide prevention, in my opinion, it
13   gives a guy an opportunity to tell somebody, "I'm not
14   doing good" or "I need to see the psych."
15              Maybe they wouldn't yell it out, but if an
16   officer stops by and sees a guy crying and he says, "You
17   okay?"
18              "No, man, I can't take this anymore" or
19   "Forget my appointment tomorrow.  I'm not going to need
20   it."  Then that saves lives.
21              It also probably helps with rapport if the
22   officers swing by and say hi to people.  Helps with
23   custody staff also.
24        Q.    Can it also save lives because the officer
25   comes upon an act of suicide and the person is still
```

```
 1      A.   Yeah, I would say it could.
 2      Q.   Would you also agree that approximately 40 to
 3 50 percent of the suicides are people who are not
 4 mentally ill?  Is that correct?
 5      A.   I believe that's approximately right, yes.
 6      Q.   You also agree it would be beneficial and save
 7 lives for California --
 8      A.   I'm sorry.  By "not mentally ill," I assume
 9 you mean not identified mental health service
10 recipients.
11      Q.   That's correct.  That question was vague.
12           Would you also agree that it might save more
13 lives if California did 30-minute welfare checks for
14 everyone in ad seg?
15           MS. VOROUS:  Vague and ambiguous.  Lacks
16 foundation.
17           THE WITNESS:  It might.
18 BY MR. BIEN:
19      Q.   It's possible that somebody would be
20 identified early enough to open the cell and maybe stop
21 his bleeding or provide CPR or other emergency medical
22 services?
23      A.   It's possible.
24      Q.   Okay.  Do you disagree with the ACA standard
25 being 30 minutes as being an appropriate national
```

THORSNES LITIGATION SERVICES, LLC | 877.771.3312 | www.thorsnes.com

```
 1   BY MR. BIEN:
 2       Q.   If you can find the CIM one, you can look and
 3   refresh your recollection.
 4       A.   CIM is when I was in Charlie yard.
 5       Q.   Let me see if I can help you out here.
 6            MS. VOROUS:   CIM is Exhibit 13.
 7   BY MR. BIEN:
 8       Q.   Okay.  Let's see if I can help you out.
 9       A.   There's a note on page 10, 104449, the fourth
10   checkmark.  It says:  "Move EOPs out of here.
11   Prioritize."
12            That was related to the same observation, and
13   then...
14       Q.   Okay.  So let's look at that page.  Higher up
15   on that page it says:  "LOB no," with an exclamation
16   mark.
17            What were you referring to there?
18       A.   That stood for -- we just go figured that out
19   yesterday.  Just figured that out.
20       Q.   Also, on the next page, I see a reference to
21   LOB again.
22       A.   Got it.  Okay.  Thank you.
23            What that was was -- so if somebody was in
24   segregation for no other reason than there wasn't a bed
25   for them.  Lack of bed.
```

1    Q.   LOB stands for lack of bed?
2    A.   I don't know why I used an acronym.  I hate
3  acronyms.  I think maybe they called it that status.
4         Anyway, on the next page, what it says is -- I
5  said, "Well, wait a second.  If I'm in seg just because
6  I need a place to sleep, why am I confined to my house?
7  Why can't I be treated like a regular old inmate if I
8  haven't done anything?"
9         And they said, "Oh, we do that."  If it's a
10 row of LOBs, they let them all out.
11        If it's interspersed because they didn't have
12 a bed next door to a seg inmate, then they said, "We
13 don't do it for them."
14        I think they were afraid of letting a seg
15 inmate out.
16        I said, "That's not okay.  Put signs on the
17 door.  Figure it out.  You shouldn't lock me down if I
18 didn't do anything.  It's not fair."
19   Q.   You understand when you visited CIM in May of
20 2012 that there was a -- a shortage of the particular
21 kind of beds that were necessary for these men who were
22 in -- called LOB?
23        MS. VOROUS:  Objection.  Lacks foundation.
24 Vague and ambiguous.
25        THE WITNESS:  Yeah.  I don't think they were

1  last entry, can you read that?

2       A.   "Lots of CCCMS groups canceled. Not const"

3  meaning not a constitutional issue.

4       Q.   Why did you write "not constitutional" next to

5  it?

6       A.   Because the -- the groups for CCCMS aren't

7  typically viewed as a constitutional mandate unless

8  somebody for a particular reason needs a group.

9            So I guess I will say I didn't think it's a

10 constitutional issue; but I think, as a matter of public

11 policy, it's good to do groups with people in CCC. In

12 fact, it's good to do groups with inmates, period.

13      Q.   I never saw in the constitution any reference

14 to whether groups are necessary for CCCs.

15           MS. VOROUS:  Objection. Argumentative.

16           Ask a question.

17 BY MR. BIEN:

18      Q.   I don't understand where the standard comes

19 from. Where do you get the standard that groups are not

20 required for CCCMS inmates as a matter of law

21 constitutional law?

22      A.   Generally speaking, I'm unaware of anyplace

23 that has required for people that are stable on

24 medication to get more than that. If they're doing

25 fine, then it's not -- it's my opinion. It's not a

```
 1   constitutional issue.  I'm not quoting case law.  That's
 2   my opinion.
 3           Whereas for people that are not stable in EOP,
 4   that it is a constitutional issue that they get
 5   something more than medication presumptively.  I guess
 6   it's possible somebody might not need it, but we presume
 7   that they do.
 8       Q.  Would you agree that if -- if there are no
 9   groups provided for CCCs, you don't see any
10   constitutional issue if there's a particular prison that
11   decided to cancel all groups?
12       A.  I think -- yeah, that wouldn't be necessarily
13   a constitutional problem.  But if somebody had an
14   unmet -- a serious unmet mental health need, that might
15   be a constitutional issue, but it wouldn't have to be
16   groups that met it.
17       Q.  Let's assume for a moment that there's a
18   prison in California and, for whatever reason, not
19   individually based, but for a staffing reason or a
20   lockdown, all CCC groups are canceled for six months,
21   let's say.  Wouldn't that be a serious problem in the
22   delivery of mental health care?
23           MS. VOROUS:  Objection.  Vague and ambiguous.
24           THE WITNESS:  Not necessarily.  If -- if a --
25   if the inmates were stable, then their mental health
```

CERTIFICATE OF REPORTER

I, MEGAN F. ALVAREZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the events of this cause, and that I am not related to any of the parties hereto.

DATED: March 1, 2013

*[signature]*

MEGAN F. ALVAREZ
RPR, CSR 12470

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com