# EXHIBIT 9

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF CALIFORNIA
 3
 4   RALPH COLEMAN, ET AL.,           )
                                      )
 5                   Plaintiffs,      )
                                      )CASE NO.:
 6            vs.                     )S 90-0520 LKK-JFM
                                      )
 7   EDMUND G. BROWN, JR., ET AL.,    )
                                      )
 8                   Defendants.      )
     _____)
 9
10
11
12
13
14        The Deposition of JACQUELINE MOORE, RN, PH.D.,
15   taken on behalf of the Plaintiffs, before Megan F.
16   Alvarez, Certified Shorthand Reporter No. 12470,
17   Registered Professional Reporter, for the State of
18   California, commencing at 8:50 a.m., Thursday,
19   February 21, 2013, at the Rosen, Bien, Galvan &
20   Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San
21   Francisco, California.
22
23
24
25
```

1  treatment standpoint?

2     A.  No, because the primary clinician always

3  followed up with that inmate afterwards.  I mean, they

4  didn't do a cell extraction to get them into that

5  module.

6     Q.  Is that clinician follow-up just as good as

7  the IDTT meeting?

8        MS. VOROUS:  Objection.  Lacks foundation.

9        THE WITNESS:  It's not as good, but it's an

10 alternative if the inmate refuses.  They do have that

11 right.

12 BY MR. FISCHER:

13    Q.  Incidentally, before touring the CDCR

14 institutions that you visited, had you worked or

15 consulted in prisons that use the therapeutic modules?

16    A.  Connecticut.

17    Q.  Connecticut?

18    A.  Connecticut.

19    Q.  Anywhere else?

20    A.  I didn't put that on your list either.

21    Q.  I'll add it.

22    A.  I'm not sure, but maybe the City of

23 Philadelphia.

24    Q.  But it sounds like it was uncommon?

25    A.  It was uncommon.  I didn't see it see it quite

1  frequently.  The first time I saw it, I thought it was
2  good idea.
3      Q.   First time you saw it where?
4      A.   In Connecticut.
5      Q.   Why did you think it was a good idea?
6      A.   Because they could bring inmates out from
7  various classifications and have group therapy with them
8  and the inmates would feel safe, whereas they might not
9  be able to get this grouping of inmates together.
10     Q.   Is it your opinion that the therapeutic
11 modules can be overused, used in situations where
12 they're not required?
13          MS. VOROUS:  Objection.  Vague and ambiguous.
14 Lacks foundation.
15          THE WITNESS:  I don't know that.  I don't know
16 that they -- I'm trying to think if I saw group therapy
17 where they didn't use therapeutic modules.
18 BY MR. FISCHER:
19     Q.   In the California prisons?
20     A.   In the California prisons.
21     Q.   What about in the other states?  Philadelphia,
22 Connecticut, Indiana, North Carolina, Kentucky,
23 New Mexico, Utah, Maine, Delaware, Puerto Rico?
24     A.   Puerto Rico didn't use modules.  There was not
25 an emphasis on group therapy as there has been here in

1  the state of California in many of the other states that
2  I've gone to.
3       Q.   What about individual treatment?
4       A.   Individual treatment, yes.
5       Q.   And did any of these other states use
6  therapeutic modules for individual treatment?
7       A.   No.
8       Q.   And that's all the states that you --
9  including Connecticut?
10      A.   I'm sorry.  I didn't hear you.
11      Q.   All the states other than California that
12 you've worked in the adult prisons have not used
13 therapeutic modules for individual treatment?
14      A.   Not that I can remember.
15      Q.   Okay.  First time you saw the therapeutic
16 module -- therapeutic modules here in California, what
17 was your -- what was your response?
18           MS. VOROUS:  Objection.  Vague and ambiguous.
19           If you can, answer that question.
20           THE WITNESS:  I refer to them as a cage.
21 BY MR. FISCHER:
22      Q.   Did you have any other opinions or thoughts
23 about their use?
24      A.   On one of my reports, I made some notations of
25 it.  It was a very early report.

CERTIFICATE OF REPORTER

I, MEGAN F. ALVAREZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the events of this cause, and that I am not related to any of the parties hereto.

DATED: February 25, 2013

*Megan F. Alvarez*

MEGAN F. ALVAREZ

RPR, CSR 12470