KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE J. VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
JESSICA KIM, State Bar No. 257766
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
   1300 I Street, Suite 125
   P.O. Box 944255
   Sacramento, CA 94244-2550
   Telephone: (916) 324-5345
   Fax: (916) 324-5205
   E-mail: Debbie.Vorous@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DECLARATION OF CHARLES SCOTT, M.D. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION RELATED TO THE HOUSING AND TREATMENT OF MENTALLY ILL PRISONERS IN SEGREGATION**<br><br>Judge: Hon. Lawrence K. Karlton<br>Date: July 24, 2013<br>Ctrm: 4 |

1

I, Charles Scott, M.D., declare as follows:

1. I am a Professor of Clinical Psychiatry at the University of California, Davis. I am licensed to practice medicine in California and am board-certified by the American Board of Psychiatry and Neurology (ABPN) in four separate areas of psychiatry. In particular, I have ABPN qualifications in Forensic Psychiatry, Addiction Psychiatry, Child and Adolescent Psychiatry, and General Psychiatry. I have served as the Forensic Psychiatry Fellowship Training Director at the University of California, Davis since October of 1998 and as the Chief, Division of Psychiatry and the Law at the University of California, Davis since 2002. From 1996 to 1998, I served as an Assistant Professor of Psychiatry at the Tulane University Medical Center.

2. In addition to the above academic and professional services, I have provided mental health services to inmates detained at the Sacramento County Jail from 1998 through 2010. I have also provided psychiatric consultation on issues related to the evaluation and treatment of offenders with mental illness who are detained at Napa State Hospital under designated penal codes for involuntary commitment. Prior to my employment with UC Davis, I was responsible for psychiatric services provided at the only maximum-security psychiatric unit in Louisiana and for direct clinical care to inmates at Hunt Correctional Facility in Louisiana. Between 1991 and 1996, I provided psychiatric services to children, adolescents and adults for the United State Army while stationed in Germany and in Texas.

3. I am the immediate Past-President of the American Academy of Psychiatry and the Law (AAPL) and have also served as Vice-President of AAPL and as a national Counselor of AAPL. Since 1996, I have been one of four United States psychiatrists selected to provide national training for the AAPL Annual Forensic Review Course, and was the sole national faculty member selected to provide the national training for issues related to correctional mental health care for this national annual training. I have also been appointed as a member of the AAPL Research and Education Institute.

4. I have served as an expert witness on litigation issues involving the standard of care in Alabama, Arizona, California, Florida, Illinois, and New Mexico. I have publications related to correctional mental health care and have served as Editor of two editions of the

2

American Psychiatric Association's Handbook of Correctional Mental Health Care. I have provided numerous trainings on standards of care in correctional settings, have served on California's Judicial Action Committee, and presently serve as a member of the American Psychiatric Association's Council on Psychiatry and the Law. My curriculum vitae (a true and correct copy of which is attached as Exhibit 1) lists my experience in the field of psychiatry, publications, and presentations.

5. I have direct experience conducting research regarding psychological phenomena experienced by offenders with mental illness who are classified under a penal code classification. This research is detailed in the Grants/Approved Research Protocols section of my curriculum vitae. I have published my research in peer-reviewed journals. Through this and other academic training and experience, I have developed proficiency and specialized knowledge of standards for designing and conducting scientific experimentation relevant to proving or disproving hypotheses that examine factors related to an individual's psychological health. As a physician, I regularly rely on my skills and abilities to interpret data and critically analyze the strengths and weaknesses of experimental and other research methodologies. In addition, as a physician licensed to diagnose and treat mental disorders, I can evaluate and interpret reported psychological symptoms and plausible alternatives for such presentations.

6. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion Related to the Housing and Treatment of Mentally Ill Inmates in Segregation. To prepare this declaration, I reviewed selected parts of several items, including but not limited to: (1) Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Segregated Housing; (2) Declaration of Craig Haney in support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Segregated Housing; (3) Declaration of Craig Haney in support of Plaintiffs' Opposition to Defendants' Motion to Terminate; and (4) the transcript of Dr. Haney's deposition taken July 10, 2013.

**Discussion of Research Standards**

7. Through my experience and training as a clinical forensic psychiatrist and as a Professor of Clinical Psychiatry, I am familiar with the research and experimental standards and

3

methodologies generally accepted in the scientific community as sufficient to establish a causal relationship between proposed factors and outcomes.

