**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

        **v.**                        **No. CIV S-90-0250 LKK JFM P**

**EDMUND G. BROWN, JR., et al.,**
**Defendants.**

**SPECIAL MASTER'S REPORT ON DEFENDANTS'
QUALITY IMPROVEMENT PROCESS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
August 2, 2013

## I.    Introduction and Background

### A.    Order of the Coleman Court for Development of a Mental Health Quality Improvement Process

On August 30, 2012, the *Coleman* court ordered defendants to review and assess their existing quality assurance process and to develop a process to evaluate and improve the quality of mental health care delivered to inmates of the California Department of Corrections and Rehabilitation (CDCR).  Order, filed August 30, 2012, Docket No. 4232.  This project was to take place under the guidance of the *Coleman* special master and his staff, with the participation and input of plaintiffs, and to be concluded within a six-month period.  The special master was subsequently ordered to report to the court on the outcome of this process on or before August 2, 2013.  Orders, filed April 23, 2013, Docket No. 4561, 4562.  This is the Special Master's report on the progress of that project.

The *Coleman* court's August 30, 2012 order adopted a recommendation of the special master in his Twenty Fourth Round Monitoring Report, filed July 2, 2012, Docket No. 4205. The court specifically ordered as follows:

> Defendants shall review and assess their existing quality assurance process, and shall develop an improved quality improvement process by which they can address issues with the quality of the care that is delivered, as described in the Special Master's Twenty-Fourth Round Monitoring Report.  The quality improvement process shall be developed from the standpoint of it being the beginning of a transition by CDCR into self-monitoring by its own Division of Correctional Health Care Services.  It shall include, but not be limited to, the development of a process for improved document production for institutional paper reviews, so that the provided information is clear, consistent, responsive to the Special Master's document request, and useful for the assessment of institutional levels of compliance.  The defendants' review and assessment of their existing quality assurance process, and the development of an improved quality improvement process, shall be carried out under the guidance of the Special Master and his staff, with participation and input of the *Coleman* plaintiffs, during the six-month period following the entry of this order.

Order, filed August 30, 2012, Docket No. 4232 at 5-6.

1

The Court noted that "[a]n important goal of the remedial phase of this case is . . . for CDCR itself to assume the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own `qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance and *move on to eventual removal from federal court oversight*." *Id*., quoting SPECIAL MASTER'S TWENTY FOURTH ROUND MONITORING REPORT at 65 (emphasis in original).

### B.    History of the Mental Health Quality Assurance Process in CDCR

The role of a sound quality assurance process in the *Coleman* remedial effort has been recognized from the outset of the remediation process.  As a general proposition, state prisoners' constitutional right to access to adequate mental health care includes access to competent medical staff, both as a matter of law and common sense.  *Coleman v. Wilson*, 912 F.Supp. 1282, 1308 (E.D. Cal. 1995), *citing Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).  In its remedial order, the *Coleman* court found, among other things, that because CDCR at that time did not have an effective method for insuring the competence of its mental health staff, it lacked a critical process for providing CDCR inmates with access to competent care.  912 F. Supp. at 1296-97 (E.D. Cal. 1995).  The Court held that a requirement that defendants develop a systemwide program to insure the delivery of *adequate* mental health was an appropriate remedy for the constitutional deficiencies in the delivery of prison mental health care.  *Id*. at 1308, *citing Grubbs v. Bradley*, 821 F.Supp. 496, 500 (M.D. Tenn. 1993).[1]

Within the ensuing remedial process under the *Coleman* court's oversight, CDCR developed a quality management process which generally consisted of a local governing body at

---

[1] This statement is not intended to offer, nor should it be construed as representing, any legal opinion by the special master with respect to compliance or noncompliance with applicable constitutional standards and/or grounds for termination of federal court oversight in this matter.  The special master is not charged with the duty or responsibility to opine on constitutional requirements or legal issues of any kind.  That role is reserved exclusively to the court.

each institution, subcommittees for quality management and mental health, quality improvement teams (QITs) to address identified issues, and clinician peer review at the institutions which have mental health missions. CDCR's quality management process was monitored and reported on by the special master in his regular semi-annual compliance reports. Over time, it was becoming clear that this fundamental infrastructure for quality management was taking root and maturing at some of the institutions.

By the conclusion of the special master's Twenty-Fourth Round of Monitoring in January 2012, it had become apparent that some CDCR institutions had generally established and were maintaining the basic quality management framework that had been conceived early in the remedial process. However, although the existing quality management structure was useful, it still did not enable CDCR to diagnose and resolve problems with the quality of care it delivers. This was related, in part, to the lack of a central office-driven quality improvement process. CDCR's quality management process had been generally focused on quantification of deficiencies in performance by looking at the presence or absence of various elements -- for example, what percentage of designated forms were completed, or how many inmates received a mental health screening within timeframes, or whether interdisciplinary treatment team meetings were conducted according to established scheduling requirements, to name a few. Even when some quality improvement processes were implemented, they were done at the institutional level, and did not include important remedies that could only be initiated or developed at the central office level to address issues that were systemwide. Quality *improvement*, on the other hand, focuses not merely on measuring performance indicators but also on identifying problems and crafting resolutions with systemwide application, and thus on improving the care that is delivered throughout CDCR prisons. As noted by the *Coleman* court in its remedial order, it is not merely

access to care, but access to *adequate* care that is constitutionally required.  912 F.Supp. at

1308.[2]

## II.    Development of the Mental Health Quality Improvement Process

Beginning on September 14, 2012, the special master's staff and CDCR officials and

staff participated in a series of teleconferences and meetings to begin developing the quality

improvement process.  They agreed on the creation of a self-auditing tool with which CDCR can

identify issues and improve its performance levels in the delivery of mental health care.  The

self-auditing tool that was developed is now known as the Continuous Quality Improvement

Tool ("CQIT" or "the tool").

Approximately 19 such meetings to work on development of the tool took place

beginning September 20, 2012 and continuing to May 13, 2013.  CDCR staff continued work on

the tool between these meetings.

At the first in-person meeting, on September 20, 2012, the goal of the project was defined

as the creation of a means to inform and enable CDCR central office to resolve identified

problems in a systematic way.  A number of potential key areas were identified for inclusion in

the tool.

CDCR then surveyed the field as to what is most important for providing patient care -

for example access to care, continuity of care, etc.  At the second in-person meeting, on

September 28, 2012, it was decided that the results from the field would be prioritized and then

broken out into domains, which would then be further broken out into categories.  Work groups

would be established to identify the categories and to come up with key indicators for each

category.

---

[2] CDCR has repeatedly indicated that various activities and projects which it has undertaken within the *Coleman* remedial effort are not constitutionally required.  Again, the special master is not offering any legal opinion or conclusion in that regard, as that would exceed the scope of his role and responsibilities. *See supra* footnote1, p. 3.

At the next in-person meeting, on October 16, 2012, CDCR provided presentations on ongoing quality management processes, as part of its assessment of existing quality management functions.  These included presentations on its mental health program subcommittee process, and the quality management programs of CSP/Sacramento (CSP/Sac) and Pelican Bay State Prison (PBSP), as well as the Department of State Hospitals' (DSH) quality management program.  The group then began to address the inclusion of *Coleman* Program Guide requirements in the tool that was going to be developed.

At a meeting on the following day, October 17, 2012, the discussion centered on the identified mental health program priorities and the importance of incorporating the "improvement" component into the tool, in addition to the data-gathering and reporting component, to comply with the full extent of the court's order.  The group identified the general priority headings:

- Access to care
- Treatment in locked units
- The rule violation report (RVR) process
- Staff training and utilization management
- Quality management
- Quality of care
- Medication management
- Therapeutic groups
- Suicide prevention
- Culture (relationships between custody and mental health)
- Use of force
- Health records

The group met again on October 22, 2012.  At that meeting, quality improvement processes at other states' prisons were discussed.  In addition, the above priorities were expanded and re-ordered with greater detail.[3]

---

[3] For a more complete list of the re-ordered and expanded priorities, *see* Exhibit A.

On the following day, October 23, 2012, the work group reviewed the above priority list and its sub-categories to ensure inclusion of all relevant elements, and then settled on a process for moving forward. It was decided that the members of the group would be canvassed on their interest in working on selected priority areas (above) and assigned to work sub-groups accordingly. Institutional CEOs would be interspersed in these assignments to sub-groups. Each sub-group would have a teleconference with the CDCR Chief Psychologist in charge of quality management to ensure that the key indicators they would be developing were sufficiently specific, measurable, and clearly defined. The Chief Psychologist also would provide each sub-group with instructional material to assist their understanding of their assignments. The sub-groups were assigned to work on how the audits and measurements would be conducted, but not on development of the audit tool itself. The work group decided to have a few "brainstorming" sessions before convening a meeting of all of the sub-groups when the key indicators would be finalized. Thereafter, the work group continued to meet to ensure that the sub-groups were staying on task toward their goals.

The sub-groups continued to meet and work on the key indicators, with participation by members of the special master's staff, through November 2012. By early January 2013, all of the sub-groups had completed their work, the key indicators had been identified, and a prototype of the audit tool had been developed. Plaintiffs' counsel and representatives of the special master's staff attended a webinar on the development of the tool on February 8, 2013.

However, because defendants had moved to terminate *Coleman* court oversight on January 7, 2013, participation by the special master's staff and plaintiffs' counsel in this project was suspended following the February 8 webinar. Although CDCR staff apparently continued to meet and work on the tool during the pendency of the motion, the momentum toward completion

and roll-out of the tool was seriously disrupted by the filing of the motion. Contrary to the intent

and direction of the court's order, the opportunity for the special master's experts and plaintiffs'

counsel to participate in and contribute to the process was stopped at a time when their input

could have added value as the process was unfolding. The special master's and plaintiffs'

participation in the process did not resume until after the motion to terminate had been denied.

By that time, the court-ordered six-month timeframe for completion of the project had expired by

approximately two months.

