

**U.S. Department of Justice**

*Washington, DC 20530*

**MAY 3 1 2013**

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

      Re:   Investigation of the State Correctional Institution at Cresson and Notice of
             Expanded Investigation

Dear Governor Corbett:

    The Civil Rights Division has completed its investigation into the conditions of
confinement at Pennsylvania State Correctional Institution at Cresson ("Cresson"), conducted
pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.
CRIPA authorizes the Department of Justice to seek equitable relief where prison conditions
violate the constitutional rights of prisoners in state correctional facilities. Consistent with the
statutory requirements of CRIPA, we write to inform you of our findings.

    After carefully reviewing the evidence, we conclude that the manner in which Cresson
uses isolation on prisoners with serious mental illness violates the Eighth Amendment of the U.S.
Constitution. We also conclude that Cresson uses isolation in a way that violates the rights of
prisoners with serious mental illness, as well as prisoners with intellectual disabilities, under
Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134.

    The manner in which Cresson uses prolonged isolation on prisoners with serious mental
illness subjects them to a risk of serious harm.[1] Cresson routinely locks prisoners with serious
mental illness in their cells for roughly 23 hours per day for months, even years, at a time. At
Cresson, the prolonged isolation is all the harder for many prisoners with serious mental illness
to endure because it involves harsh and punitive living conditions and, often, unnecessary staff-
on-prisoner uses of force. Cresson often places prisoners with serious mental illness in isolation
automatically because of their mental illness, and it fails to ensure that such placements are
reviewed by mental health staff. Once in these units, prisoners often receive inadequate mental
health care, with some receiving no therapy at all, and are often unreasonably denied access to
other services and programs. The combination of these conditions and deprivations subjects

---

[1] Cresson is a medium-security facility that uses isolation on prisoners with mental illness in the
Restricted Housing Unit, the Secure Special Needs Unit, and the Psychiatric Observation Cells. In
Section IV.C. of this letter, we discuss the harsh conditions in each of Cresson's isolation units in greater
detail.

these prisoners with serious mental illness to unnecessary and excessive risks, and many prisoners at Cresson in these conditions have suffered physical and psychological harms, such as psychosis, trauma, severe depression, serious self-injury, or suicide.

Neither the interests of the Pennsylvania Department of Corrections ("PDOC") nor those of the Commonwealth of Pennsylvania are well served when one of its prisons subjects prisoners to conditions that deny prisoners with psychiatric disabilities the benefit of mental health treatment and exacerbate their mental illnesses. When the mental health of prisoners deteriorates, when their episodes of paranoia and psychosis intensify, and when they engage in behaviors more dangerous to themselves and others, taking care of them becomes more difficult and more dangerous for correctional officers and more expensive for the Commonwealth. Moreover, those living outside the prison's walls feel the negative impact of the prison's mistreatment of prisoners with serious mental illness when these prisoners return to the community.

We recently learned that PDOC may close Cresson later this year. Even if Cresson does close, we remain concerned about the PDOC policies and practices that allowed the violations of federal law to occur there. These same policies and practices may lead to similar problems at other facilities. Indeed, in the course of our investigation, we reviewed information suggesting that other PDOC facilities may inappropriately use prolonged isolation, under conditions similar to Cresson's, on prisoners with serious mental illness and intellectual disabilities. Therefore, in addition to informing you of our findings, this letter serves as notice of our intent to expand our investigation into the use of prolonged isolation on prisoners with serious mental illness and intellectual disabilities at PDOC's other facilities. We describe the scope of our investigation and our plan for conducting it efficiently and expeditiously at the conclusion of this letter.

Secretary John Wetzel, Superintendent Kenneth Cameron, and other PDOC officials have fully cooperated with our investigation. They have displayed a genuine interest in working constructively with us, and we look forward to working with them in the coming months.

## I.    SUMMARY OF FINDINGS

We have made the following determinations regarding the manner in which Cresson uses isolation:

- **Cresson's use of prolonged isolation on prisoners with serious mental illness has caused serious and obvious harm in many cases:** Over a hundred prisoners on the Facility's own mental health roster have spent several months at a time in isolation, while roughly two dozen have spent years in isolation. The manner in which Cresson uses prolonged isolation on prisoners with serious mental illness places them at risk of, and destabilizes their condition and leads to, various serious psychological and physiological harms. Though less than 10 percent of the Prison's total population is housed in one of the isolation units, in the last year and-a-half, 2 of the Prison's 3 suicides and 14 of 17 suicide attempts occurred there.

- **Cresson's use of prolonged isolation on prisoners with serious mental illness results in inadequate mental health treatment:** Cresson's use of prolonged isolation prevents prisoners with serious mental illness from obtaining the mental health treatment they need. This denial of adequate mental health care has led to serious harms, including trauma, decompensation, psychosis, physical injuries, and death.

- **Cresson subjects prisoners with serious mental illness to excessive force and other harsh conditions, resulting in an extreme form of isolation:** Cresson's isolation units are unnecessarily harsh punitive environments where prisoners with serious mental illness suffer under chaotic conditions and are frequently subjected to excessive uses of force.

- **Cresson's use of isolation discriminates against prisoners with serious mental illness:** Cresson unnecessarily and inappropriately places prisoners in solitary confinement because they have serious mental illness. Isolating prisoners on the basis of their mental illness constitutes impermissible discrimination where it unjustifiably denies those prisoners access to services and programs provided to most other prisoners.

- **Cresson's use of isolation also violates the rights of prisoners with intellectual disabilities:** Many of Cresson's prisoners with serious mental illness also have intellectual disabilities. There are also some prisoners who have intellectual disabilities, but no diagnoses of serious mental illness. Cresson has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with intellectual disabilities in the general population, resulting in Cresson essentially warehousing them in one of the isolation units. Indeed, in the last two years, Cresson has subjected almost half of the prisoners it has identified as having intellectual disabilities to three or more continuous months of solitary confinement where they are denied meaningful services or activity.

- **Numerous systemic deficiencies contribute to the extensive use of isolation on prisoners with serious mental illness:** Cresson resorts to placing prisoners with serious mental illness in prolonged isolation in unnecessarily restrictive conditions primarily because of system-wide deficiencies that interfere with its ability to provide adequate mental health treatment. Too often, instead of providing appropriate mental health care, Cresson's response to mental illness is to confine vulnerable prisoners in its isolation units without meaningful services or activity. This approach has resulted in Cresson disproportionately placing prisoners with serious mental illness in inappropriate and unnecessarily restrictive environments. At the time of our investigation, prisoners with mental illness comprised less than 30 percent of the Facility's overall prisoner population but represented more than 60 percent of those housed in the isolation units. Thus, the prisoners at Cresson who suffer the most in isolation and are the most ill-suited to it are precisely the ones subjected to isolation most often.

The systemic deficiencies that lead the Facility to resort to isolating those with serious mental illness include:

- A system-wide failure of security staff to consider mental health issues appropriately and a marginalization of the concerns of the mental health staff;

- A mental health treatment program that fails to identify prisoners requiring treatment, lacks adequate staffing, functions in a disjointed and fragmented manner, has little in the way of treatment programming, and lacks a functioning secure residential treatment unit; and

    o   Oversight mechanisms that fail to monitor or address whether harm may result from Cresson's isolation practices and lack of treatment for prisoners with serious mental illness.

These factual findings give us reason to conclude that Cresson's practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments." "Prisoners retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). The Eighth Amendment requires prisons to provide humane conditions of confinement, and prison officials cannot be deliberately indifferent to serious medical and mental health needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1978). Embodying "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," *id.* at 102, the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1970).

The practices described in this letter also violate the ADA's requirement that qualified individuals with disabilities, including prisoners, not be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). Further, among others, the ADA's Title II regulations require correctional entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified prisoners with disabilities and to make reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. §§ 35.130(b)(7), (d) (1991); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). Cresson's practices identified in this letter violate these provisions.

## II.    INVESTIGATION

On December 1, 2011, we notified you that we were opening an investigation into the conditions of confinement at Cresson. The focus of our investigation was on whether Cresson engages in a pattern or practice of subjecting prisoners with serious mental illness to unnecessarily long periods of isolation, failing to prevent suicide and other self-harm, and failing to provide prisoners with adequate mental health treatment. In the course of the investigation, other issues of concern came to our attention, including unnecessary uses of force by staff on prisoners with serious mental illness and the use of isolation on prisoners with intellectual disabilities.

On March 19-22, 2012, we conducted an on-site inspection of Cresson with an expert consultant in mental health treatment and suicide prevention and an expert consultant in corrections security. We interviewed administrative staff, security staff, medical and mental health staff, and prisoners. We reviewed an extensive number of documents, including policies and procedures, medical and mental health records, cell histories, incident reports, investigative reports, disciplinary reports, administrative audit reports, prisoner grievances, unit logs, orientation materials, and training materials. We observed prisoners in various settings throughout the Facility. Consistent with our commitment to provide technical assistance and conduct a transparent investigation, we conducted exit conferences upon the conclusion of our visit.

We met with PDOC leadership and Superintendent Cameron on October 10, 2012, to share our consultants' concerns about information we received during our investigation and to receive an update on PDOC's and Cresson's response to the deficiencies outlined at the end of our March visit.  PDOC and Cresson provided us with information regarding new initiatives to improve the mental health and suicide prevention programs at Cresson and throughout the PDOC system.  While we commend PDOC and Cresson for considering these initiatives, most are still in the early planning stage, and our central concerns have not yet been addressed.

## III.    BACKGROUND

Cresson, which formerly served as a center for prisoners with serious mental illness, opened in 1987 as a medium-security male correctional institution.  At the time of our investigation, Cresson housed approximately 1,600 prisoners.  Of those, approximately 250 were housed in specialized housing units.

Three of the specialized housing units operate as isolation units.  **For purposes of this document, the terms "isolation" or "solitary confinement" mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others.**  *Compare Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).  An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation.

Cresson's three isolation units are:

- **The Restricted Housing Unit ("RHU"):**  Prisoners are housed in the RHU for violating prison rules (disciplinary segregation) or threatening the security of others (administrative segregation), or to protect them from significant threats to their own safety (protective custody).  Regardless of why they find themselves in the RHU, prisoners housed there are subjected to conditions that, taken together, have a punitive effect.  For approximately 23 hours per day, they are locked down in small cement cells (usually they are on their own, but sometimes, because of overcrowding, two prisoners must share the same RHU cell).  Severe restrictions are placed on their ability to engage in even basic activities, such as reading, and to have contact, even by phone, with loved ones and friends.  Prisoners are also exposed to intensive security measures, such as routine cell searches.  When we toured the Facility, 95 prisoners were housed in Cresson's RHU.

- **The Secure Special Needs Unit ("SSNU"):**  Cresson officials only house prisoners in the SSNU if they have serious mental illness, have had a number of placements in the RHU, and would otherwise be housed in the RHU.  Although the SSNU is supposed to be a therapeutic unit designed to address the serious mental health needs of prisoners who also require a more secure environment, very little mental health treatment is provided there.  Roughly two-thirds of the prisoners at the SSNU are confined to their individual cells for approximately 22 to 23 hours per day.  Generally, housing and living conditions in the SSNU are even more austere than in the RHU.  The SSNU housed 20 prisoners during our visit to the Facility.  At the time of our investigation, Cresson's SSNU was the second largest of the seven SSNUs in the PDOC system.

- **The Psychiatric Observation Cells ("POC"):**  Cresson houses prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property in one of several POC cells.  Prisoners are confined to these cells for nearly 24 hours per day.

In the RHU and SSNU, cells are all less than 100 square feet in size.  Each cell contains a steel sink, a steel toilet, a steel desk, and a steel bed frame with a mattress.  The POC cells are similar to those in the RHU and SSNU but have no desks or sinks.  All of the isolation cells have solid metal doors with narrow slots at shoulder level, wide enough for food trays to pass through, and small plastic windows facing into the housing unit's common area.  At the RHU and POC, the cells have small exterior windows, but at the SSNU, there are no such windows, and cells have no natural light.[2]

The remaining two specialized housing units, both of which are *not* isolation units, are the following:

- **The Mental Health Unit ("MHU"):**  The MHU is for prisoners needing short-term inpatient mental health care.  Certified by the Pennsylvania Department of Public Welfare, the MHU receives admissions via the Pennsylvania civil commitment process and serves prisoners from other prisons in the region in addition to Cresson prisoners.  The MHU housed eight prisoners during our visit.  Several other MHUs exist throughout the PDOC system.

