# EXHIBIT A



315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email: kstone-manista@rbgg.com

July 15, 2013

<u>VIA ELECTRONIC MAIL</u>

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908-5600
MLopes@pldwlaw.com

Re:    *Coleman v. Brown*:  Plaintiffs' Observations and Recommendations
        Following QI Pilot Tours in June 2013
        <u>Our File No. 0489-3</u>

Dear Special Master Lopes:

Plaintiffs' counsel observed portions of the Quality Improvement ("QI") process pilot tours at CMC, LAC, SAC, and CCWF, and the entirety of the pilot tour at SVSP. All references herein to the "QI tool" are to the form of the tool provided to Jane Kahn during her observation of the QI pilot at SAC on June 12, 2013.

Plaintiffs appreciate the opportunity to participate in the piloting of the QI process and to provide the following feedback based upon counsel's observations during the tours attended.  Plaintiffs understand that the QI process is only in the piloting stage, and in fact saw significant improvement in the conduct of the tours over the course of the month of piloting.  Plaintiffs are encouraged by the obvious investment of the QI team members from CDCR's Sacramento and regional headquarters, and appreciate the receptiveness of those team members to the informal feedback provided by Plaintiffs' counsel throughout the tours attended.  The following comments are offered in the spirit of continuing that engagement, and highlight those areas in which there appeared to be the greatest opportunities for growth and strengthening of the QI process and monitoring tool.  This letter does not address the *Hecker* reviews that were conducted after the QI tours at each institution.

Matthew A. Lopes, Jr.
July 15, 2013
Page 2

We note that there are important areas extensively monitored within the *Coleman* case that do not appear to be part of the QI tool, including: staffing, medication management, implementation of MHTS.net, ASU EOP Treatment Improvement Plan including the 30 day LOS Reviews, compliance with Program Guide requirements such as numbers of weekly treatment hours and frequency of individual clinician contacts, and use of alternative placements/OHUs for prisoners requiring MHCB transfers. Such subjects must be addressed in a minimally adequate self-monitoring / QI process, and we request that additional questions be added to the QI tool to cover these critical areas of review. We are willing to help draft such questions.

While Plaintiffs appreciate the opportunity to observe both the written QI tool and the process of its use during this pilot stage, no evaluation of the QI process can be complete without a review of the QI report and findings as they are delivered to the monitored institutions. Plaintiffs understand that there may be no formal reports resulting from this initial pilot, but ask that any written reports generated as a result of the tours attended by Plaintiffs' counsel be shared with counsel. Plaintiffs' observations at this stage are obviously preliminary and incomplete until written reports produced via the QI process are received and reviewed.

I.      **Process and Preparation**

It appeared that scheduling was the primary obstacle to efficient operation of the QI pilots on the tours observed. In part, this may be because the CQI Site Visit Preparation Checklist does not contain all of the requests necessary to ensure a successful and efficient visit. For example, while institution staff members are asked to provide schedules for IDTTs, ICCs, and groups, they are not asked to provide the location of those groups.

Several practical items, the necessity for which was observed during the tours attended, were not included on the Site Visit Preparation Checklist, and should be included in the future tours. These include ensuring that the QI team has access to internet connectivity and power outlets for their tablets.

Plaintiffs' counsel noted that at some institutions, senior staff did not appear fully engaged in the QI process. For example, institution Wardens did not attend the exit interviews at some institutions, and the participation and engagement of senior mental health staff varied dramatically from institution to institution. It was clear that, at least for some institutions, the QI tours were not a high priority for institution staff. Plaintiffs' counsel hopes that this will improve as the QI process moves out of the "piloting" stage,

Matthew A. Lopes, Jr.
July 15, 2013
Page 3

but urges the QI team to consider how it might more effectively persuade the institutions of the need to fully engage in the QI process.

In addition, the information elicited and gathered appeared to vary significantly based on the individual member of the QI team completing each portion of the assessment.  For example, some questions were interpreted differently by different members of the QI team in terms of what information they were designed to elicit.  There were additional inconsistencies observed with respect to how to appropriately identify samples of files to review.  In order for the assessment to be considered a valid and reliable tool, it is important that information be gathered and evaluated in as standardized a manner as possible.  Plaintiffs recommend additional training for QI team members regarding the intent and meaning of the questions in each section of the QI tool so that there is a consistent understanding of what information is to be gathered and what the questions mean, as well as additional guidance provided in order to standardize the sampling process.

