DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION** |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | Judge:  Hon. Lawrence K. Karlton |
| | Date:    November 5, 2013 |
| | Time:    10:30 am |
| | Crtrm:   4 |

[914567-7]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ............................................................................. v

INTRODUCTION ............................................................................................... 1

ARGUMENT ........................................................................................................ 4

I.   DEFENDANTS' EXPERTS FAIL TO REBUT, AND IN FACT SUPPORT, PLAINTIFFS' SHOWING OF SERIOUS HARM AND RISK OF HARM TO *COLEMAN* CLASS MEMBERS IN SEGREGATION. ...................................... 4

   A.   Defendants' Expert for the Instant Motion Has No Expertise Regarding Mentally Ill Prisoners in Segregation, Has No Foundation for Any Opinion as to Conditions in CDCR's Segregation Units, and Relies on Irrelevant Studies with No Application to the Issues Before the Court. ...................................................................................... 4

   B.   Statements in Defendants' Termination Joint Expert Report Support Plaintiffs' Request for Affirmative Relief. .............................................. 8

II.  PLAINTIFFS' UNREBUTTED EVIDENCE DEMONSTRATES THE NEED FOR TIME LIMITS FOR THE MENTALLY ILL IN SEGREGATION. ............................................................................................... 10

III. THE USE OF HARSH SEGREGATION UNITS FOR NON-DISCIPLINARY REASONS MUST END. ................................................... 14

   A.   Defendants' Placement of Mentally Ill Prisoners in Administrative Segregation "For Their Own Safety" Creates an Enormous Risk of Harm, and There Are Safe Alternatives. ................................................ 14

   B.   Defendants' Denial of the Systemwide "Lack of Beds" Problem Is Not Supported by Evidence. ..................................................................... 16

IV.  DEFENDANTS HAVE FAILED TO ADDRESS INADEQUATE SCREENING AND TO PREVENT DANGEROUS PLACEMENTS OF MENTALLY ILL PRISONERS MOST AT RISK OF HARM IF PLACED IN SEGREGATION. ............................................................................................. 18

   A.   Defendants Confirm that CDCR Ignores Clinical Input when Returning a Patient from Inpatient Hospitalization or Crisis-Level Psychiatric Care to a Segregation Unit, an Exceedingly Dangerous Practice. ......................................................................................................... 19

   B.   Defendants' Failure to Conduct Adequate Mental Health Screening for Prisoners Entering Segregation Is Dangerous, and the Special Master Must Supervise the Implementation of an Adequate Screening Process that Includes an "ASU Exclusion" When Necessary. ...................... 20

   C.   There is No Rational Basis for Continuing to Limit the SHU Exclusion Order to the Pelican Bay SHU, Particularly Given the Harms Suffered by Class Members in the System's Other SHUs. ............... 21

[914567-7]

i

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

D.   Defendants Fail to Show that Their Current System Makes Unnecessary a "Sweep" of Prisoners Housed in Segregation for Prolonged Periods. ........................................................... 23

V.   THE EVIDENCE DEMONSTRATES THE NEED FOR ADDITIONAL REMEDIAL ORDERS REGARDING LONGSTANDING INADEQUACIES IN ACCESS TO TREATMENT, UNNECESSARILY HARSH CONDITIONS, AND INSUFFICIENT SAFETY MEASURES IN SEGREGATION UNITS. .......................................................... 25

A.   Defendants' System Fails to Provide Adequate Clinical Treatment and Office Space and a Sufficient Amount of Treatment to Class Members Housed in Segregation. ................................................. 25

B.   Defendants' Blanket Use of Strip Searches Whenever Any Mentally Ill Patient in Segregation Goes to and Returns from a Treatment Session Undermines Delivery of Constitutionally Mandated Treatment. ..................................................................... 28

C.   Defendants' Blanket Use of Cages for All Treatment in Segregation Undermines Delivery of Constitutionally Mandated Treatment. .................. 29

D.   The Prolific Use of Holding Cells for Suicidal Prisoners Waiting for a Mental Health Crisis Bed Must End. ................................................. 30

E.   Defendants' Refusal to Expand Welfare Checks as Recommended by their Expert and the Special Master's Suicide Prevention Expert, and as Consistent with National Correctional Standards, Puts Lives at Risk. ................................................................................ 31

F.   Defendants Do Not Rebut Plaintiffs' Evidence of the Longstanding Failure to Provide Entertainment Appliances to Mitigate the Harmful Effects of Extreme Sensory Deprivation in ASU. ......................................... 32

VI.  DEFENDANTS MISCONSTRUE AND IGNORE THEIR DUTIES UNDER THE AMERICANS WITH DISABILITIES ACT. .................................................. 33

CONCLUSION. ............................................................................... 35

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bull v. City & Cty. of San Francisco*,
 595 F.3d 964 (9th Cir. 2010) ...................................................................... 28

*Canedy v. Boardman*,
 16 F.3d 183 (7th Cir. 1994) ........................................................................ 28

*Coleman v. Wilson*,
 1994 U.S. Dist. LEXIS 20786 (E.D. Cal. June 6, 1994) ...................... 1, 16

*Durham v. County of Maui*,
 804 F. Supp. 2d 1068 (D. Haw. 2011) ......................................................... 9

*Hutto v. Finney*,
 437 U.S. 678 (1978) .................................................................................... 12

*In re Hanford Nuclear Reservation Litig.*,
 534 F.3d 986 (9th Cir. 2008) ........................................................................ 9

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*,
 Case No. 1:08-cv-01317-TWP-MJD, 2012 U.S. Dist. LEXIS 182974 (S.D.
 Ind. Dec. 31, 2012) ..................................................................................... 18

*Jones 'El v. Berge*,
 164 F. Supp. 2d 1096 (W.D. Wis. 2001) .............................................. 12, 25

*Madrid v. Gomez*,
 889 F. Supp. 1146 (N.D. Cal. 1995) ..................................................... 12, 18

*Olmstead v. L.C. ex rel Zimring*,
 527 U.S. 581 (1999) .................................................................................... 33

*Ruiz v. Johnson*,
 37 F. Supp. 2d 855 (S.D. Tex. 1999) .......................................................... 18

## STATUTES

18 U.S.C. § 3626(a)(1) ....................................................................................... 35

28 Vt. Stat. Ann. tit. 28, § 701(a) (2012) ......................................................... 13

## RULES

Fed. R. Evid. 801(d)(2)(C) & (D) ........................................................................ 9

[914567-7]

iii

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# **REGULATIONS**

28 C.F.R. § 35.130(b)(7) ...................................................................... 35

28 C.F.R. § 35.130(d) ........................................................................ 33

28 C.F.R. § 35.152(b)(2) .............................................................. 33, 34

28 C.F.R. § 35.152(b)(2)(i)................................................................ 34

28 C.F.R. § 35.152(b)(2)(iii) ............................................................ 34

# **OTHER AUTHORITIES**

Mich. Dep't of Corr. Policy No. 03.03.105D ...................................... 13

Wash. Dep't of Corr. Policy No. 320.200 .......................................... 13

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**TABLE OF ABBREVIATIONS**

| ADA | Americans with Disabilities Act |
|------|------|
| ASU | Administrative Segregation Unit |
| ATOM | Alternative Treatment Option Module |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| COR | California State Prison-Corcoran |
| CSP | California State Prison |
| DOJ | [United States] Department of Justice |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| IDTT | Interdisciplinary Treatment Team |
| LOB | Lack of Beds |
| LPT | Licensed Psychiatric Technicians |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| PSU | Psychiatric Services Unit |
| SAC | California State Prison-Sacramento |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| SVSP | Salinas Valley State Prison |

[914567-7]

# INTRODUCTION

1  "[P]lacing mentally ill inmates in administrative segregation or segregated housing exacerbates the underlying mental illness, induces psychosis, and increases the risk of suicide." *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS 20786, *71-72 (E.D. Cal. June 6, 1994) (citations omitted). Unfortunately, nearly twenty years after this finding was made, it continues to apply to the segregation units in the California Department of Corrections and Rehabilitation (CDCR). Enough is enough. After years of failure to comply with Court orders and meet the treatment needs of *Coleman* class members, Defendants must be ordered to end the prolonged lengths of stay for mentally ill prisoners in segregation units; to reduce the use of segregation, especially for non-disciplinary inmate-patients; to reduce the grave risks of decompensation and suicide, including through appropriate screening and exclusions and by mitigating the harshness of segregation units; and to provide adequate treatment to mentally ill prisoners in segregation. Each of these elements must be achieved to remedy the constitutional violations identified in this case.

Despite years of remedial efforts by the Court and the Special Master, *Coleman* class member lengths of stays in segregation remain excessive. *Coleman* class members spend an average of more than 100 days in administrative segregation units (ASUs), with lengths of stay in ASUs, Security Housing Units (SHUs), and Psychiatric Services Units (PSUs) often lasting years and even decades. *Coleman* class members continue to disproportionately fill the state's segregated housing units, with EOP inmate-patients placed in segregation at more than two times the rate of the CDCR population as a whole. *See* Reply Expert Decl. of James Austin in Support of Plaintiffs' Motion Regarding Mentally Ill Prisoners in Segregation ("Austin Reply Expert Decl.") ¶ 22, Table 1.

As much as 20-30% of Defendants' ASU population are prisoners there for reasons unrelated to discipline, such as concerns for their own safety and lack of available beds. *See* Reply Decl. of Jane E. Kahn in Supp. of Pls.' Mot. for Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation ("Kahn Reply Decl.") Ex. S (Aug. 15, 2013 Dep. of Kathleen

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[914567-7]

Allison) ("Allison Dep.")) at 64:19-65:2.  Defendants' new plan to create a "non-disciplinary unit" for prisoners in segregation for their own safety or while waiting for an appropriate bed is a phony non-solution.  It will leave non-disciplinary prisoners, including countless *Coleman* class members, mixed in the same ASUs with nearly all of the same restrictions and harsh conditions, including approximately 23 hours per day in their cells, full restraints, treatment in cages, and strip searches.  *See id.* at 57:5-58:2.

