DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>          Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**REPLY EXPERT DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION** |

[922692-1]

I, James Austin, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief re:  Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation.

**Education, Training, and Experience**

2.      I received my Ph.D. in sociology from the University of California at Davis in 1980.  I am currently the President of JFA Institute, a corrections consulting firm.  Prior to that, I was the Director of the Institute of Crime, Justice and Corrections at the George Washington University, and Executive Vice President for the National Council on Crime and Delinquency.  I began my career in corrections with the Illinois Department of Corrections in 1970 at Statesville Penitentiary.  At Joliet, I was assigned as a correctional counselor to work in the facility's Special Program Unit (administrative segregation).  A complete description of my education and experience is contained in my curriculum vitae, which is attached hereto as **Exhibit A**.

3.      I have over 30 years of experience in correctional planning and research.  I am serving or have recently served as director for several large research and evaluation programs, most notably:  the Correctional Options Evaluation, Justice Reinvestment.  I have served as the Chair of the National Policy Council for the American Society of Criminology.  I have worked or am working in the states of Maryland, Nevada, Texas, Rhode Island, Connecticut, Arizona, Pennsylvania, and Louisiana to safely reduce their prison populations.

4.      I was jointly appointed by the Department of Justice and the Georgia Department of Juvenile Justice, and then the Louisiana Department of Youth Services to monitor both of those states' compliance with the issues specified in a Memorandum of Agreement concerning the conditions of confinement in Georgia's and Louisiana's youth facilities.

5.     I have been a consultant for the National Institute of Corrections on jail and prison classification systems.  In that capacity I have assisted over 25 states and numerous jail systems develop and implement objective prisoner classification systems.  Currently I have developed parole risk guidelines for Texas, Pennsylvania, Kentucky, Maryland, Nevada, Rhode Island, Arkansas, Louisiana, West Virginia and Oklahoma.

6.     I was named by the American Correctional Association as its recipient of the Peter P. Lejin's Research Award in 1991, and I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology in 1999.  I was a member of the CDCR's Expert Panel on Adult Offender Recidivism Reduction Programs and was a key author of the Panel's recommendations on reducing the CDCR prison population.

7.     I was retained by the state of Ohio's Attorney General and the Ohio Department of Rehabilitation and Correction in 2003 in *Wilkerson v. Austin et al.* to help the state's prison system develop a constitutional "super max" unit at the Ohio State Penitentiary.  The design of that program and my recommendations was upheld by the U.S. Supreme Court on June 13, 2005.  There were no increases in institutional violence as the segregation population was reduced.

8.     In 2006, I was retained by both the ACLU and the Mississippi Department of Corrections to conduct a thorough assessment of the DOC's administrative segregation unit.  My recommendations were adopted by the DOC and within 12 months the administrative segregation population began to significantly decline.  There has been no associated increase in the number of assaults since the reforms were implemented.

9.     In 2011, I was retained by the Colorado Department of Corrections and the National Institute of Corrections, U.S. Department of Justice, to complete an evaluation of the DOC's use of administrative segregation and its security classification system.  Many of my recommendations were adopted by the DOC which has led to a significant reduction in its administrative segregation population with no adverse impact on institutional safety.

[922692-1]

2

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

10.     Since 2011, I was retained by the Vera Institute to provide consultant services to the Maryland Department of Public Safety and Corrections, the Illinois Department of Corrections, and the New Mexico Department of Corrections on their administrative segregation systems and policies.

11.     In 2013, I was retained by the New York Attorney General to advise the state on how to reform their Special Housing Unit (SHU) in response to on-going litigation with the New York ACLU (*Peoples v. Fischer, et al.*).

12.     In 2013, I was retained by the Indiana Department of Corrections and the Indiana Attorney General to advise the state on how to reform their use of administrative segregation in response to litigation (*Indiana Advocacy and Protection Services Commission vs. Commissioner, Indiana Department of Correction*, Case No. 1:08-cv-01317-TWP-MJD).

13.     In 2013, I was selected by the Bureau of Prisons, U.S. Department of Justice to participate in a comprehensive study of the BOP's use of solitary confinement and administrative segregation.

14.     In 2013, I was retained by the Georgia Department of Corrections to assist the DOC reform its use of disciplinary and administrative segregation.

15.     I have been asked by Plaintiffs to review current policies, procedures, and practices regarding the California Department of Corrections and Rehabilitation (CDCR) segregation units, and to provide information as to what other correctional systems have done and are doing in their segregation systems to reduce the use of isolation units, to reduce the lengths of stay of prisoners — including prisoners with mental illness — in isolation units, and to address the risks of psychological harm, including suicide, to prisoners placed in isolation units.

16.     For purposes of my review, I have been provided with a significant number of documents (listed in the attached **Exhibit B**).  I am billing the plaintiffs $150 an hour, my usual billing rate.  I have testified as an expert in the following cases in the past four

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

1  years:  *Henderson v. Thomas* (Court Testimony, 2012); *Jones v. Gusman* (Court

2  Testimony, 2013).

3       17.     The State has argued in its opposition to Plaintiffs' Motion for Enforcement

4  of Court Orders and Affirmative Relief re:  Improper Housing and Treatment of Seriously

5  Mentally Ill Prisoners in Segregation, *Coleman* Docket No. 4712, that certain relief

6  requested by Plaintiffs to address problems regarding the placement, management, and

7  treatment of *Coleman* class members in the California Department of Corrections and

8  Rehabilitation (CDCR) segregated housing units is unworkable and/or dangerous.  I have

9  been asked to provide my opinion regarding the State's arguments, including whether I

10  believe that safe and feasible alternatives are available.

