DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

      Defendants.

Case No. Civ S 90-0520 LKK-JFM

**REPLY DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION**

Judge:    Hon. Lawrence K. Karlton
Date:      November 5, 2013
Time:     10:30 am
Crtrm:    4

[910169-3]

I, Jane E. Kahn, declare:

1.      I am an attorney admitted to practice law in California, a member of the bar of this Court, and Of Counsel to the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs RALPH COLEMAN, et al.  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this reply declaration in support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation.

2.      I have been counsel of record for Plaintiffs RALPH COLEMAN, et al. since the *Coleman* trial and have participated in numerous monitoring tours inside CDCR prisons.  These tours have included administrative segregation units ("ASUs"), security housing units ("SHUs") and psychiatric housing units ("PSUs").

3.      From the beginning of the *Coleman* case, one disputed area was the housing of prisoners with serious mental illness in segregated housing.  Special Master's Report on Plans, filed with the Court on June 6, 1997, Docket No. 850, at 11.  Plaintiffs argued against placing any EOP prisoners in administrative segregation, and expressed particular concern about placing either EOP or CCCMS prisoners who might decompensate or "who a clinician determines are especially likely to decompensate."  *Id*.  Plaintiffs also expressed concern about the ability of Defendants to provide the required level of mental health care in the ASUs.  *Id*.  In 1997, the Special Master recommended provisionally adopting Defendants' plan for the delivery of mental health care in the ASUs, but noted, "*the experts are willing to let the defendants try to provide some outpatient mental health services in administrative segregation, provided there are meaningful efforts to limit the duration of the stay of seriously mentally disordered inmates in administrative segregation*."  *Id*. at 13-14 (emphasis added).

4.      In June 1998, the Court directed the Special Master to file additional recommendations on administrative segregation, which were filed on January 5, 1999.  Docket No. 1008.  In his report, the Special Master noted that despite the provisional

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  approval of Defendants' Plan for ASU and the subsequent 18 months of monitoring, newly

2  generated data indicated that "a substantial number of seriously mentally disordered

3  inmates spend an inordinately long period of time in administrative segregation." *Id*. at 7.

4  Defendants proposed to cluster prisoners in regional ASUs with better staffing and to open

5  another PSU at CSP-Sacramento (SAC). *Id*. at 8-9. Although some mental health

6  treatment was provided in the segregation units in 1998, there was no group treatment

7  provided, and the Special Master recommended that, "defendants need to address the

8  serious staffing shortages that underlay the treatment deficiencies in the provision of

9  mental health services in administrative segregation." *Id*. at 17. The Defendants were

10  directed to submit within 60 days for review their plan for expanding staffing for

11  administrative segregation, together with a schedule for its implementation. The Special

12  Master was to assess the adequacy of Defendants' ASU staffing plan. This

13  recommendation became an order of the Court. Order, Docket No. 1009, Jan. 13, 1999.

14       5.       In his Supplemental Recommendations on Staffing and Administrative

15  Segregation, filed May 19, 1999, Docket No. 1032, the Special Master recommended

16  minimum staffing ratios for ASUs where CCCMS and EOP prisoners are housed. He

17  reiterated his earlier concerns that providing mental health care in ASUs did not

18  completely address the problem of housing seriously mentally ill prisoners in ASUs,

19  recommending that "keeping seriously mentally disordered inmates out of administrative

20  segregation as often as possible and moving them out … as rapidly as possible" was

21  critical. *Id*. at 10. The manner in which Defendants chose to provide the required group

22  treatment to seriously mentally ill prisoners within the segregation units was not addressed

23  by the Special Master in this report.

24       6.       Two years later, the Special Master documented Defendants' continuing

25  inability to deliver mental health care to EOP patients housed in administrative segregation

26  during the Eighth Monitoring round, and made a recommendation, which the Court

27  adopted, directing Defendants to "submit to the Special Master within 30 days of the order

28  a detailed list of measures already completed or projected to meet programming space

[910169-3]

2

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

needs in regional segregation units." Order at 2:7-9, Docket No. 1323, Dec. 20, 2001. The Court ordered the Special Master to report on the adequacy of Defendants' measures. *Id.* at 2:9-10.

7.    Attached hereto as **Exhibit A** is a true and correct copy of the January 18, 2002 Letter to Michael Keating, Jr., *Coleman* Special Master, from Deputy Attorney General, Jennifer A. Neill, enclosing a list of measures already completed or projected to meet programming space needs in regional segregation units, in response to the Court's December 20, 2001 Order. The Report included a list of ten prisons with ASUs, with a description of their treatment spaces, such as dayrooms, property rooms, kitchen area, and refers to the number of holding cells available for group treatment.

8.    The Special Master filed his Report on Defendants' Compliance with the October 26, 2001 and December 2001 Orders on February 22, 2002 ("February 2002 Report"), Docket No. 1350, noting that "[s]ome background is necessary here to understand this issue." The February 2002 Report included a review of Defendants' list of measures already completed or projected to meet programming space needs in regional segregation units, provided in response to the Court's December 20, 2001 Order. The Special Master wrote that although in 1997, "there was some heated discussion over the extent and kind of treatment necessary for seriously mentally disordered inmates in administrative segregation units," there was a consensus among the participants that that these places "*were not conducive to sound mental health*" (emphasis added). Docket No. 1350 at 8. The Special Master recounted the history of the EOP ASUs, as well as the obstacles to delivering mental health care within these segregation units. *Id.* at 11. Noting that in ASUs "privacy is not a prized value"; that ASUs "are often incredibly noisy;" and that "custody and security issues preclude the mingling of groups of administrative segregation inmates without the closest possible custody supervision," the Special Master stated that "*[t]he solution of the moment appears to be what are euphemistically referred to as 'holding cells*.'" *Id.* at 11 (emphasis added). The Special Master recognized that "these holding cells have become the staple of defendants' plans for providing

1  interviewing and programming space in EOP administrative segregation hubs." *Id.* at 12.

2  Ultimately, the Special Master concluded in his February 2002 Report that "all ten of the

3  surveyed institutions had some way to go to meet the programming space needs identified

4  in Exhibit E [a January 18, 2002 CDCR memorandum to the Special Master setting forth

5  measures completed or projected at the ten institutions]." *Id*. at 16.  These holding cells

6  which were described in 2002 as the "solution of the moment," then proliferated

7  throughout CDCR.  During the monitoring tours that I attended in 2002-2007, I began

8  seeing holding cells, also referred to as "therapeutic treatment modules" or "treatment

9  cages," in individual clinician offices, in IDTT rooms where patients would be placed, and

10  in licensed mental health crisis bed units.

11         9.       On February 3, 2006, the Special Master filed his Report and

12  Recommendations on Defendants' Revised Program Guide.  Docket No. 1749.  In that

13  report, the Special Master explained that "[t]he purpose of the report is to submit for the

14  court's final approval that 95 percent of the revised Program Guide that the parties and the

15  special master agree to and initiate a process for resolving the five percent of remaining

16  issues that continue to elect resolution." *Id.* at 4.  On February 17, 2006, Plaintiffs filed

17  Objections to the Special Master's Report and Recommendations on Defendants' Revised

18  Program Guide for the purpose of clarifying the "specific remaining objections to the

19  proposed Program Guide."  Docket No. 1763 at 1.  Among the outstanding objections were

20  the need to provide an individualized assessment of each ASU patient's risk of violence

21  towards others in determining whether treatment could include group therapy outside of

22  treatment cages, as well as individual therapy outside of treatment cages, *id*. at 12, 14-15,

23  and the need to develop exclusionary criteria for the other SHU units within CDCR,

24  including at CSP-Corcoran (COR), Valley State Prison for Women (VSPW), and

25  California Correctional Institution (CCI).  *Id*. at 13.  Plaintiffs also objected to Defendants'

26  proposal to reduce daily psych tech rounding for non-MHSDS prisoners in segregation to

27  once a week rounding and to reduce individual case manager contacts for CCCMS

28  prisoners housed in administrative segregation to every other week.  *Id.* at 16.  On

[910169-3]

4

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

March 9, 2006, the Court issued an order approving the undisputed provisions of the Program Guide, with the exception of the two provisions that would reduce the daily psych tech rounding for non-MHSDS prisoners in segregation and the individual case manager contacts for CCCMS prisoners housed in administrative segregation.  Order at 1:10-23, Docket No. 1774, Mar. 9, 2006.  There remain outstanding disputed Program Guide issues that have not been fully litigated within the *Coleman* case.

10.     On March 12, 2007, based upon a recommendation made by the Special Master in his Seventeenth Monitoring Report, the Court issued an order directing Defendants to work with the Special Master's experts to review the provision of EOP care in the administrative segregation units.  March 12, 2007 Order, Docket No. 2158.  The Order required Defendants to conduct an audit of the EOP ASU population, to examine more effective ways to reduce the lengths of stay in ASU, alternative methods of delivery of mental health treatment, the use of different housing and service models for particular categories of EOP ASU prisoners, and any other changes likely to better meet the treatment needs of this group.  *Id*.

11.     On July 11, 2007, Defendants submitted a plan in response to the March 12, 2007 Order.  Docket No. 2311.  This 2007 Plan failed to address the requirement to include alternative methods for delivery of treatment and did not provide an effective means for addressing the excessive lengths of stay in ASUs.  Plaintiffs met with Defendants and the Special Master on August 22, 2007 in a Meet and Confer to discuss the July 11, 2007 Plan.  Attached hereto as **Exhibit B,** is a true and correct copy of Plaintiffs' letter, dated August 28, 2007, to Deputy Special Master Lopes and Lisa Tillman, DAG re Defendants' Report and Plan for Improvement of EOP ASUs.  Plaintiffs' letter set forth their concerns regarding Defendants' 2007 Plan, including:  (1) the failure of the survey of length of stay and offered yard time to accurately access required data; (2) the failure of the plan to address the shocking findings that nine of ten EOP ASUs did not have sufficient confidential treatment space to provide groups, nor sufficient clinical and custody staff to escort patients to better treatment space locations; (3) the failure of the

5

plan to adequately address excessive stays in ASUs; and (4) the failure to address factors that may be contributing to high treatment refusal rates, such as scheduling problems, custody-related problems, and the nature and placement of treatment cages.  Defendants did not modify their July 2007 Plan.  Plaintiffs sent a follow-up letter to Defendants on January 3, 2008, in anticipation of a phone conference with the parties to discuss the status of implementation of the July 2007 Plan.  Attached hereto as **Exhibit C**, is a true and correct copy of Plaintiffs' January 3, 2008 Letter to Special Master Lopes and Lisa Tillman, DAG.

12.   On May 1, 2008, Defendants submitted their Plan to Improve Enhanced Outpatient Programs in Administrative Segregation Units  Status Report ("EOP ASU Status Report"), which was a report of efforts by CDCR to comply with their July 2077 ASU EOP Plan.  Attached hereto as **Exhibit D** is a true and correct copy of an excerpt from the EOP ASU Status Report, including the body of the report and Attachment A.  The EOP ASU Status Report again demonstrated a failure to implement an effective measure to remedy the problem of extended placements of seriously mentally ill prisoners in segregation, which was first flagged by the Special Master and his experts in 1997.  Furthermore, the EOP ASU Status Report deferred the significant treatment space shortfalls identified in 2007 to the Receiver's space survey, which had no timelines provided.  EOP ASU Status Report at 3-4.  Even today, many of these EOP ASUs still await treatment space construction projects not scheduled for completion until 2015 or 2016.  *See* Declaration of Deborah Hysen in Support of Defendants' Opposition to Plaintiffs' Motion Related to the Housing and Treatment of Mentally Ill Prisoners in Segregation ¶¶ 10-13, Docket No. 4712-2, July 24, 2013 (projects for EOP ASUs at RJD, MCSP, CMC and CIW).  Finally, the update failed to include any alternative methods for delivery of treatment to EOPs housed in segregated housing units.

13.   Seriously mentally ill prisoners continue to experience long stays in segregated housing units despite the clear mandate from the Special Master and his experts that prolonged stays must be addressed and remedied by Defendants.  Within the *Coleman*

[910169-3]

6

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   case, Defendants provide the *Coleman* monthly data packet prepared by the CDCR office

2   of Health Care Placement Oversight Program ("HC-POP") to the Special Master and

3   Plaintiffs' counsel, which includes length of stay data for CCCMS and EOP prisoners

4   housed in ASU, PSU and SHU units.  I regularly review this *Coleman* monthly data

5   packet.  Attached hereto as **Exhibit E** is a true and correct copy of the August 1, 2013

6   *Coleman* Monthly Packet, Enclosure 3, EOP AND CCCMS IN ADSEG/SHU/PSU

7   Placements Greater Than 90 Days, R10-1 to R10-34 (**prisoner names redacted**)  In

8   **Exhibit E**, reporting June 21, 2013 data, the length of stay data reported for EOP prisoners

9   in ASU was: CCI ASU (not an EOP ASU, 2 prisoners with range of 102-158 days), CMC

10  (9 prisoners with range of 93-345 days), KVSP (not an EOP ASU, 4 prisoners with range

11  of 109-296 days), PVSP (not an EOP ASU, 2 prisoners with stays of 135-163 days), SATF

12  (not an EOP ASU, 1 prisoner with stay of 224 days), SVSP (7 prisoners with stays of 99 to

13  615 days), WSP, (not an EOP ASU, 1 prisoner with stay of 163 days), CMF (11 prisoners

14  with stays of 109-276 days), DVI (not an EOP ASU, 2 prisoners with stays of 99-105

15  days), MCSP (8 prisoners with stays of 94-280 days), PBSP (2 prisoners with stays of 91-

16  102 days), SAC (4 prisoners with stays of 105-518 days), SOL (not an EOP ASU, 1

17  prisoner with stay of 176 days), SQ (3 prisoners with stays of 107-136 days), CIM (not an

18  EOP ASU, 1 prisoner with stay of 113 days), LAC (21 prisoners with stays of 100-297

19  days), and RJD (11 prisoners with stays of 98-365 days).  There were a total of 90 EOP

20  prisoners housed in ASUs for stays ranging from 90 days to 518 days.

21          14.     Attached hereto as **Exhibit F** is a true and correct copy of the Program Guide

22  Transfer Timelines, page 12-1-16 of the Mental Health Services Delivery System Program

23  Guide.  The Program Guide transfer timeline, Program Guide 12-1-16, mandates that an

24  EOP prisoner housed in a regular ASU, such as CCI, KVSP, PVSP, SATF, WSP, DVI,

25  SOL, and CIM, must be transferred to an EOP ASU within 30 days of placement in ASU

26  or referral to EOP level of care.  According to Defendants' monthly data (**Exhibit E,** listed

27  above), there are 14 EOP prisoners housed at the eight above regular ASUs that have been

28

[910169-3]

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  in administrative segregation for at least 90 days, three times the Program Guide mandated

2  timeline for transfer to an EOP ASU hub institution.

3      15.    In the same length of stay report, **Exhibit E,** there were 62 EOPs housed in

4  the Pelican Bay PSU with stays ranging from 93 days to 615 days, with 12 of those EOP

5  patients housed in the PSU for more than a year.  *Id*.  There were 134 EOPs housed in the

6  CSP-SAC PSU with stays ranging from 92 days to 615 days, with 34 of those in the unit

7  for more than a year and 12 for at least 615 days.  *Id*.  Finally, there were 35 EOPs housed

8  in the CIW PSU with stays ranging from 94 days to 823 days, with 9 of those in the unit

9  for more than a year.  In total, 231 EOP prisoners were housed in PSUs for greater than 90

10 days.  Defendants have been incapable of reducing the excessively long stays of seriously

11 mentally ill prisoners at the EOP level of care in ASUs and PSUs.

12     16.    **Exhibit E** also shows that CCCMS stays in ASUs and SHUs are similarly

13 long.  According to CDCR's June 21, 2013 data, the number of CCCMS prisoners in

14 segregation for greater than 90 days was:  ASP ASU: 9; CCI ASU: 38; CCI SHU: 122;

15 CCWF ASU: 44; CTF ASU: 1; KVSP ASU: 23; NKSP ASU: 15; PVSP ASU: 53; SATF

16 ASU: 34; SVSP ASU: 51; VSP SHU: 3; WSP ASP: 9; CMF ASU: 15; DVI ASU: 13; FOL

17 ASU: 7; HDSP ASU: 23; MCSP ASU: 59; PBSP ASU: 22; PBSP SHU: 1; SAC ASU: 28;

18 SAC SHU: 5; SOL ASU: 12; SQ ASU: 25; CAL ASU: 1; CEN ASU: 3; CIM ASU: 13;

19 LAC ASU: 66; and RJD ASU: 31.  In total, there were of approximately 595 CCCMS

20 prisoners housed in ASUs for stays exceeding 90 days.  There were of approximately 131

21 CCCMS prisoners housed in SHUs for stays exceeding 90 days.

22     17.    Defendants, without explanation, no longer include critical Court-ordered

23 data about *Coleman* class members in Corcoran segregation units in their monthly

24 documents.  Defendants' data thus underreports the number of *Coleman* class members

25 with prolonged lengths of stay data, omitting data on the Corcoran ASU and SHU units

26 where several hundred class members are housed.  Plaintiffs' counsel has repeatedly

27 objected to the exclusion of this Corcoran segregation unit length of stay data.

28

[910169-3]

8

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

18.     Defendants notify the Special Master and Plaintiffs' counsel of each CDCR prisoner suicide by an email notification.  Since January 1, 2013, our office has received 20 suicide email notifications from Debbie Vorous, Deputy Attorney General.  I have carefully reviewed these 20 suicide notifications, which include 19 suicides that occurred within prison housing units and one death that occurred in Salinas Valley Psychiatric Program, run by the Department of State Hospitals ("DSH").  Of the 19 suicides that have occurred inside of a CDCR-operated housing unit in 2013, 11 of the 19 (or 58%) were housed in segregated housing units.  Although the CDCR segregated housing population, which includes administrative segregation, security housing units, psychiatric services units, and the condemned housing units, represents less than 10% of the total prison population, the percentage of suicides in these high risk units remain disproportionately very high.  There have been *four* segregation suicides since Plaintiffs filed this motion, the most recent just four days ago (FOL ASU-5/27/13; CTF ASU-6/16/13; COR SHU-7/22/13; MCSP EOP ASU-8/19/13).

19.     Among the suicide notifications that Plaintiffs' counsel has received, there have been two suicides among the prisoners housed in the Corcoran SHU during the last year.  We have received from Defendants notification of one non-MHSDS prisoner who committed suicide in the Corcoran SHU on July 22, 2013, and one CCCMS prisoner who committed suicide in that unit on August 28, 2012.

20.     Attached to the Declaration of Debbie Vorous in Support of Defendants' Opposition to Plaintiffs' Motion Relating to the Housing and Treatment of Mentally Ill Prisoners in Segregation, ("Vorous Decl."), Docket No. 4714-12, July 24, 2013, are Exhibits 11-14, offered by Defendants as evidence that the Special Master and this Court approved the use of the treatment cages within the EOP HUB program.  These exhibits do not support any such finding.

21.     Exhibits 11-12 to the Vorous Declaration illustrate that the Special Master and his expert were concerned over the type of the holding cells/cages that Defendants had chosen to use for their mental health treatment (Ex. 11) and offered assistance in

9

1   mitigating harm to *Coleman* class members by assisting in the design of future treatment

2   cages that the CDCR planned to build in their Prison Industry Authority ("PIA") (Exs. 11-

3   12). Exhibit 11 is an email, dated 2005, from the Chief of Mental Health to a *Coleman*

4   court expert, who may or may not have received it, referencing an offer that may have

5   been made by the court expert to help provide CDCR information regarding a prototype

6   for a treatment cell. The Chief says that he was asked to contact the court expert because

7   the Special Master and the court expert have encouraged CDCR to pursue a better design.

8   Exhibit 12 is a 2007 Memo from one of the *Coleman* court experts, to the Special Master

9   detailing the problems identified with CDCR "prototype" for a mental health treatment

10   cell/cage created to replace some of its existing holding cells. According to the expert,

11   CDCR had: (1) placed Lexan, a solid plastic covering on the sides of the module, making

12   it difficult to hear anyone else during a group treatment session; and (2) placed a desk/table

13   inside the module which was too large to allow a larger prisoner to sit comfortably during

14   a group. After the expert's review and consultation with the Warden, Chief of Mental

15   Health, and Plant Operations Manager, he wrote that all agreed that the changes were

16   appropriate and safe from a security perspective. The court expert offered his expertise to

17   work with Defendants on their own project, to mitigate harm, and to ensure that the next

18   wave of treatment cells did not compound problems. These efforts were undertaken prior

19   to the Court's March 12, 2007 Order, Docket 2311, which required Defendants to review

20   their care in the EOP ASUs, including whether there were alternative means for delivering

21   such care.

22        22.    Exhibits 13 and 14, attached to the Vorous Declaration, are internal emails

23   between CDCR officials, and from their attorney, regarding the treatment cells that the

24   CSP-SAC Warden Walker, Mental Health Chief Kelly, Plant Operations Manager

25   Drummond and the *Coleman* expert reviewed and agreed were feasible and appropriate. In

26   communicating with other CDCR officials and employees, the attorney and CDCR

27   officials, chose to characterize the agreed upon design for the treatment cells as "Coleman

28   Court" approved for PIA construction purposes ("With the design approval by the

[910169-3]

10

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  *Coleman* Court, PIA can now go forward with production of the treatment units," Docket

2  No. 4714-15, at page 1 of 2).  This Court never approved the design or use of any

3  treatment modules.  Nor, to my knowledge, did the Special Master.  Whatever efforts were

4  made by the court expert to assist CDCR in their development of a revised treatment cell

5  for their ASUs, the focus was on mitigating the harshness and barriers to treatment that

6  existed in the CDCR model.  It was clearly not an endorsement of the method CDCR had

7  adopted for delivery of care in its segregated housing units.

8      23.      I am not aware of any *Coleman* Court Orders or Special Reports that endorse

9  or approve the use of cages or modules for mental health treatment.  In preparing this

10  declaration, I have requested a search of all *Coleman* Court Orders and Special Master

11  Reports and personally reviewed, to the best of my ability, any documents that discuss

12  cages or modules.  I found no orders or reports approving or endorsing the use of cages or

13  modules for mental health treatment.

14      24.      Defendants cite to the Program Guide as support of their widespread practice

15  of placing prisoners referred to a crisis bed in to alternative placements, including holding

16  cells, while they wait for an available crisis bed.  The Program Guide transfer timelines

17  mandate that a patient referred to a crisis bed shall be transferred within 24 hours.

18  **Exhibit F**.  The Program Guide was modified in 2006, during the extreme of the

19  overcrowding crisis, in recognition of the reality of the crisis bed shortages and the

20  practice of using alternative placements indiscriminately.  The revised Program Guide

21  includes Chapter 5, pages 12-5-3 to 12-5-5, which sets forth a hierarchy of alternative

22  placement options to guide clinical staff, so that a patient waiting for an MHCB is *not*

23  placed into a holding cell when more clinically appropriate placements are available.

24  Attached hereto as **Exhibit G** is a true and correct copy of Pages 12-5-3 to 12-5-6 of

25  Chapter 5, Mental Health Services Delivery System Program Guide.  The last two

26  placement options among the nine (9) provided for alternative placements are holding

27  cells, where the patient can "sit or stand" for up to four hours.  *Id*. at 12-5-5.

28

[910169-3]

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

25.     Defendants now use procedures developed during their most serious crisis bed shortages to justify the continued widespread use of alternative placements, including holding cells/cages/modules throughout the mental health program in all settings for delivery of treatment.  Attached hereto as **Exhibit H** is a true and correct copy of Enclosure 20, August 1, 2013 *Coleman* Monthly Report.  In this most recent *Coleman* monthly data, provided by Defendants to the Special Master and Plaintiffs, during June 2013, prison clinicians made 538 referrals for a mental health crisis bed ("MHCB") placement to the Health Care Placement Oversight Program (HC-POP) staff (an office created in CDCR Headquarters to assist local clinicians) due to the lack of an available MHCB in their prison.  Of the 538 MHCB referrals by clinicians to HC-POP, only 173 of the prisoners were placed by HC-POP in a crisis bed.  *Id.*  Those 173 prisoners were transferred by HC-POP to a crisis bed, after waits ranging from 0 to 6 days, with the average days waiting 2.06 days.[1]  *Id.* at Attachment 2A, p. 5.  Enclosure 20 does not identify the type of alternative placement (holding cage, "ZZ cell", contraband cell, Outpatient Housing Unit, as set forth in the Program Guide, **Exhibit G**, 12-5-5) used while the patient waited for transfer to a crisis bed.  365 (68%) of the prisoners referred to HC-POP for crisis bed placement in June 2013 were never placed in a crisis bed because their referrals were rescinded, either because they no longer needed crisis bed treatment after some waiting period in alternative housing or because a crisis bed became available in the prison where they were housed after some waiting period.  *Id.*  For those whose referrals were rescinded, the range of days waiting for a crisis bed was 0 to 3 days, with the average waiting 0.66 days, or more than 15 hours.  *Id.* at Attachment 2B, p. 9.  This data also

_____

[1] This report, Enclosure 20, records all stays of less than a day as "0."  Thus all patients housed in a holding cage or other alternative setting for less than 24 hours are not counted in this data.  As such, this report necessarily under-counts average waiting times for patients referred to a crisis bed.  This is an example of Defendants' under-reporting of "negative" data.

12

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  reports stays less than a day as 0, rather than reporting the number of hours spent in

2  alternative housing (see footnote 1).

3       26.     Attached as **Exhibit I** is a true and correct copy of a COMPSTAT ASU

4  Tracking Log, dated 7/23/13, marked as DEXP 113106.  It is a chart produced by

5  Defendants in support of the statement made in Paragraph 21 of the July 24, 2013

6  Declaration of Kathleen Allison, Docket. No. 4713, and shows that 50 prisoners, including

7  24 class members, are housed in an ASU while waiting for a General Population or

8  Sensitive Needs Yard bed at the same institution to become available.

9       27.     Attached as **Exhibit J** is a true and correct copy of the chart entitled

10  Enhanced Outpatient Program (EOP) Institution Counts and Bus Seat Requests – Week of

11  June 24, 2013, which is Enclosure 9 to the most recent monthly data produced by

12  Defendants to the Special Master and Plaintiffs.  This document shows that of the 305

13  EOPs for whom inter-institution transfer to an EOP bed was requested, only 48 were in

14  fact able to transfer.  The chart's right-hand column indicates that many of these EOPs are

15  in Reception Centers.  Plaintiffs' experts have also found many class members who were

16  waiting to transfer (as to an SNY bed) were being held in ASUs for extended periods.  *See,*

17  *e.g.*, Expert Declaration of Edward Kaufman, M.D., Docket No. 4379, Mar. 14, 2013, ¶ 95

18  (at every prison toured, prisoners on the mental health caseload housed in ASUs due to

19  shortage of appropriate beds), ¶¶ 97-99 (Prisoner L housed in ASU waiting for SNY

20  transfer for more than nine months); Expert Declaration of Craig Haney, Docket No. 4379,

21  Mar. 14, 2013, ¶¶ 44-50, 107-114, 141-162, 217-227 (class members spending weeks or

22  months in a "bad bed," such as ASU or OHU, waiting for transfer).

23       28.     Attached as **Exhibit K** is a true and correct copy of the Settlement

24  Agreement in *Disability Law Center v. Mass. Dep't of Corr.*, Case No. 07-10463 (D.

25  Mass.), Docket No. 252-1 (Dec. 13, 2011), a case challenging the practices of the

26  Massachusetts department of corrections in holding prisoners with serious mental illness in

27  prolonged isolation.  The document is available online at:  http://www.dlc-

28

[910169-3]

13

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  ma.org/prisonsettlement/2011%2012%209%20signed%20SETTLEMENT%20AGREEME

2  NT.pdf (last visited Aug. 21, 2013).

3      29.    Attached hereto as **Exhibit L** is a true and correct copy of the Program

4  Guide provision regarding psychiatric technician rounds in the ASU, page 12-7-5 of the

5  Mental Health Services Delivery System Program Guide.

6      30.    Attached hereto as **Exhibit M** is a true and correct copy of the Program

7  Guide provision regarding psychiatric technician rounds in the SHU, page 12-8-7 of the

8  Mental Health Services Delivery System Program Guide.

9      31.    Attached hereto as **Exhibit N** is a true and correct copy of excerpts from the

10  transcript of the deposition of Joel Dvoskin taken February 27, 2013 in San Francisco,

11  California and lodged with this Court on March 15, 2013.

12      32.    Attached hereto as **Exhibit O** is a true and correct copy of excerpts from the

13  transcript of the deposition of Charles Scott taken March 8, 2013 in San Francisco,

14  California and lodged with this Court on March 15, 2013.

15      33.    Attached hereto as **Exhibit P** is a true and correct copy of excerpts from the

16  transcript of the deposition of Steve Martin taken July 23, 2013 in San Francisco,

17  California and lodged with this Court on August 23, 2013.

18      34.    Attached hereto as **Exhibit Q** is a true and correct copy of excerpts from the

19  transcript of the deposition of Charles Scott taken July 26, 2013 in San Francisco,

20  California and lodged with this Court on August 23, 2013.

21      35.    Attached hereto as **Exhibit R** is a true and correct copy of excerpts from the

22  transcript of the deposition of Tim Belavich taken August 7, 2013 in San Francisco,

23  California and lodged with this Court on August 23, 2013.

24      36.    Attached hereto as **Exhibit S** is a true and correct copy of excerpts from the

25  transcript of the deposition of Kathleen Allison taken August 15, 2013 in San Francisco,

26  California and lodged with this Court on August 23, 2013.

27

28

[910169-3]

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

37.     Attached hereto as **Exhibit T** is a true and correct copy of excerpts from the transcript of the deposition of Jacqueline Moore taken February 21, 2013 in San Francisco, California and lodged with this Court on March 15, 2013.

38.     Attached hereto as **Exhibit U** is a true and correct copy of the Remedial Order re: Exclusion from the Security Housing Unit, issued in *Madrid v. Gomez*, N.D. Cal., Case No. C90-3094-THE, dated Dec. 15, 1995.

39.     Attached as **Exhibit V** are the "SHU Profile for Inmate" CDCR memoranda for three CCCMS prisoners housed in the Corcoran SHU.  These documents were produced by Defendants and are stamped DEXP 113107-113111, DEXP 113112-113113, DEXP 113115-113117.  These profiles are for the prisoners discussed in Paragraph 28 of the July 24, 2013 Declaration of Kathleen Allison, Docket. No. 4713.  These three CCCMS inmates have been detained in the SHU since 2000 (MERD of October 27, 2016), since 1999 (CDCR Minimum Eligible Release Date (MERD) of September 5, 2036), and since 2006 (MERD of November 3, 2017), respectively.  The names and CDCR numbers of these prisoners have been redacted.

40.     Attached hereto as **Exhibit W** is a true and correct copy of the Corcoran State Prison Health Care Evaluation, *Plata V. Brown* (N.D. Cal.), Case No. 3:01-cv-01351-THE, Docket. No. 2687, Jul. 29, 2013.  This evaluation was completed by the *Plata* court-appointed medical experts, pursuant to the *Plata* court's order requesting that this expert team conduct evaluations of essential components of CDCR's health care system at each CDCR prison.  The *Plata* court medical experts visited Corcoran State Prison to conduct their evaluation on April 16-19, 2013.  Their Overall Finding in the report (at Page 5) states: "We find that Corcoran State Prison (Corcoran) is not providing adequate medical care to patients, and that there are systematic issues that present an on-going serious risk of harm to patients and result in preventable morbidity and mortality."

41.     Attached hereto as **Exhibit X** is a true and correct copy of "California Jails: "'Solitary confinement can amount to cruel punishment, even torture' – UN rights expert," United Nations Office of the High Commissioner for Human Rights, August 23, 2013.

1    The United Nations Special Rapporteur Juan E. Mendez, issued this statement of great

2    concern about the mental and physical suffering experienced in harsh isolation units.

3    Looking at California's Security Housing Units specifically, he stated:  "I am extremely

4    worried about those numbers [more than 400 prisoners held for over a decade] and in

5    particular about the approximately 4,000 prisoners in California who are held in Security

6    Housing Units for indefinite periods or periods of many years, often decades."  This

7    document is available on line at:  http://bit.ly/14pf8KK or http://www.ohchr.org/EN/

8    NewsEvents/Pages/DisplayNews.aspx?NewsID=13655&LangID=E.

9

10       I declare under penalty of perjury under the laws of the United States and the State

11    of California that the foregoing is true and correct, and that this declaration is executed at

12    San Francisco, California this 23rd day of August, 2013.

13

14

15                   */s/ Jane E. Kahn*
                    Jane E. Kahn

16

17

18

19

20

21

22

23

24

25

26

27

28

[910169-3]

REPLY DECL. OF JANE E. KAHN ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRM. RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Exhibit A

489-3

**BILL LOCKYER**
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET. SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: 916/323-1942
Telephone: 916/324-4361
Facsimile: 916/324-5205
E-Mail: Jennifer.Neill@doj.ca.us

## *Via Facsimile and U.S. Mail*

January 18, 2002

J. Michael Keating, Jr., Special Master
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI 02903

RECEIVED

JAN 2 2 2002

ROSEN BIEN & ASC

RE:   *Coleman v. Davis*
      **Case No.:  CIV-S-90-0520 LKK JFM P**

Dear Mr. Keating:

As directed by the Court in its order dated December 20, 2001, enclosed is a list of measures already completed or projected to meet programming space needs in regional administrative segregation units.

Please feel free to call me with any questions.

Sincerely,

JENNIFER A. NEILL
Deputy Attorney General

For    BILL LOCKYER
       Attorney General

cc:    Michael Bien
       David Gransee
       Rochelle Holzmann
       Judi Lemos
       Matthew Lopes (by facsimile)
       Julianne Mossler
       Sylvia Ortiz
       Michael Pickett
       Sharon Riegel
       Tim Rougeux
       Donald Specter

State of California
Department of Corrections

# Memorandum

Date:        January 18, 2002

Subject:     Administrative Segregation Unit Program Space

In response to the court order dated December 20, 2001, Defendants submit the following report on measures already completed or projected to meet programming space needs in regional administrative segregation units.

There are ten institutions that have Administrative Segregation Units. Detailed below are the measures that these institutions have completed and that are projected to meet programming space needs.

California Medical Facility

The California Medical Facility (CMF) has two identical housing units, I-3 and P-3, which each have 38 beds providing administrative segregation housing for mental health case load inmates.

The treatment space in I-3 consists of a dayroom that has seven holding cells used to conduct group therapy. The dayroom is also used for interdisciplinary treatment team meetings (IDTTs).

Recently, a project was completed in R-2 that renovated space for use by the Facility Captains and clerical support staff. Previously, the Facility Captains and support staff were occupying space in housing units that the institution determined would be better utilized to carry out mental health treatment. The project has met the goal of opening more treatment space in the housing units.

Two offices in I-3 are assigned to clinical staff and are used for providing individual clinical contacts. A third office is used for individual services and Institutional Classification Committee (ICC) hearings.

Treatment space in P-3 is identical to I-3, except that P-3 has two nursing offices and I-3 has one. In both I-3 and P-3 the offices and dayroom are in use from 8:00 am to 5:00 pm on weekdays and the nursing office is in use from 7:30 am to 5:30 pm on weekdays.

At this point, there does not appear to be any need for additional treatment space to provide services to the EOP population.

Page 2

## California Men's Colony

As of January 11, 2002, there were 65 mental health case load inmates housed in the administrative segregation unit at California Men's Colony (CMC), 45 at the EOP level of care and 23 at the CCCMS level of care.

A double-wide modular unit was allocated to CMC and the institution is waiting for delivery. Health care transcription staff will move to the modular unit, freeing up office space for group treatment. When the transcription staff move to the modular unit, seven holding cells will be installed in the new group treatment space.

CMC received approval to convert four existing administrative segregation unit cells into two interview rooms. Additional modifications to acoustics are required in these cells to use these rooms for one-to-one treatment.

## California State Prison - Corcoran

As of January 14, 2002, there were 52 EOP inmates housed in an administrative segregation unit.

There are currently six holding cells located in the housing unit property room that are used for treatment.

The institution estimates that it needs 21 additional holding cells. CSP-Corcoran has ordered 21 additional holding cells, five of which will be installed in the property room. The remaining 16 will be installed in the 4B1 hallway. The institution anticipates that the holding cells will be installed by June 30, 2002.

## California State Prison - Los Angeles County

As of January 16, 2002, there were 10 EOP inmates housed in administrative segregation.

The current treatment space includes one auxiliary room in Facility IV, A Building, and five holding cages. Based on no projected increase in the EOP administrative segregation population, the institution has no plans to augment the treatment space.

## California State Prison - Sacramento

As of January 18, 2002, there were 42 EOP inmates housed in administrative segregation. The institution is pursuing the purchase of additional holding cells and will request approval for construction of two new treatment spaces.

Page 3

<u>Mule Creek State Prison</u>

As of January 15, 2002, there were 29 EOP patients in the administrative segregation unit. The daily census averages 35 EOP inmates housed in administrative segregation.

Mule Creek State Prison initiated its EOP administrative segregation "hub" programming during the 1999-2000 fiscal year. At that time, holding cells for mental health treatment were placed on the dayroom floor of "A" section in the administrative segregation unit. In 2001, however, the area was reconfigured at the request of mental health staff to better accommodate treatment needs. Currently, there are six holding cells for use during group therapy sessions and three holding cells used for individual therapy sessions.

Mental health staff and the Facility Captain have identified modifications that will enhance the treatment space and accommodate additional treatment staff. Anticipated changes include: reconfiguring the group treatment holding cell area to increase the capacity from six to eight patients; relocating the administrative segregation unit law library to another area of the building to provide more space for mental health treatment and lessen disruption to the mental health program; adding two additional holding cells for patient contacts; and adding two additional staff cubicles. The reconfiguration is currently in the planning stage and is anticipated to be completed by March 1, 2002. The institution will absorb the minimal cost associated with the reconfiguration.

<u>R.J. Donovan</u>

Over the past eight weeks, the average number of EOP inmates housed in the administrative segregation unit was 43. Because Donovan is an EOP hub, the institution is planning for treatment space appropriate for 50 inmate patients.

Currently, the treatment space within the designated mental health area consists of four individual cubicles. One of the cubicles contains a holding cell that is suitable for individual visits. Additionally, there is a group therapy area that contains three holding cells.

In addition to the designated mental health area, there are five designated library holding cells that are authorized for individual therapy sessions, during non-library times. The institution is in the process of preparing a letter requesting use of these holding cells for group therapy during non-library times.

As for long term plans, the institution estimates that the capacity for group therapy needs to be increased from three holding cells to seventeen holding cells, and that the individual holding cell capacity needs to be increased from one standalone holding cell to seven. Also, once the mental health treatment area is expanded, it needs to be enclosed with a partition.

Page 4

In order to accomplish the long term goals, the institution proposes the following: expansion of the current three holding cell group area to six holding cells; utilization of the five library holding cells for groups when they are not being used by the librarian; construction of an additional six holding cell group area in the administrative segregation unit; addition of three individual cubicles; and addition of six standalone holding cells for individual therapy sessions.

The institution estimates it will take one year to complete the expansion from the date of authorization.

Salinas Valley State Prison

As of January 11, 2002, there were 18 EOP inmates housed in the administrative segregation unit at SVSP.

Currently, individual therapy is conduced in an office area located in each of two housing units, D1 and D2. Each patient is placed in a semi-portable holding cell and provided treatment.

Group therapy is currently provided in the interior common area that divides building D1 and D2 in the administrative segregation unit. The area has six semi-portable holding cells that were installed to provide ongoing law library access, but that also allow for the provision of group therapy sessions.

For the long term plan, SVSP intends to locate ten semi-portable holding cells in the kitchen area of the D1/D2 building. It should be noted that the kitchen is not in use by the institution. Using the kitchen as a treatment area will provide confidentiality and will allow for increased flexibility in the scheduling of therapy sessions.

To fulfil the plan to use the kitchen, it is necessary to remove several items, such as the oven, tray machine and sink, and the counter top. Also, the ten holding cells need to be purchased. In February 2002, the institution will submit a request for project approval to the Institutions Division. The project completion date will be determined once the project is approved.

San Quentin State Prison

As of January 8, 2002, there were 27 EOP inmates housed in the administrative segregation units at San Quentin.

A private and confidential treatment space has been made available on the second floor of the Adjustment Center to be used for inmates who are housed in the Adjustment Center. This space has been in use since approximately August 1, 2001.

Page 5

An additional private and confidential area has been identified on the first floor of the infirmary and has been prepared for treatment space for inmate patients who are housed in Carson Section and the East Block. This area became available for use on January 14, 2002.

Valley State Prison for Women

From October 1, 2001 to December 3, 2001, the average daily census of EOP inmates in the administrative segregation unit and security housing unit was nine.

Valley State Prison has allocated space equivalent to the classification room, and the space has been arranged to facilitate group therapy. The area used for EOP group therapy for inmate patients housed in the ASU or SHU is located on the ASU side of the building in what was formerly a supply room. Currently, there are five holding cells in the room.

TIM ROUGEUX
Chief, Institution Services Unit
California Department of Corrections

Exhibit B

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
SHIRLEY HUEY **
JANE KAHN
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS ***
THOMAS NOLAN
LORI RIFKIN ****
LOREN STEWART
KENNETH WALCZAK *****
AMY WHELAN
SARAH OLSON ZIMMERMAN *****

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
POST OFFICE BOX 390
SAN FRANCISCO, CALIFORNIA  94104-0390

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rbg@rbg-law.com

August 28, 2007

### *Via Email Only*

Matthew A. Lopes, Jr.
Deputy Special Master
Pannone Lopes & Devereaux LLC
1800 Financial Plaza
Providence, RI  02093

Lisa A. Tillman
Deputy Attorney General
Office of the Attorney General
1300 I Street – PO Box 944255
Sacramento, CA  95814

Re:    *Coleman v. Schwarzenegger*
Defendants' Report and Plan for Improvement of EOP ASUs
Our File No. 0489-3

Dear Matty and Lisa:

On July 11, 2007, defendants filed their Report and Plan for Improvement of
Enhanced Outpatient Programs in Administrative Segregation Units.  ("EOP ASU Plan")
[Docket 2311].  The EOP ASU Plan was developed in response to the Court's March 12,
2007 Order which directed defendants to work with the Special Master's experts to
review the provision of EOP programs in the ASUs.  3/12/07 Order ¶ 3.  [Docket 2158].
The Order required an audit of the EOP ASU population, as well as an examination of
alternative methods for delivery of treatment within the units and ways to reduce lengths
of stay.  Defendants were ordered to complete their review process and report back to the
Court within 90 days.  3/12/07 Order.   On June 1, 2007, the Court ordered defendants to
include in the report on enhanced outpatient programs in administrative segregation

*         MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
**        MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
***       MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
****      MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
*****     MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

August 28, 2007
Page 2

"their plan for modification of the present requirement that allows ICC reviews for inmates in administrative segregation. Defendants should consider conducting ICC reviews every 45 days for those inmates awaiting disposition of referrals to local district attorneys and possibly for all mental health caseload inmates who have been held in administrative segregation over 90 days." 6/1/07 Order ¶ 6.a [Docket 2255].

On June 6, 2007, several days before defendants EOP ASU Plan was due to the Court, defendants filed an Ex Parte Motion requesting a forty-five day extension of time to complete their Report and Plan for the EOP ASUs. According to the Declaration of Doug McKeever in support of Ex Parte Motion, CDCR staff met with the Court-appointed experts on the plan on May 3rd and May 14, 2007, and a draft of the Plan had been completed by June 6, 2007. Declaration of Doug McKeever at P. 2, L.15. [Docket 2264] Defendants requested additional time to complete their Report and Plan in part to respond to a subsequent June 1, 2007 Order. Their July 11, 2007 Plan, however, failed to include the data required per the June 1, 2007 Order: "the numbers of administrative segregation inmates currently awaiting transfer to the sensitive needs yards." June 1, 2007 Order ¶ 6.b. [Docket 2255]. Instead, defendants simply stated in their July 11 Plan that "as of June 20, 2007, there are no inmate-patients requiring Enhanced Outpatient Program treatment in Administrative Segregation Units who are endorsed for Sensitive Needs Housing." Plan at 5. The June 1, 2007 Order did not refer to "endorsed" or to EOP ASU patients and defendants' response within their July 11 Plan has not met the requirements of the June 1 Order.

## BASIS OF THE MARCH 12, 2007 ORDER

On December 4, 2006, the Special Master provided defendants and plaintiffs with the draft version of the Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part A ("Draft 17A"). Plaintiffs filed a response to the Draft 17A on January 23, 2007, and requested specific recommendations and orders to address CDCR's inability to provide

August 28, 2007
Page 3

adequate mental health treatment to the hundreds of EOP inmates housed in the EOP

ASUs. *See* January 23, 2007 Letter to Special Master Keating re Plaintiffs' Response to

Draft 17A. Plaintiffs' requested recommendations were directed at requiring CDCR to

identify the actual program capacity at each EOP ASU (based upon the existing treatment

space, custody and clinical staffing, and scheduling capacity) and develop a policy that

would successfully limit the stay of EOP patients within the EOP ASUs. Plaintiffs have

previously requested transfer timelines for EOP ASU inmates during policy meetings and

Program Guide negotiations without success. This remains a disputed Program Guide

issue.

On February 14, 2007, the Special Master filed the final version of the

Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance

with Provisionally Approved Plans, Policies and Protocols, Part A ("17A Report")

[Docket 2140]. In discussing his recommendation regarding the EOP ASUs, the Special

Master wrote:

> The second recommendation included in the draft version of the
> report sought a clear commitment from the defendants to look again
> at the provision of the EOP level of care in hub administrative
> segregation units. The impetus of the recommendation was the
> report's finding, once again, that the delivery of EOP care in the
> administrative segregation environment remained beyond the
> capability of most institutions due to constraints of mental health and
> custody staffing, programming space and scheduling. The
> defendants first objected that the feasibility of any improvement in
> the existing delivery of EOP care in administrative segregation units
> is substantially limited by the present physical infrastructure of
> administrative segregation units, a limitation confirmed repeatedly
> by the monitor since at least mid-2001. The defendants, moreover,
> have been under court orders to improve programming space in
> administrative segregation hub units since early 2002. The fact that
> the rising population of EOP administrative segregation inmates has
> outrun earlier prognostications and provisions for programming
> space does not excuse defendants' increasing inability to provide an

August 28, 2007
Page 4

              adequate level of mental health care for EOP inmates in hub administrative segregation units. 17A Report at 134-135.

      The 17A recommendation, which was adopted by the Court in its March 12, 2007 Order, directed defendants to work with the monitors' experts to review the provision of EOP ASU care, including an audit of the population and an examination of more effective ways to reduce the lengths of stay in the ASUs and alternative methods for delivering mental health treatment to the population. The Plan filed with the Court on July 11, 2007, 120 days after the March 12, 2007 Order, is an inadequate response to the serious problems documented within the EOP ASUs by the Special Master in his Draft and Final 17A Report provided to defendants more than six months ago.

## DEFENDANTS' PLAN AND AUGUST 22ND MEET AND CONFER

      On August 22nd the parties met with the Special Master, Deputy Special Master, several members of the Special Master's team and Defendants to discuss the July 11, 2007 Plan. After the meeting on August 22, Plaintiffs have the following concerns about the July 11, 2007 Plan and request that Defendants consider providing additional information or amendments to their Plan at the next meeting of the parties:

      **1. Survey Fails to Accurately Access Required Data:** During the August 22nd discussion of the custody survey of average length of stay and offered yard it became apparent that the data included both EOP and 3CMS inmates in the administrative segregation units and did not clarify whether the yard time reported "scheduled," "offered" or "received" out of cell yard time.[1] Defendants should provide accurate data regarding the length of stay for EOPs housed in the HUB facilities (ranges, rather than ALOS) and yard time offered and received. The data reporting the census and the treatment offered and refused was collected by Steve Clavere, who contacted the Health Care Manager at each prison. Although this data is helpful, in order to fully understand

---

     [1]     The data reported on the EOP ASU survey was identical to the data reported by defendants in their August 13, 2007 Survey for their Suicide Plan in ASUs (which includes 3CMS, EOPs and GP inmates).

August 28, 2007
Page 5

the high refusal rates and Defendants' Plan (including the provision of daily case manager contacts to patients who refuse at least 50% of their treatment hours), it would be helpful to have the number of patients in each EOP HUB who currently are refusing at least 50% of their treatment hours. Presumably, in fashioning this response, Defendants had this data available.

    **2. Plan Fails to Assess the Need**: Defendants' Plan concludes that nine of the ten EOP HUBs do not have sufficient confidential treatment space to provide group therapy. July 11, 2007 Plan at 3. Furthermore, clinical and custody staff vacancy rates at most of these institutions were found to prohibit other solutions, such as escorting the patients to other locations where better treatment space is available or alternating work scheduled. *Id.* These are shocking findings.

    Short-term remedial measures are offered in the plan, including: maximizing office space not being used; ordering the authorized treatment cages; providing treatment on 3$^{\rm rd}$ watch and weekends. It is unclear whether there is any office space available or any spaces for putting new treatment cages. Plan at 6.

    Longer term remedial measures are listed, including participation in the Receiver's space survey, and AB 900 and the Infill Bed Plan. The possible solutions offered by AB 900 and the Infill Plan remain undefined. All of these possible solutions, however, require that Defendants know what type of staffing (custody and clinical), what number of treatment modules and exercise yards and what type of scheduling is required to provide the mandated hours of treatment and exercise within each of the EOP ASUs (based upon their census). Special Master Keating has previously required defendants to conduct a systematic survey based upon the census within each EOP ASU in order to ascertain the number of clinicians, custody staff, treatment modules, and exercise yards required to provide the Court-ordered treatment. *See* Special Master's February 21, 2002 Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders (reporting on the ten prisons where EOP ASUs located who were required

August 28, 2007
Page 6

to submit plans on their measures to meet the programming space needs in the hub units.) In order to participate in the Receiver's space survey as he moves from prison to prison, Defendants must first establish the basic space, staffing, treatment cages, and yards required to meet their census and treatment requirements. Will this be done?

**3. Length of Stay in EOP ASU**: Defendants' plan for addressing the excessive lengths of stay for EOP ASU patients is inadequate because it does not even begin to review EOP patients until they have been housed in the ASU for 90 days and then limits the review to custody staff. Furthermore, it is unresponsive to the additional mandate of the June 1, 2007 Order regarding the modification of ICC reviews for ASU inmates.

In the last recent monthly statistical package – which does not report average length of stay for EOP ASU patients at the ten Hub facilities – there are at least 123 EOP patients housed in the EOP ASUs for lengths of stay ranging from 97 to 391 days. The actual number is likely to be much higher as we did not include any San Quentin EOP ASU inmates because it was difficult to tell which were from the condemned unit.

During the August 22nd meeting with Defendants, they repeatedly referred to the Institutional Classification Committee (ICC ) review of EOP ASU patients that occurred in addition to the July 11, 2007 Plan's review at 90 days. Unfortunately, although CDCR previously provided ICC reviews of all inmates housed in administrative segregation every 30 days, they changed this process in 2005. At that time in 2005, CDCR proposed Emergency Regulations changing the frequency of ICC reviews from every 30 days to every 90 to 180 days, depending on the reason for placement in administrative segregation. One of the justifications given by CDCR was that this change would, inexplicably, reduce lengths of stay in administrative segregation. *See* Plaintiffs' Letter dated August 30, 2005, attached hereto (objecting to the change in frequency which would necessarily result in longer stays for *Coleman* class members). The Regulation was adopted.

August 28, 2007
Page 7

During the discussions on August 22, 2007, Defendants offered no clinical justification for the 90 day review; in fact, the only justification offered for the 90 day review was custodial convenience. Although Plaintiffs' counsel proposed adding staffing resources and/or negotiating agreements with the District Attorneys (a remedy sought previously in another context in *Coleman*), both suggestions were rejected. This was quite disturbing since both ideas offer a chance at reducing the length of stay of EOP patients who remain in the ASUs while they await decisions on their DA referred RVRs and/or processing of other classification factors. Again, the CDCR (both clinical and custody side of the house) appear to accept the extraordinary long stays of EOPs in their ASUs as routine. As discussed briefly during the meeting, Plaintiffs suggest that Defendants consider other models adopted in other systems, where clinical and custody staff have determined that lengths of stay in administrative segregation units of greater than 30 days for their "EOP" level of care inmates require significant scrutiny, including a review at 30 days, and every 14 days thereafter with written justification for why the patient should not be moved to a mental health unit where he will receive 20 hours of treatment in a treatment environment where non-caged treatment and exercise is available.

Plaintiffs request that at the next meeting Defendants consider providing alternative proposals to their 90-day review for reducing lengths of stay for EOPs in administrative segregation.

4.    **Treatment Refusals**: This aspect of the "survey" is quite troubling. At a number of the EOP ASUs, 40 to 60 percent of the treatment hours offered were refused by the EOP patients. *See, e.g.* Corcoran, LAC, RJD, SAC, San Quentin, and SVSP. Do the local programs know how many of their EOP ASU patients are refusing at least 50% of their treatment hours? Has that information been provided to the staff that developed the Plans' sections regarding Treatment Refusals?

August 28, 2007
Page 8

During the August 22nd meeting Plaintiffs were told that the Plan's requirement that the case manager provide EOPs who refused at least 50% of their treatment hours with daily individual contacts was a "punishment" or an "incentive" to the institution. Although the provision may appropriately address the individual patient who is not leaving his or her cell for treatment, it does not address the institutional factors that may be contributing to the high refusal rate. Were those identified during the development of the Plan? Although the Plan identified space and staffing deficiencies, certain other deficiencies have been noted during monitoring tours, including scheduling problems, custody problems, climate control, location of treatment cages, etc. Will the prisons with high refusal rates be targeted for special oversight?

## CONCLUSION

We request an opportunity to engage in further discussions with Defendants, the Deputy Special Master, and his team regarding the July 11, 2007 Report and Plan to improve the EOP ASUs. We hope that these discussions will prove fruitful and will result in a meaningful response to the March 12, 2007 Order.

Sincerely yours,

ROSEN, BIEN & GALVAN, LLP

/s/ *Jane Kahn*

Jane Kahn

JEK:thml

cc:    Misha Igra
       Michael Stone
       Coleman Co-counsel
       Special Master's Team

Exhibit C

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
POST OFFICE BOX 1730
SAN FRANCISCO, CALIFORNIA 94101-4390
TELEPHONE (415) 433-6830
FAX (415) 433-7104
EMAIL rbg@rbg-law.com

HOLLY BALDWIN
LISA ELLS
GAY C. GRUNFELD
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH OLSON ZIMMERMAN[6]

January 3, 2008

<u>VIA EMAIL ONLY</u>

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI 02903

Lisa Tillman
Deputy Attorney General
1300 I Street
P.O. Box 94425
Sacramento, CA 95814

     Re:   Coleman v. Schwarzenegger
          EOP HUB Plan
          <u>Our File No. 0489-3</u>

Dear Matty and Lisa:

      In preparation for a follow-up phone conference in February 2008, plaintiffs write with additional comments on defendants' EOP ASU Plan developed in response to the Court's March 12, 2007 Order. Attached is plaintiffs' August 28, 2007 letter regarding the EOP ASU Plan. In that letter, we requested additional information about our concerns raised during the August 22, 2007 meeting with defendants, the Special Master and his team on defendants' EOP ASU Plan. We have never received a response to our letter.

      We are mindful, as we comment on this EOP ASU Plan, that CDCR has a shortage of EOP Hub beds, EOP SNY beds, PSU beds and Level IV ICF beds. As a result, EOP patients are retained in regular administrative segregation units -- that are not adequately staffed -- well beyond transfer timelines, and EOP patients, who decompensate in the Hub beds, remain there waiting for transfer to DMH beds.

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

Matthew A. Lopes, Jr.
Lisa Tillman
January 3, 2008
Page 2

Defendants' EOP ASU Plan fails to address the existing PSU, EOP SNY, EOP ASU and ICF bed shortages.

<u>Survey of Out-of Cell Time, Length of Stay and Refusal Rates</u>

As noted in our August 28, 2007 letter, the survey conducted by defendants as required by the March 12, 2007 Order, which included data on the "average length of stay," out-of-cell time and refusal rates of EOP Hub patients was flawed. This became apparent during the August 22nd meeting with the parties and the Special Master, Deputy Special Master and the experts. For example, defendants reported that custody staff were asked about yard time, but could not clarify whether the time reported was "scheduled," "offered" or "received." Furthermore, the data covered housing units where CCCMS and GP prisoners were also housed and thus, did not accurately reflect the out-of-cell time provided to EOP Hub patients. The length of stay data included only average stay and did not set forth the number of patients and the range of stays. The percentage of patients refusing treatment did not include the total number of EOP patients in each unit that were refusing 50 percent of their offered hours nor did it indicate whether these patients were among those already offered reduced treatment hours as part of their IDTT.

Defendants have never clarified this information provided in their initial survey of the EOP Hub facilities. Plaintiffs request that defendants provide updated information, including the following information, prior to any conference call scheduled to discuss the EOP Hub Plan:

1.      The number of hours per week of out-of-cell time offered and received by each EOP patient housed in the EOP Hub units;

2.      The median length of stay for EOP patients in each unit, including the range of stays;

3.      The number of patients in each Hub unit refusing at least 50 percent of their treatment hours, including the number of those patients scheduled for less than ten (10) hours of structured therapeutic activities per week. The number of patients already referred and accepted for transfer to SVPP.

The survey was designed to examine the barriers to meeting Title 15 and MHSDS Program Guide requirements. EOP Hub Plan at 2. Plaintiffs request that the survey be repeated to enable defendants to adequately address the requirements of the March 12, 2007 Order.

<u>Insufficient Confidential Treatment Space for Group Therapy</u>

Defendants' EOP Hub Plan reported that nine of the ten EOP Hubs did not have sufficient confidential treatment space to provide group therapy. July 11, 2007 Plan at 3. There were a number of short-term remedial measures offered in the Plan until the

Matthew A. Lopes, Jr.
Lisa Tillman
January 3, 2008
Page 3

treatment space deficits could be addressed though the Receiver's space survey, AB 900 and the Infill Bed Plan.

Plaintiffs request the following updates:

1.      Has the Receiver's space survey identified treatment space additions for the EOP Hub programs?  If so, for which programs, and when will these additions be built?

2.      Has any additional treatment space been constructed using AB 900 or Infill Bed Planning resources?   If not, have any plans been developed?

3.      Are there any future construction plans for treatment space in any of the EOP Hub facilities at this time?

4.      Have any of the short-term remedial measures been successful in creating additional confidential treatment space for group therapy – e.g., using 3rd watch and weekends, using office space not utilized, ordering authorized treatment modules, escorting patients to other locations where better treatment space is available?  If so, plaintiffs request a report on the specifics (which EOP Hub units, how?).

Defendants' Plan to Reduce Length of Stay in EOP Hubs

During the meeting to discuss defendants' EOP Hub Plan, plaintiffs strongly objected to the Plan's proposal to reduce lengths of stay in the EOP Hubs because it did not provide for a review of EOP patients housed in administrative segregation **until** they had been there for at least ninety (90) days.  The 90 day review, as proposed, is done solely by custody staff without any mental health involvement.

As noted in our August 28, 2007 letter, defendants offered no clinical justification for waiting 90 days before reviewing the EOP patients in the Hub facilities; in fact, the **only** justification offered during the meeting with the parties was "custodial convenience."  This is an unacceptable reason given the Court's serious concerns about the deterioration of EOP patients permitted to languish in segregation.

Plaintiffs have requested that defendants modify this portion of their Plan and implement a custody/clinical review of EOP patients at 30 days, and every 14 days thereafter, with written justification for why the patient should not be moved to a mental health unit where he or she will receive increased mental health treatment. *See* August 28, 2007 Letter.  Defendants have never responded.

Defendants' EOP Hub Plan provided that the 90 day review would be implemented on September 3, 2007, and that all EOP patients housed in Hub units for more than 90 days, will be reviewed every 30 days by the Facility Captain and a CC II outside of the ICC process.  The review must include detailed information and be

Matthew A. Lopes, Jr.
Lisa Tillman
January 3, 2008
Page 4

provided to the Warden for his or her review. **Is this occurring? Has this impacted on lengths of stay?[1]**

The EOP Hub Plan also provided that the Warden would ensure that reviewers take action to resolve issues that impact length of stay and would send a monthly report to the headquarters Division of Adult Institutions Correctional Counselor II, the Correctional Captain assigned to *Coleman* compliance. EOP ASU Plan at 4. **Have these monthly reports been sent to headquarters, to the CC II assigned to *Coleman* compliance? Who is that? What have these reports indicated are the obstacles to reducing lengths of stay? Has a corrective action plan been developed to address the identified obstacles?**

The EOP Hub Plan also provided that the Warden at each prison with an EOP Hub shall contact the District Attorney (DA) to discuss expediting pending cases. It also provided that EOP patients who postpone an RVR hearing pending referral to the DA shall be reviewed for alternative housing. **Have the Wardens contacted the DAs to discuss expedited processing of EOP referrals? What are the arrangements? What type of alternative housing is available for EOP patients who postpone an RVR hearing?**

<u>Weekly Monitoring of EOP Hub Programs</u>

The EOP Hub Plan provides that beginning September 3, 2007, each prison with a Hub unit, will charter a Quality Improvement Team (QIT) to ensure that out-of-cell time and treatment are maximized for the program. EOP ASU Plan at 5. The program director and Captain for the unit will lead the QIT and provide weekly data on yard, showers, treatment hours, cell front contacts, and reasons for deficits. A monthly teleconference of all EOP Hub units shall be held with the Regional Chief Psychologist to standardize solutions and reduce barriers. **Have the QITs been chartered at each Hub institution? Is the data being provided to the Regional Chief Psychologists? Are the monthly teleconferences being held? Have standardized solutions and ways to reduce systemic barriers been created?**

<u>Treatment Refusals</u>

The EOP Hub Plan provides that beginning September 3, 2007, the designated mental health clinician assigned to EOP patients refusing more than fifty (50) percent of offered treatment must see the patient daily on scheduled work days (instead of weekly), must include as part of the treatment plan efforts to reduce resistance to group therapy,

---

[1] In the most recent monthly statistical package provided by defendants – provided on November 8, 2007 and reporting August 24, 2007 data – there were at least 120 EOP patients housed in the EOP Hubs with lengths of stay ranging from 90 to 371 days.

Matthew A. Lopes, Jr.
Lisa Tillman
January 3, 2008
Page 5

must discuss the patient during the morning meeting with custody in the adseg unit, and must consider referring the patient to a higher level of care. **Have prisons implemented this requirement? If so, are they able to staff it? Have the daily contacts and other provisions increased treatment compliance? If not, have there been more referrals to DMH? What happens with the EOP patients who are already receiving reduced treatment hours through IDTT?**

### EOPs Housed in Non-Hub ASUs

In the most recent monthly statistical package provided by defendants – reporting August 24, 2007 data - there were 112 EOP patients housed in regular administrative segregation units. Many were housed at prisons without EOP programs -- Avenal, CCI, Centinela, DVI, KVSP, SATF, SCC and Solano-- and for more than 30 days. Many of the EOP Hub units were also at or over-capacity.

At the December 3, 2007 Policy Meeting, defendants informed us that the Mule Creek SNY EOP program is full and that there are currently at least 37 EOP SNY patients on the waiting list for the program. This is one EOP population that has historically remained in the EOP Hub units for months to years waiting for EOP SNY beds. In the recent past, the Hubs were filled with EOP SNY patients waiting for the MCSP Level IV EOP SNY program to open. It is clear that the size of the EOP SNY program is inadequate to meet the needs of the population once again; CDCR's practice of retaining these EOP patients in segregation for months to years until beds open or new beds are designated as SNY EOP is simply unacceptable.

Defendants' EOP Hub Plan must acknowledge the shortage of Hub beds, EOP SNY beds, PSU beds, and Level IV ICF beds, and CDCR must develop strategies for moving EOP patients rapidly through the disciplinary, investigative and classification processes to the right beds. Unfortunately, unless the "right level of care" and the right beds are available, a speedy review process will serve no end. Defendants must commit to creating the necessary beds now to which these patients can move as part of their EOP Hub Plan.

Sincerely yours,

ROSEN, BIEN & GALVAN, LLP

*/s/ Jane E. Kahn*

By: Jane E. Kahn

JEK:
Cc:   Misha Ingra

Matthew A. Lopes, Jr.
Lisa Tillman
January 3, 2008
Page 6

      Coleman Co-counsel
      Special Master's experts and monitors

Exhibit D

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



May 1, 2008

Matthew A. Lopes, Jr., Esq.              Via:  Lisa A. Tillman, Esq.
*Coleman* Special Master                        Deputy Attorney General
Pannone Lopes & Devereaux                       Department of Justice
317 Iron Horse Way, Suite 301                   P.O. Box 944255
Providence, RI  02908                           Sacramento, CA  94244-2550

Dear Mr. Lopes:

FIVE PLANS

The California Department of Corrections and Rehabilitation submits the following:

1.  Plan for mental health treatment of Enhanced Outpatient Program inmates in Reception Centers (in response to the *Coleman* Court Order dated May 1, 2006);

2.  Plan to improve Enhanced Outpatient Programs in Administrative Segregation Units (in response to the *Coleman* Court Order dated March 12, 2007);

3.  Plan to improve mental health assessments of Correctional Clinical Case Management Services inmate-patients subject to disciplinary processes (in response to the *Coleman* Court Order dated August 2, 2007);

4.  Recruitment plan (in response to the *Coleman* Court Order dated August 2, 2007); and

5.  Referral strategy for Atascadero State Hospital Intermediate Care Facility.

If you have any questions, please contact me at (916) 445-1116.

Sincerely,

ROBIN J. DEZEMBER
Chief Deputy Secretary
Correctional Health Care Services

Enclosures

ADMINISTRATIVE SEGREGATION UNIT
ENHANCED OUTPATIENT PROGRAM
STATUS REPORT
May 1, 2008

The following is a report of efforts by the California Department of Corrections and Rehabilitation to comply with the Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) Treatment Improvement Plan, dated July 11, 2007. The report follows main headings identified in the plan. After each heading, the plan requirement is summarized, the status is described, and details are provided.

**Length of Stay**

*PLAN REQUIREMENT: Beginning September 3, 2007, all inmate-patients requiring Enhanced Outpatient Program level of care, housed in ASU Hubs for more than 90 days will be reviewed every 30 days.*

*STATUS: Compliant*
Inmate-patients who require ASU EOP Hub placement for more than 90 days are reviewed every 30 days as described below. From December 2007 to March 2008, the number of ASU EOP inmate-patients in the hub institution for more than 90 days decreased more than 22%.

*DETAILS:*
Attachment A includes the December 2007 through March 2008 Length of Stay Reports for inmate-patients at the EOP level of care, housed in ASU Hubs for more than 90 days. This report was compiled after a review of each case, and categorizes reasons for ASU retention. Categories for delays include: Pending Investigation/Other, Pending Rules Violation Report, Pending District Attorney Referral, Pending Court Proceeding, Pending Classification Staff Representative Action, Pending Minimum Eligible Release Date, Endorsed Pending Transfer to Psychiatric Services Unit, and Endorsed Pending Transfer/Special Needs Yard. The cases will continue to be reviewed every 30 days, conducted outside of the Institutional Classification Committee process, by the Facility Captain and Correctional Counselor II. Reports explaining reasons for ASU retention over 90 days shall continue to be compiled and reviewed by the Warden or designee (Chief Deputy Warden or Associate Warden for Health Care). The Warden shall ensure that reviewers take action to resolve any issue that impacts length of stay in EOP. The reports shall continue to be submitted the first week of each month to the Associate Director (General Population III and IV) responsible for management of *Coleman* requirements, and to the respective Division of Adult Institutions, Associate Director at each of the EOP Hub institutions. Statewide issues related to population management are discussed in regularly scheduled bed management meetings.

Several clarifications are necessary regarding data in Attachment A. Initially, there was some confusion at the ASU EOP hubs regarding how to calculate the length of stay. Some institutions restarted the length of stay time-clock when an inmate-patient was

placed into a Mental Health Crisis Bed or went out to court, and then returned to ASU EOP. Other institutions did not re-start the time clock even when an inmate-patient was transferred to a Department of Mental Health inpatient program. Another issue related to data collection was that some institutions initially did not count ASU EOP inmates not directly assigned to the ASU EOP Hub in the data. In order to clarify the requirement, Joseph Moss, Associate Warden General Population III/IV provided the following direction to the field on April 8, 2008:

> "Short interruptions in ASU stay, such as assignment to a Mental Health Crisis Bed, are not to result in restarting the count of days in ASU. Typically, if an inmate has been released from ASU or out of the EOP program for at least thirty days, it may be appropriate to restart counting if they are returned as ASU EOP inmates to ASU. However, if there has not been a significant change in the inmates housing conditions / treatment milieu, he or she should be counted from original date of placement."

> "Every EOP inmate housed in ASU at your institution should be included in this report if they have been in ASU in excess of 90 days. We as a Department elected to focus our attention on the institutions with EOP-ASU Hubs to reduce impact on other institutions. The intent is to gather this information on *ALL* ASU EOP inmates in ASU beyond 90 days."

The data indicates a slow reduction in the number of inmate-patients housed in ASU EOP for more than 90 days with a high in December 2007 of 213 inmates, and a low in March 2008 of 166 inmate-patients. This represents a 22% reduction in the number of inmates housed in ASU EOP for more than 90 days. The reduction was achieved even though there were more inmate-patients in the March 2008 sample based on the change in methodology described above than were included in December 2007 through February 2008.

**Stand Alone Pilot**

*PLAN REQUIREMENT:*
*CDCR is proposing that a plan be developed in coordination with the Coleman experts and Plaintiffs' Counsel for a new twenty-bed ASU EOP Hub program at California State Prison, Sacramento in the stand-alone ASU building. This plan would be in compliance with the requirements listed (in the summary of October 2002 Coleman Stipulation and Order)*

*STATUS: Progress dependent on coordination with Coleman parties*

*DETAILS:*
After discussion with all parties in *Coleman* the prognosis was not hopeful regarding the ability to reach an agreement and procure resources for this purpose. CDCR will respond

to planning efforts if the *Coleman* Special Master assigns an expert for the purpose of coordination. If a workgroup is formed to develop a plan for a stand alone pilot, monthly updates will be provided.

**Weekly Monitoring**

*PLAN REQUIREMENT:*
*Each institution with an ASU EOP Hub shall charter a Quality Improvement Team (QIT) through the Quality Management Committee to ensure that out-of-cell time and treatment are maximized.    A monthly teleconference of all ASU EOPs shall be held with the Regional Chief Psychologist to standardize solutions across institutions, and to reduce any systemic barriers. The QIT shall consider (the following\*) short term remedies for identified treatment needs.*
\*See full plan for details.

*STATUS: Compliant*
The first monthly teleconferences held by Regional Chief Psychologists were held in January 2008. Follow-up teleconferences were held in February and March 2008. Expectations were set for data collection, and the role of the QIT in increasing compliance with the provision of mandated treatment was discussed. All ten institutions have confirmed that they are holding weekly QIT meetings. Teleconferences are scheduled monthly on an ongoing basis.

*DETAILS:*
A summary of the Northern Regional Teleconferences in February 2008 and March 2008 is provided in Attachment B. A summary of the Central and Southern Regional Teleconferences in February 2008 and March 2008 is provided in Attachment C.

**Administrative Segregation Office and Treatment Space**

*PLAN REQUIREMENT:*
*The mental health program will be participating in the Office of the Receiver's space survey.*

*STATUS: Compliant*

*DETAILS:*
The space survey by the Receiver's office has now been completed at Avenal State Prison (ASP), Correctional Training Facility (CTF), California Rehabilitation Center (CRC), California Institute for Women (CIW), Richard J. Donovan Correctional Facility (RJD), California Institute for Men (CIM), and Mule Creek State Prison (MCSP)

This process has included staff from the Mental Health Program (and Dental) from the beginning in a cooperative and coordinated manner. Inclusion of mental health space needs has been incorporated and input is actively solicited and considered. Recent changes to this process have evidenced even greater inclusion of mental health space needs, in addition to those spaces originally considered if mental health staff were

displaced due to acquisition of the space by the medical program, with designated mental health space and buildings now being considered separately.

Dr. Tia Araminta has been a representative to this group on behalf of the Mental Health Program since its inception at ASP and Dr. Steve Clavere participated at Avenal State Prison and Mule Creek State Prison. Dr. Ted Ruggles, Coleman Court Expert, has also been included in the process at each site.

Final plans completed by the team are in the process of submission through the three judge coordination process.

In addition, a summary of other construction projects that will impact ASU EOP treatment and yard space is provided in Attachment D.

### In-Cell Recreation and Group Therapy Resources

*PLAN REQUIREMENT:*
*Beginning January 2008, the CDCR shall standardize therapeutic materials, video library, and in-cell activity resources.*

*STATUS: Compliant*

*DETAILS:*
Attachment D is a list of materials ordered to standardize therapeutic materials for group and in-cell activities in each ASU EOP Hub. The list includes the materials by vendor, quantity ordered per institution, and cost. Staff at each Hub provided clinical input regarding treatment needs, previewed materials, and participated in a statewide videoconference on November 14, 2007, to discuss the final choice of vendors and materials. Since each institution had slightly different needs based on previous purchases, and gender of inmate-patients, a list of materials is provided for each institution. The materials have been delivered and are in use at each ASU EOP Hub.

### Treatment Refusals

*PLAN REQUIREMENT:*
*The designated mental health clinician assigned to inmate patients who refuse more than 50% of offered treatment shall (provide specialized treatment\*).*
\*See plan for details

*STATUS: Compliant*
The requirements have been clearly communicated to the supervisory staff at the ASU EOP Hubs.

*DETAILS:*
Details are provided in the monthly teleconference summaries, Attachments B and C.

# ATTACHMENT A

# ADMINISTRATIVE SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM

# LENGTH OF STAY REPORTS

# DATA FROM DECEMBER 2007 – MARCH 2008

# JANUARY 2008 EOP ASU LENGTH OF STAY (over 90 days)*

| INSTITUTION | PENDING INVESTIGATION/ Other | PENDING RVR | PENDING DA | PENDING COURT PROCEEDING | PENDING CSR ACTION | PENDING MERD | ENDORSED PENDING TRANSFER TO PSU | ENDORSED PENDING TRANSFER/ SNY |
|---|---|---|---|---|---|---|---|---|
| CMC      (23) | 2/1 | 1 | 0 | 2 | 9 | 0 | 4 | 1/ 3 SNY |
| CMF       (0) | 0/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 |
| CSP-COR (31) | 0/2 | 4 | 1 | 0 | 8 | 1 | 13 | 1/ 1 SNY |
| CSP-LAC  (30) | 0/1 | 12 | 2 | 1 | 0 | 1 | 11 | 0/2 SNY |
| CSP-SAC (55) | 1/2 | 2 | 2 | 1 | 19 | 0 | 25 | 0/3 SNY |
| MCSP      (7) | 0/0 | 1 | 2 | 1 | 0 | 0 | 0 | 0/0 |
| RJD      (23) | 1/ 5 | 7 | 0 | 0 | 5 | 1 | 3 | 0/1 |
| SQ       (16) | 0/6 | 3 | 3 | 1 | 2 | 0 | 1 | 0/0 |
| SVSP     (28) | 3/6 | 4 | 0 | 0 | 6 | 0 | 0 | 0/8 |
| VSPW      (0) | 0/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 |
| Total    213 | 5/22 | 34 | 10 | 6 | 49 | 3 | 57 | 2/18 |

*Data from December 2007*

| | | | | | | |
|---|---|---|---|---|---|---|
| CMC | California Mens Colony | RJD | Richard J. Donovan Correctional Facility | DA | District Attorney |
| CMF | California Medical Facility | SQ | California State Prison San Quentin | DRB | Departmental Review Board |
| CSP-COR | California State Prison Corcoran | SVSP | Salinas Valley State Prison | EOP | Enhanced Out Patient |
| CSP-LAC | California State Prison Los Angeles | VSPW | Valley State Prison for Women | MERD | Minimum eligible release date |
| CSP-SAC | California State Prison Sacramento | ASU | Administrative Segregation | PSU | Psychiatric Services Unit |
| MCSP | Mule Creek State Prison | CSR | Classification Staff Representative | RVR | Rules Violation Report |
| | | | | SNY | Sensitive Need Yard |

## FEBRUARY 2008 EOP ASU LENGTH OF STAY (over 90 days)*

| INSTITUTION | PENDING INVESTIGATION/ Other | PENDING RVR | PENDING DA | PENDING COURT PROCEEDING | PENDING CSR ACTION | PENDING MERD | ENDORSED PENDING TRANSFER TO PSU | ENDORSED PENDING TRANSFER/ SNY |
|---|---|---|---|---|---|---|---|---|
| CMC     (25) | 3/0 | 2 | 3 | 3 | 10 | 0 | 4 | 0/0 |
| CMF     (12) | 2/0 | 1 | 0 | 0 | 1 | 3 | 5 | 0/0 |
| CSP-COR (26) | 2/2 | 1 | 2 | 0 | 5 | 0 | 12 | 1/1 SNY |
| CSP-LAC  (34) | 1/1 | 9 | 2 | 0 | 0 | 1 | 15 | 0/5 SNY |
| CSP-SAC (37) | 1/3 | 2 | 1 | 1 | 16 | 0 | 7 | 1/5 SNY |
| MCSP    (3) | 1/0 | 0 | 1 | 1 | 0 | 0 | 0 | 0/0 |
| RJD     (23) | 5/0 | 7 | 0 | 0 | 7 | 1 | 2 | 0/1SNY |
| SQ      (17) | 1/6 | 2 | 0 | 1 | 5 | 0 | 1 | 1/0 |
| SVSP    (26) | 1/1 | 8 | 0 | 0 | 0 | 1 | 0 | 11/4 |
| VSPW    (0) | 0/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 |
| Total   203 | 17/13 | 32 | 9 | 6 | 44 | 6 | 46 | 14/13 |

*Data from January 2008*

| | | | | | | |
|---|---|---|---|---|---|---|
| CMC | California Mens Colony | RJD | Richard J. Donovan Correctional Facility | DA | District Attorney |
| CMF | California Medical Facility | SQ | California State Prison San Quentin | DRB | Departmental Review Board |
| CSP-COR | California State Prison Corcoran | SVSP | Salinas Valley State Prison | EOP | Enhanced Out Patient |
| CSP-LAC | California State Prison Los Angeles | VSPW | Valley State Prison for Women | MERD | Minimum eligible release date |
| CSP-SAC | California State Prison Sacramento | ASU | Administrative Segregation | PSU | Psychiatric Services Unit |
| MCSP | Mule Creek State Prison | CSR | Classification Staff Representative | RVR | Rules Violation Report |
| | | | | SNY | Sensitive Need Yard |

7

## MARCH 2008 EOP ASU LENGTH OF STAY (over 90 days)*

| INSTITUTION | PENDING INVESTIGATION/ Other | PENDING RVR | PENDING DA | PENDING COURT PROCEEDING | PENDING CSR ACTION | PENDING MERD | ENDORSED PENDING TRANSFER TO PSU | ENDORSED PENDING TRANSFER/ SNY |
|---|---|---|---|---|---|---|---|---|
| CMC      (4)  | 0/0 | 0  | 0 | 1 | 2  | 0 | 0  | 1/0 |
| CMF      (13) | 0/0 | 0  | 0 | 1 | 3  | 2 | 6  | 1/0 |
| CSP-COR (27)  | 0/4 | 3  | 1 | 1 | 4  | 0 | 8  | 0/6 SNY |
| CSP-LAC  (39) | 0/4 | 14 | 1 | 1 | 0  | 0 | 14 | 5/0 |
| CSP-SAC (27)  | 0/3 | 1  | 1 | 1 | 13 | 0 | 0  | 3/5 SNY |
| MCSP     (1)  | 0/0 | 0  | 0 | 1 | 0  | 0 | 0  | 0/0 |
| RJD      (27) | 2/4 | 9  | 0 | 0 | 2  | 2 | 3  | 1/4SNY |
| SQ       (21) | 1/2 | 4  | 0 | 0 | 13 | 1 | 0  | 0/0 |
| SVSP     (26) | 0/1 | 6  | 0 | 4 | 6  | 1 | 4  | 5/0 |
| VSPW     (0)  | 0/0 | 0  | 0 | 0 | 0  | 0 | 0  | 0/0 |
| Total    185  | 3/18 | 37 | 3 | 9 | 43 | 6 | 35 | 16/15 |

*Data from February 2008*

| | | | | | |
|---|---|---|---|---|---|
| CMC | California Mens Colony | RJD | Richard J. Donovan Correctional Facility | DA | District Attorney |
| CMF | California Medical Facility | SQ | California State Prison San Quentin | DRB | Departmental Review Board |
| CSP-COR | California State Prison Corcoran | SVSP | Salinas Valley State Prison | EOP | Enhanced Out Patient |
| CSP-LAC | California State Prison Los Angeles | VSPW | Valley State Prison for Women | MERD | Minimum eligible release date |
| CSP-SAC | California State Prison Sacramento | ASU | Administrative Segregation | PSU | Psychiatric Services Unit |
| MCSP | Mule Creek State Prison | CSR | Classification Staff Representative | RVR | Rules Violation Report |
| | | | | SNY | Sensitive Need Yard |

## APRIL 2008 EOP ASU LENGTH OF STAY (over 90 days)*

| INSTITUTION | PENDING INVESTIGATION/ Other | PENDING RVR | PENDING DA | PENDING COURT PROCEEDING | PENDING CSR ACTION | PENDING MERD | ENDORSED PENDING TRANSFER TO PSU | ENDORSED PENDING TRANSFER/ SNY |
|---|---|---|---|---|---|---|---|---|
| CMC      (14) | 0/0 | 0 | 1 | 0 | 3 | 0 | 6 | 4/0 |
| CMF      (10) | 0/0 | 0 | 0 | 1 | 4 | 2 | 0 | 2/1 |
| CSP-COR (15) | 0/6 | 1 | 1 | 1 | 3 | 0 | 4 | 0/3 SNY |
| CSP-LAC  (32) | 1/1 | 13 | 1 | 1 | 0 | 1 | 12 | 1/0 |
| CSP-SAC (24) | 2/2 | 1 | 1 | 1 | 10 | 0 | 1 | 3/3 SNY |
| MCSP     (13) | 0/3 | 1 | 2 | 2 | 0 | 0 | 5 | 0/0 |
| RJD      (22) | 0/4 | 8 | 0 | 0 | 5 | 0 | 2 | 0/3 SNY |
| SQ       (19) | 0/5 | 1 | 0 | 1 | 8 | 1 | 1 | 2/0 |
| SVSP     (17) | 0/4 | 3 | 0 | 3 | 2 | 0 | 1 | 2/2 |
| VSPW      (0) | 0/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 |
| **Total**    166 | **3/25** | **27** | **6** | **10** | **35** | **4** | **32** | **14/12** |

*Data from March 2008

| | | | | | |
|---|---|---|---|---|---|
| CMC | California Mens Colony | RJD | Richard J. Donovan Correctional Facility | DA | District Attorney |
| CMF | California Medical Facility | SQ | California State Prison San Quentin | DRB | Disciplinary Review Board |
| CSP-COR | California State Prison Corcoran | SVSP | Salinas Valley State Prison | EOP | Enhanced Out Patient |
| CSP-LAC | California State Prison Los Angeles | VSPW | Valley State Prison for Women | MERD | Minimum eligible release date |
| CSP-SAC | California State Prison Sacramento | ASU | Administrative Segregation | PSU | Psychiatric Services Unit |
| MCSP | Mule Creek State Prison | CSR | Classification Staff Representative | RVR | Rules Violation Report |
| | | | | SNY | Sensitive Need Yard |

9

Exhibit E

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

## DIVISION OF HEALTH CARE SERVICES
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



August 1, 2013

Matthew A. Lopes, Jr. Esquire               via: Debbie J. Vorous, Esquire
Office of the Special Master                     Deputy Attorney General
Pannone Lopes & Devereaux LLC                    Department of Justice
317 Iron Horse Point Way, Suite 301              1300 "I" Street, Suite 125
Providence, RI  02908                            P. O. Box 944255
                                                 Sacramento, CA  94244-2550


## RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of June, 2013, data (or as otherwise noted).  The following is the list of enclosures:

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2. MHSDS Hiring Activity Report.
3. Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7. Referrals for Transfer to the Department of State Hospitals (DSH), (including admissions).
8. Atascadero State Hospital (ASH) Discharges.
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of State Hospitals (DSH) Monthly Report of CDCR Patients in DSH Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**

Matthew A. Lopes, Jr. Esquire
Page 2


15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison, San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,


TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
    Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Linda Holden, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert
     Paul Nicoll, MPA, *Coleman* Monitor
     Mary Perrien, Ph.D., *Coleman* Expert
     Kathryn A. Burns, M.D., MPH, *Coleman* Expert
     Henry A. Dlugacz, Esq., *Coleman* Expert
     Kerry F. Walsh, Esq., *Coleman* Monitor
     Patricia Williams, Esq., *Coleman* Monitor
     Haunani Henry, *Coleman* Monitor
     Debbie Vorous, Esq., Office of the Attorney General
     Nicholas Weber, Esq, Office of Legal Affairs, CDCR
     Michael Stone, Esq., Office of Legal Affairs, CDCR
     Michael Bien, Esq., Rosen, Bien and Galvan
     Donald Specter, Esq., Prison Law Office

Matthew A. Lopes, Jr. Esquire
Page 3

Judy Burleson, Associate Director, Statewide Mental Health Program, Division of
Health Care Services (DHCS)

Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS

Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health
Program, DCHCS

Teresa Owens, Associate Governmental Program Analyst, Quality Management,
DHCS

## EOP and CCCMS in Adseg/SHU/PSU
## Placements greater than 90 days

June 21, 2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | | | | | | | | | |
| **ASP** | CCCMS | Ad-Seg | | | A 140 1025001L | 11/20/2012 | 213 | 11/20/2012 | 214 |
| | | Ad-Seg | | | A 140 1037001L | 12/16/2012 | 187 | 12/16/2012 | 188 |
| | | Ad-Seg | | | A 140 2005001U | 1/4/2013 | 168 | 1/15/2013 | 158 |
| | | Ad-Seg | | | A 140 1025001L | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | | | A 140 1005001L | 2/28/2013 | 113 | 3/17/2013 | 97 |
| | | Ad-Seg | | | A 140 1027001L | 3/3/2013 | 110 | 3/3/2013 | 111 |
| | | Ad-Seg | | | A 140 1029001L | 3/4/2013 | 109 | 3/4/2013 | 110 |
| | | Ad-Seg | | | A 140 1028001L | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | Ad-Seg | | | A 140 1036001L | 3/22/2013 | 91 | 3/24/2013 | 90 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-1

| Region | | | | | | Bed | # Days in | MH Rec. | # Days of |
| Institution | Placement | Setting | CDC # | Last Name | Bed # | Occupancy | Bed | Date | MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | Ad-Seg | | | A 006B2208001L | 7/17/2012 | 339 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 006A1104001L | 7/19/2012 | 337 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 008A1105001U | 9/14/2012 | 280 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 006B2201001L | 9/21/2012 | 273 | 4/15/2012 | 433 |
| | | Ad-Seg | | | A 008B2206001L | 11/1/2012 | 232 | 11/14/2011 | 586 |
| | | Ad-Seg | | | A 007C1107001L | 11/14/2012 | 219 | 2/5/2013 | 137 |
| | | Ad-Seg | | | A 007A2204001L | 11/28/2012 | 205 | 5/1/2012 | 417 |
| | | Ad-Seg | | | A 008A1109001L | 12/11/2012 | 192 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 008B1107001L | 12/12/2012 | 191 | 3/19/2013 | 95 |
| | | Ad-Seg | | | A 007A1111001L | 12/21/2012 | 182 | 5/13/2013 | 40 |
| | | Ad-Seg | | | A 008A1106001L | 12/22/2012 | 181 | 12/23/2012 | 181 |
| | | Ad-Seg | | | A 006C1105001L | 1/8/2013 | 164 | 7/24/2012 | 333 |
| | | Ad-Seg | | | A 008B1106001L | 1/16/2013 | 156 | 1/17/2013 | 156 |
| | | Ad-Seg | | | A 008A1107001U | 1/17/2013 | 155 | 2/25/2013 | 117 |
| | | Ad-Seg | | | A 008A1107001L | 1/17/2013 | 155 | 3/21/2012 | 458 |
| | | Ad-Seg | | | A 008B1104001L | 1/21/2013 | 151 | 1/21/2013 | 152 |
| | | Ad-Seg | | | A 007C2206001U | 1/29/2013 | 143 | 4/8/2013 | 75 |
| | | Ad-Seg | | | A 007A1102001L | 1/30/2013 | 142 | 5/1/2012 | 417 |
| | | Ad-Seg | | | A 008B2209001L | 2/7/2013 | 134 | 6/19/2012 | 368 |
| | | Ad-Seg | | | A 008B2209001U | 2/7/2013 | 134 | 6/14/2012 | 373 |
| | | Ad-Seg | | | A 006B1110001L | 2/11/2013 | 130 | 2/21/2013 | 121 |
| | | Ad-Seg | | | A 008C1106001L | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | | Ad-Seg | | | A 007B1105001L | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | A 006C2205001U | 2/21/2013 | 120 | 3/21/2012 | 458 |
| | | Ad-Seg | | | A 007C1108001L | 2/26/2013 | 115 | 2/26/2013 | 116 |
| | | Ad-Seg | | | A 008B1102001L | 3/3/2013 | 110 | 3/3/2013 | 111 |
| | | Ad-Seg | | | A 008C2204001L | 3/5/2013 | 108 | 4/24/2013 | 59 |
| | | Ad-Seg | | | A 006A2211001L | 3/7/2013 | 106 | 6/6/2013 | 16 |
| | | Ad-Seg | | | A 008A1104001U | 3/7/2013 | 106 | 2/3/2013 | 139 |
| | | Ad-Seg | | | A 007C1111001L | 3/8/2013 | 105 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A 007C2205001L | 3/11/2013 | 102 | 7/1/2012 | 356 |
| | | Ad-Seg | | | A 008B2201001L | 3/12/2013 | 101 | 8/7/2012 | 319 |
| | | Ad-Seg | | | A 006A1105001U | 3/12/2013 | 101 | 10/21/2012 | 244 |
| | | Ad-Seg | | | A 006A2202001L | 3/12/2013 | 101 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 006C2210001L | 3/19/2013 | 94 | 4/2/2013 | 81 |
| | | Ad-Seg | | | A 007A1101001L | 3/21/2013 | 92 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 008C1106001L | 3/22/2013 | 91 | 5/3/2012 | 415 |
| | | Ad-Seg | | | A 007B1107001L | 3/23/2013 | 90 | 3/24/2013 | 90 |
| | | SHU | | | B 005B1105001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 001B1101001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | SHU | | | A 003B1110001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | A 004C2204001L | 10/15/2011 | 615 | 4/2/2013 | 81 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-2

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | A 002A1109001U | 10/15/2011 | 615 | 4/8/2013 | 75 |
| | | SHU | | | B 003C1111001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 005C2204001L | 10/15/2011 | 615 | 12/6/2012 | 198 |
| | | SHU | | | A 003C1107001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | SHU | | | B 001A1107001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 002B2207001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | A 005A1106001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 001B2206001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 006C2202001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | SHU | | | B 004C2202001L | 10/20/2011 | 610 | 7/18/2012 | 339 |
| | | SHU | | | A 004C2205001L | 12/29/2011 | 540 | 7/18/2012 | 339 |
| | | SHU | | | A 003C1101001U | 1/5/2012 | 533 | 1/6/2012 | 533 |
| | | SHU | | | B 003A2202001L | 1/12/2012 | 526 | 7/18/2012 | 339 |
| | | SHU | | | A 002A2208001U | 2/29/2012 | 478 | 7/18/2012 | 339 |
| | | SHU | | | B 007B2210001L | 3/5/2012 | 473 | 10/9/2012 | 256 |
| | | SHU | | | B 007B1101001L | 3/30/2012 | 448 | 4/9/2012 | 439 |
| | | SHU | | | B 005C2203001L | 4/2/2012 | 445 | 7/18/2012 | 339 |
| | | SHU | | | A 001B1105001L | 4/18/2012 | 429 | 3/21/2012 | 458 |
| | | SHU | | | A 004C1104001L | 5/4/2012 | 413 | 5/2/2012 | 416 |
| | | SHU | | | B 005B1108001L | 5/16/2012 | 401 | 4/4/2013 | 79 |
| | | SHU | | | B 004A2202001L | 5/24/2012 | 393 | 5/24/2012 | 394 |
| | | SHU | | | B 005A2210001L | 6/4/2012 | 382 | 6/5/2012 | 382 |
| | | SHU | | | B 006A1106001U | 6/4/2012 | 382 | 7/18/2012 | 339 |
| | | SHU | | | A 005A2202001L | 6/21/2012 | 365 | 11/14/2011 | 586 |
| | | SHU | | | B 004B1103001U | 6/24/2012 | 362 | 7/18/2012 | 339 |
| | | SHU | | | B 004C1103001L | 6/29/2012 | 357 | 7/18/2012 | 339 |
| | | SHU | | | B 007B2202001U | 7/3/2012 | 353 | 7/4/2012 | 353 |
| | | SHU | | | A 005A1102001U | 7/6/2012 | 350 | 6/28/2012 | 359 |
| | | SHU | | | A 005C1107001U | 7/6/2012 | 350 | 6/27/2012 | 360 |
| | | SHU | | | A 004B1103001U | 7/13/2012 | 343 | 7/18/2012 | 339 |
| | | SHU | | | A 001C1109001L | 7/17/2012 | 339 | 11/14/2011 | 586 |
| | | SHU | | | B 003B1101001L | 7/19/2012 | 337 | 7/22/2012 | 335 |
| | | SHU | | | B 001B1110001L | 7/24/2012 | 332 | 7/24/2012 | 333 |
| | | SHU | | | A 002C1101001L | 8/7/2012 | 318 | 8/7/2012 | 319 |
| | | SHU | | | B 004A2211001L | 8/16/2012 | 309 | 8/19/2012 | 307 |
| | | SHU | | | B 006A2208001U | 8/17/2012 | 308 | 8/20/2012 | 306 |
| | | SHU | | | B 002A2211001L | 8/21/2012 | 304 | 8/21/2012 | 305 |
| | | SHU | | | B 003B1101001L | 8/29/2012 | 296 | 8/29/2012 | 297 |
| | | SHU | | | B 001A1106001L | 9/12/2012 | 282 | 9/12/2012 | 283 |
| | | SHU | | | A 005C1107001L | 9/20/2012 | 274 | 9/20/2012 | 275 |
| | | SHU | | | B 008B1103001L | 9/24/2012 | 270 | 9/24/2012 | 271 |
| | | SHU | R | | A 002B2201001L | 10/9/2012 | 255 | 8/26/2012 | 300 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | A | 003A1104001L | 10/9/2012 | 255 | 9/9/2012 | 286 |
| | | SHU | | | A | 002A2210001L | 10/15/2012 | 249 | 10/15/2012 | 250 |
| | | SHU | | | B | 008B1103001L | 10/16/2012 | 248 | 10/17/2012 | 248 |
| | | SHU | | | B | 008B1104001L | 10/17/2012 | 247 | 10/18/2012 | 247 |
| | | SHU | | | A | 004A1108001L | 10/19/2012 | 245 | 10/21/2012 | 244 |
| | | SHU | | | B | 005C2208001U | 10/22/2012 | 242 | 10/23/2012 | 242 |
| | | SHU | | | A | 003C1109001U | 10/23/2012 | 241 | 10/21/2012 | 244 |
| | | SHU | | | B | 004B2205001L | 10/25/2012 | 239 | 3/7/2013 | 107 |
| | | SHU | | | A | 005C2206001L | 10/26/2012 | 238 | 9/10/2012 | 285 |
| | | SHU | | | B | 008B1102001L | 10/29/2012 | 235 | 10/29/2012 | 236 |
| | | SHU | | | A | 001C1104001U | 10/31/2012 | 233 | 10/21/2012 | 244 |
| | | SHU | | | A | 001C1104001L | 10/31/2012 | 233 | 7/25/2012 | 332 |
| | | SHU | | | A | 004C1104001U | 11/1/2012 | 232 | 11/4/2012 | 230 |
| | | SHU | | | B | 001C1101001L | 11/8/2012 | 225 | 11/8/2012 | 226 |
| | | SHU | | | A | 001C1104001U | 11/9/2012 | 224 | 11/12/2012 | 222 |
| | | SHU | | | B | 001A1106001L | 11/13/2012 | 220 | 11/13/2012 | 221 |
| | | SHU | | | B | 008B1104001L | 11/20/2012 | 213 | 11/25/2012 | 209 |
| | | SHU | | | B | 005A1109001L | 11/21/2012 | 212 | 11/25/2012 | 209 |
| | | SHU | | | A | 003B2209001U | 11/21/2012 | 212 | 11/26/2012 | 208 |
| | | SHU | | | A | 004B2203001L | 11/26/2012 | 207 | 11/26/2012 | 208 |
| | | SHU | | | A | 002B2206001L | 11/29/2012 | 204 | 8/1/2012 | 325 |
| | | SHU | | | A | 001A1106001L | 11/29/2012 | 204 | 9/9/2012 | 286 |
| | | SHU | | | A | 004C1108001L | 11/29/2012 | 204 | 9/20/2012 | 275 |
| | | SHU | | | A | 004C2201001U | 12/3/2012 | 200 | 12/5/2012 | 199 |
| | | SHU | | | B | 008B1105001L | 12/10/2012 | 193 | 12/11/2012 | 193 |
| | | SHU | | | A | 004C2205001L | 12/11/2012 | 192 | 9/20/2012 | 275 |
| | | SHU | | | B | 004A1106001U | 12/19/2012 | 184 | 4/21/2013 | 62 |
| | | SHU | | | A | 005B2203001L | 12/20/2012 | 183 | 12/16/2012 | 188 |
| | | SHU | | | B | 008B1105001L | 12/20/2012 | 183 | 12/20/2012 | 184 |
| | | SHU | | | B | 008B1104001L | 12/27/2012 | 176 | 12/27/2012 | 177 |
| | | SHU | | | A | 002A1106001L | 12/31/2012 | 172 | 11/26/2012 | 208 |
| | | SHU | | | A | 004C1105001L | 1/9/2013 | 163 | 4/22/2013 | 61 |
| | | SHU | | | A | 003B2202001L | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | SHU | | | A | 003C1106001U | 1/15/2013 | 157 | 1/15/2013 | 158 |
| | | SHU | | | B | 002A1111001L | 1/22/2013 | 150 | 1/23/2013 | 150 |
| | | SHU | | | A | 004C1102001L | 1/22/2013 | 150 | 1/22/2013 | 151 |
| | | SHU | | | A | 005C1111001L | 1/23/2013 | 149 | 10/8/2012 | 257 |
| | | SHU | | | A | 005B2209001L | 1/23/2013 | 149 | 1/22/2013 | 151 |
| | | SHU | | | B | 005C1109001L | 1/25/2013 | 147 | 1/28/2013 | 145 |
| | | SHU | | | A | 003C1102001L | 1/25/2013 | 147 | 12/19/2012 | 185 |
| | | SHU | | | B | 001C1101001U | 1/25/2013 | 147 | 1/28/2013 | 145 |
| | | SHU | | | B | 001C1101001L | 1/25/2013 | 147 | 1/28/2013 | 145 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-4

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | B 005A1110001L | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | SHU | | | A 002A2205001L | 1/29/2013 | 143 | 12/30/2012 | 174 |
| | | SHU | | | A 005A1110001L | 1/30/2013 | 142 | 2/25/2013 | 117 |
| | | SHU | | | B 007C1105001U | 1/31/2013 | 141 | 2/3/2013 | 139 |
| | | SHU | | | A 005A1109001L | 2/2/2013 | 139 | 11/26/2012 | 208 |
| | | SHU | | | B 004B2204001L | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | SHU | | | B 004B2204001U | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | SHU | | | A 002B1110001L | 2/5/2013 | 136 | 5/28/2013 | 25 |
| | | SHU | | | B 001A1104001L | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | SHU | | | B 003B1101001U | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | SHU | | | A 005B1109001L | 2/7/2013 | 134 | 7/18/2012 | 339 |
| | | SHU | | | A 002A2208001L | 2/7/2013 | 134 | 2/10/2013 | 132 |
| | | SHU | | | A 002B2208001L | 2/7/2013 | 134 | 1/24/2013 | 149 |
| | | SHU | | | B 001A1106001L | 2/9/2013 | 132 | 2/10/2013 | 132 |
| | | SHU | | | B 007A1111001L | 2/20/2013 | 121 | 2/21/2013 | 121 |
| | | SHU | | | A 004A2202001U | 2/27/2013 | 114 | 4/21/2013 | 62 |
| | | SHU | | | A 003A2207001U | 2/27/2013 | 114 | 2/14/2013 | 128 |
| | | SHU | | | A 003B1102001L | 3/5/2013 | 108 | 3/4/2013 | 110 |
| | | SHU | | S | B 008B1101001L | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | SHU | | | A 004A1105001L | 3/6/2013 | 107 | 2/3/2013 | 139 |
| | | SHU | | | A 002C2201001L | 3/11/2013 | 102 | 3/10/2013 | 104 |
| | | SHU | | | B 007B1108001L | 3/14/2013 | 99 | 3/17/2013 | 97 |
| | | SHU | | | B 001B2201001L | 3/14/2013 | 99 | 3/17/2013 | 97 |
| | | SHU | | | A 002C1104001L | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | | SHU | | | B 008B1104001L | 3/19/2013 | 94 | 3/20/2013 | 94 |
| | | SHU | | | A 002A2206001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | SHU | | | B 005B2209001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | SHU | | | B 006A2201001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | SHU | | | B 003B1109001L | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | SHU | | | B 002A1103001L | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | SHU | | | A 002C2202001L | 3/21/2013 | 92 | 3/7/2013 | 107 |
| | | SHU | | | A 004C1107001U | 3/21/2013 | 92 | 3/10/2013 | 104 |
| | | SHU | | | B 008A1109001U | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | SHU | | | B 002B2201001L | 3/22/2013 | 91 | 4/23/2013 | 60 |
| | EOP | Ad-Seg | | | A 007B1107001L | 1/14/2013 | 158 | 3/4/2013 | 110 |
| | | Ad-Seg | | | A 008B1103001L | 3/11/2013 | 102 | 5/9/2013 | 44 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-5

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCWF | CCCMS | Ad-Seg | | | A 504 1137001L | 3/21/2011 | 823 | 7/18/2012 | 339 |
| | | Ad-Seg | | Z | A 504 2250001L | 3/21/2011 | 823 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1140001L | 3/21/2011 | 823 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1134001L | 3/21/2011 | 823 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1138001L | 3/30/2011 | 814 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 2225001L | 9/15/2011 | 645 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 2247001L | 1/26/2012 | 512 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1146001L | 3/13/2012 | 465 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1141001L | 3/21/2012 | 457 | 7/18/2012 | 339 |
| | | Ad-Seg | | ON | A 504 1147001L | 3/23/2012 | 455 | 7/18/2012 | 339 |
| | | Ad-Seg | | RO | A 504 1139001L | 3/23/2012 | 455 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 1145001L | 6/14/2012 | 372 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 2248001L | 6/14/2012 | 372 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 504 2216001L | 8/1/2012 | 324 | 8/1/2012 | 325 |
| | | Ad-Seg | | | A 504 1115001LP | 10/28/2012 | 236 | 10/28/2012 | 237 |
| | | Ad-Seg | | | A 504 2217001L | 11/2/2012 | 231 | 11/4/2012 | 230 |
| | | Ad-Seg | | | A 504 2242001L | 11/3/2012 | 230 | 11/4/2012 | 230 |
| | | Ad-Seg | | | A 504 2239001L | 11/13/2012 | 220 | 11/13/2012 | 221 |
| | | Ad-Seg | | | A 504 2214001L | 11/24/2012 | 209 | 11/25/2012 | 209 |
| | | Ad-Seg | | | A 504 1130001L | 11/30/2012 | 203 | 12/2/2012 | 202 |
| | | Ad-Seg | | | A 504 1131001L | 12/15/2012 | 188 | 12/16/2012 | 188 |
| | | Ad-Seg | | E | A 504 1123001LP | 12/15/2012 | 188 | 12/16/2012 | 188 |
| | | Ad-Seg | | | A 504 1108001LP | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | Ad-Seg | | Z | A 504 2239001U | 1/15/2013 | 157 | 1/15/2013 | 158 |
| | | Ad-Seg | | | A 504 2246001L | 1/24/2013 | 148 | 1/24/2013 | 149 |
| | | Ad-Seg | | | A 504 1125001LP | 1/25/2013 | 147 | 2/6/2013 | 136 |
| | | Ad-Seg | | | A 504 2239001U | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | Ad-Seg | | | A 504 1106001LP | 1/30/2013 | 142 | 1/30/2013 | 143 |
| | | Ad-Seg | | | A 504 1108001LP | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | | | A 504 2203001U | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | Ad-Seg | | | A 504 1101001LP | 2/14/2013 | 127 | 2/14/2013 | 128 |
| | | Ad-Seg | | | A 504 1130001L | 2/23/2013 | 118 | 2/24/2013 | 118 |
| | | Ad-Seg | | Z | A 504 1101001U | 3/10/2013 | 103 | 3/10/2013 | 104 |
| | | Ad-Seg | | | A 504 1108001U | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | | Ad-Seg | | | A 504 2215001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | A 504 1133001U | 3/23/2013 | 90 | 3/24/2013 | 90 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-6

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CMC | CCCMS | Ad-Seg | | | B 004 2257001U | 10/1/2012 | 263 | 9/30/2012 | 265 |
| | | Ad-Seg | | | B 004 1115001U | 10/31/2012 | 233 | 6/20/2013 | 2 |
| | | Ad-Seg | | D | B 004 2257001U | 11/20/2012 | 213 | 11/20/2012 | 214 |
| | | Ad-Seg | | | B 004 1105001U | 1/29/2013 | 143 | 3/7/2013 | 107 |
| | | Ad-Seg | | | B 004 1157001U | 2/11/2013 | 130 | 2/11/2013 | 131 |
| | | Ad-Seg | | | B 004 2293001U | 2/22/2013 | 119 | 5/8/2013 | 45 |
| | | Ad-Seg | | ERY | B 004 2245001U | 2/26/2013 | 115 | 3/7/2013 | 107 |
| | | Ad-Seg | | | B 004 1151001U | 3/11/2013 | 102 | 3/12/2013 | 102 |
| | EOP | Ad-Seg | | | B 004 1199001U | 7/11/2012 | 345 | 7/11/2012 | 346 |
| | | Ad-Seg | | N | B 004 2219001U | 12/1/2012 | 202 | 12/2/2012 | 202 |
| | | Ad-Seg | | | B 004 2241001U | 1/12/2013 | 160 | 1/16/2013 | 157 |
| | | Ad-Seg | | | B 004 2218001L | 1/25/2013 | 147 | 4/10/2013 | 73 |
| | | Ad-Seg | | | B 004 1148001L | 1/29/2013 | 143 | 1/29/2013 | 144 |
| | | Ad-Seg | | N | B 004 2297001U | 2/12/2013 | 129 | 2/28/2013 | 114 |
| | | Ad-Seg | | | B 004 1188001L | 3/4/2013 | 109 | 3/4/2013 | 110 |
| | | Ad-Seg | | | B 004 2296001L | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | Ad-Seg | | | B 004 2223001U | 3/20/2013 | 93 | 6/5/2013 | 17 |
| CTF | CCCMS | Ad-Seg | | | C OW 1148001L | 1/4/2013 | 168 | 1/17/2013 | 156 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-7

| Region | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
| **KVSP** | CCCMS | Ad-Seg | | | B 001 1107001LP | 4/13/2012 | 434 | 7/18/2012 | 339 |
| | | Ad-Seg | | | B 001 1130001LP | 5/10/2012 | 407 | 5/10/2012 | 408 |
| | | Ad-Seg | | | B 001 1129001LP | 10/30/2012 | 234 | 10/30/2012 | 235 |
| | | Ad-Seg | | D | B 001 2220001LP | 11/1/2012 | 232 | 11/1/2012 | 233 |
| | | Ad-Seg | | | B 001 1116001LP | 11/8/2012 | 225 | 11/8/2012 | 226 |
| | | Ad-Seg | | | B 001 1120001LP | 11/12/2012 | 221 | 11/12/2012 | 222 |
| | | Ad-Seg | | | B 001 2220001UP | 1/25/2013 | 147 | 1/27/2013 | 146 |
| | | Ad-Seg | | | B 001 2203001UP | 1/30/2013 | 142 | 1/30/2013 | 143 |
| | | Ad-Seg | | | B 001 2216001LP | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | B 001 2216001UP | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | B 001 1102001LP | 2/17/2013 | 124 | 2/18/2013 | 124 |
| | | Ad-Seg | | | B 001 2220001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | B 001 2218001LP | 2/25/2013 | 116 | 2/25/2013 | 117 |
| | | Ad-Seg | | | B 001 1116001LP | 3/1/2013 | 112 | 3/3/2013 | 111 |
| | | Ad-Seg | | | B 001 2220001LP | 3/2/2013 | 111 | 3/3/2013 | 111 |
| | | Ad-Seg | | | B 001 2220001UP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | | O | B 001 1119001LP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | | | B 001 2227001UP | 3/12/2013 | 101 | 3/12/2013 | 102 |
| | | Ad-Seg | | | B 001 1116001LP | 3/17/2013 | 96 | 3/17/2013 | 97 |
| | | Ad-Seg | | I | B 001 1123001LP | 3/17/2013 | 96 | 3/17/2013 | 97 |
| | | Ad-Seg | | | B 001 2210001LP | 3/19/2013 | 94 | 3/20/2013 | 94 |
| | | Ad-Seg | | | B 001 2216001LP | 3/20/2013 | 93 | 3/21/2013 | 93 |
| | | Ad-Seg | | | B 001 2217001LP | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | | B 001 1120001LP | 8/29/2012 | 296 | 9/24/2012 | 271 |
| | | Ad-Seg | | | B 001 2213001UP | 1/30/2013 | 142 | 2/25/2013 | 117 |
| | | Ad-Seg | | N | B 001 1102001UP | 3/4/2013 | 109 | 5/9/2013 | 44 |
| | | Ad-Seg | | | B 001 2218001LP | 3/4/2013 | 109 | 3/26/2013 | 88 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

*R10-8*

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| NKSP | CCCMS | Ad-Seg | | | D 006 1135001LP | 9/28/2012 | 266 | 10/2/2012 | 263 |
| | | Ad-Seg | | | D 006 1101001LP | 10/15/2012 | 249 | 10/15/2012 | 250 |
| | | Ad-Seg | | | D 006 1143001UP | 10/26/2012 | 238 | 11/1/2012 | 233 |
| | | Ad-Seg | | | D 006 2227001LP | 11/13/2012 | 220 | 11/26/2012 | 208 |
| | | Ad-Seg | | | D 006 1114001UP | 12/14/2012 | 189 | 12/27/2012 | 177 |
| | | Ad-Seg | | | D 006 2226001LP | 1/11/2013 | 161 | 1/13/2013 | 160 |
| | | Ad-Seg | | | D 006 2232001LP | 1/18/2013 | 154 | 1/21/2013 | 152 |
| | | Ad-Seg | | | D 006 1115001LP | 1/22/2013 | 150 | 5/8/2013 | 45 |
| | | Ad-Seg | | | D 006 1122001LP | 1/25/2013 | 147 | 1/27/2013 | 146 |
| | | Ad-Seg | | | D 006 1146001LP | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | D 006 2218001LP | 2/19/2013 | 122 | 4/24/2013 | 59 |
| | | Ad-Seg | | | D 006 1116001LP | 2/27/2013 | 114 | 3/28/2013 | 86 |
| | | Ad-Seg | | | D 006 2232001LP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | Ad-Seg | | | D 006 1136001LP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | | | D 006 2241001LP | 3/12/2013 | 101 | 3/14/2013 | 100 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-9

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PVSP | CCCMS | Ad-Seg | | | D 004 2218001LP | 12/21/2011 | 548 | 12/21/2011 | 549 |
| | | Ad-Seg | | | D 004 1114001UP | 4/2/2012 | 445 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 004 1121001LP | 5/5/2012 | 412 | 7/18/2012 | 339 |
| | | Ad-Seg | | EZ | D 004 1110001UP | 5/23/2012 | 394 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 004 1141001LP | 6/6/2012 | 380 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 004 1121001UP | 7/12/2012 | 344 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 004 1126001LP | 7/17/2012 | 339 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 004 2237001UP | 7/22/2012 | 334 | 7/22/2012 | 335 |
| | | Ad-Seg | | | D 004 2238001LP | 8/12/2012 | 313 | 8/12/2012 | 314 |
| | | Ad-Seg | J | | D 004 1135001LP | 8/19/2012 | 306 | 8/19/2012 | 307 |
| | | Ad-Seg | | | D 004 1109001UP | 9/4/2012 | 290 | 9/3/2012 | 292 |
| | | Ad-Seg | | N | D 004 2219001UP | 9/4/2012 | 290 | 9/3/2012 | 292 |
| | | Ad-Seg | | | D 004 1127001LP | 9/25/2012 | 269 | 9/25/2012 | 270 |
| | | Ad-Seg | | | D 004 1127001LP | 9/25/2012 | 269 | 9/25/2012 | 270 |
| | | Ad-Seg | | | D 004 1127001LP | 10/2/2012 | 262 | 10/8/2012 | 257 |
| | | Ad-Seg | | | D 004 2247001LP | 10/12/2012 | 252 | 10/17/2012 | 248 |
| | | Ad-Seg | | D | Z 001 1187001LP | 10/21/2012 | 243 | 10/21/2012 | 244 |
| | | Ad-Seg | T | | Z 001 1135001LP | 11/7/2012 | 226 | 11/7/2012 | 227 |
| | | Ad-Seg | | | D 004 2227001LP | 11/20/2012 | 213 | 11/27/2012 | 207 |
| | | Ad-Seg | | AS | D 004 2203001UP | 11/26/2012 | 207 | 12/2/2012 | 202 |
| | | Ad-Seg | | | D 004 2210001LP | 12/17/2012 | 186 | 12/17/2012 | 187 |
| | | Ad-Seg | F | | D 004 2229001LP | 12/20/2012 | 183 | 12/20/2012 | 184 |
| | | Ad-Seg | | | D 004 1127001LP | 12/21/2012 | 182 | 12/23/2012 | 181 |
| | | Ad-Seg | T | A | D 004 1128001LP | 12/23/2012 | 180 | 12/23/2012 | 181 |
| | | Ad-Seg | | EZ | D 004 1126001UP | 12/27/2012 | 176 | 12/27/2012 | 177 |
| | | Ad-Seg | | | D 004 1109001LW | 12/31/2012 | 172 | 1/1/2013 | 172 |
| | | Ad-Seg | | | D 004 1128001LP | 1/8/2013 | 164 | 1/8/2013 | 165 |
| | | Ad-Seg | | | D 004 2238001LP | 1/9/2013 | 163 | 1/9/2013 | 164 |
| | | Ad-Seg | | A | D 004 1127001LP | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | T | | D 004 1126001LP | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | | | D 004 1127001LP | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | Ad-Seg | F | | D 004 1133001UP | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | Ad-Seg | | | D 004 1127001UP | 1/23/2013 | 149 | 1/23/2013 | 150 |
| | | Ad-Seg | T | | D 004 1123001LP | 1/24/2013 | 148 | 1/27/2013 | 146 |
| | | Ad-Seg | | D | D 004 1150001LP | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | Ad-Seg | F | | D 004 1128001UP | 1/29/2013 | 143 | 1/29/2013 | 144 |
| | | Ad-Seg | | | D 004 2216001LP | 2/2/2013 | 139 | 2/3/2013 | 139 |
| | | Ad-Seg | T | | D 004 1127001LP | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | J | | D 004 1126001UP | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | Ad-Seg | T | | D 004 1115001LP | 2/11/2013 | 130 | 2/11/2013 | 131 |
| | | Ad-Seg | | N | D 004 1149001LP | 2/22/2013 | 119 | 2/24/2013 | 118 |
| | | Ad-Seg | G | EZ | D 004 1121001LP | 2/25/2013 | 116 | 2/25/2013 | 117 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years. Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-10

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PVSP | CCCMS | Ad-Seg | | | D 004 1127001LP | 2/25/2013 | 116 | 2/25/2013 | 117 |
| | | Ad-Seg | | RIE | D 004 1126001UP | 2/28/2013 | 113 | 2/28/2013 | 114 |
| | | Ad-Seg | | | D 004 1118001LP | 3/1/2013 | 112 | 3/3/2013 | 111 |
| | | Ad-Seg | | | D 004 1108001LW | 3/1/2013 | 112 | 3/3/2013 | 111 |
| | | Ad-Seg | | | D 004 2209001LP | 3/2/2013 | 111 | 3/5/2013 | 109 |
| | | Ad-Seg | | | D 004 2213001LP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | Ad-Seg | | | D 004 1142001UP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | Ad-Seg | | | D 004 2246001UP | 3/6/2013 | 107 | 3/7/2013 | 107 |
| | | Ad-Seg | | | D 004 1127001LP | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | Ad-Seg | | | D 004 1126001UP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | D 004 2226001UP | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | | D 004 1134001LP | 1/9/2013 | 163 | 6/16/2013 | 6 |
| | | Ad-Seg | | | D 004 1141001LP | 2/6/2013 | 135 | 6/19/2013 | 3 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-11

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SATF | CCCMS | Ad-Seg | | | E 001 1117001LP | 12/20/2011 | 549 | 12/20/2011 | 550 |
| | | Ad-Seg | | | E 001 1131001UP | 2/3/2012 | 504 | 2/7/2012 | 501 |
| | | Ad-Seg | | | E 001 1127001LP | 4/30/2012 | 417 | 4/30/2012 | 418 |
| | | Ad-Seg | | | E 001 2215001LP | 6/13/2012 | 373 | 7/18/2012 | 339 |
| | | Ad-Seg | | | E 001 2246001LP | 7/10/2012 | 346 | 7/18/2012 | 339 |
| | | Ad-Seg | | | E 001 1127001LP | 7/18/2012 | 338 | 5/16/2013 | 37 |
| | | Ad-Seg | | | E 001 1113001LP | 7/22/2012 | 334 | 7/22/2012 | 335 |
| | | Ad-Seg | | | E 001 2216001LP | 8/1/2012 | 324 | 8/8/2012 | 318 |
| | | Ad-Seg | | | E 001 2238001UP | 8/25/2012 | 300 | 8/26/2012 | 300 |
| | | Ad-Seg | | | E 001 2244001UP | 9/3/2012 | 291 | 9/3/2012 | 292 |
| | | Ad-Seg | | | E 001 1114001UP | 10/4/2012 | 260 | 10/4/2012 | 261 |
| | | Ad-Seg | | | E 001 1135001UP | 10/23/2012 | 241 | 10/23/2012 | 242 |
| | | Ad-Seg | | | E 001 1148001LP | 11/21/2012 | 212 | 11/25/2012 | 209 |
| | | Ad-Seg | | | E 001 1139001UP | 12/6/2012 | 197 | 12/10/2012 | 194 |
| | | Ad-Seg | | | E 001 1102001LP | 12/7/2012 | 196 | 12/9/2012 | 195 |
| | | Ad-Seg | | | E 001 1130001UP | 12/24/2012 | 179 | 12/25/2012 | 179 |
| | | Ad-Seg | | LO | E 001 1114001LP | 12/24/2012 | 179 | 12/23/2012 | 181 |
| | | Ad-Seg | | | E 001 2243001UP | 12/26/2012 | 177 | 2/3/2013 | 139 |
| | | Ad-Seg | | | E 001 1141001LP | 12/27/2012 | 176 | 12/27/2012 | 177 |
| | | Ad-Seg | | | E 001 2203001UP | 12/27/2012 | 176 | 12/27/2012 | 177 |
| | | Ad-Seg | | | E 001 1116001LP | 1/5/2013 | 167 | 1/6/2013 | 167 |
| | | Ad-Seg | | | E 001 1142001UP | 1/7/2013 | 165 | 1/7/2013 | 166 |
| | | Ad-Seg | | | E 001 1126001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | E 001 1124001UP | 1/23/2013 | 149 | 1/23/2013 | 150 |
| | | Ad-Seg | | | E 001 2207001UP | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | Ad-Seg | | | E 001 2223001UP | 2/21/2013 | 120 | 4/2/2013 | 81 |
| | | Ad-Seg | | | E 001 1125001UP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | E 001 1111001LP | 3/3/2013 | 110 | 3/3/2013 | 111 |
| | | Ad-Seg | | | E 001 1149001UP | 3/5/2013 | 108 | 3/20/2013 | 94 |
| | | Ad-Seg | | | E 001 2232001UP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | Ad-Seg | | | E 001 2229001UP | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | Ad-Seg | | | E 001 1142001UP | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | E 001 1112001LP | 3/13/2013 | 100 | 5/22/2013 | 31 |
| | | Ad-Seg | | | E 001 2235001UP | 3/20/2013 | 93 | 3/20/2013 | 94 |
| | EOP | Ad-Seg | | | E 001 1132001UP | 11/9/2012 | 224 | 6/16/2013 | 6 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-12

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SVSP | CCCMS | Ad-Seg | | | D 008 1131001LP | 12/20/2011 | 549 | 12/20/2011 | 550 |
| | | Ad-Seg | | | D 002 1117001LP | 1/17/2012 | 521 | 1/16/2012 | 523 |
| | | Ad-Seg | | | D 002 2208001LP | 3/15/2012 | 463 | 7/18/2012 | 339 |
| | | Ad-Seg | | S | D 001 2215001UP | 3/28/2012 | 450 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 008 2221001LP | 4/22/2012 | 425 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 008 1132001UP | 7/10/2012 | 346 | 7/18/2012 | 339 |
| | | Ad-Seg | | | D 008 1115001LP | 8/2/2012 | 323 | 8/2/2012 | 324 |
| | | Ad-Seg | | | D 001 2229001LP | 8/10/2012 | 315 | 8/12/2012 | 314 |
| | | Ad-Seg | | | D 008 2216001LP | 8/25/2012 | 300 | 8/26/2012 | 300 |
| | | Ad-Seg | | | D 001 1109001LP | 9/7/2012 | 287 | 9/9/2012 | 286 |
| | | Ad-Seg | | | D 002 2211001UP | 9/8/2012 | 286 | 9/23/2012 | 272 |
| | | Ad-Seg | | | D 008 1116001UP | 9/11/2012 | 283 | 9/11/2012 | 284 |
| | | Ad-Seg | | | D 008 1108001LP | 10/9/2012 | 255 | 10/9/2012 | 256 |
| | | Ad-Seg | | | D 008 1108001LP | 10/9/2012 | 255 | 10/9/2012 | 256 |
| | | Ad-Seg | | | D 001 1106001LP | 10/22/2012 | 242 | 10/22/2012 | 243 |
| | | Ad-Seg | | | D 008 1119001LP | 10/22/2012 | 242 | 10/22/2012 | 243 |
| | | Ad-Seg | | | D 008 2215001UP | 10/24/2012 | 240 | 10/24/2012 | 241 |
| | | Ad-Seg | | | D 001 1131001LP | 11/5/2012 | 228 | 11/5/2012 | 229 |
| | | Ad-Seg | | | D 002 1110001LP | 11/14/2012 | 219 | 6/12/2013 | 10 |
| | | Ad-Seg | | | D 002 1122001LP | 12/2/2012 | 201 | 12/2/2012 | 202 |
| | | Ad-Seg | | | D 008 2231001UP | 12/3/2012 | 200 | 12/3/2012 | 201 |
| | | Ad-Seg | | | D 002 1120001LW | 12/8/2012 | 195 | 12/9/2012 | 195 |
| | | Ad-Seg | | | D 002 1104001LP | 12/20/2012 | 183 | 12/20/2012 | 184 |
| | | Ad-Seg | | | D 001 2226001UP | 12/28/2012 | 175 | 12/30/2012 | 174 |
| | | Ad-Seg | | | D 001 2226001UP | 12/28/2012 | 175 | 12/30/2012 | 174 |
| | | Ad-Seg | J | | D 008 2216001UP | 12/31/2012 | 172 | 2/14/2013 | 128 |
| | | Ad-Seg | | | D 008 2216001LP | 12/31/2012 | 172 | 1/1/2013 | 172 |
| | | Ad-Seg | | | D 001 2205001LP | 1/2/2013 | 170 | 1/2/2013 | 171 |
| | | Ad-Seg | | | D 008 1102001LP | 1/5/2013 | 167 | 1/6/2013 | 167 |
| | | Ad-Seg | | | D 008 1122001LP | 1/9/2013 | 163 | 3/20/2013 | 94 |
| | | Ad-Seg | | | D 008 1115001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | D 002 2215001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | D 008 2216001LP | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | | | D 001 2215001LP | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | Ad-Seg | | | D 008 1103001LP | 1/20/2013 | 152 | 1/21/2013 | 152 |
| | | Ad-Seg | | | D 008 2220001UP | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | | S | D 008 1106001LP | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | Ad-Seg | | | D 008 2225001LP | 2/18/2013 | 123 | 2/18/2013 | 124 |
| | | Ad-Seg | | | D 008 2224001UP | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | | Ad-Seg | | | D 002 1115001UP | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | | Ad-Seg | | | D 008 1131001LP | 2/20/2013 | 121 | 2/20/2013 | 122 |
| | | Ad-Seg | P | | D 008 1113001LP | 2/20/2013 | 121 | 2/20/2013 | 122 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-13

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SVSP | CCCMS | Ad-Seg | | | D 002 1126001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | D 001 1122001UP | 2/26/2013 | 115 | 2/26/2013 | 116 |
| | | Ad-Seg | | | D 008 2229001LP | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | D 001 2228001UP | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | D 002 2218001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | D 008 1113001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | D 002 1118001LP | 3/14/2013 | 99 | 3/14/2013 | 100 |
| | | Ad-Seg | | | D 008 1117001LP | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | D 001 2217001UP | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | | D 008 2230001LP | 10/15/2011 | 615 | 4/4/2013 | 79 |
| | | Ad-Seg | | | D 008 1102001LP | 7/23/2012 | 333 | 10/4/2012 | 261 |
| | | Ad-Seg | | | D 002 1107001LP | 8/13/2012 | 312 | 8/13/2012 | 313 |
| | | Ad-Seg | | | D 002 2230001LP | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | Ad-Seg | | | D 008 2221001UP | 2/11/2013 | 130 | 2/13/2013 | 129 |
| | | Ad-Seg | | | D 001 2209001LP | 3/5/2013 | 108 | 3/20/2013 | 94 |
| | | Ad-Seg | | | D 002 1108001LP | 3/14/2013 | 99 | 3/20/2013 | 94 |
| VSP | CCCMS | SHU | | | A 004 1129001LW | 11/5/2012 | 228 | 11/5/2012 | 229 |
| | | SHU | | | A 004 1134001LP | 11/23/2012 | 210 | 12/5/2012 | 199 |
| | | SHU | Z | | A 004 1139001LP | 3/18/2013 | 95 | 3/18/2013 | 96 |
| WSP | CCCMS | Ad-Seg | | EZ | D 006 1104001LP | 12/19/2012 | 184 | 3/21/2013 | 93 |
| | | Ad-Seg | | | D 006 1123001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | RTH | D 006 1125001LP | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | D 006 1140001LP | 2/14/2013 | 127 | 2/14/2013 | 128 |
| | | Ad-Seg | | | D 006 2233001LP | 2/14/2013 | 127 | 2/14/2013 | 128 |
| | | Ad-Seg | | A | D 006 1140001LP | 3/7/2013 | 106 | 3/11/2013 | 103 |
| | | Ad-Seg | | | D 006 2254001LP | 3/9/2013 | 104 | 3/11/2013 | 103 |
| | | Ad-Seg | | | D 006 1137001LP | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | | Ad-Seg | | | D 006 1107001LP | 3/23/2013 | 90 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | T | D 006 2201001LP | 1/9/2013 | 163 | 1/10/2013 | 163 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

R10-14

Health Care Placement Oversight Program
6/21/2013

| Region Institution | Placement | Setting | CDC # | Last Name | | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|---|
| **North** | | | | | | | | | | |
| CMF | CCCMS | Ad-Seg | | | A M | 3304001LP | 9/25/2012 | 269 | 2/21/2013 | 121 |
| | | Ad-Seg | | | A I | 3333001LP | 10/16/2012 | 248 | 10/16/2012 | 249 |
| | | Ad-Seg | | | A M | 3302001LP | 11/14/2012 | 219 | 11/14/2012 | 220 |
| | | Ad-Seg | | Z | A I | 3324001LP | 11/21/2012 | 212 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A I | 3334001LP | 12/14/2012 | 189 | 12/16/2012 | 188 |
| | | Ad-Seg | J | | A M | 3316001LP | 1/18/2013 | 154 | 1/21/2013 | 152 |
| | | Ad-Seg | | RT | A M | 3313001LP | 2/13/2013 | 128 | 3/20/2013 | 94 |
| | | Ad-Seg | | N | A M | 3302001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | A I | 3321001LP | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | A M | 3303001LP | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | Ad-Seg | | N | A I | 3301001LP | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | A M | 3314001LP | 3/16/2013 | 97 | 4/23/2013 | 60 |
| | | Ad-Seg | | | A I | 3302001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | Ad-Seg | | | A I | 3306001LP | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | | Ad-Seg | F | | A I | 3309001LP | 3/23/2013 | 90 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | | A I | 3307001LP | 9/18/2012 | 276 | 9/18/2012 | 277 |
| | | Ad-Seg | | | A I | 3307001LP | 9/29/2012 | 265 | 9/30/2012 | 265 |
| | | Ad-Seg | | | A M | 3302001LP | 10/15/2012 | 249 | 10/15/2012 | 250 |
| | | Ad-Seg | | | A I | 3306001LP | 10/18/2012 | 246 | 10/18/2012 | 247 |
| | | Ad-Seg | | | A M | 3335001LW | 12/17/2012 | 186 | 12/17/2012 | 187 |
| | | Ad-Seg | | | A M | 3301001LP | 12/19/2012 | 184 | 12/19/2012 | 185 |
| | | Ad-Seg | | | A I | 3306001LP | 12/27/2012 | 176 | 12/27/2012 | 177 |
| | | Ad-Seg | | | A M | 3322001LP | 1/22/2013 | 150 | 1/22/2013 | 151 |
| | | Ad-Seg | | | A I | 3306001LP | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | Ad-Seg | | | A M | 3303001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | ON | A M | 3303001LP | 3/4/2013 | 109 | 3/4/2013 | 110 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| DVI | CCCMS | Ad-Seg | | | A K 2035001L | 4/23/2012 | 424 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A K 2027001L | 8/12/2012 | 313 | 8/12/2012 | 314 |
| | | Ad-Seg | | | A K 3016001L | 8/20/2012 | 305 | 9/5/2012 | 290 |
| | | Ad-Seg | | | A K 3029001L | 9/4/2012 | 290 | 5/16/2013 | 37 |
| | | Ad-Seg | | | A L 1005001LP | 9/7/2012 | 287 | 9/9/2012 | 286 |
| | | Ad-Seg | | | A K 1009001LP | 10/7/2012 | 257 | 10/7/2012 | 258 |
| | | Ad-Seg | | | A K 1015001LP | 10/30/2012 | 234 | 12/18/2012 | 186 |
| | | Ad-Seg | | | A K 3042001L | 1/20/2013 | 152 | 1/21/2013 | 152 |
| | | Ad-Seg | F | | A K 2026001L | 2/9/2013 | 132 | 2/10/2013 | 132 |
| | | Ad-Seg | | | A K 3028001L | 3/2/2013 | 111 | 3/4/2013 | 110 |
| | | Ad-Seg | | | A K 1043001LP | 3/12/2013 | 101 | 3/21/2013 | 93 |
| | | Ad-Seg | | | A K 1002001LP | 3/13/2013 | 100 | 3/14/2013 | 100 |
| | | Ad-Seg | | | A K 3008001L | 3/14/2013 | 99 | 3/14/2013 | 100 |
| | EOP | Ad-Seg | | | A K 1001001LP | 3/8/2013 | 105 | 4/3/2013 | 80 |
| | | Ad-Seg | | | A K 1036001LP | 3/14/2013 | 99 | 6/19/2013 | 3 |
| FOL | CCCMS | Ad-Seg | T | | A 004A3009001L | 2/26/2012 | 481 | 5/7/2013 | 46 |
| | | Ad-Seg | T | | A 004B2002001L | 11/2/2012 | 231 | 2/12/2013 | 130 |
| | | Ad-Seg | | | A 004B1016001L | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | | | A 004A3019001L | 2/6/2013 | 135 | 2/26/2013 | 116 |
| | | Ad-Seg | | | A 004A1014001L | 2/21/2013 | 120 | 2/28/2013 | 114 |
| | | Ad-Seg | | | A 004A1014001L | 3/17/2013 | 96 | 3/17/2013 | 97 |
| | | Ad-Seg | A | | A 004B1014001L | 3/20/2013 | 93 | 3/20/2013 | 94 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years. Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-16

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| HDSP | CCCMS | Ad-Seg | | | D 008 2214001LP | 11/14/2011 | 585 | 11/17/2011 | 583 |
| | | Ad-Seg | | | D 007 1127001LP | 9/20/2012 | 274 | 9/20/2012 | 275 |
| | | Ad-Seg | | | D 007 1129001LP | 10/7/2012 | 257 | 10/7/2012 | 258 |
| | | Ad-Seg | | | D 007 1102001LP | 10/12/2012 | 252 | 10/15/2012 | 250 |
| | | Ad-Seg | | | D 007 1113001LW | 11/28/2012 | 205 | 11/28/2012 | 206 |
| | | Ad-Seg | | | D 008 1117001LP | 12/9/2012 | 194 | 12/9/2012 | 195 |
| | | Ad-Seg | | | D 007 1115001LP | 12/26/2012 | 177 | 12/26/2012 | 178 |
| | | Ad-Seg | | | D 007 1114401LP | 1/12/2013 | 160 | 1/13/2013 | 160 |
| | | Ad-Seg | | | D 007 2210001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | D 007 2221001LP | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | | | D 008 2205001LP | 1/31/2013 | 141 | 1/31/2013 | 142 |
| | | Ad-Seg | | | D 008 2220001LP | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | | | D 008 1117001LP | 2/9/2013 | 132 | 2/10/2013 | 132 |
| | | Ad-Seg | | | D 008 2222001LP | 2/9/2013 | 132 | 2/11/2013 | 131 |
| | | Ad-Seg | | | D 007 1118001LP | 2/13/2013 | 128 | 2/13/2013 | 129 |
| | | Ad-Seg | | | D 008 2207001LP | 2/24/2013 | 117 | 2/24/2013 | 118 |
| | | Ad-Seg | | | D 008 2217001LP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | Ad-Seg | | | D 008 1114001LP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | | | D 007 1132001LP | 3/13/2013 | 100 | 3/25/2013 | 89 |
| | | Ad-Seg | | | D 008 1115001LP | 3/14/2013 | 99 | 3/14/2013 | 100 |
| | | Ad-Seg | | | D 008 2201001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | Ad-Seg | | | D 007 1125001LP | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | | Ad-Seg | | | D 007 1130001LP | 3/23/2013 | 90 | 3/24/2013 | 90 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-17

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| MCSP | CCCMS | Ad-Seg | | | C 013 1125001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 2234001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 2240001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 1135001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | Ad-Seg | | | C 013 2249001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 2249001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | Ad-Seg | | | C 013 2221001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 1144001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | Ad-Seg | | | C 013 1133001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 2247001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 2240001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | A | C 013 2224001U | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | C 013 1138001L | 12/12/2011 | 557 | 7/18/2012 | 339 |
| | | Ad-Seg | | | C 013 1148001L | 1/25/2012 | 513 | 1/25/2012 | 514 |
| | | Ad-Seg | | | C 012 1127001L | 1/31/2012 | 507 | 1/31/2012 | 508 |
| | | Ad-Seg | | | C 012 1145001L | 3/25/2012 | 453 | 5/2/2012 | 416 |
| | | Ad-Seg | | | C 012 2222001L | 5/14/2012 | 403 | 5/14/2012 | 404 |
| | | Ad-Seg | | | C 012 2244001L | 5/17/2012 | 400 | 5/17/2012 | 401 |
| | | Ad-Seg | | | C 012 1121001L | 6/8/2012 | 378 | 6/10/2012 | 377 |
| | | Ad-Seg | | | C 013 1139001L | 6/27/2012 | 359 | 6/27/2012 | 360 |
| | | Ad-Seg | | | C 013 1150001L | 7/9/2012 | 347 | 7/18/2012 | 339 |
| | | Ad-Seg | | | C 013 2207001U | 8/3/2012 | 322 | 8/5/2012 | 321 |
| | | Ad-Seg | | | C 013 2240001L | 8/9/2012 | 316 | 8/9/2012 | 317 |
| | | Ad-Seg | | | C 013 2219001L | 8/10/2012 | 315 | 9/6/2012 | 289 |
| | | Ad-Seg | | | C 013 1102001L | 8/25/2012 | 300 | 8/26/2012 | 300 |
| | | Ad-Seg | | | C 013 1118001L | 9/3/2012 | 291 | 9/3/2012 | 292 |
| | | Ad-Seg | | | C 012 2232001U | 9/14/2012 | 280 | 5/5/2013 | 48 |
| | | Ad-Seg | | | C 012 2214001L | 9/15/2012 | 279 | 4/9/2013 | 74 |
| | | Ad-Seg | | W | C 012 2237001L | 9/20/2012 | 274 | 9/20/2012 | 275 |
| | | Ad-Seg | | | C 013 2240001U | 10/9/2012 | 255 | 10/9/2012 | 256 |
| | | Ad-Seg | | | C 013 1120001L | 11/1/2012 | 232 | 11/1/2012 | 233 |
| | | Ad-Seg | | | C 013 1142001L | 11/5/2012 | 228 | 11/5/2012 | 229 |
| | | Ad-Seg | | | C 013 1139001U | 12/13/2012 | 190 | 12/13/2012 | 191 |
| | | Ad-Seg | | | C 012 2212001U | 12/16/2012 | 187 | 12/16/2012 | 188 |
| | | Ad-Seg | | | C 013 1119001U | 12/18/2012 | 185 | 12/18/2012 | 186 |
| | | Ad-Seg | | D | C 013 2218001L | 1/18/2013 | 154 | 1/21/2013 | 152 |
| | | Ad-Seg | | | C 013 2220001L | 1/23/2013 | 149 | 2/11/2013 | 131 |
| | | Ad-Seg | | | C 013 2236001L | 1/30/2013 | 142 | 1/30/2013 | 143 |
| | | Ad-Seg | | | C 013 2223001U | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | C 013 1123001U | 2/1/2013 | 140 | 2/3/2013 | 139 |
| | | Ad-Seg | | | C 012 2246001L | 2/3/2013 | 138 | 2/5/2013 | 137 |
| | | Ad-Seg | | | C 012 1107001L | 2/7/2013 | 134 | 2/25/2013 | 117 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| MCSP | CCCMS | Ad-Seg | | | C 013 1130001L | 2/8/2013 | 133 | 2/10/2013 | 132 |
| | | Ad-Seg | | | C 013 1130001U | 2/8/2013 | 133 | 2/10/2013 | 132 |
| | | Ad-Seg | | | C 013 2239001L | 2/8/2013 | 133 | 2/10/2013 | 132 |
| | | Ad-Seg | | | C 013 1135001U | 2/8/2013 | 133 | 5/23/2013 | 30 |
| | | Ad-Seg | | | C 012 1131001L | 2/16/2013 | 125 | 2/18/2013 | 124 |
| | | Ad-Seg | | | C 012 1112001L | 2/19/2013 | 122 | 6/13/2013 | 9 |
| | | Ad-Seg | | | C 013 1108001L | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | | | C 012 2225001L | 2/21/2013 | 120 | 5/15/2013 | 38 |
| | | Ad-Seg | | | C 013 2216001L | 2/24/2013 | 117 | 2/24/2013 | 118 |
| | | Ad-Seg | | | C 013 2202001L | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | Ad-Seg | | | C 013 2225001U | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | Ad-Seg | | | C 013 2219001L | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | C 013 1123001L | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | C 013 1111001L | 3/10/2013 | 103 | 3/10/2013 | 104 |
| | | Ad-Seg | | | C 013 1107001L | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | Ad-Seg | | | C 012 1130001U | 3/14/2013 | 99 | 3/14/2013 | 100 |
| | | Ad-Seg | | | C 012 1103001L | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | EOP | Ad-Seg | | | C 012 2232001L | 9/14/2012 | 280 | 9/13/2012 | 282 |
| | | Ad-Seg | | | C 012 1127001L | 11/29/2012 | 204 | 12/23/2012 | 181 |
| | | Ad-Seg | | | C 012 2213001L | 12/25/2012 | 178 | 4/9/2013 | 74 |
| | | Ad-Seg | | | C 012 1143001L | 12/26/2012 | 177 | 12/26/2012 | 178 |
| | | Ad-Seg | | | C 012 1102001L | 1/15/2013 | 157 | 4/10/2013 | 73 |
| | | Ad-Seg | | | C 012 2221001U | 3/2/2013 | 111 | 4/2/2013 | 81 |
| | | Ad-Seg | | | C 012 1122001L | 3/12/2013 | 101 | 3/12/2013 | 102 |
| | | Ad-Seg | | | C 012 1124001L | 3/19/2013 | 94 | 4/9/2013 | 74 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-19

| Region | | | | | | | | | |
|--------|-----------|---------|-------|-----------|--------|-----------------|-------------------|------------------|-------------------|
| Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
| PBSP | CCCMS | Ad-Seg | | | A 001 2230001L | 10/27/2011 | 603 | 11/14/2011 | 586 |
| | | Ad-Seg | | | A 001 2226001L | 11/9/2011 | 590 | 11/14/2011 | 586 |
| | | Ad-Seg | | | A 003 1116001L | 1/4/2012 | 534 | 12/22/2011 | 548 |
| | | Ad-Seg | | | A 001 1119001L | 1/12/2012 | 526 | 1/12/2012 | 527 |
| | | Ad-Seg | | | A 001 2208001L | 4/24/2012 | 423 | 4/26/2012 | 422 |
| | | Ad-Seg | | | A 002 2219001L | 5/12/2012 | 405 | 5/20/2013 | 33 |
| | | Ad-Seg | | | A 002 2232001L | 6/8/2012 | 378 | 5/20/2013 | 33 |
| | | Ad-Seg | | | A 001 1130001L | 7/3/2012 | 353 | 7/4/2012 | 353 |
| | | Ad-Seg | | | A 001 1120001L | 8/24/2012 | 301 | 8/26/2012 | 300 |
| | | Ad-Seg | | | A 001 2224001L | 10/17/2012 | 247 | 11/1/2012 | 233 |
| | | Ad-Seg | | | A 001 1114001L | 11/8/2012 | 225 | 4/25/2013 | 58 |
| | | Ad-Seg | | | A 001 1118001L | 12/17/2012 | 186 | 12/13/2012 | 191 |
| | | Ad-Seg | | | A 001 1131001L | 12/20/2012 | 183 | 12/20/2012 | 184 |
| | | Ad-Seg | | | A 001 2228001L | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | Ad-Seg | | | A 001 2215001L | 1/22/2013 | 150 | 1/22/2013 | 151 |
| | | Ad-Seg | | AIN | A 002 1117001L | 1/31/2013 | 141 | 5/20/2013 | 33 |
| | | Ad-Seg | | | A 001 2231001L | 2/7/2013 | 134 | 2/10/2013 | 132 |
| | | Ad-Seg | | | A 001 2219001L | 2/13/2013 | 128 | 2/10/2013 | 132 |
| | | Ad-Seg | | | A 002 1118001L | 2/20/2013 | 121 | 5/20/2013 | 33 |
| | | Ad-Seg | | | A 001 1107001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | A 001 1122001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | A 002 2203001L | 3/23/2013 | 90 | 5/20/2013 | 33 |
| | | SHU | | | C 012 1122001L | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | EOP | Ad-Seg | | | A 001 2225001L | 3/11/2013 | 102 | 6/10/2013 | 12 |
| | | Ad-Seg | N | | A 002 2220001L | 3/22/2013 | 91 | 6/10/2013 | 12 |
| | | PSU | | | B 002 2215001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | B 001 2214001L | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | B 001 2232001L | 12/21/2011 | 548 | 12/20/2011 | 550 |
| | | PSU | | | B 001 1132001L | 1/17/2012 | 521 | 1/16/2012 | 523 |
| | | PSU | | | B 002 2213001L | 3/27/2012 | 451 | 3/27/2012 | 452 |
| | | PSU | | | B 001 1130001L | 4/4/2012 | 443 | 4/4/2012 | 444 |
| | | PSU | | | B 001 1128001L | 4/17/2012 | 430 | 4/17/2012 | 431 |
| | | PSU | | | B 002 1117001L | 4/24/2012 | 423 | 5/3/2012 | 415 |
| | | PSU | | | B 002 2203001L | 6/5/2012 | 381 | 7/18/2012 | 339 |
| | | PSU | | | B 001 2227001L | 6/7/2012 | 379 | 6/7/2012 | 380 |
| | | PSU | | | B 002 1118001L | 6/13/2012 | 373 | 7/18/2012 | 339 |
| | | PSU | | | B 001 2223001L | 6/13/2012 | 373 | 6/14/2012 | 373 |
| | | PSU | | | B 001 1115001L | 6/27/2012 | 359 | 6/27/2012 | 360 |
| | | PSU | | | B 001 2208001L | 6/27/2012 | 359 | 7/18/2012 | 339 |
| | | PSU | | | B 001 2206001L | 7/17/2012 | 339 | 7/17/2012 | 340 |
| | | PSU | | Z | B 001 2212001L | 7/31/2012 | 325 | 7/31/2012 | 326 |
| | | PSU | | | B 002 2226001L | 8/21/2012 | 304 | 8/21/2012 | 305 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-20

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PBSP | EOP | PSU | | | B 001 1125001L | 8/28/2012 | 297 | 8/28/2012 | 298 |
| | | PSU | | | B 002 2220001L | 8/28/2012 | 297 | 8/28/2012 | 298 |
| | | PSU | | | B 002 1128001L | 9/5/2012 | 289 | 9/5/2012 | 290 |
| | | PSU | | | B 001 2202001L | 9/5/2012 | 289 | 9/5/2012 | 290 |
| | | PSU | | | B 001 2217001L | 9/25/2012 | 269 | 9/25/2012 | 270 |
| | | PSU | | | B 002 2226001L | 10/9/2012 | 255 | 10/9/2012 | 256 |
| | | PSU | | | B 001 1107001L | 10/24/2012 | 240 | 10/25/2012 | 240 |
| | | PSU | | | B 002 2218001L | 10/25/2012 | 239 | 10/25/2012 | 240 |
| | | PSU | | Y | B 002 1131001L | 10/31/2012 | 233 | 10/31/2012 | 234 |
| | | PSU | | R | B 002 2226001L | 11/2/2012 | 231 | 11/4/2012 | 230 |
| | | PSU | | | B 002 1130001L | 11/5/2012 | 228 | 11/5/2012 | 229 |
| | | PSU | | | B 002 1123001L | 11/8/2012 | 225 | 11/8/2012 | 226 |
| | | PSU | | | B 001 2230001L | 11/8/2012 | 225 | 11/1/2012 | 233 |
| | | PSU | | N | B 002 1101001L | 11/27/2012 | 206 | 11/27/2012 | 207 |
| | | PSU | | | B 001 2213001L | 12/18/2012 | 185 | 12/18/2012 | 186 |
| | | PSU | | A | B 001 1129001L | 12/19/2012 | 184 | 12/19/2012 | 185 |
| | | PSU | | | B 001 1130001L | 12/26/2012 | 177 | 12/27/2012 | 177 |
| | | PSU | | | B 002 2213001L | 12/26/2012 | 177 | 12/26/2012 | 178 |
| | | PSU | | | B 002 2226001L | 12/26/2012 | 177 | 12/27/2012 | 177 |
| | | PSU | | | B 002 2221001L | 1/8/2013 | 164 | 1/8/2013 | 165 |
| | | PSU | | | B 001 2220001L | 1/8/2013 | 164 | 1/8/2013 | 165 |
| | | PSU | | | B 002 2125001L | 1/8/2013 | 164 | 1/8/2013 | 165 |
| | | PSU | | | B 001 1101001L | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | PSU | | | B 001 1110001L | 1/10/2013 | 162 | 11/27/2012 | 207 |
| | | PSU | | | B 001 1118001L | 1/15/2013 | 157 | 1/15/2013 | 158 |
| | | PSU | | | B 001 1129001L | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | PSU | | GO | B 001 1122001L | 1/18/2013 | 154 | 1/23/2013 | 150 |
| | | PSU | | KI | B 001 1102001L | 1/22/2013 | 150 | 1/3/2013 | 170 |
| | | PSU | | | B 001 1102001L | 1/24/2013 | 148 | 1/24/2013 | 149 |
| | | PSU | | | B 002 2224001L | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | PSU | | | B 001 1106001L | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | PSU | | | B 001 2216001L | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | PSU | | | B 002 2229001L | 2/20/2013 | 121 | 2/20/2013 | 122 |
| | | PSU | | Z | B 002 1122001L | 2/22/2013 | 119 | 2/24/2013 | 118 |
| | | PSU | | | B 002 1121001L | 2/22/2013 | 119 | 2/24/2013 | 118 |
| | | PSU | | | B 002 1105001L | 2/27/2013 | 114 | 2/28/2013 | 114 |
| | | PSU | | | B 001 1128001L | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | PSU | | | B 001 2223001L | 3/5/2013 | 108 | 3/20/2013 | 94 |
| | | PSU | | | B 001 2232001L | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | PSU | | | B 002 1114001L | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | PSU | | | B 002 2228001L | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | PSU | T | O | B 001 2224001L | 3/10/2013 | 103 | 3/10/2013 | 104 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-21

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **PBSP** | EOP | PSU | ███████ | | B 002 2224001L | 3/12/2013 | 101 | 2/21/2013 | 121 |
| | | PSU | ██████████N | | B 002 2222001L | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | PSU | V████████ | | B 001 2222001L | 3/20/2013 | 93 | 3/20/2013 | 94 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
*6/21/2013*

*R10-22*

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | CCCMS | Ad-Seg | | | B 004 1006001L | 10/25/2011 | 605 | 11/14/2011 | 586 |
| | | Ad-Seg | | | A 005 2008001L | 4/21/2012 | 426 | 4/22/2012 | 426 |
| | | Ad-Seg | | | B 004 1027001L | 5/15/2012 | 402 | 5/15/2012 | 403 |
| | | Ad-Seg | | | B 004 1022001L | 6/13/2012 | 373 | 5/17/2012 | 401 |
| | | Ad-Seg | | | B 004 2008001L | 7/31/2012 | 325 | 5/16/2012 | 402 |
| | | Ad-Seg | | | Z 001A1102001L | 10/5/2012 | 259 | 10/30/2012 | 235 |
| | | Ad-Seg | | | B 004 2013001L | 10/25/2012 | 239 | 10/25/2012 | 240 |
| | | Ad-Seg | | | A 005 2015001L | 10/30/2012 | 234 | 10/30/2012 | 235 |
| | | Ad-Seg | | | B 004 1019001U | 11/28/2012 | 205 | 11/27/2012 | 207 |
| | | Ad-Seg | | | B 004 1015001U | 12/5/2012 | 198 | 12/5/2012 | 199 |
| | | Ad-Seg | | | A 005 1009001L | 12/21/2012 | 182 | 12/23/2012 | 181 |
| | | Ad-Seg | | | B 004 1015001L | 12/27/2012 | 176 | 1/1/2013 | 172 |
| | | Ad-Seg | | | A 005 1009001L | 1/19/2013 | 153 | 1/21/2013 | 152 |
| | | Ad-Seg | | | A 005 1003001L | 1/19/2013 | 153 | 1/21/2013 | 152 |
| | | Ad-Seg | | | B 004 1032001L | 1/31/2013 | 141 | 2/3/2013 | 139 |
| | | Ad-Seg | | | B 004 1025001L | 2/5/2013 | 136 | 2/5/2013 | 137 |
| | | Ad-Seg | | | B 004 1016001L | 2/13/2013 | 128 | 2/13/2013 | 129 |
| | | Ad-Seg | | | B 004 2023001L | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | | Ad-Seg | | | B 004 1028001U | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | B 004 1028001L | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | A 005 1021001L | 2/28/2013 | 113 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A 005 1006001L | 3/1/2013 | 112 | 3/3/2013 | 111 |
| | | Ad-Seg | | | B 004 1014001L | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | Ad-Seg | | | B 004 2024001U | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | Ad-Seg | | | B 004 2024001L | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | Ad-Seg | | | B 004 1015001L | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | Ad-Seg | | | B 004 2002001U | 3/9/2013 | 104 | 3/10/2013 | 104 |
| | | Ad-Seg | | | B 004 1014001L | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | SHU | | | B 003 2027001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | SHU | | | B 003 2009001L | 6/13/2012 | 373 | 7/18/2012 | 339 |
| | | SHU | | | B 003 2028001L | 7/8/2012 | 348 | 12/30/2011 | 540 |
| | | SHU | | | B 003 2028001L | 7/17/2012 | 339 | 7/18/2012 | 339 |
| | | SHU | | | B 003 1004001U | 10/17/2012 | 247 | 7/18/2012 | 339 |
| | EOP | Ad-Seg | | | A 005 2014001L | 1/20/2012 | 518 | 1/20/2012 | 519 |
| | | Ad-Seg | | | A 005 2020001L | 10/18/2012 | 246 | 10/18/2012 | 247 |
| | | Ad-Seg | | | A 005 2030001L | 10/23/2012 | 241 | 11/6/2012 | 228 |
| | | Ad-Seg | | | A 005 2005001L | 3/8/2013 | 105 | 3/10/2013 | 104 |
| | | PSU | | | A 003 1032001LP | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | A 002 1032001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | A 001 2010001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | A 001 1015001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | A 004 1001001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected in SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-23

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | | | A 002 1013001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | A 004 2025001LP | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | A 003 1014001LP | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | A 004 1006001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | A | A 004 2016001LP | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | A 004 2027001LP | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | PSU | | | A 002 2024001LP | 10/15/2011 | 615 | 7/18/2012 | 339 |
| | | PSU | | | A 004 2032001LP | 10/21/2011 | 609 | 7/18/2012 | 339 |
| | | PSU | | | A 001 1009001LP | 11/22/2011 | 577 | 7/18/2012 | 339 |
| | | PSU | | | A 004 1032001LP | 1/4/2012 | 534 | 1/4/2012 | 535 |
| | | PSU | | | A 001 1028001LP | 1/17/2012 | 521 | 1/16/2012 | 523 |
| | | PSU | | | A 001 1022001LW | 2/7/2012 | 500 | 2/8/2012 | 500 |
| | | PSU | | | A 004 2015001LP | 2/10/2012 | 497 | 2/12/2012 | 496 |
| | | PSU | | | A 001 2027001LP | 2/21/2012 | 486 | 1/21/2012 | 518 |
| | | PSU | | | A 002 1014001LP | 3/22/2012 | 456 | 7/18/2012 | 339 |
| | | PSU | | | A 001 2028001LP | 3/29/2012 | 449 | 4/1/2012 | 447 |
| | | PSU | | | A 002 1009001LP | 4/24/2012 | 423 | 4/29/2012 | 419 |
| | | PSU | | | A 001 2017001LP | 5/8/2012 | 409 | 7/18/2012 | 339 |
| | | PSU | | | A 002 2017001LP | 5/10/2012 | 407 | 2/26/2012 | 482 |
| | | PSU | | | A 002 2001001LP | 5/22/2012 | 395 | 5/23/2012 | 395 |
| | | PSU | | | A 001 2029001LP | 5/29/2012 | 388 | 5/31/2012 | 387 |
| | | PSU | | | A 003 2012001LP | 5/29/2012 | 388 | 7/18/2012 | 339 |
| | | PSU | | | A 001 1032001LP | 5/31/2012 | 386 | 6/3/2012 | 384 |
| | | PSU | | | A 001 2030001LP | 6/4/2012 | 382 | 6/4/2012 | 383 |
| | | PSU | | | A 003 2022001LP | 6/11/2012 | 375 | 7/18/2012 | 339 |
| | | PSU | | Z | A 002 1022001LP | 6/11/2012 | 375 | 6/11/2012 | 376 |
| | | PSU | | | A 004 2020001LP | 6/14/2012 | 372 | 7/18/2012 | 339 |
| | | PSU | | | A 003 1009001LP | 6/29/2012 | 357 | 5/28/2012 | 390 |
| | | PSU | | | A 004 2024001LP | 7/2/2012 | 354 | 7/18/2012 | 339 |
| | | PSU | | | A 002 2006001LP | 7/6/2012 | 350 | 7/8/2012 | 349 |
| | | PSU | | IDE | A 002 1010001LP | 7/10/2012 | 346 | 7/18/2012 | 339 |
| | | PSU | | | A 003 1001001LP | 7/23/2012 | 333 | 7/24/2012 | 333 |
| | | PSU | | | A 004 2004001LP | 7/25/2012 | 331 | 7/25/2012 | 332 |
| | | PSU | | | A 002 2008001LP | 8/14/2012 | 311 | 11/16/2011 | 584 |
| | | PSU | | | A 004 2006001LP | 8/20/2012 | 305 | 8/20/2012 | 306 |
| | | PSU | | | A 004 2025001LP | 8/23/2012 | 302 | 8/26/2012 | 300 |
| | | PSU | | | A 004 1021001LP | 8/30/2012 | 295 | 8/30/2012 | 296 |
| | | PSU | | | A 003 1001001LP | 9/7/2012 | 287 | 9/9/2012 | 286 |
| | | PSU | | | A 001 2025001LP | 9/18/2012 | 276 | 4/11/2012 | 437 |
| | | PSU | | | A 001 1024001LP | 9/23/2012 | 271 | 9/23/2012 | 272 |
| | | PSU | | | A 004 1013001LP | 9/24/2012 | 270 | 7/18/2012 | 339 |
| | | PSU | H | | A 001 2004001LP | 9/24/2012 | 270 | 8/14/2012 | 312 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-24

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | A | | A  001 2026001LP | 9/24/2012 | 270 | 9/20/2012 | 275 |
| | | PSU | | | A  002 1006001LP | 9/27/2012 | 267 | 5/29/2012 | 389 |
| | | PSU | | | A  004 2007001LP | 9/27/2012 | 267 | 9/27/2012 | 268 |
| | | PSU | | | A  004 1019001LP | 9/28/2012 | 266 | 9/30/2012 | 265 |
| | | PSU | | | A  001 2015001LP | 9/28/2012 | 266 | 9/30/2012 | 265 |
| | | PSU | | | A  001 2031001LP | 10/3/2012 | 261 | 10/3/2012 | 262 |
| | | PSU | | | A  004 2023001LP | 10/4/2012 | 260 | 10/4/2012 | 261 |
| | | PSU | T | | A  002 1023001LP | 10/9/2012 | 255 | 10/9/2012 | 256 |
| | | PSU | | | A  003 2030001LP | 10/22/2012 | 242 | 10/22/2012 | 243 |
| | | PSU | | | A  003 2025001LP | 10/22/2012 | 242 | 10/22/2012 | 243 |
| | | PSU | | | A  003 1026001LP | 10/29/2012 | 235 | 9/27/2012 | 268 |
| | | PSU | | | A  004 1004001LP | 10/30/2012 | 234 | 9/27/2012 | 268 |
| | | PSU | | | A  003 1004001LP | 11/15/2012 | 218 | 10/15/2012 | 250 |
| | | PSU | T | | A  001 1025001LP | 11/16/2012 | 217 | 11/19/2012 | 215 |
| | | PSU | T | N | A  004 2022001LP | 11/16/2012 | 217 | 11/19/2012 | 215 |
| | | PSU | | | A  001 1027001LP | 11/16/2012 | 217 | 3/26/2013 | 88 |
| | | PSU | | | A  004 2011001LP | 11/19/2012 | 214 | 11/19/2012 | 215 |
| | | PSU | T | | A  003 2021001LP | 11/20/2012 | 213 | 10/22/2012 | 243 |
| | | PSU | | | A  004 1012001LP | 11/28/2012 | 205 | 11/28/2012 | 206 |
| | | PSU | T | | A  001 1028001LP | 11/29/2012 | 204 | 9/9/2012 | 286 |
| | | PSU | T | | A  004 1003001LP | 12/6/2012 | 197 | 12/6/2012 | 198 |
| | | PSU | | | A  004 2009001LP | 12/6/2012 | 197 | 12/6/2012 | 198 |
| | | PSU | | | A  004 1002001LP | 12/12/2012 | 191 | 12/12/2012 | 192 |
| | | PSU | | | A  002 1002001LP | 12/14/2012 | 189 | 12/16/2012 | 188 |
| | | PSU | | | A  001 1030001LP | 12/14/2012 | 189 | 12/17/2012 | 187 |
| | | PSU | | | A  001 1024001LP | 12/17/2012 | 186 | 12/17/2012 | 187 |
| | | PSU | | | A  002 1015001LP | 12/18/2012 | 185 | 12/18/2012 | 186 |
| | | PSU | | | A  001 1024001LP | 12/18/2012 | 185 | 12/18/2012 | 186 |
| | | PSU | F | | A  001 2028001LP | 12/19/2012 | 184 | 12/20/2012 | 184 |
| | | PSU | | | A  003 2024001LP | 12/21/2012 | 182 | 12/25/2012 | 179 |
| | | PSU | | | A  004 1020001LP | 12/24/2012 | 179 | 12/25/2012 | 179 |
| | | PSU | | | A  002 2025001LP | 12/24/2012 | 179 | 12/25/2012 | 179 |
| | | PSU | F | | A  004 1008001LP | 12/24/2012 | 179 | 12/25/2012 | 179 |
| | | PSU | T | Z | A  003 1001001LP | 12/26/2012 | 177 | 12/26/2012 | 178 |
| | | PSU | | | A  002 1020001LW | 12/26/2012 | 177 | 12/6/2012 | 198 |
| | | PSU | | | A  001 2032001LP | 12/28/2012 | 175 | 12/30/2012 | 174 |
| | | PSU | | | A  002 2017001LP | 1/7/2013 | 165 | 1/7/2013 | 166 |
| | | PSU | | | A  004 2005001LP | 1/9/2013 | 163 | 10/21/2012 | 244 |
| | | PSU | T | | A  002 1011001LW | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | PSU | | | A  002 2017001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | PSU | | | A  002 2031001LP | 1/18/2013 | 154 | 1/22/2013 | 151 |
| | | PSU | T | | A  003 1003001LP | 1/22/2013 | 150 | 1/22/2013 | 151 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-25

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | | | A 001 2025001LP | 1/23/2013 | 149 | 1/23/2013 | 150 |
| | | PSU | | | A 004 2002001LP | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | PSU | | | A 002 2002001LP | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | PSU | | | A 003 1001001LP | 1/31/2013 | 141 | 10/2/2012 | 263 |
| | | PSU | | N | A 001 1028001LP | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | PSU | | A | A 003 2002001LP | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | PSU | | | A 004 2021001LP | 2/12/2013 | 129 | 2/12/2013 | 130 |
| | | PSU | | | A 004 2029001LP | 2/12/2013 | 129 | 1/7/2013 | 166 |
| | | PSU | | | A 004 2018001LP | 2/12/2013 | 129 | 2/12/2013 | 130 |
| | | PSU | | O | A 004 2006001LP | 2/13/2013 | 128 | 2/13/2013 | 129 |
| | | PSU | | A | A 004 1004001LP | 2/19/2013 | 122 | 2/19/2013 | 123 |
| | | PSU | | | A 004 1007001LP | 2/20/2013 | 121 | 3/26/2013 | 88 |
| | | PSU | | | A 001 2026001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | PSU | | N | A 002 2005001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | PSU | | | A 002 2019001LP | 2/22/2013 | 119 | 2/25/2013 | 117 |
| | | PSU | | | A 003 2020001LP | 2/22/2013 | 119 | 2/24/2013 | 118 |
| | | PSU | | | A 004 1025001LP | 2/25/2013 | 116 | 2/25/2013 | 117 |
| | | PSU | | | A 004 2014001LP | 2/28/2013 | 113 | 2/28/2013 | 114 |
| | | PSU | | LY | A 002 2002001LP | 2/28/2013 | 113 | 2/28/2013 | 114 |
| | | PSU | | | A 002 1005001LP | 3/1/2013 | 112 | 3/4/2013 | 110 |
| | | PSU | | | A 004 1010001LP | 3/1/2013 | 112 | 3/4/2013 | 110 |
| | | PSU | | | A 002 1001001LP | 3/4/2013 | 109 | 3/4/2013 | 110 |
| | | PSU | | | A 001 2012001LP | 3/4/2013 | 109 | 3/20/2013 | 94 |
| | | PSU | | N | A 002 1018001LP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | PSU | | | A 003 1003001LP | 3/5/2013 | 108 | 3/5/2013 | 109 |
| | | PSU | | N | A 002 2031001LP | 3/6/2013 | 107 | 3/20/2013 | 94 |
| | | PSU | | | A 003 2018001LP | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | PSU | | AS | A 001 1030001LP | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | PSU | | | A 004 1028001LP | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | PSU | | T | A 001 2030001LP | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | PSU | | | A 004 1009001LP | 3/12/2013 | 101 | 3/12/2013 | 102 |
| | | PSU | | N | A 002 2019001LP | 3/13/2013 | 100 | 2/21/2013 | 121 |
| | | PSU | | SON | A 002 2016001LP | 3/13/2013 | 100 | 2/20/2013 | 122 |
| | | PSU | | A | A 004 1026001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | PSU | | A | A 001 2025001LP | 3/13/2013 | 100 | 2/21/2013 | 121 |
| | | PSU | | SANO | A 001 1029001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | PSU | | | A 001 2020001LP | 3/18/2013 | 95 | 3/18/2013 | 96 |
| | | PSU | | Y | A 003 1005001LP | 3/20/2013 | 93 | 10/7/2012 | 258 |
| | | PSU | | ER | A 001 1029001LP | 3/20/2013 | 93 | 2/11/2013 | 131 |
| | | PSU | | | A 001 1025001LP | 3/20/2013 | 93 | 10/24/2012 | 241 |
| | | PSU | | | A 001 1028001LP | 3/20/2013 | 93 | 3/20/2013 | 94 |
| | | PSU | H | | A 002 1026001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-26

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | | | A 003 1023001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | PSU | | | A 001 2025001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | | PSU | | | A 003 1024001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| SOL | CCCMS | Ad-Seg | | | B 010 1110001L | 10/18/2012 | 246 | 10/18/2012 | 247 |
| | | Ad-Seg | | | B 009 1137001U | 11/17/2012 | 216 | 11/17/2012 | 217 |
| | | Ad-Seg | | S | B 010 1103001L | 12/3/2012 | 200 | 12/3/2012 | 201 |
| | | Ad-Seg | | ES | B 010 1144001L | 12/19/2012 | 184 | 3/6/2013 | 108 |
| | | Ad-Seg | | | B 010 2205001L | 12/23/2012 | 180 | 12/23/2012 | 181 |
| | | Ad-Seg | | | B 010 2205001U | 1/2/2013 | 170 | 1/2/2013 | 171 |
| | | Ad-Seg | | | B 010 1101001L | 1/26/2013 | 146 | 1/27/2013 | 146 |
| | | Ad-Seg | | | B 010 2206001L | 1/29/2013 | 143 | 4/28/2013 | 55 |
| | | Ad-Seg | | E | B 010 1131001L | 2/23/2013 | 118 | 2/24/2013 | 118 |
| | | Ad-Seg | | | B 010 1148001L | 3/3/2013 | 110 | 5/15/2013 | 38 |
| | | Ad-Seg | | AN | B 010 1150001L | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | B 010 1122001L | 3/16/2013 | 97 | 3/17/2013 | 97 |
| | EOP | Ad-Seg | | | B 010 1140001U | 12/27/2012 | 176 | 1/24/2013 | 149 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-27

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SQ | CCCMS | Ad-Seg | | | A AC 1056001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | | A AC 1011001L | 10/15/2011 | 615 | 11/14/2011 | 586 |
| | | Ad-Seg | | S | A SB C3038001L | 10/15/2011 | 615 | 11/8/2012 | 226 |
| | | Ad-Seg | | ICK | A AC 1005001L | 10/28/2011 | 602 | 7/10/2012 | 347 |
| | | Ad-Seg | F | | A AC 1051001L | 3/31/2012 | 447 | 4/1/2012 | 447 |
| | | Ad-Seg | | | A AC 1002001L | 5/17/2012 | 400 | 5/17/2012 | 401 |
| | | Ad-Seg | T | | A AC 3056001L | 6/5/2012 | 381 | 8/29/2012 | 297 |
| | | Ad-Seg | | | A AC 1062001L | 7/2/2012 | 354 | 7/23/2012 | 334 |
| | | Ad-Seg | T | RD | A AC 3009001L | 8/6/2012 | 319 | 8/7/2012 | 319 |
| | | Ad-Seg | F | S | A AC 3011001L | 8/22/2012 | 303 | 11/6/2012 | 228 |
| | | Ad-Seg | | | A AC 3001001L | 9/24/2012 | 270 | 9/24/2012 | 271 |
| | | Ad-Seg | | | A AC 1061001L | 11/2/2012 | 231 | 11/5/2012 | 229 |
| | | Ad-Seg | | | A AC 1010001L | 12/29/2012 | 174 | 1/9/2013 | 164 |
| | | Ad-Seg | | | A SB C1034001L | 1/12/2013 | 160 | 1/16/2013 | 157 |
| | | Ad-Seg | | | A AC 1060001L | 2/4/2013 | 137 | 2/12/2013 | 130 |
| | | Ad-Seg | | | A SB C4035001L | 2/19/2013 | 122 | 2/20/2013 | 122 |
| | | Ad-Seg | | | A SB C4002001L | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | A SB C1028001L | 3/5/2013 | 108 | 5/16/2013 | 37 |
| | | Ad-Seg | | | A SB C3008001L | 3/7/2013 | 106 | 4/16/2013 | 67 |
| | | Ad-Seg | | LL | A SB C4042001L | 3/13/2013 | 100 | 5/30/2013 | 23 |
| | | Ad-Seg | | | A SB C4031001L | 3/14/2013 | 99 | 3/21/2013 | 93 |
| | | Ad-Seg | | | A SB C1024001L | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | | Ad-Seg | | | A SB C4016001L | 3/15/2013 | 98 | 5/2/2013 | 51 |
| | | Ad-Seg | | | A SB C3044001L | 3/19/2013 | 94 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A SB C4003001L | 3/20/2013 | 93 | 3/21/2013 | 93 |
| | EOP | Ad-Seg | | | A AC 1064001L | 2/5/2013 | 136 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A SB C1012001L | 2/28/2013 | 113 | 6/6/2013 | 16 |
| | | Ad-Seg | F | | A SB C4031001L | 3/6/2013 | 107 | 3/12/2013 | 102 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-28

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **South** | | | | | | | | | |
| **CAL** | CCCMS | Ad-Seg | J | | A 005 1134001L | 9/25/2012 | 269 | 1/10/2013 | 163 |
| **CEN** | CCCMS | Ad-Seg | T | | A 005 1127001L | 12/22/2012 | 181 | 1/10/2013 | 163 |
| | | Ad-Seg | | | A 005 1119001L | 12/26/2012 | 177 | 1/28/2013 | 145 |
| | | Ad-Seg | | IO | A 005 1127001L | 2/24/2013 | 117 | 3/20/2013 | 94 |
| **CIM** | CCCMS | Ad-Seg | | | B PH 3330001LP | 11/6/2012 | 227 | 11/6/2012 | 228 |
| | | Ad-Seg | | | B PH 3328001UP | 11/12/2012 | 221 | 11/12/2012 | 222 |
| | | Ad-Seg | | | B PH 2213001LP | 12/14/2012 | 189 | 1/8/2013 | 165 |
| | | Ad-Seg | | | B PH 2220001LP | 12/26/2012 | 177 | 1/8/2013 | 165 |
| | | Ad-Seg | | EZ | B PH 1132001LP | 1/20/2013 | 152 | 1/21/2013 | 152 |
| | | Ad-Seg | | M | B CH 1123001LP | 1/22/2013 | 150 | 1/22/2013 | 151 |
| | | Ad-Seg | | | B CH 2212001UP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | | LL | B CH 1132001LP | 3/8/2013 | 105 | 3/24/2013 | 90 |
| | | Ad-Seg | | N | B PH 1132001LP | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | Ad-Seg | F | ON | B CH 1101001LP | 3/13/2013 | 100 | 3/12/2013 | 102 |
| | | Ad-Seg | | | B PH 3327001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | T | | B PH 1132001LP | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | B PH 3312001LP | 3/14/2013 | 99 | 3/13/2013 | 101 |
| | EOP | Ad-Seg | C | | B CH 1133001LP | 2/28/2013 | 113 | 3/26/2013 | 88 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-29

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CIW | EOP | PSU | | | A SCU 1061001LP | 3/21/2011 | 823 | 7/18/2012 | 339 |
| | | PSU | | D | A SCU 1078001LP | 4/20/2011 | 793 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1092001LP | 7/5/2011 | 717 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1088001LP | 8/18/2011 | 673 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1077001LP | 1/19/2012 | 519 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1080001LP | 3/1/2012 | 477 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1082001LP | 4/4/2012 | 443 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1069001LP | 4/30/2012 | 417 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1081001U | 5/29/2012 | 388 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1076001U | 7/6/2012 | 350 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1011001L | 7/12/2012 | 344 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1005001L | 7/16/2012 | 340 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1074001U | 7/18/2012 | 338 | 7/18/2012 | 339 |
| | | PSU | | | A SCU 1020001L | 7/19/2012 | 337 | 7/19/2012 | 338 |
| | | PSU | | | A SCU 1062001LP | 9/12/2012 | 282 | 9/30/2012 | 265 |
| | | PSU | | | A SCU 1075001U | 10/4/2012 | 260 | 10/4/2012 | 261 |
| | | PSU | | | A SCU 1008001L | 10/19/2012 | 245 | 10/21/2012 | 244 |
| | | PSU | | | A SCU 1068001LP | 11/7/2012 | 226 | 11/8/2012 | 226 |
| | | PSU | | | A SCU 1070001LP | 12/21/2012 | 182 | 12/23/2012 | 181 |
| | | PSU | | | A SCU 1087001U | 1/10/2013 | 162 | 1/13/2013 | 160 |
| | | PSU | | | A SCU 1093001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | PSU | | | A SCU 1087001LP | 1/14/2013 | 158 | 1/24/2013 | 149 |
| | | PSU | | | A SCU 1095001LP | 1/15/2013 | 157 | 1/15/2013 | 158 |
| | | PSU | | | A SCU 1014001L | 1/17/2013 | 155 | 2/20/2013 | 122 |
| | | PSU | | | A SCU 1009001L | 1/30/2013 | 142 | 1/30/2013 | 143 |
| | | PSU | | | A SCU 1067001U | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | PSU | | | A SCU 1084001LP | 2/12/2013 | 129 | 2/12/2013 | 130 |
| | | PSU | | | A SCU 1006001L | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | PSU | | | A SCU 1064001LP | 2/26/2013 | 115 | 2/26/2013 | 116 |
| | | PSU | | | A SCU 1060001U | 3/4/2013 | 109 | 3/20/2013 | 94 |
| | | PSU | | | A SCU 1083001LP | 3/6/2013 | 107 | 3/6/2013 | 108 |
| | | PSU | | | A SCU 1059001LP | 3/14/2013 | 99 | 3/14/2013 | 100 |
| | | PSU | | | A SCU 1099001LP | 3/14/2013 | 99 | 3/20/2013 | 94 |
| | | PSU | | A | A SCU 1086001U | 3/17/2013 | 96 | 3/17/2013 | 97 |
| | | PSU | X | | A SCU 1099001LP | 3/19/2013 | 94 | 3/19/2013 | 95 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-30

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| LAC | CCCMS | Ad-Seg | | | A 005 2233001L | 1/19/2012 | 519 | 1/29/2012 | 510 |
| | | Ad-Seg | | ET | A 005 2247001L | 4/20/2012 | 427 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 005 2215001L | 5/18/2012 | 399 | 7/18/2012 | 339 |
| | | Ad-Seg | | | A 005 2210001L | 6/1/2012 | 385 | 6/3/2012 | 384 |
| | | Ad-Seg | | | A 005 1143001U | 6/21/2012 | 365 | 6/21/2012 | 366 |
| | | Ad-Seg | | | A 005 2211001U | 7/5/2012 | 351 | 7/5/2012 | 352 |
| | | Ad-Seg | | GO Z | 001 1177001L | 7/13/2012 | 343 | 1/21/2013 | 152 |
| | | Ad-Seg | | | A 005 2245001L | 7/30/2012 | 326 | 8/1/2012 | 325 |
| | | Ad-Seg | | | A 005 1123001L | 8/4/2012 | 321 | 8/5/2012 | 321 |
| | | Ad-Seg | | | A 004 2230001L | 8/5/2012 | 320 | 8/5/2012 | 321 |
| | | Ad-Seg | | | A 005 1101001U | 9/17/2012 | 277 | 9/20/2012 | 275 |
| | | Ad-Seg | | | A 004 1101001U | 9/27/2012 | 267 | 9/27/2012 | 268 |
| | | Ad-Seg | | | A 004 1133001L | 9/29/2012 | 265 | 9/30/2012 | 265 |
| | | Ad-Seg | | | A 004 1140001U | 10/16/2012 | 248 | 10/22/2012 | 243 |
| | | Ad-Seg | | | A 005 1117001L | 10/23/2012 | 241 | 10/24/2012 | 241 |
| | | Ad-Seg | | | A 004 2246001L | 11/7/2012 | 226 | 11/7/2012 | 227 |
| | | Ad-Seg | | | A 004 1130001L | 11/28/2012 | 205 | 12/27/2012 | 177 |
| | | Ad-Seg | | | A 004 1131001L | 12/3/2012 | 200 | 12/3/2012 | 201 |
| | | Ad-Seg | | | A 005 2204001L | 12/3/2012 | 200 | 12/5/2012 | 199 |
| | | Ad-Seg | | | A 004 2229001L | 12/6/2012 | 197 | 12/6/2012 | 198 |
| | | Ad-Seg | | | A 005 1131001L | 12/14/2012 | 189 | 12/16/2012 | 188 |
| | | Ad-Seg | | | A 004 1150001L | 12/14/2012 | 189 | 12/16/2012 | 188 |
| | | Ad-Seg | | | A 005 2212001U | 12/18/2012 | 185 | 12/18/2012 | 186 |
| | | Ad-Seg | | | A 005 1130001L | 12/26/2012 | 177 | 1/8/2013 | 165 |
| | | Ad-Seg | | | A 005 1128001L | 12/28/2012 | 175 | 12/30/2012 | 174 |
| | | Ad-Seg | | | A 004 2201001L | 12/29/2012 | 174 | 12/30/2012 | 174 |
| | | Ad-Seg | | | A 005 1127001L | 12/29/2012 | 174 | 12/30/2012 | 174 |
| | | Ad-Seg | | | A 005 1101001L | 1/1/2013 | 171 | 1/1/2013 | 172 |
| | | Ad-Seg | | | A 005 1107001L | 1/5/2013 | 167 | 1/6/2013 | 167 |
| | | Ad-Seg | | | A 005 2201001L | 1/9/2013 | 163 | 1/9/2013 | 164 |
| | | Ad-Seg | | | A 004 1108001L | 1/9/2013 | 163 | 1/9/2013 | 164 |
| | | Ad-Seg | | N | A 004 1121001L | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | Ad-Seg | | | A 004 1141001U | 1/11/2013 | 161 | 1/13/2013 | 160 |
| | | Ad-Seg | | | A 005 2250001L | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | A 005 2250001U | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | | | A 005 1101001L | 1/16/2013 | 156 | 6/6/2013 | 16 |
| | | Ad-Seg | | | A 004 1140001L | 1/16/2013 | 156 | 1/16/2013 | 157 |
| | | Ad-Seg | | | A 005 1142001L | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | Ad-Seg | | | A 005 1125001L | 1/17/2013 | 155 | 1/17/2013 | 156 |
| | | Ad-Seg | | | A 005 1150001L | 1/20/2013 | 152 | 1/21/2013 | 152 |
| | | Ad-Seg | | A | A 005 2237001L | 1/25/2013 | 147 | 1/27/2013 | 146 |
| | | Ad-Seg | E | | A 004 2230001L | 1/25/2013 | 147 | 1/27/2013 | 146 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected by SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-31

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| LAC | CCCMS | Ad-Seg | | | A 004 2250001L | 1/28/2013 | 144 | 1/28/2013 | 145 |
| | | Ad-Seg | | | A 004 2245001L | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | Ad-Seg | | | A 004 1119001L | 2/12/2013 | 129 | 2/12/2013 | 130 |
| | | Ad-Seg | | | A 004 1122001L | 2/19/2013 | 122 | 2/20/2013 | 122 |
| | | Ad-Seg | | | A 005 1145001U | 2/23/2013 | 118 | 2/24/2013 | 118 |
| | | Ad-Seg | | | A 005 2207001L | 2/24/2013 | 117 | 3/13/2013 | 101 |
| | | Ad-Seg | | | A 004 2223001L | 2/24/2013 | 117 | 2/24/2013 | 118 |
| | | Ad-Seg | | LD | A 005 1134001U | 2/27/2013 | 114 | 2/27/2013 | 115 |
| | | Ad-Seg | | | A 005 2232001L | 2/28/2013 | 113 | 3/3/2013 | 111 |
| | | Ad-Seg | | Z | A 004 1112001L | 2/28/2013 | 113 | 2/28/2013 | 114 |
| | | Ad-Seg | | N | A 005 1113001L | 3/1/2013 | 112 | 3/3/2013 | 111 |
| | | Ad-Seg | | | A 005 1136001U | 3/2/2013 | 111 | 3/3/2013 | 111 |
| | | Ad-Seg | | Z | A 004 1115001U | 3/3/2013 | 110 | 3/3/2013 | 111 |
| | | Ad-Seg | | | A 005 1139001L | 3/12/2013 | 101 | 3/12/2013 | 102 |
| | | Ad-Seg | | | A 004 2244001L | 3/15/2013 | 98 | 3/17/2013 | 97 |
| | | Ad-Seg | | | A 004 1131001L | 3/16/2013 | 97 | 3/28/2013 | 86 |
| | | Ad-Seg | | | A 005 2225001U | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | A 005 2225001L | 3/19/2013 | 94 | 3/19/2013 | 95 |
| | | Ad-Seg | | | Z 001 1137001L | 3/20/2013 | 93 | 3/24/2013 | 90 |
| | | Ad-Seg | | | A 005 1136001U | 3/20/2013 | 93 | 3/20/2013 | 94 |
| | | Ad-Seg | | | Z 001 1173001U | 3/20/2013 | 93 | 4/10/2013 | 73 |
| | | Ad-Seg | | | A 004 2236001L | 3/20/2013 | 93 | 3/20/2013 | 94 |
| | | Ad-Seg | | | A 005 1146001L | 3/21/2013 | 92 | 4/16/2013 | 67 |
| | | Ad-Seg | | | A 005 1102001L | 3/22/2013 | 91 | 3/24/2013 | 90 |
| | EOP | Ad-Seg | | | A 004 1112001L | 8/28/2012 | 297 | 8/29/2012 | 297 |
| | | Ad-Seg | | | A 004 1128001L | 10/10/2012 | 254 | 10/10/2012 | 255 |
| | | Ad-Seg | | | A 004 1140001L | 10/15/2012 | 249 | 10/15/2012 | 250 |
| | | Ad-Seg | | | A 004 2248001L | 11/6/2012 | 227 | 4/2/2013 | 81 |
| | | Ad-Seg | | | A 004 2212001L | 11/14/2012 | 219 | 11/15/2012 | 219 |
| | | Ad-Seg | | Z | A 004 2213001L | 11/30/2012 | 203 | 12/2/2012 | 202 |
| | | Ad-Seg | | | A 004 2202001L | 12/4/2012 | 199 | 12/6/2012 | 198 |
| | | Ad-Seg | | | A 004 1104001L | 12/7/2012 | 196 | 12/11/2012 | 193 |
| | | Ad-Seg | | | A 004 1120001L | 1/7/2013 | 165 | 1/7/2013 | 166 |
| | | Ad-Seg | | | A 004 2249001L | 1/8/2013 | 164 | 1/9/2013 | 164 |
| | | Ad-Seg | | | A 004 2241001L | 1/8/2013 | 164 | 1/9/2013 | 164 |
| | | Ad-Seg | | | A 004 2219001U | 1/10/2013 | 162 | 1/27/2013 | 146 |
| | | Ad-Seg | | | A 005 2214001L | 1/30/2013 | 142 | 6/6/2013 | 16 |
| | | Ad-Seg | | | A 004 1149001L | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | Ad-Seg | | | A 004 2238001L | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | Ad-Seg | | | A 004 1149001L | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | Ad-Seg | | ES | A 004 1125001L | 3/8/2013 | 105 | 3/20/2013 | 94 |
| | | Ad-Seg | J | | A 004 1116001L | 3/9/2013 | 104 | 3/10/2013 | 104 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-32

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| LAC | EOP | Ad-Seg | | | A 004 1139001L | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | A 004 2206001L | 3/13/2013 | 100 | 3/13/2013 | 101 |
| | | Ad-Seg | | | A 004 1120001L | 3/13/2013 | 100 | 3/13/2013 | 101 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

*R10-33*

Health Care Placement Oversight Program
*6/21/2013*

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| RJD | CCCMS | Ad-Seg | E | | B 006 2248001LP | 1/31/2012 | 507 | 2/21/2012 | 487 |
| | | Ad-Seg | C | | B 006 1123001LP | 6/19/2012 | 367 | 6/19/2012 | 368 |
| | | Ad-Seg | H | | B 007 2205001LP | 6/28/2012 | 358 | 7/1/2012 | 356 |
| | | Ad-Seg | V | | B 007 2223001LP | 10/23/2012 | 241 | 10/24/2012 | 241 |
| | | Ad-Seg | J | | B 007 1124001LP | 11/4/2012 | 229 | 11/4/2012 | 230 |
| | | Ad-Seg | J | | B 007 2224001LP | 11/15/2012 | 218 | 11/15/2012 | 219 |
| | | Ad-Seg | A | | B 007 1119001LP | 11/16/2012 | 217 | 12/5/2012 | 199 |
| | | Ad-Seg | V | | B 007 2248001LP | 11/21/2012 | 212 | 11/25/2012 | 209 |
| | | Ad-Seg | V | | B 007 1110001UP | 11/23/2012 | 210 | 12/4/2012 | 200 |
| | | Ad-Seg | H | | B 007 2238001LP | 12/7/2012 | 196 | 1/3/2013 | 170 |
| | | Ad-Seg | A | | B 007 2235001LP | 12/28/2012 | 175 | 12/30/2012 | 174 |
| | | Ad-Seg | V | | B 006 2241001UP | 1/10/2013 | 162 | 1/10/2013 | 163 |
| | | Ad-Seg | A | | B 007 2225001LP | 1/11/2013 | 161 | 1/13/2013 | 160 |
| | | Ad-Seg | T | ON | B 007 1107001LP | 1/14/2013 | 158 | 1/14/2013 | 159 |
| | | Ad-Seg | A | | B 007 1145001LP | 1/24/2013 | 148 | 1/24/2013 | 149 |
| | | Ad-Seg | A | EZ | B 007 1110001LP | 2/3/2013 | 138 | 2/3/2013 | 139 |
| | | Ad-Seg | H | | B 007 1147001LP | 2/4/2013 | 137 | 2/4/2013 | 138 |
| | | Ad-Seg | A | | B 007 2202001LP | 2/7/2013 | 134 | 2/7/2013 | 135 |
| | | Ad-Seg | F | L | B 007 1108001LP | 2/13/2013 | 128 | 4/29/2013 | 54 |
| | | Ad-Seg | A | | B 006 2233001LP | 2/18/2013 | 123 | 2/18/2013 | 124 |
| | | Ad-Seg | T | | B 006 2250001LP | 2/20/2013 | 121 | 2/20/2013 | 122 |
| | | Ad-Seg | F | | B 007 1103001LP | 2/21/2013 | 120 | 2/21/2013 | 121 |
| | | Ad-Seg | V | | B 006 2232001LP | 2/22/2013 | 119 | 3/6/2013 | 108 |
| | | Ad-Seg | F | Z | B 007 1105001LP | 2/23/2013 | 118 | 2/24/2013 | 118 |
| | | Ad-Seg | T | | B 006 1127001LP | 3/3/2013 | 110 | 3/3/2013 | 111 |
| | | Ad-Seg | A | | B 006 2229001LP | 3/7/2013 | 106 | 3/7/2013 | 107 |
| | | Ad-Seg | H | EZ | B 007 1128001LP | 3/8/2013 | 105 | 3/20/2013 | 94 |
| | | Ad-Seg | G | | B 007 2246001LP | 3/18/2013 | 95 | 3/18/2013 | 96 |
| | | Ad-Seg | E | NE | B 007 1134001LP | 3/18/2013 | 95 | 3/18/2013 | 96 |
| | | Ad-Seg | A | | B 007 1138001LP | 3/18/2013 | 95 | 3/18/2013 | 96 |
| | | Ad-Seg | F | | B 007 1145001LP | 3/21/2013 | 92 | 3/21/2013 | 93 |
| | EOP | Ad-Seg | G | A | B 006 2247001LP | 6/1/2012 | 385 | 6/3/2012 | 384 |
| | | Ad-Seg | F | G | B 006 1134001LP | 11/26/2012 | 207 | 11/26/2012 | 208 |
| | | Ad-Seg | J | Z | B 006 1128001LP | 11/28/2012 | 205 | 11/28/2012 | 206 |
| | | Ad-Seg | F | | B 006 2229001LP | 12/2/2012 | 201 | 12/4/2012 | 200 |
| | | Ad-Seg | G | | B 006 2222001LP | 12/9/2012 | 194 | 12/9/2012 | 195 |
| | | Ad-Seg | T | | B 006 1136001LP | 12/26/2012 | 177 | 12/26/2012 | 178 |
| | | Ad-Seg | H | | B 006 1103001LP | 2/6/2013 | 135 | 2/6/2013 | 136 |
| | | Ad-Seg | E | | B 006 1128001LP | 2/9/2013 | 132 | 2/10/2013 | 132 |
| | | Ad-Seg | T | | B 006 1129001LP | 2/25/2013 | 116 | 2/25/2013 | 117 |
| | | Ad-Seg | H | | B 006 1137001LP | 3/11/2013 | 102 | 3/11/2013 | 103 |
| | | Ad-Seg | G | EMA | B 006 2206001LP | 3/15/2013 | 98 | 3/20/2013 | 94 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
6/21/2013

R10-34

Exhibit F

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

| From: | To: | |
|---|---|---|
| Setting/Level of care | Setting/Level of Care | Timeline for Transfer |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH. (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH. (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required. Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

Exhibit G

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

Brief Psychotic Disorder
Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)
Psychotic Disorder Due To A General Medical Condition
Psychotic Disorder Not Otherwise Specified
Major Depressive Disorders
Bipolar Disorders I and II

2. <u>Medical Necessity</u>:  Mental health treatment shall be provided as needed.  Treatment is continued as needed, after review by the Interdisciplinary Treatment Team (IDTT), for all cases in which:

**Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with, or suspected of having, a mental disorder.  Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

**Specific Treatment Criteria for MHCB**

In addition to the overall treatment criteria above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

**D.  REFERRAL AND TRANSFER**

**Referrals**

An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to a MHCB.

**MHCB Transfer**

If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be

| Mental Health Crisis Bed | Mental Health Services Delivery System |

transferred to a designated MHCB institution. The inmate-patient shall be transferred within 24 hours of referral.

(See Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 3, Health Care Transfer Process* and *Volume 6, Chapter 18, Transfer of Patient Health Records Within CDCR; Institution to Institution*, for specific requirements concerning transfers and Unit Health Records)

If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours. On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed. **The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed.**

MHCB transfers shall be done under authority as "Emergency Medical Transfers" (Department Operations Manual [DOM] 62080.17). Since MHCB transfers are typically viewed as emergency moves, they do not require classification committee action or Classification Staff Representative (CSR) endorsement. MHCB transfers shall be done on a "Psychiatric and Return" basis.

Generally, the transfer process shall be initiated by the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health.

The transferring psychiatrist, psychologist, or Chief of Mental Health shall determine whether the inmate-patient is "medically cleared" to transfer. State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported. The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer. The CCR provides, in part, that a transfer or discharge may not be carried out if, in the opinion of the inmate-patient's physician, such transfer or discharge would create a medical hazard. The transferring physician must initially evaluate the relative benefits and risks associated with transporting the inmate-patient. The determination of whether the transfer creates an unacceptable risk or a "medical hazard" will depend upon the inmate-patient's condition, the expected benefits to the inmate-patient if he or she is transferred, and whether the risks to the inmate-patient's health are outweighed by the benefits.

The receiving facility must consent to the transfer. CCR, Title XXII, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has

consented to accept the patient. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless arrangements have been made in advance for admission to a health facility. Therefore, the transferring clinician must secure the receiving health facility's approval in advance for the inmate-patient's admission. The transferring clinician shall document in the inmate-patient's Unit Health Record (UHR) that approval was obtained and from whom.

Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

1.  Inpatient beds

2.  Outpatient Housing Unit

3.  Outpatient Housing Unit overflow cells

4.  Large holding cells with water/toilets including, but not limited to, "ZZ cells," "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.

5.  Large holding cells without water/toilets such as "Contraband Cells" (not in a CTC licensed area)

6.  Triage and Treatment Area or other clinic physical examining room

7.  Other unit-housing where complete and constant visibility can be maintained

8.  When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate-patients shall be retained in sit/stand cells only with approval of the watch commander and notification of on-call clinical staff.

9.  Holding cells within the licensed bed area of the CTC building (notification to Department of Health Services of an unusual occurrence is required)

All inmates-patients housed in one of the above sites while pending transfer to a MHCB shall be provided, at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. If the inmate-patient subsequently attempts to use any or all of these items

| Mental Health Crisis Bed | Mental Health Services Delivery System |

to harm him or herself, a clinician may then order that one or more of these items be removed. Inmate-patients who are subsequently returned to their housing units shall receive appropriate clinical follow-up, which may include five-day custody and clinical wellness checks.

When an inmate-patient, identified as requiring MHCB care, is housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any of the above sites, the HCPOP shall be notified of the need for MHCB placement.

**Procedure**

The Chief of Mental Health or designee at the sending institution shall contact the MHCB Clinical Director or designee at the receiving institution to obtain approval for the transfer.

In cases where the Clinical Director or designee at the receiving institution does not agree to the transfer, and the Chief of Mental Health at the sending institution believes the clinical need for transfer remains, the case shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance. If an agreement cannot be reached, the inmate shall be admitted and evaluated.

Upon receipt of approval to transfer, from the MHCB Clinical Director or designee at the receiving institution, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance. Copies of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental,* shall be forwarded to the MHCB Clinical Director or designee at the receiving institution and the Classification & Parole Representative (C&PR) at the sending institution.

The C&PR at the sending institution shall forward a copy of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, to the C&PR at the receiving institution.

The Chief of Mental Health or designee, MHCB Clinical Director or designee, and the C&PRs at both the sending and receiving institutions shall communicate to ensure all health care/classification/transportation aspects are addressed. The escort needs for each transport are different given the variation of custody and health care concerns that may arise. At times, the transportation may be accomplished with just custody staff. However, occasions do arise when a combination of custody and clinical staff are needed to accompany an escort. This may occur when the inmate-patient has highly sensitive and varying medication needs or when the presence of a clinical staff member may substantially reduce decompensating or disruptive inmate-patient behavior during transportation.

Exhibit H

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



August 1, 2013

Matthew A. Lopes, Jr. Esquire                              via: Debbie J. Vorous, Esquire
Office of the Special Master                                     Deputy Attorney General
Pannone Lopes & Devereaux LLC                          Department of Justice
317 Iron Horse Point Way, Suite 301                     1300 "I" Street, Suite 125
Providence, RI  02908                                           P. O. Box 944255
                                                                           Sacramento, CA  94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of June, 2013, data (or as otherwise noted).  The following is the list of enclosures:

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2. MHSDS Hiring Activity Report.
3. Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7. Referrals for Transfer to the Department of State Hospitals (DSH), (including admissions).
8. Atascadero State Hospital (ASH) Discharges.
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of State Hospitals (DSH) Monthly Report of CDCR Patients in DSH Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**

Matthew A. Lopes, Jr. Esquire
Page 2

15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison, San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
    Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Linda Holden, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert
     Paul Nicoll, MPA, *Coleman* Monitor
     Mary Perrien, Ph.D., *Coleman* Expert
     Kathryn A. Burns, M.D., MPH, *Coleman* Expert
     Henry A. Dlugacz, Esq., *Coleman* Expert
     Kerry F. Walsh, Esq., *Coleman* Monitor
     Patricia Williams, Esq., *Coleman* Monitor
     Haunani Henry, *Coleman* Monitor
     Debbie Vorous, Esq., Office of the Attorney General
     Nicholas Weber, Esq, Office of Legal Affairs, CDCR
     Michael Stone, Esq., Office of Legal Affairs, CDCR
     Michael Bien, Esq., Rosen, Bien and Galvan
     Donald Specter, Esq., Prison Law Office

Matthew A. Lopes, Jr. Esquire
Page 3

Judy Burleson, Associate Director, Statewide Mental Health Program, Division of
Health Care Services (DHCS)

Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS

Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health
Program, DCHCS

Teresa Owens, Associate Governmental Program Analyst, Quality Management,
DHCS

State of California                                California Department of Corrections and Rehabilitation

# Memorandum

Date:    July 30, 2013

To:      Tim Belavich
         Director (A)
         Division of Health Care Services

Subject:  **SUMMARY OF INTER-INSTITUTIONAL MENTAL HEALTH CRISIS BED REFERRALS
          AND TRANSFERS FOR JUNE 2013**

Attached are summaries regarding the number of Mental Health Crisis Bed (MHCB) referrals and placements coordinated by Health Care Placement Oversight Program (HC-POP) staff. During the month of **June 2013**, there were **538 MHCB** referrals. Of the **538** referrals, **173** were placed. The **365** not placed (**68%** of those referred) were rescinded by the referring clinician. Of the **365** rescinded, **181** no longer required MHCB treatment, **183** were placed in a MHCB internally, and **one** was not medically cleared to transport.

**Attachment 1** summarizes the referrals/transfers/rescinded cases by sending institution and previous levels of care. Additionally, every referral is tallied by classification score.

**Attachment 2A (5 pages)** provides additional details of the completed referrals/transfers, including transfer timeframes, average number of days waiting to transfer, and prior level of care. For the **173** transferred, the average number of days waiting was **2.06**. Of the **173** transferred, **58** cases were transferred within the required 24 hours.

**Attachment 2B (9 pages)** provides details regarding those MHCB referrals rescinded by the referring institution. **Attachment 2C** summarizes the cases rescinded.

**Attachment 3** summarizes, by institution, the average number of days referrals waited before being transferred or rescinded.

Please let me know if you have any questions about the information provided.

*Original Signed By*
**Robert M. Calderon**
Chief/Associate Warden
Health Care Placement Oversight Program
Division of Health Care Services

Attachments

cc:    Health Care Regional Administrators
       Mental Health Regional Administrators
       Michael Morrison
       Cathy Jefferson
       HC-POP Staff

**SUMMARY**
**TRANSFERRED AND RESCINDED MHCB REFERRALS**
**BY INSTITUTION AND PRIOR LEVEL OF CARE**
**JUNE 2013**

### TOTAL REFERRALS

| | CCCMS | EOP | MHCB | GP | DSH | TOTAL | % TTL |
|---|---|---|---|---|---|---|---|
| ASP | 8 | 0 | 0 | 1 | 0 | 9 | 1.67% |
| CAL | 1 | 1 | 0 | 5 | 0 | 7 | 1.30% |
| CCI | 6 | 0 | 0 | 1 | 0 | 7 | 1.30% |
| CEN | 2 | 0 | 0 | 4 | 0 | 6 | 1.12% |
| CIM | 2 | 4 | 0 | 0 | 0 | 6 | 1.12% |
| CIM-RC | 0 | 0 | 0 | 1 | 0 | 1 | 0.19% |
| CMC | 9 | 21 | 0 | 2 | 0 | 32 | 5.95% |
| CMF | 1 | 18 | 0 | 0 | 0 | 19 | 3.53% |
| CMF-DSH | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| COR | 2 | 4 | 0 | 1 | 0 | 7 | 1.30% |
| COR-DSH | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| CTF | 2 | 0 | 0 | 1 | 0 | 3 | 0.56% |
| CVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| DVI | 9 | 4 | 0 | 2 | 0 | 15 | 2.79% |
| DVI-RC | 4 | 2 | 0 | 0 | 0 | 6 | 1.12% |
| FOL | 5 | 0 | 0 | 10 | 0 | 15 | 2.79% |
| HDSP | 2 | 0 | 0 | 0 | 0 | 2 | 0.37% |
| ISP | 2 | 0 | 0 | 0 | 0 | 2 | 0.37% |
| KVSP | 10 | 5 | 0 | 4 | 0 | 19 | 3.53% |
| LAC | 24 | 21 | 1 | 2 | 0 | 48 | 8.92% |
| NKSP | 10 | 9 | 0 | 4 | 0 | 23 | 4.28% |
| NKSP-RC | 21 | 6 | 0 | 13 | 0 | 40 | 7.43% |
| PBSP | 4 | 6 | 0 | 1 | 0 | 11 | 2.04% |
| PVSP | 10 | 0 | 0 | 0 | 0 | 10 | 1.86% |
| RJD | 13 | 15 | 0 | 0 | 0 | 28 | 4.83% |
| SAC | 76 | 9 | 1 | 4 | 0 | 90 | 16.73% |
| SATF | 10 | 9 | 0 | 4 | 0 | 23 | 4.28% |
| SCC | 3 | 0 | 0 | 1 | 0 | 4 | 0.74% |
| SOL | 2 | 0 | 0 | 1 | 0 | 3 | 0.56% |
| SQ | 4 | 1 | 0 | 0 | 0 | 5 | 0.93% |
| SVSP | 15 | 18 | 0 | 1 | 0 | 34 | 6.32% |
| VSP | 0 | 3 | 0 | 0 | 0 | 3 | 0.56% |
| WSP | 7 | 13 | 0 | 3 | 0 | 23 | 4.28% |
| WSP-RC | 15 | 11 | 0 | 13 | 0 | 39 | 7.25% |
| **TOTAL** | 215 | 245 | 2 | 74 | 2 | 538 | 100.00% |
| **% TTL** | 39.96% | 45.54% | 0.37% | 13.75% | 0.37% | | 100.00% |

### REFERRED AND TRANSFERRED

| | CCCMS | EOP | MHCB | GP | DSH | TOTAL | % TTL |
|---|---|---|---|---|---|---|---|
| ASP | | | | | | 7 | 4.05% |
| CAL | | | | | | 7 | 4.05% |
| CCI | | | | | | 7 | 4.05% |
| CEN | | | | | | 4 | 2.31% |
| CIM | | | | | | 0 | 0.00% |
| CIM-RC | | | | | | 0 | 0.00% |
| CMC | | | | | | 2 | 1.16% |
| CMF | | | | | | 2 | 1.16% |
| CMF-DSH | | | | | | 0 | 0.00% |
| COR | | | | | | 0 | 0.00% |
| COR-DSH | | | | | | 0 | 0.00% |
| CTF | | | | | | 3 | 1.73% |
| CVSP | | | | | | 0 | 0.00% |
| DVI | | | | | | 14 | 8.09% |
| DVI-RC | | | | | | 4 | 2.31% |
| FOL | | | | | | 2 | 1.16% |
| HDSP | | | | | | 0 | 0.00% |
| ISP | | | | | | 0 | 0.00% |
| KVSP | | | | | | 2 | 1.16% |
| LAC | | | | | | 19 | 10.98% |
| NKSP | | | | | | 13 | 7.51% |
| NKSP-RC | | | | | | 27 | 15.61% |
| PBSP | | | | | | 4 | 2.31% |
| PVSP | | | | | | 3 | 1.73% |
| RJD | | | | | | 6 | 3.47% |
| SAC | | | | | | 3 | 1.73% |
| SATF | | | | | | 3 | 1.73% |
| SCC | | | | | | 2 | 1.16% |
| SOL | | | | | | 0 | 0.00% |
| SQ | | | | | | 3 | 1.73% |
| SVSP | | | | | | 8 | 4.62% |
| VSP | | | | | | 2 | 1.16% |
| WSP | | | | | | 10 | 5.78% |
| WSP-RC | | | | | | 16 | 9.25% |
| **TOTAL** | 84 | 53 | 0 | 36 | 0 | 173 | 100.00% |
| **% TTL** | 48.55% | 30.64% | 0.00% | 20.81% | 0.00% | | 100.00% |

### REFERRED AND RESCINDED

| | CCCMS | EOP | MHCB | GP | DSH | TOTAL | % TTL |
|---|---|---|---|---|---|---|---|
| ASP | | | | | | 2 | 0.55% |
| CAL | | | | | | 0 | 0.00% |
| CCI | | | | | | 0 | 0.00% |
| CEN | | | | | | 2 | 0.55% |
| CIM | | | | | | 6 | 1.64% |
| CIM-RC | | | | | | 1 | 0.27% |
| CMC | | | | | | 30 | 8.22% |
| CMF | | | | | | 17 | 4.66% |
| CMF-DSH | | | | | | 0 | 0.00% |
| COR | | | | | | 7 | 1.92% |
| COR-DSH | | | | | | 0 | 0.00% |
| CTF | | | | | | 0 | 0.00% |
| CVSP | | | | | | 0 | 0.00% |
| DVI | | | | | | 1 | 0.27% |
| DVI-RC | | | | | | 2 | 0.55% |
| FOL | | | | | | 13 | 3.56% |
| HDSP | | | | | | 2 | 0.55% |
| ISP | | | | | | 2 | 0.55% |
| KVSP | | | | | | 17 | 4.66% |
| LAC | | | | | | 29 | 7.95% |
| NKSP | | | | | | 10 | 2.74% |
| NKSP-RC | | | | | | 13 | 3.56% |
| PBSP | | | | | | 7 | 1.92% |
| PVSP | | | | | | 7 | 1.92% |
| RJD | | | | | | 22 | 6.03% |
| SAC | | | | | | 87 | 23.84% |
| SATF | | | | | | 20 | 5.48% |
| SCC | | | | | | 2 | 0.55% |
| SOL | | | | | | 3 | 0.82% |
| SQ | | | | | | 2 | 0.55% |
| SVSP | | | | | | 26 | 7.12% |
| VSP | | | | | | 1 | 0.27% |
| WSP | | | | | | 13 | 3.56% |
| WSP-RC | | | | | | 23 | 6.30% |
| **TOTAL** | 131 | 192 | 2 | 38 | 2 | 365 | 100.00% |
| **% TTL** | 35.89% | 52.60% | 0.55% | 10.41% | 0.55% | | 100.00% |

### Referrals by Classification Score

| Classification Score | Total |
|---|---|
| 0-18 | 77 |
| 19-35 | 120 |
| 36-59 | 69 |
| 60+ | 250 |
| TOTAL | 516 |
| Not Calc | 22 |
| Grand TTL | 538 |

MHCB TRANSFERS BY INSTITUTION AND PRIOR LEVEL OF CARE
JUNE 2013

| Transferred From | Transferred To | Referral Date | Transfer Date | Prior LOC | Days Waiting* |
|---|---|---|---|---|---|
| ASP | CIM | 6/3/2013 | 6/6/2013 | CCCMS | 3 |
| ASP | CIM | 6/4/2013 | 6/6/2013 | CCCMS | 2 |
| ASP | CIM | 6/18/2013 | 6/21/2013 | CCCMS | 3 |
| ASP | RJD | 6/8/2013 | 6/12/2013 | CCCMS | 4 |
| ASP | SATF | 6/27/2013 | 6/28/2013 | CCCMS | 1 |
| ASP | SOL | 6/4/2013 | 6/6/2013 | CCCMS | 2 |
| ASP | SVSP | 6/19/2013 | 6/21/2013 | GP/OP | 2 |
| **ASP Average** | | | | | **2.43** |
| CAL | KVSP | 6/19/2013 | 6/21/2013 | CCCMS | 2 |
| CAL | RJD | 6/24/2013 | 6/28/2013 | EOP | 4 |
| CAL | CMC | 6/7/2013 | 6/8/2013 | GP/OP | 1 |
| CAL | PVSP | 6/15/2013 | 6/19/2013 | GP/OP | 4 |
| CAL | SATF | 6/1/2013 | 6/2/2013 | GP/OP | 1 |
| CAL | SATF | 6/15/2013 | 6/19/2013 | GP/OP | 4 |
| CAL | SVSP | 6/7/2013 | 6/8/2013 | GP/OP | 1 |
| **CAL Average** | | | | | **2.43** |
| CCI | CCI | 6/4/2013 | 6/6/2013 | CCCMS | 2 |
| CCI | CIM | 6/1/2013 | 6/3/2013 | CCCMS | 2 |
| CCI | CMF | 6/10/2013 | 6/13/2013 | CCCMS | 3 |
| CCI | CMF | 6/13/2013 | 6/17/2013 | CCCMS | 4 |
| CCI | HDSP | 6/14/2013 | 6/20/2013 | CCCMS | 6 |
| CCI | SOL | 6/19/2013 | 6/22/2013 | CCCMS | 3 |
| CCI | SATF | 6/3/2013 | 6/4/2013 | GP/OP | 1 |
| **CCI Average** | | | | | **3.00** |
| CEN | CMF | 6/12/2013 | 6/14/2013 | CCCMS | 2 |
| CEN | SQ | 6/23/2013 | 6/26/2013 | CCCMS | 3 |
| CEN | CMC | 5/31/2013 | 6/1/2013 | GP/OP | 1 |
| CEN | RJD | 6/6/2013 | 6/7/2013 | GP/OP | 1 |
| **CEN Average** | | | | | **1.75** |
| CMC | CMF | 6/13/2013 | 6/14/2013 | EOP | 1 |
| CMC | SVSP | 6/14/2013 | 6/15/2013 | EOP | 1 |
| **CMC Average** | | | | | **1.00** |
| CMF | RJD | 6/8/2013 | 6/12/2013 | EOP | 4 |
| CMF | SVSP | 6/3/2013 | 6/5/2013 | EOP | 2 |
| **CMF Average** | | | | | **3.00** |
| CTF | CMF | 6/22/2013 | 6/25/2013 | CCCMS | 3 |
| CTF | RJD | 6/5/2013 | 6/7/2013 | CCCMS | 2 |
| CTF | HDSP | 6/27/2013 | 6/29/2013 | EOP | 2 |
| **CTF Average** | | | | | **2.33** |
| DVI | CIM | 6/4/2013 | 6/6/2013 | CCCMS | 2 |
| DVI | CMF | 6/1/2013 | 6/2/2013 | CCCMS | 1 |
| DVI | CMF | 6/19/2013 | 6/21/2013 | CCCMS | 2 |
| DVI | CMF | 6/21/2013 | 6/21/2013 | CCCMS | 0 |
| DVI | CMF | 6/24/2013 | 6/27/2013 | CCCMS | 3 |
| DVI | DVI | 6/23/2013 | 6/26/2013 | CCCMS | 3 |
| DVI | PBSP | 6/14/2013 | 6/17/2013 | CCCMS | 3 |
| DVI | RJD | 6/1/2013 | 6/3/2013 | CCCMS | 2 |
| DVI | RJD | 6/8/2013 | 6/12/2013 | CCCMS | 4 |
| DVI | CMF | 6/10/2013 | 6/12/2013 | EOP | 2 |

*Days Waiting based on days between referral and an
MHCB becoming available.  Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

7/29/2013

MHCB TRANSFER BY INSTITUTION AND PRIOR LOC / MHCB PLACEMENT
JUNE 2013

| Transferred From | Transferred To | Referral Date | Transfer Date | Prior LOC | Days Waiting* |
|---|---|---|---|---|---|
| DVI | CMF | 6/19/2013 | 6/21/2013 | EOP | 2 |
| DVI | CMF | 6/23/2013 | 6/26/2013 | EOP | 3 |
| DVI | SAC | 6/12/2013 | 6/13/2013 | EOP | 1 |
| DVI | HDSP | 6/18/2013 | 6/20/2013 | GP/OP | 2 |
| **DVI Average** | | | | | **2.14** |
| DVI-RC | CMF | 6/6/2013 | 6/7/2013 | CCCMS | 1 |
| DVI-RC | CMF | 6/21/2013 | 6/22/2013 | CCCMS | 1 |
| DVI-RC | SQ | 6/23/2013 | 6/26/2013 | CCCMS | 3 |
| DVI-RC | SQ | 6/23/2013 | 6/26/2013 | CCCMS | 3 |
| **DVI-RC Average** | | | | | **2.00** |
| FOL | MCSP | 6/12/2013 | 6/12/2013 | GP/OP | 0 |
| FOL | SATF | 6/26/2013 | 6/27/2013 | GP/OP | 1 |
| **FOL Average** | | | | | **0.50** |
| ISP | KVSP | 6/10/2013 | 6/13/2013 | CCCMS | 3 |
| ISP | RJD | 6/5/2013 | 6/6/2013 | CCCMS | 1 |
| **ISP Average** | | | | | **2.00** |
| KVSP | CMF | 6/12/2013 | 6/14/2013 | CCCMS | 2 |
| KVSP | CMF | 6/23/2013 | 6/28/2013 | CCCMS | 5 |
| **KVSP Average** | | | | | **3.50** |
| LAC | CMF | 6/10/2013 | 6/13/2013 | CCCMS | 3 |
| LAC | CMF | 6/11/2013 | 6/13/2013 | CCCMS | 2 |
| LAC | CMF | 6/19/2013 | 6/21/2013 | CCCMS | 2 |
| LAC | HDSP | 6/7/2013 | 6/8/2013 | CCCMS | 1 |
| LAC | HDSP | 6/7/2013 | 6/8/2013 | CCCMS | 1 |
| LAC | RJD | 6/4/2013 | 6/6/2013 | CCCMS | 2 |
| LAC | RJD | 6/8/2013 | 6/12/2013 | CCCMS | 4 |
| LAC | SATF | 6/17/2013 | 6/19/2013 | CCCMS | 2 |
| LAC | WSP | 6/1/2013 | 6/3/2013 | CCCMS | 2 |
| LAC | CIM | 6/11/2013 | 6/12/2013 | EOP | 1 |
| LAC | CIM | 6/23/2013 | 6/26/2013 | EOP | 3 |
| LAC | CMF | 5/30/2013 | 6/2/2013 | EOP | 3 |
| LAC | CMF | 6/1/2013 | 6/3/2013 | EOP | 2 |
| LAC | CMF | 6/19/2013 | 6/21/2013 | EOP | 2 |
| LAC | PVSP | 6/16/2013 | 6/19/2013 | EOP | 3 |
| LAC | RJD | 5/30/2013 | 6/1/2013 | EOP | 2 |
| LAC | RJD | 6/5/2013 | 6/7/2013 | EOP | 2 |
| LAC | SQ | 6/11/2013 | 6/13/2013 | EOP | 2 |
| LAC | SQ | 6/21/2013 | 6/23/2013 | EOP | 2 |
| **LAC Average** | | | | | **2.16** |
| NKSP | CIM | 6/5/2013 | 6/7/2013 | CCCMS | 2 |
| NKSP | CMF | 6/21/2013 | 6/23/2013 | CCCMS | 2 |
| NKSP | NKSP | 6/18/2013 | 6/20/2013 | CCCMS | 2 |
| NKSP | PBSP | 6/4/2013 | 6/5/2013 | CCCMS | 1 |
| NKSP | PVSP | 6/12/2013 | 6/13/2013 | CCCMS | 1 |
| NKSP | SATF | 6/3/2013 | 6/5/2013 | CCCMS | 2 |
| NKSP | CMF | 6/1/2013 | 6/2/2013 | EOP | 1 |
| NKSP | RJD | 6/1/2013 | 6/2/2013 | EOP | 1 |
| NKSP | SATF | 6/3/2013 | 6/5/2013 | EOP | 2 |
| NKSP | SATF | 6/3/2013 | 6/5/2013 | EOP | 2 |

*Days Waiting based on days between referral and an
MHCB becoming available. Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

7/29/2013

| Transferred From | Transferred To | Referral Date | Transfer Date | Prior LOC | Days Waiting* |
|---|---|---|---|---|---|
| NKSP | SOL | 6/2/2013 | 6/4/2013 | EOP | 2 |
| NKSP | HDSP | 6/17/2013 | 6/20/2013 | GP/OP | 3 |
| NKSP | SOL | 6/14/2013 | 6/19/2013 | GP/OP | 5 |
| **NKSP Average** | | | | | **2.00** |
| NKSP-RC | CIM | 6/18/2013 | 6/21/2013 | CCCMS | 3 |
| NKSP-RC | CMF | 5/30/2013 | 6/1/2013 | CCCMS | 2 |
| NKSP-RC | CMF | 6/13/2013 | 6/14/2013 | CCCMS | 1 |
| NKSP-RC | CMF | 6/28/2013 | 6/29/2013 | CCCMS | 1 |
| NKSP-RC | HDSP | 6/7/2013 | 6/10/2013 | CCCMS | 3 |
| NKSP-RC | HDSP | 6/19/2013 | 6/21/2013 | CCCMS | 2 |
| NKSP-RC | KVSP | 6/16/2013 | 6/18/2013 | CCCMS | 2 |
| NKSP-RC | KVSP | 6/29/2013 | 6/29/2013 | CCCMS | 0 |
| NKSP-RC | MCSP | 6/13/2013 | 6/16/2013 | CCCMS | 3 |
| NKSP-RC | MCSP | 6/14/2013 | 6/16/2013 | CCCMS | 2 |
| NKSP-RC | MCSP | 6/14/2013 | 6/17/2013 | CCCMS | 3 |
| NKSP-RC | SAC | 6/6/2013 | 6/7/2013 | CCCMS | 1 |
| NKSP-RC | SVSP | 6/5/2013 | 6/6/2013 | CCCMS | 1 |
| NKSP-RC | SVSP | 6/14/2013 | 6/17/2013 | CCCMS | 3 |
| NKSP-RC | CMF | 6/25/2013 | 6/28/2013 | EOP | 3 |
| NKSP-RC | CMF | 6/27/2013 | 6/29/2013 | EOP | 2 |
| NKSP-RC | HDSP | 6/19/2013 | 6/21/2013 | EOP | 2 |
| NKSP-RC | PBSP | 6/24/2013 | 6/28/2013 | EOP | 4 |
| NKSP-RC | CIM | 6/24/2013 | 6/28/2013 | GP/OP | 4 |
| NKSP-RC | CMF | 6/5/2013 | 6/5/2013 | GP/OP | 0 |
| NKSP-RC | CMF | 6/6/2013 | 6/7/2013 | GP/OP | 1 |
| NKSP-RC | CMF | 6/6/2013 | 6/7/2013 | GP/OP | 1 |
| NKSP-RC | CMF | 6/10/2013 | 6/12/2013 | GP/OP | 2 |
| NKSP-RC | CMF | 6/24/2013 | 6/28/2013 | GP/OP | 4 |
| NKSP-RC | HDSP | 6/7/2013 | 6/10/2013 | GP/OP | 3 |
| NKSP-RC | KVSP | 6/10/2013 | 6/12/2013 | GP/OP | 2 |
| NKSP-RC | PBSP | 6/5/2013 | 6/6/2013 | GP/OP | 1 |
| **NKSP-RC Average** | | | | | **2.07** |
| PBSP | CMF | 6/6/2013 | 6/7/2013 | EOP | 1 |
| PBSP | CMF | 6/6/2013 | 6/7/2013 | EOP | 1 |
| PBSP | CMF | 6/21/2013 | 6/25/2013 | EOP | 4 |
| PBSP | SVSP | 6/7/2013 | 6/8/2013 | EOP | 1 |
| **PBSP Average** | | | | | **1.75** |
| PVSP | CMF | 5/31/2013 | 6/1/2013 | CCCMS | 1 |
| PVSP | LAC | 6/28/2013 | 6/28/2013 | CCCMS | 0 |
| PVSP | SATF | 6/1/2013 | 6/2/2013 | CCCMS | 1 |
| **PVSP Average** | | | | | **0.67** |
| RJD | SVSP | 6/18/2013 | 6/20/2013 | CCCMS | 2 |
| RJD | RJD | 6/15/2013 | 6/19/2013 | EOP | 4 |
| RJD | SAC | 6/18/2013 | 6/20/2013 | EOP | 2 |
| RJD | SATF | 6/17/2013 | 6/19/2013 | EOP | 2 |
| **RJD Average** | | | | | **2.50** |
| SAC | SOL | 6/21/2013 | 6/22/2013 | CCCMS | 1 |
| SAC | CIM | 6/1/2013 | 6/2/2013 | EOP | 1 |
| SAC | PBSP | 6/1/2013 | 6/1/2013 | EOP | 0 |

*Days Waiting based on days between referral and an
MHCB becoming available. Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

7/29/2013

MHCB TRANSFER BY INSTITUTION AND PRIOR LOC/LEVEL OF CARE
JUNE 2013

| Transferred From | Transferred To | Referral Date | Transfer Date | Prior LOC | Days Waiting* |
|---|---|---|---|---|---|
| **SAC Average** | | | | | **0.67** |
| SATF | CMF | 6/22/2013 | 6/25/2013 | CCCMS | 3 |
| SATF | SVSP | 6/23/2013 | 6/25/2013 | CCCMS | 2 |
| SATF | SVSP | 6/23/2013 | 6/25/2013 | EOP | 2 |
| **SATF Average** | | | | | **2.33** |
| SCC | HDSP | 6/17/2013 | 6/20/2013 | CCCMS | 3 |
| SCC | MCSP | 6/3/2013 | 6/4/2013 | GP/OP | 1 |
| **SCC Average** | | | | | **2.00** |
| SOL | CIM | 6/11/2013 | 6/14/2013 | CCCMS | 3 |
| **SOL Average** | | | | | **3.00** |
| SQ | CMF | 6/5/2013 | 6/7/2013 | CCCMS | 2 |
| SQ | PBSP | 6/17/2013 | 6/19/2013 | CCCMS | 2 |
| **SQ Average** | | | | | **2.00** |
| SVSP | CMF | 6/10/2013 | 6/12/2013 | CCCMS | 2 |
| SVSP | HDSP | 6/7/2013 | 6/9/2013 | CCCMS | 2 |
| SVSP | SOL | 6/27/2013 | 6/28/2013 | CCCMS | 1 |
| SVSP | SQ | 6/11/2013 | 6/13/2013 | CCCMS | 2 |
| SVSP | CMF | 6/11/2013 | 6/13/2013 | EOP | 2 |
| SVSP | HDSP | 6/7/2013 | 6/9/2013 | EOP | 2 |
| SVSP | PVSP | 6/2/2013 | 6/3/2013 | EOP | 1 |
| SVSP | SATF | 6/1/2013 | 6/2/2013 | EOP | 1 |
| **SVSP Average** | | | | | **1.63** |
| VSP | CMF | 6/6/2013 | 6/7/2013 | CCCMS | 1 |
| VSP | SQ | 6/18/2013 | 6/19/2013 | GP/OP | 1 |
| **VSP Average** | | | | | **1.00** |
| WSP | CMC | 6/6/2013 | 6/7/2013 | CCCMS | 1 |
| WSP | CMC | 6/8/2013 | 6/11/2013 | CCCMS | 3 |
| WSP | KVSP | 6/3/2013 | 6/5/2013 | EOP | 2 |
| WSP | KVSP | 6/16/2013 | 6/18/2013 | EOP | 2 |
| WSP | MCSP | 6/7/2013 | 6/8/2013 | EOP | 1 |
| WSP | MCSP | 6/7/2013 | 6/8/2013 | EOP | 1 |
| WSP | PBSP | 6/3/2013 | 6/5/2013 | EOP | 2 |
| WSP | PBSP | 6/4/2013 | 6/5/2013 | EOP | 1 |
| WSP | CMF | 6/11/2013 | 6/13/2013 | GP/OP | 2 |
| WSP | RJD | 6/9/2013 | 6/12/2013 | GP/OP | 3 |
| **WSP Average** | | | | | **1.80** |
| WSP-RC | CMC | 6/6/2013 | 6/7/2013 | CCCMS | 1 |
| WSP-RC | CMC | 6/8/2013 | 6/11/2013 | CCCMS | 3 |
| WSP-RC | HDSP | 6/16/2013 | 6/19/2013 | CCCMS | 3 |
| WSP-RC | CIM | 6/11/2013 | 6/14/2013 | EOP | 3 |
| WSP-RC | HDSP | 6/16/2013 | 6/19/2013 | EOP | 3 |
| WSP-RC | HDSP | 6/28/2013 | 6/29/2013 | EOP | 1 |
| WSP-RC | SQ | 6/14/2013 | 6/16/2013 | EOP | 2 |
| WSP-RC | CMC | 6/6/2013 | 6/7/2013 | GP/OP | 1 |
| WSP-RC | HDSP | 6/7/2013 | 6/10/2013 | GP/OP | 3 |
| WSP-RC | KVSP | 6/9/2013 | 6/11/2013 | GP/OP | 2 |
| WSP-RC | KVSP | 6/10/2013 | 6/13/2013 | GP/OP | 3 |
| WSP-RC | KVSP | 6/28/2013 | 6/29/2013 | GP/OP | 1 |
| WSP-RC | KVSP | 6/28/2013 | 6/29/2013 | GP/OP | 1 |

*Days Waiting based on days between referral and an
MHCB becoming available. Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

7/29/2013

| Transferred From | Transferred To | Referral Date | Transfer Date | Prior LOC | Days Waiting* |
|---|---|---|---|---|---|
| WSP-RC | RJD | 6/29/2013 | 6/30/2013 | GP/OP | 1 |
| WSP-RC | SATF | 6/9/2013 | 6/12/2013 | GP/OP | 3 |
| WSP-RC | SOL | 6/8/2013 | 6/11/2013 | GP/OP | 3 |
| WSP-RC Average | | | | | 2.13 |
| Grand Average | | | | | 2.06 |

| SUMMARY OF TRANSFERS | | | |
|---|---|---|---|
| Time Frames | Total Transfers | Average Days Waiting | Range for Days Waiting |
| Combined | 173 | 2.06 | |
| < or = 1 day | 58 | 0.90 | |
| 2 days | 61 | NA | 0-6 |
| 3 days | 38 | NA | |
| 4 or more days | 16 | 4.25 | |

*Days Waiting based on days between referral and an
MHCB becoming available.  Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

7/29/2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| ASP | 6/19/2013 | 6/20/2013 | CCCMS | Returned to Housing | 1 |
| ASP | 6/25/2013 | 6/27/2013 | CCCMS | Returned to Housing | 2 |
| **ASP Average** | | | | | **1.50** |
| CEN | 6/7/2013 | 6/10/2013 | GP/OP | Returned to Housing | 3 |
| CEN | 6/15/2013 | 6/17/2013 | GP/OP | Returned to Housing | 2 |
| **CEN Average** | | | | | **2.50** |
| CIM | 6/27/2013 | 6/27/2013 | CCCMS | Admitted Internally | 0 |
| CIM | 6/27/2013 | 6/27/2013 | CCCMS | Admitted Internally | 0 |
| CIM | 6/4/2013 | 6/5/2013 | EOP | Admitted Internally | 1 |
| CIM | 6/4/2013 | 6/5/2013 | EOP | Admitted Internally | 1 |
| CIM | 6/27/2013 | 6/27/2013 | EOP | Admitted Internally | 0 |
| CIM | 6/27/2013 | 6/27/2013 | EOP | Admitted Internally | 0 |
| **CIM Average** | | | | | **0.33** |
| CIM-RC | 6/27/2013 | 6/27/2013 | MHCB | Admitted Internally | 0 |
| **CIM-RC Average** | | | | | **0.00** |
| CMC | 6/2/2013 | 6/3/2013 | CCCMS | Returned to Housing | 1 |
| CMC | 6/4/2013 | 6/5/2013 | CCCMS | Admitted Internally | 1 |
| CMC | 6/8/2013 | 6/10/2013 | CCCMS | Admitted Internally | 2 |
| CMC | 6/15/2013 | 6/17/2013 | CCCMS | Admitted Internally | 2 |
| CMC | 6/15/2013 | 6/17/2013 | CCCMS | Returned to Housing | 2 |
| CMC | 6/15/2013 | 6/17/2013 | CCCMS | Returned to Housing | 2 |
| CMC | 6/16/2013 | 6/18/2013 | CCCMS | Admitted Internally | 2 |
| CMC | 6/23/2013 | 6/25/2013 | CCCMS | Admitted Internally | 2 |
| CMC | 6/27/2013 | 6/27/2013 | CCCMS | Admitted Internally | 0 |
| CMC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/3/2013 | 6/4/2013 | EOP | Admitted Internally | 1 |
| CMC | 6/4/2013 | 6/4/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/4/2013 | 6/5/2013 | EOP | Admitted Internally | 1 |
| CMC | 6/4/2013 | 6/5/2013 | EOP | Returned to Housing | 1 |
| CMC | 6/13/2013 | 6/13/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/13/2013 | 6/13/2013 | EOP | Returned to Housing | 0 |
| CMC | 6/14/2013 | 6/14/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/14/2013 | 6/16/2013 | EOP | Admitted Internally | 2 |
| CMC | 6/14/2013 | 6/16/2013 | EOP | Admitted Internally | 2 |
| CMC | 6/14/2013 | 6/17/2013 | EOP | Admitted Internally | 3 |
| CMC | 6/15/2013 | 6/17/2013 | EOP | Admitted Internally | 2 |
| CMC | 6/15/2013 | 6/17/2013 | EOP | Admitted Internally | 2 |
| CMC | 6/16/2013 | 6/17/2013 | EOP | Returned to Housing | 1 |
| CMC | 6/19/2013 | 6/19/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/20/2013 | 6/20/2013 | EOP | Admitted Internally | 0 |
| CMC | 6/5/2013 | 6/5/2013 | ICF | Admitted Internally | 0 |
| CMC | 6/18/2013 | 6/19/2013 | ICF | Admitted Internally | 1 |
| **CMC Average** | | | | | **1.00** |
| CMF | 6/28/2013 | 6/29/2013 | CCCMS | Admitted Internally | 1 |
| CMF | 6/2/2013 | 6/3/2013 | EOP | Admitted Internally | 1 |

*Days Waiting based on days between referral and rescission.  Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

RESCINDED MHCB REFERRALS
BY INSTITUTION AND PRIOR LEVEL OF CARE
JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| CMF | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| CMF | 6/3/2013 | 6/3/2013 | EOP | Not Medically Cleared | 0 |
| CMF | 6/5/2013 | 6/6/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/10/2013 | 6/10/2013 | EOP | Admitted Internally | 0 |
| CMF | 6/16/2013 | 6/16/2013 | EOP | Returned to Housing | 0 |
| CMF | 6/16/2013 | 6/18/2013 | EOP | Admitted Internally | 2 |
| CMF | 6/17/2013 | 6/18/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/17/2013 | 6/18/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/23/2013 | 6/24/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/24/2013 | 6/24/2013 | EOP | Admitted Internally | 0 |
| CMF | 6/24/2013 | 6/24/2013 | EOP | Returned to Housing | 0 |
| CMF | 6/24/2013 | 6/26/2013 | EOP | Returned to Housing | 2 |
| CMF | 6/26/2013 | 6/27/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/27/2013 | 6/28/2013 | EOP | Admitted Internally | 1 |
| CMF | 6/28/2013 | 6/28/2013 | EOP | Admitted Internally | 0 |
| **CMF Average** | | | | | **0.71** |
| COR | 6/14/2013 | 6/14/2013 | CCCMS | Admitted Internally | 0 |
| COR | 6/15/2013 | 6/15/2013 | CCCMS | Admitted Internally | 0 |
| COR | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| COR | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| COR | 6/5/2013 | 6/5/2013 | EOP | Admitted Internally | 0 |
| COR | 6/15/2013 | 6/15/2013 | EOP | Admitted Internally | 0 |
| COR | 6/6/2013 | 6/6/2013 | GP/OP | Admitted Internally | 0 |
| **COR Average** | | | | | **0.00** |
| DVI | 6/15/2013 | 6/18/2013 | GP/OP | Returned to Housing | 3 |
| **DVI Average** | | | | | **3.00** |
| DVI-RC | 6/14/2013 | 6/15/2013 | EOP | Returned to Housing | 1 |
| DVI-RC | 6/26/2013 | 6/26/2013 | EOP | Returned to Housing | 0 |
| **DVI-RC Average** | | | | | **0.50** |
| FOL | 6/11/2013 | 6/12/2013 | CCCMS | Returned to Housing | 1 |
| FOL | 6/14/2013 | 6/15/2013 | CCCMS | Returned to Housing | 1 |
| FOL | 6/16/2013 | 6/17/2013 | CCCMS | Returned to Housing | 1 |
| FOL | 6/18/2013 | 6/18/2013 | CCCMS | Returned to Housing | 0 |
| FOL | 6/18/2013 | 6/19/2013 | CCCMS | Returned to Housing | 1 |
| FOL | 6/10/2013 | 6/11/2013 | GP/OP | Returned to Housing | 1 |
| FOL | 6/11/2013 | 6/11/2013 | GP/OP | Returned to Housing | 0 |
| FOL | 6/11/2013 | 6/12/2013 | GP/OP | Returned to Housing | 1 |
| FOL | 6/12/2013 | 6/13/2013 | GP/OP | Returned to Housing | 1 |
| FOL | 6/17/2013 | 6/18/2013 | GP/OP | Returned to Housing | 1 |
| FOL | 6/18/2013 | 6/19/2013 | GP/OP | Returned to Housing | 1 |
| FOL | 6/19/2013 | 6/19/2013 | GP/OP | Returned to Housing | 0 |
| FOL | 6/19/2013 | 6/20/2013 | GP/OP | Returned to Housing | 1 |
| **FOL Average** | | | | | **0.77** |
| HDSP | 6/21/2013 | 6/22/2013 | CCCMS | Admitted Internally | 1 |
| HDSP | 6/24/2013 | 6/24/2013 | CCCMS | Admitted Internally | 0 |
| **HDSP Average** | | | | | **0.50** |
| KVSP | 6/5/2013 | 6/5/2013 | CCCMS | Returned to Housing | 0 |
| KVSP | 6/5/2013 | 6/6/2013 | CCCMS | Admitted Internally | 1 |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

**RESCINDED MHCB REFERRALS**
**BY INSTITUTION AND PRIOR LEVEL OF CARE**
**JUNE 2013**

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| KVSP | 6/5/2013 | 6/6/2013 | CCCMS | Admitted Internally | 1 |
| KVSP | 6/6/2013 | 6/7/2013 | CCCMS | Returned to Housing | 1 |
| KVSP | 6/12/2013 | 6/13/2013 | CCCMS | Returned to Housing | 1 |
| KVSP | 6/21/2013 | 6/22/2013 | CCCMS | Admitted Internally | 1 |
| KVSP | 6/21/2013 | 6/22/2013 | CCCMS | Admitted Internally | 1 |
| KVSP | 6/23/2013 | 6/25/2013 | CCCMS | Admitted Internally | 2 |
| KVSP | 6/1/2013 | 6/1/2013 | EOP | Admitted Internally | 0 |
| KVSP | 6/15/2013 | 6/16/2013 | EOP | Admitted Internally | 1 |
| KVSP | 6/20/2013 | 6/21/2013 | EOP | Returned to Housing | 1 |
| KVSP | 6/22/2013 | 6/22/2013 | EOP | Admitted Internally | 0 |
| KVSP | 6/22/2013 | 6/23/2013 | EOP | Returned to Housing | 1 |
| KVSP | 6/15/2013 | 6/16/2013 | GP/OP | Admitted Internally | 1 |
| KVSP | 6/23/2013 | 6/24/2013 | GP/OP | Returned to Housing | 1 |
| KVSP | 6/24/2013 | 6/26/2013 | GP/OP | Returned to Housing | 2 |
| KVSP | 6/24/2013 | 6/26/2013 | GP/OP | Returned to Housing | 2 |
| **KVSP Average** | | | | | **1.00** |
| LAC | 6/10/2013 | 6/10/2013 | CCCMS | Returned to Housing | 0 |
| LAC | 6/10/2013 | 6/11/2013 | CCCMS | Returned to Housing | 1 |
| LAC | 6/12/2013 | 6/12/2013 | CCCMS | Admitted Internally | 0 |
| LAC | 6/13/2013 | 6/13/2013 | CCCMS | Returned to Housing | 0 |
| LAC | 6/14/2013 | 6/15/2013 | CCCMS | Returned to Housing | 1 |
| LAC | 6/14/2013 | 6/17/2013 | CCCMS | Admitted Internally | 3 |
| LAC | 6/18/2013 | 6/18/2013 | CCCMS | Returned to Housing | 0 |
| LAC | 6/18/2013 | 6/19/2013 | CCCMS | Admitted Internally | 1 |
| LAC | 6/23/2013 | 6/24/2013 | CCCMS | Admitted Internally | 1 |
| LAC | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| LAC | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| LAC | 6/24/2013 | 6/24/2013 | CCCMS | Returned to Housing | 0 |
| LAC | 6/24/2013 | 6/26/2013 | CCCMS | Returned to Housing | 2 |
| LAC | 6/26/2013 | 6/28/2013 | CCCMS | Admitted Internally | 2 |
| LAC | 6/28/2013 | 6/28/2013 | CCCMS | Admitted Internally | 0 |
| LAC | 5/31/2013 | 6/1/2013 | EOP | Returned to Housing | 1 |
| LAC | 6/1/2013 | 6/1/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/1/2013 | 6/1/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| LAC | 6/3/2013 | 6/4/2013 | EOP | Admitted Internally | 1 |
| LAC | 6/5/2013 | 6/5/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/11/2013 | 6/12/2013 | EOP | Returned to Housing | 1 |
| LAC | 6/14/2013 | 6/15/2013 | EOP | Returned to Housing | 1 |
| LAC | 6/16/2013 | 6/16/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/19/2013 | 6/19/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/20/2013 | 6/20/2013 | EOP | Returned to Housing | 0 |
| LAC | 6/29/2013 | 6/29/2013 | GP/OP | Returned to Housing | 0 |
| LAC | 6/30/2013 | 6/30/2013 | GP/OP | Returned to Housing | 0 |
| LAC | 6/10/2013 | 6/11/2013 | MHCB | Admitted Internally | 1 |
| **LAC Average** | | | | | **0.62** |
| NKSP | 6/4/2013 | 6/4/2013 | CCCMS | Admitted Internally | 0 |
| NKSP | 6/9/2013 | 6/10/2013 | CCCMS | Returned to Housing | 1 |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

# RESCINDED MH REFERRALS
## BY INSTITUTION AND PRIOR LEVEL OF CARE
### JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| NKSP | 6/10/2013 | 6/10/2013 | CCCMS | Admitted Internally | 0 |
| NKSP | 6/29/2013 | 6/29/2013 | CCCMS | Returned to Housing | 0 |
| NKSP | 6/12/2013 | 6/13/2013 | EOP | Admitted Internally | 1 |
| NKSP | 6/23/2013 | 6/24/2013 | EOP | Admitted Internally | 1 |
| NKSP | 6/23/2013 | 6/24/2013 | EOP | Admitted Internally | 1 |
| NKSP | 6/25/2013 | 6/26/2013 | EOP | Returned to Housing | 1 |
| NKSP | 6/2/2013 | 6/3/2013 | GP/OP | Returned to Housing | 1 |
| NKSP | 6/7/2013 | 6/7/2013 | GP/OP | Returned to Housing | 0 |
| **NKSP Average** | | | | | **0.60** |
| NKSP-RC | 6/6/2013 | 6/6/2013 | CCCMS | Returned to Housing | 0 |
| NKSP-RC | 6/8/2013 | 6/8/2013 | CCCMS | Returned to Housing | 0 |
| NKSP-RC | 6/8/2013 | 6/9/2013 | CCCMS | Returned to Housing | 1 |
| NKSP-RC | 6/14/2013 | 6/15/2013 | CCCMS | Returned to Housing | 1 |
| NKSP-RC | 6/23/2013 | 6/23/2013 | CCCMS | Returned to Housing | 0 |
| NKSP-RC | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| NKSP-RC | 6/27/2013 | 6/27/2013 | CCCMS | Returned to Housing | 0 |
| NKSP-RC | 6/8/2013 | 6/10/2013 | EOP | Admitted Internally | 2 |
| NKSP-RC | 6/14/2013 | 6/15/2013 | EOP | Admitted Internally | 1 |
| NKSP-RC | 6/10/2013 | 6/10/2013 | GP/OP | Admitted Internally | 0 |
| NKSP-RC | 6/18/2013 | 6/18/2013 | GP/OP | Returned to Housing | 0 |
| NKSP-RC | 6/24/2013 | 6/25/2013 | GP/OP | Returned to Housing | 1 |
| NKSP-RC | 6/28/2013 | 6/28/2013 | GP/OP | Returned to Housing | 0 |
| **NKSP-RC Average** | | | | | **0.54** |
| PBSP | 6/19/2013 | 6/20/2013 | CCCMS | Admitted Internally | 1 |
| PBSP | 6/20/2013 | 6/20/2013 | CCCMS | Admitted Internally | 0 |
| PBSP | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| PBSP | 6/24/2013 | 6/26/2013 | CCCMS | Admitted Internally | 2 |
| PBSP | 6/23/2013 | 6/25/2013 | EOP | Admitted Internally | 2 |
| PBSP | 6/24/2013 | 6/27/2013 | EOP | Admitted Internally | 3 |
| PBSP | 6/19/2013 | 6/20/2013 | GP/OP | Admitted Internally | 1 |
| **PBSP Average** | | | | | **1.43** |
| PVSP | 6/1/2013 | 6/2/2013 | CCCMS | Returned to Housing | 1 |
| PVSP | 6/13/2013 | 6/13/2013 | CCCMS | Admitted Internally | 0 |
| PVSP | 6/16/2013 | 6/17/2013 | CCCMS | Admitted Internally | 1 |
| PVSP | 6/16/2013 | 6/17/2013 | CCCMS | Returned to Housing | 1 |
| PVSP | 6/16/2013 | 6/17/2013 | CCCMS | Returned to Housing | 1 |
| PVSP | 6/18/2013 | 6/20/2013 | CCCMS | Admitted Internally | 2 |
| PVSP | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| **PVSP Average** | | | | | **1.00** |
| RJD | 6/14/2013 | 6/16/2013 | CCCMS | Admitted Internally | 2 |
| RJD | 6/15/2013 | 6/16/2013 | CCCMS | Returned to Housing | 1 |
| RJD | 6/15/2013 | 6/16/2013 | CCCMS | Returned to Housing | 1 |
| RJD | 6/18/2013 | 6/18/2013 | CCCMS | Returned to Housing | 0 |
| RJD | 6/18/2013 | 6/19/2013 | CCCMS | Admitted Internally | 1 |
| RJD | 6/18/2013 | 6/19/2013 | CCCMS | Returned to Housing | 1 |
| RJD | 6/18/2013 | 6/19/2013 | CCCMS | Returned to Housing | 1 |
| RJD | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| RJD | 6/23/2013 | 6/25/2013 | CCCMS | Admitted Internally | 2 |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

# RESCINDED MHCB REFERRALS
## BY INSTITUTION AND PRIOR LEVEL OF CARE
### JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| RJD | 6/23/2013 | 6/25/2013 | CCCMS | Admitted Internally | 2 |
| RJD | 6/2/2013 | 6/3/2013 | EOP | Admitted Internally | 1 |
| RJD | 6/2/2013 | 6/3/2013 | EOP | Admitted Internally | 1 |
| RJD | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| RJD | 6/15/2013 | 6/16/2013 | EOP | Returned to Housing | 1 |
| RJD | 6/16/2013 | 6/17/2013 | EOP | Admitted Internally | 1 |
| RJD | 6/17/2013 | 6/18/2013 | EOP | Admitted Internally | 1 |
| RJD | 6/23/2013 | 6/23/2013 | EOP | Returned to Housing | 0 |
| RJD | 6/23/2013 | 6/25/2013 | EOP | Returned to Housing | 2 |
| RJD | 6/24/2013 | 6/24/2013 | EOP | Admitted Internally | 0 |
| RJD | 6/24/2013 | 6/25/2013 | EOP | Admitted Internally | 1 |
| RJD | 6/24/2013 | 6/25/2013 | EOP | Returned to Housing | 1 |
| RJD | 6/26/2013 | 6/26/2013 | EOP | Admitted Internally | 0 |
| **RJD Average** | | | | | **0.95** |
| SAC | 6/2/2013 | 6/3/2013 | CCCMS | Returned to Housing | 1 |
| SAC | 6/10/2013 | 6/10/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/13/2013 | 6/13/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/17/2013 | 6/17/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/18/2013 | 6/19/2013 | CCCMS | Admitted Internally | 1 |
| SAC | 6/22/2013 | 6/22/2013 | CCCMS | Returned to Housing | 0 |
| SAC | 6/22/2013 | 6/23/2013 | CCCMS | Returned to Housing | 1 |
| SAC | 6/23/2013 | 6/24/2013 | CCCMS | Returned to Housing | 1 |
| SAC | 6/24/2013 | 6/24/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/25/2013 | 6/25/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/25/2013 | 6/25/2013 | CCCMS | Admitted Internally | 0 |
| SAC | 6/29/2013 | 6/29/2013 | CCCMS | Returned to Housing | 0 |
| SAC | 5/31/2013 | 6/3/2013 | EOP | Admitted Internally | 3 |
| SAC | 6/1/2013 | 6/2/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/2/2013 | 6/2/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/2/2013 | 6/3/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/3/2013 | 6/3/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/5/2013 | 6/5/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/5/2013 | 6/5/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/5/2013 | 6/5/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/5/2013 | 6/6/2013 | EOP | Admitted Internally | 1 |
| SAC | 6/7/2013 | 6/8/2013 | EOP | Admitted Internally | 1 |
| SAC | 6/8/2013 | 6/8/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/8/2013 | 6/8/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/8/2013 | 6/10/2013 | EOP | Returned to Housing | 2 |
| SAC | 6/9/2013 | 6/9/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/9/2013 | 6/9/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/9/2013 | 6/10/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/10/2013 | 6/10/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/10/2013 | 6/10/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/10/2013 | 6/10/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/11/2013 | 6/11/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/11/2013 | 6/11/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/11/2013 | 6/12/2013 | EOP | Admitted Internally | 1 |
| SAC | 6/12/2013 | 6/12/2013 | EOP | Admitted Internally | 0 |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

RESCINDED MHCB REFERRALS
BY INSTITUTION AND PRIOR LEVEL OF CARE
JUNE 2013

ATTACHMENT 2B

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| SAC | 6/12/2013 | 6/12/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/15/2013 | 6/15/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/15/2013 | 6/15/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/15/2013 | 6/15/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/15/2013 | 6/16/2013 | EOP | Admitted Internally | 1 |
| SAC | 6/16/2013 | 6/16/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/17/2013 | 6/17/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/17/2013 | 6/17/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/17/2013 | 6/17/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/18/2013 | 6/18/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/18/2013 | 6/18/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/18/2013 | 6/18/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/18/2013 | 6/18/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/18/2013 | 6/19/2013 | EOP | Admitted Internally | 1 |
| SAC | 6/18/2013 | 6/19/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/19/2013 | 6/19/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/19/2013 | 6/19/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/20/2013 | 6/20/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/20/2013 | 6/20/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/20/2013 | 6/20/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/21/2013 | 6/22/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/21/2013 | 6/22/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/21/2013 | 6/22/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/22/2013 | 6/22/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/22/2013 | 6/22/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/22/2013 | 6/22/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/22/2013 | 6/23/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/22/2013 | 6/23/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/22/2013 | 6/24/2013 | EOP | Admitted Internally | 2 |
| SAC | 6/22/2013 | 6/24/2013 | EOP | Admitted Internally | 2 |
| SAC | 6/22/2013 | 6/24/2013 | EOP | Returned to Housing | 2 |
| SAC | 6/22/2013 | 6/24/2013 | EOP | Returned to Housing | 2 |
| SAC | 6/23/2013 | 6/23/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/24/2013 | 6/24/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/24/2013 | 6/24/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/25/2013 | 6/25/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/25/2013 | 6/25/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/26/2013 | 6/26/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/26/2013 | 6/27/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/26/2013 | 6/27/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/27/2013 | 6/27/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/27/2013 | 6/27/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/28/2013 | 6/29/2013 | EOP | Returned to Housing | 1 |
| SAC | 6/29/2013 | 6/29/2013 | EOP | Admitted Internally | 0 |
| SAC | 6/29/2013 | 6/29/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/29/2013 | 6/29/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/30/2013 | 6/30/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/30/2013 | 6/30/2013 | EOP | Returned to Housing | 0 |
| SAC | 6/30/2013 | 6/30/2013 | EOP | Returned to Housing | 0 |

*Days Waiting based on days between referral and rescission.  Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

RESCINDED MHCB REFERRALS
BY INSTITUTION AND PRIOR LEVEL OF CARE
JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| SAC | 6/5/2013 | 6/5/2013 | GP/OP | Admitted Internally | 0 |
| SAC | 17-Jun-13 | 17-Jun-13 | EOP | Returned to Housing | 0 |
| SAC | 25-Jun-13 | 25-Jun-13 | EOP | Admitted Internally | 0 |
| **SAC Average** | | | | | **0.39** |
| SATF | 6/15/2013 | 6/16/2013 | CCCMS | Admitted Internally | 1 |
| SATF | 6/15/2013 | 6/16/2013 | CCCMS | Admitted Internally | 1 |
| SATF | 6/19/2013 | 6/19/2013 | CCCMS | Admitted Internally | 0 |
| SATF | 6/21/2013 | 6/22/2013 | CCCMS | Returned to Housing | 1 |
| SATF | 6/21/2013 | 6/22/2013 | CCCMS | Returned to Housing | 1 |
| SATF | 6/23/2013 | 6/25/2013 | CCCMS | Admitted Internally | 2 |
| SATF | 6/24/2013 | 6/25/2013 | CCCMS | Admitted Internally | 1 |
| SATF | 6/26/2013 | 6/26/2013 | CCCMS | Admitted Internally | 0 |
| SATF | 6/13/2013 | 6/13/2013 | EOP | Returned to Housing | 0 |
| SATF | 6/13/2013 | 6/13/2013 | EOP | Returned to Housing | 0 |
| SATF | 6/17/2013 | 6/17/2013 | EOP | Admitted Internally | 0 |
| SATF | 6/21/2013 | 6/22/2013 | EOP | Admitted Internally | 1 |
| SATF | 6/23/2013 | 6/23/2013 | EOP | Admitted Internally | 0 |
| SATF | 6/26/2013 | 6/26/2013 | EOP | Admitted Internally | 0 |
| SATF | 6/26/2013 | 6/26/2013 | EOP | Admitted Internally | 0 |
| SATF | 6/27/2013 | 6/27/2013 | EOP | Admitted Internally | 0 |
| SATF | 6/19/2013 | 6/19/2013 | GP/OP | Admitted Internally | 0 |
| SATF | 6/19/2013 | 6/20/2013 | GP/OP | Admitted Internally | 1 |
| SATF | 6/25/2013 | 6/25/2013 | GP/OP | Admitted Internally | 0 |
| SATF | 6/26/2013 | 6/26/2013 | GP/OP | Admitted Internally | 0 |
| **SATF Average** | | | | | **0.45** |
| SCC | 6/1/2013 | 6/2/2013 | CCCMS | Returned to Housing | 1 |
| SCC | 6/14/2013 | 6/15/2013 | CCCMS | Returned to Housing | 1 |
| **SCC Average** | | | | | **1.00** |
| SOL | 6/18/2013 | 6/20/2013 | CCCMS | Admitted Internally | 2 |
| SOL | 6/24/2013 | 6/26/2013 | GP/OP | Returned to Housing | 2 |
| **SOL Average** | | | | | **2.00** |
| SQ | 6/1/2013 | 6/1/2013 | CCCMS | Admitted Internally | 0 |
| SQ | 6/8/2013 | 6/8/2013 | CCCMS | Admitted Internally | 0 |
| SQ | 6/16/2013 | 6/17/2013 | EOP | Admitted Internally | 1 |
| **SQ Average** | | | | | **0.33** |
| SVSP | 6/4/2013 | 6/4/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/6/2013 | 6/6/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/7/2013 | 6/7/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/13/2013 | 6/13/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/15/2013 | 6/15/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/19/2013 | 6/20/2013 | CCCMS | Admitted Internally | 1 |
| SVSP | 6/21/2013 | 6/22/2013 | CCCMS | Returned to Housing | 1 |
| SVSP | 6/22/2013 | 6/22/2013 | CCCMS | Admitted Internally | 0 |
| SVSP | 6/24/2013 | 6/25/2013 | CCCMS | Returned to Housing | 1 |
| SVSP | 6/26/2013 | 6/27/2013 | CCCMS | Returned to Housing | 1 |
| SVSP | 6/27/2013 | 6/27/2013 | CCCMS | Returned to Housing | 0 |
| SVSP | 6/4/2013 | 6/4/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/4/2013 | 6/4/2013 | EOP | Returned to Housing | 0 |

*Days Waiting based on days between referral and rescission.  Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

# RESCINDED MHCB REFERRALS
## BY INSTITUTION AND PRIOR LEVEL OF CARE
### JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| SVSP | 6/5/2013 | 6/5/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/5/2013 | 6/5/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/6/2013 | 6/6/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/6/2013 | 6/6/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/8/2013 | 6/10/2013 | EOP | Admitted Internally | 2 |
| SVSP | 6/11/2013 | 6/11/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/15/2013 | 6/17/2013 | EOP | Returned to Housing | 2 |
| SVSP | 6/18/2013 | 6/19/2013 | EOP | Returned to Housing | 1 |
| SVSP | 6/21/2013 | 6/21/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/24/2013 | 6/25/2013 | EOP | Returned to Housing | 1 |
| SVSP | 6/27/2013 | 6/27/2013 | EOP | Returned to Housing | 0 |
| SVSP | 6/27/2013 | 6/28/2013 | EOP | Returned to Housing | 1 |
| SVSP | 6/7/2013 | 6/7/2013 | GP/OP | Returned to Housing | 0 |
| **SVSP Average** | | | | | **0.42** |
| VSP | 6/10/2013 | 6/11/2013 | GP/OP | Returned to Housing | 1 |
| **VSP Average** | | | | | **1.00** |
| WSP | 6/3/2013 | 6/4/2013 | CCCMS | Returned to Housing | 1 |
| WSP | 6/9/2013 | 6/10/2013 | CCCMS | Returned to Housing | 1 |
| WSP | 6/16/2013 | 6/18/2013 | CCCMS | Returned to Housing | 2 |
| WSP | 6/19/2013 | 6/19/2013 | CCCMS | Returned to Housing | 0 |
| WSP | 6/22/2013 | 6/23/2013 | CCCMS | Returned to Housing | 1 |
| WSP | 6/6/2013 | 6/6/2013 | EOP | Admitted Internally | 0 |
| WSP | 6/8/2013 | 6/10/2013 | EOP | Returned to Housing | 2 |
| WSP | 6/11/2013 | 6/12/2013 | EOP | Admitted Internally | 1 |
| WSP | 6/11/2013 | 6/12/2013 | EOP | Admitted Internally | 1 |
| WSP | 6/19/2013 | 6/19/2013 | EOP | Returned to Housing | 0 |
| WSP | 6/22/2013 | 6/22/2013 | EOP | Admitted Internally | 0 |
| WSP | 6/30/2013 | 6/30/2013 | EOP | Returned to Housing | 0 |
| WSP | 6/3/2013 | 6/3/2013 | GP/OP | Admitted Internally | 0 |
| **WSP Average** | | | | | **0.69** |
| WSP-RC | 6/6/2013 | 6/6/2013 | CCCMS | Admitted Internally | 0 |
| WSP-RC | 6/7/2013 | 6/9/2013 | CCCMS | Admitted Internally | 2 |
| WSP-RC | 6/9/2013 | 6/10/2013 | CCCMS | Returned to Housing | 1 |
| WSP-RC | 6/11/2013 | 6/12/2013 | CCCMS | Admitted Internally | 1 |
| WSP-RC | 6/11/2013 | 6/12/2013 | CCCMS | Admitted Internally | 1 |
| WSP-RC | 6/12/2013 | 6/12/2013 | CCCMS | Returned to Housing | 0 |
| WSP-RC | 6/12/2013 | 6/13/2013 | CCCMS | Admitted Internally | 1 |
| WSP-RC | 6/12/2013 | 6/13/2013 | CCCMS | Returned to Housing | 1 |
| WSP-RC | 6/14/2013 | 6/15/2013 | CCCMS | Returned to Housing | 1 |
| WSP-RC | 6/15/2013 | 6/15/2013 | CCCMS | Returned to Housing | 0 |
| WSP-RC | 6/17/2013 | 6/18/2013 | CCCMS | Returned to Housing | 1 |
| WSP-RC | 6/22/2013 | 6/24/2013 | CCCMS | Admitted Internally | 2 |
| WSP-RC | 6/6/2013 | 6/6/2013 | EOP | Admitted Internally | 0 |
| WSP-RC | 6/11/2013 | 6/12/2013 | EOP | Returned to Housing | 1 |
| WSP-RC | 6/15/2013 | 6/16/2013 | EOP | Admitted Internally | 1 |
| WSP-RC | 6/22/2013 | 6/22/2013 | EOP | Admitted Internally | 0 |
| WSP-RC | 6/22/2013 | 6/24/2013 | EOP | Admitted Internally | 2 |
| WSP-RC | 6/27/2013 | 6/27/2013 | EOP | Admitted Internally | 0 |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

# RESCINDED MHCB REFERRALS
## BY INSTITUTION AND PRIOR LEVEL OF CARE
### JUNE 2013

| Referred By | Referral Date | Rescind Date | Prior LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| WSP-RC | 6/28/2013 | 6/29/2013 | EOP | Returned to Housing | 1 |
| WSP-RC | 6/3/2013 | 6/4/2013 | GP/OP | Admitted Internally | 1 |
| WSP-RC | 6/4/2013 | 6/4/2013 | GP/OP | Returned to Housing | 0 |
| WSP-RC | 6/8/2013 | 6/8/2013 | GP/OP | Returned to Housing | 0 |
| WSP-RC | 6/15/2013 | 6/16/2013 | GP/OP | Admitted Internally | 1 |
| WSP-RC Average | | | | | 0.78 |
| Grand Average | | | | | 0.66 |

| SUMMARY OF RESCINDED REFERRALS | | | |
|---|---|---|---|
| Time Frames | Total Transfers | Average Days Waiting | Range for Days Waiting |
| Combined | 365 | 0.66 | |
| < or = 1 day | 317 | 0.44 | |
| 2 days | 42 | NA | 0-3 |
| 3 days | 6 | NA | |
| 4 or more days | 0 | NA | |

*Days Waiting based on days between referral and rescission. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placements.

HC-POP
7/29/2013

REASON FOR RESCINDED MHCB REFERRALS                    ATTACHMENT 2C
**JUNE 2013**

| | REASON FOR RESCINDED MHCB REFERRALS | | | | | |
|---|---|---|---|---|---|---|
| Institution | Admitted Internally | Returned to Housing | Paroled | Out to Court | Not Medically Cleared | Total Rescinded |
| ASP | 0 | 2 | 0 | 0 | 0 | 2 |
| CAL | 0 | 0 | 0 | 0 | 0 | 0 |
| CCC | 0 | 0 | 0 | 0 | 0 | 0 |
| CCI | 0 | 0 | 0 | 0 | 0 | 0 |
| CCI-RC | 0 | 0 | 0 | 0 | 0 | 0 |
| CEN | 0 | 2 | 0 | 0 | 0 | 2 |
| CIM | 6 | 0 | 0 | 0 | 0 | 6 |
| CIM-RC | 1 | 0 | 0 | 0 | 0 | 1 |
| CMC | 24 | 6 | 0 | 0 | 0 | 30 |
| CMF | 13 | 3 | 0 | 0 | 1 | 17 |
| CMF-DSH | 0 | 0 | 0 | 0 | 0 | 0 |
| COR | 7 | 0 | 0 | 0 | 0 | 7 |
| CRC | 0 | 0 | 0 | 0 | 0 | 0 |
| CTF | 0 | 0 | 0 | 0 | 0 | 0 |
| CVSP | 0 | 0 | 0 | 0 | 0 | 0 |
| DVI | 0 | 1 | 0 | 0 | 0 | 1 |
| DVI-RC | 0 | 2 | 0 | 0 | 0 | 2 |
| FOL | 0 | 13 | 0 | 0 | 0 | 13 |
| HDSP | 2 | 0 | 0 | 0 | 0 | 2 |
| ISP | 0 | 0 | 0 | 0 | 0 | 0 |
| KVSP | 9 | 8 | 0 | 0 | 0 | 17 |
| LAC | 9 | 20 | 0 | 0 | 0 | 29 |
| LAC-RC | 0 | 0 | 0 | 0 | 0 | 0 |
| MCSP | 0 | 0 | 0 | 0 | 0 | 0 |
| NKSP | 5 | 5 | 0 | 0 | 0 | 10 |
| NKSP-RC | 3 | 10 | 0 | 0 | 0 | 13 |
| PBSP | 6 | 1 | 0 | 0 | 0 | 7 |
| PVSP | 3 | 4 | 0 | 0 | 0 | 7 |
| RJD | 12 | 10 | 0 | 0 | 0 | 22 |
| RJD-RC | 0 | 0 | 0 | 0 | 0 | 0 |
| SAC | 42 | 45 | 0 | 0 | 0 | 87 |
| SATF | 16 | 4 | 0 | 0 | 0 | 20 |
| SCC | 0 | 2 | 0 | 0 | 0 | 2 |
| SOL | 1 | 1 | 0 | 0 | 0 | 2 |
| SQ | 3 | 0 | 0 | 0 | 0 | 3 |
| SQ-RC | 0 | 0 | 0 | 0 | 0 | 0 |
| SVSP | 3 | 23 | 0 | 0 | 0 | 26 |
| VSP | 0 | 1 | 0 | 0 | 0 | 1 |
| WSP | 5 | 8 | 0 | 0 | 0 | 13 |
| WSP-RC | 13 | 10 | 0 | 0 | 0 | 23 |
| TOTAL | 183 | 181 | 0 | 0 | 1 | 365 |

ATTACHMENT 3

## AVERAGE DAYS WAITING*
### Transferred and Rescinded MHCB Referrals
### JUNE 2013

| | TRANSFERS | | RESCINDED REFERRALS | | TOTAL REFERRALS | |
|---|---|---|---|---|---|---|
| | Number | Avg Days Wait | Number | Avg Days Wait | Number | Avg Days Wait |
| ASH | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| ASP | 7 | 2.43 | 2 | 1.50 | 9 | 2.22 |
| CAL | 7 | 2.43 | 0 | 0.00 | 7 | 2.43 |
| CCC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| CCI | 7 | 3.00 | 0 | 0.00 | 7 | 3.00 |
| CCI-RC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| CEN | 4 | 1.75 | 2 | 2.50 | 6 | 2.00 |
| CIM | 0 | 0.00 | 6 | 0.33 | 6 | 0.33 |
| CIM-RC | 0 | 0.00 | 1 | 0.00 | 1 | 0.00 |
| CMC | 2 | 1.00 | 30 | 1.00 | 32 | 1.00 |
| CMF | 2 | 3.00 | 17 | 0.71 | 19 | 0.95 |
| CMF/DSH | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| COCF | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| COR | 0 | 0.00 | 7 | 0.00 | 7 | 0.00 |
| CRC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| CTF | 3 | 2.33 | 0 | 0.00 | 3 | 2.33 |
| CVSP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| DVI | 14 | 2.14 | 1 | 3.00 | 15 | 2.20 |
| DVI-RC | 4 | 2.00 | 2 | 0.50 | 6 | 1.50 |
| FOL | 2 | 0.50 | 13 | 0.77 | 15 | 0.73 |
| FWF | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| HDSP | 0 | 0.00 | 2 | 0.50 | 2 | 0.50 |
| ISP | 2 | 2.00 | 0 | 0.00 | 2 | 2.00 |
| KVSP | 2 | 3.50 | 17 | 1.00 | 19 | 1.26 |
| LAC | 19 | 2.16 | 29 | 0.62 | 48 | 1.23 |
| LAC-RC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| MCSP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| NKSP | 13 | 2.00 | 10 | 0.60 | 23 | 1.39 |
| NKSP-RC | 27 | 2.07 | 13 | 0.54 | 40 | 1.58 |
| NSH | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| PBSP | 4 | 1.75 | 7 | 1.43 | 11 | 1.55 |
| PVSP | 3 | 0.67 | 7 | 1.00 | 10 | 0.90 |
| RJD | 4 | 2.50 | 22 | 0.95 | 26 | 1.19 |
| RJD-RC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| SAC | 3 | 0.67 | 87 | 0.39 | 90 | 0.40 |
| SATF | 3 | 2.33 | 20 | 0.45 | 23 | 0.70 |
| SCC | 2 | 2.00 | 2 | 1.00 | 4 | 1.50 |
| SOL | 1 | 3.00 | 2 | 2.00 | 3 | 2.33 |
| SQ | 2 | 2.00 | 3 | 0.33 | 5 | 1.00 |
| SQ-RC | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| SVSP | 8 | 1.63 | 26 | 0.42 | 34 | 0.71 |
| VSP | 2 | 1.00 | 1 | 1.00 | 3 | 1.00 |
| WSP | 10 | 1.80 | 13 | 0.69 | 23 | 1.17 |
| WSP-RC | 16 | 2.13 | 23 | 0.78 | 39 | 1.33 |
| TOTAL | 173 | 2.06 | 365 | 0.66 | 538 | 1.11 |

*Average Days Waiting is based on number of days between referral and transfer or rescission. It does not indicate days between referral and an MHCB becoming available. Field clinicians identify the most urgent cases and Headquarters' Mental Health Program senior clinical staff authorize priority placement of these cases into available MHCBs.

HC-POP 7/30/2013

Exhibit I

**COMPSTAT ASU Tracking Log 7/23/2013**

| Retained pending release GP (70) & SNY (71) | | | | |
|---|---|---|---|---|
| **Count of CDCRNumber** | **Column Labels** | | | |
| **Row Labels** | **CCCMS** | **Clear** | **EOP** | **Grand Total** |
| **CCC** | | 1 | | 1 |
| 70 | | 1 | | 1 |
| **COR** | 4 | 6 | 1 | 11 |
| 70 | 2 | 4 | | 6 |
| 71 | 2 | 2 | 1 | 5 |
| **HDSP** | 1 | 5 | | 6 |
| 70 | | 3 | | 3 |
| 71 | 1 | 2 | | 3 |
| **KVSP** | 2 | 6 | | 8 |
| 70 | | 1 | | 1 |
| 71 | 2 | 5 | | 7 |
| **LAC** | 5 | 8 | 3 | 16 |
| 70 | 5 | 8 | 3 | 16 |
| **MCSP** | 2 | | 1 | 3 |
| 71 | 2 | | 1 | 3 |
| **PVSP** | 2 | | | 2 |
| 71 | 2 | | | 2 |
| **SATF** | 1 | | | 1 |
| 70 | 1 | | | 1 |
| **SVSP** | 2 | | | 2 |
| 71 | 2 | | | 2 |
| **Grand Total** | 19 | 26 | 5 | 50 |

Exhibit J

| MALE EOP Institutions | Staffed Capacity | Institution Count (6/21/13) | Current Vacancies | Percent Filled | Total Bus Seats Requested | Total Bus Seats Provided | Number of Bus Seats Requested by Sending Location *(Inter-institution transfers only. Numbers/locations in bold reflect bus seats scheduled for transport this week.)* |
|---|---|---|---|---|---|---|---|
| SATF **SNY** II | 264 | 261 | 3 | 99% | 85 | 0 | 3-AVE, 11-CIMRC, 3-CMC, 1-CRC, 1-COR, 22-WSPRC, 1-CTF, 13-MCSP, 11-NKSPRC, 4-RJD, 2-SCC, 2-SQRC, 11-VSP |
| SATF **COD** II | 88 | 74 | 14 | 84% | 6 | 6 | *1-CIMRC, 2-CMC, 1-NKSPRC, 2-RJD* |
| CMC III | 580 | 559 | 21 | 96% | 9 | 9 | *4-CIMRC, 1-WSPRC, 1-LAC, 1-NKSPRC, 1-SAC, 1-SVSP* |
| CMF III | 333 | 326 | 7 | 98% | 4 | 0 | 2-CMC, 1-SOL, 1-SVSP |
| RJD III | 330 | 320 | 10 | 97% | 54 | 13 | *2-CIMRC, 2-CMC, 1-COR, 2-FOL, 5-LAC, 1-SAC,* 7-CMC, 5-CMF, 11-LAC, 1-PBSP, 11-SAC, 4-SATF, 1-SOL, 1-SVSP |
| LAC IV (270) | 300 | 301 | -1 | 100% | 17 | 4 | *1-CMC, 1-WSPRC, 2-SAC,* 9-SAC, 3-SVSP, 1-PBSP |
| MCSP **SNY** III | 360 | 349 | 11 | 97% | 71 | 11 | *1-ASP, 2-CIMRC, 1-CMF, 1-WSPRC, 3-DVIRC, 2-RJD, 1-SCC,* 3-VSP, 5-SAC, 12-RJD, 1-PVSP, 1-NKSPRC, 3-LAC, 5-KVSP, 5-DVIRC, 10-WSPRC, 14-COR, 1-CMC |
| COR **SNY** IV (270) | 150 | 156 | -6 | 104% | 14 | 2 | *2-RJD,* 1-LAC, 2-KVSP, 3-MCSP, 1-RJD, 5-SAC |
| MCSP **SNY** IV (270) | 150 | 151 | -1 | 101% | 13 | 0 | 1-CMC, 1-CMF, 1-COR, 1-HDSP, 5-KVSP, 1-LAC, 1-RJD, 2-SAC |
| RJD **SNY** IV (270) | 150 | 155 | -5 | 103% | 25 | 0 | 2-CIMRC, 1-CMC, 1-CMF, 3-COR, 1-WSPRC, 1-HDSP, 1-KVSP, 5-LAC, 3-MCSP, 3-SAC, 1-SATF, 3-SVSP |
| KVSP **SNY** IV (180) | 96 | 100 | -4 | 104% | 5 | 1 | *1-RJD,* 1-COR, 3-SAC |
| PBSP IV (180) | 66 | 43 | 23 | 65% | 0 | 0 | |
| SAC IV (180) | 384 | 326 | 58 | 85% | 1 | 1 | *1-CIMRC* |
| SVSP IV (180) | 192 | 176 | 16 | 92% | 1 | 1 | *1-WSPRC* |
| **TOTALS:** | **3443** | **3297** | **146** | **96%** | **305** | **48** | |

| FEMALE EOP | | | | | | | |
|---|---|---|---|---|---|---|---|
| CCWF | 54 | 49 | 5 | 91% | 0 | 0 | |
| CIW | 75 | 70 | 5 | 93% | 0 | 0 | |
| **TOTALS:** | **129** | **119** | **10** | **92%** | **0** | **0** | |

| PSU | | | | (per 6-24-13 PSU Pending List) | | | |
|---|---|---|---|---|---|---|---|
| CIW PSU | 20 | 15 | 5 | 75% | 0 | 0 | |
| PBSP PSU | 128 | 119 | 9 | 93% | 9 | 0 | 7-LAC, 1-CMF, 1-SQRC |
| SAC PSU | 256 | 244 | 12 | 95% | 10 | 2 | *1-LAC, 1-SVSP,* 1-COR, 1-LAC, 2-CMC, 1-MCSP, 3-SVSP |

"Institution Count" from Population Mgmt. Unit of the C&PRs' call-ins of filled EOP program beds.
Bus seat data source: Transportation Weekly Consolidated Worksheet

*Note:* This data is based on statewide Bus Seat Requests to an EOP program that were not scheduled to move during the subject week. Bus Seat Requests are used as an indicator of projected statewide bus seat needs for EOP.
**This is not intended to represent an EOP Wait List, Pending List, or Endorsement List.**

DHCS, Health Care Placement Oversight Program

Exhibit K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABLE LAW CENTER, INC., | ) |

DISABILITY LAW CENTER, INC.,                    )
                                               )
                           Plaintiff,          )
                                               )
                                               )    CIVIL ACTION
                                               )    NO. 07-10463 (MLW)
              v.                               )
                                               )
                                               )
MASSACHUSETTS DEPARTMENT OF                    )
CORRECTION, et. al.,                           )
                                               )
                           Defendants          )
                                               )
                                               )
                                               )

**SETTLEMENT AGREEMENT**

**Introduction**

The Plaintiff Disability Law Center, Inc. filed the instant lawsuit, *Disability Law Center, Inc. v. Massachusetts Department of Correction, et al.*, Civ. No. 07-10463 (D. Mass.), seeking declaratory and injunctive relief on behalf of its constituents, inmates with mental illness in the custody of the Massachusetts Department of Correction, alleging, *inter alia*, that their confinement in Segregation is in violation of the Eighth and Fourteenth Amendments of the United States Constitution, 29 U.S.C. § 794 (the Rehabilitation Act) and 42 U.S.C. § 12132 (the Americans with Disabilities Act).

The Defendants deny that they have violated any such constitutional or statutory rights. The Defendants also state that prior to and since the initiation of this litigation, the Department had commenced significant initiatives to enhance the delivery of mental health services, and the process has been ongoing throughout the course of the litigation. To date, the Department's initiatives include the following: Implementation of a definition of Serious Mental Illness (SMI); Implementation of Mental Health Classification; Exclusion of SMI inmates from long-term Segregation; Operation of two maximum security mental health treatment units: the Secure Treatment Program (STP) and the Behavior Management Unit (BMU); Provision of weekly out-of-cell clinical contact to SMI inmates in short-term segregation units; Monthly review by the Central Office Segregation Review Committee of SMI inmates who are segregated more than

1

thirty (30) days; Establishment of a maximum security Residential Treatment Unit; Operation of three medium security Residential Treatment Units (RTUs) for general population inmates; Tasking Old Colony Correctional Center (OCCC) to serve as a special prison for inmates with mental illness; Incorporation of clinical mental health input into the disciplinary system; Enhancement of the Inmate Management System (IMS) to identify Mental Health Classification, SMI status, and incidents of self-injurious behavior by type; and Implementation of the suicide prevention recommendations of the Department's consultant.

The parties have conducted extensive discovery.

Without conceding any infirmity in their claims or defenses, the parties have engaged in extensive and arms length settlement negotiations to resolve the claims raised by this action.

Plaintiff and Defendants have reached an agreement for settling this litigation. The parties believe that this agreement is fair, reasonable, and adequate to protect the interests of all parties. The parties further believe that this Settlement Agreement will benefit inmates with Serious Mental Illness who are confined in correctional facilities under Defendants' control.

The parties will file this Settlement Agreement with the Court, and ask that the Court approve it, which approval is a condition precedent to the Agreement's effectiveness.

## I.    Definitions

**Department** – The Massachusetts Department of Correction ("Department").

**Disability Law Center** – The Disability Law Center, Inc. ("DLC").

**Exigent Circumstances** – Circumstances, including institutional emergencies as set forth in the Department's regulations, or emergencies in Segregation or a Secure Treatment Unit, under which the doing of an act otherwise required by this Settlement Agreement would create an unacceptable risk to the safety of any person.

Exigent Circumstances shall not include the opinion of a clinician that notwithstanding an inmate's Serious Mental Illness, the inmate may remain in Segregation.

Whenever an act otherwise required by this Settlement Agreement is excused on account of Exigent Circumstances, the Department shall attempt to resolve the Exigent Circumstances as soon as possible, and the act shall be performed as soon as possible after the Exigent Circumstances cease to exist.

**Mental Health Classification** – The Department's system that identifies and codes the level of mental health services that an inmate requires based upon his /her mental health need.

**Qualified Mental Health Professional** - Treatment providers who are psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their

education, credentials and experience are permitted by law to evaluate and care for the mental health needs of patients, and to perform each function otherwise required by this Settlement Agreement (e.g., diagnosis).

**Secure Treatment Unit** - The term Secure Treatment Unit ("STU") refers to any Department maximum security residential treatment program designed to provide an alternative to Segregation for inmates diagnosed with Serious Mental Illness who cannot be housed in general population due to safety and/or security concerns. The Department currently operates two STUs: the Secure Treatment Program ("STP") and the Behavioral Management Unit ("BMU"). The Department also operates Residential Treatment Units which are not deemed STUs because the Department operates them as general population units.

**Segregation** - The term Segregation refers to the confinement of an inmate in: (1) the Departmental Disciplinary Unit ("DDU"), (2) any Special Management Unit ("SMU"), or (3) any unit where the inmate is confined to his cell for approximately 23 hours per day. For purposes of this definition, Segregation shall not include any placement ordered by a medical or mental health provider, including but not limited to, the placement of an inmate in clinical seclusion or restraint at Bridgewater State Hospital, the placement of a civilly committed Treatment Center inmate in the Minimum Privilege Unit, the placement of a civilly committed Massachusetts Alcohol and Substance Abuse Center (MASAC) or a civilly committed MCI-Framingham inmate in an observation cell, the placement of an inmate in a Health Services Unit, the placement of an inmate in a hospital or the placement of an inmate on a mental health watch.

**Serious Mental Illness (SMI)** - For purposes of assessing whether Segregation may be clinically contraindicated, or whether an inmate in Segregation should be placed in a Specialized Treatment Unit, the term "Serious Mental Illness" shall be defined as the following:

a.      Inmates determined by the Department's mental health vendor to have a current diagnosis or a recent significant history of any of the following types of DSM-IV-TR Axis I diagnoses:

(1) Schizophrenia (all sub-types)

(2) Delusional Disorder

(3) Schizophreniform Disorder

(4) Schizoaffective Disorder

(5) Brief Psychotic Disorder

6) Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)

(7) Psychotic Disorder Not Otherwise Specified

(8) Major Depressive Disorders

(9) Bipolar Disorder I and II

For purposes of this definition, "recent significant history" shall be defined as a diagnosis specified above in section (a)(1)-(9) upon discharge within the past year from an inpatient psychiatric hospital.

b.     Inmates diagnosed by the Department's mental health vendor with other DSM-IV-TR Axis I disorders that are commonly characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

c.     Inmates diagnosed by the Department's medical or mental health vendor with a developmental disability, a dementia or other cognitive disorders that result in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

d.     Inmates diagnosed by the Department's mental health vendor with a severe personality disorder that is manifested by episodes of psychosis or depression, and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

Significant Functional Impairment

Factors for consideration when assessing significant functional impairment shall include the following:

1.     The inmate has engaged in self harm which shall be defined as a deliberate act by the inmate that inflicts damage to, or threatens the integrity of one's own body.  Such acts include but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, drug overdose, jumping and biting.

2.     The inmate has demonstrated difficulty in his or her ability to engage in activities of daily living, including eating, grooming and personal hygiene, maintenance of housing area, participation in recreation, and ambulation, as a consequence of any DSM IV-TR Axis I or Axis II disorder.

3.     The inmate has demonstrated a pervasive pattern of dysfunctional or disruptive social interactions including withdrawal, bizarre or disruptive behavior, etc. as a consequence of any DSM IV-TR Axis I or Axis II disorder.

**II.     Screening and Evaluation of Inmates in Segregation to Determine SMI**

**A.     Screening Prior to Placement in Segregation**

4

Prior to placement in Segregation, all inmates shall be screened by a qualified health care professional (e.g., a physician, physician assistant, nurse, or nurse practitioner) to determine (1) whether the inmate has a Serious Mental Illness, and/or (2) whether there are any acute mental health contraindications to Segregation. Acute mental health contraindications to Segregation include that the inmate appears acutely psychotic, is actively suicidal or has made a recent serious suicidal attempt, or is otherwise in need of immediate placement on mental health watch. If there is an acute mental health contraindication to Segregation, the inmate will immediately be placed in an alternative setting (e.g., mental health watch, inpatient hospitalization, or other appropriate healthcare setting).

**B.    Segregation Rounds**

1.    A Qualified Mental Health Professional shall make mental health rounds in the DDU and each Special Management Unit two (2) times a week. The Qualified Mental Health Professional shall arrange for an out-of-cell meeting with any inmate for whom a confidential meeting is warranted in the clinician's professional judgment.    Custody staff shall provide escorts to facilitate out-of-cell meetings with clinicians, except in Exigent Circumstances and except where the inmate refuses.

**C.    Evaluation of Inmates in Segregation**

1.    Any inmate with an open mental health case who is placed in Segregation, must be assessed by a Qualified Mental Health Professional within seven (7) days of initial placement in Segregation, and not less than once every thirty (30) days thereafter, to determine if he has an SMI.  If the inmate is currently designated as SMI, a clinical evaluation need not be performed.

2.    Any inmate without an open mental health case who is placed in Segregation must be assessed by a Qualified Mental Health Professional within thirty (30) days of initial placement in Segregation, and not less than once every ninety (90) days thereafter, to determine if he has a Serious Mental Illness.

3.    The assessments described in paragraphs (C)(1) and (2) above must include, absent Exigent Circumstances, a face-to-face interview with the inmate conducted in a private confidential setting. If an inmate refuses the face-to-face interview, the clinician shall document in the progress note all attempts made to engage the inmate in such a private interview.

4.    When any inmate in Segregation is determined to have a Serious Mental Illness, he shall be removed from Segregation, referred to a Secure Treatment Unit Review Committee, referred to a Residential Treatment Unit, or provided with mental health services in accordance with Section III below.

5.    If the clinical director of the Department's mental health provider determines that continued Segregation will pose an imminent risk of substantial deterioration to an inmate's

mental health, the inmate shall be removed from Segregation, referred to the Secure Treatment Unit Review Committee, referred to a Residential Treatment Unit, or provided with mental health services in accordance with Section III below.

**D.    Evaluation of Inmates Prior to DDU Placement**

Prior to the placement of any inmate in the DDU, he shall be evaluated by a Qualified Mental Health Professional to determine whether he has an SMI. If the inmate is currently designated as SMI, a clinical evaluation need not be performed. Upon a determination that the inmate has an SMI, the clinician shall prepare a STU referral form and submit it to the Secure Treatment Unit Review Committee so that the inmate can be considered for placement in a STU.

**III.    Housing and Review of Inmates with Serious Mental Illness**

**A.    Departmental Disciplinary Unit Housing**

Inmates with SMI shall not be housed in the DDU except: (1) In Exigent Circumstances; or (2) In accordance with Section III(C). However, the parties understand that there may be times when the Department lacks an appropriate alternative placement for all SMI inmates with DDU sanctions. In that event, if the inmate has been approved for STU placement pursuant to Section III(D)(3), and after approval by the Deputy Commissioner of Classification, Programs, and Reentry and appropriate clinical staff, the Department may confine an SMI inmate in the DDU pending the availability of a Special Treatment Unit ("STU") bed. Such inmates shall be considered to be "pre-program inmates." The Department shall address the placement of such pre-program inmates on a case by case basis, taking into account the length of time that each such inmate has been awaiting STU placement and his clinical needs.

At a minimum, pre-program inmates in the DDU shall be offered additional mental health and other services, consisting of the following:

**1.    Less Than Thirty (30) Days**

a.    Two (2) out-of-cell sessions of structured individual or group activity per week shall be offered. These sessions shall be part of a treatment plan and shall include at least one session with a mental health clinician. The length of the out-of-cell clinical sessions shall be determined by the clinician on a case-by-case basis.

b.    In addition to the five (5) hours of out-of-cell leisure activity already offered to DDU inmates, two (2) additional hours of out-of-cell leisure activity per week shall be offered. These extra hours may be provided either by offering additional out-of-cell sessions or by extending the period of existing out-of-cell sessions.

c.    Upon entering the DDU from a Special Management Unit, pre-program inmates shall be offered the level of visitation, radio, and telephone privileges that had been provided in

Segregation prior to DDU placement. Pre-Program inmates shall also be eligible to earn all privileges available to DDU prisoners, contingent upon compliance with the Department's, institutional, and DDU rules.

**2.      Over Thirty (30) Days**

After thirty (30) days in the DDU, the amount of weekly out-of-cell services offered to a pre-program inmate with a mental health classification of MH-4 shall be increased to four (4) sessions of structured out-of-cell individual or group activity and, in addition to the five (5) hours of out-of-cell leisure activity already offered to DDU inmates, four (4) additional hours of out-of-cell leisure activity. A Qualified Mental Health Professional will review the mental health classification of each pre-program inmate in the DDU every 30 days, and more frequently if dictated by the inmate's mental health needs to ensure that the inmate is appropriately classified. For purposes of this section, placement of the inmate on mental health watch shall not be deemed to interrupt the duration of time in the DDU.

**3.      DDU Transfer Policy**

To maximize the effective utilization of the STU beds, within one year from the effective date of this agreement the Department will develop and implement a policy providing that, notwithstanding any outstanding DDU sanction, an STU inmate may be transferred to general population, including a residential treatment unit, if doing so would not be clinically inappropriate and would not pose a substantial threat to the safety of any person or the security of the institution.

**B.      Other Segregation Housing**

Inmates with SMI shall not be housed in any other Segregation Unit as defined by this Settlement Agreement for more than thirty (30) days, except in Exigent Circumstances; provided however, that the parties understand that there may be times when the Department lacks an appropriate placement for all SMI inmates in Segregation. In that event, the Department will use all reasonable efforts to minimize the number of SMI inmates in Segregation and to remove them from Segregation as soon as possible.

At a minimum, SMI inmates held in Segregation shall be offered the following mental health and other services:

**1.      Less than Thirty (30) Days**

a.      If the SMI inmate has a Mental Health Classification of MH-1, MH-2 or MH-3, one (1) session of structured out-of-cell individual or group mental health per week, commencing in the first week of segregation, and which shall be part of a treatment plan; the opportunity to speak to a mental health clinician at least five (5) days per week, and in-cell programming. A Qualified Mental Health Professional will review the mental health classification of each SMI inmate in

7

Segregation every thirty (30) days, and more frequently if dictated by the inmate's mental health needs to ensure that the inmate is appropriately classified.

b.      An SMI inmate with a Mental Health Classification of MH-4 shall be offered two (2) sessions of structured out-of-cell individual or group activity per week. These sessions shall be part of a treatment plan and shall include at least one session with a mental health clinician. The length of the out-of-cell clinical sessions shall be determined by the clinician on a case-by-case basis.

c.      In addition to the five (5) hours of out-of-cell leisure activity already offered to inmates in segregation, an SMI inmate with a Mental Health Classification of MH-4 shall be offered two (2) additional hours of out-of-cell leisure activity per week. These extra hours may be provided either by offering additional out-of-cell sessions or by extending the period of existing out-of-cell session.

**2.      Over Thirty (30) Days**

After thirty (30) days in Segregation, the amount of weekly out-of-cell services offered to an MH-4 SMI inmate shall be increased to four (4) sessions of structured out-of-cell individual or group activity per week and, in addition to the five (5) hours out-of-cell leisure activity already offered to inmates in segregation, four (4) additional hours of out-of-cell leisure activity. For purposes of this section, placement of the inmate on mental health watch shall not be deemed to interrupt the duration of time in Segregation.

**C.      Secure Treatment Unit Program Termination**

Inmates with SMI shall not be returned to Segregation from an STU prior to completing the program, except in Exigent Circumstances or for program termination as follows:

1.      Pursuant to the procedures established for review of Exigent Circumstances, the Department shall periodically reassess inmates who have been terminated from a STU and returned to Segregation. The inmate shall be referred to the same or a different STU if the inmate's behavior and motivation demonstrably improve. The inmate shall have a treatment plan designed to motivate him or her to participate in clinically-indicated therapeutic programming in an appropriate setting.

2.      Inmates may be considered for termination from an STU prior to completing the program if the inmate engages in assaultive behavior or presents severe behavioral problem without demonstration of any effort to change and it is the consensus of the treatment team that the behavior has not improved and shows no indication of future change. Termination will not be considered without evidence and documentation of consistent refusal to engage in programs or chronic disruptive behavior that compromises the integrity of the program. The treatment team will meet to determine if further treatment interventions can be expected to produce no or

minimum behavior changes. The treatment team will also consider whether transfer to a different STU would be appropriate. If termination is decided, the treatment team will develop a discharge plan consistent with the inmate's needs. Final approval of termination shall be made by the STU Committee.

**D**.    **Segregation Review**

**1.    Institutional Segregation Committee**

At each facility at which inmates with SMI are held in Segregation, an Institutional Segregation Committee will meet at least weekly for the purpose of reviewing the status of such inmates to determine the reason(s) for Segregation and whether alternatives exist. Such review may include a review of pending investigation status, classification status, mental health developments, and disciplinary status. The membership of the Institutional Segregation Committee or such other designated committee shall include at least one Qualified Mental Health Professional.

**2.    Central Office Segregation Oversight Committee**

Membership of the Central Office Segregation Oversight Committee shall include the Deputy Commissioner, Prison Division; the Deputy Commissioner, Classification, Program and Reentry Division; Assistant Deputy Commissioners for the Northern and Southern Sectors, the Director of the Central Inmate Disciplinary Unit; a mental health professional from the Health Service Division; and a mental health professional from the Department's mental health vendor, or if any member is unable to attend a meeting, his or her designee.

The role of the Central Office Segregation Oversight Committee shall include:

a.    Developing strategies to reduce time spent in Segregation by inmates with SMI, including reducing time on awaiting action or identifying alternatives to Segregation for such inmates; and expansion of privileges for SMI inmates remaining in Segregation;

b.    Conducting a monthly review of the circumstances of inmates with SMI, including pre-programs inmates, who has been in Segregation for a period exceeding thirty (30) days as of the date of the monthly review. The review shall include consideration of facilitating the inmates discharge from Segregation, assessment of the inmate's mental health classification level, and whether additional out-of-cell time is clinically indicated. For purposes of this review, placement of the inmate on mental health watch shall not be deemed to interrupt the duration of time in Segregation.

The Central Office Segregation Oversight Committee shall maintain minutes that document reviews and actions taken, with the reasons for the Committee's decision and the potential alternatives for Segregation considered.

**3.    Secure Treatment Review Committee**

The Secure Treatment Review Committee shall review STU referrals regarding inmates with SMI in Segregation to determine whether the inmate should be placed in a STU. If STU placement is appropriate, the Committee shall recommend such placement to the Assistant Deputy Commissioner, Clinical Services and the Assistant Deputy Commissioners, Northern and Southern sections, who shall determine in which STU the inmate shall be placed.    Any determination of Exigent Circumstance shall be made by the Deputy Commissioner for Prisons.

The members of the Committee shall include the Department's Mental Health and Substance Abuse Coordinator, the Clinical Director of the Department's mental health provider, and the Coordinators of any existing STUs, such as the STP and BMU, or if any member is unable to attend a meeting, his or her designee.

## IV.    Specialized Treatment Units and Other Methods to Reduce Placement of SMI Inmates in Segregation

### A.    Number of Secure Treatment Units and Beds

1.    The Department currently operates a (19) nineteen bed Secure Treatment Program (STP) at the Souza Baranowski Correctional Center and a ten bed Behavioral Management Unit (BMU) at MCI Cedar Junction.

2.    The Department agrees to maintain the current number of STU beds for the period set forth in Section X(B)(2) unless it determines that fewer beds are adequate to ensure that no inmate with SMI is housed in Segregation in violation of the time limitations set forth in this Settlement Agreement.

3.    Subject to Section III, the Department retains discretion to decide on appropriate methods to most effectively ensure that inmates with SMI are not confined to the DDU, or held in other Segregation units for longer than thirty (30) days. Specifically, the Department, in its discretion, may opt to achieve this outcome by reducing the amount of time inmates are held on awaiting action status; reducing the length of DDU sentences; transferring clinically and behaviorally stable inmates from STUs to RTUs or general population; increasing clinical mental health input into the disciplinary and classification processes; developing more effective treatment modalities in general population through mental health classification or other strategies; creating short-term step-down high security treatment units; developing additional STUs; transferring clinically stable inmates from STUs to RTUs or population; or adopting any other method which will achieve the above-stated outcome.

### B.    STU Treatment and Programming

### 1.    Programs

a.     Each STU shall provide a variety of treatment programs and modalities to optimize the overall level of functioning of inmates with SMI within the correctional environment, and to prepare them for successful reentry into general population or the community.

b.     Behavioral programming in the STUs shall include incentives to encourage positive behavior. These incentives may include, where appropriate, the opportunity to earn additional privileges and reduce disciplinary sanctions, including the opportunity to reduce sentences to the DDU. The Department may make earned good time available in the STUs within statutory limits to inmates who are not serving DDU or disciplinary detention.

## 2.     Out-of-Cell Time

Inmates in an STU shall be scheduled for fifteen (15) hours of structured out-of-cell activity per week, with no fewer than ten (10) hours to be offered, and ten (10) hours per week of unstructured out-of-cell activity to be offered, including exercise but excluding showers, absent Exigent Circumstances.

For inmates assigned to a program phase that allows contact with other inmates, out-of-cell activities shall include opportunities for socialization including congregate exercise and dining, as determined by the treatment team.

## 3.     Treatment Plans

Every inmate with SMI in an STU or Segregation shall have an individual treatment plan, developed by a clinician with participation from the inmate and from others, as appropriate (e.g., medical staff, security staff).

Treatment plans shall ordinarily be reviewed every ninety (90) days for the first year and then every six (6) months, but more frequently as needed.  For example, if an inmate with SMI is returned to Segregation from an STU for programmatic or security reasons, the treatment plan shall indicate goals to effect the inmate's return to a STU or general population, as appropriate.

## 4.     Staffing

Staffing of the STUs shall be adequate and appropriate to achieve the purposes of the unit and shall include:

Designated administrator and supervising clinician

Designated clinical staff;

Sufficient clinical and rehabilitative staff to provide required programming;

Sufficient correctional personnel to escort inmates to and from treatment activities;

Sufficient correctional personnel who are trained to work with inmates who have SMI.

11

### V.    Mental Health Watch

A mental health watch shall be no longer in duration than necessary to deal with the mental health crisis that caused the inmate to be placed under observation. The Department's goal is to safely discharge inmates from mental health watch to their housing units within ninety-six (96) hours; however, any decision to discharge the inmate from mental health watch is a clinical judgment.

In all cases in which an inmate is maintained on mental health watch for more than ninety-six (96) hours the clinical director or designee of the Department's mental health provider shall be consulted until the inmate is discharged from mental health watch.

An inmate who is discharged from mental health watch to Segregation shall be assessed by a Qualified Mental Health Professional upon the third and seventh day following discharge, or upon such greater frequency or longer duration as may be determined by a Qualified Mental Health Professional.

### VI.    Role of Mental Health Staff in the Disciplinary Process; Related Discipline Issues

### A.    Self-Injurious Behavior and Related Behavior

Disciplinary reports solely for self-injurious behavior are prohibited. Disciplinary reports for behavior directly and wholly related to self-injurious behavior, such as destruction of state property, are also prohibited. Likewise, disciplinary reports for reporting to the Department or contract staff feelings or intentions of self-injury or suicide are prohibited.

### B.    Notification to Mental Health –SMI Inmates

Mental Health staff will be notified prior to service of a disciplinary report on any inmate with SMI who is charged with a Category 1 or Category 2 offense, as defined by the Department of Correction Inmate Discipline regulation, 103 CMR 430.00, et seq.

### C.    Superintendent's Review of Disciplinary Reports

During regularly scheduled reviews of recently issued disciplinary reports, the Superintendent or designee shall receive consultation from a facility mental health staff member regarding mental health issues that may be implicated in the events described by the disciplinary report, and whether there are appropriate alternatives for addressing the matter by means other than the disciplinary process. Upon determination that the case should be managed by means other than the disciplinary process, the Superintendent may order that the disciplinary report be dismissed in whole or in part.

**D.     Mental Health Issues at the Disciplinary Hearing**

**1.     Consultation on Disposition**

Following the entry of a guilty finding on a Category 1 or Category 2 disciplinary offense for an inmate with a Mental Health Classification of MH-4, the hearing officer, if not recommending a DDU sanction, shall consult with mental health staff. Mental health staff will render an oral opinion, if pertinent, as to whether there are mental health considerations that may bear on the issues of mitigation and determination of an appropriate sanction. This may include an opinion on the effect of particular sanctions or combination of sanctions on the inmate's mental health (e.g., loss of visits, canteen, television, etc.). The hearing officer will indicate by "check off" on the disciplinary hearing form that he or she has received an opinion from mental health staff and document any change in the disposition of the case entered pursuant to that opinion.

**2.     Guilty Plea**

In the event that an inmate with a Mental Health Classification of MH-4 charged with a Category 1 or 2 offense pleads guilty to disciplinary charges, prior to the imposition of disciplinary detention, other than a sanction of "time served," the hearing officer or disciplinary officer will consult with mental health staff with respect to dispositional recommendations and document any such change in disposition as provided in Section VI(D)(1).

**E.     Thirty Day Limit on Disciplinary Detention**

The Department may impose a disciplinary detention sanction on an inmate with SMI of up to thirty (30) days unless there are acute clinical contraindications to such detention. However, no inmate shall be placed continuously in disciplinary detention for more than fifteen (15) days. Inmates with SMI placed on disciplinary detention must have access to all mental health services that are generally available (i.e., mental health rounds, opportunity to request mental health contact as needed, opportunity to see the inmate's primary care clinician when regularly scheduled if this falls within the time period that the inmate is serving disciplinary detention).

**VII.   Training**

**A.     Pre-Service Mental Illness and Suicide Prevention Training**

All new correctional, medical and mental health staff shall receive eight (8) hours of initial suicide prevention training. At a minimum, training should include avoiding negative attitudes to suicide prevention, prison suicide research, why correctional environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, identifying suicidal inmates, and components of the Department's suicide prevention policy.

**B.     In-Service Mental Illness and Suicide Prevention Training**

**1.    Annual Training for Correction Personnel**

(a) Subject to collective bargaining agreements and bidding process, correction officers and correctional program officers shall receive annual in-service training, of at least two hours per year, on mental health issues.

(b) Such annual training for correction officers and correctional program officers shall include the identification and custodial care of inmates with mental illness and may include (i) interpreting and responding to symptomatic behaviors, and communication skills for interacting with inmates with mental illness with emphasis on SMI; (ii) recognizing and responding to indications of suicidal thoughts; (iii) conducting a proper suicide prevention observation; (iv) responding to mental health crises, including suicide intervention and cell extractions; (v) recognizing common side-effects of psychotropic medications; (vi) professional and humane treatment of inmates with mental illness; (vii) trauma informed care; (viii) de-escalation techniques; and (ix) alternatives to discipline and use of force when working with inmates with mental illness.

**2.    Secure Treatment Units**

Subject to collective bargaining agreements and bidding process, there shall be initial pre-service and annual in-service training of all staff in the STUs regarding mental health and mental illness, medications, co-existing disorders, and programming needs. Training shall be as follows:

a.    Upon the opening of any new STU, all security and treatment staff regularly assigned to the unit will receive forty (40) hours of training.

b.    New security and treatment staff assigned to a STU after it is open and operational will receive eight (8) hours of orientation training at the time of assignment. The Department will endeavor to provide each new staff member with an additional thirty-two (32) hours of structured on-the-job training during the first seventy-five (75) days of assignment.

**VIII.  DLC's Designated Expert, Reports, Dispute Resolution and Enforcement**

**A.    Designated Expert**

1.    DLC will retain Kathryn A. Burns, M.D. to serve as its designated expert to assess the Department's compliance with the terms of this Settlement Agreement. If Dr. Burns becomes unavailable, DLC will select a successor designated expert of its choice, after consultation with the Department. Within a reasonable time after its retention of a designated expert, DLC shall provide the Department with written assurance that the designated expert will avoid any conflict of interest in her activities in Massachusetts during the period set forth in Section X(B).

2.    DLC shall pay all fees and costs incurred by the designated expert and any consultants retained by her.

3.      The designated expert shall have access to all Department facilities that have a Segregation unit, with reasonable notice, to assess compliance with this Settlement Agreement. All site visits shall take place on consecutive days. There shall be no more than three site visits in each year that the Settlement Agreement is in effect. These visits may take up to three days each, and the designated expert may visit as many facilities as is practicable on each visit.

4.      The designated expert shall have access to meet with and interview personnel whose duties pertain to the provision of mental health services and/or who work with inmates.

5.      The designated expert shall have a reasonable opportunity to conduct confidential interviews of inmates to assess whether designations of SMI are being made in conformity with this Settlement Agreement.

6.      The designated expert shall conduct an in person or telephonic "exit interview" with one or more Department representatives, designated by the Department, at a time mutually convenient to the designated expert and the Department before the conclusion of each monitoring visit. Unless otherwise stated by the designated expert, any opinions or observations shared with Department representatives during such exit interview shall be deemed to be preliminary and subject to revision.

7.      The Department may retain Dr. Jeffrey Metzner or another mental health expert at its own expense to serve as the Department's designated expert.

**B.      Records and Reports**

1.      Three times per year during the course of this Settlement Agreement, at intervals to be agreed upon by the parties, the Department will provide DLC with data and documents collected by the Department and its mental health vendor to track compliance with the Settlement Agreement. This data will cover each Department of Correction facility that operates one or more STU or Segregation unit, but shall not include data pertaining to Bridgewater State Hospital patients, civil commitments at the Massachusetts Treatment Center, civil commitments at the Massachusetts Alcohol and Substance Abuse Center (MASAC), and civil commitments at MCI-Framingham.    Specifically, the data and documents to be provided are set forth in Appendix A attached to this Settlement Agreement.

2.      DLC and its designated expert may also request additional, relevant Department documents to track compliance with the Settlement Agreement, except documents protected by attorney-client or work product privileges, subject to the Court's August 12, 2010 Protective Order (Docket No. 133) and the September 13, 2011 Amended Protective Order (Docket No. 239), or any subsequent protective order entered by the Court. If these documents are requested in conjunction with a site visit, the Department will provide these documents to the extent feasible within ten (10) days prior to the visit.

3.      During the site visits, DLC's designated expert shall have reasonable access to current inmate mental health records.  If DLC requests copies of any inmate's mental health or other records, the Department shall provide copies within thirty (30) business days of the request, and DLC shall pay the Department twenty cents ($.20) per page within thirty (30) days of receipt. Within thirty (30) days of the effective date of this Settlement Agreement the parties shall agree to a procedure to ensure access to and the confidentiality of inmate records.

## C.     Designated Expert's Reports

The designated expert may prepare written reports on the Department's efforts to meet the terms of this Settlement Agreement, and may also include additional advice, suggestions or proposals in the nature of quality assurance or quality improvement as the designated expert deems appropriate.   The designated expert shall make her written report, if any, available to the Department within thirty (30) days from the completion of her visit and the delivery by the Department of any documents requested by the designated expert, unless the time for submission is extended by agreement of the parties. Although the Department will give full consideration to advice, suggestions and proposals offered by a designated expert, all decisions concerning the provision of mental health services by the Department's mental health provider will be made by the Department in accordance with the terms of this Settlement Agreement and statutory and other legal responsibilities.  If the designated expert reports that the Department had not met the terms of any provision or provisions of this Settlement Agreement, she shall make recommendations as to actions she believes to be necessary to meet the terms of the provision or provisions.

## D.     Dispute Resolution and Enforcement

1.      If DLC believes the Department is not in substantial compliance, i.e., is in substantial non-compliance, with any provision of this Settlement Agreement, DLC shall provide the Department, in writing, specific reasons why it believes that the Department is not in substantial compliance with such provision or provisions, referencing the specific provision or provisions. DLC may not allege that the Department is not in Substantial Compliance based on minor or isolated delays in compliance.  DLC may also not allege that the Department is not in substantial compliance without evidence of a pattern of substantial non-compliance with regard to that provision or provisions.  To the extent DLC relies on observations or opinions of its designated expert to support an allegation that the Department is not in substantial compliance, DLC shall make reference to the written reports of the designated expert or to portions thereof which support DLC's belief. To the extent DLC relies upon documents provided by the Department to support an allegation that the Department is not in substantial compliance, DLC shall make reference to the specific performance measures which support DLC's belief.

The Department shall have the opportunity to consult its designated expert with respect to DLC's allegations that the Department is not in substantial compliance with such provision or

provisions. The Department shall provide DLC with a written response to the notification within thirty (30) days of its receipt. The Department's response shall contain a description of the steps it took to investigate the issues addressed in the DLC's notice, the results of the investigation, and, where the Department proposes corrective action, a specific plan for addressing the described issues. If no corrective action is proposed by reason of funding constraints (including the unavailability of appropriated funds), legal considerations or for other reasons, the Department's response shall specifically state those reasons and any statutes, regulations, expert opinion or technical bases upon which it is relying in reaching such conclusion.

DLC agrees to advise the Department of its acceptance or rejection of the Department's response within seven (7) business days of its receipt. Either the Department or DLC, in any of the written submissions pursuant to this paragraph, may request a meeting to discuss and attempt to resolve any matter addressed in the written submissions. The Department and DLC shall meet within fourteen (14) business days of the receipt of the request, unless a later meeting is agreed by both sides.

If the Department and DLC are not successful in their efforts to resolve the matter, they may jointly or individually seek relief from the Court to effect substantial compliance with the Settlement Agreement, but not through a petition for contempt.

2.    The Court's jurisdiction shall terminate at the end of the three (3) year settlement period with respect to any provision or provisions of this Settlement Agreement for which there is no outstanding determination that the Department is not in substantial compliance, i.e., is in substantial non-compliance. If the Court determines that the Department is not in substantial compliance, i.e., in substantial non-compliance, with a provision or provisions of this Settlement Agreement at any time during the three (3) year period of the Settlement Agreement, the Court's jurisdiction with respect to such provision or provisions relating thereto shall continue for the remainder of the three (3) year period or for a period to be ordered by the Court of not more than two (2) years from the date of the Court's finding that the Department is not in substantial compliance.

3.    If the Court finds that the Department is not in substantial compliance, i.e., is in substantial non-compliance, with a provision or provisions of this Settlement Agreement, it may enter an order consistent with equitable principles, but not an order of contempt, that is designed to achieve compliance.

4.    If DLC contends that the Department has not complied with an order entered under the preceding paragraph, it may, after reasonable notice to the Department, move for further relief from the Court to obtain compliance with the Court's prior order. In ruling on such a motion, the Court may apply equitable principles and may use any appropriate equitable or remedial power then available to it.

**IX.     Implementation Timeline**

**A.**     Upon the effective date of this Settlement Agreement, the Department will not place an inmate with Serious Mental Illness in the DDU, except in accordance with Section III of this Settlement Agreement.

**B.**     Within six (6) months from the effective date of this Settlement Agreement, the Department will have sufficient STU beds, or will have made other modifications to its policies and practices, to ensure that no inmate with SMI is placed in any other Segregation Unit for more than thirty (30) days, except in accordance with Section III of this Settlement Agreement.

**C.**     The Department shall maintain written policies that are consistent with the terms of this Settlement Agreement.

**X.     Form of Agreement**

**A.     Scope**

1.     The parties hereby memorialize the terms of their agreement in this Settlement Agreement.

2.     This Settlement Agreement settles any and all claims against the defendants and shall be binding on the parties, their successors and assigns.

3.     This Settlement Agreement constitutes the entire agreement of the parties and, except for any Protective Order entered by the Court, supersedes all prior agreements, representations, negotiations and undertakings in this litigation not set forth or incorporated herein.

**B.     Court Approval, Jurisdiction and Enforcement**

1.     The Settlement Agreement is not effective absent approval by the Court. All Parties and their counsel will use their best efforts to obtain Court approval of this Agreement.

2.     The term of this Settlement Agreement and the jurisdiction of the Court shall commence upon the date of approval by the Court and shall extend for three (3) years from said date of approval, subject to paragraph VIII(C)(2) of this Settlement Agreement.

3.     The Court shall be the sole forum for the enforcement of this Settlement Agreement. Any order to achieve compliance with the provisions of this Settlement Agreement shall be subject to the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. section 3626.

4.     Subject to the provisions of Sections X(1) and (2) of this Settlement Agreement, in recognition of the time necessary for implementation of this Settlement Agreement, as provided in Section IX, the parties agree not to seek termination or otherwise challenge this Settlement Agreement or any order approving this Settlement Agreement during the period of time that the

Court retains jurisdiction pursuant to Section X(B)(2). Nothing in this paragraph shall limit the parties' rights to challenge or appeal any finding as to whether the Department is not in substantial compliance, i.e., in substantial non-compliance, or consequent order entered by the Court pursuant to Section VIII(C)(2) of this Settlement Agreement.

5.     This Settlement Agreement may be enforced only by the parties hereto. Nothing contained in this Settlement Agreement is intended or shall be construed to evidence an intention to confer any rights or remedies upon any person other than the parties hereto.

6.     This Settlement Agreement may not be relied on as precedent in any future claim. Nothing in this paragraph limits the parties' rights to bring claims arising out of paragraph VIII(D) of this Settlement Agreement.

7.     Nothing in this Settlement Agreement shall be interpreted to diminish or otherwise restrict any authority granted to DLC as the protection and advocacy system for persons with disabilities in Massachusetts.

## C.     Amendments

1.     By mutual agreement, the parties may change the terms of this Settlement Agreement, including, but not limited to, the timetables for taking specific actions, provided that such mutual agreement is memorialized in writing, signed by the parties and approved by the Court.

2.     During the term provided in Section X(B) of this Settlement Agreement, the Department shall not make any changes to any policy provision implementing the provisions of this Settlement Agreement without providing DLC a written draft of such policy or policies, for its review and comment. DLC shall have fifteen (15) days to comment. Without prior agreement of the parties, no Department policy provision may be amended to conflict with the terms of this Settlement Agreement while the Settlement Agreement remains in effect. The Department shall not approve any changes to a policy maintained by its mental health provider that conflicts with the terms of this Settlement Agreement. During the term of this Settlement Agreement, the definition of Serious Mental Illness as defined herein shall not be amended without agreement of the parties.

## XI.     Funding

A.     The parties acknowledge that implementation of this Settlement Agreement is subject to the availability and receipt of appropriated funds.

B.     The parties further acknowledge that the lack of funding does not preclude the Court from entering any order to achieve compliance with this Settlement Agreement that comports with the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. section 3626 and with other applicable law, provided that the Department reserves the right to assert that the lack of funding should be taken into account in any remedial order.

**C.**    The Department agrees to make all possible good faith efforts to seek all necessary funding to implement fully the terms of this Settlement Agreement.

**D.**    In the event that the parties are unable to agree as to whether there is sufficient funding to implement fully this Settlement Agreement, the parties shall meet and confer, and if necessary, consult the Court.    In the event that the parties continue to be unable to agree, either the Department or DLC may invoke the dispute resolution procedures in Section VIII(C) of this Settlement Agreement to seek the assistance of the Court.

## XII.    Attorneys' Fees

The Department and DLC do not agree as to the prevailing party in this case.    Nevertheless, for the purpose of compromise and settlement, the Department, through the Commonwealth of Massachusetts, agrees to pay DLC a total of one million, two hundred and fifty thousand dollars ($1,250,000) to settle DLC's claim for attorneys' fees and costs.    DLC agrees not to seek further fees and costs with respect to work incurred prior to the date of approval of this Settlement Agreement.    However, DLC does not waive its right to seek reasonable attorneys' fees and costs for successful enforcement of this Settlement Agreement, and the Department, on behalf of the defendants, reserves its right to oppose any such petition for fees and costs, including all appellate rights.

**Plaintiff:**

Alan Kerzin
Executive Director
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, Massachusetts 02108
(617) 723-8455

*The undersigned as counsel for Plaintiff*

Richard M. Glassman
BBO #544381
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, Massachusetts 02108
(617) 723-8455
rglassman@dlc-ma.org

David Yamin
BBO #562216
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110-1726
(617) 951-8000
david.yamin@bingham.com

Carol F. Head
BBO #652170
BINGHAM MCCUTCHEN LLP
One Federal Street

**Defendants:**

Luis S. Spencer
Commissioner of Correction
Massachusetts Department of Correction
50 Maple Street, Suite 3
Milford, Massachusetts 01757-3698
(508) 422-3300

*The undersigned as counsel for Defendants*

Nancy Ankers White
Special Assistant Attorney General
BBO #525550
Massachusetts Department of Correction
Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300
nancy@doc.state.ma.us

William D. Saltzman
BBO #439749
Massachusetts Department of Correction
Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300, Ext. 154
wdsaltzman@doc.state.ma.us

Charles W. Anderson Jr.
BBO #635016
Massachusetts Department of Correction
Legal Division
70 Franklin Street, Suite 600

21

Boston, Massachusetts  02110-1726
(617) 951-8000
carol.head@bingham.com

Boston, Massachusetts 02110
(617) 727-3300, Ext. 161
cwanderson@doc.state.ma.us

Alison Hickey Silveira
BBO #666814
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110-1726
(617) 951-8000
alison.silveira@bingham.com

Sheryl F. Grant
BBO #647071
Department of Correction Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300, Ext. 140
sfgrant@doc.state.ma.us

James R. Pingeon
BBO #541852
PRISONERS' LEGAL SERVICES, INC.
10 Winthrop Square
Boston, Massachusetts 02110
(617) 482-2773
jpingeon@plsma.org

Leslie Walker
BBO #546627
PRISONERS' LEGAL SERVICES, INC.
10 Winthrop Square
Boston, Massachusetts 02110
(617) 482-2773
lwalker@plsma.org

Robert Fleischner
BBO #171320
CENTER FOR PUBLIC
REPRESENTATION
22 Green Street
Northampton, Massachusetts  01060
(413) 587-6265
rfleischner@cpr-ma.org

James S. Rollins
admitted pro hac vice
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
One Post Office Square, 30th Floor
Boston, Massachusetts  02109-2127
(617) 573-4722
james.rollins@nelsonmullins.com

Appendix 1 - Table of Statistics and Documents

| Statistics & Documents | Settlement Agreement Provision |
|---|---|
| Monthly Segregation Statistics (by facility): <br><br> # of Segregation rounds completed; <br><br> # out of cell contacts for MH4 in Segregation; <br><br> # out of cell contacts for SMI in Segregation; <br><br> # of individual out-of-cell contacts in DDU <br><br> # of individual mental health professional sessions in DDU, indicating no-show and reasons. | **Segregation Rounds** |
| Monthly Segregation Statistics (by facility): <br><br> # of mental health Segregation updates completed; <br><br> # of new mental health watches; <br><br> Total days mental health watch (by constant and close); <br><br> # of 18(a) transfers out of Segregation; <br><br> # of 18(a) returns to Segregation. <br><br> Monthly DDU Statistics: <br><br> #  of new mental health watches; <br><br> Total days mental health watch (by constant and close); <br><br> 18(a) transfers out of DDU; <br><br> 18(a) returns to DDU. <br><br> Monthly RTU Statistics (by unit): <br><br> # of new admissions. <br><br> Other Documents: | **Evaluation of Inmates in Segregation** |

| | |
|---|---|
| Facility lists of SMI inmates admitted to and discharged from Segregation. | |
| Monthly STU Statistics (by unit): <br><br> # of new admissions. <br><br> Other Documents: <br><br> STU referral forms. | **Evaluation Prior to DDU Placement** |
| Monthly DDU Statistics: <br><br> # of SMI in DDU; <br><br> # of MH-4 in DDU; <br><br> # of groups offered; <br><br> # of mental health professionals offering groups; <br><br> # of group therapy sessions held; <br><br> # of no-shows for groups by reason. <br><br> Monthly Segregation Statistics (by facility): <br><br> # of MH-4 placed in Segregation; <br><br> # of SMI placed in Segregation; <br><br> Average length of stay of MH-4 inmates (calculated upon release from segregation); <br><br> Average length of stay of SMI inmates (calculated upon release from Segregation); <br><br> # of out of cell contacts for MH-4; <br><br> # of out of cell contacts SMI; <br><br> # of individual mental health professional sessions; <br><br> # of no-shows and reasons; | **Housing and Review of Inmates with Serious Mental Illness** |

| | |
|---|---|
| # of groups offered; | |
| # of mental health professionals offering groups; | |
| # of group sessions held per month; | |
| # of inmates in group therapy per month; | |
| # of no-shows and reasons. | |
| Other Documents: | |
| Central Office Segregation Oversight Committee Minutes; | |
| Forms for tracking the provision of structured and unstructured out of cell time and privilege levels provided to SMI pre-program inmates and SMI SMU inmates (three times a year, by request). | |
| Monthly STU Statistics (by unit): | **STU Termination** |
| # of inmates discharged by termination. | |
| Other Documents: | |
| Report of clinical case conference convened upon termination consideration. | |
| Documents: | |
| IMS Unit Operations – SMU Reviews screen (by facility, upon request three times a year); | |
| Central Office Segregation Review Committee Monthly Report; | |
| STU referral forms and packages. | |
| Documents: | **Number of Secure Units and Beds** |
| DOC notification to DLC upon: | |
| 1. STU bed number change; | |
| 2. Major change in policies or programs that facilitate | |

| | |
|---|---|
| the goal of reducing SMI confinement in DDU or SMUs. | |
| <u>Monthly STU Statistics (by unit)</u>: | **STU Treatment and Programming** |
| # of individual psychiatry sessions; | |
| # of no-shows for psychiatry by reason; | |
| # of individual mental health professional sessions; | |
| # of no-shows for individual contact; | |
| # of group treatment sessions scheduled; | |
| # of group treatment sessions conducted (by type); | |
| # of inmates enrolled in group therapy; | |
| # inmates that participated in group therapy; | |
| % group attendance; | |
| # of no-shows for groups by reason; | |
| Average # of hours out-of-cell structured programming per inmate; | |
| Average # of hours out-of-cell unstructured programming per inmate. | |
| <u>Other Documents</u>: | |
| Group schedules; | |
| Forms for tracking the provision of structured and unstructured out-of cell-time and privilege levels provided to STU inmates, by unit (three times a year, by request.) | |
| Notification of changes to STU Inmate Handbooks; | |
| Program Descriptions, and 103 DOC 650, <u>Mental Health Services</u>; | |
| Health Services Treatment Plan Audits. | |

| | |
|---|---|
| Monthly Facility Statistics (by facility):<br><br>Average duration mental health watch (days)<br><br>Other Documents:<br><br>Health Services Division Mental Health Watch Audit. | **Mental Health Watch** |
| Documents:<br><br>Morning Meeting Minutes (three times a year, by request);<br><br>103 DOC 650, Mental Health Services;<br><br>Mental Health Consultation for Disciplinary Disposition Forms (three times a year, by request). | **Role of Mental Health in the Disciplinary Process** |
| Documents:<br><br>Lesson plans and rosters for training conducted. | **Training** |
| Documents:<br><br>A roster of the inmates in each Segregation unit and STU listing the name of each inmate housed in those units on the first day of each month during the reporting period, the date of admission to the unit and length of stay in the unit, whether the inmate is an open mental health case, the inmate's mental health classification, whether the inmate is designated as SMI, the diagnosis and any current psychotropic medications. For inmates in the DDU, the roster will also state the reason for the inmate's DDU placement and the date of his projected release.<br><br>The Department of Mental Health reviews of Segregation Units conducted pursuant to G.L. c. 127, § 39, along with the Department's responses;<br><br>All completed mortality reviews for any suicide or suicide-related death conducted by the Department | **Other Documents** |

| pursuant to 103 DOC 622, Death Procedures, and provided in accordance with state confidentiality laws concerning any open mental health inmate in Segregation or any STU. | |

Exhibit L

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

## E. CLINICAL ROUNDS AND SCREENING

### *Clinical rounds*

A mental health staff member, usually a Licensed Psychiatric Technician (LPT), shall conduct rounds seven days per week in all ASUs to attend to the mental health needs of all inmates. The LPT shall make initial contact with each inmate placed into ASU within 24 hours of placement.

A morning "check-in" meeting between custody and clinical staff shall be held each day. At minimum, an ASU Sergeant and an assigned ASU Mental Health clinician (psychologist or social worker) shall attend the morning meeting. During the meeting, involved personnel shall identify new arrivals, discuss current behavioral issues and concerns, and share any pertinent information regarding new arrivals and/or at-risk inmates. Pertinent suicide risk information from the MHTS Suicide Tracking Report will be discussed. This meeting shall be documented in the ASU Log book and salient clinical information shall be documented in the UHR and, if necessary, a referral for mental health services shall be made at the appropriate level of urgency.

In order to establish contact and provide information, mental health staff shall attend to developing rapport with new inmates on the first day of mental health rounds.

Each institution is to ensure that effective communication is observed when inmates have limited ability to speak English or are hearing impaired. Interpreter services information shall be posted in all areas where phones may be used for that purpose, and all staff assigned to ASU shall be provided documented training regarding access and use of services and available translation equipment.

Those inmates not previously identified as having mental health treatment needs who exhibit possible signs and symptoms of serious mental disorders are referred, via CDCR 128-MH5, *Mental Health Staff Referral*, for clinical evaluation. Interaction shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days. The LPT shall maintain an individual record of clinical rounds on both MHSDS and non-patients by initialing next to the inmate's name on the CDCR 114, *Isolation Log Book*, each time the inmate is seen. Any unusual findings that may require closer observation by custody shall be documented on the CDCR 114-A, *Daily Log*, on the same day of occurrence. For identified MHSDS inmate-patients, the LPT shall document a summary of daily clinical rounds on a CDCR 7230, *Interdisciplinary Progress Notes*, in the UHR on a weekly basis. Notes will be

clearly labeled as "Weekly Summary of LPT Clinical Rounds." If clinically indicated, the LPT may provide additional documentation.

Exhibit M

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

- Urgent:  Urgent cases will be seen within 24 hours

- Other:  Other cases will be seen within five working days

6. <u>Clinical rounds:</u>  A mental health staff member, usually a LPT or at PBSP, a PC, shall conduct rounds weekly unless clinically needed more often in the SHU to attend to the mental health needs of all MHSDS inmates.  The LPT shall make rounds of non-MHSDS inmates every other week.  If an inmate refuses to talk to the LPTs, the LPT will discuss the inmate's functioning with custody staff.  The LPT shall maintain an individual record of clinical rounds by making a check mark next to the inmate's name on the SHU Inmate Roster each time they are checked.  Those inmates who have not been previously identified as having mental health treatment needs but exhibit possible signs and symptoms of a serious mental disorder shall be referred, via CDCR 128-MH5, *Mental Health Referral Chrono*, to a PC for clinical evaluation.  Any unusual findings that may require closer observation by custody shall be documented on the 114-A, *Isolation Log,* on the same day of occurrence.  The LPT shall document a summary of the status of MHSDS inmate-patients in a weekly progress note in the UHR.

7. All referrals and evaluations shall be documented on approved forms, filed in individual inmate UHR, and entered into the Mental Health Tracking System.

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS (or higher if appropriate), bypassing the standard referral process.

## G. **CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM (CCCMS)**

The mental health staff shall continue to provide mental health services to inmate-patients with the CCCMS level of care designation after they are placed in SHU.  Inmate-patients who meet the clinical criteria of MHSDS resulting from staff referrals, self-referrals, or clinical rounds shall also receive mental health evaluation and ongoing services, if determined appropriate.  Each MHSDS inmate-patient is assigned a PC.

1. Interdisciplinary Treatment Team

   a. The responsibilities for overall treatment planning within the CCCMS program rest with an IDTT.  These responsibilities include:

      - Placement decisions for individual cases

      - Review of relevant clinical data for diagnostic formulation

Exhibit N

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                  Plaintiffs,         )
                                      )CASE NO.:
        vs.                           )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                  Defendants.         )
_____)



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                 UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                      Plaintiffs,      )
                                         )CASE NO.:
 6          vs.                          )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                      Defendants.      )
     _____)
 9

10

11

12           The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  MICHAEL BIEN, ESQ.
                    AARON FISCHER, ESQ.
 4                  JANE KAHN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5            315 MONTGOMERY STREET, 10TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 6            415.433.6850
              415.433.7104 FAX
 7            MBIEN@RBGG.COM

 8
      FOR DEFENDANTS:
 9
                BY:  DEBBIE J. VOROUS, ESQ.
10            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
11            1300 I STREET
              SACRAMENTO, CALIFORNIA 95814
12            916.324.5345
              916.324.5205 FAX
13            DEBBIE.VOROUS@DOJ.CA.GOV

14              BY:  HEATHER L. McCRAY, ESQ.
              DEPARTMENT OF CORRECTIONS AND REHABILITATION
15            OFFICE OF LEGAL AFFAIRS
              1515 S STREET, SUITE 314 SOUTH
16            SACRAMENTO, CALIFORNIA 95811
              916.324.4123
17            916.327.5306 FAX

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1    last entry, can you read that?

2         A.    "Lots of CCCMS groups canceled.  Not const"

3    meaning not a constitutional issue.

4         Q.    Why did you write "not constitutional" next to

5    it?

6         A.    Because the -- the groups for CCCMS aren't

7    typically viewed as a constitutional mandate unless

8    somebody for a particular reason needs a group.

9         So I guess I will say I didn't think it's a

10   constitutional issue; but I think, as a matter of public

11   policy, it's good to do groups with people in CCC.  In

12   fact, it's good to do groups with inmates, period.

13        Q.    I never saw in the constitution any reference

14   to whether groups are necessary for CCCs.

15        MS. VOROUS:  Objection.  Argumentative.

16        Ask a question.

17   BY MR. BIEN:

18        Q.    I don't understand where the standard comes

19   from.  Where do you get the standard that groups are not

20   required for CCCMS inmates as a matter of law

21   constitutional law?

22        A.    Generally speaking, I'm unaware of anyplace

23   that has required for people that are stable on

24   medication to get more than that.  If they're doing

25   fine, then it's not -- it's my opinion.  It's not a

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1  constitutional issue.  I'm not quoting case law.  That's

2  my opinion.

3          Whereas for people that are not stable in EOP,

4  that it is a constitutional issue that they get

5  something more than medication presumptively.  I guess

6  it's possible somebody might not need it, but we presume

7  that they do.

8      Q.   Would you agree that if -- if there are no

9  groups provided for CCCs, you don't see any

10  constitutional issue if there's a particular prison that

11  decided to cancel all groups?

12     A.   I think -- yeah, that wouldn't be necessarily

13  a constitutional problem.  But if somebody had an

14  unmet -- a serious unmet mental health need, that might

15  be a constitutional issue, but it wouldn't have to be

16  groups that met it.

17     Q.   Let's assume for a moment that there's a

18  prison in California and, for whatever reason, not

19  individually based, but for a staffing reason or a

20  lockdown, all CCC groups are canceled for six months,

21  let's say.  Wouldn't that be a serious problem in the

22  delivery of mental health care?

23         MS. VOROUS:  Objection.  Vague and ambiguous.

24         THE WITNESS:  Not necessarily.  If -- if a --

25  if the inmates were stable, then their mental health

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1                    CERTIFICATE OF REPORTER

2

3            I, MEGAN F. ALVAREZ, a Certified Shorthand

4     Reporter, hereby certify that the witness in the

5     foregoing deposition was by me duly sworn to tell the

6     truth, the whole truth and nothing but the truth in the

7     within-entitled cause;

8            That said deposition was taken down in

9     shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13           I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                           DATED: March 1, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit O

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                   Plaintiffs,    )
                                  )CASE NO.:
          vs.                     ) S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                   Defendants.    )
_____)



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Charles Scott, M.D.                                    March 8, 2013

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,            )
                                      )
5                     Plaintiffs,     )
                                      )CASE NO.:
6          vs.                        ) S 90-0520 LKK-JFM
                                      )
7   EDMUND G. BROWN, JR., ET AL.,     )
                                      )
8                     Defendants.     )
    _____)

9

10

11

12

13

14          The Deposition of CHARLES SCOTT, M.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:06 a.m., Friday, March 8, 2013, at the

19   UC Davis Immigration Law Clinic, Building TB-34, Davis,

20   California.

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  ERNEST J. GALVAN, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, TENTH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              EGALVAN@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
11              415.703.3035
                415.703.5843 FAX
12              PATRICK.MCKINNEY@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    documents, I have gathered a number of documents that

2    include current data from the 33 institutions and will

3    send them to you on a DVD."

4            Do you remember getting that DVD?

5        A.    No.  I remember that Mr. Spagnolo would print

6    out and hand me all hard copies of all documents

7    versus -- so if he got DVD, I never got it.  I instruct

8    him, so that I know the volume and the bulk of records,

9    to just print them all out and put them in a box for me.

10   So he may have gotten a DVD, but I know that I had hard

11   copies.

12       Q.    Did he even give you -- did he give you hard

13   copies also of spreadsheets that wouldn't print beyond,

14   you know, on one page, big long spreadsheets?

15       A.    Yes.

16       Q.    How did you work with those?

17       A.    You can position them.

18       Q.    Okay.  So you would never have seen, then, the

19   disc that came?

20       A.    That's correct.

21       Q.    This is the disc I got from the attorney

22   general with folders, as you can see here.  This CD is

23   Exhibit 4 in our transcript.

24            They divided it up for me by institution, so

25   had we started, for example, with CMF.  And as you can

Charles Scott, M.D.                                        March 8, 2013

1    see, there are a number of spreadsheets here.

2            I'm just going to look inside one of them and

3    maybe -- it may be that some of this looks familiar from

4    the hard copies you looked at.

5            So this one has -- it called CCCMS.3.ad seg in

6    addition to its Bates number, which is DEXP13765 to 67.

7            As you look across at these columns, Doctor,

8    does this look like something that David might have

9    printed out for you?

10       A.    Vaguely.  Many of the documents -- for

11   example, review of ad seg care was not my area that I

12   was working on.  My -- so my focus on was documents

13   related to medication management.

14       Q.    Also MHCB?

15       A.    And MHCB.

16       Q.    So if we look at one of the MHCB ones, for

17   example, there's one that's called MHCB.8, Bates

18   No. 23286 to 785.

19            First group, A through F, does this look like

20   something David might have printed out for you?

21       A.    Yes.

22       Q.    I'll just -- I'm going to go to the right and

23   look at some of the other columns.

24            Are you familiar with this term in Column F

25   7447MH?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                        March 8, 2013

```
 1    for MHTS.net.
 2    BY MR. GALVAN:
 3        Q.   So you have no information one way or the
 4    other whether MHTS.net serves any vital internal
 5    purposes that would be necessary even if the special
 6    master didn't exist?
 7        A.   That's not what I said.
 8        Q.   What information do you have to contradict the
 9    statement that MHTS.net serves vital internal purposes
10    independent of the special master?
11        A.   They track both diagnoses and medications on
12    MHTS.net with special fields.  Also on MHTS.net, you can
13    look at location of the inmate, appointments held, and
14    classification.  So it provides a resource to gather
15    information about an inmate that could be useful in
16    different circumstance.
17        Q.   Useful for purposes independent of meeting
18    demands of the special master?
19        A.   Yes, I think so.
20        Q.   So is it your opinion that once the special
21    mastership is ended and the Coleman case is concluded,
22    that CDCR should shut down MHTS.net?
23        A.   Not necessarily.
24        Q.   So is it your opinion that the time spent by
25    psychiatrists to enter data into MHTS.net -- never mind.
```

Charles Scott, M.D.                                    March 8, 2013

1    Asked and answered.

2           On page 18 of Exhibit 14, there's a statement

3    in the paragraph identified then with small letter "i"

4    regarding inmates needing EOP level of care.

5           And it says:  "Considering generally the

6    nontherapeutic environment of administrative

7    segregation, we applaud CDCR's effort to expedite the

8    transfer of EOP inmates out of administrative

9    segregation."

10          Is that your opinion or Dr. Dvoskin's?

11     A.   Dr. Dvoskin was looking at EOP and ad seg, not

12    me.

13     Q.   So you have no knowledge one way or the other

14    whether there are any such efforts to applaud?

15          MR. McKINNEY:  Objection.  Mischaracterizes

16    prior testimony.

17          THE WITNESS:  That wasn't my area of focus, so

18    that was an opinion by Dr. Dvoskin.

19    BY MR. GALVAN:

20     Q.   So your only basis for that statement is

21    something Dr. Dvoskin told you or what he wrote here?

22     A.   No.

23     Q.   You have another basis?

24     A.   Yes.

25     Q.   What is that?

Charles Scott, M.D.                                          March 8, 2013

```
 1                  CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8               That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13               I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                  DATED:  March 11, 2013

21

22                  _____

23                  MEGAN F. ALVAREZ

24                  RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit P

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
          vs.                             )S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____)



DEPOSITION OF

STEVE J. MARTIN


TUESDAY, JULY 23, 2013,  9:32 A.M.

SAN FRANCISCO, CALIFORNIA


VOLUME I




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,             )
                                       )
5                        Plaintiffs,   )
                                       )CASE NO.:
6          vs.                         )S 90-0520 LKK-JFM
                                       )
7   EDMUND G. BROWN, JR., ET AL.,      )
                                       )
8                        Defendants.   )
    _____)

9

10

11

12

13

14

15

16          The Deposition of STEVE J. MARTIN, taken on

17   behalf of the Plaintiffs, before Megan F. Alvarez,

18   Certified Shorthand Reporter No. 12470, Registered

19   Professional Reporter, for the State of California,

20   commencing at 9:32 a.m., Tuesday, July 23, 2013, at

21   K&L GATES LLP, Four Embarcadero Center, Suite 1200,

22   San Francisco, California.

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3           BY:  JEFFREY L. BORNSTEIN, ESQ.
                 MEGAN F. CESARE-EASTMAN, ESQ.
 4           K&L GATES LLP
             FOUR EMBARCADERO CENTER, SUITE 1200
 5           SAN FRANCISCO, CALIFORNIA 94111
             415.882.8086
 6           415.882.8220 FAX
             JEFF.BORNSTEIN@KLGATES.COM
 7           MEGAN.CESARE-EASTMAN@KLGATES.COM

 8

 9   FOR DEFENDANTS:

10           BY:  JAY RUSSELL, ESQ.
             OFFICE OF THE ATTORNEY GENERAL
11           STATE OF CALIFORNIA
             455 GOLDEN GATE AVE., SUITE 11000
12           SAN FRANCISCO, CALIFORNIA  94102-7004
             415.703.3035
13           415.703.5843 FAX
             JAY.RUSSELL@DOJ.CA.GOV

14

15

     ALSO PRESENT:
16
             ELDON VAIL
17

18

19

20

21

22

23

24

25
```

Steve J. Martin                                                    July 23, 2013

```
 1   BY MR. BORNSTEIN:
 2       Q.   So when you see those numbers, you're
 3   concerned about what's going on in the programming side,
 4   why are the numbers as high as they are?
 5            MR. RUSSELL:  Objection.  Vague and ambiguous.
 6   Lacks foundation.  Compound.
 7            THE WITNESS:  This is what I've typically
 8   found is, you know, you've got operator or system,
 9   you've got these incidents that are occurring, most of
10   which you have an objective basis on which to use some
11   level of force and they may be using too much or
12   whatever.  But that there's a basis for you to use
13   force.
14            However, that is related to maybe that you're
15   placing a mentally impaired offender in a highly
16   restricted setting such as admin seg with lack of
17   programming which generates a spiraling down of his
18   mental health which manifests itself through resistance
19   to order, resistance to officials, which in turn
20   generates three things:  Serious discipline infractions,
21   applications of force, and further extended terms of
22   admin seg.
23            It is the worst-case perfect storm for the
24   administration of a prison system.  What I've just
25   described is that of mentally ill inmates in highly
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                      July 23, 2013

1    restricted environments with lack of mental health care

2    because it generates those every system I've seen where

3    the programming has been called into question and may be

4    even proven up that it's lacking in the corollary.

5    That's generally why I'm brought in by plaintiffs'

6    attorneys, is to do that piece of it.

7    BY MR. BORNSTEIN:

8        Q.    Well, isn't that what you've seen in

9    California, what you just described?

10       A.    I have not looked at the -- that third prong

11   of admin seg placements, extended stays related to.  But

12   there's certainly an overrepresentation of those

13   offenders in the use of force element.

14           Disciplinary, I don't know -- I have not seen

15   the data that's run on them like you run -- I would

16   certainly, if I was in a position to, I would want to

17   see the data as it relates to serious disciplinary

18   violation and dispositions by MI, non-MI, and so forth.

19   I rather expect you're going to find a pattern that's

20   similar to what you see in the other two.  They're all

21   linked.  They're all self-generated.  I mean, they're

22   all -- I want to say it's a perfect storm.  Each feeds

23   off the other.  So they're all going to be high.

24       Q.    Well, here let's talk about Pelican Bay.  You

25   brought that up when we first got started.  Pelican Bay.

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20             DATED:  August 2, 2013

21

22             _____

23             MEGAN F. ALVAREZ

24             RPR, CSR 12470

25

Exhibit Q

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                Plaintiffs,       )
                                  )CASE NO.:
        vs.                       )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                Defendants.       )
_____)



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, JULY 26, 2013,  10:00 A.M.

SAN FRANCISCO, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6          vs.                        )S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)
 9

10

11

12

13

14          The Deposition of CHARLES SCOTT, M.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 10:00 a.m., Friday, July 26, 2013, at the

19   law offices of Rosen, Bien, Galvan & Grunfeld, LLP,

20   315 Montgomery Street, 10th floor, San Francisco,

21   California.

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3             BY:  AARON FISCHER, ESQ.
               ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4             315 MONTGOMERY STREET, TENTH FLOOR
               SAN FRANCISCO, CALIFORNIA 94104
 5             415.433.6850
               415.433.7104 FAX
 6             AFISCHER@RBGG.COM

 7

 8   FOR DEFENDANTS:

 9             BY:  DEBBIE VOROUS, ESQ.
               OFFICE OF THE ATTORNEY GENERAL
10             STATE OF CALIFORNIA
               1300 I STREET, 10TH FLOOR
11             SACRAMENTO, CALIFORNIA 95814
               916.324.5345
12             916.324.5205 FAX
               DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1      A.    Yes.

2      Q.    Okay.  Any other work that you've done

3   involving CDCR prisoners in DSH programs?

4      A.    It's possible over the last 15 years I may

5   have been asked to do an evaluation of an inmate that

6   may have been in a DSH facility, but I can't recall

7   offhand any name.

8      Q.    Do you expect to do any work with respect to

9   activation of the Stockton facility?

10     A.    No.

11     Q.    Okay.  Since the termination proceedings and

12  the completion of your joint report on the termination

13  motion brought in Coleman, have you done any tours of

14  CDCR prison sites?

15     A.    No.

16     Q.    Okay.  Have you reviewed any CDCR patient

17  records?

18     A.    No.

19     Q.    Have you reviewed any policy and procedures?

20  Of CDCR?

21     A.    The -- the program guide I'm familiar with and

22  have reviewed.

23     Q.    And, again, the time -- from the time of the

24  completion of your termination report to today's date,

25  you have looked at the program guide?

Charles Scott, M.D.                                                    July 26, 2013

1       A.    Since the last -- since the termination.   I
2  can't recall an exact date, but I think it's likely.
3  Yes.
4       Q.    Any other CDCR policies and procedures that
5  you've reviewed since that time?
6             Again, since the completion of your joint
7  report on termination motion.
8             MS. VOROUS:   Let me interject here.   Are
9  you -- the doctor may have looked at other documents in
10  the context of his prior deposition which was after
11  completing the report.   So I don't know if you're asking
12  him to go back and try to remember whatever he looked at
13  for that report.   Maybe we could make that distinction.
14  BY MR. FISCHER:
15      Q.    Let's make it a little simpler.   How about
16  since the date of your deposition, which I believe was
17  March -- early March?   Since the day of your deposition,
18  have you reviewed any CDCR policies and procedures?
19      A.    If -- to the degree that they were referenced
20  in Dr. Haney's declaration and any portions that he took
21  from them referencing those, obviously I read his
22  declaration.
23            But that -- no, no other policies and
24  procedures.
25      Q.    Okay.   And since the completion of your

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                        July 26, 2013

1    termination motion joint report, have you spoken with

2    any CDCR clinicians as part of your expert work in this

3    case?

4        A.   No.

5        Q.   Have you spoken with any CDCR correctional

6    staff as part of your consultancy in this case?

7        A.   No.

8        Q.   Have you interviewed any class members?

9        A.   No.

10       Q.   Have you gone to review any specific

11   segregation units in the CDCR system?

12       A.   No.

13       Q.   Have you reviewed any of the new -- any new

14   CDCR memoranda that have been issued since the

15   completion of your report?

16       A.   No.

17       Q.   As an expert on this motion, are you relying

18   on any of the work that you did in the course of the

19   termination proceedings in your tours at that point?

20       A.   No.

21       Q.   Did you evaluate any of the segregation units

22   in the course of your consultancy on the termination

23   proceedings?  You specifically.  I know as part of your

24   joint report, but I'm wondering if you did any

25   evaluation of specific units or segregation units?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    July 26, 2013

1      A.    I did not do evaluations of specific ad seg

2    units.

3      Q.    Okay.  Have you been to any CDCR segregation

4    units prior to the termination proceedings?

5      A.    Have I been to any CDCR --

6      Q.    Any CDCR segregation unit.  Just to clarify

7    what I'm asking, that includes CDCR administrative

8    segregation units, secured housing units, psychiatric

9    services units.

10     A.    And the time frame was prior to my deposition

11   have I toured or been through any ad seg units?

12     Q.    Prior to your consultancy in the termination

13   proceedings, have you been to any of those?

14           MS. VOROUS:  I think we're talking over each

15   other.  She's going to hit you, start throwing stuff.

16           THE WITNESS:  Can I just clarify real quickly?

17   BY MR. FISCHER:

18     Q.    Of course.

19     A.    Are you asking before I consulted with CDCR in

20   relationship to the termination motion, had I been to an

21   ad seg unit prior to that for any reason?

22     Q.    A CDCR seg unit.

23     A.    Yes.

24     Q.    And when was that?

25     A.    Three or four years, five years ago.  I don't

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                                July 26, 2013

1    with people and would say, "What's your job here?"  So

2    if that's defined as an interview.  "What is your name?"

3    If that's defined as an interview.  I'd ask people their

4    name, their profession, their role at the facility, but

5    it was in the few minutes before starting the lecture.

6         Q.   Okay.  And that's the extent of --

7         A.   That's roughly the extent.

8         Q.   Okay.  Do you plan to do any more tours of any

9    CDCR segregation unit in the coming months?

10        A.   No.

11        Q.   Okay.  Do you expect to provide testimony at

12   the upcoming hearing on this motion on any issues beyond

13   what's in your declaration?

14        A.   It depends on, obviously, if I'm asked

15   information at the trial and I'm -- the court directs me

16   to answer it, but that's not my intent.

17        Q.   Okay.  Your intent to provide testimony is

18   based -- consistent and on the subject matters discussed

19   in your declaration --

20        A.   Yes.

21        Q.   -- of July 17?

22        A.   Yes.

23        Q.   Dr. Scott, have you ever done a formal

24   evaluation of any segregation unit in a correctional

25   facility?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                              July 26, 2013

 1        A.   Define "formal evaluation."

 2        Q.   Where you were asked to go in and evaluate the

 3   program?

 4        A.   At the San Diego Juvenile Hall, I was asked as

 5   a consultant to look at their facility.  And they did

 6   have placement rooms for juveniles that needed to be

 7   segregated from the main population due to aggression or

 8   violence, so I was a consultant in that aspect.

 9        Q.   When was that?

10        A.   Would have been in the early 2000s.  I don't

11   know the exact year.

12        Q.   Were you looking specifically at the mental

13   health program at the juvenile hall there?

14        A.   Yes.

15        Q.   Did you produce a report?

16        A.   I don't recall.

17        Q.   Do you know what the purpose of that

18   evaluation was?

19        A.   I was retained as an outside consultant by the

20   individuals who ran juvenile hall for more of an

21   overview quality assurance part of their program.  It

22   wasn't in the course of litigation; it was as an

23   independent third party.

24        Q.   Did you provide any recommendations as far as

25   the segregation units at the juvenile hall?

Charles Scott, M.D.                                    July 26, 2013

1      A.   Not that I can recall.

2      Q.   Were you asked to?

3      A.   I would have to review what their list of

4  questions were.  It's possible.

5      Q.   Have you evaluated any other segregation units

6  in correctional facilities?

7      A.   In part, yes.

8      Q.   Where?

9      A.   There's a Florida jail case where they have

10  a -- segregation rooms.  It's not the same as prison

11  segregation.  And although there was a request put in to

12  do a site evaluation of the actual physical location,

13  the court did not grant that for the experts.  So I

14  reviewed policies related to being placed in ad seg and

15  screening for mental health in depositions related to

16  that.

17          So that's what I meant by "in part."

18      Q.   Okay.  So you reviewed policies and

19  procedures, but not on-site -- didn't do on-site review

20  of the segregation rooms?

21      A.   Yes, that's correct.

22      Q.   Was that an individual lawsuit?

23      A.   That's an interesting legal question.  I think

24  it's starting out as an individual and may or may not be

25  a class action, so I don't know if they even know the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                                      July 26, 2013

1    research.  But the triangulation method as described by

2    Dr. Haney is looking at sort of different approaches or

3    methods if a more structured study hasn't or can't be

4    done.

5         Q.   I just want to understand the last part.

6              So you agree that triangulation as a method is

7    appropriate if the variables that are used are correct

8    or are valid?

9         A.   I would say two things.

10             One is I wouldn't necessarily agree.  Although

11   O'Keefe used a measurement with many items on it, an

12   extensive measurement asking a question about different

13   symptoms isn't really the same as a within method

14   triangulation.  I think that would be a broad, perhaps

15   inappropriate use of that term.

16             At the same time, triangulation methodology

17   has been used in mostly social science research and

18   concerns about triangulation are if the original data or

19   underlying data aren't either collected in a meaningful

20   way, there's no way to verify their accuracy or

21   liability.  Adding bad data from multiple sources

22   doesn't lead you to a good product at the end.

23        Q.   Okay.  Dr. Scott, have you done any studies on

24   segregation conditions?

25        A.   Not in a prison system.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                                                July 26, 2013

1   having a process where they could be reclassified to a

2   higher level of care or transferred to a mental health

3   crisis bed, having a process before they get into

4   administrative segregation where mental illness is

5   considered as far as the rule violation alleged and

6   looking for an evaluation of that aspect.

7            For those who have been identified, for

8   example, at the EOP level, having mental health

9   follow-up and checks.  So those are different

10  mechanisms.

11           And at the CCCMS level, they have follow-ups

12  and checks as well.

13       Q.   What types of follow-ups and checks do you

14  think are appropriate for the CCCMS level?

15       A.   I think the program guide is appropriate

16  that -- as outlined in the program guide.

17       Q.   Do you think the CCCMS inmates should continue

18  to get the same level of treatment that they're

19  receiving not in segregation when placed in a

20  segregation unit?

21       A.   It depends.  If there is evidence that they

22  need more care, then they can be reclassified to EOP

23  level.  And there's a system in place to do that.

24       Q.   Should CCCMS prisoners have access to group

25  therapy in segregation units?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    July 26, 2013

1       A.   I think you could, depending on the facility,

2   that could be an option.   I don't think that's required.

3       Q.   You don't think it's required for any CCCMS

4   inmates?

5       A.   In ad seg, I don't think it's a constitutional

6   requirement.

7       Q.   What do you mean by "constitutional

8   requirement"?

9       A.   That failure to give a CCCMS inmate group

10  therapy would represent the deliberate indifference

11  under the case of Farmer v. Brennan of subjective

12  recklessness that you knew and disregarded the harm.

13      Q.   Have you been asked to give an opinion as to

14  whether the treatment or lack of treatment in CDCR

15  prisons constitutes deliberate indifference for purposes

16  of this motion?

17      A.   No, but you asked me that question.

18      Q.   Do you think that providing group therapy for

19  some CCCMS inmates is clinically appropriate?

20      A.   It may be appropriate.

21           MR. FISCHER:   Exhibit 7.

22           (Plaintiffs' Exhibit 7 was marked for

23            identification.)

24  BY MR. FISCHER:

25      Q.   Dr. Scott, this is an article authored by

Charles Scott, M.D.                                                    July 26, 2013

1        Q.    So it should apply to anyone who's on a

2   psychiatric services case load?

3              I'm just trying to understand, is that --

4        A.    It applies to individuals on a psychiatric

5   case load.

6        Q.    Dr. Scott, I want to go to page 30 of your

7   declaration where you describe CDCR's system and you

8   have five identified --

9              MS. VOROUS:  You mean paragraph 30?

10             MR. FISCHER:  Paragraph 30.

11   BY MR. FISCHER:

12       Q.    It identifies five aspects of CDCR's system.

13             Where did you get this information as to these

14   five aspects of CDCR's system?

15       A.    Primarily from the program guide.

16       Q.    Did -- have you looked at implementation of

17   these items individually in CDCR's segregation units?

18       A.    In what capacity?

19       Q.    Have you evaluated the implementation of

20   these -- of these policies?

21       A.    No.

22       Q.    On the second policy, it's a policy regarding,

23   quote, screening inmates for mental illness before

24   placement in segregation.

25             Have you evaluated the screening tool used for

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                    DATED:  August 1, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit R

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____  )



DEPOSITION OF

TIM BELAVICH, PH.D.

WEDNESDAY, AUGUST 7, 2013,  9:58 A.M.

SAN FRANCISCO, CALIFORNIA










REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                              August 7, 2013

1               UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,            )
                                       )
5                    Plaintiffs,       )
                                       )CASE NO.:
6         vs.                          )S 90-0520 LKK-JFM
                                       )
7    EDMUND G. BROWN, JR., ET AL.,     )
                                       )
8                    Defendants.       )
     _____)

9

10

11

12

13

14         The Deposition of TIM BELAVICH, PH.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:58 a.m., Wednesday, August 7, 2013, at

19   the law offices of Rosen, Bien, Galvan & Grunfeld, LLP,

20   315 Montgomery Street, 10th floor, San Francisco,

21   California.

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                              August 7, 2013

```
1   APPEARANCES OF COUNSEL:

2   FOR PLAINTIFFS:

3            BY:  JANE KAHN, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
4            315 MONTGOMERY STREET, TENTH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
5            415.433.6850
             415.433.7104 FAX
6            JKAHN@RBGG.COM

7

8   FOR DEFENDANTS:

9            BY:  DEBBIE VOROUS, ESQ.
             OFFICE OF THE ATTORNEY GENERAL
10           STATE OF CALIFORNIA
             1300 I STREET, 10TH FLOOR
11           SACRAMENTO, CALIFORNIA 95814
             916.324.5345
12           916.324.5205 FAX
             DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    that.

2    BY MS. KAHN:

3        Q.   Okay.  So that's one of the unnecessary

4    changes that plaintiffs have proposed that you think is

5    unnecessary.

6             Okay.  Are there any others that you were

7    referring to in that first sentence?

8        A.   I'd have to go over my list of the proposals

9    again.  I know that, for example, not placing

10   individuals in -- in segregation at all -- I don't

11   think -- I don't think -- you know, I think falls in

12   this category of what I was referring to.

13       Q.   You mean a nondisciplinary prisoner in

14   segregation?

15       A.   No, not mental health patients in segregation.

16       Q.   Okay.  Well, maybe if we move through your

17   declaration, we'll find the specific examples.

18             MS. KAHN:  Want to take a break now?

19             MS. VOROUS:  Sure.

20             (Off the record at 11:19 a.m. and back

21              on the record at 11:34 a.m.)

22   BY MS. KAHN:

23       Q.   We're back sort of talking about some of your

24   responsibilities as acting deputy director.

25       A.   Okay.  Can I point something out, though,

Tim Belavich, Ph.D.                                    August 7, 2013

1    about my declaration?

2          Q.    Yeah.

3          A.    There is a -- an error in paragraph 10.

4          Q.    Okay.

5          A.    The beginning of the paragraph is correct when

6    it says "groups are offered."  In the second part of the

7    paragraph, when it says "at Corcoran 114 inmates

8    attended," it should be "were offered."

9          Q.    Okay.  I was going to ask you that.

10         A.    That should be "were offered a combined."

11               MS. VOROUS:  Same for the next sentence,

12    right?

13               THE WITNESS:  Yes.  We were talking "offered."

14    BY MS. KAHN:

15         Q.    Right.  Okay.  That was -- okay.

16               You discuss -- you actually discuss, later in

17    your declaration, about a suicide prevention work group.

18    And I think it's in paragraph 16 of your declaration.

19    But I want to ask you a little bit about that.

20               First, when it was first chartered?

21         A.    Paragraph 16?

22               MS. VOROUS:   16 talks about segregation work

23    group.

24    BY MS. KAHN:

25         Q.    No.  The last sentence is -- there are two

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

 1  things I say go ahead with and pursue.

 2      Q.   So if you think something is a good idea, but

 3  it needs to go higher, who do you go to next?

 4      A.   I go to Dr. Toche.

 5      Q.   And then she would decide whether she needs to

 6  bring it to her chain of command?

 7      A.   Yes.

 8      Q.   Okay.  So, in your February deposition, you

 9  testified about one of the termination experts'

10  recommendations that providing ASU inmates with

11  televisions in their cells can significantly decrease

12  the distress inmates experience in segregation.  And at

13  that time you testified that CDCR was exploring the

14  feasibility of moving patients to accommodate the

15  provisions of TVs due to the cost of retrofitting.

16          Do you recall that?

17      A.   Yes, I do.

18      Q.   At that time you decided that you'd assign

19  someone to estimate how many patients would need to be

20  moved.

21      A.   Yes.

22      Q.   Who did you assign that task to?

23      A.   The assignment came from DAI.

24          So the assignment wasn't one that I personally

25  gave out.  That came -- that was an assignment that was

Tim Belavich, Ph.D.                                          August 7, 2013

 1  given to individuals who work for DAI, and they -- they

 2  explored that.

 3      Q.   Okay.  And do you --

 4      A.   And they -- I'm sorry.

 5      Q.   Go ahead.

 6      A.   They reported their findings, I think,

 7  directly to the secretary.

 8      Q.   So do you know what that number is?

 9      A.   I don't offhand.

10      Q.   Okay.  Has that option been taken off the

11  table?

12      A.   I don't know that it has.  I -- I know that

13  the work group explored various options.  And one of

14  them that met with our approval was to purchase crank

15  radios for those who don't have appliances or don't have

16  electrical outlets.

17      Q.   And --

18      A.   I believe that that is a recommendation we

19  followed through with and pursued.

20      Q.   Where is that recommendation at at this point?

21  What's the status of that recommendation?

22      A.   The radios have been ordered and are expected,

23  I believe.  I believe we were able to pay extra to get

24  them as soon as -- mid October is the expected date.

25  They have to be manufactured.  They're being

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                        August 7, 2013

1   manufactured specifically for us.

2        Q.   Do you know how many radios have been ordered?

3        A.   It was 3,000 or 5,000.  I don't remember the

4   exact number.  And I just saw it last week.

5        Q.   Okay.  And do you know what the plan is for

6   distributing these radios?

7        A.   To the institutions or to the patients?

8        Q.   Both.

9        A.   They will be allotted -- part of the work

10  group worked on a allocation plan based on the number of

11  cells that the institutions have as well as a reserve

12  number.  And at the institutional level, they'll be

13  checked out through the recreational therapist --

14       Q.   Okay.

15       A.   -- for anyone in housing.  They don't have to

16  be on the mental health caseload.

17       Q.   Okay.  Also, in paragraph 16, you discuss the

18  ad seg work group chartered to analyze segregated

19  housing units, including suicide risk factors in

20  administrative segregation housing.

21            Do you see that in paragraph 16?

22       A.   Yes.

23       Q.   Can you tell us when that was chartered?

24       A.   That's been an ongoing group.  I believe that

25  was going on before I arrived in headquarters 18 months

Page 61

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   Mr. Johnson had told you.

2            Mr. Galvan asked you:  "Are they moved to the

3   top of the transfer list?"

4            And your answer was:  "I don't" -- "this is

5   where I think Mr. Johnson let me know that if we wanted

6   to move them to the number one priority then someone,

7   another group, who had already been previously made the

8   number one priority, would no longer be the number one

9   priority."

10           MS. VOROUS:  Can you also read the prior

11  question that defined who "they are"?

12           MS. KAHN:  "They are"?

13           MS. VOROUS:  The reference of "they are."

14  What was the question referring to which -- which group

15  of --

16           MS. KAHN:  EOPs.

17           MS. VOROUS:  Just -- just general EOPs?

18           MS. KAHN:  The question's about EOPs.

19           THE WITNESS:  It's my understanding that

20  EOP --

21           MS. KAHN:  EOP SNY.

22           THE WITNESS:  So that would be someone with --

23  BY MS. KAHN:

24      Q.   This is referring to page 21 of the

25  termination experts the observed designated for EOP SNY

Tim Belavich, Ph.D.                                       August 7, 2013

 1   transfer for their own protections in an ASU.

 2            And then Mr. Galvan said:

 3            "Q   Are they moved to the top of the

 4            list?

 5            "A   I don't know their placement on

 6            the list.

 7            "Q   So, as far as you know, they are

 8            not moved to the top of the list?

 9            "A   I don't know their placement on

10            the list.

11            "Q   Have you issued any memorandum or

12            instructions to the field stating that

13            systemwide SNY patients awaiting a bed

14            in ad seg should be moved to the top

15            of the transfer list?

16            "A   No.  That wouldn't be my role.

17            "Q   Whose role that would be?

18            "A   That would be a joint decision or

19            a joint memo probably from HCPOP in

20            division of adult institutions.

21            "Q   And is HCPOP under your

22            supervision?

23            "A   Yes.

24            "Q   So it's fair to say you would be

25            part of the process of drafting the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

```
 1                  joint memo?
 2                  "A    I believe it would take place at
 3                  levels lower than myself.
 4                  "Q    To your knowledge, is a draft of
 5                  such a memo in the works?
 6                  "A    No, not that I'm aware."
 7          Q.    The point of the question is:  Has anything
 8   been drafted or any instruction been given to HCPOP that
 9   EOP SNY housed in ad seg should be put at the top of the
10   list above all others?
11          A.    No, nothing's been drafted.
12          Q.    Okay.
13          A.    That I'm aware.
14          Q.    In your February 22nd, 2013, deposition, you
15   testified that you asked Judy Burleson to take to the
16   ASU work group the termination expert's recommendation
17   that a mentally ill prisoner placed in ASU solely for
18   protection should have an individualized assessment
19   regarding cage treatment.  You said that if you had not
20   heard back by April 1st, 2013, you would follow up.
21                  So the question is:  Have you received an
22   updated report from the work group about this
23   recommendation?
24          A.    Yes.
25          Q.    And what did you hear?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

1     A.   That the work group is looking at issues

2  recording nondisciplinary segregation and -- and

3  developing a plan for a proposal of nondisciplinary

4  segregation.

5     Q.   Okay.  Is there a timeline for this?

6     A.   I don't -- I know that it has been worked on

7  quite a bit.  I don't know if there is a drop date, but

8  I know it's being aggressively pursued.

9     Q.   Okay.  Why don't we look at the --

10          MS. KAHN:  Let's mark this.

11          (Plaintiffs' Exhibit 3 was marked for

12           identification.)

13  BY MS. KAHN:

14     Q.   So what you have in front of you -- I just

15  want to identify what that is, if you're not familiar

16  with it.  This is partial packet of the documents

17  that -- that were provided to us that are -- are

18  supposed to be the documents that you relied on to

19  support -- you know, that you reviewed or somebody

20  reviewed to the underlying documents for the data

21  provided in your declaration.

22     A.   Yes.  I've seen this.

23     Q.   Okay.  Good.

24          What I'd like to do is start with paragraph 6

25  in your declaration.

Tim Belavich, Ph.D.                                    August 7, 2013

1   been 3- to 5,000 radios that have been ordered.

2              Have you seen the last survey that was done of

3   all the ad seg units that do not have electrical

4   capacity?

5        A.   If I have, it's been a while.

6        Q.   I have that survey if you'd like to review it.

7   It's a considerable number of seg units that do not have

8   electrical capacity.

9              MS. KAHN:  Mark the next exhibit.

10             (Plaintiffs' Exhibit 3 was marked for

11              identification.)

12  BY MS. KAHN:

13       Q.   This is a survey.  This was provided to us --

14  e-mail sent to us was from Debbie Vorous on February 10,

15  2012.  It's a two-page survey that lists -- it's an

16  update from a court-ordered file -- survey that was

17  filed in 2007.  This is the update of all the ad seg

18  units and whether or not they have electrical capacity.

19             And so, as you look down, you can see there

20  are a considerable number of ad seg units without

21  electrical capacity, correct?

22       A.   Yes.

23       Q.   For example, if you look at CMF, I3, M3, and

24  S3 do not have electrical capacity, correct?

25       A.   Electric cells.

Tim Belavich, Ph.D.                                    August 7, 2013

 1              MS. VOROUS:   Sorry.   You said CMF -- oh, I see

 2    what you're saying.

 3    BY MS. KAHN:

 4         Q.   Those all house mentally ill prisoners,

 5    correct?

 6         A.   I believe so, yes.

 7         Q.   Yeah.   If you look above, both of the CMC

 8    ad seg units also do not have electrical capacity; is

 9    that correct?

10         A.   Yes.

11         Q.   Yeah.   And if you look down at DVI, K and L

12    wings, they also do not have electrical capacity,

13    correct?

14         A.   Correct.

15         Q.   If you turn the page, continue, Lancaster,

16    which I'll represent to you has a very large ad seg

17    population, A4 and A5, I think A5 is two cells that have

18    electrical capacity.   Otherwise, those units do not have

19    electrical capacity; is that correct?

20         A.   Correct.

21         Q.   I'll represent to you -- you could do the math

22    if you want.   I went through and looked at your monthly

23    ad seg population data from HCPOP and added the number

24    of the mentally ill prisoners housed in units without

25    electrical capacity for the same month -- for the

Tim Belavich, Ph.D.                                            August 7, 2013

1    current month, and there are over 1,000 prisoners on

2    mental caseload housed in these units.

3              The department has no plans to retrofit these

4    units, correct?

5         A.   I don't believe they have plans to retrofit

6    the units; but I know, for example, at LAC the plan is

7    to move the ad segs to a different yard.

8         Q.   And would those cells have electrical

9    capacity, or would they remove the capacity?

10        A.   Will they remove the capacity?

11        Q.   Yeah.

12        A.   I don't -- I don't know the answer to that.  I

13   haven't heard they're going to -- plan on removing

14   electrical capacity when they move the ad segs.

15        Q.   Do the current housing units have electrical

16   capacity where they're moving them?

17        A.   I believe they do, but I cannot say with

18   100 percent certainty.

19        Q.   Would that be something, as the mental health

20   director, you'd want to confirm?

21        A.   Potentially.  I don't know that -- whether or

22   not they have electrical capacity would influence a

23   decision as to whether or not I feel they should be

24   moved.

25        Q.   As mental health director, you wouldn't be

Tim Belavich, Ph.D.                                      August 7, 2013

 1   full-time, correct?

 2       A.   We don't, but I can say with certainty that it

 3   was not a large amount.

 4       Q.   Right.  But we don't know.

 5       A.   No.

 6       Q.   We don't know.

 7            So what we do know is you added some new

 8   psychiatrists, and that you took some part-time

 9   psychiatrists and they're now full-time, which is good.

10       A.   Yes.

11       Q.   And we don't know what percentage of each is

12   in this category?

13       A.   Exactly.

14       Q.   Okay.  All right.

15       A.   Yeah.

16       Q.   Okay.  Thanks.

17            So paragraph 13.  Isn't it true that not every

18   prison is equipped with a confidential treatment space

19   right now?

20            MS. VOROUS:  Objection.  Lacks foundation.

21            THE WITNESS:  Could you repeat your question?

22   BY MS. KAHN:

23       Q.   Okay.

24            Isn't it true that -- I'll be a little more

25   precise -- that not every prison within the Department

Tim Belavich, Ph.D.                                    August 7, 2013

1   of Corrections has a confidential EOP ad seg group

2   treatment space?

3       A.   I can't speak to that.  My intention on this

4   was to talk about individual treatment space.

5       Q.   Okay.  So that's --

6       A.   I didn't put "group" here.  If I should have

7   put "individual," then I should have.

8       Q.   Okay.  So this paragraph 13 refers to

9   individual confidential treatment space?

10      A.   Yes.

11      Q.   Okay.  And so what you're saying is that every

12  prison is equipped with a confidential treatment space

13  location if a prisoner requests it -- if a prison wanted

14  it?

15      A.   Yes.  If -- yes.  If they accept it.

16      Q.   Okay.  Whenever requested.  Is that true?

17      A.   Yes.  From what we've been told from our

18  chiefs of mental health, that if designated space is not

19  available and they want a confidential space, that

20  custody will work with them to get them a confidential

21  space when they need it.

22      Q.   And there will be adequate custody escort to

23  transfer the patient to that confidential space?

24      A.   I would assume so.

25      Q.   What would make you assume so?

Tim Belavich, Ph.D.                                    August 7, 2013

```
 1   BY MS. KAHN:
 2        Q.   Okay.  Was -- was there a review of a suicide
 3   at Lancaster that identified the 31-question screening
 4   as an inadequate tool for inmates and recommended that
 5   the SPR-FIT review that tool?
 6        A.   I recall there being a recommendation to look
 7   at the tool.
 8        Q.   And do you recall what year that was?
 9        A.   No.
10             MS. KAHN:  This should be confidential.
11             (Plaintiffs' Exhibit 14 was marked for
12              identification.)
13   BY MS. KAHN:
14        Q.   Dr. Belavich, also under page 2, under "new
15   proposed item," they're discussing the QIP.
16             So this was to jog your memory.  This QIP was
17   developed in 2010 following the review of a suicide that
18   happened earlier in the year.
19             And the plan was to have a draft tool
20   developed within three months, correct?
21        A.   You have to point me where it says that.
22        Q.   It's the first page.  It's the suicide
23   response coordinator Catherine Prudhomme.  "The work
24   group will be ongoing and plans to have an instrument
25   developed within three months."
```

THORSNES LITIGATION SERVICES, LLC | 877.771.3312 | www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

 1        A.    That's what it states.

 2        Q.    Okay.  So the department, in fact, has known

 3   about -- has been -- this has been on the SPR-FIT agenda

 4   since November of 2010, correct?

 5        A.    I don't know if it's consistently been on

 6   there or not, but it has been something that's been

 7   talked about.

 8        Q.    Would it have dropped off if it wasn't

 9   completed?

10        A.    Potentially, if there was a decision not to

11   pursue it.

12        Q.    Was there a decision not to pursue it?

13        A.    I don't believe so, since we're piloting a new

14   tool in the near future.

15        Q.    Okay.  So the tool is in your packet as well.

16              MS. VOROUS:  Exhibit 10.

17              THE WITNESS:  113061.

18   BY MS. KAHN:

19        Q.    3061.

20              Is this the proposed tool that Dr. Canning

21   developed?

22        A.    I believe this is the proposed tool.  I don't

23   know that Dr. Canning developed it on his own, but it

24   came out of the work group.

25        Q.    In your declaration you say Dr. Robert Canning

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                        August 7, 2013

1    developed a new proposed screening tool, which is a

2    combination of two instruments that together form a

3    shorter and more targeted questionnaire.

4        A.    Yes.

5        Q.    Is this that -- this is it?

6        A.    Yes.

7        Q.    This pilot was authorized in February 2013,

8    correct?

9        A.    Yes.

10        Q.    So you have a couple questions about the

11    actual questionnaire.

12             Will this -- well, let me go through the

13    steps.

14             So page 6 of your declaration, on bullet

15    point -- on .2, can you explain how -- how you plan to

16    roll this out with using both the 31-item questionnaire

17    and this new piloted tool?  It's somewhat confusing to

18    me.

19        A.    Sure.

20             Because this is a pilot, and we don't want to

21    go directly to anything new, we will continue our

22    traditional way of administering the 31 questions with

23    the psychiatric technicians.  So that will not change

24    and will remain the same.

25             What will change is that the -- either a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

1   psychiatrist or a psychiatrist supervisor from the

2   institution will administer the new -- the new tool.

3          So not conjointly, but at some -- sometime

4   that's close to the other --

5      Q.   To the same prisoners?

6      A.   -- to 31.

7          Yes.  No -- prisoner A will get both.

8      Q.   Okay.

9      A.   Everyone will get the 31-item.  That will not

10  change.

11     Q.   Okay.

12     A.   What will change is that, in addition, some

13  inmates will get the new questionnaire, and it will be

14  administered by a psychologist.

15     Q.   Okay.  So Item 2 says actually the opposite.

16          MS. VOROUS:  I notice that as well, so...

17  BY MS. KAHN:

18     Q.   Is that correct?

19          MS. VOROUS:  Is your declaration backwards, or

20  did you recall it incorrectly?

21          THE WITNESS:  Let's see...

22          I think that's incorrect, and it should be

23  flipped.

24  BY MS. KAHN:

25     Q.   Okay.  How do we do that?

 1            You may need to file an amended declaration,

 2     if there's enough corrections here.

 3            Say it how you think it should read, Doctor,

 4     and we'll see if we need to then also correct it by

 5     filing a new declaration.

 6        A.    My understanding is -- well, they've gone back

 7     and forth on this.  My understanding is that the -- is

 8     that it should be flipped.

 9        Q.    Right.  Now my understanding is LPTs

10     administer the 31-item questionnaire.

11        A.    And that's how it should be, and that's what

12     that's -- what I was told would continue.  I believe

13     that should be changed, is my -- I think this is

14     incorrect.

15            MS. VOROUS:  I would suggest, before we file

16     amended, we verify it and make sure that it hasn't

17     changed so that we're not changing something we haven't

18     defined first.

19            THE WITNESS:  We've had to go both ways

20     because we had to negotiate with labor.  There's been

21     issue with labor, and so we're trying to complete a

22     pilot and still not have a union go after us.

23            MS. VOROUS:  So it may have been correct at a

24     certain point in time; now it's changed.  What we need

25     to find out is what it is today.

Tim Belavich, Ph.D.                                    August 7, 2013

1        MS. KAHN:  Right.  We need to know what the

2    policy is today.

3    BY MS. KAHN:

4        Q.    So let me ask you just about timelines right

5    now.

6        A.    Okay.

7        Q.    So the 31-item questionnaire is administered

8    in 72 hours, correct?

9        A.    Yes, within.

10       Q.    Within 72 hours.

11             When will this new piloted questionnaire be

12   administered?  Is that also within 72 hours, or is that

13   a longer time frame?

14       A.    Yes.  It's close in time.

15       Q.    But once it's rolled out, if it replaces the

16   31-item question, it will be administered within

17   72 hours?

18       A.    Yes.

19       Q.    Okay.

20       A.    For the pilot, they were trying to get them --

21   not happening at the same time but in a close enough

22   time period that they're catching the patient in the

23   same state.

24       Q.    Right.  So do you know when decisions will be

25   made about which tool to use?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                              August 7, 2013

1     A.    I think, as was told to me last week, the

2  challenge is the length of the pilot.  Because the

3  challenge will be to get the 100 new screens of both

4  from -- from the number of institutions, four or five

5  now, and then we'll have to -- we'll have to reconvene

6  and evaluate.

7          With it being a pilot, any number of things

8  could happen.  We could find out that one is better than

9  the other.  We could find out one is -- the new thing

10  we've developed is no good.

11     Q.    Okay.

12     A.    We don't -- right now, with it being a pilot,

13  we can't say.  We hope to move quickly on it.

14     Q.    So did the mental health team that worked on

15  this pilot consider contacting other prison systems to

16  request their ASU screening tools?

17     A.    Yes.  And I know they had as part of the

18  suicide work group.  Not only on this, but on some of

19  the other ideas that were developed.  For example, new

20  training developed to deliver to our officers at the

21  academy on suicide prevention, they contacted other

22  states.  So we've been in close contact with several

23  other states.

24     Q.    But none -- obviously none of their tools were

25  adequate, correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

1    why would you permit somebody to be transferred back to

2    an RC?

3         A.    There are -- there are going to be some

4    instances where a DSH stay may be very short, and we

5    aren't done processing him.  But the scenario you

6    describe, where someone sits at DSH for months, their RC

7    processing should be completed, and they should be

8    returned to the correct place.

9         Q.    Let's hope it works the way you say.

10        A.    Our goal was to -- to address -- address --

11             MS. VOROUS:  There's no question pending.

12   BY MS. KAHN:

13        Q.    No, I understand.  It's an enabling memo,

14   though, that allows a return back to a reception center.

15             MS. VOROUS:  Objection.  Argumentative.

16             MS. KAHN:  I know.

17   BY MS. KAHN:

18        Q.    Okay.  Let's look at page 10 -- page 9 on the

19   memo refers to ad seg cases.

20             Again, if a patient is transferred to the

21   Department of State Hospitals from a SHU or ad seg, they

22   will be returned back to that unit if they still have

23   pending -- if there are SHU or ad seg issues.  Which is

24   something that we're...

25        A.    Yes.  This didn't change any policy.

Tim Belavich, Ph.D.                                    August 7, 2013

1    that to be included in here.

2    BY MS. KAHN:

3        Q.    What's a joint mental health DAI memo?

4              The distribution list is going to chiefs of

5    mental health, health care managers, wardens, CEOs.

6        A.    And I -- I believe it went to those

7    individuals more for informational purposes.

8              The memo was directed at the custody and

9    classification staff, because they're the ones who are

10   actually doing this work, and that the others were

11   included, you know, for informational purposes.

12       Q.    Is there a process that exists to override and

13   to keep a patient outside of a ad seg if clinicians feel

14   that he or she will decompensate if they return to

15   ad seg on discharge from a DSH facility?

16       A.    Well, I think during 115 hearings, during the

17   RVR process, there's mental health input and the

18   clinicians can make their concerns known at any time.

19       Q.    This is somebody who transfers psych and

20   return from a PSU or from a EOP hub.  Decompensated

21   there, went to the Department of State Hospitals, and is

22   discharging back to that environment.

23             Is there any process that exists right now

24   within the department for a clinical input override to

25   return back to segregated housing?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                        August 7, 2013

1    A.    Well, if he's going back to segregated housing

2    and DSH doesn't believe he can function in segregated

3    housing, I don't think they would discharge him.  They

4    need to prepare him to return to whatever housing he's

5    planned to return to.

6    Q.    Do DSH clinicians know where the patient is

7    returning?

8    A.    Yeah, through -- they communicate with our

9    staff quite frequently.  Yes.  It's my understanding

10   that they do.

11   Q.    So they're informed that the patient they're

12   discharging is going back to segregated housing unit?

13   A.    It's my understanding they have an awareness

14   of where the patient's going.

15   Q.    So that's the -- that is the option that's

16   available to clinical staff is to not discharge from the

17   Department of State Hospitals if they feel the patient

18   can't manage a segregated housing unit?

19   A.    That is an option.

20   Q.    Is there any other option?

21   A.    Not that I could think of offhand.

22   Q.    Okay.  Maybe that should be our proposed

23   order.

24         MS. VOROUS:  There's no question pending.

25         MS. KAHN:  There's no question pending there.

Tim Belavich, Ph.D.                                      August 7, 2013

1    unit who makes the determination whether the particular

2    prisoner requires extended custody checks -- welfare

3    checks?

4          A.    Yes.  It would be the case manager.

5          Q.    The case manager?

6          A.    With input from -- it could be input from

7    custody staff, more than likely.  It may be input also

8    from a licensed psychiatric technician doing rounds.  So

9    the information can come from multiple sources.  But the

10   chrono should be written by the case manager.

11         Q.    Is it written -- extended day by day?

12   Extended for a week?  Is there any guidance on that?

13         A.    I don't believe there's any guidance on it.

14   It was left to the clinicians.  They can do it by day,

15   or they can -- they can pick a number of days.

16         Q.    Okay.  What about noncaseload prisoners who

17   are housed in ad seg units?  Is there a process for

18   extending their welfare checks?

19         A.    Can you repeat your question again?  I'm

20   confused.

21         Q.    Yeah.

22               If it's the case manager that extends the

23   welfare checks for the prisoner on the mental health

24   caseload, what -- who is going to write the chrono for a

25   noncaseload prisoner who's housed in ad seg who somebody

Tim Belavich, Ph.D.                                    August 7, 2013

1   determines needs to have welfare checks extended?

2        A.   Okay.  Now I understand.

3             It could be -- that person would probably be

4   brought to -- probably interviewed -- the person should

5   be evaluated more fully.  If they need more increased

6   welfare checks, there's obviously a concern for them.

7   So they would need to be evaluated and either put on a

8   caseload or if they're not put on a caseload, the

9   expectation would be someone in the housing unit would

10  be following them.

11            I -- I'm having trouble thinking of someone

12  who needs extended welfare checks and doesn't end up on

13  mental health.

14       Q.   Safety concerns?

15       A.   They can't be on caseloads?

16       Q.   Well, no, they could; but you guys have a high

17  standard for determining whether somebody has a Axis I

18  disorder that would make them eligible for MHSDS.  It

19  might be a situational anxiety disorder.

20       A.   I can't agree with that.

21       Q.   Well, I'm just saying that somebody could come

22  in and have a serious safety concern.

23       A.   And they wouldn't be brought on to mental

24  health?

25       Q.   I don't know.  That's why I'm asking what the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   process is.

2            Has the training only occurred with mental

3   health clinicians on extended welfare checks?

4       A.    Mental health clinicians, to my knowledge, are

5   the only ones who can extend the welfare checks.

6       Q.    Right.

7       A.    But -- I can't fathom the scenario you put

8   forward.  We have meetings every morning between custody

9   and custody staff.  They discuss patients and concerns.

10  And so you have a guy who needs his checks extended,

11  he's been seen three times an hour for three weeks, and

12  no one -- no one's there to extend them.  I don't

13  understand the scenario.

14      Q.    Well, I mean, are we going to have a

15  discussion here?

16            MS. VOROUS:  No.

17  BY MS. KAHN:

18      Q.    I could ask you the question.

19            Have you seen the suicide report -- I don't

20  have a date; I could go pull it -- of the man who killed

21  himself on the 22nd day?  He was not on the mental

22  health caseload.  He waited until he went off the

23  security check and killed himself.

24            I think you're going to have -- do you design

25  a system that assumes there are going to be people not

Tim Belavich, Ph.D.                                            August 7, 2013

1    on the caseload who might need extended checks and have

2    a method for extending them in your ad segs?  That's my

3    question -- that doesn't require a mental health

4    clinician to do that?

5         A.   I don't believe there's a way to make a

6    fail-safe system where every person will always be

7    protected at all times.

8         Q.   Are you aware that a quarter or half of your

9    suicides in ad seg occur with people not on your mental

10   health caseload?

11        A.   I'm aware that there are suicides of nonmental

12   health caseloads in ad seg.

13        Q.   Okay.  And are you aware that the American

14   Correctional Association standard for welfare checks,

15   30-minute welfare checks, is for everybody in ad seg for

16   their entire stay in segregation?

17        A.   I'm aware of that.

18        Q.   That includes people on a mental health

19   caseload and not on the mental health caseload.

20             Are you aware of that?

21        A.   Yes, I'm aware of that.

22        Q.   When you issue a memorandum that allows

23   clinical staff to extend 30-minute welfare checks for

24   patients on the mental health caseload, is there some

25   reason why you wouldn't create a mechanism for allowing

1    psych techs or somebody in the housing unit to extend

2    30-minute welfare checks for prisoners not on the mental

3    health caseload?

4            MS. VOROUS:  Objection.  Argumentative.

5            MS. KAHN:  I'm probing the question.

6            THE WITNESS:  I don't see anywhere on page 2

7    of this memo where it says that welfare checks can only

8    be extended for mental health patients.

9    BY MS. KAHN:

10       Q.   Have you just testified that the only person

11   that can do is the primary clinician?

12       A.   If he's on a caseload.  And I said that if the

13   patient is not on the caseload, I would expect he would

14   become on a caseload or he would be followed by someone

15   in the unit; because he's someone who is identified as

16   being in distress.

17       Q.   Isn't it true that one possibility could be

18   that for a noncaseload prisoner, who you want to extend

19   30-minute welfare checks, you could require a referral

20   to mental health?

21       A.   You could do a lot of things.  One of those

22   would be that.

23       Q.   But, as your memo reads now, the only person

24   that can write a chrono to extend 30-minute welfare

25   checks, is a clinician, correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    August 7, 2013

1       A.   Clinical staff may continue welfare checks
2   beyond 21 days.
3       Q.   And this does not include a licensed psych
4   tech?
5       A.   It says clinical staff.
6       Q.   Okay.  Okay.
7            Are you open to considering a modification of
8   this policy?
9       A.   I'm always open to looking at our policies and
10  developing things that can work better.
11      Q.   Since this policy was implemented at the end
12  of May, have you evaluated the number of prisoners who
13  have been placed on extended welfare checks?
14      A.   No.
15      Q.   Will that be part of an evaluation that the
16  department looks at?
17      A.   I don't know.
18      Q.   Okay.
19           You agree that a security check is not a
20  welfare check?
21      A.   What am I agreeing to?
22      Q.   Do you agree a custody security check is not a
23  welfare check?
24      A.   Yes.
25      Q.   Do you know what a security check is?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                            August 7, 2013

1          A.    I have an understanding of a security check.

2          Q.    What is your understanding?

3          A.    That an officer makes rounds and ensures that

4     he's got correct number of bodies in the cells, and he

5     doesn't log on individuals.  He logs on round.

6          Q.    Makes sure all the cells are locked?

7          A.    I don't know.

8          Q.    Okay.  Have you observed security checks?

9          A.    Yes.

10         Q.    Okay.  And you've observed welfare checks?

11         A.    Yes.

12         Q.    Are they different?

13         A.    Yes.

14         Q.    Okay.  How are they different?

15         A.    With the welfare checks that I've seen, the --

16    I've not seen the welfare checks with the Guard One.

17    I've seen them prior to Guard One.  The individuals are

18    logged on, and there's some acknowledgment of what

19    they're doing.

20             So it's more of a checking on the person and

21    what they're doing.

22         Q.    Have you heard them described as living,

23    breathing checks?

24         A.    I have not.

25         Q.    Okay.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20              DATED:  August 14, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit S

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---o0o---

RALPH COLEMAN, ET AL.,

     Plaintiffs,

     vs.             Case No. S 90-0520 LKK-JFM

EDMUND G. BROWN, JR., ET AL.,

     Defendants.

_____/

DEPOSITION OF KATHLEEN ALLISON

THURSDAY, AUGUST 15, 2013

SAN FRANCISCO, CA

(EXHIBITS 4, 12, 13 AND 14 ARE CONFIDENTIAL

PURSUANT TO THE COLEMAN PROTECTIVE ORDER)

REPORTED BY:

HOLLY MOOSE, CSR NO. 6438

RPR-RMR-RDR-CRR-CCRR-CLR

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4          ROSEN, BIEN, GALVAN & GRUNFELD
            BY:  AARON J. FISCHER, ESQ.
 5          315 Montgomery Street, 10th Floor
            San Francisco, CA  94104
 6          (415)433-6830
            afischer@rbgg.com

 7

 8    FOR THE DEFENDANTS:

 9          OFFICE OF THE ATTORNEY GENERAL
            BY:  DEBBIE J. VOROUS, ESQ.
10          1300 I Street, 10th Floor
            Sacramento, CA  95815
11          (916)324-5345
            debbie.vorous@doj.ca.gov

12    AND

13          DEPARTMENT OF CORRECTIONS & REHABILITATION
14          BY:  D. RAE DE LONG, R.N., J.D.
            1515 S Street, Suite 314S
15          Sacramento, CA  95811
            (916)445-3300
16          rae.delong@cdcr.ca.gov

17
      TAKEN AT:
18
            ROSEN, BIEN, GALVAN & GRUNFELD
19          315 Montgomery Street, 10th Floor
            San Francisco, CA  94104
20          (415)433-6830

21

22                      ---o0o---

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    let's say it's a level -- it's a GP institution with no

2    SNY yards, then they have to transfer.  That's a

3    different process.

4              If an inmate has been released from

5    segregation, he's to -- and been released to that yard,

6    it's coded to me in our COMPSTAT Tracking System that

7    he's been released and he's pending a bed.  But it's

8    rare that you're going to have an inmate who doesn't go

9    to the yard, oftentimes that evening after release.

10        Q.   So this is a situation where someone has been

11   in AD-SEG for one of the valid reasons; is that correct?

12        A.   Yes.

13        Q.   And then is found to be ready for release from

14   AD-SEG, correct?

15        A.   Yes.

16        Q.   And then is awaiting a bed at that same

17   institution?

18        A.   Yes.

19        Q.   And you said that's not a common scenario?

20        A.   Correct.

21        Q.   And then there's a second situation where

22   somebody is in an AD-SEG unit pending transfer to

23   another institution?

24        A.   Yes.

25        Q.   And that may be for an SNY bed?

Kathleen Allison                                         August 15, 2013

```
 1        A.    It could be for SNY or GP.

 2        Q.    Okay.  And you say you look at the data.  How

 3   common is that situation?

 4              MS. VOROUS:  Objection.  Vague and ambiguous,

 5   lacks foundation.

 6              You can answer the question.

 7              THE WITNESS:  It's a common practice.  It's

 8   every day inmates are transferred around the state.

 9              MR. FISCHER:  Q.  You said that generally when

10   someone is released from AD-SEG to return to a

11   nonsegregation bed within the institution -- that that

12   generally happens within a day or so, you said.  Is

13   that --

14        A.    Yes.

15        Q.    -- correct?

16              Does it also happen within a day or so for

17   someone in AD-SEG, pending transfer to a nonsegregation

18   bed at another institution, to be transferred within a

19   day or so?

20        A.    No.

21        Q.    How long does that take, as a general --

22        A.    I --

23        Q.    -- based on your review of the data?

24        A.    The process is once the -- let's say a

25   committee, ICC, evaluates a case, refers it for
```

```
 1   them to package it up.
 2        Q.    Can you estimate, based on your experience.
 3        A.    Within a week.
 4        Q.    Within a week?
 5        A.    Mm-hm.
 6        Q.    Would there be any concern about producing
 7   those documents once they are provided to the Office?
 8            MS. VOROUS:  I've said that as soon as they
 9   become public, we would be more than happy to produce
10   them to plaintiffs.
11            MR. FISCHER:  What is the reason that we -- why
12   we can't get them before they're public?
13            MS. VOROUS:  Because they're covered by the
14   attorney/client work product, attorney/client privilege
15   and deliberative process at this point in time.
16            MR. FISCHER:  We would disagree, but we won't
17   deal with it at this point.
18        Q.    Ms. Allison, can you just describe the policy
19   changes that are included in these draft regulations.
20        A.    Yes.  It's additional privileges provided to
21   those inmates that are in there for nondisciplinary
22   reasons.
23        Q.    What additional privileges?  Are they
24   identified in the draft regulations?
25        A.    Yes.
```

Kathleen Allison                                            August 15, 2013

 1      Q.   And so what are the additional privileges?

 2      A.   Personal property, phone calls, quarterly

 3   packages, canteen privileges.

 4           That's the primary purpose of that.

 5      Q.   Any other privileges that would be included for

 6   nondisciplinary segregation prisoners under these draft

 7   regulations?

 8      A.   Not that I recall.

 9      Q.   The personal property privileges, would those

10   be commensurate with a nonsegregation unit's personal

11   property privileges?

12      A.   Based on their prior privilege group prior to

13   placement in administrative segregation, yes.

14      Q.   Just so I understand, depending on what the

15   individual's custody assessment/privilege group -- slash

16   privilege group -- was prior to placement in

17   nondisciplinary segregation status, that personal

18   property privilege would be the same once they -- while

19   they're in the nondisciplinary segregation unit?

20      A.   Yes, with an exception of a few, due to

21   security concerns.

22      Q.   What would the exceptions be?

23      A.   For example, a fan.  There's a long metal bar

24   within most of the fans, and that could be considered

25   weapons stock.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                        August 15, 2013

1      Q.    Anything else?

2      A.    Odd thing, like petroleum jelly.

3      Q.    Anything else?

4      A.    There are -- there are others, but I cannot

5   recall exactly which ones are not.  But they're all

6   individually highlighted.

7      Q.    What about books?

8      A.    Books are allowed.

9      Q.    Commensurate with their pre-segregation

10  placement privileges?

11     A.    Yes.

12     Q.    With respect to phone calls, would access to

13  phone call privileges be the same for an individual

14  before and during nondisciplinary segregation?

15     A.    No.

16     Q.    What would the difference be?

17     A.    Under -- an inmate has to be escorted out.  So

18  it's -- it's divided -- it's broken down different for

19  an inmate in Privilege Group A versus Privilege Group B

20  versus Privilege Group U, which is unclassified.

21          Privilege Group A gets one a week, if I recall

22  correctly, and Privilege Group B gets one a month.

23     Q.    And how does that compare to a non --

24  nonsegregation unit?

25     A.    A nonsegregation unit -- and again, that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    depends upon the level of inmate and his accessibility

2    to the dayroom, because the phones are open in the

3    dayroom, and he signs up on a list.  So it's -- an

4    inmate may be able to have a phone call a couple times a

5    week, based on availability, in a GP versus a non.

6         Q.    So the difference is because of the escort and

7    custody needs in -- in the segregation units for the

8    nondisciplinary segregation prisons; is that correct?

9         A.    They don't have free access to it, correct.

10        Q.    With respect to the quarterly package --

11   quarterly package privilege, is there any difference

12   between what an individual would get prior to

13   nondisciplinary segregation placement and during

14   nondisciplinary segregation placement under the draft

15   regulations?

16        A.    If I recall, it's the same as its prior

17   privilege group.

18        Q.    What about canteen; under the draft

19   regulations, would there be any change in privileges

20   when placed in nondisciplinary segregation?

21        A.    There is a change based on his prior privilege

22   group, but I do not recall the exact specifics of the

23   frequency.

24        Q.    But there's some additional restrictions?

25        A.    No, there's -- there's additions to what a

Kathleen Allison                                      August 15, 2013

1    regular administrative segregation inmate would have.

2        Q.    But would it be commensurate with a

3    nonsegregation placement?

4        A.    Yes.

5        Q.    Under the draft regulations, would

6    nondisciplinary segregation prisoners have increased

7    out-of-cell time?

8        A.    No.

9        Q.    Would they have any -- any enhanced access to

10   yard as compared to a segregation placement?

11       A.    No.

12       Q.    For inmate patients on the mental health

13   caseload, would there be any difference in delivery of

14   treatment?

15       A.    No.

16       Q.    Would treatment still be conducted in a

17   therapeutic treatment module for nondisciplinary

18   segregation prisoners?

19       A.    Yes.

20       Q.    Would strip-search policies be the same for

21   nondisciplinary segregation prisoners as for

22   disciplinary segregation prisoners?

23       A.    Yes.

24       Q.    And would the housing location be the same for

25   nondisciplinary segregation prisoners and segregation

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1  prisoners?

2      A.   Yes.

3      Q.   Have any of those restrictions been considered

4  in CDCR discussions about the creation of a

5  nondisciplinary segregation status?

6      A.   I'm not sure what you're asking.

7      Q.   Have the -- have enhanced out-of -- increased

8  out-of-cell time or enhanced access to yard or treatment

9  outside of cages -- have any of those issues been

10 discussed in the context of the creation of this

11 nondisciplinary segregation status?

12          MS. VOROUS:  Objection.

13          To the extent that your answer would involve

14 communications with attorneys, instruct you not to

15 answer.  But beyond that, you can answer.

16          THE WITNESS:  Yes.

17          MR. FISCHER:  Q.  Can you explain the content

18 of those discussions.

19     A.   We looked at the therapeutic treatment module

20 process for consideration.  But because you have

21 nondisciplinary segregation inmates possibly in groups

22 with segregation inmates, for everyone's safety, all

23 offenders -- inmate patients will be placed in a

24 therapeutic treatment module.

25     Q.   Has there been consideration about -- to have

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    prisoners to receive their mental health treatment

2    without being placed in a treatment module?

3           MS. VOROUS:  Objection in terms of vague and

4    ambiguous as to scope and when these communications are

5    occurring or whether they're within the context of the

6    nondisciplinary segregation regulations.

7           Go ahead and answer, if you can.

8           THE WITNESS:  We looked at any time an

9    administrative segregation inmate -- whether

10   disciplinary or nondisciplinary -- is out of his cell,

11   what was the best custodial practice, and made a

12   determination that the best custodial practice was to

13   keep everybody in a holding cell.

14          MR. FISCHER:  Q.  And that applies to

15   individual clinical contacts?

16      A.   Yes.

17      Q.   As well as any group treatment in segregation?

18      A.   Yes.

19      Q.   So CDCR's nondisciplinary segregation status,

20   if it comes to fruition, will not change that in any

21   way; is that correct?

22      A.   Correct.

23      Q.   What was the reason for CDCR's consideration of

24   this nondisciplinary segregation status?

25      A.   To provide enhanced privileges to those inmates

Kathleen Allison                                        August 15, 2013

1    in there to [sic] no fault of their own.

2        Q.   Was any particular consideration given to

3    mentally ill prisoners in segregation for [sic] no fault

4    of their own, in the -- in the discussions about

5    nondisciplinary segregation?

6        A.   It wasn't -- no, it was not specific.

7        Q.   The discussion was sort of a global ASU policy

8    and practice discussion; is that correct?

9        A.   Yes.

10        Q.   So no specific discussion about Coleman class

11    members in segregation for no fault of their own?

12        A.   No.

13            MS. VOROUS:  Objection.  Asked and answered.

14            MR. FISCHER:  Q.  Would the nondisciplinary

15    segregation policies and procedures apply in all

16    segregation units in CDCR?

17        A.   Just the administrative segregation units.

18        Q.   So there'd be no changes to the PSU?

19        A.   Correct.

20        Q.   And no changes to the SHU?

21        A.   Correct.

22        Q.   Is there a pilot involved with the draft

23    regulations?

24        A.   No.

25        Q.   It would be full implementation systemwide?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          THE WITNESS:  I typically -- we provide

2    direction to the field.  Once it's finalized, we afford

3    them 30 days to provide training to their staff.

4          And then, of course, we would have to -- as --

5    so inmates -- once the training's provided, inmates that

6    are new into administrative segregation should be

7    automatically afforded these privileges.

8          We'll have to kind of play catch-up with the

9    other ones who are in those units.  And I don't -- I

10   can't give you an estimated time how long it will take

11   for those individuals.

12         MR. FISCHER:  Q.  Do you think full

13   implementation will be accomplished within three months?

14      A.  I couldn't estimate to that 'cause I -- you'd

15   have to know the exact numbers.  I have an -- we ran a

16   point in time several months ago on percentages, but I

17   wouldn't know point in time now on how many offenders

18   that is.

19      Q.  The last time that you ran the data, what

20   percentage of administrative segregation was there for

21   safety concerns?

22      A.  If I recall, it was relatively low, in -- 20 to

23   30 percent.

24      Q.  Twenty to 30 percent of individuals in

25   administrative segregation were there for non -- for

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

```
 1  safety concerns?
 2       A.   For nondisciplinary reasons.
 3       Q.   For nondisciplinary.
 4            Does nondisciplinary include investigations?
 5       A.   Not investigations of misconduct.
 6       Q.   What types of investigations would be
 7  encapsulated in the nondisciplinary category?
 8       A.   I was going to say family members, but that's
 9  not -- unless somebody was a victim of -- and we would
10  have to investigate, because he was the victim, of why
11  that incident occurred.
12       Q.   Are you aware of CDCR's data looking at
13  suicides in segregation units and the number of
14  individuals who are there for safety concerns?
15            MS. VOROUS:  Objection.  Vague and ambiguous.
16            MR. FISCHER:  Q.  Have you looked at that data?
17       A.   I've looked at suicides.  I don't know if it's
18  specific to safety concerns.
19       Q.   So you --
20       A.   I don't recall if it's specific to safety
21  concerns.
22       Q.   Okay.  Have you looked at any data regarding
23  attempted suicides in segregation units?
24       A.   I've looked at attempted suicides in general,
25  not specific to segregation units.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                         August 15, 2013

1      Q.   Do you review data as to how many incidents of
2   self-harm or attempted suicides are discovered in the
3   course of 30-minute welfare checks?
4      A.   I reviewed a snapshot of attempted suicides,
5   and I reviewed some incident reports, but I cannot
6   recall if they were specific to the 30-minute welfare
7   check being the process.
8           You know -- I'm trying to understand your link
9   here.  Go ahead and ask me again.  I'm sorry.
10     Q.   In the course of your review of the -- of
11  welfare checks in segregation, including any incident
12  reports, did you find that any -- did you find instances
13  where the 30-minute welfare checks had led to the
14  discovery of incidents of self-harm or attempted suicide
15  where an intervention was then taken?
16     A.   Yes.
17     Q.   Is that a common occurrence?
18          MS. VOROUS:  Just objection.  Vague and
19  ambiguous.
20          MR. FISCHER:  Q.  Is that how many -- is that
21  how many attempted suicides are discovered, through
22  these 30-minute welfare checks?
23          MS. VOROUS:  Objection.  Lack of foundation.
24          THE WITNESS:  Frequent -- when reviewing the
25  incident reports on attempted suicide, I did see where

Kathleen Allison                                      August 15, 2013

1    the welfare checks did assist in discovering an inmate

2    in the process or -- of an event of some kind of

3    self-harm.

4            MR. FISCHER:  Q.  And in conducting those

5    reviews, did that reiterate the importance to you of

6    doing appropriate -- appropriately-timed welfare checks?

7            MS. VOROUS:  Objection.  Vague and ambiguous,

8    lacks foundation.

9            Go ahead.

10           THE WITNESS:  Welfare checks are an important

11   part of suicide prevention.  And so certainly their -- I

12   mean, their value has been noted by this department.

13           MR. FISCHER:  Q.  In your -- in your recent

14   reviews, how many incident reports of attempted suicides

15   have you reviewed, approximately?

16       A.   I review the overall data, total number of

17   attempted suicides.  On a weekly basis, actual incident

18   reports, I would say approximately 30.

19       Q.   And of those 30, can you estimate how many --

20   in how many the 30-minute welfare check played a role in

21   the discovery of that attempted suicide?

22       A.   I cannot recall a specific number.

23       Q.   Would you say it's more than ten?

24       A.   I cannot recall specifically.

25       Q.   Would you say it's more than five?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

1    hearing or -- or his right to postpone that hearing, if

2    he chooses.

3         Q.   You've been assigned cases where a prisoner

4    postpones -- chooses to postpone an RVR hearing.  How

5    quickly is an RVR hearing supposed to occur?

6         A.   You're asking me to date myself back a few

7    years here.  The initial hearing, 30 days from the date

8    of issue of the RVR.

9         Q.   So how would a 60-day time limit for

10   administrative segregation ignore established due

11   process guidelines?

12        A.   The key is date of issue.  The event happens on

13   a specific day.  There's time -- it takes, sometimes,

14   depending upon the incident -- the RVR has to be written

15   within, if I recall, 15 days of the event.  Then the RVR

16   hearing has to be within 30 days, if I recall the

17   specifics.

18             And then there's a review process of that RVR,

19   all the way up to the chief disciplinary officer.  And

20   once the chief disciplinary officer reviews it, then it

21   goes back to the ICC for final determination.

22        Q.   So an RVR hearing should occur, in most cases,

23   within 45 days, under the current guidelines; is that

24   correct?

25        A.   Approximately, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1      A.   That is not true for the tracking system I

2  utilize because it's a continuation of his case factors,

3  despite what cell he's in.  I'm not familiar with this

4  statement, and it appears to be inaccurate based on what

5  I know.

6      Q.   So -- but you -- but you don't know -- you

7  haven't reviewed the data on length of stay that CDCR

8  provides the special master or plaintiffs' counsel,

9  which is Exhibit 4?

10         MS. VOROUS:  Asked -- asked and answered.

11         MR. FISCHER:  Q.  Is that correct?

12     A.   I have not reviewed this specific document.  I

13  reviewed numerous documents, but I have not reviewed

14  this specific document.  And our processes have evolved

15  over the years, not just to rely on DDPS and the inmate

16  tracking system.  We now have SOMS; we now have the

17  AD-SEG ASU tracking system.  So our systems have evolved

18  over the years.  I think that is an old statement.

19     Q.   Do you know whether the data that's provided to

20  plaintiffs' counsel is drawn from these new systems?

21     A.   I do not know the source.

22     Q.   And you don't review this monthly data that's

23  provided to plaintiffs?

24     A.   Not this monthly data, correct.

25     Q.   When you say "this monthly data," I just want

Kathleen Allison                                      August 15, 2013

1       A.   No.

2            MR. FISCHER:  Okay.  I just have a few more

3    questions, then we'll take lunch, if that's okay with

4    you guys.

5            MS. VOROUS:  Sure.

6            MR. FISCHER:  Q.  Ms. Allison, paragraph 15.

7    You state that the wait list for movement of EOPs to a

8    hub institution is zero.  And you testified earlier that

9    that means that no one -- no EOPs were waiting for more

10   than 30 days to move to a hub, correct?

11      A.   Yes.

12      Q.   Has that been the case since May 2012, that no

13   EOPs are waiting for a hub for more than 30 days?

14      A.    Correct.

15      Q.   I want to see if you have any idea about some

16   of the data that we received.  Let me ask you to turn to

17   Exhibit 4, page R10-5.  This is regarding CCI.

18           As you're turning -- CCI isn't a hub

19   institution, correct?

20      A.   Not that I recall.

21      Q.   On page R10-5, at the bottom of the page, there

22   are two EOPs at CCI at AD-SEG.  One has been in the bed

23   for 158 days, the other for 102.

24           Are you aware of either of these two

25   individuals' situation?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                        August 15, 2013

1       A.    No.

2       Q.    Do you have any explanation for why they've

3   been in AD-SEG at this nonhub for this -- for these

4   periods of time?

5       A.    No.

6       Q.    Are these individuals that you recall speaking

7   with the warden of CCI at any time about?

8       A.    No.

9       Q.    On page R10-8, this is KVSP.  KVSP is not a hub

10  institution; is that correct?  And you can refer to

11  paragraph 7 of your declaration, if you like.

12      A.    Thank you.  I'm like ...

13      Q.    I'll save you.

14      A.    We have so many, I get confused.

15            Page 7, you said?

16      Q.    Paragraph 7 on page 3.  And this is just to

17  confirm that KVSP is not an EOP hub institution.

18      A.    Okay.

19      Q.    Do you agree with that statement, that KVSP is

20  not a hub?  Correct?

21      A.    Correct.

22      Q.    And on page R10-8, KVSP, there are four EOPs in

23  the AD-SEG, with ranges of stay from 109 to 296.

24            Do you have any information about any of these

25  four EOP class members?

Kathleen Allison                                    August 15, 2013

1        A.    No, I do not recall.  I did have a conversation

2   with the warden at -- but I do not recall the individual

3   names that we addressed.

4        Q.    Does this data surprise you with respect to EOP

5   length of stay in a nonhub institution like KVSP?

6            MS. VOROUS:  Objection.  Vague and ambiguous as

7   to "surprise," lack of foundation.

8            THE WITNESS:  It is certainly in conflict with

9   the reports that we get from -- the HCPOP reports on

10  inmates transferring to a hub within 30 days.

11           MR. FISCHER:  I'll do one more, R10-14.

12       Q.    Wasco State Prison, you're aware, is not an EOP

13  hub institution?

14       A.    Correct.

15       Q.    And there's one EOP individual who's been in

16  AD-SEG at Wasco Prison for 163 days.

17           Do you see that at the bottom of the page?

18       A.    Yes.

19       Q.    Are you aware of this -- this individual's

20  situation?

21       A.    No.

22       Q.    Have you been in contact with Wasco about

23  lengths of stay?

24       A.    Yes.

25       Q.    And this individual -- you don't recall this

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1    individual coming up in that discussion?

2         A.    I couldn't remember the specific names.

3         Q.    So you'd agree that the data that is provided

4    by CDCR to the special master and plaintiffs' counsel is

5    not consistent with your statement and finding in your

6    declaration, correct?

7              MS. VOROUS:    Objection.    Lack of foundation.

8              THE WITNESS:    It is inconsistent with the

9    reports that I have.    The reports that I have -- and I'm

10   relying on the COMPSTAT Tracking System for my length of

11   stay -- those say different information than -- I'm not

12   sure the source of this data.

13             MR. FISCHER:    Q.    Okay.    Based on the data you

14   reviewed, do you know what the average wait for an EOP

15   in a nonhub segregation unit to be transferred to a hub

16   segregation unit is?

17        A.    There is no wait beyond 30 days.

18        Q.    Do you know what the average wait is?

19        A.    No.    We track beyond 30 days.

20        Q.    So you have no idea how long individuals are

21   staying; you just know that it's less than 30 days?

22        A.    Correct.

23        Q.    In doing your -- your -- your reviews with the

24   wardens as to the people in AD-SEG for the longest

25   periods of time, among that -- among that group, are

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1  down by the mental health caseload classifications?

2      A.   It's the overall report and then the average

3  length of stay for EOP in ASU and GP.

4      Q.   Average length of stay for EOP CCCMS?

5      A.   Yes.

6      Q.   And GP?

7      A.   Yes.

8      Q.   And ASU?  Is that right?

9      A.   Yes.

10      Q.   Okay.  And are there separate strategies for

11  reducing, say, the EOP length of stay in AD-SEG?  Have

12  any separate strategies been developed?

13          MS. VOROUS:  Objection.  Vague and ambiguous.

14  Separate from -- from what, the overall strategies?

15          MR. FISCHER:  Yes.

16          THE WITNESS:  We're -- I mean, obviously the --

17  I'm sorry.  Repeat your question, make sure I'm clear.

18          MR. FISCHER:  Q.  The question is are there any

19  strategies specific to EOP prisoners' length of stay in

20  segregation units?

21      A.   No.

22      Q.   Are there any specific strategies developed by

23  the work group, the ASU stakeholder work group, with

24  respect to reducing lengths of stay for CCCMS prisoners

25  in administrative segregation units?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                      August 15, 2013

1          A.   No.  It's for the group as a whole.

2          Q.   Is there a goal for, first of all, average

3    length of stay in administrative segregation units

4    that's been set by the group?

5          A.   There -- not by the group, but there is -- at a

6    custodial review, as a manager, each of the associate

7    directors go -- I mean, they get a COMPSTAT report

8    monthly that indicates their average length of stay.

9          Q.   Has an expectation been given to the field, or

10   just even within the group, as to what average length of

11   stay CDCR wants to achieve for people in administrative

12   segregation units?

13         A.   Yes.

14         Q.   What is that expectation or goal?

15         A.   Approximately 90 days.

16         Q.   When was the stakeholder work group created?

17         A.   It was prior to my tenure up at headquarters,

18   so I'm not sure.

19         Q.   Do you know what the average length of stay was

20   at that time?

21         A.   I do not know.

22         Q.   You state in your testimony that the average

23   length of stay in seg across all populations right now

24   is 125 days.

25              Do you know how that compares to one year ago?

Kathleen Allison                                              August 15, 2013

1      A.    No.

2      Q.    Is there discussion about doing so?

3      A.    No.

4      Q.    Are you aware of any general population units

5  that have been made into administrative segregation

6  units at any time that had their electrical capacity

7  removed during that transition?

8      A.    No.

9      Q.    Are you aware of the conversion of the M3 unit

10  at CMF to an AD-SEG unit?

11      A.    No.

12      Q.    Are you aware that that's an AD-SEG now?  Or if

13  you don't know ...

14      A.    Yeah, I'm not -- yeah.

15      Q.    What about Unit 4A at Folsom prison?

16      A.    I -- I don't know when those were converted

17  over into AD-SEGs.

18      Q.    You don't have any specific information as to

19  whether electronic appliances are provided there?

20      A.    Correct.

21      Q.    In your March 22nd, 2013 declaration -- which

22  is not in front of you right now, but -- you stated that

23  it was a goal for all ASU inmates to have access to

24  electronic appliances.

25          Other than the SVSP stand-alone and the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                              August 15, 2013

1    Corcoran stand-alone, have steps been taken to provide

2    electronic appliances in any of the other AD-SEGs that

3    currently don't have them, or that didn't have them as

4    of that time, in March 2013?

5        A.    There are a couple more institutions; I just

6    can't remember off the top of my head.  But if they had

7    electrical capability, they were instructed to afford

8    that opportunity.

9              In addition, we've looked at alternative

10   methods of electrical appliances.

11       Q.    Does that include crank radios?

12       A.    Hand-wind radios, yes, or hand-crank.

13       Q.    And do you know what the time line for

14   provision of those alternatives is?

15       A.    The purchase has been made.  And if I recall,

16   it's mid-October we anticipate delivery.

17       Q.    That will go into all of the AD-SEG units --

18   those radios will go into all AD-SEG units where

19   electronic appliances currently aren't being provided?

20       A.    We ordered enough to provide them in all the

21   units that do not have electricity.  But we also had

22   additional for those inmates who were placed in there --

23   even the units that had them but didn't have an

24   electrical appliance, so inmates would be afforded an

25   opportunity to have a radio.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

1      Q.    So is it your expectation that distribution

2    will be completed by ... October, you said?

3      A.    I anticipate receiving shipment by mid-October.

4      Q.    When do you anticipate distribution being

5    completed?

6      A.    Within, you know, a week or so following that,

7    yeah.

8      Q.    So by the end of October, would you expect

9    distribution of these radios to have been completed in

10   the administrative segregation units?

11     A.    Approximately, yes.

12            (Plaintiffs' Exhibit 9

13            marked for identification.)

14            MR. FISCHER:  Exhibit 9 is a chart provided to

15   plaintiffs' counsel by defendants on August 14th,

16   yesterday.  This document is marked DEXP 113106.

17     Q.    Ms. Allison, can you explain to me what this

18   data shows.

19     A.    This is an extract out of our COMPSTAT Tracking

20   System to tell me of inmates who are -- no longer have a

21   reason to be in ASU and that they are pending a bed.

22     Q.    So are these similar to what has been termed as

23   "lack of bed" AD-SEG inmates?

24     A.    That "lack of bed" issue was isolated to, in my

25   opinion, a misunderstanding of CI -- CIM.  But this is a

Kathleen Allison                                          August 15, 2013

1   statewide total of all inmates that are sitting in an

2   ASU, pending a bed on the yard.

3           The numbers are different today.  I mean, I get

4   a weekly report.  I want to say yesterday it was 32.

5       Q.   So I understand, these are individuals who are

6   no longer required -- it's no longer necessary to house

7   them in AD-SEG, and they are waiting for a bed on a

8   nonsegregation yard at the same institution?

9       A.   Correct.

10      Q.   And so based on this chart, CIM has no

11  individuals that fit that description?

12      A.   Correct.

13      Q.   If we were -- you know, if we were to go to CIM

14  today, would there be any individual -- any individuals

15  in any of the AD-SEGs who are there based on what they

16  term as "lack of bed"?

17      A.   Correct.

18      Q.   When was the last time you were in contact with

19  staff at CIM about this issue?

20      A.   Within a month.

21      Q.   Did they tell you how the issue had been

22  resolved?

23      A.   The issue regarding that particular building

24  had to do with the definition of that building, that the

25  warden considered that building to be an RC overflow

Kathleen Allison                                    August 15, 2013

1    building that happened to house ASU inmates.

2           All the inmates in that building that were

3    considered "lack of bed" were all general population --

4    RC inmates, general population RC inmates, who were

5    afforded full privileges as any other RC inmate.  So

6    they went to chow; they went to yard.  They had a

7    different freedom of movement than those inmates in that

8    housing unit for administrative segregation reasons.

9        Q.   Do you know whether those inmates who were

10   provided -- who were on the mental health caseload --

11   whether they were provided treatment in that treatment

12   module?

13       A.   I do not know.

14       Q.   Are you aware that during plaintiffs' tour,

15   some of those inmates reported that they were not

16   reception center inmates?  Have you reviewed the

17   declarations of Dr. Kaufman and Dr. Haney on this issue?

18       A.   I couldn't -- I've reviewed numerous documents,

19   so I couldn't tell you, you know, who -- who was who.  I

20   think there was, based on what I read, a clear

21   misunderstanding of what that building was.

22       Q.   But you didn't follow -- do you recall

23   following up as to the individual --

24       A.   Not --

25       Q.   -- class members housed in CIM under the "lack

Kathleen Allison                                    August 15, 2013

1     A.   Correct.

2     Q.   Do you know how many individuals are housed in

3  the Cypress unit who are not AD-SEG prisoners?

4     A.   I do not.

5          THE REPORTER:  Who are not ...

6          MR. FISCHER:  Who are not AD-SEG prisoners.

7     Q.   Now, Exhibit 9 shows that there are 50

8  individuals -- individual prisoners who no longer

9  require AD-SEG housing and are retained pending release

10 to a GP or an SNY at that same institution, correct?

11    A.   Correct.

12    Q.   And we discussed earlier that this does not

13 include individuals housed in AD-SEG, pending transfer

14 to another institution's nonsegregation bed.

15    A.   Correct.

16    Q.   And that would include nonsegregation GP beds?

17    A.   Pending transfer?

18    Q.   Yes.

19    A.   I'm trying to get clarification.

20         Correct.

21    Q.   And pending transfer from an AD-SEG to an SNY

22 bed at another institution?

23    A.   Correct.

24    Q.   Is the -- is the period of time that

25 individuals no longer required to be housed in

Kathleen Allison                                    August 15, 2013

1    windows in their cells, and Pelican Bay does not.

2        Q.    Any other differences?

3        A.    I understand there's some lighting differences,

4    but I -- I don't know specifically what they are 'cause

5    I've not been to Pelican Bay.

6        Q.    And any other differences that you're aware of

7    between the Pelican Bay SHU and the other SHUs in CDCR?

8        A.    Not that I can recall.

9        Q.    Are the --

10       A.    Without knowing -- without being at Pelican Bay

11   to be able to see a physical description.

12       Q.    I'm just asking based on your knowledge.

13       A.    Yeah.

14       Q.    Do the policies and procedures that affect

15   individuals inside the SHUs apply equally to the Pelican

16   Bay SHU and the other SHUs in the system, to your

17   knowledge?

18           MS. VOROUS:  Objection.  Vague and ambiguous as

19   to "the policies and procedures."

20           THE WITNESS:  Yeah, I need to have you -- I --

21   I -- there's too many different policies and procedures.

22   Can you narrow that scope for me a little bit.

23           MR. FISCHER:  Q.  In terms of the -- let's

24   begin with restrictions on -- on the -- the inmates

25   inside the SHUs.  Are you aware of any differences on

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                              August 15, 2013

1   property or other restrictions?

2       A.    There's no differences as it relates to

3   property.

4       Q.    Is there any difference as relates to

5   requirements for out-of-cell time?

6       A.    No.

7       Q.    Are there any other restrictions that apply

8   differently in Pelican Bay from the other SHUs?

9       A.    Not that I'm aware of, with the exception --

10  no, not that I'm aware of.  Yeah.

11      Q.    So all the SHUs are the same -- considered to

12  be at the same custody level?

13      A.    Yes.

14      Q.    And in all of the SHUs, movement requires

15  cuffing and escorts by two officers?

16      A.    Yes.

17      Q.    Based on your knowledge, and if you know, is

18  treatment delivered to -- are any appointments delivered

19  in the same way at Pelican Bay and at other SHUs?

20      A.    We would provide medical escorts in the same

21  fashion.

22      Q.    What about out-of-cell time?

23      A.    It would be the same.

24      Q.    Does the opportunity to be involved in work

25  programs -- work programs -- is it different between the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                        August 15, 2013

1   Pelican Bay SHU and the other SHUs?

2       A.    No.

3       Q.    Are there any work programs at any of those

4   SHUs?

5       A.    Not that I'm aware of.

6       Q.    What about vocational programs?

7       A.    Not that I'm aware of.

8       Q.    None at any of the SHUs?

9       A.    Not that I'm aware of.

10      Q.    That you're aware of.

11            Are you aware of any differences in offered

12  educational programs?

13      A.    I -- they might offer some volunteer education

14  programs, but I'm not -- I can't recall exactly what's

15  offered and what's not, as far as the education aspect

16  of it.

17      Q.    You can't think of any differences right now?

18      A.    I wouldn't -- I wouldn't say that.  I just

19  can't -- I can't -- I don't know what's allowed for

20  education as relates to SHU.  I can't -- I can't recall

21  what's allowed for education as it relates to SHU, in my

22  answer.

23      Q.    Do you know whether there are any differences

24  as far as education between Pelican Bay and the other

25  SHUs?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1    A.   Again, I can't recall, so I don't -- I wouldn't

2  know -- be able to answer that, so ... I don't know if

3  there's a difference.

4    Q.   Do you know whether there's any sort of

5  step-down programs that are different from the Pelican

6  Bay SHU to the other SHUs?

7    A.   I think all of the SHU inmates are afforded an

8  opportunity for step-down programs, so I'm not -- that's

9  not ...

10   Q.   You're not aware of any differences --

11   A.   No.

12   Q.   -- between the different SHUs?

13   A.   No.

14   Q.   What about incentive-based programs?

15   A.   I'm not aware -- I don't have any particulars

16  on that, no.  I'm not aware of that.

17   Q.   You're not aware of the existence of the

18  programs?

19   A.   I'm not -- I don't -- I don't have any

20  particulars, and I -- I'm not a hundred -- I don't --

21  that's certainly not my area of expertise, and so I -- I

22  do not know.

23   Q.   Okay.  Do you know if there are any differences

24  between the Pelican Bay SHU and the other SHUs as far as

25  contact visits?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1       A.   To my knowledge, they're all noncontact visits.

2       Q.   It applies equally in all the SHUs?

3       A.   Yes.

4       Q.   What about personal property restrictions?  I

5   might have already asked you that.

6       A.   You did.  They're the same.

7       Q.   Are there any restrictions that I haven't

8   covered that you're aware of that apply in the SHUs?

9       A.   Not that I can think of.

10      Q.   Okay.  Now, I discussed earlier that not all

11  SHU-able offenses are violent offenses, correct?

12      A.   There are few that are -- that are not violent,

13  correct.

14      Q.   So -- so a Coleman class member could be given

15  a SHU term without having committed a violent offense?

16      A.   Anybody could be issued a SHU term without

17  committing a violent offense.

18      Q.   Now, in your declaration -- I'll point to

19  paragraph 27 -- you said that:

20           "A blanket exclusion for all mentally

21      ill inmates from the SHUs would greatly

22      diminish the deterrent effect of the unit."

23      A.   I don't have that declaration anymore.

24      Q.   Oh, I might have taken it from you.

25      A.   I'm sorry, what page?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                        August 15, 2013

1       Q.   It's paragraph 27.

2            Do you have any data as to the deterrent effect

3  of the SHUs?  Are you aware of any data?

4       A.   No.

5       Q.   Does CDCR have any plans to collect data on the

6  deterrent effect of use of the SHU?

7       A.   Not that I'm aware of.

8       Q.   What is your understanding of the purpose of

9  the SHU?

10      A.   Is to -- inmates found guilty of an RVR, to

11 serve out the opposed -- the imposed sentence for that

12 violation.

13      Q.   So that's used as a punishment?

14      A.   Yes.

15      Q.   Any other reason that an inmate would be placed

16 in a SHU?

17      A.   There's -- inmates can go to a SHU for the

18 continuing refusal of housing, which is a serious rule

19 violation, and his continued refusal.  So he'd be placed

20 into a SHU.  It's disciplinary, though.

21      Q.   In paragraph 28 of your declaration, you

22 describe three CCCMS inmates with fairly long SHU

23 histories.

24           Do you recall that?

25      A.   Yes.

```
 1        Q.    -- about the individual, please.
 2        A.    Certainly.
 3              MR. FISCHER:  This is Exhibit 12.
 4              (Plaintiffs' Exhibit 12
 5              marked for identification.)
 6              MR. FISCHER:  Exhibit 12, this is a SHU profile
 7     for a particular inmate at the Corcoran SHU, dated
 8     May 20th, 2013.  It's a CDCR memorandum.  This was
 9     produced to plaintiffs' counsel yesterday, and it's
10     Bates-stamped as DEXP 113113.
11              Now, according to this SHU profile, this
12     individual's been in -- it was CCCMS -- has been in the
13     SHU since 1999.
14              I'll let you review it.
15              THE WITNESS:  Okay.
16              MR. FISCHER:  Q.  Now, on page 2, at the
17     bottom, the last ICC decision states that the individual
18     has an expected release date of September 5th, 2036.
19              Do you see that?
20        A.    Yes.
21        Q.    Okay.  How did you select this inmate for
22     discussion in your declaration?
23        A.    This inmate was seen at committee in 2000- --
24     or November 12, 2013 [sic].  And he -- excuse me --
25     November 5th, 2000- -- at Pelican Bay.  And they
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                              August 15, 2013

1    elected to suspend the remainder of his SHU term.

2            And he was released to the general population,

3    and he subsequently came back to -- came back into SHU

4    for another offense, and therefore ICC reimposed his

5    previous MERD.

6        Q.   I wanted to ask you about that.  It talked

7    about the suspension of the MERD on November 12th,

8    2013.  That's a future date.  Is that a typo, or do you

9    have an explanation for how that would work?

10       A.   That must be a typo.

11       Q.   So based on the profile, this individual was

12   EOP for a period of time and then had his level of care

13   changed to CCCMS; is that correct?

14       A.   That is what it appears, yes.

15       Q.   And he's slated -- he's now slated to be in the

16   SHU until 2036?

17       A.   At any time, the committee, based on behavior,

18   can reduce his SHU term, just as they did previously.

19       Q.   How often does -- when -- do you know when the

20   last time the committee met to discuss this inmate's

21   situation?

22       A.   If I recall -- I wish I had Title 15 in front

23   of me.  I think they have to review each case every six

24   months.

25       Q.   Do you know when that last review was, based on

 1  this or from your own independent knowledge?

 2      A.   I'm trying to find a date of the last ICC.

 3  This is only giving me the dates of the actual imposed

 4  SHU terms but doesn't give me the date of the last ICC.

 5      Q.   Okay.  So as you sit here today, you don't know

 6  when the last --

 7      A.   No.

 8      Q.   -- committee meeting was?

 9           Do you know anything about this individual's

10  treatment program at the Corcoran SHU?

11      A.   No.

12      Q.   Do you know the last time that this individual

13  received a mental health evaluation?

14      A.   No.

15      Q.   According -- on page 2, according to this memo,

16  this individual hasn't received a rule violation since

17  February 2012.

18      A.   It appears he did not receive an additional

19  rules violation between February 7, 2012 and May 20th,

20  2013.

21      Q.   May 20th, 2013?

22      A.   As I read this document.

23      Q.   Okay.  So --

24      A.   He was still under the SHU term for that

25  battery on a peace officer.

Kathleen Allison                                      August 15, 2013

1    Q.    And so do I understand that this individual
2   will be in the SHU until September 2036 unless the SHU
3   term is suspended by the ICC?
4    A.    The SHU term can be suspended by the ICC, yes,
5   at any time between now and then.
6    Q.    Have you done a case review of this individual?
7    A.    No more than this document.
8    Q.    Do you know whether anyone else at headquarters
9   has done a review of this individual?
10   A.    Not to my knowledge.
11   Q.    Is this the type of individual that would
12  receive attention at headquarters, given the lengthy
13  segregation placement that this individual has had?
14   A.    Those are done at the local institution level.
15        MR. FISCHER:  Okay.  Exhibit 13, also subject
16  to the protective order.
17        (Plaintiffs' Exhibit 13
18        marked for identification.)
19        MR. FISCHER:  This is another inmate with a
20  CDCR memorandum dated May 20th, 2013, a SHU profile
21  for the second inmate.
22   Q.    This is another inmate that you discuss in
23  paragraph 28 of your declaration; is that correct?
24   A.    Yes.
25   Q.    And the memorandum is Bates-stamped DEXP 113107

1    through 113111.

2          Ms. Allison, do I understand correctly that

3    this individual's been in segregation since 1999, first

4    in AD-SEG, and then since 2000 in SHU?

5        A.   That's how it appears, but I do not have the

6    ICC actions on this document.

7        Q.   Did you review any other documents about this

8    inmate prior to doing your declaration or since?  You're

9    shaking your head "no."

10       A.   No.  I was just trying to think if I would have

11   asked for clarifying information.

12          THE REPORTER:  If you what?

13          THE WITNESS:  If I would have asked for

14   clarifying information.  Because she's got the date of

15   the event, the date of the offense, and then the MERD,

16   if it's applicable or not; therefore, a SHU term -- a

17   new SHU term would have been assessed.

18          MR. FISCHER:  Q.  And this person's collected a

19   number of SHU terms between 2001 -- or late 2000 and

20   2011, all while in SHU, the Corcoran SHU?

21       A.   Yes, he's received various SHU terms: battery

22   on a peace officer, battery on a peace officer,

23   threatening a peace officer, battery on a peace officer.

24          MS. VOROUS:  Are you --

25          THE WITNESS:  Sorry.

1          MS. VOROUS:  Well, the court reporter's trying

2     to figure out if you're trying to answer more, 'cause

3     she can't hear you.  So I didn't --

4          THE WITNESS:  Oh.  He's received numerous SHU

5     terms.  Mostly appears to be battery on a peace officer.

6          MR. FISCHER:  Q.  Since 2000-and- -- since July

7     of 2009, he's also received three additional SHU terms

8     for refusing a cellmate.  Do you see that at the top of

9     the second page?

10     A.    Yes.

11     Q.    And that's a SHU-able offense?

12     A.    Yes.

13     Q.    And do I -- I'm just trying to understand.

14          For the May 31st, 2011 refusing a cellmate

15     RVR, based on this information, did he receive a SHU

16     term of approximately ten months?

17     A.    It depends upon how they issue the SHU term,

18     whether it's consecutive SHU term or concurrent SHU

19     term.  And this does not provide me enough information

20     to answer that.

21     Q.    I see.

22          Do you know whether this inmate has received

23     any higher levels of care higher than CCCMS since being

24     placed in the SHU?

25     A.    I don't have that information.

Kathleen Allison                                      August 15, 2013

 1      Q.    Have you reviewed this CCCMS inmate's treatment
 2   plan?
 3      A.    I'm not a clinician, sir, so no.
 4      Q.    So you haven't reviewed it?
 5      A.    His treatment plan?
 6      Q.    Or his treatment program.
 7      A.    Oh, no.
 8      Q.    When you do your reviews of individuals in
 9   segregation, do you ever look at the treatment program?
10      A.    No.  I'm not privy to that.  That's clinical
11   information.
12      Q.    Would that be useful information for you to do
13   your assessments for need for people to remain in
14   segregation?
15      A.    I think that would be a violation of HIPAA and
16   the Medical Privacy Act.
17      Q.    Do you receive any information about the
18   treatment program?
19      A.    I would receive recommendations from the
20   clinician and ICC.
21      Q.    Incidentally, these -- these CCCMS inmates in
22   the Corcoran SHU, is it your understanding that they
23   receive all of their -- any treatment that they do
24   receive, inside of a therapeutic cage?
25      A.    They have the option of the therapeutic

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

1    treatment module, or at that time the ATOM chair.

2        Q.    Do you know if the ATOM chair is still at the

3    Corcoran SHU?

4        A.    It is not.

5        Q.    So now all treatment is provided in the

6    treatment cage?

7        A.    All treatment's provided within a therapeutic

8    treatment module.

9        Q.    And these CCCMS inmates are also subject to the

10   strip-search policy at Corcoran each time they leave and

11   return to the SHU?

12       A.    Unclothed body searches are done on the inmates

13   upon leaving and entering the SHU, yes.

14       Q.    Do you know the last time that this individual

15   was considered for an alternative placement, including

16   suspension of the SHU terms?

17       A.    This does not give me the ICC data to be able

18   to answer that question.

19       Q.    And do you have any idea the last time that

20   this individual received a full mental health

21   evaluation?

22       A.    I would not be privy to that information.

23            MR. FISCHER:  This is Exhibit 14.

24            (Plaintiffs' Exhibit 14

25            marked for identification.)

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                                    August 15, 2013

1          MR. FISCHER:  This document is a CDCR

2    memorandum dated May 20th, a SHU profile for a third

3    inmate cited in Ms. Allison's declaration at paragraph

4    28, Bates-stamped DEXP 111 -- 113115 to 113117.

5          Q.   This is the third inmate that you discuss in

6    your declaration --

7          A.   Yes.

8          Q.   -- Ms. Allison?

9          Now, this inmate has been in segregation since

10   January 2006?

11         A.   I still need to review.

12         Q.   Sure.

13         A.   It appears he was released at some point in

14   time.

15         MS. VOROUS:  I don't know that there's a

16   question pending.

17         THE WITNESS:  Oh, I'm sorry.

18         MR. FISCHER:  Q.  So this person was first

19   placed in segregation, AD-SEG, in January 2006 and, as

20   you said, may have been released for some period of time

21   in 2006?

22         A.   He was assessed and opposed a two-month

23   mitigated SHU term.

24         Q.   What does that mean, "mitigated SHU term"?

25         A.   It means they gave him the least SHU term

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    versus an aggregated SHU term, which is the maximum.

2        Q.    And that was in 2006?

3        A.    Mm-hm.

4        Q.    And he's been in segregation?

5        A.    It looks at some point in time he transferred

6    to Pleasant Valley State Prison.

7        Q.    That was in 2006, correct?

8        A.    Yes.  I'm just trying -- yes.  The problem is

9    it doesn't tell me where the additional offenses have

10   occurred.

11       Q.    Okay.  And I -- at the top of page 2, it's

12   pending assessment for January 24th, 2013 RVR as of

13   May 20, 2013.  But as of May 20th, he would be in SHU

14   until November 2017?

15       A.    That was his -- no, I'd have to review the ICC

16   section.  That's what that MERD is for that specific

17   event, battery on a peace -- or resisting a peace

18   officer.

19            He had a subsequent event -- oh -- yeah, a

20   subsequent event of aggravated battery on a peace

21   officer, which would result in a DA referral.  So let me

22   see the SHU assessment.

23       Q.    Have you spoken with anyone at the institution

24   about this inmate?

25       A.    Just to have the assessment done.

Kathleen Allison                                          August 15, 2013

1      Q.   Have you asked any follow-up questions about
2  this CCCMS inmate?
3      A.   No.
4      Q.   Do you know anything about clinical factors for
5  this -- this CCCMS inmate?
6      A.   Would have no information on clinical.
7      Q.   And do you know the last time that a mental
8  health evaluation was done?
9      A.   I'm not a clinician.  I would not have that
10 information.
11     Q.   And do you know if this individual was ever
12 considered for a higher level of care?
13     A.   I do not have that information.
14     Q.   And this CCCMS, like the other two Corcoran SHU
15 CCCMS inmates, their situation would not be looked at at
16 headquarters but would be handled at the institution
17 level?
18     A.   I'm sorry, repeat that question.
19     Q.   For these three CCCMS inmates that we've just
20 reviewed, their segregation placement and stays would be
21 handled at the institution, correct?
22     A.   Yes.
23     Q.   And would not be reviewed by headquarters?
24     A.   No, no, unless -- I was just trying to gather
25 some data on these -- on -- so I've asked for a sample

Kathleen Allison                                        August 15, 2013

1    of the institution to provide me some information on

2    some of their longer-lengths-of-stay offenders.

3        Q.    So what exactly did you ask the institution to

4    provide to you?

5        A.    Provide me a small sample, 'cause it's very

6    labor-intensive to go through each one of these files,

7    as you can see, through a detailed review.  Nongang,

8    disciplinary SHU term.

9        Q.    Do you know how these three individuals were

10   selected?

11       A.    No.

12       Q.    Did you give them any guidance as to what you

13   were looking for?

14       A.    With the exception of nongang and longest

15   length of stay, no.

16              THE REPORTER:  Longest ...

17              THE WITNESS:  Longest length of stay.

18              MR. FISCHER:  Q.  so these are among the longer

19   lengths of stay?

20       A.    Yes.

21       Q.    Would you agree that the three CCCMS inmates

22   that we've discussed at the Corcoran SHU, over the last

23   several years in this SHU have had some difficulty

24   functioning appropriately in that setting?

25       A.    They have all been assaultive in one way other

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    requirements for who they see at IDTT.

2         Q.   You're aware that non-caseload prisoners don't

3    have an IDTT?

4         A.   Again, I don't know their -- their parameters

5    for what their guidelines are, specific to the frequency

6    that they have to see them.

7         Q.   Do you know what type of -- what, if any,

8    evaluation is done for non-caseload prisoners in

9    administrative segregation?

10        A.   I know that there is an evaluation done

11   within -- I can't remember the exact time frame.

12        Q.   When they're placed in segregation?

13        A.   When they're placed in segregation, yes.

14        Q.   For nonmental health caseload prisoners in

15   administrative segregation there for a longer period of

16   time, do you know if there's any automatic evaluation

17   done to see if -- how they're -- how they're doing

18   psychologically?

19             MS. VOROUS:   Objection.   Asked and answered.

20             THE WITNESS:   I do not know the parameters

21   for -- for their requirements.

22             MR. FISCHER:   Q.   But based on what you know,

23   is that referral can be made based on a custody

24   officer's report?

25        A.   Correct.

Kathleen Allison                                          August 15, 2013

1      Q.   Or another inmate's report?

2      A.   Correct.

3      Q.   Or a self-report by an inmate who feels that

4   he's not doing well psychiatrically?

5      A.   Correct.

6      Q.   And LPTs --

7      A.   Correct.

8      Q.   -- who do their rounds daily?

9      A.   Correct.

10     Q.   But you're not aware of any other mental health

11  clinician -- licensed clinician evaluation done for

12  non-caseload prisoners?

13     A.   I --

14          MS. VOROUS:  Objection.  Asked and answered.

15          THE WITNESS:  Again, I do not know the

16  param- -- what their program guides are, what their

17  responsibilities are.  That's a clinical function.

18          MR. FISCHER:  Q.  Based on your experience, do

19  you think that the daily LPT rounds play a useful role

20  in identifying nonmental health caseload prisoners who

21  may not be doing well psychiatrically?

22     A.   I think it's beneficial that the inmates have

23  somebody that they feel comfortable with to talk to.

24     Q.   And you feel -- so you feel like those daily

25  LPT rounds in the administrative segregation units are

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1      Q.    Is there any training that still needs to be
2    done with respect to welfare checks?
3      A.    There's additional training that needs to be
4    done when the institution receives their Guard1
5    installation.
6      Q.    And that's the electronic monitoring system?
7      A.    Yes.
8      Q.    Has training been done with respect to what you
9    call clinical staff's ability to continue welfare checks
10   beyond 21 days?
11     A.    I'm not aware.  That's a clinical staff, and I
12   wouldn't know that.
13     Q.    Are you -- are -- do you review the welfare
14   check logs that are completed?
15     A.    When I'm at the institutions, yes.
16     Q.    Have you reviewed any logs since the
17   implementation of the new directive regarding welfare
18   checks?
19     A.    I have, yes.
20     Q.    Have you seen any cases in which welfare checks
21   are continued beyond 21 days?
22     A.    That wasn't my intent of my review.  I was
23   looking at point in time, the -- the sheets that are on
24   the door, and if they were timely for that unit for that
25   day.

Kathleen Allison                                    August 15, 2013

1    Q.   And looking at the sheets on the door and
2    looking at the data, did you see any individuals who'd
3    been continued on welfare checks for more than 21 days?
4    A.   I didn't even look for that.  I was looking at
5    the timeliness of their -- of the checks.
6    Q.   Do you know whether the QI tool regarding
7    welfare checks has been modified, given the new
8    directive?
9    A.   I know we've looked at that and made a
10   determination, before we start our next rounds, that we
11   would have had -- I think we would have had Guard1 fully
12   implemented.  And so then it would be modified
13   accordingly.
14   Q.   So there's plans to modify the QI tool?
15   A.   Yes.
16   Q.   Will the electronic monitoring system be
17   provided in overflow AD-SEG units?
18   A.   No.
19   Q.   What will be done in the overflow AD-SEG units?
20   A.   The manual 30-minute check process, the paper
21   process.
22   Q.   Is there any plan to implement the electronic
23   monitoring system in overflow AD-SEG locations?
24   A.   No.
25        MR. FISCHER:  Okay.  Exhibit 16.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

1    sample size at SAC was a fairly good representation of

2    what I was trying to do.

3            MR. FISCHER:  Q.  Do you know whether an

4    analysis was done of these 347 attempted suicides in

5    2012 as to whether welfare checks were the -- were

6    involved in the discovery of the attempted suicide?

7        A.    They -- some of them that I reviewed, I -- I

8    know that was part of the review, but I cannot remember

9    the particulars of -- I spent an entire day reviewing

10   them at CSP-SAC, but I couldn't remember all the

11   specifics.

12           I just remember some of them being in those

13   units, whether they were welfare checks or security

14   checks, that they were discovered during that process.

15       Q.    Based on your review of suicide data, attempted

16   and completed suicides, do you believe that provision of

17   welfare checks beyond 21 days could -- could save lives?

18           MS. VOROUS:  Objection.  Lack of foundation,

19   incomplete hypothetical, speculative.

20           THE WITNESS:  I couldn't answer that without an

21   analysis.  There's a lot of people over at Mental Health

22   that do all kinds of analysis reports, and that wouldn't

23   be ...

24           MR. FISCHER:  Q.  You have no opinion?

25       A.    The department -- as a department, we've done

Kathleen Allison                                        August 15, 2013

1    the 21-day checks, three checks per hour, using the

2    anticipated as the Guard1.  I think as of date, we have

3    26 facilities.

4           And then in addition to that, we have an

5    additional 30-minute check process for all inmates,

6    despite length of stay.  Security check process.

7       Q.    Do you have any opinion as to whether the

8    expansion of welfare checks beyond 21 days could save

9    lives of individuals who attempt suicide in segregation?

10          MS. VOROUS:  Same objections.

11          THE WITNESS:  I -- I have no opinion on that.

12   That would be a clinical analysis of the data.

13          MR. FISCHER:  Q.  Why would that be a clinical

14   analysis if it's Custody who's doing the intervention

15   with the welfare checks?

16          MS. VOROUS:  Objection.  The witness has

17   already answered your question.  She said she doesn't

18   have an opinion.

19          THE WITNESS:  Clinical staff do extensive

20   analysis and do roll-up documents of those analyses.  I

21   would have to refer to that in order to answer that

22   question.

23          MR. FISCHER:  Q.  Based on your review, are you

24   aware of -- do you believe that the use of welfare

25   checks in the first 21 days has saved lives -- has saved

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

1    the lives of any individuals in segregation who attempt

2    suicide?

3            MS. VOROUS:  Objection.

4            THE WITNESS:  The only thing I'm aware of as it

5    relates to completed suicide data is approximately

6    50 percent of them are within the first 21 days, if I

7    recall.  Oh, that's a clinical thing, though.  I can't

8    remember.

9            If I recall, that's -- that was one of the

10   intentions of the purpose of the 30-minute welfare

11   checks -- of the welfare checks, rather.

12           MR. FISCHER:  Q.  So do you have an answer to

13   my question?

14       A.   Repeat your question.

15       Q.   My question is are you aware of whether -- or

16   do you -- is it your opinion that welfare checks have

17   saved any lives of individuals in segregated housing

18   during the first 21 days?

19           MS. VOROUS:  Objection.  Vague and ambiguous,

20   lacks foundation, beyond the scope of this witness's

21   testimony in the context of her declaration for pending

22   motions, asked and answered.

23           THE WITNESS:  I don't have any specific data,

24   with the exception of the reviews that I did at CSP-SAC,

25   to indicate that the checks prevented the event.  Those

Kathleen Allison                                      August 15, 2013

1   are the only -- the only way to do that is to drill down

2   in each individual incident package to make that

3   determination.

4           MR. FISCHER:  Q.  So you don't have an opinion?

5   I just want to know if you think it does or not or you

6   don't know.

7       A.   Well, what --

8           MS. VOROUS:  Same objections.

9           THE WITNESS:  I guess I'm not clear with what

10  you're asking me.

11          MR. FISCHER:  I'm asking for your opinion based

12  on your review of what sounds like a fair amount of data

13  regarding attempted suicides and completed suicides.

14          MS. VOROUS:  Same objections.

15          MR. FISCHER:  Q.  Do you think that the use of

16  welfare checks during the first 21 days in segregation

17  have saved any lives?

18      A.   I have no data to support that, no specific

19  data to say that that's the key answer.

20      Q.   Do you have an opinion?

21          MS. VOROUS:  Same objection.  Asked and

22  answered, argumentative.

23          THE WITNESS:  The only way I could render an

24  opinion is to state that the number of suicides prior to

25  the welfare checks in 2006 to current have decreased.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   So then I would say yes, that they are helpful.

2              MR. FISCHER:  Okay.  I want to turn to RVRs.

3              THE WITNESS:  Okay.

4              MR. FISCHER:  Q.  At the December 2012 AD-SEG

5   policy meeting that we referenced earlier with special

6   master and plaintiffs, do you recall being asked by any

7   of the special master experts about whether CDCR tracks

8   mitigation of RVR punishments based on clinical input?

9       A.   I don't remember that specific question at

10  the -- at the -- at the meeting, no.

11      Q.   Do you recall stating that you would work on

12  tracking RVR mitigation data?

13      A.   I talked about the possibility of SOMS in the

14  disciplinary as being an option when that section rolls

15  out.

16      Q.   Does CDCR currently track RVR mitigation based

17  on clinical input data?

18      A.   Each individual institution in their

19  institutional register would have that indicated.

20      Q.   Does that go to headquarters for review?

21      A.   No, those are local to each and every

22  institution.

23      Q.   Does any analysis of RVR mitigation data occur

24  at the institution or at the headquarters level?

25      A.   It has been part of our CQIT process, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                      REPORTER CERTIFICATE

 2

 3          I hereby certify that KATHLEEN ALLISON was by

 4   me duly sworn to testify to the truth, the whole truth

 5   and nothing but the truth in the within-entitled cause;

 6   that said deposition was taken at the time and place

 7   herein named; that the deposition is a true record of

 8   the witness's testimony as reported to the best of my

 9   ability by me, a duly certified shorthand reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting by computer; that

12   request was [ ]/ was not [X] made to read and correct

13   said deposition.

14          I further certify that I am not interested in

15   the outcome of said action, nor connected with, nor

16   related to any of the parties in said action, nor to

17   their respective counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand this 19th day of August, 2013.

20

21          _____

22               HOLLY MOOSE, CSR NO. 6438

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit T

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF CALIFORNIA

 3

 4  RALPH COLEMAN, ET AL.,              )
                                        )
 5                   Plaintiffs,        )
                                        )CASE NO.:
 6          vs.                         )S 90-0520 LKK-JFM
                                        )
 7  EDMUND G. BROWN, JR., ET AL.,       )
                                        )
 8                   Defendants.        )
    _____)
 9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15  taken on behalf of the Plaintiffs, before Megan F.

16  Alvarez, Certified Shorthand Reporter No. 12470,

17  Registered Professional Reporter, for the State of

18  California, commencing at 8:50 a.m., Thursday,

19  February 21, 2013, at the Rosen, Bien, Galvan &

20  Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21  Francisco, California.

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  AARON J. FISCHER, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              AFISCHER@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:  DEBBIE J. VOROUS, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              1300 I STREET
                SACRAMENTO, CALIFORNIA 95814
11              916.324.5345
                916.324.5205 FAX
12              DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1     A.    Okay.

2     Q.    Are you aware?

3     A.    Yes.  Yes.

4     Q.    Okay.  Did you visit the administrative

5  segregation unit at CIM?  I think you said you did.

6     A.    Um.

7     Q.    Direct you to top of the 10266, top two

8  issues:  "EOP not transfer fast enough.  That's not

9  getting 10 hours RX" --

10    A.    Treatment.

11    Q.    "RX" is treatment?

12    A.    Treatment.

13    Q.    "Now nine in seg."

14          Were you documenting that there were nine EOPs

15  awaiting transfer in this segregation unit?

16    A.    Yes.

17    Q.    And they were not there for disciplinary

18  reasons; is that your understanding?

19    A.    Yes.

20    Q.    They were there because they were awaiting for

21  a bed to open?

22    A.    Yes.

23    Q.    Okay.  On the page just before that, 102620,

24  near the bottom you write:  "Lack of beds."

25          Is this related to same issue?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        A.    Lack of beds in general population.
 2        Q.    So there were lack of beds for EOP and there
 3   were lack of beds for -- related to the general
 4   population?
 5        A.    Yes.
 6        Q.    Were there more inmates than appropriate beds?
 7        A.    Yes.
 8        Q.    It's your understanding?
 9              Were there more EOPs than appropriate beds in
10   the system?
11              MS. VOROUS:  Objection.
12   BY MR. FISCHER:
13        Q.    Trying to understand what your --
14        A.    More EOPs -- they couldn't transfer EOPs to
15   other institutions.
16        Q.    For lack of available beds?
17        A.    Lack of available beds.
18        Q.    Okay.  Do you recall, did you interview any of
19   the EOPs in segregation awaiting transfer when you were
20   at CIM?
21        A.    This -- these may have been the inmates on
22   page 102626.
23        Q.    Uh-huh.
24              Based on your interviews with these inmates,
25   were you able to reach an opinion as to whether they
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    were receiving appropriate level of care treatment?

2         A.   They were sick inmates.  They were very sick

3    inmates.  And --

4         Q.   Do you remember anyone specifically?

5         A.   No.  Just by what I'm -- I wrote down about

6    the fact that -- that they were hearing voices or that

7    they were having auditory hallucinations or that one

8    inmate was seeing signs of his grandmother.  They were

9    sick inmates; they needed to be somewhere else.

10        Q.   In your opinion, was the administrative

11   segregation unit an appropriate area for these inmates?

12             MS. VOROUS:  Objection.  Assumes that these

13   inmates were ad seg.

14             THE WITNESS:  If these inmates were in ad seg.

15   BY MR. FISCHER:

16        Q.   Based on your memory, you interviewed inmates

17   in ad seg?

18        A.   I thought these were the inmates in ad seg.

19   I'm not sure.  I'd have to look at the numbers to be

20   sure.

21        Q.   On the page after which you were reading where

22   it again says "Seg" at the top.  This is 102627.

23             About halfway down, it says "LOB" -- "Make a

24   note LOB."  Does that stand for lack of bed?

25             MS. VOROUS:  Are you asking her whether --

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                        DATED: February 25, 2013

21

22                        _____

23                        MEGAN F. ALVAREZ

24                        RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit U

FILED

DEC 15 1995

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALEJANDRO MADRID, et al., )
on behalf of themselves and )
all others similarly )
situated, )
                     Plaintiffs, )        NO. C90-3094-TEH
        v.                       )
                                 )        CLASS ACTION
JAMES GOMEZ, Director,           )
California Department of         )        REMEDIAL ORDER RE:
Corrections, et al.,             )        EXCLUSION FROM THE
                                 )        SECURITY HOUSING UNIT
_____Defendants._____)

The Court is in receipt of the Special Master's October
25, 1995 Recommendation Re: Exclusion from the Security
Housing Unit and Enforcement of Court's Order of January 10,
1995 (hereafter "Recommendation"), and plaintiffs' and
defendants' objections thereto, filed November 16, 1995. The
Court is also in receipt of the declaration of Robert Hagen,
filed in support of defendants' objections.

Having thoroughly considered each objection and the
record in this case, and having consulted with the Special
Master and the Court-appointed psychiatric and mental health

COPIES MAILED TO
PARTIES OF RECORD

expert Dr. Metzner,[1] where appropriate, the Court is
satisfied that, with some modifications, the Special Master's
carefully drafted recommendations will adequately remedy the
serious Eighth Amendment violations pertaining to conditions
in the Security Housing Unit ("SHU") at Pelican Bay State
Prison. At the same time, the Court is equally satisfied that
the recommendations, as modified, are narrowly drawn to
achieve their remedial objective, and will accommodate the
security and public safety interests and concerns of the
defendants to the extent possible while still remaining within
the limits of the Constitution. In short, we are convinced
that the relief provided by this remedial order is the least
intrusive means necessary to correct the Constitutional
violations at issue. Finally, there can be no doubt that
defendants have been given every opportunity to develop and
implement a remedy without Court intervention, and that a
judicially sanctioned remedy is vitally necessary at this time
to rectify the Constitutional violations at issue.

Accordingly, and as set forth more fully below, the Court
adopts with certain modifications the Special Master's October
25, 1995 Recommendations Re: Exclusion from the Security
Housing Unit.

---

[1] The Court notes for the record that the parties had no
objection to the Special Master retaining Dr. Metzner to serve
as a neutral psychiatric and mental health expert. Since his
appointment, Dr. Metzner has spent a substantial amount of
time examining inmates at Pelican Bay, reviewing records and
policies, and providing consultation to the Special Master.

2

## A.    BACKGROUND

On January 18, 1995, this Court issued its Findings of
Fact, Conclusions of Law, and Order in this action. See Madrid
v. Gomez, 889 F.Supp. 1146 (N.D. Cal 1995).  With respect to
plaintiffs' challenge to conditions in the SHU, the Court
found, based on the evidence at trial, that the "conditions of
extreme social isolation and reduced environmental stimulation
. . . will likely inflict some degree of psychological trauma
upon most inmates confined there for more than brief periods."
Id. at 1265.  We concluded, however, that the evidence failed
to show that the degree of mental injury suffered by most
inmates significantly exceeded the kind of generalized
psychological pain that other courts have found compatible
with Eighth Amendment standards. Id.

The evidence did, however, demonstrate that for certain
categories of persons, the risk that conditions in the SHU
will cause a very serious injury to mental health is
unreasonably high. Id. at 1265-66.  These categories of
persons consist of inmates who are already mentally ill, as
well as inmates who suffer from certain other mental
disorders, chronic depression, or brain damage and
retardation. Id.  As we explained:

> For these inmates, placing them in the SHU
> is the mental equivalent of putting an
> asthmatic in a place with little air to
> breathe.  The risk is high enough, and the
> consequences serious enough, that we have
> no hesitancy in finding that the risk is
> plainly 'unreasonable.'  Such inmates are
> not required to endure the horrific
> suffering of a serious mental illness or a

3

> major exacerbation of an existing mental
> illness before obtaining relief.
>
> We are acutely aware that defendants are
> entitled to substantial deference with
> respect to their management of the SHU.
> However, subjecting individuals to
> conditions that are 'very likely' to
> render them psychotic or otherwise inflict
> a serious mental illness or seriously
> exacerbate an existing mental illness can
> not be squared with evolving standards of
> humanity or decency, especially when
> certain aspects of those conditions appear
> to bear little relation to security
> concerns.  A risk this grave--this
> shocking and indecent--simply has no place
> in  civilized society.  It is surely not
> one 'today's society [would] choose[] to
> tolerate.'

Id. at 1265-66 (citations omitted)(emphasis added).

Accordingly, we held that defendants can not, consistent
with the Eighth Amendment, continue to confine inmates in the
SHU who fall within the categories above and thus are at an
unreasonably high risk of suffering either a serious mental
illness or a serious exacerbation of an existing mental
illness due to the conditions in the SHU. Id. at 1267.

The January 10, 1995 order directed counsel for the
plaintiffs and defendants to work together jointly and in good
faith with the Special Master to develop a remedial plan.  The
Special Master began this process on January 31, 1995.  As he
states in his Recommendation, he "proceeded on the basis of
the Court's conclusion that the remedy must do no more and no
less than correct the constitutional violation," and gave
deference to defendants in arriving at a joint remedy.
Recommendation at 1.  After working with defendants for nine

months, and giving them every opportunity, defendants still
had not provided a good faith plan designed to implement the
exclusion categories as required by the Court's January 10,
1995 order. Nor was there any indication that defendants
intended to do so. Recommendation at 7, 13, 18.[2]
Accordingly, the Special Master recommends that the Court
enter a remedial order to cure the constitutional violations
relating to the SHU.

B.    OVERVIEW OF SPECIAL MASTER'S RECOMMENDATIONS

The Special Master's recommendations were developed after
considering input from both plaintiffs and defendants, and
defendants' mental health expert.  They implement the Court's
January 10, 1995 Order by recommending that inmates who meet
certain narrowly drawn definitions be excluded from the SHU.
These definitions, which were developed with the extensive
consultation of Dr. Metzner, refine the categories originally
specified by the Court in its January 10, 1995 order, and
delete two of those categories: persons suffering from
"borderline" and "impulse" personalities.

The definitions include persons who suffer from a serious
mental illness according to defendants' own statewide

_____

[2] As the Special Master notes, this is in marked contrast
to defendants' approach in developing a Use of Force and
Investigative Plan remedy.

5

guidelines,[3] and persons who are diagnosed with (a) a mental disorder that includes being actively suicidal, (b) a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads the individual to significant functional impairment, (c) an organic brain syndrome that results in a significant functional impairment if not treated, (d) a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment, or (e) mental retardation with significant functional impairment.[4]

As the above makes clear, the exclusion categories are quite restrictive. Only those persons who are truly at grave risk of suffering a serious injury to their mental health, or exacerbation of their current mental illness, due to the extreme conditions in the SHU would be subject to the exclusion order. Notably, the definitions contained in (a) through (e) above do not rely solely on diagnosis but require a functional impairment, which addresses one of defendant's major concerns regarding the implementation of any exclusions.

_____

[3] See Exhibit 10 to Special Master's November 6, 1995 Recommendation Re: Defendants' Revised Remedial Plan for Pelican Bay State Prison Health Care Delivery System, filed November 9, 1995; see also, id., Exhibit 6 at 18 (defendants' revised proposed remedial plan for health care services).

[4] We note that persons who fall within categories (b)-(e) are not currently eligible to receive mental health care in defendants' statewide guidelines, a fact consistent with defendants' shockingly narrow view of the mental health needs of prisoners in this case. The failure to rectify this in their proposed remedial plan regarding mental health care is not acceptable. See Recommendation at 24.

6

The Special Master has also recommended that the Court permit defendants to submit a proposed procedure for making exceptions to the above exclusions based upon dangerousness and/or repeated treatment failure, and the genuine inability to house at an alternative location.  This recommendation addresses defendants' concern that there may be some few number of inmates who, because of exceptional or extraordinary circumstances, should be housed in the SHU notwithstanding their eligibility for exclusion under the criteria discussed above.

In addition to recommending the above exclusion categories, the Special Master also recommends that (1) certain inmates already identified and agreed upon by the parties be removed from the SHU, and (2) that defendants submit proposals setting forth procedures for screening and evaluating incoming SHU inmates, and evaluating and monitoring inmates already confined in the SHU.  The Recommendation also includes provisions for a temporary stay and for hearings before the Special Master concerning a limited issue regarding an additional category of "at risk" inmates.

C.   GENERAL OBJECTIONS

    1.   Defendants' Objection to Any Presumptive Exclusions

When the remedial process first began, defendants raised certain concerns regarding the scope of the categories that would be subject to exclusion from the SHU; however, as the Special Master states, it "appeared that the issue was one of

7

refining definitions, and allowing exceptions under specified facts." Recommendation at 2. Defendants, however, subsequently shifted position. They now oppose any restraints on who may be placed in the SHU, notwithstanding the refinements made to the exclusion criteria, including the inclusion of a functional impairment component, and the recommendation that a procedure for exceptions to the exclusion criteria be developed and implemented.

Rather, defendants propose to cure the Constitutional violations concerning the conditions in the SHU by implementing a system to adequately monitor SHU inmates. Under this approach, defendants would be permitted to continue placing in the SHU persons for whom the risk of suffering a serious injury to mental health or serious exacerbation of mental illness is unreasonably high, so long as they monitor and then remove those inmates whom they conclude show sufficient signs of decompensation and/or exacerbation of existing mental illness to justify removal. Accordingly, defendants object to the entry of a remedial order that presumptively excludes any category of inmate from confinement in the SHU. Defendants' Objections at 26-28.

Defendants concede that there does not yet exist a mental health care system that is capable of implementing their suggested approach. See also Recommendation at 7. Thus, they also urge the Court to delay entry of any remedial order until such time that an effective monitoring and transfer system can be developed, implemented, and observed in operation by the

8

Court. Defendants' Objections at 27.

The Court agrees that a plan for effectively monitoring inmates in the SHU will be a critical component of any remedy for the constitutionally deficient mental health care provided at Pelican Bay. See Madrid, 889 F.Supp at 1214-27, 1255-1260 (findings of fact and conclusions of law regarding mental health care). However, improving the delivery of mental health services to constitutional levels does not address the separate Eighth Amendment violation relating to the conditions in the SHU.

Indeed, defendants' objection essentially asks the Court to reconsider the factual findings and conclusions of law that underlay its ruling that confining persons who are mentally ill (or fall within other limited categories) in the SHU constitutes cruel and unusual punishment under the Eighth Amendment. See Madrid, 889 F. Supp. at 1227-37, 1260-67. Defendants, however, have made no legal or factual showing in their Objections to the Recommendation (or in their "Brief Re: Housing Mentally Ill Inmates in SHU" submitted to the Special Master in June 1995) that would justify reconsideration of the Court's decision. As the Court held, where the risk is high enough, "inmates are not required to endure the horrific suffering of a serious mental illness or a major exacerbation of an existing mental illness before obtaining relief . . ." Madrid, 889 F.Supp. at 1265-66.

We also stress that defendants' actions or lack thereof in connection with the SHU since the issuance of the Court's

9

January 1995 decision -- well over nine months ago-- provide
little incentive for the Court to engage in further delay.
See generally Recommendation at 1-21.  As the Special Master
emphasized, "identification of 'at risk' prisoners has been
the direct result of the presence of the Special Master and
his experts at [Pelican Bay State Prison]." Recommendation at
10.  Many inmates who have been jointly identified by Drs.
Metzner and Green as needing immediate alternative housing
still have not been transferred from the SHU or have only been
transferred after long delays.  The examples set forth at
pages 15 - 18 of the Recommendation provide graphic testimony
of the suffering of "at risk" inmates that continues unabated
in the SHU notwithstanding the Court's January 10, 1995
decision.[5]

Given all of the above, we emphatically reject
defendants' invitation to engage in further delay,
particularly in light of the very serious nature of the
injuries at issue.  Rather, we conclude, in light of the
Special Master's Recommendation at pages 1 - 21, that

---

    [5] The Court is also appalled by the Special Master's
description of cell extractions in the SHU of mentally ill
inmates.  The Special Master describes that one such inmate
(who was naked and covered with urine and fecal matter) was
"so disoriented by the use of chemical agents that he was
unable to stand or walk backwards to be handcuffed, and an
extraction was commenced."  He adds that he believes that
"severely mentally ill inmates continue to be subjected to
extractions" and that the California Department of Corrections
"has failed to address this problem in the past eight months,"
Recommendation 12.  The Court directs the Special Master to
address this issue with the defendants as soon as possible and
to report to the Court.

defendants' unconstitutional practices with respect to the SHU

will not be remedied absent an order from this Court. As

such, the Court will enter a remedial order at this time.[6]

2. Plaintiffs' Objection that Defendants Develop
Additional Plans

Some of the Special Master's recommendations direct

defendants to develop additional plans. For example,

Recommendation No. 9 recommends that defendants be required to

establish and submit a mental health intake screening

procedure and form for all inmates received for SHU housing.

Recommendation at 25. Plaintiffs object to allowing

defendants the opportunity to develop procedures on their own

---

[6] The Special Master's discussion of the progress and actions of the defendants with respect to the SHU remedy raises very serious questions concerning the defendants' approach to the remedial process with respect to the SHU, as well as the mental health/medical care remedy. See generally Recommendation at 1-21; see also Special Master's November 6, 1995 Recommendation Re: Defendants' Revised Remedial Plan for Pelican Bay State Prison Health Care Delivery System, filed November 9, 1995. The Court understands that the pace of progress has finally significantly picked up with respect to the Psychiatric Security Unit and the Mental/Medical Health care system since the filing of the Special Master's October 25 and November 6, 1995 Reports. While this improved pace of progress is important, it should begin on day one of the remedial process, not months later after a Special Master's report. Defendants represent in their Objections that their "commitment to the formulation and implementation of a remedy for the issues identified in the Court's findings is substantial, unwavering, and will continue." Objections at 20. If defendants expect to retain credibility with the Court this promise must be translated into sustained action at all levels of the Department of Corrections. The Court will take up its concerns regarding the overall pace of progress at the hearing on the Special Masters' November 6, 1995 recommendations regarding health care delivery.

11

given that defendants still had yet to provide -- nine months after January 1995 -- an acceptable plan relating to health care services or SHU conditions, and have shown a lack of timely cooperation in these areas. Plaintiffs instead urge the Court to direct the Special Master, with the assistance of his experts, to develop the necessary plans and procedures as expeditiously as possible.

While the Court agrees that defendants' overall progress in the areas of the SHU and mental/medical health care have been less than satisfactory, it is not persuaded that it is necessary at this juncture to totally preclude defendants from participating in the development of the proposals recommended by the Special Master. However, given the rate of progress to date, and for the reasons set forth in the Court's January 10, 1995 decision at 889 F.Supp at 1281-82, we find it appropriate to impose strict deadlines and to direct defendants to develop the proposals working in conjunction with the Special Master.[7] If defendants fail to develop satisfactory proposals within these deadlines the responsibility for developing such plans will automatically default to the Special Master and his experts.[8]

_____

[7] We note that defendants have not objected to this approach, recommended by the Special Master in his November 6, 1995 Recommendation Re: Defendants' Revised Remedial Plan for Pelican Bay State Prison Health Care Delivery System. See Defendants' Objections thereto, filed December 4, 1995.

[8] Plaintiffs repeat this general objection in their objections to specific recommendations which involve the preparation of plans. Having addressed the issue here, the Court will not address it again in its discussion of the

12

D.   OBJECTIONS TO SPECIFIC RECOMMENDATIONS

Recommendation No. 1.

Neither party asserts any objection to the transfer of the inmates identified in this recommendation.  As the Special Master notes, neither party has disputed that this group of inmates requires alternative housing.

Plaintiffs contend that defendants should be required to comply with Recommendation No. 1 within 7 days of the date of this Order.  The Court, however, adopts the Special Master's recommendation of a temporary stay until December 31, 1995 in light of the recent progress regarding the implementation of a Psychiatric Security Unit ("PSU").  See Recommendation 6-7. The Court will require that all inmates identified in Recommendation No. 1 be relocated from the SHU no later than January 1, 1996.

Recommendation No. 2

(a)   First Paragraph

Defendants suggest that the words "or who are currently receiving treatment for . . ." be deleted.  The Court can not accept this deletion because it would allow defendants to indefinitely confine persons in the SHU by minimizing their symptoms through long term use of powerful psychotropic drugs that would be potentially unnecessary in

parties' specific objections.

13

another setting.[9]

Plaintiffs suggest modifying the language in the first paragraph of Recommendation 2(a) to take into account the fact that "dangerousness to self" is not an Axis I diagnosis but a condition. As explained below, however, the Court agrees with defendants that the dangerousness to self category should be deleted. Thus, plaintiffs' requested modification is rejected.

(b) Paragraphs 2(a)(1)- (2)(a)(9)

No objections. The Court notes that these definitions are taken almost verbatim from defendants' current and proposed policies regarding treatment for people who suffer from serious mental illness.[10]

_____

[9] Defendants state that they propose, "as an alternative to striking the current treatment language of 2(a), adding language to include (on the list of exclusions) inmates with current symptoms or those whose recent clinical history suggests that they will not be able to psychologically tolerate SHU for very long." Defendants' Objections at 22.

It is not clear to the Court if defendants intended to suggest this additional restriction in the event the Court did not strike the "current treatment" language or if defendants intended to offer this additional restriction be added if the Court did strike the current treatment language. In addition, the question of "recent clinical history" appears to raise an issue that overlaps with the subject of the upcoming "history of mental illness" hearing See Recommendation No. 10. At the very least, the term ""recent clinical history" requires further definition. Accordingly, the Court will not address defendants' proposed alternative language now. Defendants may re-raise this matter if they so desire, after the upcoming hearing.

[10] See note 3 supra.

(c)    Paragraph 2(a)(10)

The Court agrees with defendants that the category of "dangerous to self" should be deleted for the reasons stated by defendants.  We also note that inmates who are clinically assessed to be dangerous to self as a result of a mental disorder are likely to be covered by one of the other exclusionary categories.

(d)  Paragraphs 2(b)-2(d)
         No objections.

(e)  Paragraph 2(e)

The Court adopts defendants' proposed language at lines 19-21 of page 23 of their Objections for the reasons set forth therein.  This change also addresses plaintiffs' objection by clarifying that the inmate's disorder can be manifested by frequent episodes of psychosis or depression.

Plaintiffs also object that paragraph 2(e) does not include prisoners who are manifesting symptoms "associated with the adverse effects of . . . Reduced Environmental Stimulation (RES)." Plaintiffs' objection at 5.  Plaintiffs stress that an RES exclusion is justified because we found that "many, if not most, inmates in the SHU experience some degree of psychological trauma in reaction to their extreme social isolation and the severely restricted environmental stimulation in the SHU." 889 F.Supp. at 1235 (emphasis added). The record at trial, however, did not sustain a finding that

15

the risk of suffering a sufficiently serious degree of psychological trauma was high enough among all inmates to justify an presumptive exclusionary category based on RES. Accordingly, this objection is rejected for the reasons set forth in the Court's January 10, 1995 decision.[11]

### Recommendation No. 3

(a) The PSU

Defendants seek clarification regarding inclusion of the PSU. The PSU was not included because of its experimental, early-stage status. In light of developments since October 25, the Court will include the PSU, subject to evaluation by the Special Master and Court approval.

(b) Use of C-1 and C-6 Pods

Both parties raise issues concerning use of the C-1 and C-6 Pods in the SHU. Placement of "at risk" inmates in these pods pursuant to Recommendation No. 3 is only permitted as an interim measure until December 31, 1995, to give the defendants an opportunity to further implement the PSU. Pods other than C-1 and C-6 may be utilized during this temporary stay period, but only after the Special Master has had an

---

[11] We emphasize, however, that if an individual inmate confined in the SHU demonstrates a severe psychological reaction due to RES, an adequate mental health care system should promptly identify such inmate (or any inmate who develops serious mental health problems as a result of conditions in the SHU but was not initially excluded from the SHU under paragraph two above) and address the problem. See Madrid 889 F.Supp at 1266, n. 211; see also Special Master's proposed Recommendation No. 4.

16

opportunity to verify the availability of enhanced treatment
and programming.   Consistent with the Court's January 10, 1995
decision, inmates who satisfy the "at risk" criteria in
paragraph two may not be housed in Pods C-1, C-6, or anywhere
else in the SHU, after expiration of the temporary stay except
during the 96 hour period set forth in Recommendation No. 5.

(c) deadline

The Court agrees with plaintiffs that deadlines
should be set; also, given the lengthy period of time that has
already elapsed since the issuance of the Court's January 10,
1995 order, we find that stringent deadlines are appropriate.
It is also the Court's understanding, having consulted with
the Special Master, that defendants have developed a screening
mechanism, although they may still be in the process of making
refinements.   Accordingly, defendants will be required to
submit for the Court's approval the screening mechanism
required by Recommendation No. 3 no later than 14 days from
the date of this Order.   The Court will also require that the
evaluations be completed within 30 days of Court approval of
the screening mechanism.

Recommendation No. 4

For the reasons discussed above, the Court agrees with
plaintiffs that a strict deadline should be imposed.   Having
consulted with the Special Master, the Court will require that
defendants comply with Recommendation No. 4 within 30 days.

17

Recommendation No.5

(a) Timeline

Defendants object to the Special Master's recommendation that incoming inmates be evaluated for "at risk" exclusion within 48 hours of arrival at the SHU orientation unit. Defendants propose a timeline that would permit them up to 13 business days in which to evaluate incoming SHU inmates, which could translate into as long as 3 weeks depending on holidays. Given that defendants have not justified this length of time (other than to say it is consistent with current practices), and given the severe impact SHU conditions are likely to have on "at risk" inmates, the Court finds that defendants' proposed timeline is excessive. Accordingly, the Court rejects defendants' objection but modifies the Special Master's recommendation to allow for 72 hours.

(b) SHU Pods C-1 and C-6

The Special Master recommends that inmates awaiting transfer out of the SHU be housed in pods C-1 and C-6. Defendants state that they should be able to utilize other SHU pods as long as "appropriate mental health treatment is available." As set forth above, defendants may utilize other pods but only after the Special Master has had an opportunity to verify that enhanced treatment and programming is available.

(c) deadline

For the reasons discussed above, we agree that deadlines should be imposed. It is contemplated that

18

defendants may utilize the same screening mechanism discussed under Recommendation No. 3 in developing the mental health intake screening procedure and form.  Accordingly, the Court will require that defendants submit for approval their proposed mental health intake screening procedure and form within 14 days.

### Recommendations Nos. 6 and 7

Plaintiffs object to the Special Master's reluctant recommendation of a temporary stay until December 31, 1995.  See Recommendation at 26.  For the reasons set forth by the Special Master, the Court concludes that the recommended temporary stay is appropriate, and notes that it will be of relatively short duration.

### Recommendation No. 8
No objections.[12]

### Recommendation No. 9

Defendants' comments concerning this Recommendation are addressed to the substance of the proposal envisioned by the Recommendation; they do not pose an objection to the Recommendation itself and thus will not be addressed.  The Court notes, however, that it does not object to a procedure

---

[12] Defendants' Objections include a section entitled "Recommendations 8 and 9;" however, the substance of that section appears directed toward Recommendation 9.

19

1  which provides for a collaborative decision between security

2  and treatment staff.

3      Plaintiffs object to any procedure that would permit

4  an exception to the exclusions. This objection is rejected.

5  Plaintiffs' remaining comments are addressed to the substance

6  of any such procedure and thus will not be addressed. The

7  Court notes, however, that while any "exceptions procedure"

8  would be monitored by the Special Master, it does not envision

9  direct or automatic review of each decision made under the

10  procedure by either the Special Master or the Court.

11

12      Recommendation No. 10

13      No objections.

14

15  E. INJUNCTION AND ORDER

16      In light of the all of the above, and good cause

17  appearing, it is HEREBY ORDERED that:

18

19      1. Defendants are permanently enjoined from confining in

20  the Pelican Bay State Prison Security Housing Unit those

21  inmates diagnosed by Drs. Metzner and Green[13] who require

22  Enhanced Outpatient Program (EOP) or Department of Mental

23  Health facilities (DMH) levels of treatment.

24

25      2.  Defendants are permanently enjoined from confining

26

27      [13]  Dr. Green is employed by the California Department of
    Corrections.

28

                            20

in the Pelican Bay State Prison Security Housing Unit those "at risk" inmates who meet one or more of the following definitions:

    a.   Inmates found to have current symptoms or who are currently receiving treatment for the following types of Diagnostic and Statistical Manual IV (DSM-IV) Axis I diagnosis:

        (1) Schizophrenia (all sub-types)

        (2) Delusional Disorder

        (3) Schizophreniform Disorder

        (4) Schizoaffective Disorder

        (5) Brief Psychotic Disorder

        (6)   Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)

        (7)  Psychotic Disorder Not Otherwise Specified

        (8)  Major Depressive Disorders

        (9)  Bipolar Disorder I and II

    b. Inmates diagnosed with a mental disorder that includes being actively suicidal.

    c. Inmates diagnosed with a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads the individual to significant functional impairment.

    d. Inmates diagnosed with a organic brain syndrome that results in a significant functional impairment if not treated.

21

e. Inmates diagnosed with a severe personality disorder that is manifested by frequent episodes of psychosis or depression, and results in significant functional impairment.

f. Inmates diagnosed with mental retardation with significant functional impairment.

3. The Permanent Injunction set forth in paragraphs 1-2 above shall be temporarily stayed until no later than December 31, 1995 to allow defendants additional time to solidify funding and increase the operational status of the EOP, PSU, and the Correctional Clinical Case Management ("CCCMS") program. During the period of this temporary stay, defendants shall house all inmates who meet the "at risk" exclusion criteria above in SHU pods C-1 and C-6, where enhanced mental health care services and programs are available. Pods other than C-1 and C-6 may also be utilized during the temporary stay period, but only after the Special Master has had an opportunity to verify the availability of enhanced treatment and programming.

4. (a) Defendants shall, within 14 days of the date of this Order, develop and submit for approval to the Court a screening mechanism that will provide for an evaluation, to be completed no later than 30 days after approval of the screening mechanism, of all inmates confined in the SHU as of the time the screening mechanism is approved to determine

22

whether they meet one of more of the "at risk" exclusion
criteria set forth in paragraph two above.  In the event that
defendants fail to meet the deadlines set forth above, the
responsibility for developing and submitting the screening
mechanism and/or completing the evaluations shall default to
the Special Master and his experts.

(b) Defendants shall transfer any inmate found under
subparagraph (a) above to meet any of the "at risk" exclusion
criteria set forth in paragraph two above to one of the
following locations, dependent upon the level of care
required: (1) DMH, (2) an EOP, (3) the PSU (once the PSU is
evaluated by the Special Master and approved by the Court).

Any inmate determined to be "at risk" prior to December
31, 1995, must be transferred to one of the above locations no
later than January 1, 1996.  Any inmate determined to be "at
risk" after December 31, 1995, shall be transferred to one of
the above locations no later than 96 hours from the time of
the "at risk" determination, but in no event shall any "at
risk" inmate be transferred later than 96 hours after the
final date for concluding evaluations pursuant to subparagraph
(a) of this paragraph.[14]

---

[14]  The Court notes that the purpose of paragraph 4  is
to ensure that there are no inmates currently confined in the
SHU who should be properly excluded under the exclusion
criteria set forth in paragraph 2.  While defendants have
undertaken some efforts to identify such inmates, the Court
having consulted with the Special Master and Dr. Metzner (who
have reviewed Roger Hagen's declaration), is not satisfied
that these efforts have been comprehensive, carefully tailored
to the purposes of paragraph No. 4, and/or are fully up-to-
date.  It will be up to the Special Master and Dr. Metzner to

23

5.   Defendants shall, within 14 days of the date of this Order, establish and submit to the Court a mental health intake screening procedure and form for all inmates received for SHU housing at the SHU orientation unit.  This procedure may utilize the same screening mechanism required by paragraph 4.  Defendants shall be prepared to fully implement such procedure within 21 days of the date of this Order.  Such procedure shall require the determination of whether an inmate meets one or more of the "at risk" exclusion criteria under paragraph two above, or is suitable for SHU housing, within 72 hours of the inmate's arrival at the Pelican Bay State Prison SHU orientation unit.  Those inmates who meet one or more of the "at risk" exclusion criteria under paragraph two above shall be removed from the SHU orientation unit within 96 hours of their arrival at the SHU orientation unit.  Any inmate awaiting removal pursuant to this paragraph shall be afforded enhanced mental health care services and programs and housed in SHU Pods C-1 and C-6.  Pods other than C-1 and C-6 may also be utilized during this 96 hour period, but only after the Special Master has had an opportunity to verify the availability of enhanced treatment and programming.

6.   Defendants shall, within 30 days of the date of this Order, submit to the Court an approved, funded, and staffed

meet with defendants to determine the current status of defendants' efforts and the extent to which additional or supplemental evaluations are required under this paragraph.

24

program which establishes appropriate and periodic monitoring
of all SHU inmates by appropriately licensed mental health
clinicians. In the event that defendants fail to meet this
deadline, the responsibility to develop and submit such plan
shall default to the Special Master.

7. Defendants may, within 30 days of the date of this
Order, submit a proposed procedure for permitting exceptions
to the permanent injunction set forth in paragraph one and two
based upon dangerousness and/or repeated treatment failures
and the inability to house at an alternative location. Such
exceptions shall only be provided in extraordinary and
exceptional circumstances.

8. Defendants may submit to the Court for evaluation at
any future time a proposal for alternative housing in addition
to the PSU or EOP at Pelican Bay. Any such proposal shall
fully describe the housing, treatment, and staffing to be
provided.

9. Because the parties have failed to reach a joint
remedy on the specific time period covered by the term "a
history of mental illness," the Special Master shall hold a
hearing, currently scheduled for December 27, 1995, to hear
expert testimony on the limited issue of appropriate "at risk"
inmates based upon historical factors.

10.   A copy of the permanent injunction issued herein shall be promptly posted in each SHU pod or unit and in each library cell in the SHU Library.

11.   Consistent with this Court's January 23, 1995 Order of Reference, the Special Master shall design a system to effectively monitor defendants' implementation and compliance with this Order.

IT IS FURTHER ORDERED THAT counsel for the parties shall appear on Monday, January 29, 1996, at 10:00 a.m. for a hearing on the Special Master's Recommendations Re: Defendants' Revised Remedial Plan for Pelican Bay State Prison Health Care Delivery System - August 25, 1995.

IT IS FURTHER ORDERED that Mr. James Gomez, Director, California Department of Corrections; Mr. Kyle S. McKinsey, Deputy Director of Health Care Services Division; Mr. Gregg Harding, Chief Deputy Director of Field Operations, and Mr. Roger Hagen, Regional Administrator for Health Care Services Division, be present at this hearing.

IT IS SO ORDERED.

DATED 12/15/95

Thelton E. Henderson, Chief Judge
United States District Court.

26

Exhibit V

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date    :    May 20, 2013

To    :    Chief of Classification Services Unit

Subject:    **SHU PROFILE FOR INMATE,** ███████████

**Placement prior to SHU:** Inmate ███████████ is a 44 year old, Black male, Second termer, originally received into the California Department of Corrections and Rehabilitation (CDCR) from Riverside County on April 28, 1994. "S" returned as a parole violator with a new term on January 2, 1998, for the controlling case of Penal Code (PC) Section 261(A) (2)-Rape/Resist w/Force Violence and PC 288A(C)-Oral Cop w/Force. "S" was sentenced to a 47-year prison term. "S's" Earliest Possible Release Date (EPRD) is May 29, 2042. "S" was received at CSP-COR SHU on March 29, 2000.

Prior to his arrival at CSP-COR SHU "S" was housed at CSATF. On May 20, 1999, "S" was placed in Ad. Seg for the specific act of Battery on a Peace Officer. "S" was found guilty of the aforementioned offense and assessed a 18 month aggravated SHU term with a Minimum Eligible Release Date (MERD) of July 5, 2000.

The following are serious Rule Violation Reports (RVR's) received during the last 5 years prior to transfer to COR-SHU:

| Date: | Offense: | MERD: |
|---|---|---|
| March 13, 2000 | Obstructing a Peace Officer | N/A |
| December 12, 1999 | Indecent Exposure | N/A |
| December 21, 1999 | Indecent Exposure | N/A |
| October 28, 1999 | Resisting a Peace Officer | N/A |
| August 8, 1999 | Indecent Exposure | N/A |
| July 7, 1999 | Masturbation | N/A |
| June 16, 1999 | Obstructing a Peace Officer | N/A |
| May 20, 1999 | Battery on Peace Officer | August 20, 2000 |
| March 16, 1999 | Indecent Exposure | N/A |
| March 9, 1999 | Indecent Exposure | N/A |
| March 8, 1999 | Indecent Exposure | N/A |
| March 6, 1999 | Indecent Exposure | N/A |
| November 24, 1999 | Obscenity | N/A |
| September 23, 1998 | Battery on Non-Peace Officer | June 23, 1999 |
| May 30, 1998 | Mutual Combat | N/A |
| February 3, 1996 | Disobeying Direct Order | N/A |
| June 9, 1995 | Indecent Exposure | N/A |
| January 6, 1995 | Indecent Exposure | N/A |

The following are serious Rule Violation Reports (RVR's) received while housed at COR-SHU.

Chief of Classification Services Unit

Page 2

| Date: | Offense: | MERD |
|---|---|---|
| October 10, 2011 | Delaying a Peace Officer | N/A |
| May 31, 2011 | Refusing a Cellmate | October 27, 2016 |
| December 18, 2009 | Delaying a Peace Officer | N/A |
| December 18, 2009 | Battery on a Peace Officer | December 19, 2015 |
| November 24, 2009 | Refusing a Cellmate | August 27, 2014 |
| October 6, 2009 | Refusing a Cellmate | December 19, 2013 |
| July 12, 2009 | Refusing a Cellmate | N/A |
| March 2, 2009 | Indecent Exposure | May 27, 2013 |
| October 20, 2008 | Threat to Non-Custody Staff | August 27, 2012 |
| October 1, 2008 | Threatening Sexual Assault on PO | November 27, 2011 |
| August 5, 2008 | Threatening a Non-Peace Officer | February 27, 2011 |
| August 3, 2008 | Indecent Exposure | May 27, 2010 |
| June 27, 2008 | Unlawful Influence | N/A |
| June 25, 2008 | Over Familiarity | N/A |
| February 10, 2008 | Disrespect/Potential for Violence | N/A |
| July 24, 2007 | Indecent Exposure | November 27, 2008 |
| March 24, 2007 | Indecent Exposure | August 27, 2009 |
| February 24, 2007 | Indecent Exposure | N/A |
| April 13, 2007 | Disrespect Towards Staff | N/A |
| December 19, 2006 | Indecent Exposure | N/A |
| September 27, 2006 | Sexually Suggestive Material | N/A |
| January 14, 2009 | Indecent Exposure | N/A |
| October 12, 2005 | Indecent Exposure | N/A |
| July 31, 2005 | Resisting a Peace Officer | N/A |
| May 19, 2005 | Threatening Sexual Assault | February 27, 2008 |
| April 29, 2005 | Destruction of State Property | N/A |
| March 13, 2005 | Indecent Exposure | N/A |
| December 29, 2004 | Delaying a Peace Officer | N/A |
| December 21, 2004 | Behavior Leading to Violence | N/A |
| February 27, 2004 | Disrespecting Staff | N/A |
| January 18, 2004 | Delaying a Peace Officer | N/A |
| November 24, 2003 | Indecent Exposure | N/A |
| August 18, 2003 | Attempted Battery on Staff | March 19, 2007 |
| July 7, 2003 | False Reporting | N/A |
| December 9, 2002 | Indecent Exposure | N/A |
| October 18, 2002 | Indecent Exposure | N/A |
| October 18, 2002 | Battery on Peace Officer | March 19, 2007 |
| October 9, 2002 | Battery on Peace Officer | September 19, 2005 |
| October 4, 2002 | refusing to Provide DNA | N/A |
| September 16. 2002 | Disobeying Direct Order | N/A |
| September 11, 2002 | Delaying Program | N/A |
| September 4, 2002 | Refusing to Provide DNA | N/A |
| August 2, 2002 | Delaying a Peace Officer | N/A |
| August 1, 2002 | Resisting Staff | N/A |
| July 14, 2002 | Threatening a Peace Officer | May 27, 2004 |

DEXP 113108

Chief of Classification Services Unit

███████████

Page 3

| July 14, 2002 | Threatening a Peace Officer | May 27, 2004 |
|---|---|---|
| July 30, 2002 | Sexual Behavior | N/A |
| June 16, 2002 | Attempted Battery on PO | May 27, 2004 |
| June 14, 2002 | Destruction of State Property | N/A |
| May 4, 2002 | Battery on Peace Officer | June 19, 2003 |
| April 14, 2002 | Battery on Peace Officer | May 29, 2003 |
| March 14, 2002 | Battery on Peace Officer | April 29, 2003 |
| Febarury 23, 2002 | Threatening a Peace Officer | May 27, 2004 |
| January 19, 2002 | Indecent Exposure | N/A |
| January 9, 2002 | Delaying a Peace Officer | N/A |
| November 26, 2001 | Attempted Battery on Peace Officer | September 12, 2002 |
| November 11, 2001 | Indecent Exposure | N/A |
| October 20, 2001 | Indecent Exposure | N/A |
| October 13, 2001 | Attempted Battery on Peace Officer | September 12, 2002 |
| September 18, 2001 | Attempted Battery on Inmate | September 12, 2002 |
| September 6, 2001 | Delaying a Peace Officer | N/A |
| September 1, 2001 | Indecent Exposure | N/A |
| August 30, 2001 | Destruction of State Property | N/A |
| March 17, 2002 | Indecent Exposure | N/A |
| March 9, 2002 | Indecent Exposure | N/A |
| December 17, 2001 | Indecent Exposure | N/A |
| November 10, 2001 | Destruction of State Property | N/A |
| November 5, 2001 | Attempted Battery on Peace Officer | September 12, 2002 |
| November 3, 2001 | Indecent Exposure | N/A |
| November 3, 2001 | Destruction of State Property | N/A |
| August 24, 2001 | Indecent Exposure | N/A |
| July 30, 2001 | Disrespect Towards Staff | N/A |
| July 27, 2001 | Battery on Peace Officer | September 12, 2002 |
| July 26, 2001 | Battery on Peace Officer | September 11, 2002 |
| June 13, 2001 | Refusing Direct Order | N/A |
| June 6, 2001 | Delaying a Peace Officer | N/A |
| May 20, 2011 | Delaying a Peace Officer | N/A |
| May 15, 2001 | Threatening a Peace Officer | December 8, 2001 |
| May 9, 2001 | Threatening Staff | December 2, 2001 |
| May 7, 2001 | Resisting | N/A |
| May 4, 2001 | Indecent Exposure | N/A |
| April 25, 2001 | Battery on Peace Officer | June 10, 2002 |
| April 7, 2001 | Battery on Peace Officer | October 30, 2001 |
| April 6, 2001 | Indecent Exposure | N/A |
| April 3, 2001 | Delaying a Peace Officer | N/A |
| March 20, 2001 | Refusing Direct Order | N/A |
| March 12, 2001 | Threatening Staff | February 12, 2002 |
| March 12, 2001 | Indecent Exposure | N/A |
| March 10, 2001 | Indecent Exposure | N/A |
| March 4, 2001 | Battery on Peace Officer | February 12, 2002 |
| March 2, 2001 | Indecent Exposure | N/A |
| February 15, 2001 | Indecent Exposure | N/A |

DEXP 113109

Chief of Classification Services Unit

Page 4

| February 11, 2001 | Masturbation | N/A |
|---|---|---|
| February 8, 2001 | Destruction of State Property | N/A |
| January 26, 2001 | Battery on Peace Officer | August 19, 2001 |
| December 27, 2000 | Battery on Peace Officer | February 12, 2002 |
| December 23, 2000 | Indecent Exposure | N/A |
| December 22, 2000 | Masturbation | N/A |
| December 19, 2000 | Delaying a Peace Officer | N/A |
| December 8, 2000 | Delaying a Peace Officer | N/A |
| December 8, 2000 | Indecent Exposure | N/A |
| October 27, 2000 | Masturbation | N/A |
| October 27, 2000 | Delaying a Peace Officer | N/A |
| October 26, 2000 | Resisting a Peace Officer | N/A |
| October 24, 2000 | Delaying a Peace | N/A |

Name of institution contact person:   D. Altamirano Counselor II Security Housing Unit, CSP-Corcoran (559) ███████ extension ███████

D. Altamirano
Facility 4B SHU, CCII
California State Prison-Corcoran

**ROUTE SLIP**
**Facility IV-B**
**Regarding: DRB – Inmate,** ███████
**FOR WARDEN'S SIGNATURE**

_____
A.  Pacillas
Correctional Counselor I
Facility IV-B


APPROVED/DISAPPROVED                    APPROVED/DISAPPROVED


_____                _____
C.  Moreno                             S.  ROCHA
Correctional Counselor II              C & PR (A)
Facility IV-B


APPROVED/DISAPPROVED                    APPROVED/DISAPPROVED


_____                _____
J.  Castro                             S.  Johnson
Facility Captain                       Chief Deputy Warden-Operations (A)
Facility IV-B


APPROVED/DISAPPROVED                    APPROVED/DISAPPROVED
                                       **FOR WARDEN'S SIGNATURE**


_____                _____
R.S.  LAMBERT                          C.  Gipson
Associate Warden                       Warden (A)
Level-IV SHU

State of California                                                     Department of Corrections and Rehabilitation

# Memorandum

Date    :    May 20, 2013

To      :    Chief of Classification Services Unit

Subject :    **SHU PROFILE FOR INMATE** ████████████ **APPROPRIATE HOUSING
             REVIEW**

**Placement prior to SHU:** ████████████████ is a 47 year old multi termer
received into the California Department of Corrections and Rehabilitation (CDCR) from
Kern County on December 4, 1998, for the offence of Attempted Murder 2nd, Inflicting
Mental Suffering on a Child, and Assault with a Deadly Weapon (x2), resulting in a term
of Life pus 32 years 8 months. S's current Minimum Eligible Parole Date (MEPD) is
March 8, 2045. S was received at CSP-COR SHU on March 8, 2007.

Prior to arrival at CSP-COR SHU, S was housed at CCI-SHU and PBSP-SHU. S's SHU
placement dates back to 1999, when he was first placed in SHU at Centinela State
Prison on August 5, 1999, for Battery on an Inmate w/o SBI. Since 1999 S has had a
total of **36 SHU terms**.

Although S had an extensive assaultive behavior towards staff and an established
MERD of November 5, 2015, PBSP-ICC elected to suspend S's MERD on
November 12, 2013. S was released to PBSP-IV EOP for a period of observation. On
February 11, 2004, S's level of care was changed to CCCMS and he was transferred to
PBSP-IV GP. On February 20, 2004, S was placed in ASU at PBSP for Possession of a
Deadly Weapon. On May 12, 2004, ICC elected to re-impose previous MERD of
November 5, 2015.

The following are serious Rule Violation Reports (RVR's) received during the last 5
years prior to transfer to CSP-COR SHU.

| DATE | CHARGE | INSTITUTION | MERD |
|------|--------|-------------|------|
| 05/01/02 | BATTERY ON P.O. | PBSP-SHU | 05/28/10 |
| 05/01/02 | POSS OF WEAPON | PBSP-SHU | 05/28/11 |
| 05/01/02 | DELAY P.O. | PBSP-SHU | N/A |
| 05/08/02 | BATTERY ON P.O. | PBSP-SHU | 05/05/14 |
| 07/02/02 | BATTERY ON P.O. | PBSP-SHU | 11/05/15 |
| 07/02/02 | REFUSAL TO OBEY ORDER | PBSP-SHU | N/A |
| 07/09/02 | DELAY P.O. | PBSP-SHU | N/A |
| 02/20/04 | POSS WEAPON | PBSP-SHU | 11/05/15 |
| 02/24/04 | BATTERY ON P.O. | PBSP-SHU | 11/05/15 |
| 03/06/04 | BATTERY ON P.O. | PBSP-SHU | 05/05/17 |
| 05/14/04 | ATT BATTERY ON P.O. | PBSP-SHU | 05/05/17 |
| 07/09/04 | BATTERY ON P.O. | PBSP-SHU | 05/05/17 |
| 07/09/04 | AGG BATTERY ON P.O. | PBSP-SHU | 05/05/17 |

| Date | Charge | Institution | MERD |
|---|---|---|---|
| 07/09/04 | BATTERY ON P.O. | PBSP-SHU | 05/05/17 |
| 12/03/04 | COUNT PROCEDURE | PBSP-SHU | N/A |
| 03/13/05 | POSS CONTRABAND | PBSP-SHU | N/A |
| 05/10/05 | ATT MURDER OF P.O. | PBSP-SHU | 02/05/21 |
| 05/11/05 | POSS WEAPON | PBSP-SHU | 02/28/23 |
| 05/13/05 | POSS WEAPON | PBSP-SHU | 05/28/24 |
| 05/27/05 | BATTERY ON P.O. | PBSP-SHU | 11/05/25 |
| 06/18/05 | DISRESPECT STAFF | CCI-SHU | N/A |
| 07/30/05 | POSS WEAPON | CCI-SHU | 02/28/27 |
| 02/17/06 | THREAT TO BATTER CELL | CCI-SHU | 09/20/27 |
| 11/21/06 | BATTERY ON P.O. | CCI-SHU | 12/05/28 |
| 03/08/07 | POSS WEAPON | COR-SHU | 03/28/30 |

The following are serious Rule Violation Reports (RVR's) received while housed at CSP-COR SHU.

| DATE | CHARGE | INSTITUTION | MERD |
|---|---|---|---|
| 03/08/07 | POSS OF WEAPON | CCI-SHU | 03/29/30 |
| 04/20/07 | BATTERY ON P.O. | COR-SHU | 09/05/31 |
| 03/22/09 | DESTRUCTION ROPERTY | COR-SHU | N/A |
| 12/26/09 | BATTERY ON P.O. (GASS) | COR-SHU | 03/05/33 |
| 06/04/10 | DISRESPECTING STAFF | COR-SHU | N/A |
| 06/03/11 | DELAYING P/O | COR-SHU | N/A |
| 06/10/11 | OBSTRUCTING P/O | COR-SHU | N/A |
| 10/10/11 | OVERFAMILIARITY | COR-SHU | N/A |
| 12/24/11 | THREAT STAFF | COR-SHU | 02/13/34 |
| 02/06/12 | POSS OF WEAPON | COR-SHU | 03/28/35 |
| 02/07/12 | BATTERY ON P/O | COR-SHU | 09/05/36 |

**ICC Chronology:** The following is the last five years of ICC decisions.

| 04/30/08 | COR ICC | RET COR SHU W/MERD OF 09/05/31 |
|---|---|---|
| 02/10/09 | COR ICC | RET COR SHU DETERMINATE |
| 04/14/10 | COR ICC | RET COR SHU W/MERD OF 09/05/31 |
| 05/18/11 | COR ICC | ASS & IMPOSE 18 MO CONSEC SHU W/MERD OF 03/05/33 |
| 03/21/12 | COR ICC | ASS & IMPOSE 9 MO CONSEC SHU W/MERD OF 02/13/34 |
| 06/20/12 | COR ICC | ASS & IMPOSE 15 MO CONSEC SHU, ASS & IMPOSE 18 MO CONSEC SHU W/ CONTROLLING MERD OF 09/05/36 |

Name of institution contact person, R. Broomfield, Captain Security Housing Unit, CSP-Corcoran ▮▮▮▮▮▮ extension ▮▮▮▮▮

# Memorandum

Date    :    May 20, 2013

To    :    Chief of Classification Services Unit

Subject:    **SHU PROFILE FOR INMATE,** ███████████████

**Placement prior to SHU:** On January 31, 2006 ███████████████ was previously housed at CSATF. He, is a 46 year old, Black male, multi termer, originally received into the California Department of Corrections and Rehabilitation (CDCR) from Los Angeles County on November 24, 1998, for the controlling case of 9 counts of Penal Code (PC) Section PC 212.5 (C). "S" was sentenced to a 93 year, 8 month to Life prison term. "S's" Minimum Eligible Parole Date (MEPD) is May 29, 2091. <u>"S" was received at CSP-COR SHU on June 15, 2006, with SNY requirements.</u>

**Precipitating Event:**  "S's" was originally placed in ASU on January 31, 2006, at CSATF, for "Threatening an Inmate".

The following are serious Rule Violation Reports (RVR's) received during the last 5 years prior to transfer to COR-SHU:

| <u>Date:</u> | <u>Offense:</u> | <u>MERD:</u> |
|---|---|---|
| January 31, 2006 | Threatening Inmate | March 16, 2006 |

The following are serious Rule Violation Reports (RVR's) received while housed at COR-SHU.

| <u>Date:</u> | <u>Offense:</u> | <u>MERD:</u> |
|---|---|---|
| May 3, 2008 | Threatening Peace Officer | November 26, 2008 |
| May 13, 2008 | Disrespect Towards Staff | January 11, 2009 |
| July 3, 2008 | Delaying PO | |
| July 10, 2008 | Disrespect Towards Staff | |
| August 2, 2008 | Disrespecting Staff | |
| August 11, 2008 | Willfully Delaying PO | |
| October 26, 2008 | Battery on Staff w/UoF | August 26, 2009 |
| October 15, 2008 | Aggravated Battery on PO | December 18, 2010 |
| October 10, 2008 | Assault on PO | November 26, 2011 |
| November 29, 2008 | Destruction of State Property | January 11, 2012 |
| April 1, 2009 | Threatening a PO | August 26, 2012 |
| July 29, 2009 | Destruction of State Property | |
| August 7, 2009 | Destruction of State Property | |
| September 21, 2009 | Battery on PO | December 18, 2013 |
| October 27, 2009 | Disobeying a Direct Order | |
| November 23, 2009 | Battery on PO | June 18, 2015 |

Chief of Classification Services Unit
Page 2 ███████

**RVRs Cont.:**

| | | |
|---|---|---|
| December 3, 2009 | Intentionally Destroying State Prop. | September 18, 2015 |
| January 4, 2010 | Destruction of State Property | November 3, 2015 |
| January 17, 2010 | Destruction of State Property | |
| August 6, 2010 | Threatening Staff | May 26, 2016 |
| October 1, 2010 | Battery on PO | September 18, 2017 |
| January 30, 2012 | Resisting PO Resulting in UoF | November 3, 2017 |
| January 24, 2013 | Aggravated Battery on PO | Pending Assessment |

**ICC Chronology:**

| Date: | ICC Action: |
|---|---|
| February 8, 2006 | Retain ASU Pending RVR process for RVR 1/31/06 |
| March 22, 2006 | A/I 2 mo mitigated SHU term for RVR 1/31/06 |
| April 26, 2006 | Retain ASU pending TX to PVSP-III SNY |
| August 9, 2006 | Retain ASU status at ACH, pending TX to PVSP-III SNY |
| November 29, 2006 | A/I 12 mo SHU for RVR 9/20/06 |
| May 16, 2007 | A/I 18 mo concurrent SHU for RVR 9/19/06, A/I 18 mo concurrent SHU for RVR 9/20/06 and 9 mo concurrent SHU for RVR 9/20/06. |
| October 17, 2007 | Retain COR-SHU Indet upon MERD 11/4/07 due to DX HX. |
| April 30, 2008 | Retain COR-ASU pending TX KVSP-IV SNY / SATF-IV SNY. |
| July 2, 2008 | Retain COR-SHU, A/I 9 mo aggravated SHU term for RVR 5/13/08 and enhance MERD 45 days for RVR 5/13/08 w/controlling MERD of 1/11/09. |
| December 10, 2008 | Retain COR-SHU Indet., upon MERD 1/11/09, due to DX HX. |
| February 4, 2009 | A/I 18 mo consecutive SHU term for RVR dated 10/26/08 w/MERD Of 3/18/10. |
| April 1, 2009 | Vacate and re-assess and impose 9 mo SHU term for RVR 10/26/08, A/I 18 mo SHU term for RVR 10/15/08, A/I 18 mo SHU Term for RVR 10/10/08 and enhance MERD 45 days for RVR 11/29/08 w/controlling MERD of 8/3/12. |
| April 29, 2009 | Vacate and re-assess and impose 9 mo SHU term for RVR 10/10/08. Enhance MERD 45 days for RVR 11/29/08 w/MERD of 1/11/12. |
| April 21, 2010 | A/I 9 mo Agg/Consec SHU term for RVR dated 4/1/09, A/I 18 mo Agg/Consec SHU term for RVR 11/23/09 w/Controlling MERD of 6/18/15. |
| September 15, 2010 | Rescind ICC action dated 8/11/10. A/I 18 mo Consec, Agg SHU Term for RVR 9/21/09, A/I 18 mo Agg Consec SHU term for RVR 11/23/09, enhance MERD 45 days each for RVRs 11/16/09 and 11/14/10 w/controlling MERD of 11/3/15. |
| November 23, 2010 | A/I 9 mo Agg Consecutive SHU term for RVR 8/6/10 w/MERD 5/26/16. |
| February 16, 2011 | A/I 18 mo Agg Consecutive SHU term for RVR 10/1/10 w/MERD 9/18/17. |
| February 29, 2012 | Enhance MERD 45 days for RVR 1/30/12 w/MERD of 11/3/17. |

DEXP 113116

Chief of Classification Services Unit
██████████████████████

Page 3


Name of institution contact person:



D. Altamirano Counselor II Security Housing Unit
CSP-Corcoran ████████████, extension ████████

Exhibit W

# Corcoran State Prison

# Health Care Evaluation

July 29, 2013

Prepared by the Plata Medical Experts

Joe Goldenson MD
Madie LaMarre MN, FNP-BC
Mike Puisis DO

# Contents

Introduction ................................................................................................................ 3

**Overall Finding** ........................................................................................................... 5

**Executive Summary** .................................................................................................... 5

**Findings** ...................................................................................................................... 8

    Facility Description ................................................................................................... 8

    Organizational Structure and Health Care Leadership ............................................ 8

    Human Resources, Staffing and Budget ................................................................ 11

    Health Care Operations, Clinic Space and Sanitation ............................................ 15

    Policies and Procedures ......................................................................................... 18

    Intrasystem Transfer ............................................................................................. 20

    Access to Care ....................................................................................................... 24

    Chronic Disease Management ................................................................................ 30

    Pharmacy and Medication Administration ............................................................ 34

    Pharmacy Services ................................................................................................. 35

    Medication Management and Administration ....................................................... 36

    Laboratory/Radiology ........................................................................................... 39

    Health Records ...................................................................................................... 39

    Urgent/Emergent Care .......................................................................................... 41

    Specialty Services/Consultations .......................................................................... 46

    General Acute Care Hospital (GACH) and Outpatient Housing Unit Care (OHU) .... 50

    Mortality Review .................................................................................................... 56

    Internal Monitoring and Quality Improvement Activities ...................................... 62

**Recommendations** ................................................................................................... 65

# Introduction

In September 2012, the Federal Court, in <u>Order Re: Receivership Transition Plan and Expert Evaluations</u>, requested that the Court medical experts conduct evaluations at each CDCR prison to determine whether an institution is in substantial compliance. The Order contemplates that an institution "shall be deemed to be in substantial compliance, and therefore constitutionally adequate, if it receives an overall OIG score of at least 75% and an evaluation from at least two of the three court experts that the institution is providing adequate care."

To prepare for the prison health evaluations, in December 2012 the medical experts participated in a series of meetings with Clark Kelso, Receiver, California Correctional Health Care Services (CCHCS), and CDCR leadership to familiarize ourselves with structural changes that have occurred in the health care system since the beginning of the Receivership. Information gained from these meetings was invaluable to us in planning and performing the evaluations, and we express our appreciation to Mr. Kelso, CCHCS and CDCR.

In conducting the reviews, the medical experts evaluated essential components to an adequate health care system. These include organizational structure, health care infrastructure (e.g., clinical space, equipment, etc.), health care processes and the quality of care.

Methods of assessment included:

- Interviews with health care leadership and staff and custody staff;

- Tours and inspection of medical clinics, medical bed space (e.g. Outpatient Housing Units, Correctional Treatment Centers, etc.) and administrative segregation units;

- Review of the functionality of business processes essential to administer a health care system (e.g., budget, purchasing, human resources, etc.);

- Reviews of tracking logs and health records;

- Observation of health care processes (e.g. medication administration);

- Review of policies and procedures and disease treatment guidelines;

- Review of staffing patterns and professional licensure; and

- Interviews with inmates.

With respect to the assessment of compliance, the medical experts seek to determine whether any pattern or practice exists at an institution or system wide that presents a serious risk of harm to inmates that is not being adequately addressed.[1]

---

[1] Order re: Receivership Transition Plan and Expert Evaluations No. C01-1351 TEH, 9/5/12.

To evaluate whether there is any pattern or practice that presents a serious risk of harm to CDCR patients, our methodology includes review of health records of patients with serious medical conditions using a "tracer" methodology. Tracer methodology is a systems approach to evaluation that is used by the Joint Commission for Accreditation of Health Care Organizations. The reviewer traces the patient through the organization's entire health care process to identify whether there are performance issues in one or more steps of the process, or in the interfaces between processes.

The experts reviewed records using this methodology to assess whether patients were receiving timely and appropriate care, and if not, what factors contributed to deficiencies in care. Review of any given record may show performance issues with several health care processes (e.g., medical reception, chronic disease program, medication issues, etc.). Conversely, review of a particular record may demonstrate a well-coordinated and functioning health care system; as more records are reviewed, patterns of care emerge.

We selected records of patients with chronic diseases and other serious medical conditions because these are the patients at risk of harm and who use the health care system most regularly. The care documented in these records will demonstrate whether there is an adequate health care system.

The tracer methodology may also reflect whether any system wide issues exist. Our methodology includes a reassessment of the systemic issues that were described in the medical experts report to Judge Henderson in April 2006 at the time the system was found to be unconstitutional and whether those systemic issues have been adequately addressed.[2]

We are available to discuss any questions regarding our audit methodology.

---

[2] The Status of Health Care Delivery Services in CDCR Facilities. Court-Appointed Medical Experts Report. April 15, 2006.

# Overall Finding

We find that Corcoran State Prison (Corcoran) is not providing adequate medical care to patients, and that there are systemic issues that present an on-going serious risk of harm to patients and result in preventable morbidity and mortality.

# Executive Summary

On April 16-19, 2013, the Plata Court Medical Experts visited Corcoran State Prison to evaluate health care services.  Our visit was in response to the OIG Medical Inspection Results Cycle 3 report showing that Corcoran scored 87.2% in September 2012.  This report describes our findings and recommendations.  We thank Warden Connie Gipson, Chief Executive Officer Teresa Macias and staff for their assistance and cooperation in conducting the review.

At Corcoran, we found serious problems related to access, timeliness, and quality of care. Clinical systems that we found to be deficient included the intrasystem transfer process, nursing sick call, chronic disease management, urgent/emergent care, specialty services, and medication administration. The lack of a fully engaged management team and the absence of effective clinical supervision of the physicians are major factors contributing to these problems.

We also have concerns related to the General Acute Care Hospital (GACH).  According to GACH Bylaws, the Organized Medical Staff is to provide clinical oversight of the unit.[3] However, the Organized Medical Staff has been dormant and oversight committees are inactive. Therefore, there is no effective medical oversight of care of patients in the GACH.   We found serious patient care issues related to medical and nursing practice for GACH patients.  Nursing care on the GACH did not adequately address the needs of the patients. Patient monitoring (e.g. vital signs and symptom monitoring for medication reactions) was not performed in accordance with physician orders or as clinically indicated.  Most troubling, however, is that there have been a high number of intravenous catheter and other infections, including bacteremia[4] that in some cases have led to sepsis.[5]   These are potentially life-threatening infections are indicative of problems related to management of intravenous central lines, as well as lack of adequate hygiene, sanitation, and infection control activities in the unit.  Hand washing observation studies conducted in April and May 2013 showed that none of the observed staff washed their hands before engaging in patient care.[6] Another contributing factor is inadequate custody staffing that prevents health care staff from having timely access to patients.[7]

---

[3] California State Prison Hospital, Corcoran Bylaws, Revision of February 2003

[4] Bacteremia is a condition in which bacteria are found in the blood.  These are serious and potentially life-threatening infections.

[5] Sepsis is an inflammatory reaction of the body caused by infection that can lead to multiorgan failure and death.

[6] Corcoran April and May 2013 Infection Control Reports.  Nursing leadership responded that none of the nurses were observed to wash their hands prior to putting on clean gloves before engaging in patient care.  However, gloves are an adjunct to, but not a replacement for proper hand hygiene.

[7] It is notable that the patients housed in the GACH do not meet the clinical criteria for being in an acute care hospital. These patients could be appropriately placed in a well-run Correctional Treatment Center (CTC).  Due to the expense of the licensing and staffing requirements for an acute care hospital, it is not cost effective to maintain a GACH at Corcoran.

When patients present urgently or emergently, prompt evaluation is critical in managing the patient. Delays in evaluation may result in deterioration of the patients' condition and can result in unnecessary hospitalization.  We note that CCHCS quality data reports indicate that Corcoran had more than double the days of preventable hospitalization than other prison facilities. Our findings are consistent with their assessment.  Corcoran leadership attributed these preventable hospitalizations to errors of judgment, delayed reports from specialty or hospital care, mental health overflow into medical beds, and inmate non-compliance. Based on our own chart reviews, preventable hospital days resulted primarily from problems with primary or urgent care evaluations and from deficiencies in care on the GACH, particularly nosocomial[8] infections.

We found serious problems with the intrasystem transfer process including lack of adequate communication and coordination of care from the transferring institution to Corcoran and medical errors by the transferring facility that were not noted upon arrival at Corcoran. In several cases this resulted in preventable hospitalization and deaths.  We also found that patients did not receive continuity of essential medications (e.g. insulin), nurses did not refer high-risk patients in a timely manner, and providers did not thoroughly review the patient's previous medical history resulting in failure to follow-up previously abnormal diagnostic tests (e.g. CT scan) or obtaining missing hospital or diagnostic reports necessary for appropriate patient management.

There are problems with access to care, particularly in restricted housing units (e.g., SHU and ASU).  Health care leadership reported that patient refusal rates were high; and we believe that some of the refusals are a result of custody practices that negatively affect access. When nurses do see patients, the quality of assessments is highly variable and, in several cases, nurses performed no assessment, but instead referred the patient directly to a provider. However, when these direct referrals were made, the provider often did not address the patient's concerns.  There was lack of consistent providers taking care of patients, and care was fragmented.

We found significant problems with management of chronic disease patients related to the timeliness and quality of care.  We also noted a high rate of patient refusals of chronic care visits, blood sugar monitoring and insulin administration. This was discussed with the medical staff, who acknowledged that the rate appeared to be around 40%, which is much higher than in other facilities and needs to be investigated.

We also found that inadequate custody staffing and/or cooperation adversely impacted timely medication administration in the SHU and Facility III general population.  In the SHU, we observed, and staff reported, that custody does not provide escorts for nurses to administer medications in a timely manner. One patient refused his insulin because he said that nurses did not coordinate his insulin with meals.   In general population housing units, custody did not

---

[8] Nosocomial refers to a hospital acquired condition.

permit inmates to come to a central medication window to receive medications in the evenings in accordance with policy, which resulted in nurses prepouring medications in violation of generally accepted nursing practice standards.  At the time of our review, it did not appear that the medical leadership was effectively addressing these issues to custody leadership.[9]

We find that internal monitoring and quality improvement activities are not effectively focused on identifying and analyzing problems to determine their root causes and implement a corrective action plan that specifically targets the root causes.  For example, infection control data shows a high number of health care associated infections in the GACH, but the response to this serious problem has been fragmented, less than thorough and has not included physician l leadership.   According  to  the  infection  control  nurse,  there  is  no  Infection  Control Subcommittee;  instead  the  infection  control  nurses  provide  reports  to  the  Medical Subcommittee.  However, in neither Quality Management Committee meeting minutes[10] nor in Medical Subcommittee Meeting minutes was this serious problem addressed.[11]  Likewise, when staff hand washing observational studies revealed that none of the observed staff washed their hands before patient care, there was no discussion of the results of these studies, that they represent a serious problem, or plans to study and address the problem

Administratively, we found that health care operations are not well organized.  Sanitation and disinfection activities do not reliably take place in all clinical areas.  Clinical supplies are stored in areas where they are exposed and covered with dust and dirt.  There is no effective periodic automatic replacement (PAR) system, and many of the clinical areas are cluttered with excess supplies. There is no effective system for tracking materials and supplies, which has resulted in a large excess inventory.  Similarly, the facility does not have a system for inspecting and replacing equipment.

We also found problems, similar to the ones we found in other facilities, with the disciplinary process.  Due to the length of time it takes to complete the process, there are a number of clinical staff working in non-clinical positions because their supervisors do not trust them to be involved in patient care activities.  Not only is this wasteful; it prevents the manager from being able to hire someone else into the position.  We also are concerned that the GACH Bylaws[12] are not consistent with the 2008 Court order on physician competency[13] and are concerned about the effect of this on potential physician discipline.

---

[9] Following our visit, Corcoran nursing leadership advised us that Health Care Access Teams from Sacramento instructed the Warden to have general population inmates come to the medication window.

[10] Quality Management Committee Meeting Minutes January 28, 2013; February 12, 2013; March 4, 2013; April 22, 2013; and May 20, 2013 as provided by Corcoran management

[11] Medical Program Subcommittee Meeting Minutes February 20, 2013; March 13, 2013; and April 10, 2013 provided by email on July 24, 2013.

[12] State of California, Department of Correction, CSP-Corcoran; California State Prison Hospital Corcoran Bylaws, Revision of February 2003 provided by Dr. Wang, CME, as the existing Bylaws of the Corcoran GACH.

[13] Plata v. Schwarzenegger Order Approving, With Modifications, Proposed Policies Regarding Physician Clinical Competency No. C01-1351 TEH.

# Findings

## Facility Description

Corcoran opened in February 1988 initially to house Level I minimum security inmates, Level III general population (GP), and security housing unit inmates.  Since then Corcoran has evolved into a more complex, multi-mission institution comprised of the following facilities: Level I, Level III Special Needs Yard (SNY), Level IV SNY, Level IV General Population (GP), Administrative Segregation Unit (Ad-Seg), Security Housing Unit (SHU), Protective Housing Unit, Prison Industry Authority (PIA) and a fully licensed acute care hospital (GACH).

It also has an enhanced outpatient (EOP) treatment center.  Construction of a multi-story EOP Administrative Segregation Treatment Clinic is underway and the unit is scheduled to open June 1, 2013.

The current population is 4,477, a decrease of 519 inmates from September 2011.[14]  The design capacity of the facility is 3,116 inmates.  It is currently 143.6% of design capacity.

## Organizational Structure and Health Care Leadership

**Methodology:**  We interviewed facility health care leadership and reviewed tables of organization, health care and custody meeting reports, and quality improvement reports.

**Findings:** Teresa Macias is the Chief Executive Officer (CEO) and has been in her position for three years.  Ms. Macias has 30 years of experience in Federally Qualified Health Care organizations (FQHC).  She was a chief operating officer for 20 years and chief executive for six years for Family Health, a FQHC in Tulare County.  Jeffrey Wang MD is the Chief Medical Executive (CME).   He has been at the facility since 2007 and was appointed Acting CME in June 2011.  Since January 31, 2013, he has been permanent CME.  Conall McCabe MD is the Chief Physician and Surgeon (CPS), and has been in his position since 2009.  Laura Schaper RN is the Chief Nursing Executive (CNE) and has been in her position since June 2011. Joseph Obiza is the Chief Support Executive (CSE) and has been in his position since August 2011.  Brian Miller is the Pharmacist-in-Charge (PIC), and has been in his position since August 16, 2011.

The Corcoran administrative table of organization is organized along functional lines of authority.  The CEO indicated that she reports to Dr. Steve Tharratt for medical issues.  She indicated that she collaborates with Regional Mental Health and Dental Directors but has no direct reporting relationship for these areas. As with other facilities, the CEO operates independently with minimal interactions with Central Office.   There are quarterly Chief Executive Officer Meetings in Sacramento and periodic meetings with Chief Medical and Nursing Executives. There are also weekly conference calls for Chief Executive Officers.  Central Office does not have regularly scheduled visits to the facility, but Dr. John Zweifler, the Regional

---

[14] April 3, 2013

Medical Director, comes to the facility at least quarterly and has seen patients during his visits at the facility.

The CEO participates in regular meetings with Warden Connie Gibson.  Ms. Macias attends the daily Warden briefings.  The Executive Leadership Team including the CEO, CME, CPS, and CNE meet daily.  The Warden attends the weekly Executive Team Roundtable meetings. Captain Dennis Overly attends the Quality Management and Executive Team Roundtable meetings.  Tim Press, the Deputy Warden, occasionally attends Quality Management and Executive Team Roundtable meetings.

Despite the length of time that Executive staff has been in place and the number of meetings that occur, the medical program is not being well-managed.  We found that:

- Medical leadership does not provide effective supervision of medical providers or quality of medical care; either in the GACH or the facility as a whole;
- Provision of equipment and supplies is not standardized or well-managed;
- Health care sanitation is poor, especially on the GACH;
- Serious issues such as health care associated infections in the GACH and the high rate of patient refusals are not being effectively addressed through the quality improvement process;
- Custody issues that adversely affect patient care (such as patient access in the GACH and medication administration) are not being addressed to custody leadership in a manner that results in improved and timely clinical care.

Medical leadership at Corcoran is not effective in providing clinical supervision of staff physicians or clinical leadership to the medical program.  The CPS focuses his attention primarily on responding to medical appeals.[15]   The CPS also reviews non-formulary medication requests, addresses issues related to litigation, performs death reports and attends meeting. He chairs the Medical Subcommittee which is charged with monitoring, assessing and improving delivery of medical services.[16] While most of the time of the CPS is occupied with paperwork related to complaints, appeals and litigation, there was little evidence of meaningful clinical peer review of physicians as will be detailed later in the Peer Review section of this report.  In addition, although the CPS chairs the Medical Subcommittee, meeting minutes identify no clinical concerns with corresponding recommendations and action plans to be implemented. [17] The Medical Subcommittee meeting minutes reflect an organization with no medical issues, which is clearly not the case.

Infection control on the GACH is an example of the lack of adequate oversight. Oversight of GACH medical care is to be provided by the Chief of Staff of the Organized Medical Staff. The Chief of Staff, who is a staff physician, is responsible for appointing the chairperson of multiple

---

[15] Staff reported that Corcoran had over 300 appeals in the last year.
[16] Local Operating Procedure1060 Health Care Quality Management Program revised 8/30/12
[17] Medical Program Subcommittee Meeting Minutes February 20, 2013, March 13, 2013, and April 10, 2013.

medical committees of the GACH, including the Infection Control Committee. However, according to the CME, the Organized Medical Staff is inactive, a Chairperson of the Infection Control Committee has not been appointed, and an Infection Control Committee has not been convened in years. Because there are no Infection Control Committee meetings, serious infection control problems are not being addressed by medical leadership.

Although there is no Infection Control Committee, GACH nursing leadership and public health nurses have been involved in surveillance of infections and development of infection control reports. The GACH Supervising Nurse and public health nurses also developed 2013 Infection Control Improvement Goals to address the increase in blood stream and PICC line infections. These reports are submitted to the Medical Subcommittee, a subcommittee of the Quality Management Committee. In this respect, the Medical Subcommittee is a proxy for the Infection Control Committee. However, review of Medical or Quality Improvement Meeting minutes shows that although infection control goals have been established, no meaningful discussion or action plan was developed and implemented to address infections. Regarding nosocomial (i.e., health care associated) infections on the GACH, the CPS said, "I also did not appreciate the frequency of PICC line infections; however these were not highlighted as issues of concern in the infection control reports presented to the Medical Subcommittee meetings and the issue was never presented to me by providers or nursing staff". We do not understand this comment, particularly since the Infection Control Reports include statistical data on infections on the unit were reported to the committee he chairs.

The CME stated that he lacks confidence in the CPS with respect to physician management skills.[18] Nevertheless, the current CME has not performed an annual performance evaluation of the CPS. The CPS believes he had a performance evaluation completed by an Interim CME a few years back. The CPS was unsure if he had seen his duty statement. We reviewed the CPS duty statement and found that it is dated and not descriptive of his current assignments.[19] Except for a custody orientation, the CPS does not recollect a definite orientation relative to duty expectations.[20]

In summary, it is our opinion that clinical supervision of providers and oversight of medical care at Corcoran is grossly inadequate and threatens patient safety. If the Organized Medical Staff does not provide medical leadership of the GACH, the CEO, CME, and CPS should consult with CCHCS central office and must make alternate arrangements to protect patients on the unit. The Medical Subcommittee must be re-evaluated and act in accordance with its stated mission. Duty expectations for the Chief Physician and Surgeon should be established, performance of those duties should be annually reviewed, and all Executives must be accountable for their performance. We note that these conditions are ultimately the responsibility of the CEO. With respect to operational management, it is our opinion that leadership is not sufficiently engaged in managing the operations of the medical program.

---

[18] Mike Puisis DO telephone interview with Jeffrey Wang MD July 24, 2013.
[19] Mike Puisis DO telephone interview with the Chief Physician and Surgeon on July 24, 2013.
[20] According to the CME the CPS came directly from a hospital faculty position and started directly as the Chief Physician and Surgeon without having had experience in correctional medicine.

## Human Resources, Staffing and Budget

**Methodology:**  We interviewed facility health care leadership and human resources staff. We reviewed current and Acuity Based Staffing Realignment (ABSR) plans, vacancy and fill rates and job descriptions. We also reviewed the process for credentialing and peer review.

**Findings:** The Acuity Based Staffing Realignment (ABSR) plan was placed into effect April 1, 2013.  Prior to this, Corcoran had 380.8 employees.  Under the ABSR plan, Corcoran has 389.7 employees, an addition of 8.9 employees. The major staffing changes include hiring an additional 2.7 pharmacy staff; eliminating 28.6 Registered Nurses; adding 21.6 Licensed Vocational Nurses; and adding 16.9 psychiatric technicians.  For nursing, this is a net reduction of seven nursing position, all of which are registered nurses (RN).  The changes in nurse staffing were designed to replace RNs with psychiatric technicians on the mental health unit and with licensed vocational nurses (LVNs) on the medical units of the GACH that previously consisted only of registered nurses.

The GACH staffing requirements are determined by Title 22, which states that the nurse-to-patient ratio will be 1:5, with LVNs not comprising more than 50% of nurses.[21]  Nursing leadership believes that the new ABSR staffing patterns are insufficient to meet these requirements, particularly for registered nurses.  Because the GACH is mostly used for CTC and OHU level of patients, we believe it would be most cost effective to change the unit to a CTC, thereby providing more flexibility to staffing patterns.

Corcoran management indicated that the ABSR plan[22] has resulted in 2.0 fewer RN positions than the Corcoran staffing plan and calls for the loss of a 0.6 supervisory nurse, while the Corcoran staffing plan calls for an additional supervisor.   Management is concerned that these changes will result in an insufficient number of nursing supervisors and will adversely impact the health care program.

During this review, we noted that nursing tasks are not always completed on the GACH unit.  It is unclear whether this is a result of lack of staff supervision, lack of staffing, or lack of nursing access to patients because of custody staffing patterns and/or practices.  An evaluation of staffing, work assignments and productivity, and nurse access to patients needs to be performed.

Hiring a new employee takes about a month.  Management does not feel that there have been problems or delays in bringing on new employees.  However, there were issues related to the implementation of the ABSR plan in that initial projections of staffing positions contained errors that affected the number of employees who would be noticed that they were potentially losing their jobs. In addition, management was not informed which staff would receive notices before

---

[21] Conversation with Laura Schaper CNE.
[22] 94.60 RNs

employees began to receive letters.  Corcoran leadership requested that they receive a list before the next round of notices was sent to employees; however, this did not occur.

Physicians receive training via mandatory webinars.  Nurses receive annual training in a number of areas related to patient care, as well as training on physical assessment, urgent evaluations and sick call protocols.  Nurses working on the GACH receive additional training on a variety of nursing functions related to specialized nursing care on that unit.  Outlines for these trainings were reviewed and appear adequate.  However, given the lack of documentation on the GACH and the number of infections on the GACH, we question the effectiveness of the existing training.

There is a nurse educator at the facility that has been in the position since March, although the position existed previously. He has a Master's degree in clinical nursing.  He provides basic life support (BLS) training for all providers. He also provides 24 hours of mandatory training for RNs and 8 hours For LVNs and Psychiatry Technicians.  Course material has been gathered over the years.  The training manuals for RNs and LVNs were refreshed this past January and appear appropriate.

### Credentialing and Peer Review

No credential files are maintained at Corcoran.   Dr. Wang has not seen the credential files for the physicians and does not know whether any of the physicians has had a prior lawsuit or adverse action as registered in the National Practitioner Data Bank (NPDB).  He knows their specialty but does not know whether physicians are Board Certified.  While it is reasonable that the Central Office maintains credentialing, the CME at each facility needs to be aware of the credential status of each of the physicians working under their supervision.

The CME or designee is required by CCHCS policy[23] to perform an annual eUHR Clinical Appraisal (UCA) peer review for each medical provider and  submit the review to the CCHCS Clinical Support Unit (CSU). At Corcoran, the practice is for the CPS to perform these evaluations. However, this is not written into the duty assignment of the CPS and appears to be an informally understood assignment.  These UCA reviews are not up to date.  The CPS completed only 5 of 12 (40%) required UCA evaluations in 2012.  More importantly, after the CPS completed the UCA evaluations he did not discuss the results of the evaluation with the provider even when significant issues were uncovered in the reviews.  As of April of 2013 only 2 of 12 (16%) UCA reviews for 2013 had been performed.  Again, in neither of these reviews did the CPS discuss findings with the clinical provider.   The Regional Medical Director recommended to the CPS repeatedly that he discuss the findings of the review with the provider but this has not occurred.    This failure to effectively perform routine physician peer review contributes to lack of oversight of the clinical program.

---

[23] Inmate Medical Services Policies and Procedures Volume 3 Quality Management, Chapter 4B PCP Mentoring-Proctoring Program and Clinical Performance Appraisal Process Procedure found at the website http://www.cphcs.ca.gov/imspp.aspx

As noted earlier in this report, Corcoran has a GACH which is regulated by Title 22.   Title 22 requires every acute care hospital to have an Organized Medical Staff.[24]  The Bylaws of the Organized Medical Staff are to provide procedures to credential, assign clinical privileges, and means of enforcement of the Bylaws.  The current Corcoran GACH Bylaws[25] were last revised in February of 2003 prior to initiation of the Medical Receiver.  These Bylaws appear to contradict credentialing procedures of CCHCS.  The Medical Executive Committee Action of the Bylaws also appear to create a parallel and contradictory procedure for discipline with respect to the 2008 Court Order on physician competency[26] and its associated policies[27] on physician discipline.[28]   Although it does not appear that the Organized Medical Staff at Corcoran is effective or active, nevertheless, its Bylaws do currently appear to contradict existing Court ordered policy.  Because the Organized Medical Staff is not carrying out its stated functions, this negatively affects clinical care on the GACH. CCHCS and medical leadership at Corcoran should confer to develop a solution to ensure that Bylaws at Corcoran required by Title 22 are consistent with the existing 2008 Court order and to ensure that the Bylaws adequately provide for clinical oversight of medical care on GACH.


**Disciplinary Process**

We continue to find problems with the disciplinary process.  A regional Employee Relations Officer (ERO) provides assistance for discipline. She comes to the facility once a month and more often if necessary.  The disciplinary process is similar to other facilities.  Minor disciplinary action is immediately addressed without investigation.   For serious matters all cases are referred to the OIA for investigation as the first part of the disciplinary process.  After the OIA has completed its investigation, the hiring authority executes discipline which may include involvement of the Personnel Board.  As with other facilities the OIA investigation may take up to 3 years.  Follow up action by the hiring authority or Personnel Board can also be an extensive process and can extend the personnel action on completed OIA investigations.  There were 15 employees involved in disciplinary actions at Corcoran from January 2012 until April 2013.  Of these 15 disciplinary actions, 5 have been concluded.  Of the remaining 10 actions, 1 employee is Absent Without Official Leave (AWOL).  The Office of Internal Affairs (OIA) has completed investigations on 4 but personnel action has not yet been completed.  The personnel action has been pending for 9 months in 2 cases and 4 months in 2 cases.  In 5 remaining cases, the OIA has not completed the investigation.

---

[24] California Code of Regulations Title 22, Social Security volume 30  70703 Organized Medical Staff

[25] State of California, Department of Correction, CSP-Corcoran; California State Prison Hospital Corcoran Bylaws, Revision of February 2003 provided by Dr. Wang, CME, as the existing Bylaws of the Corcoran GACH.

[26] Plata v. Schwarzenegger Order Approving, With Modifications, Proposed Policies Regarding Physician Clinical Competency No. C01-1351 TEH

[27] Plata Physician Professional Clinical Practice Review, Hearing and Privileging Procedures, Pursuant to Order Approving, With Modifications, Proposed Policies Regarding Physician Clinical Competency, July 9, 2008; *Plata, et al. v. Arnold Schwarzenegger, et al.* Federal Court Case No. C01-1351

[28] Section 6.1-3 Investigation and section 6.1-4.

There are several employees working out of their job classification. There is one RN working at the warehouse. The allegation was a HIPAA issue; the nurse wrote detailed notes about patients on his public blog.

Another nurse assigned to nursing sick call is also working in the warehouse. He received discipline notices for poor performance and an adverse action was initiated. The nurse went out on mental health leave. A second adverse action was initiated because management found a large volume of health care request (7362) forms in a desk which should have been addressed by this employee. When the employee came back to work, he was reassigned to the warehouse. Shortly after reassignment, the employee went out on stress leave. This was November 2011. He has not yet returned to work. Furthermore, the nursing board has informed the facility that the nurse has been placed on probation by the nursing board due to an arrest for DUI and having drug paraphernalia in his vehicle. This nurse's position has been considered occupied since 2011 when he was placed on leave. Discipline has not yet been completed.

Another nurse also is on probation with the nursing board for having inappropriate relations with an underage client prior to employment at Corcoran. He started work at Corcoran before the probation was filed. The employee also had a second probation with the nursing board for an allegation of DUI and vandalism, which were criminal charges. The nurse did not report either of these probation episodes to management. Management discovered these probations because the nursing board called Corcoran about the infractions in October of 2012. At that point, management instituted disciplinary actions. Management sought termination but the final disciplinary disposition was that the employee obtained a 3-day suspension for not reporting his probation status. This employee is still working pending a decision by the nursing board regarding his license.

Another case is a psychiatry technician who was allegedly viewing pornography at the facility, which was identified by checking his computer. He is still performing patient care pending resolution by investigation.

These cases are all serious alleged infractions. Based on our experience in other systems, such employees would be suspended pending investigation. CCHCS management is unable to effectively remove these employees; therefore, employees with serious infractions are reassigned outside their job classification within the organization or continue in their assignments pending investigation. Because investigations can take a long time, these situations drag on, may result in patient safety concerns, and negatively affect staff morale.

AWOL terminations are another problem. If an employee fails to show up to work for an extended period of time, management must formally terminate the employee before another employee can be hired into the position. Because these termination proceedings take time, the position can remain open for extended periods. One example is a nurse who last worked 2/13/10. He had just started working two weeks before that but apparently decided not to continue working at the facility. He went AWOL. Although he was not getting paid, he

continued to occupy a position and management was unable to hire into the position until he was formally terminated.  The formal termination did not occur until January 2013, so the position was vacant for almost three years.

**Health Care Budget**

In fiscal year 2010-2011, Corcoran had an initial budget allotment of $28.6 million, a final budget allotment of $52.8 million and had expenditures of $50.4 million.  In fiscal year 2011-2012 Corcoran had an initial budget allotment of $46.2 million, a final budget allotment of $61.6 million, and had expenditures of $61.8 million. As with other facilities, expenditures exceed the allotment because the budget is not based on actual need.

## Health Care Operations, Clinic Space and Sanitation

**Methodology:** We toured central and housing medical clinics, the GACH, Outpatient Housing Unit (OHU) and administrative and ancillary support areas. In addition, we interviewed staff involved in health care operations.

**Findings:** Health care operations are not well organized.  Equipment management and supply chain are disorganized. Clinic and inpatient sanitation is poor and disinfection practices are inadequate.

Local operating procedure 1081, *Clinical Storerooms Supplies and Maintenance*, directs that each clinic storeroom shall be set up and maintained in a standardized fashion.  All shelves are to be labeled with the item to be contained on the shelf.  The LVN in the yard clinic is said to be responsible for maintaining each clinic storeroom. Each week the clinic LVN is required by the procedure to order supplies to bring them to periodic automatic replacement (PAR) levels.  The supervising RN is to monitor this process weekly by filling out a designated form. This procedure is excellent but is not followed in any area we reviewed.

In practice, there is no PAR system in place.  Any registered nurse can fill out a store order supply form. This is then signed by the supervisory nurse and given to the storeroom.  The storeroom delivers supplies to the supply area. The actual placement of supplies is by clinic staff. Management acknowledged that PAR lists for clinical areas do not actually match the levels of supply in the respective clinical areas, which results in oversupply.  For example, in Level 1 Facility, the doctor's examination room had dozens of wrist and knee splints and other supplies and equipment, which were not on the PAR list.  Also, there were over 400 1 cc syringes that were not on the PAR list.  These syringes are mostly used for placing Mantoux skin tests, which are performed annually.  As there are only a couple hundred low security inmates in this area, the current supply exceeded approximately two years of prospective use.  The LVN from the area agreed that this supply was seldom used and had been there for a while.

One section of the Triage and Treatment Area (TTA) had supplies in containers that were appropriately labeled and were neatly arranged.  However, other areas of the TTA had supplies in a disorganized arrangement.  Some cabinets in the TTA had labels on containers or on

cabinets that either had no supplies or had supplies different from the labels. Some drawers and cabinets had excessive supplies in disorganized arrangements.  Another room used for TTA supplies had multiple cabinets with labels for various supplies but either had no supplies or supplies not corresponding to the label.

Management has not provided leadership on supply management.  The issues noted above in the Level 1 Facility clinic and the TTA reveal that there is no standardized PAR system and that supplies are arranged in a disorganized fashion.

Corcoran has about 4500 inmates and could probably be serviced by a supply storage area of several hundred square feet of supplies, provided that a prime vendor was utilized for frequent deliveries.  Instead, the program has a massive warehouse for storage of supplies. Several years ago, there was a separate storage area for medical supplies.  At that time, the Warden changed the arrangement and required that the medical program share warehouse space with the institutional program.   As a result, the medical program has an aisle in the institutional warehouse for disposable supplies that is approximately 100 yards long. It contains three levels of shelving reaching approximately twenty feet high and containing multiple skids of product. This area has an open bay door through which dirt, dust and debris are blown in by the wind. Many boxes in this aisle were open, and individual product, although covered in its wrapping, was exposed and covered with dust and dirt.  Products included urinary catheters, intravenous line tubing and kits, anesthesia tubing, oxygen tubing and other similar items. Medical products should not be maintained in areas exposed to dust and debris, as the dust and debris may contaminate the product when opened.

In another room of the same warehouse, there was another aisle, about half the size of the first aisle used for medical supplies.  This area was not exposed to dust blown in from the outside, as it was sheltered from the outside. Supplies in this area included office supplies and other disposable medical equipment.  We could not be given an explanation why some equipment was in this area as opposed to the other area. Paper and office supplies and forms were locked up and protected from dust and dirt, but sterile medical disposable supplies were exposed to dirt and dust.

There was a third storage area in a locked room in the locked area.  This room was large and contained syringes and certain surgical and dental equipment. This room was protected from debris and dust.

The warehouse space was enormous as compared to what is needed for storage of medical supplies. We asked for an inventory of supplies but none was provided. Inventory is based on the unit of measure in the Business Information System (BIS), which is not the same unit of measure that is used in the clinics.  For example, the unit of use for gloves is a box containing 100 gloves. The unit of use for BIS is a carton of gloves which contains 10 boxes. When health care staff order a box of gloves they do not need a carton, so the system of ordering for clinic use does not match the BIS inventory system; tracking of use is therefore impossible using the BIS system. In other facilities we visited, they have created additional tracking spreadsheets in

an attempt to manage inventory, but this is not the case at Corcoran. As a result, the inventory in the warehouse is not evaluated in comparison to supplies used. This has resulted in a large excess inventory, which does not appear to be monitored. The warehouse manager acknowledged that many items in the warehouse are seldom used and have been on the shelves for years.

When physical plant items break, staff fills out a Plant Operations Work Request. These are signed off on by a supervisor and submitted to an office technician. The office technician is the work order coordinator. She enters the work order into a work order database, which is a shared database managed by CDCR.  A number is assigned for each work order and when plant operations' personnel get the work order, an email confirmation returns to the work order coordinator. Since January 1, 2013, the work order coordinator has received 194 work orders. An opening presentation to us by leadership stated that staff ensures that work orders are closed out once repairs are complete.  However, we could not verify this in practice.  Staff could not show us the process to identify that a work order is completed.  They also could not tell us the length of time it takes to complete a work order. The work order coordinator was unaware of timeliness tracking.  We could also not verify that there is feedback to the medical program on outstanding orders. As a result, management does not know if the work order process is effective in repairing broken furnishings or fixtures such as sinks and toilets.  On tour, we talked to staff who complained to us that broken items are not timely fixed.  The current system does not provide a means to evaluate whether work orders are processed timely.

The facility does not use an inventory list of equipment matched against a preventive maintenance inspection report to assess adequacy of equipment.  We could not verify from the list provided to us whether all equipment was inspected.  For example, on tour we found three otoscopes or ophthalmoscopes that did not function in C yard clinic and one otoscope that did not function in the level 1 clinic.  We asked for verification that equipment in those clinics was inspected, and mid-level management staff initially were unable to provide us either with an inventory list of equipment or with a report of inspection.  After several requests, we were provided with a Preventive Maintenance Inspection report.  This report did have an inventory of equipment with a comment section on it related to whether inventoried equipment was inspected. However, we could not find ophthalmoscopes or otoscopes on this report. We did find an item called charger base for otoscopes but could not verify whether this was for the charger base only or for the combination of the charger base, the otoscope and the ophthalmoscope.  Management did not know how to verify whether the otoscopes had been evaluated. In addition, 60 (18%) of 325 line items on the Preventive Maintenance Inspection report were listed as either unavailable or could not be found.  Management staff could not tell us what this meant.  When we talked to the preventive maintenance vendor, he told us that this meant that the equipment was not in its proper location and he could not find it.  He stated that staff moves equipment from its designated location and it becomes lost.  Clearly, this report is not being effectively used, and almost 20% of all medical equipment was not in its designated location.  In summary, we could not verify that equipment is in its correct location, is reported as broken, or that broken equipment is replaced or repaired.

All other facilities we visited utilized a spreadsheet listing all existing equipment with its location and most recent inspection date. This made verification easy and could be checked by inspecting certain areas and checking equipment in that area. It also was an easy way to verify that management was monitoring equipment adequately. We urge that this same system of equipment inventory and management be used at this facility.

We toured a couple of areas. The level 1 clinic was not well organized or clean. Clutter was evident in all rooms.

Civilian employees perform sanitation in the GACH. There are nine employees who report to a custodian supervisor who reports through the medical organizational structure. One registry staff employee cleans units 4A, 4B, 3A03, 3A04 and stand-alone Ad Seg using a schedule. Inmate porters clean other areas. Medical leadership did not know how many porters are assigned to medical. Inmate porters clean 3A, 3B and 3C and level 1. Health care management did not know the cleaning schedule of the inmate porters, and we were unable to verify how these units are sanitized.

The requirements for sanitizing patient rooms on the GACH as stipulated in the GACH Infection Control policy are not being adhered to. [29] This policy requires daily cleaning of patient rooms but the custodians clean the patient rooms only twice a week when inmates take showers. Each GACH unit take showers in rotation, so each unit gets to shower twice a week and, on that day, the custodians clean the rooms. In one unit, there were a number of persons with infections and draining wounds and in 5½ months there were multiple cases of bacteremia (systemic infections cultured from blood) or PICC line infections, which had developed in patients on the unit. On several occasions, bacteria were growing in the ice machine. Clearly, there are sanitation and infection control issues on this unit. A review of sanitation should be undertaken and sanitation standards should be maintained at the level of an acute care hospital. Custody must cooperate with the medical custodian staff in custodian efforts to sanitize rooms on a daily basis.

## Policies and Procedures

**Methodology:** We interviewed health care leadership and staff and reviewed selected statewide and local policies and procedures to determine whether they were periodically reviewed and whether updated local policy was consistent with statewide policies.

**Findings:** We were provided the local operating procedures (LOPs) for review prior to our visit. There were 31 local operating procedures, excluding addendums and attachments, provided to us. All of these procedures have been reviewed and signed by March 2012. Many have been reviewed in 2013. Almost all significant areas of concern in our audits are covered by local operating procedures. Exceptions are that there are no local procedures on mortality review, credentialing, hiring, or admission to the GACH. Procedures were generally well written and comprehensive.

---

[29] CSP-Corcoran Hospital; Policy and Procedure Manual, Infection Control  Revised September 7, 2012.

We have the following comments on specific local operating procedures. The Health Care Transfer Process procedure states that the eUHR shall accompany each inmate when transferring. This implies that the eUHR will be up-to-date at the time of transfer. However, if the inmate was in a GACH, CTC, or OHU, it is likely that the inpatient record will not have been scanned at the time of transfer. So the transfer of medical record information is not occurring as stipulated in the procedure, and an additional process needs to be established to ensure accurate transfer of medical information when patients transfer. For high acuity patients it is important to have physician-to-physician communication on transfers; however, there is no requirement in this policy for physician-to-physician communication when patients transfer between, to, or from higher levels of care. Nursing intrasystem procedures seem adequate. Also, the intrasystem transfer procedure requires potential high-risk patients to be seen by a provider within 30 days. This is too long of a time period to evaluate a medically high-risk patient. The policy also states that patients who have a scheduled specialty consult within the next two-week period, including specialty visits for chemotherapy or radiation therapy, can have the appointment rescheduled within 30 days of the inmate's arrival at the receiving institution. This may not be appropriate in certain cases, as a delay in chemotherapy, radiation therapy or other consultation may result in harm.  In those situations, medical staff needs to institute a medical hold or confirm with the specialist that the delay is medically acceptable. Also, for high-risk patients, the CME or other physician is not required to document an endorsement by the receiving facility indicating that the receiving facility can manage the patient being transferred and provide continuity of care. A clinical endorsement between physicians needs to be documented in the eUHR.  In addition, discussions between UM and the facility physician about patients returning from hospitals needs to be documented in the eUHR. There were several deaths that are illustrative of concerns with the intrasystem transfer process, and we recommend health care leadership review these cases in relation to this policy and procedure.

The procedure for Emergency Medical Response Documentation and Review includes a review of all emergencies and emergency off-site visits including hospitalization. These are performed by the supervising nurse but also need to include a review by physicians.

The procedure on Health Care Quality Management Program states that the Public Health/Infection report shall be sent to the Medical Program Subcommittee of the Quality Management Program, but the procedure has little detail on what the report consists of. At Corcoran we identified several health care associated infections in patients on the GACH including serious bacteremia requiring hospitalization. An infection control policy and procedure for facility wide use should be developed.  The procedure for monitoring infection control issues needs to be improved. This should be through the Quality Management Program.

We note that in preparation for our visit we were only provided local operating procedures and assumed that these policies included all policies for the medical program.  During interviews conducted after our tour related to infection control issues on the GACH, we discovered that there is a policy manual for the GACH, including infection control policies, which was not

provided to us in advance of our tour.  GACH policies include a 232 page policy and procedure manual for infection control which was revised in September 2012.  This policy details responsibilities of the Organized Medical Staff in establishing an Infection Control Committee and describes procedures for performing surveillance, cleaning, and other items related to infection control.  None of the responsibilities of the Organized Medical Staff outlined in this policy are currently being performed.  Also, even though this policy was recently revised, we recommend that the surveillance section be reviewed with respect to definitions of infections as these do not appear to be consistent with the CDC/NHSN surveillance definitions.[30]  Instead of attempting to define surveillance criteria for infections on the GACH, it may be better to merely reference the CDC document and utilize their definitions to ensure uniformity in defining infections. Also, Section #10 on Cleaning/Disinfection of Patient Rooms should reference hospital standards with respect to cleaning.  We note that cleaning regimens for the GACH required by this policy are not currently implemented.

The Organized Medical Staff play a major role in development of policies on the GACH and have a responsibility for clinical oversight of the GACH.  Because we were not provided with any other GACH policies we did not have an opportunity to review the effect of the dormant Organized Medical Staff on existing policy and its effect on oversight of clinical care of this unit.

The Access to Primary Care procedure permits nursing assessments to occur in a holding cell in the rotunda of housing units if the inmate is "restricted."  All assessments need to be conducted in a clinical area.[31]

We compliment the organization for their procedure on Clinical Storerooms Supplies and Maintenance.  It attempts to standardize clinic supply provision.  However, we note that it is not evidenced in practice.


## Intrasystem Transfer

**Methodology:** We interviewed facility health care leadership and staff involved in intrasystem transfer and reviewed tracking logs, staffing and 16 health records of medium- to high-risk medical patients that transferred into Corcoran in the past year.

### Intrasystem Transfers

**Findings:** We found that in each record reviewed the transferring facility staff completed a Health Care Transfer Information Form (CDCR 7371) and Corcoran staff medically screened the patient upon arrival.   However, we found significant concerns with the intrasystem transfer

---

[30] Horan T, Andrus M, Dudeck M; CDC/NHSN surveillance definition of health care-associated infection and criteria for specific types of infections in the acute care setting; American Journal of Infection Control 2008; 36:309-32
[31] Corcoran staff responded that "*Per Local Operating Procedure 1068 it states...*In the GP facilities the inmate-patients shall be ducated to the facility clinic.  In a restricted housing unit, the inmate-patient shall be escorted to the facility medical clinic for RN face-to-face triage Monday through Friday; 0700-1500...*Medical leadership does not condone conducting assessments in the rotunda for inmates in restricted housing units."*

process at both the sending and receiving facilities. In addition, we identified concerns related to utilization management of medical bed space.

We found:

- Medically high-risk patients that were scheduled for medical procedures or treatment immediately prior to transfer for whom a medical hold was not considered or implemented and that resulted in delayed access to care.
- Lack of continuity of critical medications. In one case, lack of continuity of a patient's glargine insulin contributed to his death shortly after his arrival.
- Lack of timely nurse referral to a provider for patients with urgent conditions.
- Lack of provider familiarity with the patient's medical history and need for follow-up and continuity of care.
- Inappropriate plans for medical interval follow-up (e.g., 150-180 days) for high-risk medical patients.

Examples are described below:

- On 3/29/13, a 49-year-old with a history of diabetes, hypertension and coronary artery disease with stent placement transferred from Folsom State Prison to Corcoran. Prior to transfer a cardiologist saw the patient for chest pain and recommended a stress thallium and echocardiogram that were scheduled for 4/3/13. On 3/26/13, the transferring nurse at Folsom completed a 7371 but there is no documentation that the nurse consulted with a provider to determine whether the patient should be placed on medical hold pending the procedures. Upon arrival at Corcoran, the nurse did not measure the patient's vital signs.  The nurse scheduled a provider appointment for 4/4/13 but this appointment did not take place until 4/17/13. On 4/30/13 the patient underwent the previously recommended cardiac procedures. A medical provider saw the patient afterwards and planned to have him return to the clinic in 30 days. On 6/10/13 another provider saw the patient. The patient's diabetes was not at goal consistent with American Diabetes Association guidelines (7.8%, ADA goal=<7.0%).[32] He assessed his diabetes as being at goal and planned to see the patient in 150-180 days. This is not appropriate given the patient's high-risk medical acuity.[33]

- On 4/15/13, a 41-year-old patient with hypertension, latent TB infection and disseminated coccidioidomycosis transferred from Kern Valley State Prison (KVSP) to Corcoran.  Upon arrival, the patient's hypertension was not well controlled (BP=156/101 mmHg and 146/97 mmHg) and he complained of two ingrown toenails that were painful

---

[32] The American Diabetes Association 2013 Guidelines notes that lowering hemoglobin A1C goal of <7% reduces microvascular complications of diabetes and implemented soon after diagnosis reduces macrovascular complications. Less stringent goals may be appropriate for patients with a history of severe hypoglycemia, limited life expectancy, however in the absence of these documented limitations, the recommended goals of <7% should be pursued to minimize diabetes complications.
.In some cases,
[33] Intrasystem Transfer/Nurse Sick Call Patient #1.

and red.  The nurse did not refer the patient to a medical provider at that time.  A week later the patient presented urgently to the TTA for surgical removal of his toenail plates. In addition, in November 2012, while he was at KVSP, the patient was hospitalized at San Joaquin General Hospital and diagnosed with disseminated cocci. A chest CT also showed a 10 mm nodule for which the physician recommended a repeat chest CT in 3 months. The CT was due in February 2013 but this recommendation was not addressed at KVSP or at Corcoran.[34] As of 7/27/13 the chest CT has not been performed.

- On 4/4/13, a 63-year-old with hypertension, hyperlipidemia, and severe cardiomyopathy with an ejection fraction of 20% transferred from CCI to Corcoran.  In early March, he was hospitalized for treatment of his heart failure. Two weeks prior to transfer, a cardiologist recommended that spironolactone be added to his medication regimen and to return in 6-8 weeks as his prognosis was poor and medical management should be titrated to the maximum.  This recommendation was not addressed at CCI.  At the time of transfer he was housed in the OHU for uncontrolled hypertension. Neither the CCI nor Corcoran nurse noted on transfer forms that he had recently had a cardiology consultation.  The Corcoran nurse also did not document the need for provider referral, and a provider did not see the patient until a month after his arrival. At that visit, the provider did not address the cardiologist's recommendation for spironolactone or note that his lipids were not at goal (LDL-C=139, goal=<70).  On 5/16/13, the cardiologist saw the patient again, noting his very high mortality risk, and recommended adding nitrates; adding a statin since the patient's LDL was still high; and ordering a lab test (BNP) to evaluate the severity of his heart failure. The patient's shortness of breath has limited his activities to the extent that he is wheelchair bound. On 6/4/13, a Corcoran provider saw the patient and documented that although he had a cough, his heart disease was "well compensated" and that "I don't think he will die within 6 months. Will defer this issue to PCP." He did not order a nitrate; did not intensify his statin regimen; and did not order a BNP to evaluate the patient's heart failure in accordance with the cardiologist's recommendations.  The provider then wrote an order for a chest x-ray and follow-up in 150-180 days. The providers' assessment of that his heart disease was "well compensated" not consistent with the patient's functional status (e.g., wheelchair bound due to shortness of breath) or the cardiologist' assessment of his high mortality risk.   A follow-up interval of 5-6 months is inappropriate given this patient's high-risk status.[35]

- On 11/20/12, a 55-year-old with gigantism, acromegaly[36], pituitary tumor, schizophrenia, bipolar disorder, hyponatremia[37] secondary to psychogenic polydipsia[38], paroxysmal atrial fibrillation, recurrent syncope, left nephrectomy as an infant, colon cancer with right hemicolectomy, chronic deep vein thrombosis (DVT) with an IVC

---

[34] Intrasystem Transfer/Nurse Sick Call Patient #5.
[35] Intrasystem Transfer/Nurse Sick Call Patient #6.
[36] Acromegaly is a hormonal problem that results in increased bone size, including those of the hands, feet, and face.
[37] Hyponatremia is low serum sodium.
[38] Drinking excessive amounts of water.

filter[39], degenerative disk disease and left foot drop transferred to Corcoran. One week before transfer, the patient was hospitalized for right lower leg pain and edema. Upon arrival at Corcoran, the patient had a rapid pulse (pulse=139-147/bpm) and borderline low blood pressure (BP=102/68 mmHg). He had 3+ pitting edema (swelling) of his legs and reported pain 8 of 10 in severity. The nurse notified the ER and documented that the physician was "aware," but a medical provider did not see the patient and the nurse did not document another disposition.   We did not find MARs in the record documenting that he received his diuretic (furosemide) used to treat his leg edema. On 11/26/12, at an undocumented time, a provider saw the patient and addressed some of his medical conditions but not his history of chronic DVT or hyponatremia. He documented that the patient has heart failure, but there is no objective data in the record to support this diagnosis. He did not reference the patient's hospitalization two weeks prior. Physical exam showed trace bilateral lower leg edema.  His plan was to order labs and follow the patient in 60-90 days.  The same day at an undocumented time, another provider saw the patient for chest pain and planned to send him to San Joaquin General Hospital (SJGH), but we find no documentation that this occurred.[40]

- On 8/23/12, a 56-year-old with diabetes, hypertension, chronic hepatitis C infection, gastric ulcer, internal hemorrhoids and severe anemia transferred from SVSP to Corcoran.  The patient had a history of GI bleeding and severe anemia (hemoglobin= 6.4 gr., normal=14-16) in January 2012. The patient underwent endoscopy and colonoscopy and was found to have a healing gastric ulcer and severe internal hemorrhoids. Prior to transfer, in February 2012, a SVSP provider submitted a request for services for a general surgery consult for a hemorrhoidectomy. [Note: when the surgeon initially saw the patient, he recommended a laxative with follow-up in 4 weeks, not a hemorrhoidectomy]. The follow-up visit did not occur because the patient refused because he had not yet taken the laxative for four weeks as directed by the surgeon. However, at subsequent visits, the SVSP provider mistakenly documented that the patient had had the hemorrhoidectomy and took no action to have the patient sent back to the surgeon. At the time of transfer, the SVSP nurse checked with the provider to determine if he should be placed on medical hold. The provider indicated it was unnecessary and the patient was transferred.  Upon arrival at Corcoran, the patient's hypertension was uncontrolled (BP=162/90 mmHg) and the nurse referred the patient to the provider in 4-6 weeks. We do not find August or September 2012 MARs to show the patient received his medications, except for lisinopril.  On 9/11/12, a provider saw the patient as a new arrival and for chronic disease management. The physician did not perform a review of systems for each condition; did not explore the history of rectal bleeding; or perform a rectal examination. The physician did not document an assessment or plan. Two days later, the patient submitted a 7362 stating that the doctor told him to let him know when he started to seriously bleed, and that he was hemorrhaging like water. The nurse triaging the 7362 did not refer the patient urgently

---

[39] A mesh filter placed in the inferior venous cava to prevent blood clots in the leg from going to the lungs.
[40] Intrasystem Transfer/Nurse Sick Call Patient #12.

to the TTA. When a nurse saw the patient four days after he submitted his request, the nurse sent him to the TTA and he was immediately sent to San Joaquin General Hospital.[41]

Also, as described in the mortality section later in this report, there were three deaths in which problems with the intrasystem transfer process played a role. In two cases, medication continuity was not ensured. In another case, utilization management arranged for a patient transfer to Corcoran but critical specialty consultation was not arranged before transfer. The patient died, possibly as a result of failed access to care. These cases demonstrate a need for CCHCS leadership to review the statewide intrasystem transfer policy, especially in light of current utilization management practices of transferring patients into any open higher-level bed without ensuring clinical continuity of care; and for Corcoran leadership to review its own procedures.

We also found problems with care immediately following transfer. Of 16 intrasystem records reviewed, four patients were admitted to the GACH, and in two of four cases patients developed sepsis or a wound infection.  Our review of care of patients in the GACH confirmed a serious problem with nosocomial infections (See GACH section). The two cases are noted below.

- On 3/21/13, a 39-year-old patient transferred from Pleasant Valley State Prison with coccidioidomycosis and admitted to the GACH treatment with a PICC line[42] for intravenous antibiotics.  Ten days later, the patient developed a fever of 102°F and was diagnosed with Methicillin-Sensitive Staph Aureus (MSSA) sepsis.  His PICC line was removed and a new one inserted.[43]
- On 4/9/13, a 65-year-old patient transferred from Mule Creek State Prison (MCSP) following open-heart surgery at UC Davis and was admitted to the GACH. While in the GACH, the patient developed a wound infection from his right upper thigh where saphenous veins were removed from his leg to perform bypass graft surgery.  His infection was still being treated when he transferred back to MCSP on 5/9/13.[44]

## Access to Care

**Methodology:** To evaluate access to care, we interviewed health care leadership and reviewed patient tracking and scheduling systems. We also reviewed 34 health services requests (CDCR Form 7362) in 15 records of patients with chronic diseases, including medium- and high-risk medical patients from different housing units including 3A, 3B, 3C, the SHU and ASU.

---

[41]Intrasystem Transfer/Nurse Sick Call Patient #14.
[42] A PICC line is a peripherally inserted central catheter. It is long, slender, small, flexible tube that is inserted into a peripheral vein, typically in the upper arm, and advanced until the catheter tip terminates in a large vein in the chest near the heart to provide intravenous access.
[43] Intrasystem Transfer/Nurse Sick Call Patient #2.
[44] Intrasystem Transfer/Nurse Sick Call Patient #3

**Health Care Appointment Scheduling**

**Findings:** We did not find any backlogs in patient appointments, but we did find that scheduled appointments did not take place due to reported patient refusals. However, in several cases we reviewed, there was no signed patient refusal, or one that was signed with a note from the patient saying "please reducat me," which indicates that the patient did not truly wish to refuse health care services.

Health care staff also reported that even although health care access data shows that custody escorts inmates to their appointments, custody escorts patients back to their housing units for count, whether or not the appointment has been completed; and custody may or may not bring the patient back to the clinic.  Custody staff does not permit inmates to be "out counted" in the clinic as other institutions allow.  This results not only in missed appointments but inefficient use of expensive provider time.

**Nursing Sick Call (Face-to-Face Triage)**

**Findings:** Our findings showed significant problems with timely access to care and are not consistent with the OIG Cycle 3 report score of 82.1% for Clinical Services or the Corcoran OIG and Dashboard Performance Trends that showed the quality of nursing assessments to be 91%.

Corcoran health care staff collects and triages medical health care request forms (CDCR 7362) in a timely manner. However, health care staff does not consistently date, time, and sign 7362s with dental or mental health complaints at the time of receipt or triage, document a triage disposition, or see the patient for potentially urgent dental and mental health complaints. Instead, staff typically forwards the forms directly to dental or mental health staff.  We noted delays in access to care resulting from this process.

Moreover, we found that although 7362s with medical concerns are collected and triaged timely, nurses do not see patients in a timely manner, if at all, and the quality of nursing assessments is inadequate.  In some cases, a nurse sees the patient, but instead of performing an assessment, refers the patient directly to a provider, and in some cases "piggybacks" the referral onto a previously scheduled appointment that may not occur for several weeks.  In these cases, a nursing encounter amounts to no care at all.   Moreover, record review shows that the provider appointment is often not timely and/or the provider does not address the reason the patient submitted the 7362. Thus, care is extremely fragmented, and patients repeatedly submit 7362s trying to get their medical concerns addressed.

This was particularly problematic for patients housed in the administrative segregation unit (ASU) and Special Housing Unit (SHU).  In several cases, nurses administratively handled the 7362 without seeing the patient and without documenting any communication back to the patient.[45]

---

[45] Nursing leadership reported that the involved nurse in the SHU would be counseled regarding not seeing patients and performing appropriate assessments.

Health records also show that Ad-Seg and SHU patients frequently "refuse" appointments. In some cases we found this to be the case with signed refusals of treatment forms in the eUHR. In other records, health care staff documented refusal of appointments with no signed refusals in the record. We also found that patients signed the refusal form but also wrote "please reducat me," an indication that the refusal of the visit does not truly reflect intent to refuse medical care.  Often there was a refusal form in the record, but it was not clear what service the patient was refusing.

Health care leadership is aware of the high rate of refusals but has not effectively addressed this through the quality improvement process. A nursing supervisor reported that inmates sometimes do not know when they are scheduled for their appointment and, when custody comes to escort them to the appointment, they are surprised and not ready. According to staff, custody won't wait for them and state that they are "refusing" their appointment. Staff also reported that inmates refuse appointments because it may conflict with recreation, which is the one opportunity to leave their cell each day.  Staff also reported that when officers arrive to escort inmates to their appointments, their cellmate is required to stand up against the back wall of the cell until security procedures are completed. The supervisor stated that sometimes inmates do not want to inconvenience their cellmates.  We did not independently confirm this and it requires further investigation. Health care leadership also communicated that lack of custody cooperation was an obstacle to patient access to care.

Examples of concerns related to access, timeliness or quality of care in the ASU or SHU include the following reviews:

- On 3/30/13, a 49-year-old patient with diabetes, hypertension, coronary artery disease and stent placement, and hypothyroidism submitted a 7362 requesting to see the doctor.  On 4/2/13, a nurse documented "Ø (no) S/S (signs or symptoms)". There is no documentation of the nature of the patient's concerns in order to assess the urgency of the patient's complaint, and a disposition was not documented. On 4/17/13, a provider saw the patient who complained of chest pain and whose diabetes and hypertension were not at goal. This inmate was housed in the SHU.[46]
- On 5/4/13, a 58-year-old patient with hypertension, hepatitis C infection and neck pain following surgery with hemiparesis submitted a 7362 complaining of falling down secondary to needing a new left arm and knee brace. On 5/8/13, a nurse documented that the patient refused to see the RN for sick call. There is no signed refusal in the record showing that the patient refused the visit. This patient was housed in the ASU.[47]
- On 4/10/13, a 63-year-old patient with hypertension, hyperlipidemia, coronary artery disease, myocardial infarction and heart failure submitted a 7362 that requested several chrono items including a walker or cane. The nurse did not see the patient but documented that the provider saw the patient and "chrono issued." However the provider saw the patient for follow-up of gout and did not address the patient's chrono

---

[46] Intrasystem Transfer/Nursing Sick Call Patient #1.
[47] Intrasystem Transfer/Nursing Sick Call Patient #4.

request. Instead the provider wrote an order to "address the 7362 that was not addressed today," although it is not clear who this order was directed towards. This patient was housed in the SHU.[48]

- On 3/25/13, a 52-year-old patient with hypertension, epilepsy, chronic low back pain and mental health disorders submitted a 7362 complaining of dental pain. A nurse did not triage the form or assess the patient. Seven days later, on 4/2/13, a dentist signed the form and saw the patient the same day. The patient also submitted the following requests:

  o On 4/11/13, the patient submitted a 7362 complaining of back pain and constant urination that was uncontrollable. It was received and triaged the following day. On 4/12/13, the nurse documented that the nurse practitioner saw the patient. However, the nurse practitioner documented that the patient refused the visit, although there is no signed refusal in the record.

  o On 4/17/13, the patient submitted a 7362 complaining of neck, upper and lower back pain such that he was unable to sleep. It was received and triaged on 4/20/13. On 4/22/13, the nurse saw the patient and measured vital signs but did not perform an assessment or examination of any kind. The nurse did not address the patient's pain but referred him to a provider.

  o On 5/5/13, the patient submitted a 7362 complaining of difficulty urinating and being concerned about his prostate. It was received and triaged the following day. The nurse saw the patient and noted that the patient had been concerned about his prostate since watching a TV commercial, but aside from documenting frequency of urination did not perform a review of systems (e.g., painful urination, hematuria, urinary discharge, changes in force of stream, etc.) or perform a urinalysis. The nurse's assessment was that the patient was obsessing about his prostate and he referred the patient routinely to the provider.

  o On 5/19/13, the patient submitted a 7362 requesting to see the provider about his right shoulder and elbow and a chrono regarding waist chains. It was received and triaged the same day. The nurse did not see the patient but documented a referral to the provider.

  o On 5/30/13, a provider saw the patient for chronic disease management and evaluation of his shoulder and elbow pain. The provider documented "Limited range of motion examination was done secondary to Administrative Segregation status," suggesting that the provider did not request that the patient be uncuffed during the examination. The provider assessed him as having "chronic right elbow arthritis with limited range of motion."  The provider did not address complaints in recently submitted 7362s including the patients back pain, urinary complaints or prostate concerns.[49]

- On 3/31/13, a 56-year-old with hypertension, gastric carcinoid tumor, dysphagia, latent TB and chronic hepatitis C infection submitted a 7362 stating he needed to see the doctor concerning his multiple medical issues and high-risk status. It was received and

---

[48] Intrasystem Transfer/Nursing Sick Call Patient #6.
[49] Intrasystem Transfer/Nursing Sick Call Patient #7.

triaged on 4/1/13. The nurse documented that the patient was a new arrival and the date of the appointment was TBA (to be announced). The nurse did not see the patient to find out the nature and urgency of the patient's concerns. The patient was housed in the SHU.

- o On 4/1/13, the patient submitted another 7362 stating that he had not been seen by mental health and his medications weren't working. It was date-stamped as being received on 4/2/13, but a nurse did not date, time, or sign when she saw or triaged the patient. The psychiatrist did not see the patient until 4/11/13.
- o On 4/11/13, a nurse practitioner saw the patient as a new arrival. The NP did not perform a review of systems for each chronic disease.
- o On 5/5/13, the patient submitted a 7362 requesting to see the psychiatrist because of his rage issues and he did not want to do something he regretted. It was received on 5/6/13, but there is no documentation that a nurse triaged the form, saw the patient to assess the urgency of his concerns, or communicated with mental health. On 5/13/13, the psychologist saw the patient.[50]

- On 3/10/13, a 56-year-old patient with a history of diabetes, hypertension, dyslipidemia, coronary artery disease and coronary artery bypass surgery, pacemaker, major depression, bipolar disorder and low back pain submitted a 7362 stating that he had burned his hand with hot water and needed to put something on it. The 7362 was received and triaged on 3/13/13. The nurse did not see the patient but documented that he forwarded the concern to the provider whom the patient was scheduled to see the same day.  For reasons that are unclear, the patient refused the visit but stated "please reducat me." This case is a concern because of the risk of infection from burns of the hand.[51]

We also found issues for patients not housed in restricted housing units. Examples are noted below.

- On 1/27/13, the 55-year-old discussed above with acromegaly, gigantism, pituitary tumor, hyponatremia secondary to psychogenic polydipsia, colon cancer with hemicolectomy, schizophrenia and bipolar disorder submitted a 7362 complaining of constipation and diarrhea. It was triaged timely and a nurse saw the patient the same day. The nurse did not note the patient's history of colon cancer or other pertinent medical history, or obtain a complete abdominal ROS (e.g. abdominal pain, blood in stools, etc.). The nurse measured vital signs and performed a brief abdominal exam without palpation.  The nurse's assessment was patient "knowledge deficit," and she encouraged the patient to increase fluids. Unfortunately, the patient had psychogenic polydipsia causing hyponatremia, and increased fluids were contraindicated for his condition. The following day, the

---

[50] Intrasystem Transfer/Nursing Sick Call Patient #8.
[51] Intrasystem Transfer/Nursing Sick Call Patient #10.

patient developed syncope, was hypotensive and hyponatremic and was sent out to the hospital.  He was housed in 3C and later in the GACH.[52]

- On 8/30/12, a 55-year-old with diabetes, hypertension, chronic hepatitis C infection, gastric ulcer, severe anemia, hemorrhoids and an enlarged prostate submitted a 7362 complaining of peripheral neuropathy and needing a lower bunk.  A nurse evaluated the patient the following day using the musculoskeletal assessment protocol. The nurse obtained a history but did not examine the patient's feet, including color, warmth, sensitivity, and pedal pulses. The nurse routinely referred the patient to a provider who saw him on 9/11/12. This patient is housed in 3C.

  o On 9/13/12, the patient submitted a 7362 stating that the provider told him to let him know when he started to have serious rectal bleeding and that it was hemorrhaging regularly like water every time he used the bathroom. He was supposed to have an operation at the last facility. It was received and triaged on 9/15/12, but the patient was not seen until 9/17/12.  The nurse immediately sent him to the TTA. His hemoglobin had dropped from 11 to 9 and he was hospitalized for colonoscopy and further evaluation. He was diagnosed with diverticulosis, small internal hemorrhoids and end-stage liver disease. In this case, the nurse who triaged the 7362 on 9/15/12 should have arranged for the patient to be seen urgently.

  o On 10/23/12, the patient submitted a 7362 complaining of needing his omeprazole instead of ranitidine. It was received and triaged on 10/25/12. On 10/26/12, the nurse saw the patient and took a brief history, but did not ask him whether he had abdominal pain, rectal bleeding, or tarry stools. The nurse did not examine the patient's abdomen. The nurse educated the patient and told him to keep his scheduled 10/29/12 appointment with the provider.  For unknown reasons, this visit did not take place.

  o On 11/1/12, the patient submitted a 7362 complaining of a change in his medication from omeprazole to ranitidine. It was received and triaged on 11/2/12.  The nurse documented that the patient saw the provider the same day.  However, on 11/2/12, the physician assistant saw the patient for chronic disease management but did not address the patient's concern regarding the change in medications and renewed the ranitidine.

  o On 11/5/12, the patient submitted a 7362 complaining of peripheral neuropathy.  On 11/7/12, the nurse saw the patient and assessed him using the musculoskeletal protocol.  This protocol is not adequately designed to guide the nurse in the assessment of the patient's complaint and as a result the quality of the assessment was inadequate. The nurse documented that the patient already had medication prescribed for his condition and made a routine referral to a provider.  On 11/15/12, the provider saw him for his neuropathic pain but did not address his earlier concerns (7362 dated 11/1/12) regarding his GI medication.

---

[52] Intrasystem Transfer/Nursing Sick Call Patient #12.

- On 5/20/13, a 45-year-old with mood and seizure disorders, low back pain with sciatica, and chronic hepatitis C infection submitted a 7362 complaining of painful arthritis in his knee. It was received and triaged on 5/21/13. The nurse saw the patient that day.  The quality of the nursing assessment was good. The nurse referred the patient to a provider.  On 5/29/13, a physician saw the patient but did not address his knee pain. Instead the physician documented that the patient had an ingrown toenail and wanted a cane for chronic back pain. The physician did not perform any examination except "+ right ingrown toenail."  He referred him to the procedure clinic and ordered Ibuprofen, physical therapy and activity modification. The patient is housed in 3B.
  - On 6/5/13, the patient submitted a 7362 complaining of his knee getting so bad he could not walk on it. On 6/6/13, the nurse assessed the patient using the musculoskeletal protocol noting bilateral knee pain 6 of 10 in severity without deformity, tenderness, or edema. The nurse did not refer the patient to a provider.  This is not appropriate care.[53]

In summary, at Corcoran there are serious problems with both access to and quality of care, particularly in restricted housing units.  As a result, patients submit multiple requests to try to get their health concerns addressed. This presents a serious risk of harm to patients.


## Chronic Disease Management

**Methodology:** We interviewed facility health care leadership and staff involved in management of chronic disease patients. In addition, we reviewed the records of 30 patients with chronic diseases, including diabetes, hypertension, and clotting disorders, as well as other chronic illnesses. We assessed whether patients were seen in a timely manner in accordance with their disease control. At each visit, we evaluated the quality of provider evaluations and whether they were complete and appropriate (subjective, objective, current labs, assessment and treatment plan). We also evaluated whether the Problem List was updated and continuity of medications provided.

**Findings:** We found significant problems with management of chronic disease patients related to the timeliness and quality of care. Our findings are not consistent with the OIG's Cycle 3 report score of 86.8% for chronic disease management. However, our findings are more consistent with those noted in the CCHCS Dashboard. With respect to quality of care, according to the April 2013 Dashboard: Corcoran scored 79% for the management of diabetes and 73% for the management therapeutic anti-coagulation. Another concern is the rate of patient refusals of chronic care visits, blood sugar monitoring and insulin administration. This was discussed with the medical staff, who acknowledged that the rate appeared to be around 40%, which is much higher than in other facilities. The reason for such a high refusal rate needs to be investigated.

---

[53] Intrasystem Transfer/Sick Call Patient #20.

The following cases exemplify some of the problems we found:

- The patient is a 50-year-old man with diabetes and hypertension. On 12/21/12, his LDL cholesterol was elevated (LDL-C=132 mg/dl; the goal for diabetic patients is less than 100 mg/dl). He was seen by providers for other issues on 1/10/13 and 2/7/13. The providers did not address his high cholesterol on either of these occasions. The patient was next seen for chronic care on 2/26/13. The provider did not address his high cholesterol at that time either. On 3/21/13, the patient refused a clinic appointment. The provider noted that he would see the patient again in 3-5 months. A provider saw the patient for back pain on 4/16/13. The provider did not address the patient's elevated cholesterol.[54]

    Assessment
    There were problems related to quality and timeliness of care. The patient did not receive appropriate follow-up of his elevated cholesterol.

- The patient is a 58-year-old man with diabetes, hypertension, coronary artery disease with a history of bypass surgery in 1998 and a stent in 2005, and peripheral vascular disease with a femoral bypass in 2006. On 11/26/12, his LDL cholesterol was very elevated (LDL-C=170 mg/dl; the goal for patients with diabetes and coronary artery disease is less than 70). On 11/27/12, a provider notified the patient that he was being scheduled for a follow-up visit related to his laboratory tests. The patient was not seen until 1/4/13. The provider ordered a repeat blood test at that time. He did not adjust the patient's medications. On 1/9/13, the patient's LDL cholesterol was even higher (LDL-C=201 mg/dl). That day, a provider notified the patient that a follow-up visit was being scheduled to discuss his laboratory tests. On 1/10/13, a different physician notified him that his laboratory tests were within normal limits. The patient's very elevated LDL cholesterol was not addressed until 3/29/13 when a provider adjusted his medications.[55]

    Assessment
    There was a problem related to timeliness of care. The patient's very elevated LDL was not appropriately addressed for four months. (The CCHCS guideline on hyperlipidemia has an "alert" for patients with diabetes, coronary artery disease and an LDL greater than or equal to 100 mg/dl.)

- The patient is a 50-year-old man with diabetes, hypertension and hyperlipidemia. His LDL cholesterol was elevated (LDL-C=122 mg/dl, goal=<100) on 7/17/12. His medication was adjusted at a chronic care visit on 8/6/12. The patient refused a repeat blood test on 11/14/12 and refused a counseling visit with the provider on 11/29/12. The patient was not seen again for chronic care until 3/13/13. The provider ordered repeat blood

---

[54] Chronic Care Patient #3.
[55] Chronic Care Patient #4.

tests. They were performed on 3/26/13. The LDL cholesterol was 139 mg/dl. The patient has not been seen for follow-up since then.[56]

<u>Assessment</u>
There were problems related to quality and timeliness of care. The patient was not seen for over three months after he refused his appointment on 11/29/12. Furthermore, the patient has not been seen for his elevated LDL cholesterol on 3/26/13.

- The patient is a 66-year-old man with diabetes, hypertension, hyperlipidemia, coronary artery disease, aortic stenosis, aortic regurgitation, renal insufficiency and hepatitis C. He was seen for chronic care on 9/4/12. At that time, the provider noted that the patient's blood pressure was not at goal and ordered blood pressure monitoring one time per week. There is no documentation that this was done. The patient was next seen on 10/29/12 for chronic care. The provider noted that the patient's blood pressure was elevated (BP=145/95 mmHg; blood pressure goal for patients with diabetes is less than 140/80mmHg). The provider noted that the patient stated that he had forgotten to take his medication that day. The provider did not adjust the patient's medication. The patient was next seen on 12/3/12. His blood pressure at that time was again above goal (BP=137/87 mmHg). The provider noted that the patient's blood pressure was not at goal. He advised the patient to decrease salt intake and lose weight but did not adjust his medication. The provider also noted that the patient's hemoglobin A1C had been normal on 8/1/12 and that his blood sugar monitoring revealed that his morning blood sugars had ranged from 118 to 327 mg/dl[57] and that his afternoon blood sugars ranged from 103 to 410 mg/dl. Despite these elevated recent blood sugars, the provider documented that the patient's diabetes was at goal. The provider ordered follow-up in 8-10 weeks with laboratory tests. The patient was next seen for chronic care on 2/5/13. The clinician noted that the patient's blood pressure was 143/88 mmHg and that his recent morning blood sugars had ranged from 245 to 285 mg/dl and that his afternoon blood sugars range from 313 to 385 mg/dl. He noted that the patient's hypertension was not at goal but did not document an assessment for the patient's diabetes. He adjusted the patient's hypertension medication and ordered a repeat hemoglobin A1C. This was performed on 2/7/13 and was elevated (9.7%; goal is less than 7%). The patient was next seen on 3/19/13. The provider counseled the patient regarding his diet but did not adjust his diabetes medication.[58]

<u>Assessment</u>
There were problems related to quality of care. The patient did not receive appropriate care for his hypertension or his diabetes.

---

[56] Chronic Care Patient #8.
[57] Normal blood sugar is less than 105. While many diabetic patients have blood sugars that are routinely higher than this, values over 200-250 mg/dl are very high.
[58] Chronic Care Patient #17.

- The patient is a 51-year-old man with diabetes, hypertension, coronary artery disease with coronary bypass surgery in 2000 and stent placement on 8/9/12. On 9/5/12, he was found to have a thrombus in his heart and was started on warfarin. His INR (a blood test used to monitor patients on warfarin) was sub-therapeutic from that time until 12/26/12 (This was partly due to the patient's non-compliance but mostly related to lack of appropriate care and follow-up).[59]

Assessment
There were problems related to quality of care. The patient did not receive appropriate care related to his warfarin therapy.

- The patient is a 53-year-old man with atrial fibrillation for which he takes warfarin. On 1/23/13, his INR was very high (11.3 mg/dl, goal=2-3). The provider ordered a repeat INR the following day. On 1/24/13, the patient's INR was 15.8 mg/dl and the provider gave the patient 20 mg of vitamin K (vitamin K reverses the effects of warfarin). The following day, the patient's INR was therapeutic.[60]

Assessment
There was a problem related to quality of care. The patient did not receive appropriate care for his elevated INR. The CCHCS guidelines on anticoagulation specify that vitamin K (5 to 10 mg) be given when the INR is greater than 9.0 mg/dl. On 1/23/13, the provider should have given vitamin K to the patient when his INR was 11.3 mg/dl. On 1/24/13, the provider gave too high a dose of vitamin K. (The American College of Chest Physicians recommends only giving 2.5 to 5 mg of vitamin K when the INR is greater than 9.0 mg/dl.)

- The patient is a 49-year-old man with hypertension and a history of multiple deep vein thromboses for which he is receiving warfarin. On 2/6/13, a provider ordered a fasting lipid panel. It was obtained on 2/11/13. The patient's LDL cholesterol was elevated (163 mg/dl) and his HDL cholesterol was low (37 mg/dl, goal >= 40). He was subsequently seen by a provider on 4/25/13 and 5/7/13. The provider did not address his elevated LDL cholesterol at either visit.[61]

Assessment
There was a problem related to quality of care. The LDL cholesterol goal for a 49-year-old man with hypertension and low HDL cholesterol is 100 mg/dl.

- The patient is a 65-year-old man with diabetes, atrial fibrillation and hypertension. His hemoglobin A1C was 7.6% (normal=<7.0%) on 6/7/12. As of 5/15/13, it had not been repeated.[62]

---

[59] Chronic Care Patient #20.
[60] Chronic Care Patient #23.
[61] Chronic Care Patient #24.
[62] Chronic Care Patient #25.

Assessment
There was a problem related to quality of care. The CCHCS guidelines specify that the hemoglobin A1C needs to be monitored at least every six months.

- The patient is a 49-year-old man with diabetes and hypertension. Between 1/18/13 and 4/5/13, the patient had seen a provider on five occasions and his blood pressure was elevated at each visit. (The blood pressure goal of a patient with diabetes is less than 140/80 mmHg. The patient's blood pressures had been 126/85 mmHg, 135/87 mmHg, 133/84 mmHg, 130/87 mmHg and 136/93 mmHg.) None of the providers addressed his elevated blood pressure.[63]

Assessment
There was a problem related to quality of care. The patient's elevated blood pressure was not addressed.

- The patient is a 42-year-old man with a clotting disorder and recurrent deep vein thromboses for which he was taking warfarin. On 4/9/13, his INR was 4.0. The provider noted that the patient had been stable since July 2012. His plan was to repeat the INR. A repeat test was performed on 4/16/13 and was 5.0. The provider reviewed the result on 4/17/13 and wrote an order to hold the warfarin and to check the patient's INR daily beginning the next day. The INR was not repeated until 4/20/13, at which time it was therapeutic.  At that time, the provider restarted the warfarin at a lower dose and ordered a repeat INR on 4/22/13. The INR was not repeated until 4/29/13, at which time it was still therapeutic. As of 5/15/13, the INR had not been repeated.[64]

Assessment
There was a problem related to quality of care. The patient did not receive appropriate management of his warfarin therapy. INRs were not performed in the timeframe ordered by the provider. In addition, the INR had not been checked for over two weeks. Since the dose of warfarin was decreased because the patient's INR was 5.0, the INR needed to be checked on a weekly basis until the INRs were stable for at least a few weeks.


## Pharmacy and Medication Administration

**Methodology:** We interviewed Pharmacist-in-charge (PIC) Bryan Miller, nurses who administer nurse-administered and keep-on-person (KOP) medications, toured the pharmacy, clinic medication rooms and observed nurses administer medications and reviewed medication administration records (MARs) in clinics and in health records.

---

[63] Chronic Care Patient #26
[64] Chronic Care Patient #28.

**Findings:** Pharmacy services are adequate, but in need of improvement with respect to the security of dispensing containers for non-blisterpack or unit dose medications. Currently the pharmacy dispenses medications into plastic baggies that cannot be securely closed. We found that when nurses store medication bags in containers in the clinics, the baggies can easily open, spilling loose pills from the bag and contaminating the medication. This medication should be discarded, resulting in waste and shortages in the number of doses.[65]  We also found that the pharmacy needs improvement with respect to sanitation and disinfection practices.

With respect to medication administration, we found concerns regarding lack of custody support for medication administration in the SHU and Facility III; in the latter case, this resulted in nursing departures from accepted standards of nursing practice for medication administration. These departures from standards of nursing practice likely contribute to medication errors, particularly in documentation.

We also note that there is an inadequate system for identifying, reporting and tracking medication errors in outpatient clinics.  This is not surprising since the primary approach to these errors is progressive discipline.  Although staff should be held accountable for their performance, medication error reporting should be encouraged and then studied under the auspices of the quality improvement program to determine whether system issues (e.g., how nurses are delivering medications, etc.) contributes to medication errors as opposed to individual performance issues, or both.  Record review showed that medication administration records are not scanned into the eUHR in a timely manner. From our review, it was not possible to know whether patients consistently receive their medications in a timely manner. Quality improvement reports reflected that it takes an average of 4-6 weeks for MARs to be scanned into the record.[66]  Our findings are discussed in greater detail below.

## Pharmacy Services

**Findings:** The pharmacy is physically located in the General Acute Care Hospital (GACH) and provides both inpatient and outpatient pharmacy services.  Pharmacy services operate under a hospital pharmacy license, a Drug Enforcement Agency (DEA) license, and a Sterile Compound license.  All licenses are current.

The pharmacy physical plant is suboptimal. It appears to be of sufficient size but is cluttered and not clean.  Floor tiles are missing. An accumulation of dust is noted on computers.  The surfaces of medication exchange carts used in the GACH were dirty. The PIC indicated that during his previous employment in a hospital setting, housekeeping cleaned the pharmacy 2-3 times per day, but he feels fortunate if housekeeping services clean two to three times weekly. He reported that the pharmacy is the cleanest that it has ever been in the 18 months he has worked at the facility.  Lack of adequate sanitation and disinfection is a major patient safety issue.

---

[65] We did not observe whether or not loose medications were discarded.
[66] Quality Improvement Meeting Minutes, 5/20/13.

The pharmacy operates Monday to Friday from 6 am to 4 pm, and on Saturday from 7 am to 3 pm for the hospital only.  With respect to pharmacy staffing, there is currently one PIC and five state pharmacist positions and one contract pharmacist.  There are also eight state pharmacy and two registry pharmacy technicians. The PIC believes this staffing pattern is adequate.

As at other facilities (e.g. CMC), prescription dispensing practices are not uniform and vary by location and security level. Pharmacy services process approximately 20,000 prescriptions per month through the in-house pharmacy and Central Fill Pharmacy in Sacramento. The pharmacy compounds approximately 800 intravenous (IV) bags per month.

The pharmacy processes all new prescriptions, ASU and SHU prescriptions, and provides medications to GACH patients through a medication cart exchange system.  These prescriptions are typically filled through unit doses or loose pills in labeled baggies. One issue with dispensing loose pills into labeled baggies is that it difficult to keep them securely closed. When inspecting medication rooms in the yards we found that the bags easily opened and pills fell out into the storage bins or containers.  This contaminates the medication which should be discarded and in these circumstances will result in shortages of medications.  With respect to medication refills, Central Fill processes general population medication refills using blisterpack packaging.

Medication reconciliation reports show that when providers order medications, the pharmacy dispenses the medication in a timely manner. However, we found that MARs are not scanned into the record in a timely manner; and some have not been scanned at all.

With respect to medication error tracking systems, the PIC reported that a tracking system was in place. Review of the tracking log showed some medication errors identified in the GACH, but according to the Pharmacist in Charge, from January to April 2013, only one medication error had been reported or identified from the outpatient yard clinics. We reviewed MARs that showed blank spaces where nurses should have documented, but did not, the status of medication administration for a given dose. This is a missed dose, or error of omission, and should be reported as a medication error. Internal medication studies (e.g. AMAT) have also shown blanks spaces on MARs.[67] That no errors have been reported from facility clinics or from medication audit processes reflects lack of an adequate medication error reporting system and represents a patient safety issue.

## Medication Management and Administration

**Findings:** We found significant issues related to medication administration at Corcoran. As noted in the intrasystem transfer section of this report, 5 (31%) of 16 records showed that when providers order medications, the MARs are not scanned into the eUHR to show whether or not the patient received continuity of medications upon arrival or even after residing at the facility for several months.[68]

---

[67] See Corcoran March 2013 internal medication audit reports.
[68] See Intrasystem Transfer/Nursing Sick Call Patients #1, #7, #12, #14, and #20.

We inspected the medication room in the Special Housing Unit (4B4). The room had adequate space and was clean except for the walls.   However, there is no schedule of sanitation or disinfection activities for the clinic or logs showing that these activities have been completed. Staff reported that they sweep and mop the room daily as needed.   There was an emergency response bag and automatic external defibrillator. The refrigerator was clean and we found no expired medications. The nurse indicated that there were issues with wastage of vials of injectable interferon because there was no refrigerator to store the medication in the area where pharmacy picks up returned medications.   According to the nurse, each vial costs $6,000 and therefore any waste is costly. We recommend that this be addressed by health care leadership in the P & T Committee.

We reviewed medication administration records in the restricted, Special Needs Yards, and general population medication clinics that we found to be generally neat and legible. We noted blank spaces for some medication doses on some MARs reflecting that staff did not document administration of medication for those scheduled doses, which are errors of omission.   In the SHU and 3B, we asked staff how these blank spaces are handled, and the nurses responded that they would call the nurse and tell them that they should fill in the blank the next time they came to work.   One nurse stated that she would not report it as a medication error because she did not want to get the nurse in trouble.   This is problematic because documentation of medications on the MARs days or weeks after the fact raises questions about the credibility of MARs. The nurses' concerns are supported by quality management committee meeting minutes that discussed April 2013 Medication Administration Process Improvement Plan (MAPIP) findings that identified missing documentation and blanks on the MARs in which the plan was to implement progressive discipline and in-service training.[69]   The study also identified multiple MARs that were not scanned into the eUHR.

While it is important to hold staff accountable for their performance, there may be other systemic issues contributing to the lack of proper documentation that should be investigated. For example, during this visit we found that custody did not permit general population inmates to come to the medication window in Facility C. This resulted in nurses pre-pouring medications into improperly labeled envelopes and administering medications in the housing units without the MAR present.   This is not in keeping with standards of nursing practice and could easily lead to both medication and documentation errors.

Medication Administration in the SHU

There are access to care issues related to the lack of custody support for medication administration in administrative segregation and SHU.   We observed the noon medication administration in the SHU (4B4) during our site visit. After the nurse had received medications from the pharmacy and prepared the medication cart, she notified the control unit officer that she required custody escort to administer medications.   The officer told her that there was no one available to escort her because officers were escorting inmates to and from recreation. The nursing supervisor accompanying us attempted to obtain the escort without success.   We

---

[69] Quality Management Committee Meeting Minutes 5/20/13.

waited for approximately 30 minutes, and the nursing supervisor notified an officer in the chain of command that a Plata court expert was with the team, and then an officer appeared to escort the nurse. Nursing staff reported that it is a common occurrence and that they do not receive consistent custody support for medication administration.

This can have adverse clinical implications. For example, a 56-year-old with poorly controlled diabetes (HgbA1C=11.2%, goal=<7%) and heart disease repeatedly refused insulin doses. On 5/7/12, the patient told the physician that the reason he refuses insulin is that the nurses do not give the medication on time in relation to meals.  His refusal of insulin was worsening his diabetes and increased his risk of cardiovascular events, and emphasizes the importance of medication administration taking place at appropriately scheduled times.[70] .

The nurse administered medications by pushing the medication cart to the cell front of each inmate scheduled for a medication dose. When the nurse administered medications in the SHU, the nurse did not consistently verbally and independently (e.g. ID badge) confirm the identity of each patient before administering the medication.  The nurse passed the medication through the food port, and watched the inmate take the medication but did not consistently perform oral cavity checks. The nurse documented administration of medications onto the MAR at the time of administration which is the correct procedure.

## Medication Administration in General Population Facilities

We found an issue on the main line yards with the evening medication administration.  During the daytime medication administration, general population inmates are allowed to come to the medication window to receive their medications.  However, custody staff does not allow general population inmates in facility 3A, 3B and 3C to come to the window for the evening medication administration.  So the nurses pre-pour medications into coin envelopes that do not contain the same labeling that the pharmacy label contains.  In the 3B medication room, a nurse used a coin envelope that had an inmate's last name, two inmate numbers on it, the location of the inmate, and that it was a pm dose. The envelope did not contain the name of the medication.  The nurse then placed the coin envelopes into bags prior to transporting and administering the medications in the housing units. Nurses documented administration of medications when they returned to the medication room at the end of medication pass.  These practices are not consistent with generally accepted standards of nursing practice and are error-prone.

Staff showed us a joint memorandum from Clark Kelso, Receiver, and Matt Cate, former Secretary of CDCR, which indicated that standard practice should be for general population inmates to come to a central window for medication administration.  In addition, according to Operational Procedure 1050 Medication Administration that the CEO and Warden signed on 5/11/12, general population inmates are to come to a central administration window.  Finally, Karen Rea, Statewide Chief Nurse Executive, has told facility leadership that facilities are not staffed for decentralization of medication administration for general population inmates.

---

[70] Intrasystem Transfer/Nurse Sick Call Patient #10.

Despite this, nurses were still administering medications in the housing units. We discussed this with nursing leadership who explained their numerous efforts to resolve this issue with custody leadership to no avail.[71]   In this case, although lower level supervisory staff attempted to resolve the issue, we believe that the CEO should have taken this issue up the respective custody and medical chains of command given support at the highest levels of CDCR and the Receiver. It is our impression that health care leadership did not effectively address the issue.[72]

## Laboratory/Radiology

**Methodology:**  We interviewed laboratory and radiology staff, tracking systems and health care records.

**Findings:** Because Corcoran has a general acute care hospital it is required to have an on-site laboratory. It was very difficult to obtain accurate data from the laboratory. The supervisor provided one set of data for laboratory tests done in January of 2013 called a January 2013 Plata Report. This report documented 2797 tests done in January on 1893 specimens. The laboratory staff gave us a second report, called an Individual Test Tally Report, which documented that for January there were 2117 tests done. The supervisor was unable to explain the difference of 680 tests between the two reports. Routine tests are sent to an outside laboratory, and hospital tests and urgent tests are done on-site. The supervisor was not able to provide data for this area during our discussion. We asked for the data to be given to us prior to conclusion of the visit but we did not receive any.

We did not notice any problems with ordering or completion of laboratory tests. However, we noted issues with timely provider review, signing and dating of laboratory and diagnostic tests, and clinical follow-up of abnormal tests.

## Health Records

**Methodology:** We toured the health records unit, interviewed health records staff, reviewed health records staffing and the health records (eUHR) for organization, ease of navigation, legibility and timeliness of scanning health documents into the health record.

**Findings:**  As noted in previous reports, CDCR has migrated statewide from a paper record to an electronic Unit Health Record (eUHR). This has been described in previous reports and will not be duplicated in this report.[73] However, we continue to support the Receiver procuring a true electronic health record, which will dramatically improve communication between health care

---

[71] In early April 2013 SRNIII Vryhof met with Captain Gamboa of 3B facility to address the matter. This issue was referred to CDW Timothy Perez. SRN III Vryhof met with the facility Captains and the CDW on several occasions but to no avail. Custody held their position regarding no release of Close A, Close B inmates after 2000 to pill line despite the memo dated Aug 24, 2011 Pill Line Policy. In addition CEO Macias requested assistance from other CEOs who had encountered the same obstacle and CNE L. Schaper notified Statewide CNE Karen Rea. Medical leadership was actively discussing the issue with Custody leadership. Meetings continued with custody leadership subsequent to the Plata Expert visit.

[72] During a telephone conversation with nursing leadership following the audit, it was reported that a Health Care Access Team from Sacramento advised the Warden that general population inmates should be brought to the medication window for evening medication administration.

[73] Court Experts San Quentin report. March 2013.

staff, reduce opportunity for medical errors and improve the efficiency of health care service delivery.

At Corcoran we found several problems regarding the management of health records. Our findings are consistent with the OIG Cycle 3 report that scored Access to Health Information at 50%.

We did not find a backlog of health documents to be scanned at the time of our visit. In January 2013, reports showed that it was taking Corcoran staff on average 6.1 days from the date of a patient encounter until it was scanned into the health record, compared to 5.5 days statewide. We note, however, that April 2013 MAPIP studies showed that multiple MARs were not in the eUHR, and follow-up of these findings showed that some MARs were still missing and others were scanned but the average time frame was 4-6 weeks.  Our review confirmed issues related to scanning of MARs into the eUHR (See intrasystem Transfer Section).

We also found the following issues:
- Hospitalization and diagnostic reports are not tracked, obtained, and scanned into the eUHR in a timely manner and some not at all.
- Medical providers do not consistently request medical records for care provided at a prior facility important to managing patients.
- There is no system to have medical providers review, date and legibly sign health documents such as diagnostic, specialty services or hospital reports prior to scanning them into the record.
- Health records has no system for tracking documents sent to staff for corrections (e.g., signatures, dates, etc.).
- In the GACH, a medical provider documents progress notes by cutting and pasting from previous notes, documenting the same history and clinical findings even though the patient's condition has changed, thus rendering clinical information inaccurate and unreliable.

Examples of these problems included the following cases:

- A 63-year-old with severe heart disease saw the cardiologist on 5/16/13. The cardiologist recommended adding nitrates, a statin and a lab test to evaluate the severity of the patient's heart failure. The report was printed on 5/17/13 and scanned into the record without being reviewed, signed and dated by a provider. The provider managing the patient did not implement the cardiologist's recommendations.[74]
- A 56-year-old with diabetes, hypertension, and coronary artery disease with heart surgery was sent out the hospital for chest pain on 11/15/12. At the hospital, diagnostic tests showed that he had severe left ventricular function and heart failure.  At the time

---

[74] Intrasystem Transfer/Nursing Sick Call Patient #6.

of our visit in mid-April 2013, a medical provider had not signed and dated these reports as having been reviewed.[75]

- A 56-year-old with hepatitis C infection, gastrointestinal (GI) bleeding and severe anemia was hospitalized on 9/27/12 for GI bleeding. On 10/5/12, a medical provider saw him for follow-up noting that the results of his capsule endoscopy were not in the record.  The provider planned to follow-up on these reports but as of June 5, the report was still not in the record.[76]
- A 39-year-old with diabetes and pulmonary coccidioidomycosis had chest CT for follow-up of a pulmonary nodule on 6/10/13.  On 6/12/13, an ID consultant requested follow-up of the CT report, but as of 6/23/13 the report was not scanned into the record as having been reviewed by a primary care provider.[77]

Other medical record issues are noted in cases described in the GACH and mortality reviews.


## Urgent/Emergent Care

**Methodology:** We interviewed health care leadership and staff involved in emergency response and toured the Triage and Treatment Area (TTA). We also reviewed 10 records of patients selected from the on-site urgent/emergent and off-site ED/hospitalization tracking log.

### Emergency Department/Hospitalizations

**Findings:** When patients have urgent or emergency problems, prompt evaluation is critical in managing the patient. Delays in evaluation may result in deterioration of the clinical condition and can result in unnecessary hospitalization. For urgent care services, the OIG "addresses the care provided by the institution to inmates before and after they were sent to a community hospital."[78]  Corcoran received an OIG score of 85.4% in this area. However, we found this area of care inadequate for reasons detailed below.

We note that CCHCS quality data reports indicate that Corcoran had more than double the days of preventable hospitalization than other prison facilities. Our findings are consistent with this assessment. Corcoran leadership provided us with a presentation at the start of our tour, and in that presentation, they addressed the issue of preventable hospital days. The facility attributes these preventable days to errors of judgment, delayed reports from specialty or hospital care, mental health overflows into medical beds, and inmate non-compliance. However, we were unable to verify inmate non-compliance as a reason for preventable hospital days. Based on our own chart reviews, preventable hospital days resulted primarily from problems with primary care or urgent care evaluations and also from deficiencies in care on the GACH. These and other problems with urgent care and care before and after hospitalization are detailed as follows.

---

[75] Intrasystem Transfer/Nursing Sick Call Patient #10.
[76] Intrasystem Transfer/Nursing Sick Call Patient #14.
[77] Intrasystem Transfer/Nursing Sick Call Patient #2.
[78] OIG *California State Prison, Corcoran, Medical Inspection Results, Cycle Three*, Executive Summary Table

- One patient was evaluated via a 7362 and was assessed by a nurse as having a swollen thumb which was draining pus. [79]  The nurse's plan was to send the patient to the TTA, but the nurse documented that custody was unable to transport the patient to the TTA on an emergency basis. The next day, the patient was transported to the TTA and ultimately admitted to a local hospital for an infected thumb. The nurse evaluation was a routine evaluation but the referral to the TTA was for urgent care. It was delayed and this may have resulted in preventable hospitalization. This problem of urgent care resulted from custody's failure to transport an inmate for evaluation. Custody must not refuse to transport patients when medical staff advises them of the need for an urgent/emergent evaluation.

- Another patient saw a pulmonologist on 7/2/12 for asthma. [80] The consultant noted that during a recent hospitalization for an asthma exacerbation, the patient had an x-ray showing a possible pulmonary infiltrate. The consultant recommended a CT scan. The CT scan was done in about five weeks and showed consolidation in two lobes of the lung. The CT scan was signed as reviewed on 8/8/12. Even though the CT scan results indicated infectious disease and should have been acted on immediately, the patient was not promptly evaluated. The patient eventually had an urgent evaluation on 8/15/12 for breathing problems. The doctor did an x-ray but did not notice the previously positive CT scan results. The x-ray showed a left lower lobe infiltrate and the doctor prescribed antibiotics and prednisone with a 4-day follow up. Two days later, the CT scan results were identified and the patient was admitted to a local hospital. If the patient had been diagnosed earlier, hospitalization might have been prevented. The patient returned from the hospital 8/25/12, but wasn't seen until 8/29/12; when he was seen, the doctor noted that the hospital record was unavailable, so he did not know what had occurred in the hospital. Within six weeks, the patient was admitted to the GACH because his asthma was poorly controlled. The scanned GACH record is on three separate large PDF files that were not in chronological order and were disorganized and extremely difficult to read.

  For this patient, this kind of care continued. Over the period between 7/2/12 until 12/16/12, the patient was seen twice by pulmonary consultants via telemedicine, had two local area hospitalizations, was admitted to the GACH once, was seen in the TTA for exacerbations of asthma five times but was seen only twice in chronic care clinic. The chronic care visits were not of good quality and neither visit contained an adequate history of the patient's asthma. This is a failure of the chronic illness program in managing chronic illness and resulted in episodic management. When the episodes of urgent care are evaluated, each individually appears adequate, but evaluating care before and after hospitalization reveals significantly defective chronic care management resulting in preventable hospitalization.

---

[79] Hospital Patient #3.
[80] Hospital Patient #5.

- Another patient was seen in clinic urgently for buttock pain.[81]  The history and physical examination was very poor and the doctor documented that the eUHR was not available. Almost no physical examination was done, and a muscle sprain was diagnosed. No follow-up occurred. Ten days later, the patient presented urgently for fever and an abscess of his hip with swelling of his leg and hip. The patient gave a history during the urgent care evaluation of having been ill for 2-3 weeks, had a fever, and said that he drained an abscess himself. He had a fever of 103.2°. Blood cultures were done in the TTA and the patient was admitted to the GACH on 12/13/11 for intravenous Vancomycin (an antibiotic used to treat staphylococcal (staph) infections). Vancomycin levels were not ordered (a routine method of monitoring antibiotic therapy). The patient's white blood cell count was high (WBC=23.9 K, normal=<10 K). Blood cultures were positive for penicillin-resistant staph but it was sensitive to oxacillin. The preliminary blood culture results were available on 12/15/11 but were unnoticed for two days while the patient was on the GACH. On 12/16/11, a physician did not see the patient. A physician recognized the positive blood cultures on 12/17/11, but the doctor did not document noticing that the patient had a 101.2° fever the evening before. On 12/18/11, the patient was admitted to a local hospital. Because Corcoran does not have capacity to do evaluations necessary to manage bacteremia with staphylococcus (performance of an echocardiogram), the patient should have been promptly sent to a local hospital.

The patient spent nine days in the hospital. Upon his return to Corcoran, the patient was seen by a physician on 12/27/11, but from 12/28/11 until 1/2/12, the patient was not seen by a physician and the antibiotics were not monitored. On 12/31/11, the patient had a fever of 100.8°. However, the nurse who recorded the temperature wrote that the patient was afebrile, which is not accurate. The doctor was not notified. 12/31/11 and 1/1/12 were on a Saturday and Sunday and there were no physician notes on these days even though this is a GACH and the patient had an acute illness. On 1/2/12, the patient spiked a fever to 102.8° and his blood pressure was low (BP=94/54 mmHg) with a rapid heart rate (pulse=107 bpm). His creatinine was elevated, indicating decreased kidney function.  His antibiotics were held because one of the side effects was kidney damage. The patient was sent back to the local hospital. This was a potentially preventable hospitalization, but the patient's creatinine was not monitored until he developed early renal failure. He remained at the hospital until 1/9/12 and was sent back to the prison on a different antibiotic.  Upon return to the prison, the patient remained on the GACH until 3/15/12. A proper initial history and physical may have prevented the first hospitalization, and daily physician visits and attentive nursing care might have prevented the second hospitalization. This patient's hospitalization was in 2012, which resulted in our reviewing this case.  We did review elements of care extending into 2011.  We note however, that as with other patients reviewed, there were no differences in the overall patterns of care provided in 2011, 2012 or 2013.

---

[81] Hospital Patient #6.

We noticed on chart reviews that information obtained during offsite hospitalization was not consistently available for clinicians upon return from the hospital. This appears to be a major system problem at this facility and was seen on several chart reviews. The absence of data often resulted in guesses rather than informed clinical decisions.

- One patient was hospitalized for a deep-seated abscess and possible osteomyelitis.[82] Upon return from hospitalization, the patient had a telemedicine infectious disease consultation. At that consultation, the consultant did not have information in the eUHR on whether the patient's staph infection was Methicillin sensitive or resistant. Six weeks later, the patient was seen again by infectious disease and, although sensitivities were available, it was not specified whether culture results were taken intra-operatively or whether they were superficial cultures. This confusion altered antibiotic choices and may have affected care. Although this did not result in a preventable hospitalization, it indicates the type of process problem that exists.

- Another patient[83] had a history of mental illness, hypertension, coronary artery disease and a prior heart valve replacement. Apparently, this was a mechanical mitral valve for which he was receiving Coumadin. The patient was seen for chest pain in the TTA and sent to an outside emergency room. The patient was admitted to a local hospital where a myocardial infarction was diagnosed. His INR upon admission was sub-therapeutic and the hospital suggested that the infarction was due to an embolus from his mitral valve due to inadequate anti-coagulation.

  Upon discharge, the patient spent six days on the GACH because of suicidal thoughts and then was discharged to general population. He only saw a medical doctor on the day of admission even though he had just had a heart attack. A psychiatrist discharged him. Upon discharge to general population, he submitted a 7362 stating that he had missed several days of his anticoagulant. He had just had a myocardial infarction because of sub-therapeutic anti-coagulation. Review of the MAR verified that the patient did not get anti-coagulation upon discharge from the GACH. It took about 2 ½ weeks to obtain a therapeutic INR.

  For multiple visits, physicians documented confusion as to what type of heart valve replacement the patient had and when the valve replacement surgery was. This is important to know because valve failure depends on valve type. Antithrombotic therapy also varies with valve type and valve site. Doctors at the local hospital documented that the patient had a mitral valve replacement. A cardiology consultant via telemedicine documented that the patient had an aortic valve replacement with a pig valve in 2003. A physician at Corcoran noted that the valve was a mechanical aortic valve replaced in June 2011. This confusion was never cleared up in the record. In part, this resulted from

---

[82] Hospital Patient #4.
[83] Hospital Patient #9.

poor history. In part, it resulted from not obtaining old records and verifying exactly what surgery the patient had.

On 5/17/12, a doctor documented that the patient had three prior positive fecal occult blood tests. A digital rectal examination was not done. For five months, there was no follow up of this abnormal test. On 7/29/12, the patient had syncope and fell and had a large hematoma on his scalp. He was sent to a local hospital for a brain scan. At the hospital, an echocardiogram was done, indicating that the patient had a mechanical mitral valve. However, even after return from the hospital, Corcoran physicians documented that the patient had an aortic valve replacement. Upon return to the facility, the patient did not have a consistently therapeutic INR. At times, it was high and at times it was low. On 10/31/12, the patient reported urgently for nausea, vomiting and dizziness. His blood pressure was 84/40 mmHg and the pulse was 126/bpm. An INR test was done that day and it was 8.4 (INR goal=2.5-3.5) and the hemoglobin was 4.7. These critical laboratory tests were reported 10/31/12 late in the evening but were not acted on until 11/1/12. On 11/1/12, the laboratory tests were noted and the patient was admitted to a local hospital. At the hospital, the patient was diagnosed with gastritis and hemorrhoids. If the positive fecal occult blood tests from May had been investigated, this October hospitalization may have been prevented by treating the source of bleeding before it resulted in extreme anemia. This was a preventable hospitalization caused by failure to communicate a laboratory result and act on it timely.

- Another patient[84] was on the GACH for coccidioidomycosis. The care for this patient on the GACH was sub-standard. Monitoring of the patient was not thorough. In addition to his diagnosis of coccidioidomycosis, he also had a diagnosis of systemic lupus erythematosus (SLE). He had four separate episodes of bacteremia, ostensibly from PICC line infections being used to treat the patient for coccidioidomycosis. Three of these episodes of bacteremia resulted in hospitalization. All were potentially preventable. A medical provider did not see the patient between 10/23/12 and 11/1/12. Patients on a GACH should be seen daily. On 10/31/12, blood cultures were ordered, although no note was present in the eUHR. On 11/1/12, the blood cultures were preliminarily positive for gram-negative organisms. A doctor on call on the GACH prescribed clindamycin and ceftazidime by phone order. To start treatment for bacteremia without seeing the patient is not appropriate. On the same day, a different doctor started Vancomycin. Another doctor on the same day stopped the ceftazidime by verbal order. Oral Levaquin was then started. Later that day a different doctor gave a phone order to hold the Vancomycin. Three days later another physician stopped the clindamycin and Levaquin and started Bactrim for ten days. Later that day another physician wrote an order to discontinue the Bactrim and continue Levaquin for four more days. This bizarre sequence of antibiotic ordering for a very ill patient involved multiple doctors, none of whom documented the reasons for their prescriptions and changes to prescriptions. Many of these order changes occurred without seeing the patient and explaining to the

---

[84] Hospital Patient #10.

patient what the reason for the antibiotic change was. This epitomizes episodic medicine. During the entire sequence, there was no attempt to establish the source of the bacteremia. About five days later, the Levaquin prescription had run out and shortly thereafter, the patient spiked a fever to 102.6°. A doctor re-ordered Levaquin. About a week after the Levaquin ran out, the patient again spiked a fever and was hospitalized; he had bacteremia with Serratia. The catheter tip from the PICC line grew Serratia.

These examples demonstrate that communication errors affecting patient care, poor chronic care, and significant issues in care management on the GACH are resulting in preventable hospitalization.

## Specialty Services/Consultations

**Methodology:** We interviewed staff involved in the review, approval and tracking of specialty services, OIG and other internal reports and reviewed health care records of 20 patients for whom services were requested.

**Findings:** There were delays in timeliness of specialty services in four (20%) of the cases we reviewed. This is in contrast to the findings of the OIG's Cycle 3 Inspection Report where they found that 100% of the specialty visits were timely. The cases we found are summarized below. In terms of primary care provider follow-up, we found that 90% of the patients were seen timely after their specialty care visits. This is slightly better than the 83.3% reported by the OIG.

- The patient is a 57-year-old-man. On 9/3/12, prior to his arrival at Corcoran, he had had surgery at a community hospital for a paraspinal abscess. At that time, he was also diagnosed with osteomyelitis (a bone infection) of his spine. On 9/13/12, he was transferred to the CTC at PVSP for completion of a six-week course of intravenous Vancomycin (an antibiotic commonly used to treat staphylococcal infections). He was readmitted to the community hospital on 9/17/12 for severe abdominal distention. He was discharged back to the PVSP CTC on 9/26/12, with an order for three more weeks of Vancomycin and follow-up in one week. Upon admission to the CTC, the physician noted that the cultures from the abscess had been negative for Methicillin-resistant staphylococcus and that the wound culture had been positive for Serratia (another type of bacteria). Despite this, he continued the Vancomycin. (Vancomycin is not used to treat Serratia.) On 10/1/12, the patient was transferred to the GACH at Corcoran because there was a lack of CTC beds at PVSP. The admitting physician ordered Vancomycin for three more weeks. On 10/16/12, the patient saw a neurosurgeon who noted that the patient stated he was doing well. The neurosurgeon's plan was for follow-up in three months or sooner if necessary.

On 10/17/12, a blood test revealed that the level of Vancomycin was sub-therapeutic. A physician re-ordered the medication at a higher dose for thirty days. On 10/19/12, the level was still low and a physician increased the dose for twenty-one more days. On 11/20/12, a physician ordered a follow-up MRI. The neurosurgeon noted that he would

like the actual films mailed to his office as soon as possible for review so he could
determine if the patient needed further surgery. On 12/13/12, the patient saw a
neurosurgeon who recommended an MRI with and without contrast. On 12/17/12, the
MRI originally ordered on 11/20/12 was done. On 12/28/12, the patient saw the
neurosurgeon who again requested an MRI with contrast. The MRI was done on 1/14/13
and revealed that there had not been any improvement in the patient's condition. On
1/15/13, the GACH physician re-started the Vancomycin and ordered an urgent
infectious disease consult.

An infectious disease consultant saw the patient via telemedicine on 1/25/13. He noted
that another infectious disease consultant had seen the patient on 9/5/12 and had
recommended treatment with Vancomycin for a spinal infection that the physician
thought was most likely staphylococcal in origin. The consultant on 1/25/13 noted,
however, that microbiological data from 9/12/12 indicated the presence of Serratia. He
added, "As you are well aware, Vancomycin has no activity against Serratia." He further
noted that an MRI on 1/4/13 indicated continued evidence of infection with spread to
other areas of the spine. He stated, "My concern is that this patient has not been
appropriately treated since September due to the choice of antibacterial therapy. At this
time, I would strongly recommend discontinuation of Vancomycin and initiation of
ceftriaxone [an antibiotic with activity against Serratia]. Furthermore, I would
recommend neurosurgical consultation as the patient may need further surgical
intervention...".[85]

Assessment
There were problems related to quality and timeliness of care. A CDCR physician did not
adequately review the patient's medical records despite the fact that he was admitted
to the CTC at PVSP on two occasions and had been housed in the GACH at Corcoran
since 10/1/12. In addition, the MRIs ordered on 11/20/12 and 12/13/12 were not done
in a timely manner. They should have been done on an urgent basis given the patient's
history of a serious infection.

- The patient is a 34-year-old man with a history of pulmonary cocci in 2006 that was
  treated with one year of Diflucan. He was admitted to a community hospital on 10/9/12
  for back pain. He was diagnosed with osteomyelitis of the spine and started on
  intravenous antibiotics. The hospital physician obtained a cocci titer that was weakly
  positive at a dilution of 1:4. The physician ordered Diflucan and noted that the patient
  should be on it indefinitely for treatment of cocci. On 10/16/12, the patient was
  transferred back to Corcoran and housed in the GACH for completion of six weeks of
  intravenous antibiotics. The admitting physician at the GACH noted that the patient had
  possible cocci and ordered an infectious disease consult. He also repeated the cocci
  titers and antibody tests. The tests were done, and the interpretation of the results was
  that there was no change from December 2010. On 11/27/12, the patient was

---

[85] Specialty Care Patient #11.

discharged to general population with follow-up ordered in 5-7 days. The patient had not seen an infectious disease consultant. The patient did not have follow-up with a primary care provider until 2/19/13. The provider did not address the question of whether the patient should be taking Diflucan. On 3/22/13, a provider submitted a request for infectious disease consultation stating, "Please enlighten if we need to continue the Diflucan indefinitely?" The infectious disease consultant saw the patient on 4/3/13 and noted that the cocci titer remained low and that there was no clinical evidence of relapse or active infection. He recommended stopping the Diflucan and repeating the titer in one month.[86]

Assessment

There were problems related to quality and timeliness of care. The patient did not receive timely or appropriate follow-up care for his cocci or for his osteomyelitis.

- The patient is a 35-year-old man who had nasal surgery on 7/26/12. He was seen for follow-up on 8/27/12. The surgeon noted that the patient was having some nasal obstruction and that his nose hurt when he moved. He also noted that the patient was complaining of numbness in his teeth and pain when chewing. The surgeon ordered a nasal spray and follow-up in one month. The patient was not seen for follow-up until 10/22/12. The surgeon noted that the patient stated that he was having electrical type shocks or pain in his nose and that he also felt that his two upper teeth were numb since the surgery. The surgeon ordered oral prednisone and follow-up in one month. The patient was not seen by a primary care provider for follow-up of this visit. The patient was not seen by the surgeon again until 1/28/13.[87]

Assessment

There were problems related to timeliness of care. The patient was not seen for follow-up after his appointment with the surgeon and did not have timely follow-up with the surgeon.

- The patient is a 45-year-old man who had an ultrasound for evaluation of a neck mass on 3/4/13. The ultrasound revealed that the mass was probably a lymph node. The patient was referred to an ENT physician for further evaluation. The ENT physician saw the patient on 3/25/13. The ENT physician recommended a biopsy and follow-up after the biopsy. The patient was not seen by a primary care provider for follow-up of this visit. Furthermore, the patient had not had the biopsy or follow-up as of 5/18/13.[88]

Assessment

---

[86] Specialty Care Patient #17
[87] Specialty Care Patient #18
[88] Specialty Care Patient #20

There were problems related to timeliness of care. The patient was not seen by a provider for follow-up of his specialty visit and did not have a timely biopsy or follow-up with the ENT physician.

In addition to issues of timeliness, two of the above cases (the patient who was treated with the wrong antibiotic and the patient who was inappropriately treated with Diflucan) raise concerns about the thoroughness of care by the physicians. The following two cases raise similar concerns.

- The patient is a 54-year-old man who had three positive tests for fecal occult blood and was scheduled for a colonoscopy. He had refused the procedure in January, February and March 2013. There was no documentation that a provider had counseled the patient following any of these refusals.[89]

  Assessment
  There was a problem related to quality of care. Patients need to be counseled when they refuse important clinic visits, specialty consultations, tests or procedures.

- The patient is a 32-year-old man who submitted a health services request on 11/26/12 stating that he had an irregular bump on the side of his testicle. He added that upon self-examination, his testicles seemed asymmetrical. He requested to be tested for testicular cancer. A provider saw him on 12/14/12 and noted that his examination was within normal limits and that there were no masses. He ordered follow-up in 3-5 months. On 3/19/13, the patient submitted another healthcare services request stating that he was having a dull throbbing pain in his pelvic and testicular areas. He added that he was concerned that something was "out of the ordinary down there." The patient saw a provider that day, who noted that his testicle was enlarged and painful. The provider arranged for a urologist to see the patient the next day. The urologist saw the patient on 3/20/13. His assessment was that the patient possibly had testicular cancer and he scheduled the patient for surgery. On 4/15/3 an ultrasound was highly suspicious for neoplasm. On 5/28/13 the patient underwent left orchiectomy; pathology reports show a seminoma, a form of testicular cancer.[90]

  Assessment
  There was a problem related to timeliness and quality of care. There was a significant delay in the evaluation of the patient's testicular cancer.

---

[89] Specialty Care Patient #6.
[90] Specialty Care Patient #16.

## General Acute Care Hospital (GACH) and Outpatient Housing Unit Care (OHU)

**Methodology:** We toured the GACH and OHU, interviewed health care and custody staff, and reviewed tracking logs and 10 patient health records.

**Findings:** Corcoran has both a GACH and an OHU. The GACH and the OHU are located in the same area. The GACH is on A and B units. The A unit has 24 beds separated into three corridors. The B unit has 26 beds separated into three corridors. All three units terminate in a central nursing station. The C unit is a 24-bed mental health unit with the same physical arrangements as the A and B units. The OHU is the D unit which is a 20-bed unit also with three corridors terminating in a central nursing station. The GACH, according to the information provided to us by the medical leadership, "has been providing 'step-down' services for all institutions to reduce Administrative Day costs in community hospitals."[91] As well, the GACH and OHU are used for housing patients who eventually will be sent to the new Stockton facility.

In evaluating patient charts, it appears that the GACH is not being used as an acute general hospital. It functions mostly as a Correctional Treatment Center (CTC). On the day of our visit, the GACH B unit had one empty bed and the A unit was filled. Seven of the 49 patients were on the unit for long-term treatment of disseminated cocci. Six patients had serious open wounds. Most of the patients on all units were chronically ill. Notably, three patients on the unit had recent PICC line infections. The OHU was completely filled. Patients on the OHU were mostly CTC type patients with disabling disorders. Few of these individuals would be able to provide the self-care required of OHU patients. Almost all of these patients will be transferred to the Stockton facility when it opens. Their disabling disorders include dementia, post-stroke, and end stages of various diseases.

Custody staffing on these units is inadequate and prevents medical staff from gaining access to patients as required for their physician ordered care. The lack of access may be one reason why many hospital-acquired infections are occurring.  We were told that there were two officers on the third watch, three officers on the second watch and one officer on the first watch per hospital unit of 24-26 beds. On every watch, there are three RNs and two LVNs per unit.   It is a rule that for any SHU or administrative segregation inmate, there must be two officers present to open the door and monitor the patient during any health care encounter. Staff estimated that 40% of inmates are SHU or administrative segregation. Given the amount of care that has to be provided, this number of officers is not able to provide sufficient staff access to the patients. At any one time, there may be as many as seven medical staff (five nursing, physician, physical therapist) but only two officers.   As a result, necessary care is either delayed or not provided. Nursing leadership reported that they have proposed modifications to the GACH policy similar to those found at CMC, but to date no changes have been made that would increase access to patients.

---

[91]Health Care Services CSP-Corcoran; April 16, 2013 Powerpoint slideshow presented by Corcoran healthcare leadership team.

For example, on the A unit there are four patients with dementia or who otherwise require total care, 12 patients on intravenous antibiotics, and six patients who need serious attention to wounds or feeding. On second watch, there are five nursing staff, a physician and occasionally a physical therapist to care for these patients but only three officers to open the doors. If one of the patients is a SHU or administrative segregation inmate, both officers need to be present during the entire nursing or physician encounter regardless of the physical condition of the patient. In addition to nursing care, inmates are fed and are permitted a shower. Even though this unit is a hospital and patients have intravenous catheters and draining wounds, showers are permitted only twice a week. When showers occur, the officers are occupied in letting the inmates out of their rooms one by one to shower. For meals, officers participate in feeding inmates. Given the time it takes for showers and meals, officer are probably available to nurses about 6.5 hours a day; and, in practice, the availability is less than this since two officers are required to be present with SHU patients. For seven clinical staff this means that each clinical staff can have access to inmates less than three hours a day at best. For this reason, on the day of our visit, most nurses remained in the nursing station, not occupied in patient care activities. Based on our observations, it does not appear that nurses are adequately managing the patients' needs. This is especially problematic for those patients who require total care.

For example, one patient[92] was bedridden from severe late stage Huntington's chorea. He can no longer swallow and is at risk for aspiration. He cannot speak except in guttural tones yet he is documented as occasionally refusing vitals. He is a long time boarder and vitals are ordered three times daily. The need for vitals at this frequency is not clear and is probably unnecessary. The last physician note was a month prior to our visit. One of our monitoring team was on the unit from 11 A.M. until 4 P.M. and did not see a nurse enter his room. The patient needs assistance with his ADLs, including eating and getting to the toilet.  Other than nurse feedings and toilet activity, the patient remains in bed continuously. This patient needs more human contact and should be engaged in some programming rather than having to lie in bed all day because of lack of staff/access.

The lack of access to inmates is evident in the failure of nursing staff to complete physician-ordered assignments. On multiple chart reviews, inmates had physician-ordered vital signs performed only about 40-50% of the time. Vital signs are almost never performed on the first watch when there is only one officer. This lack of performing vital signs is ascribed to patient refusals. These refusals seldom have patient-signed refusals. Refusals also occur for patients with dementia or other disorders which one would expect could not result in a refusal. For an acute care hospital, the degree of refusals of basic nursing tasks is unacceptable. This issue has not been raised in the quality improvement committee. Nursing notes are also not good. For example, patients on Amphotericin infusion may complain of rigors and shaking chills with the infusion or may have signs of phlebitis. When this occurs, these and other symptoms are often treated with medications including steroids. It is recommended that these medications be titrated to the symptoms the patient is having. However, on this unit, patients were given

---

[92] GACH Patient #8.

routine doses of these medications and, in many cases, we were unable to find documentation in the medical records that a nurse asked a patient about symptoms during the infusion. This culture of not engaging the patient may have developed in part as a result of lack of access to patients. This is detrimental to patient care.

Another aspect reflecting poor care on this unit is the management of health care associated infections.  These infections may be related to lack of adequate nursing care, sanitation, and hygiene.  Over the past year the supervising nurse of the GACH and the two infection control nurses have been attempting to institute hospital based infection control practices on the GACH unit.  This has been made difficult because the two infection control nurses assigned to the hospital are public health nurses and have no specific training in hospital infection control. For this reason, they attended a 2 day surveillance reporting course and have been self-training on hospital infection control surveillance reporting so they can be consistent with Centers for Disease Control (CDC) and the National Healthcare Safety Network (NHSN) surveillance criteria.[93] Additionally, there is no central office guidance on hospital-based infection control. The manner of tracking data is not consistent or standardized and there has been no input from physician leadership or an expert in hospital infection control.

As an example, we reviewed a log of positive culture results for the institution provided to us by the infection control nurse.  This log does not indicate if a patient has a reportable healthcare associated infection.  It appears from the log that over a 5½ month period, there have been 13 episodes of either bacteremia or PICC line infection, almost 2.4 a month. These are serious life-threatening infections. However, the log does not classify the infection according to CDC/NHSN criteria; nurses keep this information in a separate folder.  Also the log does not track infections diagnosed presumptively without a culture result.

Summary information on infections, including reportable healthcare associated (nosocomial) infections on the GACH unit is reported in a monthly Infection Control Report which is an official report of the infection control nurses.  This monthly report is submitted to the Medical Subcommittee.  To assess the validity of the report and data on the log we reviewed every positive culture entry on the log for the month of December in comparison with the Infection Control Report for December with an infection control nurse in an extensive interview.   While reviewing the log the nurse told us that 4 blood stream infections (bacteremia) and one soft tissue infection of an arm listed on the log in December were nosocomial.[94]   However, the actual December 2012 Infection Control Report lists only 3 nosocomial infections identified through cultures (there were 3 additional nosocomial infections due to empiric diagnoses).  The number of cultures listed on the log did not correspond to reported nosocomial infections in the Infection Control Report of December 2012.   The supervising nurse and the infection

---

[93] Horan TC, Andrus M, Dudeck MA; CDC/NHSN surveillance definition of health care-associated infection and criteria for specific types of infections in the acute care setting; American Journal of  Infection Control 2008; 36: 309-32

[94] Nosocomial infections is an older term which has been supplanted by the term healthcare associated infections.  Both terms refer to infections that are acquired in a health care setting and as a result of being in the healthcare setting.  The Corcoran Infection Control Reports continue to use the term nosocomial to define these infections.

control nurses admit that infections are not always appropriately classified.  The system of identification, classification and reporting of infections on the unit must be standardized.

Infection control efforts related to infections on the GACH are largely led by the supervising nurse on the GACH and the two infection control nurses but should include physician, environmental custodial staff, custody leadership and medical management input.  There is no evidence of physician, custodial staff, or management involvement in this effort.

Custody staff controls access of nurses to patients and access of environmental custodial staff to patient rooms for cleaning.  In addition, the frequency of showers is not determined by medical staff based on hygiene needs of the patients but is regulated by the availability of officers to transport inmates to the single shower on each unit. Because of the numbers of individuals with infections and draining wounds, it makes sense to increase the opportunities for inmates to be able to wash. The fact that inmates are only permitted to shower twice a week also affects hygiene on the unit. Custodians do not clean inmate rooms except when the inmate goes to the shower, so inmate rooms are not sanitized except twice a week on shower days. This may promote transmission of infection and may be contributing to the number of infections on the unit. The lack of hygiene on the unit is evident in cultures of the ice machine. The ice machine is regularly cultured as part of hospital regulations. Over the 5½ month period of data we were provided, ice machines on one or the other of the hospital wards grew bacteria or yeast on five occasions. When this happens, the machine is decommissioned and cleaned.

These issues of nurses' poor access to patients, of patients' insufficient access to showers, and of custodians' inability to adequately clean inmate rooms demonstrate a degree of custody control of the unit such that hospital functions cannot take place as needed. If custody cannot accommodate the medical needs of the hospital, the hospital should close. We did not get a sense from medical leadership or from Quality Improvement studies that these custody issues on the GACH unit have been communicated to custody. This demonstrates a lack of leadership on the part of the medical program.

Several other examples illustrate the inadequate care on this unit.

One patient[95] on the GACH had hemoptysis for several years at KVSP and ultimately was diagnosed with coccidioidomycosis in April of 2012. It appeared that diagnosis of his coccidioidomycosis was significantly delayed. After diagnosis with coalescing coccidioidomycosis, pulmonary cavities and involvement of his orbital bone, he was transferred to Corcoran's GACH on 5/8/12 for long-term Amphotericin infusions. Staff documented that he refused to have his vital signs taken 45% of the time but he never signed the refusals. During the infusions of Amphotericin, nurses did not document assessment of symptoms related to the Amphotericin infusions. Instead, they gave PRN (as needed) Demerol as a routine medication. Twice this medication was given because of fear of symptoms. Glucocorticoids were also used routinely with Amphotericin without assessment of symptoms. On 7/16/12, he developed

---

[95] GACH Patient #1

bacteremia from a PICC line infection and was admitted to a local hospital. This was a potentially preventable hospitalization. After return to the facility, the pattern of not performing vitals and not assessing for symptoms during infusions continued. As well, physician notes after the patient returned from the hospital were almost all cut and pasted and identical except occasionally for a modified assessment or plan. On 8/27/12, the PICC line was removed because a physician thought that the Amphotericin dose was complete. However, the patient actually needed a few more weeks of Amphotericin. A peripheral IV was started, but the physician continued to document in five subsequent notes the same cut and pasted physical examination stating that the "PICC line is clean dry, intact, no redness, warmth or tenderness." This underscores the lack of attention of the physician to the history and physical examination of the patient which was ongoing during the entire GACH stay of two months.

Another patient[96] developed an abscess at RJD after removal of orthopedic hardware in his leg. He was sent to Corcoran to complete his antibiotics. The patient was on the unit for about a month when the doctor ordered the wound VAC removed. On 6/25/12, the patient was lethargic. Instead of documenting a history and physical examination, the doctor wrote, "pt is lethargic refer to psychiatry." There was no examination. The patient was seen 6/26/12 and 6/27/12, but the notes were brief and did not include an adequate neurologic examination. On 6/29/12, the patient had a critically low white count of 1.9 but was not evaluated. On 6/30/12, which was a Saturday, a nurse documented that the patient was confused and disoriented; no physician referral occurred and the patient was not evaluated. Even though it was a weekend, because this is a hospital, physicians should be available continuously. On 7/1/12, a Sunday, a nurse documented again that the patient was confused and disoriented; again, no physician evaluation occurred. On 7/2/12, the patient spiked a fever to 101.2°. The doctor noted pain in the arm where the PICC line was. The line was removed and blood cultures were drawn. The patient was sent to a hospital where Klebsiella bacteremia was diagnosed.

Upon return from the hospital on 7/23/12, a physician saw the patient but the records from the hospital were not available. The patient was not seen again until 7/29/12. Subsequent physician notes were all copied and pasted and identical, with minor modifications to the plan. At times, these notes did not make sense. On one note 8/27/12, the doctor copied and pasted the words "Denies increase drainage from wound site, pain, redness." Yet in the assessment, the doctor wrote that the skin graft had failed and there was greenish drainage from the wound. These contradictory statements represent extremely poor documentation of clinical care. Also, this patient refused vitals 54% of the time and nursing notes seldom included an evaluation of the wound. Nurses frequently documented that the patient refused evaluation. Neither nurses nor doctors documented a reason for consistent refusals of vital signs or evaluations. Because the doctor's physical examinations were all copied and pasted, all physical examinations were identical for 2½ months. The wound was described identically over this 2½-month period of time and there was almost no nursing documentation of wound assessment. For the patient's entire GACH stay, it was therefore not possible to determine the progress of the wound.

---

[96] GACH Patient #2.

Another patient[97] was transferred from RJ Donovan (RJD) to Corcoran on 10/10/12.   He had had a stroke in 2011. The initial nurse assessment at Corcoran documented expressive and receptive aphasia[98] and documented that RJD staff had recommended audiology and speech therapy. The first chronic visit was scheduled for 10/29/12, almost three weeks after transfer. This visit was subsequently cancelled because of provider reassignment. On 10/26/12, the patient was evaluated by a psychologist who documented a prior assessment performed at RJD on 9/24/12, indicating that the patient had cognitive impairments due to his prior stroke resulting in dementia. A single cell placement was recommended because of victimization concerns. The patient was admitted to the GACH in a mental health bed. Another note documented that the patient was referred due to custody and medical staff saying that he was not eating and showering without prompts. He was described as confused, nonsensical, and unable to identify his age or what year it was. When mental health staff asked the physician to evaluate the patient and include an EKG, the doctor documented that the patient denied any problems and wrote that there was no medical indication for an EKG unless mental health wanted a baseline. He then documented a normal neurological examination and concluded that the patient could return to general population. He gave mental health a list of tests to perform if they wanted a dementia work up. This was an irresponsible way to respond to a professional colleague's request for consultation. The patient remained on the GACH. It was documented that he refused almost all vital signs and assessments even though the patient had expressive, receptive aphasia and may have had dementia. Vital signs were performed three times during the month and on two occasions the blood pressure was elevated but not brought to the attention of a physician. A psychiatrist attempted to get the patient committed to a long-term mental health facility but the request was denied on the basis that the patient belonged in a medical facility.

The patient was ultimately transferred to the medical service on the GACH where speech and receptive aphasia were acknowledged; the doctor documented that the patient was developmentally disabled. The patient was seen several times in December 2012, but all notes were copied and pasted and identical except for different blood pressures. Pulse, respiratory rate and temperature were identical for three consecutive physician notes. Ultimately, the patient was transferred to CSP-SAC. He was diagnosed with severe dementia and was placed in the OHU secondary to "his IQ level." The patient never received brain imaging, nor did he receive occupational or speech therapy. Care for this patient was not professional, respectful or appropriate.

Another patient[99] was on the unit for recurrent coccidioidomycosis and had a PICC line to receive Amphotericin. His vitals were refused about half the time they were to be taken. On 4/8/13, he developed fever. Blood cultures were ordered and levofloxacin and Vancomycin were ordered. Later that day another doctor discontinued the PICC line. Nurses had a difficult time getting a peripheral IV. The line site was changed once because the site was reddened. The patient pulled the line out later that evening. Another line was started in the morning. On

---

[97] GACH  Patient #5.
[98] The inability to communicate and understand.
[99] GACH Patient #6  .

4/11/13, Vancomycin was stopped and oxacillin was started, but there was no documented note by the physician explaining the rationale for the change in antibiotics. Later the same day, the oxacillin was stopped and clindamycin was started; again, there was no documented explanation. The following day, the doctor documented that the patient was refusing an IV so oral clindamycin was being used. The uninformed changes of antibiotics are problematic, as this practice can lead to resistance.

In summary, care on the hospital unit was below the standard of care because the physicians changed antibiotics without documenting a clinical rationale. Custody rules dominate the culture on this unit and medically ordered evaluations are not being carried out. Rates of refusals are significant and appear not to be related to actual patient refusals. Many adverse events (bacteremia) are occurring at rates higher than should be expected. It does not appear that severely disabled patients receive nursing services that are needed. The unit is not sanitized consistent with hospital sanitation. Patients do not have access to showers on a daily basis. Physician documentation utilized a cut and paste method which demonstrated a lack of concordance between documentation and the condition of the patient.  Leadership did not identify these issues as problems and there was no plan of action for any of these items except for a nurse driven list of goals for reducing infections.

Corcoran does have a Quality Improvement Care Team for the GACH that meets twice a month to evaluate various patient care items. However, hygiene, failure to obtain vital signs, lack of access to patients, and PICC line infections were not items of discussion. The GACH Nursing Quality Improvement includes infection control in its areas of concern but for this item, it only monitors hand-washing compliance.  We noted that in April and May 2013 none of the staff were observed to wash their hands prior to patient contact, but despite the frequency of nosocomial infections, this has not been noted as a problem or addressed in infection control or quality improvement meeting minutes.

## Mortality Review

**Methodology:** We reviewed the CCHCS mortality reviews of the 23 deaths and performed record reviews for three patient deaths.

**Findings:** There were 23 deaths in calendar year 2012. The causes of death were mostly related to end-stage disease consistent with the use of the Corcoran GACH and OHU as long-term care placement units. We reviewed care for three deaths. All three of the deaths demonstrated significant problems with the intrasystem transfer process. In none of these deaths did the CCHCS mortality review conclude that there was a problem with the transfer process. Two of these deaths involved failure to inform the receiving institution of the patient's prescribed medication. For one patient, failure to provide that medication probably resulted in his death. In the other patient, failure to provide medication resulted in hospitalization and may have contributed to death. In the third death, the transfer of the patient was ill advised, in our opinion, because care the patient needed was not able to be provided at Corcoran and this may

have contributed to his death. We also note that Corcoran scored 100% for inmate transfers in the OIG Cycle 3 report. The question asked by the OIG for this item is:

> Focuses on inmates pending transfer to determine whether the sending institution documented medication and medical conditions to assist the receiving institution in providing continuity of care.[100]

The sending and receiving institutions failed to accomplish this in all three of these deaths. So while the OIG score was 100%, we found three patient deaths related to defective intrasystem transfers. Also, in these cases we found that the CCHCS mortality reviewers did not include as systemic problems those that involved Central Office, specifically utilization management, which plays a significant role in these transfers. CCHCS utilization management, in attempting to reduce hospital days, will arrange for transfer of inmates from hospitals to any open bed at a higher level of care facility. We have noticed that these transfers often occur with no information being provided to the CDCR facility receiving the patient. The 7371 form is not completely or correctly filled out because the patient is coming from the hospital, not the sending facility, and the sending facility may not know what medications the hospital physician prescribed at the time of discharge. Also, CCHCS utilization management does not ensure that needed specialty care follow-up appointments are arranged but expects the facility to arrange for this. In a number of cases this did not occur and the failure to do so contributed to the deaths of the patients.  We continue to recommend that CCHCS review this process.

One death reviewed was a patient who was housed at Wasco State Prison (WSP).[101]  He had diabetes, three prior cardiac stents, disease in two other coronary arteries, hypertension, hiatal hernia, esophageal strictures requiring dilation, and epilepsy. His diabetes was very poorly managed at WSP. He had five TTA visits and a hospitalization for poorly controlled diabetes before he had his first chronic clinic visit at WSP. The patient had episodes of confusion but had a normal CT scan. The reason for his intermittent confusion was not determined and the patient continued to have episodes of confusion. Ultimately, he was housed on the CTC unit where his diabetes continued to be ineffectively managed. Almost all of his physician notes were cut and pasted and are nearly identical except for some differing lab values. Because of the cut and paste notes, neither the history nor physical examination was meaningful. Because of the episodes of confusion, a neurology consultation was ordered but the neurologist could not identify a reason for the confusion. A referral was made to mental health. While at Wasco, the patient had nearly continuous intermittent nausea and vomiting. An EGD showed a hiatal hernia and chronic reflux with scar tissue at the gastroesophageal (GE) junction sufficient to require dilation.

At WSP, the patient was ultimately cleared for discharge from the CTC to general population but was transferred to Corcoran upon discharge from the CTC.   How this happened is not evident from the record. It appears from the eUHR that the discharging physician documented

---

[100] OIG, California State Prison, COR; Medical Inspection Results Cycle 3, December 2012.
[101] Mortality Review Patient #1.

that the patient was on glargine insulin on his discharge note but he failed to renew the patient's glargine insulin on the prescription medication reconciliation form. When the patient arrived at Corcoran, he was not placed on glargine insulin. Corcoran staff might have identified the problem if they had the WSP CTC record in the eUHR, but these documents are paper and are not scanned until the CTC stay is complete. Since the patient's CTC stay was long, this was an extensive document. The CTC stay was contained in three separate PDF files containing 382 pages. An electronic medical record would have eliminated this error. Also, the problem of intermittent confusion and chronic gastric reflux were not noted when the patient arrived at Corcoran. The discharge note from WSP was not thorough and was based on cut and pasted notes that did not accurately describe the history of the patient's illness or its complicated course. The 7371 transfer note was also poor quality. It was not signed by Corcoran staff. It documented that the patient had an adjustment disorder and needed mental health follow up. It did not mention his significant medical problems. In effect, the providers at Corcoran had very little meaningful information regarding this patient and were not aware of his medical history.

After arrival at Corcoran, the patient was sent to general population. The patient's history of confusion was not noted and it is not clear what his mental status was and how it might have affected his decision-making capacity.   Two days after arrival, the patient was seen in the TTA for chest pain. His oxygen saturation was low (87%). The patient was hospitalized. His blood sugar was very elevated (564 mg/dL). The patient returned to the facility from the hospital in three days. Myocardial infarction had been excluded and the patient was diagnosed with dehydration and elevated blood sugar. Providers at Corcoran did not evaluate his insulin regimen after return from the hospital even though he had just had extremely high blood sugar and dehydration. The patient was returned to general population housing still only on small doses of regular insulin. The day after return from the hospital, a nurse documented a blood sugar of 523 mg/dL. Additional regular insulin was given by a physician phone order. The patient was not referred to a physician. Regular insulin was refused on 10/2/12 and 10/3/12. There was no notification to a physician and there was no evaluation of his mental status. The following day the patient was found unresponsive. He was sent to a hospital where his blood sugar was 1087 mg/dL. The patient died in the intensive care unit the following day. This was a preventable death because, through a mistake, the patient failed to receive his glargine insulin, and he did not receive appropriate care for his diabetes at Corcoran.

The mortality review identified multiple clinical care issues including sending him to the wrong level of housing and nurses not referring the patient to a provider after refusing insulin. However, they did not identify that the glargine insulin was not renewed. They did not identify the problems with the intrasystem transfer process which permitted an unstable patient to be transferred and which resulted in the patient arriving on the wrong insulin dose and without medical information. They did not identify the failure of Corcoran staff to review the insulin orders after the patient was hospitalized with an extremely high blood sugar. They determined that this death was not preventable. We believe it was preventable. Problems we identified include a defective paper record system which may have resulted in this patient's death, a defective intrasystem transfer process which does not ensure continuity of medications, failure

to reassess the patient appropriately after his first hospitalization at Corcoran and failure to address refusals of insulin appropriately. There were also many problems with clinical care at WSP.

The second patient[102] had end-stage cirrhosis from hepatitis C, hypertension, coronary artery disease and knee prosthesis. His prosthetic knee became infected while he was housed at California Treatment Facility (CTF). This was treated at UCSF by operative debridement only. Typically, knee joints that become infected are removed and replaced either immediately or during a later surgery. In this case, we can only assume that this was not done because the patient was an extremely poor surgical candidate and might not have survived an extensive surgery. Despite having a complicated disease at end-stage and a serious infection, the patient was transferred to the Corcoran GACH, presumably by utilization management. Identification of a follow-up orthopedic consultant was not identified or arranged for prior to transfer.

The patient arrived at Corcoran on 4/25/12.  On 5/7/12, he was transferred to a hospital for exacerbation of his knee infection. Of note, on 5/5/12 and 5/6/12, which were a Saturday and Sunday, a physician on the GACH at Corcoran did not see the patient. At the local area hospital, a physician was noted to say that the patient should be sent back to the hospital where he was operated on. The patient was returned to Corcoran on 5/11/12, and the next day was sent to another local hospital because of the knee infection. He remained hospitalized for two days. An acute gastrointestinal bleed was treated but, according to the mortality review, the infected knee apparently was not addressed. The patient returned to Corcoran on 5/14/12. An appointment with UCSF was secured, but on 5/18/12, when the patient's appointment was scheduled, a custody van was not operable and custody failed to transport the patient. An ambulance was not called. The patient's condition did not improve. Between 5/21/12 and 5/25/12, the patient's renal function deteriorated but the physicians did not document the progressive doubling of the creatinine level from 1.5 on 5/21/12 to 3.3 on 5/25/12.  On 5/25/12 and 5/26/12, a provider did not examine the patient. On 5/27/12, the patient was confused and his Lactulose was increased. The following day, the patient was sent to a local hospital where he died with a diagnosis of septic shock.

We agree with most of the problems the CCHCS mortality review identified. Notably, they did cite a physician on 5/25/12 for having signed off on the creatinine of 3.3 but taking no action. They also cited the physician on 5/27/12 for not more aggressively managing a confused patient with deteriorating renal function. The mortality review did address the lack of transportation to a critical appointment but did not make suggestions. This is a serious issue and it is not clear how this problem will be followed up.

The mortality review did not address failure of physicians to examine the patient on the GACH on several occasions between 4/25/12 and 5/28/12. The lack of physician evaluation on the GACH is something we identified earlier in this report as possibly caused by a lack of access to patients on this unit.   Most importantly, the mortality review did not identify how the

---

[102] Mortality Review Patient #2.

utilization process allowed this very ill patient to be sent to a facility without having secured the necessary follow-up consultation. Apparently, it is assumed that because of existing contracts, utilization is able to move patients to any facility where they have a contract and specialists will see the patient. In fact, this may not always be the prudent approach and this case demonstrates that. Transfer of clinically ill patients should include high-level physician review and acceptance by a consultant physician before the transfer. We believe this patient should have remained at CTF or a facility nearby so that appointments could have continued at UCSF. This calls for clinical expertise but it is not clear whether utilization decisions are made by higher-level clinicians.

The third mortality chart reviewed[103] involved a patient who was at Avenal State Prison (ASP) when he suffered a stroke. He was admitted directly to the ICU at Delano Regional Medical Center. During the hospitalization, the patient became hypotensive and was placed on a ventilator. He spent nine days in the ICU. A tracheostomy was necessary but was eventually removed. The patient needed speech therapy intervention to help him swallow. He was able to take small amounts of food by mouth but continued to have a PEG tube for feeding. The patient was discovered to have severe cardiomyopathy and had atrial flutter with a 3:1 block alternating with atrial fibrillation. On 9/21/11, the patient was transferred to a long-term care facility where he remained for almost four months until 1/13/12. The doctor at the long-term care facility wrote that he was told to discharge the patient and he talked to a doctor at ASP about arrangements for taking the patient back to the prison. Apparently, this was arranged by utilization management. The patient's prognosis was listed as guarded. The patient had seven major diagnoses and was on 16 different medications.

Instead of returning to ASP, the patient was sent to Corcoran. The 7371 transfer summary from ASP included only his pre-hospital diagnoses, which were four months old. Also, the 7371 mentioned that the receiving facility should check the Delano Hospital medication list. However, no list accompanied the patient to the facility.

Upon arrival, the admitting physician had no information on this patient and in his admission note he wrote:

> "A 63-year-old man who suffered a right-sided stroke in September 2011. Apparently, he was found unconscious, from what I can tell. He was taken to Delano Regional Medical Center where he was treated. I am handicapped by not having a History and Physical, a discharge summary, and I have not spoken to the attending physician. The attending physician was supposed to call me, but did not. I do have some notes and I have a whole bunch of medications, but I am not sure what he is taking…. On the record, they said he has congestive cardiomyopathy, however, there is no evidence of that and I do not see anything from his electronic unit health record (eUHR) when he was at a previous prison. He does have diabetes. He has been on Lantus. I do not have a

---

[103] Mortality Review Patient #3.

hemoglobin A1C. He has had a below the knee amputation of his right leg he says in the past from diabetes."

Importantly, the diagnosis of cardiomyopathy was documented in a different note by a physician as history "of cardiomyopathy without evidence." The patient was on 16 different medications at the long-term care facility but was only started on four medications upon arrival at Corcoran. The dose of warfarin at the long-term care facility was 1 mg of warfarin on Friday, Sunday and Wednesday and 2 mg of warfarin on Monday, Saturday and Thursday. This totals 9 mg a week or approximately 1.3 mg a day on average. Significantly, over the next two weeks no one from Corcoran's clinical staff attempted to contact the long-care facility to obtain the patient's medical information. As a result, the patient remained off his medication for heart failure. The dosages of his anticoagulant were incorrect also. These errors had clinical ramifications. The patient did not maintain a consistent therapeutic level of anticoagulation. More importantly, his heart failure was not treated and within two weeks the patient was in heart failure and needed to be hospitalized. This hospitalization was not mentioned as preventable by the mortality review.

At the long-term care hospital, they had established the status of his heart failure, but when the patient was re-hospitalized after coming to Corcoran, the hospital repeated many of the tests including cardiac catheterization, exposing the patient to unnecessary testing that put him at risk. The patient also received an implanted pacemaker. The patient was placed back on many of the medications he should have been on when he first came to Corcoran two weeks earlier.

Upon return to Corcoran, the patient had normal blood pressure. He returned on a Thursday night about 10:30 in the evening. Notably, the patient was started on 3 mg of warfarin upon return from the hospital, which was a 50% higher dose than the patient had needed to be therapeutic at the long-term care facility. Inexplicably, a physician at Corcoran increased the dose to 5 mg a day, which was 2 ½ times the dose the patient required for a therapeutic level at the long-term care facility. The doctor who did this did not document a reason, although he did note that the INR at the hospital was 1.7, which is sub-therapeutic. Additionally, the hospital re-started many of the medications that the patient had been on at the long-term care facility. Providers did not consider the effects these other drugs might have on the warfarin the patient was using for anticoagulation. One of the drugs, Amiodarone, carries a warning to use caution when initiating Amiodarone in patients on warfarin because cases of increased INR with or without bleeding have occurred in patients treated with warfarin. It calls for monitoring the INR closely after initiating Amiodarone in patients on warfarin. At the long-term care facility, the patient was on Amiodarone and his dose of warfarin was less than half the 5 mg dose he was on at Corcoran. Additionally, other drugs the patient was on including aspirin and omeprazole may also increase the INR or bleeding tendency in patients on warfarin. Thus, the patient was on three medications known to increase the anticoagulation effect of warfarin and he had his dose doubled from a dose known to produce a therapeutic INR at the long-term care facility.

On Saturday, two days after his return from the hospital, the patient's blood pressure was extremely low (BP=64/22 mmHg) and his urine output was extremely low. Without ordering

any laboratory testing to assess his hydration status, the doctor concluded, "this is probably end of life event. Death is imminent." Nothing was done for the patient. Even though the patient had signed a POLST that he did not want extreme measures performed, he did want ordinary medical care and the doctor did not even attempt to determine whether the patient would have improved with simple intravenous fluid. Nothing further was done, and the next day, the patient was in shock with a blood pressure of 55 systolic and no diastolic blood pressure. The staff could not start an intravenous catheter and the patient was transferred to the hospital. This patient should have had a more thorough evaluation as to why he was hypotensive.

At the hospital, the patient was discovered to have extremely low hemoglobin. It had been 14.1 at Corcoran on 2/3/12, but was 7.2 at the hospital. The patient was discovered to have had a massive retroperitoneal bleed. The initial INR at the hospital was 3.1 but it is not clear what it might have been when the bleed started and it was uncertain when the INR was taken relative to medication administration. Medication administration records were not in the eUHR. Warfarin was stopped and fresh frozen plasma was started. The patient died the following day of septic shock.

The initial and final mortality review found no departures from the standard of care by medical providers. The review identified that the patient's directives for end of life care resulted in unnecessary hospitalization. However, the POLST on record signed on 2/2/12 indicated that the patient wanted limited additional interventions. Included in this category was medical treatment, antibiotics, IV fluid, and non-invasive airway pressure. It indicates general avoidance of intensive care units. However, there were many medical interventions, including simple intravenous fluids, that may have helped this patient when he was initially hypotensive, (BP=64/22 mmHg). The mortality review did not mention the lack of transfer of the records to Corcoran, the failure to provide the patient with continuous critical medication from the nursing home, or the preventable hospitalization for heart failure.  It was also not critical of cessation of care when the patient's blood pressure was 64/22 mmHg. These were all serious problems that should have been recognized. The mortality review recognized no systemic problems. We found significant problems with the intrasystem transfer process, failure to obtain necessary medical information from outside providers, failure to provide continuity of medication, failure to intervene appropriately for a distressed patient and failure to evaluate potential drug-drug interactions for a critical medication. Most serious of these problems, in our opinion, is the intrasystem transfer process which, if performed well, might have prevented this patient's death.

## Internal Monitoring and Quality Improvement Activities

**Methodology:** We reviewed the Corcoran OIG report, facility Primary Care Assessment Tool, Performance Improvement Work Plan (PIWP), and internal monitoring and quality improvement meeting minutes for the past four months.

**Findings:**  We find that although many meetings related to internal monitoring and quality improvement activities are occurring, they are lacking in focused problem identification,

developing a plan to study and identify root causes, and then developing and implementing strategies to correct root causes.  After the corrective strategy has been implemented, the problem should be reevaluated to see if it has been corrected.

We reviewed Quality Improvement Meeting Minutes from 1/28/13 to 5/20/13. The minutes contain health care utilization data, but there is no discussion as to its significance. Many topics are briefly noted, but documentation of discussion is limited.  If issues noted in QM meeting minutes were effectively described and addressed in subcommittee reports, it would at least provide documentation to support processes intended to improve services, but this is not the case.

As an example, infection control reports list nosocomial, or healthcare associated infections that occur in the GACH but there is no discussion of possible causes and how the infections can be reduced. We note with concern that staff hand washing observation studies in April and May 2013 showed that no staff was observed to wash their hands prior to patient contact, yet there is no discussion of these findings in infection control reports or Quality Management Meeting Minutes.

Review of Emergency Medical Response Review Committee Meeting minutes from 11/1/12 to 2/14/13 showed minimal documentation related to urgent events with no meaningful discussion of whether there are systemic issues to be addressed.  The minutes are so scant that it is difficult to tell what transpired during EMRRC meetings.

Review of Pharmacy and Therapeutics Committee Meeting minutes from November 2011 to January 2013 showed that at several meetings key members whose attendance is required are absent.[104] Meeting minutes reflect data regarding pharmacy utilization but lack analysis and discussion intended to improve pharmacy services. Discussion of reported medication errors is limited to the type of error but does not include any root cause analysis or discussion of how these errors occurred or, more importantly, how they can be prevented in the future. There is no acknowledgment of sanitation issues or underreporting of medication errors.

In February 2011, a nurse was assigned to perform Medication Administration Process Improvement Plan (MAPIP) studies. According to nursing leadership, over a period of months the results of these studies were 100%. In March 2012, the PLO conducted a site visit and noted that their review of chronic disease medication management did not correlate with the high scores.  We discussed this with nursing leadership, who reported that they performed a validation study of the nurse's work and found that she did not maintain any supporting documentation for the studies performed. When they attempted to replicate the study, it was determined that many of the patients included in the study were not eligible and in some cases

---

[104] For example, at the March 2012 P & T meeting, only four of ten required committee members were present. The meeting minutes were not approved until 10/23/12. In June 2012, only five of ten required committee members were present. Meeting minutes were approved on 9/6/12. In September 2012, six of ten required committee members were present. These minutes were approved on 1/8/13.  In January 2013, most required members attended. The minutes were approved on 5/23/13.

never resided at the facility or had been released. In June 2012, the nurse was removed from this responsibility, and nursing leadership now monitors MAPIP studies more closely.

# Recommendations

**Organizational Structure, Facility Leadership and Custody Functions**

1. CCHCS should assist Corcoran management in attempting to better organize its services.
2. CCHCS should meet with CDCR to address custody practices at this facility when these practices prevent appropriate medical care from being delivered.  This effort should begin at the facility through the QMC but should escalate to a higher level if custody practices continue to prevent appropriate medical care.

**Human Resources: Staffing and Facility Mission Hiring and Firing, Job Descriptions**

1. As with other facilities, disciplinary procedures should be expedited.
2. The Chief Physician and Surgeon must engage in meaningful review of the clinical work of physicians.  This should be clarified in a duty statement which is reviewed with the Chief Physician and Surgeon.  Performance should be reviewed annually.
3. The process of hiring nurses should include a check of prior probations and sanctions by the nursing board prior to hiring.
4. Bylaws of the GACH should be revised so that they are consistent with the 2008 Court Order on physician competency and its related policies.  If this is not possible due to Title 22 regulations, this issue should be brought to the Receiver's office for a resolution.

**Operations: Budget, Equipment, Space, Supplies, Scheduling, Sanitation, Health Records, Laboratory, Radiology**

1. Budgets should be based on actual need and should be actively managed.
2. Supply chain processes should be standardized and streamlined.
3. The use of the current warehouses should be re-evaluated. Under no circumstances should medical supplies be exposed to dirt, dust and debris.
4. The GACH inmate rooms should be sanitized daily.
5. Clinical areas sanitized by inmate porters should be cleaned in a standardized manner acceptable for health care facilities.
6. Equipment inventory should be standardized and maintained so management knows where equipment is located and is knowledgeable regarding maintenance of the equipment.
7. Work orders should be tracked so that management knows when work orders are completed.
8. Tracking of laboratory tests should be standardized.

**Reception and Intrasystem Transfer**

1. CCHCS should review and revise the intrasystem transfer policy to incorporate improved coordination and clinical oversight of transfers of complex CDCR patients from outside hospitals to CDCR higher levels of care; reevaluate criteria for medical holds or require provider review of high acuity patients to promote patient safety for patients being transferred; and require provider evaluation of high-risk patients within 7 to 14 days.

---

2. Utilization management should ensure that, prior to transfer of complex high-acuity patients between higher levels of care, specialty care services or other necessary medical care can be provided timely upon transfer of the patient.

3. Nurses should refer medically complex patients to a provider and document the time frames for provider referral on the 7277. There should be a mechanism to ensure that the time frames are met.

4. Medical providers should thoroughly review all intrasystem transfer patients' records with particular attention to outside hospitalization and diagnostic test reports, status of implementation of consultant recommendations, abnormal labs requiring monitoring, and control of chronic diseases management.

5. Sending and receiving institutions should coordinate continuity of critical medications with particular focus on insulin, anticoagulation, HIV and TB medications.

**Access to Care:  Nursing Sick Call**

1. Health care leadership should conduct studies and root cause analysis regarding reasons for uncompleted health care appointments and develop targeted strategies to address root causes. Studies should focus on root causes of real and alleged patient refusals of health care appointments.

2. Nurses should triage all 7362 forms, including requests for dental and mental health treatment, and document name, credentials and date and time of triage. If the triage is urgent, the nurse should either see the patient or definitively arrange for the respective service to see the patient.

3. Nurses should see patients with symptoms within policy time frames in an adequately equipped and supplied examination room with auditory privacy. This particularly applies to restricted housing units where nursing assessments were generally inadequate.

4. Nurses should improve the quality of assessments by performing adequate review of systems related to a specific complaint and a pertinent physical assessment.  Corcoran nursing leadership should provide ongoing feedback to nurses to improve their performance.

5. Nurses should refrain from "piggybacking" referrals onto future provider appointments unless there is communication with the provider so the patient's concerns are addressed.

**Chronic Disease Management**

1. Corcoran health care leadership should perform studies and a root cause analysis to identify the reasons for the lack of timely and appropriate chronic care.

2. The CME and/or the Chief Physician and Surgeon should provide more clinical oversight for the medical staff regarding patients with chronic illnesses.

3. Corcoran health care leadership should perform a quality improvement study to determine the reasons for the high rates of refusal of care. This may require assistance from Central Office staff.

**Pharmacy and Medication Administration**

1. Health care leadership should ensure that a strict schedule of sanitation and disinfection activities is implemented in the pharmacy.
3. Pharmacy should explore ways to ensure that prescription baggy containers can either be securely closed or consider other forms of packaging.
4. In general population housing units, nurses should administer medications from a centralized window using the MAR and administer medications from pharmacy dispensed, properly labeled containers. Nurses should document administration of medications at the time they are administered and, after each medication pass, document the status of medication doses that were not administered.
5. Custody should provide escorts to nurses administering medications based upon an established schedule. Particular attention should be focused on patients with time-sensitive medications such as diabetics taking insulin.
6. Health care leadership should conduct studies and root cause analysis of medication errors (e.g., missed medication doses, failure to document) to understand and address systemic versus individual performance issues.
7. Health care leadership should ensure that Medication Administration Records are scanned into the eUHR in a timely manner.

**Specialty Consultations**

1. Corcoran health care leadership should identify and address the issues related to lack of timely specialty care.
2. The CME and/or the Chief Physician and Surgeon should provide more clinical oversight for the medical staff regarding specialty care.

**Specialized Medical Housing: OHU/CTC/GACH**

1. CCHCS should re-evaluate the need for having a GACH at Corcoran. It is not functioning as a GACH and seriously ill patients might be better cared for at local hospitals.  The Corcoran GACH would be best converted to a CTC.  All the following recommendations would remain whether this facility had a GACH or a CTC.
2. Corcoran health care leadership should ensure that patients on the GACH have access to physician-ordered care. Adequate custody staff needs to be assigned to the unit so that health care staff can perform their assignments. To increase health care staff access to patients, establish GACH/OHU custody staffing based on a ratio of 1 custody staff for every 1.5 clinical staff. This can be modified during night shift. Another alternative, which is done in other systems, is to allow nursing staff to have keys to the rooms.
3. Corcoran health care leadership should work with custody to ensure that patients in the GACH are permitted to shower daily or as frequently as ordered by physicians.
4. Corcoran health care leadership should establish a special Quality Improvement Team (QIT) to improve the quality and timeliness of care on the GACH. The review should include investigation and root cause analysis of episodes of bacteremia and other nosocomial infections, failure to implement of physician orders and nursing care plans, and inmate refusals of medical and nursing care, as well as any other issues noted by staff.

5. Corcoran medical providers should review patient records thoroughly and request retrieval of relevant clinical information from hospitals or prior CDCR facilities to enable the provider to provide appropriate medical care.

6. Corcoran health care leadership should ensure that acutely ill patients on the GACH are examined daily and that these examinations are documented in the medical record.

7. Medical leadership at Corcoran and CCHCS central office should confer to develop a strategy to address the inaction of the Organized Medical Staff in providing medical oversight on the GACH.   If it conforms to Title 22 regulation, it would be our recommendation that the Chief Physician and Surgeon should take responsibility for clinical care on the GACH. This would include development of policy and procedure, providing medical leadership on the unit, review of adverse events on this unit and planning for corrective action when problems are identified. Corcoran or CCHCS health care leadership needs to assess whether the current Chief Physician and Surgeon is capable of performing in this role.

8. CCHCS should ensure that infection control practices and sanitation standards on the Corcoran GACH are consistent with hospital based infection control practices and sanitation standards.

**Mortality Review**

1. The CCHCS mortality review process should include identification of systemic issues that may contribute to adverse patient outcomes.

2. Corcoran health care leadership should review as sentinel events all deaths or hospitalizations that occur within a month of an intrasystem transfer.

3. CCHCS should review the intrasystem transfer policy and procedure in light of the three deaths at Corcoran in which issues in the intrasystem transfer process were noted.

**Internal Monitoring and Quality Improvement**

1. Health care leadership should seek to have internal monitoring and quality improvement activities that are more meaningful in content, address actual problems, and are driven by data and root cause analysis.  Minutes should adequately reflect these activities.

Exhibit X



## California jails: "Solitary confinement can amount to cruel punishment, even torture" – UN rights expert

GENEVA (23 August 2013) – The United Nations Special Rapporteur on torture, Juan E. Méndez, today urged the United States Government to abolish the use of prolonged or indefinite solitary confinement. There are approximately 80,000 prisoners in the United States of America who are subjected to solitary confinement, nearly 12,000 are in isolation in the state of California.

"Even if solitary confinement is applied for short periods of time, it often causes mental and physical suffering or humiliation, amounting to cruel, inhuman or degrading treatment or punishment, and if the resulting pain or sufferings are severe, solitary confinement even amounts to torture," Mr. Méndez stressed as nearly 200 inmates in Californian detention centres approach their fifth consecutive week on hunger strike against cruel, inhuman and degrading prison conditions.

"I urge the US Government to adopt concrete measures to eliminate the use of prolonged or indefinite solitary confinement under all circumstances," he said, "including an absolute ban of solitary confinement of any duration for juveniles, persons with psychosocial disabilities or other disabilities or health conditions, pregnant women, women with infants and breastfeeding mothers as well as those serving a life sentence and prisoners on death row."

The independent investigator on torture and other cruel, inhuman or degrading treatment or punishment urged the US authorities to ensure that "solitary confinement is only imposed, if at all, in very exceptional circumstances, as a last resort, for as short a time as possible and with established safeguards in place." In Mr. Méndez's view, "its application must be subject to independent review, and inmates must undergo strict medical supervision."

Since 8 July 2013, thousands of prisoners detained in nine separate prisons across the state of California have gone on hunger strike to peacefully protest the cruel, inhuman and degrading prison conditions. The inmates are demanding a change in the state's excessive use of solitary confinement as a disciplinary measure, and the subjugation of prisoners to solitary confinement for prolonged periods of time by prison authorities under the California Department of Corrections and Rehabilitation.

In California's maximum security prison in Pelican Bay more than 400 prisoners have been held in solitary confinement for over a decade, and the average time a prisoner spends in solitary confinement is 7.5 years. "I am extremely worried about those numbers and in particular about the approximately 4,000 prisoners in California who are held in Security Housing Units for indefinite periods or periods of many years, often decades," Mr. Méndez said.

In many cases inmates are isolated in 8-foot-by-12 foot (2.5 x 3.5 m. Approx.) cells and lack minimum ventilation and natural light. The prisoners are forced to remain in their cells for 22 to 23 hours per day, and they are allowed only one hour of exercise alone in a cement lot where they do not necessarily have any contact with other inmates.

In the context of reported reprisals against inmates on hunger strike and a District Judge's approval of Californian authorities' request to engage to force-feed prisoners under certain circumstances, the UN Special Rapporteur also reminded the authorities that "it is not acceptable to use threats of forced feeding or other types of physical or psychological coercion against individuals who have opted for the extreme recourse of a hunger strike."

Mr. Méndez addressed the issue of solitary confinement in the US, including prison regimes in California, in his 2011 report* to the UN General Assembly and in numerous communications to the Government. He has also repeatedly requested an invitation to carry out a visit to the country, including State prisons in California, but so far has not received a positive answer.

"My request coincides with some prominent voices in the United States, including the first-ever congressional hearing chaired by Senator Durbin on 19 June 2012; the decision to close Tamms Maximum Security Correctional Center by the State of Illinois on 4 January 2013 and numerous editorials by prominent columnists in major papers addressing the excessive use of solitary confinement across the country," Mr. Méndez said.

Case 2:90-cv-00520-KJM-SCR   Document 4765   Filed 08/23/13   Page 412 of 412

commending states since country's ratification and…

"It is about time to provide the opportunity for an *in situ* assessment of the conditions in US prisons and detention facilities," the UN Special Rapporteur underscored.

Juan E. Méndez (Argentina) was appointed by the UN Human Rights Council as the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment on 1 November 2010. He is independent from any government and serves in his individual capacity. Mr. Méndez has dedicated his legal career to the defense of human rights, and has a long and distinguished record of advocacy throughout the Americas. He is currently a Professor of Law at the American University – Washington College of Law and Co-Chair of the Human Rights Institute of the International Bar Association. Mr. Méndez has previously served as the President of the International Center for Transitional Justice (ICTJ) until 2009, and was the UN Secretary-General Special Advisor on the Prevention of Genocide from 2004 to 2007, as well as an advisor on crime prevention to the Prosecutor, International Criminal Court, between 2009 and 2010. Learn more, log on to:
http://www.ohchr.org/EN/Issues/Torture/SRTorture/Pages/SRTortureIndex.aspx

(*) Check the 2011 report on solitary confinement: http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement or http://ap.ohchr.org/documents/dpage_e.aspx?m=103

UN Human Rights Country Page – United States of America:
http://www.ohchr.org/EN/Countries/ENACARegion/Pages/USIndex.aspx

For more information and media requests, please contact Ms. Sonia Cronin (+41 22 917 91 60 / scronin@ohchr.org) or Ms. Stephanie Selg (+1 202 274 4378 / ssleg@ohchr.org) or write to sr-torture@ohchr.org.

For **media inquiries** related to other UN independent experts:
Xabier Celaya, UN Human Rights – Media Unit (+ 41 22 917 9383 / xcelaya@ohchr.org)

**UN Human Rights, follow us on social media:**
**Facebook:** https://www.facebook.com/unitednationshumanrights
**Twitter:** http://twitter.com/UNrightswire
**Google+** gplus.to/unitednationshumanrights
**YouTube:** http://www.youtube.com/UNOHCHR
**Storify:** http://storify.com/UNrightswire

**Watch "The Riddle":** http://www.youtube.com/embed/sYFNfW1-sM8?rel=0