1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4
5
6
7
8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
10 RANJINI ACHARYA – 290877
   K&L GATES LLP
11 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
12 Telephone:    (415) 882-8200

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

13 Attorneys for Plaintiffs

14

15                UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN, et al.,          Case No. Civ S 90-0520 LKK-JFM

19            Plaintiffs,          **PLAINTIFFS' REPLY IN SUPPORT
                                   OF MOTION FOR ENFORCEMENT
20        v.                       OF COURT ORDERS AND
                                   AFFIRMATIVE RELIEF RELATED
21 EDMUND G. BROWN, JR., et al.,   TO USE OF FORCE AND
                                   DISCIPLINARY MEASURES**
22            Defendants.
                                   Judge:   Hon. Lawrence K. Karlton
23                                 Date:    September 26, 2013
                                   Time:    10:00 a.m.
24                                 Crtrm:   4

25

26

27

28

[917342-1]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................................................. iii

INTRODUCTION ................................................................................................. 1

ARGUMENT ................................................................................................. 4

I.    UNDER THE APPLICABLE LEGAL STANDARD, THE EVIDENCE ESTABLISHES THAT DEFENDANTS CONTINUE TO VIOLATE PLAINTIFFS' RIGHTS BY USING FORCE AGAINST COLEMAN CLASS MEMBERS WITHOUT REGARD FOR MENTAL ILLNESS .................. 4

    A.    Deliberate Indifference is the Relevant Legal Standard for Assessing Defendants' Ongoing Violations With Respect to Use of Force Against Prisoners with Mental Illness ................................................. 4

    B.    The Evidence Plaintiffs Have Presented and Will Present at the Hearing Establishes that Defendants Continue to Be Deliberately Indifferent to Use of Force Against *Coleman* Class Members Without Penological Justification or Necessity and Without Regard for Effects on Mental Health ................................................. 7

II.    DEFENDANTS' CURRENT POLICIES AND PROCEDURES ARE INADEQUATE TO PREVENT AND REMEDIATE HARM RESULTING FROM MISUSE OF FORCE AGAINST PRISONERS WITH MENTAL ILLNESS ................................................................................................. 12

    A.    Internal Institution Use of Force Critique System ......................................... 13

    B.    Office of Internal Affairs Investigations ....................................................... 13

    C.    Monitoring by Office of the Inspector General.............................................. 16

    D.    Affirmative Orders by this Court are Necessary to Remediate Unconstitutional Use of Force Against *Coleman* Class Members ................ 17

III.    THE EVIDENCE ESTABLISHES THAT DEFENDANTS' DISCIPLINARY POLICIES, PROCEDURES, AND PRACTICES CONTINUE TO VIOLATE PLAINTIFFS' RIGHTS BY INAPPROPRIATELY PUNISHING PRISONERS FOR BEHAVIOR RESULTING FROM MENTAL ILLNESS ................................................. 19

    A.    Defendants' Formal Disciplinary Procedures Violate Class Members' Rights ................................................................................................. 20

    B.    Defendants' Use of "Management Status" as an Unregulated Disciplinary Procedure is Dangerous and Abusive ...................................... 22

CONCLUSION ................................................................................................. 22

[917342-1]

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

*Biselli v. Cnty. of Ventura*,
  2012 U.S. Dist. LEXIS 79326 (C.D. Cal. June 4, 2012) ................................... 20, 21

*Brown v. Plata*,
  131 S. Ct. 1910 (2011) .................................................................................... 3

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995) ................................................... passim

*Earl Old Person v. Brown*,
  312 F.3d 1036 (9th Cir. 2002) ........................................................... 6

*Hudson v. McMillan*,
  503 U.S. 1 (1992) ............................................................................. 6

*Jeffries v. Wood*,
  114 F.3d 1484 (9th Cir. 1997) ........................................................... 6

*Jordan v. Gardner*,
  986 F.2d 1521 (9th Cir. 1993) ........................................................... 5

*Madrid*
  (Case No. C 90-3094 TEH N.D. Cal.) ............................................... 17, 18

*Olmstead v. L.C. ex rel Zimring*,
  527 U.S. 581 (1999) ...................................................................... 20, 21

*Redman v. Cnty. of San Diego*,
  942 F.2d 1435 (9th Cir. 1991) ........................................................... 5

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010) ........................................................ 5

*U.S. v. Alexander*.
  106 F.3d 874 (9th Cir. 1997) ........................................................... 6

*Watison v. Carter*,
  668 F.3d 1108 (9th Cir. 2012) ........................................................ 4

*Wilkins v. Gaddy*,
  559 U.S. 34 (2010) ......................................................................... 6

## RULES

Fed. R. Evid. 801(d)(2)(C) & (D) .......................................................... 12

[917342-1]

ii

**TABLE OF ABBREVIATIONS**

| ADA | Americans with Disabilities Act |
|------|------|
| CDCR | California Department of Corrections and Rehabilitation |
| DOM | Department Operations Manual |
| OC | Oleoresin Capsicum |
| OIA | Office of Internal Affairs |
| OIG | Office of the Inspector General |
| RVR | Rules Violation Report |

[917342-1]

# INTRODUCTION

Defendants are so entrenched in their custodial mindset with respect to prisoners with mental illness that they have opposed Plaintiffs' motion for relief regarding use of force and disciplinary practices wearing blinders to the legal, procedural, and factual posture of this case, almost twenty years into the remedial phase.  Despite obtaining specific recommendations for reforms from their own expert, Defendants continue to use unnecessary and dangerous force and discipline against *Coleman* class members.  Defendants' expert Steve Martin called CDCR's punitive approach to prisoners with serious mental illness—in which CDCR persistently places prisoners with mental illness in highly restricted settings such as administrative segregation with a lack of programmatic support—a "worst-case perfect storm for the administration of a prison system" that "generates three things:  serious discipline infractions, applications of force, and further extended terms of admin[istrative] seg[regation]."  Declaration of Lori Rifkin in Support of Pls.' Reply ("Rifkin Decl.") ¶ 2 & Ex. A (July 23, 2013 Deposition of Steven Martin) (hereinafter "Martin Depo.") at 117:14-120:23.  Within this "perfect storm," CDCR equips—in Martin's words, "corrupts"—its custody officers with an arsenal that both Plaintiffs' and Defendants' experts agree is unmatched by any other prison system in the country, and authorizes use of these weapons without adequate policies, training, or oversight.  *See* Martin Depo. at 138:7-22; *id.* at 129:9-131:4 ("It's just old axiom, you know, that if you build them, they will come….  You just don't need them [large canisters of OC[1] spray] there.  There's no reason for them to be even on the scene … we saw a whole tray [of chemical dispersant agents], unprecedented in my experience."); *id.* at 139:3-140:5 ("[W]hen I came out here and I saw how they were equipped … I saw the expandable baton and I saw [the chemical agent] and I saw two grenades.  I immediately said 'Whoa.' … They had more [chemical agent] in that control station than most prisons

---

[1] Oleoresin Capsicum

1

1    have for their entire prison."); *id.* at 143:8-14; *id.* at 202:15-203:11; *id.* at 99:11-100:11.

