1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:   (510) 280-2621
4
5
6
7

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

8  JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
10  RANJINI ACHARYA – 290877
K&L GATES LLP
11  4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
12  Telephone:   (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:   (415) 864-8848

13  Attorneys for Plaintiffs

14

15                    UNITED STATES DISTRICT COURT

16                    EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN, et al.,

19              Plaintiffs,

20        v.

21  EDMUND G. BROWN, JR., et al.,

22              Defendants.

23

24

25

26

27

28

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF LORI E. RIFKIN IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES**

Judge:  Hon. Lawrence K. Karlton
Date:   September 26, 2013
Time:   10:00 a.m.
Crtrm:  4

[914719-1]

1      I, Lori E. Rifkin, declare:

2      1.      I am an attorney admitted to practice law in California, a member of the bar

3 of this Court, and an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP,

4 counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5 and if called as a witness I could competently so testify.  I make this declaration in support

6 of Plaintiffs' Reply In Support Of Motion For Enforcement Of Court Orders And

7 Affirmative Relief Related To Use Of Force And Disciplinary Measures.

8      2.      Attached hereto as **Exhibit A** are true and correct excerpts from the

9 deposition of Steve Martin, taken on July 23, 2013.

10      3.      Attached hereto as **Exhibit B** are true and correct excerpts from the

11 deposition of Michael Stainer, taken on August 15, 2013.

12      4.      Attached hereto as **Exhibit C** is a true and correct excerpt from the

13 deposition of Kathleen Allison, taken on August 15, 2013.

14      5.      Attached hereto as **Exhibit D** are true and correct excerpts from the

15 deposition of John Day, taken on August 14, 2013.

16      6.      Attached hereto as **Exhibit E** are true and correct excerpts from the

17 deposition of Robert Barton, taken on July 11 and 16, 2013.

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1

7.    To my knowledge, Mr. Martin did not conduct any additional inspections of CDCR prisons related to use of force or the disciplinary process during the pendency of Plaintiffs' motion regarding these issues, beyond viewing a limited number of the videos Mr. Vail had previously viewed.  I confirmed with Defendants' counsel several times during this time period that they were not planning to request that Mr. Martin conduct additional inspections, and Plaintiffs' counsel were not notified of any such inspections.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 23rd day of August, 2013.


*/s/ Lori E. Rifkin*
Lori E. Rifkin

Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                  Plaintiffs,         )
                                      )CASE NO.:
        vs.                           )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                  Defendants.         )
_____  )



DEPOSITION OF

STEVE J. MARTIN


TUESDAY, JULY 23, 2013,  9:32 A.M.

SAN FRANCISCO, CALIFORNIA


VOLUME I




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Steve J. Martin                                                    July 23, 2013

```
 1                 UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6          vs.                        )S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)
 9

10

11

12

13

14

15

16          The Deposition of STEVE J. MARTIN, taken on

17   behalf of the Plaintiffs, before Megan F. Alvarez,

18   Certified Shorthand Reporter No. 12470, Registered

19   Professional Reporter, for the State of California,

20   commencing at 9:32 a.m., Tuesday, July 23, 2013, at

21   K&L GATES LLP, Four Embarcadero Center, Suite 1200,

22   San Francisco, California.

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  JEFFREY L. BORNSTEIN, ESQ.
                  MEGAN F. CESARE-EASTMAN, ESQ.
 4            K&L GATES LLP
              FOUR EMBARCADERO CENTER, SUITE 1200
 5            SAN FRANCISCO, CALIFORNIA 94111
              415.882.8086
 6            415.882.8220 FAX
              JEFF.BORNSTEIN@KLGATES.COM
 7            MEGAN.CESARE-EASTMAN@KLGATES.COM

 8

 9   FOR DEFENDANTS:

10            BY:  JAY RUSSELL, ESQ.
              OFFICE OF THE ATTORNEY GENERAL
11            STATE OF CALIFORNIA
              455 GOLDEN GATE AVE., SUITE 11000
12            SAN FRANCISCO, CALIFORNIA  94102-7004
              415.703.3035
13            415.703.5843 FAX
              JAY.RUSSELL@DOJ.CA.GOV

14

15

     ALSO PRESENT:
16

              ELDON VAIL
17

18

19

20

21

22

23

24

25
```

Page 3

1    I am.  I don't think that's at issue.

2         Q.   So then as an expert who's working for the

3    State of California, wouldn't you expect them to listen

4    to you?

5              MR. RUSSELL:  Objection.  Vague and ambiguous.

6    Lacks foundation.  Calls for speculation.

7              THE WITNESS:  Certainly.  And they have.

8    BY MR. BORNSTEIN:

9         Q.   And, in fact, as late as yesterday, weren't

10   you complaining about the fact that they got the wrong

11   people looking at this, whether it's the defendants or

12   the plaintiffs, and they really need to get the right

13   person or the right people in to fix the problems that

14   they've got?  Didn't you say that?

15        A.   I said that fairly paraphrasing.  That's

16   probably more accurate than not.  I wouldn't take issue

17   with it.  I said that, and I say it again.

18        Q.   Okay.  What did you mean by that?

19        A.   That, for instance, Madrid v. Gomez was tried

20   in the early '90s, decision rendered in mid-'90s,

21   remedial structure developed over some number of years,

22   and then the case terminated, as I understand it, in

23   2011.

24             Out of that emerged a very, very complex,

25   burdensome structural scheme to manage force.  That's

Steve J. Martin                                                                July 23, 2013

1    the essence of Madrid v. Gomez.

2            Have you looked -- has anybody looked closely

3    recently at use of force incidents at Pelican Bay?  I

4    did.  I found some disturbing patterns.

5        Q.   What did you find?

6        A.   I found that for a period of, I believe,

7    January to October 2012, there were some 180 incidents

8    of which 174 were characterized as immediate

9    applications of force.

10           And looking at some number of those, with

11   which I clearly and plainly disagreed that they were

12   immediate as plain as the nose on your face, I see no

13   record in this case of anybody having looked at that.

14           This is a institution that was under the

15   scrutiny of a court, plaintiffs, defendants, special

16   masters for at least a decade and looked at that as

17   recently as 2012.

18       Q.   Didn't you see the same thing in the system as

19   a whole?

20       A.   No.

21       Q.   That there were more -- significantly more

22   immediate use of force incidents than there were

23   controlled use of force incidents?

24       A.   I did.  I did.

25       Q.   So that pattern --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                          July 23, 2013

1          A.    Not at the level I saw at Pelican Bay.

2          Q.    What do you mean "not at the level"?

3          A.    At the level of 174 of 180-some incidents,

4    95 percent level.

5          Q.    What was the pattern you saw at the

6    institutions you visited?  Did you keep track?

7                MR. RUSSELL:  Objection.  Vague and ambiguous.

8                THE WITNESS:  Where I had data --

9                MR. RUSSELL:  Assumes facts not in evidence.

10               THE WITNESS:  Where I had data, I did.  I

11   didn't have it quite at the level I had at Pelican Bay.

12   But I certainly, as I reviewed my incidents, that was a

13   common point of analysis.  It always is.  Because it

14   goes to the first element of analytical framework of the

15   need for force.  So you always look at that.

16               I've looked at it in every single incident

17   that I've reviewed.

18   BY MR. BORNSTEIN:

19         Q.    You went to 13 different prisons as part of

20   your work here?

21         A.    No, I went to 11.  Reviewed documents from two

22   additional, which is 13.  I've had document review at

23   13, visited 11.

24         Q.    And isn't it fair to say that with respect to

25   every one of those 13 institutions that you either

Steve J. Martin                                                    July 23, 2013

1   visited or reviewed documents from, that the vast

2   majority of use of force incidents involved immediate

3   force as opposed to controlled force?

4        A.   No.

5             MR. RUSSELL:  Objection.  Vague and ambiguous.

6             THE WITNESS:  I wouldn't agree with the

7   characterization "vast majority."  I would be

8   comfortable with "majority."

9   BY MR. BORNSTEIN:

10       Q.   Is there any place in any written record you

11  made in which you actually looked at or analyzed those

12  numbers?

13       A.   Not if it's not in the files I've already

14  produced.

15       Q.   Can you recall having done that?

16       A.   You mean actually done, looked at aggregate

17  data or data by facility on that issue?

18       Q.   Well, the same data that you're using to make

19  the point that you're making about Pelican Bay, right?

20  In the 174 out of 185 incidents, I think you said were

21  immediate versus -- it was 174 out of 184 were immediate

22  use of force.

23            And my question is:  Did you do the -- were

24  you able to come up with the same kind of statistics for

25  each one of the other institutions you looked?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

```
 1        A.   Not all institutions maintained it that way.

 2        Q.   Is that a problem, that they don't maintain

 3   the statistics that way?

 4             MR. RUSSELL:  Objection.  Vague and ambiguous.

 5             THE WITNESS:  I don't know that it is a

 6   problem.  This business is driven by how well informed

 7   administrators are.

 8             If -- obviously there is an issue related to

 9   that, then not tracking that is a -- I guess can be

10   fairly said to be a problem because you're not informed.

11   BY MR. BORNSTEIN:

12        Q.   Well, there is an issue as, you know, relating

13   to use of force incidents as it relates to mental health

14   inmates?

15             MR. RUSSELL:  Objection.  Vague and ambiguous.

16   BY MR. BORNSTEIN:

17        Q.   There is an issue concerning use of force

18   incidents relating to mental health inmates?

19             MR. RUSSELL:  Objection.  Vague and ambiguous.

20             THE WITNESS:  I thought that's why we're here.

21   BY MR. BORNSTEIN:

22        Q.   So you know that there is that issue and that

23   concern, right?

24             MR. RUSSELL:  Objection.  Vague and ambiguous.

25             THE WITNESS:  Yes.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

```
 1   periods where there's lawful resistance to an order and
 2   it becomes a calculated or controlled.  All the steps
 3   that they go through before they actually resolve it
 4   without force or use force can be hours.
 5            As I talk about a little bit in the
 6   declaration where we -- it's stuff is really -- can't
 7   hardly capture it.  Your expert talks about, in his
 8   examples, the 15 seconds that a clinical technician
 9   has -- you call them psychology, whatever -- takes for
10   deescalation.  That's what he's focused on, is 15
11   seconds later, so forth.  Totally ignores this comes
12   three and four hours into an event in which they've been
13   trying to avoid using force.
14        Q.   Well, do you know that they've been doing
15   anything other than just sitting and waiting?
16        A.   Sometimes that's what you want to do.
17        Q.   Okay.
18        A.   That's exactly what you want to do, is do you
19   really want to have us come in on you?
20            But they're not using precipitous immediate
21   force in those situations.  They may be or not bringing
22   to bear what a sophisticated system could in the way of
23   civilians could really talk.  And I would acknowledge
24   that, you know, that is a best practice, is to get
25   somebody there that has rapport, listen, and avoid it.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1      Q.    They don't do that, do they?

2      A.    I haven't seen too many instance where that's

3   a genuine effort.  Again, that's this mechanical walking

4   through of a cooling off period and clinical

5   intervention and so forth.

6            I would not -- I could tell you, under my

7   administration, if I had an inmate at a high-security

8   institution and I gave him a lawful command to cuff up,

9   assuming this is lawful -- I'm not talking about

10  manufacturing some -- you think I wait four hours before

11  I effectuate that order in a high security?  That is --

12  I mean, it doesn't make any sense.  That's what's built

13  into your system now.  That's what everyone's agreed is

14  the right way to do it.

15     Q.    Well, you disagree?

16     A.    I obviously do.

17     Q.    But you think the best way to do it is to have

18  civilians who can really talk and communicate and try

19  and work through persuading inmates, especially mentally

20  ill inmates, right?

21     A.    It's not necessarily -- I wouldn't limit it,

22  again, to civilians.  I would limit it to an earnest

23  effort to communicate with an individual that probably

24  is impaired, maybe is paranoid, and regardless of who

25  talks to him is going to remain so.  So that's one

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              MR. BORNSTEIN:  Go ahead.

 2              MR. RUSSELL:  You can read back it.

 3              (Record read as follows:

 4              "QUESTION:   What you wanted to do,

 5               which was to do it in a thoughtful way

 6               so you could present it to the decision

 7               makers who are running the institutions

 8               so that they could adopt and implement

 9               practices that were more well informed

10               based on your training and experience

11               and expertise.")

12  BY MR. BORNSTEIN:

13      Q.   Correct?

14              MR. RUSSELL:  Objection.  Vague and ambiguous.

15  Overly broad.

16              THE WITNESS:  What was important is that I be

17  able to deliver those recommendations in a thoughtful

18  manner.  Whether they be delivered through Rule 26

19  report, vis-a-vis memoranda, in meetings, I don't know

20  that that's that critical, obviously, or I would have

21  made a -- I would have bolted when they told me to do it

22  that way.

23              I don't have any hesitancy in getting

24  crosswise with attorneys for whom I work if I believe

25  that would have undermined my overall intention, which
```

Steve J. Martin                                                     July 23, 2013

 1  is one thing is to advance good corrections in the
 2  California system as a neutral party, not defense
 3  expert, plaintiffs' expert, but just to advance and
 4  leave the system better than I found it.  If I could do
 5  that through -- I quite frankly thought my
 6  recommendations would be processed differently than they
 7  apparently have been.  Quite honestly, I thought when I
 8  met with officials and drafted those memorandums, that
 9  that would affect possibly some reconsiderations and
10  change.  Maybe I should have not been so naive.  In
11  retrospect, I don't know.
12                MR. BORNSTEIN:  We've been going a little more
13  than an hour.  Why don't we take a few minutes' break.
14                (Off the record at 10:36 a.m. and back
15                 on the record at 10:52 a.m.)
16  BY MR. BORNSTEIN:
17      Q.  We're back on the record.  You understand
18  that, Mr. Martin?
19      A.  Yes, sir.
20      Q.  So we're copying your file that you produced
21  to us.
22            Are those all of the notes that you have from
23  the time of your last deposition until today or are
24  there more?
25      A.  This actually was done after my deposition.

1    inmates?

2         A.   Correct.

3         Q.   And are those the two that we talked about

4    today or are they something different?

5         A.   I think that between the Centinela and

6    R.J. Donovan, that captures those.

7         Q.   Okay.  Two of the five involved possibly

8    unnecessary or excessive OC spray?

9         A.   Correct.

10        Q.   And why do you say "possibly unnecessary or

11   excessive"?  What did they involve?

12        A.   Well, Counsel, this is another thing that --

13   that I don't have a firm position on because I respect

14   the law.  If I don't, the law doesn't guide me.  I don't

15   presume that it does if I can't find an answer.

16             Just as the seven incidents that we reviewed

17   yesterday, there's no question that there was,

18   tactically speaking, more chemical agent used than

19   should have been, tactically speaking.

20             In weighing and arriving at that opinion of

21   excessive and unnecessary force, I'm not entirely

22   comfortable reaching that definitive position in those

23   instances in which I thought tactically more was used

24   than should be for this reason:  In those seven

25   incidents, they were all resolved without any intense

 1   hands-on physical force.  Several of them were resolved

 2   without any hands-on force.  They, quote, gave up and

 3   they were secured.

 4           The other two, there was very minimal levels

 5   even though it was cast, in my view, in an outright

 6   misrepresentation by your expert that an inmate was

 7   thrown down and dragged.  Notwithstanding that

 8   misrepresentation of what I saw, I would actually grade

 9   those officers out with high marks of how they secured

10   those inmates.

11           I think there's one other incident in which

12   they used some hands-on, but...

13           All said and done, and there were no injuries

14   of note in those seven incidents.  That's not to say

15   there wasn't some pain from a chemical agent because

16   there certainly was.  But physical impact injuries, none

17   that I saw.  I can only relate to my general work in the

18   field, as I said in my most recent declaration, that

19   every excessive and unnecessary pattern and practice

20   case in which I've been involved either as a defendant's

21   expert, plaintiff's expert, court expert, court monitor,

22   there are injuries associated with excessive force,

23   impact injuries.  So -- which makes that finding much

24   easier to arrive at, quite frankly.

25           Here we may have an excessive use of chemical

Steve J. Martin                                                    July 23, 2013

1    agent, but does that equate and translate to a finding
2    of excessive force?  I don't know the answer to that.  I
3    think in certain cases it most certainly does, in the
4    number of cases we've seen in this case where it was
5    used in one or two ways:  Way beyond where it should
6    have been because of the impairment of the inmate or
7    sheer volume.  It was -- that I think you could arrive
8    at ultimate findings.
9          But it's not clear to me that if you use
10   6 ounces out of an MK-9 versus a half-ounce out of MK-4
11   and they're both equally effective that the MK-9
12   constitutes excessive force, especially if we don't know
13   how much chemical agent is used in a given situation.
14         Now, some cases we might.  Some of those we
15   saw yesterday, we do know that it's a great amount.  But
16   I'm talking about in the typical incident that we see in
17   the system where there's maybe two or three bursts
18   either in a cell or a yard.  Do we know how much that
19   is?  Well, if we don't, how do we make a determination
20   of whether it's excessive?  I just don't know how you
21   get there.
22         Your expert appears to have solved that, even
23   though he has no record of having done this kind of work
24   that I'm aware of at all and shows no basis for how he
25   arrived at that.  He nonetheless has.  I can't so

Steve J. Martin                                              July 23, 2013

```
 1   easily.
 2         Q.   Well, what you did, you said two out of the
 3   five involved possibly unnecessary or excessive OC
 4   spray.  That was before you saw the videos that you saw
 5   yesterday?
 6         A.   Yes.
 7         Q.   And then you saw seven other ones where you
 8   said that you thought more than should have been used in
 9   a -- tactically speaking, at least?
10         A.   Yes.
11         Q.   And it raised issues in your mind about
12   excessive or unnecessary?
13         A.   Yes.  Absolutely.
14         Q.   Right?
15         A.   Absolutely.
16         Q.   Why was that?
17         A.   Why was what?
18         Q.   Why did it raise the issues?  Because of the
19   amount?
20         A.   Yes.  I was able to see -- that's the first
21   that I could see, Counsel.  The first evidence I've had
22   in those particular cases of the amount used.
23         Q.   In all those seven cases you saw yesterday,
24   did all of them raise the issue for you about excessive
25   use or unnecessary use of spray?
```

Page 56

Steve J. Martin                                                    July 23, 2013

1        A.    Tactically, yes.

2        Q.    Okay.

3        A.    I think so.  Now, let me be very quick.  I

4   want my record -- I'm bound and determined to have this

5   record made in a way where my work is to be judged

6   appropriately.

7              There was one incident that I recall of seeing

8   the inmate at the back of the cell with protective gear

9   on the spray.

10             Those kinds of things have to be taken into

11  account in arriving at even this tactical question

12  because -- also the type of chemical agent used.  I

13  believe that you -- CDCR is sometimes not employing the

14  appropriate tactical weaponry of OC agent; that if they

15  did, they likely would not find the need to keep

16  spraying streamers in and some of the other things they

17  do.

18             So you've got to make judgments on was the

19  chemical agent an effective tactical response there.

20  Was it reaching its intended target.  Were they --

21  inmates muster some defense or some way to ameliorate

22  the effects of it.  Because if he has, then that's the

23  tendency for officers to keep dumping it in there.

24             So those things -- it's a very difficult,

25  careful analysis that has to be done in arriving at the

Steve J. Martin                                          July 23, 2013

```
 1   are the steps that we ought to be asking the court to do
 2   to deal with the problems that even you acknowledge are
 3   still ongoing in CDCR.
 4            MR. RUSSELL:  There's no question.  Don't
 5   raise your voice.
 6   BY MR. BORNSTEIN:
 7       Q.   So will you help me do that?
 8            MR. RUSSELL:  Objection.
 9   BY MR. BORNSTEIN:
10       Q.   You can answer that "yes" or "no."
11            MR. RUSSELL:  Excuse me.  Don't talk when I'm
12   talking.  Okay?  And keep your voice down.
13            The question is irrelevant and lacks
14   foundation.  It's also argumentative.
15            THE WITNESS:  I'm here to answer questions to
16   the best of my ability.
17   BY MR. BORNSTEIN:
18       Q.   I want to know what you mean when you say you
19   have concerns about the tactical deployment of the
20   chemical weapons in the seven incidents that you
21   reviewed yesterday.
22       A.   The dispersal mechanism and amount of agent
23   dispersed would be the two primary concerns.
24       Q.   How about the -- by "dispersal mechanism,"
25   what do you mean?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Case 2:90-cv-00520-KJM-SCR    Document 4766-1    Filed 08/23/13    Page 23 of 183
Steve J. Martin                                              July 23, 2013

1      A.    MK-46 versus a MK-9 versus a fogger versus a

2  streamer versus a wand, all those different issues.

3      Q.    What about those dispersal mechanisms raised

4  issues for you about whether it was unnecessary or

5  excessive force?

6           MR. RUSSELL:  Objection.  Misstates testimony.

7  Lacks foundation.  Vague and ambiguous.

8           THE WITNESS:  Well, they were -- I believe all

9  those inmates were in enclosed, secure cells of the

10 limited size.  And I saw basically nothing but crowd

11 control, contaminant dispersal mechanisms employed for

12 the most part.  I never saw MK-3 or -4 or -- doesn't

13 mean it wasn't present, an MK-9 fogger, or deployed.

14 BY MR. BORNSTEIN:

15     Q.    Why is that a problem?

16     A.    Because it is an enclosed area of limited

17 size.  And typically, if you've got the appropriate

18 delivery agent, a fogger agent from a canister, you can

19 cover that area with one or two bursts.  You know,

20 relatively small -- we're talking about grams, you know,

21 ounces as opposed to entire canisters.

22     Q.    Did you see evidence from the video of entire

23 canisters being emptied?

24     A.    Well, I saw a container that appeared to be

25 taken out of the service after it was used, but we don't

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

```
 1    know if it was put in service with very small quantity
 2    or it was full.
 3              Those are questions I like to -- when I'm
 4    looking at something.  Of course, we just don't know.
 5       Q.   That's because the State has not taken and
 6    adopted your recommendation to weigh the canisters
 7    before and after every shift, correct?
 8       A.   That's -- not to my knowledge, they haven't.
 9    I haven't heard anything about it.
10       Q.   That's why you don't know, right?
11       A.   That would be correct.
12       Q.   And do other prison systems that you have
13    consulted with, do they weigh canisters?
14       A.   Some do and some have as a result of either
15    recommendations or litigation or consultation or
16    whatever.
17       Q.   You also expressed concern about crowd control
18    canisters being used especially in cells, right?
19       A.   Yes.
20       Q.   Cell extractions?
21       A.   Yes.
22       Q.   And you've now explained why; is that right?
23       A.   To some extent.
24       Q.   Or is there more?
25       A.   It's primarily -- and you can look at these
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1  incidents by incident, have variations on theme or

2  anomalies, but typically it's, you know, the delivery

3  system and the amount that those systems put into a

4  enclosed cell.

5       Q.   You saw there on some of the videos inmates in

6  cells in distress as a result of repeated spraying,

7  didn't you?

8            MR. RUSSELL:  Objection.  Vague and ambiguous.

9            THE WITNESS:  Of course, that's what OC does,

10 create temporary distractions distress.

11 BY MR. BORNSTEIN:

12      Q.   And did you find instances in which it was

13 hard for the inmates to follow the orders to cuff up and

14 disrobe?

15      A.   I -- I don't -- you know, that's an area that

16 I think requires expertise I don't have.  I saw inmates

17 resisting orders.  Whether they were rendered

18 incompetent to abide by, I don't know.

19      Q.   Did you --

20      A.   I certainly saw some that, by my experience in

21 the business over 40 years, exhibited some signs of

22 mental distress and impairment.  But I'm not a clinical

23 psychologist so I don't know what.

24      Q.   Did you see or hear some of the guards saying

25 things like, "Well, let's spray them in the face, get

 1  R.J. Donovan than, you know, than Corcoran because
 2  they've got at least probably somewhat comparable
 3  populations.  I'd have to look at that.
 4           And you start trying to identify those, and
 5  then you look -- I think most of these are mentally
 6  impaired.  And do you -- my first probably issue that I
 7  would want to see is I think there should probably be a
 8  slightly higher standard of use if the operator knows
 9  that this is a mentally impaired person and he's engaged
10  in some type of resistance.  Because, again, it may be
11  more often than not ineffective or simply escalate a
12  situation as opposed to intervention.
13           So you'd want to, you know, we need to
14  separate out -- and I don't know whether my data --
15  well, I know it did not.  We need to separate out the
16  MI -- the baton usage on MIs vis-a-vis non-MIs.
17           Is there a higher rate of use on MIs?  Is it
18  concentrated on certain units?  You know, those types of
19  things.  And then you start to address the issue.
20           I know there has been data that appears --
21  thank you, ma'am -- in your pleadings on
22  disproportionate disparate use of force on MIs.
23           I think it would be important to break down
24  that certainly beyond just those numbers.  Break it down
25  as to OC.  Break it down as batons.  Break it down as to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

1  hands-on and see what those circumstances are.  In other

2  words, do we have routinely the 15-second walk-by of a

3  clinical psychology saying, "Are you" blah, blah, blah?

4  Is that what's apparent in every one of those, even

5  though they've waited all that time and so forth?

6          Well, that needs to be changed.  If we're

7  going to take -- this is three and four hours.  Why in

8  the world would we not bring all the skills available

9  during that time to diffuse it professionally.  When I

10  say "professionally," from a mental health standpoint.

11  Or just an officer that has a good rapport.

12          In those, you start doing that by what I call

13  teachable moments.  You institutionalize it by sitting

14  down with the commander and saying, "Commander, this is

15  not a situation at which you check a box off."

16          "Clinical psychologist director, we're going

17  to demand more of you than 15-seconds of asking a

18  perfunctory, canned question.  You understand that?

19  We're going to demand more of you and we're going to

20  monitor that."

21          That's how you effect change.  It's very

22  straightforward if it's done diligently and correctly,

23  but it's hard, hard, hard work.  You've got to do it on

24  the ground at the facility with -- and, I believe in a

25  collaborative fashion, not drive-by experts that come by

1          MR. RUSSELL:  Objection.  Vague and ambiguous.

2   Lacks foundation.  Exceeds the scope of Mr. Martin's

3   expertise or what he's been retained to provide in this

4   case.

5   BY MR. BORNSTEIN:

6          Q.   And that's what I've been trying to get you to

7   help me understand.  As you're giving your expertise and

8   the work that you have done and the fact that you have

9   been able to identify certain issues, problems, and

10  concerns as it relates to the use of force in general,

11  do you have any opinion regarding recommendations for a

12  court order as it relates to use of force issue and the

13  mentally ill?

14         MR. RUSSELL:  Objection.  Vague and ambiguous.

15  Lacks foundation.  Exceeds the scope of subjects for

16  which Mr. Martin has been retained.  Also irrelevant.

17         THE WITNESS:  Probably a starting point -- I

18  mean, it's a very -- such a hugely important question

19  and it requires lot of deliberation.

20         But my starting point just because my

21  knowledge base is I would think the court could

22  appropriately ask the California officials, number one,

23  whether they have acted on any recommendations made by

24  their consultant/expert relative to use of force.  We

25  know they're out there.  You're developing more in these

Steve J. Martin                                                July 23, 2013

 1   depositions and so forth.

 2        And if the response to that is no, then -- I

 3   play federal judge, kind of fun -- my next question

 4   would be:  Why not, Counsel?  You retained him.  He has

 5   a track record in California, class action litigation in

 6   the state going back 30 years.  He's made

 7   recommendations based on a somewhat exhaustive look at

 8   some number of institutions.  Why have you not acted on

 9   his recommendations?  And then depending on what the

10   answer to that is, is the next step.

11        I'm ordering you to take a position on his

12   recommendations in your agency.  No, we're not going to

13   alter the baton regs or training.  And why.  And then

14   you present that.  Seems like the only fair way to do

15   it, right through, you know, the issues on chemical

16   agents, batons, immediate use of force versus

17   controlled, et cetera.

18        I mean, there's got to be -- the agency should

19   be held -- I fully agree with you -- should at least be

20   held to answer why they are not acting on what appears

21   to be valid recommendations to improve their system in

22   an area in which y'all are now all over it.

23        And, quite frankly, more review will probably

24   make things probably get worse before they get better.

25

Steve J. Martin                                            July 23, 2013

```
 1    BY MR. BORNSTEIN:
 2         Q.   You think it will make it worse or --
 3         A.   Ultimately make it better, but I'm saying
 4    you're going to find more evidence that you would use as
 5    plaintiffs' attorney to say we need help here.
 6         Q.   Right.
 7         A.   Is what I'm saying.
 8         Q.   Did you read the deposition of the inspector
 9    general, Robert Barton?
10         A.   I did.
11         Q.   He recommended that absent unusual
12    circumstances, such as a legitimate concern about a
13    weapon or someone harming themselves or others, that use
14    of force ought to be under controlled situation and not
15    immediate.
16              Do you agree with him?
17         A.   Oh, I don't know how you say it.  But I
18    absolutely agree that any incident that can be managed
19    in a controlled, calculated way, not only should you but
20    I think you're required to.  I think it's a
21    constitutional -- virtually a constitutional
22    requirement.  Because if you don't, you subject yourself
23    to violating that first element.
24         Q.   What's the first element?
25         A.   Was the force necessary.  In other words, if
```

Steve J. Martin                                                    July 23, 2013

 1    you can wait -- in fact, I've just written a article for

 2    Correctional Law Reporter.  "When Is Force Really

 3    Necessary," which I recommend everybody's reading in

 4    this case.

 5         Q.   I read it, and I guess what --

 6         A.   What we're talking about is right on point

 7    with that.

 8         Q.   And you were saying it's right if the person's

 9    ready to jump off the cliff, then that's when you got to

10    do it.  But if it's short of that, then you need to

11    wait.

12         A.   Well, you've reduced it a little bit more than

13    I did.  The article speaks for itself.  That's the

14    general idea.  And that if you failed to do that, you're

15    subjecting yourself to violation of that -- violating

16    that first tenet of was the force necessary.

17         Q.   Part of that, for whatever it's worth, at

18    least you'll have a video record of what happened,

19    right?  And you think that's important, too, don't you?

20         A.   Of course, it is.  That's the teachable

21    moments, investigatory -- there's nothing -- there's no

22    downside to doing that.  Not a single one.  Everything

23    benefits some party, some individual, some agency in

24    doing that.

25         Q.   Do you agree that there should be more cameras

1        Q.    Do you assume it is independent?

2        A.    I assume it's structured like most internal

3    affairs are.  It does have some detachment.

4        Q.    Agree.

5              Do you -- in your work that you've done, have

6    you been able to determine the quality of any of those

7    office of internal affairs reports or investigations?

8        A.    Two issues.  Very few referred to them.

9        Q.    Okay.

10       A.    And some that were referred were rejected.  So

11   I took a very dim view of -- so that's not positive.

12             I did read just a extremely isolated number of

13   their investigations on particular incidents.  Was, you

14   know, mildly impressed in the trade as though internal

15   affairs goes for correctional agencies.  But there's

16   such a limited number of those that I review because

17   there are very few that are done.

18       Q.    In your review that you just did of the

19   disciplinary reports that the OIG does periodically, did

20   you notice that there seemed to be a number of instances

21   where discipline couldn't be imposed because the hiring

22   authority didn't get the report with time to do anything

23   about it or with very little time to do something about

24   it?

25       A.    Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                      July 23, 2013

 1   was talking about the internal affairs.

 2        A.   No, I misheard.  No, I don't recall the

 3   internal affairs being cut back.  Sorry.

 4        Q.   If it has, is that a problem?

 5             MR. RUSSELL:  Objection.  Vague and ambiguous.

 6   Calls for speculation.

 7             THE WITNESS:  Again, I just have not looked at

 8   their manpower, their staffing.  You know, it -- and

 9   even how many investigations, use of force

10   investigations they complete a year.  I just don't know.

11   But certainly that is a staff-intensive, demanding

12   component of -- certainly would be of an agency of this

13   immense size that you would -- you would have to have

14   that division adequately staffed or they would just get

15   overrun with work.

16   BY MR. BORNSTEIN:

17        Q.   In your Recommendation No. 1, the revisit

18   referral investigation requirements per use of force

19   Regs 51020 --

20        A.   Yes, sir.

21        Q.   -- would you agree that the definition of use

22   of force events giving rise to mandatory investigations

23   should be expanded?

24             MR. RUSSELL:  Objection.  Vague and ambiguous.

25   Lacks foundation.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

 1          THE WITNESS:  Yes.  Giving you an example,
 2   looking at this, I think it should be mandatory that if
 3   you have unexplained injury -- all those I listed
 4   probably fall in this category, impact strikes to lethal
 5   target areas such as the incident we were talking about
 6   in Centinela where he was hit on the head with a baton,
 7   mandatory investigation.  I don't care what the
 8   statements say.  You're going to investigate that.
 9          Certainly conflicting reports.  I think that's
10   what I did there.
11          Application of nonlethal weaponry exceeds what
12   would normally be expected, so MK-46, four applications
13   unarmed, unbarricaded inmate, boom.  Tell me why you did
14   that.  They don't know any better right now.  You first
15   got to get them to know better, Counsel.  These people
16   don't know they're doing wrong.
17   BY MR. BORNSTEIN:
18      Q.   Which people?
19      A.   Most of the people I've seen using OC spray in
20   these situations, like yesterday, they do not know
21   they're erring, Counsel.  Should we not first as
22   responsible people correct that problem instead of
23   hurling all kinds of stuff at them?
24          I mean, it's just they don't know what they
25   are doing.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

 1        Q.   We're talking about the correctional officers?

 2        A.   Yes.

 3        Q.   We're also talking about their supervisors?

 4        A.   Yes.  Take it as high up as you want to go.

 5        Q.   The wardens?

 6        A.   As high as you want to go.

 7        Q.   Secretary Beard?

 8        A.   He knows.  I mean --

 9        Q.   He knows better?

10        A.   I've told him.  He's heard that directly in no

11   uncertain terms from my mouth.

12        Q.   But he's not listening?

13        A.   I don't know what he's doing.  When we had

14   discussions, he tended to agree and be concerned.  I

15   read him.  He's a good man, as far as I know.

16        Q.   Well, the seven incidents that --

17        A.   I'm not going to sit here and adopt your -- I

18   don't know what he's doing.  If you do, he's not doing

19   anything, then I'll probably join you.  But you don't

20   know.

21        Q.   Fair enough.

22        A.   Okay.

23        Q.   In the seven incidents that you looked at on

24   videotape yesterday, did that -- did they exhibit to you

25   a failure of training and supervision?

Steve J. Martin                                          July 23, 2013

```
 1       A.   Yes.  Yes.  Yes.  Unqualified.  That's my
 2   point.
 3       Q.   Do you agree that there needs to be an
 4   increase in the transparency of investigations of
 5   alleged excessive or unreasonable uses of force?
 6            MR. RUSSELL:  Objection.  Vague and ambiguous.
 7            THE WITNESS:  I just need some help on what --
 8   where that came from.  I mean, what are they saying
 9   there?  I -- there's not a lot of investigation so
10   transparency is not a -- I mean, I don't know what
11   they're asking.
12   BY MR. BORNSTEIN:
13       Q.   For instance, when I read the OIG reports and,
14   you know, he goes out of his way to give us lots of
15   statistics.  Like in October of 2012, he tells us there
16   were 142 allegations requesting an investigation.  And
17   he breaks it down.  57 were...
18       A.   No.  I'm listening.  I'm just getting this
19   turned off.
20       Q.   57 involved failing to report use of force by
21   somebody else.  7 involved allegations of unreasonable
22   force likely to cause an injury.  29 involved failure to
23   report your own use of force.  45 involved unreasonable
24   force allegations, and 4 some other minor policy.  Okay.
25       A.   Uh-huh.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

```
 1        Q.   But he doesn't tell us what happened in any of
 2   those 142 cases.
 3        A.   Oh, that's what you're referring to?
 4        Q.   Yeah.
 5        A.   Well, yeah.  I agree.
 6        Q.   You can't tell, could you?
 7        A.   No.  No.  No.
 8        Q.   He said --
 9        A.   And that's maybe -- let me relate that back to
10   what I was saying earlier.
11             Drilling down, you need to know everything you
12   can about those.
13        Q.   Right.
14        A.   Are you -- it doesn't do any good to report
15   that stuff alone.  It really doesn't.
16        Q.   No, because --
17        A.   You know what it is?  It's tattle-tailing.
18   You know, the person in the classroom that runs up and
19   is always wanting to snitch off somebody is the most
20   unpopular person?  There's a reason for that.
21        Q.   So it doesn't give -- doesn't really help an
22   administrator figure out, "Where are my problems?  What
23   do I got to do to fix the problems?" does it?
24        A.   May I?
25        Q.   Well, this is my notes.  I can give you the
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1    report if you'd like to look at it.

2                This is October 2012.

3         A.    If they're handy.

4         Q.    No.  No.  We got it.

5         A.    I just want to lay my eyes on that stuff you

6    read.

7         Q.    Let me give you the page cite.

8                It's on page -- if you look on page 4 up at

9    the top.

10        A.    Yeah.

11        Q.    So he's got unreasonable use of force, 45;

12   failure to report use of force witnessed, 57; failure to

13   report own use of force, 29; unreasonable force likely

14   to cause injuries, 7; other minor policy, 4.  Total

15   allegations, 142.

16        A.    I'm with you, no.

17        Q.    But you can go to the next report, he doesn't

18   go back to those and say, "All right.  Here's what we

19   did.  And we found -- we looked at those 142 and we

20   concluded" -- there's nothing like that.

21        A.    Right.  Now, this presented in this way is --

22   and if that's the extent, it goes nowhere.  It's going

23   to track down who got this, what they did.  It is

24   virtually worthless.  It has no utility at all.

25        Q.    Right.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

1        A.    It's, again, like the little girl who goes or

2    little boy who goes up and tells on somebody but doesn't

3    identify who it was.  Runs up to the teacher.

4             You know, you got to have something to, you

5    know, carry on act with, you know.  And these are

6    serious.  I mean, in my view -- and I don't know if it's

7    of record in this case because I haven't found too many

8    instances of it -- the failure to report a use of force

9    witnessed is the most serious use of force.  It's more

10   serious than the use of force itself.

11            You know why?

12       Q.    Why?

13       A.    Because you never get to the force itself if

14   that failure to report is successful.  It's absolutely

15   the most serious event in a use of force system.

16            If you're having in that 57 for January to

17   June of 2012 of failure to report a use of force

18   witnessed, I'd be all over that you wouldn't believe.

19       Q.    What do you mean you'd be all over it?

20       A.    I want to know every one of those situations.

21   And if they were sustained and they were indeed failure

22   to report a witnessed -- failure to report you're

23   witnessing a use of force report there would be severe

24   discipline imposed as quickly as possible.  My IA people

25   would be saying:  You get that case cleared.  If it's

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1    evidence, you get it sustained.  I want it in the

2    disciplinary mill, and I want in there now.  Because I'm

3    going to send a message to this system that is

4    absolutely zero tolerance.

5        Q.    What about the failure to report your own use

6    of force 29 of those?

7        A.    The combined, it's worse.  I just got hung up

8    on the first.  86, 86.  Now, if those were righteous,

9    that's a serious problem.  Very serious.  Especially if

10   you look within those 86 and you find some questionable

11   applications of force.  It becomes even more, ratchets

12   it up.

13            You know, like the number of these

14   unreasonable use of force that involve these two things,

15   that is the absolute worst-case scenario in a system.

16   It will drive you right into the poorhouse.

17       Q.    I think it's a good time to take a break.

18            But before I do that, I want to follow up with

19   one question relating to what -- well, might be more

20   than one.  This concept, that's kind of this code of

21   silence issue or problem that we talked about a little

22   last time, right?

23       A.    I don't think we did.

24       Q.    Okay.

25       A.    I don't remember, yeah.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

1     Q.    But there is this code of silence.  Is that

2  what we're talking about here?

3     A.    Yes.

4          MR. RUSSELL:  Objection.  Vague and ambiguous.

5  Lacks foundation.  Calls for speculation.

6          THE WITNESS:  Well, if you permit -- if you

7  don't swiftly and surely flesh out and act on failure to

8  report or report, I think all -- even where I go, setup

9  similar on this issue.  I mean, as incomplete reporting

10 is serious in my view, failure to report is serious.

11 But in any of those systems, you have got to enforce

12 that one first and foremost among your -- whatever

13 you're oversight entities are, whether it's internal

14 affairs or whatever.  Because you can't address

15 something that you don't know about.  If an inmate for

16 whatever reason is close to getting out and just he

17 doesn't -- he's just going to keep it to himself.  But

18 he's had his ass whooped, who's going to know about

19 that?

20          And if officers get by with that, that's the

21 most quickly reinforced behavior in the institutional

22 setting.  Bar none.  If they get by with incomplete or

23 failure to report, they will -- why would they not do

24 it, Counsel?  There's nothing but grief that can come

25 from forthright reporting of wrongdoing.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                          July 23, 2013

1        Q.    In California State Prison Los Angeles, is

2   that the one you call Centinela?

3        A.    No.

4              MS. CESARE-EASTMAN:  That's LAC.

5   BY MR. BORNSTEIN:

6        Q.    That's a different one.  Sorry.

7        A.    That's LAC.

8        Q.    That's LAC.

9              You went there, too, though, right?

10       A.    That's one of the ones I did not go to.

11       Q.    Did not go to that one.  Okay.

12             You went to San Quentin?

13       A.    Yes.

14       Q.    So in San Quentin, as of beginning of

15   June 2012, they had about 3,684 total inmates and was

16   operating at 119.5 percent capacity.  And of those,

17   902 were mental health inmates, or about 25 percent of

18   the population.

19             Of the use of force incidents, 53 percent of

20   them occurred against mental health inmates, basically

21   more than double of their representative population.

22             Is that a disturbing number?

23             MR. RUSSELL:  Objection.  Lacks foundation.

24   vague and ambiguous.  Calls for speculation.

25             THE WITNESS:  Again, that's within the range

Steve J. Martin                                                                          July 23, 2013

1    of what I typically have seen when I've examined -- had

2    the data to do that.

3    BY MR. BORNSTEIN:

4        Q.   You mean double?

5        A.   Oh, yes.

6        Q.   What you typically see?

7        A.   Yes.

8        Q.   Doesn't raise issues with you?

9        A.   Of course it raises issues.

10       Q.   What issues does it raise?

11            MR. RUSSELL:  Objection.  Vague and ambiguous.

12   Overly broad.

13            THE WITNESS:  There's kind of two -- two

14   track.  One is an examination of the actual incidents to

15   see whether there were precipitating factors justifying

16   the application of force.  That's just a straight ahead

17   incident review and that tells us something.

18            The other is to -- which is outside my area of

19   expertise, which is to make assessments of the overall

20   functionality of mental health services delivery program

21   because clearly there's a relationship between those

22   programs and how well they function and mentally

23   impaired offenders being involved in the three primary

24   negative indices, which is major disciplinary actions,

25   use of force, and admin seg placement.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

 1   BY MR. BORNSTEIN:

 2       Q.   So when you see those numbers, you're

 3   concerned about what's going on in the programming side,

 4   why are the numbers as high as they are?

 5           MR. RUSSELL:  Objection.  Vague and ambiguous.

 6   Lacks foundation.  Compound.

 7           THE WITNESS:  This is what I've typically

 8   found is, you know, you've got operator or system,

 9   you've got these incidents that are occurring, most of

10   which you have an objective basis on which to use some

11   level of force and they may be using too much or

12   whatever.  But that there's a basis for you to use

13   force.

14           However, that is related to maybe that you're

15   placing a mentally impaired offender in a highly

16   restricted setting such as admin seg with lack of

17   programming which generates a spiraling down of his

18   mental health which manifests itself through resistance

19   to order, resistance to officials, which in turn

20   generates three things:  Serious discipline infractions,

21   applications of force, and further extended terms of

22   admin seg.

23           It is the worst-case perfect storm for the

24   administration of a prison system.  What I've just

25   described is that of mentally ill inmates in highly

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                                July 23, 2013

1    restricted environments with lack of mental health care

2    because it generates those every system I've seen where

3    the programming has been called into question and may be

4    even proven up that it's lacking in the corollary.

5    That's generally why I'm brought in by plaintiffs'

6    attorneys, is to do that piece of it.

7    BY MR. BORNSTEIN:

8        Q.   Well, isn't that what you've seen in

9    California, what you just described?

10       A.   I have not looked at the -- that third prong

11   of admin seg placements, extended stays related to.  But

12   there's certainly an overrepresentation of those

13   offenders in the use of force element.

14            Disciplinary, I don't know -- I have not seen

15   the data that's run on them like you run -- I would

16   certainly, if I was in a position to, I would want to

17   see the data as it relates to serious disciplinary

18   violation and dispositions by MI, non-MI, and so forth.

19   I rather expect you're going to find a pattern that's

20   similar to what you see in the other two.  They're all

21   linked.  They're all self-generated.  I mean, they're

22   all -- I want to say it's a perfect storm.  Each feeds

23   off the other.  So they're all going to be high.

24       Q.   Well, here let's talk about Pelican Bay.  You

25   brought that up when we first got started.  Pelican Bay.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

```
 1   manager.
 2        Q.   What do you mean?
 3        A.   It's last thing you want if you're running a
 4   system, is that set of dynamics.
 5        Q.   So to be effective and really make sure that
 6   we're looking at the whole picture, what we need is a --
 7   we need to have somebody like a special master who can
 8   look not only at the kind of programming and services
 9   that are being made available to inmates but also where
10   they're being housed, how they're being disciplined, how
11   they're being classified, and how they're being treated
12   as it relates to use of force; is that right?
13        A.   Not as it relates to use of force.  Use of
14   force is just an element of that.  You know, it's just
15   like the RVR.  You mentioned that the recommendation I
16   made on being able to identify what the action actually
17   was by the hearing officer.
18             The reason I made that recommendation is
19   because that's the starting point to start informing
20   ourselves on how that is operating.  Everything else we
21   say about it without that information is speculation or
22   borders on speculation.
23             The starting point is to figure out how they
24   are taking into consideration that and as it's reflected
25   through a disposition of a disciplinary.  That's it.
```

Steve J. Martin                                                    July 23, 2013

1    Until we have a system that answers -- that collects

2    that data, everything else we're doing is pissing in the

3    wind.

4         Q.   So does California have that system in place

5    now?

6         A.   No.  Clearly they don't or I wouldn't have

7    made the recommendation, Counsel.  And you would have

8    seen my data.  You would have seen me report that in a

9    very objective concrete fashion of -- on that issue.

10        Q.   You know the Coleman litigation has been going

11   on since 1990?

12        A.   I know why, too.

13        Q.   Why?

14        A.   A lot of folks that aren't looking at this in

15   a logical, linked fashion where you're, you know, you're

16   operating in a way where one issue is linked and

17   compliments another and so forth.  You're -- you have

18   this myriad of, you know, the program guide and other

19   things that I quite honestly -- and I've never shied

20   away from a challenge in this business in my career.

21   And I've been involved in as many complex cases in this

22   field as anybody you'll sit across the table from.  It

23   intimidates me.

24             I do not know.  If Jeff and Governor Brown and

25   the attorney general said, "Mr. Martin, we're going to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

```
 1   really, I think, understood these guys have -- these
 2   mentally ill guys have some issues, and we need to
 3   consider it's a wonderful thing when they recognize
 4   that.  But you've got some that don't.  You've got some
 5   that are just checking boxes, that -- like a
 6   psychologist I saw at one unit that had never found one,
 7   a single one where he thought the mentally health was
 8   impacted.  And there he sits doing that every day with
 9   nobody questioning that.
10          So it's all these kind of issues and
11   requirements, so forth.  It's terribly difficult -- we
12   were talking about it at noon -- of how do you keep
13   track, number one, of what all the requirements are.
14          And that's just the first, you know -- but,
15   more importantly, how do you coordinate properly with
16   the -- you know, the priority and requirements of that
17   faction versus that faction and so forth.  It's just a
18   huge problem.
19      Q.   I want to go back to this issue.  You would
20   agree the current state of California's prisons is not
21   working as it relates to the care and custody of mental
22   health inmates, wouldn't you?
23          MR. RUSSELL:  Objection.  Vague and ambiguous.
24          THE WITNESS:  I don't have the expertise to
25   make a -- render that opinion.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1    much, relatively speaking, what most of us as parents

2    would say you want in a child.

3          You think I'm not constantly advising her,

4    warning her, guiding her in her life?  I'm doing it

5    constantly, even though she's probably as close to where

6    we'd want her to be.

7    BY MR. BORNSTEIN:

8          Q.    But --

9          A.    It's the same thing.  You could always,

10   always, always find areas of improvement and certainly

11   with RVR.  Are they better than -- is it better than

12   nothing?  Considerably so.  Considerably so.  There was

13   a time when it made no difference at all.  Utterly no

14   difference.  In fact, it could work the other way; you

15   would get more time because you were mentally ill.

16         So yeah, use of force, same thing to an extent

17   that -- except we've got to solve -- we need -- all of

18   us need guidance on this.  I think it, you know, this

19   baton issue that I leave to the fact finders and the

20   lawyers on what I've laid out.  And I'll respect

21   whatever the fact finder comes down with.

22         The other issue is the chemical agent, the

23   amount of agents being used oftentimes.  Not -- I'm not

24   talking about the seven cases; I'm talking about when I

25   saw incidents that were really righteous incidents and

Steve J. Martin                                                July 23, 2013

1    OC was effective, but I questioned did you really need

2    to use that much.

3            Because if that's happening very often, then

4    it's -- you get into these situations like we saw, the

5    seven incidents yesterday.  There clearly is too much.

6    It's just old axiom, you know, that if you build them,

7    they will come.  I mean, it's there, you know, type of

8    thing.

9            So if you got to do that, you've got to have

10   greater safeguards.  You've got to have better data.

11   You've got to set a standard where the official knows

12   this is enclosed 80-square-foot cell, unarmed inmate,

13   he's recalcitrant, he's troublesome, but we've got the

14   situation secure in terms of no immediate threat.

15           There's a perception you don't pull out any

16   large canisters of OC spray.  You just don't need them

17   there.  There's no reason for them to be even on the

18   scene.  Instead, we saw a whole tray, unprecedented in

19   my experience, that one incident -- I believe it's

20   paragraph 21 of the Vail depo -- in which they had a

21   tray to hold the various dispersal agents.  It was like

22   a surgical tray of instruments.  Okay.  Here's the BRD.

23   Here's the MK-9.  Here's the MK-46.  Here's the wand

24   with these two inmates.

25           And clearly something needed to be done

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                                    July 23, 2013

1    because if -- am I correct?  Is this paragraph 21 we're

2    talking about?

3              MS. CESARE-EASTMAN:  I'm not sure.

4              THE WITNESS:  Okay.  I believe it is.

5              But anyway, they were barricaded.  They

6    were -- the cell was darkened.  They were possibly

7    armed.  Possible intoxication.  There were five elements

8    that made that a serious situation.  And something

9    needed to be done.  They needed to get that door pierced

10   and make sure that those guys were secure.

11             So that -- how that was drawn out and all the

12   spray that they used, and then they ultimately popped

13   the door a little bit and finished up the ordeal.  But

14   it was just tactically not handled in the safest way for

15   both inmates and staff even though it was a serious

16   situation, know...

17             And where I think it was critical of Mr. Vail

18   is while I think there was probably tactically more OC

19   used in that incident, therefore, it would be in

20   agreement with him on that, you would not want to

21   ultimately reach an opinion on excessive force without

22   considering these other viable evidentiary facts of

23   barricading and so forth.

24             But even incorporating those, having weighed

25   those, I still believe there was probably excessive

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1    chemical agent used now.

2            Does that equate to a finding of excessive

3    force?  That's where it spills over into the realm of

4    you lawyers and fact finders.  I think there's a point

5    at which the amount itself per se constitutes excessive

6    force.  But where that line is, how much, I don't know.

7    It depends.  It's so related to have they mustered a

8    good defense, too.  Are they able to ameliorate the

9    effects of it?  It's not quick and easy.  And I wouldn't

10   be quick to arrive in that situation if that was an

11   instance of excessive force.

12           I don't know, quite frankly.  I'm here to tell

13   you I don't know.  And in that particular situation, I

14   know they were barricaded.  I do know they had said they

15   were armed.  Cell was darkened.  Windows covered.

16   Somebody can die in that situation.  That's what I do

17   know.

18   BY MR. BORNSTEIN:

19       Q.   So there were a couple of other things about

20   that incident that were on the videotape.

21           You saw that they were, as they came out of

22   the video, they were with the triangle?

23       A.   Yes.

24       Q.   What is that called?  Just called triangle?

25       A.   Tether, triangle securing device.  They have

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

 1      Q.   And so I went back -- I went back and I
 2   started pulling letters.  And I got letters back to 2003
 3   where various issues have been raised by the plaintiffs'
 4   counsel to the OIG.  And I guess there was a period of
 5   time when the OIG could actually do investigations.  You
 6   know they can't do investigations now, right?
 7      A.   Right.
 8      Q.   And I saw that there was a letter about the
 9   Corcoran SHU on November 26 of 2003.
10           There was one about Salinas Valley State
11   Prison, misconduct by correctional officers January 27,
12   2004.
13           There was one about Lancaster, harassment of
14   mentally ill inmates, May 11th, 2004.
15           There's one on October 20th, 2004, California
16   Men's Colony, where an inmate died.
17           There's one in November 2005, Corcoran State
18   Prison, alleged excessive force against mentally ill
19   inmates.
20           Soledad, use of force incidents involving a
21   particular inmate.  That would be June 14, 2006.
22           Another one on June 26, 2007, at
23   Salinas Valley about administrative segregation issues,
24   mentally ill inmates.
25           August 16, 2007, Salinas Valley, misconduct

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                          July 23, 2013

1   allegation.

2          Same thing with another inmate on the same

3   day, August 24, 2007, Salinas Valley staff misconduct.

4       A.   Can I save you time in doing that?

5       Q.   Sure.

6       A.   It's absolutely meaningless.

7       Q.   Why?

8       A.   Well, because we're talking about systemic

9   issues.  Or I have.  Can you show me a single bit of

10  that correspondence that raises the issues I have in my

11  best practice recommendations?  Can you show me a single

12  one that touches on any one of those?  I bet you -- I

13  can tell you probably no.

14      Q.   Well, I don't know.

15      A.   That's what I'm referring to when I say where

16  has everybody been.  Where has everybody been with a

17  system that in plain view corrupts their officers with

18  batons and MK-9s and grenades which haven't been talked

19  about?  A lot of them.  Where has everybody been about

20  raising -- is that a possible issue?  Should we be

21  looking at incidents in which that stuff is deployed?

22  That's what I was talking about.

23          And you want to show me one of those files

24  where that's raised and maybe I'll back up.  Absent

25  that, I'm not moving one bit off of that and I'll

Steve J. Martin                                                    July 23, 2013

 1    continue to pose it.  And the more I look at this, the

 2    more I pose that question, quite frankly.

 3         Q.   So let's talk about what you just said.  The

 4    the weaponry that the guards have is an issue that ought

 5    to be dealt with, right?

 6         A.   It's an issue that should generate any

 7    oversight by be it the special master, be it the OIG, of

 8    seeing how that equipment is being deployed.  Because in

 9    the correctional mainstream, systems typically don't

10    have to rely on that -- that level of ready, immediate

11    arsenal equipment to manage inmates.

12              Okay.  That's the general that -- when I came

13    out here and I saw how they were equipped and I -- the

14    very first officer I saw when I walked on the unit, I

15    didn't have any idea they were equipped this way.  And I

16    saw the expandible baton and I saw MK-9 and I saw two

17    grenades.  I immediately said, "Whoa."

18              Has there been no other single person out of

19    all the expertise that y'all bring to bear and the

20    special master brings to bear and everything else, that

21    anybody asked that simple question:  "Should we maybe

22    look at these incidents and see how MK-9 is being

23    deployed?  Had we better look and see what all equipment

24    they have?"

25              I can remember the first control tower went up

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                                    July 23, 2013

```
 1   in a housing unit.  I was stunned at the arsenal they
 2   had in that control center with the MK -- they had a
 3   whole rack of MK-46.  They had more MK-46 in that
 4   control station than most prisons have for their entire
 5   prison.  So I said, "Whoa, yeah."
 6           So this is before I looked at anything much.
 7   But I did see on those logs, MK-46 and so forth.  I
 8   immediately knew there was an issue.  I mean, I
 9   immediately knew it, before I looked at an incident.
10   That's why I'm saying, where's everybody been?
11       Q.   Well, aren't California inmates more dangerous
12   than everybody else's?
13       A.   Absolutely they're no different than Maine and
14   Texas inmates, Ohio inmates, Michigan inmates,
15   Mississippi inmates.  And I've been in all those
16   systems.  I've been in your system over 30 years.
17       Q.   But I thought that they need all that stuff.
18       A.   I don't know whether they need it or not, but
19   I know they have it.  So I want to see how they're using
20   it, and then I'll make a judgment whether they need it.
21           I don't think they need batons at all
22   facilities.  But at certain facilities, I'm not
23   uncomfortable with them carrying that on their person if
24   they're guided right, trained right, and managed right.
25   Because those are yard fights.  I mean, those
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

 1    inmate-on-inmate assaults can be so dangerous and so

 2    life-threatening and so forth.  And if you've -- you

 3    know, commanded them to stop and you've used OC spray

 4    and they continue to do it, if you want to go with the

 5    block guns, if you want to go with some other things

 6    that's generated the issues...

 7              I mean, what do you do?  I mean, what do you

 8    do to get those guys to stop trying to kill one another?

 9              Do they need them at a lower level facility?

10    I'd say no.  I'd limit the MK-9 and the expandible to

11    where you, you know, you can -- your track record shows

12    you have some pretty dangerous people and so forth, you

13    know.  And then you're going to reduce your incidents

14    like that.  I can reduce incidents of MK-9 in this

15    system probably 30 to 40 percent in probably 60 days.

16         Q.   How?

17         A.   Take the damn stuff away at certain places.

18    Limit it to you need it here or it's authorized here or

19    accessible here.  "Yeah, Lieutenant, you can use MK-9,

20    but you -- but this is where it's going to be.  Or maybe

21    you can carry it or maybe a sergeant can."  It may be

22    certain officers in certain areas where they're dealing

23    with dangerous predatory inmates that have recently

24    assaulted other inmates or staff.

25              Yeah.  Yeah.  I'll go with you that far.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1          So that it's those kinds of things that I

2    think can be done to immediately reduce usage.  I mean,

3    the -- I would hope would be accepted by rank and file

4    although in this state, the union is so very strong and

5    they may just take the position that if one officer

6    carries it, we all do.  And I don't know how, quite

7    frankly, what to advise you on that.

8          Q.   So you're saying, though, that from a safety

9    perspective -- and I'm talking now about guard/personnel

10   safety -- based on your training and experience, your

11   expertise, guards can safely operate in a prison like

12   California's without all that weaponry?

13         A.   They do in almost all the other systems of

14   which I'm familiar and I know the feds included.

15         Q.   What we're talking about are the crowd control

16   gas canisters and the grenades and the expandable baton?

17         A.   Right.

18         Q.   Is that -- is that right?

19         A.   Yes, I don't know that I'd have an objection

20   to him carrying MK-4, pretty high potent MK-4.  Don't

21   know that I'd object to them having that expandable

22   baton in certain facilities, you know, where you have

23   inmates that go after one another quite frankly.

24         Q.   So long as there's enough training to

25   ensure --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1  really concerned about the absence of training or

2  guidelines and how force is used because that could lead

3  to systemic problems, right?

4      A.   Yes.  Let me put it maybe a little bit

5  different way since we're -- I mean, I just decided I

6  don't care what anybody says.  I'm going to do my best

7  to advance the issues in this case.  I mean, everyone's

8  taking potshots at me already so what have I got to

9  lose.  I've pissed everybody off.

10          What were we talking about?

11      Q.   I was saying the lack of training or

12  guidelines and how use of force could lead to the kind

13  of injuries that you'd become concerned about.

14      A.   Thank you, Counsel.

15          I've told agency officials -- and, again,

16  going back to why these recommendations were -- best

17  practices were fairly very, very carefully crafted.

18  You're flirting around the edges of a systemic pattern

19  and practice on use of force.  You're not there, that

20  I've been able to establish, and -- but you're flirting,

21  you're on the edges, and you could at any point in time

22  cross the boundary out.

23          I used the one analogy, I think to Patrick, is

24  that think of yourself as an automobile and you're

25  running -- you're -- just about to peg out at empty.

Steve J. Martin                                                    July 23, 2013

```
 1   You're still running.  And you're still going from
 2   Point A to Point B and everything looks, by appearances,
 3   anybody that would see that car traveling down the road,
 4   oh, it's a nice car and it's running, never knowing that
 5   it's about to peg out on empty.  I said that's -- you've
 6   got to bring that back, in my view, by doing these
 7   things to ensure that you're not going to peg out.
 8         But I firmly believe there is not an
 9   established pattern and practice of excessive force in
10   this matter based on what I've reviewed.  Has my review
11   been comprehensive enough?  No.  There's 11 to 13
12   institutions.  Would I dig deeper at certain
13   institutions about which I think maybe there would be
14   individually systemic issues?  Yes.
15         Q.   Which ones?
16         A.   Corcoran, R.J. Donovan, and Pelican Bay.
17         So R.J. Donovan on batons, Corcoran on amounts
18   of chemical agent, and Pelican Bay on immediate use of
19   force.  There you have it.  Three concrete,
20   straightforward issues that are supported by the
21   evidence.
22         Q.   And is that what you mean --
23         A.   Are they flirting?  Yes, they are.  Doggone
24   sure you are.
25         Q.   On those three, have they crossed the line?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

 1        A.   I would have to look at it more closely, but I
 2   wouldn't be shocked if I took a more comprehensive look
 3   that I would walk away.  I saw some disturbing things at
 4   all three that would suggest that they need some
 5   attention at some point.
 6             I mean, Pelican Bay alone is, but for -- I
 7   mean, I did not find any aggravated that I recall, you
 8   know, instances, you know, really high levels.  What --
 9   what was so bothersome at Pelican Bay was that they
10   looked at every single incident as an immediate use of
11   force when clearly, objectively, any number of those
12   were not.
13             So I'm left thinking could some of those have
14   been prevented had they been calculated and with the
15   appropriate forces brought to bear.  And if the answer
16   to that is yes, then I've got a duty to say something.
17   And I did.  And I have.
18        Q.   Did you tell the secretary that?
19        A.   I think Jeff -- we can check the record -- I
20   never -- I discussed this very issue with the party that
21   was there.  I'd come back at the end of day and
22   basically we'd debrief and I would say, "Whoa, look at
23   this."
24             And then I talked about some specific
25   incidents, and I said those things in combination have

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                July 23, 2013

1   got -- you know, very saddening to me because of the

2   Madrid litigation I was involved in in the early '90s

3   and had a part in, I thought, reforming significantly

4   that facility.  Which I -- hopefully it is.  But I know

5   it's a lot better than it used to be.  But it bothered

6   me that I found that after all these years that the case

7   had been terminated.  Whoa.  What are they looking at

8   here?

9          Q.   That it shouldn't have been terminated?

10         A.   I don't know about that.  But anybody that

11  knew that 9 out of 10 -- or more than.  It's 174.  I

12  think I calculated 95 percent.

13         Q.   174 out of 184?

14         A.   Whatever it was, yeah.  Is that 95 percent?

15  It's higher than that, I think.

16              Anyway, the -- that if that has -- if that is

17  reflective periods before and since -- because I looked

18  at January to October, if memory serves me, 2012 -- that

19  that's a serious problem.  Given that I looked at

20  specific incidents within my cohort of January to

21  October where my judgment was they were not immediate.

22  They were -- clearly could have been converted to

23  calculated and should have been taken down that road.

24              So -- and I don't know -- like I say, I didn't

25  look at it prior to.  I don't know whether she had --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1   have included these recommendations that we've been

2   talking about in your declaration?

3           MR. RUSSELL:  Objection.  Vague and ambiguous.

4   Lacks foundation.

5           THE WITNESS:  More complete as to what?

6   BY MR. BORNSTEIN:

7       Q.   The breadth and scope of your opinions.

8           MR. RUSSELL:  Objection.  Vague and ambiguous.

9   Lacks foundation.

10          THE WITNESS:  I understood this to be opinions

11  related to the constitutional elements of the RVR use of

12  force process.  That's what I understood I was being

13  asked to do.

14  BY MR. BORNSTEIN:

15      Q.   The policies that we've been talking about in

16  CDCR, do they limit the amount of OC spray that can be

17  used?

18      A.   I don't believe they do, no.

19      Q.   Should they?

20          MR. RUSSELL:  Objection.  Vague and ambiguous.

21  Lacks foundation.

22          THE WITNESS:  There should be certainly some

23  guidance that identifies -- that creates an operational

24  standard where one knows that there is excessive amount

25  of spray that can be deployed in a situation.  That does

Steve J. Martin                                                July 23, 2013

 1  not achieve, you know, a lawful tactful objective such

 2  as neutralized or immobilizing a threat.

 3  BY MR. BORNSTEIN:

 4      Q.   All right.  Six of the 13 incidents cited by

 5  Mr. Vail were incidents that you yourself noted were

 6  problematic, right?

 7      A.   Six of the incidents -- I would have to see my

 8  declaration how I stated that.

 9      Q.   Paragraph 14.

10      A.   Thank you.

11           Yeah, I would think it's most accurately

12  stated when I say six of 13 came to his attention as a

13  result of my reviews.  I haven't taken a position on

14  what those reviews were in terms of, as you said,

15  problems.

16      Q.   Okay.  And then obviously I know you

17  repeatedly criticize Mr. Vail for lots of things.  One

18  of the things you criticize him for is relying too much

19  on the videos, right?

20      A.   Well, relying exclusively or primarily on the

21  videos.  Obviously it's very relevant, any use of force.

22      Q.   You agree that when you watch the videos,

23  there are some very shocking things that you witness,

24  isn't there?

25           MR. RUSSELL:  Objection.  Vague and ambiguous.

Steve J. Martin                                              July 23, 2013

```
 1        Q.    And so those are some of the real world
 2   circumstances, too, right?
 3        A.    Correct.
 4        Q.    And all that has to be taken into
 5   consideration, right?
 6        A.    If you -- you're trying to improve the
 7   situation, yeah.
 8        Q.    You agree that there needs to be -- this is
 9   paragraph 9, I think, in your declaration.
10             You don't like the idea of a continuum of
11   force, so I'm not going to ask you about that right now.
12   I just want to make sure clear.
13             You don't like that idea, right?
14        A.    I don't favor continuum of force, no.
15        Q.    Okay.  But you agree there's got to be better
16   policies about use of force.  We've talked about those,
17   right?
18        A.    Yes.
19        Q.    And there needs to be better training and --
20        A.    Yes.
21        Q.    And that's not only with OC but also the
22   baton, right?
23        A.    Yes.
24        Q.    And probably any other sort of force?
25        A.    In fact, I wouldn't develop specifically only
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                    July 23, 2013

1    training on baton and OC spray.  I would start with

2    developing a training package on having the line staff

3    understand basic use of force and why it's used and how

4    it's analyzed and how it's looked at, you know, both in

5    their correctional standard and the law.

6            It's inextricably linked to the law, and

7    you've got to have that element in teaching this, that

8    it's an Eighth Amendment violation and this is how

9    courts typically look at it and why they look at it.

10   And so there's a substantive understanding you aren't

11   going to be given unfettered discretion to harm people.

12       Q.   And one of the -- when you went to go look at

13   the videos, did they ever bring out the training video

14   that they supposedly have developed from Sacramento?

15       A.   I did not see such a thing, no.

16           MR. BORNSTEIN:  We're reasking for that again,

17   Jay.  Patrick had promised us that we would get it and

18   we haven't seen it yet.

19           MR. RUSSELL:  When we get it, we'll provide

20   it.

21           MR. BORNSTEIN:  Just thought I would mention

22   that again if you are making notes.

23   BY MR. BORNSTEIN:

24       Q.   The immediate use of force versus the

25   controlled use of force is obviously something you've

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                              July 23, 2013

 1    commented on as it relates to Pelican Bay in particular.

 2            Is that, though, a problem in the

 3    institutions, the other institutions that you visited?

 4        A.   I saw variations of it kind of across the

 5    board with the -- again, Pelican Bay was the last

 6    facility we visited, and it just happened to have

 7    been -- have the most pronounced pattern.  But I saw --

 8    I mean, I certainly identified the issue prior to

 9    Pelican Bay.

10        Q.   Okay.  And with respect to the hearing

11    officers in the RVR process, would you agree it would be

12    better if they had like hearing officers that weren't

13    necessarily custody supervisors, you know, were neutral?

14        A.   No.  No.

15            MR. RUSSELL:  Objection.  Vague and ambiguous.

16            THE WITNESS:  I wouldn't necessarily agree to

17    that.

18    BY MR. BORNSTEIN:

19        Q.   Why not?

20        A.   It's just, you know, in the business, hearings

21    are routinely and have been historically and

22    traditionally in American corrections conducted by

23    custody staff.

24        Q.   Okay.

25        A.   It all again goes back to whether there's a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Steve J. Martin                                                          July 23, 2013

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4     Reporter, hereby certify that the witness in the

 5     foregoing deposition was by me duly sworn to tell the

 6     truth, the whole truth and nothing but the truth in the

 7     within-entitled cause;

 8              That said deposition was taken down in

 9     shorthand by me, a disinterested person, at the time and

10     place therein stated, and that the testimony of the said

11     witness was thereafter reduced to typewriting, by

12     computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14     attorney for either or any of the parties to the said

15     deposition, nor in any way interested in the events of

16     this cause, and that I am not related to any of the

17     parties hereto.

18

19

20              DATED:  August 2, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

Exhibit B

Michael D. Stainer                                    August 15, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____

                                    )
RALPH COLEMAN, ET AL.,              )
                                    )
                  Plaintiffs,       )
                                    )CASE NO.:
          vs.                       )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                  Defendants.       )
_____)

DEPOSITION OF

MICHAEL D. STAINER

THURSDAY, AUGUST 15, 2013,  10:08 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Michael D. Stainer                                    August 15, 2013

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3

4    _____

5                                    )
     RALPH COLEMAN, ET AL.,          )
6                                    )
                      Plaintiffs,    )
7                                    )CASE NO.:
            vs.                      )S 90-0520 LKK-JFM
8                                    )
     EDMUND G. BROWN, JR., ET AL.,   )
9                                    )
                      Defendants.    )
10   _____)

11

12

13

14

15

16          The Deposition of MICHAEL D. STAINER, taken on

17   behalf of the Plaintiffs, before Megan F. Alvarez,

18   Certified Shorthand Reporter No. 12470, Registered

19   Professional Reporter, for the State of California,

20   commencing at 10:08 a.m., Thursday, August 15, 2013, at

21   the law office of K&L GATES LLP, Four Embarcadero

22   Center, Suite 1200, San Francisco, California.

23

24

25

Michael D. Stainer                                          August 15, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3           BY:  MEGAN F. CESARE-EASTMAN, ESQ.
                 JON MICHAELSON, ESQ.
 4           K&L GATES LLP
             FOUR EMBARCADERO CENTER, SUITE 1200
 5           SAN FRANCISCO, CALIFORNIA 94111
             415.882.8086
 6           415.882.8220 FAX
             JON.MICHAELSON@KLGATES.COM
 7           MEGAN.CESARE-EASTMAN@KLGATES.COM

 8

 9   FOR DEFENDANTS:

10

11           BY:  PATRICK R. MCKINNEY, ESQ.
             OFFICE OF THE ATTORNEY GENERAL
12           STATE OF CALIFORNIA
             455 GOLDEN GATE AVE., SUITE 11000
13           SAN FRANCISCO, CALIFORNIA  94102-7004
             415.703.3035
14           415.703.5843 FAX
             PATRICK.MCKINNEY@DOJ.CA.GOV

15

16           KATHERINE K. TEBROCK, ESQ.
             CDCR
17           OFFICE OF LEGAL AFFAIRS
             1515 S. STREET, SUITE 314 SOUTH
18           SACRAMENTO, CALIFORNIA 95811
             916.323.2929
19           916.327.5306 FAX
             KATHERINE.TEBROCK@CDCR.CA.GOV

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

 1        A.   I will be now.  Unless I'm unavailable.

 2        Q.   Okay.

 3        A.   However, you know, as deputy director, I was

 4   an alternate for the director.

 5        Q.   I see, because you just began your new role

 6   August 1st?

 7        A.   Correct.

 8        Q.   I understand.

 9        A.   Yes.  But I did sit in on approximately seven

10   cases, I think.  A total of three times for maybe a

11   total of seven cases, about.  That's an estimate.

12   During this calendar year.

13        Q.   Okay.  Do you think it would be a good idea to

14   include a member of mental health or clinical staff on

15   the committee?

16             MR. McKINNEY:  Objection.  Vague and

17   ambiguous.  Calls for speculation.

18             THE WITNESS:  I'm not sure that would be a

19   good idea.

20   BY MS. CESARE-EASTMAN:

21        Q.   Is there any part of the process you think

22   that that would add value or not?

23             MR. McKINNEY:  Objection.  Vague and

24   ambiguous.  Calls for speculation.

25             THE WITNESS:  I'm not sure what a mental

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

 1   health or clinician could yield or could bring to the

 2   table when we're evaluating an officer's or staff

 3   member's actions with regard to the application of

 4   deadly force.  I'm not sure how they could be utilized

 5   when we're simply looking at the actions by the staff

 6   and all the surrounding circumstances to determine

 7   whether or not that application of force was within

 8   policy.

 9   BY MS. CESARE-EASTMAN:

10        Q.   Do you think that the mental condition of the

11   inmate is a relevant factor when you're determining

12   whether force was within policy or not?

13             MR. McKINNEY:  Objection.  Calls for

14   speculation.  Incomplete hypothetical.

15   BY MS. CESARE-EASTMAN:

16        Q.   Do you understand the question?

17        A.   Yes.  And I do.  I think, you know, every

18   situation's so different, to answer that broadly I'm

19   not -- you would have to look at every situation and

20   see.  I mean...

21        Q.   Do you think that if there was a situation

22   that came to the deadly force review board that involved

23   an inmate that was in some sort of state of crisis or

24   engaging in behavior that was, you know, triggered by

25   mental illness, would it be helpful to the committee to

Michael D. Stainer                                    August 15, 2013

1    have the input of a mental health clinician?

2              MR. McKINNEY:  Objection.  Calls for

3    speculation.  Incomplete hypothetical.

4              THE WITNESS:  Not necessarily.

5    BY MS. CESARE-EASTMAN:

6         Q.   Let's talk about the DERC, Department

7    Executive Review Committee.

8              What does that committee do?

9         A.   That committee simply -- after the institution

10   would complete their use of force review process, all

11   the way up through the executive level at the

12   institution, meaning the wardens' committee, they would

13   receive the entire package.

14             They would then do a complete assessment of

15   the package, make sure that all issues were addressed,

16   if there were any issues.  Basically just another level

17   of review to determine, you know, did the institution

18   cover everything.

19             If there was anything that was deemed outside

20   of the policy, was it caught?  Was the appropriate

21   corrective action taken, if necessary?

22             And if there was something missed, then we

23   would provide the institution with direction to -- you

24   know, advise them of what they missed.  We might have to

25   provide training to the review committee, you know, with

Michael D. Stainer                                    August 15, 2013

1    regard to their processes and why they may have missed

2    something.

3           And then document those findings in a report,

4    return to it the warden with directions and/or -- you

5    know, stating that we've completed our review and, you

6    know, document the fact that they did everything they

7    were suppose to do.

8        Q.   And who's on that committee?

9        A.   It's chaired by the associate director, and

10   when I was available as the deputy director, I would

11   sometimes go sit in to just review -- provide oversight

12   to that process.

13       Q.   Is it chaired by -- and it's chaired one of

14   the associate directors that you oversee?

15       A.   That's correct.

16       Q.   Do you oversee all of the associate directors

17   that exist?

18       A.   As deputy director I -- of division of adult

19   institutions, just the associate directors that are

20   assigned to the division of adult institutions.

21       Q.   Okay.  I understand.

22           Who else is on that committee besides the

23   associate directors?

24       A.   Generally, the associate warden for that

25   mission, the correctional captain for that mission and a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

 1    lieutenant and/or CCII for that mission who would work
 2    up the case for presentation to the associate director.
 3         Q.   And who selects the committee members?
 4         A.   Would be up to the associate director to --
 5    want everybody in this mission to be versed within that
 6    process.
 7         Q.   How often does the committee meet?
 8         A.   When necessary.
 9         Q.   And how are cases referred to the DERC?
10         A.   Again, we select the cases.  There is some
11    that are automatically referred.  Like I stated earlier,
12    we got the head injuries and any serious injury suffered
13    by the inmate when there are -- you know, that appear to
14    be due to the use of force.
15              Or just when we want to look a little bit
16    closer at a case.
17         Q.   So how do incidents come to your attention?
18    Is it filtered through the warden?
19         A.   Again, as I stated earlier, the wardens on a
20    regular basis, either through their AAPIOs, which is
21    their administrative assistants, public information
22    officers, they're required to provide notification to
23    the associate directors when they have particular types
24    of incidents.  Then on a daily basis, you know, via
25    e-mail or telephone call, depending upon the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                      August 15, 2013

 1   significance of the occurrence.

 2           On a daily basis, the administrative

 3   assistants at each institution report to the reception

 4   center mission.  Who then puts together what we call the

 5   dailies and that's our daily briefing report and it

 6   lists by institution all significant incidents.  So

 7   there are two ways that we become aware of incidents.

 8           Either through, again, telephonic or e-mail

 9   contact directly from the institution to the associate

10   director or by review of the dailies.  That we call them

11   the daily briefing reports.

12       Q.   Are there minutes that are created at those

13   meetings -- the DERC meetings?

14       A.   Not necessarily, no.

15           What they do is they come up with basically a

16   memorandum where they describe a synopsis of the

17   incident.  What occurred.  They evaluate the

18   institution's actions and their review processes at each

19   of the levels at the institution and then they provide

20   their findings.  And, if necessary, any recommendations.

21       Q.   Are those findings also made by majority vote

22   of the committee?

23       A.   Not necessarily, because the associate

24   director chairs.  So we want to solicit the input and

25   listen to the presentation.  We have the reports in

Michael D. Stainer                                        August 15, 2013

1   front of us so if we have any questions.  When I say

2   "the reports," I'm talking about every report that was

3   part of that use of force.

4           So we can go through and review those.  But in

5   essence, the associate director who, in almost every

6   single case, we know is a former warden and is very

7   familiar with the use of force process and how it should

8   be executed, would then render the decision.

9           But we would listen to the input from the

10  other staff that are sitting on that.

11      Q.   So the ultimate decision and recommendation is

12  within the purview of the associate director?

13      A.   That's correct.

14      Q.   Is there ever a mental health or clinical

15  staff on that committee?

16      A.   No.  Not that I've been aware of.

17      Q.   Do you know why not?

18      A.   Again, we are reviewing the actions of staff

19  to determine whether or not they're within policy.

20  These are folks that have been trained in use of force

21  policy, the review of the use of force policy.  I'm not

22  sure that clinicians receive that same -- I'm not sure

23  what role they would play in that review committee.

24      Q.   And do you think it could help the committee

25  more throughly evaluate whether the force applied was

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                              August 15, 2013

 1  and another manager.

 2      Q.   Who selects the additional members?  Is it the

 3  warden?

 4      A.   It could be the warden and I would always

 5  invite people to come because I believe the managers

 6  needed and other supervisors needed to see what this

 7  process is about so they become familiar with it.  They

 8  know what kind of questions we ask at the committee.

 9      Q.   Is there ever a committee member from mental

10  health or clinical staff?

11      A.   I've had -- I have had those people attend.

12  Mostly from the medical angle, though, medical as

13  opposed to mental health.  But I have had mental health

14  folks on there but not on a regular attendance and more

15  to observe.

16      Q.   Do you know whether institutions other than

17  the one where you were participating in these meetings

18  invite mental health or clinical staff to participate in

19  the committee?

20      A.   I've sat in on two other prisons and, you

21  know, there were no mental health clinicians or medical

22  there present but I don't know if that was -- you know.

23      Q.   There's no formal policy or requirement that

24  mental health or clinical staff be present?

25      A.   No, there is not.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                          August 15, 2013

1       Q.   Would that be a good idea?

2       A.   Again, in talking about everything we've

3   talked about earlier today, I don't know what role they

4   could serve.

5       Q.   Do you feel it would help the committee

6   evaluate incidents more thoroughly, especially incidents

7   that occurred against mentally ill?

8            MR. McKINNEY:  Objection.  Calls for

9   speculation.

10           THE WITNESS:  No.  And again, I -- the -- the

11  role of that committee is to evaluate that staff

12  member's use of force given the set of circumstances

13  that were occurring and make that determination whether

14  or not they were within policy.

15  BY MS. CESARE-EASTMAN:

16      Q.   So do you feel it would help them evaluate the

17  incidents more throughly or not?

18           MR. McKINNEY:  Objection.  Calls for

19  speculation.

20           THE WITNESS:  I don't believe that it would be

21  an asset.  No.

22  BY MS. CESARE-EASTMAN:

23      Q.   Do you still attend IERC meetings?

24      A.   I have not since I've been the deputy

25  director.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                      August 15, 2013

1        A.    I think there are occasions, yes.

2        Q.    And do you believe that the current policies

3    and training were inadequate to address the problem?

4        A.    I believe the current policy which simply

5    states that minimal amount necessary to gain compliance,

6    you know, again, based upon a person's experiences, and

7    their -- it's open.  I mean, for lack of a better term.

8    I felt it was necessary to provide some direction with

9    that regard and some expectations to that regard and so

10   obviously the -- the policy as written is okay, however,

11   the way that it was being followed was probably not and

12   we had to provide some additional expectations, hence

13   the memo.

14       Q.    And the policy as written does not provide any

15   guidance as to how much spray is allowed to be used.  It

16   doesn't -- or any requirement that you weigh canisters

17   so there's documentation of how much spray was used?

18            MR. McKINNEY:  Objection.  Compound.  Vague

19   and ambiguous.

20   BY MS. CESARE-EASTMAN:

21       Q.    Is that correct?

22       A.    Correct on both accounts.

23       Q.    Nor does it provide any guidance as to what an

24   appropriate waiting period is between applications?

25       A.    That is correct as well.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1       Q.   Do you think it should?

2       A.   I think that it is a very -- controlled use of

3   force situations are very dynamic and it's very

4   difficult to provide any hard and fast rules as to what

5   you can and cannot do because you have to be able to be

6   flexible and you have to be able to adjust based upon

7   the ever-evolving situation.  And so I think the policy

8   is appropriate.  I really do.  But it's how we implement

9   and practice that policy that I had concerns with which

10   is why this memo was authored.

11       Q.   Have you ever observed a situation that you

12   felt it would have been appropriate to spray an inmate

13   with pepper spray 40 times?

14       A.   Personally, no.

15       Q.   Thirty-five times?

16       A.   Personally, no.

17       Q.   Twenty times?

18       A.   Let me just say -- this will probably answer

19   your next three questions as well.  I've been involved

20   in a very, very large amount, as a incident commander,

21   of controlled use of force situations by means of my

22   assignments in the prison when I was a lieutenant.  I've

23   done a whole lot of cell extractions.

24            I've never had to spray an inmate 40 times nor

25   35 nor 25.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1      Q.   Those were approximately five times over the

2   last five to six months with Ms. McDonald, Kelly

3   Harrington, and your instructor in Tehachapi?

4      A.   I did not discuss -- well, actually, you know

5   what, yeah, I did discuss with him about weighing it.

6   Because he's also former armory personnel.

7           And we talked to -- pretty sure I discussed

8   that with the former director as well.

9      Q.   So I guess we can talk about these discussions

10  together since it seems that the discussions about his

11  second recommendation regarding the baton and his third

12  recommendation regarding OC spray happened concurrently?

13     A.   Okay.

14     Q.   What did those five or six discussions entail?

15  What did you discuss?

16     A.   The recommendation.  What was being talked

17  about.  Feasibility of, for example, when it comes to

18  the weighing, you know, operationally, you know, do

19  we -- something that we seriously considered but at the

20  same time, you know, how would we go about doing that.

21     Q.   Other systems weigh their canisters before and

22  after use, correct?

23     A.   I'm told that they do.

24     Q.   So presumably it's possible to do it somehow?

25          MR. McKINNEY:  Objection.  Calls for

Michael D. Stainer                                             August 15, 2013

1  speculation.

2           THE WITNESS:  Yeah.  I wouldn't -- I think,

3  again, when comparing us to another system, I'm not

4  sure -- you know, when I've got 40 canisters when do we

5  weigh them?  Do we weigh them as the officer retrieves

6  it?  We've got canisters that are on post.  We've got

7  canisters that are checked in and out of central control

8  at the beginning and at the end of each shift.

9           Operationally, it was not -- we just couldn't

10 figure out how we could do that operationally without

11 adding to the walk time.  Adding to, you know, the

12 efficiency of trying to get a shift change and, again,

13 how do we weigh -- you know, if a housing unit officer

14 would report to his or her post, and relieve that other

15 officer, and simply, you know, take over their

16 equipment, and I've got 16 officers and eight different

17 housing units or more, if it's a -- it's a

18 administrative segregation or SHU housing unit, how do

19 we -- you know, do we have scales everywhere?  Who

20 records that weight?  So we were trying to figure out

21 how do we do that.

22 BY MS. CESARE-EASTMAN:

23     Q.   Did you ask Mr. Martin how to do it?

24     A.   No.  I didn't ask him that.  I don't recall

25 asking him that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1      Q.    Did anybody examine how this is done in other

2  systems?

3      A.    No.

4      Q.    So your ultimate conclusion is that you

5  declined to adopt Mr. Martin's recommendation regarding

6  weighing canisters before and after use because it was

7  operationally difficult?

8      A.    That was our main argument, yes.

9      Q.    What else did you discuss at those meetings

10  regarding these two recommendations?

11      A.    Again, I think one of the discussions was

12  observations made -- this was not unique to just

13  Mr. Martin's recommendations so I don't know if you want

14  to talk about that as well.  This is also included in

15  Mr. Vail's observations.

16      Q.    We can discuss them together.  That's fine.

17      A.    So I think one of Mr. Vail's recommendations

18  was while at Corcoran with regard to the expandable

19  baton, there was an alarm and he observed, you know,

20  several dozen staff running out of -- I believe his

21  words were actually several dozen staff pouring out of

22  the housing units, responding to whatever unknown

23  situation and, you know, numerous of those staff had

24  their baton's out and extended, and running toward the

25  that alarm that they had no idea what they were running

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1    you know, totally different -- we talked about that --

2    review process.

3        Q.    So the officers have wide discretion in what

4    type of force they choose to use?

5        A.    Absolutely.

6        Q.    What data does CDCR maintain regarding

7    compliance with reporting requirements for use of force?

8            MR. McKINNEY:  Objection.  Vague and

9    ambiguous.

10            THE WITNESS:  CDCR headquarters does not

11   maintain data at that level.  However, each institution,

12   through the use of force coordinator, do keep statistics

13   and records of each of the reviews that they've

14   completed.

15   BY MS. CESARE-EASTMAN:

16       Q.    Are those statistics shared with anyone?

17       A.    I'm not sure.  There's not a requirement

18   and -- let me back up.  There's not a requirement for

19   those statistics.

20            I used to be able to, you know, because I was

21   interested as warden.  So I was ask my use of force

22   coordinator to put together "How many times have we done

23   this?"  And she would have to go and compile that data.

24   She didn't keep a database of that type of information.

25       Q.    Is there any requirement that CDCR maintain

Michael D. Stainer                                    August 15, 2013

1    present in the interview if it is a custody staff member

2    of any rank when they're making allegations against any

3    other rank of custody staff?

4                MR. McKINNEY:  Objection.  Calls for

5    speculation.

6                THE WITNESS:  I would have to speculate.

7    BY MS. CESARE-EASTMAN:

8        Q.  Mr. Barton describes his role as more of an

9    auditor than an investigator.

10               Would you agree with that?

11               MR. McKINNEY:  Object.  Lack of foundation.

12               THE WITNESS:  I think that's one aspect of his

13   role.  Oversight.  Transparency.  He's an independent.

14   You know, I have auditors go out but they report to me.

15               Mr. Barton and his agency do not report to me.

16   They will provide me with information, but they don't

17   answer to me is what I mean.  So they are independent.

18   They are auditors.  They do investigations.

19               So, you know, maybe it's more of an auditor,

20   but to say he's not an investigator is not accurate

21   either.

22   BY MS. CESARE-EASTMAN:

23       Q.  Okay.  So does CDCR currently track use of

24   force data as it relates to mentally ill inmates,

25   specifically?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1        A.    I do not believe we do.

2        Q.    Should it?

3        A.    Don't have an opinion either way.

4        Q.    Are you concerned that force is used

5   disproportionately against mentally ill?

6              MR. McKINNEY:  Objection.  Vague and

7   ambiguous.

8              THE WITNESS:  I -- I've read the

9   declarations -- I don't know that the data while it may

10  seem that, oh, this is -- in some of the data that I've

11  read it may appear that.  But just reading sheer

12  statistics or percentages, you have to dive down and

13  look at those specific incidents.

14             So I'm not that concerned I think we need to

15  have maybe a deep dive and that would determine whether

16  or not I need to be concerned.

17  BY MS. CESARE-EASTMAN:

18       Q.    So do you think that this is a subject area

19  that CDCR should examine in detail?

20       A.    I think sitting in this room right now and

21  being asked questions that, you know, that I, you know,

22  the allegations are being made.  I think we'd need to be

23  in a position to defend that or to either refute it or

24  accept it so, you know.

25       Q.    Would tracking use of force statistics as they

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                              August 15, 2013

1  relate to mentally ill specifically help you be in a

2  better position to respond to these allegations?

3           MR. McKINNEY:  Objection.  Calls for

4  speculation.  Go ahead.

5           THE WITNESS:  And again, you know, to go back

6  to the beginning of this deposition, when we're looking

7  at the use of force as a whole.

8           Again, we're looking at the application of

9  force for any given situation and was that appropriate.

10 Regardless of the inmate's mental health status of, you

11 know, not having any issues or having issues.  We're

12 looking at the situation and whether or not the use of

13 force was appropriate for that given situation.

14 BY MS. CESARE-EASTMAN:

15      Q.  Well, respectfully, I move to strike.  My

16 question was a little different.

17           I mean, is it better to have the data relating

18 to mentally ill or is it better to not have the data?

19      A.  I don't know at this point.

20      Q.  Do you think having that data would allow CDCR

21 to manage the mentally ill population more effectively?

22           MR. McKINNEY:  Objection.  Calls for

23 speculation.

24           THE WITNESS:  I don't know.

25 BY MS. CESARE-EASTMAN:

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1   California prisons?

2              MR. McKINNEY:  Objection.  Argumentative.

3              THE WITNESS:  I think statistics as a whole

4   with this use of force policy as we look at each of the

5   incidents, are we doing our job to protect each

6   individual regardless of, you know, mental health or

7   non-mental health or public or staff or custody staff or

8   noncustody staff or a visitor.  That is our role.  I

9   don't think there's any evidence to show that we're not

10  doing our job.

11  BY MS. CESARE-EASTMAN:

12       Q.   But you're not tracking that at an

13  institutional level, right?  Or at systemwide level,

14  you're not tracking any of these numbers, correct?

15       A.   No.  The institutions -- it's the warden's

16  responsibility to ensure that their system is alive and

17  well.  I rely upon outside -- first and foremost the

18  warden is a governor-appointed official.  He or she is

19  vetted through the OIG, responsible to the legislature.

20  This is not some Joe Blow cop that is just walking by

21  and we decide to give him or her the keys to the

22  institution.

23            We put a lot of responsibility on these

24  wardens the ensure that their process is within the

25  confines of the policy that they're doing what they're

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                August 15, 2013

1    supposed to be doing.  But we also have the oversight

2    and the independent oversight.

3            We have the COMPSTAT.  We have our associate

4    directors that do quarterly tours and this is some of

5    the things they look at when they go there.  The wardens

6    have institutional annual COMPSTAT reviews with the

7    associate directors where they're looking at everything.

8            So we have processes to look at the systems

9    within the prison, but a lot of responsibility is placed

10   upon that warden to ensure that they are following and

11   adhering to what the policies and requirements are.

12           So while headquarters may not have a tracking

13   system to show how many times a report was not completed

14   appropriately, but the wardens have that responsibility

15   to take that corrective action and move that forward,

16   but we do have, again, checks and balances at

17   headquarters to do reviews of those cases when we deem

18   appropriate.

19           We have the ability -- and not just because it

20   rises to a head injury or a serious injury -- we can

21   pull any case that we want just to do a spot-check.

22   That does happen on occasion.

23      Q.   But you're, again, talking about individual

24   reviews of individual cases.  And like we talked about

25   already in this deposition neither the OIG or CDCR is

Michael D. Stainer                                           August 15, 2013

1    tracking use of force as it relates specifically to the

2    mentally ill; is that correct?

3         A.   That's correct.

4         Q.   Would you -- and like you said a lot of

5    responsibility for this is placed on the wardens,

6    correct?

7         A.   That is correct.

8         Q.   Would you be surprised to learn that several

9    of the wardens that we interviewed at different

10   institutions did not know that their statistics were

11   disproportionate regarding use of force events in this

12   population of mentally ill?

13             MR. McKINNEY:  Objection.  Assumes facts not

14   in evidence.  Lack of foundation.  Hearsay.

15             THE WITNESS:  I -- I'm not privy to those

16   covers.  Would I be surprised?  Not necessarily.

17   BY MS. CESARE-EASTMAN:

18        Q.   Let me reframe the question.

19             Would you expect a warden to know that?

20        A.   No.  Because I, as being a warden, and I'd

21   like to believe that I was a, you know, above average

22   warden doing my job.  I had a large percentage of

23   mentally ill inmates, and that's not something I

24   tracked.

25             I looked at each case individually, but I also

Michael D. Stainer                                    August 15, 2013

1   looked for trends, okay.  But never once was it, oh, my

2   gosh, we have a disproportionate amount of use of force

3   against mentally ill inmates.  I looked at, you know,

4   that never rose to the level of a trend that we had to

5   do something about.

6       Q.   Okay.

7       A.   Because even then, you know, what type of

8   force incidents are we having?  Are we having, you know,

9   emergency use of forces or -- excuse me -- the immediate

10  use of force due to the immediate need.

11           So I wouldn't know what that answer is, and

12  could I do something about that.  I'm not sure because

13  every situation -- it's, again, it's a statistic that

14  doesn't tell a whole story.

15      Q.   Well, is CDCR tracking emergency versus

16  controlled use of force events as they relate to the

17  mentally ill?

18      A.   Not as they relate to the mentally ill.  As a

19  whole, yes.

20      Q.   Do you know of any instances where a warden

21  has taken corrective action regarding use of force

22  against the mentally ill in his or her prison?

23      A.   Not specifically in that category, no.

24           MR. McKINNEY:  Can you read that question

25  back?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1        A.    Yeah.

2        Q.    Okay.

3        A.    The worst I had -- I'll be totally honest with

4    you -- is when I was showering later that night, because

5    it was in my hair and it was coming down.  And then when

6    I used the restroom, no matter how many times you washed

7    your hands, you touched your clothes and after I used

8    the restroom, I had some issues.

9        Q.    Understandable.

10              Let me talk about management status.

11       A.    Okay.

12       Q.    Which you discuss at paragraphs 27 to 31 in

13   your declaration.  Correct?

14       A.    26 through 31, yes.

15       Q.    Okay.  What is management status?

16       A.    Management status is a set of restrictions or

17   precautions that we would impose upon an inmate for a

18   certain set of behaviors that he exhibits in order to --

19   when an inmate exhibits behaviors or threatens, those

20   behaviors that would threaten the safety of staff or

21   other inmates or jeopardize the security of the

22   institution, we would impose a set of restrictions or

23   precautions depending upon the behaviors.

24              And they're controlled at local level, and

25   they should have a procedure that would identify what

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                          August 15, 2013

1    set of behaviors would -- if the inmate exhibited --

2    would result in what set of restrictions.  Who can

3    authorize those restriction and for how long.  And then

4    who, if necessary, would extend that authorization and

5    for how long and why.

6         Q.   What types of behaviors would subject an

7    inmate to management status?

8         A.   There are numerous different restrictions

9    within the management status.  For example, if an inmate

10   threatens to or kicks at staff, he might be placed on

11   leg iron restrictions.

12             If he spits or threatens to spit on staff, he

13   might be placed on spit net precaution.

14             If he assaults staff through the food port, he

15   might be placed on food port restriction.

16             If he during -- if he damages his cell, if

17   he's tearing up his cell, which has happened -- wonder

18   how an inmate can do that, but it's happened.  If he's

19   utilized items within his cell, the structure of the

20   cell to create barricades and during the cell

21   extraction, then he might be placed on management cell

22   status.

23             You know, but, again, the local operating

24   procedure should cite, again, specific behaviors that

25   result and give the staff option to impose a specific

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1    restriction.  So it's not just, you know, applied with

2    out -- you know, I guess without thought.  And, again,

3    there's -- it's just not applied punitively against the

4    inmate.

5         Q.   And this is in addition to whatever formal RVR

6    process there would be for that same infraction?

7         A.   It's not in lieu of the RVR process.  It's not

8    punitive.  It's something to stop the set of behaviors,

9    protect the inmate, protect staff, and protect other

10   inmates until the behaviors stop.

11        Q.   Who's subject to management status?  Any

12   inmate?

13        A.   Mostly it's inmates within our lockup --

14   within our segregated units.  If an inmate is displaying

15   the type of behaviors that require one of these

16   management status precautions, he would not be permitted

17   to remain in the general population.

18        Q.   What regulations cover management status?  The

19   DOM?

20        A.   Not in the DOM.  It's in the local operating

21   procedure.

22        Q.   And that's -- each of the 34 institutions has

23   their own local operating procedure on management

24   status?

25        A.   You're going to find those mostly having to do

Michael D. Stainer                                           August 15, 2013

1   with their administrative segregation procedures or

2   their security housing unit procedures.  There would be

3   a section within there, or they may have a stand-alone

4   document to go with that.

5       Q.   Have you reviewed those local operating

6   procedures?

7       A.   I've -- I'm speaking from my personal

8   experience with that.  I haven't reviewed other

9   institutions procedures.

10      Q.   Has there been any CDCR oversight as to the

11  content of those local operates procedures?

12      A.   Not that I'm aware of.

13      Q.   It's currently pretty much up to the sole

14  discretion of the warden?

15      A.   The warden, yes.

16      Q.   Did you review the Corcoran local operating

17  procedure?

18      A.   I did not.

19      Q.   You quoted it on paragraph 27 of your

20  declaration.

21      A.   What paragraph?

22      Q.   I'm sorry.  Paragraph 29.  You discuss the

23  local operating procedure at Corcoran.

24      A.   Right.  I haven't reviewed it.  That's what I

25  was informed of.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                      August 15, 2013

1      Q.    So this is on information and belief?

2      A.    Yes.

3      Q.    Did you write this paragraph of your

4  declaration?

5      A.    I did.

6      Q.    Who informed you of the Corcoran local

7  operating procedure?

8      A.    The warden.

9      Q.    The warden at Corcoran?

10     A.    Correct.

11           MS. CESARE-EASTMAN:  And I'll note for the

12  record that we had asked for all local operating

13  procedures, and we were informed in your objections that

14  he did not rely on any local operating procedures so

15  they were not produced.

16           MR. McKINNEY:  Correct.

17           MS. CESARE-EASTMAN:  But it appears here he

18  relied on Corcoran's.

19           MR. McKINNEY:  He did not.  The court order of

20  August 9th states that we were only obligated to produce

21  documents he reviewed to prepare his declaration.  He

22  just testified he did not review local operating

23  procedure at Corcoran or any other institution to

24  prepare his declaration.

25           MS. CESARE-EASTMAN:  So this is based on

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                          August 15, 2013

```
 1   hearsay.
 2   BY MS. CESARE-EASTMAN:
 3        Q.   Now, CDCR Title 15 sections 330 to 333 talk
 4   about disciplinary detention.  Is that separate from
 5   management status?  Is that something different?
 6        A.   Disciplinary detention is different.
 7        Q.   What is the difference between disciplinary
 8   detention and management status?
 9        A.   Disciplinary detention is a sanction as part
10   of an RVR process where an inmate could be sentenced for
11   up to 10 days of disciplinary detention.
12        Q.   And that's after the due process of the RVR
13   process itself?
14        A.   That's correct.
15        Q.   Okay.  Now, CCR Title 15 Section 332F is what
16   you refer to as defining management status in the CCRs;
17   is that correct?
18        A.   That's correct.
19        Q.   And that policy allows for -- and I'm
20   quoting -- "an inmate who persists in unduly disruptive,
21   destructive, or dangerous behavior and who will not heed
22   or respond to orders and warnings to desist from such
23   activity may be placed in a management cell."
24             Is that correct?
25        A.   Correct.
```

Michael D. Stainer                                    August 15, 2013

1        A.    No, it's not.  But again, being in a

2   management cell versus on management status are two

3   separate things.

4        Q.    I understand that.

5              How long can an inmate be put in a management

6   status cell?

7        A.    On management status?

8        Q.    Yes.

9        A.    Generally, I know my guidelines were up to 72

10  hours.  But they were reviewed every 24 hours by the

11  manager or administrative officer of the day for

12  potential removal.  And that's the first go around.

13       Q.    And those -- how long an inmate can be left in

14  the a management status in a management status cell it

15  depends on the local operating procedure?

16       A.    Yes.

17       Q.    How much variation is there between the local

18  operating procedures on that time frame?

19       A.    Well, if the inmate still -- I -- I don't

20  know.  Because like I said I haven't reviewed all those

21  procedures.

22       Q.    Do you know how long the longest one is?

23  Like, what is the longest amount of time for a local

24  operating procedure an inmate can remain on management

25  status in a management status cell?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                              August 15, 2013

1    A.   I have not reviewed those procedures so I

2  don't know.

3    Q.   Is that something you think you should look

4  at?

5    A.   I think for consistency basis, yeah.

6    Q.   Is that something you're planning to look at?

7    A.   I tell you that's something that I put on my

8  to-do list.

9    Q.   How long in your opinion would be too long as

10 part of the local operating procedure?

11   A.   I -- don't know.  I could only tell you from

12 my experiences.

13   Q.   In your experience what do you think is too

14 long to leave an inmate on management status as a matter

15 of policy?

16   A.   I've never really had an inmate go past three

17 or four days because of his behavior we were able to

18 remove him from that status.

19   Q.   The regulations say that an inmate shouldn't

20 be on management status for more than 24 hours; is that

21 correct?

22   A.   That I think -- I think that refers to

23 something different.  I'm not sure exactly what those

24 regulations state.

25   Q.   Should there be a different standard for how

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                          August 15, 2013

1   long somebody can remain on management status if they're
2   on the mental health caseload?
3            MR. McKINNEY:  Objection.  Incomplete
4   hypothetical.
5            THE WITNESS:  I don't have an opinion to that.
6   BY MS. CESARE-EASTMAN:
7       Q.   Do you know how long an institution could
8   leave, hypothetically, an EOP inmate on management
9   status without consulting that inmate's clinician?
10      A.   I don't know.  I don't know.
11      Q.   Okay.  Do you think you should know?
12      A.   Do I think I should know?  I think I know what
13  should happen.
14      Q.   What do you think should happen?
15      A.   I think that if we have an inmate designated
16  as serious mentally ill, such as a EOP inmate, and he is
17  acting out to the point that he requires placement on
18  management status, his clinician should definitely be
19  consulted and have interaction with that intimate.
20      Q.   And I agree with you, but is that codified in
21  policy anywhere?
22      A.   I don't know that answer.
23      Q.   Okay.
24           Do you know how many mentally ill inmates in
25  CDCR are currently -- have been on management status for

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

```
 1   more than 24 hours?
 2        A.   Do not know that.
 3        Q.   So is any of the management status information
 4   reported to CDCR headquarters?
 5        A.   It is not.
 6        Q.   So you don't know how many have been on it for
 7   more than a week?
 8        A.   I do not.
 9        Q.   More than a month?
10        A.   I do not.
11        Q.   Is it possible there are inmates out there
12   that have been on management status for more than a
13   month?
14             MR. McKINNEY:  Objection.  Calls for
15   speculation.
16             THE WITNESS:  Couldn't even guess.
17   BY MS. CESARE-EASTMAN:
18        Q.   Do you think that's something that should be
19   reported to CDCR headquarters?
20        A.   Not necessarily.
21        Q.   Do you think it should be reported for
22   mentally ill inmates?
23        A.   I think it should be reported up through the
24   warden and the warden should be well aware of what is
25   going on in their institution.  And being able to, you
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                                August 15, 2013

1    know, manage those cases and know when they have those

2    issues.

3          I know when I was a warden we would be

4    reporting that daily in our morning meetings if we had

5    anybody on management status.  I know other institutions

6    do have that same thing.

7          You know, based on what I, you know, being

8    present during their morning managers' meetings.  They

9    report if they have anybody, you know, on specialized,

10   you know, whether it's suicide watch or suicide

11   precaution or management status or, you know, other --

12   specialized outside of the normal housing routine.

13        Q.   But you don't feel there's any need for any

14   sort of oversight beyond the warden level at the

15   institutions in regards to management status practices?

16        A.   And, again -- Okay.  So I told you I think we

17   need to, you know, that's something I should probably do

18   is look at our management status to ensure that we have

19   a consistent application and we don't have anything

20   inappropriate going on out there.

21        That's something I'll concede to.  But at the

22   headquarter level I don't necessarily -- not going to

23   tell you I think we need to track that up there where

24   our role is more visionary, more, you know, providing

25   guidance, providing support.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        And again, you know, I set the vision, I set

2   the mission, and I hold people accountable for those

3   expectations.

4        Q.   Now, the policy says that an inmate is

5   considered for a psych evaluation after 24 hours; is

6   that correct?

7        A.   That's the management cases.  And, again, I

8   think that's where we're kind of -- management cases are

9   a little bit different than management status.

10       Q.   So the only -- the only CDCR or formal

11  statewide policy or regulation on management status is

12  that one section Title 15, Section 332F?

13       A.   That's correct.

14       Q.   And everything else is dictated by local

15  operating procedures?

16       A.   That's correct.

17       Q.   Is there any requirement that you're aware of

18  among all of the local operating procedures that a

19  mental health clinician be consulted if an MHSDS inmate

20  is put on management status?

21       A.   I'm not aware that that does exist, but I know

22  that, you know, that does occur.

23       Q.   But it's not codified in policy?

24       A.   I'm not going to say that it is.

25       Q.   As part of management status is one of the

Michael D. Stainer                                    August 15, 2013

1    some wouldn't care.  Some would care.  Not the

2    clinicians but the inmates.

3    BY MS. CESARE-EASTMAN:

4        Q.   Right.

5        A.   I think, again, they're all individuals as

6    well.  And different situations impact different

7    individuals different ways.

8        Q.   So wouldn't the mentally ill inmate's

9    clinician be in the best or -- mental health clinician

10   be in the best position to know whether management

11   status practices could negatively affect that inmate,

12   perhaps cause that inmate to decompensate?  Wouldn't the

13   clinician be in the best position to know that and not

14   the custody staff?

15           MR. McKINNEY:  Objection.  Calls for

16   speculation.

17           THE WITNESS:  And I would be speculating.

18   BY MS. CESARE-EASTMAN:

19       Q.   What if the clinician finds that management

20   status does put a particular inmate at a risk of

21   decompensation?

22           Would the custody staff defer to the

23   clinician's consideration?

24       A.   Should be definitely taken into consideration.

25       Q.   But the ultimate decision rests with custody

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1   staff?

2        A.    Ultimately, yes.

3        Q.    Could an alternative behavior management plan

4   be developed with clinical input for a particular

5   inmate?

6              MR. McKINNEY:  Objection.  Calls for

7   speculation.

8              THE WITNESS:  We don't have that practice.

9   I'm not familiar with that.

10  BY MS. CESARE-EASTMAN:

11       Q.    Is that something that could be developed in

12  the prisons?

13             MR. McKINNEY:  Calls for speculation.

14             THE WITNESS:  Don't have an answer for that.

15  BY MS. CESARE-EASTMAN:

16       Q.    What safeguards are in place to assure that

17  management status is not used as retaliation against

18  inmates?

19       A.    Again, speaking from my experiences, we had a

20  very good process where, you know, the any -- A,

21  required documentation for any precaution, whether it be

22  the simplest of double escort because of the inmate's

23  violence, all the way up to the management cell status,

24  that that documentation would be approved by a second

25  line supervisor, number one.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Michael D. Stainer                                    August 15, 2013

1       A.   Actually, no, the inmate is provided with --
2    may not have his own toothbrush and toothpaste.
3            He's provided with a fish kit with a soap bar.
4    And, again, speaking from my own experiences, we're not
5    going to let him languish in the cell without minimum
6    hygiene products.
7       Q.   And that's at every institution?
8            Or does that also depend on local operating --
9       A.   Testified that I have not reviewed the
10   procedures from those local institution.
11           MR. McKINNEY:  Just want to note for the
12   record, this is not a 30(b)(6) deposition with respect
13   to management status.  So Mr. Stainer is testifying as
14   to his personal experience here.
15   BY MS. CESARE-EASTMAN:
16      Q.   What about food?
17           In your experience is food provided to inmates
18   on management status?
19      A.   Absolutely.
20      Q.   Bedding?
21      A.   Dependent.
22      Q.   So that's not necessarily a guarantee?
23      A.   That's correct.
24      Q.   Doesn't the management status practice change
25   conditions of confinement for the prison?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8          That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:  August 20, 2013

21

22                    _____

                      MEGAN F. ALVAREZ
23                    RPR, CSR 12470

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit C

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

RALPH COLEMAN, ET AL.,

     Plaintiffs,

     vs.              Case No. S 90-0520 LKK-JFM

EDMUND G. BROWN, JR., ET AL.,

     Defendants.

_____/


DEPOSITION OF KATHLEEN ALLISON

THURSDAY, AUGUST 15, 2013

SAN FRANCISCO, CA


(EXHIBITS 4, 12, 13 AND 14 ARE CONFIDENTIAL

PURSUANT TO THE COLEMAN PROTECTIVE ORDER)


REPORTED BY:

HOLLY MOOSE, CSR NO. 6438

RPR-RMR-RDR-CRR-CCRR-CLR

Kathleen Allison                                                    August 15, 2013

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         ROSEN, BIEN, GALVAN & GRUNFELD
           BY:  AARON J. FISCHER, ESQ.
 5         315 Montgomery Street, 10th Floor
           San Francisco, CA  94104
 6         (415)433-6830
           afischer@rbgg.com
 7

 8    FOR THE DEFENDANTS:

 9         OFFICE OF THE ATTORNEY GENERAL
           BY:  DEBBIE J. VOROUS, ESQ.
10         1300 I Street, 10th Floor
           Sacramento, CA  95815
11         (916)324-5345
           debbie.vorous@doj.ca.gov
12
      AND
13
           DEPARTMENT OF CORRECTIONS & REHABILITATION
14         BY:  D. RAE DE LONG, R.N., J.D.
           1515 S Street, Suite 314S
15         Sacramento, CA  95811
           (916)445-3300
16         rae.delong@cdcr.ca.gov

17
      TAKEN AT:
18
           ROSEN, BIEN, GALVAN & GRUNFELD
19         315 Montgomery Street, 10th Floor
           San Francisco, CA  94104
20         (415)433-6830

21

22                     ---o0o---

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                          August 15, 2013

1      Q.    But was there ever any consideration given to

2   providing updated information as to the number of RVRs

3   issued to class members during the reporting period when

4   that came in?

5      A.    No.

6      Q.    I have similar questions for Lancaster.

7            You also dispute the numbers provided in the

8   management report for Lancaster.

9      A.    Do you have Lancaster's report?

10     Q.    I do.

11           (Plaintiffs' Exhibit 19

12           marked for identification.)

13           THE WITNESS:   Thank you.

14           MR. FISCHER:   Exhibit 19 is the 25th round

15   Lancaster management report.

16     Q.    On page 17, Ms. Allison, if I can show you, at

17   the bottom, under "RVR Protocols" it states:

18           "During the reporting period, 1290

19      inmates at the institution received RVRs:

20      192 for GP inmates, 6800 CCCMS, 395 EOP, 15

21      MHCB and 16 ASU."

22           On the document, Exhibit 18, that CDCR just

23   produced to plaintiffs yesterday, it states the total

24   RVRs issued during the 25th round was 1,314,

25   difference of 24, and the RVRs issued to mentally ill

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                        August 15, 2013

1   was 725.

2           Would you agree that that's much fewer RVRs

3   issued to the mentally ill as compared to what was

4   reported to the special master?

5           Ms. Allison?

6       A.   I'm -- I'm reviewing the data and checking the

7   dates.

8           Yes, there is a difference.

9       Q.   Have you or any of your staff looked and tried

10  to understand how to reconcile what was reported to the

11  special master as compared to what's in your declaration

12  and what's on this Exhibit 18?

13      A.   Again, it's point in time, meaning at the time

14  that this was collected.  At the time this was

15  collected, I -- I would have to evaluate the sources,

16  drill down a little bit more.

17      Q.   As you sit here today, you're unable reconcile

18  the two --

19      A.   Correct.

20      Q.   -- pieces of data?

21      A.   With the exception of explaining the

22  difference, I mean, of the point in time or --

23  understand, if an RVR is voided, meaning the chief

24  disciplinary officer, through the process, got rid of

25  it, he voided it, then it could impact the numbers of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kathleen Allison                                    August 15, 2013

REPORTER CERTIFICATE

1

2

3         I hereby certify that KATHLEEN ALLISON was by

4    me duly sworn to testify to the truth, the whole truth

5    and nothing but the truth in the within-entitled cause;

6    that said deposition was taken at the time and place

7    herein named; that the deposition is a true record of

8    the witness's testimony as reported to the best of my

9    ability by me, a duly certified shorthand reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting by computer; that

12   request was [ ]/ was not [X] made to read and correct

13   said deposition.

14         I further certify that I am not interested in

15   the outcome of said action, nor connected with, nor

16   related to any of the parties in said action, nor to

17   their respective counsel.

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand this 19th day of August, 2013.

20

21         _____

22         HOLLY MOOSE, CSR NO. 6438

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                  Plaintiffs,     )
                                  )CASE NO.:
          vs.                     )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                  Defendants.     )
_____   )



DEPOSITION OF

JOHN R. DAY

WEDNESDAY, AUGUST 14, 2013,  10:05 A.M.

SAN FRANCISCO, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                        Plaintiffs,    )
                                         )CASE NO.:
 6           vs.                         )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                        Defendants.    )
     _____)
 9

10

11

12

13

14           The Deposition of JOHN R. DAY, taken on behalf

15   of the Plaintiffs, before Megan F. Alvarez, Certified

16   Shorthand Reporter No. 12470, Registered Professional

17   Reporter, for the State of California, commencing at

18   10:05 a.m., Wednesday, August 14, 2013, at the law

19   offices of Rosen, Bien, Galvan & Grunfeld, LLP, 315

20   Montgomery Street, 10th floor, San Francisco,

21   California.

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  LORI RIFKIN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, TENTH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            LRIFKIN@RBGG.COM

 7

     FOR DEFENDANTS:
 8
              BY:  PATRICK R. MCKINNEY, ESQ.
 9            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
10            455 GOLDEN GATE AVE., SUITE 11000
              SAN FRANCISCO, CALIFORNIA  94102-7004
11            415.703.3035
              415.703.5843 FAX
12            PATRICK.MCKINNEY@DOJ.CA.GOV

13
              D RAE DE LONG, ESQ.
14            CDCR
              OFFICE OF LEGAL AFFAIRS
15            1515 S. STREET, SUITE 314 SOUTH
              SACRAMENTO, CALIFORNIA 95811
16            916.323.2929
              916.327.5306 FAX

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

1    kind of progressive discipline.  There's correction

2    action --

3         A.   Training.  Corrective action, which is

4    informal.  No one's losing money or losing a job over

5    corrective action or adverse action, meaning they can

6    lose anything from a letter of reprimand up to and

7    including losing money or suspension or termination.

8         Q.   So how does one determine which behaviors are

9    potentially subject to adverse action?

10        A.   They use their training and experience

11   combined with Article 22, which discusses employee

12   discipline.  They also counsel with the Office of Legal

13   Affairs, employee prosecution, and -- I just drew a

14   blank on their acronym -- EAPT, Employee and Prosecution

15   Team.

16        Q.   Your CDCR counsel can probably help you out.

17             All right.  So when you say they use their

18   training and experience in addition to Title 22 --

19        A.   Article 22.

20        Q.   Article 22.

21             Are you referring to the hiring authority or

22   the warden when you say "they use their training and

23   experience"?

24        A.   Yes.  Certainly.

25        Q.   So am I correct that it's discretionary which

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

 1    cases a warden refers to Office of internal affairs for

 2    investigation?

 3         A.    Certainly to a degree.

 4         Q.    What are the mandatory referrals to the Office

 5    of Internal Affairs, if any, from a hiring authority?

 6         A.    If they intend to take adverse action, it must

 7    be referred to our office.

 8         Q.    Is that the only mandatory criterion for a

 9    referral?

10         A.    It's so -- it's an all-inclusive question.  So

11    I -- I will have to say generally that's the guide we

12    use.  If -- when guiding and providing counsel to

13    wardens, we -- we tell them, "If you intend to take

14    adverse action, you must refer to our office."

15         Q.    So another way of saying that would be only if

16    a warden intends to take formal disciplinary action

17    against a correctional officer, would they have to refer

18    an incident to your office.

19         A.    If they intend to take adverse action, yes.

20         Q.    And adverse action is formal disciplinary

21    action?

22         A.    Yes.

23         Q.    And formal disciplinary action includes

24    suspension, loss of pay, or termination?

25         A.    It includes any of the -- any training,

Page 96

John R. Day                                                      August 14, 2013

1   corrective action, or adverse action.  But when they get

2   the results back, they could determine, based on the

3   facts, that "Maybe I don't want" -- they don't have to

4   take adverse action as a result of it.

5       Q.   I think you've just confused me.

6       A.   Okay.  Sorry.

7       Q.   I thought adverse action was different from

8   corrective action and training?

9       A.   It is.

10      Q.   So my understanding is only if the warden --

11  in this case, we're talking about institutions --

12  intends to take adverse action, do they have to refer --

13      A.   Let me clarify.

14           If the facts -- if the facts present to them

15  are found true at the end of the day -- and, of course,

16  they don't have all the facts in front of them, they may

17  be requesting an investigation.

18           So the facts, if found true, would that result

19  in adverse action?  If the answer is yes, then you must

20  send it to us; because you could not take adverse action

21  unless you -- unless it went through our office.

22      Q.   But the warden gets to decide whether adverse

23  action is warranted in any given case; is that right?

24      A.   At the -- yes.

25      Q.   So it's not any case that could result in

John R. Day                                                    August 14, 2013

1    adverse action is referred to your office, right?

2        A.    I -- I'd have to say yes to that question.

3    I --

4        Q.    Let's try and untangle.

5        A.    Okay.

6        Q.    Just because a case would be eligible for

7    adverse action, that doesn't mean it has to be referred

8    to your office by the warden.

9        A.    That's correct.

10       Q.    So the decision to refer is discretionary from

11   the warden?

12       A.    Yes.

13       Q.    But they cannot take adverse action, which I

14   understand to mean formal disciplinary action against an

15   officer, unless they first refer to your office?

16       A.    That's true.

17       Q.    And is that why there's a category of, quote,

18   direct action cases that get referred to your office so

19   that they can take adverse action, but there doesn't

20   necessarily need to be an investigation right away?

21       A.    That's correct.  You got it.  Yes.

22       Q.    I know you got excited that I understood.

23       A.    Yes.

24             MS. RIFKIN:  Maybe that's a -- maybe this is a

25   good time to take a break.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

 1    to OIA to determine whether an investigation moves

 2    forward, but there's not necessarily an allegation of

 3    misconduct against an employee.

 4          It is the only mandatory referral -- which I

 5    would characterize as a mandatory referral, and it is

 6    not an allegation of misconduct as compared to every

 7    other referral to OIA from a hiring authority.

 8        Q.   Thank you for that clarification.

 9          If we can look at Exhibit 3, which is the

10    declaration you filed on July 24th.  And I would like to

11    have you look at page 4, paragraph 11.

12          Take a moment to review it and let me know --

13    look up when you're done.

14          (Witness reviewing document.)

15        A.   Okay.

16        Q.   Okay.  So the sentence where you specifically

17    say:  "Our office reviews every report of allegation of

18    employee misconduct" -- and "our office" there is

19    referring to OIA; is that right?

20        A.   That's correct.

21        Q.   And to say that OIA reviews every reported

22    allegation of employee misconduct, what that really

23    means is every allegation that's referred by a warden of

24    employee misconduct; is that right?

25        A.   That's correct.

John R. Day                                                August 14, 2013

1    that right?

2        A.    I think you can call it five, but I think

3    you've got -- is it four?  You've got the incident

4    commander, you have the first level and second level

5    manager review, and then the -- the fourth level, I

6    guess, would be the use of force committee.  So yes.

7        Q.    And then it's the actually warden's decision

8    to refer something from out of the -- use of force

9    committee to -- to IA; is that right?

10       A.    It's always the warden's prerogative -- their

11   signature is the only one that can refer a case to

12   internal affairs.  Any person in that chain, whether

13   incident commander, first-second review, use of force

14   committee, at any point any supervisor or manager or any

15   employee can refer something to the hiring authority's

16   attention and say there is misconduct here.  At that

17   point the hiring authority can refer it to our office.

18            And so it can occur at any level.

19       Q.    But it always goes through the warden or other

20   hiring authority; is that right?

21       A.    The decision to refer it to OIA?  Yes.

22       Q.    So specifically with incidents related to use

23   of force, those have gone through five, or perhaps six,

24   if you were to include the hiring authority levels of

25   review at an institution before they are referred to

John R. Day                                                    August 14, 2013

1    through the full use of force review process at an

2    institution?

3         A.    I don't know.  I didn't review the cases.

4         Q.    Would a case that related to use of force that

5    hadn't gone through the five levels of review be

6    rejected at that stage?  Is that possible?

7         A.    It could be rejected prior to the critique or

8    after the critique.  It's really dependent upon the

9    facts presented to central intake panel.

10        Q.    Can you explain to me how something that does

11   go through five levels or more of use of force critique

12   at an institution would be so obviously not misconduct

13   as to be rejected prior to a formal investigation?

14        A.    The critique is not focused on allegations of

15   misconduct.  The critique is focused on compliance with

16   policy.

17             So what you're asking -- if I understand your

18   question:  How can it possibly be rejected after it's

19   been reviewed two, three, four, five times?  Doesn't

20   mean that all four or five of those times alleged

21   misconduct.

22             They could have reviewed it and said

23   everything was in compliance, and -- and at the

24   committee it was discovered.

25             As I explained previously, they've -- I've

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        A.    Handful of cases so...

 2        Q.    Handful of cases --

 3        A.    Yes.

 4        Q.    -- in any given year?

 5        A.    Yes.

 6        Q.    Those relate -- might relate to any kind of

 7   complaint?

 8        A.    Absolutely.

 9        Q.    Is there any kind of quality control that

10   you're aware of for referral of incidents to OIA from

11   the hiring authority?

12              MR. McKINNEY:  Objection.  Vague and

13   ambiguous.

14   BY MS. RIFKIN:

15        Q.    Is there any review done by any agency or

16   subagency office in CDCR of warden's decisions whether

17   or not to refer allegations of misconduct to OIA?

18              MR. McKINNEY:  Can you read that question,

19   please?

20              (Record read as follows:

21              "QUESTION:   Is there any review done by

22               any agency or subagency office in CDCR

23               of warden's decisions whether or not to

24               refer allegations of misconduct to

25               OIA?")
```

John R. Day                                                        August 14, 2013

```
 1              MR. McKINNEY:  So within CDCR is the question.

 2         Okay.  Thank you.

 3              THE WITNESS:  Within CDCR?

 4    BY MS. RIFKIN:

 5         Q.   Yes.

 6         A.   Not that I know of.

 7         Q.   And OIA does not perform that function,

 8    correct?

 9         A.   That's correct.

10         Q.   And you don't know what percentage of use of

11    force related incidents the hiring authority refers to

12    OIA?

13         A.   That's correct.

14              MS. RIFKIN:  Can we take a short break?

15              MR. McKINNEY:  Sure.

16              (Off the record at 2:30 p.m. and back on

17               the record at 2:37 p.m.)

18              (Plaintiffs' Exhibit 5 was marked for

19               identification.)

20    BY MS. RIFKIN:

21         Q.   Okay.  I'm going to hand you what's been

22    marked Exhibit No. 5, which is the -- titled "2012

23    Annual Report.  Office of the Inspector General."

24              Have you -- are you familiar with this report?

25         A.   Have to review it here.
```

John R. Day                                                August 14, 2013

 1   declarations filed in this case.

 2            THE WITNESS:  I don't have a sense.

 3   BY MS. RIFKIN:

 4       Q.   And I just want to make sure I'm further

 5   understanding your declaration.

 6            We talked about 21 of the cases that were

 7   referred of the 107 cases being rejected prior to formal

 8   investigation, and 29 of the cases being direct action

 9   cases.

10            In each of the direct action cases, would

11   adverse action have actually been taken against the

12   employee?

13       A.   Not necessarily.

14       Q.   What might be the outcome of a direct action

15   case?

16       A.   They can do one of -- the hiring authority has

17   the option of doing one of four things.  They can do --

18   take no action.  They can conduct training.  They can

19   take corrective action, or they can take adverse action.

20       Q.   So of those 29 cases for which you report

21   direct action, you don't know what the outcome of those

22   cases ultimately was; is that right?

23       A.   That's correct.  I did not review the case.

24       Q.   Does OIA track what happens to those cases

25   once they're given back to the hiring authority?

John R. Day                                              August 14, 2013

1       A.   Yes.

2       Q.   Who tracks that in OIA?

3       A.   My case management system.

4       Q.   But you didn't review that information when

5   preparing this declaration?

6       A.   That's correct.

7       Q.   You do say, in paragraph 2, that 31 of the 107

8   cases had at least one allegation of misconduct

9   sustained.

10          Is that -- am I understanding that correctly?

11      A.   Yes.

12      Q.   And who decides whether an allegation of

13  misconduct is sustained against an employee?

14      A.   The hiring authority.

15      Q.   Does OIA ever determine whether or not a

16  allegation of misconduct is sustained?

17      A.   No.

18      Q.   What are the options of outcomes for an

19  allegation of misconduct?  Sustained is obviously an

20  option.  What are the other options?

21      A.   Sustained, not sustained.  Unfounded.

22          I'm missing one.

23      Q.   Is it "unable to determine"?

24      A.   No.  It's in Article 22.

25      Q.   Okay.  Okay.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

1        A.   I then asked how many -- how many cases that

2    were completed of those, where -- where they had

3    sustained allegations, how many of them had a penalty of

4    9.  And 9 is -- the penalty of 9 is dismissal.  So if

5    they had an allegation that was sustained with a penalty

6    attached of 9, I wanted a list of those.

7             So what's been produced here is a list of

8    cases.  And the reason the case numbers are duplicated

9    are because they have multiple allegations that were

10   sustained that had a 9 attached to them.

11            So in those cases -- and I believe there are

12   six.  My declaration says 9, but it is actually six

13   cases.  Again, that was my typo when -- when preparing

14   new information.  There was six cases where there was at

15   least one allegation in -- with at least one subject

16   where the penalty was dismissal.

17        Q.   Okay.  And on all of the pages that we've

18   looked at where it lists the case, the first portion of

19   each case is blacked out.

20            What type of information is underneath the

21   redaction?

22        A.   The -- where the case was -- was the acronym

23   for the institution or hiring authority as well as the

24   region where the case was -- would have been assigned if

25   investigated or where that institution or hiring

John R. Day                                                    August 14, 2013

1    investigated administratively by OIA had an allegation

2    sustained; is that right?

3         A.   Yes.

4         Q.   Does the OIA make recommendations to the

5    hiring authority about whether to sustain allegations or

6    not?

7         A.   No.

8         Q.   So OIA does an investigation gathering

9    information and transmits that information to the hiring

10   authority in a neutral manner; is that --

11        A.   We are collectors of facts, yes.

12        Q.   Do you render conclusions about those facts?

13        A.   No.

14        Q.   Who is empowered to render conclusions about

15   those facts?

16        A.   The hiring authority.

17        Q.   And the hiring authority for institutions is

18   wardens.

19        A.   Primarily wardens, yes.

20        Q.   Is there any individual or office outside of a

21   direct chain of command in an institution that is

22   empowered to make conclusions about allegations of

23   employee misconduct?

24             MR. McKINNEY:  Objection.  Vague and

25   ambiguous.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1    report.

2        Q.    Were there open cases from 2012 that hadn't

3    yet been concluded by the time you ran this report?

4        A.    Yes.

5        Q.    Do you know how many?

6        A.    Two.

7        Q.    Two out of the 107 cases?

8        A.    Two out of the 29.  Two out of the 29 direct

9    actions.

10       Q.    Okay.  And out of those 19 cases that were

11   authorized for direct action and in which at least one

12   allegation were sustained, do you know how many -- do

13   you know what action was actually taken by the hiring

14   authority for those 19 cases?

15       A.    No.

16       Q.    But your case management system would have

17   that information; is that right?

18       A.    Yes.

19       Q.    Do you know for the six misconduct cases in

20   2012 relating to use of force that resulted in

21   termination which categories they fall into, as far as

22   direct action, administrative investigation, or criminal

23   investigation?

24       A.    Yes.

25       Q.    Is that information in this packet?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                            August 14, 2013

```
 1        A.   Yes.

 2        Q.   Yes, more than 20?  Or yes, you know?

 3        A.   Yes.

 4        Q.   Is it more than 50?

 5        A.   I don't know.  I'm not sure.

 6        Q.   Okay.  And is it right that you don't know how

 7   many of those cases related to use of force?

 8        A.   Right.  I don't have the information in front

 9   of me.

10        Q.   Do you ever refer -- does OIA ever refer cases

11   to the U.S. Attorney's office?

12        A.   I believe.  And, yes, we have consulted with

13   the U.S. District -- U.S. Attorney's office on cases

14   before.

15        Q.   Did that happen in 2012?  Do you know?

16        A.   I don't remember.  It is rare.

17        Q.   For the six cases in which a termination

18   resulted, do you have any way of knowing if that

19   termination was a result of the allegation relating to

20   use of force?

21        A.   I don't have that information in front of me.

22        Q.   That's solely up to the hiring authority?

23        A.   Yes.  It certainly could have been related to

24   something else in a case.

25        Q.   Is it your understanding that talking here
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

 1    for incidents that have been referred to OIA; is that

 2    right?

 3         A.    That's correct.   Matrix can only be applied on

 4    cases that have been referred to OIA.

 5         Q.    If you can, look at Exhibit 3 again, which is

 6    your declaration.   Paragraph 3.

 7              You state that hundreds of corrective actions

 8    occur concerning use of force incidents that do not

 9    involve the Office of Internal Affairs.

10         A.    Yes.

11         Q.    What is your basis for using the term

12    "hundreds of corrective actions" there?

13         A.    I'm -- based on my training and experience,

14    many minor things occur during the -- during the course

15    of any job.   And specifically, in use of force

16    incidents, we find -- often find minor policy or

17    training deviations that we need to address that can and

18    should be addressed at the level of training.

19              So based on my training and experience, I have

20    personally experienced use of force review and critiques

21    where corrective action has been ordered.

22         Q.    But you're not involved in the internal

23    institution use of force critique, right?

24         A.    Not currently.

25         Q.    And you haven't been since you left

John R. Day                                              August 14, 2013

 1   San Quentin; is that correct?

 2         A.   That's correct.

 3         Q.   And you said that that was prior to the

 4   complete implementation of the Madrid use of force

 5   process changes?

 6         A.   Yes.  Because there was a revision.  There

 7   were -- they implemented changes from the Madrid court

 8   in '04, '5 and '6.  And then there were additional

 9   changes that occurred specifically to regulation 3268 in

10   2010.

11         Q.   So you haven't actually participated in the

12   use of force review process in an institution since

13   about --

14         A.   2007.

15         Q.   -- 2007; is that right?

16         A.   That's correct.

17         Q.   So -- and you said that at Office of Internal

18   Affairs you don't track corrective actions that are made

19   that don't involve OIA.  Is that right?

20         A.   Correct.

21         Q.   So when you say "hundreds," in this paragraph,

22   "of correction actions occur," you don't actually know

23   that from personal knowledge, do you?

24         A.   I know, based on consultation and discussions

25   I have with wardens and other managers and administers

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                        August 14, 2013

1    throughout the state, that what I've experienced

2    continues to go on where they address, again, deviations

3    from policy at the appropriate level.

4           So if the question is:  Can I quantify the

5    hundreds?  I'd have to answer no, I cannot.

6    Q.    And how -- when you have conversations with

7    wardens about the corrective actions that they take at

8    their institutions, how have you recorded your notes

9    about those conversations?

10   A.    I don't record notes about those conversations

11   typically, unless they're involving a referral -- it's

12   involving a case or it's involving some other document

13   referral that they sent to me.

14   Q.    When you say "hundreds of corrective actions,"

15   which year are you talking about that these hundreds of

16   corrective actions refer to?

17   A.    I would characterize that as any given year.

18   Q.    There would be hundreds?

19   A.    That's my -- based on my training, experience,

20   and interactions with the institutions, yes.

21   Q.    What kind of tracking do you do in your

22   position at Office of Internal Affairs of these actions

23   that don't involve the Office of Internal Affairs?

24   A.    I don't.  I cannot quantify those.

25   Q.    You can't quantify those?

John R. Day                                                    August 14, 2013

1      A.   No.

2      Q.   Would you agree that hundreds of corrective

3  actions -- you don't actually have a personal basis for

4  knowing whether those hundreds happened in 2012, for

5  example?

6      A.   It -- to provide a count of them?  No, I do

7  not.

8      Q.   Could be 100?

9      A.   Very unlikely.

10     Q.   Could be 1,000?

11     A.   It's possible.

12     Q.   But you don't know?

13     A.   That's correct.

14     Q.   And you would have no way of knowing what

15  those corrective actions were, would you?

16     A.   I don't have the individual cases.

17     Q.   You don't have any breakdowns about whether

18  those corrective actions were training or discipline or

19  what they would be?

20     A.   That's correct.

21     Q.   Okay.

22          Since you moved to Office of Internal Affairs,

23  you haven't personally been involved in any reviews of

24  use of force by an incident commander; is that right?

25     A.   That's correct.  As an incident commander?  Is

John R. Day                                                    August 14, 2013

1    that what you said?

2         Q.    That's right.

3         A.    Yes.

4         Q.    And have you been present at any of the

5    reviews by an incident commander --

6         A.    No.

7         Q.    -- since you moved to OIA?

8         A.    No.

9         Q.    Have you been present at any of the reviews by

10   a first level manager review since you moved to OIA?

11        A.    No.

12        Q.    Have you participated in any of the manager's

13   first level reviews since you moved to OIA?

14        A.    No.

15        Q.    Have you participated in any of the manager's

16   second level reviews since you moved to OIA?

17        A.    No.

18        Q.    Have you observed any of those manager second

19   level reviews since you moved to OIA?

20        A.    While they conducted them?

21        Q.    Yes.

22        A.    No.

23        Q.    Have you served on a institutional executive

24   review committee since you moved to OIA?

25        A.    No.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

1          Q.   Have you attended institution executive

2    committee review meetings since you moved to OIA?

3          A.   No.   Not at the institution level.

4          Q.   You haven't personally participated in any of

5    the internal use of review process at an institution

6    since you went to OIA, right?

7               MR. McKINNEY:  Objection.  Vague and ambiguous

8    as to "participated."

9    BY MS. RIFKIN:

10         Q.   You can answer.

11         A.   I have not attended committee meetings, no.

12         Q.   And you haven't been part of other levels of

13   review of the use of force review process at an

14   institution, correct?

15         A.   Correct.

16              MR. McKINNEY:  Same objection.  Vague and

17   ambiguous.

18   BY MS. RIFKIN:

19         Q.   When central intake is reviewing a referral

20   and deciding whether or not to take the case for

21   investigation, how do they incorporate consideration of

22   mental health issues in their review?

23              MR. McKINNEY:  Objection.  Assumes facts not

24   in evidence.

25   BY MS. RIFKIN:

John R. Day                                    August 14, 2013

1     Q.   Is that your testimony that in order to
2  determine whether or not an officer's conduct relating
3  to use force violates the law, that it violates any law?
4     A.   I -- maybe I'm misunderstanding your question
5  or what you're trying to get to.  But if the behavior
6  as -- if the behavior, as alleged, constitutes a
7  violation of the law, as we understand it, in central
8  intake and, again, with consultation with counsel and
9  district attorney consultation --
10    Q.   What do you understand the law to be as it
11 relates to use of force for correctional officers?
12    A.   It could be an assault or a battery, assault
13 under the cover of authority.
14    Q.   Can -- do you know if an action relating to
15 use of force by an officer can be within CDCR policy but
16 break the law?
17    A.   I don't know of a policy that would -- an
18 action that would be within policy and violate the law.
19 If it violates the law, it would -- it certainly is
20 outside of a -- it would be outside of our policy.
21    Q.   So when central intake receives a referral
22 relating to use of force being OC spray by a
23 correctional officer against an inmate in a housing cell
24 during a cell extraction, would central intake look at
25 the mental health status of the inmate in evaluating

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                             August 14, 2013

1    whether or not to investigate that case?

2              MR. McKINNEY:  Objection.  Vague and

3    ambiguous.  Incomplete hypothetical.

4              THE WITNESS:  We're not looking at the

5    inmate's mental health status.  We're looking at the

6    actions by the officer or LVN or any other staff members

7    alleged to have violated policy or law.

8    BY MS. RIFKIN:

9        Q.   If an inmate is psychotic and cell extraction

10   is performed, is the fact that that inmate is psychotic

11   at all relevant to the inquiry that central intake

12   performs?

13       A.   If that's what the -- it depends on the

14   actions that are being alleged.

15       Q.   I'll give you a hypothetical.  If we need to,

16   we can go to files.

17              Let's say there's an inmate who is EOP in his

18   housing cell and he sticks his arm through a food port

19   in his housing cell, and an officer gives him an order

20   to remove his arm and the inmate does not remove his

21   arm, and, as a result, the officer uses OC spray on that

22   inmate and the inmate alleges excessive force and that

23   incident gets referred to your office, would the mental

24   health status of the inmate be relevant to your office's

25   consideration?

John R. Day                                                    August 14, 2013

1              MR. McKINNEY:  Objection.  Misleading.
2    Incomplete hypothetical.
3    BY MS. RIFKIN:
4         Q.   You can go ahead and answer.
5         A.   What's the alleged misconduct by the officer?
6         Q.   The inmate has alleged that the officer used
7    excessive force by spraying him for not removing his arm
8    from the food port?
9         A.   What policy is being cited?
10        Q.   The inmate hasn't cited a policy.  Does an
11   inmate have to cite a policy in order to get an
12   allegation of staff misconduct referred to your office?
13        A.   The hiring authority does.
14        Q.   Hiring authority does.
15             So --
16        A.   The hiring authority tells us behavior and
17   tells us what policy they believe they violated.
18        Q.   So an incident of -- relating to staff conduct
19   can only be referred to your office if a hiring
20   authority believes that it violates a CDCR policy.  Is
21   that accurate?
22        A.   If it violates law, policy, or an order.
23        Q.   Right.  And in the hypothetical I just gave
24   you, the inmate has alleged that the officer used
25   excessive force, so that the officer has violated the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

1      Q.   Is there a requirement that the referral
2  package relating to any use of force incident identify
3  whether an inmate is on the mental health caseload or
4  not?
5      A.   No.
6      Q.   If that information is not part of the packet,
7  does central intake request it from the institution?
8           MR. McKINNEY:  Objection.  Calls for
9  speculation.  Vague and ambiguous.
10          THE WITNESS:  If relevant to the officer's or
11  staff member's misconduct.
12  BY MS. RIFKIN:
13     Q.   If the status of inmate's mental health isn't
14  listed, how does the central intake determine if it's
15  relevant or not?
16          MR. McKINNEY:  Objection.  Vague and
17  ambiguous.  Assumes facts not in evidence.
18  BY MS. RIFKIN:
19     Q.   You can answer.
20     A.   Again, we're so hypothetical.
21          If it's -- all aspects of use of force are not
22  necessarily due to behavior -- all acts of use of force
23  and policy violations thereof are not necessarily
24  connected to -- even inmates actions.  They certainly --
25  again, it's so hypothetical.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

 1              I'm pulling out some cases that I can think of
 2    that we still find policy violations in a use of force
 3    package when, in fact, we find that the officer's
 4    actions were appropriate, but yet there were other --
 5    other issues unrelated to the actions between inmate and
 6    officer that were policy violations.  So we would still
 7    maybe give a direct action or open investigation.
 8         Q.   Of the 107 allegations that were referred to
 9    OIA relating to use of force in 2012, how many of those
10    involved uses of force against inmates on the mental
11    health caseload?
12         A.   I don't know.  I don't have that information
13    in front of me.
14         Q.   Is that part of the database tracking system
15    that you referred to?
16         A.   Yes, but I do not have that tracked as a -- I
17    don't have the inmates' mental health status tracked in
18    the system.
19         Q.   So within your system of tracking allegations
20    of staff misconduct, you don't actually track inmates'
21    mental health status; is that right?
22         A.   That's correct.
23         Q.   So can I assume, based on that, that for the
24    rest of the numbers you offer in paragraph 2 of your
25    declaration about the breakdowns of the 107 cases

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

 1  referred in 2012, you don't know how many of any of

 2  those numbers involved inmates on the mental health

 3  caseload?

 4       A.  No, I did not review that.

 5       Q.  Are you familiar with the Coleman case?

 6       A.  Generally, yes.

 7       Q.  Have you read -- have you reviewed the

 8  memorandum of law in plaintiffs' motion relating to use

 9  of force?

10       A.  I would have to look at it to --

11       Q.  Okay.  But you did review Mr. Vail's

12  declaration or expert report on use of force; is that

13  right?

14       A.  I believe so.  I believe there was a document

15  I looked at, expert opinion of Vail.  I think that's...

16       Q.  Okay.  And you know that the Coleman case

17  focuses on inmates with mental illness, right?

18       A.  Yes.

19       Q.  And that -- did you know that what plaintiffs

20  contend in this motion is that there are violations in

21  the use of force against inmates with mental illness

22  specifically?

23          MR. McKINNEY:  Objection.  As relevant to this

24  witness, it misstates the record.  That section of the

25  motion actually states that CDCR does not conduct

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

 1   investigations or discipline employees.
 2   BY MS. RIFKIN:
 3       Q.   I'm not sure why counsel is testifying.  We'll
 4   go back to questions.
 5            MR. McKINNEY:   Thank you.
 6   BY MS. RIFKIN:
 7       Q.   So how -- I guess...
 8            Is there anything that OIA does in its
 9   investigation of allegations related to use of force
10   that specifically looks at use of force against inmates
11   with mental illness?
12       A.   Yes.  As it applies to policy violations.  If
13   there's a policy violation which has been alleged and
14   says you are not to do something and they've done it, or
15   a sins of omission, in the reverse case, and we can
16   identify a policy law or order that was given, then we
17   certainly investigate that.
18            So can I cite a case?  I can't off the top of
19   my head.  But if provided with information of employee
20   misconduct, again, we're looking for -- we're looking
21   for policy as guidance to support a -- something that
22   will support or refute the allegations.
23       Q.   If an inmate is in his cell, kicking on the
24   door, and officer orders him to stop kicking on the door
25   and inmate refuses, CDCR policy allows for use of force

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

1   was a violation of it.

2        Q.   And when --

3        A.   As it applies to the misconduct of the

4   employee.

5        Q.   When does OIA seek to determine whether the

6   clinical intervention in a controlled use of force was

7   meaningful?

8             MR. McKINNEY:  Objection.  Vague and

9   ambiguous.

10            THE WITNESS:  I have a difficult -- difficult

11   time answering that question.

12            If -- I'm not sure that we are -- we are the

13   ones that are skilled in -- as investigators in

14   determining whether a clinical intervention is

15   meaningful.  We would ask for clinical expertise and

16   seeing if -- if there was some question about that, we

17   would be asking clinicians about whether that was --

18   that met their guidelines according to their policies

19   and understanding.

20   BY MS. RIFKIN:

21        Q.   Is there a type of allegation of staff

22   misconduct that a controlled use of force against

23   someone in one of these explicit categories articulated

24   here was made without a meaningful clinical

25   intervention?  Does that kind of staff allegation exist?

John R. Day                                              August 14, 2013

```
 1              MR. McKINNEY:  Objection.  Vague and
 2     ambiguous.  Calls for speculation.
 3              THE WITNESS:  I've never heard of a meaningful
 4     or less meaningful intervention.  I've never heard of an
 5     allegation presented to us in that way.
 6     BY MS. RIFKIN:
 7         Q.   Has there been an allegation that controlled
 8     use of force was made against an EOP or someone in this
 9     kind of housing unit without a clinical intervention as
10     a violation of policy?
11         A.   I don't recall a case at this time.  It
12     certainly could have.
13         Q.   When OIA is reviewing an incident involving
14     controlled use of force in this kind of circumstance, is
15     OIA mainly looking to see whether the clinical
16     intervention happened or not?
17         A.   No.
18         Q.   What is OIA looking at?
19         A.   What we're looking at is we're looking for
20     misconduct.  We're looking for policy violations.  We're
21     looking at staff's actions and their -- whether those
22     actions violated policy.
23         Q.   Right.  And if no clinical intervention
24     occurred, that would be a violation of policy, right?
25         A.   That -- as phrased, yes.  If it was required
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

 1    and they didn't do it, then we would be -- we would add
 2    the allegation.
 3        Q.   Have you ever seen that allegation as part of
 4    a misconduct investigation?
 5        A.   Not that I can recall specifically.  There
 6    certainly be one in there.  I do not review every single
 7    case that comes into internal affairs, but...
 8        Q.   If you can, turn to page 319 of the document,
 9    Section 51020.11.2.
10        A.   Uh-huh.
11        Q.   Food ports.
12        A.   Okay.
13             MR. McKINNEY:  What page?
14             MS. RIFKIN:  319.
15             MR. McKINNEY:  Thank you.
16    BY MS. RIFKIN:
17        Q.   According to the food port policy, if a CO
18    orders an inmate to relinquish control of the food port
19    and the inmate doesn't relinquish control, this policy
20    authorizes that correctional officer to administer
21    chemical agents against that inmate after a warning; is
22    that correct?
23        A.   As -- that's what -- how I read it.  In the
24    third paragraph.  Yes.
25        Q.   So anytime an inmate refuses to allow a staff

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                    August 14, 2013

1   to close and lock the food port and does not follow an

2   order to relinquish control, even after a warning, staff

3   is within policy to use chemical agents against that

4   inmate; is that correct?

5        A.   Yes.  That's the way I read it.  Without other

6   considerations, that's -- I would agree.

7        Q.   And where is the requirement that inmate be

8   posing a threat in this section in order for force to be

9   used?

10       A.   When we look at safety and security of the

11  institution.  This doesn't -- this small statement

12  doesn't take into account other factors.

13            Remember, as narrowly stated, I agreed with

14  that.  But typically where -- what type of unit is this

15  person in?  Is it Level 1, 2, 3, or 4?  Is the person

16  single celled?

17       Q.   But you --

18       A.   What's their status?

19            So this -- this provides some guidance as

20  to -- as I read it, some guidance, that they have that

21  option and they're authorized.

22            Is this the only controlling piece of

23  information that officer should use?  No.

24            So to answer your question, I would have to

25  consider the other factors that may pose a threat,

John R. Day                                                    August 14, 2013

1   entire -- to make sure that that's true.  I don't know

2   that there's not another section in here that points

3   back to it.  But in what we just read about food ports,

4   I don't see anything in there that says -- that points

5   to a mental health inmate.

6        Q.   So if an officer used a chemical agent against

7   an inmate for blocking a food port, that wouldn't

8   necessarily ever be referred to your office because it's

9   an violation of policy, correct?

10            MR. McKINNEY:  Objection.  Calls for

11   speculation.

12            THE WITNESS:  As narrowly stated, no, it would

13   not be.

14   BY MS. RIFKIN:

15        Q.   In investigating allegations of staff

16   misconduct relating to use of force, does the -- does

17   OIA have any specific considerations that it evaluates

18   if an inmate is EOP?

19            MR. McKINNEY:  Objection.  Vague and

20   ambiguous.

21            THE WITNESS:  In OIA cases?

22   BY MS. RIFKIN:

23        Q.   Yes.

24        A.   We're considering the officer's misconduct.

25        Q.   Doesn't how the officer use force against an

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1   whether there's any other factors that we should be
2   considering.
3       Q.   But that wouldn't violate policy, correct?
4       A.   According to the policy we just reviewed, no.
5       Q.   The amount of OC spray used is irrelevant to
6   CDCR policy on OC spray; isn't that correct?
7            MR. McKINNEY:  Objection.  Misstates
8   testimony.  He testified it would not violate that
9   particular section of the policy.
10           THE WITNESS:  It's outside my expertise.
11           MS. RIFKIN:  Counsel, please don't advise the
12  witness on the answer.
13           MR. McKINNEY:  I'm not.  If you're going to
14  just try to -- you know, we can start at the beginning
15  of the policy and work down.  But if you're going to
16  focus on bits and pieces, it's misleading.  So --
17  BY MS. RIFKIN:
18      Q.   So you testified that you're not aware of any
19  other policy -- CDCR policy that would address a
20  restriction on the amount of OC spray that can be used
21  against an inmate in a housing cells; is that correct?
22      A.   That's correct.  Sitting here, I would have to
23  check with my subject matter experts or other consulting
24  staff to ensure that I haven't missed something.
25      Q.   Who was the subject matter expert in your

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1    office on OC spray?

2         A.    I don't have a designated person.

3         Q.    So based on the policy, as you understand it

4    sitting here --

5         A.    Uh-huh.

6         Q.    -- would there ever be a policy violation

7    based on the amount of OC spray used against an inmate

8    in a housing cell?

9         A.    Nothing you presented to me at this point

10   points me to a policy violation.

11        Q.    Without a policy violation, a hiring authority

12   doesn't make a referral to your office; is that right?

13        A.    That's up to the hiring authority.  We will --

14   if a hiring authority sends us something and says it is

15   too much, we will certainly take it and review it.

16        Q.    Let me rephrase.

17              But you reject cases for investigation that

18   don't have a policy violation in them; is that right?

19        A.    That's correct.

20        Q.    So if a hiring authority referred you a case

21   based on the amount of OC spray used and you couldn't

22   find a policy that that violated, you would reject that

23   case for investigation; is that right?

24        A.    Yes.

25        Q.    And the inmate mental health status would be

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

 1    irrelevant to that consideration, wouldn't it?

 2              MR. McKINNEY:  Objection.  Argumentative.

 3              THE WITNESS:  That's not true.  It's -- again,

 4    what we're looking for are -- is the staff member's

 5    behavior.

 6    BY MS. RIFKIN:

 7         Q.   But the staff member behaved according to

 8    policy, right, in this hypothetical?

 9         A.   In this hypothetical.  And I think you brought

10    up a few minutes ago if it was in a PSU, a CTC, or an

11    EOP unit, it may have an effect.

12         Q.   But we're talking about the amount of

13    OC spray.  Those restrictions we just talked about

14    didn't relate to the amount of the OC spray used against

15    a mentally ill inmate, did they?

16         A.   Nothing we just discussed or reviewed.

17         Q.   So within, we can stipulate the universe of

18    what we've been talking about here today.

19         A.   Yes.

20         Q.   There's no restrictions on the amount of

21    chemical agents used against an inmate with mental

22    illness, correct?

23         A.   As far as we reviewed, I agree.

24         Q.   So there would be no violation of CDCR policy,

25    that we've talked about today, based on the amount of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                     August 14, 2013

1    OC spray used?

2           MR. McKINNEY:  Objection.  Misstates the

3    document.

4           THE WITNESS:  According to what we've talked

5    about, I agree.

6    BY MS. RIFKIN:

7           Q.   Okay.

8           A.   But, again, my expertise is in staff

9    misconduct investigations.

10          Q.   Do you know what is meant by a Non-use of

11   force incident in CDCR?

12          A.   Non-use of force incident?

13          Q.   The term "non-use of force incident," are you

14   familiar with that?

15          A.   I believe so.

16          Q.   What does that mean?

17          A.   A -- an incident that doesn't involve use of

18   force.  I...

19          Q.   Does it have a technical definition in CDCR

20   that you're aware of?

21          A.   I'm not sure where you're characterizing it.

22          Q.   CDCR reports use of force incidents and

23   non-use of force incidents.

24          A.   On what form or in what forum?  Are we talking

25   about staff investigations?  Are we talking about an 837

John R. Day                                                August 14, 2013

```
 1        A.    Okay.

 2        Q.    -- requires an investigation by OIA?

 3        A.    I can't -- I can't answer the investigation.

 4   All of them require -- some of these require review.  So

 5   mandatory reporting is you must report to OIA if you use

 6   deadly force.

 7        Q.    Right.

 8        A.    That's in policy.  And so No. 2 states "an

 9   impact to a lethal target area."  Which, in my

10   interpretation of that statement, says you used

11   something that could have lethal consequences.  That is

12   already in Title 15 3268.

13        Q.    Is unexplained injury as a criteria -- does

14   that require investigation by OIA?

15        A.    No.

16        Q.    Does conflicting or incomplete reports require

17   investigation by OIA?

18        A.    Not as a mandatory referral, no.

19        Q.    Does application of nonlethal weaponry that

20   exceeds what would normally be expected for the type of

21   force reported require an investigation by OIA?

22        A.    Not necessarily, no.

23        Q.    So of these categories articulated, only

24   impact strikes to lethal target areas already -- is a

25   required investigation by OIA; is that correct?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

 1        A.   No.  It requires a referral to OIA.
 2        Q.   So of these categories, only impact strikes to
 3   lethal target areas requires a referral to OIA; is that
 4   correct?
 5        A.   Yes.  Yes.
 6        Q.   So in your last sentence of this paragraph,
 7   "thus CDCR already investigates many of the categories
 8   identified by plaintiffs," are you using investigations
 9   in the technical sense in this sentence?
10        A.   I'm sorry.  Repeat your question.
11        Q.   You previously told me that investigates is a
12   term of art that refers to formal investigations
13   undertaken by the Office of Internal Affairs.  Is that
14   correct?
15        A.   Yes.
16        Q.   So of the categories, mandatory investigation
17   criteria that you're discussing in paragraph 16,
18   unexplained injuries, impact strikes to lethal target
19   areas, conflicting or incomplete reports, and the
20   application of nonlethal weaponry that exceeds what
21   would normally be expected for the type of force
22   reported, only one of those categories is actually a
23   mandatory referral for investigation by OIA; is that
24   correct?
25        A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1      Q.   So when you say "many of the categories
2   identified by plaintiffs," that's one of the categories
3   identified by plaintiffs; is that right?
4           MR. McKINNEY:  Misstates the document.
5           THE WITNESS:  No.  I'm looking at these two
6   different ways.
7           This statement says that we should expand --
8   we should expand and make mandatory these things.  That
9   was my -- that was the way I read this document.  Unless
10  I misunderstood it.  And that these should be -- this
11  referral criteria -- again, I'm looking at an
12  investigation, the referral I'm reading as to internal
13  affairs with an allegation of misconduct.
14          So the way I read it was:  A referral with an
15  allegation of misconduct for unexplained injuries, and
16  the other -- other three items should be mandatory.  And
17  what I'm saying is we already review and investigate all
18  of those things once the 989 gets to us.
19  BY MS. RIFKIN:
20      Q.   I want to stop you right there.
21      A.   Yes.
22      Q.   You review them once a 989 gets to you, which
23  is a discretionary act by a hiring authority; isn't that
24  correct?
25      A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                          August 14, 2013

1         Q.    So they're not currently mandatory referrals;
2    is that correct?
3         A.    That is correct.
4         Q.    Okay.
5              MS. RIFKIN:  Take a brief break.
6              (Off the record at 5:05 p.m. and back on
7               the record at 5:13 p.m.)
8              (Plaintiffs' Exhibit 11 was marked for
9               identification.)
10   BY MS. RIFKIN:
11        Q.    All right.  Mr. Day, I'm handing you what's
12   been marked -- or the court reporter handed you,
13   actually, what's been marked Exhibit 11.  It's a
14   document that's numbered 4638-2 at the top, filed
15   May 29th, 2013.
16              It's been filed in the Coleman court for
17   identification.
18              Have you seen this document before?
19        A.    It looks vaguely familiar, but I'm not -- I'm
20   not -- I'm not closely familiar with it.
21        Q.    I'll represent to you that this document was
22   authored by Steve Martin --
23        A.    Okay.
24        Q.    -- and contains recommendations that he made
25   to CDCR.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1    baton?

2          A.   I haven't read through this.  So I'm not sure.

3          Q.   Okay.  That's fair.

4               As part of OIA's investigation of allegations

5    of misconduct, does OIA ever evaluate whether staff

6    actions escalated the situation?

7          A.   Yes.  That's part of the critique forms.

8          Q.   The critique forms are completed by the

9    internal use of force review; is that right?

10         A.   When you say "internal" --

11         Q.   I mean internal to the institution.

12         A.   Institution level?  Yes.

13         Q.   Yes.

14              So OIA considers it by looking at what the

15   institutions use of force critique says?

16         A.   That's one way we look at it.  But we also

17   look -- we take an independent view of it.  We aren't --

18   you know, we are an independent office outside the

19   authority of DAI, parole, DJJ.  So we don't -- we don't

20   answer to any of them.  We're not under their authority.

21   We're an independent office that takes a look at it, and

22   if we see something different, then we certainly have --

23   do and have opened cases even when the hiring authority

24   thinks otherwise.

25         Q.   But ultimately your office isn't authorized to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

1   take action on those cases; is that right?

2        A.   Correct.

3        Q.   And ultimately your office isn't authorized to

4   actually make findings in those cases; is that right?

5        A.   Yes.  That's correct.

6        Q.   In order to make findings or take action, it

7   gets referred back to the hiring authority; is that

8   right?

9        A.   Yes.

10       Q.   And the hiring authority isn't independent

11  from DAI, is it?

12       A.   Not wardens.

13       Q.   So the people ultimately making decisions

14  about whether officers are disciplined or not are not

15  independent like the OIA is; is that correct?

16       A.   Independent from?

17       Q.   You just said OIA is an independent entity

18  from DAI and other CDCR entities; is that correct?

19       A.   Yes.  Uh-huh.

20       Q.   But the hiring authority, who's ultimately

21  making findings about these allegations of misconduct --

22       A.   Sure.

23       Q.   -- is not independent; is that right?

24       A.   Is not independent from?

25       Q.   The --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                              August 14, 2013

1      A.   I can make broad general -- and what I can say

2  is the system works very well.  I've seen -- I've seen

3  that the process is transparent, and the -- and it

4  involves entities that are certainly outside chain of

5  command and have -- like the Office of Legal Affairs and

6  the inspector general.

7      Q.   But you don't actually participate in the

8  decisions that are made by the hiring authority.  That's

9  correct?

10     A.   Correct.

11     Q.   And you don't review the information that the

12 hiring authority has before it.  You just said that,

13 right?

14     A.   Seldom.

15     Q.   Okay.

16          Does OIA look at the rate at which force is

17 used against inmates with mental illness in CDCR?

18     A.   Sorry?

19     Q.   Does OIA look at the rate at which force is

20 used against inmates with mental illness in CDCR?

21          MR. McKINNEY:  Objection.  Vague and

22 ambiguous.

23          THE WITNESS:  Not within internal affairs.  I

24 don't know that they do or don't.

25 BY MS. RIFKIN:

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                          August 14, 2013

1       Q.   OIA doesn't --

2       A.   OIA does not.

3       Q.   -- look at that?

4       A.   Right.

5       Q.   Does OIA review whether force is

6   disproportionately used against inmates with a mental

7   illness in CDCR?

8       A.   Don't track that.  Ours is a staff-focused

9   system.

10      Q.   Do you know today, as you sit here, whether

11  there's a problem with unreasonable force being used

12  against mental illness prisoners in CDCR prisons?

13           MR. McKINNEY:  Objection.  Vague and

14  ambiguous.  Calls for speculation.  Calls for legal

15  conclusion.

16  BY MS. RIFKIN:

17      Q.   You can go ahead and answer.

18      A.   Okay.  Based on -- based on what I see in

19  the -- in the system, in staff misconduct, I don't see a

20  pattern of behavior that would give me rise to agree

21  with that statement.

22      Q.   The question is:  Do you know whether there is

23  a problem with unreasonable force being used against

24  mentally ill prisoners in CDCR prisons?

25           MR. McKINNEY:  Same objections.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John R. Day                                                    August 14, 2013

1            THE WITNESS:  In individual cases I have seen

2    that it has occurred and has been addressed.  But if

3    your question is:  Is there a systemic issue?  I have

4    not seen a pattern of behavior that would lead me to

5    believe there's a systemic problem.

6    BY MS. RIFKIN:

7        Q.   But you also don't monitor the use of force

8    against the mentally ill inmates; is that correct?

9        A.   That's correct.

10       Q.   So, as you sit here today, you don't have a

11   basis for knowing whether there is a systemic issue.

12   Wouldn't that be accurate?

13       A.   Based on my view under -- in cases referred

14   for -- with allegations against staff for misconduct,

15   I -- that's the only criteria I can use.  I have not

16   reviewed other systems to make that -- that determine.

17       Q.   And you said before that you don't -- OIA

18   doesn't systemically track the mental health status of

19   inmates in those cases that are referred.

20       A.   That's correct.

21       Q.   Okay.  Do you think it would be useful to have

22   mental health clinician on your staff to evaluate mental

23   health considerations in use of force?

24            MR. McKINNEY:  Objection.  Vague and

25   ambiguous.

John R. Day                                                    August 14, 2013

```
 1        Q.   Is OIA authorized to investigate incidents
 2   without a specific allegation of violation of policy?
 3        A.   Say that again.
 4        Q.   Is OIA authorized to investigate incidents
 5   without a specific allegation of a violation of policy?
 6        A.   It's an interesting way to pose it.
 7             What would we investigate if we don't know
 8   what we're investigating?  I guess it's a kind of a
 9   catch-22.
10        Q.   In your experience, OIA investigates only
11   those incidents where there's a specific allegation of a
12   violation of policy; is that correct?
13        A.   Can I ask a question of counsel?
14        Q.   Not while a question's pending.  You can give
15   me an answer, then we can take a break.
16        A.   Say that again.
17             MS. RIFKIN:  Can you read the question back,
18   please?
19             (Record read as follows:
20             "QUESTION:   In your experience, OIA
21              investigates only those incidents where
22              there's a specific allegation of a
23              violation of policy; is that correct?")
24             MR. McKINNEY:  Put an objection that it's
25   misstates prior testimony.  It's been asked and answered
```

John R. Day                                          August 14, 2013

1   five or six times throughout the course of the day.

2              THE WITNESS:  It has.  And I think the -- what

3   I've said is primarily the answer is yes, although

4   deadly force investigations do not have allegations of

5   misconduct.  You know, they're -- sometimes we don't

6   have the subject identified, but we've -- we've got an

7   allegation of misconduct there.  We don't know who did

8   it, but we know a violation did occur.

9              Can I ask counsel a question?

10             MS. RIFKIN:  Yeah.  You can take a break if

11  you want.

12             MR. McKINNEY:  Do you need a break?

13             THE WITNESS:  Yes.  Just a minute.

14             (Off the record at 5:44 p.m. and back on

15              the record at 5:51 p.m.)

16  BY MS. RIFKIN:

17      Q.   Turning to your declaration again, which is

18  Exhibit 3, page 4, the last sentence of paragraph 12,

19  you're talking about when cases are referred back to the

20  hiring authority from OIA.  And you said that attorneys

21  from CDCR and OIG are available to assist and, in some

22  cases, are required to participate.

23             Which cases are they required to participate

24  in?  Do you know?

25      A.   The ones they designate and monitor.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1               CERTIFICATE OF REPORTER

 2

 3        I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8             That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20               DATED:  August 19, 2013

21

22             _____

23               MEGAN F. ALVAREZ

24               RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                 Plaintiffs,        )
                                    )CASE NO.:
        vs.                         )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                 Defendants.        )
_____)



DEPOSITION OF

ROBERT A. BARTON


TUESDAY, JULY 16, 2013,  9:57 A.M.

SAN FRANCISCO, CALIFORNIA


VOLUME II






REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Robert A. Barton                                                    July 16, 2013

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF CALIFORNIA

 3

 4    RALPH COLEMAN, ET AL.,              )
                                          )
 5                     Plaintiffs,        )
                                          )CASE NO.:
 6           vs.                          )S 90-0520 LKK-JFM
                                          )
 7    EDMUND G. BROWN, JR., ET AL.,       )
                                          )
 8                     Defendants.        )
      _____)

 9

10

11

12

13

14           The Deposition of ROBERT A. BARTON, taken on

15    behalf of the Defendants, before Megan F. Alvarez,

16    Certified Shorthand Reporter No. 12470, Registered

17    Professional Reporter, for the State of California,

18    commencing at 9:57 a.m., Tuesday, July 16, 2013, at

19    K&L GATES LLP, Four Embarcadero Center, Suite 1200,

20    San Francisco, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3           BY:  JEFFREY L. BORNSTEIN, ESQ.
                 MEGAN F. CESARE-EASTMAN, ESQ.
 4           K&L GATES LLP
             FOUR EMBARCADERO CENTER, SUITE 1200
 5           SAN FRANCISCO, CALIFORNIA 94111
             415.882.8086
 6           415.882.8220 FAX
             JEFF.BORNSTEIN@KLGATES.COM
 7           MEGAN.CESARE-EASTMAN@KLGATES.COM

 8           BY:  STEVEN FAMA, ESQ.
             PRISON LAW OFFICE
 9           GENERAL DELIVERY
             SAN QUENTIN, CALIFORNIA 94964
10           510.280.2621
             510.280.2704 FAX
11           SFAMA@PRISONLAW.COM

12
     FOR DEFENDANTS:
13
             BY:  PATRICK R. McKINNEY, ESQ.
14           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
15           455 GOLDEN GATE AVE., SUITE 11000
             SAN FRANCISCO, CALIFORNIA  94102-7004
16           415.703.3035
             415.703.5843 FAX
17           PATRICK.MCKINNEY@DOJ.CA.GOV

18
     FOR ROBERT A. BARTON:
19
             BY:  JAMES CASEY SPURLING, ESQ.
20           OFFICE OF THE INSPECTOR GENERAL
             10111 OLD PLACERVILLE ROAD, SUITE 110
21           SACRAMENTO, CALIFORNIA 95827
             916.255.1102
22           SPURLINGJ@OIG.CA.GOV

23

24

25
```

Robert A. Barton                                                      July 16, 2013

1      A.    That's why we're asked to review those.  So we

2   review -- we're not up to 100 percent yet.  I would hope

3   we get there if the streamline process ever goes

4   through, but to the degree that we monitor a majority of

5   the use of force cases -- and they don't always know

6   which committee we're coming to.  As I said before, if

7   they have two that month, they may only know the day

8   before we're coming for the one second week as opposed

9   to third week.

10          So there is a certain amount of -- excuse

11   me -- unknown for them because we were concerned about

12   that, too, that any problematic cases would get put on a

13   different day.

14      Q.    So do you interact with the special master on

15   the mental health side of the monitoring that's going

16   on?

17      A.    I've met Mr. Lopes once, I think.  I would

18   welcome meeting with him.  We've never been asked to be

19   involved in terms of the mental health aspect of use of

20   force, but I would welcome that.

21      Q.    One of the things that Mr. Vail suggested is

22   that the special master hire a use of force expert to

23   help him analyze and monitor use of force incidents to

24   ensure that there's accountability for improper,

25   unnecessary, or unreasonable use of force incidents

Robert A. Barton                                              July 16, 2013

 1  extensive review, I think is overbroad.  I think, for

 2  the reasons you've stated and we've gone over, there are

 3  good reasons for those to be scrutinized by someone who

 4  knows mental health.

 5       Q.   What are some of your other ideas in that

 6  regard?

 7       A.   Well, we've talked about, for example, on our

 8  side of the shop, in the OIG's office, just like we do

 9  in Plata, we employ a subject matter expert, a doctor;

10  we have two nurses.  We currently don't have any

11  psychologists or psychiatrists on staff.

12            If the court were to order our involvement,

13  you know, to this degree for purposes of Coleman

14  litigation, we would approach the governor's office to

15  staff us with a psychologist or psychiatrist to advise,

16  much as our medical people do in the realm of Plata,

17  could advise us in the realm of use of force.  Because,

18  again --

19       Q.   She's okay.  She's a professional.

20       A.   I lost my train of thought.

21            Even if you inject that CDCR mental health

22  clinician, there's still CDCR's employee and, at the end

23  of the day, we would want even an independent check on

24  that.

25            So that's why I would want to have that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                                July 16, 2013

1    resource, if you will, within my own office in addition

2    to which I think we could do a much better job -- and I

3    can't speak for CDCR, but we could -- of tracking,

4    because we've never -- as I said, we never contemplated

5    it when he started this.

6         And I wasn't one of that original team either

7    when we started the use of force review process

8    specifically tracking those checked boxes, but I think

9    that we could certainly train our staff on looking at

10   the underlying events that gave rise to the use force

11   and not only making recommendations if it's excessive or

12   unnecessary, which is something they could do whether

13   someone is a mental health patient or not.

14        But you could look at making recommendations.

15   Which currently, for example, if we get an intake

16   complaint that we think has a medical component, we

17   would go to a nurse in our office.  We could go to

18   someone on staff and say, "Hey, look.  Here's what this

19   guy did."  You know, "He wasn't listening" or "He wasn't

20   doing this.  Here's what he's diagnosed as."  You know,

21   "What do you think they could do so this doesn't happen

22   again?"

23        We can make a recommendation for training.  We

24   can make a recommendation for a different way of

25   handling that inmate.

Robert A. Barton                                        July 16, 2013

1        Q.   Does it work?

2        A.   Sometimes it does.

3        Q.   You think that's something at that officers

4   ought to use, too?

5        A.   The pen?

6        Q.   Yeah.  In other words --

7        A.   That would take extensive training.

8        Q.   -- using the discipline system and -- instead

9   of using immediate force?

10       A.   Well, again, from my own experience when I was

11  an officer, I would always prefer to talk to somebody

12  and use verbal persuasive before I used any amount of

13  force on anyone, because you don't want to get hurt.

14  You don't want to hurt other people.  And I would hope

15  that would be the attitude of most officers.

16       Q.   But you know that the policies and procedures

17  allow force whenever there is a lawful command, right?

18            So if a custody officer says to an inmate, "Do

19  something," whatever that something is, and they don't

20  comply, they're authorized by policy to use force,

21  right?

22       A.   Correct.

23       Q.   And the problem is that that could be kicking

24  the door of their cell.  They tell them to stop and they

25  don't stop.  They can use force under the policy, right?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                                    July 16, 2013

```
 1        A.   Correct.

 2        Q.   It could be that they don't close the food

 3   tray or, you know, the slot --

 4        A.   The port.

 5        Q.   The port.  Thank you.

 6             -- and they're told, "Do it" and they don't do

 7   it, they can use force, right?

 8        A.   Correct.

 9        Q.   And so when you're going in and monitoring it,

10   and you say, well, they complied with policy, the policy

11   would be they were given an order.  The policy allows

12   the use of force and, therefore, they would be in

13   compliance with their policy if they spray someone for

14   kicking the door, right?

15        A.   The way the policy is written now, yes.

16        Q.   Isn't that a problem from your perspective?

17             MR. McKINNEY:  Objection.  Vague and

18   ambiguous.

19             THE WITNESS:  I think it goes back to the

20   discussion we had way back at the beginning, and that

21   was:  What does the actual code require?  And that's

22   reasonable force.

23             So, to me, if it's unnecessary or it's

24   excessive, then by definition it's not reasonable.

25             So then it gets down to whether or not you
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    testimony.  Mr. Barton testified that it was because of

2    the plaintiff's filing this incident use of force

3    motion.

4              THE WITNESS:  Correct.  Yes, it's a total

5    coincidence.  I had made that decision way prior to any

6    involvement of mine in terms of filing declarations in

7    the litigation; that is, the change in the reports.  And

8    it was based solely on the indicated change to me of

9    their process, which we had hoped would be by now.

10             Secondly, my filing of the declaration in the

11   three-court judges panel was based upon the findings in

12   our Plata inspections or medical inspections.  I've

13   never commented or given opinion as to any of the mental

14   health issues involved in the litigation.

15             And, as I stated here today, I would be more

16   than happy to work with the court, the special master,

17   the parties involved in monitoring the department's

18   review of use of force in the realm of mental health

19   that I freely admit we have not done up until now.

20        Q.   You want to take a break?

21             (Off the record at 3:31 p.m. and back on

22              the record at 3:31 p.m.)

23   BY MR. BORNSTEIN:

24        Q.   Back on the record.

25             Mr. Vail also thought and thinks it would be a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                                   July 16, 2013

1            So each institution has an attorney assigned

2     that works sort of side by side with that deputy

3     inspector.

4            Q.   When's the last time you were trained on the

5     legal aspects of what's excessive or what's unreasonable

6     use of force, you personally?

7            A.   Yeah, I'm thinking.

8                 2009.

9            Q.   I assume there has not been any training

10    regarding your staff and the needs of -- or the issues

11    surrounding mental health inmates, correct?

12           A.   That's correct.

13           Q.   Have you, in your work as the inspector

14    general, gone to conferences or had meetings with other

15    inspector generals in other systems where you've talked

16    about, specifically, use of force and, you know, numbers

17    or incidents or how do we get a better handle on this or

18    stop it?  I mean, have you gone and done that kind of

19    stuff?

20           A.   Yes.

21           Q.   And how many times in the last year have you

22    had interactions outside of the state prison system with

23    your peers?

24           A.   Once.  One conference this year.

25           Q.   And where was that?

Robert A. Barton                                                    July 16, 2013

 1  actually live up to their obligations to report, right?
 2          MR. McKINNEY:  Objection.  Vague and
 3  ambiguous.
 4          THE WITNESS:  It's still a challenge to have
 5  every officer report misconduct when they see it.
 6  BY MR. BORNSTEIN:
 7      Q.   Mr. Vail believes that there needs to be an
 8  independent external review of California's use of force
 9  against mental health inmates, especially where
10  excessive or unnecessary use of force allegations have
11  been made.
12          What's your opinion of his opinion?
13      A.   I would hope we could provide that.
14      Q.   Do you agree that there should be?  It's just
15  a question of whether you are the right entity to do it?
16      A.   Well, I agree that there needs to be
17  independent oversight of use of force.  Again, I don't
18  know enough about mental health aspect of it to know
19  that that part has to be pulled out entirely on its own.
20      Q.   But you would agree that if the court ordered
21  it, that's something that you would be capable of doing?
22      A.   I believe we could.
23      Q.   Now, let me know ask you about that.
24          You know the courts, both courts,
25  Judge Karlton's court and the three-judge court, have

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    take all the people that died that were in chronic

2    care," which is what I was represented the experts were

3    doing.

4         Q.   I'm just asking about the chronic care cases

5    that you selected for review for the chronic care

6    component.

7         A.   And I answered you earlier.  I don't know

8    specifically.

9         Q.   So you don't know?

10        A.   Same answer, Steve.

11             MR. FAMA:  I'm sorry.  Thank you.

12             MR. McKINNEY:  Anything else, Mr. Bornstein?

13                         --o0o--

14                       EXAMINATION

15   BY MR. BORNSTEIN:

16        Q.   Do you know, as you sit here today, whether

17   there is a pattern and practice of unreasonable force

18   being used against mentally ill inmates in California

19   prisons?

20        A.   I do not.  I have not looked into that

21   specific issue.

22             MR. BORNSTEIN:  Thank you.

23             THE REPORTER:  Mr. Spurling, did you want a

24   copy of the transcript?

25             MR. SPURLING:  Please.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Robert A. Barton                                                    July 16, 2013

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8              That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:  July 22, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com