DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, Jr., et al., <br><br> Defendants. | Case No. Civ S 90-0520 LKK-JFM <br><br> **EXPERT DECLARATION OF ELDON VAIL IN SUPPORT OF REPLY BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |

[916614-1]

I, Eldon Vail, declare:

1.  I have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify. I submit this declaration in support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures ("Motion").

2.  Defendants and their expert grossly mischaracterize the foundation for my opinions in support of the Motion, claiming it is based only on a review of the seven videos examples detailed in my July 2013 declaration submitted in support of the Motion. However, as outlined in my prior declarations submitted in this case, my opinions are based on: 1) more than 50 videos I observed during my work for the termination proceeding including controlled use of force events and interviews with inmates who alleged excessive use of force or who had been injured during a use of force event. Pursuant to our request, these videos should have included every interview and controlled use of force event that occurred at Corcoran, KVSP, LAC and San Quentin between July 1, 2012 and the dates of my inspections in February 2013; 2) hundreds of CDCR internal documents I reviewed, including more than 268 RVR reports and more than 204 use of force incident reports, and which included all of Mr. Martin's file for the termination proceeding plus additional documents produced by CDCR in connection with my own inspections; 3) the four full-day prison inspections I conducted in February 2013 where I visited the living units and yards, and interviewed dozens of mentally ill inmates and staff members; 4) a review of all of the pleadings and supporting documents submitted in the Motion to Terminate, as well as the Court's Order denying the motion, and the subsequent orders of the Three-Judge Court; 5) a review of the relevant reports of the OIG and Special Master; 6) a review of CDCR's use of force and RVR policies and procedures, and all applicable regulations.

3.  In addition, my opinions are based upon my substantial experience running correctional institutions and presiding over a statewide prison system for more than a

[916614-1]

1

EXPERT DECLARATION OF ELDON VAIL

decade, a system that successfully addressed the challenge created by the rapid influx of the mentally ill into the prison environment. In my 35 years of work in corrections, I have spent considerable time working to provide for the proper custody and care of the mentally ill sentenced to prison. Among other accomplishments with this population, I was the Superintendent (and later the Assistant Director with oversight) of the McNeil Island Corrections Center and charged with program design and operation of an intermediate care treatment unit at that prison. Later in my career as the Secretary and the Deputy Secretary of the Washington State Department of Corrections, I was responsible for all programs for the mentally ill in all Washington state prisons, including the physical plant design of an expansion that doubled the state's beds for the growing population of mentally ill inmates in the system. We developed a design that allowed inmates to move through progressive custody levels from maximum to minimum and to avoid segregation whenever possible. The design has proven effective. For the mentally ill inmates who did end up in segregation we created a specialized high security treatment unit, separate and apart from a regular segregation unit, where the inmates could be safely housed and also receive robust treatment from mental health professionals. The pioneering work of the McNeil program, and Washington's correctional programs overall, have been extensively studied by researchers from the University of Washington, as referenced in my first expert declaration.[1] As I said in my first declaration, "[i]t is difficult work, but it is not impossible work."[2]

4. Since my last declaration, I had an opportunity to re-watch seven of the use of force videos I observed during the termination proceeding.

5. Since my last declaration I reviewed the deposition transcripts, declarations, and supporting exhibits of defense expert Steve Martin, CDCR Deputy Director Kathleen

---

[1] Expert Declaration of Eldon Vail, signed March 14, 2013, page 36-38

[2] Expert Declaration of Eldon Vail, signed March 14, 2013 at 38:7-8.

1  Allison, CDCR Deputy Director Michael Stainer, and Office of Internal Affairs Chief of
2  Headquarters Operations John Day, submitted or taken in opposition to the Motion. I have
3  reviewed the declaration of CDCR Adult Institutions Captain Joe Stein, submitted in
4  opposition to the Motion. I reviewed the deposition transcript of Inspector General Robert
5  Barton, taken in connection with the Motion. And I reviewed the latest OIG Semi-Annual
6  Report, which was published after I submitted my July 2013 declaration in support of the
7  Motion.

8        6.    I have also reviewed Mr. Martin's file produced in connection with his July
9  2013 deposition. That file included full use of force incident reports and some RVR
10  packets for most of the incidents referenced in my prior declaration. It was the first time
11  complete files were provided to Plaintiffs' counsel in connection with some incidents.

12        7.    With one minor exception[3], after reviewing this additional information the
13  opinions given in my prior declarations remain unchanged. If anything, having an
14  opportunity to view some of the videos a second time allowed me to document the use of
15  even more OC spray than I had previously noted. Of the 17 use of force videos that CDCR
16  produced, all but one were problematic, and the majority exhibited excessive or
17  unnecessary force. Furthermore, a review of the additional records produced in connection
18  with Mr. Martin's July 2013 deposition only strengthens my prior opinions.

19        8.    In paragraph 14 of my July 17, 2013 declaration, I discuss a mentally ill
20  inmate who was in a state of de-compensation and was subjected to excessive OC spray
21  when he was sprayed more than 40 times in a single incident. Having now reviewed the
22  related Internal Executive Review Committee ("IERC") report, I found that the IERC takes

---

[3] In paragraph 19 of my July 2013 declaration I said that two inmates were, "thrown to the ground and dragged." Upon a second viewing I discovered this was not accurate. The inmates were taken to the ground. My concerns about using OC on someone with asthma, the amount of OC pumped into the cell and use of the spit mask in this incident are unchanged.

issue with some technical details of the event but fails to note that too much spray was used. In fact, the report states: "The amount of force used was in direct relationship to the inmate's actions," and "Staff used a reasonable amount of force in order to effect compliance." This incident clearly exemplifies the inadequacy of the IERC review process, which merely evaluates CDCR's compliance with its own deficient policies, including its policy allowing for the unlimited use of pepper spray.

9. In paragraph 15 in that same declaration, I discuss a mentally ill and suicidal inmate who was place on "management status," as an example that illustrates my concern about that practice. After reviewing the additional documents, I am even more concerned. The written record clarifies that there was no weapon involved, no immediate threats of harm, and no justification that the inmate, who uses a cane to walk, posed anything more than a routine disruption for staff. His behavior does not meet the threshold of threatening "institutional security," the justification given by the Incident Commander to twice overrule the medical staff's recommendation against the use of OC spray due to the inmate's asthma. The decision by the Lieutenant to place the inmate on "management status" for ten days, in the middle of a use of force event, after the inmate had willingly entered the holding cell, served only to escalate the situation and further disturb an already distraught inmate. It is conceivable that this staff escalation caused this disturbed inmate to resist any further cooperation with the staff. I remain concerned about "management status," the fact that it is entirely unregulated by CDCR on a system-wide basis, and the potential for it to be an abusive mechanism to circumvent due process, especially for mentally ill inmates. The IERC, however, fails to examine any of these issues and merely notes that the OC spray was used from two or three feet away, instead of the recommended six feet.

10. In paragraph 16 of my July 2013 declaration, I discussed the failure of CDCR staff to pay attention to a decompensating inmate's cues during a use of force event. The inmate asked for the involvement of mental health staff in the process of

4

EXPERT DECLARATION OF ELDON VAIL

"cuffing up" after he observed them nearby.  At that moment, custody staff instead escalated the incident by refusing to bring mental health staff into the event, and simply ordered the inmate to "get that shit off your head."  The inmate said he was afraid of the Barricade Removal Device and started talking about his fear of being raped.  Staff insisted that he remove his boxers in order to be stripped searched.  While I would not suggest putting mental health staff in harm's way, it may well have been useful to bring mental health staff closer to the cell to talk a decompensating inmate through his fears.  He had expressed a willingness to comply and was looking for a way to maintain some control, but that need was unheeded by custody staff.  That kind of flexibility is not part of CDCR's toolbox during use of force events.  Again, none of this information was addressed by the IERC.  A review of its report illustrates how CDCR is simply focused on checking the boxes with a mechanical approach that ignores the needs of mentally ill inmates in a dynamic situation.   Instead IERC simply looked at the narrow issue of whether department policies were followed, not whether their staff might have missed an opportunity to deescalate the situation earlier in the event.  This incident exemplifies the fact that the IERC process does not take into account the complexity of using force against mentally ill inmates.  As a result, there is very little feedback that would provide a learning opportunity for CDCR, or much of a chance that the review will change or improve CDCR's use of force practices against class members.

11.    In paragraph 17 of my July 2013 declaration, I discuss a mentally ill inmate who was subjected to excessive spray because he would not come out of his cell.  Having now reviewed the IERC report, I note that they share my concern that the inmate's naked body was exposed on camera in this incident.  However, the IERC report makes no mention, and once again appears to have no concern, about the amount of OC spray used against this decompensating inmate.

12.    These examples illustrate that the IERC is not consistently acting as an effective review process for use of force against mentally ill inmates.  Coupled with

Inspector General Barton, Deputy Director Stainer, and Internal Affairs Chief Day's statements throughout their depositions that neither the OIG nor CDCR, including OIA, specifically reviews the manner or frequency with which force is used against the mentally ill or tracks data related thereto, and given Mr. Stainer's statements in his deposition that such a review is unnecessary[4], my opinion that a meaningful outside review is critical to protect the mentally ill inmates in the CDCR is further solidified.

13. In Mr. Martin's third declaration he reports that I failed to take into consideration the level of the inmate's resistance.[5] He is wrong. The level of an inmate's resistance is a dynamic measure that can and will change during the course of a use of force event. In the videos I reviewed (including the videos discussed above) the staff consistently demonstrate a lack of an agile tactical response to that dynamic measure, which is one reason why I opine that nearly all of the videos I viewed were examples of excessive uses of force. In many of the videos the custody staff members escalate the situation rather than contain it. In nearly every video I reviewed the staff were stuck on one approach — keep spraying as much OC as possible into the cell of a mentally ill inmate – whether effective or not. CDCR staff should be better trained and CDCR administrators should have higher standards for their staff.

14. Mr. Martin also says in his declaration that I did not, "provide objective evidence that officers used force for the very purpose of causing harm to the inmate."[6] He is correct, I did not make that assertion in any of my declarations or in my depositions. I have no way of knowing the intent behind the behavior of CDCR officials in any particular situation. I can opine, however, that the effect of excessive OC spray is that mentally ill

---

[4] Deposition of Michael Stainer, taken August 15, 2013, at 177:23-179:24, 184:12-187:10
[5] Martin declaration signed July 17, 2013, paragraph 13, page 3, line 26
[6] Martin declaration signed July 17, 2013, paragraph 13, page 4, line 5

1  inmates experience a great deal of immediate pain and harm, whatever the intention of the
2  officer inflicting the pain.
3      15.    In sum, after reviewing all of the available information since my expert
4  opinions and recommendations were offered in my first two declarations, my opinions and
5  recommendations are unchanged. In fact my prior opinions have been reinforced by the
6  additional information I reviewed. CDCR needs additional oversight to ensure that the
7  rights of mentally ill inmates are protected.

9      I declare under penalty of perjury under the laws of the United States that the
10 foregoing is true and correct and that this declaration is executed in Olympia, WA on
11 August 21, 2013.

Eldon Vail