DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>       v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>            Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF MARGOT MENDELSON IN SUPPORT OF OPPOSITION TO MOTION TO STAY JULY 11, 2013 ORDER PENDING APPEAL**<br><br>Judge: Hon. Lawrence K. Karlton |

[925607-1]

DECLARATION OF MARGOT MENDELSON IN SUPPORT OF OPPOSITION TO MOTION TO STAY
JULY 11, 2013 ORDER PENDING APPEAL

I, Margot Mendelson, declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and an associate of the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Opposition To Motion To Stay July 11, 2013 Order Pending Appeal.

2. On July 26, 2013, my colleague Jane Kahn sent an email to Defendants and the Special Master Team reporting the practice of transferring patients from the Department of State Hospitals ("DSH") to segregated EOP units in CDCR prisons. Ms. Kahn observed that there are 35 DSH patients who have been transferred to CDCR prisons, despite open beds at Salinas Valley Psychiatric Program ("SVPP") and Vacaville Psychiatric Program. A copy of that email is attached hereto as **Exhibit A**. Prisoners' names and CDCR numbers have been redacted.

3. Defendants responded to Ms. Kahn's on August 19, 2013. A copy of that email is attached hereto as **Exhibit B**. Prisoners' names and CDCR numbers have been redacted.

4. On August 2, 2013, my colleague Michael Bien sent an email to Defendants and the Special Master team containing an email from Executive Director of Atascadero State Hospital Linda Persons. The subject of the email was "Psychiatry Coverage," and it addressed to eight individuals. The email stated: "I want to thank the eight of you for coming to work today, and carrying the workload of at least 35 doctors. … The wheels of bureaucracy move slow during the best of times, but seem particularly so when we are in a staffing crisis." A copy of that email, with attachments, is attached hereto as **Exhibit C.**

5. Ms. Kahn participated in the last of the Special Master's scheduled on-site monitoring visits to SVPP. That visit was held on August 20-22, 2013.

6. On August 23, 2013, Ms. Kahn sent an email to Defendants and the Special Master Team reporting that she had encountered three patients in the temporary units of SVPP who had been retained on "cuff status" since their arrival at SVPP many months

earlier due to their "MAX" custody status.  Ms. Kahn observed that two of the three patients she observed in the D-5 unit at SVPP had been on MAX custody status, with "very little treatment and out-of-room time" for more than four months.  A third patient had been on MAX custody status for more than two months.  Ms. Kahn reported that other patients in other units were also on MAX custody status and had not yet been released to programming.  A copy of that email is attached hereto as **Exhibit D**. Prisoners' names and CDCR numbers have been redacted.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 28th day of August, 2013.

*/s/ Margot Mendelson*
Margot Mendelson

# Exhibit A

| | |
|---|---|
| **From:** | Jane E. Kahn <JKahn@rbgg.com> |
| **Sent:** | Friday, July 26, 2013 2:43 PM |
| **To:** | Debbie Vorous |
| **Cc:** | Stone, Michael@CDCR (Michael.Stone@cdcr.ca.gov); Nick Weber; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team |
| **Subject:** | RE: WIC 7301 Issues, including Review of 7301 Patient at SAC [IWOV-DMS.FID6429] |

Dear Debbie:

Plaintiffs write regarding Defendants' current policies and procedures implementing WIC 7301, which permits the transfer of DSH patients to CDCR prisons for treatment and housing. Section 7301 provides that "[w]henever, in the opinion of the Director of State Hospitals and with the approval of the Secretary of the Department of Corrections and Rehabilitation, any person who has been committed to a state hospital pursuant to provisions of the Penal Code or who has been placed in a state hospital temporarily for observation pursuant to, or who has been committed to a state hospital … needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections and Rehabilitation, that person may be transferred for those purposes from an institution under the jurisdiction of the State Department of State Hospitals to an institution under the jurisdiction of the Department of Corrections and Rehabilitation." CDCR has several DSH units housed within its facilities, including VPP and SVPP. However, Defendants have informed us most recently that there are approximately 35 DSH patients who have been transferred to CDCR prisons, pursuant to WIC 7301, for housing and treatment, with the majority housed in the SAC PSU. Plaintiffs object to Defendants' current practice, of transferring DSH patients to segregated EOP housing units where they cannot receive appropriate level of care. This current practice is especially disturbing in light of Defendants' assertions that there are open DSH beds at DMH-Vacaville and SVPP, both DSH programs, which has higher security available for patients who might require such a setting until they have fully stabilized.

Plaintiffs request the policies and procedures that govern the implementation of the WIC 7301 program, including the process of certifying patients for WIC transfers within DSH and through the Department Review Board, the process of developing goals and objectives for patients to achieve in order to return to DSH, the policies governing the transfer options for WIC 7301 patients, and the CDCR process for review of 7301 patients for return to DSH. We continue to object to the practice of placing DSH patients inside of CDCR prison mental health programs, which are overcrowded and ill-suited for them, and which are maintained for prisoners with serious mental illnesses.

We have reviewed the records of one such WIC 7301 transfer to SAC, ███████████████, whom I met during the QI tour at CSP-SAC. ███████ transferred to SAC from Patton in November 2008 and is currently housed in the mainline EOP. ███████ was quite distressed over his long placement inside the prison and hopeless about when and how he would ever return to Patton State Hospital after his nearly five-year stay in prison. ███████ case factors illustrate many of the concerns and questions that we have about the WIC 7301 process.

On November 21, 2008, ███████ was transferred to SAC as a WIC 7301 patient due to behavioral outbursts in Patton. (11/21/08 Classification Chrono) He was initially placed in the PSU when he arrived, and it was noted in June 2009, that he had been programming favorably in the PSU for the last 5 months and had remained disciplinary free, "[h]owever, ICC feels that "S" should remain in PSU for

continued observation and elects to continue "S" on Indeterminate SHU status within SAC PSU." (CDC 128G, 6/4/09)  Thus, this patient, who was not a prisoner and who had been programming favorably for 5 months without any misbehavior, was retained in the PSU for an additional six months until he was released to the SAC Level IV EOP on November 5, 2009.  (CDCR 128-G, 11/5/09 Chrono). The November 2009 chrono notes that a nine-point list of goals and objectives were specified prior to his transfer to SAC, which must be achieved and maintained for a minimum of one year before ▓▓▓▓▓ would be considered for return to Patton.  The list included the following items:  (1) remain free of homicidal threats for 12 months; (2) remain free of physical assault for 12 months; (3) remain free of any verbal threats for 12 months; (4) remain free of any inappropriate sexual behavior for 12 months; (5) 100% compliance with rules re contraband for 12 mos; (6) 100% compliance with rules re gambling for 12 mos.; (7) 100% compliance with rules re destruction of property for 12 mos.; (8) remain free of all RVRs resulting in 115s and notices for 12 mos.; and (9) remain free of all AWOL attempts for 12 mos.   Apparently, the timeline for the year did not start until he was released from the PSU.

**How are the goals and objectives developed for a WIC patient?  What are the policies and procedures that govern this?  Is it an individualized list?  Is this a clinically driven process?  What role does the MH 115X play in this process?  Are these the same behaviors that would cause a patient to be transferred from DSH to CDCR as a WIC 7301?   Where does the 12 month timeframe come from?**

Between November 5, 2009 and December 8, 2012, ▓▓▓▓▓ was issued 12 rule violations.  Nine of the 12 occurred between 2010 and November 2011, with the majority minor rule violations (Disrespecting staff, refusing housing or cellmate, out of bounds, refusing order, theft of CD). During several of the RVR hearings, he testified that he was threatened by a prisoner and got nervous and responded or was told to take the CD by a prisoner and did so.   In 2012, he was issued three RVRs.  The first, in May 2012, was issued for "being out of bounds" as he left a treatment room when told,  but reentered the room.  The second, in June 2012, was issued for fighting, although there was no physical contact between him and the prisoner.  The third, on December 8, 2012, was issued for indecent exposure at CIM in the ASU where he was housed when he returned from out to court.  The clinician who completed the MH 115X wrote:  "Pt was psychotic and unstable at the time of the incident.  In fact, he was sent to the MHCB shortly after and remains there to this day.  He ws put on Keyhea – forced meds – on 12/19 due to his acute psychosis … <u>He is currently in MHCB and is being referred to DMH</u>."  (MH 115X 1/3/13, emphasis added)  Apparently, CIM clinical staff who referred this psychotic patient to DSH, were unaware that ▓▓. ▓▓▓▓ was a DSH patient.  A CIM classification chrono, dated 1/18/13, notes that ▓▓▓▓▓ was placed in CIM ASU on 12/6/12 for LOB ("Lack of Bed Space"), after returning from out-to-court.

In his file, there is a MH Summary of 7301 Joint DMH/CDCR Conference, dated April 25, 2013, which reviewed his treatment at SAC and decided to retain him at SAC until at least 12/8/13, pending confirmation of the 12/8/12 RVR for IEX (CIM), and assessment of him again in October 2013 via Teleconference with PSH and CDCR SAC.  He ws noted to be doing quite well.  The Mental Health assessment, which determined that ▓▓▓▓▓ was psychotic and unstable at the time of this RVR, appears to have been completely disregarded by the 7301 Joint DMH/CDCR Conference, which reviewed ▓▓ ▓▓▓▓ most recently for return to Patton.

Plaintiffs request clarification of the WIC 7301 process as requested above, and specifically with reference to ▓▓▓▓▓, who has shown significant improvement in his behavior over the past year yet remains housed in a CDCR prison rather than in a DSH facility.  Why was ▓▓▓▓▓ referral to DSH in December 2012, when he was psychotic at CIM, later rescinded?  Why was the MH 115X disregarded?  We request a review of ▓▓▓▓▓ current behavior and risk factors, and consideration of his timely return to DSH.

2

Thank you for your prompt response to this email.


Sincerely,

Jane Kahn
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
Telephone:  415/433-6830
Fax:  415/433-7104
jkahn@rbgg.com



The information contained in this e-mail message may be privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# Exhibit B

| | |
|---|---|
| **From:** | Debbie Vorous |
| **Sent:** | Monday, August 19, 2013 2:33 PM |
| **To:** | Jane E. Kahn |
| **Cc:** | Stone, Michael@CDCR (michael.stone@cdcr.ca.gov); Nick Weber; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team; Debbie Vorous |
| **Subject:** | RE: WIC 7301 Issues, including Review of 7301 Patient at SAC [IWOV-DMS.FID6429] |

Dear Jane:

As you know, the State has consistently taken the position that DSH patients temporarily housed within CDCR under Welfare and Institutions Code section 7301 for the additional custodial security measures required in response to their violent propensities, are not *Coleman* class members. For that reason, the State is not in a position to provide further responses to your questions and requests.

With respect to ▓▓▓▓▓▓ it appears that his records were erroneously provided to your office in response to a letter sent by paralegal Glenn Baldwin to the Litigation Coordinator at California State Prison, Sacramento, seeking records of alleged class members, including ▓▓▓▓▓▓ To that end, we would ask that your office return the records.

Thank you,

---

**From:** Jane E. Kahn [mailto:JKahn@rbgg.com]
**Sent:** Friday, July 26, 2013 2:43 PM
**To:** Debbie Vorous
**Cc:** Stone, Michael@CDCR (Michael.Stone@cdcr.ca.gov); Nick Weber; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team
**Subject:** RE: WIC 7301 Issues, including Review of 7301 Patient at SAC [IWOV-DMS.FID6429]

Dear Debbie:

Plaintiffs write regarding Defendants' current policies and procedures implementing WIC 7301, which permits the transfer of DSH patients to CDCR prisons for treatment and housing. Section 7301 provides that "[w]henever, in the opinion of the Director of State Hospitals and with the approval of the Secretary of the Department of Corrections and Rehabilitation, any person who has been committed to a state hospital pursuant to provisions of the Penal Code or who has been placed in a state hospital temporarily for observation pursuant to, or who has been committed to a state hospital … needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections and Rehabilitation, that person may be transferred for those purposes from an institution under the jurisdiction of the State Department of State Hospitals to an institution under the jurisdiction of the Department of Corrections and Rehabilitation." CDCR has several DSH units housed within its facilities, including VPP and SVPP. However, Defendants have informed us most recently that there are approximately 35 DSH patients who have been transferred to CDCR prisons, pursuant to WIC 7301, for housing and treatment, with the majority housed in the SAC PSU. Plaintiffs object to Defendants' current practice, of transferring DSH patients to segregated EOP housing units where they cannot receive appropriate level of care. This current practice is especially disturbing in light of Defendants' assertions that there are open DSH beds at DMH-Vacaville and SVPP, both DSH programs, which has higher security available for patients who might require such a setting until they have fully stabilized.

Plaintiffs request the policies and procedures that govern the implementation of the WIC 7301 program, including the process of certifying patients for WIC transfers within DSH and through the Department Review Board, the process of developing goals and objectives for patients to achieve in order to return to DSH, the policies governing the transfer options for WIC 7301 patients, and the CDCR process for review of 7301 patients for return to DSH. We continue to object to the practice of placing DSH patients inside of CDCR prison mental health programs, which are overcrowded and ill-suited for them, and which are maintained for prisoners with serious mental illnesses.

We have reviewed the records of one such WIC 7301 transfer to SAC, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬, whom I met during the QI tour at CSP-SAC. ▬▬▬▬ transferred to SAC from Patton in November 2008 and is currently housed in the mainline EOP. ▬▬▬▬ was quite distressed over his long placement inside the prison and hopeless about when and how he would ever return to Patton State Hospital after his nearly five-year stay in prison. ▬▬▬▬ case factors illustrate many of the concerns and questions that we have about the WIC 7301 process.

On November 21, 2008, ▬▬▬▬ was transferred to SAC as a WIC 7301 patient due to behavioral outbursts in Patton. (11/21/08 Classification Chrono) He was initially placed in the PSU when he arrived, and it was noted in June 2009, that he had been programming favorably in the PSU for the last 5 months and had remained disciplinary free, "[h]owever, ICC feels that "S" should remain in PSU for continued observation and elects to continue "S" on Indeterminate SHU status within SAC PSU." (CDC 128G, 6/4/09) Thus, this patient, who was not a prisoner and who had been programming favorably for 5 months without any misbehavior, was retained in the PSU for an additional six months until he was released to the SAC Level IV EOP on November 5, 2009. (CDCR 128-G, 11/5/09 Chrono). The November 2009 chrono notes that a nine-point list of goals and objectives were specified prior to his transfer to SAC, which must be achieved and maintained for a minimum of one year before ▬▬▬▬ would be considered for return to Patton. The list included the following items: (1) remain free of homicidal threats for 12 months; (2) remain free of physical assault for 12 months; (3) remain free of any verbal threats for 12 months; (4) remain free of any inappropriate sexual behavior for 12 months; (5) 100% compliance with rules re contraband for 12 mos; (6) 100% compliance with rules re gambling for 12 mos.; (7) 100% compliance with rules re destruction of property for 12 mos.; (8) remain free of all RVRs resulting in 115s and notices for 12 mos.; and (9) remain free of all AWOL attempts for 12 mos. Apparently, the timeline for the year did not start until he was released from the PSU.

**How are the goals and objectives developed for a WIC patient? What are the policies and procedures that govern this? Is it an individualized list? Is this a clinically driven process? What role does the MH 115X play in this process? Are these the same behaviors that would cause a patient to be transferred from DSH to CDCR as a WIC 7301? Where does the 12 month timeframe come from?**

Between November 5, 2009 and December 8, 2012, ▬▬▬▬ was issued 12 rule violations. Nine of the 12 occurred between 2010 and November 2011, with the majority minor rule violations (Disrespecting staff, refusing housing or cellmate, out of bounds, refusing order, theft of CD). During several of the RVR hearings, he testified that he was threatened by a prisoner and got nervous and responded or was told to take the CD by a prisoner and did so. In 2012, he was issued three RVRs. The first, in May 2012, was issued for "being out of bounds" as he left a treatment room when told, but reentered the room. The second, in June 2012, was issued for fighting, although there was no physical contact between him and the prisoner. The third, on December 8, 2012, was issued for indecent exposure at CIM in the ASU where he was housed when he returned from out to court. The clinician who completed the MH 115X wrote: "Pt was psychotic and unstable at the time of the incident. In fact, he was sent to the MHCB shortly after and remains there to this day. He ws put on Keyhea – forced meds – on 12/19 due to his

2



acute psychosis … <u>He is currently in MHCB and is being referred to DMH</u>." (MH 115X 1/3/13, emphasis added)  Apparently, CIM clinical staff who referred this psychotic patient to DSH, were unaware that ▇. ▇▇ was a DSH patient.  A CIM classification chrono, dated 1/18/13, notes that ▇▇▇ was placed in CIM ASU on 12/6/12 for LOB ("Lack of Bed Space"), after returning from out-to-court.

In his file, there is a MH Summary of 7301 Joint DMH/CDCR Conference, dated April 25, 2013, which reviewed his treatment at SAC and decided to retain him at SAC until at least 12/8/13, pending confirmation of the 12/8/12 RVR for IEX (CIM), and assessment of him again in October 2013 via Teleconference with PSH and CDCR SAC.  He ws noted to be doing quite well.  The Mental Health assessment, which determined that ▇▇▇ was psychotic and unstable at the time of this RVR, appears to have been completely disregarded by the 7301 Joint DMH/CDCR Conference, which reviewed ▇▇ ▇▇ most recently for return to Patton.

Plaintiffs request clarification of the WIC 7301 process as requested above, and specifically with reference to ▇▇▇, who has shown significant improvement in his behavior over the past year yet remains housed in a CDCR prison rather than in a DSH facility.  Why was ▇▇▇ referral to DSH in December 2012, when he was psychotic at CIM, later rescinded?  Why was the MH 115X disregarded?  We request a review of ▇▇▇ current behavior and risk factors, and consideration of his timely return to DSH.

Thank you for your prompt response to this email.

Sincerely,
Jane Kahn
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
Telephone:  415/433-6830
Fax:  415/433-7104
jkahn@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit C

| | |
|---|---|
| **From:** | Michael W. Bien |
| **Sent:** | Friday, August 02, 2013 2:14 PM |
| **To:** | Debbie Vorous; Jay Russell |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama |
| **Subject:** | Coleman:  DSH Staffing Crisis [IWOV-DMS.FID6429] |
| **Attachments:** | Persons-MWB, Ltr re staffing. 0489-3, 8-2-13.PDF |

We received the attached email and handwritten note today in the mail.

Please respond before the close of business today as to the actual mental health staffing at Atascadero.  How many psychiatrists are working at ASH on Mondays and Fridays?  Is it true that only one psychiatrist was assigned to cover all four 2684 units, each housing between 43 and 46 patients?

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** LINDA PERSONS
**Sent:** Monday, July 22, 2013 10:26 AM
**To:** MARTIN STEED; MIGUEL ALVARELLOS; JOSHUA DEANE; BELLA GERIO-PRESTOZA; RAVINDRA CHAND; OLGA YAHONTOVA; THOMAS JOHNSON; CHRISTOPHER MARRA
**Cc:** TOM CAHILL; JOAN ODOM; DOUGLAS SHELTON
**Subject:** Psychiatry Coverage
**Importance:** High

Good morning,

I want to thank the eight of you for coming to work today, and carrying the workload of at least 35 doctors. You are medicating, admitting, discharging and handling a myriad of paperwork and documentation that keep our patients and staff safe and healthy.

The wheels of bureaucracy move slow during the best of times, but seem particularly so when we are in a staffing crisis. I want to assure you that Sacramento is aware of our staffing and there are many activities in process to address our staffing needs.

I appreciate your patience and perseverance,

lp

Linda S. Persons
Executive Director
Department of State Hospitals - Atascadero
PO Box 7001
Atascadero CA 93423-7001
805-468-2001 (work)
805-460-0103 (fax)
linda.persons@ash.dsh.ca.gov



*Caring Today for a Safe and Healthy Tomorrow*

1

On this date, there was one psychiatrist for 4 2684 Units (each unit ~ 43-46 patients)

Shortage critical — more doctors leaving — due to this and administration's mis-handling of scheduling and punitive actions towards psychiatrists / Medical Director is family

Practitioner known to hold grudges against psych. He has worked @ ASH for many years but not as medical director.

This memo documents 8 psychiatrists for approx 1100 ± patients - happens on Fridays, Mondays, but very low any day

Very unsafe for patients.
2 suicide attempts in past few weeks — 1 serious attempt.

SANTA BARBARA
CA 931 2 T
30 JUL 2013 PM

RECEIVED
AUG 01 2013
Rosen Bien Galvan & Grunfeld

Michael Bien, Attorney at Law
315 Montgomery Street, 10th Floor
San Francisco, Ca 94104-1823

Confidential
(Re: ash.)

# Exhibit D

| | |
|---|---|
| **From:** | Jane E. Kahn |
| **Sent:** | Friday, August 23, 2013 4:24 PM |
| **To:** | Debbie Vorous; Anne.Nguyen@dmh.ca.gov; Coleman Special Master Team |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; 'jessica.Kim@doj.ca.gov'; Stone, Michael@CDCR (Michael.Stone@cdcr.ca.gov) |
| **Subject:** | SVPP Tour follow-up: Patients ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮ [IWOV-DMS.FID6429] |

Dear Debbie and Anne:

Plaintiffs write to follow-up on an issue that was observed during the monitoring visit at SVPP. During the last day of the site visit, August 22, 2013, we toured the temporary ICF units, C5/C6 and D5 with members of the Special Master's team who were reviewing patients on so-called "cuff-status." As part of the review, we entered each unit and spoke with the Senior MTA and nursing staff who identified patients who were on "cuff-status as a result of behavioral issues. We also encountered three patients in D5 who had been retained on "cuff-status" due to their MAX Status, since their arrival at SVPP many months earlier. The explanation provided by staff was that they had not yet been cleared by ICC to program and so were required to be on "cuff-status," with all the limitations to mental health programming associated with that. The *Coleman* monitors have reported that those on "cuff-status" get very little treatment and out-of-room time. Note, there were other patients in the other units who were also on MAX status, but had more recently arrived. They had not been released in their Initial ICC, and may join the ranks of these three patients.

As you are aware, the ordinary classification process for a patient who has been transferred to SVPP on MAX Status is an ICC review for suspension of a SHU, if applicable, to allow the patient to begin programming in the hospital. SVPP Program Manual 3.09; PG, 12-6-9.. As described in the SVPP Program Manual, until SVSP's ICC clears the patient to program, the patient remains on "cuff-status." Although Plaintiffs have objected to this status for even the shortest period of time, given the acuity of the patients transferring into the hospital program, we are shocked to learn that there are patients who have remained on this "cuff status," with limited program (much more limited than what they were receiving inside the prisons) for months on end. Two of the three patients housed in D5 had been on MAX Status since **April 5, 2013 or for more than four months** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮ The third patient had been on MAX status since **June 12, 2003 or for more than two months** ▮▮▮▮▮▮▮▮▮▮▮ As was reported by the *Coleman* monitoring team during the exit, SVPP offers considerably less mental health programming to those patients who are permitted to participate (4 to 6 hours at best) than an EOP program offers, but for those constrained on "cuff status," the mental health program is sparse and limited by the MTA staffing and availability of space.

Why have these three patients been kept on MAX status and "cuff-status" for these many months? What possible reason justifies the Warden's decision not to permit these patients to participate in the treatment program at SVPP? Are there policies and procedures that guide his decision whether to permit a patient admitted to the hospital program to participate? What is the plan for these patients? Why have they been retained at SVPP where they cannot receive treatment?

We request a copy of each of these patients" IDTTs since arrival, including their 72 hour IDTT, 14 day IDTT, 30 day IDTT, 60 day IDTT, 90 day IDTT, and 120 day IDTT. Furthermore, we request a copy of any and all ICCs held for these three patients since their arrival at SVPP. Thank you for your prompt response to these requests.

Sincerely,

Jane Kahn
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor

San Francisco, CA 94104
Telephone: 415/433-6830
Fax: 415/433-7104
jkahn@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.