1  KAMALA D. HARRIS                          Hanson Bridgett LLP
   Attorney General of California            JERROLD C. SCHAEFER, State Bar No. 39374
2  JONATHAN L. WOLFF                         PAUL B. MELLO, State Bar No. 179755
   Senior Assistant Attorney General        WALTER R. SCHNEIDER, State Bar No. 173113
3  JAY C. RUSSELL                            SAMANTHA D. WOLFF, State Bar No. 240280
   Supervising Deputy Attorney General       MEGAN OLIVER THOMPSON, SBN 256654
4  DEBBIE VOROUS, State Bar No. 166884         425 Market Street, 26th Floor
   PATRICK R. MCKINNEY, State Bar No. 215228   San Francisco, California 94105
5  MANEESH SHARMA, State Bar No. 280084        Telephone:  (415) 777-3200
   Deputy Attorneys General                    Fax:  (415) 541-9366
6   455 Golden Gate Avenue, Suite 11000       E-mail: pmello@hansonbridgett.com
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5553
    Fax: (415) 703-1234
8   E-mail:  patrick.mckinney@doj.ca.gov
   *Attorneys for Defendants*
9

10              IN THE UNITED STATES DISTRICT COURTS

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12           AND THE NORTHERN DISTRICT OF CALIFORNIA

13      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

14        PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15

16  **RALPH COLEMAN, et al.,**                2:90-cv-00520 LKK JFM P

17                          Plaintiffs,       **THREE-JUDGE COURT**

18      v.

19  **EDMUND G. BROWN JR., et al.,**

20                          Defendants.

21

22  **MARCIANO PLATA, et al.,**              C01-1351 TEH

23                          Plaintiffs,       **THREE-JUDGE COURT**

24      v.

25  **EDMUND G. BROWN JR., et al.,**          **DEFENDANTS' REQUEST FOR AN
                                              EXTENSION OF DECEMBER 31, 2013
26                          Defendants.       DEADLINE AND STATUS REPORT IN
                                              RESPONSE TO JUNE 30, 2011, APRIL 11,
27                                            2013, JUNE 20, 2013, AND AUGUST 9,
                                              2013 ORDERS**

28

**INTRODUCTION**

In the last several years, the State has taken extraordinary actions to improve the state prisons and the larger criminal justice system.  The State has reformed sentencing laws, increased the amount of prison good time and program-completion credits, realigned lower level offenders to local jurisdictions, strengthened rehabilitative services and treatment, significantly expanded the prison health care infrastructure, and more than doubled the yearly amount spent on health care per inmate.  And now the State has taken yet another major step to reduce the state prison population while at the same time setting in motion steps that will lead to durable solutions to the court-ordered population cap.  On September 12, 2013, Governor Brown signed into law Senate Bill 105, which the Legislature passed with nearly unanimous, bipartisan support.  SB 105 appropriates $315 million to be used for a mix of increased prison capacity and long term reforms to control prison crowding.  S.B. 105, 2012-2013 Reg. Sess., sec. 23 (Cal. 2013.)  Under SB 105, the State will:

- Immediately reduce the prison population by transferring approximately 2,500 inmates to available in-state capacity in county jails, community correctional facilities, and a private prison;

- Avoid increasing the current level of inmates housed in private prisons in other states;

- Infuse the substantial savings achieved from avoiding the expense of additional out-of-state capacity into a newly established state fund for activities and programs to decrease the state's prison population by reducing recidivism;

- Permanently increase funding beginning next fiscal year by an estimated $100 million to bolster rehabilitative programs for felony probationers, including mental health, drug and alcohol abuse treatment, and job training; and

- Initiate a collaborative process to develop balanced solutions to further reduce the prison population.

But SB 105 can only operate as outlined above and achieve durable reforms if more time is afforded than currently exists under the December 31 deadline.  For prison-population-reduction measures to be effective and lasting, they cannot be unilaterally imposed because the

state prison system does not operate in isolation.  State prisons are just one part of the larger, interconnected criminal justice system which includes county jails, sheriffs, police chiefs, parole officials and probation chiefs, the courts, district attorneys, public defenders, mental health providers, alcohol and substance abuse treatment providers, county supervisors, and victim advocacy groups.  When the State changes its policies to reduce the prison population, the entire criminal justice system must absorb the changes.  State and local officials must find ways to protect public safety while helping offenders, who would have otherwise been in prison, successfully reintegrate into our communities.  For a prison-crowding solution to last, it must be developed with in consultation with the state and local officials who will place a decisive role in its implementation.

Recognizing the interconnected nature of criminal justice in California, SB 105 mandates that additional solutions be developed in consultation with criminal justice stakeholders and the Legislature through California's democratic process, to ensure that the resulting reforms will be sustainable.  But these further reforms will take time to develop—time that does not exist under the current end-of-the-year deadline.  Accordingly, Defendants respectfully ask the Court for a three-year extension to meet the population cap.  Without an extension, Defendants will be forced to use the money appropriated under SB 105 to reach the 137.5% cap by sending thousands of additional inmates out of state.  With the requested extension, the State will have the time and flexibility to achieve SB 105's objective of developing durable measures to reduce recidivism, promote public safety, and further improve the fairness and effectiveness of our criminal justice system.

I.    THROUGH SB 105, THE STATE WILL IMMEDIATELY REDUCE THE STATE PRISON POPULATION WHILE DEVELOPING FURTHER DURABLE REFORMS TO ACHIEVE AND MAINTAIN COMPLIANCE WITH THE PRISON POPULATION CAP.

SB 105 appropriates $315 million to be used in different ways depending on whether the current December 31 population-cap deadline remains in place.  S.B. 105, 2012-2013 Reg. Sess., sec. 23 (Cal. 2013.)  If the current deadline remains unchanged, then the money appropriated by SB 105 will be used to obtain additional prison capacity, which will mostly be in other states, to

1   satisfy the population cap by the end of the year.  (*Id.*; Beard Decl. ¶ 9.)  With additional time, SB

2   105 will allow the state to develop longer-term solutions to reduce recidivism while achieving

3   immediate reductions to the prison population through available in-state capacity.  (*Id.*)

4       **A.      SB 105 Authorizes Immediate Additional Capacity in California.**

5       SB 105 modifies existing state laws to allow the state to make immediate and significant

6   progress toward meeting the population cap by leasing additional capacity currently available in

7   California.  (Beard Decl. ¶ 6.)  Specifically, Defendants are exercising their authority under SB

8   105 to transfer approximately 2,500 inmates to available capacity in county jails, community

9   correctional facilities and a private prison by the end of the year.  (*Id.*)  This will reduce the prison

10  population to approximately 145% of design capacity this year.  (*Id.*)

11      **B.      With the Extension, SB 105 Allows the State to Avoid the Need for Additional
12              Out-of-State Capacity.**

13      With the requested extension, Defendants will not use the remaining available funds under

14  SB 105 to pay for housing additional inmates in private prisons in other states.  (Beard Decl. ¶ 7.)

15  Defendants will maintain the current out-of-state population of approximately 9,000 inmates, but

16  not increase it.  (*Id.*)

17      **C.      With the Savings That Can Be Realized From Avoiding Additional Out-Of-
18              State Capacity, SB 105 Devotes Significant Funding to Reduce Recidivism.**

19      SB 105 establishes a new Recidivism Reduction Fund that will receive savings from not

20  having to house additional inmates out of state.  (Cal. Pen. § 1233.9, added by SB 105.)  The new

21  fund will receive the first $75 million in savings, and 50% of all savings thereafter.  (*Id.,* § 22(c).)

22  The money in the fund will be available for appropriation by the Legislature for "activities

23  designed to reduce the state's prison population, including but not limited to, reducing

24  recidivism."  (*Id.*)

25      **D.      SB 105 Significantly Increases Funding of Rehabilitative Programs for Felony
26              Probationers.**

27      In 2009, the state enacted Senate Bill 678, titled the California Community Corrections

28  Performance Incentive Act, which established a system of performance-based funding that shares

3

state General Fund savings with county probation departments when counties divert felony

probationers who have violated probation into rehabilitative programs instead of returning them

to prison.  (Decl. Audrey Bazos ¶¶ 4, 5.)  Under SB 678, the funding is used for evidence-based

rehabilitative programs including drug and alcohol treatment, mental health treatment, anger

management, and job training.  (Cal. Pen. Code § 1230(b)(3)(D).)  Since its implementation, this

measure has decreased California's prison admissions by reducing criminal behavior and the

violations of the terms of probation.  (Bazos Decl. ¶ 4.)  Between 2011 and 2013, it is estimated

that SB 678 has prevented over 15,000 prison admissions.  (*Id.* ¶ 10.)  SB 105 builds on this

success by increasing the 2014-15 fiscal year funding for this measure by approximately $20,000

per felony probationer for an increase of $50 million over the current fiscal year funding and an

estimated increase of $100 million over the amount originally anticipated for 2014-15.  (*Id.* ¶¶ 11,

12.)  SB 105 provides for this significant increase in funding on a permanent basis beginning in

the upcoming fiscal year.  (*Id.* ¶¶ 11, 13.)

> **E.      SB 105 Requires the State to Immediately Begin Developing Additional Lasting and Effective Reforms to Address Prison Crowding.**

      Finally, SB 105 directs the Governor's administration to "begin immediately, in

consultation with stakeholders, including appropriate legislative committees, to assess the state

prison system, including capacity needs, prison population levels, recidivism rates, and factors

affecting crime levels, and to develop recommendations on balanced solutions that are cost

effective and protect public safety."  (SB 105, sec. 1.)  SB 105 further provides that the

Department of Finance is to submit the administration's interim report to the Legislature by April

1, 2014, and final report by January 10, 2015, for consideration during the annual budget process.

(*Id.*)  Shortly after signing SB 105, Governor Brown appointed Linda Penner, former chief

probation officer of Fresno County and current chair of the Board of State and Community

Corrections, to lead this initiative on behalf of the administration, and begin consulting with the

numerous stakeholders in the criminal justice system to develop further reforms to reduce

recidivism and improve the criminal justice system.  (Decl. Linda Penner.)

1

2
**II.    DEFENDANTS REQUEST AN EXTENSION OF THE CURRENT POPULATION-CAP DEADLINE TO ALLOW TIME TO BUILD UPON THE SIGNIFICANT CRIMINAL JUSTICE REFORMS THE STATE HAS ALREADY ACHIEVED.**

3

4    Defendants respectfully request that that Court extend the December 31, 2013 deadline to

5    reduce the prison population to 137.5% of design capacity by three years to December 31, 2016.

6    (Beard Decl. ¶ 9.)  This motion is consistent with the United States Supreme Court's decision that

7    this Court must remain open to requests for an extension of time to achieve the required

8    population reduction.  *Brown v. Plata*, 563 U.S. __, 131 S.Ct. 1910, 1946-47 (2011).  Further,

9    Plaintiffs' counsel recently stated publicly that they too would be "open to an extension of the

10   date for compliance with the three judge court's order if an agreement produces an effective and

11   sustainable approach that will resolve the chronic overcrowding problem in the state's prisons."

12   (Prison Law Office Press Release dated Aug. 27, 2013, available at www.prisonlaw.com.)  As

13   explained above, SB 105 produces an "effective and sustainable approach" that Plaintiffs

14   describe.  Absent this extension, Defendants will, on September 30, 2013, pursue the plan

15   detailed in Section III to comply with the December 31, 2013 deadline.  (Beard Decl. ¶ 9.)

16   The State has accomplished major reforms in recent years to address the challenges of

17   prison crowding and the delivery of constitutional care in the prison system.  (*See* Beard & Bazos

18   Decls.)  These actions have reformed sentencing and prison credit-earning laws, reduced the

19   prison population, strengthened rehabilitative services and treatment, and expanded prison health

20   care services and infrastructure.  (*See id.*)  Summarized below, these historic reforms demonstrate

21   the State's clear commitment to improving the prison health care system and developing lasting,

22   balanced, and cost-effective solutions for California's prisons and the broader criminal justice

23   system.

24   **1)** Senate Bill 678 (2009), established a system of performance-based funding that shares

25   state General Fund savings with county probation departments when counties successfully reduce

26   the number of adult felony probationers going to state prison for new crimes or for violating their

27   probation.  (Bazos Decl. ¶ 4.)  Funding provided through SB 678 has reduced probation failure

28   rates, and has been very successful.  (*Id.* ¶ 10)  Between 2011 and 2013, it is estimated that SB

678 has prevented over 15,000 prison admissions.  (*Id.*)

**2)** Senate Bill 18 (2009), increased credit-earning capacity for both "good time" credits and program "milestone" completion credits, funded evidence-based community programs for felony probationers, expanded drug and mental health reentry courts through which offenders receive highly structured treatment in lieu of prison time for parole violations, and reformed sentencing laws to increase the dollar threshold for "wobbler" crimes, thereby reducing the number of offenders sent to state prison.  (S.B. 18, 2009 Leg., Reg. Sess. (Cal. 2009).)

**3)** Public Safety Realignment (2011), which took effect in October 2011, diverts lower level offenders and parole violators to local authorities and dedicates resources for evidence-based community rehabilitative programs.  (A.B. 109, 2011-12 Leg., Reg. Sess. (Cal. 2011).) The Legislature implemented these changes by reforming the penal code to shift incarceration and post-release responsibilities for non-serious, non-violent, and non-registerable sex crimes from the State prison system to local supervision.  (*Id.*)  Realignment effectuated a prison population decrease of 25,000 inmates in a single year and is widely recognized as "the biggest penal experiment in modern history."  J. Petersilia & J. Greenlick Snyder, *Looking Past the Hype: 10 Questions Everyone Should Ask About California's Prison Realignment*, 5(2) Cal. J. Pol. Pol'y 266, 268 (2013).  Realignment also provided substantial funding to counties for evidence-based programs including drug courts, as well as counseling, educational, work-training, and mental health treatment programs.  (Cal. Penal Code § 1230.1)  The funding for Realignment, which includes these programs, was constitutionally protected by Proposition 30.  Cal. Const. art. XIII, § 36, subd. (d).  In the current fiscal year, the funding provided to the counties by realignment for the community corrections activities that includes these types of evidence-based rehabilitative programs is just under <u>one billion dollars</u>.  (Bazos Decl. ¶ 14.)

**4)** Substantial numbers of indeterminately-sentenced offenders are now receiving parole after demonstrating that they no longer pose a threat to the community.  (Decl. Jennifer Shaffer ¶ 3.)  From 1978 to 2008, the Board of Parole Hearings granted parole to roughly 2,100 life-sentence inmates, with Governor Davis reversing 98% of the Board's decisions, and Governor Schwarzenegger reversing 74% of the Board's decisions.  (*Id.*; *see also Coleman* ECF 4572/*Plata*

6

ECF 2612 at 1-2.)  In just two and a half years, Governor Brown has reviewed 1,500 grants of

parole and has blocked parole only 18% of the time.  (Shaffer Decl. ¶ 3.)  Governor Brown's

actions reflect adherence to the state law requirement that parole "shall normally" be granted

"unless consideration of the public safety requires a more lengthy period of incarceration."  (*Id.*;

*see* Cal. Penal Code § 3041(a) & (b).)

   **5)** Proposition 36, passed by the voters in November 2012, reformed California's "Three

Strikes" sentencing law to impose a life sentence only when the third-strike felony conviction is

serious or violent.  Cal. Pen. Code § 1170.126.  Proposition 36 also authorizes resentencing for

inmates currently serving a life term for a third-strike conviction that was not serious or violent,

so long as the resentencing does not pose an unreasonable risk to public safety.  *Id*.  To date,

1,011 prisoners have been released from custody through resentencing, and more than 2,000

petitions are pending in state courts.  *See* https://www.law.stanford.edu/sites/default/files/child-

page/441702/doc/slspublic/ Three%20Strikes%20Reform%20Report.pdf at 6.

   **6)** Senate Bill 9 (2012) allows inmates serving a term of life without the possibility of

parole for crimes committed as a minor to petition a court for resentencing after serving at least

fifteen years of their sentence.  Cal. Pen. Code § 1170(d)(1)-(2).  Courts may resentence these

inmates to indeterminate terms of 25 years-to-life if they demonstrate remorse and rehabilitation

in prison.  (*See id.*)  Based on data in 2011, approximately 295 offenders are eligible for re-

sentencing under SB 9.  (*See* Assembly Appropriations Committee Analysis Aug 16, 2011 at 5,

*available at* http://www.leginfo.ca.gov/pub/11-12/bill/sen/sb_0001-0050/sb_9_cfa_

163614_asm_ comm.html.).

   **7)** Senate Bill 260 (2013).  On September 16, 2013, Governor Brown signed into law a

measure that allows inmates whose crimes were committed as minors to appear before the Board

of Parole Hearings to demonstrate their suitability for release after serving at least fifteen years of

their sentence.  *See* Cal. Penal Code §§ 3041, 3046, 3051 & 4801.  The law directs the Board to

give "great weight to the diminished culpability of juveniles" and to consider evidence of their

maturity and rehabilitation in prison.  Cal. Penal Code § 4801(b)(1).  Approximately 5,700

inmates are currently serving sentences for crimes they committed as juveniles: nearly 1,500 have

served at least 15 years, 729 have served at least 20 years, and 333 have served at least 25 years in prison.  (*See* Assembly Appropriations Committee Analysis, Aug. 13, 2013, *available at* http://leginfo.ca.gov/pub/13-14/bill/sen/sb_0251-0300/sb_260_cfa_20130813_150553_asm_comm.html.)  The Board must complete all parole hearings for inmates eligible for consideration under SB 260 by July 1, 2015.  Cal. Penal Code § 3051.

**8)**  Inmate Health Care Spending: The State has more than doubled the amount spent on health care costs for each inmate, rising from $7,580 per inmate in 2005-06 to $17,924 in 2013-14.  (Bazos Decl. ¶ 19.)  This per-inmate health care expenditure vastly exceeds that of other states with large prison populations.  (*Id.* ¶ 20.)  For example, in 2010-11, average cost per inmate for health care in the State of Texas was $2,992 for a prison population of 156,562.  (*Id.* ¶ 21.)  In 2010-11, the State of New York's average cost per inmate for health care was $5,958 with a prison population of 56,732.  (*Id.* ¶ 22.)

**9)**  Health Care Facility Construction & Upgrades:  The State has recently spent well over $1 billion on the construction of new and expanded health care facilities and upgrades that will meet the present and future needs of its inmates.  This recent construction includes:

- San Quentin Health Services Facility: a $128.3 million, 135,000 square foot correctional health care center which opened in November 2009.   (Jan. 7, 2013 Decl. Chris Meyer ¶ 3 & Ex. 1, *Coleman* ECF 4278.)
- California Health Care Facility in Stockton: an $840 million, 1,818-bed health care facility which opened in July 2013.  (*Id.* ¶ *5;* July 18, 2013 Decl. Jeffrey Beard ¶ 2, ECF 2680/4681.)
- Dewitt Nelson Facility: a $173 million, 1,133 bed health care facility annex scheduled to open in 2014.  (Meyer Decl. ¶ 6 & Ex 4.)
- at California Medical Facility: a $33.7 million, 64-bed Intermediate Care Facility, which opened in February 2012; a $23.8 million project to add treatment and office space for Enhanced Outpatient Program (EOP) inmates; a $29.8 million, 50-bed Mental Health Crisis Bed unit.  (*Id.* ¶ 7 & Exs. 6 & 7.)
- at Salinas Valley State Prison: a $29.5 million, 64-bed Intermediate Care Facility and additional treatment space, completed in 2009; and is completing construction of additional treatment and office space for 300 EOP inmates this month at a project cost of $19.7 million.  (Beard Decl. ¶ 3; Meyer Decl. ¶ 8 & Ex. 8.)
- at California Men's Colony: a $38.7 million, 50-bed Mental Health Crisis Bed unit, opened in September 2013.  (Beard Decl. ¶ 3.)
- at California Institution for Women: a $7.2 million, 20-bed Psychiatric Services Unit facility, and a $36.3 million, 45-Psychiatric Inpatient Program, which began admitting inmates in July 2012.  (Meyer Decl. ¶ 12 & Exs. 11 & 12.)
- at California State Prison, Sacramento: additional office and treatment space for

EOP inmates at a project cost of $12.2 million, and housing treatment and office space for 128 inmates needing Psychiatric Services Unit treatment at a project cost of $15.4 million, scheduled for completion in October 2013.  (Beard Decl. ¶ 3; Meyer Decl. ¶ 15 & Ex. 15.)

- at California State Prison, Corcoran: a $10.7 million project to add treatment and office space for EOP inmates, opened in June 2013.  (Beard Decl. ¶ 3.)

California stands ready to build upon these accomplishments in collaboration with those parties who will be responsible for carrying out further reforms, including sheriffs, police chiefs, parole officials and probation chiefs, the courts, district attorneys, public defenders and defense counsel, mental health providers, alcohol and substance abuse treatment providers, and county supervisors.  (Beard Decl. ¶ 4.)  Without the wholehearted participation and support of these stakeholders, no reform—including any court-ordered measure—is sustainable.  (*Id.*) Realignment, which reduced the inmate population by over 25,000 inmates, is an effective and lasting reform because it was developed in concert with stakeholders through the democratic process.  (*Id.*)  SB 105 was also developed through the give and take of the state's democratic process to earn the near unanimous, bipartisan support of the Legislature as well as the support of a broad network of criminal justice stakeholders.  (*Id.*)  SB 105 not only forges a clear path towards further durable solutions to reduce recidivism and prison crowding, but it sets the wheels of progress in motion towards achieving those objectives.  (*Id.*)  Defendants respectfully ask the Court for a three-year extension to give SB 105 the time it needs to work.  (*Id.*)

## III.  DEFENDANTS' PLAN TO REACH THE COURT-ORDERED PRISON POPULATION RATIO OF 137.5 PERCENT ABSENT MODIFICATION OF THE POPULATION-REDUCTION ORDERS.

Exhibit A sets forth the current design bed capacity, population, and population as a percentage of design bed capacity for each state prison and for all state prisons combined.  As of September 11, 2013, 120,027 inmates were housed in the State's 34 adult institutions, which amounts to 147.1% of design bed capacity.[1]  Consistent with the Court's August 9, 2013 Order, and as previously reported, Defendants have implemented and accomplished the following

---

[1] The data in Exhibit A is taken from CDCR's September 11, 2013 weekly population report, available on CDCR's Web site at http://www.cdcr.ca.gov/Reports_Research/Offender_ Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad130724.pdf

9

1  measures from the Court's Amended Plan: new construction; expanded fire camp capacity; and

2  slowing the return of out of state inmates.  (*See* Aug. 29 Status Report, ECF 2705/4777.)

3      Defendants acknowledge that in the Court's view, compliance with the population cap

4  could be quickly and safely achieved through releasing the requisite number of inmates

5  (approximately 8,500 based on current estimates) either through awarding retroactive credits or

6  using the an early-release system.  (Beard Decl. ¶ 8.)  Governor Brown, CDCR Secretary Beard,

7  and the State Legislature, however, respectfully disagree.  (*Id.*; *see also* SB 105.)  Implementing a

8  mass inmate release of this scale would necessarily encompass more than nonviolent low-risk

9  offenders, and reach into offenders who are deemed to present higher-level risks to public safety.[2]

10  (July 19, 2013 Decl. Jay Atkinson ¶¶ 5-7.)

11      Moreover, these offenders would be released into communities that lack the institutional

12  capacity at this time to absorb more offenders than they are currently handling under

13  Realignment.  (Beard Decl. ¶ 8.)  A recent article in the Los Angeles Times reports that Los

14  Angeles County is routinely releasing even serious and violent offenders early due to a lack of

15  resources and jail capacity.  Jack Leonard and Abbey Sewell, *Even violent and sex offenders*

16  *released early by L.A. County Jail*, Los Angeles Times, August 31, 2013, latimes.com/local/la-

17  me-jail-early-release-20130901,0,4947366.story.  Releasing inmates into communities that lack

18  resources to provide the necessary supervision, treatment, and reentry services will degrade

19  existing services, heighten risks to public safety, and make it far more difficult to build upon

20  Realignment with further lasting reforms.  (Beard Decl. ¶ 8.)

21      Accordingly, should the Court deny Defendants' motion to extend the December 31, 2013

22  deadline, SB 105 provides funding to ensure compliance with the population-reduction orders by

23  authorizing the State to lease additional prison capacity both within California and in private, out-

24  of-state prisons.  (Beard Decl. ¶ 9.)  The additional capacity provided for by SB 105 will cause

25  the prison population to be at or below 112,164 by December 31, 2013, which amounts to 137.5%

26  _____

[2] Indeed, even offenders categorized as "low risk" present public safety risks.  A 2013 study reports that 41% of "low-risk" recently released offenders reoffended within three years; and 11% of those new offenses were violent felonies.  J. Petersilia & J. Greenlick Snyder, *Looking Past the Hype: 10 Questions Everyone Should Ask About California's Prison Realignment*, 5(2) Cal. J. Pol. Pol'y 266, 295 (2013).

1   or less of design bed capacity. (*Id.*)  Defendants anticipate that they will be able to transfer

2   inmates into out-of-state facilities at a faster rate and in bigger numbers than they are able to

3   transfer into in-state facilities. (*Id.* ¶ 10.)  Given the exigent circumstances, if the current end-of-

4   year deadline remains in place, Defendants will need to rely most heavily on additional out-of-

5   state capacity to meet the cap on time. (*Id.*)  Defendants will continue to report to the Court on

6   the progress of leasing additional capacity and transferring prisoners to these facilities. (*Id.*)

7   Under the authority granted to it by SB 105, the State will contract for beds that exceed the

8   difference between 137.5% of design capacity and the current prison population, thus allowing

9   Defendants to address any unexpected changes to the prison population. (*Id.*)  Once Defendants

10  meet the court required capacity of 137.5%, they will continue to monitor their capacity needs

11  and maintain the population at or below the target into 2014 and beyond if no change to the

12  designated capacity limit occurs. (*Id.*)

13  **IV.    STATUS OF COURT ORDERED EARLY RELEASE SYSTEM**

14        Consistent with the Three-Judge Court's June 20, 2013 Order, Defendants have completed

15  the framework for an early release system which identifies and categorizes offenders based on

16  several criteria, including their California Static Risk Assessment Risk Score, prior felonies, and

17  in-prison behavior. (Beard Decl. ¶ 11.)  As a result of SB 105's enactment, Defendants do not

18  anticipate the need arising to resort to this early release system. (*Id.*)

19  **IV.    CONCLUSION**

20        By granting Defendants' motion to modify, the Court can assist the State in continuing to

21  develop comprehensive and sustainable population-reduction reforms.  Defendants respectfully

22  request that the Court rule on the motion to modify as expeditiously as practicable so that the

23  State can ascertain whether it may reserve SB 105 funds for recidivism reduction, or if it will be

24  forced to pursue further out-of-state prison transfers to meet the December 31, 2013 deadline.

25  ///

26  ///

27  ///

28  ///

Defendants' Sept. 16, 2013 Status Report and Request for an Extension
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

1    Because of the many practical challenges involved in the transfer of thousands of inmates out of

2    state, Defendants ask that the Court rule on Defendants' motion no later than September 27, 2013.

3    (Beard Decl. ¶ 9.)

4    Dated:  September 16, 2013                    KAMALA D. HARRIS
                                                   Attorney General of California
5
                                                   By:  */s/ Patrick R. McKinney*
6                                                  PATRICK R. MCKINNEY
                                                   Deputy Attorney General
7                                                  *Attorneys for Defendants*

8    Dated:  September 16, 2013                    HANSON BRIDGETT LLP

9                                                  By:  */s/ Paul B. Mello*
                                                   PAUL B. MELLO
10                                                 *Attorneys for Defendants*

11   SF2007200670
     40770270.docx
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Sept. 16, 2013 Status Report and Request for an Extension
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH