DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>     v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>            Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' REQUEST FOR RECONSIDERATION BY THE DISTRICT COURT OF MAGISTRATE JUDGE'S RULING RE: PLAINTIFFS' ACCESS TO CLASS MEMBER RECORDS**<br><br>Judge: Hon. Lawrence K. Karlton |

[943065-1]

I, Michael W. Bien, declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Request For Reconsideration by the District Court Of Magistrate Judge's Ruling Re: Plaintiffs' Access To Class Member Records.

2. Defendants have taken the position that inmate-patients confined in California Department of Corrections and Rehabilitation (CDCR) institutions pursuant to Welfare and Institutions Code section 7301 ("WIC § 7301") are not *Coleman* class members. Relying on this position, Defendants have refused to respond to Plaintiffs' counsel's requests for information and CDCR records regarding this group of inmate-patients.

3. In the context of the instant dispute, Defendants have refused to provide updated records for a WIC § 7301 inmate-patient who in the last several months has been housed in the CSP-Sacramento Psychiatric Services Unit (PSU) (a segregation unit that houses EOP inmate-patients) and at the Department of State Hospitals (DSH) Intermediate Care Facility program at the Salinas Valley Psychiatric Program inside of Salinas Valley State Prison. This inmate-patient's case was reviewed in February 2013 by Plaintiffs' expert Dr. Pablo Stewart, in the course of discovery on Defendants' termination motion. Our office requested this inmate-patient's records in February 2013 for Dr. Stewart's review, and Defendants provided the requested records. Defendants' most recent monthly DSH inpatient data (dated July 31, 2013), provided to the Special Master and Plaintiffs' counsel pursuant to court order, shows that this inmate-patient has been at SVPP since February 27, 2013. This inmate-patient has been in CDCR custody since July 2010, according to CDCR's online inmate locator, and has been issued a CDCR number. Dr. Stewart found that this patient has reported being "very suicidal," and has had multiple

[943065-1]

1

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLS.' REQUEST FOR RECONSIDERATION BY THE DISTRICT COURT OF MAGISTRATE JUDGE'S RULING RE: PLS.' ACCESS TO CLASS MEMBER RECORDS

1  mental health crisis bed (MHCB) and inpatient admissions since his confinement in
2  CDCR's custody began in 2010.  *See* Docket No. 4381, ¶ 408.
3      4.  This is unfortunately another chapter in Defendants' effort to obstruct the
4  Court, the Special Master, and Plaintiffs' counsel's access to important evidence as to the
5  treatment of seriously mentally ill prisoners in CDCR institutions.  This dispute comes on
6  the heels of Defendants' recent refusal to provide important information and
7  documentation regarding the treatment provided to the WIC § 7301 inmate-patient who
8  died by water intoxication in the Salinas Valley Psychiatric Program earlier this year.  This
9  inmate-patient was the subject of considerable testimony during the June 2013 evidentiary
10 hearing on inpatient care provided to the *Coleman* class.  *See* 6/19/13 Hr'g Tr. at 41-45 (P.
11 Stewart direct examination); 75-77 (P. Stewart cross-examination).
12     5.  Defendants have refused to provide to Plaintiffs requested documents and
13 information about this inmate-patient who died while at SVPP, both prior to the June 2013
14 evidentiary hearing, *see* 6/19/13 Hr'g Tr. at 44-45, and again in July 2013 in response to
15 my email requesting such information following the Court's July 11, 2013 order regarding
16 inpatient treatment.  Defendants stated in response to my email request that because this
17 inmate-patient "was temporarily placed in CDCR's custody under Welfare & Institutions
18 Code section 7301," he "[i]s not a *Coleman* class member."  Attached as **Exhibit A** is a
19 true and correct copy of the email chain between Defendants' counsel and Plaintiffs'
20 counsel on this matter, with the most recent email dated July 16, 2013.
21     6.  Even more recently, Defendants refused to provide information and
22 documentation requested by Plaintiffs' counsel regarding another WIC § 7301 inmate-
23 patient who has been in CDCR custody since November 2008, and who has spent
24 significant periods in the CSP-Sacramento PSU (again, a unit meant to serve EOP
25 prisoners) and been referred for MHCB and DSH inpatient care based on his serious
26 mental illness and treatment needs.  Attached as **Exhibit B** is a true and correct copy of the
27 email chain between Defendants' counsel and Plaintiffs' counsel on this matter, with the
28 most recent email dated August 19, 2013.  The inmate-patient's name has been redacted in

[943065-1]

2
DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLS.' REQUEST FOR RECONSIDERATION BY THE
DISTRICT COURT OF MAGISTRATE JUDGE'S RULING RE: PLS.' ACCESS TO CLASS MEMBER RECORDS

1 this document.  In this email chain, Defendants' counsel states: "As you know, the State
2 has consistently taken the position that DSH patients temporarily housed within CDCR
3 under Welfare and Institutions Code section 7301 for the additional custodial security
4 measures required in response to their violent propensities, are not *Coleman* class
5 members.  For that reason, the State is not in a position to provide further responses to
6 your questions and requests."

7      7.     Defendants have recently informed Plaintiffs' counsel that there are
8 approximately 35 DSH patients who have been transferred to CDCR prisons pursuant to
9 WIC § 7301, and that many are being housed in the CSP-Sacramento PSU (a segregation
10 unit that houses EOP inmate-patients).

11      8.     Defendants' refusals to provide important information and records regarding
12 WIC § 7301 inmate-patient in CDCR have obstructed Plaintiffs' efforts to gather and
13 analyze information about the treatment of this group of CDCR prisoners with serious
14 mental illness, both for purposes of formal litigation and individual case-related advocacy.

15      I declare under penalty of perjury under the laws of the United States and the State
16 of California that the foregoing is true and correct, and that this declaration is executed at
17 San Francisco, California this 17th day of September, 2013.

19                    */s/ Michael W. Bien*
                      Michael W. Bien

[943065-1]

3

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLS.' REQUEST FOR RECONSIDERATION BY THE
DISTRICT COURT OF MAGISTRATE JUDGE'S RULING RE: PLS.' ACCESS TO CLASS MEMBER RECORDS

# EXHIBIT A

**From:** Debbie Vorous
**Sent:** Tuesday, July 16, 2013 11:10 AM
**To:** Michael W. Bien
**Cc:** Coleman Team - RBG Only; Kerry Courtney Hughes, MD; Patricia M. Williams; Haunani Henry; Mary Perrien; Henry D. Dlugacz; Raymond F. Patterson, MD; Kathryn Burns, MD, MPH; Paul Nicoll; Linda Holden; Jeff Metzner; Matt Lopes; Mohamedu Jones; Steve Raffa; Kristina Hector; Steve Fama; 'kwalsh@pldw.com'; Jay Russell; Debbie Vorous
**Subject:** RE: Objection to Defendants' plan to close ICF and APP beds at SVPP and VPP; request for documents [IWOV-DMS.FID6429]

Michael and Margot,

This e-mail addresses your e-mails dated July 2 and 10, 2013, and April 22, 2013 requested related to the death of Mr. Watkins.

The State's revised long-range mental health bed plan anticipates that the State migrate inmates from the temporary ICF units at SVPP and VPP to the new Stockton facility, otherwise the facility would remain near empty. The State's plan also anticipates direct admissions to the facility. Defendants disagree that the evidence is such that a shortage of ICF beds would change this process. Consequently, the bed plan also anticipates that all the temporary mental health program beds at SVPP and VPP convert back to CDCR for alternative usage, e.g, D5/D6 will convert to Level IV EOP beds and C5/C6 to Level IV GP bed. As DSH representatives testified to at the hearing, they expect to start migrating inmates from the temporary ICF beds at SVPP to Stockton on July 22, and to start migrating inmates from the temporary ICF beds at VPP in the fall. Because of the current need for acute beds, however, DSH expects to start direct admissions to the facility on July 22 and to delay any migration of inmates from the temporary Acute beds at VPP until some later date.

The Court's June 15, 2012 order on the State's revised long-range mental health bed plan requires that Defendants, at least thirty days before decommissioning any operating temporary mental health program, notify the Special Master of their intent to do so. It also provides that the State not decommission any currently operating temporary mental health program "unless there is adequate alternative capacity to accommodate future need." (ECF No. 4199.) DSH representatives testified at the hearing that they have no intent to decommission any of the temporary beds (covert the beds back to CDCR) until the State determines there is adequate alternative capacity to accommodate future need. This decision has not yet been made. Thus, although the ICF inmates will transfer, the capacity will remain until the State determines that there is adequate alternative capacity to accommodate future need. Once it does, Defendants intend

1

to provide the appropriate notice before returning the beds back to CDCR for its use. The Court's order requires *only* that the State make the determination on adequate alternative capacity—it does not require that it make any affirmative showing, as you assert.

Although Defendants disagree that they have any obligation to either respond or provide you with any discovery associated with the DSH hearing, Defendants, in an effort to remain transparent and without waiving any future objections to Plaintiffs' discovery requests, attach a schedule regarding the transfer of patients from SVPP and VPP to Stockton and an activation schedule for Stockton.

As for documents related to the staffing for Stockton, they are made up of the budget change proposals submitted over the past three years, which are public documents and equally available to you. Moreover, the majority of these documents were provided in response to your request for production of document in connection with Defendants' termination motion. Nonetheless, attached are those portions of the budget change proposals directly related to Stockton. In addition, attached is a DSH summary of the proposals.

In your July 2, 2013 e-mail, you also ask for reviews conducted by DSH relating to the death of Terry Wolfe. This suicide was jointly investigated by CDCR and DSH and the reports uploaded to the secure CDCR FTP site. Therefore, you already have all reviews conducted relating to this death.

With respect to your request related to Desmond Watkins, Defendants disagree that his death was a suicide. As you know, the Coroner determined this death accidental, not a suicide. Defendants further disagree with your request for a complete copy of Mr. Watkins' records because Mr. Watkins was not a *Coleman* class member. Thus, we are not aware of any independent basis for you to receive copies of any records related to Mr. Watkins. In April 2008, Mr. Watkins was transferred to Atascadero State Hospital after pleading not guilty by reason of insanity under Penal Code section 1026. In August 2011, he was transferred from the hospital to San Luis Obispo county jail after an assault on a staff member. In July 2012, as a result of his assault case, Mr. Watkins was committed to Atascadero State Hospital under Penal Code 1370 for competency restoration. Thereafter, Mr. Watkins was temporarily placed in CDCR's custody under Welfare & Institutions Code section 7301 due his violent propensities and ultimately moved to Salinas Valley Psychiatric Program to complete his competency restoration under Penal Code section 1370. As such, Mr. Watkins was a DSH patient under a superior court commitment. Therefore, If your firm is representing Mr. Watkins' heirs in any other capacity, please advise. Otherwise, Defendants are unable to provide any further response to your questions and requests for information absent a release of information from his heirs.

Thank you,

# EXHIBIT B

| | |
|---|---|
| **From:** | Debbie Vorous |
| **Sent:** | Monday, August 19, 2013 2:33 PM |
| **To:** | Jane E. Kahn |
| **Cc:** | Stone, Michael@CDCR (michael.stone@cdcr.ca.gov); Nick Weber; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team; Debbie Vorous |
| **Subject:** | RE: WIC 7301 Issues, including Review of 7301 Patient at SAC [IWOV-DMS.FID6429] |

Dear Jane:

As you know, the State has consistently taken the position that DSH patients temporarily housed within CDCR under Welfare and Institutions Code section 7301 for the additional custodial security measures required in response to their violent propensities, are not *Coleman* class members. For that reason, the State is not in a position to provide further responses to your questions and requests.

With respect to ▓▓▓▓▓▓ it appears that his records were erroneously provided to your office in response to a letter sent by paralegal Glenn Baldwin to the Litigation Coordinator at California State Prison, Sacramento, seeking records of alleged class members, including ▓▓▓▓▓▓ To that end, we would ask that your office return the records.

Thank you,

---

**From:** Jane E. Kahn [mailto:JKahn@rbgg.com]
**Sent:** Friday, July 26, 2013 2:43 PM
**To:** Debbie Vorous
**Cc:** Stone, Michael@CDCR (Michael.Stone@cdcr.ca.gov); Nick Weber; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team
**Subject:** RE: WIC 7301 Issues, including Review of 7301 Patient at SAC [IWOV-DMS.FID6429]

Dear Debbie:

Plaintiffs write regarding Defendants' current policies and procedures implementing WIC 7301, which permits the transfer of DSH patients to CDCR prisons for treatment and housing. Section 7301 provides that "[w]henever, in the opinion of the Director of State Hospitals and with the approval of the Secretary of the Department of Corrections and Rehabilitation, any person who has been committed to a state hospital pursuant to provisions of the Penal Code or who has been placed in a state hospital temporarily for observation pursuant to, or who has been committed to a state hospital … needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections and Rehabilitation, that person may be transferred for those purposes from an institution under the jurisdiction of the State Department of State Hospitals to an institution under the jurisdiction of the Department of Corrections and Rehabilitation." CDCR has several DSH units housed within its facilities, including VPP and SVPP. However, Defendants have informed us most recently that there are approximately 35 DSH patients who have been transferred to CDCR prisons, pursuant to WIC 7301, for housing and treatment, with the majority housed in the SAC PSU. Plaintiffs object to Defendants' current practice, of transferring DSH patients to segregated EOP housing units where they cannot receive appropriate level of care. This current practice is especially disturbing in light of Defendants' assertions that there are open DSH beds at DMH-Vacaville and SVPP, both DSH programs, which has higher security available for patients who might require such a setting until they have fully stabilized.

Plaintiffs request the policies and procedures that govern the implementation of the WIC 7301 program, including the process of certifying patients for WIC transfers within DSH and through the Department Review Board, the process of developing goals and objectives for patients to achieve in order to return to DSH, the policies governing the transfer options for WIC 7301 patients, and the CDCR process for review of 7301 patients for return to DSH.  We continue to object to the practice of placing DSH patients inside of CDCR prison mental health programs, which are overcrowded and ill-suited for them, and which are maintained for prisoners with serious mental illnesses.

We have reviewed the records of one such WIC 7301 transfer to SAC, ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, whom I met during the QI tour at CSP-SAC.  ▮▮▮▮▮ transferred to SAC from Patton in November 2008 and is currently housed in the mainline EOP.  ▮▮▮▮▮ was quite distressed over his long placement inside the prison and hopeless about when and how he would ever return to Patton State Hospital after his nearly five-year stay in prison.  ▮▮▮▮▮ case factors illustrate many of the concerns and questions that we have about the WIC 7301 process.

On November 21, 2008, ▮▮▮▮▮ was transferred to SAC as a WIC 7301 patient due to behavioral outbursts in Patton. (11/21/08 Classification Chrono)  He was initially placed in the PSU when he arrived, and it was noted in June 2009, that he had been programming favorably in the PSU for the last 5 months and had remained disciplinary free, "[h]owever, ICC feels that "S" should remain in PSU for continued observation and elects to continue "S" on Indeterminate SHU status within SAC PSU." (CDC 128G, 6/4/09)  Thus, this patient, who was not a prisoner and who had been programming favorably for 5 months without any misbehavior, was retained in the PSU for an additional six months until he was released to the SAC Level IV EOP on November 5, 2009. (CDCR 128-G, 11/5/09 Chrono). The November 2009 chrono notes that a nine-point list of goals and objectives were specified prior to his transfer to SAC, which must be achieved and maintained for a minimum of one year before ▮▮▮▮▮ would be considered for return to Patton.  The list included the following items:  (1) remain free of homicidal threats for 12 months; (2) remain free of physical assault for 12 months; (3) remain free of any verbal threats for 12 months; (4) remain free of any inappropriate sexual behavior for 12 months; (5) 100% compliance with rules re contraband for 12 mos; (6) 100% compliance with rules re gambling for 12 mos.; (7) 100% compliance with rules re destruction of property for 12 mos.; (8) remain free of all RVRs resulting in 115s and notices for 12 mos.; and (9) remain free of all AWOL attempts for 12 mos.  Apparently, the timeline for the year did not start until he was released from the PSU.

**How are the goals and objectives developed for a WIC patient?  What are the policies and procedures that govern this?  Is it an individualized list?  Is this a clinically driven process?  What role does the MH 115X play in this process?  Are these the same behaviors that would cause a patient to be transferred from DSH to CDCR as a WIC 7301?  Where does the 12 month timeframe come from?**

Between November 5, 2009 and December 8, 2012, ▮▮▮▮▮ was issued 12 rule violations.  Nine of the 12 occurred between 2010 and November 2011, with the majority minor rule violations (Disrespecting staff, refusing housing or cellmate, out of bounds, refusing order, theft of CD). During several of the RVR hearings, he testified that he was threatened by a prisoner and got nervous and responded or was told to take the CD by a prisoner and did so.  In 2012, he was issued three RVRs.  The first, in May 2012, was issued for "being out of bounds" as he left a treatment room when told, but reentered the room.  The second, in June 2012, was issued for fighting, although there was no physical contact between him and the prisoner.  The third, on December 8, 2012, was issued for indecent exposure at CIM in the ASU where he was housed when he returned from out to court.  The clinician who completed the MH 115X wrote: "Pt was psychotic and unstable at the time of the incident.  In fact, he was sent to the MHCB shortly after and remains there to this day.  He ws put on Keyhea – forced meds – on 12/19 due to his

2



acute psychosis ... <u>He is currently in MHCB and is being referred to DMH</u>." (MH 115X 1/3/13, emphasis added)  Apparently, CIM clinical staff who referred this psychotic patient to DSH, were unaware that ▮▮▮▮▮ was a DSH patient.  A CIM classification chrono, dated 1/18/13, notes that ▮▮▮▮▮ was placed in CIM ASU on 12/6/12 for LOB ("Lack of Bed Space"), after returning from out-to-court.

In his file, there is a MH Summary of 7301 Joint DMH/CDCR Conference, dated April 25, 2013, which reviewed his treatment at SAC and decided to retain him at SAC until at least 12/8/13, pending confirmation of the 12/8/12 RVR for IEX (CIM), and assessment of him again in October 2013 via Teleconference with PSH and CDCR SAC.  He ws noted to be doing quite well.  The Mental Health assessment, which determined that ▮▮▮▮▮ was psychotic and unstable at the time of this RVR, appears to have been completely disregarded by the 7301 Joint DMH/CDCR Conference, which reviewed ▮▮▮▮▮ most recently for return to Patton.

Plaintiffs request clarification of the WIC 7301 process as requested above, and specifically with reference to ▮▮▮▮▮, who has shown significant improvement in his behavior over the past year yet remains housed in a CDCR prison rather than in a DSH facility.  Why was ▮▮▮▮▮ referral to DSH in December 2012, when he was psychotic at CIM, later rescinded?  Why was the MH 115X disregarded?  We request a review of ▮▮▮▮▮ current behavior and risk factors, and consideration of his timely return to DSH.

Thank you for your prompt response to this email.

Sincerely,
Jane Kahn
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
Telephone:  415/433-6830
Fax:  415/433-7104
jkahn@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.