DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **SUPPLEMENTAL EXPERT DECLARATION OF EDWARD KAUFMAN, M.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |
| | Judge:   Hon. Lawrence K. Karlton |
| | Date:    September 26, 2013 |
| | Time:    10:00 a.m. |
| | Crtrm:  4 |

[950665-1]

1

## TABLE OF ABBREVIATIONS

2

3

| Ad Seg | Administrative Segregation |
| BRD | Barricade Removal Device |
| CDCR | California Department of Corrections and Rehabilitation |
| CTC | Correctional Treatment Center |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| GAF | Global Assessment of Functioning |
| ICC | Institution Classification Committee |
| MAB | Management of Assaultive Behavior |
| MHCB | Mental Health Crisis Bed |
| OC | Oleoresin Capsicum [pepper spray] |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| UOF | Use of Force |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

1    I have personal knowledge of the matters set forth herein, and if called as a witness,

2  I could competently so testify.  I make this supplemental declaration in support of

3  Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use

4  of Force and Disciplinary Measures.

5    1.    I previously filed an Expert Declaration in support of  Plaintiffs' Opposition

6  to Defendants' Motion to Terminate Prospective Relief ("Termination Opp. Decl."), Doc.

7  4379, filed March 14, 2013, and an Expert Declaration in support of Plaintiffs' Reply in

8  Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use

9  of Force and Disciplinary Measures ("Reply Decl."), Doc. 4640, filed August 23, 2013.

10  Those declarations attach my curriculum vitae and outline my experience and

11  qualifications.

12    2.    As noted in my Reply Declaration (¶ 21), Defendants refused to make use of

13  force videos available so that I could review in time for consideration in my Reply

14  Declaration.  Additional materials that I have reviewed since August 23, 2013 concerning

15  this issue are listed in Appendix A attached hereto.  On September 6, 2013, I also visited

16  California State Prison-Sacramento, where I watched videos of six uses of force against

17  four *Coleman* class members, and interviewed two of those class members.  I was

18  scheduled to interview a third class member, but when I arrived at the institution, I was

19  informed that the class member had been transferred to another facility.  I had also

20  requested that the health records of these class members be available for my review, but

21  they had not been prepared for my review by the institution.  I was provided with a very

22  brief opportunity to review very limited health records for three of the class members.

23    3.    I also received partial health records for class members involved in use of

24  force incidents on September 17, 2013.  Those that I have reviewed are included in

25  Appendix A.

26    4.    I understand that the sample of controlled use of force incidents I reviewed

27  are those that the State provided in response to Plaintiffs' request for reports for all UOF

28  incidents involving class members at the four prisons visited by Plaintiffs' expert Vail

1   from July 1, 2012 to the dates of the inspections.

2       5.    I make this declaration to augment the opinions set forth in my Reply

3   Declaration after reviewing videos showing six "controlled" uses of force against four

4   class members; reviewing incident reports, use of force review packets, and health records;

5   and conducting interviews with two class members.  Although this review was of a limited

6   sample, it is my understanding based on review of both Plaintiffs' and Defendants'

7   experts' reports and depositions that the incidents I have reviewed are typical of CDCR

8   practice and within CDCR policy.  I note that the videos I reviewed are of "controlled," or

9   calculated uses of force, when CDCR employees knew they were being videotaped, and do

10  not depict the "immediate" uses of force, for which there is no video record.

11      6.    Based on this information and my experience, it is my opinion that CDCR

12  continues to use force and disciplinary measures against persons with mental illness in a

13  punitive manner similar to that employed at the time of trial twenty years ago.  These uses

14  of force do not appear to evidence consideration of the mental health status of the subject

15  of force, either in terms of how mental illness may be contributing to the behavior of the

16  prisoner, or in terms of how the use of force may affect the prisoner's mental health or

17  treatment.

18      7.    Further, it is my opinion that CDCR uses force and disciplinary measures

19  against persons with mental illness in ways that are contraindicated for their mental health,

20  and which likely exacerbate the symptoms and effects of their mental illness.

21      8.    The records I reviewed clearly demonstrate punishment of prisoners with

22  serious mental illness for behaviors directly related to and resulting from their mental

23  illness.  For example, numerous patients were subjected to OC spray for refusing to exit

24  their cells to be involuntarily medicated, when records indicate that they were under

25  *Keyhea* orders for involuntary medication precisely because they lack insight into their

26  mental illnesses, and their mental illnesses caused symptoms such as paranoia and anxiety

27  that, at times, result in refusal to take medication.  Not only are these patients subjected to

28

[950665-1]

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

1   the use of force, but CDCR then additionally charges them with disciplinary Rules

2   Violations, demonstrating the punitive approach CDCR takes to mental illness.

3        9.    For example, the clinician completing the Mental Health Assessment

4   attached to the RVR for one of these patients (Inmate B[1], below) states that the patient

5   "has a severe mental disorder and at times this mental illness will result in difficulty

6   following rules or delaying peace officers ….  His severe mental illness is why he was

7   placed on a forced medication protocol.  He will probably need to be forced or persuaded

8   to take his medication from time to time."  (COR12379.)  Despite the clinician's finding

9   that this patients' mental illness contributed to the behavior leading to the RVR and

10   recommendation that mental health factors mitigate the penalty, the patient was found

11   guilty of "willfully delaying a peace officer" and assessed 61 days loss of credit.

12   (COR12382.)  Approximately two weeks after this incident, the same patient against

13   refused to leave his cell for involuntary medication, was subjected to an approximately

14   four-second burst of OC-spray, and received another RVR for "obstructing a peace

15   officer."  Although the clinician completing the Mental Health Assessment for this RVR

16   wrote that "symptoms such as paranoia appear to have contributed to the behavior that led

17   to the RVR" (COR12372), the clinician did not recommend mitigating any penalty, and

18   the hearing officer found the patient guilty of obstructing a peace officer and assessed 90

19   days loss of credit, and 10 days loss of yard.  (COR12363.)  The records I received do not

20   include information showing whether or not the patient was additionally referred to the

21   classification committee for consideration of additional segregation or SHU time.

22        10.    This extremely punitive treatment of persons with mental illness undermines

23   the ability to create an appropriate therapeutic environment in which to effectively provide

24   mental health treatment.  The CDCR prisons I toured earlier this year, and the materials I

25   recently reviewed, evidence an environment wholly dominated by custody staff and

---

[1] I identify the inmate-patients referred to herein by name and CDCR number in confidential Appendix B, attached hereto.

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

considerations.  The types of behaviors demonstrated by the patients in the incidents I reviewed are clinical situations that require clinical responses.  However, in CDCR, these situations are escalated by custody staff and converted into custodial battles that exacerbate the fear, anxiety, and paranoia of a patient who is often already in psychiatric crisis.  In the words of one class member, the custody officers appear to be "trained to battle" the inmates.

11.     While there appears to be a requirement for "clinical" involvement in calculated uses of force involving patients at the EOP or higher levels of care through a "clinical intervention" attempt, based on my review of records and videos, this is merely a formalistic requirement with no clinical or therapeutic value.  What CDCR calls "clinical interventions" amount to mere seconds, or, at most, a few minutes, of perfunctory questioning by a psychiatric technician as to whether the prisoner will comply with custodial orders to "cuff up" or "be involuntarily medicated."  The videos and records I reviewed do not reflect standard and appropriate verbal de-escalation techniques by the psychiatric technicians (or custody staff).  Unsurprisingly, none of the records for the controlled use of force incidents I reviewed report a "successful" mental health clinical intervention.

12.     As I have previously stated, clinically appropriate responses to a psychiatric patient who is agitated or potentially violent include the use of the technique of Management of Assaultive Behavior (MAB).  MAB is widely employed in psychiatric hospitals serving populations with similar characteristics to the forensic population, and instructs that how clinicians and staff approach a psychiatric patient in crisis and/or displaying agitated or aggressive symptoms is critical.  The intervention should be matched to the cause of the behavior, and the patient should be approached in a non-threatening way, with a focus on calming and de-escalating the situation, letting the patient know that he or she is being heard, explaining the rules in an authoritative but respectful tone, and giving the patient safe choices (in contrast to a choice such as "obey the order or

[950665-1]

4
SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

1   you will be forcibly extracted with OC spray").  Force should be the last resort in

2   psychiatric crisis intervention.

3       13.     One of the foundations for employing this type of technique and responding

4   appropriately to a patient in psychiatric crisis is a therapeutic relationship or alliance

5   between a patient and mental health staff.  Especially in housing units specifically

6   designated for patients needing higher levels of mental health treatment such as EOP units,

7   Mental Health Crisis Bed Units, and inpatient hospital units, custody staff should also be

8   supportive of creating this type of therapeutic environment.  This means that custody staff

9   who work in these units need to receive appropriate and ongoing training on mental illness

10  as well as MAB techniques, and assignment of custody staff to these units should reflect

11  demonstrated ability to work with this population and be done on a consistent or long-term

12  basis rather than rotating.  However, CDCR's punitive approach to patients with serious

13  mental illness destroys the ability of mental health staff (and custody staff) to create trust

14  between an inmate-patient and the staff, especially when a patient's mental illness already

15  includes symptoms such as paranoia, anxiety, or delusions.  In the videos I observed, the

16  "cell extraction teams" (consisting of approximately five to seven custody officers) gear up

17  in head-to-toe protective gear and gas masks or helmets, rendering them a bizarre and

18  frightening team of figures as experienced by the inmate-patient.  They then approach the

19  inmate-patient's cell with various weapons at the ready including a range of sizes of OC

20  canisters, expandable batons, and full-body shields  The officers proceed by speaking or

21  shouting at the patient through a closed door and a helmet or mask, and deploying OC

22  spray, grenades, and/or Barricade Removal Devices ("cell-busters") into the cells.  For a

23  psychiatric patient who may already be responding to delusions or internal stimuli such as

24  voices, or who has impaired reality testing, or paranoia or anxiety about people picking on,

25  physically hurting, sexually assaulting, poisoning, or attacking him or her—as is typical of

26  patients with these types of diagnoses—this type of approach can not only appear to be his

27  delusions come-to-life, but also concretizes them, making them more permanent and less

28  amenable to treatment.  In fact, as further detailed below, one patient (Inmate-Patient C)

5

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

had a detailed apparently delusional system with beliefs of a multitude of ways that the correctional officers were torturing him.  Indeed, these cell extractions negatively impact not only the inmate-patient against whom this force is directly targeted, but the other inmate-patients housed in the unit, who, besides likely suffering physically from the effects of the OC spray, observe this behavior and experience it as confirmation of a non-therapeutic and punitive environment.  Even for inmate-patients who are not actively delusional or psychotic, the forced cell extractions and discipline for "refusing orders" such as medication or coming out of a cell to be transferred to a higher level of mental health care or another housing unit exacerbate fear, anxiety, and paranoia, and preclude therapeutic relationships.  In my opinion, many of these types of situations could be appropriately handled without the use of force by a clinician actually engaging with the inmate-patient in a conversation about what is going on, establishing a therapeutic alliance, sometimes agreeing to wait a number of hours to re-engage with the patient, and if restraints become necessary, doing so using a hands-on approach with as minimal force as possible.  Dr. Koson, Defendants' expert at the time of the original trial, testified to this effect.  1/7/93 Deposition of Dennis F. Koson, M.D., *Coleman v. Wilson,* at 440:22-442:7.

14.     The videos I reviewed, coupled with the corresponding incident reports and patients' mental health records, evidence exactly this kind of punitive reaction to persons with mental illness and resulting psychological harm, as well as physical pain and suffering from the administration of the chemical agent.

15.     Inmate-Patient A:  One of the video incidents I reviewed showed a use of force against a patient housed in a hospital (Correctional Treatment Center) unit in Corcoran.  This patient was already at the Mental Health Crisis Bed level of care and had decompensated and was so psychotic that he was smearing feces on himself.  The psychiatrist ordered that medication be involuntarily administered to the patient.  The time period between the nurse reporting that the patient was refusing his medication and the determination to use a controlled use of force for a cell extraction was reported to be less than 25 minutes.  (COR12786.)  The attempt at "clinical intervention" lasted

approximately 32 seconds.  What is then depicted on the video is a group of 8-9 custody

officers, with at least 6 suited up from head to toe in protective gear, and wearing gas

masks, repeatedly ordering the clearly psychotic patient to "cuff up" or "submit to

handcuffs," without attempting to engage the patient at all other than continuing to shout

these phrases over and over.  Although it appears that the patient cannot understand or

comply with such orders, each failure by the patient to "cuff up" is met by another

injection of OC spray into the cell.  Even as the patient is repeatedly crying for help, there

is no further attempt by officers or clinicians to engage him.  Rather, they administer more

OC spray.  In fact, the Captain who ordered the cell extraction stated in her incident report

for this use of force that the patient was "observed in a mental state where he could not

follow the simplest [sic] instruction.  When ordered to submit to handcuffs he was

observed responding, how do I do that, although staff explained to him he needed to back

up to the cuff port and submit to handcuffs.  He was still very confused and disoriented

with complying with instructions." (DEXP 112873-4.)  Yet, even after this was observed,

the Sergeant "dispersed one continuous burst of OC pepper spray from an MK-09

approximately 4 feet from the intended target.  Inmate [A] still was not submitting to

handcuffs.  Inmate [A] was attached to a lanyard through the food port and was clearly not

capable of submitting to handcuffs due to his mental state." (*Id.*)  What I observed on the

video is that the inmate-patient approached the cuff port and gave the officers one hand to

be cuffed, but kept pulling the other hand back because he was overwhelmed and

frightened by what was occurring.  The first time he pulled his hand back was as he was

touched and asked, "What's going on?"  He then said, "I want to go home," in a child-like

way, further indicating fear and confusion.  It appeared to me that his reluctance to give his

hands to the officer to cuff up was a result of his fear rather than willful resistance, but the

officers were not able to tell the difference.  When the officers finally determined they

needed to open the door of the cell and physically remove the patient from the cell, the

patient appeared poised to exit the cell voluntarily, but the officers rushed at him with a

full-length shield, shoving him back into the cell filled with OC spray.  The pain and

7

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

1    suffering of this patient is evident throughout the video as he repeatedly cries out in

2    anguish for help, and asks "Why is this happening to me?" and "Why isn't anybody

3    listening to me?"  Observing the degree of force and degradation used against this clearly

4    vulnerable and frightened patient was shocking.  After he had been placed on a gurney in

5    five-point restraints, nude, with his genitals showing, multiple custody officers held him

6    down for the forced injections, including at least two holding down his head, he said, "I

7    didn't do nothing wrong … I don't want to decapitate nobody … I don't want to kill

8    people … I don't want this to happen to me … I don't want to be executed."  He does not

9    ever appear to be decontaminated.  The medical report states that he had scratches on his

10   left wrist, left hand, and finger.  He complained on the video about feeling like his skin and

11   wrist were falling off.

12        The patient was charged with a Rule Violation for "obstructing a peace officer in

13   the performance of his duties in the use of force."  (COR12790.)  Although the clinician

14   who completed the Mental Health Assessment stated that "Inmates mental health state

15   included delusions/false thoughts/paranoia and didn't seem to understand consequences of

16   not complying with a custody officer" and recommended that "inmate will benefit from

17   therapy & activities that provide reality orientation … social interaction/talking with others

18   and things that help prompt his memory" (COR12792), Inmate A was found guilty of

19   "obstructing a peace officer in the performance of his duties in the use of force."  He was

20   assessed 90 days loss of credit, and 30 days loss of privileges including loss of dayroom,

21   TV/radio, visits, family visits, special purchase, telephone, and quarterly package, effective

22   upon release from the Mental Health Crisis Bed.  (COR12790.)  This means that even

23   when he was released from the crisis bed, he would be deprived of virtually all of his

24   opportunities for external stimuli, which further isolates him and increases his paranoia

25   and anxiety, and totally contradicts every recommendation made by the clinician in the

26   Mental Health Assessment.  The patient was also referred to the ICC for "Program/

27   Housing review," which I understand to be consideration of a segregation or SHU term.

28   (COR12791.)  This inmate-patient's health records were not made available to me, and I

8

1   am informed that Defendants refused to produce them to Plaintiffs' counsel.  However, the

2   incident reports do indicate that he was subsequently referred for a *Keyhea* order, which

3   indicates the very high level of acuity of his mental illness.

4       16.     Inmate-Patient B:  Another of the video incidents I reviewed showed a use of

5   force against a patient at Kern Valley State Prison who was being forcibly extracted from

6   his cell in an Administrative Segregation unit in order to transfer him to a Mental Health

7   Crisis Bed level of care in the Correctional Treatment Center.  The clinician described the

8   patient as "becoming more paranoid" and "playing with feces."  In reviewing the health

9   record of Inmate-Patient B, it was noted that around the time of the cell extraction, he was

10  given many different primary psychiatric diagnoses, including psychotic disorder, bipolar

11  disorder, schizophrenia, paranoid type; all very severe forms of mental illness.  The

12  clinical notes around the time of the cell extraction also state that he was exhibiting

13  auditory hallucinations and gravely disabled.  In the community, being gravely disabled

14  would mean that someone could be involuntarily hospitalized because they were unable to

15  care for themselves, but Inmate B was cell extracted and subjected to force for refusing to

16  comply with orders.  It was also noted that his Global Assessment of Functioning the day

17  after the extraction was 20, which is an extremely low level of functioning.  After Inmate

18  B was extracted, he was placed directly on suicide watch in the MHCB, given multiple

19  powerful antipsychotic medications and a high dose of a sedative drug, and was referred to

20  acute care at DSH three weeks later.  He was housed in the crisis bed for more than two

21  months while he was waiting for the DSH placement, and in this time, was apparently

22  subjected to two additional cell extractions, for which I was not provided incident reports,

23  but are referred to in the medical record.

24      In the extraction for which I watched the video and reviewed the incident reports,

25  the "clinical intervention" attempt lasted approximately 23 seconds.  The extraction team,

26  covered in plastic suits, and gas and face masks then approached the cell.  A custody

27  officer wearing a gas mask read an "admonishment" advising the patient to submit to

28  handcuffs or force would be used.  Approximately seven sprays of OC then appear to be

1   administered into the patient's cell in quick succession (less than six minutes) and the

2   patient can be heard saying "can't treat me like a dog," and "you're trying to kill me,

3   man."  At this point, the patient began asking the officers to "get medical," saying "get the

4   medical staff and I'll cuff up.  You mother-fuckers are trying to kill me."  The patient

5   continued to ask for medical staff for the next two to three minutes, and then started

6   expressing his fear that if he strips down as he has been ordered to do, he will be raped.

7   He sees the Barricade Removal Device, which has a long metal tube on it, and becomes

8   even more agitated, saying "You're not fucking me in my ass."  The custody officers

9   ordered him to "strip out." The patient responded, "You want me to strip out so you can

10  fuck me.  I'm not a homosexual … I'm not stripping out … I have no weapons … I'll

11  volunteer to come out without stripping."  The officers continued to order him to strip out

12  and ordered him to "turn around."  The patient says, "You're not gonna ram that up my

13  ass."  The officers then used the BRD, shoving the metal tube through the cuff port into the

14  cell, with a massive burst of OC spray.  The patient then stripped down, but before they

15  would open the door, the officers told him to "show me your hands," "take that shit off

16  your head," "open your mouth," "lift up your testicles," and "get on your knees."  Only

17  after the patient was naked and on his knees did the officers cuff him and open the door.

18  They brought him onto the dayroom floor completely naked, keeping him on his knees,

19  and retrieved a spit mask and put it around his neck even though he said, "I'm not going to

20  give you any problems … I'm not going to spit on you."  The patient asked for some

21  water, but was not given any.  The officers then brought the patient to the shower to be

22  decontaminated, and, after this, still naked, they strapped him to a gurney on the dayroom

23  floor in full view of the housing unit.  They then wheeled him out through the dayroom

24  and control/office area, still naked and with his genitals exposed, although one of the

25  primary concerns he expressed was his fear of stripping down.  The patient was charged

26  with a Rule Violation for this cell extraction, although the documents I was provided do

27  not include the disposition of that charge.  The committee reviewing the use of force at the

28  institution focused on technical problems with the introduction of the extraction team, and

[950665-1]

did note that the inmate-patient should not have been videoed with his genitals exposed, but did not touch at all on the use of force against a paranoid and frightened inmate who was too psychotic to be able to comply with the demands. In one of the medical notes it was stated that Inmate B had a history of being sexually abused, which is relevant to his reactions to the cell extraction, his fear of turning his back to the cuff port, the BRD and refusal to strip. Although I was unable to interview this inmate-patient because he was transferred a few days before I was scheduled to interview him during my September site visit, it is reasonable to conclude that this incident potentially re-traumatized him and made recovery from his decompensated state more difficult.

17.     <u>Inmate-Patient C:</u>  Two of the use of force incidents I reviewed on video were against the same EOP class member, approximately two weeks apart, in a segregation housing unit at Corcoran. Both of these incidents, referred to in paragraph 9 above, were in response to the patient refusing involuntary medication pursuant to an active *Keyhea* order. According to this patient's health records, he has been diagnosed with schizophrenia, chronic undifferentiated type, as well as paranoid schizophrenia. The clinical notes indicate that he does well on medications, but off medications does poorly and isolates. He has a history of responding to internal stimuli, delusions about talking to God and being clairvoyant, and around the time of these incidents was displaying regressed behavior and confused rapid speech, had a GAF score of 25, which is very low-functioning, and according to clinical notes, was manifesting what were deemed delusions that officers were tampering with medications, poisoning his food, having sexual contact with nurses in front of him, touching his food with their penises and urinating on it. He was also reportedly suffering from grief from the recent loss of father. His medication history included his having been on a very high dose of a powerful antipsychotic, which was at times paired with another highly potent antipsychotic. This combination of two powerful antipsychotic drugs, and the fact that he was on a *Keyhea* order, are indicative of a high level of acuity of mental illness.

In the first incident, the clinical intervention lasted for approximately one minute

[950665-1]

1   before it was declared unsuccessful.  The video then shows the extraction team wheel a

2   cart with variously-sized canisters of OC spray out in front of the patient's cell.  Following

3   the "admonishment" to the patient by a custody officer that if he did not submit to

4   handcuffs, he would be OC sprayed, the patient indicated he would voluntarily come out.

5   In the second incident, just weeks later, the intervention lasted approximately 21 seconds.

6   On the video, the patient can be heard saying "I need mental health ... I'm going crazy,"

7   but the psychiatric technician literally walked away from the cell while the patient was

8   asking for help, and declared the intervention unsuccessful.  The extraction team, wearing

9   in hazmat suits, including knee and elbow pads, then approached his cell.  OC spray was

10  then pumped into the cell for approximately four seconds.  The patient then agreed to come

11  out, was restrained, put in the shower with his clothes still on for decontamination, and

12  then placed in a holding cage.  As I noted earlier, the patient received RVRs for both of

13  those incidents, and was found guilty and lost a total of 121 days of credit, despite both

14  Mental Health Assessments indicating that his behavior was related to his serious mental

15  illness.

16        I interviewed this inmate-patient, and he described the effects of being sprayed with

17  OC as "suffocating ... taking all the oxygen away that belongs inside you," "it chokes you

18  out," "it takes the life out of me," and "burning your skin ... feeling like it is going to fall

19  off."  He said that when the extraction team approaches, "when they're all geared up, it

20  feels like they're coming in to kill me ... when they come into the cell, they hold you up

21  against the wall with a shield so that you can't move."  He noted that after the second

22  incident at Corcoran, he was kept in his wet clothes after he was decontaminated.

23        After experiencing multiple cell extractions, he is acutely paranoid of corrections

24  officers and of being manipulated by them.  He reported nightmares about being jumped

25  and beaten up by correctional officers, and states that he now takes his medications

26  because he is scared that if he does not, they will beat him.  He reported being subjected to

27  multiple additional uses of force by correctional officers, which I was not able to confirm

28  or deny because I was not provided with his custody file.  However, whatever shows of

SUPPLEMENTAL EXPERT DECL. OF EDWARD KAUFMAN, M.D. ISO PLS.' REPLY ISO MOTION FOR ENFORCEMENT
OF COURT ORDERS AND AFFIRMATIVE RE USE OF FORCE & DISCIPLINARY MEASURES

1    force officers have used against him have substantially contributed to and exacerbated his

2    paranoia.

3        18.    Inmate-Patient D:  I also reviewed a video showing two uses of force against

4    another class member in the same day, about three hours apart.  This EOP patient was

5    housed in an administrative segregation unit at Corcoran, and expressed suicidal ideation.

6    He covered the windows of his cell with pieces of paper and initially refused orders to

7    remove them and to submit to restraints. (COR17005.)  However, after a licensed

8    psychiatric technician came to his cell, he agreed to remove the paper, and come out of his

9    cell to be evaluated by mental health.  When the inmate-patient came out of his cell, the

10   Lieutenant on the unit informed him that when he returned to his cell he would be placed

11   on Management Status for the next ten days "due to his unruly and dangerous behavior."

12   Per the management cell status chrono, he would be allowed "one mattress, one blanket, a

13   pair of boxer shorts, a pair of shoes, and legal material upon verification of pending legal

14   deadline." (COR17005.)  At this point, according to the Lieutenant, the inmate-patient

15   "was unreceptive to my counseling and became verbally irate about my decision."

16   According to my interview with the inmate-patient, he felt as though he had been tricked

17   into coming out of his cell so that they could remove his belongings and place him on

18   Management Status.  After this, the inmate-patient was seen by mental health and cleared

19   to be re-housed.  It is unclear whether this screening took place while the inmate-patient

20   was in a holding cage on the housing unit or at the CTC, but at some point the inmate-

21   patient was placed in a holding cage on the dayroom floor, and refused to submit to

22   restraints and exit the holding cell, expressing anger and frustration about being placed on

23   Management Status, and not wanting to return to his cell without his property.  While the

24   patient was locked in the holding cage, a psychiatric technician approached to do a

25   "clinical intervention," which appeared to consist of listening to the patient talk for

26   approximately 2 minutes and 38 seconds about his belief that he had been improperly

27   placed on management status, and if they put him back in his cell, he will become suicidal,

28   and then they will spray him again.  The psychiatric technician then walked away and

13

1  declared the intervention unsuccessful.  The cell extraction team then approached the

2  holding cage and sprayed the inmate-patient three separate times with OC spray in under

3  two minutes.  The patient had not been medically cleared for OC spray because he has

4  asthma, but custody overrode that consideration, stating that overruling medical orders was

5  okay because they had secured the presence of an emergency vehicle outside the unit.

6  After the third spray, the inmate-patient agreed to submit to restraints, and was restrained

7  by his arms and legs, and his arm restraint was attached to a large metal triangle lanyard.

8  The patient used a cane to walk and was escorted to a shower for decontamination by a

9  number of officers, including one holding the metal lanyard behind the patient.  He was

10  put in the shower fully clothed for decontamination.  Following this, the inmate-patient

11  was escorted back to his housing cell, where he was required to strip out of all of his

12  clothing except his boxers and hand it through the cuff port.  Less than three hours later,

13  the patient expressed suicidal ideation, but refused to submit to restraints to exit his cell.

14  Although OC spray was again not medically cleared, custody determined another cell

15  extraction was required.  A clinical intervention attempt lasting approximately thirteen

16  seconds was made, followed by administration of approximately three seconds of OC

17  spray into the cell.  The inmate-patient was charged with a Rules Violation, although the

18  documents I was provided do not include the disposition of that charge.

19       Inmate-Patient D is most often diagnosed as having an adjustment disorder, with

20  mixed disturbance of emotions and conduct.  He has also been diagnosed with a rule-out

21  bipolar affective disorder and has been intermittently diagnosed with an antisocial

22  personality disorder on Axis II.  The health records for Inmate-Patient D report that he has

23  a history of expressing suicidal ideation and having made an attempt on at least one

24  occasion, when he was dealing with the death of his two-and-a-half year old daughter.

25  Clinical notes further state that he was sexually abused as a child, and feels re-traumatized

26  and humiliated by the strip search procedures when Ad-Seg inmates go in and out of their

27  cells, and has historically refused clinical appointments outside of his cell for this reason.

28  This clinical information is relevant to the kind of situation described above, where he

1   reacts disproportionately to custody officers' demands that he submit to stripping down

2   and restraints.  This inmate-patient has a number of specific fears about what custody

3   officers will do to him and told me that he estimates he has been subjected to OC spray

4   approximately 50 times on 25 occasions.  He also reports that in many instances, custody

5   officers have targeted him for physical force or removal or destruction of his property, and

6   then blamed him.  Again, I was not given access to his custody records to confirm or deny

7   this.  He also stated that he does well when he takes his medication, an antidepressant, but

8   that he had been off of his medication for several days at the time of this incident.

9   　　　　During my interview of this inmate-patient, he described the effects of OC spray as

10   feeling like "you are hyperventilating … you can't breathe … it takes all your oxygen

11   away."  He described the feeling of being extracted from the holding cage as

12   dehumanizing:  "You feel like an animal … you're chained to a steel heavy bar and they

13   walk you around in front of everyone.  It's what they do to cattle and horses."  This

14   inmate-patient shows insight into his own behavior, declaring that he "has been an

15   asshole" at least forty percent of the time, but also describes the mindset of the custody

16   officers as "trained to battle" the inmates.  In describing the effects of being cell extracted,

17   he said, "I'm not against law or authority, but you never get along with officers after that."

18   　　　　19.　　　Not only does the use of force on inmate-patients potentially exacerbate

19   mental illness, but it also causes contemporaneous pain and suffering—both physical and

20   psychological—that is evident from even the limited sample of incidents Defendants

21   provided and I reviewed.  As I stated, patients I interviewed describe the effects of OC

22   spray as feeling like "you are hyperventilating … you can't breathe … it takes all your

23   oxygen away," "suffocating … taking all the oxygen always that belongs inside you," and

24   "burning your skin … feeling like it is going to fall off."  They reported that when they are

25   eventually returned to their cells following cell extractions involving OC spray, the spray

26   is still all over the walls, floor, bedding, sink, etc., so that every time they touch any of

27   these, it burns.  In some of these cases, spit masks are placed over the patients immediately

28   after exposure to OC spray, which can be assumed to exacerbate feelings of being

suffocated.  I reviewed instances in which inmate-patients were sprayed with OC even though they had asthma and were not medically cleared for such exposure.  Inmates I interviewed also reported that when OC spray is delivered into a cell or cage in a housing unit, the whole unit feels the effects.

20.     The dehumanizing and degrading effect of this approach to the inmate-patients—people—who are locked behind doors in cells while correctional officers administer spray through canisters, wands, grenades, and the Barricade Removal Device from the other side of the door, and then demand the patients strip down naked, open their mouths, raise their testicles, kneel, submit to shackling, including being attached to a giant metal triangle lanyard, is plain from the statements made by the inmate-patients while the force is occurring, and in talking about these incidents after.  These include:  "You can't treat me like a dog … there's no need to do that"; "You feel like an animal … you're chained to a steel heavy bar and they walk you around in front of everyone.  It's what they do to cattle and horses."  Even when the inmate-patients are attempting to communicate with the officers during the use of force, there is no attempt by the officers to engage in effective communication.  The inmate-patient in the crisis bed (Inmate-Patient A) can be heard shouting "Help" repeatedly, and "Open the door," "I'm trying" (in response to orders to cuff up), "Don't do this to me," "Why is this happening?" and "Why isn't anybody listening to me?"  But the only verbal response to these pleas for help by custody officers was to repeat the order to "submit to handcuffs" or "cuff up."  Similarly, in the video I reviewed where a decompensated patient (Inmate-Patient B) who had been playing with his own feces was sprayed with OC approximately seven times in six minutes, followed by the Barricade Removal Device, the inmate-patient repeatedly told the custody officers that he would cuff up if medical staff came over, and then that he would cuff up, but he would not strip down because of fears about being raped.  In response, the officers told him "That's not how it works," and repeated their orders to strip down.  In the associated incident report, one of the officers described the inmate-patient's expression of fears of being sexually assaulted as "[the inmate] began to scream incoherently."  (KVSP

16

[950665-1]

18904.) Also relevant to this dynamic are the statements made by the officers while they are using force, such as "Cuff up or do you want more OC?" and "Hit him with a [MK-]9, he's almost there."

21.     The punitive approach to inmate-patients with serious mental illness I have described in this supplemental declaration is consistent with the observations and opinions I expressed in my Termination Opposition Declaration and my Reply Declaration.  In my Termination Opposition Declaration, I described custodial interference with mental health treatment and the dominance of harsh custodial practices such as strip searches that had dehumanizing effects on the inmate-patients subjected to these practices.  ¶¶ 163-168.  I also described the ways in which antagonistic relationships with custody staff destroy trust and create an atmosphere of fear, frustration, helplessness, and anger that individuals with serious mental illness may be especially unequipped to handle.  *Id.* ¶ 170.  The use of force practices I describe herein are even more severe practices in the same vein.  One of the inmate-patients (Inmate-Patient C) I interviewed described his complete fear of custody staff as a result of the "beat-downs" with OC spray he has received, and his preference to leave his cell as little as possible in an effort to avoid interaction with custody staff.  For an inmate-patient with serious mental illness, this kind of increased isolation and hesitancy to program outside the cell (if such programming is actually offered and available) has grave mental health consequences.

22.     It is striking that CDCR continues to respond to prisoners who have been diagnosed as seriously mentally ill and are exhibiting symptoms of serious mental illness in exactly the same manner I commented on in 1993.  *See* Expert Decl. of Kaufman ¶¶ 470-473.  Then, I described the use of 37 mm guns on patients housed at the inpatient level of care or classified as "Cat J" who refused cell moves, were smearing feces on themselves, or displaying behavior that was deemed bizarre or potentially self-injurious.  I described the gearing up of the cell extraction team in infectious disease control gear, flak jackets, helmets, face guards, and gloves; the brandishing of weapons; speaking to the frightened inmate through masks and shields; and the routine escalation of conflict by

[950665-1]

1  untrained custody staff who demanded compliance from a psychotic patient.  It was my

2  opinion that in such incidents, "psychological injury to the mentally ill inmate, damage to

3  any existing therapeutic relationship, and a reduced prospect of successful mental health

4  treatment in the present and future are almost certain."  *Id.*

5       23.    Returning to the system twenty years later, it is obvious that CDCR has still

6  not trained its custody and clinical staff in appropriate methods for understanding and

7  managing agitated psychiatric patients, despite my findings and the opinion of its own

8  expert decades ago that the force employed was inappropriate and damaging to patients

9  with mental illness.  *See* Koson Depo. at 441-444.  The systemic exposure of patients with

10  serious mental illness to the punitive reactions I have described above (because it is almost

11  certain that most of these patients are subjected to multiple uses of force over their

12  confinement as they repeatedly cycle into a decompensated psychotic state, and also

13  witness additional uses of force against fellow inmate-patients on their housing units)

14  confirms and exacerbates paranoid or delusional thinking, impairs patients' ability to form

15  therapeutic relationships, and, consequently, voluntarily participate in mental health

16  treatment , and likely causes long-term psychological damage.  In fact, it has been

17  demonstrated that, for patients with mental illness generally, with repeated psychotic

18  breakdowns, each subsequent breakdown results in greater brain damage than the prior

19  episode.  Thus, in the type of environment I have described in CDCR, these repeated

20  cycles of psychosis and extremely punitive responses thereto, can be assumed to cause

21  severe and long-lasting harm to class members.

22

23       I declare under penalty of perjury under the laws of the United States and the State

24  of California that the foregoing is true and correct, and that this declaration is executed at

25  Laguna Beach, California this 20th day of September, 2013.

26                         */s/ Edward Kaufman*

27                         Edward Kaufman, M.D.

                       [*signature on file with counsel for Plaintiffs*]

28

**Appendix A to the Supplemental Expert Declaration of Edward Kaufman, M.D. in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use Of Force and Disciplinary Measures**

TO BE FILED UNDER SEAL

**Appendix B to the Supplemental Expert Declaration of Edward Kaufman, M.D. in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use Of Force and Disciplinary Measures**


**TO BE FILED UNDER SEAL**