DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES**<br><br>Judge: Hon. Lawrence K. Karlton<br>Date: September 26, 2013<br>Time: 9:15 a.m.<br>Crtrm.: 4 |

[951863-5]

# TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| I. | SUMMARY OF VIOLATIONS | | 1 |
| | A. | Use of Force | 2 |
| | B. | Disciplinary Process | 5 |
| II. | REQUESTED RELIEF | | 7 |
| | A. | Use of Force | 7 |
| | | 1. Direct the Special Master to Prepare a System-Wide Report on Use of Force Against Class Members | 7 |
| | | 2. Revision of Use of Force Policies and Procedures | 8 |
| | | 3. Revision of Investigatory Policies and Procedures | 9 |
| | B. | RVR Disciplinary Process | 10 |
| | | 1. Modification of the RVR Process to Include Mental Health Diversion | 10 |
| | | 2. Revision of RVR Policies and Procedures | 10 |
| | C. | Provision of Training | 11 |
| | D. | Prohibit the Unregulated Use of "Management Status" Against Class Members | 11 |
| III. | PLAINTIFFS' EVIDENCE | | 12 |
| | A. | Pleadings | 12 |
| | B. | Plaintiffs' Trial Witnesses | 13 |
| | | 1. Expert Eldon Vail | 13 |
| | | 2. Expert Edward Kaufman, M.D. | 14 |
| | C. | Documentary and Other Evidence | 15 |
| | | 1. Reports to the Special Master | 15 |
| | | 2. Use of Force Incident Packages, Related CDCR Records, and Videos of Controlled Use of Force | 15 |
| | | 3. Videos of CDCR Interviews of Class Members Subjected to Uses of Force | 16 |
| | | 4. Defendants' Admissions | 16 |
| | | 5. Exemplars of Weapons Used Against Class Members | 17 |

[951863-5]

i

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| IERC | Institutional Executive Review Committee |
| MAB | Management of Assaultive Behavior |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| OC | Oleoresin Capsicum [pepper spray] |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |

[951863-5]

ii
PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

## I. SUMMARY OF VIOLATIONS

Twenty years ago, this Court found California's use of force and discipline against prisoners with serious mental illness to be unconstitutional. At that time, custody staff used Tasers and 35 mm block guns. Today, CDCR has changed its weapons of choice to massive amounts of OC spray and expandable batons, but CDCR's punitive approach to prisoners with mental illness remains largely unchanged. Custody staff and custodial considerations continue to dominate all levels of housing—even mental health crisis beds—undermining the creation of a therapeutic environment for prisoners with mental illness, and compromising the ability to provide appropriate and necessary mental health treatment.

Plaintiffs' use of force and disciplinary expert, Eldon Vail, and mental health expert, Edward Kaufman, M.D., and Defendants' use of force and disciplinary expert, Steve Martin, *all agree* that Defendants continue to warehouse class members in highly restricted and isolated environments with limited opportunities for treatment and a lack of meaningful programming. This exacerbates inmate-patients' fear, anxiety and paranoia, compromising the ability to conform behavior to the demands of custody staff. The results are predictable: inmate-patients are subjected to disproportionate uses of force, rule violations, and, ultimately, to even more time in highly restrictive housing units such as segregation and SHU. As Defendants' expert, Steve Martin, put it:

> [Y]ou're placing a mentally impaired offender in a highly restricted setting such as admin seg with lack of programming which generates a spiraling down of his mental health which manifests itself through resistance to order, resistance to officials, which in turn generates three things: Serious discipline infractions, applications of force, and further extended terms of admin seg. ***It is the worst case perfect storm for the administration of a prison system.***[1]

---

[1] Deposition of Steven J. Martin, July 24, 2013 at 119:14-24, emphasis added (excerpt filed as Ex. A Decl. of Lori E. Rifkin in Support of Pls.' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, Doc. 4766-1, filed Aug. 23, 2013).

[951863-5]

1
PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

Plaintiffs' motion for affirmative relief in the form of specific orders designed to remedy unconstitutional use of force and disciplinary measures against *Coleman* class members is based on this Court's recent finding that constitutional violations continue to persist, and evidence developed during the secret prison tours conducted by Mr. Martin at the direction of the State, as augmented by the Plaintiffs' own inspections and discovery conducted in response to the State's termination motion.

### A. Use of Force

CDCR's current use of force policies and procedures systemically cause grave harm to class members. These flawed policies and practices include, *inter alia*: use of immediate force for behavior that does not constitute an "imminent threat"; unnecessary, excessive, and anti-therapeutic use of OC spray, including as the "preferred" method for cell extractions; the offensive use of the expandable baton for pain compliance; and an inadequate use of force review process that does not account for mental illness.

For example, the vast majority of uses of force in CDCR are "immediate,"[2] and CDCR's use of immediate force is seemingly unconnected to consideration of whether there is actually a credible and imminent threat to the safety and security of the institution. Immediate force is used even for incidents involving open food ports, or inmates keeping food trays. Use of "immediate" rather than "controlled" force exempts CDCR from requirements for videotaping and clinical interventions by mental health staff for inmates at the EOP level of care and higher. Even when controlled use of force is employed, however, Defendants continue to inflict unnecessary pain and suffering on inmates with mental illness. The so-called safeguards of a "clinical intervention" attempt and medical clearances are perfunctory and do not result in meaningful consideration of mental health

---

[2] In Pelican Bay, for instance, Mr. Martin found that nearly all of the use of force incidents he reviewed (approximately 174 of 180) involved immediate and not controlled applications of force. Deposition of Steven J. Martin, July 24, 2013 at 15:2-13 (excerpt filed as Ex. A Decl. of Lori E. Rifkin in Support of Pls.' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, Doc. 4766-1, filed Aug. 23, 2013).

[951863-5]

2

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

status or effective communication with and management of mentally ill inmates to gain compliance without force.

Although Defendants cite to reforms to their use of force policies and review process in connection with the *Madrid* case, the evidence shows that existing policies and procedures do not adequately protect inmates with mental illness from unnecessary, excessive, and disproportionate use of force. Nor do Defendants' review processes evaluate appropriateness of force given an inmate's mental illness. Rather, Defendants' policies and practices authorize force against all prisoners, including those with mental illness, for refusal to comply with an order from custody staff.[3] This can include an inmate blocking a food port, kicking his cell door, refusing to "cuff up" and exit his cell, and many "violations" of orders that do not present an imminent threat.

The State relies on a formalistic and one-size-fits-all approach to use of force that its own expert, Mr. Martin, described as just "checking boxes." There is little coordination and teamwork between custody and mental health staff in managing and working with inmates with mental illness; rather, clinical staff are treated as interlopers in this environment. For example, although CDCR policy requires a "clinical intervention" by a mental health technician, psychologist or other practitioner prior to a controlled use of force such as a cell extraction, these interactions last only seconds or a few minutes at the outside, cell doors remained closed and locked, and there is no real attempt to engage and problem-solve with the inmate-patient. If at the end of this intervention, an inmate-patient refuses to "cuff up," a team of custody officers will subject him to massive amounts of OC spray, perhaps accompanied by other physical force, and almost always followed by a rules violation charge, discipline, and possible ICC reclassification, which could result in a SHU term.

---

[3] Defendants' high-level managers testified during their depositions that use of force is authorized and appropriate, including the use of large volumes of OC pepper spray, whenever an inmate does not comply with an order.

Plaintiffs' experts found these problems with the use of force procedures against inmates with mental illness to be systemic throughout CDCR. Even the States' expert, Mr. Martin, found systemic problems at three of the institutions he visited and expressed broad concerns concerning the State's use of force tactics, training and oversight. ***All of the experts agree*** that there is a lack of meaningful attempts to use verbal de-escalation and other non-force alternatives, CDCR does not appropriately regulate and limit the use of its OC and expandable baton weapons, the clinical interventions before controlled uses of force are ineffective, and the videos of controlled uses of force for cell extractions evidence poor planning and tactics. The experts also all agree that CDCR's use of highly restrictive housing environments with inadequate treatment and programming lead to increased uses of force against prisoners with mental illness. Defendants' expert provided specific recommendations directly to Defendants, including Secretary Beard, for some of his concerns regarding significant problems with CDCR's use of force including the use of expandable batons, the extensive and completely unregulated use of OC spray, and the failure to routinely investigate important categories of use of force incidents. Yet, despite these observations, the State has steadfastly refused to make needed changes in its policies and practices.[4]

Plaintiffs' mental health expert, Dr. Edward Kaufman, has concluded that CDCR's punitive practices cause harm to class members, punishing them for behaviors directly related to mental illness. Plaintiffs will present videos of controlled uses of force against

---

[4] A CDCR memorandum dated September 12, 2012 purported to set expectations for use of pepper spray. *See* Ex. 12 to Decl. of Lori E. Rifkin in Support of Pls.' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, Doc. 4766-1, filed Aug. 23, 2013). In the memorandum, Mr. Stainer noted that, while there was no restriction on the "amount or number of applications of OC product used," he expected that custody officers would give the spray time to work before using additional applications. The memorandum also included a requirement for compliance with all existing policies and on-the-job training to be provided no later than October 12, 2012. However, as of February 2013, none of the wardens or other supervisory staff whom Plaintiffs' experts interviewed during their inspections reported any change in their institutions' pepper spray policies, practices, or procedures.

1  class members involving the forcible removal of mentally ill inmates from their cells for
2  reasons such as administration of psychotropic medications and transfers to higher levels
3  of mental health care.  Some of the videos show massive force being used against class
4  members in MHCB units—those parts of the institution that are supposed to be providing
5  the highest level of care and therapeutic treatment to acutely ill inmate-patients.  While
6  CDCR characterizes these types of use of force against class members as "for their own
7  good," these aggressive and harmful tactics further escalate the paranoia, anxiety, and fear
8  decompensated inmate-patients experience, and likely make them even less receptive to
9  future mental health treatment.

CDCR's punitively-oriented environment interferes with and prevents the establishment of effective therapeutic relationships with inmate-patients.  Rather than incorporating any awareness of mental illness into their approach to inmate-patients displaying symptoms of mental illness, custody officers gear up in head-to-toe protective gear with an arsenal of weapons Mr. Martin and Mr. Vail observed is unmatched in other correctional systems, in order to, as one class member put it, do "battle" with inmates.

### B. Disciplinary Process

CDCR uses its disciplinary process hand-in-glove with its use of force practices to punish class members for their mental illness.  As both Plaintiffs' expert Mr. Vail and Defendants' expert Mr. Martin have observed, what little mental health input there is into the RVR process is largely ineffective.  If present, it comes in only at the back end of the process, after an inmate has already been charged with a rule violation.  The experts have seen no evidence of the Mental Health Assessment being used by hearing officers in the determination of "guilt."  Rather, it is considered by hearing officers only in the punishment phase in terms of possibly mitigating certain sanctions.  There, again, as both experts noted, whether and how hearing officers take this information into account varies greatly and is not tracked by CDCR.

CDCR's disciplinary process enables the punishment of class members for mental illness—and, in the cases provided to Plaintiffs of controlled uses of force against class

members, punishes them *on top* of using force against them.  Thus, for example, class members on *Keyhea* orders for involuntary medication who lack insight into their mental illness and sometimes refuse medication as a result of their symptoms, are not only subjected to violent cell extractions, but then receive rules violations for charges such as "obstructing" or "delaying" a peace officer.  They are found guilty, despite the relationship of the behavior to mental illness, and, even when hearing officers note "mitigation" in modifying dispositions, still generally receive, at minimum, substantial loss of days of good time credit and privileges.  Moreover, the punishment of class members for behaviors related to mental illness and in ways that exacerbate mental illness does not necessarily end there.  CDCR often subsequently refers them to the Institutional Classification Committee for consideration of a segregation or SHU term, and even to the District Attorney for possible criminal charges.  All of these sanctions can occur regardless of any input from a clinician on the Mental Health Assessment that an inmate's mental illness played a role in the behavior, or contraindicates isolation and programming restrictions.

For years, the Special Master has encouraged Defendants to reform their disciplinary system to remediate the punishment of prisoners for mental illness, in ways that exacerbate symptoms of mental illness.  Yet Defendants have failed to effectively remedy their violation, and have now compounded the problem with the introduction of the "informal" and largely unregulated use of "Management Status."  This disciplinary practice is not outlined in statewide policy, but is implemented through "local operating procedures" (written or unwritten) that vary by institution.  Mr. Stainer testified that the use of management status has never been reviewed by CDCR headquarters.[5]  However, this harsh sanction is arbitrarily meted out by custody officers without any due process protections, can last up to ten days (although it is unclear whether this time limit is actually

---

[5] Deposition of Michael D. Stainer, Aug. 15, 2013 at 227:18-228:15 (excerpt filed as Ex. B Decl. of Lori E. Rifkin in Support of Pls.' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, Doc. 4766-1, filed Aug. 23, 2013).

6
PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

tracked and enforced), and deprives an inmate of essentially all property except bedding and boxer shorts, leaving him locked down and isolated.

Mr. Vail and Dr. Kaufman have observed that CDCR's disciplinary process does not adequately account for an inmate's mental health status either in adjudicating the offense or mitigating the punishment. Moreover, Dr. Kaufman, Mr. Vail and Mr. Martin *all agree* that disciplinary sanctions that further isolate mentally ill inmates-patients can exacerbate symptoms of mental illness and lead to further deterioration of mental health. As Mr. Martin has accurately observed, in CDCR's harsh and non-therapeutic environment, this punitive approach results in a vicious cycle of deterioration of an inmate-patients' mental state, increased resistance or inability to comply with custody officers' orders, more use of force and more discipline, increased fear, anxiety, and paranoia, and the cycle begins again. Yet the State has refused to consider even the relatively modest RVR recommendations made by Mr. Martin to change the Mental Health Assessment form, and to require better oversight and monitoring of the process. As it stands now, there is no effective mechanism even to track how the hearing officers are applying recommendations in the Mental Health Assessment in determinations of guilt or mitigations of punishment, or whether clinical input is considered at all. Unless the Court intervenes and orders specific and tailored remedial action, the State has conclusively demonstrated it will not change this status quo.

## II. REQUESTED RELIEF

### A. Use of Force

Plaintiffs request that the Court issue an order providing the following relief:

#### 1. Direct the Special Master to Prepare a System-Wide Report on Use of Force Against Class Members

The Court should direct the Special Master to undertake a comprehensive review of the use of force against class members, and make recommendations for changes to policies and procedures governing use of force. The Special Master should be authorized to hire additional use of force experts, if necessary, to analyze and monitor use of force incidents

to ensure that there is accountability for improper, unnecessary or unreasonable use of force incidents involving class members. The Court should specify that the Special Master and his experts have complete access to CDCR's use of force data and documents, such as written reports concerning use of force generated by CDCR, and unrestricted access to videos of use of force events, including those captured on prison surveillance cameras.

### 2. Revision of Use of Force Policies and Procedures

While Plaintiffs expect that the Court and class members will benefit from the Special Master's closer scrutiny of use of force issues, there is targeted relief that the Court should order now, based on the recommendations of Plaintiffs' and Defendants' experts, to immediately alleviate the pain and suffering of the Plaintiff class and remediate clear deficiencies in Defendants' policies and practices.

The Court should order Defendants to revise their use of force policies and procedures to minimize the potential for unnecessary and excessive uses of force against prisoners with mental illness, and to require appropriate consideration of mental illness prior to and during uses of force. These policy and procedural changes should include the following restrictions and guidelines for using force against *Coleman* class members:

- Enforcement of restriction in existing policies on "immediate" uses of force to those enumerated in Departmental policy: "inmate behavior that constitutes an ***imminent*** threat to institution/facility security or the safety of the person" (emphasis added) and revision of policies that are not commensurate with such a definition, such as the blanket policy permitting immediate uses of force on inmates who block their food ports, regardless of whether such behavior actually constitutes an imminent threat.
- Prohibition on using OC spray and expandable batons, and any equivalent weapon that CDCR may employ, against inmates with mental illness in their cells, holding cages, mental health crisis bed units, EOP units, and inpatient hospitalization units, except where circumstances call for extreme measures to protect staff or inmates.

[951863-5]

8
PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

- Issuance of OC spray and expandable batons based on post-specific criteria rather than standard issue.
- Enumerated procedures for the use of OC spray including: prohibition on administration of OC spray through the use of crowd-control sized canisters or grenades; requirement that OC canisters have a wand attachment, and be weighed before and after each use in order to monitor and regulate the amount of chemical spray being used; clear guidelines regarding the amount of OC spray to be dispensed, the distance from which it should be dispensed, and required waiting periods between subsequent applications.
- Enumerated procedures for the use of expandable batons including that use be restricted to defensive use, and limited to situations involving the safety of the officer or in which there is risk of death or serious bodily harm to staff or another inmate.
- Enumeration of specific reasons for using a spit mask on a class member subsequent to the application of OC spray, and strict reporting requirements every time a spit mask is so used.
- Provision of handheld cameras in every security station to be used whenever possible during "immediate" or "emergency" uses of force. Specific officers in each shift should be designated to be responsible for video recording all uses of force occurring in the unit, whenever possible.
- Implementation of meaningful tracking and quality assurance systems regarding use of force against prisoners with mental illness.

### 3. Revision of Investigatory Policies and Procedures

Defendants should revise their policies and procedures regarding the investigation of use of force against class members to ensure that all potentially unnecessary and excessive uses of force against prisoners with mental illness are identified. These policy and procedural changes should include the following:

- Expansion of mandatory investigations for use of force events against class

[951863-5]

9

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

members to include the following categories: 1) unexplained injuries; 2) impact strikes to lethal target areas (head, eyes, throat, spine or groin) regardless of the seriousness of the injury; 3) incomplete or conflicting reports; and 4) application of non-lethal weaponry that exceeds what would normally be expected for the type of force reported (e.g. unarmed inmate in cell subjected to great amounts of chemical agents via multiple delivery systems).

- Creation of a unit of trained and dedicated investigators, outside the institutional chain of command, to review uses of force against class members. This investigative unit shall report their findings, including whether uses of force were found to be unreasonable or excessive, and recommend disciplinary measures where appropriate, to CDCR headquarters and to the Special Master.

### B. RVR Disciplinary Process

Plaintiffs request that the Court issue an order providing the following relief:

#### 1. Modification of the RVR Process to Include Mental Health Diversion

Defendants should revise their policies and procedures to provide for mental health diversion or mitigation prior to, or instead of, the issuance of an RVR.

#### 2. Revision of RVR Policies and Procedures

Defendants should, in coordination with the Special Master, revise and restructure their system for administering discipline to class members to ensure meaningful mental health input and consideration. These policy changes should include:

- Formal requirements for communication and feedback between custody and mental health staff.
- Revision of forms to ensure meaningful mental health input and consideration prior to and during the RVR process, including at both determination of guilt and punishment stages.

- Implementation of meaningful tracking and quality assurance systems regarding discipline against prisoners with mental illness, including data showing whether and how recommendations for mitigation were considered and adopted.
- A new protocol for the provision of a staff assistant to ensure meaningful and effective accommodation for prisoners with mental illness, including a prohibition on the assignment of a staff assistant who is in a direct reporting line to the hearing officer, who was involved in the incident or who investigated the incident giving rise to the RVR, and expanding the definition of "staff assistant" to include mental health staff.

### C. Provision of Training

Defendants should be required to provide training for all custody and clinical staff regarding changes to policies and procedures concerning the use of force and the RVR process outlined above. Annual training for custody staff should include education about mental illness generally, including identification of symptoms of mental illness, communication with a person having a mental health crisis, and ways that mental illness could affect inmates' behavior and ability to comply with rules and regulations. Annual training for both custody and mental health staff should include Management of Assaultive Behavior (MAB) methods to limit and reduce uses of force against class members.

Defendants should also develop specialized training and criteria for the assignment of custody staff to mental health treatment units in order to ensure that they have the appropriate capacity to supervise prisoners with serious mental illness.

### D. Prohibit the Unregulated Use of "Management Status" Against Class Members

Defendants should immediately cease using any manner of informal, ad hoc, or local procedure of "management status," and shall comply with formal disciplinary procedures and/or devise appropriate statewide process and regulations for the use of "management status" as a disciplinary process to be reviewed and approved by the Special

Master.

**III. PLAINTIFFS' EVIDENCE**

  **A. Pleadings**

Plaintiffs have submitted the following briefing and supporting declarations and exhibits regarding Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures:

- Notice of Motion and Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4638]
- Expert Declaration of Eldon Vail in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4638-1]
- Declaration of Lori E. Rifkin in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4638-2]
- Declaration of Jane E. Kahn in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4640]
- Proposed Order Granting Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4638-2]
- Plaintiffs' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4766]
- Declaration of Lori E. Rifkin in Support of Plaintiffs' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4766-1]
- Expert Declaration of Eldon Vail in Support of Reply Brief in Support of

[951863-5]

12

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4766-2]

- Reply Declaration of Steven Fama in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measure [Doc. 4768]
- Expert Declaration of Edward Kaufman, M.D., in Support of Pls.' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, [Doc. 4766-3];
- Suppl. Expert Declaration of Edward Kaufman, M.D., in Support of Pls.' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures [Doc. 4825]
- Plaintiffs' Evidentiary Objections re Defendants' Opposition to Plaintiffs' Motion related to Use of Force and Disciplinary Measures [Doc. 4769]

Plaintiffs' experts Vail and Kaufman also filed declarations in opposition to Defendants' termination motion that are relevant to and referenced in the instant motion:

- Expert Declaration of Eldon Vail (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3) [Docs. 4385, 4385-1 through 4385-3]] Exhibit 4 to Expert Declaration of Eldon Vail [Doc. 4386]
- Expert Declaration of Edward Kaufman, M.D. [Doc. 4379]

**B.    Plaintiffs' Trial Witnesses**

**1.    Expert Eldon Vail**

Eldon Vail is a correctional expert with over 35 years of experience working in and administering prisons, including, most recently, serving as the Secretary of the Washington Department of Corrections for nearly four years. Mr. Vail's experience included responsibility for, and a focus on, the mentally ill population and their custody, housing and treatment, including designing and opening a new program for mentally ill inmates within the Washington State Department of Corrections at McNeil Island Corrections

Center, oversight of mental health programs for all prisons in the State of Washington, and providing proper treatment for the mentally ill in prison on a system-wide basis. Mr. Vail provided prior testimony to this Court in support of Plaintiffs' opposition to Defendants' termination motion and has provided two declarations in support of the instant motion for affirmative relief and enforcement of court orders related to the use of force and disciplinary process. (Docs. 4385, 4638-1 & 4766-2.) Mr. Vail conducted inspections of four CDCR prisons in February 2013, reviewed all documents provided to Defendants' expert on use of force and disciplinary practices, Steve Martin, and additionally reviewed videos, force reports, and other files produced to Plaintiffs in response to requests for production.

Mr. Vail will testify about his findings that CDCR's policies and practices governing the use of force and RVR disciplinary process do not account for mental illness and cause unnecessary harm to prisoners with mental illness system-wide; that CDCR allows custody staff to dominate and interfere with mental health treatment in its institutions; that CDCR's practices escalate incidents involving prisoners with mental illness and that CDCR's policies governing the expandable baton and use of pepper spray allow for unnecessary and excessive force to be used against class members.

### 2. Expert Edward Kaufman, M.D.

Dr. Edward Kaufman is a psychiatrist with over fifty years of experience in the field, including extensive experience in forensic psychiatry. Dr. Kaufman has served as an expert and consultant on many occasions, and provided expert testimony to this Court in connection with the original proceedings in 1993. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1307, 1309, 1312, 1313, 1314, 1320 n.54, & 1322 n.58 (E.D. Cal. 1995). Earlier this year, Dr. Kaufman conducted inspections of three CDCR prisons and provided a detailed expert report in support of Plaintiffs' opposition to Defendants' termination motion. (Doc. 4379.) The three-judge court cited Dr. Kaufman's findings in its Opinion and Order Denying Defendants' Motion to Vacate or Modify Population Reduction Order. (Doc. 4541 at 51.) Dr. Kaufman provided a declaration in support of the instant motion on

[951863-5]

14

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

August 23, 2013, and a supplemental declaration after Defendants permitted him access to inspect use of force videos and interview several class members at CSP-SAC, and very shortly after Defendants provided excerpts of health records for these class members. (Docs. 4766-3 & 4825.)

Dr. Kaufman will testify about his findings that CDCR's punitive use of force and discipline against persons with mental illness is materially the same as it was at the time of trial and causes harm to class members; that CDCR's use of force does not evidence appropriate consideration of the mental health status of an inmate, either in terms of how mental illness may be contributing to behavior, or in terms of how the use of force may affect the inmate's mental health or treatment; that CDCR applies force and disciplinary measures in a manner that is contraindicated for their mental health, and likely exacerbates the symptoms and effects of mental illness; that CDCR systemically punishes inmates for behaviors directly related to mental illness; and that CDCR's punitive and custody-dominated practices undermine the ability to provide effective mental health treatment.

### C. Documentary and Other Evidence

#### 1. Reports to the Special Master

Plaintiffs will introduce the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Management Reports for Round XXV for the 33 facilities.

#### 2. Use of Force Incident Packages, Related CDCR Records, and Videos of Controlled Use of Force

In response to Plaintiffs' Second Amended Inspection Demand, which requested that all "Use of Force Reports [involving class members], including videos," from July 1, 2012 through the date of Plaintiffs' inspections in February 2013, be produced to Plaintiffs during each prison inspection, Defendants identified and produced 17 controlled use of force videos. Plaintiffs will introduce these 17 videos at trial. Those videos show class members in acute psychological distress subjected to unnecessary and excessive uses of force, as well as perfunctory and ineffective attempts at "clinical intervention." Plaintiffs

will also introduce documents related to use of force that were produced pursuant to the Plaintiffs' Requests for Production of Documents to Defendants and that Defendants provided to their expert, Steve Martin. These documents include use of force incident reports and related Institutional Executive Review Committee (IERC) reports, inmate allegations of excessive or unnecessary force, RVR files, inmate appeals, and portions of the inmate-patient medical records. These documents demonstrate unnecessary and excessive use of force against mentally ill inmates-patients, failure to meaningfully consider mental illness in use of force and disciplinary practices, and the lack of effective oversight by CDCR over the use of these punitive practices against class members.

### 3. Videos of CDCR Interviews of Class Members Subjected to Uses of Force

In response to the Second Amended Inspection Demand, Defendants also identified and produced 36 investigatory interviews of class members who had been injured during a use of force incident, or who were alleging that they were the victims of excessive or unnecessary force. Plaintiffs anticipate introducing a sample of those video interviews during cross-examination of Defendants' witnesses.

### 4. Defendants' Admissions

Defendants' expert, Steve Martin, and their other declarants have made a number of material admissions that Plaintiffs will introduce into evidence. These include Mr. Martin's recommendations for changes to CDCR's use of force and disciplinary practices, which Plaintiffs have adopted as part of their requested relief, as well as Mr. Martin's deposition testimony that CDCR's use of force and disciplinary policies and practices are badly flawed. These also include, *inter alia*, admissions by Inspector General Robert Barton, Division of Adult Institutions Deputy Director Michael Stainer, CDCR Office of Internal Affairs Chief of Headquarters John Day, and Division of Adult Institutions Deputy Director Kathleen Allison that the State's current use of force oversight procedures do not include evaluation of use of force practices specifically against prisoners with mental illness, or in any way consider the relationship of a prisoner's mental illness to

1 the necessity, degree, or appropriateness of the force used; nor does the State track data in
2 a manner that would allow it to make any of these assessments on a system-wide basis.

### 5. Exemplars of Weapons Used Against Class Members

Plaintiffs will introduce exemplars of CDCR's weaponry arsenal, including OC spray canisters and grenades; a CDCR duty belt, an expandable baton, a barricade removal device, a cell extraction custody staff uniform and shield, 35 mm and 40 mm block guns, and a variety of pistols and rifles.

DATED: September 23, 2013     Respectfully submitted,

ROSEN BIEN
GALVAN & GRUNFELD LLP

By: */s/ Michael W. Bien*
Michael W. Bien

DATED: September 23, 2013     K&L GATES LLP

By: */s/ Jeffrey L. Bornstein*
Jeffrey L. Bornstein

Attorneys for Plaintiffs

[951863-5]

17
PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES