**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

```
FILED

Sep 24, 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
```

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

        **v.**                       **No. CIV S-90-0250 LKK JFM P**

**EDMUND G. BROWN, JR., et al.,**
**Defendants**

**SPECIAL MASTER'S REPORT ON
THE SALINAS VALLEY PSYCHIATRIC PROGRAM**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax:  (401) 824-5123
September 24, 2013

I.   **INTRODUCTION**

On April 11, 2013, plaintiffs herein moved for enforcement of various orders relating to treatment of *Coleman* class members in programs run by the California Department of State Hospitals (DSH) to treat inmates of the California Department of Corrections and Rehabilitation (CDCR) who require mental health inpatient care.  An evidentiary hearing on the motion took place over three and a half days, beginning on June 19, 2013, with live testimony taken from nine witnesses.

One of the orders sought by plaintiffs involved modification of the policy of automatic Cuff or Orientation Status for newly-arriving patients at the Salinas Valley Psychiatric Program (SVPP).[1]  Under this policy, all such patients must be handcuffed at all times they are outside of their cells, without consideration of whether the patient has demonstrated any assaultive or dangerous behavior, until the patient has been cleared by an interdisciplinary treatment team (IDTT) and an institutional classification committee (ICC).  As implemented at SVPP, Cuff or Orientation Status results in suspension of all group treatment and group dayroom activities for the patient until and unless the status is lifted.  In addition, per SVPP policy, an existing patient may be returned to Cuff Status if he exhibits aggressive or threatening behavior or commits indecent exposure (IEX), and will be placed on Cuff Status if he exhibits assaultive behavior.

The other orders sought by plaintiffs involved SVPP hiring and staffing levels; provision of basic necessities including soap, blankets, and undergarments to patients; patient wait lists, stays, and discharges; inmates' access to DSH programs without regard to their parole dates; activation and closure of the DSH programs pending transition to inpatient  treatment of CDCR inmates at the new California Health Care Facility (CHCF); and treatment provided at the

---

[1] Unlike the DSH programs at Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH), SVPP treats exclusively CDCR prisoners, all at the intermediate inpatient level of care.

Vacaville Psychiatric Program (VPP).  Defendants objected to the plaintiffs' motion on a number of grounds.

The court rendered its decision on the motion on July 11, 2013.  Order, Docket No. 4688. It directed the special master to monitor and report to the court on issues related to inpatient care at the DSH programs which treat CDCR inmates, plus the 45-bed inpatient program at the California Institution for Women (CIW) which is run by CDCR.  The court denied without prejudice plaintiffs' request for orders pending the aforesaid monitoring and reporting by the special master.  The special master's report on the inpatient care programs must be filed no later than March 31, 2014.

The court also directed the special master to monitor and report to the court within 75 days on the adequacy of staffing levels at SVPP and on whether the Cuff or Orientation Status there unduly interferes with or delays the provision of necessary care to *Coleman* class members. The court also left to the discretion of the special master the inclusion in his report of any other matters which he determines require urgent attention by the court.  Docket No. 4688 at 12.

Members of the special master's staff of experts and monitors[2] examined SVPP over the course of three visits, from July 31 to August 2, August 5 to August 7, and August 20 to August 22, 2013.  Plaintiffs' and defendants' counsel joined the special master's third visit. The monitor's review consisted generally of SVPP staff interviews, record and document reviews, and observation of treatment including group and individual therapeutic activities, and meetings of SVPP interdisciplinary treatment teams (IDTTs), institutional classification committees (ICCs) and one unit classification committee (UCC).

---

[2] As in prior reports by the special master, the experts and monitors on his staff who toured the program shall be referred to as "the monitor," or, as applicable, "the monitor's expert."

This is the special master's report on the monitor's findings at SVPP.  In addition to covering staffing and Cuff or Orientation Status, it also covers a number of areas which merit being brought to the court's attention at this time.

## II.   SUMMARY OF THE SPECIAL MASTER'S FINDINGS

As currently staffed, programmed, and constituted, the mental health care being delivered at SVPP is generally inadequate to address the clinical needs of its patients.  During the monitor's visits, SVPP staff frequently concurred with the monitor's identification of need for improvements in various areas, and cited most prominently the lack of sufficient staffing resources as a major obstacle to the implementation of adequate programming.  The interim executive staff at SVPP indicated that plans were underway to address some of these problems, but necessary specific remedial measures had not yet been developed and put into place.

Notably, the issues identified by the monitor include the following:

- **Clinical staffing shortages frequently resulted in very large psychiatrist caseloads, exceeding the SVPP planned ratio of no more than 35 patients for each practitioner, and resulting in further dilution of the already-limited care that is provided.**

- **Assignments to therapeutic groups were driven by patient housing location rather than treatment needs.**

- **The amount of weekly group therapy per patient was too limited for the intermediate level of care, at only four to six hours per week on average.  <u>This is far less than the minimum requirement of ten hours for inmates at the lower, outpatient level of care, known as the Enhanced Outpatient Program (EOP), within CDCR prisons.</u>[3]  Individual patient treatment hours were not tracked for quality assurance and supervisory purposes.**

- **The quality of group treatment was inconsistent and ranged from very poor to excellent.  The majority of it lacked clinical content and individualization to the patients' treatment needs, including the need for Spanish language groups.  Many of the groups lacked curricula and/or deviated from the assigned topic(s).**

- **Psychologists appeared to have an overly-narrow role and to be underutilized.**

---

[3] *See Coleman Program Guide*, Chapter 4, part E., no. 4, "Required Treatment."

- **Individualized therapy by psychologists and social workers was not provided regularly and occurred rarely for most patients, even when prescribed by an IDTT, when clinically indicated, or when requested by patients.**

- **The use of MTAs in clinical settings at SVPP was excessive.  Based on reviews of patients' records and the monitor's observations during the site visits, those individualized clinical contacts which did occur were frequently conducted at cell-front.  When individual contacts were in otherwise private settings, two medical technical assistants (MTAs) were required to be in the same room, rendering those clinical contacts significantly less effective.  The presence of MTAs was also required in group therapy.  Moreover, some of the practices employed in the use of MTAs did not conform to SVPP's own written policy.**

- **Many patients on Cuff or Orientation Status were unable to receive *any* out-of-cell programming for significant periods of time, leading to a deficit of needed treatment and exacerbation of patient symptomology and frustration levels.**

- **As a result of the use of Cuff or Orientation Status, many patients at SVPP remain in their cells for long periods of time, excluded from therapeutic services.  Many of these patients were placed on what is referred to as "solo programming" status, which means they do not participate in group treatment or other activities, for reasons that were unclear.  The result was very little out-of-cell time for these patients.**

- **There were significant failures in the procedures and documentation related to Cuff Status.  Multiple patients were found to be on Cuff Status without any documented rationale, intervention and/or release criteria, leaving patients with very limited mental health programming for long periods of time.  Patients on Cuff Status for longer than ten days were not referred to a psychologist supervisor for the development of a behavior plan, as required by SVPP policy.**

- **Transfer times for referrals to SVPP are too long, with 27 percent of transfers exceeding the 30-day timeframe during the period of March through June, 2013.  Even among those transfers meeting the 30-day timeframe, the average transfer time was 22.5 days, and 61 percent of those transfers took from 25 to 30 days.  Transfers should be expedited whenever possible.  Given that there are vacant beds, every effort should be made to fill these beds rather than delay admissions until well into the 30-day time period.**

- **ICC action for newly-arriving patients appeared to have improved, with many ICC meetings occurring in about six business days following arrivals, and more of those patients who have no custody factors being removed from Orientation Status more quickly.  However, IDTT meetings resulted in patient treatment plans that tended to be too limited and generic to be of therapeutic value.**

- **Although systemic issues with patient laundry appeared to have been resolved by administrative action, problems persisted with the timely provision of sufficient clean clothing, towels, and bedding to patients.**

- **There were significant problems with issuance and processing of patient Rule Violation Reports (RVRs), with a lack of appropriate input from clinical staff and consideration of patients' mental illness in the commission of the violations, and a lack of meaningful options for appropriate penalties, sometimes resulting in cumulative extensions of the patients' release dates without good reason.**

## III.   THE SPECIAL MASTER'S FINDINGS

### A.   STAFFING

The monitor found that generally SVPP was struggling with staffing its program, as discussed below, discipline by discipline.

#### 1.   Administrative and Clinical Staffing

At the time of the site visits, the positions of SVPP executive director, assistant executive director, hospital administrator, clinical administrator, and medical director were technically vacant and were covered on an interim or acting basis by staff from other DSH programs. Positions for an assistant hospital administrator, an executive assistant, a program assistant, coordinator of nursing services, nursing coordinator for safety, and two health program coordinator positions were filled.  One program assistant was on long-term leave, and two program director positions, a program assistant position, a nursing coordinator position for safety, and a health program coordinator position were vacant.  The program also had a staffing complement who included office techs and information technology staff, and covered property control, accounting, health and safety, staff services, training, and personnel positions.

Information on clinical staffing at SVPP was provided to the monitor in the form of the SVPP Vacancy Report, dated August 9, 2013, which indicated the following:

Psychiatrists.  All psychiatry positions were designated as "blanket," meaning that like other positions they are authorized, but unlike other positions they are not in the budget.  The chief psychiatrist position was filled but the two senior psychiatrist supervisor positions were not.  There were 20 line psychiatry positions, five of which were designated as "do not fill." Five line psychiatry positions were filled, and hiring to fill an additional line psychiatrist position was pending.  However, on August 22, 2013, SVPP staff confirmed that one staff psychiatrist had resigned, dropping the number of line psychiatrists back to five, for a vacancy rate of 75 percent.  Contractors provided some additional hours of coverage.

Psychologists.  All psychology positions were also designated as "blanket positions." One of two senior psychologist supervisor positions was listed as filled, but on August 22, 2013, it was reported that the position was vacant following personnel action.  The other senior psychologist supervisor position was vacant.  There were 20 line psychology positions assigned to SVPP.  On August 9, 2013, eight line psychologists were working in the program, but one of these was scheduled to transfer to the CHCF effective October 2013.  Three supplemental psychologists provided additional services.  Of the 12 vacant positions, five were designated as "do not fill."

Social Workers.  All social work positions were designated as "blanket positions." The supervising psychiatric social worker position was filled. Of the 23 social worker positions, 14 were filled. One social worker was on long term leave. Four clinical social workers provided "additional" services to the program.

Rehabilitation Therapists.  One of the two supervising rehabilitation therapist positions (which class includes recreational, music, and art therapists) was filled; the other was designated as a "blanket" position and was vacant.  All 24 rehabilitation therapist positions were designated

as "blanket" positions, of which 15 were filled.  Five of these were scheduled to transfer to the

CHCF in October 2013, but one of these was on long-term leave.  As of August 9, 2013, 14 full-

time equivalent rehabilitation therapist positions were covered.

Supervising Registered Nurses (SRNs).  There were 17 approved positions for SRNs,

none of which were designated as "blanket" positions.  Twelve of the 17 positions were filled,

and five, including one long-term leave, were vacant.  Three SRNs were listed as transferring to

the CHCF in July and August 2013.

Registered Nurses (RNs).  There were 41 approved and 23 "blanket" RN positions.  Forty

of the 41 approved positions were filled, but one RN was on long-term leave, and six were listed

as transferring to the CHCF, one in July and five in October 2013.  One "blanket" RN position

was filled but was not covered due to the employee's long-term leave.

Senior Medical Technical Assistants (SMTAs).  There were 28 approved SMTA

positions, and none designated as "blanket" positions.  Twenty-one positions were filled, and two

were not covered due to employee long-term leaves.

Medical Technical Assistants (MTAs).  There were 144 approved and 81 "blanket" MTA

positions, of which 166 were filled and 49 were vacant, including 23 on long-term leave.

Psych Techs.  The Program had 20 approved psych techs, none of which were designated

as "blanket" positions.  Only three of the positions were filled.

Correctional Staff.  Correctional officers in the units were to provide assistance only, and

did so when called upon.  Throughout the nine days the monitor was on site, correctional officers

did not impede programming on the units in any respect.  When called to action in response to an

alarm, they were swift to arrive and complete the necessary tasks.  During the monitor's visit,

there appeared to be no problems between custody staff and clinicians, nor were there any complaints of excessive force or inappropriate conduct by correctional staff.

## 2.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

Staffing at SVPP was significantly inadequate.  The planned clinician-to-patient ratio at SVPP was designated as 1:35, meaning that on average each psychiatrist and primary clinician is supposed to be responsible for 35 patients at any point in time.  However, SVPP was unable to achieve a ratio anywhere close to its own planned ratio of 1:35 among certain key disciplines. Provided information indicated that two psychiatrists each had a caseload of 58 patients. Information obtained from social workers indicated that their caseloads averaged about 40 patients, which was approximately double the size of their caseloads in prior years.  During the monitor's staff meeting with senior MTAs and SRNs, it came out that a major barrier to increasing programming for patients identified by MTAs as needing it was the shortage of MTA staff allocations.  This problem was both evidenced and exacerbated by MTAs having to cover units that were not their regular assignments and/or working two consecutive shifts, resulting in over-fatigue.

The treatment teams at SVPP were assigned at the ratio of 1:35.  Each team consisted of one psychiatrist, one psychologist, one social worker and one rehabilitation therapist. Documentation dated August 2, 2013 showed that two teams comprised as stated were assigned to the 64-bed Treatment Center 1 (TC-1) and to the 74-bed Treatment Center 2 (TC-2). Three teams of the same composition were assigned to the 116-bed on C-Yard and the 116-bed D-Yard.  Twenty additional psychiatry service hours were provided in C-Yard and 24 hours were provided D-Yard.  Two additional psychiatrists provided 60 hours per week specifically dedicated for patient transfers to the CHCF.

Currently, SVPP does not have the capacity or the resources to provide basic therapeutic

and rehabilitative mental health support, services, and treatment to its inpatients in a coordinated,

comprehensive, and individualized manner that is consistent with accepted standards for forensic

and other hospital settings.  The 1:35 clinical staffing ratio adopted by SVPP is inadequate for

individual clinician caseloads as well as for admissions units and treatment teams.  Clinician-to-

patient staffing ratios in the field of inpatient psychiatric programs are more customarily 1:15 for

admissions units, which conduct initial assessments and stabilization of newly arrived patients,

and 1:25 for treatment units. [4]

The barriers which insufficient staffing cause to the delivery of clinical care are further

compounded by the use of Cuff Status at SVPP.  (*See* discussion of Cuff Status and its effect on

patient programming, *infra*, p. 21-29.)  The default to, and prolonged use of, cuffing and

restraints are examples of what can result when staffing ratios are overly-thin.  At SVPP, the

monitor found that Cuff Status and solo programming were commonly used.  As noted above, as

of August 1, 2013, 47 or 16 percent of patients were on Cuff Status.  Yet, as also noted above,

the monitor's observation of staff reviewing interdisciplinary treatment notes (IDNs) revealed

that staff consistently fail to comply with SVPP's documentation requirements for Cuff Status,

including failure to state the rationale for placement of the patient on Cuff Status and solo

programming, the intervention(s) taken or to be taken to address the issue, or the criteria for

removal of the patient from Cuff Status, all as required by express SVPP policy.  During the

course of this review, SVPP staff was unable to produce documentation that for those patients on

---

[4] The use of a 1:25 staffing ratio in the consent judgment in *Kim v. Yang*, *U.S. v. State of CA*, which involved
Metropolitan State Hospital, Napa State Hospital, "collectively, and including any facility that supplements or
replaces them, the `State Hospitals'", is illuminating as well as instructive in this context.  See *Id*., Consent
Judgment, Part C.1.i., "Integrated Therapeutic and Rehabilitative Services Planning, Interdisciplinary Teams"
("Hospitals shall ensure that the team shall . . . [n]ot include any core treatment team members with a case load
exceeding 1:15 in admission teams (new admissions of 90 days or less), and, on average, 1:25 in all other teams at
any point in time."

Cuff Status longer than ten days, a supervising psychologist had developed and documented a behavior modification plan, again as required by SVPP policy.

To be effective, the treatment of each SVPP patient needs to individualized and structured according to that patient's treatment needs.  It has to be determined by a core treatment team consisting of, at a minimum, the treating psychiatrist, primary mental health clinician (a psychologist, social worker, etc.), a rehabilitation therapist, the RN assigned to the unit, and a psych tech or MTA who is knowledgeable about the patient.  Under SVPP's current staffing allocations for these team members, the teams are over-extended to an unacceptable degree.  Basic therapeutic/rehabilitative mental health service is a combination of time-consuming tasks which cannot be carried out appropriately without adequate staffing resources. It requires ongoing assessment and adjustment of treatment goals and the patient's progress towards them; a thorough knowledge of the individual's medical, psychological, and social history, and the patient's history of response to past clinical interventions; incorporation of pertinent information from collateral sources; and, when indicated, ongoing efforts to engage patients who resist participation in treatment.

But when staff is too scarce to do their part, the team cannot treat the patient consistently with accepted professional standards of inpatient psychiatric care.  The result can be unproductive at best, and even be dangerous.  Unsuccessful past interventions which failed may be re-tried because staff is unaware of that they had been used and failed.  Patients may be unnecessarily restricted from therapeutic activities because of over-reliance on mechanical restraints or unnecessarily prolonged assessment periods.  Patients receiving inadequate care continue to occupy inpatient beds instead of recovering and moving on.  Conversely, patients

may be prematurely discharged based on lack of participation in available programming because staff was too unavailable to engage the patients or make use of motivational techniques.

To fulfill its mission, SVPP requires a level of staffing that will enable the Program to comply with required policy, and deliver individualized, integrated therapeutic and rehabilitative services that optimize patient recovery and self-sustainment.  The present 1:35 staff-to-patient planned ratio at SVPP raises concerns over whether the Program can meet its goals with that ratio.  With richer staffing, IDTTs at SVPP will be better positioned to review, assess, and develop positive and dynamic clinical strategies to overcome barriers to full patient participation in the therapeutic and rehabilitative services offered.  Additional staffing will also foster the Program's capacity to conduct ongoing individual patient assessments, to set patient goals, and to develop, monitor, and improve services to patients as indicated by those assessments; that is, to provide treatment that is more individually-tailored to the patient, for better patient outcomes.

## B.    TREATMENT AND CLINICAL SERVICES

During each of the three visits to SVPP, the monitor's expert observed treatment activities, including IDTT meetings, individual therapy sessions, group therapy, and patient observations that occurred on the treatment units.  Staff often acknowledged the need for improvement in some of the areas identified by the monitor's expert, as discussed below, but they cited the shortage of staffing resources as a major obstacle to implementing them.  Staff also indicated that planning to address these issues was underway, but had not progressed to the point of development or implementation of specific measures.

The following is a summary of the monitor's expert's finding and observations on treatment and clinical services:

1.      **Interdisciplinary Treatment Teams (IDTTs)**

IDTT meetings throughout SVPP were observed by the monitor's expert.  These teams typically consisted of a psychiatrist, a psychologist, a social worker, a rehabilitation therapist, and a member of nursing staff.  There were always two MTAs in the meeting room.  However, due to staffing limitations, there were occasions when treating psychiatrist was not present at the meeting, minimizing the effectiveness of psychiatric input and thus of the treatment team as a whole.

Generally, the monitor's expert found inadequacies in the IDTT process employed at SVPP, including the following:

- Not uncommonly, clinicians used IDTT meetings to conduct initial mental health assessments of the patient.

- Treatment planning in the meetings was often too cursory and not developed or discussed with the patient during the meeting.

- Interdisciplinary discussion among the team members was frequently scant and superficial.

Levels of quality and effectiveness of IDTTs varied.  One team observed by the monitor's expert appeared to be a cohesive group that appropriately assumed responsibility for the patient's care, with relevant treatment-focused interactions and good summarization and reinforcement of the patient's progress.  The monitor's expert also observed in some IDTT meetings that rehabilitation therapists provided helpful and easily understood information for the patient that was framed positively and helped the patient understand what he had done well and what were his objectives for upcoming meetings.

However, it appeared that social work staff were essentially responsible for development of the treatment plans, but some IDTT members did not participate adequately in the treatment planning process. Nursing staff appeared to be uncertain of their roles and often did not

contribute usefully, despite their access to significant applicable information.  Clinical staff often had to prompt their participation.  The treatment plans drawn by the teams were often generic and frequently not individualized; this may have been at least in part a result of the limited treatment options available at SVPP.  In addition, the staffing shortages at SVPP made it difficult to have sufficient appropriate staff present and prepared at IDTT meetings.

There were inconsistencies in the services that were provided to patients following their IDTT meetings.  Some patients who asked for a one-to-one clinical contact received it quickly, while others who had comparable symptoms, problems, and treatment targets and asked for a clinical contact were not given one, regardless of how many times they requested it.  When the team was asked why there was a discrepancy, they attributed it to lack of staffing, which resulted in patients having to wait until clinical contacts with other patients were completed.  When staff was asked if there was a wait list for individual clinical contacts, they indicated that they were unaware of any wait list or any system for tracking it.

SVPP's use of MTAs in clinical settings appeared to be excessive.  At all IDTT meetings, two MTAs escort the patients into the meeting room, stand alongside him throughout the meeting, and escort him from the meeting, regardless of his stage or status, and without apparent consideration the individual patient's condition or tendencies.  This approach may lead to a false sense of security, and complacency toward monitoring of individual patient triggers for violence.  Close patient observations and assessments should be part of all patient encounters, including IDTT meetings.  A better practice would be to review patients' charts prior to IDTT meetings, or discuss whether the patient even requires an escort to the meeting. An individualized approach to patient security should be reinforced by supervisors through shift briefings, chart documentation, and decisions on staging the patient, in both IDTT meetings and during training sessions.

MTAs also did not appear to have any consistent role insofar as providing input on the individual patients at IDTT meetings.  During many of the observed IDTT meetings, the MTAs spoke rarely, if at all.  In one observed meeting the comments made by an MTA were counter-therapeutic, although in another observed IDTT meeting, at the solicitation of the social worker, the MTA offered some positive input.  Given the number of staff in the IDTT meeting room, it was unclear why MTAs were present for stable patients who were already were well known to the staff.

### 2.    **Group Therapy**

The monitor and expert found serious deficiencies in the amount group therapy offerings, as well as the content of the groups that were provided at SVPP.  For patients on Cuff or Orientation Status, the problem of lack of groups is exacerbated because, as discussed in greater detail below, these patients are excluded from any out-of-cell programming, even if groups are occurring. This is a serious deprivation of treatment for patients already at risk of worsening symptomology due to lack of isolation and therapeutic stimuli.

The amount of group therapy received by patients was severely insufficient.  Patients were receiving only four to six hours of group therapy per week – *barely half of the minimum requirement of ten hours for inmates at the lower, outpatient level of care known as the EOP, within CDCR prisons.*  For example, the monitor's expert attended an anger management group in unit C-5 that was provided to 12 patients.  However, another five patients requested to attend but were refused to due to limits on the group size, causing them to become very upset and angry.  Ironically, many of the patients at SVPP receiving so little group therapy had been transferred from EOPs or psychiatric services units (PSUs) in CDCR prisons, where they were

often being provided with more group therapy per week than they were receiving at SVPP and had been deemed to need a higher level of care.

The problem of insufficiency of scheduled group therapy is further compounded by the not infrequent cancellations of scheduled groups. For example, on August 2, 2013, a total of eight activities were scheduled for the 73 patients in TC-2. However, two of these scheduled activities did not occur. Based on information obtained from an MTA, groups were usually comprised of eight patients, and sometimes as many as ten to 15. This means that on TC-2, the typical patient was receiving only 45 minutes to one hour of out-of-cell structured therapeutic activity per day – an amount that clinically is far too little.

There was also a lack of group therapy for Spanish-speaking patients. The monitor's expert noted at several observed IDTT meetings that non-English speaking patients were not attending groups due to the language barrier. Spanish-speaking patients were not congregated in housing to assist in provision of Spanish-speaking groups, and as a result they remained confined to their cells.

There was no systematic database and reporting structure to track the number of hours of group therapy offered and received. Group facilitators are required to complete a planned scheduled treatment (PST) sheet indicating attendance at each group. Daily and weekly group hours were manually tallied from the PSTs to develop a program hours report of the total number of group hours provided, and how many total patients attended. It was unclear how the program hours report was of any assistance with supervision of group activities: it does not report the number of hours offered to, or received by, any individual patient, nor does it reflect the number of hours offered or provided for any specific group – in short, it has virtually no value with respect to managing patient care.

The monitor was informed during the final week of the SVPP visit that it was "break week," which occurs every tenth week for two weeks, during which program activities are curtailed to allow staff to plan for the next quarter and conduct in-service training. The monitor requested but was not provided with documentation on the policy governing "break week."

The quality of the observed groups ranged from excellent to very poor.  There was a notable lack of therapeutic curricula. While group offerings included anger management and symptom management, most of the offered groups lacked clinical content.  Group schedules, observations of ongoing groups, and staff and patient interviews revealed that the vast majority of the groups provided at SVPP were recreation-related.  Although these types of groups can be beneficial and therapeutic, they should not comprise the majority of the group therapy provided at the intermediate level of care in an inpatient program.

Group offerings also were not aligned with patients' treatment needs.  Group assignments were instead based upon their housing location, resulting in a mixture of patients at varying levels of functioning in groups that were overly generic to address clinical issues.  For example, following an incident of attempted suicide by a patient with known history of self-injurious behaviors, the monitor's expert asked staff about provision of cognitive/behavioral therapy groups, which may help prevent such incidents.  Staff reported that no such groups were offered. In addition, while the monitor noted significant occurrence of indecent exposure (IEX) behaviors, no group therapy devoted to curbing this behavior was offered.  Some groups hewed to their assigned topics, but others veered off-topic and needed more structure and relevant content to ensure that pertinent areas were covered.

Overall, given the shortage and unevenness of group therapy and the lack of adequate tracking, group therapy at SVPP needs re-design and re-structuring from the ground up.  It

should be revamped to provide clinically appropriate groups according to actual patient needs in the amount necessary to reach therapeutic levels, and be tracked and administered with supervisory oversight that is consistent with generally accepted professional standards.  As it presently stands, group therapy at SVPP is deficient in every one of these respects.

### 3.   **Individual Therapy**

The monitor's expert found that individual therapy by psychologists and social workers was not provided routinely when clinically indicated, and that recommendations from the IDTT for individual therapy were not always made even when clinically indicated.  Again, lack of staffing resources was cited as the reason, meaning that this important treatment modality had very limited frequency and availability.  Observations and reviews of patients' charts indicated that those individual contacts which did occur were often conducted at cell-front.  This was attributed to lack of available MTAs for escorts to private settings, patient resistance, and overly-large caseloads for clinicians.

A related concern was the presence of two MTAs in the room for those contacts which supposedly did occur in a private setting.[5]  As with IDTT meetings, this was done in an apparent safety effort, but it was in direct contravention of written policy.  In contrast, while many of these same patients had been in CDCR prisons, they were interviewed by their primary clinicians alone, with custody officers nearby but not inside the room during the clinical session. The presence of the MTAs during the clinical session should be discouraged, as it can inhibit the patient's openness and willingness to providing the clinician with sensitive and clinically valuable information.  The practice of having two MTAs in the room should be the exception

---

[5] Interestingly, with only one exception, MTAs are not used at the other DSH programs for CDCR inmates, including Atascadero State Hospital (ASH), Coalinga State Hospital (CSH), or the California Health Care Facility (CHCF), nor are they used at the 45-bed inpatient program at the California Institution for Women (CIW/PIP), which is run by CDCR The only other known DSH program for CDCR inmates at which MTAs are used is the Vacaville Psychiatric Program (VPP).

rather than the norm, and any decision to have them there should be based upon the patient's levels of stability and actual, recent determinations of degree of dangerousness, if any.

The lack of individual one-to-one clinical contacts is a major component of the overall programmatic problems at SVPP.  Provision of clinically-indicated individual therapy to each patient at SVPP is essential to appropriate care of these patients.  It should be provided in an organized, programmatic manner that focuses on the individual patient's symptoms and treatment needs, with the requisite frequency and duration.  These contacts should be provided in a private setting to the extent that safety considerations permit.  Every attempt should be made to give SVPP patients this core mental health service in an inpatient setting.

### 4.   Solo Treatment Activity/Solo Programming

According to the SVPP Program Manual, patients who are unable to socialize in a group setting may be provided with solo treatment or solo programming. The appropriate limited activity for these patients is determined by the IDTT, with input from the SMTA and the SRN. In general, when a patient is solo programming, he may leave his cell and engage in activity only by himself, often with two MTAs or with two MTAs plus clinical staff present.  In effect, solo status is similar to Cuff Status, as it effectively cuts off the patient from out-of-cell treatment and any unstructured recreational activity.  (*See infra* p. 21-29)  Although solo programming is discussed within SVPP policy within the context of placement on Cuff Status or temporary program restriction, some SVPP staff indicated that it has been applied to some patients who are within neither of those categories.  Based on casual observation of cell door notations, this appeared to be true, although no solo programming status charts were available to corroborate or refute this.

During the site visit, the monitor discovered that a significant number of patients were placed on solo programing, but without apparent clear clinical criteria. SVPP staff acknowledged that *due to staffing shortages, a patient on solo programming may not be removed from his cell even as little as once a week*. The monitor's expert examined a log of out-of-cell hours for patients on solo programming. Tellingly, the log was filled with blank pages because these patients were not being brought out of their cells. Staff acknowledged that at best, any one of those patients may have 45 out-of-cell minutes during any given week. The monitor's expert randomly selected two cases in the log for review. One patient, designated as Patient A, was admitted on June 19, 2013. By August 6, 2013, he had been taken out of his cell on only two occasions (June 29 and July 17) for only a total of 95 minutes. The other patient, designated as Patient B, had been admitted on May 22, 2013, and was offered out-of-cell time on seven occasions and refused it once. Over the other six occasions, from May 22 to August 6, 2013, he spent a total of only 270 minutes out-of-cell. These randomly selected cases indicate a degree of isolation and lack of treatment for these patients that is deeply disturbing.

Due to its anti-therapeutic nature, solo programming and its functional equivalent, Cuff Status, should be used as sparingly and briefly as possible, as a last resort. If they must be used, they should be paired with intensive individual treatment to minimize the behavioral issues which led to the need for this harsh, restrictive status. If that is to no avail, then referral of the patient to acute care should be considered.

### 5. Psychiatric Services

Significant issues with psychiatric staffing shortages emerged during the monitor's visit to SVPP, causing the nine psychiatrists on staff to carry excessively large caseloads. Toward the conclusion of the monitor's three-week site visit, there were two psychiatrists covering both TC-

1and TC-2.  Although one psychiatrist technically had a caseload of 38 patients, he was also

covering another 20-plus patients due to a psychiatrist's absence.

Continuing admissions and other duties for the psychiatrists resulted in struggles to meet

the level of care necessary for this already-challenging patient population. At least some

psychiatrists indicated some difficulties in the implementation of physician orders such as

laboratory studies and medication orders, particularly on days when IDTT meetings were

scheduled.  Issues with staffing of nursing positions resulted in problems with notation and

implementation of psychiatrists' orders.  In addition, there was a lack of administrative support,

such as a unit clerk to assist in clerical and other duties, which would help avoid spending of

valuable psychiatric time on such duties.

The monitor and monitor's expert met with the nine SVPP psychiatrists in a group setting

during the afternoon of August 6, 2013.  The psychiatrists agreed that patients should be

receiving four to five hours per day of structured out-of-cell therapeutic activities, as compared

to the one to two hours per day that they were actually receiving.

The monitor was informed that in an effort to address the psychiatric staffing problem,

SVPP had begun to pilot the use of tele-psychiatry for some patients who were relatively stable

and later in the course of treatment.

### 6.   <u>Other Treatment Issues</u>

The monitor's expert's observations of IDTT meetings and activity on the units indicated

that  a subset of patients who had frequent, multiple admissions may require long-term

hospitalization. There were significant numbers of patients who, for various reasons, remained in

their cells and essentially did not program. Many of these patients were housed in the B-Pod of

C-Unit. The SVPP treatment teams appeared to be at a loss regarding how to treat these patients,

which unfortunately can lead to return of these unstable, unimproved patients to CDCR prisons, only to be later re-hospitalized.

All meals were served in-cell in C-Yard and D-yard, and the vast majority of the meals were served in-cell in TC-1 and TC-2. A practice of allowing patient to choose to take meals in-cell appeared to only incentivize socially isolated or paranoid patients to remain in their cells. Instead, meal times should be used to encourage patients to leave their cells and to improve socialization.

### 7.    Patient Mentor Program

SVPP had a program to screen and identify some patients to serve as mentors to other patients. It was overseen by the recreation therapists. Reportedly, the mentors conducted cell-front rounds to ask patients about their needs and concerns. Mentors also co-facilitated groups with social workers or recreation therapists.

The monitor's expert attended a patient support group that was conducted by a recreation therapist and co-facilitated by a patient mentor. Although this type of group may provide valuable information for patients, it needed additional structure and a curriculum to improve its efficacy. It should not be used as a substitute for therapeutic groups. Additionally, the placement of patient mentors into a therapeutic role raises questions surrounding patient confidentiality and abuse of private information. Increased supervision and clarification, and limits on the role of patient mentors, are indicated if this program is going to continue.

### C.    PATIENT ORIENTATION, STAGING, AND CUFF STATUS

### 1.    Standards and Procedures for Orientation and Stages

According to the SVPP Program Manual, "Maintaining safety and security is paramount in ensuring the success of our mission. Patients are provided care and treatment within a secure

and safe environment with the understanding that the former cannot exist without the latter."

SVPP Program Manual, February 2012 ed., Section 1, "Values/Safety and Security."  To that end, SVPP follows a staging and status paradigm in determining its patients' housing and programming. The stages/statuses are Orientation, Stages 1, 2, and 3, and Cuff Status, as described below.  (Applicable SVPP Program Manual sections on patient stages and statuses, Policy 3.09 and Procedure 6.12, are attached as Exhibit A.)  To advance in terms of housing and programming, SVPP patients are required to proceed from level to level, "through which each patient will advance dependent on their behavior and participation in treatment."  SVPP Program Manual, Policy No. 3.09, "Policy." As noted below, as of August 1, 2013, SVPP reported that among its 300 patients, 47 or 16 percent were on Cuff Status, 90 or 30 percent were on Stage 1, 58 or 19 percent were on Stage 2, and 105 or 35 percent were on Stage 3.  Orientation, Stages 1 through 3, and Cuff Status are described generally as follows:

Orientation

All newly-admitted patients are placed on Orientation Status, wherein they are housed in a single cell for up to 14 days, have only personal hygiene items for property, and must be cuffed at all times they are outside of their cells (i.e. they are effectively on Cuff Status) until they are cleared by an ICC to program without such restrictions.  Patients on Orientation Status are to be seen daily by an IDTT member at the patient's cell front, but according to the SVPP Program Manual, they do not have additional programming.

Stage 1

Once cleared from Orientation Status by the ICC, the patient is moved into Stage 1, meaning that he no longer has to be handcuffed whenever he is out of his cell.  At this stage, the SVPP Program Manual calls for individualized treatment planning by the patient's IDTT, (*see*

22

Exhibit A, <u>SVPP Program Manual</u>, Policy No. 3.09, "Stage 1."), and patient participation in programming, including therapeutic groups, to begin.  Yard activities, visitation, dormitory living, and a television or radio may be available.

Stage 2

If the patient has programmed successfully at Stage 1, he may proceed to Stage 2.  (*See* Exhibit A, <u>SVPP Program Manual</u>, Policy No. 3.09, "Stage 2.")  Privileges may be increased to include two telephone calls per week, limited patient government positions, basic personal property, incentive store points, and eligibility for the Mentor Apprenticeship Program (described *infra* p. 21).

Stage 3

To proceed to Stage 3, the patient must complete 80 percent of the core therapeutic groups at SVPP, which include anger management, symptom management, medication management, health and nutrition, and Thinking for a Change (TFAC), and be demonstrating appropriate knowledge and coping skills.  (*See* Exhibit A, <u>SVPP Program Manual</u>, Policy No. 3.09, "Stage 3.")  At this stage, the patient should be actively involved in treatment activities with good attendance and preparing for discharge.  Increased privileges include eligibility for any position in patient government, use of recreational supplies, open telephone access, added incentive program points and Mentor Program points, and loaner entertainment appliances if living in a dorm setting or single cell.

2.      **Standards and Procedures for Cuff Status**

a.      **When Cuff Status Can be Imposed**

*A patient may be placed on Cuff Status at any point in his program for safety reasons, clinical reasons, the patient's own choice, or because the patient presents to the unit*

*administrator as a high safety risk*.  SVPP Program Manual, Sections 3.09; 6.12, III, Procedures: A. "Cuff Status."  (*See* Exhibit A)  For patients who have progressed beyond the Orientation Status, placement on Cuff Status is behavior-driven.  All patients in Orientation and those "who engage in aggressive/threatening behavior, assaultive behavior and indecent exposure shall be placed on Cuff Status and consequently will be escorted in cuffs for all out-of-cell activities." *See* SVPP Program Manual, Section 6.12, "Cuff Status and Temporary Suspended Program." (*See* Exhibit A)  *If a patient is placed on Cuff Status, that placement overrides his Stage assignment, which removes any patients on Cuff Status from Stages 1, 2 or 3, and he must be handcuffed and escorted by MTAs whenever he is out-of-cell.*

According to the SVPP Program Manual Section 6.12, IV, "Criteria for Cuff Status Use," triggers for imposition of Cuff Status include:

A. Aggressive/Threatening Behavior

Exhibition of aggressive and/or hostile behavior, even in the absence of physically assaultive acts may lead to Cuff Status (CS).  Examples include "fighting stance, threats of harm, or verbally abusive." In cases of aggressive or threatening behavior, the Senior Medical Technical Assistant (SMTA) or designee is responsible to make decisions regarding placing the patient on Cuff Status.

B. Assaultive Behavior

In cases where a patient commits assault or demonstrates assaultive behavior, "the patient will immediately be placed on CS by the SMTA." Patients placed on CS for assault or assaultive behavior are required to remain on the status for "a minimum of 72 hours for a cooling down period until determined that the patient no longer poses a threat to the safety and security of program operations."

C. Indecent Exposure Behavior

Patients who engage in "sexually inappropriate conduct may be placed on CS with release criteria determined by SMTA." Sexually inappropriate conduct is classified in Procedure 6.12 of the Program Manual as "openly masturbating towards others, sexually inappropriate threats, demonstrative behavior, exhibitionism, etc."

     b.      **Procedures for Cuff Status**

The procedures involved in imposition of Cuff Status are found in the <u>SVPP Program</u>

<u>Manual</u>, Section 6.12, III. "Procedures":

- If a patient is not cleared from Orientation Status within ten business days of arrival, the supervising social worker is to be contacted to follow-up on the ICC process and monitor and track delays.

- The Senior Registered Nurse (SRN) and/or the SMTA, acting in their capacities as unit administrators, are required to evaluate the patient status and "may consult with IDTT members regarding patient's clinical stability." The SMTA may singly "determine Cuff Status for any patient who presents as a danger to others and unstable to exit their cell without precautions."

- The SMTA or designee will place appropriate signs on the doors of patients on Cuff Status.

- The Assistant Executive Director is to be called at the end of each shift to report all Cuff Status initiations on that shift.

- The SRN is to review patients' Cuff Status daily to determine if it is being used appropriately.

- Removal from Cuff Status is required to be discussed by the SRN/SMTA and the IDTT to assess safety issues.

- The SRN/SMTA is to alert all staff through a 24-hour report and document the change of status in the interdisciplinary note (IDN) in the appropriate section of the patient's chart once a determination has been made that the patient will be removed from Cuff Status.

- If the application of, or removal from, Cuff Status is in dispute, the Program Director or designee is responsible for resolving the dispute and determining the patient's status.

- When a patient is removed from Cuff Status, the SRN/SMTA is to notify the IDTT to determine the appropriate stage for the patient.

- A patient who remains on Cuff Status for ten days shall be referred to the Psychologist Supervisor for a behavior plan to address the issue.

     c.      **Documentation Requirements for Cuff Status**

According to the <u>SVPP Program Manual</u>, Section 6.12, VI.C., "Considerations for Use –

Documentation," each placement on Cuff Status must be documented appropriately for the

purposes of management and tracking.  The SMTA is required to record the following in the

IDN section of the patient's chart:

      (a)     Date and time of placement on Cuff Status.

      (b)     The reason for placement on Cuff Status.

      (c)     Intervention measures provided for the patient.

      (d)     Notifications made after placement in Cuff Status.

      (e)     Release criteria for removal from Cuff Status

      (f)     In addition, for all patients on Cuff Status, the psychiatrist, psychologist, and/or social worker are required to assess and document the patient's clinical stability and their recommendations regarding clinical appropriateness for treatment and socialization.

      **2.**     **In Numerous Instances, SVPP Had Failed to Comply with Its Own Standards and Procedures Regarding Cuff Status**

During the monitor's visits, it became apparent that there was widespread noncompliance

with SVPP's own policies on application of Cuff Status in multiple cases.  Required

documentation was missing in IDNs.  *In some cases, Cuff Status was not even mentioned in the*

*patient's health record.*  These lapses in documentation related to Cuff Status in patient's charts

are deeply disturbing, given that treatment decisions are largely driven by the content of the

patient's chart.  They should not be minimized or excused as mere administrative or clerical

oversight.

The monitor observed SVPP unit staff conduct a review of IDNs in charts for a sample of

11 patients who were post-Orientation Status (designated herein as Patients C through M).

SVPP staff conceded that they had failed to follow all required procedures and documentation

regarding Cuff Status.  They were unable to find and indicate the reasons for placement of three

patients, designated as Patients C, D, and E, on Cuff Status.  Staff also could not locate and

indicate documentation of required intervention measures for patients designated as Patients C, D, E, F, G, H, and I.  In the case of Patient J, for example, he was placed on Cuff Status on July 4, 2013 but the intervention plan was not documented until 8/1/2013.  Staff was also unable to locate and indicate documentation of release criteria in the cases of Patients C, D, E, F, G, H, and K.  Patient L was placed on Cuff Status on August 8, 2013, but the very first entry of any required documentation appeared ten days later and was designated as a "late entry" into the IDN on August, 18, 2013.  SVPP staff was also unable to locate and indicate documentation that seven patients – Patients D, E, F, I, J, K, and M -- who had been on Cuff Status for ten days or longer had been referred to the Psychologist Supervisor for the development of a behavior plan to address the issue.

The monitor's expert observed the 60-day review of a patient, designated herein as Patient L. The IDTT did not discuss the patient's Cuff Status with the patient and/or among themselves.  The monitor's expert reviewed the patient's chart and found none of the required documentation in it.  There was:

- no written entry in the IDNs by the SMTA noting the time and date of placement on Cuff Status.

- no documentation of the reason for Cuff Status,

- no documentation of intervention measures for the patient,

- no notifications made, and

- no release criteria for the patient.

Further, there was no subsequent documentation in Patient L's chart by the psychiatrist, psychologist or social worker to reflect or support the completion of the required evaluation of stability, which is part of the overall Cuff Status process and as well as required for compliance with the SVPP Program Manual, Section 6.12, VI. C., "Considerations for Use –

27

Documentation." As part of that evaluation process, the psychiatrist, psychologist, or social worker is also required to make recommendations regarding clinical appropriateness for treatment and socialization. The monitor's expert's review of two other charts, one for a patient designated herein as Patient O and the other for Patient J (referred to above), found that these patients were also placed on Cuff Status without required documentation, in direct violation of SVPP's own policy.

In the case of another patient, designated as Patient P, it appeared that he may never have been taken off Cuff Status, *even after he had been cleared for removal from Cuff Status by the ICC*. He was admitted on July 17, 2013, and seen by the IDTT on July 22, 2013. In the resulting treatment plan, the IDTT referred to "Cuff Status until the patient is cleared by ICC." However, once the patient was seen by the ICC, there was no follow-through – Patient N erroneously remained on Cuff Status and his file was not documented, as it did not fall neatly and directly into the "initial intake" category. In the chart of another patient, designated herein as Patient Q, there was an IDN that indicated he was at "Stage I Cuffed." The sole stated rationale for his placement in Cuff Status was that he "continues to show mood and psychotic instability," which meets *none* of the documentation requirements within applicable provisions in Section 6.12 of the <u>SVPP Program Manual</u>. None of the required evaluations, treatment indications, release criteria, or other critical information could be found in this patient's chart.

The failures to document Cuff Status-related developments in patient's charts must be corrected. When documentation lapses, patients on Cuff Status are at great risk of not being properly followed clinically and can "fall through the cracks," remaining on Cuff Status for no valid reason, as evidenced by Patients P and Q, above. When a patient is on Cuff Status, his treatment is severely curtailed, and as a practical matter, is limited to "solo programming." This

means the patient receives no day room time or yard time with other patients.  He receives no group therapy, which is a mainstay of treatment that offers the patient relief from the sensory deprivation of living in a single cell and the loss of dignity that goes with being cuffed whenever out of cell.

By placing a patient on Cuff Status without documenting the reason for the placement, the intervention planned, and the criteria for release from Cuff Status, and by failing to develop a required behavior plan, SVPP in effect places the patient at risk of needless deprivation of treatment and isolation in his cell -- the very antithesis of a therapeutic environment for a seriously mentally ill person.  As described above, the ability of a patient on Cuff Status to access treatment is also severely limited, despite the fact that he was transferred to an inpatient program *because he needs more treatment than he was receiving at the sending institution*.  The sad irony is that the same patient would likely receive more treatment in a lower-acuity program within a CDCR prison, such as an EOP, than he would receive as an inpatient at SVPP.

### D.      REFERRALS TO SVPP

Although CDCR is responsible for providing timely acute and intermediate inpatient care to its inmates in need of such care, it has contracted out that function to the DSH.  *See Coleman Program Guide*, Chapter 6, "Department of Mental Health Program," Part A, p. 12-6-1.  The mainstay of intermediate inpatient care placement for male inmates who require close or high custody has been SVPP.  *See Coleman* Program Guide, Chapter 6, Part D, p. 12-6-6.

Referral and placement of CDCR inmates to DSH inpatient programs must adhere to designated timeframes.  Referrals to the intermediate level of care must be completed within five working days of identification by a CDCR IDTT if patient consent is obtained, and within ten working days of identification if a due process hearing is required.  *Coleman* Program Guide,

Part D., p. 12-6-9.  DSH shall review the referral packet within three working days of receipt, and shall immediately notify the referring institution by fax of its decision to accept or reject the referral.  *Coleman* Program Guide, Chapter 6, Part D., p. 12-6-10.  "Referral to DSH" is defined as "The date the completed referral packet is received by DSH by facsimile or overnight mail."  *Coleman* Program Guide, Chapter 1, Part M, "Level of Care Change/Transfer Timelines," p. 12-1-15.  If the referral is accepted by DSH, the patient must be transferred to the designated DSH program within 30 days of referral.  *Coleman* Program Guide, Chapter 6, Part D., p. 12-6-10 – 12-6-11.  Inmate patients who have been accepted into an intermediate inpatient DSH program shall be transported to DSH within 72 hours of bed assignment.  *Coleman* Program Guide, Chapter 6, Part D., p. 12-6-11.

While on site at SVPP, the monitor requested a report on its adherence to the afore-described referral and transfer timeframes.  SVPP produced monthly reports on referrals and transfers from CDCR for March through June 2013, and a partially-completed report for July 2013.  These reports indicated the dates of referral, acceptance, and admission, but the monitor was told that dates of bed assignments were not tracked.  The monitor then consulted monthly reports posted by CDCR on its secure FTP website to locate information on dates of DSH bed assignments, as well as any updated information on the status of the referrals received by SVPP in July.  The CDCR reports, however, listed bed assignments for only a very small minority of the referrals to SVPP.  They also did not contain updated data on the status of the total 68 referrals to SVPP in July 2013, indicating only that seven patients were admitted and that the status of the remaining 51 patients remained unknown.  Accordingly, the reports from both SVPP and CDCR on intermediate care transfers for July 2013 are too incomplete for reporting of useful information at this time.

Nevertheless, the reports for March through June 2013 indicate the following with regard to intermediate inpatient care transfers to SVPP:  **From March 1, 2013 through June 30, 2013, SVPP received a total of 227 referrals and admitted 127.  Of those 127 admissions, 93, or 73 percent were transferred within the 30-day timeframe, and 34, or 27 percent, were transferred late.  The transfers within the 30-day timeframe took an average of 22.5 days, with a range of one to 30 days.  Fifty-seven, or 61 percent, of the transfers within 30 days took from 25 to 30 days.**

Month-by-month during the same period, transfers to SVPP occurred as follows:

- **<u>March 2013</u>**.  In March 2013, SVPP received a total of 48 referrals and admitted 33.[6]  Of those 33 admissions, 20, or 60 percent, were transferred within the 30-day timeframe, and 13, or 40 percent, were transferred late.  The transfers within the 30-day timeframe took an average of 16 days, with a range of one to 30 days.  Five, or 25 percent, of the transfers within 30 days took from 25 to 30 days.

- **<u>April 2013</u>**.  In April 2013, SVPP received a total of 49 referrals and admitted 28.  Of those 28 admissions, 21, or 75 percent, were transferred within the 30-day timeframe, and seven, or 25 percent, were transferred late.  The transfers within the 30-day timeframe took an average of 28 days, with a range of 26 to 30 days.  All of the transfers within 30 days took from 25 to 30 days.

- **<u>May 2013</u>**.  In May 2013, SVPP received a total of 77 referrals and admitted 38.  Of those 38 admissions, 31, or 82 percent, were transferred within the 30-day timeframe, and seven, or 18 percent, were transferred late.  The transfers within the 30-day timeframe took an average of 24 days, with a range of four to 30 days.

---

[6] CDCR inmates who were not admitted were generally rescinded referrals, transferred to other inpatient programs, or were on hold status for medical or medication-related reasons.

Twenty-one, or 68 percent, of the transfers within 30 days took from 25 to 30 days.

- **June 2013**.  In June 2013, SVPP received a total of 53 referrals and admitted 28. Of those 28 admissions, 21, or 75 percent, were transferred within the 30-day timeframe, and seven, or 25 percent, were transferred late.  The transfers within the 30-day timeframe took an average of 21 days, with a range of two to 30 days. Ten, or 48 percent, of the transfers within 30 days took from 25 to 30 days.

These referral and admission statistics point out a number concerns surrounding referrals to SVPP:

First, far too many -- 27 percent – of the accepted referrals from March through June 2013 were *not* completed within the 30-day timeframe.  Thirty days is a generous period of time which should be more than ample to place these seriously mentally ill patients into beds. Moreover, it must be recognized that the 30-day timeframe in the *Coleman* Program Guide was negotiated during a time when inpatient beds for CDCR inmates were slowly becoming less scarce, and there was need for a timeframe with which CDCR could conceivably comply under the circumstances at that time.  *See* SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' REVISED PROGRAM GUIDE, at 2, filed February 3, 2006, Docket No. 1749. However, in more recent years, inpatient bed availability has increased dramatically; there are now known vacant beds which can be filled by patients from the CDCR institutions. Thus, although the 30-day timeframe still appears within the *Coleman* Program Guide, the original context that led to adoption of the 30-day timeframe has long since passed and has lost its relevance.  Today, transfers need not take anywhere close to 30 days to complete, and in no instance should they take more than 30 days.

Second, given the availability of beds, there is no excuse for waiting until well into the 30-day period to effectuate transfers.  Among those transfers that do occur within 30 days, far too many occur very late in the 30-day period.  Even among these "timely" transfers, the average transfer time was 22.5 days, with 61 percent of the transfers taking from 25 to 30 days to complete, during the four-month period covered above.  Time devoted to preparation of the referral packet by CDCR is no excuse for delay because the 30-day period does not begin to run until DSH receives the completed packet.

Third, as noted above, SVPP does not track bed assignments.  This is problematic because, as noted above, patients who have been accepted at the intermediate inpatient level of care must be transported to DSH within 72 hours of bed assignment.  *See Coleman* Program Guide, Chapter 6, Part D., p. 12-6-11.  The failure to track bed assignments makes compliance with this 72-hour timeframe difficult, if not impossible.

It is time for SVPP to re-orient its approach to admissions and transfers so that an empty bed prompts a transfer and admission.  There is no excuse for delays in transfers when beds are available, regardless of the present 30-day outer limit on transfer times.  Tracking of bed assignments, as per the *Coleman* Program Guide, is essential and should begin immediately.  Patients who are so ill as to require inpatient care should not have to wait for treatment if there is a bed available for them in the program.  Good patient care requires no less than this.

### E.   ADMISSIONS AND DISCHARGES

SVPP staff reported to the monitor that it was continuing to admit and discharge patients as clinically appropriate. Data presented for review during the first of the monitor's three visits indicated that from July 1 to 22, 2013, SVPP accepted 22 referrals from various CDCR prisons and discharged 34 patients back to CDCR prisons. On August 1, 2013, SVPP reported a census

of 300 patients, among whom 47 or 16 percent were on Cuff Status, 90 or 30 percent were on

Stage 1, 58 or 19 percent were on Stage 2, and 105 or 35 percent were on Stage 3.  There were

40 patients in TC-1, 73 in TC-2, 57 each in C-5, C-6 and D-5, and 16 patients in D-6. On August

22, 2013, SVPP staff informed the monitor's expert that there were no patients housed in D6.

During the week of July 22, 2013, SVPP transferred 15 of its patients to the new CHCF.  This

was part of the closure of C-Yard and D-Yard at SVPP, and the activation process of the new

CHCF, as planned.

On August 7, 2013, the monitor's expert observed five ICC meetings in TC-1. These

meetings were being conducted within six days of each patient's admission. The monitor's

expert observed a patient admission conducted by a medical doctor, psychiatrist, and nurse on

one of the treatment units.  Generally, it was conducted appropriately, but some issues were

noted.  Additional patient information from CDCR as well as access to this patient's unit health

record (eUHR) at the sending CDCR prison were needed.  However, the patient's eUHR could

not be accessed, for reasons that were not made clear.  Such important patient information needs

to be readily accessible to SVPP, and to that end, there needs to be greater communication and

collaboration between the sending institution and SVPP.  The same issue was present with

respect to the community hospitals where patients were sent for outside medical treatment and

consultation.  It was also noted that incoming patients did not received a suicide risk evaluation

(SRE) until 72 hours after admission.  Given the heightened stressors and anxiety experienced by

newly-admitted patients, the SRE should be administered at the time of the patient's admission

to avoid potential suicides during that time of elevated risk of suicidality.

Discharge planning appeared to be very limited for patients being returned to CDCR

prisons for paroling.  The monitor's expert observed an IDTT meeting for a patient scheduled to

parole from California Substance Abuse Treatment Facility (CSATF).  Although he had been

referred to the transitional case management program (TCMP), and the TCMP clinician had been

seen on the unit, there was no documentation regarding discharge planning in this patient's

medical record.  This sort of lack of communication and treatment planning between SVPP and

the sending prison is problematic as it can result in poorly stabilized patients being returned to

the sending CDCR institution just prior to the patient's release back to the community.

      F.      **LAUNDRY ISSUES**

Overall, the monitor found that SVPP's problems with tracking and dispersing adequate

clean laundry, towels, and bed linens needed further attention and were not yet resolved.

While there has been some improvement with clean laundry availability, a number of issues in

this area remained.  At the time of the visit, a draft administrative directive to address this

problem was still under review, but had not been signed or implemented.

Historically, laundry from SVPP and Salinas Valley State Prison (SVSP) was sent to

Central California Women's Facility (CCWF) twice per week for cleaning, but often not all of it

was returned to SVPP, leaving the Program with a short supply. Laundry services were then re-

routed to Avenal State Prison (ASP), but only once per week.  Under a new administrative

directive, an MTA is assigned responsibility for tracking delivery and return of all laundry to

SVPP, and must receive and inventory it when it returns.  This MTA is solely responsible for

reporting missing, torn, or worn-out items which need to be replaced.  Unfortunately, this

arrangement negatively affects patient programming on the units, as the MTA is redirected away

from the unit for up to two hours for each step of the process and cannot fulfill his or her duties

insofar as escorting patients.

It was reported that issues with ASP not returning all of the sent laundry have been resolved.  However, there was no system to inventory the actual items which each patient had or did not have.  Both staff and patients at SVPP reported continued problems with patients not being given the full complement of the required clothing after it comes back from being cleaned. In addition, individual patients' missing items were not tracked or inventoried, and it was usually left to the patient to remind staff that he was missing an item.  Another related issue was that clothing issued to patients was not always the appropriate size.

There were also reports of continued problems with patient access to clean and adequate towels and bedding, and that most of the patients in C-Unit had only one sheet.  Pillows had been distributed to patients just prior to the monitor's visit.

### G.   PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

There were significant problems in the areas of issuance and processing of RVRs for patients at SVPP.  Any staff member, including correctional officers, MTAs, nursing staff, and mental health clinicians, may write an RVR.  Staff expressed frustration with the RVR process because, given the patients' mental health status, they cannot be assessed loss of privileges as a penalty. Rather, they can only be assessed loss of behavioral credits, which may extend their release dates.  Additionally, it was reported that patients who frequently committed IEX continued to accrue more time but were not treated for indecent exposure.

The monitor met with the SVPP's coordinators for RVRs, appeals, use of force, and involuntary medications.  The RVR coordinator said that following issuance of an RVR, he assigned a clinician to complete a mental health assessment of the patient.  He maintained a log of all RVRs and completed assessments and shared it with the monitor.  For nine RVRs selected randomly by the monitor from the log, the monitor examined the completed RVRs and mental

health assessments.  Also, because 40 percent of all RVRs issued during that quarter were for

IEX, the monitor also requested access to three confidential files, as these patients had received

multiple RVRs in a short period of time, some of which were for IEX.

Review of the RVRs and mental health assessments confirmed correctional staff reports

of patients not losing privileges and indicated that these patients lost significant behavioral

credits, extending their earliest possible release dates (EPRDs).  The quality of the mental health

assessments was poor, with very little helpful or useful information for the hearing officer.

Some of the assessments hindered the patient's interests, as one clinician noted that the patient,

designated as Patient R, stated, "This is what I do, I hate cops."  He was assessed 150 days' loss

of behavioral credit and was referred to the district attorney for prosecution for an IEX offense.

In a meeting with the clinicians, many stated that they were not trained on how to

conduct mental health assessments.  One said that she had been trained by a correctional

counselor, and some reported training by their supervising social worker.  It was reported that

several new clinicians had not been trained at all.  Staff reported that there was no review at any

level of the quality of the assessments, and that they were all forwarded to the RVR coordinator.

Review of RVRs and patient C-files indicated `that senior hearing officers parroted the same

language in every RVR that was reviewed, documenting, "SHO (senior hearing officer) mitigates

no loss of privileges due to (patient name) participation in the mental health program."

Unfortunately, there was no mitigation of the number of days of forfeited behavioral

credits, resulting in accumulations of excessive high numbers of extra days.  The result was

sometimes bizarrely and cumulatively punitive, given the circumstances. One example,

designated as Patient S, received three RVRs in one day (May 28, 2013) and was assessed a total

of 570 days forfeiture of behavioral credits.  He was housed in TC-1 when he asked for a time

out and stated he was suicidal.  He relinquished a self-fashioned weapon for said purpose and

was escorted to the observation room.  He was then given an RVR for possession of a patient-

manufactured weapon.  The mental health assessment said that his mental disorder contributed to

the behavior, and that "the patient is currently being treated for delusion of staff talking about

him and wanting to eat him which contributed to this behavior warranting disciplinary action."

The assessment further documented that if the patient were found guilty, there were mental

health factors to consider in penalty assessment.  The clinician documented that "the patient's

delusions about and pertaining to staff should be considered.  There are a lot of suspicions

surrounding staff wanting to eat him."  The patient was found guilty and assessed 360 days'

forfeiture of behavioral credits.  The senior hearing office documented that he had considered the

mental health assessment and mitigated utilizing the rote language noted above, "SHO mitigates

no loss of privileges due to (patient name) participation in the mental health program."

On that same date, May 28, 2013, patient S received another RVR for gassing while

housed in the observation cell.  The mental health assessment again documented that his mental

disorder appeared to contribute to the behavior and that similar factors should be considered, as

in the assessment prepared for the earlier RVR.  Patient S was found guilty, assessed 150 days'

forfeiture of behavioral credits, and the same mitigation language documented in the earlier RVR

reappeared.  Yet again, on May 28, 2013 while housed in the observation cell, Patient S received

a third RVR for defacing state property, as he had been writing on his cell wall with a red

beverage and his own blood.  The mental health assessment stated the same language as the two

earlier RVRs that day, that his mental disorder did appear to contribute to this behavior.  He was

found guilty, assessed an additional 60 days' forfeiture of credits, with the same language

regarding mitigation appearing in the conclusion of the latest RVR.  On May 29, 2013, while still

housed in the observation cell, Patient S received a fourth RVR, written by his psychiatrist, for

terrorist threats against a public official. (He threatened to kill the President.)  At the patient's

request, this RVR had not been heard due to a pending referral for prosecution by the district

attorney.  On June 6, 2013, Patient S received yet another RVR for gassing.  This RVR was

delayed due to placement of Patient S on mental health crisis bed (MHCB) status and his being

incapable of participating in a disciplinary hearing, pursuant to a memorandum dated July 20,

2013 by a senior hearing officer.

Another illustration of the problems with the RVR process at SVPP is the case of the

patient designated as Patient T.  He received five RVRs between May 25, 2013 and June 2, 2013

(four for IEX with masturbation and one for gassing).  He was found guilty of all and

accumulated 510 days' forfeiture of behavioral credits within nine days.  Each RVR contained

the same language regarding mitigation: senior hearing office mitigates no loss of privileges due

to (patient name) participation in the mental health program.  However, Patient T continued to

lose behavioral credits.

Another patient, designated as Patient U, also received seven RVRs for IEX between

April 30, 2013 and June 21, 2013, one of which was written by a psychiatrist.  Patient U was

repeatedly assessed 150 days' forfeiture of behavioral credits.  Review of this patient's

confidential file revealed that on August 2, 2013, CDCR completed a calculation worksheet

(CDCR Form 1897-U), which showed that Patient U lost 720 behavioral credits in one year due

to RVRs.  Consequently, his EPRD went from March 15, 2012 to July 15, 2014, for extension by

two years and four months.

All of the foregoing indicated to the monitor that mentally disordered patients at SVPP

were being subjected to excessive forfeitures of behavioral credits, without adequate

consideration of the role of the patient's mental illness in his behavior.  The mental health

assessments were of poor quality, and while they may have been nominally considered, there

was no reliable evidence that they had resulted in mitigation of penalty when they should have.

Ironically, the stated "mitigation" from the assessments was no loss of privileges, but as was

evident over the monitor's nine-day site visit, these patients had very little to no privileges to

begin with.

MTA staff reported to the monitor that if doctors were not on site, it was not uncommon

for them to order a cell-extraction to remove a patient from his cell.  Upon receipt of this report,

the monitor consulted the use of force coordinator about the frequency of cell extractions at

SVPP, and reviewed the 837 incident packets. The monitor found a total of 13 use-of-force

incidents, including four cell extractions, during the second quarter of 2013. Three of the cell

extraction incident reports documented the presence of mental health staff before the extraction

was executed, and the fourth was an emergency extraction with no mention of mental health

participation.

### H.  USE OF OBSERVATION CELLS

Information regarding the tracking of use of restraints and seclusion at SVPP was

requested, but not received.  Interviews with line and supervisory staff revealed that the

observation rooms and seclusion rooms are utilized and tracked in two ways:  Observation rooms

were utilized for "time outs," which by policy are requested by the patient and included in his

treatment plan.  Observation and safety cells were also utilized for seclusion of patients due to

dangerous behaviors.  These seclusion episodes were to include physician orders as well as

documentation in medical records of release criteria.

Actual practice, however, appeared to be less distinct than as described by staff. Reviewed treatment plans did not include the use of time outs as outlined by policy, nor did the time-out practice include the reported amount of tracking, such as the completion of incident reports or physician orders, making it difficult to monitor this practice.  Of concern was the use of the observation cells for seclusion and time outs in C-Unit and D-Unit.  These cells lacked toilets, and it was reported that patients were provided urinals and bedpans to toileting purposes. In addition, these rooms, with breakable windows and low ceilings, were unsafe.

Given the lack of tracking of time outs and the inhumane conditions of some of the observation cells, consistent adherence to policy, at least as it was reported, and better tracking of seclusion are indicated.

## I.      EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

The monitor's expert observed emergency responses to three separate incidents which occurred during the site visit.  One, which occurred on C-Unit, involved response to a possible medical emergency wherein the patient presented with instability and weakness.  Several minutes after the first alarm, a second alarm occurred in the same building.  The response of the MTAs, and correctional and other staff was timely, competent, and effective.

A third incident occurred on TC-2, wherein a patient housed in the safety cell attempted to hang himself with a noose made from his clothing.  Again, the response by MTAs and medical staff was prompt and appropriate.  The patient continued his attempts at self-harm, refused to stop, and was pepper-sprayed by an MTA.  This resulted in his surrender.  He was then cuffed, removed from the cell, showered, and placed into an observation cell under one-to-one observation.  The primary area of concern regarding this incident was the lack of programming provided to this patient, who had a long history of similar behavior with impulsivity, multiple

41

suicide attempts, and limited treatment services at SVPP.  Although he was receiving individual

therapy with a psychologist, and initial discussions regarding behavioral therapy had occurred,

increased individual therapy and targeted group therapy were clinically indicated for this patient.

Overall, it appeared that SVPP had a process in place for death reviews.  The SVPP

medical director outlined the death review process. Upon a death, all staff in the building where

the death occurred would be debriefed.  In addition, patients in a therapeutic group on the pod

where the suicide had occurred would also be debriefed.  The decedents' medical records would

then be secured by the litigation coordinator.  Then, there would be a local mortality review

including involved direct care staff to identify precipitating events, areas of concern, and areas in

need of improvement.  The mortality review would then generate a report.  In addition, a death

summary would be completed by a physician and nursing staff.  In addition to these local

reviews, an external review at the headquarters level would also be conducted, but this review

for one of the patient deaths was reportedly delayed due to administrative concerns and had not

yet been reviewed by the medical director.  When asked about corrective actions resulting from

the incidents, the medical director indicated that policy guidelines regarding polydipsia

(excessive drinking of water than can lead to death) had been instituted for psychiatry and

nursing, and that at-risk patients were now more readily identified.

### J.      UTILIZATION REVIEW AND QUALITY MANAGEMENT

The monitor's expert observed a meeting of SVPP's utilization review committee that

was attended by the psychiatrists and medical doctors and was chaired by the medical director.

Patients who had been housed at the facility for six months or longer were tracked and presented

at the committee meeting. Psychiatrists discussed the status of the patients presented and whether

they were nearing discharge.

Although the staff indicated that they sometimes felt pressured by this committee to discharge patients, it was difficult to make this determination at the time of the site visit.  While there is a need for utilization review to address treatment progress and efficacy, it is critically important that there be no undue pressure to discharge patients prematurely.  The lack of consistent individual therapy, prolonged in-cell time, and seriously inadequate provision of group therapy appeared to result in patients who were treatment-refractory and little improved.  These patients can be returned to CDCR prisons only to be re-referred to DSH programs, cycling through with little or no remission or recovery.

At the time of the monitor's visit, SVPP did not have systematic quality management, quality assurance, and/or quality improvement processes in place.  There appeared to be a complete absence of program-wide performance indicators and metrics, with no structure for identifying problems, crafting solutions, and overall improving the mental health care provided at the program.  The interim executive staff informed the monitor that a new data system, known as DSH's Patient Wellness and Recovery Model Support System (PaWSS) was scheduled to be piloted in TC-1 and TC-2, beginning on September 3, 2013.  Staff interviews and provided documentation indicated that PaWSS is a comprehensive data system that is designed to track and report on patients care matters.  It appeared to be designed to support scheduling of IDTT meetings, treatment planning, individualized therapeutic group assignment and management, and individual therapy, in addition to tracking custody data provided by CDCR.  Once fully implemented, PaWSS is designed to provide SVPP with the capacity to track access to care and individual patient care in a comprehensive and systematic way, and to provide functional data and reports for quality improvement and supervisory purposes.

K.    *COLEMAN* POSTINGS

There were no *Coleman* notices posted in the buildings, and patients often did not know who to contact for help with *Coleman* issues.

IV.    RECOMMENDATIONS

Given the broad range of issues at Salinas Valley Psychiatric Program that are described above, it would be unrealistic, and probably overwhelming, for the Program to tackle all of these problems at the same time.  Nevertheless, certain areas of concern stand out as calling for action forthwith.  Based on all of the foregoing, the special master recommends the following:

1.  That the Salinas Valley Psychiatric Program be directed to fill remaining staffing vacancies and consider modifying its planned staff-to-patient ratio of 1:35. Priority should be given to filling psychiatry, psychology, and social work positions.

2.  That the Salinas Valley Psychiatric Program be directed to increase significantly the amount and quality of individualized and group therapy provided.

3.  That the Salinas Valley Psychiatric Program be directed to reconsider and re-evaluate its use of Orientation Status to automatically require patient cuffing whenever out-of-cell and withhold mental health programming or treatment other than a daily cell-front contact by a member of the interdisciplinary treatment team.

4.  That the Salinas Valley Psychiatric Program be directed to eliminate the use of Cuff Status to require automatic cuffing of patients when out-of-cell, overriding of patients' stage designations, and barring of patients' access to out-of-cell individual and group treatment.

5.  That the Salinas Valley Psychiatric Program be directed to begin tracking all patient bed assignments, and admit referred and accepted patients as quickly as bed availability

permits so that all beds are utilized to the fullest extent possible, and in no event beyond

72 hours following bed assignment and 30 days from the date of the referral.

6.   That the Salinas Valley Psychiatric Program resolve any and all remaining issues with,

and obstacles to, providing patients with the full complement of clean clothing, towels,

and bed coverings, and make these provisions available to  patients on a timely basis

according to established schedules.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

September 24, 2013

# SALINAS VALLEY PSYCHIATRIC PROGRAM



# Salinas Valley Psychiatric Program

## PROGRAM MANUAL
### FEBRUARY 2012

SALINAS VALLEY PSYCHIATRIC PROGRAM

INTERMEDIATE INPATIENT TREATMENT FACILITY

PROGRAM MANUAL

**POLICY NUMBER:**                                           3.09

**SUBJECT:**          STAGES PROGRAM

**RESPONSIBLE:**      Program Director or designee

**REVISION:**         1-18-2012

**CROSS REFERENCE:**  Cuff Status/Temporary Program Status Policy 6.12

**Review/Date:**      *Repeal 2/22/12*

## POLICY

Salinas Valley Psychiatric Program (SVPP) has adopted a system to monitor patient progress and recognize growth and advancement toward meeting treatment goals.   STAGE Program consists of stages or levels through which each patient will advance dependent on their behavior and participation in treatment.  Salinas Valley Psychiatric Program (SVPP) strives to maintain a safe and secure, therapeutic and supportive environment for patients and staff.  The Stages include Orientation Phase, Stages 1, 2, and 3.   Safety and Security issues will be evaluated by the ICC and SMTA/SRNs.  Clinical status will be monitored by the IDTT for treatment recommendations.

## RATIONALE:

Salinas Valley Psychiatric Program (SVPP) utilizes the STAGE Program.   The Stage program provides the system in which patient progress in treatment and determines their privileges on the unit.  Each Stage permits access to various activities within the program.  Uniform with the goals of Salinas Valley Psychiatric Program, the STAGE Program shall also be consistent with each patient's necessary security measures, level of functioning, and risk factors.   Stage Program takes into consideration the intrinsic elements of change which include an individual's strengths and personal involvement in the process of changing attitudes, values, feelings, skills, goals and roles.

## STAGE PROGRAM integrates progressive treatment in the following Phases:

ORIENTATION PHASE (until ICC clearance)

STAGE 1

STAGE 2

STAGE 3

At any point in the patient's programming restrictions may be placed for safety such as cuff status. **Please refer to SVPP Policy 6.12 on Cuff Status and Temporary Restrictions.**

**ORIENTATION PHASE:** Integral to the development of a sound treatment program is a period of time during which all newly admitted patients will be closely and systematically observed and evaluated by all professional staff. During this observation period patients will be housed individually with limited privileges and possessions.

This phase incorporates the necessary timeframe to assess and evaluate each patient as well as safely orient to the treatment program and expectations.

A.  It is the goal of Orientation Phase to introduce the patient to the expectations of treatment, understand their individual needs, and ultimately release them into full program.
B.  All patients shall be administratively housed in a single cell during the orientation phase (1-14 calendar days) to minimize safety security risks pending further assessment.
C.  Possessions limited to personal hygiene items (per OP 500).
D.  All initial assessments, evaluations, and treatment planning are completed during the Orientation phase – Per Title 22:12, 10-14 days.
E.  Until cleared from Orientation Phase by SVSP's ICC to program without restrictions (cuffs), a patient may be brought out in handcuffs to participate in individual or small group activities for socialization, orientation, individual sessions or evaluation.
F.  While on Orientation status an IDTT team member will see the patient daily at his cell front.
G.  If a patient has not been cleared by ICC within 15 days of admission the IDTT will notify the SVSP CCI and program management.
H.  Incentive point eligible.

**HOUSING:**  It is the mission of SVPP to utilize all housing to meet the clinical an safety needs of all patients. Due to a variety of factors each patient will be assessed for appropriate housing to insure safety and clinical goals are reached. The program offers both single cell living in Treatment Centers and C and D yards with both upper and lower tiers.  Yards vary from solo patio in TC2 and group yards in TC1 and 2. The C and D yards provide large open grass areas for group activities both free yard and structured.  The TC's offer four man and two man dorm living.  It is up to the determination of the SVSP ICC classification committee to direct housing and release a patient into dorm living.   Once the determination for 2 or 4 man housing, a patient may move into a dorm at any stage.

**STAGE 1:**   Once the patient is cleared by ICC, he is released from Orientation Phase and is promoted to Stage 1. His individualized treatment programming will be established by his IDTT with the participation of SMTA and/or SRNs. This phase transitions them into socialization and implementation of the Master Treatment Plan.   In this stage, patients are adjusting to treatment and learning the process of recovery and coping.

A.  Participate in treatment activities as identified by the IDTT and Master Treatment Plan. IDTT will identify number and types of group activities to attend.
B.  Participate in Patient Council and Community Meetings
C.  Understand and focus on their targeted problems identified in Treatment Plan as well as identified Strengths to safely participate in the initial treatment activities.
D.  Orient to group rules
E.  Integrate into the treatment community and develop socialization skills to appropriately interact with other patients and staff.
F.  Orient and teach community rules.
G.  Encourage attendance and participation in all treatment groups identified by the IDTT, understanding initially some may attend more groups than others based on their tolerance and social capability.
H.  Patio/Yard activities per IDTT.
I.   SMTA/SRN will assess each patient for safety and security risk and appropriately place on cuff status immediately following the initial ICC as necessary.
J.   Following patients returned to Stage 1 the IDTT providers will assess each patient's risk factors and ability to effectively participate in treatment as necessary.
K.  One phone call per week as staffing permits.
L.  Orientation into treatment program and individual treatment goals.  Patients will have an understanding of their working problems on treatment plan and goals/objectives.
M.  Eligible for Visitation privileges per SVSP/SVPP, all visits are non-contact.
N.  Annual Package (Dec. 1 through January 31st)
O.  Additional incentive points transferable for use in the Incentive program.
P.  2 or 4 man dorm as IDTT and ICC recommended
Q.  Loaner Appliances if living in a two or four man dorm setting.  The patient may choose either a TV or a radio/cd player
R.  Dorm Living may receive a Quarterly package; (Those with a Dorm Exemption per ICC may also receive a Quarterly Package.)
S.  Eligible for access to SVSP canteen when living in a two or four man dorm setting.

**STAGE 2:**  Patients who have successfully socialized and programmed in STAGE 1 will promote to Stage 2.  It is recommended that each patient individually be assessed for stages and promoted per their participation and ability to socialize with peers and staff.  In the event the IDTT determines that the patient is not able to maintain adaptive behavior at Stage 2, they may be returned to Stage 1 status pending IDTT recommendations.  Furthermore, if after routine business hours a patient is deemed a safety and security threat to the program and his peers,



the SMTA and/or SRN may place the patient on cuff status which will also return the patient to Stage 1.

They will have all Stage I privileges as well as:

A.   Telephone privileges – 2 phone calls per week as staffing permits.
B.   Eligible for Patient Government positions (except President and Vice-President)
C.   Basic Property – per Allowable property (see OP 500)
D.   Additional Incentive Store points
E.   Eligible for Mentor Apprenticeship Program

In order to progress to Stage 3 a patient must complete 80% of the Core Groups provided at SVPP: Anger Management, Symptom Management, Medication Management, Health and Nutrition, and TFAC.  The patient will complete these groups, demonstrate appropriate knowledge and coping skills and will receive a certificate of completion.  After completing these groups he is eligible for Stage 3.

**STAGE 3:** Patients who have successfully progressed to Stage 3 will demonstrate coping skills, be actively involved in treatment activities with good attendance and positive support to their peers, as well as preparing for discharge.  Patients at Stage 3 should be dorm or discharge ready.  Their IDT teams should be referring the patient to dorms, mentorship, or be discussing discharges.

In the event the IDTT assesses the patient is not able to maintain adaptive behavior at Stage 3, they may be returned to Stage 1 or 2 status pending IDTT recommendations.  Furthermore, if after routine business hours a patient is deemed a safety and security threat to the program and his peers, the SMTA and/or SRN may also reduce the patient to Stage to 1 or 2, pending IDTT review.

In addition to privileges gained in STAGE 2, patients will be given the following additional privileges:

A.   Eligible for any vacant position in Patient Government Including President or V-President
B.   Check out recreational supplies through Rehab and IDTT, per policy.
C.   Open access phone use – per staff availability.
D.   Additional Incentive Program points
E.   Eligible for Mentor Program
F.   Loaner appliances (as available) if living in a dorm setting or if single cell status per ICC ONLY.

**SALINAS VALLEY PSYCHIATRIC PROGRAM**

**INTERMEDIATE INPATIENT TREATMENT FACILITY**

**PROGRAM MANUAL**

**PROCEDURE:**                    6.12

**SUBJECT:**      Cuff Status  and Temporary Suspended Program
**RESPONSIBLE:** All Staff
**CROSS-**        Salinas Valley Psychiatric Program Manual Procedure 3.12- Stage Program,
**REFERENCE:**    Procedure 3.13- Incentive Program, Procedure 3.10- Interdisciplinary Treatment
                  Team
**Review/ Date**   Dant Van (OANTE K/NH), CNA) 6/28/12

## I. POLICY

It is the policy of Intermediate Treatment Program to protect and prevent injury to staff and patients. Accordingly, there may be instances where it will be necessary to place a patient on Cuff Status (CS) or Temporary Suspended Program (TSP) to ensure that safety and security are maintained.  Placement on Cuff Status or Temporary Suspended Program may be necessary for custodial reasons.  The Supervising Registered Nurse (SRN) and Senior Medical Technical Assistant (SMTA) are permanent members of the IDTT.  The SRN is responsible for the overall clinical supervision for all nursing staff on the units. The SMTA is responsible for all administrative supervision and is the first line custody supervisor on the unit. They are both responsible to ensure the program safety and security in their assigned units. It is the policy for all patients to be placed on Orientation Stage during the intake/orientation process until cleared by IDTT and ICC, during which they will be on cuff status. A patient placed on Cuff Status for behavior issues may be taken off Cuff Status any time after close of business Friday by SMTA. Cuff Status will be reviewed daily by SRN to determine if status is being appropriately used. The AED will be called by the SMTA at the end of shift with a report of cuff status initiated that shift. The Cuff Status allows for patients to have  a "cooling down" period when implemented for safety reasons.  Patients on TSP or Cuff Status may participate in treatment activities as indicated in the Individualized Treatment Plan (ITP).

## II. DEFINITION:

A.      Temporary Suspended Program (TSP) status is applied to patients who have a hold on their treatment program due to enemy concerns or patient imposed/requested. Patients on TSP are not on cuff status and therefore not cuffed during movement.

B.      Cuff Status (CS) is imposed for patients on Orientation Phase, as well as patients who engage in aggressive/threatening behavior, assaultive behavior and indecent exposure (IEX). Patients on CS will be escorted in cuffs for all out-of-cell activities.

SVPP Program Manual
Revised: 6/25/2012

III.   **PROCEDURES:**

    A.    Cuff Status-
        Categorically all patients are placed on Cuff Status (CS) during intake and orientation until cleared by ICC.  The ICC orientation process takes approximately ten (10) business days. If a patient has not been cleared in this time period the Supervising Social Worker will be contacted to follow up with the ICC process, as well as monitor and track the delays. Other categories for Cuff Status include patients that present to the unit administrators as a high risk for safety. The SRN/SMTA as administrators of the unit will evaluate the patient status and may consult with IDTT members regarding patient's clinical stability, however the SMTA can determine CS for any patient who presents as a danger to others and unstable to exit their cell without precautions.  Any patient placed on CS will have release criteria for removal of CS documented by the SMTA in the IDN section of the patient's chart. It is the responsibility of the SMTA or designee to place appropriate door sign on patient cell door. The AED will be called at the end of the shift with a report of any cuff status initiated that shift. Any removal from CS will be discussed by SRN/SMTA and IDTT to assess safety issues. Once the SRN/SMTA determine the patient has reached the release criteria for CS and can return to programming without restraints/cuffs they will alert all staff through 24 hour report and document change of status in the IDN section of the patient's chart.  In the event there is disagreement as to application or removal of CS, the Program Director (PD) or designee will resolve and determine patient status.   CS over rides any assigned stage.  A patient may not be CS and Stage 2 or 3.  Upon removal from CS, the SRN/SMTA will notify the IDTT to determine the appropriate stage level.  A patient who remains on CS for a period of 10 days will be referred to the Psychologist Supervisor for a behavior plan to address the issue. Cuff Status will be reviewed daily by SRN to determine if status is being appropriately used.

    B.    Temporary Suspended Program (TSP) can be utilized for patients who have an identified enemy concern or who request a self imposed suspension of program due to clinical reasons. TSP will be evaluated every 24 hours by SRN/SMTA in conjunction with IDTT. Property will be considered on a case by case basis. It is the responsibility of the SMTA or designee to notify staff when patient is placed on TSP and appropriate door sign is placed on patient cell door.

IV.  **CRITERIA FOR CS USE:**

    **A. <u>Orientation:</u>** Upon admission to the program, a patient will be required to be on CS until approved by the ICC for release to program.  This requirement will serve as an observation period, which will allow for the assessment and evaluation of a patient's mental health condition, behavior, and adjustment to a new environment. A

sign will be placed on the outside of the patient's cell door annotating both Orientation & CS. The patient on CS will be handcuffed and escorted by the MTA or Custody Officers for all out-of-cell activities. At the end of their orientation period he patient will be placed on recommended stage level as determined by the IDTT (refer to Stage Policy 3.12)

B. **Aggressive/Threatening Behavior:** There may be situations where a patient exhibits aggressive and/or hostile behavior. While no physically assaultive act has occurred the patient's behavior and actions (e.g. fighting stance, threats of harm, or verbally abusive) are such that it comprises the safety and security of the unit. In these situations the SMTA shall determine whether the patient will be placed on CS and document release criteria in the IDN section of the patient's chart. It is the responsibility of the SMTA or designee to notify the staff of the CS and place appropriate door sign on the outside of the patient's cell door. The patient will be handcuffed and escorted by the MTA for all out of cell activities. The AED will be called at the end of the shift with a report of any cuff status initiated that shift. The patient will remain on CS until release criteria are met. The SRN/SMTA will have the authority to remove CS once criteria are met and will inform treatment staff in 24 hour report, emails, etc. A patient may not resume program from CS for aggressive or threatening behavior at Stage 3. It is expected that within 72 hours a minimum of a mini team will review the patient's treatment program and an individual from the team will inform the patient of their program status and document this information and update the Individualized Treatment Plan (ITP). The unit administrative staff will refer to the clinical staff to review treatment recommendations and justification for continued CS. If a patient remains on CS for a period of 10 days, the patient will be referred to the Psychologist Supervisor for a behavior plan to address the issue. Cuff Status will be reviewed daily by SRN to determine if it is being appropriately used.

C. **Assaultive Behavior:** When a patient commits assault or assaultive behavior on staff or peers, the patient will immediately be placed on CS by the SMTA. It is the responsibility of the SMTA or designee to notify the staff of the CS and place appropriate door sign on the outside of the patient's cell door. The patient will remain on CS for a minimum of 72 hours for a cooling down period until determined that the patient no longer poses a threat to the safety and security of program operations. The patient will be handcuffed and escorted by the MTA for all out of cell activities. The AED will be called at the end of the shift with a report of any cuff status initiated that shift. IDTT members will assess and plan for clinical treatment and/or plan for discharge if deemed appropriate. A mini IDTT will be held for treatment planning to include the SMTA or SRN, psychiatrist and/or psychologist, as well as an RN within 72 hours. A patient may not resume program from CS for assaultive behavior at Stage 3. The unit administrative staff will refer to the clinical staff to review treatment recommendations and justification for CS. If a patient remains on CS for a period of 10 days the patient will be referred to the Psychologist Supervisor for a behavior plan to address the issue. Cuff Status will be reviewed daily by SRN to determine if it is being appropriately used.

D. **Indecent Exposure Behavior**  (openly masturbating towards others, sexually inappropriate threats, demonstrative behavior, exhibitionism, etc.) will not be tolerated.  Therefore, patients with sexually inappropriate conduct may be placed on CS with release criteria determined by SMTA.  It is the responsibility of the SMTA or designee to notify the staff of the CS and place appropriate door sign on the outside of the patient's cell door. The patient will be handcuffed and escorted by the MTA for all out-of-cell activities. The AED will be called at the end of the shift with a report of any cuff status initiated that shift. The patient may be referred to Psychology Supervisor or designee for assessment of a Planned Behavior Structured Treatment (PBST) to address the behavior. The patient will remain on CS until release criteria are met. The SRN/SMTA will have the authority to remove CS once criteria are met and will inform treatment staff in 24 hour report, emails, etc. It is expected that within 72 hours a minimum of a mini team will review the patient's treatment program and an individual from the team will inform the patient of their program status and document this information and update the ITP (Individualized Treatment Plan). Cuff Status will be reviewed daily by SRN to determine if it is being appropriately used.

## V.  CRITERIA FOR TEMPORARY SUSPENDED PROGRAM (TSP) USE:

A: **Enemy Concerns:** In the event that custody staff or a patient notifies staff of a potential enemy concern, both patients will be placed on Temporary Suspended Program (TSP) pending investigation by the SMTA.  If in the investigation, enemy concerns are substantiated then SMTA, or Sgt. on Duty, shall determine if patient is to be transferred to another unit within SVPP. Patient will remain on TSP until other appropriate placement is determined. When the investigation is completed and if  the patient has behaved appropriately throughout this process, he may re-instate to prior program stage, including Stage 3, at the discretion of his IDTT with the inclusion of the SMTA and SRN.

B: **Patient Imposed/Requested:** In the event a patient reports he does not feel stable due to medical, clinical or custody reasons, he may "self-impose" Temporary Suspended Program (TSP) upon himself.  The patient will notify a staff member of his justification, and then if agreed by the SRN/SMTA placed on TSP.  The TSP will be reviewed within 24 hours by the IDTT, not including weekends. In the event the self imposed TSP remains in effect for 24 hours or longer, the unit staff will refer to the clinical staff to review treatment recommendations and justification for isolation. A patient on self-imposed TSP must be re-assessed by his IDTT or mini IDTT the following business day, at that time IDTT will determine the patient stage level. Self- imposed TSP is limited to 24 hours and requires an IDTT determination. SMTA or designee will review patient's property on a case by case basis.

## VI.  CONSIDERATIONS FOR USE:

**A.**  <u>**Property:**</u>  Whenever a patient is placed on CS the patient will be provided only the property permitted by program policy (Stages Program 3.12).   In accordance with Program Manual procedure 3.13, any items purchased through the SVPP Incentive Program shall be confiscated. Patient property is controlled by the unit SMTA. Excess property will be removed, boxed, and stored until the patient's CS is removed by SRN/SMTA. Quantity of allowed property is permitted per OP500.

**B.**  <u>**Solo Treatment Activity/:**</u>  Solo and/or group treatment may be provided for patients unable to socialize in a group setting. The SMTA and/or SRN with input from IDTT will determine the activity appropriateness.

**C.**  <u>**Documentation:**</u>  Upon placement of CS for a patient, the SMTA must make a written entry within the Interdisciplinary Notes (IDN) of the patient's chart to include the date and time of CS placement, the reason for CS, and the intervention measures provided for the patient, the notifications made after CS placement and the release criteria for CS removal. The Psychiatrist, Psychologist, and/or Social Worker will assess clinical stability and document their assessment and recommendation regarding clinical appropriateness for treatment and socialization.

**D.**  <u>**IDTT:**</u>   It is the role of IDTT to discuss stability and make appropriate recommendations. It is the role of the SMTA as custodial administrator, in the absence of an SMTA staff will consult with the Sgt. on Duty assigned to unit, to determine custodial needs as well as contact AED. Furthermore, it is the responsibility of the IDTT to contact the Social Work Supervisor if the patient has been in Orientation Status for more than 10 business days and to contact the Psychology Supervisor if the patient has been on CS for more than 10 days for IEX behavior.

## VII.  <u>Removal from CS</u>:  It is the expectation of SVPP that any removal from CS will be a collaborative effort and discussed by SRN/SMTA and the IDTT during business days/hours to assess safety and clinical issues. The IDTT will assess clinical stability and document their assessment and recommendation regarding clinical appropriateness for treatment and socialization, as well as communicate this information to the SRN/SMTA.   Once the SRN/SMTA determine the patient is stable to return to programming without restraints/cuffs they will alert all staff on the unit through the 24 hour report and document change of status in the IDN section of the patient's chart. In the event there is disagreement as to application or removal of CS the PD or designee will resolve and determine patient status.

## ACRONYMS and ABBREVIATIONS

ASH:                        Atascadero State Hospital

ASP:                        Avenal State Prison

C-file:                     Central File

CCWF:                       Central California Women's Facility

CDCR:                       California Department of Corrections and Rehabilitation

CHCF:                       California Health Care Facility

CIW:                        California Institution for Women

CS:                         Cuff Status

CSH:                        Coalinga State Hospital

DSH:                        Department of State Hospitals

EOP:                        Enhanced Outpatient Program

EPRD:                       Earliest Possible Release Date

ICC:                        Institutional Classification Committee

IDN:                        Interdisciplinary Note

IDTT:                       Interdisciplinary Treatment Team

IEX:                        Indecent Exposure

MHCB:                       Mental Health Crisis Bed

MTA:                        Medical Technical Assistant

PaWSS:                      Patient Wellness and Recovery Model Support System

PST:                        Planned Scheduled Treatment

PSU:                    Psychiatric Services Unit

Psych Tech:             Psychiatric Technician

RN:                     Registered Nurse

SRN:                    Senior Registered Nurse

RVR:                    Rule Violation Report

SMTA:                   Senior Medical Technical Assistant

SRE:                    Suicide Risk Evaluation

SRN:                    Senior Registered Nurse

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TFAC:                   Thinking for a Change

TC:                     Treatment Center

TCMP:                   Transitional Case Management Program

UCC:                    Unit Classification Committee

UCSF:                   University of California at San Francisco

eUHR:                   Electronic Unit Health Records

VPP:                    Vacaville Psychiatric Program