DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

         Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

    Defendants.

Case No. 2:90-cv-0520 LKK DAD

**SUPPLEMENTAL DECLARATION OF PABLO STEWART IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING INPATIENT PSYCHIATRIC HOSPITALIZATION FOR CONDEMNED INMATES**

Judge:  Hon. Lawrence K. Karlton
Date:   October 1, 2013
Time:   10:15 a.m.
Crtrm.: 4

[955396-5]

I, Pablo Stewart, declare:

1. I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry. A true and correct copy of my current *curriculum vitae* is attached hereto as **Exhibit A**. My background and experience as relevant to my expert testimony in this case and this declaration are set forth in my March 14, 2013 Expert Declaration in Support of Plaintiffs' Opposition to Defendants' Motion to Terminate, Docket No. 4381 (hereinafter "3/14/13 Stewart Termination Decl."). I make this declaration in support of Plaintiffs' Motion For Enforcement of Court Orders and Affirmative Relief Regarding Inpatient Psychiatric Hospitalization For Condemned Inmates. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. In preparing to testify at the upcoming evidentiary hearing on access to inpatient hospital care for condemned prisoners, I have reviewed some additional documents that were not available at the time of my March 14, 2013 Termination Declaration, and were also not available at the time of my May 15, 2013 Reply Declaration of Pablo Stewart, M.D. In Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment, Docket 4617-1. A complete list of those additional documents and records is attached hereto as **Exhibit B**.

3. My review of these additional documents does not change my prior opinions concerning the urgent clinical need of death row prisoners for full and equal access to inpatient treatment programs, but the new records do provide additional evidentiary support and factual grounding in current and ongoing conditions to those opinions. All of the additional evidentiary materials either did not exist at the time of my May 15, 2013 Stewart Reply Declaration, or had not been made available by Defendants. For example, one of the key documents I reviewed is the suicide report for Prisoner WWW, a condemned prisoner who took his own life on April 14, 2013. That report is dated June 4, 2013, and thus was not available for me to review at the time of my May 15, 2013 Reply Declaration in the Department of State Hospitals ("DSH") enforcement briefing. *See*

[955396-5]

**Exhibit B** to the Confidential Declaration of Thomas Nolan in Support of Plaintiffs' Motion For Enforcement of Court Orders and Affirmative Relief Regarding Inpatient Psychiatric Hospitalization For Condemned Inmates (hereinafter "Confidential Nolan Decl."), filed herewith.

4.    Likewise, I reviewed updated medical records from the period of February-August 2013 for seven condemned prisoners I interviewed and evaluated at California State Prison - San Quentin ("SQ" or "San Quentin") on February 26, 2013.  Plaintiffs' counsel only received these records on September 9, 2013, and thus I could not review them until very recently.[1]  *See* Confidential Nolan Decl., Ex. A (cover letter from CDCR attaching records stamped received on September 9, 2013).

5.    I also reviewed deposition transcripts for some recent depositions, including the deposition of Ellen Bachman, the Executive Director of the Vacaville Psychiatric Program run by DSH at the California Medical Facility ("CMF") in Vacaville.  Her deposition was not taken until last Friday, September 20, 2013, and thus the transcript was not available to me until this week.  I also reviewed the transcript of the deposition of Eric Monthei, the Chief of Mental Health at San Quentin, whose deposition was taken earlier this week on Tuesday September 24, 2013, and the deposition of San Quentin Warden Kevin Chappell, which was taken earlier this week on Monday, September 23, 2013.  I also reviewed some new documents produced by Defendants in connection with those depositions.

---

[1] A portion of the medical records Plaintiffs' counsel received from Defendants on September 9, 2013 was previously cited in Defendants' May 9, 2013 filing in the Declaration of Eric Monthei in Support of Defendants' Opposition to Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment (Docket 4594), and attached to the Confidential Declaration of Debbie Vorous in Support of Defendants' Opposition to Plaintiffs Motion for Enforcement (Docket 4596).

**The Suicide of Condemned EOP Prisoner WWW at San Quentin on April 14, 2013 Illustrates the Tragic Consequences of Denying Condemned Prisoners Access to Appropriate Inpatient Care When Needed**

6.      The first new records that I reviewed in connection with my preparation for the upcoming evidentiary hearings concerned the suicide of Prisoner WWW.  I was very concerned by this suicide and by the care provided to this prisoner in the months and years leading up to it.  Prisoner WWW blinded himself by severing his optic nerve with two ball point pens inserted into the side of his eye sockets during a severe psychotic episode in 2010.  Despite the horrific and life-threatening self-injury caused by this event – one of the most severe and disturbing acts of self-mutilation I have learned about during my professional career in forensic psychiatry – and despite two serious overdoses on opiates in 2012 that may have been suicide attempts, this prisoner was never referred to the Acute Psychiatric Program at CMF or to any other program for inpatient psychiatric care.  *See* Confidential Nolan Decl., Ex. B (Suicide Report for Prisoner WWW).

7.      Prisoner WWW entered the CDCR in 2005.  *See id*. at 5.  Prior to his incarceration in the CDCR, he had two well-documented instances of suicidal ideation, one when he was in college in 1998 and a second in 2004 when he was in detention at the Contra Costa County Jail.  *See id*. at 7.  While he was in court during his capital case, he spoke out and said, "The sooner I die the better.  I want the death penalty."  *Id*.  When he entered the CDCR, he immediately began reporting multiple somatic complaints of foot, groin, and shoulder pain.  *Id*.  The Suicide Report noted that "over time, it became clear that his pathology was expressed in a fixation on somatic issues."  *Id*.  Somatic complaints are complaints of physical pain and other symptoms that have no medical explanation, and they are often, as in this case, associated with an active psychotic illness.  In 2009, Prisoner WWW reported that his groin pain was preventing him from walking.  *Id.* at 14.  At that point, a medical work up found no physical basis for the pain.  *Id*.

8.      The CDCR Suicide Report noted that between from 2005 to 2010, Prisoner WWW's psychiatric pathology was expressed by this fixation on somatic issues and his clinicians noted "intermittent grandiose and paranoid delusional beliefs as well as

intermittent auditory and visual hallucinations." *Id*. at 7. His Axis I diagnoses included Delusional Disorder, and at times, Schizophrenia. *Id*. He was prescribed Risperidone, an antipsychotic medication. *Id*. at 7-8.

9.      Prisoner WWW started refusing his antipsychotic medicine Risperidone in the summer of 2009. *Id*. at 8. At that time, he became more focused on somatic concerns, and by the fall of 2009, "he became socially withdrawn, refused to eat, and would not discuss his mental state with anyone." *Id*. Although he was made EOP at the time, it does not appear that he was given a suicide risk assessment, nor was he considered for inpatient care or even for inclusion on a high-risk list for suicide. *See id*. at 8; *see also id*. at 12-13 (listing suicide risk assessments and not including any prior to 2012).

10.     It appears that despite his severe symptoms, this prisoner went back and forth between the Correctional Clinical Case Management System ("CCCMS") level of care and the Enhanced Outpatient Program ("EOP") level of care during his CDCR tenure. *Id*. at 7 (initially placed in CCCMS program in 2005), 8 (level of care raised to EOP in October of 2009), & 11 ("After his first overdose [in 2012], his level of care was changed to EOP [from CCCMS].").  I find it remarkable and troubling that this prisoner's level of care was lowered to CCCMS at any point in the years following his extreme act of self-mutilation in 2010.

11.     In January 2010, Prisoner WWW started to give away his possessions to correctional officers, who called mental health. *Id*. at 8. Giving away one's possessions is generally a "red flag" in terms of suicide risk, and correctional officers in the condemned unit correctly acted to inform mental health staff quickly. The CDCR's Suicide Report recounts that:

> On January 19, 2010, Prisoner WWW began giving away his possessions to custody staff, who notified his mental health clinician. An immediate appointment was scheduled with his mental health clinician but the inmate refused to attend. A cell-front visit was completed and the inmate "strongly and emphatically denied all thoughts of suicide and self harm." The inmate implied that he no longer wanted the possessions and requested the clinician ducat him for group. Since the inmate had been refusing to attend group the clinician took this

[955396-5]

1    a positive sign [sic].

2  *Id.* Two days later, Prisoner WWW stuck a pen into the side of each of his eye sockets,

3  severing the optic nerve for each eye, thereby blinding himself in both eyes. *Id.*

4    12.    Following this horrific injury, Prisoner WWW was transported

5    to Marin General Hospital where the pens were removed. Notes from the
     neurosurgeon indicated "this was a devastating life-threatening injury."

6    Inmate [WWW] had not punctured either globe but the pens had penetrated
     bilaterally directly into the midbrain and cerebellum. . . . While at Marin

7    General Hospital, the inmate displayed flight of ideas and incoherent speech.

8  *Id.*

9    13.    Prisoner WWW was returned to San Quentin and admitted to the MHCB on

10 February 2, 2010. *Id.* The CDCR Suicide Report includes this lengthy quote from the

11 treating psychiatrist in the MHCB that underscores the severity of Prisoner WWW's

12 mental illness at that point in time:

13    He exhibits loosening of association, derailment, tangentiality,
      circumstantiality and blocking. He describes bizarre delusions

14    of aliens interacting with him & his being made chief prophet
      of a church along with somatic delusions of his eyes, now

15    blinded by his own hand, having helped a long-standing
      complaint of rib discomfort improve. He shows no emotion as

16    he describes his near-lethal act of self-impalement[.] He
      denies homicidality or suicidality but he has nearly killed

17    himself and is on death row for killing five individuals with his
      brother in 2000 …. He has no insight whatsoever and

18    demonstrates severely impaired judgment and impulse control.
      He lacks understanding of his brain illness and he has no

19    appreciation of its need for treatment. His emotional
      disconnect between describing how he sought help for his ribs

20    by blinding himself is stunning to observe.

21 *Id.* at 8-9. While Prisoner WWW was in the MHCB, the psychiatrists noted how deeply

22 psychotic he was, and they made the connection that by blinding himself, he now claimed

23 that his somatic complaints of rib pain were cured. *Id.* at 8. CDCR clinical staff in the

24 MHCB diagnosed him with chronic paranoid schizophrenia with somatic delusions. *Id.* at

25 9. Prisoner WWW agreed to take Risperidone, but the MHCB clinicians apparently were

26 prepared to submit a *Keyhea* petition for involuntary medication if he refused. *Id.* After a

27 short two-day stay in the MHCB unit at San Quentin, Prisoner WWW was discharged to

28 the Outpatient Housing Unit ("OHU") – the unlicensed portion of the Central Health

Services Building at San Quentin – for ongoing medical treatment.  *See* Confidential Nolan Decl., Ex. C. at Prisoner-WWW_000107 (2/4/10 Physician's Order).  When discharged from the MHCB, he was made EOP level of care.  *Id*.

14.    It is incredible to me that after this patient stuck two pens into his mid-brain, he was only kept in the MHCB for two days.

15.    Shortly thereafter, he was transferred to the hospital at Corcoran State Prison for medical care and rehabilitation.  *See* Confidential Nolan Decl., Ex. B at 9  However, Prisoner WWW was never transferred to the acute inpatient psychiatric program or to an ICF inpatient psychiatric program for treatment of his diagnosed serious and dangerous mental illness.  *Id*.

16.    Despite his claim of having cured his pain by blinding himself, by mid-2011 this prisoner began to re-experience somatic hip and groin pain.  *Id*.  In early to mid-2012, his somatic complaints became even more severe.  *Id*.  On January 25, 2012, he was taken to the prison clinic area for emergency care (called the "TTA" or "treatment and triage area" in CDCR infirmaries) complaining that "'ghosts or spirits of the unborn'" were controlling his body.  *Id*.  In the progress note for that visit, the psychiatrist explained that:

> Three weeks ago [he] began hearing [auditory hallucinations] . . .
> Three weeks ago [he] began limiting [food and water] intake.  Six
> days ago [he] stopped eating solid food.  [Three days] ago stopped
> drinking fluids.  [His r]ationale for [food and water] intake limitations
> is 'I wanted to show the spirits I can exercise will power.'  In response
> to psychotic [symptoms], [he] reports onset of anxiety, depressed
> mood, anergia, insomnia, feelings of being overwhelmed, and some
> hopelessness.

*See* Confidential Nolan Decl., Ex. C at Prisoner-WWW_000093 (1/25/12 Treatment and Triage (TTA) Psychiatry Progress Note).

17.    I strongly disagree with the decisions not to admit this individual to the MHCB unit and immediately place him on involuntary medications at this time.  Those decisions are especially problematic given his acute psychotic illness at this time, as well as the clinical need to understand and stabilize the underlying psychiatric condition which drove this individual's somatic delusions – delusions which previously had caused him to

[955396-5]

7

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

1    maim himself.  Although he was not admitted to the MHCB, he was given five-day follow

2    up care.  *Id.*  A little more than a month later, in March of 2012, he stopped taking his

3    antipsychotic medication Zyprexa, and his psychiatrist explained in a March 22, 2012

4    progress note that Prisoner WWW's "recent decision to refuse Zyprexa is concerning

5    given [the] high risk of [symptom] recurrence in the absence of [the] antipsychotic.

6    However, he does not meet [*Keyhea* criteria for involuntary medication] and has [the] right

7    to refuse at this time."  Confidential Nolan Decl., Ex. C at Prisoner-WWW_000085

8    (3/22/12 Psychiatry Progress Note).

9         18.    I also disagree with this psychiatrist's initial conclusion that this individual

10   did not qualify for involuntary medication as a danger to himself, given the severity of his

11   self-mutilation in 2010, which was caused by his untreated psychotic disorder.  Moreover,

12   while this prisoner minimized his somatic complaints to the psychiatrist in their meeting

13   on March 22, 2012, six days earlier his case manager reported that "[h]e continues to be

14   preoccupied with issues pertaining to physical pain," suggesting that in fact his somatic

15   delusions were still severe and were still a preoccupation, and hence were a serious risk

16   factor for future self-harm.  *Id*. at Prisoner-WWW_000087 (3/16/12 Case Manager

17   Progress Note).

18        19.    Following his decision to stop taking his antipsychotic medication, Prisoner

19   WWW's somatic complaints quickly worsened.  In a note on March 30, 2012, eight days

20   after his medications were discontinued, his case manager reported that Prisoner WWW

21   was "anxious and tense" about somatic medical complaints and that he had begun to

22   experience "fleeting visual hallucinations of a Ghost."  *Id*. at Prisoner-WWW_000084

23   (3/30/12 Case Manager Progress Note).  The same clinical note recounts that Prisoner

24   WWW "remains isolated in his cell, not attending yard because he feels he may develop an

25   injury if he walks at all."  *Id*.  In my opinion, even assuming for the sake of argument that

26   this individual did not meet the *Keyhea* standard of "danger to himself" when he initially

27   refused his medications in mid-March, he met that standard by March 30, 2012.

28

[955396-5]

8

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

20.    Not surprisingly, Prisoner WWW's somatic delusions began to increase further in the spring and summer of 2012, which should have raised concerns among staff that he was deteriorating psychiatrically.  In addition to his increased somatic delusions, he had additional psychotic symptoms involving "'paranormal entities'" directing his actions, as well as auditory and visual hallucinations.  Confidential Nolan Decl., Ex. B at 9.  Despite this increase in the severity of his psychotic symptoms, I saw no indication in his suicide review or his medical records that he was placed into the Specialized Care Program, or referred to an MHCB or the acute inpatient program run by DSH at CMF.  Indeed, Psychiatry Progress Notes from June 5, 2012 and July 18, 2012 both indicate that his level of care was CCCMS and this is confirmed in the Suicide Report.  *See* Confidential Nolan Decl., Ex. C at Prisoner-WWW_000082 & Prisoner-WWW_000080 (6/05/12 and 7/18/12 Psychiatry Progress Notes); Confidential Nolan Decl., Ex. B at 12 (noting that Prisoner WWW was at the CCCMS level of care between January 13, 2011 and August 7, 2012).  Given the high level of psychiatric dysfunction during this period, this prisoner should have been referred to an inpatient psychiatric treatment setting, such as ICF, if such an option were available for patients on death row, or the Acute Psychiatric Program ("APP") run by DSH at CMF.

21.    On July 5, 2012, Prisoner WWW was noted to be "irritable and angry" and "[h]ighly anxious."  *See* Confidential Nolan Decl., Ex. C at Prisoner-WWW_000081 (7/5/12 Case Manager Progress Note).  On July 23, 2012, it was noted that "somatic preoccupation/delusions have recurred and have resulted in anxiety/insomnia/isolation."  *Id*. at Prisoner-WWW_000079 (7/23/12 Psychiatry Progress Note).  Despite these indications for a higher level of care, he was still maintained at the CCCMS level of care and no suicide risk assessment was completed.

22.    In the late summer and early fall of 2012, this general decline in his mental health functioning led to two additional self-injurious actions that likely reflected some degree of suicidality and certainly reflected a high level of psychopathology.  *See* Confidential Nolan Decl., Ex. B at 10.  First, on August 4, 2012, he was taken to Marin

[955396-5]

9

General Hospital for a Methadone overdose.  *Id*.  When he returned from Marin General Hospital on August 5, 2012 to the CTC, he remained preoccupied with somatic complaints of foot pain.  *Id*.  In spite of having committed one of the most horrendous self-inflicted injuries that I have seen in my career, in the days immediately following his return from an outside hospital after he overdosed on opiates, two different San Quentin clinicians completed suicide risk assessments that each indicated that Prisoner WWW had moderate or low chronic risk, and low acute risk of, suicide.  *See* Confidential Nolan Decl., Ex. C at Prisoner-WWW_000075 - Prisoner-WWW_000076 (Suicide Risk Assessment Dated 8/6/12 (Burton)) & Prisoner-WWW_000073 - Prisoner-WWW_000074 (Suicide Risk Assessment Dated 8/7/12 (Murthy)).  Indeed, most of the suicide risk assessments for this individual concluded that he had a low chronic risk and low acute risk, which I find very troubling given the link between his delusional thinking and his risk for self-harm.  *See* Confidential Nolan Decl., Ex. B at 12-13.  His level of care was increased to EOP, however, on August 7, 2012.  *Id*. at 12.

23.     Next, on September 20, 2012, Prisoner WWW reported seeing "amorphous 'shapes' caused by 'paranormal entities' in his cell and complained of increased foot pain." *Id*. at 10.  In addition, clinical progress notes for both September 18th and 20th noted his somatic delusions continued to pre-occupy him.  *See* Confidential Nolan Decl., Ex. C at Prisoner-WWW_000070 & Prisoner-WWW_000069 (9/18/12 and 9/20/12 Progress Notes).  On September 25, 2012, he was found unresponsive, having overdosed on heroin and morphine, and was sent to Marin General Hospital.  Confidential Nolan Decl., Ex. B (Suicide Report) at 10.  Subsequently, he was admitted to the Mental Health Crisis Bed unit at San Quentin.  *Id*.  He initially told the psychologist in the MHCB that he attempted to kill himself.  *Id*.  However, he then retracted the statement somewhat, saying "'I'm over that, I am not suicidal anymore.'"  *Id*.  Then he retracted the statement further saying he was just trying to get attention for his medical problems.  *Id*.

24.     Next, rather than referring him to the APP acute unit or to another inpatient program for psychiatric stabilization, his clinicians held a case conference where they

[955396-5]

10

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

"focused on developing a collaborative approach among providers to validate the inmate's experience of pain." *Id*. According to the Suicide Report, "the team believed he would deteriorate if transferred [to APP] since stress had been identified as one of the triggers of his psychotic symptoms." *Id*. at 11. He clinicians discharged Prisoner WWW back to his cell on October 4, 2012 without seeking a transfer to either APP or intermediate inpatient care. *See* Confidential Nolan Dec., Ex. C at Prisoner-WWW_000048 - Prisoner-WWW_000050 (10/4/12 Mental Health Treatment Plan). Also, it appears that his clinicians made this decision without evaluating Prisoner WWW's suitability for the Specialized Care Program, *id*., which at that point in time did not include a designated treatment unit in the OHU, but instead existed as a program for enhanced EOP services on East Block. At a minimum, he should have been retained in the MHCB.

25.    On that same day, Prisoner WWW signed a "Treatment Plan Contract" wherein he agreed to the following: "1. I will attend weekly therapy sessions with Dr. Murthy for a minimum of 15 minutes. 2. I will take my prescribed psychiatric medications. 3. I will not take medications that I am not prescribed or illicit drugs. 4. I will not overdose on any substance. 5. I will not hurt myself in any way. 6. I will take 20 DBT [Dialectical Behavioral Therapy] group sessions with Dr. Parecki. 7. I will attend the Monday and Friday therapeutic yards each week. If I cannot attend a therapeutic yard, I will attend a group instead." *See id*. at Prisoner-WWW_000061 (10/4/12 Mental Health Treatment Contract). These treatment components fall far short of the mandated EOP treatment level of 10 hours a week of structured therapeutic activities.

26.    Thus, following a serious opiate overdose that this individual initially admitted was a suicide attempt, Prisoner WWW's treatment team agreed to release him from the MHCB back to East Block because he agreed to a treatment regime that falls well short of basic EOP requirements. Moreover, the treatment components in the contract themselves fail to sufficiently address his severe psychopathology. In addition, although progress notes following his second overdose indicate that he was placed on the high-risk list for suicide, his subsequent treatment plans *do not* note this fact and list his suicide risk

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

[955396-5]

as "low." *Compare id*. at Prisoner-WWW_000034 (11/10/12 Psychiatry Progress Note (one of numerous progress notes by his case manager noting "[inmate-patient] on high-risk list for suicide")), *with id*. at Prisoner-WWW_000043 - Prisoner-WWW_000046, *and id*. at Prisoner-WWW_000027 - Prisoner-WWW_000029 (10/9/12 and 11/13/12 Treatment Plans (both listing his suicide risk as "low").

27.    Prisoner WWW's treating clinician's subsequent progress note dated November 28, 2012 fails to note that he is on the high-risk list, states that Prisoner WWW "resists talking about issues that he considers relating to mental health," and notes that he and Prisoner WWW have been working on "asanas" – yoga exercises – to strengthen his balance. *See id*. at Prisoner-WWW_000025 (11/28/12 Progress Note).  In a December 6, 2012 treatment note, his primary clinician noted that Prisoner WWW "continues to refuse the visits [with his family and girlfriend] because he is afraid that he may develop sores on his bottom if he sits down for a lengthy visit, though he is not experiencing any soreness in his bottom at this time." *Id*. at Prisoner-WWW_000024 (12/6/12 Progress Note).

28.    Prisoner WWW appeared to improve somewhat in December 2012, but continued to refuse to attend mental health groups, in violation of his "contract" with his treatment team, and denied that he had a mental disorder. *See id*. at Prisoner-WWW_000022 (12/13/12 Progress Note) & Prisoner-WWW_000024 (12/6/12 Progress Note) .  Moreover, in early 2013, he began expressing severe despair to his primary clinician, even though he also reported a reduction in his somatic symptoms.  On January 18, 2013, he told his primary clinician "*I'm always the same.  I feel terrible.  I'm not in any [physical] pain.  I'm in emotional pain.  Why does it matter to talk about it?*"  *Id*. at Prisoner-WWW_000020 (1/18/13 Progress Note (emphasis added)).  On January 25, he told his case manager "What's the point.  I'm blind in prison," and reported his mood to be terrible.  *Id*. at Prisoner-WWW_000019 (1/25/13 Progress Note).  On February 1, 2013, he told his case manager, "I am doing the same.  I feel terrible every day."  *Id*. at Prisoner-WWW_000018 (2/1/13 Progress Note).

29.    On March 1, 2013, he was noted to be angry during a clinician's visit.  *Id*. at Prisoner-WWW_000008 (3/1/13 Progress Note).  He told the therapist, "Life is always terrible.  Why do you ask me how I feel?  I'm always terrible.  It never changes.  I want you to stop asking me that."  *Id*.  For some reason, none of these expressions of despair are mentioned in the CDCR Suicide Report for this case.

30.    During this entire period, Prisoner WWW's clinical progress notes all include the note "[inmate-patient] on High-risk list for suicide.  Interventions to mitigate self-harm risk include frequent contact, individual [appointments], group therapy/MH yard, and med [management]."  *See, e.g., id*. at Prisoner-WWW_000038 (10/17/12 Psychiatry Progress Note) & Prisoner-WWW_000009 (2/26/13 Psychiatry Progress Note).  However, by this point, it should have been apparent to his clinicans that those interventions were inadequate.  Moreover, he was not even following the contract at this time.  *See id*. at Prisoner-WWW_000020 (1/18/13 Progress Note (not attending therapy groups "due to his belief that therapy groups are unnecessary and unhelpful")) & Prisoner-WWW_000024 (12/6/12 Progress Note (refusing group therapy)).  As noted above, the use of a contract of this type with an individual who possesses such severe psychopathologies is itself questionable, particularly as it does not sufficiently address his underlying psychotic disorder, severe risk of self-harm, and persistent somatic preoccupations.

31.    Prisoner WWW continued to have somatic preoccupations until he took his life on April 14, 2013.  A number of aspects of this case raise concerns about the quality of the mental health care Prisoner WWW received, and about the failure to send this individual to a higher level of care.  Under Program Guide standards, he should have been referred to acute inpatient psychiatric hospitalization and/or to ICF psychiatric hospitalization, and he probably would have been had Prisoner WWW not been on death row at San Quentin.  In addition, there was a failure to increase his level of care sufficiently using the resources available to the mental health program inside San Quentin.  First, this was a person with a documented serious psychotic illness, whose symptoms included prominent somatic delusions, auditory/visual hallucinations, and other delusional

[955396-5]

13

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

1    thought content such as being controlled by "paranormal entities." He had received anti-

2    psychotic medications for these symptoms over an extended period of time. Although he

3    went off the medications at various times, at no time did I see evidence in his records that

4    he was referred for involuntary psychiatric medication – a *Keyhea* order. <u>Second</u>, there is

5    also no indication that he was ever referred for acute inpatient care in the APP program at

6    DSH Vacaville. I cannot understand why this prisoner was not referred for inpatient

7    treatment after blinding himself. Moreover, after two subsequent overdoses, the institution

8    still persisted in not referring him to inpatient care. Indeed, rather than sending him to

9    inpatient care, his clinicians appear to have used the threat of transfer to the Vacaville

10   acute program to motivate better treatment compliance. *See id*. at Prisoner-

11   WWW_000060 (10/1/12 Suicide Risk Assessment, noting "[Inmate-Patient] does not want

12   to go to DSH but understands that his risky behaviors lend to a possible, future referral").

13   The fact that such a transfer might have been "stressful" for this patient should not have

14   been a relevant consideration given the grave risk of self-harm here.

15        32.    <u>Third</u>, I was also concerned that although his discharge summary from the

16   Mental Health Crisis Bed Unit following his second overdose noted that "he will be

17   discharged back to East Block and agree to the treatment planning of his specialized

18   treatment team," there is no mention of the specialized care team in subsequent progress

19   notes and treatment plans. <u>Fourth</u>, there is no indication of any meaningful enhancements

20   in his treatment in response to this second overdose in 2012 – he clearly was not even

21   receiving the minimums required for EOP treatment under the Program Guides. This

22   individual's treatment plan following the September 2012 overdose was to attend three

23   groups a week (two of them yard groups) and one weekly 1:1 therapy session for 15

24   minutes, a level of treatment intensity far below even the minimum EOP level of required

25   treatment. *See id*. at Prisoner-WWW_000061 (10/4/12 Treatment Contract for attendance

26   at either two yard groups or one therapeutic group per week, plus one 15 minute individual

27   contact). Moreover, once the designated Specialized Condemned Care Program beds in

28

[955396-5]

14

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

1  the OHU opened in January of this year, there is no indication Prisoner WWW was even

2  considered for placement there.

3      33.    Finally, I was disturbed that the Suicide Review for this prisoner's death did

4  not include any recommendations.  In my opinion, the failures of care in this case are

5  significant and should have been the subject of remedial efforts, including additional

6  training in the following areas: (1) suicide prevention and suicide risk assessments, (2)

7  referrals to more intensive levels of care, and (3) the appropriate use of *Keyhea* involuntary

8  medication procedures and, when necessary, *Vitek* involuntary hospitalization procedures.

9  These clinical skills are vital in cases like this one, where there is a high risk of self-harm.

10  This case may also illustrate a need for the CDCR to broaden the scope of its suicide risk

11  assessment procedures to encompass cases of life-threatening self-harm that may not be

12  ostensibly motivated entirely by a desire to end one's life.

13      34.    The facts of this case are not subtle.  Any reasonable clinician would have

14  recognized this patient's need for more intensive psychiatric care.  These terrible failures

15  demonstrate a troublingly high tolerance for psychiatric dysfunction among condemned

16  prisoners by mental health staff at San Quentin, a failure that is reflected in the hesitancy

17  to take appropriate action to move this individual to a higher level of care, or even to

18  ensure that he was receiving the basic requirements of EOP level of care.  In my opinion,

19  this patient's death would likely have been prevented if he had been provided with

20  appropriate access to higher levels of care and more intensive treatment for his mental

21  health conditions.  This case confirms my serious concerns about mental health care at San

22  Quentin, as expressed in my earlier Declaration.

23      35.    San Quentin prisoners and death row prisoners in particular have suffered

24  from high rates of suicide in recent years.  *See* Stewart Termination Decl. at ¶¶ 169-282

25  (section on problems with suicide prevention in the CDCR in general), ¶ 253 (discussing

26  inadequate staggering of safety checks in administrative segregation at SQ), ¶ 272 (citing

27  e-mail from San Quentin staff indicating that only half of the required staff had been

28  trained under the new suicide risk assessment mentor program as of February 4, 2013).  In

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

preparing this report, in addition to reviewing the suicide report for Prisoner WWW, I reviewed suicide reports for the next three most recent death row suicides from San Quentin.  (Although I did not discuss these earlier suicides, they were provided to me in connection with the February 2012 tour of San Quentin and are listed in Exhibit B to my March 15, 2013 Termination Declaration.)  *See* Stewart Termination Decl. ¶ 27 & Ex. B. These documents make clear that four prisoners on death row at San Quentin have committed suicide in the last 22 months, an alarming rate given that there are only approximately 700 condemned prisoners currently at San Quentin.  Using a population figure of 700, this translates into a suicide rate of *285 per 100,000* prisoners for death row inmates at San Quentin over the last two years.  While there is some natural fluctuation in suicide rates and this is a relatively narrow time period, this rate is a cause for concern calling for heightened suicide prevention efforts among the condemned, particularly given that the national suicide rate per 100,000 state prisoners in recent years has been steady at approximately 16 per 100,000.  *See* Patterson Report on Suicides Completed in the CDCR January 1, 2012 - June 30, 2012 (Docket 4376), filed 3/13/13, at 2 (reporting United States prison suicide rate of 16 per 100,000), 46 (chart: "Suicides in CDCR Institutions By Facility, 1999-2012," showing San Quentin has the fourth highest rate of suicides of the 33 institutions listed, with 24 suicides in this period), & 63 (chart showing that San Quentin experienced 19 suicides between 2005 and 2012 alone).  Thus, the suicide rate for condemned prisoners at San Quentin over the last two years is over *17 times greater* than the national rate for state prisoners.

**My Review of the New Program Description for the Specialized Care Program for the Condemned Produced by Defendants This Week**

36.     I have also reviewed a new program description for the Specialized Care for the Condemned Program (sometimes called the SCCP, and sometimes simply referred to as the "specialized care beds located in the OHU").  That new program description was produced earlier this week by Defendants in connection with the deposition of Eric Monthei, the Chief of Mental Health at San Quentin.  A true and correct copy of the new

[955396-5]

1  program description is attached hereto as **Exhibit C**.  In reviewing this program

2  description, I was impressed that it is an improvement in some respects over the current

3  EOP treatment program in East Block for the condemned.  For example, prisoners in the

4  program are able to eat meals together and have "dayroom" recreation time together in a

5  common indoor area.  Neither of these opportunities is afforded to condemned prisoners on

6  East Block or the Adjustment Center, who are cell-fed and who have no dayroom.

7  However, I was also struck by the fact that in most respects this program closely resembles

8  a standard EOP program, except for its location in a new health care facility and some

9  augmented staff.  For example, the goal of the new program is clearly only 10 hours a

10  week of out of cell therapeutic activity.  *See* Monthei Opposition Decl. ¶ 23 ("The goal for

11  each inmate in a designated specialized care bed is to engage in a minimum of 10 hours of

12  out of cell activity.").

13          37.      In preparing this supplemental report, I also reviewed the deposition of Dr.

14  Monthei, which took place on September 24, 2013.  A true and correct copy of excerpts

15  from Dr. Monthei's deposition is attached hereto as **Exhibit D**.  In his deposition, Dr.

16  Monthei reaffirmed that the treatment provided in this program is EOP level of care.  *See*

17  Ex. D. (Monthei Dep.) at 24:2-6, 48:16-49:3 ("Q:  Is there a required number of treatment

18  hours per week for prisoners in the Specialized Treatment Program in the OHU?  A: The

19  requirement would be not to fall below EOP standards, considering that it is an EOP

20  program.  There's an aspirational goal to provide enhanced services…").  The Program

21  Guide requires that EOP programs provide each prisoner with "10 hours of structured

22  therapeutic activity" activity per week.  A true and correct copy of Chapter 4, Section 12-

23  4-8 of the Program Guide, which describes this 10 hour requirement, is attached hereto as

24  **Exhibit E**.

25          38.      In his deposition, Dr. Monthei was asked whether he agreed with a passage

26  in a memorandum that he wrote, which described the Specialized Care Program that was

27  then in development as raising "a core legal argument that condemned inmates are refused

28  equal treatment due to their legal status."  Ex. D at 220:12-221:13.  The same section of

1   the memorandum asserted that "separate but equal was insufficient as a response to civil

2   rights-related segregated schools and it is likely to fall flat as well in this case." *Id*.  Dr.

3   Monthei responded by stating that he didn't think the specialized care program is separate

4   but equal to ICF programs, stating "I don't think that, but I don't think because I don't

5   have a thorough understanding of the ICF to know what the comparison is." *Id*; *see also*

6   *id*. at 224:3-15 ("Q:  How come you haven't visited one of the DSH-ICF programs just to

7   see what it's like?  A:  I haven't felt that there was a need to do so.").

8                    **Problems with the Condemned EOP Program at San Quentin**

9          39.    The fact that the Specialized Care for the Condemned Program closely

10  resembles a mainline EOP program serves to underscore the degree to which the current

11  EOP program in East Block has serious deficiencies.  One of the biggest differences

12  between the EOP program on East Block and the typical EOP program state-wide is the

13  fact that the EOP program for the condemned on East Block is not a sheltered program.  In

14  all other mainline EOP units in the CDCR, EOP prisoners are housed in a sheltered

15  housing unit in order to maximize their opportunities for therapeutic engagement, and in

16  order to permit them to socialize and program with other EOP inmates where there is less

17  chance they will be victimized by other prisoners.  In these programs, EOP prisoners eat

18  with other EOP prisoners and only with other EOP prisoners; they go to yard with EOP

19  prisoners and only with other EOP prisoners; and they have dayroom with other EOP

20  prisoners and only with other EOP prisoners.  This kind of "sheltering" of EOP programs

21  is vital because it allows reclusive and/or vulnerable individuals with severe mental illness

22  to socialize and participate in group activities that they would avoid in a setting where

23  more non-mentally ill prisoners are present.

24  **Severe and Unwarranted Restrictions on Acute Inpatient Program Participation at**
    **DSH Vacaville for the Condemned**

25

26         40.    In preparing this supplemental report, I also reviewed the Deposition of Ellen

27  Bachman, which took place on Friday, September 20, 2013.  True and correct copies of

28  excerpts from the deposition of Ms. Bachman are attached hereto as **Exhibit F**.  Ms.

1   Bachman is the Executive Director of the Vacaville Psychiatric Program, which includes

2   APP, an acute inpatient mental health program.  Ms. Bachman testified regarding the

3   extremely restrictive blanket policies that apply to all condemned prisoners receiving

4   treatment in the acute program at CMF.  A true and correct copy of the relevant policy on

5   security measures for condemned prisoners in the APP program is attached hereto as

6   **Exhibit G**.  The policy prohibits condemned prisoners from "com[ing] in[to] direct contact

7   any other patient" for the duration of their time in the program.  Ex. G at 1.  Condemned

8   prisoners in APP are required to be kept physically separated from other patients by a

9   locked door or gate at all times.  *Id.*  Anytime a condemned prisoner is out of his cell, he

10  must be in both waist restraints and leg irons at all times and escorted by two correctional

11  officers (or a correctional officer and an medical technician assistant), regardless of the

12  location.  *Id.* at 1-2.  All of the other prisoners in the acute unit are kept in their cells or

13  behind a locked gate for the duration of the time any condemned prisoner is out of his cell.

14  *Id.* at 1.  Accordingly, condemned prisoners can never participate in any form of group

15  activity while in APP, including group therapy, dayroom, or yard.  *Id.*; Ex. F at 111:9-21.

16  Even when there is more than one condemned patient in APP at the same time, DSH's

17  policy prohibits them from programming together.  *Id.* at 80:7-21, 83:15-84:11.  The

18  policy allows no exceptions for a condemned patient's individual circumstances, and no

19  other group of prisoners is subjected to any similar restrictions.  *Id.* at 153:21-155:2.

20      41.    In fact, the goal of the APP program is for patients to progress in their

21  treatment to programming with other patients in the dayroom and going to open yard

22  together.  *Id.* at 109:21-25; *see also id.* at 95:11-97:4, 97:16-98:5.  The program has five

23  stages, which non-condemned patients move through when their treatment team

24  determines, based on an individualized assessment, that they are ready:  When patients

25  first arrive, they receive only individual treatment while cuffed.  This initial stage is the

26  only time non-condemned prisoners are cuffed.  When ready, non-condemned patients

27  move to stage two, which is individual treatment without cuffs.  Patients in stage three

28  receive treatment in small groups, and eventually move to large groups in stage four.  By

SUPP. DECL. OF P. STEWART ISO PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE INPATIENT PSYCH. HOSPITALIZATION FOR CONDEMNED INMATES

[955396-5]

1    stage five, non-condemned patients go in groups to the acute unit's open yard.  *See*

2    *generally id.* at 95:11-97:4, 97:16-98:5.

3        42.    Ms. Bachman testified that the goal of the APP program is for patients to

4    progress through all five stages, and that, as a rule, patients in the acute program benefit

5    from group treatment.  *Id.* at 108:25-109:6, 109:21-25.  Nonetheless, condemned prisoners

6    can never progress beyond step one of the APP program, because they can never interact

7    with another patient or be un-cuffed while out of their cells.  They receive none of the

8    benefits of group therapy, and they have no behavioral incentive program whatsoever

9    while in APP.  *Id.* at 110:24-111:21.  In fact, condemned prisoners spend the bulk of their

10   day locked in their cell while other patients program in the dayroom or on the yard.  *Id.* at

11   112:21-115:7.  Even when they do receive individual treatment, condemned patients do not

12   necessarily leave their cell—some treatment is provided cell front rather than in the

13   dayroom, and the only other treatment they receive is in the form of materials they work

14   on by themselves in their cells.  *Id.* at 111:22-112:20.

15       43.    Keeping condemned patients isolated and locked in their cells in this manner

16   during their stays in the acute inpatient mental health treatment programs is clinically

17   contraindicated.  These restrictions prevent condemned prisoners from receiving many of

18   the benefits associated with inpatient hospital programs.  Such programs provide several

19   useful resources for dealing with extremely mentally ill individuals, including expertise in

20   mental health crises, rich clinical staffing, rich nursing staffing for close surveillance and

21   to keep such individuals safe, and various groups and programs designed to increase

22   patients' socialization by encouraging interaction with other patients and staff in various

23   contexts.  It is well known that prolonged isolation causes mentally ill individuals to

24   decompensate.  I would never expect inpatient psychiatric treatment programs to isolate

25   their patients in this manner in the middle of an acute mental health crisis.  Dr. Monthei

26   confirmed these problems in his deposition, noting that his patients viewed their placement

27   in the APP as a punishment and explaining that patient anger at being sent to this

28   restrictive, locked-down program severely disrupted the patients' therapeutic alliance with

1    their clinicians when they returned to San Quentin. *See* Ex. D at 194:22-195:21 & 195:1-5

2    (testifying that patients told their clinicians upon return from APP, "I'm done dealing with

3    you. Last time I dealt with you, you sent me there.").

4

5    **My Review of Additional Medical Records for the Seven Condemned Prisoners**
     **Whom I Evaluated in February of 2013 at San Quentin**

6

7        44.    I have also reviewed the last six months' worth of mental health treatment

8    records for six of the seven condemned individuals I interviewed and assessed at San

9    Quentin on February 26, 2013. My review of these records reinforced my earlier concerns

10   about mental health care at San Quentin and about the Specialized Care Program in

11   particular, and did not significantly change my views concerning these cases as expressed

12   in my earlier Declarations.

13       45.    Namely, it remains my opinion after review of the additional records that all

14   of these individuals require some form of inpatient hospital treatment, that each of these

15   individuals is severely and chronically mentally ill, and that most of them have severe

16   psychotic symptoms and significant functional impairment. To the extent that any of these

17   individuals may have shown limited improvement once removed from the harsh conditions

18   in East Block, that improvement does not negate their need for inpatient treatment.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

[955396-5]

21

1    I declare under penalty of perjury under the laws of the United States and the State

2  of California that the foregoing is true and correct, and that this declaration is executed at

3  San Francisco, California this 27th day of September, 2013.

4

5                                             _____

6                                             Pablo Stewart

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A TO THE SUPPLEMENTAL DECLARATION OF PABLO STEWART IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING INPATIENT PSYCHIATRIC HOSPITALIZATION FOR CONDEMNED INMATES**

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated  January 2013)**

<u>EDUCATION:</u>

University of California School of Medicine, San Francisco, California, M.D., 1982

United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>

California Medical License #GO50899
Hawai'i Medical License #MD11784
Federal Drug Enforcement Agency #BS0546981
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

September 2006-
Present

<u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

July 1995 -
August 2006

<u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1989 -
June 1995

<u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1986 -
July 1989

<u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

<u>EMPLOYMENT:</u>

December 1996-
Present

<u>Psychiatric Consultant</u>
Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation.

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California</u> <u>San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.   Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 - August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

<u>COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK</u>:

| | |
|---|---|
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM.  The Litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Plata v. Brown,* ___ U.S. ___, 131 S. Ct. 1910, at 1933, n.6, and at 1935, 179 L. Ed. 2d 969, at 992, n. 6, and at 994 (2011). |
| July/August 2008 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006- December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004- September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003- June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003- December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).   This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002- August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998- June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.   This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998- February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, |

critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged.

July 1998-
July 2001

Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA).

March 1997-
Present

Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services.

January 1996-
June 2003

Psychiatric Consultant to the San Francisco Drug Court.

November 1993-
June 2001

Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego.

December 1992 -
December 1994

Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines.

June 1991-
February 2006

Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic.

December 1990 -
June 1991

Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic.

October 1996-
July 1997

Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison.

April 1990 -
January 2000

Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian. Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville).

January 1984 -
December 1990

Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients.

July -
December 1981

Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups.

<u>SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:</u>

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the<br>Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary<br>School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance<br>Abuse issues to the student body, Hidden Valley Elementary<br>School and Santa Rosa Jr. High School, Santa Rosa, CA. |

<u>PRESENTATIONS:</u>

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.   Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.   Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.   Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.   "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.   Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.   "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.   9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.   Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.   Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.   California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.   California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.    11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.    The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83. "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84. 1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86. "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87. "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88. "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89. "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90. "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91. "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92. "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93. "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94. "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95. "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96. "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97. "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98. "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.  "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.    "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114.  "Dual Diagnosis-Assessment and treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.  Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.  National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.  Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California.  (6/15/01)

118.  Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington.  (11/15/01)

119.  The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

120.  Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121.  3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

122.  New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

123.  Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California.  (8/15/02)

124.  California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California.  (8/22/02)

125.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (1/14/02)

126.  First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."  El Centro, California.  (1/28/02)

127.  Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.  Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.  "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.    "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th.)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist the Federal Court to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011 & 1/25/12)

155.    2011 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th.)

156.    2012 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd.)

PUBLICATIONS:

1)      Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2)      Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.*  Group, Volume 13, Number 2, Summer 1989.

3)      Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)  Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)  Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)  Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)  Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)  Stewart, P. (1999).   *New Approaches and Future Strategies Toward Understanding Substance Abuse.*  Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)  Stewart, P. (2002).   *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10) Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11) James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12) Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon

**EXHIBIT B TO THE SUPPLEMENTAL DECLARATION
OF PABLO STEWART IN SUPPORT OF PLAINTIFFS'
MOTION FOR ENFORCEMENT OF COURT ORDERS
AND AFFIRMATIVE RELIEF REGARDING INPATIENT
PSYCHIATRIC HOSPITALIZATION FOR
CONDEMNED INMATES**

**Exhibit B to the Supplemental Expert Declaration of Pablo Stewart in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Use Of Force and Disciplinary Measures**

**List of Documents Provided to and Reviewed by Dr. Stewart Since His Prior Declarations**

| |
|---|
| Policy and Procedure 03.07 - Housing and Treatment of Condemned Inmates/Patients, DSH Vacaville Acute Psychiatric Program - Program Manual, dated August 15, 2012 |
| Suicide Report for Prisoner WWW, San Quentin State Prison, dated June 4, 2013 |
| Specialized Care for the Condemned Program Description – Produced by Defendants September 23, 2013 in Connection with the September 24th Deposition of Dr. Eric Monthei |
| Deposition of Ellen Bachman taken on September 20, 2013 |
| Deposition of Dr. Eric Monthei taken on September 24, 2013 |
| Deposition of Warden Kevin Chappell taken on September 23, 2013 |
| Medical and Central File Records for Prisoner WWW, 2010-2013 |
| Medical and Central File Records for Prisoner DDD, February – August 2013 |
| Medical and Central File Records for Prisoner EEE, February – August 2013 |
| Medical and Central File Records for Prisoner FFF, February – August 2013 |
| Medical and Central File Records for Prisoner GGG, February – August 2013 |
| Medical and Central File Records for Prisoner HHH, February – August 2013 |
| Medical and Central File Records for Prisoner III, February – August 2013 |
| Medical and Central File Records for Prisoner CCC, February – August 2013 |
| Monthly Statistical Reports Sections Concerning MHCB Referrals and Admissions and DSH Referrals and Admissions from San Quentin, February-July, 2013 |
| CDCR Website Data Sheet, Condemned Inmates Who Have Died Since 1978, CDCR Office of Public and Employee Communications, June 10, 2013 |
| Patterson Report on Suicides in the CDCR the First Half of 2012, Docket 4376, filed 3/13/13. |

**EXHIBIT C TO THE SUPPLEMENTAL DECLARATION OF PABLO STEWART IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING INPATIENT PSYCHIATRIC HOSPITALIZATION FOR CONDEMNED INMATES**

Redacted

## SPECIALIZED CARE FOR THE CONDEMNED PROGRAM

The Specialized Care for the Condemned Program (SCCP) consists of ten (10) designated beds located in the Central Health Services Building (CHSB Rooms 4248-4257), one (1) designated

Monthei  01

dayroom (CHSB 4348), two (2) designated clinical offices (CHSB 4233 & 4234), designated shower area (CHSB 4242) and a minimum of four (4) hours of daily yard time for SCCP activities. The SCCP is an individualized incentive program for EOP inmate-patients who are either not participating in treatment and/or not experiencing symptom reduction in response to current treatment. The goal of SCCP is to help inmate-patients reach their highest level of functioning, and maintain that functioning upon integration back into their housing units. While it is anticipated that most inmate-patients will remain in this program for a period of six (6) to twenty-four (24) months prior to reintegration, the length of stay of each inmate-patient will be determined by the individual's clinical needs.

SCCP treatment activities are tailored to promote self-management of daily living and mental health symptoms at an individual's optimal level. All SCCP inmate-patients shall have an individual treatment plan and an individual Therapeutic Activity Schedule (TAS) consistent with the inmate-patient's clinical needs. The recommended individualized treatment plans for all condemned inmate-patients may require modification due to the heightened safety concerns associated with this population. Out-of-cell activities for condemned inmate-patients require intensive staff resources to ensure the safety and security for all involved: inmates, clinical staff, and correctional staff.

The provision of services must take into account the unique security operations and procedures necessary to effectively manage the condemned population during institutional lockdown for an execution. Programs and services, including all out-of-cell activities are curtailed prior to, during, and after the execution of a condemned inmate, as determined by the Warden and Chief of Mental Health. Medication administration, crisis services, and PT rounds are mandatory and persist despite institutional lockdown due to the sensitive and potentially volatile atmosphere at the institution when carrying out an imposed death penalty.

## SCCP PROGRAM OBJECTIVES

The goal of the SCCP is to determine the biopsychosocial factors that have limited the inmate-patient's ability to adjust to placement on a condemned housing unit at CCCMS or EOP level of care. The overall objective is to provide clinical services that will enable the inmate-patient to return to the least restrictive clinical and custodial environment. More specific objectives include:

1. Provision of focused care for condemned EOP inmate-patients who, do not function well in the Condemned EOP Treatment Program because of a severe and persistent mental disorder.

2. Provision of longer-term placement for condemned inmate-patients with chronic mental disorders whose symptoms have stabilized, but whose level of functioning is not sufficient to allow for a placement in condemned housing units.

## SCCP ENTRANCE CRITERIA

In addition to the above referenced Condemned EOP Treatment Program, inmate-patients meeting the following criteria are considered for treatment in the SCCP.

Monthei 02

1. Acute onset of symptoms or significant decompensation due to a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, agitated or vegetative signs, definitive impairment in reality testing and/or judgment.

2. Inability to function in the condemned population based upon any of the following:

   a. A demonstrated inability to program in and/or benefit from the Condemned EOP Treatment Program for two consecutive months.

   b. A demonstrated inability to program in condemned correctional activities such as education, religious services, self-help programs, canteen, recreational activities, or visiting, as a consequence of a serious mental disorder.

   c. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior, or inappropriate sexual behavior, as a consequence of a serious mental disorder.

   d. An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

## SCCP REFERRAL PROCESS

1. Mental Health clinicians may initiate a SCCP referral for condemned inmate-patients. This referral is documented on a CDCR 7230, *Interdisciplinary Progress Note,* submitted to the SCCP Coordinator, and filed in the inmate-patients eUHR (electronic Unit Health Record).

2. Referral documentation is prepared by the referring clinician and identifies presenting symptoms, situational stressors, and behaviors that are not responding to treatment despite varying treatment modalities in the Condemned EOP Treatment Program.

## SCCP BASELINE AND INITIAL EVALUATION PROCESS

The baseline and initial SCCP evaluation begins while the inmate-patient is receiving services in the Condemned EOP Treatment Program. This is in accordance with the Assertive Community Treatment model employed throughout the Condemned Units Program.

1. A comprehensive CDCR 7386, *Mental Health Evaluation,* is written by the SCCP Coordinator or designee within 14 days of referral to the SCCP. The updated CDCR 7386 includes:
   a. A review of the Central File and eUHR
   b. the inmate-patient's current multi axial diagnosis
   c. past and current symptom manifestation

Monthei 03

    d.  past and current responses to treatment
    e.  identification of current problems not responding to treatment in the Condemned EOP Treatment Program
    f.  a functional analysis
    g.  a recreational assessment
    h.  a rule out of  medical and/or other, potentially reversible etiology for mental health symptoms; this includes a nursing assessment and referral for medical evaluation as indicated

2. Upon completion of the updated CDCR 7386 the SCCP Coordinator, or designee, attends the inmate-patient's condemned EOP IDTT to formalize placement decision.

3. All decisions regarding a change in treatment program made in the IDTT shall be documented on a CDCR 128-MH3, *Mental Health Placement Chrono*. This chrono shall be forwarded to custody for review and Central File update. One copy of the chrono is placed in the eUHR and another copy forwarded for entry into MHTS.net. The CDCR 128-MH3 must be submitted prior to placement in the SCCP.

4. The initial evaluation process continues after arrival to the SCCP and focuses on the inmate-patient's treatment needs.

## SCCP TREATMENT COMPONENTS

SCCP treatment activities will occur seven days a week during 2nd and 3rd watch. Activities will primarily occur on the 4th floor CHSB, the 4th floor CHSB yard, the 2nd floor CHSB group room, the 2nd floor CHSB treatment offices, the 2nd floor CHSB IDTT room, and East Block yard. All treatment activities assigned are based on individual clinical need and are offered to SCCP inmate-patients prior to being offered to inmate-patients in other levels of care.

## SCCP INTERDISCIPLINARY TREATMENT TEAM

The responsibility for overall treatment planning rests with the SCCP Coordinator or designee, and is formulated in the IDTT. The IDTT develops an individualized treatment plan, which includes a TAS and an individualized incentive program. The IDTT provides an opportunity for coordinated treatment between the 4th floor SCCP and the Condemned EOP Treatment Program. Initial and routine IDTTs prescribe services and activities aimed at addressing the identified problems. Prescribed services will be delivered, monitored, and modified as clinically indicated.

An IDTT shall be held for all SCCP inmate-patients within 14 days of arrival to the SCCP and monthly thereafter unless clinically indicated. In addition:
1. An IDTT shall be held biweekly for inmate-patients who, after 12 weeks of programming in the SCCP, are not participating in 10 hours of out of cell activity per week.
2. A 7230 designed to outline the individual TAS is completed at each IDTT. The TAS is filed with the CDCR 7388, *Mental Health Treatment Plan*, and a copy of the TAS is provided to the inmate-patient following IDTT.

The IDTT is responsible for the following:

Monthei  04

1. Admission and discharge decisions made in collaboration with the Condemned EOP Treatment Program
2. Formulation and approval of initial and updated individual treatment plans, including TAS and incentive structures
3. Establishing measurable short-term and long-term treatment objectives
4. Identifying areas of achievement and areas of continued need
5. Specific interventions with identified providers
6. Monthly case reviews and re-justifications of treatment
7. Overall utilization review of available beds

The IDTT at a minimum is composed of:
1. Inmate-Patient
2. SCCP Coordinator or designee
3. Assigned SCCP PC
4. Assigned PP
5. Assigned PT
6. CC
7. Recreational Therapists

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information, including:
1. Assigned Condemned EOP Treatment Program PC
2. Assigned Condemned EOP Treatment Program PP
3. Nursing Staff
4. Housing Custody Officers
5. Escort Custody Officers
6. Educational staff
7. Religious Leaders
8. Other institutional staff providing services to the inmate-patient

The SCCP inmate-patient shall be included in the IDTT unless the inmate-patient refuses to participate. If the inmate-patient refuses to participate in the IDTT, the SCCP PC shall document the inmate-patient's stated reason for refusal in the treatment plan, CDCR 7388, *Mental Health Treatment Plan*, and in the progress notes, CDCR 7230-MH, *Mental Health Progress Note*. Inmate-patients shall not be disciplined for refusing to participate in the IDTT. The PC is responsible for presenting the inmate-patient's concerns to the IDTT and for informing the inmate-patient of changes to the treatment plan and/or TAS. The SCCP Coordinator or designee shall lead the IDTT.

## SCCP CLASSIFICATION HEARINGS

The Warden, CDW or designee shall chair the all SCCP classification hearings. The initial hearing is to occur within 14 calendar days of arrival to the SCCP unit. Subsequent classification hearings are to occur monthly as needed or sooner if clinically indicated in order to mitigate the unique programming restrictions placed on condemned inmate-patients. A representative from the SCCP treatment team is present in all SCCP classification hearings. The SCCP classification hearings shall include:
1. East Block Yard Compatibility and assignment

Monthei 05

2. CHSB Day Room Compatibility and assignment (CHSB 4348)
3. Address any potential security and/or enemy concerns within the SCCP

## SCCP INTERDISCIPLINARY CASE CONFERENCES

Interdisciplinary Case Conferences shall be held monthly for identified SCCP inmate-patients. The purpose of these conferences is to ensure a common understanding of all services received by the inmate-patient and to provide greater collaboration among service providers, for collaborative problem-solving for inmate-patients with complex clinical presentations. Invitees shall include:

1. SCCP and Condemned EOP Program PCs
2. SCCP and Condemned EOP Program PPs
3. CHSB 4th Floor and Condemned Unit Primary Care Providers
4. CHSB 4th Floor and Condemned Unit Nursing Staff (RN, LVN, PT)
5. Recreational Therapists

## SCCP POSITIVE INCENTIVE PROGRAM

The Positive Incentive Program (PIP) is a reward system that allows Inmate-Patients to obtain positive reinforcement in the form of Incentive Credits. The PIP operates as follows:

1. Incentive Credits can be exchanged for Incentives that will be offered to inmate-patients on an Incentive Menu. The Incentive Menu will include a variety additional treatment services, recreational items, food items, and personalized use of time (See Attachment B).
2. Inmate-patients can earn Incentive Credits for treatment participation.
3. Inmate-patients can earn Incentive Credits for progress towards treatment goals as observed by any and all SCCP staff.
4. Incentive Credits are recorded on the Inmate-patients' TAS and are tallied daily (Monday through Sunday), and reflect the inmate-patients' progress in the preceding 24 hours.
5. Inmate Patients will have the opportunity to exchange Incentive Credits on a daily basis.

## SCCP TREATMENT SERVICES

In order to ensure that the treatment plan is suitable to the inmate-patient's ability and tolerance level, assignment to therapeutic activities will be progressive. This progressive treatment plan will aim to ensure the inmate-patient's integration by providing the inmate patient with a gradual introduction to the available therapeutic activities. The goal is for each inmate-patient to engage in a minimum of 10 hours of out of cell weekly activities. Condemned inmate-patients receiving less than 10 hours of out of cell structured activities after 12 weeks in the SCCP will be presented to the IDTT for approval of alternate individual therapeutic activities suitable to the inmate-patient's needs and ability.

## SCCP TREATMENT ACTIVITIES

1. Weekly PC clinical contact with both the assigned Condemned EOP Treatment Program PC and the SCCP PC.
2. Daily PT contact during both 2nd and 3rd watch.
3. Daily Recreational Therapy contacts.

Monthel 06

4. Biweekly Psychiatry contact for medication evaluation and medication management.

SCCP TREATMENT SERVICES

Specific treatment services offered in the Specialized Care for the Condemned Unit include, but are not limited to the following:

1. Group Therapy: The inmate-patients ability to participate in treatment activities will be discussed by the Classification Committee and MHSDS staff. Group treatment provides inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff, as well as supportive interactions with inmate-patients who have similar problems or experiences. Group Therapy offers one Incentive Credit to inmate-patients for every half hour of participation. Groups offered will include but are not limited to the following:
   a. Social Skills
   b. Recreational Therapy
   c. Activities of Daily Living
   d. Current Events
   e. Stress Management
   f. Cognitive Behavioral Therapy
   g. Art Therapy
   h. Bibliotherapy
   i. Narcotics Anonymous/Alcoholics Anonymous
   j. Music Therapy
   k. Feelings Management
   l. Book Club
   m. Communication Skills
   n. Friends/Family Outreach
   o. Anger Management
   p. Ethnicity/Culture
   q. Health Education
   r. Cinema therapy

2. Once the inmate-patient has been cleared via the classification system, each SCCP inmate-patient is offered a minimum of five out of cell milieu groups on the SCCP seven days per week. These activities include three milieu meals, a morning dayroom milieu and an evening dayroom milieu. In addition to milieu groups, SCCP inmate-patients are offered a combination of the following:
   a. Therapeutic groups on the 4th floor CHSB
   b. Therapeutic groups on the 2nd floor CHSB
   c. Therapeutic yard on condemned units
   d. Therapeutic yard on the 4th floor CHSB

3. Group treatment activities offered to each SCCP inmate-patient are detailed on the inmate-patient's CDCR 7230 TAS and are targeted to address problems listed in the problem section of the most recent CDCR 7388 *Mental Health Treatment Plan.*

Monthei 07

4. SCCP inmate-patients have priority access to the clinical activities indicated in the attached schedule (Attachment B).

5. Individual Therapy:   Individual therapy provides SCCP inmate-patients with the opportunity to discuss issues that may not be adequately addressed in a group setting. Each SCCP inmate-patient is offered a minimum of two weekly individual treatment sessions, one session with the condemned EOP PC and one session with the SCCP PC. If the SCCP inmate-patient requires additional individual services, the services will be offered by the SCCP PC. Inmate-patients can earn one Incentive Credit for every half hour engaged in Individual Therapy.
   a. The condemned EOP PC contacts will occur on the 2nd Floor CHSB.

   b. The SCCP PC contacts will occur on the 4th Floor CHSB.

6. Medication Management:  Medication management provides the inmate-patient with bi-weekly contact with the PP to discuss the inmate-patient's medication regimen, and monitor potential side-effects.  Medication Management offers one Incentive Credit for every half hour of participation.

7. Recreational Therapy:  Recreational therapy, including indoor and outdoor supervised recreational activities, will be offered to SCCP inmate-patients daily.  The recreational therapy offered in the SCCP is designed to reduce stress, improve self-esteem and physical health, foster positive interpersonal interactions, and promote constructive use of leisure time.  Recreational therapy is considered structured therapeutic activity only if a Recreational Therapist is present and supervising the activity.  Unsupervised routine exercise is available for all inmate-patients and is not considered to be a structured therapeutic activity.  Inmate-patients can earn one Incentive Credit for every hour spent in Recreational Therapy.

8. Activities of Daily Living:  All SCCP inmate-patients will be rounded on daily by a PT during both 2nd and 3rd watch. PTs will be familiar with the aspects of the inmate-patient's TAS targeted at improving activities of daily living.  The PT rounds will serve to address the general well being and in cell ADL issues and will serve as a wrap around function addressing and reinforcing the inmate-patients treatment plan.  SCCP inmate-patient will be assigned to a weekly Activities of Daily Living Group targeted at addressing and maintaining in cell cleanliness.  Inmate Patients can earn one Incentive Credit for every half hour participating in structured Activities of Daily Living.

9. Nursing and Supportive Care:  24-hour nursing care is available as ordered on the 4th Floor CHSB.  Specific services provided to SCCP inmate-patient by RN, LVN, and/or PT include:
   a. Administration of all medications.
   b. Regular monitoring of medication compliance and notification of medication non-compliance to the treating PP, consistent with DCHCS policy.
   c. Provision of nursing procedures as ordered by a physician.
   d. Supervision and assistance of Activities of Daily Living, including maintenance of living quarters, personal hygiene, and eating habits as needed.

Monthei 08

10. Therapeutic Work Activity: All SCCP inmate-patients will be offered therapeutic work on the unit. Contributing to the well being of the SCCP offers intimate-patients the opportunity to experience ownership and connectedness to things outside of themselves and their personal property. Therapeutic Work Activity offers one Incentive Credit for every half hour of participation.

## SCCP COLLATERAL CONTRIBUTION

Collateral contacts apply to non-clinical staff at SQSP who have working relationships with inmate-patients in the SCCP (e.g. education, hobby shop, religious services), and friends/family members who would like to participate in the inmate-patients' treatment planning.

1. Non-clinical staff who are employees of San Quentin State Prison are encouraged to work with the inmate-patient in CHSB, if clinically appropriate as determined by the IDTT and documented on a CDCR 7388 treatment plan.

2. Friends/family members may participate when deemed clinically appropriate, with the following guidelines:
    a. Express consent and release of information from the inmate-patient, to be documented on CDCR 7230 and 7385, respectively.
    b. All non-CDCR staff shall be vetted through the appropriate custody protocols

## SCCP CONTINUING CARE

1. Condemned inmate-patients who experience decompensation in the form of crisis while on the SCCP shall be referred for consideration for a higher level of care.

2. Condemned inmate-patients whose level of functioning has improved to the point that they may function adequately in the Condemned EOP Program without additional support will be integrated back to condemned housing units. The reintegration plan will be developed by the condemned EOP PC and SCCP PC to ensure continuity of care. The reintegration plan will be discussed and endorsed by the IDTT prior to re-housing the inmate-patient.

Monthei 09

## MEDICAL OUTPATIENT HOUSING UNIT

Please see Medical Outpatient Housing Unit Local Operating Procedure #03-017. It is assumed that the operational aspects of LOP #03-017 will co-exist with the CTP LOP and co-occur on the 4th Floor CHSB. Please see schedule of service delivery that is inclusive of current CTP and Medical OHU operations (Attachment B).

SPACE AND ENVIROMNENTAL CONSIDERATIONS

- The addition of the SCCP to the 4th Floor CHSB will reduce current OHU beds from 33 to 23.
- Inmate-patient movement on the 4th Floor will require increased coordination and additional Health Care Access Unit (HCAU) staff in order to facilitate programming on the 4th floor.
- SCCP custody staff and OHU custody staff will work in tandem to ensure that the mandates of both programs are met.
- Health Care Population Oversight Program (HCPOP) will assist SQSP medical staff in placing SQSP identified inmate-patients in appropriate OHU housing.

Monthei  10

**EXHIBIT D TO THE SUPPLEMENTAL DECLARATION OF PABLO STEWART IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING INPATIENT PSYCHIATRIC HOSPITALIZATION FOR CONDEMNED INMATES**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

ERIC MONTHEI

TUESDAY, SEPTEMBER 24, 2013,  9:56 A.M.

SAN FRANCISCO, CALIFORNIA








REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eric Monthei                                                September 24, 2013

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,           )
                                      )
 5                    Plaintiffs,     )
                                      )CASE NO.:
 6          vs.                       )S 90-0520 LKK-JFM
                                      )
 7   EDMUND G. BROWN, JR., ET AL.,    )
                                      )
 8                    Defendants.     )
     _____)
 9

10

11

12          The Deposition of ERIC MONTHEI, taken on

13   behalf of the Plaintiffs, before Megan F. Alvarez,

14   Certified Shorthand Reporter No. 12470, Registered

15   Professional Reporter, for the State of California,

16   commencing at 9:56 a.m., Tuesday, September 24, 2013, at

17   Rosen Bien Galvan & Grunfeld, LLP, 315 Montgomery

18   Street, 10th Floor, San Francisco, California.

19

20

21

22

23

24

25
```

Eric Monthei                                          September 24, 2013

 1        A.    In my opinion.

 2        Q.    What level of care does the specialized care

 3   program provide?

 4              MS. VOROUS:   Objection as to "level of care."

 5   Vague and ambiguous.

 6              THE WITNESS:   EOP.

 7   BY MR. NOLAN:

 8        Q.    EOP level of care?

 9              Does the specialized care program, does that

10   term currently refer to the specialized care beds that

11   that you set up in the OHU or does the program also

12   encompass some EOP class members housed in east block?

13        A.    That's been part of the evolution.   It

14   originally began as pertaining to participants on east

15   block.   And with the designation of beds, it tends to be

16   more commonly associated with the beds; however, it also

17   extends to the services still being delivered on the

18   east block.

19        Q.    When you're speaking to your staff about the

20   specialized care program -- I believe it's sometimes

21   abbreviated as SCCP; is that correct?

22        A.    That's correct.

23        Q.    When you're speaking to your staff about

24   either the specialized care program, or the SCCP, do you

25   usually -- are you usually referring to the OHU program?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              THE WITNESS:  I'm not sure how to answer that.
 2   I haven't compared licensing requirements at an ICF and
 3   done an analysis between their program and our program
 4   to determine how similar they may be in function.
 5   BY MR. NOLAN:
 6        Q.   Have you ever been told that your program puts
 7   at risk the CTC license at San Quentin?
 8        A.   That information was communicated to me.  It
 9   depends how you define "told."
10        Q.   Who communicated it to you?
11        A.   Our standards and compliance coordinator at
12   San Quentin.
13        Q.   How did he or she communicate it to you?
14        A.   Via e-mail.
15        Q.   I'll ask you more about that e-mail later on.
16              For now, I'd like to ask you if -- is there a
17   required number of treatment hours per week for
18   prisoners in the specialized treatment program in the
19   OHU?
20        A.   The requirement would be not to fall below EOP
21   standards considering that it's an EOP program.
22              But on top of that, they're provided with an
23   enhancement.  So they all receive well above EOP
24   requirements.
25              There isn't necessarily a requirement that
```

Eric Monthei                                      September 24, 2013

 1   outlines the specific number of hours in which we exceed

 2   the minimums that were already agreed upon.  There's an

 3   aspirational goal to provide enhanced services that are

 4   individually tailored designed to improve the day-to-day

 5   function of the individual.  And many of those patients

 6   receive far in excess of the EOP requirements.

 7        Q.    What are the EOP requirements that you're

 8   speaking about?

 9        A.    Just standard, commonly referred to EOP

10   program guide requirements.

11        Q.    Is the main -- or is one of the significant

12   EOP guide requirements 10 hours a week of structured

13   therapeutic activity?

14        A.    It is.

15        Q.    I'd like to call your attention to a paragraph

16   in your declaration dated May 9th, Exhibit 2 in front of

17   you, paragraph 23.

18            Paragraph 23, you state that, quote:  The goal

19   for each inmate in a designated specialized care bed is

20   to engage in a minimum of 10 hours of out-of-cell weekly

21   activities.  Condemned inmates receiving less than

22   10 hours of out-of-cell structured activities after

23   12 weeks in a specialized care bed will be presented to

24   the interdisciplinary treatment team for approval of

25   alternative individual therapeutic activities suitable

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    receive or don't receive, the manner in which they

2    receive it which leads me to wonder about other items.

3           But it's not implying that I have some inside

4    information or knowledge in terms of how they operate.

5    I don't know what the condemned ICF program looks like,

6    nor if they have one.

7       Q.    You're not aware that there is no ICF program

8    for the condemned at DMH?

9       A.    To my knowledge, there isn't one that I'm

10   aware of.  Now, there may be, but if there is, not to my

11   knowledge.

12      Q.    Yes, there's not one.  That's why we're here.

13          You're saying you do have some information

14   about people coming back from the acute program,

15   patients coming back unhappy about that program; is that

16   right?

17      A.    Yes.

18      Q.    I would say that we also have some concerns.

19   Do you have an opinion -- I mean, could you tell me some

20   of the concerns that have been expressed to you by

21   returning patients?

22      A.    It's more of a theme.  We recently had a few

23   condemned inmate patients return from acute.

24          To the best of my knowledge, the referrals,

25   the acceptance, the discharge were all appropriate.

Eric Monthei                                      September 24, 2013

1    However, upon return, the initial out-of-the-gate

2    reaction to the therapist was to the effect of -- excuse

3    my language -- but "Fuck off" and "Fuck you.  I'm done

4    dealing with you.  Last time I dealt with you, you sent

5    me there.  What the fuck did I do to you?"

6            It was placed in the context of a punishment,

7    and it certainly wasn't designed to be a punishment.

8    But they viewed it in terms of "Now, I'm done.  I want

9    out of mental health.  I don't want anything to do with

10    you," and we have to start the whole rapport process all

11    over again.

12            And that's just for a very short-term acute

13    admission that, from a clinical standpoint for the

14    mental health providers that are on the unit, they

15    describe as a tremendous setback in the clinical care

16    and their ability to work with the individuals despite

17    the fact that they may have received some benefit while

18    they were there.

19            I'm not -- I don't know whether they received

20    a benefit or didn't receive a benefit.  But I know the

21    fallout once they return.

22        Q.    Based on these conversations, are you aware

23    that programming for condemned prisoners in the the

24    acute program is very restrictive?  Let me start with

25    that.

Eric Monthei                                    September 24, 2013

1    BY MR. NOLAN:

2        Q.    You can answer the question.

3        A.    No, I've certainly had my disagreements with

4    the respective members of the special master's team.

5    There are times where we simply had to agree to

6    disagree.  I've always found their disagreements to be

7    professional in nature.

8            I could understand and appreciate their

9    perception and perspective even when I didn't agree

10   with.  At the end of the day, I always felt like they

11   treated us fair even when they were critical.

12       Q.    So I want to draw your attention to the first

13   bullet on page 3 where you say, quote:  It does not

14   answer the core legal argument that condemned inmates

15   are refused equal treatment due to their legal status,

16   separate but equal was insufficient as a response to

17   civil rights-related segregated schools and it is likely

18   to fall flat as well as in this case.

19           Do you agree that it's unfair to not provide

20   ICF level of care access to condemned prisoners?

21           MS. VOROUS:  Objection.  Argumentative.  Vague

22   and ambiguous as to "unfair."

23           Go ahead and answer the question if you can.

24           THE WITNESS:  I've tried to state in -- in

25   different manners over the course of the day.  The

Eric Monthei                                      September 24, 2013

 1    question of whether it's fair or not fair isn't the
 2    manner in which I base my decisions.
 3           There was a population that I believe was in
 4    need of receiving enhanced services, and my objective --
 5    my goal was to provide them with the level of services
 6    that I believe was adequate to the needs of their
 7    presentation.
 8    BY MR. NOLAN:
 9       Q.   Do you think the specialized care program is
10    separate but equal to the ICF programs?
11       A.   I don't think that, but I don't think that
12    because I don't have a thorough understanding of the ICF
13    to know what the comparison is.
14       Q.   You mentioned earlier that there were problems
15    reported to you regarding acute care at DSH.  Assuming
16    DSH was able to provide appropriate intermediate and
17    acute care, would you be in favor of condemned patients
18    having access to those programs?
19           MS. VOROUS:  Objection.  Lack of foundation.
20    The witness has already testified he doesn't know what
21    the intermediate program would look like for the
22    condemned.
23           MR. NOLAN:  The witness knows those are
24    available to other prisoners.
25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eric Monthei                                            September 24, 2013

1          I was simply fulfilling a request that I was

2     asked to generate.

3          Q.   Do you think that the current specialized care

4     program in the OHU could fairly be described as ICF

5     light?

6          A.   I have no reason to believe that it should or

7     should not be perceived or labeled "ICF light."  And I

8     come back to the same reason.  To my -- the best of my

9     knowledge, there is no ICF program for the condemned.

10         So I don't know what an ICF light program

11    would look like because I don't know what a condemned

12    ICF program looks like.

13         Q.   How come you haven't visited one of the

14    DSH-ICF programs just to see what it's like?

15         A.   I haven't felt that there was a need to do so.

16         Q.   Near the end of the memo you say:  "Due to

17    lack of custody positions, the condemned group room and

18    additional group yard that we originally proposed remain

19    unused."

20         Is that group room being used now?

21         A.   I'm not sure where you are.

22         Q.   I'm not sure where I am either.

23         MR. NOLAN:  Can I get a time check?

24         THE REPORTER:  Six hours 35 minutes.

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eric Monthei                                          September 24, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8              That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                    DATED:  September 25, 2013

21

22                    _____

                      MEGAN F. ALVAREZ
23                    RPR, CSR 12470

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

**EXHIBIT E TO THE SUPPLEMENTAL DECLARATION
OF PABLO STEWART IN SUPPORT OF PLAINTIFFS'
MOTION FOR ENFORCEMENT OF COURT ORDERS
AND AFFIRMATIVE RELIEF REGARDING INPATIENT
PSYCHIATRIC HOSPITALIZATION FOR
CONDEMNED INMATES**

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment. The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment. Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan*. A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate). If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

## E. **EOP INMATE-PATIENT TREATMENT SERVICES**

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*. Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

**EXHIBIT F TO THE SUPPLEMENTAL DECLARATION
OF PABLO STEWART IN SUPPORT OF PLAINTIFFS'
MOTION FOR ENFORCEMENT OF COURT ORDERS
AND AFFIRMATIVE RELIEF REGARDING INPATIENT
PSYCHIATRIC HOSPITALIZATION FOR
CONDEMNED INMATES**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                Plaintiffs,       )
                                  )CASE NO.:
         vs.                      )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                Defendants.       )
_____)


DEPOSITION OF

ELLEN BACHMAN


FRIDAY, SEPTEMBER 20, 2013,  9:32 A.M.

SAN FRANCISCO, CALIFORNIA


VOLUME I


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,          )
                                     )
 5                    Plaintiffs,    )
                                     )CASE NO.:
 6         vs.                       )S 90-0520 LKK-JFM
                                     )
 7   EDMUND G. BROWN, JR., ET AL.,   )
                                     )
 8                    Defendants.    )
     _____)
 9

10

11

12

13

14         The Deposition of ELLEN BACHMAN, taken on

15   behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 10:29 a.m., Friday, September 20, 2013, at

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Ellen Bachman                                          September 20, 2013

1        A.   I think it's an individual treatment issue.

2        Q.   So that you think that there are some cases in

3   which it would be therapeutically beneficial depending

4   on the inmate's particular needs?

5        A.   It really depends on that patient's --

6   depending on that patient's particular needs.

7        Q.   Okay.  Right now you have three condemned

8   prisoners in your acute unit, right?

9        A.   Yes.

10       Q.   Are they currently allowed to be in the same

11   room with one another?

12       A.   No.

13       Q.   And will that remain the case unless you come

14   to an agreement with the warden that that should change?

15       A.   Yes.

16       Q.   And you've had more than one acute patient --

17   one condemned patient in your acute unit before, right?

18       A.   Yes.

19       Q.   And when you did that, did you also have them

20   separate at all times from all persons?

21       A.   Yes.

22       Q.   Have you ever done any research or looked at

23   any data about how condemned prisoners fare compared to

24   noncondemned prisoners with respect to violence?

25            MR. McKINNEY:  Objection.  Vague and

1    Q.   But it's not a new issue on your acute unit,

2    is it, because you've had, on multiple occasions, more

3    than one condemned person in your unit at the same time,

4    right?

5    A.   We have.

6    Q.   And have you ever sought guidance on those

7    occasions from the warden or from San Quentin as to

8    whether or not those prisoners can be in the same room

9    together?

10   A.   I have not.

11   Q.   Is this the first time that you're aware of

12   that there have been three condemned prisoners in the

13   unit at the same time?

14   A.   I don't know.

15   Q.   You don't know if it's the first instance

16   you're aware of in which there are three at the same

17   time in the same unit?

18   A.   It's the first instance I can recall.  But

19   there were many years where I wasn't at DSH Vacaville

20   where it could have happened.

21   Q.   Of course.

22        That you're aware of, this is the first time

23   that this has happened?

24   A.   First time in the last few years that I'm

25   aware of.

Ellen Bachman                                          September 20, 2013

1       Q.    Are you aware of other instances prior to the

2   last few years, then?

3       A.    I believe it has happened before based on

4   asking staff, "Has this happened before?" and them

5   saying, "Yes, this has happened before."

6       Q.    Okay.  And did you ask staff who had lived

7   through that experience how they handled the situation

8   in terms of whether or not to allow multiple condemned

9   prisoners to be in the same room together?

10      A.    No, because the policy has been that they

11  don't.

12      Q.    Does that mean you are currently considering

13  modifying the policy?

14      A.    If we were -- yes, if we had information that

15  demonstrated that it could be modified, then we could

16  consider modifying it.

17      Q.    What do you mean by "information that it could

18  be modified"?

19            Do you mean should be modified?

20      A.    No.  What I meant was if we got information

21  that indicated that from a custody perspective condemned

22  inmates are able to program together, then we could

23  consider modifying this policy.

24      Q.    Okay.  But you don't have any opinion as to

25  whether or not it should be modified if you find out

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Ellen Bachman                                      September 20, 2013

1          A.    Yes.

2          Q.    Why would you need them?  And by "them," I

3     mean additional custody officers.

4          A.    Additional custody officers.  Because per the

5     policy, every time you're escorting a condemned inmate

6     patient, you need an officer or two -- you need an

7     officer and an MTA or two officers.

8                So if you had more condemned patients and

9     there was a need to be moving more than one at a time,

10    you would need more personnel to accomplish that.

11         Q.    Okay.  Okay.  I'd like to talk with you a

12    little bit about the program that you run on Q3.

13               Are you familiar with the step program that's

14    run in various ICF programs in DSH?

15               It's also sometimes referred to as the stage

16    program, stages?

17         A.    Yes.

18         Q.    Do you run something similar or do you have

19    something similar to that in the acute program?

20         A.    Yes.

21         Q.    Could you describe that in the acute program?

22         A.    The acute program does use a step program.

23         Q.    Is it the same step program as used in the ICF

24    context?

25         A.    It's not identical.  There are some

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Ellen Bachman                                          September 20, 2013

1  similarities.

2        Q.    What are the similarities?

3        A.    Patients, as they advance through the

4  different steps, have -- the amount of treatment that

5  they're participating in increases, whether they are

6  cuffed or uncuffed, changes, things of that sort.

7        Q.    So that's true for the ICF step program also.

8              What is the distinction between the two of

9  them?  How does the acute step program differ from the

10 ICF step program?

11       A.    In ICF, there are some incentives that are not

12 part of the acute program.  For example, in ICF, someone

13 on Step 3 earns the use of a television within their

14 cell.  In acute, we don't have that kind of thing as

15 part of the step program.

16       Q.    Okay.  Are those different incentives the only

17 distinction between the two step programs?

18       A.    No.

19       Q.    What are other differences?

20       A.    In the acute program, the first step is solo

21 with cuffs.

22             Second step is solo without cuffs.

23       Q.    Okay.

24       A.    Third step, patients then begin attending

25 small groups without cuffs.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Ellen Bachman                                          September 20, 2013

1          And then they advance to large groups and then
2     to yard.
3          So there's five steps.  By Step 5, they're
4     attending large groups and they're attending yard.
5          Q.   And is that in the ICF context or is that the
6     acute program?
7          A.   That's the acute program.
8          Q.   Okay.  Is it the case in the acute program
9     that, upon admission, a patient has to be cleared by
10    ICC?
11         A.   No.
12         Q.   Okay.  Does ICC play any role in the programs
13    committed or allowed -- offered to a prisoner in the
14    acute program?
15         A.   No.
16         Q.   Okay.  How does somebody move through the
17    stages in the acute program or steps?
18         A.   On admission, they start out on stage -- or
19    Step 1.
20         Q.   Okay.  And --
21         A.   And then it's as evaluated by the treatment
22    team at what point they advance to the next step.
23         Q.   What are the criteria used by the treatment
24    team to decide whether or not somebody's ready to move
25    to the next step?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1       A.    It's an individual evaluation.   They consider

2  patient's behavior, psychiatric stability, violence risk

3  as evaluated by the team.

4       Q.    It's an individualized assessment, then?

5       A.    Yes.

6       Q.    What type of -- let me backtrack.

7            Am I correct, then, that prisoners in the

8  acute unit don't attend any groups until they're at

9  Step 3?  Is that right?

10      A.    Yes.

11      Q.    They also don't go to dayroom until Step 3; is

12 that right?

13      A.    Well, the dayroom is where they would come out

14 for the solo activity at Step 1 or Step 2.

15      Q.    Okay.

16      A.    They would be in the dayroom but by

17 themselves.

18      Q.    So at Step 3 can patients go to dayroom with

19 other people?

20      A.    Yes.

21      Q.    Okay.  But not until Step 3?

22      A.    I believe that's correct.

23      Q.    Okay.  And patients don't receive any yard

24 until they're at Step 5; is that correct?

25      A.    That's correct.

```
 1   when we've discussed the hours set aside for group
 2   treatment, the amount of that that is recreational
 3   therapy is part of the hours that we've discussed for
 4   group treatment, right?  It's not a separate chunk of
 5   time?
 6        A.   It's part of that, yes.
 7        Q.   And the same thing goes for the portion of
 8   individual treatment that is recreational therapy?  That
 9   is part of what we've already discussed, right?
10        A.   Yes.
11        Q.   Okay.
12        A.   If I could clarify.
13        Q.   Sure.
14        A.   We have a category we refer to as
15   rehabilitation therapy.  So we may have recreational
16   therapists providing treatment, but we might also have a
17   music therapist or an art therapist.
18             So, within our programs, we have a mix of
19   those therapeutic disciplines.  So it's not recreation
20   therapy necessarily.
21        Q.   Got it.  Okay.
22             Do you think there's value to the
23   rehabilitative therapy program?
24        A.   Yes.
25        Q.   And do you think there's value for group
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    therapy for the average person in the acute unit?

2         MR. McKINNEY:  Objection.  Calls for

3    speculation.

4         THE WITNESS:  In general terms, patients in

5    the acute treatment program benefit from group

6    treatment.

7    BY MS. ELLS:

8         Q.   And what is beneficial about a group treatment

9    program?

10        MR. McKINNEY:  Objection.  Vague.  Calls for

11   speculation.

12        THE WITNESS:  It depends on the individual

13   treatment needs of that patient.  If a patient has, you

14   know, whatever -- for whatever reason they came in, if

15   that ties in with their ability to get along with other

16   people, to socialize, then for someone who had those

17   sorts of issues, involving them in groups where they

18   then learn how to interact more effectively would be a

19   positive thing.

20   BY MS. ELLS:

21        Q.   Is the ideal for people in the acute program

22   to move through all five stages?

23        A.   Yes.

24        Q.   So that's the goal.

25        A.   Generally.

Ellen Bachman                                    September 20, 2013

1      Q.    What about privileges?  Do people in the acute

2    program receive things like phone calls?

3      A.    Yes.

4      Q.    At all stages?

5      A.    No.

6      Q.    At what stages do they receive phone calls?

7      A.    I don't recall.

8      Q.    Do you know if it varies depending on what

9    stage they're at?  Do they get more phone calls as they

10   move through the stages?

11     A.    I don't recall if phone calls is directly tied

12   to the steps or not.

13     Q.    What about visiting?  Do you know if people

14   get more visiting as they move through the stages?

15     A.    Again, I'm not certain that visiting is tied

16   to the steps.

17     Q.    But people in acute do get visiting; is that

18   right?

19     A.    It's determined on an individual basis.

20     Q.    And in the discussion we've just had about the

21   program in Q3, I'm just clarifying that we've been

22   discussing noncondemned people; is that right?

23     A.    Yes.

24     Q.    I'd like to talk a little bit about what the

25   program is for people that are condemned.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          It's my understanding that the step program

2     doesn't apply to them.  Is that right?

3          A.   Correct.

4          Q.   The step program we've just discussed?

5          A.   Correct.

6          Q.   Is there a different type of incentive program

7     they can work towards while they're in acute?

8          A.   No.

9          Q.   So condemned prisoners don't receive any

10    group; is that right?

11         A.   That's correct.

12         Q.   And that is not based on an individualized

13    assessment; it's just a rule?

14         A.   That's correct.

15         Q.   And is the same thing true for dayroom with

16    more than one person?

17         A.   Yes.

18         Q.   Okay.  What about yard?  I assume that they --

19    that condemned prisoners do not receive yard ever; is

20    that right?  In the acute program?

21         A.   That is correct.

22         Q.   So do condemned prisoners in the acute program

23    receive anything except for individual treatment in

24    terms of therapeutic activities?

25         A.   They receive -- again, it's individualized

1    depending on what their treatment goals are.  The

2    clinicians may provide them materials they can work on

3    in their cell.

4        Q.    Okay.

5        A.    Worksheets particular issues, that type of

6    thing that then they talk with them about and...

7        Q.    And is individual -- besides the materials

8    that they can work on in their cell, is individual

9    treatment for acute prisoners that are also condemned

10   prisoners, does that occur cell front ever?

11       A.    I don't know.

12       Q.    Does it generally occur in the dayroom?

13       A.    Again, I don't know.

14       Q.    Okay.  So you don't know where condemned

15   prisoners receive their treatment in the acute unit in

16   Q3?

17       A.    It would be in the dayroom unless it was cell

18   front.  So...

19       Q.    It would be one of those two places, though?

20       A.    Yes.

21       Q.    And do you have any idea, on average, how

22   often on a given day a condemned prisoner is out of

23   their cell?

24       A.    No.

25       Q.    So walking back to the schedule that we walked

1    through for an average day, I believe we said that two

2    hours in the morning are available for either IDTT or

3    individual treatment; is that right?

4         A.   I think that's what we said earlier.

5         Q.   And is that generally your understanding?

6         A.   Two to three.

7         Q.   Okay.  And so during that block of time, a

8    condemned prisoner could be out of their cell, right?

9         A.   Yes.

10        Q.   For some portion of that?

11        A.   For some portion of that, a condemned patient

12   could be out.

13        Q.   But it would probably not be that entire chunk

14   of time, right, because there are other people that need

15   IDTT or individual treatment, right?

16        A.   Yes.

17        Q.   And then I think we said -- correct me,

18   actually.  How many hours did you say approximately are

19   devoted to group treatment in the dayroom on a given day

20   Monday through Friday?

21        A.   There are three hours in the schedule during

22   the day that are set aside for clinician-led group

23   treatment.

24        Q.   And during that time, a condemned prisoner

25   would never leave their cell, right, unless there was an

1    emergency or something like that?

2        A.   Right, unless they were scheduled to go

3    somewhere off the unit for some other function.

4        Q.   And then -- for the portion of the time

5    devoted to yard and to sort of social time in the

6    dayroom, a condemned prisoner would not leave their cell

7    during that period of time either, right?

8        A.   Not.

9        Q.   Unless there was an emergency?

10       A.   Right.  If other patients were out in the

11   dayroom or a group or a social activity, no, they would

12   be in their cell.

13       Q.   And is there any other portion of the day that

14   we've not discussed in which there is some programming

15   occurring?

16           MR. McKINNEY:  Objection.

17   BY MS. ELLS:

18       Q.   In the acute unit?

19           MR. McKINNEY:  Vague.

20           THE WITNESS:  Did we talk about the evening?

21   BY MS. ELLS:

22       Q.   What happens in the evening?

23       A.   It's flexible depending on the needs of the

24   unit.  But there -- there is either -- certain evenings

25   there's showers.

1         After showers or on days when there aren't

2    showers, there are leisure activity kinds of groups, or

3    there are solo times worked into the schedule.

4         Q.   Okay.  And so a condemned prisoner would not

5    be able to participate in the evening group type of

6    social things, right?

7         A.   Right.

8         Q.   But they may be able to participate in an

9    individual out-of-cell activity in the evening if that

10   happens, right?

11        A.   Right.

12        Q.   Just to circle back quickly to our discussion

13   about custody officers in Q3, does Q3 have more custody

14   officers than the other acute units when there's no

15   condemned person in the unit?

16        A.   I believe we always have one officer on Q3,

17   whereas some of our other acute units share an officer.

18             On -- Q3 has an officer, and Q1 and 2 split an

19   officer, I think.  I'm fairly certain that's the way it

20   is.

21        Q.   What about MTAs?  Are there more MTAs in Q3

22   than there are on the other acute units?

23        A.   No.

24        Q.   And that's regardless of whether or not a

25   condemned person is in Q3?

1    San Quentin and into our facility, they are at risk of

2    assault or attempt on their life or things like that

3    because they are very high profile as condemned.

4        Q.   How do you know that that's the case?

5        A.   That's my understanding of why some of these

6    procedures exist.  Why we are so -- so careful in how

7    they are escorted and whatnot.

8        Q.   And do you know what the basis for that

9    rationale is?

10       A.   No, I don't.

11       Q.   Did somebody tell you that or is that --

12   what's the reason you believe that to be true?

13       A.   I mean, I must have heard that along the line.

14   I couldn't say who told me that, but that's my

15   understanding.  Someone who is a death row inmate is at

16   substantial risk of being attacked.

17       Q.   Are there other -- pardon me.

18       A.   And that's why we are so careful in how

19   they're brought through the institution when they come

20   into our program.

21       Q.   Are there other types of prisoners, for

22   instance, sex offenders and child molesters, who are

23   also more susceptible to attack in your acute program?

24           MR. McKINNEY:  Objection.  Compound.  Vague

25   and ambiguous.

1          THE WITNESS:   I mean, we do have sex offenders

2    in the program.

3    BY MS. ELLS:

4         Q.   Do you treat them any differently than you do

5    the other noncondemned prisoners because of the nature

6    of their crime?

7         A.   When patients come into the program, any of

8    those kinds of factors are reviewed to ensure that they

9    can safely be out with other patients.

10        Q.   But it's an individualized assessment; am I

11   right?

12        A.   Yes.

13        Q.   So sex offenders -- pardon me.

14             Condemned prisoners are the only ones that

15   have these special safety precautions that are outlined

16   in this policy memo in your acute program, right?  No

17   other prisoners are subject to these restrictions,

18   right?

19        A.   I don't have a policy specific to another

20   category of patients, if that's what you're asking.

21        Q.   Are you aware of any other policy that applies

22   as a blanket rule to any other category of prisoner in

23   terms of additional safety and security procedures that

24   you're required to follow at all times for them

25   regardless of individual circumstances within your acute

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Ellen Bachman                                            September 20, 2013

1   unit?

2        A.   No, I'm not aware of any.

3             MS. ELLS:  I think we're done.

4             MR. McKINNEY:  I have nothing.

5             THE REPORTER:  Counsel, did you want to order

6   a copy of the transcript?

7             MR. McKINNEY:  Yes, please.

8             THE REPORTER:  Would you -- do you want a

9   rough or expedite?

10            MS. ELLS:  They're telling me Tuesday or

11  Wednesday.

12            THE REPORTER:  Tuesday is fine.  Would you

13  also like a rough?

14            MS. ELLS:  Yes.

15            MR. McKINNEY:  We'll take the same thing.

16

17            (Whereupon, the deposition was adjourned

18             at 3:47 p.m.)

19

20                      --o0o--

21

22

23

24

25

Ellen Bachman                                    September 20, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8               That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20              DATED:  September 24, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

**EXHIBIT G TO THE SUPPLEMENTAL DECLARATION
OF PABLO STEWART IN SUPPORT OF PLAINTIFFS'
MOTION FOR ENFORCEMENT OF COURT ORDERS
AND AFFIRMATIVE RELIEF REGARDING INPATIENT
PSYCHIATRIC HOSPITALIZATION FOR
CONDEMNED INMATES**

[958237-1]

DEPARTMENT OF STATE HOSPITALS – VACAVILLE
ACUTE PSYCHIATRIC PROGRAM
PROGRAM MANUAL

SUBJECT:          **03.07  HOUSING AND TREATMENT OF CONDEMNED INMATES/PATIENTS**

EFFECTIVE DATE:   **08-15-2012**                              REPLACES:   **10-19-2011**

RESPONSIBLE:      **ACUTE PROGRAM AND POLICY REVIEW COMMITTEE**

CROSS REFERENCE:

---

**I    POLICY**

It is the policy of the Acute Psychiatric Program to provide treatment to condemned inmates on a referral basis. Due to the increased security necessary, the treatment will be provided individually and the patient will be evaluated daily regarding his psychiatric condition and readiness to return to California State Prison, San Quentin.

Any inmate referred from San Quentin Death Row shall have the direct approval of the DSH Medical Director prior to admission.

Transfer of Death Row inmates between San Quentin and the California Medical Facility shall be approved by the Wardens of each institution.

**II   PROCEDURE**

  **A.  HOUSING:**

  1.  Condemned patients admitted to the Acute Psychiatric Program shall be housed on unit Q3 only.

  2.  The housing cell must be between the two grill gates.

  3.  The patient shall not come in direct contact with any other patient. He shall be separated from other patients by a locked door or grill gate at all times.

  4.  When the condemned patient is out of his cell or his cell door is open, the other patients must be locked in their cells or separated from the condemned patient by a locked grill gate or door.

  5.  Condemned patients shall be fed in their cells at all times. The eating utensils will be accounted for before and after the meal by the unit Medical Technical Assistant (MTA) staff.

  **B.  TREATMENT:**

  1.  All treatment provided for a condemned patient will be on an individual basis. He shall not be allowed to participate in group therapies or activities; however, individual treatment shall be encouraged and provided under direct supervision.

  2.  The condemned patient is entitled to appropriate nursing care, medications, and clinical services prescribed by the attending physician, and may be involuntarily medicated under the guidelines of the PC 2602 process.

  **C.  CUSTODY:**

  1.  An additional correctional officer is assigned in Q3 with the responsibility of supervision of the condemned patient. The assigned correctional officer shall make a security check on each condemned patient no less than every 20 minutes and document the findings on a CDCR-114A Segregation-Log.

**Bachman   01**

DEPARTMENT OF STATE HOSPITALS - VACAVILLE
ACUTE PSYCHIATRIC PROGRAM
PROGRAM MANUAL

2.  There shall be a minimum of two correctional officers or one correctional officer and one academy trained MTA present whenever a condemned patient's cell door is opened. The condemned patient will be escorted with waist restraints and leg irons in place at all times.

3.  When the condemned patient is escorted off the unit for any reason, at least one correctional officer and one MTA shall provide escort. While on escort, the condemned patient will remain in direct line of sight at all times (i.e. employees will put on lead protected aprons and remain with the patient during x-ray procedures). Unit Sergeant and Watch Commander will be notified prior to escorting the condemned patient to and from the unit to stop institutional inmate movement.

Bachman   02