**Exhibit B**

```
                  UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,         )
                               )
          Plaintiffs,          )
                               )
     vs.                       )  Case No. Civ S 90-0520 LKK-JFM
                               )
EDMUND G. BROWN, JR., et al,   )
                               )
                               )
          Defendants.          )
_____)
```

      DEPOSITION OF EDWARD KAUFMAN, M.D., Volume II, taken on behalf of the defendants, at 32392 South Coast Highway, Suite 250, Laguna Beach, California, commencing at 9:14 a.m., Saturday, September 21,

Reported by:
Audrey L. Ricks
CSR No. 12098, CCR, RPR, CLR

```
 1   APPEARANCES:
 2   For Plaintiffs:
 3        ROSEN BIEN GALVAN & GRUNFELD LLP
          BY: Lorie Rifkin, Esq.
 4        315 Montgomery Street, 10th Floor
          San Francisco, California 94104
 5        415-433-6830
          lrifkin@rbgg.com
 6
 7
 8   For Defendants:
 9        STATE OF CALIFORNIA OFFICE OF THE ATTORNEY
          GENERAL
10        BY: Debbie J. Vorous, Esq.
          1300 I Street, 10th Floor
11        Sacramento, California 95814
          916-324-5345
12        debbie.vorous@doj.ca.gov
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    other cases?
2         A    Yes.
3         Q    In what case?
4         A    It's the case of -- actually, it wasn't a
5    deposition.  It was a -- I testified at a hearing in
6    front of a judge.  And it was in regard to a
7    mitigation of a three-strikes sentence.
8              MS. RIFKIN:  And I think that's on the
9    updated legal cases that we provided to you; is that
10   right?
11             THE WITNESS:  Yes.  That's my . . .
12   BY MS. VOROUS:
13        Q    That would be in September of this year?
14        A    Yes.
15        Q    So, Doctor, you understand that you've
16   been designated as an expert for the plaintiffs to
17   testify in the context of their current motion on
18   CDCR's use of force against mentally ill inmates;
19   correct?
20        A    Yes.
21        Q    And as part of that designation, you've
22   submitted a declaration in August of this year.  And
23   then we also received by e-mail your supplemental
24   declaration late yesterday afternoon; is that
25   correct?

1        A    Yes.
2        Q    So let's start with the first declaration.
3   And this is a declaration that was filed on
4   August 23rd, 2013.
5                  (Exhibit 1 marked.)
6   BY MS. VOROUS:
7        Q    So, Doctor, if you would turn to the last
8   page of the declaration, which is on page 7.  So it
9   would be page 8 of 32.
10            Are you there?
11       A    Yes.
12       Q    And is that your signature?
13       A    Yes.
14       Q    And you signed this declaration on
15  August 21st of 2013; correct?
16       A    Yes.
17       Q    And Exhibit A to your declaration is your
18  CV; correct?
19       A    Yes.
20       Q    Other than what your -- not your lawyer --
21  Plaintiff's lawyer has provided today for legal
22  cases between 2002 and 2013, have you updated your
23  resume in any other way?
24       A    Just very, very minor changes on some
25  dates of things that began and ended.

1     Q    -- that based on your -- your review of
2  materials, that the RVR process disregarded mental
3  considerations.  And if I'm stating your testimony
4  correctly, would that be in the context of the four
5  prisoners that you reviewed?
6     A    Yes, the ones I reviewed.  And also the
7  one that I mentioned a few minutes ago where the
8  mental health input was blank.
9     Q    Beyond these five inmates, you haven't
10 reviewed any other materials to determine whether or
11 not mental health considerations were taken in the
12 context of disciplinary processes.
13         Is that accurate?
14    A    Well, I looked at the other RVRs, and I
15 didn't quantitate that.  I can certainly quantitate
16 that before I testify next week.
17    Q    Do you plan on doing that?
18    A    I think that would be a good idea.
19    Q    But so far you haven't; correct?
20    A    Correct.
21    Q    And in looking at Exhibit -- excuse me --
22 Appendix A, what other documents would you need to
23 look at to -- to quantify that?
24    A    I have medical records available to me on
25 all of these inmate patients, and it's possible that

```
 1     I might take another look at them -- I just reviewed
 2     the medical records briefly on these individuals --
 3     if I think it's indicated after looking at the RVRs.
 4          Q    And you're talking about all the other
 5     inmates that are listed on Appendix A outside of the
 6     ones we've already discussed; correct?
 7          A    Correct.  And I might even look at
 8     those -- some of the others to see whether the
 9     mental health input is indicated or regarded or
10     disregarded.
11          Q    When you say "others," I'm sorry, I'm not
12     following what you're --
13          A    I meant other than the three that I
14     mentioned of the 17 that are here.  So the other 14.
15               MS. RIFKIN:  I think, to clarify, that's
16     three we talked about in addition to the four.  So
17     it would really it would be about ten, approximately
18     ten people that you're talking about that you
19     haven't discussed yet today?
20               THE WITNESS:  Right.
21               MS. RIFKIN:  Okay.
22               THE WITNESS:  Three plus four is seven
23     minus seventeen is ten.  Thank you --
24               MS. RIFKIN:  I'm just clarifying for the
25     record.
```

1   record.
2              THE WITNESS:  Okay.  I wanted to clarify
3   one thing.
4   BY MS. VOROUS:
5        Q    Okay.
6        A    That the CDCR's policies on use of force
7   were not provided to me.  What I was mistaking for
8   them was the public correctional policy on use of
9   force from the American Correctional Association,
10  which has been provided to you.
11             However, I did have information indirectly
12  about CDCR's use of force from the declarations of
13  Martin and Vail.
14       Q    And the ACA public correctional policies
15  that you're referring to is what you have listed in
16  Appendix A to your supplemental declaration;
17  correct?
18       A    Correct.
19       Q    If you could pull back out Exhibit 2,
20  which is your supplemental declaration, and turn to
21  page 18, please.
22             MS. RIFKIN:  Let's keep this one separate
23  too because that's one of the marked exhibits
24  separate from your file.
25             THE WITNESS:  Page 18?

 1   specifically are reinforced by uses of force like I
 2   observed on those videos and have read about, they
 3   become progressively vulnerable to repeated
 4   psychotic episodes, and they become progressively
 5   more resistant to therapeutic interventions.
 6       Q    So is it -- is it unusual, then, that
 7   seriously mentally ill inmates within a prison
 8   system would be subjected to multiple uses of force
 9   over their period of confinement?
10            MS. RIFKIN:  Objection.  Overbroad.
11            THE WITNESS:  Well, again, you know, from
12   reading statements of Martin and Vail, it seems
13   like, relative to other correctional systems, the
14   use of force in California is more extensive.
15   BY MS. VOROUS:
16       Q    Aside from reading the declarations of
17   Martin and Vail, do you have any other basis to draw
18   that conclusion?
19       A    In terms of comparing it to other prison
20   systems in the last decade, no.
21       Q    In this same paragraph further down, on
22   line 16, you make the statement that the exposure to
23   the punitive reactions that you've described above
24   likely causes long-term psychological damage.
25            Do you see that?

1        A    Yes.
2        Q    And what do you base that opinion on?
3        A    Well, no, I've only seen these individuals
4   in one slice of life.  I haven't had the opportunity
5   to see them over long term.  But, you know, I do see
6   that, after an episode or after a series of
7   episodes, they are less amenable to therapeutic
8   intervention.
9             I see that they -- they have had serious
10  psychotic episodes and that, with each psychotic
11  episode, the brain becomes progressively more
12  vulnerable to further psychotic episodes which then
13  become more frequent and more severe.
14            And a lot of damage is they don't trust
15  the system anymore and they're very resistant to
16  treatment.  And so it just escalates the cycle of
17  fear, anxiety, panic, psychosis, cell extractions
18  and increased fear.
19       Q    Doctor, what I'm trying to understand is
20  if -- and I apologize if I'm not asking this as
21  eloquent as I should.
22            But is this based on your review of the
23  four patients that you've discussed in your
24  declaration?  Or is it based on some broader
25  understanding of CDCR's system and the inmates

```
 1    within their system?
 2         A    Well, I think it's based on all of the
 3    materials that I've reviewed, that I've cited.
 4    Certainly, the four inmates whose videotapes I
 5    observed are striking examples of people who have
 6    been grossly traumatized by the punitive aspects of
 7    use of force.
 8         Q    So is your opinion, then, that, based on
 9    the trauma associated with the use of force at least
10    with respect to those four inmates, they would then
11    suffer long-term psychological damage as a result of
12    that?
13         A    I think that it's one cog in the wheel of
14    long-term psychological damage.
15         Q    Explain what you mean by that.
16         A    Well, I mean that -- you know, each
17    episode of violence is another cog in the wheel.
18    Time spent in all of the untherapeutic aspects of
19    being incarcerated is another cog in the wheel.
20    Being put into SHU and AD-SEG is another cog in the
21    wheel.
22              There are many aspects of the cruel and
23    inhumane punishment that takes place in the state
24    prison system that contribute to repeated psychoses
25    and repeated psychotic decompensation, and each
```

Page 351

1  had been subject to use of force while they were in
2  prison?
3       A    You know, by and large, I really can't
4  recall instances where, in my psychiatric
5  evaluation, the issue of whether or not they had
6  been subjected to force in prison came up.  So it
7  would be -- it would be a rare occurrence that I
8  would pursue it in my -- in my private practice.
9            Most of those inmates I see for initial
10 psychiatric evaluation, and I focus more on the here
11 and now of their psychiatric illness rather than to
12 what extent their incarcerations contributed to that
13 illness.
14      Q    Doctor, have you ever conducted any
15 studies on the impact of use of force on an inmate's
16 mental health illness?
17      A    No methodological studies, just the
18 observational studies that I've been speaking about.
19      Q    And the observational studies that you've
20 been speaking about, are they referred to in
21 Appendix A to your supplemental declaration?
22      A    Just in talking to inmates, as I've
23 mentioned here.
24      Q    Oh.
25      A    And in my, you know, series of dating

```
 1        A    Vacaville, back in, I think it was about
 2   1989.
 3        Q    Are you aware of any published studies
 4   that look at the question of the impact or potential
 5   impact of use of force on mentally ill inmates?
 6        A    No.  I've not reviewed any.
 7        Q    Turn back to page 2 of your supplemental
 8   declaration, please, paragraph 5.
 9        A    (Witness complies).
10        Q    Line 7 of paragraph -- well, excuse me --
11   line 7 on page 2, this is paragraph 5, you talk
12   about how, although your review was a limited
13   sample, it's your understanding that the incidents
14   you reviewed were "typical of CDCR practice and
15   within CDCR policy."
16             Do you see that?
17        A    Yes.
18        Q    Can you explain why you have that
19   understanding or what you base your understanding
20   on?
21        A    Well, that my observations were compatible
22   with those of Vail and those particularly in the
23   deposition of Martin.
24             When I say "particularly in the
25   deposition," as opposed to the declaration.
```

```
 1    rotation at Rockland State Hospital in upper
 2    New York State.
 3              I was the director of a psychiatric
 4    emergency room in Spanish Harlem.
 5              I was the -- I had two years working in
 6    Metropolitan State Hospital in Norwalk.
 7              I also have done a series of
 8    investigations of state hospitals in many states on
 9    something that was called "right to treatment
10    suits."
11              And I was also the director of psychiatric
12    services at the University of California, Irvine,
13    Medical Center at a time when it served essentially
14    as the major county acute psychiatric hospital.
15              So in terms of my experiences, I just
16    wanted to list that I have had other kinds of
17    experiences dealing with severe mentally ill
18    patients, some of whom have had criminal records.
19         Q    Have you ever written any articles,
20    chapters in books, anything along that line that
21    address the impact of use of force on a mentally ill
22    inmate?
23         A    Not to date.  I may have to after today.
24         Q    Have you -- have you made presentations on
25    that subject?
```