1  FUTTERMAN DUPREE DODD CROLEY MAIER LLP
   MARTIN H. DODD (104363)
2  180 Sansome Street, 17th Floor
   San Francisco, California 94104
3  Telephone:  (415) 399-3840
   Facsimile:  (415) 399-3838
4  mdodd@fddcm.com

5  *Attorneys for Receiver*
   J. Clark Kelso
6

7              **UNITED STATES DISTRICT COURT**

8           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

              **AND FOR THE EASTERN DISTRICT OF CALIFORNIA**
9

10  MARCIANO PLATA, et al.,                    Case No. C01-1351 TEH

11            *Plaintiffs*,

12         v.

13  EDMUND G. BROWN, JR., et al.,
              *Defendants*.
14  _____

15  RALPH COLEMAN, et al.,                     Case No. CIV S-90-0520 LKK JFM P

16            *Plaintiffs*,

17         v.

18  EDMUND G. BROWN, JR., et al.,
              *Defendants*.
19  _____

20  JOHN ARMSTRONG, et al.,                    Case No. C94-2307 CW

21            *Plaintiffs*,

22         v.

23  EDMUND G. BROWN, JR., et al.,
              *Defendants*.
24  _____

25            **NOTICE OF FILING OF RECEIVER'S
              TWENTY-FOURTH TRI-ANNUAL REPORT**
26

27

28

1    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

2  1351 TEH, has filed herewith his Twenty-Fourth Tri-Annual Report.

3  Dated:  October 1, 2013                    FUTTERMAN DUPREE DODD CROLEY
                                              MAIER LLP
4

5                                             By:_____/s/ Martin H. Dodd_____
                                                        Martin H. Dodd
6                                                       Attorneys for Receiver J. Clark Kelso

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Achieving a Constitutional Level of Medical Care in California's Prisons

**Twenty-fourth Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action**
**For May 1 – August 31, 2013**

**October 1, 2013**

# California Correctional Health Care Receivership

**Vision:**

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

**Mission:**

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1. **Executive Summary**……………………………………………………………………………… 1

2. **The Receiver's Reporting Requirements**……………………………………………… 4

3. **Status and Progress Toward the Turnaround Plan Initiatives**………………… 5

   **GOAL 1    Ensure Timely Access to Health Care Services**……………………… 5

   *Objective 1.1*    Screening and Assessment Processes…………………………… 5

   *Objective 1.2*    Access Staffing and Processes………………………………………… 5

   *Objective 1.3*    Scheduling and Patient-Inmate Tracking System………………… 6

   *Objective 1.4*    Standardized Utilization Management System…………………… 6

   **GOAL 2    Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services**………………………………………………… 7

   *Objective 2.1*    Primary Care…………………………………………………………………… 7

   *Objective 2.2*    Chronic Care…………………………………………………………………… 7

   *Objective 2.3*    Emergency Response……………………………………………………… 7

   *Objective 2.4*    Specialty Care and Hospitalization………………………………… 8

   **GOAL 3    Recruit, Train and Retain a Professional Quality Medical Care Workforce**……………………………………………………………………………… 9

   *Objective 3.1*    Physicians and Nurses…………………………………………………… 9

   *Objective 3.2*    Clinical Leadership and Management Structure…………………… 9

   *Objective 3.3*    Professional Training Program……………………………………… 9

   **GOAL 4    Implement a Quality Assurance and Continuous Improvement Program**……………………………………………………………………………… 10

   *Objective 4.1*    Clinical Quality Measurement and Evaluation Program………… 10

   *Objective 4.2*    Quality Improvement Programs……………………………………… 18

   *Objective 4.3*    Medical Peer Review and Discipline Process………………………… 25

   *Objective 4.4*    Medical Oversight Unit…………………………………………………… 25

   *Objective 4.5*    Health Care Appeals Process………………………………………… 25

i

*Objective 4.6*    Out-of-State, Community Correctional Facilities and Re-entry Oversight.................................................................................... 25

**GOAL 5**    **Establish Medical Support / Allied Health Infrastructure...................** **27**

*Objective 5.1*    Pharmacy........................................................................................ 27

*Objective 5.2*    Medical Records.............................................................................. 27

*Objective 5.3*    Imaging/Radiology and Laboratory Services.................................... 27

*Objective 5.4*    Clinical Information Systems............................................................ 29

*Objective 5.5*    Telemedicine.................................................................................. 29

**GOAL 6**    **Provide for Necessary Clinical, Administrative and Housing Facilities............................................................................................** **30**

*Objective 6.1*    Upgrade Administrative and Clinical Facilities.................................. 30

*Objective 6.2*    Expand Administrative, Clinical, and House Facilities....................... 32

*Objective 6.3*    Finish Construction at San Quentin State Prison.............................. 32

**4.**    **Additional Successes Achieved by the Receiver........................................** **33**

    A.    Office of the Inspector General – Update on the Medical Inspections of California's 33 Adult Prisons.................................................................. 33

**5.**    **Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented By Institutions Or Individuals.........................................................** **35**

    A.    CCHCS Activities related to the Court's June 24, 2013, Order Granting Plaintiff's Motion for Relief Re: Valley Fever at PVSP and ASP............................ 35

    B.    Overcrowding Update.......................................................................... 36

**6.**    **An Accounting of Expenditures for the Reporting Period...........................** **37**

**7.**    **Other Matters Deemed Appropriate for Judicial Review...........................** **38**

    A.    Coordination with Other Lawsuits........................................................ 38

    B.    Master Contract Waiver Reporting....................................................... 38

    C.    Consultant Staff Engaged by the Receiver............................................. 38

    D.    Overview of Transition Activities.......................................................... 38

**8.**    **Conclusion......................................................................................................** **47**

# Section 1: Executive Summary

In our final Tri-Annual report for 2013, the accomplishments for the period of May 1 through August 31, 2013 are highlighted. Progress continues toward fully implementing the Vision and Mission outlined in the Receiver's Turnaround Plan of Action (RTPA). Highlights for this reporting period include the following:

- RTPA – Work on remaining action items continues, including completion of a system-wide scheduling function now functional at all 34 institutions (final completion date scheduled for December 2013); continued expansion of the Patient Safety Program; and the continued expansion of work performed in the Quality Improvement Program, with all institutions having completed a draft Performance Improvement Work Plan (PIWP).

- When the Office of the Inspector General (OIG) inspections began, more than 75 percent of the institutions earned low adherence scores. By the end of cycle three, no institutions received low adherence scores, and over 75 percent of the 33 institutions earned high adherence scores. This seemed to indicate that the delivery of medical care to the patient-inmate population of California's correctional institutions had drastically improved. However, towards the end of cycle three, the *Plata* Court Experts began their own inspections. Their first four reports, for Richard J. Donovan Correctional Facility (RJD), California Men's Colony (CMC), California State Prison, San Quentin (SQ), and Sierra Conservation Center (SCC) indicated that while some of the institutions would be delivering an adequate level of care once physical plant issues were corrected, others were not delivering adequate medical care. This highlighted the discrepancies between the OIG metrics and the *Plata* experts. Cycle four of the OIG medical inspections is now on hold due to the discrepancies between the OIG and *Plata* Court Expert findings.

    o In light of the differences between the OIG scores and the *Plata* Court Expert findings, the Court suggested, "it may be helpful for the OIG to meet with the court experts with the goal of refining the OIG audit instrument to more accurately measure the adequacy of care". In accordance with the Court's suggestion, the parties, the Receiver and the OIG, conducted several rounds of meetings and discussions. In addition, the OIG's inspectors shadowed the *Plata* Court Experts during a recent inspection to determine how best to incorporate elements of the *Plata* Court Expert inspection process into their own.

    o During this reporting period, OIG and California Correctional Health Care Services (CCHCS) held discussions to contemplate changes to the OIG medical inspection process which will subsequently be discussed with internal and external stakeholders. It is anticipated that cycle four inspections will commence in December 2013.

- Most importantly, the California Health Care Facility (CHCF) in Stockton was successfully opened with the first patient-inmates arriving in July 2013. Health Care Facility Improvement Program (HCFIP) projects continue to progress through the Public Works Board (PWB) approval process and the Pooled Money Investment Board (PMIB) funding process. Despite some early delays in receiving PWB and PMIB approvals, projects are again proceeding on a sequential submittal schedule to the PWB and PMIB. To date, 17 projects (all of the intermediate level-of-care facilities and male reception centers, as well as three basic level-of-care facilities) have received PWB project level approvals and PMIB interim loan approvals. Contracts for developing site-specific designs have been negotiated for 15 of these projects, with two others in the process of negotiation. Since these projects still require PWB approval of the completed preliminary plans, and Department of Finance (DOF) approval once the working drawings are complete before CDCR may proceed to bid, they continue to carry significant risk. The statewide medication distribution projects are scheduled to be submitted for PWB design approval in October 2013, which is a two-month delay from the prior schedule.

Format of the Report
To assist the reader, this Report provides three forms of supporting data:

*Metrics*: Metrics that measure specific RTPA initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions that are not completed.

*Appendices*: In addition to providing metrics, this report also references documents in the Appendices of this report.

*Website References*: Whenever possible website references are provided.

RTPA Matrix
In an effort to provide timely and accurate progress reports on the RTPA to the Courts and other vested stakeholders, this format provides an activity status report by enterprise, for statewide applications/programs, and by institution, as appropriate for and in coordination with that operation.

The Enterprise Project Deployment worksheet and the Institution Project Deployment worksheet provide an illustration of the progress made toward each action item outlined in the RTPA and reported in the Tri-Annual Report. The Enterprise Project Deployment worksheet captures projects specifically assigned to the Receiver for broad administrative handling, analysis or testing. The Institution Project Deployment captures the status of all other activity by institution. Reporting will reflect activity that is completed, on schedule, delayed or not progressing, with corresponding dates. The Tri-Annual Report will continue to provide a narrative status report.

Due to the size of the document, the Matrix is included as Appendix 1.

Information Technology Project Matrix
In addition to the RTPA Matrix, a separate chart has been created to specifically illustrate the major technology projects and the deployment of those projects. This document is included as Appendix 2.

## Section 2: The Receiver's Reporting Requirements

This is the twenty-fourth report filed by the Receivership, and the eighteenth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2-3 of the Appointing Order at
http://www.cphcs.ca.gov/docs/court/PlataOrderAppointingReceiver0206.pdf)

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against the CDCR, the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman, and Plata*. An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (http://www.cphcs.ca.gov/receiver_tri.aspx)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

# Section 3: Status of the Receiver's Turnaround Plan Initiatives

## Goal 1: Ensure Timely Access to Health Care Services

**Objective 1.1.** Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*
This action is completed.

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*
Based on the *Plata* Court Expert review of SQ's reception center processes in March 2013, a review of optimizing further reception center processes in light of redistribution of reception center missions is underway.

*Action 1.1.3. By January 2010, begin using the new medical classification system at each reception center prison.*
This action is completed.

*Action 1.1.4. By January 2011, complete statewide implementation of the medical classification system throughout CDCR institutions.*
This action is completed.

**Objective 1.2.** Establish Staffing and Processes for Ensuring Health Care Access at Each Institution

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution.*
This action is completed.

*Action 1.2.2. By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions.*
This action is completed.

Refer to Appendix 3 for the Executive Summary and Health Care Access Quality Reports for April 2013 through July 2013.

**Objective 1.3.** Establish Health Care Scheduling and Patient-Inmate Tracking System

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System (SOMS) with a scheduling and inmate tracking system as one of its first deliverables.*

This action is ongoing. The medical, dental, and mental health scheduling systems have been deployed to all 34 institutions. We are in the process of rolling out the medical management reports to the institutions. Several high priority change requests for the medical and dental systems are in process.

Progress during this reporting period is as follows:

- Deployments to all 33 institutions were completed by June 2013. CHCF, the new facility, was rolled out in July 2013.

- Several essential change requests to the medical scheduling system are in process now. Scheduled implementation is October 2013.

- Change requests are being implemented to the dental scheduling system, including the addition of essential reports. This effort will be completed by December 2013.

- Roll out of the medical management reports is in process now and will be completed by October 2013.

We anticipate the Health Care Scheduling and Tracking System (HCSTS) to be completed and closed by December 2013.

**Objective 1.4.** Establish a Standardized Utilization Management System

*Action 1.4.1. By May 2010, open long-term care unit.*

This action is completed.

*Action 1.4.2. By October 2010, establish a centralized UM System.*

This action is completed.

## Goal 2: Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

**Objective 2.1.** Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models.*

This action is ongoing. Progress during this reporting period is as follows:

Elements of the draft Episodic Care Policy and Procedure are being considered for inclusion in the revision to the Primary Care Model Policy and Procedure (Volume 4, Chapter 4a) in the Inmate Medical Services Policies and Procedures (IMSP&P). The Primary Care Model Policy and Procedure is being examined and revised by a workgroup presently and, in addition to Episodic Care, the workgroup is considering inclusion of elements of the following IMSP&P policies and procedures into the Primary Care Model Policy and Procedure: Chronic Care Disease Management (Volume 7, Chapters 1a and 1b); Preventive Clinical Services (Volume 4, Chapter 7); and Access to Care (Volume 4, Chapter 4). The extent to which the draft Episodic Care Policy and Procedure will be incorporated into the Primary Care Model Policy and Procedure is unknown at this time, but the workgroup and Clinical Operations Team (COT) are conceptually supportive of incorporating elements of the Draft Episodic Care Policy and Procedure into the Primary Care Model. A separate group has also convened to revise the CDCR 7362, Health Care Services Request Form. Revisions to the form were made and are awaiting additional feedback related to the Primary Care Model Policy and Procedure, as additional modifications to the CDCR 7362 may be required.

*Action 2.1.2. By July 2010, implement the new system in all institutions.*

This action is ongoing. Please see action item 2.1.1.

**Objective 2.2.** Improve Chronic Care System to Support Proactive, Planned Care

*Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered.*

This action is completed.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions.*

This action is completed.

*Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff.*

This action is completed.

***Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response.***

This action is completed.

**Objective 2.4.** Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

***Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.***

This action is completed.

***Action 2.4.2. By October 2010, establish on a statewide basis approved contracts with specialty care providers and hospitals.***

This action is completed.

***Action 2.4.3. By November 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner.***

This action is completed.

## Goal 3: Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1** **Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions**

For details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for April 2013 through July 2013. These reports are included as Appendix 4.

> ***Action 3.1.1. By January 2010, fill ninety percent of nursing positions.***
This action is completed.

> ***Action 3.1.2. By January 2010, fill ninety percent of physician positions.***
This action is completed.

**Objective 3.2** **Establish Clinical Leadership and Management Structure**

> ***Action 3.2.1. By January 2010, establish and staff new executive leadership positions.***
> ***Action 3.2.2. By March 2010, establish and staff regional leadership structure.***
These actions are completed.

**Objective 3.3.** **Establish Professional Training Programs for Clinicians**

> ***Action 3.3.1. By January 2010, establish statewide organizational orientation for all new health care hires.***
This action is completed.

> ***Action 3.3.2. By January 2009, win accreditation for CDCR as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.***
The action is completed.

# Goal 4: Implement Quality Improvement Programs

**Objective 4.1.** Establish Clinical Quality Measurement and Evaluation Program

> ***Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs.***

This action is ongoing. Progress during this reporting period is as follows:

Patient Safety Program

In May 2012, CCHCS adopted policies and procedures to establish a statewide Patient Safety Program. Implementation of the new Patient Safety Program requires establishing a certain infrastructure statewide, such as a health incident reporting system, as well as orienting CCHCS staff at all levels of the organization to multiple new concepts and skills. As a result, CCHCS has adopted a phased approach to program implementation, with updates provided below.

- Annual Patient Safety Plan. Members of the Patient Safety Committee identified several statewide projects in August 2013 intended to advance or shore up the new statewide Patient Safety Program, including a statewide Patient Safety Culture Survey to assess aspects of the organizational culture which may support or present barriers to patient-inmate safety. In addition, specific patient-inmate safety strategies and objectives, such as reducing potentially avoidable hospitalizations, improving laboratory monitoring for patient-inmates on psychotropic medications, and addressing polypharmacy risk (described in more detail below) have been incorporated into the CCHCS Performance Improvement Plan for 2013-2015, finalized by the Headquarters Quality Management Committee (QMC) in August.

- Statewide Surveillance System. The new Patient Safety Program Policy requires CCHCS to create a statewide system to integrate and analyze data from a number of sources – death reviews, suicide case studies, patient-inmate appeals, reports from stakeholders, adverse events and "near misses" captured in the Health Care Incident Reporting System – as a means of identifying and addressing risks to patient-inmate safety.

   CCHCS staff continued to report potential adverse events and other types of incidents through the Health Care Incident Reporting System, and a multi-disciplinary group of executives at headquarters met daily to triage the health incidents, directing institutions to take appropriate follow-up action, as per policy. Eighty incidents had been reported by the end of August 2013. During this reporting period, CCHCS staff introduced refinements to the Sentinel Event/Adverse Event Reporting Form, making adjustments to reflect a new taxonomy which draws from models used in the broader health care industry. Form modifications are pending approval by the Patient Safety Committee.

During this reporting period, a new Intranet webpage was established to facilitate access to the Health Incident Reporting System, as well as other Patient Safety Program tools and training. (Please see Figure 1.)

*Figure 1. New Patient Safety Page on Lifeline.*



- <u>Technical assistance, staff development programs, and decision support tools.</u> In August 2013, CCHCS launched a statewide training program to orient CCHCS staff to the new standardized process for Root Cause Analysis (RCA) – a structured method for identifying the fundamental reasons an adverse event occurred and implementing interventions to prevent similar events from happening in the future. Mandated for all health care staff, the RCA training explains the role of root cause analysis in the health care industry and other types of enterprise, describes the new requirements for root causes analysis in the California prison system, and outlines the standardized procedures for conducting a thorough and credible RCA. Please see Appendix 5 for the training PowerPoint.

The presentation introduces the Root Cause Analysis Tool Kit, designed to guide CCHCS staff through each procedural step of the RCA process, and directs institutions to staff that may assist with RCAs. Since initial implementation of the Health Incident Reporting System in April, seven RCAs have been assigned to institutions; four RCAs were performed by institutions on their own initiative, though not mandated by policy. A

report will be issued this year describing the outcomes and lessons learned from RCAs statewide.

- <u>Headquarters Patient Safety Committee and Adverse/Sentinel Event Committee.</u> Since its inaugural meeting in August 2012, the Patient Safety Committee has convened 13 times; the Adverse/Sentinel Event Committee has met 25 times (four meetings were joint between these two committees). With the Patient Safety Program still in phased implementation, both committees have primarily focused on activities required to fully implement the new program, such as the development and approval of tools and training programs.

- <u>Statewide Patient Safety Initiative – Patient-Inmates at Risk for Coccidioidomycosis ("cocci").</u>
  In July 2013, CCHCS modified the Medical Classification System (MCS) Policy and Procedures[1] to preclude patient-inmates with certain risk factors, such as history of lymphoma, from placement at prisons where cocci is most prevalent – referred to as Cocci Areas 1 and 2. Patient-inmates who are already housed at a prison in Cocci Area 2 may complete a waiver to stay at their current institution if they meet specific criteria. Please see Table 1 for exclusion and waiver criteria.

*Table 1: Exclusion and Waiver Criteria per MCS Policy and Procedures – Institutions in Cocci Areas 1 and 2*

| Patient Group | Associated Risk Factors | Excluded from the Following Institutions: |
|---|---|---|
| Excluded: Cocci Area 1 | HIV positive, history of lymphoma, chronic immunosuppressive therapy, moderate to severe COPD<br>Exception: Patient-inmates already cocci-infected | CCI, COR, SATF, KVSP, NKSP, WSP |
| Excluded: Cocci Area 2 | All risk factors listed for Cocci Area 1, diabetes, pregnant, designated as medical high risk, Filipino or African-American<br>Exception: Patient-inmates already cocci-infected | ASP and PVSP |
| Eligible for Waiver (Cocci Area 2) | Patient-inmates who are excluded only because they are Filipino or African-American or have diabetes; must be low or medium medical risk | N/A |

Among other supports, CCHCS has provided institutions with training to promote adherence to the new policy, revised forms to guide patient-inmate placement, and ongoing technical assistance. During this reporting period, CCHCS also released a Cocci Risk Registry that allows health care and custody staff to determine at a glance whether patient-inmates:

- Are eligible (or ineligible) for placement in Cocci Area 1 or 2.

---

[1] IMSP&P, Volume 4, Chapter 29 and 29.1

- Have signed a waiver to remain at their current institution despite having cocci risk factors that would otherwise require transfer.

A June 2013 federal court order mandates that the CDCR move all patient-inmates with certain risk factors from Cocci Area 2 [Avenal State Prison (ASP) and Pleasant Valley State Prison (PVSP)], or obtain appropriate waivers, within 90 days or on or about September 24, 2013. The Cocci Risk Registry allows custody and health care staff to run customized reports that identify patient-inmates who must transfer out of Cocci Areas 1 and 2, as well as patient-inmates who are appropriate to backfill soon-to-be-vacant cells. Because it is updated daily, data from the Cocci Risk Registry allows CCHCS staff to monitor progress toward the organizational goal of appropriately placing all patient-inmates with cocci risk factors.

The Cocci Risk Registry features two types of views, one for custody staff who need certain information for patient-inmate placement purposes, but are not authorized to view some clinical details per state and federal law, and a separate view for clinical staff. Figure 2 provides screenshots of both the custody and clinical views from the new registry; Appendix 6 provides further detail about the two primary registry views and available features.

*Figure 2, Part A. Custody View of Cocci Risk Registry with Select Data Points Highlighted*



*Figure 2, Part B. Clinical View of Cocci Risk Registry with Select Data Points Highlighted*



- <u>Statewide Patient Safety Initiative – High-Risk Patient-Inmates.</u>
  As part of its annual Performance Improvement Plan, CCHCS has set incremental goals for concentrating the prison systems' high risk patient-inmates at a subset of Intermediate Institutions that are resourced specifically to care for the more complex and unstable patient-inmates. As of August 2013, 65 percent of high risk patient-inmates are housed at an Intermediate Institution, an increase of more than 700 patient-inmates placed at Intermediate Institutions in comparison to May 2013. The goal is to reach 90 percent of high risk patient-inmates at Intermediate Institutions by the close of 2013. Please see Figure 3.

On a daily basis, CCHCS staff use reports and patient-inmate lists to identify high risk patient-inmates currently housed at Basic Institutions who may be more appropriately managed at an Intermediate Institution and initiate moves for these patient-inmates.

CCHCS now provides medical executives with detailed information about each patient-inmate's health risk factors through a tool called the Patient Risk Profile, released in August 2013. By clicking on the clinical risk designation next to a patient-inmate's name, health care staff are able to view the specific risk factors attributed to that patient-inmate, as well as other relevant data, such as demographics, disability program status, and active prescriptions. Please see Figures 4 and 5. Appendix 7 provides further detail about features of the Patient Risk Profile.

*Figure 4. Accessing the New Patient Risk Profile*



*Figure 5. Mock Patient Risk Profile*



- Statewide Patient Safety Initiative - Polypharmacy. CCHCS has selected polypharmacy as one of its first statewide patient-inmate safety initiatives, with special emphasis on potentially harmful drug-drug interactions associated with Hepatitis C (HCV) and psychotropic medications and medications that could put patient-inmates at risk if they have underlying cardiovascular conditions. During the last reporting period, CCHCS developed on-demand reports identifying patient-inmates taking 10 or more medications, as well as patient-inmates taking two or more psychotropic medications in excess of 90 days; during this reporting period, CCHCS continues to work on more detailed patient-inmate registries alerting care teams about specific drug-drug interactions.

  In the course of developing an annual improvement plan this year, 26 institutions chose to focus on polypharmacy as a patient-inmate safety issue locally, performing systematic pharmacy and care team reviews to ensure that medication regimens were free from redundancies or drug-drug interactions and were still merited by the patient-inmate's current condition.

Revisions to the Health Care Services Dashboard
During this reporting period, CCHCS continued to release the monthly Health Care Services Dashboard, which consolidates strategic performance information across all clinical program areas into a single report, allowing health care staff to identify improvement opportunities and assess progress toward local and statewide performance objectives.

Dashboard measures are drawn directly from the priority areas and objectives in the statewide Performance Improvement Plan. During this reporting period, CCHCS prepared for updates to the Dashboard to reflect the new Performance Improvement Plan covering the time period from 2013 through 2015.

Patient-Inmate Registries
CCHCS has made it a priority to promote the use of its 24 registries and sub-registries, which make critical clinical information, such as a patient-inmate's health risk status, easily accessible to care teams working to manage an assigned patient-inmate panel. The flags imbedded in the patient-inmate registries prompt care teams to follow CCHCS guidelines, which both improves patient-inmate outcomes and helps to reduce costs. Widespread and consistent registry use is required for full implementation of the Population and Care Management elements of the CCHCS Primary Care Model, and necessary for compliance with certain IMSP&P.

During this reporting period, CCHCS enhanced features of existing registries by accessing daily updates to pharmacy data and incorporating data from the electronic Problem List, which offers important diagnostic information. CCHCS also began development of an HIV Patient Registry.

Registry usage has steadily increased statewide since the May 2012 release of on-demand patient-inmate registries, which allow users to select from drop-down menus to customize

registry reports for a particular patient-inmate population, care team, or other data element. Registry usage increased from 785 unique users per month in May of 2012 to more than 1,976 unique users per month in August 2013. To date, more than 6,700 unique users have accessed the registries, for a total of 330,000 on demand reports run since the initial introduction of the registries. Please see Figures 6 and 7.



Figure 6.

*Figure 7.*



In the next reporting period, CCHCS will continue to provide registry demonstrations at scheduled site visits and at the request of institution staff.

***Action 4.1.2. By July 2009, work with the Office of the Inspector General to establish an audit program focused on compliance with Plata requirements.***

This action is completed. However, the parties, the Receiver and the OIG, recently held a preliminary meeting to discuss possible refinements to the OIG's inspection program. Discussions are ongoing, and the next scheduled meeting will include the *Plata* Court Experts as previously suggested by the Court. *See* April 18, 2013 Order Extending Time for *Plata* Court Experts to Complete Written Evaluations, pg. 2, fn. 1 (in which the Court suggested that "it may be helpful for the OIG to meet with the court experts with the goal of refining the OIG audit instrument to more accurately measure the adequacy of care").

**<u>Objective 4.2.</u> Establish a Quality Improvement Program**

***Action 4.2.1.(merged Action 4.2.1 and 4.2.3): By January 2010, train and deploy existing staff--who work directly with institutional leadership--to serve as quality advisors and develop model quality improvement programs at selected institutions; identify clinical champions at the institutional level to implement continuous quality improvement locally; and develop a team to implement a statewide/systems-focused quality monitoring/measurement and improvement system under the guidance of an interdisciplinary Quality Management Committee.***

This action item is ongoing. Progress during this period is as follows:

<u>Quality Management Policy and Procedures</u>

In December 2012, CCHCS issued new Quality Management (QM) Program Policies and Procedures, replacing outdated program standards from 2002. Incorporated into Volume 3 of the IMSP&P, the new policy and procedures maintain many of the existing quality management structures, but also introduces a number of new program elements, such as current nationally-recognized improvement techniques.

As part of policy implementation, the QM Section offers QM Academy training approximately every quarter, a two-day training to orient staff to the statewide QM and Patient Safety Programs, as well as available quality improvement resources and processes. Institutions send "quality champions" – staff of all disciplines and classifications that play a leadership role in the institution QM Program – to the QM Academy, which also links participants to contacts within the QM Section.

To date, seven QM Academy training sessions have been offered. During this reporting period, one QM Academy session occurred, serving 25 institution staff, with another session scheduled in November 2013.

During the next reporting period, CCHCS will begin to develop QM Academy modules specifically for regional teams and for institution quality champions who already have received basic orientation and are ready to move into advanced topics.

Institution Performance Management Support Units

In September, CCHCS officially reorganized existing resources at the local level into Institution Performance Management Support Units (IPMSUs) to better focus on QM activities in an integrated approach across program areas.

Units of staff with systems improvement expertise dedicated full-time to activities such as performance evaluation and process redesign are commonplace in the broader health care industry. Typically, the role of these units within the organization is to support and integrate all activities related to prioritizing, planning, designing, testing, and implementing performance improvement and evaluating performance in order to:

- Monitor institution health care performance (e.g., via the monthly Health Care Services Dashboard).
- Design interventions to improve patient-inmate outcomes.
- Prevent or mitigate patient-inmate risk.
- Improve efficiency and cost-effectiveness.
- Comply with laws, regulations, and court orders.
- Redesign processes and manage large-scale changes, such as implementation of the Electronic Health Record.

When Chief Executive Officers (CEOs) first assumed responsibility for institution health care programs, organized performance management units were conspicuously missing at California prisons, prompting CEOs to elevate numerous requests for staff resources to support QM and patient-inmate safety efforts. In response, CCHCS and the Division of Health Care Services (DHCS) took a number of steps to help CEOs formally establish an IPMSU by reorganizing existing resources, including provision of:

- A full-time Senior Psychologist Specialist position to each institution. This classification brings critical facilitation, evaluation, analysis, and clinical and program management skills to quality improvement activities, in addition to expertise in mental health processes and programs.

- An approved organizational structure for institution Performance Management Units. Headquarters Human Resources staff worked with the California Department of Human Resources to obtain statewide approval for the IPMSU organizational structure, which will further support Dental Program Health Program Manager III positions previously only allowable as an exceptional allocation. Please see Figure 8.

*Figure 8. IPMSU Organizational Model*



- <u>Duty statements to clarify the roles and responsibilities of IPMSU members.</u> The release package provides a revised duty statement for the Dental Program Health Program Manager III which clearly defines dental and overall performance management duties, as well as a duty statement for Health Program Specialists and the new Senior Psychologist Specialist.

- <u>An intensive training program in foundational quality improvement techniques designed specifically for IPMSU members and ongoing technical support.</u> Building on the QM Academy's two-day general orientation, CCHCS and DHCS will offer more detailed skill-building workshops on topics such as performance measure design, process mapping and redesign, root cause analysis, failure mode and effects analysis, rapid-cycle improvement, Lean six sigma and other quality improvement techniques in 2013 and 2014. The QM Section will continue to mentor and provide technical support to institution IPMSUs upon completion of intensive training.

Institution IPMSUs are a critical part of the effort to build QM capacity enterprise-wide, establish an organizational culture that promotes continuous performance improvement, and strengthen the institution, regional, and state-level QM infrastructure. However, the CCHCS philosophy is that continuous performance improvement is everyone's job. Core IPMSU resources supplement and support leaders, managers and supervisors who must ultimately champion and be responsible for quality work and organizational excellence, which are essential to successful transition of prison health care services to state control, and maintaining the advances achieved well into the future.

<u>Statewide Performance Improvement Plan</u>
Three years ago, CCHCS established its first statewide Performance Improvement Plan, which outlines the organization's major improvement priorities, lists statewide performance objectives, and describes strategies that will be used to achieve the stated objectives. The Performance Improvement Plan is updated periodically as performance objectives are met and new priorities emerge and is posted on the Intranet. After vetting with CCHCS staff at different

levels of the organization, the Headquarters QMC finalized the Performance Improvement Plan for 2013-2015, included in Appendix 8.

<u>Institution Performance Improvement Work Plans and the CCHCS Primary Care Model</u>
During this reporting period, CCHCS completed a statewide initiative to establish improvement plans at each institution. The project began in fall of 2012, and required each institution to complete a PIWP after receipt of the third cycle medical inspection report from the OIG. The PIWP places priority on core processes in the primary care model, such as medication management and timely access to health information. Institutions are encouraged to describe all improvement priorities that will be the focus for the next six months in their PIWP, including mental health, dental, and allied health projects. By producing this plan, institutions also satisfy a major element of the new QM Program Policy.

To assist institutions in developing their PIWP, QM Section staff created a tool kit that guides institutions through the process. Institutions receive an orientation to the tool kit by Webinar, and have the option of having QM Section staff facilitate leadership team discussions that determine PIWP content.

Once the institution has submitted a draft PIWP, the plan is disseminated to the Joint Clinical Executive Team (JCET) at headquarters and the Prison Law Office for comment, with comments forwarded on to the institution. Institutions are required to update the PIWP monthly, and the most current version of the Work Plan is posted on the QM Portal for view by all health care staff.

By the conclusion of this reporting period, all institutions had completed a draft PIWP with the exception of the not-yet-fully-ramped CHCF, bringing the total statewide to 33 institutions with an established plan. One pair of institutions await finalization of their plan and posting to the Intranet. Please see Figure 9.

CCHCS has begun planning for the next phase of the PIWP process, which will include updates to institution PIWPs that are ready for new initiatives, as well as integration of some standardized improvement initiatives to ensure alignment with major statewide improvement initiatives, including scheduling and EHRS projects.

*Figure 9: PIWP Completion at CDCR Adult Institutions, September 2012 through August 2013*



## Statewide Improvement Initiative – Scheduling System

Starting in February 2013, CCHCS began rolling out an enterprise-wide Medical Scheduling and Tracking System (MedSATS) to improve the scheduling process, increase timely access to medical services, and establish a single centralized and standardized medical scheduling system for all institutions. As of this reporting period, MedSATS has been successfully deployed at 32 of 34 institutions (PBSP and CHCF are in progress), and currently captures approximately 80,000 to 90,000 completed encounters each week. Please see Figure 10.

During this reporting period, CCHCS launched a Scheduling Process Improvement (SPI) Initiative to provide institution leadership with a structured process and the new tools available through MedSATS implementation to improve access to care and scheduling efficiency locally. To apply the new structured process and tools, institution staff will learn quality improvement techniques used broadly in the health care industry, building institution capacity to improve other critical health care processes in the future.

*Figure 10. Ramp-Up of MedSATS Deployment.*
**Number of Encounters Captured in MedSATS per Week Statewide**



The SPI Initiative helps leadership teams use MedSATS data to identify inefficiencies within the scheduling process. Once a leadership team becomes aware of these inefficiencies, there are prescribed steps for achieving and maintaining positive changes in the process, described in the current QM Program Policy and Procedures as the Cycle of Change.

Based on the Chronic Care Model and a number of Performance/QM models that support behavioral change and sustainable business processes, the Cycle of Change Model is a framework for design and implementation of improvement initiatives at both the state and institution levels. When applying the Cycle of Change to scheduling processes, institutions:

- Identify specific scheduling processes as improvement priorities,
- Set performance objectives for the targeted processes,
- Clarify performance expectations and create a change package to help staff meet performance expectations,
- Provide training and staff development,
- Provide targeted technical assistance from managers, supervisors, designated mentors or "champions" or other staff in areas where performance continues to lag, and
- Regularly re-assess performance to determine progress toward performance objectives.

The Cycle of Change was introduced in December 2012 as an approved statewide improvement model, but many institutions have not yet mastered it or the other important quality improvement concepts covered in the QM Program Policy and Procedures and commonly used at health care organizations across the country. The SPI Initiative presents an opportunity to orient institutions to the Cycle of Change as well as other common quality improvement techniques, such as rapid-cycle improvement. With the experience gained through this initiative, institutions will be better poised to improve other critical areas of the health care services delivery system.

The SPI Initiative is intended to be implemented under the current QM infrastructure at CCHCS. For example, the most critical performance objectives for this initiative will be integrated into existing statewide and local improvement plans, improvement activities will be monitored through a standing network of QMCs and improvement teams, and the most critical performance objectives will be incorporated into the monthly Health Care Services Dashboard. Many institutions are not optimally applying the QM infrastructure; the SPI Initiative will support institutions in effectively engaging the QM system for the purposes of improving scheduling processes, which will build quality improvement capacity for other improvement priorities.

As of this reporting period, executives have access to new reports supporting improvements to medical scheduling operations, with orientation sessions planned for September 2013. The MedSATS report portfolio shows data on timeliness, workload, continuity, efficiency, effective communication and other performance priorities. MedSATS also includes exception reports that provide lists of potential or actual scheduling failures (e.g., late appointments). Over the

next few months, MedSATS data will begin to replace other data sources (including the Access Measure Audit Tool) now used for access, productivity and continuity measures in the Health Care Services Dashboard.

Initial reviews of MedSATS data quality suggest that there is still progress to be made in standardizing data entry practices statewide. During this reporting period, CCHCS began to assess the reliability of MedSATS institution by institution, with the intent to provide detailed and customized feedback to institutions about ways to increase MedSATS data reliability relative to critical measures.

Targeted Technical Assistance – RJD

In May 2013, a review by *Plata* Court Experts found that RJD's health care system had "serious problems related to access, timeliness, and quality of care", including gaps in core processes such as intrasystem transfer, chronic disease management, emergency response, and specialty services. In response, the Headquarters QMC convened a workgroup to develop recommendations for immediate interventions to mitigate risk to patient-inmates, with most actions to be implemented in a 90-day period.

Institution staff were provided with a remedial plan for improving health care services, which emphasized six major improvement areas, including evaluation of all high risk patient-inmates within the 90 days, filling key leadership positions, and establishing continuity between providers and patient-inmate panels, daily huddles, an effective scheduling system, and other fundamental aspects of the Primary Care Model. A multi-disciplinary team of regional executives worked closely with RJD during the 90-day period to implement program changes and monitor progress. Several additional staff were allocated to the institution to support reform efforts.

Upon reaching the close of the 90-day period at the end of August 2013, the RJD Workgroup reviewed the efforts of RJD staff to date and progress toward performance objectives, finding that though RJD has worked hard to address gaps in the health care system, current performance suggests that the health care system still poses a risk to patient-inmates, particularly those with complex medical needs. Specifically, RJD is on track to have all high risk patient-inmates evaluated by a physician by September 30, 2013, and has reached project objectives for establishing continuity between high risk patient-inmates and primary care providers, but there are a number of areas that still require improvement, such as care for Coumadin patient-inmates and patient-inmates returning from hospital stays.

Over the next reporting period, the RJD Workgroup and Southern Region Team will continue to work closely with RJD to implement urgent initiatives to mitigate risk to complex patient-inmates, provide the institution with tools to better track patient-inmates in four targeted risk categories, and build upon the progress to date in fully implementing the Primary Care Model at RJD.

*Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.*

This action is completed.

*Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors.*

This action is combined with Action 4.2.1.

**Objective 4.3.** Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

*Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care.*

This action is completed.

**Objective 4.4.** Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations.*

This action is completed.

**Objective 4.5.** Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative

*Action 4.5.1. By July 2008, centralize management overall health care patient-inmate appeals, correspondence and habeas corpus petitions.*

This action is completed.

Refer to Appendix 9 for health care appeals, and habeas corpus petition activity for May 2013 through August 2013.

*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver.*

This action is completed.

**Objective 4.6.** Establish Out-of-State, Community Correctional Facilities (CCF) and Re-entry Facility Oversight Program

***Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities.***

This action is completed.

## Goal 5: Establish Medical Support / Allied Health Infrastructure

**Objective 5.1.** **Establish a Comprehensive, Safe and Efficient Pharmacy Program**

> ***Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications.***
> This action is completed.

Refer to Appendix 10 for Top Drugs, Top Therapeutic Category Purchases, and Central Fill Pharmacy Service Level for May 2013 through August 2013.

> ***Action 5.1.2. By March 2010, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system.***
> This action is completed.

> ***Action 5.1.3. By May 2010, establish a central-fill pharmacy.***
> This action is completed.

**Objective 5.2.** **Establish Standardized Health Records Practice**

> ***Action 5.2.1. By November 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions.***
> This action has been completed.

**Objective 5.3.** **Establish Effective Imaging/Radiology and Laboratory Services**

> ***Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants.***
> This action is ongoing. Progress during the reporting period is as follows:

Imaging/Radiology Services

The strategy to improve radiology services statewide has been established.
Components included:
1) upgrading and installation of electronic radiographic equipment statewide
2) training in use of Radiology Information System/Picture Archiving and Communication System (RIS/PACS) to all affected staff (clinicians, nurses, radiology technicians, etc.)
3) facility upgrades to permit mobile imaging studies to be transmitted electronically from all institutions
4) centralized storage and handling of all imaging records throughout the system

RIS/PACS electronic radiographic services implementation in all CCHCS institutions was completed in June 2013.
- Computerized images and reports of imaging studies are accessible to CCHCS staff

electronically.
- All new images are stored in digital format and older images are uploaded into the system upon request or as received to permit easy viewing and comparisons.
- A single contract for radiology services is in place statewide which permits standardization (radiologic technologists use standard exam protocols), cost savings, and improved quality control. Report turnaround times have been reduced from days to hours due to the radiologists reviewing the exams electronically and dictating reports using voice recognition software.
- The radiologist contractor also provides Radiation Safety Officer (RSO) oversight to all institutions.
- The Imaging Record Center (IRC) opened in November 2012. The IRC has received hundreds of pallets of x-ray studies on film from all 33 institutions. These studies are in the process of being unpacked, shelved, sorted, and scanned. The IRC will maintain the master film jackets for all patient-inmates regardless of their location.
- The IRC is responsible for uploading relevant prior exams into the system, responding to requests for prior x-rays, and handling off-site provider and legal requests for records.
- The use of RIS/PACS eliminates film and chemical supply costs, film jacket transportation costs to an off-site radiology group for interpretation, transfer of film jackets between institutions, and loss of films and film jackets in transit.
- Mobile imaging capability with electronic transmission capability was established in all institutions by June 2013.

Laboratory Services

Strategies to improve laboratory services statewide have been established. Components include:
- The statewide Enterprise Laboratory Information System (LIS) project was approved in January 2013. The LIS will enable clinicians to access to real-time lab testing results and reduces duplicate testing at the institutions. The system will also enable clinicians to access a single repository of lab data for all lab testing results, logistic tracking of specimens and testing turnaround time, and management reporting.
- A workgroup was established to assess Point of Care (POC) testing practices in the institutions, in particular the glucose and anticoagulation testing devices, as well as any other POC test devices in use. The goal is to enhance patient-inmate care and patient-inmate safety.
- A workgroup was established to provide guidelines on the ordering of lab tests pursuant to the CCHCS Care Guides on infectious, communicable, and chronic diseases, and preventive health diagnostic testing.
- In February 2013, the contracted referral lab began utilizing an electronic order entry for all institutions.  The compliance rate has improved from 82 percent to 90 percent.

**Objective 5.4.** Establish Clinical Information Systems

> ***Action 5.4.1. By September 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems.***

This action is completed.

**Objective 5.5.** Expand and Improve Telemedicine Capabilities

> ***Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure.***

This action is completed.

## Goal 6: Provide for Necessary Clinical, Administrative and Housing Facilities

The two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system are nearing completion. CHCF received the first patient-inmate in July 2013 as scheduled. Additionally, CDCR completed projects at the California State Prison, Corcoran (COR) and CMC that provided additional mental health beds and/or office and treatment space. Additional projects addressing office and treatment space needs are under design or construction at the California State Prison, Sacramento (SAC), Salinas Valley State Prison (SVSP), California State Prison, Los Angeles County (LAC), and Central California Women's Facility (CCWF).

Regarding the HCFIP, which includes upgrades to add/renovate exam rooms and related health care space, as well as improvements to medication distribution at existing prisons, projects at 17 institutions have now received initial approval from PWB and interim funding from PMIB. Despite significant early delays in receiving PWB and PMIB approvals, projects are now proceeding on a sequential submittal schedule to PWB and PMIB. CDCR is continuing to seek methods to accelerate design and/or construction in order to recover some of the prior schedule delays. Contracts for developing site-specific designs for 15 of the 17 projects, and the statewide medication distribution projects, have been executed and preliminary plans are being prepared. Contracts for developing site-specific plans for the remaining two projects are being negotiated. There have been no additional delays beyond those described in the last report. The remaining basic level-of-care HCFIP projects are being sequenced for submittal to the PWB upon completion and review of site specific plans. The statewide medication distribution projects have received initial PWB approval. However, due to budget increases resulting from unanticipated site conditions as well as a scope change related to the number of medication distribution windows at various locations, these projects will require a scope change approval from PWB and will be delayed approximately three months. Submittal of preliminary plans is scheduled for October 2013.

CDCR and the State continue to demonstrate commitment, focus, and the ability to complete construction of CHCF and DNCA projects pursuant to the revocable Delegation of Authority. The new medical and mental health beds added pursuant to Goal 6 will be substantially completed by 2014. It is possible for HCFIP and medication distribution upgrades at existing prisons to be substantially completed by 2017, with the priority focus on the upgrades at intermediate level-of-care facilities substantially to be completed by 2016. However, these projects still require two approvals by PWB (one for project authorization and one for approval of preliminary plans) and interim funding by PMIB. Thus, if projects experience additional delays in receiving approval and interim funding as scheduled, this program will be at risk for completion by the aforementioned timeline.

**Objective 6.1.** **Upgrade administrative and clinical facilities at each of CDCR's thirty-three prison locations to provide patient-inmates with appropriate access to care.**

CDCR has received PWB project approvals and PMIB interim loan approvals for the ten

intermediate level-of-care facilities, four reception centers, and three basic level-of-care facilities. PWB approval for the statewide medication distribution projects was received at the September 2012 PWB. (PMIB financing is not required since these projects are being funded by State General Funds). CDCR is proceeding with sequential submittals for the remaining basic level-of-care projects through August 2014 as site-specific plans are developed. This is a two month acceleration from the last report.

**Action 6.1.1. By January 2010, completed assessment and planning for upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.**
This action item is ongoing. Progress during this reporting period is as follows:

Initial PWB project approvals have been secured for all of the intermediate level-of-care projects (California Medical Facility, California State Prison, Solano, CMC, California Institution for Women (CIW), RJD, SAC, Mule Creek State Prison, Folsom State Prison, California Institution for Men (CIM), and LAC (SQ is already complete except for medication distribution)), the reception center projects (Deuel Vocational Institution, North Kern State Prison (NKSP), Wasco State Prison, and CCWF), and three basic level-of-care facilities (Valley State Prison, Correctional Training Facility (CTF), and SVSP along with the statewide medication distribution projects. Submission of the remaining basic level-of-care projects will be scheduled through August 2014 following completion and review of site-specific plans. These site reviews are now occurring. Plans are not being developed for California Rehabilitation Center due to the planned closure. The planned closure is suspended pending a review by DOF under Senate Bill 105.

**Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.**
This action item is ongoing. Progress during this reporting period is as follows:

The design, bid, and construction phase for each of the projects begins once PWB project approvals and PMIB loan approvals have been obtained. Following PWB and PMIB approval, architectural/engineering contracts for site-specific preliminary plans for 15 of the approved projects have been executed and the other two are being negotiated. Additional approval from PWB for the completed preliminary plans will be required before the architects/engineers can proceed to preparation of the working drawings. Department of Finance approval is also required before CDCR is allowed to bid these projects for construction. Most recently, CDCR has implemented streamlined processes for executing professional services contracts (including architectural/engineering design contracts), which should reduce several months off the project schedules. Preliminary designs for the statewide medication distribution projects are scheduled to be submitted for PWB design approval in October 2013. This is a two-month delay from the prior schedule and is primarily due to an increase in cost and the need for approval of a scope change for an increase in the number of medication distribution windows at various locations. The latest schedule shows that the last HCFIP upgrade project [Chuckawalla Valley State Prison (CVSP)] will be completed in August 2017.

**Objective 6.2.** **Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs.**

CHCF began accepting patient-inmates in July 2013, as scheduled. CHCF continues to receive patient-inmates and as of August 31, 2013, the patient-inmate count is 273.

*Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible.*
This action item is ongoing. Progress during this reporting period is as follows:

CHCF received the first patient-inmates on schedule in July 2013. Construction is being completed and operations staff continue to be hired to support the full operation.

*Action 6.2.2. By February 2009, begin construction at first site.*
This action item is ongoing. Progress during this reporting period is as follows:

CHCF is on schedule for final construction completion and the first patient-inmates were received in July 2013.

*Action 6.2.3. By July 2013, complete execution of phased construction program.*
This action item is ongoing. Progress during this reporting period is as follows:

Receipt of the first patient-inmates at CHCF occurred in July 2013.

**Objective 6.3.** **Complete Construction at San Quentin State Prison**

*Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility.*
This action is completed.

*Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility.*
This action is completed.

# Section 4: Additional Successes Achieved by the Receiver

A.  **Office of the Inspector General – Update on the Medical Inspections of California's 33 Adult Prisons**

To evaluate and monitor the progress of medical care delivery to patient-inmates at each prison, the Receiver requested that the OIG conduct an objective, clinically appropriate, and metric-oriented medical inspection program to determine compliance with the IMSP&P. To fulfill this request, the Inspector General, in conjunction with internal and external stakeholders, developed a court-approved, compliance based, Medical Inspection Tool (MIT) that assigns a score based on multiple metrics, to derive an overall rating of zero to 100 percent. Although only the federal court may determine when CCHCS' delivery of medical care meets constitutional standards, the Receiver's scoring criteria for adherence to medical policies and procedures establish the minimum score for moderate adherence to the policies and procedures to be 75 percent. Scores below 75 percent denote low adherence, while those above 85 percent reflect high adherence.

Using the MIT, the Inspector General conducted three review cycles between September 2008 and March 2013. Collectively, the institutions averaged 71.9 percent compliance during the first review cycle, indicating low adherence to policy and procedures. OIG modified the inspection tool prior to the commencement of the second review cycle to reflect changes to the Chronic Disease Management Program policy. For cycle two, the institution's average finalized medical inspection score was 79.6 percent, indicating that collectively the institutions had reached moderate adherence to IMSP&P. For cycle three, the OIG again edited the inspection tool to reflect changes in CCHCS policy and/or to clarify their own methodologies. The cycle three changes affected numerous categories, including Health Screening, Diagnostic and Specialty Services, Inmate Hunger Strike, Chemical Agent Contraindications, Internal Reviews, and Access to Health Care Services. The OIG submitted their proposed changes to all internal and external stakeholders and held numerous rounds of discussions before the cycle three inspection tool met with stakeholder approval. At the end of cycle three, collectively, the institution's inspection scores rose to the high adherence level, with an average finalized inspection score of 87 percent.

When the OIG inspections began, more than 75 percent of the institutions earned low adherence scores. By the end of cycle three, no institutions received low adherence scores, and over 75 percent of the 33 institutions earned high adherence scores. This seemed to indicate that the delivery of medical care to the patient-inmate population of California's correctional institutions had drastically improved. However, towards the end of cycle three, the *Plata* Court Experts began their own inspections. Their first four reports, for RJD, CMC, SQ, and SCC indicated that while some of the institutions would be delivering an adequate level of care once physical plant issues were corrected, others were not delivering adequate medical care. This highlighted the discrepancies between the OIG metrics and the *Plata* experts. Cycle three of the

OIG medical inspection is now on hold due to the discrepancies between the OIG and *Plata* Court Expert findings.

In light of the differences between the OIG scores and the *Plata* Court Expert findings, the Court suggested, "it may be helpful for the OIG to meet with the court experts with the goal of refining the OIG audit instrument to more accurately measure the adequacy of care". In accordance with the Court's suggestion, the parties, the Receiver and the OIG, conducted several rounds of meetings and discussions. In addition, the OIG Inspectors shadowed the *Plata* Court Experts during a recent inspection to determine how best to incorporate elements of the *Plata* Court Expert inspection process into their own.

The OIG recently provided all internal and external stakeholders their proposed changes for cycle four medical inspections. The goal of these proposed changes, a higher emphasis on measuring adequacy of care, coupled with several amendments to the existing policy compliance tests, is greater parity between the OIG findings and those of the *Plata* Court Experts. CCHCS stakeholders will meet and discuss the proposed changes to the medical inspection tool within the coming weeks. CCHCS will facilitate a larger meeting with all internal and external stakeholders tentatively set for mid October 2013. At that time, should the stakeholders agree to the proposed changes, the OIG anticipates commencement of cycle four of the medical inspections by early December 2013.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

**A.  CCHCS Activities related to the Court's June 24, 2013, Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at Pleasant Valley and Avenal State Prisons**

On June 24, 2013, the Court issued its Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at PVSP and ASP ("Order") that, among other actions, requires the Receiver to present the response to the Order in the Tri-Annual report. The information reported below is current as of September 15, 2013. The events related to this matter have been evolving quickly and it is expected that the rapid pace of change will continue in the coming months.

On July 10, 2013, CCHCS formally requested the Centers for Disease Control (CDC) to examine the available epidemiologic data to assess if the risk based exclusionary policy should be expanded to include other groups, including those age greater than 55. CDC and the National Institute for Occupational Safety and Health (NIOSH) have completed their preliminary field assessments of the two institutions. CCHCS is awaiting the results of the CDC evaluation. The preliminary recommendations were received from the Health Hazard Evaluation from NIOSH on June 17, 2013 and largely concerned facility modifications which were referred to CDCR. The recommendations regarding education and training to employees working at PVSP and ASP are being evaluated for incorporation into existing workplace health and safety training.

Provider education on the diagnosis, treatment, and management of cocci infection was developed with input from the *Plata* Court Experts, Plaintiffs' expert, the public health community, and CCHCS' multidisciplinary continuing medical education group resulting in a comprehensive CCHCS cocci clinical guideline and a web based training utilizing the guideline. Sixty percent of the initial web based training sessions for providers have been completed with the remainder scheduled for the second half of September 2013. Nursing training to all the institution's nurse educators has been completed; 100 percent of the nurses at PVSP and ASP have completed training and nursing education will continue for the remainder of the institutions through October 2013. Approximately 33 percent of the medical providers have attended the web based training that supplements local training on the guideline. Mechanisms to ensure education to those who have not completed web based training are in progress. In addition, CCHCS has developed a "warm line" management service coordinated by the clinical support unit at headquarters staffed with infectious disease and clinicians experienced in cocci management to provide treatment assistance and clinical support to the field care teams.

Patient-inmates who meet the exclusion criteria are in the process of being transferred from the affected institutions. Approximately 800 patient-inmates in the exclusion group have voluntarily waived transfer after being advised of the risks of remaining at PVSP or ASP. As of

August 31, 2013 ASP has 410 patient-inmates, and PVSP has 241 patient-inmates, remaining to be transferred.

## B.  Overcrowding Update

California's prisons remain significantly overcrowded as of the end of this reporting period (i.e., 8/31/2013). Moreover, the total number of prisoners (including prisoners within institutions, out-of-state inmates, and inmates in other in-state facilities) is beginning to rise. As of February 20, 2013, the total population was 132,431. As of the end of August, that number had risen by 1,000, and it continues to rise on a monthly basis. This presents the State with a long-term challenge that demands some immediate attention and planning.

The State also has not demonstrated its willingness or ability to comply with the Three-Judge Court's June 20, 2013, order. Instead of following the pathway to compliance set out by that order, the State enacted SB 105, which would implement a new strategy for reaching the required overcrowding target, if the Court extends the compliance deadline.  Alternatively, SB 105 would expand capacity through leased space, both in-state and out-of-state. It appears the State, if necessary, may be able to comply with the 137.5% overcrowding figure by the end of this year using the increased capacity approach. However, a capacity-only approach does not appear to be the State's preference, and neither approach is consistent with the terms of the Court's June 20, 2013, order).

In response to SB 105 and a filing by the State on September 16, 2013, the Three-Judge Court has ordered the parties to engage in a brief meet and confer to "explore how defendants can comply with [the] Court's June 20, 2013, Order, including means and dates by which such compliance can be expedited or accomplished and how [the] Court can ensure a durable solution to the prison crowding problem." Three-Judge Court, Order to Meet and Confer, p. 2 (September 24, 2013).

# Section 6: An Accounting of Expenditures for the Reporting Period

**A.   Expenses**

The total net operating and capital expenses of the Office of the Receiver for the year ended June 2013 $2,204,205 and $0.00 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 11.

For the two months ending August 31, 2013 the net operating and capital expenses were $347,133 and $0.00 respectively.

**B.   Revenues**

For the months of May and June 2013, the Receiver requested transfers of $558,145 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver. Total year to date funding for the FY 2012/2013 to the CPR from the State of California is $2,383,145.

For the two months July and August 2013, the Receiver requested transfers of $175,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver.

All funds were received in a timely manner.

# Section 7: Other Matters Deemed Appropriate for Judicial Review

### A.  Coordination with Other Lawsuits

During the reporting period, regular meetings between the three courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have continued. Coordination Group meetings were held on May 22 and July 17, 2013. Progress has continued during this reporting period and is captured in meeting minutes.

### B.  Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the Court, included as Appendix 12 is a summary of the contract the Receiver awarded during this reporting period, including a brief description of the contract, the project to which the contract pertains, and the method the Receiver utilized to award the contract (i.e., expedited formal bid, urgent informal bid, sole source).

### C.  Consultant Staff Engaged by the Receiver

During this reporting period, the Office of the Receiver has not engaged any consultant staff.

### D.  Overview of Transition Activities

During this reporting period, CCHCS and CDCR successfully completed initial drafting and revisions to proposed delegations of authority for all program units under the direction of CCHCS.

During the next reporting period, CCHCS will begin to implement performance monitoring reports for metrics identified in each of the program units (reported either on a monthly or quarterly basis) to establish baseline levels of performance for each program unit.

Below is a discussion of the performance to date of the operations previously managed by the Receivership that have been subsequently delegated to CDCR: Health Care Access Units, Activation, and Construction.

Post Delegation Report for Health Care Access Units

On October 26, 2012, the Receiver delegated authority for Health Care Access Unit (HCAU) custody staff at all 33 institutions to the Secretary of CDCR. Under the terms of the delegation, each Warden maintains local control of the institution's HCAU and will work collaboratively with the institution's CEO in fulfilling the HCAU's mission. The delegation contained several provisions. Wardens no longer need the Receiver's approval regarding any change in the deployment of HCAU staff or their assigned duties; however, any change to the post assignment schedule, master assignment roster or duties of HCAU Captains and Associate Wardens will require notification upon making the change.

Under the delegation, the institutions are required to submit a monthly Access Quality Report (AQR), which is used to measure custody performance. The delegation established an AQR performance goal of access to care specific to the custody HCAU of 99 percent. The institutions are also subject to on-site audits of the HCAU, with a performance goal of 85 percent in each chapter of the Operations Monitoring Instrument. The Operations Monitoring Instrument is an audit instrument developed to measure custody performance with key indicators. An audit schedule has been initiated which ensures each institution is audited once approximately every 180 days.

The Secretary also accepted the responsibility for the statewide medical transportation fleet. This includes a responsibility to maintain and replace medical transportation vehicles for the HCAUs statewide, as necessary to provide patient-inmate access to medical care.

Access Quality Report

The Monthly Health Care AQR tracks the number of health care ducats issued for scheduled appointments and unscheduled appointments, the outcomes of those appointments, the reasons why patient-inmates are not seen, and the HCAU resources (staffing and vehicles) allocated and utilized in the process.

The published AQR remains unchanged from the report in place at the time of delegation. The Receivership continues to receive institution AQRs on a monthly basis in accordance with the AQR Instruction Guide and Counting Rules as outlined under the terms of the delegation.

Through the Operations Monitoring Audit (OMA) process, CCHCS Field Operations staff assesses and validates AQR data, which involves a detailed analysis of an institution's ability to collect custody tracking sheets of health care appointment outcomes and reconcile AQR data on a daily basis.

Custody Access to Care Success Rate

Under the terms of the delegation, each institution must achieve an access to care rate of 99 percent or better. This rating is a measure of the institution HCAU performance in facilitating patient-inmate access to care. The Custody AQR Performance Indicator titled *Custody Access to Care Success Rate* is a score based on the total number of ducats issued and add-on appointments, less the number of patient-inmate refusals shown as a percentage of success.

During the eight-month period preceding the delegation, March through October 2012, the average custody Access to Care Success Rate was 99.26 percent. In the eight-month period post delegation, November 2012 through June 2013, the average custody Access to Care Rate was 99.40 percent. Utilizing the same periods, the chart below illustrates the number of institutions that fell below the 99 percent benchmark each month. The average number of institutions performing below the 99 percent benchmark per month prior to the delegation is 6.12, where as the average number of institutions performing below the 99 percent benchmark post delegation is 5.50.



As a provision of the delegation of authority, institutions failing to achieve 99 percent are to complete a Corrective Action Plan (CAP) and provide the Receiver with a copy of the action plan. In the previous tri-annual report, only one institution submitted a CAP out of the 17 institutions that fell below the benchmark during the months of November through February. Since then, 18 CAPs were to be submitted for the months of April, May, and June 2013 as indicated above. To date, 16 CAPs have been received, which is a significant positive step over the previous reporting period.

<u>Operations Monitoring Audits</u>
During the first quarter of the 2013 calendar year, Field Operations conducted Round I audits at five institutions: Calipatria State Prison (CAL), Centinela State Prison (CEN), Ironwood State Prison (ISP), CCWF, and the SCC.

During the second quarter of the 2013 calendar year, Field Operations increased operations, conducting Round I audits at 11 additional institutions: SQ, CIM, COR, CIW, ASP, CTF, RJD, PVSP, CMC, Kern Valley State Prison (KVSP), and SVSP. The findings of all 16 institutions listed above have been published.

The following quantitative scores and trends are based on the findings of the audits conducted to date:

- The highest-achieving institutions (SCC and CIM) both scored 96.1 percent. The lowest score to date was 71.8 percent at CTF.

- Of the 16 institutions audited during the first and second quarters, the chapters of the OMA most prevalently scoring below the benchmark of 85 percent were:
  - Access to Mental Health Care (11 institutions)
  - Policies and Procedures (8)
  - Medical Emergencies (6)
  - Access Quality Report (6)
  - Access to Medication (5)
  - Restricted Housing and Programs (4), and
  - HCAU Post Orders / Duty Statements (4)

The *Access to Mental Health Care* audit chapter appears to be the most challenging for nearly all institutions audited. The items rated within this chapter are primarily based on custody requirements identified in the *Mental Health Services Delivery System Program Guide*. Five of sixteen institutions received passing scores in this chapter.

The *Policies and Procedures* chapter was second highest in terms of the number of institutions falling below 85 percent. The average chapter score across all institutions audited to date is 85 percent, with nine of 16 institutions receiving passing scores.

Data validity is the chief target of the AQR Access Quality Report / Data Validation chapter, which also appears to present systemic challenges to several institutions. The value of this data is to establish true and reliable statistics upon which to rate: (a) the sustainability of the institutions' health care access units; and (b) the success rates of achieving adequate access to health care services for all patient-inmates. As stated, the average chapter score for all institutions audited to date is 82.7 percent, with 11 of 16 institutions receiving passing scores.

The previous Tri-Annual Report mentioned that CCHCS staff who are assigned as AQR analysts at the institutions were provided formal classroom training during the week of March 23-29, 2013. Training was provided to improve validity of AQR data. Training and subsequent audits resulted in AQR data being reported with greater consistency and accuracy during the second quarter. The strongest indication of this improvement to date is the average AQR chapter score. Across all institutions audited through April 2013 (the last reporting month wherein the effects of the training would not have been seen), the average score was 85.6 percent. The average chapter score across all institutions[2] after May 1, 2013, was 90.9 percent, an improvement of

---

[2] Excludes score for CTF, as the institution's data validity was not able to be fully examined due to incomplete document submission.

5.3 percentage points. The improvement of these scores correlates directly to an improvement in estimated data validity and recording

<u>Transportation Vehicles</u>
CCHCS staff continued to work with CDCR staff on transitioning the responsibility for managing medical transportation vehicles. Accomplishments made during the reporting period include the following:

- Delivery of 24 new transportation vans to replace medical transportation vehicles previously purchased by the Receiver's Office that exceeded the Office of Fleet Administration's (OFA) mileage replacement criteria was completed as of August 5, 2013.

- Pursuant to the Delegation, CDCR agreed to purchase and replace 12 Emergency [Medical] Response Vehicles (ERVs) that were previously identified as needing to be replaced. The Division of Adult Institutions (DAI) has placed the 12 ERVs on the CDCR Fiscal Year 13/14 Fleet Acquisition Plan with the expectation of completing the purchases by December 2013.

- Responsibility for collecting and tracking medical transportation vehicle mileage was officially transitioned to the CDCR Office of Business Services on August 16, 2013.

As of the date of this report, DAI has not provided a plan for managing the medical transportation vehicles to CCHCS. Data compiled in July 2013 reflects that 198 medical transportation vehicles had a mileage which exceeded the OFA replacement criteria and should be replaced. The above issues will continue to be monitored under the terms of the delegation.

<u>CDCR Performance Under the Revocable Delegation of Authority for HCAU</u>
CDCR continues to be successful in maintaining the AQR performance benchmark. Prior to delegation, March through October 2012, the average Custody Access to Care Success Rate was 99.26 percent. In the eight-month period post delegation, November 2012 through June 2013, the average custody Access to Care Rate was 99.40 percent. HCAU staff utilization remains adequate to date with regular notice to the Receivership if there are changes to HCAU post hours, days off or duties. HCAU audit scores are improving and, for the most part, corrective action plans are now being prepared and submitted routinely.

In terms of medical transportation vehicles, CDCR has yet to provide an overall plan on the management and replacement of the vehicles. However, CCHCS has been successful in the full transition of collecting and tracking the vehicle mileage and CDCR has placed 12 ERV's on the CDCR Fiscal Year 13/14 Fleet Acquisition Plan, indicating replacement of the ERV's that were identified as needing to be replaced. CCHCS will continue to closely monitor CDCR's adherence to the timely replacement of transportation vehicles, as memorialized in the signed delegation of authority.

Post Delegation Report for Facility Planning and Activation

The first free-standing medical facility project activated is CHCF at Stockton. The activation of CHCF involved extensive coordination among all project disciplines, including construction contractors, construction management, medical, nursing, allied services, mental health, dental, licensing, custody, transportation, and support services. Since CHCF includes a Department of State Hospitals (DSH) facility for patient-inmates who require licensed intermediate or acute level of mental health care, coordination between CDCR, DSH, and CCHCS has been particularly critical for successful activation. With significant efforts on the part of all team members, the activation of CHCF and the receipt of the first patient-inmates occurred on schedule. As of August 31, 2013, CHCF housed 273 patient-inmates with new patient-inmates arriving daily.

The challenges the team faced and addressed in the activation included issues such as the timely procurement and delivery of large quantities of equipment and supplies, coordination with construction contractors so that activation staff could ensure the placement of equipment and stocking of supplies without adversely affecting construction completion, the timely recruitment and hiring of facility staff in all disciplines in time to prepare and implement operational procedures and ensure licensure, the development and provision of training for CHCF staff, and the development of a patient-inmate intake and transportation plan. While challenges and issues continue to arise on a daily basis as the facility moves into the final months of activation, the Facility Planning and Activation Management unit (FPAM) and the facility staff continue to work collaboratively to identify and resolve issues.

Although the construction of DNCA is following that of CHCF, activation activities and management by FPAM have begun. An activation schedule has been drafted based on the current baseline construction schedule. A list of the Group II (movable) equipment has been prepared and sent to DOF for approval, and a purchase order has been issued for Group I (contractor-installed) equipment. Hiring activities have begun for pre-activation staff. Again, FPAM continues to apply sound project management and critical path scheduling skills and tools to this project.

Under the delegation of authority, FPAM was required to provide a project schedule in its April 2013 monthly report for the remainder of HCFIP projects not previously available when the delegation was signed last November. The new schedule shows that the last HCFIP upgrade project CVSP will be completed in August 2017.

CDCR Performance Under the October 26, 2012 Revocable Delegation of Authority For FPAM

Since the signing of this revocable delegation, FPAM has continued to perform with the same rigor, focus, and skills they demonstrated prior to the delegation. Activation of projects as complex and accelerated as these health care facilities poses many challenges as well as potential delays in both construction and activation. The coordination and collaboration of FPAM with the construction management team and the application of sound project management tools and skills continues to be effective, with the first patient-inmates arriving on schedule at CHCF on July 22, 2013. To facilitate success, CDCR created a team environment with active involvement from members of the Project Management firm (Vanir Construction

Management, Inc.), the Construction Management firm (URS/Lend Lease), CCHCS, and DSH. The team has continuously used appropriate project management tools, such as dashboards, critical path schedules, regular team meetings and reports to maintain open lines of communication and to track and monitor the necessary activation activities.

Post Delegation Report for Construction Oversight

In order to streamline and coordinate health care construction, on September 21, 2009, the Receiver and the Secretary of CDCR issued a revocable delegation of their respective authorities related to the construction of the new Consolidated Care Center, now known as CHCF, and the HCFIP to CDCR's Senior Chief of Facility Planning, Construction and Management (FPCM). Under the direction of the Senior Chief, FPCM became responsible for the study, planning, design, development, management, and construction of CHCF (and DNCA) and HCFIP. These projects comprise the elements of Goal 6; to expand administrative, clinical and housing facilities for patient-inmates with medical and/or mental health needs and to upgrade administrative and clinical facilities at CDCR's existing prisons.

Expand Administrative, Clinical and Housing Facilities

The two major construction projects to add medical and mental health beds and provide for necessary clinical, administrative, and housing facilities are the 1,818 bed CHCF and the conversion of DNCA (located adjacent to CHCF) to serve as a 1,133 bed facility annex to CHCF. The permanent work crew capacity at CHCF was recently increased from 100 beds to 196 beds.

CDCR continues to meet its project schedule for completion of CHCF. Site preparation commenced on this project in December 2010, and CDCR has continued to manage an aggressive design and construction schedule and received first patient-inmates in July 2013. The 1.2 million square foot CHCF project is comprised of 54 buildings; 23 of those will house patient-inmates with medical and/or mental health treatment needs and one will house inmate work crews. The remaining buildings provide treatment and office space or support facilities (e.g. guard towers, central plant, material services center, kitchen, etc.). A 144,000 square foot shared services building is at the core of the facility and contains elements typical of outpatient clinics, including a laboratory, pharmacy, exam and treatment rooms, diagnostic imaging, dental clinic, dialysis clinic, triage and treatment clinic, and therapy rooms. The project remains on schedule. Construction by the design-build firms began in June 2011, and the facility was ready for occupancy in July 2013.



*Figure 11 CHCF in July 2013*

As indicated, the 1,133 bed DNCA is adjacent to and will serve as an annex to CHCF. DNCA will house intermediate-care patient-inmates needing enhanced medical services and Enhanced Outpatient Program (EOP) patient-inmates with EOP-level mental health needs. After delays due to legislative concerns about the project, interim project funding was received from PMIB in May 2012. In order to minimize schedule delays, CDCR had proceeded through the contractor selection process and thus construction began in July 2012. This project is continuing under an aggressive construction schedule. To date, construction is approximately 60 percent complete.



*Figure 12 DNCA in July 2013*

<u>Upgrade Administrative and Clinical Facilities in CDCR's Existing Prisons</u>
The HCFIP projects continue to progress through PWB approval process and PMIB funding process. Despite significant early delays in receiving PWB and PMIB approvals, projects are now proceeding on a sequential submittal schedule to PWB and PMIB. To date, 17 projects have received PWB project-level approvals and interim financing loans from PMIB. Contracts for developing site-specific designs for 15 of these projects have been executed. Although these 17 projects are proceeding, the delays in processing design contracts have resulted in projected

construction start delays ranging from one to two months for five of the projects (two of the early projects are one month ahead of schedule). CDCR continues to evaluate methods to accelerate design and/or construction to mitigate past approval delays. Most recently they took steps to streamline approval of design contracts. Contracts that previously took up to eight months to execute, most recently were executed in less than two months. Since these projects still require PWB approval of the completed preliminary plans and DOF approval once the subsequent working drawing are completed before CDCR may proceed to bid for construction, they continue to carry risk. Current CDCR plans reflect project authorization and funding submittals to PWB and PMIB for the remaining projects sequenced through August 2014 (in the last report, these projects were sequenced through October 2014).

The statewide medication distribution projects received PWB approval in September 2012 (they are funded with State general funds and, therefore, do not require PMIB interim bond loans). These projects are scheduled to have preliminary designs submitted for PWB design approval in October 2013.

<u>CDCR Performance under the September 21, 2009 Revocable Delegation of Authority For Construction Oversight</u>
CDCR continues to demonstrate a high level of commitment, focus, and ability to effectively manage the health care construction projects in Stockton. FPCM has done an exceptional job in effectively managing the design and construction of CHCF. This project is nearing completion and the schedule has been maintained despite the various challenges that occur in any project of this magnitude. While the DNCA project still has considerable construction work remaining. FPCM is demonstrating the same abilities and commitment to a timely and successful completion of this project.

With regard to HCFIP, CCHCS remains cautiously optimistic regarding completion of the HCFIP projects. However, while FPCM is demonstrating the same project management discipline as with CHCF and DNCA, these projects are still early in the initiation and design stages, they still require additional external approvals and thus, carry risk. After nearly four years since construction was delegated, the State has yet to break ground on one HCFIP project.

<u>Facility Construction</u>
With the exception of SQ, which had physical plant upgrades constructed under the Receivership to address lack of treatment and clinic space, the *Plata* Court Experts found that all of the facilities they visited had serious physical plant issues. Their observations underscore the importance of completing the HCFIP program as quickly as possible, as the experts stated that in some cases (such as SCC), only physical plant issues stand in the way of declaring that an institution is providing adequate care.

## Section 8: Conclusion

As the above makes clear, we are continuing to make durable improvements to CDCR's health care system. Progress has not always been in a straight line, and for every success, we discover additional room for improvement, some of which we have discovered for ourselves, some of which is reported by plaintiffs' counsel, and some of which is discovered by the *Plata* Court Experts. At present, the two most important uncertainties are (1) when and how the State will comply with the Three-Judge Court's overcrowding reduction orders and (2) whether and when the State will complete the institution upgrade program. The resolution of these two issues is critical to moving the case forward.