| | |
|---|---|
| 1 | KAMALA D. HARRIS<br>Attorney General of California |
| 2 | JAY C. RUSSELL<br>Supervising Deputy Attorney General |
| 3 | DEBBIE VOROUS, State Bar No. 166884<br>PATRICK R. MCKINNEY, State Bar No. 215228 |
| 4 | JESSICA S. KIM, State Bar No. 257766<br>MANEESH SHARMA, State Bar No. 280084 |
| 5 | Deputy Attorneys General<br> 1300 I Street, Suite 125 |
| 6 |  P.O. Box 944255<br> Sacramento, CA 94244-2550 |
| 7 |  Telephone: (916) 323-8789<br> Fax: (916) 324-5205 |
| 8 |  E-mail: Jessica.Kim@doj.ca.gov<br>*Attorneys for Defendants* |

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>　　　　　　　　　　　Defendants. | 2:90-cv-00520 LKK DAD<br><br>**DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE OR MODIFY PORTIONS OF THE SPECIAL MASTER'S REPORT ON THE SALINAS VALLEY PSYCHIATRIC PROGRAM**<br><br>Judge:　　The Honorable Lawrence K. Karlton<br><br>Action Filed: 1990 |

**INTRODUCTION**

Defendants object to the Special Master's Report on the Salinas Valley Psychiatric Program because the Court's order granting the Special Master the authority to issue the report was not based on a finding that Salinas Valley Psychiatric Program had violated the Constitution. Defendants also object to each of the six recommendations outlined in the Special Master's report because they do not seek to remedy findings of constitutional inadequacy. Moreover, the Special Master's recommendations depend, in part, on inaccurate factual findings. For these reasons,

1

Defendants respectfully request modification of the Special Master's report, and ask the Court not to adopt the Special Master's recommendations.[1]

## OBJECTIONS

I. **OVERALL OBJECTIONS**

   A. **The Special Master Should Not Have Been Granted the Authority to Issue a Report on the Salinas Valley Psychiatric Program.**

On July 11, 2013, the Court ordered the Special Master to issue a report on the Salinas Valley Psychiatric Program's staffing levels and cuff or orientation status. (ECF No. 4688 at 13.) The Court required Salinas Valley Psychiatric Program to provide the Special Master with all the documents and facility access required to meet this obligation. (*Id*.) Defendants timely filed a notice of appeal of this order with the Ninth Circuit. (ECF No. 4740.) Defendants object to the Special Master's report on the Salinas Valley Psychiatric Program because the Court's order requiring the issuance of the report was improper.

The Court's order was issued after an evidentiary hearing on Plaintiffs' motion for affirmative relief regarding Department of State Hospital inpatient care. (ECF No. 4688.) Based on the evidence presented at the hearing, the Court did not make a finding that Salinas Valley Psychiatric Program was providing constitutionally inadequate care. (*Id.*) Despite this, the Court granted Plaintiffs' request to expand the Special Master's monitoring and supervision authority because their evidence "suggest[ed]" it was necessary. (*Id*. 11.) The Court directed the Special Master to commence monitoring Salinas Valley Psychiatric Program and issue a report about the program within seventy-five days. (*Id*. 12.)

The Court's order contravenes the plain language of the PLRA's restrictions on prospective relief. *See* 18 U.S.C. § 3626(a)(1)(A). Under the statute, a Court is forbidden from granting prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means

---

[1] The Special Master made no recommendations in his report regarding Rules Violation Reports at Salinas Valley Psychiatric Program. Accordingly, Defendants do not respond to that part of the report due to pending litigation.

2

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)

necessary to correct the violation of the Federal right." *Id*.  Thus, at the very least, establishing the existence of a defendant's constitutional violation is a necessary predicate to any provision of prospective relief.  *See id*.; *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) ("a federal court may not grant any prospective relief at all - let alone appoint a special master" without first making the required statutory findings).

Here, the Court acknowledged that it "has never found DSH provides inadequate care to class members." (ECF No. 4688.)  Yet the Court concluded that the Special Master has always had the authority to oversee DSH's mental-health practice. (*Id*.)  The Court erred.  DSH was not a party to this case in 1995, and in the 17 years since, DSH's provision of mental-health care was never subject to the Special Master's supervisory powers.  The Court's order improperly imputed liability to DSH for the constitutional violations found against different Defendants in 1995.  Most importantly, the Court did not find that DSH was violating the Constitution.  Instead, the Court stated only that there was some basis "for questioning" the adequacy of care, and that the evidence suggested monitoring is necessary. (*Id*. 11.)  The Court's order thus exceeded the PLRA's restrictions on prospective relief.  Accordingly, Defendants object to the Special Master's report because the Special Master should not have been ordered to monitor Salinas Valley Psychiatric Program or issue a report regarding Salinas Valley Psychiatric Program.

**B.  The Court Should Not Adopt the Special Master's Recommendations as They are Not Tethered to Constitutional Standards.**

The evidence offered in support of Plaintiffs' motion for affirmative relief was insufficient to show that DSH violated the Constitution.   And even though the Special Master's Report includes critiques and room for improvement, the report still does not support a finding of deliberate indifference.  In May 2013, Salinas Valley Psychiatric Program appointed a new Interim Executive Director. (Ahlin Decl. ¶ 2).  Since this appointment, Salinas Valley Psychiatric Program has implemented and piloted new policies and has overall improved the quality of care to inmate-patients. (Ahlin Decl. ¶¶ 5-6; 11; 15-18; 21; 33; 42).  Salinas Valley Psychiatric Program is continuing to improve quality of care to inmate-patients, including but not limited to several of the areas described in the Special Master's report. (*Id*.)  However, because Salinas

Valley Psychiatric Program's quality of care remains above constitutional minima, any policy changes should be directed by California's executive branch, and not the Court. Thus the Court should not issue an order based on the recommendations in the Special Master's report.

## II. SPECIFIC OBJECTIONS TO RECOMMENDATIONS

### A. Objections to Recommendation Number One Regarding Staffing Vacancies

The Special Master recommends that the Court direct Salinas Valley Psychiatric Program to: (1) fill remaining staffing vacancies; (2) consider modifying its planned staff-to-patient ratio of 1 to 35; and (3) give priority to filling psychiatry, psychology, and social worker positions. (ECF No. 4830 at 45.)

The Special Master inaccurately reports that Salinas Valley Psychiatric Program is not able to achieve a staffing ratio of 1:35. (*Id.* 9.) Salinas Valley Psychiatric Program's staff to inmate-patient ratio is 1:35 or better for psychiatrists, psychologists, and rehabilitation therapists. (Ahlin Decl. ¶ 8.)

The Special Master also inaccurately found that the psychiatrist vacancy rate is 75 percent. (ECF No. 4830 at 7.) The Special Master calculated this number based on an assumption that Salinas Valley Psychiatric Program has 20 psychiatrist positions, and of these 20 positions, five are filled. (ECF No. 4830 at 7.) At the time of the Special Master's monitoring tour of Salinas Valley Psychiatric Program (August 22, 2013) Salinas Valley Psychiatric Program's patient census was 283. (Ahlin Decl. ¶ 9.) Accordingly, to satisfy the 1:35 staffing ratio, Salinas Valley Psychiatric Program needed to employ eight psychiatrists. In fact, Salinas Valley Psychiatric Program employed the equivalent of eight full time psychiatrists and thus fulfilled the 1:35 staffing ratio. (Ahlin Decl. ¶ 9; *see also* ECF No. 4602 at ¶ 14 [stating that as of May 9, 2013, the "present total of full-time-equivalent staff psychiatrists at Salinas Valley is 8.25"].)[2] Salinas Valley Psychiatric Program employs enough psychologists and rehabilitation therapists to meet or

---

[2] As of October 7, 2013, the Salinas Valley Psychiatric Program employs the equivalent of nine full-time psychiatrists. The inmate-patient census at Salinas Valley Psychiatric Program has been reduced since August 2013. Accordingly the current psychiatrist to inmate-patient ratio is 1:30. (Ahlin Decl. ¶ 9.)

4

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)

exceed the 1:35 ratio. (Ahlin Decl. ¶ 8.) The Special Master criticized that there were only three filled psychiatric technician positions at Salinas Valley Psychiatric Program. But the psychiatric technician is a newly allocated position at Salinas Valley Psychiatric Program, and Salinas Valley Psychiatric Program is actively recruiting for this position. (Ahlin Decl. ¶ 25.)

Further, it is unclear how the Special Master calculated the number of 20 psychiatrist positions at Salinas Valley Psychiatric Program. This number does not appear to be derived from a particular staff to inmate-patient ratio, nor does it take into account Salinas Valley Psychiatric Program's reduced census. An order to fulfill twenty psychiatrist positions would not make sense—assuming a census of 268 patients, twenty psychiatrists would result in a ratio of 1 psychiatrist per every 13 inmate-patients. This ratio would exceed even the staffing ratio of 1:25 for treatment units and 1:15 for admission units that the Special Master's report indicated was the community standard.[3] (ECF No. 4830 at 9.)

Salinas Valley Psychiatric Program is already undertaking dramatic measures to recruit staff. (Ahlin Decl. ¶ 11.) Accordingly, a Court order to fill vacancies is not necessary and would not enable Salinas Valley Psychiatric Program to exert any more effort in this area. Particularly for psychiatrists, Salinas Valley Psychiatric Program has gone through significant efforts to recruit qualified individuals. (Ahlin Decl. ¶ 11.) However, there is a national shortage of psychiatrists, and an even more select group of psychiatrists who are willing to practice in a remote locale for a program that treats inmate-patients. (Ahlin Decl. ¶ 11.) Salinas Valley Psychiatric Program is considering yet more innovative ways to attract psychiatrist recruits, including changing psychiatrist shifts to forty hours over three days. (Ahlin Decl. ¶ 11.) A Court order for Salinas Valley Psychiatric Program to fill vacancies is not necessary because the executive team already highly prioritizes recruitment efforts. An order to fill twenty psychiatrist positions at Salinas Valley Psychiatric Program could result in unintended consequences,

---

[3] The Special Master's report did not include evidence that these ratios were the appropriate standard for use at Salinas Valley Psychiatric Program.

5

including drawing resources away from other programs providing mental health care to inmate-patients. (Ahlin Decl. ¶ 12.)

In particular, an order requiring Salinas Valley Psychiatric Program to fill all vacancies could impact the migration process to the California Health Care Facility. Salinas Valley Psychiatric Program is currently following a plan to migrate beds to the newly opened California Health Care Facility, which is an ideal space for treatment of inmate-patients needing intermediate level of care. (Ahlin Decl. ¶ 12.) An order for Salinas Valley Psychiatric Program to fill all staffing vacancies, particularly at a rate that is not necessary given Salinas Valley Psychiatric Program's patient census, would make it difficult for California Health Care Facility to meet their staffing goals. (Ahlin Decl. ¶ 12.) As just one example of the competition for a limited pool of qualified mental health clinicians, Salinas Valley Psychiatric Program recently hired three psychologists, at least one of which was previously slated to work at California Health Care Facility. (Ahlin Decl. ¶ 21.)

Overall, an order for increased staffing levels at Salinas Valley Psychiatric Program is not constitutionally required. The Special Master's Report does not contain any specific examples where a staffing issue resulted in inadequate care. Further, an order is not necessary because Salinas Valley Psychiatric Program already expends significant efforts on recruitment, and an order could actually harm inmate-patients by drawing staffing resources away from California Health Care Facility and other institutions.

### B. Objections to Recommendation Number Two Regarding Individualized and Group Therapy

The Special Master's report recommends that the Court order Salinas Valley Psychiatric Program to significantly increase the quality and quantity of its group and individualized therapy. (ECF No. 4830 at 45.)

Many inmate-patients are referred to Salinas Valley Psychiatric Program because they consistently refuse to attend group therapy in their Enhanced Outpatient Program. (Ahlin Decl. ¶ 14.) Refusing to attend group therapy is a clinical finding that can justify a transfer to the Salinas Valley Psychiatric Program. (Ahlin Decl. ¶ 14.) This explains, in part, the group therapy refusal

6

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)

rates of inmate-patients who have recently transferred to Salinas Valley Psychiatric Program. (Ahlin Decl. ¶ 14.)

The Special Master's recommendation relies on his finding that "Patients [at Salinas Valley Psychiatric Program] were receiving only four to six hours of group therapy per week—*barely half of the minimum requirement of ten hours for inmates at the lower, outpatient level of care known as the EOP, within CDCR prisons*." (ECF No. 4830 at 15) (emphasis in original.) However, this is an inaccurate and unfair comparison. The Program Guide requires that inmate-patients at the Enhanced Outpatient Program level of care be <u>offered</u> ten hours per week of scheduled structured therapeutic activities, it does not require that the patient <u>receive</u> all ten hours. (Program Guide, 2009 Rev., 12-4-8.) Further, the Program Guide defines structured therapeutic activities to include group therapy, individual therapy, and recreational and occupational therapy with a clinician. (*Id*. at 12-4-9 through 12-4-10.) Thus, to fairly compare Salinas Valley Psychiatric Program to EOP level of care at CDCR prisons, the Special Master should have counted the number of group hours <u>offered</u> by Salinas Valley Psychiatric Program, and added to that number the hours of individual therapy, recreational and occupational therapy with a clinician, and work and educational programs offered to inmate-patients. The Special Master did not indicate how he calculated the four to six hours of group therapy per week. (ECF No. 4830.) The data Salinas Valley Psychiatric Program provided with Defendants' Opposition to Plaintiffs' Motion Related to Inpatient Care demonstrated provision of group therapy at a significantly higher rate. (ECF No. 4602 at ¶¶ 19-20.)

Salinas Valley Psychiatric Program is in the process of improving its group programming. The executive team at Salinas Valley Psychiatric Program has established a plan to provide more therapeutic groups. (Ahlin Decl. ¶ 17.) Salinas Valley Psychiatric Program has also established a curriculum group to review the core clinical groups offered at Salinas Valley Psychiatric Program. (Ahlin Decl. ¶ 17.) Additionally, treatment team conferences will review a patient's goals and objectives and place patients in groups that will address these objectives. (Ahlin Decl. ¶ 17.) Salinas Valley Psychiatric Program acknowledges that changes to group therapy can be

made, and is making those changes. (*Id*.) Salinas Valley Psychiatric Program's ongoing efforts reflect that they are not deliberately indifferent to inmate-patients' needs.

The Special Master's recommendation is also based on the finding that Salinas Valley Psychiatric Program does not have a database tracking group and individual therapy hours. Salinas Valley Psychiatric Program has been developing a database system, Psychiatric Wellness Support System (PaWSS), since February 2011 (Ahlin Decl. ¶ 16.) The PaWSS tracking system tracks individual and group therapy hours. (Ahlin Decl. ¶ 16.) PaWSS was finalized and rolled out in April 2013, and it is currently in the process of being implemented at Salinas Valley Psychiatric Program. (Ahlin Decl. ¶ 16.) Salinas Valley Psychiatric Program is not showing deliberate indifference because it is providing adequate care and at the same time improving the quality and quantity of group therapy. Accordingly, the Special Master's recommendation should be rejected.

### C. Objections to Recommendation Numbers Three and Four Regarding Cuff Status and Orientation Status

#### 1. The Report's Critique of Salinas Valley Psychiatric Program's Cuff Status and Orientation Status Fails to Adequately Weigh the Safety and Security Needs that Necessitate this Policy.

There are two different instances where an inmate-patient at Salinas Valley Psychiatric Program may be placed in cuffs for security reasons. The first, is referred to as Orientation Status or sometimes Cuff and Orientation Status. This status applies to all newly arrived inmates until CDCR can review their central files and check for enemy concerns or other security issues. (ECF No. 4604-1 at ¶¶ 4-5.) The second, Cuff Status, occurs when an inmate-patient presents a high safety risk during the course of their treatment at Salinas Valley Psychiatric Program. (Salinas Valley Psychiatric Program Program Manual, Section 6.12, "Cuff Status and Temporary Suspended Program"; ECF No. 4830 at 52-56.)

The Special Master's Report makes a recommendation regarding Cuff Status and regarding Orientation Status. (ECF No. 4830.) However, the Special Master improperly failed to analyze the safety and security benefits of Cuff Status and Orientation Status. Orientation Status protects inmate-patient and staff safety during the crucial time period when an inmate-patient first arrives

at Salinas Valley Psychiatric Program. (ECF No. 4604-1 at ¶¶ 3-11.) Cuff Status protects inmate-patient and staff safety when an inmate-patient's behavior demonstrates that they are a high safety risk. (ECF No. 4830 at 52-56.) The Special Master's duty to give proper credence to the program's safety concerns is rooted in case law.

The Ninth Circuit has recognized that Courts must weigh legitimate penological interests when deciding whether an institution's policy violates the Fourth Amendment. *Bell v. Wolfish*, 441 U.S. 520 (1979) and *Turner v. Safley*, 482 U.S. 78 (1987); *Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (San Francisco jails' policy of conducting strip searches of all arrestees introduced into custodial housing did not violate the Fourth Amendment because the policy was reasonably related to the penological interests of the jail.)

Salinas Valley Psychiatric Program's Orientation Policy should similarly be analyzed under the Eighth Amendment. And the legitimate correctional reasons why the policy was adopted must be considered before finding that it violates the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *Whitley v. Albers*, 475 U.S. 312, 313 (1986); *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992). Here, the Salinas Valley Psychiatric Program's Orientation Status is intended solely to prevent new inmate-patients from hurting each other and staff. (Grounds Decl. in Supp. Of Defs.' Opp. To Pls.' Mot. For Relief Related to Inpatient Care ¶¶ 3-11, ECF No. 4604-1.) Once an assessment of the inmate-patent's risk to himself and others is undertaken, the status is continued, modified, or rescinded. (*Id.*) The Special Master's recommendations regarding Orientation Status fail completely to consider the safety concerns that underlie the policy, and so his recommendations must be rejected.

### 2. Defendants Move to Modify the Special Master's Findings Regarding Inmate-Patients on Cuff Status.

The Special Master's critique focuses mostly on Cuff Status as opposed to Orientation Status, and mostly on documentation issues with Cuff Status. (ECF No. 4830 at 27-28.) The report notes that the Special Master's team reviewed the files of several inmate-patients on Cuff Status, and found that eleven of those inmates' files did not contain all the required documentation required by Salinas Valley Psychiatric Program's policies. (ECF No. 4830 at 27-

29.) But the Special Master failed to give Salinas Valley Psychiatric Program adequate credit for the documentation that was present for these eleven inmates. (Ahlin Decl. ¶ 31.) Moreover, contrary to the Special Master's Observation, Salinas Valley Psychiatric Program does provide appropriate treatment to inmates on solo programming. (*See, e.g.*, Ahlin Decl. ¶¶ 26-30.)

Salinas Valley Psychiatric Program's executive staff acknowledges that staff could benefit from further training on documenting Cuff Status. To that end, Salinas Valley Psychiatric Program recently completed training on documentation. (Ahlin Decl. ¶ 33.) Further, in August 2013, the Nursing Department developed a "cuff status monitoring tool" which was implemented in September 2013, and tracks and monitors documentation. (Ahlin Decl. ¶ 33.)

Salinas Valley Psychiatric Program's documentation of Cuff Status can and will be improved. But this does not amount to a constitutional violation. Of all the inmate files that the Special Master reviewed, the report points to only two instances, Patients P and Q, where documentation issues affected an inmate-patient's treatment. (ECF No. 4830 at 29.) The Special Master's report does not show a system-wide impact of Cuff Status on inmate-patient care. Further, although the Special Master examined the files of multiple inmates on Cuff Status, the Special Master did not discuss whether safety concerns required that inmate-patients to be placed on Cuff Status. And the Special Master's report did not offer any feasible alternatives when an inmate-patient presents a danger to others. Accordingly, Defendants request that the Court deny the Special Master's recommendation to eliminate Cuff Status and modify Orientation Status.

### D. Objections to Recommendation Number Five Regarding Transfer Timelines

The Special Master recommends that the Court direct Salinas Valley Psychiatric Program to: (1) begin tracking all patient bed assignments; (2) admit referred and accepted patients as quickly as bed availability permits; and (3) admit inmate-patients within 72 hours of bed assignment and 30 days from the date of referral. (ECF No. 4830 at 45-46.)

However, the Special Master's recommendations are based on an inaccurate calculation of Salinas Valley Psychiatric Program's Wait List Numbers. The Special Master's Report states that between March 1, 2013 through June 30, 2013, 27 percent of the transfers to Salinas Valley

10

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)

Psychiatric Program were outside the 30-day timeline in the *Coleman* Program Guide. (ECF No. 4830 at 31.) However, the Special Master's calculation of this percentage is based on an unreasonable interpretation of the Program Guide—that an inmate is on the "waitlist" from the time of that Salinas Valley Psychiatric Program receives notice of referral rather than from the time of Salinas Valley Psychiatric Program's acceptance of the referral.

According to the Program Guide timelinee for transfer of inmates for immediate care is as follows:

- For intermediate care, referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required; transport must be completed within 72 hours of bed assignment; and transfer must be completed within 30 days of referral if accepted to DSH.

(Program Guide, 2009 Rev., 12-1-16.)

Further, the Program Guide defines "Referral" as "The date the <u>completed</u> referral packet is received by [DSH] by facsimile or overnight mail." And it defines "Acceptance" as "The date the Clinical Assessment Team at [DSH] accepts the inmate-patient for placement at a [DSH] facility. <u>Some inmate-patients may be placed on a waitlist pending bed availability after acceptance</u>." (Program Guide, 2009 Rev., 12-1-15) (emphasis added).

The expression in the Program Guide's timelines—"within 30 days of referral, if accepted"—is subject to interpretation. But under the Special Master's interpretation, the waiting time begins immediately upon CDCR's referral—a finding at odds with the Program Guide's definition of "acceptance." Using this interpretation, the Special Master found Salinas Valley Psychiatric Program non-compliant when an inmate-patient was not admitted with thirty days of notice of referral. However under a more reasonable interpretation (and an interpretation more in keeping with the Program Guide's definition of "acceptance") the Special Master should have calculated the thirty-day timeline for transfer to begin to run upon Salinas Valley Psychiatric Program's acceptance of the referral. If measured under this interpretation of the Program Guide,

11

Salinas Valley Psychiatric Program achieved 89% compliance with the thirty-day transfer timeline between March 1, 2013 through June 30, 2013. (Ahlin Decl. ¶ 37, Ex. A.) And examining the transfer timeline data more closely reveals an even stronger picture of Salinas Valley Psychiatric Program's compliance. (*Id*.) Most of the inmate-patients who were transferred beyond the thirty-day timeline had transfers delayed for unavoidable reasons, including the need for an inmate to appear at a *Keyhea* hearing held at their referring institution. (*Id*.) Not counting those patients, the non-compliance rate for the transfer timelines shrinks to 5 percent. (*Id*.) These numbers demonstrate that Salinas Valley Psychiatric Program is achieving almost perfect compliance with the thirty-day transfer timeline stated in the Program Guide. Accordingly, an order related to Salinas Valley Psychiatric Program's wait list is not necessary.

The Special Master recommends that the Court order Salinas Valley Psychiatric Program to admit patients as quickly as bed availability permits. This order is not necessary because Salinas Valley Psychiatric Program already does so. (Ahlin Decl. ¶ 38.)

Finally, strict compliance with transfer timelines is not the measure of whether Salinas Valley Psychiatric Program is constitutionally compliant. Instead, the key question is whether transfer waiting periods expose inmates to significant risks of harm. The Special Master's report fails to describe a single example in which an inmate-patient was exposed to an excessive risk of harm because his admission to the Salinas Valley Psychiatric Program was not completed immediately. It is also important to note that Salinas Valley Psychiatric Program is an intermediate program, and inmate-patients with a need for acute care are transferred to programs that accept acute patients under shorter timelines. (Program Guide, 2009 Rev., 12-1-16.) And even when Salinas Valley Psychiatric Program's transfers are measured by compliance to the Program Guide, the compliance rate is 95%. (Ahlin Decl. ¶ 37, Ex. A.) Accordingly, Defendants object to the recommendations of the Special Master regarding transfer timelines because an order is not necessary.

### E. Objection to Recommendation Number Six Regarding Laundry

12

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)

The Special Master's Report recommends that Salinas Valley Psychiatric Program resolve any 'remaining issues" concerning inmate-patients' laundry. (ECF No. 4830 at 46.) In May 2013, Salinas Valley Psychiatric Program found that after laundry was sent out for cleaning to Avenal State Prison, not all of it was returned by that institution. (Ahlin Decl. ¶ 40.) However, as the Special Master report notes, this issue was resolved. (*Id.*) The Special Master's report contains only anecdotal examples to show that any laundry issues remain. (ECF No. 4830 at 37.) Further, Salinas Valley Psychiatric Program has formed a laundry committee that inventories the laundry and is responsible for resolving any laundry issues that arise. (Ahlin Decl. ¶ 41.) Accordingly, an order related to laundry is unnecessary.

## CONCLUSION

For all the above reasons, the Court should not adopt the Special Master's six recommendations related to Salinas Valley Psychiatric Program. Further, the Court should modify the Special Master's report to correct the factual inaccuracies identified by Defendants.

Dated: October 14, 2013                                    Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General


***/s/ Jessica S. Kim***


JESSICA S. KIM
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

13

Defs.' Obj. & Mot. To Strike and or Modify Special Master's Report on the Salinas Valley Psychiatric Program
(2:90-cv-00520 LKK DAD PC)