KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
JESSICA KIM, State Bar No. 257766
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
    1300 I Street, Suite 125
    P.O. Box 944255
    Sacramento, CA 94244-2550
    Telephone: (916) 323-8789
    Fax: (916) 324-5205
    E-mail: Jessica.Kim@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK DAD PC<br><br>**DECLARATION OF JESSICA S. KIM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 1: TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DR. CRAIG HANEY** |

1    I, Jessica S. Kim, declare as follows:

2    1. I am a Deputy Attorney General with the California Office of the Attorney General,

3  attorneys of record for Defendants in this case, and I am licensed to practice in this Court. I have

4  personal knowledge of the facts stated in this declaration and if called on to testify to those facts,

5  could and would do so competently. I submit this declaration in support of Defendants' Motion

6  In Limine No. 1: To Exclude Testimony of Plaintiffs' Expert Witness Dr. Craig Haney.

7    2. Attached as Exhibit 1 is a true and correct copy of excerpts from the deposition

8  transcript of Dr. Craig Haney taken on July 10, 2013.

9    3. Attached as Exhibit 2 is a true and correct copy of excerpts from the deposition

10  transcript of Dr. Charles Scott taken on July 26, 2013.

11    I declare under penalty of perjury under the laws of the State of California and the United

12  States of America that the foregoing is true and correct. Executed in Sacramento, California on

13  October 22, 2013.

14

15                  **/s/ Jessica S. Kim**
                          Jessica S. Kim

16

17  CF1997CS0003
    31813948.doc

18

19

20

21

22

23

24

25

26

27

28

1

# EXHIBIT 1

# TLS | THORSNES
litigation services

Transcript of the Testimony of:

# **Craig Haney, Ph.D.**

Coleman v. Brown

July 10, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
             vs.                      )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____     )

DEPOSITION OF

CRAIG HANEY, PH.D.

WEDNESDAY, JULY 10, 2013,   9:05 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,              )
                                         )
5                   Plaintiffs,          )
                                         )CASE NO.:
6              vs.                       )S 90-0520 LKK-JFM
                                         )
7    EDMUND G. BROWN, JR., ET AL.,       )
                                         )
8                   Defendants.          )
     _____    )

9

10

11

12

13

14             The Deposition of CRAIG HANEY, PH.D., taken on

15   behalf of the Defendants, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:05 a.m., Wednesday, July 10, 2013, at

19   the Attorney General's Office, 455 Golden Gate Avenue,

20   11th Floor, San Francisco, California.

21

22

23

24

25

Craig Haney, Ph.D.                                              July 10, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:   AARON J. FISCHER, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              AFISCHER@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:   DEBBIE J. VOROUS, ESQ.
 9                    LORAN MICHAEL SIMON, ESQ.
                OFFICE OF THE ATTORNEY GENERAL
10              STATE OF CALIFORNIA
                1300 I STREET
11              SACRAMENTO, CALIFORNIA 95814
                916.324.5345
12              916.324.5205 FAX
                DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2                   INDEX OF EXAMINATIONS

3

4    Examination by Ms. Vorous  ........................5

5

6                         --o0o--

7

8            EXHIBITS MARKED FOR IDENTIFICATION

9    No.                Description                    Page

10   Exhibit 1    Notice of Deposition and Request .....6
                  for Production

11

     Exhibit 2    Expert Declaration of Craig ..........8
12                Haney filed 3/14/13

13   Exhibit 3    Expert Declaration of Craig ..........8
                  Haney re: CDCR segregated
14                housing units

15

16

17

18

19

20

21

22

23

24

25

1   not.   That's why I brought mine.

2        Q.   We'll just give these back to the court

3   reporter, then.

4             Take a look at Exhibit 2, which is your

5   March 20, 2013, declaration.  Take a look at your resume

6   which is Appendix A.

7        A.   Uh-huh.

8        Q.   Is this your current CV as of March 2013?

9        A.   Yes.  It appears to be, yes.

10       Q.   Have you updated your CV since March 2013?

11       A.   No, I don't think I have.  I think this is the

12   most current one I have.  I can't say for sure there

13   hasn't been an article or two added, but I don't think

14   there has.

15       Q.   So, Dr. Haney, based on your CV, you're

16   currently a professor of psychology at the University of

17   California at Santa Cruz; is that correct?

18       A.   Yes, it is.

19       Q.   And is that -- if I'm using the terms

20   correctly and I -- I hope -- are you a professor of

21   social psychology?

22       A.   No.  I'm a professor of psychology.

23       Q.   Is there a different between social psychology

24   and clinical psychology?

25       A.   Yes.

1      Q.    What is that difference?

2      A.    Well, clinical psychology is typically the

3   study of psychopathology.  It can involve diagnosis.  It

4   can involve treatment.  But the focus tends to be on

5   psychopathology.

6          Social psychologists focus on a broader range

7   of behavior.  They focus on behavior of people in a wide

8   range of social settings, social interactions in social

9   groups, social institutions.  It's more generally.  So

10  it's not focused specifically on psychopathology but,

11  rather, a broader range of human behavior.

12     Q.    Do you teach both social and clinical

13  psychology?

14     A.    No, I don't.  No.

15     Q.    What classes do you currently teach?

16     A.    I teach courses on -- graduate courses of

17  psychological theory.  Typically, also courses on

18  research methodology.  There are a variety of those,

19  also at graduate level.  I teach undergraduate courses

20  in the psychology in law, usually two versions of that

21  class, a kind of introductory version and advanced

22  version of class.

23          Before I had undertaken administrative

24  responsibilities, I also taught a course on advanced

25  social psychology and sometimes a course on the social

1  psychology of institutions.

2      Q.   So have you ever taught a class on clinical

3  psychology?

4      A.   No.  I'm not a clinical psychologist.

5      Q.   As your role as a professor at the university,

6  do you perform research?

7      A.   I do.

8      Q.   Explain to me what type of research you

9  perform.

10     A.   Sure.  I do research on a variety of different

11 issues.  A lot of that research involves studying the

12 way people react in small group settings, juries, for

13 example, and jury behavior.

14          I do research on prison-related issues.  I've

15 done -- published research on psychological effects of

16 solitary confinement, for example, and research on how

17 people react to and are affected by prison conditions of

18 various types:  Overcrowding, prison in general,

19 isolated conditions of confinement.

20     Q.   Have you ever researched prison populations in

21 California?

22     A.   Yes.  I have in the sense that -- I've written

23 about work that I've done oftentimes in conjunction with

24 legal cases, but interviews that I've conducted with

25 people who are confined in California prisons.

Craig Haney, Ph.D.                                    July 10, 2013

1    different prison systems.

2        Q.   Okay.  Can you -- what prison systems are you

3    going to be covering in what you're working on now?

4        A.   Well, this would include data collected in the

5    state of Texas.

6        Q.   Do you have an expectation when you'll publish

7    that work?

8        A.   I wish I did.

9        Q.   Okay.

10        A.   That's a more loaded question than you

11   intended it to be.  My anxiety level just went up very

12   high.

13        Q.   Was the study that you conducted in connection

14   with the Pelican Bay State Prison secured housing unit

15   published?

16        A.   Yes.  It was part of an article that was

17   published in 2003.

18        Q.   Is that one of the articles that you listed in

19   your declaration on the secured housing unit?

20        A.   Yes.  I'm sure it was.

21        Q.   As a psychologist, have you ever treated

22   patients?

23        A.   No.

24        Q.   I'm assuming you've never been licensed to

25   treat patients, as well.

Craig Haney, Ph.D.                                          July 10, 2013

1      A.   No.   Exactly.   I don't do treatment or
2  diagnosis.   It's not something I'm trained in or am
3  experienced in or licensed to do.
4      Q.   Okay.   Have you ever worked inside of a
5  correctional setting?
6      A.   No.   Not in a formal capacity.   I've been a
7  consultant at times but not actually an employee of the
8  prison system.
9      Q.   So I also noted from your resume that you
10 received your JD at Stanford Law School; is that
11 correct?
12     A.   Yes, it is.
13     Q.   Have you -- are you currently licensed as an
14 attorney?
15     A.   No.
16     Q.   Okay.
17     A.   I don't practice law.   I haven't practiced
18 law.
19     Q.   As an expert witness, how many times have
20 you -- start with, I guess, just testified for
21 plaintiffs?   Do you know?   Do you have a recollection of
22 the number of times?
23     A.   It would be a rough estimate.   Maybe 10 or 15
24 times.
25     Q.   Other than the Coleman case, what other cases

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    isolated conditions of confinement.

2        Q.    Is it your opinion that segregated housing

3    causes mental illness?

4        A.    I think in some instances it does.  I mean, I

5    should, just to clarify my previous answer to the

6    question you asked me before, I know no reason why

7    prisoners in administrative segregation or security

8    housing unit, even if they're not mentally ill, would

9    not, to some degree, show or manifest the negative

10   effects of isolation.

11           You asked me a question about whether or not I

12   favored a blanket prohibition.  That's a somewhat

13   different question.  I didn't mean to say by that I

14   didn't think there was any reason to believe they would

15   be adversely affected by being kept in those -- under

16   those conditions.

17           And, you know, I do think that, for some

18   prisoners, the experience of prolonged isolation is, in

19   fact, a mental illness-producing event.  I think I've

20   seen cases in which it occurred.  I've consulted with

21   many other clinicians who have seen it.  So I don't -- I

22   don't doubt that it occurs.  I also wouldn't suggest to

23   you that it occurs for everybody.  It clearly doesn't.

24       Q.    What about exacerbates mental illness?  Is it

25   your opinion that segregated housing exacerbates mental

Craig Haney, Ph.D.                                    July 10, 2013

1    illness in an inmate that was previously diagnosed as

2    having a mental illness?

3         A.    I think -- I think it places them at grave

4    risk of harm of exacerbation, yes.  I think in a much

5    higher number of cases than those who enter

6    psychologically healthy and exit psychologically

7    unhealthy, people who enter psychologically unhealthy

8    who are psychologically disabled, the stress and rigor

9    of isolation is very likely to exacerbate the nature of

10   the mentally illness from which they suffer.

11        Q.    And how do you reach that opinion?  What is

12   the basis of that opinion?

13        A.    It's 30 years of interviewing people in

14   environments like this, not all of whom are mentally ill

15   at the time they entered.  Some of whom were.  It -- I

16   mean, I've -- I've seen it all over the country and

17   interviewed people to whom it has happened.

18             It happens -- it happens now to clearly be the

19   consensus among mental health professionals, the

20   American Psychiatric Association among them.  It was not

21   necessarily when I started to do this work, but it -- it

22   now seems to me to be clearly what most mental health

23   professionals that work in that area now understand to

24   be the case.

25        Q.    So I think you may have already answered this

Craig Haney, Ph.D.                                    July 10, 2013

1    question.  But if not, is it also your opinion that

2    inmates with mental illness are at greater risk of

3    deterioration or harm if they're placed in a segregated

4    housing unit?

5        A.   Yes.

6        Q.   Same question:  How did you reach that

7    opinion?  Is it similar to the answer that you just gave

8    me?

9        A.   Yes.  I also want to say that it's certainly

10   consistent with the large literature.  The American

11   Psychiatric Association came to this conclusion based on

12   the accumulated wisdom of people who studied this issue.

13        There is a literature on this issue.  And it

14   is -- there are international as well as domestic

15   studies of this issue, and I've certainly relied that.

16   I mean, I'm -- I haven't operated in a vacuum on this --

17   on this issue, so I've certainly acknowledged the

18   analysis of this issue by my colleagues who, as I've

19   said, appear now to have reached consensus as well.

20        Q.   So, in your opinion, why is it that some

21   inmates with mental illness are more vulnerable to

22   deterioration in segregated housing than others?

23        A.   Well, it -- I think, in my experience, it

24   comes about as a variety of different -- for a variety

25   of different reasons having to do with the -- some of it

Craig Haney, Ph.D.                                                July 10, 2013

1    participants in an experiment with the understanding

2    they will produce data for you in the needed or required

3    ways.

4          That model is not a model that we can almost

5    ever use in the real world.  We can almost never use it

6    in clinical science.  The whole field of psychiatry, for

7    example, is without the opportunity to do that.  You

8    can't give people some mental illness and other people

9    not.  You can't expose them to things that you think

10   cause mental illness.  You have to approach this in a

11   much more complicated and nuanced way along the lines I

12   described earlier.

13        Q.  So setting aside real world and looking at

14   prison environment, do you have the same opinion that it

15   would be problematic to use the, you know, causal-type

16   models in a prison environment?

17        A.  Well, I -- it's -- it's impossible to -- to do

18   it -- to use the simplistic pure form of causal study

19   for obvious reasons.  And so people don't do it.  Can't

20   do it.

21        And so that's why you approach the issue of

22   reaching causal conclusions in this much more elaborate

23   way which requires you look at all these other things.

24        Q.  Okay.  And what are the obvious reasons?  I

25   just want to make sure I have the same reasons you're

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    grave risk of psychological harm to which prisoners in

2    isolated confinement are subjected."

3        Do you see that?

4    A.    Yes.

5    Q.    What do you mean by the term "documents"?

6    A.    That describes, provides factual evidence or

7    support for, empirically confirms.

8    Q.    Okay.  And is it your opinion that the large

9    body of literature that you're referring to in

10   paragraph 8 establishes that segregated conditions cause

11   psychological harm?

12   A.    Yes, it does in that complicated way that I

13   described before lunch.  There is no experimental study

14   of this for all these reasons.  But for all the reasons

15   that I discussed earlier, it's possible to reach a

16   conclusion about what these studies mean and what they

17   show with respect to the harm that's created.

18   Q.    Are you making a distinction between

19   experimental studies and causality studies?

20   A.    I'm not sure what you mean by that.  The --

21   I -- I described earlier the most widely accepted way of

22   establishing causality is through experimental research

23   for all the reasons that I described that.  You can

24   control, it's simple if something changes, you know, why

25   it changed and so on.

Craig Haney, Ph.D.                                        July 10, 2013

1      Q.    So looking at the various studies that are in

2    Footnote 8, do any of these studies involve -- or employ

3    an experimental-type methodology as we've been talking

4    about?

5      A.    No.

6      Q.    Okay.

7      A.    Just to clarify, Footnote 8 really refers to

8    other reviews.  So these are not necessarily primary

9    studies but they review, as I did in several of my

10   studies, they review the literature which does cite --

11   the review cites to primary studies.

12            The -- the later part of this footnote does

13   talk about two studies which are primary studies, the

14   studies which report direct data.  But the first part of

15   that footnote talks about reviews of the various

16   literature to which I refer.

17     Q.    And the last -- the last two studies, I'm

18   assuming you're referring to findings -- I would refer

19   to it as, I guess, as the Zinger study.  I'm not sure if

20   that's correct.  It's 2001.  And then an O'Keefe study;

21   is that correct?

22     A.    Yes.

23     Q.    And why are you referring to them as primary

24   studies?

25     A.    Because they -- those two articles report --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                        July 10, 2013

1    all of them.  Sometimes in prison settings people feel

2    angry or they feel frustrated, they may feel depressed.

3         What's different about isolation is that it

4    tends to produce much more severe versions of these

5    symptoms.  And it also tends to produce them in much

6    greater numbers of people.  The prevalence is much

7    higher than it is in the prison population in general.

8         Q.   Do you know whether any of the studies in

9    paragraph 12 looked at presegregation conditions?  So,

10   in other words, did they look to see whether or not any

11   of the inmates that were studied in the segregation unit

12   had any of these symptoms before going into the

13   segregation unit?

14        A.   I'm not sure.  I'd have to check.

15             I think what most of the studies conclude is

16   that self-reports of the prisoners, as well as the very

17   elevated rates of the symptoms, counterindicate that --

18   the proposition that these were things people were

19   experiencing beforehand.

20             To the extent to which they were measured

21   beforehand is another question.  I'd have to look at the

22   study specifically to see that.

23        Q.   Turn to paragraph 11, please, again in the

24   May 2013 declaration.

25        A.   Yes.

# EXHIBIT 2

# TLS | THORSNES
## litigation services

Transcript of the Testimony of:

# **Charles Scott, M.D.**

Coleman v. Brown

July 26, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
            vs.                       )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)


DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, JULY 26, 2013,  10:00 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4    RALPH COLEMAN, ET AL.,                )
                                            )
 5                       Plaintiffs,        )
                                            )CASE NO.:
 6             vs.                          )S 90-0520 LKK-JFM
                                            )
 7    EDMUND G. BROWN, JR., ET AL.,         )
                                            )
 8                       Defendants.        )
      _____ )
 9

10

11

12

13

14             The Deposition of CHARLES SCOTT, M.D., taken

15    on behalf of the Plaintiffs, before Megan F. Alvarez,

16    Certified Shorthand Reporter No. 12470, Registered

17    Professional Reporter, for the State of California,

18    commencing at 10:00 a.m., Friday, July 26, 2013, at the

19    law offices of Rosen, Bien, Galvan & Grunfeld, LLP,

20    315 Montgomery Street, 10th floor, San Francisco,

21    California.

22

23

24

25
```

Charles Scott, M.D.                                    July 26, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3            BY:  AARON FISCHER, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, TENTH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            AFISCHER@RBGG.COM

 7

 8    FOR DEFENDANTS:

 9            BY:  DEBBIE VOROUS, ESQ.
              OFFICE OF THE ATTORNEY GENERAL
10            STATE OF CALIFORNIA
              1300 I STREET, 10TH FLOOR
11            SACRAMENTO, CALIFORNIA 95814
              916.324.5345
12            916.324.5205 FAX
              DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          July 26, 2013

```
 1                        I N D E X
 2                   INDEX OF EXAMINATIONS
 3
 4   Examination by Mr. Fischer  ........................6
 5
 6                       --o0o--
 7
 8         EXHIBITS MARKED FOR IDENTIFICATION
 9   No.                Description                   Page
10   Exhibit 1     Plaintiffs' Notice of Deposition .....8
                   of Defendants' Expert Witness
11                 Charles L. Scott and Request for
                   Production of Documents
12
     Exhibit 2     Declaration of Charles Scott, .......11
13                 M.D., in Support of Defendants'
                   Opposition to Plaintiffs' Motion
14                 Related to the Housing and
                   Treatment of Mentally Ill
15                 Prisoners in Segregation
16   Exhibit 3     DSH - Psychiatry Opportunities, .....14
                   Web site printout "A Message
17                 from the California Department
                   of State Hospitals Medical
18                 Director"
19   Exhibit 4     State of Colorado, 2010, ............38
                   "One-Year Longitudinal Study of
20                 the Psychological Effects of
                   Administrative Segregation,"
21                 Maureen L. O'Keefe
22   Exhibit 5     APA Official Actions, Position ......43
                   Statement of Segregation of
23                 Prisoners with Mental Illness,
                   Approved by the Board of
24                 Trustees December 2012
25   //
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                                    July 26, 2013

```
 1              EXHIBITS MARKED FOR IDENTIFICATION
 2    No.              Description                        Page
 3    Exhibit 6      The Psychological Effects of 60 .....89
                     Days in Administrative
 4                   Segregation, by Ivan Zinger,
                     December 1998
 5
      Exhibit 7      International Journal of ...........103
 6                   Offender Therapy and Comparative
                     Criminology Article, The
 7                   Psychological Effects of
                     Solitary Confinement on
 8                   Prisoners in Supermax Units:
                     Reviewing What We Know and
 9                   Recommending What Should Change,
                     Bruce A. Arrigo and Jennifer
10                   Leslie Bullock, November 2007
11    Exhibit 8      "Solitary Confinement Is Not .......118
                     Cruel and Unusual Punishment:
12                   People Sometimes Are!" Paul
                     Gendreau and James Bonta
13
      Exhibit 9      American Psychiatric Associates, ...128
14                   Psychiatric Services in Jails
                     and Prisons, Second Edition
15
      Exhibit 10     Handbook of Correctional Mental ....146
16                   Health, Charles Scott and Joan
                     Gerbasi, 2005, Chapter 10,
17                   Offenders with Mental Illnesses
                     in Maximum- and
18                   Supermaximum-Security Settings,
                     Gary E. Beven, M.D.
19
      Exhibit 11     "An Overview of Correctional .......158
20                   Psychiatry," Jeffrey Metzner and
                     Joel Dvoskin, 2006
21
22
23
24
25
```

Page 5

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                July 26, 2013

1    visit wasn't allowed.

2        Q.   Dr. Scott, in addition to some of the

3    criticisms that you have about Dr. Haney's studies in

4    your declaration, are there any other criticisms or

5    concerns you have about his methodology?

6        A.   Yes.

7        Q.   What are they?

8        A.   First, it's unclear to me if Dr. Haney is a

9    licensed clinician that is allowed by the -- to make

10   clinical diagnoses and treatment recommendations.  So to

11   the degree that he's doing study interviews and that is

12   not what he's trained to do as far as diagnosing and

13   treatment, then that would be a concern for data

14   collection.

15       Q.   Have you seen in his studies instances where

16   he makes diagnoses?

17       A.   He clearly, particularly in the SHU, talks

18   about psychiatric symptoms and then makes conclusions

19   that SHU causes psychological harm.

20            So if you're going to conclude that there's

21   mental harm caused by your review of symptoms, you are

22   making a mental health conclusion and observation.  And

23   that's what he does.

24       Q.   My question is:  Have you seen any of those

25   studies where he makes a mental health diagnosis?

Charles Scott, M.D.                                        July 26, 2013

1          A.   I would have to review --

2          Q.   You're not sure?

3          A.   Yeah.

4          Q.   Any other concerns or critiques you have of

5    Dr. Haney's findings?

6          A.   The study on the SHU inmates, his methodology

7    section is, I think, a few sentences and describes it as

8    a randomized selection of 100 inmates.  There is no

9    description of how many inmates refused, how many

10   inmates agreed and didn't participate, the length of the

11   interview, how the interview was developed.

12              He developed some questions.  Was that

13   questionnaire -- has it ever been peer-reviewed,

14   studied?  Is there a known error rate?  Has it been

15   generally accepted in the scientific community?

16              So nonclinician comes up with 12 questions --

17   he says they're questions.  And we don't know the length

18   of time, how the interviews went, who was present, how

19   the cases were selected, who didn't agree.

20              Did it receive an IRB approval?  Is it within

21   his university's ethical guidelines if he did not?

22              Those are some of the general concerns of that

23   study.

24              Other concerns, when you look at his

25   triangulation method, is downloading information from

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    other standards that may not in a much more extreme way

2    be applicable to the California system.

3            So certainly we've been talking today about

4    does the Colorado prison and the decade of the 2000s,

5    you know, subtle differences or not, you know, is it

6    applicable versus citing Dr. Toch's work in 1975 based

7    on interviews in a New York prison with a very different

8    system versus in his literature to support his

9    triangulation methodology, he also talks about reviews

10    on jails and prisons in the 1700s in America and

11    reported effects and descriptions based in units that

12    are fundamentally very different in many ways than

13    current.

14            So I would have a concern about using

15    historical data from different settings.

16            Next --

17        Q.   Let me break it down.  I don't want to cut you

18    off.  I don't want to lose everything because there's a

19    lot here.

20            First, on the first topic of whether

21    Dr. Haney's -- his status as a licensed clinician.  Is

22    it your opinion that it's inappropriate for anyone who's

23    not a licensed clinician to identify psychological

24    distress?

25        A.   I wouldn't say it's inappropriate, depending

1   on what your training and background is.  For example,
2   you could have clinical social workers who have not yet
3   met their final licensing hours, but they are supervised
4   by psychiatrists or psychologists.  They are trained to
5   gather clinical information that can be very different
6   than a sociologist who reads the literature but hasn't
7   gone through diagnosing, assessment of psychiatric
8   symptoms.
9           So, for example, when someone tells you
10  something, you know, what is your training and
11  background to look at either the accuracy of the report,
12  the potential meaning of that from a psychiatric
13  perspective review and/or medical perspective.
14          So there are unlicensed providers that they
15  have had at least some fundamental training and clinical
16  training in the -- in a clinical track, be it social
17  work or psychology.
18      Q.   So if they -- let me ask it again.  Outside of
19  those professions or specialties, do you think it's
20  inappropriate for any other unlicensed clinician to
21  identify psychological distress in a segregation
22  environment?
23      A.   I won't say it's inappropriate for people to
24  do their best to identify psychological distress.  So a
25  mother, for example, whose child is crying, she does not

 1    need a degree to identify psychological distress.

 2            Where it raises concern is when assumptions,

 3    causation, causality, and conclusions are reached about

 4    what that's about, what that means without the

 5    background and training to do so.

 6        Q.  Do you think discussion of historical data on

 7    use of historical data over time is an inappropriate

 8    piece of evidence to -- or piece of information to

 9    consider?

10        A.  I think it provides historical context for the

11    evolution of care provided to prisoners over time.  And

12    so I think it's important to understand that evolution.

13            However, for example, one similar researcher,

14    Mr. Jackson we talked about earlier, in that setting,

15    Canadian setting, he talked to a particular inmate, last

16    name was Oag, O-A-G, and that inmate, as part of his

17    study, was described as being naked in the cell, only

18    had cold water thrown on him periodically and very

19    extreme, harsh conditions.

20            So that --

21        Q.  I want to make sure I understand.  The

22    question was whether historical data is an appropriate

23    piece of information to consider in writing an article

24    about segregation.

25        A.  It may be important to consider, but it may

1   case?

2       A.   If he's not trained to look at diagnoses,

3   understand either medical or psychiatric causation, and

4   isn't licensed to do so, his review of medical and

5   psychiatric records, I don't understand how one could be

6   assured he has the expertise to do that, something he's

7   not trained to do.

8       Q.   That's -- let me ask this:  Is his experience

9   touring and doing interviews in CDCR segregation

10  populations an appropriate type of evidence for which --

11  on which he may rely in forming an opinion in this case

12  for example?

13      A.   I think because the evidence has been captured

14  in such an ambiguous, undefined way, I do not find it

15  reliable.

16      Q.   Have you reviewed any of the records of

17  inmates that Dr. Haney has reviewed in the course of

18  this case?

19          MS. VOROUS:  Objection.  Asked and answered.

20          THE WITNESS:  No.  But when he was asked in

21  his deposition about reviewing records of people he

22  interviewed, many of the cases he did not, to

23  corroborate the findings one way or the other.

24  BY MR. FISCHER:

25      Q.   But you didn't review any records he reviewed?

1    declaration in the context of the termination motion, or

2    are you talking about --

3            MR. FISCHER:  The two declarations that have

4    been filed and relied upon in this case on this motion.

5    So this is the March 14th declaration and the May

6    declaration.

7            MS. VOROUS:  Specific to his tours, putting

8    aside all of his articles?

9            MR. FISCHER:  My last question was just

10   specific to his tours.

11   BY MR. FISCHER:

12       Q.   Do you have any basis to -- for disputing any

13   of his findings as to conditions of the individuals that

14   he interviewed in the units that he toured?

15       A.   I would say yes.  I have concerns about how he

16   reached conclusions without looking at corroborative

17   evidence.

18       Q.   Is the corroborative evidence records?

19       A.   It could be speaking with correctional

20   counselors, officers, treating clinicians and looking at

21   the records to see if what the individual says is true.

22            For example, an inmate could say, "They

23   haven't seen me in two weeks and haven't given me my

24   medicine."

25            The record shows that they had a note that

1    day.  The nursing medication administration record

2    indicates that they received the pill.  And without

3    doing that, you would have a report that says, "Nobody

4    sees me.  They don't come by.  I don't get my

5    medicines."

6        Q.   Are you aware of an example of that being the

7    case in Dr. Haney's -- either of Dr. Haney's

8    declarations?

9        A.   Because he didn't review the records, we can't

10   know.

11       Q.   If he hadn't reviewed the records, that would

12   be a concern for you?

13       A.   If he -- yes.

14       Q.   But you're not aware of a situation where the

15   medical records or psychiatric records conflicted with

16   Dr. Haney's findings?

17       A.   No.  Because he took everything an inmate said

18   at face value without determining if it was true or not.

19       Q.   That wasn't my question.

20            My question was -- sorry.  Are you aware of

21   any situation where the psychiatric records conflict

22   with Dr. Haney's finding?

23       A.   No.  I've already said I haven't looked at the

24   psychiatric records.

25       Q.   Any other concerns or criticisms you have

1    about Dr. Haney's work beyond what you've stated here

2    today and what's in your declaration?

3        A.    Yes.

4        Q.    What is that?

5        A.    In using his triangulation model, he

6    references research that doesn't reflect current

7    circumstances for the CDCR.

8            For example, he references concentration camp

9    survivors, prisoner of war experiences.  He will

10   reference some of the deprivation studies I mentioned

11   earlier that were highly severe, extreme, and not

12   characteristic of the administration segregation unit

13   using his methodology of triangulation.

14           He relies heavily on self-report and case

15   histories alone, primarily or frequently citing

16   plaintiffs' experts who collected the data in the course

17   of gathering information for a lawsuit.

18           So, for example, Stuart Grassian, 14 inmates

19   that he interviewed which in one area, maybe even in his

20   declaration, he described as one of the -- I don't want

21   to misquote him, but he speaks very positively of it.

22   Was in the course of a class action decades ago with

23   14 inmates that told him how they felt about the

24   circumstances over a series of interviews.  So he relies

25   heavily on Grassian and similar researchers.

1          Another, I believe, example of class action

2    experts that he references are Brodsky, B-R-O-D-S-K-Y.

3          So his support for his findings are primarily

4    from many plaintiffs' experts who, during the course of

5    their tours, got information from inmates without

6    verifying it.

7          And his -- historical data from the system is

8    not consistent with the CDCR system.  So I think that

9    reflects my concerns.

10         Q.   Okay.

11         A.   And then one more.

12         I did not see in any of his -- I did not see

13    in his studies that he made an attempt to look at if

14    there were preexisting conditions that were either

15    similar or perhaps even worse rather than take the

16    symptoms at self-report and then, therefore, conclude

17    the SHU caused this without knowing if prior psychiatric

18    history would have shown a similar presentation.

19         Q.   If somebody is psychologically distressed in

20    segregation, would you agree that movement out of

21    segregation or enhanced treatment would be an

22    appropriate step?

23         A.   It could be.

24         Q.   And can that determination be made based on an

25    interview and review of records from a particular point