DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>　　　　Defendants. | Case No. Civ S 90-0520 LKK-DAD<br><br>**PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE DECLARATION AND TESTIMONY OF CHARLES L. SCOTT**<br><br>Judge: Hon. Lawrence K. Karlton<br>Date: November 5, 2013<br>Time: 10:15 a.m.<br>Crtrm.: 4 |

[948510-4]

# INTRODUCTION

Plaintiffs move to exclude the purported "expert" testimony of Charles L. Scott, M.D. at trial and in his Declaration filed in Support of Defendants' Opposition to Plaintiffs' Motion Related to the Housing and Treatment of Mentally Ill Prisoners in Segregation, Docket No. 4715, July 17, 2013 (hereinafter "Scott Declaration" or "Scott Decl."). Dr. Scott's testimony should be excluded because his opinions do not meet the basic requirements of expert testimony under Federal Rules of Evidence 702 and 703 as well as *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Dr. Scott has no foundation for providing an opinion as to conditions in CDCR's segregation units. He instead relies only on out-of-state and out-of-country studies that, by their own terms, cannot be applied to the issues before the Court. In addition, Dr. Scott has no relevant expertise regarding prison segregation or prisoners with mental illness in segregation.

Dr. Scott's expert testimony has already been excluded by this Court. This Court excluded the expert report signed by Dr. Scott, along with Drs. Joel A. Dvoskin and Jacqueline M. Moore, in support of Defendants' January 7, 2013 termination motion ("January 2013 Report"). *See* Order Denying Mot. to Terminate, Docket No. 4539, Apr. 5, 2013, at 22. The Court found that the improper, unethical, and prejudicial conduct that underlay the January 2013 Report warranted its exclusion, and that Defendants would have to "retain[] untainted experts to re-inspect the prisons" in order to provide admissible expert testimony as to the adequacy of treatment for CDCR prisoners with mental illness. *See id.*

Dr. Scott remains a "tainted" witness. Equally important, his testimony demonstrates that he has no foundation on which to opine regarding CDCR segregation units or any of the issues now before the Court. Dr. Scott confirmed that he has not done any CDCR prison tours or reviews other than those done for the tainted January 2013 Report that the Court previously excluded. Decl. of Aaron J. Fischer in Supp. of Pls.' Mot. *in Limine* to Exclude the Decl. & Testimony of Charles L. Scott, filed concurrently

herewith ("Fischer Decl.") Ex. A (July 26, 2013 Dep. of Charles Scott, M.D.) ("7/26/13 Scott Dep.") at 18:10-12, 16:11-18:4.  And in any event, Dr. Scott has testified that his role on the January 2013 Report did not include an examination of CDCR segregation units. Fischer Decl. Ex. A (July 26, 2013 Dep. of Charles Scott, M.D.) ("7/26/13 Scott Dep.") at 18:21-19:2; *id.* Ex. B (Mar. 8, 2013 Dep. of Charles Scott, M.D.) ("3/8/13 Scott Dep.") at 122:21-123:12 & 215:24-216:12.

The Scott Declaration contains just one paragraph regarding CDCR segregation units, *see* Scott Decl. ¶ 30, which is taken nearly verbatim from the declaration of CDCR Director of Health Care Services.  *See* Am. Decl. of Dr. Tim Belavich in Supp. of Defs.' Opp. Br., Docket No. 4759-1, Aug. 22, 2013 ¶ 19.  Because Dr. Scott has *not* completed (whether during the termination proceedings or otherwise) any sort of assessment of CDCR's segregation system, the opinion contained in Paragraph 30 is without foundation and should be stricken.

Dr. Scott turns out to be no segregation "expert" at all.  He has never worked in or conducted a full review of *any* adult prison or jail segregation system, or otherwise studied a segregation system.  He readily acknowledges that he has not reviewed, and cannot offer an opinion on, conditions in CDCR's segregation units.  He instead points to a few studies from other states or countries that purportedly support Defendants' incredible claim that "there is insufficient data to conclude that CDCR's use of segregated housing causes or exacerbates mental illness."  Defs.' Opp. to Pls.' Mot. Related to Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation, Docket No. 4712, July 24, 2013 ("Defs.' Opp. Br.") at 6.  These studies, as discussed below, are expressly inapplicable to any analysis of CDCR segregation units and the important issues now before the Court. Dr. Scott's testimony fails to meet the basic requirements for admissible expert testimony, is of no use to the Court, and should be excluded.

At a minimum, the Court should order that Dr. Scott's expert testimony be limited to a "Discussion of Research Standards" (Scott Decl. ¶¶ 7-12) and a presentation of the academic studies discussed in his declaration (*id*. ¶¶ 13-27).  Given that Dr. Scott has not

evaluated CDCR's segregation units, the Court should not permit him to offer expert testimony regarding those units. Dr. Scott has no foundation to provide testimony on any of the core disputed matters at issue in Plaintiffs' motion, including, *inter alia*: whether Defendants are providing minimally adequate treatment to prisoners with mental illness in CDCR segregation units; whether prisoners with mental illness are being subjected to risk of serious harm as a result of the harsh and excessive stays in CDCR segregation settings; whether Defendants appropriately screen prisoners for mental illness and prevent dangerous segregation placements; whether the Pelican Bay SHU exclusion order should apply to all CDCR SHUs; and whether the blanket uses of treatment cages and strip searches on all segregated prisoners with mental illness cause harm and undermine treatment. Even if Dr. Scott can somehow be said to be an "expert" on anything relevant to this proceeding – on, for example, "research and experimental standards and methodologies," Scott Decl. ¶ 7 (whatever that means) – he should not be permitted to offer testimony regarding CDCR's segregation conditions, practices, and lengths of stay, and the harms they inflict on prisoners with mental illness.

## LEGAL STANDARD

Federal Rule of Evidence 702 ("Rule 702") establishes several requirements for admissibility of expert testimony. A proffered expert must have "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This requirement that the expert testimony assist the factfinder "goes primarily to relevance," and "[w]hat is relevant depends on what must be proved." *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010) (internal quotation marks omitted). The testimony of the proffered expert must also be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of expert testimony has the burden of establishing that these requirements for admissibility are met by a preponderance of the evidence. Fed. R. Evid. 702, Adv. Committee's Note to the 2000 Amendments.

Under Rule 703 of the Federal Rules of Evidence ("Rule 703"), an expert must base his or her opinion "on facts or data in the case that the expert has been made aware of or personally observed." Importantly, courts must determine whether a proffered expert's testimony furnishes more than what lawyers could offer in argument. *Eymard v. Pan Am. World Airways (In re Air Crash Disaster at New Orleans, La.)*, 795 F.2d 1230, 1233 (5th Cir. 1986).

I.  ARGUMENT

   A.  **Dr. Scott Has No Foundation for Any Opinion as to Conditions in CDCR's Segregation Units.**

Dr. Scott cannot offer an expert opinion as to mental health treatment, conditions of confinement, or any other aspect of CDCR's segregation units *because he has never reviewed them*. He thus has no foundation to provide any opinion, as such opinion would not be "based on sufficient facts or data," would not be "the product of reliable principles and methods," and would not be based on a "reliabl[e] appli[cation of] the principles and methods to the facts of the case." Fed. R. Evid. 702.

Dr. Scott did not evaluate CDCR segregation units during the termination proceedings. *See* 7/26/13 Scott Dep. at 18:21-19:2 ("Q. Did you evaluate any of the segregation units in the course of your consultancy on the termination proceedings? … A: I did not do evaluations of specific ad seg units."); 3/8/13 Scott Dep. at 122:21-123:12 (stating that, during the termination tours, "review of ad seg care was not my area that I was working on"); *id.* at 215:24-216:12 (stating that, during the termination tours, "Dr. Dvoskin was looking at EOP and ad seg, not me").

Nor has Dr. Scott conducted any evaluation of CDCR segregation units since that time. *See* 7/26/13 Scott Dep. at 18:10-12 ("Q: Have you gone to review any specific segregation units in the CDCR system [since the termination proceedings]? A: No."); *id.* at 16:11-18:4 (confirming that he has not toured any CDCR prisons, reviewed any CDCR patient records, reviewed CDCR policies and procedures other than the Program Guide, or spoken with CDCR clinicians or correctional staff since the termination proceedings).

1    Dr. Scott's declaration contains a single paragraph on CDCR's purported "system"
2 for housing and treating prisoners with mental illness in segregation, Scott Decl. ¶ 30,
3 which – by his own admission – is without factual foundation. Dr. Scott admits that his
4 knowledge of the five "aspects" of CDCR's segregation system referred to in his
5 declaration is based on the *Coleman* Program Guide, *not* any facts or data regarding actual
6 conditions or implementation. *See* 7/26/13 Scott Dep. at 143:12-21 ("Q. Where did you
7 get this information as to these five aspects of CDCR's system? A. Primarily from the
8 program guide… Q. Have you evaluated the implementation of these [] policies?
9 A. No.").

10    Defendants' counsel's objections during Dr. Scott's deposition confirm his inability
11 to offer expert testimony regarding the CDCR segregation conditions now at issue.
12 Defendants' counsel repeatedly objected to Plaintiffs' questions as to Dr. Scott's opinions
13 regarding CDCR segregation practices now at issue as "beyond the scope" of his expert
14 testimony and expertise. *See, e.g.*, 7/26/13 Scott Dep. at 65:12-16 (Q. … Do you think that
15 this is an appropriate practice, to have mental health appointments in a noncontact booth?
16 MS. VOROUS: Objection. … Beyond the scope of his expertise."); *id.* at 134:20-135:1
17 ("Q. …Do you believe that a person placed in administrative segregation for safety
18 reasons, for their own safety reasons, should be treated in a therapeutic cage? MS.
19 VOROUS: Objection. Beyond the scope of his expert testimony …"); *id.* at 135:9-16
20 ("Q. If [prisoners with mental illness] weren't receiving treatment in a therapeutic cage
21 prior to treatment in segregation and then that inmate is transferred to segregation for their
22 own safety, do you think that it's … appropriate to treat that person in a therapeutic cage?
23 MS. VOROUS: Objection. Again, beyond the of expert opinion provided in the context of
24 this motion and Dr. Scott's declaration."); *id.* at 140:18-24 ("Q. … [O]nce the clinician
25 finds that they're no longer in a psychiatric crisis, should a clinician also make a
26 determination as to whether that individual may safely discharge [from an MHCB] to a
27 segregation unit? MS. VOROUS: Objection. Beyond the scope of expert opinion in
28 connection with this plaintiffs' motion."); *id.* at 160:16-22 ("Q. Dr. Scott, are you familiar

with any … correctional facility outside of the CDCR that provides one-to-one clinical treatment to individuals in segregation in a therapeutic treatment module or a cage?  MS. VOROUS: Objection.  Beyond the scope of Dr. Scott's opinions in the context of the segregation motion and his declaration.").  Defendants' objections confirm that Dr. Scott is not qualified to offer expert testimony regarding CDCR's segregation units, and that his testimony is being offered for the limited purpose of discussing "research standards" (Scott Decl. ¶¶ 7-12) and a few studies of out-of-state and Canadian segregation systems (*id.* ¶¶ 13-27).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Watts v. Allstate Indemnity Co.*, No. Civ. S-08-1877 LKK/GGH, 2013 U.S. Dist. LEXIS 7407, at *18 (E.D. Cal. Jan. 17, 2013) (quoting *General Electric v. Joiner*, 522 U.S. 136, 146 (1997)).  Dr. Scott's "expert" testimony is not based on actual facts or data regarding any aspect of the CDCR segregation system or the risk of harm to *Coleman* class members housed in segregation.  He is thus unqualified to offer an expert opinion on these matters.  *See Primiano*, 598 F.3d at 567; Fed. R. Evid. 702 & 703.  The Court thus should exclude his testimony.  At a minimum, the Court should order that Dr. Scott's testimony is for the limited purpose of discussing "research standards" and a presentation of the selected academic studies in his declaration, and should exclude Paragraph 30 of his declaration regarding CDCR's purported segregation system.

**B.    Dr. Scott Opines on Studies with No Application to the Issues Before the Court.**

Without knowledge of facts or data regarding actual conditions of CDCR's segregation system, Dr. Scott instead turns to summarizing studies that are authored by other academics and that have been cited by Defendants in their opposition brief.  Scott Decl. ¶¶ 15-26; Defs.' Opp. Br. at 7.  Dr. Scott summarizes a study of Canada's segregation system, a study of a now-defunct Colorado segregation unit, and a trio of Canadian studies from the 1970s and 1980s on two- to ten-day periods of isolation.  By

1  their own terms, these studies have *nothing* to do with the risk of harm to *Coleman* class
2  members in CDCR's harsh and dangerous segregation units.  The studies, two of which
3  Defendants have filed with the Court, are available and understandable to the Court
4  without Dr. Scott's summarizing.  Dr. Scott does not explain how or why these selected
5  studies' findings are probative evidence of CDCR's segregation conditions, practices, and
6  lengths of stay, and the harms they inflict on prisoners with mental illness.  His testimony
7  does not connect these studies to the disputed issues, does not assist the Court, and would
8  serve only to waste the Court's time.  *See Daubert.*, 509 U.S. at 591 (quoting 3 Weinstein
9  & Berger P702[02], p. 702-18) ("Expert testimony which does not relate to any issue in the
10 case is not relevant and, ergo, non-helpful."); *Primiano*, 598 F.3d at 567 (noting that the
11 relevance of proffered expert testimony "depends on what must be proved"); *O'Conner v.
12 Commonwealth Edison Co.*, 807 F. Supp. 1376, 1392 (C.D. Ill. 1992) ("The mere
13 recitation of a list of studies is not a magical incantation paving the way to the witness
14 stand …..") (internal quotation marks omitted).[1]

15      The researchers for the studies cited by Defendants and summarized by Dr. Scott
16 make clear that their findings  are not applicable to the type of segregation system that
17 CDCR operates.  First, Dr. Scott cites a 2011 article entitled "The Psychological Effects of
18 60 Days in Administrative Segregation."  *See* Decl. of Debbie Vorous in Supp. of Defs.'
19 Opp. Br., Docket No. 4714, July 24, 2013 ("Vorous Decl.") Ex. 2 ("Zinger study").  The
20 Zinger study sought to examine the effects of up to 60 days' placement in Canada's prison
21 segregation system.  *See* Scott Decl. ¶¶ 15, 22.  The Zinger researchers assert that their
22 "findings are limited to 60 days in administrative segregation, and any extrapolation to

---

[1] There remains overwhelming empirical consensus that isolated confinement poses a grave risk of psychological harm, particularly to individuals with mental illness. *See* Expert Declaration of Craig Haney re CDCR Segregated Housing Units, Docket No. 4581, May 6, 2013 ¶¶ 8-12.  But what matters in this proceeding is whether there are real and ongoing harms and serious risk of such harms to *Coleman* class members *in CDCR's segregation units*.  Plaintiffs have presented extensive, unrebutted evidence that there are.

1 lengthier stays would be inappropriate," Vorous Decl. Ex. 2 at p. 72, and that "the findings
2 of this study may be less applicable to other jurisdictions, such as the United States, in
3 which segregated prisoners typically remain in administrative or disciplinary segregation
4 for much longer periods of time, and often under harsher conditions of confinement." *Id.*
5 at p. 73. The authors of the Zinger study thus expressly counsel against using their
6 findings in the way Dr. Scott's testimony would suggest.

7 Second, Dr. Scott cites to a Colorado Department of Corrections study of that
8 state's now-defunct administrative segregation unit. Scott Decl. ¶¶ 16, 24-26. The
9 researchers in this study explicitly identify "several limitations that affect [the study's]
10 generalizability to other settings," including being limited to a one-year isolation period (as
11 compared to the exceedingly long placements, lasting years and even decades, in CDCR's
12 segregation units). *See* Vorous Decl. Ex. 1 ("O'Keefe study") at 11-12. The researchers
13 caution that the study should not be generalized to, *inter alia*, female offenders, illiterate
14 offenders, prisoners with no prior experience in isolation, and – most importantly – to
15 other prison systems with different segregation conditions. *Id.* As detailed in Plaintiffs'
16 Reply Brief, the system examined in the O'Keefe study has *no* bearing on the issues to be
17 decided by this Court. *See* Docket No 4761, Aug. 23, 2013 ("Pls. Reply Br.") at 7-8. The
18 Colorado segregation unit in the O'Keefe study had numerous, highly significant
19 differences compared to CDCR's segregation system (with several features that Plaintiffs
20 now seek as a *remedy* to the existing violations in CDCR segregation units).[2] *Id.* The
21 O'Keefe study's findings have no relevance to any analysis of CDCR's dramatically

---

[2] For example, the Colorado segregation unit in the O'Keefe study had a time limit of 60 days for punitive segregation; provided welfare checks for *all* segregated prisoners; provided mental health screening for prisoners with prolonged segregation placements; allowed segregated prisoners to participate in programming and education; provided mental health contacts in a confidential setting without use of a treatment cage; had an incentive-based program for segregated prisoners to gain privileges; and provided group mental health treatment without use of treatment cages. *See* Pls. Reply Br. at 7-8.

harsher and less therapeutic segregation conditions, and Dr. Scott's summary does not assist the Court.

Dr. Scott also cites a trio of Canadian studies that were completed in the 1970s and 1980s. Scott Decl. ¶ 21 (the "Gendreau studies"). He concedes, however, that these studies cannot be generalizable to CDCR segregation units beyond the "short initial period of time" (*i.e.* 2-10 days) that the Gendreau studies used. 7/26/13 Scott Dep. at 122:10-123:12. He also concedes that at least one of the Gendreau studies he discusses *excluded* individuals with mental illness from the study. *Id.* at 121:12-24.

Dr. Scott's academic summaries of these studies do not assist the Court in its important fact-finding work on the disputed issues. *See* Fed. R. Evid. 702. They further do not provide anything beyond what counsel offers in argument. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d at 1233. Such testimony should be excluded.

**C. Dr. Scott Lacks "Scientific, Technical, or Other Specialized Knowledge" to Assist the Factfinder.**

Underlying the impropriety of Dr. Scott's expert testimony is the fact that Dr. Scott has no expertise regarding the operation of prison segregation units or the treatment of prisoners with mental illness in segregation. Dr. Scott lacks any expertise at all on the subject of segregation and its effects on prisoners with mental illness.

Dr. Scott has never worked in or conducted a full review of a segregation system at an adult prison, nor has he otherwise studied a prison segregation system. *See* Scott Decl. (providing no academic or professional experience working in, reviewing, evaluating, or providing other services related to inmates in segregation units); 7/26/13 Scott Dep. at 36:23-25 (Q: …Dr. Scott, have you done any studies on segregation conditions? A: Not in a prison system.); *id.* at 21:23-23:21 (describing extent of experience evaluating correctional segregation systems, which has been limited to a consultancy in a juvenile hall in the early 2000s and a review of policies and procedures for a jail's "segregation rooms," which Dr. Scott explained "[i]s not the same as prison segregation").

Because Dr. Scott has not established that he has any "scientific, technical, or other

specialized knowledge" regarding conditions, provision of mental health treatment, or any other aspect of prison segregation systems, he lacks the requisite expertise that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Dr. Scott's lack of relevant expertise provides a further basis to exclude, or at least to substantially limit, admission of his "expert" testimony.

## CONCLUSION

The Scott Declaration and any trial testimony offered by Dr. Scott fail to meet the basic requirements under Rule 702 and *Daubert*. Dr. Scott has not demonstrated expertise on the matters now before the Court, and his expert testimony is not based on sufficient facts and data and thus lacks foundation. He instead simply summarizes studies from other states and countries that are expressly inapplicable and, in any event, readily available and understandable to the Court without an academic summary. Plaintiffs respectfully request that the Scott Declaration and all testimony which Dr. Scott may offer be excluded in this proceeding.

DATED: October 22, 2013          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Aaron J. Fischer*
      Aaron J. Fischer

Attorneys for Plaintiffs