EXHIBIT A TO THE DECLARATION OF AARON J. FISCHER IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE DECLARATION AND TESTIMONY OF CHARLES L. SCOTT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,          )
                                )
            Plaintiffs,         )
                                )CASE NO.:
       vs.                      )S 90-0520 LKK-JFM
                                )
EDMUND G. BROWN, JR., ET AL.,   )
                                )
            Defendants.         )
_____ )


DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, JULY 26, 2013,  10:00 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1       A.   Yes.
2       Q.   Okay.  Any other work that you've done
3  involving CDCR prisoners in DSH programs?
4       A.   It's possible over the last 15 years I may
5  have been asked to do an evaluation of an inmate that
6  may have been in a DSH facility, but I can't recall
7  offhand any name.
8       Q.   Do you expect to do any work with respect to
9  activation of the Stockton facility?
10      A.   No.
11      Q.   Okay.  Since the termination proceedings and
12 the completion of your joint report on the termination
13 motion brought in Coleman, have you done any tours of
14 CDCR prison sites?
15      A.   No.
16      Q.   Okay.  Have you reviewed any CDCR patient
17 records?
18      A.   No.
19      Q.   Have you reviewed any policy and procedures?
20 Of CDCR?
21      A.   The -- the program guide I'm familiar with and
22 have reviewed.
23      Q.   And, again, the time -- from the time of the
24 completion of your termination report to today's date,
25 you have looked at the program guide?

```
 1        A.   Since the last -- since the termination.  I
 2   can't recall an exact date, but I think it's likely.
 3   Yes.
 4        Q.   Any other CDCR policies and procedures that
 5   you've reviewed since that time?
 6             Again, since the completion of your joint
 7   report on termination motion.
 8             MS. VOROUS:  Let me interject here.  Are
 9   you -- the doctor may have looked at other documents in
10   the context of his prior deposition which was after
11   completing the report.  So I don't know if you're asking
12   him to go back and try to remember whatever he looked at
13   for that report.  Maybe we could make that distinction.
14   BY MR. FISCHER:
15        Q.   Let's make it a little simpler.  How about
16   since the date of your deposition, which I believe was
17   March -- early March?  Since the day of your deposition,
18   have you reviewed any CDCR policies and procedures?
19        A.   If -- to the degree that they were referenced
20   in Dr. Haney's declaration and any portions that he took
21   from them referencing those, obviously I read his
22   declaration.
23             But that -- no, no other policies and
24   procedures.
25        Q.   Okay.  And since the completion of your
```

1   termination motion joint report, have you spoken with
2   any CDCR clinicians as part of your expert work in this
3   case?
4        A.   No.
5        Q.   Have you spoken with any CDCR correctional
6   staff as part of your consultancy in this case?
7        A.   No.
8        Q.   Have you interviewed any class members?
9        A.   No.
10       Q.   Have you gone to review any specific
11  segregation units in the CDCR system?
12       A.   No.
13       Q.   Have you reviewed any of the new -- any new
14  CDCR memoranda that have been issued since the
15  completion of your report?
16       A.   No.
17       Q.   As an expert on this motion, are you relying
18  on any of the work that you did in the course of the
19  termination proceedings in your tours at that point?
20       A.   No.
21       Q.   Did you evaluate any of the segregation units
22  in the course of your consultancy on the termination
23  proceedings?  You specifically.  I know as part of your
24  joint report, but I'm wondering if you did any
25  evaluation of specific units or segregation units?

```
 1         A.   I did not do evaluations of specific ad seg
 2   units.
 3         Q.   Okay.  Have you been to any CDCR segregation
 4   units prior to the termination proceedings?
 5         A.   Have I been to any CDCR --
 6         Q.   Any CDCR segregation unit.  Just to clarify
 7   what I'm asking, that includes CDCR administrative
 8   segregation units, secured housing units, psychiatric
 9   services units.
10         A.   And the time frame was prior to my deposition
11   have I toured or been through any ad seg units?
12         Q.   Prior to your consultancy in the termination
13   proceedings, have you been to any of those?
14              MS. VOROUS:  I think we're talking over each
15   other.  She's going to hit you, start throwing stuff.
16              THE WITNESS:  Can I just clarify real quickly?
17   BY MR. FISCHER:
18         Q.   Of course.
19         A.   Are you asking before I consulted with CDCR in
20   relationship to the termination motion, had I been to an
21   ad seg unit prior to that for any reason?
22         Q.   A CDCR seg unit.
23         A.   Yes.
24         Q.   And when was that?
25         A.   Three or four years, five years ago.  I don't
```

1   with people and would say, "What's your job here?"  So
2   if that's defined as an interview.  "What is your name?"
3   If that's defined as an interview.  I'd ask people their
4   name, their profession, their role at the facility, but
5   it was in the few minutes before starting the lecture.
6        Q.   Okay.  And that's the extent of --
7        A.   That's roughly the extent.
8        Q.   Okay.  Do you plan to do any more tours of any
9   CDCR segregation unit in the coming months?
10       A.   No.
11       Q.   Okay.  Do you expect to provide testimony at
12  the upcoming hearing on this motion on any issues beyond
13  what's in your declaration?
14       A.   It depends on, obviously, if I'm asked
15  information at the trial and I'm -- the court directs me
16  to answer it, but that's not my intent.
17       Q.   Okay.  Your intent to provide testimony is
18  based -- consistent and on the subject matters discussed
19  in your declaration --
20       A.   Yes.
21       Q.   -- of July 17?
22       A.   Yes.
23       Q.   Dr. Scott, have you ever done a formal
24  evaluation of any segregation unit in a correctional
25  facility?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        A.   Define "formal evaluation."
 2        Q.   Where you were asked to go in and evaluate the
 3   program?
 4        A.   At the San Diego Juvenile Hall, I was asked as
 5   a consultant to look at their facility.  And they did
 6   have placement rooms for juveniles that needed to be
 7   segregated from the main population due to aggression or
 8   violence, so I was a consultant in that aspect.
 9        Q.   When was that?
10        A.   Would have been in the early 2000s.  I don't
11   know the exact year.
12        Q.   Were you looking specifically at the mental
13   health program at the juvenile hall there?
14        A.   Yes.
15        Q.   Did you produce a report?
16        A.   I don't recall.
17        Q.   Do you know what the purpose of that
18   evaluation was?
19        A.   I was retained as an outside consultant by the
20   individuals who ran juvenile hall for more of an
21   overview quality assurance part of their program.  It
22   wasn't in the course of litigation; it was as an
23   independent third party.
24        Q.   Did you provide any recommendations as far as
25   the segregation units at the juvenile hall?
```

1      A.   Not that I can recall.
2      Q.   Were you asked to?
3      A.   I would have to review what their list of
4   questions were.  It's possible.
5      Q.   Have you evaluated any other segregation units
6   in correctional facilities?
7      A.   In part, yes.
8      Q.   Where?
9      A.   There's a Florida jail case where they have
10  a -- segregation rooms.  It's not the same as prison
11  segregation.  And although there was a request put in to
12  do a site evaluation of the actual physical location,
13  the court did not grant that for the experts.  So I
14  reviewed policies related to being placed in ad seg and
15  screening for mental health in depositions related to
16  that.
17      So that's what I meant by "in part."
18      Q.   Okay.  So you reviewed policies and
19  procedures, but not on-site -- didn't do on-site review
20  of the segregation rooms?
21      A.   Yes, that's correct.
22      Q.   Was that an individual lawsuit?
23      A.   That's an interesting legal question.  I think
24  it's starting out as an individual and may or may not be
25  a class action, so I don't know if they even know the

1  research.  But the triangulation method as described by
2  Dr. Haney is looking at sort of different approaches or
3  methods if a more structured study hasn't or can't be
4  done.
5       Q.   I just want to understand the last part.
6            So you agree that triangulation as a method is
7  appropriate if the variables that are used are correct
8  or are valid?
9       A.   I would say two things.
10           One is I wouldn't necessarily agree.  Although
11 O'Keefe used a measurement with many items on it, an
12 extensive measurement asking a question about different
13 symptoms isn't really the same as a within method
14 triangulation.  I think that would be a broad, perhaps
15 inappropriate use of that term.
16           At the same time, triangulation methodology
17 has been used in mostly social science research and
18 concerns about triangulation are if the original data or
19 underlying data aren't either collected in a meaningful
20 way, there's no way to verify their accuracy or
21 liability.  Adding bad data from multiple sources
22 doesn't lead you to a good product at the end.
23      Q.   Okay.  Dr. Scott, have you done any studies on
24 segregation conditions?
25      A.   Not in a prison system.

1           MR. FISCHER:  And we'll take a break in a few
2    minutes if that's okay, Deb.
3           MS. VOROUS:  Okay.
4    BY MR. FISCHER:
5       Q.  Page 11, next page, second paragraph, the
6    first line says:  "Mental health appointments occur in a
7    noncontact booth in visiting room."
8           This, again, is in the Colorado segregation
9    setting that was studied in the O'Keefe study.
10          Do you see that there?
11      A.  Yes.
12      Q.  I guess my first question is:  Do you think
13   that this an appropriate practice, to have mental health
14   appointments in a noncontact booth?
15          MS. VOROUS:  Objection.  Vague and ambiguous.
16   Beyond the scope of his expertise.  Lacks foundation.
17          THE WITNESS:  Yeah.  I would -- I have not
18   done a site visit of the Colorado facility, so I can't
19   answer that.
20   BY MR. FISCHER:
21      Q.  As a general matter, do you think mental
22   health appointments should be conducted in a setting
23   that's confidential?
24          MS. VOROUS:  Same objections.
25          THE WITNESS:  I think it depends on the case

```
 1   able to take themselves out of solitary confinement
 2   conditions at any time.  Is that your understanding?
 3        A.   There are three different studies I cited.
 4   One was for two days, and so that wouldn't be
 5   necessarily relevant to that study.  The others involved
 6   10 subjects, I think, one involved.  And so we'd have to
 7   go through each study and look at that methodology
 8   because there were different conditions, different
 9   lengths of stay.
10             So I'd have -- we'd have to go through each
11   study.
12        Q.   Okay.  Are you aware that in the 1972 study
13   that Paul Gendreau did mentally ill were excluded from
14   the study?
15        A.   I'd like to look at the 1972 citation.
16        Q.   Sure.
17        A.   So...
18             Are you talking about the changes in the EEG
19   study?
20        Q.   Yes.
21        A.   What was the question?
22        Q.   The question is:  Are you aware that mentally
23   ill were excluded from the study?
24        A.   Yes.
25        Q.   Do you think that would -- not having mentally
```

1   ill in a study on solitary confinement could affect the
2   results?
3       A.   If the study was to look at the impact of
4   solitary confinement on the mentally ill, then obviously
5   that could impact the results.
6            If the study was to look at the impact of
7   solitary confinement on non-mentally ill, then that --
8   which was what the purpose of the study was, then it was
9   appropriate not to have mentally ill in that study.
10      Q.   Do you believe that any of the Gendreau
11  studies that you cite are generalizable to CDCR
12  segregation units?
13      A.   Only to the degree that over the short initial
14  period of time that he did not find, nor his coauthors,
15  the level of psychological harm and deterioration
16  described by other authors.  So, for me, I would say
17  it's relevant to briefer periods of time up to 10 days.
18      Q.   Would you apply the findings of this study to
19  an analysis of potential harms in segregation units in
20  CDCR?
21           MS. VOROUS:  Objection.  Vague and ambiguous
22  as to "this study."
23  BY MR. FISCHER:
24      Q.   I'm sorry.  The Gendreau studies.
25      A.   Okay.  There are three different studies.  And

Page 122

1  so one used a eyelid methodology that would not be
2  applicable or used anymore in a medical setting.  So
3  it's a little bit apples and oranges.  So I wouldn't say
4  the two-day study looking at eyelid response and then
5  subsequent reading interest or capability would apply
6  beyond that.  It did --
7       Q.   You don't think it would apply to whether
8  psychological harm may occur to mentally ill inmates in
9  CDCR segregation units?
10      A.   Beyond the time frames that he described.
11      Q.   Two days?
12      A.   For that study, yes.
13      Q.   Do you think that either -- the other two
14 Gendreau studies that you cite would apply to an
15 assessment of whether psychological harm may be caused
16 to mentally ill prisoners in CDCR segregation units?
17      A.   For the time periods he described, yes.  What
18 his studies indicated, that with the measurements they
19 used, they did not find the level of impairment
20 described in the other literature that was more
21 descriptive in nature.
22           So at the time, which was in the late '60s and
23 '70s, they used the objective measures available at that
24 time and they weren't able to find the level of
25 impairment described in other studies.

1   inmate.  Thus, such inmates must receive any mental
2   health services that are deemed essential, their
3   segregation status notwithstanding.
4         Do you agree with the APA guideline?
5     A.   Yes.
6     Q.   Do you agree that a comparable number of
7   treatment hours should be provided in segregation to an
8   inmate as to what that inmate was receiving in an -- the
9   nonsegregation environment?
10    A.   It would depend on the inmate and his
11  situation.
12    Q.   Could it be that that inmate might need more
13  treatment?
14    A.   It's possible.  It may be that, for example,
15  if you had someone that became paranoid in a group
16  setting, to require him to go to a group setting may --
17  may be inappropriate treatment.  So you have to --
18    Q.   Adapt the treatment for that individual?
19    A.   Yes.
20    Q.   Okay.  Do you believe that a person placed in
21  administrative segregation for safety reasons, for their
22  own safety reasons, should be treated in a therapeutic
23  cage?
24         MS. VOROUS:  Objection.  Beyond the scope of
25  his expert testimony and beyond -- that's it.  That's my

1   objection.  Sorry.
2           THE WITNESS:  So I understand your question,
3   do I believe that if a person who is placed into an
4   administrative segregation environment for their safety,
5   do I think they should be treated in a therapeutic
6   module?  I think that it can be one option to provide
7   treatment.  I wouldn't say it has to only occur there.
8   BY MR. FISCHER:
9       Q.   If they weren't receiving treatment in a
10  therapeutic cage prior to treatment in segregation and
11  then that inmate is transferred to segregation for their
12  own safety, do you think that it's -- it's appropriate
13  to treat that person in a therapeutic cage?
14          MS. VOROUS:  Objection.  Again, beyond the
15  scope of expert opinion provided in the context of this
16  motion and Dr. Scott's declaration.
17          MR. FISCHER:  We can make that a standing
18  objection for any of the therapeutic cages, if you'd
19  like, Deb.
20          MS. VOROUS:  Okay.
21          THE WITNESS:  I would want to look at the
22  administrative segregation environment, where the
23  therapeutic module was located, what other alternatives
24  there were to make the -- a recommendation on that.
25

1      A.   I think you have to have collaboration with
2  custody in making that determination.
3      Q.   Should there be clinical input to that
4  decision?
5      A.   There is clinical input to that decision if
6  the person thinks that the individual does not require
7  mental health crisis bed and is safe for discharge.  So
8  the mental health crisis bed, if they're in a severe
9  psychiatric crisis, the clinician -- that wouldn't be
10  the criteria for discharge.
11           So they would, if they are -- if they continue
12  in a severe -- a current severe psychiatric crisis that
13  qualifies for a mental health crisis bed and they make a
14  decision when they're no longer in a current severe
15  psychiatric crisis.  So that is the system now as far as
16  when it's appropriate for someone that's no longer in a
17  current severe psychiatric crisis.
18      Q.   Once that -- once the clinician finds that
19  they're no longer in a psychiatric crisis, should a
20  clinician also make a determination as to whether that
21  individual may safely discharge to a segregation unit?
22           MS. VOROUS:  Objection.  Beyond the scope of
23  expert opinion in connection with this plaintiffs'
24  motion.
25

1     Q.   So it should apply to anyone who's on a
2  psychiatric services case load?
3          I'm just trying to understand, is that --
4     A.   It applies to individuals on a psychiatric
5  case load.
6     Q.   Dr. Scott, I want to go to page 30 of your
7  declaration where you describe CDCR's system and you
8  have five identified --
9          MS. VOROUS:  You mean paragraph 30?
10         MR. FISCHER:  Paragraph 30.
11 BY MR. FISCHER:
12    Q.   It identifies five aspects of CDCR's system.
13         Where did you get this information as to these
14 five aspects of CDCR's system?
15    A.   Primarily from the program guide.
16    Q.   Did -- have you looked at implementation of
17 these items individually in CDCR's segregation units?
18    A.   In what capacity?
19    Q.   Have you evaluated the implementation of
20 these -- of these policies?
21    A.   No.
22    Q.   On the second policy, it's a policy regarding,
23 quote, screening inmates for mental illness before
24 placement in segregation.
25         Have you evaluated the screening tool used for

1       A.   I think it's a best practice ideal
2  recommendation.  It might not be applicable for all
3  people with a serious mental illness.
4       Q.   Why do you think it's the best practice
5  recommendation?
6       A.   First, this is a standard certainly above most
7  levels of care offered in prisons in the United States,
8  so it wouldn't be the standard practice.  It would be
9  more than what's typically offered.
10      Q.   Do you think that's -- this level of treatment
11 is an appropriate method to address any risk of
12 psychological harm to individuals with serious mental
13 illness in segregation?
14      A.   This method might be one way to address it,
15 yes.
16      Q.   Dr. Scott, are you familiar with any -- any
17 correctional facility outside of the CDCR that provides
18 one-to-one clinical treatment to individuals in
19 segregation in a therapeutic treatment module or a cage?
20           MS. VOROUS:  Objection.  Beyond the scope of
21 Dr. Scott's opinions in the context of the segregation
22 motion and his declaration.
23           THE WITNESS:  Is the question am I aware of
24 another correctional facility that provides treatment in
25 a setting on -- that resembles the therapeutic module in

| | |
|---|---|
| 1 | CERTIFICATE OF REPORTER |
| 2 | |
| 3 | I, MEGAN F. ALVAREZ, a Certified Shorthand |
| 4 | Reporter, hereby certify that the witness in the |
| 5 | foregoing deposition was by me duly sworn to tell the |
| 6 | truth, the whole truth and nothing but the truth in the |
| 7 | within-entitled cause; |
| 8 | That said deposition was taken down in |
| 9 | shorthand by me, a disinterested person, at the time and |
| 10 | place therein stated, and that the testimony of the said |
| 11 | witness was thereafter reduced to typewriting, by |
| 12 | computer, under my direction and supervision; |
| 13 | I further certify that I am not of counsel or |
| 14 | attorney for either or any of the parties to the said |
| 15 | deposition, nor in any way interested in the events of |
| 16 | this cause, and that I am not related to any of the |
| 17 | parties hereto. |
| 18 | |
| 19 | |
| 20 | DATED:   August 1, 2013 |
| 21 | |
| 22 | _____ |
| 23 | MEGAN F. ALVAREZ |
| 24 | RPR, CSR 12470 |
| 25 | |