DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

       Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

       Defendants.

Case No. 2:90-cv-0520 LKK DAD

**DECLARATION OF MARGOT MENDELSON IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1: TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DR. CRAIG HANEY**

Judge: Hon. Lawrence K. Karlton

[1004240-1]

1     I, Margot Mendelson, declare:

2     1.     I am an attorney admitted to practice law in California, a member of the bar

3  of this Court, and an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP,

4  counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5  and if called as a witness I could competently so testify.  I make this declaration in support

6  of Opposition to Defendants' Motion *In Limine* No. 1: to Exclude Testimony of Plaintiffs'

7  Expert Witness Dr. Craig Haney.

8     2.     Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the

9  transcript of the deposition of Craig Haney taken July 10, 2013 in San Francisco,

10  California and lodged with this Court by Defendants on August 27, 2013 (Docket

11  No. 4773).

12     I declare under penalty of perjury under the laws of the United States and the State

13  of California that the foregoing is true and correct, and that this declaration is executed at

14  San Francisco, California this 12th day of November, 2013.

15

16                    */s/ Margot Mendelson*
                      Margot Mendelson

17

18

19

20

21

22

23

24

25

26

27

28

[1004240-1]

1

DECLARATION OF MARGOT MENDELSON IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1:  TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DR. CRAIG HANEY

# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

CRAIG HANEY, PH.D.

WEDNESDAY, JULY 10, 2013,  9:05 A.M.

SAN FRANCISCO, CALIFORNIA










REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        Q.    Excuse me.

2              And you previously toured the secured housing

3   unit at what used to be Valley State Prison for Women?

4        A.    Yes.

5        Q.    Do you remember when the last time you toured

6   that prison was -- or that SHU?  I'm sorry.

7        A.    I believe it was in 2007 in conjunction with

8   the earlier version of your overcrowding case.

9        Q.    Have you ever toured the secured housing unit

10  at California State Prison Sacramento?

11       A.    No, I have not.

12       Q.    What about the secured housing unit at

13  California Institution for Women?

14       A.    No.  It's my understanding that's the newer

15  version of the Valley State secured housing unit.  And

16  no, I have not been there.

17       Q.    While you were visiting the four prisons

18  that -- again, Corcoran, Mule Creek, CIM, CCI -- did you

19  review any inmates' mental health records during those

20  visits?

21       A.    Some.  At the end of the day at Mule Creek, I

22  reviewed some inmates' records.  I don't remember

23  whether or not we did that at the California Institution

24  for Men.  I believe we looked at some inmate records in

25  Corcoran and then, I think, briefly at CCI, but I don't

Craig Haney, Ph.D.                                                    July 10, 2013

1   remember specifically.  Most of the records review took

2   place after the tours.

3       Q.   And how did you go about reviewing the records

4   after the tours?

5       A.   I requested the records through Mr. Fischer of

6   particular inmates with whom I had had contact and who

7   had given me information that I wanted to follow up on.

8            It's my understanding -- and I didn't -- I

9   wasn't I didn't have hands-on with this process, so I'll

10  represent it as I understood it -- these records were

11  then collected, copied, and brought to Mr. Fischer's

12  office, Rosen Bien Galvan office, and I reviewed them

13  there.

14      Q.   How many -- how many inmates did you request

15  records for?  Do you remember?

16      A.   It was quite a few.  I think it was most of

17  the people that I spoke with.  So there -- there were

18  pretty voluminous records, as I recall, or at least a

19  fairly large number of individual prisoners whose

20  records we requested.

21      Q.   Do you remember how many people -- can you

22  give me an estimate of how many individuals in total

23  that you spoke with?

24      A.   I can't.  It's a number which is probably

25  pretty closely estimated by my declaration, because the

Craig Haney, Ph.D.                                              July 10, 2013

1    great majority of the people that I spoke with were

2    mentioned in the declaration.  So, I mean, I could if

3    you want me to at a break, count the names.  But several

4    dozen certainly, and I would say, you know, probably 20

5    or so at each facility.  Maybe more than that.  I'd have

6    to -- again, I'd have to look at the declaration.

7            There were relatively few people who I spoke

8    to whose -- who I did not refer to or mention in the

9    course of the declaration.  I typically identify them by

10   name and number.

11       Q.   Did you review all of the records that were

12   provided to you in connection with the inmates that

13   you'd requested records for?

14       A.   Not necessarily all of them, no.  I typically

15   focus the records review on aspects of that particular

16   inmate's file that pertained to things that the inmate

17   had told me about and which I was interested in

18   following up on given what had been said to me about the

19   treatment that immediately preceded when I spoke to

20   them.  And also, in some instances, I tried to determine

21   what had happened to them subsequently.

22           So the records review took place, I want to

23   say, a couple weeks at least after I interviewed the

24   prisoners.  And so I tried to determine, with

25   Mr. Fischer's help and the inmate record locator,

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                          July 10, 2013

1    whether that inmate was still in the unit that he had

2    been in when I spoke with him.

3         Q.   Is it fair to say for those inmates that you

4    did look at records for, that you would have referenced

5    that record review in your declaration?

6         A.   Yes.  I think that's correct, yes.

7         Q.   You've already mentioned I -- that you looked

8    at your declarations prior to deposition today.

9              Did you review any other documents in

10   preparation for today's deposition?

11        A.   Yes.  I reviewed a declaration that I had

12   filed some years ago in the Madrid vs. Gomez case.

13             I reviewed a declaration that Attorney

14   Jane Kahn filed in this case that pertained to a number

15   of issues, but, in particular, lengths of time spent by

16   mental health case load prisoners in segregation units.

17             I looked at a deposition that had been

18   conducted of Dr. Kaufman, deposition of Dr. Stewart.

19             I did also a fairly -- I don't want to say

20   cursory -- but modestly intense review of the literature

21   on solitary confinement-related issues.

22        Q.   So, Dr. Haney, I'm -- if you prefer to use

23   your binder to look at your declarations, I'm fine with

24   that.

25        A.   I didn't know if you'd have a copy for me or

1  not.  That's why I brought mine.

2       Q.   We'll just give these back to the court

3  reporter, then.

4            Take a look at Exhibit 2, which is your

5  March 20, 2013, declaration.  Take a look at your resume

6  which is Appendix A.

7       A.   Uh-huh.

8       Q.   Is this your current CV as of March 2013?

9       A.   Yes.  It appears to be, yes.

10      Q.   Have you updated your CV since March 2013?

11      A.   No, I don't think I have.  I think this is the

12 most current one I have.  I can't say for sure there

13 hasn't been an article or two added, but I don't think

14 there has.

15      Q.   So, Dr. Haney, based on your CV, you're

16 currently a professor of psychology at the University of

17 California at Santa Cruz; is that correct?

18      A.   Yes, it is.

19      Q.   And is that -- if I'm using the terms

20 correctly and I -- I hope -- are you a professor of

21 social psychology?

22      A.   No.  I'm a professor of psychology.

23      Q.   Is there a different between social psychology

24 and clinical psychology?

25      A.   Yes.

Craig Haney, Ph.D.                                                    July 10, 2013

1        Q.    What is that difference?

2        A.    Well, clinical psychology is typically the

3   study of psychopathology.  It can involve diagnosis.  It

4   can involve treatment.  But the focus tends to be on

5   psychopathology.

6             Social psychologists focus on a broader range

7   of behavior.  They focus on behavior of people in a wide

8   range of social settings, social interactions in social

9   groups, social institutions.  It's more generally.  So

10  it's not focused specifically on psychopathology but,

11  rather, a broader range of human behavior.

12       Q.    Do you teach both social and clinical

13  psychology?

14       A.    No, I don't.  No.

15       Q.    What classes do you currently teach?

16       A.    I teach courses on -- graduate courses of

17  psychological theory.  Typically, also courses on

18  research methodology.  There are a variety of those,

19  also at graduate level.  I teach undergraduate courses

20  in the psychology in law, usually two versions of that

21  class, a kind of introductory version and advanced

22  version of class.

23            Before I had undertaken administrative

24  responsibilities, I also taught a course on advanced

25  social psychology and sometimes a course on the social

Craig Haney, Ph.D.                                                      July 10, 2013

1    psychology of institutions.

2         Q.   So have you ever taught a class on clinical

3    psychology?

4         A.   No.  I'm not a clinical psychologist.

5         Q.   As your role as a professor at the university,

6    do you perform research?

7         A.   I do.

8         Q.   Explain to me what type of research you

9    perform.

10        A.   Sure.  I do research on a variety of different

11   issues.  A lot of that research involves studying the

12   way people react in small group settings, juries, for

13   example, and jury behavior.

14             I do research on prison-related issues.  I've

15   done -- published research on psychological effects of

16   solitary confinement, for example, and research on how

17   people react to and are affected by prison conditions of

18   various types:  Overcrowding, prison in general,

19   isolated conditions of confinement.

20        Q.   Have you ever researched prison populations in

21   California?

22        A.   Yes.  I have in the sense that -- I've written

23   about work that I've done oftentimes in conjunction with

24   legal cases, but interviews that I've conducted with

25   people who are confined in California prisons.

Craig Haney, Ph.D.                                                     July 10, 2013

1       Q.   Outside of the work you've done in the Coleman

2    case, can you explain to me what work you've done in

3    researching prisoners in California?

4       A.   Well, I, in the Madrid case, for example,

5    conducted interviews with prisoners who were confined in

6    the solitary confinement unit in Pelican Bay.

7           I have spent time in evaluating individual

8    prisoners in individual other cases, sometimes criminal

9    cases, where people have long institutional histories.

10   And I've been asked to try to evaluate and understand

11   how they've been affected by the various institutions in

12   which they've been confined.

13          And so that contributes to my understanding of

14   the process of institutionalization or what's called

15   prisonization, how people are changed and affected by

16   the prison conditions in which they've been housed.

17      Q.   So the study you conducted in Madrid, was that

18   a study that was -- I think I've read about that -- in

19   the early '90s?  Is that accurate?

20      A.   Yes.

21      Q.   Okay.  With respect to any study that you've

22   conducted of prison systems outside of California, have

23   you published any of those studied?

24      A.   No, no.  I have a work in progress which

25   actually integrates that information from a variety of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    inadequacies and deficiencies in the nature of the

2    mental health care which the prison system was and

3    continues to provide.

4            The program guide was a remedy, a plan to

5    address those problems, an agreed-upon plan or an

6    implemented plan.  And so in that sense it's a -- it's a

7    strategy or a plan or a guide to get to constitutionally

8    adequate mental health care.

9        Q.   Okay.  Take a look at paragraph 26 in your

10    declaration, please.

11            Go back to paragraph 25 first.

12        A.   Okay.

13        Q.   Same page.

14            Second sentence of this paragraph 25, you

15    indicate that you're, quote, confident that even more

16    such problems would have been identified and additional

17    concerns surfaced with more time available in which to

18    conduct inspections and reviews.

19            Could you explain the basis for that

20    statement?

21        A.   Yes.  First of all, the problems that I

22    identify were widespread, pervasive, and consistent,

23    leading me to believe that the more time I had available

24    to me, the more such problems I would find.  They were

25    not difficult to find.  As I said, they appeared to be

Craig Haney, Ph.D.                                                    July 10, 2013

1    pervasive, evident, manifest simply in going through the
2    units and in talking to or interviewing the prisoners
3    with whom I came in contact.
4            My experiences in doing this kind of work over
5    the years and with respect to California and other
6    places, that when that's the case, that the problems
7    tend to be systemic; that is to say, since these were
8    not institutions that were selected because they were
9    outliers, that pervasive, consistent problems that exist
10   in certain institutions are likely to exist in other
11   institutions.  They're likely to be systemic.
12           I also note that many of the problems that I
13   identified in these particular institutions are problems
14   that the special master has identified in other
15   institutions that I didn't see.  And so that's, in a
16   sense, corroboration for that -- for this suggestion
17   that I've seen in other prisons.  It's very likely that
18   I would have seen similar kinds of problems because
19   other people who evaluated those other prisons, saw
20   those similar kinds of problems similar to the ones that
21   I was seeing in the facilities I investigated.
22           It was also the case that there were -- there
23   were opportunities to spend even more time in the units
24   that I was in and collect even more information had time
25   permitted.  And so it was the case that each time we

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                      July 10, 2013

1   left a unit, I never left it thinking that we learned

2   everything about the problems or the harms that

3   prisoners were suffering in those units but, rather, we

4   simply had other places that we needed to see.

5          So it wasn't as though we left the unit

6   because I had run out of people to talk to.  Actually,

7   quite the contrary.  There were other people with whom I

8   could have responsible and, had time permitted, would

9   have spoken.  And given the consistency of what the

10  inmates told me, I had every reason to believe that the

11  more inmates I spoke to, the more I would hear that was

12  consistent with the things that I had already heard.

13     Q.   So paragraph 27 -- I think we talked a little

14  bit about this already -- but you indicate that your

15  review of systemwide data and materials strongly

16  suggests that the kinds of problems you observed at the

17  four institutions you toured were not -- excuse me --

18  were not unique to the institutions that you did tour.

19          What systemwide data and materials are you

20  referring to?

21     A.   Well, largely the special master's 25th round

22  report, which I reviewed before I conducted these

23  inspections, spoke to a range of problems that were very

24  similar to the problems that were evident in the

25  particular institutions that I looked at.

Craig Haney, Ph.D.                                                    July 10, 2013

1    were being seen by their clinicians, they were being

2    seen less frequently than they would like and that they

3    should be -- some of them talked about not getting

4    clinically contacts on weekly basis.

5            But even more common was the expression that

6    the clinical contacts they had were of a very limited

7    nature:  Limited in time, limited in the quality of the

8    interaction.  Sometimes it was cell front -- or if it

9    wasn't cell front, it always was, except for CCI, it was

10   always done in a -- in a treatment cage, which a number

11   of the inmates said they felt was appropriate for

12   treatment.  It made them feel like animals and that they

13   found themselves unable to really receive any kind of

14   meaningful therapeutic contact in an environment like

15   that and sometimes declined to go for that reason.

16       Q.   And I understand these were comments that were

17   made by the inmates that you were interviewing.

18            Did you follow up and look at any of their

19   medical records to see whether or not they were -- they

20   were being provided the program guide treatment

21   requirements?

22       A.   Yes.  In a number of instances I did.

23       Q.   And what was your conclusion?

24       A.   Well, you know, it was that certainly, in some

25   instances, they were being provided -- they were being

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                July 10, 2013

1    the segregation unit?

2        A.    Yes.  Again, same answer.  I think most of the

3    time I did.  It would come up naturally in the course of

4    my interview.  But I can't say literally every time.

5        Q.    Okay.  Did you ever speak with any of the

6    custody staff about the security risks that were

7    associated with any of the inmates that you interviewed?

8        A.    Sometimes.  I mean, I -- I remember asking

9    certainly, I think, with respect to one of the people in

10   the management cell, why he was there.  And another

11   instance in SHU unit, I asked a custody officer that

12   question.  I didn't do it -- it didn't happen literally

13   every time but there were times when I did.

14       Q.    We talked a little bit earlier about clinical

15   contacts that occur at cell front.

16       A.    Yes.

17       Q.    In your opinion, is there ever a time where

18   that type of contact would be appropriate, clinical

19   contact?

20       A.    Well, I guess it depends on what you mean by

21   "appropriate."  I think there are very significant

22   limitations to cell front contact and they take a

23   variety of different forms.

24              One is if you're talking about a prisoner

25   who's double-celled, then it requires that prisoner to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                July 10, 2013

1    Q.    Can you describe -- see if I can pronounce

2    it -- ethno- -- help me out here.

3    A.    Ethnography?

4    Q.    Yes.  Describe what that means.

5    A.    Ethnography is the study of social settings or

6    situations in which you make observations in those

7    settings or situations.

8          Oftentimes includes interviewing the people

9    whose behavior you're observing, and drawing conclusions

10   about, you know, a variety of different things including

11   perhaps the influence or effect of those settings or

12   situations on the people who are -- whose behavior

13   you're observing.

14   Q.    Dr. Haney in Footnote 6 of your May 6, 2013,

15   declaration, you reference -- it looks like three

16   difference articles that you were either the primary

17   author or wrote in conjunction with someone else.

18         Do you see that?

19   A.    Yes.

20   Q.    So in the context of your -- the 2003 article

21   and the 1997 article, you used several different terms

22   I'd like to ask you about and have you explain what you

23   mean by them.

24         One of them you use is the term "descriptive

25   study."  Can you define what you mean by the term

Craig Haney, Ph.D.                                                    July 10, 2013

 1    "descriptive study"?

 2         A.    Descriptive studies are studies which, as the

 3    term implies, describe a phenomena.  Could be a setting

 4    or situation, could be an ethnographic study of a

 5    particular place or environment, or it could be a -- a

 6    descriptive study could be a study of people's behavior

 7    or could be a study of individuals.

 8         Q.    Okay.  How about the -- how about the term

 9    "correlational study"?

10         A.    Correlational study is a study that correlates

11    variables.  So it shows a relationship between variables

12    typically -- I mean, in a simple correlation, between

13    two variables.  Multi or multiple or multicorrelation

14    studies might correlate several difference variables.

15         Q.    And how would the descriptions of those two

16    studies be different from what you've defined as a case

17    study or used the term "case study"?

18         A.    Case studies are -- usually focus on --

19    typically focus on an individual.  So you might -- you

20    might describe a particular person.  If you were talking

21    about a person in a prison or institutional setting, you

22    might look at the history of that person through that

23    setting.  You know, what they were like in the

24    beginning, middle, and end of that process, and so on.

25    But the focus is typically on a case.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                        July 10, 2013

1        Q.    Uh-huh.  Is that different than a person

2   account?

3        A.    Personal accounts are usually first-person

4   accounts.  So usually when -- in the context we're

5   talking about, research or published literature, a

6   personal account be would a first-person account.

7              I was -- for example, "I was a prisoner in

8   solitary confinement and I experienced this and this and

9   this."  Or it might even be, "I was a clinician in a,

10  you know, in a solitary confinement unit, and I saw this

11  and experienced that."

12       Q.    In your 1997 article, the article relating to

13  regulating prisons of the future, you use the terms

14  "causal connection" and "triangulation"?

15       A.    Yes.

16       Q.    That's another one.

17             How do you define both of those terms?

18       A.    Causal connection is the connection between

19  one variable that appears to cause another.

20             And triangulation involves looking at

21  phenomena that are related and drawing inferences about

22  how those phenomena in different related areas of study

23  speak to or reflect on another phenomena ideally or

24  hopefully within the triangle from which you're

25  triangulating.

Craig Haney, Ph.D.                                                    July 10, 2013

1       Q.    What would be an appropriate research approach

2   for determining causal connection between variables?

3       A.    Well, there are lots of ways that people go

4   about that.  The most straightforward way, the way that

5   we teach students in experimental methodology is that

6   you randomly assign individuals to a treatment condition

7   or not.  And then you observe whether and how they are

8   changed by that treatment condition or how the two

9   groups compare at the end of that process.  So that's a

10  classic experimental way to approach the issue of

11  understanding causation.

12          That's the way people who did laboratory

13  research generally can establish causal relationships.

14          Most studies of phenomenon that exist in the

15  real world, particularly complex social systems, don't

16  lend themselves to that kind of study.  So there,

17  understanding causal relationships involves a much more

18  complicated process.  It involves looking at existing

19  research literature on that particular phenomenon,

20  looking at the consistency of that literature, looking

21  at literature or triangulating in from other kinds of

22  literature on seemingly related phenomena to see if

23  those things are pointing in the same or similar

24  directions.

25          It involves also trying to understand the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                July 10, 2013

1  hypothesized causal connection from a theoretical

2  perspective so that if there is good theoretical reason

3  to believe that there's a causal connection between

4  certain kinds of variables, that allows you to rely with

5  more confidence on the literature which -- from which

6  you have gleaned information about the connection

7  between these variables, albeit sometimes imperfect

8  information.

9          Outside of laboratory science, in the real

10 world it's very difficult to engage in a study which

11 reflects in a clear and unequivocal way a causal

12 relationship.  So you have to rely on a body of

13 information, a body of evidence tested against other

14 related bodies of evidence and also tested against the

15 theoretical proposition of whether or not this makes

16 sense from a psychological or psychiatric perspective.

17     Q.   Why is that difficult to do in a -- I think

18 you used term "real world situation"?

19     A.   You can't control the variables.  When I do an

20 experiment, I have total and complete control over who

21 is in the experiment and -- because I select them; I

22 have total and complete control over who is exposed to

23 what because I control the exposure to the treatment;

24 and I have a great deal of control over measurement

25 because they're in a laboratory and they are

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                              July 10, 2013

1    participants in an experiment with the understanding

2    they will produce data for you in the needed or required

3    ways.

4              That model is not a model that we can almost

5    ever use in the real world.  We can almost never use it

6    in clinical science.  The whole field of psychiatry, for

7    example, is without the opportunity to do that.  You

8    can't give people some mental illness and other people

9    not.  You can't expose them to things that you think

10   cause mental illness.  You have to approach this in a

11   much more complicated and nuanced way along the lines I

12   described earlier.

13        Q.   So setting aside real world and looking at

14   prison environment, do you have the same opinion that it

15   would be problematic to use the, you know, causal-type

16   models in a prison environment?

17        A.   Well, I -- it's -- it's impossible to -- to do

18   it -- to use the simplistic pure form of causal study

19   for obvious reasons.  And so people don't do it.  Can't

20   do it.

21             And so that's why you approach the issue of

22   reaching causal conclusions in this much more elaborate

23   way which requires you look at all these other things.

24        Q.   Okay.  And what are the obvious reasons?  I

25   just want to make sure I have the same reasons you're

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                    July 10, 2013

1    why and how overcrowding affects delivery of mental

2    health care services at Mule Creek.  It's pretty

3    dramatic.

4         Q.    I think you've explained the basis for your

5    statement.  I think you may have moved back past the

6    paragraph I was going to ask you about.  If you could

7    turn back to paragraph 80.

8              In paragraph 80 you're referring to inmate --

9    excuse me -- a Prisoner B that you interviewed; is that

10   correct?

11        A.    Yes.

12        Q.    In this paragraph, you mention that the

13   prisoner was claiming that he was begging for help or

14   treatment and not getting it?

15        A.    Yes.

16        Q.    Is this one of the prisoners that you looked

17   at medical records for, if you recall?

18        A.    I believe I did, I think, because I referred

19   up top to the fact that he came to -- he came to the

20   institution as an SNY sometime earlier, and I believe I

21   was able to confirm that by looking at his custody

22   records.

23        Q.    Do you recall if you looked at his medical or

24   mental health records?

25        A.    I don't recall.

1    in both of those photographs?

2         A.   Yes.

3         Q.   And is this the prisoner that you were

4    speaking about earlier when you were referring to inmate

5    that you interviewed in a management cell?  Or maybe you

6    didn't interview him in the management cell.  He may

7    have been housed in there.

8         A.   I think he had spent time in the management

9    cell.  I don't believe he was in the management cell

10   when I -- when I was on that unit.

11             I made the mistake -- there was a man housed

12   in the management cell on that unit, and I don't believe

13   I spoke to him.  He appeared to be very disheveled,

14   asleep on the floor, and I think I chose not to wake

15   him.  So this was another man.

16        Q.   The reference to A being housed in a

17   management cell would have been information that you

18   obtained during the interview with him; is that correct?

19        A.   I believe so.  I don't know how else I would

20   have obtained it.

21        Q.   Here you reference difficulty in looking at

22   records for Prisoner H; is that correct?

23        A.   Yes.

24        Q.   Were you able at a later date to obtain

25   whatever mental health records that you needed for

Craig Haney, Ph.D.                                              July 10, 2013

1    Prisoner H?

2         A.   Yes.  But not on the unit.

3              As you may remember here, there were some

4    eight volumes of his medical and psychiatric records

5    that were indicated in his file had been lost.  But I

6    was able to review some of the records what remained.

7         Q.   Who told you that his records were lost?

8         A.   I believe it was an indication in the file, or

9    it may have been Dr. Ortega told me this.  Dr. Ortega

10   told me that he had -- that he had a very substantial

11   file; that they weren't able to review it because those

12   files had been lost.  And I believe there was a notation

13   in his file to that affect.

14        Q.   Move forward to paragraph 118.

15             Here you're talking about an interview with

16   Prisoner N who complained of numerous problems, at least

17   according to what you've indicated in this paragraph,

18   correct?

19        A.   Yes.

20        Q.   Do you have any recollection of reviewing the

21   medical records or mental health records for Prisoner N?

22        A.   I'm not sure that I did.

23        Q.   Beyond Prisoner N who complained not only of

24   numerous problems according to this paragraph but also a

25   concern that mental health staff repeatedly ignored his

Craig Haney, Ph.D.                                          July 10, 2013

1    Bayesian analysis with inaccurate data.

2         Q.   So you indicate that you found this notation

3    in multiple inmate patient mental health records.  How

4    many did you find it in?

5         A.   It appeared a couple of times.  I don't know

6    how many more than that.  It occurred at the very end of

7    the day, and I was looking at the files of some of the

8    prisoners earlier.  And I was looking at it in the EUHR

9    screens, and that's where I encountered it.

10        Q.   Did you also look to see whether or not the

11   clinician or some other treating clinician or some other

12   clinician conducted a suicide risk evaluation in

13   addition to applying, it looks like, a Bayesian

14   analysis?

15        A.   I don't recall whether that was in the file or

16   not.  I would hope that it was, but I don't recall

17   specifically.

18        Q.   Paragraph 121 the last sentence in that

19   paragraph, your comment is:  "It's hard to imagine a

20   more flawed (or more dangerous) approach to

21   suicidality."

22             Are you referring to what we just discussed,

23   the Bayesian analysis?

24        A.   Yes.

25        Q.   Is it your opinion that any inmate with a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                              July 10, 2013

1         A.   No, not specifically, but the most -- most, if

2    not all of them, would have been reflected in the -- in

3    the declaration.

4              But I don't, off the top of my head, have a

5    specific memory that I can share with you.

6         Q.   The medical records that you requested after

7    your visit, did you request records for the inmates that

8    you spoke to at the California Institution for Men?

9         A.   I think some of them.  I can't say for sure

10   every single one of them.  But some of them.

11        Q.   When you were -- in looking at the mental

12   health records of the inmates that you interviewed, did

13   you personally review those records or did someone

14   provide summaries to you?

15        A.   I personally, yeah.

16             And I should say I think that was true in each

17   case.  I'm -- looking through here, I -- to make sure,

18   but I think that's the case.

19        Q.   Look at paragraphs 145 and 146, please.

20        A.   Yes.

21        Q.   Both of these paragraphs discuss your

22   interview with Prisoner O, CCCMS inmate housed in

23   administrative segregation?

24        A.   Yes.

25        Q.   Do you have any recollection of discussing

Craig Haney, Ph.D.                                    July 10, 2013

1     the OHU at CIC.

2               MR. FISCHER:  CCI.

3               THE WITNESS:  Sorry.  CCI.

4               MS. VOROUS:  Every other place that he

5     mentioned CIC, supposed to be CCI.

6               That's okay.  I just let it go.

7               THE WITNESS:  Sorry.

8               MR. FISCHER:  We all knew what you're talking

9     about.

10              THE WITNESS:  I used to say Tehachapi.  I

11    don't know even why I tried to get those initials right.

12              You know, I'm pretty sure that in -- I think

13    it was OHU in Tehachapi that I saw -- that I saw a

14    prisoner who had been brought from a mainline general

15    population unit to the OHU, receiving treatment in a

16    treatment cage.

17              I don't know that I saw it at CIM.  Let me

18    make sure.

19              So I don't know -- no, I don't think so, and I

20    don't think I saw it elsewhere in a mental health crisis

21    bed.

22    BY MS. VOROUS:

23         Q.   Just back -- real quick back to Prisoner W

24    that we were just discussing.  Beyond what he told you,

25    do you have any independent knowledge of what mental

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                July 10, 2013

1   health treatment he was actually receiving while he was

2   in the ad seg unit?

3       A.   No.  He was receiving some because he referred

4   to it.  He was receiving it in the treatment cage

5   because he referred to that.  His records confirm there

6   were multiple MHCB admissions.  And I think there was

7   also a discussion of his high level of suicidality in

8   the records.

9            But I don't know specifically what kind of

10  treatment he was referring while he was in the ad seg

11  unit.

12      Q.   Okay.  Skip ahead to paragraph 201.

13           That paragraph relates to your visit at

14  Corcoran; is that correct?

15      A.   Yes.

16      Q.   Paragraph 201, first sentence, you state:

17  "EOP ASU treatment is also deeply lacking."

18           Explain the basis for making that statement.

19      A.   Well, I mean, part of the basis, in the

20  preceding paragraph, the correctional captain in charge

21  of access to treatment who accompanied us said, "We

22  schedule for 10 hours.  We get a he wide range, but we

23  rarely make 10 hours or even get close."

24           Well, even getting -- not even getting close

25  is evidence in my mind of deeply lacking treatment.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Craig Haney, Ph.D.                                                July 10, 2013

```
1              CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                        DATED:  July 16, 2013

21

22                        _____

23                        MEGAN F. ALVAREZ

24                        RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com