1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    RALPH COLEMAN, et al.,              No. CIV. S-90-520 LKK/DAD (PC)

12              Plaintiffs,

13         v.                             **ORDER**

14    EDMUND G. BROWN, JR., et al.,

15              Defendants.

16

17         Pursuant to court order, on September 24, 2013 the Special

18    Master filed a Report on the Salinas Valley Psychiatric Program

19    (SVPP) (Report) (ECF No. 4830).  The Report contains numerous

20    findings concerning the delivery of mental health care to class

21    members at SVPP.  Based on those findings, the Special Master

22    makes six recommendations for orders to address inadequacies

23    identified in the Report.  Defendants have filed objections to

24    and a motion to strike or modify the Report (ECF No. 4868).

25    Plaintiffs have filed a response to the Report and a request for

26    additional recommendations and orders (ECF No. 4867).  Pursuant

27

28

                                      1

1  to Fed. R. Civ. P. 53(f), the matters objected to are reviewed de

2  novo.[1]

3       A.  Defendants' General Objections

4       Defendants interpose two general objections to the Report

5  and a number of specific objections to the recommendations

6  contained therein.  First, defendants contend that this court's

7  July 11, 2013 order (ECF No. 4688) requiring the Special Master

8  to issue the report was improper because it "contravenes the

9  plain language" of restrictions contained in 18 U.S.C. §

10  3626(a)(1)(A) for prospective injunctive relief.  Defs. Objs.

11  (ECF No. 4868) at 3.  Defendants renew their contention that the

12  court could not order the Special Master to report to the court

13  on care provided at SVPP, arguing (1) the Department of State

14  Hospitals (DSH) was not a party to this case at the time of the

15  original trial in 1995; (2) DSH care has "never been subject to

16  the Special Master's supervisory powers" since the remedial phase

17  of this action began; (3) the court's order "improperly imputed

18  liability to DSH for the constitutional violations found against

19  different Defendants in 1995;" and (4) the court did not, in its

20  July 2013 order, find that DSH was violating the Constitution in

21  its provision of hospital care to members of the plaintiff class.

22  Id. at 3.  The court already considered and rejected these

23  contentions.  See Order filed July 11, 2013 (ECF No. 4688) at 4-9;

24  Order filed September 5, 2013 (ECF No. 4784) at 2-5.  A few

25  points bear repeating.

26  _____

27  [1] All reports provided by the Special Master to the parties in
    accordance with the Order of Reference filed December 11, 1995
    (Doc. No. 640) are reviewed under the standards set forth in that
28  order.  The Report at bar was filed directly with the court.

1    First, for the reasons explained in the court's September 5,

2    2013 Order, the provisions of 18 U.S.C. § 3626(a)(1)(A) do not

3    apply to the court's order directing the Special Master to

4    monitor inpatient mental health programs.  See Order filed

5    September 5, 2013 (ECF No. 4784) at 2-3.  Monitoring by a Special

6    Master is not "relief" within the meaning of that statute.  See

7    id.

8    Second, the monitoring ordered by this court in the July 11,

9    2013 order is necessary to a complete remedy in this action.  In

10   1995, this court found the Governor of the State of California

11   and the California Department of Corrections and Rehabilitation

12   defendants in violation of their Eighth Amendment obligation to

13   provide seriously mentally ill inmates with ready access to

14   constitutionally adequate mental health care.  See Coleman v.

15   Wilson, 912 F.Supp. 1282 (E.D.Cal. 1995).  The California

16   Department of Corrections and Rehabilitation (CDCR) defendants

17   are the custodians of the members of the plaintiff class and have

18   the primary legal responsibility for providing constitutionally

19   adequate mental health care to members of the plaintiff class.[2]

20   See In re Estevez, 165 Cal.App.4th 1445, 1463 (Cal. App. 5 Dist.

21   2008) (even where federal receiver appointed, "the state, and

22   through its appointed representative, the warden, cannot abdicate

23

24   _____

     [2] The plaintiff class consists of "all inmates with serious
25   mental disorders who are now, or who will in the future, be
     confined within" the CDCR.  July 23, 1999 Order & Stip. & Order
26   Amending Plaintiff Class & Application of Remedy appended thereto
     at 2.  All members of the plaintiff class are in the legal
27   custody of the CDCR and, pursuant to state regulation, "remain
     under the jurisdiction" of CDCR when housed in Department of
28   State Hospitals.  15 C.C.R. § 3369.1(c).

3

1   its constitutional responsibility to provide adequate medical

2   care, concomitant with which is the duty to assure said care is

3   not dispensed without any regard for the effect on the prison

4   system as a whole.")

5       The remedial phase began with appointment of a Special

6   Master, who was tasked first with working with defendants to

7   develop a plan to remedy the "gross systemic failures in the

8   delivery of mental health care" and thereafter with monitoring

9   defendants' implementation of that plan. Coleman v. Brown, ___

10  F.Supp.2d ___, 2013 WL 1397335 (E.D.Cal. Apr. 5, 2013), slip op.

11  at 1. The remedial plan, known as the Revised Program Guide, was

12  developed over a decade of effort and most of its provisions were

13  given final approval by this court in 2006. See id. at 12.[3] The

14  Revised Program Guide includes provisions governing delivery of

15  inpatient hospital care, and provides in relevant part:

16          The California Department of Corrections and
17          Rehabilitation (CDCR) is responsible for
            providing acute and intermediate inpatient
18          care, in a timely manner, to those CDCR
            inmates clinically determined to be in need
19          of such care. CDCR currently maintains a
            contract with the California Department of
20          Mental Health (DMH) to provide acute and
            long-term intermediate inpatient mental
21          health care to inmate-patients.

22  Program Guide, 2009 Revision, at 12-6-1 (footnote added).

23      Delivery of constitutionally adequate inpatient mental

24  health care to class members is a necessary part of complete

25  _____

26  [3] The version of the remedial plan under which defendants are
    currently operating is identified as the Mental Health Services
27  Delivery System Program Guide, 2009 Revision. It will be
    referred to herein as the Revised Program Guide or the Program
28  Guide; all citations will be to the 2009 Revision.

1  remediation of systemic Eighth Amendment violations in the

2  delivery of prison mental health care in California and full

3  compliance with defendants' own remedial plan.  At all relevant

4  times in the remedial phase of this action CDCR has contracted

5  with DMH to provide most of the inpatient hospital care for class

6  members, and the Director of DMH has therefore been joined in

7  this action as a necessary party to the remedy.[4]  However, as

8  this court has previously explained, that contractual arrangement

9  does not relieve the CDCR defendants in this action of their

10  constitutional obligation to provide ready access to adequate

11  hospital care, which also runs to DMH and its successor the

12  Department of State Hospitals(DSH) as long as it maintains a

13  contract with that agency to provide inpatient care to members of

14  the plaintiff class.  See Order filed July 11, 2013 (ECF No.

15  4688) at 8 (citing West v. Atkins, 487 U.S. 42, 56 (1988).

16      Finally, the court rejects defendants' suggestion that a

17  separate finding of constitutional violations in the delivery of

18  inpatient care is required to support the monitoring ordered in

19  the July 11, 2013 order.  The July 11, 2013 order arose in the

20  context of ongoing remediation of systemic Eighth Amendment

21  violations in the delivery of constitutionally adequate mental

22  health care to California's seriously mentally ill prisoners

23  which has been monitored by a Special Master since 1995 and is

24  part of that remedial process.  The order is also based on

25

26  [4] The Department of State Hospitals (DSH) is the current name for
the state agency that provides inpatient mental health hospital

27  care for CDCR inmates and was referred to as DMH earlier in this
remedial process.  See Twenty-Fifth Round Monitoring Report filed

28  January 18, 2013 (ECF No. 4298) at 33 n.11.

1    significant and troubling evidence of serious deficiencies in the

2    delivery of inpatient care to class members.  See Order filed

3    September 5, 2013 (ECF No. 4784) at 4-5 (quoting Order filed July

4    11, 2013 (ECF No. 4688) at 10-11). Nothing further is required.

5         For the foregoing reasons and those set forth in this

6    court's July 11, 2013 and September 5, 2013 orders (ECF Nos. 4688

7    and 4784), defendants' first general objection is overruled.

8         Defendants' second general objection is that the Special

9    Master's recommendations "are not tethered to constitutional

10   standards."   Defs. Objs. (ECF No. 4868) at 3.  This objection is

11   frivolous.  The Special Master's recommendations focus on (1)

12   staffing levels; (2) the adequacy of treatment provided at SVPP,

13   particularly individualized and group therapy; (3) the impact of

14   so-called Orientation or Cuff Status on timely access to adequate

15   care; (4) delays in transfer to SVPP; and (5) timely provision of

16   basic necessities including clean clothing, bedding, and towels.

17   Report (ECF No. 4830) at 44-45.  The recommendations are grounded

18   in the fundamental requirement that defendants provide a "'system

19   of ready access to adequate [mental health care,'" Coleman v.

20   Brown, ___ F.Supp.2d ___, 2013 WL 1397335, slip op. at 16

21   (quoting Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982)).

22   All but the last directly concern several of the components

23   required for such a system, components which have been repeatedly

24   identified by this court. See id.[5]  Defendants' second general

25   objection is overruled.

26   ─────────────────
     [5] The last recommendation implicates the fundamental Eighth

27   Amendment requirement that prison institutions provide inmates in
     their care with adequate clothing and sanitation, see Hoptowit,

28   682 F.2d at 1246, as well as the adequacy of conditions that

B. <u>Defendants' Specific Objections</u>

   1.  <u>Staffing/Programming</u>

The Special Master's first recommendation is that SVPP be directed to fill remaining staffing vacancies, giving priority to filling psychiatry, psychology, and social work positions, and consider modifying its planned staff-to-patient ratio of 1:35. Report (ECF No. 4830) at 45.  His second is that SVPP "be directed to increase significantly the amount and quality of individualized and group therapy provided." <u>Id.</u>  The two are interrelated:  the Special Master reports that

> [c]urrently, SVPP does not have the capacity or the resources to provide basic therapeutic and rehabilitative mental health support, services, and treatment to its inpatients in a coordinated, comprehensive, and individualized manner that is consistent with accepted standards for forensic and other hospital settings. The 1:35 clinical staffing ratio adopted by SVPP is inadequate for individual clinician caseloads as well as for admissions units and treatment teams. Clinician-to-patient staffing ratios in the field of inpatient psychiatric programs are more customarily 1:15 for admissions units, which conduct initial assessments and stabilization of newly arrived patients, and 1:25 for treatment units.

Report (ECF No. 4830) at 10.  <u>See also</u> Report at 11 ("Staff often acknowledge the need for improvement in some of the areas identified by the monitor's expert, as discussed below, but they cited the shortage of staffing resources as a major obstacle to implementing them.")

---

directly impact the care of inmate-patients housed at SVPP.

1    Defendants raise a number of objections to these
2    recommendations and the findings on which they are based.
3    Defendants' objections and the declaration in support thereof
4    contain little if any substantive disagreement with the findings
5    of the Special Master concerning staffing levels at SVPP during
6    the period monitored by the Special Master.[6]   Significantly, in
7    an apparent acknowledgement that more staff is needed, defendants
8    represent that SVPP "is already undertaking dramatic measures to
9    recruit staff." Defs. Objs. (ECF No. 4868) at 5.   Defendants
10   assert that these efforts make a court order unnecessary.   Id.
11   As noted above, the Special Master's recommendation
12   concerning staffing levels is directly related to his
13   recommendation to increase the quantity and quality of
14
15   _____
16   [6] Defendants presently have a 1:35 staff to patient ratio for
     psychiatrists, psychologists, social workers, and rehabilitation
17   therapists.  See Report (ECF No. 4830) at 9.  Defendants do not
     object to the Special Master's finding that social workers'
18   caseloads average approximately 40 patients.  See id. at 8.
     Defendants agree with the Special Master's finding that there
19   were 8 psychologists on staff at SVPP as of August 9, 2013; they
     do not address his finding that one was due to transfer to the
20   Correctional Health Care Facility (CHCF) in October 2013.
     Defendants do object to the Special Master's finding that as of
21   August 22, 2013, there were five line psychiatrists and one chief
     psychiatrist, with contractors providing "some additional hours
22   of coverage."  Report at [cit.]  Defendants' evidence, which
     consists of the declaration of Pam Ahlin, is insufficient to
23   contravene the Special Master's finding.  Ms. Ahlin avers that on
     August 22, 2013 there were eight psychiatrists on staff "not
24   including the second positions worked by 2 full-time
     psychiatrists."  It is unclear whether defendants are suggesting
25   that there were eight psychiatrists, two of whom were working
     second positions, or something else.  In any event, defendants'
26   evidence is insufficient to contradict the Special Master's
27   findings concerning the number of psychiatrists on staff at SVPP
     in August 2013.
28

8

individualized and group therapy at SVPP.  The latter
recommendation is based on several findings, including:

- "The amount of weekly group therapy per patient
  was too limited for the intermediate level of
  care, at only four to six hours per week on
  average";

- "The quality of group treatment was inconsistent
  and ranged from very poor to excellent";

- "Psychologists appeared to have an overly-narrow
  role and to be underutilized";

- "Individualized therapy by psychologists and
  social workers was not provided regularly and
  occurred rarely for most patients, even when
  prescribed by an IDTT,[7] when clinically indicated,
  or when requested by patients."

Id. at 4.  Defendants interpose a number of objections to the
findings concerning the quantity and quality of therapy provided,
none of which contravene in any significant way the serious
inadequacies reported by the Special Master.[8] Moreover, as with

_____

[7] IDTT stands for Interdisciplinary Treatment Team.  See Report
(ECF No. 4830) at 12.

[8] Defendants first object that refusal to attend group therapy
can be and is a basis for transfer of an inmate to SVPP which
"explains, in part, the group therapy refusal rate of inmate-
patients who have recently transferred to" SVPP.  Defs. Objs.
(ECF No. 4868) at 7.  This objection is not responsive to the
Special Master's findings concerning the insufficient amount of
therapy available at SVPP.

   Defendants next object that the Special Master's comparison
of therapy received by inmate-patients at SVPP with the minimum
number of therapy hours required for the Enhanced Outpatient
(EOP) level of care is "inaccurate and unfair."  Id.  Defendants
contend the Special Master should have "counted the number of
group hours offered by [SVPP] and added to that number the hours

9

of individual therapy, recreational and occupational therapy with a clinician, and work and educational programs offered to inmate-patients." Id.  Defendants also object that the Special Master does not explain how he arrived at the finding that weekly group therapy at SVPP is limited to an average of four to six hours per week, and they contend their evidence filed in opposition to plaintiffs' motion concerning access to inpatient care "demonstrated provision of group therapy at a significantly higher rate." Id.  These objections are without merit. Defendants are correct that the "[t]en hours per week of scheduled structured therapeutic activities" required at the EOP level of care includes more than just group therapy. See Program Guide, 2009 Revision, at 12-4-9, 10.  However, the Special Master's Report includes findings about other therapy and programming provided at SVPP, including individual therapy and "solo treatment activity/solo programming", which show that these other forms of therapy and programming do not materially increase the quantity or quality of programming offered to inmate-patients at SVPP. See Report (ECF No. 4830) at 18-22.  Finally, the evidence cited by defendants about the amount of group therapy offered at SVPP is from March and April 2013, see Dec. Gaither (ECF No. 4602) at ¶¶19-20, while the Special Master's report is based on findings from three visits between July 31 and August 22, 2013.  Report at 2, 14-15.  Defendants have presented no evidence of therapeutic program hours from July or August 2013 that calls into question the Special Master's findings.

Finally, defendants suggest that the Special Master should have based his recommendation on therapy hours offered, not hours received, because the Program Guide only requires that EOP inmate-patients be offered ten hours of therapy, not that they receive ten hours of therapy.  Defs. Objs. (ECF No. 4868) at 7; see Program Guide at 12-4-8.  Had defendants presented evidence to the Special Master or to this court that they were in fact offering sufficient therapeutic programming at SVPP to meet therapeutic requirements for an ICF level of care (which presumably in most instances will over the course of a hospitalization, as the Special Master observes, exceed that required for EOP inmate-patients), this objection might merit further consideration.  However, defendants represent that they have only begun to implement a program for tracking individual and group therapy hours, see Decl. of Ahlin at ¶ 16, and they have not presented any data from that tracking system concerning therapy hours offered.  Absent such evidence, however, this objection is overruled.

The Special Master found significant deficiencies in the quantity and quality of therapy offered to inmate-patients at SVPP.  Defendants acknowledge that SVPP "is in the process of

1  staffing levels defendants also represent that SVPP "is in the

2  process of improving its group programming," "acknowledge that

3  changes to group therapy can be and is" being made, and that they

4  have been developing and implementing a program for tracking

5  individual and group therapy hours.  Defs. Objs. (ECF No. 4868)

6  at 7-8.

7       After de novo review, the court will adopt in full the

8  Special Master's factual findings concerning staffing levels and

9  therapy provided at SVPP.  However, in light of defendants'

10 representations concerning their efforts to recruit and hire

11 staff and to improve the quantity and quality of therapy provided

12 to inmate-patients and SVPP and the fact that the Special Master

13 is continuing to monitor SVPP and other DSH inpatient programs

14 pursuant to the July 11, 2013 order, the court will not make

15 specific orders concerning staffing or therapy at this time.

16 Orders concerning staffing and the quantity and quality of

17 therapy will be deferred pending a further report and

18 recommendations from the Special Master.

19            2. <u>Orientation Status/Cuff Status</u>

20      The Special Master recommends that SVPP "be directed to

21 reconsider and re-evaluate its use of Orientation Status to

22 automatically require patient cuffing whenever out-of-cell and

23 withhold mental health programming or treatment other than a

24 daily cell-front contact by a member of the interdisciplinary

25 _____

   improving its group programming."  Defs. Objs. (ECF No. 4868) at
26 7.  Defendants have not presented any evidence that calls into
   question the Special Master's findings concerning the
27 inadequacies in individualized and group therapy at SVPP.
   Defendants' objections are overruled.

28

treatment team." Report (ECF No. 4830) at 45.  He also

recommends that SVPP "be directed to eliminate the use of Cuff

Status to require automatic cuffing of patients when out-of-cell,

overriding of patients' designations, and barring of patients'

access to out-of-cell individual and group treatment." <u>Id.</u>

Defendants contend the Special Master has failed to adequately

weigh the safety and security needs that undergird use of

Orientation Status.  They characterize their objections to the

recommendation concerning Cuff Status as a motion to modify the

Special Master's findings concerning Cuff Status; however, they

specifically request that the recommendation be rejected.  Defs.

Objs. (ECF No. 4868) at 9-10.

        As reported by the Special Master, both Orientation Status

and Cuff Status are part of a "status and staging paradigm" used

at SVPP to set housing and programming for inmate-patients.

Report (ECF No. 4830) at 23.  The Special Master reports that all

inmate-patients arriving at SVPP are placed on Orientation

Status, which means that they

> are housed in a single cell for up to 14
> days, have only personal hygiene items for
> property, and must be cuffed at all times
> they are outside of their cells (i.e. they
> are effectively on Cuff Status) until they
> are cleared by an ICC [Institution
> Classification Committee] to program without
> such restrictions.  Patients on Orientation
> Status are to be seen daily by an IDTT member
> at the patient's cell front, but according to
> the SVPP Program Manual, they do not have
> additional programming.

Report (ECF No. 4830) at 23.  After inmate-patients are released

from Orientation Status, they program through three Stages.  <u>See</u>

1   id.  Cuff Status is a "behavior-driven" return to the conditions

2   of Orientation Status.  Report (ECF No. 4830) at 25.  The SVPP

3   Program Manual requires that inmate-patients "'who engage in

4   aggressive/threatening behavior, assaultive behavior and indecent

5   exposure" be placed on Cuff Status. Id. (quoting SVPP Program

6   Manual, Section 6.12.)  Cuff Status placement "overrides" the

7   Stage to which an inmate-patient has progressed and requires

8   handcuffs and escort by an MTA whenever an inmate it out of cell.

9   Id.  The Special Master describes in detail the procedures for

10  Cuff Status, as well as the documentation required for that

11  status.  Id.

12      Defendants contend that the Special Master has not

13  adequately considered the safety and security concerns in

14  recommending that the use of Orientation Status and Cuff Status

15  be reviewed and re-evaluated. This objection is without merit.

16  The Special Master recommends review and re-evaluation of the use

17  of Orientation Status and Cuff Status in light of the impact

18  placement in these statuses has on hospitalized inmate-patients'

19  access to necessary mental health care.  See Report (ECF No.

20  4830) at 5.

21      Orientation Status and Cuff Status require the same

22  restricted housing conditions and extremely limited programming

23  for inmate-patients placed in either status.  Orientation Status

24  delays the start of all but the most basic level of mental health

25  treatment for up to fourteen days for inmate-patients in need of

26  hospital care, many of whom have already waited more than thirty

27  days for necessary inpatient hospital care.  Cuff Status

28  interrupts for behavioral reasons all but the most basic mental

1  health treatment.   A recommendation to review and re-evaluate

2  these policies is not a recommendation for a particular outcome.

3  It is a recommendation, entirely appropriate on this record, that

4  defendants review these policies to assess whether the proper

5  balance between security considerations and necessary inpatient

6  mental health care has been achieved.   After de novo review of

7  the record, and good cause appearing, this court will adopt in

8  full the Special Master's recommendation concerning review and

9  re-evaluation of the use of Orientation Status and Cuff Status.

10  In view of the fact that CDCR is the custodian of all members of

11  the plaintiff class and ultimately responsible for the delivery

12  of constitutionally adequate mental health care to them, and in

13  view of defendants' continuing objection concerning the role of

14  DSH in the remedial phase of this action, the order to review and

15  re-evaluate these policies will be directed to both the CDCR and

16  the DSH defendants.   Given all the above, the review and re-

17  evaluation will take place under the supervision of the Special

18  Master and his experts.

19       Defendants seek modification of the Special Master's

20  findings concerning a lack of adequate documentation for eleven

21  inmates placed on cuff status because they contend "the Special

22  Master failed to give [SVPP] adequate credit for the

23  documentation that was present for these eleven inmates."  Defs.

24  Objs. (ECF No. 4868) at 10.   Defendants' evidentiary support for

25  this assertion is scant.   See Decl. of Ahlin (ECF No. 4830-1) at

26  ¶ 31.   Moreover, as with most of the other findings underlying

27  the Special Master's recommendations, defendants acknowledge the

28  need for improvement.   See Defs. Objs. (ECF No. 4868) at 10.

1  The motion to modify the Special Master's findings concerning the

2  adequacy of documentation for inmate-patients on Cuff Status will

3  be denied.

4      The Special Master reports that

5          [m]ultiple patients were found to be on Cuff
           Status without any documented rationale,
6          intervention and/or release criteria, leaving
           patients with very limited mental health
7          programming for long periods of time.
           Patients on Cuff Status for longer than ten
8          days were not referred to a psychologist
           supervisor for the development of a behavior
9          plan, as required by SVPP policy.

10

11  Report (ECF No. 4830) at 5.  As the Report makes clear, placement

12  on Cuff Status interrupts the provision of necessary mental

13  health care.  As the Special Master finds,

14          [b]y placing a patient on Cuff Status without
           documenting the reason for the placement, the
15         intervention planned, and the criteria for
           release from Cuff Status, and by failing to
16         develop a required behavior plan, SVPP in
           effect places the patient at risk of needless
17         deprivation of treatment and isolation in his
           cell – the very antithesis of a therapeutic
18         environment for a seriously mentally ill
           person. . . .  The ability of a patient on
19         Cuff Status to access treatment is also
           severely limited, despite the fact that he
20         was transferred to an inpatient program
21         *because he needs more treatment than he was*
           *receiving at the sending institution.*
22

23  Id. at 30.

24      While the security considerations at issue cannot be

25  gainsaid, neither can the risk to members of the plaintiff class

26  from inappropriate placement and retention on Cuff Status be

27  underestimated.  Defendants represent that they are correcting

28

                                    15

1    the problems with documentation, have recently trained staff, and

2    have developed and implement a "cuff status monitoring tool."

3    Defs. Objs. (ECF No. 4868) at 10.  Good cause appearing,

4    defendants will be directed to report to the court within fifteen

5    days whether there is any inmate-patient at SVPP on Cuff Status

6    without the required documentation.  If there is any such inmate-

7    patient, defendants shall show cause in writing why this court

8    should not issue an injunction preventing defendants from placing

9    or maintaining any inmate-patient at SVPP on Cuff Status without

10   the required documentation.

11              3.  Transfer Timelines

12       The Special Master recommends that SVPP "be directed to

13   begin tracking all patient bed assignments, and admit referred

14   and accepted patients as quickly as bed availability permits so

15   that beds are utilized to the fullest extent possible, and in no

16   event beyond 72 hours following bed assignment and 30 days from

17   the date of the referral."  Report (ECF No. 4830) at 46.

18   Defendants contend this recommendation is based on an inaccurate

19   analysis of the wait list and an unreasonable interpretation of

20   Program Guide requirements for transfer to inpatient care.[9]

21   ───────────────

[9] Defendants also contend that "strict compliance with transfer
22   timelines is not the measure of whether SVPP is constitutionally
     compliant; defendants argue that the key question is whether
23   transfer waiting periods expose inmates to significant risks of
     harm" and "[t]he Special Master's report fails to describe a
24   single example in which an inmate-patient was exposed to an
     excessive risk of harm because his admission to the SVPP was not
25   completed immediately."  Defs. Objs. (ECF No. 4868) at 12.  The
     court reminds defendants, once again, that the Program Guides are
26   the remedial plan for this action and represent defendants'
     determination of what is required to meet their constitutional
27   obligations to the plaintiff class.  Moreover, the Special Master
     reminds the court that the thirty-day timeframe in the Program
28

                                16

1    The Special Master's recommendation is based on findings

2    that (1) in a four month period between March 1, 2013 and June

3    30, 2013, twenty-seven percent of inmate-patients accepted for

4    treatment at SVPP were transferred after the end of the thirty

5    day period; (2) during that same four month period more than half

6    of the transfers completed within the thirty day period occurred

7    in the last five days of that period; and (3) SVPP does not track

8    bed assignments, which makes compliance with the seventy-two hour

9    timeframe for transport "difficult, if not impossible."

10   Defendants object to the percentages as reported by the

11   Special Master.  In defendants' view, the thirty day period runs

12   from the time DSH decides to accept the inmate-patient, not from

13   the date the patient is referred by CDCR.  Defendants base their

14   argument on language in the Program Guide that provides that some

15   inmate-patients may be placed on a waitlist after "acceptance."

16   The Program Guide is clear.  All inmate-patients accepted

17   for treatment at SVPP, which is an intermediate care facility

18   (ICF), must be transferred within thirty days of referral.

19   Program Guide, 2009 Revision, at 12-1-16.  Referral is defined as

20   "the date the completed referral packet is received by DMH by

21   _____

22   Guide "was negotiated during a time when inpatient beds for CDCR
     inmates were slowly becoming less scarce, and there was need for

23   a timeframe within which CDCR could conceivably comply under the
     circumstances at that time."  Report (ECF No. 4830) at 32.  He

24   suggests, correctly, that in light of the dramatic increase in
     availability of inpatient beds and known vacant hospital beds,

25   "[t]oday, transfers need not take anywhere close to 30 days to

26   complete, and in no instance should they take more than 30 days."
     Id.  Defendants are reminded that their constitutional obligation

27   is to provide "ready" access to adequate mental health care.  See
     Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) abrogated on

28   other grounds by Sandin v. Conner, 515 U.S. 472 (1995).

facsimile or overnight mail." Referral must be completed within five or ten working days from when an interdisciplinary treatment team (IDTT) identifies an inmate-patient for referral to inpatient care.  Id. at 12-1-15, 12-1-16.  Transfer is defined as the date on which an inmate-patient "is placed into the LOC and program to which s/he was referred."  Id. at 12-1-15.  The Program Guide also requires that transport of inmate-patients to the ICF "must be completed within 72 hours of bed assignment." Id. at 12-1-16.  Under the Program Guide, all inmate-patients accepted by DSH for treatment at SVPP must arrive at SVPP within thirty days of the date the referral packet arrives at DSH from CDCR.[10]  Within that thirty day period all of the following must occur:  (1) the decision whether to accept an inmate-patient, which be made within three working days of DSH receipt of the referral,  see id. at 12-6-10; (2) bed assignment for the accepted inmate-patient; and (3) transport of the accepted inmate-patient, which must occur within seventy-two hours of bed assignment, see id. at 12-6-11. None of these operates to extend the thirty day period, nor does the language cited by defendants change the controlling timeframe.  Defendants' objections are overruled.  The Special Master's recommendation will be adopted in full.

>        4.  Laundry

The Special Master's final recommendation is that SVPP "resolve any and all remaining issues with, and obstacles to, providing patients with the full complement of clean clothing,

---

[10] In fact, the Program Guide defines "'Referral' to DMH" as "the date the completed referral packet is received by DMH by facsimile or overnight mail."

1   towels, and bed coverings, and make these provisions available to

2   patients on a timely basis according to established schedules."

3   Report (ECF No. 4830) at 46.  Defendants contend an order

4   concerning laundry is unnecessary because SVPP "has formed a

5   laundry committee that inventories laundry and is responsible for

6   resolving any laundry issues that arise."  Defs. Objs. at 13.  It

7   is unclear when this committee was formed, but it may be that the

8   existence of the committee will operate to fulfill the Special

9   Master's final recommendation without a further order by this

10  court.

11        C.  Plaintiffs' Motion

12        Plaintiffs seek a further report from the Special Master

13  within sixty days and a series of other specific orders.  Two of

14  the matters for which plaintiffs seek remedial orders, use of

15  force and issuance of rules violation reports, are the subject of

16  ongoing proceedings before this court.  The Special Master has

17  not included recommendations concerning these or the other two

18  issues highlighted by plaintiffs.  The court finds that

19  resolution of plaintiffs' pending motion concerning use of force

20  and disciplinary proceedings (ECF No. 4638), as well as further

21  monitoring by the Special Master, is necessary before the court

22  considers issuance of further specific orders in this area.

23  Plaintiffs' motion will be denied without prejudice.

24        D.  Standards for Injunctive Relief

25        The court does, by this order, direct specific action by

26  defendants.  In this court's view, the orders contained herein

27  are in aid of the remedy required by this court's 1995 order.  To

28  the extent that the requirements of 18 U.S.C. § 3626(a)(1) may

1   apply, this court finds that the orders contained herein are

2   narrowly drawn, extend no further than necessary to correct the

3   Eighth Amendment violation in the delivery of mental health care

4   to members of the plaintiff class, and are the least intrusive

5   means to that end.  See 18 U.S.C. § 3626(a)(1)(A).

6        In accordance with the above, IT IS HEREBY ORDERED that:

7        1.  Defendants' October 14, 2013 motion to modify findings

8   in the September 24, 2013 Report of the Special Master on the

9   Salinas Valley Psychiatric Program (ECF No. 4868) is denied.

10       2.  The findings in the September 24, 2013 Report of the

11  Special Master on the Salinas Valley Psychiatric Program (SVPP)

12  (ECF No. 4830) are adopted in full.

13       3.  The recommendations of the Special Master in said Report

14  are adopted in part.

15       4.  The CDCR and DHS defendants shall review and re-evaluate

16  the use of Orientation and Cuff Status at SVPP to determine

17  whether these policies as designed and implemented achieve the

18  proper balance between legitimate security needs and access to

19  necessary inpatient mental health care.  This shall be carried

20  out under the guidance of the Special Master and his staff, with

21  participation and input from plaintiffs.  The Special Master

22  shall report to the court on the results of this review and re-

23  evaluation in the report to be filed on March 31, 2014.

24       5.  Within fifteen days from the date of this order

25  defendants shall inform the court in writing whether any there is

26  any inmate-patient at SVPP on Cuff Status without the

27  documentation required for such status, including reason for

28  placement, intervention planned, and criteria for release.  If

1   there is any inmate-patient on Cuff Status without required

2   documentation, defendants shall show cause in writing why this

3   court should not issue an injunction preventing defendants from

4   placing or maintaining any inmate-patient at SVPP on Cuff Status

5   without the required documentation.

6          6.   Defendants shall forthwith begin tracking all patient

7   bed assignments at SVPP, and admit referred and accepted patients

8   to SVPP as quickly as bed availability permits and in no event

9   beyond seventy-two hours following bed assignment and thirty days

10  from the date of the referral.

11         7.   Plaintiffs' October 14, 2013 motion for additional

12  orders (ECF No. 4867) is denied without prejudice.

13         IT IS SO ORDERED.

14         DATED:  November 12, 2013.

15

16

17

18                       LAWRENCE K. KARLTON
                         SENIOR JUDGE
19                       UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

27

28

                              21