1    KAMALA D. HARRIS
Attorney General of California
2    JAY C. RUSSELL
PATRICK R. MCKINNEY
3    Supervising Deputy Attorneys General
DEBBIE VOROUS, State Bar No. 166884
4    JESSICA KIM, State Bar No. 257766
MANEESH SHARMA, State Bar No. 280084
5    Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
Telephone:  (415) 703-3035
7    Fax:  (415) 703-5843
E-mail:  Patrick.McKinney@doj.ca.gov
8    *Attorneys for Defendants*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK DAD PC |
| Plaintiffs, | |
| v. | **POST EVIDENTIARY HEARING BRIEF RE: (1) MOTION RELATED TO USE-OF-FORCE AND DISCIPLINARY PROCESS, AND (2) MOTION RELATED TO SAN QUENTIN SPECIALIZED CARE FOR THE CONDEMNED PROGRAM** |
| **EDMUND G. BROWN, JR., et al.,** | |
| Defendants. | |
| | Hearing Dates:  October 1-2, 16-18, 22-25, 29-31 & November 1, 5-7, 2013 |
| | Dept.:    4 |
| | Judge:   Hon. Lawrence K. Karlton |
| | Action Filed:  1990 |

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................. 1

Plaintiffs Failed to Meet Their Burden Under the PLRA to Justify Their Requests for
    Further Injunctive Relief. ................................................................................... 3

Use-of-Force and Inmate Disciplinary Process ...................................................... 4

    I.    California's comprehensive use-of-force policy and system ensure that
        staff apply force in good faith. .............................................................. 4

    II.    There is no pattern or practice of excessive or unnecessary force against
        Coleman class members ......................................................................... 5

        A.    Controlled use of force is employed when necessary and with
            consideration of an inmate's mental health status. .................... 6

            1.    The cell extraction videos offered by Plaintiffs are not
                representative of use of force within CDCR ................... 7

            2.    Controlled use of force is utilized as a last resort and is often
                successfully avoided by clinical and custody staff. ....... 9

        B.    Plaintiffs failed to establish their speculative theory that exposure to
            pepper spray causes long-term psychological harm. ............... 10

        C.    Plaintiffs' allegations concerning use of the expandable baton are
            not supported by the evidence. ................................................ 11

        D.    Plaintiffs failed to raise a systemic issue with respect to immediate
            use of force. ............................................................................ 11

            1.    Plaintiffs' failed to establish a systemic policy issue
                concerning inmates who refuse to relinquish control of their
                food port. ....................................................................... 11

            2.    There is no systemic issue concerning immediate use of
                force at Pelican Bay. ..................................................... 12

        E.    Plaintiffs failed to prove that unnecessary or excessive force
            disproportionately affects mentally ill inmates. ...................... 12

    III.    CDCR staff appropriately consider and accommodate inmates' mental
        health conditions in the disciplinary process. ...................................... 14

    IV.    There is no basis or need for the Court to issue further remedial orders. ............ 15

San Quentin Specialized Care for the Condemned ................................................ 17

    I.    San Quentin State Prison provides condemned inmates with ready access to
        adequate mental health care. ................................................................ 17

        A.    San Quentin's overall mental health program for condemned
            inmates. .................................................................................. 17

        B.    The Specialized Care for the Condemned Program provides
            appropriate care—including inpatient care—to condemned inmates. ...... 20

            1.    The ten Outpatient Housing Unit beds meet the needs of the
                condemned population. ................................................... 23

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

       2.     The Specialized Care for the Condemned Program's 10 beds
in the Outpatient Housing Unit is legal and safe: California

4

law does not require a license for these beds. .............................. 24

5

II.    The Acute Psychiatric Program is a valuable and appropriate complement
to the continuum of care available to the condemned inmates and its

6

custodial policies are grounded in legitimate penological interests...................... 25

7

III.   Dr. Wadsworth's testimony regarding suicide statistics should be
considered by the Court. ...................................................................................... 27

8

Conclusion ........................................................................................................................ 29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Armstrong v. Schwarzenegger*
  622 F.3d 1058 (9th Cir. 2010)...................................................................... 3

5

6

*Hoptowit v. Ray*
  682 F.2d 1237 (9th Cir. 1982)................................................................... 3, 4

7

*Hudson v. McMillian*
  503 U.S. 1 (1991)...................................................................................... 3

8

9

*In re Qawi*
  32 Cal. 4th 1 (2004) ........................................................................... 22, 23

10

*Keyhea v. Rushen*
  178 Cal. App. 3d 526 Cal. Rptr. 746 (Ct. App. 1986) ........................ 22, 23

11

12

*Lewis v. Casey*
  518 U.S. 343 (1996)................................................................................. 3

13

*Rhodes v. Chapman*
  452 U.S. 337 (1981)................................................................................. 3

14

15

*Sandin v. Conner*
  515 U.S. 472 (1995)................................................................................. 3

16

17

*Toguchi v. Chung*
  391 F.3d 1051 (9th Cir. 2004)................................................................. 21

18

*Turner v. Safley*
  482 U.S. 78 (1987)..................................................................... 3, 4, 26, 27

19

20

*Washington v. Harper*
  494 U.S. 210 (1990)............................................................................... 23

21

22

*Whitley v. Albers*
  475 U.S. 312 (1986)................................................................................. 3

23

24

*Wilkins v. Gaddy*
  559 U.S. 34 (2010)................................................................................... 3

25

*Wilson v. Seiter*
  501 U.S. 294 (1991)................................................................................. 3

26

27

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*
  259 F.3d 1101 (9th Cir. 2001)................................................................. 28

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

California Code of Regulations, Title 15
 § 3268.1(a)(1)..................................................................................................... 4

California Code of Regulations, Title 22
 § 79516 ............................................................................................................... 24
 § 79555 ............................................................................................................... 24
 § 79581 ............................................................................................................... 24

California Health & Safety Code
 § 1250 ................................................................................................................. 24
 § 1250(j) ............................................................................................................. 24

California Welfare & Institution Code
 § 5300 ................................................................................................................. 22

Penal Code
 § 2602 ........................................................................................................... 22, 23

PLRA (Prison Litigation Reform Act) ................................................................... 3

United States Code, Title 18
 § 3626(a)(1) ......................................................................................................... 3

**CONSTITUTIONAL PROVISIONS**

United States Constitution
 Eighth Amendment .............................................................................................. 3

**COURT RULES**

Federal Rules of Civil Procedure
 Rule 26 ........................................................................................................... 27, 28
 Rule 26(a)(2)(B) ............................................................................................. 27, 28
 Rule 26(a)(2)(C) ................................................................................................... 27
 Rule 26(a)(2)(D) ................................................................................................... 28
 Rule 26(a)(2)(D)(i) ............................................................................................... 28
 Rule 37(c)(1) ........................................................................................................ 28

Federal Rules of Evidence
 Rule 702 ......................................................................................................... 28, 29

**INTRODUCTION**

After 16 days of hearing and testimony from 12 witnesses, the evidence established: (1) there is no systemic, current, and ongoing constitutional violation with respect to staff use of force; (2) CDCR appropriately considers and accommodates mental health in the inmate disciplinary process; and (3) San Quentin State Prison provides a spectrum of appropriate care to condemned inmates.

Plaintiffs' evidence supporting the use-of force-motion was limited to a handful of "isolated aberrations, anomalies, outliers" that do not represent the vast majority of incidents within CDCR. There is no pattern or practice of unnecessary or excessive use of force against severely mentally ill class members. Plaintiffs presented no evidence that staff use force against *Coleman* class members for the purpose of inflicting pain or punishment. Instead, the opposite is true: CDCR staff use force to prevent self-harm or harm to others, and to ensure that inmate-patients receive necessary medication and mental health treatment, and are placed in the right mental health level of care. Even then, staff resort to force only after both clinical and custody staff employ time and distance to deescalate the need to enter an inmate-patient's cell. In the vast majority of cases, that intervention is successful.

The evidence further established that CDCR developed and implemented a comprehensive system, including heightened safeguards to ensure that inmates with mental illness are not subjected to unnecessary or excessive staff use-of-force. Plaintiffs submitted isolated instances where the system did not work, and attempted to argue that these anomalies were "representative" of staff use-of-force within CDCR. But the evidence demonstrated that these incidents were not representative. Indeed, being able to identify individual failures in the system—whether by CDCR administrators, the State's expert, or by Plaintiffs—is evidence that the systems are in place.

When the Court questioned whether it had authority to issue further remedial orders based on this record, Plaintiffs' counsel did not refer to any systemic evidence. Instead, counsel pointed to the testimony of their expert, Dr. Kaufman, whose knowledge about use-of-force within CDCR is limited to incidents involving four inmates, including interviews with two of those inmates.

1

1   This is insufficient to justify systemic relief.

2   　　　Plaintiffs conceded during oral argument that they did not bring this motion to remedy

3   constitutional violations, but to implement best-practice recommendations that would "expand the

4   toolbox of options for working, dealing with severely mentally ill inmates in California." The

5   Court should not substitute the preferences of Plaintiffs' counsel for the considered judgments of

6   the State's correctional administrators and mental health professionals. The evidence before this

7   Court is that there is no systemic pattern and practice of unnecessary or excessive force against

8   inmates with serious mental illness within CDCR, and the Court may not issue further remedial

9   orders to compel the State to continue improving its systems.

10   　　　The evidence, including Plaintiffs' evidence, also demonstrated that the State appropriately

11   considers and accommodates mental health in the disciplinary process. CDCR has policies and

12   procedures that are consistently applied, with a well-defined system for referring and completing

13   mental-health assessments by a trained clinician prior to a disciplinary hearing. CDCR's hearing

14   officers consider the clinician's assessment and appropriately mitigate sanctions. Plaintiffs raised

15   questions about whether *Coleman* class members should be held accountable for their actions at

16   all. But the evidence demonstrated that the vast majority of *Coleman* class members understand

17   the consequences of their actions and, accordingly, should be held accountable.

18   　　　Plaintiffs also failed to meet their burden of proving a current and ongoing constitutional

19   violation concerning the care provided to condemned inmates at San Quentin State Prison.

20   Neither Dr. Stewart's nor Ms. Woodford's testimony proved deliberate indifference or even

21   inadequate care. In turn, Defendants offered testimony by Drs. Monthei, Burton, Wadsworth

22   demonstrating that the leadership, staffing, space, therapy, and overall mental health treatment

23   provided to the condemned population is not only adequate but exceeds the community standard

24   of care. Defendants further proved that the Acute Psychiatric Program is a valuable and

25   appropriate complement to the continuum of care available to condemned inmates.

26   　　　Plaintiffs' motions fail to raise systemic issues of constitutional scope or otherwise. No

27   further orders are necessary or appropriate, and Plaintiffs' requests for further enforcement orders

28   and affirmative relief must be denied.

2

1

**PLAINTIFFS FAILED TO MEET THEIR BURDEN UNDER THE PLRA TO JUSTIFY THEIR REQUESTS FOR FURTHER INJUNCTIVE RELIEF.**

2

3       Under the PLRA, district courts may grant prospective relief only to the extent "necessary

4   to correct the violation of [a] Federal right," and only when the relief "is the least intrusive means

5   to correct the violation."  18 U.S.C. § 3626(a)(1).  "The function of a court is limited to

6   determining whether a constitutional violation has occurred . . . and to fashion a remedy that does

7   no more and no less than correct that particular constitutional violation."  *Hoptowit v. Ray*, 682

8   F.2d 1237, 1246 (9th Cir. 1982) (citing *Rhodes v. Chapman*, 452 U.S. 337 (1981), abrogated on

9   other grounds by *Sandin v. Conner*, 515 U.S. 472, 115 (1995).  This limited power applies even

10  when a case is in the remedial phase, and requires that there must be sufficient evidence to justify

11  the relief being ordered.  *See., e.g., Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1072 (9th Cir.

12  2010) (finding that plaintiffs presented insufficient evidence to justify the new system-wide relief

13  ordered by the district court).  System wide relief requires evidence of system wide violations.

14  *See Lewis v. Casey*, 518 U.S. 343, 359 (1996).  Singular isolated incidents do not equate to a

15  system wide violation.  *Id.*

16       Under the Eighth Amendment, inmates have the right to be free from "cruel and unusual

17  punishment."  *Wilson v. Seiter*, 501 U.S. 294, 29 (1991).  In a systemic use-of-force case, the

18  Eighth Amendment prohibits the unnecessary and wanton infliction of pain.  *Whitley v. Albers*,

19  475 U.S. 312, 319 (1986).  The core judicial inquiry is "'whether force was applied in a good-

20  faith effort to maintain or restore discipline, or malicious and sadistically to cause harm.'"

21  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1991)).

22  With respect to the care provided to condemned inmates, prison officials must provide ready

23  access to adequate mental health care, by either staff physicians or outside physicians or facilities.

24       Courts should also be cognizant that prisons present issues that are "complex and

25  intractable" and "not readily susceptible of resolution by decree."  *Turner v. Safley*, 482 U.S. 78,

26  84 (1987).  "Running a prison is an inordinately difficult undertaking that requires expertise,

27  planning, and the commitment of resources, all of which are peculiarly within the province of the

28  legislative and executive branches of government."  *Id.* at 84-85.  Under separation-of-powers

3

1   concerns, federal courts should accord due deference to state prison authorities. *Id.* at 85.

2   Moreover, "[w]hat experts may consider desirable may well constitute appropriate goals to which

3   the [legislative and executive] branches may aspire but they do not usually establish those

4   minimums below which the Constitution establishes a prohibition." *Hoptowit, supra,* at 1246.

5   ### USE-OF-FORCE AND INMATE DISCIPLINARY PROCESS

6   **I.   CALIFORNIA'S COMPREHENSIVE USE-OF-FORCE POLICY AND SYSTEM ENSURE THAT**

7   **STAFF APPLY FORCE IN GOOD FAITH.**

8   California's use-of-force policy is sophisticated and consistent with sound correctional

9   practice. (Evidentiary Hearing Transcripts (Tr.) 1759:5-20, 1980:22-1981:2 [S. Martin]; Exs. I, J

10  & 150 (Ex. A ("Martin Rpt.") at 11).) CDCR's comprehensive statewide use-of-force system

11  includes:

12  (1) *Heightened safeguards for inmates with mental illness with requirements that go beyond*

13  *the policies in other jurisdictions*. (*See* Ex. J [D.O.M. §§ 51020.12.2, 51020.15.1, 51020.14 &

14  51020.14.1]; Tr. 1760:14-16 & 1981:3-5 [S. Martin]; Martin Rpt. at 11.) Before staff employ

15  controlled uses of force involving seriously mentally ill inmates, California regulations require:

16  (a) consultation with a licensed health care practitioner before using chemical agents; (b) clinical

17  intervention; and (c) verbal counseling to persuade the inmate to voluntarily come out of the area

18  without force. (Tr. 806:23-807:24 [M. Stainer]; D.O.M. § 51020.12.2.) These heightened

19  safeguards in California's policy are enhancements over policies in other jurisdictions. (Tr.

20  1760:6-16.)

21  (2) *Mandatory reporting of use-of-force incidents*. Use of force incident reports are

22  detailed, self-critical, and allow for a credible review of the need for the force utilized. (Tr.

23  1770:5-20 [S. Martin]; Exs. 149 ¶ 5, 167 ¶ 6; 15 Cal. Code Regs. § 3268.1(a)(1); D.O.M. §§

24  51020.17, 51020.18.1, 51020.18.1.)

25  (3) *A multi-tiered review process for every use-of-force incident*. (Tr. 868:21-871:21 [M.

26  Stainer] & 1759:5-1760:20 [S. Martin]; Martin Rpt. at 12; Exs. 149 ¶¶ 5-12 & 14, 157 at 197, &

27  167 ¶¶ 5-14.) During the review process, CDCR identifies issues in staff use of force and

28  requires training or other corrective action. In 2012, CDCR imposed formal corrective action in

4

1   67 cases, informal corrective action in 118 cases, and provided training in 4,066 cases.  (Exs. 169

2   & F.)

3       (4) *Effective training (both pre-service and in-service) for all correctional staff on the*

4   *proper use of force and proper reporting of use-of-force.*  (Exs. 150 at 11 & 167 ¶¶ 15-19.)  All

5   custody staff are trained on managing interactions and conflict with inmates, and recognizing

6   signs and symptoms of mental illness.[1]  (Ex. 167 ¶ 16.)  To argue otherwise, Plaintiffs relied on

7   observations by the State's expert that he saw instances of incompetence or lack of training, but

8   Mr. Martin was clear that this was "not [a] systemic observation," but referred to certain of the

9   videos in evidence.  (Tr. 1995:8-1996:5.)

10      (5) *Effective and appropriate investigation of use-of-force incidents through CDCR's*

11  *Office of Internal Affairs, and meaningful disciplinary measures imposed for violations of the*

12  *use-of-force policy.*  (Tr. 862:22-863:11, 878:10-879:7 [M. Stainer] & 1991:25-1992:21 [S.

13  Martin]; Ex. 149 ¶¶ 2, 11, & 12.)  In 2012, 107 cases were referred to the Office of Internal

14  Affairs alleging employee misconduct related to use of force.  (Ex. 149 ¶ 2.)  The Office of

15  Internal Affairs investigated 57 of the referred cases, although all investigations are not complete,

16  and sustained allegations of misconduct in 31 cases, including 6 cases which resulted in

17  termination.  (*Id.*; *see also* Tr. 2007:6-16.)

18      (6) *Independent and effective oversight of the system by the Office of Inspector General.*

19  (Exs. 157-160, 164-166, & L-N.)

20  **II.   THERE IS NO PATTERN OR PRACTICE OF EXCESSIVE OR UNNECESSARY FORCE AGAINST**
    **COLEMAN CLASS MEMBERS**

21

22      Plaintiffs failed to meet their burden to prove a system wide violation with respect to staff

23  use of force.  The only evidence Plaintiffs presented—systemic or otherwise—related to use of

24  pepper spray during cell extractions.  Of the hundreds of use-of-force incidents produced in

25  discovery, Plaintiffs chose the few incidents they believed would support their argument and

26

27  _____

    [1] Plaintiffs' critiques of staff training were based on their expert's limited review of
    isolated incidents, and did not include a review of the training that mental health receive on de-
    escalation techniques.  (Tr. 236:10-13.)

28

deemed them "representative." That allegation proved to be false—Mr. Martin reviewed the 377 use-of-force incidents produced to Plaintiffs for use by their expert, and found that Plaintiffs selection "do not . . . represent the vast majority of incidents . . . [t]hey are not representative of that body of incidents." (Tr. 1794:19-1795:13.) More than half of the incidents were fight interventions between inmates where staff appropriately intervened. (*Id.* at 1789:18-1790:2.) Eighty-eight of the incidents, or 23%, "did not involve chemical agents at all." (*Id.* at 1790:3-4.) Out of 377 incidents, there is only *one* that involved the application of a closed-fist, hard-impact strike, a fact Mr. Martin described as remarkable in a prison setting. (Ex. AH & Tr. 1791:10-1792:25.) Overall, Mr. Martin found "serious applications of force involving *Coleman* class inmates that are disposed of in an appropriate manner. And they, in [his] view, represent the large, large majority of force applied as to the *Coleman* class inmates." (Tr. 1794:10-14; *see also id.* at 1830:6-14 & Exs. AE, AF, AG, AH, AI, AJ & AL.)

The representative use-of-force incidents in evidence establish:

- Successful clinical and custody intervention by staff that does not involve the application of pepper spray. (Ex. AG; Tr. 816:9-819:20 [M. Stainer], 635:16-636:19 & 637:6-638:5 [E. Wagner], & 1832:21-1833:19 [S. Martin].)

- Staff systemically employ time and distance in the controlled use-of-force context. (Tr. 1994:13-24 [S. Martin].)

- Staff use force, including batons and other physical force, in a restrained and appropriate manner. (Ex. 33; Tr. 1800:11-1801:10 [S. Martin].)

- Staff exercise restraint and restore order in situations where an inmate successfully spits or gasses an officer or clinical staff. (Exs. AF & AI; Tr. 1831:22-1832:14 & 1834:9-19 [S. Martin].)

- Staff learn from prior applications of force and do not repeat tactically inappropriate applications of pepper spray. (Ex. AE; Tr. 1830:15-1831:15 [S. Martin].)

- The Institutional Executive Review Committees take action when they find that a particular use of force is inconsistent with policy. (Exs. AJ & AL; Tr. 1834:20-1836:3 [S. Martin].)[2]

**A.    Controlled Use of Force Is Employed when Necessary and with Consideration of an Inmate's Mental Health Status.**

---

[2] Mr. Martin made similar findings in reaching his systemic opinions based on his independent review of more than 300 incidents that occurred between November 2011 and November 2012. (Tr. 1773:8-15, 1794:15-18, & Ex. 150 [Martin Rpt].)

1

**1.     The Cell Extraction Videos Offered by Plaintiffs Are Not Representative of Use of Force Within CDCR**

2

3      To support their allegations regarding controlled use of force, Plaintiffs referred to 17 use-

4      of-force incidents and entered six videos into evidence.  Those six videos are:

5              [I]solated aberrations, anomalies, outliers.  They do not, in my view,
               represent the vast majority of incidents which is near now 700.
6              They are not representative of that body of incidents.  Objectively, I
               just don't see how they are.

7

8      (Tr. 1795:6-10 [S. Martin].)  The six videos are not even representative of the other 11 videos that

make up the universe of videos referenced by Plaintiffs, whether in evidence or not.  (*Id.* at

9      1795:11-13 & 1990:14-1991:24; *see also* Ex. 33A.)

10      The total number out of the approximately 700 incidents Mr. Martin reviewed where too

11      much pepper spray was used "is a small number."  (Tr. 1797:2-16.)  Of the six videos, Mr. Martin

12      noted three incidents which raised the question of whether too much pepper spray was used:

13      Inmates A, B, and E.  (*Id.* at 1795:14-1796:2; 1807:24-1808:10; Exs. 2A, 4A, & 10A.)  Of those

14      three, only one—Inmate A—could be said to be unable to comply with instructions or understand

15      the situation.  (Tr. 191:22-19:24 [E. Kaufman] & 1821:10-16 [S. Martin].)  And these incidents

16      are not representative of the hundreds of incidents Defendants' expert reviewed.  (*Id.* at 1823:11-

17      20.)

18      The evidence before the Court demonstrates that in most instances of controlled use of

19      force, the determination to remove a mentally inmate from a cell is made by clinical staff, not

20      custody staff.  And to avoid force, clinical staff only order an extraction after (1) the inmate has

21      repeatedly refused treatment—often over weeks—and (2) clinical staff determine that the inmate

22      must receive necessary treatment and/or medication.  As Dr. Wagner testified, Inmate A

23      presented an extraordinary circumstance, both from a mental health and a custody perspective.

24      (Tr. 635:16-636:23.)  Before the decision was made to enter Inmate A's cell in the inpatient crisis

25      bed unit, clinicians spent weeks attempting to establish a relationship and convince him to come

26      out.  (*Id.* at 631:15-24; 635:6-14; Exs. 2A, 2D, & 1157.)  Although Inmate A was

27      decompensating, he did not meet the legal requirements for involuntary medication.  (Tr.

28

7

1391:10-1392:4, 1392:17-1394:5 [P. Burton], 689:23-690:5, 701:19-702:2, & 702:21-703:9 [E. Wagner].)  During the intensive monitoring, an event occurred which provided the clinicians with the legal right to seek emergency medical treatment.  Inmate A flooded his cell, was standing in water that contained feces, and had smeared himself with feces.  (*Id.* at 633:7-23 & Ex. 2A.)[3]  At this point, Inmate A presented a medical emergency and a threat to himself that justified forced entry into his cell.  (*Id.* at 196:2-6 [E. Kaufman], 848:2-9, 848:21-25 [M. Stainer], & 1995:2-7 [S. Martin]; Ex. 150 ¶ 16.)  While the Court may be able to draw conclusions about Inmate A's individual cell extraction, it is impossible to draw broader conclusions from this incident.

The evidence also demonstrated that it was necessary from both the clinical and custody perspective for Inmate E to be removed from his cell for mental health treatment.  Dr. Wadsworth testified that Inmate E needed to be evaluated due to evolving concerns that he posed a danger to others.  (Tr. 1596:12-23.).  The decision to remove Inmate E was "a careful consideration involving several disciplines."  (*Id.* at 1600:19-1601:1.)  The day before the extraction, doctors worked with Inmate E and decided to defer the cell entry overnight—a lengthy cooling off period.  (Ex. 10A; Tr. 1596:12-18.)

The vast majority of inmates in the *Coleman* class are dissimilar from Inmate A and are able to function in the prison environment, including having the ability to understand and comply with orders, and to be held accountable for their actions.  (Tr. 1880:20-1883:5 & 1993:23-1994:6 [S. Martin]; *see also id.* at 906:6-21 [M. Stainer] & 1395:8-10, & 1397:7-11 [P. Burton].)  Inmate B was coherent, yelling to officers: "don't waste your time, I ain't coming out."  (*Id.* at 214:24-215:1 [Kaufman], Exs. 4A, 4B, & 150 ¶ 18.)  He had also barricaded himself behind the cell door with his mattress, and was observed holding a milk carton believed to be feces.  (Tr. 1824:3-10 & Ex. 4A.)  Inmate B presented a threat to himself and others that justified entry into his cell.  (*Id.* at

---

[3] Plaintiffs' expert testimony concerning Inmate A does not make sense.  On the one hand, Plaintiffs claim that Inmate A could not understand the officer, but also contend that he somehow could have understood a clinician.  As Dr. Kaufman stated, you just "enter the cell and you attempt to deal in an authoritarian but understanding way with the inmate."  (Tr. 198:20-22.)  By acting "authoritarian," Dr. Kaufman testified that a clinician could tell the inmate "he's going to have to accept this injection and there is no way you're not going to give" him the shot.  (*Id.* at 199:17-20.)  Plaintiffs proposal that Defendants be required to follow this course of action is reckless and, if accepted, the chances of injury to the inmate and staff increase significantly.

850:10-18, 851:5-16 [M. Stainer] & 1824:24-1825:1 [S. Martin].)  The evidence also showed that, although staff used several applications of pepper spray, there is a question about whether too much spray was used since the first two applications either failed or were successfully blocked by Inmate B.  (*Id.* at 1824:1-10.)

    The remaining incidents presented by Plaintiffs similarly show inmates who had the capacity to comply with orders, and that force was used only after de-escalation had failed and the inmates presented continued threats or resistance.  For example:

- Inmate D was thinking logically, and verbally escalated the situation by arguing with staff and challenging them to pepper spray him.  (Tr. 1826:10-14.)  He presented a threat that justified the use of force when "he closed his fist and pumped it into his other hand and [he] was using some rather profane language . . . ."  (Tr. 1825:14-1826:9; Ex. 150 ¶ 17.)
- Inmate F refused to take his Court ordered involuntary medication and was provide with multiple hours to cool off.  (Ex. 12B)  At the time of the extraction, he was coherent and continued to resist orders from officers to come out of his cell.  The cell entry for Inmate F "was an effective tactical operation . . . without a large amount of OC spray being used."  (Tr. 1827:5-6.)  Mr. Stainer agreed, stating that this "was a very good example of what the norm should be with regard to the application of" pepper spray.  (*Id.* at 853:11-19.)
- Inmate I refused exit his cell to be transferred to higher level of care.  (Ex. 8B.)  Attempts to deescalate and avoid the need to use force lasted approximately three and a half hours.  (Exs. 8B & 150 ¶ 19; Tr. 1827:9-1828:1.)  Clinical intervention was ongoing during this time.  (Ex. 8; Tr. 1827:9-1828:1.)

### 2. Controlled Use of Force is Utilized as a Last Resort and is Often Successfully Avoided By Clinical and Custody Staff.

    Contrary to Plaintiffs' claims, controlled uses of force—even in the unrepresentative sample of videos presented by Plaintiffs—are not initiated precipitously.  Plaintiffs and their experts ignored documented evidence that clinical and custody staff spend hours and sometimes days attempting to deescalate and avoid the need to use force.  Dr. Kaufman's testimony that he "never saw an intervention – a mental health intervention that was successful" (Tr. 187:4-10) withers under any basic reasoning.  Dr. Kaufman of course never saw this because he limited his review to the videos involving four inmates where force was actually used.  (*Id.* at 229:10-23.)  Dr. Kaufman conceded that, in the vast number of cases where force is avoided, there is no cell extraction video or a use-of-force incident report.  (*Id.* at 230:10-19; *see also id.* at 820:8-821:2

9

1  [M. Stainer].)  Further, the evidence clearly demonstrates that in many cases both custody and

2  clinical staff successfully avoid the need to use force through intervention and de-escalation

3  techniques.  (Tr. 635:16-636:19, 637:6-638:5 [E. Wagner] & 810:8-15 [M. Stainer].)

**B.   Plaintiffs Failed to Establish Their Speculative Theory that Exposure to Pepper Spray Causes Long-Term Psychological Harm.**

6  The credible evidence established that exposure to pepper spray does not have a long-term

7  mental health impact.[4]  The only witness with the background and foundation to testify on this

8  issue was Dr. John Lindgren, who worked as a Parole Outpatient Clinic psychiatrist for

9  approximately 4 ½ years.  (Tr. 708:17-709:4.)  Dr. Lindgren had approximately 4,000 clinical

10  contacts with approximately 1,200 inmate-patients who had paroled from a CDCR prison.  (*Id.* at

11  709:5-14.)[5]  Based on his extensive clinical experience with patients subjected to force, Dr.

12  Lindgren concluded that use-of-force incidents in prison do not cause lasting or significant injury

13  to a patient's mental health condition.  (*Id.* at 709:15-20, 710:16-712:5.)  Dr. Lindgren

14  specifically reviewed the medical records for Inmates A and D and found no evidence that their

15  cell extractions caused long-term psychological harm.  (*Id.* at 738:1-7; *see also* Exs. 2D & 18.)

16  Moreover, there is no scientific evidence that exposure to pepper spray causes organic brain

17  damage.  (Tr. 717:12-15.)  The evidence further established that using physical force to extract an

18  inmate-patient is far more likely to not only cause lasting physical injury, but also lasting

19  psychological injury.  (*Id.* at 718:25-719:12, 721:16-722:16.)

20  Plaintiffs offered Dr. Kaufman—who has not worked in a prison setting in over 40 years

21  (Tr. 234:19-23)—to support their speculative allegation that exposure to pepper spray causes

---

22  [4] It is undisputed that the physical effects of exposure to pepper spray are temporary.  (Tr.
23  559:25-560:5 [E. Vail]; 822:16-823:14 [M. Stainer]; 1816:5-1817:1 [S. Martin].)  Moreover,
   pepper spray is low on the spectrum of use-of-force options, and is not lethal absent other
24  aggravating factors.  (*Id.* 1985:11-18; *see also id.* at 1905:19-1906:21, 1913:1-3.)

25  [5] Dr. Lindgren's testimony is based on his own experience with CDCR inmates who have
   paroled and is admissible notwithstanding Plaintiffs' belated protest after the close of evidence.
26  At the hearing, Plaintiffs' withdrew their objections with respect to Dr. Lindgren.  (Tr. 743:5-8.)
   Moreover, Defendants were required to call Dr. Lindgren only because Plaintiffs (1) failed to
27  disclose Dr. Kaufman as an expert witness until they filed their reply brief and (2) provided an
   untimely supplemental declaration expanding Dr. Kaufman's opinion on September 23,
28  approximately a month after they filed their reply brief.

1   long-term psychological harm.  But Dr. Kaufman admitted that he lacks experience in assessing

2   or addressing the impact of use-of-force incidents.  (*Id.* at 234:24-235:2.)  Dr. Kaufman's use-of-

3   force opinions were based on his review of six videos involving four inmates among the outliers

4   chosen by Plaintiffs' counsel, and interviewing two of the inmates depicted in the videos.  (*Id.* at

5   156:2-17 & 228:11-229:23.)  He could not cite a single example in evidence where exposure to

6   pepper spray caused long-term harm.  And Dr. Kaufman conceded that there is nothing in the

7   record showing that Inmate A suffered any long-term harm from his exposure to pepper spray.

8   (*Id.* at 238:18-23.)  Similarly, he conceded that his opinions about long-term harm formed during

9   his interview with Inmate C were based on speculation.  (*Id.* at 254:5-15.)  His opinions about

10  Inmate D were also speculative.  (*Id.* at 254:25-255:8.)

11        **C.    Plaintiffs' Allegations Concerning Use of the Expandable Baton Are Not**
12              **Supported by the Evidence.**

13        Plaintiffs' alleged that CDCR staff use the baton with "disturbing frequency," but offered

14  no evidence to support that conclusory allegation.  (Tr. 1813:18-1814:6 [S. Martin].)  Plaintiffs

15  did not place into evidence a single incident involving use of the expandable baton within CDCR.

16        Plaintiffs also failed to offer any evidence that when batons are used, the force is excessive

17  or unnecessary.  And Plaintiffs expert Eldon Vail conceded that his opinions were not based on

18  any actual analysis regarding the use of batons, but rather solely on his interpretation of Mr.

19  Stainer's deposition testimony.  (*Id.* at 97:23-98:2.)  In fact, Mr. Vail agreed that it is appropriate

20  to use the baton to intervene in the defense of self or others  (*Id.* at 98:5-9.)  The evidence

21  established that within CDCR, batons are used in exactly the manner that Mr. Vail endorsed, and

22  typically only after other less harmful means of neutralizing a threat have been exhausted.  (Tr.

23  1811:23-1812:10 & 1813:2-10 [S. Martin]; Exs. 154 & 155.)

24        **D.    Plaintiffs Failed to Raise a Systemic Issue With Respect to Immediate Use**
25              **of Force.**

26        **1.    Plaintiffs' Failed to Establish a Systemic Policy Issue Concerning**
               **Inmates Who Refuse to Relinquish Control of Their Food Port.**

27        The statewide use-of-force policy provides specific guidance for inmates who refuse to

28  relinquish control of their food ports.  (Ex. J [D.O.M. § 51020.11.2].)  Plaintiffs alleged, based on

                                            11

1    three isolated incidents, that CDCR staff routinely employ force in this context for "minor

2    infractions" or when there is no imminent threat.  (Mot. 16; Ex. 112 ¶¶ 34-36.)  Plaintiffs have

3    misinterpreted the policy and the incidents establish that the force used is appropriate to

4    neutralize a threat and avoid cell extractions.  (Tr. 854:1-856:18 [M. Stainer] & 1760:25-1762:11

5    [S. Martin]; Opp'n 24-25; Ex. 150 ¶¶ 20-23.)

6         Moreover, Defendants submitted evidence showing that officers apply force in this context

7    to respond to an immediate threat, such as when inmates are "gassing" or attempting to "gas" an

8    officer.[6]  (Ex. AI & Tr. 1834:3-19 [S. Martin].)  When staff apply force to regain control of a food

9    port absent and imminent safety threat, the Institutional Executive Review Committees take

10   action, including ordering that training be provided to officers who misapply the policy.  (Exs. AJ

11   & AL; Tr. 1834:20-1836:20 [S. Martin].)  Further, contrary to Plaintiffs assumptions, allowing

12   inmates to unilaterally retain control over their food port poses a risk to staff and inmates.  (Tr.

13   854:17-855:9 & 856:8-18 [M. Stainer].)

14              **2.    There Is No Systemic Issue Concerning Immediate Use of Force at
                        Pelican Bay.**
15

16        Plaintiffs attempted to generate an issue based on Mr. Martin's preliminary impression that

17   Pelican Bay State Prison had a high percentage of use-of-force incidents categorized as

18   "immediate."  (Tr. 1966:9-24.)  After Mr. Martin evaluated the issue, he concluded that although

19   Pelican Bay classified more incidents as immediate than other institutions, he found only "three to

20   five cases out of the immediate category . . . that [he] believed could have been calculated

21   applications of force."  (*Id.* at 1968:10-16.)

22        **E.    Plaintiffs Failed to Prove that Unnecessary or Excessive Force
                  Disproportionately Affects Mentally Ill Inmates.**
23

24        In an effort to support their allegations, Plaintiffs stretched data provided by Defendants to

25   the Special Master.  The data generated by Plaintiffs is misleading for several reasons.  First, the

26   data shows all incidents involving a mentally ill inmate where force was used, whether the inmate

27   ────────────────────

28              [6] "Gassing" is tactic in which inmates throw urine or feces at staff to cause harm.

1    was the aggressor or victim during an inmate-on-inmate assault.  (Ex. 169 ¶¶ 43-44; Tr. 1996:12-

2    18.)  Second, Plaintiffs' charts include all class members, although the evidence showed that most

3    CCCMS inmates do not have a serious mental illness and are more like general population

4    inmates.  (Tr. 906:6-21 [M. Stainer], 1395:8-10, & 1397:7-11 [P. Burton].)  Third, Plaintiffs'

5    charts do not account for prison demographics, i.e. whether the prison has a large mental health

6    program or whether the prison is a Level III or Level IV institution.  Having failed to account for

7    these demographic differences, Plaintiffs' charts are meaningless and misleading.[7]

8         Plaintiffs also tried to use Mr. Martin's notes to show disparity, but the notes—which

9    simply show the incidents Mr. Martin selected for review and focused on incidents involving

10   *Coleman* class members—cannot be used for this purpose.  (*See* Ex. U & Tr. 2002:13-17 &

11   2003:1-14.)  Even if Plaintiffs had submitted appropriate evidence that *Coleman* class members

12   are overrepresented in use-of-force incidents compared to the general population, this

13   overrepresentation in California is consistent with what occurs in other jurisdictions throughout

14   the United States.  (Tr. 2006:4-12 [S. Martin].)  Moreover, Plaintiffs failed to show that any

15   disparity is the product of inappropriate use of force; the evidence demonstrates that staff do not

16   manufacture ways to use force against *Coleman* class members.  (*Id.* at 2010:7-9.)

17        Contrary to Plaintiffs' claims, the Special Master requests detailed information regarding

18   use-of-force incidents and the disciplinary process.  He asks for lists of inmates issued rules

19   violation reports, a description of the infraction, mental health assessments, and the outcome of

20   the hearing.  To evaluate use of force, the Special Master requests details concerning particular

21   yards and by security level.  All of this information is made available to the Special Master's

22   team during their site visits or through document productions.

23

24

---

25   [7] Plaintiffs' claim that CDCR does not provide the Special Master with population data
     (Tr. 2078:3-4) is false—the census for each institution is reported and included in the Special

26   Master's reports.  (Special Master's 25th Round Report, ECF 4298 at 84, 97, 104, 114-15, 126,
     128, 141, 145, 160, 169-70, 194, 203, 221, 232, 243, 253, 267, 275-76, 289, 301, 310, 324-25,

27   336-37, 347, 358, 365-66, 376, 383, 386, 390, 393-94, 400, & 414.)  Similar to Plaintiffs' failure
     to look beyond the video outliers for evidence of clinical intervention, this is another example of

28   Plaintiffs' failure to look for and consider readily available information.

1    With respect to the inmate disciplinary process, the Special Master's 25th round monitoring

2    report makes no negative findings about the rules violation report process.  (ECF 4298.)  Instead,

3    the Special Master noted that a handful of prisons had challenges with data reporting.  (*Id.*)

4    And the 25th round report discusses the use-of-force information from a single prison –

5    Corcoran.  Noting the 165 use-of-force incidents that occurred at Corcoran between June 1 and

6    June 30, 2012, the Special Master reported:

> The institution maintained appropriate tracking of use-of-force
> incidents.  Institutional data indicated that among the 165 use-of-
> force incidents, 112 or 68 percent involved MHSDS inmates,
> slightly down from the 74 percent reporting for the preceding
> monitoring period.  *Required clinical intervention occurred for
> those incidents involving cell extractions.*  Staff training on clinical
> intervention continued.

11   (ECF 4298 at 220 [emphasis added].)  The charts created by Plaintiffs' counsel are without

12   evidentiary value, and their associated arguments should be given little weight.

13   **III.    CDCR STAFF APPROPRIATELY CONSIDER AND ACCOMMODATE INMATES' MENTAL
              HEALTH CONDITIONS IN THE DISCIPLINARY PROCESS.**

15   CDCR staff appropriately consider inmates' mental health during the disciplinary process

16   and, when appropriate, mitigate penalties to accommodate these conditions.  (Tr. 892:19-902:23

17   [M. Stainer] & Martin Rpt. 10 & 13-15.)  Clinicians prepare assessments for inmates with serious

18   mental health conditions, and those assessments are considered by hearing officers in judging the

19   disciplinary action and imposing penalties.  (Tr. 893:4-894:7 [M. Stainer], 1841:3-7 & 1986:2-6

20   [S. Martin].)  CDCR staff mitigate disciplinary actions in several ways, including (1) reducing the

21   charged violation to lesser violation, (2) imposing low amounts of mandatory credit forfeiture,

22   and (3) choosing to not impose loss of privileges.  (*Id.* at 895:20-902:23.)

23   Plaintiffs' evidence submitted with their motion demonstrated that hearing officers

24   affirmatively considered the inmate's mental health condition and, in three of the six cases,

25   imposed no penalty.  (*Id.* & 1986:7-14 [S. Martin]; Exs. 43, 46, 47, & 150 ¶ 30.)  Plaintiffs'

26   expert conceded that, in the rules violation reports he reviewed, staff took mental health into

27   account and mitigated penalties.  (Tr. 166:24-167:4.)  Further, records for Inmate E demonstrates

28   that multiple Rule Violation Reports were reduced to counseling chronos.  (Exs. D-H)

14

1         Plaintiffs also fail to provide substantial evidence that CDCR systemically violates

2    seriously mentally ill inmates' constitutional rights when imposing discipline.  CDCR has in

3    place a well-defined, valid, and predictable process to reasonably accommodate inmates whose

4    mental health status requires consideration.  (Ex. U & Martin Rpt. at 10, 13-16; *see also* Tr.

5    1810:20-1811:2.)  Under this policy, inmates are timely and appropriately referred for mental

6    health assessments.  (Tr. 1985:19-1986:1)  And CDCR's policy and practice with respect to staff

7    assistants during rule violation hearings is appropriate.  (Tr. 2008:14-2009:2.)  Neither law nor

8    sound correctional policy require that staff assistants act as an inmate "advocate."  (*Id.*)

9         Plaintiffs have not and cannot cite any caselaw justifying a blanket immunity for mentally

10   ill inmates who violate prison rules.  Inmates within the *Coleman* class function at varying levels

11   of competence, and even the individual competence of an inmate may vary over time.  (Tr. 906:6-

12   21 [M. Stainer]; 1395:8-10, 1397:7-11 [P. Burton], 1879:17-1883:5, & 1986:15-1987:4 [S.

13   Martin].)  Plaintiffs' expert, Mr. Vail, agreed that it is necessary for inmates to comply with

14   lawful orders and agencies must respond when inmates refuse to comply with orders.  (Tr.

15   539:10-20.)  It is appropriate to hold the inmate accountable for his actions even if the inmate is a

16   *Coleman* class member.  (*Id.* at 1987:2-4, 1844:13-18 [S. Martin].)  It is also important from a

17   clinical perspective for mentally ill inmates to comply with rules and orders.  (Tr. 748:23-749:10

18   [J. Lindgren].)  Further, there are only rare instances where an inmate who received a rules

19   violation report was not aware that they were violating the rules, or was incapable of complying

20   with an order.  (Tr. 1986:19-1987:1 [S. Martin].)

21   **IV.    THERE IS NO BASIS OR NEED FOR THE COURT TO ISSUE FURTHER REMEDIAL ORDERS.**

22        Plaintiffs offered no evidence of systemic constitutional violations against mentally ill

23   inmates with respect to use-of-force and the inmate disciplinary process.  Instead, they presented

24   isolated incidents that may in some of the cases possibly demonstrate violations, but are not

25   representative.  Out of approximately 30,000 *Coleman* class members, Plaintiffs identified one

26   inmate who was unable to understand commands and was then exposed to pepper spray so that

27   life-saving mental health medication could be administered.

28

15

1    Plaintiffs' presentation—which asked the Court to "expand the toolbox of options for

2    working, dealing with severely mentally ill inmates in California" (Tr. 2020:2-4)—confuses

3    professional preferences or best practices with constitutional requirements.  The intrusive,

4    expensive list that Plaintiffs characterize as minimum requirements are "at most, best practice

5    policy preferences, and in some cases overly restrictive that could cause harm to staff and

6    inmates."  (Ex. 150 ¶ 21.)  Moreover, CDCR already does many of the items Plaintiffs requested

7    during oral argument, including headquarters review of use-of-force videos;[8] intervention by

8    treating clinicians in the controlled use-of-force context; collecting and analyzing data for use-of-

9    force incidents and rules violation reports; and providing meaningful staff assistants.

10   The only reasonable conclusions that can be reached based on the evidence are that (1) the

11   State has in place a system to minimize and control unnecessary and excessive use-of-force on

12   inmates, and (2) the State has in place a valid process to consider and accommodate mental health

13   conditions when adjudicating rules violations.  There is thus no legal basis for the Court to issue

14   further remedial orders.

15   Moreover, there is no need for the Court to issue further orders.  Any refinements or

16   improvements should be left to CDCR administrators who "are competent to address those issues

17   and to put into place corrective measures to improve their system.  They are best situated to do

18   that . . . ."  (Tr. 1845:5-7.)  Indeed, CDCR administrators—both mental health and custody—are

19   engaged in a process of continual quality improvement that began with hiring a consultant and

20   continues today.  (*Id.* at 841:20-847:4.)  The State's efforts to improve upon its extensive

21   safeguards include the following proposed revisions to the use-of-force policy: (1) a mandatory

22   waiting period between applications of pepper spray; (2) a maximum permitted amount of time

23   per application; (3) a maximum number of applications of pepper spray; and (4) elimination of

24   the MK-46 for use in cell extractions.  (Tr. 811:13-17, 837:14-838:8, & 990:2-17.)  The State

25   should be permitted to refine its process without court intervention or Plaintiffs' interference.

26   

27   [8] Contrary to the arguments of Plaintiffs' counsel, the 122 controlled use-of-force videos
     under review by Mr. Stainer are "*every* use of force that had been all the way through the
     Institutional Executive Review Committee . . . ."  (Tr. 845:20-22 [emphasis added].)

28   

16

# SAN QUENTIN SPECIALIZED CARE FOR THE CONDEMNED

I.  **SAN QUENTIN STATE PRISON PROVIDES CONDEMNED INMATES WITH READY ACCESS TO ADEQUATE MENTAL HEALTH CARE.**

   A.  **San Quentin's Overall Mental Health Program for Condemned Inmates.**

San Quentin provides adequate mental health care to condemned inmates at all levels of the mental health spectrum through San Quentin's Correctional Clinical Case Management System (CCCMS) program, Enhanced Outpatient Program, Specialized Care for the Condemned Program, Mental Health Crisis Bed, and its use of the Acute Psychiatric Program at California Medical Facility.  (Tr. 1183:04-1188:20, 1192:05-09, 1195:25-1196:23 [E. Monthei], & 1401:23-1402:08 [P. Burton].)

Dr. Monthei has served as the Chief of Mental Health at San Quentin  for the past six years.  (*Id*. at 1175:20-1176:01 [E. Monthei].)  Dr. Monthei holds the mental health staff at San Quentin to high standards, and believes that they have superior knowledge regarding the provision of mental health services to condemned inmates, a unique prison population.  (*Id*. at 1230:16-24.)  Dr. Wadsworth and Dr. Burton, who also testified at the hearing, are examples of the dedicated professionals who treat condemned inmates at San Quentin.  Overall, San Quentin has an adequate number of mental health staff to provide mental health services to the condemned population.  (*Id*. at 1227:01-04 & 1223:06-1224:07.)  Dr. Monthei asked for, and received, additional staffing for the Specialized Care for the Condemned Program.  (*Id*.at 1227:10-15.)

San Quentin has adequate treatment space for mental health services, including significant treatment space in San Quentin's Central Health Services Building.  (*Id*. at 1181:07-1183:03, 1192:25-1193:23, 1194:07-20 [the new central health care building is a "state-of-the-art building" with "ample treatment space"].)  One innovative aspect of mental health care at San Quentin is that treating clinicians follow condemned inmates as they move through different levels of care.  This means that condemned inmates retain the same clinicians if they are placed in the mental health crisis bed or elevated from a Correctional Clinical Case Management System or Enhanced Outpatient Program level of care.  (*Id*. at 1226:08-25 [E. Monthei] & 1403:06-21 [P. Burton].)

17

1    Plaintiffs request that this Court issue affirmative orders that change San Quentin's overall

2    mental health program for condemned inmates.  First, Plaintiffs ask for a Court-ordered "sweep."

3    But Plaintiffs' criticism of San Quentin's mental health screening process and their request for a

4    Court-ordered "sweep" is unjustified.  Upon arrival, a condemned inmate receives a thorough

5    mental health evaluation.  (*Id*. at 1176:16-23 [E. Monthei].)  There are several mechanisms where

6    inmates not on the mental health caseload can be identified as candidates for mental health

7    treatment, including psychiatric technician rounds and routine mental health screenings.  (*Id*. at

8    1176:24-1178:03.)  In addition, clinicians regularly walk the tier on East Block, and become

9    aware of emergent mental health needs.  (*Id*. at 1386:15-24 [P. Burton].)  Defendants' evidence

10   also showed that Plaintiffs' request is unnecessary because San Quentin already conducts mental

11   health sweeps of the entire condemned population.  (*Id*. at 1177:08-10, 1178:04-1179:15,

12   1263:03-21 [E. Monthei], 1553:17-1555:12, & 1587:22-1589:08 [C. Wadsworth].)

13   Second, Plaintiffs argue that the State is violating the Program Guide by not housing

14   condemned inmates at the Enhanced Outpatient Program level of care in a separate housing unit.

15   (*Id*. at 1672:15-18.)  Plaintiffs are wrong.  The Program Guide has a separate section describing

16   the requirements for Enhanced Outpatient Program condemned inmates, which does not require

17   these inmates to be housed in a different unit from non-Enhanced Outpatient Program inmates.

18   (Ex. O, *Coleman* Program Guide at 12-4-17 to 12-4-18.)  And as Dr. Monthei testified, the

19   commingling is beneficial to condemned Enhanced Outpatient Program inmates because of the

20   unique aspects of the condemned population, including long stays and a sense of ownership over

21   particular cells.  (Tr. 1188:08-1192:04.)  Further, regardless where they are housed, Enhanced

22   Outpatient Program condemned inmates are receiving care that is not only adequate, but also

23   meets and exceeds the community standard of care.  (*Id*. at 1420:20-1421:05 [P. Burton].)

24   Third, Plaintiffs request that the Court label East Block and North Segregation as

25   Administrative Segregation Units.  (*Id*. at 1672:19-23.)  Plaintiffs' evidence does not support this

26   request.  (*See* Ex. 1135.)  Exhibit 1135, which shows that San Quentin State Prison reported the

27   psychiatric technician rounding of East Block and North Segregation to the Special Master,

28   merely demonstrates that Defendants provide information to the Special Master above and

18

1   beyond the Court's reporting requirements.  (*Id*.)  On June 13, 2002, the Court ordered

2   Defendants to "ensure that daily psych tech rounds are actually provided in the administrative

3   segregation units of the three hub units to which Enhanced Outpatient Program (EOP) inmates are

4   being transferred from elsewhere including CSP/Corcoran, SQ, and SVSP."  (ECF 1384 ¶ 6.)

5   Defendants then began reporting data on psychiatric technician rounding in the three Enhanced

6   Outpatient Program administrative segregation hubs identified by the Court.  Defendants went

7   above and beyond the order by also reporting on psychiatric technician rounding at East Block

8   and North Segregation.  (Ex. 1135.)  Plaintiffs misconstrue this extra reporting as an "admission"

9   that East Block and North Segregation Units are administrative segregation units.  They are not.

10  (Tr. 1275:17-22 [E. Monthei].)  This is simply yet another example of Plaintiffs using

11  Defendants' efforts at extra transparency against them.  Plaintiffs' counsel alleged for the first

12  time in his closing that because East Block and North Segregation are not considered

13  administrative segregation units, they do not receive funding or staffing packages equal to

14  administrative segregation units.  (*Id*. at 1682:16-23.)  However, Plaintiffs did not offer any

15  evidence to support that allegation.[9]

16      There are key characteristics that differentiate an administrative segregation unit from East

17  Block and North Segregation.  Plaintiffs' own expert, Ms. Woodford, testified that "in North

18  Segregation death row inmates are out on the tier together in large numbers.  "They're able to

19  take themselves to the telephone and to showers and whatever else they need to do without

20  escort."  (*Id*. at 1098:13-17, *see also id*. at 1150:5-8.)  Many of the condemned inmates in East

21  Block have access group yards and, when necessary, mental health recreation yards.  (*Id*. at

22  1483:03-09 [P. Burton].)  Perhaps the most important difference between East Block and North

23  Segregation and an administrative segregation unit is that inmates are not housed in these units

24  due to behavioral reasons.  The Adjustment Center is the administrative segregation unit at San

25

26  _____

27      [9] Because this allegation was not brought up until Plaintiffs' closing argument, Defendants did not have a chance to counter the argument made by Plaintiffs' counsel.  Defendants are prepared to submit further evidence on this issue upon the Court's request.

28

1  Quentin where condemned inmates are placed for behavioral reasons.  (*Id*. at 1271:20-21 [E.

2  Monthei].)

3       Although East Block and North Segregation are not administrative segregation units,

4  Defendants recognize that these units are unique because they house only condemned inmates, a

5  sentence which, in and of itself, may create a higher suicide  risk.  (Tr. 1560:06-09 [C.

6  Wadsworth].)  Accordingly, San Quentin officials utilize many of the policies and procedures

7  usually found in administrative segregation units in East Block.  (*Id*. at 1276:01-16 [E. Monthei].)

8  For instance, psychiatric technicians round East Block every day for all inmates at the Enhanced

9  Outpatient Program level of care and for Grade B inmates at the CCCMS level of care.  (*Id*. at

10  1337:07-12, 1340:22-1341:01.)  Grade B, CCCMS inmates in East Block also receive weekly

11  case manager contact.  (*Id*. at 1481:04-09 [P. Burton].)

12      **B.    The Specialized Care for the Condemned Program Provides Appropriate
            Care—Including Inpatient Care—To Condemned Inmates.**
13

14       As Dr. Monthei explained, the Specialized Care for the Condemned Program uses a

15  "holistic approach" designed to "minimize referrals to a higher level of care" and "mitigate . . .

16  the severity of [a patient's] mental illness by providing more services."  (*Id*. at 1196:17-34.)

17  There are 37 condemned inmates at San Quentin who receive treatment at the Enhanced

18  Outpatient Program level of care.  (*Id*. at 1211:21-25.)  Of these 37 inmates, approximately 23 are

19  part of the Specialized Care for the Condemned Program.  (*Id*.)  Ten of the 23 are housed in the

20  Outpatient Housing Unit beds.  (*Id*.)  Inmates in the Specialized Care for the Condemned

21  Program's Outpatient Housing Unit stay connected to their community by receiving mental health

22  treatment both in the new Central Health Care Services building and also on East Block.  (*Id*. at

23  1217:21-1218:6.)  The clinicians that are part of the Specialized Care for the Condemned

24  Program tailor the services provided by the program to each inmate's individual needs.  (*Id*. at

25  1202:14-17.)  The Specialized Care for the Condemned Program provides a spectrum of services

26  including psychology, psychiatry, and social worker contacts, therapeutic yards and groups, and

27  informal outreach.  (*Id*. at 1203:18-1204:15 & 1214:16-20.)

28

1   Dr. Stewart criticized the care of seven participants in the Specialized Care for the

2   Condemned Program in his March 14, 2013 and May 16. 2013 declarations.  (ECF 4381 ¶¶ 457-

3   471; ECF 4617-1 ¶¶ 5-16.)  Dr. Stewart's declaration cited the Program Guide Section regarding

4   Intermediate Care Programs, claiming that "what is required for these [seven] class members at

5   San Quentin is the . . . breadth of treatment programs available in ICF hospital programs[.]"

6   (ECF 4617-1 ¶ 23, citing *Coleman* Program Guide at 12-6-7.)  But the testimony established that

7   San Quentin clinicians provide services that meet, and even exceed, the services required by the

8   Program Guide for inmates housed at an Intermediate Care Facility.  (Tr. 360:19-21, 361:10-

9   362:10, 365:24-366:19 [Dr. Stewart], & 1202:22-1203:06 [E. Monthei].)  In fact, Dr. Burton

10  testified that the intensive care provided by the Specialized Care for the Condemned Program has

11  dramatically improved the mental health of the participants in the program.  (*Id.* at 1421:16-

12  1422:06 [P. Burton].)  The Specialized Care for the Condemned Program provides not only

13  adequate care, but meets and exceeds the community standard of care.  (*Id.* at 1420:20-1420:24

14  [P. Burton].)

15  Dr. Burton and Dr. Stewart disagreed regarding certain treatment decisions made by mental

16  health clinicians at San Quentin.  A difference in opinion between two clinicians does not amount

17  to deliberate indifference.  *See, e.g., Toguchi v. Chung*, 391 F.3d 1051, 1059-60 (9th Cir. 2004).

18  During the hearing, the Court raised the issue of whether Dr. Burton or Dr. Stewart's opinion was

19  entitled to more weight.  (*Id.* at 1691:03-18.)  While it is true that Dr. Burton is a CDCR

20  employee and Dr. Stewart is not, it is also true that Dr. Burton actually treated the patients in

21  question, while Dr. Stewart spent less than 20 minutes with each patient.  (*Id.* at 352:11-14 [P.

22  Stewart], 1389:10-16, & 1389:25-1391:06 [P. Burton].)  Twenty minutes is insufficient time to

23  conduct a through psychiatric evaluation, particularly for a condemned inmate with psychotic

24  disorders who may be particularly averse to conversing with new clinicians.  (*Id.*)  In contrast, Dr.

25  Burton's testimony showed his credibility and knowledge about mentally ill condemned inmates'

26  conditions and care at San Quentin.  (*Id.* at 1385:15-22 (Dr. Burton's clinical office was located

27  on East Block) & 1389:02-04 (Dr. Burton provided psychiatric services for the seven Specialized

28  Care for the Condemned Program patients interviewed by Dr. Stewart).)

21

1    In addition, Dr. Burton and Dr. Stewart disagree as to the involuntary medication standard

2    under Penal Code section 2602.  Dr. Stewart identified several inmates at San Quentin that he

3    believed should have been involuntarily medicated.  (*Id*. at 320:09-13, 327:15-19 (criticizing that

4    Inmate WWW was not placed on involuntary medication), 346:19-23, 381:23-382:02 (same for

5    EEE).)  However, Dr. Stewart either does not know or misunderstands the requirements for

6    involuntary psychotropic medication.  In Dr. Stewart's view, psychiatrists can initiate involuntary

7    medication for mentally ill inmates who, in the past, demonstrated they are a danger to self,

8    danger to others, or gravely disabled, even if no recent act demonstrating dangerousness has

9    occurred.  (*Id*. at 381:23-383:19, 400:16-23.)  Under this interpretation of the law, *every* mentally

10   ill condemned inmates would be subject to involuntary medication at any time, because of their

11   past violent behavior.  As Dr. Burton and Dr. Monthei testified, this is not the law or consistent

12   with ethical standards.  (*Id*.at 1391:14-1393:08 [P. Burton] (there is "an emergent, an acute, or an

13   imminent requirement for dangerousness in order for involuntary psychiatric medications to be

14   administered"] & 1259:01-1260:01 [E. Monthei].)

15   Involuntary psychotropic medication of California inmates is governed by Penal Code §

16   2602.  Prior to Section 2602's recent adoption, the involuntary psychotropic medication of

17   inmates was governed by *Keyhea v. Rushen*, a case brought by two taxpayers that challenged

18   CDCR's involuntary psychotropic medication practices.  *Keyhea* held that there must be a

19   "judicial determination of [an inmate's] competency to refuse treatment before they can be

20   subjected to long-term involuntary psychotropic medication. . . . Forced drugging is one of the

21   earmarks of the gulag.  It should be permitted in state institutions only after adherence to stringent

22   substantive and procedural safeguards." *Keyhea v. Rushen*, 178 Cal. App. 3d 526, 542, 223 Cal.

23   Rptr. 746 (Ct. App. 1986).  The *Keyhea* court specifically modeled its requirements for

24   involuntary psychotropic medication of inmates to requirements in the Lanterman-Petris-Short

25   Act.  For a person to be considered a danger to others under the Lanterman-Petris-Short Act, the

26   person must have committed a recent act that shows that they are a current danger to others.  Cal.

27   Welf. & Inst. Code § 5300; *In re Qawi*, 32 Cal. 4th 1, 20-23 (2004).  A recent act demonstrating

28   that the inmate is a danger to self or others is a necessary element for involuntary medications

22

1   under both *Keyhea* and Penal Code § 2602. *See, e.g., In re Qawi*, 32 Cal. 4th at 20-23.  Reading

2   Section 2602 to allow involuntary medications solely on a past history of danger would violate

3   the Constitution.  As the California Supreme Court noted, "forced medication based on a vague

4   and generalized suspicion of dangerousness would likely violate the state, if not the federal,

5   Constitution." *Id.* at 20, *see also Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (inmates

6   have significant liberty interest in avoiding unwanted antipsychotic medication).  San Quentin

7   staff—including Dr. Burton—properly initiate involuntary medications only when they an inmate

8   meets the Penal Code 2602 requirement of danger to self, danger to others, and grave disability.

9   (Tr. at 1391:14-1393:08 [P. Burton] & 1259:01-1260:01 [E. Monthei].)

10       Plaintiffs also rely on a single document from 2011, Exhibit 1008, to criticize the

11   Specialized Care for the Condemned Program.  As an initial point, this document was authored

12   over two years ago and does not reflect the robust program that the Specialized Care for the

13   Condemned Program is today.  These custodial policies discussed on page 3 of Exhibit 1008 were

14   in effect for only two weeks in 2011.  (*Id.* at 1365:19-1367:13 [E. Monthei].)  Further, even

15   during those two weeks, Dr. Monthei and his mental health staff mitigated the policies' impact on

16   inmate-patients.  (*Id.* at 1329:03-1330:03.)

17       1.       **The Ten Outpatient Housing Unit Beds Meet the Needs of the Condemned Population.**

18

19       The evidence shows that the ten Outpatient Housing Unit beds are sufficient to meet the

20   mental health care needs of the condemned population.  (Tr. at 1325:13-14 [E. Monthei].)  Dr.

21   Burton and Dr. Monthei testified that there is currently one inmate in the process of being

22   discharged from a Outpatient Housing Unit bed, and another inmate identified who will be placed

23   in that bed.  (*Id.* at 1326:11-15, 1368:04-07 [E. Montei], & 1470:15-20 [P. Burton].)  Using ten

24   beds is not arbitrary—there are approximately 37 condemned inmates who participate in the

25   Enhanced Outpatient Program.  (*Id.* at 1211:21-25.)  There are thus enough beds for 27% of

26   condemned Enhanced Outpatient Program inmates to be housed in the Outpatient Housing Unit

27   beds at any given time.  This is in line with the non-condemned population, where there is space

28   for approximately 22% percent of Enhanced Outpatient Program level of care inmates to be

23

1   placed in Intermediate Care Facility beds at any given time.  (ECF 4196-2 at 2 [Defendants' bed

2   plan filed 6/12/13.])

3           **2.      The Specialized Care for the Condemned Program's 10 beds in the
                      Outpatient Housing Unit is Legal and Safe: California Law Does not
4                     Require a License for These Beds.**

5           California law does not require Outpatient Housing Unit beds to have a license.  Cal.

6   Health & Safety Code § 1250, Cal. Code Regs., Tit. 22, §§ 79516 & 79581.  The ten beds in San

7   Quentin's Central Health Care Building designated for the Specialized Care for the Condemned

8   Program are Outpatient Housing Unit beds, and operate properly without a license.

9           Plaintiffs argue that the 10 beds must be licensed under a Correctional Treatment Center

10  license.  (Tr. 1662:09-12.)  The law requires Correctional Treatment Center beds to be licensed,

11  but specifically exempts Outpatient Housing Unit beds from a licensing requirement.  Cal. Health

12  & Safety Code § 1250.  Health & Safety Code Section 1250(j) states in relevant part:

13              "Correctional treatment center" means a health facility operated by
                the Department of Corrections and Rehabilitation . . . that, as
14              determined by the department, provides inpatient health services to
                that portion of the inmate population who do not require a general
15              acute care level of basic services. *This definition shall not apply to
                those areas of a law enforcement facility that houses inmates or
16              wards who may be receiving outpatient services and are housed
                separately for reasons of improved access to health care, security,
17              and protection.*

18  *Id.* (emphasis added); *see also* Cal. Code Regs., Tit. 22, §§ 79516 & 79555 (specifically

19  exempting Outpatient Housing Unit beds from licensing requirements).

20          The ten beds dedicated to the Specialized Care for the Condemned Program fall under the

21  definition of Outpatient Housing Unit beds.  They are beds where inmates are "housed separately

22  for reasons of improved access to health care, security, and protection."  Neither the Health &

23  Safety Code, nor Title 22 create a limit for length of stay in Outpatient Housing Unit beds.

24  Accordingly, California law permits the State to house inmates in the Specialized Care for the

25  Condemned Program's Outpatient Housing Unit beds for however long is necessary to treat their

26  mental health condition.  (*See* Tr. 1208:12-16 [E. Monthei, noting that the average length of stay

27  in the Outpatient Housing Unit beds is estimated at six months to two years].)  Further, neither the

28  Health and Safety Code, nor Title 22 regulations limit the mental health services that can be

24

1    offered in an Outpatient Housing Unit.  Thus, the state is properly using Outpatient Housing Unit

2    beds to provide specialized and needed services to the condemned population.

3         Plaintiffs accuse CDCR of not licensing the Specialized Care for the Condemned

4    Program's Outpatient Housing Unit beds to save money.  (*Id.* at 1662:13-17.)  But their only

5    alleged evidence to support this allegation is a Budget Change Proposal from February 2011.  (*Id.*

6    at 1692:11-1693:10; Ex. 1043.)  This document notes that it would cost $200,000 a year to house

7    inmates in an Intermediate Care Facility bed at Salinas Valley State Prison.  But this document

8    does not discuss the cost of licensing beds at San Quentin for the Specialized Care for the

9    Condemned Program.  Because Exhibit 1043 is not evidence that prisons officials are trying to

10   save money by not licensing beds, it should be disregarded by the Court.

11        In addition, as Plaintiffs are aware, the Receiver's Office controls the 50 mental health and

12   medical beds on the fourth floor of San Quentin's Central Health Care Facility.  (*See id.* at

13   1222:17-23.)  Of these 50 beds, 17 are licensed mental health crisis beds.  The Receiver

14   suspended the license for the remaining 33 beds, and in December 2012, the Receiver designated

15   10 of the 33 Outpatient Housing Unit beds to the Specialized Care for the Condemned Program.

16   (*Id.* at 1222:17-23, 1291:13-20 [E. Monthei] & 1155:02-06 [J. Woodford].)  After the

17   designation, the Specialized Care for the Condemned Program beds have continued to operate as

18   Outpatient Housing Unit beds.  (*Id.* at 1211:21-25 [E. Monthei].)

19   **II.    THE ACUTE PSYCHIATRIC PROGRAM IS A VALUABLE AND APPROPRIATE COMPLEMENT
         TO THE CONTINUUM OF CARE AVAILABLE TO THE CONDEMNED INMATES AND ITS
20       CUSTODIAL POLICIES ARE GROUNDED IN LEGITIMATE PENOLOGICAL INTERESTS.**

21        Plaintiffs argue that CDCR has "taken away" acute care for condemned inmates.  But Dr.

22   Stewart's testimony relating to the Acute Psychiatric Program at California Medical Facility is in

23   conflict.  He criticized San Quentin clinicians for not referring inmates to the Acute Psychiatric

24   Program.  (Tr. 343:01-05 [P. Stewart], ECF 4840 ¶ 20, & Ex. 1014.)  But he also testified that the

25   care provided in that program was inadequate.  (ECF 4840 ¶ 43 & Ex. 1014.)  This conflict arises

26   from Dr. Stewart's limited knowledge of the Acute Psychiatric Program at California Medical

27   Facility.  He admitted the last time he visited California Medical Facility was in 2008, and that he

28   had not spoken to any clinicians treating condemned inmates in the acute program.  (Tr. at

                                            25

1   402:23-403:24.)  Given his limited knowledge about the Acute Psychiatric Program, Dr. Stewart

2   cannot credibly offer the opinion that it fails to provide adequate mental health care to condemned

3   inmates.

4        As Dr. Burton and Dr. Carter testified, the Acute Psychiatric Program is a viable resource

5   for condemned inmates in their continuum of care.  (*Id*. 1424:21-1425:04 [P. Burton] & 1017:5-8

6   [B. Carter].)  Dr. Carter testified that condemned inmates are not, as Plaintiffs suggest, isolated,

7   and that treatment outcomes are the same for condemned and non-condemned inmates.  (*Id*. at

8   1017:14-24 & 1010:21-1011:23 [B. Carter].)  Dr. Burton also discussed Inmate FFF, a seriously

9   mentally ill inmate with repeated admission to the acute program, as receiving positive results in

10  the program.  (*Id*. at 1424:21-1425:04 [P. Burton].)

11       Plaintiffs argue that the custodial policies in acute program interfere with care, but cannot

12  show that these practices constitute deliberate indifference to these patients' serious mental health

13  needs.  Plaintiffs offered one witness, Ms. Woodford, to criticize the Acute Psychiatric Program's

14  custodial policies.  But Ms. Woodford had little to no familiarity with the Acute Psychiatric

15  Program's security policies.  Specifically, she was unaware of the Acute Psychiatric Program's

16  security policies both when she was Warden of San Quentin, and when she was Secretary of

17  CDCR.  (*Id*. at 1152:20-1153:09.)  And she failed to discuss the Acute Psychiatric Program's

18  security policies in her expert declaration.  (Ex. 1002, ECF 4380.)  In fact, Ms. Woodford

19  acknowledged during cross-examination that she only became aware of security procedures at the

20  Acute Psychiatric Program three or four weeks before testifying for Plaintiffs.  (Tr. 1153:25-

21  1154:20.)  Her opinion that the program can change its custodial policies was primarily based on

22  a comparison to the security policies for condemned inmates at San Quentin.  (*Id*. at 1097:19-

23  1098:21.)  But that comparison fails to account for the unique security concerns posed by treating

24  condemned inmates at the Acute Psychiatric Program, a short-term program that treats both

25  condemned and general population inmates.  (ECF 4598, ¶ 25; ECF 4599 ¶¶ 6-11.)

26       The Acute Psychiatric Program's custodial policies for condemned inmates are reasonably

27  related to the legitimate penological interests of safety and security.  Under the Constitution

28  security considerations may appropriately shape polices.  *See Turner v. Safley*, 482 U.S. 78, 89

(1987).  Security concerns increase any time a condemned inmate is transferred from San Quentin to another prison setting.  (ECF 4601 ¶ 8.)  Condemned inmates present a higher security risk than non-condemned inmates.  (ECF 4599 ¶ 6.)  They are at a higher risk from victimization from non-condemned inmates because they are often high-notoriety cases.  (*Id.*)  They are also at a higher risk for victimizing other inmates.  (*Id.*)  Because of this higher risk, California Medical Facility has adopted special custodial procedures for condemned inmates.  (*Id.*)  Most importantly, these legitimate custodial policies have not affected the mental health outcomes of the condemned inmates receiving treatment at the Acute Psychiatric Program.  (Tr. 1017:14-24 [B. Carter].)

Because security restrictions do not interfere with the State's ability to provide appropriate mental health care to the condemned, there is no justification for their removal.

### III.   DR. WADSWORTH'S TESTIMONY REGARDING SUICIDE STATISTICS SHOULD BE CONSIDERED BY THE COURT.

Plaintiffs objected to Dr. Wadsworth's testimony concerning his analysis and the data underlying his research on suicide statistics for condemned inmates.  (Tr. 1572:19-24 & 1577:15-19.)  Plaintiffs' ostensibly asserted that Defendants should have provided a report from Dr. Wadsworth at least 90 days before he testified.  (*Id.* at 1575:6-10.)  Even though it appears from the record that Plaintiffs withdrew this objection, the Court notes that it would look to the trial brief "as to whether or not to consider it." (*Id.* 1578:5-13.)  For that reason, Defendants now address Plaintiffs' objection.

Plaintiffs' objection is unfounded for several reasons.  Dr. Wadsworth's testimony did not require a written report within 90 days because he is a CDCR employee whose regular duties do not include giving expert testimony.  Fed. R. Civ. P. 26(a)(2)(B).  For witnesses who are not required to submit a written report, parties must disclose the subject matter of the expert testimony the witness is expected to present and a summary of the facts and opinions to which the witness is expected to testify.  Fed. R. Civ. P. 26(a)(2)(C).[10]  This disclosure is generally due at

---

[10] The 2010 Amendment notes to Federal Rule of Civil Procedure 26 states that the disclosure requirements for witnesses who provide expert testimony that are not required to

(continued…)

1   least 90 days before a trial, or if the evidence is intended solely to contradict or rebut evidence,

2   within 30 day after the other party's disclosure.  Fed. R. Civ. P. 26(a)(2)(D).

3        Here, Dr. Wadsworth's testimony regarding suicide statistics was submitted to rebut Dr.

4   Stewart's testimony on the same subject.  Plaintiffs first introduced this statistical evidence in Dr.

5   Stewart's supplemental declaration, filed on September 27, 2013, after this motion had been fully

6   briefed for approximately four months.  (ECF 4840 ¶ 35; Ex. 1014.)  Dr. Stewart further testified

7   regarding these statistics at the hearing on October 16, 2013.  (Tr. 313:01-318:23.)  Dr. Stewart's

8   supplemental declaration was not submitted ninety days before the hearing, as required under

9   Federal Rule of Civil Procedure 26(a)(2)(D)(i).  Defendants filed a motion in limine to exclude

10  the supplemental declaration, which the Court denied on October 1, 2013.  (ECF 4869; Tr.

11  285:16-20.)  Plaintiffs do not dispute that Defendants disclosed Dr. Wadsworth as a rebuttal

12  witness regarding the suicide statistics.  Nor do they assert that Defendants failed to provide this

13  disclosure within 30 days of Dr. Stewart's testimony.  Accordingly, Dr. Wadsworth's testimony

14  complied with Federal Rule of Civil Procedure 26.

15       Plaintiffs may argue that Defendants should have provided them with a written disclosure

16  instead of a verbal disclosure.  Defendants acknowledge that it is ambiguous under Rule 26

17  whether a written disclosure is required.  The Court has the power to consider expert testimony

18  even without the disclosures described under Rule 26 if the failure to disclose was substantially

19  justified or harmless.  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1106 (9th Cir.

20  2001); Fed. R. Civ. P. 37(c)(1).  Dr. Wadsworth's testimony was substantially justified because it

21  was submitted to rebut Dr. Stewart's untimely supplemental declaration and testimony.

22  Moreover, any error in disclosure was harmless, as Plaintiffs' counsel had full opportunity to

23  cross-examine Dr. Wadsworth regarding his opinions on the statistics.  (*Id*. at 1635:14-1640:24.)

24       Further, most of Dr. Wadsworth's testimony regarding suicide statistics was not expert

25  opinion testimony under Federal Rule of Evidence 702.  Dr. Wadsworth conducted the research

26  (…continued)
    submit a report are "considerably less extensive than the report required by Rule 26(a)(2)(B).

27  Courts must take care against requiring undue detail, keeping in mind that these witnesses have
    not been specially retained and may not be as responsive to counsel as those who have."

28

1   as part of his job, prompted by concern about the mental health needs of condemned inmates prior

2   to the November 2012 election.  (*Id*. at 1554:05-1558:19.)  This testimony is factual, not expert

3   opinion, and should be considered by the Court as evidence that Defendants are not deliberately

4   indifferent to condemned inmates' mental health needs.  Similarly, testimony that the U.S.

5   Department of Justice maintains publicly-available current statistics concerning condemned

6   inmates, is not expert opinion testimony.  (*Id*. at 1557:02-1558:03.)  This testimony should be

7   considered by the Court and compared to Dr. Stewart's statement that he was only able to find

8   national suicide statistics for condemned inmates through the year 1999.  (*Id*. at 314:23-315:18.)

9       Dr. Wadsworth did not dispute that national data shows there is a higher risk of suicide for

10  condemned inmates versus non-condemned inmates.  (*Id*. at 1560:06-09.)  Defendants properly

11  address this risk in several ways, including increased psychiatric technician rounding.  (*Id*. at

12  1177:04-06 & 1276:12-16.)  Dr. Wadsworth's testimony was not offered to argue that condemned

13  inmates do not generally have a higher suicide risk, but instead to correct several of Plaintiffs'

14  expert's erroneous assertions.  First, Dr. Wadsworth explained that comparing California's

15  condemned inmate suicide rate to the national rate for all inmates was a highly misleading

16  comparison of apples to oranges.  (*Id*. at 1562:14-1563:10.)  Second, although determining

17  condemned population suicide rates may be useful information, any action based on rates alone

18  would be misguided because of small sample sizes.  (*Id*. at 1568:12-1570:04 & 1580:14-1581:03.)

19  Further, Dr. Wadsworth testified that published suicide rates for condemned inmates do not

20  account for other potentially relevant factors, such as lengths of stay data.  (*Id*. at 1578:20-1579:2

21  & 1582:21-1585:25.)  Finally, Dr. Wadsworth rebutted Dr. Stewart's assertion that the suicide

22  rate at San Quentin was reflective of poor mental health care.  (*Id*. at 1568:20-1569:06.)

23      For all these reasons, the Court should consider Dr. Wadsworth's testimony regarding

24  suicide statistics for death row inmates.

25                              **CONCLUSION**

26      The use-of-force outliers presented by Plaintiffs provide no basis for this Court to issue

27  further remedial orders concerning use of force or the inmate disciplinary process.  The evidence

28  showed that Defendants employ a comprehensive and extensive system to minimize and control

29

1  unreasonable use of force, including heightened systemic safeguards to ensure that inmates with

2  mental illness are not subjected to unnecessary or excessive force.  CDCR has also implemented a

3  well-defined, valid, and predictable process to reasonably accommodate mental health needs in

4  the disciplinary process.

5        Plaintiffs are also not entitled to prospective relief related to the care provided to

6  condemned inmates at San Quentin State Prison.  San Quentin provides condemned inmates with

7  ready access to adequate mental health through a continuum of care that ranges from the

8  Correctional Clinical Case Management System level of care to the inpatient acute care at the

9  Acute Psychiatric Program.  Dr. Monthei testified that "San Quentin has come a long way in the

10  short amount of time I have been there, and we've achieved a level of success that many who

11  have known San Quentin for much longer than I have report they didn't believe was achievable at

12  San Quentin.  I don't think we're done.  I think we have made a tremendous amount of

13  improvements.  I think we can continue to evolve and continue to do better.  We have an

14  outstanding department an outstanding team.  I'm very proud of the work they do."  (Tr 1230:25-

15  1231:09.)  Even if, as Dr. Monthei asserts, care can continue to improve, this falls far short of

16  deliberate indifference.

17        Plaintiffs' motions for affirmative relief should be denied.

18

19  Dated:  November 15, 2013          Respectfully Submitted,

20            KAMALA D. HARRIS
             Attorney General of California

21            JAY C. RUSSELL
             Supervising Deputy Attorney General

22

23

24            /s/ Patrick R. McKinney
             PATRICK R. MCKINNEY

25            Supervising Deputy Attorney General
             *Attorneys for Defendants*

26  CF1997CS0003
   40820559.doc

27

28