DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
MEGAN CESARE-EASTMAN – 253845
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>                Defendants. | Case No. 2:90-cv-0520 LKK DAD<br><br>**PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION**<br><br>Judge:  Hon. Lawrence K. Karlton<br><br>Trial Date: November 19. 2013 |

[963575-3]

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II. PLAINTIFFS' MOTION BUILDS ON THE EVIDENCE PRESENTED AT THE RECENT EVIDENTIARY HEARINGS .......................................... 3

III. SUMMARY OF VIOLATIONS ................................................................ 5

    A.  Overreliance on Segregation to Control and Manage Prisoners with Mental Illness ....................................................................................... 5

    B.  Excessive Time Spent in Harsh Segregation Units ............................ 6

    C.  Placement of Mentally Ill in Segregation For "No Fault of Their Own" ..................................................................................................... 7

    D.  Inadequate Mental Health Screening and Failures to Exclude from Segregation Class Members at Heightened Risk of Harm ................... 8

    E.  Inadequate Access to Treatment, Unnecessarily Harsh Conditions, and Insufficient Safety Measures in CDCR Segregation Units ............ 9

    F.  Defendants' Purported Solutions to the Issues Raised in Plaintiffs' Motion Do Not Remedy the Serious Violations of Class Members' Rights .................................................................................................... 9

IV. REQUESTED RELIEF .......................................................................... 10

    A.  Set Time Limits for Class Member Lengths of Stay in Segregation Units ..................................................................................................... 10

    B.  Stop Placement of Class Members in Segregation for Non-Disciplinary Reasons ......................................................................... 11

    C.  Provide Adequate Mental Health Screening for All Segregated Prisoners and Ensure Segregation Exclusions for Class Members at Heightened Risk of Serious Harm ..................................................... 12

        1.  Revision of Segregation Screening Protocol .............................. 12

        2.  Application of Existing Pelican Bay SHU Exclusion Order to All SHUs in CDCR ..................................................................... 12

        3.  Completion of Mental Health Screening for Prisoners with Extended Stays in Segregation Units ......................................... 12

    D.  Ensure Adequate Treatment, Eliminate Unduly Harsh Conditions, and Provide Sufficient Safety Measures in Segregation ..................... 13

        1.  Provision of Appropriate Mental Health Treatment in Segregation .................................................................................. 13

[963575-3]

2.    Elimination of Unduly Harsh and Dangerous Conditions for
      Mentally Ill Prisoners in Segregation .................................................. 14

3.    Provision of Sufficient Safety Measures to Address High
      Suicide Risk in Segregation ................................................................ 14

V.    PLAINTIFFS' EVIDENCE AND RELATED COURT FILINGS ........................ 14

      A.    Plaintiffs' Trial Witnesses ................................................................ 14

            1.    Dr. Craig Haney ...................................................................... 14

            2.    Dr. Pablo Stewart .................................................................... 16

            3.    Edward Kaufman, M.D. ........................................................... 16

            4.    James F. Austin ....................................................................... 17

      B.    Pleadings ........................................................................................... 18

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# TABLE OF ABBREVIATIONS

| ADA | American with Disabilities Act |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| DOJ | United States Department of Justice |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| MHCB | Mental Health Crisis Bed |
| OHU | Outpatient Housing Unit |
| PSU | Psychiatric Housing Unit |
| SHU | Security Housing Unit |
| SNY | Special Needs Yard |

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

I.     **INTRODUCTION**

Defendants' practice of placing prisoners with mental illness in dangerous segregation units, often for excessive periods of time and routinely for non-disciplinary reasons, must be ended.  This is a "'critically important' goal[] which [is] necessary to remedy the Eighth Amendment violation in this action."  *See* Order Denying Mot. to Terminate, Docket No. 4539, Apr. 5, 2013 at 24, 43-46.  Plaintiffs' instant motion requests orders to remedy the substantial risks of serious harm the Court has identified related to segregation issues, namely:

- "[R]eduction of lengths of stay in administrative segregation";
- "[A]lternatives to use of administrative segregation placements for nondisciplinary reasons";
- "[R]eduction of risks of decompensation and/or suicide"; and
- "[A]ccess to treatment/mitigation of harshness of conditions in the administrative segregation units."

*Id.* at 45-46 (quoting Special Master 25th Round Report at 38).

The violations flowing from Defendants' dangerous segregation practices are longstanding, with little to no progress and no apparent light at the end of the tunnel.  In early 1999, the Special Master reported that "[t]he delivery of mental health care services in administrative segregation has long been recognized as one of the stiffest challenges to defendants' creation of a constitutional health care delivery system."  Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding, Docket No. 1008, Jan. 4, 1999 at 1.  Defendants promised to bring treatment into the segregation units and to ensure "meaningful input" into the process of placing prisoners with mental illness in segregated housing.  *Id.*  The Court agreed to "give the defendants the opportunity to deliver mental health services in administrative segregation, with the understanding that serious efforts to limit the duration of stay of seriously mentally disordered inmates in administrative segregation would be undertaken."  *Id.* at 2.

Defendants have, over the last fifteen years, been permitted to conduct an experiment of whether they can house and adequately treat prisoners with mental illness in

1

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

their harsh segregation units.  The Court and the Special Master have repeatedly found serious deficiencies.  Defendants have consistently failed to implement an effective remedy.  There are no time limits for how long a prisoner with mental illness can spend in CDCR's bleakly punitive segregated housing.  Defendants long have promised to bring adequate treatment for EOP prisoners, the group designated for the highest level of outpatient mental health care, into the segregated housing units in the form of the EOP ASU "hubs" and the PSUs.  But Defendants are not even meeting their own treatment guidelines, which are in any event inadequate.  The fact is, the anti-therapeutic conditions in CDCR's segregation units fundamentally interfere with and preclude clinically necessary treatment.  While Defendants have followed the *Madrid* Pelican Bay SHU Exclusion Order, which protects nearly all *Coleman* class members from placement in the dangerous and toxic Pelican Bay SHU, they continue to place hundreds of *Coleman* class members, for months, years, or even <u>decades</u>, into the system's four other SHUs, which impose the same restrictions and deprivations as the Pelican Bay SHU, and are equally dangerous and toxic.  Defendants' system also permits and openly endorses the dangerous cycling of prisoners with mental illness between segregation, mental health crisis beds (MHCBs), and DSH hospitals, and then back to segregation.  Defendants perpetuate a dangerous and inhumane cycle of further deterioration, avoidable hospitalizations, and even death.

Defendants' fifteen-year experiment with housing prisoners with mental illness in segregation is a resounding failure.  Plaintiffs will demonstrate that Defendants continue to operate a system of segregated housing that is toxic and dangerous for prisoners with mental illness.  Plaintiffs will further show that the harsh and punitive features of Defendants' segregated units preclude the delivery of minimally adequate mental health treatment.  The horrendous conditions in segregation are underscored by the staggering suicide rate in these units, where approximately 80 prisoners have killed themselves in the last six years; there have been six suicides since Plaintiffs' motion was filed in May.

The irrefutable reality is that Defendants' segregation system systemically violates

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

the rights of prisoners with mental illness under both the Eighth Amendment and the Americans with Disabilities Act (ADA), and that these violations cannot be remedied without meaningful—and fundamental—changes to Defendants' use of segregated housing units and the conditions in those units.

## II.     PLAINTIFFS' MOTION BUILDS ON THE EVIDENCE PRESENTED AT THE RECENT EVIDENTIARY HEARINGS

Over the last several months, this Court has heard a substantial body of evidence demonstrating that Defendants persist in their punitive approach to prisoners with mental illness.  Plaintiffs incorporate by reference this evidence into the record in support of the instant motion.

Defendants continue to view class members primarily through a custodial lens, refusing to modulate that approach even when necessary to provide safe, effective, and sufficient mental health treatment.  This systemic failure interferes with the State's ability to provide the minimally adequate mental health treatment necessary to end Court oversight.

Former Washington and California state prison system administrators Eldon Vail and Jeanne Woodford, as well as Defendants' own custodial expert, Steve Martin, have testified that it _is_ possible—indeed, desirable—to house prisoners with mental illness in a manner that accounts for, accommodates, and addresses their treatment needs, while also ensuring the safety and security of the institution, other prisoners, and the staff.  These experts testified extensively about:  (1) meaningful implementation of a team clinical-custodial approach in units primarily housing individuals with mental illness; (2) the provision of an administrative framework and training necessary for staff to engage in this approach; (3) the modification of custody practices in segregation, such as blanket strip searches, that impede mental health programming; and (4) the use of individualized determinations of each class member's particular custody and clinical needs so that he or she is able to live and receive treatment without unnecessary and harmful deprivations. Psychiatrists, including former DSH clinician Dr. Joel Badeaux and psychiatric experts

3

1  Drs. Pablo Stewart and Edward Kaufman, have testified that Defendants' custodial

2  practices pose grave risk of psychological damage, including suicide, to the *Coleman* class.

3  As Mr. Vail and Mr. Martin both queried, the fundamental question remains:  How did we

4  get here, what are we trying to accomplish, and can it be done in a more humane,

5  appropriate, and effective manner?

6      During the June 2013 evidentiary hearing regarding *Coleman* class members'

7  access to minimally adequate inpatient care, Plaintiffs proved that, among other treatment

8  problems, Defendants assign "Orientation Status" and "Cuff Status" to prisoners in need of

9  psychiatric hospital-level care.  These designations lead to the imposition of "restricted

10  housing conditions and extremely limited programming," which "delays" or "interrupts . . .

11  all but the most basic level of mental health treatment."  Order, Docket No. 4925, Nov. 13,

12  2013 at 13-14.  Such severe custodial restrictions inflict a substantial risk of psychological

13  harm, including suicide, on class members.

14      During the second evidentiary hearing, on Plaintiffs' motion for relief concerning

15  use of force and disciplinary practices against prisoners with mental illness, and on

16  Plaintiffs' motion for access to appropriate and licensed inpatient psychiatric

17  hospitalization for death row prisoners, Plaintiffs demonstrated the intersection of

18  unnecessarily harsh custodial policies and practices—particularly in segregated housing—

19  and substantial risk of psychological harm.  The record brought to light that Defendants

20  employ use-of-force practices that torture *Coleman* class members for behavior

21  symptomatic of their mental illness, perpetuate disciplinary practices designed to punish

22  class members for behaviors that are manifestations of mental illness, and stubbornly

23  prevent death row prisoners from accessing clinically necessary inpatient psychiatric care

24  based on custodial justifications that are utterly unfounded.

25      The Court is now familiar with the "worst case perfect storm" that is caused by the

26  placement of *Coleman* class members in highly restricted and isolated settings that provide

27  extremely circumscribed opportunities for treatment and meaningful programming.

28  Defendants' expert Steve Martin discussed this "perfect storm" at the most recent

4

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

evidentiary hearing as follows:

> **It's been my experience, through study and direct observation and et cetera, et cetera, that an inmate that is mentally impaired, that is confined in highly restrictive in-cell time, that is to say in excess of 20 hours a day, that he or she has difficulty in coping with that highly restricted environment vis-a-vis a healthy, advantaged person.**
>
> And that that will begin at some point to manifest itself through a variety of behaviors, some of which are nuisance violations, some of which are threatening behaviors. And if they rise to a certain level, a threat in which an application of force comes into play, then that occurs.
>
> That typically is followed by disciplinary action related to whatever gave rise to the use of force, refusal to obey an order or assault or whatever it might be. So that gives rise to a disciplinary action, that if it is serious enough or cumulatively dealt with, that is to say other related priors that notch that up, then that offender may find him or herself placed for even a longer term of confinement in a highly restricted setting in which you then are into a cycle of behaviors that are untoward and manifest themselves, again in a variety of ways of violations, to where that time is extended, to where **you have placed that offender in a situation in which he simply cannot cope on a daily basis without decompensating, without struggling more and more**, which again manifests itself in the difficult task of managing that offender.

Nov. 5, 2013 Evid. Hr'g Tr. 1857-58.

In Defendants' treatment of prisoners with mental illness, a central feature of this "perfect storm" is the systemic overuse and misuse of segregation, as well as the unnecessarily harsh, punitive, and anti-therapeutic conditions in segregation units. Plaintiffs now ask the Court to order an effective and durable remedy for the dangerous, harmful, and deadly effects of California's segregation practices with respect to prisoners with serious mental illness.

## III.   SUMMARY OF VIOLATIONS

### A.   Overreliance on Segregation to Control and Manage Prisoners with Mental Illness

Pursuant to the instant motion, Plaintiffs will prove that Defendants' systemic deficiencies have resulted in a significant overreliance on punitive segregation units as a means of controlling and managing prisoners with serious mental illness. More than 3,500

[963575-3]

5

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

*Coleman* class members are housed in segregated and isolated units.[1]  Nearly 1,500 of those class members have been in segregation for more than three months, including hundreds with lengths of stay spanning years.  Even as the overall prison population has decreased by tens of thousands of prisoners since the three-judge court proceedings began, the number of prisoners with mental illness in segregation has, if anything, increased. More than 20% of EOP prisoners are housed in segregation, compared with 9% of the overall CDCR population (which, as Plaintiffs will show, is itself remarkably and unnecessarily high).

### B.    Excessive Time Spent in Harsh Segregation Units

Prisoners with mental illness continue to spend enormous periods of time in CDCR's segregation units.  California's administrative segregation units are designed for use when there is an "*immediate* threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity," or as "*temporary*" housing "pending a classification committee determination of the inmate's housing assignment."  Cal. Code Regs. tit. 15, § 3335 (emphasis added).  Yet the amount of time that EOP and CCCMS prisoners spend in ASUs <u>averages</u> more than 100 days at a time, and frequently exceeds a year or more. Similarly, class members' disciplinary terms in the SHU or PSU are extraordinarily long, lasting from months to decades (and are, in many cases, "indeterminate"); hundreds of *Coleman* class members have been in these highly restrictive units for more than a year. As demonstrated at the most recent evidentiary hearing, class members' behaviors manifesting from their mental illness too often lead to rule violations, lengthy

---

[1] These segregated housing units include more than thirty (30) Administrative Segregation Units ("ASUs"), eleven (11) Enhanced Outpatient Program Administrative Segregation Unit hubs ("EOP ASUs" or "EOP ASU hubs"), five (5) Security Housing Units ("SHUs"), and three (3) Psychiatric Services Units ("PSUs").  The San Quentin Death Row also functions as an extraordinarily restrictive isolation unit.

1  administrative and disciplinary segregation terms, decompensation, and further rule

2  violations and uses of force.

3      Plaintiffs will show that Defendants' *Coleman* monthly data, provided to the

4  Special Master and Plaintiffs' counsel pursuant to court order, significantly misrepresent

5  and understate the extent of the problem of excessive lengths of stay.  Defendants

6  underreport and undercount segregation lengths of stay for prisoners with mental illness,

7  sometimes by several years, through statistical legerdemain and reporting irregularities.

8      CDCR has no limit, in the Program Guide or anywhere else, on the amount of time

9  a prisoner with mental illness can spend in Defendants' dangerous isolation units.

10  Plaintiffs will demonstrate that, after years of unfulfilled promises by CDCR to

11  meaningfully reduce segregation lengths of stay for *Coleman* class members, the

12  implementation of exclusion orders and strict time limits—bright line rules—is necessary

13  to ensure an effective remedy to the longstanding constitutional violations.

14      **C.      Placement of Mentally Ill in Segregation For "No Fault of Their Own"**

15      The Court recently identified, once again, Defendants' failure to implement

16  "alternatives to use of administrative segregation placements for non-disciplinary reasons."

17  *See* Order Denying Mot. to Terminate at 45-46.  Plaintiffs will show that placement of

18  prisoners with mental illness in segregation for non-disciplinary reasons—that is, for no

19  fault of their own—is widespread and the result of systemic failures that Defendants have

20  no plan to fix.

21      The evidence will establish beyond question that Defendants are aware that this

22  practice is extraordinarily dangerous—half of CDCR prisoners who commit suicide in

23  ASUs are there for non-disciplinary reasons.  Yet, as Plaintiffs will demonstrate,

24  Defendants continue to knowingly house prisoners with mental illness in ASUs for their

25  own "safety," or simply because there is no safe, appropriate non-segregation bed available

26  for them.

27  / / /

28  / / /

[963575-3]

7

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**D.     Inadequate Mental Health Screening and Failures to Exclude from Segregation Class Members at Heightened Risk of Harm**

Defendants are failing to provide adequate mental health screening of prisoners placed in segregation units, and are failing to exclude prisoners for whom placement in such units is simply too psychologically damaging.  Plaintiffs will show that Defendants' system permits the discharge of a psychiatrically hospitalized inmate-patient to segregation units that are known to put them at risk of psychological deterioration and suicide. Plaintiffs will demonstrate that this practice is extremely dangerous, and leads to further decompensation, additional hospital and crisis bed admissions, and in too many tragic cases, death.

Plaintiffs will further show that serious deficiencies in CDCR's mental health screening of prisoners in segregated housing units persist.  Defendants' initial screening of prisoners coming into segregation is insufficient, and there is no formal mental health screening of any sort for prisoners with long segregation stays.  The complete lack of any system for periodic clinical assessments in these units is inconsistent with national correctional standards and practices, and reflects Defendants' conscious disregard of the fact that the life span and reliability of initial segregation mental health screenings are limited.  In short, people can and do develop mental illness in CDCR segregation units; Defendants fail in their duty to timely identify and treat them.

Plaintiffs will also demonstrate that CDCR's five SHUs are, in all critical aspects, equally dangerous and psychologically damaging.  The evidence will show that the Pelican Bay SHU Exclusion, which arose from the *Madrid v. Gomez* litigation, 889 F. Supp. 1146 (N.D. Cal. 1995), and is incorporated in the *Coleman* Program Guide (12-8-1, 12-8-2), is insufficient to address the harms and risks of harm to *Coleman* class members in the SHUs.   The Pelican Bay SHU Exclusion must be applied to all five CDCR SHUs to remedy the ongoing constitutional violations.

/ / /

/ / /

[963575-3]

8

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

E.   **Inadequate Access to Treatment, Unnecessarily Harsh Conditions, and Insufficient Safety Measures in CDCR Segregation Units**

Plaintiffs will prove that Defendants routinely place prisoners with mental illness in severely restrictive segregation settings without access to minimally adequate mental health treatment.  While in those units, Defendants subject class members to unnecessary and extreme custodial measures, such as the blanket use of "treatment" cages and strip searches, that undermine and interfere with whatever limited mental health programming that does exist.  Plaintiffs will show that Defendants cannot even meet their own guidelines for providing treatment to EOP and CCCMS prisoners in the segregated housing units. Treatment space deficiencies remain pervasive.  And Defendants, despite the agreement of experts on all sides of this litigation, refuse to implement the nationally recognized standard safety measure of staggered 30-minute living, breathing welfare checks for *all* prisoners in segregation.

F.   **Defendants' Purported Solutions to the Issues Raised in Plaintiffs' Motion Do Not Remedy the Serious Violations of Class Members' Rights.**

Defendants have responded to Plaintiffs' motion with new promises and plans to ameliorate the harms that Plaintiffs identify.  This Court has seen similar vows many times before, which never seem to come to fruition.  This time around, Defendants promise to create a new "non-disciplinary status" for prisoners in administrative segregation, offer a new "psych-and return" policy memorandum, and offer a new memorandum on welfare checks.  As Plaintiffs will show, these purported solutions to the issues raised by Plaintiffs (and long identified as problems by the Court and Special Master) will not remedy the serious violations, even if they are fully implemented.  Defendants continue to ignore the core issues and harms regarding the placement of prisoners with mental illness in dangerous segregated housing.

To give just one example, Defendants claim in their opposition to be "examining the creation of a non-disciplinary unit." Defs.' Opp. Br., Docket No. 4712, July 24, 2013 at 13.  As Plaintiffs will show, this promise is an empty one.  Defendants are not creating a

1 true non-disciplinary segregation unit at all.  Rather than housing non-disciplinary

2 prisoners in less harsh conditions, Defendants plan to simply change their categorization to

3 a new "non-disciplinary status" while keeping them in bleak, punitive segregated housing

4 for no fault of their own.  The new policy makes no accommodation for the special

5 vulnerabilities of prisoners with mental illness, sets no time limits or objectives for getting

6 non-disciplinary prisoners out of ASUs, and fails to remedy the core deprivations,

7 including the confinement of prisoners to their cells for 23 hours per day, the lack of out-

8 of-cell activity, the denial of normal contact visits, the use of treatment cages for all mental

9 health treatment, and the imposition of strip searches whenever leaving or returning to the

10 unit for treatment or yard.

11 **IV.    REQUESTED RELIEF**

12         Plaintiffs request that the Court issue an order providing the relief described below.

13 The Court should direct Defendants to revise their policies and procedures, including but

14 not limited to the Program Guide, and to take all necessary steps, including but not limited

15 to training of custody and clinical staff, obtaining appropriate staffing, and modifying

16 office and treatment space, to cure the violations.

17         **A.    Set Time Limits for Class Member Lengths of Stay in Segregation Units**

18         The Court should direct Defendants to set the following time limits for the

19 placement of *Coleman* class members in CDCR segregation units:

20             • For EOP class members, no more than 30 days in segregated housing.

21             • For CCCMS class members, no more than 60 days in segregated housing.

22         The Court should direct that such time limits should be subject to the following

23 provisions:  Transfer between one segregation cell (or unit) and another shall not "restart

24 the clock" in the calculation of class members' length of stay in segregation for purposes

25 of the order.  Likewise, transfer from a segregation unit to a crisis/inpatient placement

26 (such as MHCB, OHU, or DSH) and back to a segregation unit shall not "restart the clock"

27 in the calculation of a class member's length of stay in segregation for purposes of the

28 order.

[963575-3]

10

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   The Court should direct, effective 30 days from the date of its order, Defendants not

2   to place, for more than 72 hours, any class member in any segregated housing unit that has

3   not been found capable of providing a minimally adequate mental health treatment

4   program (as defined in Part IV.D.1, below).

5   The Court should order Defendants to provide monthly reports, prepared and signed

6   by the Warden of each prison, identifying each case in which a class member's segregation

7   placement exceeds applicable time limits, the reason for the continued placement, and

8   what steps Defendants are taking to promptly transfer the class member to an appropriate

9   placement and to fix the cause of the undue delay.

10   **B.     Stop Placement of Class Members in Segregation for Non-Disciplinary Reasons**

11

12   The Court should further direct Defendants to modify their policies and procedures

13   so that *Coleman* class members are not placed in segregation units based on concerns

14   about their safety or SNY (Special Needs Yard) status, or because they are a victim of an

15   assault.  The Court should direct Defendants to submit, within 30 days, their plan to

16   provide such class members a safe and appropriate alternative placement where they will

17   not be subject to the harsh and restrictive conditions of existing CDCR segregation units

18   and can receive appropriate mental health care.

19   The Court should direct Defendants to modify their policies and procedures so that

20   *Coleman* class members are not placed in segregation units due to "lack of beds" – that is,

21   while awaiting either placement at the institution or transfer to another CDCR prison or

22   program.  The Court should direct Defendants to submit, within 30 days, their plan to

23   provide class members currently awaiting an appropriate bed with a placement where they

24   will not be subject to the harsh and restrictive conditions of existing CDCR segregation

25   units and can receive appropriate mental health care.

26   / / /

27   / / /

28   / / /

[963575-3]

11

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**C.**   **Provide Adequate Mental Health Screening for All Segregated Prisoners and Ensure Segregation Exclusions for Class Members at Heightened Risk of Serious Harm**

**1.**   **Revision of Segregation Screening Protocol**

The Court should direct Defendants to modify their policies and procedures so that no prisoner discharging from an inpatient (DSH) or crisis level of care (MHCB/OHU) setting shall be placed in a segregation setting upon discharge absent a written clinical determination by both the patient's discharging and receiving clinicians that the individual's mental health will not be put at risk by such a placement.

The Court should direct Defendants to implement, in consultation with the Special Master and Plaintiffs' counsel, a revised ASU screening protocol.  The protocol should include a comprehensive file review to identify a prisoner's prior segregation placements that resulted in MHCB/DSH placements, as well as history of self-harm, suicide attempts, or other signs of decompensation when in segregated housing.  For those prisoners who are found to have a "likelihood of decompensation if placed or retained in ASU" (*Coleman* Program Guide 12-7-2), Defendants should be directed to apply a chrono and/or identifier code for the prisoner that will prevent him or her from placement in the ASU, clearly identify the prisoner with an "ASU exclusion," and identify appropriate alternative placements for such inmate-patients.

**2.**   **Application of Existing Pelican Bay SHU Exclusion Order to All SHUs in CDCR**

The Court should direct Defendants to develop and submit to the Special Master, within 30 days, a plan to immediately identify all prisoners confined in any CDCR SHU that are at risk of psychological harm or exacerbation of current mental illness if retained in the SHU.  These exclusion criteria should substantially follow the criteria applied to the Pelican Bay SHU exclusion, as set forth by the court in *Madrid v. Gomez*.

**3.**   **Completion of Mental Health Screening for Prisoners with Extended Stays in Segregation Units**

The Court should direct Defendants to conduct, within 60 days and in consultation

[963575-3]

with the Special Master and Plaintiffs, a comprehensive clinical assessment, including a thorough file review, of prisoners currently in SHU, in ASU, or on Death Row who have been housed in such placements for more than 90 days, to determine if their mental status puts them at too great a risk of harm to remain in their current setting, or if referral for mental health evaluation and treatment is necessary.

**D.     Ensure Adequate Treatment, Eliminate Unduly Harsh Conditions, and Provide Sufficient Safety Measures in Segregation**

**1.     Provision of Appropriate Mental Health Treatment in Segregation**

The Court should direct Defendants to file within 30 days a plan to address the treatment space deficiencies in their EOP ASU hubs and PSU's as well as a treatment schedule and participation data for all EOPs in ASU and PSUs, for review by the Special Master and recommendations for further action.  The Special Master should provide a report to the Court that identifies which (if any) segregated housing units are capable of providing a minimally adequate mental health treatment program, and thus which units may house *Coleman* class members for more than 72 hours (*see* Part IV.A, above).

The Court should direct Defendants to modify their policies and procedures so that class members shall not be placed, for more than 72 hours, in any segregated housing unit found incapable of providing a minimally adequate mental health treatment program based on their level of care.  A minimally adequate mental health treatment program in segregated housing should, at a minimum, include the following:

- For any segregated unit housing EOP prisoners:  (1) sufficient mental health and custody staffing; (2) adequate confidential treatment space; (3) provision of at least the Program Guide minimum treatment for EOP prisoners (*i.e.*, 10 hours per week); and (4) provision of at least 10 hours of other out-of-cell time (*e.g.*, for exercise) per week.

- For any segregated unit housing CCCMS prisoners:  (1) sufficient mental health and custody staffing; (2) adequate confidential treatment space; (3) provision of clinically indicated treatment hours (including group therapy); and (4) provision of at least 10 hours of other out-of-cell time (*e.g.*, for exercise) per week.

[963575-3]

13

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1

### 2. Elimination of Unduly Harsh and Dangerous Conditions for Mentally Ill Prisoners in Segregation

2

3  The Court should direct Defendants to modify their policies and procedures to

4 prohibit the current blanket practice of indiscriminate strip searches for all mentally ill

5 prisoners housed in segregation units.  The use of strip searches on mentally ill prisoners

6 housed in segregation should be permitted only where there is a specific, individualized

7 determination, based on clinical and security input, that such a procedure is required.

8  The Court should direct Defendants to modify their policies and procedures to

9 prohibit the use of "therapeutic treatment modules" for group or individual mental health

10 treatment, as well as the use of caged holding cells for class members identified as at risk

11 of self-harm or suicide or awaiting clinical evaluation or treatment.  The Court should

12 direct Defendants, in consultation with the Special Master and Plaintiffs, to devise

13 appropriate alternatives to the use of "therapeutic treatment modules" and holding cages

14 that are not anti-therapeutic, are humane, and are appropriate to meet the individual

15 clinical and security needs of mentally ill prisoners.

16

### 3. Provision of Sufficient Safety Measures to Address High Suicide Risk in Segregation

17

18  The Court should direct Defendants to modify their policies and procedures to

19 provide staggered welfare checks (through personal observation by a staff member) at least

20 every thirty minutes to *all* prisoners placed in any segregation unit for the duration of such

21 placements.

22 ## V.   PLAINTIFFS' EVIDENCE AND RELATED COURT FILINGS

23   ### A.   Plaintiffs' Trial Witnesses

24  Plaintiffs will present four expert witnesses in support of their Motion regarding the

25 housing and treatment of seriously mentally ill prisoners in CDCR segregation units:

26 Dr. Craig Haney, Dr. Pablo Stewart, Dr. Edward Kaufman, and Dr. James Austin.

27   ### 1.   Dr. Craig Haney

28  Dr. Craig Haney is a psychologist who has spent nearly 40 years studying the

[963575-3]

14

1    psychological effects of prison conditions, specifically in segregation or solitary

2    confinement units.  His work has included conducting interviews with correctional

3    officials, officers, and prisoners to assess the nature and consequences of living and

4    working in correctional settings.  He has studied and statistically analyzed data to examine

5    the effects of overcrowding, punitive segregation, and other conditions of confinement.

6    *See* Expert Declaration of Craig Haney, Docket 4378, Mar. 14, 2013 ¶¶ 1-13.  Dr. Haney

7    examined overcrowding and its effects and offered expert testimony in the three-judge

8    court proceedings.  His expert opinions in the three-judge court proceedings were relied

9    upon extensively by both the three-judge court and by the United States Supreme Court.

10   Earlier this year, Dr. Haney conducted inspections of four CDCR prisons, including the

11   segregation units at those facilities, and provided a detailed expert report in support of

12   Plaintiffs' opposition to Defendants' termination motion.  The three-judge court cited

13   Dr. Haney's findings in its Opinion and Order Denying Defendants' Motion to Vacate or

14   Modify Population Reduction Order.  Docket 4541, April 11, 2013 ("4/11/13 3JC Op. &

15   Order") at 41, 51.  Dr. Haney has submitted an additional declaration in support of

16   Plaintiffs' instant motion.  *See* Expert Declaration of Craig Haney re CDCR Segregated

17   Housing Units, Docket 4581, May 6, 2013.

18        Dr. Haney will testify about his findings that CDCR's segregation system has

19   caused serious harm to mentally ill prisoners and continues to put mentally ill prisoners at

20   risk of such harm.  His testimony will include discussion of the serious harms that stem

21   from systemic deficiencies that include excessive lengths of stay in segregation; the

22   placement of mentally ill prisoners in segregation for non-disciplinary reasons; failures to

23   adequately screen and exclude mentally ill prisoners at high risk of harm in segregation

24   settings; failures to provide minimally adequate mental health treatment in segregation

25   units; and unduly harsh and dangerous conditions in segregation units.  Dr. Haney will also

26   testify as to the need to apply the current Pelican Bay SHU exclusion order for prisoners

27   with mental illness to all of the SHUs in CDCR's system.

28

[963575-3]

15

PLS.' TRIAL BRIEF ISO MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1          **2.      Dr. Pablo Stewart**

2          Dr. Pablo Stewart is an experienced forensic psychiatrist who has previously

3   provided testimony to this Court on numerous occasions as an expert for the Plaintiff class.

4   He has testified to the Court twice this year: on June 19, 2013 in support of Plaintiffs'

5   motion for affirmative relief regarding inpatient psychiatric hospitalization, and again on

6   October 16, 2013, in support of Plaintiffs' motion for affirmative relief regarding

7   condemned mentally ill prisoners' access to inpatient treatment.

8          Earlier this year, Dr. Stewart conducted inspections of four CDCR prisons and

9   provided a detailed expert report in support of Plaintiffs' opposition to Defendants'

10  termination motion.  *See* Expert Declaration of Pablo Stewart, M.D., Docket 4381,

11  Mar. 14, 2013.  The three-judge court cited Dr. Stewart's findings in its Opinion and Order

12  Denying Defendants' Motion to Vacate or Modify Population Reduction Order.  4/11/13

13  3JC Op. & Order at 51.

14         Dr. Stewart will testify about his findings that CDCR's segregation system has

15  caused serious harm to mentally ill prisoners and continues to put mentally ill prisoners at

16  risk of such harm.  His testimony will include discussion of the serious harms that stem

17  from systemic deficiencies that include excessive lengths of stay in segregation; the

18  placement of mentally ill prisoners in segregation for non-disciplinary reasons or due to a

19  lack of appropriate beds in the system; failures to adequately screen and exclude mentally

20  ill prisoners at high risk of harm in segregation settings; failures to provide minimally

21  adequate mental health treatment in segregation units; and unduly harsh and dangerous

22  conditions in segregation units.

23         **3.      Edward Kaufman, M.D.**

24         Dr. Edward Kaufman is a psychiatrist with over fifty years of experience in the

25  field, including extensive experience in forensic psychiatry.  Dr. Kaufman has served as an

26  expert and consultant on many occasions, and provided expert testimony to this Court in

27  connection with the original proceedings in 1993.  *See Coleman v. Wilson*, 912 F. Supp.

28  1282, 1307, 1309, 1312, 1313, 1314, 1320 n.54, & 1322 n.58 (E.D. Cal. 1995).  Earlier

1   this year, Dr. Kaufman conducted inspections of three CDCR prisons and provided a

2   detailed expert report in support of Plaintiffs' opposition to Defendants' termination

3   motion.  *See* Expert Declaration of Edward Kaufman, M.D., Docket 4379, Mar. 14, 2013.

4   The three-judge court cited Dr. Kaufman's findings in its Opinion and Order Denying

5   Defendants' Motion to Vacate or Modify Population Reduction Order.  4/11/13 3JC Op. &

6   Order at 51.  Dr. Kaufman provided two declarations in support of Plaintiffs' motion

7   regarding use of force and disciplinary measures.  *See* Docket 4766-3, Aug. 23, 2013 &

8   Docket 4825, Sept. 23, 2013.  He testified to the Court regarding the risk of psychological

9   harm to mentally ill prisoners subjected to Defendants' use of force and disciplinary

10  policies and procedures on October 2, 2013.

11          Dr. Kaufman will testify about his findings that CDCR's segregation system has

12  caused serious harm to mentally ill prisoners and continues to put mentally ill prisoners at

13  risk of such harm.  His testimony will include discussion of the serious harms that stem

14  from systemic deficiencies that include excessive lengths of stay in segregation; the

15  placement of mentally ill prisoners in segregation for non-disciplinary reasons or due to

16  the lack of appropriate beds in the system; failures to adequately screen and exclude

17  mentally ill prisoners at high risk of harm in segregation settings; failures to provide

18  minimally adequate mental health treatment in segregation units; and the unduly harsh and

19  dangerous conditions in segregation units.

20                  **4.      James F. Austin**

21          Dr. Austin was a member of the Expert Panel on Adult Offender Recidivism

22  Reduction Programming, which was convened by the CDCR and issued a report

23  recommending ways to reduce the prison population while at the same time reducing

24  recidivism and generating savings.  *See* Op. & Order, Docket 3641, Aug. 4, 2009 at 45

25  n.39.  His expert testimony was cited extensively by the three-judge court.  *See id.* at 60,

26  64, 132 n.65, 134, 139, 140, 141, 143, 144-47, 149-50, 152, 158-59, 161-63, 173-77, 180.

27  As noted by the three-judge court, Dr. Austin has thirty years of experience in correctional

28  planning and research, and has personally worked with correctional systems in several

1  states to reduce their prisoner populations safely.  The three-judge court relied on Dr.

2  Austin's testimony regarding correctional reform measures to which he contributed in

3  other states, along with the outcomes of those measures.  *See id.* at 175.

4      Dr. Austin will testify concerning feasible alternative policies and procedures to

5  address the serious harm and risk of harm to mentally ill prisoners currently being

6  subjected to CDCR's harsh, excessive, and unnecessary segregation detention.  He will

7  testify regarding alternatives that are safe and workable, and in fact have been successfully

8  implemented in other states' prison systems.  He will testify to various safe and workable

9  methods to reduce lengths of stay in segregation, to reduce the overreliance on and overuse

10  of harsh segregation units for mentally ill prisoners (including for non-disciplinary

11  reasons), to screen and identify prisoners in segregation for extended periods who have

12  deteriorated psychologically, and to reduce the harmful blanket use of treatment cages and

13  strip searches on mentally ill prisoners housed in segregation units.  Dr. Austin will also

14  testify as to the need to apply the current Pelican Bay SHU exclusion order for prisoners

15  with mental illness to all of the SHUs in CDCR's system.

16      **B.   Pleadings**

17      Plaintiffs have submitted the following briefing and supporting declarations and

18  exhibits regarding Plaintiffs' Motion for Enforcement of Court Orders and Affirmative

19  Relief Re: Improper Housing and Treatment of Seriously Mentally Ill Prisoners in

20  Segregation:

21      •   Notice of Motion and Motion for Enforcement of Court Orders and
           Affirmative Relief Re: Improper Housing and Treatment of Seriously
22           Mentally Ill Prisoners in Segregation [Doc. 4580]

23      •   [Proposed] Order Re: Housing of Mentally Ill Prisoners in Segregation [Doc.
           4580-1]
24

25      •   Expert Declaration of Craig Haney Re CDCR Segregated Housing Units
           [Doc. 4581]
26
        •   Declaration of Jane E. Kahn in Support of Plaintiffs' Motion for
27           Enforcement of Court Orders and Affirmative Relief Re:  Improper Housing
             and Treatment of Seriously Mentally Ill Prisoners in Segregation Related to
28

1    Use of Force and Disciplinary Measures [Doc. 4582]

2    • Plaintiffs' Reply in Support of Motion for Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation [Doc. 4761]

3

4    • Reply Expert Declaration of James Austin in Support of Plaintiffs' Motion Regarding Mentally Ill Prisoners in Segregation [Doc. 4762]

5

6    • Reply Declaration of Jane E. Kahn in Support of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation [Doc. 4765]

7

8    • Plaintiffs' Evidentiary Objections Re Defendants' Opposition to Plaintiffs' Motion Related to Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation [Doc. 4764]

9

10

11    Plaintiffs' experts Drs. Haney, Kaufman, and Stewart have also submitted

12   declarations in opposition to Defendants' termination motion that are relevant to and

13   referenced in the instant motion:

14    • Expert Declaration of Craig Haney [Doc. 4378]

15    • Expert Declaration of Edward Kaufman, M.D. [Doc. 4379]

16    • Expert Declaration of Pablo Stewart, M.D. [Doc. 4381]

17    In addition, the United States Department of Justice ("DOJ") has submitted a

18   Statement of Interest regarding Plaintiffs' motion. *See* Statement of Interest of the United

19   States of America, Docket No. 4736, Aug. 9, 2013. This Statement was submitted based

20   on Plaintiffs' challenge to Defendants' segregation practices, "including the prolonged

21   isolation of prisoners with serious mental illness under what Plaintiffs allege are

22   'excessively harsh' conditions 'devoid of appropriate treatment,'" and in light of the

23   federal government's "broad interest in ensuring that conditions of confinement in state

24   and local correctional facilities are consistent with the Constitution and federal law." *Id.* at

25   1, 2. The DOJ has requested that this Court consider its recent findings regarding Eighth

26   Amendment and Americans with Disabilities Act (ADA) violations in the use of solitary

27   confinement for mentally ill prisoners at the Pennsylvania Correctional Facility at Cresson.

28    In response to Defendants' Motion *in Limine* No. 4 to exclude the DOJ's Statement,

the DOJ clarified that its Statement was submitted to "provid[e] guidance to the Court regarding *applicable legal standards* for analyzing solitary confinement of prisoners with serious mental illness." Docket No. 4919, Nov. 12, 2013 at 3 (emphasis added). With respect to the Court's legal analysis under the ADA, the DOJ noted that "prisoners with disabilities cannot be automatically placed in restrictive housing for mere convenience," and that any "housing determinations . . . of prisoners with serious mental illness or intellectual disabilities" must be based on an "individualized assessment" that "should, at a minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment, and whether the segregation is medically indicated." *Id.* at 4. With respect to the Eighth Amendment inquiry, the DOJ "identified factors to assess the constitutionality of the use of solitary confinement for those with serious mental illness," which (as discussed in the Cresson findings letter) include:

> (1)  "the <u>amount of time</u> prisoners with serious mental illness spen[d] in solitary confinement";
>
> (2)  "the extent to which the use of solitary confinement on prisoners . . . [i]s <u>interfering with their ability to obtain adequate mental health treatment</u>";
>
> (3)  "the <u>conditions attendant to the solitary confinement</u> experienced by prisoners with serious mental illness"; and
>
> (4)  "the extent to which systemic deficiencies at the facility - such as deficiencies in mental health programming and screening and accountability mechanisms – contribute[] to an <u>overreliance on solitary confinement as a means of controlling prisoners with serious mental illness</u>."

*Id.* at 4-5 (emphasis added).

Plaintiffs ask that the Court consider the legal interpretations in the DOJ's Statement of Interest, as has been requested by the United States Department of Justice.

DATED:  November 15, 2013          Respectfully submitted,

                                   ROSEN BIEN GALVAN & GRUNFELD LLP


                              By:  */s/ Michael W. Bien*
                                   Michael W. Bien

                                   Attorneys for Plaintiffs

[963575-3]