1  DONALD SPECTER – 083925
STEVEN FAMA – 099641
2  PRISON LAW OFFICE
1917 Fifth Street
3  Berkeley, California  94710-1916
Telephone:    (510) 280-2621
4

5

6

7

8

9  JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
MEGAN CESARE-EASTMAN – 253845
10  RANJINI ACHARYA – 290877
K&L GATES LLP
11  4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
12  Telephone:    (415) 882-8200

13

14  Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

15                    UNITED STATES DISTRICT COURT

16                    EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN, et al.,

19              Plaintiffs,

20        v.

21  EDMUND G. BROWN, JR., et al.,

22              Defendants.

23

24

25

26

27

28

Case No. 2:90-cv-0520 LKK DAD

**PLAINTIFFS' POST-TRIAL BRIEF
REGARDING USE OF FORCE AND
DISCIPLINARY PRACTICES AND
PROVISION OF INPATIENT MENTAL
HEALTH TREATMENT TO
CONDEMNED CLASS MEMBERS**

Judge:    Hon. Lawrence K. Karlton

# TABLE OF CONTENTS

**Page**

I.   DEFENDANTS' USE OF FORCE AND DISCIPLINARY PRACTICES
VIOLATE THE RIGHTS OF COLEMAN CLASS MEMBERS AND CAUSE
GRAVE HARM AND UNNECESSARY PAIN AND SUFFERING .................................. 1

   A.   Introduction ................................................................................................... 1

   B.   Legal Standard ............................................................................................... 3

      1.   Ongoing Violations Establish the Need for Further Remedial Orders .......... 3

      2.   Correct Legal Standard for Evaluating Systemic Violation ........................ 4

   C.   Evidence ........................................................................................................ 6

      1.   Defendants' Policies and Practices Result in the Use of Unnecessary
Force and Inappropriate Discipline Against Class Members ...................... 6

         (a)   Use of Force Policies ........................................................................ 6

         (b)   RVR Policies ................................................................................... 10

         (c)   CDCR's Review Process .................................................................. 12

      2.   The Evidence Presented by Plaintiffs Shows That Constitutional
Violations in the Use of Force and Discipline Against Class
Members are Systemic ............................................................................. 13

         (a)   The Universe of Controlled Use of Force Videos ............................ 13

         (b)   Defendants' Own Use of Force and RVR Statistics ........................ 14

         (c)   Mr. Martin's Flawed Methodology .................................................. 14

   D.   Requested Relief ......................................................................................... 16

      1.   The Court Has Authority to Issue Specific and Targeted Remedial
Orders ...................................................................................................... 17

      2.   Specific Relief Requested ....................................................................... 18

II.   DEFENDANTS ARE FAILING TO PROVIDE CONSTITUTIONAL MENTAL
HEALTH CARE TO CONDEMNED INMATES AT ANY LEVEL OF CARE ............. 20

   A.   Condemned Prisoners Are Wrongfully Denied Access to Both Intermediate
and Acute Inpatient Psychiatric Hospitalization ....................................... 20

   B.   The Special Master Must Fully Evaluate the Program Currently Operating
Within San Quentin's OHU ........................................................................ 23

   C.   Defendants Must Conduct Adequate and Regular Mental Health Screenings
for the Condemned Population .................................................................... 26

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

D.   The Court Should Direct the Special Master to Conduct a Full Evaluation of the EOP and CCCMS Programs for Condemned Inmates ...................................... 27

E.   Defendants Must Develop Adequate Reporting Mechanisms Regarding Mental Health Care for the Condemned ................................................................ 29

III.   CONCLUSION ............................................................................................................ 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii
PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Brown v. Plata*,
  131 S. Ct. 1910 (2011) ................................................. 17

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998)................................... 29

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ..................................................... 5

*Coleman v. Wilson*,
  1994 U.S. Dist. LEXIS 20786 (E.D. Cal. June 6, 1994)........................... 3, 9, 16

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995) ..................... 3, 5, 7, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................... 15

*Gates v. Gomez*,
  60 F.3d 525 (9th Cir. 1995).......................................... 7

*Hutto v. Finney*,
  437 U.S. 678 (1979) ................................................... 18

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................... 15

*Madrid v. Gomez*,
  889 F. Supp. 1146 (N.D. Cal. 1995) .......................... 7

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ..................................................... 5

*Morris v. Harper*,
  94 Cal. App. 4th 52 (2001)........................................ 25

*Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985) ..................................................... 5

*Plata v. Schwarzenegger*,
  2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ............ 17

*Prieto v. Clarke*,
  Case No. 12-cv-01199-LMB-IDD (E.D. Va.) Dkt. 91 (Op. Granting Summary
  Judgment for Plaintiff), Nov. 12, 2013 ............... 23

*Toussaint v. McCarthy*,
  801 F.2d 1080 (9th Cir. 1986)................................... 18

1015767-2

*U.S. v. Erie County, NY,*
    724 F. Supp. 2d 357 (W.D.N.Y. 2010) ................................................................ 5

## **STATUTES**

42 U.S.C. § 1983 ....................................................................................................... 5

42 U.S.C. § 1997a ..................................................................................................... 5

Cal. Health & Safety Code § 1250(j)(1) ................................................................ 25

Cal. Penal Code § 3600(b)(4) ................................................................................. 21

## **RULES**

Fed. R. Evid. 702 ................................................................................................. 4, 14

Fed. R. Evid. 703 ..................................................................................................... 4

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| APP | Acute Psychiatric Program |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| EOP | Enhanced Outpatient Program |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Inpatient Hospitalization |
| MHA | Mental Health Assessment |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| OIG | Office of the Inspector General |
| OHU | Outpatient Housing Unit |
| RVR | Rule Violation Report |
| SCCP | Specialized Care for the Condemned Program |
| SVPP | Salinas Valley Psychiatric Program |
| UOF | Use of Force |
| VPP | Vacaville Psychiatric Program |

I.   **DEFENDANTS' USE OF FORCE AND DISCIPLINARY PRACTICES VIOLATE THE RIGHTS OF COLEMAN CLASS MEMBERS AND CAUSE GRAVE HARM AND UNNECESSARY PAIN AND SUFFERING**

A.   **Introduction**

Plaintiffs have proven that Defendants continue to perpetuate systemic constitutional violations against class members through the use of force and discipline without regard to mental illness.  The graphic evidence contained in the six cell extraction videos presented in court is representative examples—not outliers—illustrating the underlying problem with Defendants' custody-dominated approach to prisoners with mental illness.  Plaintiffs proved that CDCR allows inmate-patients to deteriorate to the point seen in the videos because it does not provide them appropriate mental health treatment.  Indeed, one of CDCR's own psychiatrists testified that it is preferable to allow an inmate to deteriorate to the point of acute psychosis in a segregation cell rather than refer that inmate to a higher level of care.[1]  In turn, CDCR meets behaviors resulting from the decompensation of inmate-patients with a harsh custodial response:  orders are issued, admonishments read, boxes checked, force used, punitive disciplinary sanctions imposed, and further segregation time ordered.

As Plaintiffs' experts testified, in a properly functioning correctional mental health system, the situations necessitating cell extractions are few and far between, and when extractions must be performed, they are done with the least amount of force possible, after all other avenues have been exhausted.[2]  Yet, in CDCR's system, inmate-patients are subjected to repeated cell extractions and uses of force, even as they wait months to even be referred—let alone transferred—to inpatient psychiatric hospitals.  In a functioning system, psychiatrists in a mental health crisis bed unit do not walk away when an acutely ill patient becomes agitated and needs help.  Rather, clinicians engage with patients using techniques standard in forensic psychiatry, such as the widely-

---

[1] Trial Testimony of Dr. Ernest Wagner ("Wagner") at 650:23-651:11.
[2] Trial Testimony of Edward Kaufman, M.D. ("Kaufman") at 198:12–199:8, 220:12–221:10; Trial Testimony of Steve Martin ("Martin") at 1869:23–1871:25; Trial Testimony of Eldon Vail ("Vail") at 568:2–570:12.

1015767-2

1    recognized Management of Assaultive Behavior approach described by Dr. Kaufman.[3]

2          In a properly functioning system, if a prisoner attempts to engage with custody staff they

3    should respond to those behavioral signals, and attempt to de-escalate the situation rather than

4    proceeding with a cell extraction.[4]  By contrast, CDCR responds to clinical situations with

5    custodial reactions far outside the correctional mainstream.  CDCR arms its officers with an array

6    of weapons unparalleled in any other system in the United States.[5]  Defendants' own expert

7    described CDCR as having a "culture of violence" and "intimidation."[6]  Defendants' approach to

8    seriously mentally ill inmates escalates fear and trauma, causes physical and psychiatric harm, and

9    exacerbates mental illness.[7]

10          The State's expert, Mr. Martin, rendered his opinion there was no "pattern and practice" by

11   selectively looking at use of force and rules violation incidents without connecting the dots.  In

12   particular, he identified key factors that, by his own description, would demonstrate a "perfect

13   storm" of abuse against mentally ill inmates, yet inexplicably and deliberately declined to review

14   evidence that such a condition exists in California.  Plaintiffs' experts, on the other hand,

15   conducted their review of Defendants' uses of force and discipline against the *Coleman* class by

16   looking at the entire lifecycle of Defendants' punitive approach to prisoners with mental illness,

17   and identifying the systemic failures and resulting harms.

18          Constitutionally and correctionally-sound practice requires CDCR to view inmates with

19   mental illness as patients who require treatment.  It requires custody and clinical staff to work

20   together as a team.  It requires CDCR to implement structures and systems that demand and foster

21   that team approach.  It requires policies which safeguard against unnecessary force and discipline,

22   along with education, training, meaningful supervision and review, and quality assurance to

23

24   _____
     [3] Kaufman at 198:12-200:14, 220:12-221:10.

25   [4] Trial Testimony of Michal Stainer ("Stainer") at 951:17–952:18.
     [5] Duty belts are "extraordinary" compared to Washington and other states.  Vail at 86:18-88:3.

26   The standard issue of crowd-control OC canisters, expandable batons, and OC grenades to line
     staff in CDCR is "unprecedented."  *See also* Martin at 1863:3-15.

27   [6] Martin at 1863:23-1864:11; *see also* Vail at 87:18-89:3.
     [7] *See* footnote 9, *infra.*

28

1    enforce those policies as outlined in Plaintiffs' proposed order.[8]

2        **B.      Legal Standard**

3            **1.        Ongoing Violations Establish the Need for Further Remedial Orders**

4            Defendants' ongoing punishment of class members for behaviors related to mental illness

5    violates the Constitution and the ADA.  In 1994, Magistrate Judge Moulds found that "mentally ill

6    inmates who act out are typically treated with punitive measures, without regard to their mental

7    status," and that "inmates who act out are also subjected to the use of tasers and 37 mm guns,

8    without regard to whether their behavior was caused by a psychiatric condition and without regard

9    to the impact of such measures on such a condition."  *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS

10   20786 at *71 & *54 (E.D. Cal. June 6, 1994).  In 1995, this Court found "substantial evidence in

11   the record of seriously mentally ill inmates being treated with punitive measures by the custody

12   staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of

13   such measures, or the impact of those measures on the inmates' mental illnesses."  *Coleman v.*

14   *Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995).  The Court determined that Defendants'

15   policies and practices with respect to the use of force and discipline against *Coleman* class

16   members in a manner that did not appropriately consider their psychiatric condition and—in

17   fact—exacerbated mental illness, amounted to deliberate indifference.  *Id.* at 1323.

18           Defendants' present policies and practices with respect to use of force and discipline

19   continue to result in violations of class members' constitutional rights, and to cause them

20   unnecessary pain and suffering including short and long-term psychiatric harm.[9]  As the Court

21

22   [8] As the Court noted in its November 13, 2013 Order, CDCR has an obligation to provide
     constitutional treatment to class members regardless of where they are housed, and CDCR's
23   constitutional obligations also run to DSH as long as it provides inpatient care to the class.  Order
     at 3:15-19 & 5:3-14.   As the Special Master reported, and as evidence presented at trial by
24   Plaintiffs demonstrates (*see, e.g.,* Ex. 1167, showing the issuance of repeated RVRs at CMF for
     Inmate JJJJ), Defendants' use of unconstitutional use of force and disciplinary practices against
25   class members extends to housing units run by DSH.  *See* Rpt. on SVPP (Dkt. 4830) at 36-40.
     Plaintiffs request that the Court issue orders to remediate the constitutional violations described
26   herein in all units housing class members, including those in DSH.
     [9] The psychiatric and physical harm inflicted on class members by Defendants' use of force
27   practices cannot credibly be disputed.  ("[inmates] talk about having the oxygen sucked out of
28   (cont'd...)

1    observed in its April 5, 2013 Order, after almost twenty years in the remedial phase, Defendants'

2    failure to remediate the violations giving rise to judicial oversight, and their failure to enact

3    appropriate policies, is the very definition of deliberate indifference.  *See* Order (Dkt. 4539) at

4    63:23-65:5.

5           The evidence presented by Plaintiffs, outlined below, demonstrates that each and every

6    element of this Court's original findings relating to Defendants' use of force and discipline against

7    prisoners with mental illness persists today.  As Dr. Kaufman succinctly explained, although

8    CDCR's weapons of choice have changed since 1995, the manner in which CDCR punishes

9    prisoners for behaviors related to mental illness has not.[10]

10                    **2.     Correct Legal Standard for Evaluating Systemic Violation**

11          Throughout their pleadings and the evidentiary hearing on this issue, Defendants have

12   obfuscated the correct legal standard for evaluating whether Defendants' use of force and

13   discipline against class members, without regard for mental illness, constitutes an ongoing

14

15

16   _____

     (…cont'd)

17   them.  They feel their skin is on fire, that they can't breathe.  Also, pepper spray has been given to
     asthmatic inmates, which runs a very high risk of compromising their breathing" (Kaufman at

18   219:4-12); "'You can't breathe.  It takes all your oxygen away. It's dehumanizing.  You feel like
     an animal'…"  (Kaufman at 219:13 – 220:5); UOF, including cell extractions, causes short and

19   long-term psychological harm to mentally ill inmates, including "an escalation of inmate anxiety,
     fear, paranoia and resistance" in the short term, and destruction of trust in custody and mental

20   health staff, and prolonged or recurrent psychotic episodes, and increased difficulty in
     participating in mental health treatment in the long-term.  (Kaufman at 177:1–178:10, 239:14-

21   240:9, 262:4-13); "Some inmates have almost a posttraumatic stress disorder in which they
     become very frightened of even seeing custody.  They have dreams and nightmares about

22   custody… And then with each succeeding psychosis there is potentially brain damage and
     definitely vulnerability to future psychotic episodes."  (*See* Kaufman at 177:1-178:10).).  The

23   testimony of Defendants' treating clinicians who testified to the contrary should be accorded no
     weight.  These clinicians do not meet the qualifications for unretained experts, their opinions

24   are not based on methodology that is reliable or accepted in the field, or even on relevant personal
     knowledge.  (*See* Trial Transcript at 219:4–220:5, 177:1–178:10, 239:14–249:9, 262:4-13.)  Fed.

25   R. Evid. 702 & 703; *see also* Pls.' Motion *in Limine* to Exclude or Limit Improper Testimony
     Offered by Non-Retained Witnesses and to Compel Adequate Disclosures (Dkt. 4924) at 3-4 & 7

26   (discussing testimony of Drs. Lindgren and Wadsworth).
     [10] Kaufman at 230:24-231:12.

27

28

                                          4
                        PLAINTIFFS' POST-TRIAL BRIEF

1   "systemic" violation.[11]  The deprivation of constitutional or other federal rights, pursuant to an

2   official policy or practice—including deliberate indifference evidenced by failure to correct a

3   policy resulting in constitutional violations or to provide training to employees necessary to

4   prevent the violation of federal rights—is what establishes a systemic violation under the Eighth

5   Amendment and 42 U.S.C. § 1983.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978);

6   *Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985), *City of Canton v. Harris*, 489 U.S. 378 (1989);

7   *see also* 912 F. Supp. 1282, 1320.

8          Defendants and their expert, Mr. Martin, used the wrong standard to evaluate whether a

9   systemic problem exists with use of force and discipline against class members in California's

10  prisons.  Mr. Martin's entire assessment was premised on a determination of whether there is a

11  "pattern or practice" of excessive or unnecessary force.  This opinion was based on the legal

12  standard in the Civil Rights of Institutional Persons Act, 42 U.S.C. § 1997a, which governs the

13  ability of the U.S. Department of Justice to institute civil actions for equitable relief against state

14  or local governments for constitutional violations, and requires as a prerequisite to such action that

15  the Attorney General find a "pattern or practice" of deprivation of rights.[12]

16         Mr. Martin's premised his conclusion that no "systemic" use of force and discipline

17  violation exists on his failure to identify a "pattern" of excessive force, pursuant to this

18

19

20  [11] Defendants also erroneously claim Plaintiffs must establish that individual custody officers act
    maliciously and sadistically for the purpose of causing harm in order to show unreasonable or
21  excessive force.  This has been explicitly rejected by this Court.  As this Court has already held,
    the proper test is the deliberate indifference standard.  *Coleman*, 912 F. Supp. at 1321-23; *see* Pls.'
22  Reply Br. (Dkt. 4766) at 2:4-10, n.2.
    [12] 42 U.S.C. § 1997a authorizes the U.S. Department of Justice to institute civil actions for
23  equitable relief against state or local governments which deprive prisoners of "any rights,
    privileges, or immunities secured or protected by the Constitution or laws of the United States
24  causing such persons to suffer grievous harm, *and that such deprivation is pursuant to a pattern or*
    *practice of resistance to the full enjoyment of such rights, privileges, or immunities*." (emphasis
25  added).  *See also U.S. v. Erie County, NY*, 724 F. Supp. 2d 357, 369 (W.D.N.Y. 2010) ("The
    statute's reference to the deprivation of rights being 'pursuant to a pattern or practice of resistance
26  to the full enjoyment of such rights' refers not to a municipal liability standard but to specific
    findings that the Attorney General must make before initiating a CRIPA action.").
27

28

1  inapplicable legal standard.[13]  Like Mr. Vail and Dr. Kaufman, however, Mr. Martin did find

2  ongoing systemic violations resulting from CDCR's force and disciplinary policies and practices,

3  as well as CDCR's failure to appropriately train staff, and identify corrective action—all of which

4  result in serious harm to the Plaintiff class.[14]  *See* Section C(2)(c), *infra*.

**C.    Evidence**

**1.    Defendants' Policies and Practices Result in the Use of Unnecessary Force and Inappropriate Discipline Against Class Members**

**(a)    Use of Force Policies**

Plaintiffs have demonstrated that CDCR's flawed policies expressly permit unnecessary and excessive force against class members.  Defendants have deliberately refused to alter their policies to prevent such abuses, ignoring this Court's previous findings, the recommendations of their own expert, and several reforms suggested by California's Inspector General.[15]  It is a fundamental precept of a civilized society that law enforcement authorities cannot use force against individuals as a matter of convenience but, rather, only when there is an actual and imminent threat to safety.  Yet, by policy, CDCR routinely substitutes force for competent and necessary clinical and custodial care, and in the absence of actual threats.  CDCR does not believe its approach problematic because, in its most astounding view, mentally ill people have a "higher than average threshold for pain," and do not remember the pain they encounter.[16]

**(i)    Immediate Use of Force**

CDCR policy authorizes and approves the use of immediate force against prisoners who "disobey lawful orders," without *any* consideration of mental illness and the prisoner's ability to comply with such an order, and without regard to whether such a refusal actually constitutes an imminent threat to the safety and security of the institution.[17]  The majority of uses of force

---

[13] Even were Plaintiffs required to establish a "pattern" of unreasonable use of force and discipline, the evidence clearly establishes such a pattern, as described in Sections C(1)-(2) *infra*.
[14] Vail at 463:21-464:2; Kaufman at 166:6-168:16; *see also*, Stainer at 960:12-17.)
[15] Stainer at 912:11-18, 913:18-915:12; Martin at 1874:24-1875:3
[16] Trial Testimony of John Lindgren ("Lindgren") at 712:6-20, 719:13–720:19, 791:8-22.
[17] *See, e.g.*, Martin at 1871:12-1872:24 (distinguishing between refusal to obey lawful order and imminent threat).

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

1   against *Coleman* class members are immediate and not videotaped, making them even less

2   susceptible to review than the "controlled" use of force incidents shown in the videos played in

3   Court (each of which was approved through all levels of CDCR's internal review process).  This

4   includes the immediate use of OC spray against prisoners who in any manner obstruct their food

5   port, regardless of the actual threat posed and without any consideration of mental health status.[18]

6   Despite repeated federal court findings that this type of use of force violates the constitution,

7   Defendants have deliberately declined to alter their policies to prevent such abuses.[19]

8                            **(ii)   OC Spray**

9         By policy and practice, CDCR currently authorizes and approves "controlled" use of force

10  for cell extractions of prisoners with mental illness, with a policy preference for the use of OC

11  spray for these extractions.[20]  The amount of spray used and lack of waiting periods between

12  applications is extraordinary. [21]  Despite actual knowledge that "too much" OC spray is routinely

13  used, CDCR deliberately declined to ban, limit, or even measure its use.[22]  For example,

14  Mr. Stainer testified that application of *forty* OC sprays and *six* grenades against an unarmed

15  mentally ill inmate, in his cell, was not unreasonable or excessive, and was consistent with CDCR

16  policy.[23]  Even after Defendants' own expert, Mr. Martin, raised this incident with high-level

17

---

18  [18] Vail at 151:12 – 152:16, 435:17 – 436:18; 553:5-554:4.

19  [19] *See, e.g.*, *Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995).

20  [20] Martin at 1796:24 – 1797:16.

21  [21] *See*, e.g.: "[T]he amounts and the lack of time that they take between applications is extremely excessive for any inmate let alone a mentally ill inmate"  (Vail at 423:6-13); "[T]he amount of spray pumped into that cell was enormous and excessive" (Vail 271:25–272:22:, discussing Inmate E); "There was a point at which the command staff should have disengaged the use of weaponry that obviously was not achieving the tactical goal, because it not only was obviously ineffective, it could have reached the point of endangering that inmate through its sheer volume" (Martin at 1820:8-21, discussing Inmate A); "I probably would have severely critiqued it in a manner of letting the officers know they were perilously close [to excessive UOF]" (Martin at 1824:1-4, discussing Inmate D); OC spray is used when it is obviously ineffective and with insufficient waiting periods (Stainer at 827:1-4, 915:18-916:14); It is "critical" not to use crowd control canisters of pepper spray in the cell of an unbarricaded unarmed mentally ill inmate (Martin at 1913:4-9).

27  [22] *See* Vail at 129:6-17, Stainer at 810:21-23.

28  [23] Stainer at 965:20-23 Stainer at 965:20-23, 966:24-967:9.

1015767-2

1   CDCR administrators and provided specific enumerated recommendations for regulating the use

2   of OC spray, Defendants declined to make any changes to their policies.[24]  Instead Mr. Stainer

3   issued a vague memorandum that provided no meaningful guidance regarding use of OC spray.[25]

4   As this Court found in 1995, this is the essence of deliberate indifference, in violation of the

5   Eighth Amendment.  912 F. Supp. at 1319 ("[P]atently ineffective gestures purportedly directed

6   towards remedying objectively unconstitutional conditions do not prove a lack of deliberate

7   indifference, they demonstrate it.").

8          CDCR also considers the force used in each of the six videos shown in court to be within

9   policy and not to be unnecessary or excessive.[26]  Defendants' own expert testified, however, that it

10  is inappropriate to use OC spray on an inmate who cannot conform his or her behavior, or when it

11  is obviously ineffective.[27]  Yet only after the videos were shown in open court, did CDCR even

12  begin to *consider* new guidelines.  And it still refuses to acknowledge the need to protect or

13  accommodate class members who may have difficulty obeying orders because of their mental

14  illness, or for whom this type of force may have negative psychiatric consequences.[28]

15                     **(iii)      Expandable Baton**

16         Similarly, CDCR ignored its own expert's concern that CDCR's policy provides "virtually

17  no guidance regarding the use of the expandable baton."[29]  Both Mr. Martin and Mr. Vail noted

18  their serious concerns about CDCR's practice of using the baton offensively for pain compliance,

19  rather than defensively, as used in other systems.[30]

20                     **(iv)      Pre-Force Interventions**

21         By policy and practice, Defendants today continue to be deliberately indifferent to the

22  clinical needs of prisoners with mental illness in a manner that results in unreasonable use of force

23  and discipline against class members.  Defendants have created what Mr. Martin calls an elaborate

24  ───────────────
    [24] Stainer at 912:8-915:17; 926:1-18, 928:24-929:19.
25  [25] Ex. J.
    [26] Stainer at 910:20–912:7; Lindgren at 787:8–788:3, 788:21-789:12.
26  [27] Martin at 1868:12-25.
    [28] Stainer at 960:12-961:7.
27  [29] Stainer at 927:23-928:23; Martin at 1809:23-1810:22; Ex. K.
    [30] Vail at 97:12-98:9; Martin at 1809:23-1810:22; Ex. K.
28

system that is based on "checking boxes" but is not designed to fundamentally change CDCR's approach towards mentally ill inmates.[31]  Following *Gates* and the original *Coleman* decisions, Defendants established a requirement for "clinical intervention" prior to a controlled use of force involving an inmate at the EOP level or higher.[32]  Other than prohibiting use of the specific weapons (tasers and 37 mm block guns) employed by CDCR at the time of the original *Coleman* trial against mentally ill prisoners at an EOP level or higher, this is the *only* procedural requirement in CDCR's use of force policies that accounts for a prisoner's mental health status.[33] Defendants do not dispute that the "interventions" performed immediately prior to controlled uses of force are perfunctory and do not constitute meaningful clinical interaction.  Rather, they take the position that "real" clinical interventions take place in the hours and days before a controlled use of force occurs.  As Plaintiffs' experts explained, however, this simply is not true.[34]

Defendants have also suggested that they subject class members to these horrific cell extractions "for their own good," in order to provide medication and treatment.  Not only is this rationale an unacceptable justification for use of force (*see* 1994 U.S. Dist. LEXIS 20786 at *77-83), but it is also directly contradicted by the evidence.  For example, Dr. Stewart testified that after Inmate E was extracted to be transferred to the mental health crisis bed unit for a comprehensive mental health evaluation, he was released one day later back to the same cell in the

---

[31] Martin at 1890:4-15; 1896:16-1898:14; *see also* Vail at 464:15-465:15.

[32] DOM, Article 2, § 510201.12.2.

[33] Eleven of the seventeen cell extraction videos Defendants produced involved inmates classified only at the CCCMS level of care.

[34] Plaintiffs' forensic psychiatric experts, Dr. Kaufman and, in the case of Inmate E, Dr. Stewart, reviewed the medical files of class members subjected to cell extractions, and found no record or indication of such interventions.  Defendants presented no actual evidence to contradict these findings.  In fact, Dr. Wagner, the psychiatrist who treated Inmate A testified that he deliberately allowed Inmate A to decompensate in his cell to the point where a cell extraction was determined necessary rather than conduct meaningful and standard clinical intervention.  He also deliberately ordered Inmate A to be kept in five-point restraints for almost 72 hours because Inmate A would not "take responsibility" for the events leading to restraints (Wagner at 663:12-20), although, Dr. Wagner testified in court that Inmate A was not capable of rationally responding or making decisions at that time, and could not have complied with the criteria Dr. Wagner set to be released from restraints (Wagner at 672:6-15).  No CDCR supervisor, has questioned, criticized or corrected Dr. Wagner's views or approach.  (Wagner at 648:10-11.)  To the contrary, Defendants deliberately chose to offer him as a key witness in this case.

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

1    administrative segregation unit at San Quentin without that evaluation.  Then, over the next six

2    months, Inmate E was subjected to at least three more cell extractions, another use of force, and

3    received eleven or more RVRs, before he was finally transferred to an acute inpatient hospital.[35]

4    As Dr. Stewart stated, if Inmate E had actually been provided appropriate and timely mental health

5    treatment, "none of the following use of force would have been necessary."[36]

### (b)    RVR Policies

#### (i)    Provision of Mental Health Diversion

8            CDCR has refused to incorporate mental health diversion from the disciplinary process in

9    order to provide accommodation for inmates whose behavior was related to mental illness rather

10   than willful disobedience.[37]  Instead, the agency uniformly issues Rules Violations to prisoners

11   with mental illness against whom force is used, even when they were indisputably too

12   decompensated to understand or follow the orders involved.  Even Defendants' proffered rationale

13   of using force against prisoners with mental illness "for their own good," falls apart where the

14   record demonstrates that Defendants also impose disciplinary sanctions on these same inmates.[38]

15   Defendants' expert Mr. Martin testified that "of course" no competent correctional system would

16   charge a prisoner with mental illness who has decompensated in his cell and is subjected to a cell

17   extraction with a rule violation.[39]  Yet, in every single instance of a cell extraction of a class

18   member for which Defendants produced documentation, CDCR charged the prisoner with a rule

19   violation *and* found the prisoner guilty.[40]  Moreover, after reviewing hundreds of rules violations

20   issued to class members, neither Mr. Vail nor Mr. Martin found even a single instance in which a

21   class members was found not guilty as a result of consideration of mental illness.[41]  An appropriate

22   disciplinary policy includes diversion for behaviors that are symptomatic of mental illness,

---

[35] Trial Testimony of Pablo Stewart, M.D. ("Stewart) at 345:5-356:8.

[36] Stewart at 348:4-13.

[37] *See* Martin at 1869:25-1871:1(explaining that inmates should not receive an RVR because their mental health status decompensated to the point where a cell extraction was necessary).

[38] *Id.*

[39] Martin at 1872:25-1873:5; Vail at 131:10-132:5.

[40] *See, e.g.*, Exs. 2A-C (Inmate A), 20A-C (Inmate J), 23A-C (Inmate C), 33A-C (Inmate Q).

[41] Martin at 1869:25-1871:; Vail at 486:12-25.1

PLAINTIFFS' POST-TRIAL BRIEF

1   mitigation of the penalty where appropriate, and tailoring of a disciplinary sanction when

2   necessary to accommodate an inmate's mental health needs.[42]  CDCR fails this test.

### (ii)   Inadequate Mental Health Assessments

4       Both Plaintiffs' and Defendants' experts agree that mental health assessments are many

5   times inadequate, and even when clinicians recommend mitigation, CDCR fails to track, review,

6   or otherwise ensure that the disciplinary process meaningfully considers and provides

7   accommodation for mental illness. [43]  While this is certainly a custodial failing, both parties'

8   experts found evidence that there are problems on the clinical side as well.[44]  Refusal of CDCR

9   officials to recognize and address these problems is further evidence of their conscious disregard

10  for the harm perpetuated in its institutions.

### (iii)   Punishment Beyond the RVR Process

12      Even on occasions when a hearing officer does "mitigate" punishment to reduce the loss of

13  good time credits and privileges, inmates who receive an RVR for a "SHU-able offense"

14  (including disobeying/delaying a Peace Officer, which is the category often used for issuing rules

15  violations associated with uses of force against inmates), or who receive a referral to the local

16  District Attorney's office, are held in administrative segregation until their RVR hearing, even if

17  the underlying offense was not violent.[45]  Further, in the rules violation adjudication process, even

18  if punishment is "mitigated" to some degree, an inmate is still referred to the Institutional

19  Classification Committee for a SHU term, and possibly also to the DA for a separate

20  prosecution.[46]  Once in segregation, inmates receive all treatment in a cage or ATOM chair, and

21  are subjected to strip searches upon exit and entry of their cells, even for mental health treatment.[47]

22      Finally, Defendants deliberately allow wardens to bypass the formal disciplinary process

---

[42] Martin at 1946:2-22.

[43] Vail at. 143:19-144:17; Stainer at 974:8-19; Martin at 1871:9-23.

[44] *See, e.g.*, Martin at 1945:5-11 (at CMF the psychologist never found an instance where an inmate's mental illness contributed to the behavior giving rise to the RVR).

[45] Allison Depo. Desig. at 77:24-78:17, 79:25-80:4, 85:18-86:3.

[46] Stainer at 960-964:16-24

[47] Allison Depo. Desig. at 202:21-203:21.  Even Defendants' expert conceded that classification decisions can have punitive effects on mentally ill inmates.  Martin at 1841:1-10.

1   and arbitrarily impose immediate "management status" as a restrictive disciplinary punishment on

2   Coleman class members.[48]  This, too, is done without regard for mental illness, and is governed

3   exclusively by local operating procedures, written and unwritten, that vary by institution and, by

4   design, were not reviewed by CDCR administrators or submitted to the Special Master.[49]

5                          **(c)    CDCR's Review Process**

6            Because excessive force and inappropriate disciplinary sanctions are permitted by policy,

7   they are sanctioned by CDCR's review process.  CDCR systemically approves force and

8   discipline against mentally ill inmates whose behavior is related to mental illness.  Not one

9   incident discussed during this trial was referred for investigation by any warden or CDCR

10  supervisor.[50]  Not one incident was evaluated in terms of how force was used or why it became

11  necessary to use it in the first place.[51]  This is because CDCR's internal reviews examine only

12  whether the conduct at issue was in compliance with policy,[52] and because CDCR custody staff

13  and supervisors are not adequately trained, and therefore cannot appropriately determine whether

14  force is reasonable.[53]

15           Mr. Martin testified that the "bedrock of a use of force system is ensuring the integrity of

16  reviews of use of force."[54]  He found it "disturbing" that the "sophisticated IERC, with all these

17  ranking administrators as experienced as Director Stainer, could read these reports and not at least

18  question the amount of spray or the tactics used and/or refer those [17 videos], because until

19  you're getting that type of action, you're not substantively reviewing the cases.  You're simply

---

20  [48] Vail at 273:14-23, 454:12-24; Stainer at 889:9-21.

21  [49] Vail at 243:24-25:1, 454:25-455:14; Stainer at 888:6-891:14.

22  [50] *See, e.g.*: **Inmate A**:  No IERC criticism of amount and necessity of spray used (Vail at 110:21–112:16); **Inmate B**: No IERC criticism of amount and necessity of spray used (Vail at

23  117:4-11); **Inmate E**: No IERC criticism of "fucking pussy" comment, which is "the path to institutionalizing in a culture that lends itself to harm, to institutionalized harm" (Martin 1904:25-

24  1905:18); **Inmate L**: 40-spray incident was not flagged by IERC for further review because CDCR considers even that amount of spray to be "within policy" (Stainer at 965:20 – 967:25).  No

25  officer involved in any of the 17 videos was disciplined.  Stainer at 954:6-17.

    [51] The IERC review process does not examine "why" an inmate was allowed to decompensate to

26  the point where UOF occurred.  Vail at 138:21–139:24; Stainer at 954:18-955:12.

    [52] Day Depo. Desig., 114:4-16.

27  [53] Martin at 1862:5-17 & 1859:20-23.

    [54] Martin at 1901:20-23.

28

1    processing them."[55]

2        **2.    The Evidence Presented by Plaintiffs Shows That Constitutional**
         **Violations in the Use of Force and Discipline Against Class Members**
3        **are Systemic**

4        Defendants' contention that Plaintiffs have provided only "isolated examples" of

5    "aberrations" or "outliers" is contrary to the evidence.  Plaintiffs have presented ample proof that

6    the incidents highlighted in court represent Defendants' systemic practices.

7        **(a)    The Universe of Controlled Use of Force Videos**

8        Defendants' analysis of the data—which they themselves provided—is wrong on its face.

9    During termination discovery, Plaintiffs requested every controlled use of force video generated

10   from July 1, 2012 into February 2013 for each of the four prisons visited by Mr. Vail.  Defendants

11   produced 17 videos. Every single one of these recordings shows unreasonable use of force against

12   class members.[56]  Yet CDCR found that all of the videos depicted behavior that was consistent

13   existing CDCR policy.[57]  While Defendants asserted that Plaintiffs showed only the six worst

14   cases, they declined to introduce any of the supposedly exonerating videos, despite a Court Order

15   expressly permitting them to do so.  As this Court observed, "sometimes the absence of evidence

16   is just as persuasive as the presence of evidence."[58]

17       The evidence is therefore undisputed that all of the controlled uses of force at issue in this

18   case were consistent with CDCR policy and involved behavior which was and is approved

19   throughout the chain of command.  Moreover, Plaintiffs presented evidence that these particular

20   incidents constitute only a small subset of the force used against prisoners with mental illness, and

21   that the far larger universe of force applications against class members are subject to even less

22   scrutiny than what was recorded in the videos shown in Court.  As Mr. Vail and Mr. Martin both

23   testified, "the mere fact of turning on the cameras" means officers "likely act more in accord with

24   _____

25   [55] Martin at 1903:13-19.  Having an adequate number of trained investigators is "critical" for any
     UOF review system.  OIG reported that OIA's training budget has been slashed by 80% and have
26   over 20% vacancy rate.  (OIG 2013 Semi-Annual Report Vol. 1).
     [56] Vail at 439:8-19.
27   [57] Stainer at 910:20–912:7; 965:20-23, 966:24-967:9.
     [58] Trial Transcript at 2065:21-22.
28

1  how they're required to act."[59]

2  **(b)**      **Defendants' Own Use of Force and RVR Statistics**

3      It is undisputed that *Coleman* class members are subjected to uses of force and disciplinary

4  actions at a rate far disproportionate to their representation in the prison population.[60]  This

5  evidence points to systemic discrimination against and abuse of mentally ill prisoners.  It also

6  demonstrates a lack of awareness and consideration of the effects of mental illness on prisoners'

7  abilities to comply with orders, as well as indifference to the negative effects of force and

8  discipline on mental health.  Defendants have offered no evidence to justify such

9  disproportionality, instead proffering only the specious contention that it is common in other

10  jurisdictions as well, or that their own self-reported data is somehow flawed.  The evidence

11  demonstrates that CDCR does not even bother to analyze its own data regarding its treatment of

12  *Coleman* class members.[61]

13  **(c)**      **Mr. Martin's Flawed Methodology**

14      The only evidence Defendants offered to repudiate Plaintiffs' claim of systemic violations

15  is Mr. Martin's testimony and report that he found no "pattern or practice" of constitutional

16  violations.  Putting aside that he used the wrong legal standard, Mr. Martin's conclusion should be

17  accorded little, if any, weight because his methodology was unreliable and inadequate.  During the

18  course of Defendants' secret termination discovery process, Mr. Martin failed to look at the

19  universe of use of force incidents against Coleman class members for the institutions he visited for

20  any given time period, nor did he trace any incidents from the use of force through the inevitable

21  disciplinary sanction.[62]  Mr. Martin did not describe any defined criteria used to select incidents he

22  reviewed; nor was the sampling consistent across institutions.[63]  This does not meet any known

23  standard for sampling methodology.  *See* Fed. R. Evid. 702 (testimony must be product of reliable

24  _____

25  [59] Vail at 439:20-44:24; Martin at 1837:21-25.
    [60] Exs. 62B, 62C, 62D, 63B, 63C, 63D (diagrams comparing, by prison, MHSDS population to

26  incidents of use of force events and RVRs); Martin at 2004:7-15.
    [61] Stainer at 973:3-19.

27  [62] Martin at 1980:6-1981:10.
    [63] Martin at 1996:19-2004:21.

28

1   principles and methods, and expert must reliably apply principles and methods to facts of case);

2   *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526

3   U.S. 137 (1999).  When pushed, Mr. Martin admitted that his review was not representative and he

4   disclaimed any ability to draw conclusions for CDCR operations as a whole.[64]

5          In contrast, Mr. Vail requested documentation for every single use of force incident against

6   *Coleman* class members over a defined time period for each institution he visited.  He examined

7   every set of reports produced by Defendants, covering some more than 400 incidents.[65]  Mr. Vail

8   also read all of the additional materials reviewed by Mr. Martin.  Mr. Vail found widespread use

9   of unreasonable force against class members based on this analysis, using an understandable and

10  reasonably reliable approach of the type generally relied on by experts in the field.[66]

11         Mr. Martin also opined that while he found "no pattern and practice of use of force

12  violations," he identified a number of "serious concerns about the way in which California was

13  treating its mentally ill inmates," including:  failure to appropriately train CDCR custody officers

14  and supervisors as to use of force; demonstrated "ineptness and a lack of competence" by CDCR

15  officers; armament of CDCR officers with weapons unprecedented in any other system in the

16  country; decreased likelihood of use of verbal de-escalation and the failure to focus on human

17  interactions and relationships that would avoid the need for use of force, particularly when dealing

18  with prisoners with serious mental illness.[67]  Mr. Martin would also agree that a systemic problem

19  arises when inmates are disciplined for behaviors related to mental illness, such as issuing RVRs

20  for cell extractions of decompensating inmates.[68]  Mr. Martin also advised that while he called his

21

---

22  [64] Martin at 1968:10-16, 1997:6-1998:14.

    [65] Vail Reply Decl. (Dkt. 4766-2 & Ex. 180) at ¶ 2.

23  [66] Vail Decl. (Dkt. 4638-1 & Ex. 124); Vail Reply Decl. (Dkt. 4766-2 & Ex. 180).

    [67] Martin at 1853:2-9, Martin 1859:20-23, 1862:5-1, 1863:21-1869:10, 1871:12-1872:24.

24  [68] Mr. Martin explained his concern that there could be a "Perfect Storm" based on highly
    segregated and restrictive housing environment, lack of appropriate mental health treatment and

25  programming, use of force, discipline, and further restricted housing—a cycle that he described as
    one "where you have placed that offender in a situation in which he simply cannot cope on a daily

26  basis without decompensating, without struggling more and more, which again manifests itself in
    the difficult task of managing that offender." (Martin at 1857:9-1858:15)  Despite reviewing

27  hundreds of use of force reports and, separately, hundreds of RVRs, Mr. Martin deliberately

28  (cont'd…)

15

1  suggested reforms "best practices," they were actually "sound correctional management" practices

2  he believed were *constitutionally required* to remediate Defendants' current flawed policies and

3  practices governing use of force and discipline.[69]

4         In fact, all of these observations by Defendants' own expert closely track the original

5  findings made by the Magistrate Judge in 1994 with respect to use of force and disciplinary

6  practices against class members.  These include, *inter alia*: custody staff lack sufficient training to

7  differentiate between an inmate who is acting out as a result of mental illness and an inmate who is

8  acting out for other reasons; mentally ill inmates who act out are typically treated with punitive

9  measures, without regard to their mental status, to include the use of weapons;  custody staff

10  escalate conflict by demanding compliance to orders, then use force; use of weapons against class

11  members in this context causes further damage and deterioration of mental condition and reduces

12  the possibility that future mental health treatment would be successful; inmates who act out as a

13  result of mental illness are treated only as custody problems and subjected solely to punitive

14  measures rather than provided with necessary care in conjunction with appropriate discipline.

15  1994 U.S. Dist. LEXIS 20786 at *71-84.

16        **D.**      **Requested Relief**

17         Without orders from this Court, Defendants cannot be relied upon to act in a timely and

18  effective fashion.  Despite the OIG's concerns with CDCR's pepper spray policy in November

19

20

---

21  (…cont'd)

declined to look at the disciplinary consequences for mentally ill inmates who were subjected to

22  uses of force.  1982:6-1983-10.  Had Mr. Martin looked, he would have found evidence of his
"Perfect Storm," just as Mr. Vail and Dr. Kaufman did.

23  [69] "[I]t's like an automobile that is bugging out towards empty.  It is running, and it is getting you
from point A to point B, but at any point in time you can run out of gas and the car stops, the car

24  stopping being the constitutional issue."  (Martin at 1872:4-12.)  Despite Martin's finding of "no
pattern and practice," his recommendations to CDCR were on "important matters" to ensure "that

25  the agency not run afoul or cross that line into an unconstitutional operation."  (Martin at 1773:19–
1774:10.)  "There, in my view, is a need for them to take some corrective measures to insulate or

26  create a bright-line between constitutionally suspect actions and good correctional practice … Do
they fail to do that, there's no doubt in my mind what is likely to happen … If they can't see it,

27  then they're in trouble."  (Martin at 1841:19-1842:18)

28

1   2011,[70] Mr. Martin's recommendations for reform in 2012,[71] and Plaintiffs' filing of the instant

2   motion in May 2013, Defendants made no move toward remedial action until the week Mr. Stainer

3   was scheduled to testify at trial.[72]  Even then, none of these possible reforms are aimed specifically

4   at resolving issues confronted by *Coleman* class members.[73]

5           **1.      The Court Has Authority to Issue Specific and Targeted Remedial
                      Orders**

6

7           This Court has the authority to issue specific orders targeted at finally remediating

8   Defendants' unconstitutional use of force and discipline against prisoners with mental illness.

9   Constitutional deficiencies in the use of force and disciplinary process were part of the Court's

10  original findings in this case.  Defendants have had almost two decades to remediate these

11  violations, and failed to do so.

12          As the Supreme Court held in this very case, if the government fails to fulfill its

13  constitutional obligations, "the courts have a responsibility to remedy the resulting Eighth

14  Amendment violation. … Courts may not allow constitutional violations to continue simply

15  because a remedy would involve intrusion into the realm of prison administration."  *Brown v.*

16  *Plata*, 131 S. Ct. 1910, 1928-29 (2011).  While deference by a federal court to prison

17  administrators in choosing how to remedy constitutional violations is appropriate, "the Court is

18  not required to restrict its powers to those means that have proven inadequate, or that show no

19  promise of being fruitful."  *Plata v. Schwarzenegger*, 2005 WL 2932253 at *24 (N.D. Cal. Oct. 3,

20  2005).  Moreover, a "defendant's history of noncompliance with prior court orders is a relevant

21  factor in determining the necessary scope of an effective remedy."[74]  *Toussaint v. McCarthy*, 801

---

22  [70] Ex. 159 at 19.

23  [71] Ex. K.

    [72] Stainer at 915:18-916:20.

24  [73] Stainer at 960:12-961:7; *see also* Stainer at 964:16-24 (CDCR has never considered banning
    ICC/DA referrals when there is a finding that mental illness contributed to behavior giving rise to

25  the violation).

26  [74] For example, the Special Master engaged in extensive efforts to induce Defendants to provide
    appropriate diversion and consideration based on mental health considerations in the disciplinary

27  process, but Defendants have refused.  *See* Pls.' Mot. for Enforcement of Orders and Aff. Relief
    Related to UOF and Disciplinary Measures (Dkt. 4638) at 19-23.  Moreover, Defendants'

28  (cont'd…)

1   F.2d 1080, 1087 (9th Cir. 1986); *see also Hutto v. Finney*, 437 U.S. 678, 690 (1979). ("federal

2   courts are not reduced to issuing injunctions against state officers and hoping for compliance.

3   Once issued, an injunction may be enforced.").  Although Defendants may have started to talk

4   about to an eleventh-hour effort to avoid further judicial orders on these issues, 18 years in the

5   remedial phase of this case instruct otherwise.  This Court must act to stop the harm to class

6   members caused by Defendants' force and disciplinary policies.

7                   **2.       Specific Relief Requested**

8           Plaintiffs have demonstrated the need for this Court to order Defendants to do what they

9   have conclusively established they will not their own:  stop using force and discipline to punish

10  people for being sick, and implement policies and practices that provide class members with the

11  mental health treatment—and human dignity—that the Constitution requires.

12          Mr. Vail observed that "CDCR runs an insular system that has sold themselves a delusion

13  that inmates in California are somehow different and more difficult than those in other states.

14  They are not different; they are just treated that way and the results are predictable."[75]  Solving the

15  problems identified in Plaintiffs' motion is not impossible.  Mr. Martin testified that running a

16  sound correctional system that appropriately identifies and remedies systemic issues affecting

17  prisoners with mental illness is "not rocket science."[76]  But it does require orders from this Court.

18          Defendants must be ordered to promptly revise their use of force policies and procedures to

19  minimize the potential for unnecessary and excessive uses of force against class members,

20  especially with respect to the use of "immediate" uses of force, the use of OC spray and grenades,

21  and the use of the expandable baton.[77]  This Court should prohibit the use of OC spray and

22  expandable batons against inmates with mental illness in housing units, holding cages, mental

23  _____

24  (…cont'd)
    suggestion during the evidentiary hearing that use of force policies are "new," dating only to 2010,
    is a red herring.  The main body of the State's use of force policies existed long before that.
25  Moreover, nothing in *Madrid* changed Defendants' use of force policies or review process relating
    to prisoners with mental illness.
26  [75] Vail Decl. (Dkt. 4385 & Ex. 112) at ¶ 139.
27  [76] Martin at 1974:8
    [77] *See* Pls.' Proposed Order (Dkt. 4638-3).
28

1   health crisis bed units, EOP units, and inpatient hospitalization units, except when circumstances

2   call for extreme measures to protect staff or inmates.  Extensive evidence exists that inmate-

3   patients with serious mental illness can be safely and appropriately managed without the force

4   currently used by CDCR.[78]

5       This Court should also order Defendants to revise their procedures and practices to enforce

6   the existing restriction of "immediate" uses of force to situations constituting "an imminent threat

7   to institution/facility security or the safety of persons,"[79] and to include a requirement for

8   videotaping immediate uses of force whenever possible.[80]

9       Defendants should be directed to promptly revise the disciplinary process to create a

10  mental health diversion prior to the issuance of a Rule Violation Report, and to provide an

11  opportunity for mitigation at the guilt phase of the disciplinary adjudication.  Defendants must also

12  revise the procedures followed during the disciplinary process to comply with the Constitution and

13  the ADA, including creating a new protocol for the provision of a staff assistant to ensure that this

14  is a meaningful and effective accommodation.

15      Defendants should be ordered to revise their policies and procedures to create a team

16  custodial-clinical approach in EOP, MHCB, inpatient units, and other units housing *Coleman* class

17  members.  This should include continuous and extensive training for both custodial and clinical

18  staff on strategies for managing prisoners with mental illness, including management of assaultive

19  behavior techniques, the legal standards for application for administration of involuntary

20  medication, and consideration of mental health in the disciplinary process.[81]

21      The Court should also prohibit the use of any informal, ad hoc, or local procedure, such as

22  Management Status, that is outside the formal disciplinary procedures.

23      Finally, Defendants should be ordered to work with the Special Master and Plaintiffs'

24  _____

25  [78] Vail at 469:20-472:9; 540:21-542:15; 544:15-545:14; 550:7-24; Kaufman at 196:7-200:14;
    215:11-216:2; 220:6-221:10; 253:1-17; Stewart at 349:14-351:6; Woodford at 1141:20-1146:15;
26  Stainer at 950:19-952:10.
    [79] DOM, Art. 2, Ch. 5 § 51020.4.
27  [80] *See* Pls.' Proposed Order (Dkt. 4638-3).
    [81] Vail at 485:10–486:11; Kaufman at 220:12–221:10, 256:18–257:12.
28

1015767-2

19

1    counsel to develop a remedial plan, including the implementation of pilot programs that focus on

2    implementing the kind of custody-clinical team-oriented approach described by the experts.  The

3    plan should also include requirements for effective data collection and analysis, quality assurance,

4    and review, focused specifically on class members.

5    **II.      DEFENDANTS ARE FAILING TO PROVIDE CONSTITUTIONAL MENTAL HEALTH CARE TO CONDEMNED INMATES AT ANY LEVEL OF CARE**

6

7         California's death row has grown large and overcrowded, and now holds more than 700

8    men and women.[82]  In 2011, Governor Brown cancelled the previously approved and funded

9    project to build appropriate housing and treatment space for death row.[83]  The suicide rate for

10   California's condemned is far higher than the national average for death rows and is evidence of

11   failures of the mental health system.[84]  Mental health care for the condemned is improvised and ad

12   hoc, operating without regard for the remedies ordered by the Court and carefully enumerated in

13   the Program Guide, and applied to all other California prisoners.

14   **A.      Condemned Prisoners Are Wrongfully Denied Access to Both Intermediate and Acute Inpatient Psychiatric Hospitalization**

15        Defendants deny the condemned any access to intermediate inpatient hospitalization ("ICF

16   care").[85]  Defendants themselves have directly connected the denial of ICF care to the high suicide

17   rate on death row, finding that for the years 2006 through 2011, "31 [c]ondemned inmate-patients

18   were identified as those who would benefit from an ICF level of care with another 14 being

19   monitored for possible inclusion," and noting that "*approximately 20% (6 of 31) inmate-patients*

20   *who would have benefitted from an ICF level of care have effected suicide.*"[86]

21        Defendants allow condemned prisoners access to CMF's acute psychiatric hospital

22   (Vacaville Psychiatric Program, or "VPP") that is so restricted by extreme custodial policies any

23

24   _____

25   [82] Woodford at 1078:5- 1078:3; Ex. 1086.
     [83] Ex. 1002 ¶ 37.

26   [84] Stewart at 314:20-319:11; Trial Testimony of Christopher Wadsworth, M.D. ("Wadsworth") at 1563:11-1566; Exs. 1074, 1076, 1077, 1078, 1079, 1080, 1081, 1082 & 1178.

27   [85] Trial Testimony of Eric Monthei, M.D. ("Monthei") at 1250:24-1251:5 & 1466:18-1467:2.
     [86] Ex. 1043 at 1.

28

1  therapeutic benefits are essentially eliminated.[87]  Condemned prisoners cannot participate in the

2  Step program, group therapy, or *any* group activities, including yard, dayroom, and all other

3  recreational programs.[88]  Dr. Stewart testified that these custodial restrictions unduly interfere with

4  acute psychiatric hospitalization.[89]

5        There are no legitimate custodial or clinical rationales for this blanket denial of inpatient

6  hospital care to death row inmates.  Penal Code Section 3600(b)(4) does not prohibit the transfer

7  of death row patients to ICF care and condemned inmates are regularly sent to other prisons and

8  community facilities for medical care.  Jeanne Woodford testified that as Warden of San Quentin,

9  she routinely sent condemned inmates "to other prisons for physical therapy for long periods of

10  time."[90]  The current Warden testified at deposition that this remains the case.[91]  This oxymoron is

11  illustrated by the example of Inmate WWW, who committed suicide in March 2013, and was who

12  sent to Corcoran prison for physical rehabilitation after horrifically blinding himself, but who

13  could not be considered for a transfer to ICF care due to his death row status.[92]  Defendants'

14  declarants identified several locations within existing DSH programs where intermediate inpatient

15  care could be safely provided to condemned inmates.[93]  Ms. Woodford testified that the physical

16  security at the ICF hospitals at VPP and SVPP exceed the security present at San Quentin, in that

17  CMF and SVSP have electric fences.[94]

18        Defendants offered no persuasive evidence to justify these restrictions on inpatient

19  psychiatric hospitalization for condemned inmates.  Ms. Woodford testified that there is no

20  custodial justification for the discriminatory policies and that it is Defendants' responsibility to

---

[87] Ex. 1140.

[88] Trial Testimony of Bennie Carter, M.D. ("Carter") at 1003:10-1004:18; Excerpts of Deposition of Michelle Bachman, lodged 11/8/13 ("Bachman Depo.") at 111:1-17, 112:7-20.

[89] Stewart at 290:17-293:16.

[90] Woodford at 1138:13-21.

[91] Excerpts of Deposition of Kevin Chappell, lodged 11/8/13 ("Chappell Depo.") at 98:21-25 & 102:4-9.

[92] Ex. 1082 at 9.

[93] Duffy Decl. (Dkt. 4599) ¶ 9 (VPP could designate a 16-bed quad for program); Grounds Decl., (Dkt. 4604) ¶ 17 (SVPP could designate a 16-bed wing).

[94] Woodford at 1137:9-1138:12.

1015767-2

"provide inmates with the treatment they need, and then it is up to custody to decide what custody provisions need to be in place…"[95]  A policy requiring individualized assessments of the security concerns of each death row patient can be developed and safely implemented.[96]  Any one of the inmates whose central files Ms. Woodford reviewed—all identified as potentially in need of ICF care—could safely participate in such care.[97]  And the Acute Psychiatric Program ("APP") safely treats "very high risk inmates from Pelican Bay and other places, inmates serving life without possibility of parole."[98]

San Quentin Warden Chappell and Dr. Monthei testified that the extreme custodial barriers to treatment imposed at CMF on the condemned are not in place at San Quentin and are unnecessary.[99]  Ellen Bachman, the Director of the VPP and a former recreation therapist, provided no legitimate custodial or clinical justifications for the extreme restrictions at her deposition.[100]

The only rationale Defendants offered for the extreme custodial restrictions on death row patients receiving treatment in the APP was Dr. Carter's unsubstantiated view of death row patients as "predatory" and "maladaptive," who have "milder stressors" and are better "accommodated" to their mental illnesses, or do not have serious mental illness.[101]  Dr. Carter's opinion, based on his "study" of death row prisoners, should be given little or no weight as it fails the basic rules of admissibility for expert testimony.  *See* Fed. R. Evid. 702; *see also* Pls.' Motion In Limine to Exclude or Limit Improper Testimony (Dkt. 4924) at 5-8.  Death row patients are denied access to group therapy and the other treatment in the APP based on their legal status alone.[102]  As a result, death row prisoners understandably object to transfers to the APP,[103] and

---

[95] Woodford at 1104:10-15.
[96] Ex. 1002 ¶ 48.
[97] Woodford at 1104:16-1105:13.
[98] Woodford at 1100:13-1101:3; *see also id.* at 1102:6 (testifying that death row inmates' behavior is no different than other inmates).
[99] *See* Chappell Depo. at 118:17-119:9 (contact with other inmates); *id.* at 120:21-122:2 (day room); *id.* at 123:16-24 (group therapy); Monthei at 1261:9-11 (group therapy); 1261:6-8 (condemned and non-condemned housed in San Quentin MHCB).
[100] Bachman Depo. at 72:8-73:10, 75:19-80:7, 77:7-25 & 79:10-80:12.
[101] Carter at 1000:23-1001:14, 1004:12-18, 1006:19-23, 1015:11-20 & 1023:17-1024.
[102] Carter at 1026:1-1027:16.

1015767-2

1  San Quentin psychiatrists hesitate to refer even severely mentally ill condemned individuals like

2  Prisoner WWW to the acute program.[104]  Defendants' custodial practices not only eviscerate the

3  clinical value of the APP program, but, they also violate the due process rights of condemned

4  inmates, who are "deprived of safeguards against erroneous placement in conditions that are more

5  restrictive than necessary by virtue of [their] sentence[s] alone."  *Prieto v. Clarke*, Case No. 12-cv-

6  01199-LMB-IDD (E.D. Va.) Dkt. 91 (Op. Granting Summary Judgment for Plaintiff), Nov. 12,

7  2013, at 25.

8       This Court should therefore order Defendants to immediately rescind any policies,

9  procedures, or practices prohibiting or restricting referrals and transfers of death row inmates to

10  ICF level of inpatient psychiatric hospitalization.  Defendants should additionally be ordered to

11  establish a licensed ICF program for death row inmates at San Quentin, CMF, SVPP or Stockton,

12  within 60 days, of sufficient size to meet the clinical need for that level of care for death row

13  inmates.  The Court should direct the Special Master to investigate the custodial restrictions in

14  place in the APP and to make recommendations on alternatives to those measures that will allow

15  true inpatient psychiatric hospitalization for death row patients.

16      **B.**    **The Special Master Must Fully Evaluate the Program Currently Operating Within San Quentin's OHU**

17

18       Defendants have spent three years purporting to develop a new mental health program for

19  death row—the Specialized Care for the Condemned Program ("SCCP")—which remains a work

20  in progress.[105]  Beginning in early 2013, Defendants have operated an unlicensed 10-bed program

21  in the 4th floor OHU as part of the SCCP, which has never been evaluated by the Special

22  Master.[106]  Although at times, Defendants contend that the OHU at San Quentin is an appropriate

23  substitute for intermediate inpatient hospital care,[107] the 10-bed OHU is not and was not intended

24

25  (...cont'd)
   [103] Woodford at 1101:13-1102:4.

26  [104] Trial Testimony of Paul Burton, M.D. ("Burton") at 1424:4-1425:7.
   [105] Exs. 1008, 1043 &1046; *see also* Ex. 1031 at 184-86

27  [106] Monthei at 1317:5-21.
   [107] Monthei at 1217:6-8.

28

1   to be a substitute for true inpatient care and there remains an urgent need for ICF level of care

2   among the condemned.  In fact, it is more accurately described as an "enhanced" and unlicensed

3   EOP program[108] that is currently used as long-term housing for ten very seriously ill mental health

4   patients in need of a high level of mental health care.

5         The OHU is not an adequate substitute for a licensed inpatient hospital.  At best, the OHU

6   program offers 10-15 hours per week of therapeutic activity, while the ICF program at CMF for

7   the non-condemned offers 30 hours a week of treatment.[109]  The OHU is not staffed to provide 24

8   hours a day, seven days a week 15 minute nursing checks required in all DSH and MHCB

9   programs.[110]

10         Dr. Stewart testified that the patients in the OHU all would benefit from a true licensed

11   inpatient program.[111]  The psychiatric patients currently housed in San Quentin's OHU were

12   transferred to the program only earlier this year after spending years confined to their cells in

13   severely regressed, psychotic, decompensated states.[112]  While these patients are assuredly better

14   off in the enhanced EOP-like OHU program than in their cells on East Block, and however well-

15   intentioned the San Quentin clinical staff are in their efforts to provide treatment without

16   allocation of necessary resources, death row patients must be provided mental health treatment

17   appropriate for the acuity of their illnesses.  Without access to real inpatient hospitalization, these

18   patients continue to struggle with severe symptoms, and to require more intensive treatment.[113]

19

20   [108] *See* Trial Transcript at 1701:22-1702:9 ("VOROUS:  The ten beds are in an outpatient housing
unit.  They're not considered inpatient.  When you're looking at providing care that would

21   normally fall under Title 22, whether that's in a Mental Health Crisis Bed, or in a facility that
provides intermediate or acute care, then that's true, the parties are bound by the Title 22 licensing

22   requirements, but those requirements do not apply to an outpatient facility.  THE COURT:  But
you can't call it an outpatient facility when the doctor says that, no, we intend for people who are

23   going to be remaining six months to, I think he said, 24 months.").

24   [109] Monthei at 1353:21-1354:5; Ex. 1167 at VPP_JJJJ_000064-67 (non-condemned VPP ICF
patient JJJJ scheduled for more than 30 hours a week of treatment for the month of May 2013).

25   [110] Wadsworth at 1565:15-1567:8.

     [111] Stewart at 304:2-5 & 312:18; Ex. 1013 ¶ 23.

26   [112] Stewart at 297:17-298:17, 521:7-19.

27   [113] *See, e.g.*, Ex. 1118 at EEE-001332 (August 30, 2013 clinical note that Prisoner EEE "is not
doing as well as when he first arrived in the SCCP.  His hygiene is worse and he is less

28   cooperative").

1  The new OHU program, which provides less than half of the treatment provided in a DSH

2  intermediate inpatient hospital, is not a substitute for access to ICF care.

3      The OHU unquestionably violates licensing requirements for health and safety of mental

4  health patients.  Health and Safety Code Section 1253 requires that  inpatient treatment facilities

5  run by the CDCR must be licensed:  The OHU is an inpatient mental health program with a

6  projected length of stay between six months and two years.[114]  It is required to be licensed as a

7  Correctional Treatment Center ("CTC") under Cal. Health and Safety Code § 1250(j)(1); *see*

8  *Morris v. Harper*, 94 Cal. App. 4th 52, 56-57 (2001). It is operating in a location that was

9  previously so licensed, adjacent to a licensed MHCB, where the license has been suspended based

10  on the representation that the space would not be used for inpatient services.  Operating an

11  unlicensed ICF within San Quentin's CTC jeopardizes the license for the entire CTC.[115]

12      Defendants have long been aware of the many practical difficulties that operating an ICF-

13  like program within San Quentin's OHU poses.[116]  San Quentin staff was aware almost two years

14  ago that there was insufficient yard space in the OHU for the proposed program.[117]  The new

15  program would "create a confusing environment in the high-risk area" with multiple levels of care

16  sharing the same space; and would require significant physical plan modifications in order to

17  operate an effective program.[118]  And the *Plata* court's neutral experts recently wrote that the

18  decision to "rededicate 10 OHU medical beds to mental health" is "inappropriate" because it will

19  "reduce the OHU capacity" to a "ratio of six OHU beds per thousand inmates."[119]  Ms. Woodford

20  agreed.[120]  If Defendants build a new ICF program at San Quentin, they will need to provide for,

21  or construct, significant additional yard and treatment space.[121]

22      The Special Master should be directed to investigate, monitor, and report within sixty days

23

24  [114] Burton at 1413:18-22.
   [115] Ex. 1012.

25  [116] Ex. 1004.
   [117] *Id.* at 2.

26  [118] *Id.* at 2 & 6.
   [119] Ex. 1011 at 31.

27  [120] Woodford at 1113:8-18.
   [121] Woodford at 1109:23-1111:19.

28

25

PLAINTIFFS' POST-TRIAL BRIEF

1   on whether the current use of MHCB or OHU beds at San Quentin for the provision of mental

2   health care is safe, appropriate, and consistent with licensing standards or able to be made

3   consistent with such standards.  The Special Master should further be directed to consult with the

4   *Plata* Receiver and Defendants in order to determine whether the 10-bed mental health OHU is an

5   appropriate use for these beds, threatens the license, or otherwise unduly restricts access to

6   medical care at San Quentin.[122]  The Special Master's investigation and report on this issue should

7   include a recommendation as to whether this program should be maintained as an enhanced EOP

8   program at San Quentin even after an intermediate inpatient program is established, given the high

9   clinical acuity of condemned prisoners and the current high rate of suicide among the condemned.

10          **C.      Defendants Must Conduct Adequate and Regular Mental Health Screenings
                     for the Condemned Population**

12          An essential part of the *Coleman* remedy is appropriate screening of prisoners to identify

13   those with symptoms of mental illness, to prevent suicides, and to address episodic, situational

14   mental health crises that may not progress into chronic mental illnesses.  The informal, ad hoc

15   screening to which San Quentin clinicians testified is commendable, but is not an acceptable

16   substitute for regular and organized screening.[123]  This Court should order Defendants to regularly

17   screen all individuals on death row for mental health needs and assess suicide risk using formal,

18   validated screening tools.

19          San Quentin houses condemned male prisoners in three housing units: East Block, North

20   Segregation, and the Adjustment Center.  All three are harsh segregation units in which inmates

21   have little out-of-cell or yard time, and no access to work or out-of-cell educational opportunities.

22   Plaintiffs' photographic exhibits also demonstrate the harsh conditions of the condemned housing

23   units.[124]  Ms. Woodford found that custody staff are failing to properly monitor and refer

_____

[122] The decision to create a 10-bed unit rather than some different number was arbitrary.  Monthei
at 1304:9-19; Chappell Depo. at 150:12-23.  No one knows how many death row patients require
higher levels of care.  Monthei at 1325:18-1326:15.  The true demand for inpatient psychiatric
hospitalization must be determined and appropriate resources provided to meet the actual need.
[123] Monthei at 1178:4-21.
[124] *See* Exs. 1096, 1097, 1099, 1100, 1101 & 1106.

1015767-2

1   condemned inmates housed in these severely restricted housing units for mental health issues.[125]

2       Several of the death row prisoners who committed suicide in recent years had little or no

3   contact with mental health for long periods.  For example, when Prisoner CCCC took his life on

4   December 17, 2011 on the 5th tier of East Block, he had had "no contact with mental health staff at

5   San Quentin from 1999-2006" and only a handful of brief welfare check contacts between 2006

6   and 2009.[126]  Similarly, when Prisoner BBBB killed himself in North Segregation in August of

7   2010, he had not had *any* contact with mental health since 1990.[127]  Proper mental health screening

8   could have revealed that these prisoners were at risk and should have been monitored by mental

9   health staff.

10      Defendants must ensure the safety and meet the mental health needs of the condemned

11  inmates who are housed in the harsh conditions of death row for decades.  The Court should order

12  Defendants to work with the Special Master to develop a protocol for a one-time thorough mental

13  health evaluation of all death row prisoners, and orderly and systematic evaluations on a regular

14  basis thereafter.  *See* Proposed Order, filed herewith.  For those inmates already in the MHSDS,

15  Defendants should be ordered to conduct a comprehensive evaluation of whether such individuals

16  are at an appropriate level of care, and use the results of this evaluation to determine the actual and

17  projected clinical need for different levels of mental health care for the condemned.

18      **D.    The Court Should Direct the Special Master to Conduct a Full Evaluation of
            the EOP and CCCMS Programs for Condemned Inmates**

19       Although condemned prisoners on East Block and North Segregation live in harsh,

20  isolated environments, Defendants have deemed them "general population" prisoners by

21  bureaucratic fiat.  Consequently, although the Program Guide has extensive requirements for

22  mentally ill prisoners in segregation units (Chapter 7) and this Court has issued many orders on

23  the subject specifically because of the recognized negative effects such environments have on

24  mental health, Defendants have dismissed these requirements as inapplicable to inmates on East

25

26  _____

27  [125] Woodford at 1094:25-1096:12; Ex. 1002  ¶¶ 27-30 & 55; Ex. 1007.
    [126] Ex. 1079 (CCCC Suicide Report) at 7.

28  [127] Ex. 1077 at 5-6.

27

Block and North Segregation.  Defendants instead assert that these requirements apply only to the Adjustment Center, and that any segregation-like procedures Defendants choose to implement in the other condemned units are "above and beyond *Coleman* requirements."[128]  But Defendants' decision to classify death row segregation units by another name does not eliminate the risk of serious harm arising from isolated conditions: death row prisoners in these units are "in their cell unless they're in restraints and escorted to the exercise yard or escorted to medical appointments or visiting, things like that.… They're isolated from the general population or segregated from the general population."[129]

CCCMS prisoners in East Block receive only one case manager contact every 90 days, rather than the weekly contacts required for all other segregated CCCMS prisoners.[130]  Similarly, psychiatric technician rounding in North Segregation and East Block is conducted for Grade A prisoners only twice a month, rather than daily as would be required in a segregation unit.[131]

Death row EOP prisoners are not housed in a separate unit to protect them from other prisoners and encourage them to participate in treatment.  The 25th Special Master's Report noted that the EOP treatment in East Block was woefully inadequate, was not in a sheltered setting, and that "[i]nmate refusal to engage, even if due to mental illness, was generally tolerated and often was not a focus of treatment, which could exacerbate and reinforce symptoms."[132]  East Block is a "very old housing unit" that is "really big, really noisy and quite chaotic," with high tiers which cannot safely house inmates on heat medication and in which emergency response is difficult.[133]  Within East Block, EOP inmates are not housed in any particular area, but are "chunked" into groups of indeterminate size.[134]

The death row EOP program also fails to deliver the mandated EOP treatment hours.  Even after Prisoner WWW's second overdose in 2012, when he was made EOP, labeled "high risk" for

---

[128] Monthei at 1275:25-1276:11.
[129] Woodford at 1089:6-15.
[130] Burton at 1480:17-1481:9.
[131] Burton at 1486:6-16; Ex. 1060.
[132] Ex. 1031 at 179.
[133] Woodford at 1084:19-1086:16.
[134] Monthei at 1187:23-1188:20.

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

1   suicide, and placed into the purportedly enhanced Specialized Care EOP Program on East Block,

2   Prisoner his treatment consisted of *at most* 3.75 total hours of treatment a week, two or three hours

3   of which were "therapeutic yards."[135]

4         The tragic result of the failure to provide death row prisoners with appropriate CCCMS,

5   EOP and segregation care required by the Program Guide for all other populations, in addition to

6   the deprivation of inpatient psychiatric hospitalization, is evidenced by the extremely high rate of

7   suicide in the death row population.  In the last two years alone, there have been five suicides on

8   death row – an extraordinary number for a population of only 700.[136]  Dr. Wadsworth's attempt to

9   minimize or explain away the high rate of suicide through a nonsensical adjustment for length of

10   stay on death row– with no evidence of a correlation between length of stay and risk of suicide – is

11   both inadmissible and beside the point.[137]  Such an opinion, "based on such unsubstantiated and

12   undocumented information is the antithesis of the scientifically reliable expert opinion admissible

13   under *Daubert* and Rule 702" and is entitled to little or no weight.  *Cabrera v. Cordis Corp.*, 134

14   F.3d 1418, 1423 (9th Cir. 1998); *see also* Pls.' Motion In Limine to Exclude on Limit Improper

15   Testimony (Dkt. 4924) at 5-8.  In any event, what Dr. Wadsworth overlooks in his rush to excuse

16   San Quentin's extraordinarily high suicide rate is that it alone puts Defendants on notice that these

17   are high risk units where the mentally ill need to be given extra monitoring and care, not less.

18         The Special Master should be directed to undertake a comprehensive investigation of the

19   care offered to CCCMS and EOP condemned inmates, with particular attention to whether

20   Defendants are delivering adequate levels of structural therapeutic activity, and whether a

21   separate, sheltered treatment area should be created for condemned EOP prisoners.

22       **E.**    **Defendants Must Develop Adequate Reporting Mechanisms Regarding Mental**
23           **Health Care for the Condemned**

24         Policy makers in Sacramento have historically shown scant concern for the mental health

25

---

26   [135] Burton at 1511:17-1512:21.
    [136] Ex. 1085.

27   [137] Wadsworth at 1636:22-1640:3 (admitting no foundation for supposed correlation or for

28   assertion that long lengths of stay on death row are directly correlated to suicide risk).

PLAINTIFFS' POST-TRIAL BRIEF

1015767-2

1 needs of the extraordinarily vulnerable prisoners on death row.  Indeed, Defendants have failed to

2 even ensure that CDCR headquarters receives accurate data about the numbers of inmates on death

3 row.[138]  Defendants have hidden the long lengths of stay of EOPs on East Block from the Special

4 Master by deleting these prisoners from *Coleman* monthly reports.[139]  Defendants' omission of

5 this critical monitoring information continues to the present day, nor do Defendants regularly

6 report any other separate information about death row mental health care.  The Court should order

7 Defendants to report relevant information about the status of mentally ill death row prisoners to

8 the Court and the Special Master.  Specifically, the Court should order Defendants to:  (1) include

9 condemned inmates on already-required reports about inmates in segregation units, such as length

10 of stay and rounding reports; (2) report separately about condemned access to inpatient care,

11 including lengths of waitlists and lengths of stay; and (3) provide separate and specific statistical

12 data to the Special Master regarding the numbers of condemned inmates in the MHSDS at every

13 level of care, including those in the Specialized Care for the Condemned Program.

14 **III.    CONCLUSION**

15        In order to address the ongoing constitutional violations described herein, Plaintiffs request

16 that the Court issue remedial orders as set forth in Plaintiffs' proposed orders regarding use of

17 force and disciplinary processes, Dkt. 4543-1, and inpatient mental health treatment to death row

18 inmates, filed herewith.

19 DATED: November 15, 2013              Respectfully submitted,

20                                      ROSEN BIEN GALVAN & GRUNFELD LLP

21                                      By:  */s/ Michael W. Bien*
                                            Michael W. Bien

22                                      K&L GATES LLP

23                                      By:  */s/ Jeffrey L. Bornstein*
                                            Jeffrey L. Bornstein
24
                                        Attorneys for Plaintiffs
25

26

27 _____
[138] Woodford at 1080:7-10:82:5; Ex. 1057.
28 [139] Monthei at 1347:19-1352:2; Exs. 1131 & 1133.

1015767-2