1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,              No. CIV. S-90-520 LKK/DAD (PC)

12              Plaintiffs,

13        v.                             **ORDER**

14   EDMUND G. BROWN, JR., et al.,

15              Defendants.

16

17        On April 11, 2013, plaintiffs filed a motion for enforcement

18   of court orders and affirmative relief related to inpatient

19   treatment for members of the plaintiff class, including those

20   condemned to death and housed at San Quentin State Prison

21   (hereafter San Quentin or SQSP). (ECF No. 4543).  The issue was

22   also tendered as grounds for denying defendants' January 7, 2013

23   motion to terminate the court's ongoing supervision of the

24   remedial effort (ECF No. 4275). See Pls. Corr. Opp. To Defs. Mot.

25   to Terminate, filed Mar. 19, 2013 (ECF No. 4422) at 82-85. The

26   court denied the defendants' motion, see Coleman v. Brown, 938 F.

27   Supp. 2d 955 (E.D. Cal. 2013), and, separately, set an

28   evidentiary hearing on plaintiffs' motion to enforce the court's

                                     1

1  previous judgment.  Nonetheless, this order, in addition to

2  resolving the instant motion, also inevitably addresses the

3  propriety of defendants' motion to terminate.

4      An evidentiary hearing on plaintiffs' motion as it relates

5  to inpatient care for seriously mentally ill inmates in

6  California's condemned population commenced on October 1, 2013

7  and continued over fourteen court days, concluding on November 6,

8  2013.[1]  Following filing of closing briefs the matter was

9  submitted for decision and is resolved herein.[2]

10      As this court has explained,

11          [p]laintiffs are a class of prisoners with
            serious mental disorders confined in the
12          California Department of Corrections and
            Rehabilitation ("CDCR"). In 1995, this court
13          found defendants in violation of their Eighth
            Amendment obligation to provide class members
14          with access to adequate mental health care.
            Coleman v. Wilson, 912 F.Supp. 1282
15          (E.D.Cal.1995). To remedy the gross systemic
            failures in the delivery of mental health
16          care, the court appointed a Special Master to
            work with defendants to develop a plan to
17          remedy the violations and, thereafter, to
            monitor defendants' implementation of that
18          remedial plan. See Order of Reference, filed
            December 11, 1995 (Dkt. No. 640). That
19          remedial process has been ongoing for over
            seventeen years.
20
21
22  Coleman v. Brown, 938 F.Supp.2d at 958.

23          Over a decade of effort led to development of
            the currently operative remedial plan, known
24          as the Revised Program Guide. The Revised
            Program Guide "represents defendants'
25          considered assessment, made in consultation

26  _____

    [1] Approximately nine of those days were spent on testimony related to
27  plaintiffs' motion concerning use of force and disciplinary measures (ECF No.
    4543).  That motion will be resolved by separate order.
    [2] The remainder of plaintiffs' motion concerning inpatient care was resolved
28  by order filed July 11, 2013 (ECF No. 4688).

> with the Special Master and his experts, and approved by this court, of what is required to remedy the Eighth Amendment violations identified in this action and to meet their constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates." February 28, 2013 Order (ECF No. 4361) at 3. [Footnote omitted.] Over seven years ago, this court ordered defendants to immediately implement all undisputed provisions of the Revised Program Guide. [Footnote omitted.]

Id. at 972.[3]

CDCR's Mental Health Services Delivery System Program Guide provides four levels of mental health care services: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient (EOP); Mental Health Crisis Bed (MHCB) and inpatient hospital care, which is offered in two programs, intermediate care facilities (ICF) and acute psychiatric programs (APP). Mental health crisis beds are inpatient beds to treat acute mental health crises and stays in MHCB units are generally limited to ten days. Program Guide at 12-5-1.[4] Acute hospital care "is a short-term, intensive-treatment program with stays usually up to 30 calendar days to 45 days provided." Id. at 12-6-2. Intermediate hospital care programs (ICF) "provide longer-term mental health intermediate and non-acute inpatient treatment for inmate-patients who have a serious mental disorder requiring treatment that is not available within CDCR." Id. at 12-6-6.

---

[3] Defendants are currently operating under the Mental Health Services Delivery System Program Guide, 2009 Revision (hereafter Program Guide). All references to the Program Guide in this order are to the 2009 Revision, a copy of which has been entered in the record in these proceedings as Plaintiffs' Exhibit 1200.

[4] Exceptions to the ten day length of stay must be approved by "[t]he Chief Psychiatrist or designee." Id.

3

1    Plaintiffs contend that defendants are denying condemned inmates

2    necessary access to inpatient hospital care.[5]

3        I.   Facts

4        Pursuant to California Penal Code § 3600, condemned male

5    inmates are housed at San Quentin.  In relevant part, the statute

6    provides:

7            A[] [condemned] inmate whose medical or
8            mental health needs are so critical as to
             endanger the inmate or others may, pursuant
9            to regulations established by the Department
             of Corrections, be housed at the California
10           Medical Facility or other appropriate
             institution for medical or mental health
11           treatment.  The inmate shall be returned to
             the institution from which the inmate was
12           transferred when the condition has been
             adequately treated or is in remission.
13

14   Cal. Penal Code § 3600(b)(4).  Citing California Penal Code §

15   3600, the Program Guide contains a separate section governing EOP

16   treatment for condemned inmates.  See Program Guide at 12-4-17 to

17   12-4-21.  In relevant part, that section provides that

18   "[c]ondemned male inmate-patients who experience decompensation

19   in the form of a crisis shall be referred to the DMH Inpatient

20   Program at CMF for a MHCB level of care or DMH inpatient level of

21   care."  Id. at 12-4-20, 21.  Defendants interpret § 3600(b)(4) as

22   limiting the DMH inpatient level of care for condemned inmate-

23   patients to that provided in the APP, i.e., the Acute Psychiatric

24   Program.[6]

25

26   [5] In their post-trial brief, and at the hearing, plaintiffs raised additional
     issues concerning the adequacy of mental health care provided to condemned
27   inmates at the EOP and CCCMS level of care at San Quentin.  For the reasons
     explained infra, the court will not make any specific orders concerning those
     issues at this time.
28   [6] MHCB care is available to condemned inmate-patients at San Quentin.

4

1    It is undisputed that defendants have not historically "had

2  a viable option" for condemned inmate-patients in need of an

3  intermediate level of hospital care.  Pls. Ex. 1043 at 1.  Dr.

4  Eric Monthei, the Chief of Mental Health at San Quentin,

5  testified that when he assumed his position six or seven years

6  ago he began a "gradual transition" of identifying condemned

7  inmate-patients in need of a higher level of services.  RT at

8  1199:2-10.  Approximately three years ago, the process became

9  more formalized and mental health staff at San Quentin were

10  "tasked with researching and developing a specialized care

11  regimen tailored to the subcategory of Condemned inmates who may

12  have met criteria" for referral to an intermediate level of

13  hospital care.  Monthei Decl.(ECF No. 4593) at ¶ 4.  On November

14  8, 2010, the mental health staff implemented "a Specialized

15  Treatment plan for the condemned inmates at San Quentin."  Id.

16  The Specialized Treatment plan "is based on a model of assertive

17  community treatment" and reflects defendants' asserted belief

18  that "[d]ue to the unique nature of the condemned inmate

19  population, . . . providing services near the inmate's home and

20  within their community is clinically indicated."  Id. at ¶¶ 5-6.[7]

21    In early 2011, Dr. Monthei "prepared a written version of

22  the Specialized Treatment plan" which identified the following

23  treatment "indicators":

24         Significant difficulties with hygiene.

25

26  Reporter's Transcript re: Evidentiary Hearing (RT) at 1180:7-1181:4.

27  [7] While the court has reservations about whether the condemned regard E block
in San Quentin as their home, acceptance or rejection of that clinical
indication is not material to resolution of the motion and will not be further

28  considered.

> Non-compliance with voluntary medication to a degree that it impaired functioning.
>
> Rarely leaves cell.
>
> Other behaviors or events that are indicative that additional treatment and clinical time may be beneficial to the inmate, including but not limited to:
>
>> Disruptive to the treatment milieu.
>>
>> Repeated rules violation reports.
>>
>> Difficulties in maintaining eating, clothing, or housing to a degree less than requires inpatient care or 24-hour nursing.
>>
>> Bizarre behaviors or actions that warrant increased number and modalities of treatment.

Ex. 1 to Confidential Vorous Decl. (ECF No. 4622-1) at 6-7[8];

Monthei Decl. (ECF No. 4593) at ¶ 7. The written document also identified services and treatment available under the plan, including:

> (1) several contacts per day by mental health providers; (2) groups and daily therapy sessions; (3) daily recreational time; (4) assistance with cleaning; (5) in-cell structured therapeutic activity; (6) psychiatric technician rounds; (7) daily encouragement to complete activities of daily living; (8) objective monitoring of multiple areas of functioning; and (9) weekly formal team coordination of care meetings.

Monthei Decl. (ECF No. 4593) at ¶ 9 (citing Ex. 1 to Confid. Vorous Decl.).

In February 2011, the then Chief Deputy Secretary for the

---

[8] This document is filed under seal with several other documents attached to the Confidential Declaration of Debbie Vorous filed May 20, 2013 (ECF No. 4622).

Division of Correctional Health Care Services of the CDCR circulated a budget change proposal (BCP) seeking funding for the program, referred to in that document and today as the Specialized Care Program for the Condemned (SCCP).  Pls. Ex. 1043.  The BCP describes a "high risk need" for the SCCP, as follows:

> On or about 2006 through 2011, up to 31 Condemned inmate-patients were identified as those who would benefit from an ICF level of care with another 13 being monitored for possible inclusion.  Approximately 20% (6 of 31) inmate-patients who would have benefitted from an ICF level of care have effected suicide.  Data available from March 2008 to December 2009 show approximately 120 admissions to higher levels of care such as Out Patient Housing Units (OHU), Mental Health Crisis Beds (MHCB), and DMH Acute Programs.  SQSP is currently compiling the 2010 data but they expect that the overall referral patterns are unlikely to have changed significantly.

Id.  The BCP described six inmate suicides in the condemned population in six years.  Id.  Five condemned inmates have committed suicide in the last two years.  RT at 318:16-23.[9]  The BCP also reflects defendants' acknowledgement of a need for an adequate treatment program to meet this need.[10]

---

[9] The court heard a substantial amount of testimony concerning the annual suicide rate among California's condemned inmates, including whether the length of time inmates spend on California's death row should be "factored into th[e] consideration of annual suicide rates so that something more instructive could come out of it."  RT at 1579:8-10.  The court is satisfied that the clear weight of the evidence, including testimony from defendants' clinicians, demonstrates that the number of suicides in California's condemned population is an area of grave concern.

[10] The BCP states that "[a]bsent this program, CDCR will not be able to testify in court that the needs of the condemned inmate-patients are being met at SQSP" and that "it is likely that CDCR would ultimately be ordered to transfer inmates" to ICF beds at Salinas Valley State Prison.  Pls. Ex. 1043 at 2.

In his Twenty-Fifth Round Monitoring Report, filed in January 2013, the Special Master reported on the SCCP.  Pls. Ex. 1031.[11]  At a visit to San Quentin in August 2012, the Special Master's experts found, _inter alia_, that

> [b]asic clinical requirements such as admission and discharge criteria were not articulated, although program clinicians could discuss the various treatment modalities and demonstrated that consideration had gone into determining the appropriate treatment for each inmate. However, there were space limitations and challenges with escorts which created problems with access to care. . . .
>
> The medical records of each of the participants in the specialized care program were reviewed.  Most of these inmates clearly needed inpatient care and were not receiving it or its equivalent. . . .
>
> IDTT[12] meetings for the condemned care program were reportedly scheduled twice per month.  Treatment plans did not focus on the primary symptoms for many inmates, and some interventions appeared to reinforce these symptoms.  Some inmates did not even have treatment plans or current treatment plans. . . .

_Id._ at 177-178.  In December 2012, the Special Master and his staff, together with CDCR and DSH representatives and plaintiffs' counsel, revisited San Quentin "to further examine the condemned care program."  _Id._ at 179.  At that time, defendants "agreed to work with the special master's expert to draft a written addendum to the draft LOP[13] that would describe [the Specialized Care for

---

[11] The Twenty-Fifth Round Monitoring Report is in the record at ECF No. 4298. All citations to pages in Pls. Ex. 1031 are to the ECF page number at the top of the exhibit.
[12] IDTT stands for Interdisciplinary Treatment Team.
[13] LOP stands for Local Operating Procedure.

the Condemned] program, including an outline of the criteria for admission to it and the services that it offers." Id. at 184. The specific "[t]riggers for consideration for admission to the program were defined as those used in the sustainable process for identification and referral of inmates" to inpatient care. Id.; see also, e.g., Order filed July 13, 2012 (ECF No. 4214). Enhanced staffing, additional necessary services, and "a dedicated housing unit for inmates in the [SCCP]" were to be included.  Pls. Ex. 1031 at 184-185.

There have been "multiple revisions" to the original "working document" for the Specialized Treatment plan (SCCP) since the January 2011 iteration.  RT at 1212:20-1213:3.  The latest, generated in early 2013, sets forth the following criteria for "consideration" of treatment in the SCCP:

> 1. Acute onset of symptoms or significant decompensation due to a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, agitated or vegetative signs, definitive impairment in reality testing and/or judgment.
>
> 2. Inability to function in the condemned population based upon any of the following:
>
>    a. A demonstrated inability to program in and/or benefit from the Condemned EOP Treatment Program for two consecutive months.
>
>    b. A demonstrated inability to program in condemned correctional activities such as education, religious services, self-help programs, canteen, recreational activities, or visiting, as a

9

consequence    of    a    serious    mental
disorder.

   c. The    presence    of    dysfunctional    or
disruptive  social  interaction  including
withdrawal,   bizarre   behavior,   extreme
argumentativeness,  inability  to  respond
to    staff    directions,    provocative
behavior,    or    inappropriate    sexual
behavior,  as  a  consequence  of  a  serious
mental disorder.

   d. An  impairment  in  the  activities  of  daily
living  including  eating,  grooming  and
personal  hygiene,  maintenance  of  housing
area,  and  ambulation,  as  a  consequence
of a serious mental disorder.

Pls. Ex. 1014 at Monthei 03.   These criteria are similar, though

not identical, to several of the Program Guide criteria for

admission to the intermediate level of hospital care, including:

   1. An Axis I major (serious) mental disorder
with  active  symptoms  and  any  one  of  the
following:

   • As  a  result  of  the  major  mental  disorder,
the  inmate-patient  is  unable  to  adequately
function  within  the  structure  of  the  CDCR  EOP
level of care.

   •    The    inmate-patient    requires    highly
structured  inpatient  psychiatric  care  with
24-hour  nursing  supervision  due  to  a  major
mental  disorder,  serious  to  major  impairment
of    functioning    in    most    life    areas,
stabilization  or  elimination  of  ritualistic
or    repetitive    self-injurious/suicidal
behavior,  or  stabilization  of  refractory
psychiatric symptoms.

   . . . .

   • The  inmate-patient  would  benefit  from  a
comprehensive   treatment   program   with   an
emphasis  on  skill  (i.e.,  coping,  daily
living,  medication  compliance)  development

1
          with increased programming and structured
2
          treatment environment.

3
          . . . .

4
          • The inmate-patient's Global Assessment of
5
          Functioning indicates behavior that is
          considerably influenced by psychotic
6
          symptoms; OR serious impairment in
          communication or judgment; OR inability to
7
          function in almost all areas.

8
Program Guide at 12-6-7, 8.  Program Guide criteria concerning

9
suicidality, below, are not specifically included in the criteria

10
for admission to SCCP:

11
          2. In addition to a primary Axis I disorder,
          admission to VPP and SVPP shall be considered
12
          when:

13
          • The patient engages in ritualistic or
          repetitive self-injurious/suicidal behavior
14
          that has not responded to treatment in a CDCR
          facility. Without inpatient mental health
15
          treatment, the inmate-patient is likely to
          develop serious medical complications or
16
          present a threat to his life.

17
          • The patient is chronically suicidal and has
18
          had repeated admissions to a Mental Health
          Crisis Bed (MHCB).
19
Program Guide at 12-6-8.[14]

20
_____

21
[14]  Other Program Guide criteria for ICF care not reflected in the criteria
for SCCP include:

22
          • The inmate-patient requires a
23
          neurological/neuropsychological consultation.

24
          • The inmate-patient requires an inpatient diagnostic
          evaluation.

25
          • The inmate-patient's psychiatric medication history
26
          indicates that a clozapine trial might be useful.

27
          • Inmate-patients, who are deemed a significant
          assault risk, have a history of victimizing other
28
          inmate-patients (including inciting others to act in a
          dangerous manner) or present a high escape risk,

As discussed above, during evaluation of the SCCP, the Special Master's experts identified the need for a separate housing unit for this program.  See, e.g., Pls. Ex. 1031 at 183-184.

San Quentin has a Central Health Services Building (CHSB), built under the auspices of the Receiver in Plata v. Brown, No. 01-1351 TEH.  The fourth floor of the CHSB is a licensed Correctional Treatment Center (CTC) containing fifty beds.  Pls. Ex. 1012 at 3.  Seventeen of the beds are licensed mental health crisis beds.  Monthei Decl. at ¶ 16.  The 17 licensed MHCBs are used by inmate-patients from prisons all over California who are in need of a crisis bed level of care.  RT at 1180:7-1181:4.  The license for the remaining thirty-three beds is suspended and those beds are operated as an Outpatient Housing Unit.  RT at 1291:9-20; see Chappell Decl. (ECF No. 4601) at ¶ 4.

In December 2012, the Plata Receiver "agreed to designate up to 10 beds in the Outpatient Housing Unit [(OHU)] for use by inmates receiving services under the Specialized Treatment plan." Belavich Decl. at ¶ 11.  The ten OHU beds are designated as

_____

shall be referred to the SVPP Intermediate Program. CDCR refers to these inmate-patients as high custody inmate-patients.

. . . .

• For SVPP only, the inmate-patient is medically appropriate as determined by the receiving prison medical staff. The program psychiatrist will determine mental health suitability. If agreement is not reached refer to the Coordinated Clinical Assessment Team (CCAT) process in Section VI. Any denial for medical reasons will be immediately referred to the, Assistant Deputy Director, CDCR, Division of Correctional Health Care Services (DCHCS).

"flexible beds" for inmate-patients in the SCCP.  Monthei Decl. at ¶ 16.  Dr. Monthei is aware of "pressures" to return the ten beds from mental health care to physical medical care[15] and has discussed with his "management team alone" what might be done if the beds are no longer available for mental health care.  RT at 1379:10-25.  See also Pls Ex. 1011 at 31-32 (Report of court experts to Plata court regarding OHU beds).

Over the past two years, "[t]he census for inmates-patients receiving specialized treatment has ranged from a low of 6 to a high of 45."  Monthei Decl. at ¶ 10.  San Quentin staff began admitting inmate-patients into the OHU beds approximately six months before Monthei's testimony.  RT at 1221:21-25.  At the time of the hearing, twenty-three inmate-patients were participating in the SCCP.  RT at 1211:22.  Of those, ten were housed in the OHU, twelve were housed in the East Block condemned housing unit, and one was in a mental health crisis bed.  RT at 1211:23-1212:7.

Dr. Monthei testified that within the group of patients identified as requiring an SCCP level of services, "clinicians would . . . prioritize by clinical severity those individuals that were most ill.  And those individuals that are most ill would be the ones we would first refer to the specialized care beds that are within the OHU."  RT at 1206:21-25.  He testified that "the average length of stay for somebody that we admit into [the OHU] beds will be somewhere between six months and two

---

[15] In March 2013, court experts in Plata reported to that court that the dedication of ten OHU beds to mental health care and the corresponding reduction in the number of medical OHU beds was "inappropriate" "given the medical mission of the facility."  Pls. Ex. 1011 at 31.

13

1  years," and longer if necessary but "probably not" shorter.  RT

2  at 1208:12-14; 1209:22-1209:1.  Because the ten OHU beds are

3  full, Dr. Monthei envisions a "continuous rotation of

4  individuals, in and out of the OHU in order to provide the

5  enhanced services."  RT at 1303:17-1304:1. Dr. Paul Burton, the

6  senior psychiatrist supervisor at San Quentin, testified that

7  while San Quentin does not "use the term 'wait list'" there was

8  one inmate-patient waiting for admission to the OHU unit.  RT at

9  1470:15-20.  Dr. Monthei testified similarly.  See RT at 1326:8-

10 15.[16]

11      Services are offered to inmate-patients in the OHU beds

12 "[s]even days a week, two shifts, second watch and third watch,

13 weekends and holidays."  RT at 1214:16-20. Dr. Monthei testified

14 that it is "a full spectrum of mental health services analogous

15 to what you would find in an ICF-type program."  RT at 1217:6-8.

16 Twenty-four hour nursing care is also available to the inmates in

17 the ten OHU beds through the two nursing stations that serve the

18 seventeen MHCBs and the thirty-three OHU beds in the Central

19 Health Services Building.  RT at 1221:4-20.

20      The ten OHU beds used for the SCCP are, by definition,

21 outpatient beds.  Inpatient care for male condemned inmates is

22 limited to the MHCB units at San Quentin and CMF and the Acute

23 Psychiatric Program (APP) at California Medical Facility (CMF).

24 Evidence tendered at the hearing established that condemned

25 inmates transferred to the APP are subject to substantial

26 custodial restrictions which severely limit treatment options.

27 _____

28 [16] You can call a cat a dog, but that doesn't change the cat.  Likewise denying
   the cat is on the bed does not change the cat being on the bed.

1  Other testimony suggested that clinicians at San Quentin are

2  reluctant to transfer condemned inmates to the APP and do so only

3  in very limited circumstances.

4       Pursuant to a policy implemented on August 15, 2012,

5  condemned inmates transferred to the APP are housed in a

6  specified housing unit, Q3, and subject to the following

7  restrictions:  (1) A condemned inmate-patient's housing cell must

8  be between two grill gates; (2) No condemned inmate-patient shall

9  come into contact with any other inmate-patient; "[h]e shall be

10 separated from other patients by a locked door or grill gate at

11 all times;"  (3) Any time a condemned inmate-patient is out of

12 his cell, all other inmate-patients "must be locked in their

13 cells or separated from the condemned patient by a locked grill

14 gate or door;" (5) condemned inmate-patients must eat in their

15 cells; (6) all condemned inmate-patients receive individual

16 therapy only and are not permitted to participate in group

17 therapy or activities; (7) a minimum of two correctional officers

18 or one correctional officer and one "academy trained" medical

19 technical assistant (MTA) must be present whenever a condemned

20 inmate-patient's cell door is opened, and the condemned inmate-

21 patient must be escorted in waist restraints and belly chains;

22 escort must be provided by at least one  correctional officer and

23 one MTA.  Pls. Ex. 1140.[17]

24      Dr. Bennie Carter, a staff psychiatrist working in the APP

25 testified that when condemned inmate-patients leave their cells,

26

---

27 [17] Condemned inmates are "entitled to appropriate nursing care, medications, and clinical services provided by the attending physician, and may be involuntarily medicated under the guidelines of the [Penal Code] 2602

28 process."  Id.

15

1  at least three correctional officers accompany them and grill

2  gates are opened and closed around them to "contain" them within

3  a specific area and away from other inmates.  RT at 1000:23-

4  1001:14.  These security restrictions impact both condemned

5  inmate-patients and non-condemned inmate patients housed in the

6  Q3 unit.[18]  Ellen Bachman, the Executive Director of the Vacaville

7  Psychiatric Program, averred that

> treating even one condemned patient on the
> acute unit has a significant impact on the
> provision of care to the other 29 patients on
> the unit. Because the unit has one day room
> that is used for groups, individual sessions,
> and treatment team meetings, it is very
> difficult to provide treatment to a condemned
> patient within the specifications described
> above without reducing group or individual
> treatment for the other patients. In
> addition, when the condemned inmate is out of
> his cell or his cell door is open, the other
> patients must be locked in their cells or
> separated from the condemned inmate by a
> locked grill gate or door.

17  Bachman Decl. (ECF No. 4598) at ¶ 24. See also Duffy Decl. (ECF

18  No. 4599), *passim*.

19      Treatment options for condemned inmates transferred to the

20  APP are extremely limited.  Non-condemned inmates in the APP

21  progress through a series of steps in a treatment program,

22  starting with individual programming "which means they come out

23  using – they're handcuffed when they come out to watch TV in the

24  dayroom."  RT at 1003:18-20.  Their behavior while out of cell is

25  assessed and "after, on average, two to three periods of watching

26  TV or watching a video, then they come out without handcuffs for

27

28  [18]  The Q3 unit houses both condemned and non-condemned inmate-patients.  See
RT at 1001:17-22.

1  another two to three times." RT at 1003:21-24."  Thereafter,

2  "[i]f that is successful" non-condemned inmates progress to small

3  group programs and then to large group programs.  RT at 1003:25-

4  1004:18.  Condemned inmates "stay on the first level.  They come

5  into the dayroom handcuffed.  Every place they go, if they go to

6  the showers, they go handcuffed.  If they go to an EKG, they are

7  physically restrained with handcuffs." RT at 1004:15-18.[19]

8       Since the start of the SCCP, admissions of condemned inmates

9  to the APP "have substantially decreased."  Bachman Decl. at ¶

10  22; see also RT at 1236:17-25 (Testimony of Monthei).  Dr. Carter

11  testified that the six condemned inmates treated at APP in the

12  preceding year had "psychiatric conditions that . . . would be

13  considered more mild and not the chronically debilitated

14  individuals that one would typically see in a long-standing

15  mental health system."  RT at 1008:22-25.  He also testified that

16  since the SCCP opened San Quentin sends condemned inmate-patients

17  "who have more the behavioral acting out situations."  RT at

18  1010:3-4.  Dr. Monthei testified that a "spike" in referrals made

19  to the APP early in 2013 "were for patients who had very little

20  or no mental illness" but were referred "in part because of the

21  drug-induced psychosis" caused by a "bad batch of meth" on the

22  condemned unit at San Quentin and "the homicidal and suicidality

23  that they exhibited during the course of intoxication."  RT at

24  1236:20-1238:8.  In addition, the suicide of an inmate at San

25  Quentin shortly after his primary clinician went on vacation led

26

27

---

28  [19] Given these custody provisions, it is hardly surprising that the
psychiatrists at San Quentin are reluctant to refer patients to the APP.

1   to a "degree of hypervigiliance" among clinicians at San Quentin.

2   RT at 1237:21-24; 1239:16-1240:10.

3        Dr. Burton testified that there is "no stimulation" in "the

4   DHS acute environment . . . .  There's not a lot of activity for

5   the condemned.  There's not a lot of groups, not a lot of yards.

6   They still get medication and therapy, but there's a lot of quiet

7   time." RT at 1424:16-20.  He suggested that the APP program

8   might be helpful for patients "who have not a primary psychiatric

9   disorder, but perhaps a personality disorder. . . ."  RT at

10  1424:22-25.  Among other considerations, the fact that it is a

11  "low stimulation environment" without a lot of group or treatment

12  options influences the referral decisions of clinicians at San

13  Quentin.  See, e.g., RT at 1447:16-1448:8.

14  II. Analysis

15       The motion at bar implicates the adequacy of provisions of

16  the Program Guide governing access to inpatient hospital care  to

17  seriously mentally ill inmates on California's death row as well

18  as the adequacy of defendants' interpretation and implementation

19  of those provisions.[20]  Those provisions require that "[c]ondemned

20  male inmate-patients who experience decompensation in the form of

21  a crisis shall be referred to the DMH Inpatient Program at CMF

22  for a MHCB level of care or DMH inpatient level of care."

23  Program Guide at 12-4-19, 20.

24       The evidence establishes an identified need in the condemned

25  inmate population for long-term inpatient mental health care

26  equivalent to that provided by the ICF programs described in the

27  _____

28  [20] The provisions at issue were approved by this court by order filed March 3,
    2006 (ECF No. 1773).

1   Program Guide.  At present, defendants limit inpatient referrals

2   for condemned male inmate-patients to the acute level of care, a

3   short-term program where treatment options are severely limited

4   due to substantial custodial restrictions.  Defendants assert

5   that this limitation is grounded in California Penal Code § 3600

6   which, as discussed above, requires condemned inmates to be

7   housed at San Quentin except in limited circumstances.

8       It seems clear that defendants construe the statute too

9   narrowly with respect to access to intermediate hospital care for

10  condemned inmate-patients, at least with respect to providing

11  access to inpatient care that is longer-term than acute care.

12  The statute authorizes transfer of condemned inmate-patients for

13  inpatient mental health care where their mental health needs "are

14  so critical as to endanger the inmate or others."  Cal. Pen. Code

15  § 3600(b)(4).  Where that criterion is met, nothing in the

16  statute limits the time an inmate-patient may be treated in an

17  outside facility; the criteria for return is "adequate treatment

18  of the condition or remission."  Id.  Thus, condemned inmate-

19  patients who meet the statutory criteria could, without running

20  afoul of the statute, be transferred to an ICF facility if

21  "adequate treatment" of their condition required a longer length

22  of stay than available in an acute hospital program.

23      It is also arguable that most, if not all, of the criteria

24  for inpatient hospital care described in the Program Guide could

25  be encompassed under a broad construction of Penal Code §3600.4's

26  criterion of "mental health needs . . . so critical as to

27  endanger the inmate or others."  Cal. Pen. Code § 3600(b)(4).

28  Given the substantial evidence before the court of sequelae to

deteriorating mental illness, the determination that an inmate-patient has decompensated to the point where he needs a higher level of care than available in the Enhanced Outpatient Program would in most instances support a determination that the inmate-patient has "mental health needs . . . so critical as to endanger" himself and possibly others.  As noted, defendants have not, however, so construed the statute.

While the court finds that transfers to existing ICF units could be accomplished consistent with California Penal Code §3600(b)(4), the evidence suggests significant impediments to adequate care by such transfers.  As discussed above, testimony concerning the severe custodial restrictions placed on condemned inmate-patients in the APP raises grave concerns about the adequacy of treatment available to condemned inmate-patients were defendants to transfer them to existing ICF units under such restrictions.[21]  The custodial restrictions have a significant and substantial negative impact on treatment options in the acute hospital setting, which is a short-term placement.  That negative impact and the attendant anti-therapeutic consequences would be magnified in the longer placements that are the hallmark of

---

[21] This concern extends to non-condemned inmate-patients as well.  According to the Executive Director of the Vacaville Psychiatric Program, applying these security protocols to the ICF programs at Vacaville "would reduce access to care for the other patients living on the designed treatment unit.  Given that intermediate treatment is long term, with lengths of stay 180 to 240 days or more, inclusion of even one or more condemned inmates in the intermediate care facility milieu would have a profound impact.  In our 64-bed high custody Intermediate Treatment Center, providing individual treatment for a condemned inmate would require having all 63 other patients behind a locked door or gate (in a cell, group room, or yard) before escorting the condemned patient out to a treatment area.  This process would need to be repeated to return the condemned inmate to his cell.  The overall treatment milieu would slow down significantly during these escort periods." Bachman Decl. (ECF No. 4598) at ¶ 25.

1  intermediate hospital care.  The court received credible evidence

2  that called into question whether all of these restrictions are

3  necessary, whether custodial restrictions can be considered on an

4  individual basis, and whether creation of a separate unit housing

5  only condemned inmate-patients might obviate the need for some or

6  all of the restrictions.  All of those matters can and should be

7  considered by defendants moving forward, under the guidance of

8  the Special Master.

9      The court also heard substantial testimony about factors

10 unique to the condemned population in California which suggest

11 that providing necessary care at San Quentin is not only

12 consistent with California Penal Code § 3600 but in fact a sound

13 policy decision for providing adequate mental health care to this

14 population.

15     The SCCP is defendants' response to the identified need for

16 ICF care in the condemned inmate population.  See Pls. Ex. 1043;

17 see also RT at 1214:5-15 (Testimony of Monthei describing

18 spectrum of mental health services available within "the

19 overarching treatment program we refer to as the condemned

20 treatment program", starting with inmates in the general

21 population and including correctional clinical case management

22 system (CCCMS), enhanced outpatient program (EOP), Specialized

23 Care for the Condemned Program (SCCP), mental health crisis beds

24 (MHCB), and DHS acute hospital care (APP)).  It is intended to

25 provide long-term care for condemned inmate-patients in need of a

26 higher level of care than EOP care.  It is not, however, a

27 licensed inpatient hospital program.  Furthermore, even assuming

28 arguendo that defendants might be able to meet this identified

1   need in an outpatient housing unit, rather than a licensed

2   inpatient facility, defendants do not presently have sufficient

3   beds to meet the identified need.

4       The SCCP is in some respects a program that brings

5   defendants closer to meeting their Eighth Amendment obligations

6   to these members of the plaintiff class than does the acute

7   psychiatric program at CMF.  As discussed above, even assuming a

8   legitimate penological purpose for all of the custodial

9   restrictions imposed on condemned inmate-patients transferred to

10  the APP, the restrictions are so severe that they preclude all

11  but the most basic mental health treatment.  Moreover, in and of

12  themselves the restrictions appear significantly anti-

13  therapeutic.[22]

14      In addition, the planned length of stay for the OHU beds is

15  six to twenty-four months, well beyond the duration of an acute

16  hospital stay. The SCCP is a real step forward, in that the APP

17  is simply not an adequate alternative for condemned inmate-

18  patients in need of long-term hospital care.  Moreover, the

19  dedication and qualifications of the clinical staff at San

20  Quentin who testified before this court is impressive, as is the

21  apparent evolution of a working and appropriate balanced

22  partnership between clinical and custodial staff at that

23  institution.

24      Notwithstanding the foregoing, as currently designed and

25  implemented, the SCCP is also insufficient in a number of

26  _____

27  [22] As discussed above, the evidence shows that once the SCCP became available,
    referrals to APP declined significantly.  While there may be several reasons
    for the decline, it is plain to this court that the restrictive and limited
28  therapeutic environment of the APP is one of those reasons.

1   important respects to meet the identified need in the condemned

2   inmate-population and defendants' Eighth Amendment obligation to

3   provide these inmates with access to adequate mental health care.

4        Most importantly, there are not enough beds available for

5   the need that has been identified.  At the time of the

6   evidentiary hearing defendants had identified twenty-three

7   inmates as needing an SCCP level of care.  By defendants'

8   criteria, all twenty-three of these inmates have active symptoms

9   of serious mental illness that make them unable to function in

10  the condemned population and in need of a higher level of mental

11  health care than the Enhanced Outpatient Program.  Yet only one

12  of these inmates was in an actual hospital bed, an MHCB, ten were

13  in the OHU, and twelve remained housed in East Block.  The

14  evidence before this court demonstrates that the conditions of

15  confinement in East Block are inadequate for seriously mentally

16  ill inmates in need of inpatient hospital care or its equivalent.

17  Defendants plan to "rotate" SCCP inmate-patients through the ten

18  available OHU beds, with those identified as most critically ill

19  being given priority to those beds and others waiting six to

20  twenty-four months until a bed becomes available.  There is an

21  identified need for more than the ten OHU beds presently

22  available and defendants are not presently providing sufficient

23  adequate beds to meet their constitutional obligations to these

24  members of the plaintiff class.[23]

---

25  [23] While the new Stockton facility would provide additional beds, the court has
26  not received any information as to what custodial standards would apply to
    condemned inmates.  Moreover, the court has been informed that transfers to
    that facility have been stayed because of staffing difficulties.
27  In addition, space may be available at CMF for an inpatient unit for condemned
    inmates only, but similar questions are presented concerning, at least, what
28  custodial restrictions would apply in such a unit and how such restrictions

Second, it is far from clear that the ten OHU beds are permanently available for mental health care for condemned inmate-patients.  The beds are in a unit originally intended for medical care and the transfer of those beds to mental health care has, in the opinion of court experts in the <u>Plata</u> action, jeopardized the sufficiency of medical beds for the condemned inmate population at San Quentin.  <u>See</u> Pls. Ex. 1011 at 31-32. Dr. Monthei acknowledged uncertainty as to whether the ten OHU beds will remain available for mental health care, and there is no evidence that any CDCR officials except Dr. Monthei and his local team have even begun to discuss alternatives should the OHU beds be returned to medical care.

Third, the ten OHU beds in use as part of the SCCP are outpatient beds.  The beds were licensed as correctional treatment center beds but for reasons not explained at the hearing the license for those beds is not presently active. Thus, while some inpatient services such as twenty-four hour nursing services are apparently available if prescribed, the ten OHU beds are not inpatient hospital beds.

For all of the foregoing reasons, defendants are not yet in compliance with their Eighth Amendment obligation to provide condemned inmate-patients with access to necessary inpatient hospital care.  The solution is not, however, clear from the record before the court.  Instead, the record demonstrates that each remedy in its present form is insufficient and that it is defendants in the first instance who must make the decisions necessary to a complete remedy.  For that reason, defendants will

would affect the adequacy of care.

1  be directed to resume working with the Special Master to

2  establish a durable remedy that provides access to necessary

3  inpatient mental health care for seriously mentally ill inmates

4  on California's death row.[24]

5      Plaintiffs also request a "sweep" of the condemned

6  population at San Quentin to conduct an assessment of need for

7  inpatient care.  The record in this action establishes that an

8  insufficient number of necessary hospital beds is directly

9  correlated with underidentification of need.  See, e.g., Order

10  filed March 31, 2010 (ECF No. 3831) at 2-3 (discussing two

11  separate unidentified needs assessments conducted in this action

12  to identify unmet need for inpatient care).  As discussed above,

13  the evidence before the court demonstrates that there are not

14  presently a sufficient number of beds to meet the identified need

15  for access to an ICF level of mental health care in the condemned

16  inmate population.  Defendants' evidence concerning the general

17  "sweeps" that they have conducted periodically at San Quentin is

18  insufficient to outweigh the countervailing concerns presented by

19  the demonstrated shortfall in the number of available beds.

20  Accordingly, defendants will be directed to conduct an assessment

21  of need for inpatient care under the guidance and supervision of

22  the Special Master.

23

24

---

25  [24]  The record before the court shows that cooperative efforts by the parties, under the supervision of the Special Master, to resolve this issue were

26  interrupted by the filing of defendants' termination motion and the litigation that has ensued.  The present contours of the SCCP suggest that defendants

27  have moved forward with this alternative incorporating at least some of the guidance provided by the Special Master and his experts following their

28  December 2012 visit.  The court is hopeful that process can resume and be completed expeditiously.

1    Finally, at the hearing plaintiffs raised a number of issues

2  concerning adequacy of care provided to condemned inmates at the

3  EOP and CCCMS levels of care.  In particular, plaintiffs seek

4  orders requiring defendants to "regularly screen all individuals

5  on death row for mental health needs and assess suicide risk

6  using formal, validated screening tools," and to develop

7  "adequate reporting mechanisms regarding mental health care for

8  the condemned, as well as an order directing the Special Master

9  to conduct a full evaluation of the EOP and CCCMS programs for

10 condemned inmates at San Quentin  Pls. Post-Trial Brf. (ECF No.

11 4935) at 32-36.[25]

12    The court will not issue any additional orders at this time.

13 First, the Special Master is already tasked with monitoring the

14 delivery of mental health care at San Quentin and no further

15 orders are necessary to direct him to fulfill that obligation.

16 Second, the court anticipates that the assessment required by

17 this order will provide substantial additional information as to

18 whether there are additional unmet mental health needs in the

19 condemned inmate population.  Should those be demonstrated, the

20 court will take such further action as may be required at that

21 time.

22 IV.  <u>Standards for Injunctive Relief</u>

23    The court does, by this order, direct specific action by

24 defendants.  In this court's view, the orders contained herein

25 are in aid of the remedy required by this court's 1995 order.  To

26 the extent that the requirements of 18 U.S.C. § 3626(a)(1) may

27 apply, this court finds that the orders contained herein are

28 [25] The page citations are to the ECF page number in this document.

1  narrowly drawn, extend no further than necessary to correct the

2  Eighth Amendment violation in the delivery of mental health care

3  to members of the plaintiff class, and are the least intrusive

4  means to that end.  See 18 U.S.C. § 3626(a)(1)(A).

5      In accordance with the above, IT IS HEREBY ORDERED that:

6      1. Plaintiffs' April 11, 2013 motion to enforce judgment and

7        for affirmative relief related to inpatient treatment for

8        class members in California's condemned inmate population

9        is granted in part.

10     2. Defendants shall forthwith, under the guidance and

11        supervision of the Special Master, conduct an assessment

12        of unmet need for inpatient care in the condemned inmate

13        population at San Quentin.

14     3. Defendants shall forthwith resume working under the

15        guidance of the Special Master to establish a durable

16        remedy that provides adequate access to necessary

17        inpatient mental health care or its equivalent[26] for

18        seriously mentally ill inmates on California's death row.

19     4. In meeting their obligations under paragraph 3 of this

20        order, consideration shall be given to all possible

21        remedies, including, but not limited to, creation of a

22        hospital unit for condemned inmates only at CMF, San

---

[26] The parties disagree as to whether the required care can be provided in an unlicensed outpatient housing unit or whether an inpatient licensed facility is required.  At the present time no request has been made to waive any provision of state law governing the delivery of mental health care in a prison or hospital setting.  While this court is precluded from ordering defendants to comply with state law, see. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984), a durable remedy to the Eighth Amendment violations in this action must not include programs whose continued existence are jeopardized by noncompliance with state law. The dispute over whether the proper remedy requires a licensed facility should be resolved as part of the establishment of a durable remedy required by this order.

1    Quentin, Stockton or other appropriate facility.

2    5. Within six months the Special Master shall report to the

3    court on the remedy elected and the time frame for its

4    complete implementation.

5    6. Except as expressly granted herein, plaintiffs' motion to

6    enforce judgment and for additional orders is denied

7    without prejudice.

8    7. This order further demonstrates that defendants' motion

9    to terminate should not have been granted.

10   IT IS SO ORDERED.

11   DATED:  December 10, 2013.

12

13

14

15   LAWRENCE K. KARLTON
     SENIOR JUDGE
16   UNITED STATES DISTRICT COURT

17

18

19

20

21

22

23

24

25

26

27

28

28