DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

       Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

       Defendants.

Case No. 2:90-cv-0520 LKK DAD

**PLAINTIFFS' POST-TRIAL BRIEF REGARDING ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF REGARDING IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION**

Judge:   Hon. Lawrence K. Karlton

[1053037-28]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

I.  DEFENDANTS' SYSTEMIC POLICIES AND PRACTICES VIOLATE
    THE RIGHTS OF CLASS MEMBERS ................................................................ 2

    A.  CDCR's Segregation Units Are Harmful and Dangerous Settings for
        *Coleman* Class Members ............................................................................. 2

    B.  Defendants Fail to Provide Constitutionally Adequate Mental Health
        Treatment to Class Members in Segregation ................................................ 5

    C.  Clinicians Cannot Protect Patients From Known Risks Of Segregation ........ 7

    D.  Defendants Use Segregation Units as a Stop Gap Solution for
        Persistent, Systemwide Shortages of Appropriate Placements ..................... 8

    E.  There Is No Penological Justification for Defendants' Extreme and
        Harmful Disciplinary Practices .................................................................... 10

    F.  The Persistence of Staggeringly High Suicide Rates in Segregation
        Demonstrates That the Units Are Dangerous and Anti-Therapeutic ........... 12

II. ONGOING VIOLATIONS ESTABLISH THE NEED FOR FURTHER
    REMEDIAL ORDERS ....................................................................................... 14

    A.  Defendants' Intransigence and Misrepresentations Warrant
        Immediate, Bright-Line Orders .................................................................... 14

    B.  To Remedy Severe and Systemic Constitutional Violations, the Court
        Should Issue Short-Term and Long-Term Relief ......................................... 16

    C.  The Court Should Exclude Class Members from Extraordinarily
        Dangerous and Inappropriate Segregation Settings ..................................... 17

        1.  The Court Should Prohibit CDCR from Using Segregation for
            Any Class Member Who Has Not Received a Rule Violation ........... 17

        2.  The Court Should Order an End to the Dangerous Practice of
            Cycling Class Members Between Segregation and Inpatient
            Care ................................................................................................. 19

        3.  The Court Should Exclude Any EOP from Segregation Until
            and Unless a Mental Health Assessment Determines That the
            Rule Violation Was Not Due to Mental Illness ................................. 20

        4.  The Court Should Extend the Pelican Bay SHU Exclusion
            Order ................................................................................................ 20

    D.  The Court Should Order Defendants to Immediately Implement
        Measures to Reduce Dangers to Class Members in Segregation ................. 21

[1053037-28]

i

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1        1.    The Court Should Require Defendants to Certify That All
              Segregation Units Provide Adequate Treatment Hours,
2             Confidential Treatment Space, Staffing, and Out-of-Cell Time ........ 21

3        2.    The Court Should Impose Time Limits for Segregation of
              Class Members ................................................................... 22
4
         3.    The Court Should Order Defendants to Provide Monthly
5             Reports About Class Members' True Lengths of Stay in
              Segregation ........................................................................ 23
6
         4.    The Court Should Prohibit CDCR's Indiscriminate Use of
7             Cages ................................................................................ 23

8        5.    The Court Should Prohibit CDCR's Blanket Strip Search
              Policy ................................................................................ 24
9
         6.    The Court Should Prohibit the Use of Management Cells ................ 25
10
         7.    The Court Should Order Defendants to Implement Basic
11            Suicide Prevention Measures in All Segregation Units .................... 25

12   E.   The Court Should Order an Audit of Class Members in Segregation ........... 28

13   F.   The Court Should Order Defendants to Develop Treatment-Based
         Disciplinary Programs for *Coleman* Class Members .................................... 30
14
     CONCLUSION .............................................................................. 30
15

16

17

18

19

20

21

22

23

24

25

26

27

28

[1053037-28]

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Coleman v. Brown*,
    428 F. App'x 743 (9th Cir. 2011)...................................................................... 2

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) .............................................................. 13

*Coleman v. Wilson*,
    Case No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786..................... 1

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995)............................................................... 10

*Olmstead v. L.C. ex rel Zimring*,
    527 U.S. 581 (1999) .............................................................................. 10, 24

## <u>STATUTES</u>

42 U.S.C. § 12101(a)(2) ............................................................................. 10, 24

42 U.S.C. § 12101(a)(5) ............................................................................. 10, 24

42 U.S.C. § 12132.................................................................................... 10, 24

## <u>REGULATIONS</u>

28 C.F.R. § 35.104...................................................................................... 10

28 C.F.R. § 35.152(b)(2) .............................................................................. 10

28 C.F.R. §§ 35.130(b)(7), (d) ....................................................................... 10

Cal. Code Regs. Title 15 § 3332(f).................................................................. 3

Cal. Code Regs. Title 15 § 3343(h) ................................................................ 22

[1053037-28]

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ASU | Administrative Segregation Unit ("Ad Seg") |
| ATOM | Alternative Treatment Option Models |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| DAI | Division of Adult Institutions |
| DMH | Department of Mental Health (now DSH) |
| DSH | Department of State Hospitals (formerly DMH) |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| LAC | California State Prison—Los Angeles County |
| LOB | Lack of Bed |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NDS | Non-Disciplinary Segregation |
| PSU | Psychiatric Services Unit |
| RC | Reception Center |
| RJD | R.J. Donovan Correctional Facility |
| RVR | Rule Violation Report |
| SAC | California State Prison—Sacramento |
| SHU | Security Housing Unit |
| SNY | Special Needs Yard |
| SVSP | Salinas Valley State Prison |

[1053037-28]

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1

## INTRODUCTION

2          In defiance of numerous orders of this Court, Defendants continue to place

3   *Coleman* class members at reckless and needless risk of suffering, decompensation, and

4   suicide in CDCR segregation units.[1]  Twenty years ago, Magistrate Judge Moulds found

5   that the placement of class members in segregation "exacerbates the underlying mental

6   illness, induces psychosis, and increases the risk of suicide," and that Defendants' failures

7   to provide adequate mental health treatment to class members in segregation and to

8   implement sufficient screening mechanisms violated the Eighth Amendment.  *Coleman v.*

9   *Wilson*, Case No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786, at *71-72

10  (Dkt. 547).  Two decades later, these constitutional violations persist.  Defendants continue

11  to vastly overuse and over-rely on segregation, eschewing more humane and cost-effective

12  disciplinary sanctions and refusing to implement straightforward, well-established

13  measures to reduce the suffering and death of class members.

14          *Coleman* class members suffer disproportionately from Defendants' ill-advised

15  disciplinary and segregation policies.  The number of class members in segregation

16  continues to climb systemwide, even as the overall CDCR population has decreased.[2]

17  EOP patients, the most acutely ill class members, are more than twice as likely to be in

18  segregation as other CDCR prisoners.  Ex. 2032.[3]  Current CDCR data shows that more

19  than a fifth of all EOPs are in segregated housing.  *Id.*  Moreover, the average length of

20  stay for CCCMS patients in ASUs exceeds that of non-caseload prisoners.  Defs' Ex. PPP;

21  T. 2998:25-2999:14.  Suicide rates in segregation continue at levels the Special Master has

22  _____

23  [1] A summary of the Court's orders regarding segregated housing can be found in Plaintiffs'
    Notice of Motion and Motion for Enforcement re Segregated Housing, Dkt. 4580 at 4,
24  nn.2 & 3.  These orders date back to 1999 and address, *inter alia*, staffing ratios,
    programming space, length of stay, population caps, and suicide prevention measures.
25  [2] Since April 2000, the overall CDCR population has decreased by 19.6%.  Ex. 2035.
    During the same period, the number of mentally ill prisoners in CDCR segregation units
26  has increased 124%.  Ex. 2037.  The number of EOPs in ASUs has increased 401%.  *Id.*
    [3] EOP prisoners represent 4% of the total CDCR population and 9% of the segregated
27  population.  Ex. 2302.

28

1  described as "staggering," and data show that in the last five years, well over half of the

2  suicides in segregation have been identified class members.  First Half of 2012 Suicide

3  Rpt., Dkt. 4376 at 16; Exs. 2781, 2800, 2801, 2802.

4      The Court must issue immediate, bright-line remedial orders to exclude class

5  members from dangerous segregation units, to strictly limit class members' lengths of stay

6  in all segregation units, to ensure minimally adequate conditions and mental health

7  treatment in all segregation units, and to implement essential suicide precautions.[4]

8  **I.    DEFENDANTS' SYSTEMIC POLICIES AND PRACTICES VIOLATE THE**
   **RIGHTS OF CLASS MEMBERS**

9
       **A.    CDCR's Segregation Units Are Harmful and Dangerous Settings for**
10            ***Coleman* Class Members**

11     It is undisputed that CDCR segregation units are dangerous, high-risk environments

12  for the mentally ill.  The harm caused by isolation is exacerbated by inadequate treatment,

13  excessively long terms of segregation, unnecessarily punitive custodial measures that

14  discourage class members from receiving needed mental health care, insufficient outdoor

15  exercise, inadequate suicide precautions, inappropriate use of segregation for non-

16  disciplinary purposes, and dangerously deficient screening and exclusion procedures.

17     The conditions of confinement for class members in segregation are not contested.

18  The 3,569 *Coleman* class members in CDCR segregation units spend their days and nights

19  in a series of cages:  small steel and concrete cells to which they are confined for nearly

20  every hour of the day, "walk-alone" exercise yards in which they are fenced into enclosed

21  outdoor spaces, metal cages to which they are confined for mental health treatment, small

22  holding cells where they are placed when in acute psychiatric distress, and barren

23  management cells into which they are locked when considered "unduly disruptive."

_____

24

25  [4] In addition to relying on the evidence presented at trial, the Court should, as it has in the
    past, rely on the long record of constitutional violations in this case in reaching its findings
26  and ordering remedial relief.  *See, e.g.*, *Coleman v. Brown*, 428 F. App'x 743, 744 (9th Cir.
    2011) ("The district court expressly relied in its orders on the expansive record in this case,
27  spanning over two decades and thousands of entries.  This record contains ample evidence
    of the unconstitutional conditions ....").

28

[1053037-28]

1    T. 2185:17-2186:25, 2454:2-13, 3283:12-3284:15; Ex. 2302; Title 15 § 3332(f) (use of

2    management cells).  Simple diversions such as checkers, chess, playing cards, and dominos

3    are prohibited, and even personal clothing, shoes, and undergarments are deemed

4    contraband.  T. 2978:13-2979:6, 2976:5-21.  All class members in segregation are strip-

5    searched each time they leave or enter the housing unit, cuffed for all out-of-cell

6    movements, and caged for treatment, without regard to their psychological vulnerabilities

7    or the security risk they pose.  T. 2274:8-20, 2784:3-11, 2803:20-24.

8        Dr. Edward Kaufman testified that the absence of social contact in segregation units

9    frequently leads to regression and decompensation among class members.  Without

10    external stimulation, they "turn further and deeper into their own psychotic inner

11    selves. . . . [T]he less contact they have with the outside world, the more likely they are to

12    hallucinate and have delusions."  T. 2459:20-2460:7.  He described Prisoner F, a class

13    member who started to experience auditory hallucinations, psychiatric distress,

14    hopelessness, and suicidal ideation during the first four years of his indeterminate SHU

15    sentence.  T. 2497:10-2505:12.  By the time Prisoner F was removed from the SHU and

16    placed in an MHCB, his level of mental health functioning was so low that he was

17    "incapable of caring for himself or providing for any kind of basic needs."  T. 2500:8-13.

18        Prisoner N was a CCCMS patient placed in the ASU at CIM for non-disciplinary

19    reasons.  Faced with the stressors of segregation, he began to experience intensified

20    auditory hallucinations and acute suicidal ideation, leading him to report to a mental health

21    clinician that he "just can't take being in here, ad-seg."  Ex. 2205 at 1, T. 2467:13-2468:3.

22    Only when Prisoner N was finally released from ASU, more than ten months later, did his

23    acute psychiatric distress abate.  Ex. 2205 at 6 (clinical note indicating that his psychiatric

24    "[i]ssues have largely resolved with his release from Ad Seg").  But, as Dr. Kaufman

25    observed, the harm caused by such episodes of psychotic decompensation is permanent,

26    doing "measurable damage to the brain" and predisposing the patient to "more severe

27    episodes … [and] more frequent episodes in the future."  T. 2471:7-16.

28        Dr. Pablo Stewart testified that class members frequently decompensate in CDCR's

3

1  segregation units due to their inability to withstand the psychological stressors.  T. 2782:7-

2  14.  Dr. Stewart described a "perfect storm" in which class members are unable to comply

3  with disciplinary rules because of their mental illnesses, get placed in segregation, and then

4  suffer from inadequate treatment and "the antitherapeutic effect of being within a

5  segregated housing unit."  T. 2771:16-2772:17.[5]  The predictable result is psychiatric

6  decompensation, more rule violations, and more segregation of the mentally ill.

7          Dr. Craig Haney testified that class members suffer due to extraordinarily and

8  unnecessarily long terms in segregation.  Although administrative segregation is explicitly

9  designed to be "temporary," class members routinely spend months and years in ASUs.

10  T. 2127:21-2129:12; Exs. 2044 & 2045 (showing 124 EOPs and 689 CCCMS in ASU for

11  greater than 90 days).  In CDCR's extremely harsh and deprived SHUs, class members

12  spend months, years, and even decades.  Ex. 2058 (491 CCCMS in SHU greater than 90

13  days).[6]  Dr. Haney opined that it is tremendously dangerous and harmful to place mentally

14  ill prisoners in these "extremely isolating environments … that really deprive the

15  prisoners … of meaningful social contact at almost every level."  T. 2118:13-2120:24.

16          Defendants' witnesses and experts do not dispute that segregation units can be

17  dangerous settings for mentally ill prisoners.[7]  Defendants' sole retained testifying expert,

18  Dr. Charles Scott, did not opine on the specific conditions inside CDCR segregation units,

19  _____

20  [5] This cycle is exacerbated by chronically insufficient mental health input into the RVR
   process.  *See* Stewart, T. 2772:18-2781:1 (Prisoner V at SVSP had untreated psychosis;
21  clinician documented that "mental health factors seem to very strongly contribute to the
   inmate-patient's alleged acting out behavior," but the ICC found "no mitigating factors");
22  *see* Ex. 2136 (same); *see also* Martin, T. 1854:10-24 ("perfect storm"); Belavich,
   T. 3691:8-14 (need for expanded mental health input into the disciplinary process).
23  [6] *See* Haney T. 2211:3-17 (class member in SHU for 23 years, misreported to Special
   Master as 269.1 days in segregation because MHCB placement had "restarted the clock").
24  [7] The Court should reject Defendants' assertions that CDCR segregation units are not
25  solitary confinement.  T. 3108:5-6, 3466:17-3467:3; *see* USA Statement of Interest, Dkt.
   4736-1 at 5 of 39 (defining "'isolation' or 'solitary confinement'" as the "state of being
26  confined to one's cell for approximately 22 hours per day or more, alone or with other
   prisoners, that limits contact with others"); Kahn Decl., Dkt. 4582, Ex. 11 at 5 (Chase
27  Riveland, Supermax Prisons: Overview and General Considerations, U.S. Dep't of Justice,
   1999) (describing CDCR SHUs as "highly restrictive" and "isolat[ing]").

28

1  or any individual class member cases.  T. 3334:7-13.[8]  He claimed no knowledge as to

2  Defendants' compliance with Program Guide requirements.  T. 3344:17-3345:6.  Dr. Scott

3  did not provide any rebuttal to the testimony of Plaintiffs' psychiatrist experts, Dr. Stewart

4  and Dr. Kaufman.  His limited rebuttal opinion as to Dr. Haney concerned only the

5  interpretation of published studies and did not address Dr. Haney's assessment of CDCR

6  segregation conditions or their impact on class members.  T. 3333:12-3334:6.[9]

7         Dr. Scott himself acknowledged that segregation units are more stressful than

8  general population units by design and may be psychologically damaging to some

9  individuals.  T. 3367:12-19, 3370:17-19.  Dr. Belavich admitted that "segregation can be a

10  high-risk environment for both mentally ill and nonmentally ill."  T. 3564:11-16.  He also

11  testified that if given the power, mental health clinicians would be very reluctant to place

12  patients in segregation on account of the risks it poses to their safety and mental health.

13  T. 3685:2-24.  CIM's Dr. Jordan testified that extended placements in segregation can be

14  harmful and acknowledged that *Coleman* class members' lengths of stay in segregation

15  units are concerning.  T. 3132:22-25, 3137:2-4.

16     **B.     Defendants Fail to Provide Constitutionally Adequate Mental Health
17             Treatment to Class Members in Segregation**

18         The harm to class members is exacerbated by chronically insufficient mental health

19  treatment in CDCR segregation units.  By Defendants' own account, mental health

20  treatment, even by primary clinicians, is often administered through the doorjamb of

21

22  _____

23  [8] It is telling that Defendants did not offer testimony from the three other termination
experts to defend their use of segregation.  Dr. Dvoksin, for example, was responsible for
24  the experts' review of CDCR's segregation units and has published widely on the subject.
*See* Kahn Decl., Dkt. 4582, Ex. 12 (2006 Metzner & Dvoskin article).

25  [9] Dr. Scott testified about a Canadian study and a now-repudiated Colorado study, which—
as Dr. Scott conceded—looked at strikingly distinct and less severe segregation systems
26  and explicitly caution against generalizing their findings to other systems.  *See* Scott, T.
3359:25-3374:22; *see also* Haney, T. 3359:25-3374:22, 2373:20-2374:16 (discussing
27  Colorado's recent decision to "take[] their mentally ill prisoners out of administrative
segregation and put them a residential treatment program").

28

[1053037-28]

1  locked cells.[10]  The treatment spaces for segregated class members are, by and large, the

2  same "makeshift facilities" that the Supreme Court found in 2011 to "impede the effective

3  delivery of care and place the safety of medical professionals in jeopardy, compounding

4  the difficulty of hiring additional staff."  *Brown v. Plata*, 131 S. Ct. 1910, 1933 (2011).

5      Both individual and group contacts frequently take place on the dayroom floor of

6  housing units, with no auditory or visual confidentiality.  Consistent with the findings of

7  the 25th Round Report, Dr. Stewart testified that he observed group treatment taking place

8  on the dayroom floor at the EOP hubs at RJD and LAC.  T. 2761:15-25; Ex. 2778 at 36.

9  Dr. Haney and Dr. Kaufman also testified about inadequacies in treatment space that

10  seriously diminish the quality of the treatment provided in segregation units.  T. 2161:4-23,

11  2475:7-2476:6; Exs. 2003 & 2005.  Converted storage closets stand in for group treatment

12  spaces, and therapy takes place in rooms that also double as clinical offices and conference

13  rooms.  T. 2170:12-2171:2, 2472:3-17, 2475:7-2476:6; Exs. 2011 & 2211.  The few

14  treatment space projects Defendants presented include one that cannot be opened until

15  further construction to add cages, and another that fails to address major deficits in

16  treatment space for CCCMS prisoners in the SHU and ASU.  T. 2891:24-2892:6, 3237:2-

17  10 (further construction required at LAC); T. 2654:7-12 (insufficient space for CCCMS

18  SHU and ASU at Corcoran).  Meanwhile, major deficiencies persist in the segregation

19  treatment spaces at more than half a dozen other prisons, with no improvements planned,

20  or projects still years away from expected completion.  *See* Ex. 2620 (Hysen Decl. ¶¶ 10-

21  14 (RJD, MCSP, CMC, CIW)); Ex. 2007 & T. 2163:2-2164:14 (CCI); Exs. 2003-2006,

22  2012 & T. 2159:4-2162:10, 2172:11-2173:19 (MCSP); T. 3128:8-17 (CIM).

23      Dr. Stewart testified that the mental health treatment provided to class members in

24  segregation is inadequate to address the harsh conditions and deprivations of these

25

26  ───────────────

[10] *See* Fischer, T. 2678:22-2679:4, 2682:3-11 (about 50% of primary clinician (PC)
27  contacts in Corcoran EOP hub occur at cell-front; cell-front treatment "is a challenge");
Jordan, T. 3125:12-18 (40% refusal rate for out-of-cell PC contacts in CIM's ASU).

28

1 disciplinary units.  T. 2790:20-2791:4.  He observed that in EOP ASU hubs and PSUs—
2 both ostensibly designed to deliver enhanced treatment to critically ill class members—
3 treatment consistently falls short of the Program Guide's ten-hour minimum for structured
4 therapeutic treatment.  *See also* Stewart, T. 2790:12-19, 2796:2-7, 2797:15-21, 2800:4-14
5 (inadequate mental health treatment in EOP hubs at RJD, LAC, SVSP, and SAC, as well
6 as SAC PSU).  The Special Master found that ten of the eleven EOP ASU hubs failed to
7 offer the required ten hours of weekly treatment.  Ex. 2778 (25th Round Rpt.) at 37.

8 Defendants admit that the number of treatment hours *received* by class members in
9 segregation consistently lags well behind the hours offered. Defs' Ex. GGGG.  Dr. Stewart
10 testified that high refusal rates are unsurprising given that inmates must endure strip
11 searching, handcuffing, cell searching, and caging in order to participate in therapeutic
12 groups, which include many that may involve nothing more than watching television
13 reruns.  T. 2762:19-2763:14.  Dr. Belavich acknowledged that Defendants' blanket strip
14 search practices "could definitely be a factor" in persistently high refusal rates.
15 T. 3503:13-25.  Dr. Fischer testified that some patients "object to being strip-searched and
16 sometimes for that reason don't come out to group" or "decline to come out for one-on-one
17 treatment."  T. 2670:23-2671:7.  Dr. Jordan testified that long waits in holding cells for
18 mental health appointments may have the same effect.  T. 3169:15-17.

19 Moreover, treatment for EOPs in CDCR's segregation units is getting worse, not
20 better.  Seven of ten EOP hubs and two of three PSUs, reported that patients received
21 fewer structured therapeutic treatment hours in November 2013 than June 2013.  *Compare*
22 Ex. 2120, *with* Defs' Ex. GGGG; *see also* T. 3580:7-3583:10.

23 **C.    Clinicians Cannot Protect Patients From Known Risks Of Segregation**

24 Defendants' mental health clinicians are powerless to protect their patients from the
25 adverse effects of segregation.  Clinicians are unable to prevent the placement of class
26 members into segregation or to remove their patients from segregation even if they
27 determine that the patient is suffering in that setting.  *See* Fischer, T. 2688:19-2689:3,
28 2691:12-21, 2712:6-2713:3; Allison, T. 3208:17-25.  Dr. Belavich testified that the

1   clinician's only option is to wait until a patient's mental health condition deteriorates

2   sufficiently to warrant referral to inpatient care in an MHCB or DSH.  T. 3566:22-3567:3,

3   3571:22-3572:4.  Then, upon discharge from the inpatient setting, clinicians lack authority

4   to prevent their patients from being returned to the same segregation settings in which they

5   decompensated.  T. 3571:10-3572:4.  Defendants insist that such decisions are "rightly

6   with correctional officers, and not with mental health clinicians."  Defs' Ex. LLL ¶ 25.

7   **D.    Defendants Use Segregation Units as a Stop Gap Solution for Persistent,**
     **Systemwide Shortages of Appropriate Placements**

8

9        Defendants routinely use segregated housing as the default placement for class

10  members due to ongoing overcrowding.  The Supreme Court denounced Defendants' use

11  of segregation units to compensate for system wide shortages of appropriate placements

12  for mentally ill prisoners.  *See Brown*, 131 S. Ct. at 1924 ("[I]nmates awaiting care may be

13  held for months in administrative segregation, where they endure harsh and isolated

14  conditions and receive only limited mental health services."); *id.* at 1933 ("Mentally ill

15  prisoners are housed in administrative segregation while awaiting transfer to scarce mental

16  health treatment beds . . . . One correctional officer indicated that he had kept mentally ill

17  prisoners in segregation for '6 months or more.'").  These deplorable practices persist.

18       The reductions to date in CDCR's overall levels of crowding have not reached the

19  *Coleman* class,[11] and Defendants continue to subject class members to extended

20  placements in segregated units merely because they have nowhere else to put them.  This is

21  most evident in Defendants' use of "non-disciplinary segregation" (NDS).  Class members

22  who have committed no disciplinary infractions are routinely placed in ASUs for

23  prolonged periods.[12]  Many are placed in segregation units awaiting transfer to SNY beds.

24

25  [11] Since April 2000, the total CDCR population has decreased by 19.6%, but the mentally
     ill population has increased by 73%.  *See* Haney, T. 2143:17-2145:18; Exs. 2035 & 2036.
26  [12] Kaufman Prisoner L was held in CIM's ASU for almost a year as an "LOB" (Lack of
27  Bed).  T. 3146:16-23; Ex. 2617.  Haney Prisoner WW was in ASU for no fault of his own
     for about a year and a half.  T. 2385:8-16; Ex. 2034.  Haney Prisoner GG was held in the
28  (footnote continued)

1  Ex. 2019 (CIM ASU census board).  DAI Directors Stainer and Allison also testified about

2  so-called "SHU kickouts," who have served their full disciplinary terms, but get

3  transferred from the SHU to ASUs, rather than to GP settings where they belong, because

4  there is nowhere else to place them.  T. 2930:8-25, 3312:4-13.[13]  Still other class members

5  are simply described by Defendants as "LOBs" (lack of beds) and held in ASUs for no

6  reason except the obvious—the lack of an appropriate bed for them.  Ex. 2019.[14]

7        Defendants' inability to manage their prison population causes class members to

8  pile up in segregation units.  Class members are routinely retained in ASUs simply because

9  Defendants are unable to timely process and investigate their cases.[15]  Allison

10  acknowledged bottlenecks in CDCR's process for endorsing transfers.  T. 2949:17-21.

11  Allison and Stainer testified that even once available beds have been identified, some class

12  members remain in segregation units simply because Defendants cannot obtain a bus seat

13  to effectuate the transfer.  T. 3190:1-14, 3314:19-3315:6.  Ambulances and vans are used

14  for medical transports, but Defendants have no plan to use these services to get mentally ill

15  prisoners out of segregation.  T. 3221:11-3222:7.  Meanwhile, some class members are

16  held in segregation units awaiting transfer for so long that their transfer endorsements

17  expire—forcing them to start the process anew.  T. 3408:21-3409:20.

18        Allison acknowledged that segregation units are used as overflow housing.

19

20  _____

21  ASU for safety concerns for at least eight months, even as he began to decompensate and a
   CDCR clinician documented "want[ing] to write a chrono indicating that continued lock-
   up is adversely affecting inmate's mental state."  Ex. 2050 at 17; *see* T. 2245:8-2252:7.

22  [13] Stainer testified that some individuals are also retained in the SHU indefinitely due to a
   shortage of appropriate housing.  T. 3288:7-3289:5, 3427:24-3429:22.

23  [14] For example, Kaufman Prisoner L's mental health records stated that "[p]er custody I/P
   unable to attend the movie group because he is LOB and unable to mix with ADSEG

24  inmates."  Ex. 2617 at 3.  Dr. Jordan acknowledged that despite claims that all the LOB
   inmates in Cypress Hall were Reception Center overflow, Prisoner L had been transferred

25  from the mainline and was not in RC status.  T. 3111:5-16, 3144:1-3145:16.

26  [15] Allison testified that CDCR routinely takes up to 45 days to write up and investigate rule
   violations, and frequently extends those investigations.  T. 3225:17-23.  Dr. Austin

27  testified that this process can and should be resolved in seven to ten days, if not sooner, as
   is standard practice in other states.  T. 3043:13-15, 3054:8-3055:2.

28

1    T. 2980:18-2981:5.  Dr. Belavich admitted that Defendants use ASUs as alternative

2    housing placements for class members in need of MHCBs when overcrowding and

3    shortages prevent transfer to a crisis bed.  T. 3662:19-3665:9.

4         By warehousing class members in segregation units because appropriate beds and

5    timely transfers cannot be provided, Defendants' system fails to make the reasonable

6    accommodations necessary for mentally ill prisoners to be housed and treated in the most

7    integrated setting appropriate to their individual needs.  In addition to violating the Eighth

8    Amendment, these practices constitute illegal disability discrimination.  *See* 42 U.S.C.

9    §§ 12101(a)(2), (a)(5), 12132; 28 C.F.R. §§ 35.104, 35.130(b)(7), (d), 35.152(b)(2); *see*

10   *also Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation …

11   is properly regarded as discrimination based on disability.").

12        **E.    There Is No Penological Justification for Defendants' Extreme and**
             **Harmful Disciplinary Practices**

13

14        Defendants' disciplinary practices "bear little relation to security concerns."

15   *Madrid v. Gomez*, 889 F. Supp. 1146, 1266 (N.D. Cal. 1995).  Defendants have failed to

16   establish a valid penological justification for the extraordinary rates at which class

17   members are placed in segregation or their extended lengths of stay.  Dr. Austin testified

18   that CDCR sends large numbers of class members to segregation when less dangerous

19   punishments, such as loss of privileges or work assignments, would suffice.  T. 3018:10-

20   16.  Such alternative sanctions have proven to be effective in deterring rule violations, less

21   resource intensive, and far less psychologically damaging for mentally ill prisoners.[16]

22        By CDCR's account, class members are routinely assessed SHU terms for offenses

23   such as refusing a cellmate, indecent exposure, exhibitionism, and drug trafficking.

24   _____

25   [16] Plaintiffs' experts testified extensively about CDCR's overreliance on segregation.  *See*
     Austin, T. 3055:3-14 ("informal kinds of sanctions are very effective if they're done
26   properly"); Stewart, T. 2826:7-23 ("removing privileges in a clinically sensitive manner …
     can be effective"); Haney, T. 2290:8-2291:6 ("especially with the mentally ill … there are
27   limits to what sanctions can be").

28

[1053037-28]

1   T. 3319:8-3320:15.  Dr. Austin testified that these low-level offenses are "not SHU-able

2   offense[s] in any of the places I've worked."  T. 3067:13-3068:23.  Defendants transfer all

3   class members charged with SHU-able offenses to ASUs, where they remain until the rule

4   violation is investigated and adjudicated.  T. 3225:9-13.  This process may not be

5   completed until the entire expected SHU term has already been served.  T. 3273:3-9.

6   Dr. Austin condemned this practice as unnecessary and excessively punitive, opining that

7   pre-disciplinary segregation should be employed only in the very rare circumstances where

8   individual risk assessments absolutely compel it.  T. 3019:1-10, 3055:15-3056:11.

9        Once assessed, disciplinary terms for class members are exceptionally long.  As

10  Dr. Haney testified, the American Psychiatric Association defines prolonged segregation

11  as segregation lasting "greater than 3-4 weeks," and the organization advises that

12  "[p]rolonged segregation of adult inmates with serious mental illness … should be avoided

13  due to the potential for harm to such inmates."  Ex. 2054; T. 2284:7-14.  New York,

14  Georgia, and Mississippi—states with which Dr. Austin has worked—cap their

15  disciplinary segregation terms for all prisoners at 30 to 40 days, with the end of that range

16  reserved for extreme and assaultive behavior.  T. 3017:13-16, 3020:2-22.  Upon

17  completion of this disciplinary term, the vast majority of prisoners in systems where

18  Dr. Austin has worked return directly to the general population, including (where

19  necessary) to a higher custody setting.  The remaining 10 to 20 percent of prisoners are

20  sent to step-down programs after completing their disciplinary terms.  These programs are

21  designed to be completed in about nine months and offer increasing levels of privileges

22  and freedoms whereby prisoners are guaranteed to achieve release from segregation

23  through compliance with behavioral rules.  T. 3015:13-3016:18, 3017:21-25, 3078:11-

24  3079:9.  A separate, parallel step-down program run by mental health clinicians exists for

25  prisoners with mental illness.  T. 3023:2-17, 3034:9-12.  Custody's role in these special

26  mental health units is to assist the clinicians at their direction, not to dictate restrictions and

27  procedures.  The states that employ this system—a short disciplinary sentence, followed

28  by, in rare cases, a longer stay in a special step-down program run by clinicians—have

11

1    seen no increase in violence or misconduct.  T. 3027:12-15, 3031:7-21, 3072:18-24.

2        In CDCR, by contrast, class members routinely languish in the SHU for years, or

3    even decades in the case of gang members or associates.  In California, even the most

4    minor SHU-able offense has a minimum term of two months.  Defs' Ex. NNN (Title 15

5    § 3341.5).  Although wardens may suspend SHU terms at their sole discretion, there are no

6    structures in place to facilitate class members' transition to greater freedoms and no way

7    for a class member to earn his way out of the SHU.  T. 3310:9-3311:5.[17]

8        Defendants' practices are not only inhumane and wasteful from the perspective of

9    resource allocation,[18] but also counterproductive.  The purpose of segregation, Dr. Austin

10   testified, is to increase safety and security.  Placing and leaving seriously mentally ill

11   prisoners in units where conditions exacerbate their underlying illnesses and preclude

12   meaningful treatment has the opposite effect.  T. 2291:2-14, 3026:25-3027:11.

13       **F.    The Persistence of Staggeringly High Suicide Rates in Segregation
             Demonstrates That the Units Are Dangerous and Anti-Therapeutic**
14

15       Tragically, in the final days of 2013, a CCCMS class member housed in

16   administrative segregation at North Kern State Prison committed suicide in his cell.  *See*

17   Declaration of Margot Mendelson ISO Plaintiffs' Post-Trial Brief, filed herewith, Ex. 1.

18   The prisoner, who had no rule violation history, was placed in the ASU for safety concerns

19   on December 6, 2013—three days after Defendants issued their NDS Transfer Timelines

20   Memos.  *Id.*; *id.* Ex. 2 at 1-3; Defs' Ex. RRR.  The prisoner killed himself on the 22nd day

21   of his confinement in the ASU.  Mendelson Decl. Ex. 2 at 3.  His was the 16th suicide in a

22   CDCR segregation unit in 2013 and makes plain the inadequacy of Defendants' purported

---

[17] The only semblance of a step-down program from the SHU is the pilot Security Threat Group program, intended to phase gang members out of the SHU.  Stainer testified that the program is only for gang members, takes a minimum of three years to complete, and does not prioritize class members.  T. 3295:21-3296:6, 3425:8-16.

[18] Dr. Belavich testified that "the demands of the Program Guide on my staff are more significant when the patients are in administrative segregation," and that getting patients out of segregation "should begin to free up statewide resources."  T. 3563:1-3564:6.

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  solutions—which permitted this prisoner's non-disciplinary placement in ASU and would

2  have allowed it to continue for 38 more days.

3      The harm caused by Defendants' segregation policies and practices is starkly

4  illustrated by the astronomical suicide rates in CDCR's segregation units. This Court has

5  directed Defendants to address the "escalating percentage of suicides occurring in

6  administrative segregation units." Order, Dkt. 1830, 6/8/06 at 2 ¶ 1. The Court's suicide

7  expert, Dr. Ray Patterson, concluded that "[t]he difference between segregated housing

8  and non-segregated housing with regard to their respective rates of suicides per 100,000 is

9  staggering." First Half of 2012 Suicide Rpt., Dkt. 4376 at 16.

10     At trial, Defendants urged the Court to disregard the overall suicide rate in

11 segregation units because it includes prisoners who were not identified as class members at

12 the time they took their lives. T. 3610:1-2, 3646:16-20. In essence, Defendants ask the

13 Court to ignore their systemic failure to identify individuals in acute psychiatric distress in

14 their segregation units. Defendants' failed mechanisms for screening for mental illness

15 have been at issue since the beginning of this litigation. *See Coleman v. Wilson*, 912 F.

16 Supp. 1282, 1296 (E.D. Cal. 1995). The overall suicide rate in segregation units is

17 important evidence that those deficiencies persist. It is well within the authority and

18 responsibility of the Court to consider and address suicides both among class members and

19 individuals whom Defendants failed to identify as class members.

20     Nonetheless, zeroing in on the suicide data for class members in segregation yields

21 important insights for suicide prevention. In the past five years, well over half of the

22 suicides in segregation units took place among *Coleman* class members (*i.e.*, prisoners

23 with CCCMS or EOP codes at the time of their deaths).[19] In 2013, class members

24

25 _____

26 [19] Defendants insist that condemned units are not segregation units. T. 3519:5-12,
   3706:17-25. This position has been rejected by Dr. Patterson. *See, e.g.*, 2011 Suicide Rpt.,
27 Dkt. 4308 at 26. Nonetheless, if suicides in condemned units are excluded from the
   calculations, the data remain eye-popping: class members accounted for 54% of the
28 suicides in (non-condemned) segregation units in 2013 (Ex. 2781), 85% in 2012 (*id.*), 73%
   (footnote continued)

1   represented 33% of the segregated population and 53% of the suicides in segregation units.

2   Exs. 2302 & 2781.[20]   In 2012, class members accounted for 80% of the segregation

3   suicides.  *Id.*  In 2011, 69% of the suicides in segregation units were class members.  Ex.

4   2802.  In 2010, the figure was 54%, and in 2009, it was 75%.  Exs. 2800 & 2801.

5        Effective, pragmatic measures to remove class members from these dangerous

6   settings are necessary to reduce suicides in segregation.  Defendants are well aware of the

7   steps necessary to address the high suicide rates in segregation; many have been

8   recommended since 2006.  *See* Ex. 2459 (Suicide Compendium); First Half of 2012

9   Suicide Rpt, Dkt. 4376 at 8 ("This reviewer has repeated many of the same

10  recommendations over and over again . . . *because, year after year, CDCR fails to*

11  *implement these recommendations.*") (emphasis in original).

12  **II.    ONGOING VIOLATIONS ESTABLISH THE NEED FOR FURTHER**
     **        REMEDIAL ORDERS**

13
14        **A.    Defendants' Intransigence and Misrepresentations Warrant Immediate,**
     **            Bright-Line Orders**

15        Immediate judicial action is necessary because Defendants have proven unwilling to

16  address the unconstitutional conditions in their segregation units despite years of judicial

17  findings and monitoring reports highlighting constitutional violations.  Given this record,

18  the Court can and should issue an effective remedy without delay.  T. 2302:18-2303:7.

19        Dr. Belavich admitted that there may be a need for more suicide-resistant intake

20  cells in ASUs "at several institutions" (T. 3530:22-3531:9), but Defendants have no

21  current plan to create more. T. 3256:6-3257:14; *see also* Ex. 2047 (finding that intake cells

22  are "indeed effective").  Dr. Belavich also testified that Defendants know they "need to

23  look at" their strip search policies which discourage the utilization of essential treatment,

24  but have not taken steps to do so.  T. 3504:15-3505:3.  In 2007, Defendants declared that it

25  _____

26  in 2011 (Ex. 2802), 58% in 2010 (Ex. 2801), and 73% in 2009 (Ex. 2800).

27  [20] Class members represent 56% of the 2013 segregation suicides when the December 27,
    2013 suicide (which occurred after the close of evidence) is factored in.  Ex. 2781.

28

1  was "important that we take an immediate, active role" in providing entertainment devices

2  to address concerns about sensory deprivation in segregation units.  Defs' Ex. LLL (Ex. A

3  (4/27/07 CDCR Memo)).  At the time of trial, more than six years later, entertainment

4  devices still had not reached class members, and Defendants could not provide a date by

5  which "hand-crank" radios would be distributed.  T. 2955:6-2956:23, 3246:17-3247:10.

6          Defendants are willfully indifferent to the risk of harm to class members.  Stainer

7  testified that he sees no problem with lengths of stay in the SHU, despite the fact that class

8  members are spending decades in solitary confinement.  T. 3414:15-25.  CDCR data

9  specialist Dr. Leidner testified that "nobody has asked for" a report that would provide

10  accurate and complete lengths of stay for class members in segregation.  T. 2596:6-15.

11  Rather than considering the systemic reasons why class members are concentrated in

12  segregation units, Allison asserted, with no data or evidence, that the mentally ill "have a

13  higher propensity for the violent crimes" and "attacking somebody."  T. 3209:2-19.

14          Defendants' failure to provide accurate information on critical issues to the Court

15  further demonstrates the need for bright-line orders.  Defendants' data regarding class

16  members' length of stay in segregation systematically underreports lengths of stay.

17  According to Dr. Leidner, the report is designed always to show the shortest possible

18  length of stay and resets each time a class member transfers institutions, decompensates to

19  the point of requiring inpatient care, or moves to a different level of care.  T. 2600:3-5,

20  2608:8-19; *see* Ex. 2040.  The report also fails to capture any length of stay that

21  commenced before April 9, 2008.  T. 2641:14-2642:19.  Defendants are well aware of the

22  deficiencies and misrepresentations in their report, but continue to produce it to the Court.

23          Likewise, Defendants fail to meaningfully apprise the Court of clinical vacancies in

24  segregation units and elsewhere.  Dr. Belavich testified that staffing data provided to the

25  Court is inaccurate and untimely.  T. 3614:21-3615:11.  A new telepsychiatry program is

26  claimed to be "very successful" (T. 3445:5-11), but Defendants admit that they "haven't

27  fully worked out how [the use of] telepsychiatry is being recorded."  T. 3619:14-21.

28  Confronted with apparent inaccuracies in Defendants' staffing data, Dr. Belavich described

[1053037-28]

15

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    the reports provided to the Court as "a puzzle." T. 3622:23-3623:3. With respect to one of

2    the staffing documents, Dr. Belavich testified that he "ha[s] [his] staff redo this document"

3    so as to be of greater use than the one provided to the Court. T. 3616:14-3617:2.

4        Dr. Belavich's chart, "Program Guide Compliance – Administrative Segregation

5    Units" omits compliance rates in important areas, including rates of pre-placement mental

6    health screening, attendance of required personnel at treatment team meetings, timeliness

7    of referrals to higher levels of care and placement requests, and consistency of psych tech

8    rounding. Defs' Ex. DDDD; T. 3586:12-19, 3591:10-3592:13, 3593:6-10. The chart also

9    omits key information about the treatment and conditions for class members in

10   segregation, such as rates of cell-front contacts with primary clinicians, hours of yard time,

11   and access to entertainment devices. T. 3592:18-3593:5, 3593:16-19, 3595:24-2596:9.

12       In sum, Defendants' record of inaction and obfuscation warrants clear and

13   immediate orders from the Court.

14   **B.    To Remedy Severe and Systemic Constitutional Violations, the Court
            Should Issue Short-Term and Long-Term Relief**

15

16       Despite the magnitude of the problem before the Court, Plaintiffs have presented

17   clear, well-tested measures to address the systemic harm to class members in segregation.[21]

18   In the short term, the Court should issue a series of immediately effective exclusion orders

19   to protect class members at significant risk of harm in CDCR segregation units. The Court

20   should ban the use of segregation for any class member who has not been served with a

21   rule violation. The Court should issue orders prohibiting the placement of class members

22   in segregation upon discharge from inpatient care and the use of segregation for any EOP

23   patient whose rule violation was found to be related to mental illness. The Court must also

24   exclude all seriously mentally ill inmates from CDCR's dangerous SHUs.

25       For those class members who remain in segregation, steps must be taken to ensure

26   _____

27   [21] A revised Proposed Order is filed herewith.

28

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    that the units meet constitutional minima.  First, the Court should impose time limits for all

2    class members in any segregation unit.  The Court should prohibit the indiscriminate use of

3    cages for mental health treatment, the blanket use of strip searches, and any use of

4    management cells for class members.  The Court should also ban Defendants from housing

5    class members in any segregation unit that the Special Master has not certified as capable

6    of providing adequate treatment hours, confidential treatment space, staffing, and out of

7    cell time.  The Court should require basic suicide prevention measures in all segregation

8    units, including welfare checks for the full duration of a class member's placement in

9    segregation, effective pre-placement screening, and periodic mental health screening for all

10   prisoners in segregation, as well as the creation of sufficient suicide-resistant intake cells.

11          The Court should order Defendants to initiate a comprehensive audit of class

12   members in segregation units in order to identify those whose retention is unnecessary.

13   The Court should also order Defendants to submit a plan to create appropriate, treatment-

14   based, step-down disciplinary units designed to deliver appropriate mental health care.

15   **C.**    **The Court Should Exclude Class Members from Extraordinarily**
        **Dangerous and Inappropriate Segregation Settings**

16

17          **1.**    **The Court Should Prohibit CDCR from Using Segregation for**
                  **Any Class Member Who Has Not Received a Rule Violation**

18          Defendants do not deny that they use segregation units to house class members for

19   non-disciplinary reasons.  The harm suffered by these class members is beyond dispute.

20   Dr. Haney testified that more suicides in ASUs took place among inmates there for their

21   "safety reasons" than among those there for disciplinary reasons.  T. 2240:8-2242:23,

22   2242:13-23; Ex. 2048.  Dr. Canning admitted that "placement in ASU of already fearful

23   inmates may only serve to make them even more fearful and anxious, which may

24   precipitate a state of panicked desperation, and the urge to die."  Ex. 2049 at 2.

25          Defendants' new NDS policy does not fix this dangerous problem.   For example,

26   Allison testified that even under the new regulations designed to expand privileges for

27   some members of this population, NDS class members remain in the same segregation

28   units and still have limited yard, no dayroom, no contact visits, and fewer phone privileges

[1053037-28]

1  in many instances. *See* Defs' Ex. OOO; T. 3199:18-3200:15. They also remain subject to

2  treatment in cages, strip searches, and escorting in cuffs. T. 3200:16-3201:16.

3      Moreover, Defendants apply the "NDS" label to only a small percentage of the class

4  members who are in segregation for no fault of their own. Allison initially estimated that

5  20-30% of the ASU population was there for non-disciplinary reasons, but Defendants'

6  "NDS" label applies to only 9% of the ASU population. T. 3185:2-3187:19; *see* Defs' Ex.

7  QQQ. Allison testified that the policy may not apply to class members who are:

8  (1) housed in ASUs but not "officially" classified as ASU inmates, such as those in CIM's

9  Cypress Hall ASU who are "officially" deemed RC overflow; (2) housed in ASUs while

10 awaiting transfer to GP units, SNY beds, or higher custody yards; (3) placed in ASUs for

11 safety reasons that CDCR deems to be their "fault," such as drug debts, but for whom no

12 rule violation has been served, investigated, or adjudicated; or (4) retained in the SHU after

13 the expiration of their terms due to Defendants' inability to place them in appropriate beds.

14 T. 2994:9-23, 2995:9-18, 3177:5-3179:15, 3183:11-24, 3247:24-3429:22.

15     Defendants' December 3, 2013 memo, which provides for time limits for class

16 members in NDS, is wholly inadequate. *See* Defs' Ex. RRR. Even for class members to

17 whom the time limits apply, the 30- and 60-day limits are unjustifiably long. Stainer

18 testified that he did not consult mental health clinicians about the appropriateness of the

19 time limits when developing the policy. T. 3412:22-3413:3. Allison testified that CDCR

20 did not consider shorter time limits. T. 3198:21-25.[22]

21     Dr. Austin testified that "[t]here is no reason for people to be held in [NDS] status

22 for those periods of time," and observed that in the states with which he works, individuals

23 are moved "within 24 hours" to appropriate settings. T. 3021:8-3022:11. Dr. Austin also

24

25 [22] Defendants elected not to implement a policy akin to the *Armstrong* model Operational

26 Procedure, which limits the use of ASU housing for prisoners with disabilities to a short-term basis where appropriate housing is unavailable, but requires transfer "to appropriate

27 GP housing within 48 hours." *See* Ex. 2410. The *Armstrong* policy requires notification to CDCR headquarters in case of any ASU placement over 48 hours. *Id.*

28

18

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  discussed options utilized by other states in lieu of housing this population in segregation,

2  such as leaving them in their existing units and modifying their program or moving them

3  to a different non-segregation bed or unit.  T. 3019:7-10, 3043:3-15.  Dr. Haney confirmed

4  that California's NDS practices are "very unusual" and that there are alternatives to trading

5  class members' "physical safety … for their mental health stability."  T. 2383:16-2384:18.

6        There is no justification for housing seriously mentally ill prisoners who committed

7  no disciplinary infractions in segregation for 30 or 60 days.  The Court should prohibit the

8  placement of any class member in segregation except pursuant to a documented rules

9  violation.  Defendants may comply with this order by opening additional yards, modifying

10  transfer and transportation policies, or implementing any number of other steps.

11        **2.**        **The Court Should Order an End to the Dangerous Practice of Cycling Class Members Between Segregation and Inpatient Care**

12

13        The Court must order Defendants to stop their irresponsible practice of placing class

14  members into segregation upon discharge from inpatient care.  Placing class members

15  returning from CDCR's highest level of psychiatric care into its most dangerous housing

16  setting, with no input from treating mental health clinicians, is reckless and unacceptable.

17        Allison testified that CDCR policy permits the return of class members directly into

18  segregation units upon discharge from DSH or MHCBs.  T. 3250:14-19.  She confirmed

19  that a patient's housing placement upon discharge from an inpatient unit is a solely

20  custodial determination.  T. 3250:20-3251:3.  Dr. Belavich testified that even in the case of

21  a patient who has "been in administrative segregation three times and each time it has

22  resulted in a lengthy stay in a crisis bed or referral to the state hospital," a clinician cannot

23  prevent placement in segregation.  T. 3571:10-3572:4.[23]

24        To remedy this violation, this Court must immediately bar Defendants from placing

25

26  [23] *See* Kaufman, T. 2499:22-2504:17 (Prisoner F repeatedly cycled between EOP, MHCB,

27  and SHU); Stewart, T. 2822:18-2824:14 & Ex. 2121 (Prisoner H committed suicide just days after being transferred directly from DSH to an ASU at SVSP).

28

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   class members in segregation units upon discharge from DSH or a MHCB absent written

2   determinations by mental health clinicians at both the sending and receiving institutions (or

3   programs) that the placement will not jeopardize the patient's mental health.

### 3.    The Court Should Exclude Any EOP from Segregation Until and Unless a Mental Health Assessment Determines That the Rule Violation Was Not Due to Mental Illness

6       Plaintiffs presented extensive evidence about the vulnerability and acuity of EOP

7   inmates and the particular harms segregation causes to this subset of *Coleman* class

8   members.  T. 2456:14-2458:16, 2838:10-21.  Defendants routinely fail to sufficiently

9   incorporate mental health input into the assessment of disciplinary sanctions for class

10  members.  T. 3689:4-9.  As a result, vastly disproportionate numbers of EOP class

11  members are held in segregation despite their heightened vulnerability to these settings.

12      The Court should order that no EOP class member who receives an RVR may be

13  placed into segregation until a mental health assessment is completed.  This policy shall be

14  overridden only pursuant to written findings by the Chief of Mental Health that the

15  patient's mental health will not be harmed by the placement *and* by a Correctional Captain

16  that the patient's security needs cannot be met in a non-segregated unit.  Defendants also

17  should be prohibited from placing EOPs into segregation if the mental health assessment

18  determines that mental illness caused the behavior.  In those cases, the patient should be

19  transferred to a higher level of care or retained in an EOP unit with alternative sanctions.

### 4.    The Court Should Extend the Pelican Bay SHU Exclusion Order

21      The SHU is a severe, long-term punishment unit and is simply too dangerous for the

22  mentally ill.  The essential features of all SHUs are near-constant confinement in cells,

23  enclosed yard spaces, deprivation of educational and vocational programming, and harsh

24  custodial policies.  T. 2297:14-2299:11.  There is no basis on which to conclude that the

25  Corcoran, CCI, CIW, or SAC SHUs are appropriate or safe for *Coleman* class members.

26      Meting out long and harsh SHU terms has no deterrent value, especially to prisoners

27  with mental illness.  *See* Austin, T. 3069:15-24 ("you get the same result … [w]hether you

28  put someone in punishment for 30 days, three months, nine months, 12 months.…"),

[1053037-28]

20

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    T. 3070:14-24 (reducing length and frequency of disciplinary terms does not increase

2    violence), T. 3073:5-18 (limited deterrent value for mentally ill prisoners).

3        There is no legitimate reason to restrict the *Madrid* exclusion order to Pelican Bay.

4    *See* Haney, T. 2297:16-25 (Pelican Bay SHU is "similar, if not identical [to the rest of

5    CDCR SHUs] in terms of the oppressive nature of the environment, the severity of the

6    conditions of confinement to which prisoners are exposed"); Ex. 2056 (*Madrid* order).

7    Moreover, the evidence shows that the *Madrid* exclusion order saves class members' lives:

8    in the past five years, there have been no suicides in the Pelican Bay SHU compared to

9    four in the CCI SHU and two in the Corcoran SHU. Exs. 2781, 2801, 2802. The Court

10   should immediately apply the *Madrid* exclusion criteria to all CDCR SHUs.

11   **D.    The Court Should Order Defendants to Immediately Implement**
         **Measures to Reduce Dangers to Class Members in Segregation**

12

13       Insofar as any class members will remain in segregation, Defendants must promptly

14   implement measures to reduce the known dangers of their segregation units.

15       **1.    The Court Should Require Defendants to Certify That All**
                **Segregation Units Provide Adequate Treatment Hours,**
16             **Confidential Treatment Space, Staffing, and Out-of-Cell Time**

17       No class member should be placed in a segregation unit incapable of meeting min-

18   imal standards for the delivery of mental health care, including outdoor exercise. CDCR

19   has failed to recruit or retain sufficient clinical or custody staff to deliver adequate care in

20   segregation units. T. 2491:18-25; 2540:3-6. Defendants admit ongoing staffing deficits.

21   *See* Fischer, T. 2650:22-24, 2698:14-22, 2750:22-2751:6 (shortages of psychiatrists,

22   recreation therapists, and escort staff in Corcoran ASUs), T. 2674:15-2675:6 (EOP ASU

23   psychiatry ratio is 1:100; "we are doing the best we can with our staff") , T. 2681:14-17

24   ("full staffing" would help reduce cell-front contacts); Jordan, T. 3131:4-7 (Management

25   Rpt. described CIM ASU as "chronically understaffed"); Belavich, T. 3442:23-3443:8

26   (major difficulties with recruiting and retention in some regions).

27       EOPs in segregation receive less than the required ten hours of treatment. *See* Defs'

28   Ex. GGGG. When treatment does occur, it frequently takes place in spaces that are anti-

[1053037-28]

therapeutic and unsuited to the delivery of meaningful mental health care.  Defendants have identified confidential mental health interviews as a component of suicide prevention, but Dr. Belavich acknowledged that there are still "varying degrees" of confidential space in CDCR segregation units.  T. 3494:25-3495:5; *see* Ex. 2459 (Suicide Compendium).  Dr. Fischer testified that Corcoran does not provide group therapy to CCCMS in segregation because of "lack of space availability," and Dr. Jordan testified about the cancellation of a plan to create treatment and office space at CIM's ASU.  T. 2654:7-12, 3127:13-3128:7.

Defendants also harm class members in segregation by failing to provide sufficient out-of-cell exercise time.  The provision of sufficient out-of-cell exercise time is not only a legal requirement, but a specific concern of this Court dating back at least to 2007.  Title 15 § 3343(h); Order, 6/1/07, Dkt. 2255.  Defendants have acknowledged that the provision of out-of-cell/yard time is a component of suicide prevention.  Ex. 2459 (Suicide Compendium).  Their suicide reports have identified the lack of outdoor exercise time as a contributing factor in prisoner deaths.  Ex. 2520 at 11.  Nonetheless, they cite "numerous barriers to meet[ing] mandated hours," and about half of CDCR prisons still fail to provide the required yard time.  Exs. 2459 & 2778 (25th Round Rpt.) at 66.

The Court should bar the placement of any class member in a segregation unit that has not been certified as capable of minimally adequate treatment and outdoor exercise.

## 2. The Court Should Impose Time Limits for Segregation of Class Members

Defendants jeopardize the health and safety of seriously mentally ill prisoners by placing them in segregation for prolonged periods.  The Court must impose strict and enforceable time limits for all class members in all CDCR segregation units.

CDCR segregation units are toxic to class members.  *See* Part I, *supra*.  This includes PSUs, where (as with SHUs and ASUs) class members spend up to 24 hours a day in their cells, eat all meals inside their cells, and exercise in walk-alone yards.  They are not permitted TVs or radios until after a full year in segregation.  T. 3248:4-3249:5;

1  Ex. 2650 § 54030.10.6.  Dr. Stewart found inadequacies in mental health treatment at the

2  PSUs. T. 2800:4-21; *see also* Ex. 2778 (25th Round Rpt.) at 37 ("problem of insufficient

3  structured therapeutic activity was not confined to the [ASUs]," but also included PSUs).

4        Ultimately, only enforceable time limits will prevent Defendants from subjecting

5  class members to harmful and excessive terms in segregation.  Measures short of time

6  limits have failed.  The Court should order strict limits of 10 calendar days for the

7  placement of any EOP in any segregation unit and 30 calendar days for CCCMS.

8        **3.      The Court Should Order Defendants to Provide Monthly Reports
        About Class Members' True Lengths of Stay in Segregation**

9

10       Defendants cannot implement time limits, and the Court cannot enforce those

11  limits, without complete and accurate data about class members' lengths of stay.

12  Defendants acknowledge they provide inaccurate data to the Court, but claim they are

13  under no obligation to report this data.  T. 3496:23-3498:11.  The Court must order

14  Defendants to develop and produce monthly reports that provide accurate, complete

15  information about class members in segregation, including about their length of stay,

16  access to exercise and other critical indicia.

17       **4.      The Court Should Prohibit CDCR's Indiscriminate Use of Cages**

18       All class members in segregation units are locked in cages for all mental health

19  treatment.  Dr. Fischer confirmed that class members are restrained regardless of why they

20  are in segregation, and Allison admitted that all inmates are subjected to the same custodial

21  policies in segregation unless custody determines that further enhanced measures, such as

22  leg chains, are needed.  T. 2708:6-10, 3415:24-3416:14.

23       The blanket use of cages for mental health treatment in segregation units has been

24  roundly denounced.  Plaintiffs' experts testified that the practice is humiliating and

25  degrading, creating "a very strong disincentive" for patients to utilize treatment.  T.

26  2789:20-22; *see* T. 2480:5-2481:5.  Dr. Austin testified that this practice is unnecessary

27  and that he knows of no other state "where the cage is universally applied to all mentally

28  ill inmates who are in a segregated unit," rather than "as needed."  T. 3074:17-3077:3.  A

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   CDCR memo acknowledged "repeated and long-term concerns by the *Coleman* Court

2   experts and plaintiffs' attorneys that there may be a more humane and effective way to

3   provide group/individual therapy to seriously mentally ill I/Ps in segregated housing."

4   Ex. 2497 at 4.[24]  The ATOM chair pilot fails to offer a less restrictive alternative to cages.

5       Plaintiffs have presented alternatives, such as tether tables, that would allow

6   custody officers to restrain class members when necessary, but would not require metal

7   cages.  T. 2374:5-25, 3075:6-16.  Dr. Austin confirmed that "less constraining, less

8   restrictive, less punitive" alternatives exist, and noted that one benefit of tethering systems

9   is that inmates retain "some movement of their hands" and can have "a more normal

10  dialogue with the treatment provider."  T. 2576:23-2577:2, 3075:6-16.

11      This Court should order Defendants to implement a policy prohibiting the use of

12  "therapeutic treatment modules" for group or individual mental health treatment.  The

13  policy should also prohibit the use of caged holding cells for class members at risk of self-

14  harm or awaiting treatment.  The Court should order Defendants to devise humane,

15  appropriate alternatives to the use of treatment modules and holding cages.

16      **5.    The Court Should Prohibit CDCR's Blanket Strip Search Policy**

17      Defendants' strip searching policies apply to all inmates in segregation, regardless

18  of disciplinary history, risk assessments, or clinical contraindications.  T. 2970:20-2971:5,

19  3137:24-3138:2, 3138:14-21.  Dr. Jordan stated that strip searches may be psychologically

20  damaging.  T. 3137:5-8.  Dr. Fischer and Dr. Belavich testified that blanket strip searching

21  may prevent essential treatment.  T. 2671:2-7, 3503:13-25.  Dr. Belavich admitted that

22  CDCR's strip search policies need to be revisited.  T. 3504:15-3505:3.  Dr. Austin testified

23  that these policies are overbroad and unnecessary.  T. 3099:4-13, Ex. 2135 ¶ 58.

24      Yet the fact remains that every class member in every segregation unit continues to

25

26  [24] The blanket use of treatment cages and strip searches, without regard to individualized
    assessments, violates federal disability law, which requires reasonable accommodations for
27  prisoners with mental illness.  *See* 42 U.S.C. §§ 12101(a)(2), 12101(a)(5), 12132; 28
    C.F.R. §§ 35.130(b)(7), (d); *Olmstead*, 527 U.S. at 597.

28

[1053037-28]

24

PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   be subjected to two strip searches each time he or she goes to exercise yard or the MHCB,

2   and in some cases, even to mental health treatment.  Dr. Belavich made it clear that the

3   strip searching policies are custodial requisites—"not mine"—and that it is not within his

4   authority as Deputy Director of Mental Health to override them.  T. 3502:18-3503:3.

5       The Court should prohibit blanket strip searches of mentally ill prisoners in

6   segregation.  Class members should be strip searched only where there is an individualized

7   determination that such a procedure is required and will not harm the patient.

8                    **6.     The Court Should Prohibit the Use of Management Cells**

9       No centralized policy governs the use of management cells, limits prisoners' lengths

10  of stay within management cells, or provides for oversight with respect to prisons' use of

11  management cells.  T. 3302:13-3303:3.  *Coleman* class members are placed in these

12  extremely harsh and punitive cells within segregation units, including as punishment for

13  behaviors related to their mental illnesses.  *See* Exs. 2013 & 2018 (CCI and MCSP

14  management cells); T. 2194:3-9 (Haney:  "it's hard to imagine anything more distressing

15  and despairing than that cell, even for a healthy person").  Dr. Haney testified about a class

16  member at MCSP who was confined to a management cell because he displayed suicidal

17  behavior (T. 2190:16-2194:9), and another at CCI who was sent to a management cell

18  because he kicked the door out of frustration at being held for months in non-disciplinary

19  segregation while his endorsement for transfer expired (T. 2195:17-2201:2).  The Court

20  should prohibit Defendants from placing class members in management cells.

21                    **7.     The Court Should Order Defendants to Implement Basic Suicide
                            Prevention Measures in All Segregation Units**

22

23                    **(a)     The Court Should Order Defendants to Implement Welfare
                            Checks for All Prisoners in Segregation Units**

24      Despite the extraordinary suicide rate in CDCR's segregation units and the general

25  agreement that welfare checks save lives, Defendants refuse to expand these checks.

26  Under current policy, welfare checks—also known as living, breathing checks—are

27  conducted every 30 minutes, on a staggered schedule, only for the first 21 days of a

28  patient's placement in ASU.  T. 3257:25-3258:11.  In the SHU and the PSU, no welfare

1    checks are conducted. *Id.*

2        According to CDCR suicide data for 2007 through 2012, more suicides took place

3    in ASUs among prisoners who had been there for over 21 days than among those there for

4    21 days or less. Ex. 2061. After reviewing CDCR data, Dr. Haney concluded that "the

5    likelihood of committing suicide … is more concentrated in the beginning, but certainly

6    doesn't abate in a significant way over time" and "persons are at risk of committing

7    suicide … well after 21 days in administrative segregation." *See id.*; T. 2314:1-8.

8        National correctional standards call for welfare checks for the duration of a

9    prisoner's stay in segregation (Ex. 2134 at 71; T. 2829:6-2830:18), and powerful evidence

10    shows that welfare checks are effective. Prisoner R's suicide report admitted: "He waited

11    until day 22 of his ASU stay, which was the first day he would not be subjected to 30-

12    minute custody welfare checks." Ex. 2132 at 10; *see* Stewart, T. 2828:6-2829:1.

13        Defendants claim that welfare checks are unnecessary because "security checks" are

14    conducted. Allison testified, however, that security checks merely require the officer to

15    "mak[e] sure the doors are closed" and "look[] for obvious signs of misconduct."

16    T. 2962:13-18. Allison clarified that custody checks are nothing new, but just "part of

17    every correctional officer's training at the academy." T. 3258:19-3260:1.

18        The Court must order Defendants to provide staggered welfare checks at least every

19    30 minutes to all prisoners placed in all segregation units for the duration of the placement.

20        **(b)    The Court Should Order Defendants to Create Adequate
            Numbers of Intake Cells**

21

22        Despite the Court's long-standing concern about suicide hazards in ASU cells,

23    Defendants have failed to create sufficient numbers of intake cells and continue to place

24    prisoners entering ASU into cells that have not been retrofitted. *See, e.g.*, Order, 6/9/05,

25    Dkt. 1668. Dr. Stewart testified that when he toured RJD's ASU, he observed 72 prisoners

26    on intake status and only 16 retrofitted intake cells. T. 2833:7-18. To deal with the

27    shortage, Defendants simply taped "little sheets of paper that are pink that say 'intake' on

28    them" on regular ASU cells. *Id.* Dr. Stewart also found shortages at SVSP. T. 2833:19-

[1053037-28]

1   24.  Dr. Jordan confirmed that CIM has a shortage of intake cells.  T. 3131:22-3132:8.

2   Dr. Belavich admitted that Lindsay Hayes recently reported that "at several institutions

3   that there may not be enough intake cells."  T. 3530:23-3531:2.  The Court must prohibit

4   Defendants from placing any prisoner in a cell that is not retrofitted for suicide resistance

5   during the first 21 days of placement in any segregation unit.

6           **(c)     The Court Should Order Defendants to Implement
                       Adequate Pre-Placement Segregation Screening**

7

8           The current segregation screening system is inadequate to identify and exclude class

9   members who are unable to withstand the stressors of segregation.  The pre-screening

10  compliance levels "have deteriorated, with only seven institutions compliant."  Ex. 2778

11  (25th Round Rpt.) at 25.  Dr. Canning's January 2013 suicide analysis found that only 58%

12  of inmates entering ASU are reported as being screened.  Ex. 2049 at 2.  Among those

13  screened, more than half of the screens were entered as "completed," with no indication as

14  to whether the individual should be referred for mental health evaluation.  *Id.*  Moreover,

15  Defendants have been aware of serious deficiencies in their 31-item screening tool for over

16  three years.  *See* Conf. Kahn Decl., Dkt 4411, Ex. 45 at 2 (questionnaire "doesn't capture

17  things that may be important").  This Court has long been concerned about the sufficiency

18  of screening procedures for the mentally ill.  *See, e.g.*, Stipulation & Order, 10/10/02, Dkt.

19  1440.  The Court must order Defendants to implement an effective, comprehensive

20  screening procedure for all prisoners before they are placed in segregation.

21          **(d)     The Court Should Order Mental Health Screening of All
                       Non-Class Member Prisoners in Segregation Every 90 Days**

22

23          The harms of segregation are not limited to current class members.  Dr. Haney

24  testified that "there are many prisoners who are deteriorating in these [segregated]

25  environments," and many prisoners who are "not mentally ill to begin with … begin[] to

26  deteriorate in the face of this kind of confinement."  T. 2306:11-2307:4.  He explained that

27  "[t]here is so little interaction in these environments that it is difficult to observe …

28  deterioration.  So [there] are people who aren't on anybody's mental health caseload or

1   mental health screen, but who, nonetheless, may be suffering." T. 2307:5-2308:7. Dr.

2   Belavich testified that segregation is a high-risk setting for all prisoners. T. 3564:13-16.

3        Non-caseload prisoners in segregation units do not receive clinical contacts or

4   treatment team meetings. T. 2693:14-20. Dr. Fischer testified that there is no formal

5   mental health screening for non-caseload prisoners in the SHU, irrespective of their length

6   of stay. T. 2693:14-2694:3. Dr. Belavich claimed that daily psych tech rounding in ASUs

7   and bi-monthly psych tech rounding in the SHU are intended to identify prisoners in need

8   of mental health assessment and treatment, but also stated that these interactions typically

9   take place across a cell door. T. 3459:21-3461:7, 3467:6-10. Allison claimed that custody

10  officers act as a referral mechanism, but cited no training that would qualify them to

11  identify signs of psychiatric decompensation. T. 2958:13-2959:2.

12       Dr. Austin testified that periodic assessments are advised because "mental health

13  status may deteriorate simply as a function of extended periods of isolation and prolonged

14  periods without normal contact." Ex. 2135 ¶¶ 52-54. He and Dr. Haney noted that many

15  states conduct these evaluations, and the American Correctional Association recommends

16  mental health screens every 90 day in segregation units. *Id.*; T. 2308:9-2309:1.

17       In California, instituting periodic mental health screens is necessary to prevent

18  ongoing suffering and death in segregation. The chronically high rate of suicide in CDCR

19  segregation units, among both class members and those who were not recognized as class

20  members, demonstrates the need for additional and more effective screening. Defendants

21  have testified this would raise no custodial concerns. T. 3253:5-11.

22       The Court should order Defendants to conduct a comprehensive assessment of

23  prisoners currently in segregation who have been housed in such placements for more than

24  90 days, and to regularly rescreen all prisoners in long-term segregation.

25       **E.    The Court Should Order an Audit of Class Members in Segregation**

26       In order to bring CDCR segregation units into constitutional compliance, the Court

27  must order Defendants to develop and implement a process to audit all class members in

28  segregation in order to determine if they are suitable for release to the general population.

1  Defendants acknowledge that class members wind up in segregation for a wide range of

2  reasons and their own data fails to accurately capture lengths of stay.  Defendants must

3  undertake a systematic review of class members in segregation units and promptly remove

4  those whose retention is deemed unnecessary when objectively evaluated.

5      This measure is practical, feasible, and will ultimately allow CDCR to develop

6  enduring alternatives to their dangerous segregation practices.  Dr. Austin testified that as a

7  correctional consultant, a critical step "which I don't see yet in California, is [to conduct] a

8  very good analysis of who is in these [segregation] beds and for what reasons."

9  T. 3028:13-15.  For each *Coleman* class member, it is critical to determine "what is the

10  conduct that's produced admission" to segregation and "why they're staying so long."

11  T. 3028:16-18.   Dr. Austin explained that during this audit, "we go through the cases, and

12  we put those cases in a pile and say that those people don't need to be here.  They never

13  should have been admitted here. … That's a pile of inmates."  T. 3029:11-19.  Among

14  those are inmates who are "in for a nonviolent offense" and did not "pose a danger" in the

15  first place.  T. 3029:21-22.  Next, the audit identifies "people [who] have been there too

16  long," including gang members whose security concerns should be "reevaluate[d]" and

17  those retained in segregation because of repeated nuisance offenses.  T. 3030:15-24.

18      Dr. Austin explained that "through that audit process, generally we get a pretty

19  substantial reduction in the population."  T. 3030:25-3031:3.  In other words, the case-by-

20  case application of objective classification criteria reduces the scope of the overall

21  problem.  Within CDCR, the audit can be limited to a subset of the overall population:

22  *Coleman* class members in segregation.  EOPs in segregation are largely concentrated at

23  12 prisons (those with EOP hubs and PSUs) and can be prioritized in the audit.

24      By identifying and removing class members who do not meet the criteria for

25  retention in segregation, CDCR will not only move toward compliance with federal

26  disability law, which requires that prisoners with mental illness be housed and treated in

27  the most integrated setting appropriate to their needs, but will also reduce its unwieldy

28  segregation population to a more manageable scale.  Moreover, this audit will yield a

[1053037-28]

1  better understanding of which class members are in segregation and why, enabling the

2  development of long-term plans for more appropriate disciplinary settings.

3    **F.    The Court Should Order Defendants to Develop Treatment-Based Disciplinary Programs for *Coleman* Class Members**

4

5    Ultimately, Defendants must create specialized disciplinary units designed for

6  mentally ill prisoners.  The creation of treatment-focused disciplinary units is necessary to

7  comprehensively and permanently address the constitutional deficiencies that have long

8  plagued Defendants' segregation units as they relate to *Coleman* class members.

9    Plaintiffs have presented safe and pragmatic alternatives to placing seriously

10  mentally ill prisoners in the SHU.  For example, effective models for treatment-focused

11  disciplinary units have been run by psychiatrists with strict step-down programs.

12  T. 3015:13-3016:13, 3023:2-17.  An alternative program could be centralized and located

13  in a region less challenged by the staffing and recruiting limitations that Dr. Belavich and

14  Dr. Fischer described.  T. 2744:4-2745:16, 3443:18-3444:5, 3447:1-9.

15    Determinations about specific disciplinary models for seriously mentally ill

16  prisoners are best made by CDCR, in consultation with correctional and mental health

17  experts, but it is clear that such a remedy is necessary.  The Court should order Defendants

18  to submit a plan to create a specialized disciplinary unit designed to deliver consistent and

19  effective mental health treatment to *Coleman* class members.

20                    **CONCLUSION**

21    In order to address the ongoing and systemic constitutional violations described

22  herein, Plaintiffs request that the Court issue remedial orders as set forth in Plaintiffs' post-

23  trial proposed order.

24  DATED:  January 21, 2014          Respectfully submitted,

25                    ROSEN BIEN GALVAN & GRUNFELD LLP

26

27                    By:  */s/ Margot Mendelson*
                          Margot Mendelson
28                        Attorneys for Plaintiffs

[1053037-28]

30
PLS.' POST-TRIAL BRIEF RE ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION