KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
PATRICK R. MCKINNEY
Supervising Deputy Attorneys General
DEBBIE J. VOROUS, State Bar No. 166884
ELISE OWENS THORN, State Bar No. 145931
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 324-4921
 Fax:  (916) 324-5205
 E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>        **v.**<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 LKK DAD PC<br><br>**POST EVIDENTIARY HEARING BRIEF RE: PLAINTIFFS' MOTION RELATED TO HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS  IN SEGREGATION** |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

PLAINTIFFS FAILED TO MEET THEIR BURDEN UNDER THE PLRA FOR ORDERS IMPOSING FURTHER INJUNCTIVE RELIEF. ....................................... 2

I.  Plaintiffs Failed To Present Evidence Justifying A Restrictive Order Limiting Lengths Of Stay In CDCR'S Segregated Housing Units........................................ 4

    A.  Plaintiffs Failed To Prove That Inmates Suffer Harm Simply By Virtue Of Being Placed In Segregation........................................................ 4

        1.  Coleman Class Members In Segregated Housing Units Are Not Isolated Or Placed In "Solitary Confinement."....................... 5

        2.  Plaintiffs Failed To Prove That Segregated Housing Placements Cause Psychological Harm. ......................................... 6

        3.  The Fact That Inmates Commit Suicides Within Segregation Units Does Not Justify Further Court Orders. ............................... 7

    B.  Mental Health Care In CDCR'S Segregation Units Is Appropriate And Effective. ....................................................................................... 8

        1.  Plaintiffs Failed To Demonstrate That The State Does Not Provide Adequate Mental Health Care. ................................... 10

        2.  CDCR's Administrative Segregation Unit Hubs Are Sufficiently Staffed And Have Appropriate Clinical Space. ........ 12

    C.  CDCR Does Not Use Administrative Segregation Units To Manage Mentally Ill Inmates. ................................................................................ 12

    D.  Lengths Of Stay In Segregation Units Are Constantly Reviewed And Appropriately Ordered. ...................................................................... 13

II.  The Madrid Pelican Bay Exclusion Should Not Be Extended To All Security Housing Units. ...................................................................................... 15

III.  Defendants Must Be Allowed To Place Inmates—Including Those With Mental Health Disorders—In Protective Housing. ............................................ 17

IV.  Plaintiff's Additional Requests For Relief. .......................................................... 19

    A.  Inmates Discharged From Psychiatric Hospitalization Do Not Have Higher Risks Of Suicide Or Psychological Harm......................................... 19

    B.  Defendants Appropriately Screen All Prisoners Entering Segregation For Mental Health Issues. ...................................................... 21

    C.  No Evidence Supports Plaintiffs' Request For Additional Mental Health Screening For Prisoners With Extended Stays In Segregation. ....................................................................................... 21

    D.  "Strip Searches" And Therapeutic Treatment Modules Do Not Constitute Harsh And Dangerous Conditions Warranting Their Elimination. ..................................................................................... 22

CONCLUSION ...................................................................................................... 24

i

1

# TABLE OF AUTHORITIES

2

**Page**

3  CASES

4  *Anderson v. County of Kern*
5      45 F.3d 1310 (9th Cir.1995)................................................................. 2, 3

6  *Balla v. Idaho State Bd. of Corrs.*, 595 Fed. Supp. 1558 (D. Idaho 1984) ................................ 7

7  *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) ........................... 7

8  *Hewitt v. Helms*
    459 U.S. 460 (1983) ......................................................................... 2
9

10  *Hope v. Pelzer*
    536 U.S. 730 (2002) ......................................................................... 3

11  *Hoptowit v. Ray*
12      682 F.2d 1237 (9th Cir. 1982)............................................................. 3

13  *In re Long Term Administrative Segregation of Inmates Designated As Five Percenters*
    174 F.3d 464 (4th Cir. 1999)............................................................. 3
14

15  *Madrid v. Gomez*
    889 F. Supp. 1146 (N.D. Cal. 1995) ................................................. 2

16  *Michenfelder v. Sumner*
17      860 F.2d 328 (9th Cir. 1988)............................................................. 3

18  *Neal v. Shimoda*
    131 F.3d 818 (9th Cir.1997)............................................................. 2
19

20  *Orr v. Larkins*
    610 F.3d 1032 (8th Cir. 2010)............................................................. 2

21  *Rellergert v. Cape Girardeau Cty., Missouri*
22      924 F.2d 794 (8th Cir. 1991)............................................................. 21

23  *Toussaint v. Yockey*
    722 F.2d 1490 (9th Cir.1984)............................................................. 2

24  *Turner v. Safley*
25      482 U.S. 78 (1987) ........................................................................... 2, 3

26  *Wilson v. Seiter*
    501 U.S. 294 (1991) ......................................................................... 2
27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3 **STATUTES**

4 California Code of Regulations Title 15, § 3343(h) ........................................................ 6

5 **CONSTITUTIONAL PROVISIONS**

6 Eighth Amendment ............................................................................................ 2, 3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## INTRODUCTION

3      Twelve days of hearing and testimony from eleven witnesses proved:  (1) conditions in

4  CDCR's segregation units do not violate the Constitution; (2) CDCR clinicians provide

5  appropriate mental health treatment to inmates in segregated housing; and (3) the relief Plaintiffs

6  seek would impair CDCR's ability to construct effective, flexible, and sustainable programs to

7  meet the needs of its inmate population.

8      The evidence reflects the State's commitment both to maintaining a safe and secure prison

9  system and providing Plaintiffs appropriate mental health care.  Plaintiffs ignored or misconstrued

10  the work done by CDCR to address system-wide issues, using stale data to argue that current

11  conditions are inadequate, and presenting a handful of worst-case examples that are not

12  representative of CDCR's segregation units as a whole.  But Plaintiffs failed to present evidence

13  of systemic issues of constitutional scope.  Nor could they:  CDCR consistently exceeds or meets

14  Revised Program Guide requirements for all inmates housed in segregated housing units.[1]  In

15  addition, the evidence demonstrates that CDCR is improving a system that constantly presents

16  new challenges and issues that need to be resolved, such as creating additional bed capacity for

17  class members having safety concerns.

18      Plaintiffs' experts conceded during the hearing that their goal was to force CDCR to

19  implement best-practice recommendations.  Testimony from Drs. Haney, Stewart, and Kaufman

20  fail to prove deliberate indifference or even inadequate care.  In turn, the testimony of Drs.

21  Fischer, Jordan, Scott, and Belavich demonstrate that the leadership, staffing, space, therapy, and

22  overall mental health treatment provided to inmates in segregated housing is not only adequate

23  but often exceeds community standards.

24      The Court should not substitute Plaintiffs' and their experts' preferences for the considered

25  judgments of the State's correctional administrators and mental health professionals.  Granting

26  Plaintiffs' motion would improperly supplant those officials' judgment regarding the safety and

27  ───────────────────
          [1] Mental Health Services Delivery System Program Guide (2009 Revision) (Program

28  Guide).

1

1    security of the prison system with Plaintiffs' notion for a perfect system.  While perfection is an

2    admirable target, it is not the legal standard.  Plaintiffs have failed to meet their burden of

3    demonstrating that they are entitled to the relief requested – that the safeguards and policies for

4    mentally ill inmates in segregation are not reasonably related to legitimate penological interests

5    but are instead an exaggerated response to such objectives.  *Turner v. Safley*, 482 U.S. 78, 87

6    (1987).  No further orders are necessary or appropriate, and Plaintiffs' motion must be denied.

7    **PLAINTIFFS FAILED TO MEET THEIR BURDEN UNDER THE PLRA FOR ORDERS
     IMPOSING FURTHER INJUNCTIVE RELIEF**

8

9        To demonstrate they are entitled to injunctive relief, Plaintiffs must prove Defendants are

10   deliberately indifferent to serious mental health needs, which the Court must weigh against

11   Defendants' legitimate penological purposes.

12       Under the Eighth Amendment, inmates have the right to be free from "cruel and unusual

13   punishment."  *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991).  The United States Supreme Court

14   and numerous circuit courts of appeal have recognized that placement of an inmate in segregation,

15   in and of itself, does not constitute cruel and unusual punishment in violation of the Eighth

16   Amendment.  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *cf. Neal v. Shimoda*, 131 F.3d 818, 833

17   (9th Cir.1997) (state program designed to identify and treat inmate sex offenders did not

18   constitute cruel and unusual punishment);  *Anderson v. County of Kern*, 45 F.3d 1310, 1315–16

19   (9th Cir.1995) (no contact with any other inmate in administrative segregation, either for exercise,

20   day room access or otherwise not cruel and unusual punishment); *Toussaint v. Yockey*, 722 F.2d

21   1490, 1494 n.6 (9th Cir.1984) (the usual hardships associated with administrative segregation do

22   not violate the Eighth Amendment).

23       The same holds true for the placement of mentally ill prisoners in segregation.  No court

24   has mandated a blanket exclusion of mentally ill inmates from prison disciplinary systems or

25   security settings designed to preserve safety and order, provided that these measures do not

26   interfere with mental health care.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1267 (N.D. Cal.

27   1995); *Orr v. Larkins*, 610 F.3d 1032, 1035 (8th Cir. 2010) (dismissing Eighth Amendment claim

28   by mentally ill inmate kept in administrative segregation for nine months where inmate received

2

1   treatment and antipsychotic medication); *In re Long Term Administrative Segregation of Inmates*

2   *Designated As Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (no violation where

3   administrative segregation procedures provided for periodic visits by medical personnel of

4   inmates displaying mental health problems).

5       In determining whether prison officials are subjectively deliberately indifferent, the Court

6   should examine whether the challenged conduct or regulation is without penological justification.

7   *See Hope v. Pelzer,* 536 U.S. 730, 737 (2002) ("'[U]nnecessary and wanton' inflictions of pain

8   are those that are 'totally without penological justification.'"  (internal quotations omitted.))  The

9   Ninth Circuit has noted that the factors described in *Turner v. Safley* may be instructive in

10  evaluating whether regulations challenged under the Eighth Amendment have a legitimate

11  penological purpose.  *Michenfelder v. Sumner*, 860 F.2d 328, 331 n.1 (9th Cir. 1988).

12  Specifically, in *Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995), the court cited *Turner*

13  and found that "prison officials have a legitimate penological interest in administrative

14  segregation and they must be given 'wide-ranging deference in the adoption and execution of

15  policies and practices that in their judgment are needed to preserve internal order and discipline

16  and to maintain institutional security.'" *Id.* at 1316 (internal quotations omitted).

17      Courts should also be cognizant that prison issues are "complex and intractable" and "not

18  readily susceptible of resolution by decree." *Turner*, 482 U.S. at 84.  "Running a prison is an

19  inordinately difficult undertaking that requires expertise, planning, and the commitment of

20  resources, all of which are peculiarly within the province of the legislative and executive branches

21  of government." *Id.* at 84-85.  Under separation-of-powers concerns, federal courts should accord

22  due deference to state prison authorities. *Id.* at 85.  Moreover, "[w]hat experts may consider

23  desirable may well constitute appropriate goals to which the [legislative and executive] branches

24  may aspire but they do not usually establish those minimums below which the Constitution

25  establishes a prohibition." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982).

26      To determine whether Plaintiffs have met their burden to show that Defendants' use of

27  segregation is "unnecessary and wanton," the Court can and should make use of the *Turner*

28  factors to evaluate whether the policies under attack are supported by legitimate penological

3

1    purposes.  Doing so here shows that Defendants' policies are soundly grounded in inmate and

2    institutional safety and security, and are not wantonly and recklessly imposed to inflict

3    unconstitutional punishment.  Lacking any evidence showing otherwise, Plaintiffs' motion must

4    be denied.

**I.    PLAINTIFFS FAILED TO PRESENT EVIDENCE JUSTIFYING A RESTRICTIVE ORDER LIMITING LENGTHS OF STAY IN CDCR'S SEGREGATED HOUSING UNITS.**

7         In their opening statement and trial brief, Plaintiffs attempt to paint a picture of long-

8    standing constitutional violations, with class members allegedly languishing in "solitary

9    confinement" and lacking access to mental health care.  They allege that Defendants are violating

10   the Eighth Amendment by the purported "dangerous, harmful, and deadly effects of California's

11   segregation practices."  (ECF No. 4934, 5:20-22.)  Plaintiffs sought an order limiting the length of

12   stay for class members in CDCR's segregated housing units based on these allegations, but failed

13   to present systemic supporting evidence.  Instead, Plaintiffs chose the few incidents they believed

14   would support their argument and deemed them "representative."

15        But even assuming Plaintiffs' few examples support their argument, those isolated cases do

16   not represent a long-standing system-wide constitutional violation.  Testimony from Drs. Scott,

17   Belavich, Fischer, and Jordan, and DAI officials Michael Stainer and Kathleen Allison,

18   demonstrates: (1) there is no conclusive evidence that CDCR's use of segregated housing

19   conclusively causes or exacerbates mental illness; (2) CDCR is providing appropriate mental

20   health care in its segregated units; and  (3) CDCR's policies and procedures governing segregated

21   housing are reasonably related to legitimate penological interests and do not result in system-wide

22   failures to provide constitutionally mandated mental health care.

**A.    Plaintiffs Failed to Prove that Inmates Suffer Harm Simply By Virtue of Being Placed in Segregation.**

25        Plaintiffs, without any evidentiary basis, ask this Court to either remove *Coleman* class

26   members from any type of segregated housing or severely limit their length of stay.  Plaintiffs'

27   position is not legally or factually supportable, and even Plaintiffs' own experts recognize that at

28   least a segment of *Coleman* class members belong in segregation.

4

1    Plaintiffs' expert Dr. Haney, a social psychologist, testified that mentally ill inmates suffer

2    harm in segregation units simply because the units are isolated.  (Tr. 2225:2-7.)  Dr. Haney

3    inaccurately characterizes the units as "isolated" and the studies upon which he bases his opinions

4    do not stand up to modern scientific scrutiny, do not apply to California's prison system, and fail

5    to recognize the extensive treatment options available in the segregation units.

6           1.    ***Coleman* Class Members In Segregated Housing Units Are Not
           Isolated or Placed in "Solitary Confinement."**

7

8    California's administrative segregation units do not place inmates in isolation.  As Dr.

9    Belavich, the Acting Director of the Mental Health Service Delivery System testified, CDCR's

10    administrative segregation units cannot be characterized as "solitary confinement."  (Tr. 3466:17–

11    3467:3.)  Inmates at the Correctional Clinical Case Management System level of care housed in

12    administrative segregation units receive weekly and daily contacts with mental health clinicians,

13    which is more contact than inmates at that level of care receive in the general population.  (Tr.

14    3467:4–3468:3; Exs. AAAA & DDDD.)  CDCR clinicians scheduled more than 29,000

15    appointments for this population in October 2013.  (Tr. 3473:22-3475:3 & Ex. EEEE.)  Likewise,

16    Enhanced Outpatient Program inmates housed in administrative segregation units receive

17    frequent clinical contact (approximately 25,000 appointments in October 2013) and are offered

18    more structured therapeutic activity on average than the Program Guide requires.  (Tr. 3475:5-

19    3481:18; Program Guide at 12-7-10; Exs. AAAA, DDDD, FFFF & GGGG.)

20    CDCR houses Correctional Clinical Case Management System inmates in the security

21    housing units, and provides mental health treatment, including scheduling 3,771 appointments in

22    October 2013, that meets or exceeds Program Guide requirements.  (Tr. 3482:10-3486:8; Program

23    Guide at 12-8-10; Exs. AAAA, DDDD & HHHH.)  CDCR's Psychiatric Services Units were

24    built specifically to provide focused mental health treatment to Enhanced Outpatient Program

25    inmates serving a Security Housing Unit term.  (Tr. 3486:9-21.)  These inmate-patients receive

26    structured therapeutic activity and treatment that meets or exceeds Program Guide requirements,

27    including 11,733 appointments for 388 patients in October 2013.  (Tr. 3486:22-3493:7; Program

28    Guide at 12-9-8; Exs. AAAA, DDDD, GGGG, & JJJJ.)  In addition, under California regulations,

5

1   prison officials must provide all inmates in segregated units with at least ten hours of out-of-cell

2   activity per week.  Cal. Code Regs. tit. 15, § 3343(h).

3        Mr. Stainer also testified that inmates housed in the Security Housing Units are not isolated,

4   as Dr. Haney claimed, and explained that this type of housing does not result in the sensory

5   deprivation alleged by Plaintiffs.  (Tr. 3280:25-3283:2.)  In fact, Mr. Stainer testified that "[t]here

6   is quite a social network going on in these areas" as inmates communicate with one another

7   between the walls and are permitted visits.  (Tr. 3280:25-3283:2.)  Additionally, recent

8   implementation of management yards has enabled CDCR to provide more yard time to inmates in

9   secured units.  (Tr. 3286:16 - 3287:11.)  Ms. Allison further testified that all secured units,

10  including Psychiatric Services Units, have electronic capabilities and offer inmates book

11  exchange opportunities.  (Tr. 2897:3-8, 2954:6-17; Ex. LLL [Allison Decl.] ¶ 26.)

12              **2.    Plaintiffs Failed to Prove that Segregated Housing Placements Cause
                        Psychological Harm.**

13

14       Dr. Haney's opinions failed to establish a causal connection between placement in

15  segregation and an inmate's psychological deterioration with a reliable degree of medical

16  certainty.  (Defs. Ex. VVV, Decl. of Dr. Scott at ¶ 13.)  Defendants' expert witness Dr. Scott

17  testified that to determine causation, one must consider:  (1) whether the inmate had the same

18  symptoms pre-segregation; (2) the measurement of the inmate's condition over time once in

19  segregation; and (3) control groups.  (Tr. 3334:19–3336:3.)  Dr. Haney relies on descriptive

20  studies that neither discuss base-line measurements nor use control groups.  (Tr. 3338:13–3339:7

21  [Scott].)  More recent studies show that segregation placements do not cause the type or severity

22  of psychological harms described by Dr. Haney.  For instance, in the 2013 "O'Keefe" study,

23  mentally ill and non-mentally ill inmates in long-term administrative segregation were compared

24  to inmates in the general population, and the research results contradicted the hypothesis that

25  segregated prisons cause psychological deterioration. (Tr. 3342:14–3344:4 [Scott].)  This

26  "O'Keefe" study examines characteristics much more similar to California's system than those on

27  which Dr. Haney relies to support his opinions.  (Tr. 3344:9-13.)

28

1    The lack of a causal link between placement in segregation and psychological harm within

2    CDCR is supported by the testimony of numerous clinicians.  Dr. Fischer, who supervised five

3    major programs at Corcoran State Prison, including the Enhanced Outpatient and Correctional

4    Clinical Case Management System administrative segregation units and the Security Housing

5    Unit programs, testified that some inmates do very well in segregation, preferring Security

6    Housing Units or administrative segregation over a general population placement.  (Tr. 2747:3-

7    20.)  In his experience, Correctional Clinical Case Management System inmates in Security

8    Housing Units often do not decompensate.  (Tr. 2654:25-2655:7.)  Similarly, Dr. Jordan testified

9    that at the California Institution for Men, he saw only a small percentage of inmates develop

10   further mental health problems in administrative segregation.  (Tr. 3162:19-3164:1.)  As Dr. Scott

11   explained, inmates have a variety of coping skills and their ability to cope within a segregation

12   unit varies.  (Tr. 3371:2-10; Ex. VVV, ¶ 19.)

13   **3.    The Fact That Inmates Commit Suicides Within Segregation Units
         Does Not Justify Further Court Orders.**

14

15   Unable to establish a causal link, Plaintiffs argued that suicide rates in segregation units are

16   evidence that these units are "toxic."  (Pls.' Mot. at 35:22-36:1.)  While it is sadly true that

17   suicides occur in prison, the suicide rate does not demonstrate system-wide failures or warrant a

18   change in policy.  The Constitution does not require that prison officials prevent every death, but

19   that they have in place a "basic program for the identification, treatment, and supervision of

20   inmates with suicidal tendencies."  *Balla v. Idaho State Bd. of Corrs.,* 595 Fed. Supp. 1558, 1577

21   (D. Idaho 1984); *see also Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1252 (9th Cir.

22   2010) (rejecting deliberate indifference where the county had reasonable and well established

23   written policies for handling mental health needs and had invested considerable resources in

24   developing its policies and training its employees on mental health issues.)[2]

25

26   [2] The Court issued an order in July 2013 addressing suicide prevention measures in
     administrative segregation units, and more recently granted the Special Master's request to add a

27   suicide prevention expert to his team.  (ECF No. 4693, filed 7/12/13.)  For that reason alone, no
     further orders premised on Plaintiffs' arguments related to suicides are necessary or appropriate.

28

7

1    Plaintiffs presented evidence of various suicide rates for the years 2007 through 2013, but

2    incorrectly implied that the percentage and number of class member suicides in segregation is

3    increasing.  (Pls.' Mot., 2.)  In fact, both decreased in 2013. (Ex. LLLL.)  Moreover, the number

4    of class members who have committed suicide within segregation units, even considering those in

5    Security Housing Units and Psychiatric Units, is not disproportionate to those outside the class.

6    (*See* Defs. Ex. MMMM.)

7    Plaintiffs have specifically requested that the Court direct Defendants to "modify their

8    policies and procedures to provide staggered welfare checks (through personal observation by a

9    staff member) at least every thirty minutes to *all* prisoners placed in any segregation unit for the

10   duration of such placements."  (ECF No. 4934 at 14:16-21.)  This request is purportedly based on

11   the American Correctional Association's standard for conducting custody check on special

12   management inmates without any reference to segregation units.  (Tr. 2829:2-11; Pls. Ex. 2134;

13   Tr. 2867:2-2868:17.)  But Plaintiffs not only misrepresent the standard itself, they mix up the

14   concept of "welfare checks" and "personal checks."  The American Correctional Association

15   guidelines require only personal observation akin to custody/security checks.  (Tr. 2869:1-

16   2870:14.)  CDCR not only provides 30-minute custody/security checks to all inmates in

17   segregated housing units for the duration of their stay, but goes above and beyond the American

18   Correctional Association's standard by providing additional "welfare checks" akin to a living-

19   breathing check three times an hour for all inmates housed in administrative segregation for their

20   first 21 days. (Tr. 2959:3-2960:7; Ex. LLL [Allison Decl.] ¶ 38, Ex. C.)

21   **B.    Mental Health Care in CDCR's Segregation Units is Appropriate and Effective.**

22   The evidence established that CDCR has in place comprehensive systems for identifying

23   and treating inmates with mental illness in segregated housing units.  Specifically:

24   • All inmates are screened for mental health conditions both before being placed in

25        segregation and following such placement.  (Tr. 3351:23-3352:24 [Scott] & 3458:6-

26        3459:20 [Belavich].)  CDCR also identifies inmates whose mental health conditions

27        require a transfer to another type of housing unit.  (Tr. 3354:18–3356:1 [Scott] &

28        3465:21–3466:16 [Belavich].)  To facilitate continuity of care, CDCR requires clinician-

8

1  to-clinician contacts when inmates are transferred to an administrative segregation unit

2  or transferred between institutions.  (Ex. BBBB.)

3  • All Correctional Clinical Case Management System inmates in administrative

4  segregation are provided appropriate services and are periodically assessed to evaluate if

5  they need a higher level of care.  (Ex. HHH at 21; Tr. 3700:9-3701:22.)  CDCR

6  clinicians provide extensive mental health care services in administrative segregation,

7  including medication contacts, weekly primary clinician contacts, daily contacts with

8  licensed psychiatric technicians, and interdisciplinary treatment team meetings.  (Tr.

9  3352:24-3354:14, 3460:8-3461:7, & 3467:4-3475:3; Exs. AAAA, DDDD, & EEEE.)

10  • CDCR "appropriately meets the mental health needs of inmates assigned to an EOP

11  Administrative Segregation Unit hub."  (Ex. HHH at 22; Tr. 3702:3-22.)  This Enhanced

12  Outpatient Program population receives treatment that meets or exceeds Program Guide

13  requirements, including structured therapeutic activity.  (Tr. 3475:5-3481:18; Exs.

14  AAAA, DDDD, FFFF, & GGGG.)

15  • CDCR "appropriately meets the mental health needs of CCCMS inmates assigned to a

16  SHU."  (Ex. HHH at 24; Tr. 3702:23-3703:12.)  The systemic evidence shows that the

17  mental health care provided in CDCR's Security Housing Units meets or exceeds

18  Program Guide requirements.  (Tr. 2655:8-19 [Fischer] & 3482:10-3486:8 [Belavich];

19  Exs. AAAA, DDDD, & HHHH; *see also* Decl. Dr. Walsh, 3/22/13 (ECF No. 4439), ¶

20  15.)

21  • CDCR "appropriately meets the mental health needs of EOP inmates assigned to a PSU."

22  (Ex. HHH at 24; Tr. 3703:13-19.)  These inmate-patients receive mental health

23  treatment that meets or exceeds Program Guide requirements.  (Tr. 3486:22-3493:7; Exs.

24  AAAA, DDDD, GGGG, & JJJJ.)

25  CDCR's current system, as outlined in the Program Guide, comports with national

26  standards and frequently exceeds the recommended guidelines.  (Tr. 3349:16–3350:12; Ex. VVV,

27  ¶¶ 28-31.)  In addition to the extensive mental health care provided in segregation, mental health

28  and custody staff meet daily to discuss patients and issues, and CDCR has implemented

1    mechanisms for mental health input in Institutional Classification Committee meetings. (Tr.

2    3352:24–3354:14.)

3        The evidence demonstrates that CDCR has a system in place to provide mental health care

4    and a tracking system to identify and address problems that may arise.  The State's intensive

5    internal monitoring through MHTS.net reflects a high degree of compliance system-wide with the

6    Program Guide requirements.  (Tr. 3468:10-3470:19; Ex. DDDD.)  For example, in October 2013,

7    Enhanced Outpatient administrative segregation logs showed 98% compliance with weekly

8    primary clinician contacts and Inter-Disciplinary Treatment Team meetings and 94% compliance

9    with psychiatrist contacts.  (Tr. 3476:10-23; Ex. DDDD.) MHTS.net data also showed high

10    compliance rates for care provided to inmates in administrative segregation.  (Tr. 3471:2-15.)

11    When a particular indicator does not meet Program Guide compliance, CDCR has a process to

12    effectively follow up with individual prison programs and address such issues.  (Tr. 3481:19-

13    3482:3.)

14        Consistent with Dr. Belavich's testimony, Drs. Fisher and Jordan testified that their

15    programs were generally meeting or exceeding Program Guide required care.  Dr. Fischer

16    described the complement of treatment provided at California State Prison, Corcoran, including

17    the extensive groups provided to the Enhanced Outpatient Program population.  (Tr. 2653:2-24.)

18    Dr. Jordan testified that adequate mental health care is being provided at California Institution for

19    Men on a timely basis and because he keeps the administrative segregation unit "richly staffed,"

20    there is "plenty of opportunity for mental health treatment within the unit."  (Tr. 3110:21-3111:4.)

21        **1.    Plaintiffs Failed to Demonstrate that the State Does Not Provide**
22        **Adequate Mental Health Care.**

23        Plaintiffs offered no evidence to rebut Defendants' evidence demonstrating that the care

24    provided to inmates in segregated housing systematically meets or exceeds Program Guide

25    requirements.  Instead, Plaintiffs' experts (Drs. Haney, Kaufman, and Stewart) based their

26    opinions on isolated anecdotes and statements from inmates.  This is insufficient to carry their

27    burden, and does not withstand the testimony of Defendants' officials and experts that the care

28    provided to inmates in segregation is appropriate and effective.

1    Dr. Haney's opinions at the hearing concerning the adequacy of care were based upon only

2    four examples, omitting any discussion of inmates housed in Security Housing Units or

3    Psychiatric Services Units.  He criticized group treatment overall, but admitted that he had limited,

4    if any, exposure to actual groups taking place.  (Tr. 2322:22-2323:1 & 2335:11–2335:12.)  Dr.

5    Haney also criticized the refusal rate for inmates attending Inter-Disciplinary Treatment Team

6    meetings at California Institution for Men, but the institution's staff have already implemented

7    measures to increase inmate participation in these meetings.  (Tr. 3165:17–3167:12.)

8    Dr. Kaufman admittedly had not investigated or evaluated conditions in prisons for at least

9    a decade - until he was retained as an expert witness in this case.  (Tr. 2518:12–18.)  In fact, most

10   of his evaluations were done 20 to 30 years ago.  (Tr. 2518:21 – 2519:3.)  Dr. Kaufman's

11   opinions were based on interviews with inmates selected by Plaintiffs' counsel having the longest

12   lengths of stay in administrative segregation.  (Tr. 2520:9-19; 2527:9–2528:17.)  Moreover, Dr.

13   Kaufman's interviews were so perfunctory that he failed to note that four inmates interviewed at

14   Central California Women's Facility and California State Prison, Corcoran were no longer in

15   segregated housing.  (Tr. 2537:21-23.)

16   Dr. Stewart, contrary to his prior deposition testimony, took the extreme position that

17   inmates with mental health disorders can never be placed in administrative segregation.  (Tr.

18   2814:19-25, 2841:1-18.)  Dr. Stewart offered no data or study to support this assertion, which is

19   contrary to Plaintiffs' other experts' opinions.  Specifically, Dr. Kaufman conceded that

20   placement of *Coleman* class members in administrative segregation can be appropriate if mental

21   health care is provided.  (Tr. 2567:7-2568:6; 2573:1-11.)

22   Beyond the isolated and handpicked individual examples, Plaintiffs argued that five

23   suicides over the past two years (Prisoners 1, 4, 6, 7 and 15) show that Defendants are not

24   providing adequate mental health care to class members in segregation**.  (Pls.' Trial Brief, 2:25-27;

25   Exs. 2520, 2524, 2526, 2540, 2773.)  However, all but one case (Prisoner 15) involved non-class

26   members.  (Exs. 2520, 2524,2526, 2773.)  Although the suicide report for this one class member

27   noted communication lapses and issues associated with the monitoring and logging of custody

28   checks in August 2012, this single case does not demonstrate a system-wide failure.  (Ex. 2540.)

11

1   What it does show is CDCR's self-critical analysis and the steps taken to address similar issues in

2   the future.  (Ex. 2540.)

3           **2.    CDCR's Administrative Segregation Unit Hubs Are Sufficiently**
                    **Staffed and Have Appropriate Clinical Space.**

4

5           Plaintiffs assert that Defendants' staffing at the Enhanced Outpatient Program

6   administrative segregation programs is insufficient.  The evidence established that past staffing

7   challenges have been addressed through increased hiring and the use of telemedicine.  **(**Tr.

8   3507:8-17; 3445:5–3446:3.)

9           Plaintiffs misrepresented the entirety of the staffing materials that CDCR Mental Health

10  provides to the Special Master by introducing isolated staffing reports, as opposed to the complete

11  data picture sent to the Special Master.  (Tr. 3622:4–3623:25; 3633:24–3637:4; 3643:18–

12  3644:20.)  As Dr. Belavich testified, Defendants' Exhibit MMMM shows the entire picture:

13  CDCR provides all the staffing reports required by this Court's orders as well as additional reports

14  agreed upon by the parties**,** including a report produced separately by the Receiver's office**.**  (Tr.

15  3634:8–3635:17; 3643:10-23.)  That data is accurate and complete.  (Tr. 3644:7-9.)

16          Plaintiffs also alleged that there is insufficient treatment and office space for inmates

17  housed in administrative segregation unit hubs and Psychiatric Services Units.   However, the

18  evidence proves otherwise.  The new treatment and office space projects completed over the past

19  two years at various administrative segregation unit hubs and the new Psychiatric Services Unit

20  programs at California State Prison, Sacramento and California Institution for Women, as well as

21  those hub projects that will be providing additional treatment space this coming spring

22  demonstrate sufficient space.  (Tr. 3494:21–3495:17; 2884:1–2897:8; Defs. Ex. MMM.)  In

23  addition, confidential treatment spaces are available as needed, while alternative space to provide

24  care is used while new space is continuing to be constructed.  (Tr. 3494:21–3495:17.)

25          **C.    CDCR Does Not Use Administrative Segregation Units to Manage Mentally Ill**
                    **Inmates.**

26

27          Plaintiffs presented no evidence to support their allegation that CDCR uses its segregation

28  units to manage mentally ill inmates.  Contrary to Plaintiffs' unsubstantiated assertions, the

                                                12

1  evidence shows that CDCR uses segregation in an appropriate manner with a goal to safeguard

2  inmates' rights.  Inmates are placed into Security Housing Units as a result of properly

3  adjudicated, serious disciplinary violations, not as a means to manage mental illness.  (Tr.

4  3270:14-23.)  Inmates who serve indeterminate Security Housing Unit terms receive a low,

5  medium, or high term for their offense, based on a number of mitigating or aggravating factors.

6  (Tr. 3270:18-3271:6; Ex. NNN.)  In addition, each inmate receives a Minimum Eligible Release

7  Date, which is less than the full term assigned.  (Tr. 3273:17-22.)  If an inmate demonstrates good

8  behavior in segregated housing, he will be released by his Minimum Eligible Release Date.  (Tr.

9  3274:3-9.)  Moreover, the classification committee always has the option of suspending the

10  Security Housing Unit term.  (Tr. 3310:22–3311:5.)  And Ms. Allison testified to the extensive

11  requirements in place to ensure that inmates facing disciplinary charges are guaranteed their due

12  process rights.  (Tr. 2900:2–2901:24; 2915:22–2917:22.)

13      Dr. Haney testified that Defendants' use of segregation beds at California Institution for

14  Men reflected Defendants' lack of beds and resultant use of segregation to manage mentally ill

15  inmates.  (Tr. 2257:2-2259:9.)  But Dr. Haney failed to investigate the facts of the purported

16  "Lack of Bed" placements in the California Institution for Men's administrative segregation unit.

17  As testified to by Ms. Allison and Dr. Jordan, inmates were housed in the section of the building

18  used for reception center overflow and granted full privileges.  Overflow inmates are not treated

19  as segregated inmates; receive treatment in the reception center clinic; and are allowed to attend

20  yard and eat meals with other reception center inmates.  (Tr. 2980:18–2982:25; 3111:9– 3113:3.)

21      The evidence demonstrates that CDCR's population is constantly changing and that the

22  placement of mental health inmates in segregation is based on sound policies and programs that

23  are also constantly being adapted in response to the orders of this court, changing regulations, the

24  Revised Program Guide and changes in inmate populations.

25      **D.    Lengths of Stay in Segregation Units Are Constantly Reviewed and Appropriately Ordered.**

26

27      CDCR makes every effort to place inmates in the least restrictive location and to make

28  alternative placements as quickly as possible.  (Tr. 2991:13-17; 3305:11-17.)  The majority of

13

1    inmates in an administrative segregation unit are released in less than 20 days and, in many cases,

2    within a short period following placement into segregation.  (Tr. 2921:4-6.)  When an inmate is

3    housed in administrative segregation for a lengthier period, it is typically for one of the following

4    reasons: (1) gang validation; (2) pending district attorney determination; or (3) the inmate is

5    serving a security housing unit term in administrative segregation.  (Tr. 2925:4-13.)

6         Moreover, the process for placing inmates with extensive custody factors, including

7    inmates with serious mental illness, is extremely complex.  (Tr. 3314:1–3315:6.)  CDCR has

8    taken several steps to reduce length of stay, including multiple levels of review, and weekly

9    meetings to monitor lengths of stay and potential transfers.  (Tr. 2948:7-20.)  In December 2013,

10   CDCR implemented a "non-disciplinary segregation" policy limiting lengths of stay to 30 days

11   for Enhanced Outpatient Program inmates and to 60 days for Correctional Clinical Case

12   Management System inmates.  (Tr. 2936:7-2937:25; Ex. RRR.)

13        CDCR is also reviewing the case factors and behavior of every Security Housing Unit

14   inmate serving an indeterminate term as a result of gang validation to determine if a continued

15   Security Housing Unit term is appropriate.  (Tr. 3291:17-3292:23.)[3]  CDCR has reviewed roughly

16   600 cases, and approximately 360 inmates have been released to general population.  (Tr.

17   3293:17-3294:3.)  The new policy will reduce lengths of stay in Security Housing Units for

18   inmates on indeterminate status, because inmates will be able to earn early release through

19   positive behavior in as little as three years (Tr. 3295:15-3296:6) and gang associates are no longer

20   placed in Security Housing Units based on gang validation alone.  (Tr. 3291:12-16.)

21        Plaintiffs ignore the evidence, and argue for additional limits on segregated housing terms.

22   Dr. Haney opined that custody's alleged domination of CDCR's segregation units created a harsh

23   and punitive environment for inmates with long lengths of stay (2194:3-9), but he presented no

24   evidence or references to studies supporting this theory.  His sole example related to Prisoner G.

25   (Tr. 2190:21-2194:2.)  But his opinions regarding custodial actions regarding this inmate are

26   speculative and lack any evidentiary foundation.

27        [3] Seventy percent of the inmates in Security Housing Units are prison gang members or
     associates.  (Tr. 3289:10-17.)

28

14

1    The evidence, including from Plaintiffs' experts, showed that custodial staff are aware of

2    and attend to inmates' mental health needs.  (Tr. 2528:10-21.)  Custody staff interact extensively

3    with inmates in segregation units, and play a valuable role in screening and responding to inmates

4    with mental health conditions.  (Tr. 2957:21-2959:2.)  These interactions include:  (1) 10 hours of

5    out-of-cell time, including the ability to exercise outside and in close proximity with other

6    inmates or sometimes in the same exercise yard (Tr. 2957:3-17); (2) 30-minute custody/security

7    checks that occur every day in the administrative segregation units, Security Housing Units, and

8    Psychiatric Service Units that allow ongoing custody interaction.  (Tr. 2962:9-12); (3) custody

9    movement of inmates to and from yard, showers, appointments, etc.  (Tr. 3282:10-21); (4)

10    morning meetings with mental health staff (Tr. 2957:21–2958:12); and (5) referrals for emergent,

11    urgent, and routine care.  (Tr. 2958:13–2959:2.)  Moreover, despite Plaintiffs' assertions, CDCR

12    allows all administrative segregation unit inmates to possess electrical appliances if the unit has

13    electrical capacity. (Tr. 2954:22-5.)  For those units without capacity, the department has now

14    purchased hand-cranked radios that it intends to distribute to inmates in segregation units.  (Tr.

15    2955:23– 2956:23.)  And all segregation inmates are provided reading materials.  (Tr. 2954:6-21.)

16    For all the foregoing reasons, the Court must deny Plaintiffs' request for strict time limits

17    on placing class members in CDCR's segregation units, and to further expand Defendants'

18    monitoring and reporting requirements.  In addition, because Plaintiffs failed to prove their

19    assertion that CDCR is not providing "minimally adequate mental health treatment" the Court

20    must also deny Plaintiffs' request for a 72-hour limit on placement in those programs and

21    associated requests.

22    **II.    THE *MADRID* PELICAN BAY EXCLUSION SHOULD NOT BE EXTENDED TO ALL
         SECURITY HOUSING UNITS.**

23

24    As with other segregation units, and as discussed above, CDCR has a system in place to

25    provide appropriate mental health care to inmates in Security Housing Units.  The Program Guide

26    provides that inmates at the Correctional Clinical Case Management System level of care can be

27    housed in Security Housing Units and describes the care to be provided.  The evidence is

28    undisputed that *Coleman* class members housed in Security Housing Units receive mental health

15

1  treatment that meets or exceeds program guide requirements. (Tr. 2655:8-19 [Fischer] 3482:18-

2  3484:18 [Belavich]; Exs. YYY (Belavich Opp'n. Decl.) ¶¶ 6-13, 17-19, DDDD & HHHH; ECF

3  No. 4429 [Fischer Decl.] ¶¶ 30-31.) During the month of October 2013, there was 98%

4  compliance with timely interdisciplinary treatment team meetings statewide, 88% compliance for

5  monthly primary clinician visits, and 98% compliance for timely psychiatry contacts. (Tr.

6  3483:19-3484:18; Ex. DDDD.) CDCR scheduled 3,771 appointments for class members housed

7  in the Security Housing Units statewide, totaling 1,664 hours of treatment. (Tr. 3484:19-3485:13;

8  Ex. HHHH.) Moreover, to the extent that an inmate with serious mental illness cannot function in

9  a Security Housing Unit and requires a higher level of care, the inmate is moved to a Psychiatric

10  Services Unit. (Tr. 3455:21-3456:1.)

11      In addition, all Security Housing Units have electronic capabilities and offer inmates book

12  exchange opportunities. (Tr. 2897:3-8, 2954:6-17; Ex. LLL [Allison Decl.] ¶ 26.) Moreover, as

13  already discussed, CDCR expects that the pilot step-down program will substantially reduce the

14  number of inmates in Security Housing Units, as well as their length of stay in the those cells

15  within the next two years. (Tr. 3291:17-3294:22.)

16      Plaintiffs request for an order expanding the exclusion of inmates with serious mental

17  illness from the Pelican Bay Security Housing Unit to every such unit in the State is unsupported

18  by the evidence. (ECF No. 4934 at 12:19-25.) Dr. Haney opined that the Court should order this

19  prohibition. (Tr. 2293:15-2303:7.) But other than this statement, Plaintiffs offered no evidence

20  to support their demand.

21      Dr. Haney posits that the Security Housing Unit environment is somehow "toxic" and

22  inappropriate for all inmates in the Mental Health Services Delivery System. (Tr. 2400:17-25.)

23  Although he could not dispute that the State is providing Program Guide level of care to those

24  inmates, Dr. Haney asserts—without reference to supporting studies or evidence—that inmates

25  receiving mental health treatment cannot function in that "environment." (Tr. 2399:17-2400:15;

26  Haney Decl. Supp. Opp'n Mot. Terminate ¶¶ 207-13, 259-63, 267; Ex. VVV [Vorous Decl.], Ex.

27  5 [Haney Depo.] 207:15-22, 214:23-215:21.) But none of the patient histories Dr. Haney

28  discussed during his testimony supports his opinion. Rather, as Dr. Scott explained, Dr. Haney's

16

1  interview or descriptive study of inmates at Pelican Bay's Security Housing Units many years ago
2  does not support his causation theory. (Tr. 3337:16-3338:22.)

3      The Court must reject Plaintiffs' request for a blanket exclusion of Security Housing Units
4  for all class members. In its order denying Defendants' termination motion, this Court stated that
5  the degree to which "defendants are complying with the Revised Program Guide is an appropriate
6  way to assess whether defendants are meeting their constitutional obligations." (ECF No. 4539 at
7  30 n. 30.) The evidence presented at trial showed that CDCR places inmates at the Correctional
8  Clinical Case Management System level of care into Security Housing Units consistent with
9  placement guidelines dictated by the Program Guide and that once in those units, CDCR provides
10 the required care to those inmates. (Tr. 3482:18-3484:18, Exs. DDDD & YYY (Belavich Opp'n.
11 Decl.) ¶¶ 6-13, 17-19; Tr. 2655:8-19; ECF No. 4429 [Fischer Decl.] ¶¶ 30-31.)

12     To maintain the safety and security of the institutions and all inmates, CDCR must have the
13 ability to hold inmates accountable for their behavior, even those with mental health conditions.
14 (Tr. 3275:4-13.) As such, the *Madrid* Pelican Bay exclusion should not be extended to all
15 Security Housing Units.

16     III.  **DEFENDANTS MUST BE ALLOWED TO PLACE INMATES—INCLUDING THOSE**
17           **WITH MENTAL HEALTH DISORDERS—IN PROTECTIVE HOUSING.**

18     A blanket policy barring inmates from administrative segregation for non-disciplinary
19 reasons would directly interfere with CDCR's ability to maintain the safety and security of the
20 institutions. (Tr. 2908:8-2909:17; Ex. LLL (Allison Opp'n. Decl.) ¶¶ 5, 8, 19). When safety
21 issues arise, correctional staff often address those issues without placing inmates in administrative
22 segregation. (Tr. 2908:8-2909:17 ; Ex. LLL [Allison Decl.] ¶ 19.) In fact, administrative
23 segregation is the option of last resort to address safety issues concerning mentally ill inmates. *Id.*
24 There are, however, situations where placement of inmates in administrative segregation is
25 absolutely necessary to protect their safety, as well as institutional security. *Id.*

26     During the trial, the Court asked for information on two subjects: (1) measures CDCR has
27 taken to address issues concerning placement of these inmates in administrative segregation; and
28 (2) the number of inmates who are currently classified as non-disciplinary segregation inmates.

17

1    CDCR has undertaken several measures to avoid placing class members in administrative

2    segregation for non-disciplinary reasons or to mitigate the effects of such placements.

3        First, in October 2013, CDCR implemented new non-disciplinary segregation regulations.

4    (Tr. 2904:17-2906:3, 2907:17-2908:19; Ex. OOO)  This classification includes inmates housed in

5    administrative segregation for: 1) safety concerns; 2) investigations not related to misconduct or

6    criminal activity; and/or 3) being a relative or an associate of a prison staff member.  (Tr. 2908:8-

7    19 ; Ex. OOO.)  Under these new regulations, non-disciplinary segregation inmates receive

8    approximately 90% of the privileges they had prior to placement in administrative segregation,

9    such as telephone calls and greater access to personal property, books, electronic appliances, and

10   games that are not provided to disciplinary segregation inmates.  (Tr. 2963:23-2964:22, 2975:20-

11   2978:23.)  CDCR has also directed that prisons, to the extent possible, cluster non-disciplinary

12   segregation inmates in certain pods or a unit.  (Tr. 2964:23- 2965:12.)

13       Second, CDCR has modified its COMPSTAT tracking system to closely track and monitor

14   non-disciplinary segregation inmates.  (Tr. 2918:10-2920:13.)  As Ms. Allison testified, she

15   works closely with the institutions to ensure that they are correctly applying the new regulatory

16   classification to keep track of those inmates.  (Tr. 2918:10-14; 2991:13-17.)

17       Third, CDCR has implemented a policy limiting the length of stay in administrative

18   segregation to 30 days for inmates at the Enhanced Outpatient level of care and 60 days for

19   Correctional Clinical Case Management System inmates.  (Tr. 2936:15-2937:12; Ex. RRR.)  As

20   part of the new policy, CDCR issued directives that will shorten times frames for case reviews,

21   allowing these inmates to be transferred more quickly.  (Tr. 2936:15-2937:18; Ex. RRR.)

22       Fourth, CDCR continues to add Sensitive Needs Yard beds statewide.  CDCR currently

23   houses nearly 35,000 inmates in Special Needs Yard beds throughout the state, and of those, over

24   1,400 inmates are housed in designated Enhanced Outpatient Special Needs Yard beds.  (Tr.

25   2942:17-23; 2945:5–2946:3; Exs. SSS & TTT.)  Both Ms. Allison and Mr. Stainer testified to the

26   constant process CDCR undertakes to address and adjust bed needs as population changes dictate,

27   including those resulting from a change in the classification system.  (Tr. 2939:10-2941:4; 3318:9

28   3319:7.)

The number of inmates classified as non-disciplinary is small.  As of December 4, 2013, there were 42 inmates at the Enhanced Outpatient level of care and 188 inmates at the Correctional Clinical Case Management System level of care in non-disciplinary segregation.  (Tr. 2931:12-15; Ex. QQQ.)  Despite these significant policy changes, Plaintiffs demand that all non-disciplinary segregation class members be housed in another housing unit separate from other administrative segregation inmates.  Plaintiffs also request that all restrictions concerning non-disciplinary segregation inmates be removed.  But dedicating a separate housing unit to non-disciplinary segregation inmates is impractical given space limitations in each institution, the small number of such inmates at each institution, and the complexity of each inmate's case factors.  (Tr. 3418:16-3419:16.)  And some restrictions related to segregated housing—particularly those involving inmate movement—are necessary to maintain safety of the inmates and security of the institutions.  (Tr. 2971:10-20; Ex. LLL [Allison Decl.] ¶ 19.)

CDCR must be allowed discretion and flexibility to place inmates in administrative segregation if and when necessary to protect institutional safety and security.  For these reasons, Plaintiffs have failed to meet their burden to justify any orders relating to non-disciplinary segregation inmates.

## IV.    PLAINTIFF'S ADDITIONAL REQUESTS FOR RELIEF.

### A.    Inmates Discharged From Psychiatric Hospitalization Do Not Have Higher Risks of Suicide or Psychological Harm.

Plaintiffs seek an order directing "Defendants to modify their policies and procedures so that no prisoner discharged from an inpatient (DSH) or crisis level of care (MHCB/OHU) setting shall be placed in a segregation setting upon discharge absent a written clinical determination by both the patient's discharging and receiving clinicians that the individual's mental health will not be put at risk by such a placement."  (ECF No. 4934 at 12:1-8.)  Plaintiffs' evidence does not support the premise that CDCR's use of segregated housing causes or exacerbates mental illness. During the trial, Dr. Haney testified that inmates housed in segregation units decompensate in the face of stress and are sent to a Mental Health Crisis Bed or Department of State Hospitals to stabilize.  (Tr. 2123:10-2126:21.)  According to Dr. Haney, upon stabilization, these inmates are

19

1   then returned to conditions in segregated units that caused them to decompensate.  (Tr. 2123:10-

2   2124:19.)  To support these assertions, Dr. Haney identified one inmate, Prisoner GG.  (Tr.

3   2236:13-2347:9.)  But even if this single inmate's mental health condition were affected by his

4   return to segregated housing (which, based on the evidence and testimony presented is

5   questionable), that single instance, no matter how unfortunate, does not support the broad order

6   sought by Plaintiffs restricting the housing of inmates returned from Mental Health Crisis Beds or

7   Department of State Hospitals placements.[4]

8          CDCR does not categorically return segregated inmates discharged from inpatient care back

9   to the segregated housing unit from which they originated.  (Tr. 2983:1-9 [Allison].)  Instead,

10  CDCR has comprehensive policies and procedures to ensure that inmates are housed in the most

11  appropriate location possible based on their mental health needs, institutional safety, and security

12  considerations.  (Tr. 2983:1-2985:6 [Allison].)  Both Mr. Stainer and Dr. Fischer testified to the

13  cooperative effort between custody staff and clinicians to respond to concerns relating to inmate

14  movement and placements.  (Tr. 3306:18-3307:24; 2660:5-2661:24.)

15         Although CDCR aims to house inmates discharged from the Department of State Hospitals

16  and Mental Health Crisis Beds in the least restrictive housing possible, there are instances in

17  which inmates must be returned to the Security Housing Unit or Psychiatric Services Unit for

18  inmate and institutional safety.  (Tr. 2985:10 - 2986:21 [Allison].)  For example, inmates housed

19  in Security Housing Units for heinous crimes such as murder must be returned to segregated

20  housing to serve the remainder of their term.  *Id.*  As Mr. Stainer testified, "discipline is an

21  important part of [] behavior modification and accountability [] and a very important part of the

22  overall security and safety of all inmates."  (Tr. 3309:9-12.)  Plaintiffs demands would obviate all

23

24         [4] The other cases Plaintiffs' expert witnesses identified do not show a risk of danger
    caused by segregated housing.  For example, Dr. Kaufman testified that Prisoner F was placed in

25  a Mental Health Crisis Bed because he decompensated in segregation but did not point to any
    evidence in the medical record to show that housing in the Security Housing Unit had, in fact,

26  caused decompensation.  (Tr. 2501:24-2504:25.)  In fact, Dr. Kaufman stated that "it's a frequent
    occurrence that individuals . . . will try to manipulate their environment to get out of [segregated

27  housing]."  (Tr. 2503:20-23.)  And Prisoner F's Mental Health Crisis Bed Discharge Summary
    states that "[u]pon admission, the patient denied any custody issue that could have made him
    depressed."  (Tr. 2503:14-15; Pls. Ex. 2203).

28

1  responsibility to in-prison criminal behavior, leading to even greater risks to inmates and

2  institutions.

3      **B.  Defendants Appropriately Screen All Prisoners Entering Segregation for
           Mental Health Issues.**

4

5      Plaintiffs seek to alter the State's administrative segregation screening process without

6  having shown that the current process is insufficient to protect inmates from unreasonable risk of

7  harm.  During trial, both Dr. Belavich and Dr. Scott described CDCR's process for identifying

8  inmates who should not be placed in segregated housing.  (Tr. 3458:8-3459:14, 3679:23-3680:7;

9  3351:23-3353:1.)  Before being placed in administrative segregation, inmates receive

10  comprehensive mental health screening and are referred for mental health evaluation on an

11  emergency, urgent, or routine basis as deemed needed.  (Tr. 3351:23-3353:1; Ex. XXX.)  Upon

12  placement, inmates receive further screening for treatment.  (Tr. 3353:2-22; 3459:21-3461:7; Ex.

13  XXX [Belavich Decl.] ¶ 15.)

14      Plaintiffs offer no evidence showing that the State's screening process is deficient.  Instead,

15  Plaintiffs argue that CDCR should have immediately implemented suggestions for innovations of

16  the administrative segregation suicide risk assessment.  (Pls.' Mot. at 32:21-33:12.)  But no

17  evidence was presented showing that the proposed improvements will improve mental health.

18  Moreover, Defendants' self-criticism or continuous evaluation of their system does not prove that

19  the current system poses unreasonable risks or that the State is indifferent to potential risks.  *See*

20  *Rellergert v. Cape Girardeau Cty., Missouri,* 924 F.2d 794, 797 (8th Cir. 1991).

21      Absent any credible evidence that the State's screening process for inmates in

22  administrative segregation is deficient, the Court must exclude Plaintiffs' demands for a new

23  screening tool or additional tracking systems.  Both would impose substantial costs and further

24  administrative burdens without any showing of a benefit to either inmates or the State.

25      **C.  No Evidence Supports Plaintiffs' Request for Additional Mental Health
           Screening for Prisoners With Extended Stays in Segregation.**

26

27      CDCR's screening process for segregation meets or exceeds the guidelines recommended

28  by the American Psychiatric Association for managing inmates in segregation units.  (Tr.

21

1    3350:10-12.)  All inmates are pre-screened for mental health issues before placement in

2    segregation (Tr. 3351:8-3352:24; 3458:6-3459:14.)  Inmates receive additional screening and the

3    opportunity to speak with a mental health professional once they are placed into administrative

4    segregation in the form of daily rounds by licensed psychiatric technicians.  (Tr. 3459:5-3460:20;

5    Ex. LLL, ¶¶ 29 & 30 [Allison Decl.].)  Inmates housed in Security Housing Units in excess of 90

6    days are also subject to mental health checks every other week.  (Tr. 3356:16-3357:2.)  Should an

7    issue arise concerning an inmate's need for mental health, there is already a system of referrals

8    and procedures to get the inmate help.  (Tr. 3459:21-3461:7.)

9        Contrary to the evidence, Plaintiffs seek an order directing Defendants to conduct an

10   immediate, comprehensive clinical assessment of all prisoners currently in Security Housing

11   Units, Administrative Housing Units and Death Row, who have been in such placements for more

12   than 90 days, to determine their mental health.  (Pls.'s Mot, 40:4-42:17 & Trial Brief, 12:28-

13   13:5.)  Plaintiffs acknowledge that their request is based on speculation by Dr. Haney that another

14   assessment is required to identify "mentally ill inmate-patients [who] may languish in segregation

15   without being identified."  (Pls.'Trial Brief, 41:3-18.)  But Defendants currently have detailed

16   screening processes and policies for mental health checks for segregation inmates.

17       The evidence showed that custody and mental health staff are aware of the conditions of the

18   inmates in segregation units.  (Tr. 2528:18-21 & 2853:4-8.)   In fact, Plaintiffs' experts testified

19   that they asked for and received interviews with the sickest inmates at the institutions they

20   visited.  (Tr. 2528:10-17 & 2854:15-18.)

21       There is simply no evidence that Defendants are not able to track the mental health of

22   inmates in segregation.

23       **D.    "Strip Searches" and Therapeutic Treatment Modules Do Not Constitute**
         **Harsh and Dangerous Conditions Warranting their Elimination.**
24

25       Plaintiffs seek an order directing Defendants to modify their policies and procedures

26   concerning strip searches and therapeutic treatment module use.  But again, the evidence

27   demonstrates that both practices are used for legitimate penological purposes and are not unduly

28   harsh or inhumane.

22

1    Strip searches are necessary in administrative segregation because even the smallest of

2    items, such as a paper clip, can become a weapon. (Tr. 3417:15–3418:10.)  Because inmates in

3    segregation units are more likely to engage in dangerous behavior, increased security precautions

4    for all inmates in segregation are imperative. (Tr. 3417:19-22.)  If a particular group were not

5    subject to search, these inmates could be victimized by other segregated inmates. (Tr. 2971:1-20;

6    3418:11-15.)  Plaintiffs have not provided any feasible alternatives that would balance the need

7    for providing treatment with the need to protect staff and inmates, or even evidence that

8    Defendants' strip search policy is unduly harsh and dangerous and not related to legitimate

9    penological interests.

10    Defendants showed that the use of therapeutic treatment modules allows groups to take

11    place outside the presence of correctional officers. (Tr.2894:20 – 2895:5; 2969:5 – 2970:14

12    [Allison].)  Treatment modules enable CDCR to provide treatment to inmates housed in

13    segregation units above and beyond the treatment provided in other states.  Most notably,

14    California is one of few states that provide group therapy to mentally ill inmates in administrative

15    segregation. (*See* ECF No. 4582 [Metzner & Dvoskin (2006) at 761-72].)  Dr. Metzner further

16    offered his support for the modules in the 2006 article he co-authored with Defendants' expert Dr.

17    Joel Dvoskin. (ECF No. 4582 at 764 ("it has been the experience by one of these authors that

18    these programming cells, when properly constructed and used, have been well accepted by most

19    inmates using them"; and "it would not be appropriate for custody staff to require the presence of

20    a correctional officer in the room during therapy sessions if such sessions could be safely done

21    without them present.")

22    Plaintiffs presented no evidence that therapeutic treatment modules are unduly harsh and

23    dangerous.  Dr. Haney testified that therapeutic treatment modules do not allow for confidential

24    treatment, but could not identify a case where that led to an unsatisfactory clinical outcome.  He

25    also testified therapeutic treatment modules are used in other prison systems. (Tr. 2374:17-25.)

26

27

28

23

1   Dr. Haney also acknowledged that he had no discussions with any clinicians regarding Plaintiffs'

2   concerns with treatment modules.  (Tr. 2375:18-22.)[5]

3

4                                    **CONCLUSION**

5       Plaintiffs seek substantial and burdensome changes to the Revised Program Guide, a

6   document that has defined the Special Master's actions and recommendations, and CDCR's

7   responses to those recommendations.  While Plaintiffs advocate for far-reaching changes to the

8   controlling document in this case, the evidence demonstrates that Defendants have enacted

9   policies and programs expressly designed to meet Plaintiffs' demands and the Revised Program

10  Guide requirements.  Plaintiffs rely primarily on their standard stable of experts and largely

11  anecdotal evidence to support their motion.  However, that evidence fails to demonstrate system-

12  wide violations of Plaintiffs' rights or a system-wide failure to provide constitutionally mandated

13  care to *Coleman* class members in segregation units.  Instead of evidence of "long-standing

14  constitutional violations," CDCR has implemented and followed sound policies to ensure that

15  mentally ill inmates receive adequate mental health care.

16      As this Court recognized early in this case, there is no mandated blanket exclusion of

17  mentally ill inmates from prison disciplinary systems or security settings designed to preserve

18  safety and order, provided that these measures do not interfere with necessary mental health care.

19  Likewise, Defendants are not aware of any legal precedent limiting length of stay in segregation

20  units.  A handful of examples where a few inmates were not fully served by the sound policies in

21  place does not demonstrate system-wide failures and does not warrant the injunctive relief

22  requested.

23      Further Court orders related to CDCR's segregation units are unwarranted.  The evidence

24  established that CDCR presently has appropriate policies and procedures in place to ensure

25  _____

26      [5] Plaintiffs also request in their trial brief an order relating to Defendants' use of holding
    cells.  (ECF No. 4934 at 14:8-15.)  Plaintiffs presented no credible evidence to support this
27  request.  Regardless, the Program Guide authorizes the placement of mentally ill prisoners in
    holding cells while they are pending admission to a Mental Health Crisis Bed.  (Program Guide at
28  12-5-5.)  Stays in holding cells are limited to 4 hours.  *Id.*

1   adequate mental health care in its segregation units, and that custody and mental health staff

2   continue to work together to improve care in those units and to ensure the safety and security of

3   staff and inmates alike.  Granting Plaintiffs' requested relief would lead to problematic secondary

4   effects throughout the prison system, and limit CDCR's ability to construct effective, flexible,

5   and sustainable programs to meet the needs of its inmate population.  Accordingly, their motion

6   must be denied.

7

8   Dated:  January 21, 2014                    Respectfully Submitted,

9                                               KAMALA D. HARRIS
                                                Attorney General of California
10                                              JAY C. RUSSELL
                                                Supervising Deputy Attorney General
11
                                                /s/ Debbie Vorous
12
                                                DEBBIE J. VOROUS
13                                              Deputy Attorney General
                                                *Attorneys for Defendants*
14
15  CF1997CS0003
16
17
18
19
20
21
22
23
24
25
26
27
28

25