1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                         ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                         CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12    _____/

13

14

15                         ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                 TUESDAY, OCTOBER 1ST, 2013

20

21                         ---o0o---

22

23

24
     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  LORI RIFKIN, ATTORNEY AT LAW

 9            BY:  JANE KAHN, ATTORNEY AT LAW

10

11            K&L GATES LLP
              4 EMBARCADERO CENTER, SUITE 1200
12            SAN FRANCISCO, CALIFORNIA  94111

13            BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

14            BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

15

16    FOR THE DEFENDANTS:

17             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
18             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
19
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
20
               BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
21
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
22
               BY:  JESSICA S. KIM, DEPUTY ATTORNEY GENERAL
23

24

25                           ---o0o---
```

```
 1                        APPEARANCES

 2                         ---o0o---

 3

 4    FOR THE LA TIMES:

 5            DAVIS WRIGHT TREMAINE LLP
              865 SOUTH FIGUEROA STREET, SUITE 2400
 6            LOS ANGELES, CALIFORNIA  90017-2566

 7            BY:  ROCHELLE L. WILCOX, ATTORNEY AT LAW

 8

 9

10

11

12

13

14

15

16

17                        ---O0O---

18

19

20

21

22

23

24

25
```

1                        PROCEEDINGS INDEX

2                            ---o0o---

3

4    PROCEEDINGS:                                      PAGE

5        Motion to Intervene                            2

6        Opening Statement by Mr. Bien                 19

7        Opening Statement by Mr. Bornstein            29

8        Opening Statement by Ms. Vorous               44

9

10                           ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE PLAINTIFFS:

4         EXAMINATION:                                    PAGE

5

6      ELDON VAIL

7         Direct Examination by Mr. Bornstein            63
          Voir Dire Examination by Mr. Russell           74
8         Continued Direct Exam. by Mr. Bornstein        78

9

10

11                             ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        EXHIBIT INDEX

2                          ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO          DESCRIPTION              EVD
5

6      3                 Video                     106

7      5                 Video                     108

8      67                Photo                      96

9      70                Photo                      99

10     74                Barricade Removel Device  117

11     75                Photo                     100

12     96                Resume                     64

13

14

15

16

17

18

19

20

21

22                         ---o0o---

23

24

25
```

1

1           SACRAMENTO, CALIFORNIA

2        TUESDAY, OCTOBER 1ST, 2013 - 10:30 A.M.

3                  ---o0o---

4        THE CLERK:  All rise.

5        Court is now in session.  The Honorable Lawrence K.

6   Karlton presiding.

7        THE COURT:  Please, be seated everyone.

8        THE CLERK:  Calling Civil Case S-90-0520, Coleman,

9   et al., versus Brown, et al.

10        THE COURT:  Counsel approach the podium and state

11   your appearance for the record.  If you're arguing --

12   actually, no, just state your appearance and then you may

13   retire because we've got yet another matter to deal with.

14        MR. BIEN:  Michael Bien, counsel on behalf of

15   plaintiffs.

16        MR. BORNSTEIN:  Good morning, Your Honor.  Jeff

17   Bornstein, counsel on behalf of plaintiffs.

18        Could I introduce the other members at counsel table?

19        THE COURT:  Please.

20        MR. BORNSTEIN:  Megan Cesare-Eastman, Ranjini Acharya

21   who is sitting right behind her, Linda Woo, senior paralegal,

22   Lori Rifkin and Jane Kahn.

23        MS. VOROUS:  Good morning, Your Honor.  Debbie Vorous

24   on behalf of defendants.

25        MR. MCKINNEY:  Good morning, Your Honor.  Patrick

2

1    McKinney on behalf of defendants.

2         MS. KIM:  Jessica Kim on behalf of defendants.

3         MR. RUSSELL:  Good morning, Your Honor.  Jay Russell

4    on behalf of defendants.

5         THE COURT:  The first matter that we've got to take

6    up is the motion of the LA Times to intervene for the sole

7    purpose of addressing the question of the extent of the

8    protective order.

9         Who speaks on behalf of New York Times -- of LA

10   Times?

11        MS. WILCOX:  Good morning, Your Honor.  I do --

12        THE COURT:  Before you start, it is true, folks,

13   whether you believe it or not, that if you don't speak into

14   the microphone, I have no idea of what you are saying.

15        Yes, ma'am.

16        MS. WILCOX:  Good morning.  My name is Rochelle

17   Wilcox.  I am appearing on behalf of the Los Angeles Times.

18        THE COURT:  And you have served the parties?

19        MS. WILCOX:  The parties have been served through

20   electronic notice.

21        THE COURT:  I don't think there is any doubt, but

22   I'll just check.

23        Mr. Bien, you have received?

24        MR. BIEN:  Yes, Your Honor.

25        THE COURT:  Miss Vorous?

3

```
 1              MS. VOROUS:  Yes, Your Honor.
 2              THE COURT:  The motion to intervene for the purpose
 3    of arguing the substance is granted.
 4              Let me start by asking, so that we can see whether --
 5    just how much time we're going to have to spend on this
 6    instead of getting to the substance, my understanding -- I'm
 7    sorry, ma'am.  I lost your name already.
 8              MS. WILCOX:  Rochelle Wilcox.
 9              THE COURT:  Miss Wilcox, my understanding is that you
10    object to the court's order which says that the --
11              MS. WILCOX:  That --
12              THE COURT:  I know it is hard for you to believe, but
13    occasionally -- these lawyers have already learned it --
14    occasionally when I stop to think, it is not an invitation to
15    speak.
16              MS. WILCOX:  My apologies.
17              THE COURT:  I promise you, I'll let you talk when the
18    time comes.
19              MS. WILCOX:  My apologies.
20              THE COURT:  The objection is that, as I understand
21    it, ma'am, that the LA Times objects to that portion of the
22    protective order which directs that members of the press not
23    use the names of either the inmates or the correctional
24    guards.
25              Is that right?
```

4

1          MS. WILCOX:  That is correct, Your Honor.

2          THE COURT:  Now, as it relates to the inmates, it

3    seems quite clear to me that since this deals with their

4    mental state, it's a medical record -- it's a medical issue,

5    and that under these circumstances the protection of their

6    privacy in these very sensitive areas is wholly justified

7    because of the very limited nature of the court's order as to

8    those folks.

9          May I have the position of the intervenor as to that

10   matter?

11         MS. WILCOX:  We disagree with that, Your Honor.  I

12   would note initially that plaintiffs' memorandum filed

13   yesterday in anticipation of the status conference expressly

14   addressed that issue and indicated that the privacy interests

15   are not as paramount as the interests in this proceeding and

16   making sure that this proceeding is -- results in changes for

17   their clients.

18         THE COURT:  Go ahead.

19         MS. WILCOX:  In addition, Your Honor, the -- this is

20   a prior restraint, and no level of privacy justifies a prior

21   restraint.

22         THE COURT:  Thank you.  I understand.  I understand

23   your position.

24         Mr. Bien, it is suggested by LA Times -- or

25   Mr. Bornstein, I don't know who speaks about this -- it is

5

1    suggested that you have surrendered the rights of your

2    clients without their consent, at least there is no

3    indication that you have consulted with your individual

4    clients to know whether or not they maintain their right of

5    privacy.

6         MR. BIEN:  Your Honor, we do not oppose that part of

7    your order that dealt with the prisoners.  We have taken

8    every measure we can reasonably to balance protecting their

9    privacy with the rights to proceed in this case.

10         It is correct, we do not have individual consent from

11   these clients.

12         THE COURT:  So whatever you say, you have no power to

13   waive their right of privacy, I take it, without their

14   consent?

15         MR. BIEN:  I am the attorney on behalf of their class

16   in this matter.

17         THE COURT:  I understand that, sir.  These are very

18   serious and very, in my view, very delicate issues.  And I'm

19   going to ask you straight on:  Is it your view that you have

20   the power to waive your clients' right of privacy without

21   their consent?

22         MR. BIEN:  I think I do, Your Honor.  That's why --

23   to the extent I'm trying to keep their identities as

24   confidential as possible, I'm doing that, but to the extent

25   something may leak out, I think I have to take responsibility

6

1    for that as their attorneys in this situation.

2            In other words, we're going to do everything in our

3    power to keep them anonymous.

4            THE COURT:  I understand that you'll do everything in

5    your power.  The fact of the matter is that the LA Times'

6    position is we want to limit any power that you have because

7    if we can figure out who they are, we'd be delighted to

8    titillate the public with their names.  That's their view of

9    what their function is.

10           I don't want an argument.  I'm opposing it.  This is

11   preposterous.

12           The depth of concern -- you know, you folks don't

13   publish the name of juveniles because it's a human, decent

14   thing to do.

15           MS. WILCOX:  I'm here, Your Honor, to challenge the

16   prior restraint.  We may choose, as a matter of editorial

17   discretion to not publish these names.  And I believe our

18   reporting to date has reflected that kind of editorial

19   discretion.

20           But the issue is being ordered -- being curtailed

21   from publishing names under these circumstances where they

22   have been revealed in open court.  And the law is crystal

23   clear that that order cannot stand.

24           THE COURT:  Thank you, ma'am.

25           Thank you, ma'am.

7

1          I understand your position.

2          I understand your position as whatever it is.

3          Who speaks for the government?

4          MR. MCKINNEY:  Good morning, Your Honor.  Patrick

5     McKinney.

6          We believe, as we discussed yesterday at the status

7     conference, that the court's struck the right balance here in

8     the protective order.

9          There are a number of complications.  You know, the

10    plaintiffs have discussed their own clients, but two of the

11    inmates about to be discussed have been released.

12         THE COURT:  Right.  They couldn't even talk to

13    them.

14         MR. MCKINNEY:  It is unclear who represents those

15    people.

16         THE COURT:  Well, okay.  Yes, I understand your

17    position.

18         But in particular will you focus on whether there is

19    an interest on the part of the defendants in protecting the

20    identity of any guards.

21         Let me give you an argument, which I'm not at all

22    certain helps, but, you know, in the few minutes that I've

23    had to think about it...  The central argument of -- well, I

24    suppose they'll retreat as soon as I say it.

25         The way I read their brief, their interest in

8

1    publication deals with wrongdoing -- potential government

2    wrongdoing and the right to identify government officials who

3    are engaged in wrongdoing, which is hardly an insubstantial

4    interest.

5           But in this case, as I understand it -- maybe I don't

6    understand it -- but from our conversations and reading the

7    briefs, the plaintiffs don't argue wrongdoing because the

8    guards were acting in conformance with, as I understand it --

9    if I'm wrong, I'm wrong -- in conformance with the policies

10   which were adopted under Madrid or subsequent to Madrid.

11          What the plaintiffs argue is that those regulations

12   did not contemplate or didn't involve the effects that the

13   use of force authorized under Madrid would affect mentally

14   ill persons.

15          If that is so, there is no governmental wrongdoing,

16   there is simply an argument about the adequacy of the

17   regulations.  But I don't know whether you agree with that.

18          MR. MCKINNEY:  Your Honor, I don't want to predict

19   what the plaintiffs are going to argue in this proceeding,

20   but their experts have certainly argued in a handful of

21   isolated cases, which is what you're going to hear about

22   today.  Nothing systemic.  You're going to hear about a few

23   cases that they picked out that they are alleging wrongdoing.

24          In that case, you know, the legislature has spoken on

25   this, in Penal Code 832.7, confidential identifying

9

1    information is protected.

2          THE COURT:  We're in federal court.

3          MR. MCKINNEY:  I understood, Your Honor.  But this is

4    a state agency, and these are state records this would apply

5    to.

6          One case that is conspicuously absent from the Times

7    brief and what we've had a chance to review is the Copy Press

8    versus Superior Court case which held that identifying

9    information regarding officers in a complaint-type scenario

10   is absolutely protected.

11         So the legislature has spoken here that

12   confidentiality of this information outweighs the public

13   right to openness.

14         Again, Your Honor, we think you struck the right

15   balance here.  We think it is in your discretion to review

16   these in camera or clear the courtroom.  But I think you

17   struck a better balance than that.

18         THE COURT:  Yeah.  I will tell you, Mr. McKinney --

19   well, you've heard me say it now at least twice or three

20   times during our phone calls, these are matters of public

21   concern, that the public has an absolute right to have placed

22   before it what is actually going on.

23         And I would not review the matter in chambers because

24   I think it would deprive the public of an understanding of

25   the functioning of a major governmental agency as relates to

10

1    a limited -- well, not so much limited, but a subgroup of

2    persons incarcerated.

3         MR. MCKINNEY:  Your Honor, we do not disagree with

4    that.  The position, again, is just the identifying

5    information with respect to both the inmates and the

6    officers.

7         And there is a third category, and those are the

8    inmates depicted on the videos on the boards as we discussed

9    yesterday, who may or may not be identified, who have nothing

10   to do with this lawsuit.

11        And as you know, the parties have discussed

12   alternatives.  One would be redacting certain information

13   from the videos.  Again, that would take time, but we could

14   certainly do it, Your Honor.

15        MS. WILCOX:  May I address the issues that have been

16   raised, Your Honor?

17        I would like to initially make the first point that

18   this is not about titillating our viewers.  This is about

19   making sure that we have whatever information is that --

20   whatever information is shown in open court, that we are not

21   restrained from publishing that information.

22        And part of what is going on is the practical effects

23   of the court's order.  For example, if we obtain the

24   information outside of court --

25        THE COURT:  If you obtain the information outside of

11

1    court, there's no order which bars you from doing anything.

2        MS. WILCOX:  The court's order is broad enough as

3    written to suggest that it is.  But may I also state that we

4    are -- we think that plaintiffs' suggestion, as stated in the

5    memorandum filed yesterday, is a good approach, make sure

6    that what is actually presented in open court is information

7    that can be divulged to the public by redacting as necessary.

8        And the --

9        THE COURT:  All right.  Just stop.  Plaintiff, please

10   approach.  Defendant, please approach.

11       We have reached a place where it is the court's view,

12   but I'm -- you know, it is your lawsuit, but I am almost

13   certainly inclined at the moment to continue this hearing so

14   that you can redact, as you can, information which is simply

15   not relevant to the case.

16       And I don't know how long that takes, and I don't

17   know what's involved.  But it just seems to me that's the

18   only way we can proceed.

19       I believe that the Times has failed to appreciate the

20   delicacy of this matter.  I'm astonished that they do not

21   recognize that medical records of people who are desperately

22   ill are just subject to their whim.  "We will not do this

23   maybe."  "On the other hand, we might, because after all

24   we're selling newspapers."

25       MR. BIEN:  May I, Your Honor?

12

1          THE COURT:  Yes.

2          MR. BIEN:  I just want to remind the court that we

3     are going to use abbreviations and not the names.

4          THE COURT:  There are things apparently I am told --

5     I don't know.  I'm told that the names of desperately sick

6     people are repeated in the course of the --

7          MR. BIEN:  Our understanding, we have yet to review

8     the tapes, is that it will be last names, no first names, no

9     identifying information.

10         We obviously are not going to release copies of the

11    tapes.  We're not going to assist anyone in identifying

12    anyone.  We're going to be using codes.  So we think that

13    that balance is sufficient to protect our clients' interests.

14         And to the extent -- we don't agree that the

15    correctional officers have an interest here, but even to the

16    extent they did, we are going to do everything possible, by

17    removing identification in the beginning of each, to avoid

18    that too.

19         THE COURT:  Given the redaction that you folks agreed

20    to yesterday, are there other places on the tape where the

21    names of the correctional officers appear?

22         MR. MCKINNEY:  Your Honor, these are dynamic

23    situations.  First the inmate's name is repeated over and

24    over.

25         THE COURT:  I'm sorry.

13

1          MR. MCKINNEY:  The inmate's name is repeated over and

2    over.  Other things are blurted out.  It is an extremely

3    dynamic situation.

4          Are officers' names mentioned?

5          Potentially.  I don't want to speak to that because I

6    don't recall specifically, but there are other things

7    depicted in the videos that I think would identify either the

8    inmate or other inmates not involved in this lawsuit.

9          So again, Your Honor, I think you have identified the

10   safest course.  We can certainly get this started by the next

11   date the court's reserved.

12         THE COURT:  How long will it take you to redact?

13         MR. MCKINNEY:  I don't know the answer to that.  I

14   assume we can get most or all of them by the time we need to

15   come back, by the 15th.

16         If I can confer with my clients and maybe get some

17   clarity on that.

18         THE COURT:  Please do.

19         This is such an urgent matter that to be diverted in

20   this way is disgraceful.

21         Nonetheless.

22         (Brief pause.  Counsel confer.)

23         MR. MCKINNEY:  Your Honor, thank you.

24         Unfortunately, I'm not in a position to tell you

25   exactly how long it will take.  I can report back to the

14

1    court.

2         I am reminded, however, that during each of these

3    videos the last name of the officer is taped to the back of

4    the uniform.  So it is not just a matter of sound, it is

5    pixelating the video or obscuring the video to redact that

6    identifying information.

7         Again, I think it is extremely prejudicial to my

8    clients and would violate the Peace Officers Bill Of Rights.

9         MR. BORNSTEIN:  Your Honor, Jeff Bornstein.  I want

10   to respond to that last comment.

11        If the court were to do a Google search and asked for

12   a --

13        THE COURT:  I understand that there are limited

14   number of names and hundreds of people share it.

15        MR. BORNSTEIN:  That wasn't my point.

16        THE COURT:  I'm sorry.  Excuse me.

17        MR. BORNSTEIN:  You will see that the State has

18   released these similar videos, I don't know whether they're

19   class members or not, to news organizations, including ABC,

20   that has the names of the officers shown.

21        They also have the officers being videotaped as part

22   of this news program.  I can give the court the cite for

23   that.

24        THE COURT:  I accept your representation.

25        MR. BORNSTEIN:  And I think that what we're dealing

15

1   with here, we are prepared to show these videos in a way that

2   does everything we can to protect the privacy rights of

3   everyone involved.  And we're willing to move to strike if

4   there is any inadvertent mention of a name so that it is not

5   in a public record.  We are doing that.

6        That happens in trial all the time, where there are

7   things that come out that aren't supposed to that are

8   stricken from the record.  And we're prepared to do that.

9        But we think the issue here is so -- the best

10  evidence of what is going on in California's prisons are in

11  these videos.

12       THE COURT:  Mr. Bornstein, there is no doubt -- I

13  mean, I want everybody to understand that I have no doubt

14  that I'm going to permit these disks to be shown.  I think

15  they're very important for me, and I think it may not even be

16  unimportant for the public.

17       But it is equally true, from this court's point of

18  view, that unnecessary involvement -- exposure to the public

19  of irrelevant matters, namely the names of officers who are

20  not accused, as I understand it, of wrongdoing because they

21  are obeying a policy which is clearly, in the opinion of the

22  plaintiffs, inadequate when dealing with mentally ill

23  persons.

24       And it is clear to me -- maybe that's the answer.  It

25  is clear to me that the names of the class members who are

16

1    shown on these films, and under the circumstances the names

2    of the officers who are shown in the film, is simply

3    irrelevant to the question.

4         And I think you're right, that the simplest way of

5    proceeding -- the court will entertain a motion from

6    plaintiffs and defendants, if they are willing to provide

7    such a motion, jointly, to strike the names of all of the

8    persons shown on the tapes.  And if incidentally there are

9    names of other inmates who are not even parties to this

10   action, their names as well.

11        MR. BORNSTEIN:  We would so move on behalf of the

12   plaintiffs, Your Honor.

13        MR. MCKINNEY:  Your Honor, I'm not sure how this

14   would work as a practical matter.  Once the cat is out of the

15   bag it is done.

16        THE COURT:  It is not out of the bag because I have

17   stricken it.  And if they publish it, then their whole

18   argument, which is that this was revealed in open court, and

19   therefore they have a right, is significantly undermined.

20        And I will now say that given the fact that the court

21   has peremptorily struck the names, I do not believe that the

22   Times or anybody else has the right to use those names.

23        And if you disagree, we'll see you in contempt.

24        Thank you, ma'am.

25        MS. WILCOX:  Do you mean even if we obtain the names

17

1    outside --

2         THE COURT:  If you find it outside, you can publish

3    anything you want.  The question is what is derived here in

4    open court.

5         MS. WILCOX:  I do not -- Your Honor, I don't agree

6    that the court can strike something from the record that has

7    been already introduced in open court and that we can be

8    prevented from publishing that.

9         Our brief obviously doesn't address that issue, but

10   if it arises, we will certainly address that issue.

11        I do want to -- I don't know what has already come

12   before the court, but certainly information that has already

13   come out in open court, information that may come out in open

14   court, we have a right to publish under the clear authority

15   we cited.

16        THE COURT:  I understand your position.  You've heard

17   the court's order.  You may retire.

18        MR. BIEN:  Your Honor, can we distribute the order to

19   the press?

20        We have copies.

21        THE COURT:  Well, it is different now because what

22   I've now ordered is that all of those names are stricken and

23   nobody has a right to publish them.  And that's the order of

24   the court to everybody in the courtroom who is a

25   representative of the press or has a blog or anything else.

18

1          That's the order of the court.

2          You may retire, ma'am.

3          MS. WILCOX:  Do you mean, Your Honor, if I may, names

4     that have already been introduced in open court?

5          THE COURT:  I'm going to say it again.  I understand

6     that I'm not being precise.  If you gain information outside

7     of this courtroom, there is no court order barring you from

8     using that information.

9          MS. WILCOX:  But do you mean, Your Honor, names that

10    have already been introduced in open court or that will be

11    introduced in open court?

12         THE COURT:  I'm going to say it again.  There are no

13    names properly introduced because I've ordered them stricken.

14    And if they are inadvertently, or by virtue of the nature of

15    the disk revealed, the order applies to them and they are

16    stricken.

17         MS. WILCOX:  But that is completely contrary to

18    Florida Star and other cases that we have cited in our brief.

19         In Florida Star, the name was revealed

20    inadvertently --

21         THE COURT:  Thank you, ma'am.

22         MS. WILCOX:  The police department was not allowed to

23    reveal the name of the rape victim.  And the court struck

24    down a penalty imposed against a newspaper that published it

25    in violation of a state statute.

19

```
 1            THE COURT:  Thank you, ma'am.  You may retire.
 2            MS. WILCOX:  Your Honor --
 3            THE COURT:  You may retire.  I'm sorry that I'm not
 4    speaking clearly.  You may retire.
 5            MS. WILCOX:  I will, Your Honor.  Will the court's --
 6            THE COURT:  Now.
 7            MS. WILCOX:  Will the court's order be on the record
 8    and available?
 9            THE COURT:  Yes, of course.
10            MS. WILCOX:  Thank you.
11            THE COURT:  Call your first witness, or whatever you
12    are going to do.
13            MR. BIEN:  Your Honor, we're going to proceed with an
14    opening statement.
15            THE COURT:  You may proceed.
16            MR. BIEN:  Your Honor, two of plaintiffs' enforcement
17    motions are before the court for the evidentiary hearing
18    today.  My cocounsel, Jeff Bornstein, of K&L Gates will
19    address plaintiffs' motion for affirmative relief regarding
20    use of force, and I will address the second motion, access to
21    inpatient psychiatric care for death row prisoners.
22            This issue is severed from the DSH issues that were
23    tried to the court in June.  After the June trial this court
24    ordered on July 11th, 2013, that the Special Master should
25    investigate barriers to inpatient care, including custodial
```

20

1    obstacles to get inpatient psychiatric care.

2        There is a single issue though that pervades all of

3    the issues in these enforcement motions.  Defendants denial

4    of timely and appropriate access to mental healthcare as a

5    result of exaggerated and overblown custodial interference

6    with the housing and treatment of seriously mentally ill

7    class members.

8        Blanket security rules and procedures without

9    individualized assessment of risk and without regard or

10   understanding of mental illness and treatment, again, again,

11   overwhelm clinical needs even at the highest levels of care.

12   Punishment over treatment is the rule.

13       Whether one is for or against the death penalty, the

14   fact remains that California has a massive, decrepit and

15   overcrowded death row that continues to grow in size.

16       Long delayed plans to build a new death row at

17   San Quentin were approved by Governor Schwarzenegger,

18   approved by the legislature, funded, but then abruptly

19   cancelled by Governor Brown in April 2011 due to the

20   financial crisis.

21       The new death row would have opened in 2014 and added

22   medical and mental health capacity, programming and yard

23   space and alleviated overcrowding.  No new plans have been

24   announced, and the unconstitutional, overcrowded and

25   dangerous conditions persist with no relief in sight.

21

1         Inpatient psychiatric hospitalization is the most

2    intense level of mental healthcare necessary for treatment of

3    prisoners with serious mental illness at the highest levels

4    of acuity of their disease.

5         Inpatient psychiatric hospitalization for male

6    prisoners is provided in acute and ICF for intermediate care,

7    and is provided at the CMF Prison at Salinas Valley

8    Psychiatric Program and at the new Stockton facility.  The

9    ICF or intermediate care provides the largest number of

10   resources to male prisoners.

11        The court, in its July 11th order, page 8, and I

12   quote, found that:

13             "Consistent with established principles of Eighth

14             Amendment jurisprudence, under the express language

15             of the remedial plan the CDCR is responsible for

16             providing acute and intermediate inpatient care, in a

17             timely manner, to those CDCR prisoners clinically

18             determined to be in need of such care."

19        There can be no exception to this principle for

20   prisoners on death row.

21        It is undisputed that about 700 male prisoners housed

22   on death row at San Quentin are denied any access whatsoever

23   to any of the intermediate or ICF programs available to other

24   male prisoners.

25        High security ICF programs are available, they're

22

1    open, but defendants refuse to provide access to this

2    population.

3        CDCR and DSH provide limited access to the acute

4    inpatient psychiatric program at CMF for death row patients,

5    but severely and unnecessarily restrict treatment for those

6    patients even after admitted.

7        These patients are locked in their cells, are

8    deprived of group therapy, rehabilitation therapy, and get

9    little or no benefit from the inpatient psychiatric program.

10        This is a blanket prohibition against treatment of

11    death row prisoners in the acute program no matter what the

12    risk is.  They don't look at the individual.  They don't look

13    at his behavior.  They don't look at his mental illness.

14        Death row prisoners at San Quentin all live in harsh,

15    segregated conditions with extremely limited access to yard,

16    programming and activities.

17        The adjustment center is the most restrictive

18    segregation unit where death row prisoners serve SHU terms

19    and are placed for in-prison misbehavior.

20        East block and north seg, with less restrictions than

21    the adjustment center, are lockdown segregation units with

22    limited out-of-cell programming.

23        Death row prisoners with serious mental illness are

24    housed both in the adjustment center and east block.  They're

25    mixed with other condemned prisoners.  This is the only EOP

23

1    program, Your Honor, where EOPs are mixed with other

2    prisoners.  They don't have their own location, no separate

3    unit.

4         There are many difficult problems with death row

5    conditions and healthcare that will take millions of

6    dollars -- hundreds of millions of dollars and many years to

7    resolve.  And that's not what we're here to talk about.  We

8    can't solve those problems.

9         But the inpatient psychiatric hospitalization issues

10   we bring to the court now, if remedied, can alleviate pain

11   and suffering and save lives in a matter of months.

12        Defendants can be ordered to use existing and empty

13   inpatient hospital beds at CMF or Salinas Valley Psychiatric

14   Program to open a unit for death row patients.

15        Ellen Bachman, the DSH executive in charge of all the

16   inpatient programs at CMF, testified in deposition in

17   September, just a few weeks ago, months after this

18   enforcement motion was filed, that she has never even

19   considered herself, investigated or discussed with the CMF

20   warden setting up a condemned unit at CMF.

21        Your Honor, this is deliberate indifference.

22        In their briefs defendants assert that the amorphous,

23   undefined, unlicensed, unapproved, specialized treatment

24   program at San Quentin obviates any need for inpatient

25   psychiatric hospitalization at the intermediate level for

24

1    death row.

2          They also rely on a Penal Code provision they say

3    prohibits transfers of prisoners for that purpose, but

4    Dr. Monthei, the chief of mental health at San Quentin,

5    testified that the unapproved program is designed to offer

6    only EOP level of care.

7          Moreover, Dr. Monthei admits that the program model

8    he employed to design the program he's called "Assertive

9    Community Treatment," is designed to reduce the need for

10   hospitalization but not eliminate it.

11         There is no claim, Your Honor, that San Quentin is

12   offering an equivalent level of care to inpatient psychiatric

13   hospitalization.  Thus, there is no actual defense to this

14   motion legally or factually.

15         Defendants reliance on some Penal Code Section

16   3600(B)(4) as an excuse to deny death row patients access to

17   ICF hospitalization is a sham.  Penal Code 3600(B)(4)

18   contains no prohibition on transfers of death row prisoners

19   for inpatient psychiatric hospitalization.

20         In fact, it expressly permits transfers for medical

21   mental health treatment.  And CDCR uses that provision to

22   send death row prisoners to Marin General Hospital,

23   University of California of San Francisco for medical

24   treatment.  They even send them to Corcoran prison for

25   rehabilitation services and medical care in the Corcoran

25

1   hospital.  But they will not send death row prisoners to the

2   ICF inpatient psychiatric hospitalization programs.

3          The Special Master, Your Honor, has worked tirelessly

4   with the defendants for more than three years to address this

5   dangerous deficiency without the need for a court order.

6          We explored -- the Special Master explored with the

7   defendants the idea of opening an ICF unit at San Quentin or

8   dedicating a wing of an ICF prison in CMF for this purpose.

9          To this day defendants have been unable or unwilling

10  to commit to any solution whatsoever to this problem.

11  Avoidable pain, suffering and even death has resulted in the

12  interim.

13         Suicides on death row continue at an extraordinary

14  high rate that is not improving despite defendants' claim

15  they have a fully implemented, robust psychiatric program for

16  death row male prisoners.

17         Four men have committed suicide on death row in the

18  past two years alone.  The rate of suicide on San Quentin's

19  death row is almost ten times the already high rate of

20  suicide in CDCR.

21         Could you put the chart up?

22         Your Honor, on your screen is a chart that compared

23  suicide rates -- Is it up?

24         THE COURT:  No.

25         MR. BIEN:  I'll just talk about it.

26

1          THE COURT:  Go ahead.

2          You folks have consulted with Andre about how to work

3     the equipment?

4          MR. BIEN:  Yes.

5          THE COURT:  It is not up.  What can I tell you.

6          MR. BIEN:  We'll get to it later on.

7          The fact is that the overall suicide rate for CDCR,

8     as Your Honor knows from the most recent Special Master

9     report, is 21 per 100,000.  That compares with the national

10    rate of 16 per 100,000.  In other words, we're still not

11    doing very well for all CDCR patients.

12         But on death row, over the last five years, we have

13    calculated the rate as 206 per 100,000.  Almost ten times --

14    between nine and ten times the rate of the rest of the CDCR

15    population.

16         We also will introduce evidence about a study of

17    death row suicides nationally.  Death rows do have a higher

18    suicide rate than other parts of prison populations, but the

19    national rate in this published study is 113 per 100,000.  So

20    again we're way, way over in that department.

21         I'm sad to report there has already been at least one

22    suicide on death row in 2013, as well as one other death

23    where the cause has yet to be determined.  There have been at

24    least one or two suicides on death row every single year

25    since 2006.

1          Dr. Pablo Stewart will testify about the seriously

2     mentally ill men he evaluated on death row at San Quentin and

3     their need for inpatient psychiatric hospitalization.

4          He will also testify about a March 2013 suicide, the

5     one I just spoke about, that likely would have been prevented

6     if appropriate access to inpatient psychiatric

7     hospitalization was permitted.

8          Dr. Stewart will also discuss the undue custodial

9     restrictions on acute care at CMF and the interference with

10    mental health treatment that results.

11         Jeannie Woodford, the former warden of San Quentin,

12    more familiar with that program than anyone, will testify

13    about the security needs of the death row population and why

14    current blanket CDCR restrictions on access to inpatient

15    psychiatric hospitalization are excessive and unnecessary.

16         There are numerous workable options for ICF care for

17    death row and no legitimate or appropriate reason to deny

18    this life saving treatment to this group of men.

19         Dr. Stewart and Miss Woodford will testify that

20    custodial and mental health staff at San Quentin appear to

21    tolerate a high level of psychiatric dysfunction on death

22    row.

23         Referrals for phychiatric evaluation and for higher

24    levels of care are simply not made, even for prisoners who

25    rarely leave their cells even for showers or yard.

28

1          We request that this court order defendants to

2     promptly open a licensed ICF program for the seriously

3     mentally ill men on death row that meets the same standards

4     of ICF care as any other program.

5          We request that the court order the Special Master to

6     investigate the extreme and unnecessary security restrictions

7     imposed on mental healthcare in the APP program, the acute

8     program at CMF, and make recommendations about how those can

9     be solved.

10          We also request that the court order a one-time sweep

11     of death row under the supervision of the Special Master to

12     identify prisoners who should be on the mental health

13     caseload, or if on the caseload, require a higher level of

14     care, including those wrongfully denied ICF care.

15          Death row's harsh conditions are already extremely

16     dangerous for prisoners with mental illness.  Compounding the

17     danger by deliberately denying access to inpatient

18     psychiatric hospitalization is unconscionable.  The State

19     must be ordered to remove the sham and artificial barrier

20     that they have themselves erected that denies any access to

21     this program for these death row prisoners.

22          The Eighth Amendment requires the governor and the

23     state government to provide minimally adequate mental

24     healthcare, even to those persons we've sentenced to death.

25          Depriving seriously mentally ill prisoners on death

29

1  row to access to inpatient psychiatric care is below the

2  standards of our society.

3          I will now turn the podium over to my cocounsel,

4  Jeffrey Bornstein of K&L Gates, to address the use of force

5  and disciplinary issues.

6          MR. BORNSTEIN:  With the court's permission I would

7  like to stand over here, and also I'm going to have a couple

8  of charts.

9              (Brief pause.)

10         Your Honor, the use of force and the disciplinary

11 part of this case is based on the following truism, that CDCR

12 punishes people because of their mental illness, it uses

13 force in great amounts, it uses a punitive disciplinary

14 policy and practice to increase their stays, it puts them in

15 isolation units, whether it is Ad. Seg. or SHU terms because

16 of their illness.  And that is wrong, it is unconstitutional,

17 and it is systemic, and it needs to be stopped.

18         That's what we're here for, to ask you to order CDCR

19 to change that system because without your order they refuse

20 to do it, if, for no other reason, than they don't even

21 recognize that the problem exists.

22         The defense expert, not the plaintiffs' expert, the

23 defense expert, who is actually in court today, Mr. Martin,

24 has explained what he calls the "perfect storm."

25         The perfect storm is what he says is now existing in

30

1    California in the way in which they treat mentally ill

2    inmates and patients.

3          What he said was where you have inmates who are put

4    in highly restricted environments, with limited programming,

5    they're likely to decompose.  And that leads to three

6    consequences.

7          One, there will be serious disciplinary problems with

8    those inmates.  Second, they will be then placed in highly

9    restricted environments as a result of those disciplinary

10   problems.  And, of course, force will be used against them

11   because of those disciplinary problems.

12         That is what he calls the perfect storm for mentally

13   ill inmates.  That's what we're dealing with.

14         So what the evidence will show in this case --

15         (Brief pause.  Microphone issue.)

16         What the evidence will show in this case, and it will

17   be both from the videos -- I'll talk from here -- but what it

18   will show in this case, Your Honor, is there are graphic

19   videos that we're going to show that will demonstrate the

20   abuse of force by the State of California against mentally

21   ill people.

22         And these include people where force is being used

23   against them because they are out of touch with reality, they

24   need medication, maybe they're on Keyhea orders where they're

25   involuntarily medicated, and the State goes in and uses force

31

1   against them so they can be given a shot.

2        Or there are people that are in mental healthcare

3   crisis beds, and they're pacing because, again, they are

4   not -- they're out of touch with reality.  And the same

5   thing, they are refusing medication so the State goes in and

6   has to use force against them.

7        Or people are decomposing while they're in isolation

8   cells.  In one case where their feces is being smeared on the

9   walls or on himself, he clearly is having a breakdown and

10  force is used against him.  And it happens over and over

11  again.

12       And yes, we only have 17 videos of that happening in

13  this case, because that's all the State would provide to us,

14  but that is representative of what is going on in the system.

15       Why?

16       Because in almost every instance where force like

17  that is used, whether it is on video or not, the State of

18  California, through the Institutional Executive Review

19  Committee, approves it and says that this is within policy,

20  this is absolutely correct, what you are doing is reasonable

21  and we don't have a problem with it.

22       So what happens is the inmates are given some sort of

23  an order.  Usually, when it is where they need to be

24  involuntarily medicated, it is:  Turn around.  Put your hands

25  into the food port so we can cuff you up.  Because nobody

32

1    moves in or out of any cell in Ad. Seg. or the SHU or any

2    other highly restricted environment in the State of

3    California unless they're cuffed up and unless they are

4    subject to a strip search, both in and out, even when they go

5    to programming in the unit.  Then force is used.

6         Twenty years ago, when you issued your order

7    initially, it was tasers and block guns was the weapon of

8    choice by the State of California.  Now the weapon of choice

9    are is mass quantities of OC, pepper spray.

10         They will pump that stuff into the cells trying to

11   cause great pain and suffering until the inmate finally gives

12   up.  Sometimes the inmate is so decompensated he can't even

13   try, he can't even begin to comply.  But that's their weapon

14   of choice.

15         Then what happens is any time force is used, pepper

16   spray or anything else, an inmate is charged with obstructing

17   or delaying an officer -- peace officer, and then he is given

18   a formal RVR, Rules Violation Report.

19         Many of the clients, the seriously mentally ill

20   people who are inmates, are entitled to have a mental health

21   assessment that's done.  Even the State's expert, Mr. Martin,

22   has noted that there are huge holes and problems in the way

23   in which mental health forms are being used by the State of

24   California.

25         They're supposed to be taken into consideration by

33

1    the hearing officer.  Did this person's mental state cause

2    the incident, cause the behavior so that you should mitigate

3    the punishment or, you know, mitigate the hearing on the

4    incident, basically divert or find not guilty?

5         Or even if the person is guilty of something, should

6    you mitigate the punishment?

7         And there is no guidance given to hearing officers

8    about how to use these forms or the input from mental health.

9         There is no communication between custody staff on

10   the one hand and mental health staff on the other.  They

11   don't work together as a team.  They don't value the input,

12   custody doesn't, of mental health people in most instances.

13        And in fact, in all of the inspections that our

14   expert was able to do, Mr. Vail, who is the former Secretary

15   of the Department of Corrections in Washington, he will say

16   that mental health people said that we never are even told of

17   the outcome of our input.

18        That's part of the process.

19        What happens?

20        In almost every instance there is loss of good time

21   credit, meaning that someone's stay in prison is extended.

22   There is, in many, many instances, loss of privileges,

23   whether that be yard access, whether it be able to have

24   contact with family, whether it means being able to come out

25   and go to programming.  All of those things are restricted

34

1    once the inmate is back in whatever facility they're in.

2        And then there is a referral to the Institution

3    Classification Committee.  And that is almost -- whose

4    purpose is:  Well, should we put this person in Ad. Seg. or

5    SHU for a term so that we can further ensure that there won't

6    be a problem with this person, again by further restricting

7    them.

8        That then leads to limited programming, limited

9    treatment, and the cycle continues because they're going to

10   further deteriorate.

11       So you've got this -- you've got this circle -- this

12   circle of action and reaction by the State of California

13   where punishment is imposed because of someone's mental

14   illness.

15       There is something also I want to point out to you

16   that has come about during these instructions.  The State

17   chose not to disclose to its own expert, Mr. Martin, that

18   there was something called "management status."

19       And management status is an off-book, unreviewed

20   punishment that varies by institution, but it can be for up

21   to ten days where basically they strip the inmates down to

22   their boxer shorts and take everything else away from them.

23   And that can happen for up to ten days.

24       So they keep their legal papers, if they've got any,

25   and boxer shorts and maybe a blanket, and that's it.  And

35

1   that's only reviewable up to a warden's level.

2       Mr. Stainer, who is the deputy director under the

3   secretary, Mr. Beard, will say that it is not a policy or

4   procedure that is reviewed by anyone in his department.  In

5   other words, it is only up to the discretion of the wardens.

6       So you've got both an informal, unregulated,

7   arbitrary disciplinary policy piled on top of use of force

8   and a formal policy.

9       Now, the State will argue that we've picked out

10  examples.  And probably, although they usually don't agree

11  with us about anything, they'll probably say that even some

12  of these are egregious, although I'm waiting for that

13  admission because I've yet to hear it.

14      We are here to tell you it is not cherry-picking.  It

15  is not that we picked out egregious examples.  We are

16  prepared to show you all of the videos that they've turned

17  over to us, if we are permitted to do so, and there are 17 of

18  them, and we'll play as many as you will allow us to play.

19      That's number one.

20      Number two, if you look at the statistics, you will

21  see the disproportionate impact that the State is having in

22  both its use of force and its disciplinary policies as it

23  relates to mental illness inmates suffering -- inmates with

24  mental illness.

25      I want to digress just for a second.  I want to talk

36

1    about the most recent report by the court's own Special

2    Master, Mr. Lobes, who is here.  He noted in Salinas Valley,

3    the psychiatric program there, that he found things there were

4    so disturbing with respect to the disciplinary practices he

5    observed, even though it was outside the scope of what he was

6    asked to do, that he needed to bring it to the court's

7    attention.  And he did.

8        And if you look in his report that was filed on

9    September 24th, at pages 37 through 39, he starts to detail

10   some of the things that he found.  And one patient he refers

11   to as Patient S was someone who was decompensating, who asked

12   for a time out because he felt he might be suicidal.

13       He's in a very high level of care, almost like their

14   version of a hospital setting.  He asked for a time out

15   because he felt suicidal.  And he had a weapon that he

16   voluntarily surrendered.

17       He was then put in a holding cell, and he received

18   three RVR violations, Rules Violation Reports, in one day for

19   first, having the weapon and feeling suicidal, two, while he

20   was in the cell he gased, threw something or did something

21   that -- I don't know what it was, could have been spitting,

22   could have been any sort of bodily fluid, that he threw it at

23   a staff member, and then the third was he damaged state

24   property because he used his own blood and a beverage that

25   was red to write on the walls of the holding cell he was in.

1          For that he received a disciplinary sanction of loss

2    of 550 day's worth of credit.  They couldn't take away his

3    privileges because by the program that they have in that

4    particular facility for those particularly highly, seriously

5    mentally ill people, they weren't able to do anything other

6    than that.  So that's what they did.

7          The next day he gets another RVR.  This time he made

8    some threatening comment about the president, and he was

9    referred to the DA for prosecution.  So they didn't do a

10   disciplinary hearing in that case.

11         Then a week later there was another incident that

12   Mr. Lobes reports where, again, he got a RVR for gasing

13   again.  And again, that has yet to be ruled upon because

14   they're waiting for things to play out, I guess, with the

15   district attorney.

16         Why belabor this point?

17         The point is what the State refuses to do is to

18   create the kind of therapeutic working relationship both

19   between the staffing in the prison itself, that would be

20   mental health staff on the one hand and custody staff on the

21   other, and then using that team approach to work with

22   inmates.

23         I want to show you some statistics that I think are

24   extremely telling as to what is going on, and they're the

25   kind of statistics that any responsible director of any

38

1    institution would want to understand better, would want to

2    know why it is this happening.

3        What are we doing?  What is going on that is causing

4    this in our system?  What can we do to prevent it?  Are there

5    things we ought to be doing better or differently than we are

6    doing.

7        These are the kind of questions that are not being

8    asked at CDCR, and that's why we need your help.

9        First, the -- the first chart that I have got here,

10   which is also being displayed, shows the disproportionate,

11   overrepresentation of discipline being dished out to mental

12   health inmates.

13       And you will see that in the top -- the worst are up

14   here at the top.  The Corcoran facility, that deals with

15   substance abuse.  The Kern Valley facility.  Pelican Bay.

16   Los Angeles County.  The California Institute For Women.  All

17   of those, 185 percent of the RVRs, up to 290, almost 291 at

18   the substance abuse facility are directed against inmates

19   with serious mental health.  And of course it is 149 percent

20   at Avenal, and it goes down slightly.

21       But all of those are overrepresented.  The population

22   of mental health inmates in California is roughly 30 percent,

23   and yet the State does not track this information.  It does

24   not report on this information.

25       We had to extrapolate it from what it does.  And as I

39

1    said, most importantly, it doesn't ask the question of what

2    and why.

3            And it is even worse for use of force.  Use of force

4    is horrific in terms of these statistics.  You will see all

5    the red.  All of it.  It shows that in California the amount

6    of force that is being used against inmates because of their

7    serious mental illness is -- at the top, Pelican Bay, almost

8    340 percent of the use of force incidents involve inmates.

9            THE COURT:  Mentally --

10           MR. BORNSTEIN:  Mentally ill inmates.

11           And Mr. Martin has testified under oath that he was

12    so disturbed by what he saw at Pelican Bay.  He said there

13    180 use of force incidents.  And he said that all but six

14    were so-called immediate use of force, meaning that there was

15    no videotape or DVD record of what happened.  It was

16    immediate, and he has grave concerns about that.

17           You can see the statistics here.

18           You can look at Sierra Conservation Center, 330.

19    California Men's Colony 289.  Again, the California

20    Institution For Women at 274 almost.  North Kern, 245

21    percent.

22           It is shocking.

23           And you say to yourself:  Well, there's all these

24    numbers, all these statistics, all these reports.  Why isn't

25    someone asking the question of why?

40

1          And Mr. Vail will tell you as an administrator of a

2    system that reduced its violence against staff and violence

3    against inmates involving the mentally ill, he will tell you

4    there are programs, he will tell you there are ways that you

5    can do this safely that California has deliberately chosen

6    not to explore or to use in its prisons.

7          So what do we do about it?

8          We're asking -- we're asking you for five things.

9          (Document published.)

10         THE COURT:  It's on.

11         MR. BORNSTEIN:  All right.

12         We're asking you first to -- I know the Special

13   Master has a lot on his plate, but we're asking you to

14   empower him to get his own use of force experts, his own

15   people that he can rely upon so that he can give you a

16   systemwide report on what is going on in the State of

17   California and importantly why.

18         Secondly, we are asking that you revise or cause the

19   State to revise its use of force policies and procedures for

20   Coleman class members, for mentally ill inmates so that

21   current restrictions that exist are going to be -- should be

22   enforced so they just can't use immediate force for little

23   things like having your hands in a food port and some of the

24   other things they are doing.

25         We're asking you to prohibit or restrict the use of

41

1    pepper spray, the way they are doing it against mentally ill

2    inmates.

3            We're asking you to basically cause them to look at

4    the way they arm their guards.  They have more armaments and

5    their guards are more heavily armed than any institution in

6    the United States.

7            And we're asking you to prohibit the way in which

8    they use crowd control, not personal control, crowd control

9    quantities of pepper spray in the cells, which is what they

10   do now.

11           There needs to be other kinds of revisions as well

12   that we're going to talk about.

13           With respect to the disciplinary process, we are

14   asking that there be specific changes in those procedures so

15   that instead of just checking the box there's meaningful

16   input from mental health professionals before discipline is

17   imposed.

18           Is the reason that this inmate is acting out because

19   of their mental illness?

20           Are there things we could do programmatically to try

21   and deal with that behavior?

22           Can we build a therapeutic relationship with this

23   person through programming and other things that will give us

24   the desired change in behavior or do we have to be punitive.

25   Things like that.

42

1          We're also talking about meaningful tracking and

2    meaningful investigations.  Again, the State's own expert,

3    Mr. Martin, has told the State:  You guys need to do a better

4    job of investigating use of force incidents, certainly those

5    involving class members, because your current system is not

6    getting at the heart of what is going on in this system.  And

7    they refuse to listen to him.

8          The next thing we're talking about is increasing

9    training.  And we're not just talking about, you know, a sort

10   of roll out a two-hour block.  But we are talking about real

11   training where they really are committed to trying to work

12   together with their own internal staffs to build the kind of

13   teamwork that they need, especially when dealing with

14   mentally ill inmates.

15         And finally we are asking you to order them to end

16   the unregulated status -- or mental management status system

17   of discipline that they are using.  It is unfair.  It is

18   arbitrary.  It creates more problems than it solves.

19         We're asking you to do these things to stop the State

20   from continuing to torture people with mental illness because

21   of their illness.

22         Thank you.

23         THE COURT:  I assume, but don't know, that the

24   defendants wish to make an opening statement as well.

25         Is that correct?

43

1              MS. VOROUS:  Yes, Your Honor.  That's correct.

2              THE COURT:  We'll take our recess at this time.

3      We'll reconvene at 1:10.

4              (Off the record at 11:50 a.m.)

5                          ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 SACRAMENTO, CALIFORNIA

 2              TUESDAY, OCTOBER 1, 2013; 1:15 P.M.

 3                      ---O0o---

 4

 5         THE COURT:  Does defense wish to present an opening

 6    statement?

 7         MS. VOROUS:  Good afternoon, Your Honor.

 8         I will be presenting the opening statement with

 9    request to the San Quentin condemned aspect of the hearing,

10    and my colleague, Mr. McKinney, will be presenting the

11    opening statement with respect to force and use of force

12    process.

13         In plaintiffs' opening statement, plaintiffs made

14    three requests to the court:

15         First, that the court order defendants essentially to

16    transfer condemned inmates to a licensed ICF program.

17         Second, that there be a one time sweep of EOP

18    condemned inmates for a referral to ICF care.

19         And the third request with respect to the acute

20    program at the Vacaville psychiatric program.

21         With respect to the first two requests, the evidence

22    will establish why the court should --

23         THE COURT:  I'm having trouble hearing you.  Would

24    you -- pull it up, I think.

25         That's better.
```

1          MS. VOROUS:  With respect to the first two requests,

2    the evidence presented during the course of the evidentiary

3    hearing will establish why the court should deny the request.

4          As to the third request which relates to the inpatient

5    DSH program for the condemned, the court should disregard it

6    for the reason it was not properly noticed, and, therefore,

7    is outside the scope of this hearing.  This hearing involves

8    a very discrete issue, which is the appropriate treatment for

9    condemned inmates under the specialized care program.

10         With respect to plaintiffs' assertions that defendants

11   are improperly refusing to transfer condemned inmates for ICF

12   care, the evidence will not show reckless indifference on the

13   part of prison officials as the plaintiffs argue.  Instead,

14   what the evidence will show is that the condemned inmates at

15   San Quentin have ready access to adequate mental health care,

16   including mental health crisis care and acute inpatient care

17   at the Vacaville psychiatric program.

18         This evidence, which has been presented in the

19   declarations filed in opposition to plaintiffs' motion that

20   will be supplemented through the course of this hearing by

21   Dr. Monthei, Chief Mental Health -- excuse me -- at San

22   Quentin is first.

23         CDCR has built a program specially designed to meet

24   the unique needs of condemned inmates by providing for their

25   care near their home, within their community, which is the

1    condemned unit.

2        Second, that inmates have reasonably prompt access to

3    sufficient numbers of staff positions that are designated to

4    provide services under the specialized care program, whether

5    that's in the condemned unit itself East Block or through the

6    use of ten designated outpatient beds that have been made

7    available by the received to the mental health program.  This

8    program has been approved and does offer services better in

9    excess of EOP care.

10        Third, the staff has superior knowledge, experience

11    and training concerning these inmates, some who have been in

12    their care for years and perhaps decades.

13        Fourth, what you'll hear is the San Quentin staff

14    believe that providing care to this unique class of inmates

15    near their home in the condemned unit and through this

16    specialized care plan is clinically indicated, but when

17    appropriate, they do refer them to a mental health crisis bed

18    placement or the Department of State Hospitals Acute Care

19    Program.

20        Fifth, the program has accountability and oversight.

21        Last, in response to the potential testimony from Dr.

22    Stewart, defendants expect that additional testimony from San

23    Quentin's treating clinicians will not only highlight the

24    success of the program but also the treatment of the seven

25    inmates that Dr. Stewart -- we expect Dr. Stewart to discuss

1   in particular.  This testimony will show that the state's

2   conduct is anything but deliberately indifferent.

3        The evidence will further show that defendants have

4   not instituted a non-justified policy of categorically

5   denying or prohibiting death row inmates from transferring

6   from San Quentin to ICF care.  There are no policies,

7   procedures or agreements that prohibit transfer to ICF care.

8        The Penal Code Section 3600, contrary to plaintiffs'

9   assertion is not a sham.  As defendants have presented in

10  their opposition papers, the plain reading of the statute

11  supports defendants' interpretation that the statute

12  authorizes transfer for acute care, but not for intermediate

13  long term care of those inmates that have chronic mental

14  illness.

15       The suicides that the plaintiffs raise in their

16  opening statements do not implicate the adequacy of services

17  provided under the specialized care program.  The suicide

18  rates that were cited by the plaintiffs in their opening

19  statement are misleading.

20       You have a population of approximately 700 inmates in

21  the condemned program and comparing that to other statistics

22  and using a rate of 100,000 inmates is not an appropriate

23  reflection of the number of suicides that occur.

24       More importantly, as will be explored during the

25  course of this trial and as the evidence will show, the more

1    recent suicides did not result in any quality improvement

2    recommendations by the department with respect to that

3    suicide.  That's extremely important given the court's --

4    excuse me.

5         It's extremely important given the fact that in the

6    past, as the court well knows, CDCR reviewers have been

7    extremely critical of suicides, and, for the most part, do

8    make recommendations with respect to quality improvements.

9    In this particular case, there were no recommendations.

10        In addition, the suicides that the plaintiffs will

11   present evidence on, do not implicate specialized care.  The

12   evidence will show, that at least with respect to the last

13   two suicides, neither of the inmates were in the specialized

14   care program.

15        In other words, there will be no evidence of

16   causation; that the care that was provided to the inmates

17   that were -- excuse me -- that are -- that the care provided

18   to the inmates with respect to the suicides that the

19   plaintiffs intend to present evidence on is not related to

20   care that was provided under the specialized care program.

21        This new evidence which is raised now relates to the

22   San Quentin Mental Health Program as a whole, but it is not

23   evidence relating to plaintiffs' claims that defendants are

24   refusing to transfer condemned inmates to DHS for inpatient

25   care.

1     Regardless, defendants expect testimony from the

2     treating psychiatrist at San Quentin will establish that the

3     care provided to these particular inmates was appropriate.

4          With regard to plaintiffs' second request that

5     defendants, under the supervision of the Special Master,

6     evaluate each condemned EOP class member to determine if

7     transfer to ICF care is appropriate, the evidence again will

8     show the inmates in the specialized care program are being

9     referred to a mental health crisis bed or acute care when

10    appropriate.

11         Further, as outlined in the declarations provided by

12    by Dr. Monthei in opposition to plaintiffs' motion, inmates

13    are receiving care and review on an ongoing basis, so there

14    is no further need for this type of increased review.

15         The last request and the new request that the Special

16    Master be directed to investigate and monitor the acute

17    programs for the condemned at Vacaville Psychiatric Program

18    confuses the issue.  And, again, this is not an issue that

19    was brought as part of plaintiffs' moving papers, and we

20    would urge that the court not consider the evidence

21    throughout the hearing with respect to that care.

22         Similarly, the other arguments that plaintiffs made

23    with respect to increase in inmates, the number of inmates on

24    death row, the plans to build a condemned unit that were

25    taken -- changed and this unit will no longer be built, the

 1    limited access to acute beds, overcrowding and how the

 2    condemned program overall is operating are simply red

 3    herrings for this hearing.

 4         The focus of this court should be on whether or not

 5    the evidence presented with respect to the condemned inmates

 6    at San Quentin have ready access to mental healthcare and

 7    whether the care provided in the specialized care program is

 8    appropriate to their mental health needs.

 9         There are no artificial barriers to treatment.  The

10    Eighth Amendment requires that defendants provide appropriate

11    care, but not a particular level of care.  There is no

12    constitutional requirement that the state provide

13    intermediate care to condemned inmates.  The state is

14    required to provide constitutionally appropriate care,

15    including inpatient care, which they did.

16         Thus, we believe at end of this hearing, the court

17    will conclude that no further orders related to the San

18    Quentin condemned population are necessary or appropriate.

19         Thank you.

20         MR. MCKINNEY:  Your Honor, good afternoon.

21         While plaintiffs' opening statement was full of

22    argument and exaggeration, they simply do not have the facts

23    to justify the relief they seek in this case.

24         To carry their burden on their use of force motion, we

25    all need to keep in mind that the issues were framed by their

MICHELLE L. BABBITT, OFFICIAL COURT REPORTER -- (916)  448-7938 USDC

1    motion in this case, plaintiffs must demonstrate there's a

2    pattern and practice of unnecessary or excessive force used

3    by staff against CDCR inmates with serious mental illness.

4         The court inquiry there:  Is force applied in good

5    faith effort to maintain or restore discipline?  Or is force

6    is applied maliciously and sadistically to cause harm?

7         Plaintiffs did not come close to meeting this

8    standard.  Instead, their motion and the relief they seek is

9    a list of best practice recommendations that may improve the

10   system, but there's really no basis for implementing any of

11   those recommendations.

12        In looking at the evidence here, the court really need

13   not go past the plaintiffs' opening motion to find that they

14   did not meet their burden.  There simply is no evidence to

15   support the relief they seek.

16        Out of the hundreds and perhaps over a thousand use of

17   force incidents that the experts for both plaintiffs and

18   defendants looked at, plaintiffs would come forward with a

19   handful of incidents, and many of those incidents don't even

20   support their argument.  In fact, they support the sound

21   correctional practice in use of force.

22        Let's take a look at their evidence.

23        First of all, plaintiffs' expert.  In support of their

24   motion, plaintiffs had one expert, Eldon Vail.  He filed his

25   first report in this case without reviewing the state's use

1    of force policy.  He was unaware of the Madrid decision which

2    resulted in the statewide use of force policy.  He was not

3    aware of the Supreme Court case, Hudson versus McMillian, the

4    seminal case on use of force, and had not even considered

5    that opinion by the time he gave his last deposition in this

6    case.

7         The result of all that is plaintiffs' expert simply

8    did not do a sound review of use of force practices within

9    CDCR.  Most specifically, he never considered the threat or

10   the resistance offered by the inmate which justified or

11   necessitated the use of force.  Instead, he simply looked at

12   the quantity force used in particular cases.

13        Beyond that, Your Honor, Mr. Vail offered to testify

14   against the state without reviewing a single item of

15   evidence.  Once he did look at the evidence, he looked at a

16   tiny amount of that evidence.

17        The plaintiffs are going to lead you down that path

18   again today by asking you to focus on the videos.  What

19   precedes those videos are hours, in many cases, of clinical

20   intervention, cooling-off period attempts to get the inmate

21   to come out of his cell without the use of force which

22   ultimately resulted in the videos which depict the amount of

23   force used.

24        Plaintiffs' experts have focused clearly on the force

25   used and not on the events that led up to the force being

1    used.  Even after hooking at just that small, narrow window

2    of evidence, plaintiffs' expert could not offer the opinion

3    that any officer acted with the intent to inflict harm on an

4    inmate.

5         Second, plaintiffs' motion ignored the statewide use

6    of force policy.  The factual discussion in the motion stops

7    oddly in 2007, which is right at the time that the policies

8    in Madrid came into play.  It was not until the reply, when

9    they submitted a declaration through counsel, that they

10    acknowledged resistance of the statewide use of force policy.

11         Plaintiffs also failed to consider the comprehensive

12    review process that CDCR has for every single use of force

13    incident, including investigations.  Plaintiffs were not

14    aware that Internal Affair investigates cases at the time

15    they filed their motion.  They certainly ignored the

16    oversight by the Inspector General.

17         Looking at the specifics of what they're asking for,

18    plaintiffs failed to establish any systemic violation with

19    respect to pepper spray.  Their motion is limited to pepper

20    spray.  They have made other allegations, but they focused on

21    the use of pepper spray within CDCR.  They also will not be

22    able to prove the current policy does not appropriately limit

23    the use of pepper spray.  Viewed in the best light,

24    plaintiffs seek systemic relief based on a handful of videos.

25         I wanted to address counsel's comments about there

1    being 17 videos.  As an initial matter, when plaintiffs

2    conducted their tours, they had access to the use of force

3    logs, use of force coordinators.  They had virtually

4    unlimited access to the number of videos they wanted to ask

5    for and look at.  They, in fact, asked for 60 videos and

6    reviewed those videos.  Ultimately, they identified 13, which

7    amount to four hours.

8         The magistrate judge asked us to bring another four,

9    which is how we got to 17, but the 13 videos were each

10   selected by the plaintiffs.  They were their choice.  That an

11   undisputed fact.  The fact that -- the idea they were limited

12   to that is false.  There's no truth to that.

13        Six of the cases that the plaintiffs rely on were

14   identified by the state's expert Steve Martin as issues to

15   follow up on when he conducted his site visits relating to

16   the termination motion, depending on how the court comes out

17   on that, plaintiffs may not be able to rely on that evidence

18   at all.

19        However, if they do, these are issues identified by an

20   expert retained by the state, that the state was aware of and

21   that the state was addressing.  To have the plaintiffs use

22   this evidence now in this motion, because the state's own

23   expert had questions about it is really inappropriate.

24        Moreover, in the individual cases that plaintiffs

25   represented, their own evidence demonstrates that careful

1    consideration is given to mental health issues before force

2    is applied.  In each of these videos and accompanying

3    reports, you will see evidence of clinical intervention with

4    the mental health clinician.

5         There is a cooling-off period.  Sometimes that

6    cooling-off period is lengthy.  Plaintiffs own evidence

7    leaves them with no facts to lead to the conclusion of their

8    efforts.

9         Beyond pepper pray, plaintiffs have made allegations

10   representing no evidence with respect to the use of the

11   baton, nor could they.  The Inspector General's most recent

12   report covering the period July through December of 2012,

13   found during that reporting period, there was zero incidents

14   where either a baton or a 40-millimeter launcher was

15   intentionally used against any inmate throughout CDCR.

16        Plaintiffs in their motion had a total of two

17   examples, but contrary to the claims of their expert, one use

18   was a stop and assault on an officer and the other was to

19   break up an inmate-on-inmate assault.  There is simply no

20   evidence regarding a baton or a 37-millimeter or 40-milimeter

21   launcher, and the court should simply deny any request

22   related toed those methods.

23        Similarly, plaintiffs do not present a single example

24   involving rifles or tear gas.  We addressed the subpoena

25   yesterday.  The department has brought the photos, as the

1    court requested, but, again, we believe it's objectionable

2    because there is absolutely no allegation regarding rifles,

3    launchers, tear gas, and in many of the categories they

4    requested, there's simply no evidence whatsoever to support a

5    claim for those items.

6          Plaintiffs have also presented no evidence that

7    officers used force for the purpose of causing harm to an

8    inmate.  In paragraph 14 of his reply declaration, Mr. Vail

9    conceded he not offer such an opinion.  Based on that,

10   plaintiffs are not able to state a claim.

11         Under Hudson, there is certainly no evidence that

12   force is used maliciously and sadistically.  Even if the

13   court applies a deliberate indifference standard here,

14   there's no evidence to support that claim either.  You'll see

15   this in the videos.  The videos demonstrate that officers

16   sought to remove inmates from their cells to conduct mental

17   health assessments, to move an inmate to a different housing

18   unit because they needed mental healthcare or to medicate an

19   inmate.

20         In each of these cases, the inmate refused the lawful

21   order to come out of his cell which necessitated,

22   unfortunately, the use of force, but this is the very

23   opposite of deliberate indifference.

24         Looking at defendants' evidence, defendants have

25   already submitted evidence of a comprehensive system

 1    governing use of force.  The evidence presented includes the

 2    comprehensive statewide use of force policy which resulted

 3    from the Madrid case.  Plaintiffs' counsel has relied fairly

 4    heavily on Mr. Martin in his testimony.  Mr. Martin is here

 5    and will testify, unfortunately not for a few weeks, due to

 6    availability, but Mr. Martin was a plaintiffs' expert in

 7    Madrid.

 8         As he testified in deposition, he continued to work

 9    with plaintiffs after the Madrid case on certain issues.  In

10    this case, Mr. Martin's opinion was that there was no pattern

11    of practice of unnecessary or excessive force against inmates

12    with mental illness within CDCR.  The fact that plaintiffs

13    are relying on his best practice recommendations, wholly

14    ignores Mr. Martin's opinions in this case.

15         With respect to the policy, the policy includes

16    heighten safeguards before force is used against inmates with

17    mental illness.  There's verbal persuasion, a cooling-off

18    period.  There's clinical intervention throughout the

19    process.  As I mentioned earlier, the videos and the

20    accompanying reports will demonstrate that that policy is

21    followed.

22         The policy includes mandatory reporting requirements

23    for use of force incidents and discipline for failure to

24    report.  CDCR internally reviews every use of force incident

25    through a multi-tiered process.  While there may be issues

1    with certain incidents, every single incident is reviewed

2    by -- up through Incident Commander, through three levels of

3    review, up to the committee, which includes the warden or

4    warden's designee.  So each incident, whether it involves an

5    inmate with mental illness or not, is reviewed extensively

6    throughout the system.

7         We put forward evidence of training on the use of

8    force issues and recognizing signs of mental illness.  That's

9    before the court.  There's a robust investigation process

10   that results in a variety of forms of discipline, training,

11   corrective action and formal action, up to and including

12   termination.  There is evidence of completed investigations

13   resulting in termination of staff resulting from use of

14   force.

15        Finally, on that, there's independent oversight and

16   public reporting by the Office of the Inspector General.

17   They issue semi-annual reports.  Twice each year they issue

18   reports on use of force, and that is made available to the

19   public.

20        Plaintiffs have made something of there being a shift.

21   CDCR long ago prohibited use of tasers and 37-millimeter

22   launchers, so there's no simply no evidence of that, which

23   the basis for the court's order back in the nineties.  Those

24   are removed from the system.

25        While they try to argue that the state has simply

 1    replaced that, the evidence does not back it up, Your Honor.

 2    There's simply no pattern and practice of unnecessary or

 3    excessive force in CDCR against the mentally ill.

 4         With respect to management status, the evidence is

 5    already in front of the court.  The declaration of

 6    Mr. Michael Stainer, and, in particular, this is the

 7    declaration submitted in July, at paragraph 26 and forward,

 8    Mr. Stainer explains management status and points out that

 9    plaintiffs' allegations regarding management status are not

10    based in fact.  The plaintiffs simply repeat those

11    allegations here, and despite the evidence that has already

12    been submitted, makes it no more true.

13         We talked about the evidence submitted with the

14    motion.  After we submitted our opposition, plaintiffs

15    scrambled to find a second expert.  They chose Dr. Kaufman, a

16    psychiatrist who has worked with them earlier during the

17    termination proceedings, although he told plaintiffs'

18    counsel, "I am not an expert at all in use of force."

19         On that basis alone, the court should not consider Dr.

20    Kaufman's opinions on use of force.  The court should also

21    not consider these opinions since they were submitted with

22    the reply and plaintiffs did not carry their initial burden.

23         Dr. Kaufman purports to offer systemic opinions, but,

24    as he testified at deposition, he did not review the

25    statewide use of force policy.  He watch a total of four use

1    of force videos.  Like plaintiffs' other expert, he did not

2    review the underlying reports.  He interviewed two inmates.

3    He reviewed a handful of medical records.  That is the sum

4    total of what Dr. Kaufman looked at that he purports to offer

5    systemic opinions to support plaintiffs' motion.

6         It is defendants' position that Dr. Kaufman's

7    testimony should be excluded, Your Honor.

8         If the court does consider it, defendants intend to

9    offer evidence from the clinicians who treated the patients

10   Dr. Kaufman based his opinions upon to disprove his opinions

11   and show that CDCR clinicians have therapeutic alliances with

12   the inmates that Dr. Kaufman spoke of.  The inmates were

13   engaged with those clinicians in a robust treatment program,

14   and the use of pepper spray on those inmates did not cause

15   long-term psychological harm.

16        During plaintiffs' opening, counsel spoke of an inmate

17   at the Salinas Valley Psychiatric Program.  Of course that

18   motion was decided, and the use of force issues within DSH

19   have not been addressed by plaintiffs' motion that referenced

20   a patient as simply irrelevant to the issues which the court

21   is being asked to decide here today.

22        With respect to the statistics that plaintiffs have

23   created, it's unclear where those came from.  They didn't

24   identify it.

25        With respect to use of force, it's been pointed out in

1    the evidence, it's in the record that plaintiffs have simply

2    made the incorrect assumption that force was used against a

3    mentally inmate in each of the instances they identified.

4        What those statistics show is that a mentally ill

5    inmate was involved in that particular use of force incident.

6    That inmate could have been a victim and would still have

7    been counted in that count as though he were the aggressor,

8    even though force is not used against that particular inmate.

9    The statistics are simply misleading.

10       Quickly, with respect to the disciplinary process,

11   Your Honor, the evidence before the court demonstrates that

12   the state appropriately considers and accommodates mental

13   health in the disciplinary process.  That the process for

14   completing mental health assessments before the hearings is a

15   result of agreements between the defendants and the

16   plaintiffs, and it was approved by the Special Master in the

17   23rd monitoring report.  Plaintiffs fail to mention this fact

18   in their motion.

19       CDCR hearing officers consider the clinician's

20   assessments when appropriate and mitigate sanctions when

21   appropriate.  Plaintiffs presented no evidence to the

22   contrary.  What their evidence actually shows is the

23   effectiveness of the process.

24       Plaintiffs presented a total of six cases to support

25   their relief on the rules violation process.  Of those six,

1    no penalty was imposed in three of the cases.  In the other

2    three, the hearing officer affirmatively considered the

3    inmate's mental health condition and mitigated the penalty.

4    That's what the evidence will show.

5          These cases demonstrate amply that staff consider and

6    accommodate mental health conditions in the disciplinary

7    process, and plaintiffs have failed to carry their burden to

8    show otherwise.

9          With respect to the statistics they offered, the

10   evidence in the record from the declaration of Kathy Allison

11   shows that inmates with serious mental illness receive 29

12   percent of rules violation reports and comprise 27 percent of

13   the population.

14         Again, it's not clear where those statistics came

15   from, but the evidence currently in the record is to the

16   contrary.

17         In short, there's no basis for this court to make any

18   additional orders with respect to use of force or the rules

19   violation process.  Plaintiffs represented no evidence of an

20   ongoing constitution violation, and the evidence they did

21   present, reflects the state systems are working.

22         The state system is reasonable and plaintiffs' motion

23   raises a dispute over whether there might be arguably be

24   superior alternatives, and I submit to the court, that is not

25   an issue for the court to decide, but should be decided by

 1    CDCR and the officials responsible for managing the state's

 2    correctional system.

 3              Thank you, Your Honor.

 4              MR. BORNSTEIN:  May we proceed?

 5              THE COURT:  Yes.

 6              MR. BORNSTEIN:  Plaintiffs call Eldon Vail to the

 7    stand, please.

 8                          ELDON VAIL

 9    called as a witness on behalf of the plaintiffs herein, was

10    sworn, examined, and testified as follows:

11              THE CLERK:  You do solemnly swear that the testimony

12    you are about to give to this Court in this proceeding is the

13    truth, the whole truth and nothing but the truth, so help you

14    God?

15              THE WITNESS:  I do.

16              THE CLERK:  State your name, spell your last name, and

17    speak directly into the microphone, please.

18              THE WITNESS:  Eldon Vail, V-A-I-L.

19                      VOIR DIRE EXAMINATION

20    BY MR. BORNSTEIN:

21    Q.    Mr. Vail, where do you live?

22    A.    In Olympia, Washington.

23    Q.    What do you do for a living?

24    A.    Some correctional consulting and expert witness work.

25    Q.    I'm going to show you what's been pre-marked as

 1    Exhibit 96 for identification.

 2            If I may, Your Honor?

 3            THE COURT:  Yes.  May I inquire, my courtroom deputy

 4    has indicated you intend, if they're moved into evidence, to

 5    put them on the screen?

 6            MR. BORNSTEIN:  I will, yes, Your Honor.

 7            THE COURT:  You may proceed.

 8            MR. BORNSTEIN:  Thank you.

 9    Q.    Do you recognize Exhibit 96?

10    A.    I do.

11    Q.    What do you recognize it to be?

12    A.    My current resume.

13            MR. BORNSTEIN:  Your Honor, I move Exhibit 96 into

14    evidence.

15            THE COURT:  Received.

16                        (Whereupon, Plaintiffs' Exhibit 96 was

17                        received into evidence.)

18    BY MR. BORNSTEIN:

19    Q.    I'd like to go over your background please, Mr. Vail.

20    A.    Okay.

21    Q.    I'd like you to describe for the court the work that

22    you've done in connection with corrections and correction

23    departments?

24    A.    The whole thing?

25    Q.    You can give us an overview, and we'll get more

1    specific.

2    A.      I started out working in juvenile prison, basic role

3    was correctional officer, but we all had college degrees, and

4    we also did case work with a small case load, four to six.  I

5    did that for about five years.

6          I was promoted to a supervisor, and then that facility

7    that I was in changed to an adult facility at Cedar Creek

8    Corrections Center.  I was a correctional unit supervisor

9    there for several years.

10          I had a brief stint working in juvenile parole,

11    primarily sex offenders in Tacoma, Washington, and then came

12    back to Cedar Creek in an adult facility in what's called in

13    the State of Washington, Correctional Program Manager, which

14    is number II in that facility.

15          During that period of time, I had a number of

16    rotational assignments as an associate superintendent and

17    prerelease supervisor, and then I was the superintendent

18    there for about six months and then moved to Washington

19    Corrections Center as a Correctional Program Manager, which

20    is the state's only reception center for males in the State

21    of Washington.

22          In that role, I was responsible for classifying folks

23    to different institutions throughout the state.  It was also

24    a 1,200 bed medium and level III and level VI, in California

25    parlance, a facility on the grounds there, and I was

1    responsible for the classification and case work and the

2    operation of those units.

3        There was also what's called in Washington an

4    Intensive Management Unit, an IMU.  The equivalent in SHU

5    here California, and I was responsible for the discipline

6    process and the classification process in that unit.

7        From there I was promoted to superintendent of the

8    state's only women's prison and did that for about three

9    years, a little shy of three years.

10        From there to McNeil, another approximately three-year

11   period.  And from there I was promoted to Assistant Director

12   of Prisons.  I had four and later five facilities under my

13   supervision plus some subject matter areas that I was

14   responsible for.

15        For a couple years after that, I was Assistant Deputy

16   Secretary, responsible for operation of all the prisons in

17   the community corrections division, and a seven-year stint

18   working for --

19        From '99 to 2006, I was Joe Lehman's deputy secretary

20   responsible for the operation of prisons and community

21   corrections in the State of Washington, Chief Operating

22   Officer.  I retired for about 18 months, and the governor at

23   the time asked me to come back, and I came back as secretary

24   for about four years.

25   Q.    So the secretary then being the overall head of the

1    Department of Corrections in the State of Washington?

2    A.    That's true.

3    Q.    I want to talk a little bit about some of the specific

4    work experience you have had in corrections.  You mentioned

5    working at McNeil Island Correction Center.

6         Can you tell us, please, whether in that role you had

7    any responsibility for or focus on inmates that were mentally

8    ill?

9    A.    I went to McNeil after it had been a state facility

10   for about 12 years.  At the time, by direction from my

11   supervisors -- Jim Spaulding was the Prison Director and

12   Chase Liberman was the secretary -- it was the fix-it

13   assignment.  There were lots of things broken on that island.

14        It was dominated by an old-style cell house.  The

15   blueprints of Alcatraz were actually based on the footprint

16   that was previously built at McNeil, and my overall job there

17   was to transform the culture at that institution, including

18   constructing new direct supervision living units and knocking

19   that old cell house down.

20        At the time, this is about '92, '93, like other

21   jurisdictions, we saw influx of mentally ill into the prison

22   system, and the folks I worked for paid a lot of attention to

23   what was going on in the court's, being part of the Ninth

24   Circuit, they were aware certainly aware of Coleman after it

25   was filed.

1          And so they asked me to take one of those living units

2    and work with people or staff from the University of

3    Washington and design a new living unit, two living units for

4    the mentally ill on McNeil Island.

5          At the time for men, we only had 144 beds devoted to

6    mentally ill, and to try to not go too far afield, some of

7    those were being swallowed by the civil commitment process

8    for sex offenders, but we were losing beds for the mentally

9    ill at the time we were receiving more and more.  So I was

10   asked to work with the University of Washington to set up a

11   program on McNeil, which is what we did.

12         There is a natural and constant tension between

13   custody staff and mental health staff that in my opinion and

14   experience needs to be confronted and managed in a way that

15   allows for improved treatment for the mentally ill, and

16   structurally, when we designed McNeil, we kept that in the

17   forefront of our minds.

18         We did not have correctional officers work the floor

19   of that unit.  We created a new job category called

20   correctional mental health counselor, and we hired them new

21   into those positions.  Those are the basic custody folks that

22   worked the floor.  About two-thirds of them had actually been

23   correctional officers and about a third were hired from the

24   streets.

25         More importantly, I think, the folks who ran that

1    unit, we also sought to have a blend of backgrounds of those

2    who were mental health professionals and those who had come

3    up on the custody chain of command but had mutual respect for

4    one another.

5         And so having that kind of leadership, having the

6    collaboration with the outside agency that was informing how

7    we created the program, that's precisely what we did.  McNeil

8    was a level III facility in California parlance, but we

9    overroad those folks that would have been level VI into this

10   treatment program in order to give them the opportunity to

11   receive quality mental health treatment.

12        There's two units there.  I think I previously said

13   that.  The other unit was, in fact, a maximum security unit.

14   I had a SHU as part of my prison and we weren't filling it

15   up, so we took one-third of that and devoted that to the

16   program as well.

17        Our initial plan was to bring people into that maximum

18   security environment to get them stabilized, do an

19   assessment, and then put them out into the medium security

20   unit.  We found most often that wasn't necessary.  We could

21   take them into the medium and do the assessment there.  But

22   in those cases where people did decompensate, over

23   stimulated, needed to get their medication stabilized, we

24   would occasionally move them back to the max unit for short

25   periods of time.

1          The treatment that was provided there was by

2    psychiatrist, psychologist, but also the correctional mental

3    health counselors.  They ran a lot of groups on the floor.

4    This was a very open program.  These inmates moved throughout

5    the facility.

6          The goal was to give them treatment, reduce their

7    symptoms, and get them out into the mainstream population on

8    the assumption that the most frequently and successfully you

9    can do that, the better you will improve the community

10   safety.  They need to be able to function in a larger

11   society, and in prison, that's a general population unit.

12         So the University of Washington, along with providing

13   lots of technical expertise in designing the program and in

14   helping us train our staff, also studied the outcomes.  There

15   are variety of studies that have been published from our

16   experience in that program.

17         I think I attached one to the first declaration I

18   wrote in this case that confirms that we achieved our goals,

19   reduced symptoms, reduced infractions, better behavior.

20   Q.    As you moved on from the mid-nineties from McNeil

21   Island into other positions in the State of Washington

22   Department of Corrections, were you able to replicate that

23   program or aspects of that program in other institutions in

24   the State of Washington?

25   A.    In a sense, yes.  I'll try to explain that.  When I

1    was assistant director, the mentally ill inmates keep coming

2    and so we had to expand our base of beds available for those

3    folks that needed significant treatment.  So the 144 bed

4    facility that I talked about that was solely what we had

5    before McNeil, we got money to expand that to 400.

6         I was in the middle of designing that program, had

7    quite a fight internally.  That unit, that 144-bed unit, had

8    been built very secure.  The cells were of good size and the

9    units were small, but they were by all definitions closer to

10   level VI security.

11        My belief and assumption, based on my experience at

12   McNeil and also at the Washington Correctional Center for

13   Women, is that mentally ill inmates who receive treatment can

14   be managed successfully at lower custody levels.  That's best

15   for them and ultimate that's best for community safety.

16        So the fight was over, no, we're not going to build

17   all these level VI or even maximum security cells in the

18   expansion of 400 beds.  We're going to have a custody

19   progression, move people from close custody to medium, to

20   long-term minimum, which is an equivalent of level II in the

21   State of California.

22        I won that battle, and that's indeed what we built,

23   and that's what they operate today.

24   Q.    When you talk about level III, level VI, can you tell

25   us what that means in California prison terms?

 1    A.      Well, those are California prison terms.

 2            THE COURT:  Let me interrupt.  I take it you're

 3    offering him as an expert in the field; is that correct?

 4            MR. BORNSTEIN:  Yes.  I was trying to lay some

 5    foundation for him.

 6            THE COURT:  I'm sorry.  I thought you had.  You may

 7    proceed.  My apologies.

 8            Go ahead.

 9    BY MR. BORNSTEIN:

10    Q.      I want to talk about the work that you did in

11    California and I want to get some terminology straight.

12            When we're talking about level III, level VI, what are

13    we talking about?

14    A.      That is the security level of the living units that

15    the inmates live in here.  In Washington, it's medium and

16    close, so I was mingling the two a bit.  I'm completely

17    comfortable going with California terms of level III and

18    level VI.

19    Q.      In your work in corrections did you also look at

20    issues relating to use of force and disciplinary policies?

21    A.      Throughout my career as a supervisor and manager and

22    administrator, use of force is always in the forefront of

23    what we look at, that and trying to reduce violence overall,

24    and engaged in a number of strategies to improve how we used

25    force, trying to use it as infrequently as possible and also

1    trying to reduce violence in your prisons.

2    Q.    Were you successful?

3    A.    From '99 until I left the agency in 2011, we had

4    reduced the rate of violence. I said 30 percent. The last

5    time I looked at the numbers, it was closer to 40 percent.

6    Q.    When you say "violence," what do you mean?

7    A.    As measured by violent infractions or in California

8    terms, RVRs, the number of infractions committed. It's

9    broken down in great detail, but I didn't take that kind of

10    data with me.

11    Q.    Do you consider yourself to be an expert?

12    A.    I consider myself to be an expert in general

13    correctional administration. I've spent a lot of time

14    looking at use of force. I've spent a lot of time focusing

15    on the issues of the mentally ill. I've spend a lot of time

16    focusing on the issues related to solitary confinement, and

17    I've spent a lot of time investing in programs that give

18    another way to manage facilities so that they are safe,

19    beyond just being good at use of force.

20    Q.    As part of your expertise does that include

21    administering a system where use of force and disciplinary

22    issues relating to mentally ill inmates is part of the

23    program that you would be overseeing or implementing?

24    A.    Yes.

25    Q.    Are you an expert in those areas as well?

 1   A.        I believe I am.

 2   Q.        I'd like to talk about your work in this case.

 3             THE COURT:  Before you do that, you're now offering

 4   him as an expert?

 5             MR. BORNSTEIN:  Yes.

 6             THE COURT:  Defendants desire to voir dire?

 7             MR. RUSSELL:  Just a couple of questions, Your Honor.

 8             THE COURT:  You may.

 9                         VOIR DIRE EXAMINATION

10   BY MR. RUSSELL:

11   Q.        Good afternoon, Mr. Vail.  My name is Jay Russell.  I

12   think we met before in this case.

13             You haven't published any papers regarding use of

14   force, have you?

15   A.        No.

16   Q.        And you never testified in a courtroom regarding use

17   of force issues, have you?

18             THE COURT:  May I interrupt, counsel?  I'm sorry

19   counsel, your name?

20             MR. RUSSELL:  Jay Russell.

21             THE COURT:  Thank you, sir.

22             THE WITNESS:  Could you ask again?

23   BY MR. RUSSELL:

24   Q.        You have never testified in a courtroom before, have

25   you, regarding use of force issues?

1  A.      Not as not expert, no.

2  Q.      You have not been qualified as an expert witness in

3  any court in a court proceeding as an expert witness?  You

4  have not been qualified by a judge, have you?

5  A.      That's correct.

6  Q.      The use of force training that you talked about,

7  that's the same use of force training that all correctional

8  officers received when they -- as part of the Washington

9  Department of Corrections.

10          Is that right?

11  A.      I'm not sure I understand your question.  What use of

12  force training are you referring to?

13  Q.      Did you undergo any kind of use of force training as a

14  correctional officer?

15  A.      Sure.

16  Q.      And that's the same training that other correctional

17  officers in Washington receive; is that correct?

18  A.      When I was in that level of position, yes.

19  Q.      In other words, you didn't receive any kind of

20  specialized training on use of force, have you?

21  A.      Only as it relates to the issue of emergency response

22  in terms of administering systems that have to deploy use of

23  force in disturbance kinds of situations or hostage kinds of

24  situations, I haven't received advanced training in that.

25  Q.      But not specifically as to the application of force in

1    a correctional setting.

2            Is that right?

3    A.      No, I think that is application of force in a

4    correctional setting.

5    Q.      And you have not -- as you say, you have not testified

6    in any courtroom setting regarding use of force issues.

7            Correct?

8    A.      Not as an expert.

9    Q.      You have not been retained as a Special Master

10   regarding the use of force by any court, have you?

11   A.      I have not.

12   Q.      Is there, apart from the training that you talked

13   about -- I think you said it involves hostage situations --

14   you have not received any other specialized training that

15   would distinguish you from any other person that worked

16   within the Washington Department of Corrections.

17           Isn't that correct?

18   A.      Yes, I have.  That's what I'm referring to, extensive

19   training in overall emergency response.  A big piece of

20   emergency response is application of a variety of use of

21   force choices by the National Institute of Corrections on a

22   couple different occasions.

23   Q.      That's involved in a hostage situation, I think you

24   earlier mentioned.

25           Is that correct?

 1    A.      It could be any number of situations that would arise

 2    as a result of an emergency in the institution, from riots to

 3    hostages, to disturbances, to folks who are barricaded,

 4    anything you can think of that can go wrong in a correctional

 5    facility.  You need to have a good emergency response.  I

 6    worked hard on that for several years.  I certainly didn't do

 7    it alone.  There's a lot of people who are also good at that.

 8    Q.      You did not receive any kind of certificate for that,

 9    did you?

10    A.      Well, the National Institute of Corrections, yeah,

11    they give certificates.

12    Q.      You have -- you don't have any legal background in

13    terms of law school training?

14    A.      No, I'm not an attorney.

15            MR. RUSSELL:  I would submit that Mr. Vail, while he's

16    very experienced in matters of correction and correctional

17    administration, does not have the specialized training that

18    would assist the court in deciphering use of force issues.

19            THE COURT:  The court finds that the witness is

20    competent to testify as to those matters and overrules the

21    motion.

22            You proceed, Mr. Bornstein.

23            MR. BORNSTEIN:  Thank you, Your Honor.

24    /////

25    /////

                              DIRECT EXAMINATION

1    BY MR. BORNSTEIN:

2    Q.      Do you know who Matt Cate is?

3    A.      I do.  Matt was previous secretary here in the State

4    of California.

5    Q.      Were you ever asked by him to do anything in

6    California?

7    A.      I got to know Matt.  He came to a lot of the national

8    meetings and training sessions that corrections directors are

9    involved in, and I think we were -- it doesn't matter where

10   we were -- in Alaska in 2010, and he began to court me, for

11   lack of better word, to come to California to serve as his

12   undersecretary.

13           We went back and forth over that through emails and

14   phone calls, and then springtime of 2011, I came down and

15   spent several years with him and visited a couple of

16   California prisons to talk about that possibility in more

17   depth.

18   Q.      And ultimately did you take the job?

19   A.      No, I didn't.

20   Q.      Was it offered to you?

21   A.      From Matt's level of authority, yes.  Now, I

22   understand that that is a position that requires, I think,

23   confirmation by one of the legislative bodies here.  He took

24   me over to see if the governor was in.  He happened to be

 1    out.  We sat down with the person who is responsible for

 2    coordinating appointments, and I spent some time with her,

 3    and then I told Matt I needed a couple of months to think

 4    about it, which I thought was a pretty long period of time,

 5    but he said okay.

 6          I went back to Washington, talked to my own governor,

 7    thought about it, and ultimately decided not to take the

 8    position.

 9    Q.     In this case you filed three declarations; is that

10    right?

11    A.     That's true.

12          MR. BORNSTEIN:  Your Honor, I ask you to take judicial

13    notice of Document 4385, which is dated or filed on March 14,

14    2013.

15          Document 4638-1, which was filed on May 29, 2013.

16          Document 4766-2, which was filed on August 23, 2013.

17          THE COURT:  The court will take judicial notice that

18    the documents specified were filed, and it's not clear

19    whether or not I can take judicial notice of the content.  I

20    will, subject to such cross examination as the state chooses

21    to make.

22          You may proceed, sir.

23          MR. BORNSTEIN:  Thank you.

24    Q.     With respect to those declarations, I want to talk

25    about the last one, Document 4766-2, filed on August 23,

1    2013.

2          In that declaration, when you were reviewing it in

3    preparation for your testimony, did you find that you had

4    made a mistake in a date?

5    A.    Yes, I did.

6    Q.    And what was the date that you need to correct?

7    A.    The declaration refers to my second declaration as if

8    it was filed in July.  It, in fact, was filed in May.

9    Q.    There are various places in the declaration that refer

10   to your July 17, '13 declaration, and those should be

11   corrected to state that it was -- your second declaration was

12   filed on May 29, 2013?

13   A.    That's correct.

14         MR. BORNSTEIN:  We'll file an errata.

15         THE COURT:  You don't need to.

16         You may proceed.

17         MR. BORNSTEIN:  Thank you.

18   Q.    I want to talk about the work you did in this case.

19   I'd like you to start with describing the background of what

20   you did to form your opinions.

21   A.    Well, this case has around for a long time, and so the

22   capacity to read everything just doesn't exist, but I read

23   lots of documents, previous court decisions more recent than

24   not.

25         I read the recent Special Master reports.  I read the

```
 1    reports from the Office of the Inspector General.  I read
 2    various California policies, memorandums, declarations,
 3    depositions, all of that was, to the degree it was provided
 4    to me, was consumed prior to the inspection tour of the four
 5    prisons in California that I toured as a result of being
 6    retained in this case.
 7    Q.      Did the policies that you review include the use of
 8    force policy?
 9    A.      Yes, they did.
10    Q.      Did you review that before you offered any opinions in
11    this case?
12    A.      Yes, I did.
13    Q.      You said you went on four inspections.
14            When did you do that?
15    A.      I think they were in February and March of this year,
16    I believe.
17    Q.      In addition to those four inspections, do you
18    remember -- strike that.  Let me start over.
19            Which instructions did you visit?
20    A.      Corcoran, Kern Valley, Lancaster and San Quentin.
21    Q.      Have you been inside other California prisons in
22    addition to those?
23    A.      Yes.
24    Q.      Which other ones?
25    A.      I have been inside High Desert.  I've been inside
```

1    Salinas Valley.  I've been inside Solano, very briefly in

2    Vacaville, and San Quentin previously.

3    Q.      Was what the purpose of your going to the other four

4    other prisons that you went with?

5    A.      With Matt Cate I went to Solano and San Quentin and we

6    stopped for a short visit at Vacaville.  The High Desert

7    visit, the other Solano visit, the other Kern Valley visit,

8    and, unfortunately, I'm forgetting the other, they were part

9    of the Mitchell case, where I've been retained.  That case is

10   yet to go to trial.

11   Q.      What does that case concern?

12   A.      About the CDCR practice of raised space lockdowns.

13   Q.      In the work you did in this case, did you look at any

14   videos?

15   A.      Yes.  At each site that we inspected, we asked for any

16   use of force videos.  I think we took it back to July 1st of

17   2012.  There weren't too many available for us to view at

18   each institution, and so after that, we got a chance to go

19   back to San Quentin for a second time where we saw many more

20   videos.

21          17, 18, 16, whatever it is of use of force videos, and

22   there was another 31 videos that were interviews of inmates

23   who had either been injured during the use of force situation

24   or who had alleged that the use of force was unnecessary or

25   excessive, and I viewed all of those.

1  Q.      Were there any videos that the state provided as a

2  result of plaintiff's request or your request that you did

3  not view?

4  A.      No.  My hesitation is that we did ask if there was

5  surveillance work.  I remember asking at Lancaster for

6  surveillance videos, and we did not get to see that, but

7  whatever they made available, we looked at.

8  Q.      Did you also look at records?

9  A.      Yes.

10  Q.      What kind of records did you look at?

11  A.      Use of force reports and RVRs.  Those are brief

12  phrases that describe a number of different documents.

13  During the site inspections, they were difficult to come by

14  and not very organized, and for example, at one facility, the

15  mental health wasn't filed with the RVRs, so we didn't get a

16  chance to look at those.

17          But over the last nine or ten months, we have been

18  able to assemble a much better theme within the documents

19  where we can take a look at the use of force report from the

20  incident commander's level to the manager's review to the

21  institution executive review committee, and then sometimes

22  even the subsequent RVR would have been really nice to been

23  able to look at that all the way along because it was quite a

24  puzzle to figure out what happened as a result of some of

25  these incidents.

```
 1              I'll rest with that.

 2    Q.        In your declaration, you refer to reviewing

 3    approximately 268 RVR reports; is that accurate?

 4    A.        Yes, I quit counting after that.  There's probably

 5    more, but I stopped counting.

 6    Q.        Those are the disciplinary reports?

 7    A.        Yes.

 8    Q.        Do all of those reports pertain to inmates with mental

 9    illness?

10    A.        That's what we asked for.  I think one or two of them

11    didn't or I couldn't identify from the paperwork they were

12    class members, but the overwhelming majority did.

13    Q.        With respect to the use of force, according to your

14    declaration, you identified approximately 204 use of force

15    reports that you reviewed.

16              Is that accurate?

17    A.        Yes.  Again, I quit counting after those numbers

18    represented.

19    Q.        The reports that we were just talking about, both the

20    RVRs and the use of force reports, were those for those four

21    institutions only?

22    A.        No, not exclusively.  I toured those institutions.  We

23    eventually got file material about those institutions, but I

24    also had access to Mr. Martin's files, and he had been at

25    other facilities and had some other reports from some other
```

 1  institutions.

 2  Q.    Did review any of Mr. Martin's files?

 3  A.    I reviewed all of it, I believe, all that was made

 4  available.

 5  Q.    As part of your work when you went on the inspections,

 6  I'd like you to tell the court what you did when you went

 7  into an institution to conduct an inspection.

 8  A.    The beginning of the day was a meeting with the

 9  warden.  That's what we requested.  There was, I think in

10  every case, staff from the CDCR central office, plus the

11  warden would have a pretty big entourage of his senior staff,

12  and it gave us a chance to introduce ourselves and to talk

13  and to ask some questions.

14        I'll start with that.

15  Q.    Do you remember specific questions that you asked in

16  any of your inspections?

17  A.    It varied, but the one question that I asked each

18  warden -- and California's crowding condition has been

19  national news, and being friends with Matt and living on the

20  West Coast, we all paid attention to it.

21        So one of the questions I made a point of asking each

22  of the wardens:  Now that your population is coming down -- I

23  first asked them:  How high their population used to be as to

24  where it was today, what's changed in the operation of your

25  prison?

 1                  With one exception, the answers were:  Nothing has

 2      changed.  It's business as usual.  The warden at San Quentin

 3      did tell me that as a result of the reduction in the inmate

 4      population, they were better able to get inmates to

 5      their mental health appointments on time.

 6      Q.      After you conducted these initial or you were part of

 7      this initial meeting with the warden and the warden staff,

 8      what did you do?

 9      A.      Well, we asked to tour the areas in the facility where

10      mentally inmates were housed, and that's what we did.  There

11      was a huge entourage every time.  I mean, I'm used to walking

12      around a facility alone or with one or two people.  There

13      were ten or 12 of us, state's attorneys, AGs, plaintiff's

14      attorneys and me, which made it a little tricky to get

15      around, but we could get through check points and then make

16      it out to various living units and treatment areas in each of

17      the prisons.

18      Q.      When you say you're used to walking around prisons

19      alone, what do you mean?

20              THE COURT:  He's used to walking around prisons alone.

21              MR. BORNSTEIN:  I'm sorry, Your Honor.  Bad question.

22      Q.      Why were you walking around prisons?  What are you

23      talking about?

24      A.      I ran them.  It's important that inmates know who the

25      warden is and that you get out and an about.  It's even

1    important that inmates know who the secretary is.  It was a

2    little harder to move on your own as a secretary, but I would

3    show up on a weekend or swing shift and show myself around.

4    Q.    Was it safe to do that?

5    A.    Yes.

6    Q.    Weren't you afraid?

7    A.    No.

8    Q.    Why not?

9    A.    Fear is the enemy in corrections.  So what you try to

10   do is model that for your staff.  Bad things happen in

11   prisons and bad things happen in Washington prisons, but the

12   more comfort that you can show and how you are in a living

13   unit or a yard or dining hall, I think it gives everybody

14   confidence.

15         I've worked for some good people over the years.  I

16   was a role model to do that.  That was the expectation, so

17   that's what I did.

18   Q.    Tell us about the tours that you took in terms of

19   going into the living units.

20         Did you inspect areas where severely mentally ill

21   inmates were housed?

22   A.    I did.  That was a fairly disturbing experience.

23   Q.    Why?

24   A.    Well, I guess it goes back to the issue of fear.  When

25   I -- back then, California living units before with Matt on a

 1    different case, but I had not been in the mental health

 2    units, and my own assumption is that they would be different

 3    because that's what I was used to.  Those units do feel a

 4    little bit different and they did feel different.  They felt

 5    worse.

 6         The amount of armament that typical California

 7    correctional officer carries with them, everybody in

 8    stab-proof vests, many staff with spit shields.  I think it

 9    sends the wrong message to the inmate population whether or

10    not this is a safe place to live, let alone receive

11    treatment.

12         There was one facility when the warden did not want me

13    to go in without a stab-proof vest and I declined that offer

14    and he did not make me.  That was shocking to me and

15    illustrated to me that the California officials have a great

16    deal of fear of the inmates they are responsible for

17    incarcerating.

18    Q.    You said "a great deal of armament."

19         What are you talking about?

20    A.    Well, their duty belts are extraordinary.  I don't

21    think that that's news to anybody, but there are large

22    canisters of OC, batons, some of them have grenades, OC

23    grenades on their belt.

24         That's just not what I've seen certainly seen in

25    Washington prisons or any other prisons that I've ever been

1    in.  I think it creates a climate of fear and violence that

2    contributes to the level of violence and use of force that

3    they do have in their system.

4    Q.    Wouldn't heavily armed correctional staff keep

5    violence from happening?

6    A.    No, not necessarily.  I mean, you need to be good at

7    emergency response.  I'm never going to argue that, and you

8    need to be good at use of force, but you need to be better at

9    the legitimate exercise of authority and knowing that inmates

10   who are programing positively and aren't restricted to their

11   cells are less violent than those who are.

12   Q.    Did you see evidence of that sort of positive program

13   in any of the inspections that you conducted in this case?

14         MR. RUSSELL:  Objection, Your Honor.  Lacks foundation

15   and exceeds the scope of this expert's expertise regarding

16   use of force.

17         THE COURT:  Overruled.

18         You may answer, sir.

19         THE WITNESS:  You know, not really.  Maybe some

20   fragments.  I don't want to oversell my position here, but,

21   for example, I attended one therapy group that was not in a

22   living unit that I thought was pretty good.  The inmates were

23   pretty upset and wanted to tell me how hard it was to go back

24   and live in that living unit, but I thought what was going on

25   in that room wasn't too bad.

 1          But, generally speaking, no, I did not see the kind of

 2    free movement, the interaction between the custody staff,

 3    mental health staff and the inmates I would have expected to

 4    see.

 5          THE COURT:  May I interrupt for just a minute.

 6          I think what I am hearing, but I may not be right,

 7    you're comparing what you saw in California with your own

 8    experience in Washington.

 9          Have you been in other prisons and inspected or

10    whatever you do mental health units?

11          THE WITNESS:  I've been in mental health units in

12    other systems, but not to the degree I've looked in

13    California.

14          THE COURT:  Of course.  But when you say there was

15    this element of force and fear, is that more exaggerated in

16    California, in your view, than other prison systems, in

17    Washington and other prison systems that you went in?

18          THE WITNESS:  Absolutely, yes.

19    BY MR. BORNSTEIN:

20    Q.    Why do you say that?

21          THE COURT:  Because that's what he saw.  Sometimes

22    your questions are difficult to understand.

23          MR. BORNSTEIN:  I've had that problem at home too,

24    Your Honor.  I'll try to be clearer.

25    Q.    With regard to the -- you talked about interviewing

1    some inmates in a therapy group session who complained or

2    wanted to complain about the living unit.

3         Would you please tell us about that.

4    A.    Just because someone is mentally ill doesn't mean

5    they're not very smart.  Some inmates can be pretty

6    articulate even if they've got to interrupt you and tell you

7    the voices are coming at them right now.

8         So I think I represented a safe harbor, and so they

9    told me what it was like to be in those units when staff gave

10   them orders and expected them to be able to immediately

11   respond when they didn't always have the capacity to do that.

12   Q.    Can you give us an example from any of the interviews

13   you conducted.

14   A.    Returning your food tray.  Right now.  I need it right

15   now.  If you've got voices and other issues, you want to do

16   the right thing, you're trying to do the right thing, but

17   sometimes the motor skills just don't work the way you need

18   them to when you're suffering from mental illness or

19   adjusting to new medications.  A couple guys talked about

20   that.

21   Q.    We were talking about your inspections and you told us

22   about going into living units.  You talked a little bit about

23   your impressions.

24        I'd like you to fill out exactly the rest of the day

25   in terms of what you did on these inspections so we have that

1  clear.

2  A.    Well, sticking to the living units, generally, we

3  started or I started by going from cell to cell.  There was

4  very few inmates out of cells, even in the EOP, general

5  population units, so it was through the cell door.

6       And trying to get inmates to talk and tell me about

7  their experience, most of them did.  There were a few who

8  didn't.  One common theme that emerged from some inmates is

9  that they just as soon stay in their cell because it's not

10  safe to go out there and get hassled by the staff.

11       That wasn't once or twice.  That was a pretty strong

12  theme from the inmates I spoke with.

13  Q.    Did you get any additional information from the

14  inmates that you interviewed about what they meant when they

15  said "getting hassled by the staff"?

16  A.    I believe that they were talking about the way in

17  which orders were given, the rules would frequently change in

18  the living unit and they would get in trouble because they

19  hadn't kept up with the fact that the rules had changed.

20  Stability and predictability for the mentally ill and how

21  those units operate are important.

22       For the most part, they did not know who I was.  I was

23  just somebody willing to stand and listen for a while.  We

24  also called inmates out for confidential interviews,

25  sometimes because we knew they had experienced use of force,

1    sometimes because the cell-front interviews peaked our

2    interest in different names, and we conducted those

3    interviews as well.

4    Q.    Did you interview any CDCR staff?

5    A.    Throughout the unit inspections, I talked to staff

6    that were willing to talk to me, some officers and some

7    sergeants.  Of course we had the entourage of captains and

8    sometimes the warden or essential office people that were

9    with us, and I talked to them, but we also made a point of

10   interviewing mental health staff in each facility that we

11   went to.

12   Q.    From the interviews of CDCR unit staff and mental

13   health staff, did you reach any kind of opinions?

14   A.    Well, they don't work together very closely and they

15   don't work together in how those living units operate, which,

16   in my experience, I have found is critical if you want

17   improved treatment outcomes, what goes on in that therapy

18   group.

19         If it can occur in a day room, it's pretty healthy,

20   and if the staff who are helping deliver that program are

21   also the staff that have the custody responsibility in the

22   living unit, that reinforces what they're learning in

23   treatment and it also gives the officers or the counselors,

24   whoever is working the floor, the knowledge that they need to

25   have to help support guys as they struggle with their

 1    different symptoms.

 2    Q.      In the more restricted housing units, level IV, is

 3    that like ad seg?

 4    A.      No.

 5    Q.      Did you become familiar with any operating policies or

 6    proceedings in terms of moving inmates in or out of their

 7    cells in any of the tours that you were in?

 8    A.      Inmates were put in restraints and strip searched

 9    coming in and going out.  Even when the treatment was

10    occurring in the unit itself, I found that different than

11    what I found, not only in Washington but other jurisdictions.

12          It's usually, unless there's some kind of cause,

13    you're not going to do those strip searches unless the person

14    leaves the unit for a while.

15    Q.      The strip searching that you're talking about, that

16    is -- was that only for mentally ill inmates?

17    A.      No, that was for all inmates.

18    Q.      Was there any accommodation made for mentally ill

19    inmates?

20    A.      Not that I was ever made aware of, no.

21    Q.      I want to show you some pictures of some of the

22    facilities.

23          Could we display what has been marked for

24    identification as 75, please.

25          THE COURT:  Don't put it up until somebody puts it

```
 1   into evidence.

 2            MR. BORNSTEIN:  Hang on.

 3            I'll start with something else.

 4            THE COURT:  All right.

 5   BY MR. BORNSTEIN:

 6   Q.    First, I want to show you what has been remarked as

 7   Exhibit 67 for identification.

 8            May I approach, Your Honor?

 9            THE COURT:  Of course.

10   BY MR. BORNSTEIN:

11   Q.    Showing you what's been pre-marked for identification

12   as Exhibit 67, there's two pictures.

13            The first is from the San Francisco Chronicle.  Do you

14   recognize that picture?

15   A.    I don't think I've seen it before.

16   Q.    Do you recognize what's depicted?

17   A.    A couple of California correctional officers escorting

18   an inmate in belly chains.

19   Q.    Do you recognize the -- does that picture demonstrate

20   the kind of armaments or the kind of duty belt you saw when

21   you were in California?

22   A.    It's not a very clear picture, but, yes, and it

23   appears that one of the officers has the baton out.

24            MR. BORNSTEIN:  Your Honor, I move 67, two pictures

25   into evidence and ask that they be displayed.
```

 1              THE COURT:  I'm sorry?  There are two pictures?

 2              MR. BORNSTEIN:  Yes.  One is the picture itself and

 3     the other is a close-up of the baton.

 4              THE COURT:  I see.

 5              MR. RUSSELL:  I object.  There's lack of foundation

 6     here.  I believe that Mr. Vail testified that although this

 7     approximates something he may have seen, he wasn't familiar

 8     with the photograph.  We don't know where the photograph

 9     comes from.

10              THE COURT:  I understand the objection.  I thought the

11     witness said, but I may be wrong, that it appears to him

12     typical of what he saw, the armament was typical of what he

13     saw during your visits.

14              Is that right or wrong?

15              THE WITNESS:  Correct.

16              THE COURT:  Received.

17                         (Whereupon, Plaintiffs' Exhibit 67 was

18                          received into evidence.)

19              MR. BORNSTEIN:  May I proceed, Your Honor?

20              THE COURT:  Yes.

21     BY MR. BORNSTEIN:

22     Q.     So looking at the officer here that I'll circle,

23     there's a blue canister over there.

24              Do you see that?

25     A.     I do.

```
 1    Q.      What is that?

 2    A.      Well, I'm going to presume that it's a can of OC

 3    spray.

 4    Q.      Why do you presume that?

 5    A.      Because I can't see the writing on it, and I'm not

 6    trying to be difficult.

 7            THE COURT:  Is it typical of what you saw going

 8    through the inspections?

 9            THE WITNESS:  Yes.

10            THE COURT:  You may proceed, counsel.

11    BY MR. BORNSTEIN:

12    Q.      The baton that I just -- this baton here, what kind of

13    baton is that?

14    A.      It's an expandable baton, extended.  It collapses and

15    you can put it in your duty belt.

16    Q.      How are those supposed to be used?

17    A.      It's my belief it is defensive purposes.

18    Q.      Why?

19    A.      Because they can do considerable damage to humans, and

20    I'm not a fan of pain compliance when it's unnecessary.

21    Q.      In the work that did in this case, did you come to

22    understand how California uses the expandable baton?

23    A.      Yes, I believe I did.

24    Q.      What is that belief?

25    A.      I think it was Mr. Stainer's deposition when he
```

 1    embraced the motion of pain compliance as an appropriate use

 2    of the expandable baton.

 3    Q.      Based on your understanding, is that an appropriate

 4    use of the expandable baton?

 5    A.      If you're in a life and death situation or a situation

 6    where somebody is going to have a very, very serious injury,

 7    I think you need to do what you need to do to try to keep

 8    people safe, but absent that, I don't think the baton should

 9    be authorized.

10    Q.      Okay.  I want to turn to a different kind of picture.

11            This is Exhibit 70.

12            THE COURT:  70?

13            MR. BORNSTEIN:  Yes.

14    Q.      Do you recognize what is depicted in Exhibit 70?

15    A.      A spit mask.

16    Q.      What is a spit mask?

17    A.      A mask that's put over a person's face to keep them

18    from spitting on the staff.

19    Q.      And are you familiar with those?

20    A.      I am.

21    Q.      And are there reasons not to use them?

22    A.      Well, there are reasons not to use them.  You

23    shouldn't use them unless you need to use them, when you have

24    a either a history of somebody who is a spitter or somebody

25    who is threatening to spit or has already spit.

```
 1              MR. BORNSTEIN:  Your Honor, I move Exhibit 70 into

 2    evidence.

 3              THE COURT:  Received.

 4                         (Whereupon, Plaintiffs' Exhibit 70 was

 5                          received into evidence.)

 6    BY MR. BORNSTEIN:

 7    Q.      In your work in this case, did you see the evidence of

 8    the use of spit masks in California?

 9    A.      Yes, I did.

10    Q.      Were there anything about those occurrences that

11    raised any issues for you?

12    A.      Well, what I said previously, there are certain

13    circumstances where they make sense, but I don't recall

14    seeing any documentation that supported their use.  Now it

15    may have been that someone was a spitter and that was never

16    entered in any of the records, but I didn't found any place

17    where that was said.

18              I did see where that they were used in certain

19    situations, including a couple of the use of force videos.

20              MR. BORNSTEIN:  May I approach, Your Honor?

21              THE COURT:  Yes.

22    BY MR. BORNSTEIN:

23    Q.      Showing you a series of photographs from Exhibit 75,

24    do those photographs depict the inside and/or the outside of

25    certain cells or holding areas that you viewed while you were
```

 1    on some -- in some of the institutions or similar to holding

 2    house cells or other cells you saw while you were in some of

 3    the institutions?

 4    A.      Yes, they do.

 5            MR. BORNSTEIN:  I move those photographs into

 6    evidence, Your Honor.  That would be Exhibit 75.

 7            THE COURT:  Received.

 8                        (Whereupon, Plaintiffs' Exhibit 75 was

 9                         received into evidence.)

10    BY MR. BORNSTEIN:

11    Q.      So with respect to the first picture, did you see

12    evidence of mentally ill inmates housed in cells like this?

13    A.      Sure.  Yes.

14    Q.      The second picture, there is a small metal cage type

15    thing.  Did you see evidence of metal cages, like a phonebook

16    metal cage on the left-hand side of the second photograph,

17    did you see evidence of cages like that?

18    A.      Yes, I did.

19    Q.      How were they used?

20    A.      I think there used as holding cells for a variety of

21    purposes.

22    Q.      Were they used with mentally ill inmates in them

23    during your tours?

24    A.      Yes.

25    Q.      Were they -- did you see any therapy sessions taking

```
 1   place with inmates in cells like this?

 2   A.      Sometimes those were arranged in groups and there

 3   would be a mental health person who would stand in the middle

 4   and run a group session while guys were in those cells.

 5   Q.      Have you seen cells like this used for treatment in

 6   any other institutions you've ever been in?

 7   A.      Yes.

 8   Q.      And for the same thing?

 9   A.      Yes.

10   Q.      With respect to this third picture, again, this is the

11   kind of cell you saw inmates with mental health issues in?

12           MR. RUSSELL:  I'm going to object.  The form of the

13   question, "kind of cell"?  I think it's vague and ambiguous.

14           THE COURT:  Were cells like this cells in which

15   mentally ill prisoners were housed during your inspection?

16           THE WITNESS:  Yes.

17   BY MR. BORNSTEIN:

18   Q.      With respect to --

19           THE COURT:  Are you about to turn to another subject?

20           MR. BORNSTEIN:  Yes, Your Honor.

21           THE COURT:  We'll take our afternoon recess.

22           15 minutes.

23                           (Whereupon, a break was taken at

24                           2:43 p.m.)

25                           (Nothing Omitted.)
```

102

1                (Back on the record at 3:10 p.m.)

2                THE CLERK:  You may remain seated.

3                Court is now in session.

4                THE COURT:  Sit down everybody.

5                MR. BORNSTEIN:  Thank you, Your Honor.

6                THE COURT:  Hang on.  Yes.

7                MR. RUSSELL:  Your Honor, I believe Mr. Bornstein --

8    that we may be looking at some of the videotapes this

9    afternoon.

10               There may be people in the courtroom now that were

11   not here earlier as part -- who heard your earlier order.

12               I would also like to make one point clear.  I think

13   the court meant this, but I hope the court can clarify it.

14   The court says that if something is obtained outside of this

15   courtroom, that's not what you're ruling on, but I just want

16   to make sure that no one thinks that we're going to leave

17   this courtroom today and mention anybody's name outside the

18   doors of your courtroom.

19               THE COURT:  I assume that counsel for both sides are

20   as concerned about the privacy notes -- the privacy issues,

21   and they will restrain themselves.

22               As to anybody who wasn't here earlier, the court is

23   ruling that the names of either the inmates or the guards is

24   irrelevant to this proceeding.  They may be shown in the

25   course of this, if they are shown today at all, and if so,

1  they may not be regarded as having been learned in open court

2  because the court has struck them.

3          You may proceed, sir.

4          MR. BORNSTEIN:  Thank you, Your Honor.

5  BY MR. BORNSTEIN:

6  Q.      Mr. Vail, the first prison that you inspected, was

7  that Corcoran?

8  A.      Yes.

9  Q.      And did you look at some use of force videos relating

10 to Corcoran?

11 A.      I did.

12 Q.      And whether you looked at them at that facility or

13 later on at San Quentin, did you look at a use of force video

14 involving Inmate A?

15 A.      I did.

16 Q.      And with respect to Inmate A, can you tell us please

17 where he was housed?

18 A.      He was in the MHCB, Mental Health Crisis Bed, at

19 Corcoran State Prison.

20 Q.      And what was his condition according to the video?

21 A.      He was --

22         MR. RUSSELL:  Your Honor, I object.  It is vague and

23 ambiguous as to "condition."  I don't know if he is talking

24 about mental health condition.

25         MR. BORNSTEIN:  Let me start over, Your Honor.  I'll

104

1    withdraw the question.

2            THE COURT:  All right.

3    BY MR. BORNSTEIN:

4    Q.    What were the circumstances, based on your review of

5    the video and the accompanying paperwork, that led to the use

6    of force in Inmate A's case?

7            MR. RUSSELL:  Objection, Your Honor.  Vague and

8    ambiguous.

9            THE COURT:  Overruled.  You may answer.

10           THE WITNESS:  He was described as decompensating to

11   the point where he needed to be forcibly medicated.

12   BY MR. BORNSTEIN:

13   Q.    And was he considered to be a danger to himself or a

14   danger to others?

15           If you recall?

16   A.    That requires a judgment.

17   Q.    From the paperwork?

18   A.    That's where I was going.  The officials in

19   California believed that he was a danger to himself at least.

20           MR. BORNSTEIN:  Okay.  So Your Honor, I would like to

21   play portions of Exhibit 2.  And I would like to explain, so

22   that it is clear, because we're only going to play portions

23   of it what we're playing.

24           THE COURT:  You're not going to play anything until

25   you move it into evidence.

105

1          MR. BORNSTEIN:  Okay.  So I would like to move into

2     evidence the portions of Exhibit 2 that we intend to play in

3     open court with your -- and with the motion that to the

4     extent that inadvertently there is any mention of an inmate

5     name or staff name on the video, I am moving in advance to

6     have that stricken and replaced because we intend it only to

7     be referencing Inmate A.

8          THE COURT:  The motion to -- you're standing.  Yes,

9     sir.

10          MR. RUSSELL:  Your Honor, I would like to remind the

11    court of when we discussed this issue earlier.  I think what

12    Mr. Bornstein is saying, when he's going to play portions of

13    this, what we're not going to do is play the first portion of

14    it that has a lot of identifying information.  But I don't

15    think these videos are supposed to be redacted or shortened

16    in any way.

17          MR. BORNSTEIN:  Your Honor, let me try again.

18          THE COURT:  Gentlemen, stop.  We had an agreement

19    early this morning.  That's part of what we are proceeding

20    with.

21          You may proceed, Mr. Bornstein.

22          MR. BORNSTEIN:  Thank you, Your Honor.

23          I need to correct something.  I misspoke.  It is

24    Exhibit 3.

25          THE COURT:  Exhibit 3 is in evidence.  Exhibit 2 is

106

1    not.

2              (Whereupon, Plaintiff's Exhibit Number 3 received

3              into evidence.)

4         MR. BORNSTEIN:  I want to just, if I may, set the

5    stage.

6    BY MR. BORNSTEIN:

7    Q.    Before use of force with respect to Inmate A, is

8    there something called a clinical intervention that is on the

9    video?

10   A.    I'm sorry, but I don't recall.  There is in many of

11   the videos.

12        MR. BORNSTEIN:  All right.  Let's play -- I want to

13   play the first part of the tape, which I will represent to

14   the court it's a psychologist who is doing a clinical

15   intervention.  And there is some portions on either side

16   where there's identifying information that we're not playing.

17   But other than that, that's what is going on.

18        THE COURT:  You may proceed.

19        (Plaintiff's Exhibit 3 played in open court.)

20        MR. BORNSTEIN:  Stop the video.

21        At this point, Your Honor, I will proffer that the

22   psychologist will come and make a report to the video

23   cameraman that the intervention has failed and the inmate has

24   refused to take his medication.

25        And then we move to the second part of this which is

107

1    the actual use of force incident.  The first part of the use

2    of force incident is various custody staff that will announce

3    themselves, they will identify what they're doing, who the

4    inmate is, why they are doing it.  In this case it was

5    because of his need to be involuntarily medicated.

6         They will say that there was a clinical intervention

7    that was tried.  Then they will introduce themselves and say

8    what their names are, badge numbers, what their role will be.

9    And we are not going to play that part.  We're going to play

10   immediately after that.

11        THE COURT:  You may proceed.

12        MR. BORNSTEIN:  Thank you, Your Honor.

13        (Plaintiff's Exhibit 3 continued being played in open

14         court.)

15        MR. BORNSTEIN:  So that was the admonishment.  Now

16   we're going to go to the actual use of force.

17        Before you play it, is there a way to could we dim

18   the lights a little bit to make it easier to see?

19        THE COURT:  You may proceed, sir.

20        MR. BORNSTEIN:  All right.

21   Thank you, Your Honor.

22        (Plaintiff's Exhibit 3 continued to be played in open

23         court.)

24        MR. BORNSTEIN:  Your Honor, I would like to now play

25   a portion of Exhibit 5.

108

1    BY MR. BORNSTEIN:

2    Q.      This is Inmate B.  This is taken from KVSP, one of

3    the other institutions that you toured or inspected.

4            Is that correct?

5    A.      Yes.

6            THE COURT:  We'll take a five minute recess.

7            (Off the record at 3:43 p.m.)

8            (Back on the record at 3:51 p.m.)

9            THE CLERK:  Please, remain seated.

10           Court is now in session.

11           THE COURT:  Mr. Bornstein.

12           MR. BORNSTEIN:  Thank you, Your Honor.

13           I'm going to move portions of Exhibit B into evidence

14   that are actually played in court.

15           THE COURT:  B?

16           MR. BORNSTEIN:  I'm sorry.  Exhibit 5 that are

17   actually played in court.  This is relating to Inmate B, and

18   to the extent that there are any other names used in this

19   video of any inmates or any CDCR staff, I'd ask they be

20   stricken from the record.

21           THE COURT:  They are stricken.

22           (Whereupon, Plaintiff's Exhibit Number 5 received

23            into evidence.)

24           MR. BORNSTEIN:  May we proceed?

25           THE COURT:  Yes.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

109

1          MR. BORNSTEIN:  The first part of the video will show

2     the clinical intervention.  I believe this is also a

3     psychologist.  We're only going to show a portion of it

4     without the introductory.

5          MR. RUSSELL:  Your Honor, I would move to strike his

6     comments.  I mean, the videotape is what it is.

7          THE COURT:  It's important that the record will

8     reflect those portions which are being shown.  The objection

9     is overruled.

10          You may proceed.

11          MR. BORNSTEIN:  Thank you, Your Honor.

12          (Plaintiffs' Exhibit 5 played in open court.)

13          THE COURT:  Stop that.  Stop that.

14          MR. BORNSTEIN:  You started too soon.

15          (Plaintiffs' counsel confer.)

16          THE COURT:  I'm going to tell you people, if you

17     can't get this right, there will be no more.

18          MR. BORNSTEIN:  I'm sorry, Your Honor.  That was a

19     mistake.  There is a not a counter apparently on this DVD.

20     We'll start with just the use of force.

21          (Plaintiffs' counsel confer.)

22          (Plaintiffs' Exhibit 5 played in open court.)

23          (Video paused.)

24          (Plaintiffs' counsel confer.)

25          (Plaintiffs' Exhibit 5 continued playing in open

110

1              court.)

2    BY MR. BORNSTEIN:

3    Q.       Mr. Vail, from your review of the records relating to

4    Inmate B, can you give us a little context as to what is

5    going on please?

6              MR. RUSSELL:  Objection, Your Honor.  Calls for a

7    narrative.

8              THE COURT:  Overruled.  You may answer, sir.

9              THE WITNESS:  He's been determined to be a threat to

10   himself because he's decompensating.  And they are trying to

11   move him to a crisis bed so he can have a mental health

12   evaluation.

13   BY MR. BORNSTEIN:

14   Q.       And with respect to either of the two incidents that

15   we've just viewed, the portions of Exhibit 3 and the portions

16   of Exhibit 5, was the force that was used in your opinion

17   reasonable?

18   A.       No.

19   Q.       Why not?

20   A.       Well, it is different for each.

21   Q.       Let's talk about Inmate A first.

22   A.       Okay.  Inmate A was decompensated to the point where

23   he was playing in his own feces.  The record doesn't show any

24   particular threat directed at staff.  Although, I would

25   acknowledge that someone playing with their feces needs to

111

1  be -- there needs to be some kind of intervention.

2       In terms of the force that was used, they chose to

3  use pepper spray.  It was clear, I think, from watching the

4  video, that the pepper spray did have an effect the first

5  time, that the first burst hit him and he was in pain.

6       It was equally clear thereafter that he was not lucid

7  enough to be able to respond to the officer's direction.

8  That's true the second time, and that's true the third time.

9       They finally make the decision to go in, and when

10  they do, he comes to the door actually rather passively.  And

11  I suspect that they have been trained in one approach, which

12  is to take them to the floor.  And when they do that, he

13  begins to fight for his life because he doesn't understand

14  what is happening to him.  And that follows throughout the

15  rest of that video.

16  Q.    Was there an Institutional Executive Review Committee

17  report on this incident that you reviewed?

18  A.    Yes, there was.

19  Q.    And was there any critique by the IERC about this

20  incident?

21  A.    There was a critique.  My memory is that they were

22  concerned with how the triangle lanyard was used.  I'm not

23  sure if that made the IERC.  That might have just made the

24  manager's report.  There was concerned about covering the

25  inmate's genitals.  I think there was one concern about he

112

1    was sprayed from too close than the recommended distance.

2         But what there wasn't was any discussion about how

3    they got there.  There wasn't any self-reflection on why this

4    person was decomposed to such a state to begin with, which I

5    think is probably the more key question.

6         I might even argue -- and all of this is

7    second-guessing and looking at it in hindsight, I do

8    acknowledge -- but if he had been smearing feces for some

9    period of time, they maybe should have gone in sooner.

10   Q.    Did IERC question the amount of spray that was used?

11   A.    No, they did not.

12   Q.    Did they indicate whether it was necessary or

13   excessive?

14   A.    I believe it had pretty much the standard language,

15   that the use of force response was commensurate with the

16   threat presented.

17   Q.    The IERC process involves a review at what level?

18   A.    Basically the warden level.  I mean, it's the highest

19   level of review at the institution.  I'm not sure that the

20   warden is always there, but that's the highest level of

21   review at the institution.

22        What I think is notable is that while I've been

23   informed that mental health staff may attend, they're not

24   obligated to attend or participate for class members.

25   Q.    Was there any investigation done by the Office of

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

113

```
 1    Internal Affairs to your knowledge?
 2    A.      Not to my knowledge.  I don't believe it was referred
 3    for investigation.
 4    Q.      Under California's use of force policies, is this the
 5    kind of incident that meets the criteria for their to be an
 6    Office of Internal Affairs investigation?
 7            MR. RUSSELL:  Objection, Your Honor.  Lacks
 8    foundation.
 9            THE COURT:  Overruled.  You may answer.
10            THE WITNESS:  I don't believe it is, no.
11    BY MR. BORNSTEIN:
12    Q.      Why do you say that?
13    A.      Because there's -- it doesn't meet the threshold of
14    great bodily harm.  Typically massive amounts of pepper spray
15    aren't considered a serious injury.
16    Q.      By whom?
17    A.      By CDCR.
18    Q.      Was there a Rules Violation Report that was issued
19    against this inmate for the incident that we just viewed?
20    A.      Yes, there was.
21    Q.      And were you able to determine from your review of
22    the records whether or not his -- there was a mental health
23    assessment that was done?
24    A.      Yes, there was.
25    Q.      And from your review of the records, was there any
```

114

1    indication that the inmate's mental disorder appeared to

2    contribute to the behavior in this case?

3          MR. RUSSELL:  Objection, Your Honor.  Lacks

4    foundation.  Exceeds the scope of his expertise.  We're going

5    into the area of a mental health diagnosis now.

6          THE COURT:  Overruled.  You may answer, sir.

7          THE WITNESS:  The mental health assessment describes

8    himself as paranoid, and it may have contribute to the

9    behavior.

10   BY MR. BORNSTEIN:

11   Q.     Was that taken into consideration in some manner

12   during the process, from what you could tell, from the

13   report?

14   A.     The results, I believe, is he lost 90 days conduct

15   time and was -- and lost certain privileges.

16   Q.     What were those privileges?

17   A.     I would have to look, to be honest with you.  But --

18   Q.     If you would like to refresh your memory, turn to

19   COR-12792.

20   A.     I'm there.

21          He lost 30 days of dayroom, TV, radio, visits, family

22   visits, special purpose, telephone and quarterly package,

23   which is pretty much directly contraindicated by the mental

24   health assessment, which says that he needs to have

25   activities that provide reality orientation.

115

1    Q.      With respect to the portions of the video we showed

2    that's Exhibit 5 involving Inmate B, do you have an opinion

3    as to whether the force used in that case was reasonable?

4    A.      Reasonable?

5            It went on for too long.  And I particularly object

6    to the use of the barricade removal device in that

7    circumstance.

8    Q.      What was going on?

9            Can you give us, from your review of the records, the

10   precipitating act that led to the use of force?

11   A.      Well, he wouldn't come out to go for a mental health

12   evaluation.  He had a couple of cups of something that he was

13   threatening to throw.  That may or may not have been

14   identified as fecal matter.  I don't remember.  But that

15   would be a reasonable assumption on the part of the staff.

16   Q.      But did they know that before they went to use force

17   according to the reports that you read?

18   A.      Not that I recall.

19   Q.      So what was the reason then they were going into the

20   cell to extract him prior to that?

21   A.      To move him to a crisis bed so he could receive a

22   mental health evaluation.

23   Q.      From your perspective was this incident handled the

24   way you think that a reasonably competent staff in a

25   correctional institution should have handled it?

116

1  A.      Well, one of the challenges that corrections faces,

2  and this is true in any jurisdiction, is that you tend to say

3  this is the B1 solution to this particular problem.

4        And I think in this case they got locked into their

5  series of events that they couldn't question or challenge in

6  response to the inmate's changing behavior.

7        I don't think it would have been unreasonable to put

8  a mask on one of those mental health staff he was asking for

9  and bring them to the cell door.  It might not have worked,

10  but it might have.

11        Generally I suspect the folks in California just

12  don't think that's the right thing to do.  But I'm reminded

13  that this is a case about folks with serious mental illness.

14        Then later, when he was willing to cuff up, they

15  insisted that he be strip searched.  And they do that in some

16  videos I've seen and others that they don't.

17        I think in this case, when the inmate was willing to

18  cuff up, they could have cuffed him up and brought him out of

19  his cell safely.  They all had their gear on, and they could

20  have figured out a better time and place to make sure he

21  didn't have a weapon concealed under his T-shirt or inside

22  his boxers.

23        I think those are a couple of different alternative

24  approaches that could have been tried in this case.

25        He was deathly afraid of whatever was going on in his

117

1    mind with that barricade device and his fear that he was

2    going to be sexually assaulted or his stated concern over and

3    over again.

4    Q.    In the institutional review, was there any question

5    raised about the amount of spray or whether it was necessary?

6    A.    No.  Again, I think they were concerned about the

7    exposure of his genitals.  I don't recall if there are other

8    concerns expressed, but there certainly wasn't any about the

9    amount of spray or any self-reflection of how did we get here

10   and how do we not try to get into this situation the next

11   time around.

12   Q.    With respect to the barricade removal device, I know

13   we kind of saw it there, but I'm going to show you what's

14   been premarked for identification as Exhibit 74.

15        MR. BORNSTEIN:  May I approach, Your Honor?

16        (Exhibit handed to witness.)

17   BY MR. BORNSTEIN:

18   Q.    Do you recognize Exhibit 74?

19   A.    Yes.  It's an example of a barricade removal device.

20        MR. BORNSTEIN:  Your Honor, I move Exhibit 74 into

21   evidence.  I'll display it.

22        THE COURT:  Received.

23            (Whereupon, Plaintiff's Exhibit Number 74

24             received into evidence.)

25            (Exhibit published.)

118

BY MR. BORNSTEIN:

Q.      In Exhibit 74, the red canister there, what is that?

A.      That's a canister of OC spray.

Q.      Can you tell from your experience typically how big those canisters are?

A.      That's a large canister of OC spray.  I couldn't give you the precise ounce.

Q.      Is it like a fire extinguisher size?

A.      Almost.  I've seen fire extinguishers smaller, some larger.  You can see it in the video.  You can see it.  He's carrying it.  It gives you a sense of proportion.

Q.      The proportion here, that is the part that actually goes into the food port?

A.      Yes.  It is designed to be used when the cell is blocked -- when the food port is blocked.

Q.      To your knowledge, from reviewing the paperwork, was there a Rules Violation Report issued to Inmate B?

A.      There was.

Q.      Do you know the outcome?

A.      I don't believe I do, no.

Q.      Was it included in the materials that the State provided in this case?

A.      I don't think it was, no.

        THE COURT:  It's 4:30.  We'll reconvene tomorrow at 9:15.  I have a telephone call with my doctor at 8:45 so we

119

1    may be a little delayed, but I hope not.

2         MR. BORNSTEIN:  Can we talk just a minute about the

3    schedule, just to alert you?

4         THE COURT:  Sure.

5         MR. BORNSTEIN:  We have one witness, another expert,

6    who only has tomorrow.  So we may need to interrupt Mr. Vail

7    for that purpose.  I just wanted to alert you to that.

8         THE COURT:  That's fine.

9         MR. BORNSTEIN:  Thank you.

10         THE COURT:  Stand in recess.

11         (Off the record at 4:30 p.m.)

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                        ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6
            I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                 IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```