1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7          Plaintiffs,

8   Vs.                              CASE NO. CIV. S-90-0520 LKK

9   EDMUND G. BROWN JR., et al.,
    et al.,

10

11         Defendants.

12   _____/

13

14

15                        ---o0o---

16

17                   REPORTER'S TRANSCRIPT

18              RE:  EVIDENTIARY HEARING

19            WEDNESDAY, OCTOBER 2ND, 2013

20

21                        ---o0o---

22

23

24
    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926
25  Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
1                        APPEARANCES

2                        ---o0o---

3

4   FOR THE PLAINTIFFS:

5          ROSEN, BIEN, GALVAN & GRUNFELD, LLP
           315 MONTGOMERY STREET, TENTH FLOOR
6          SAN FRANCISCO, CALIFORNIA  94104

7          BY:  MICHAEL BIEN, ATTORNEY AT LAW

8          BY:  LORI RIFKIN, ATTORNEY AT LAW

9          BY:  JANE KAHN, ATTORNEY AT LAW

10

11         K&L GATES LLP
           4 EMBARCADERO CENTER, SUITE 1200
12         SAN FRANCISCO, CALIFORNIA  94111

13         BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

14         BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

15

16   FOR THE DEFENDANTS:

17          STATE OF CALIFORNIA, DEPT. OF JUSTICE
            OFFICE OF THE ATTORNEY GENERAL
18          13OO I STREET
            SACRAMENTO, CALIFORNIA  95814
19
            BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
20
            BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
21
            BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
22
            BY:  JESSICA S. KIM, DEPUTY ATTORNEY GENERAL
23

24

25                       ---o0o---
```

```
 1                    EXAMINATION INDEX

 2                       ---o0o---

 3   FOR THE PLAINTIFFS:

 4       EXAMINATION:                              PAGE

 5

 6     ELDON VAIL (Continued)

 7         Cont'd Dir. Exam by Mr. Bornstein        120
           Cont'd Dir. Exam by mr. Bornstein        267
 8

 9     DR. EDWARD KAUFMAN

10
           Direct Examination by Ms. Rifkin        153
11         Cross-Examination by Ms. Vorous         224
           Redirect Examination by Ms. Rifkin      257
12         Recross-Examination by Ms. Vorous       263

13

14

15

16

17                       ---o0o---

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO           DESCRIPTION              EVD
 5

 6      2A                 Record - Sealed          122

 7      2B                 Record - Sealed          122

 8      2C                 Record - Sealed          122

 9      2D                 Record - Sealed          122

10      4                  Record                   206

11      10A                Incident Rpt. Sealed     268

12      10B                Incident Rpt. Sealed     268

13      11                 Video                    271

14      60                 Photo                    147

15      61                 Photo                    147

16      69                 Photo                    127

17      181                Kaufman Dec.             160

18      184                Rpt. Summary             164

19

20

21

22

23

24                          ---o0o---

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                          EXHIBIT INDEX

2                            ---o0o---

3

4    DEFENDANTS'
     EXHIBIT NO              DESCRIPTION                    EVD
5

6      A              Interdisciplinary Prog. Note         247

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2              WEDNESDAY, OCTOBER 2, 2013; 9:20 A.M.

3                          ---oOo---

4

5         THE COURT:  You were inquiring, Mr. Bornstein?

6         MR. BORNSTEIN:  Yes.  May I continue?

7         THE COURT:  Yes.

8                          ELDON VAIL

9    Recalled as a witness on behalf of the plaintiffs herein, was

10   previously sworn, examined, and testified as follows:

11                  DIRECT EXAMINATION (CONTINUED)

12   BY MR. BORNSTEIN:

13   Q.    I want to go back and talk about the DVDs from the

14   cell extractions we looked at yesterday.

15         Okay?

16   A.    Okay.

17   Q.    I want to start with Inmate A.

18         In addition to the video, you've looked at what we

19   call the incident package; is that correct?

20   A.    Yes.

21   Q.    That would be the incident report?

22   A.    Yes.

23   Q.    And then the IERC packet?

24   A.    Yes.

25   Q.    And then to the extent we have it, the RVR packet.

1              Is that correct?

2    A.        Correct.

3    Q.        In what's been premarked and in front of you as

4    Exhibit 2, are those documents in that exhibit?

5    A.        They are.

6              MR. BORNSTEIN:  Your Honor, I'm moving into evidence

7    Exhibit 2 under seal because it has lots of personal

8    information, but I would like then to be able to show

9    redacted portions and continue my examination.

10             THE COURT:  Received.

11             However, this is the same problem that we had

12   yesterday, which I didn't comment on because I didn't

13   understand what you were doing.  These documents are all

14   separate and should come in as 2A, 2B, 2C.

15             There are three or four documents?

16             THE WITNESS:  Three that he's mentioned, but there's a

17   fourth.

18             THE COURT:  A, B, C are received.

19             What is the fourth one?

20             MR. BORNSTEIN:  That's what these are.  So what I

21   have, there are tabs in the binder that you have that will

22   say "incident report," and I'll change that to A.

23             IERC, I will change that to B.

24             RVR, will be C.

25             And there may also be some medical records, and that

1    will be D.

2              THE COURT:  All right.  They are received.

3                        (Whereupon, Plaintiffs' Exhibits 2A,

4                        2B, 2C and 2D were received into

5                        evidence under seal.)

6              MR. BORNSTEIN:  Thank you.

7    Q.     So one of the things that we heard yesterday was the

8    cell extraction advisement.

9              Right?

10   A.     Correct.

11   Q.      In that advisement, is that sort of a standard thing,

12   although it varies from institution to institution, that you

13   heard on the videos?

14   A.      With the caveat that there's some variation between

15   facilities, yes.

16   Q.      This is the done right before force is used; correct?

17   A.      Correct.

18   Q.      Prior to that, it's a clinical intervention; right?

19   A.      Usually.

20   Q.      Were you able to view the clinical intervention in

21   this case?

22   A.      I was.

23   Q.      Was it sufficient?

24   A.      It wasn't effective and it didn't last very long.  In

25   that it was on camera, it seemed to me its purpose was mainly

 1    to demonstrate there was some effort to try to get the inmate

 2    to comply, but I did not see much real conversation

 3    occurring.

 4         THE COURT:  May I interrupt for a moment, because I'm

 5    not quite clear who performs the clinical intervention.

 6         Does the record reflect -- I don't need a name -- who

 7    he was?  What title he had?

 8         THE WITNESS:  It varies from incident to incident,

 9    but, yes, the record will reflect who.

10         THE COURT:  As to Inmate A, what was the title of the

11    person?

12         THE WITNESS:  I believe it was a psychologist.

13         THE COURT:  Thank you.

14         You may proceed.

15         MR. BORNSTEIN:  Thank you.

16    Q.    With respect to the intervention, was any connection

17    made between the psychologist and the inmate?

18         MR. RUSSELL:  Objection.  Vague and ambiguous.

19         THE COURT:  I have no idea what it means.

20         The objection is sustained.

21         But let me ask you:  Apparently, a psychologist or at

22    least it appears that a psychologist was involved in the

23    so-called intervention.  Do we know whether the inmate

24    conceding that he was having a psychotic breakdown even knew

25    who that person was?

1          Was it a psychologist who had treated him in the past

2    or anything like that or do we know?

3          THE WITNESS:  I don't know.

4          THE COURT:  All right.

5    BY MR. BORNSTEIN:

6    Q.    I'm going to show you now a portion of the incident

7    report from the captain.  I've highlighted down at the bottom

8    some of the facts as reported by the captain.

9          THE COURT:  Can we blow that up?

10         MR. BORNSTEIN:  Sure.

11   Q.    So from your review of the materials, what was it,

12   what was the precipitating act that led to the use of force?

13   A.    That the inmate had been smearing feces over his body

14   and was refusing to take his involuntary medication.

15   Q.    Where was he being housed at the time?

16   A.    In a mental health crisis bed.

17   Q.    And what is a mental health crisis bed?

18   A.    It is a facility designed to deal with inmates who are

19   on in an acute mental health crisis.

20   Q.    There was force used that we saw on the video and I

21   want to talk about that.

22         There's a description of a continuous burst of OC

23   pepper spray from the MK-46, approximately three feet from

24   the intended target.

25         What does that mean?

1    A.      The plain meaning of the words, that they sprayed the

2    offender with OC from an MK-46 canister about three feet from

3    where he was standing.

4    Q.      What is OC pepper spray?

5    A.      Well, it's derived from basically hot peppers, an

6    organic compound.  It's an inflammatory.  It inflames the

7    tissues.  It burns the eyes, the throat, the skin.  It

8    frequently causes temporary blindness as the eyes dilate.

9           It makes breathing difficult because of that, and

10    sometimes people will panic, and usually the training

11    includes instructions for the person administering the spray

12    to tell the subjects to try to breath normally.

13           Depending on how much you are hit with, it lasts at

14    least 30 to 45 minutes, sometimes as much as four hours.  In

15    some people it causes headaches.  It makes the skin -- people

16    describe it as it feels like your skin is burning off.  The

17    eyes feel like they're bubbling and boiling.  Some people

18    cough convulsively.  It brings them to their knees.

19           There is some variation as to how people respond to

20    it, but, generally speaking, I think that's a relatively good

21    and accurate description.

22           MR. RUSSELL:  I object and move to strike.  The

23    question is:  What is OC pepper spray?  The witness is

24    rendering essentially medical testimony.

25           THE COURT:  The objection is sustained.

1      But in terms of your own experience, sir, have you

2  been trained as to what OC spray does and its effect upon the

3  recipients?

4      THE WITNESS:  Yes.

5      THE COURT:  Would your testimony be that what you've

6  just described is essentially what you received in training?

7      THE WITNESS:  Correct.

8      THE COURT:  You may proceed, sir.

9      MR. BORNSTEIN:  Thank you, Your Honor.

10  Q.    What is an MK-46?  By that I mean, can you tell me, is

11  it a small container?  Big container?

12  A.    It's a large container.

13  Q.    Is it -- do you know anything about -- when you say

14  it's a big container, what do you mean?

15      THE COURT:  It means it's larger than a small

16  container.

17  BY MR. BORNSTEIN:

18  Q.    How big is big?

19  A.    I can't give you an ounce size.  If you look at the

20  different canister sizes in comparison, it's one of the

21  larger ones.

22  Q.    The report goes on to talk about (Reading:)

23          One continuous burst from the OC pepper spray

24          from an MK-9 at approximately seven to eight

25          feet from the intended target.

```
 1                What is an MK-9?

 2   A.       A smaller canister than the MK-46, but generally used

 3   for crowd control situations.

 4   Q.       Please turn to tab 69.

 5   A.       (Witness complies.)

 6   Q.       Do you recognize what's depicted in Exhibit 69 for

 7   exemplar purposes?

 8   A.       They're examples of pepper spray sizes.

 9   Q.       Does it have an MK-46?

10   A.       It does.  MK-9, MK-4 and MK-3.

11   Q.       Are these similar to at least the size containers that

12   California uses in its prisons?

13   A.       I'm not sure that they have consistent products in

14   each facility, but, generally speaking, yes, and these are

15   referenced in a variety of reports I read and saw when I was

16   inspecting.

17            MR. BORNSTEIN:  I move Exhibit 69 and ask that it be

18   displayed.

19            THE COURT:  Received.

20                        (Whereupon, Plaintiffs' Exhibit 69 was

21                         received into evidence.)

22            MR. BORNSTEIN:  Can you put that up?

23   Q.       So when we're talking about an MK-46, that's the big

24   one here that looks like a fire extinguisher.

25            Is that right?
```

1    A.      Okay.  Correct.

2            THE COURT:  Is it what it is, whether it likes like a

3    fire extinguisher or not.

4    BY MR. BORNSTEIN:

5    Q.      The MK-9 is the next size down; correct?

6    A.      Yes.

7    Q.      Is there a -- when you viewed the video, there were

8    certain delays between the administration of the pepper spray

9    that you observed.

10           Correct?

11   A.      There were.

12   Q.      Were they adequate?

13           THE COURT:  Adequate for what purpose, what end?

14   BY MR. BORNSTEIN:

15   Q.      In other words, are there guidelines, are there

16   procedures that are supposed to be followed in the delivery

17   of pepper spray that you're aware of?

18           MR. RUSSELL:  Objection.  Lacks foundation.

19           THE COURT:  Well, once again, I'm not at all clear as

20   to what the question means, but --

21           MR. BORNSTEIN:  I'll rephrase it.  I think I can help

22   myself that way.  Thank you.

23   Q.      In California, are there guidelines for officers when

24   they use pepper spray in terms of how much to use or when to

25   use it?

1    A.        There are two questions there.  I'm sorry.

2    Q.        Let's try first --

3              THE COURT:  Multiple questions.

4              Sustained.

5    BY MR. BORNSTEIN:

6    Q.        Let's try this as the first question:  Are there

7    guidelines in California directing officers how much pepper

8    spray to use?

9    A.        There are not, not that I've been made aware of.

10   Q.        Are there guidelines in California telling officers

11   how long they should wait in between the administration of a

12   pepper spray dose?

13   A.        Again, no, not that I'm aware of.

14   Q.        Are there guidelines in California that tells officers

15   how long or how much spray to use each time they insert it

16   into a cell?

17   A.        No, not that I'm aware of.

18   Q.        In the report from the captain about Inmate A, down

19   here at the bottom, he was -- the captain states that he was

20   observed in a state where he could not follow the simplest

21   instruction.

22             Was that your impression from watching the video?

23             MR. RUSSELL:  Objection, Your Honor.  The video speaks

24   for itself.  This calls for speculation.

25             THE COURT:  Well, it asks him for a conclusion, but

1   the court can draw its own conclusion from viewing the disk;

2   however, the fact that it was observed by the captain is

3   itself significant and will be received.

4        You may proceed, sir.

5        THE WITNESS:  I think I've said similar things about

6   this incident, that I didn't believe the inmate was lucid

7   enough to be able to respond to the instructions that he was

8   being given.

9   BY MR. BORNSTEIN:

10  Q.    I want to go to Exhibit 2B, a portion of the IERC

11  report.  I just want to sort of start by having you describe

12  the nature of the documentation that we're going to be

13  looking at.

14        Okay?

15  A.    Okay.

16  Q.    So this is for Corcoran.  Is this similar to the IERC

17  reports from all of the institutions that you've seen IERC

18  records from?

19  A.    Similar.

20  Q.    There is a question and answer:  (Reading)

21              State the threat reasonably perceived by the

22              responsible officials.

23        And then there's information that's filled out?

24  A.    Yes.

25  Q.    In this case it was an inmate who had smeared himself

1    with feces?

2    A.       Yes.

3    Q.       And it says (Reading:)

4             A doctor deemed the inmate mentally unstable and

5             ordered him out of his cell for mental health

6             treatment.

7    A.       Correct.

8    Q.       And:  "An injection of medication."

9    A.       Yes.

10   Q.       Is that, in your view, adequate rational for using

11   force for the type we observed?

12   A.       Not for the type we observed.

13   Q.       Why not?

14   A.       The inmate is characterized throughout these reports

15   as refusing orders.  I believe, and from looking at the

16   video, he was so out of touch, whether or not he had the will

17   to refuse is very unlikely.  There needed to be an

18   intervention.

19            But what I found in this case and in many other cases

20   or many other examples that are in these videos and also in

21   the file material I reviewed is that when an inmate breaks

22   down to this level and needs to come out for forcible

23   medication or he is refusing transfer or any other kind of

24   acute mental health breakdown, too often the response is

25   simply to pour an unreasonable amount of OC into the cell.

1          If that works, then they cuff up the inmate and haul

2     him off to segregation and give him an RVR.  If it doesn't

3     work, they go in and get him, but that singular approach to

4     the same kind of repetitive problem, I think, is a major

5     issue that the CDCR should be paying attention to.

6          THE COURT:  May I interrupt for a moment.

7          Part of the problem -- I don't know if it's part of

8     the problem.  It appears to the court that the decompensated

9     inmate represents a danger, not only to himself, although

10    that appears to be the case as well, but to staff.

11         Do you agree or disagree?

12         THE WITNESS:  Decompensating inmates can.  I didn't

13    see --

14         THE COURT:  This particular one?

15         THE WITNESS:  He may have.  I have to knowledge that.

16         THE COURT:  Fair enough.

17         In your expert opinion, what should they have done to

18    achieve the extraction while limiting the chances of injury

19    to himself or to others?

20         Do you understand what I'm trying to get it?

21         THE WITNESS:  I think I do.  I can't answer that

22    without saying that if I was responsible for this facility, I

23    would want to back way up and take a look at how long had he

24    been smearing feces?  Are we paying attention at the level of

25    these patients in acute beds so the intervention could have

1    occurred earlier and not driven to the use of force.

2          Setting that aside, going into this situation,

3    layperson's observation of how disturbed this particular

4    inmate was, if I was the incident commander, I would have

5    gone in with a hands-on approach.

6          THE COURT:  I take it that that means -- I'm not quite

7    sure.  One of the things about this lawsuit, people use all

8    these phrases as if I'm supposed to understand what they

9    mean.

10          Does "hands-on approach" mean they go in with the

11    guard that they had but without spraying him first and then

12    just grab him and hold him the way they do in the Sacramento

13    County Jail, which is a four-point restraint?

14          THE WITNESS:  Typically, you go in a shield, but other

15    than that, what you state is pretty accurate.

16          THE COURT:  In you view, your own view, were there

17    steps to be taken beforehand which might have reduced the

18    need for force?

19          That's one point you made.

20          THE WITNESS:  Yes.

21          THE COURT:  I'm asking you, not telling you, is that

22    in any way dependent on when the psychologist or psychiatrist

23    who said, "We've got to get him medicated," indicates that

24    that's the case or are the guards themselves responsible for

25    discovering, in your view, in a properly run prison,

1    responsible for discovering conditions which might well wind

2    up in the serious situation as we found on the disk?

3            THE WITNESS:  It really varies.  And I don't mean to

4    be vague, but it depends on how long that person has been in

5    that unit.  Did he just arrive?  I don't really know that.

6            Who is the primary clinician?  What kind of treatment

7    has been provided previously?

8            But in acute crisis mental health beds, there's a lot

9    of custody staff, a lot of medical staff, and I would expect

10   both of those groups to be observing, knowing what's going on

11   with individual inmates before they get to the point where

12   they have been in their cell for a considerable period of

13   time smearing feces.

14           THE COURT:  Thank you, sir.

15   BY MR. BORNSTEIN:

16   Q.      I'd like to follow up on that.

17           In your inspections of the prisons, and let's talk in

18   particular about Corcoran or the other institutions you went

19   to, did you interview mental health staff about their

20   relationship with custody staff?

21   A.      In every facility, yes.

22   Q.      What were your observations, based on those

23   interviews?

24   A.      The purpose of the interviews were mainly or initially

25   to try to get at their understanding of their role in the

1    mental health assessment process, but several different

2    mental health staff expressed considerable frustration about

3    their relationship with custody staff and how the program as

4    it is run gets in the way of providing adequate treatment.

5         There was one gentlemen, I believe it was at Kern

6    Valley, who figured out who we were and what we were doing

7    and told us that he thought we were foolish if Coleman was

8    going to make any difference in the living units where the

9    inmates lived.

10        He then gave me an example of a person on his case

11   load who had received an RVR for assault because a tuna can

12   had fallen off the shelf in the cell and hit an officer on

13   the leg.  He went to bat for the inmate.  He went to the

14   captain asking that a bit of sanity be restored to the

15   situation because the person on his case load was actually

16   facing a potential assignment to a SHU, which he believed

17   would do some serious damage to the person on his case load.

18        Another facility --

19        THE COURT:  I take it that intervention was not

20   successful?

21        THE WITNESS:  It was not, he used that as an example

22   to show the custody dominance.

23        There was another less passionate person, a mental

24   health psychologist who had been assigned to work with a

25   group of inmates who had life without parole, and that's a

1    particular difficult group of folks to work with because they

2    don't have a lot of hope.  He was trying to copies of Viktor

3    Frankl's book, Man Search For Meaning.  He was having a hard

4    time.  He never could get it approved, at least he hadn't had

5    it approved when we visited him.

6        And that was used as example that some of the simplest

7    things that might help some of the people -- this is a guy

8    with a mental health case load, not general population

9    inmates -- an example of kind of what he perceived to be

10    unreasonable interference in trying to do something

11    significant to help people cope while they're doing their

12    prison time, and this was the rest of their life, the way it

13    was looking for each of them.

14    BY MR. BORNSTEIN:

15    Q.    You talked about the need to be on top of the

16    situation sooner as it relates to Inmate A. I want to ask you

17    about that observation.

18        Did you in your inspections see mental health inmates

19    that were in ad seg or level VI or above --

20        THE COURT:  There is no above.

21        MR. BORNSTEIN:  Well, I bet there is a SHU, Your

22    Honor, but I could be wrong.

23        THE COURT:  It's different.  I shouldn't say that.

24        Was it your understanding that level VI constitutes

25    the level of concern for safety and the SHU is a different

```
 1   kind of -- supposed to have a different kind of function?
 2         THE WITNESS:  A level VI a general population
 3   facility, and a SHU is a segregated environment.  There's
 4   that difference.
 5   BY MR. BORNSTEIN:
 6   Q.    All right.  Let me start over.  I want to start over.
 7         Did you observe inmates in level VI housing units out
 8   of their cells in the day room doing activities during the
 9   time you did your tours?
10   A.    No, not really.  I wouldn't say that I didn't -- too
11   many double negatives.  I saw a few inmates out of their
12   cells in level VI day rooms, but not what I would expect and
13   not in any kind of structured activity or much in the way of
14   unstructured recreational activity.
15   Q.    In your -- when you went to the mental health crisis
16   center or crisis bed units, did you observe any sort of
17   programing or treatment going on in those facilities?
18         MR. RUSSELL:  I'm going to object.  Lacks foundation.
19         THE COURT:  He's asking what he saw.
20         MR. RUSSELL:  I understand, Your Honor, but he asking
21   what he saw in terms of treatment or programing.
22         THE COURT:  The objection is overruled.
23         You may answer, sir.
24         THE WITNESS:  You're talking about the MHCBs?
25         MR. BORNSTEIN:  Yes.
```

```
 1              THE WITNESS:  I'm sorry.  I had to catch back up

 2    there.  My answer to that question is a little complicated.

 3    Generally, in those units, you wouldn't see people out for

 4    congregate programing.  To the degree that treatment would be

 5    occurring, it would probably be one on one, and I didn't

 6    observe any.

 7    Q.    I want to go down to bottom of the page.  It's DEXP --

 8              THE COURT:  There should be a microphone.

 9    BY MR. BORNSTEIN:

10    Q.    It's DEXP112904.

11              There is a -- the issue is:  State the relationship

12    between the need for the use of force and the amount of force

13    used.

14              And there's a conclusion by the committee that the

15    amount of force used was in direct relationship to the

16    inmate's actions.

17              Right?

18    A.    Correct.

19    Q.    And then it gives the reasons; correct?

20    A.    Yes.

21    Q.    In the report, the rest of the report that you've

22    reviewed, which is here, was there ever any discussion by the

23    committee that was reported about whether there were other

24    ways that could have been, should have been tried?

25    A.    No, there were not.
```

1    Q.        Was there any discussion about:  How did we get in the

2    situation where the inmate had decompensated to the point we

3    needed to use force?

4    A.        No, there was not.

5    Q.        Have you seen that in any of the IERC reviews that you

6    have reviewed in this case?  In other words, where they've

7    asked that question?

8    A.        I don't recall any, no.

9    Q.        From your expertise as a prison administrator, is that

10   the kind of question that should be asked by a review

11   committee?

12   A.        Yeah, that's pretty fundamental to what you want to

13   know.

14   Q.        Why?

15   A.        Well, this case is about use of force in the mentally

16   ill, and, again, as a layperson, but prison administrator,

17   I've been schooled that use of force incidents with mentally

18   ill can exacerbate and worse their mental health illness.  A

19   lot of them have trauma in their background.

20             I could give a longwinded answer, but the short answer

21   is you don't want to do anything to make that person worse if

22   you absolutely don't have to.  So avoidance of use of force

23   needs to be a primary value of the organization when you're

24   dealing with mentally ill inmates.

25   Q.        On the second page of the document, which is the last

 1    three digits of it, which would be 905, so 112-905, there's a

 2    question that is asked (Reading:)

 3                Were staffs actions during the use of force in

 4                compliance with departmental standards and

 5                policies?

 6    A.    Correct.

 7    Q.    There are certain criticism in this case?

 8    A.    There is.

 9    Q.    I want to talk first the triangle or lanyard?

10    A.    What is that.

11          THE COURT:  We saw it.

12          MR. BORNSTEIN:  I just wanted to make it so we had it

13    in the record, but if you're satisfied --

14          THE COURT:  Go ahead.

15          THE WITNESS:  It's a device that you attach to the

16    cuffs and it makes it so that the inmate can't pull the cuffs

17    through the cuff port.

18    BY MR. BORNSTEIN:

19    Q.    And is it -- let me ask it this way:  There was a

20    criticism in about the way in which the lanyard was used?

21    A.    Yes.

22    Q.    What was the nature of the criticism?

23    A.    You know, I would have to look at the other pictures

24    here.  I can't recall it off the top of my head.

25    Q.    Actually, there really wasn't any criticism; there was

1    just a comment that it was used; right?

2              MR. RUSSELL:  Objection, Your Honor.

3              THE COURT:  The objection is sustained.

4              You may ask the question:  As you read it now, can you

5    find -- and of course, the document speaks for itself.  That

6    objection is also sustained.

7              MR. BORNSTEIN:  Okay.

8    Q.    I want to go -- let me move on to the next page

9    because I want to talk about this.

10             At the end of the video, we watched the inmate being

11   restrained in a five-point restraint; right?

12   A.    Yes.

13   Q.    Was he given any -- was he put in the water or allowed

14   to get rid of the spray that was on him before they strapped

15   him in that bed?

16   A.    No.

17   Q.    There's criticism here about mental health staff not

18   having actually done the restraining, that custody staff did

19   it.

20             Right?

21   A.    Yes.

22   Q.    From your experience, what's the difference if custody

23   staff does it or mental health staff does it?

24   A.    Well, this is a requirement of CDCR policy.  In this

25   circumstance and in my experience, the level of fear this

1    inmate was experiencing -- and I think I said yesterday I

2    believe he probably felt like he was fighting for his life --

3    I understand why custody staff were applying those

4    restraints.

5    Q.      In Exhibit 2C in the RVR section, we talked about the

6    mental health assessment form.

7            Right?

8    A.      Yes.

9    Q.      Is what I'm now displaying now, which is COR-12792, is

10   that the mental health assessment form that was filled out

11   for Inmate A?

12   A.      It is.

13   Q.      This is filled out by mental health staff?

14   A.      Yes.

15   Q.      Is the mental health assessment that is done as part

16   of the discipline process adequate, in your opinion?

17   A.      I'm sorry.  I need you to help me with "adequate."

18   For what purpose?

19   Q.      For ensuring that it is helpful or useful in the

20   disciplinary process?

21   A.      I think it has some value.  I think it could be

22   reviewed.

23   Q.      Have you reviewed Steve Martin's suggestions, the

24   state's expert, about how to change this process and this

25   form?

 1    A.        I have.

 2    Q.        And what do you understand those to be?

 3              THE COURT:  You want him to explain what Mr. Martin

 4    suggested?

 5              MR. BORNSTEIN:  Yes.

 6              THE COURT:  Why do I find that useful?

 7              MR. BORNSTEIN:  He's an expert and I want to get his

 8    opinion about that.

 9              THE COURT:  That's different.

10              You reviewed Mr. Martin's comments, I understand?

11              THE WITNESS:  Yes.

12              THE COURT:  Do you agree or disagree?

13              THE WITNESS:  I agree.

14              THE COURT:  We'll get it from Mr. Martin then.

15    BY MR. BORNSTEIN:

16    Q.        In the process of reviewing the RVR that you have

17    reviewed, are you able to determine whether or not the

18    hearing officer -- strike that.

19              Does CDCR monitor how the hearing officer takes into

20    account an inmate's mental health in the imposition of

21    discipline?

22    A.        No, they don't, and I actually think that's the larger

23    problem.

24    Q.        Why is that the larger problem?

25    A.        Well, California has been been under the jurisdiction

1      of the court with this set of issues for a long, long time.

2      If I was running the system, if I was running an institution,

3      I would want to know, not just how often the mental health

4      assessment form has been completed, but what the

5      recommendations were and whether or not they were followed by

6      the hearing officer, and if they weren't followed, why not?

7              The purpose of doing that is because when you get --

8      when you start to get the aggregate data, you can find out

9      which institution.  If it's the central office level that is

10     having problems, you can focus your efforts there.  Maybe

11     some are fine; some are not.

12             But if I was in the institution, I would also want it

13     by a hearing officer.  It's a way to measure performance.

14     It's a way to measure compliance with the expectations.  It's

15     a way to figure out if the system is actually working.  When

16     I asked those questions of California officials, that data is

17     not available.

18     Q.    You reviewed the Inspector General's reports about use

19     of force and discipline that come out either semi-annually or

20     otherwise.

21             Correct?

22     A.    I have.

23     Q.    Does the Inspector General, who's in charge of

24     reviewing California's prisons, track the information about

25     use of force relating to mentally ill inmates?

1    A.      No, they do not.

2    Q.      Does he track discipline as it relates to mentally ill

3    inmates?

4    A.      No, he does not.

5    Q.      Does anyone in the State of California track --

6            THE COURT:  As far as you know.

7    BY MR. BORNSTEIN:

8    Q.      -- as far as you know, from the records you have seen,

9    track use of force incidents relating to mental health

10   inmates?

11   A.      Yeah.  There's raw data about numbers of use of force

12   incidents against mentally ill inmates.

13   Q.      Did you look at that raw data?

14   A.      I did.

15   Q.      I want to turn now, please, to tab 60 for

16   identification.  I want to talk about some of the raw data

17   you're talking about.

18           Do you recognize what's been pre-marked as Exhibit 60?

19   A.      Yeah.  It's a weekly population report for California

20   Department of Corrections and Rehabilitation.

21   Q.      And this particular report is dated June 6, 2012?

22   A.      It is.

23   Q.      And then turning to tab 61 for identification, is this

24   also a report that you reviewed?

25   A.      Yes, I've seen this report.

1    Q.      And this is dated when?

2    A.      June 8, 2012.

3    Q.      What is this?

4    A.      It's the number of mental health populations by

5    institution, broken down into three different categories,

6    what is called:  3C, EOP and the PSU.

7    Q.      In these two reports, are these available on CDCR's

8    website?

9    A.      I know the first one is.  I don't know if the second

10   one is.  I haven't seen it there, but that doesn't mean it's

11   not.

12   Q.      As far as you know, both of these documents, CDCR

13   documents, either reflect the population as of a certain date

14   and the mental population as a certain date?

15   A.      Yes.

16   Q.      Is this part of the raw data that you're talking about

17   in terms of trying to figure out either use of force or

18   disciplinary issues relating to mental health inmates?

19   A.      It gives you the baseline, yes.

20   Q.      Is this part of what you reviewed in this case?

21   A.      Yes.

22          MR. BORNSTEIN:  Your Honor, I move 60 and 61 into

23   evidence.

24          THE COURT:  Received.  Both are received.

25   /////

```
 1                    (Whereupon, Plaintiffs' Exhibits 60

 2                    and 61 were received into evidence.)

 3    BY MR. BORNSTEIN:

 4    Q.    With respect to Exhibit 60, if we can go to the second

 5    page -- actually, let's start at the first page just so we

 6    can get it clear.  Can you make it a little bigger?

 7          This will give us -- it gives us the total population;

 8    right?

 9    A.    Yes.

10    Q.    If we go to the second page, it will break it down by

11    particular institution.

12    A.    Yes.

13    Q.    So you take that information then and then we go to

14    Exhibit 61.  If you can make this a little bigger.  This then

15    will break down in each institution what the mental health

16    population is.

17          Correct?

18    A.    Correct.

19    Q.    I would like you to turn to Exhibit 62A.

20    A.    (Witness complies.)

21    Q.    Was this -- before we do that, first, let's turn to

22    Exhibit 64.

23          THE COURT:  While counsel is trying to figure out

24    where to go next, there is, I think, some uncertainty about

25    what "mental health population" means.  There are all types
```

 1    of folks carrying neuroses and other things.  We have been

 2    using in the course of this case "severe mental illness."

 3            Is that what is meant by "mental health population,"

 4    if you know?

 5            THE WITNESS:  This is the population identified by

 6    CDCR as mentally ill.

 7            THE COURT:  Thank you, sir.

 8            You may proceed.

 9            MR. BORNSTEIN:  Your Honor, I'd like to kind of clear

10    that up for the record.

11            THE COURT:  You might want to clear it up for me,

12    actually.

13    BY MR. BORNSTEIN:

14    Q.    Okay.  61.  If we go to the second page of 61, that

15    summary.  This is for ACU, general population, receiving

16    center and SHU.

17            And then we go to the next page, and then it's broken

18    down:  First administration segregation unit by triple CMS

19    and EOP?

20            Correct?

21            MR. RUSSELL:  I'm going to object.  This is leading.

22    As the court pointed out earlier, we were talking about a

23    definition of the mental health population.  If we refer to

24    the first page of this document, it shows it's a summary of

25    outpatient population.  We're starting to mix apples and

1    oranges.

2         THE COURT:  I bet you're going to cross-examine the

3    heck out of the witness, sir.

4         You may be seated, sir.

5         It's time for our morning recess.  15 minutes.

6                        (Whereupon, a break was taken at

7                         10:12 a.m.)

8                        (Nothing Omitted.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    /////

25    /////

150

1              (Back on the record at 10:30 a.m.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Mr. Bornstein.

5              MR. BORNSTEIN:  Thank you, Your Honor.

6              I'm going to change topics and come back to

7    statistics later with the court's permission.

8              I guess we have another witness we'd like to put on,

9    Dr. Kaufman, so I'm going to try and interrupt Mr. Vail so

10   that Dr. Kaufman can testify today.

11             THE COURT:  That's fine.  You want to do it now?

12             MR. BORNSTEIN:  I just want to ask about one area,

13   then I will turn it over.

14             THE COURT:  All right.

15             MR. BORNSTEIN:  Thank you.

16   BY MR. BORNSTEIN:

17   Q.     In this case we've been talking about controlled use

18   of force and immediate use of force.  Will you please tell us

19   the difference?

20   A.     Well, controlled use of force is when you have some

21   containment of the situation, and you can assemble your team

22   and develop a plan, which would include videotaping the

23   event.

24             An immediate use of force is when something

25   spontaneously pops off in a yard or a living unit or

151

1    wherever, in a facility, such as a fight, where the staff

2    have to respond immediately.

3    Q.      From the incidents that you've been able to review,

4    are the -- in California, is force used usually immediately

5    or in a controlled situation?

6    A.      There's a high number of immediate use of force

7    incidents compared to controlled.

8    Q.      Have you seen any patterns with respect to incidents

9    that are treated immediately that shouldn't be?

10         MR. RUSSELL:  Objection.  Vague and ambiguous.

11   BY MR. BORNSTEIN:

12   Q.      Are there instances of use of force in California, a

13   pattern and practice, of immediate use of force when it

14   should be controlled?

15   A.      There are some situations where I would -- could

16   second-guess, but there is, I think, a big hole in their

17   policy when it comes to food ports, the port in the door

18   where the food goes through, or from the use of force videos

19   where the inmates put their hands through in order to be

20   cuffed up.

21         California policy makes a distinction between

22   controlled and immediate use of force.  In my opinion they

23   don't put enough emphasize on controlled.  But when you get

24   farther down in the policy, there's an exception for the food

25   ports.  And the language that applies to all the rest of the

152

1    policy about controlled and immediate is thrown out the

2    window, and officers are given discretion to use OC

3    immediately if the inmates won't relinquish control of the

4    food port.

5            I think that's a problem.

6    Q.    Why is that a problem?

7    A.    Well, because there's no immediate or imminent or

8    serious danger in some situations.  There might be in others,

9    but in this case the officer has sort of a free pass.  He

10   doesn't have to make that evaluation, and the policy allows

11   him to go ahead and use spray immediately.

12           The policy also says that they may consult with their

13   supervisor, but they're not required to.  I think that

14   contributes to the overall custody dominance, oppression, use

15   of force kind of culture that makes it difficult for

16   inmate-patients to be treated.

17           MR. BORNSTEIN:  Your Honor, this would be a good time

18   to have Dr. Kaufman.

19           THE COURT:  You are excused for the time being, sir.

20           You may call your witness.

21           MS. RIFKIN:  Good morning, Your Honor.  Lori Rifkin

22   for plaintiffs.

23           We would like to call Dr. Edward Kaufman as our next

24   witness.

25           THE COURT:  Come around and be sworn, sir.

153

1          THE CLERK:  Please, raise your right hand.

2                    DR. EDWARD KAUFMAN,

3  was thereupon called as a witness herein by the Plaintiff,

4  and having been sworn to tell the truth, the whole truth and

5  nothing but the truth, was thereupon examined and testified

6  as follows:

7          THE CLERK:  Thank you.

8          Please, take a seat.  State your name and spell your

9  last name and speak directly into the microphone.

10          THE WITNESS:  Dr. Edward Kaufman, K-a-u-f-m-a-n.

11          THE COURT:  You may proceed, ma'am.

12                    DIRECT EXAMINATION

13  BY MS. RIFKIN:

14  Q.     Good morning, Dr. Kaufman.

15          Dr. Kaufman, you have more than five decades of

16  experience in forensic psychiatry; is that correct?

17  A.     Yes.

18  Q.     And you have previously offered opinions as a

19  psychiatric expert as to the effects of use of force on

20  prisoners with mental illness; is that right?

21  A.     Yes.

22  Q.     In fact, you've offered those opinions in this case?

23  A.     Yes.

24  Q.     Is that correct?

25          About 20 years ago; is that right?

154

1  A.      Yes.

2          THE COURT:  Can I ask you to move that microphone in

3  front of you instead of off to the side?

4          There you go.

5          THE WITNESS:  Thank you.

6  BY MS. RIFKIN:

7  Q.      And you've submitted three declarations in this case

8  recently; is that correct?

9  A.      Yes.

10 Q.      One of those was in connection with the plaintiffs'

11 opposition to defendants' motion to terminate?

12 A.      Yes.

13 Q.      The other two have been in connection with the

14 instant motion before the court?

15 A.      Yes.

16 Q.      Dr. Kaufman, you toured three CDCR prisons earlier

17 this year; is that right?

18 A.      Yes.

19 Q.      During these tours did you tour different housing

20 units where prisoners with mental illness are housed?

21 A.      Yes.

22 Q.      Which types of housing units were those?

23 A.      General population, Ad. Seg., SHU, death row and the

24 women's facility.

25 Q.      When you were touring those different housing units,

155

1   did you talk with members of the class here?

2   A.      Yes, I did.

3   Q.      Did you also talk with staff operating those units?

4   A.      Yes, I did.

5   Q.      Did you review mental health records for the class

6   members that you interviewed?

7   A.      Yes.

8   Q.      In connection with your work on this motion, did you

9   review the declarations and depositions of plaintiffs' and

10  defendants' use of force experts?

11  A.      Yes.

12          MS. VOROUS:  Objection, Your Honor.  Leading.

13          THE COURT:  That objection is sustained.

14          You know, this is all clearly preliminary, but I

15  think you're about to get to substance.  And at that point

16  you're going to have to ask questions rather than tell the

17  witness what he did.

18          You may proceed.

19          MS. RIFKIN:  Yes, Your Honor.  I'm just establishing

20  the foundation.

21          THE COURT:  I just said that.

22  BY MS. RIFKIN:

23  Q.      Dr. Kaufman, did you have the opportunity to review

24  any use of force videos in connection with your work on this

25  motion?

156

1    A.    Yes.

2    Q.    Approximately how many videos did you review?

3    A.    Six.

4    Q.    And how many inmates did those involve?

5    A.    Four.

6    Q.    These were class members?

7    A.    Yes.

8    Q.    And did you also review any incident reports or rules

9    violation reports in connection with your work?

10    A.    Yes.

11    Q.    Do you know approximately how many?

12    A.    A little over 30.

13    Q.    And you also had the opportunity to interview class

14    members who were subjects of the use of force?

15    A.    Yes.

16    Q.    How many?

17    A.    Two.

18    Q.    Is there any other -- are there any other documents

19    or evidence you reviewed in connection with your work on this

20    motion?

21    A.    Just the documents that have been listed and

22    submitted in this case.

23    Q.    Dr. Kaufman, you wrote an email to plaintiffs'

24    counsel in which you said that you're not an expert on use of

25    force.

157

1          Can you explain what you meant by that?

2          THE COURT:  He's not an expert in the use of force.

3          Your next question.

4    BY MS. RIFKIN:

5    Q.     What areas do you consider yourself an expert in that

6    are relevant to this motion, Dr. Kaufman?

7    A.     On the effects of force on the

8    psychiatric/psychological status of mentally ill patients and

9    inmates.

10   Q.     Do you feel that the evidence you reviewed provides a

11   sufficient basis on which to render an opinion about whether

12   these practices -- what effect these practices have on the

13   mental health state of inmates?

14   A.     Yes.

15   Q.     Do you feel that you have enough information about

16   which to form an opinion about whether these kinds of

17   practices may cause harm on a systemwide basis?

18         THE COURT:  Ma'am, if you're going to continue to

19   lead, I'll ask you to stop questioning.

20         Now, try again.

21         The way you do this is you elicit information from

22   the witness, not tell him what the answer is.

23         If you can't -- you may proceed.

24         MS. RIFKIN:  Yes, Your Honor.

25         I'll try again.

158

1    BY MS. RIFKIN:

2    Q.      Why do you feel you have a sufficient basis for

3    rendering an opinion in this matter?

4            MS. VOROUS:  Objection.  Vague and ambiguous as to

5    "this matter."

6            THE COURT:  Overruled.  You may answer, Doctor.

7            THE WITNESS:  Because of my visits to several

8    facilities, my interviews of the inmates, my extensive review

9    of records, my observation of the videotapes.

10           THE COURT:  And you do that all against your own

11   background as a forensic psychiatrist, I take it?

12           THE WITNESS:  Correct.

13           THE COURT:  You may proceed.

14           MS. RIFKIN:  Your Honor, I would like to offer

15   Dr. Kaufman at this point as an expert in forensic

16   psychiatry.

17           THE COURT:  Does anyone wish to voir dire?

18           MS. VOROUS:  No, Your Honor.

19           THE COURT:  You may proceed.

20           The court will find he is competent to testify on

21   those subjects.

22           MS. RIFKIN:  Thank you.

23           Before the court and Dr. Kaufman, as well as copies

24   provided to the Special Master, the clerk and defendants, are

25   binders titled Kaufman Exhibits.

159

1          What these binders are are documents or excerpts of

2    documents that have been identified in the larger exhibit

3    list as exhibits in the case.  And I'll go through and admit

4    where necessary.

5          I wanted to let everyone know what is going on

6    there.

7    BY MS. RIFKIN:

8    Q.    If you turn to tab 2 in front of the binder in front

9    of you, Dr. Kaufman, this is a supplemental declaration you

10   offered in this case.

11         I would like you to specifically turn to page 2,

12   paragraph 6 of your declaration, page 2 by the bottom of the

13   page, page 4 of 22 if you are looking at the top numbers.

14         THE COURT:  May I interrupt.  Is 2 in this binder

15   equivalent to 2 in the list of exhibits?

16         MS. RIFKIN:  No, it is not, Your Honor.

17         THE COURT:  Well, isn't that --

18         MS. RIFKIN:  I'll identify for the record what

19   exhibit it is.

20         THE COURT:  Thank you very much.

21         MS. RIFKIN:  Sorry about that.

22         What's tab 2, the supplemental expert declaration of

23   Edward Kaufman in this binder, has been marked for

24   identification previously as Trial Exhibit Number 181.

25         I would like to move this supplemental declaration

160

1    previously filed in this case into evidence.

2            THE COURT:  Received.

3                (Whereupon, Plaintiffs' Exhibit 181 received into

4                evidence.)

5    BY MS. RIFKIN:

6    Q.      Dr. Kaufman, are you on page 2 of your declaration?

7    A.      Yes.

8    Q.      Okay.  I would like to direct your attention to

9    paragraph 6.  In paragraph 6 you stated that it is your

10   opinion that CDCR continues to use force and disciplinary

11   measures against persons with mental illness in a punitive

12   manner similar to that employed at the time of trial 20 years

13   ago.

14           THE COURT:  Before you -- I'm afraid that my exhibit

15   list -- my exhibit does not conform.

16           This is page 1.  Oh, I'm sorry.  I see what happened.

17           You may proceed.

18           MS. RIFKIN:  Thank you, Your Honor.

19   BY MS. RIFKIN:

20   Q.      In this opinion can you describe what you mean by

21   "punitive" when you use it here, Dr. Kaufman?

22   A.      Well, 20 years ago, when an inmate was having extreme

23   difficulties with his mental illness, and in some way

24   represented a threat to himself or in the eyes of custody, a

25   threat to others, the intervention in that context 20 years

161

1 ago would often have been tasers followed by pellet guns,

2 shooting rubber pellets.

3      The correctional officers that approached the cell at

4 that time would be dressed in garb which, I think, could be

5 very frightening to inmates, albeit for the protection of the

6 correctional officers.

7      They would be wearing hazmat suits and masks, and

8 there would be fairly large groups of them who would approach

9 the inmate in his cell.  And then they would restrain the

10 inmate with the use of tasers, which were dangerous and

11 caused a series of inmate deaths and followed by pellet guns.

12      And there seemed to be then no understanding of the

13 factors of mental illness that were driving the inmate's

14 behavior so that the incident would be addressed in a very

15 punitive and punishing manner.

16      And now, 20 years later, what I see is a group of

17 individuals, custodial officers, their clothing has changed

18 somewhat, but maybe even more frightening to inmates, with a

19 combination of helmets and gas masks and full body shields,

20 with OC spray and batons at their side coming to deal with

21 the inmate.

22      And again, based on all of my reviews, there appears

23 to be no awareness of the mental illness that the individual

24 has or in some cases where, for instance, the supervising

25 officer might have some awareness that the individual is

162

1    psychologically disturbed.

2         But even when there is that awareness, the disturbed

3    inmate is treated in a very punitive and harsh way and in a

4    way which demonstrates little if any understanding of his

5    mental illness.

6         And then further on down the line, when there's an

7    RVR submitted, and there's mental health input into how the

8    RVR should be dealt with, or as often there is no mental

9    health input as to how the RVR should be dealt with -- as far

10   as I can ascertain in my review of the records -- and then

11   the inmate might lose 30, 60, 90, 150, 360 days of their

12   earned time when whatever they have done is a direct result

13   of their mental illness.  And they end up being very harshly

14   punished for this.

15   Q.    Taking that last bit that you just talked about,

16   Doctor, when you said that further on down the line they

17   receive an RVR, can you describe where that works in the

18   process and what kind of situations you observed this in?

19   A.    Well, any time there is a forcible cell extraction,

20   there is an RVR written up for it.  And I believe when it is

21   with a Coleman class inmate, there should always be mental

22   health input as to the sentencing.  And then the inmate comes

23   before a committee, and the incident is reviewed and

24   punishment is meted out.

25        You know, in some cases not only is there an ignoring

163

1    of the recommendation of mental illness, but it might just be

2    exactly the opposite.

3        One of our inmates, the recommendation is made

4    specifically that he needs to continue to find means of

5    socialization and sensory stimulation, and yet part of his

6    sentence, as a result of his RVR, is a loss of that privilege

7    for 30 days.

8        So it is the opposite of the mental health

9    recommendation, when the mental health recommendation seems

10   quite sound and the inmate-patient is seriously disturbed and

11   greatly in need of social contact, and without that kind of

12   social contact at great risk for further decompensation.

13   Q.    I would like to direct your attention to what is tab

14   8 in this binder and has been marked for identification

15   previously as Plaintiffs' Exhibit 184.

16   A.    Talking about the list of rules violation reports?

17   Q.    Yes.  Can you describe generally what this exhibit

18   consists of, Doctor?

19   A.    Well, this consists of over 30 reports of individuals

20   with mental illness who have received a review for what they

21   have done as a result of their mental illness.  And it

22   summarizes the sentences that they received, sentences as in

23   a loss of days earned.

24        Very often it is difficult --

25   Q.    Doctor, I'm going to stop you there from describing

164

1   it for just a second.

2   A.      Okay.

3   Q.      This is the packet of documents -- CDCR documents

4   that you reviewed in connection with this case?

5   A.      Yes.

6           MS. RIFKIN:  At this point I would like to admit

7   Plaintiffs' Exhibit 184, Your Honor.

8           THE COURT:  Received.

9               (Whereupon, Plaintiffs' Exhibit 184 received into

10              evidence.)

11  BY MS. RIFKIN:

12  Q.      Now, Doctor, I would like to call your attention to

13  page 187 of this document.  The page numbers are at the top

14  right-hand corner.

15          I apologize.  Page 184 of the document.

16          MS. RIFKIN:  Do you have that in front of you, Your

17  Honor?

18          THE COURT:  Yes.  Go ahead.

19          MS. RIFKIN:  Thank you.

20  BY MS. RIFKIN:

21  Q.      Without using any inmate names, Dr. Kaufman, can you

22  briefly describe what this document is and what offense the

23  inmate was accused of in this incident?

24  A.      This inmate was accused of throwing his food tray

25  through the opened food port and striking a correctional

165

1   officer in the right-side lower abdomen.

2   Q.      I would like to turn now to page 192 of this

3   document.

4           What is this document in relation to the rules

5   violation, Dr. Kaufman?

6   A.      This is the mental health assessment request.  And a

7   mental health clinician answers basically three questions.

8   Q.      What is the mental health clinician essentially

9   saying?  What kind of input is he giving?

10  A.      Well, it is interesting that there is no input on

11  question 1, and it is not even checked "yes" or "no".

12          That's the question:

13          (Reading:)

14          Are there any mental health factors that could cause

15          the inmate to experience difficulty in understanding

16          the disciplinary process and representing his

17          interests in the hearing?

18          (Reading concluded.)

19          And question 2 is:

20          (Reading:)

21          Did the inmate's mental disorder appear to contribute

22          to the behavior that led to the RVR?

23          (Reading concluded.)

24          And if I may read the mental health clinician's

25  response:

166

1          (Reading:)

2          The inmate-patient is severely mentally ill.  His

3          condition renders him out of touch with reality and

4          responding to internal stimuli on a frequent basis.

5          His perceptions are distorted.  He has very limited

6          interpersonal skills.

7          (Reading concluded.)

8          And then the question is:  If inmate is found guilty,

9     are there any mental health factors the hearing officer

10    should consider?

11         And the comment is:

12         (Reading:)

13         The offense, the RV, could have taken place due to

14         the inmate-patient's perception of events.

15         (Reading concluded.)

16    Q.    After reviewing this file, what's your assessment of

17    the punishment of this inmate and the degree to which the

18    mental health assessment was taken into account?

19         MS. VOROUS:  Objection.  Compound.  Also beyond the

20    scope of this witness's expertise as a forensic psychologist

21    (sic).  She's asking his opinion as to the punishment.

22         THE COURT:  The objection is overruled.  But the

23    question, I think, is less than perfect.

24         As best you can tell from reading the record, did the

25    mental health assessment in any way affect the punishment

167

1  ultimately accorded the inmate?

2          THE WITNESS:  Well, it did in theory because the

3  offense was lowered from "assault on a peace officer with a

4  weapon" to "assault on a peace officer."  But the effect was

5  still a very punitive response.

6          THE COURT:  Is it your view, from the psychiatric

7  point of view, that the punishment accorded the inmate was

8  inconsistent with his ability to conform his behavior to

9  appropriate conduct?

10          THE WITNESS:  As best as I can tell from the

11  information available to me.

12          THE COURT:  Now, there are two different issues here.

13  One is from a psychiatric point of view what would be

14  appropriate, and that obviously is your area of expertise,

15  and a custody point of view, which is not your expertise.

16          But in your view, from the psychiatric point of view,

17  does the punishment meted out in any way suggest that it will

18  in some way modify the behavior of the particular inmate?

19          THE WITNESS:  I do not believe it will modify the

20  behavior of this inmate.

21          THE COURT:  That's because of his psychiatric

22  condition?

23          THE WITNESS:  Correct.  I don't believe that he's

24  mentally competent, based on the limited reports I have, to

25  be able to learn from his punishment in a way that will help

168

1    him modify his behavior.

2            THE COURT:  You may proceed.

3    BY MS. RIFKIN:

4    Q.      To follow up on that, Dr. Kaufman, do you know if

5    beyond the loss of credit this inmate received, if it was

6    also referred to the district attorney for prosecution?

7    A.      I believe that it was referred to the district

8    attorney for prosecution.

9    Q.      Change gears just a little bit.

10           Dr. Kaufman, last week the Special Master in the case

11   issued a report on the Salinas Valley Psychiatric Program.  I

12   know you had a chance to review that document.

13           Has the information in this report impacted your

14   opinions concerning any of the issues concerning use of force

15   and discipline?

16           MS. VOROUS:  Objection, Your Honor.  This line of

17   questioning goes beyond the scope of Dr. Kaufman's

18   supplemental expert declaration.  This report -- this was a

19   report that was issued by the Special Master last week.

20           In addition, it is not relevant to the issue with

21   respect to use of force within CDCR prisons.

22           THE COURT:  The objection is overruled.

23           Obviously events occur subsequent to the deposition

24   which may have bearing upon the issues that the court must

25   resolve.

169

1          I must confess that I think the question -- I mean,
2   it is very elaborate.  I think the question is simply:  Did
3   you review the Special Master's report on Salinas Valley,
4   which I have not had a chance to do yet.
5          THE WITNESS:  Yes, I did.
6          THE COURT:  And upon reading that report does it in
7   any way affect your views concerning the use of force as
8   applied to mentally ill patients?
9          THE WITNESS:  It supports that mentally ill patients
10  are handled in a punitive way and punished for incidents
11  related to their mental illness without consideration of
12  their mental illness.
13         THE COURT:  That was your position actually before
14  you ever read the report?
15         THE WITNESS:  But it is even stronger reading the
16  report.
17         THE COURT:  All right.
18         You may proceed, ma'am.
19  BY MS. RIFKIN:
20  Q.     Dr. Kaufman, can you briefly summarize what specific
21  area of this report you found relevant to your opinion in
22  this case?
23  A.     They stated that there is a lack of input of mental
24  health staff in consideration of mental illness for
25  violations, and that it results in extension of release dates

170

1    for no good reason.

2           In one case an inmate was extended -- his release

3    date was extended 570 days for three incidents in one day,

4    all of which were directly a part of his mental illness.

5    Q.     Dr. Kaufman, is your understanding that all of the

6    disciplinary incidents described in this report happened in

7    the inpatient unit at Salinas Valley?

8    A.     Yes, they were.

9    Q.     And what significance does it have that this

10   disciplinary practice is occurring in an inpatient unit in

11   CDCR?

12   A.     This is supposed to be a unit where --

13          THE COURT:  Sir, if you don't speak into the

14   microphone pretty soon, the reporter is just going to stop

15   reporting.

16          Do you want to repeat the question?

17          MS. RIFKIN:  Sure.

18   BY MS. RIFKIN:

19   Q.     You said that it is your understanding that all of

20   these disciplinary incidents occurred within the inpatient

21   unit at Salinas Valley.

22          I'm asking what significance does it have, if any,

23   that this practice is occurring in an inpatient unit?

24   A.     This is a unit where there is supposed to be

25   psychiatric treatment and that the level of psychiatric

171

1    treatment in a unit like this is supposed to be at a higher

2    level than in correctional institutions that don't specialize

3    in psychiatric treatment.

4    Q.    And turning to tab 9 in the binder before you, which

5    is the Special Master's report, which is document number 4830

6    in this case, turning to page 38 -- 38 at the bottom of the

7    page, 39 of 58 at the top of the page --

8           THE COURT:  I'm sorry.  First of all, is this an

9    exhibit marked by you?

10          I don't mean you personally.  I mean your side.

11          MS. RIFKIN:  This exhibit has not been marked.  It's

12   in the file already, but I can move it into evidence.

13          THE WITNESS:  Just to be sure, you're talking about

14   the Master's report on Salinas Valley, correct?

15          MS. RIFKIN:  Yes.

16          THE COURT:  The defendant objects because it has had

17   no opportunity to cross-examine or even to know what was --

18   that this was going to be in the case.

19          Is that right?

20          MS. VOROUS:  Yes, Your Honor.

21          THE COURT:  That objection is sustained.

22          You may proceed, Ms. Rifkin.

23   BY MS. RIFKIN:

24   Q.    You've had an opportunity to review the report,

25   Doctor; is that correct?

172

1    A.      Yes.

2            THE COURT:  You're now going to question him about

3    the contents of the report which is not in evidence.

4            That objection is sustained.

5            You may proceed to other matters, ma'am.

6    BY MS. RIFKIN:

7    Q.      Dr. Kaufman, during your tours earlier this year of

8    CDCR institutions, did you have an opportunity to observe the

9    relationships between clinicians and patients in these

10   institutions?

11   A.      Yes.

12   Q.      And were you able to form any opinions about those

13   relationships?

14   A.      I thought very often they were not therapeutic.

15   Q.      Can you explain what you mean by that?

16   A.      Well, I thought that there was an atmosphere of

17   unrest among the mental health staff.

18           In one institution that I visited over half of a

19   fairly large staff of psychologists were on sick leave.  I

20   saw, you know, many evidences of understaffing.

21           I saw group therapy sessions that were often

22   underutilized.  The group therapy took place in therapeutic

23   models or cages with inmates most often hand and ankle

24   shackled.

25           The group therapy often consisted of a movie that had

173

1    nothing to do with mental health, like a movie about reggae

2    music.

3        When I attended a IDTT, which is an interdisciplinary

4    treatment team meeting that inmates were supposed to

5    participate in so that they could have input into their

6    treatment process, nine of the nine inmates that were

7    supposed to appear did not show up.

8        When I read the medical psychiatric records of these

9    individuals, in the vast majority of cases there was little

10   if any understanding of the inmate's psychological problems.

11       THE COURT:  Do I understand you to be saying, sir --

12   and I don't know -- do I understand you to be saying that

13   these documents which were prepared by people who are

14   supposed to be involved in psychiatric treatment did not, in

15   your view, indicate the appropriate understanding of the

16   condition of the inmate?

17       THE WITNESS:  Correct.

18       THE COURT:  Okay.

19       THE WITNESS:  Some other evidences of therapeutic --

20   BY MS. RIFKIN:

21   Q.    Dr. Kaufman, actually I would like to ask you a

22   question about one of the examples.

23       THE COURT:  Why don't you pull that microphone again.

24   It's gotten away from you.

25       MS. RIFKIN:  You can pull it back towards you.

174

1          THE WITNESS:  Let me ask you a question.  When you

2     ask a question I prefer to face you.  If I face you, I can't

3     face --

4          THE COURT:  I understand you prefer it.  We've got a

5     problem making sure the record is clear.

6          THE WITNESS:  Okay.

7          THE COURT:  I won't feel insulted if you're not.

8          THE WITNESS:  Please, don't.  Thank you.

9          THE COURT:  Pull that microphone to you, sir.

10         There you go.

11         MS. RIFKIN:  May I approach the witness, Your Honor?

12         THE COURT:  Yes.

13         (Microphone adjusted.)

14    BY MS. RIFKIN:

15    Q.    Dr. Kaufman, in the examples you just described, you

16    give one particular example of a treatment team meeting you

17    attended where I believe you said that nine of nine inmates

18    didn't show up.  And you just gave that as an example of the

19    relationship you saw between clinicians and patients.

20         Can you explain more what that indicated to you about

21    the relationship?

22    A.    Well, it's either a lack of trust in the process that

23    their participation would not affect their treatment at all,

24    or in some cases it may be related to what inmates have to do

25    to leave the cell.

175

1           Often, mentally ill inmates are not permitted to

2      leave the cell unless they are strip searched and shackled

3      and escorted by two officers for every inmate.

4           But particularly I found that the strip searches were

5      very discouraging to the inmates, and that they often

6      wouldn't leave their cell because they would rather stay in

7      their cell and not have therapy than be strip searched.

8           To me that's an interesting little example of how

9      custodial policies interfere with the therapy process.

10     Q.     In your review of the disciplinary charges issued to

11     prisoners with mental illness, are you aware whether these

12     kinds of disciplinary charges are ever filed by mental health

13     clinicians?

14          MS. VOROUS:  Objection, Your Honor.  Vague and

15     ambiguous.  Leading, "filed by mental health clinicians."

16          THE COURT:  The objection is overruled.

17          You may answer, Doctor.

18          THE WITNESS:  I saw in one instance at Salinas Valley

19     State Prison where the mental health person was the one that

20     filed the RVR.  And that, according to the Special Master's

21     report, is a common practice for mental health clinicians to

22     file RVRs at that facility.

23          MS. VOROUS:  Objection.  Move to strike.

24          THE COURT:  Overruled.  May I inquire?  I assume --

25     Well, I shouldn't assume anything.

1          Assume for a moment, as a hypothetical, that the

2     mental health clinician, whoever he was, believed that there

3     was a rule violation, which the mental health person

4     perceived the inmate was capable of understanding despite his

5     mental illness.

6          Would that, in your view, be inappropriate?

7          THE WITNESS:  Well, I think it's the rule -- it's the

8     job of the mental health personnel to deal with that rule

9     violation.  It destroys the therapeutic relationship.

10         I mean, the way it's handled in our society, if you

11    have a patient and he shares something that represents he's a

12    danger to himself or a danger to others, then you do have an

13    obligation to report it.

14         But if it's some kind of rule violation, you know,

15    like let's say he confides to you that he has a cell phone,

16    you know, that is something that you have to deal with in the

17    therapeutic process.  You might even decide it was critical

18    and report it, but as the -- and you would tell the

19    individual you would.  But as a therapist it is inappropriate

20    to make out a Rules Violation Report for this kind of

21    incident.

22         It just doesn't work in therapy.  The only time you

23    report it is if the person is really a threat.

24         THE COURT:  You may proceed.

25    BY MS. RIFKIN:

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

177

1    Q.      Dr. Kaufman, in your declarations that you submitted

2    on use of force and disciplinary process you describe a

3    number of ways that these practices cause harm to the class

4    members they're used against.

5           One of the things you mention is "immediate

6    psychological harm."

7           Can you describe what you mean by that?  What kinds

8    of psychological harm are caused by the practices you

9    observed?

10   A.      Well, if we go back to the videotapes in general,

11   what you see is an escalation of inmate anxiety, fear,

12   paranoia and resistance.

13          With each burst of pepper spray, with each admonition

14   to "cuff up," with each admonition to place your hands

15   outside the cell, with each admonition to strip, the inmate

16   seems to get more and more angry, upset, desperate.  In some

17   cases more regress, crying for help, where an inmate says

18   that I want to go home in the middle of all of this.

19          So in the short-term there is a real escalation of

20   fear and anxiety.  And then in the longer term there is

21   destruction of trust in custody, there is a destruction of

22   trust in the mental health staff.

23          And in many of the cases there occur prolonged

24   psychotic episodes.  Then when the inmate recovers, there are

25   recurrent psychotic episodes.

178

1          Some inmates have almost a posttraumatic stress

2     disorder in which they become very frightened of even seeing

3     custody.  They have dreams and nightmares about custody.

4          Many of the inmates whose files I reviewed and who I

5     interviewed, there is a detailed paranoid, delusional system

6     in most cases, and hopefully not reality, of the ways that

7     correctional officers have tortured him.

8          And then with each succeeding psychosis there is

9     potentially brain damage and definitely vulnerability to

10    future psychotic episodes.

11    Q.     Dr. Kaufman, would there be any additional effects

12    for class members who also had a history of sexual or other

13    abuse?

14    A.     Yes.  Many of them did have histories of sexual

15    abuse.  It is often hidden in one line in -- hidden in one

16    line in the psychiatric history.  But the trauma of being

17    strip searched, of being asked to be nude, of being wheeled

18    around in a gurney totally nude and being filmed, of having

19    barricade removal devices with long nozzles being inserted

20    into their cells with large bursts of OC spray, the

21    implications of their reliving their sexual trauma through

22    this, and also that part of what corrections is feeling as

23    resistance is motivated for them by the trauma of the

24    violation, which in the case of one inmate who is

25    experiencing it very clearly as a sexual violation.

179

1          This has a big role to play in the traumatic aspects

2     of what happens to an inmate as a result of this type of cell

3     extraction.

4     Q.     Earlier you mentioned the kind of garb that the cell

5     extraction team comes to the cells wearing.  How does that

6     play into the --

7          THE COURT:  Does that play into --

8     BY MS. RIFKIN:

9     Q.     Does that play into the psychological effects for the

10    class members with mental illness?

11    A.     Yes, it does.

12    Q.     Can you describe how?

13    A.     Well, I realize that the officers feel that they need

14    to do this for their own protection, but the impact of it is

15    that it adds to the delusional aspects of being attacked by

16    almost foreign figures.

17         In general, this kind of attack that they experience,

18    and some of the other things that I mentioned, serve to

19    actually concretize their delusions about all the ways that

20    they're being harmed.

21    Q.     Are delusions like this typical of inmates with

22    diagnoses of the type you found in these records?

23    A.     Yes.  Consistently I found paranoid delusions

24    involving harm done by correctional officers in the records

25    of these inmates.

180

1   Q.      What types of diagnoses would these kinds of

2   paranoid -- paranoia and delusions be related to?

3   A.      The most common diagnosis is schizophrenia or

4   schizophrenic reaction paranoid type.  And many of the

5   inmates that I evaluated had that diagnosis.

6           And then other forms of the diagnosis which are very

7   close are schizophrenia, undifferentiated type,

8   schizoaffective disorder, bipolar disorder.  And these are

9   all diagnoses that I saw in the inmates that I observed and

10  have written about.

11          And the diagnoses on the individuals in the videos,

12  the first three individuals all had schizophrenic diagnoses,

13  that's A, B and C, and then Inmate D had one instance of a

14  bipolar diagnosis.

15          So all four of them had diagnoses which are

16  compatible with paranoia.

17  Q.      How did you learn about -- or what these inmates'

18  diagnoses were, Doctor?

19  A.      By reading the medical records.  And then in the two

20  inmates that I interviewed, I confirmed the diagnosis that I

21  had read in the medical records.

22  Q.      When you say the "medical records," are you talking

23  about the CDCR records?

24  A.      I am talking about the CDCR -- more commonly, mental

25  health records.

181

1  Q.      So these are records that are available to the

2  institution and are prepared by clinicians at the institution

3  for these patients?

4  A.      They should be available.  One of my issues in my

5  February visit was that medical records are often not

6  available when they should be.

7  Q.      Who are the clinicians?

8          Who are filling out these medical records, as far as

9  you could tell?

10 A.      Most of them I think are psychologists.  There are

11 some records by psychiatrists.  There are often records

12 filled out at the interdisciplinary treatment team.

13         Sometimes there are brief clinical notes written by

14 nurses.  More commonly in the nursing staff they would be

15 written by psychiatric technicians.

16 Q.      Those are all CDCR employees?

17 A.      Yes.

18 Q.      Doctor, I want to talk to you about -- more

19 specifically about the videos.  One more question before we

20 do that.

21         All of the kinds of effects that you have just

22 described for us, how does this affect -- does this affect

23 these patients' ability to successfully program in mental

24 health treatment in the future?

25 A.      Yes.  It makes it progressively more difficult.

182

1    Q.      Why is that?

2    A.      Well, each traumatic incident, in the context of

3    being at CDCR, not only traumatizes the individual

4    psychologically, probably physically in terms of the damage a

5    psychosis can do to the brain, but also leaves the

6    inmate-patient progressively more resistant to participating

7    in treatment.

8           THE COURT:  Can I go back to another matter because I

9    don't know.

10          This interdisciplinary treatment process that

11   apparently is adopted in CDCR, is that common outside of the

12   prison context?

13          THE WITNESS:  It's different outside, but in general

14   I would say that it's common, particularly in psychiatric

15   state hospitals it is also quite common.

16          THE COURT:  To go back to something that you said

17   earlier, is it common or ordinary or expected -- those may be

18   three different things, I don't know -- that the patient

19   participates in these interdisciplinary meetings?

20          THE WITNESS:  For at least part of it, yes.  The

21   inmate usually needs to sign a summary of what takes place at

22   the meeting.

23          THE COURT:  Thank you, sir.

24          I'm sorry to have interrupted.  Go ahead.

25          THE WITNESS:  Thank you.

183

BY MS. RIFKIN:

Q.      To follow up on the questions the judge just asked,
you described some custody reasons that an inmate-patient
might refuse to go to the interdisciplinary treatment team
meetings.  Are there any other reasons that you became aware
of through your tours and interviews why inmates choose not
to attend the interdisciplinary treatment team meetings?

A.      What I was told at that facility that it was the
inmate culture there not to participate.

Q.      Did you learn what that meant?

A.      It seemed to me that the treatment staff had gotten
used to the nonparticipation.  And I believe this had been
commented on by the defendants' expert and/or the Special
Master.  And they had known that this was inappropriate, but
they kind of shrugged their shoulders and said that it is the
inmate culture.

Q.      Did any inmates share with you why they choose not to
go, not to attend?

A.      What I ascertained was that they didn't attend in
part because they didn't think it would affect their
treatment in any way that would be helpful to them.

Q.      Doctor, you reviewed videos of six controlled uses of
force against four class members.  And turning to your
declaration again, your supplemental declaration, which is
tab 2 of the binder which we've already admitted, you

184

1   describe these videos in paragraphs 15, 16, 17 and 18.

2          THE COURT:  I'm sorry.  What is the court designated

3   exhibit?

4          MS. RIFKIN:  Trial Exhibit 181, your Honor.

5          THE COURT:  Thank you.

6          THE WITNESS:  Starting with paragraph 15?

7   BY MS. RIFKIN:

8   Q.     Yes.  Some videos -- I know you weren't in the

9   courtroom yesterday, but two of these videos were played in

10  the court yesterday, paragraphs 15 and 16.  So I would like

11  to start with the inmate referenced in paragraph 15.  Inmate

12  A is how he's referred to here.

13         In paragraph 15 you state that the video shows this

14  patient already in a crisis bed and that he was decompensated

15  and so psychotic he was smearing feces on himself.

16         You had a chance recently to review the medical files

17  for this patient; is that right, Doctor?

18  A.     Yes.

19  Q.     Turning to tab 3 of the binder, which is Trial

20  Exhibit 2, which has been entered into the record, this tab

21  has been entered into the record as Exhibit 2D --

22         THE COURT:  D as in dog?

23         MS. RIFKIN:  D as in dog.

24  BY MS. RIFKIN:

25  Q.     I would like to turn to page number 62 and 63 in the

185

1    upper right-hand corner of this exhibit.

2    A.      Just to be sure we're on the right page, this is the

3    Involuntary Medication Notice?

4    Q.      Yes.  Can you explain what this document is, Doctor?

5    A.      This is a document used to justify that an inmate is

6    a candidate for involuntary medication.

7    Q.      You had the chance to review this part of the

8    inmate's medical record; is that right?

9    A.      Yes.

10   Q.      Some of the text here summarizes the inmate's

11   state -- or describes in detail, rather, the inmate's state

12   at the time of this use of force.

13           Can you give us your opinion about the critical

14   points to help us understand his mental state at the time of

15   the use of force incident we saw in the video?

16   A.      Well, he was admitted to the mental health crisis bed

17   because he was suicidal.  And in the bed he proceeded to

18   regress and go from a state of wanting to kill himself to a

19   state of being out of control and paranoid and smearing

20   feces.

21   Q.      Do you know anything about whether he was taking

22   medication at that point, Doctor?

23   A.      Well, at the time that the cell extraction was

24   ordered he was not taking medication.

25   Q.      And from reviewing his medical records, did you

186

1   become aware of his history with psychotropic medication?

2   A.      Yes, I did.  He had a long history of being on

3   psychotropic medication and of having side effects from

4   psychotropic medication and requesting frequent psychiatric

5   consultation whenever he experienced either the medication

6   wasn't working, was too weak, wasn't strong enough or

7   particularly had side effects.

8   Q.      Do you know how long he had been refusing his

9   medication at the point of this incident?

10  A.      No, I don't.  I don't recall that.

11          It was at least several days, but again, I'm not

12  exactly sure.

13  Q.      Dr. Kaufman, during the video there was a clinical

14  intervention shown for this extraction.

15          What is your assessment of the clinical intervention

16  that took place?

17  A.      Well, it seemed quite brief.  You can actually time

18  it while watching the video.  So it was less than 30 seconds.

19  And no matter how good a clinician you are, you're not going

20  to have a successful intervention in less than 30 seconds.

21          It just appeared like the criteria for intervention

22  was met, but there was no meaningful contact that took place

23  or no contact that had a chance at altering the course of

24  what was to happen.

25          And then I believe this is one of the tapes where the

187

1    person who had done the intervention, who I think was a

2    psychiatric technician, turned to the camera and said that

3    the intervention not successful.

4    Q.    Based on your review of the other use of force

5    videos, as well as your incident reports, how does this

6    compare to the other clinical interventions that you observed

7    or learned about?

8    A.    I never saw an intervention -- a mental health

9    intervention that was successful.  They were all, that I was

10   able to read, not successful.

11   Q.    In terms of the timing and the approach, how did

12   this -- how did the one you just described compare to the

13   others?

14   A.    It was very comparable.  Several of the others I saw

15   were less than 30 seconds.  There was one I saw that was

16   approximately two minutes and 30 seconds.  Also a rather

17   brief time, but long compared to the less than 30 second

18   interventions that I saw in the other tapes.  And none of

19   them showed evidence of any kind of meaningful therapeutic

20   contact.

21   Q.    Do you know what category of staff in CDCR typically

22   performs these clinical interventions in use of force

23   situations?

24   A.    The ones that I saw were mainly done by psychiatric

25   technicians.

188

1          THE COURT:  What is a psychiatric technician, Doctor?

2          THE WITNESS:  A psychiatric technician is a high

3     school graduate who goes to a specialized training program

4     for psychiatric technicians.

5          In the past that program has been several years in

6     duration.  And I hope my friends who are psychiatric

7     technicians will bear with me when I say that they're

8     somewhat below the level of a registered nurse and above the

9     level of a medical technical assistant.

10    BY MS. RIFKIN:

11    Q.      There is various categories of mental health

12    clinicians within CDCR.  To the best that you can, can you

13    describe where psychiatric technicians fit in that staffing

14    scheme?

15    A.      They're at the low point of the totem pole.  Probably

16    a little bit ahead of the recreational therapists, but very

17    close in level to the recreational therapists.

18          I'm not sure of the criteria for recreational

19    therapists in CDCR.  A fully trained recreational therapist

20    has substantial training, but one can be noted as a

21    recreational therapist in many institutional settings with a

22    minimum of training.

23          So they're probably above the recreational therapist

24    and below the registered nurse.  Maybe in some settings they

25    might even be considered at the same level as a LVN, a

189

1   licensed vocational nurse, or maybe a little bit higher than

2   the LVN.

3   Q.    From your observation of the clinical interventions

4   you saw on the videos, were you able to form an opinion about

5   whether the psychiatric technicians or other mental health

6   staff who performed the interventions had a prior treating

7   relationship with the inmate-patient?

8   A.    It did not appear they did.

9         THE COURT:  Would that make any difference in the

10  success or failure of the intervention?

11        THE WITNESS:  I think if there was a prior

12  relationship that had a therapeutic atmosphere, and there was

13  an atmosphere of trust between the inmate and the individual,

14  I think it would have a much higher level of degree of

15  success potential.

16  BY MS. RIFKIN:

17  Q.    Based on your experience, can you describe what an

18  appropriate clinical intervention in your opinion might look

19  like, as compared to what you saw?

20  A.    Well, the inmate would be approached with an

21  attitude, first of all, of trying to make a relationship,

22  then of trying to understand what the problem was that led to

23  the inmate being so disturbed.

24        And if one is able to then determine what the problem

25  is, trying to fix the actual problem that's leading to the

190

1  disturbance.  For instance, a particular side effect of the

2  medication the individual's concerned about.  Then you would

3  go about trying to fix that.

4         Then you face the inmate directly.  You make sure

5  that the inmate knows that he's being heard.  You look at

6  alternative solutions to the problem with the inmate, trying

7  to give the inmate positive choices rather than choosing

8  between strip down or cuff up, but rather let's come out and

9  talk.

10        If the inmate can be calmed to a point where a mental

11  health professional can enter the cell and actually have more

12  direct contact, and it is quite possible to do that if you

13  have a therapeutic relationship.

14        And then using the sense of awareness of the inmate

15  and yourself, making sure you are safe, and then focusing on

16  the problem and positive options for dealing with it.

17  Q.      Dr. Kaufman, in your own experience as a psychiatrist

18  in various units, have you had occasion where one of your

19  patients was experiencing this level of psychotic breakdown

20  or agitation?

21  A.      I have.

22  Q.      And were you able to -- or I guess did you, in those

23  cases, attempt an intervention with those patients?

24  A.      I have.

25  Q.      Would that be using the kind of approaches you just

191

1    described?

2    A.      Yes, it would.

3    Q.      Were those successful?

4    A.      Yes, they were.

5    Q.      Dr. Kaufman, you had the opportunity to review, at

6    least briefly, some of the medical records of the

7    inmate-patients for whom you saw the uses of force.

8           Did you see evidence of attempts at the kinds of

9    clinical intervention you just described as what you would

10   recommend in their medical records prior to what you have

11   described as the 30-second interventions that we saw on tape?

12   A.      I did not.

13   Q.      And Dr. Kaufman, I think you still have tab 3 of the

14   binder open in front of you.  If you can, turn to page 2 of

15   that tab which, again, has been entered into evidence as

16   Trial Exhibit 181.

17   A.      To be sure we're on the same page, Cell Extraction

18   Advisement.

19   Q.      Dr. Kaufman, on the video we heard one of the

20   officers on the extraction team read this advisement to

21   Inmate A off this script.

22          Based on your review of that video and Inmate A's

23   records, were you able to form an opinion about Inmate A's

24   capacity to understand this advisement?

25   A.      He could not understand that advisement.

192

1    Q.      Why not?

2    A.      Because he was too mentally ill to do so.  And even

3    the corrections captain who was supervising the extraction

4    agreed with that.

5    Q.      You said that the corrections captain agreed with

6    that.  Did you observe any altering of the approach to the

7    cell extraction based on an observation he was not able to

8    understand the advisement as it was read?

9    A.      I saw no evidence that there was any awareness that

10   his mental illness was influencing his behavior.

11   Q.      I just want to make sure I understand that.

12          You saw no evidence of awareness that his mental

13   illness was influencing his behavior?

14   A.      Correct.

15   Q.      I just want to be sure I heard that right.

16          And as the cell extraction went on we saw repeated

17   sprays of OC.  Were you, as a psychiatrist, able to draw any

18   conclusions about what was happening for Inmate A from a

19   psychiatric point of view as the extraction continued?

20   A.      With each burst of OC spray it appears that he

21   becomes more confused, more frightened and more childlike.

22   Q.      Did you note any of the particular statements that

23   Inmate A made that helped you form the basis for that

24   opinion?

25   A.      Well, I could review some of them specifically.

193

1    They're all in the report, but he makes statements like:

2             I want to go home.

3             I didn't do anything.

4             I don't know why this is happening to me.

5             Why are you doing this to me.

6    Q.      When you -- you just mentioned the statement he made,

7    "I didn't do anything."  What does that reflect, if you know,

8    or if you can opine for what was going on for what he was

9    perceiving?

10            Let me start that question over.

11            You mentioned the statement, "I didn't do nothing

12   wrong."  What is your understanding from that statement of

13   Inmate A's perception of what was happening to him?

14            THE COURT:  Do you have an understanding, first of

15   all, Doctor, as to what the patient was saying in a

16   meaningful psychiatric way?

17            MS. RIFKIN:  Thank you, Your Honor.

18            THE WITNESS:  Yes, I do.

19            THE COURT:  Would you tell us what that is?

20            THE WITNESS:  I think he had a lack of understanding

21   of why he was being punished so severely.  He didn't feel

22   like he had committed any wrongdoing and yet he experienced

23   what was happening as an extreme form of punishment.

24   BY MS. RIFKIN:

25   Q.      And in your declaration you specifically talk about a

194

1    time in the video when you observed Inmate A give one hand

2    through the food port to be cuffed and when the officers went

3    to cuff his other hand he pulled away.

4         Were you able to form an opinion about why Inmate A

5    would be behaving in this way?

6    A.    Yes.

7    Q.    What was that opinion?

8    A.    That he was very frightened, that he wasn't defying

9    the officer, although it appeared the officer experienced

10    what was going on as defiance.

11         Each time he put his other hand out, as soon as he

12    was touched, in a very frightened, childlike way he pulled it

13    back.  Yet the officer seems to pursue the situation as if

14    he's defying him.

15    Q.    In your opinion, watching the video, did the custody

16    officers ever try to engage in communication you would

17    consider effective for a patient experiencing that level of

18    psychosis?

19    A.    No.

20    Q.    What kind of communication did they engage in?

21    A.    They just say things like:  Cuff up.  Strip down.

22         I think -- I believe this is the inmate-patient that

23    asked to speak to mental health, and they say to him that it

24    doesn't work that way.  And they dismiss his efforts at that

25    point to cooperate.

195

1    Q.      I think that might be Inmate B who we'll get to in a

2    minute.

3            Turning to your declaration, which is at tab 2, page

4    8 -- I'm sorry -- paragraph 15, turning to page 8 of your

5    declaration you talk about after Inmate A was placed on a

6    gurney in five-point restraints, nude, with genitals showing.

7            What is your concern about that?

8    A.      That it is --

9            MS. VOROUS:  Objection.  Leading.

10           THE COURT:  Overruled.  You may answer.

11           THE WITNESS:  That it is extreme humiliation,

12   degradation and inhumane.

13   BY MS. RIFKIN:

14   Q.      Are you aware of any clinical justification for

15   keeping Inmate A nude while this restraint and forcible

16   medication is taking place?

17   A.      Would you repeat that question?

18   Q.      Are you aware of any clinical justification or reason

19   for keeping Inmate A nude while this restraint and forced

20   medication is taking place?

21   A.      No.

22   Q.      Is it contraindicated from a clinical point of view?

23   A.      Yes.

24   Q.      Why is that?

25   A.      Well, because it's degrading and inhuman.  And there

1    is no reason why he can't be covered at least with a sheet.

2    Q.      Dr. Kaufman, we've learned that Inmate A -- that the

3    reason given for this cell extraction was because Inmate A

4    needed to be forcibly medicated.

5            Doesn't a patient like this need his medications?

6    A.      The patient does need the medication.

7    Q.      So what is the appropriate way to handle a patient

8    like this who is refusing psychiatric medication?

9    A.      It is -- the first step is to really find out why the

10   inmate is refusing it, whether it is, as I said before,

11   because of side effects or because it's a medication that

12   hasn't worked before or some -- in some way he's

13   uncomfortable with the medications.

14           So that's the first step is to find out why.

15           Then the second step is to say:  Well, okay.  So, you

16   know, your hands are trembling because of the Haldol.  Well,

17   you know, we can give you a medication like Cogentin to fix

18   that.

19           Or you're gaining weight at a rapid rate because of

20   the Clozapine.  We can change that to another medication that

21   will help you with your fear that doesn't have that side

22   effect.

23           Or you're depressed and the medication doesn't seem

24   to be strong enough.  We're going to increase the dose or

25   augment it and add another medication.

197

1        So what's indicated here is to look at the reason and

2    to try to fix it.  And in the majority of cases it's

3    remediable by an intervention.

4        Another option might be, you know, there's no

5    emergency within a few hours of taking the medication so you

6    might give the -- spell out to the individual what the

7    options are in terms of dealing with the medication, and then

8    give them some time and perhaps enter into a therapeutic

9    relationship during the time the individual's waiting or just

10   give him time to think about the options involved in taking

11   his medication.

12       THE COURT:  I'm really somewhat -- not somewhat.  I'm

13   confused.  From everything you and others have told me about

14   Inmate A, he had, in essence, really divorced -- been

15   divorced from reality.  Yet, what you seem to be describing

16   is an effort to reason with him as if he weren't.

17       Can you explain to me what that apparent

18   inconsistency really means?

19       THE WITNESS:  I think that's a very good point.

20   There are sometimes small areas where inmates can communicate

21   even when they are psychotic.  And part of it might be to be

22   able to reach the individual.

23       Again, part of it might be to bring in the

24   psychiatrist with whom he has a good relationship and who has

25   prescribed medication in the past and whom he can trust.  And

198

1    the psychiatrist might be able to simply say:  You know,

2    we're going to take you off medicine A, and you did well when

3    we worked together on medicine B so we're going to substitute

4    medicine B.

5            So there are times when you can reason with a

6    psychotic individual within a small area.

7            But there are also times when the situation has

8    escalated because of a lack of therapeutic environment and

9    that despite your best efforts the individual might still

10   refuse the medication.

11   BY MS. RIFKIN:

12   Q.      Dr. Kaufman, you just said there are times when

13   because of a lack of a therapeutic environment an individual

14   might come to this point of refusing medication.

15           What kind of approach should one use when an inmate

16   has gotten to that point, if there is a lack of therapeutic

17   environment?

18   A.      Well, you can use involuntary medication techniques

19   if you have a legal right to involuntarily medicate with

20   using techniques of management of assaultive behavior, where

21   you enter the cell and you attempt to deal in an

22   authoritarian but understanding way with the inmate.

23           Let the inmate-patient know that you're going to

24   administer the medication intramuscularly.  And if necessary,

25   the nurse does it right then and there and he agrees.  Or if

199

1    necessary, there might be a show of force.  Again, hopefully,

2    with two mental health personnel only, two psychiatric

3    technicians that the inmate-patient knows as backup, and at

4    times maybe even general pressure to hold the patient down

5    when the patient gets the injection.

6         But that's really a last resort.  But it does happen

7    in psychiatric settings.  And generally it happens with a

8    minimum of force and without the use of OC spray or grenades.

9    Q.    To track back a bit, you said a show of a use of

10   force.  Can you describe in more detail the kind of force

11   that is typical in an inpatient hospital environment of which

12   you're familiar?

13   A.    It would be two mental health assistants or two

14   psychiatric technicians going in with a nurse or with a

15   doctor, again, having a preexisting therapeutic relationship

16   with the individual.

17        Just let him know, very firmly, that he's going to

18   have to accept this injection and that there is no way you're

19   not going to give it and that he knows from the past that

20   this medication can be very helpful.

21   Q.    Would this require any restraints of the inmate?

22   A.    Again, as a very, very, very last resort, in a

23   psychiatric setting you might actually have to restrain an

24   individual before you can medicate them.

25   Q.    Assuming we've gotten to that last resort, can you

200

1    describe what that use of -- what that actual restraining

2    process or use of force would look like in a clinical

3    setting?

4    A.    Well, the vast majority of times the individual is

5    gently, yet firmly, put into four-point restraints and

6    medicated intramuscularly.

7    Q.    And you mentioned talking to the inmate, explaining

8    to the inmate what you are doing.  Is that kind of

9    communication, in your opinion, important during this forced

10    medication or restraining process?

11    A.    Yes.

12    Q.    Why?

13    A.    Because the more you can establish communication, the

14    less force you're going to have to use.

15    Q.    Doctor, in your review of Inmate A's medical file

16    while he was in the crisis bed in the days leading up to this

17    incident, did you see evidence of the psychiatrist meeting

18    with the patient to have the kind of interactions you

19    described?

20    A.    I have that file here, if I can refer to it?

21         THE COURT:  Sure.

22         (Witness reviews document.)

23         THE WITNESS:  I saw only brief interventions.  I

24    noticed that his global assessment of functioning was

25    assessed and found to be 35, which is quite low.

201

1          But I didn't see any evidence of any kind of detailed

2    psychiatric note which would demonstrate that a therapeutic

3    relationship had been established.

4    Q.     Can you explain what the global assessment of

5    functioning is briefly?

6    A.      Well, it's a scale on zero to 100.  And, you know,

7    most people who are functioning as attorneys are at a level

8    of about 80 or 90.  And in order to qualify to be a mental

9    patient in a psychiatric hospital you have to score in the

10   30s.  And he, indeed, did score in the 30s.  So it's a rather

11   low level of functioning implying an inability to care for

12   one's self.

13   Q.     Dr. Kaufman, turning again to tab 3 of this binder,

14   which has been admitted into evidence as Trial Exhibit 2D,

15   can you turn to page 12 of tab 3?

16          This is the mental health assessment for the rules

17   violation report Inmate A received following this incident.

18          Can you explain what the mental health clinician

19   completing the form concluded about this inmate?

20   A.      The conclusion was that the inmate's mental health

21   state included delusions, false thoughts, paranoia, and

22   didn't seem to understand consequences of not complying with

23   the custody order.

24          The recommendation was that the inmate will benefit

25   from therapy and activities that provide reality orientation

202

1    such as time of day and year, social interaction, talking

2    with others and things that help prompt his memory.

3           He's currently in a crisis bed and pending a Keyhea

4    hearing for involuntary medication.

5    Q.     And turning to page 10 of this exhibit, this is the

6    Rules Violation Report, the hearing outcome at the bottom of

7    page 10, in addition to the disposition that Inmate A

8    received is he's assessed 90 days forfeiture of credit, he's

9    assessed 30 days loss of privileges, including dayroom, TV,

10   radio, visits, family visits, special purchase, telephone,

11   quarterly package.

12          And after that it notes:

13          "Loss of privileges will be imposed upon release from

14          the mental health crisis bed."

15          Dr. Kaufman, is there significance from a clinical

16   perspective that this loss of privileges would be imposed

17   upon his release from the crisis bed?

18   A.     Yes.

19   Q.     What clinical significance does that have?

20   A.     Well, when he's released from the crisis bed, it

21   assumes that there is a certain level of improvement.  The

22   mental health assessment that's recommended is that this

23   individual have social interaction.

24          So what happens when he gets out of his mental health

25   crisis bed and goes back into whichever segment of population

203

1    he goes back into, he's lost his privileges for social

2    contact, which is what the mental health clinician has

3    advised he have as a basic therapeutic program.  So it is the

4    antithesis of the recommendation.

5              THE COURT:  We'll take our afternoon recess.

6              We'll reconvene at 1:15.

7              (Off the record at 12:00 p.m.)

8                        ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, OCTOBER 2, 2013; 1:15 P.M.

 3                        ---oOo---

 4

 5          THE COURT:  Before we begin the questioning, I am

 6      informed by my staff that we have cleared, somehow or other,

 7      Tuesday of next week.

 8              Is that all through the week, Ana?

 9          THE CLERK:  Through Friday.

10          THE COURT:  If you folks are available, we can do

11      that.

12              What's the position of the parties?  Plaintiffs?

13          MR. BORNSTEIN:  I scheduled the witnesses around the

14      schedule you gave us.  I'll be in Los Angeles all week.

15          THE COURT:  Well, that's the answer.

16              I'm also informed that the 16th, 17th, 18th is

17      available.  Can you do this the 18th?

18          MR. BORNSTEIN:  Yes, Your Honor.

19          MR. BIEN:  We can, Your Honor.

20          MS. VOROUS:  Yes, I think we'll be able to do that as

21      well.

22          THE COURT:  Ms. Rifkin, you were questioning.

23                        EDWARD KAUFMAN

24      Recalled as a witness on behalf of the plaintiffs herein, was

25      previously sworn, examined, and testified as follows:

```
1                    DIRECT EXAMINATION (CONTINUED)

2    BY MS. RIFKIN:

3    Q.    I'd like to turn to a different incident than the one

4    we were discussing prior to the break in which we viewed the

5    video for yesterday of Inmate B, which you describe in

6    paragraph 16 of your declaration, which is tab two, starting

7    on page nine.

8          In what kinds of housing units did this cell

9    extraction take place?

10   A.    In administrative segregation at Kern Valley State

11   Prison.

12   Q.    What was the reason provided for performing the cell

13   extraction on Inmate B?

14   A.    That he was becoming more paranoid and playing with

15   his feces.

16   Q.    Where were they trying to move him?

17   A.    I believe to a mental health crisis bed.

18   Q.    If you can turn to tab four in your binder, Dr.

19   Kaufman --

20         THE COURT:  Four is -- I know that you don't care, but

21   it really is quite important that the record be clear.

22         MS. RIFKIN:  It is Trial Exhibit 4, Your Honor.

23         THE COURT:  Okay.

24   BY MS. RIFKIN:

25   Q.    Are you familiar with what this group of documents
```

1   that's Trial Exhibit 4 is, Dr. Kaufman?

2   A.      Yes.

3   Q.      What is it?

4   A.      Well, the exhibit is certain aspects of his mental

5   health record, including the incident report and the

6   disciplinary progress report and other psychiatric

7   assessments.

8           MS. RIFKIN:  I would like to move this packet into

9   evidence as Trial Exhibit 4.

10          THE COURT:  Received.

11                          (Whereupon, Plaintiffs' Exhibit 4 was

12                           received into evidence.)

13  BY MS. RIFKIN:

14  Q.      Dr. Kaufman, if I can direct your attention to page 11

15  of this exhibit.

16          This is a note from the clinical file on the day of

17  the extraction prior to the extraction.

18          THE COURT:  I'll you have sworn and you can testify if

19  you want; otherwise, you can ask him what it is.

20  BY MS. RIFKIN:

21  Q.      Dr. Kaufman, can you describe what this document is,

22  please?

23  A.      This is an interdisciplinary progress note from a

24  contact with an inmate that took place a few hours before the

25  extraction.

1    Q.      This is for Inmate B?

2    A.      Correct.

3    Q.      Can you translate for us in layman's terms the

4    critical parts of this clinical note.

5    A.      Well, it's in what's called an SOAP format.  So S is

6    subjective.  O is objective.  A is assessment.  P is plan.

7    Basically, in the subjective -- this is a little difficult to

8    read, but he's exhibiting paranoid ideation.  There's a

9    strong smell from the cell, the toilet is full of feces, and

10   there's a report that he's washing himself with feces.

11          I believe it looks like a psychologist consults with

12   Dr. Ward, the psychiatrist, and they agree that the inmate is

13   supposed to go to an inmate patient level of care.  The

14   objective is that he's visually decontaminated, and his GAF

15   is 20.  That's extremely low.  The inmate is delusional,

16   paranoid, and I'm not sure what the next words are.

17          The plan is to admit him for further evaluation and

18   treatment.

19   Q.      Does this document reflect that the psychiatrist

20   actually went to meet with Inmate B?

21   A.      No, it does not.

22   Q.      And all of the things that you just said, what does

23   that mean for Inmate B's ability to understand what is going

24   on around him?

25   A.      It means it's severely limited.

 1   Q.      Turning back to your declaration at tab two, page

 2   nine, paragraph 16, what was your opinion of the clinical

 3   intervening attempt in this video?

 4   A.      That as the inmate experiences it, it's quite brutal,

 5   and given the type of reaction that the inmate has and his

 6   responses, it does not take into consideration his mental

 7   health illness and the extent to which it mounts, nor does it

 8   take into consideration some obvious features about his

 9   psychology and how these aspects of his personality, which I

10   can elaborate on, lead to extreme paranoia and fear.

11   Q.      The question I meant to ask you and I think I

12   misspoke, was:  Before we get to the actual cell extraction,

13   what was your opinion of the clinical intervention piece of

14   this video?

15   A.      Well, as evidenced by the note, which is quite brief,

16   it does not show any detailed understanding of this

17   individual or why he has decompensated.

18   Q.      If we turn to page ten of your declaration, there's a

19   point at which you note that the patient began asking the

20   officers to get medical.

21           Why is this relevant?

22   A.      Well, because it demonstrates that he's asking for

23   help, that at this point, he wants to accomplish what the

24   medical staff and apparently the custodial officers say they

25   want him to accomplish.  He's asking to speak directly to

1  mental health.

2  Q.    Is it your opinion that if mental health staff or

3  medical staff had interacted with him at that point he might

4  have agreed to come out?

5       THE COURT:  It might happen.  What is your best

6  judgment as to whether an experience like that would have

7  altered what actually happened?

8       THE WITNESS:  I think there's a very good chance it

9  could have altered what happened.

10  BY MS. RIFKIN:

11  Q.    At some point after he starts asking for medical, you

12  note on page ten that the patient didn't want to strip.

13       Based on your review of his records, do you know if

14  this resistance to stripping out was related to his mental

15  illness?

16  A.    He did have a history of early sexual abuse, so that

17  could very well have a great deal to do with his reluctance

18  to strip.

19  Q.    Is there any other information, from your review of

20  the video and his records, that's relevant to his reluctance

21  to comply with the officer's orders at that point?

22  A.    Yes, there is.  I would really like to describe the

23  sequence that occurs in this tape in terms of his responses

24  and parenthetically to add that in one viewing of the tape,

25  it's very hard to actually hear everything that's said, so we

1    had to stop and start the tape several times because I wanted

2    to be exactly sure that I was getting his words in an exact

3    way.

4          As the procedure begins and after several bursts of OC

5    spray in less than six minutes, what he says is, "You're

6    trying to kill me," and "Don't treat me like a dog."  He's

7    starting to feel degraded.  Then early on he says, "Get

8    medical.  Get the medical staff and I'll cuff up."

9          Then he says -- he curses them, "You are trying to

10   kill me."  Then he continues to ask for the medical staff for

11   several minutes, and then he starts to say, "If I strip down,

12   I'll be raped."  Then they take the barricade removal device,

13   which has a long metal tube on it, and they bring it to the

14   cell front to force it into the cell.

15         He then becomes afraid that he's going to be anally

16   raped and he expresses that fear directly.  Then the officers

17   order him to strip out, and he responds and says, "You want

18   me to strip out so that you can have anal sex with me.  I'm

19   not a homosexual.  I'm not stripping out.  I have no weapons.

20   I volunteer to come out without stripping."

21         They continue to order him to strip out and then they

22   order him to turn around.  This awakens his fears of anal

23   rape, and he says, "You're not going to ram that up my" --

24   I'm paraphrasing -- "back side."

25         The officers then use the barricade removal device and

1    shove the metal tube through the cup port with a massive

2    burst of OC spray.  Then he strips down, but before they open

3    the door, they give him orders and say, "Show me your hands.

4    Take that shit off your head," which is a piece of cloth,

5    "Open your mouth, lift up your testicles and get on your

6    knees."

7          Again, all these things, if there's any awareness that

8    this man is having incredible homosexual fears, one would be

9    much more careful about one's language and one's orders.  I

10   didn't see any other inmate being asked to lift up his

11   testicles in the tapes I viewed.  That this is the one that

12   was chosen to have that command, I think, again, shows a

13   great psychological naivete as to what's really going on.

14         Then after he's --

15   Q.    Can I stop you for a minute there.

16         You said, "as to what's really going on."  You told us

17   about the words that Inmate B was saying, expressing his fear

18   of rape.

19         Based on your review of the records, is this related

20   to his mental illness diagnosis?

21   A.    This is the kind of fear that paranoid individuals

22   often have, that this individual is one who's paranoia is

23   often focused on custodial officers, and then his own

24   psychology is very much related to fears of anal rape.

25   Q.    So, in your opinion, was his resistance to following

1    orders, to the degree he was aware, related to his mental

2    illness?

3    A.    He's afraid that he's going to be raped anally if he

4    does all of the things that the officers ask him to do.  Each

5    one to him feels like an anal rape:  Putting his hands behind

6    him, putting his hands through the cuff, stripping down,

7    lifting up his testicles.  It's all Psychology 101 that it's

8    all related to fears of homosexual assault.

9    Q.    Dr. Kaufman, you noted on page ten that after the

10   inmate was brought out from the cell, that he was brought out

11   naked, decontaminated, strapped to a gurney on the dayroom

12   floor in full view of the housing unit.

13        What clinical significance does this have in light of

14   what you just described?

15   A.    It's one -- just one last bit of degradation and

16   humiliation and inhumane treatment.  Once again, it's his

17   worse fears.  He's exposed, naked before everyone that he's

18   wheeled in front of.

19   Q.    Did you have an opportunity to review the IERC reports

20   for this use of force incident?

21   A.    I did.

22   Q.    And do you recall if they were any critiques of this

23   use of force?

24        MS. VOROUS:  Objection.  Dr. Kaufman has admitted he's

25   not a use of force expert.  To the extent the questions are

1    as to his critique of use of force, we would suggest they are

2    improper.

3            THE COURT:  The suggestion is overruled.

4            You may answer, sir.

5            Do you have the question in mind?

6            THE WITNESS:  Restate it.

7    BY MS. RIFKIN:

8    Q.    Are you aware if the IERC made any critiques of this

9    use of force?

10   A.    Yes, I am.

11   Q.    What critiques did they make, if any?

12   A.    The specific critique relative to him, they did

13   critique the fact he was videotaped nude.  There may have

14   been other critique about the way the officers introduced

15   themselves or not, but the point about the institutional

16   reviews are that they will focus on things like how the

17   officers introduce themselves.

18            In this case, at least they focused on the nude

19   videotape, but they don't focus on the fact or appear to

20   consider the fact that this is a severely mentally ill inmate

21   who's being subjected to extreme force.

22   Q.    Do you recall if they critiqued the actual action of

23   keeping the inmate nude?

24   A.    My reaction it was just about the videotape.

25   Q.    Dr. Kaufman, turning back to tab four, which we've now

```
 1    admitted as Trial Exhibit 4, page two, this is the incident

 2    report.

 3              What is your understanding of who is writing this

 4    incident report?

 5    A.      The sergeant.

 6    Q.      The sergeant involved in the incident?

 7    A.      Yes.

 8    Q.      And at the end of -- you've described a lot of

 9    statements you heard being made.  Looking at the end of the

10    paragraph, the full paragraph on the page, how did the

11    correctional officer involved in the incident describe Inmate

12    B's statements?

13    A.      He stated this infuriated -- (NAME STRICKEN) as he --

14              MS. RIFKIN:  I'd like to strike that from the record,

15    Your Honor.

16              THE COURT:  You want to strike the name?

17              MS. RIFKIN:  The name.

18              THE COURT:  Motion is granted.

19    BY MS. RIFKIN:

20    Q.      And ask Dr. Kaufman, again, to read that part.

21    A.      (Reading:)

22                  This infuriated Inmate B as he began to scream

23                  incoherently.

24    Q.      Is it your opinion that Inmate B was screaming

25    incoherently at this point?
```

1    A.        No.  I think I heard many discrete specific words.

2    Q.        In your review of the video, did you see any point at

3    which custody officers responded to this inmate's concerns?

4    A.        This is the tape when he asked to see medical staff.

5    They communicate to him that it doesn't work that way.

6    That's not the way it's done.

7    Q.        What about, did you see any or hear any attempt by the

8    custody staff to respond to his express fears of being

9    sexually assaulted?

10   A.        No.

11   Q.        Dr. Kaufman, you said a few minutes ago that Inmate B

12   was being forcibly extracted in order to move him to a crisis

13   bed.

14            In your opinion, what would be the more appropriate

15   way to approach this type of patient from a clinical

16   perspective?

17   A.        It's many of the things I talked about before, but

18   that, basically, if you have a therapist or a psychiatrist

19   that has a therapeutic alliance with him, that you do it in a

20   team approach with the patient and you also do it before the

21   patient goes totally out of control.

22            This is relevant to Inmate A as well, that there's a

23   warning that these inmates are deteriorating, and if you

24   intervene earlier to get somebody to take medications, or, in

25   this case, to get somebody to move to a higher level of care,

```
 1    then it's much easier and it doesn't have to be done with

 2    force.

 3    Q.    Dr. Kaufman, turning to -- I believe we're at tab

 4    four.  Turning to page 24 of inmate B's records, do you --

 5    this notes that after the incident, while Inmate B is in the

 6    crisis bed, he has a GAF score of 20, and transfers to APP,

 7    or there's a note saying "transferred to APP."

 8          Can you explain from your review what is indicated

 9    here, what the clinical significance of this note is?

10          MS. VOROUS:  Objection.  Leading.

11          THE COURT:  You may answer, sir.

12          THE WITNESS:  That he has a qualifying medical mental

13    disorder.  That he's currently included in MHSDS, and his

14    global assessment of functioning is 20, which I said before

15    is very low, and that he has psychotropic medication

16    prescribed.

17    BY MS. RIFKIN:

18    Q.    Are you able to tell from this note and from his other

19    files how acute inmate B's level of mental illness was at

20    this point?

21    A.    It would be very acute at this point.

22    Q.    In turning to page 27 of his record, there is a

23    handwritten note at the bottom.

24          Can you explain what's in that note and the

25    significance of that note for Inmate B?
```

```
 1   A.        (Reading:)

 2                    Inmate patient needs to have cell extraction to

 3                    receive IM meds:  Haldol, five milligrams

 4                    intermuscularly; Ativan, two milligrams

 5                    intermuscularly; and Cogentin, two

 6                    milligrams intermuscularly.

 7   Q.      And this is after the cell extraction we've been

 8   talking about; is that right?

 9   A.      This appears to say "needs" -- that sentence is

10   applying to a cell extraction to common, it appears.  That's

11   on 8-6-12, yeah.  This was after the cell extraction we've

12   been talking about.  This was after he was in the mental

13   health bed.

14   Q.      Are you able to opine about what kind of facts another

15   cell extraction would be -- at this point in time would

16   likely to have on Inmate B?

17           MS. VOROUS:  Lacks foundation.  Speculation.

18           THE COURT:  Overruled.

19           You may answer, Doctor.

20           THE WITNESS:  That each cell extraction is going to be

21   increasingly traumatizing and make the inmate more paranoid

22   and less amenable to treatment.

23           THE COURT:  There's an immediate effect.  Is there a

24   reasonable expectation as to what a long-term effect would

25   be, if you know?
```

```
 1              THE WITNESS:  I think there's a reasonable expectation

 2    that he will also have long-term cumulative effects, yes.

 3    BY MS. RIFKIN:

 4    Q.      Doctor, do you know if Inmate B was subjected to any

 5    further cell extractions prior to his transfer to the acute

 6    inpatient hospital?

 7    A.      Yes, I believe he had one more in addition to this

 8    one.

 9    Q.      Turning back to your supplemental declaration at tab

10    two, which is Exhibit 181, can you describe to us, did

11    inmates describe to you how they felt undergoing cell

12    extractions with OC spray?

13    A.      Yes, they did.

14    Q.      Can you share with us what they described to you.

15    A.      This isn't on page 16.

16    Q.      I'm just asking you to share with us what kind of

17    things they described to you about how it felt.

18    A.      I have to refer to my notes so I can be exact on that.

19    One of them is inmate C. When he was asked about this, he

20    said (Reading:)

21                  I tried to talk to them.  I wouldn't come out of

22                  the cell.  When I told the officer that I needed

23                  my fluids replaced, he brought others in.  He

24                  went into the cell, stomped on my head and

25                  pepper-sprayed me.  He told me that if I told
```

1                    the warden, they would beat me.  I got really

2                    scared of them.  I remember how they jump on me.

3                    They pepper spray me.

4    Q.    Dr. Kaufman, do you have notes or do you remember

5    specifically how these inmates described the feeling of being

6    sprayed, the physical feeling?

7    A.    Well, I think that he's a good example of it, but then

8    there are other examples where they talk about having the

9    oxygen sucked out of them.  They feel their skin is on fire,

10   that they can't breath.  Also pepper spray has been given to

11   asthmatic inmates, which runs a very high risk of

12   compromising their breathing.

13   Q.    Turning back to your declaration, Dr. Kaufman, on page

14   15, you described your interview of one particular inmate

15   patient where one thing he says is, "You feel like an

16   animal."

17         Can you share more with us about your interview of

18   this inmate and what he expressed to you about his experience

19   with OC spray.

20   A.    This is inmate D, and this is an asthmatic inmate.

21   He's the one who says that when he's OC-sprayed, he feels

22   he's hyperventilating.  "You can't breath.  It takes all your

23   oxygen away.  It's dehumanizing.  You feel like an animal."

24         He's someone that the triangle or lanyard was used on

25   and I have commented on.  His experience with the lanyard

1    (Reading:)

2              You feel like an animal.  You're chained to a

3              steel heavy bar and they walk you around in

4              front of everyone.  It's what they do to cattle

5              and horses.

6    Q.    Dr. Kaufman, given the psychological effects you

7    described earlier and the physical effects we've heard about

8    of OC spray, in your clinical opinion, is it appropriate to

9    use OC spray as a restraint on inmates with mental illness in

10   these type of situations?

11   A.    It's my strong preference that it not be used at all.

12   Q.    And what tool would you give custody officers and

13   clinicians in the prison setting to approach inmates in these

14   situations and to manage inmates in these situations if they

15   don't have OC spray?

16   A.    The first tool is that they have detailed initial

17   training in dealing with mentally ill inmates.

18         The second, that they have ongoing training that

19   details with mentally ill inmates.

20         The third, that they be part of a team with mental

21   health in which they're both working together and they both

22   understand each other's approach to deal with mentally ill

23   inmates.

24         Then when all that is said and done, and you will find

25   that you have far fewer crisis situations when that is done,

1    then the officers and the mental health staff needs to be

2    trained in techniques of management of assaultive behavior,

3    which I've talked about before and which is standard practice

4    in many psychiatric hospitals that deal with severe mentally

5    disturbed inmates.

6           I've alluded to the constituents of that technique

7    before, and there's also a manual that's used in acute

8    psychiatric hospitals that is included in this material as to

9    what these techniques are and how to train people and

10   specifically using them.

11   Q.    Dr. Kaufman, I know we weren't able to provide you

12   with the training materials that CDCR uses for their custody

13   officers, but were you able to form an opinion from your

14   review of the videos you saw and your review of the reports,

15   as to whether the actions of their custody officers reflect

16   this type of training?

17   A.    I saw no evidence that there was any kind of training

18   in understanding and dealing with mentally ill inmates.

19   Q.    Dr. Kaufman, how do these practices you've just been

20   describing for us, how do they fit in with our overall

21   observations about the relationship of custodial mental

22   health staff in the prisons you observed?

23   A.    I did not see evidence of a team approach.  What I see

24   is that custody considerations and custody regulations are

25   dominant in almost every interaction with the mentally ill

1    inmate.

2    Q.    Did you form an opinion about the effects of this

3    overall custodial dominance on the ability to provide

4    effective mental health treatment?

5    A.    It's extremely destructive to it.

6    Q.    How?

7    A.    Well, because all the kinds of custodial issues that

8    I've been talking about consistently override the therapeutic

9    issues, going from how an inmate is handled initially as to

10   how they're handled in crisis, to how they're sentenced, to

11   how they are handled after they come out of crisis beds or

12   correctional psychiatric facilities.

13        All you see are decisions made on the basis of

14   custodial issues and almost a total ignorance or rather

15   ignoring and maybe ignorance of mental health issues.

16   Q.    If I can direct you once again to tab four of the

17   medical records of Inmate B that have been admitted as

18   Exhibit 4.

19        If I can direct you to the last page of this exhibit,

20   page 36, can you tell us what this document shows about

21   inmate B's treatment?

22   A.    That after his treatment when he went back to the --

23   Q.    Can I stop you for a minute.

24        Where had he been treated?

25   A.    He had been treated by DMH and he was discharged to

1    EOP back to Corcoran.

2    Q.    This is after the initial cell extraction we watched?

3    A.    Correct.  He was in treatment until January 3rd, 2013,

4    when he returned to Corcoran.

5    Q.    What does this document tell us?

6    A.    Basically it says that he was assessed a SHU term.

7    Q.    Upon his return?

8    A.    Upon his return, yes.  And to me, this seemed like a

9    relentless pursuit of the custodial factors here and an

10   overriding of the therapeutic factors here.  An individual

11   comes out of several months of mental health treatment and

12   they need a gradual reintroduction to prison society in a

13   carefully maintained therapeutic environment.

14        And what does he get?  He gets a SHU term.

15   Q.    Do you know if the rules violation that Inmate B was

16   charged with as a result of the cell extraction we saw

17   resulted in a referral for a SHU assessment?

18   A.    Well, ultimately, it did, as far as I can recall.

19   Q.    Dr. Kaufman, you spent a half day at one of the

20   institutions reviewing these six use of force videos that

21   you've described.

22        Can you describe for the court what your reaction was

23   to seeing this practice of cell extractions?

24   A.    You know, I've been around awhile.  I can tolerate

25   seeing a lot of force, but I actually felt a bit sick when I

 1   saw the videos of Inmates A and B, repulsed and sick, sick to

 2   the stomach.

 3            MS. RIFKIN:   Thank you, Dr. Kaufman.

 4                        CROSS-EXAMINATION

 5   BY MS. VOROUS:

 6   Q.      My name is Debbie Vorous and we met a week and a half

 7   ago after at your depositions.

 8            Doctor, you testified in response to a question with

 9   respect to your review of records, that you had reviewed all

10   of the RVRs, Rules Violation Reports, that are located in tab

11   eight of the binder that you have in front of you, which is

12   also Trial Exhibit 184.

13            Is that correct?

14   A.      Yes.

15   Q.      Doctor, at your deposition on September 27th, do you

16   recall me asking you about your opinions with respect to the

17   impact of the failure of correctional officers to take into

18   account mental illness in the Rules Violation Reports?

19   A.      Yes.

20   Q.      At that time, do you recall identifying for me three

21   additional inmates that you had felt correctional officers

22   did not take into account the mental illness of the inmate at

23   the time of the disposition of the rules violation?

24   A.      Yes.

25   Q.      And isn't it also correct that at the time of your

 1    deposition, you had not reviewed the majority of these Rules

 2    Violation Reports?

 3    A.      I had begun an evaluation of the rest of them, but I

 4    certainly hadn't read them all.

 5    Q.      With respect to the report that you were asked about,

 6    and this is identified at page -- beginning at page 184,

 7    again, this is tab eight.

 8    A.      What document?

 9    Q.      Page 184 of tab eight.

10            THE COURT:  Tab eight, will you please specify what

11    the trial exhibit is.

12            MS. VOROUS:  I thought I did.  184.

13            THE COURT:  You did.  I'm sorry.  You actually did.

14    BY MS. VOROUS:

15    Q.      This is the Rules Violation Report that you had

16    testified to earlier during your direct examination.

17            Correct, doctor?

18    A.      Yes.

19    Q.      This is not one that we discussed at your deposition.

20            Is that a correct statement?

21    A.      Yes.

22    Q.      Is it also true that you have not read the mental

23    health records for the inmate that's identified in the Rules

24    Violation Report that starts at page on 84 of tab eight,

25    Trial Exhibit 184?

 1    A.    That's correct.

 2    Q.    Doctor, are you aware of the regulations that govern

 3    the rules violation process to the extent of -- strike that.

 4    Let me start that question over.

 5          Are you aware of the regulations that outline when a

 6    mental health assessment must be conducted for an inmate that

 7    is at the correctional clinical case management system level

 8    of care?

 9          MS. RIFKIN:  Objection.  Vague as to regulations?

10          THE COURT:  What?

11          MS. RIFKIN:  Vague as to regulations.  I'm not sure if

12    Ms. Vorous is referring to state-mandated regulations or

13    something else.

14          THE COURT:  Can you specify what regulations you're

15    talking about, ma'am?  I assume they're CDCR, but I don't

16    know.

17          MS. VOROUS:  Yes, that's correct, but I'll find the

18    exact --

19          THE COURT:  You don't have to.

20          The question is:  Are you familiar with the CDCR

21    regulations dealing with mental health assessment of persons

22    who are within the Coleman class?

23          THE WITNESS:  Not directly, no.

24    BY MS. VOROUS:

25    Q.    So you don't know, Doctor, whether those regulations

```
 1    require a mental health assessment be conducted for every

 2    inmate that is in the triple CMS level of care.

 3            Correct?

 4    A.      Correct.

 5    Q.      And if a particular rules violation fell into a

 6    category that did not require a mental health assessment for

 7    the triple CMS level of care, that would not be an indicator

 8    that a mental health assessment was not done when it should

 9    have.

10            Isn't that correct?

11            MS. RIFKIN:  Objection.  Vague and confusing.

12            THE COURT:  You should talk.

13            Restate your question, ma'am.

14            THE WITNESS:  I thought there was a triple negative in

15    that question.

16            THE COURT:  That's why I sustained it and requested

17    that she restate it.

18    BY MS. VOROUS:

19    Q.      Doctor, you had testified on direct that you found

20    cases in your review of the Rules Violation Reports where

21    mental health assessments had not been completed.

22            Is that correct?

23    A.      Yes.

24    Q.      Was it your opinion that mental health assessment

25    should have been done in those cases?
```

 1    A.      It's my opinion that any time you have an inmate

 2    designated as mentally ill and he commits an infraction

 3    that's subject to an RVR, that a mental health assessment

 4    should be done.  That's a clinical opinion.

 5    Q.      But, Doctor, you're not saying that by failing to

 6    complete a mental health assessment in the cases that you're

 7    referring to, that there was a violation of CDCR policy or

 8    regulation.

 9            Correct?

10    A.      Correct.

11    Q.      Doctor, you testified earlier to your prison tours

12    that you took in the context of defendants' termination

13    motion.

14            Correct?

15    A.      Correct.

16    Q.      And you visited three prisons; is that accurate?

17    A.      This time, correct.

18    Q.      Where were those three prisons?

19    A.      They were Corcoran, the correctional facility for

20    woman and CIN.

21    Q.      You did not visit Kern Valley State Prison; correct?

22    A.      Correct.

23    Q.      Each of those tours took one day; is that accurate?

24    A.      Yes.

25    Q.      Doctor, you testified earlier to an example of, I

 1    believe you said, nine inmates who did not show up for the

 2    treatment team meeting.

 3           Is it correct that you did not review those inmates

 4    for impacts from use of force taken against them?

 5    A.     Not to my knowledge.

 6    Q.     And as far as you know, Doctor, there had not been any

 7    use of force taken against those inmates.

 8           Correct?

 9    A.     I don't know if there was or was not.

10    Q.     Doctor, in preparing for your testimony and

11    supplemental declaration that was submitted in the context of

12    this hearing, you reviewed videos for four inmates.

13           Is that correct?

14    A.     Yes.

15    Q.     You interviewed two of those inmates?

16    A.     Yes.

17    Q.     Is it fair to say that your opinions with respect to

18    the impact of use of force on the mental health of the

19    inmates within CDCR is based solely on your review of those

20    four inmates' mental health records and two interviews?

21    A.     No.

22    Q.     Did you review any other use of force videos?

23    A.     No other videos.

24    Q.     Did you review any other mental health records of

25    inmates that had been subject to use of force?

1    A.      Just the RVRs of over 30 inmates.

2    Q.      It's your opinion that in the videos you did review,

3    that you did not see a successful intervention.

4            Is that correct?

5    A.      Yes.

6    Q.      And that none showed any evidence of a therapeutic

7    alliance.

8            Is that correct?

9    A.      Yes.

10   Q.      Doctor, isn't it also true that if there is a

11   successful intervention, there wouldn't be a need for use of

12   force?

13   A.      I would assume so.

14   Q.      And there would no use for videos; is that correct?

15   A.      I would assume so.

16   Q.      You have no idea how many successful interventions

17   have occurred within CDCR prisons over the last year.

18           Correct?

19   A.      Correct.

20   Q.      Based on your review of the videos, it would appear

21   that the interventions that were videotaped were done

22   primarily by licensed psychiatric technicians.

23           Is that correct?

24   A.      Yes.

25   Q.      Isn't it also correct that you do not know whether

```
 1    prior interventions had been attempted by psychiatrists or

 2    psychologists for any of those four cases?

 3    A.      Correct.

 4    Q.      Doctor, are you aware that within administrative

 5    segregation units in CDCR prisons, licensed technicians are

 6    used to conduct daily rounds of inmates within those units?

 7    A.      Yes.

 8    Q.      And during those rounds, wouldn't it be possible for

 9    the licensed psychiatric technicians to develop therapeutic

10    alliances with the inmates within those units?

11            THE COURT:  Anything is possible.

12            Doctor, what she really means is it reasonable to

13    expect that they would develop a therapeutic relationship?

14            THE WITNESS:  Depending on their personality, their

15    attitude and how much time they spend with each inmate, and

16    their ability to make therapeutic contact at sell front, they

17    could develop an alliance.

18    BY MS. VOROUS:

19    Q.      With respect to the four videos -- the videos you

20    reviewed for the four inmates, you don't know whether the

21    psychiatric technicians in those cases had developed that

22    kind of relationship.

23            Correct?

24    A.      I saw no evidence of it on the tape.  I think if you

25    have a therapeutic relationship with someone, you try to
```

1    spend more than 23 seconds to get them to agree to come out

2    of a sell when they're about to be extracted.

3    Q.    Again, Doctor, you don't know whether or not prior

4    efforts had been made by those licensed psychiatric

5    technicians to get the inmates to come out of their cell.

6         Correct?

7    A.    There was that one SOAP that we read on Inmate B, but

8    I believe -- it's very hard to tell what degree that person

9    had -- could have been a psych tech.  I wasn't clear, but

10   that was one example of an intervention that took place about

11   two hours before an extraction done by a mental health

12   person.

13        I'm not sure what the degree was, but it was very

14   matter of fact and did not really deal with any factors that

15   would demonstrate there wasn't therapeutical hands on that

16   one.

17   Q.    Doctor, I'm not sure that you answered my question.

18        You don't have any evidence that the licensed

19   psychiatric technicians that were part of the intervention in

20   the context of the four inmates use of force videos that you

21   reviewed did not previously attempt intervention.

22        Isn't that accurate?

23   A.    Yes.

24   Q.    Doctor, early on in your testimony today you talked

25   about your belief that the conditions within CDCR prisons are

```
 1   similar -- excuse me -- the conditions with respect to use of
 2   force were similar to the conditions that were in place when
 3   you previously testified back in '93.
 4        Correct?
 5   A.   Yes.
 6   Q.   But you have no evidence today that CDCR uses tasers;
 7   correct?
 8   A.   Correct.
 9   Q.   You have no evidence that they use block guns?
10   A.   Correct.  My point was that tasers and block guns have
11   been replaced with other weapons that are as punitive and as
12   little therapeutic as the prior ones.
13   Q.   Doctor, you have no evidence that -- you have no
14   evidence of any use of force situations that have caused
15   death, correct, within CDCR?
16   A.   There's one example in a declaration or a deposition
17   of Mr. Martin, and I can actually reference that so we can be
18   sure that's what happened.  It will take a moment, but my
19   recollection of it is that it was an instance where an inmate
20   received pepper spray and then had a spit mask and then
21   choked to death.
22   Q.   Doctor, what you're referring to is a comment that's
23   made by another expert in this case.
24        Do you have any independent knowledge that the use of
25   force within CDCR prisons has caused a death?
```

1    A.      No.

2    Q.      Doctor, isn't it also true that you are not aware of

3    any published studies that look at the question of the

4    impacted use of force on mentally ill inmates?

5    A.      I'm not aware at this time of any published studies.

6    Q.      You've never written any articles or chapters in books

7    that address the impact of use of force on mentally ill

8    inmates.

9            Is that correct?

10   A.      I've never what?

11   Q.      Written any articles or chapters in books that address

12   the impact of use of force on mental health inmates.

13   A.      Not directly.  One of my articles is called, Prisons:

14   Punishment, Treatment or Deterrent, where I go into the

15   general aspects of that, but I don't specifically pinpoint

16   use of force in that article.

17   Q.      Doctor, you've never worked for CDCR; is that correct?

18   A.      That's correct.

19   Q.      And you've not worked in a prison setting in over

20   40 years.

21           Is that correct as well?

22   A.      Not directly, no.  Going to prisons to interview

23   inmates from time to time, but not directly.

24   Q.      Isn't it true, Doctor, that you've had little

25   experience in assessing or addressing the impact of use of

 1   force incidents even when you interact with inmates or form

 2   inmates through your current work?

 3   A.      Correct.

 4   Q.      Doctor, the four inmates that you viewed use of force

 5   videos for, those were inmates that were selected by

 6   plaintiffs' counsel for you.

 7           Correct?

 8   A.      I'm not sure what the criteria was for selecting them.

 9   When we came to the prison to view them, there were 18 tapes

10   there.  I know three were selected because we were to

11   interview the inmates, but I'm not sure why those inmates

12   were selected for both the videotaping and the interviewing.

13   Q.      You did not select which inmates to interview;

14   correct?

15   A.      Correct.

16   Q.      You didn't select which use of force videos to review?

17   A.      Correct.

18   Q.      Isn't it also correct the plaintiffs' attorneys

19   provided you with materials on the management of assaultive

20   behavior techniques?

21   A.      I provided one set and they provided one set.

22   Q.      And the ones that you're referring to is the manual

23   that you obtained from psychiatric hospital.

24           Is that accurate?

25   A.      Correct.

```
 1   Q.      Doctor, you have not reviewed the use of force

 2   policies for CDCR prisons.

 3           Correct?

 4   A.      Not directly.

 5   Q.      Doctor, isn't it also true that you are not familiar

 6   with the training that custody staff at CDCR receive on

 7   recognizing the signs and symptoms of mental health?

 8   A.      We have requested it, but it has not been provided, so

 9   I am not familiar with it.

10   Q.      And isn't it also correct that you are not familiar

11   with the training that mental health staff in CDCR receive on

12   deescalation techniques?

13   A.      That is correct.

14   Q.      So, Doctor, you don't know whether they do or do not

15   receiving training.

16           Is that an accurate statement?

17   A.      I only know from the results which don't show

18   evidence.  I've read in the materials I have reviewed.

19   Q.      Doctor, I'd like to talk about Inmate A that you've

20   been discussing in your testimony today, and this is are at

21   tab three of your binder, trial Exhibit Number 2.

22   A.      Which page are you referring to?  I'm on tab three

23   now.

24   Q.      Currently I'm referring to the entire exhibit.

25           Is it correct you reviewed all of these records;
```

1    correct?

2    A.      Yes.

3    Q.      Doctor, is it also correct that you have no knowledge

4    whether there had been any prior efforts to engage Inmate A

5    in taking his medication prior to cell extraction?

6    A.      Depends on the date.  There have been some changes in

7    his medication.  June 20, 2012, his medication was changed.

8    So there was an effort, at least of a month before, to change

9    medication.

10          THE COURT:  The question is whether or not the

11    material that you reviewed indicates that there was an effort

12    to have him voluntarily take the medication that was

13    perceived to be required at the time of the extraction?

14          THE WITNESS:  Thank you.

15          THE COURT:  I think that's your question.

16          MS. VOROUS:  Yes, Your Honor, it was.

17          THE WITNESS:  I didn't see any evidence that there

18    was, but if there's a page that you feel that that's

19    discussed or that you want me to look at or discuss that, I'd

20    be glad to.

21    BY MS. VOROUS:

22    Q.      Doctor, turn to page 62 of tab A, which is Trial

23    Exhibit 2.

24    A.      Is this two in my file?

25    Q.      No. Tab three, page 62.

1    A.    I have that page.

2    Q.    Doctor, I believe you testified earlier you're

3    familiar with this involuntary medication notice.

4          Is that correct?

5    A.    Yes.

6    Q.    And, in fact, the extraction that occurred on July 24,

7    2012, was for the initial Keyhea medication for this inmate.

8          Is that accurate?

9    A.    Yes.

10   Q.    Would you agree that this inmate benefited from the

11   start of the medication?

12   A.    Well, after the medication is administered, he doesn't

13   have a steady upward course.  He goes up and down.  So that

14   he may have temporarily be helped by it, but in terms of all

15   the other factors that I've outlined before, in the long run,

16   it may have been more damaging to him, especially the way it

17   was done, than the temporary benefit of the medications.

18   Q.    Doctor, there's nothing in his records, correct, that

19   show any long-term damage from his extraction to initiate the

20   Keyhea order.

21         Correct?

22   A.    This is Inmate A; correct?

23   Q.    Correct.

24   A.    I didn't have the opportunity to interview him,

25   unfortunately.

1  Q.    Doctor, I'm just asking about the medical records.

2  A.    I note that after the extraction, that he repeatedly

3  complains of side effects of his medications, repeatedly asks

4  to see the doctor.  It isn't clear how often he sees the

5  doctor, and then on September 5, 2012, he's placed on suicide

6  watch.  So it doesn't sound like he's doing too great.

7       Then on October 3rd, 2012, he complained that the

8  correctional officers were going to kill him and his family.

9       October 24th, he's injected with long-acting Haldol,

10  an anti-psychotic, and also given the second anti-psychotic

11  very high doses, and then December 2nd he goes to DSH.

12       Although he may have been helped temporarily, he

13  continued to have a psychotic and suicidal course thereafter.

14       THE COURT:  Is it your view, Doctor, or can you tell

15  whether or not that, the after effects -- I'm sorry.  The

16  condition after the extraction was in any way related to the

17  extraction or was related to the fact that he was psychotic

18  to begin with?

19       THE WITNESS:  It's really difficult to tell what role

20  it had.  It's just that the cumulative effects of multiple

21  extractions and psychotic episodes and the brutalizing that

22  takes place has got to damage somebody psychologically.  The

23  question is how much is that damage and how much is the

24  preexisting psychotic picture?  It's difficult sometimes to

25  sort that out.

1          THE COURT:  I understand and respect your hesitancy in

2     trying to make a direct relationship.  My one concern that I

3     will have, obviously, is whether or not as a medical matter,

4     clinical matter, your judgment is not only couldn't it have

5     helped, which, obviously, you take that position, but it

6     probably had long-term adverse effects.

7          Is that right?

8          THE WITNESS:  It's my position it may have helped in

9     the short term, but that it has long-term adverse effects.

10    BY MS. VOROUS:

11    Q.     Doctor, you don't know how many extractions that

12    Inmate A had while he was incarcerated; correct?

13    A.     I don't know.

14    Q.     You don't know what -- the extent of any use of force

15    that was taken against him while he was incarcerated at CDCR.

16         Correct?

17    A.     I don't know the total number of incidents, no.

18    Q.     Doctor, I believe you may still open page 62 of tab

19    three, which is Trial Exhibit Number two.  That was the

20    involuntary medication notice.

21    A.     Yes, I have that now.

22    Q.     If I could draw your attention to page 63.  Paragraph

23    seven on page 63, if you mark "grave disability," there's

24    requests that the clinician provide justification for grave

25    disability.

```
 1            Correct?

 2   A.       Yes.

 3   Q.       In this justification, isn't it accurate that the

 4   treating psychiatrist indicated that during all the time that

 5   he is evaluating him, he was refusing to accept any

 6   psychiatric medication?

 7   A.       Yes.

 8   Q.       Doctor, wouldn't that indicate to you that efforts

 9   were made to get Inmate A to take his medication?

10   A.       Unsuccessful efforts were made.

11   Q.       If you look further up in paragraph seven, there's a

12   reference to, again, a second reference to his persistent

13   refusal of psychotropic medication, and also a reference to

14   the fact that (Reading:)

15                   Once the inmate was admitted to the mental

16                   health crisis bed, he met with the treatment

17                   team on a single occasion, but thereafter

18                   completely refused to meet with the treatment

19                   staff.

20   A.       I don't know where you're reading from.  Are you

21   reading from number six or seven?

22   Q.       I'm reading from number seven, six lines down.

23   A.       Starting with "subsequently"?

24   Q.       Yes.

25                   Doctor, wouldn't that --
```

1            THE COURT:  The doctor is reviewing.  I think he's

2     reviewing the page you referred him to.

3            THE WITNESS:  I have it.

4     BY MS. VOROUS:

5     Q.       Doctor, wouldn't that also indicate to you that

6     efforts were being made by the clinical staff at Corcoran to

7     engage this inmate in mental health treatment?

8     A.       Unsuccessful attempts were made, yes.

9     Q.       But attempts, nonetheless; correct?

10    A.       Yes.  It does say that (Reading:)

11               He would accept occasional verbal interactions

12               with treatment staff, at which time a mental

13               disorganization was obvious.  He could not

14               engage in a cogent conversation with any staff.

15           So, again, we're talking about his mental illness.

16    He's difficult to reach, but occasionally he does engage in

17    some communication.  So there is some contact, but he's very

18    confused.

19    Q.       So, in fact, the clinicians that were attempting to

20    work with Inmate A in the mental health crisis bed unit were,

21    in fact, taking the same efforts you described in your

22    example of creating a therapeutic alliance; they were talking

23    to him, reaching out to him, trying to prescribe medication?

24    A.       Whatever they were doing, it wasn't working.

25            THE COURT:  That's a different question, Doctor.

```
 1              THE WITNESS:  Okay.  There's evidence that they

 2    attempted to communicate with him.

 3    BY MS. VOROUS:

 4    Q.     Doctor, you testified earlier that even using your

 5    tools or technique that you described, that there are

 6    occasions where it's not going to work.

 7              Correct?

 8    A.     Yes.

 9    Q.     Doctor, you also talked about your concerns with

10    officers wearing protective gear to enter this inmate's cell

11    during the extraction.

12              Do you recall that testimony?

13    A.     What I've said is that officers have to protect

14    themselves, and I'm aware of that.  What I'm talking about is

15    that they be cognizant of the effect that their gear has on

16    the individual, that it can be extremely frightening and

17    threatening to them.

18    Q.     In this particular extraction, would you have had the

19    officers abandon their protective gear to enter his cell?

20    A.     When you're given this environment, you have to do

21    what is necessary in this environment for officers to

22    survive.  Given the way the system works, of course they have

23    to have protective gear.  I've said that before.

24    Q.     Doctor, would you also have the correctional officers

25    abandon their practice of strip searching when you have an
```

```
 1   inmate with a history or potential -- history of hiding
 2   weapons?
 3   A.     Well, I've written a lot about indiscriminate strip
 4   searching in that there are many circumstances where if an
 5   individual is housed on a unit, just by the fact he's housed
 6   on the unit, he's going to be strip searched.  That's what
 7   I'm talking about.
 8          In the case of say, Inmate B, and the need to have him
 9   naked, I'm asking for sensitivity as to how that's
10   accomplished and what kinds of words are used to accomplish
11   that.
12   Q.     Beyond that, you are not offering any suggestion on
13   alternatives to the strip search; correct?
14   A.     Not when it's clinically indicated, no.
15          THE COURT:  It's 2:45.  We'll take our afternoon
16   recess.
17          15 minutes.
18                        (Whereupon, a break was taken at
19                        2:43 p.m.)
20                        (Nothing Omitted.)
21
22
23
24   /////
25   /////
```

245

1          (Back on the record at 3:00 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Miss Vorous.

5          MS. VOROUS:  Thank you.

6    BY MS. VOROUS:

7    Q.     Doctor, if I could ask you to turn to tab 4 in your

8    binder and what has been marked -- admitted as Trial Exhibit

9    Number 4.

10          Have you found that, Doctor?

11   A.     Yes.

12   Q.     And the documents that are contained within tab 4

13   constitute records for Inmate B, correct?

14   A.     Yes.

15   Q.     Doctor, these constitute all of -- Strike that.

16          Doctor, do the mental health records contained within

17   tab 4 constitute all the mental health records that you

18   reviewed in preparation for providing your opinions on

19   Inmate B?

20   A.     Yes.  And my interview -- no, not my interview.  The

21   viewing of the videotape.  I didn't interview him, no.

22   Q.     Doctor, did you review -- Excuse me.  Were you

23   provided additional records for Inmate B that you did not

24   review?

25   A.     Not to my knowledge.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

246

1          MS. VOROUS:  Your Honor, may I approach the witness?

2          (Document handed to witness.)

3    BY MS. VOROUS:

4    Q.    Doctor, I've handed you what's been marked as

5    exhibit -- Defendants' Exhibit A.

6          Do you recognize this document?

7    A.    No.

8          THE COURT:  A?

9          MS. VOROUS:  A, yes.

10         THE COURT:  Thank you, ma'am.

11   BY MS. VOROUS:

12   Q.    Doctor, can you describe for me what the first two

13   pages of this document are?

14   A.    It's an Interdisciplinary Progress Note under the

15   title of General Psychiatry.

16   Q.    Is it true that this is a note with respect to

17   Inmate B?

18   A.    Yes.

19   Q.    And is it also true that this is a note that is dated

20   the same date as Inmate B's cell extraction?

21   A.    Yes.

22         MS. VOROUS:  Your Honor, I would request that Exhibit

23   A be admitted as a record produced in the normal course of

24   business.

25         THE COURT:  Hearing no objection, A is received.

247

1              (Whereupon, Defendants' Exhibit A received into

2               evidence.)

3          MR. BIEN:  No objection.

4          THE COURT:  It's a little late, sir.

5    BY MS. VOROUS:

6    Q.     Doctor, if I can draw your attention to the top of

7    page -- the first page of Exhibit A.  Do you see the time

8    that is referenced on this document is 3:00 p.m., correct?

9    A.     Correct.

10   Q.     And isn't it true that the cell extraction for

11   Inmate B occurred after 3:00 p.m. on July 20th, 2012?

12   A.     Yes.

13   Q.     So if I can draw your attention to the middle of the

14   document under Section S, Subjective.

15          Do you see that, Doctor?

16   A.     Yes.

17   Q.     And do you see the first sentence in that, if I'm

18   reading this accurately, as stating "I/P," meaning

19   inmate-patient I'm assuming, yelling:

20          "I don't want to talk to you.  I don't have mental

21          problems."

22          And second:

23          "I don't want any medication."

24          Do you see that, Doctor?

25   A.     Yes.

248

1    Q.      Further on down this paragraph there's additional

2    comments that are made by the psychiatrist that wrote the

3    notes, correct?

4            THE COURT:  Do you know who made this -- these notes,

5    sir?

6            THE WITNESS:  No.

7    BY MS. VOROUS:

8    Q.      Look at the second page of the document, Doctor.

9            Does it indicate at the bottom that it was -- that

10   the notes were prepared by a psychiatrist?

11   A.      Yes.

12   Q.      Would you agree that the subjective comments that are

13   part of this progress note were made by a psychiatrist at --

14           THE COURT:  How would he know?

15           He knows what the document says.

16   BY MS. VOROUS:

17   Q.      Would you agree that what this document states is --

18   that that is what this document states, that the notes were

19   made by the psychiatrist?

20   A.      Yes.

21           A psychiatrist's name is stamped on here and the

22   signature is stamped on here.  You know, I can't be 100

23   percent sure that somebody else didn't write it and he

24   stamped it, but he stamped it and signed it.

25           THE COURT:  Is it stipulated between the parties that

249

1    this is part of the regular medical records that CDCR keeps?

2         MS. RIFKIN:  Your Honor --

3         THE COURT:  The answer is just "yes" or "no."

4         MS. RIFKIN:  No, Your Honor.

5         THE COURT:  Ma'am, I've admitted them, but I have no

6    idea of what they are.  I don't want to prevent you from

7    going forward, particularly at this point with this doctor.

8         Will you represent to me that someone will come in

9    and say this is what it purports to be?  I mean, this is a

10   part of the record?

11        MS. VOROUS:  Yes.  We will be able to call someone to

12   come in.

13        THE COURT:  You may proceed with that understanding

14   that that will be -- that the foundation will be laid.

15        You may proceed.

16   BY MS. VOROUS:

17   Q.    Doctor, wouldn't it be reasonable to conclude that

18   with respect to Inmate B a clinical intervention with a

19   psychiatrist did occur prior to the cell extraction?

20   A.    I don't know if I would use the word "intervention."

21   I would use the word "brief assessment."

22   Q.    But isn't it -- it is correct that this inmate was

23   seen before the cell extraction by a psychiatrist, correct?

24   A.    A psychiatrist signed a note to that effect.

25   Q.    Doctor, wouldn't you agree that it was important for

250

1    clinical staff to have this inmate removed from his cell for

2    a mental health evaluation?

3    A.      Would you repeat the question?

4    Q.      Yes.  Would you -- wouldn't you agree that it was

5    important for clinical staff to have this inmate removed from

6    his cell for a mental health evaluation?

7    A.      It would be more helpful if it were done that way,

8    yes.

9    Q.      And since, Doctor, you did not visit Kern Valley

10   State Prison as part of your tour, it is fair to say you

11   didn't have any opportunity to observe the interaction

12   between mental health staff and custody at that prison,

13   correct?

14   A.      Yes.

15   Q.      Doctor, this inmate was housed in the Correctional

16   Clinical Case Management System -- Excuse me.  Strike that.

17          This inmate was a participant in the Mental Health

18   System at the Correctional Clinical Case Management System

19   Level of Care, correct?

20   A.      Yes.

21   Q.      Doctor, you testified earlier about your observations

22   from the video of the use of force for Inmate B, correct?

23   A.      Yes.

24   Q.      Isn't it true that when the inmate said that he did

25   not want to be stripped out, that the correctional officer

251

1   said something to the effect, "Okay.  Then cuff up"?

2   A.      I didn't hear the "Okay."  I only heard "cuff up."

3   Q.      And in fact, the inmate refused to cuff up?

4   A.      Yes.

5   Q.      That's correct?

6   A.      Yes.  Yes.  As I said, it was very threatening for

7   him, especially to turn around and cuff up because of his

8   specific fears of anal rape.

9   Q.      At the time he made that statement, though, he had

10  not stripped out, correct?

11  A.      Correct.

12  Q.      Also you testified that the inmate asked for medical

13  care.  Isn't it also correct that the correctional officer

14  said to the inmate, "She's right here.  All you need to do is

15  come out"?

16  A.      I don't recall hearing that, the way you state it.

17  Q.      Doctor, you've talked about the Management of

18  Assaultive Behavior technique on a couple of different

19  occasions during your testimony today, correct?

20  A.      Yes.

21  Q.      Isn't it true that this technique is typically used

22  in an inpatient acute hospital environment?

23          THE COURT:  Excuse me.  What is -- what technique are

24  you talking about, the techniques that the doctor described?

25          MS. VOROUS:  I'm talking about the Management of

252

1    Assaultive Behavior technique.

2          THE COURT:  Okay.  Those that, I take it, the doctor

3    has described in his direct?

4          MS. VOROUS:  Yes.

5          THE COURT:  All right.

6          THE WITNESS:  They are used in acute psychiatric

7    hospitals and also chronic psychiatric hospitals, yes.

8    BY MS. VOROUS:

9    Q.     Isn't it true that that technique is not typically

10   used in a correctional setting?

11   A.     I have not surveyed 48 states of correctional

12   facilities to determine --

13         THE COURT:  There are 50 now, but --

14         THE WITNESS:  Sorry.  Shows my age.  -- 50 states to

15   determine whether or not it's used.  I really leave that to

16   the correctional experts that are here.

17   BY MS. VOROUS:

18   Q.     So you don't know, Doctor, whether it is used in any

19   other correctional setting, correct?

20   A.     I don't know.

21   Q.     And if it is correct that this technique is typically

22   used in an acute inpatient hospital setting, that would not

23   include outpatient care, correct?

24   A.     It would be used much less, if at all, in outpatient

25   care.

253

1   Q.      At least with respect to one of the inmates that
2   we've been discussing today, that inmate was, in fact, in
3   outpatient care, correct?
4   A.      Outpatient care in a correctional facility is very
5   different from outpatient care in a community.  It is really
6   apples and oranges.
7           (Brief pause.)
8           The other thing I might just say, in terms of my
9   knowledge of correctional facilities, is that when I was
10  chief of psychiatric services at Lewisburg Federal
11  Penitentiary where I worked for two years, there was never
12  any need to restrain a patient with tasers or pellet guns or
13  OC spray.
14          We did not have to use that kind of level of force.
15  We were able to restrain inmates with the hands-on techniques
16  of that era which have since been refined and improved to
17  what is Management of Assaultive Behavior.
18          MS. VOROUS:  I'd just request that the witness's
19  prior statement be struck as nonresponsive.
20          THE COURT:  Denied.  You may proceed.
21  BY MS. VOROUS:
22  Q.      Doctor, you also testified that you interviewed --
23  Prisoner C is identified in your declaration, correct?
24  A.      Yes.
25  Q.      And your conclusions with respect to the impact of

254

1   use of force on this inmate was based solely on what he told

2   you during the interview, correct?

3   A.      I believe there was also a review of records in his

4   case.

5   Q.      You didn't verify with correctional officers at the

6   institution that the statements he was making with respect to

7   the impact on him from the use of force?

8   A.      Well, I didn't think it was necessary because either

9   he was extremely delusional about what correctional officers

10  had been doing to him, or he had, in effect, truly been

11  tortured by them.

12          You know, I suspect that, just as in most paranoids,

13  there's an element of reality, but it was a mixture of both.

14  Q.      That's based on your speculation?

15  A.      Yes.  And knowledge of paranoid behavior.

16  Q.      Excuse me.  I'm sorry.  I didn't hear that.

17  A.      And knowledge of paranoid behavior.

18  Q.      Doctor, you also testified with respect to your

19  interview of Patient D, correct?

20  A.      Yes.

21  Q.      And again, with respect to Patient D, it is true you

22  did not confirm with correctional officials the statements

23  that were made?

24          Strike that.

25          Isn't it true that with respect to Patient D you did

255

1    not confirm with the correctional officials that the

2    statements that were made to you by Inmate D with respect to

3    the impact from the use of force were true?

4    A.    Correct.

5    Q.    So is it fair to say that his response -- his

6    response as conveyed to you could also be associated with

7    paranoia?

8    A.    It could, yes.

9         MS. VOROUS:  Your Honor, if I can have a second?

10        (Defense counsel confer.)

11   BY MS. VOROUS:

12   Q.    Doctor, with respect to Inmate D, did you know that

13   his forfeiture of credit as a result of the RVR was restored?

14   A.    No, I did not know that.

15   Q.    Would that change your opinion with respect to the --

16        THE COURT:  Consequences?

17        MS. VOROUS:  Yes.

18        THE COURT:  Of the event?

19   BY MS. VOROUS:

20   Q.    I'm sorry.  I'm referring to Inmate A.

21        THE COURT:  Now I'm complete confused.

22        Go back.

23        Apparently there was a -- I think you testified there

24   was among the punishments some reduction in good time; is

25   that correct, sir?

256

1           THE WITNESS:  Yes.

2           THE COURT:  And apparently -- are you asking now

3    whether that was restored, ma'am?

4           MS. VOROUS:  Yes.

5           THE COURT:  Do you know that one way or another?

6           THE WITNESS:  No, I did not know that.

7           THE COURT:  You still don't know it?

8           THE WITNESS:  No.

9    BY MS. VOROUS:

10   Q.     If it was restored, Doctor, would that change your

11   opinion with respect to Inmate A?

12   A.     I would have to know the full disposition of the case

13   to comment on that.  Maybe it was restored, but it was

14   referred to the district attorney.  Or maybe it was restored,

15   but he was put in the SHU.

16          So, you know, I would have to know the whole picture

17   to be able to answer that question accurately.

18   Q.     Doctor, in your opinion the process that CDCR should

19   be using with respect to use of force would involve four

20   steps, initial training for mental health and correctional

21   officers, ongoing training, a team approach between custody

22   officers and mental health, and finally more training on the

23   Management of Assaultive Behavior technique, correct?

24   A.     Well, that's an excellent partial answer, but it

25   doesn't deal with all of the other issues that exist in the

257

1   correctional system in California that impinge on adequate

2   care, things like the institutions that are overpopulated,

3   overcrowded, the lack of mental health staff.

4   Q.    Doctor, I'm asking you about your recommended tool

5   for utilizing use of force within CDCR prisons.

6   A.    That's the tip of the pyramid.  You know, I would --

7   for it to work best, some of the other issues which were

8   brought out in my declaration in March would also have to be

9   implemented to make this work.  So it's -- yeah, as the tip

10  of the iceberg, that's what I'm talking about.

11        But in terms of being able to solve the problem there

12  has to be a realization that other aspects of the

13  infrastructure have to be changed too.

14  Q.    And within that pyramid there would be no actual

15  physical use of force, correct?

16  A.    No.  I think the techniques of MAB as a last resort

17  do include a hands-on approach of containing an

18  inmate-patient.

19  Q.    And only hands-on, correct, in terms of use of force?

20  A.    Well, at some point you may have to use restraints as

21  well.

22        MS. VOROUS:  No more questions.

23                    REDIRECT EXAMINATION

24  BY MS. RIFKIN:

25  Q.     Dr. Kaufman, the first thing I would like to do is

258

1    talk about some of the details with regard to Inmate B that

2    you just discussed with defense counsel.

3           I would like you to look at what's been marked

4    Defendants' Exhibit A.  And the check box for "Was the

5    setting confidential for this meeting" is marked yes.

6           Is your understanding that a cell front clinical

7    contact would be confidential, Doctor?

8    A.     I would say 99 percent of the time a cell front

9    contact is not confidential.

10   Q.     So would your interpretation, looking at this kind of

11   clinical record, which was marked that the setting was

12   confidential, be that it likely did not happen cell front?

13   A.     That's the inference.

14   Q.     And Doctor, if you can turn to what's been marked --

15   what's tabbed 4 in your binder, which has been admitted as

16   Trial Exhibit 4, page 7.

17   A.     Okay.

18   Q.     This is a Rule Violation Report dated July 20, 2012?

19          MS. VOROUS:  Objection, Your Honor.  Beyond the scope

20   of cross.

21          THE COURT:  I have no idea where we are going.  It

22   may well be, but -- You may proceed.

23          You may raise your objection if and when there is a

24   question asked.

25          MS. RIFKIN:  Thank you, Your Honor.

259

BY MS. RIFKIN:

Q.      Is July 20th, 2012, the date that the cell extraction
for Inmate B occurred?

A.      Yes.

Q.      And this Rules Violation Report for the act of a cell
extraction, can you tell what time it's -- the time -- what
time this occurred from this document?

A.      1400.

Q.      That's two o'clock?

A.      Yes.

Q.      Okay.  Turning back to Defendants' Exhibit A, can you
tell what time this confidential clinical contact occurred?

A.      3:00 p.m.

Q.      So Doctor, you were asked many times whether you saw
evidence that clinical interventions occurred prior to these
cell extractions.

        Did you see any evidence -- I'm sorry.  Let me start
over.  I have confused myself.

        You were asked many times whether you had evidence
that clinical interventions prior to those shown on the
videos did not occur prior to the cell extractions.

        Did you find any evidence that clinical
interventions, other than those on the videotapes, did occur?

A.      I did not, until I received this document in court
today.

260

1      THE COURT:  But this document says that it occurred

2  after the extraction, as I understand it.

3      THE WITNESS:  No.  This is one hour before.

4      THE COURT:  3:00 p.m.  Correct?

5      It says 3:00 p.m. at the very top.

6      THE WITNESS:  The extraction was -- I guess the

7  extraction was at -- was it at 2:00?

8      THE COURT:  That's what I think the evidence is.

9      Is there any doubt?

10      MS. VOROUS:  Yes, there is, Your Honor.

11      THE WITNESS:  It's at 2:00.  Sorry.  So it is one

12  hour afterward, the note was, yeah.  Sorry.

13      THE COURT:  Well, you'll have to tell me about if and

14  when we ever get to argument, which I doubt.  But, you know,

15  some day maybe.

16  BY MS. RIFKIN:

17  Q.    So Dr. Kaufman, you reviewed the medical records --

18  all the medical records you were provided for these four

19  class members whose use of force videos you reviewed?

20  A.    Yes.

21  Q.    Laying aside the confusion over these two documents,

22  did you find any evidence in those records that clinical

23  interventions, other than those captured on the videos, did

24  occur?

25  A.    No.

261

1    Q.      And Doctor, what is standard practice as far as

2    documentation in California when clinical contacts occur?

3    A.      That they are always documented, and they become a

4    part of the medical chart or the psychiatric chart.

5    Q.      And Dr. Kaufman, on cross-examination there was some

6    discussion about whether or not in your interviews of inmate

7    C and D you could discern independently whether they were

8    delusional or not.

9            Dr. Kaufman, you reviewed videos of use of force

10   against these two inmates; is that right?

11   A.      Yes.

12   Q.      Inmate C and D?

13           And in those videos did you see Inmate C and Inmate D

14   subjected to uses of force by correctional officers?

15   A.      Yes.

16   Q.      And I would like to talk about Inmate C for a minute.

17           You testified earlier that Inmate C had very specific

18   paranoia about custody officers attacking him.

19           Is it your opinion that those were related to the

20   type of force you saw?

21           I'm sorry.  Let me rephrase.

22           Do you have an opinion about whether that kind of

23   paranoia could be related to the type of force that you saw

24   in the video?

25   A.      Yes.  He was so paranoid about correctional officers

262

```
1    and had such a detailed delusional system about correctional
2    officers that uses of force would have to contribute to this
3    delusional system or to this feeling of being persecuted.
4    Q.    So Dr. Kaufman, I think you also testified in answer
5    to a question from the court, I think, that it can be hard to
6    tease out which ultimate harms are due to uses of force
7    versus mental illness.
8          In your clinical opinion, do the types of force that
9    you observed on the videos and reviewed in the reports pose
10   substantial risk of harm to inmates with serious mental
11   illness?
12   A.    Yes.  Psychological harm and in some minor cases, in
13   the inmates that I reviewed, physical harm.
14   Q.    Do you know if it would ever be possible to
15   determine --
16         THE COURT:  Ever possible?
17         What is the likelihood that...
18         MS. RIFKIN:  Thank you.
19   BY MS. RIFKIN:
20   Q.    What is the likelihood that an experienced clinician,
21   a psychiatrist, meeting with a patient like those we've
22   discussed months or years after one of these extractions,
23   would be able to tease out exactly what harm was caused by
24   the extraction and the force versus the other parts of
25   someone's mental illness?
```

263

1    A.      It would be incredibly difficult.

2    Q.      It's your opinion that these kinds of use of force

3    practices can contribute to long lasting harm?

4    A.      Yes.  I've said that many times.

5    Q.      Dr. Kaufman, turning to the issue of the ultimate use

6    of force after an inmate is gravely disabled and in a

7    decompensated, psychotic state, what is your opinion about

8    whether the types of force you saw on those videos is

9    clinically appropriate in those instances?

10   A.      I feel that it is not clinically appropriate.

11   Q.      Even when the inmate isn't -- even when it is very

12   difficult to communicate with an inmate in that state?

13   A.      Yes.  There are other means, as we've outlined.

14           MS. RIFKIN:  Thank you.

15                         RECROSS-EXAMINATION

16   BY MS. VOROUS:

17   Q.       Dr. Kaufman, if you would turn to tab 4 of your

18   binder, Trial Exhibit 4, and look at the first page.

19   A.      Is that the Incident Report, Part C Staff Report on

20   the upper left-hand corner?

21   Q.      Yes, that is it.  Look down at the narrative.

22           Can you read that, please.

23   A.      (Reading:)

24           On Friday, July 20th, 2012, at approximately 1400

25           hours I was advised by Dr. A. Ward of a medical order

264

1          he placed on (NAME STRICKEN) to be seen, s-c-e-n-e,

2          at CTC for a phychiatric evaluation.  Dr. Ward went

3          on to say he made the determination (NAME STRICKEN)

4          was a danger to himself.  However (NAME STRICKEN) was

5          not willing to exit his cell.  I approached cell 117

6          and attempted to create a dialogue with (NAME

7          STRICKEN).  I advised (NAME STRICKEN) he needed to

8          exit his cell in order to be seen by medical staff.

9          (NAME STRICKEN) refused and continued to do so

10         adamantly.

11         (Reading interrupted.)

12         MS. RIFKIN:  Your Honor, we would move to strike the

13    name of the inmate.

14         THE WITNESS:  I'm sorry.

15         THE COURT:  The names are stricken.

16         THE WITNESS:  It is hard when I read.  I'll make an

17    effort to correct that.  Thank you.

18         (Reading continued:)

19         I immediately contacted --

20         (Reading interrupted.)

21         Can I read the names of the correctional officers?

22         THE COURT:  Correctional officers?  Go ahead.

23         THE WITNESS:  (Reading continued:)

24         Correction Lieutenant Speidell advised him of the

25         situation and he responded to the housing unit after

265

1          notifying Lieutenant Speidell.

2          (Reading interrupted.)

3          MS. RIFKIN:  We also object that the document speaks

4     for itself.

5          THE COURT:  Overruled.  You may proceed.

6          THE WITNESS:  (Reading continued:)

7          I made contact with Captain Lesniak and advised him

8          of the situation.  At approximately 1515, which is

9          now three o'clock, 3:15, Associate Warden Denny

10         arrived and gave clearance to extract Inmate B.

11         (Reading concluded.)

12    Q.    So, in fact, the cell extraction did occur after --

13         THE COURT:  We hardly know "in fact."  These

14    documents suggest certain things that I am certain you will

15    argue for.

16         Thank you, ma'am.

17         MS. VOROUS:  Thank you.

18         THE COURT:  Doctor, I have no idea what the sequence

19    is, and I'll listen to the lawyers, if we ever get there,

20    but -- and I must confess I have problems reading some of

21    this.  You might be in a better position than I am, but as I

22    understand it, it would hardly be surprising that the inmate

23    would resist leaving the cell, whether nude or dressed.

24         Is that a fair evaluation?

25         THE WITNESS:  Yes, sir.

266

1          THE COURT:  Given that, and the obvious knowledge

2     that -- strike that -- and the apparent understanding that

3     that would be resisted -- Well, never mind.  That's a

4     decision I have to make.  But given that, is there any --

5     there is no clinical sense -- I'm sorry.  Is there any

6     clinical sense in the use of the OC?

7          Of course your view is it never makes sense anyhow;

8     is that right?

9          THE WITNESS:  Yes, especially in this context.

10          THE COURT:  My questions invite questions of counsel?

11          MS. RIFKIN:  No more questions, Your Honor.

12          MS. VOROUS:  No more questions, Your Honor.

13          THE COURT:  May the witness be released?

14          MS. RIFKIN:  Yes, Your Honor.

15          THE COURT:  Defendants, may the witness be released?

16          MS. VOROUS:  Yes, Your Honor.

17          THE COURT:  Thank you, sir.  You may step down.

18          THE WITNESS:  Thank you.

19          THE COURT:  Mr. Vail, will you resume -- Is he still

20     here?

21          MR. BORNSTEIN:  Yes.

22          THE COURT:  Okay.  When he clears, will you resume

23     the stand, sir.

24          (HAVING BEEN PREVIOUSLY SWORN, ELDON VAIL RESUMES THE

25           WITNESS STAND.)

267

                    CONTINUED DIRECT EXAMINATION

 1

 2   BY MR. BORNSTEIN:

 3   Q.      Mr. Vail, I would like you to turn to --

 4   A.      I'm going to need you to identify a book.

 5   Q.      It would be the binder that has Exhibit 1 through 19.

 6   I would like you to turn to Exhibit 10 for identification.

 7   A.      I'm sorry.  That binder doesn't appear to be on the

 8   stand here.

 9           MR. BORNSTEIN:  May I approach, Your Honor?

10           (Binder handed to witness.)

11   BY MR. BORNSTEIN:

12   Q.      This will be -- these are records pertaining to

13   Inmate E.

14           So with respect to Exhibit 10, that would be Exhibit

15   10A which would be the Incident Report.

16           Is that -- are these true and accurate copies of the

17   Incident Report that you have reviewed?

18   A.      Yes.

19   Q.      And Exhibit 10B would be the IERC Report?

20   A.      Yes.

21   Q.      And to your knowledge was there an RVR packet that

22   was included in here?

23   A.      I do not know.

24   Q.      Do you recall whether you reviewed one?

25   A.      I do not.

268

1    Q.    With respect to Inmate E, was this one of the videos

2    that you reviewed?

3    A.    It is.

4          MR. BORNSTEIN:  Your Honor, I would like to play the

5    portions of the video which would be Exhibit 11.  Again, the

6    portions that we're going to play -- before I do that though,

7    I want to move into evidence under seal Exhibit 10A and

8    10B.

9          THE COURT:  Hearing no objection they are received.

10               (Whereupon, Plaintiffs' Exhibits 10A and 10B

11                received into evidence.)

12   BY MR. BORNSTEIN:

13   Q.    Where is this inmate housed?

14         First of all, which prison before the cell

15   extraction?

16   A.    San Quentin.

17   Q.    Can you tell us please the precipitating event that

18   leads to the cell extraction?

19   A.    It was determined that he needed a mental health

20   evaluation, and he would not willingly come out of the cell.

21   Q.    Was there -- on the video that you viewed, was there

22   a -- I would like you to turn to Bates Number SQ-1931.

23   A.    I'm there.

24   Q.    All right.  This is the supplement to the Incident

25   Report?

269

1   A.      Yes.

2            THE COURT:  I'm sorry.  What is the --

3            MR. BORNSTEIN:  Bates number is SQ --

4            THE COURT:  I don't care about the Bates number.  The

5   record has got to reflect that it is a document that's been

6   marked.

7            MR. BORNSTEIN:  No.  I'm sorry.  This is part of

8   Exhibit 10A.

9            THE COURT:  All right.

10           MR. BORNSTEIN:  It is page -- it will be the seventh

11  page.

12           THE COURT:  Thank you.

13           MR. BORNSTEIN:  Just for the record, SQ-1931 is the

14  Bates number on the bottom.

15  BY MR. BORNSTEIN:

16  Q.      The sequence of events here -- I would like you to

17  give us the sequence of events that happened so we -- so it

18  is clear.

19           THE COURT:  He doesn't know what happened.  He can

20  tell you what it says.

21           MR. BORNSTEIN:  Yes.  Thank you.

22           THE WITNESS:  Okay.  At six o'clock in the morning he

23  was given a direct order to submit to being handcuffed so he

24  that could be moved to CHSB per orders of a psychologist.

25           He refused.

270

1          At 6:30 the nurse was contacted and asked to look at

2     his medical file to see if there were any health factors that

3     would preclude the use of OC.

4          At 7:15 the captain gave an order to form an

5     extraction team.

6          At 8:15 the video was turned on.

7          At 8:17 the team staged.

8          At approximately 8:30 the extraction team made entry

9     into the cell.

10          In the middle of that, between 8:17 and 8:30, there

11     was the deployment of quite a bit of OC.

12     BY MR. BORNSTEIN:

13     Q.    Was there a clinical intervention that you could see

14     from the record that was provided to you?

15     A.    No.

16     Q.    So we're going to pick up the video, and this will be

17     as the officers are proceeding to the cell, Your Honor.

18     We're going to try and use the mute button at the beginning

19     of it because there is some interaction, but then we're going

20     to unmute it so that the contact between the custody officer

21     and the inmate will be heard.

22          But again, we would move to strike any reference that

23     is made to the inmate's name or to the officers' names for

24     purposes of this video.

25          THE COURT:  That motion will be granted.

271

1          You're moving to receive 11 into evidence?

2          MR. BORNSTEIN:  Yes.  The limited portion that we're

3    playing.

4          THE COURT:  Received.

5              (Whereupon, Plaintiffs' Exhibit 11 received into

6               evidence.)

7          MR. BORNSTEIN:  So this should be, if we got it

8    right, Your Honor, the point where we'll see the inmate come.

9    As soon as we see the inmate come, we'll unmute it and start

10   to play.

11             (Plaintiffs' Exhibit 11 played in open court.)

12             (Brief pause.)

13         MR. BORNSTEIN:  We're not sure exactly what they are

14   talking about, that's why me muted it at this point.

15         MR. RUSSELL:  Your Honor, my understanding was the

16   court's order was these be played unedited.

17             (Plaintiffs' Exhibit 11 continued being played in

18              open court.)

19         (Playing concluded.)

20         MR. RUSSELL:  Your Honor, again, excuse me.  I

21   apologize.  I thought we were going to watch these unedited.

22             THE COURT:  You may be seated.

23         You may proceed.

24   BY MR. BORNSTEIN:

25   Q.     From your review of the video and the Incident

272

1    Report, do you have an opinion as to whether the use of force

2    in this particular case was appropriate?

3    A.        Yes, I do.

4    Q.        What is your opinion?

5    A.        The amount of spray pumped into that cell was

6    enormous and excessive.  They used an MK-46.  If you use that

7    in a cell, you should use it with a wand attachment.  They

8    didn't use the wand attachment.

9            The written report says that the officer bounced it

10   off the ceiling because he did not have a wand attachment

11   available.  That's not what I saw, although I would

12   acknowledge it's difficult to see where that spray was going

13   into the cell.  In addition, there was grenades thrown into

14   the cell.

15           Outside of just the amount that went into that cell,

16   this is an administrative segregation unit, Carson in

17   San Quentin.  It's a very old unit with an open bar cell

18   front.  I wouldn't use OC in that unit absent some kind of

19   imminent threat of loss of life or serious bodily injury

20   because of the contamination effect that it has and did have.

21   You could hear the coughing from other inmates in other

22   cells.

23   Q.        In reviewing the material did you also see -- even

24   though we don't have the RVR packet, did you see whether or

25   not there was any sort of a charge made for resisting or

273

1    obstructing an officer?

2    A.        I honestly do not recall.

3    Q.        Turn to page -- in the IERC, which would be section B

4    of Exhibit 10, and you turn to --

5            THE COURT:  I don't believe 10 has been received into

6    evidence.

7            Madam Clerk, I am right?

8            THE CLERK:  I believe you moved 10A and 10B.

9            THE COURT:  I'm sorry.  They have been received.

10           THE CLERK:  A and B.

11           MR. BORNSTEIN:  So this would be part of 10B.

12           Hang on just a second.

13   BY MR. BORNSTEIN:

14   Q.        I apologize.  Apparently we don't have the RVR, just

15   the charge from the Incident Report?

16   A.        No.  What we do have is a copy of the admonishment,

17   which includes a statement that he will be placed on

18   management status if his cell extraction is necessary.  I

19   think that is a circumventing of due process.

20           There is sometimes a need to restrict the regular

21   conditions of confinement for an inmate held in a

22   high-security cell, but it needs to be rationally related to

23   specific behaviors and tightly regulated.

24           I don't know how San Quentin conducts their

25   management status practices, but I do know that there is no

274

1  consistency or no guidance from CDCR.

2  Q.     Is an inmate who is -- well, is an inmate who is

3  acting out because of his mental illness, from what you could

4  tell from the video and from the reports, is this someone who

5  would benefit from that sort of disciplinary action?

6          THE COURT:  Hang on.

7          MR. RUSSELL:  Objection, Your Honor.  Argumentative

8  and lacks foundation.  There has been no establishment --

9  there's no facts establishing this inmate is suffering from a

10 mental illness.

11         THE COURT:  I frankly don't recall at this stage.  I

12 thought all of these -- that it had been understood all of

13 these disks involved the extraction of inmates who were

14 mentally -- who had been designated by CDCR as mentally ill.

15         Is that wrong?

16         MR. RUSSELL:  Your Honor, there is no indication in

17 these records -- we have no indication he was designated

18 within the MHSDS at the time of this incident.

19         We provided records that the plaintiffs demanded.

20         MR. BORNSTEIN:  Your Honor, all I can say is there

21 was a claim made.  We asked for incidents relating to class

22 members and this was provided to us.  And it is obvious from

23 watching the video, from reading the material that was

24 provided, that if he wasn't on some sort of status as a MHSDS

25 inmate, he should have been given what we just saw.

275

```
 1        THE COURT:  My understanding -- I mean, you know, I'm
 2   at a loss to know what we are doing here.
 3        My understanding is that he was taken out because
 4   they wanted to give him mental health -- I mean, medications
 5   appropriate to persons suffering from mental illness.
 6        We saw him being prepared for injection.  I don't
 7   know.
 8        Again, I'm going to say -- Mr. Bornstein, you say
 9   give us the information about the class members and this is
10   what they have given to you; is that right?
11        MR. BORNSTEIN:  Yes.  And all I can say if we looked
12   at -- my proffer to the court would be the reason we thought
13   that is in the Manager's Review, First Level Use of Force
14   Incident, that's part of their packet, it said:
15        (Reading:)
16        Based upon the inmate's continued refusal to submit
17        to handcuffs and exit his cell, the information
18        provided by psychologists, the inmate's health and
19        safety would be gravely compromised should he remain
20        in the assigned Admin. Segregation cell and not be
21        escorted to the full CTC for a full mental health
22        evaluation and admission into the crisis bed.  A
23        controlled use of force was authorized by the person
24        who did it.
25        (Reading concluded.)
```

276

```
1           I perhaps, naively, thought he was suffering from
2    mental illness.
3           THE COURT:  Counsel?
4           MR. RUSSELL:  Your Honor, we provided the documents
5    that were demanded by plaintiffs.  They asked for this video.
6    We provided it.  The record show he's being extracted for
7    purposes of evaluation.
8           THE COURT:  You got to be kidding me.
9           You may sit.
10          The objection is noted and overruled.  But, of
11   course, if you want to provide documents that demonstrate
12   that he was as sound as I am, you are free to do so in your
13   case.
14          You may proceed, sir.
15   BY MR. BORNSTEIN:
16   Q.     The orange color that we saw on the back of the
17   inmate's garb, was that just water from a shower?
18   A.     No.  That was residue from the spray.
19   Q.     How do you know, by the way, that was what you said
20   it was?
21   A.     From experience.
22          MR. BORNSTEIN:  Okay.  With respect to -- if we have
23   time, Your Honor, I would like to play one more.
24          THE COURT:  We don't because it is 4:30.  But that
25   brings up an issue that we have to discuss, and I'll ask
```

277

1    counsel for the defendants to come to the other microphone.

2             How many of these do you propose to play, sir?

3             MR. BORNSTEIN:  Can I answer that by telling you what

4    we would like to do first.

5             THE COURT:  That's what I just said.

6             MR. BORNSTEIN:  Thank you.  But I'm not going to

7    directly say the number yet.  What I would like to do is ask

8    you to permit us to take these videos, have them taken to an

9    expert who can then take out the audio, just the audio

10   portion that has the names so we can play them a little more

11   securely, then I would like to play more of them.

12            Now, we were told that we were limited to four hours

13   by Magistrate Judge Drozd.  We are prepared to play all of

14   them, if you are willing to watch them.  If you're not, then

15   we're -- there's at least two or three other ones that we

16   think you ought to look at as part of the record.  And then

17   the rest of them we would like to move in so that they're

18   part of this case.

19            We just would like to make sure that we're able to do

20   it in a way that protects the privacy interests going

21   forward, and we think we can do that if we're given the

22   opportunity to.

23            THE COURT:  I think we now have two separate issues.

24            I am not going to require the CDCR to surrender their

25   control of these tapes provided that you tell me that by the

278

1    16th you can get at least the next two, or whatever it is.

2              How long have you gone so far?

3              MR. BORNSTEIN:  Yes, we have exactly --

4              THE COURT:  Just approximately.

5              MR. BORNSTEIN:  Approximately an hour and 15 minutes

6    or an hour and 20 minutes.

7              Your Honor, I don't mean to belabor this.  If you

8    have seen enough, I don't need to continue to play these.

9              My only concern from the opening that the State gave

10   was that somehow we're cherry-picking certain videos and not

11   playing others.  We're prepared to play them all.

12             THE COURT:  All right.  I understand.

13             I'm not sure I need to have them all since having

14   seen what I have seen and having heard that each of these

15   people was punished in one way or another.  I don't know that

16   there is any usefulness in proceeding, but I'll hear from the

17   defendants before I make any judgments.

18             Two things:  One, can you get these properly doctored

19   so we eliminate the names?

20             MR. MCKINNEY:  Your Honor, we question why that is

21   actually necessary.  The court's order seems to have been

22   effective.  In the articles we've seen no one has reported

23   names.

24             When plaintiffs were here yesterday they essentially

25   waived the rights of their own clients.  I'm not really sure

279

1    what the point is given the effectiveness of the court's

2    order to date.

3         THE COURT:  Fellows, look, I am very anxious to get

4    this case done.  I don't think that we'll ever do that, but

5    your answer is we don't think it should be done.

6         Different question.

7         Can you get it done, at least the next two tapes,

8    between now and our reconvening on the 16th?

9         MR. MCKINNEY:  We'll certainly try.  The next two, I

10   don't know which are the next two.

11        THE COURT:  They'll have to tell you.

12        MR. BORNSTEIN:  We'll tell them.

13        THE COURT:  That's as far as we have to go now

14   because I doubt very much that I'm going to need to watch

15   more than the next two.  I'm not even sure I have to, but

16   just to get everybody in a posture to argue this case we'll

17   at least have two more.

18        And I've now completely forgotten what I thought was

19   important.

20        MR. BORNSTEIN:  I think we were talking about the

21   rest of the timing, which we would also like to talk to you

22   about.

23        THE COURT:  Yeah.  Go ahead.

24        MR. BORNSTEIN:  So we understand that we now are

25   coming back on the 16th, 17th and 18th.

280

1          THE COURT:  Correct.

2          MR. BORNSTEIN:  What we would like to talk about are

3    sort of the basic schedule because we want to make sure that

4    we can complete at least the three witnesses that we know are

5    going to be available then.  And then if there are going to

6    be additional witnesses from the State after we're done with

7    Mr. Vail, then we would like to know who they are and when

8    they're coming.

9          THE COURT:  Let me stop.

10          Is Mr. Vail your last witness, sir?

11          MR. BORNSTEIN:  Yes.

12          THE COURT:  All right.

13          MR. BIEN:  On the use of force.

14          MR. BORNSTEIN:  Yes.  On use of force.  Not on the

15    San Quentin part.

16          THE COURT:  And what is intended, I understand, but

17    correct me if I'm wrong, is that we have another -- I'm

18    making this up, I'm asking you, not telling you -- another

19    hour, hour and a half with Mr. Vail?

20          MR. BORNSTEIN:  Yes.

21          THE COURT:  And then the State is going to put on its

22    experts relative to the use of force; is that correct?

23          MR. MCKINNEY:  Your Honor, our expert is not

24    available again until November 5th.  But yes, he will

25    testify.

281

1          At this point, in all candor, I don't think we can

2     state if we're going to call other witnesses on this issue

3     because Mr. Vail has really only started his testimony.

4          THE COURT:  He's not been cross-examined yet,

5     et cetera.

6          MR. MCKINNEY:  Right.  They played three videos, but

7     the time in testimony has not been that much.

8          THE COURT:  Are you prepared to go forward with

9     evidence on the San Quentin matter on the 16th, 17th and

10    18th?

11         MR. BIEN:  Yes, Your Honor.  We have witnesses --

12    both defendants and plaintiffs have witnesses that we would

13    like to call on the 16th and 17th.

14         THE COURT:  All right.

15         The way I hear what you guys are saying, and, you

16    know, you tell me what you want to do, they're going to

17    complete two more tapes -- disks and complete Mr. Vail

18    themselves.  You're going to argue -- are you going to have

19    extensive cross?

20         MR. MCKINNEY:  We will cross-examine, Mr. Vail.

21         THE COURT:  A couple hours perhaps?

22         MR. MCKINNEY:  I don't know how many more days

23    plaintiffs are going to go, Your Honor.

24         THE COURT:  Thereafter, you don't have any witnesses

25    that you have to put on because those are the dates that are

282

1    available, the 16th, 17th and 18th; is that correct?

2            THE COURT:  That is correct.

3            MR. MCKINNEY:  That is correct.

4            THE COURT:  Then you will go forward with the

5    San Quentin on the 16th, 17th, 18th, and we'll figure out

6    where we are from there.

7            MR. BIEN:  Defendants are going to -- have gone back

8    and forth about who their witnesses are, on both additional

9    use of force as to responding to Dr. Kaufman and -- I guess

10   that's really the issue.  And yesterday you mentioned some

11   other witnesses.

12           So just in terms of preparation and planning, we

13   would like to know how many witnesses are coming, if

14   possible.

15           THE COURT:  I thought, but I can tell from your

16   conversation I haven't, but the standard rule in this

17   office -- in this office -- I'm going mad -- in this court is

18   that each side is to inform the other side as the day ends

19   who they are calling the next day.  And that's the order.

20           If I haven't made that order beforehand, and it

21   sounds like I didn't, that is the order.

22           I think that's as far as we can go.

23           Wait.  There is yet more?

24           MR. BORNSTEIN:  Sorry.  I want to make sure you're

25   clear on what we've all talked about, which is Dr. Stewart

283

1    was going to come in and testify on the 16th.

2         THE COURT:  All right.

3         MR. BORNSTEIN:  Then the State was going to put on --

4         MR BIEN:  Dr. Monthei from San Quentin.

5         MR. BORNSTEIN:  Then when that is done, we were going

6    to ask Mr. Vail to come back.

7         THE COURT:  Is that satisfactory to the defendants?

8         MS. VOROUS:  Yes.

9         THE COURT:  All right.  That is the way it will be.

10        Mr. Vail, they want to keep you here because it is so

11   much fun.

12        We'll see you all on the 16th.

13        MR. BORNSTEIN:  On the videos, Your Honor, would you

14   like the times we've played so we can put it in the record so

15   you know what we've lodged?

16        THE COURT:  You can just tell the court reporter.  I

17   don't have to be here for that, I take it, unless there is

18   going to be a big dispute about time?

19        MR. MCKINNEY:  Not until we go back and check.

20        THE COURT:  Go ahead and tell her.

21        Court is excused except for this terribly important

22   purpose.

23        MR. MCKINNEY:  Thank you, Your Honor.

24        (FOLLOWING STATED ONLY TO THE COURT REPORTER)

25        MS. CESARE-EASTMAN:  So Exhibit 3 is File

284

1   M200066.MPG.  We showed from 01:05 to 0:58.

2       Then file M200067.MPG we showed 3:28 to 3:41 and then

3   4:24 to 28:07.

4       For Exhibit 5, File Number VTS_01_1.VOB, we played

5   two minutes to 22:41.

6       For Exhibit 11 we do not have times so we played the

7   video from the moment the officer begins speaking to the

8   inmate at cell front to the point in the video where he's in

9   the mental health crisis bed and his clothes have been cut

10  off.

11      MR. MCKINNEY:  But no time.

12      MS. CESARE-EASTMAN:  Your video doesn't have times.

13      MR. MCKINNEY:  I have one comment for the record.

14  The court's order permits plaintiffs a total of four hours.

15  Sounds like they've gone with the running time of the videos.

16  The order is clear it is total time which we can take up with

17  the court.

18      MS. CESARE-EASTMAN:  Total time is the running time,

19  total time we're allowed to play in court.

20      MR. MCKINNEY:  We can take it up with the court.

21      (Off the record at 4:40 p.m.)

22                     ---o0o---

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                    REPORTER'S CERTIFICATE

 2                        ---o0o---

 3
     STATE OF CALIFORNIA  )
 4   COUNTY OF SACRAMENTO )

 5

 6          I certify that the foregoing is a correct transcript
 7
     from the record of proceedings in the above-entitled matter.
 8

 9

10              IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                           CERTIFICATION

2

3       I, Michelle L. Babbitt, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                           /s/ MICHELLE L. BABBITT
                            MICHELLE L. BABBITT CSR #6357
10                          Official Court Reporter
                            United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25