1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12    _____/

13

14

15                        ---o0o---

16

17                   REPORTER'S TRANSCRIPT

18              RE:  EVIDENTIARY HEARING

19            WEDNESDAY, OCTOBER 16TH, 2013

20

21                        ---o0o---

22

23

24

25    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926

```
1                         APPEARANCES

2                          ---o0o---

3    FOR THE PLAINTIFFS:

4            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
5            SAN FRANCISCO, CALIFORNIA  94104

6            BY:  MICHAEL BIEN, ATTORNEY AT LAW

7            BY:  LORI RIFKIN, ATTORNEY AT LAW

8            BY:  JANE KAHN, ATTORNEY AT LAW

9            BY:  THOMAS NOLAN, ATTORNEY AT LAW

10           BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

11

12           K&L GATES LLP
             4 EMBARCADERO CENTER, SUITE 1200
13           SAN FRANCISCO, CALIFORNIA  94111

14           BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

15           BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

16

17   FOR THE DEFENDANTS:

18            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
19            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
20
             BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
21
             BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
22
             BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
23
             BY:  JESSICA S. KIM, DEPUTY ATTORNEY GENERAL
24
             BY:  MARTINE N. D'AGOSTINO, DEPUTY ATTORNEY GENERAL
25                          ---o0o---
```

1                        EXAMINATION INDEX

2                              ---o0o---

3    FOR THE PLAINTIFFS:

4        EXAMINATION:                                    PAGE

5

6     DR. PABLO STEWART

7        Direct Examination by Mr. Nolan              288
         Cross-Examination by Ms. Vorous              351
8        Redirect Examination by Mr. Nolan            407

9

10

11

12

13                             ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                           ---oOo---

 3

 4    PLAINTIFFS'
      EXHIBIT NO          DESCRIPTION                 EVD
 5
         10d              Prisoner E Excerpt          344
 6
         1003             Stewart Dec.                287
 7
         1013             Stewart Dec.                287
 8
         1014             Stewart Dec.                287
 9
         1032             SM Report                   316
10
         1082             Suicide docs.               321
11
         1096             Photo East Block            308
12
         1097             Photo East Block            308
13
         1099             Photo East Block            308
14
         1115             Prisoner FFF Excerpt        384
15
         1118             Prisoner EEE Exceprt        300
16
         1119             Prisoner CCC Excerpt        300
17
         1121             Prisoner DDD Excerpt        300
18
         1130             Email Re:  Suicide          319
19
         1137             Report by Lester & Tartaro  315
20
         1138a            Prisoner WWW Excerpt        322
21
         1138b            Prisoner WWW Timeline       337
22
         1138c            Prisoner WWW Timeline       337
23
         1140             APP Policy 3.07             292
24
25                           ---oOo---
```

1                              EXHIBIT INDEX

2                                ---o0o---

3

4    DEFENDANTS'
     EXHIBIT NO                 DESCRIPTION                    EVD

5

6       B                      EOP Excerpt                     365

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

285

```
 1                    SACRAMENTO, CALIFORNIA
 2            WEDNESDAY, OCTOBER 16TH, 2013 - 10:30 A.M.
 3                          ---o0o---
 4            THE CLERK:  All rise.
 5            Court is now in session.
 6            The Honorable Lawrence K. Karlton, United States
 7    District Court Judge, presiding.
 8            THE COURT:  Please, be seated everyone.
 9            Good morning.
10            THE CLERK:  Calling Civil Case S-90-520, Coleman,
11    et al., v. Brown, et al.
12            THE COURT:  Counsel, state your appearance for the
13    record.
14            MR. NOLAN:  Thomas Nolan for the plaintiffs.
15            MS. VOROUS:  Debbie Vorous for the defendants.
16            THE COURT:  I suppose the first order of business is
17    to deal with the motion in limine filed by the defendants and
18    opposed by plaintiffs.
19            For the reasons set forth in the plaintiffs'
20    opposition the motion in limine is denied.
21            Madam Clerk, I'm lost.  What is today's date?
22            THE CLERK:  The 16th.
23            THE COURT:  The 16th?
24            THE CLERK:  Yes.
25            THE COURT:  Plaintiff may call their next witness.
```

286

1      MR. NOLAN:  Plaintiffs would like to call Dr. Pablo

2  Stewart as an expert in forensic psychiatry.

3      THE COURT:  I've lost your name.

4      MR. NOLAN:  I'm sorry.  Tom Nolan.

5                        PABLO STEWART,

6  was thereupon called as a witness herein by the Plaintiff,

7  and having been sworn to tell the truth, the whole truth and

8  nothing but the truth, was thereupon examined and testified

9  as follows:

10      THE CLERK:  Thank you.

11      Take a seat.  State your name, spell your last name

12  and speak directly into the microphone.

13      THE WITNESS:  My name is Pablo Stewart, P-a-b-l-o,

14  S-t-e-w-a-r-t.

15      MR. NOLAN:  Your Honor, we have previously offered a

16  number of Dr. Stewart's expert reports into evidence in this

17  case.  There have been three this year that are relevant to

18  these proceedings.  The first is the March 14th report in the

19  Termination Proceedings.

20      THE COURT:  What exhibit number is that, sir?

21      MR. NOLAN:  That is Docket Number 4381, and it is

22  Exhibit Number 1003.

23      THE COURT:  1003.

24      MR. NOLAN:  It is located at tab L of the binder --

25  the large binder in front of you.  On the first page of that

287

1  binder there's a chart with links an exhibit number to each

2  tab also.

3         The second is his May 16th Reply Declaration in

4  support of DSH enforcement motion, Docket Number 4617-1, and

5  that is Exhibit 1013 which is at tab AA.

6         And the third declaration is Dr. Stewart's September

7  27th Supplemental Declaration which is at Docket Number 4840,

8  and that is Exhibit 1014 which is at tab BB.

9         Dr. Stewart's qualifications --

10         THE COURT:  Before you go forward, what tab is that?

11         MR. NOLAN:  That's at tab BB.  It's the last tab.

12         THE COURT:  Thank you.

13         You move those into evidence.

14         MR. NOLAN:  Yes, I would like to move those into

15  evidence.

16         THE COURT:  Hearing no objection, they are received.

17              (Whereupon, Plaintiffs' Exhibits 1003, 1013 and

18               1014 received into evidence.)

19         MR. NOLAN:  Dr. Stewart's qualifications and

20  experience are set forth in the first declaration.

21         THE COURT:  The court will find that Dr. Stewart is

22  qualified to set forth opinions in the area of forensic

23  psychiatry.

24         You may proceed, counsel.

25         MR. NOLAN:  Your Honor, just given the length of that

288

1    first declaration, I just wanted to point out the paragraphs

2    that concern San Quentin, if I could list them?

3            THE COURT:  All right.

4            MR. NOLAN:  The main paragraphs about inpatient care

5    for the condemned are 452 to 471.  Other paragraphs about

6    San Quentin include 63, 115 to 118, 135, 140, 157 to 168,

7    203, 206, 253, 272, 288-89, 296 --

8            MR. BIEN:  Slow down.

9            MR. NOLAN:  Sorry.  So 296, 342 to 347 and 437.

10           His two more recent declarations are largely about

11   the issues that we'll talk about today.

12                         DIRECT EXAMINATION

13   BY MR. NOLAN:

14   Q.      Dr. Stewart, your report discusses problems with

15   access to intermediate inpatient care for individuals on

16   death row.  When did you visit San Quentin to investigate

17   these issues?

18   A.      I visited San Quentin --

19           THE COURT:  No.  I don't know.  It may not be

20   working.  Hang on.

21           (Microphone adjusted.)

22           THE WITNESS:  I visited San Quentin February 26 of

23   this year.

24   BY MR. NOLAN:

25   Q.      And what did you find concerning these issues when

289

1    you visited San Quentin?

2    A.      I found that -- the green light went off again.

3            (Microphone adjusted.)

4            Okay.

5            I'll be mindful of that, Your Honor.

6            I found that, unlike every other prisoner in CDCR,

7    the condemned prisoners do not have access to intermediate

8    care facilities, but they do have access to acute psychiatric

9    services.

10   Q.      Could you explain the difference between those two

11   different types of inpatient care?

12   A.      Well, the acute is fairly what the name implies, it

13   is more intense treatment, shorter duration, it lasts

14   anywhere from 30 to 90 days.  And that's located at CMF.

15           The intermediate care facility is still an inpatient

16   psychiatric treatment facility, but it's more long-term where

17   people can stay up to a year.  And it is meant for more

18   chronic stabilization and socialization -- psychosocial

19   rehab.

20           THE COURT:  Excuse me for a moment.

21           Madam Clerk, my watch is behaving badly.  What time

22   is it?

23           THE CLERK:  10:43 a.m.

24           THE COURT:  My apologies everybody.

25           Go ahead.

290

1    BY MR. NOLAN:

2    Q.      Doctor, did you learn anything about access to acute

3    inpatient care during your preparation for today?

4    A.      Yes, I did.  I found out that condemned prisoners do

5    have access to the Acute Psychiatric Program at CMF.

6    However, they have very severe restrictions placed upon them

7    in this APP, Acute Psychiatric Program.

8    Q.      Doctor, are you personally familiar with the acute

9    program at CMF?

10   A.      Yes, I am.  For the decade of the 1990s I was the

11   court appointed psychiatric monitor for the Gates case.  And

12   during my work in that matter I frequently toured and

13   evaluated the care on the then DMH program at CMF.

14           Also I returned during the overcrowded litigation --

15   the overcrowding litigation in 2008 and again revisited those

16   units.

17   Q.      Doctor, could you describe for me the custodial

18   restrictions on condemned prisoners in that program?

19   A.      The custodial restrictions, as laid out in the policy

20   and procedure, as well as other documents that I reviewed,

21   states that all treatment for condemned inmates at the APP is

22   to be done in an individual basis, where they don't have

23   access to group therapy, they can't have any contact with any

24   other prisoners, they have limited -- or my understanding is

25   basically no access to yard or day room.

1    So it's a very limited program.  It ends up being

2    like a very severe segregation unit.

3    Q.    How did you learn about these problems in the acute

4    program?

5    A.    Well, I learned about them from a policy and

6    procedure from the CDCR that stated very clearly that care

7    would be done only on an individual basis and that the

8    condemned prisoners would never be able to access group

9    therapy.

10    Q.    Doctor, if you could, look at -- Do you have an

11    exhibit binder?

12         THE COURT:  He's got a whole bunch of them.

13         (Binder handed to witness.)

14    BY MR. NOLAN:

15    Q.    So Doctor, if you could, look at tab B, Plaintiffs'

16    Exhibit 1140?

17    A.    Yes.

18    Q.    It is DSH Policy 3.07 regarding, quote, "Housing And

19    Treatment Of Condemned Inmate/Patients"?

20    A.    Yes.

21    Q.    This was provided by defendants at the deposition of

22    APP Director Ellen Bachman on September 20th where it was

23    marked as Deposition Exhibit 3.

24         MR. NOLAN:  Your Honor, we would like to move to have

25    that admitted into evidence.

292

1              THE COURT:  Hearing no objection, it is received.

2                    (Whereupon, Plaintiffs' Exhibit 1140 received

3                     into evidence.)

4    BY MR. NOLAN:

5    Q.      So Doctor, did you review any other depositions --

6    did you review any depositions regarding access to care in

7    the inpatient -- in the Acute Inpatient Program?

8    A.      I reviewed portions of the deposition of Ellen

9    Bachman, the director of the APP.

10   Q.      And she confirmed those restrictions that you have

11   described already?

12   A.      She reiterated the fact that condemned patients can

13   only received individual care, and they're basically kept in

14   their cells the entire time.

15   Q.      And did you review any other depositions on that

16   issue?

17   A.      Also I reviewed portions of the deposition that Eric

18   Monthei gave on the same issue.

19   Q.      And do you recall what he had to say about it?

20   A.      He went a little further in his opinions about APP

21   than Miss Bachman did.  He talked about the fact that in his

22   speaking to patients that have been referred and returned

23   from the APP, that the inmate-patients consider referral to

24   APP as a punishment.  Those were, I believe, his words.

25              And that the harsh conditions of the APP resulted in

293

1    the patients basically losing trust with referring clinicians

2    and how their participation in the APP actually significantly

3    interfered with their -- the clinician-patient relationship

4    when they were finally returned to San Quentin.

5    Q.      Was there any evidence about this issue in the

6    patient records for the individuals you had interviewed at

7    San Quentin?

8    A.      Yes, there was.  A patient that I believe the code is

9    FFF, this was a person that I evaluated as part of my tour,

10   the medical records in her case were that she was very

11   motivated to return to San Quentin from the APP because she

12   felt that there were more care available on East Block as

13   opposed to the APP, which to put it into context was very

14   notable because during my interview with her she was talking

15   about the limitations of the care on East Block and she

16   wouldn't attend very many treatment opportunities there.

17   Q.      So Doctor, along with that prisoner you interviewed,

18   including that prisoner you interviewed seven individuals on

19   death row who are receiving mental health treatment?

20   A.      Yes.

21   Q.      How did you select those seven individuals?

22   A.      Those individuals' names were given to me -- were

23   given to us on our tours back in February of this year as

24   people who were identified by staff at San Quentin as being

25   especially regressed, isolative and severely mentally ill.

294

1  Q.      Doctor, who did you interview and how did you learn

2  about their treatment?

3  A.      Well, in this cohort of seven patients that I

4  interviewed, there were basically two subgroups.  There were

5  three individuals, patients CCC, DDD and EEE, who had been

6  placed in this OHU Program referred to as a Specialized Care

7  Program.

8  Q.      Doctor, can I just interrupt you.  What is an OHU?

9  A.      An OHU is an unlicensed housing unit that is

10  basically used as overflow for the MHCB.

11         THE COURT:  Before we start with that, I want to go

12  back to these restrictions that you indicated existed when

13  the condemned prisoners are referred for inpatient care.

14         I don't know whether it exists any more.  I assume

15  there are state hospitals that have mentally ill -- not

16  prisoners -- but persons who have committed homicides.

17         Is that true or false?

18         THE WITNESS:  My understanding, Your Honor, is that

19  there are state hospitals that have people that have

20  committed homicides and have been found insane.

21         THE COURT:  And therefore remanded to the hospital?

22         THE WITNESS:  And they're in state hospitals.

23         THE COURT:  Do you know -- maybe you don't know and

24  that's okay -- do you know whether such persons are subjected

25  to the same sort of restrictions as the persons on death row

295

1   are asserted to have at the inpatient care?

2           Do you understand what I'm trying to ask?

3           THE WITNESS:  Yes, I understand, Your Honor.

4           And I do -- in my work as a forensic psychiatrist

5   I've had several people that have been found insane by the

6   court and have been sent to a state hospital.  And my

7   understanding is that they are considered patients as

8   everyone else.

9           There are certain restrictions placed upon them

10  because they are in a forensic unit, et cetera, but that they

11  receive the full benefit of treatment.

12          THE COURT:  You must forgive me.  I don't know what

13  that means.  That's not intended to be disrespectful.  It is

14  just true.

15          Would they be subjected to the same restrictions,

16  that is essentially no contact with any other patient, no

17  group therapy, and no yard and that sort of thing?  I know

18  there is no yard in the hospital, but dayrooms and that sort

19  of thing?

20          THE WITNESS:  No, Your Honor.  The restrictions that

21  I've come to learn about the APP at CMF are unique among

22  acute psychiatric hospitals that I'm aware of.

23          THE COURT:  Thank you, sir.

24          I'm sorry.  I didn't mean to interrupt you,

25  Mr. Nolan.

1    BY MR. NOLAN:

2    Q.      So we were talking about the OHU -- what an OHU was.

3    I just wanted to ask you, is the OHU the same -- an

4    outpatient housing unit the same as a mental health crisis

5    unit?

6    A.      No.  It is a much lesser setting.  There is not --

7    there isn't much -- poor staffing and poor treatment

8    opportunities in the OHU as compared to MHCB.  They're not an

9    MHCB.

10   Q.      Is it dangerous to use a OHU instead of a licensed

11   unit?

12   A.      Well, it's -- it's dangerous in the extent that if

13   you have people that require a higher level of care, as it

14   was my opinion about the three people that I saw at

15   San Quentin who were being housed in OHU, and they were

16   getting -- they were given a level of care that didn't match

17   their needs, then you certainly are asking for difficulties

18   there.

19   Q.      What was the program in the OHU that these

20   individuals were in?

21   A.      They were participating in this newly minted what was

22   referred to as Special Treatment Program For The Condemned.

23   Q.      And do you know, was that a new program?

24           Do you know how long that had been operating?

25   A.      Well, my understanding was the program itself had

1  allegedly been taking place on the East Block for a year or

2  so prior to this.

3          Remember, I went in February of 2013.  So it was my

4  understanding there was some type of specialized program

5  going on in the East Block prior to 2013, but the actual OHU

6  housing began right prior to my touring.

7  Q.      Doctor, do you have an understanding why the three

8  individuals who were in that program had been placed there?

9  A.      In reviewing the charts and actually speaking with

10  two of the staff on the OHU, these patients had been placed

11  in the OHU due to their severely regressed state while they

12  had been on the East Block.

13          These three individuals had not -- had been cell

14  dwellers and had basically been staying in their cells for,

15  the staff told me, several years.  So these were some very

16  regressed, isolative, chronically mentally ill individuals.

17  Q.      Doctor, what did you do to evaluate these

18  individuals?

19  A.      Well, the three people that were housed in the OHU, I

20  was able to have confidential interviews with them.  I also

21  reviewed their medical records when I was there at the

22  prison, but then I also reviewed hard copies later on at your

23  office.  And also, as I mentioned, I was able to interview

24  staff on the OHU.

25  Q.      When did you learn from talking to staff in the OHU?

298

1          THE COURT:  As distinguished from all the other

2    material that he reviewed?

3          MR. NOLAN:  Yes.

4    BY MR. NOLAN:

5    Q.      Just to start, yes.

6    A.      Well, the staff, I found them to be refreshingly

7    honest with me.  And they were quite chagrined or even

8    embarrassed in relating the fact that these individuals who

9    were there in the OHU had basically not left their cells for

10   18 months.  They talked about several years.

11         There was one individual actually they told me that

12   the clinician who was assigned to this person while they were

13   on the East Block hadn't even been noted to sit up on his bed

14   for an extended period of time.

15         So they confirmed what my clinical evaluations

16   showed, they were very chronically ill, very regressed

17   individuals.

18   Q.      Doctor, could you identify for me the first three

19   individuals you interviewed using the codes on the prisoner

20   name key which is at tab A?

21   A.      Again, they were CCC, DDD and EEE.

22   Q.      Doctor, could you describe Prisoner CCC when you

23   first met him in February?

24   A.      Well, Prisoner CCC -- again, in general, they were

25   all very regressed, isolative individuals.  He was overtly

299

1    psychotic, responding to internal stimuli.  He had been

2    placed on an involuntary psychiatric hold as being gravely

3    disabled.  And it was very difficult to engage him in any

4    sort of meaningful conversation because of his condition.

5    Q.      Do you have a sense of how he's doing now?

6    A.      Again, based on the charts, and based on what I

7    understand is the GAF score, he basically -- his condition

8    has basically remained unchanged.

9           THE COURT:  What is a GAF score?

10          THE WITNESS:  A GAF score is G-A-F.  In the DSM-4-TR

11   it is a 100 point scale called Global Assessment of

12   Functioning, zero being the lowest, 100 being the highest.

13   It's a quick measure that clinicians can use to give you a

14   snapshot of where someone is.

15          I think for our purposes today, sir, you would

16   consider psychosis.  According to the GAF score, if you're

17   mildly psychotic, the highest score you could get is a 40.

18   If you were more severely psychotic, then your score would be

19   somewhere in the 20s or 30s.

20   BY MR. NOLAN:

21   Q.      So Doctor, if you look at the binder I gave you, tab

22   C, D and E are excerpts from the last seven months' worth of

23   medical records for prisoners CCC, DDD and EEE.  These are

24   Exhibits 1119, 1121 and 1118.

25          THE COURT:  I'm sorry.  1129 and -- sorry -- 1119,

300

1    1121 and what?

2              MR. NOLAN:  And 1118.

3              THE COURT:  1118.

4              Are they in evidence?

5              MR. NOLAN:  I would like to offer them into evidence.

6              THE COURT:  Hearing no objection, they are received.

7                   (Whereupon, Plaintiffs' Exhibits 1119, 1121 and

8                    1118 received into evidence.)

9    BY MR. NOLAN:

10   Q.    So Doctor, could you look at tab C, the last page of

11   the medical record there which is Bates Number CCC-000433.

12         It is the very last record behind that tab.

13   A.    Yes.

14   Q.    Do you recognize this document?

15   A.    Yes, I do.

16   Q.    Is this the most recent note that was made available

17   to you?

18   A.    Yes, it is.

19   Q.    Could you briefly summarize the clinical findings set

20   forth in the note?

21   A.    The clinical findings in general are that the staff

22   note him to be internally preoccupied and psychotic, that he

23   was responding to questions by shaking his head, and that he

24   remained very withdrawn and not necessarily engaged in his

25   treatment.

301

1  Q.      I see here -- do you see here that it says he's

2  "currently at medicated baseline"?

3  A.      Yes.

4  Q.      Can you explain what that means, "baseline"?

5  A.      When in psychiatry you refer to someone at their

6  baseline, you are saying that that is basically as good as

7  someone is going to get, that they've returned to baseline

8  functioning or they've achieved their level of baseline

9  functioning.

10         What is bothersome about this comment about that he's

11 "currently at medicated baseline," I don't believe that the

12 staff know what his baseline is.  They're assuming that this

13 regressed, psychotic state is a person's baseline, and I

14 think that's an erroneous assumption based on the fact that

15 he's never been afforded inpatient treatment.  So we don't

16 know what his baseline is.

17 Q.      Is that something you saw in other medical records

18 too, this baseline concept?

19 A.      I saw it in at least one other medical record.  But

20 this use of the term "baseline," where a person is at his

21 baseline is consistent with what my overall impressions were

22 as far as the staff at San Quentin did.

23         It was my overall impression that they were unable to

24 appreciate -- truly appreciate the severity of the mental

25 illness in the patients they were responsible for.  And

302

1    therefore, they tolerated this overwhelming level of

2    psychopathology and where in any other setting people with

3    this degree of symptoms, regression and severity of illness

4    would be treated in an inpatient setting.

5    Q.        Doctor, I wanted to ask you a little bit about

6    Prisoner DDD, the next one.

7    A.        Yes.

8    Q.        Could you tell me about how he appeared when you met

9    him in February?

10   A.        Prisoner DDD was quite memorable in that he presented

11   with symptoms referred to as "catatonic," which is a somewhat

12   rare presentation for people with schizophrenia.

13           And catatonic is this severely internalized state of

14   being.  And Prisoner DDD was mute.  He was unable to speak

15   with us.  He would answer my questions by nods of the head,

16   those sorts of things.

17           And also during the course of my interview with him,

18   he was sitting there writing.  I don't want to say furiously,

19   but writing the whole time.  And my initial thought was that

20   he was going to communicate with me through writing notes.

21           In fact, when I asked him if I could see some of his

22   notes, it was gibberish.  They were nonsensical comments that

23   had nothing to do with what we were discussing or anything

24   else like that.

25           So he was a notable patient in the severity of his

303

1  symptoms.

2  Q.      Doctor, can you look at tab D, the page Bates stamped

3  DDD-001775.

4          These are in chronological order towards the end of

5  the exhibit.

6  A.      Yes.

7  Q.      Is this one of the most recent notes for this

8  prisoner?

9  A.      Yes.

10 Q.      What is the date of it?

11 A.      The date is August 15th.

12         THE COURT:  You're off.

13         (Microphone adjusted.)

14         THE WITNESS:  August 15th.

15 BY MR. NOLAN:

16 Q.      What does this note indicate?

17 A.      It says (Reading:)

18         No change in symptom presentation, catatonic

19         symptoms, flat affect, mutism, stiff body posture.

20         (Reading concluded.)

21         So basically it confirms the situation that -- the

22 clinical situation I observed in February.

23 Q.      Essentially, after six months in the program, he was

24 doing the same?

25 A.      Again, based on their description it appeared that's

304

1    exactly how he presented to me in February.

2    Q.      Did you form a general opinion concerning the mental

3    healthcare needs of these three individuals in the OHU?

4    A.      Yes.  That all three of them, in my opinion, required

5    inpatient level of services.

6            THE COURT:  But here's the problem -- not problem,

7    but the question.  You have indicated that condemned

8    prisoners -- condemned inmates who are transferred to

9    inpatient aren't treated adequately because of the

10   restrictions.

11           In effect are you saying that neither the OHU or the

12   inpatient treatment could be satisfactory under the

13   circumstances?

14           THE WITNESS:  Under the circumstances, Your Honor,

15   that's exactly my opinion.

16           THE COURT:  All right.

17   BY MR. NOLAN:

18   Q.      Doctor, just as a follow up I wanted to ask you, what

19   makes you think that inpatient care would, if it were a fully

20   functioning --

21           THE COURT:  That's a different question.

22           MR. NOLAN:  -- appropriate --

23           THE COURT:  That's not what the doctor said.  He said

24   under current circumstances.

25   BY MR. NOLAN:

305

1  Q.      Right.  But I'm asking now about that.

2         If there were a fully functioning inpatient program

3  where the prisoners could participate in psychosocial

4  rehabilitation with other prisoners, with other death

5  condemned prisoners or perhaps non-condemned prisoners, what

6  makes you think that would help these three particular

7  individuals?

8  A.      Again, from a clinical standpoint there were -- I

9  hate to sound like a broken record every time I get up in

10 this chair.  I'm telling you about how severe the patients

11 are in the California Department of Corrections as far as

12 these people go, but these people are some of the more

13 psychiatric patients in the State of California.  And they do

14 not just deserve, but their clinical case calls for an

15 appropriate level of treatment.

16         And if there were facilities where they could have

17 properly aggressive psychopharmacology, if they could have a

18 psychosocial rehabilitation program, if they could

19 participate in group therapies, then I think they would

20 significantly improve.  We don't know how well they could

21 get.

22         There was an erroneous assumption on the part of

23 staff that these people had achieved some sort of stable

24 baseline.  I don't know what the basis of that is because

25 they've never gotten appropriate treatment, certainly under

306

1    the current circumstances.  So we don't know how good these

2    people can be.

3    Q.      So what are the -- what are the reasons that the new

4    Specialized Treatment Program in the OHU doesn't meet their

5    needs?

6    A.      Again, based on Dr. Monthei's deposition testimony,

7    he made it very clear that the Specialized Care Program is an

8    EOP-level program where the goal is to get people ten hours

9    of treatment per week.

10          And, you know, I've been around the EOP Program for

11   many years.  I know it was designed as a sheltered

12   environment for people with severe mental illness to prevent

13   their needing to go to higher levels of care.  So it was a

14   pre-hospital program.

15          So now it is clear that these individuals, in my

16   opinion, required inpatient services.  And yet they're being

17   treated in a program that's designed to prevent their needing

18   to go to the hospital.  So it is a real clinical mismatch as

19   far as I'm concerned.

20   Q.      Doctor, you also interviewed -- or attempted to

21   interview four individuals who had been identified for the

22   program but were not yet in the OHU Program; is that correct?

23   A.      Correct.  These people were still housed on East

24   Block.

25   Q.      What was your overall view of these other four

307

1    individuals?

2    A.    Again, I was able to interview two of the

3    individuals, and I was only able to do cell-front interviews

4    on the other two because they were so psychotic they couldn't

5    come out of their cells.

6            In general they had the same level of psychiatric

7    disability as the three people that I had seen on the OHU

8    Program.

9            MR. NOLAN:  This is Plaintiffs' Exhibit 1097.

10           THE COURT:  I'm sorry, sir.  I have no idea what you

11   just said.

12           MR. NOLAN:  I'm sorry.  I'll come back.

13   BY MR. NOLAN:

14   Q.    So this photograph is Plaintiffs' Exhibit 1097.

15           Doctor, is this what East Block looks like?

16           Is this what it looked like when you visited in

17   February?

18           THE COURT:  Before you do that, is this in evidence?

19           MR. NOLAN:  We would like to offer this into

20   evidence.

21           THE COURT:  Can you confirm this is what the cell

22   blocks look like, Doctor?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  Received.

25   ///

308

1                    (Whereupon, Plaintiffs' Exhibit 1097 received

2                 into evidence.)

3     BY MR. NOLAN:

4     Q.      And actually there's two.  If I could briefly show

5     two more photos that we would like to offer into evidence

6     that are also East Block.

7              This is Plaintiffs' Exhibit 1099.

8              Doctor, does this look like the East Block you

9     visited?

10    A.      Yes, it is.

11             THE COURT:  Received.

12                    (Whereupon, Plaintiffs' Exhibit 1099 received

13                 into evidence.)

14    BY MR. NOLAN:

15    Q.      Finally, this is Plaintiffs' Exhibit 1096.

16             Doctor, can you confirm this looks like East Block?

17    A.      It looks like the East Block I visited, yes.

18             THE COURT:  Received.

19                    (Whereupon, Plaintiffs' Exhibit 1096 received

20                 into evidence.)

21             MR. NOLAN:  Thank you.

22    BY MR. NOLAN:

23    Q.      What did you conclude based on your tour in February

24    about the four individuals in East Block?

25    A.      Again, I found them to be of the same severity as far

309

1    as their psychiatric disability as the people I evaluated on

2    the OHU Program.

3    Q.        Did you -- were you later able to review more recent

4    treatment records for these individuals?

5    A.        As with the people in the OHU, I looked at records

6    while I was there at the prison, then subsequently I looked

7    at more complete records.

8    Q.        And from the more recent records were you able to see

9    a number of these other individuals had also been moved into

10   the OHU?

11   A.        Yes.

12   Q.        Was there any one of those individuals whose course

13   of treatment in the OHU stood out to you?

14   A.        There's one patient whose course of treatment in OHU

15   stood out to me.  It was Patient GGG.

16          When I evaluated him, he was one of the individuals

17   that was able to come out of his cell.  And I evaluated him

18   in a private room, a converted cell.

19          And he was an elderly African American gentleman who

20   was very psychotic and had notable cognitive impairments.  He

21   was telling me that -- he was reluctant to talk given the

22   fact that he felt that he -- that East Block had been a

23   church and that he had been living there since he was ten

24   years old.  So he was a fairly impaired individual.

25          And I've learned subsequently he was moved to the OHU

310

1    Program where he proceeded to further decompensate.  He

2    eventually was placed on a Keyhea involuntary medication

3    order for grave disability.  It was based in part on the fact

4    that he started saving his feces because in his thinking that

5    somehow his feces were valuable and that they could be used

6    as money by other individuals.

7            THE COURT:  I want to be sure I understand.  Let's go

8    back.

9            Who is in East Block?

10           Condemned prisoners?  All kinds of condemned

11   prisoners?

12           THE WITNESS:  Yes, Your Honor.  That is the main --

13   my understanding that is the main condemned housing in

14   San Quentin.

15           THE COURT:  And it is your understanding, I take it,

16   that persons with mental illnesses are in East Block?

17           THE WITNESS:  Yes, Your Honor.  In fact, the people

18   that are -- the four that I evaluated on East Block were

19   severely mentally ill.

20           THE COURT:  And the expectation under the

21   regulations, as I understand, is when a person -- asking you,

22   not telling you, I am just trying to understand what I think

23   I am hearing -- when a person on East Block is found to be

24   mentally ill, what they do supposedly is move them into the

25   Specialized Treatment Program hoping to get them stabilized

311

1    so that they can return to East Block?

2         THE WITNESS:  Not necessarily, Your Honor.

3         THE COURT:  All right.

4         THE WITNESS:  Not everyone.  In fact, in a couple of

5    the cases that I suspect we'll talk about here in a little

6    bit, the inmates had been identified as needing mental

7    healthcare but yet they were never moved into the OHU.

8         THE COURT:  I understand.  I sort of surmised that's

9    what you were going to testify about.

10        I'm asking a different question.  Under the

11   regulations the expectation was that if a person is mentally

12   ill on East Block, he's moved into the specialized program

13   for the purpose of stabilizing them and returning them to

14   East Block.  That's the theory?

15        THE WITNESS:  That's the theory.  Yes, Your Honor.

16        THE COURT:  You may proceed.

17   BY MR. NOLAN:

18   Q.    Maybe I can clarify a bit.

19        Is there an EOP Program on East Block for mentally

20   ill prisoners?

21   A.    The patients on East Block still have -- still fall

22   under the Program Guide so they're CCCMS designations.  There

23   is EOP prisoners on East Block.

24        THE COURT:  So it is not true that as a matter of at

25   least the regulations' expectation that every person with a

312

1    mental illness is moved into the specialized program?

2            THE WITNESS:  Yes, Your Honor, that's correct.

3            THE COURT:  If you know, what distinguishes persons

4    who are moved into the program from those who are mentally

5    ill and not moved into the program?

6            If you know?

7            THE WITNESS:  I don't know.  And based on my clinical

8    evaluation it is totally mysterious to me how that decision

9    is made.

10           THE COURT:  All right.  Thank you, sir.

11   BY MR. NOLAN:

12   Q.      So Doctor, for Prisoner GGG, did you review

13   subsequent medical records for him?

14   A.      Yes.

15   Q.      And actually I guess you just told me what you

16   learned from the subsequent records?

17   A.      Yes.

18   Q.      As to these four individuals that you saw who were on

19   East Block, did you conclude they all needed inpatient care?

20   A.      The four people that I was able to interview on East

21   Block -- well, the two I interviewed and the two that I did

22   cell-front interviews on, it was my opinion that each one of

23   them -- the mental illness was a severity that required

24   inpatient treatment.

25   Q.      Thank you, doctor.

313

1          I would like to move on and talk about a different

2     subject, which is the suicide rate for the condemned.

3          This is an exhibit -- Let me see if I can focus it.

4               (Exhibit published.)

5          This is tab Q.  This is Exhibit 1088.  If you want to

6     look at the tab, you'll be able to read the source

7     information.

8          Doctor, do you recognize this document?

9     A.     Yes, I do.

10    Q.     How was this chart prepared?

11    A.     This chart was prepared by staff in your office under

12    my direction.

13    Q.     What does this chart illustrate?

14    A.     This chart illustrates three different rates.  The

15    small red bar is the suicide rate for CDCR for the years 2008

16    to 2012.

17         The middle blue bar is the rate of suicide on death

18    rows in the United States for the period of 1976 to 1999.

19         And the tall red bar on the right is the rate of

20    suicide on death row in the California Department of

21    Corrections.

22    Q.     Doctor, is the document in your binder at tab R --

23         THE COURT:  Do you move this document into evidence?

24         MR. NOLAN:  Yes, sir.  I would like to move this

25    document into evidence.

314

1          MS. VOROUS:  Objection, Your Honor.

2          THE COURT:  Yes.

3          MS. VOROUS:  There is no foundation for this chart.

4   The data that was -- there is no foundation for the numbers.

5   This was a chart that was created by plaintiffs' counsel.

6          THE COURT:  I understand how it was created.

7          Doctor, where did you get the numbers that are

8   represented by the various levels in the chart?

9          THE WITNESS:  These were numbers provided to me by

10  counsel from the CDCR for the red bars.

11         THE COURT:  Okay.  And the blue bar?

12         MR. NOLAN:  I think that the chart actually has the

13  sources in the footnotes to it for each of the --

14         THE COURT:  I can't read it from here perhaps,

15  Doctor --

16         MR. NOLAN:  Maybe I could ask and go through each

17  one?

18         THE COURT:  Yeah.

19  BY MR. NOLAN:

20  Q.     Doctor, what's the -- so for the blue bar, the

21  national rate for suicide among condemned, what was that

22  based on?

23  A.     The blue bar is based on a study of suicides on death

24  row between 1976 and 1999.

25  Q.     Is that document in your binder at tab R?

315

1   A.      Yes, it is.

2           THE COURT:  Who --

3           THE WITNESS:  This study, Your Honor, was completed

4   by two social scientists at Stockton College of New Jersey.

5           The reason that this document is used is that from

6   reviewing the literature, this was the only study that I

7   could find on suicide rates on death row.

8           Subsequently I had staff, again from Mr. Nolan's

9   office, attempt to contact the authors of the study to see

10  if, in fact, their numbers had been updated.  Because, again,

11  this study was published in 2002.

12          And they were able to speak with Dr. Tartaro, who is

13  one of the co-authors in the study.  And to her understanding

14  she and her partner are the only social scientists in the

15  United States that look at these types of issues.  She's

16  wasn't aware that there were any updated numbers.

17          So given what restrictions may exist, this is what we

18  have, yes, Your Honor.

19          THE COURT:  And the two red bars are supplied by the

20  CDCR?

21          MR. NOLAN:  Could I just enter into evidence that

22  study, which was Exhibit 1137.

23          THE COURT:  Received.

24              (Whereupon, Plaintiffs' Exhibit 1137 received

25                into evidence.)

316

1   BY MR. NOLAN:

2   Q.      And then, Doctor, could you also take a look at tab

3   T. -- I'm sorry -- tab U, Plaintiffs' Exhibit 1032.

4   A.      Yes.

5   Q.      I apologize.  I should have shown you these first

6   before I brought up the chart.

7           So do you recognize that document?

8   A.      Yes.

9   Q.      What is it?

10  A.      It's a report on suicides completed in the California

11  Department of Corrections and Rehabilitation from during the

12  first half of 2012.

13          MR. NOLAN:  And that is Plaintiffs' Exhibit 1032,

14  which I would also like to move into evidence.

15          THE COURT:  Received.

16              (Whereupon, Plaintiffs' Exhibit 1032 received

17               into evidence.)

18  BY MR. NOLAN:

19  Q.      So Doctor, could you tell me the source of the CDCR

20  rate, the first bar?

21  A.      The CDCR rate in the first bar comes from the study

22  by -- or the report by Dr. Patterson.

23  Q.      And then, Doctor, do you have an understanding how

24  the third bar was calculated?

25  A.      This is from CDCR data, the number of suicides and

317

1    the number of people on death row, then the rate was

2    calculated.

3            MR. NOLAN:  Your Honor, based on those

4    representations we would like to move this into evidence.

5            MS. VOROUS:  We still object, Your Honor.  The fact

6    that --

7            THE COURT:  I'm sorry, ma'am.  I'm having trouble

8    hearing you.

9            MS. VOROUS:  I'm sorry.  We still object on the basis

10   that there's no foundation for the third chart with respect

11   to the numbers relating to CDCR death row 2008 to 2012.

12           THE COURT:  That objection is overruled.  But I have

13   a different concern about the propriety of receiving this

14   evidence.

15           It appears to the court, but maybe, again, I don't

16   understand, but it appears to the court that we're measuring

17   different things.  And putting them in this chart suggests

18   that somehow or other they teach us something by virtue of

19   the bars.  And that is troubling, Mr. Nolan.

20           It is your problem.  It is your exhibit.  But to try

21   and compare the blue line which is suicides on death row in

22   the United States against suicides in CDCR, first of all that

23   blue bar would obviously include people in CDCR.

24           I'm not sure, in other words, that it is really --

25   I've talked myself into it.  The objection is sustained.

318

```
 1            You may proceed, sir.

 2            That document is will not be received into evidence.

 3   BY MR. NOLAN:

 4   Q.      In reviewing --

 5            THE COURT:  That means take it down, sir.

 6            MR. NOLAN:  Okay.  Sorry.

 7            (Exhibit removed.)

 8   BY MR. NOLAN:

 9   Q.      In reviewing Dr. Patterson's report, were you able to

10   review information about condemned suicides?

11   A.      Yes.

12   Q.      And in preparing for your testimony today, were you

13   able to review CTR documents about recent suicides on death

14   row?

15   A.      Yes, I did.

16   Q.      Were you aware -- did you become aware of the number

17   of recent suicides on death row?

18   A.      I'm aware that the documents that I reviewed that

19   there had been four suicides within the last two years.  And

20   those were the suicide reports that I reviewed.

21            Then I was later informed of a more recent suicide, I

22   believe in the last month.  So it was a total of five over

23   the last couple of years.

24   Q.      How did you become aware of the fifth suicide?

25   A.      The fifth suicide is I was shown an email that I
```

319

1   believe your office was copied on that went to the Special

2   Master informing the Special Master of the recent suicide.

3   Q.     Doctor, if you could, take a look at Exhibit Z -- I'm

4   sorry -- tab Z, Exhibit 1130.

5          This is a notice from counsel for defendants

6   confirming a death row suicide on October 5th?

7   A.     Yes.

8   Q.     Is that the email I showed to you?

9   A.     Yes.  It was actually October 4th.

10  Q.     I'm sorry?

11  A.     Well, October 5th he was pronounced dead, yes.

12         MR. NOLAN:  I would like to move that exhibit into

13  evidence.

14         THE COURT:  Received.

15             (Whereupon, Plaintiffs' Exhibit 1130 received

16              into evidence.)

17  BY MR. NOLAN:

18  Q.     Did any of the recent death row suicides raise

19  particular concerns for you?

20  A.     Yes, there was one in particular that raised some

21  concerns.

22  Q.     Which prisoner was that?

23  A.     That was Prisoner WWW.

24  Q.     Do you know when he took his life?

25  A.     Prisoner WWW took his life April 24th, 2013.

320

1    Q.      What overall concerns did you have about his case?

2    A.      Several.  Prisoner WWW was, again, a severely

3    mentally ill person who had documented suicide ideation prior

4    to his arrival at CDCR.

5           He had documented delusional, psychotic symptoms, in

6    addition to auditory and visual hallucinations for which he

7    was treated with antipsychotic medication on and off while at

8    CDCR.

9           He had three very serious episodes of self-injurious

10   behavior, one of which was the most horrendous I had the

11   opportunity to examine during the course of my career.  And

12   yet he was never offered inpatient treatment, nor was he ever

13   put on involuntary medication.

14          THE COURT:  WWW is the inmate that blinded himself.

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  Am I understanding your view, that

17   whatever else is true, he required intensive inpatient care

18   that he never received?

19          THE WITNESS:  Yes, Your Honor.

20   BY MR. NOLAN:

21   Q.      So Doctor, if you could, look at tab S, which is

22   Plaintiffs' Exhibit 1138b and 1138c.  I would like to show

23   you a timeline of the key events in Prisoner WWW's history.

24               (Exhibit published.)

25          This is intended as a demonstrative exhibit just to

321

1   assist in making his testimony clear.

2           So can you tell me -- there is this chart and then a

3   second chart which I'll use in a little bit which is just a

4   blow up of the later time period.

5           Doctor, could you tell me what the information in

6   this chart is based on, drawn from?

7           Actually, can you tell me how it was prepared?

8   A.      This chart was prepared under my direction by staff

9   at your office based on the suicide report, as well as the

10  medical record review.

11  Q.      So tab T of your report is a document -- Plaintiffs'

12  Exhibit 1082?

13  A.      Yes.

14  Q.      Is this the suicide report that you relied upon in

15  preparing this timeline and your testimony today?

16  A.      In part I relied upon that, yes.

17  Q.      Also in your binder at tab J are excerpts from the

18  medical records --

19          THE COURT:  Before you go any further, are you

20  moving --

21          MR. NOLAN:  Sorry.  Yes.  We would like to move 1082.

22          (Whereupon, Plaintiffs' Exhibit 1082 received

23           into evidence.)

24  BY MR. NOLAN:

25  Q.      Doctor, also in your binder at tab J are excerpts for

322

1    the medical records for this individual.

2        Can you take a look at that?

3    A.    Yes.

4    Q.    Are those the records you relied upon in forming your

5    opinion about this individual's case?

6    A.    Yes.

7        MR. NOLAN:  Your Honor, I would like to move Exhibits

8    1082 and 1138 into evidence.

9        THE COURT:  Received.

10        (Whereupon, Plaintiffs' Exhibit 1138 received

11         into evidence.)

12    BY MR. NOLAN:

13    Q.    Doctor, could you take me through this timeline

14    starting with the period before Prisoner WWW entered CDCR?

15    A.    Yes.  I just want to emphasize that this information

16    was available to staff at San Quentin throughout the course

17    of WWW's stay there.

18        There was -- he had a first documented episode of

19    suicidal ideation while in college in 1998 for which he had

20    to drop out of college and participate in some treatment.

21        Then later on, during the course of his capital

22    trial, during the penalty phase exactly, he stood up in the

23    court and said something to effect that the sooner I die the

24    better.

25        So I see those both of documented evidence of the

323

1  fact that he had suicide ideation prior to his being admitted

2  to CDCR.

3  Q.    What was his mental state like in his first few years

4  in CDCR?

5  A.    His mental state when he was first admitted to CDCR

6  was one of having multiple somatic complaints; hip, groin,

7  back, leg, these sorts of things.

8       Then he also had other, frankly, delusional,

9  psychotic symptoms, including auditory and visual

10  hallucinations during this time frame, to the extent he was

11  started on the antipsychotic medication Risperidone.

12  Q.    What kind of medication is Risperidone?

13  A.    It's an atypical antipsychotic used in the treatment

14  of schizophrenia.

15  Q.    It looks like the next point marked on the timeline

16  is 2009.  Let me switch to the second exhibit.

17            (Exhibit published.)

18       Can you tell me what happened in 2009?

19  A.    Well, in 2009 they documented him becoming

20  increasingly psychotic.  At the same time he started refusing

21  his antipsychotic medication.

22  Q.    Do you think that he met the criteria for involuntary

23  medication at that time?

24  A.    At that time it is my understanding that he also had

25  difficulties eating and drinking.  You know, eating food and

324

1  drinking water so he -- it certainly raises a big concern of

2  mine why the staff didn't submit an involuntary medication

3  order.

4  Q.      What happened in early 2010?

5  A.      Well, in 2010 -- in January of 2010 the guards on the

6  East Block noted his starting to give away his possessions,

7  and they appropriately alerted mental health staff.

8          Mental health staff attempted to interview him

9  outside of his housing unit, but he refused so they did a

10 cell-front visit.  And he denied that he was suicidal at that

11 point.

12         THE COURT:  Your view, as I read your affidavit, is

13 giving away his personal possessions was an indication of a

14 possible suicidal impulse?

15         THE WITNESS:  Yes, Your Honor.  You know, giving away

16 a possession is sort of a very commonly accepted symptom of

17 impending suicide or impending self-injurious behavior.

18 BY MR. NOLAN:

19 Q.      Doctor, what happened next?

20 A.      He remand on East Block, which is very disturbing to

21 me given his history and given the fact he had been psychotic

22 before.

23         And then in February of 2010 he inserted two ball

24 point pens in each eye socket, and the pens extended all the

25 way back to his cerebellum.

325

1      Again, that was based on the neurosurgical consult he

2   had at Marin General Hospital.

3   Q.    Did the neurosurgeon consider the injury to be life

4   threatening?

5   A.    The neurosurgeon used some very strong language as

6   far as this is an overwhelmingly devastating injury or words

7   to that effect.

8      And he was quite amazed that the patient survived

9   this injury.  And he made a note to point out that no

10  vascular structure, by pure luck, were involved given how he

11  inserted the pen in his eye socket and it went all the way to

12  the cerebellum which is in the back of the brain.

13  Q.    But it is correct that he blinded himself?

14  A.    And as a result of this -- I'm sort of at a loss of

15  words on how to describe it -- but due to the fact that he

16  had stuck these pens in his brain, he had severed both his

17  optic nerves, and also had -- so it blinded him, as well as

18  causing some gait problems and speech problems.

19  Q.    Doctor, what happened when this prisoner returned

20  from Marin General?

21  A.    When he was returned from Marin General, he stayed in

22  the -- he was admitted to MHCB for a period of two days,

23  which I find amazing given the extent of this injury that he

24  did, and given -- and not just the extent of the injury,

25  that's bad enough, but it wasn't just otherwise a mentally

326

1  sane individual who then decided to stick pens in his brain.

2          It was a person with documented psychotic symptoms.

3  It was a person with documented suicidal ideation who had

4  done this.  And he only stayed in MHCB for two days.

5  Q.      Was he on antipsychotic medication at the time of his

6  self-injury?

7  A.      At the time of the injury -- I'm sorry.  I believe

8  that he was not.

9  Q.      Did the clinicians pursue an involuntary medication

10  order for him while in the MHCB?

11  A.      No, they didn't.  And this was -- again, there are

12  many, many things that I find very difficult about this case.

13  The psychiatrist in the MHCB wrote a very extensive note

14  linking the person's somatic delusions to his underlying

15  psychotic disorder and the self-harm.

16          And he clearly stated in there that the patient was

17  saying that now that he had blinded himself, his previous

18  complaints of rib pain had decreased because he had somehow

19  ameliorated it by this blinding.

20          So the psychiatrist in the MHCB very correctly noted

21  the connection, but yet given that, there was no attempt

22  to -- to send him to a higher level of care, meaning the

23  hospital, or put him on an involuntary medication order.

24  Q.      Did this individual go to any other institutions for

25  medical care following this act?

327

1    A.      He stayed in the CTC for a short period of time, and

2    then went to a rehab hospital somewhere in Marin County for a

3    number -- for a period of time.  And then he was sent to

4    Corcoran Medical Facility where he went through further

5    medical rehabilitation.

6    Q.      Do you find it surprising that he could go to

7    Corcoran for medical care but couldn't go to CMF for

8    inpatient care?

9    A.      Again, there are many surprises about this case.  I

10   don't want to keep saying each one of these is so amazing to

11   me, but each one of these is so amazing to me, the fact that

12   he can go to a medical hospital and be treated but yet

13   couldn't receive the proper psychiatric care.

14   Q.      So what happened next with this case?

15   A.      Well, after his stay at Corcoran he was returned to

16   San Quentin where he was housed on East Block.  And while he

17   was housed on -- then he was housed on East Block.  And he

18   was not referred to higher levels of care or not considered

19   for involuntary medication.

20   Q.      Do you know what his level of care was during this

21   period?

22   A.      At that time he went back and forth between CCCMS and

23   EOP, which I find amazing in and of itself that after he --

24   he was only made an EOP after he blinded himself.  He was at

25   CCCMS up to that time.  So I believe he was in EOP.

328

1  Q.    So it looks like on the chart that the next incident

2  is in January of 2012?

3  A.    Yes.  Over the course of the later half of 2011 and

4  it continues into the beginning part of 2012, he started

5  having -- reporting psychotic symptoms.  And in January of

6  2012 he was reporting the presence of paranormal activities,

7  entities that were somehow controlling his bodily functions,

8  but yet he was not admitted to MHCB.

9        And, you know, I just want to emphasize, okay, the

10  presence of psychotic symptoms in a prisoner in and of

11  themselves is not a reason to admit someone to MHCB.  But

12  given his particular history, the fact that he almost killed

13  himself, that he had this horrendous blinding, that he had

14  this documented evidence of psychotic symptoms, his report of

15  worsening psychotic symptoms should have been an indication

16  to admit him to the MHCB at a minimum, if not to a higher

17  level of care than that.

18  Q.    Should he have been placed onto involuntary

19  medications at this time?

20  A.    Throughout the course of this he was voluntarily

21  taking meds and then not taking meds as was his history.  So

22  my understanding of the statute for the Keyhea statute is if

23  a person accedes to taking medication, then they're not

24  eligible for an involuntary medication order.

25        But in his case, knowing the fact that he had taken

329

1   meds for a while, had then refused it, then taken meds for a

2   while, then refused it, staff should have been alerted.

3        His chart should have been flagged somehow that at

4   the first sign of his refusing medication, staff should have

5   proceeded with a request for involuntary medication.

6   Q.    What happened next in this case?

7   A.    When he was in the MHCB in January 2012, he did

8   take -- he did agree to take antipsychotic medication.  But

9   he stopped taking it in March 2012.

10       And he went on with, again, worsening psychotic

11  symptoms until August of that year where it was the first of

12  his two overdoses on opiates.

13       The first one occurred in August where he had

14  obtained methadone and he overdosed on that drug and was

15  required to go to Marin General Hospital for medical

16  stabilization.

17  Q.    Was a suicide risk assessment done after this first

18  overdose?

19  A.    Yes.

20  Q.    I would like you to look at tab J at Exhibit 1138.

21  Again, it is Prisoner WWW's medical file excerpts at

22  WWW-000071 and the subsequent pages.

23  A.    You just told me a bunch of different pages.

24  Q.    So 71 and 72.  Let me look.

25  A.    Okay.  71 and 72.

330

1    Q.      Make sure it is the right one.

2            (Brief pause.)

3            I'm sorry.  Actually the one I -- the first one I

4    want to ask you about is at 75 and 76.

5            THE COURT:  Those are tab numbers.  They mean nothing

6    to the court.

7            MR. NOLAN:  Yes.  At WWW -- it's in Exhibit 1138 at

8    WWW-000075 and 76.

9    BY MR. NOLAN:

10   Q.      Does this look like the Suicide Risk Evaluation that

11   you have reviewed?

12   A.      This is the Suicide Risk Evaluation that was

13   completed on August 5th, 2012.

14   Q.      Do you think this evaluation was appropriate?

15   A.      No.  I mean the first thing that struck me about this

16   is that the person completing this, and the name is Burton,

17   came up with a low acute risk for self-harm.

18           This was after the eye-gouging incident and after the

19   first opiate overdose.

20   Q.      Turning back to Prisoner WWW's suicide and this

21   timeline, how long was WWW housed in MHCB after this initial

22   overdose?

23   A.      I believe he was there for two days.

24   Q.      Were there any changes made to his care after this

25   overdose?

331

1    A.       He was made an EOP level of care because he had

2    previously been CCCMS level of care.

3    Q.       Do you think a two day stay in the MHCB was an

4    appropriate length of stay?

5    A.       Again, this was the second documented evidence of his

6    doing things that could have ended his life.  And he had a

7    two day stay in the Mental Health Crisis Bed Unit.  I think

8    it's woefully inadequate.

9    Q.       Did treating clinicians consider sending him to

10   inpatient care at this time?

11   A.       You know, at this time I don't believe that they did.

12   Q.       Could you tell me what happened next on the timeline?

13   A.       What happened next is in a little over a month after

14   this initial opiate overdose on Methadone he overdosed again

15   on heroin and morphine, and again he was required to be taken

16   to an outside hospital for medical stabilization.

17   Q.       Was this act a suicide attempt?

18   A.       Well, see here it is notable in that the records say

19   that he initially told a psychologist that he was -- this was

20   a suicide attempt.  But then he quickly retrenched from that

21   position and said:  No.  No.  I'm over it.  I'm not suicidal

22   any more.  Then as time went on he denied it was even an

23   attempt to end his life.

24   Q.       What was done in response to this second overdose?

25   A.       Now, in the second overdose there was a discussion in

332

1    the medical records about -- about potentially sending him to

2    the Acute Psychiatric Program at CMF.  But the chart makes it

3    very clear that staff felt that it would have been too

4    stressful for the patient to be sent to the APP Program.  And

5    they had identified stress as part of the issues that led to

6    his psychotic decompensation in the past so they decided to

7    retain him at San Quentin.

8    Q.      Doctor, do you agree with that decision?

9            THE COURT:  Take two and hit to right.

10           THE WITNESS:  I'm sorry, Your Honor?

11           THE COURT:  Nothing.  Go ahead.

12           THE WITNESS:  You know, I'm sort of losing my ability

13   to adequately express my amazement at how this case was

14   progressing.

15           He had another opiate overdose, and they decided not

16   to send him to the hospital because such a referral would

17   have been too stressful for him.

18           I think we've discussed the fact that the condemned

19   patients have -- basically when they go to the APP they're

20   sent to a very restrictive segregation unit where the only

21   treatment occurs on an individual basis, but even given those

22   restrictions, APP is a much safer place for an individual

23   than East Block.  And given this person's multiple episodes

24   of self-injurious behavior, why he was not sent to a higher

25   level of care remains a question in my mind.

333

1    Q.    Doctor, what did the clinicians at San Quentin do for

2    this individual instead of sending him to inpatient care?

3    A.    Okay.  The chart said something to the effect that

4    the staff were going to work to help the patient validate his

5    experience of pain or words to that effect.

6          That's what was done.

7          He was then offered a contract -- a so-called

8    treatment contract which was set up to give him anywhere from

9    three to five hours of treatment per week, which is much

10   less.  By this time he's in EOP so it is not even -- it is

11   about half what the minimum EOP requirements are according to

12   the Program Guide.

13         So we have a person that blinded himself and has two

14   opiate overdoses, has never been sent to the hospital, and he

15   was entered into a contract, which going into it, only

16   allowed him to have half the treatment that he would

17   necessarily get in a normal EOP Program.

18   Q.    Did he even live up to his contract?

19   A.    Then yes, the next thing was he was even unable to

20   meet the minimal requirements of this contract.  And again he

21   wasn't sent to the hospital, and again he wasn't placed on

22   involuntary medications.

23   Q.    Doctor, were there any signs of distress in the

24   months leading up to his suicide in April of 2013?

25   A.    Now, we move to 2013, and he did accede to treatment

334

1    with antipsychotic medication and antidepressant medication.

2         But then his clinical picture started to change a

3    little bit in that he was no longer talking about somatic

4    delusions as he had previously, but he was talking more

5    about, I guess I would characterize them, as existential

6    concerns.

7         He was talking about how his life was horrible, that

8    I'm blind in prison, every day is a horrible day for me.  And

9    he -- so the content of his conversations, at least according

10   to the chart, had changed to what I just described.

11   Q.       So they had changed from physical pain to emotional

12   pain?

13   A.       Yes.

14   Q.       Should these complaints have raised concerns?

15   A.       Okay.  Now, again, and I keep having to go back to

16   this, in and of themselves a person on death row having

17   complaints of emotional pain wouldn't necessarily elicit a

18   response to send them to a hospital or involuntary

19   medications or anything like this.  But in this particular

20   case staff should have been alerted to this change in his

21   presentation as to, again, possibly heralding a more serious

22   outcome in his case.

23   Q.       Were there -- aside from these expressions, were

24   there any other warning signs or risk factors in those

25   months?

335

1   A.      There was a couple of other things that were very

2   notable in his case.

3           One, he requested to decrease the frequency of his

4   therapy from weekly to biweekly.  And in addition, his

5   primary clinician was noted to be getting ready to go on an

6   extended vacation.

7           Although there was vacation backing put in place, at

8   least according to the chart, the fact that his clinician was

9   going on vacation, the fact that he had personally requested

10  a decrease in services and that his clinical presentation has

11  somewhat changed were all, I think, real clear markers that

12  something was up with this guy.

13  Q.      Do you think that intermediate inpatient care would

14  have been appropriate for this individual?

15  A.      I think that a stabilization in an acute program, a

16  functioning -- a fully functioning acute program, then follow

17  up with intermediate care would have been appropriate.

18  Q.      What would have been the benefit for someone like

19  this of intermediate care?

20  A.      Well, if nothing else besides having more closer

21  supervision, the ability to have greater involvement in

22  psychosocial treatments and to have closer monitoring of his

23  medications, he would have been safer.

24          This guy was in a prison here with his particular

25  background being treated with a couple of different

336

1  antipsychotic and antidepressants with his history of

2  overdoses and his blinding himself.  So if nothing else his

3  presence on an intermediate care facility would have assured

4  at least a greater degree of safety for him.

5  Q.      Is that partly because of the 24 hour nursing?

6  A.      And because it is more staffed and closer

7  supervision.

8  Q.      Do you have any concerns about the CDCR suicide

9  review and report in this case?

10      THE COURT:  Well, the first thing that happened is

11 then he committed suicide?

12      THE WITNESS:  Yes, Your Honor.

13      THE COURT:  We'll take our afternoon luncheon recess.

14 We'll reconvene at 1:30.

15      (Off the record at 12:00 p.m.)

16      (Back on the record at 1:35 p.m.)

17      THE CLERK:  Please, remain seated.

18      Court is now in session.

19      THE COURT:  Mr. Nolan.

20      MR. NOLAN:  Good afternoon, Your Honor.

21      MR. NOLAN:  Your Honor, before starting to finish

22 Dr. Stewart's direct I wanted to offer into evidence Exhibits

23 1138, 1138b and 1138c.  Those are the timelines for Prisoner

24 WWW and his records.

25      THE COURT:  Hearing no objection, they are received.

337

1          (Whereupon, Plaintiffs' Exhibits 1138, 1138b and

2          1138c received into evidence.)

3    BY MR. NOLAN:

4    Q.      So Doctor, just to finish up with Prisoner WWW and

5    his suicide, was Prisoner WWW ever referred to either the new

6    specialized care program in the OHU or the older specialized

7    care program that operated in East Block?

8    A.      You know, from a review of the records I saw no

9    indication that even prior to 2013, when this specialized

10   care program was going on in the East Block, nor when it was

11   going on in the OHU was he ever referred or admitted to that

12   program.

13   Q.      Did the Suicide Report done by the Department of

14   Corrections on the prisoner's suicide find any problems?

15   A.      Did I find any problems?

16   Q.      About the report itself?  The internal CDCR report,

17   did they identify any problems in the way his case was

18   handled?

19   A.      You know, surprisingly they did not.

20   Q.      I want to shift gears a little bit and talk to you

21   about the East Block.  We spoke a little bit about it

22   earlier.

23          Are there aspects of the condemned housing unit on

24   East Block that make it a particularly risky place as far as

25   suicide prevention?

338

1    A.      Well, it's -- you can describe it in a variety of

2    ways, but it is basically a very high security, segregated

3    unit so everyone is single celled.  So as we've learned from

4    recent experiences with CDCR, segregated units like this have

5    a higher rate of suicide.  So that alone makes it a higher

6    risk location.

7    Q.      Do you have an overall opinion about the quality of

8    the EOP Program that takes place in the East Block for the

9    condemned?

10   A.      Well, again, I find it notable that on East Block

11   it's the only place that I encountered where the EOP Program

12   has its own separate housing.  And EOP patients are not just

13   kept with other EOP patients.  Here on East Block there was

14   CCCMS and with inmates not on the mental health caseload so

15   that makes it very different.

16          In addition, in reviewing the records of the seven

17   people that I reviewed, I find that they weren't routinely

18   receiving ten hours of care as indicated in the Program

19   Guide.

20   Q.      Do you have an understanding about the reasons, with

21   the exception of the Condemned EOP Unit on East Block, the

22   reason that EOP prisoners are generally kept in a separate

23   housing unit?

24   A.      Well, again, I take this straight from the Program

25   Guide.  They talk about the need for sheltered environment so

339

1   that -- so that the EOP inmates would not be preyed upon by

2   others.  So they're placed into the EOP because of their

3   inability to maintain themselves in a GP setting.  So that is

4   not afforded to them while they're on East Block.

5   Q.       Doctor, in general is it your opinion that

6   San Quentin is keeping people in the mental health programs

7   on East Block at a lower -- maybe in general -- at a lower

8   level of care than their mental health condition requires?

9   A.       Based on the seven cases that I personally reviewed

10  and interviewed, as well as the suicide of WWW that I

11  reviewed, it is my opinion that there are tremendously sick

12  people on East Block that are being maintained at levels of

13  care where they shouldn't be maintained.

14  Q.       In other words, there is CCCMS patients that should

15  be EOP, and there is EOP patients who should be at higher

16  levels of care?

17  A.       Again, I can only base it on what I did, and the

18  people were at EOP level because they were on the special

19  care program.

20          And the seven out of the seven that I interviewed

21  should have been, in my opinion, at a higher level of care.

22  Q.       Doctor, do you have concerns about the number of

23  death row individuals identified as being EOP?

24  A.       I do.  In reviewing the numbers the percentage of EOP

25  patients on the East Block roughly is equivalent to the

340

1  percentage of EOP patients within the California Department

2  of Corrections and Rehabilitation as a whole.

3  　　　　Now, coupled with my experience in working with a

4  population that have been given the death penalty, I find

5  that this population has a higher incidence of serious mental

6  illness.  That's basically my experience.

7  　　　　So I would have expected to see a higher level -- a

8  higher percentage of people on East Block to have -- be EOP

9  status.  That's what I found.

10  Q.    Doctor, can you briefly describe your experience

11  working with condemned prisoners?

12  A.    As part of my -- one of my roles as a forensic

13  psychiatrist I personally have been involved in over 200

14  cases across the country of people that are either in the

15  process of being sentenced to death or have been sentenced to

16  death.  And I have performed psychiatric evaluations on those

17  people.  So it is based on that experience that I partially

18  base my opinion.

19  Q.    Dr. Stewart, I want to shift gears a little bit and

20  ask you about Prisoner E, a non-death row prisoner, whose

21  cell extraction was shown in the use of force portion of

22  these evidentiary hearings, and whom you also evaluated and

23  discussed in your March Termination Brief in the section on

24  San Quentin.

25  　　　　He's coded Prisoner GG in your March 14th Declaration

341

1  where he's discussed at paragraph 343 and 344.

2          Doctor, when did you meet this prisoner?

3  A.      I met him on the Carson Unit at San Quentin on

4  February 26 of this year.

5  Q.      When you met him, what was his level of care?

6  A.      His level of care when I met him was EOP.

7  Q.      Did you talk to treating clinicians at San Quentin

8  about this case?

9  A.      Yes, I did.

10 Q.      What did they tell you?

11 A.      Well, my concern that I shared with them was that

12 this individual should be in a higher level of care, higher

13 than EOP.  I felt he needed to be hospitalized.

14         As it turned out, in my discussions with Dr. Frank,

15 he agreed, and, in fact, the patient had been referred to the

16 APP Program at CMF and was waiting transfer.

17         But my discussions with Dr. Frank were that I didn't

18 feel that he could be safely managed in his current housing

19 in Carson Unit.  He should be in the MHCB.

20 Q.      Just to be clear, the Carson Unit is a Ad. Seg. Unit?

21 A.      Yes, it is Ad. Seg. Unit for EOP.

22 Q.      Did you also personally meet face-to-face with

23 Prisoner E?

24 A.      Yes, I did meet him on the Carson Unit.

25 Q.      What was your impression of him?

342

```
 1            THE COURT:  I'm sorry.  I'm confused.  I thought we
 2       were talking about GG.
 3            MR. NOLAN:  I'm sorry.  Just to be clear, this is a
 4       prisoner who was, I think through happenstance, identified as
 5       both somebody who force had been used against.  So it was a
 6       case that was reviewed in the use of force and he was in the
 7       EOP Ad. Seg.
 8            THE COURT:  Let's decide which one we're going to
 9       use.
10            MR. NOLAN:  I'm going to use Prisoner E.  I just
11       mentioned GG so if anyone is looking for Dr. Stewart's
12       testimony in his declaration.
13            THE COURT:  Please get on with it, sir.
14            MR. NOLAN:  Sorry.
15       BY MR. NOLAN:
16       Q.    So when you met face-to-face with Prisoner E, what
17       was your impression of him?
18       A.    He was acutely psychotic, very agitated, was yelling,
19       was delusional, was demanding that I show him my medical
20       license before he would speak with me.  And then he demanded
21       that I immediately contact the San Francisco Sheriff because
22       he felt that he was kidnapped out of the Hall of Justice of
23       San Francisco and brought illegally to San Quentin.
24       Q.    Did you review any medical records for Prisoner E?
25       A.    Yes, I did.
```

343

1    Q.      What level of care did you think he needed?

2    A.      I felt he needed to be in the hospital.

3    Q.      Do you know if he ever made it to acute care?

4    A.      Yes, he did.  He eventually made it.  I want to say

5    he went in May of this year.

6    Q.      Did you have occasion this morning to review the

7    video of a use of force incident against a prisoner?

8    A.      Yes.

9    Q.      This same video was played in court on October 2nd,

10   2013, as Exhibit 11.  Was the prisoner in the video Prisoner

11   E?

12   A.      Yes, it was.

13   Q.      Do you have an understanding of when this use of

14   force incident took place?

15   A.      The use of force incident that I reviewed the video

16   of occurred November -- I believe November 15th, 2012.

17   Q.      Are you aware of whether Prisoner E was on the

18   caseload at the time of this use of force incident?

19   A.      At the time of the use of force incident he was a

20   CCCMS inmate.

21   Q.      Doctor, if you could please look at tab K, which are

22   records for Prisoner E at REC-008683 and 84.  And it is --

23   Sorry.

24           I will tell you the exhibit number in a minute.  It

25   is Plaintiffs' Exhibit 10d.

344

1          THE COURT:  Ten, boy?

2          MR. NOLAN:  10d as in David.

3          THE COURT:  Is that admitted into evidence already?

4          MR. NOLAN:  I believe it was admitted.

5          It was not.

6          I would like to move to have these records

7     admitted.

8          THE COURT:  I don't know what it is.

9          MR. NOLAN:  These are medical records for Prisoner E

10    from his time at San Quentin.

11         THE COURT:  Received.

12              (Whereupon, Plaintiffs' Exhibit 10d received

13               into evidence.)

14         (Brief pause for Court Reporter computer issue.)

15    BY MR. NOLAN:

16    Q.     So Doctor, do you recognize this document?

17    A.     Yes.  This is a Suicide Risk Evaluation dated October

18    24th, 2012.

19    Q.     And what did the Suicide Risk Evaluation find?

20    A.     It found that the patient was at a high risk -- high

21    chronic risk for suicide and a high acute risk for suicide.

22    Q.     Was he referred for emergency evaluation?

23    A.     He was referred to the TTA for a crisis intervention,

24    yes.

25         THE COURT:  What does TTA stand for, sir.

345

1           THE WITNESS:  It's the emergency room there before --

2    people get sort of triaged, where they go in the system, Your

3    Honor.

4    BY MR. NOLAN:

5    Q.      Dr. Stewart, do you have an understanding why this

6    cell extraction that you saw was done in mid-November?

7    A.      My understanding was that after this suicide

8    evaluation found him to be at high chronic and acute risk for

9    suicide that the patient was uncooperative with a more

10   thorough evaluation, and so he was brought to the MHCB for

11   the evaluation to occur.

12   Q.      When did this cell extraction take place?

13   A.      November 15th.

14   Q.      What happened after the cell extraction?

15   A.      After the cell extraction he was in the MHCB.  He was

16   there for a day.  He had an evaluation by Dr. Jeffers who

17   felt that he wasn't psychotic, and that he suffered from a

18   personality disorder.  And he was sent back to his housing

19   unit.

20   Q.      In your opinion should Prisoner E have remained in

21   the MHCB for more than one day?

22   A.      Well, he should have been afforded a more

23   comprehensive evaluation.  Therefore, he should have been

24   there longer because even in what I found to be a very

25   cursory evaluation by Dr. Jeffers, the doctor noted that he

346

1    hadn't been able to review the 1370 information as this

2    patient had been found incompetent, had been treated at Napa

3    State Hospital in early in 2012.

4         So yes, he should have stayed there longer.

5    Q.    Doctor, in your opinion, based on the video you

6    observed this morning, during the actual cell extraction was

7    this prisoner manifesting symptoms of his mental illness?

8    A.    Yes.

9    Q.    And what were those?

10    A.    Paranoid delusions was the biggest type of symptom,

11    the most prompt symptom he was displaying.

12    Q.    Was a Keyhea order for involuntary medication ordered

13    following the cell extraction?

14    A.    No, it was not.

15    Q.    Had one been done in February when you saw him three

16    months later?

17    A.    He was on a Keyhea eventually.  I don't believe he

18    was on a Keyhea when I saw him in February.

19    Q.    Do you agree with the decision not to pursue

20    involuntary medication in November or at the time when you

21    saw this individual?

22    A.    Yes, I disagree with that decision based on the fact

23    that he didn't get a thorough enough evaluation.  The Napa

24    State records were real clear that this person was suffering

25    from bipolar disorder with psychotic features and responded

347

1   to a relatively low dose of antipsychotic medication.

2   So if the clinician had been aware of that fact then I think

3   a lot of this other stuff could have been avoided.

4   Q.      When you saw him in February of 2013, was he still in

5   the Carson Ad. Seg. Unit?

6   A.      He was in the Carson Ad. Seg. Unit.  I was attempting

7   to interview various people on the EOP level of care at

8   San Quentin.  He refused to come out of his cell so I did a

9   cell-front evaluation.

10  Q.      What did you observe from that in that evaluation?

11  A.      Again, I noted him to be agitated, psychotic,

12  paranoid.

13  Q.      From your review of the records did you become aware

14  of any other uses of force against Prisoner E?

15  A.      Yes.

16  Q.      After that first instance?

17  A.      Yes.

18  Q.      What were those?

19  A.      Well, he was brought back to the MHCB sometime after

20  I saw him in February.  I believe it was in April -- March or

21  April.  Then while he was on the MHCB they had another cell

22  extraction that was used to administer a tuberculosis test to

23  him.  And then there was at least one other use of force

24  incident regarding this patient that had to do with

25  involuntary administration of medication.

348

1    Q.      So there were at least three more uses of force after

2    this one in the video?

3    A.      Yes.

4    Q.      Do you think these could have been avoided if the

5    individual had been transferred appropriately to a higher

6    level of care such as acute inpatient?

7    A.      I think, again, and I'm basing this on what the Napa

8    records show, and I'm also basing it on what the current

9    records show, is that he responded very well to low dose

10   antipsychotic medication.

11           And if this could have been done, even after the

12   first extraction, then none of the following use of forces

13   would have been necessary.

14   Q.      Was he eventually transferred to inpatient care?

15   A.      He was.  He was -- he went to inpatient care in May

16   of this year.

17   Q.      So all total do you know how many times he was cell

18   extracted when he was finally transferred to the APP?

19   A.      Based on the records I reviewed he had three cell

20   extraction and one additional use of force incident.

21   Q.      And did he respond well to treatment in the acute

22   program, as far as you could tell?

23   A.      As far as I could tell from the records he did

24   respond to antipsychotic medication.

25   Q.      Do you know if he received rules violations during

349

1    the period before he was sent to acute?

2    A.       During the period of time before he went to the APP

3    Program he, I believe, accrued eleven rule violations.

4    Q.       Do you have any overall thoughts about this

5    particular case?

6    A.       Well, the overall thought is that when he presented

7    in October, prior to when he first arrived at San Quentin, I

8    think a thorough evaluation, as well as a record review,

9    would have prevented all of the following cell extractions

10   and difficulties that the gentleman experienced, as well as

11   the staff experienced.  And even given the fact that on the

12   first intervention I think it could have been done in a lot

13   different way than what I viewed on the video.

14   Q.       Doctor, when you ran the inpatient psychiatric clinic

15   at the San Francisco General Hospital, a unit of the

16   San Francisco Jail, did you ever participate in having to

17   restrain somebody in that hospital setting?

18   A.       Yes.  It was a quite common experience.

19   Q.       In a clinical setting like that how is that typically

20   done?

21   A.       Well, again, in a clinical setting we gathered the

22   nursing staff.  And in my particular unit I was responsible

23   for -- I would say two-thirds of the nursing staff were

24   women.  So we would gather a team outside of the door.  And

25   it was very common that people would barricade themselves in

350

1    their rooms, et cetera.  And we would, you know, say:  Look,

2    we're going to come in here and give you medications so we

3    want to do this.  We'd like for you to lie on the bed so we

4    can do this.

5           Then if the person refused, we opened the door and

6    went in.  And everybody -- there was a way we did it.  The

7    nursing staff and I were all assigned a particular limb.  We

8    went in there, put the person in restraints.  There was

9    another nurse that was responsible for administering the

10   medication.  And it was done -- it was done without the use

11   of any pepper spray, that's for sure.

12   Q.      Would you have security staff there when you did

13   that?

14   A.      At times we may have because, again, we were a unit

15   in the general hospital.  And there was a sheriff's deputy at

16   the front door.  Sometimes we would have staff standing by.

17   But the sheriff deputies would rarely, if ever, participate

18   in the actual intervention.

19   Q.      How long were you involved in that inpatient unit?

20   A.      For a little over four years.

21   Q.      And did you -- were there any instances where OC

22   pepper spray was used in those years?

23   A.      We had one incident in those four years where OC

24   pepper spray was administered.  That was not -- that was when

25   a nurse had basically violated our protocol and had let

351

1    someone out of restraints without consultation with the

2    staff.

3            And the person pushed his way past her into the

4    hallway.  And it turned out he was a marshal arts expert.

5    And so the deputies came in and sprayed him.  That was the

6    only time we ever used OC spray.

7            MR. NOLAN:  Thank you, Doctor.

8            I have no further questions.

9                            CROSS-EXAMINATION

10   BY MS. VOROUS:

11   Q.      Good afternoon, Doctor.

12   A.      Good afternoon.

13   Q.      My name is Debbie Vorous.  I'm one of the attorneys

14   for defendants.  I know we've met before, last time you were

15   testifying I believe.

16   A.      Yes.

17   Q.      And you indicated that you spent time in February at

18   San Quentin State Prison evaluating the condemned population,

19   correct?

20   A.      Yes.

21   Q.      And while you were at San Quentin you spent one to

22   two hours in East Block; is that correct?

23   A.      Maybe a little longer than that, but in that range.

24   Q.      And you met -- briefly met with the seven inmates

25   that we've been talking about throughout the day, correct?

352

1    A.      Right.

2    Q.      And you interviewed the three inmates in the OHU and

3    two in East Block, correct?

4    A.      I interviewed three in OHU, yes.

5    Q.      Yes.

6    A.      I interviewed two of the four on East Block in an

7    office, and then I went to the cells of the other two.

8    Q.      So in the time that you spent at the condemned unit,

9    you were able to interview five inmates and again went to the

10   cell for the two other.

11           How much time did you spend with each interview?

12   A.      I would say 20 minutes or so per person.  Maybe a

13   little less with the people at cell front because they were

14   yelling and screaming at me to get away.

15   Q.      During that same time I believe you testified you

16   also looked at some of the medical records for at least some

17   of the inmates?

18   A.      Then later on in the day I went.  They had a room set

19   up for us with computer access.  We looked at records there.

20   Q.      And I believe you also testified while you were at

21   San Quentin you visited the Carson Unit which is the EOP Ad.

22   Seg. Unit?

23   A.      Yes.

24   Q.      You spent -- is it correct you spent approximately

25   one hour in that unit?

353

1    A.       Maybe a little less.

2    Q.       Doctor, in 1998 and 1999 you worked -- or excuse

3    me -- you were responsible for the 12-bed lock inpatient unit

4    for San Francisco County, correct?

5    A.       Actually, between 1986 and 1990.

6    Q.       Outside this four-year period you've never worked in

7    a system where you were responsible for treating prisoners or

8    inmates, correct?

9    A.       Not that I had direct responsibility, but I was

10   working in prison settings.  For example, in the case of the

11   Gates case I was a court appointed monitor for mental health

12   for ten years.

13   Q.       And you have never -- aside from your work for

14   San Francisco County, you've never worked in any other

15   systems where you were responsible for implementing programs

16   for mental health for inmates, correct?

17   A.       Well, yes and no.  I was the consultant to the New

18   Mexico Department of Corrections while they were being sued

19   for prison conditions.  And I was responsible for

20   establishing a high-security mental health unit which would

21   be like a psychiatric SHU setting.  So I was involved in

22   planning for mental health systems within prisons.

23   Q.       Doctor, it is true you have never treated condemned

24   inmates, correct?

25   A.       I've never been responsible for their care.  I have

354

1    certainly been actively involved in consulting around their

2    care.

3    Q.      As a forensic expert; is that fair?

4    A.      As a forensic psychiatrist, yes.

5    Q.      So would it be fair to say that you have no clinical

6    experience in treating inmates with long sentences for

7    horrendous crimes such as the inmates in the condemned unit

8    at San Quentin?

9    A.      Well, again, I was not directly responsible, but over

10   the course of my career, especially even if you look over the

11   course of the Coleman case, I have probably evaluated several

12   hundred people who have all committed crimes, many people who

13   have been convicted of murder, both on and off death row, and

14   I was reviewing their care.  So in that sense, yes, I have

15   been intimately involved.

16   Q.      Doctor, you testified regarding Prisoner E just a few

17   minutes ago.  This is the prisoner that you had talked to in

18   the condemned -- excuse me -- in the EOP Ad. Seg. Unit at

19   San Quentin the day you were there in February?

20   A.      Correct.

21   Q.      And you indicated that you reviewed his mental health

22   records prior to his cell extraction in November 2012; is

23   that correct?

24   A.      I have reviewed records that were of the time before

25   the cell extraction, yes, including the 1370 records that

355

1   occurred while he was at Napa State Hospital earlier in the

2   year.

3   Q.    So Doctor, are you aware that the day prior to the

4   extraction that this particular prisoner was seen by a mental

5   health provider to try to urge him to voluntarily leave his

6   cell for a mental health evaluation?

7   A.    I was aware of that.  That was the goal.  They were

8   trying to get him to cooperate with a mental health

9   evaluation, yes.

10  Q.    Do you disagree that he -- or do you disagree with

11  the clinical need to extract him from his cell for purposes

12  of a mental health evaluation?

13  A.    I agree with the fact that he was deservant of a

14  comprehensive mental health evaluation which, in fact, he

15  didn't get after the cell extraction.

16        But -- and if he wouldn't cooperate with it, then I

17  don't necessarily disagree with bringing him to the MHCB for

18  evaluation.

19  Q.    It is your opinion he did not obtain an adequate

20  evaluation based on your review of the records, correct?

21  A.    My review of the records both prior and afterwards.

22  Because it was clear from the records that this gentleman

23  suffered from bipolar disorder with psychotic features.  That

24  was the diagnosis at Napa State Hospital.

25        It has subsequently been the diagnosis he has in the

356

1    CDCR, that he currently has.

2           So yeah, I based it on those two, that when he left

3    the MHCB after a one day stay -- after this real horrendous

4    cell extraction he was there for one day, and the doctor who

5    did the evaluation questioned whether or not he should even

6    be at the EOP level of care, questioned whether or not he

7    actually suffered from psychotic symptoms or whether this was

8    as the result of a personality disorder.

9           He then thought out loud in a note and he said:  It

10   would be nice if I could see some of the records that

11   occurred at Napa Hospital.  But he didn't do it.  He didn't

12   have them.

13          I don't know why he didn't do it.  He didn't have

14   them, didn't bother too read them or what.  But based on all

15   of that I'm saying he didn't get an adequate evaluation.

16   Q.      You don't know at that time whether the records at

17   Napa State Hospital were available to him, correct?

18   A.      I don't know that for a fact, whether they were

19   available or not, but they should have been.

20   Q.      When you were at San Quentin and talking to this

21   inmate did you speak to his treating clinician at -- his

22   clinician that was treating him at the time of his cell

23   extraction?

24   A.      I spoke with a Dr. Frank.  And I don't know if Dr.

25   Frank was the treating clinician at time of the cell

357

1   extraction.  Although in my conversations with Dr. Frank, he

2   did mention to me that there was a very difficult cell

3   extraction that had occurred several months prior to my

4   evaluation in February.

5   Q.      Isn't it also true there's no evidence in

6   Prisoner E's mental health records that the extraction that

7   occurred in November 2012 impacted his mental healthcare?

8   A.      There was no mention of that in the records.  You are

9   right.

10  Q.      So Doctor, you've talked about the specialized care

11  plan that's currently in place at San Quentin for treating

12  the condemned inmates on -- or the inmates on death row,

13  correct?

14  A.      Correct.

15  Q.      And do you have an understanding of what that plan is

16  based on?

17  A.      The plan is -- again, as I read the program

18  description, as well as reviewing Dr. Monthei's deposition,

19  that it is based on the EOP level of care.

20  Q.      Wouldn't you agree that it's based on a model

21  designed to reduce hospitalization?

22  A.      That's what the EOP level of care is designed for, to

23  reduce hospitalization.

24  Q.      Wouldn't that also be -- wouldn't that be a

25  reasonable goal of a program, to reduce the need for

358

1  hospitalization?

2  A.      It is, but it is not meant as a replacement to

3  hospitalization.  So I think it is very important what you

4  said.  It is designed to reduce the need for referral to a

5  hospital, not to care for people who need to be in a hospital

6  and not referred.

7  Q.      So in your opinion, again, these four individuals

8  that we've talked about should be in inpatient

9  hospitalization care, correct?

10  A.      In every other setting I'm familiar with in other

11  parts of the CDCR, if patients with that degree of

12  psychopathology were present, they would be on some list

13  waiting to get into a hospital, or they would be maintained

14  in MHCB, or they would be doing something to get them to the

15  next higher level of care.

16  Q.      So in your opinion these inmates shouldn't even be

17  given an opportunity in the first instance to receive

18  services through the specialized care plan, correct?

19  A.      Well, what I think they should be offered is the

20  opportunity for the correct level of care.  If, as you said,

21  the specialized care program is an EOP based level program

22  meant to prevent hospitalization, then all of those inmates

23  on the mental health caseload in East Block should

24  participate in this program -- excuse me -- all of those

25  inmates who don't require hospitalization should be

359

1  participating in this program.  And the people that are on

2  East Block, condemned East Block or in OHU that need

3  inpatient care should go to inpatient care.

4  Q.    And I don't believe that I said it was an EOP program

5  designed to reduce.  I believe that was your term.

6      THE COURT:  I'm sorry.  I didn't understand what you

7  were saying.

8      THE WITNESS:  Myself, Your Honor?

9      THE COURT:  Restate your question, ma'am.

10     MS. VOROUS:  Your Honor, it wasn't a question.  I was

11 clarifying what the witness had said I indicated.

12     THE COURT:  You were arguing with him then.  Don't do

13 that.  You get a chance to argue at the end of the case, if

14 it ever ends.

15 BY MS. VOROUS:

16 Q.    Doctor, are you aware of any other states that have

17 intermediate care programs for condemned inmates -- inpatient

18 intermediate care programs for condemned inmates?

19 A.    I'm aware that in Arizona the condemned have full

20 access to a full range of mental services.

21     I'm aware that on the death row in Georgia they have

22 access to a full range of psychiatric services.

23     Those are the two that come to mind.

24 Q.    So would you agree that the level of care that we're

25 talking about, intermediate care, is a creation of -- is a

360

1    creation in California?

2        In other words, it is a creation that's part of the

3    Program Guide?

4    A.    I don't understand the question.

5    Q.    So you gave me an example of two other states where

6    you said the condemned inmates have an opportunity to have

7    access to full inpatient programming.

8        My question is, wouldn't you agree that with respect

9    to an intermediate care facility level of care, as defined in

10   the Program Guide, that's unique to California?

11   A.    You know, I don't know enough about all the programs

12   in the other states to answer that question accurately.

13   Q.    So Doctor, looking just at the ten beds that have

14   been designated in the Outpatient Housing Unit at

15   San Quentin, for purposes of my next question wouldn't you

16   agree that the inmates that are in those ten beds have the

17   ability on the floor to receive 24 hour nursing supervision?

18   A.    In OHU.  I'm not aware there is 24 hour nursing

19   available in OHU.  I know in MHCB there is.  I believe there

20   is some nursing available in OHU, but I don't believe it is

21   24 hours.

22   Q.    Have you asked whether or not there is 24 hour

23   nursing services available to the inmates that are in those

24   ten beds in the OHU?

25   A.    I didn't ask particularly when I was at San Quentin.

361

1   I'm basing my answer on the OHUs that I observed throughout

2   the rest of the system.

3   Q.      So Doctor, do you understand that these ten beds that

4   are part of the OHU at San Quentin are on the same floor as

5   the Mental Health Crisis Bed Units, correct?

6   A.      Yes.  Yes.

7   Q.      They're also on the same floor as the OHU beds that

8   are designated for medical patients, correct?

9   A.      That's my understanding, yes.

10  Q.      Doctor, based on your September declaration that

11  we've talked about some today, you're familiar with the

12  description of the services that are provided by San Quentin

13  mental health care staff in those ten OHU beds, correct?

14  A.      Correct.

15  Q.      And isn't it correct that the description includes a

16  treatment plan that emphasizes inmate coping skills?

17  A.      Again, I don't have it committed to memory, but it

18  sounds like something that might be there so I really can't

19  answer that question.

20  Q.      Are you aware that it also includes daily living

21  skills?

22  A.      I believe it does.

23  Q.      What about medication compliance?

24  A.      And I know medication is administered.

25  Q.      Isn't it also correct that the specialized care plan

362

1    provides increased programming opportunities for the inmates

2    that are housed in those beds?

3    A.       Increased as compared to what?

4    Q.       Increased as compared to an Enhanced Outpatient

5    Program level of care?

6    A.       Well, if we just look at the enhanced outpatient care

7    that exists on East Block, people aren't routinely getting

8    ten hours of care.  And I know Dr. Monthei testified to the

9    fact that the goal was to get ten hours of care for the

10   people in the OHU Program.  So in that sense it a greater.

11            THE COURT:  I think I understand, but folks are using

12   terms I think interchangeably, but I'm not sure.  The

13   specialized program is the ten bed in the OHU, correct?

14            THE WITNESS:  Yes, Your Honor.

15            THE COURT:  Okay.  You may proceed.

16            MS. VOROUS:  If I could also clarify, and I think

17   Dr. Monthei will testify, it does go beyond the ten beds.

18   But that's we're referring to right now.

19   BY MS. VOROUS:

20   Q.       Doctor, you mentioned several times the requirement

21   that inmates in the Enhanced Outpatient Program level of care

22   receive ten hours of therapy per week, correct?

23   A.       That's from the Program Guide, yes.

24   Q.       Isn't it correct that the Program Guide requires that

25   the institutions schedule or offer ten hours of structured

363

1   therapeutic activity per week?

2   A.      Actually, again, I shouldn't be quoting the Program

3   Guide, but I believe it says something to the fact that ten

4   hours is the minimum that should be offered to EOP level

5   patients.

6   Q.      Isn't it also correct that the Program Guide for

7   Enhanced Outpatient Program level of care also allows for

8   modified programming in certain circumstances?

9   A.      How do you mean "modified programming"?

10  Q.      Well, for instance, a reduction?

11          THE COURT:  You know, this is not appropriate.  I

12  mean you're asking the Doctor to memorize the Program Guide.

13          I assume you haven't done that, Doctor?

14          THE WITNESS:  I have not memorized it, Your Honor.

15          THE COURT:  How surprising.

16          If you have the Program Guide, you can give it to him

17  and ask him specific questions about it.  It will move along

18  much faster and hopefully more enlightening.

19          MS. VOROUS:  May I approach the witness, Your Honor?

20          (Document handed to witness.)

21  BY MS. VOROUS:

22  Q.      Doctor, are you familiar with what I provided to you

23  that's marked as Exhibit E to your supplemental declaration?

24  A.      Yeah.   It's one page of the EOP section of the

25  Mental Health Service Delivery System.

364

1    Q.      Looking at the third page, which is referred to as

2    1248, do you see that?

3    A.      Yes.

4    Q.      In this paragraph isn't it accurate that it does

5    indicate that for some patients ten hours per week may be

6    clinically contraindicated?

7    A.      I'm reading what it says.  It says:

8            (Reading:)

9            Each inmate-patient shall be offered at least ten

10           hours per week.

11           (Reading concluded.)

12           Is there another reference to ten hours?

13   Q.      Yes.  If you read down two more sentences.

14   A.      (Reading:)

15           It is recognized that not all inmate-patients can

16           participate in and/or benefit from ten hours per week

17           of treatment services.

18           (Reading concluded.)

19   Q.      Yes.  Then the next sentence?

20   A.      (Reading:)

21           For some inmate-patients ten hours per week may be

22           clinically contraindicated.

23           (Reading concluded.)

24   Q.      Correct.  Then the sentence after that states:

25           (Reading:)

365

1           For those inmate-patients scheduled for less than ten

2           hours per week of treatment services, the PC -- which

3           I believe means primary clinician -- shall present

4           the case and recommend a treatment program to the

5           IDTT for approval.

6           (Reading concluded.)

7   A.      Correct.  That's what it says here.

8           THE COURT:  You want this marked as -- well, it is

9   Exhibit E to his affidavit.

10          You want to receive it into evidence, ma'am?

11          MS. VOROUS:  Yes, I do.

12          THE COURT:   Received.

13          Received as what?

14          MS. VOROUS:  Be Defendant's Exhibit B at this point,

15  I believe.

16          THE COURT:  E?

17          MS. VOROUS:  B as in boy.

18          THE COURT:  B.

19          MS. VOROUS:  Yes.

20          THE COURT:  Received.

21              (Whereupon, Defendants' Exhibit B received

22               into evidence.)

23  BY MS. VOROUS:

24  Q.      Doctor, in addition to providing group therapy

25  services, isn't it also correct that the specialized care

366

1    services that are provided to the inmates in the ten OHU beds

2    include individual psychotherapy?

3    A.      I believe that's an option.

4    Q.      Isn't it also true that they include depression and

5    crisis management?

6    A.      Yes.

7    Q.      And also that they include training in daily living

8    skills?

9    A.      Yes.

10    Q.      And substance abuse as well?

11    A.      I believe that's mentioned in there.

12    Q.      And it's also correct that they provide services

13    related to management of assaultive behavior?

14    A.      Yes.

15    Q.      And also supportive counseling?

16    A.      Yes.

17    Q.      In addition, the services include modification of

18    maladaptive behaviors?

19    A.      Correct.  But all the services are designed to keep

20    people out of the hospital.  So these are designed for people

21    who are able to function at the outpatient level of care, not

22    for people who need to be in the hospital.

23          People that need to be in the hospital need to be in

24    the hospital.  People that can be effectively kept out of the

25    hospital because their level of mental illness is a lower

367

1    degree, they can take advantage of this array of services.

2    That's what the program is designed for.

3    Q.      Doctor, are you familiar with the criteria -- Strike

4    that.

5            Are you familiar with the services that are provided

6    by the Department of State Hospitals as part of their

7    Intermediate Care Facility Program at the DMH hospitals or

8    Salinas Valley Psychiatric Program or the CMF program?

9    A.      I'm aware of it generally, what supposedly should

10   take place.

11   Q.      So isn't it correct then that all the things that we

12   just discussed are included in the definition of a Department

13   of State Hospital Inpatient Program, as it is described in

14   the Program Guide?

15   A.      There may be some overlap in the type of services

16   offered.  But again, an EOP program is not a substitute for a

17   inpatient program.  That's the difference.

18   Q.      All of the things that I just mentioned to you, are

19   those part of an EOP Program?

20   A.      They can be part of an EOP Program.

21   Q.      And they can be part of an ICF Program, correct?

22   A.      They can be part of the array of services available

23   at an ICF Program.  But that's a hospital.  And when that is

24   operating correctly, people should be out of their cells

25   almost every moment of the day, getting 35 to 40 hours of

368

1    treatment per week.

2         That's very different than the program you're

3    describing here in OHU, the specialized care program, where

4    the goal is ten.  It is a very different program, although

5    there may be overlap of services.  I won't disagree with you.

6    Q.    Is it your understanding that the Department of State

7    Hospital Inpatient Programs provide 35 to 40 hours of

8    structured therapeutic treatment per week?

9    A.    I know the last time I toured, the last time I

10   testified here, I was aware that they fell woefully short of

11   the goal.

12        That's a goal that I have seen stated by people from

13   the Department of Corrections.

14   Q.    Doctor, in your experience has it been uncommon for

15   inmates to refuse to participate in group therapy?

16   A.    In my experience where?

17   Q.    In your experience as a treating psychiatrist?

18   A.    In my experience as a treating psychiatrist one of

19   the more -- one of the more challenging aspects of the

20   treatment can be engaging a person in treatment.  Yes.

21   Q.    And it's also true that inmates, despite the fact

22   that they are imprisoned, also have a right to refuse

23   treatment, correct?

24   A.    Correct.

25   Q.    Doctor, putting aside what you have indicated to be

369

1    the goal of group therapy for the outpatient -- for the

2    Specialized Care Service Plan in the ten OHU beds, do you

3    know how many hours of structured therapeutic activity are

4    being provided on an average to inmates in those beds?

5    A.    You know, what I'm aware of is that in the OHU

6    program there are certain activities that are counted as

7    structured activities, like meals or sitting together in the

8    dayroom, and they're not structured activities.

9         I'm aware that those hours are counted towards this

10   tally that you're talking about, but -- so I can't answer

11   your question exactly how much therapeutic activities they

12   get.

13   Q.    Do you know how many one-on-one clinician contacts

14   occur on average per week, per patient?

15   A.    I do not.

16   Q.    Doctor, you talked a little bit during your direct

17   examination about the prisoner that has been identified as

18   Prisoner CCC.

19        Do you recall that?

20   A.    Yes.

21   Q.    So if you could, please look at tab C in the binder

22   in front of you which is also Trial Exhibit 1119.

23        You testified with respect to the last mental health

24   record in this tab, correct, the last page, which is

25   identified as CCC-000433?

370

1    A.    Yes.

2    Q.    Is it correct that you testified that this was the

3    most recent mental health record you had reviewed with

4    respect to this patient?

5    A.    That's the most recent one that I have reviewed, yes.

6    Q.    And can you please turn to CCC-000402?

7    A.    Yes.

8          THE COURT:  Is this part of 1119?

9          MS. VOROUS:  Yes.

10   BY MS. VOROUS:

11   Q.    Doctor, pages CCC-000402 and 000403 represent a

12   Suicide Risk Evaluation that was completed on August 29,

13   2013, correct?

14   A.    Correct.

15   Q.    Doctor, have you reviewed this Suicide Risk

16   Evaluation?

17   A.    I certainly looked at all the pages here.  I can't

18   say as I have memorized this page.

19   Q.    So if you would look at the second page under the

20   Treatment Plan.  Do you see that?

21   A.    Yes.

22   Q.    Under the Treatment Plan isn't it correct that it

23   notes that the inmate is collaborating with the SCCP to

24   develop a weekly individualized treatment schedule?

25   A.    Yes.

371

1    Q.      And that that scheduled would include weekly

2    individual sessions with the SCCP.  And in this note it says

3    "EB PCs."  I believe that means East Block Primary

4    Clinicians.

5            Is that correct?

6    A.      Yes.

7            THE COURT:  What does "SCCP" stands for, if you know?

8            THE WITNESS:  It's the special care program for

9    condemned prisoners.

10           THE COURT:  Thank you, sir.

11   BY MS. VOROUS:

12   Q.      And this treatment plan would also include

13   recreational therapy and psychoeducation, correct?

14   A.      Yes.

15   Q.      And also that the inmate meets with his psychiatrist

16   for ongoing medication management and medical doctors as

17   needed, correct?

18   A.      Yes.

19   Q.      It also indicates that the inmate has reached and is

20   able to maintain his level of treatment with fairly little

21   prompting?

22   A.      That's what it says.

23   Q.      And that the clinical focus of his plan will be on

24   increasing insight.

25           Is that correct as well?

372

1   A.      That's what it says.

2   Q.      So Doctor, looking at this treatment plan, wouldn't

3   you agree that this inmate has showed improvement since his

4   admission into the OHU bed?

5   A.      The treatment plan doesn't tell you anything about

6   his clinical improvement.  Okay.  What I referred to earlier

7   in my direct testimony was the GAF scores that had been

8   assigned him by San Quentin clinicians.

9           I believe he started off the program at 35 and

10  currently was at 32.  So based on that he hasn't made any

11  progress.  The treatment plan sounds very great.  It sounds

12  like a good treatment plan.  But you can't then leap from the

13  treatment plan and assume a clinical response.  You can't do

14  that.

15          We look objectively at what your clinicians are

16  saying.  Basically he's remained the same clinically the

17  entire time he's been in this program.

18  Q.      Doctor, if you look at the next page, again we're

19  looking at Trial Exhibit 1119 that is identified as

20  CCC-000404?

21  A.      Yes.

22  Q.      This is an actual Mental Health Treatment Plan dated

23  August 29th, 2013, correct?

24  A.      Correct.

25  Q.      And if you look at page 3 of this document, which

373

1    would be CCC-000406, you see that?

2    A.      Yes.

3    Q.      That has -- that page reflects that this treatment

4    plan was signed off by at least three members of the

5    treatment team, correct?

6    A.      Correct.

7    Q.      The primary clinician, the psychiatrist and

8    correctional counselor?

9    A.      Correct.

10           It also lists his GAF at 32.

11   Q.      So looking under the -- Excuse me.

12           If you can, go back to 000404, which is first page of

13   the Mental Health Treatment Plan.

14           Are you there?

15   A.      Yes.  Yes.  I'm sorry.

16   Q.      Under Justification To Remain At Current Level Of

17   Care, towards the bottom of the treatment plan --

18   A.      Yes.

19   Q.      -- isn't it correct that the plan indicates the

20   inmate-patient has increased participation and out-of-cell

21   treatment activities over the previous 30 days to greater

22   than 15 hours per week on average?

23   A.      That's what it says.

24   Q.      Wouldn't that show that the inmate has improved since

25   his admission to the OHU beds?

374

1   A.      How do we explain that your staff assigned him a GAF

2   of 32.  So something is not right.  Either the GAF isn't

3   right or what they say about his treatment participation is

4   not right.

5           So there absolutely is a disconnect.  I agree with

6   you.  But when you look at the treatment plan, you can't tell

7   what level of participation, if he's acutely psychotic or

8   anything else by the fact that they say he's going to greater

9   than 15 hours per week.  Because then we have the objective

10  analysis, again by your staff, not by me, that says that he

11  remains significantly psychotic and is unchanged basically

12  throughout his stay.

13  Q.      So isn't it also true that patients, despite

14  receiving care within an intermediate care program, may have

15  the same GAF score as when they -- the same score as they had

16  when they were admitted as when they are discharged?

17  A.      I hope not.

18  Q.      But isn't that a fair statement?

19  A.      No, it is not necessarily a fair statement.  You are

20  sending someone to the hospital, which the ICF Program is,

21  because they need hospital-based care.  And then after an

22  extended period of time you're going to say their clinical

23  situation is the same upon admission?

24          I would say not much was done during that admission.

25          I don't think it is fair to say that it is usual to

375

1    see the fact that they leave the same way they came in.

2          Why bother to send them up there if that's going to

3    be the case?

4    Q.    Let's talk about Prisoner DDD, which is the second

5    prisoner we talked about?

6    A.    Yes.

7    Q.    You can look at tab D of your binder, and this is

8    Plaintiffs' Exhibit 1121?

9          THE COURT:  Can we go back before you start on

10   another prisoner.

11         I know nothing about this, and if I say thing that's

12   wrong, please feel free to say no.

13         Isn't it -- I mean, I would assume that there are

14   some people who don't get better, whatever treatment you give

15   them.

16         THE WITNESS:  There are some people that after

17   appropriate levels of treatment, Your Honor, will plateau

18   out.  Absolutely.

19         THE COURT:  Okay.  That's not -- asking you, not

20   telling you -- that's not an indication that the therapy was

21   inadequate.  It's got to do with what is going on in the

22   person's psyche?

23         Right or wrong?

24         THE WITNESS:  It does, Your Honor.  But if the

25   treatment is appropriately matched to the clinical needs, you

376

1   would expect to see some movement.

2           THE COURT:  But at least with some folks that won't

3   be the case?

4           I'm asking, not telling.

5           THE WITNESS:  If after a period of time, when a

6   person's administered appropriate treatment, they could max

7   out.  So maybe after month three to month four or five

8   they're going to stay the same.  But there usually is some

9   movement, Your Honor.

10          THE COURT:  That raise's an interesting question.

11  Let's assume there's a guy, a prisoner, an inmate -- what was

12  the word?

13          THE WITNESS:  Plateaus out.

14          THE COURT:  Okay.  But he's still very sick obviously

15  because that's why he's in the hospital.  Should that person

16  remain in the hospital?

17          THE WITNESS:  That person should remain in a setting

18  to address those symptoms.  And I believe on previous

19  testimony I have said there is a subpopulation within the

20  Department of Corrections that should never be able to be --

21  should always have to be placed in a hospital setting.

22          THE COURT:  Thank you, sir.  You have answered my

23  question.

24          I'm sorry to have interrupted you, ma'am.

25  BY MS. VOROUS:

377

1    Q.      So Doctor, is it your opinion then that the GAF score

2    is the only measure of improvement in an inmate's mental

3    health condition?

4    A.      What I'm saying -- what I'm saying is that the GAF

5    score is assigned by your clinicians as a reflection of how

6    the person is doing in that moment.

7            No, it is not the only measure, but it is a measure.

8    And it is a measure that is being used by the clinicians in

9    the Department of Corrections.

10   Q.      So it's one measure.  So you're not saying there is

11   not other measures that can be used, correct?

12   A.      Well, no.  See, the thing is, in the cases that I

13   reviewed, the GAFs were basically unchanged.  As we're going

14   to find in Mr. DDD, his actually went down by a few points.

15           And the clinical description of what is going on with

16   him is fairly consistent with the clinical description of

17   what was going on with him when he first arrived.

18   Q.      So if you would look at -- again, we're in tab D,

19   Plaintiffs' Exhibit 1121.  If you would find page DD-001702?

20   A.      Yes.

21   Q.      Doctor, did you review the mental health treatment

22   plan that starts at 001702 that is dated 8-29-2013?

23   A.      Yes.

24   Q.      Looking at the bottom of the first page of the Mental

25   Health Treatment Plan under Justification To Remain At

378

1    Current Level Of Care, do you see that?

2    A.      Yes.

3    Q.      Again, here the justification is that the current EOP

4    level of care within the SCCP is appropriate given the

5    inmate's increasing participation and offered out-of-cell

6    treatment opportunities.

7            Is that correct?

8    A.      I see that's what is stated there.

9    Q.      Based on your testimony with respect to GAF scores,

10   is it also your opinion that this would not reflect

11   improvement in this inmate's condition either?

12   A.      You know, my same answer to your similar question on

13   the previous inmate still holds.  You can't necessarily make

14   anything out of this.  Okay.

15           It is great he's going out of his cell and

16   participating.  Maybe he's getting something out of it.  I

17   hope he is.  But then if we look at the objective measures

18   they're still saying his GAF is 20.

19           That means he's fairly psychotic and impaired by his

20   psychotic symptoms.

21   Q.      Would you turn to tab F?

22           THE COURT:  You are about to start a different topic.

23           MS. VOROUS:  Yes.

24           THE COURT:  We'll take a 15-minute recess.

25           (Off the record at 2:50 p.m.)

379

1          (On the record at 3:05 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Off the record.

5          (Discussion held off the record.)

6          THE COURT:  Back on the record.

7          Miss Vorous.

8    BY MS. VOROUS:

9    Q.      Doctor, I would like to go back to Prisoner DDD for a

10   minute.

11   A.      Yes.

12   Q.      Given this inmate's mental health illness, isn't it

13   true that one of the goals in treating him would be to

14   provide a consistent routine and familiarity with the

15   providers?

16   A.      I think that's good in any mental health treatment.

17   Q.      With respect to this particular inmate would it have

18   a better chance of alleviating his muteness by having him

19   remain with the same providers over a long period of time

20   rather than go to another facility with no connection to the

21   providers?

22   A.      His muteness, as you say, is a result of a very

23   serious neuropsychiatric condition that doesn't respond to

24   talk therapy.  He needs aggressive medical intervention.

25   That can occur best in a hospital setting.

380

1          THE COURT:  So your answer is, under these

2    circumstances the answer is no?

3          THE WITNESS:  Yes, Your Honor.

4    BY MS. VOROUS:

5    Q.        Doctor, with respect to Prisoner EEE, I believe it is

6    your testimony that this inmate should have been placed on

7    involuntary medication; is that correct?

8    A.        What prisoner are we talking about?

9    Q.        EEE.

10   A.        Did I even discuss EEE in my direct?

11         That's a question to you.  I don't believe I did.

12   Q.        You discussed it in your declaration of September

13   29th which has been admitted.  It's plaintiffs' exhibit.  It

14   is tab number BB in the binder.

15         THE COURT:  The question is whether or not this is

16   proper cross-examination because he didn't discuss it in his

17   direct.  But it appears to me, but I'll listen to counsel if

18   you disagree, that having tendered the exhibit, that is the

19   affidavit, you put everything in the affidavit subject to

20   cross-examination.

21         MR. NOLAN:  Yes, we agree.

22         THE COURT:  All right.  You may proceed, ma'am.

23         That means, Doc, even though you didn't talk about it

24   on direct, it's proper cross-examination.

25         THE WITNESS:  Yes, Your Honor.  Thank you.

381

1    BY MS. VOROUS:

2    Q.      So Doctor, with respect to Prisoner EEE, is it

3    correct that one of your criticisms with respect to care was

4    that this inmate was not placed on involuntary medication?

5           THE COURT:  If you want to look at your affidavit to

6    be sure you know what you said, please feel free to do so,

7    Doctor.

8           THE WITNESS:  Yes.  Do you have a particular part of

9    my -- you're referring to my supplemental declaration.  And

10   can you tell me exactly where you're finding this?

11   BY MS. VOROUS:

12   Q.      Yes.  I spoke in error.  It is actually in your May

13   16th, 2013 declaration, not your supplemental declaration.

14   A.      Okay.

15          MR. NOLAN:  That's AA.

16          MS. VOROUS:  Yes.  AA.

17   BY MS. VOROUS:

18   Q.      Trial Exhibit Number 1013.

19   A.      So my same question exists.  Can you point out to me

20   where you are referring to?

21   Q.      Look at page 4, paragraph 9.

22   A.      Yes.

23   Q.      So Doctor, the question is one of your criticisms

24   with respect to Prisoner EEE was that clinical staff was not

25   moving forward in seeking an order for involuntary

382

1    medication?

2    A.    Yes.

3    Q.    So Doctor, what is your standard for placing an

4    inmate on involuntary medication?

5    A.    It's the standard that's listed in the statute.

6    Q.    What is that?

7    A.    That a person meets the legal standard for grave

8    disability, danger to others or danger to self.

9    Q.    With respect to Prisoner EEE, in paragraph 9 of your

10   May 16th, 2013 declaration, you cite to a section from this

11   prisoner's medical record, a progress note starting on line

12   7.

13         Do you see that?

14   A.    Yes.

15   Q.    You indicate that this patient is known for chronic,

16   moderate paranoid fears, isolated tendencies, and

17   self-neglect.

18         Is that correct?

19   A.    Correct.

20   Q.    In your opinion does that meet the standard for

21   gravely disabled?

22   A.    What it meets is a clinical concern that this

23   individual, who has demonstrated in the past inability to

24   care for himself, even in the prison setting, should be

25   considered for involuntary medications.

383

1      It is not necessarily up to the treating psychiatrist

2  to interpret the law and then say:  Well, he doesn't qualify.

3      It is the responsibility of the treating psychiatrist

4  to put forward this based on data, as we already have, and

5  then let the administrative law judge make the decision.

6      What is happening in San Quentin time and again is

7  that the clinicians are saying:  Let's don't bother with this

8  because I know somehow Dr. Monthei can read the

9  administrative law judge's mind and knows that, in fact, this

10  person doesn't qualify for involuntary medication.

11      He doesn't know that.

12  Q.    So is it your opinion that the information provided

13  in the progress note that you cite in your declaration is

14  sufficient to justify an involuntary medication order for

15  this patient?

16  A.    That, along with his overall history, yes, is part of

17  it.  That should be at least taken into consideration by the

18  clinician to submit a request for involuntary medication and

19  let the judge decide.

20  Q.    So Doctor, right before the break I believe I had

21  asked you to look at tab F, which was our -- is identified as

22  Plaintiffs' Exhibit 1115.

23      THE COURT:  Do we know whether 1115 is in evidence,

24  Madam Clerk?

25      THE CLERK:  I do not have it in evidence.

384

1          THE COURT:  It's not in evidence.

2     BY MS. VOROUS:

3     Q.     Doctor, if you would look at page --

4          THE COURT:  If you're going to ask him questions

5     about the content, you can't do that if it is not in

6     evidence.

7          If you want to move it into evidence, we'll go from

8     there.  It is not in evidence apparently.

9          MS. VOROUS:  Okay.  I'll move these records into

10    evidence.

11         THE COURT:  Ma'am?

12         MS. VOROUS:  Yes, I would like to move them into

13    evidence.

14         THE COURT:  Hearing no objection, it is received.

15              (Whereupon, Plaintiffs' Exhibit 1115 received

16               into evidence.)

17    BY MS. VOROUS:

18    Q.     So Doctor, if you would look at page SQ-FFF-001610.

19    A.     Yes.

20    Q.     Doctor, have you reviewed this medical record -- or

21    did you review this medical record in preparation for today's

22    testimony?

23    A.     Yes.

24    Q.     Is this the record you were referring to earlier when

25    you mentioned that one of the patients had been -- or had

385

1    made comments with respect to Department of State Hospital

2    treatment?

3    A.       Correct.

4    Q.       And under the subjective portion of this progress

5    note, which is dated August 14th, 2013, it states that this

6    particular inmate, which is Inmate FFF, is attributing the

7    change in her mental health condition to her recent DSH visit

8    and Doctors Burton and Weisz as managing her psychiatric

9    medication upon her return to East Block.

10           Is that correct?

11   A.       That's what it says.

12   Q.       Before that it also states that her -- she had

13   indicated that her depression had lifted and anxiety had

14   decreased?

15   A.       Correct.

16   Q.       And that her session ended in good spirits as of that

17   date, correct?

18   A.       Yes.  That's what the note says.

19   Q.       With respect to this patient, would you agree that

20   the care she received in the acute program at the Vacaville

21   Psychiatric Program benefited her?

22   A.       Based on this note, on this particular day, that's

23   what she said.

24   Q.       Also she attributed her change in behavior to the

25   doctors in East Block managing her psychiatric medication

386

1    upon her return, correct?

2    A.      Yes.

3    Q.      Doctor, you also talked about your attempt to

4    interview Prisoner HHH, correct?

5    A.      Correct.

6    Q.      And is it your understanding that at this time he is

7    receiving services through the specialized care plan in one

8    of the ten Outpatient Housing Unit beds?

9    A.      That's my understanding, yes.

10   Q.      At the time that you prepared your initial

11   declaration for the termination motion back in March 2013,

12   had you reviewed any of this prisoner's mental health

13   records?

14   A.      Yes.

15   Q.      You indicated that you had difficulty trying to talk

16   to this patient, correct?

17   A.      Correct.

18   Q.      And that wasn't through your fault, correct?

19   A.      I didn't have difficulty talking with him.  He had

20   difficulty speaking with me.

21   Q.      But you didn't fault yourself for that as a

22   psychiatrist, correct?

23   A.      Well, I don't know about "fault" is the right word.

24   I was unable to really accomplish to the full extent that I

25   would like to an interview with him.  And in that sense, you

387

1  know, I participated in that.  But no, I didn't necessarily

2  fault myself for it.

3  Q.      Wouldn't you agree that in order to conduct an

4  accurate evaluation of that particular inmate that you would

5  need to talk to him, conduct a face-to-face evaluation?

6  A.      Well, I did speak with him.  I did observe him.  I

7  did speak with staff who were aware of his condition, and I

8  reviewed medical records.  So given the restrictions that I

9  had, I thought that was as thorough as I was going to be able

10 to do.

11 Q.      Wouldn't you agree, that at least with respect to

12 this particular inmate, that the clinicians that see him on a

13 regular basis would be in a better position to evaluate his

14 mental healthcare than you would be, for instance, given your

15 limited exposure to him?

16 A.      Not based on what I have observed as the quality of

17 mental healthcare on East Block.  Not necessarily.

18 Q.      Have you reviewed this prisoner's recent medical

19 records?

20 A.      Whatever we have is what I've reviewed.

21 Q.      And were you aware -- or are you aware that in the

22 past this inmate had not been receptive to additional

23 services, instead tending to act out when he was asked to

24 participate?

25 A.      Yes.

388

1   Q.     Would you agree recently he'become more receptive to

2   care in the Outpatient Housing Unit beds?

3   A.     Some of the more recent notes that I reviewed I

4   remember a comment that he's cooperated more with staff, yes.

5   Q.     So Doctor, you testified with respect to Prisoner

6   WWW, in particular the care that he received while he was

7   housed at San Quentin, correct?

8   A.     Correct.

9   Q.     And one of your opinions with respect to this

10   particular prisoner was that you found -- you found it

11   troubling that his level of care was lowered to a CCCMS level

12   after he had self-mutilated himself in 2010?

13   A.     After he blinded himself after sticking pens in his

14   brain, he has placed on CCCMS.  I found that amazing.  I

15   still find that very amazing.

16   Q.     So it is correct then, that based on a single prior

17   incident from prior years, an inmate should always remain at

18   the same level of care despite improvement in their mental

19   health condition?

20   A.     If I could just have a moment.

21         (Brief pause.)

22         What you describe as "a single prior incident" is as

23   horrible an incident as I have encountered in my career, and

24   I've only worked in an acute psychiatric settings with the

25   serious mentally ill.

389

1          I have never known a patient to stick pens in his

2     eyes, blinding himself, and end up sticking the end of the

3     points in the cerebellum.  I never had that.  I never

4     experienced that as a clinician, and I have treated thousands

5     of patients.

6          So what you describe as "a single incident" is

7     probably the most severe example of self-injurious behavior

8     one can do short of killing themselves.  So yes, based on

9     that incident that would dictate his care from that moment

10    on.  And the staff and the people that evaluated his suicide

11    still don't get that point.

12         I'm just at a loss to understand that.

13    Q.    That would be all of his treating clinicians,

14    correct?

15         You're critical of the care that was provided by all

16    his treating clinicians?

17    A.    Ma'am, no one ever sent him to the hospital after

18    that.  After he blinded himself with two pens in his brain

19    they kept him in the MHCB for two days.  You know, that's how

20    long we keep people in the psychiatric general hospital in

21    the emergency room when they scratch their wrist.

22    Q.    How long had it been since his incident before he was

23    placed in the Mental Health Crisis Bed?

24         Could it have been several weeks?

25    A.    Say that again?

390

1    Q.      You were noting that he had been placed in a Mental

2    Health Crisis Bed for two days -- or kept him in a Mental

3    Health Crisis Bed for two days, correct?

4    A.      Correct.

5    Q.      At the time he was placed in the Mental Health Crisis

6    Bed how long had it been since he committed the act of

7    self-mutilation?

8    A.      It had been, I want to say, less than two weeks.  So

9    something in that range.  It wasn't a really long time from

10   the event until he was returned back from Marin General

11   Hospital.

12   Q.      So wouldn't it be reasonable to conclude by the time

13   he returned back from the hospital that his condition had

14   stabilized to the point where he could be seen in an

15   Outpatient Housing Unit with follow-up mental healthcare?

16   A.      No.

17   Q.      Okay.  Doctor, you also discussed -- Strike that.

18          Doctor, you also indicated that you disagreed with

19   the decisions of this inmate's psychiatrist not to admit him

20   to a Mental Health Crisis Bed in early to mid-2012, correct?

21   A.      Yes.  When he stopped eating and drinking and became

22   acutely psychotic, thinking that paranormal activity were

23   controlling his ability to achieve an erection and ejaculate.

24   That was in the chart.  So based on that level of psychotic

25   symptoms, yes, I believe he should have been placed in the

391

Mental Health Crisis Bed.

Q.      So if you would, look at page WWW-000093, this is in
tab J, Plaintiffs' Exhibit 1138.

THE COURT:  Madam Clerk, is that in evidence?

THE CLERK:  1138a.

THE COURT:  Are we talking about the same thing,
Miss Vorous?

MS. VOROUS:  Yes, Your Honor, I believe so.

THE COURT:  All right.

MR. NOLAN:  I believe I misspoke.

THE COURT:  All right.

THE WITNESS:  What page do you want me to refer to,
please?

BY MS. VOROUS:

Q.      000093.

A.      Yes.

Q.      So Doctor, have you reviewed this psychiatric
progress note dated January 25th, 2012?

And I would note it's two pages so it extends on to
000094.

A.      Yes, I have.

Q.      So if you could, look at the second page -- or page 2
of 2 which is 000094.

A.      Yes.

Q.      I believe it is five lines down -- actually, six

392

1   lines down.  Do you see where there's a note that the

2   psychiatrist considered CTC admission?

3   A.      Yes.

4   Q.      And then after that the psychiatrist indicates it

5   is -- in his opinion he's safe to return to East Block for

6   the following reasons.

7           Do you see that?

8   A.      Yes.

9   Q.      And then the psychiatrist goes on to identify a

10  number of reasons why he believed he was safe to return to

11  East Block, correct?

12  A.      Correct.

13  Q.      And the first one is that he denied suicidal ideation

14  or self-injurious ideation, he contracts for safety, he's

15  future oriented, he is now accepting all antipsychotics, he

16  is now agreeing to resume PO intake, he's motivated to

17  address his symptoms versus a mental health treatment, he's

18  compliant with treatment, and he has the support of his

19  brother who is housed next to him.

20          Do you see that?

21  A.      Yes.

22  Q.      Is it your opinion that those factors were not

23  sufficient to support a determination that this inmate should

24  not go to a Mental Health Crisis Bed?

25  A.      I stand by my earlier testimony, that -- see, it is

393

1    very difficult for me to talk about this because the whole

2    chart is so illogical and irrational.  Okay.

3            This is a guy that stuck pens in his brain.  That

4    determines -- that should determine what goes on from that

5    point on.

6            So he says that he doesn't have any self-injurious

7    behavior.  Look at his history.  Look at his previous suicide

8    ideation.  Look at his psychotic symptoms.

9            And then we see this here.  Okay.  So the clinician

10   knows the right words to put in the chart.  Okay.  But the

11   only reason that this gentleman didn't kill himself the day

12   after, the moment after this chart entry, was pure luck.  It

13   had nothing to do with clinical intervention.  Okay.

14           That's what was going on with this guy.  I can't -- I

15   don't know.  It's like I'm speaking a different language.

16           When we have this severity of illness in this man

17   that does determine what you do with him from that point on.

18           If this man had never done that act of blinding

19   himself, then you look at this chart and say:  Okay.  Yeah.

20   He's looking pretty good.  Not doing anything.

21           But that's not the case.

22   Q.      Again, that was something that happened two years

23   previously, correct?

24           You're referring back to the incident that happened

25   in January of 2010?

394

1   A.      Okay.  But not just an incident.  Okay.  Let's be
2   real clear.  See, that is not just an incident.
3   Q.      I understand.  I understand what occurred in January
4   2010?
5   A.      Well, do you really?  Because this man blinded
6   himself by sticking two pens into his brain.  Now you're
7   saying he's okay to be housed on East Block.
8           That's what you are saying.
9           The guy with psychotic symptoms, suicide ideation and
10  the man who blinded himself two years ago is now safe to be
11  housed in this horrible outpatient setting where he has
12  minimal supervision.
13          Okay.  That's what you are saying by that.  By that
14  question that's what you're implying.  That's not the case.
15  Q.      So again, you disagree with the clinical decisions
16  that were made by the treating providers for this inmate,
17  correct?
18  A.      Yes, I do.
19  Q.      And you were not his treating provider?
20  A.      I was not his treating provider.
21  Q.      Were you aware that he was seen the following day?
22          Again, referring back to the note of January 25th,
23  2012, are you aware he was seen the day after that by a
24  psychiatrist for follow-up care?
25  A.      I was not.

395

1   Q.      Doctor, you've also discussed two overdoses by Inmate

2   WWW that occurred later on in the year in 2012, correct?

3   A.      Yes.

4   Q.      Isn't it true with respect to both of those overdoses

5   that the inmate denied any intent to kill himself?

6   A.      Well, in the second one he initially did not, but

7   eventually he changed his mind.

8           So what?

9           So what if he denies it?

10          The clinician -- is the clinician then also going to

11  take his word when he says paranormal activities are

12  controlling his genitals and that he's supposed to understand

13  that's the facts also?

14          So when a person does two separate overdoses on

15  illicitly obtained opiates while on death row, and then the

16  person denies suicidal ideation, and you're saying the

17  clinician should believe that?

18  Q.      Are you aware this inmate had a drug problem?

19  A.      Regardless of his drug problem, he could have died

20  those two particular times.  And now you are telling me that

21  the clinician should believe him when he says that I'm not

22  suicidal.

23  Q.      Doctor, you also talked about, I believe it was, a

24  record or something you read with respect to comments that

25  were made by this prisoner in March 2013 to the effect, that,

396

1    you know:  Life on the East Block was never good.

2         Correct?

3    A.     My life is horrible.  Words to that effect.  It is

4    terrible.  I always feel terrible.  Why do you ask me?  I

5    don't want to talk about it any more.

6         Something like that, yes.

7    Q.     Isn't it reasonable to conclude that life on death

8    row is never good?

9    A.     If you would listen to my direct testimony this

10   morning, I said that.  And if any other inmate, without his

11   history, said that life on East Block is terrible, I would

12   say, yeah, you're right, I agree with you.

13        Not a person who has by that time had three serious

14   self-injurious behaviors, had extensive psychotic symptoms

15   that were well-documented for which he was treated with

16   antipsychotic medication.

17        So this gentleman saying that statement is not the

18   same as a non-mentally ill inmate who is housed on East

19   Block.  That's the point that I made this morning.

20   Q.     But you also criticized staff's use of a contract

21   with this particular inmate while he was in EOP care.

22        Is that accurate?

23   A.     After his second opiate overdose, within a month or

24   so of each other, rather than doing the clinically

25   appropriate thing, which would have been to send him to

397

1    higher levels of care, or at a minimum -- at a minimum

2    maintain him in the MHCB where he could have 24 hour nursing

3    observation, they entered into a contract with him.

4         How is that good psychiatric care?

5    Q.    Isn't it true that a treatment contract is a useful

6    tool?

7    A.    After a person has three times tried to kill

8    themselves, a person who has documented psychotic symptoms.

9    Come on.  You're trying to -- you are making examples that

10   don't apply to this particular case.

11   Q.    Again, you're talking about a particular case,

12   correct?

13   A.    I'm talking about this particular case, which is

14   illustrative in my experience of the care that people get

15   certainly on East Block, and also what I found that was

16   getting one patient in the Carson Unit.

17   Q.    And that's, again, based on your opinions with

18   respect to the seven inmates that were receiving services

19   under the specialized care program, this particular suicide

20   and the one inmate you found in the Carson Unit, correct?

21   A.    Yes.

22   Q.    Doctor, if you would, look at tab T in the binder.

23   This is Plaintiffs' Exhibit Number 1082.

24   A.    Yes.

25         THE COURT:  Is that in evidence, Madam Clerk?

398

```
 1              THE CLERK:  Yes, it is.

 2              THE COURT:  All right.

 3    BY MS. VOROUS:

 4    Q.      Doctor, you indicated that you reviewed the suicide

 5    report for Prisoner WWW, correct?

 6    A.      Correct.

 7    Q.      That's what this document reflects; is that correct?

 8    A.      Yes.

 9    Q.      If you would, look at page 18 of the suicide report.

10            Have you found that?

11    A.      Yes.

12    Q.      Under the recommendation it indicates that, quote:

13            (Reading:)

14            The staff at San Quentin State Prison is to be

15            commended for their actions in the following areas

16            which meet or exceeded program guidelines.

17            (Reading concluded.)

18    A.      I see that.

19    Q.      Underneath that there is a reference with respect to

20    mental health, and in that reference it states:

21            (Reading:)

22            His primary clinician, psychiatrist and PCP worked

23            well together to develop an integrated treatment plan

24            to address not only the inmate's psychological and

25            psychiatric needs, but also his physical needs.
```

399

1              (Reading concluded.)

2              Correct?

3      A.      That's what it says.

4      Q.      (Reading:)

5              Since much of the inmate's pathology was centered on

6              somatic complaints, communication between the

7              providers ensured the inmate's evolved as a

8              collaboration of the disciplines to the inmate's

9              benefit.

10             (Reading concluded.)

11             Correct?

12     A.      That's what it says.

13     Q.      So you disagree not only with his treating providers,

14     but you disagree with the CDCR headquarter's review of the

15     suicide, correct?

16     A.      As I testified earlier, I cannot disagree more

17     strongly with this recommendation because the man killed

18     himself.

19             If he's having such great coordinated care among all

20     these people, why didn't somebody pick up on this?

21             Why didn't somebody bother to send him to the

22     hospital when me needed it many times along the way?

23             Why didn't anyone note that he occasionally agrees to

24     make meds, then decides not to take them?

25             Why wasn't that flagged in the chart to say at that

400

1    point:  Colleagues, since we are working so well together, we

2    should apply for an involuntary medication order because we

3    know this person's pattern.  We know he's suicidal in the

4    past, psychotic now, and has been three serious episodes of

5    self-harm.

6           Why isn't that mentioned here?

7    Q.     Wouldn't you agree that in order to apply for an

8    involuntary medication there has to be current evidence of

9    grave disability?

10   A.     That's one of the factors in the statute.

11   Q.     And the other two are danger to self --

12   A.     Danger to self, yes.

13   Q.     It has to be current, correct?

14   A.     It has to be danger to self, yes.  I haven't

15   memorized the statute.  But those are the three categories.

16   Q.     So is it your understanding that there is no

17   requirement that there be a finding or determination by a

18   treating clinician that the danger to self has to be a

19   current danger?

20   A.     He was a danger to self at all times.  He was a

21   danger to himself at all times.  And the staff didn't

22   appreciate that.  So yes.  If the statute required a current

23   danger to self, then in my estimation he met the standard.

24          I would have put forward an involuntary medication

25   order when he started to refuse antipsychotic medication and

401

1  left it up to the administrative law judge to interpret the

2  law.  I would have appropriately presented the clinical

3  situation.

4        Psychiatrists are not versed in law.  Psychologists

5  are not versed in law.  They should put this forward and let

6  the judge make the decision.

7        If that would have happened, and the judge would have

8  found he didn't qualify for involuntary medications, then I

9  would have no point to argue with you on this.

10       But it never happened.  They never bothered to put it

11  forward to let someone else make the decision.

12 Q.     Doctor, isn't it your opinion that there are no good

13 mental health programs in prisons in the United States?

14 A.     No.  I don't believe that is my opinion.  I don't

15 think I have ever stated that opinion.

16 Q.     In March of this year you had your deposition taken

17 in this case, correct?

18 A.     Yes.

19 Q.     And at that time you were asked the question:

20        (Reading:)

21        What, in your opinion, is the best mental health

22        program in a prison in the US?

23        (Reading concluded.)

24        Do you recall that?

25 A.     Vaguely.

402

```
 1    Q.      And your answer was, quote:

 2            (Reading:)

 3            I'm not aware of there being a best program.  It

 4            would be the least bad.  In my experience of contacts

 5            around the country, I'm not aware of one that is much

 6            better than the other.

 7            (Reading concluded.)

 8            Do you recall that testimony?

 9    A.      I do after you reminded me, yes.

10    Q.      So the next question was:

11            (Reading:)

12            So no good ones.

13            Your response was:

14            Not that I'm aware of.

15            (Reading concluded.)

16            Correct?

17    A.      In my experience I stand by that testimony, yes.

18    Q.      Doctor, I would like to switch gears for a moment and

19    talk about the VPP Acute Program, the program at the

20    Vacaville Psychiatric -- the Vacaville Psychiatric Program at

21    the California Medical Facility?

22    A.      Yes.

23    Q.      It is correct that your opinions with respect to the

24    acute program for condemned are based on Miss Bachman's

25    deposition testimony?
```

403

1    A.        And the policy and procedure that describes what

2    treatment services are available.  It actually doesn't

3    describe what treatment services are available.  It dictates

4    that all condemned at the acute psychiatric at CMF will be

5    treated on an individual basis and not participate in any

6    group activities.

7    Q.        It is correct that you have not visited the program;

8    isn't that correct?

9    A.        Not -- not in the last few months, no.

10   Q.        When's the last time that you visited the acute

11   program at CMF run that is by the Department of State

12   Hospitals?

13   A.        It was for the overcrowding litigation back in 2008.

14   Q.        Have you ever looked at -- Strike that.

15             It's correct that you're familiar with the policy

16   that relates to custodial restrictions, but you're not

17   familiar with the actual treatment provided to the condemned

18   inmates in the acute program, correct?

19   A.        Well, I think the policy and procedure lays out

20   exactly what they're available to get.

21   Q.        It is also correct that you haven't talked to any of

22   the treating clinicians -- or the clinicians that are

23   treating the condemned at the Vacaville Psychiatric Program?

24   A.        That's correct.

25   Q.        And also that you have no familiarity with the goals

404

1   of the program for the condemned?

2   A.      In the policy and procedure it was stated that these

3   condemned prisoners would come to the APP, and as rapidly as

4   possible be returned back to San Quentin.  Words to that

5   effect, which was the stated goal of the program.

6   Q.      Doctor, if you would look at tab BB in your binder,

7   which is your September 27th, 2013 declaration.

8   A.      Yes.

9   Q.      That's Trial Exhibit 1014.

10          The last two pages of your declaration you reference

11  a policy with respect to housing and treatment of condemned

12  inmate-patients.

13          Is this the policy you're talking about?

14  A.      Can you tell me exactly where you're referring?

15  Q.      It's page 97 and 98.  It's at the very last tab in

16  your binder, BB.  I think you need to keep going.

17  A.      No.  I'm looking at it.

18          Can you tell me what the page number on the bottom of

19  the declaration is because I'm looking at page 20, 21.

20  Q.      It's the last two pages of the court's filing.  It is

21  not identified as a page of your actual declaration.  It is

22  an exhibit to your declaration.

23  A.      Okay.  What page is that again?

24          I'm sorry.

25  Q.      Page 97 and 98.

405

1    A.    Yes.

2    Q.    Is this the policy that you were just referring to in

3    your testimony?

4    A.    Yes.

5    Q.    Can you show me where in this policy it states that

6    the goal of the program is to return the patients to, I

7    believe you said, San Quentin, or return them back as soon as

8    possible?

9    A.    That's why I said "words to the effect."

10         It is the first paragraph where it says:

11         (Reading:)

12         It is the policy of the acute program to provide

13         treatment to condemned inmates on a referral basis.

14         Due to the increased security necessary, the

15         treatment will be provided individually and the

16         patient will be evaluated daily regarding psychiatric

17         condition and readiness to return to the California

18         State Prison at San Quentin.

19         (Reading concluded.)

20   Q.    Isn't it a reasonable goal to treat someone to the

21   point where they are stabilized and can return to their

22   sending institution?

23   A.    Yes.

24   Q.    Doctor, you discussed in your direct testimony your

25   experience at San Francisco General Hospital with respect

406

1    to -- I think you referred to it as "tie down procedures,"

2    procedures when an inmate needed to be extracted?

3    A.    Yes.  Seclusion and restraint, yes.

4    Q.    Do you consider that as a use of force contact?

5    A.    Well, I don't know technically if it qualifies for

6    use of force, but it was forcing the inmate, these patients,

7    to do things they wouldn't necessarily have done.  So in that

8    sense I guess it is use of force.

9    Q.    Were those incidents ever videotaped?

10    A.    No.

11    Q.    Were they ever reviewed by another body to verify the

12    appropriateness of the actions taken?

13    A.    After every one of these procedures, the staff would

14    meet and we would review it.

15    Q.    Any outside review by another body?

16    A.    No.

17    Q.    Doctor, take you back briefly to Inmate E, which was

18    the inmate that you interviewed at San Quentin who was housed

19    in the Carson Unit and you talked about his cell extraction

20    in November 2012?

21    A.    Yes.

22    Q.    You also testified, I believe, that it was your

23    opinion that things would have gone very differently if this

24    inmate had been under an involuntary medication order at the

25    time of his extraction.

407

1          Is that accurate?

2    A.      Well, I think I said something to effect that if he

3    would have been properly treated prior to the extraction,

4    that the extraction, one, may not have been necessary, and

5    two, it may have gone -- the extraction itself could have

6    gone very differently.

7    Q.      Would that treatment have included involuntary

8    medication in your opinion?

9    A.      Yes.

10   Q.      You have no way of knowing if it would have gone

11   differently if he had been involuntarily medicated, correct?

12   A.      I have a very good idea it would, yes.

13   Q.      Do you know whether this particular inmate is still

14   being extracted from his cell for refusing to receive mental

15   health treatment or medications?

16   A.      The last clinical note that I reviewed regarding his

17   care said he was cooperating with staff and taking his meds.

18          MS. VOROUS:  No further questions.

19          Thank you, Doctor.

20          THE COURT:  Redirect?

21                    REDIRECT EXAMINATION

22   BY MR. NOLAN:

23   Q.      So I have a few quick questions.

24          So Doctor, Miss Vorous had you look at a record

25   that's behind tab J which was Exhibit 1138a or 1138.

408

```
 1   A.       Yes.

 2   Q.       And she had you read a treatment note by, I think,

 3   Dr. Burton, from -- there was a WWW-0094 explaining the

 4   reasons that CTC admission was considered and then rejected

 5   by the doctor.

 6            So I just wanted you to look at the first page of

 7   that, which is at WWW-093, and note the date and time.  So

 8   that would be about 3:17 on the 25th?

 9   A.       Correct.

10   Q.       So if you look at the prior page -- I'm sorry -- a

11   slightly later page, which is WWW-00095, there's a note from

12   his case manager, it looks like Dr. Murthy, that is about an

13   hour earlier.

14            Is that correct?

15   A.       Correct.

16   Q.       Could you just read the first half of that page?

17   A.       (Reading:)

18            Inmate seen for one-to-one.  Initially seen cell

19            front to see if he wanted to attend office session,

20            and he and his brother reported that he has been

21            distraught.  He subsequently became tearful and

22            agitated.  Stated he has been having problems with

23            spirits that won't leave him alone.  Requested help,

24            medication, anything that can help him feel better.

25            He was subsequently escorted to a holding cell and
```

409

1          seen by Dr. Burton.  During this interview he

2          revealed that he felt that he has been possessed by

3          ghosts, spirits of the dead, spirits of the unborn

4          for about one month.  He further indicated that this

5          happened previously about a year ago, and that was

6          the reason why he blinded himself with pen fillers

7          about one year ago.  He reported that he has been

8          fasting for the past three weeks to prove to the

9          spirits that he is willful so that they will leave

10          him alone.

11          (Reading concluded.)

12          Continue?

13     Q.     Maybe just one more sentence.

14     A.     (Reading:)

15          He indicated he ate only a small amount of peanut

16          butter for one week, then he ate only apples for the

17          next week.  Then this week he has eaten nothing and

18          is taken no fluid for three days and has not eaten

19          for six days total.

20          (Reading concluded.)

21     Q.     So does that clinical description support your

22     opinion that he should have been admitted to the Mental

23     Health Crisis Bed at this time?

24     A.     I think that's pretty clear evidence.  And also the

25     fact that he met criteria for grave disability probably.

410

1  Q.      Another thing Miss Vorous asked you about was whether

2  patients have the right to refuse treatment.

3  A.      Yes.

4  Q.      I believe you responded that they do.

5  A.      Yes, they do.

6  Q.      I just wanted to ask you, isn't resistance to

7  treatment often a focus of the treatment itself?

8  A.      Well, it is.  Again, I think, as I mentioned to her

9  earlier question, is that one of the larger tasks of a mental

10 health professional is to engage people in treatment.

11         But, you know, I just might add that yes, people can

12 refuse treatment if it is an informed decision.  But if, as

13 you very clearly note in this particular clinical

14 observation, that he's talking about spirits of the undead

15 and ghosts that are controlling him, if those psychotic

16 reasons are the basis for refusing treatment, then that's not

17 an informed refusal and clinical staff needs to take that

18 into consideration and act appropriately.

19 Q.      Doctor, Miss Vorous also asked you about Prisoner CCC

20 and some of the treatment plans.  She had you review a

21 treatment plan at CCC-410, I believe, or maybe it was at 404

22 with some positive language.

23         When you reviewed the treatment plans from

24 San Quentin, did you encounter stock language sometimes?

25 A.      Yes.  I refer to it as boilerplate language.

411

1   Q.      And just, I believe, around the same date, so that

2   treatment plan was from 8-29, I believe, at CCC-404, and I

3   just wanted to call your attention to a treatment note from

4   the day before which is at CCC-00410.

5           I'm sorry.  Excuse me.

6           My apologies.  That is at Exhibit 1119, tab C.

7           Could you just read what looks like a case manager

8   note in the very last sentence under the section that starts

9   with "O," I guess for objective?

10  A.      (Reading:)

11          Email sent out to team to clarify others' perceptions

12          and discuss making a plan to move forward as there is

13          concern that inmate-patient may be cheeking

14          medications.

15          (Reading concluded.)

16  Q.      Then also the first line in the section under "A".

17  A.      (Reading:)

18          Schizophrenia, paranoid-type with history of

19          catatonic features, has been more psychotic over past

20          month and today is withdrawn and detached.

21          (Reading concluded.)

22  Q.      Then lastly at tab D, Exhibit 1121, I just wanted to

23  show again a case manager note for Prisoner DDD from around

24  the same time as the treatment plan that Miss Vorous was

25  showing you for him.  That is DDD-001775.

412

1    A.       Say that number again, please.

2    Q.       SQ-DDD-1775.

3    A.       Yes.

4    Q.       If you could just read the paragraph -- the first

5    paragraph of this.  This says this was cell front.  I don't

6    know if it was a case manager or a different clinician.

7    A.       Where do want me to begin?

8    Q.       "No change..."

9    A.       (Reading:)

10            No change in symptom presentation, catatonic

11            symptoms, flat affect, mutism, stiff body posture,

12            poor eye contact.

13            (Reading concluded.)

14   Q.       So does that sound like Prisoner DDD when you met

15   with him in February?

16   A.       That's a pretty good description of how I encountered

17   him on February 26.

18            MR. NOLAN:  Thank you.

19            No further questions, Your Honor.

20            MS. VOROUS:  No further questions.

21            THE COURT:  May the witness be released?

22            MR. NOLAN:  Yes.

23            THE COURT:  Miss Vorous?

24            MS. VOROUS:  Yes, Your Honor.

25            THE COURT:  You're released, sir.  You are free to go

413

1  or stay, as you choose.

2          THE COURT:  I'm almost afraid to ask.  Do you have

3  another witness you're ready to go with now?

4          MR. BIEN:  Your Honor, the plan was for defendants to

5  call a witness now out of order because he was available

6  today.  I'm not sure where we are.

7          MS. VOROUS:  Yes.  We can go ahead and start today.

8          THE COURT:  All right.

9          MR. BIEN:  Your Honor, can I take a moment to ask

10  Miss Vorous something?

11          (Counsel confer.)

12          THE COURT:  Cathie just said that given the fact

13  she's the only person reporting today, and she wants to get

14  it out so you have it by tomorrow, we ought to stop right

15  now.

16          I think that's a good suggestion for other reasons.

17  We'll resume tomorrow morning at?

18          THE CLERK:  9:15.

19          THE COURT:  9:30.

20          THE CLERK:  9:30.

21          (Off the record at 4:10 p.m.)

22                          ---o0o---

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
   STATE OF CALIFORNIA  )
4  COUNTY OF SACRAMENTO )

5


6
        I certify that the foregoing is a correct transcript
7
   from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.
11

12

13     /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25