1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12    _____/

13

14

15                          ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                THURSDAY, OCTOBER 17TH, 2013

20

21                          ---o0o---

22

23

24

     Reported by:  DIANE J. SHEPARD, CSR. No. 6331, RPR
25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                          APPEARANCES

 2                          ---o0o---

 3    FOR THE PLAINTIFFS:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5           SAN FRANCISCO, CALIFORNIA  94104

 6           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7           BY:  LORI RIFKIN, ATTORNEY AT LAW

 8

 9           K&L GATES LLP
              4 EMBARCADERO CENTER, SUITE 1200
10           SAN FRANCISCO, CALIFORNIA  94111

11           BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

12           BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

13

14    FOR THE DEFENDANTS:

15            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
16            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
17
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
20
              BY:  JESSICA S. KIM, DEPUTY ATTORNEY GENERAL
21

22                          ---o0o---

23

24

25
```

1                         EXAMINATION INDEX

2                              ---o0o---

3     FOR THE PLAINTIFFS:

4          EXAMINATION:                                    PAGE

5

6       ELDON VAIL (Previously Sworn)

7          Cont'd Direct Exam. by Mr. Bornstein        414
           Cross-Examination by Mr. Russell            503
8

9

10

11

12

13                             ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

---o0o---

PLAINTIFFS'
EXHIBIT NO               DESCRIPTION                EVD

| EXHIBIT NO | DESCRIPTION | EVD |
|---|---|---|
| 4a | Inmate B Incident Rpt. | 502 |
| 4b | Inmate B IERC Rpt. | 502 |
| 4c | Inmate B RVR Materials | 502 |
| 4d | Inmate B Med. Records | 502 |
| 8 | Inmate I Records | 459 |
| 9 | Inmate I Cell Extrac. Video | 495 |
| 12 | Inmate F Records | 462 |
| 13 | Inmate F Cell Extrac. Video | 462 |
| 18 | Inmate D Records | 452 |
| 19 | Inmate D Cell Extrac. Video | 456 |
| 20 | Inmate J Records | 490 |
| 23c1 | Inmate C RVR | 474 |
| 23c2 | Inmate C RVR | 474 |
| 23d | Inmate C Med. Records | 474 |
| 25 | Inmate L Records | 444 |
| 43 | Inmate BB Records | 482 |
| 54 | CDCR Mental Health Ass. Form | 466 |
| 112 | Expert Dec. of Vail | 489 |
| 118 | CDCR Memo Re: Use of Chems. | 445 |
| 124 | Expert Dec. of Vail | 489 |
| 180 | Expert Dec. of Vail | 489 |

---o0o---

1                              EXHIBIT INDEX

2                                ---o0o---

3

4    DEFENDANTS'
     EXHIBIT NO              DESCRIPTION                    EVD

5

6      C                    Minutes Re: Rules
                            Classification Committee
7                           For Inmate C                   510

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2                  THURSDAY, OCTOBER 17, 2013

3                        ---oOo---

4          MR. BORNSTEIN:  Good morning, Your Honor.

5          THE COURT:  Counsel, remind me of your name, please.

6          MR. BORNSTEIN:  Yes.  Jeff Bornstein.

7          THE COURT:  Spell it.

8          MR. BORNSTEIN:  B-o-r-n-s-t-e-i-n.

9          THE COURT:  I remind you you are still under oath,

10    sir.  You may proceed.

11                        ELDON VAIL,

12    a witness called by the Plaintiff, having been previously sworn

13    by the Clerk to tell the truth, the whole truth, and nothing

14    but the truth, testified as follows:

15                  DIRECT EXAMINATION (CONT'D)

16    BY MR. BORNSTEIN:

17    Q.        Mr. Vail, when we left off earlier this month we had

18    just watched three videos of cell extractions of seriously

19    mentally ill patients at three different California prisons,

20    right?

21    A.        Correct.

22    Q.        And just so we're clear, Inmate A was from Corcoran,

23    and that was a July 2012 extraction?

24    A.        It was.

25    Q.        Inmate B was from Kern Valley, again in July 2012?

```
 1    A.         Yes.

 2    Q.         And then Inmate E, which is the third video we

 3    watched, was from San Quentin, and that was in November of

 4    2012?

 5    A.         That's correct.

 6    Q.         I want to focus your attention first on Inmate E's

 7    cell extraction.

 8    A.         Okay.

 9    Q.         From the video were you able to hear comments made by

10    custody staff to the camera?

11    A.         Yes.  Several.

12    Q.         And was there any comments that you heard that you

13    found to be disturbing?

14    A.         At one point --

15               MR. RUSSELL:  Objection, Your Honor.  The video

16    speaks for itself.

17               THE COURT:  You may be seated.  You may proceed, sir.

18               THE WITNESS:  At one point you can hear one of the

19    officers say "f'ing pussy."

20    Q.         BY MR. BORNSTEIN:  And what was the context of that

21    statement?

22               MR. RUSSELL:  Objection, Your Honor.  Calls for

23    speculation.

24               THE COURT:  Overruled.  You may answer.

25               THE WITNESS:  The time when it occurred was shortly
```

1    after the staff had gone into the cell to extract the inmate.

2    The situation was beginning to wind down.

3    Q.        BY MR. BORNSTEIN:  From your experience and expertise

4    as a corrections department administrator, are comments like

5    that things that would be of concern?

6    A.        They are completely unacceptable.

7    Q.        And have you had the opportunity to review the

8    Institutional Executive Review Committee's report about this

9    particular incident?

10   A.        I have.

11            MR. BORNSTEIN:  Your Honor, if it is not in evidence,

12   I'm moving into evidence Exhibit 10-A, which is the incident

13   report; 10-B, which is the IERC materials.  I think that's all

14   we have for this particular incident.

15            THE COURT:  Madam Clerk.

16            THE CLERK:  I have that admitted, Judge.  It was

17   admitted.

18            THE COURT:  They are admitted already, sir.

19   Q.        By MR. BORNSTEIN:  I'm going to direct your attention

20   please to Exhibit 10-B, which is the IERC reports, and it's the

21   eighth page in.

22   A.        I'm there.

23            THE COURT:  Excuse me.  What is IERC?

24   Q.        By MR. BORNSTEIN:  What does that stand for?

25   A.        That's the Institutional Executive Review Committee.

1    Q.        And could you briefly describe for us your

2    understanding of what's involved in the review done by the IERC

3    process?

4    A.        They take a look at all the reports generated by a

5    use of force event.  And it's the highest level of review in

6    the institution.  The committee is usually chaired either by

7    the warden or the deputy warden.

8    Q.        Is it an investigation?

9    A.        No.

10   Q.        With respect to page eight, which is the first page

11   of the actual report from the warden's committee -- is that

12   right, the IERC?

13   A.        Correct.

14             MR. BORNSTEIN:  Your Honor, I've redacted this, and I

15   would like to show the redacted version.

16             THE COURT:  You may.

17   Q.        BY MR. BORNSTEIN:  There is a series of questions and

18   answers that are on these forms, right?

19   A.        Yes, that's correct.

20   Q.        And you've reviewed those forms, to the extent that

21   we were provided them, for many incidents, right?

22   A.        I have.

23   Q.        Certainly all of the videos that you were able to

24   watch?

25   A.        When they were available.

1    Q.        Right.  When they were available.

2    A.        Yes.

3    Q.        And how many videos of cell extractions were you able

4    to review?

5    A.        Well, there's 17 different events.  I think three of

6    them have two events within that overall incident.  And then in

7    a couple of cases there's two cameras because there's two

8    inmates in the cell.  But 17 is probably the useful number.

9    Q.        And of those 17, were the majority of them related to

10   either involuntary medication or the need to transfer someone

11   for mental health services at a different unit or higher level

12   of care?

13   A.        By my count about ten of them were.

14   Q.        Now, in any of these IERC reviews, the warden

15   committee reviews -- and let's just talk about the first three

16   videos that we showed in court -- was there any criticism about

17   the use -- the amount of spray that was used on these inmates?

18   A.        No, there was not.

19   Q.        Was there any criticism of the tactics that were

20   used?

21   A.        No.

22   Q.        Was there any discussion about whether there might

23   have been a different approach that could have or should have

24   been considered rather than the approach that the custody staff

25   took?

1    A.        No.  And I think that's a glaring omission.

2    Q.        Why?

3    A.        Because you don't learn from your own behavior.  I

4    mean by definition use of force represents oftentimes some kind

5    of failure in your management of a population especially a

6    mental health population.  So the goal of a review should be to

7    try to figure out how you get better next time around.  And

8    there is absolutely no energy put into that in the IERC

9    process.

10    Q.        When you say no energy, was there even any discussion

11    of it ever in any of these reports from any incidents that

12    you've reviewed?

13    A.        In one of the incidents at the manager's level --

14    because, like I said, they are looking at chain of command

15    documents all the way through until it gets to the

16    superintendent's level -- at one of those, the second level

17    manager review did question whether or not spray was necessary,

18    but it didn't make the final summary of the IERC report.  So my

19    answer would be no.

20    Q.        Were any of the incidents of the 17 -- well, let's

21    take the three.  Let's take the three that we showed in court.

22              First, were any of those referred to the Office of

23    Internal Affairs for an investigation to your knowledge?

24    A.        Not to my knowledge, no.

25    Q.        Were any of the 17 incidents referred to the Office

1    of Internal Affairs for an investigation to your knowledge?

2    A.        Not to my knowledge.  And there's actually a part on

3    this form where if they were referred from this committee, it

4    would have been indicated.

5    Q.        Now, I've blown up a portion of the document, and I

6    hope it's legible.

7              The first question asks:  What steps were taken to

8    avoid the need for the use of force or to minimize the amount

9    of force used, right?

10   A.        Correct.

11   Q.        And here, of course, the form describes:  That Inmate

12   E was given orders to come to the cell port to the handcuffed.

13   He disobeyed the orders and was given a cooling-down period of

14   close to one hour.  At each stage of the extraction, including

15   the reading of the admonishment, he was ordered to come to the

16   cell port without complying with orders.  He clearly stated on

17   tape that he refused to be cuffed.  Right?

18   A.        That's what it says.

19   Q.        Under California's use of force policies and

20   procedures, does an inmate -- a seriously mentally ill inmate

21   who is in his cell, who is not at that time causing harm to

22   himself or others, who refuses to be cuffed up, does that then

23   justify them using force in their policies?

24   A.        Well, in their practice.  Not in my opinion.

25   Q.        Why not, in your opinion?

1    A.        Well, they haven't exhausted the alternatives.  They

2    haven't looked at, in this case particularly, what the behavior

3    of the inmate was and where he was being housed.

4    Q.        Okay.  Can you explain a little bit more what you

5    mean by where he was being housed?

6    A.        He was in an older cell block in San Quentin where

7    you've got pretty open -- well, you do have open-bar cells.  So

8    that the ventilation or the impact of the spray in a unit like

9    that is going to travel to the cells next door.  He was on the

10   bottom floor.  It's going to move up.  So not only are you

11   going to be creating pain for this inmate, you're going to have

12   it impact on the other inmates, which is going to make that

13   unit more difficult to run.

14   Q.        And could you see that evidence of that impact on

15   others on the videotape?

16   A.        You could hear an awful lot of coughing, which I

17   presume some of that came from the inmates in the cell next

18   door or up above.

19   Q.        Could you also see vapors from the spray kind of

20   going through the cell?

21   A.        You could.  And you could also hear some inmates

22   yelling to wrap it up because they were being impacted.

23   Q.        I want to talk about the California's definition of

24   reasonable force, which is stated here, the need -- state the

25   need for the application of force.  Okay?

1      A.        Okay.

2      Q.        And it says, reasonable force, the force that an

3      objective, trained and competent correctional employee, faced

4      with similar facts and circumstances, would consider necessary

5      and reasonable to subdue an attacker, overcome resistance,

6      affect custody, or gain compliance with a lawful order.

7               Do you -- using that definition, was the force that

8      was used in extracting Inmate E reasonable?

9      A.        I think I'm objective.  I think -- I know I've been

10     trained.  And I believe I'm competent.  And looking at the

11     facts and circumstances in this case, absolutely not.

12     Q.        And is the same true for the other two videos that we

13     showed in court?

14     A.        It is.

15     Q.        In the tapes that we watched and in the reports that

16     we've read, inmates are repeatedly -- the justification, as it

17     is here, for using force is their failure to comply with an

18     order, right?

19     A.        Yes.

20     Q.        In this case, cuffing up so that, you know, moving

21     back and cuffing up, and so that they can then be searched and

22     then taken out of their cells, right?

23     A.        Right.

24     Q.        And isn't it true that unless California changes it's

25     definition of reasonable force, that they have decided that

1      using lots of spray is reasonable?

2                MR. RUSSELL:  Objection, Your Honor.  Mr. Bornstein's

3      testimony is interesting, but this is all leading.

4                MR. BORNSTEIN:  I'll rephrase it, Your Honor.

5                THE COURT:  The objection is well-taken.

6      Q.        BY MR. BORNSTEIN:  Thank you.

7                Do you have an opinion as to whether California

8      abuses pepper spray in the way in which it extracts mentally

9      ill inmates?

10     A.        It is their preferred method of use of force in

11     general, and the amounts and the lack of time that they take

12     between applications is extremely excessive for any inmate let

13     alone a mentally ill inmate.

14     Q.        I want to turn to the second page of the IERC

15     document.  And I would like to display a portion of it, Your

16     Honor.  Again, it's redacted.

17               One of the questions that's asked is, state the

18     extent of any inmate injury suffered as a result of the use of

19     force, correct?

20     A.        Yes.

21     Q.        What does it say in this case?

22     A.        Inmate E was only exposed to OC chemical agents,

23     which isn't considered an injury.

24     Q.        And is that, in fact, consistent with all of the

25     reports that you've seen that California does not consider

```
1   exposure to OC chemical agents as being an injury or harm?

2   A.        It's very consistent.

3   Q.        Do you agree with that?

4   A.        No.  Not at all.

5   Q.        Why not?

6   A.        Well, I think the last time I was up here I talked a

7   little bit about the effects of OC on the individual, including

8   the amount of time that it can take before that pain goes away.

9             I was also here for Dr. Kaufman's testimony, and I

10  read his declarations, which is very consistent with what I

11  have been told, working with mental health professionals

12  throughout the years, about the impact of pepper spray on a

13  decompensating inmate.  That it can interact with their mental

14  illness in such a way to make their mental illness worse.

15  Q.        In any of the IERC reports that you read, where

16  pepper spray only was used as part of the force, was there ever

17  any discussion about possible injury or harm to the mentally

18  ill inmates who were sprayed?

19  A.        No, there wasn't.

20  Q.        So unless there's physical injury like a cut on a

21  wrist, or a bruise of some fashion, or you know --

22            THE COURT:  Sir, just ask a question.

23  Q.        BY MR. BORNSTEIN:  Sorry.

24            Unless there is a physical injury, have you seen any

25  indication of pepper spray being involved in any discussion
```

1        about possible harm?

2        A.        Sometimes on the medical reports, which can be

3        attached to the IERC, there will be mention of reddening of the

4        skin as a result of the OC spray, but otherwise no.

5        Q.        At the bottom of this particular IERC report there

6        are series of questions.  The first being whether staff's

7        actions following the use of force were in compliance with the

8        department's policies and standards, right?

9        A.        Yes.

10       Q.        And it's answered "yes" here?

11       A.        It is.

12       Q.        Whether any preventive or corrective actions were

13       taken, and it says "none needed," right?

14       A.        Yes.

15       Q.        And then it says:  Is any further action warranted?

16       No.  Right?

17       A.        Right.

18       Q.        And are there any policy, procedure revisions

19       recommended?  No.

20       A.        Correct.

21       Q.        Now, I want to talk about the staff's actions

22       following the use of force.

23                 Now one of the things that happens when an inmate is

24       pepper sprayed is there are supposed to be something done to

25       decontaminate them?

1    A.        Yes.  Inmates should be decontaminated after they are

2    exposed to pepper spray.

3              THE COURT:  I'm sorry.  I don't know what the

4    question means.  Does he mean that there is a California

5    regulation or practice, or in general, or what?

6              MR. BORNSTEIN:  Let me clarify that.

7              THE COURT:  Yes.  That might be good.

8    Q.        By MR. BORNSTEIN:  Thank you.  Based on your

9    understanding of California's rules and regulations, do they

10   require decontamination of inmates who are pepper sprayed?

11   A.        Yes.

12   Q.        And in your -- based on your knowledge and expertise,

13   is that consistent -- the concept of decontaminating inmates

14   following pepper spray, is that something that is good

15   correctional practice?

16   A.        It's part of the process, yes.

17   Q.        Now, in the three videos that we looked at, were all

18   three inmates decontaminated in your opinion?

19   A.        I don't believe that Inmate A was, at least not that

20   we saw on camera or in the reports.

21   Q.        Okay.  And what about Inmates B and E?

22   A.        There were decontamination efforts, yes.

23   Q.        And were they, in your opinion, adequate?

24   A.        Well, no.  That each one of them were put under a

25   shower for a little bit of time, probably not long enough, and

1    actually absolutely not long enough.  They weren't given good

2    instructions about how to get the spray out of the eyes.  You

3    don't want to stand with your head under the shower because

4    whatever is in your hair and your face will then run down on

5    your body and cause additional items.  If you're trying to get

6    it out of your eyes, you want to instruct the person to tilt

7    their head sideways so that the spray runs out of their eyes

8    and onto the ground.

9        For Inmate E, he was kept in his clothes for a long

10   period of time.  That would continue to sort of re-inflict the

11   spray and exacerbate the experience.  He should have had a

12   change of clothes.

13       Those were a couple of examples of what was wrong

14   with the way they decontaminated.

15   Q.       And did you see that -- or did you have similar

16   concerns with the other videos you looked at as far as the

17   decontamination process used by California?

18   A.       Yeah.  I didn't see a good example of

19   decontamination.

20   Q.       I want to talk about the -- with respect to the time

21   necessary, how much time is necessary for an inmate who is

22   sprayed with the amount of spray that we saw in those three

23   videos to be decontaminated, if you know?

24       MR. RUSSELL:  Objection, Your Honor.  Lacks

25   foundation.  Calls for medical testimony.

1          THE COURT:  That appears to me to be correct.  But

2     you can -- but I would like to know whether there is a standard

3     within the prison industry as to how long a person should be --

4     how long it takes for a person to be properly decontaminated.

5     Is there such a standard?

6          THE WITNESS:  Yes.  It's usually around a half hour.

7     That's consistent with what the manufacturers say.

8          What I try to do whenever possible was to get the

9     inmate into a secure shower cell where they could just be in

10    there long enough to get it off their body.  And you need to

11    give them instructions along with how to do the eyes.  Don't

12    rub your skin.  You need a lot of towels to pat it off.

13         Manufacturers talk about the need for a non-oil base

14    solution like Dawn detergent.  We never did that.  But the

15    evidence continues to emerge about how you treat pepper spray

16    exposure.

17         THE COURT:  I'm sorry.  I'm going to interrupt you

18    because it has occurred to me several times during the course

19    of the testimony.

20         You're dealing with mentally ill inmates,

21    particularly Inmate A appears to be non-responsive because he

22    is so ill -- I don't know what the technical terms are -- that

23    he's not able to even respond.

24         You take a guy like that, you put him in a shower,

25    you give him instructions, what are the chances that he's going

1          to be able to respond?

2                    THE WITNESS:  Well, what we don't know about that

3          case is how long it took for the forced medication to kick in,

4          and would he have been able to do it after that.  If the

5          medication was effective, he may well have been able to do

6          that.

7                    THE COURT:  So he's at least not being decontaminated

8          until the anti-psychotic medication has been applied.  In your

9          view that would be appropriate?

10                    THE WITNESS:  It would.  Also in that case he was in

11          four- or five-point restraints.  You could take cold, wet towel

12          and pat the skin at least and begin to provide some relief,

13          which also might begin to establish a reality-based contact

14          with an inmate who was suffering.

15                    THE COURT:  You may proceed.

16          Q.        BY MR. BORNSTEIN:  I want to talk about the amount of

17          spray, and I'd like to focus on -- we've talked a little bit

18          about crowd control canisters of spray.

19                    Are you familiar with that term as it applies to the

20          fact in this case?

21          A.        I am.

22          Q.        And does California use what you -- what are

23          called --

24                    Let me ask it this way.  What are crowd control

25          canisters of pepper spray?

1    A.        Well in California's case, they often issue to

2    officers what's called the MK-9, which is identified as a crowd

3    control spray.

4    Q.        What's the difference between a crowd control spray

5    canister and, I don't know, a regular canister?

6    A.        Well, there's other sizes for individual use.  The

7    MK-3 and MK-4.  You know, I know a little bit about the

8    differences.  Obviously one has more spray in it.  And also

9    it's designed so that more spray comes out of the nozzle when

10    you pull the trigger for the same amount of time.

11          If you pull a 3 and 9 for the exact same seconds, you

12    would get a lot more spray out of the 9 than you would the 3.

13    Q.        To your knowledge, does any other prison system equip

14    its custody staff with MK-9 canisters of pepper spray as a

15    matter of course?

16    A.        You know, I don't have good information about that.

17    I know that I didn't equip officers with that level of spray.

18    I haven't seen it in other jurisdictions, but I haven't done

19    much research on that particular item either.

20    Q.        From your review of the records -- not of the

21    videos -- and also the other incidents that you've reviewed,

22    have you seen other kinds of pepper spray being used in

23    addition to MK-9 canisters?

24    A.        Yeah.  And I don't have an exhaustive inventory in my

25    head, but there's an MK-46, there's foggers.  There's different

1    kinds of OC grenades.  There is a variety of weapons that are

2    used.

3    Q.        In the case of the MK-46, the large canister, are

4    there certain precautions that are required to be taken?

5              THE COURT:  Required by whom?

6              MR. BORNSTEIN:  By --

7              THE COURT:  Good practice?

8    Q.        BY MR. BORNSTEIN:  Good practice.

9    A.        Yes.  In the case of Inmate E, the 46 is used without

10   the wand applicator, which is how it's recommended that it be

11   used if you're using it on an individual or have to use it in a

12   cell extraction.

13             The report said that there was no wand applicator

14   available in the Carson Unit at San Quentin.  It didn't say

15   that there wasn't a wand applicator somewhere in the prison.

16             The report also says that the person who was using it

17   was bouncing it off the ceiling in order to avoid tissue damage

18   on the inmate.  When I watched that video, I don't see that

19   it's aimed at the ceiling.  It looks to me like it's aimed

20   directly at the inmate.

21   Q.        In your prison tours and in your reviews of the

22   documents, did you also find that California equips it's prison

23   custody staff with the expandable baton?

24   A.        I did.

25   Q.        And is that a problem in your view?

1    A.          I wrote, I think, in my first declaration, and I

2    would reiterate here that I think its existence contributes to

3    a climate of violence and force as the primary means of

4    controlling their prison system, which I believe in fact

5    creates more violence than it resolves.

6                THE COURT:  May I interrupt for a moment?

7                MR. BORNSTEIN:  Please.

8                THE COURT:  There is a problem I think in different

9    folks having different responses to the same questions.

10               What appears to be the case here -- I'm asking you

11   not telling you -- is that California has made a judgment about

12   the level of violence that can be expected in a prison, which

13   may be distinct from what would be likely in another prison, if

14   for no other reason than because of the overcrowding.

15               Given those facts, is it still your view that

16   equipping people with the expandable baton is not good

17   practice?

18               THE WITNESS:  If California Department of Corrections

19   and Rehabilitation ever decides that they want to effect

20   meaningful change, they need to do it slowly and they need to

21   do it carefully.

22               What I've said in my written work is that they should

23   examine what posts they have issued the baton to and begin to

24   draw back some.  I believe I also said that they need to do

25   that in conjunction with behavior and programs that create more

1    legitimacy for their authority in the eyes of the inmates.  It

2    needs to be a slow and gradual process, but that's referring to

3    the big department, all the issues.

4         With the mentally ill, I have not seen evidence that

5    it's needed in those units that house solely mentally ill

6    inmates.  And I would recommend that they pull it out of there.

7         THE COURT:  I'm asking you again, not telling you

8    because I know it sounds -- I don't know.

9         Is this simply a question of choices which reasonable

10   people might disagree about, or is this, in your view, just a

11   question of good practice?  You follow what I'm asking you?

12        THE WITNESS:  I think so.  It's fundamental.  I don't

13   know of any other system in the country that allows the

14   expandable baton on regular officers' duty belt.  There are a

15   few systems that have a few batons out in population, but the

16   overwhelming practice in institutions is that batons are kept

17   in the armory and pulled out when you have a disturbance, or

18   when you have a riot, or when you actually need them.

19        To have them out there on everybody's belt I believe

20   sends a message to the inmates, and I also believe it creates

21   the likelihood that they are going to be misused.

22        THE COURT:  Thank you, sir.

23   Q.       BY MR. BORNSTEIN:  I want to talk about controlled

24   versus immediate use of force.  Are those concepts embodied in

25   California's policy -- use of force policy?

1    A.         They are.

2    Q.         Would you please explain your understanding of what

3    is a controlled -- what -- when is force only to be used in a

4    controlled manner under California's policies?

5    A.         Well, a controlled use of force is most frequently in

6    a cell extraction, where you've got the inmate contained in an

7    area, and you've got the time and the circumstance to go

8    through a series of behaviors that would hopefully end the

9    situation without using force.

10        But it also gives you the opportunity to get your

11   plan together, to get your staff together, to get people

12   equipped in order to perform the cell extraction.

13        You can have controlled use of force in other

14   situations, but that's the dominant way it's referred to,

15   especially in California.

16   Q.         In California when it is, as you just described,

17   situation permits or requires a controlled use of force, are

18   there certain steps then, procedural steps, that are required

19   before force is used?

20   A.         There are.

21   Q.         And can you briefly describe those?

22   A.         Well, there is the recommendation that there be a

23   cool-down period.  There is also the reading of an

24   admonishment.  Usually before the admonishment, though -- try

25   to get the sequence correct -- there is a requirement with the

1    mentally ill for a clinical intervention, and then the

2    admonishment, and then the use of force begins.

3    Q.        And then is there also a requirement that they -- the

4    actual force incident be videotaped?

5    A.        Yeah.  Well, that's the value of controlled use of

6    force that you've got the camera, which should have a profound

7    effect on the behavior of everybody involved.  And in my

8    experience, often does.

9    Q.        Can force be used immediately against inmates -- and

10   let's talk about mentally ill inmates in particular, MHSDS

11   inmates -- while they are in their cells under California's

12   policies and procedures?

13   A.        Yes.  The California policy does create the

14   difference in handling mentally ill inmates in controlled

15   environments, but there is no reference to the mentally ill in

16   immediate use of force situations.

17   Q.        In immediate use of force if you are a mentally ill

18   inmate in your cell, are there certain things that you can do

19   that will result in immediate use of force notwithstanding

20   California's protections that they offer in a controlled use of

21   force?

22   A.        I think that I've mentioned this in everything that

23   I've written, and I'm greatly concerned about what I see is a

24   flaw and an exception in their policy that allows for the

25   immediate application of pepper spray when an inmate refuses to

1    move his hand out of the food port so that the officer can

2    close it.

3           Similarly, looking at the records, it seems to be a

4    practice certainly at Pelican Bay where I saw it in the notes a

5    lot.  If an inmate kicked a cell door, then the immediate

6    application of OC spray was authorized by policy.

7           California's policy for immediate use of force talks

8    about imminent threat.  And in many of those food port or

9    kicking the door examples there is no imminent threat.  There

10   should not be that exception in the policy.  Staff should be

11   expected to back up, maybe observe the inmate.  Certainly

12   behavior needs to be dealt with, but it would make much more

13   sense and be much safer for everybody if that was a controlled

14   use of force.

15          And if I may, I think that having that exception in

16   the policy gives a kind of license and permission to use

17   immediate force in situations not related to the cell port that

18   also don't represent an imminent threat to anybody.

19   Q.      In your opinion, should California's use of force

20   policy be changed at least as it relates to mentally ill

21   inmates regarding the immediate use of force?

22   A.      I think it should be changed for everybody but

23   especially mentally ill inmates, yes.

24   Q.      How should it be changed?

25   A.      Require the same threshold for the immediate use of

1    force that the policy language currently requires, which is

2    there has to be an imminent threat, not a theoretical threat,

3    not a possible threat, but a real and imminent threat.

4    Q.       Do you also -- based on your review of the records,

5    are most use of force incidents that are reported controlled or

6    immediate?

7    A.       Those numbers are hard to come by, if they exist.  I

8    haven't seen a lot of them, but I've seen some of them.

9             After we toured San Quentin the first time, we asked

10   for some documents.  And one of those pieces of paper that we

11   got showed that at least at San Quentin 92 percent of the use

12   of force incidents were immediate versus controlled.

13            And in reading Mr. Martin's second deposition, he has

14   a similar number for Pelican Bay and expresses a similar

15   concern where 95 percent of the use of force at Pelican Bay was

16   immediate instead of controlled.  Those are just numbers that

17   in my experience are off the chart.

18   Q.       From your perspective as an expert in the

19   administration of correctional institutions, are numbers like

20   that --

21            THE COURT:  Acceptable?

22   Q.       BY MR. BORNSTEIN:  Yes.  Thank you.

23   A.       They are alarming, and it would cause me to want to

24   look at what's causing the violence in the facility and how my

25   staff are behaving.  It would be really clear to me that the

1    relationships between the staff and inmates is very poor and

2    some work needs to be done on that.

3    Q.        Have you seen any evidence of anyone in California in

4    the administration looking at those specific -- the specific

5    issue of why are the numbers so high at the two institutions

6    that you just mentioned?

7    A.        I haven't seen it, no.

8    Q.        Are there videos taken of immediate use of force

9    currently in California?

10   A.        No, they are not.

11   Q.        Should they?

12   A.        Well, some other jurisdictions, including my own --

13   and I recently received some videos from another state that

14   I've been watching.

15            It's rare that you can have the camera there when

16   it's immediate because it kind of doesn't meet the definition.

17   But there is a couple ways to get around that.  One is to draw

18   on your surveillance cameras to see what they show.  And the

19   other practice, which I'm quite fond of, is that once an

20   incident gets kicked off, that somebody goes and gets a camera.

21            Even though the inmate might be in cuffs, to put the

22   camera on him at that moment and watch the rest of the

23   procedure whether it's decontamination, whether it's a medical

24   examination, or escort to a cell, it has that same controlling

25   effect on everybody's behavior that it would if it had been

1        there from the beginning.

2               So in Washington I did that, and this other

3        jurisdiction I'm referencing I was pleased to see that they are

4        doing the same thing.  The camera doesn't lie.  It shows you

5        the behavior.  And that can be really helpful in understanding

6        who is accountable, who is doing well, and who's not.  So I'll

7        rest on that.

8        Q.      Well, in the videos you have reviewed, then are there

9        behaviors that would have or should have been disturbing to a

10       prison administrator?

11       A.      Well, that's what was shocking to me from the first

12       time I had a chance to look at controlled use of force videos

13       in California.  That they are pretty outrageous.

14              And I was basically stunned by the amount of gas that

15       they are pumping into those cells, and very often the

16       conditions of the inmates that are on the receiving end of that

17       gas.  To me, again, it was just outside of my experience in my

18       own jurisdiction and when I've looked at other places around

19       the country.

20       Q.      To your knowledge, does California have surveillance

21       cameras in its prisons?

22       A.      I don't have an exhaustive understanding of that, but

23       I believe that they certainly do have some surveillance cameras

24       inside.  Cameras are getting cheaper.  It's a good investment

25       these days.  And many jurisdictions are adding cameras for

1    precisely this purpose.

2            THE COURT:  But in the so-called controlled force

3    videos that we saw, did you see any evidence that the presence

4    of the cameras in any way influenced the behavior that you find

5    -- of custody officers that you found inappropriate?

6            THE WITNESS:  It's -- this is kind of -- let me think

7    about this answer.

8            Watching the behavior that I saw in these use of

9    force videos on camera made me greatly concerned for what's not

10   on camera.  If they are comfortable, and they think that's

11   okay, and they get passes from their wardens and from their

12   department on this behavior, I can't imagine what might be

13   happening when the camera is not on.

14           THE COURT:  So your answer I take it, another way of

15   expressing it, is the cameras operating in the controlled force

16   circumstances may not restrain custody because it's approved --

17   essentially going to be approved by review in any event?

18           THE WITNESS:  Yeah.  And I also wouldn't say that

19   there's not some restraining.  I mean even the comment that I

20   referenced earlier today in the case of Inmate E, after the

21   officer says that, he says, oh, whoops, I'm sorry, I shouldn't

22   have said.  And I think he was talking to the camera when he

23   said that.  Just one small example of how that might be

24   inhibiting behavior.

25           THE COURT:  I'm sorry.  I'm departing from your line

1    of questioning, but I think we're at a crux issue, maybe.

2            At least in theory, it appears to me -- nobody has

3    testified to this yet, but I think it must be true -- that the

4    presence of the cameras and the reviews are intended to be ways

5    of reviewing conduct subsequent to their occurrence, so at

6    least prison administrators know what happened.  But if the

7    administrators approve on a regular basis conduct, which I

8    understand to be the case -- is that right?

9            THE WITNESS:  Yes.

10            THE COURT:  -- that whole purpose has been

11    frustrated, I mean, is that not true?

12            THE WITNESS:  Yeah, I think it is.  I mean, the lens

13    -- the limited lens that the prison administrators have, they

14    are looking at whether or not the behavior in these videos is

15    technically consistent with the California policy, and they are

16    not looking any deeper.  So I mean --

17            THE COURT:  Well, there is a question that says given

18    what happens, should we be changing something?  And apparently

19    the answer is always no.

20            THE WITNESS:  Yes.  That's always the answer.  Or at

21    least in the ones that I've looked at, yes.

22            THE COURT:  You may proceed, sir.  Sorry I

23    interrupted you.

24    Q.        BY MR. BORNSTEIN:  Given what you just said, how --

25    from your perspective as an expert how do you change the

1    behavior that we're watching?

2    A.          I'm sorry, Mr. Bornstein, but I want to fully answer

3    the judge's last question.

4              And there is an example where there was a -- I'm

5    going to use the word impotent effort to change the behavior as

6    a result of one of the IERC reports that I read.  And I don't

7    know if you were going to talk about this or not, but this is a

8    case where there was around 40 different applications of OC,

9    from MK-9s to grenades, that were thrown into the cell of a

10   single offender, even though the report says after about three

11   applications it was clear that they weren't having any effect.

12             That example was -- it's pretty insane to think that

13   that could happen.  And then in the IERC report there was no

14   criticism of that behavior.  However, when that incident was

15   brought to the attention of some of the officials within CDCR,

16   one of the deputy directors sent out a memo that didn't really

17   address the fundamental issues, and I don't think produced any

18   change from looking at these videos before and after the memo

19   went out.

20             But it was the only time in this outrageous example

21   that I was able to track that the department made an effort,

22   however feeble, to try and get a little bit more control over

23   the use of pepper spray.  But, again, I don't think it was

24   effective at all.

25             THE COURT:  I mean, I think that -- never mind what I

1    think.  It seems to me, as an outsider that has no experience,

2    that there are two separate issues in every one of these

3    situations.  One is the relationship between custody and the

4    resisting inmate.  The other is between custody and

5    administration.  And I would assume, is it right, that that

6    relationship between administration and custody is an important

7    one which must enter into every judgment that administration

8    makes about custody's conduct?

9            THE WITNESS:  Your Honor, I'm with you on the first

10   one, but the second one is a little different.

11           The administration is responsible for the complete

12   operation of the facility, not just the custody staff.  And,

13   obviously, in every case when life and limb is at stake, you

14   know, you got to go with custody.

15           But the obligation of administration is to make sure

16   that those other parts of the -- important parts of the program

17   are given status and understanding.  I don't see much

18   disconnect between the custody staff and the administration in

19   CDCR.  I quite honestly would like to see a little more so that

20   the administrators were saying, wait a minute, these mental

21   health staff have something to offer here, and we're going to

22   make them a more important part of our operation than they are

23   today.

24           THE COURT:  Thank you, sir.  That was helpful.  You

25   may proceed.

1    Q.        BY MR. BORNSTEIN:  Thank you.  The inmate you're

2    referring is that Inmate L?

3    A.        I believe it is.  Is there an exhibit number?

4    Q.        Yes.  Could you take a look at what's been marked for

5    identification as Exhibit 25-A, and see if that's -- and if you

6    look on 47th page of that --

7              THE COURT:  125-A?

8              MR. BORNSTEIN:  25-A, Your Honor, and then it's on

9    page 47 of that.

10             And I would move 25-A, -B, which is the IERC report,

11   C, which is RVR report into evidence.

12             THE COURT:  Hearing no objection, they are received.

13             (Plaintiffs' Exhibit 25, Inmate L records, admitted

14   into evidence.)

15   Q.        BY MR. BORNSTEIN:  Is that what we're talking about,

16   Exhibit 25?

17   A.        Yes, it is.

18   Q.        For Inmate L?

19   A.        Yes.

20   Q.        Now you talked about then -- you called it an

21   impotent response by was it Mr. Stainer?

22   A.        Yeah, I believe -- yes, that was his name.

23   Q.        Do you know what his position is in California?

24   A.        He's a deputy director of some sort, but, no, not

25   precisely.

1           MR. BORNSTEIN:  Your Honor, may I approach?

2    Q.      BY MR. BORNSTEIN:  I'm showing you what's been marked

3    as Exhibit 118 for identification, do you recognize

4    Exhibit 118?

5    A.      I do.  It's the memo that I was referencing.

6           MR. BORNSTEIN:  Your Honor, I move Exhibit 118 into

7    evidence.

8           THE COURT:  Received.

9           (Plaintiffs' Exhibit 118, September 12, 2012, CDCR

10   Memorandum Regarding Use of Chemical Agents During Controlled

11   Use of Force Situations and Review of Use of Force Incidents,

12   admitted into evidence.)

13   Q.      BY MR. BORNSTEIN:  So I want to talk about

14   Exhibit 118, and you've indicated that this was in response to

15   Mr. Martin bringing Inmate L's situation to the attention of

16   Mr. Stainer, correct?

17          MR. RUSSELL:  Objection, Your Honor.  Mr. Bornstein's

18   testimony contradicts the testimony of the witness.

19          THE COURT:  I don't know whether it does or not.

20          MR. RUSSELL:  Well, the testimony was not that this

21   was any reaction to anything done by Steve Martin.

22          THE COURT:  Well, I have no idea whether it is or

23   not.  The question that is before you is, are you aware of how

24   this came to the attention of the associate director?

25          THE WITNESS:  In both the depositions of Mr. Martin

1    and Mr. Stainer, a conversation that they had about this

2    incident --

3            Let me back up.  In Mr. Stainer's deposition this

4    incident is referenced as the cause for writing this memo.  In

5    Mr. Martin's deposition, a conversation he had with Mr. Stainer

6    is referenced, but I don't recall if this specific incident was

7    referenced in Mr. Martin's deposition, but it was in Stainer's.

8            THE COURT:  You may proceed, sir.

9            MR. BORNSTEIN:  May I display the Exhibit 118, Your

10   Honor?

11           THE COURT:  You may.

12   Q.      BY MR. BORNSTEIN:  First of all, the memo states that

13   the purpose -- its purpose is to reiterate expectations

14   relative to the use of force.

15   A.      Yes.

16   Q.      Do you know what the Department Executive Review

17   Committee is?

18   A.      It's the next level of review in the process that I

19   described earlier.  It's the one beyond Institutional Executive

20   Review Committee.  I don't have a thorough understanding of

21   what incidents they select for reviewing, though.

22   Q.      Is that the committee that decides on policy and

23   practice in CDCR, to your knowledge?

24           MR. RUSSELL:  Objection, Your Honor.  Lacks

25   foundation.

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

```
 1                THE COURT:  He said to his knowledge.  We'll find out
 2      whether it's got foundation or not.
 3                THE WITNESS:  I would presume they have the authority
 4      to.  I think they also kick it to something called a Joint
 5      Review Committee.
 6                MR. RUSSELL:  Objection, Your Honor.  Move to strike.
 7      It's based on speculation.  I mean, Mr. Vail testified he
 8      wasn't quite certain.
 9                MR. BORNSTEIN:  I'll withdraw the question, Your
10      Honor.  It's fine.
11                THE COURT:  You may proceed.  I can't imagine why
12      anybody cares, but you may proceed.
13      Q.        BY MR. BORNSTEIN:  Okay.  Why do you refer to this as
14      an impotent response to the incident that you described about
15      Inmate L?  By the way, when did that incident occur, do you
16      know?
17      A.        Well, let me look at the document for a minute.  This
18      one is in December of 2011, I believe, these notes say.
19      Q.        Okay.
20      A.        Yes.
21      Q.        And this particular memo is issued when?
22      A.        September of 2012.
23      Q.        From your perspective as an expert in prison
24      administration, does this memo address the concerns that a
25      responsible prison administrator should have based on what
```

1    happened to Inmate L?

2    A.        It doesn't begin to.  I mean, first and foremost is

3    that there is no reference to use of force with the mentally

4    ill.  I mean, he's talking about everybody, which is a good

5    thing to talk about, but it misses the point of the issues that

6    we're talking about here.

7              And it gives no definitive guidance to what people

8    are supposed to do.  It's vague.  It doesn't talk about what

9    kind of products you can use and can't use.  It doesn't give

10   the amount of time you should be deploying the spray.  It

11   doesn't mention that you need to have waiting periods or

12   doesn't define those waiting periods between that and the next

13   application.  It doesn't mandate that these canisters should be

14   weighed before and after use.

15             This is not going to have much effect on a department

16   as big as California with practices as ingrained as they are.

17   A memo doesn't change behavior.  Actually, a policy change

18   doesn't change behavior, but that's a fundamental -- that's

19   foundational to actually trying to produce a behavioral change.

20             There should be a policy change with the kinds of

21   definitions that I just referenced in the policy.  And that's

22   only the beginning.  From there, you've got to rewrite your

23   curriculum for your academy.  You've got to get everybody

24   through a training program.

25             Not only do you have to be able to train in the new

```
 1     tactics, you have to train them in the reason behind the

 2     tactics and have those kinds of discussions about what you're

 3     doing and why you're doing it.

 4             In order to change this behavior, it's a major

 5     department initiative.  And kicking off a memo to wardens to

 6     tell him to talk to a handful of staff in each of their

 7     institutions is not going to change the behavior of the agency.

 8     Q.      So down at the bottom, Mr. Stainer asks that wardens

 9     provide on-the-job training to all incident commanders and

10     managers with regard to the expectations he sets out above.

11             Are you saying that that's not adequate?

12     A.      Well, what are the expectations set out above.  It is

13     not clear.  You've got 30-some institutions in California.  The

14     chances of this being interpreted differently in those

15     institutions is huge.

16             Hopefully, the people being trained are going to ask

17     questions, and the people who are doing the training aren't

18     going to be asked the questions -- be able to answer the

19     questions because they haven't been provided any real or clear

20     guidance from their central office administration.

21     Q.      What is a proof of practice?  Do you know what that

22     is?

23     A.      According to Mr. Stainer's deposition, it's basically

24     a memo that the folks on the receiving end would send to their

25     associate director to say, yes, we did this.
```

1    Q.       Is that in keeping with good prison administration

2    practice?

3    A.       Not for an issue this fundamental.  Absolutely not.

4    Q.       And there is a date here, the proof of practice was

5    required to be provided no later than October 12, 2012, right?

6    A.       That's what it says, yes.

7    Q.       And of the 17 videos, controlled force videos that

8    you were able to review -- or I should say videos of 17

9    incidents that you were able to review -- did some of those

10   occur after October 12, 2012?

11   A.       Yes, they did.

12   Q.       Can you tell us how many?

13   A.       No, I'm sorry.  I didn't count them, but there's

14   several.

15   Q.       All right.  Would --

16            THE COURT:  Was there any change effectuated by

17   virtue of the memo that you could discern?

18            THE WITNESS:  No.  Not that I could discern.  And

19   when I had a chance to talk with each warden at the prisons I

20   inspected, and talked to them about their over reliance on

21   pepper spray, nobody mentioned this memo.

22   Q.       BY MR. BORNSTEIN:  Did anybody mention a change of

23   practice?

24   A.       No.

25   Q.       To your knowledge, has there been any auditing done

1   by anybody at CDCR in terms of, gee, have we changed anything?

2   A.       Not to my knowledge, no.

3   Q.       Should there have been?

4   A.       Yeah.  Particularly on this issue.

5   Q.       Okay.  I want to talk about some additional videos

6   that you've had the chance to look at, and I don't know what --

7   I'm probably going to get ready to show a video with your

8   permission.

9           THE COURT:  There is going to be a point at which I'm

10  going to say no more, but this is not the point.  You may

11  proceed.

12  Q.       BY MR. BORNSTEIN:  Okay.  I want to show -- well, I

13  want to talk about Inmate D, and that would be Exhibit 18.

14          And I would move Exhibit 18 and it's subparts into

15  evidence.

16          THE COURT:  And it is what?

17          MR. BORNSTEIN:  This would be the incident report,

18  the IERC report -- well, the incident report is Exhibit 18-A.

19  The IERC report is Exhibit 18-B.  The RVR materials, to the

20  extent we have them, is 18-C.  There is some excerpts from

21  medical records which are 18-D.  And there's something called

22  inmate complaint form which is 18-E.  And would I move those

23  into evidence.

24          THE COURT:  Hearing no objection, they are all

25  received.

1          (Plaintiffs' Exhibit D, Inmate D records, admitted

2     into evidence.)

3          MR. BORNSTEIN:  With respect to all these inmate

4     records we're moving into evidence, we're asking that they all

5     be under seal because they are not redacted.

6          THE COURT:  Well, I'm going to get reversed again.

7     That motion is granted.

8          MR. BORNSTEIN:  We're not going to publish them.

9     We're just going to use them to -- for testimony purposes and

10    for -- we think it's important for you to see them but --

11         THE COURT:  I understand, sir.

12         MR. BORNSTEIN:  I understand, too.

13         THE COURT:  You understand.  I understand.  The Ninth

14    Circuit doesn't understand.

15         MR. BORNSTEIN:  I understand, too.

16    Q.        BY MR. BORNSTEIN:  I want to -- you've talked a

17    little bit about something called management status when you

18    were here earlier in the month.

19         Does management status play into what is on this

20    video?

21    A.        It does.

22    Q.        And can you explain to us -- can you tell us what

23    happened, the leading up to the video that we're going to see?

24    A.        Well, what's not on the video is how Inmate E (sic)

25    gets into the holding cell.  And the record shows that this

1    inmate was -- he papered up his cell front and told the staff

2    that he was suicidal.  There was a psychiatric technician, I

3    believe, who came to the cell and successfully talked this guy

4    out of it -- of taking the covering off and into being willing

5    to cuff up, so that he could come out to get a mental health

6    evaluation.

7              It was significant I think in this case because when

8    you look some of the medical records that are here, this is a

9    guy who had been sexually abused as a child, and the strip

10   search practices of every time he came in and out of that cell

11   were keeping in the cell, and the mental health staff were

12   working with him to try to get him to come out and get some

13   treatment.  So his willingness to comply after the conversation

14   with the psychiatric tech was very encouraging.  But --

15   Q.       So would you consider that to have been a successful

16   intervention?

17   A.       So far, yes.

18   Q.       And prevented any use of force?

19   A.       So far, yes.

20             But what they did was they pulled him out of his

21   assigned cell, and rather than, you know, now he's cuffed up

22   and ready to move, rather than taking him over to the mental

23   health building where he could begin to get that evaluation,

24   they put him in a holding cell.

25             And then what happened is the lieutenant came to him

1    and gave him a ten-day sentence of management status at which

2    point the inmate ceased cooperating, felt -- said he felt

3    betrayed.  And then the other process began relative to

4    extracting him out of that holding cell and then subsequently

5    out of his own cell when they put him back in there a second

6    time.  So it resulted in two cell extractions.

7              And in my estimation, watching this video two or

8    three times, and understanding more about the inmate, this was

9    completely caused by the ignorant behavior of the staff in the

10   living unit about how to handle somebody who is having

11   difficulty functioning.

12   Q.        Your understanding of when you said, you know, he's

13   placed on management cell status or management status, what did

14   that mean in this case for this inmate?

15   A.        He was going to lose all his property and be put back

16   in the cell that he just agreed to come out of in order to get

17   a mental health evaluation.

18   Q.        For how long?

19   A.        Ten days.

20   Q.        And that is not part of the formal RVR process?

21   A.        No, it is not.

22   Q.        And it was not done with any sort of hearing or due

23   process?

24   A.        No.

25   Q.        Is that management status similar to what you've seen

1      in other -- in some of the other institutions?

2            This one is Corcoran.  Was it similar to other

3      institutions that you visited?

4      A.      It's similar, but it's very inconsistent.  Of the 17

5      videos, eight times either the people were placed on management

6      status or threatened that they would be placed on management

7      status if they didn't come out of their cell.

8            Anyway, eight out of the 17, that was either happened

9      or it was a threat that it was going to happen.

10     Q.      Does anybody at CDCR headquarters, to your knowledge,

11     play any role in managing management status?

12     A.      No.  And, again, from Mr. Stainer's testimony -- or

13     his deposition -- there is no central control over this

14     practice.

15           MR. BORNSTEIN:  Your Honor, I don't know whether

16     you're going to take a morning break.

17           THE COURT:  I'm just about to do that.

18     Fifteen minutes.

19           (Break taken.)

20           MR. BORNSTEIN:  May I proceed, Your Honor?

21           THE COURT:  Yes, please.

22           MR. BORNSTEIN:  We are now going to show the redacted

23     video that has the name --

24           THE COURT:  Whatever.  You may proceed.

25           MR. BORNSTEIN:  Thank you.

 1                    (Video playing.  11:04 a.m. to 11:23 a.m.)

 2                    THE COURT:  The tape that you just played is 18, sir?

 3                    MR. BORNSTEIN:  Your Honor, that would actually be

 4        19.

 5                    THE COURT:  19 has not been received into evidence.

 6        It shouldn't have been played.

 7                    MR. BORNSTEIN:  I'm sorry.  19 is the extraction that

 8        we just played.

 9                    THE COURT:  I have no idea what you just said.  In

10        any event --

11                    MR. BORNSTEIN:  19 is the extraction we just played.

12                    THE COURT:  Moving it into evidence now?

13                    MR. BORNSTEIN:  Yes.  And I'm sorry for not taking

14        care of that before.

15                    THE COURT:  You may proceed.

16                    (Plaintiffs' Exhibit 19, Inmate D extraction video,

17        admitted into evidence.)

18        Q.        BY MR. BORNSTEIN:  Was that a reasonable use of force

19        in your opinion?

20        A.        No, it wasn't.

21        Q.        Why not?

22        A.        This one illustrates the importance of having mental

23        health staff work with the custody staff, and they clearly

24        aren't in this case.

25                    This particular inmate was -- his symptoms were

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    different than the ones that we saw in earlier videos.  He

2    becomes agitated when stressed.  And this is according to the

3    medical records that we have.  And he has got anger control

4    issues.

5            Plus, like I already mentioned, given his history of

6    sexual abuse he objected to coming out of his cell and having

7    to submit to a strip search every time that happened.  And so

8    they are having a hard time getting him out of his cell.

9            In an actual treatment unit, this guy would have an

10   individual treatment plan that the regular custody staff would

11   know about.  The fact that he came out of his cell after he was

12   experiencing the initial distress should have been rewarded and

13   not immediately punished.

14           This incident was created by the lack of working

15   together between the custody staff and the mental health staff

16   in this unit at this time.

17           Plus, he's got asthma.  There is no level of threat

18   that he demonstrates in this situation that justifies the use

19   of OC.  Now things came out, you know, fine, which is good, but

20   it's not worth the risk to have used OC in this situation.

21   Q.      The captain said for the safety and security of the

22   institution he's overruling the lack of medical clearance.  Is

23   that adequate?

24   A.      No.  I mean, if there is a specific threat that you

25   can point to and, you know, I can theoretically think of one,

1     it wasn't present in this case.

2          I have no idea why they used the triangle with this

3     guy.  That's just further demeaning and degrading.

4     Q.     He was -- I don't think we have the RVR for this, but

5     from the documentation that you've been able to review, was he

6     charged with obstructing a peace officer?

7     A.     The information that I have and that's present in

8     this exhibit says that a 115, which means RVR was pending.

9     Q.     I want to -- I want to talk about Inmate I.  And the

10    incident report for inmate I is Exhibit 8-A.  The IERC report

11    is Exhibit 8-B.  And the materials, to the extent we have them,

12    are 8-C.

13          And I move them into evidence under seal based on the

14    protective order that the Court has previously entered and the

15    fact that we're not going to display or publish the information

16    that's in here.

17          THE COURT:  I take it there is a motion to file under

18    seal?

19          MR. BORNSTEIN:  I thought there was at the beginning

20    of the case, Your Honor.

21          THE COURT:  I have no idea.  That motion is granted.

22    You may proceed.

23          MR. BORNSTEIN:  And I'm also going to move into

24    evidence Exhibit 9, which is the cell extraction Inmate I.

25          THE COURT:  I thought you just told me that the film

1          -- or 19, I see, I'm sorry.

2                    MR. BORNSTEIN:  Yes, so this is 8 and 9.

3                    THE COURT:  I got it.  8 and 9 are received into

4          evidence.

5                    (Plaintiffs' Exhibit 8, Inmate I records, admitted

6          into evidence.)

7                    (Plaintiffs' Exhibit 9, Inmate I cell extraction

8          video, admitted into evidence.)

9          Q.        BY MR. BORNSTEIN:  By the way, with respect to Inmate

10         D, the one we just watched, he was in EOP level of care?

11         A.        He was, yes.

12         Q.        And is this inmate also in an EOP level of care?

13         A.        He is.  Yes, he's scheduled to be transported to a

14         mental health enhanced outpatient hub for further mental health

15         care.

16         Q.        When you reviewed this video and the incident here,

17         what, if anything, was remarkable?

18         A.        The amount of spray that they used is the most

19         remarkable thing, which is typical in other circumstances.  But

20         also he was threatened with management status if he didn't come

21         out of his cell.  The lack of any immediate threat justifying

22         the actions.  And the volume of response in this situation is

23         out of proportion to the behavior he was exhibiting.

24                    MR. BORNSTEIN:  Your Honor, with the Court's

25         permission I would like to play Exhibit 9.

1              THE COURT:  You may.

2              (Video playing.  11:30 a.m. to 11:47 a.m.)

3     Q.      BY MR. BORNSTEIN:  Was the use of force in the case

4     we just looked at reasonable?

5     A.      No.  It was excessive.  The amount of spray pumped

6     into that cell was pretty astonishing.

7     Q.      From the reports were you able to determine the

8     different types of spray that they used or different armaments

9     they used?

10    A.      Well, they used an OC vapor grenade, an OC cell

11    buster, fogger, T-16, OC blast grenade.

12            And troubling to me is they used a barricade removal

13    device, and there was no barricade.  That's mainly just

14    designed to pump as much spray as you can into an area.  But

15    it's not designed to do that.  That's how it was used.  It's

16    designed to remove a barricade.

17    Q.      This was reviewed by the Institutional Executive

18    Review Committee?

19    A.      It was.

20    Q.      And I'd like to direct your attention to Exhibit 8-E,

21    page 6.

22    A.      Yes.

23    Q.      And there were some concerns noted by the IERC?

24    A.      There were.

25            MR. BORNSTEIN:  With the Court's permission, I would

1    like to display a redacted portion.

2              THE COURT:  Go ahead.

3    Q.        BY MR. BORNSTEIN:  What were the criticisms?

4    A.        That the inmate's genitals were observed during the

5    videotaping.  He was not -- according to this -- not subjected

6    to an unclothed body search prior to the escort, and all of the

7    team members weren't properly equipped, a gas mask prior to

8    entering the extraction area.

9    Q.        So nothing about the use of spray?

10   A.        No mention.

11   Q.        And no further policy concerns, et cetera?

12   A.        No further action or no further policy revisions

13   recommended.

14             MR. BORNSTEIN:  Your Honor, I would have one more I

15   would like to show you, and then I'm done with the showing of

16   the videos.

17             THE COURT:  Last one.  You may proceed.

18             MR. BORNSTEIN:  Thank you.  This is with -- this is

19   for Inmate F.  The video is Exhibit 13.

20             THE COURT:  Move it into evidence?

21             MR. BORNSTEIN:  Yes, Your Honor.

22             THE COURT:  Received.

23             MR. BORNSTEIN:  This is the redacted video that I'm

24   moving in.  And then the incident report is Exhibit 12-A.  The

25   IERC is Exhibit 12-B.  The RVR report is Exhibit 12-C. I move

```
 1              those into evidence under seal.

 2                        THE COURT:  Received.

 3                        (Plaintiffs' Exhibit 12, Inmate F records, admitted

 4              into evidence.)

 5                        (Plaintiffs' Exhibit 13, Inmate F cell extraction

 6              video, admitted into evidence.)

 7      Q.         BY MR. BORNSTEIN:  Where does this one take place?

 8      A.         Let me catch up with you here.  This one is at

 9              Corcoran.

10      Q.         And which housing unit?

11                        THE COURT:  What difference does it make?

12                        MR. BORNSTEIN:  Sorry.  I just wanted the record to

13              reflect that he is in a higher level of care.

14                        THE COURT:  That's appropriate.

15                        MR. BORNSTEIN:  That's all.

16                        THE WITNESS:  Yeah.  He's in a mental health crisis

17              bed.

18                        (Video playing 11:52 a.m. to 12:10 p.m.)

19      Q.         BY MR. BORNSTEIN:  What was the garment that this

20              inmate was wearing?

21      A.         It's called a suicide smock.

22      Q.         Was the use of force reasonable in this case?

23      A.         No.

24      Q.         Why not?

25      A.         This is the preferred, instructed, sanctioned method
```

 1    to deal with somebody who is having difficulty in CDCR.  This

 2    is a guy who just got his court-ordered medication.  And rather

 3    than work with him -- he clearly demonstrates that he's not a

 4    violent person.  He's only pacing in that cell and talked

 5    afterwards about how they would get no violence out of him.

 6           They did what they always do, which is use pepper

 7    spray.  In this case, there was three different bursts in about

 8    60 seconds.

 9           MR. BORNSTEIN:  Your Honor, I don't know if this

10    would be a good time for a recess.

11           THE COURT:  My watch is not working, but I think it

12    must be noon.

13           MR. BORNSTEIN:  It's a little after.

14           THE COURT:  Take our afternoon recess.  Reconvene at

15    1:30 p.m.

16           (Lunch break taken.)

17

18

19

20

21

22

23

24

25

464

1              SACRAMENTO, CALIFORNIA

2          THURSDAY, OCTOBER 17TH, 2013 - 1:30 P.M.

3                     ---o0o---

4          THE CLERK:  Please, remain seated.

5          Court is now in session.

6          THE COURT:  Counsel.

7          MR. BORNSTEIN:  Thank you, Your Honor.

8    BY MR. BORNSTEIN:

9    Q.     Mr. Vail, I would like to talk about the --

10         THE COURT:  I'm sorry.  My watch isn't working.  What

11   time is it, Madam Clerk?

12         THE CLERK:  1:38.

13         THE COURT:  Thank you.  Go ahead.

14   BY MR. BORNSTEIN:

15   Q.     Mr. Vail, I would like to switch gears and talk about

16   the inmate disciplinary process as relates to mentally ill

17   inmates in the State of California.

18   A.     Okay.

19   Q.     Are you familiar with the RVR process?

20   A.     Yes.

21   Q.     And do you have an opinion based on your expertise as

22   a prison administrator about the manner in which California

23   disciplines its severely mentally inmates?

24   A.     I don't believe that the process systematically takes

25   into account the mental illness of inmates in their system,

465

1    and the result is that inmates are often punished for their

2    mental illness.

3    Q.      There are certain procedures, though, that are built

4    into California's policies that, at least on paper, are

5    designed to account for someone's mental illness; is that

6    right?

7    A.      There are.

8    Q.      Are they working, those procedures?

9    A.      One of the concerns I have about their system is the

10   lack of aggregate data to know whether or not it is working

11   or where it might be working, either at the institution level

12   or within the institution.

13           But having said that, I looked at lots of examples,

14   individual examples, granular examples, where I don't believe

15   it was working.

16   Q.      One of the safeguards that California has built into

17   its system is the use of a Mental Health Assessment FORM for

18   certain seriously mentally ill inmates; is that correct?

19   A.      That's correct.

20   Q.      And are you familiar with that form and how it is

21   used?

22   A.      I believe I am.  It's used for certain inmates,

23   inmates who are in a mental health unit or inmates who are

24   EOP or the lower level of inmates known as the CCCs when

25   certain RVRs are alleged, and also if the officer identifies

466

1   the behavior as somehow bizarre.

2          MR. BORNSTEIN:  May I approach, Your Honor?

3          (Exhibit located for witness.)

4   BY MR. BORNSTEIN:

5   Q.     Would you turn to tab 54 for identification.

6          Is this a copy of a Rules Violation Report, Mental

7   Health Assessment Request Form?

8   A.     Yes, it is.

9   Q.     Similar to the ones you've seen in use?

10  A.     Yes.

11         MR. BORNSTEIN:  Your Honor, I move Exhibit 54 into

12  evidence.

13         THE COURT:  Received.

14             (Whereupon, Plaintiffs' Exhibit 54 received into

15              evidence.)

16         MR. BORNSTEIN:  May I display?

17         THE COURT:  Go ahead.

18         MR. BORNSTEIN:  Thank you.

19             (Exhibit published.)

20  BY MR. BORNSTEIN:

21  Q.     There are -- these are supposed to be filled out by

22  whom?

23  A.     By a mental health professional.

24  Q.     Did you interview mental health professionals when

25  you went on your prison inspections?

467

1    A.       At each institution we inspected I asked to talk to

2    clinicians who were responsible for completing this form, and

3    at each institution I had the ability to do that.

4    Q.       Did you talk to them about the form and kind of what

5    goes into the mental health assessment?

6    A.       Well, I asked them what they do to fill out the form,

7    and then the conversation invariably led to their thoughts

8    and feelings about the process.

9    Q.       And was there any takeaway from your perspective as

10   an expert based on those conversations?

11   A.       Several.  One of them is that they pretty universally

12   express frustration that they never knew the outcomes of

13   their input into the process.

14           In other cases -- well, that was the main thing that

15   I heard, that they did not know the outcomes of the

16   process.

17           The other places the conversation went were generally

18   about mental health treatment and their frustration with

19   being able to break through the obstacles that they

20   encountered to get the job down.

21   Q.       Obstacles?  Can you be more specific what you mean by

22   "obstacles"?

23   A.       Yeah.  I think I talked about that a little bit

24   earlier on the stand here.  Many folks felt like the custody

25   staff threw up barrier after barrier after barrier, in fact I

468

1    think that is a direct quote from my first declaration, to

2    actually getting the inmates treated.

3    Q.      There are three questions on this form.

4           THE COURT:  Before you go on to that, one of the

5    possible takeaways from the disc that we saw -- and it has

6    not been mentioned, and maybe -- and it has not been

7    mentioned, and that is that the conditions were such that

8    someone might wonder at the conduct of the custody folks who

9    seem to be inured as to the harm they might be inflicting.

10          And my question is about you talking about custody

11   people getting in the way of mental health people, but do you

12   see any relationship between that conduct and the apparent

13   hardening of human feelings during these extractions?

14          Do you understand what I'm asking?

15          THE WITNESS:  Yeah, I think so.  I would characterize

16   it was as the officers don't know any better.  They have been

17   taught to do things a certain way, and that's to be pretty

18   hard to the human suffering they witness.

19          They aren't really given an opportunity to be part of

20   a process that might change or improve the inmate's behavior.

21   And I've seen that really transform some of the hardest

22   custody staff I have ever meet.  It gives meaning to their

23   job and creates a whole other dimension for their

24   professional life.  I'm sure that there's lots of staff in

25   CDCR that would like to do that.

469

1          I think the mental health staff were a little more

2     open in expressing their frustration because based on

3     training and experience they had a sense there might be a

4     different way to do this, but they couldn't figure out how to

5     navigate the obstacles to get it done in their current

6     positions.

7               THE COURT:  I'm sorry, Mr. Bornstein.

8               Go ahead.

9               THE WITNESS:  The other thing that I thought of in

10    response to your first question is that especially this third

11    question, a lot of the mental health staff wasn't sure what

12    that meant, "Are there mental health factors that the health

13    officer should consider in assessing the penalty."

14          Is that to mitigate the penalty, to tailor the

15    penalty, to accommodate the penalty, to eliminate the

16    penalty?

17          More than one, maybe a good half of them, were

18    frustrated with the meaning of that question.

19    BY MR. BORNSTEIN:

20    Q.    I want to go back, though, to the question that

21    Judge Karlton asked you and your response.

22          When you say that you have seen custody officers

23    transformed, what do you mean by that?

24    A.    Corrections is difficult work if you do it right, or

25    it is simple-minded work if you don't.  But the ability to

470

1    manage human behavior in a prison environment, of course you

2    must have good custody and you must be good at use of force.

3    But you also must be good at rewarding pro-social behavior,

4    and you must demonstrate pro-social behavior.

5            That increases the legitimacy -- the perception of

6    the legitimacy of authority in the minds of the inmates.  And

7    there's considerable research about the significance of that

8    in reducing institution violence.  So it is a much more

9    complicated job than most folks think it is or give it credit

10   for.

11           And when you can create those environments, what

12   you'll find is not just the mental health staff teaching

13   custody staff about inmate behavior, but the reverse will

14   happen too.  Some of the folks that who are mentally ill are

15   also very manipulative, very cunning, very sly, and the

16   custody staff can offer that teaching to the mental health

17   staff while the mental health staff can give their context

18   that comes with their professional background.

19           If you do it right, you get them feeding each other

20   to figure out how to manage individual inmates.

21   Q.      This process -- this transformation process you are

22   talking about, how does one go about doing that in a

23   institution like CDCR?

24   A.      Well, that's a good question.

25           If I could break it down to a facility level, which

471

1   is where I would start, I would go into one of these

2   treatment units, and I would give real authority for the

3   operation of that unit, the daily operation of that unit,

4   shared authority, to custody staff and mental health staff.

5        And I would dedicate those folks to that purpose.

6   They're not going to move on.  They're not going to bid out.

7   They're not going to wake up next week and find themselves at

8   another job.  They're there to work on that unit.

9        So you get that dynamic, that tension between those

10  two groups responsible for running the unit, responsible for

11  the inmates' behavior, responsible for the daily schedule and

12  activities.

13       One of the complaints that I did hear from mental

14  health staff is that the schedule is such that inmates had to

15  choose between going to treatment or going to yard.  It

16  wasn't structured so that they could get access to all of the

17  other programs and attend treatment.  They had to make these

18  difficult choices.

19       The institutions operate 24 hours a day, seven days a

20  week.  There is a lot of time in that schedule to accommodate

21  all of those needs.  California doesn't have that many

22  programs to begin with.  It seems like a small thing, but if

23  you put -- if you empower both of those groups to run the

24  unit and force them to negotiate a solution that meets the

25  custody needs and the mental health needs, you'll have a

472

1    different program.

2    Q.       Does that mean less use of force?

3    A.       In my experience it means much less use of force,

4    yes.

5    Q.       Does it mean less disciplinary rules violation type

6    of sanctions?

7    A.       Yes.  Sometimes it might mean that behavior is

8    handled in different ways rather than a formal RVR process,

9    but yes, it would reduce RVRs.

10   Q.       With respect to the system that is currently in

11   place, you stated this afternoon that California disciplines

12   its severely mentally ill inmates because of their mental

13   illness.

14           I would like you to explain what you meant by that?

15   A.       I mean the symptoms of mental illness, and there is a

16   number of examples, including some in the videos that we

17   watched, where the behavior is an expression of a symptom

18   that the inmate at the moment doesn't have any control over.

19   And you see what happens.  You have seen what happens in the

20   use of force.

21           What follows that, though, in many circumstances --

22   in most every circumstance, is an RVR.  Depending upon which

23   RVR is charged, they can be referred to the district attorney

24   for further prosecution, they can be referred to the Inmate

25   Classification Committee and wind up with a sentence to the

473

1    Special Housing Unit.  They can lose their earned time or

2    good time, whatever they call it here in California, and they

3    can also lose certain specified privileges, which, you know,

4    all of them are bad.

5         The latter is one that can have an immediate impact

6    on a guy who is trying to navigate reality if he winds up not

7    being able to go to the dayroom or go to yard or have a

8    television or have a radio.

9    Q.    The Special Master in this case recently issued a

10   report that focused on the disciplinary issue at Salinas

11   Medical Facility.

12        Do you remember that?

13   A.    Yeah, I looked at it.

14   Q.    Was that typical of what you saw in the records and

15   materials you reviewed?

16   A.    In terms of the repeat violations that were charged

17   in a sequence of hearings that culminated in loss of lots of

18   good conduct time, yes, I saw that in other cases.

19   Q.    I want to talk about Inmate C.  It's Exhibit 23.

20   A.    I'm sorry.  Did you say 23?

21   Q.    Exhibit 23, yes.

22   A.    Okay.

23   Q.    And is this an example of sort of two RVRs kind of

24   following close in time?

25   A.    Yes.

474

1          MR. BORNSTEIN:  Your Honor, I move into evidence

2   under seal 23-C1 and 23-C2.

3          THE COURT:  Received.

4              (Whereupon, Plaintiffs' Exhibit 23c1 and 23c2

5               received into evidence.)

6          MR. BORNSTEIN:  Is there also -- is there a d also?

7          (Counsel confer.)

8          And there is also 23d, Your Honor.

9              (Whereupon, Plaintiffs' Exhibit 23d received into

10              evidence.)

11  BY MR. BORNSTEIN:

12  Q.      With respect to the initial violation, was that on

13  July 15th, 2012?

14  A.      Yes.

15  Q.      And can you briefly summarize the salient facts.

16  A.      He was in his cell and -- give me a second here --

17  refused to take his morning medication.  And so a decision

18  was made to bring him out of his cell.  And in the first

19  incident he came out as a result of the admonishment.

20  Q.      And even though he came out as a result of the

21  admonishment, was he still subjected to an RVR?

22  A.      He received one for willfully delaying a peace

23  officer.

24  Q.      And then there was a mental health assessment that

25  was done?

475

1   A.      There was.

2   Q.      And were there -- did the clinician find that the

3   inmate's mental disorder appeared to contribute to the

4   behavior?

5   A.      The reports says that he has several -- that he has a

6   severe mental disorder and at times this mental illness will

7   result in difficulty following rules or delaying peace

8   officers.

9   Q.      And then did the clinician recommend or suggest that

10  the if the inmate is found guilty, that there are mental

11  health factors that the hearing officer should consider?

12  A.      Yes.  It says:

13          (Reading:)

14          His severe mental illness is why he was placed on a

15          forced medication protocol.  He will probably need to

16          be forced or persuaded to take his medication from

17          time to time.

18          (Reading concluded.)

19  Q.      What was the sanction, if any, that resulted from

20  willfully delaying a peace officer for this incident?

21  A.      It may take me a minute to find it with all of these

22  pieces of paper.

23  Q.      Maybe I can help you.  If you can, look on the top of

24  page 9 or 10.

25          It's part C of the Rules Violation Report, I think,

476

1    on page 10.

2    A.        He lost 61 days of credits.

3    Q.        That's good time credit?

4    A.        Yes.

5    Q.        Okay.  And based on the recommendation of the Mental

6    Health Assessment Form, was there any loss of privileges?

7    A.        No.  In fact, the Mental Health Assessment Form was

8    given credit for not losing privileges.

9    Q.        Okay.  Then in tab C2 of the same Exhibit 23 there's

10   a subsequent Rules Violation Report dated August the 6th?

11   A.        I have August the 2nd.

12   Q.        Okay.  Excuse me.  August the 2nd.

13            And what happened in this one?

14   A.        In this case I believe it was the same behavior.

15   Yeah.  He wasn't going to take his prescribed medication, and

16   so there was another cell extraction.  This time they had

17   to -- or they determined that they needed to use pepper

18   spray.

19   Q.        Now, that is exactly what the first clinician thought

20   was likely to happen.  In other words, there would be a

21   problem with this inmate refusing medication?

22   A.        It was predicted, yes.

23   Q.        In this particular health assessment did the

24   clinician find that the inmate's disorder appeared to

25   contribute to the behavior?

477

1    A.        They did.

2    Q.        And for basically the same reasons?

3    A.        In consultation with the inmate's primary clinician

4    and a review of the UHR, mental health tracking, symptoms

5    such as paranoia appear to have contributed to the behavior

6    that led to the RVR.

7    Q.        With respect to the third question, was the box "yes"

8    or "no" checked?

9              In other words, are there any mental health factors

10   that the hearing officer should consider in assessing the

11   penalty?

12   A.        The "no" box is checked.

13   Q.        And in this particular case, what happened?

14   A.        In this case he lost 90 days credit and was assessed

15   ten days loss of yard.

16   Q.        And you said he was also subjected to pepper spray

17   and a cell extraction?

18   A.        Yes.

19   Q.        Okay.  We talked a little bit about immediate force,

20   and you talked about the --

21             THE COURT:  Before you get there, apparently he was

22   punished because it was perceived he willfully interfered

23   with an officer's timely response.  The word was "willfully."

24             THE WITNESS:  Yeah.  That's the specific charge.

25             THE COURT:  If you are mentally ill, it is unlikely

478

1   that you're willful?

2          THE WITNESS:  That would be a good use of the third

3   question I think.

4          THE COURT:  And nobody stopped to ask that question

5   apparently.  I mean, was the decision even reviewed?

6          I take it that the officer imposing the punishment

7   didn't perceive any relationship between the words and the

8   conduct?

9          THE WITNESS:  No.  They rely on the MHA, the Mental

10  Health Assessment.

11         THE COURT:  And is this reviewed by anybody?

12         THE WITNESS:  There is an appeal process that the

13  inmate can access.

14         THE COURT:  Did he access it at this time?

15         THE WITNESS:  I don't know.

16         THE COURT:  Okay.  You may proceed, sir.

17  BY MR. BORNSTEIN:

18  Q.     Just to follow up on that, is there any systematic

19  tracking that you -- that exists where someone in CDCR is

20  looking at these RVR reports, especially for seriously

21  mentally ill inmates, and trying to find out whether and to

22  what extent the mental illness factors that are supposedly

23  documented on some of these forms are taken into

24  consideration?

25  A.     That's a question that we asked at the morning

479

1    briefing that we had with each superintendent or each warden

2    and his group of executive staff that were assembled.  It was

3    either at the beginning of the day or the end of the day, but

4    we always asked that question.  And I didn't find that any of

5    the institutions that I inspected that that data was being

6    tracked.

7           I think that data is very important, not only at the

8    central office level so they can see how each institution is

9    doing, but if it was kept at the facility level, you could

10   measure the performance of different clinicians and different

11   hearing officers.

12          There were cases where -- or examples I found in the

13   records I reviewed where at least one mental health clinician

14   always said "No," "No," "No."  I mean, on its face that's a

15   problem.

16          But if you don't collect aggregate data, you can't

17   take that 30,000 foot look that allows you to then dive in

18   and solve individual problems where they exist -- where you

19   find they exist.

20   Q.      Staying with the second RVR, if you could, turn to

21   page C-2 of Exhibit 23, page 3 at the top?

22   A.      Yes.

23   Q.      I want to talk about the staff assistant issue.

24          How does CDCR use staff assistants in the RVR process

25   for seriously mentally ill inmates?

480

1  A.      Well, if it's determined that a staff assistant is

2  necessary, which relates to the first question on the Mental

3  Health Assessment, and also I believe if the TABE score is

4  below 4 they can get a staff assistant, they're assigned a

5  staff member to help them with preparation for the hearing

6  and that person attends the hearing.

7         What I -- what troubles me about the process is that

8  they're always correctional officers and most always officers

9  that are within the chain of command of the hearing officer

10 who is their lieutenant.

11        I don't believe -- I think that creates a conflict

12 and that effective advocacy for the inmate is not going to

13 occur when the officer would have to do that in front of his

14 on her lieutenant.

15 Q.      In the Rules Violation Report, again on that same

16 page, it appears as though the treating psychologist -- or

17 the psychologist who filled out the form concluded his

18 assessment noting that "if the inmate is found guilty of the

19 offense, there are mental health factors that the hearing

20 officer should consider in assessing the penalty."

21        Isn't that what this form says?

22 A.      I'm sorry.  I lost track of where you are at.

23 Q.      In the section that says "Mental Health," middle of

24 the page, last sentence.

25        Do you see that?

481

1    A.      Yeah.  That's what it says.

2    Q.      So there is some internal inconsistency in the

3    paperwork here too?

4    A.      There is.

5    Q.      Do you know what a TABE reading score is?

6    A.      I think it usually pronounced TABE.  It is an adult

7    basic education score.  It more or less corresponds with

8    grade level.

9    Q.      What does it mean if it is -- there is a note on this

10   that says there is a TABE reading score below 4.0?

11   A.      That means the person's reading below a fourth grade

12   level.

13   Q.      So with respect the second RVR, were you able to

14   determine whether there was any taking into account of this

15   inmate's mental condition in fashioning the sanction?

16   A.      No, not that I can see.

17   Q.      So based on these two incidents, there was a total of

18   150 days of lost credit for essentially refusing to be

19   medicated within, what, a two-week period?

20   A.      Yeah.  Within a -- might have been three, but yes.

21   Q.      I want you to turn to tab 43 for identification.

22           This concerns Inmate BB.

23   A.      Yes.

24   Q.      Are you familiar with the RVR materials that are

25   here?

482

1    A.       I've looked at them before, yes.

2             MR. BORNSTEIN:  Your Honor, I move under seal Exhibit

3    43 into evidence.

4             THE COURT:  Received.

5                 (Whereupon, Plaintiffs' Exhibit 43 received into

6                  evidence.)

7    BY MR. BORNSTEIN:

8    Q.       Can you tell us what happened in this case?

9    A.       This is an example of the food port concern that I

10   expressed previously.  And while there is different accounts

11   of this, what the RVR report says is that the inmate threw

12   his food tray out of the food port and wouldn't let the

13   officer close the port.  Then he was immediately pepper

14   sprayed.

15   Q.       What, if any -- Strike that.

16            Was this -- were there mental health factors that

17   were considered or at least reported on in this case?

18   A.       Looking at the Mental Health Form --

19   Q.       Well, actually if you turn to the report on page 3 --

20   it's the third page in.  I'm sorry.

21            On page 9 is the mental health form.

22   A.       Yeah.  On question 2 it is checked "yes."  It says:

23            (Reading:)

24            The inmate-patient is severely mentally ill.  His

25            condition renders him out of touch with reality and

483

1           responding to internal stimuli on a frequent basis.

2           His perceptions are distorted.  He has very limited

3           interpersonal skills.

4           (Reading concluded.)

5   Q.      With respect to the third question, whether there are

6   mental health factors that should be considered in assessing

7   a penalty?

8   A.      The box "yes" is checked.  And it says:

9           (Reading:)

10          The offense/RV could have taken place due to inmate's

11          perception of events.

12          (Reading concluded.)

13  Q.      Could you tell whether or not the inmate's mental

14  condition was taken into account in the sanction that was

15  imposed?

16  A.      Let me find the sanction.

17  Q.      It would be on page -- well, the fourth page in tab

18  43.

19          It's page 3 of 5 of the Rules Violation Report, part

20  C.

21  A.      Page 3 of 5.  Okay.

22  Q.      It will say 4 at the top.

23  A.      The paperwork is a bit confusing.

24  Q.      Actually, let's go to page 6.

25  A.      All right.

484

1        For one thing, the original charge of battery on a

2   peace officer -- or the original charge was -- I'll get this

3   right in a minute -- battery on a peace officer with a

4   weapon, and it was reduced to battery on a peace officer.

5   Q.        Actually, the sanction in this particular case is set

6   forth on page 1 of 5, which is page 2 of the -- page 2 at the

7   top.

8   A.        Yes.  He was assessed 121 days forfeiture of credits.

9   He was also referred to the Inmate Classification Committee

10  for program review, which I believe means consideration of

11  placement in a Special Housing Unit.

12  Q.        Was he also referred to the district attorney?

13  A.        I believe that is true.

14  Q.        And on the very first page of this packet there's

15  some handwriting relating to the ICC.

16            Can you make out what that means?

17            Was he given an 18-month sentence of some sort?

18  A.        That's what it looks like.  It says "ICC," then there

19  a date, then 18 months.  A couple dates written on here.

20            MR. RUSSELL:  Your Honor, move to strike.  It's based

21  on speculation.  It is deciphering the handwriting on the

22  page.

23            THE COURT:  Well, you're having trouble.  Apparently

24  the witness is not.

25            You may proceed, sir.

485

1        What was your last question?

2   BY MR. BORNSTEIN:

3   Q.      Do you know what that refers to?

4   A.      I believe that it refers to a 18 month SHU term.

5   Q.      Are these examples that we've just talked about

6   representative of the kind of discipline that you saw imposed

7   on seriously mentally ill inmates in the papers that you

8   looked at?

9   A.      Yes.

10  Q.      What, from your perspective -- are there certain

11  changes that need to be made in the way in which California

12  imposes discipline on seriously mentally ill inmates beyond

13  what you have already testified to?

14  A.      Yeah.  And I might repeat myself a little bit, but I

15  would get that hearing officer out of the chain of command

16  from an area where the inmate exhibited the behavior so that

17  you can begin to establish some legitimacy in that process,

18  and it is not just seen as a rubber stamp because this is

19  part of the folks who run things.  They need to be somewhat

20  independent.

21          I would expand the list of staff eligible to be staff

22  assistants and certainly would include mental health staff.

23  Sometimes they would have the best relationship with the

24  inmate.

25          I would change this form, especially the last

486

1  question.

2          It's always important to document behavior.  There

3  might be lots of uses for that documentation at a later date,

4  but when someone's behavior is connected to their

5  hallucinations or their paranoia, it doesn't make sense to

6  punish them.

7          The result is that punishment is things like longer

8  stay in more isolated environments, lack of privileges,

9  staying in prison longer.  And that cycle begins anew because

10  you're putting mentally ill inmates in conditions that are

11  going to acerbate their mental health condition.

12  Q.     Did you find whether there was any sort of process or

13  procedure that allowed staff to mitigate the actual charge

14  itself as opposed to just the punishment.

15          In other words, some sort of diversion program or

16  something else based on someone's mental illness?

17  A.     No, not that I saw.

18  Q.     Should there be?

19  A.     Yeah, absolutely.  In a treatment unit that can be

20  very valuable.  Depending upon the nature of the behavior,

21  the sanction might be:  Go talk to your anger management

22  group about what happened here.

23          That might not sound like sufficient punishment, but

24  it might have a bigger effect in changing behavior than

25  keeping someone out of the dayroom for 30 days.

487

1   Q.      I want to talk about one more, and this is Inmate J

2   at tab 20.  And there are -- with respect to Inmate J, there

3   appear to be four separate incident reports.

4           I take that back.  There are two separate incidents

5   here, right?

6   A.      This is not one that I've looked at before.

7   Q.      Okay.  Well, then never mind.

8   A.      I'm sorry.  I'm sorry.  I saw the wrong name.

9   Q.      This is Inmate J.

10  A.      No.  I am familiar with this.  I was confused.

11  Q.      So do you recall this one?

12  A.      I do.

13  Q.      Were there two separate incidents?

14  A.      There were.

15  Q.      On the 13th and 14th of August 2012?

16  A.      Yes.

17  Q.      And can you just summarize them for us briefly?

18  A.      There's a video of this one too, and it's a bit

19  bizarre.

20          The staff had decided that they were going to take

21  this wheelchair away from the inmate because it was

22  determined that he no longer needed the wheelchair.  And

23  their decision was to go in and restrain him before they told

24  him.

25          So that began a kind of cell extraction.  I don't

488

1    know if that is quite the right word, but there winded up

2    being an immediate pepper spray in his face as a result, if

3    I'm remembering this case correctly.

4    Q.    As a result of the first cell extraction, then did

5    they take away his wheelchair?

6    A.    Yes.

7    Q.    Then what happened?

8    A.    He was in the MHCB, and he was in a -- I mean, the

9    next video is he's in a suicide smock in a different cell.

10    I'm going to look at my notes for a minute to make

11    sure I'm tracking this one, if that's all right.

12    (Brief pause.  Witness reviews notes.)

13    Yeah.  On the second day he had done some damage to

14    his smock and his mattress.  And it was determined that a

15    cell extraction was necessary to remove those items from his

16    cell.

17    Q.    When you say "had done some damage to his smock," you

18    are talking about a suicide smock?

19    A.    Yes.

20    Q.    And the damage he had done was what?  Ripping it up?

21    A.    Yes, he was tearing it up.

22    Q.    And what were the result of these two RVRs?

23    A.    On the first one he lost 90 days of credit.  On the

24    second one he lost 150 days and was charged $753 for the

25    damaged items.

489

1    Q.      In your -- you filed three declarations in this case,

2    right?

3    A.      I did.

4           MR. BORNSTEIN:  The first one has been marked as

5    Exhibit 112, and that's dated 3-14-13.  And I'd move that

6    into evidence, Your Honor.

7           THE COURT:  Hearing no objection, it is received.

8               (Whereupon, Plaintiffs' Exhibit 112 received into

9                evidence.)

10          MR. BORNSTEIN:  The second one is dated May 29, 13.

11   It is marked as Exhibit 124, and I move that into evidence.

12          THE COURT:  Received.

13              (Whereupon, Plaintiffs' Exhibit 124 received into

14               evidence.)

15          MR. BORNSTEIN:  The third one is dated August 23rd,

16   13.  It's marked as Exhibit 180.  I move that into evidence.

17          THE COURT:  Received.

18              (Whereupon, Plaintiffs' Exhibit 180 received into

19               evidence.)

20   BY MR. BORNSTEIN:

21   Q.      By the way, before I move on to something else, with

22   respect to the last inmate, Inmate J, do you know why he got

23   the first RVR?

24   A.      I would have to look.

25   Q.      Maybe it is worth just taking a quick look at Exhibit

490

1    20 for identification.

2          MR. BORNSTEIN:  Your Honor, I haven't moved it in,

3    but I would move in Exhibit 20 and its subparts in evidence

4    under seal.

5          THE COURT:  Received.

6                (Whereupon, Plaintiffs' Exhibit 20 received into

7                 evidence.)

8    BY MR. BORNSTEIN:

9    Q.       If you look at --

10   A.       Yeah.  This is Disobeying Orders/Resisting.  He wound

11   up with one of those triangles on, and they had some trouble

12   getting it off.

13   Q.       And wasn't the problem that he remand sitting on the

14   end of his bed and didn't stand up?

15   A.       Yeah.  This is -- you know, the video would show this

16   is a pretty passive guy who is not really doing anything

17   aggressive.  He's just kind of, with all due respect to him,

18   a bit of an immovable object.

19   Q.       This is the same guy who had a wheelchair?

20   A.       Yeah.  Previously.  Yeah.

21   Q.       Well, that day?

22   A.       Yes.  That day.

23   Q.       I want to talk about something that you wrote about

24   in one of your declarations about the disproportionate impact

25   that California's use of force and disciplinary processes

491

1   have on seriously mentally ill inmates.

2   A.      Okay.

3   Q.      Did you find that?

4   A.      Yes.  Some of the first documents -- well, there was

5   a lot of documents that came at once, and in trying to read

6   through them prior to the inspections, I got the Monthly

7   Mental Health Management Reports from, I think the 25th

8   round, to the Special Master.

9           I got them not just for the facilities I was

10  inspecting, but I got them for all the facilities that

11  submitted them within CDCR.

12          And it wasn't a complete report.  It was a portion of

13  the report.  But it included available information about

14  RVRs, and it also included information about use of force

15  relative to mentally ill inmates.

16  Q.      These are the Mental Health Management Reports

17  prepared for the Special Master in connection with the 25th

18  round of monitoring?

19  A.      Yes.  That's what I was looking at.

20  Q.      If you would turn to tab 64.

21  A.      Okay.

22  Q.      Are these, in fact, the excerpts that have the

23  information about use of force and RVR data provided to the

24  Special Master by the facilities?

25  A.      Yes, they appear to be.

492

1    Q.       And does each report then have a section for both Use

2    of Force and RVR?

3    A.       You know, they're not perfect, but most of them do.

4    Q.       In the Use of Force section -- maybe we can look at

5    one of them.  Why don't we turn to -- why don't we turn to

6    the one for LAC.

7             And if we turn -- so on page DRPD 1 00354?

8    A.       Yes.

9    Q.       That will have the RVR -- they call it RVR Protocols?

10   A.       It does.

11   Q.       So during the reporting period 1290 inmates at the

12   institution received RVRs?

13   A.       That's what it says.

14            THE COURT:  What institution?

15            MR. BORNSTEIN:  Pardon me?

16            THE COURT:  What institution?

17            MR. BORNSTEIN:  This is LAC.

18            THE COURT:  All right.

19   BY MR. BORNSTEIN:

20   Q.       It will say 192 for GP inmates.

21   A.       Yes.

22   Q.       680 for CCCMS?

23   A.       Uh-huh.

24   Q.       You have to answer yes or no?

25   A.       Yes.  Sorry.

493

1    Q.      395 EOP?

2    A.      Yes.

3    Q.      15 MHCB?

4            That's Mental Health Crisis Bed, correct?

5    A.      Yes.

6    Q.      And 16 ASU?

7    A.      Yes.

8    Q.      Then the next page it will have the breakdown of Use

9    of Force?

10   A.      Yes.  At the top of the page.

11   Q.      In that one they say:

12           (Reading:)

13           Of the Use of Force Incidents, 65 percent occurred

14           with MHSDS inmate-patients.

15           (Reading concluded.)

16   A.      Yes.

17   Q.      Then it talks about something called Non-Use of Force

18   Incidents, that 61 percent occurred with MHSDS patients.

19           Do you know what that means?

20   A.      Not precisely, no.

21   Q.      Okay.  So that's an example of the kind of

22   information that would go to the Special Master?

23   A.      That's my understanding, yes.

24   Q.      Then how were you able to determine -- by the way,

25   this was generally during what period of time that we're

494

1  looking at this data, the 25th monitoring period?

2  A.      I'm going to guess, which is probably a bad idea.  It

3  depended.  I mean, the reports were due like in June of 2012,

4  but, for example, this report, you know, if you look at the

5  first page, it talks about the audit period being October

6  2011 to March 2012.  But all of these fit within that

7  nine-month window, October 2011 until June of 2012.

8  Q.      Okay.  Then with respect to the percentage or, you

9  know, how many inmates we're talking about, many times was

10  that information not in those Mental Health Reports.

11  A.      It was reported very inconsistently.

12  Q.      So then turn to tab 60.

13          Does CDCR give weekly population reports on its

14  website?

15  A.      Yes.

16  Q.      And does it give the total number of inmates at each

17  institution?

18  A.      It does.

19  Q.      Does it also -- is that what is in Exhibit 60, a

20  printout dated as of midnight June 6, 2012?

21  A.      Yes.

22          MR. BORNSTEIN:  Your Honor, I move Exhibit 60 into

23  evidence.

24          THE COURT:  Received.

25              (Whereupon, Plaintiffs' Exhibit 60 received into

495

1              evidence.)

2    BY MR. BORNSTEIN:

3    Q.      Then with respect to -- are there further reports

4    that CDCR provides to the Special Master about the mental

5    health population by institution?

6    A.      There's a summary of the outpatient population that's

7    provided to the Special Master, and I believe a copy goes to

8    the plaintiffs' counsel.

9    Q.      And that will show all of the CCCMS, EOP and PSU

10   inmates?

11   A.      Yes.

12   Q.      And it will also break them down by where they're

13   housed, whether they're ASU or GP or what have you; is that

14   right?

15           On the succeeding pages?

16   A.      Oh, okay.

17           Yes, it does.

18           MR. BORNSTEIN:  I move 61 into evidence, Your Honor.

19           THE COURT:  Received.

20               (Whereupon, Plaintiffs' Exhibit 61 received into

21                evidence.)

22           THE CLERK:  60 and 61 were admitted October 2nd.

23           THE COURT:  We've readmitted them.  Didn't want them

24   to get away from us.

25           Go ahead.

496

1    BY MR. BORNSTEIN:

2    Q.      There was a particular reason that you looked at the

3    June 2012 data?

4    A.      That was the data that was available that

5    corresponded with the information that we had at the time.

6    Q.      And then from that data were you able to -- what did

7    you ask be done with that data?

8    A.      I mean, it was a lot of information to absorb in a

9    very short period of time.  But as I was reading these

10   documents, it appeared to me that there was a

11   disproportionate impact on the mentally ill subjected to use

12   of force in the RVR process.

13          So I began to talk with different members of

14   plaintiffs' counsel to see if they saw the same thing and to

15   try to help me get to the bottom and understand what was

16   going on.

17          As a result, they took the ball, if you will, and

18   went through all of the documents in great detail and

19   produced the results.

20   Q.      And are those results for use of force in 62-B, C and

21   D?

22   A.      Yes.

23          MR. BORNSTEIN:  Your Honor, I move 62-B, C and D into

24   evidence.

25          May I approach and hand you a copy?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

497

1          MR. RUSSELL:  Defendants object.  Mr. Vail has

2     testified he did not put these documents together.  These

3     were put together by plaintiffs' counsel.

4          There has been no verification of the numbers within

5     these documents.  The underlying documents speak for

6     themselves, but there is no way to verify this is an accurate

7     representation of what's been either reported to the Special

8     Master or what's within CDCR's data itself.

9          THE COURT:  These are summaries, and the summaries

10    have got to show they were prepared under circumstances in

11    which they were reasonably reliable.

12          I have no doubt that Mr. Vail saw what he saw, but

13    being put together, I assume, by somebody on plaintiffs' --

14    I'm not sure who.  Who put the numbers together, if you know,

15    Mr. Vail.

16          THE WITNESS:  There was a couple of people.  Megan

17    Cesar and Linda Woo.

18          THE COURT:  I think the objection as present record

19    is well-taken.  You're going to have to establish -- if you

20    represent you'll put somebody on to say how it was done and

21    demonstrate that it was done properly, I'll let it in

22    conditionally.  But otherwise, I'm not going to let it in.

23          MR. BORNSTEIN:  May I have a minute?

24          THE COURT:  Take two.

25          MR. BORNSTEIN:  Thank you.

498

1          (Plaintiffs' counsel confer.)

2          MR. BORNSTEIN:  I think I'll start by asking

3    Mr. Vail.

4    BY MR. BORNSTEIN:

5    Q.     Mr. Vail, Did you review the numbers and the charts

6    to see whether they were accurate?

7    A.     It would be accurate to say I spot checked them.

8    Q.     Are you satisfied these are reliable for you to use

9    as far as your -- from your expert opinion?

10   A.     Yes.

11          THE COURT:  Same objection?

12          MR. RUSSELL:  Yes, Your Honor.

13          THE COURT:  Same ruling.

14          MR. BORNSTEIN:  All right.

15          Well, I will lay a foundation, but I will put these

16   in at a different time then.

17          THE COURT:  You can put them in now if you represent

18   to the court that you're going to get the person who did the

19   numbers to say:  Yes, I did them.  This is how I did them.

20   I'll conditionally admit them.

21          It is up to you whether you want them now, later or

22   not at all.

23          MR. BORNSTEIN:  I want them.  I want to do that.

24          THE COURT:  They will be admitted conditionally.

25          Madam Clerk, remind me at the end of the case if they

499

1  don't put it in and we'll strike them.

2        THE CLERK:  62B, C and D?

3        THE COURT:  62B, C and D, correct.

4        MR. BORNSTEIN:  Yes.

5            (Whereupon, Plaintiffs' Exhibits 62B, 62C and 62D

6            conditionally received into evidence.)

7  BY MR. BORNSTEIN:

8  Q.    I ask you to look at 63B, C and D.  And are those

9  similar summaries of the RVRs based on the underlying

10 documents we just went over?

11 A.    Yes.

12        MR. RUSSELL:  Your Honor, I object.  The numbers were

13 put together by plaintiffs' counsel.  This is essentially

14 testimony my plaintiffs' counsel regarding the numbers.

15        THE COURT:  Thank you, sir.  The objection is

16 overruled.

17        Again, I remind you that I'm receiving these

18 conditionally only.

19        Proceed.

20        There's no harm in who prepares them as long as the

21 person who gets on the stands says that I prepared them and

22 this is what I did and demonstrates that it was properly

23 done.

24        You may proceed, sir.

25        MR. BORNSTEIN:  Thank you.

500

1           So I move 63B, C and D into evidence as well, Your

2     Honor.

3           THE COURT:  I'm sorry.  63?

4           MR. BORNSTEIN:  63.  These are the RVRs.  62 are the

5     Use of Force.

6           THE COURT:  I got B, C, D of 62.

7           MR. BORNSTEIN:  Right.  This is 63.

8           THE COURT:  What is 63 supposed to be?

9           MR. BORNSTEIN:  The RVRs.

10          THE COURT:  I see.  That's admitted conditionally as

11    well.

12          The objection is the same?

13          MR. RUSSELL:  Yes, Your Honor.

14          THE COURT:  And the ruling is the same.  They are

15    conditionally received.

16          (Whereupon, Plaintiff's Exhibits 63B, 63C and 63D

17             conditionally received into evidence.)

18          MR. BORNSTEIN:  Your Honor, I would like to approach

19    again and show you Exhibit 1001.

20          Exhibit 1001 is a summary document that's to aid the

21    court in terms of -- that we'd ask be filed under seal.

22          It gives the inmate name with the code we're using,

23    the CDCR number, what exhibit or exhibits are pertinent.  And

24    then to the extent that there were paragraphs in one or more

25    declarations that have been filed in this case, what the

501

1    declarations -- what paragraphs refer to these particular

2    inmates.

3            And it is simply to help the court as it considers

4    all this evidence.  I move it in for that purpose.

5            MR. RUSSELL:  Your Honor, we have no problem with the

6    plaintiffs attempting to assist the court in deciphering

7    these documents.  But the problem I have here is the

8    references in the briefing.

9            Again, I think this is testimony by plaintiffs'

10   counsel.  I don't know whether this is true or not.  This is

11   counsel's estimation of what has been said by the witnesses.

12           THE COURT:  I have no idea of what you just said,

13   counsel.  I don't mean that disrespectfully.

14           I'm going to receive it as a demonstrative document

15   to aid the court in understanding what everybody has been

16   talking about.  And I don't even know that I particularly

17   need to admit it conditionally, but I don't know who put this

18   together.

19           Do you know who put this together, Mr. Vail?

20           THE WITNESS:  No.

21           MR. BORNSTEIN:  Plaintiffs' counsel did.

22           THE COURT:  Well, when you say plaintiffs' counsel,

23   there are a whole bunch of them.

24           MR. BORNSTEIN:  I know.  I don't know which one

25   exactly.

502

1          THE COURT:  But you'll find out and tell me in due

2     course.

3          MR. BORNSTEIN:  Yes.

4          THE COURT:  Received conditionally as well.

5               (Whereupon, Plaintiffs' Exhibit 1001 received

6                    conditionally into evidence.)

7          MR. BORNSTEIN:  I think I forgot to do this when we

8     played the video.  There was a little confusion on Exhibit 4.

9     This is for Inmate B.  I think the court received into

10    evidence an Exhibit 4, but those are really only the medical

11    records.  So to be consistent it really should be 4d.

12         THE COURT:  Do you want to move 4d as well?

13         MR. BORNSTEIN:  Then I want to move 4a, b and c in,

14    which are the underlying Incident Report, IERC and RVR, to

15    the extent that we had it.

16         THE COURT:  Hearing no objection, they're received.

17              (Whereupon, Plaintiffs' Exhibits 4a, 4b, 4c and

18                   4d received into evidence.)

19         MR. BORNSTEIN:  At this time, Your Honor, subject to

20    my being able to go back and maybe move in some other

21    documents, I have nothing further at this time.

22         THE COURT:  What time is it, Madam Clerk?

23         THE CLERK:  2:40.

24         THE COURT:  We'll take our break now.

25              Afternoon break of 15 minutes, Ladies and Gentlemen.

503

1          (Off the record at 2:40 p.m.)

2          (On the record at 3:00 p.m.)

3          THE CLERK:  Please, remain seated.

4          Court is now in session.

5          THE COURT:  Counsel.

6          May I have your name, sir?

7          MR. RUSSELL:  Yes, Your Honor.  Jay Russell.

8          THE COURT:  You may proceed.

9                         CROSS-EXAMINATION

10   BY MR. RUSSELL:

11   Q.     Good afternoon, Mr. Vail.  We met before.  I'm Jay

12   Russell.  I represent the defendants in this case.

13          I would like to take you back to your testimony

14   regarding Inmate C.  And I believe that you looked at the

15   documents at tab Number 23.  And in particular I believe that

16   tab has two sections, there is an A and B.  And I want you

17   to -- if it is 23b I would like you to turn to the Rules

18   Violation Report.

19   A.     23b?

20   Q.     I believe so.  It's the Rules Violation Report

21   section of that exhibit.

22          MR. BORNSTEIN:  Excuse me, counsel.

23          Your Honor, I just got documents provided to me.  Is

24   this what we are talking about, or are we talking about

25   something different?

504

1        THE COURT:  I'm sure that you have said something of

2    great significance, but since you're mumbling I have no idea

3    what it is.

4        MR. BORNSTEIN:  Your Honor, I object.  I was just

5    handed two pieces of paper that were not produced to us until

6    just now.  And I don't know what -- whether these are the two

7    pieces of paper Mr. Russell is trying to use to inquire of

8    Mr. Vail.  But these are not part of any of the records

9    they've given us.

10        THE COURT:  We have two things going on.

11        You can't find what he's asking you for, best you can

12    tell, correct?

13        THE WITNESS:  I think it is at 23c1 and c2.  There

14    are RVRs related to the same inmate.

15        THE COURT:  Is that what you are looking for?

16        MR. RUSSELL:  Yes, Your Honor.  I'm asking him to

17    look in the binder.

18        THE COURT:  All right.  23 what, sir?

19        THE WITNESS:  23c1 and c2.  I'm not sure which one

20    we're looking at.

21        THE COURT:  I don't know either.

22        And we now have an objection about some documents

23    which you handed apparently to plaintiffs which they say they

24    have never seen before and object on that basis.

25        I don't know what it is about either.

505

1          MR. RUSSELL:  Your Honor, these are documents

2   produced to plaintiffs' counsel approximately three weeks ago

3   relating to -- they relate to this inmate.

4          MR. BORNSTEIN:  Your Honor, we have not seen these

5   documents before today.

6          THE COURT:  When are you going to question about

7   these documents?

8          Is that what you are doing right now?

9          MR. RUSSELL:  I do want to ask the witness about

10  these documents.

11         THE COURT:  Well, I have two different version:  Yes,

12  I did.  No, I didn't.  I wasn't there.

13         Who did you -- you sent them by mail or something or

14  email.

15         MR. RUSSELL:  I believe by email directly by CDCR,

16  Your Honor.

17         MR. BORNSTEIN:  Do you have a date?

18         MR. RUSSELL:  September 27th.

19         Excuse me.  October 2nd.

20         MR. BORNSTEIN:  I'm sorry to burden you with this.

21         THE COURT:  All right.  If you haven't seen them, you

22  haven't seen them.

23         MR. BORNSTEIN:  I object to the late production of

24  this under the circumstances, but I would like to move

25  forward.  And we'll --

506

1       THE COURT:  I have no idea of what you are talking

2   about.

3       Counsel, if you object, I'll have to worry about

4   that.  If you are just mumbling, that's fine as well.

5       MR. BORNSTEIN:  I object on the grounds that this was

6   not produced.  And if it was produced, it was produced in a

7   way that we didn't get it.

8       THE COURT:  And you, of course, don't know.  All you

9   know is that CDCR told you they were.

10      MR. RUSSELL:  And copied us on the email, as well,

11  Your Honor.

12      THE COURT:  I'm sorry?

13      MR. RUSSELL:  And copied us on the email as well to

14  plaintiffs' counsel.

15      THE COURT:  I don't know what to tell you guys.

16      MR. BIEN:  This will take one second.

17      THE COURT:  Yeah.  Go ahead.

18      (Brief pause while counsel confer.)

19      MR. BORNSTEIN:  We pulled up the three emails.  These

20  documents are not in any of the three emails they sent us.

21      As my cocounsel is reminding me, there was a meet and

22  confer afterwards asking for any additional documents that

23  they had on any of the inmates that we had testimony about.

24      THE COURT:  You've received an email that you say

25  included these documents, correct, Mr. Russell?

507

1          MR. RUSSELL:  That is correct, Your Honor.

2          THE COURT:  They say that we got an email, but it

3     didn't include these documents.

4          MR. RUSSELL:  Your Honor, these documents -- they

5     have a date on them.  They have a Bates stamp number.  My

6     understanding is that CDCR did everything possible to provide

7     these to the plaintiffs' attorneys in a timely fashion.

8          THE COURT:  It is precisely the objection that you

9     made to these documents.  I have know idea who did what to

10    who.

11         If you have somebody from CDCR who is prepared to

12    say -- Well, wait a minute.  They may be solving your

13    problem.

14         MR. RUSSELL:  May I speak to that, Your Honor?

15         THE COURT:  Hang on.

16         MR. RUSSELL:  Okay.

17         MR. BORNSTEIN:  What I understand, Your Honor, is

18    that these two pages were not sent on August -- on October

19    2nd.  They bear a date of 9-24-2013.  I'm told by my

20    colleagues that there was a huge stack of materials that were

21    produced on that day, and we specifically asked whether we

22    were going to use any of this or show it to Mr. Vail and we

23    said no because otherwise they had to demanded that he would

24    be deposed again or trial would be postponed.

25         So we didn't show it to him.  We did not know that it

508

1   was going to be at issue to day.  And that's probably where

2   these documents are.  So that's my objection.

3        THE COURT:  You indicated that somebody has indicated

4   to you they would not be used in cross-examining Mr. Vail.

5        Who told you that?

6        MR. BORNSTEIN:  No.  It was that we were not going to

7   use them.  We were not going to show them to him because

8   otherwise they were going to move the court to postpone the

9   trial.  So we said:  Okay.  Fine.  We won't show him these

10  documents.

11       And I think there was an order from the Magistrate

12  Judge to that effect or from Judge Karlton.

13       THE COURT:  You didn't show it to him.  That is

14  different than saying they can't use it.

15       MR. BORNSTEIN:  I understand.  But I wanted that

16  noted for the record that I have never seen these before, and

17  this is the first time I'm seeing them and the witness has

18  not.

19       THE COURT:  That may be an internal problem.  I have

20  no idea.  I'm not going to hold it up any further.  I can't

21  imagine that the world will collapse on the use of these

22  documents.

23       You may proceed, Mr. Russell.

24       MR. RUSSELL:  Thank you, Your Honor.

25       I will submit these are documents maintained in the

509

1   regular course of business by CDCR relating to this inmate.

2   I would like to move these into evidence as defendants' next

3   objection.

4           MR. BORNSTEIN:  I object.  Lack of foundation.

5           THE COURT:  You can't represent that, sir.  You can

6   hope that it is true.

7           You understand what I'm saying?

8           MR. RUSSELL:  I do, Your Honor.

9           THE COURT:  I mean, if somebody from CDCR shows up

10  and says yes, this is -- again, I can admit them

11  conditionally.  And if you can bring somebody who will

12  demonstrate it is kept in the regular course of business, I

13  suppose we'll have to worry about that then.

14          MR. RUSSELL:  We can do that, Your Honor.

15          THE COURT:  All right.  They are received

16  conditionally.

17          THE CLERK:  Exhibit number?

18          THE COURT:  I don't know.

19          You haven't marked them yet.

20          MR. BORNSTEIN:  Which is which, please?

21          MR. RUSSELL:  I was going to mark them together.

22          THE CLERK:  So together?

23          THE COURT:  I don't know.

24          THE CLERK:  I don't know either.  So C.  Exhibit C.

25          THE COURT:  What are the numbers, Madam Clerk?

510

1          THE CLERK:  I think it is just C.  Exhibit C.

2          THE COURT:  All right.  C is received conditionally.

3              (Whereupon, Defendants' Exhibit C received

4               conditionally into evidence.)

5          MR. RUSSELL:  Your Honor, may I show those to the

6    witness?

7          THE COURT:  Of course.

8          (Exhibit hand to witness for review.)

9    BY MR. RUSSELL:

10   Q.     Now, Mr. Vail, regarding this inmate, who I believe

11   has been identified as Inmate C, I believe your testimony was

12   that under the Rules Violation Report that he received he did

13   not receive a loss of privileges but he received a loss of

14   credit; is that correct?

15   A.     There's two RVRs here.  There was different outcomes

16   for each of them.  Can you help me with which one we are

17   talking about.

18   Q.     I think we're talking about the second one.

19   A.     Well, in the second one he did lose some yard

20   privileges.

21   Q.     Okay.  And if you look at the second page of this

22   exhibit, these appear to be Institutional Classification

23   Committee minutes.

24          Are you aware of the function of the Institutional

25   Classification Committee?

511

1    A.      Generally speaking, yes.

2    Q.      And that's the community that meets within the

3    institution to review things like the assessment of loss of

4    credits, right?

5    A.      I actually don't know that.

6    Q.      If you look at this document you can see, can you

7    not, that a staff assistant appeared and a Mental Health

8    Assessment was presented at this Institutional Classification

9    Committee, and that the treating clinician presented the

10   committee with his Mental Health Assessment that included the

11   inmate's level of care, his treatment needs, his ability to

12   understand and participate in that hearing, and the effects

13   of his psychological state if ordered retained in segregated

14   housing.

15           Do you see that?

16   A.      I tracked you with the last sentence, but there is a

17   lot of stuff before that --

18   Q.      All right.  Well, it is about -- in that first

19   paragraph it's the next to last sentence.

20   A.      Yeah.  I got that sentence, but you said some things

21   before that.

22           THE COURT:  Hang on.  I'm reading it.

23               (Brief pause.)

24           Okay.  Go ahead.

25   ///

512

1    BY MR. RUSSELL:

2    Q.      You see, Mr. Vail, that the conclusion here by the

3    Institutional Classification Committee is to elect to restore

4    90 days of credit for the Rules Violation Report for

5    obstructing a peace officer, correct?

6    A.      Is that in the third paragraph?

7    Q.      Yes.

8    A.      (Witness reviews exhibit.)

9            After a six-month disciplinary free period.  I'm just

10   trying to understand the language here.

11   Q.      Right.

12   A.      So have the six months elapsed when this happened?

13   Q.      Well, I'm just asking what it states here within the

14   document.  I'm not asking you to speculate.

15           THE COURT:  I don't know what it means either.  The

16   front page seems to say -- and again, I have no idea because

17   it's all apparently magical stuff -- but a number of days

18   credit that were forfeited, 360.

19           Then it says after that:  I remain disciplinary free

20   for 180 days.

21           Then below that it says:  Meet all the criteria for

22   credit restoration.

23           I don't know.  They're not eligible, which I have no

24   I tee what it means.  And then they give him back 90 of the

25   180 that were taken.

513

1          Is that a fair assessment of what happened?

2          MR. RUSSELL:  Well, Your Honor, I believe the

3  documents that have been submitted into evidence show

4  actually what was taken were the 90 days.  I believe that's

5  what Mr. Vail testified to earlier today.

6          THE COURT:  I don't know what you are saying.

7          Did they take 360 days?

8          MR. RUSSELL:  No, Your Honor.  That's the appeal that

9  was actually signed and filled out by the inmate himself.

10          THE COURT:  Okay.  So apparently he was wrong.  They

11  took 160 days.  Do you know how many days they took?

12          MR. RUSSELL:  Based on the documents received into

13  evidence it was a 90-day loss of credit.

14          MR. BORNSTEIN:  Well, no.  It was not.  It was 100 --

15  or excuse me -- 151 from two incidents, Your Honor.  And this

16  relates to additional incidents we didn't have the records

17  for that apparently must have added up to more than what we

18  knew.

19          THE COURT:  All right.  So you now take the position

20  that these -- that C represents yet another and different

21  punishment that was received by C; is that correct?

22          MR. BORNSTEIN:  Correct.  On 8-16-11 and 10-17-11,

23  those two we didn't have any records for.  So what we did

24  have records for, and what we talked about, was the July

25  15th, 12 and the August 2nd, 12.  And it was only the August

514

1    2nd, 12, that was ruled to be "eligible."

2          THE COURT:  There we are.  I have no idea, and I

3    can't imagine -- well, maybe you think it is useful.

4          It now appears these may have related to yet a

5    different discipline, Mr. Russell.

6          MR. RUSSELL:  Well, Your Honor, again the second tab

7    that I have here of the documents that were introduced by

8    plaintiffs talked about the Rules Violation Report occurring

9    August 2nd, 2012.  And that's what I believe this pertains

10   to.

11         THE COURT:  Well, I have no idea.  I find this all

12   mysterious.

13         Mr. Vail, do you have any idea of what this is all

14   about?

15         Don't guess.  Do you know what it is about?

16         THE WITNESS:  No, I don't know.  I would have to

17   guess.

18         THE COURT:  All right.

19         MR. RUSSELL:  That's fine, Your Honor.

20   BY MR. RUSSELL:

21   Q.    What I would like to ask, Mr. Vail, isn't it true

22   that by looking at this Institutional Classification

23   Committee, these minutes of the committee, that they are

24   taking into account the inmate's mental health condition in

25   deciding whether or not to return credits?

515

1    A.        No, I don't see that.  If this is a decision to

2    return credits, it is based on 180 days of good behavior.  I

3    don't see that the Mental Health Assessment is part of that

4    decision-making process.  Perhaps -- I haven't read every

5    word on here, but from reading --

6            THE COURT:  Let me assure you, if you read every word

7    on here you won't know either.

8            You may proceed, counsel.

9    BY MR. RUSSELL:

10   Q.        Well, Mr. Vail, I would draw your attention to the

11   language that talks about the treating clinician

12   presenting -- actually coming in and presenting.

13           THE COURT:  You don't know that either.  He may have

14   sent it by the same email that these guys didn't get.

15           MR. RUSSELL:  Your Honor, I'll just read from the

16   document.

17   BY MR. RUSSELL:

18   Q.        It states:

19            (Reading:)

20            The treating clinician presented the Institutional

21            Classification Committee with a Mental Health

22            Assessment that included the subject's level of care,

23            his treatment needs, his ability to understand and

24            participate in the classification hearing, and the

25            effects of this psychological state if ordered to

516

1          remain in segregated housing.

2          (Reading concluded.)

3          THE COURT:  Well, that says something else entirely.

4     Well, all right.  Never mind.  I'm tired of trying to figure

5     it out.

6          You proceed, and when we get to arguing you can see

7     whether you can convince me at sometime that what you just

8     said has anything to do with what the witness testified to.

9          You may proceed, sir.

10    BY MR. RUSSELL:

11    Q.    Mr. Vail, isn't it true, though, that what's

12    happening here is the mental health -- the treating mental

13    health clinician is presenting information to the

14    classification committee for them to determine whether or not

15    credit should be restored to this inmate?

16    A.    I don't know that.  I see that the inmate's clinician

17    has presented information.  I can't tell what the purpose of

18    that information is, and it makes me wonder if there are

19    other pages to this document that describes why the person is

20    in front of this committee.

21         THE COURT:  Moreover, it seems to be a question of

22    whether or not, if he remains in segregation, something bad

23    will happen, not whether or not that bears upon the initial

24    deprivation of days.

25         I mean, I don't know.  I'm just trying to understand

517

1    and read what you have just said.  It clearly says they were

2    there for some other purpose.

3            You may proceed, Mr. Russell.

4    BY MR. RUSSELL:

5    Q.      Well, Mr. Vail, turning down to the paragraph in

6    bold --

7            (Court Reporter requires a brief break for computer

8             issue.)

9            (Discussion held off the record between the court and

10            counsel.)

11           (Discussion held off the record.)

12           THE COURT:  Book the record.  Two things have been

13   done while waiting for the computer to behave itself.

14           One, my understanding is that plaintiff has now

15   withdrawn as evidence Plaintiffs' 1001, 63D, 63B, 63C and

16   63 -- that's D again -- but wishes the court to examine them

17   during oral argument as they pertain to plaintiffs' view of

18   what the evidence says.

19           Is that correct?

20           MR. BORNSTEIN:  That's correct, Your Honor.

21           THE COURT:  And also you are withdrawing your

22   objections to receipt of Defendants' C.

23           Is that correct?

24           MR. BORNSTEIN:  Yes, Your Honor.

25           THE COURT:  All right.

518

1          MR. RUSSELL:  Your Honor, I would want to ask, I

2     think the document we're talking about also includes

3     Exhibit 62.

4          MR. BORNSTEIN:  62 and 63.  The three charts in each,

5     we're withdrawing them and entering them in argument.

6          THE COURT:  Thank you.

7          You may now proceed, Mr. Russell.

8          MR. RUSSELL:  Thank you, Your Honor.

9     BY MR. RUSSELL:

10    Q.    Mr. Vail, again turning back to this document marked

11    as defendants, you've testified here on the basis of a few

12    instances that mental health conditions are not being

13    considered by CDCR in determining whether or not somebody

14    should be punished or whether somebody should be losing

15    credits.

16         And the point I'm making here, what I'm asking you

17    about is, does not this document state that after reviewing

18    this inmate's mental health condition, at least with regard

19    to this Rules Violation Report, that the committee elected to

20    restore those 90 days of credits, and it's for the Rules

21    Violation Report that you testified to earlier?

22         Isn't that correct?

23         THE COURT:  Hang on.  There is an objection.

24         MR. BORNSTEIN:  Objection.  Argumentative.

25         THE COURT:  Sustained.

519

1  BY MR. RUSSELL:

2  Q.      Mr. Vail, does this Rules Violation -- does this

3  Institutional Classification Committee minute indicate it is

4  restoring credits for the rules violation that you testified

5  to earlier today?

6  A.      The language says:  ICC elects to restore 90 days of

7  credit for RVR dated 8-2-12.

8  Q.      Thank you.

9          You talk a bit about Exhibit 43.

10         This, I believe, relates to Inmate BB.

11         It's the first page.

12         THE COURT:  He's got to find it first, sir.

13         MR. RUSSELL:  Sure.

14         THE WITNESS:  Yes.

15  BY MR. RUSSELL:

16  Q.      It is the first page of what I think is marked as

17  43A, the Rules Violation Report.

18  A.      I've got it as C, but it is the RVR.

19         (Brief pause.)

20  BY MR. RUSSELL:

21  Q.      Actually, I believe, Mr. Vail, that it is actually

22  marked 43C.

23         Is that what you have there?

24  A.      Yes.

25  Q.      And it has handwriting on it.  It appears to be the

520

1    initials "ICC 20/27/11."  And then the handwriting below that

2    I believe you testified says "18 month."

3         Is that correct?

4    A.    Yes.

5    Q.    You don't know who wrote that, do you?

6    A.    No.

7    Q.    And you don't know what that refers to, do you?

8    A.    No, I do not.

9    Q.    And there is no indication in this document that

10   refers to any kind of a Security Housing Unit term, correct?

11   A.    The last line on the next page says -- it refers to

12   ICC for program review.  And then so the next you see ICC

13   here.  Those are the connections.

14   Q.    Right.  But there is nothing about a SHU term here,

15   right?

16   A.    No.

17   Q.    Mr. Vail, you, as part of your work for the

18   plaintiffs, you reviewed various use of force videos,

19   correct?

20   A.    I did.

21   Q.    And the videos that you reviewed were either

22   identified by plaintiffs' counsel for you, or were mentioned

23   in the report by defendants' expert or pertained to incidents

24   described in the declaration of Steve Martin; is that

25   correct?

521

1    A.        No.  That is not correct.

2    Q.        Well, you did not ask to review videos based upon

3    your own independent review of use of force packets, did you?

4    A.        We asked to review videos dated back to July 1st of

5    2012 for the institutions that I inspected.  All controlled

6    use of force videos.

7    Q.        And you did look at 17 of those, correct?

8    A.        The use of force videos, yes.

9    Q.        And you didn't pursue to look at other use of force

10   videos; is that right?

11   A.        There were -- I think I said this earlier today.

12   There is more than 17 incidents represented by those 17

13   events.  Then there was an additional 31 video interviews of

14   inmates who either were injured during use of force or

15   alleged excessive use of force.

16   Q.        I think you had earlier testified, I think it was

17   based on the information in one of these charts, there are

18   hundreds of use of force incidents, correct?

19   A.        There are thousands.

20   Q.        You didn't review thousands of videos, did you?

21   A.        There aren't thousands of videos.  There is a very

22   small amount of controlled videos.  What I asked for was to

23   look at the videos of the prisons I inspected.

24   Q.        So it is your testimony that you reviewed every

25   single use of force video that's maintained by CDCR?

522

1   A.      No.  My testimony is that I viewed every controlled

2   video that you-all gave me for the four institutions I

3   inspected dated back to July 1st, 2012.

4          THE COURT:  He's told you that four times.  If you

5   ask it again, I'm going to rule it out.

6          You may proceed, sir.

7   BY MR. RUSSELL:

8   Q.      Well, your opinion is based upon your review -- at

9   least in part of your review of those videos, correct?

10  A.      Underlying "in part," yes.

11  Q.      And your opinion is not based upon the use of force

12  incidents where CDCR successfully avoided using force,

13  correct?

14  A.      No, it is not.

15  Q.      I mean, there are instances, at least we've seen in

16  the documents, I think you talked -- referred to some of them

17  earlier today, where a use of force team was assembled but

18  then force was ultimately not used, right?

19  A.      Well, depends which incident you are talking about.

20          There was -- I can't remember which inmate it was.  I

21  can figure it out.  But there was a successful intervention,

22  and the staff managed to blow that up to two more uses of

23  force.

24          I would acknowledge that there was first a successful

25  intervention, but the staff didn't know what to do with that.

523

```
1    They didn't know how to declare victory.

2    Q.      You haven't undertaken any kind of a survey to figure

3    out how often the interventions are successful, have you?

4    A.      No, I don't believe that data exists.

5    Q.      But you didn't try to find it, did you?

6    A.      Well, there's similar questions that we asked during

7    the tours of the various officials we were touring with.

8    Q.      Now, Mr. Vail, my understanding is your first

9    declaration in this case was filed, I believe it was, in

10   March -- I wants to say about March 16th of this year.

11           Is that approximately correct?

12   A.      I know it was in March of this year, yes.

13   Q.      And before providing that declaration, you had not

14   reviewed the Use Of Force Policy; is that correct?

15   A.      No, that is not correct.

16   Q.      Mr. Vail, a short time after you filed that

17   declaration, I took your deposition.

18           Do you recall that, in March of this year?

19   A.      I do.

20   Q.      And during that deposition I asked you --

21           THE COURT:  Just a minute.  Let counsel get the

22   deposition and give him the page and line number.

23           I don't know why I. --

24           THE CLERK:  Do you want it?

25           THE COURT:  Yeah.  Let me have it.
```

524

```
1         THE CLERK:  I have two.  One for June 7th and one
2    March 19.
3         MR. RUSSELL:  March 19.
4         THE COURT:  Mr. Bornstein, I'm the soul of
5    patience.
6         MR. BORNSTEIN:  I'm sorry.  Please continue, Your
7    Honor.
8         THE COURT:  Page and line number, please, sir?
9         MR. RUSSELL:  Page 29.
10        THE COURT:  And?
11        MR. RUSSELL:  Line 23.
12        THE COURT:  I'm sure I've got the wrong thing.
13        March 19th, Volume I.
14        MR. RUSSELL:  Correct.  There is only one volume.
15   Well, there is the exhibits.
16        THE COURT:  And 23 is Madrid -- dealing with
17   Madrid.
18        MR. RUSSELL:  Yes, Your Honor.  And the Use Of Force
19   Policy.
20        THE COURT:  And you think that's impeaching?
21        MR. RUSSELL:  Your Honor, I asked if he had -- I
22   said:
23        It is true, you had not reviewed the Use Of Force
24        Policy before providing your initial --
25        THE COURT:  He said that's --
```

525

1          MR. RUSSELL:  He said that that's not true, I did.

2          THE COURT:  Then you talk about the Madrid

3   litigation.  He says:  No.  I don't know anything about that.

4          MR. RUSSELL:  Well, the implementation of a statewide

5   Use Of Force Policy.

6          THE COURT:  Stop it.  I'll object it is not

7   impeaching.

8          You may proceed.

9          Good Lord.

10          I'm sorry.  Excuse me.

11          Both of you gentlemen are experienced lawyers.  I

12   shouldn't be doing this.

13          You may proceed, sir.

14   BY MR. RUSSELL:

15   Q.    One of the other things that we talked about during

16   that deposition, Mr. Vail, were -- actually, returning to

17   your declaration, the declaration that was filed in March, I

18   believe that you discussed -- you referenced an OIG Report

19   that had been filed in 2011 stating that CDCR should ensure

20   appropriate training for pepper spray use and guidelines for

21   assessing exposure.

22          Do you recall that testimony?

23   A.    It would be helpful if I could look at it, but I do

24   recall addressing that issue.

25          MR. RUSSELL:  Sure.  Just a moment, Your Honor.

526

1          What exhibit?

2          I believe you introduced the declarations.

3          MR. BORNSTEIN:  112, 124 and 180.

4    BY MR. RUSSELL:

5    Q.     I believe it is number 112, Mr. Vail, if that's in a

6    binder up there.

7          Is that in a binder?

8    A.     I only go to 99.  Sorry.

9          (Exhibit handed to witness.)

10   Q.     To help you out, Mr. Vail, specifically what I'm

11   referring to is paragraph 45.

12   A.     Got it.

13   Q.     Now, in response to questions by Mr. Bornstein

14   earlier -- I can't remember if it was earlier today or back

15   at the beginning of October -- you stated that there are no

16   guidelines that you know of regarding the use of pepper

17   spray.

18          Do you recall that testimony?

19   A.     In general, yes.

20   Q.     But my understanding is you have reviewed all of the

21   use of force training materials; is that correct?

22   A.     "All" is a big word.  I reviewed some.  I don't know

23   that I have seen the universe of use of force materials, but

24   I have seen some.

25   Q.     So if you have not reviewed all, are there guidelines

527

1  out there regarding the use of pepper spray that are provided

2  to CDCR staff?

3  A.       I reviewed what was produced.

4  Q.       Earlier, I think both at the begin of October, as

5  well as earlier today, you talked about -- in mental health

6  units you testified that they felt different because staff

7  were fearful -- I believe that was your testimony -- and

8  conveyed a sense that the units were not safe.

9         Is that accurate?

10  A.       It's part of what I said.

11  Q.       But during your tours you never had any the staff

12  come up to you and tell you that they were fearful, correct?

13  A.       No.  I wouldn't expect that to happen in a

14  correctional facility.

15  Q.       And the units that you are talking about, these were

16  Administrative Segregation Units, correct?

17  A.       No.  Some were general population EOP units, some

18  were inmate CBs.

19  Q.       But in your testimony you didn't distinguish one way

20  or the other; is that right?

21  A.       Nor would I.  They all have that feeling of

22  oppression and disconnect between the staff and the inmates.

23  Q.       And you didn't note for the court or in any of your

24  declarations which units that you were particularly talking

25  about when you were talking about this condition of fear; is

528

1  that right?

2          THE COURT:  Sir, he just said to you that it was a

3  general impression he got from all of units that he visited.

4          Why would he distinguish?

5          I don't understand.

6          Go ahead.  I don't care.  I'm sorry.

7  BY MR. RUSSELL:

8  Q.      During the work you did in this case you went to four

9  prisons I believe; is that correct?

10 A.      That's correct.

11 Q.      And you don't know what the condition is in the

12 institutions that you didn't visit; is that right?

13 A.      Well, I have been in a few others, and they weren't

14 remarkably dissimilar.

15 Q.      Now, I think as part of that testimony you also

16 talked about being offered a protective vest and some of

17 other protective equipment being worn by staff.

18         Do you recall that testimony?

19 A.      I think in most of the Administrative Segregation

20 Units it was there as an option.  And in one of the

21 facilities there was quite a bit of insistence on the part of

22 the warden.

23 Q.      Asking you to wear a protective vest; is that

24 correct?

25 A.      Yeah.  He felt like it wasn't safe not to wear one.

529

1   He was very clear about that.

2   Q.      But he didn't require you to wear that.  In fact, you

3   chose not to, right?

4   A.      That is true.

5   Q.      And these are precautions taken, I think as you just

6   said, generally in high security units; is that correct?

7   A.      No.  I haven't said that.  I think of them as

8   inhibitions to having effective communication with the inmate

9   population when they are not needed.

10          I've had them be used in high security transports

11  with particular offenders, but never in an entire living

12  unit.  Certainly not a living unit for the mentally ill.

13  Q.      Would you agree that it is -- it is prudent to be

14  taking precautions, particularly in a high security unit?

15  A.      Precautions has many different definitions.  Good

16  communication is a more effective precaution than donning a

17  spit shield and vest.

18  Q.      Are you advocating that precautions like that not be

19  taken in the higher security units like Administrative

20  Segregation?

21  A.      I think that they need to be connected to a rational

22  reason, a real reason why you need to have that kind of

23  equipment around a particular offender.

24          In the units I visited I did not see any units

25  that -- where you needed to wear at all times.  There is a

530

1    variety of people in those units, some held simply for

2    protection.

3    Q.    Well, even in the videos today we saw people that

4    were in high security units not wearing protective vests and

5    shields; isn't that correct?

6    A.    It's correct about the shields, although sometimes

7    when they were trying to talk through them, that seemed like

8    kind of counterproductive.

9         But many of the people in those -- in fact, I think

10   maybe the vast majority had vests on, either over the top of

11   their clothes or under their clothes.

12   Q.    It would be your suggestion that they take those

13   vests?

14   A.    Not all by itself, no.  That would be a portion of a

15   number of things I would want to do simultaneously.

16   Q.    How many high security units did you visit in

17   California as part of your work?

18   A.    I don't think I have a count of that.  We went to Ad.

19   Seg. Units where they existed for the EOP population.  We

20   went to Ad. Seg. Units where it was mixed population.  You

21   know, I would be speculating.  But there was usually more

22   than one in each of the prisons we visited.

23   Q.    So you're familiar with high security units, like

24   Administrative Segregation and Psychiatric Services Units,

25   and SHUs in California, correct?

531

1    A.      Somewhat.

2    Q.      And you're familiar with those types of units -- I

3    think they're called -- is it Intensive Management Units in

4    Washington?

5    A.      Well, no.  That would be the equivalent of a special

6    housing unit here.

7    Q.      But you are familiar with those in the State of

8    Washington, correct?

9    A.      Yes, I am.

10   Q.      How many others, other than -- how many of those

11   types of units have you visited, other than in California and

12   in Washington?

13   A.      Over the years, maybe half a dozen.

14   Q.      And so it's from your visits to about a half a dozen

15   of these types of units that you are coming to the conclusion

16   that wearing this protective gear contributes to the

17   atmosphere of fear and oppression in California's units?

18   A.      It is not just protective vests.  That's an element.

19   There is a whole range of behaviors and equipment and

20   attitudes that caused me to reach my conclusions.  It is not

21   singularly about the vest.

22   Q.      I think you also testified that when you went into

23   these units, you did not see free movement of inmates while

24   you were there.

25           Units -- almost all units operate under schedules;

532

1   isn't that correct?

2   A.      I want to go back.  I said that I didn't see free

3   movement in the EOP general population like I would expect to

4   see.

5   Q.      And an EOP general population unit would operate

6   according to a schedule, correct?

7   A.      Every prison should, yes.

8   Q.      And you didn't check what the schedule was at the

9   time you were there, did you?

10  A.      Yeah.  I often asked:  How much dayroom time do these

11  guys get?

12          It was very minimal.  Sometimes an hour, hour and a

13  half in the afternoon.

14          That is completely foreign to my experience, where if

15  you're not locked down for count or for the night, even in an

16  EOP unit, you can come and go, sometimes on the hour

17  depending upon the cell mechanism.  You can come and go into

18  that dayroom all day long and interact with other human

19  beings, play card games, talk to staff, be engaged in

20  activities rather than huddled in your cell.

21  Q.      Do you know what the schedule was at the time you

22  were visiting these units as part of your work?

23  A.      The question I asked was about dayroom time.  It was

24  very limited, an hour, hour and a half a day, and oftentimes

25  not in the evening when you would expect to let inmates out

533

1    of the cells.  It was usually in the afternoon.

2    Q.      Well, again, what was -- do you know what the

3    schedule was?

4            You don't know what the schedule was at the time that

5    you were making these visits, correct?

6            MR. BORNSTEIN:  Asked and answered.  Objection.

7            THE COURT:  The objection is sustained.

8            You may proceed.

9    BY MR. RUSSELL:

10   Q.      And you didn't receive a copy of the dayroom

11   schedule, did you, when you visited these units?

12   A.      I believe that I did see some.  I didn't take them

13   with me.  Some were posted on bulletin boards.

14   Q.      Would you agree with me that the free movement of

15   inmates does create an inherent risk?

16   A.      As well as an inherent benefit, sir.

17   Q.      But that risk needs to be taken into account when

18   determining whether or not inmates should be moving freely

19   within a unit or within an institution, right?

20   A.      The more you lock inmates down for reasons that

21   aren't rational, the more bad behavior you're going to get.

22   There is actually an inverse relationship.  I feel quite

23   strongly about that.

24           If inmates have the opportunity to access common

25   areas, when it is reasonable to do so, they will respect that

534

1    and appreciate that.

2            Will a fight break out every once in a while?

3            Yeah, it will.  But that is no reason to keep them in

4    their cells when you don't have to.

5    Q.      In fact, murders can happen when that occurs, right?

6            One happened in the State of Washington right near

7    the end of your term in early 2012 based upon the free

8    movement of inmates; isn't that correct?

9    A.      There was a murder in the State of Washington of a

10   correctional officer, a tragic murder, for the first time in

11   32 years.

12   Q.      That was with an inmate who was allowed to move

13   freely within the institution, correct?

14   A.      It was an inmate who hid.  He hid in an area and

15   assaulted an officer who was alone.  It was a tragic event,

16   sir.

17   Q.      I agree it was a tragic event.  And as a result of

18   that, policies were changed regarding the unrestricted

19   movement of inmates; isn't that correct?

20   A.      No.  Not in any kind of way similar to what

21   California does.  There was increased accountability in part

22   for the staff who didn't clear the area as they should.  But

23   there was not sweeping or massive changes in the inmate

24   movement policies in Washington as a result of that murder.

25   Q.      And as a matter of fact, as a result of that

535

1    incident, officers were allowed to carry -- were issued and

2    allowed to carry pepper spray sidearms, correct?

3    A.      I made that decision prior to my departure

4    authorizing the MK3.

5    Q.      I believe during the first day of your testimony you

6    also talked about not having seen documentation regarding

7    when use of a spit mask was necessary.

8            Do you recall that testimony?

9    A.      I do.

10   Q.      And your -- the criticism, if I remember correctly,

11   is that the need for the use of the spit mask was not

12   documented; is that correct?

13   A.      That is correct.

14   Q.      But nevertheless, I mean a spit mask is used, again,

15   as a precautionary measure; is that right?

16   A.      If it is used because it is related to either the

17   current or past behavior of a particular inmate, yes.

18           If it is used just as another way to harass or demean

19   or punish an inmate, then I have concerns with it.

20           And what I was saying is that when I have seen spit

21   masks referenced in reports, there is never any explanation

22   about why they decided to use a spit mask, either he

23   attempted to spit on me already or the last time he spit on

24   staff.  That's what I would expect to see in those.

25           So my fear is that they're sometimes put on people

536

1  just as a way to punish them and not because there has been

2  any particular behavior.  If you would document the reason

3  for that, then you know.

4  Q.     But in the work that you have done, you've talked

5  about all the use of force incident packets that you

6  reviewed, as well as videos.  That might be your fear, but

7  you did not see an example of a spit mask being used to

8  humiliate or otherwise punish an inmate; isn't that correct?

9  A.     There was a couple of videos where they put a spit

10  mask on people, and I don't know why.  It wasn't clear in the

11  record why they did it.

12  Q.     But by watching the video there is one in particular

13  where you can see, and I think it was documented, that the

14  inmate put something into his mouth immediately before the

15  extraction started.

16        Isn't that right?

17  A.     I'm not sure which one you're speaking about, sir.  I

18  can remember one incident where the inmate said he swallowed

19  something, swallowed a piece of metal.

20  Q.     Would that be an appropriate incident in which to use

21  a spit mask?

22  A.     No, I don't think so.  He swallowed it.  I don't

23  think you have anything to worry about.

24  Q.     He stated he swallowed it, correct?

25  A.     Correct.

537

1    Q.     And so if an inmate -- is it your testimony that if

2    an inmate says something to a correctional officer, that's

3    supposed to be accepted without any kind of critical analysis

4    or weighing and balancing as to whether or not he's telling

5    the truth?

6         MR. BORNSTEIN:  Objection.  Argumentative.  Lacks

7    foundation.

8         THE COURT:  You may answer, sir.

9         THE WITNESS:  No, it is not.

10         THE COURT:  What a surprising answer, sir.

11   BY MR. RUSSELL:

12   Q.     Well --

13   A.     All I'm asking for on a spit mask is put the reason

14   down so it can be verified there was a rational reason.  I'm

15   not saying don't use them.  Just say why you used them.

16         Simple thing, but I think it is important to protect

17   the inmates and to protect the staff, for that matter.

18   Q.     During the first day of your testimony you also

19   talked about the policy for strip searching.  And I believe

20   your testimony was that it is used inappropriately with

21   regard to -- particularly with regard to mental health

22   inmates; is that correct?

23   A.     There's more detail to it, but yes, I talked about

24   that.

25   Q.     Again, a strip search is a precautionary measure;

538

1    isn't that correct?

2    A.      If it's done for a reason that makes sense relative

3    to a true security issue, yes.

4    Q.      Well, your concern is that the strip searching was

5    done, it sounded like, simply when inmates were placed in

6    restraints and then moved from one unit to another, whether

7    or not there was a cell extraction taking place?

8    A.      No.  My concern was with strip searches that would

9    occur when the inmate didn't even leave the unit.  And we

10   witnessed that.  And I had many mental health staff say that

11   is a huge impediment to treatment.

12          Again, one of the cases that we talked about today,

13   the individual wasn't going to treatment in the unit because

14   he didn't want to have to go through the strip searches

15   because it touched issues of his trauma in his previous life.

16          There is not a security reason to strip search

17   somebody who is not going to leave the unit.

18   Q.      Well, isn't it true, though, that at least in the

19   Intensive Management Units in Washington, when moving from

20   one or into an Intensive Management Unit, those inmates are

21   always strip searched?

22          Isn't that correct?

23   A.      When you breach the security of the building, yes.

24   Not when you stay in the building.

25   Q.      And there's no exception made in the Washington

539

1    policy for mental health inmates, when you are removing them

2    from an Intensive Management Unit, correct?

3    A.      Well, I wouldn't say we were pure, but we try not to

4    put them in the Intensive Management Unit.  We created an

5    Intensive Treatment Unit in the middle of what is our

6    equivalent of a mental health hospital.  And that is run

7    completely different from an IMU.

8            But if there is a mentally ill person in an IMU, yes,

9    you are correct, it would apply.

10   Q.      Now, Mr. Vail, would you agree that lawful orders

11   need to be followed in institutions; isn't that right?

12   A.      Yes.  With the caveat there is lots of lawful orders.

13   Some are more important than others.

14   Q.      Well, is it your testimony that you can pick and

15   choose which lawful order that an inmate is to heed?

16   A.      No.  It would be my testimony that an agency's

17   response to the lawful order violation should be different

18   depending upon what order we are talking about.

19   Q.      But there does need to be some reaction, correct?

20   A.      Yes.

21   Q.      Particularly when that lawful order -- actually, what

22   we are talking about is when lawful orders are not heeded,

23   right?

24   A.      Yes.

25           THE COURT:  This raises a question which I've -- I'll

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

540

1  ask you what your opinion is.

2       Giving lawful orders to people who can't respond, is

3  that a justification for subsequent punishment or even OC

4  spray?

5       That is they can't respond because of mental illness?

6       THE WITNESS:  No, I don't think it is.  I was maybe,

7  prematurely, trying to say there's lawful orders that are

8  pretty significant and lawful orders that aren't so

9  significant.  And sometimes in that not-so-significant

10  situation it is a minor write-up or counseling or something

11  like that.  I mean, you don't have to leap to use of force.

12       THE COURT:  So your view is that even when people are

13  mentally ill, and those mental illnesses interfere with their

14  ability to respond, some sort of response by a corrections or

15  by the institution is appropriate?

16       THE WITNESS:  Some sort of response, but the range

17  can be huge.  I mean, you're not going to let someone howl in

18  their cell all night and keep 100 people up.  But how -- what

19  way you respond to that needs to be tailored to, especially

20  with the mentally ill, the particular illness and symptoms.

21       THE COURT:  Excuse me.  I really want to explore this

22  a little bit because it is something that I've been thinking

23  about -- worrying about since we've seen the videos,

24  et cetera.

25       I think what you are advocating, but you tell me if

541

1     I've got it wrong, is that corrections has got to be

2     sensitive to the ability of people to respond because of

3     their mental illnesses.

4              That's a starting point?

5              THE WITNESS:  A starting point, yes.

6              THE COURT:  But even if people are not able to

7     respond because of mental illness, there are times when you

8     simply have got to put a stop to the behavior?

9              THE WITNESS:  Yes.

10             THE COURT:  What is a correctional officer supposed

11    to do?  He knows the guy is nuts -- I'm sorry -- he's

12    mentally ill, and, you know, he's howling all night long

13    because he's mentally ill.  But you can't allow that to go

14    on.  What do you do?

15             THE WITNESS:  In terms of use of force I think it is

16    much more effective with the mentally ill to use hands-on.

17             THE COURT:  To?

18             THE WITNESS:  A hands-on approach.  Use actual

19    physical force and try to do that in a way where you maintain

20    dialogue with the person and are giving them ways out so that

21    they don't feel like their life is threatened.

22             But sometimes there is other sorts of creative ways.

23    I can give you an example.  When I was working at Washington

24    Correction Center, and I had a mental health unit under my

25    purview then, we had a gentleman who was mentally ill,

542

1    developmental disabled and pretty childish.

2        Whenever he saw a woman, he couldn't resist hugging

3    her.  His intention wasn't assault but, I mean, that freaked

4    the ladies out.  It wasn't a good way to do it.

5        It wasn't my idea, but the psychologist decided to

6    give him a box.  And so he carried this box around the

7    institution for a long period of time.  And as long as his

8    hands were occupied, he wasn't grabbing women any more.

9        Rather than use force, throw him in segregation,

10   pepper spray him, whatever, he was walking around outside,

11   going to work, going to school.

12       You have to be adaptable and creative and have those

13   mental health staff working with custody staff to find

14   solutions that are safe for everybody.

15       THE COURT:  Thank you, sir.

16       Sorry to have interrupted, Mr. Russell.

17       MR. RUSSELL:  No, Your Honor.

18   BY MR. RUSSELL:

19   Q.    I'd actually like to ask you a little bit about that.

20       You're saying, in your opinion, that hands-on use of

21   force should be used earlier -- should have been used earlier

22   in the instances of some of these videos we saw; is that

23   correct?

24   A.    You know, I could speculate that it may have been,

25   but without knowing the context because, I mean, these things

543

sort of start abruptly.  You don't get a sense from the
records of what the history has been, what the kinds of
behavior has been, what their symptoms are, what the
relationship with the clinician is.

So in some of those, coming into it without that
information, I think, yeah, maybe you might have just done
this quicker, rather than prolong and have this long period
where the person is suffering from the affects of OC spray
and yelling and giving of orders and all that, yes.

Q.     That is -- actually, you've raised another point.  I
mean, what we've been looking at with these videos and the
Use of Force Incident Reports are snapshots in time, correct,
essentially from when the use of force incident begins,
correct?

A.     Pretty much.  There is a little bit of stuff in the
beginning, but not much, no.

Q.     Right.  So the assessment that we are seeing on the
videotape of, for example, the mental health clinician coming
in and talking to these people, that's not the only
intervention that's taken place in these cases; isn't that
correct?

A.     If there is, it is rarely mentioned, if ever, in the
reports.

Q.     You didn't go back -- but you didn't go back and look
at that preceding information, right?

544

1    A.       I don't know that it exists.

2    Q.       Well, it might exist in the medical reports, correct,

3    and you didn't look?

4             THE COURT:  All things might be true.

5             The point is the documents that he reviewed -- my

6    understanding of your evidence -- of your testimony, sir, is

7    you saw the video, then you read the minutes of the reviewing

8    committee, and they didn't mention anything that would

9    suggest to you that there had been some long prolonged

10   attempts prior to the use of force?

11            THE WITNESS:  Yeah.  If there were, and if I was

12   running that committee, I would want to know what those

13   were.

14   BY MR. RUSSELL:

15   Q.       Well, for example, let's talk about -- I believe he's

16   been identified as Inmate E.  And that's the inmate at

17   San Quentin.  We watched that use of force video.

18            Did you review the records that showed the concern of

19   mental health clinicians and their attempts at intervention

20   the day before, saying that he needed to be taken out of that

21   cell so they could do an assessment?

22   A.       My memory of that one is that they gave him -- I

23   think it might have been a day.  If he still won't do this

24   tomorrow, we're going to get him.  But there was no records

25   of actual intervention and trying to interact with that guy.

545

1    I actually think that guy gave an opening to try to

2    work with him.  And not that I would have known that I would

3    have been successful, but he was convinced that he was being

4    held, that he was being kidnapped, being held illegally.

5    I would have gone with that and had a high-ranking

6    person go talk to him at cell front and draw that out a

7    little bit and say:  You know, we need to check that out.

8    Maybe I can help you.  Tell you what, I'm going to get you a

9    phone to call somebody.  Or I'm going to get the law library

10   clerk down here to talk to you.  Maybe we can figure out a

11   solution here.  But in the meantime, what I need you to do, I

12   need you to go up to the medical clinic because you are here

13   and we're worried about you.  We need to make sure you are

14   okay.  See if you can strike a bargain.

15   I don't know if that was possible or if that would

16   have worked, but I would have tried it in that circumstance.

17   Sometimes it does work, and you can avoid that mess that that

18   incident was.  There was a ton of spray put in that person's

19   cell.

20   Q.    And you understand that Inmate E had just recently

21   arrived for his commitment offense to San Quentin; isn't that

22   correct?

23   A.    Yeah.  Probably terrorized at finding himself in

24   prison.  So work that fear a little bit.  Draw him out.  Make

25   a connection.

546

1          Don't just go to the officers yelling at him and

2    putting a bunch of spray in there.  That is not a way to

3    start a good prison sentence for that guy.

4    Q.    But the staff didn't know.  What they were trying to

5    do is try to find out about his mental health condition,

6    correct?

7          I mean, they don't know at that point what his

8    condition was or what his potential for violence was even at

9    that point; isn't that true?

10   A.    I knew enough from the video that I would have tried

11   talking to this guy in a different way.  That's information

12   probably less than information that was available to the

13   staff.

14   Q.    So again, let's go back then.  So your assessment of

15   whether or not force is excessive is essentially based upon

16   what you saw, certainly for this inmate, what you saw in the

17   video, correct?

18   A.    The amount of OC deployed in many of these incidents

19   is just overwhelming and unjustified for the kinds of

20   behaviors that, in California's own reports, that they're

21   using to justify their force.

22         It is not connected.  It is an overwhelming amount of

23   spray for guys who don't want to take their medication, guys

24   who are afraid to come out of their cell.  It's just wrong.

25   Q.    So you didn't undertake any kind of an analysis as to

547

1    what the threat of harm was or the resistance to any kind of

2    a lawful order, you can just look at that video and say in

3    and of itself that's excessive?

4    A.    No.  That's exactly what I didn't say.  I said, yes,

5    I'm looking at the threat that the inmate represents from

6    what I can see, and as described by CDCR, and in seeing a

7    completely disproportionate force response to a threat that

8    isn't that big a deal.

9    Q.    But isn't that the analysis that needs to take place?

10   A.    I'm telling you that's what I did in reaching my

11   conclusions.

12   Q.    My understanding is that you could determine whether

13   or not the force is excessive just by looking at the video?

14   A.    No.

15   Q.    So there does need to be an assessment of the threat

16   of harm or the resistance -- the level of resistance when

17   balancing whether or not the response with use of force is

18   appropriate -- or is actually is constitutionally correct;

19   isn't that true?

20         MR. BORNSTEIN:  Objection, Your Honor.  Asks for a

21   legal conclusion.

22         THE COURT:  That objection is sustained.

23         In any event -- that objection is sustained.  Try it

24   again.

25   BY MR. RUSSELL:

548

1    Q.      So it is true that you need to assess the threat of

2    harm or the resistance that's being offered to a lawful

3    order, you need to assess that when determining whether or

4    not the force that ultimately used was appropriate?

5    A.      That's what I did.

6            THE COURT:  In any event, as I understand your

7    testimony, it doesn't matter what the level of threat was,

8    the use of the OC spray was disproportionate because of the

9    quantities used and the method of its use?

10           THE WITNESS:  Yes, generally speaking.

11           I mean, there is theoretically some event that could

12   be described out there that would justify the kinds of spray

13   that California is using against the mentally ill, but I

14   can't come up with it.

15           THE COURT:  Thank you, sir.

16   BY MR. RUSSELL:

17   Q.      Well, Mr. Vail, when you filed your initial

18   declaration in this case that we've referred to here

19   earlier -- this is the one from March 14th, 2013 -- you talk

20   about what you reviewed.  And you didn't review any of these

21   records, did you, in making your determination that the force

22   being used was excessive?

23   A.      There is a lot of compounds to that question.

24           THE COURT:  Indeed.  The objection that it is a

25   compound question is sustained.

549

1          You may try again.

2          MR. RUSSELL:  Okay.

3          THE COURT:  "Did you," it is simple.

4          Did you review whatever documents you want him to

5    review?

6          MR. RUSSELL:  I'll ask that question, Your Honor.

7          THE COURT:  That's a good thought.

8          MR. RUSSELL:  I try to keep it to leading questions

9    when on cross-examination.

10          THE COURT:  You're cross-examining.

11   BY MR. RUSSELL:

12   Q.     Did you review these documents that we're talking

13   about to be able to make the assessment before rendering your

14   opinion on March 14th, 2013?

15   A.     I reviewed documents when I wrote -- prior to writing

16   this.  I'm not sure what documents we're talking about or

17   what connection you are trying to draw.  And I'm --

18   Q.     You didn't review the full use of force packets, did

19   you?

20   A.     For the incidents that I wrote about?

21   Q.     Yes.

22   A.     No.

23   Q.     And you were able to make the determination that the

24   force was excessive even without reviewing that material?

25   A.     And subsequently, since I got the material, it

550

1    confirmed those opinions, yes.

2    Q.       But you made -- you jumped to the conclusion first,

3    correct?

4            THE COURT:  Sir, you will stop arguing with the

5    witness.

6    BY MR. RUSSELL:

7    Q.       Now, you talked about in your opinion that you need

8    to -- in your opinion you would go into the cells that you

9    saw, at least in these videos, earlier with hands-on force,

10   correct?

11   A.       No, I didn't say that.

12            I said I might have in some of the circumstances if I

13   had more information.

14   Q.       And going in with hands-on force means going into the

15   cell with shields, correct?

16   A.       In California it means that.  In a mental health unit

17   it may or may not mean that depending upon who the person is,

18   what their history is, what the relationship is, whether

19   their primary clinician is on duty.

20            I've seen people open cell doors without all that

21   equipment, although they're ready and prepared, and have a

22   successful resolution to the situation, particularly in a

23   mental health unit, the ones that I operated in the prison

24   that I ran.

25   Q.       But if the inmate continued to resist the lawful

551

1  order, for example, coming out in cuffs to be able to be

2  moved to another unit, it would require going in with that

3  equipment, correct?

4  A.       It might get to that point in some circumstances,

5  yes.

6  Q.       And that would mean going in and putting your hands

7  on these inmates, possibly with shields and other material,

8  correct?

9  A.       Yes.

10  Q.       And are you aware of the National Institute of

11  Corrections' study that shows that the use of pepper spray --

12  OC pepper spray minimizes the number of instances in which

13  physical harm is caused in, for example, cell extractions?

14  A.       That's pretty consistent with other reports as well,

15  yes.

16  Q.       So in fact, what's happening is by using pepper spray

17  you're reducing the number of broken bones and fractured

18  skulls that might occur if you went in hands-on?

19  A.       I don't think that you need to break bones or

20  fracture skulls.  In fact, in this first declaration I give

21  CDCR credit for a very effective cell extraction that didn't

22  involve pepper spray because they believed the person was

23  immune to pepper spray.  It was very clean and very

24  efficient.

25          Plus those statistics aren't directed at the mentally

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

552

1   ill.  Those statistics are across the board.  And it is true

2   that many jurisdictions, including my own, before the tragic

3   murder, began to rely on pepper spray in certain situations

4   where they didn't in the past.

5          But to develop a sort of one note symphony like

6   California has, that's what you do in this circumstance,

7   isn't responsible, particularly with the mentally ill.

8   Q.     But again, you do not know how many instances in

9   which use of pepper spray was avoided, right?

10  A.     There's lots of things I don't know.  That's true.

11  Q.     Earlier today you also talked about the immediate use

12  of force and the difference between controlled use of force,

13  which is what we're seeing in these videos, and the immediate

14  use of force.

15         And I think that your testimony, at least back at the

16  beginning of the month, was you might have been

17  second-guessing, but that you're critical of a regulation

18  that allows for the discretionary use of pepper spray when a

19  food port has been taken over by an inmate.

20         Is that correct?

21         MR. BORNSTEIN:  Object to the form of the question.

22  There's a lot of preamble.  Argumentative.  Little to no

23  foundation.  His testimony today speaks for itself.

24         THE COURT:  The objection is overruled.

25         I am troubled, counsel, by your characterizing the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

553

1  witness's testimony.  But he apparently -- he's demonstrated

2  he can take care of himself.

3          We've lost the question now.  Restate it.

4  BY MR. RUSSELL:

5  Q.     Mr. Vail, you talked earlier today about the

6  regulation that allows for the discretionary immediate use of

7  force when an inmate has taken over a food port.

8          You're critical of that regulation, correct?

9  A.     Very much so.

10 Q.     And it is because of the discretion that's allowed to

11 the officer, correct?

12 A.     It's unnecessary.  You've got policy that talks about

13 an imminent threat, which would justify the immediate use of

14 force.  Why not apply that to the food port situation or the

15 kicking the door situation?

16         It makes no sense to have that exception.  And it

17 creates an attitude and option for officers to begin to use

18 immediate force when they're not meeting that threshold of

19 imminent threat.

20 Q.     You would agree there are instances in which, if an

21 inmate takes over that food port, that it would be a very

22 serious threat; isn't that true?

23 A.     The issue in California's own policy is imminent

24 threat for immediate force.  Could it be possible that not

25 letting that food port be closed create an imminent threat?

554

1          Yes.

2          So make that the foundation for the decision, not a

3    separate rule that says you don't have to make that judgment.

4          This is a really huge flaw in the policy.

5    Q.     The policy provides discretion to the correctional

6    officer, right?

7    A.     That's my point.  It should not.

8    Q.     So they should never be able to --

9          THE COURT:  Oh, my.

10         THE WITNESS:  It is not what I'm saying.  What I'm

11   saying is they should have to meet the same threshold to use

12   immediate force as they do in any other circumstance.

13         Forget the food port.  Whether it is in the yard or

14   in the school or in the dayroom, they have to justify that

15   there was an imminent threat here.

16         They should have to make the same justification in

17   the food port situation as well.  There is no reason not

18   to.

19   BY MR. RUSSELL:

20   Q.     But they do have that same discretion in those other

21   instances, right, if there is a fight on the yard or if

22   there's some kind of serious disturbance occurring?

23         THE COURT:  Sir, I don't know what -- I mean, if

24   you're trying to make a record that would impress me, or any

25   trier of fact, the most important thing to do is not to

555

1    mischaracterize the witness's testimony and then say "isn't

2    that what you are saying" because the answer is no.

3            He's repeatedly said that the question is whether or

4    not there is imminent force -- I'm sorry -- imminent danger.

5            It is not -- obviously if somebody is fighting in the

6    yard, that's imminent danger and something has got to be

7    done.

8            Is that right, sir?

9            THE WITNESS:  Yes.

10           THE COURT:  I mean, common sense.

11           You may proceed.

12           MR. RUSSELL:  Your Honor, I understand.  I was

13   confused.  I was trying to investigate that.

14           THE COURT:  You may proceed, sir.

15   BY MR. RUSSELL:

16   Q.    So isn't that the same discretion that's allowed for

17   the food port?

18   A.    No.  It's different discretion.  They don't have to

19   meet the threshold for the food port.  They don't have to

20   meet the threshold of imminent threat to use immediate force

21   in the food port.  It is not required there.

22           It is required in the yard fight.  I'm saying it

23   should be required for the food port situation as well.  It

24   is different.  It is not the same discretion.

25   Q.    Well, the goal in that situation would be to get that

556

1   food port closed, right?

2   A.      Yeah.  Ultimately.  Sure.

3           The sky is not going to fall if that food port is not

4   closed immediately.  Back up.  Get a sergeant.  Get a

5   counselor.  Wait a bit.  And if you are going to have to use

6   spray, go to a controlled use of force situation.  That's all

7   I'm saying.

8   Q.      But that depends upon each individual instance,

9   doesn't it?

10  A.      Yes.  And it should rise to the level of imminent

11  threat before you spray, or you should move it to control.

12          It is a very simple concept.  I'm sorry that we're

13  struggling with it.  It is just wrong in the policy.

14          THE COURT:  You have a bit yet to go, do you, sir.

15          It is all right.  I just want to know.

16          MR. RUSSELL:  I don't know, Your Honor.

17          THE COURT:  Because it is 4:25 now, and we ordinarily

18  would be getting ready to pack up.

19          If there is five or ten minutes, fine.  If there's 20

20  minutes, we'll take it up tomorrow.

21          I'm sorry, sir.

22          MR. RUSSELL:  It may be ten.  It may be -- I don't

23  know, Your Honor.  I apologize.

24          THE COURT:  We'll take our evening recess.  We'll

25  reconvene tomorrow morning at 9:30.

557

1          (Off the record at 4:25 p.m.)

2                    ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                      REPORTER'S CERTIFICATE

2                            ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5

6
             I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                   IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3            I, Diane J. Shepard, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8                                    /s/ DIANE J. SHEPARD
                                     DIANE J. SHEPARD, CSR #6331, RPR
9                                    Official Court Reporter
                                     United States District Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25