1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7          Plaintiffs,

8   Vs.                          CASE NO. CIV. S-90-0520 LKK

9   EDMUND G. BROWN JR., et al.,
    et al.,

10

11          Defendants.

12   _____/

13

14

15                    ---o0o---

16

17                REPORTER'S TRANSCRIPT

18              RE:  EVIDENTIARY HEARING

19            FRIDAY, OCTOBER 18TH, 2013

20

21                    ---o0o---

22

23

24

25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                        APPEARANCES

 2                        ---o0o---

 3   FOR THE PLAINTIFFS:

 4          ROSEN, BIEN, GALVAN & GRUNFELD, LLP
            315 MONTGOMERY STREET, TENTH FLOOR
 5          SAN FRANCISCO, CALIFORNIA  94104

 6          BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7          BY:  LORI RIFKIN, ATTORNEY AT LAW

 8

 9          K&L GATES LLP
            4 EMBARCADERO CENTER, SUITE 1200
10          SAN FRANCISCO, CALIFORNIA  94111

11          BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

12          BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

13

14   FOR THE DEFENDANTS:

15           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
16           13OO I STREET
             SACRAMENTO, CALIFORNIA  95814
17
             BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
             BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19

20

21                        ---o0o---

22

23

24

25
```

1                          EXAMINATION INDEX

2                              ---o0o---

3      FOR THE PLAINTIFFS:

4          EXAMINATION:                              PAGE

5

6        ELDON VAIL (Previously Sworn)

7            Cont'd Cross-Exam. by Mr. Russell         558

8

9

10       MEGAN CESARE-EASTMAN

11           Direct Examination by Mr. Bornstein       588

12           Cross-Examination by Mr. Russell          601

13

14

15                             ---o0o---

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO           DESCRIPTION              EVD
 5

 6      62B              Summary Diagram            616

 7      62C              Bar Chart                  616

 8      62D              Summary Diagram            616

 9      63B              Summary Diagram            616

10      63C              Bar Chart                  616

11      63D              Summary Diagram            616

12      64               MHSDS Management Rpts.     586

13

14

15

16                          ---o0o---

17

18

19

20

21

22

23

24

25
```

1                          EXHIBIT INDEX

2                            ---o0o---

3

4    DEFENDANTS'
     EXHIBIT NO            DESCRIPTION              EVD

5

6      D               Inmate E File Doc.          577

7      E               Inmate E File Doc.          577

8      F               Inmate E File Doc.          577

9      G               Inmate E File Doc.          577

10     H               Inmate E File Doc.          577

11

12

13

14

15                           ---o0o---

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                  (916) 446-6360

558

1                        SACRAMENTO, CALIFORNIA

2                FRIDAY, OCTOBER 18TH, 2013 - 9:30 A.M.

3                            ---o0o---

4          THE CLERK:  All rise.

5          Court is now in session.

6          The Honorable Lawrence K. Karlton, United States

7    District Court Judge, presiding.

8          THE COURT:  Thank you.  You may be seated.

9          Mr. Russell.

10         MR. RUSSELL:  Good morning, Your Honor.

11         Before we get started, your courtroom clerk had asked

12   about further witnesses today.

13         THE COURT:  I've heard the horror story.  Let's get

14   done with Mr. Vail, and then I'll -- luckily I was told

15   earlier and so it's not likely that I'm going to skin

16   somebody alive, but let's go.

17         MR. RUSSELL:  Okay.

18            CONTINUED CROSS-EXAMINATION OF ELDON VAIL

19   BY MR. RUSSELL:

20   Q.    Good morning, Mr. Vail.

21   A.    Good morning.

22   Q.    Yesterday, when you were testifying, you talked about

23   a standard for decontamination from exposure to pepper spray,

24   and I believe that you stated that you thought the standard

25   was half an hour decontamination; is that correct?

559

1    A.        That's what I've seen as a recommendation.  I may

2    have used the word "standard," but I know it is a

3    recommendation.

4    Q.        That's a recommendation from the manufacturer?

5    A.        And the training that I received.

6    Q.        That's training in Washington State?

7    A.        Yeah.

8    Q.        Do you know what manufacturer that is?

9    A.        No.

10   Q.        And where did you find that information?

11   A.        A couple of places I remember when we first went to

12   OC spray several years ago.  And then I looked it up most

13   recently.  It might have been Sabre, S-a-b-r-e, is the

14   manufacturer.  But I looked at several sources recently, and

15   that seemed to be a pretty consistent recommendation, that it

16   may take up to a half hour for folks who have suffered a lot

17   of spray.

18   Q.        Have you looked at the National Institute of

19   Corrections' recommendations regarding pepper spray?

20   A.        No, not recently.

21   Q.        So you have not looked at their information that the

22   effects of --

23            THE COURT:  He said, "No, I haven't looked at it."

24   BY MR. RUSSELL:

25   Q.        Are you aware from any source that the effects of

560

1    pepper spray completely resolve within 30 to 45 minutes of

2    exposure?

3    A.    No.  That's not my experience or the training that I

4    have had.  It depends.  Some people it can last up to four

5    hours.

6    Q.    Does the State of Washington have written standards

7    or written guidelines regarding decontamination?

8    A.    Yes.

9    Q.    And where can I find those?

10   A.    I can't tell you today.  I've been gone over two

11   years.  It is probably an attachment to an emergency response

12   plan, but I can't tell you for sure.

13   Q.    Now, yesterday you also talked some about, I think

14   they're called the Management Reports, that are provided by

15   the State to the Special Master where they talk about the

16   percentage of inmates involved in use of force incidents.

17         Do you recall that testimony?

18   A.    The Mental Health Management Reports?

19   Q.    Yes.

20   A.    Yes.

21   Q.    I think in particular you talked about Lancaster and

22   a percentage of 92 percent.

23         Do you know how that percentage is calculated by the

24   institution?

25   A.    No.  I just know it's reported by the institution.

561

1    Q.       In the definition of "use of force" that's contained

2    within those reports, do you know how use of force is

3    defined?

4    A.       I would presume that it is defined as it is defined

5    in California policy.

6    Q.       But you are saying you presume.  You do not know?

7    A.       Well, it wouldn't make sense if it is not.

8    Q.       Does California policy provide that if an inmate is

9    involved in an altercation with another inmate, and force is

10   used in that incident, that regardless of who may have been

11   contacted or who may have been affected, that both inmates

12   are included as being involved in that use of force incident?

13   A.       That would seem logical to me.

14   Q.       Do other states track information concerning the

15   percentage of mental health inmates in the mental health

16   system involved in use of force incidents?

17   A.       I can't speak for very many states in that regard.

18   Yeah.  Just leave it at that.

19   Q.       Yesterday you were asked about a memorandum that was

20   written by Mr. Stainer concerning the use of pepper spray.

21           Do you recall that?

22   A.       I do.

23   Q.       And I believe that your testimony was that memorandum

24   was written in response to a particular cell extraction

25   incident?

562

1    A.       In reading Mr. Stainer's deposition, that was a

2    preclude to writing the memo according to what the deposition

3    said, yes.

4    Q.       Yesterday we watched a video of an inmate whose

5    identified as Inmate F.  I believe that video was introduced

6    as Exhibit Number 13, and the documents relating to that

7    inmate are Exhibit 12.

8    A.       Okay.

9    Q.       And you noted in watching the video that the inmate

10   said that he was not violent or wasn't going to commit any

11   violence once he was extracted from the cell.

12            Do you recall that?

13   A.       I do.

14   Q.       Is it your opinion that statements like that, by an

15   inmate, are what should be relied upon in determining whether

16   or not to enter a cell?

17   A.       Not solely.  I think you have to look at the rest of

18   the behavior along with what he was saying.

19   Q.       Do you recognize -- do you understand, from having

20   reviewed the documents, that custody staff had gone to the

21   mental health staff to ask about the inmate, and the mental

22   health staff said it was documented that he need to be

23   involuntarily medicated?

24   A.       I understand that, yes.

25   Q.       At that point -- well, given that statement by mental

1   health, that this is an inmate who is being involuntarily

2   medicated, it's still your opinion that mental health staff

3   should have entered that cell with a medical sharp, with a

4   hypodermic, to try to provide the involuntary medication?

5           MR. BORNSTEIN:  Object.  That is not what the

6   testimony was.

7           THE COURT:  Put it as a question, not as a statement.

8           Is it your view that under the totality of the

9   circumstances it would have been appropriate for mental

10  health personnel to enter the cell to provide medication?

11          THE WITNESS:  Certainly not alone.  It might have

12  been an option in partnership and in conjunction with some

13  custody officers.

14  BY MR. RUSSELL:

15  Q.      And how is that determination made?

16  A.      It's made by the professional judgment of the folks

17  who are on the floor.

18  Q.      That's the correctional staff?

19  A.      Yes.

20          No.  I'm sorry.  It would be in partnership with the

21  mental health staff.

22          If you know your inmates, and from what we know --

23  what I know about this inmate, he didn't represent any kind

24  of immediate threat.  He seemed like someone that you could

25  talk to.  He didn't show any violence.

564

1          He was agitated.  You could see he was pacing in his

2     cell, but an alternate approach may well have been to have

3     gone into the cell, and even if you have to use some physical

4     force to lay him on the bed, you would have accomplished the

5     same thing without putting him through the pain of pepper

6     spray.

7     Q.      But going into the cell and putting hands on him,

8     that also involves the risk of physical harm also, correct?

9     A.      There's always risk, even if you use the spray.

10    Q.      And doing that could cause -- you've talked about the

11    mental harm that occurs from these exposures.  Having

12    somebody experiencing hands-on force within a cell and being

13    forced down to a bed, that could cause the same kind of harm,

14    couldn't it?

15    A.      Anything is possible, sir.

16    Q.      I think we talked a little bit yesterday -- you've

17    talked on direct, and maybe even on cross, about the purposes

18    for the use of force.  And one of the reasons to use force is

19    to prevent an inmate actually harming himself, correct?

20    A.      Can be, yes.

21    Q.      And so this is an instance in which the medical --

22    the mental health professionals were contacted by

23    correctional staff and the response was that this is somebody

24    who needs to be involuntarily medicated, correct?

25    A.      Yeah.  But that is different than somebody who is

565

1   about to hurt himself.

2   Q.    Well, do you know --

3   A.    Significantly different.

4   Q.    Do you know what he was being medicated for?

5   A.    Because he refused to take his meds.

6   Q.    Do you know the purpose of the medication was for

7   Inmate F?

8   A.    To treat his psychosis.

9   Q.    Do you know what his psychosis was?

10  A.    I do not.  We didn't get his medical records I don't

11  believe.

12  Q.    I would like to turn back to testimony that I believe

13  that you offered on the first day.  This is pertaining to

14  Inmate A.  And that video was -- well, the documents, I

15  believe, are Exhibit 2, and the video was Exhibit 3.

16        And you have now reviewed those documents, correct?

17  A.    Yes.

18  Q.    And those documents show that the inmate had flooded

19  his cell prior to the extraction; is that right?

20  A.    Yes.

21  Q.    And that the cell -- there was feces on the floor of

22  the flooded cell?

23  A.    I believe that's what the report says, yes.

24  Q.    And that this inmate had smeared himself with feces

25  as well; is that correct?

566

1    A.        Yes.

2    Q.        But it is your opinion today, that given those

3    circumstances -- oh, this is an inmate who, again, is to be

4    involuntarily medicated, correct?

5    A.        That's correct.

6    Q.        He's not doing this voluntarily.

7              Is it your opinion that medical staff, again, should

8    have entered that cell under those conditions?

9    A.        In that case, I suspect not, no.

10   Q.        And the records that you reviewed, particularly

11   records in Exhibit 2, or anything else that you may have been

12   provided, showed that there was substantial clinical

13   intervention that was attempted before the use of force video

14   actually started, right?

15   A.        No.  I don't think that it shows that there was

16   substantial clinical intervention.  There was some effort at

17   clinical intervention.  I would not call it substantial from

18   what I have seen in the records.

19   Q.        The records do show that the only intervention that

20   is attempted is not just what is depicted on the video,

21   right?

22   A.        Some do, some don't.

23             THE COURT:  I think he's talking about specifically

24   about Inmate A, if you recall?

25             THE WITNESS:  I don't recall without looking at the

567

1    records again.  I do recall the on-camera intervention.

2            THE COURT:  This is another one of the cases that I

3    think we've talked about in a general way earlier, which

4    raises the entire question of what do we do with intransigent

5    inmates and how do we approach it when something must be

6    done.

7            But I gather what you have said about this inmate is

8    that even if pepper spray had to be used, this was far

9    excessive to the need?

10           THE WITNESS:  Yeah.  Exactly.  It was a massive

11   amount of spray.  It was clear early on it was not having its

12   desired effect.  It continued to be used, and that's

13   basically why I wrote about that case.

14           I thought it was a good example of not having an

15   agile tactical response once the situation begins to unfold.

16           THE COURT:  But here we have, and I don't want to

17   keep pressing this, but I think it is central to the whole

18   problem that is faced in these circumstances -- I don't know

19   whether the defendants agree -- but my own evaluation was

20   that this inmate was in such a sufficient psychotic state

21   that he was unable to comply with the request to -- not

22   request -- but the order to cuff up.

23           Assuming that that's so -- let me ask you.  Is that

24   your understanding as you saw it as well?

25           THE WITNESS:  Yeah.  I think that's how I

1    characterized it when I wrote about it too.  Yes.

2          THE COURT:  Assuming, therefore, that he was

3    incapable, by virtue of his psychosis, nonetheless something

4    had to be done.

5          The pepper spray that was initially applied -- I

6    don't know whether that's the right word.

7          MR. RUSSELL:  Deployed.

8          THE COURT:  -- was not terribly effective.

9          What was supposed to be done then?

10          What the custody people did was they keep shoving OC

11   spray on him, which may not be sensible, but what were they

12   supposed to do?

13          THE WITNESS:  I think in this case you had to go into

14   the cell and lay him down on the bed.  And if you're

15   organized enough, bring the mental health staff right after

16   that and get the injection done and not go through the

17   rigmarole that they went through to get him in restraints and

18   over to the restraint room.

19          It would have --

20          THE COURT:  Excuse me.  I'm sorry.

21          THE WITNESS:  That would have avoided the pain in the

22   middle.  It creates a risk for him, it creates a risk for the

23   officers, but it would have been over quicker.  And I have

24   seen California officers be able to do that quite effectively

25   in at least one of the videos.

569

1    THE COURT:  Some of these things appear to me, and I

2    think you're even suggesting it, that these are custody

3    judgments, what do you do next?

4    And even assuming that in the case of Prisoner A

5    there was a misjudgment about what to do, these are -- it

6    appears to the court that these are very complicated,

7    difficult problems.  And can we fault custody -- I mean, it's

8    clear there was -- I'm sorry.

9    It appears that there was excessive force used, but

10   under the circumstances it's difficult to know what to --

11   what to have done.

12   I don't know.

13   THE WITNESS:  It is.  I mean, I don't fault the

14   officers as much as I do the system, the administration for

15   not creating the environment where those mental health staff

16   and those custody staff work together.

17   THE COURT:  I see.  Okay.

18   So the problem in your view is not simply, well,

19   there was excessive OC spray when it was clear that wasn't

20   going to do much good, but that you contend that there had

21   developed a culture by virtue of failure of administrative

22   supervision or planning or whatever, to involve mental health

23   people at the scene right then and there?

24   THE WITNESS:  Yeah.  I mean, I can't, in this case

25   particularly though, walk away from the sort of disaster that

570

1    the tactical fumbles that are repeated in that incident.

2         I mean, I recognize that California says spray first.

3    And they say that in some policies and they kind of don't say

4    that.  But spray is clearly their preferred first use of

5    force.  And I might even accept that and understand that,

6    although not necessarily for the mentally ill.

7         But what they don't do is give their custody staff

8    good direction on how to make a decision about:  I think it's

9    not working.  We're going to have to go to the next step.

10        They go overboard before they get to that point.

11   They go to the point of exhaustion before they're willing to

12   open that cell door.

13        THE COURT:  I'm sorry, Mr. Russell.  I didn't mean to

14   interrupt, but this is a crux question.  And I think it's

15   more difficult -- well, I don't want to criticize people.

16        Go ahead.  You may proceed.

17        MR. RUSSELL:  I agree, Your Honor.  That's why I was

18   probing this issue to try to have the court have sufficient

19   information.

20   BY MR. RUSSELL:

21   Q.    I do have to go back to something that you said,

22   though, Mr. Vail.

23        Isn't it true, even looking at Inmate A's video, that

24   there were mental health staff present, at least in the area,

25   during that extraction?

571

1    A.        Not in any significant way that I could see.

2    Q.        Well, mental health staff or at least some healthcare

3    staff were there administering the involuntary medication

4    once they got the inmate out of the cell, correct?

5              We saw that on the video.

6    A.        Yeah.  They would be the only ones qualified to do

7    so.  You wouldn't have an officer actually do an injection,

8    if what's that we are talking about.

9    Q.        That's right.  So they were present at least at some

10   point during this?

11   A.        Yeah.  They work in that unit.  It's flooded with

12   mental health staff and medical staff.

13   Q.        Is it your opinion that the mental health staff

14   should have been the ones to tell the correctional officers

15   to stop deploying the pepper spray?

16   A.        No.  It is my opinion that there should -- I'll give

17   you an example.  There should probably be a weekly meeting

18   with the officers of the unit to learn who is in there, what

19   their symptoms are, make sure they have a good understanding

20   of the past behavior, to share some insights with the mental

21   health staff about how to deal with them and vice versa.

22             I mean it is that kind of contextual environment that

23   I don't believe exists in those units.

24   Q.        Do those kinds of meetings take place on units?

25   A.        Yeah.  In California?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

572

1    Q.      Yes.  In California?

2    A.      No.  Not that I am aware of.

3    Q.      You are aware that California holds what are called

4    Interdisciplinary Treatment Team Meetings concerning mental

5    health inmates?

6    A.      But those are with mid-level staff, not with the

7    staff working the floor.

8    Q.      That's your understanding?

9    A.      I think it is accurate.

10   Q.      We also talked about Inmate B.  His video -- the

11   documents, I believe, were introduced as Exhibit 4, and the

12   video was Exhibit 5.

13           And I think that you testified here -- it wasn't in

14   your declaration -- but you did recognize, after having

15   reviewed the records, that this inmate -- it appears that he

16   had armed himself with a container that may have contained

17   feces.

18           Is that correct?

19           THE COURT:  I thought it was liquid but...

20           THE WITNESS:  In the video he holds a cup.  And it

21   may have contained feces -- or did the report say that it

22   might have contained feces?  I would acknowledge that, yes.

23   BY MR. RUSSELL:

24   Q.      And I think in this video that this is an instance

25   when the inmate was asking to talk to a clinician, correct?

573

1    A.       As the situation unfolded, yes.

2    Q.       And in the video do you recall having seen the

3    officer say:  The clinician is right here, but you need to

4    come out?

5    A.       I do remember that.  Yes.

6            THE COURT:  Really.  I don't remember that.  Okay.

7            Wasn't this the inmate where they told him that

8    that's not the way it works?

9            MR. RUSSELL:  That is one of the things said.

10           THE COURT:  Okay.  He's supposed to discriminate

11   between those statements even though he's having a psychotic

12   experience?

13           I understand what your position is.

14           You may proceed, sir.

15   BY MR. RUSSELL:

16   Q.       But it is your opinion that after having acknowledged

17   that the mental health officer -- the mental health clinician

18   was there, this is another instance in which the mental

19   health clinician should have entered the cell?

20   A.       No, I didn't say that.

21   Q.       Well, what is your opinion about what the mental

22   health clinician, the one on-site at that time, should have

23   done?

24   A.       I'm not faulting the clinician.  I think that the

25   person who was mainly shouting at the inmate in the cell and

574

1    increasing his vocal volume as the incident went on, and I

2    believe exacerbating the situation, didn't recognize that the

3    inmate was terrified.

4         He was afraid.  He was talking about his fear of

5    being -- of experiencing homosexual rape.  And he saw, I

6    believe, someone who represented more safety in that mental

7    health staff.

8         And I probably would have drawn them closer to the

9    door and tried to at that point continue an intervention to

10   talk that guy out of there without having to use more spray.

11   Q.    So I think that's reiterating what you discussed in

12   your declaration, essentially that the inmate should have

13   somehow been coerced to come out of the cell?

14   A.    Not coerced.  You could have at least, at that

15   moment, tried the conversation with the mental health staff.

16   It might have worked.  They might have been able to not use

17   that last spray.  It might have calmed the inmate down.

18        That's the lack of expertise that I see in these

19   videos.  They just escalate and go and dump the spray.  And

20   they don't -- they're not agile in their response.  And

21   they're not paying attention to what is going on with the

22   inmate because they have no context to.

23   Q.    And then I believe it was yesterday that we also

24   talked about Inmate I.  And the documents are Exhibit 8, and

25   the video is Exhibit Number 9.

575

1          And in your declaration, and I think it was

2    reiterated yesterday as well, you had stated that there was

3    no documented attempt on camera to deescalate the situation.

4          Is that borne out by the records as well?

5    A.    I don't recall sitting here this morning.  I would

6    have to go back over the records.  What I did say is that

7    there is no documented attempt on the camera.

8    Q.    But there may be further documented attempts, and

9    this is what I think we were talking about, documented within

10   the records that doesn't appear on the video itself?

11         THE COURT:  Anything is possible.  The witness has

12   said that four times and it's clearly so.

13         If you have a specific document that you want him to

14   look at, that's an appropriate thing to do.  But speculating

15   about what might be in documents is simply irrelevant and

16   wasteful of everyone's time.

17   BY MR. RUSSELL:

18   Q.    And again, I believe it was on the first day,

19   Mr. Vail, we also talked about Inmate E.  And his documents

20   are located at Exhibit 10, and the video was introduced as

21   Exhibit 11.

22         One thing that you were asked about yesterday was

23   disparaging comments that you heard on that video made by one

24   of the officers.

25         Is it your opinion that comments like that made by

576

1    one officer to another are inappropriate?

2    A.    I don't know who they were made to or who they were

3    made about.  Comments like that are inappropriate by

4    correctional staff in the workplace.  Their job is to model

5    pro-social behavior, not to descend into street talk.  That

6    undermines their authority, and it undermines their

7    legitimacy.

8          It is a difficult issue in corrections, but it has a

9    big impact when you can get that out of a unit.  I have had

10   units where there was problems with that and sent in people

11   that cleaned it up.  And those units operated much better.

12   Q.    And it's not your opinion that that comment was made

13   to the inmate himself, is it?

14   A.    As I said, I don't know who it was made to.  It was

15   an inappropriate comment in any situation, but especially in

16   that situation.

17         MR. RUSSELL:  Your Honor, I have a series of

18   documents and I have provided another copy to plaintiffs'

19   counsel.

20         These were provided last month as part of document

21   production.  I would like to provide these to the clerk.

22              (Brief pause.)

23         THE COURT:  Go ahead.

24         MR. RUSSELL:  Your Honor, these are documents kept in

25   the regular course of business in Inmate E's file.  We'd like

577

1    to move these into evidence as Defendants' Exhibit D through

2    G, I believe, I put on there.

3         MR. BORNSTEIN:  No objection, Your Honor.

4         THE COURT:  Received.

5              (Whereupon, Defendants' Exhibits D, E, F, G and H

6               received into evidence.)

7         MR. BORNSTEIN:  What is D and which is E?

8         THE COURT:  They say right on them.

9         MR. RUSSELL:  They start with D.

10        MR. BORNSTEIN:  Mine don't.

11        I can take care of it later.

12        I'm sorry.  I don't want to interrupt.

13        MR. RUSSELL:  Excuse me, Your Honor.

14        (Counsel confer.)

15        (Court and Clerk confer.)

16        THE COURT:  They are exhibits D to H.

17        We have a problem that I'm not clear about -- well,

18   if plaintiff doesn't care, go ahead.

19        Continue.

20   BY MR. RUSSELL:

21   Q.    Mr. Vail, the first of these is a correctional

22   custody chrono that's dated December 3rd, 2012.

23        THE COURT:  Have you seen this before, sir?

24        THE WITNESS:  I have not.

25        THE COURT:  When you asked for the records pertaining

578

1    to this person -- to the people on the videos, did you expect

2    this kind of information to be provided to you?

3            THE WITNESS:  This is the kind of thing we asked for

4    in March, I belive, in conjunction with the tours.

5            THE COURT:  And it was not supplied to you?

6            THE WITNESS:  No.

7            THE COURT:  They never have until this morning?

8            THE WITNESS:  Not in front of me.

9            THE COURT:  And you want to question him about it

10   now?

11           MR. RUSSELL:  I do, Your Honor.

12           THE COURT:  You got to be kidding.

13           MR. RUSSELL:  Well, Your Honor, these documents were

14   provided to plaintiffs' counsel about a month ago in response

15   to their request for documents.

16           THE COURT:  And how many documents were supplied?

17           MR. RUSSELL:  On that day, I have no idea.  It was

18   probably hundreds.

19           THE COURT:  Precisely.  Precisely.

20           There is no objection.  You may proceed, but it is --

21   I'm not sure it is useful, but go ahead.

22   BY MR. RUSSELL:

23   Q.    Well, what I wanted to ask you, Mr. Vail, is looking

24   at these chronos, you can see for the first one, for example,

25   that the Rules Violation Report --

579

```
 1           THE COURT:  Sir, the document speaks for itself.  If
 2   you have a question about it, you can ask him.
 3           MR. RUSSELL:  Okay.
 4   BY MR. RUSSELL:
 5   Q.      Mr. Vail, why was this chrono reduced -- Strike that.
 6           Does it appear from this document that potential loss
 7   of credits or loss of privileges is being mitigated in the
 8   interests of justice for an inmate who is identified as --
 9   who has a mental health condition?
10   A.      I'd have to look at it.  I'm sorry.
11           (Witness reviews exhibit.)
12           This is about him not making an appointment.  And I
13   don't know, you know, about the key, what the reductions
14   mean, but the words are here that say that something was
15   reduced to a 128A in the interests of justice.  I don't know
16   what that means.
17   Q.      Well, I think we've talked about this before, that
18   it's necessary for inmates to comply with lawful orders,
19   correct?
20   A.      Yes.
21   Q.      And if an inmate does not comply with an order that
22   is appropriately given, there needs to be some reaction,
23   correct?
24   A.      Yes.
25   Q.      And I think what you've been testifying to here today
```

580

1    is that, in your opinion, in many instances those reactions

2    are excessive?

3    A.        Sometimes they are.

4    Q.        And that they should be mitigated because of the

5    mental health condition of an inmate; is that correct?

6    A.        I've been talking about use of force.  That's not

7    what these are about, right?

8    Q.        I do not believe these are about use of force.

9    A.        Okay.

10   Q.        But what I'm asking you about is does it --

11             THE COURT:  He's objecting it's beyond the scope of

12   direct, which, of course, should have been raised by counsel

13   for the plaintiff.  But since the witness is a little more

14   agile than counsel, I will sustain the objection.

15             You may proceed, sir.

16   BY MR. RUSSELL:

17   Q.        Mr. Vail, I would like you to turn to the last

18   exhibit.  It is the one I have a paper clip on.

19   A.        Okay.

20   Q.        And I believe this is a Rules Violation Report

21   similar to what you have seen in some of the other files, and

22   you were provided in some of the other files, correct?

23   A.        Yeah.  Can I ask if this is about the incident I saw

24   in the video or a different incident?

25   Q.        This is a different incident.

581

1          As you can see the top, the date of the Rules

2     Violation Report is May 14, 2013?

3     A.      Yes.

4     Q.      So that's about six months or so later?

5     A.      Okay.

6          MR. BORNSTEIN:  So my objection here is that this is

7     beyond the scope of anything we had available to show this

8     witness prior.

9          THE COURT:  And therefore anything that has been

10    testified to and therefore is improper cross; is that what

11    you are trying to say?

12         MR. BORNSTEIN:  Yes, Your Honor.

13         THE COURT:  Sir?

14         MR. RUSSELL:  Your Honor, the testimony -- Mr. Vail

15    has been testifying about reactions and excessive use of

16    force and overreactions.

17         What these documents show is, at least with regard to

18    one of the few inmates we have been talking about in these

19    proceedings, that that is not true, that's not universally

20    true.  And these --

21         THE COURT:  I understand your position.  The question

22    is -- I don't know how to say it.

23         Deep breath.

24         The objection is that it is beyond the scope of

25    direct.  I suppose that you can take the witness as your own

582

1    as to this matter, and we can do it in what would have been

2    cross-examination.  But it deals with an entirely different

3    subject, and the objection is that it is beyond the scope of

4    direct.

5            Now, what do you want to do about that?

6            That objection is well-taken.  I don't know -- well,

7    that objection is well-taken.

8            MR. RUSSELL:  Your Honor, may I ask a question?

9            THE COURT:  Sure.

10           MR. RUSSELL:  Is that objection sustained to the

11   entirety of this document and questions pertaining to it?

12           THE COURT:  Yes.  I mean, as best I can tell, unless

13   you can enlighten me in some way how it is relevant to the

14   testimony made by the witness indirect, yes.  The answer is

15   yes.

16           MR. RUSSELL:  I'll try, Your Honor.

17           THE COURT:  All right.

18   BY MR. RUSSELL:

19   Q.      Mr. Vail, you earlier testified -- I think you

20   testified here this morning that one of the problems that you

21   see with CDCR is that there is a lack of cooperation

22   essentially between mental health staff and custody staff to

23   be able to assess situations and come to appropriate

24   solutions.

25           Am I essentially summarizing that properly?

583

1    A.      Yeah.  I might expand on the word "cooperation," but

2    we're in the ballpark.  Sure.  Go ahead.

3    Q.      Well, I would like you to turn to the last page of

4    this exhibit, Exhibit H.  There's a heading there in the

5    middle of the page that states "Additional Information."

6    A.      Yes.

7    Q.      And it states that Inmate E is a Department of State

8    Hospital inmate at the Enhanced Outpatient level of care.

9    And then the abbreviation is SHO.  I believe that stands for

10   senior hearing officer.  That SHO deferred to the 115 mental

11   health -- essentially a mental health chrono authored by a

12   clinician -- stating that any socialization privileges that

13   assist the inmate in achieving or maintaining stability

14   should not be removed.

15          And is it true that in this instance, based upon that

16   cooperation between mental health staff and custody staff,

17   that the hearing officer elected not to enforce loss of

18   privileges.

19          MR. BORNSTEIN:  Your Honor, objection.  This document

20   by its terms refers to the Department of State Hospital.  The

21   inmate, when we saw the video, and the records that we were

22   provided that were the subject of this case, was in

23   San Quentin.

24          As far as I know the Department of State Hospitals is

25   a different institution and is not San Quentin.  Therefore,

584

1    this is irrelevant and has nothing to do with the information

2    that was previously presented to the court.

3            MR. RUSSELL:  May I respond, Your Honor?

4            THE COURT:  Yes.

5            MR. RUSSELL:  The front page of the document shows

6    that it is concerning an event that occurred at San Quentin.

7    And that the Rules Violation Report is being adjudicated at

8    San Quentin.  This is entirely a San Quentin incident.

9            THE COURT:  I'm sorry.  I mean, part of the problem

10   is, of course, that all of these documents are difficult to

11   understand when presented the way this was done.

12               (Brief pause.)

13       I can't even read it.  Hang on.

14               (Brief pause.)

15       Assuming that -- I don't know.  I'm trying to read it

16   quickly in the midst of a trial.  I don't know where even to

17   look.  "San Quentin SP," does that mean San Quentin -- I mean

18   "SQSP"?

19           MR. RUSSELL:  Yes, Your Honor.

20           THE COURT:  That means San Quentin?

21           MR. RUSSELL:  Yes.

22           THE COURT:  You stipulate that means San Quentin?

23           MR. BIEN:  Yes, Your Honor.  That's the abbreviation

24   for it.  I don't know where it took place.

25           THE COURT:  I have no idea.  In any event, when we go

585

1    back to this back page --

2           MR. BORNSTEIN:  It says "CMF" on the back page at the

3    top.

4           THE COURT:  I see that.

5           MR. RUSSELL:  That is true, Your Honor.  It does say

6    CMF.

7           THE COURT:  I don't know what it says.  It is clear,

8    that at minimum, it is ambiguous.  And the failure to thrash

9    this out with counsel for plaintiff sometime other than in

10   the midst of trial -- the objection as being irrelevant

11   because it appears to have been determined by a different

12   department by a different hearing officer is sustained.

13          That's as best I can tell.

14          You may proceed.

15          MR. RUSSELL:  I have no further questions, Your

16   Honor.  Thank you.

17          THE COURT:  Redirect?

18          MR. BORNSTEIN:  Aside from moving into evidence the

19   Mental Health Management Reports that I referred to --

20          THE COURT:  Please, speak into microphone.

21          MR. BORNSTEIN:  Aside from moving into evidence the

22   Mental Health Management Reports that we referred to on

23   direct, which I believe is Exhibit 64, I have no questions.

24          THE COURT:  Madam Clerk, let's be sure that's what he

25   is talking about.

586

```
 1              Is 64 in or out?
 2              THE CLERK:  I don't have 64.
 3              (Clerk and court confer.)
 4              THE COURT:  Well, he is moving to admit it.
 5              Objection?
 6              MR. RUSSELL:  I apologize, Your Honor.
 7              MR. BORNSTEIN:  The Mental Health Management Reports,
 8     the excerpts in Exhibit 64, I'm moving to have them admitted
 9     into evidence.
10              MR. RUSSELL:  No objection.
11              THE COURT:  Received.
12                  (Whereupon, Plaintiffs' Exhibit 64 received into
13                   evidence.)
14              THE COURT:  May the witness be released?
15              MR. BORNSTEIN:  Yes, Your Honor.
16              MR. RUSSELL:  Yes, Your Honor.
17              THE COURT:  I would leave if I were you, Mr. Vail.
18              MR. BORNSTEIN:  Your Honor, recognizing that your
19     time -- I didn't want to waste any more of your time, but we
20     did withdraw those exhibits yesterday, the summary exhibits.
21     I've got the person who prepared them.  She's a lawyer with
22     us.
23              THE COURT:  It is up to you.  I mean, I will accept
24     them as argument in any event when we get there.  If you're
25     changing your mind and want to put them into evidence, put
```

587

1    her on.

2          MR. BORNSTEIN:  We'll do that.  I just wanted to let

3    you know though, normally I wouldn't if we were in front of a

4    jury, but...

5          THE COURT:  Here we are.

6          MR. BORNSTEIN:  Thank you.  So I will call Megan

7    Cesare-Eastman.

8          THE COURT:  We're going to have lots of time this

9    morning to discuss how we can go forward in a more rational

10   way.

11         THE CLERK:  Please, remain standing and raise your

12   right hand.

13                    MEGAN CESARE-EASTMAN,

14   was thereupon called as a witness herein by the Plaintiff,

15   and having been sworn to tell the truth, the whole truth and

16   nothing but the truth, was thereupon examined and testified

17   as follows:

18         THE CLERK:  Please, take a seat.  State your name,

19   spell your last name and speak directly into the microphone,

20   please.

21         THE WITNESS:  Megan Cesare-Eastman, C-e-s-a-r-e,

22   dash, E-a-s-t-m-a-n.

23         THE COURT:  I'm sorry, ma'am.  I just lost it all.

24         Your name is Megan?

25         THE WITNESS:  Cesare-Eastman.

588

1           THE COURT:  Hang on.  Megan, Cesare, Eastman,

2     E-a-s-t-m-a-n.

3           You may proceed.

4            MR. BORNSTEIN:  Thank you.

5                        DIRECT EXAMINATION

6     BY MR. BORNSTEIN:

7     Q.    Miss Eastman, you're employed at K&L Gates?

8     A.    I am.

9     Q.    What is your position?

10    A.    I'm an Associate Attorney.

11    Q.    Were you involved with -- are you familiar with

12    what's been marked for identification as Exhibits 62B, C and

13    D, and 63B, C and D?

14    A.    I am.

15          THE COURT:  And 1001 apparently.

16    BY MR. BORNSTEIN:

17    Q.    And 1001?

18    A.    I am.

19    Q.    With respect to 62B, C and D, and 63B, C and D, can

20    you just tell us generally what those are?

21    A.    They are a summary of the information that was

22    presented in each institutions Mental Health Management

23    Report.

24    Q.    And those are the documents that are in Exhibit 64?

25    A.    Yes.

589

1   Q.      Now, with respect to the summary charts, were you

2   involved in preparing the summary charts?

3   A.      Yes.

4   Q.      Would you please tell the court what you did

5   initially as far as the information that goes into the

6   summary charts?

7   A.      Yes.  Mr. Vail had been reviewing the Mental Health

8   Management Reports and had noticed some trends that he wanted

9   explored further.  He, based on time constraints, had asked

10  me to put all of the information together into a single

11  document so it would be easier to review.

12  Q.      And when you say "putting the information together,"

13  you're talking about from Exhibit 64, the Mental Health

14  Management Reports?

15  A.      That's correct.  The Mental Health Management Reports

16  give numbers regarding the total percentage of use of force

17  incidents that occurred against MHSDS inmates, as well as the

18  percentage of RVR incidents that occurred against MHSDS

19  inmates.

20  Q.      So maybe we can take a look at one and have you

21  explain your methodology of what you did?

22  A.      Sure.

23  Q.      Is there one in particular that you want to look at?

24  A.      It doesn't matter.

25  Q.      How about -- I don't know.  How about SAC, California

590

1    State Prison in Sacramento.

2    A.      Sure.

3            THE COURT:  I'm sorry.  Which one would that be?

4            MR. BORNSTEIN:  It will say California SP Sacramento,

5    S-A-C.

6            Your Honor, it is in Exhibit 64.  I'll display -- I

7    can display it.

8            THE COURT:  Okay.  Go ahead.

9            MR. BORNSTEIN:  Let me put it up on the screen.

10           (Exhibit published.)

11   BY MR. BORNSTEIN:

12   Q.      So looking first at the RVR Protocols, is that the

13   section that you looked at -- or one of the sections you

14   looked at?

15   A.      Yes, it is.

16   Q.      Okay.  So now if we take this section, and then which

17   of the summary charts should we use?  Is it 62 -- or excuse

18   me 63B?

19   A.      Yes.  63B.

20           THE COURT:  Hang on.  Let me find 63B.

21           Okay.

22   BY MR. BORNSTEIN:

23   Q.      So then on the summary chart, 63B, we look for where

24   it says Cal SP SAC?

25   A.      Yes.

591

1    Q.      All right.  So tell us, please, what you did.

2    A.      In the Mental Health Management Report it says during

3    the reporting period 1490 RVRs were issued for inmates at

4    SAC.

5            If you look at the fifth column, it says total RVRs

6    at SAC 1490.

7            Then it says, the Mental Health Management Report, of

8    the RVRs issued during the review period -- I'm sorry -- 419

9    for GP inmates, 462 for CCCMS, 549 for EOP, 60 for MHCB, 11

10   for ASU-GP.

11           So what I did there is I took the total for the

12   CCCMS, the EOP and the MHCB, and I added them to together to

13   get the total number of RVRs issued to MHSDS inmates.

14   Q.      What did you find that number to be?

15   A.      For SAC I found it to be 1071.

16           THE COURT:  I'm sorry.  For what?

17           THE WITNESS:  For SAC on Exhibit 63B --

18           THE COURT:  Okay.

19           THE WITNESS:  -- I found the total to be 1071.

20           THE COURT:  1071.

21   BY MR. BORNSTEIN:

22   Q.      That is literally adding up 462 plus 549 plus 60?

23   A.      Yes.

24           THE COURT:  Okay.

25   ///

592

1   MR. BORNSTEIN:

2   Q.      All right.  Then what did you do?

3   A.      The rest was basic math.  I divided the total RVRs to

4   MHSDS by their total RVRs issued to all inmates to get the

5   percentage of RVRs issued to MHSDS.

6   Q.      So where did you get the total population?

7   A.      We realized after we had compiled those numbers that

8   in insolation they didn't tell us much without knowing what

9   the percentage of mentally ill inmates at the prison was.

10          So a few of the institutions self-reported those

11  numbers in the Mental Health Management Reports, but the

12  majority did not.  So I used data that's provided publicly on

13  the CDCR website in the weekly population reports, which, I

14  believe, is at Exhibit 60.

15  Q.      Okay.  And Exhibit 60 shows on the second page a

16  breakdown by institution?

17  A.      Yes.  It shows in the third column the total number

18  of inmates at each institution as of June 6, 2012.

19  Q.      Why did you use the date June 6, 2012?

20  A.      Because that was the end of the reporting period.  I

21  actually recalculated these numbers using population data

22  from December of 2011, and it made a negligible difference.

23  Q.      When we look at Exhibit 60 on the second page, and we

24  find SAC, it shows the prison population at what number?

25          THE COURT:  I don't have 60.

1          MR. BORNSTEIN:  It's in the binder, Your Honor.

2          THE COURT:  Okay.  All right.  Then I can find it if

3     I need it.  All right.

4          That's All right.

5     BY MR. BORNSTEIN:

6     Q.      Do you have Exhibit 60?

7     A.      Yeah.  It looks like it is 2706.

8     Q.      I can display it.

9              (Exhibit published.)

10          What we're looking at is this number right in there,

11     2706?

12     A.      Yes.

13     Q.      And then that is -- if I go back, if we go back to

14     Exhibit 63B --

15     A.      It's in the information in the first column, yes.

16              (Exhibit published.)

17     Q.      It is right there?

18     A.      Yes.

19     Q.      Right?

20     A.      Yes.

21     Q.      Okay.  Then the total MHSDS, where did you get that

22     information from?

23     A.      The total number of MHSDS inmates at each institution

24     is contained in the summary of outpatient population that is

25     provided as part of the Coleman Report to the Special Master,

594

1    I believe, on a monthly basis.  And plaintiffs' counsel

2    receives a copy that report.

3    Q.     And is that in evidence as Exhibit 61?

4    A.     Yes.

5    Q.     So if we look at Exhibit 61, if we go down to SAC --

6    we have to go to SAC, right?

7              (Exhibit published.)

8              What is the total population then for CCCMS, EOP and

9    PSU inmates in SAC as of the date of this report, which is

10   June 8, 2012?

11   A.     1497.

12   Q.     Okay.  So then going back to 62B, that's what's in

13   the second column, 1497?

14             (Exhibit published.)

15   A.     Yes.

16   Q.     All right.

17             Then so how did you get the percentage of MHSDS?

18             That would be the percentage of MHSDS inmates in the

19   particular institution?

20   A.     Yes.  And you get that by dividing the total number

21   of MHSDS inmates by the total population.

22   Q.     And that gave you 55.3 percent?

23   A.     Yes.

24   Q.     Okay.  Now, the next column says Percent of RVRs to

25   MHSDS.

595

1          How did you get that?

2    A.     I believe we discussed that.  I divided the total

3    RVRs issued to MHSDS by the total number of RVRs issued to

4    all inmates.

5    Q.     So you took the 1490 -- so the figures you're using

6    are the 1490?

7    A.     I took 1071 divided by 1490.

8    Q.     Okay.  And then that gave you a percentage of the

9    percentage of RVs issued?

10   A.     Right.  71.9 percent.

11   Q.     So what you -- and you compared the 71.9 percent to

12   the 55.3 percent?

13   A.     Yes.

14   Q.     All right.

15          Now, so this is -- so 62B then is the summary of the

16   data that you just described?

17   A.     Yes.

18   Q.     And it comes from the Mental Health Management

19   Reports?

20   A.     Yes.

21   Q.     And then augmented by the CDCR institution population

22   on September 6?

23   A.     June 6.

24   Q.     June 6?

25   A.     Yes.

596

1    Q.      And then the report that CDCR makes to the Special

2    Master on June 8th of the MHSDS population at each

3    institution?

4    A.      Yes.

5    Q.      Correct?

6    A.      Yes.

7    Q.      So that's where all these numbers come from?

8    A.      Yes.

9    Q.      And you -- and then in 62 -- I'm sorry.  I got

10   confused myself.

11   A.      63C.

12   Q.      63C.  What did you show -- what does 63C show?

13   A.      That's just a bar graph with the percentages that

14   were illustrated on 63B.  It is just a graphic illustration

15   of the data.

16   Q.      So if we go down to Sacramento, what we're going

17   to -- we're going to see two bars.  One is a green bar that

18   says 55.3, and one is an orange bar that says 71.9?

19           THE COURT:  I'm sorry.  I'm lost.  I haven't found

20   Sacramento yet.

21           Where is it, counsel?

22           MR. BORNSTEIN:  I'm sorry.  It will say Cal SP SAC.

23           THE COURT:  Thank you.  Okay.

24           MR. BORNSTEIN:  It is right here, Your Honor.

25              (Exhibit published.)

597

1    I have circled it on your screen.

2    THE COURT:  It's all right.  I found it now that you

3    told me what to look for.

4    BY MR. BORNSTEIN:

5    Q.    So the green and orange is simply using a bar to

6    describe the same data that we just looked at from 63B?

7    A.    Yeah.  It is just a different way to display the same

8    data.

9    Q.    Okay.  And this just a visual?

10   A.    Yes.

11   Q.    Then 63D.  What is 63D?

12   A.    It's just another way of displaying the data.  It

13   shows the amount by which each -- MHSDS inmates at each

14   institution are overrepresented or underrepresented.

15   Q.    When you say that, what would be proportional

16   representation?

17   A.    One hundred percent would be proportional

18   representation.

19   Q.    So for Sacramento 63D shows 130.02 percent.

20   (Exhibit published.)

21   So, again, the formula you used was?

22   A.    I took the percentage of RVRs issued to MHSDS, and I

23   divided it by the percentage of MHSDS at the institution.

24   Q.    So for instance, up at the top, the Cal Substance

25   Abuse Treatment Facility, there were 95.7 percent of the RVRs

598

1    issued to mental health patients on the MHSDS system; is that

2    correct?

3    A.      Yes.

4    Q.      But their population in that particular prison is

5    32.9 percent?

6    A.      Yes.

7    Q.      And so that's how you got the number 290.88 percent

8    overrepresentation?

9    A.      Yes.

10   Q.      Now, that's with respect to the RVRs.

11           Going back to Exhibit 64, is there also -- again, I'm

12   using the same one from SAC -- but there's also a section in

13   the reports that are given to the Special Master by CDCR

14   concerning use of force; is that correct?

15   A.      Yes.  On page 29 it says that of the 178 use of force

16   incidents, 94 percent occurred with MHSDS inmate-patients.

17   Q.      So you used that number?

18   A.      Yes.  We used all CDCR self-reported numbers.

19   Q.      So now turn to Exhibit 62.  You start with 62B.

20           (Exhibit published.)

21           And we have the same inmate population that we saw

22   which was 2706, correct?

23   A.      Yes.

24   Q.      The same total of MHSDS inmate patients which is

25   1497?

599

1    A.       Yes.

2    Q.       Correct?

3              We have the same percentage of MHSDS by population

4    which is 55.3 percent?

5    A.       Correct.

6    Q.       And then we use the percent of use of force to MHSDS

7    inmates?

8    A.       Yes.  Those percentages were directly reported so

9    they're just copied straight from the MHMR reports.

10   Q.       In this case, 94 percent?

11   A.       Yes, 94 percent for SAC.

12   Q.       So in other words, what they self-reported was that

13   94 percent of their use of force incidents involved MHSDS?

14   A.       That is correct.

15   Q.       Then so you prepared the same summary chart of the

16   use of force data?

17   A.       Yes.

18   Q.       And then Exhibit 63C --

19              (Exhibit published.)

20              So 63C then is the bar chart which is just the same

21   data but in a graphic representation; is that right?

22   A.       That's correct.  It's just a different way of

23   displaying the information.

24   Q.       And then 63D.

25              (Exhibit published.)

600

1          (Court Reporter requests break due to computer

2           issue.)

3          (Off the record at 10:45 a.m.)

4          (On the record at 11:09 a.m.)

5          THE CLERK:  Please, remain seated.

6          Court is now in session.

7          THE COURT:  Mr. Bornstein.

8          MR. BORNSTEIN:  Thank you, Your Honor.

9   BY MR. BORNSTEIN:

10  Q.      Going back to SAC again, you took the percentages of

11  use of force that were reported for the Special Master, 94

12  percent, and you also took the 55.3 percent, which is the

13  percentage of MHSDS inmate-patients at Sacramento, correct?

14  A.      Yes.

15  Q.      And then those -- did you then -- the last chart,

16  which is 62D, is the percentage of use of force against MHSDS

17  inmates over the percent of MHSDS inmates?

18  A.      Right.  It's just a different graphic representation

19  of the same data.

20  Q.      For instance, in Sacramento that is 169.99 percent?

21  A.      Right.  What that means is it is 1.69 times what you

22  would expect the number to be based on the representative

23  population.

24          (Exhibit published.)

25  Q.      So for Pelican Bay, what does the 345.7 percent mean?

601

1  A.      That means it is three-and-a-half times what you

2  would expect it to be.

3          MR. BORNSTEIN:  Your Honor, I move into evidence

4  Exhibits 62B, C and D, and 63B, C and D, as summaries of

5  voluminous documents and other records that are in evidence

6  before the court.

7          THE COURT:  Mr. Russell?

8          MR. RUSSELL:  Your Honor, we would -- we believe

9  there are errors in some of the ways this information was

10 compiled.

11         THE COURT:  You want to question?

12         Feel free to do so.

13         MR. RUSSELL:  Yes.  Thank you, Your Honor.

14         MR. BORNSTEIN:  I have no further questions.

15         THE COURT:  Court is reserving the ruling on the

16 motion to admit.

17                      CROSS-EXAMINATION

18 BY MR. RUSSELL:

19 Q.      Good morning, Miss Cesare-Eastman.

20         Did I get that right?

21 A.      Cesare.

22 Q.      Cesare.  Sorry.

23         You had been asked about the way that you compiled

24 data.  I think you started with the Rules Violation Reports.

25         That's in Exhibit 63, correct?

602

1   A.      I started by looking at the Mental Health Management

2   Reports.

3   Q.      Okay.  And then you listed each of these based upon

4   what you saw in the Management Reports?

5   A.      Are you talking about in the B exhibits?  63B?

6   Q.      Yes.  Exactly.  The B exhibits.

7   A.      Yes.

8   Q.      Now, I note that for Folsom you have here an "NR,"

9   which by the footnote says --

10           (Exhibit published.)

11           MR. RUSSELL:  Which button is it to turn this on?

12           THE CLERK:  It's on.

13           THE WITNESS:  I'm sorry.  Are you looking at 63B?

14           MR. RUSSELL:  Yes.

15  BY MR. RUSSELL:

16  Q.      So on Folsom you have "NR," and then there's a

17  footnote at the bottom that states:

18           (Reading:)

19           This facility did not report the total number of RVRs

20           and/or RVRs issued to mental health inmates.

21           (Reading concluded.)

22           Correct?

23  A.      Right.  I believe Folsom reported the total number of

24  RVRs that MHSDS inmates received, but not the total that all

25  inmates at the institution received.  So there is no way to

603

1   calculate the percentage.

2   Q.      You were earlier talking about SATF as well?

3   A.      Yes.

4   Q.      And if you go the tab of the Management Report for

5   SATF, this states it is based on mental health RVR logs,

6   correct?

7   A.      I don't know where you're referring to.

8   Q.      Well, under the excerpts that you put in for SAFT in

9   the Management Report, I think it is the fourth page in.

10  A.      For RVR?

11  Q.      Yes.

12  A.      Yes.

13  Q.      So these are all RVRs that are -- these are Mental

14  Health RVR Logs, correct?

15  A.      That's not what it says.

16          I see what you are saying.  Yes, it says Mental

17  Health RVR Logs.

18  Q.      Right.  So these were RVRs that were assessed against

19  inmates in the mental health system, correct?

20  A.      I did not make that assumption.  I merely reported

21  their data.  We actually footnote SATF in the -- I think it

22  is Exhibit 32 -- I'm sorry -- 62B.

23          THE COURT:  What does "SATF" mean?

24          THE WITNESS:  I believe it is Substance Abuse

25  Treatment Facility.

604

1            MR. RUSSELL:  It's a prison, Your Honor.

2     BY MR. RUSSELL:

3     Q.     So this is the same reporting that was done for

4     Folsom, correct?

5            This is just for inmates that are in the mental

6     health system?

7     A.     No SATF actually reported slightly different

8     information or they qualified it in a way the other

9     institutions did not, which is why on Exhibit 63B we dropped

10    that footnote where I quoted:

11           (Reading:)

12           SATF reported that, quote, "305 inmates at the

13           institution received RVRs that were reported to

14           mental health."

15           (Reading concluded.)

16    Q.     But you still maintain that within -- I mean, you're

17    arguing that should still be maintained within this data,

18    correct?

19           MR. BORNSTEIN:  I object to the form of the question.

20    It is not an argument.

21           THE COURT:  The objection is sustained.

22           You may ask her whether that's what she believes or

23    whether isn't it correct that's what she's done.

24    BY MR. RUSSELL:

25    Q.     It your belief that this reporting that's been done

605

1   by SATF, the Substance Abuse Treatment Facility includes

2   general population inmates that aren't involved in mental

3   health?

4   A.      Well, it says here that 13 RVRs were issued to GP

5   inmates.  I don't know what it means.  That's why I merely

6   reported the numbers that were included in the MHMR.

7   Q.      So you don't know whether this includes general

8   population inmates or not outside of the mental health

9   system, correct?

10  A.      For this particular report I don't know whether it

11  does or it doesn't.  They reported their numbers slightly

12  differently.

13  Q.      And there are other places where the total number of

14  RVRs that an institution reported, correct?

15  A.      In almost every other one, yes.

16  Q.      Well, apart from the Management Reports there are

17  ways of finding out the total number of RVRs for

18  institutions?

19  A.      I have no idea.

20  Q.      All right.

21          And then going to what's been called Exhibit 62, in

22  the column here I think you had earlier stated that these are

23  use of force incidents against Mental Health Services

24  Delivery System inmates?

25  A.      I believe that's what is reported, yes.

606

1    Q.      Well, let's go to the report regarding Lancaster

2    because I know you talked about that as well.

3            MR. BORNSTEIN:  Well, actually she didn't.  That was

4    Mr. Vail who did.

5            THE COURT:  I think that's right.  That's one of the

6    dangers -- well, never mind.

7            Go ahead.

8            MR. RUSSELL:  Your Honor, I didn't know this witness

9    was going to testify today.  I'm doing the best I can here.

10           THE COURT:  You weren't given notice that she was --

11   I'm not going to permit -- I thought -- I know -- I'm about

12   to blowup.

13           I ordered that 24 hours before any witness appears

14   the other side will be given notice of that fact.

15           Does plaintiffs' counsel want to tell me why you

16   violated the order?

17           MR. BORNSTEIN:  Your Honor, it was inadvertent.  We

18   we're trying to make up for the fact we had this break in

19   time.

20           Had they said that to me before I put her on, I

21   wouldn't have put her on.  I was simply trying to accommodate

22   your -- accommodate the fact that you carved out this time.

23           I apologize.  It is my fault.

24           THE COURT:  Mr. Russell, I don't know what to tell

25   you.

607

1          You want me to put over cross-examination until next

2     week so you can pull yourself -- get all the documents the

3     way you want or do you want to proceed?

4          You tell me.  It is your -- you're the person who has

5     been offended -- properly offended -- I mean improperly

6     offended.

7          MR. RUSSELL:  Can you hang on for just a second, Your

8     Honor.

9          (Defense counsel confer.)

10          MR. RUSSELL:  Your Honor, rather than stumbling

11     around, maybe I should take a minute to look at this

12     material.

13          THE COURT:  Good.

14          MR. BORNSTEIN:  Again, I apologize, Your Honor.

15          THE COURT:  Sit down.  I'm sorry.  Excuse me.

16          We can do this one of two ways or whatever you want.

17     We can take our recess now, reconvene in an hour and a

18     quarter and go until 2:30, if you want to do it today.  Or

19     I'll put it over until Tuesday.  Whatever you want.

20          MR. RUSSELL:  Excuse me, Your Honor.

21          THE COURT:  Sure.

22          (Defense counsel confer.)

23          MR. RUSSELL:  Your Honor, I'll take a look at this

24     stuff at a break, and we'll come back.  I'm trying to --

25          THE COURT:  We'll take our luncheon recess early.

608

1    We'll reconvene at 12:30, and we'll go to 2:30.

2            MR. RUSSELL:  I don't think we'll have to go that

3    long, Your Honor.

4            THE COURT:  I understand.  12:30 is when we

5    reconvene.

6            I'm going to amend my previous order in light of

7    something that happened today.

8            Not only are you to tell the other side when somebody

9    is testifying 24 hours beforehand, you are also to specify

10   what documents will actually be used.  Because apparently

11   there is this problem of having delivered 200 documents, and

12   who knows what is in those documents and whether they can be

13   prepared to cross-examine.

14           So it will be -- this goes for both plaintiff and

15   defendant, who is being called and what documents will be

16   discussed in the course of the direct examination.

17           See you all at 12:30.

18           (Off the record at 11:25 a.m.)

19           (Back on the record at 12:30 p.m.)

20           THE CLERK:  Please, remain seated.

21           Court is now in session.

22           Mr. Russell.

23           MR. RUSSELL:  Thank you, Your Honor.

24   BY MR. RUSSELL:

25   Q.      Miss Cesare-Eastman, I wanted to direct your

609

1    attention to what's tentatively marked as Exhibit 63B.  And

2    that is your compilation of information concerning RVRs.

3           And before I start with that, what information does

4    the Special Master ask to be reported in the Management

5    Reports concerning RVRs?

6    A.    I don't know.  That wasn't what I was asked to look

7    at.

8    Q.    Okay.  I would just like to take a couple of examples

9    here.

10          (Exhibit published.)

11          So looking at this, looking at, for example, Kern

12   Valley State Prison, it's about in the middle of the page

13   here, it shows that by the information that you were

14   reporting, 98.8 of all of the Rules Violation Reports issued

15   during the reporting period were two -- the way you reference

16   it here were two Mental Health Services Delivery System

17   inmates, correct?

18   A.    That was what was reported in the Mental Health

19   Management Report.

20   Q.    And if you turn to that page in the Management

21   Reports, in the Kern Valley tab --

22          THE COURT:  I don't know that the Management Reports

23   are in evidence, sir.

24          MR. RUSSELL:  I believe they are.

25          THE COURT:  Is that right?

610

1          MR. BORNSTEIN:  Yes, Your Honor, Exhibit 64.

2          THE COURT:  Good.  Go ahead.

3    BY MR. RUSSELL:

4    Q.      Here are the provisions talking about RVR Protocols.

5          It states:

6          (Reading:)

7          During the reporting period 422 inmates at the

8          institution received RVRs, 5 for GP inmates.

9          (Reading concluded.)

10         Do you know whether GP inmates can be considered to

11   be within the Mental Health Services Delivery System?

12   A.      I just reported what the document said.

13   Q.      Okay.  So you don't know one way or the other whether

14   the total of all of these RVRs were assessed against inmates

15   in the mental health system?

16   A.      The document says that during the reporting period

17   422 inmates at the institution received RVRs.

18   Q.      Right.  This was reporting that was done to the

19   Special Master as part of the Coleman case that involves

20   inmates with mental disabilities, correct?

21   A.      Right.  But if you look at, for example, Pelican Bay,

22   they include non-MHSDS in those totals.  A lot of the

23   institutions do.

24   Q.      They expressly do; isn't that correct?

25         And this one did not?

611

1    A.      I think it does.  It says that 422 inmates at the

2    institution received RVRs.  It doesn't say 422 MHSDS inmates

3    received RVRs.

4    Q.      Well, let's look at the Pelican Bay page.

5            (Exhibit published.)

6            And you see there where it talks about Rules

7    Violation Report Protocols?

8    A.      Which page are you on?

9    Q.      I think it's the last page of the Pelican Bay tab.

10   A.      Yes.

11   Q.      And that expressly shows, does it not, the inmates

12   who received RVRs with no MHSDS LOC.

13           To tell you the truth, right now I can't remember

14   what LOC stands for, but it says they are not within the

15   MHSDS; is that correct?

16   A.      I believe LOC is "Level Of Care."

17           THE COURT:  Is what?

18           THE WITNESS:  Level Of care.

19           THE COURT:  Thank you, ma'am.

20   BY MR. RUSSELL:

21   Q.      So this expressly shows that those inmates are not

22   within a Mental Health System Delivery Service Level Of Care,

23   right?

24   A.      Right.  Pelican Bay provides more specific

25   information than most the other reports.

612

1    Q.       Right.  And the one for Kern Valley did not.  It just

2    said "inmates," right?

3    A.       Right.

4    Q.       But you assume that to mean if the word "general

5    population" was used within "inmates," that those had to have

6    not been within the mental health system?

7    A.       I didn't make any assumptions.  I just merely

8    reported what the document said.

9    Q.       But, for purposes of the demonstrative aid, you did

10   include that information in there as RVRs against mental

11   health inmates, right?

12   A.       I compiled a list of information that was reported to

13   the Special Master in the reports.

14   Q.       Well, let's turn to another one.  That would be

15   Valley State Prison.  And let's go back to the list.

16   A.       Which exhibit?

17   Q.       63B.

18              (Exhibit published.)

19              And here, the very last line for Valley State Prison,

20   says that 100 percent of the inmates who received RVRs during

21   the six-month period of time were mental health inmates,

22   correct?

23   A.       That's what the report says.

24   Q.       And again, going to the last page of the Valley State

25   Prison tab of the Management Report -- it's the last tab of

613

1  Exhibit 64.

2            (Exhibit published.)

3        That states that for the RVR Protocols during the

4  reporting period inmates at the institution received 717

5  RVRs, 705 CCCMS and 12 EOP.

6        So you took that to mean that every inmate who

7  received an RVR at Valley State Prison was someone with a

8  mental disability; is that correct?

9  A.     I took that to say that inmates at the institution

10 received 717 total RVRs.  Then I added up the CCCMS and EOP

11 numbers to get the total issued to MHSDS.

12 Q.     You are assuming they were all issued to MHSDS

13 because that's the way you're reading the report, correct?

14 A.     I didn't make any assumptions.  I merely reported --

15 or I listed what the report says.

16 Q.     You put down in this potential Exhibit 63 that every

17 single person at Valley State Prison who received an RVR was

18 somebody with a mental impairment, right?

19 A.     That's what the document said.  I certainly didn't

20 want to assume that when they said "inmates," they actually

21 meant MHSDS inmates.

22 Q.     Now, as far as document number 62B and C, you put in

23 here -- in the column regarding the Percentage of Use of

24 Force, you say that this is use of force to Mental Health

25 Services Delivery Service inmates, correct?

614

1    A.      I believe that's a typo.

2    Q.      What's the typo?

3    A.      It should probably say "involving."  I believe that

4    is how it is reported.

5    Q.      Isn't it true it was actually reported as "with"?

6    A.      Either one.  I don't think it makes a difference.

7    Q.      So these are not necessarily use of force incidents

8    that were against or to inmates, right?

9    A.      Sure.

10   Q.      And what you are reporting here, is you're comparing

11   everybody in the general population in each of these

12   institutions, whether they're minimum support, Level I, Level

13   IV, Administrative Segregation, you're comparing all of that

14   to the inmates who are in the mental Health Services Delivery

15   System, correct?

16   A.      No.  I'm just reporting the numbers reported in the

17   Mental Health Management Report.

18   Q.      No.  When you have Total Population in this document

19   here -- This is 62B.

20           (Exhibit published.)

21       You're using the total population of the institution,

22   correct?

23   A.      I'm using the June 6th population data on the CDCR

24   website that lists the total number of inmates at each

25   institution.

615

1  Q.      And that's not broken down between classification

2  levels, correct?

3  A.      It may be.  I don't see how that was relevant for the

4  preparing of this chart.

5          MR. RUSSELL:  I don't have any other questions, Your

6  Honor.

7          THE COURT:  Do you continue to object to the receipt

8  of the documents?

9          MR. RUSSELL:  I do, Your Honor.

10          THE COURT:  It seems to me that these are the figures

11  that are available.  They were produced by your client.  I'm

12  going to receive them into evidence.  And we can talk about

13  how much credibility I ought to give to your own documents

14  when we get there.

15          But, I mean, that's the problem we face at the

16  moment.  In any event, we'll worry about it later.

17          I'm sorry.  You didn't have any further examination?

18          MR. BORNSTEIN:  No, Your Honor.

19          THE COURT:  May the witness be released?

20          MR. RUSSELL:  Yes, Your Honor.

21          THE COURT:  May the witness be released?

22          MR. BORNSTEIN:  Yes, Your Honor.

23          THE COURT:  Thank you, ma'am.  You are free to go or

24  stay as you choose.

25          MR. RUSSELL:  Your Honor, could I make one more

616

1    point?

2            THE COURT:  Sure.

3            MR. RUSSELL:  At least as to what you have said, I

4    would agree it appears to relate numbers that are within

5    documents for documents -- the ones that are labeled B and C.

6            When you get to the number D of these documents, or

7    letter D of these documents, which are the red lines and the

8    bars going across, that I would submit, Your Honor, is

9    argument of the evidence.

10           THE COURT:  There is something to be said for that.

11           You are free to go.

12           I would get out of here if I were you.  If you want

13   to stand around and get questioned more, just wait.

14           I think that they may well reflect argument that the

15   plaintiffs want to make if we ever get to the final argument,

16   but I think that they fairly reflect the underlying documents

17   found in B and C.

18           I'm going to admit it.  You want talk me out it?

19           MR. BORNSTEIN:  Nope.

20           THE COURT:  I'm going to receive it.

21           And like all evidence it is subject to argument about

22   how much value to place upon it.

23           That will be the order of the court.

24               (Whereupon, Plaintiffs' Exhibits 62B, 62C, 62D,

25                63B, 63C and 63D received into evidence.)

617

1          THE COURT:  Where we are now is that we're out of

2    witnesses?

3          MR. RUSSELL:  That's correct.  For today, Your Honor.

4          THE COURT:  Okay.  Fellows, I'm sorry.  I'm going to

5    make a really unpleasant order.  But this trial is close to

6    chaos.  It has got to stop.

7          I expect you gentlemen, before this afternoon or

8    whenever, you're going to sit down, decide who's going to

9    have witnesses here, and if time needs to be filled in,

10   they're going to be filled in with your witnesses.  We're

11   going to get this done in as orderly a way as we can.

12         I want to emphasize again, I hate to be this sticky,

13   but you're to identify to each other documents that are going

14   to be used.

15         There is a problem.  I don't want to order

16   cross-examination documents because that's the point of

17   cross-examination.

18         On the other hand, I'm faced with the fact that you

19   folks, for whatever reason, and however it was done,

20   delivered a couple hundred documents nobody in his right mind

21   would know which documents are of significance.

22         MR. BIEN:  Your Honor, may I?

23         THE COURT:  Yes.

24         MR. BIEN:  Miss Vorous and I spoke at the break a

25   little bit about this subject.  I think we have a methodology

618

1    to deal with that problem next week.  And I think the most

2    important thing for us is that we know who the actual

3    witnesses are, their names.  We don't have that finalized

4    yet.  She said by the end of the day today we'd have that.

5             THE COURT:  If you're satisfied, I'm satisfied for

6    the time being until we run into the situation in which

7    people are saying "What documents?"  And then I'm going to do

8    something else.

9             I really don't want to interfere with your running

10   your own case, but we came so close to chaos today it is not

11   acceptable.  It can't be done.

12            That's not intended to be criticism, gentlemen.

13   That's just an observation of what happened.

14            We will reconvene --

15            MR. BIEN:  Your Honor, could we bring up some other

16   issues?

17            THE COURT:  Sure.

18            MR. BIEN:  On the use of force, obviously we have

19   already spent a lot of time, as has the Ninth Circuit, on the

20   videotapes.

21            We would like to request that defendants be ordered

22   to do the same editing of the first three videotapes that

23   were played in court.

24            THE COURT:  That's a good thought.

25            MR. BIEN:  And that those six videotapes could then

619

1    be filed not under seal and be in the record.

2              THE COURT:  Okay.  Let me stop you.

3              Counsel nodded his head yes because he recognized,

4    like everybody does, that's a sensible thing to do and that

5    can be done.

6              My courtroom deputy tells me, it was something that I

7    didn't know -- there are things going on that everybody says

8    that judges don't have to know about.

9              Apparently we no longer -- Ana, if I got it wrong,

10   stop me.  Apparently we no longer keep any of the exhibits.

11   They are returned to the party which has tendered them.  And

12   when it goes up to the Ninth Circuit, they'll ask for what

13   they want.

14             THE CLERK:  For trial exhibits and evidentiary

15   hearings like this, yes, we return everything to counsel.

16             But that would be different for exhibits actually

17   admitted into the record.

18             THE COURT:  Well, yeah.  We'll put them into the

19   record, but physically they're going to be kept, as I

20   understand it now, by whichever party tendered the exhibit.

21   And they'll be produced if the Ninth Circuit asks for it,

22   right?

23             THE CLERK:  For evidentiary hearing and trial

24   exhibits.  But if an exhibit is submitted as part of the

25   record, then we would have like a DVD that is lodged.

620

1         THE COURT:  All right.  Well, that's what happened.

2    All of this stuff was --

3         MR. BIEN:  I think there is still some confusion,

4    Your Honor.  I think -- Miss Rivas, are you saying if

5    something is admitted the court does keep the copy.

6         THE CLERK:  If something is admitted during the

7    course of the trial, no, it is returned at the conclusion of

8    any order that is issued.

9         MR. BIEN:  Once the court completes its work, yes.

10        So I guess that's fine, but I think there needs to be

11   this process of you having it during the period where you're

12   reviewing and issuing your decision.  Then we both know that

13   it is part of the record.

14        THE COURT:  Right.  Right.

15        MR. BORNSTEIN:  Right.  And again, at least with the

16   three that we showed yesterday, those are really easy in case

17   you wanted to see them again because you could just press

18   play and play them.  The others would be a little harder

19   because they were on a bigger disk with all sorts of other

20   things on there.

21        THE COURT:  I mean, we'll worry about that.  Let's go

22   off the record.

23             (Discussion held off the record.)

24             (Off the record at 12:55 p.m.)

25                          ---o0o---

1                        REPORTER'S CERTIFICATE

2                              ---o0o---

3

    STATE OF CALIFORNIA   )
4   COUNTY OF SACRAMENTO  )

5


6           I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9

10                  IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25