8. The scientific method to establish causality (i.e. that one event *causes* another) generally incorporates the following components: a. statement of the problem to be studied; b. formulation of a hypothesis; c. design of the experiment to test the hypothesis; d. collection of observations (i.e. data); e. interpretation of data; f. reaching of conclusions based on data analysis; and g. accepting or rejecting of the hypothesis based on results of data analysis. Publishing research results in peer-reviewed journals and replication of findings are additional criteria that subject methodologies and findings to critical analysis and further testing.

9. The scientific method approach is an important methodology to produce valid findings that can be relied on by the public, businesses, and governments to help create products or policies that broadly affect public health, safety, and the environment. In addition, it is important for psychological research—especially research that purports to establish or disprove causal relationships—to be founded on standardized/rigorous scientific methodologies and practices because evidence of causal relationships can form the basis of diagnosis and treatment of human subjects. A scientific study must strive to minimize the introduction of biased or flawed methodologies, which can directly or indirectly result in biased or flawed results or interpretations.

10. The scientific method requires that the following issues be evaluated to test the hypothesis that placing individuals with mental illness in a segregation environment causes a mental health symptom or disorder: (a) determining whether the individual experienced the mental health symptom or disorder prior to exposure to the segregation environment; (b) determining the individual's baseline mental health and psychological functioning prior to exposure to the segregation environment; (c) observing and measuring the individual's mental health and psychological functioning after exposure to the segregation environment; and (e) analyzing data to determine the impact, if any, of the segregation environment on the individual consistent with the proposed hypothesis. In addition, evaluating control groups of individuals who are not exposed to the segregation environment are important to determine if similar findings

4

Decl. Charles Scott M.D. Supp. Defs.' Opp. to Mot. Rel. to Housing & Treat. Mentally Il Prisoners in Segregation
(2:90-cv-00520 LKK JFM PC)

would have occurred in a non segregation environment. Finally, depending on the assessment methodology and study instruments, verifying self-reported symptoms through collateral sources of information may also be indicated. Although the exact combination and number of the above components may vary depending on the study design, evaluating most of them would be necessary to establish a scientific methodology to study the hypothesis that placement in a segregation environment causes mental illness or mental health deterioration.

11. In contrast to research that uses a scientific method, a descriptive study is one that generally collects information from individuals or collateral sources but does not evaluate the impact of an environmental change on the individual. Descriptive studies are sometimes referred to as "correlational" or "observational" studies. Descriptive studies can provide information about the naturally occurring health status, behavior, attitudes or other characteristics of a particular group. For example, a descriptive study could collect information about the frequency of a symptom or behavior reported by an individual in a segregation environment through the use of an interview, questionnaire survey, or record review. However, such studies are not designed to establish, nor can they establish, that the segregation environment causes a reported symptom or behavior.

12. There are various commentaries, literature reviews, and manuscripts reporting the results of non-experimental studies, case reports, or anecdotal experiences that appear to demonstrate that inmates confined in segregated housing are at an increased risk to experience psychological harm as a result of their placement. Dr. Haney's declarations provide his review of this literature that collectively suggests that placement in isolated confinement may psychologically harm some inmates. One notable exception to Dr. Haney's literature review is his omission to note that the longitudinal study conducted by Dr. Maureen L. O'Keefe and colleagues, which does not support the hypothesis that placement in a segregation environment results in psychological harm or deterioration to individuals, was published in 2013. (O'Keefe, ML: A longitudinal study of administrative segregation. J Am Acad Psychiatry Law 4:49–60, 2013).

**Overall Opinions.**

13. The studies that Dr. Haney cites in support of his declaration and self-authored articles are insufficient to establish a causal connection between the segregated prison setting and the behaviors observed with any reliable degree of medical or scientific certainty. In his deposition, Haney concedes that no experimental studies have demonstrated a causal relationship between conditions in segregated housing and psychological deterioration. (Haney Dep. 130:13–20, 139:8–17, 146:1–6.) Despite this lack of medical or scientific certainty, Haney opines that a method known as "triangulation" provides an adequate methodology to establish a causal relationship between segregated prison settings and psychological deterioration in lieu of scientific experiments. (*Id.* at 127:16–129:16.)

14. "Triangulation" combines more than one approach to the investigation of a research question to enhance confidence in the ensuing findings. If the original data sets used in the triangulation method are flawed or biased, then combining that flawed data with other information does not enhance confidence in the conclusions of the triangulation methodology. In other words, combining flawed or disparate data from multiple "studies" using the triangulation method cannot correct problematic data and faulty conclusions that originate from the primary data source.

15. Zinger and colleagues note methodological shortcomings of various "studies," which report that administrative segregation type environments negatively impact an individual's psychological health and/or cause psychological deterioration. These shortcomings include: (a) relying primarily on qualitative data (i.e. casual interviews and anecdotes); (b) inconsistent definitions of terms of confinement; (c) reliance on field studies and laboratory measures of sensory deprivation as substitutes for evaluating actual administrative segregation-type environments; (d) wide ranging and variable use of subjects (such as inclusion only of individuals who are plaintiffs in litigation); (e) failure to identify varying reasons for segregation; (f) subject attrition; (g) reliance on cross-sectional research without longitudinal follow up (i.e. comparing segregated vs. non segregated inmates at one point in time); (h) indeterminate or unknown administrative lengths of stay described in the study; (i) lack of comparison groups; (j) failure to

6

consider impact of custody staff on psychological health (as opposed to the physical conditions of confinement); and (k) personality factors unique to the individual that may influence psychological outcome. (Zinger I, Wichman C, Andrews DA: The psychological effects of 60 days in administrative segregation. Can J Criminol 43:47–88, 2001). Other researchers have also criticized the lack of well-designed research to study the effect of segregation on individuals, with a resulting inability to rule out plausible alternatives to reported or observed symptoms. (Arrigo BA, Bullock JL: The psychological effects of solitary confinement on prisoners in supermax units: reviewing what we know and recommending what should change. Int J Offender Ther Comp Criminol 52:622–41, 2008; Metzner JL, Dvoskin JA: An overview of correctional psychiatry. Psychiatr Clin North Am 29:761–72, 2006; Pizarro JM, Narag RE: Supermax prisons: what we know, what we do not know, and where we are going. Prison J 88:23–42, 2008).

16. Many studies included in the "triangulation" methodology cited by Haney are fraught with these described methodological flaws. Concerns with reaching causation conclusions based on such data are summarized by O'Keefe et al. (2013) when they write: "Researchers have been unable to settle the question of whether the high rates of mental illness found in AS [administrative segregation] are caused by this harsh environment or whether there is a selection bias such that offenders with mental illness, unable to adapt to general prison settings, are placed in AS at higher rates." (O'Keefe (2013) at 49).[1]

17. Dr. Haney's primary reliance on triangulation methodology in lieu of scientific methodology to opine on causal connections between psychological deterioration and placement in segregated prison settings is problematic because the predicate studies he includes in his triangulation methodology do not employ scientific experimentation that measures psychological functioning related to conditions of segregated environments. In fact, Haney concedes that none of the predicate studies he relies on use scientific experimentation that is capable of demonstrating a causal connection between segregated housing in prison and psychological harm.

---

[1] O'Keefe defines "AS" as "long-term administrative segregation" that "generally involves locking an inmate in a cell for 23 hours per day, with out-of-cell time occurring with significant security restriction (e.g., hands and ankles cuffed) and escort by two correctional officers." (O'Keefe (2013) at 49.)

7

Decl. Charles Scott M.D. Supp. Defs.' Opp. to Mot. Rel. to Housing & Treat. Mentally Il Prisoners in Segregation
(2:90-cv-00520 LKK JFM PC)

And Haney's methodology for reviewing and assigning weight to the studies he includes is unclear. For example, it is unclear what weight or importance he accords to each individual study and why he selected only those studies that supported his hypothesis in his triangulation methodology.

18.     Several of the studies that Haney cites to support his conclusions are primarily descriptive studies, which do not control the conditions or variables under which data is collected. These studies do not examine whether the individual reported similar problems with psychological functioning prior to being placed in segregation, demonstrated problems with psychological functioning in non segregation environments, or had a baseline level of functioning upon placement in segregation to compare the change, if any, of psychological functioning after being placed in a segregation environment.

19.     Although observations of an individual's psychological functioning in a segregation environment are important in assessing mental health treatment, such observations alone are insufficient to establish that segregation environments cause or contribute to psychological deterioration or decline without some understanding of the individual's actual mental health history. For example, if an individual used a sharp object to cut on his arm in administrative segregation, a descriptive study could naively and incorrectly conclude that administrative segregation caused that self-injurious behavior. However, if the individual's record describes similar self-injurious behavior prior to incarceration or in a non administrative segregation setting, then one can not conclude that administrative segregation was the cause of this behavior.

20.     In contrast to Dr. Haney's opinions that rely on the triangulation methodology, longitudinal studies collect data about the same group of individuals over time to measure the potential impact of an environment or intervention to outcome. A primary benefit of a longitudinal research design is that researchers are able to study variables of interest beyond a single moment in time such that the design is more likely than a cross-sectional study to allow for determination of a cause-and-effect relationship. Longitudinal studies that use baseline measurements of functioning before and after placement into segregation type environments have

8

Decl. Charles Scott M.D. Supp. Defs.' Opp. to Mot. Rel. to Housing & Treat. Mentally Il Prisoners in Segregation
(2:90-cv-00520 LKK JFM PC)

not consistently established that these environments cause the type or severity of psychological harms described by Haney.

21. For example, Gendreau and colleagues used repeated-measures experimental designs to assess inmates in segregation over periods of up to 10 days. Their research found few negative impacts from segregation over these brief periods (Gendreau P, Bonta J: Solitary confinement is not cruel and unusual punishment: people sometimes are! Can J Criminol 26: 467–78, 1984; Gendreau PE, Freedman N, Wilde GJS, et al: Stimulation seeking after seven days of perceptual deprivation. Percept Mot Skills 26:547–50, 1968; Gendreau P, McLean R, Parsons T, et al: Effect of two days 'monotonous confinement on conditioned eyelid frequency and topography. Percept Mot Skills 31:291–3, 1970 Gendreau PE, Freedman, N, Wilde GJS, et al: Changes in EEG alpha frequency and evoked response latency during solitary confinement. Abnorm Psychol 79:54–9, 1972). Although this research has been criticized for examining inmates housed in segregation for only a brief period of time, the findings provide evidence-based information from actual data on the short-term impact of segregation, in contrast to anecdotal data, descriptive reviews, or case reports.

22. The failure to establish negative effects of segregation on individuals is not limited to the research by Gendreau and colleagues. For example, Zinger and colleagues conducted a longitudinal study of 60 Canadian inmates who had been either involuntarily or voluntarily placed in administrative segregation for 60 days or randomly selected from the general population and remained in general population for 60 days (comparison group). The methodology for the Zinger and Wichmann study involved the following approach: (1) following one group in administrative segregation for 60 days (quasi-experimental group) and another group of randomly selected inmates from general population which remained in general population for days (control group); (2) matching the experimental and control groups based on education, offense, history, and criminogenic needs; (3) administering written psychological tests and structured interviews, debriefing after each session, and repeating the testing and interview procedure at 30 and 60 day intervals [the initial test was a two hour battery and the follow-up testing was less lengthy]; and (4) gathering data on physical conditions of segregation units and collected information from the

offender intake assessment to establish criminogenic baselines. Contrary to their hypothesis that inmates placed in administrative segregation would psychologically deteriorate, the researchers found no evidence that over a period of 60 days the mental health and psychological functioning of these segregated offenders significantly deteriorated.

23. Although Dr. Haney has criticized this study for various reasons (i.e. high attrition and refusal rates), this study represents a substantial improvement in striving for a more scientific methodology than reliance on selected anecdotal reports, case descriptions, or studies that have no attempts to establish baseline measurements of functioning or measured outcome on subsequent evaluations.

24. Furthermore, the findings by Zinger and colleagues have been replicated in subsequent research. In their study, O'Keefe et al. (2013) conducted a longitudinal study in Colorado state prison system that compared mentally ill and non-mentally ill inmates in long-term administrative segregation to inmates in the general population. The research results contradicted the hypothesis that segregated prison settings cause psychological deterioration. Like the Zinger et al. study, the O'Keefe et al. study (2013) compared the mental and psychological functioning of a group of inmates held in segregated conditions to inmates that were housed in general population. However, to address criticisms that longitudinal studies examining potential negative effects of segregation should be conducted over a period longer than 60 days, researchers repeatedly assessed inmates over a one-year period.

25. The O'Keefe et al. study employed the following methodology: (1) participants were divided into 5 control groups: (a) mentally ill in general population; (b) mentally ill in segregation; (c) non-mentally ill in general population; (d) non-mentally ill in segregation; (e) special needs facility mentally ill; (2) inmates were administered the Brief Symptom Inventory (BSI) to measure the variety of psychiatric constructs hypothesized to be affected by confinement in segregated setting (The BSI is a 53 item self-report measure used to assess a broad range of psychological symptoms); (3) the general population and special needs control groups were tested at three month intervals for five testing sessions; and (4) the segregation subjects had tests after placement and for every three months thereafter for a total of six testing sessions.

10

26. Contrary to the researcher's hypotheses, the results showed that placement in segregation did not result in the onset or worsening of psychological symptoms or cognitive impairment for mentally ill and non-mentally ill inmates, nor did inmates with mental illness fare worse in segregation than their non-mentally ill peers. In fact, contrary to the direction expected by researchers, inmates with mental illness placed in segregation evidenced some improvement in mental health functioning (i.e., reduced symptomatology) over time. The researchers concluded that their results did not support the hypothesis that segregation caused or exacerbated mental illness.

27. Drs. Haney criticizes the O'Keefe study, claiming that it is unreliable because all study participants were exposed to segregation and that the control groups were therefore contaminated. (Haney Dep. 150:8-151:20.) However, even if subjects ultimately assigned to general population experienced some prior exposure to segregation, the research findings nevertheless did not support the assertion that individuals worsen over time with increased exposure to segregated environments.

28. Although the various longitudinal studies summarized above indicate that segregation does not cause the type and severity of psychological harm previously described in descriptive studies, CDCR nevertheless recognizes the concern that segregated environments may negatively impact individuals with and without mental illness. Therefore, CDCR has designed a system to identify and provide care to mentally ill individuals in a segregated environment consistent with the American Psychiatric Association (APA) guidelines for delivering psychiatric services in prison segregation units. (*See* Psychiatric Services in Jails and Prisons, Second Edition, pp. 4-5.)

29. The APA guidelines for providing psychiatric care in prison segregation units acknowledge that inmates with mental illnesses may be safely housed in prison segregation units when certain principles are followed, including: (1) prohibiting placement of an inmate solely because the inmate exhibits symptoms of mental illness, unless there is an immediate and serious danger for which there is no reasonable alternative; (2) ensuring that inmates in segregated housing have access to psychiatric and medical services that meet the inmates' medical and

11

psychiatric needs; (3) removing inmates who are suffering a severe psychiatric crisis, including psychosis and suicidal depression, and not returning them until they are able to psychologically tolerate that setting; and (4) assessing inmates who are known to have serious mental health needs, especially those with a known history of serious and persistent mental illness, on a regular basis by qualified mental health practitioners to identify and respond to emerging crises at the earliest possible moment. (*Id.*)

30. In accordance with these APA guidelines for managing inmates with mental illness in a segregation environment, CDCR has designed a system that includes: (1) administrative review hearings to identify the contribution, if any, of mental illness to rule violations and to prevent placing inmates in segregation when mental illness caused the rule-violating behavior; (2) screening inmates for mental illness before placement in segregation; (3) access to psychiatric services while housed in segregation with enhanced psychiatric services for individuals classified as Enhanced Outpatient Program level of care; (4) removing inmates from segregation who exhibit severe psychiatric crises to mental health crisis bed treatment and/or Department of State Hospital inpatient care when appropriate; and (5) assessing inmates known to have serious mental health needs to identify and respond to emerging crises as soon as possible.

31. In summary, studies examining the effects of segregation on individuals have reached mixed conclusions. Longitudinal research that employs a more scientific methodology has not substantiated the negative impact of segregation on individuals described in descriptive and less rigorous studies. However, CDCR nevertheless has a mental health delivery system consistent with the American Psychiatric Association guidelines that is designed to screen, identify, monitor, treat, and transfer individuals who may experience psychological deterioration in a segregation environment even if more recent longitudinal research does not indicate that such deterioration is likely.

///
///
///
///

1  I declare under penalty of perjury of the laws of the State of California and the United
2  States of America that the foregoing is true and correct. Executed in _SACRAMENTO_,
3  California on July 17, 2013.

Charles Scott, M.D.

CF1997CS0003