Because of this delay, the *Coleman* court then granted, on April 22, 2013, a limited

extension of time to July 1, 2013, for the process to be completed. Order, filed April 22, 2013,

Docket No. 4561. The special master's and plaintiffs' participation then resumed, but it was

clear to everyone involved that the process must accelerate rapidly, that the initial form of the

tool should be completed, and that a pilot of the fledgling tool should be organized and

implemented forthwith in order to accomplish its purpose and still meet the quickly-approaching

July 1 deadline. In early May 2013, it was decided to organize and schedule an eight-institution

pilot of the tool. CDCR and the special master agreed that the eight institutions for the pilot

would be the California Institution for Men (CIM), CSP/Los Angeles County (CSP/LAC),

California Men's Colony (CMC), CSP/Sac, Salinas Valley State Prison (SVSP), Central

California Women's Facility (CCWF), California Substance Abuse Treatment Facility (CSATF),

and the California Correctional Institution (CCI). The schedule for the eight-institution pilot had

to be significantly compressed, and was slotted into a total period of six consecutive weeks, from

May 22, 2013 to June 26, 2013 to meet the July 1 deadline. Had there been no interruption as a

result of the motion to terminate, the pilot could have been initiated following the court-ordered

six-month period for development of the process, i.e. at the beginning of March 2013, but instead

the pilot was delayed for approximately another two and half months and did not begin until May 22.

These obvious time constraints necessitated that the pilot begin almost immediately. There were time pressures to catch up on the project, position the pilot, and execute it, while trying to regain momentum following the interruption that had been caused by CDCR's filing of its motion to terminate. With virtually no time between site visits to pause, self-correct, and prepare for the next one, it appeared that the intensive back-to-back schedule may have hindered the institutions' and the CDCR audit teams' ability to re-group after an on-site audit and adequately prepare for the next one. For example, one of the more concrete ways in which this manifested itself was that some audit team members did not examine the relevant pre-site information from MHTS.net (CDCR's internet-based mental health tracking system) before they appeared at the next institution to conduct the pilot there. As a result, precious time allocated to conduct the on-site audit had to be spent examining data with which the assessors should have been familiar upon their arrival at the site.

In a teleconference on May 10, 2013, CDCR updated the special master's staff on their progress which had occurred during the hiatus. They reported that the assessors[4] on each on-site audit team would include a regional mental health director, a nurse consultant, and a custody staff member. The special master's staff emphasized the importance of having a psychiatrist at each site for the pilot audits. CDCR, however, reported that a psychiatrist would not be present at every pilot site visit.[5] CDCR also reported that they were working with their information technology support team to procure a server for automatic uploading of gathered audit data. They had developed a pre-site visit checklist for the institutions to use in preparation for their

---

[4] It was decided to refer to the individual audit team members as "assessors" rather than "auditors."
[5] The effect of this omission is discussed below.

audits to save time and promote efficiency during the audit teams' on-site visits.  (*See* Checklist, Exhibit B).  They said that for the patient group surveys, which are an element of the on-site audits, lists of CDCR inmates for these groups were randomly selected at headquarters and emailed to the audit team.[6]  In response to concerns that interviewed inmates should be informed of the reason why they were being ducated, CDCR prepared a "script" to be used for explaining the purpose of the ducats to the selected inmates.  (*See* Script, Exhibit C).

At the May 10 teleconference, CDCR also explained that the tool works by using both data gathered and entered by the assessors in the course of conduct of their assessments, plus data from headquarters and data pulled from MHTS.net, which is CDCR's internet-based mental health tracking system.  (According to CDCR's latest report, 43 percent of the data collection for a CQIT audit is gathered on site, and the balance of the data is imported from MHTS.net at headquarters.)  The night before an audit team appears at an institution for an audit, MHTS.net data files are refreshed for the assessors' use in preparation for the visit.  At the conclusion of the audit visit, the information entered by the assessors into the tool via the tablet is uploaded to the server dedicated to the tool.

On May 15, 2013, at an in-person meeting with members of the special master's staff and plaintiffs' counsel, CDCR presented further updates on the project.  By that time, the audit teams had been designated, with each team including one regional administrator.  There had been some changes to the data collection process.  They were still working on issues involving automation of the data collected in the audits (the "data warehouse"), which is comprised of headquarters'

---

[6] Headquarters' selections were random within the set of patient characteristics fitting the designated group to be surveyed.  For example, for a group survey of EOP inmates in administrative segregation at a particular institution, the audit team would notify headquarters that it needed a group of inmates at the EOP level of care and in administrative segregation at the institution.  Headquarters would then draw a random sample of inmates with those characteristics at the designated institution.  Those inmates would then be ducated to attend the group survey at the institution during the scheduled time during the audit.  Headquarters would select more than the minimum number of inmates for the survey on the assumption that some inmates may refuse to participate or be otherwise engaged in programming.

data collection[7], data entered and stored in MHTS.net, plus data obtained via the audit teams' on-site observations and use of the chart audit tool. The checklist for audits of the use of clinical restraints had been completed. CDCR stated there would not be any psychiatrists on the teams for the pilot, which drew a repeated strong recommendation from the special master's experts that each audit team should include a psychiatrist. CDCR also reported that the new tablets would not be available in time for use during the pilot, and that work was continuing on data security or "firewall" issues.

CDCR also reported that preliminary to the upcoming pilot of the tool, it had tested it at two institutions. The first test was run at CSP/Sac, where the most difficult applications of the tool were tried to test its capacity. This test indicated that the tool worked but needed certain technical adjustments, which were made. It also indicated that the tablets (i.e. portable personal computers) for the assessors to use for entering information during an audit were too slow and could not sustain a sufficient battery charge, among other things. As a result, new tablets were ordered. The second test was run at Mule Creek State Prison (MCSP) for tool functionality. It indicated sufficient functionality to proceed toward a pilot audit.

## III.    How the CQIT Works and What it Covers

Before this report discusses the conduct and findings of the pilot, an explanation of how the tool works is in order. The CQIT measures compliance levels in multiple areas related to mental health care and its delivery. Its scope includes direct mental health care as well as mental health-related custody matters. The CQIT is comprised of a set of questions, organized by topics and sub-topics, that works by prompting the assessor question-by-question to enter the answers.

---

[7]The headquarters' data collection refers to any information which can be collected from headquarters or by automation so that the audit team would not have to spend time getting this information while on site at the institutions. The intent is to devote the on-site portion of the audits to gathering the information which can only be obtained within the prisons.

(See CQIT questions, Exhibit D)  As stated above, the balance of the data and information to produce an audit report that is not gathered on site at the institutions is drawn electronically into the CQIT system from MHTS.net and headquarters' data.

The CQIT questions to be answered during an on-site institutional audit cover the following general areas:[8]

- Referrals to DSH programs for inmates in need of higher levels of care/follow-up of inmates who were identified in the sustainable process for referral to higher levels of care at DSH programs

- Interdisciplinary Treatment Teams (IDTTs)

- Limited issue (i.e. limitations on inmate's clothing and personal effects) in inpatient housing

- Space

- Treatment modules

- Patient group surveys eliciting patient opinions and feedback on various aspects of the delivery of mental health care

- Psych tech rounds

- RVRs (which refers to the inmate disciplinary process)

- Suicide prevention

- Institutional classification committee (ICC) meetings

- Daily morning meetings between custody and mental health in administrative segregation, including attendance

- Inmates' out-of-cell time

- 30-minute welfare checks

- Custody work regarding patient discharges from DSH programs

- Cell cleanliness

_____

[8] For a more complete list of the areas covered during an on-site institutional audit, *see* Exhibit E.

- Quality of clinical assessment of discharges from the MHCB, based upon review of documentation in clinical progress notes, including assessment of any suicidal ideation by the inmate

- Use of clinical restraints, including number of inmates placed into restraints, compliance with standards applicable to use of restraints, any deficiencies identified and if any, how they were addressed

- Use of mechanical restraints during custody escorts of inmates

- Compliance with the heat plan

- Group therapeutic treatment

The mechanics of how the CQIT works are as follows:  The assessor accesses the tool through an electronic tablet, which is a portable light-weight personal computer.  The tablet is connected via wireless internet connection to CDCR's CQIT system.  The assessor begins an auditing session by logging in and connecting to MHTS.net.  A click of the "refresh" button pulls entered data into MHTS.net, so that, for example, a tab pull-down to research an individual patient will produce the latest information entered on him or her.  Once logged in, the assessor is presented with a series of tabs indicating the various general areas for inquiry in the audit.  These areas are based on the categories that were identified in the CQIT development process.  From each selected tab, there is a pull-down tab menu which reveals the questions or "prompts" to be answered by the assessor.  These questions track the key indicators that were developed by the work sub-groups, as described above.  The assessor then enters the answers directly into the tool via the tablet.  This direct entry of information into the system helps save and protect the integrity of the information, while reducing the risk of error in data entry associated with transfer of paper-based records into electronic format.

Because many aspects of mental health care are not susceptible of analysis by merely a "yes" or "no" answer or quantitative data, the tool also provides a box for entry of narrative or

commentary by the assessor. The assessor can access these narrative or comment boxes by use of a "comment" button on the tool. (For those questions which may have multiple answers, CDCR reports that it will increase the options in the tool for possible answers.) At the conclusion of the audit session, the assessor then can click "upload" to move the data onto the dedicated server. Thereafter, authorized users of the system can access an electronic dashboard, where compliance rates can be viewed and exported to Word files approximately five minutes after uploading. (*See* exemplar of a dashboard screenshot, Exhibit F)

## IV.    The Pilot of the CQIT

The tool was piloted at the eight selected CDCR prisons from May 22, 2013 to June 26, 2013. Each of these institutions was audited on site by its designated audit team. Two to three members of the special master's staff accompanied and observed the audit teams at all eight institutions. Plaintiffs' counsel also accompanied and observed the teams at CSP/LAC, CMC, CSP/Sac, SVSP, and CCWF. Each audit team toured the facility, and entered the on-site audit information into the tool via the tablet. Utilizing the tool prompts and questions within the categories listed above, the following general areas of mental health were examined:

- Mental Health Crisis Bed Units (MHCBs) (including IDTTs)

- Psychiatric Services Units (PSUs), (including IDTT meetings, ICC meetings, and group therapy observation)

- Administrative Segregation Enhanced Outpatient Program (EOP), (including group therapy observation, IDTTs, ICCs, and patient group interviews)

- Administrative Segregation and Security Housing Unit (SHU) Correctional Clinical Case Management System (3CMS), (including daily morning meetings between mental health and custody, and alternate housing)

- EOP (including IDTTs, group therapy observation, and patient group interviews)

- 3CMS (including IDTTs, group treatment space, individual treatment space, and patient group interviews)

- Outpatient Housing Units (OHUs)

- Alternate Housing Areas

In addition, the following custodial areas and functions were examined:[9]

- In administrative segregation, thirty-minute welfare checks, new inmate intake status, yard time, showers, and entertainment appliances

- Thermometer inspections in non-air conditioned housing units and heat log review

- RVR processes

- Mental health referrals

- Presence of personal protective equipment, cut-down tools, ambu-bags, and inventory logs

- Custody checks following MHCB discharge

- Mechanical restraint use

- Lengths of stay in administrative segregation

At the conclusion of the site visits, the audit teams conducted an exit conference or briefing on their preliminary findings with the warden and relevant institutional mental health and custodial staff.

CDCR's report on the audit teams' findings at the eight pilot institutions is projected for completion during the first week of November 2013. As of the present time, CDCR has not informed the special master of what the scope or format of that particular report will be.

---

[9] While on site, the audit teams also reviewed the institutions' levels of compliance with the requirements of the sustainable process for identification and referral of inmates in need of higher levels of care.

14

CDCR has indicated that reports on the findings from its audits can be accessed in the following manner.  After data is uploaded, a performance report can be run and viewed within five minutes, and then updated and run repeatedly at any chosen intervals.  (*See* exemplar of a performance report, Exhibit G)  These reports will contain information from both MHTS.net as well as the information entered by the assessor in the conduct of an on-site CQIT audit.  The performance report appears on the dashboard.  It indicates a narrative summary, followed by the data, which is grouped by the key indicators.  (*See* Exhibit G)  The information in the report can then be exported into an Excel format or PDF, and can be emailed to management at the individual institutions, if desired.  The institutions then may use these reports.  Following such electronic report transmission to the institutions, many of the links in the report will remain active, so that the reader at the institution can click on a link to view the interactive version of the performance report.  Ultimately, the goal is for each institution to be reviewed and to receive a performance report on a regular basis.  As part of the ongoing quality improvement process, focus areas for improvement – both institution-specific and statewide – will be identified.  The regional administrators will then report back on any corrective actions being taken.

**V.**    **The Special Master's Findings and Recommendations from the Pilot**

Overall, the pilot indicated that CDCR is off to a good start with this project and appears to have taken the first step toward the goal of assuming responsibility for self-monitoring and maintaining its own quality improvement process.  The pilot indicated that the new CQIT is a fundamentally sound tool that shows promise as a valuable aid to self-monitoring by CDCR in the future.  It also brought to light a number of issues which would have been difficult, if not impossible, to foresee without having done this live run-through of the tool.  In that regard, the pilot was successful, because that is exactly what a pilot is intended to accomplish.

It also became clear that more work remains to be done to develop this fledgling self-auditing mechanism into a reliable, sustainable means by which CDCR can identify and resolve issues and improve delivery of care to its mentally ill inmate population. The special master offers the following observations and recommendations on the CQIT, which became apparent during the pilot and from which he believes CDCR can draw useful information to improve the CQIT and attendant policies and practices.

**A.        Pre-Site Visit Preparation**

Some of the assessors did not examine the pre-site information from MHTS.net before they appeared at the institution to conduct the pilot. As noted above, this unfortunately may have been due to serious time pressures to catch up on the project and pilot the tool after the interruption that was brought about by CDCR's filing of its motion to terminate. Following denial of the motion, the organization and scheduling of the eight-institution pilot was accelerated into a tight timeframe, to begin almost immediately, and with virtually no time between site visits to pause and prepare for the next one. The *Coleman* court granted a limited extension of time for completion of the project and preparation of this report. The special master resumed participation and the pilot was allowed to begin shortly thereafter. That said, the members of the audit team need to familiarize themselves with the institutional pre-site information before they arrive at an institution. It allows them to maximize their awareness of the conditions they are about to evaluate at the institution, and efficiently begin the pilot without wasting precious allocated time while on site. Preparedness also enhances the assessors' and the process's credibility and helps set the right tone at the institutions from the beginning of their visits.

16

Another observation having to do with preparation is that headquarters and the assessment teams did not always lay sufficient groundwork with the institutions before appearing there to conduct the pilot.  Administration and staff at some institutions appeared to have a lot of questions about the pilot, even as it was being implemented at their institutions.  At some of the institutions, there was no opening meeting with the warden or facility leadership.  A good opening meeting can avoid confusion and waste of time.  It can provide an opportunity to answer staff questions about the audit before it begins so that it is understood and is not mistaken for a *Coleman* monitoring visit.  It is also an opportunity to send the message that headquarters takes CQIT seriously and considers it very important.  Trying to explain and "sell" the CQIT to institutional staff while conducting the pilot is inefficient at best, and at worst it may compromise the quality of the audit.  It is recommended that preparatory communication from headquarters to an institution for a CQIT audit should be worked on, standardized, and used consistently.  It should be targeted to administration, mental health staff, and to custody staff as well.

> **B.    The Assessors' Use of the Tool and the Tablet**

The tool appears to have been well designed for its intended use, i.e. it is user-friendly and can be navigated quickly.  Generally, the assessors appeared to have mastered the mechanics of the tool.  They were familiar with how to use the tablets and were able to enter the answers to the questions without apparent difficulty.  That said, the tool is only as good as the skill and preparation level of the assessor who is using it.  To maximize the potential of the tool, it is recommended that the assessors be trained on how to manage and use the tool to accomplish the objectives of the process.  The quality improvement process should not be driven or limited by the tool.

Because the tool relies heavily on data drawn from MHTS.net, it is crucial that MHTS.net be as reliable and up-to-date as possible.  Although MHTS.net has been rolled out for some time, it was apparent during the most recent round of *Coleman* monitoring that many institutions still had not mastered its use, and the data it produced was unreliable.  It is essential that if these sort of problems with MHTS.net persist, they must be rectified immediately or they risk derailment of the reliability, and hence the success, of the CQIT, and call into question the reliability of the entire quality improvement process.

C.    **Adequacy of Sample Sizes; Scheduling Issues**

For each function tested, the CQIT contains guidelines for the size of samplings to help build in a level of reliability and consistency across audits.  For example, the number of IDTT meetings in the various programs to be observed by the assessor is five.  However, at least one institution did not schedule a sufficient number of IDTT meetings to meet this sampling standard, thereby reducing the reliability of the assessor's findings and conclusions on these meetings due to a too-small sample size.  Another reported example of an issue with drawing an adequate sample was the exclusion of inmates who were not assigned to therapeutic groups.  A third example was that two therapeutic groups to be observed and evaluated were attended by only one inmate, who was the same person at each of the two groups – thus there were no groups to observe.  Notably, at one institution visited in the latter part of the pilot, a CDCR official said during the exit conference that there should be a contingency plan in place for those instances when things do not go as planned.  This was a good suggestion, and it is recommended that it be followed.

**D.    Logistical Issues with Observation of Group Therapy and Conduct of Group Surveys**

Some inmate group surveys could not begin timely because of delays in escorts to the survey room.  In at least one instance at one institution, no inmates had been ducated and no space had been reserved for the group survey.  When a group was eventually assembled, the participants had not been notified of why they were brought out of their cells, and the assessor had to explain what was going on before commencing the survey and lost valuable time.  These kinds of problems need to be avoided because each activity is given a time allotment so that the next scheduled activity can begin timely, and all succeeding activities can be completed by the end of the visit.  It is recommended that escorts to the group surveys be completed in accordance with the audit schedule.

When therapeutic modules are going to be used in a group survey or IDTT room, they should be modules which have seats.  At observed sessions in which the modules did not have seats, it was clear that the inmates were very uncomfortable.  At another observed session, the seats in the modules were quite small and were situated in a way that forced the inmates to sit facing away from the IDTT treatment team.  These issues with the modules can interfere with conduct of a useful survey or a good IDTT meeting and should be avoided.

**E.    The Importance of Observing Mental Health Activities Conducted in their Normal and Usual Manner**

To capture reliable observations of meetings or group interactions in an audit, it is important that these functions' activities be carried out in their normal and usual way, the same as if no audit were being conducted.  For example, to obtain a reliable audit of observed IDTT meetings, the institution should have the IDTT meetings conducted by the same person who would normally do so.  At one institution, it became apparent that the person moderating the

19

IDTT meetings was not usually a participant in these meetings.  At another site, members of the

IDTT meeting directly addressed the assessor and the *Coleman* expert who was present.  Such

deviations from regular practice hinder the assessor's ability to capture information and report on

these functions as they would normally occur, and they should be avoided.  In the same regard, it

is recommended that some of the CQIT questions be expanded.  For example, while the tool asks

whether required staff is present at IDTT meetings, it should ask specifically whether the

inmate's primary clinician and psychiatrist are present.  Although the CQIT includes questions as

to whether case files (C-files) and electronic unit health records (UHRs) are available to staff, it

is important that it also document whether staff in IDTT meetings actually refer to these records,

when indicated.

### F.    Inmate Group Surveys

The inmate group surveys are designed to be conducted with groups of ten inmates.

Although there was intentional over-ducating to ensure that the minimum of ten inmates would

appear for the surveys, in some cases significantly more than ten inmates appeared, causing the

room to be overcrowded and making the interview difficult to administer successfully among so

large a group.  It is recommended that custody be instructed to stop escorting ducated inmates to

the group surveys once the minimum of ten have been brought to the interview room.

Some assessors introduced themselves and explained the purpose of the group survey

clearly, but others did not, leading to confusion among the participants in the survey.  It is

recommended that the group survey begin with a brief but clear explanation of the purpose of the

meeting.

The tool provides a script of the questions for the clinician to ask the survey group.

During the pilot, some of the assessors followed the script very literally when circumstances

indicated that he or she should have deviated from a literal reading.  For example, in a group of only three inmates, if they are asked if they arrive at most of their appointments on time, and two answer "yes," then there is no need to ask the next scripted question, which is "How many of you do not get to most of your appointments on time?"  Some inmates showed frustration and confusion with the seeming absurdity of overly-strict adherence to the script because the question had already been answered by the responses to the previous question.  It is recommended, and CDCR has reported, that it will revise the scripted questions with the above concern in mind.

Another concern was some inmates did not understand the survey questions, being unfamiliar with terms like "treatment plan," "IDTT," or "primary clinician," for example.  Another example of this was the difficulty some inmates had with responding to questions involving the terms "generally" or "usually" without any more concrete reference point for what these terms mean.  Some assessors were unable to explain the questions sufficiently so that the participants understood what they were being asked.  It is recommended that the assessors limit the use of terminology and instead use verbiage that laymen can more readily understand and be prepared to explain their questions to the inmates.  It is also recommended that assessors avoid using acronyms when talking with the inmates, as many of these abbreviations are unknown to them.  These and other kinds of communication issues can be addressed through training of the assessors.

The group survey questions do not differentiate between inmates' levels or care or their lengths of stay in administrative segregation.  Because not all scripted questions are relevant to all inmates, it is important for the assessor to be flexible and ask the questions in a way which is pertinent to the particular group being surveyed.

Some inmates wanted to provide more information than "yes" or "no" answers and clearly want to say things that are on their minds about their care. The scripted questions in the tool do not accommodate such detail. A skilled interviewer will communicate to the inmates that their messages are valuable and that they will be taken into consideration in the survey, but also will finish the survey. One observed assessor who handled this effectively listened to brief comments from the inmates, but if the comments were going on at length or were otherwise de-railing the momentum of the survey, the assessor told the inmate that his comments were important and that they would get back to them as soon as the "yes" or "no" questions were answered. The assessor then was able to finish the formal survey, and did come back to the comments and questions from the inmates which were "off script." The inmates appeared to find this satisfactory and welcomed the opportunity to provide feedback. This assessor's approach appeared to work well. It is recommended that training be offered to assessors on strategies for effective management of group surveys.

Presently, the tool does not provide for a measurement of congruence between inmates' survey responses and the assessors' own observations of rounding, IDTTs, group therapy, etc. This may be a valuable feature to build into the tool and the data analysis, if possible.

Although institutional clinicians may be invited to sit in on the group survey sessions in order to better understand the CQIT process, or institutional mental health staff may want to help out the group surveys, these practices should be discouraged. They could tend to inhibit the inmates from giving candid answers and feedback about their care if the very people about whom they are commenting are in the same room with them.

**G.    Other Training Issues**

It may be helpful to provide training of custody leadership on better coordination between custody and mental health on the conduct and goals of an audit.  The assessors may also benefit from training on how to handle various situations, apart from the group survey settings described above.  Some examples of these situations are when:

- Inmates in observed therapeutic groups or in IDTT meetings are concerned with why there are "outsiders" in the room, if they have not received an introduction and explanation for their presence

- Inmates request contact information or a mechanism to provide additional information, or they wish to address the assessor while a treatment group is in progress

- Space for group surveys is insufficient

- There is interference by outsiders during a group interview, or other potential breaches of confidentiality

- The assessor needs to communicate to staff that they should conduct the IDTT in their usual manner and not be influenced by the presence of an assessor

This list is by no means exhaustive, but it indicates the sort of common situations that occur in the course of an audit which should be addressed appropriately and consistently.

**H.    The Importance of Qualitative Clinical Input**

The skilled assessor knows what qualitative information is important to include in the comments/narrative box of the tool.  It became clear, and it is not surprising, that the place where much of the qualitative input in the CQIT is entered is in the comment boxes. This sort of information is critical to the success of the CQIT to truly facilitate improvement in the quality of the care that is delivered.  Accordingly, it is very important that the comments be examined closely and synthesized and used appropriately in CDCR's upcoming report of the pilot results.

As presently configured, the tool does include some measures by which quality of care can be assessed, such as the patient group surveys and the inclusion of comment boxes for the assessor's qualitative narrative. However, as the tool is further refined, it could benefit from having additional more qualitatively-oriented questions or prompts than it presently has. Without additional quality-of-care queries prompting the assessor, the tool as presently designed may still be too concrete and overly concerned with quantitative box-checking, and thus it will not accomplish the goal of not only making sure the benchmarks are met but also helping CDCR improve the *quality* of the care it delivers. In addition, there is risk that even if valuable qualitative clinical information is entered into the comments/narrative boxes, it will not be synthesized and utilized properly. It is unknown whether the tool provides for a functional way to collect and synthesize such narrative input. If it does not, it is recommended that this be looked into and developed, if it has not already been done.

For example, the present version of the tool does not prompt the user for input on the quality of the interaction with the inmate during an IDTT meeting, nor does it have questions about whether his progress toward his treatment plan goals was covered during the meeting, nor does it ask whether the inmate's own assigned primary clinician and/or psychiatrist were present at the meeting. Other qualitatively-oriented questions might involve whether the treatment interventions are clinically sound and appropriate, and whether the goals of the treatment plan are objectively measurable.

Another noted area in which more detailed questions of a qualitative nature would be helpful is ICC meetings, specifically concerning the effectiveness of the staff assistant, the provision of meaningful mental health input by the clinician, the number of ICC meetings which the inmate had, and whether the inmate had understood the proceedings. A further area in which

more qualitatively-oriented questions would be useful is group therapy, for which questions in the tool might ask whether the group is process or psycho-educational in nature, open or closed, why it is attracting its participants, whether the participants engage in discussion, and whether the group is making progress toward its goals. It also appears that the tool prompts or questions may be too limited to adequately capture the quality of observed clinical rounding. In this area in particular, CDCR should consider integrating more qualitatively-oriented questions.

As stated below, there was a general lack of psychiatrists on the audit teams during the pilot. Conversely, where a psychiatrist was present on the team, his or her presence was noticeably valuable to the process. The importance of having a psychiatric presence is clear: at an IDTT meeting at one institution, for example, the treatment team psychiatrist was participating via telemedicine, but the team in the room forgot to introduce him or give him an opportunity to participate. The psychiatrist began asking questions of the inmate and the treatment team members then began talking amongst each other. Had there been an audit team psychiatrist present, he or she could have seized this opportunity to address this problem, thereby providing feedback that goes directly to the provision of good quality care. The psychiatrist provides the perspective that is necessary to the unique role of the psychiatrist on the IDTT treatment team and to psychotropic medication issues.

In some instances, staffs' answers, while made in good faith, turned out not to be accurate. One example of this was when staff answered that they were using the required forms in the IDTT process, but the forms turned out to be the wrong ones. Accordingly, it is recommended that in some contexts it may be necessary for the assessor to cross-check some answers from line staff with inmates' health care records for corroboration before entering the staff responses into the tool.

25

## I.    Mental Health Staffing

One important area of the delivery of mental health care that appears to be missing from the tool is mental health staffing at the institutions.  This is particularly important with regard to psychiatry staffing, of which there have been serious shortages in recent months.  Because there are often discrepancies between headquarters' staffing data and actual mental health staffing at the institutions, it is recommended that a field for mental health staffing be included in the on-site portion of the tool for the assessors to examine and enter while at the institutions.

## J.    Custody Aspects of the CQIT

As part of the custody aspect of the pilot, assessors examined RVRs issued during the pilot review period.  The process involved examining all such RVRs to come up with a sample of 30 which met the criteria for review.  The process was very long and tedious, and might be improved if there were a way for the sample to be pulled before the start of the on-site audit.

Another important aspect of the custody part of the tool is assessment of the institution's compliance with heat measures.  It became clear that there is widespread misunderstanding at the institutions as to where in the units the thermometers should be placed and how the temperatures should be calculated and recorded.  Some practices that came to light indicated that methods of taking and recording temperatures are not capturing the true extent of high temperature conditions present in the units.  In addition, some heat logs did not indicate whether inmates on heat-sensitive medications were actually being returned to their housing units on days when the temperature exceeded 90 degrees.  Accordingly, it is recommended that additional heat compliance measurement objectives be added to the CQIT in order to adequately cover this area.

Audits of 30-minute welfare checks in administrative segregation detected issues with the sufficiency of the proper staggering of the timing of these checks.  The assessors appeared to

have detected this issue and took steps to modify the tool and thus improve its ability to capture and report problems in this area.

The tool presently includes several questions on the features and use of treatment modules, but it does not include a question on the cleanliness of these modules. It is recommended that a question on module cleanliness be added to the tool.

**K.      Exit Conferences**

The quality and value of the exit conferences conducted by the assessors at the eight pilot institutions varied to a large extent. Some were vague as to what the CQIT process is and what they learned through its use. Some were quite concrete in their presentations and recited a list of detected failures to meet specified mental health program standards. Others provided a broad, more impressionistic review of the quality level of clinical care being delivered. It is understood that the assessors' observations related at the exit conferences were preliminary, and it is further understood that CDCR will produce a report on the pilot, which is now projected for completion during the first week of November 2013. In the meantime, training of assessors on how to prepare and deliver a useful exit conference on site is recommended. Although performance reports will follow on-site audits, there is value to real-time feedback that could be lost without an in-person exit conference.

**L.      Reporting**

Initially, CDCR indicated its intention to use only the electronic dashboard for reporting the results of its CQIT audits. Although useful, the dashboard reports data only in terms of compliance percentage rates for various requirements of the mental health program, with color-coding into three classes of performance level. (*See* Exhibit F) The special master's staff strongly encouraged CDCR to also produce the audit results in a report format, which includes

better, more detailed graphic representation of performance levels, as well as narrative description of findings and statements of any corrective actions to be taken. (*See* Exhibit G)

CDCR then agreed to produce a systemwide report. However, the special master's staff further recommended that CDCR produce audit results in both dashboard and report formats, at regular intervals, on both an institution-by-institution and a statewide basis.

The special master now re-emphasizes the importance of production of regular reports in both formats, for the entire system as well as for each institution. The information garnered from the audits needs to be conveyed as clearly and readily as possible in order for the purpose of the quality improvement project to be realized. The greater clarity, depth, and readability of the report-type format add immeasurably to this. It is important that each institution be able to access useful, in-depth feedback and corrective actions with respect to its own individual performance levels. Although the value of systemwide reports is obvious for evaluation and planning on a more global level, the details of any specific institution's performance can be too easily obscured in a systemwide report for the institution's needs to be served. In addition, the reports - both statewide and institution-by-institution - should be issued on a regular basis so that any charting and trending of institutional performance levels can be systematic and reliable.

For all of these reasons, the special master wishes to reemphasize his recommendation that audit results be produced in both systemwide and individual institutional reports, in both dashboard and narrative report-type formats, at regular intervals.

IV.    **Conclusion**

Overall, the CQIT pilot indicated that the tool is on its way to being a sound mechanical aid that can assist CDCR with its quality improvement efforts and its eventual assumption of responsibility for self-monitoring. The pilot brought to light the various above-described issues

which would have been difficult, if not impossible, to foresee without having done this live run-through of the tool. In that regard, the pilot was successful, because that is exactly what a pilot is intended to accomplish.

The pilot also indicated a glaring omission in the CQIT process that warrants an emphatic reminder: Throughout the course of the special master's participation in the development of the tool and the audit process, his expert staff repeatedly urged CDCR to make sure that a psychiatrist was on every on-site audit team. However, many of the audit teams during the pilot lacked a psychiatrist. The importance of having a psychiatrist on site cannot be overstated. The psychiatrist is uniquely qualified to identify and report problems in the delivery of mental health care that no other discipline is nearly as well qualified to do. This is particularly so with regard to problems in the area of prescription and use of psychotropic medications. Such medications are used extensively within, and indeed comprise a critical part of, the treatment of serious mental illnesses. The psychiatrist also plays an important role in the IDTT process, which is concerned with inmates' treatment plans and modifications thereto as necessary. An insightful and competent evaluation of this aspect of the IDTT process requires a psychiatrist on the audit team, as other disciplines are simply not qualified to evaluate the psychiatrist's performance. These are only two examples among many others of the pivotal role of psychiatry in treatment of serious mental illness. The special master urges CDCR to make sure that its audit teams include a psychiatrist for each on-site institutional audit.

The issues with the tool that were detected in the pilot should be the focus of additional work, as recommended above. Because the project is still so new, and more work needs to be done before a full roll-out, CDCR and the special master have agreed that the tool will be refined based on the pilot results, and then it will be re-piloted at the same eight institutions some time

during the remainder of 2013.  To facilitate this re-pilot, CDCR and the special master have

agreed to suspend commencement of the upcoming twenty-sixth round of monitoring until the

re-pilot has been completed.  The re-pilot will proceed as before, with continued observation by

members of the special master's staff and plaintiffs' counsel.  One of the goals of the re-pilot

should be to determine whether the identified issues with the tool and the process have been

resolved, whether additional refinements are needed, and whether the tool will be ready for roll-

out at all 33 institutions in 2014, or will require more work and/or a third pilot.

    The special master wishes to reiterate that his and his experts' comments and

recommendation above should in no way be interpreted to mean that the CQIT thus far has fallen

short.  To the contrary, the special master finds that the CQIT is a significant advancement by

CDCR within a relatively short period of time.  The work of the CDCR Chief Psychologist in

charge of quality management on this project was exemplary, indicating capable leadership in

quickly assembling a skilled team and building their input into a useful self-auditing tool.  At this

time, the tool appears to be evolving into a valuable aid to CDCR's transition of its quality

management function to one of quality improvement.  It also represents another step closer to the

day when court oversight of the delivery of mental health care in CDCR prisons is no longer

necessary.

Respectfully Submitted,


_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master

August 2, 2013

30

**EXHIBIT A**

List of Expanded Priorities to be Covered in the Mental Health Quality Improvement Process

- Access to care
- Sufficiency of access-to-care officers
- Staffing
- Transfer timelines to higher levels of care
- Appropriate referrals to higher levels of care
- Routine, urgent, and emergent referral response times
- Difference in sick-call process in lockdown vs. non-lockdown units
- Frequency of lockdowns
- Group attendance rates/percentages
- Group treatment hours offered
- Treatment space
- Initial evaluation timeframes/reception center initial evaluation timeframes
- Access to health records
- Access to C-files
- Special populations
- Treatment in lockdown units
- RVRs
- Suicide prevention
- Utilization and resource management
- Quality management
- Quality of care
- Medication management
- Group treatment
- Treatment
- Safety
- Outcome measures
- Miscellaneous

**EXHIBIT B**

| Facility: | Reporting Period:  Q1 Jan-March 2013 |
|---|---|
| Dates:  May 22-24 | |
| Contact: Dr. Laura Ceballos, Chief MHQM  office: 916-691-0308 cell:916-616-6699 | |
| Admin: La Toya Holmes-Green, HPS I  916-691-0287 | |

*Instructions:  Please ensure each item on the list is completed prior to your CQI Site Visit.*

| | | |
|---|---|---|
| 1. | Notify Warden/Health Care Access Capt. or designees of tour | ☐ |
| 2. | Notify ASU Capt. and other custody staff in affected areas of tour | ☐ |
| 3. | Notify custody staff in ASU that the assessment teams will need access to isolation logs and custody wellness check log information for the 24 hours prior to the tour. | ☐ |
| 4. | Secure room/space for team to interview selected patients | ☐ |
| 5. | Using each "Random Patient List" received in the email that included this checklist for a group interview, either ducat or coordinate with custody staff to ensure groups of 10 inmates are scheduled to be seen for a patient group satisfaction survey on a day during the tour.<br>• Groups need to have a minimum of 10 patients.  Please account for refusals, if you are ducating inmate-patients, ducat more than 10 as many will refuse.<br>• One group for ML CCCMS, ML EOP, and ASU must be ducated. No other programs will require this group interview.<br>• To schedule, start with the first name on the list and continue scheduling until at least 20 inmate-patients have successfully been scheduled for the group.<br>• Do NOT cancel treatment appointments for inmates to participate in this interview: Skip inmate-patients with scheduling conflicts and move onto the next patient on the list.<br>• Provide custody staff with script "Reason for Appointment" which should be used to inform patients why they are being scheduled for group. | ☐ |
| 6. | For any inmates ducated in step 5 above, ensure translators or sign language interpreters are also scheduled for any inmate patients with effective communication needs. | ☐ |
| 7. | Arrange access to C-Files or ERMS. Auditors will need to be able to pull C-files or access ERMS on site. Ensure records staff are prepared to accommodate these requests. | ☐ |
| 8. | Secure space for the assessment team to leave their personal belongings and work throughout the day. | ☐ |
| 9. | Notify nursing staff that auditors will need access to the "Restraint Log Checklist" for at least the past three months prior to the audit. This is a new checklist that is kept in the MHCB nursing schedule. | ☐ |
| 10. | Email an IDTT Schedule to the HQ staff person who emails you this checklist at least two weeks prior to the planned week of the audit. The IDTT schedule should include all IDTTs scheduled for the entire week in which the assessment is planned to occur. | ☐ |
| 11. | Email a group schedule for all EOP, ASU, PSU, and SHU programs to the HQ staff person who emails this checklist to you at least two weeks prior to the planned audit week. The group schedule should include all groups scheduled for the entire week in which the assessment is planned to occur. | ☐ |
| 12. | Email an ICC Schedule to the HQ staff person who emailed you this checklist at least two weeks prior to the planned week of the assessment.  The ICC schedule should include all ICCs scheduled for the entire week in which the assessment is planned to occur. | ☐ |
| 13. | ASU 114A. Ensure the ASU 114As are available for the past three months of the audit period (only required historically for inmates who are in ASU at the time of the audit and have been for at least three months). | ☐ |
| 14. | Provide 2 copies of a list of DSH discharges for the reporting period. | ☐ |
| 15. | Have the SRE Mentor Program Tracking Log (list and number of all clinicians who have completed the program) readily available. | ☐ |
| 16. | Ensure the MHCB Discharge Custody Wellness Check Logs for the prior reporting period (for example Q1 is Jan-March so audits conducted in April-June are for Q1, Q2 is April-June so audits conducted in July-Sept are for Q2, etc.) are readily available. | ☐ |
| 17. | Provide a list of all MHCB I/Ps admitted for suicidal reasons and were discharged the quarter prior to the audit date.  Exclude any I/Ps who were psych and return and were discharged directly to their home institution. (note our Custody team members will be requesting this list). | ☐ |
| 18. | Ensure HQ teams are provided access to the MHCB Unit Health Records for all patients in the MHCB during the time of the assessment. | ☐ |

**EXHIBIT C**

"Script" for Custody Escort Officers regarding the reason for the group
appointment

Custody officers:  Please give each inmate the reason they are being escorted to
the patient group interview appointment.  Below is a script you can use.

"A small group of mental health clinicians would like to interview you regarding your level of
satisfaction with the mental health treatment you are receiving here at _____

The interview results will be confidential. This is your chance to anonymously give feedback
regarding the mental health treatment you are receiving here at CDCR."

**EXHIBIT D**

AuditItemInt

### 7388B on site review (Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Was this i/p referred by HQ or through regional review? | Headquarters, Regional | |
| 2 | Was this a follow up for an open case review? | Yes, No | |
| 3 | If yes, is the issue resolved or being addressed in a clinically appropriate manner? | Yes, No, Not an open case review | |
| 4 | What intervention(s) was/were made? | IDTT was held, CDCR 7388-B form corrected, New CDCR 7388-B completed, CDCR 7388-B created prior to visit, Training provided, Refer to supervisor, Other | |
| 5 | Please note additional comments | | |

### 837s(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | How many suicide attempts are documented on the 837's? | , | |
| 2 | How many had a delay of more than 5 minutes for cell entry? | , | |

### ASU ICC Observation(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is a MH clinician in attendance? | Yes, No | |
| 2 | Did the MH clinician provide useful information regarding each inmate's mental condition (ie. Need for medication,tendency for behavioral difficulties,suggested interventions,LOC,likelihood of decompensation if maintained in ASU,need for staff assistant). | Yes, No | |

## ASU Morning Meeting Observation(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Did MH staff identify high risk inmates? | Yes, No | |
| 2 | Were the ASU sgt and MH clinician in attendance? | Yes, No | |
| 3 | Were new arrivals discussed? | Yes, No | |
| 4 | What method of measurement was used? | Interview, Observation | |

## ASU Out of Cell Time and Showers(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Out of the past 4 weeks, how many weeks were required(note: when safety and security issues preclude out of cell/yard time the week is not counted as required)? | | |
| 2 | Of those, how many weeks was exercise outside the room (out of cell) offered one hour per day, five days per week or use of yard at least 3 days per week for a total of 10 hours? | | |
| 3 | Out of the past 4 weeks, how many weeks were showers offered at least three times per week? | | |

## Casework for DSH discharges(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Was the classification casework form completed prior to transfer from DSH? | Yes, No | |

## Cell Cleanliness(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | How many cells were observed? | | |
| 2 | Of those cells observed, how many were clean? | | |
| 3 | Is there a cleaning schedule that is up to date for all cells in alt housing, OHU and MHCB? | Yes, No | |

## Clinical Assessment of MHCB Discharges(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Did the clinician note his/her observations of the inmate/patient's behavior and appearance? | Yes, No | |
| 2 | Did the clinician assess suicidal ideation? | Yes, No | |
| 3 | Does the PC progress note reference the recent MHCB/OHU admission/placement? | Yes, No | |
| 4 | Is there documentation that the treatment plan from the MHCB/OHU was reviewed? | Yes, No | |

## Clinical Restraint(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | How many inmates were placed in restraints during the quarter? | | |
| 2 | Did the institution meet all audit criteria for all restraint events? | Yes, No, Logs not done | |
| 3 | For deficiencies, which items were not met? | | |
| 4 | Did institution address deficiencies? | Yes, No | |
| 5 | How did institution address deficiencies? | | |

## Clinical Review of Staff Referrals(Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Based upon your assessment, does this inmate/patient require a higher level of care? | Yes, No | |
| 2 | Was the Unit Health Record Reviewed? | Yes, No | |
| 3 | What is the outcome of the assessment? | No intervention needed, Refer to IDTT, Refer to Medical, Refer to MH Clinician-Urgent, Refer to MH Clinician-Non Urgent, Refer to CTC, Other-Specify | |

## Clinician Communication for DSH discharges(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is DSH treatment record review or clinician to clinician contact documented on a CDCR progress note within 5 working days of the i/p's return to CDCR? | Yes, No | |

## Custody MHCB Discharge Follow-ups(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Were all hourly checks completed by custody staff for the first twenty-four (24) hours of arrival to program? | Yes, No | |

## DSH non referral log i/p review(Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Based upon your assessment, does this inmate/patient require a higher level of care? | Yes, No | |
| 2 | Was the Unit Health Record Reviewed? | Yes, No | |
| 3 | What is the outcome of the assessment? | No intervention needed, Refer to IDTT, Refer to Medical, Refer to MH Clinician-Urgent, Refer to MH Clinician-Non Urgent, Refer to CTC, Other-Specify | |

**Group Treatment Space(Mental Health)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is the group treatment space confidential? | Yes, No | |
| 2 | Is the space large enough to accommodate chairs for each participant? | Yes, No | |

**Group Wait List(Mental Health)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Have any inmates on the list been longer than 90 days? | Yes, No | |
| 2 | If there is no waitlist why? | | |

## IDTT Observation - General(Mental Health/Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Did the regularly assigned primary clinician complete the 7386 intake evalustion or update the 7389 prior to the IDTT meeting? | Yes, No, Not Initial | |
| 2 | Did the regularly assigned psychiatrist complete the 7230-G intake evaluation prior to the IDTT meeting? | Yes, No, Not Initial | |
| 3 | Can the clinician access the health record upon request? | Yes, No | |
| 4 | Can the correctional counselor access the c-file/ERMS upon request? | Yes, No | |
| 5 | Did the IDTT Leader state the purpose of the IDTT to the inmate? | Yes, No | |
| 6 | Did the regularly assigned PC provide relevant treatment information (fuctional impairments,diagnosis,areas of distress)? | Yes, No | |
| 7 | Did the regularly assigned psychiatrist provide relevant information regarding diagnosis, medications to address the diagnosis, and discuss side effects? | Yes, No | |
| 8 | Is the inmate-patient invited to the IDTT ? | Yes, No, N/A inmate declined to attend or there is good clinical rationale for not inviting the inmate | |
| 9 | If inmate-patient is invited to IDTT are they asked open-ended questions? | Yes, No | |
| 10 | Did the Correctional Counselor provide a comprehensive description regarding the inmate's custody information? | Yes, No | |

## IDTT Treatment Space(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is there enough space for a chair for each participant? | Yes, No | |
| 2 | Is there a chair for each participant? | Yes, No | |
| 3 | Is there a conference table? | Yes, No | |

## Individual interview of inmate-patients (Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Based upon your assessment, does this inmate/patient require a higher level of care? | Yes, No | |
| 2 | Was the Unit Health Record Reviewed? | Yes, No | |
| 3 | What is the outcome of the assessment? | No intervention needed, Refer to IDTT, Refer to Medical, Refer to MH Clinician-Urgent, Refer to MH Clinician-Non Urgent, Refer to CTC, Other-Specify | |

## Individual Treatment Space(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is there confidential treatment space? | Yes, No | |
| 2 | Is there space enough for two chairs? | Yes, No | |
| 3 | Is the space configured so the space is safe? | Yes, No | |
| 4 | Do staff report accessibility to space when needed? | Yes, No | |

## Inmate-Patient flags (Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Select the patient that requires follow up | | |
| 2 | Reason for follow up | ADLS, Dirty Cell, IP not programming, Atypical or bizarre behavior, Psychotic symptoms, Medication Non-compliance, Other-Specify | |
| 3 | What intervention(s) was/were made? | IDTT was held, CDCR 7388-B form corrected, New CDCR 7388-B completed, CDCR 7388-B created prior to visit, Training provided, Refer to supervisor, Other | |

## Limited Issue Observation(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Does the progress note or physician's order justify limited issue(required every 24 hours)? | Yes, No | |

## Mechanical Restraint Observation(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Was there a 128-B documented for the inmate who was escorted with mechanical restraints for a regular MH encounter? | Yes, No | |

## Mental Health Program Subcommittee minutes review (Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is table V included in the minutes? | Yes, No | |
| 2 | Do minutes reflect a discussion of table V? | | |
| 3 | Is there variability in the trended data(viewed in table V)? | Yes, No | |

**MHQMC Minutes(Mental Health)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Has the Mental Health Program Subcommittee at the facility met monthly and are minutes available? | Yes, No | |
| 2 | Did the mental health subcommittee achieve a quorum? | Yes, No | |
| 3 | Are action items kept open until resolved? | Yes, No | |
| 4 | Do mental health subcommittee notes indicate that peer review was completed and it was discussed at least once in the past 6 months. | Yes, No | |

## Non-referral log review (Sust Proc)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Does the 7388B correspond(implicitly or explicitly) with the other documentation in the Unit Health Record? | Yes, No | |
| 2 | If no, what intervention(s) was/were taken? | IDTT was held, CDCR 7388-B form corrected, New CDCR 7388-B completed, CDCR 7388-B created prior to visit, Training provided, Refer to supervisor, Other-Specify | |
| 3 | What documents were reviewed to conduct this assessment(3 different doc types required)? | Case manager progress notes, Group summary note, Mental Health treatment plan-7388, Psychiatrist note, Suicide Risk Evaluation (SRE), Other-Specify, | |
| 4 | Comments noted: | | |

**Patient Group Interview(Mental Health)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | How many of you go to most of your mental health appointments? | | |
| 2 | How many of you do not go to most of your mental health appointments? | | |
| 3 | What keeps you from going to your mental health appointments? | Did not get ducat., Escort problems., Modified program., Discouraged by others., Weather (too hot or cold)., Schedule conflicts., Treatment is not helpful., I don't like my clinician., N/A, Other | |
| 4 | How many of you are usually able to get your mental health appointments on time? | | |
| 5 | How many of you are NOT usually able to get your mental health appointments on time? | | |
| 6 | What keeps you from getting to your appointments on time? | Did not get ducat., Escort problems., Modified program., Discouraged by others., Weather (too hot or cold)., Schedule conflicts., Treatment is not helpful., I don't like my clinician., N/A, Other | |
| 7 | How many of you feel that you are seen as often as you need to be? | | |
| 8 | How many of you feel that you are NOT seen as often as you need to be? | | |
| 9 | How many of you are usually seen quickly when you need to be? | | |
| 10 | How many of you are NOT usually seen quickly when you need it? | | |
| 11 | How many of you know how to make an appointment with your clinician or psychiatrist? | Yes, No | |
| 12 | How many of you DON'T know how to make an appointment with your clinician or psychiatrist? | | |
| 13 | How many of you know your mental health treatment plan? | | |

| | | |
|---|---|---|
| 14 | How many of you don't know your mental health treatment plan? | |
| 15 | How many of you agree with your mental health treatment plan? | |
| 16 | How many of you do NOT agree with your mental health treatment plan? | |
| 17 | How many of you are satisfied with the treatment from your primary clinician? | |
| 18 | How many of you are NOT satisfied with the treatment from your primary clinician? | , No |
| 19 | How many of you are satisfied with the treatment from your psychiatrist? | Yes, No |
| 20 | How many of you are NOT satisfied with the treatment from your primary psychiatrist? | Yes, No |
| 21 | How many of you are mostly satisfied with your mental health treatment team meetings? | |
| 22 | How many of you are NOT satisfied with your mental health treatment team meetings? | |
| 23 | What don't you like about your mental health treatment team meetings? | It makes me nervous, They don't listen to me, I don't get the opportunity to talk, Other- Note in comments |
| 24 | How many of you take psychiatric medication? | |
| 25 | How many of you do not take medications? | |
| 26 | How many of you usually do NOT have to wait long to start getting a new medication that was prescribed to you? | |
| 27 | How many of you usually have to wait a while before you start getting a new medication that was prescribed to you. | Yes, No |
| 28 | How many of you usually get your regular medications on time? | |

29  How many of you have had delays in     Yes, No
    getting your routine medications?

30  How many of you have not had
    delays in getting your routine
    medication?

31  How many of you are mostly
    satisfied with your group treatment?

32  How many of you are NOT mostly
    satisfied with your group treatment?

33  How many of you are usually seen     Yes, No
    by mental health clinicians in a
    confidential setting?

34  How many of you are usually NOT
    seen in private settings by your
    mental health clinicians?

35  EOP only: How many patients being
    interviewed are EOP Level of Care?

36  EOP Only:  Of EOP patients, how
    many are getting at least 10 hours
    of treatment per week for ML or at
    least 5 hours per week for RC?

37  EOP Only: Of EOP patients, how
    many are NOT getting at least 10
    hours of treatment per week for ML
    or at least 5 hours per wk for RC?

38  ASU Only: How many of you have
    received the ASU inmate orientation
    mental health guide?

39  ASU Only: How many of you have
    not received the ASU orientation
    guide?

**Psychiatric Technician Rounds Completion(Mental Health)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | ASU:Did initial contact occur within 24 hours? | Yes, No | |
| 2 | ASU:Were rounds conducted daily for the past month? | Yes, No | |
| 3 | SHU:Did initial contact occur within 24 hours? | Yes, No | |
| 4 | SHU:Were rounds conducted weekly for MHSDS or every other week for non-MHSDS for the past month? | Yes, No | |
| 5 | PSU:Was the inmate observed daily by mental health staff? | Yes, No | |

**RVRs(Custody)**

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | How many RVR's were issued? | | |
| 2 | How many met criteria for MH assessment? | | |
| 3 | Of those that met criteria, how many were referred for MH assessment? | | |
| 4 | Of those referred, how many include clear documentation that mitigation was considered? | | |
| 5 | Of those referred, for how many did the MH clinician recommend mitigation? | | |
| 6 | Of those in which mitigation was recommended, how many were mitigated? | | |
| 7 | How many were CCCMS at the time of issue? | | |
| 8 | How many were EOP at the time of issue? | | |

## SPRFIT Minutes(Mental Health )

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Are minutes present? | Yes, No | |
| 2 | Was there a quorum as defined by MHPG (12-10-5) | Yes, No | |
| 3 | Did minutes cover at least three areas required by MHPG (12-10-4) | Yes, No | |

## SRE Completion (Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Are risk factors clearly indicated? | Yes, No | |
| 2 | Are protective factors clearly indicated? | Yes, No | |
| 3 | Is there evidence of obtaining collaborating information (spoke with custody, psych techs, review of C-file, | Yes, No | |
| 4 | Is the risk level justified by descriptive narrative documentation? | Yes, No | |
| 5 | Does the individualized tx plan, documented on the SRE, address risk and support the protective factors? | Yes, No | |

## SRE Mentor Program staff who completed program(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 2 | How many current clinicians have been mentored? | | |

## Thermometer Check(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is a working thermometer present? | Yes, No | |
| 2 | Is the thermometer in a location that gives an accurate reading of the temperature? | Yes, No | |
| 3 | Are the staff documenting the highest reading (NOT averaging them)? | Yes, No | |

## Treatment Group Observation(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Did the group leader attempt to engage each participant? | Yes, No | |
| 2 | If media or music is used is it only used for short periods of time to illustrate? | Yes, No, N/A, not applicable | |
| 3 | Does the leader facilitate interaction between all group members on the clinical topic? | Yes, No | |
| 4 | For clinician led groups, is clinical process addressed during the group? | Yes, No, N/A not clinical led | |
| 5 | Is more than one type of group currently offered? | Yes, No | |

## Treatment Module Standards(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | For groups, are the modules in a semi-circle? | Yes, No, N/A | |
| 2 | Are the modules in an area where other inmates and/or staff are not able to hear or see the interaction? | Yes, No, N/A, not applicable | |
| 3 | Do the modules meet PIA approval standards? | Yes, No | |
| 4 | Do staff report sufficient number of tx modules for providing treatment? | Yes, No, N/A, not applicable | |

## Treatment Plan(Mental Health)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Is there a conflicting diagnosis between the documents reviewed that directs significantly different treatment plans? | Yes, No | |
| 2 | Does the treatment plan include referral/linkage/discussion regarding obtaining treatment once released? | Yes, No | |
| 3 | Does the treatment plan include discussion regarding housing plans upon release? | Yes, No | |
| 4 | Is there a provisional or rule out diagnosis for greater than 90 days? | Yes, No | |
| 5 | If yes, is documentation providing rationale present? | Yes, No | |
| 6 | Does the treatment plan adequately address the symptoms that lead to high utilization? | Yes, No | |
| 7 | Is/are the reason(s) for refusals documented? | Yes, No | |
| 8 | Are interventions to increase attendance documented? | Yes, No | |
| 9 | Is there mental health documentation of a consultation between mental health and medical staff over the past 6 months? | Yes, No | |
| 10 | Is the treatment plan legible? | Yes, No | |
| 11 | Does the clinical summary include a brief summary of mental health symptoms and treatment over time? | Yes, No | |
| 12 | Is the clinical summary consistent with the problems listed in the treatment plan? | Yes, No | |
| 13 | Is the diagnosis consistent with the problems and clinical summary? | Yes, No | |
| 14 | Are the medications listed with target symptoms and goals? | Yes, No | |

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 15 | Are the identified interventions individualized and appropriate for targeting the problems? | Yes, No | |
| 16 | Are the goals related to the problems and interventions? | Yes, No | |
| 17 | Was the treatment plan meaningfully updated within the required time frame? | Yes, No | |
| 18 | Are the diagnosis, problems, and interventions consistent with the MSE? | Yes, No | |
| 19 | Are the risk factors noted consistent with the rest of the clinical picture/descriptions? | Yes, No | |
| 20 | Is there a meaningful discharge plan or description of why extended care will likely be required? | Yes, No | |
| 21 | Is the rationale for level of care provided and consistent with presentation? | Yes, No | |

## Welfare checks(Custody)

| # | Item | Answers | Comment |
|---|------|---------|---------|
| 1 | Were 48 welfare checks completed for all inmates who were in an ASU intake for the full 24 hours audited? | Yes, No | |
| 2 | Did every check in the log occur within 30 minutes of the prior when there was a prior check? | Yes, No | |
| 3 | Are welfare checks start and stop times staggered at irregular intervals to avoid a discernable pattern? | Yes, No | Staggered: Irregular checks that do not follow a pattern - not to exceed 30 minutes . Two checks back to back that are not irregular are acceptable but not three. |

**EXHIBIT E**

List of Areas Covered within the Continuous
Quality Improvement Tool (CQIT)

- Referrals to DSH programs for inmates in need of higher levels of care/follow-up of inmates who were identified in the sustainable process for referral to higher levels of care at DSH programs
    - Reasons for follow-up
    - Clinical interventions taken
    - Clinical review of staff referrals to DSH programs; was assessment conducted, was the UHR reviewed, and what was outcome of the assessment
    - Regional directors' individual interviews of inmates
    - Clinician-to-clinician communication following discharge from DSH program
    - Custody follow-up after discharges from DSH programs
    - Review of DSH non-referral logs
        - Was decision to not refer supported by documentation in the inmate's UHR
        - What, if any, clinical interventions were taken
        - Identification of documents reviewed to answer these questions
    - Review of minutes of the mental health program subcommittee relating to DSH referral and non-referral data
    - Frequency of meetings
    - Presence of a quorum
    - Resolution of action items
    - Conduct of peer review

- IDTTs
    - Compliance with required activity by psychiatrist and primary clinician prior to meeting
    - Access to UHRs and C-Files
    - Evaluation of the activity and input of the meeting leader, primary clinician, psychiatrist, and correctional counselor
    - Presence of inmate at the meeting
    - Questions asked of the inmate
    - Adequacy of treatment plans
        - Presence of conflicting diagnoses
        - Provisional diagnoses for over 90 days
        - Presence of supporting rationale for diagnosis and level of care/consistency with patient's presentation
        - Addressing of symptoms that led to high utilization of services
        - Documentation of reasons for treatment refusals
        - Interventions to decrease refusals
        - Documentation of consultation between medical and mental health staff in preceding six-month period
        - Legibility

- Presence of summary of mental health symptoms and treatment over time
- Consistency among diagnosis, problems, and clinical summary
- Consistency of medications with targets and goals
- Individualization and appropriateness of interventions
- Relationship of interventions to patient problems and goals
- Timely and meaningful updates
- Consistency between risk factors and balance of clinical picture
- Post-discharge planning or need for extended care
- Post-release treatment planning, including housing

- Limited issue (i.e. limitations on inmate's clothing and personal effects) in inpatient housing
  - Correlation with clinical progress notes or physician's order for limited issue
  - Appropriateness of renewal(s) of order

- Space
  - IDTT meetings
  - Therapeutic groups
    - Confidentiality of surroundings
    - Size of rooms

- Treatment modules
  - Layout
  - Auditory and visual confidentiality
  - Compliance with Prison Industries Authority (PIA) standards
  - Sufficiency of number

- Patient group surveys eliciting patient opinions and feedback on:
  - Access to care
  - Patients' perceptions of the quality of mental health care they receive
  - Timeliness of appointments
  - Ability to have contacts with clinical staff
  - Treatment plans and individual treatment
  - IDTTs
  - Medications
  - Therapeutic and recreational groups
  - Confidentiality
  - Orientation in administrative segregation

- Psych tech rounds
  - Initial contacts
  - Daily and weekly rounds
  - Daily observations as required by specific program areas

- RVRs
  - Numbers issued to EOP and 3CMS inmates

- o Number meeting criteria for mental health assessment
- o Number referred for assessment
- o Presence of clear documentation showing consideration of mitigation of penalty based on mental health input
- o Number recommended for mitigation of penalty
- o Number actually mitigated

- Suicide prevention
  - o Minutes of Suicide Prevention and Response Focused Improvement Team meetings
    - Presence of a quorum
    - Adequacy of coverage of required items
  - o Suicide attempts
    - Time delay prior to cell entry
  - o Suicide Risk Evaluations (SREs)
    - Quality of evaluations
    - Indication of risk factors and protective factors
    - Obtaining of corroborating information
    - Support for risk factors in narrative
    - Documentation of individualized treatment addressing risk and supporting protective factors
    - Number of clinicians who have received SRE mentor training

- Institutional classification committee meetings
  - o Attendance of the inmate's mental health clinician and his/her role in the proceedings

- Daily morning meetings between custody and mental health in administrative segregation, including attendance
  - o Review of high-risk inmates and new arrivals in administrative segregation

- Inmates' out-of-cell time

- 30-minute welfare checks
  - o Total number completed
  - o Time entered into the log
  - o Staggering/irregularity of checks to avoid discernible pattern

- Custody work regarding patient discharges from DSH programs

- Cell cleanliness

- Quality of clinical assessment of discharges from the MHCB, based upon review of documentation in clinical progress notes, including assessment of any suicidal ideation by the inmate

- Use of clinical restraints, including number of inmates placed into restraints, compliance with standards applicable to use of restraints, any deficiencies identified and if any, how they were addressed

- Use of mechanical restraints during custody escorts of inmates
    - Presence of related documentation

- Heat plan
    - Presence of a working thermometer
        - Location
        - Documentation of highest reading

- Group treatment
    - Engagement by group leader
    - Use of media or music
    - Facilitation of interaction by group leader
    - Variety of group offerings
    - Clinical process (for clinician-led groups)

**EXHIBIT F**

|  |  | ⊞ Closed Appts | ⊞ IDTTs | ⊞ PC Contacts | ⊞ Psychiatry Contacts | ⊞ IDTT Attendance | ⊞ MH Referrals | ⊞ Placement Requests | ⊞ EOP Weekly Hours |
|---|---|---|---|---|---|---|---|---|---|
|  |  | Percentage | Percentage | Percentage | Percentage | Percentage | Percentage | Percentage | Percentage |
| **Large MH Programs** | ⊞ CIM | 100% | 96% | 93% | 99% | 14% | 89% | 86% | -- |
|  | ⊞ CMC | 99% | 97% | 98% | 98% | 6% | 97% | 83% | 77% |
|  | ⊞ CMF | 99% | 96% | 85% | 85% | 10% | 99% | 45% | 42% |
|  | ⊞ COR | 99% | 91% | 91% | 93% | 0% | 68% | 89% | 45% |
|  | ⊞ KVSP | 100% | 97% | 96% | 99% | 16% | 90% | 89% | 70% |
|  | ⊞ LAC | 100% | 98% | 97% | 98% | 26% | 84% | 85% | 50% |
|  | ⊞ MCSP | 100% | 98% | 93% | 94% | 26% | 72% | 91% | 13% |
|  | ⊞ NKSP | 96% | 97% | 87% | 97% | 7% | 38% | 42% | -- |
|  | ⊞ PBSP | 100% | 33% | 46% | 52% | 0% | 100% | 89% | 15% |
|  | ⊞ RJD | 100% | 98% | 95% | 96% | 0% | 93% | 63% | 77% |
|  | ⊞ SAC | 100% | 95% | 92% | 87% | 56% | 78% | 56% | 32% |
|  | ⊞ SATF | 89% | 95% | 92% | 99% | 5% | 70% | 87% | 52% |
|  | ⊞ SQ | 100% | 95% | 97% | 99% | 57% | 99% | 66% | 69% |
|  | ⊞ SVSP | 97% | 93% | 92% | 90% | 4% | 86% | 62% | 28% |
|  | ⊞ WSP | 100% | 94% | 92% | 98% | 1% | 44% | 52% | -- |
| **Small MH Programs** | ⊞ ASP | 100% | 99% | 99% | 100% | 47% | 99% | 77% | -- |
|  | ⊞ CCI | 100% | 99% | 98% | 99% | 7% | 87% | 76% | -- |
|  | ⊞ CRC | 98% | 97% | 97% | 100% | 0% | 76% | 88% | -- |
|  | ⊞ CTF | 100% | 93% | 97% | 100% | 95% | 86% | 82% | -- |
|  | ⊞ DVI | 99% | 82% | 94% | 99% | 67% | 98% | 64% | -- |
|  | ⊞ FSP | 98% | 99% | 98% | 100% | 59% | 90% | 95% | -- |
|  | ⊞ HDSP | 100% | 93% | 89% | 99% | 76% | 91% | 80% | -- |

|  | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | ⊞ PVSP | 100% | 94% | 95% | 98% | 2% | 65% | 88% | -- |
|  | ⊞ SCC | 100% | 94% | 95% | 100% | 32% | 91% | 82% | -- |
|  | ⊞ SOL | 100% | 98% | 97% | 99% | 7% | 79% | 78% | -- |

|  | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | ⊞ CAL | 100% | 99% | 46% | 100% | 71% | 97% | 90% | -- |
|  | ⊞ CCC | 100% | 93% | 36% | 100% | 0% | 99% | 100% | -- |
| No MH Program | ⊞ CEN | 100% | 100% | 100% | 100% | 9% | 97% | 93% | -- |
|  | ⊞ CVSP | 93% | 98% | 72% | 100% | 0% | 84% | 80% | -- |
|  | ⊞ ISP | 91% | 46% | 9% | -- | 0% | 65% | 93% | -- |

|  | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | ⊞ CCWF | 100% | 97% | 96% | 100% | 17% | 97% | 81% | 95% |
| Women | ⊞ CIW | 100% | 92% | 95% | 96% | 13% | 93% | 94% | 60% |
|  | ⊞ VSPW | 100% | 94% | 95% | 99% | 15% | 93% | 91% | 43% |

|  | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ALL |  | 99% | 95% | 93% | 96% | 19% | 78% | 73% | 47% |

**About This Report**

**Report Refreshes and Date Range**
This report is refreshed every Sunday night, for the date range from 194 days prior to that Sunday to 14 days prior to that Sunday.

**Levels**
Institution->Placement->Month
Clicking on a given percentage will take you to the individual report from which those data were derived.

**Indicators**
Closed Appointments: The percentage of appointments scheduled to occur during the reporting date range that have been closed. #Measures reports the total number of scheduled appointments (open and closed). Clicking on a percentage takes you to the Overdue Pending Appointments report.
IDTTs, PC Contacts, Psychiatry Contacts: Average weekly on-time percentage of required IDTT, PC, and Psychiatry contacts across all applicable placements. #Measures reports the total number of weekly observations made for that contact. Clicking on a percentage takes you to the Contact Intervals report. The dashboard data are refreshed on the same schedule as the Contact Intervals report (3 times per week).
IDTT Attendance: Percentage of completed IDTTs attended by a psychiatrist, clinician (psychologist or social worker), and a custody counselor. In ASU and SHU, an LPT must also be present, and in SHU, a Custody Officer and a Senior Psychologist must also be present. Only IDTTs attended by all required professions are treated as compliant. Staff profession is determined by that staff's occupation designation in MHTSnet. #Measurements gives the total number of completed IDTTs measured. Clicking on a percentage takes you to the Closed Appointment Search report, which shows each IDTT measured and who attended it.
MH Referrals: Percentage of Routine, Urgent, Emergent, Psych Testing, and RVR referrals completed within established timeframes. (See Compliance Rules grid for MH Referral timeframes.) # Measurements is the total number of referrals measured. Clicking on a percentage takes you to the MH Referrals report.
Placement Requests: Percentage of placement request timeframes completed on time. This includes any timeframe for which there is a rule in the Compliance Rules grid, including request-to-placement timeframes and length of stay timeframes. Covered placement requests include ML CCCMS, ML EOP, OHU, MHCB, DMH Acute, and DMH ICF. # Measurements indicates the number of placement requests measured.
EOP Weekly Hours: Percentage of EOP treatment weeks where the minimum required hours of structured treatment was offered (>=10 hours in ML, ASU, and PSU and >=5 in RC). # Measurements indicates the number of full weeks (all 7 days) during which a patient was EOP. Additionally, only weeks where the patient had already been in the program for at least 14 days prior are included. These data are not real-time but rather are refreshed every Sunday, Tuesday, and Thursday night. Clicking on a percentage takes you to the Weekly Tx Hours2 report, which also refreshes its data on the same schedule (and not real time).

**EXHIBIT G**

**Spotlight**

Example Summary: Statewide, performance was good on indicators A, C, and D and borderline on indicator B. All indicators showed either an increase of 1 to 2 percentage points or no change since the previous quarter. At the program level, performance on all indicators was good except for ML CCCMS which was borderline on indicator A and ASU EOP which was poor on indicators B and C. This was likely due to recent changes in ASU policies for these indicators. At the institution level, performance on all indicators was good except for indicator C which was borderline for institutions 1 and 2 and poor for institution 3, indicator D which was borderline for institutions 1, 5, and 7 and poor for institutions 4 and 5.

Corrective Actions: Provide statewide training on new ASU policies regarding indicators B and C. Require corrective action plans from institutions regarding poor performing indicators.



**Data Entry**

In Xanadu did Kubla Khan a stately pleasure-dome decree where Alph, the sacred river, ran through caverns measureless to man



**Access to Care**          Summary text for this indicator group goes here.



**Timely Transfers**          Summary text for this indicator group goes here.

| | | Monthly Trend | Summary Bar | | |
|---|---|---|---|---|---|
| Timely CDCR Transfers | **79%** 79 ⚠️ | ●●●●●● | 16 | 12 | 4 | (# Institutions) |
| Timely DSH Transfers | **36%** 36 ❌ | ●●●●●● | 1 1 | 17 | (# Institutions) |

## Tx Hours

Summary text for this indicator group goes here.



| | | | Monthly Trend | Summary Bar | |
|---|---|---|---|---|---|
| EOP Tx Hours Attended | **52%** 52 | ✗ | | 3 — 15 | (# Institutions) |
| EOP Tx Hours Cancelled | **76%** 76 | ⚠ | | 6 — 7 — 5 | (# Institutions) |
| EOP Tx Hours Offered | **63%** 63 | ✗ | | 2 — 6 — 10 | (# Institutions) |
| EOP Tx Hours Refused | **72%** 72 | ⚠ | | 6 — 7 — 5 | (# Institutions) |
| EOP Tx Hours Scheduled | **84%** 84 | ⚠ | | 11 — 5 — 2 | (# Institutions) |

## Tx Quality

Summary for Data Entry. Four score and seven years ago our fathers brought forth on this continent, a new nation, conceived in Liberty, and dedicated to the proposition that all men are created equal.

| | | | Monthly Trend | Summary Bar | |
|---|---|---|---|---|---|
| IDTT Staffing | **67%** 67 | ✗ | | 7 — 11 — 14 | (# Institutions) |
| Patient Satisfaction | **53%** 53 | ⚠ | | 9 — 3 | (# Institutions) |

## ACRONYMS and ABBREVIATIONS

3CMS:            Correctional Clinical Case Management System

C-file:          Case File

CCI:             California Correctional Institution

CCWF:            Central California Women's Facility

CDCR:            California Department of Corrections and Rehabilitation

CIM:             California Institution for Men

CMC:             California Men's Colony

CQIT:            Continuous Quality Improvement Tool

CSATF:           California Substance Abuse Treatment Facility

CSP/LAC:         California State Prison/Los Angeles County

CSP/Sac:         California State Prison/Sacramento

DSH:             Department of State Hospitals

EOP:             Enhanced Outpatient Program

eUHR:            Electronic Unit Health Record

ICC:             Institutional Classification Committee

IDTT:            Interdisciplinary Treatment Team

MCSP:            Mule Creek State Prison

MHCB:            Mental Health Crisis Bed

| | |
|---|---|
| MHTS.net: | Mental Health Tracking System |
| OHU: | Outpatient Housing Unit |
| PBSP: | Pelican Bay State Prison |
| PSU: | Psychiatric Services Unit |
| RVR: | Rule Violation Report |
| SHU: | Security Housing Unit |
| SVSP: | Salinas Valley State Prison |