- **The Special Needs Unit ("SNU"):**  The SNU is for prisoners who, as a result of their mental illness or other disability, are vulnerable and require additional support and/or protection.  Two-thirds of the prisoners housed there are double-celled; the other third are single-celled.  The SNU is considered general population housing in terms of security operations, permissible property, and out-of-cell time.  The SNU housed 130 prisoners during our visit.

Finally, a few additional terms used throughout this letter are defined as follows:

- **Serious Mental Illness:**  In the context of this letter, we rely on PDOC's own definition of what constitutes serious mental illness.  PDOC currently defines serious mental illness as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pennsylvania Department of Corrections, *Policy 13.8.1.*, Section 2, Delivery of Mental Health Services § A.1.a.(2) (2010).

- **Intellectual Disability** is a disability characterized by a significant impairment in cognitive functioning and deficits in adaptive behaviors, such as communication, social skills, personal independence, and school or work functioning.

- **Intellectual Deficit** refers to preliminary indications of a potential intellectual disability, often on the basis of a low IQ, a review of documents, and/or observations of the prisoner.

---

[2]  In Section IV.C. of this letter, we discuss the harsh conditions in each of Cresson's isolation units in greater detail.

## IV.    THE MANNER IN WHICH CRESSON USES ISOLATION ON VULNERABLE PRISONERS VIOLATES THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION

Cresson uses isolation on prisoners with serious mental illness in a manner that violates their rights under the Eighth Amendment.  The Eighth Amendment prohibits prison officials from acting with deliberate indifference to conditions of confinement presenting a substantial risk of serious harm to prisoners.  *Farmer*, 511 U.S. at 828.  Deliberate indifference can be inferred where the risk of serious harm is obvious.  *Id.* at 842; s*ee also Hope v. Pelzer*, 536 U.S. 730, 738, 745 (2002) (finding officials deliberately indifferent where handcuffing prisoners to hitching posts for long hours resulted in an obvious and substantial risk of harm to prisoners); *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009) (holding that officers may be liable for prisoner's suicide under deliberate indifference standard).  Our understanding of what constitutes serious harm is not static, and the Amendment therefore requires us to consider "the evolving standards of decency that mark the progress of a maturing society."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *see also Davenport v. De Robertis*, 844 F.2d 1310, 1314-15 (7th Cir.) (1988), *cert. denied*, 488 U.S. 908.

Cresson has ignored obvious and serious risks in its approach to the use of isolation on prisoners with serious mental illness.  It has done so by:  (A) unnecessarily placing them into isolation for prolonged periods of time despite clear evidence in numerous cases that such conditions pose risks; (B) denying them adequate mental health care while they languish in prolonged isolation; and (C) combining prolonged isolation with other extreme conditions and unnecessary uses of force.  These practices violate the Eighth Amendment.

### A.  Cresson's Use of Prolonged Isolation Subjects Prisoners with Serious Mental Illness to a Risk of Serious Harm

Cresson's practice of subjecting prisoners with serious mental illness to prolonged periods of isolation under the conditions described in this letter has resulted in harm, including trauma, bouts of hysteria and extreme paranoia, severe depression, psychosis, serious self-injury and mutilation, and suicide.  Though Cresson is aware of numerous serious harms suffered by prisoners with serious mental illness in its isolation units, it nonetheless continues to use the same dangerous isolation units for these same vulnerable prisoners for months, sometimes years, at a time.

Solitary confinement and other forms of isolation are increasingly being practiced across the nation.  The forms of isolation, the conditions in which prisoners are held, the availability of mental stimulus, physical activity, and access to treatment and social interaction vary greatly.  Prison authorities run afoul of the Eighth Amendment when they are "deliberately indifferent to the serious risks posed by subjecting [prisoners with serious mental illness] to confinement in [isolation] for extended periods of time."  *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001).

While the potentially harmful effects of subjecting prisoners to certain forms of solitary confinement have long been recognized, *see, e.g.*, *In re Medley*, 134 U.S. 160, 168 (1890) (Supreme Court discussing prisoners who were held in extreme forms of solitary confinement without access to other human beings and noting that, "[a] considerable number of prisoners fell, after even a short confinement [in isolation], into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed

suicide"),[3] more recently, courts have noted that special risks may exist when those placed in prolonged isolation have certain serious mental illnesses that make them especially vulnerable to such conditions. *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995) (discussing particular conditions of isolation, and holding that some prisoners had mental health conditions that made them especially vulnerable to prolonged isolation, such that subjecting them "to conditions that are 'very likely' to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness cannot be squared with evolving standards of humanity or decency"). As one court has put it, using prolonged isolation on prisoners who are, because of their serious mental illness, "at a particularly high risk for suffering very serious or severe injury to their mental health" can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." [4] *Id.* Mental health experts, opining in the profession's standards of practice, have recognized that "[p]rolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates." American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012); *see also* American Bar Association, *Standards for Criminal Justice Standards: Treatment of Prisoners* ("ABA Standards") §§ 23-1.0(o), 23-2.8(a) (2011) (stating that prisoners diagnosed with serious mental illness should not be placed in isolation for more than 30 days because of its damaging effects); *Casey v. Lewis*, 834 F. Supp. 1477, 1548 (D. Ariz. 1993) (noting that "both the plaintiffs' and defendants' experts agreed that it was inappropriate to house acutely psychotic inmates in [isolation] for more than three days").

Moreover, long-term segregation of prisoners with mental illness may often be counterproductive to prison security or public safety. A commission chaired by former United States Attorney General Nicholas Katzenbach and Third Circuit Judge John J. Gibbons concluded: "The increasing use of high-security segregation is counter-productive, often causing violence inside facilities and contributing to recidivism after release." [5] Instead, General Katzenbach and Judge Gibbons recommended: "Caring for those who cannot be housed in the general prisoner population requires investing in secure therapeutic units inside prisons and jails staffed by mental health professionals who can handle troubled individuals without locking them in their cells all day." *Id.* at 61.

Notwithstanding the serious risks that may result from subjecting prisoners with serious mental illness to prolonged isolation, Cresson's staff routinely subject prisoners they have

---

[3] More recently, the Third Circuit has also recognized that that "prison authorities may [not] turn a blind eye to the mental and emotional state of prisoners" housed in isolation. *Peterkin v. Jeffes*, 855 F.2d 1021, 1030 (3d Cir. 1988) (nevertheless finding that conditions were not unconstitutional); *see also Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1117 (W.D. Wis. 2001) ("Prisoners in [isolation] who have no history of serious mental illness and who are not prone to psychiatric decompensation (breakdown) often develop . . . diagnoses such as paranoid delusional disorder, dissociative disorder, schizophrenia and panic disorder."); *Ruiz*, 37 F. Supp. 2d at 907 ("[Isolation] units are virtual incubators of psychoses–seeding illness in otherwise healthy inmates . . . .").

[4] *See also* Jules Lobel, *Prolonged Solitary Confinement and the Constitution*, 11 U. PA. J. CONST. L. 115 (2009).

[5] John J. Gibbons and Nicholas de B. Katzenbach, *Confronting Confinement, A Report of the Commission on Safety and Abuse in America's Prisons*, 14 (2006), http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

already identified as having serious mental illness to months, even years of solitary confinement. From January 2010 to March 2012, 125 prisoners on Cresson's active mental health roster spent 90 days or more in isolation,[6] and 27 of those spent one year or more in isolation. At the SSNU, a unit specifically designed to house prisoners with serious mental illness, each of the 28 prisoners who exited the SSNU in the two years preceding our review (2010-2012) spent an average of more than 656 days in isolation.[7]

Not only is the isolation often objectively long, but for prisoners at Cresson's SSNU, the isolation feels like it will never end. These prisoners are surrounded by others like them who almost never make it out of isolation (since 2010, only 5 of the 48 prisoners in Cresson's SSNU program have "graduated" out of isolation). According to our mental health consultant, prisoners "are provided no information about what is specifically expected of them to advance [out of isolation] and often remain 'stuck' . . . ." Our consultant went on to opine that advancement "appears to be based upon the subjective assessment of staff" with no "objective criteria . . . such as completion of a particular course of treatment or a specific time period without rule infractions." As one of the prisoners we spoke to told us, confinement at the SSNU "feel[s] like it will last for the rest of [your] life." A grossly disproportionate amount of the self-harm at Cresson occurs in its isolation units. Although Cresson houses most of its prisoners with serious mental illness in one of the non-isolation units, most of the self-harm involving prisoners with serious mental illness occurs in the isolation units. For instance, in 2011, 14 of the Prison's 17 documented suicide attempts occurred in the isolation units. In the last two years, two of the three prisoners who committed suicide were housed in one of the isolation units when they took their lives. Moreover, Cresson's records show that in 2011, there were dozens of incidents involving prisoners on the mental health roster engaging in self-harm in the isolation units, while just two such incidents occurred in the general population.

Below are examples of prisoners at Cresson who have suffered serious harm after prolonged periods of solitary confinement and inadequate treatment:

- On May 6, 2011, prisoner AA,[8] diagnosed by PDOC with delusional disorder and personality disorder with paranoid and narcissistic features, committed suicide after

---

[6] Based on a review of documents that include records of diagnoses, we and our expert consultant in mental health are confident that most of these prisoners have serious mental illness. Cresson separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need." Our expert consultant was clear that not only may prisoners in both of these categories have serious mental illness, but that Cresson far under-designates those having the most serious need for mental health services. The vast majority of the prisoners on the mental health roster who spent extended periods of time in isolation have a serious mental illness, and the proportion increases as the duration in isolation increases, further demonstrating the use of isolation in response to challenging behaviors associated with mental illness.

[7] For most of those with serious mental illness at Cresson who have spent more than 30 days in solitary confinement, their time in isolation is spent entirely in Cresson's isolation units. However, for a minority, the time in isolation consists of periods of confinement in both Cresson's isolation units and the isolation units of other PDOC facilities. The average indicated for those in the SSNU does *not* include time spent in the isolation units of other PDOC facilities. For some of prisoners, their time in Cresson's SSNU followed lengthy periods of isolation at other facilities.

[8] To protect the identity of prisoners, we use coded initials throughout this letter.

spending roughly nine months in isolation, consisting of three months at Cresson's RHU and six months at the RHU of another PDOC prison. After reviewing his records, our consultant told us that, following an April 6, 2011, POC placement for threatening suicide and self-harm, he received virtually no out-of-cell time. During a cell-side visit by a psychiatrist, he was described as "still paranoid delusional" but, despite the prisoner's active psychosis, the plan was merely to "re-check in 1 month." Ten days later, while still in isolation in the RHU, he committed suicide.

- In October 2010, prisoner BB, diagnosed by PDOC with schizoaffective disorder and major depressive disorder with psychotic features, tore open his scrotum with his fingernail while housed at the RHU after experiencing isolation and a lack of adequate treatment there for three months. In the three days preceding this incident, BB cut his arm with a staple, smeared feces on himself while complaining of hearing voices, and tore off a fingernail. After the incident involving BB injuring his scrotum, he told staff that "mental health won't listen to me so I'm pulling my nuts out." Instead of responding to this incident and the other instances of self-harm by providing him with the long-term treatment he needed, Cresson returned him to isolation after less than a month of treatment. Ten days later, he cut his wrists with a razor.

- Prisoner CC has been diagnosed by PDOC with schizophrenia and has a past diagnosis of an intellectual disability, a history of psychiatric hospitalization starting at age eight, and an IQ of 55. In July 2011, after spending nearly a year and-a-half in isolation, he had decompensated to the point of becoming an immediate threat to himself or others and was transferred to the inpatient treatment unit at the MHU (his third admission to the MHU in that year and-a-half). Nonetheless, ignoring CC's history of decompensation while in isolation, after three weeks at the MHU, Cresson officials returned him to isolation at the SSNU. There, his condition deteriorated again. He ingested objects such as sandwich bags and spoons. He cut his wrists. He tied a sheet around his neck. Cresson staff inappropriately minimized these serious acts of self-injury as "behavioral issue[s]." Then, when he swallowed a nurse's lancet (a plastic device containing a spring loaded needle), he had to be hospitalized and undergo surgery for the serious injuries he sustained. Again ignoring CC's extensive history of self-harm and decompensation while in isolation, after one month at the infirmary, staff again returned CC to isolation at the SSNU and failed to provide him with adequate treatment. CC remained desperate to get out of isolation, telling one of the staff psychologists, "I'm sick in the head, I'm psycho. . . . I'm just sitting in a dark cell with nothing to do."

- In December 2011, prisoner DD, who has an IQ of 70 and was diagnosed by PDOC with multiple mental illnesses, attempted to cut his throat with a razor after nearly five consecutive months in isolation at the RHU. DD had made several other suicide attempts and engaged in other instances of self-harm before this incident, including an August 2010 hanging attempt in an SSNU strip cage and an April 2010 hanging attempt at the SNU. Despite DD's suicide attempts and self-harm while in isolation and his multiple diagnoses, after placing him in the inpatient treatment unit at the MHU for a month, Cresson officials ignored these repeated warning signs regarding the risk of harm to the prisoner and returned him to an isolation cell at the RHU, where he remained at the time of our tour. At the SSNU, DD told us, "Here [in isolation] there's a lot of emptiness filled by other people's noises. The others prey on us – the [prisoners with serious

mental illness], the weak." There is "nothing to occupy your mind, just inmates and [corrections officers] taunting you."

- PDOC has diagnosed prisoner EE as having a schizoaffective disorder and an intellectual disability. When we toured in March 2012, EE was on his fifteenth month of isolation at Cresson. He had threatened or attempted self-harm or suicide at least 15 times during that period. In July 2011, after EE was in isolation for seven months, staff reported instances of him banging his head on the cell wall, smearing feces all over the cell, tearing the dressing off a hip wound, and digging his fingers into it to get it to bleed. Despite the prisoner's repeated self-harm while in isolation and his diagnoses, authorities held him in isolation for another eight months. Altogether, EE has spent roughly 7 of the last 12 years in isolation in PDOC facilities. EE told us that "isolation makes me want to rip my face off."

By not taking reasonable steps to address the risks described above, prison officials at Cresson have been deliberately indifferent.

**B. <u>Prisoners Subjected to Prolonged Isolation at Cresson Are Denied Adequate Mental Health Treatment</u>**

By subjecting prisoners with serious mental illness to prolonged periods of isolation, Cresson routinely prevents them from receiving adequate mental health treatment. Cresson officials cannot ignore conditions of confinement that have the obvious effect of preventing prisoners with serious mental illness from obtaining the mental health care they need. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). At Cresson, prisoners with serious mental illness cannot receive adequate mental health care while in solitary confinement for extended periods of time. *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [isolation]"); *see also Plata*, 131 S. Ct. at 1933 (acknowledging the concern that prolonged isolation results in inappropriate delays of mental health care); *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (noting availability of mental health treatment as a critical factor for assessing constitutionality of prolonged isolation but finding no violation where prisoner did not have mental illness).

According to our consultant on mental health and corrections, isolating prisoners with serious mental illness for prolonged periods often prevents them from receiving the therapeutic treatment they need at Cresson. Specifically, providing adequate mental health care to prisoners with serious mental illness requires meaningful out-of-cell activities, such as individual and group therapy, peer and other counseling, or skills building, as well as unstructured activities, such as showers, recreation, or eating out-of-cell.

The severe form of isolation used at Cresson – which often involves isolating the prisoner for 23 hours per day or more and depriving them of mental health care and other human interaction – prevents prisoners with serious mental illness from receiving even a fraction of the out-of-cell activities they need. At Cresson's RHU, prisoners identified by Cresson as having serious mental illness are offered zero hours of structured out-of-cell therapeutic activity and at most five hours of unstructured out-of-cell activity per week. Our consultant told us that the

prisoners with serious mental illness she observed at the RHU were "provided no treatment whatsoever except psychotropic medications (if they agreed to take them)."[9]

Prisoners placed into Cresson's POC, ostensibly to monitor them for suicidality or self-injurious behavior, often arrive there from and quickly return to another isolation unit. Conditions in the POC simply make placement there a part of prisoners' longer period of isolation. Many prisoners who experience this cycling through the POC are identified by Cresson as having serious mental illness and continue to be offered zero out-of-cell hours, despite their obvious need for treatment and other activities. Our consultant concluded that Cresson provides grossly inadequate mental health treatment at the POC and makes no effort to truly stabilize the prisoner before returning him to another isolation unit, where he will continue to deteriorate. She explained that, in the POC, "[t]here is little [therapeutic] intervention provided to inmates other than a psychiatric assessment within 72-hours of admission, monitoring by nursing staff and observation by correctional officers."

Even though all of the prisoners in Cresson's SSNU program have serious mental illness, prisoners there typically receive fewer than two hours of structured therapy per week, though many receive none. For unstructured out-of-cell activity, roughly half receive fewer than four hours per week.[10] Former mental health staff told us that SSNU management actively prevented them from providing meaningful treatment, instructing them to shorten the number and length of therapy sessions and to conduct "drive-bys."

Notably, one of Cresson's own psychiatrists explained to us the effect isolation has on his ability to provide adequate treatment. He told us that isolation can create "animal-like" characteristics in prisoners. He also admitted that at least some of the therapy the prisoners needed could not be provided to them while they remained in solitary confinement. According to this psychiatrist, individuals he treats at a nearby forensic hospital fare much better than his patients at Cresson because the hospital's patients are not in solitary confinement and can more readily access mental health care.

Staff are also inhibited in their ability to identify prisoners who are decompensating or at risk for suicide. *See Coleman*, 912 F. Supp. at 1298 n.10 (noting that identifying prisoners at risk of suicide is one of the six basic components of a minimally adequate prison mental health care delivery system); *see also Madrid*, 889 F. Supp. at 1259 (emphasizing the need for "adequate monitoring . . . on far more than just isolated occasions, particularly in the [isolation units]"). At Cresson, the practice of routinely leaving prisoners with serious mental illness locked away in cells behind solid doors with small cell-front windows interferes with mental health staff's ability to adequately identify and monitor those with acute symptoms in need of intervention.

---

[9]  Much of the mental health therapy prisoners with serious mental illness at Cresson receive is provided during cell-side visits. These visits in no way make up for the absence of meaningful out-of-cell therapeutic activity. Cell-side visits at Cresson involve mental health staff standing outside prisoner cells attempting to speak to the prisoners through cracks in door frames or food tray slots, amid the commotion on the unit. Such visits typically last for only a few minutes at a time, lack confidentiality, and cannot, on their own, be equated with structured, out-of-cell activity.

[10]  The data about out-of-cell hours in this paragraph remains true nearly seven months after our expert consultant provided Cresson staff with her assessment of their mental health program following our tour.

The following examples illustrate how prisoners in prolonged isolation at Cresson often were unable to obtain the mental health treatment they need:

- On July 16, 2012, prisoner FF committed suicide at the RHU where he had been placed a few days earlier for minor infractions.[11]  Since his admission to Cresson in June 2011, he had spent multiple 30-day stays in isolation and, despite a history of self-harm and suicide attempts, he continued to be placed in isolation, eventually leading to his death. Less than two weeks before the suicide, a psychiatry note recorded that FF had requested and felt he could benefit from "one to one counseling."  Ignoring both this request and FF's destabilized condition, the psychiatrist neither ordered the counseling nor referred him to Psychology.  Psychology staff visited him in December 2011 but did not see him again until May 2012.  His recommended June 2012 psychiatric visit did not occur until July 5, 2012, 11 days before his suicide.

- Between June 2011 and September 2012, prisoner GG, identified by PDOC as having an intellectual disability and impulse control disorder, attempted suicide four times and threatened self-harm six times while in isolation for all but one and-a-half months of that period.  After reviewing his records, our consultant told us that GG was provided no continuity of mental health care, that staff simply react crisis by crisis, and that after a crisis he is returned to isolation where he receives inadequate follow-up care.

  As a specific example, on June 21, 2011, after attempting suicide by hanging in which his face turned blue in asphyxiation at the RHU, he was placed in the POC for a week and then returned to isolation at the RHU.  Over the next month, he received no out-of-cell therapeutic activity and psychology staff conducted only three brief cell-side visits.  After the last of these visits, a psychology staff member noted that GG was hearing voices.  On July 27, 2011, he again was placed in the POC after attempting self-harm and threatening suicide.  Nevertheless, he was then returned to isolation at the RHU on July 29, 2011, where he again received no mental health therapy and grossly inadequate follow-up psychiatric care.  Four months later, still in isolation, GG again attempted to hang himself, this time by tying a sheet around his neck and anchoring it to a rail.

- PDOC has diagnosed prisoner HH with paranoid schizophrenia.  For most of his time at Cresson, staff have housed him in an isolation unit instead of providing him the mental health care he needs.  While isolated for extended periods of time, HH has experienced episodes of profound decompensation.  For instance, in November 2011, after three months in isolation at Cresson's SSNU, staff found HH lying in the fetal position in his cell, mumbling incoherently to himself.  Though staff responded by briefly moving HH to the MHU, where he received improved mental health treatment, in this instance (as with other instances like it), staff returned HH to isolation at the SSNU without stabilizing his condition and despite his history of decompensating in isolation.

---

[11]  FF received a misconduct for "refusing to obey an order" and for "presence in an unauthorized area" after an officer ordered him to return to his cell and he refused.  According to PDOC policy, both of these constitute less serious misconducts and are even eligible for an informal resolution rather than disciplinary time.

These examples illustrate how Cresson's practice of subjecting prisoners with serious mental illness to prolonged isolation routinely prevents them from receiving the treatment they need.

C. **Cresson Combines Prolonged Isolation With Other Harsh Conditions, Resulting in an Extreme Form of Isolation, Especially Harmful to Prisoners with Serious Mental Illness**

Cresson combines prolonged isolation with other harsh conditions. Those conditions include forced idleness through the stripping away of stimuli, punitive behavior modification plans, and excessive uses of force by staff. The combining of these conditions leads to an extreme form of isolation that is especially harmful to the psyche of prisoners with serious mental illness.

A condition of confinement such as isolation may combine with other harsh conditions to produce a single, identifiable unconstitutional threat to a prisoner's mental health. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need" they violate the Eighth Amendment). In other words, a combination of dehumanizing conditions may lead to an extreme form of isolation manifestly at odds with the Eighth Amendment's "evolving standards of decency." *See Young v. Quinlan*, 960 F.2d 351, 363-65 (3d Cir. 1992) (citing *Hutto v. Finney*, 437 U.S. 678, 685-87 (1978)) (holding that, under the totality of the circumstances, staff violated the Eighth Amendment when they placed a prisoner in isolation for four days, deprived him of running water, taunted him, and threatened to restrain him to a steel slab).

At Cresson, prisoners with serious mental illness are often subjected to a toxic combination of conditions that include: prolonged isolation, harsh housing conditions, punitive behavior modification plans, and excessive uses of force. These conditions, intended to control these prisoners' behavior, serve only to exacerbate their mental illness. Frequently, these conditions combine to do serious harm in the following way: a prisoner with serious mental illness is placed in isolation with inadequate mental health care, causing him to decompensate and behave negatively; staff respond by subjecting the prisoner to harsher living conditions, denying him stimuli, and/or using excessive force against him; the prisoner's mental health continues to deteriorate, and he begins to engage in self-injurious conduct (e.g., banging his head hard and repeatedly against a concrete wall, ingesting objects, or hurling himself against the metal furnishings of his room) or attempts to kill himself; staff eventually respond by placing him in the MHU – a unit where a limited amount of treatment is provided; as soon as the prisoner begins to stabilize, he is returned to isolation, and the prisoner's mental health again spirals downward.

Below we review the conditions that, *in combination,* make isolation at Cresson extreme:

**Baseline housing conditions in the isolation units are harsh.** The prison cell itself defines the contours of the prisoner's life. In the RHU and SSNU, cells are all less than 100 square feet in size. Each of the cells is barely large enough to contain its furnishings, consisting of a steel sink, a steel toilet, a steel desk, and a steel bed frame with a mattress. The POC cells are similar to those in the RHU and SSNU but have no desks or sinks. All of the isolation cells have solid metal doors with narrow slots at shoulder level wide enough for food trays to pass through, and small plastic windows, facing into the housing unit's common area. At the RHU

and POC, the cells have small exterior windows, but at the SSNU, there are no such windows, and cells have no natural light. While in their cells, prisoners hear other prisoners in the unit who are actively psychotic banging on doors or yelling. The banging and yelling they hear is frequent, loud, cacophonous, and stress-inducing.[12] The units also often reek of urine and feces, particularly in the SSNU.

In the isolation units, the out-of-cell conditions are also harsh. In the RHU and SSNU, staff allow most prisoners to have limited access to small, individualized, and caged exercise pens (the ones we observed in the SSNU were roughly 28 by 8 feet in size). In the isolation units, when a prisoner with serious mental illness receives out-of-cell therapy, the therapy is generally provided to the prisoner while he sits in a small cage roughly the size of a telephone booth. When moving between their cells and these out-of-cell facilities, prisoners are at all times escorted by officers and have their arms and legs shackled together.

Typically, staff prevent those in isolation, including those with serious mental illness, from having access to anything that could distract them from their idleness. None have access to television, most have no access to radio, and severe restrictions are placed on the amount of reading material a prisoner can have at any given time. One of the prisoners we spoke to in the SSNU – a prisoner who has attempted suicide on multiple occasions while in solitary confinement – told us he suffers in isolation, in large part, because he has absolutely nothing to do. He explained that while staff give him access to books, they are of no use to him because his intellectual disability prevents him from being able to read. For this prisoner, and others with serious mental illness, being left in a small cement cell, entirely alone with their thoughts, for months at a time, is mentally torturous and routinely leads to psychosis and a serious worsening of their mental health.

Most of the prisoners housed in the isolation units experience little in the way of human interaction. The typical prisoner rarely speaks to or sees others, except for when an officer peers through the prisoner's cell window during rounds, or the occasional mental health staff member asks about how he is doing. Facility staff severely limit the opportunities prisoners have to speak to friends or loved ones by telephone or during non-contact visits. The only human touch prisoners usually experience is when they are placed in handcuffs or restraints.

**Punitive approach to symptoms makes conditions in the isolation units even worse.** At Cresson, staff working in the isolation units are encouraged to use punitive behavior modification plans to address behaviors that are derivative of prisoners' serious mental illness. Our consultant severely criticized the Prison for over-relying on aversives, explaining that Cresson staff "have a misunderstanding that all behavior, even that which flows from untreated or under-treated serious mental illness is intentional misbehavior that must be punished rather than treated."

---

[12] Further contributing to the chaotic conditions at the SSNU is the placement there of some "RHU overflow prisoners" without mental illness because of a lack of space in the RHU. This blending of populations is harmful to both groups of prisoners. The RHU prisoners without mental illness yell at and abuse the SSNU prisoners with mental illness, while the RHU overflow prisoners are exposed to the unpleasant conditions that pervade the SSNU, especially the noise, odors, and frenzy that result from prisoners with serious mental illness becoming acutely symptomatic in the absence of mental health treatment.

Witnesses we spoke to, including members of the Facility's mental health staff, told us that aversives staff have used in response to behaviors mostly or entirely derivative of mental illness include:  forcing the prisoner to sleep on cement slabs without a mattress; denying the prisoner access to warm food and instead giving him nothing but "food loaf" to eat;[13] denying access to reading materials; denying the prisoner access to the caged, exercise pens; denying the prisoner access to showers; and restricting or eliminating the prisoner's already limited ability to make phone calls or engage in non-contact visits with loved ones or friends.

Also, by policy and practice, SSNU staff routinely respond to the prisoner engaging in behaviors associated with serious mental illness (such as shouting, throwing feces, or banging his head against a wall) by further restricting or even eliminating whatever minimal amounts of therapeutic unstructured and structured out-of-cell time a prisoner has.  This practice punishes the sickest of prisoners by depriving them of adequate treatment and other out-of-cell opportunities when they need it most.  In the words of our consultant, "[t]he SSNU … system actually withholds treatment from the most ill inmates. . . .  On its face, this mental health program is set up backwards:  sicker inmates should get the most intensive treatment."

**Staff hostility toward vulnerable prisoners with serious mental illness aggravates conditions in the isolation units.**  The punitive approach to prisoners in the isolation units has risen to a level where officers and staff are frequently hostile and cruel toward prisoners, even while knowing that these prisoners are more vulnerable because of their serious mental illnesses or intellectual disabilities.  For instance, three of Cresson's psychology staff told us that they had witnessed a senior member of the staff telling SSNU prisoners with intellectual disabilities that they had to sing, "I'm a little teapot" if they wanted to improve their living conditions and obtain more mental health treatment.  When we asked one of the alleged victims about being required to sing in this way, the victim looked embarrassed and sad, and explained, "I just couldn't remember the song."  Witnesses also told us that certain officers working in the SSNU withheld toilet paper from the prisoners, and that officers there tell prisoners to "go ahead and hang it up," encouraging them to commit suicide.  One prisoner told us that he had seen officers make fun of another prisoner by demanding he tell them a certain number before giving him his food.  "It was like they were testing his IQ, but in a mean way."  Another prisoner said he is routinely called a "retard" by officers.  Finally, many prisoners we interviewed volunteered that officers would routinely withhold their food, spit in their food, or throw their food on the floor simply to taunt or provoke them.  This hostility adds yet another layer of extremeness to the prolonged isolation prisoners with serious mental illness at Cresson are forced to endure.

**In the isolation units, staff's frequent use of unnecessary force on prisoners with serious mental illness also aggravates the harmful effects of solitary confinement.**  Cresson officials have countenanced the frequent, unnecessary, and excessive use of force on prisoners with serious mental illness housed in the isolation units.  *Cf. Hope*, 536 U.S. at 738-45 (holding that Alabama prison officials violated the Eighth Amendment and acted with deliberate indifference to a prisoner's health or safety when, despite the absence of an emergency, they knowingly subjected the prisoner to a substantial risk of physical harm and to unnecessary risk of physical pain by handcuffing his hands above shoulder height to a metal restraining post or "hitching post" for a seven-hour period, depriving him of bathroom breaks, exposing him to the heat of the sun, and taunting him).  Many of the applications of force on prisoners with serious

---

[13]  Food loaf is a bland mixture of vegetables, meat, and grains baked into a solid loaf.

mental illness at Cresson could be avoided entirely if the prisoners currently housed in isolation units were instead housed in therapeutic units providing adequate mental health treatment.

Among the unnecessary uses of force occurring in Cresson's isolation units are the excessive use of restraints and other practices involving prison officials acting with deliberate indifference toward prisoner safety. *Cf. Caldwell v. Luzerne Cnty. Corr. Facility Mgmt.*, 732 F. Supp. 2d 458, 471 (M.D. Pa. 2010) (involving placement of prisoners in five-point restraints for many hours). Full-body restraints that bind the prisoner's arms and legs to a stationary object, such as a bed or chair, are of particular concern because, under the best of conditions, they risk subjecting the prisoner to pain and mental stress, and when misapplied can easily result in cardiac difficulties, aspiration (breathing in of vomit), and positional asphyxia (death by respiratory obstruction).[14]

Because of the dangers associated with using full-body restraints, professional standards have been developed to delineate the scope of their use.[15] These standards require staff to only use full-body restraints in exigent circumstances, and only for the briefest time necessary to ensure the safety of the subject prisoner or those around him. As with all uses of force, staff have an obligation to explore alternatives to the use of full-body restraints as a means for controlling a prisoner's behaviors. Those alternatives include engaging in de-escalation techniques, giving the prisoner medicine, and/or providing additional mental health treatment.[16] Under current norms for using full-body restraints, their use should be closely and directly supervised and monitored by medical/mental health professionals, especially when they are used on prisoners with serious mental illness and for lengthy periods of time.

Departing from the well-established standards and alternatives noted above, correctional officers working in Cresson's isolation units use full-body restraints on the prisoners with serious mental illness not only to prevent imminent harm, but also to discipline or punish prisoners by using the restraints to cause discomfort or pain. We have good reason to believe full-body restraints are being misused in this way for a number of reasons.[17]

First, at Cresson, the average length of time that staff subject prisoners with serious mental illness to restraint chairs or four-point restraints is excessive. Our review of existing records concerning the use of full-body restraints in 2011 in Cresson's specialized units reveals

---

[14] Am. Psychiatric Ass'n, *Use of Restraint and Seclusion in Correctional Mental Health Care* (Dec. 2006).

[15] *See* ABA Standards (*citing Joint Comm'n on Accreditation of Healthcare Orgs., Preventing Restraint Deaths* (Nov 18, 1998)), http://www.jointcommission.org/assets/1/18/SEA_8.pdf; *Gen. Accounting Office, Mental Health: Improper Restraint or Seclusion Use Places People at Risk*, GAO/HEH-99-176 (1999).

[16] ABA Standards.

[17] At Cresson, two different restraint procedures may be used: security restraints and psychiatric restraints. While a shift commander authorizes security restraints, a psychiatrist must order psychiatric restraints. By policy, psychiatric restraints require face-to-face contact by a psychiatrist within 2 hours, constant monitoring by security staff, assessments by nursing staff every 15 minutes, and authorization by a psychiatrist to extend beyond 4 hours. Security restraints entail far less medical supervision and can be used for longer periods. Our mental health consultant found that at Cresson security restraints are often inappropriately substituted for psychiatric restraints for prisoners with serious mental illness.

that numerous prisoners with serious mental illness were placed in restraints for an average of 10.5 hours at a time, and on at least two occasions prisoners were held in restraint chairs for closer to 20 hours. When restrained, the prisoners typically were held in one fixed position in a windowless cement cell, were sometimes required to urinate while still in restraints, and wore only light smocks that left most of their bodies bare and exposed to the cold.

Second, at Cresson, restraints are oftentimes used when a prisoner with serious mental illness is already under control or not in a position to do further harm to himself or others. In 2011, staff video-recorded the initial application of restraints on a number of prisoners with serious mental illness, and we have reviewed a sampling of these recordings. Some of the recordings show that the prisoner involved was calm and compliant during the time period immediately preceding his placement in the full-body restraint. In other instances, documents indicate that the prisoner involved was in no condition to cause harm, having already seriously injured himself or just barely survived an attempted suicide. In such instances, the appropriate response is to take the prisoner to the clinic where he can receive medical and/or mental health treatment, not to place the prisoner in a restraint chair.

Third, we identified instances of officers applying additional force to prisoners with serious mental illness already in full-body restraints. These prisoners were clearly in no position to harm themselves or others. The willingness of officers to use additional force on immobilized prisoners by, for example, tasering them, suggests that the restraints and the other force tools used on the prisoners were employed to punish and cause pain, not to prevent imminent harm.

Finally, Cresson departs significantly from established protocols by routinely failing to have mental health professionals supervise or direct the use of full-body restraints on prisoners with serious mental illness. Mental health professionals are the only ones who have the ability to assess the effect of continued use of a full-body restraint on a prisoner with serious mental illness and whether another intervention, such as medication or additional mental health treatment at the MHU, would be more appropriate. Nonetheless, at Cresson, at most, mental health professionals are merely consulted when restraints are first applied on a prisoner with serious mental illness and are routinely left out of the decision to use restraints altogether. For example, we found that in 2011, 52 percent of the time that restraints were used, a mental health professional was not even at the Facility when full-body restraints were used on a prisoner with serious mental illness.

Below are examples of uses of full-body restraints that were excessive and unnecessary:

- Staff responded with force to numerous instances of self-harm involving prisoner JJ, who has depressive disorder and an extensive history of self-harm, between January and February 2011. This force included the use of unsupervised restraints in response to an attempted suicide by hanging while in the MHU, even after he vomited and gasped for air, and restraints lasting more than eight hours in response to cutting while in the POC. In response to self-harm on another occasion in an RHU overflow cell in the SSNU, officers placed JJ into four-point medical restraints. When JJ requested a mattress for the bed before being placed in restraints, officers took this as a sign of non-compliance and forcibly placed him onto the bed, deploying a handheld electronic body immobilization device ("EBID"), or tasing device, on JJ's back. JJ continued to struggle and harm himself, and he coughed repeatedly, but this did not prompt medical attention. On the video of the restraint, an officer observing JJ bang his head against the metal bed can be

heard saying that he is going to "place a fucking helmet on his fucking head."  JJ remained in four-point restraints for nearly 15 hours.

- On July 21, 2010, prisoner KK, who has an extensive history of self-injury and was diagnosed with a depressive disorder, ran headfirst into his cell door in the POC. Officers found KK unresponsive and lying on his back.  After a brief medical evaluation, officers placed him into a restraint chair and deploying an EBID twice during the placement.  While restraining him in the restraint chair, officers "exercised" KK – a process during which one limb at a time is removed from restraints.  When KK's left leg was exercised, he began kicking.  Officers responded by twice applying a handheld EBID.  Later, during another exercise, a handheld EBID was applied again when he had only one limb removed.  A third time, during exercise, officers applied a handheld EBID four times and deployed pepper spray on his face twice while he had only one limb removed.  It appears KK's total time in the restraint chair neared 24 straight hours.

- CC (see above) has told staff that being "locked down" causes him to engage in self-injurious behavior, but staff have largely dismissed his behaviors as "malingering" and often respond to self-harm by using force.  On July 4, 2011, he was placed into a restraint chair for more than 19 hours after banging his head against the wall in POC and threatening self-harm.  On five previous occasions between February and March 2011, he was placed in the restraint chair for periods lasting between 7 and 15 hours.

The uses of force described above and others like them are cruel and unnecessary. Instead of increasing compliance with prison rules, Cresson's use of excessive force on prisoners with serious mental illness without any meaningful mental health supervision or intervention has the effect of further traumatizing the prisoners, intensifying their psychotic episodes, and exacerbating their mental illness.  Subjecting prisoners with mental illness to ever harsher treatment in response to behaviors derivative of their illness does nothing but accelerate their mental deterioration and intensify their mental torment and anguish.

The experience of prisoner LL while he was housed at the SSNU shows how mutually reinforcing conditions at Cresson combine to subject prisoners with serious mental illness to an extreme form of isolation.  Prisoner LL, who has an IQ of 70 and was diagnosed by PDOC with schizoaffective disorder, spent two and-a-half years in isolation at Cresson's SSNU, beginning in January 2009.  In December 2009, LL told psychology staff that officers were taunting him for days in a row by opening his tray slot but not delivering his evening meal.  He alleged that taking his medications on an empty stomach was causing him to vomit.  Soon after, an officer then allegedly dropped his food on purpose, causing it to spray all over his cell.  LL told a staff member that he did "go off" and break his tray because he "could not take it anymore, how they were messing with my meals."  The officers responded by placing him in an SSNU concrete observation cell, though officers claimed they placed him there because he was threatening to harm himself.

He was placed in this cell for roughly a week with no mattress or pillow and only a suicide smock and blanket.  Instead of regular meals, he was given food loaf.  According to the psychology records, he was also denied out-of-cell visits by psychology staff.  One psychology staff member told us that he had asked officers to permit him to speak with LL outside of the cell on at least four occasions, but each time his request was denied.

Even after LL returned to a regular SSNU isolation cell, security staff denied a psychology staff request to counsel LL out-of-cell, allegedly because LL had been kicking his cell door earlier in the day. When a psychology staff member spoke to LL, LL explained that he had kicked the door only because he desperately wanted toilet paper to avoid having to use his hand to clean himself after defecating.

A staff member told us that in February 2010, after LL left a treatment meeting with mental health and security staff, the chief psychologist allegedly mocked LL, saying to the unit manager, "Oh, please don't mess up my 43 IQ."

Between March and July 2011, Cresson management formally implemented a behavioral modification plan severely restricting LL's access to stimuli and making his housing conditions harsher. The plan noted that LL's "acting out behavior" was a "result of significant psychosocial, emotional and cognitive deficits," but nonetheless required that he be stripped of everything but a suicide smock and that he receive food loaf "to safely alter his behavior." Then the plan outlined that over time if he acts "with positive adjustment," he can be given an anti-suicide blanket, regular meal tray, a jump suit, boxers, a mattress, a pillow, socks, shoes, and bed linen, but only in increments appropriate to alter his behavior.

During these five months, LL fell into the downward spiral described at the beginning of this section. Staff reported to us that at no time during that period was he offered group therapy, one-on-one therapy, or therapeutic materials. By May 2011, he was smearing feces on the wall of his cell. By July 2011, he was threatening self-harm. On July 2, 2011, he tied a sheet around his neck after other prisoners told him to do so. On July 5, 2011, he was found banging his head on his cell walls. Cresson responded by placing him in a restraint chair for 10 and-a-half hours in the concrete observation cell. After being released from the restraint chair, Cresson kept him in the concrete cell without a mattress wearing only a smock for six days. A mental health staff member who was allowed to visit him at that time told us that LL's condition had deteriorated to the point of him having virtually no ability to lift himself up or talk. On July 13, 2011, LL refused to wear his suicide smock, went to his treatment review meeting naked, and later smeared feces in his cell while naked. Cresson transferred him out of its Facility three weeks later in August 2011.

This example shows psychological and physiological damage resulting from Cresson's use of extreme isolation in combination with a lack of adequate treatment.

## V. SYSTEMIC DEFICIENCIES GIVE RISE TO CRESSON'S OVERRELIANCE ON ISOLATION AS A MEANS OF CONTROLLING ITS PRISONERS WITH SERIOUS MENTAL ILLNESS

The unconstitutional use of prolonged and extreme isolation on prisoners with serious mental illness described above has come about because of systemic deficiencies relating to Cresson's mental health care program. Instead of having systems in place to ensure it is providing adequate mental health care throughout the Facility, Cresson uses isolation to control and warehouse prisoners with mental illness as they become more ill and less stable.

The deficiencies at Cresson include: (A) a system-wide failure of security staff to consider mental health issues appropriately and a marginalization of the concerns of the mental health staff; (B) a fragmented and ineffective mental health care program; and (C) ineffective mechanisms for assessing the quality of the mental health care program and the level of risk to prisoners with serious mental illness. These significant and obvious deficiencies have not only led to the unconstitutional use of isolation on prisoners with serious mental illness, they also pose a direct and serious risk of harm to the Facility's prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny Cnty. Case*, 612 F.2d at 761-63 (Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

### A. Cresson Creates Excessive Risk of Serious Harm by Marginalizing Mental Health Staff and Failing To Appropriately Account for Mental Health Considerations

At Cresson, no meaningful collaboration exists between security staff and mental health staff. Consequently, too often security staff fail to solicit or adequately consider the opinions of mental health staff when making decisions impacting the conditions of confinement of prisoners with serious mental illness. This marginalization occurs in a variety of contexts, including the process for deciding: (1) whether and for how long to place prisoners with serious mental illness in isolation at the RHU; and (2) which prisoners have to share RHU cells.

#### 1. Cresson fails to take mental health care considerations into account appropriately in the course of disciplinary hearings held to determine whether to subject prisoners to isolation at the RHU

Cresson ignores the serious risks associated with failing to consider the role mental illness may play in causing prisoners to engage in disciplinary infractions. As a result, Cresson ends up punishing some prisoners with serious mental illness for the uncontrollable outward manifestations and symptoms of their mental illness by placing them in solitary confinement instead of providing them with adequate mental health care. For instance, when prisoners with serious mental illness cut themselves as a result of their illness, Cresson often punishes them for doing so by placing them in prolonged or otherwise dangerous solitary confinement and restricting their access to mental health treatment. *Cf. Arnold on behalf of H.B. v. Lewis*, 803 F. Supp. 246, 256 (D. Ariz. 1992) (holding that isolating a prisoner "as punishment for the symptoms of [his] mental illness and as an alternative to providing mental health care" violates the Eighth Amendment).

At Cresson, when the prisoner has been identified by the Facility as having serious mental illness, mental health staff have no formal role in determining the appropriateness of disciplining the prisoner with RHU time. Consequently, the hearing examiner and others involved in placement determinations routinely decide the prisoner's fate with an insufficient understanding of the extent to which mental illness or disability played a role in the prisoner committing the infraction at issue, resulting in the prisoner being punished with isolation for conduct over which the prisoner had little or no control. Specifically, a PDOC policy statement provides that mental health staff may "recommend that the sanction be reduced" for those on the mental health roster, but no guidance is provided regarding when mental health staff should weigh in during the disciplinary process or whether placement into isolation may pose a serious risk to the mental health of the prisoner. The hearing examiner told us that mental health staff never participate directly in the disciplinary process, though sometimes correctional staff relay to

him, on an informal and inconsistent basis, information they have obtained about the mental health of the prisoner whose conduct is under consideration.

Even in cases in which the prisoner is found to have willfully violated a prison rule that justifies punishment, failing to consider mental health issues as part of the disciplinary placement process subjects prisoners with serious mental illness to an excessive risk of serious harm. The failure to obtain input from mental health staff means that the hearing examiner and others involved in the placement process may routinely commit prisoners to extended periods of isolation without fully appreciating the serious harm that will be done to the prisoners' mental health because of it.

### 2. Cresson fails to account for mental illness when deciding which prisoners have to share RHU cells

Special concerns are raised when double-celling in isolation prisoners whom the facility has identified as having serious mental illness and may therefore be vulnerable. Cresson fails to properly assess whether a prisoner faces a substantial risk of harm as a result of double-celling. *Tillery*, 907 F.2d at 427 (holding that one relevant factor in determining the constitutionality of double-celling is when "violent, delusional and predatory inmates are often placed with inmates who are unable to protect themselves") (internal quotations omitted); *Clark v. California*, 739 F. Supp. 2d 1168, 1181 (N.D. Cal. 2010) (holding that, under the ADA, the prison must take extra caution before double-celling where prisoner is especially vulnerable because of a disability). Unfortunately, Cresson's current procedures and practices compromise proper screening.

First, when the Facility considers double-celling a prisoner on the mental health roster with someone not on the roster, mental health staff are not explicitly asked to assess the suitability for double-celling of the prisoner not on the roster or the potential for victimization of the prisoner on the roster. Double-celling decisions are therefore made without fully assessing whether the behavior associated with the prisoner's mental illness would be viewed by the cellmate as odd, irritating, or antagonistic, or whether the prisoner with serious mental illness is easily manipulated, submissive, or unlikely to report threats or harm.

Second, when mental health staff weigh in on double-celling decisions at the RHU, their opinions are not given appropriate weight. The circumstances leading to a March 2011 incident involving the beating, hogtying, and sodomizing of a prisoner with serious mental illness by his RHU cellmate speak to how the Facility marginalizes mental health staff when making double-celling placement decisions at the RHU. In that case, the records show that a member of the psychology staff repeatedly warned against keeping the victim, prisoner II, double-celled with prisoner QQ, who ultimately assaulted II. Prior to the assault, the psychologist emphasized the need to transfer the threatening prisoner to his own cell. In writing, he warned prison authorities that he believed prisoner QQ "presented as anxious & agitated," and that "concerns exist that this [prisoner] might actually act out in a lethal manner." The assault occurred, in large part, because the views of the mental health professional were ignored.

Cresson's marginalization of mental health considerations in the context of decisions to isolate and double-cell prisoners are but two manifestations of a facility-wide problem. Mental health staff we spoke to alleged that, at Cresson, the priorities of those working in security routinely trump important mental health considerations. Too often decisions are made through the prism of maintaining order in the manner most convenient to security, without adequately considering the implications of those decisions on prisoner mental health.

**B.** **System-Wide Deficiencies in the Mental Health Treatment Program Pose a Serious Risk of Harm to Prisoners and Cause Cresson To Resort to Using Prolonged Isolation on Prisoners with Serious Mental Illness**

The inadequacies of the mental health treatment program at Cresson subject prisoners to excessive risk of serious harm and cause staff to resort to prolonged and extreme isolation in the absence of treatment options. Resorting to what amounts to warehousing prisoners in isolation, instead of providing them with the mental health treatment they need, results in serious harm, and the Eighth Amendment prohibits this type of deliberate indifference to prisoners' serious mental health care needs. *See Inmates of Allegheny Cnty. Case*, 612 F.2d at 761-63. Systemic deficiencies in Cresson's mental health care program include: (1) a dearth of mental health treatment for prisoners throughout the Facility; (2) the absence of a functioning secure residential treatment unit for prisoners who require such placement; and (3) inadequate coordination among mental health care providers.

1. **The grossly inadequate mental health care Cresson provides to prisoners in the general population leads to psychiatric deterioration and placements in the isolation units**

Inadequate mental health treatment at Cresson has significantly compromised the mental health of many of Cresson's prisoners and led to a higher incidence of self-injury. In the course of our review, we came across many cases where the absence of mental health care contributed to decompensation, self-injury, and/or a behavior leading to a transfer to an isolation unit. For example, in the case of prisoner RR, the absence of appropriate mental health treatment while he was housed with the general population probably contributed to his death. RR committed suicide in March 2012. Our consultant reviewed the suicide and concluded that his case "illustrates the absence of any mental health care other than psychotropic medications which were prescribed without clear diagnostic indications or objective measures of any response. Psychiatric follow-up lacked even a modicum of continuity of care."

Care at Cresson is inadequate largely because there are not enough mental health professionals to service such a large pool of prisoners with mental illness. Our consultant concluded, and psychology staff confirmed, that the psychology staffing complement is far too low given that over a quarter of Cresson's 1,600 prisoners are on the mental health roster. *See Inmates of Allegheny Ctny. Case,* 612 F.2d at 63 (noting that "[t]he key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances"). In the view of our consultant, because of staffing shortages, the Facility's mental health professionals simply do not have enough time to provide adequate care. *Cf. Plata*, 131 S. Ct. at 1933 (noting that "shortfall of resources relative to demand contributes to significant delays in treatment"). She noted that prisoners in general population, regardless of their need, receive, at most, monthly visits by psychology staff and very little programming. When we toured, Cresson's leadership conceded that they had serious staffing shortages and expressed a desire for more mental health staff contacts with prisoners.

At the SNU, the mental health care programming is no better than the programming provided to those housed in the rest of general population. While there are some organized activities for the SNU prisoners, none of them are led by mental health staff or qualify as mental health treatment.

The institution has also unnecessarily exposed prisoners with mental illness housed in the SNU to stigmatization and harassment by other prisoners. Specifically, the institution's failure to provide medications at the SNU means that SNU prisoners can only obtain their medications by standing in line for them with prisoners from general population who routinely harass and tease them. As a consequence, SNU prisoners often avoid getting their medications, which in turn leads to them decompensating and cycling through various isolation units and the MHU. As with other services, medications should be brought to the SNU if SNU prisoners cannot safely visit other parts of the Prison to access them.

Poor screening and diagnostic procedures also contribute to system-wide inadequacies in mental health care. Our consultant found that Cresson routinely understated the mental health care needs of those on its mental health roster. She is of the view that the majority of the 450 prisoners on the roster have serious mental illness but that many have had their conditions "under-classified" in ways that significantly understate the severity of their mental illness. Cresson's practice of under-classifying prisoners' mental illness leads to management underestimating the amount of mental health care, programming, and staffing needed at the Facility.

## 2. In the absence of a functioning secure residential treatment unit, Cresson resorts to using isolation on prisoners with serious mental illness when it cannot safely house them in the Prison's general population

Cresson, which has a large population of prisoners with serious mental illness, should have a secure residential treatment unit for those whose condition prevents them from being housed with the general population. Instead, Cresson punishes such prisoners with isolation either in the SSNU or the RHU, and torments them with punitive behavior modification plans.

Cresson's obligation under the Eighth Amendment to provide adequate mental health care exists irrespective of whether prisoners have serious mental illnesses that preclude them from being housed in a less secure general population environment. *See Madrid*, 889 F. Supp. at 1259 (noting that mental health care must be adequately provided no matter where prisoners are housed); *see also Young*, 960 F.2d at 363-65 ("The touchstone is the health of the inmate."). Moreover, as discussed above, Cresson must make reasonable modifications to its policies, practices, and procedures so that these prisoners can avail themselves of the same services, programs, and activities available to prisoners without disabilities. *See Chisolm*, 275 F.3d at 324-25.

Cresson must commit the necessary resources, including: adequate therapy staff for therapeutic group and recreational programs; psychiatric nurses, psychology staff, social workers, psychiatrists, and unit management staff sensitive to the needs of prisoners with mental illness; correctional officers with specialized training on how to work with prisoners with serious mental illness and a demonstrated history of compassion, flexibility, and professionalism; adequate private office space for treatment records; cells that afford adequate observation and

communication; indoor and outdoor recreational facilities; and secure group program space adjacent to prisoner cells.[18]

Currently, Cresson has nothing that even resembles a functioning secure residential treatment unit. The SSNU falls far short for many reasons. First, in the absence of clear PDOC policies concerning how long prisoners at the SSNU can be placed in solitary confinement, Cresson management has adopted procedures that have led to prolonged periods of isolation for most of those housed in the unit. Instead of treatment, the overwhelming majority of the prisoners at Cresson's SSNU experience only extreme isolation, punitive behavior modification plans, and unnecessary uses of force. Second, by PDOC policy, prisoners can only be placed in the SSNU after they have had repeated placements in isolation at one or more of PDOC's RHUs. No meaningful treatment unit would condition treatment on months of solitary confinement. And third, PDOC has not committed the resources required to make the SSNU a fully functioning secure residential treatment unit.

### 3. Cresson's mental health providers fail to coordinate their efforts, resulting in placement in isolation and mental decompensation

The lack of coordination among the various providers of mental health care at the Facility leads to dangerous placements of vulnerable prisoners into isolation, disrupts treatment, and results in a lack of continuity of care.

#### a. Mental health staff fail to coordinate their efforts

While Cresson may have justifiable reasons for contracting for psychiatric staff while using PDOC psychology staff, it has not integrated them well. Instead, care is provided on parallel tracks, which undermines continuity of care. There are myriad meetings among the various mental health staff, but they are duplicative and are not transcribed or memorialized. Also problematic, psychiatrists are regarded as "consultants" rather than treatment team leaders. Thus, psychiatrists' authority is essentially limited to prescribing psychotropic medication and initiating the MHU commitment process.

The disconnect between psychiatry and psychology staff has contributed toward dangerous discharges from the MHU to the SSNU. The psychiatry administrator, who oversees the MHU, did not know that almost all of those discharged from the MHU to the SSNU are then placed in solitary confinement. He believed he could stabilize prisoners on the MHU and discharge them to the SSNU to continue their treatment and out-of-cell programming. His limited understanding of the extent of the mental health care provided to prisoners at the SSNU has resulted in discharges from the MHU to the SSNU that have caused serious harm to prisoners with serious mental illness.

Deficiencies in the way in which mental health staff document their work contributes to the lack of coordination between mental health providers. Mental health staff document their interventions and observations in different places, creating a fragmented picture of each prisoner's needs and program of care. For example, psychology staff document their interactions with prisoners in the Inmate Cumulative Adjustment Record ("ICAR"). Sometimes, the identical information is entered into the prisoner's medical record, but other times, it is not. Contract

---

[18] Charles L. Scott, HANDBOOK OF CORRECTIONAL MENTAL HEALTH 461 (2d ed. 2010).

psychiatry staff, on the other hand, have access to and document all of their interactions in the medical record, not the ICAR. Certain units use other files and charts. For example, there is a separate record for prisoners in the MHU and a separate "green file" for prisoners in the SSNU. This disjointed approach compromises communication and treatment planning, creates confusion, and leads to dangerous discharges from the MHU.

The failure of Cresson's mental health providers to adequately coordinate their efforts as well as the various other system-wide deficiencies in mental health care discussed above not only directly lead to serious harm by causing deterioration in the mental health of prisoners, they also lead to the security staff resorting to extreme isolation as a method for maintaining order in the Facility. This response to mental illness merely accelerates the downward spiral of psychiatric decompensation, inevitably leading to serious injury and death.

C. **Deficient Oversight Mechanisms Prevent the Prison From Adequately Addressing Systemic Failures in its Mental Health Program and the Harmful Effects of Its Use of Isolation on Prisoners with Serious Mental Illness**

Deficient oversight mechanisms have undermined Cresson's ability to recognize and address the harmful effects of its use of isolation, as well as systemic problems concerning its provision of mental health care. Cresson neither collects necessary information, including critical incidents and information about the use of isolation, nor properly reviews and responds to the information it does have. The Prison's response to suicides and suicide risk is especially problematic. This flawed oversight system inhibits Cresson's ability to identify and respond to trends or patterns of harm.

1. **Cresson's failure to report critical information hinders the Prison's ability to identify underlying systemic problems relating to its use of isolation**

Because Cresson fails to report critical information in tracking documents, the Prison has an incomplete understanding of the levels of harm occurring there. The severity of the harm and its concentration in the isolation units should have prompted the Prison to track this information.

First, threats of suicide and incidents of self-harm are not reported in the primary incident tracking document (Extraordinary Occurrence Reports or "EORs") and therefore not tracked to assess potential trends, such as whether such harm is occurring in particular units. Only when the incident rises to the level of a "suicide attempt" is it reported in the EOR. For example, we discovered the self-castration attempt at the RHU by prisoner BB in October 2010 not by reviewing data but because a prisoner told us about it. Other incidents not reported in the EORs included a prisoner banging his head against the wall at the SSNU, resulting in a POC admission and, a prisoner threatening suicide accompanied by a hunger strike resulting in 18 missed meals.

Second, the failure to report serious incidents in the EORs also hinders the Prison's ability to assess the adequacy of mental health care in the non-isolation units. For example, recent incidents in the SNU involving a prisoner with serious mental illness diving into a concrete landing, a prisoner with serious mental illness and an intellectual disability taking 29 pills, and a prisoner with serious mental illness and intellectual deficits injuring his neck with a pen were not tracked.

Third, many instances of prisoner-on-prisoner violence are likewise not reported in the EORs and are therefore not available for the Prison to assess trends and patterns to prevent further harm, particularly where vulnerable prisoners are involved. In one case, on June 14, 2011, prisoner SS was found bloody and unconscious in his RHU cell with cellmate TT. In another in the SNU, on July 11, 2011, prisoner UU – who is diagnosed with schizophrenia – poured boiling water on prisoner VV – who is diagnosed with paranoid schizophrenia and post-traumatic stress disorder and has an IQ of 48 – causing blistering. We only learned about these incidents by piecing together non-electronic documentation that is unlikely to be thoroughly reviewed by Cresson officials.

Finally, Cresson fails to accurately report lengths of stay in Cresson's SSNU in its tracking document, the semi-annual reports. It is often impossible to determine from the reports whether prisoners are spending consecutive stays in isolation, or if those stays are broken up by less restrictive periods. Similarly, information is not collected regarding the amount of time prisoners with serious mental illness are held in the RHU. The lack of such critical information weakens the Facility's ability to assess areas for improvement in the mental health treatment program serving especially vulnerable prisoners in especially harsh conditions. The supervisory mental health staff told us that they view isolation as an appropriate practice, even when prisoners show serious signs of decompensation. In other words, the Prison's mental health program does not consider periods of isolation or even signs of decompensation to be important information the Prison should collect and assess.

### 2. Cresson's failure to properly review and respond to critical information prevents it from properly identifying or correcting its overreliance on isolation and inadequate mental health treatment

To the extent that Cresson staff review serious incidents, their reviews often ignore or gloss over key issues regarding the Prison's isolation practices and mental health treatment program. Prison officials have an obligation to "cure [their] own lack of attention and unresponsiveness to inmate complaints and other indicators of serious problems." *Tafoya v. Salazar*, 516 F.3d 912, 917 (10th Cir. 2008) (reversing grant of summary judgment in case where female prisoner alleged sexual assault by officer, and prison leadership failed to have an active presence at the jail or to address known deficiencies); *see also A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 583 (3d Cir. 2004) (concluding that evidence of the lack of policy for reviewing and following up on incident reports supported plaintiff's deliberate indifference claim). This flawed review process complicates PDOC and Cresson's ability to identify trends and correct problematic processes or policies regarding isolation, risk of harm, and mental health treatment.

### a. The harmful effects of Cresson's use of isolation on prisoners with serious mental illness and other systemic problems concerning Cresson's mental health program have gone undetected by Cresson, in part, because of deficient reviews of suicides and suicide attempts

The Prison's reviews of suicides are inadequate, and suicide attempts are not reviewed at all. Consequently, the Prison cannot accurately assess underlying systemic deficiencies, including the excessive use of isolation and inadequate mental health treatment that place prisoners at risk of such serious harm. Our consultant noted that the suicide prevention program "is highly problematic in a number of areas that include unsafe POC cells, incorporation of

placement in RHU as a component of the treatment program, failure to intensify treatment efforts and intensity following crisis, [and] failure to provide adequate mental health care and critically review suicides and serious suicide attempts to identify areas for improvement." As a preliminary matter, while we commend the Deputy Superintendent for attempting to provide appropriate oversight, the clinical review should not be led by someone who has no clinical background.

We are especially concerned, however, that a general belief exists at the Prison that the suicides that occur at the Facility are essentially inevitable and could not have been prevented. This message is then transmitted to staff. Without first understanding the contributing factors that can lead to suicide and the realities of serious mental illness, the Prison cannot take effective steps toward a solution. Thus, the internal reviews conclude that none of the Prison's own missteps could have led to the suicide, even though the evidence is clear that Cresson is doing many things wrong. The culture regarding suicide prevention must change.

It does not appear that the Prison has done a comprehensive assessment of suicide risks. Instead, its assessment occurs on a suicide-by-suicide basis. We observed suicide hazards in the RHU and POC. In the RHU, the coat hook, which is supposed to break away under pressure, was stuck. In the POC, poor visibility and blind spots in the cells and tie-off points on the beds remain. Also, based on documents we reviewed, officers sometimes responded to attempted hangings by securing prisoners with handcuffs before cutting the prisoner down. This demonstrates a need for training.

Each of the suicide reviews conducted since 2011 suffered from numerous serious deficiencies:

- **May 2011:** As our consultant noted with respect to the suicide in May 2011, "The institution's suicide review was critical of correctional observation/monitoring in the RHU but didn't even mention the serious problems with mental health care." For example, "[t]he mental health review neglected to mention [AA's] numerous previous POC admissions; the lack of follow-up after the April Cresson POC admission; the assessment of the inmate by the psychiatrist only at cell-front; the lack of any other mental health contacts except during rounds at cell-front; the observation that the inmate was not only delusional but acting on the content of his delusional belief system in his interactions with prison correctional staff." The review did not consider the potential role of isolation in AA's condition.

  Even the review's treatment of correctional practices was problematic, as it minimized the possible link between AA's death and the delay in officers' response. There is no medical support for the review's assumption that this delay did not contribute to the death. We are concerned that, while staff were disciplined, the response did not match the failure, as the failure was not given due weight. Specifically, the Prison identified the failure to immediately investigate the prisoner not responding to requests to take down a covering he had placed over his cell window and the decision to instead continue rounds, as well as the failure to bring a radio outside once staff did investigate, thus requiring the officer to return to the unit to call for help and delaying medical response. Security staff

also conducted cursory rounds, even though they knew many of the prisoners had serious mental health needs.[19]

- **March 2012:** While the review of prisoner RR's March 2012 suicide, which occurred in the general population, was somewhat more thorough with respect to mental health treatment, it included significant flaws. We are especially troubled by the attitude of the Deputy Superintendent who led the review that the Prison received no "red flags" and that the suicide could not have been prevented. It is inappropriate to send this message to the staff when a prison is short-staffed and when the prisoner did, in fact, communicate his own depression to staff.

  The conclusions that no "warning signs" existed and that the prisoner "voiced no concerns" were simply untrue. So was the finding that RR had been seen regularly by clinical staff. The review also minimized the lack of continuity of care and the impact of deviation from policy requirements on the frequency of visits by mental health staff even while acknowledging that RR was twice "seen out of the 90 day rule" for prisoners on the mental health caseload and despite recent changes in his diagnosis, increases in his medication, and reports that he was having nightmares about stabbings in prison.

- **July 2012:** The most recent suicide review – that of prisoner FF – had similar deficiencies. The review emphasized that there were no warning signs that FF intended to commit suicide, noting "the inmate was a person of average intelligence so he could have asked for help if he felt the need." In fact, FF clearly did ask for help. The review notes that FF expressed concern that his medications were not working but makes no mention that he specifically requested counseling. Rather than acknowledging FF's own requests, the review credits the accounts of other prisoners describing a happy and laughing FF the day he committed suicide. In doing so, the review fails to recognize that prisoners often mask their anxieties from other prisoners for fear of revealing their weaknesses.

  The review also emphasized an unusual event in FF's life as the trigger for his suicide without acknowledging that prisoners with mental health concerns need added support so that they can confront these inevitable challenges. Had FF received timely and better continuity of care that facilitated building a meaningful clinical relationship, or had he received out-of-cell therapy or been diverted from isolation, he might have had the therapeutic resources to deal with his serious personal issue.

  The review overstates the amount and quality of treatment provided to FF and does not consider the potential effects of isolation. According to the review, FF "was being seen regularly by psychology, psychiatry and his counselor." The review groups the staff together when, in fact, visits by each staffing complement were infrequent. Indeed, the review notes that psychiatry visited him only "sporadically." Moreover, the review minimizes the untimeliness of the June psychiatric visit by stating that he was still "seen

---

[19] These failures in security and supervision practices, identified by Cresson itself, also demonstrate a lack of training for security officers regarding proper response to warning signs by prisoners with serious mental illness, including immediately involving mental health staff and conducting proper rounds, particularly in units housing prisoners with serious mental illness.

within a 90 day period which was within policy and exceeds the standard of community care." However, if a psychiatrist orders a 60-day visit to more closely monitor a patient, then the standard is that the patient should be seen as clinically indicated. Finally, the insufficient quality of most of the visits, including their lack of privacy, was also omitted.

These suicide reviews are a critical tool for assessing weaknesses in the Prison's practices and taking appropriate corrective action to prevent further harm. Cresson's flawed review process significantly compromises its ability to take a full accounting of such issues and protect its most vulnerable prisoners.

> **b. Prisoner-on-prisoner abuse is not properly reviewed, leading to failures in accurately assessing procedures placing prisoners in danger, especially in the isolation units**

Prisoner-on-prisoner violence involving prisoners with serious mental illness may also escape adequate review to address potential systemic deficiencies. As a result, prisoners will continue to be subjected to a heightened risk of harm in the already-dangerous isolation units.

In the course of reviewing the incident involving prisoner II, the RHU prisoner who had serious mental illness and was hogtied and assaulted by his cellmate, Cresson staff identified a number of problems with the way they determine whether a prisoner's background precludes him from sharing a cell. However, the review failed to identify and/or address a number of key issues:

- The review did not identify problems with the response to the incident, including an admission by an officer that he had "actually turned off the camera" while recording the response.

- The review does not question how it was possible that staff in the RHU did not hear the assault, given the length of time that must have lapsed as II was attacked, punched, kicked, stripped, and tied up.

- The staff's handling of the investigation and of coordination with law enforcement was not addressed critically, even though there were clear indications that the rape kit was not properly administered, and dual investigations created the potential for interference with a criminal investigation.

- The review minimized the aggressor's history of assaultive behavior.

- The review does not describe the psychology staff's reasons for recommending that the aggressor be placed into a single cell rather than be double-celled with another prisoner.

- The counselor expressed suspicion that the aggressor was not sincere in his threats and was instead manipulating staff, yet the review did not assess the legitimacy of the counselor's suspicion in light of the psychology staff's assessment.

- The Prison's policy requires that those staff who vote "no" on a recommendation against double-celling must explain such a vote. Yet key votes against double-celling did not provide justification, and this deficiency was not noted in the review.

While we understand that the Prison has made some changes to its policies regarding double-celling, the review process itself is flawed and must be improved to ensure adequate protection from similar harm to other prisoners.

### c. Use of force is not properly reviewed, especially in the isolation units and the MHU

Cresson fails to provide proper oversight of staff's use of force, particularly in the isolation units and the MHU. As a result, prisoners in the isolation units and the MHU are subjected to uses of force that traumatize them, destabilize their conditions, and interfere with their ability to return to a less restrictive housing setting.

No early warning system exists by which the Prison could assess the relative frequency with which different staff engage in the use of restraints or other force, and it appears that little or no assessment is conducted to determine whether the force was appropriate. The frequency and duration of the use of restraints alone evidence the failure to properly review the practice from a systemic perspective. Staff failed to document efforts to deescalate situations prior to resorting to restraints. In some instances, the use of force was not properly recorded. Even the release from restraints was not always indicated, nor was exercising the prisoner. Security restraints, rather than psychiatric restraints, are used extensively with far less clinical supervision and oversight than needed and no understanding of the appropriate limitations on the duration of their use. Without such protections in place, prisoners who are at risk of having their mental health compromised by harsh treatment will continue to be subjected to unnecessary or excessive placement in restraints.

## VI.  CRESSON'S PRACTICES VIOLATE THE AMERICANS WITH DISABILITIES ACT

The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Justice Department may conduct investigations and compliance reviews of covered public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. §§ 35.172-35.174. The Justice Department is authorized to issue a Letter of Findings under Title II, which includes findings of fact, conclusions of law, and remedies for violations found. 28 C.F.R. § 35.172(c)(1)-(3).

The Department has determined that Cresson violates Title II in a variety of ways. 42 U.S.C. § 12132. Cresson denies many of its prisoners with disabilities, including those with serious mental illness or intellectual disabilities, the opportunity to participate in and benefit from a variety of correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate or benefit from Cresson's classification, security, housing, and mental health services. 28 C.F.R. § 35.130(b)(1)(i)-(iv). Cresson unlawfully segregates and warehouses prisoners with serious mental illness and/or intellectual disabilities in isolation units, and fails to individually assess such prisoners concerning the risk they actually and objectively pose to others. 28 C.F.R. § 35.130(d). Cresson also fails to reasonably modify its policies, practices, and procedures, which is necessary for Cresson to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7).

**A.  Cresson Unnecessarily Segregates and Isolates Prisoners with Disabilities and Fails To Reasonably Modify its Policies and Practices**

Cresson denies prisoners with serious mental illness and intellectual disabilities the opportunity to participate in and benefit from general population housing, security, and classification systems, and their benefits, such as out-of-cell time and interaction with other prisoners, and routinely and unnecessarily segregates and isolates prisoners with serious mental illness and intellectual disabilities.  Such unnecessary isolation constitutes unlawful discrimination under Title II of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified.  *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (under Section 504 of the Rehabilitation Act, recipients of federal financial assistance must ensure "meaningful access" to prison programs and activities).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA.  42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.,* 527 U.S. 581, 592, 597 (1999)  ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability.").  The Justice Department explained in the 1991 Preamble to the Title II regulation:  "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status."  28 C.F.R. pt. 35, App. A.  Moreover, a covered entity, such as Cresson, may not provide unequal services to individuals with disabilities, 28 C.F.R. § 35.130(b)(1)(ii), and may not provide different or separate services to people with disabilities unless the different or separate services are necessary in order to afford those individuals an equal benefit.  28 C.F.R. § 35.130(b)(1)(iv).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-25 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private).  The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities.  28 C.F.R. § 35.130(b)(7).

Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with serious mental illness can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See also* 28 C.F.R. § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities"). While those identified by the Facility as having mental illness are roughly 28 percent of the Prison's population, they represent over 60 percent of those placed in solitary confinement. Moreover, almost all of those who have been in solitary confinement for more than six months at Cresson have serious mental illness. The overrepresentation of prisoners with serious mental illness, as well as the direct indicators discussed above, indicates that individuals with serious mental illness are intentionally, and discriminatorily, being directed to solitary confinement because of their disabilities. Moreover, the inadequacy and inappropriateness of the services provided in solitary confinement for individuals with serious mental illness and the failure to adequately consult with mental health professionals on such placement, indicate that this placement is not necessary to accommodate individuals with serious mental illness.

Individuals with intellectual disabilities are also overrepresented in solitary confinement. As discussed above, in the last two years, Cresson has subjected almost half of the prisoners it has identified as having intellectual disabilities to three or more continuous months of solitary confinement. The overrepresentation of prisoners with intellectual disabilities in solitary confinement for prolonged periods raises serious questions about whether this disparity has a legitimate explanation, or if it means that the Prison is using isolation to manage these prisoners. Instead of any meaningful attempt at assessing the needs of these prisoners and providing the services to meet these prisoners' needs, the Prison has resorted to placement in highly restrictive housing. The Prison could protect prisoners with intellectual disabilities in a less restrictive setting.

Further compounding the mistreatment of prisoners with intellectual disabilities, the Prison has diverted many of them to the SSNU, a unit designed for prisoners with serious mental illness. As a result, prisoners with intellectual disabilities are exposed to the intense and chaotic environment of the SSNU, where dozens of prisoners languish without mental health treatment and engage in frightening and disturbing psychotic behaviors. This becomes virtually the only human contact that prisoners on the SSNU have. Prisoners with intellectual disabilities are forced to bear these conditions without any other meaningful opportunity for stimulation or relationships, and without even basic modifications geared toward their disabilities. The inadequacy and inappropriateness of solitary confinement and the services provided on the segregated units for individuals with intellectual disabilities clearly indicate that these placements are not intended or designed to accommodate those individuals or that such placement is necessary to provide effective services to those individuals.

The investigative evidence thus reflects methods of administration that have the effect of subjecting prisoners with serious mental illness or intellectual disabilities to discrimination on the basis of disability and of defeating or substantially impairing accomplishment of the objectives of the Prison's programs with respect to such individuals. *See* 28 C.F.R. § 35.130(b)(3). Cresson must modify its policies and practices so prisoners with serious mental illness or intellectual disabilities are not automatically or categorically housed in segregation and

instead receive the services they need.  Cresson must ensure that qualified prisoners with serious mental illness or intellectual disabilities have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out-of-cell time, interaction with other prisoners, and movement outside of confined environments.[20]

### B.    Cresson Fails to Properly Assess Prisoners on an Individual Basis To Determine Whether Segregation is Appropriate Housing

Cresson may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h).  But Cresson "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  *Id.*; *see also* 28 C.F.R. § 35.139 (affirmative defense of direct threat); *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures").  The burden on public entities in denying an individual with a disability the opportunity to participate in and benefit from services, programs, and activities on the basis of direct threat is considered a "heavy burden," and the same would be true of legitimate safety criteria.  *See Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007); *Doe v. Deer Mt. Day Camp, Inc.*, 682 F. Supp. 2d 324, 347 (S.D.N.Y. 2010); *Celano v. Marriott Int'l, Inc.*, No. 05-4004 PJH, 2008 U.S. Dist. LEXIS 6172 at *51 (N.D. Cal. Jan. 28, 2008).

Cresson cannot categorically deny prisoners with serious mental illness or intellectual disability the opportunity to participate in and benefit from housing, classification, and mental health services.  Instead, Title II requires Cresson to make individualized assessments of prisoners with serious mental illness or intellectual disabilities, and their conduct, relying on current medical or best available objective evidence, to assess:  (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk.  56 Fed. Reg. 35,701 (1991); 75 Fed. Reg. 56,180 (2010); *Arline*, 480 U.S. at 287-88.  The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities."  56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 636, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

---

[20]  The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities.  Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

35

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[21]

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See Scherer v. Pa. Dep't of Corr.*, No. 3:2004-191 2007 WL 4111412 at *44 (W.D. Pa. Nov. 17, 2007) (finding that because the prisoner's misconduct may have been a result of his mental illness, "the lack of modification of its disciplinary procedures to account for . . . [his] mental illness . . . possibly resulted in a violation of the ADA"); *Purcell v. Pa. Dep't of Corr.*, No. 50-181J 2006 WL 891449 at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to

circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).[22]

At Cresson, even when the prisoner has been identified by the Facility as having serious mental illness or intellectual disability, placement decisions may be automatic, and mental health staff have no role in determining or reviewing the appropriateness of placing the prisoner in the RHU. The hearing examiner and others involved in placement determinations routinely decide the prisoner's fate with an insufficient understanding of the implications of the prisoner's mental illness or disability. A PDOC policy statement provides that mental health staff may "recommend that the sanction be reduced" for those on the mental health roster, but no guidance is provided regarding when mental health staff should weigh in during the disciplinary or placement process. The hearing examiner told us that mental health staff never participate directly in disciplinary hearings. He noted that sometimes correctional staff relay to him information they have obtained about the mental health of the prisoner whose conduct is under consideration, but only on an informal and inconsistent basis. The failure to obtain input from mental health staff before prisoners with serious mental illness or intellectual disability are placed in solitary confinement for long periods means that the placement of the prisoner may occur without any consideration of that prisoner's mental health history or needs.

---

[21] *See, e.g.*, Position Statement on Segregation of Prisoners with Mental Illness, Am. Psychiatric Association (Dec. 2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

[22] Even before a prisoner enters the disciplinary process, at least one court has held that "[t]he ADA also requires that prison staff try to counsel [prisoners with intellectual disabilities], rather than subjecting them to the disciplinary process, when they break prison rules that they do not understand." *Clark,* 739 F. Supp. 2d at 1179 (also holding that program modifications for prisoners with intellectual disabilities should enable the prison to effectively communicate with such prisoners as part of the disciplinary process).

We viewed many instances in which Cresson failed to adequately consider mental health issues in the course of placement decisions, including the following:

- Prisoner MM received disciplinary time totaling 880 days of isolation at the RHU in a three-and-a-half-month period in late 2011 and early 2012. Records show that the nursing supervisor understood that MM's behavior was a product of untreated mental illness and resulted in disciplinary write-ups, but no one suggested reviewing his disciplinary history or advocated reducing his time in the RHU.

- On June 2, 2011, prisoner NN, diagnosed by PDOC with schizoaffective disorder and having spent several years at the SSNU, spat on an officer. NN received a misconduct for the assault. He pleaded guilty to the offense but stated, "I have health problems. I just snapped." The hearing officer sentenced NN to the full 90 days of disciplinary time in segregated housing, but the record does not reflect any input from mental health staff.

- OO, who has a 55 IQ and was diagnosed by PDOC with paranoid schizophrenia, accumulated more than 1,305 days in disciplinary time. Two-thirds of this disciplinary time has been for failure to obey orders or failure to stand for count, misconduct likely linked to his mental illness. However, 270 days of that time is for two incidents that occurred at Cresson's MHU – one in which OO reacted aggressively to a forced medication and one in which he spontaneously punched a staff member. Other information strongly suggests that OO's behavior was the result of his acute mental illness. OO's clinical record after the assault indicates that he "had little recall of the events." OO did not participate in his hearing for either incident, though his condition would have required an advocate to act on his behalf. Clinicians described him at the time as severely paranoid, withdrawn, unkempt, and unable to provide basic self-care. Records note that it took several weeks of medication after his transfer to Rockview's MHU for OO even to realize he was incarcerated. The disciplinary record does not reflect any input from mental health staff before his extended placement in segregated housing.

- Staff charged PP, a prisoner who has a 71 IQ and was diagnosed by PDOC with an anxiety disorder and antisocial personality disorder, with two misconducts following an April 2011 suicide attempt: one for "Tattooing, or other forms of self-mutilation" and another for "[d]estroying, altering, tampering with, or damaging property." The hearing examiner reviewed the charges at a disciplinary hearing held three days after the suicide attempt. The examiner decided to punish PP with 30 days of disciplinary time in segregated housing at the RHU for the attempted suicide. She also charged him $24.12 for damaging a towel in the course of trying to kill himself. No member of the mental health staff participated in the hearing.

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities. Cresson has provided no evidence to make that showing here. Accordingly, Cresson must modify its policies and practices of automatically placing prisoners with serious mental illness or intellectual disabilities in segregation and conduct regular individualized analyses of such prisoners. Each individualized analysis must evaluate whether the prisoner poses a health or

safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

**C. Even When It Is Necessary To Remove Prisoners From General Population, Prisoners With Disabilities Cannot Be Denied or Provided Unequal Mental Health Services or Other Participation in or Benefit From Services, Programs, or Activities**

Cresson fails to ensure that prisoners placed in segregated housing by reason of a disability still receive adequate programs and services. We found many prisoners with serious mental illness were not provided mental health treatment or access to other programs or services while they were in isolation. For those prisoners with serious mental illness or intellectual disabilities who cannot be integrated into the general population, the Facility still has an obligation to provide the prisoners with the opportunity to participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access. *See* 28 C.F.R. § 35.130(b).

## VII.    CONCLUSION AND NOTICE OF EXPANDED INVESTIGATION

We recognize that this letter comes as PDOC actively downsizes Cresson as part of its plan to close the Facility by June 30, 2013. Nonetheless, our findings have implications going forward. First, we want to ensure that, for however long Cresson remains open, steps are taken to address the unconstitutional and otherwise unlawful conditions we identified there.

Second, our findings compel us to expand our investigation. In the course of our investigation into Cresson, we received information indicating that similar conditions may exist throughout the PDOC system. Specifically, we identified system-wide policies and individual instances that may reflect inappropriate placements of prisoners with serious mental illness into prolonged isolation. Therefore, this letter also serves to inform you that, pursuant to our authority under CRIPA and the ADA, we are expanding our investigation into the conditions of confinement regarding prisoners with serious mental illness and/or intellectual disabilities housed in the RHU and other isolation units at the other PDOC prisons. We will also focus on the denial of adequate mental health treatment and any substantial risk of serious harm resulting from the inappropriate use of prolonged isolation. We recognize that PDOC faces enormous challenges at Cresson and throughout its prison system because an increasing percentage of its prison population has mental illness. Since 1999, statewide the percentage of prisoners on PDOC's mental health roster increased by more than 50 percent to more than a fifth of all prisoners. At Cresson, the percentage increased by more than a third since just 2007, to 28 percent of the prison population.

PDOC is by no means the only state prison system confronting these sorts of challenges. For decades, states have increasingly turned to their prison systems to take on a task they are not naturally equipped to handle – namely, to serve as caregivers for those with serious mental illness. Investigations conducted by the Civil Rights Division indicate that a burgeoning population of prisoners with mental illness may be connected to a state's failure to adequately care for individuals with mental illness.[23] These individuals need to be cared for in our

---

[23] Recent investigations have led to findings or complaints alleging that police departments in Portland and Seattle engaged in a pattern or practice of using unreasonable force during interactions with individuals who have or are perceived to have mental illness; that the practices of a city, county, state, and

communities in ways that are effective and safe, and that prevent them from unnecessarily becoming enmeshed in the state's criminal justice system.

While we recognize that PDOC likely has been left with the unenviable burden of having to take care of many individuals with mental illness who should not have ended up in the criminal justice system to begin with, we cannot excuse the unnecessarily restrictive conditions and lack of adequate mental health care imposed on this population as a result of their inappropriate placement into prolonged isolation. PDOC must meet the challenges presented by the prison population it now serves by ensuring that prisoners with serious mental health needs receive appropriate mental health treatment and making reasonable modifications for those with mental illness and intellectual disabilities.

While we have gathered a substantial amount of information about policies and practices that affect prisons across the PDOC system, we have not reached any conclusions about the subject matter of the expanded investigation. During the course of our expanded investigation, we will consider all relevant information, and, where appropriate, will offer recommendations on ways to improve prison conditions. If we find no systemic constitutional or ADA violations, we will notify you that we are closing the investigation.

On the other hand, if we find violations, we will inform you of the findings and attempt to work with PDOC to remedy any such violations. In addition, we will identify any financial, technical, or other assistance the United States may be able to provide to assist PDOC in correcting the identified deficiencies. In our many years of enforcing CRIPA, the good faith cooperation we receive from state or local jurisdictions frequently enables us to resolve our claims without resort to contested litigation.

We encourage PDOC to cooperate with our investigation and can assure you that we will seek to minimize any potential disruption our investigation may have on its operations. To be clear, we do not anticipate touring or visiting most of the 26 prisons in the PDOC system, nor do we anticipate conducting the kind of extensive document review conducted in the Cresson matter. Instead, we hope to work collaboratively with PDOC to efficiently and expeditiously collect the information we need.

We commend Secretary Wetzel and his staff for the cooperation they have already shown us and their receptivity to our concerns. Now that we are expanding our investigation, we look forward to continuing to work with PDOC in a collaborative manner.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting the PDOC attorney to discuss this matter in further detail. If you have any questions, please feel free

---

youth court in Mississippi combine to create a "school-to-prison pipeline" that disproportionately affects youth who have disabilities; and that the states of Delaware, Mississippi, New Hampshire, and Georgia have unnecessarily institutionalized, and placed at risk of unnecessary institutionalization, individuals with mental illness. We have settled nearly every one of these cases and continue to pursue others.

to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Aaron Zisser, at (202) 305-3355.

Sincerely,

Thomas E. Perez
Assistant Attorney General
United States Department of Justice
Civil Rights Division

David J. Hickton
United States Attorney
United States Attorney's Office
Western District of Pennsylvania

cc:    John E. Wetzel
       Secretary
       Pennsylvania Department of Corrections

       Kenneth Cameron
       Superintendent
       State Correctional Institution at Cresson

       Theron Perez
       Acting Chief Counsel
       Governor's Office of General Counsel