## II.    QI Tool Comments and Suggested Additions

### A.    Staff and Training

In the QI tool section titled "SRE Mentor Program staff who completed program (Mental Health)," Plaintiffs recommend that the following question be added as question (3) in this section:  "What percentage of total mental health staff members have been mentored?".  This may provide for a more useful measurement than the raw number of staff members who have been mentored, as asked by question (2).

### B.    Patient Surveys

The group patient surveys have the potential to be a uniquely useful self-assessment tool.  Plaintiffs recommend the following improvements to the process as it was observed at LAC, SVSP, SAC, CCWF, and CMC.

The "Reason for Appointment" script that custody staff members are to use when ducating inmates prior to the survey appeared inconsistently provided to and used by custody staff.  It also appeared insufficient to give inmates a concrete understanding of the purpose and voluntary nature of the survey group.  The script should be revised to better describe the reason for the ducat, and the importance of the script's consistent use should be emphasized.  In addition to using custody staff to convey an explanation of the purpose of the survey group, Plaintiffs suggest that the QI team develop a script for use by mental health staff to explain the purpose of the survey group to their patients.  This would allow the institution to improve inmates' understanding of and participation in the

[881281-1]

Matthew A. Lopes, Jr.
July 15, 2013
Page 4

survey groups by leveraging patients' existing relationships with their mental health providers.

Plaintiffs recommend that the QI team develop a clearer introduction for use at the beginning of the survey. It appeared from some of the groups observed that inmates were not clear as to the identity of the facilitators or the intended use of the information collected. A better introduction to the process and the facilitators might also improve the low rates of response observed in the early part of each survey group, and mitigate the flaws in data collected during the "warm-up" period.

Various terms used throughout QI tool questions for conducting the group survey require substantial clarification. The pilot teams seemed well-aware of the definitional problems, which seemed most severe in the context of the questions that asked about frequency of treatment attendance (which used imprecise terms such as "most" and "usually") and in the context of questions about timeliness of treatment (which used vague phrasing such as "seen as often as you need to be," "seen quickly when you need to be," and "wait a while before you start getting a new medication"). While the facilitators of each survey were doing well in extemporaneously elaborating during the pilots observed, the data produced via these surveys will lack analytic value if it is dependent upon unwritten and untracked facilitator elaborations which vary from session to session. Plaintiffs request an opportunity to review any redrafted version of the questions intended for use during the QI survey groups.

QI team members appeared to understand and appreciate the need for confidentiality and anonymity in the survey process. This is only possible if custody staff are not present and cannot overhear inmates' participation in the survey group. Group survey meetings were held in confidential settings at some of the institutions visited. At LAC, however, the EOP group survey was conducted in a visiting room where several custody officers were present. At SVSP, custody officers from the inmates' housing unit could observe the group from the control tower, and were able to enter the room where the survey was occurring on several occasions during the survey. In such circumstances, the survey is neither anonymous nor confidential. The QI team should emphasize to institutions that the spaces provided for group surveys need to be of a kind where custody staff's presence is not required and where observation and interruptions are minimized.

In addition, the use of cages for conduct of the ASU patient surveys is likely a significant deterrent to patients' voluntary and full participation in those surveys. The pre-tour checklist should include a request that the institution identify an appropriate location for ASU patient surveys without cages. At CMC, the ASU patient surveys were conducted in a room in which the prisoners were held in individual cages that did not

[881281-1]

Matthew A. Lopes, Jr.
July 15, 2013
Page 5

have stools, and so they were forced to stand or sit on the floor during the survey, while many of the QI team members sat on chairs. During the EOP ASU patient surveys, several patients indicated that they do not attend any of the two hour long groups offered there because they felt that two hours was too long to be in a cage. Thus, it is likely that even an hour standing in a cage may discourage full and in-depth participation in the patient surveys. The use of cages also presents logistical difficulties for the QI reviewers. For example, at CMC, the room where the patient surveys were conducted was hot, noisy and poorly lit. These conditions made it difficult to hold an open-ended discussion with the class members who were selected for the interviews. At least one of the prisoners in each interview group was in a cage that was poorly lit, making it impossible to assess the prisoner's body language and facial expression during the interview.

Finally, although the investment and engagement of the QI team members conducting the group surveys was apparent, Plaintiffs strongly suggest that formal facilitator training be provided to these individuals. Formal training would better equip facilitators to provide appropriate introductory information, engage all members of the survey group, refrain from inaccurately re-framing individuals' answers, prevent one individual from dominating the group, and better ensure that the group remains focused on the task at hand.

### C.    General Population Groups and Individual Treatment

Plaintiffs' counsel observed EOP and ASU mental health groups at SVSP, SAC, and CMC.

Plaintiffs recommend that the following questions be added to the QI tool section titled "Group Treatment Space (Mental Health)" as questions (3), (4) and (5) in this section: "Is the treatment space clean and well-maintained?", "Does the treatment space have adequate light and ventilation?" and "Are materials available in the treatment space for use by clinicians?".

Plaintiffs additionally recommend that the same three questions be added to the QI tool section titled "Individual Treatment Space (Mental Health) as questions (5), (6) and (7) of this section.

### D.    IDTTs

Plaintiffs' counsel observed IDTT meetings for MHCB and CCCMS patients at SVSP, SAC, CCWF, and CMC. At CMC, Plaintiffs' counsel was favorably impressed by the level of participation and the depth of knowledge about each individual case exhibited by treatment team members. Plaintiffs suggest that one element of the training

Matthew A. Lopes, Jr.
July 15, 2013
Page 6

for CDCR QI monitors using the new process should be to note areas where an institution's performance stands out (like this committee at CMC) and try to understand any elements of that success that might be usefully applied elsewhere.

Plaintiffs recommend that the following questions be added to the QI tool section titled "IDTT Observation (Mental Health)" as question (11) in this section: "Did the correctional counselor offer input into relevant custody issues affecting the inmate's mental health treatment?". This would allow the QI team to assess not only whether the correctional counselor provides an initial overview of the inmate's status, as indicated by existing question (10), but also whether he or she is in fact a functional member of the IDTT team.

Plaintiffs additionally recommend that the following question be added to the same QI tool section as question (12): "If it appears that the inmate's mental health status had an impact on his or her understanding of the proceedings, did staff members of the IDTT ensure effective communication?".

Plaintiffs additionally recommend that the following question be added to the same QI tool section as question (13): "For MHCB IDTTs of inmates recently released from DSH, were DSH records available for review and considered by the IDTT?".

Generally, Plaintiffs suggest that the QI team consider what questions can be added to the tool to allow the assessment of whether the IDTT meeting is an actual interactive process, or a mere recitation of a previously-decided upon plan to a non-engaged inmate. For instance, the tool might evaluate whether the inmate's treatment plan has been determined prior to the IDTT, whether the inmate participates in the IDTT in any meaningful way, and whether the IDTT is of a length of time sufficient to allow for meaningful discussion or merely a fast and cursory exercise. These issues, which are not monitored by the current QI tool, appeared particularly critical in the case of CCCMS patients, whose observed IDTT meetings were extraordinarily short.

Plaintiffs recommend that the following questions be added to the QI tool section titled "IDTT Treatment Space (Mental Health)" as questions (4) and (5) in this section: "Is the IDTT treatment space clean and well-maintained?", and "Does the IDTT treatment space have adequate light and ventilation?".

### E.    Suicide Prevention

In the QI tool section titled "SPRFIT Minutes (Mental Health)", Plaintiffs recommend that the present question (3) be amended from: "Did minutes cover at least three areas required by MHPG (12-10-4)?" to read "Did minutes from the prior year

Matthew A. Lopes, Jr.
July 15, 2013
Page 7

cover all of the areas required by MHPG (12-104)?".  Plaintiffs also recommend that the
following question be added as question (4) in this section:  "If there was a recently
completed post-suicide QIP at the institution, did the SPRFIT minutes reflect discussion
and implementation of the QIP?".  These additions would permit the QI team to assess
whether the institution's SPRFIT team is functioning well over time, and whether it is
acting appropriately with respect to completed QIPs at the institution.

### F.  Administrative Segregation

Plaintiffs' counsel observed an ASU ICC meeting at SVSP, SAC, and CMC.

Plaintiffs recommend that the following questions be added to the QI tool section
titled "ASU ICC Observation (Mental Health)" as questions 1(b):  Was the MH clinician
in attendance the prisoner's treating clinician? (3) and (4) in this section:  "Did the
members of the ICC respond to the input provided by the MH clinician?" and "Did the
ICC's determinations expressly take into account the input provided by the MH
clinician?".  The addition of these questions would allow the QI teams to assess not only
if meaningful mental health input is provided at ASU meetings, but whether it has a
meaningful effect upon the decisions made by the ICC.

Plaintiffs additionally recommend that the following question be added to the
same QI tool section as question (5):  "If it appears that the inmate's mental health status
had an impact on his or her understanding of the proceedings, did members of the ICC
ensure effective communication?".

Plaintiffs' counsel observed an ASU morning meeting at CMC.  Plaintiffs
recommend that the QI tool for observing the morning meeting include more questions
about how the meeting was documented, and how long each new or high risk case was
discussed.  Also, the department should set forth more detailed standards and possibly a
form for local institutions to use for documentation of the morning meetings.

### G.  MHCB

Plaintiffs' counsel observed an MHCB IDTT meeting at SVSP, SAC, and CMC.

The QI tool section headed "Limited Issue Observation (Mental Health)" requires
clarification as to the definition of "limited issue," as the use of this term appears to vary
by institution.

The QI team should consider whether, in addition to the general section for
observation of IDTTs as discussed above, the QI tool should contain a section specific to

[881281-1]

Matthew A. Lopes, Jr.
July 15, 2013
Page 8

the observation of IDTTs within MHCB units.  These IDTTs appear to present a number of unique challenges, which may be impracticable to monitor within the general IDTT framework.  These include an in-depth consideration of whether effective communication has been achieved or is even possible, whether the institution's staff have sufficient knowledge of the patient to allow for an effective IDTT meeting, and whether the members of the IDTT have access to sufficient patient records to allow for an accurate understanding of the patient's mental health history and treatment priorities.

Finally, the MHCB section should include an inquiry into the institution's practices regarding the use of cuffing and caging of newly admitted patients to the MHCB, and compliance with timely review of patients for removal of cuff-status for those on non-segregation status.

### H.    Custody Issues

In the QI tool section titled "837s (Custody)", question 2 asks:  "How many had a delay of more than 5 minutes for cell entry?".  Plaintiffs understand the standard for emergency response to be four minutes, as stated in CDCR's Emergency Medical Response System Policy 4.12.1:  "The response time for BLS capable personnel (First Responders) shall not exceed four (4) minutes (the First Responder Response Time)."  The QI tool should be edited to reflect the correct standard.

In the QI tool section titled "RVRs (Custody)", Plaintiffs suggest the addition of the following as questions (9) and (10):  "Of those RVRs in which mitigation occurred, how many were referred to the District Attorney?" and "Of those RVRs in which mitigation occurred, how may were referred to the ICC for SHU assessment?".  Plaintiffs also suggest modifying question (4) or adding a follow-up question to qualitatively assess whether the hearing officer meaningfully considered information from the Mental Health Assessment.  For example, "Did the hearing officer explain his or her consideration of information from the Mental Health Assessment?".  This would enable the QI team to assess the practical effects of the mental health assessment and mitigation process at a particular institution.  Additionally, Plaintiffs noted that members of the QI team appeared to have inconsistent understandings about the information some of the questions in this section were designed to elicit, such as whether all reductions in discipline qualify as mitigation, or only reductions in discipline explicitly stated as connected to mental health information.

In the QI tool section titled "Treatment Module Standards (Custody)", Plaintiffs suggest the addition of the following as question (5):  "Are the treatment modules observed clean and in good repair?".

Matthew A. Lopes, Jr.
July 15, 2013
Page 9


      Plaintiffs thank the members of the QI teams, the individuals participating in the pilots at each of the visited institutions, and the Special Master and his team for the opportunity to participate in the pilot of the QI process.

                    Sincerely,

                    ROSEN BIEN
                    GALVAN & GRUNFELD LLP

                    */s/ Krista Stone-Manista*

                By:  Krista Stone-Manista

KSM:amc
cc:     *Coleman* Special Master Team
       *Coleman* Co-Counsel
       Debbie Vorous