Plaintiffs have presented overwhelming evidence of harm and serious risk of harm to *Coleman* class members.  The number of suicides in CDCR's segregation units continues at a staggering rate.  Although prisoners in segregated housing units constitute less than 10% of CDCR prisoners (Austin Reply Expert Decl. Table 1), 12 of the 34 (or 35%) CDCR suicides in 2011 were housed in segregated housing units, while 8 of the 15 (or 53%) CDCR suicides in the first half of 2012 were housed in segregation.  *See* Report on Suicides Completed in CDCR in Calendar Year 2011, Docket No. 4308, Jan. 25, 2013 ("2011 Suicide Report") at 26 (Appx. D); Report on Suicides Completed in CDCR Jan. 1, 2012 – June 30, 2012, Docket No. 4376, Mar. 13, 2013 ("First Half 2012 Suicide Report") at 43 (Appx. F).  Already in 2013, 11 of the 19 (or 58%) suicides in CDCR-run facilities have occurred in segregation units.  *See* Kahn Reply Decl. ¶ 18.  There have been *four* segregation suicides since Plaintiffs filed this motion.  *Id.*

Defendants deny that any constitutional violations or problems of any kind exist in their segregation units, despite Plaintiffs' evidence and the Court's April 2013 findings to the contrary.  *See* Order Denying Mot. to Terminate, Docket No. 4539, Apr. 5, 2013, at 43-46.  Defendants' opposition fails to rebut Plaintiffs' evidence.[1]  Defendants further contend

---

[1] Plaintiffs have submitted evidentiary objections, filed concurrently herewith and earlier at Docket No. 4423, Mar. 19, 2013 (Corrected Pls.' Evid. Objs. to Defs.' Expert Reports & Decls.) and at Docket No. 4513, Mar. 26, 2013 (Pls.' Evid. Objs. to Defs.' Reply Declarants & Mot. to Strike, & Resp. to Defs.' Objs.) (incorporated herein by reference), much of Defendants' evidence is deficient and inadmissible.  The Court should exclude and disregard such evidence.

that Plaintiffs' proposed remedies are unworkable and dangerous.  There is no evidence in support of Defendants' assertions of danger, and there are safe, sensible, and workable alternatives to Defendants' current deficient segregation policies and practices, as demonstrated by the examples of other systems.  *See generally* Austin Reply Expert Decl.

The Special Master, Defendants' consultants and experts, and Plaintiffs' experts have all identified significant deficiencies in the State's segregation units that compromise treatment, exacerbate mental illness, and put *Coleman* class members at risk of harm.  And just last month, the *Plata* medical experts identified significant staffing and treatment deficiencies in the large ASU and SHU facilities at CSP-Corcoran, including problems that directly interfere with the delivery of mental health treatment.  Notably, Defendants, without explanation, no longer include critical Court-ordered data about *Coleman* class members in Corcoran segregation units in their monthly reports.  Kahn Reply Decl. ¶ 17.

The United States Department of Justice ("DOJ") has submitted a Statement of Interest regarding Plaintiffs' motion.  *See* Statement of Interest of the United States of America, Docket No. 4736, Aug. 9, 2013.  According to the DOJ, this Statement was submitted in response to Plaintiffs' challenge to the State's segregation practices, "including the prolonged isolation of prisoners with serious mental illness under what [Plaintiffs] allege are 'excessively harsh' conditions 'devoid of appropriate treatment,'" and in light of the federal government's "broad interest in ensuring that conditions of confinement in state and local correctional facilities are consistent with the Constitution and federal law."  *Id.* at 1, 2.  The DOJ has requested that this Court consider its recent findings regarding Eighth Amendment and Americans with Disabilities Act (ADA) violations in the use of solitary confinement for mentally ill prisoners at the Pennsylvania Correctional Facility at Cresson.  A review of those DOJ findings reveals striking parallels between Cresson's segregation practices and those in CDCR's segregation units, including prolonged periods in segregation without adequate mental health treatment (Docket No. 4736-1 at 2, 11-14); harsh segregation conditions that include treatment in a cage, minimal out-of-cell time, and extreme restrictions (*id.* at 14-16); the use of unnecessary force on

3

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    mentally ill prisoners (*id.* at 16-20, 31); inappropriate use of segregation on prisoners with

2    serious mental illness that the system cannot safely house in general population (*id.* at 24-

3    25); and a high risk of decompensation, self-harm, and suicide (*id.* at 7-11).

4         Defendants' extensive use of harsh segregation units for mentally ill prisoners

5    continues to place the State of California dangerously outside the mainstream.

6    Defendants' expert Steve Martin recently identified the problem well, recognizing a

7    "worst-case perfect storm for the administration of a prison system" that involves "placing

8    a mentally impaired offender in a highly restricted setting such as admin[istrative]

9    seg[regation] with lack of programming which generates a spiraling down of his mental

10   health" and "generates three things: serious disciplinary infractions, applications of force,

11   and further extended terms of admin[istrative] seg[regation]."  Kahn Reply Decl. Ex. P

12   (July 23, 2013 Dep. of Steve Martin) ("Martin Dep.")) at 119:1-120:6.  It is clear that

13   Defendants will not take the necessary steps to end its most harmful segregation practices

14   on their own accord.  *See, e.g.*, First Half 2012 Suicide Report at 16 ("the special master …

15   is not aware of any initiatives [CDCR] has taken to address suicide prevention in

16   administrative segregation").  After years of giving Defendants the opportunity to correct

17   the violations, this Court should order long overdue relief that sets bright line limits and

18   that will bring an end to this "perfect storm" of prolonged segregation and resulting harm.

19   **ARGUMENT**

20   I.    **DEFENDANTS' EXPERTS FAIL TO REBUT, AND IN FACT SUPPORT,**

21          **PLAINTIFFS' SHOWING OF SERIOUS HARM AND RISK OF HARM TO**
            ***COLEMAN* CLASS MEMBERS IN SEGREGATION.**

22             **A.**    **Defendants' Expert for the Instant Motion Has No Expertise Regarding**

23                  **Mentally Ill Prisoners in Segregation, Has No Foundation for Any**
                    **Opinion as to Conditions in CDCR's Segregation Units, and Relies on**

24                  **Irrelevant Studies with No Application to the Issues Before the Court.**

25        Defendants' sole segregation "expert" for the instant motion, Dr. Charles Scott

26   (whose Termination expert report was also excluded), is no segregation expert at all.  He

27   readily acknowledges that he has not reviewed, and cannot offer an opinion on, conditions

28   in CDCR's segregation units.  He instead points to a few irrelevant studies that purportedly

4

1   support Defendants' incredible claim that "there is insufficient data to conclude that

2   CDCR's use of segregated housing causes or exacerbates mental illness."  Defs.' Opp. to

3   Pls.' Mot. Related to Housing and Treatment of Seriously Mentally Ill Prisoners in

4   Segregation, Docket No. 4712, July 24 2013 ("Defs.' Opp. Br.") at 6.  His testimony is of

5   no use to the Court, and should be excluded and disregarded.

6        First, Dr. Scott has never worked in or conducted a full review of a segregation

7   system at an adult prison, nor has he otherwise studied a prison segregation system.  Kahn

8   Reply Decl. Ex. Q (July 26, 2013 Dep. of Charles Scott, M.D.) ("7/26/13 Scott Dep.")) at

9   18:13-16, 21:23-23:21, 36:23-25.  Nothing in his report establishes any expertise at all on

10  the subject of adult mentally ill prisoners in segregation.

11       Second, Dr. Scott has not conducted any review of CDCR's segregation system,

12  and is unable to provide any opinion as to the implementation of any policies.  His

13  declaration provides a single paragraph on CDCR's purported "system" for housing and

14  treating mentally ill prisoners in segregation.  Decl. of Charles Scott, M.D. in Support of

15  Defs.' Opp. Br., Docket No. 4715, July 24, 2013 ("Scott Decl.") ¶ 30.[2]  But Dr. Scott

16  admits that his knowledge of the system is based on the *Coleman* Program Guide, not any

17  review of actual conditions.  *See* 7/26/13 Scott Dep. at 143:12-21 (Q. Where did you get

18  this information as to these five aspects of CDCR's system?  A. Primarily from the

19  program guide… Q. Have you evaluated the implementation of these [] policies?  A. No.);

20  *id*. at 18:21-19:2 ("I did not do evaluations of specific ad seg units.").  Dr. Scott also did

21  not review treatment, conditions, or any other aspect of CDCR's segregation units during

22  the Termination proceedings.  *See* Kahn Reply Decl. Ex. O (Mar. 8, 2013 Dep. of Charles

23  Scott) ("3/8/13 Scott Dep.") at 122:21-123:12 (stating that, during the Termination tours,

24  _____

25  [2] Plaintiffs note that this paragraph is in fact taken nearly verbatim from the declaration of
26  CDCR Director of Health Care Services Tim Belavich, which also provides no evidence of
    implementation of these guidelines.  Am. Decl. of Dr. Tim Belavich in Supp. of Defs.'
27  Opp. Br., Docket No. 4759-1, Aug. 22, 2013 ("Am. Belavich Decl.") ¶ 19.

28

1  "review of ad seg care was not my area that I was working on"); *id.* at 215:24-216:12

2  (stating that, during the termination tours, "Dr. Dvoskin was looking at EOP and ad seg,

3  not me").  Dr. Scott has not toured any CDCR prisons, reviewed any CDCR patient

4  records, reviewed CDCR policies and procedures other than the Program Guide, or spoken

5  with CDCR clinicians or correctional staff since the Termination proceedings.  7/26/13

6  Scott Dep. at 16:11-18:4.[3]

7  　　　Without any experience or expertise about segregation systems and no personal

8  knowledge of CDCR's segregation units, Dr. Scott instead relies on irrelevant studies also

9  cited by Defendants, one regarding a now-defunct Colorado segregation unit and one

10  regarding Canada's segregation system from more than a decade ago.  Scott Decl. ¶¶ 22-

11  26.  Of course, those studies have *nothing* to do with the risk of harm to *Coleman* class

12  members in CDCR's harsh and dangerous segregation units.[4]  There remains

13  overwhelming empirical consensus that isolated confinement poses a grave risk of

14  psychological harm, particularly to individuals with mental illness.  *See* Haney Segregation

15  Decl. ¶¶ 8-12.  More importantly, Plaintiffs have presented extensive, unrebutted evidence

16  of real ongoing harms and serious risk of harm to *Coleman* class members in CDCR's

17  segregation units.

18  　　　The studies cited by Defendants have no application to the issues before this Court.

19  The researchers for those studies themselves make clear that the findings cannot be

20  generalized to the sort of segregation system that CDCR currently maintains.  For

21  

22  [3] It is notable that Dr. Joel Dvoskin, Defendants' Termination expert who reviewed

23  CDCR's segregation units, and who has signed his name to no less than four expert
reports, "responses," or "comments" in support of Defendants' filings in 2013, provides no

24  expert opinion on behalf of Defendants for purposes of this motion.  *See* Docket No. 4275-
5, Jan. 7, 2013; Docket No. 4314-1, Jan. 29, 2013; Docket No. 4326-6, Feb. 11, 2013;

25  Docket No. 4491-17, Mar. 22, 2013.

26  [4] The methodologies of these studies have also been widely criticized.  *See* Expert Decl. of

27  Craig Haney re CDCR Segregated Housing Units, Docket No. 4581, May 6, 2013 ("Haney
Segregation Decl.") ¶ 8 n.8.

28

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  example, the researchers in the Colorado Department of Corrections study of the state's

2  then-administrative segregation unit, Decl. of Debbie Vorous in Supp. of Defs.' Opp. Br.,

3  Docket No. 4714, July 24, 2013 ("Vorous Decl.") Ex. 1 ("O'Keefe Study"), identified

4  "several limitations that affect [the study's] generalizability to other settings," including

5  being limited to a one-year isolation period (as compared to the exceedingly long

6  placements in CDCR's segregation units). *Id.* at 11-12.  The researchers caution that the

7  study should not be generalized to, *inter alia*, female offenders, illiterate offenders,

8  prisoners with no prior experience in isolation, and – most importantly – to other prison

9  systems with different segregation conditions. *Id.*  Defendants point to an article

10  summarizing the methods and results of the O'Keefe Study, but a more detailed 2010

11  report by the authors of the O'Keefe Study regarding their research (O'Keefe, Maureen et

12  al., "One Year Longitudinal Study of the Psychological Effects of Administrative

13  Segregation" (Colo. Dept. Corr./Univ. of Colo., Oct. 31, 2010), available at:

14  https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf, last accessed Aug. 22, 2013) puts

15  beyond question that the study has *no* bearing on CDCR's segregation system and the

16  psychological harms inflicted upon *Coleman* class members.  Notably, unlike CDCR's

17  segregation units, the Colorado segregation unit in the O'Keefe Study had the following

18  features (many of which Plaintiffs seek as a *remedy* to the existing violations):

19     • **Time Limits**: Punitive segregation had a time limit of 60 days (*id.* at 8, 13);

20     • **Welfare Checks**: Welfare checks were done for *all* segregated prisoners (*id.* at 10);

21
22     • **Mental Health Screening for Prisoners with Prolonged Segregation Placements**: Mental health clinicians were required to do monthly rounds for *all*
23       segregated prisoners (*id.* at 10);

24     • **Enhanced Stimulation and Activity to Mitigate Isolation**: Segregation prisoners could participate in programming and education (*id.* at 10);

25
26     • **Confidential Treatment**: Mental health contacts occurred in a confidential setting, and not in a treatment cage (*id.* at 11);

27     • **Incentive Program for Increased Privileges**: There were incentive-based
28       programs, with segregation prisoners able to move up "quality of life" levels that

[914567-7]

7

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

led to more privileges (*id.* at 11); all segregation prisoners could earn access to a television in cell (*id.* at 12); and segregation prisoners could have jobs (*id.* at 12);

- **Group Treatment Sessions in Less Restrictive Settings**: Group therapy was provided *without* cages; patients were instead initially tethered to a special table and later allowed to attend groups without even a tether (*id.* at 14).

The O'Keefe Study's findings thus cannot in any way be applied to CDCR's dramatically harsher and less therapeutic segregation conditions.

The other study on which Dr. Scott relies is also inapplicable. Dr. Scott cites a 2011 article entitled "The Psychological Effects of 60 Days in Administrative Segregation" (Vorous Decl. Ex. 2, the "Zinger Study"), which sought to examine the effects of up to 60 days' placement in Canada's prison segregation system. *See* Scott Decl. ¶ 22. The researchers assert that their "findings are limited to 60 days in administrative segregation, and any extrapolation to lengthier stays would be inappropriate." Vorous Decl. Ex. 2 at p. 72, and that "the findings of this study may be less applicable to other jurisdictions, such as the United States, in which segregated prisoners typically remain in administrative or disciplinary segregation for much longer periods of time, and often under harsher conditions of confinement." *Id.* at p. 73. The authors of the Zinger Study thus expressly counsel against using their findings in the way Dr. Scott suggests.

Dr. Scott has no expertise about prison segregation systems and no knowledge of CDCR's use of segregation for mentally ill prisoners, and the studies on which he relies are expressly inapplicable. His testimony should again be excluded and disregarded, as it was during the Termination proceedings.

**B.      Statements in Defendants' Termination Joint Expert Report Support Plaintiffs' Request for Affirmative Relief.**

Defendants' Termination experts, led by Dr. Dvoskin, made several findings identifying the risk of harm to mentally ill prisoners placed in segregation and recommended changes. These opinions, reiterated in deposition testimony, include:

- "Administrative Segregation Units (including ASU/EOP hubs) remain a high-risk environment, including inmates who were not previously identified as mental health

[914567-7]

8

clients, as well as inmates who were assigned to the CCCMS and EOP levels of care." (Dvoskin, Moore, & Scott Clinical Evaluation of California's Prison Mental Health Services Delivery System, Docket No. 4275-5, Jan. 7, 2013 ("Defs.' Joint Expert Report") at 35-36);

- CDCR's segregation units are "generally non-therapeutic," "even when EOP level care is provided." (*Id.* at 18, 23);

- Placement of prisoners with serious mental illness in segregation should occur "only when absolutely necessary," and such placements should be (1) "as brief as possible" and (2) "as rare as possible." (*Id.* at 21, 23);

- "[I]nmates with serious mental illness who are housed in an Administrative Segregation Unit while awaiting a Special Needs Yard bed [should] be placed at the front of any waiting list." (*Id.* at 19);

- Mentally ill segregation prisoners are "strip searched upon leaving and returning to their housing unit" for group therapy, and "[t]his procedure can be a disincentive to group participation and should be reviewed." (*Id.* at 23); and

- "When a mentally ill inmate is housed in an Administrative Segregation Unit solely for his own protection, we see no appropriate reason to require that the inmate be seen only in a therapeutic module and recommend that this decision be made on an individual basis." (*Id.* at 21).

Defendants do not claim to have changed their practices in light of these recommendations. They instead argue that the admissions by their own experts may not be considered because the reports were excluded. Defs.' Opp. Br. at 9. This is legally incorrect. Statements in Defendants' expert reports may be used by Plaintiffs as admissions under Federal Rule of Evidence 801(d)(2)(C) & (D). *See In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (holding expert trial testimony provided in previous trial admissible because a party cannot "exclude trial testimony that she, herself, proffered"); *Durham v. County of Maui*, 804 F. Supp. 2d 1068, 1071 (D. Haw. 2011) (holding that opinions in party expert's report should be admitted where party has "authorized the particular statements by the expert (by, for example, presenting the expert at trial)").

[914567-7]

9

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

## II.   PLAINTIFFS' UNREBUTTED EVIDENCE DEMONSTRATES THE NEED FOR TIME LIMITS FOR THE MENTALLY ILL IN SEGREGATION.

Defendants have long failed to remedy the unconstitutional conditions in CDCR's segregation units regarding treatment of mentally ill prisoners.  Hundreds of mentally ill prisoners continue to languish in segregation for months and even years at a time.

By Defendants' own recent data, lengths of stay in ASU remain extraordinarily long, an average of 105 days for EOP class members and 115 days for CCCMS class members (both just marginally below the staggering statewide average length of stay in CDCR's ASUs, at 125 days).  Decl. of Kathleen Allison in Supp. of Defs.' Opp. Br., Docket No. 4713, July 24, 2013 ("Allison Decl.") ¶ 14.  Of course, the use of "average" length of stay ignores the large number of mentally ill inmates who are made to spend months, if not years, in segregation units, as even a brief glance at Defendants' monthly data shows.  According to Defendants' most recent data, 90 EOP prisoners have been housed in ASUs for stays ranging from 90 days to 518 days.  Kahn Reply Decl. ¶ 13, Ex. E.  There are some 231 EOP prisoners housed in PSUs for more than 90 days, including many for well over a year.  *Id.* ¶ 15.  Hundreds of CCCMS prisoners have been housed in ASUs and SHUs for stays greater than 90 days (595 CCCMS prisoners in ASUs, 131 CCCMS prisoners in SHUs).  *Id.* ¶ 17.  Defendants' data in fact underreports the number of *Coleman* class members with prolonged lengths of stay, mis-reporting the longest segregation placements, *see* Pls.' Mot. for Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation ("Pls.' Mot.") at 7 n.5, and *omitting all data* from the Corcoran ASU and SHU units where several hundred class members are housed.  *See* Kahn Reply Decl. ¶ 17.  Plaintiffs' counsel has repeatedly objected to the exclusion of this Corcoran segregation unit length of stay data.  *Id.*

Defendants also fail to rebut Plaintiffs' evidence that CDCR allows EOP prisoners to remain in regular ASUs not designed to provide EOP level of care, including in excess of the Program Guide transfer timeline of 30 days.  Defendants' assertion that no EOP

[914567-7]

10

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   prisoners have been in a non-EOP ASU pending transfer to an EOP ASU since May 2012

2   (*see* Allison Decl. ¶ 15) proved to be false.  Defendants' June 2013 monthly data, provided

3   to the Special Master and Plaintiffs' counsel pursuant to Court order, indicates that 14 EOP

4   prisoners have been in regular segregation units for more than 90 days, three times the

5   Program Guide mandated timeline for transfer to an EOP ASU institution.  *See* Kahn

6   Reply Decl. ¶ 14, Ex. E.  Ms. Allison had no explanation.  Allison Dep. at 118:6-121:12.

7   This critical Program Guide timeline is not being met for EOP class members.  Equally

8   troubling, Defendants admit that CDCR Headquarters does not even track EOP placements

9   in non-EOP ASUs at all until the 30-day mark, essentially sanctioning extended

10  inappropriate EOP placements in segregation units neither staffed nor designed to provide

11  EOP level of care.  *Id.* at 121:13-22; *see also* Austin Reply Expert Decl. ¶ 37 (finding 30

12  days for such transfer to be longer than necessary).

13          Defendants assert, without evidence, that the use of a time limit for mentally ill

14  prisoners' detention in segregation "is incredibly dangerous."  Defs.' Opp. Br. at 9.  But

15  years of experience make clear that prolonged detention of *Coleman* class members in

16  CDCR's segregation units is itself incredibly dangerous, resulting in a staggering number

17  of suicides.  Defendants quibble with Plaintiffs' characterization of CDCR's own data as

18  an "analysis" (Defs.' Opp. Br. at 10), but do not contest the facts: since 2007, more than 30

19  prisoners have committed suicide after spending more than a month, and even several

20  months, in segregation units.  *See* Decl. of Jane E. Kahn in Supp. of Pls.' Opp. to Defs'

21  Mot. to Terminate (filed under seal), Docket Nos. 4396, 4411, Mar. 15, 2013, Ex. 6.[5]

22  _____

23  [5] Among the many suicides following prolonged segregation cited by Plaintiffs,

24  Defendants cite to one case in an attempt to "demonstrate[] the fallacy of relying on
    Plaintiffs' simplistic efforts to tie suicides to lengths of stay."  Defs.' Opp. Br. at 10

25  (suggesting Inmate L's suicide "was directly related to notice that he would be released
    from segregation and transferred to another facility").  But this case actually highlights the

26  CDCR's failures.  Contrary to Defendants' suggestion, Inmate L was reportedly concerned
    about the unit to which he would transfer, not about his release from segregation.  The

27  Special Master's expert determined that the Suicide Risk Evaluation done for this prisoner

28  (footnote continued)

[914567-7]

1    Likewise, the evidence shows that prisoners in segregation units decompensate to the point

2    that they require inpatient psychiatric hospitalization in staggering numbers.  *See* 6/21/13

3    DSH Hr'g Tr., Docket No. 4691, at 103:11-15 (SVSP warden testifying that "majority" of

4    prisoners referred to DSH's Salinas Valley Psychiatric Program for psychiatric

5    hospitalization come from segregation).

6          Setting time limits for placement of prisoners in harsh isolation units, particularly

7    after years of failed remedial efforts, is well within the discretion of a federal court.  Such

8    an order has been approved by the United States Supreme Court itself.  In *Hutto v. Finney*,

9    437 U.S. 678 (1978), the Supreme Court affirmed a district court's order setting a time

10   limit of 30 days for placement of *all* prisoners in Arkansas prisons' punitive isolation

11   setting.  *See id.* at 680.  The Court noted that the "District Court had given the Department

12   repeated opportunities to remedy the cruel and unusual conditions in the isolation cells."

13   *Id.* at 687.  The Court concluded: "If petitioners had fully complied with the court's earlier

14   orders, the present time limit might well have been unnecessary.  But taking the long and

15   unhappy history of the litigation into account, the court was justified in entering a

16   comprehensive order to insure against the risk of inadequate compliance." *Id*.  Courts have

17   not only set time limits for placement in harsh isolation units, but have banned the

18   placement of mentally ill prisoners in such dangerous units entirely.  *See, e.g.*, *Madrid v.

19   Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) (finding constitutional violations at Pelican

20   Bay SHU) & Kahn Reply Decl. Ex. U (*Madrid v. Gomez*, N.D. Cal., Case No. C90-3094-

21   THE, Remedial Order re: Exclusion from the Security Housing Unit, Dec. 15, 1995

22   ("Pelican Bay SHU Exclusion Order")); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1125-

23   26 (W.D. Wis. 2001).

24         The basic principle enunciated in *Hutto* – that a time limit is an appropriate remedy

25   ───────────────────

26   failed to adequately assess his suicide risk, and that had a proper assessment been done, "it
     may have resulted in more effective treatment planning and possibly a higher level of care,
27   such as EOP." First Half 2012 Suicide Report at Appx H, p. 71.

28

[914567-7]

where, despite years of failed remedial efforts, a segregation system continues to pose a risk of harm not tolerated by the Constitution– fully applies here.  Defendants have failed to comply with court orders on this issue for years.  Even now, Defendants have given no particular consideration to mentally ill prisoners in segregation for non-disciplinary reasons (*see* Allison Dep. at 61:2-12), and have implemented no strategies specific to addressing class members' lengths of stay in segregation units.  *Id.* at 138:10-139:1.

There is nothing unusual, extraordinary, or inherently dangerous about setting time limits for the detention of mentally ill prisoners (or even all prisoners) in segregation units:

- In Georgia, disciplinary segregation placements may not exceed 30 days.  Austin Reply Expert Decl. ¶ 26.  In Mississippi, such placements may not exceed 40 days.  *Id.*  The vast majority of prisoners return to general population settings at the end of their disciplinary term.  Prisoners found to pose a threat to institution security following those terms are placed in a step-down program that allows them to earn greater privileges and to work their way back to general population in a discrete period of time.  Mentally ill prisoners in this category participate in a specialized step-down mental health treatment program.  *Id.* ¶¶ 30-32.

- In Vermont, prisoners with mental illness may not be housed in segregation for more than 15 days for disciplinary reasons, or for more than 30 days for non-disciplinary reasons (with allowance for 30-day extensions only following a due process hearing that includes assessment by a qualified mental health professional and approval of a physician).  28 Vt. Stat. Ann. tit. 28, § 701(a) (2012).

- In Washington, prisoners retained in ASU for more than 47 days must be referred to Headquarters for intensive management status, returned to general population, or transferred to a "more appropriate facility/unit."  Wash. Dep't of Corr. Policy No. 320.200, available at http://www.doc.wa.gov/policies/default.aspx?show=300 (last accessed Aug. 22, 2013).

- In Michigan, disciplinary segregation may not exceed 30 days for any violation, or 60 days for all violations arising from a single incident.  Mich. Dep't of Corr. Policy No. 03.03.105D, available at http://www.michigan.gov/corrections/0,1607,7-119-1441_44369---,00.html (last accessed Aug. 22, 2013).

- In Massachusetts, the State established a 30-day limit on disciplinary segregation for inmates with serious mental illness, with the added provision that no inmate would be placed continuously in disciplinary detention for more than 15 days.  *See* Kahn Reply Decl. Ex. K, *Disability Law Center v. Mass. Dep't of Corr.*, Case No. 07-10463 (D. Mass.), Docket No. 252-1, Dec. 13, 2011, Settlement Agreement at 13.

[914567-7]

13

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Plaintiffs have demonstrated the enormous risk of harm to class members housed in

2   segregation and the urgent need for relief to end prolonged segregation placements, and to

3   end anything more than extremely brief placements of class members in segregation units

4   that are incapable of providing a minimally adequate treatment program.

5   **III.   THE USE OF HARSH SEGREGATION UNITS FOR NON-DISCIPLINARY**
    **REASONS MUST END.**

6

7   **A.   Defendants' Placement of Mentally Ill Prisoners in Administrative**
        **Segregation "For Their Own Safety" Creates an Enormous Risk of**
8       **Harm, and There Are Safe Alternatives.**

9   The parties agree that "CDCR has a duty to keep inmates safe."  Defs.' Opp. Br. at

10  11.  But that means keeping them safe both from known physical harm (as when they have

11  safety concerns on the yard) and from known psychological harm (as being placed in harsh

12  solitary confinement conditions).  Defendants' system creates a Hobson's choice for

13  mentally ill prisoners with safety concerns: they can be placed in the harsh ASU setting

14  known to create a risk of psychological harm, or they can receive no protection from the

15  physical threats they face in their current setting.  Defendants state that 20-30% of the

16  6,600 ASU prisoners are there for reasons unrelated to discipline (*i.e.*, safety concerns,

17  lack of beds).  *See* Allison Dep. at 64:19-65:2.

18  Defendants play various word games in their opposition in an attempt to deny that

19  placing mentally ill prisoners with safety concerns in ASU creates a risk of harm,

20  including suicide.  *See* Defs.' Opp. Br. at 12-13.  But Defendants know very well that this

21  is a dangerous practice from, among other things, the CDCR Suicide Prevention

22  Coordinator's report that "placement in ASU of already fearful inmates may only serve to

23  make them even more fearful and anxious, which may precipitate a state of panicked

24  desperation, and the urge to die," and their own clinician's published findings on the

25  unique psychological risks related to the such placements. Pls.' Mot. at 22-23.

26  Defendants' continued head-in-the-sand strategy should not be countenanced, and

27  underlines the need for this Court to intervene.

28  Contrary to Defendants' assertion (Defs.' Opp. Br. at 13), Defendants did reject

[914567-7]

14

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   their experts' recommendation that mentally ill prisoners in ASU pending transfer to a

2   non-segregation SNY bed should be placed at the top of the waiting list.  Defendants'

3   compendium explicitly states that they "disagree[d]" with the recommendation, on the

4   grounds that "there is already a priority list of inmate-patients awaiting transfer.  CDCR

5   stands behind the current list."  Decl. of Michael W. Bien in Supp. of Pls.' Opp. to Mot. to

6   Terminate, Docket No. 4399, Mar. 15, 2013 ("Bien Decl.") Ex. 92 at 20 of 23 (last

7   Dvoskin Report recommendation on page).  Defendants' transfer priority list remains silent

8   on the issue of mentally ill prisoners in ASU for safety concerns.  Vorous Decl. Ex. 15; *see

9   also* Kahn Reply Decl. Ex. R (Aug. 7, 2013 Dep. of Tim Belavich ("Belavich Dep.")) at

10  65:24-67:11 (confirming that CDCR has not drafted instruction to the field on the issue).

11      Defendants now state that "CDCR is examining the creation of a non-disciplinary

12  unit."  Defs.' Opp. Br. at 13:20.  But at present, Defendants are merely "developing a plan

13  for a proposal" and there is no timeline for implementation.  Belavich Dep. at 67:14-68:8.

14  What is more, Defendants have no intention of creating a true non-disciplinary segregation

15  unit at all.  Instead, under Defendants' purported plan, "non-disciplinary" prisoners,

16  including mentally ill prisoners with safety concerns, would continue to be housed in the

17  same ASU settings, mixed with other ASU prisoners, and subjected to the same extreme

18  restrictions: the same 23 hours per day in their cell, the same lack of out-of-cell activity,

19  the same mental health treatment delivered in cages, and the same strip searches whenever

20  leaving or returning to the unit for treatment.  *See* Allison Dep. at 57:5-58:2.[6]

21      Other systems demonstrate that real alternatives exist, where mentally ill (and non-

22  mentally ill) prisoners are not placed in punitive-type segregation settings for "their own

23  safety."  Austin Reply Expert Decl. ¶¶ 38-46.  *Coleman* class members with safety (i.e.,

24  non-disciplinary) concerns should be promptly and directly placed into a safe bed.  *Id.*

25

26

27  [6] Ms. Allison acknowledges that these "non-disciplinary" mentally ill prisoners are placed
    in segregation for "no fault of their own."  Allison Dep. at 60:23-61:1.

28

1

2

**B.     Defendants' Denial of the Systemwide "Lack of Beds" Problem Is Not Supported by Evidence.**

3

4

Defendants admit that prisoners, including mentally ill prisoners, are being held in segregation because they are "waiting for a[n appropriate] bed to open on a yard." Allison Decl. ¶ 21.  They acknowledge that, as of the date of their Opposition, 50 prisoners – including 24 *Coleman* class members – are being held in an ASU until a non-segregation bed at that institution becomes available.  *Id.*; Kahn Reply Decl. ¶ 26, Ex. I.

5

6

7

8

Defendants claim that Plaintiffs "greatly overstated this perceived issue." But the "lack of bed" segregation problem is pervasive.  At California Institution for Men (CIM), an entire unit was filled with "LOBs" as recently as February 2013.  Expert Decl. of Craig Haney, Docket No. 4378, Mar. 14, 2013 ("Haney Termination Decl.")  ¶¶ 143-153 & Photo Ex. S.  Defendants do *not* include the CIM "LOBs" in their data.  They assert that the CIM ASU housing "LOBs" (Cypress Unit) is not a "real" ASU, but rather a unit being used both to house segregation prisoners and as an "overflow" unit when beds in non-segregation units are not available.  *See* Allison Dep. at 165:13-166:21.  Likewise, Defendants do *not* include in their data prisoners housed in segregation while waiting for transfer to an appropriate bed at another CDCR institution.  *Id.* at 168:7-23.

9

10

11

12

13

14

15

16

17

18

Defendants' denials rest on distinctions without a difference.  "Lack of beds"—that is, shortages due to overcrowding, system mismanagement, or any other factor—is not a valid reason for subjecting a mentally ill prisoner to harsh isolation conditions known to "exacerbate[] the underlying mental illness, induce[] psychosis, and increase[] the risk of suicide."  *Coleman*, 1994 U.S. Dist. LEXIS 20786, at *71-72.  When a class member is placed in an ASU being used as a non-segregation "overflow," or is placed in an ASU pending transfer to a GP or SNY bed at another institution, that is an inappropriate "LOB" segregation placement.[7]  Defendants confirm that it is "common practice" for individuals

19

20

21

22

23

24

25

26

27

28

---

[7] Of course, persistent overcrowding almost certainly plays a role in these inappropriate placements.  Austin Reply Expert Decl. ¶¶ 39, 44.  For the week of June 24, 2013, CDCR (footnote continued)

[914567-7]

awaiting placement in non-segregation beds, including SNYs, to be held in an ASU pending transfer. *See* Allison Dep. at 32:21-33:20; *see also* Reply Decl. of Kim Holland in Supp. of Defs.' Mot. to Terminate, Docket No. 4438, Mar. 22, 2013, ¶ 6 ("The issue of inmates waiting transfer to an appropriate bed is a statewide one and not just specific to [CCI]"); Reply Decl. of Connie Gipson in Supp. of Defs.' Mot. to Terminate, Docket No. 4430, Mar. 22, 2013, ¶ 19 (COR); Reply Decl. of Brenda Cash in Supp. of Defs.' Mot. to Terminate, Docket No. 4459, Mar. 22, 2013, ¶ 11 (CIM); Reply Decl. of James Telander in Supp. of Defs.' Mot. to Terminate, Docket No. 4480, Mar. 22, 2013, ¶ 6 (MCSP).

Contrary to Defendants' assurances that "LOB" prisoners in segregation receive the same 30-minute welfare checks as other segregation prisoners and "full reception center privileges," Allison Decl. ¶¶ 21-22, the evidence shows that these prisoners face severe segregation-type conditions, do not receive ASU mental health screening, and do not receive 30-minute welfare checks. *See* Am. Reply Decl. of Victor Jordan, Ph.D. in Supp. of Defs.' Mot. to Terminate, Docket No. 4507, Mar. 25, 2013, ¶ 24 (LOBs at CIM "do not receive the 30 minute welfare checks or the 31-item pre-placement questionnaire [*i.e.*, ASU mental health screening]"); Haney Termination Decl. ¶¶ 143-153; Expert Decl. of Edward Kaufman, M.D., Docket No. 4379, Mar. 14, 2013 ("Kaufman Termination Decl.") ¶¶ 96-98, 105, 115-118.

Defendants' core argument appears to be that "[b]ecause there are valid penological reasons for placement of an inmate into administrative segregation, the Court should deny Plaintiffs' request to remove class members placed in segregation for non-disciplinary reasons" (*i.e.*, due to lack of appropriate beds). Defs.' Opp. Br. at 15. But Defendants provide no "valid penological reason" for placing a mentally ill prisoner in ASU where there is not an available non-segregation bed that meets the individual's needs. Other

---

was able to place just 48 of 305 EOPs who were waiting for transfer to an appropriate EOP bed (including hundreds waiting for an EOP SNY bed). *See* Kahn Reply Decl. ¶ 27, Ex. J.

[914567-7]

1  systems do not use such a practice, instead providing adequate beds for prisoners who need

2  protection or are endorsed for general population.  Austin Reply Expert Decl. ¶¶ 38-46.

3       Plaintiffs' experts have reported in detail about the substantial psychological

4  distress and risks that result from these indeterminate "LOB" segregation placements.[8]

5  This practice is dangerous and must end.

6  **IV.  DEFENDANTS HAVE FAILED TO ADDRESS INADEQUATE SCREENING
       AND TO PREVENT DANGEROUS PLACEMENTS OF MENTALLY ILL
7      PRISONERS MOST AT RISK OF HARM IF PLACED IN SEGREGATION.**

8       Plaintiffs have demonstrated the need for orders to ensure appropriate mental health

9  screening of prisoners placed in segregation units, and to exclude those mentally ill

10 prisoners who would be put at risk of serious harm if placed there.  For many mentally ill

11 prisoners, it is simply too dangerous for them to remain in CDCR's segregation units.  "[I]f

12 the particular conditions of segregation being challenged are such that they inflict a serious

13 mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then

14 defendants have deprived inmates of a basic necessity of human existence—indeed, they

15 have crossed into the realm of psychological torture."  *Madrid*, 889 F. Supp. 1146, 1264;

16 *see also Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, Case No.

17 1:08-cv-01317-TWP-MJD, 2012 U.S. Dist. LEXIS 182974, at *58-59 (S.D. Ind. Dec. 31,

18 2012); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999) ("As to mentally ill

19 inmates in [the Texas prison system], the severe and psychologically harmful deprivations

20 of its administrative segregation units are, by our evolving and maturing society's

21 standards of humanity and decency, found to be cruel and unusual punishment").

22 _____

23 [8] Defendants' discussion of four of the many LOB prisoners observed by Plaintiffs'
   experts mischaracterizes those class members' circumstances.  Defs' Opp. Br. at 14-15.
24 Plaintiffs correctly assert that class members were placed in the ASU while waiting for an
   appropriate non-segregation bed to become available.  Plaintiffs' experts found individuals
25 to be having great difficulty coping in the segregation setting.  In some cases, class
   members act out in the ASU and are assessed additional segregation terms.  That
26 inappropriate segregation placements may lead to rule violations and further segregation
   terms should come as no surprise to Defendants.  *See* Martin Dep. 119:1-120:6.
27

28

1

**A.    Defendants Confirm that CDCR Ignores Clinical Input when Returning a Patient from Inpatient Hospitalization or Crisis-Level Psychiatric Care to a Segregation Unit, an Exceedingly Dangerous Practice.**

2

3    It is well established that Defendants' psych-and-return policy creates a substantial

4    risk of harm to fragile mentally ill prisoners.  Defendants do not dispute that class

5    members have committed suicide in segregation soon after being returned there from a

6    DSH or MHCB unit.  And Defendants confirm the importance of "removing inmates who

7    are suffering a severe psychiatric crisis [from segregation] … a*nd not returning them until*

8    *they are able to psychologically tolerate that setting*."  Scott Decl. ¶ 29 (emphasis added).

9    But Defendants have taken no steps to prevent such harms.

10    By Defendants' own policy, an inmate-patient's return from inpatient or crisis level

11    of care to an ASU, SHU, or PSU is determined solely by custody; clinical input does not

12    play a role in determining the safety or appropriateness of such a placement following

13    discharge.  *See* Allison Decl. ¶¶ 24-25, Ex. B.  Defendants trot out their March 21, 2013

14    memorandum on the "Psychiatric and Return" policy, but admit that it "didn't change any

15    policy" with respect to the returning of class members discharged from inpatient care to

16    ASU or SHU.  Belavich Dep. at 189:18-25.  If an inmate-patient discharging from DSH is

17    slated for return to a segregation unit but cannot be safely returned to that setting, a DSH

18    clinician's only option is to keep him or her in an inpatient bed indefinitely.  *Id.* at 191:19-

19    192:21.  In short, Defendants' system explicitly permits the discharge of a psychiatrically

20    hospitalized patient to segregation without clinical consideration of whether such

21    placement is safe.  *See* Allison Decl. ¶ 25 ("[T]he decision … is rightly with correctional

22    officers, and not with mental health clinicians.").

23    Defendants mount oblique, irrelevant attacks on Plaintiffs' discussion of several

24    specific cases involving the discharge of patients from inpatient or crisis level care to

25    segregation that resulted in class member decompensation, repeated crisis care admissions,

26    and at least two suicides.  Defendants dismiss such cases as "idiosyncratic" and thus not

27    warranting a remedial order.  But Plaintiffs' evidence demonstrates a fundamental failure

28    in addressing constitutional violations and, specifically, in implementing important

[914567-7]

19

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Program Guide provisions prohibiting such discharge to clinically inappropriate settings.

2   *See* Bien Decl. Ex. 16 (*Coleman* Program Guide 12-5-27 & 28) & Ex. 17 (*Coleman*

3   Program Guide 12-6-13).

4        Defendants attack Plaintiffs' expert Dr. Haney for being unable to "define which

5   inmates he believed were more vulnerable to deterioration in segregated housing than

6   others." Defs.' Opp. Br. at 19. Such an attack is disingenuous: Dr. Haney discusses in

7   great detail factors relevant to whether an isolation placement may create a substantial risk

8   of psychological harm, including for prisoners discharging from an inpatient or crisis bed.

9   Haney Termination Decl. ¶ 288; *id.* ¶¶ 36-50, 284-287; *accord* Expert Decl. of Pablo

10   Stewart, M.D., Docket No. 4381, Mar. 14, 2013 ¶ 347.

11        Plaintiffs' proposed remedy is a simple one: A class member discharging from an

12   inpatient or crisis level of care setting should not be returned to segregation absent a

13   clinical determination that his or her psychiatric condition will not be put at risk by such a

14   placement. Defendants' obstinacy on this matter unnecessarily puts lives at risk.

15

16       **B.**    **Defendants' Failure to Conduct Adequate Mental Health Screening for Prisoners Entering Segregation Is Dangerous, and the Special Master Must Supervise the Implementation of an Adequate Screening Process that Includes an "ASU Exclusion" When Necessary.**

17

18        The Special Master has repeatedly found that Defendants' failure to conduct

19   adequate mental health screenings for prisoners entering segregation contributes to the

20   high rate of suicide. *See* First Half 2012 Suicide Report at 4 (inadequacies in 40% of

21   suicides reviewed, including four segregation suicides (Inmates C, F, J, O)); 2011 Suicide

22   Report at 3 & 11 (in 50% of suicides reviewed, suicide risk evaluations were either not

23   done or were not completed appropriately).

24        Defendants have been aware of deficiencies in their screening tool since at least

25   August 2010, following a tragic suicide (Pls. Mot. at 32-33), but a pilot for a new

26   screening tool is being authorized only now, *three years later.* Am. Belavich Decl. ¶ 14.

27   Defendants were unable to explain the reason for this delay, or to identify important

28   aspects and the timeline for implementation. Belavich Dep. at 146:14- 152:13. Given

1    Defendants' abysmal record on suicide prevention in segregation units, the implementation

2    of a new screening tool and related changes (such as "ASU exclusion" criteria) are

3    necessary, and must be monitored closely by the Special Master, with input from Plaintiffs.

4          **C.    There is No Rational Basis for Continuing to Limit the SHU Exclusion
             Order to the Pelican Bay SHU, Particularly Given the Harms Suffered
5            by Class Members in the System's Other SHUs.**

6          Defendants do not argue against the exclusion of mentally ill prisoners from the

7    Pelican Bay SHU, a policy instituted by court order that has been in effect for more than

8    17 years.  Nor do Defendants claim that the restrictions and conditions in the other SHUs

9    in the system—at CSP-Corcoran (COR), CSP-Sacramento (SAC), California Correctional

10   Institution (CCI), and California Institution for Women (CIW)—are any different than

11   those at the Pelican Bay SHU, with two exceptions: (1) the lack of windows and natural

12   light at the Pelican Bay SHU[9], and (2) the concrete rather than fenced-in exercise yard at

13   the Pelican Bay SHU.  *See* Allison Decl. ¶ 26.  Defendants provide no evidence as to how

14   these two architectural variations make the other SHUs suitable and safe for housing the

15   mentally ill.  Defendants confirm that the SHUs are in all other respects the same,

16   including the extremely limited out-of-cell time, the extensive use of restraints, the lack of

17   programs, and the severe personal property and visiting restrictions.  *See* Allison Dep. at

18   189:23-193:6; *accord* Haney Segregation Decl. ¶¶ 18-20.  Dr. Haney's opinion that the

19   Pelican Bay SHU exclusion should apply for all SHUs is unrebutted.

20         Conditions in the SHUs where *Coleman* class members are housed remain

21   extremely dangerous.  At the Corcoran SHU, there have been two suicides in the last year.

22   Kahn Reply Decl. ¶ 19.  The *Plata* medical expert team recently identified numerous

23   problems related to the delivery of care in the Corcoran segregation units.  *See id.* ¶ 40, Ex.

24   _____

25   [9] This assertion is in fact belied by CDCR Secretary Jeffrey Beard who, in a recent *Los
     Angeles Times* Op-Ed article discussing the CDCR SHUs, wrote that "[a]t Pelican Bay, all
26   SHU cells have skylights."  *Hunger Strike in California Prisons Is a Gang Power Play*,
     L.A. Times, Aug. 6, 2013, at A13.
27

28

[914567-7]

1    W (Corcoran State Prison Health Care Evaluation, *Plata v. Brown* (N.D. Cal.), Case No.

2    3:01-cv-01351-THE, Docket No. 2687, Jul. 29, 2013).  The deficiencies in the Corcoran

3    SHU include access, timeliness, and quality of care (*id.* at 26), inadequate custody support

4    for medication administration (*id.* at 37), inadequate custody staffing in the Outpatient

5    Housing Unit and hospital unit (where 40% of patients come from segregation) that

6    interfere with treatment (*id.* at 50-51), and inadequate nursing assessments (*id.* at 66).

7         Defendants present the cases of three CCCMS prisoners in the Corcoran SHU,

8    which serve only to highlight the impact of the extraordinarily prolonged segregation

9    placements of class members.  *See* Allison Decl. ¶ 28.  These three *Coleman* class

10   members have been housed between *seven and thirteen years* in SHU, where they have

11   accrued multiple consecutive SHU terms, often for non-serious rule violations.  *See* Kahn

12   Reply Decl. Ex. V.  One of these mentally ill men has an expected SHU release date in

13   *September 2036.  Id.*  Defendants do not provide information as to these class members'

14   mental health condition, their treatment program, or any recent CDCR consideration of

15   whether a less restrictive placement or enhanced treatment program may be appropriate.

16   *See* Allison Dep. at 196:6-207:2.  Defendants' examples prove the point: mentally ill

17   prisoners should not be housed in the SHUs for years and even decades, as the current

18   system allows.

19        At the CCI SHU, three prisoners (including two CCCMS inmate-patients) have

20   committed suicide since June 2011, and the Special Master's expert deemed each death

21   preventable or likely preventable.  *See* First Half 2012 Suicide Report, Appx. H at 6 (for

22   Inmate B, noting failure to provide adequate outdoor recreation and emphasizing that

23   "[i]nmates in SHU need out-of-cell activities and access to recreation to help them cope

24   with the conditions of confinement"); 2011 Suicide Report at 170 (for Inmate P, finding

25   "clear deterioration in mental health functioning" and "grossly inadequate" assessments

26   and IDTT reviews, noting "minimal consideration that he should have had an evaluation to

27   determine his ability to remain mentally healthy in a SHU"); *id.* at 199 (for Inmate S,

28   noting observed "deteriorating physical condition and depression" in SHU and that his

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   "death is very likely to have been preventable").

2    Defendants argue that the exclusion of CCCMS inmates would "greatly diminish

3   the deterrent effect" of the SHU.  Defs.' Opp. Br. at 23:17-21.  But Defendants concede

4   that they have no evidence showing that the SHU has any "deterrent effect" at all.  *See*

5   Allison Dep. at 192:1-7; *accord* Austin Reply Expert Decl. ¶¶ 29, 51 (discussing

6   experience that lengthy disciplinary SHU terms do not have a greater deterrent effect).

7    Defendants also mischaracterize Plaintiffs' requested relief.  Plaintiffs seek an end

8   to the dangerous housing of mentally ill prisoners for whom the risk of psychological harm

9   is unreasonably high, as consistent with the *Madrid* court's Pelican Bay SHU exclusion

10   order.  *See* Kahn Reply Decl. Ex. U.  Safe and workable alternatives are available, such as

11   creation of psychiatric treatment units that provide the setting, treatment, and programming

12   to meet class members' mental health needs while addressing problematic behaviors and

13   reducing the need for harsh SHU placements.  *See* Austin Reply Expert Decl. ¶¶ 50-51.

14    On August 23, 2013, United Nations Special Rapporteur on torture, Juan E.

15   Méndez, issued a statement expressing great concern about the mental and physical

16   suffering in harsh isolation units.  Looking at California's system specifically, he stated: "I

17   am extremely worried about … the approximately 4,000 prisoners in California who are

18   held in Security Housing Units for indefinite periods or periods of many years, often

19   decades."  Kahn Decl. Ex. X (*California jails: "Solitary confinement can amount to cruel*

20   *punishment, even torture" – UN rights expert*, United Nations Office of the High

21   Commissioner for Human Rights, Aug. 23, 2013).  There is an urgent need to protect

22   mentally ill prisoners who are at substantial risk of harm in these dangerous units.

23    The lack of exclusionary criteria in CDCR's SHUs has been an unresolved issue for

24   years.  *See* Kahn Reply Decl. ¶ 9.  The SHU exclusion order already in place for the

25   Pelican Bay SHU should be expanded to cover all of CDCR's SHUs.

26

  **D.** **Defendants Fail to Show that Their Current System Makes Unnecessary**

27      **a "Sweep" of Prisoners Housed in Segregation for Prolonged Periods.**

28    Defendants argue that a mental health screening "sweep" of inmates who have been

[914567-7]

1   housed in segregation for a prolonged period is "nonsensical," "unnecessary," and even

2   "dangerous." *See* Defs.' Opp. Br. at 24-24; Allison Decl. at p. 11:24:25.  They provide no

3   response to their own expert's identification of segregated CDCR prisoners she saw who

4   were "very sick" and "needed to be somewhere else," Kahn Reply Decl. Ex. T (Feb. 21,

5   2013 Dep. of Jacqueline Moore ("Moore Dep.")) at 166:4-168:9, or to their own staff's

6   finding that the initial mental health screening in segregation may not be adequate to

7   identify suicide risk that develops during prolonged isolation.  Bien Decl. Ex. 22 at p. 3.

8       Defendants' current system does not provide for adequate mental health assessment

9   of prisoners housed in segregation for prolonged periods, particularly those prisoners who

10  are not on the mental health caseload.  Defendants admit that case reviews of such

11  prisoners are done by custody staff.  *See* Allison Decl. ¶¶ 29-30.  Defendants rely on

12  correctional officers and inmates themselves to identify psychiatrically deteriorating

13  prisoners.  *See* Allison Dep. at 212:14-213:5.  Defendants also rely on the brief rounds

14  done by licensed psychiatric technicians (LPTs), who do not conduct formal mental health

15  assessments during those rounds.  The rounds are supposed to be done daily for inmates in

16  ASU (Kahn Reply Decl. Ex. L (*Coleman* Program Guide 12-7-5)), and weekly for mental

17  health caseload prisoners in SHU and every other week for non-mental health caseload

18  prisoners in SHU.  *Id.* Ex. M (*Coleman* Program Guide 12-8-7).  In the San Quentin

19  condemned unit, LPT rounds are done only on East Block.  Reply Decl. of Eric Monthei,

20  Psy. D, in Supp. of Defs.' Mot. to Terminate, Docket No. 4436, Mar. 22, 2013, ¶ 23.

21  Given the evidence of decompensation and high suicide rates in CDCR segregation units

22  (for prisoners on and off the mental health caseload), the current system clearly does not

23  adequately identify heightened acuity of mental illness and need for treatment.

24      Assessing the mental health of prisoners who have been held in segregation units

25  for long periods of time is standard practice in many states' prison systems, and plays an

26  important role in identifying and responding to segregated prisoners who have

27  decompensated.  *See* Austin Reply Expert Decl. ¶¶ 52-54.

28      Where a prison system fails to provide adequate mental health assessments for

[914567-7]

24

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   prisoners known to be at risk of psychological harm based on prolonged segregation stays,

2   courts have stepped in to provide a remedy.  For example, in *Jones 'El*, the court found

3   that inmates with mental illness were subject to serious risk of harm in the state's

4   "Supermax" segregation unit.  164 F. Supp. 2d at 1122.  The court ordered an independent

5   clinical evaluation of all Supermax prisoners "at risk of having serious mental illnesses," a

6   group that included, *inter alia*, "those who have been hospitalized in a psychiatric

7   institution at any time; those who have spent longer than 30 days at Level One [*i.e.*, the

8   most restrictive of five 'levels']; [and] those who have spent longer than 90 days at

9   Supermax without progressing beyond Level Two."  *Id.* at 1125; *see also* Pelican Bay

10  SHU Exclusion Order at 22-23 (ordering screening for all Pelican Bay SHU inmates to

11  determine whether they meet "at risk" exclusion criteria).

12  **V.     THE EVIDENCE DEMONSTRATES THE NEED FOR ADDITIONAL
        REMEDIAL ORDERS REGARDING LONGSTANDING INADEQUACIES**
13      **IN ACCESS TO TREATMENT, UNNECESSARILY HARSH CONDITIONS,
        AND INSUFFICIENT SAFETY MEASURES IN SEGREGATION UNITS.**
14

15      **A.     Defendants' System Fails to Provide Adequate Clinical Treatment and
            Office Space and a Sufficient Amount of Treatment to Class Members**
16          **Housed in Segregation.**

17      Major deficits persist in the treatment and office space in segregation units

18  throughout the system.  Court-ordered projects to address inadequate clinical treatment and

19  office space continue to be substantially delayed, with Defendants' latest expected

20  completion dates as far out as 2016.  *See* Kahn Reply Decl. ¶ 12.  As an example, the EOP

21  ASU treatment space at MCSP has long been identified as problematic.  Haney

22  Termination Decl. ¶¶ 74-78 & n.43 (citing MCSP's institutional report for 25th Round

23  monitoring tour that the "treatment area for ASU EOP and ASU CCCMS" constituted an

24  "[o]bstacle[] to providing mental health services and adherence to Program Guide

25  Requirements").  As of February 2013, planned ASU treatment space construction at

26  MCSP was scheduled to begin in March 2014.  *Id.* ¶ 74.  Defendants now state that

27  construction will not begin before October 2014 and will not be completed until *February*

28  *2016.*  Decl. of Deborah Hysen in Supp. of Defs.' Opp. Br., Docket No. 4712-2, July 24,

[914567-7]

25

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   2013, ¶ 11.

2          Defendants' response to Plaintiffs' evidence that class members in segregation are

3   denied an adequate amount of treatment rehashes long-rejected arguments and is

4   unsupported by evidence.  Defendants rely on their Termination experts' irrelevant and

5   improper legal opinion that group treatment is not a "constitutional requirement" for

6   CCCMS class members, even if such treatment is clinically appropriate.  *See, e.g.*, 7/26/13

7   Scott Dep. at 102:24-103:12 (stating that the "failure to give a CCCMS inmate group

8   therapy would [not] represent the deliberate indifference under the case of *Farmer v.*

9   *Brennan*"); Kahn Reply Decl. Ex. N (Feb. 27, 2013 Dep. of Joel Dvoskin ("Dvoskin

10  Dep.")) at 276:6-277:16.  Defendants also persist with the position that providing EOP

11  prisoners in segregation at least ten hours of treatment "is not a constitutional mandate."

12  Defs.' Opp. Br. at 28.  This Court has rejected such arguments before, and should do so

13  again.  *See* Order Denying Mot. to Terminate at 30 n.30 (noting that "defense counsel

14  acknowledge that '[t]he program guide is the remedial plan designed to get the State up to

15  a constitutional level of care,'" and finding that "the degree to which defendants are

16  complying with the Revised Program Guide is an appropriate way to assess whether

17  defendants are meeting their constitutional obligations").[10]

18         Defendants provide little or no treatment for CCCMS prisoners in the ASUs and

19  SHUs.  *See* Pls.' Mot. at 5, 35-36 (citing Special Master findings and Plaintiffs' evidence).

20  With respect to treatment in ASUs, Defendants assert that 447 CCCMS prisoners were

21  offered (though did not necessarily receive) 2,100 hours of group treatment in April 2013.

22  Am. Belavich Decl. ¶ 6.  This works out to an average of 1.2 hours/week of offered

23  treatment for these 447 patients, and ignores the other nearly 1,500 CCCMS prisoners in

24  ASU (including the ASUs where no group treatment is available).  With respect to

25  _____

26  [10] Defendants are simply wrong that Plaintiffs do not present evidence of inadequate
    staffing and out-of-cell time in segregation.  *See, e.g.*, Haney Termination Decl.¶ 57, 79-

27  83, 139-140, 196-216; Kaufman Termination Decl. ¶¶ 24-46.  Such evidence is unrebutted.

28

1  treatment in SHUs, Defendants state that 114 CCCMS COR SHU prisoners were offered

2  (though did not necessarily receive) 856.75 hours of group treatment, and that 86 CCCMS

3  CCI SHU prisoners were offered 471.25 hours of group treatment over a six-month period.

4  *Id.* ¶ 10.  This works out to 0.3 hours/week of offered treatment for a sub-group of COR

5  SHU patients, and 0.2 hours/week of offered treatment for a sub-group of CCI SHU

6  patients, and ignores hundreds of class members who received no treatment at all.

7         For EOP prisoners, Defendants rely on the *Coleman* Program Guide provision that

8  EOPs housed in segregation get ten hours per week of "*scheduled* structured therapeutic

9  activities."  Defs.' Opp. Br. at 27-28 (citing *Coleman* Program Guide 12-7-10) (emphasis

10  in brief).  Of course, the "scheduling" of structured therapeutic treatment is of no use to a

11  mentally ill prisoner if it is *cancelled*, as 23.09 hours/week were cancelled in EOP ASUs

12  and PSUs systemwide in June 2013, or if such treatment is *not attended* (for reasons such

13  as inmate-patients' reluctance to undergo strip searches prior to treatment or to be placed

14  in a cage), as 52.98 hours/week were "refused" in EOP ASUs and PSUs systemwide in

15  June 2013.  Am. Belavich Decl. Ex. 1.  The Special Master has found that "structured

16  therapeutic activity is a critical part of EOP care in general . . . [and] particularly . . . in

17  segregation units," and that "the provision of at least ten hours of structured therapeutic

18  activity should be made a priority."  Special Master's 25th Round Monitoring Rep.,

19  Docket. No. 4298, Jan. 18, 2013, at 37.  Defendants have for years failed to meet this

20  minimum standard.  According to Defendants' June 2013-only data, EOP prisoners in the

21  EOP ASUs and PSUs attended an average of at least ten hours/week of treatment at only

22  *one* of these fourteen programs (San Quentin).  Am. Belavich Decl. Ex. 1.

23         Class members should not be housed in segregation units where minimally adequate

24  treatment is not provided.  Plaintiffs request an order precluding the prolonged placement

25  of mentally ill prisoners in segregated units (i.e., beyond 72 hours) that cannot provide

26  minimally adequate treatment.  The longer time limits of 30 days (EOP) and 60 days

27  (CCCMS) sought by Plaintiffs would be appropriate only where the Special Master has

28  determined that a segregated unit is providing minimally adequate mental health treatment

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    in appropriate, confidential treatment settings.

2        **B.     Defendants' Blanket Use of Strip Searches Whenever Any Mentally Ill**
         **Patient in Segregation Goes to and Returns from a Treatment Session**
3        **Undermines Delivery of Constitutionally Mandated Treatment.**

4        Defendants confirm that all segregation prisoners—whether in isolation for

5    disciplinary or non-disciplinary reasons, and without regard to their individual custodial

6    needs or psychological vulnerabilities—are subject to the same strip searches each time

7    they leave their housing unit, and again each time they return to their housing unit.  Allison

8    Decl. ¶ 31.  Defendants rely on inapplicable case law regarding inmate strip search

9    challenges based on the Fourth Amendment.  Defendants' reliance on *Turner v. Safley*, 482

10   U.S. 78 (1987) is inapposite.  *See Johnson v. California*, 543 U.S. 499, 511 (2005). ("[W]e

11   have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual

12   punishment in prison.  We judge violations of that Amendment under the 'deliberate

13   indifference' standard, rather than *Turner*'s 'reasonably related' standard."); *Jordan v.*

14   *Gardner*, 986 F.2d 1521, 1530-31 (9th Cir. 1993) (en banc) (enjoining policy of cross-

15   gender, random, non-emergency, suspicion-less clothed body searches on female prisoners

16   to violate Eighth Amendment, and rejecting application of *Turner*).  Defendants

17   improperly conflate the *Turner* analysis with the appropriate Eighth Amendment analysis.

18       Defendants' strip search policy has been determined harmful by the Special Master

19   (Special Master's 21st Round Monitoring Report, Docket No. 3638, July 31, 2009, at 163),

20   by Defendants' Termination experts (Defs.' Joint Expert Report at 23), and Plaintiffs'

21   experts (Haney Termination Decl. ¶¶ 182-183, Kaufman Termination Decl. ¶¶ 163-166).

22   Defendants' policy undermines the delivery of treatment and serves to humiliate and

23   degrade inmate-patients who may be in segregation for no fault of their own and for whom

24   the practice may be particularly harmful due to their mental illness.  *See Bull v. City &*

25   *County of San Francisco*, 595 F.3d 964, 975 (9th Cir. 2010) (recognizing that "strip

26   searches are invasive and embarrassing"); *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir.

27   1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person

28   of his clothes.") (internal quotations omitted); Austin Reply Expert Decl. ¶ 58.

[914567-7]

28

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    Defendants' policy also violates the right of mentally ill prisoners to be free of disability

2    discrimination.  *See* Part VI, *infra.*

3

         C.    **Defendants' Blanket Use of Cages for All Treatment in Segregation
4              Undermines Delivery of Constitutionally Mandated Treatment.**

5          The use of cages, or "therapeutic treatment modules," for the delivery of all

6    treatment in segregation units, must be stopped.  Defendants' argument that cages were

7    approved by the Special Master, supported solely by emails from CDCR staff with

8    inadmissible hearsay that mischaracterize any such "approval," are wrong.  Defendants do

9    not rebut Plaintiffs' evidence that the blanket use of these cages for all group and

10   individual treatment in segregation units interferes with treatment and is harmful.

11         In 2006, during the Program Guide revisions process, Plaintiffs objected to the

12   blanket use of treatment cages for all mentally ill prisoners receiving treatment in

13   segregation units, and asserted the need to provide an individualized assessment of each

14   ASU patient's risk of violence in determining whether treatment could include group

15   therapy outside of treatment cages, as well as individual therapy outside of treatment

16   cages.  Kahn Reply Decl. ¶¶ 8-9.  This remains an outstanding issue in the case.  *Id.*  The

17   Special Master has never endorsed Defendants' use of cages for treatment.  Whatever

18   effort may have been made by one of the Special Master's experts was undertaken simply

19   to mitigate the harshness and barriers to treatment that existed in the CDCR model.  This

20   Court has never approved CDCR's use of cages in segregated housing units.  *Id.* ¶¶ 20-23.

21         The Special Master, in fact, just recently criticized Defendants' cages as

22   uncomfortable, interfering with treatment, and inappropriate for mental health treatment

23   such as Interdisciplinary Treatment Team (IDTT) meetings:

24         When therapeutic modules are going to be used in a group survey or IDTT
           room, they should be modules which have seats. At observed sessions in
25         which the modules did not have seats, it was clear that the inmates were very
           uncomfortable. At another observed session, the seats in the modules were
26         quite small and were situated in a way that forced the inmates to sit facing
           away from the IDTT treatment team. These issues with the modules can
27         interfere with conduct of a useful survey or a good IDTT meeting and should
           be avoided.

28

                                          29
─────────────────────────────────────────────────────────────
         PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
      IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Special Master's Rep. on Defs.' Quality Improvement Process, Docket No. 4730, Aug. 2,

2   2013 at 19.

3          Safe alternatives to the blanket use of treatment modules do exist.  Individualized

4   assessments can be done to determine whether placement in a cage for treatment is

5   necessary, as recommended by Defendants' experts.  *See* Defs.' Joint Expert Report at 21.

6   Defendants are wrong that there is no way to reduce or eliminate the use of treatment cages

7   in segregation units.  Several state segregation systems do not use cages at all, relying on

8   safe and less restrictive alternatives such as tether systems that allow for more normal

9   movement and interactions.  Austin Reply Expert Decl. ¶ 56.  In those states that have

10  cages, prisoners are able to progress to a level of security where they can receive treatment

11  without a cage, as through participation in a step-down program.  *Id.* ¶ 57.

12         Defendants' survey finding that some inmate-patients and clinicians "prefer" the

13  treatment cages to the Alternative Treatment Option Module (ATOM) chair that has been

14  piloted at some facilities proves nothing.  The ATOM chairs themselves are "painful and

15  restrictive," and may interfere with the delivery of treatment.  Kaufman Termination Decl.

16  ¶ 62.  Defendants' failure to pilot a viable alternative to treatment cages does not change

17  their constitutional duty to provide adequate mental health treatment in an appropriate

18  setting.  Nor does it change the fact that Defendants' blanket use of treatment cages for all

19  mentally ill prisoners in segregation—regardless of reason for placement or individual

20  security needs—violates disability discrimination law, including the right to receive

21  services in the most integrated setting that is appropriate.  *See* Part VI, *infra.*

22
23         **D.     The Prolific Use of Holding Cells for Suicidal Prisoners Waiting for a
               Mental Health Crisis Bed Must End.**

24         Defendants cite to the Program Guide in defending their widespread practice of

25  placing prisoners referred to a mental health crisis bed (MHCB) in alternative placements,

26  including holding cells, while they wait for an available MHCB.  The Program Guide

27  transfer timelines mandate that a patient referred to an MHCB shall be transferred within

28  24 hours.  Kahn Reply Decl. Ex. F.  The Program Guide was modified in 2006, during the

30

1   height of the overcrowding crisis, to address the reality of the MHCB shortages and the

2   practice of using alternative placements indiscriminately.  Kahn Reply Decl. ¶ 24.  The

3   revised Program Guide sets forth a hierarchy of alternative placement options to guide

4   clinical staff, so that a patient waiting for an MHCB is *not* placed into a holding cell when

5   more clinically appropriate placements are available.  *See id.* Ex. G.  The last two

6   placement options among the nine provided for alternative placements are holding cells,

7   where the patient can be made to "sit or stand" for up to four hours.  *Id*. ¶ 24.

8        Defendants now use procedures, developed during their most serious bed shortages,

9   to justify the continued widespread use of alternative placements, including holding cell

10  cages throughout the mental health program in all settings for delivery of treatment.  Kahn

11  Reply Decl. ¶ 25.  This practice must be brought to an end, and the Court should order

12  Defendants to devise, in consultation with the Special Master and Plaintiffs, appropriate

13  alternatives to these inhumane holding cages.

14  **E.    Defendants' Refusal to Expand Welfare Checks as Recommended by
            their Expert and the Special Master's Suicide Prevention Expert, and as**

15  **        Consistent with National Correctional Standards, Puts Lives at Risk.**

16       Defendants desperately deflect the recommendations of expert after expert on all

17  sides in this litigation, each of whom opines that 30-minute welfare checks should be

18  provided to all segregation prisoners for the entirety of their placement in segregation.

19  They admit that their own expert, Dr. Moore, opined that welfare checks should be

20  provided for all inmates in segregation for the entire segregation period, but argue that she

21  did not explicitly say that doing so would "save lives."  Defs' Opp. Br. at 38.  They

22  acknowledge that Plaintiffs' psychiatric expert, Dr. Stewart, and former CDCR consultant,

23  Lindsay Hayes, testified that welfare checks should be provided for all inmates in

24  segregation for their entire placement, but argue that these findings "only reflect their

25  opinions."  *Id.*  They recognize that their expert, Dr. Dvoskin, has stated that welfare

26  checks in segregation can save lives, but dismiss his opinion on the ground  that "anything

27  'could' or 'might' save an inmate's life."  *Id.*  CDCR staff themselves acknowledge that

28  welfare checks are helpful, and have frequently assisted in the discovery of and

[914567-7]

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  intervention in incidents of self-harm or attempted suicide by ASU prisoners.  Allison Dep.

2  at 70:1-71:3; 250:3-254:1.

3         Defendants rely heavily on their May 28, 2013 memorandum regarding welfare

4  checks.  Allison Decl. ¶¶ 37-38, Ex. C.  But this memorandum leaves serious deficiencies

5  in CDCR's welfare check policy intact.  First, it does not provide for welfare checks to all

6  ASU prisoners beyond the current 21-day time period.  While it provides that clinical staff

7  *may* continue welfare checks for individual MHSDS class members, there is no evidence

8  that this has ever occurred, and the memo ignores any need for continued welfare checks

9  for non-mental health caseload class members.  Belavich Dep. at 195:16-200:17; Allison

10 Dep. at 246:16-247:5.  Second, while the new electronic system for tracking welfare

11 checks may be useful, it will not be implemented systemwide, as Defendants represent to

12 the Court.  Allison Dep. at 247:16-24 (acknowledging that the new system will not be used

13 for overflow ASU placements).

14        Defendants assert that welfare checks are unnecessary because "security checks"

15 are done in all segregation units.  Defs.' Opp. Br. at 40:3-5.  But "security checks" are

16 designed to identify obvious signs of problems (*e.g.*, escapes, attacks), and are not intended

17 to ensure the health and safety of segregation prisoners.  Belavich Dep. at 200:22-201:21.

18 Notably, the May 28, 2013 memorandum does not fix the problem that *no* welfare checks

19 are provided in PSUs or SHUs.  Allison Decl. Ex. C (discussing welfare checks in ASU

20 and provision of only "security/custody rounds" for PSUs and SHUs).

21        Defendants cynically label universal welfare checks as a "best practice," a

22 meaningless term that ignores the fact that these welfare checks, if done consistently and

23 adequately, would save lives in CDCR's segregation units.  Defendants should be ordered

24 to comply with the national correctional standard of providing 30-minute welfare checks to

25 all segregation prisoners for the entirety of their placement.  *See* Bien Decl. Ex. 64.

26    **F.    Defendants Do Not Rebut Plaintiffs' Evidence of the Longstanding
              Failure to Provide Entertainment Appliances to Mitigate the Harmful
27            Effects of Extreme Sensory Deprivation in ASU.**

28        Plaintiffs have submitted evidence that approximately 40 ASUs in CDCR either do

1    not have electrical capacity for entertainment appliances or do not provide access despite

2    having such capacity.  Pls.' Mot. at 9-10.  The deliberate indifference to this serious

3    problem  dates back many years, and grows out of this Court's concerns over sensory

4    deprivation and suicide trends.  Defendants have claimed to be "working on" providing

5    entertainment appliances to prisoners in ASUs, with memoranda clarifying their

6    importance dating back to at least 2007.  Allison Decl. Ex. A. This effort has long been

7    stalled, leaving numerous ASU prisoners, including *Coleman* class members, without radio

8    or television to mitigate the isolation and harshness of segregated units.

9         Defendants falsely suggest that inmates "have access to … electrical appliances in

10   segregation units."  Defs' Opp. Br. at 10.  This is incorrect.  Many ASUs still do not have

11   electrical capacity.  Defendants still do not provide a substantial number of ASU prisoners,

12   including hundreds of class members, with an entertainment appliance.  Belavich Dep. at

13   75:2-77:18.  Defendants now claim to have finally decided to authorize hand-crank, or

14   hand-wind, radios for ASUs without electrical capacity, but not a single such appliance has

15   been distributed to date.  Belavich Dep. 59:8-61:16; Allison Dep. at 162:21-164:11.

16
17   **VI.   DEFENDANTS MISCONSTRUE AND IGNORE THEIR DUTIES UNDER
        THE AMERICANS WITH DISABILITIES ACT.**

18        Defendants do not dispute that this Court may enforce federal disability law and

19   enjoin conduct that violates the rights of *Coleman* class members under the Americans

20   with Disabilities Act (ADA), but they misconstrue the ADA's prohibition on the

21   discrimination.  Under the ADA, Defendants must provide prisoners with a mental

22   disability (including mental illness) "services, programs, and activities in the *most

23   integrated setting appropriate* to the[ir] needs."  28 C.F.R. § 35.130(d) (emphasis added);

24   *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999).  The ADA's mandate explicitly

25   extends to correctional facilities, which must "ensure that inmates or detainees with

26   disabilities are housed in the *most integrated setting appropriate to the needs of the

27   individuals*."  28 C.F.R. § 35.152(b)(2) (emphasis added).  "Unless it is appropriate to

28   make an exception, a public entity (i) Shall not place inmates or detainees with disabilities

33

1    in inappropriate security classifications because no accessible cells or beds are available,"

2    and "(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer

3    the same programs as the facilities where they would otherwise be housed." *Id.*

4        The placement of mentally ill prisoners in the ASU because there is not a safe and

5    available non-segregation bed that meets their needs constitutes an improper placement in

6    an "inappropriate security classification." 28 C.F.R. § 35.152(b)(2)(i). The ASU is not the

7    "most integrated setting appropriate to the needs" of these individuals with a mental

8    disability, who have violated no rules and do not pose a security threat to others. 28 C.F.R.

9    § 35.152(b)(2). Their ASU placement effects a denial of the "same programs as [offered

10   in] the facilities where they would otherwise be housed," such as access to education and

11   work programs, yard, dayroom, adequate treatment hours, confidential treatment outside of

12   a cage and without strip searches imposed, personal property and visiting privileges, and

13   the like. 28 C.F.R. § 35.152(b)(2)(iii).

14       The DOJ's May 31, 2013 findings on the conditions of confinement at the

15   Pennsylvania State Correctional Institution at Cresson provides useful clarification on this

16   point. The DOJ found that "Cresson unlawfully segregates and warehouses prisoners with

17   serious mental illness and/or intellectual disabilities in isolation units, and fails to

18   individually assess such prisoners concerning the risk they actually and objectively pose to

19   others. 28 C.F.R. § 35.130(d)." Docket No. 4736-1 at 31. It noted that the ADA is

20   violated where mentally ill prisoners are improperly denied the "opportunity to participate

21   in and benefit from general population housing, security, and classification systems, and

22   their benefits, such as out-of-cell time and interaction with other prisoners." *Id.* at 32.

23   This is precisely what happens when *Coleman* class members are placed in segregated

24   units for non-disciplinary reasons (*i.e.*, because CDCR cannot place them in a safe bed that

25   meets their mental health needs); they are subjected to onerous restrictions, degrading strip

26   searches, and caged treatment without regard to their individual needs.

27       The DOJ also stated that "[p]risoners with disabilities thus cannot be automatically

28   placed in restrictive housing for mere convenience. If prisoners with serious mental illness

PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE
IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  can be housed in general population by being provided adequate care, the prison may not

2  house such prisoners in segregated housing without showing that it is necessary to make an

3  exception." *Id.* at 33.  There are safe and appropriate alternatives to housing mentally ill

4  prisoners in harsh segregation units for non-disciplinary reasons.  Austin Reply Expert

5  Decl. ¶¶ 38-46.  Thus, under the ADA, CDCR must "reasonably modify its policies,

6  practices, and procedures when necessary … to avoid discrimination against prisoners with

7  serious mental illness. . . ." *Id.* at 32 (citing 28 C.F.R. § 35.130(b)(7)).  Where Defendants

8  refuse to make reasonable modifications to avoid disability discrimination, as here, the

9  Court must order an appropriate remedy.

10                                                    **CONCLUSION**

11          The constitutional violations that mentally ill prisoners now suffer have persisted

12  for years, and remain both serious and pervasive.  Defendants' use of segregation for the

13  mentally ill is defined by excessive lengths of stay, dangerous segregation placements for

14  non-disciplinary reasons as a result of chronic shortages of appropriate beds, lack of access

15  to minimally adequate treatment, and extremely harsh and unsafe conditions that pay no

16  heed to actual custodial and clinical needs, and a known and unconscionable risk of

17  decompensation and death.  The relief requested by Plaintiffs will, at long last, provide a

18  constitutional remedy to these violations.  *See* 18 U.S.C. § 3626(a)(1).

19

20  DATED:  August 23, 2013                  Respectfully submitted,

21                                                          ROSEN BIEN GALVAN & GRUNFELD LLP

22
                                                            By:  */s/ Aaron J. Fischer*
23                                                                  Aaron J. Fischer

24                                                          Attorneys for Plaintiffs

25

26

27

28