**CDCR's Segregation System Suffers from the Overuse of Segregation**

12       18.     The CDCR currently places prisoners in a variety of segregated housing

13  units for varying lengths of time and for varying reasons.  Inmates who are under

14  investigation, are seeking immediate protection, or are waiting to be placed or transferred

15  to appropriate non-segregation beds, or are waiting to enter a disciplinary segregation unit

16  may all be placed in Administrative Segregation Units (ASUs).  Inmates who have been

17  convicted of certain kinds of misconduct and have received either a determinate or

18  indeterminate SHU "term" are assigned to a Security Housing Unit (SHU).  The

19  "expected" range of sentences, according the Title 15 regulations, run from 3 to 48

20  months.  Not all disciplinary SHU terms are for violent offenses.  For example, the

21  "expected" disciplinary term for a rule violation involving Indecent Exposure or Refusal to

22  Accept Assigned Housing is six months, with the range of a "typical term" reaching nine

23  months.  (*See* 15 Cal. Code Regs. § 3341.5.)  A prisoner who receives multiple disciplinary

24  SHU terms, including while in the SHU, may serve those terms consecutively.  This means

25  that prisoners could have a total SHU term that lasts for years and even decades.

26       19.     Inmates can also receive indeterminate SHU terms for a variety of reasons,

27  including for being validated gang members.  These inmates can and do spend years, and

28  even decades, in a SHU.

[922692-1]

4

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

20.     The Psychiatric Services Unit (PSU) is for inmates who have SHU terms and require an EOP level of care, which is the highest level of outpatient mental health care in CDCR.  The PSU is itself a maximum security unit, with restrictions similar to those in the SHU.

21.     As illustrated in Table 1 (Number of Segregated Populations by Type of Segregation Status), below, as of August 7, 2013, there were 123,602 prisoners in CDCR prisons and camps.  Based on the data I have reviewed, approximately 3,936 inmates were housed in a SHU, 382 inmates were in a PSU, and approximately 6,600 inmates were in a ASU.  Of the 6,600 inmates in the ASUs, approximately 569 were EOP.  The overall percentage of the CDCR inmate population that is segregated is approximately 9 percent.  As I discuss below, states that I have worked with that have lowered their segregated populations have percentages at 5% or even lower.  Some of the reasons for a high proportion of segregation within the CDCR are a) the inappropriate placement of protective custody inmates in such punitive units, b) housing inmates waiting to be placed in the general population (Lack of Bed or "LOB"), and c) excessive periods of confinement in segregation for punitive purposes.

22.     The data also shows that EOPs are significantly over-represented in CDCR's segregation units.  While the overall in-state segregated population is 9 percent, 21% of EOP prisoners are housed in a segregated housing unit.

23.     Based on the Special Master's 25th Round Monitoring Report and other information that I reviewed, it is clear that a) the CDCR suicide rate is significantly higher than other large state prison systems, b) that the suicide rate is increasing, c) a staggeringly high proportion of CDCR suicides occur in segregated housing units, and d) there are deficiencies in the level of mental health care being provided to inmates housed in segregation who are in need of such services.

[922692-1]

**Table 1. Number of Segregrated Populations by Type of Segregation Status**

| Population | N | % | Source |
|---|---|---|---|
| Total CDCR Institutions | 123,602 | | CDCR Weekly Report of Population as of Aug. 7, 2013 |
| **Total EOP** | 4,493 | 4% | June *Coleman* monthly data – Summary of Outpatient Pop |
| **% EOP Segregated** | 21% | | |
| In ASU | 569 | | June *Coleman* monthly data – Summary of Outpatient Pop |
| In SHU | 1 | | June *Coleman* monthly data – Summary of Outpatient Pop |
| In PSU | 378 | | June *Coleman* monthly data – Summary of Outpatient Pop, Mental Health Adseg/SHU/PSU |
| **Total CCCMS** | 28,084 | 21% | June *Coleman* monthly data – Summary of Outpatient Pop |
| **% CCCMS Segregated** | 9% | | |
| In ASU | 1,824 | | June *Coleman* monthly data – Summary of Outpatient Pop |
| In SHU | 726 | | June *Coleman* monthly data – Summary of Outpatient Pop |
| In PSU | 4 | | June *Coleman* monthly data – Mental Health Adseg/SHU/PSU |
| **Total Segregated Population** | 10,918 | 9% | |
| Total ASU | 6,600 | | 7/24/13 Declaration of Kathleen Allison, *Coleman* Docket No. 4713 ¶ 22 |
| Total SHU | 3,936 | | June 2013 CDCR COMPSTAT Data |
| Total PSU | 382 | | June *Coleman* monthly data – MH Adseg/SHU/PSU |

24.     In assessing the proposed changes set forth by the Plaintiffs and rejected by the Defendants, I use the examples of other states that I have worked and am working with in terms of segregation policy and how much time prisoners, including those with mental illness, can spend in segregation.  I note that segregation units are extremely expensive and segregation units for prisoners with mental illness are even more expensive.  The costs of

[922692-1]

6

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

these units have led many states to reform their segregation system to reduce lengths of stay in segregation and the segregated inmate population overall.

### *Coleman* Class Members' Excessive Lengths of Stay in Segregation

25.     Defendants report an average length of stay in ASUs systemwide of 125 days, and the average length of stay is only slightly less for *Coleman* class members. (7/24/13 Declaration of  Kathleen Allison, *Coleman* Dkt. No. 4713 ("Allison Decl.") ¶ 14.) I have also reviewed data and profiles regarding *Coleman* class members in disciplinary segregation units (SHUs and PSUs), where the lengths of stay regularly run into the hundreds of days, and can last for years.

26.     Other states operate a much different system with respect to segregation lengths of stay.  In terms of time allocated for disciplinary segregation, several states significantly limit the amount of time a prisoner can be placed in disciplinary segregation. For example, in Georgia the limit is 30 days, and in Mississippi it is 40 days.  Further, if an inmate is determined to have a significant mental health problem while housed in those states' disciplinary segregation units, they are transferred to a specialized mental health unit within 14 days.

27.     It is uncommon to find states that allow disciplinary segregation terms (as in a SHU or PSU term) that go beyond 90 days, and even disciplinary segregation terms of that length would only be for violent incidents.  Policies in states like Georgia or Mississippi contrast significantly with the CDCR SHU Assessment Chart (15 Cal. Code. Regs. § 3341.5), which provides that even non-violent rule violations can result in a several-month SHU term.  These lengthy punitive segregation terms are much higher than what I have seen in other states' systems.

28.     Defendants state that placing time limits on segregation placements would be "dangerous."  But the use of short time limits for disciplinary segregation terms in other states have not proven to increase the incidence of violence or rule violations among their inmate population.

[922692-1]

7
REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

29.     Based on my experience, it is my opinion that such lengthy disciplinary segregation terms do not have a greater deterrent effect than the shorter disciplinary segregation terms I see in other states.

30.     In systems like Mississippi and Georgia, if an inmate cannot be assigned to general population following completion of the segregation term due to a finding that he still poses a threat to institution security, the inmate can be placed in a higher custody level placement than where he was previously housed, or he can be referred to a specialized administrative segregation unit.  In my experience, in other states' segregation systems, assignment to a specialized administrative segregation unit once a prisoner has completed a disciplinary segregation term occurs in about 10% of cases.

31.     In the rare cases where an inmate continues to be removed from general population after serving a disciplinary segregation term, the inmates are placed in a "step-down" program through which inmates assigned to an administrative  segregation unit can work their way out of segregation and back to general population, and can receive greater levels of privileges and out-of-cell time as they proceed through the step-down program. These step-down programs are designed both for mentally ill segregated prisoners and non-mentally ill segregated prisoners.

32.     Mississippi's system provides one useful example of how policies to limit periods of segregation detention can work.  The state's Department of Corrections' long-term segregation population was 1,300 in 2007 (or about 6% of the total prison population).  Following my consultancy with Mississippi's system and after a number of reforms were implemented, the segregated population dropped to 300 (or 1% of the prison population) within a year.  Among the reforms was the refining of criteria for admission to long-term segregation.  Of the 300 remaining segregated prisoners, 125 are assigned to a specialized step-down mental health treatment program.  Mentally ill inmates who receive a disciplinary segregation term must be transferred to the special step-down mental health treatment program unit within 14 days.  These mentally ill inmates are able to complete the step-down program out of segregation within nine months.  At each stage of the step-down

[922692-1]

1   program, the state's system provides an increasing level of privileges and out-of-cell time,

2   providing for incentives and mitigating the harshness of the segregation-type restrictions.

3   There has been no associated increases in inmate and staff assault rates as the segregation

4   population has declined.

5        33.    In Colorado, the administrative segregation population was 1,500 as of 2011

6   (or 7% of the inmate population). After reforms were implemented (refined criteria and a

7   step-down program that one can complete within nine months), the administrative

8   segregation population dropped to 1,000 (or about 5% of the inmate population). The

9   Colorado DOC also implemented an intensive step-down program for administrative

10   segregation for those with significant mental health disorders.

11        34.    In addition to the unusually long disciplinary segregation terms in

12   California's prisons discussed above, CDCR does not have a "step-down" program for

13   prisoners, including those with serious mental illness, who are placed in segregation units

14   (with the arguable exception of the new step-down process available for some gang-

15   affiliated SHU inmates, which itself can take several years). The lack of a meaningful

16   step-down program is causing inmates to spend excessive periods of time in segregation

17   units, without a system to prepare them to return to general population yards and often

18   without any real sense of how long they will remain in segregation.

19        35.    One model I would recommend for segregating inmates who commit

20   misconduct in CDCR prisons is described below. It is my opinion that such procedures

21   would be safe and workable in CDCR's system:

22             a.    Inmates who become involved in serious misconduct if found guilty

23   are assigned to a disciplinary segregation unit for relatively short periods of time

24   (generally, 30 days or less). Prior to admission to segregation for a rule violation, each

25   inmate is screened by mental health staff to determine if the inmate can be safely housed in

26   the segregation unit. If an inmate is mentally ill or at risk of psychological harm, he or she

27   should be promptly transferred to a specialized mental health unit. That unit should have

28   the staffing and resources to provide adequate treatment to those prisoners.

[922692-1]

9

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

b.      Rule violations should be resolved as promptly as possible.  In general all major rule violations should be disposed of within seven working days.  The timeframe between CDCR prisoners' placement in the ASU for an alleged rules violation, 45 days according to DAI Deputy Director Kathleen Allison (8/15/13 Allison Dep. Tr. at 75), is much longer than what I have seen in other states.  These excessive delays in the disciplinary process is also unnecessarily inflating the segregation population.  Delays in resolving a rule violation beyond a few weeks in the investigation stage are and should be relatively rare.  Input from mental health clinicians should be considered as appropriate, and no inmate should be punished for conduct that is a manifestation of mental illness.

c.      Upon completion of the disciplinary segregation sentence, the inmate will be returned to general population.  Transfer to a facility with higher security level than the inmate's previous placement is one of the options that can be employed prior to release to general population.  Any such elevation in custody level would be based upon a re-assessment of the CDCR inmate classification system that takes into account recent institutional conduct.

d.      If the facility believes the inmate cannot be assigned to general population due to a finding that inmate is still a threat to institution security, a referral process begins where a recommendation is made to central office to admit the inmate to a specialized unit for completion of a clearly defined step-down program that allows inmates to earn greater privileges and ultimately work their way back into general population — usually within nine months.

e.      The administrative segregation system for longer periods of confinement should be bifurcated into two sub-systems.  One is for inmates with no serious mental illness and the other is for inmates with serious mental illness.  Those with serious mental health issues are never placed in the punitive non-mental health system (analogous to CDCR's SHUs).  The mental health segregation system should be directed solely by a psychiatrist.

[922692-1]

10
REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

f.      For both sub-segregation systems, there should be a three-tiered step-down system whereby compliant inmates will be re-released to the general population within nine months, and earlier than that if safe to do so.  The specialized mental health treatment step-down program should be appropriately tailored to the needs and capacities of the mentally ill prisoners it houses, such that all participants have a meaningful opportunity to work their way back to general population.  On any given day, most of the inmates in the step-down program will be in Phases 2 and 3, which allow for increased amounts of out-of-cell time and fewer visiting, telephone, commissary and other restrictions.

36.     This recommended model has been implemented in states such as Ohio, Mississippi, and Colorado.  When fully implemented, the segregated population was substantially reduced, lengths of stay were significantly lower, and the outcomes did not include a heightened level of violence or rules violations among the prison population.

37.     The states that I consult with have policies in place that require that any seriously mentally ill prisoner who must be removed from general population due to their threat to institutional safety be transferred *immediately* to the administrative segregation mental health program.  In contrast, CDCR's data show that there are dozens of EOPs in regular ASUs, and that some of have been there for months.  Ms. Allison states that no EOPs are housed in ASUs beyond 30 days (a claim that appears to conflict with the June 2013 CDCR data that was provided to Plaintiffs).  (Allison Decl. ¶ 15.)  She also states that CDCR Headquarters does not track EOP placements in regular ASUs until the 30-day mark is reached (8/15/13 Allison Dep. Tr. at 121).  In my opinion, a delay of anything close to 30 days in the transfer of seriously mentally ill prisoners housed in segregation to a program that can provide an appropriate treatment program is more than is necessary, as shown by the practices in other states where I have worked

/ / /

/ / /

/ / /

[922692-1]

11

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

**Inappropriate Placement of Mentally Ill Prisoners in Segregation For Non-Disciplinary Reasons**

38.     The CDCR is co-mingling protective custody and Lack of Bed ("LOB") (*i.e.*, non-disciplinary) prisoners, who pose no threat to institutional safety, in the ASUs alongside disciplinary or disruptive inmates.  All protective custody inmates should be removed from punitive-type segregated housing, and "Lack-of-Bed" inmates or inmates waiting to transfer should be placed in general population housing as quickly as possible. CDCR should be prohibited from using segregation units for the purpose of protective custody or Lack of Beds or waiting for a placement/transfer.

39.     It should be noted that the State's still overcrowded system is obviously contributing to the placement in ASU of inmates who pose no threat to institutional safety. Had the state reduced its prison population as consistent with the Three-Judge Court's order, problems in promptly transferring the Lack of Bed and protective custody inmates out of ASUs would be greatly reduced, if not virtually eliminated.  Such inmates should be placed in safe units with privileges and programming commensurate with what they would receive in a general population unit.  While it is important to protect individuals who face threats to their safety on a general population yard, there is no reason or need to subject such prisoners to the harsh restrictions and conditions of segregated housing to accomplish this objective.

40.     It is my opinion that CDCR can prevent the placement of non-disciplinary inmates in ASUs without compromising safety or placing an undue burden on the system's resources.  In fact, experience suggests that that such a step, once implemented, may reduce the number of rule violations and even lead to the saving of money with the reduced use of expensive segregation beds.

41.     Unlike growing numbers of states, including the ones in which I am now working, there is not an adequate protective custody system in CDCR, which has contributed to the placement of non-disciplinary prisoners in segregation.  Defendants have taken the position that "CDCR must sometimes place inmates who voice safety concerns

1   in administrative segregation," and that it would be unsafe to proscribe such a placement.

2   (Allison Decl. ¶ 19.)  Through my experience, state prison systems can effectively and

3   safely house inmates who voice safety concerns in settings where they are not subject to

4   solitary confinement-type restrictions and dangers.

5       42.     For example, in Mississippi, protective custody inmates are housed in a

6   separate housing area but are allowed to program like other general population inmates

7   commensurate with their custody level.  In Colorado, based on my recommendations, the

8   state created a special housing unit for protective custody inmates.  In New Mexico, the

9   prison system has a separate facility that houses large numbers of protective custody

10  inmates who are allowed to program as general population inmates.  In these states,

11  individuals who are identified as having safety concerns go promptly to the protective

12  custody unit, and are not placed in an ASU-type setting.

13      43.     Likewise, in the above states where I have helped to safely reduce the

14  segregation population, segregated inmates determined to no longer require such a

15  placement are not held for more than a short period of time in an administrative

16  segregation unit while waiting to be placed into a general population yard at the institution

17  where he is located, or while waiting to transfer to a general population yard at another

18  institution.  The key is to ensure that appropriate non-segregation beds are promptly made

19  available to inmates who need them, to safely lower the segregation populations by

20  narrowing the criteria for such placement, to remove all protective custody (non-

21  disciplinary) inmates from punitive-type segregation units, and to install incentive-based

22  step-down programs in the segregation units that facilitate moving inmates out of those

23  units in a timely way.  These reforms are evidence-based to reduce violence and improve

24  safety, and are also cost-effective.

25      44.     I understand that CDCR has Sensitive Needs Yards (SNYs) that serve as a

26  kind of protective custody program for prisoners.  Prisoners with safety concerns should be

27  promptly transferred to this kind of unit.  To the extent prisoners are being held in

28  segregation units for extended periods while waiting for an SNY bed to become available,

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

[922692-1]

1  that indicates the need for CDCR to set aside additional beds and units for this purpose.

2  Once again, overcrowding appears to continue to hamper and delay the prison system's

3  ability to place prisoners in an appropriate bed.

4       45.    I understand that the CDCR is in the process of considering a "non-

5  disciplinary" segregation status.  Allison Decl. ¶ 20.  I understand from Ms. Allison's

6  testimony that this "non-disciplinary" segregation status, as envisioned, will provide some

7  additional property, telephone, and canteen privileges.  "Non-disciplinary" prisoners will

8  still be mixed with disciplinary or disruptive prisoners in the same segregation units and be

9  subject to the same custodial restrictions, including very limited out-of-cell time and no

10  access to work, education, and other meaningful programs (8/15/13 Allison Dep. Tr. at 53-

11  58).  This is very different from the successful "non-disciplinary," or "protective custody,"

12  segregation systems I have seen in other states, where all non-disciplinary segregation

13  prisoners are housed in separate units, in conditions commensurate with general population

14  settings.

15       46.    For these reasons, I support Plaintiffs' request that the court order that no

16  *Coleman* class member be placed in segregation units based on concerns about their safety

17  or SNY status, or because they are a victim of an assault, or due to "lack of beds" in the

18  system or while awaiting transfer to another CDCR prison or program.

19       **The Exclusion of Mentally Ill Prisoners from the SHU**

20       47.    I am aware of the Pelican Bay SHU exclusion order for prisoners with

21  mental illness.  I understand that prisoners with diagnosed mental illness who are not at the

22  EOP level of care — that is, CCCMS prisoners — and who are assessed a SHU term for a

23  rule violation, are placed in one of the other SHUs in the system, including at California

24  Institution for Women (CIW), California Correctional Institution (CCI), California State

25  Prison-Corcoran (COR), and California State Prison-Sacramento (SAC).

26       48.    I understand that the policies, procedures, and restrictions in all of the SHU

27  units, including at Pelican Bay, are essentially the same.  CDCR has noted two differences

28  between the Pelican Bay SHU and the other SHUs:  (1) there are windows in the cells of

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

[922692-1]

1  all SHUs except those at Pelican Bay, and (2) the exercise yards at the other SHUs use

2  walk-alone modules surrounded by chain-link fencing, as compared to the concrete-

3  enclosed walk-alone yards at the Pelican Bay SHU.

4       49.     CDCR prisoners at the CCCMS level of care who receive a SHU term are

5  not placed in a PSU, and are instead placed in regular SHUs along with non-mental health

6  caseload prisoners.  Drs. Edward Kaufman and Craig Haney documented in their March

7  2013 *Coleman* declarations a substantial number of CCCMS prisoners in the SHUs who

8  they found to be receiving an inadequate level of mental health care and who were having

9  a very difficult time coping in the SHU environment.  They reported that long-term SHU

10 placements of CCCMS prisoners had resulted in psychological harm, deterioration and

11 mental health crisis bed admissions.

12      50.     Once again, other state prison systems do things differently.  I am familiar

13 with several states for which most or all prisoners with diagnosed mental illness are

14 excluded from the state's punitive segregation units and are assigned to a specialized

15 mental health unit.  States that I am familiar with that have such a policy are Mississippi,

16 Kentucky, Georgia, New Mexico, Colorado and Oklahoma.  Each of these states have

17 highly specialized mental health treatment units for disruptive inmates with significant

18 mental health problems.

19      51.     It is my opinion that a systemwide SHU exclusion for mentally ill prisoners

20 can be implemented safely and successfully.  Defendants argue that expanding the Pelican

21 Bay SHU exclusion to all SHUs is inappropriate, including because a "blanket exclusion"

22 of mentally ill inmates would "greatly diminish the deterrent effect of the Security

23 Housing Unit" (Defs.' Opp. Brief at 23).  In my experience, the exclusion of mentally ill

24 prisoners from disciplinary segregation units should not be based on a hypothetical

25 "deterrent effect."  I have seen systems in which prisoners with diagnosed mental illness

26 are effectively housed and treated not in regular disciplinary segregation units but rather in

27 specialized mental health treatment programs that have incentive-based step-down

28 programs that help to prepare prisoners to general population settings.  Only in rare

[922692-1]

REPLY EXPERT DECLARATION OF JAMES F. AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION
REGARDING MENTALLY ILL PRISONERS IN SEGREGATION

instances, where a mentally ill inmate poses an immediate and violent threat to staff and other inmates in the specialized mental health treatment program, would it be appropriate to transfer such an inmate from one of these specialized mental health treatment programs to a more restrictive placement.  Such placements should be rare and should be done in consultation with mental health staff.  Such placements should also be temporary, and include delivery of mental health treatment appropriate to the inmate's needs.

### Mental Health Screening for Prisoners
### Who Have Been in a Segregation Setting for More Than 90 Days

52.     In several states I am working in, there are standard operating procedures that require all inmates who have been in any form of segregation for 90 days to receive a mental health screen.  This is especially important for those prisoners who were originally diagnosed as not requiring mental health treatment when first admitted to segregation status, and thus are not being seen by mental health staff pursuant to a treatment plan.  It is similarly important for inmates who are being treated primarily via medication (like some CCCMS inmates) whose mental health status may deteriorate simply as a function of extended periods of isolation and prolonged periods without normal human contact. Examples of other states who have procedures for mental health clinicians to do periodic evaluations of all prisoners in segregation are Kentucky, Mississippi, Colorado, and Georgia.  It is also required in these states that mental health staff make periodic rounds in the punitive segregation units to ensure that there are no inmates who are decompensating.

53.     The American Correctional Association (ACA) has established a standard on this issue (Standard 4-4256), which provides that mental health staff should interview and prepare a written report on any inmate held in segregation for more than 30 days, and should complete a mental health assessment of all segregated inmates at least every three months thereafter (and more frequently if warranted).  I am aware of a number of other states, including Washington and Vermont, that also provide periodic mental health screening for all prisoners who have spent extended periods in segregation.  These states' policies are generally consistent with the ACA standard, and in some cases provide for

1    even more frequent mental health assessments for prisoners who must be segregated for

2    more than a short period of time.

3          54.    In my experience, these periodic sweeps can also serve to better provide

4    treatment in a therapeutic setting before more serious disruptive behavior emerges.  If a

5    segregated inmate develops mental illness that can be treated in a therapeutic setting, that

6    in turn can address the misbehaviors and reduce the need for punitive segregated housing

7    placements.  That is, the behavior of prisoners with repeated rules violations may be more

8    effectively addressed in a therapeutic setting.  Periodic screening of people originally

9    thought not to require mental health treatment but who now do will help to reduce the level

10   of disruptive behavior, including in the segregation units.

11   **Blanket Use of Therapeutic Treatment Modules/Treatment Cages For Treatment**

12         55.    Defendants have argued that it is necessary for all prisoners in segregation to

13   receive mental health treatment in cages.  This statement is inconsistent with my

14   experience in other states.

15         56.    There are several states that I work with who either do not use any cages for

16   mental health treatment contacts, or if they do, it is only as a last resort.  States that I have

17   worked with do not use them are Kentucky, Illinois, and Mississippi.  Mississippi has used

18   a very practical method for inmate group sessions in which stools are installed in a semi-

19   circle with enough space between so that inmates cannot reach each other.  The ankles are

20   secured to the base of the stool to prevent any aggressive movement but their arms and

21   hands are free so they can motion and converse with each other in a normal manner.

22   Kentucky and Illinois use tethered systems (tables and stools) that negate the use of cages

23   for group sessions.

24         57.    The states that I know that use cages (Colorado, Ohio and New York) use

25   them only for those inmates who a.) want them or b.) have acted so aggressively in the

26   recent past that such a restriction is needed.  I know of no states that use them at all times

27   for all inmates, as is the case in California.  In the states where cages are used at all,

28

1  inmates are able to progress to a level of security where they can receive treatment without
2  the use of a cage, as through the kind of step-down program I describe above.

3                          **Blanket Use of Strip Searches in Segregation**

4        58.     The State has argued that it is necessary for all inmates in administrative
5  segregation to be subjected to strip searches when they leave and return to the unit for
6  treatment. The argument is false on several fronts. First and foremost, the act of a strip
7  search without a valid security reason is a demeaning degradation ceremony and when
8  repeated only serves to build resentment and anger. Second, if the strip searches are done
9  when inmates are being escorted to and from a cage for treatment, one must ask what
10 opportunities exist for the inmate to secure contraband unless the escorting staff is
11 complicit in some fashion. The security issue may be different, for example, when the
12 inmate is going to a recreation or other area that is less secure and not under the direct
13 supervision of prison staff. Third, within the context of an incentive-based step-down
14 program that rewards inmates for positive behavior, the use of strip searches should be
15 reserved for those inmates who are not demonstrating conforming behavior. Finally and in
16 particular, this practice is inappropriate for mentally ill prisoners in segregation for non-
17 disciplinary reasons, as those inmates should not be in a punitive-type segregation setting
18 or subjected to such restrictions to begin with. A reasonable alternative would be to use an
19 individualized assessment to determine whether strip searches are necessary for a
20 segregated inmate. Likewise, the inmate should be able to progress through a step-down
21 program to where strip searches are not required.

22

23       I declare under penalty of perjury under the laws of the United States and the State
24 of California that the foregoing is true and correct, and that this declaration is executed at
25 San Francisco, California this 23 day of August, 2013.

26

27

                                                    James F. Austin
28

[922692-1]

                                                    18

EXHIBIT A TO DECLARATION OF JAMES AUSTIN

[921591-1]

# James Austin

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *President, The JFA Institute*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President* National Council on Crime and Delinquency San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate* National Council on Crime and Delinquency San Francisco |
| 1970 - 1974 | *Correctional Sociologist* Illinois Department of Corrections Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2010 – Present | Consultant. Technical Assistance on Solitary Confinement in Maryland, New Mexico, and Illinois. Vera Institute. |
| 2011 – Present | Director, Los Angeles County Sheriff Jail Population Projections and Impact of AB 109. Funded by Public Welfare Foundation. |

| 2005 – Present | Director, Design and Evaluation of the Maryland Department of Public Safety and Corrections (MDPSC) Risk and Case Management System (Parole, Probation and Prison). MDPSC and Open Society Foundation. |
| 2012 | Co-Director. Evaluation of the Oklahoma Administrative Segregation System. Oklahoma Department of Corrections. |
| 2011 - 2012 | Consultant. Study of Colorado Administrative Segregation System. Colorado Department of Corrections and National Institute of Corrections, U.S. Department of Justice. |
| 2010 – 2011 | Co-Director, Revalidation of the Texas Pardon and Parole Board System. Texas Pardon and Parole Board. |
| 2009 – 2012 | Director, Prison Population-Justice Re-investment Initiative. Pew Charitable Trusts. |
| 2010 – 2011 | Special Consultant, Jail Population Projection Study, US Department of Justice and Orleans Paris. |
| 2008 – 2009 | Special Consultant, Administrative Segregation/Super Max Parchment Study. Mississippi Department of Corrections and ACLU |
| 1998 – 2011 | *Director,* Correctional Options Program (Bureau of Justice Assistance, U.S. Department of Justice) |
| 2007 – 2008 | Director, Harris County Pretrial Services Re-Validation Risk Assessment Study. (Harris County, Texas). |
| 2005 – 2008 | Director, Montgomery Pretrial Services Risk Assessment Validation Study. (Bureau of Justice Assistance,   U.S. Department of Justice). |
| 2003 – 2006 | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |

| 2002 – 2006 | *Director,* Parole Guidelines System Project, Maryland Parole Commission.  (Baltimore Open Society Institute). |
| 2003 – 2006 | *Director,*  Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |
| 2002—2006 | *Independent Expert,* Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
| 2003-2004 | *Director,* Evaluation And Redesign Of Systems For Berks County Pretrial And Sentenced Populations. (Berks County, PA). |
| 2002 – 2003 | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003 | *Director,* Development of the Kentucky Parole Risk Assessment System.  Kentucky Parole and Pardon Board. |
| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of  Georgia and U.S. Department of Justice, Civil Rights Division. |
| 1997 - 2002 | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - 2002 | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |

| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
|---|---|
| 1995 - 1999 | *Director,* Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director,* National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director,* Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director,* Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director,* National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director,* Congressionally mandated evaluation of the D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1991 - 1997 | *Director,* Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD |
| 1991 - 1995 | *Director,* Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD |
| 1991 - 1994 | *Director,* Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD |

| 1990 - 1993 | *Director*, Evaluation of the Los Angeles Sheriff's Boot Camp Program (National Institute of Justice), NCCD |
| --- | --- |
| 1991 - 1993 | *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD |
| 1990 - 1991 | *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD |
| 1988 - 1992 | *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD |
| 1987 - 1992 | *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD |
| 1986 - 1990 | *Director*, National Jail Classification Project (NIC), NCCD |
| 1985 - 1987 | *Co-Director*, California Youth Authority Parole Risk Study (Packard Foundation and CYA), NCCD |
| 1984 - 1986 | *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD |
| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |
| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

# SPECIAL APPOINTMENTS

| | |
|---|---|
| 2006 – 2007 | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

# EXPERT WITNESS/LITIGATION

| | |
|---|---|
| 1987 - 1989 | Office of the Special Masters, Ruiz v. Lynaugh, Evaluation of the TDC Classification System and Inmate Violence |
| | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, U.S. v. State of Florida: Florida Department of Corrections, et al., Case No. TCA 86-7330 (N.D. Fla) |
| | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |

| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, Hammer v. King County |
|---|---|
| | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, Lamar v. Collins |
| 1991 | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate.<br>Office of the Attorney General, State of Texas, Alberti v. Sheriff of Harris County, et al., No. CA-H-72-1094 |
| | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, U.S. v. The Parish of Orleans Criminal Sheriff's Office |
| | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding females from certain post positions within the jail. |
| 1991 - 1994 | Calvin R. vs. Illinois Department of Corrections. Consent Decree. |
| | Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence. |
| 1995 | International Fidelity Insurance Co. et al. v. Charles Nobel et al: In the United States District Court of the Southern District of Texas, Houston Division. |
| | Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R. |
| 1995 | Sandra Herrera, et al., v Pierce County, et al. |

Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail.

| 1995 - 1996 | Montoya v. Gunter, et al. |

Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed.

1995 - 1997    Inmates A,B,C and D v. Illinois Department of Corrections
Consent Decree

Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs.

1995 - 2002    USA v. Michigan and Cain v. Michigan Consent Decrees

Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system.

1996    Rentschler v. Carnahan et al.

Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison.

1997    Carlos Morales Feliciano v. Pedro Rossello Gonzales Consent Decree

Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections.

1998 - 1999    Southern Ohio Correctional Facility (Civil Action No. C-1-93-436).

Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot.

1998 - 1999    Busey et al. v. Corrections Corporation of America

|  | Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria. |
|---|---|
| 1998 - 2000 | Holloway, et al., v. King County |
|  | Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being encouraged by male correctional officers and departmental policy. |
| 2001 | Gartrell et al., v. Ashcroft et al. |
|  | Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted? |
| 2001 - 2005 | Austin, et al., v. Wilkinson, et al. |
|  | Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison. |
| 2008- present | Plato and Coleman versus Schwarzenegger. Retained by plaintiffs to develop plan to depopulate the California Prison Population. |

# MAJOR PUBLICATIONS

## Books

| 2011 | It's About Time: America's Imprisonment Binge (with John Irwin), 4th Edition, Cengage, Publishing. |
|---|---|
| 1993 | Reinventing Juvenile Justice (with Barry Krisberg), Beverly Hills, CA: Sage Publications. |
| 1978 | The Children of Ishmael: Critical Perspectives on Juvenile Justice (with Barry Krisberg), |

## Articles

| | |
|---|---|
| 2010 | "Reducing America's Correctional Populations", 2001. Justice Research and Policy, Vol, 12, No. 1, pp,1-32. |
| 2009 | "Prisons and the Fear of Terrorism." August 2009. Criminology and Public Policy. Vol., Issue 3: 641-649. |
| 2009 | "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs." 2009. Criminal Justice and Behavior. Vol. 36, No. 10: 1025-1037. |
| 2006 | "How Much Risk Can We Take?  The Misuse of Risk Assessment in Corrections."  2006.  Federal Probation. Vol. 70, No. 2: 58-63. |
| 2004 | Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Thinking About Prison Release and Budget Crisis in the Blue Grass State." Critical Criminology: An International Journal, Vol. 12, No.3: 243-263. |
| 2004 | Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Kentucky's Perpetual Prisoner Machine: It's All about Money." Review of Policy Research, Vol. 24, No. 1 (at press). |
| 2003 | "Why Criminology Is Irrelevant", Criminology and Public Policy, Vol. 2, No.3: 557-564 |
| 2003 | "Three Strikes Laws", in Current Controversies in Criminology, Ronald Weitzer, ed., Prentice Hall: Upper Saddle River, NJ. |
| 2003 | "The Use of Science to Justify The Imprisonment Binge", Convict Criminology, Jeffrey Ian Ross and Stephen C. Richards, eds., Wadsworth: Belmont, CA. |
| 2003 | "Its About Time:  America's Imprisonment Binge", Punishment and Social Control, Aldine De Gruyter: New York, NY. |

1999            "Are We Better Off?: Comparing Private and Public
               Prisons in the United States", Current Issues in
               Criminal Justice. Vol. 11 (2): 177-201.

1999            "The Impact of 'Three Strikes and You're Out'",
               Punishment and Society, Vol 1(2): 131-162.

1998            "The Limits of Prison Drug Treatment", Corrections
               Management Quarterly, Vol. 2, Issue 4, Fall 1998, pp.
               66-74.

1996            "The Effect of 'Three Strikes and You're Out' on
               Corrections" in Three Strikes and You're Out:
               Vengance as Public Policy, David Shichor and Dale
               K. Sechrest, eds., Sage Publications: Thousand
               Oaks, CA.

1996            "Are Prisons A Bargain?: The Case of Voodoo
               Economics", Spectrum, Spring 1996, pp. 6-24.

1995            "The Overrepresentation of Minority Youths in the
               California Juvenile Justice System: Perceptions and
               Realities" in Minorities in Juvenile Justice, Kimberly
               Kempf Leonard, Carle E. Pope, and William H.
               Fyerherm, eds., Sage Publications: Thousand Oaks,
               CA.

1994            "Three Strikes and You're Out: The Likely
               Consequences". St. Louis University Public Law
               Review, 14, 1, pp. 239-258.

1993            "Classification for Internal Purposes: The Washington
               Experience" (with Chris Baird, and Deborah
               Nuenfeldt), Classification: A Tool for Managing
               Today's Offenders, Laurel, MD: American
               Correctional Association.

1993            "Objective Prison Classification Systems: A Review",
               Classification: A Tool for Managing Today's
               Offenders, Laurel, MD: American Correctional
               Association.

1986            "Using Early Release to Relieve Prison Crowding:
               A Dilemma in Public Policy," Crime and Delinquency
               (October):404-501

| 1986 | "Evaluating How Well Your Classification System Is Operating," Crime and Delinquency (July):302-321 |
|------|-----|
| 1985 | "Incarceration in the United States:  The Extent and Future of the Problem," The Annals (March):15-30 |
| 1983 | "Assessing the New Generation of Prison Classification Models," Crime and Delinquency (October):561-576 |
| 1982 | "Do We Really Want to Get 'Tough on Crime'?" Corrections Today, Vol. 44, No. 6:50-52 |
| 1982 | "Bail Reform in California:  The Passage of AB2" (with E. Lemert), Pretrial Services Annual Journal, 1982, Vol V:4-23 |
| 1982 | "Review of Fatal Remedies:  The Ironies of Social Intervention" (Sam D. Seiber) in Crime and Delinquency, Vol. 20, No. 4:639-641 |
| 1982 | "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), Crime and Delinquency, Vol. 28, No. 3:374-409 |
| 1982 | "Promises and Realities of Jail Classification," Federal Probation, Vol. 46, No. 1:58-67 |
| 1981 | "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), Journal of Research in Crime and Delinquency, Vol. 18, No. 1:165-196 |
| 1980 | Instead of Justice: Diversion, Ph.D. Dissertation, University of California, Davis |

# AWARDS

| 2009 | Recipient  of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American Society of Criminology, Corrections and Sentencing Division |
|------|-----|
| 1999 | Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology |

1991                      Recipient of the Peter P. Lejins Research Award,
                          American Correctional Association

EXHIBIT B TO DECLARATION OF JAMES AUSTIN

## EXHIBIT B TO THE DECLARATION OF JAMES AUSTIN

| |
|---|
| Notice of Motion And Motion For Enforcement Of Court Orders And Affirmative Relief Re: Improper Housing And Treatment Of Seriously Mentally Ill Prisoners In Segregation, 5/6/13 [Dkt. 4580] |
| Declaration of Craig Haney in Support of Motion For Enforcement Of Court Orders And Affirmative Relief Re: Improper Housing And Treatment Of Seriously Mentally Ill Prisoners In Segregation, 5/6/13 [Dkt. 4581] |
| Declaration of Jane Kahn in Support of Motion For Enforcement Of Court Orders And Affirmative Relief Re: Improper Housing And Treatment Of Seriously Mentally Ill Prisoners In Segregation, 5/6/13 [Dkt. 4582] |
| Defendants' Opposition to Plaintiffs' Motion Related To Housing And Treatment Of Seriously Mentally Ill Prisoners In Segregation, 7/24/13 [Dkt. 4712] |
| Declaration of Charles Scott, M.D. in Support of Defendant's Opposition to Plaintiffs' Motion Related To Housing And Treatment Of Mentally Ill Prisoners In Segregation, 7/24/13 [Dkt. 4715] |
| Declaration of Kathleen Allison in Support of Defendant's Opposition to Plaintiffs' Motion Relating To Housing And Treatment Of Mentally Ill Prisoners In Segregation and Motion Related to Use of Force and Disciplinary Measures, 7/24/13 [Dkt. 4713] |
| Declaration of Tim Belavich in Support of Defendant's Opposition to Plaintiffs' Motion Related To Housing And Treatment Of Mentally Ill Prisoners In Segregation, 7/24/13 [Dkt. 4712(1)] |
| Declaration of Deborah Hysen in Support of Defendant's Opposition to Plaintiffs' Motion Related To Housing And Treatment Of Mentally Ill Prisoners In Segregation, 7/24/13 [Dkt. 4712(2)] |
| Declaration of Debbie Vorous in Support of Opposition to Plaintiffs' Motion Relating To The Housing And Treatment Of Mentally Ill Prisoners In Segregation, 7/24/13 [Dkt. 4714] |
| Expert Declaration of Pablo Stewart, M.D., 3/14/13 [Dkt. 4381] |
| Expert Declaration of Craig Haney, 3/14/13 [Dkt. 4378] |
| Expert Declaration of Edward Kaufman, M.D., 3/14/13 [Dkt. 4379] |
| CDCR Monthly Data for May 2013 |
| CDCR Monthly Data for June 2013 |
| Twenty-Fifth Round Monitoring Report Of The Special Master On The Defendants' Compliance With Provisionally Approved Plans, Policies, And Protocols, 1/18/13 [Dkt. 4298] |

[921448-1]

| |
|---|
| Corrections To The Special Master's Twenty-Fifth Round Monitoring Report, 3/19/13 [Dkt. 4420] |
| Report On Suicides Completed In The California Department Of Corrections And Rehabilitation In Calendar Year 2011, 1/25/13 [Dkt. 4308] |
| Special Master's Report On His Expert's Report On Suicides Completed In The California Department Of Corrections And Rehabilitation January 1, 2012 – June 30, 2012, 3/13/13 [Dkt. 4375] |
| California Code of Regulations - Title 15 Crime Prevention and Corrections |
| June 2013 COMPSTAT data, available at http://www.cdcr.ca.gov/COMPSTAT/DAI-Reports.html |
| SHU Profiles for CCCMS Inmates, DEXP 113107 – DEXP 113117 |
| Chart of Average Administrative Segregation Unit Length of Stay by Institution, DEXP 113105 |
| 8/15/13 Deposition of Kathleen Allison |
| 8/7/13 Deposition of Tim Belavich |
| 7/26/13 Deposition of Charles Scott |
| 28 Vermont Stats § 701a – Segregation of Inmates with a Serious Functional Impairment |
| Washington State Department of Corrections Policy Nos. 320.200, 320.255, available at http://www.doc.wa.gov/policies/default.aspx?show=300. |
| Weekly Report of Population, as of midnight, August 7, 2013, available at http://cdcr.ca.gov. |

[921448-1]