2    Uncontrolled, unmonitored, and essentially unsupervised local practices such as

3    "management status" make things worse yet for mentally ill prisoners.

4          Defendants attempt to justify systemic abuse of force against prisoners with mental

5    illness by relying on a legal standard this Court explicitly considered and rejected as

6    inapplicable in this very case—an analysis Defendants cast aside in a single inaccurate

7    footnote in their Opposition.  Opp. at 15, n.3.[2]  The correct legal standard—which was, and

8    still is, deliberate indifference—goes to the heart of the issue:  Defendants use force and

9    impose discipline against class members without regard to whether behavior was related to

10   mental illness, or whether the force or discipline will negatively impact mental health.

11   Two decades after the Court's decision in this case, Defendants' actions are the epitome of

12   deliberate indifference.  Their existing use of force and disciplinary policies, procedures,

13   and practices still do not effectively include consideration of mental illness.  In fact,

14   Defendants' use of force review system does not analyze whether use of force was

15   reasonable in a particular situation; rather, it is premised entirely on whether custodial

16   action violated CDCR policy.  As a result, to the extent CDCR policy permits

17   unreasonable, unnecessary, or excessive use of force against class members—which it

18   does—the matter at hand will never be redressed within Defendants' existing system.

19   Defendants' flawed policies with respect to prisoners with mental illness thus make

20   remediation of this element of the continuing constitutional violation impossible absent

21   further affirmative relief from the Court.

22

23   [2] Defendants claim that the Court applied the deliberate indifference standard "because

24   Defendants did not present the malicious and sadistic standard to the magistrate judge."
     Opp. at 15, n.3 (internal quotations and alteration omitted).  While this Court noted that

25   Defendants did not present that argument to the magistrate judge, the Court proceeded to
     explicitly analyze which legal standard should apply to the use of force claim in this

26   systemic conditions case.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1321-23 (E.D. Cal.

27   1995).

28

[917342-1]

2
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    Defendants also maintain that the findings the Magistrate Judge and this Court

2    made with respect to use of force and discipline at the time this case was tried are

3    irrelevant: "[n]one of this dated information is relevant to conditions existing today."

4    Opp. at 2:25-26; *see also id.* at 30:2.  In point of fact, those findings formed one of the

5    bases on which this Court found Defendants to be systemically violating Plaintiffs'

6    constitutional right to be free from cruel and unusual punishment—a constitutional

7    violation this Court found just months ago to be ongoing.  *See* 912 F. Supp. at 1320

8    (finding "substantial evidence in the record of seriously mentally ill inmates being treated

9    with punitive measures by the custody staff to control the inmates' behavior without regard

10   to the cause of the behavior, the efficacy of such measures, or the impact of those measures

11   on the inmates' mental illnesses."); April 5, 2013 Order at 23:8-11 ("The Eighth

12   Amendment violation in this action is defendants' 'severe and unlawful mistreatment' of

13   prisoners with 'serious mental disorders,' through 'grossly inadequate provision of …

14   mental health care.'") (citing *Brown v. Plata*, 131 S. Ct. 1910, 1922-23 (2011); *id.* at 67:3-

15   7 (finding prospective relief remains necessary "to correct current and ongoing violations

16   in the delivery of adequate mental health care to plaintiff class members").  The original

17   findings and decision in this action established that, in evaluating force and discipline

18   imposed against members of the *Coleman* class, it *matters* whether a prisoner is acting out

19   as a result of mental illness, and consideration must be given to the impact that force or

20   discipline will have on the prisoner's mental health.  But in nearly twenty years,

21   Defendants have not yet been willing to incorporate these findings into their correctional

22   approach to prisoners with mental illness.

23       It is precisely because Defendants have so significantly misapprehended or ignored

24   the Court's findings that the scope and misuse of punitive measures against *Coleman* class

25   members remains substantially unresolved.  Indeed, Defendants have shown that they will

26   not act to implement needed reforms absent a clear and direct order form this Court.  One

27   of the most troubling examples of why such specific guidance is necessary is provided by

28   Defendants' current contention that a pattern or practice of excessive use of force against

[917342-1]

1   class members cannot exist because Defendants allege there is no widespread evidence of

2   physical injury. *See* Opp. at 17:18-20; Martin Decl., Doc. 4706, at ¶ 13 ("Moreover, what

3   is starkly and objectively absent … is any pattern of serious injuries normally associated

4   with those systems and institutions found to have engaged in a pattern and practice of

5   excessive and unnecessary staff use of force."); Martin Depo. at 53:7-55:21 ("All said and

6   done, there were no injuries of note in those seven incidents.  That's not to say there

7   wasn't some pain from a chemical agent because there certainly was.  But physical impact

8   injuries, none that I saw.…  Here we may have an excessive use of chemical agent but

9   does that equate and translate to a finding of excessive force?").  Defendants entirely

10  ignore this Court's prior rebuke for discounting psychological harms inflicted on prisoners

11  with mental illness:  "there is nothing of record suggesting a penological justification for

12  the distinction between inflicting physical as contrasted with mental injury."  912 F. Supp.

13  at 1323; *see also id.* at 1322 n.58 ("This policy suggests that the administration is drawing

14  some unaccountable distinction between mental patients being subjected to physical as

15  contrasted with psychological injury."); *accord Watison v. Carter*, 668 F.3d 1108, 1112

16  (9th Cir. 2012).  Defendants have demonstrated that unless this Court issues further orders,

17  they will not recognize nor remediate the harm they continue to inflict on class members

18  through their use of force and disciplinary policies.

19                              **ARGUMENT**

20  **I.    UNDER THE APPLICABLE LEGAL STANDARD, THE EVIDENCE**
    **ESTABLISHES THAT DEFENDANTS CONTINUE TO VIOLATE**
21  **PLAINTIFFS' RIGHTS BY USING FORCE AGAINST COLEMAN CLASS**
    **MEMBERS WITHOUT REGARD FOR MENTAL ILLNESS**
22

23          **A.    Deliberate Indifference is the Relevant Legal Standard for Assessing**
                 **Defendants' Ongoing Violations With Respect to Use of Force Against**
24               **Prisoners with Mental Illness**

25          Ignoring the Court's prior ruling in this case, Defendants argue that the legal

26  standard applicable to Plaintiffs' claim concerning use of force is not deliberate

27  indifference, but whether force is used "maliciously and sadistically to cause harm."  Opp.

28  at 14-16.  This Court analyzed and rejected the same argument when Defendants raised it

1  nearly two decades ago.  912 F. Supp. at 1321 ("Defendants first argue that the use of

2  tasers and 37mm guns against members of the plaintiff class must be analyzed under the

3  standard applicable to excessive force claims under the Eighth Amendment, i.e., whether

4  these weapons are used maliciously and sadistically for the purpose of causing harm, and

5  not under the deliberate indifference standard.").  Recognizing that "[t]he gravamen of

6  plaintiffs' claim here is that they suffer from medical conditions which are exacerbated by

7  use of the weapons at issue, and that defendants' policy permitting use of these measures

8  against class members constitutes deliberate indifference to their serious mental disorders,"

9  the Court "conclude[d] that the deliberate indifference standard" applied to Plaintiffs' use

10  of force claims.  *Id.* at 1322-23.

11      Deliberate indifference continues to be the correct legal standard applicable to

12  Plaintiffs' claim of systemic mistreatment of prisoners with mental illness, and this Court's

13  1995 decision remains good law today.  *See Jordan v. Gardner*, 986 F.2d 1521, 1527-28

14  (9th Cir. 1993) (discussing application of deliberate indifference standard versus malicious

15  standard in context of considered policy that causes harm indefinitely versus one-time

16  exercise of judgment by officer on one occasion)*; see also Redman v. Cnty. of San Diego*,

17  942 F.2d 1435, 1442 (9th Cir. 1991) (explaining Ninth Circuit analysis of deliberate versus

18  malicious indifference standard); *cf. Thomas v. Bryant*, 614 F.3d 1288, 1306 (11th Cir.

19  2010) ("unsurprising" that the district court concluded the deliberate indifference standard

20  applied to case challenging "considered policy" regarding use of force on inmates with

21  mental illness rather than "heightened standard applicable to decisions made in haste")

22  (internal quotations and citations omitted).  Despite Defendants' characterization of this

23  Court's determination as outdated ("Plaintiffs rely on this Court's application of the

24  deliberate indifference standard to use-of-force claims back in 1995"), all but one of the

25  cases Defendants cite on this issue were decided prior this Court's 1995

26  / / /

27  / / /

28  / / /

[917342-1]

5

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  decision, and were considered by the Court.[3]  *See* 912 F. Supp. at 1321-23 (discussing

2  cases cited by Defendants including *Whitley v. Albers*, *LeMaire v. Maas*, *Jordan v.*

3  *Gardner*, and distinguishing between claims arising out of uses of force in exigent

4  circumstances to maintain order and conditions of confinement claims involving policies

5  developed over time that cause unnecessary suffering).

6      None of the cases Defendants now cite undermine this Court's determination of the

7  legal standard; nor have Defendants made any showing that the law of the case doctrine

8  does not apply, given that this legal issue was already decided in this matter.  *See Earl Old*

9  *Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002) ("Under the 'law of the case'

10  doctrine, a court is ordinarily precluded from reexamining an issue previously decided by

11  the same court, or a higher court, in the same case."); *U.S. v. Alexander*, 106 F.3d 874, 876

12  (9th Cir. 1997) (court generally precluded from reconsidering issue decided in same case,

13  unless the first decision was clearly erroneous; an intervening change in the law has

14  occurred; the evidence on remand is substantially different; other changed circumstances

15  exist; or a manifest injustice would otherwise result); *Jeffries v. Wood*, 114 F.3d 1484,

16  1489 (9th Cir. 1997) (law of case doctrine "founded upon the sound public policy that

17  litigation must come to an end.  An appellate court cannot efficiently perform its duty to

18  provide expeditious justice to all if a question once considered and decided by it were to be

19  litigated anew in the same case upon any and every subsequent appeal.  This doctrine also

20  serves to maintain consistency.") (internal quotation marks and citations omitted).

21      By policy and practice, Defendants continue to systemically act with deliberate

22  indifference to Plaintiffs' mental health needs by using weapons "on inmates with serious

23  mental disorders without regard to the impact of those weapons on their psychiatric

24  condition, and without penological justification."  912 F. Supp. at 1323.  This conclusion is

25

26

27  [3] Defendants reference the more recent case, *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010), only for its internal citation to *Hudson v. McMillan*, 503 U.S. 1 (1992).

28

[917342-1]

6

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    no more "outdated" than the Eighth Amendment itself.

2    **B.    The Evidence Plaintiffs Have Presented and Will Present at the Hearing**
         **Establishes that Defendants Continue to Be Deliberately Indifferent to**
3        **Use of Force Against *Coleman* Class Members Without Penological**
         **Justification or Necessity and Without Regard for Effects on Mental**
4        **Health**

5        Plaintiffs tendered extensive evidence establishing Defendants' unreasonable and

6    excessive use of force against *Coleman* class members without regard to consideration of

7    mental illness.  This includes, *inter alia*, use of crowd-control sized OC canisters and OC

8    grenades against decompensated class members locked in housing cells in both

9    "immediate" and "controlled" use of force situations, the offensive use of expandable

10   batons against prisoners with mental illness, and uses of force against class members

11   housed in crisis beds and hospital units.  Mot. at 9-17; 27-30.  Plaintiffs also demonstrated

12   that Defendants continue to use force in a manner that disproportionately harms prisoners

13   with mental illness.[4]  *Id.*  Moreover, because Defendants now maintain, despite this Court's

14   _____

15   [4] Defendants' attacks on Plaintiffs' use of data reported to the Special Master regarding
     uses of force involving mentally ill inmates serve to further demonstrate the deficiency of
16   Defendants' own monitoring of these issues.  For example, Defendants state, "[t]o
     determine the actual number of inmates with mental illness that were the subject of force,
17   Plaintiffs would need to review each use-of-force incident."  Opp. at 19:15-16.  In other
     words, Defendants themselves acknowledge that they do not accurately or regularly track
18   uses of force against *Coleman* class members, despite the Court's finding of a
     constitutional violation.  Rifkin Decl. ¶ 3 & Ex. B (August 15, 2013 Deposition of Michael
19   Stainer) (hereinafter "Stainer Depo.") at 177:23-178:1.  Similarly, in response to Plaintiffs'
     analysis showing disproportionate use of discipline against *Coleman* class members,
20   Defendants state that "Mr. Vail acknowledged that the statistics cited by Plaintiffs were not
     obtained by CDCR, but were prepared by Plaintiffs' attorneys."  Opp. at 30:25-27.  Again,
21   this highlights Defendants' own failure to monitor or account for the issue of
22   disproportionate discipline against prisoners with mental illness, despite the violation
     found by the Court, and its status as an unresolved issue in this case.  To the extent
23   Defendants now seek to provide different numbers for RVRs and uses of force involving
     *Coleman* class members at a limited sample of prisons in their Opposition through the
24   Allison Declaration, these numbers differ substantially from those reported to the Special
     Master for the same time period.  Moreover, Defendants' new data is not credible or
25   admissible as Ms. Allison was unable to explain during her deposition on what basis or
26   through what process the data was obtained or modified.  Rifkin Decl. ¶ 4 & Ex. C
     (footnote continued)
27

28

[917342-1]

1   previous ruling, that only a pattern of physical harm can establish a systemic practice of

2   excessive force, Plaintiffs proffer the expert report of Dr. Edward Kaufman herewith to

3   explain the serious psychological harms caused by using inappropriate force on individuals

4   with mental illness in various states of decompensation, which this Court has found to be

5   constitutionally cognizable.  *See* Declaration of Edward Kaufman, M.D., in Support of

6   Pls.' Reply ("Kaufman Decl.") ¶¶ 7-21.[5]

7        Defendants' protestations against Plaintiffs' evidence are premised mainly on two

8   theories.  Defendants' first theory is that Plaintiffs do not present evidence that staff use

9   force maliciously and sadistically for the purpose of causing harm.  As discussed above,

10  that is the wrong legal standard.  Plaintiffs do not need to establish evidence of individual

11  officers' mindset in using force against inmates in this type of systemic deliberate

12  indifference case where Defendants have been on notice of the violation for decades.

13       Defendants' second theory is that as long as they can demonstrate that CDCR staff

14  acted in accordance with policy in applying force, there is no constitutional violation.  *See,*

15  *e.g.*, Opp. at 22:8-11.  This misses the point:  Plaintiffs filed this motion for affirmative

16  relief precisely *because* Defendants' policies allow for unconstitutional force against

17  prisoners with mental illness.  Although the State did enact specific policies following the

18  original *Coleman* findings to address misuse of weapons against mentally ill prisoners,

19  those policies proscribe only the precise impact munitions weapons in use at the time of

20  trial rather than addressing the underlying problem of excessive use of weaponry and force

21  _____

22  (August 15, 2013 Deposition of Kathleen Allison) at 262:6-263:19.

23  [5] Plaintiffs do not concede that Defendants' use of unnecessary and excessive force is not
    causing class members physical harm (*See, e.g.*, Declaration of Eldon Vail in Support of
24  Pls.' Motion, Doc. 4638-1, ¶¶ 14 & 37; Reply Declaration of Eldon Vail in Support of
    Pls.' Reply, filed herewith ("Vail Reply Decl.") ¶ 14 ), but, rather, emphasize that
25  constitutionally cognizable harm is not limited to physical injury.  Mr. Martin has
    acknowledged that he is not an expert in the evaluation of the relationship of mental
26  illness, use of force, and delivery of adequate mental health treatment.  Martin Depo. at
    64:5-23 &118:10-25.
27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  generally against individuals with mental illness.  *See* DOM § 51020.14.1.  For example,

2  as Plaintiffs describe in their motion, CDCR has exchanged those weapons (37mm guns

3  and tasers) for others (crowd-control sized OC spray, OC grenades, and expandable

4  batons) that State policies do not sufficiently regulate with regard to prisoners with mental

5  illness.  Moreover, CDCR policy still permits the extreme overuse of "immediate" uses of

6  force and does not restrict these immediate uses of force against inmates with mental

7  illness.  Therefore, *Coleman* class members are still widely subjected to unrestricted uses

8  of force, which do not require even a putative clinical intervention, and are subjected to

9  virtually no scrutiny.  *See* Martin Depo. at 80:8-81:24 ("I absolutely agree that any incident

10  that can be managed in a controlled, calculated way, not only should but I think you're

11  required to."); *id.* at 82:6-83:14 (important to closely regulate immediate uses of force, in

12  part, because controlled uses of force have a video record).

13          Defendants nonetheless claim that "CDCR's use-of-force policy requires staff to

14  consider mental health issues before using force" and "the policy requires consultation and

15  a written recommendation from health care staff prior to the use of chemical agents against

16  any inmate in the Enhance Outpatient Program or Psychiatric Services Unit."  Opp. at

17  17:23-24; *id.*at 18:12-14.  These assertions are misleading.  Even were these policies to

18  result in meaningful consideration of mental illness (which they presently do not), the

19  policies apply only to "controlled" uses of force, not to "immediate" force.  *See* Mot. at

20  32:24-26.  Immediate uses of force comprise the vast majority of uses of force by CDCR.

21  Consistent with previous observations by the Special Master, and the conclusions of

22  Plaintiffs' experts in 2007 and, again, today, even Defendants' own expert acknowledged a

23  problem with immediate use of force "across the board" in CDCR institutions.  Martin

24  Depo. at 203:24-204:9.  Systemic acceptance of unreasonable use of immediate force

25  against prisoners with mental illness is exemplified by CDCR policy authorizing

26  immediate application of OC spray whenever a prisoner refuses to "relinquish control" of

27  the food port in his or her cell.  Examples of such uses of force against prisoners with

28  mental illness are manifest, and, as Defendants' declarants acknowledged, they are

9

[917342-1]

1   authorized by CDCR policy, and therefore are never investigated as misuse of force under

2   CDCR's current system.  *See* Rifkin Decl. ¶ 5 & Ex. D (August 14, 2013 Deposition of

3   John Day) (hereinafter "Day Depo.") at 184:17-185:6 & 188:6-13; Rifkin Decl. ¶ 6 &

4   Ex. E (July 11 & 16, 2013 Deposition of Robert Barton) (hereinafter "Barton Depo.") at

5   391:16-392:15.

6        Defendants continue to refuse to implement policy changes that would ameliorate

7   excessive and unnecessary uses of force against prisoners with mental illness.  In 2012,

8   while Defendants were preparing their termination motion, Steve Martin, the expert hired

9   by the State to review use of force, recommended several revisions to Defendants'

10  policies.  *See* Declaration of Lori Rifkin in Support of Pls.' Motion, Doc. 4638-2, Ex. 1.

11  Mr. Martin provided these recommendations to top-level administrators, and repeatedly

12  discussed systemic problems concerning use of force personally with Secretary Beard.

13  Martin Depo. at 49:7-11, 78:6-79:10, 98:21-100:11, 162:11-165:8.  Yet, Defendants chose

14  not to implement any of Mr. Martin's recommendations related to use of force.  *Id.*  For

15  example, despite Mr. Martin's serious concern about CDCR's regular use of large

16  quantities of OC spray (*see, e.g.*, Martin Depo. at 61:18-64:4, 99:13-100:11, 129:9-132:1,

17  167:15-168:2), CDCR rejected his recommendation to regulate the quantity of OC spray

18  that may be used, determining that "controlled use of force situations are very dynamic and

19  it's very difficult to provide any hard and fast rules as to what you can and cannot do

20  because you have to be able to be flexible … And so I think the policy is appropriate.  I

21  really do."  Stainer Depo. at 101:14-102:10.  CDCR even refused to implement a

22  procedure to track the amount of OC spray used in any given incident by weighing OC

23  canisters before and after use, concluding "we just couldn't figure out how we could do

24  that operationally without adding to the walk time."  *Id.* at 111:21-113:8.  CDCR decided

25  that these measures would simply be too hard to implement without even asking the expert

26  they themselves retained for information about how it could be done, or examining any

27  other correctional system that has managed to implement such a procedure.  *Id.*

28       Beyond these arguments, to the extent Defendants take issue with specific examples

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

[917342-1]

1  described by Plaintiffs and Plaintiffs' expert (*see* Opp. at 22-23), these factual

2  determinations are best resolved during the evidentiary hearing.  While Defendants

3  recently contended that there are no material factual disputes relating to Plaintiffs' motion

4  for relief regarding use of force and disciplinary measures, this conjecture appears

5  premised on the contention that Plaintiffs have not provided any evidence of problems

6  with use of force against prisoners with mental illness.[6]  Defendants apparently believe that

7  if they merely assert that Plaintiffs' and Plaintiffs' expert's findings are untrue, then those

8  findings no longer exist.  Although Defendants and their expert make misguided attacks on

9  Plaintiffs' expert's methodology by castigating him for not reviewing documents that

10  Defendants did not previously produce, Plaintiffs' expert reviewed all use of force and

11  disciplinary materials Defendants provided in response to Plaintiffs' requests at each

12  institution inspected during the termination motion proceedings, and all of the materials

13  Defendants provided in response to Plaintiffs' request for Mr. Martin's notes.[7]  Vail Reply

_____

[6] The only other way Plaintiffs can understand Defendants' claim that there are no material factual disputes is to assume that because Plaintiffs' and Defendants' respective experts agree as to many of the problems with California's use of force and disciplinary system (*see, e.g.*, Martin Depo. at 53:8-19, 56:23-57:1, 61:18-64:4, 130:19-132:1) and as to many of the remedies for these problems, Defendants no longer dispute the ongoing constitutional violation, and will instead stipulate to the fact of systemic unnecessary and excessive force and inappropriate discipline against class members.  Alternatively, given Defendants' reliance on the wrong legal standard and their consequent misplaced focus on whether or not Plaintiffs demonstrated a pattern or practice of malicious or sadistic use of force, the Court may conclude that Defendants have not rebutted Plaintiffs' establishment of the prima facie need for the relief requested.

[7] Defendants' gratuitous attack on Mr. Vail at pages 11-12 of the Opposition is improper. Defendants did not challenge Mr. Vail's qualifications or methodology in a *Daubert* motion during termination proceedings.  It is Defendants' expert—not Plaintiffs'—whose report was stricken during those proceedings.  Plaintiffs' expert relied upon his own independent observations and review of materials produced by Defendants, as well as his decades of experience in corrections and corrections administration, to form his conclusions.  Vail Reply Decl. ¶¶ 2-6.  Moreover, to Plaintiffs' knowledge, Defendants did not avail themselves of the opportunity this Court afforded them to establish an untainted basis for their expert's opinion by conducting new inspections.  *See* August 1, 2013 Order (footnote continued)

[917342-1]

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

Decl. ¶ 2.  Plaintiffs' expert's opinions and recommendations regarding systemic use of force and discipline against *Coleman* class members are reinforced by the additional information he reviewed after being afforded the same access to documents as Defendants' expert.  *Id.* ¶¶ 7-12 & 15.

## II.  DEFENDANTS' CURRENT POLICIES AND PROCEDURES ARE INADEQUATE TO PREVENT AND REMEDIATE HARM RESULTING FROM MISUSE OF FORCE AGAINST PRISONERS WITH MENTAL ILLNESS

Defendants focus the bulk of their Opposition on the State's current review process for use of force incidents.  They assert that this review process is sufficient, despite the conclusions of Plaintiffs' expert, Defendants' expert, and the Inspector General that the review process is generally inadequate and ineffective.  However, here again, Defendants' focus misses the mark.  None of these review systems identify or address the relevant question for the *Coleman* class:  was the use of force against a prisoner with serious mental illness without penological justification or necessity, and without regard to the prisoner's mental health?  In fact, none of the review systems Defendants describe consider or even track the mental health status of the prisoner against whom force is used, or the frequency or type of force used against prisoners with mental illness  (Stainer Depo. at 177:23-179:24; Day Depo. at 167:8-22 & 226:19-227:9; Barton Depo. at 341:14-20  & 404:15-19).

---

at 3, n.3; Rifkin Decl. ¶ 7.  As a result, Defendants' expert's report remains stricken, and his subsequent declaration derived from the same improper conduct must also be stricken.  *See* August 1, 2013 Order at 3:10-11.  To the extent Defendants attack Plaintiffs' expert for not conducting the identical year-and-a-half review as Defendants' expert, this criticism is not only specious; it is yet another product of Defendants' unethical behavior in connection with their termination motion. *See* April 5, 2013 Order at 20-22.  Finally, Defendants may not use their improper conduct and the Court's consequent decision to strike Mr. Martin's expert report as a shield against Plaintiffs' use of admissions by Mr. Martin as evidence in support of this motion.  Fed. R. Evid. 801(d)(2)(C) & (D).

1  **A.    Internal Institution Use of Force Critique System**

2        Defendants characterize CDCR's use of force "critique system" within each prison

3  as "multi-tiered and comprehensive," and their declarants describe the various levels of

4  review at length.[8]  Ultimately, however, this review process has very limited relevance to

5  the harms identified in Plaintiffs' motion.  The internal institution review focuses solely on

6  whether officers' actions were in accordance with CDCR policy.  *See* Stainer Depo. at

7  30:13-36:23 & 53:5-14; *see also* Day Depo. at 114:4-16.  There is no inquiry as to whether

8  the use of force was appropriate or reasonable outside of the specific requirements of

9  CDCR policy, and no inquiry into whether the use of force was appropriate or reasonable

10  given the prisoner's mental illness.  *Id.*  Rather, the only analysis conducted relevant to

11  mental illness is that, per CDCR policy, if a use of force was a "controlled" and took place

12  in an EOP, MHCB, or PSU housing unit, the incident report must indicate that a clinical

13  intervention was nominally attempted.  There is no assessment of whether this clinical

14  intervention was meaningful, or merely a brief, pro-forma interaction with the inmate.  No

15  input from mental health clinicians is required or solicited during use of force reviews, and

16  CDCR's Acting Director for the Division of Adult Institutions repeatedly explained that

17  consideration of an inmate's mental health is not relevant to this critique.  Stainer Depo. at

18  30:13-36:23 & 52:9-53:21.  Nor does CDCR engage in any systemwide monitoring of use

19  of force against prisoners with mental illness, despite the longstanding violations identified

20  in this litigation.  Stainer Depo. at 141:6-19, 186:8-187:5, 187:15-19.

21  **B.    Office of Internal Affairs Investigations**

22        The Office of Internal Affairs ("OIA") conducts CDCR's formal investigations into

23  _____

24  [8] Plaintiffs note that Mr. Day, who is currently the Chief of Headquarters Operation at
Internal Affairs, has no personal knowledge to establish a foundation for testifying about
25  the current internal institution use of force review process because he has not participated
in this process since approximately 2007.  Day Depo. at 151:22-152:16 & 154:22-156:15.
26  As stated in Plaintiffs' Evidentiary Objections, filed herewith, Plaintiffs move to strike
paragraphs 5-10 of Mr. Day's declaration for lack of foundation.
27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    employee misconduct, and Defendants cite these investigations as another safeguard

2    obviating the need for Plaintiffs' requested relief.  However, OIA investigates only those

3    allegations of staff misconduct that are referred to it by a hiring authority (for CDCR

4    prisons, generally the warden).  The hiring authority's decision whether to refer an

5    allegation to OIA for investigation is completely discretionary, with the exception of

6    mandatory referrals for deadly use of force, which is narrowly defined.  Day Depo. at

7    95:25-98:12, 102:16-25, 111:7-21.

8        An allegation of staff misconduct can consist only of an allegation that an officer

9    violated CDCR policy—in other words, if there is no violation of policy, no allegation of

10   misconduct can exist, and, thus, OIA does not investigate.  Day Depo. at 162:6-22 &

11   235:10-236:8.  Indeed, OIA rejects referrals that do not specifically identify a policy

12   violation.  Id. at 195:16-24.  Thus, for example, in the current CDCR system, there can

13   never be referral of a force-related incident to OIA for investigation based on the amount

14   of chemical agent used for a cell extraction because CDCR policy does not address or limit

15   the amount of chemical agent that can be used, regardless of whether a prisoner is mentally

16   ill.  Id. at 194:18-24 & 196:12-197:5.  Similarly, there can never be a referral for use of a

17   chemical agent against an inmate for blocking a food port because CDCR policy

18   authorizes the use of chemical agents in an immediate use of force whenever an inmate

19   refuses to "relinquish control" of a food port.  Id. at 184:17-185:6.

20       OIA's investigatory process consists solely of gathering information; OIA does not

21   make any findings about the allegations, does not recommend findings, does not impose

22   corrective action, and does not recommend corrective action.  Day Depo. at 138:4-19 &

23   222:25-223:9.  Rather, after OIA completes its fact-finding, it sends the incident back to

24   the warden.  The warden then has sole discretion to make a finding as to whether

25   misconduct occurred, and to decide what, if any, corrective action will be taken.[9]

26

27   [9] Defendants' claim in their Opposition that OIA "investigated 57 of the referred
     (footnote continued)

28

[917342-1]

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    The numbers Defendants cite in their Opposition regarding outcomes of OIA

2 referrals or investigations regarding use of force-related incidents are misleading:  they do

3 not reflect whether any officers were actually disciplined or terminated for actions related

4 to use of force.  Day Depo. at 129:4-130:6; 142:10-15 & 145:17-24.  Nor do they reflect

5 any information about incidents specific to use of force against *Coleman* class members.

6 *Id.* at 167:23-168:4.  CDCR's Director of the Division of Adult Institutions testified that he

7 is not aware of any instance in which a warden has taken corrective action against an

8 employee regarding the use of force against mentally ill prisoners.  Stainer Depo. at

9 187:20-23.  OIA does not monitor referrals of use of force-related incidents by the hiring

10 authority to ensure appropriate referrals are being made, nor does OIA review or track use

11 of force incidents that wardens do not refer for investigation.  Day Depo. at 125:15-126:13.

12 Ultimately, the effectiveness of OIA's investigatory process is undercut by the fact that

13 OIA can investigate only those incidents referred by wardens at their own discretion, and

14 then sends incidents back to those same wardens to make findings and determine

15 discipline.  It is a system set up to insulate staff from discipline rather than protect

16 prisoners from abuse.  *See* Martin Depo. at 95:5-17.

17    As with the internal institution use of force review process, OIA's screening and

18 investigative function does not include analysis of whether a use of force was reasonable

19 given a prisoner's mental illness, or whether a prisoner's mental health status was

20 appropriately take into consideration prior to or during the use of force.  Day Depo. at

21 160:21-161:7 & 169:8-22.  OIA does not require that information about a prisoner's

22 mental health status be included in the referral packet from the hiring authority; nor does

23 OIA track mental health status of prisoners against whom force was used, or the rate at

24 _____

25 cases…and sustained allegations of misconduct in 31 cases, including 9 cases which
26 resulted in termination," (Opp. at 7:12-13) is inaccurate because OIA does not make
   findings about allegations of misconduct.  Day Depo. at 130:12-17, 138:4-19, 222:25-
27 223:9.

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

[917342-1]

1   which force is used against prisoners with mental illness.  Day Depo. at 166:1-5, 167:8-

2   168:4, 226:19-227:9, 228:7-9.  Even in the limited circumstances when CDCR policy

3   specifically requires that a use of force event incorporate an attempted intervention by a

4   mental health clinician, OIA does not evaluate whether the effort was meaningful, but,

5   rather, just whether it technically occurred.  Day Depo. at 182:21-183:5.  *See also*

6   Kaufman Decl. ¶ 18 (interventions "appear to be formalistic interactions"); Martin Depo.

7   at 40:14-41:5 ("I haven't seen too many instances where that's a genuine effort.  Again

8   that's this mechanical cooling off period and clinical intervention and so forth.").

9           **C.      Monitoring by Office of the Inspector General**

10          While the Office of the Inspector General ("OIG") provides oversight of CDCR's

11  use of force review and investigative process, the OIG's monitoring is also largely

12  irrelevant to the issues in this motion.  OIG has identified the basic failure of custody

13  officers to appropriately and accurately report the force used, as well as failures along the

14  entire chain of supervisory review to adequately ensure accurate and complete use of force

15  reporting.  Pls.' Mot. at 31 n.14 & 37:22-28.  Such failures are significant because they

16  indicate that the existing use of force review systems cannot be relied upon.  Therefore,

17  merely incorporating an element of tracking of mental health status of the inmate into the

18  existing review mechanisms will not suffice to effectively prevent and correct misuse of

19  force against *Coleman* class members.  *See* Martin Depo. at 104:4-106:19 ("[F]ailure to

20  report is absolutely the most serious event in a use of force system … you have got to

21  enforce that one first and foremost … Because you can't address something that you don't

22  know about.").

23          Beyond these observations, the OIG's monitoring process of CDCR use of force is

24  not useful for evaluating whether force is being systemically misused in CDCR:  even

25  Defendants' expert concluded that OIG engages mainly in a "box-checking" exercise to

26  see if Defendants are technically complying with their own policies.  There is no analysis

27  of whether those policies are effective to prevent, detect, and correct the use of

28  unreasonable force.  *See* Martin Depo. at 101:13-24 (What the OIG presented in the reports

[917342-1]

1    "is virtually worthless.  It has no utility at all.")

2    As with the internal institution use of force critique, and the OIA investigatory

3    process, the OIG monitoring process does not examine issues specifically related to use of

4    force against prisoners with mental illness.  The Inspector General acknowledged that OIG

5    has never considered whether there is a practice of unreasonable use of force against

6    prisoners with mental illness in CDCR, and it is not within the current expertise of OIG.

7    *See* Barton Depo. at 361:5-362:5, 419:9-12; 421:14-19, 515:16-21.

8
9    **D.    Affirmative Orders by this Court are Necessary to Remediate Unconstitutional Use of Force Against *Coleman* Class Members**

10   The fact that Defendants' current review systems do not prevent or remedy the use

11   of unnecessary and inappropriate force against *Coleman* class members is further

12   evidenced by the lack of corrective action taken by Defendants when excessive force is

13   used against persons with mental illness.  Defendants complain that Plaintiffs' expert

14   focuses on a few isolated examples, but these are representative of the incidents for which

15   information was furnished to Plaintiffs during the inspections connected with Defendants'

16   termination motion.  *See* Vail Reply Decl. ¶¶ 2, 7, 13.  Defendants have not provided any

17   evidence that corrective action was taken as a result of any of these incidents.  In fact,

18   Defendants continue to defend the uses of force in these examples and argue that the force

19   used was within policy and therefore appropriate, even though this position is contradicted

20   by their own expert.  (Martin Depo. at 53:7-19, 56:23-57:1, 61:18-64:4, 130:19-132:1).

21   Moreover, as both Plaintiffs' and Defendants' experts have noted, the incidents for which

22   the experts were able to review video likely represent just one small portion of Defendants'

23   problematic use of force practices because the majority of the uses of force in CDCR's

24   system are classified as "immediate" uses of force, and, therefore, not videotaped nor

25   required to go through any sort of supervisory or clinical pre-approval process.  *See* Martin

26   Depo. at 78:6-79:24.

27   Additionally, although Defendants continually cite to the 2011 dismissal of the

28   *Madrid* litigation (Case No. C 90-3094 TEH N.D. Cal.) for the proposition that their force-

[917342-1]

1   related policies and procedures must be held sacrosanct, that is not what the *Madrid* Court

2   actually held at the time of dismissal.  Under the jurisdiction of the federal court during the

3   tenure of the *Madrid* litigation, CDCR implemented a statewide use of force review

4   system.  Unfortunately, Plaintiffs' and Defendants' experts' present-day observations, and,

5   particularly, Mr. Martin's conclusions about the "disturbing patterns" he found regarding

6   present use of force at Pelican Bay (Martin Depo. at 14:9-18:1), bear out the *Madrid*

7   Court's fear of CDCR's failure to sustain change when federal oversight ends.  *See*

8   March 21, 2011 *Madrid* Order at 3 (attached as Exhibit 1 to Declaration of Maneesh

9   Sharma in Support of Defs.' Opposition, Doc. 4707); ("This Court, too, is concerned about

10  a reversion to the unconstitutional practices that once existed at Pelican Bay … But this

11  Court cannot retain jurisdiction to see … The Court is confident that should the *Madrid*

12  protocols be abandoned and conditions at Pelican Bay devolve to unconstitutional levels,

13  counsel will come forward to challenge those conditions…"); *see also* Fama Decl. ¶8 & 10

14  (after November 2008 for CDCR generally, and after March 2011 for Pelican Bay, there

15  was no monitoring or Court assessment in *Madrid* regarding actual practices under the

16  statewide use of force policy).

17          The *Madrid* Court anticipated precisely what has actually happened here—that

18  monitoring of the issues relating to prisoners with mental illness would continue as part of

19  the *Coleman* class action.  March 21, 2011 *Madrid* Order at 2; Declaration of Steven Fama

20  in Support of Pls.' Reply, filed herewith ("Fama Decl.")  ¶11.  Both Plaintiffs' and

21  Defendants' experts have opined that, to this day, CDCR does not monitor or assess crucial

22  information about the use of force against prisoners with mental illness.  Martin Depo. at

23  71:4-72:20.  By the instant motion, Plaintiffs do not request that this Court enter orders

24  directed at an overall fix for Defendants' broken use of force system.  Rather, Plaintiffs

25  seek specific orders related to prohibiting, preventing, identifying, and correcting

26  Defendants' ongoing practice of using unconstitutional force against prisoners with serious

27  mental illness.  That issue was not before the *Madrid* Court, and has not yet been resolved

28  in this case.  *See* Aug. 27, 2007 Order, Dkt. No. 2388.

[917342-1]

1    Plaintiffs cannot wait any longer for Defendants to remedy their abuses of force

2    against prisoners with mental illness.  Plaintiffs' and Defendants' experts largely agree on

3    measures that must be taken to remediate the problem, and this Court should order those

4    measures implemented without further delay.  *See, e.g.*, Martin Depo. at 140:17-141:25

5    ("A:  I can reduce incidents of MK-9 [chemical agent] in this system probably 30 to 40

6    percent in probably 60 days.  Q:  How?  A:  Take the damn stuff away at certain places.").

7    **III.    THE EVIDENCE ESTABLISHES THAT DEFENDANTS' DISCIPLINARY**
         **POLICIES, PROCEDURES, AND PRACTICES CONTINUE TO VIOLATE**
8        **PLAINTIFFS' RIGHTS BY INAPPROPRIATELY PUNISHING**
         **PRISONERS FOR BEHAVIOR RESULTING FROM MENTAL ILLNESS**
9

10    Defendants oppose Plaintiffs' request for remedial orders concerning the

11    disciplinary process primarily by using a tactic parallel to their flawed *Madrid* defense:

12    they assert that the Special Master blessed the current process, and, therefore, it must be

13    considered inviolate.  *See* Opp. at 9:11-13 ("[T]he process for completing mental health

14    assessments was the result of agreement between Defendants and Plaintiffs, and approved

15    by the *Coleman* Special master in the Twenty-Third Monitoring Report.").  The Special

16    Master has never determined, nor have Plaintiffs ever agreed, that Defendants' current

17    mental health assessment process actually resolves the problem of Defendants' meting out

18    punishment to class members for behaviors related to mental illness.[10]  *See* Mot. at 19-23.;

19    Twenty-Third Round Monitoring Rpt. of the Special Master, Dkt. No. 4124 at 20-28.  As

20    explained in detail in Plaintiffs' motion and in the supporting Kahn Declaration, Plaintiffs

21    have consistently expressed objections that Defendants' mental health assessment

22    procedure does not target the basic underlying deficiency in the disciplinary process:  the

23    system does not meaningfully result in mitigation of punitive consequences for behavior

24    _____

25    [10] Defendants attempt to establish that the Special Master has approved the disciplinary
      process by stating the inverse—that the Special Master "has not reported negatively since"
26    2011.  Opp. at 30:5-7.  Given the numerous other issues in the case on which the Special
      Master has focused his attention in the last two years, Defendants' conclusion that any
27    perceived silence on this issue constitutes approval is a stretch.

28

[917342-1]

19
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   related to mental illness, including the key element of diverting some RVRs from ever

2   being written.  Mot. at 23-26 & 45-46; Kahn Decl. in Support of Pls.' Mot., Doc. 4640,

3   ¶¶ 16-18.

4        **A.**     **Defendants' Formal Disciplinary Procedures Violate Class Members'**

5                     **Rights**

6        Beyond their misrepresentation of the history of mental health assessment in the

7   disciplinary process in this case, Defendants' meager opposition regarding the disciplinary

8   process consists of asserting that "all the law requires" is that a prisoner's mental illness be

9   "taken into account" when assessing discipline.  Opp. at 29:28-30:1.  This argument does

10  not address Plaintiffs' contention that, rather than meaningfully identifying and

11  remediating punitive disciplinary response to behavior related to mental illness, CDCR's

12  disciplinary process instead results in a mechanical recitation that mental health was

13  considered.  *See* Mot. at 17-26 & 47-48; Martin Depo. at 124:5-125:9 ("A:  The starting

14  point is to figure out how they are taking into consideration [mental health information]

15  and as it's reflected through a disposition of a disciplinary … Until we have a system that

16  answers—that collects data, everything else we're doing is pissing in the wind.  Q:  So

17  does California have that system in place now?  A:  No.  Clearly they don't or I wouldn't

18  have made the recommendation.").  Although Defendants are again quick to dismiss this

19  Court's 1995 findings regarding the role of the disciplinary process in the mistreatment of

20  prisoners with mental illness, those findings remain applicable today.  CDCR's

21  disciplinary process still results in the disproportionate placement of class members in

22  segregated housing and other punitive disciplinary measures without appropriate

23  consideration of the relationship of class members' behavior to mental illness or the

24  deleterious effects of placing class members in segregation on their mental health.

25       Defendants' punishment of class members for behaviors related to mental illness

26  violates not only the Eighth Amendment, but, also, the Fourteenth Amendment and the

27  ADA.  Defendants' only response to this claim is that *Olmstead* does not apply because it

28  did not involve prisoners and *Biselli* is not instructive because, in that case, segregated

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    housing was used "solely for punitive reasons."  Opp. at 30:8-18.  *Olmstead* establishes

2    that a State's unjustified isolation of people with disabilities "is properly regarded as

3    discrimination based on disability."  *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597

4    (1999).  In the prison context, Defendants discriminate against prisoners with mental

5    illness by placing them in isolated and restricted housing settings disproportionately and

6    without due regard for mental illness.  This is especially so because, as detailed in

7    Plaintiffs' concurrent motion regarding segregation, Defendants do not provide appropriate

8    mental health treatment in these segregated environments; as a result, placing class

9    members in segregation constitutes both punishment for mental illness and denial of

10   adequate treatment.  *Biselli* also squarely supports the argument that Defendants' practice

11   of disproportionate discipline of *Coleman* class members without meaningful

12   consideration of mental illness violates the ADA.  *See Biselli v. Cnty. of Ventura*, 2012

13   U.S. Dist. LEXIS 79326 at *45 (C.D. Cal. June 4, 2012) ("[A] rational jury could find that

14   Hernandez had proven he could be housed in more integrated environments without posing

15   a security risk, and that Hernandez's placement in Ad Seg and disciplinary isolation was

16   punishment for behavior known to be related to his mental illness.").  When Defendants

17   place class members in segregated housing as a consequence of rule violations, that

18   placement is made as punishment.  When Defendants mete out this punishment for

19   behavior resulting from or caused by mental illness, they inflict harm on class members

20   because of mental illness.

21        Defendants do not even attempt to defend their referral of class members to the

22   District Attorney for prosecution and the ICC for consideration of placement in

23   segregation for incidents in which their own hearing officers mitigated a penalty based on

24   mental health considerations, except to state that "CDCR has a responsibility to report

25   suspected crimes to the appropriate prosecuting authority."  Mot. at 48 & 53; Decl. of Joe

26   Stein in Support of Defs.' Opp. at ¶¶ 19-20.  Nor do Defendants contest Plaintiffs' claims

27   or request for relief concerning meaningful and effective accommodation for class

28   members during the disciplinary hearing process.  Mot. at 47-48 & 52-53.

[917342-1]

## B.    Defendants' Use of "Management Status" as an Unregulated Disciplinary Procedure is Dangerous and Abusive

During discovery in the termination motion proceedings, Plaintiffs observed Defendants' widespread use of "management status," an immediate restrictive disciplinary mechanism imposed against prisoners whose behavior is deemed disruptive.  Plaintiffs' experts documented the imposition of management status on *Coleman* class members, and Plaintiffs challenged the use of management status for class members as violative of their rights under the Eighth and Fourteenth Amendments and the ADA.  Mot. at 53-54.  Class members are subjected to management status without any due process, without assessment as to whether the disruptive behavior is related to mental illness, and without regard for the impact of management status on mental health.  Although Defendants purport to justify their use of management status by claiming that the severely restrictive status is "a temporary procedure to immediately stop and deescalate an inmate's persistent disruptive, destructive or dangerous behavior" (Opp. at 32:26-28), the Director of CDCR's Division of Adult Institutions acknowledged that this is a disciplinary mechanism essentially unregulated by CDCR and unsupervised by anyone outside each individual institution.[11]  Stainer Depo. at 227:18-228:15 & 236:3-238:24.  Imposition of management status does not require consideration of mental illness, nor approval from a mental health clinician, and there are no restrictions on the length of time to which prisoners with serious mental illness can be subjected to management status.  *Id.*; *id.* at 243:19-244:9.  This dangerous ad hoc procedure without any due process or accountability should be ended immediately.

## CONCLUSION

Defendants' ongoing punitive treatment of prisoners with mental illness subjects

---

[11] Additionally, as explained in Plaintiff's Evidentiary Objections, Mr. Stainer has insufficient foundation for his assertions regarding the procedures governing management status in his declaration, which he acknowledged were not based on personal review of any local operating procedures governing management status, but, rather, on hearsay from the warden at a single institution.  Stainer Depo at 227:18-230:1.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

[917342-1]

1   *Coleman* class members to harm on a routine basis.  The State's willful and continuing

2   refusal to recognize and address this harm, and to revise its force and disciplinary policies

3   and practices to appropriately account for mental illness, is intolerable.  The Court must act

4   to provide relief to the class because it is exceedingly and regretfully clear that Defendants

5   will not end these inexcusable practices of their own accord.

6

7   DATED:  August 23, 2013                    Respectfully submitted,

8                                              ROSEN BIEN GALVAN & GRUNFELD LLP

9
                                               By:  */s/ Lori E. Rifkin*
10                                                  Lori E. Rifkin

11                                             Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[917342-1]

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES