1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0o---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     RALPH COLEMAN, et al.,

7            Plaintiffs,

8     Vs.                          CASE NO. CIV. S-90-0520 LKK

9     EDMUND G. BROWN JR., et al.,
      et al.,

10

11           Defendants.

12     _____/

13

14

15                          ---o0o---

16

17                     REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                 TUESDAY, OCTOBER 22ND, 2013

20

21                          ---o0o---

22

23

24

25     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                      APPEARANCES

 2                       ---o0o---

 3   FOR THE PLAINTIFFS:

 4          ROSEN, BIEN, GALVAN & GRUNFELD, LLP
            315 MONTGOMERY STREET, TENTH FLOOR
 5          SAN FRANCISCO, CALIFORNIA  94104

 6          BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7          BY:  LORI RIFKIN, ATTORNEY AT LAW

 8

 9          K&L GATES LLP
            4 EMBARCADERO CENTER, SUITE 1200
10          SAN FRANCISCO, CALIFORNIA  94111

11          BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

12          BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

13

14   FOR THE DEFENDANTS:

15           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
16           13OO I STREET
             SACRAMENTO, CALIFORNIA  95814
17
             BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
18
             BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
             BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
20

21

22                       ---o0o---

23

24

25
```

```
1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE DEFENDANTS:

4       EXAMINATION:                                    PAGE

5

6     DR. ERNEST WAGNER

7        Direct Examinatin by Mr. Sharma            627
         Cross-Examination by Ms. Rifkin            640
8        Redirect Examination by Mr. Sharma         695

9

10    DR. JOHN LINDGREN

11       Direct Examinatin by Mr. Russell           707
         Voir Dire Examination by Ms. Rifkin        743
12       Cont'd Direct Examination by Mr. Russell   748

13

14

15

16                             ---o0o---

17

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3    PLAINTIFFS'
      EXHIBIT NO              DESCRIPTION              EVD
 4
        1200              MHSDS Program Guide          670
 5
        1157          Inmate A Med. Files (Under Seal) 657
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                            ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

621

1                      SACRAMENTO, CALIFORNIA

2                TUESDAY, OCTOBER 22ND, 2013 - 10:30 A.M.

3                          ---o0o---

4          THE CLERK:  All rise.

5          United States District Court is now in session.  The

6    Honorable Lawrence K. Karlton presiding.

7          THE COURT:  Please, be seated everyone.

8          Good morning.

9          THE COURT:  Call the case.

10         THE CLERK:  Calling Civil S-90-0520, Coleman et al.,

11   v Brown, et al.

12         THE COURT:  Who speaks to the matter of the motion

13   filed by the plaintiffs concerning the tapes?

14         MR. BIEN:  Good morning, Your Honor.  Michael Bien on

15   behalf of the plaintiffs.

16         MR. MCKINNEY:  Good morning, Your Honor.  Patrick

17   McKinney on behalf of the defendants.

18         THE COURT:  The State has not filed a written

19   response.  Do you have any matter you would like to address

20   to the court?

21         MR. MCKINNEY:  Yes, Your Honor.  I did not actually

22   see this motion until this morning.  They filed it in the

23   middle of the night on Sunday.

24         THE COURT:  I never saw it.

25         MR. MCKINNEY:  Yes.  We were getting ready preparing

622

1  our case so I wanted to preface my comments with that, but I

2  do have a number of comments.  This is now the fourth or

3  fifth time plaintiffs have made this motion.

4      Beginning back in February the motion was denied.

5  The court decided it would not turn over the tapes to

6  plaintiffs.  They renewed that motion in the context of this

7  proceeding, which both the magistrate judge and this court

8  denied that motion again.

9      They renewed the motion again at start of this

10  evidentiary hearing on October 1st.  The court was crystal

11  clear that it would not be releasing the tapes to the

12  plaintiffs at that time.  So this -- if anything this is an

13  improper motion for reconsideration.  The facts have not

14  changed.  There is no basis for turning over the tapes to the

15  plaintiffs.

16      Further, this motion is based on complete

17  misrepresentations.  If anything, the plaintiffs have had

18  more access to the videotapes than our office.

19      It's true these are defendants' tapes.  The tapes

20  have been, since February, available to the plaintiffs upon

21  request.  Any time they want to go over to CDCR they are free

22  to view those videos.  So the idea they haven't had access to

23  the videos is absolutely false.

24      Finally, Your Honor, we don't have any objection to

25  lodging the videos with the court, but, again, we ask you

623

1    simply affirm your last three or four orders of not turning

2    the tapes over to plaintiffs.

3            MR. BIEN:  Your Honor, I think we've briefed the

4    matter and cited the law concerning this issue.  For us to

5    fully be able to represent our clients we need possession of

6    the tapes.  They also need to become part of the record of

7    the case.

8            THE COURT:  The question about part of the record is

9    one thing, the question about turning copies over to you is

10   quite another.

11           I had not heard and did not know that the plaintiffs

12   claim that they've had only one hour to examine the tapes,

13   which, I mean, if it is the case, that is clearly

14   inadequate.

15           MR. MCKINNEY:  That's false.

16           MR. BIEN:  What we said is the tapes have been made

17   available to us during trial for an hour before court

18   sessions.

19           Besides that, we had to arrange to go to CDCR

20   headquarters or to a prison to see the tapes.

21           And the fact that the AG Office is not taking

22   possession is make believe.  The tapes are the tapes.  It is

23   their clients.

24           MR. MCKINNEY:  Your Honor, the plaintiffs do remain

25   free to go to CDCR to review the tapes at any time.

624

1          THE COURT:  I don't know what to do about this.  You

2     know, I had assumed that pretrial you had had more than an

3     adequate opportunity to examine the tapes, and therefore it

4     seemed to me, you know, unreasonable.  Now I'm told that, for

5     whatever reasons, you had an hour and that's not sufficient.

6          The State says:  Well, they were available.  You just

7     had to go get them -- go look at them.  And you didn't do

8     that.

9          MR. MCKINNEY:  Your Honor, may I address that?

10         Plaintiffs had at least five full days prior to this

11    proceeding starting to review the videos.  They reviewed them

12    on at least two, if not three occasions, with Mr. Vail.  They

13    spent another day at least with Dr. Kaufman.

14         So I'm not sure where this "one hour" is coming from,

15    but it is not true.

16         MR. BIEN:  We did have time pretrial, Your Honor.  It

17    was burdensome that during the trial we're getting ready for

18    cross-examination or something that we don't have access to

19    the tapes.

20         And in terms of closing argument, post-trial briefing

21    of the appeal, we're obligated to have these tapes and to

22    make them part of the record.

23         THE COURT:  Making them part of the record is wholly

24    independent of the question of whether or not the State is

25    going to be required to provide you with copies of the tapes

625

1    for your own use at your own leisure.

2          I mean, there is an additional matter because I'm

3    going to order obviously the State to do two things, to file

4    a redacted copy with the clerk and the originals under seal.

5          I don't know how long that will take you.

6          Do you have a redacted copies available?

7          MR. MCKINNEY:  The last three have been reacted, not

8    the first three.  Those are being redacted currently.

9          THE COURT:  Very good.  You will promptly file the

10   last three, and the first three as early as possible.  You

11   know, within reason.

12         And the reason I say all of that is there is no doubt

13   that now the Sacramento Bee wants to have their own copies

14   because after all they have needs much greater than the

15   plaintiff does.

16         I don't know whatever happened to the notion of

17   medical privacy, but it obviously doesn't apply in this case,

18   for reasons that are absolutely incomprehensible to this

19   court.  But that's because I just don't understand.

20         MR. BIEN:  Your Honor, may I address the court?

21         THE COURT:  Not now, Mr. Bien.

22         Mr. McKinney, you will supply plaintiffs with

23   redacted copies as soon as possible, and it will be at the

24   cost of the plaintiffs.  They'll have to pay you for that.  I

25   don't know what else to do.

626

1        MR. MCKINNEY:  Can I address that briefly?

2        We have a legitimate concern.  Obviously these

3   attorneys represent the inmates.  One concern is there may be

4   an inadvertent disclosure to the inmates which would reveal

5   tactics about cell extraction and put the Department at risk

6   essentially.

7        We're also concerned these will be inadvertently

8   released to the press.  I think this is a legitimate concern,

9   Your Honor.

10       THE COURT:  Let me make it clear.  The tapes are

11  provided to the plaintiffs solely for the purposes of this

12  case.  Their content cannot be revealed to any of your

13  clients and cannot be distributed to anybody else.  I mean,

14  they're for your use only.  And that's the order of the

15  court.

16       I understand your concerns.  They're not frivolous.

17  But, you know, we've also got a trial that's got to go.

18       MR. BIEN:  We understand, Your Honor.

19       MR. MCKINNEY:  Can I ask for one further

20  clarification?

21       Can we have an order that the tapes be returned to

22  the defendants either upon conclusion of trial or upon the

23  conclusion of the time for appeal.

24       THE COURT:  No.  That order will be granted as well,

25  after all appeals have been exhausted.

627

1          Thank you, folks.

2          MR. BIEN:  Thank you.

3          THE COURT:  Call your next witness.

4          MR. SHARMA:  Good morning, Your Honor.  Maneesh

5    Sharma for defendants.

6          Defendants call Dr. Ernest Wagner.

7          THE COURT:  Come around and be sworn, sir.

8          THE CLERK:  Please, raise your right hand.

9                    ERNEST WAGNER,

10   was thereupon called as a witness herein by the Defendant,

11   and having been sworn to tell the truth, the whole truth and

12   nothing but the truth, was thereupon examined and testified

13   as follows:

14         THE CLERK:  Please, take a seat.

15         State your full name, spell your last name and speak

16   directly into the microphone, please.

17         THE WITNESS:  Ernest Wagner, M.D., W-a-g-n-e-r.

18         THE COURT:  Let me interrupt.

19         I have to -- this morning's session will end at

20   11:30.  You may proceed.

21         MR. SHARMA:  Thank you, Your Honor.

22                   DIRECT EXAMINATION

23   BY MR. SHARMA:

24   Q.    Dr, wagner what is your profession and area of

25   specialty?

628

1    A.    Psychiatry.

2    Q.    And how long have you been practicing psychiatry?

3    A.    I began my training in psychiatry in 1969.

4    Q.    And where did you train to become a psychiatrist?

5    A.    I took my psychiatry residency at Yale University.

6    Q.    And who is your current employer?

7    A.    The State of California.

8    Q.    And where do you work for the State of California?

9    A.    At Corcoran prison.

10   Q.    And how long have you been working at Corcoran

11   prison?

12   A.    At this point, about five and a half years.

13   Q.    And prior to working at Corcoran, did you have any

14   other experience working in a correctional setting?

15   A.    Yes.

16   Q.    Could you please describe that?

17   A.    Well, early in my practice, as a matter of fact in my

18   residency, I had some contact with prisoners in Connecticut.

19   Q.    Was there any other experience you had working in a

20   correctional setting?

21   A.    I also worked at a youth center in Los Angeles,

22   Optimists Boys Home, which treats young offenders.

23   Q.    Thank you.

24        And Dr. Wagner, prior to working at CDCR, could you

25   please just briefly describe the type of work you have done

629

1   in the community?

2   A.      I've been in private practice treating both

3   inpatients and outpatients.

4   Q.      Thank you, Dr. Wagner.

5           Dr. Wagner, on the stand next to you in the black

6   binder there's -- if you could please open that binder I'm

7   going to refer you to tab 2.

8           MR. SHARMA:  Your Honor, tab 2 is the Supplemental

9   Declaration of Edward Kaufman.  This is Plaintiffs' Trial

10  Exhibit 81.

11          THE COURT:  Is it in evidence, Madam Clerk?

12          THE CLERK:  For Plaintiffs' 81 I have MK Pepper

13  Spray.

14          MS. RIFKIN:  It is 181.

15          MR. SHARMA:  I apologize, Your Honor.  It is 181.

16          THE CLERK:  That's in evidence.  Yes.

17          THE COURT:  You may proceed, sir.

18          MR. SHARMA:  Thank you, Your Honor.

19  BY MR. SHARMA:

20  Q.      Dr. Wagner, have you found the exhibit?

21  A.      Yes.

22  Q.      Dr. Wagner, have you seen this document before?

23  A.      Yes.

24  Q.      Thank you.

25          Dr. Wagner, if I could ask you, turn to page 6 of the

630

1    document.

2    A.      Yes.

3    Q.      At paragraph 15 the document refers to an

4    Inmate-patient A.

5            Do you see that?

6    A.      Yes.

7    Q.      And Dr. Wagner, do you know who Inmate-patient A is?

8    A.      I've been told, yes.

9    Q.      And Dr. Wagner, I just want to remind you at this

10   time that we're trying to preserve confidentiality.  So at

11   all times, when we refer to this inmate, we would use the

12   letter A rather than the inmate's name?

13   A.      I understand.

14   Q.      Dr. Wagner, how are you aware who Inmate-patient A

15   is?

16   A.      You mean what was my relationship to Patient A?

17   Q.      That's correct.

18   A.      Okay.  I was his treating psychiatrist when he was an

19   inpatient at the Corcoran prison.

20   Q.      And Dr. Wagner, again, just to be clear, when you say

21   "an inpatient at Corcoran facility," are you referring to the

22   Mental Health Crisis Bed Unit?

23   A.      Yes.

24   Q.      And Dr. Wagner, do you remember when you first

25   started treating Inmate-patient A?

631

1   A.      Yes.

2   Q.      Do you remember around what time you started treating

3   Inmate-patient A?

4   A.      It was July 1, 2012.

5   Q.      And could you please describe for the court

6   Inmate-patient A's condition when you first began treating

7   him?

8   A.      He was psychotic.  In meeting with him he could not

9   present an organized history, he couldn't -- he just couldn't

10  organize himself.

11          He was suffering from hallucinations -- auditory

12  hallucinations which were telling him to kill himself.  And

13  it was also evident that he had been refusing his medications

14  prior to entering the hospital.

15  Q.      And Dr. Wagner, during your course of treatment of

16  Inmate-patient A, did you make attempts to get him to take

17  his medication?

18  A.      Yes.

19  Q.      Could you please describe your interactions

20  Inmate-patient A to the court?

21  A.      Well, when I had the chance to meet with him, I would

22  address the issue of medication with him personally.  And

23  also the record states that the nurses were encouraging him

24  to take his medication several times daily.

25  Q.      And what was Inmate A's response to these

632

1   interactions?

2   A.      He refused to take his medication or he would accept

3   the medication, but then he would throw it in the toilet.

4   Q.      And did Inmate-patient A ever express to you why he

5   was refusing to take the medication?

6   A.      I don't have that information.

7          THE COURT:  I assume you inquired that from him, but

8   he couldn't answer you?

9          THE WITNESS:  That's right.

10  BY MR. SHARMA:

11  Q.      Dr. Wagner, did it ever become necessary to place

12  Inmate A on involuntary medication?

13  A.      Yes.

14  Q.      Could you please describe why you felt it was

15  necessary to place Inmate A on involuntary medication?

16  A.      I put him on involuntary medication because in my

17  opinion there was an emergency.  He -- he met with us

18  initially, subsequent to which he refused to come out of his

19  cell.  So the team and I would go by his cell every day that

20  we were there and try to engage him in a conversation.

21          In the course of events there, he just deteriorated.

22  Initially he was eating well.  He was keeping his cell clean.

23  But as time went on his cell got messy.  He became grossly

24  disheveled.  He would participate even less and less in any

25  conversation with the clinicians or other people that came by

633

1    his cell.

2         And he then started -- he took off his clothes, and

3    he was naked in his cell.  And he was gesturing bizarrely and

4    assuming bizarre postures.  He was talking as if he were

5    responding to internal stimuli.  He wasn't talking to anybody

6    outside the cell.  And at times he would scream.

7         Thereafter, he then quit eating.  He flooded his

8    cell.  And he had previously urinated on his mattress.  The

9    flooded cell, which by the time it was flooded, it was very

10   messy.  It had feces in the fluid.

11        The custody officers blocked off the cell.  I mean,

12   they can put a barrier below so it doesn't get out in the

13   hall.

14        His clothing, which was a smock, it was in the liquid

15   that was on the floor.  And with that constellation of

16   symptomatology, plus he then -- he refused to even recognize

17   anybody that came by, that is as you go by and try to get his

18   attention he just ignored us or it didn't seem that he heard

19   us, even though we made quite a bit of noise, and so he was

20   completely unresponsive to any treatment efforts.

21        When he stopped eating and this behavior occurred, in

22   my opinion it was an emergency.  And for that reason we

23   instituted involuntary medications.

24   Q.   Dr. Wagner, in your opinion what do you think would

25   have happened to Inmate-patient A if he had not received the

634

1    involuntary medication?

2    A.      He would have died.

3    Q.      And Dr. Wagner, given the state that Inmate-patient A

4    was in at that time, do you think, in your opinion, would it

5    have been safe for clinical staff to enter the cell to

6    attempt to reason with Inmate-patient A or to provide him

7    with the involuntary medication?

8    A.      Not without protection.  I mean --

9    Q.      Do you think it was necessary that Inmate-patient A

10   be restrained?

11   A.      Absolutely.

12   Q.      Dr. Wagner, I want to refer you back to Exhibit 2 in

13   the binder before you.

14           THE COURT:  Exhibit 2 or tab 2.

15           MR. SHARMA:  Tab 2, your Honor.  I apologize.

16   BY MR. SHARMA:

17   Q.      Exhibit 181 at page 6, line 28, if you could read the

18   sentence that starts with "The attempt..."

19   A.      (Reading:)

20           The attempt at "clinical intervention" lasted

21           approximately 32 seconds.

22           (Reading concluded.)

23           Did you want me to go on?

24           THE COURT:  That's the point.

25           MR. SHARMA:  Yes.  Thank you.

635

BY MR. SHARMA:

Q.     Dr. Wagner, given your treatment of Inmate-patient A, was this the first clinical intervention that had been attempted with this patient?

A.     No.

Q.     Could you estimate how many times you or other staff tried to intervene to get inmate-patient A to take his medication?

A.     He was seen daily by a psychiatrist.  So there is a psychiatric note on the chart every day.  He didn't meet with the psychiatrist.  Personally, my team met with him four days out of the week.  So from the -- from the admission to the involuntary medication was 24 days.  So we tried to meet with him on all of those occasions.

Q.     Thank you.

       Dr. Wagner, during the course of your employment with CDCR, have you ever found it necessary in other situations to ask custody staff to produce an inmate?

A.     Yes.

Q.     How many times would you estimate that you have had to do that?

A.     I would estimate 40.

Q.     And do you have an estimate of how many times that custody staff had to employ -- of those 40 how many times custody staff had to employ pepper spray?

636

1   A.      Ten or less.  Might be six.

2   Q.      And could you explain why in the other situations

3   custody staff did not have to use pepper spray?

4   A.      Yes.  When we order involuntary medications, the

5   inmate is told that they're going on involuntary medications

6   and they will receive medications whether they like it or

7   not.

8           At that point, when they leave the cell, they are

9   asked to accept handcuffs.  And if they accept handcuffs,

10  then there's no struggle.

11          If they do not accept handcuffs, why then we have to

12  go to plan B, I guess you call it, and custody then

13  intervenes in the interaction.

14          And their process is they mobilize several additional

15  officers so that they have enough body power there to control

16  the inmate if necessary.

17          And most of the time the very appearance of those

18  extra officers at the cell door will secure the cooperation

19  of the inmate.

20  Q.      And Dr. Wagner, in the circumstances where custody

21  officers did have to use pepper spray, roughly how much

22  pepper spray do you estimate was used?

23  A.      Most the time, just one spray and they comply.

24  Q.      And Dr. Wagner, have you treated inmates who have

25  been subjected to the use of pepper spray?

637

1    A.      Yes.

2    Q.      And in your clinical experience, did you see any

3    evidence that that pepper spray caused long-term

4    psychological harm to those inmates?

5    A.      I haven't seen any harm from it.

6    Q.      Dr. Wagner, I also want to ask you, in your work at

7    CDCR do you work closely with custody staff?

8    A.      Yes.

9    Q.      And could you describe the relationship that you feel

10   you as a clinician have with custody staff?

11   A.      Well, it's a cooperative effort.  There are times

12   when custody needs to intervene with a patient.  And they

13   are, as a matter fact, more effective in dealing with a

14   patient than I am under certain circumstances.

15           When I'm dealing with a patient, and most the

16   patients there are in some sort of argument with somebody,

17   and sometimes the argument is with me about what I'm going to

18   do or what I have to do, and then my position leaves the

19   patient unhappy, in which instance sometimes they start

20   banging on the side of the interview module or they start

21   yelling, and under such circumstances I terminate the

22   interview and I leave.  And custody officers then take over.

23   And what they do is they deescalate the patient and return

24   him to the cell.

25   Q.      Dr. Wagner, when you say "deescalate," can you

638

1    describe, is that through physical force, is that through

2    verbal methods?

3    A.        No.  It is through verbal methods.  They do not use

4    physical force.  I don't remember a situation where they had

5    to do that.

6    Q.        Dr. Kaufman -- Sorry, Dr. Wagner.

7              Dr. Wagner, were you present when Inmate A had to be

8    extracted from his cell?

9    A.        Yes, I was.

10   Q.        And -- If I could have a moment, Your Honor?

11             (Brief pause.)

12             Dr. Wagner, if you could just briefly describe from

13   your perspective how Inmate A was responding to custody staff

14   during the extraction?

15   A.        During the extraction custody asked him to cuff --

16   accept handcuffs.  He refused to do that, and he continued

17   his refusal.

18             They then pepper sprayed in his cell, and he did not

19   respond to the pepper spray.  Subsequently they had to spray

20   additional spray into the cell, eventually securing one hand.

21             The inmate has to put his hand through a feeding

22   door.  And he put his hand through it, and they got one hand.

23   Then he refused to allow them to cuff his other hand.

24             And they then had to open the door with one hand

25   secured, at which time he was flailing and was very resistant

639

1    to control.

2          They secured control of him only after he had to be

3    taken to the ground and officers were on every limb.  And

4    subsequently they had to bodily lift him up and put him on a

5    gurney.  And they had to hold him while he was on the gurney.

6          And they took him into a room where we have

7    five-point restraints.  And he was restrained.  And he was

8    struggling with the restraints the entire time.

9    Q.    And Dr. Wagner, based on your experience in dealing

10   with patients at the Mental Health Crisis Bed Unit at

11   Corcoran, can patients, even patients who are undergoing or

12   in the middle of a psychotic break, understand commands given

13   by a custody officer such as "cuff up"?

14   A.    Yes.

15          MR. SHARMA:  Nothing further at this time, Your

16   Honor.

17                      CROSS-EXAMINATION

18   BY MS. RIFKIN:

19   Q.    Good morning, Dr. Wagner.  My name is Lori Rifkin.

20   I'm one of plaintiffs' counsel here in this matter.

21          THE COURT:  You're Miss Rifkin, aren't you?

22          MS. RIFKIN:  Rifkin.

23          THE COURT:  Excuse me.  Go ahead.

24   BY MS. RIFKIN:

25   Q.    Dr. Wagner, did you review any records in preparation

640

1   for your testimony here today?

2   A.      Yes.

3   Q.      What records were those?

4   A.      It was the records of his hospital stay.  I also had

5   some records available that preceded his hospital stay and

6   some records after his hospital stay.

7   Q.      Did you review anything else in preparation for your

8   testimony here today?

9   A.      The document that was referred to by Mr. Sharma, yes,

10  I reviewed that.

11  Q.      Anything else?

12  A.      Not that I recall.

13  Q.      You testified that as of July 1st, the date when

14  Inmate A entered the Crisis Bed Unit, he was psychotic; is

15  that correct?

16  A.      That's right.

17  Q.      And you were aware that he had been refusing his

18  medications for some time before he arrived at the Crisis

19  Bed?

20  A.      That's right.

21  Q.      And he was in the Crisis Bed because he was hearing

22  voices telling him to kill himself?

23  A.      That's right.

24  Q.      And when he arrived in the Crisis Bed Unit, you would

25  have reviewed his treatment plan that he had prior to

641

1    arriving in the Crisis Bed; is that right?

2    A.       Yes.

3    Q.       And you were aware that in his treatment plan the

4    plan was that if he decompensated further, he should have an

5    immediate referral to inpatient care; is that right?

6    A.       I don't recall seeing that specifically.  I can

7    imagine it was there.  I don't recall it specifically.

8    Q.       And you testified that you went by Inmate A's cell

9    every day that you were in the unit; is that right?

10   A.       That's right.

11   Q.       How many days a week do you work in the Crisis Bed

12   Unit?

13   A.       Four days a week.

14   Q.       And Inmate A was extracted on July 24th, 2012; is

15   that right?

16   A.       That's right.

17   Q.       So that's about -- let's see -- three -- a little

18   over three weeks that he would have been in the Crisis Bed

19   Unit by that time?

20   A.       That's right.

21   Q.       You probably would have seen him about 12 times.

22            Does that sound about right?

23   A.       At least.

24   Q.       At least 12 times.

25            And when we say "see," he was in his cell all of

642

1    those times; is that correct?

2    A.        Except for one.  The initial time I think was July 2

3    and he met with us.

4    Q.        And he --

5    A.        After that he refused to leave his cell.

6    Q.        When he met with you, he was in a treatment module or

7    cage; is that right?

8    A.        That's right.

9    Q.        He was handcuffed while in the treatment module?

10   A.        No.

11   Q.        Was he handcuffed when he left his cell to go to the

12   treatment module?

13   A.        Yes.

14   Q.        And after July 2nd he refused to exit his cell to

15   meet with you or the treatment team?

16   A.        That's right.

17   Q.        And you testified that he deteriorated further over

18   that period of three weeks; is that correct?

19   A.        That's right.

20   Q.        And in those three weeks you didn't refer him to

21   inpatient care?  That's right?

22   A.        That's right.

23             I'm sorry.  He was in inpatient care.  I don't -- you

24   say that I didn't refer him to inpatient care.  He was in

25   inpatient care.

643

1    Q.        Let me just try and clarify a bit.

2              You're familiar with the Program Guide governing the

3    delivering of mental health services in California Department

4    of Corrections, right?

5    A.        Yes.

6    Q.        There's a distinction between a unit known as a

7    Mental Health Crisis Bed and units referred to as

8    Intermediate Care Facilities or Acute Psychiatric Care

9    facilities; is that correct?

10   A.        I'm not sure what the difference is.  Mental Health

11   Crisis Bed is an inpatient unit that not every facility has.

12   That is most facilities have what they call a CTC, which is

13   not a Mental Health Crisis Bed.

14             People are -- it's the intention to keep people there

15   a very short period of time until they can go from there to a

16   crisis bed usually in another institution.

17             So our institution, if there's space available, we

18   also take referrals from other institutions.

19             THE COURT:  The question was somewhat different.

20             The question is, whether or not the Mental Health

21   Crisis Bed is the equivalent of acute -- I take it this is

22   your question -- the acute psychiatric care; is that correct,

23   ma'am?

24             MS. RIFKIN:  Yes.  More or less, yes.

25             THE COURT:  There is something called Acute Care and

644

1    there is something called Mental Health Crisis Bed, correct?

2            THE WITNESS:  Yeah.  The Acute Care is, number one,

3    to be determined if they need further treatment.  And then if

4    they need further treatment, then they're referred out.

5            The Inmate CB, Mental Health Crisis Bed is actually a

6    hospital unit.  That's how it functions.

7    BY MS. RIFKIN:

8    Q.      Dr. Wagner, are you aware the Program Guide for the

9    delivery of mental health services places a ten day limit on

10    a patient's stay in the Mental Health Crisis Bed?

11    A.      Yes.

12    Q.      Do you know what is supposed to happen if those ten

13    days aren't sufficient to stabilize a patient?

14    A.      Yes.

15    Q.      What's supposed to happen then?

16    A.      They, according to the Program Guide, are supposed to

17    be transferred to the Department of State Hospitals.

18    Q.      But Inmate A in this case had been in the crisis bed

19    for 24 days at the time he was extracted; is that right?

20    A.      That's right.

21    Q.      Without referral to the Department of State

22    Hospitals?

23    A.      That's right.

24    Q.      And after this extraction, he remained in the crisis

25    bed until approximately August 14, 2012; is that right?

645

1    A.       That's right.

2    Q.       And he wasn't referred to inpatient care then either,

3    was he?

4    A.       He was not.

5    Q.       So Inmate A was in that Crisis Bed Unit for a month

6    and a half; is that correct?

7    A.       Correct.

8    Q.       Without referral to inpatient care?

9    A.       That's right.

10   Q.       But the Program Guide says he should be referred

11   after ten days?

12   A.       That's right.

13   Q.       You saw him deteriorating.  Why didn't you refer him?

14   A.       I did not refer him because in my experience the

15   Department of State Hospitals did not pursue involuntary

16   medications on these people.

17            Furthermore, if we're the ones that are treating him,

18   we have the experience with him to witness, to testify in the

19   court about his condition.  We're at an advantage in terms of

20   his treatment.  And in terms of the involuntary medication,

21   we're at an advantage because we can testify firsthand about

22   what has happened.

23   Q.       In your treatment notes you stated that when Inmate A

24   arrived at the crisis bed, it was clear he was gravely

25   disabled; is that right?

646

1    A.    Yes.

2    Q.    So wouldn't it also have been clear, if he were

3    transferred to an inpatient unit, by the doctors there that

4    he was gravely disabled?

5          MR. SHARMA:  Objection.  Calls for speculation.

6          THE COURT:  That objection is sustained.

7    BY MS. RIFKIN:

8    Q.    You were able to see, when Inmate-patient A arrived

9    in your unit, that he was gravely disabled; is that correct?

10   A.    I guess you can say in clinical terms he was gravely

11   disabled.

12   Q.    And gravely disabled is one of the standards for

13   applying for involuntary medication; is that correct?

14   A.    That's correct.

15   Q.    Is it your practice in the Corcoran Mental Health

16   Crisis Bed Unit to keep inmate-patients in the unit?

17         THE COURT:  Greater than the ten days?

18   BY MS. RIFKIN:

19   Q.    Greater than the ten days, if you feel they require

20   involuntary medication?

21         MR. SHARMA:  Objection, Your Honor.  Outside the

22   scope of direct and relevance.

23         THE COURT:  You may answer, sir.

24         THE WITNESS:  Can I ask you to repeat the question.

25         MS. RIFKIN:  Can you read the question back.

647

1          (Whereupon, the record was read back as requested.)

2          THE WITNESS:  It depends on the clinical situation.

3    Is it my practice to keep them longer than ten days?  Again,

4    it depends on the clinical situation.

5    BY MS. RIFKIN:

6    Q.      So is it your opinion, when you're treating patients

7    in your Crisis Bed Unit, that you can help them more by

8    keeping them while they deteriorate in order to get them

9    eventually on involuntary medications?

10   A.      Exactly.

11   Q.      Are you the most senior psychiatrist in the Crisis

12   Bed Unit?

13   A.      Am I the most senior psychiatrist in the Crisis Unit?

14          I've been there longer than the other people there,

15   yes.

16   Q.      Is there a supervising psychiatrist?

17   A.      There is.

18   Q.      And does the supervising psychiatrist meet with you

19   and the other psychiatrists to review treatment plans and

20   care of inmate-patients?

21   A.      That is not done by the particular person who is

22   my -- treatment plans are reviewed, but not by the chief of

23   psychiatry.

24   Q.      Who are they reviewed by?

25   A.      The person assigned there was a psychologist.

648

1    Q.    Did that person ever review the treatment of Inmate A

2    during his time in the crisis bed and bring up any

3    recommendations or problems to your attention?

4           THE COURT:  The objection is that it is cumulative.

5    That objection is sustained.  Do it one at a time.

6           To your knowledge was the treatment plan reviewed by

7    a person authorized to do so?

8           THE WITNESS:  I don't know.

9           THE COURT:  Fair enough.

10          THE WITNESS:  I was not -- I was not notified that

11   anybody was unhappy with what we were doing.

12          THE COURT:  Different question, sir.

13          You do not have any personal information as to

14   whether or not the treatment plan was ever reviewed?

15          THE WITNESS:  That's right.

16   BY MS. RIFKIN:

17   Q.    About how long did your meetings with Inmate A, when

18   he refused to come out of his cell and you would approach his

19   door, last?

20   A.    You're speaking about toward the end of the time that

21   he was allowed to -- without involuntary medications or

22   initially?

23   Q.    I'll clarify.

24          Initially, during the first week of his stay in the

25   Mental Health Crisis Bed, about how long were your cell-front

649

1    meetings with Inmate A?

2            THE COURT:  Well, that assumes something, that he

3    wasn't -- At any time was Prisoner A willing to leave the

4    cell for treatment in the module?

5            THE WITNESS:  Not after the initial meeting.

6            THE COURT:  Okay.  Now your question is?

7    BY MS. RIFKIN:

8    Q.      How long were your cell-front meetings with Inmate A

9    during the first week of his stay?

10   A.      Ten to 15 minutes I would estimate.

11   Q.      And the second week?

12   A.      I can't really say.

13   Q.      Were these meetings interactive, was he responding to

14   you?

15   A.      Initially he would converse.  As time went on he

16   refused to converse.

17   Q.      What did you do when he refused to converse?

18   A.      What did I do?

19           You know, I eventually placed him on involuntary

20   medications.  I don't recall that I did anything directly

21   with him.  Of course, I, you know, reviewed the chart and

22   paid attention to his condition the whole time.

23   Q.      So you were aware then that Inmate A was refusing his

24   medications not only prior to entering the Crisis Bed Unit,

25   but for those 24 days he was in the Crisis Bed Unit before

650

1    the incident?

2    A.    Yes.

3    Q.    But you didn't initiate involuntary medication until

4    the morning of July 24th, the day of the extraction; is that

5    right?

6    A.    That's right.

7    Q.    Until he was so gravely disabled he was smearing

8    himself with feces and had flooded his cell?

9    A.    His condition was as I described.

10   Q.    But he had urinated on the floor -- he had urinated

11   on himself and the floor of his cell prior to that day; isn't

12   that right?

13   A.    Probably.

14   Q.    And he was responding to auditory hallucinations

15   prior to that time; is that right?

16   A.    Yes, we knew that.  That was since his admission.

17   Q.    At some point prior to the 24th, on approximately

18   July 16th, you at first discharged this Inmate A from the

19   Crisis Bed Unit; is that right?

20   A.    That's right.

21   Q.    But then you rescinded that discharge?

22   A.    That's right.

23   Q.    On what basis did you initially authorize the

24   discharge of Inmate A from this unit?

25   A.    It was obvious we weren't being effective.  We

651

1    weren't doing anything.  And in that unit you want to have --

2    you want to be doing something for the patient.  And in my

3    opinion, at that time, he could sit in his cell outside of

4    that unit and he didn't need to be in that unit and

5    deteriorate, which seemed to me to be inevitable.  So that

6    was the rationale for discharging him.

7    Q.    So in your opinion at that time it was preferable to

8    discharge him back to an EOP Ad. Seg. Unit for him to sit in

9    the cell and deteriorate, then refer him to a higher level of

10   care for treatment?

11   A.    Yes.

12   Q.    On the date of the actual cell extraction you were

13   the one who ordered that cell extraction; isn't that right?

14   A.    I ordered the cell extraction.  I wrote involuntary

15   medication orders.  And at that point custodial personnel are

16   responsible for making the patient available to receive the

17   involuntary medication.

18        THE COURT:  The inevitable consequence of your

19   ordering the involuntary medication was cell extraction by

20   custody?

21        THE WITNESS:  That's right.

22   BY MS. RIFKIN:

23   Q.    You're aware that involved OC spray when a patient

24   refused to submit to handcuffs, correct?

25   A.    On occasion, yes.

652

1    Q.        And in fact, you're the person who ordered that the

2    Inmate A be placed in five-point restraints during the course

3    of the extraction; is that correct?

4    A.        That's right.  After extraction, that's correct.

5    After the extraction, yes.

6    Q.        And you continued to authorize those five-point

7    restraints continuously for almost 72 hours; is that correct?

8    A.        That's correct.

9    Q.        An it was a different psychiatrist in the unit who

10   ultimately released Inmate A from those five-point restraints

11   after almost 72 hours; is that right?

12   A.        That's correct.

13   Q.        Because every time you had seen Inmate A, you made

14   the determination he should stay in the five-point

15   restraints?

16   A.        That's correct.

17   Q.        And you were present during the entire cell

18   extraction of Inmate A; is that right?

19   A.        I was in the nursing station.  I was about, what, 30

20   feet away.  Maybe 25 or 30 feet away, yes.

21   Q.        And you could observe the entire extraction; is that

22   correct?

23   A.        That's right.

24   Q.        Did you observe the transport of Inmate A on the

25   gurney into the room where he was administered medication?

653

1    A.      Yes.

2    Q.      And Inmate A was never decontaminated from the OC

3    spray; is that correct?

4    A.      Not before he was placed in restraints.  That's

5    correct.

6            THE COURT:  As far as you know was he ever

7    decontaminated?

8            THE WITNESS:  I'm sure he was eventually.

9            THE COURT:  I'm sure you're sure --

10           THE WITNESS:  But not --

11           THE COURT:  As far as you know he was never

12   decontaminated; is that correct?

13           THE WITNESS:  I don't have direct knowledge of when

14   he was.

15           THE COURT:  Did somebody tell you he was

16   decontaminated?

17           THE WITNESS:  No.

18   BY MS. RIFKIN:

19   Q.      Did you ever ask if he was decontaminated?

20   A.      Did I ever ask him?

21   Q.      Did you ever ask anyone if he was decontaminated?

22   A.      No.

23   Q.      You were his treating clinician; is that correct?

24   A.      That's right.

25   Q.      Are you aware of the physical effects of OC spray on

654

1    a patient?

2    A.      Yes.

3    Q.      What is your awareness of what those effects are?

4    A.      It's an irritant.

5    Q.      Have you ever experienced OC spray, Dr. Wagner?

6    A.      Yes.

7    Q.      And you experienced it as an irritant?

8    A.      Yes.

9            MR. SHARMA:  Objection, Your Honor.  Asked and

10   answered.

11           THE COURT:  Overruled.

12   BY MS. RIFKIN:

13   Q.      So you observed the entire cell extraction.  Do you

14   remember how much -- how many OC sprays Inmate A was

15   subjected to?

16   A.      I can't say exactly how many.  I know it was more

17   than two.

18   Q.      What was your role in observing the cell extraction?

19           THE COURT:  That assumes something that is not in

20   evidence.

21           Did you have a role relative to the cell extraction?

22           THE WITNESS:  Not directly.

23   BY MS. RIFKIN:

24   Q.      You weren't the medical observer for the extraction?

25   A.      I don't know what you call me.  I mean, I was the

655

1    patient's doctor.  I happened to be there when he was

2    extracted.  I viewed the extraction.  I'm not sure what the

3    question is.

4    Q.    So you don't have any responsibility for checking the

5    inmate's medical care after the extraction; is that accurate?

6    A.    No.  There is some responsibility.

7    Q.    What is the scope of your responsibility for that

8    patient after the extraction?

9    A.    To determine that the -- when he's in restraints to

10   determine that he is not in danger of further physical

11   injury.

12         THE COURT:  It's 11:30.  We're going to have to

13   break.  We'll reconvene at 1:30.

14         (Off the record at 11:32 a.m.)

15         (Back on the record at 1:30 p.m.)

16         THE CLERK:  Please, remain seated.

17         Court is now in session.

18         THE COURT:  Miss Rifkin.

19         I'm sorry.  I don't know why I insist your name is

20   the something else.

21         MS. RIFKIN:  Thank you, Your Honor.

22         May I approach the witness, Your Honor?

23         (Document handed to witness.)

24   BY MS. RIFKIN:

25   Q.    Good afternoon, Dr. Wagner.

656

1    A.       Good afternoon.

2    Q.       I've handed you a stack of documents that's been

3    marked Plaintiffs' 1157.  These are medical files for

4    Inmate A that were produced to us.

5             Do you recognize these files?

6    A.       I have seen them before, let's put it that way.  Yes.

7    Q.       I'll represent to you that these are excerpts of

8    Inmate A's medical files that were provided.

9             You recognize these as parts of the files that you

10   reviewed prior to coming here?

11   A.       Yes.  I'm just looking at the first one here.  I

12   haven't reviewed all of them at this time.

13             Go ahead.

14             MS. RIFKIN:  I would like to move to admit

15   Plaintiffs' Exhibit 1157 under seal pursuant to the

16   protective order, Your Honor.

17             THE COURT:  Hearing no objection, it is received.

18   And it will be received under seal.

19             You may proceed.

20                  (Whereupon, Plaintiff's Exhibit 1157 received

21                   into evidence.)

22   BY MS. RIFKIN:

23   Q.       Dr. Wagner, if you could, turn to what's been marked

24   page 139 in the upper right-hand corner of those documents.

25             For convenience they've been marked with additional

657

1   numbers in the upper-right hand page so it is easier to find.

2   A.      Right-hand page.  Okay.

3   Q.      It's page 139.

4   A.      I'll get to it hopefully in a minute.

5           Yes.

6   Q.      Okay.  Page 139 says Interdisciplinary Progress

7   Notes.  It's dated July 24th, 2012, and there is a note at --

8   that says "1400 Psychiatry"?

9   A.      Yes.

10  Q.      Is that a note that you wrote, Dr. Wagner?

11  A.      Yes.

12  Q.      Can you read what you wrote for that note, please?

13  A.      (Reading:)

14          Remains defiant of custody.  Throughout procedure

15          constantly struggling despite pepper spray.  Custody

16          refused to place him --

17          (Reading interrupted.)

18          I'm not sure that's "refused."

19          Oh.

20          (Reading continued:)

21          Custody required to place him on the ground in order

22          to subdue him.  Constantly hollering "Help"

23          throughout.  Placed in five-point restraints --

24          (Reading interrupted.)

25          No.

658

1              (Reading continued:)

2              Placed in five-point restraints requiring --

3              (Reading interrupted.)

4              I'm not sure what that word is.

5    Q.        Looks like "restraining" to me?

6    A.        Restraining?  Probably that's what it is.

7              (Reading continued:)

8              ...requiring forcible restraining throughout.

9              Remained agitated and struggling against restraints.

10             Given Haldol, Benadryl, Ativan IM.  Remains agitated.

11             (Reading concluded.)

12   Q.        "IM" would be inmate?

13   A.        That's intramuscular.

14   Q.        Okay.  And this note, this was written right after

15   the cell extraction we were discussing earlier; is that

16   correct?

17   A.        That's right.  It was right after he was placed in

18   restraints.  He was taken to the restraints from the cell

19   extraction.

20   Q.        Yes.  Okay.  If you can turn to the next page, which

21   is marked page 140.

22   A.        I have it here.

23   Q.        There's a note that's marked July 24th, 2012, 1634.

24   So that's two hours and 34 minutes later?

25   A.        Yes.

659

1    Q.       It notes that you saw Inmate A in restraints; is that

2    right?

3    A.       That's right.

4    Q.       If you could, read your notes starting with the

5    sentence "The major problem."

6             It's about halfway through the first paragraph.

7    A.       (Reading:)

8             The major problem encountered by custody in

9             maintaining physical control --

10            (Reading interrupted.)

11            I presume that is "noted with him."

12            (Reading continued:)

13            However I would not expect a viable response while

14            he's sedated as much as he is at this point.

15            (Reading concluded.)

16   Q.       If you could keep reading please, Dr. Wagner?

17   A.       I'm sorry.

18   Q.       If you could keep reading please, Dr. Wagner?

19   A.       Okay.

20            (Reading continued:)

21            Recommend - Keep in restraints until he takes more

22            than one dose of medication PO and reliably agrees to

23            take PO meds for the --

24            (Reading Interrupted.)

25            THE COURT:  "...for the future," I think.

660

1          THE WITNESS:  That's right.

2          (Reading Continued:)

3          2) There is substantial reason to believe he will

4          meet with treatment team and will not demonstrate

5          resistance to custodial procedures.

6          (Reading concluded.)

7     Q.    What does "PO" mean in these notes?

8     A.    By mouth.  Per oral.  Per oral, but it is by mouth is

9     what it means.

10    Q.    If you could turn to the next page, which is marked

11    page 141?

12    A.    Yes.

13    Q.    There's a note halfway down, July 25th, 2012, 8:15.

14          Looks like another one of your notes; is that

15    correct?

16    A.    That's right.

17    Q.    And at this point Inmate A had been in restraints

18    continuously since you had seen him after the cell extraction

19    the day before; is that correct?

20    A.    That's right.

21    Q.    If you could, read your note at that point please,

22    Doctor?

23    A.    (Reading:)

24          Seen in restraints.  Still a bit loose with some

25          trouble processing data.  Taking meds per oral.  In

661

1          view of severe combativeness when psychotic, cannot

2          take him out of restraints, behavior to

3          unpredictable.  He will need to satisfy both his

4          treatment team and custody that removing restraints

5          is safe.

6          (Reading concluded.)

7          Do you want me to go to the next page?

8     Q.   Yes, please.

9     A.   (Reading continued:)

10         Especially since custody personnel were endangered

11         by his behavior.  My criteria are 1, taking meds PO,

12         plus my judgment that there is substantial reason to

13         believe he's going to take medications in the future,

14         plus a demonstrated ability to acknowledge and state

15         the reason he's restrained.  At this time he does not

16         acknowledge any awareness of the behavior that led to

17         his cell extraction and the violent aftermath

18         (his violence).  He claims he doesn't remember what

19         happened yesterday which is untrue.  Acutely

20         psychotic people remember events very well.  Again,

21         the violence of the situation yesterday merits a

22         great deal of caution in removing restraints.

23         (Reading concluded.)

24    Q.   And the next note is a note from you at 1300, which

25    is about almost five hours after the next note; is that

662

1   right?

2   A.      I don't remember the time.  It is what is listed on

3   the record.

4   Q.      That's probably reliable, you would agree, right?

5   A.      Yes.

6   Q.      So the note at 1300, please?

7   A.      (Reading:)

8           Remains defiant.  Not responding at all.  Ignoring

9           treatment team.

10          (Reading concluded.)

11  Q.      And the next note, which is dated the same day at

12  5:00 p.m.; is that right?  Is that 1700?

13  A.      That's right.

14  Q.      Okay.  If you could read the next note as well,

15  please?

16  A.      (Reading:)

17          Unchanged.  Two problems remain.  Firstly, his

18          psychosis makes it impossible to give the necessary

19          assurances necessary to remove restraints.  Secondly,

20          his defiant posture is --

21          (Reading interrupted.)

22          Not sure what that word is.

23  Q.      I'm not sure either.  We can skip it.

24  A.      Okay.

25          (Reading continued:)

663

1        -- and would lead to recurrent violence with custody.

2        Remains unsafe to release from restraints.  Med dose

3        has been increased.

4        (Reading concluded.)

5   Q.   And there's another note on the same page, July 26,

6   2012.

7   A.   Uh-huh.  Yes.

8   Q.   Is that 8:40?  Is that what time that is?

9   A.   8:45.

10  Q.   8:45.  Okay.

11       Can you read that note, please?

12  A.   (Reading:)

13       Seen in restraints.  Much better organized.  Some

14       affect.  Interactive.  Politely requesting removal

15       from restraints.  However, continues to deny largely

16       the events leading to restraints.  And this denial,

17       whether because of continuing psychotic process or

18       psychologic mechanism is dangerous.  Unless he can

19       take responsibility for this behavior it can reoccur

20       at any time.

21       (Reading concluded.)

22  Q.   At that point you ordered --

23       THE COURT:  There is another line.

24       THE WITNESS:  I'm sorry.

25       THE COURT:  There's another line.  It says

664

1    "continuing current" -- I can't read it.

2    BY MS. RIFKIN:

3    Q.    Can you read that for the record too?

4    A.    (Reading continued:)

5          Continue current meds.  Re-eval in four hours.

6          (Reading concluded.)

7    Q.    So at that point you ordered that Inmate A continue

8    to remain in five-point restraints; is that right?

9    A.    That's right.

10   Q.    And at that point he had been in five-point

11   restraints -- let's see, that is July 26 at 8:45.  He had

12   been in five-point restraints continuously since July 24th at

13   2:00 p.m.; is that right?

14   A.    That's right.

15   Q.    If you can, turn to the next page, page 143.

16         There is a note dated July 26.  I believe it is 1330.

17   1:30?

18   A.    That's right.

19   Q.    Which is about almost five hours after your previous

20   note; is that right?

21   A.    That's right.

22   Q.    Can you read that note, please?

23   A.    (Reading:)

24         Seen in restraints.  Very angry or very psychotic.

25         Psychosis obviously better this morning this a.m. so

665

1           it is difficult to say he's more psychotic.  Avoided

2           eye contact.  Would not speak until directed to me by

3           another staff member.  Softly asked to be released

4           and when asked under what conditions he replied with

5           apology to me for which there is no reason.  He then

6           asked what condition would get him released.  My

7           reply that if he cannot remember, then he certainly

8           is not appropriate for release.  Patient broke off

9           conversation.  Appeared to be seething.  Five point

10          restraints continued.

11          (Reading concluded.)

12  Q.      In your next note, Doctor, IS July 26, 2012, at 1655,

13  so that's about three and a half hours later?

14  A.      That's right.

15          (Reading:)

16          Seen in restraints.  Still some looseness of

17          associations, but able to listen.  Told conditions of

18          release again at his request.  Number 1, acknowledge

19          reasons for restraints.  Agreed to take meds at PO.

20          (Reading interrupted.)

21          Something to the psychiatrist.  Not sure what that

22  word is.

23  Q.      Could it be "convincingly"?

24  A.      I'm sure that's what it is.

25          (Reading continued:)

666

1          Convincingly to the psychiatrist and demonstrating a

2          willingness to get along with custody.  Will consult

3          custody before releasing.

4          (Reading concluded.)

5    Q.    At that point that's 1655.  So Inmate A had been in

6    five-point restraints continuously for more than 48 hours at

7    that point.

8          Is that correct?

9    A.    That's correct.

10   Q.    If you turn to page 162 of the exhibit in front of

11   you.

12         Page 162.

13   A.    I have that.

14   Q.    Okay.  There's a note at July 27th, 2012, at 8:30.

15   That's 8:30 a.m.; is that right?

16   A.    That's right.

17   Q.    And this is a note by Dr. Wang, another psychiatrist

18   in the Crisis Bed Unit?

19   A.    That's right.

20   Q.    Can you read that note?

21   A.    (Reading:)

22         I/M Inmate (Name Stricken) --

23         (Reading interrupted.)

24         MR. SHARMA:  Objection.  Move to strike the inmate's

25   name.

667

1        THE COURT:  Thank you.  It will be stricken.

2        "Inmate had been..."

3        THE WITNESS:  (Reading continued:)

4        Inmate had been in five-point restraints continuously

5        for about three days.  Last night he was screaming

6        all night, even when he was in restraints.  According

7        to the nursing staff he had PRN Haldol, Ativan,

8        Cogentin at about 6:00 a.m.  Therefore he is now

9        sedated and is sleeping.

10       (Reading interrupted.)

11       THE COURT:  He's now sedated, isn't it?

12       THE WITNESS:  (Reading continued:)

13       Plan:  Will release him from five-point restraints.

14       2, will give another set of emergency meds, including

15       Haldol Ativan and Benadryl and release of five-point

16       restraints.

17       (Reading concluded.)

18  BY MS. RIFKIN:

19  Q.     I think "prior to release of five-point restraints."

20         Is that correct?

21  A.     That's correct.

22  Q.     Okay.  Dr. Wagner, are you familiar with the Mental

23  Health Services Delivery System Program Guidelines regarding

24  clinical restraint?

25  A.     Yes.

668

1    Q.    So you're aware that a renewal for authorization to

2    remain in five-point restraints has to be completed at least

3    every four hours; is that right?

4    A.    That was not my understanding.  My understanding was

5    after the first couple or three the rule has been every eight

6    hours thereafter.

7    Q.    That's for a face-to-face evaluation, isn't it?

8    A.    I'm sorry.

9    Q.    The every eight hours applies to a face-to-face

10   evaluation, but there has to be an authorization to continue

11   restraints at least every four hours; isn't that correct?

12   A.    I'm not aware of that rule.

13   Q.    And are you familiar with the language in the Program

14   Guide that states that restraint -- clinical restraint and/or

15   seclusion are special treatment procedures used to protect

16   the safety of inmate-patients who pose an immediate danger to

17   themselves or others?

18         MR. SHARMA:  Objection, Your Honor.  Assumes facts

19   not in evidence.  Lacks foundation.

20         THE COURT:  Well, I assume she's reading from the

21   guideline.  Give counsel the citation if you will.

22         MS. RIFKIN:  Sure.  This has been admitted as

23   Plaintiffs' 1136.  It is page 12-5-16 of that exhibit.

24         THE COURT:  Page 5?

25         MS. RIFKIN:  12-5-16.

669

1          If I can approach the witness, I'm happy to give him

2     a copy of what's been admitted?

3          THE COURT:  You may proceed.

4          (Document hand to witness.)

5          (Court and clerk confer.)

6          THE COURT:  As far as we know, 1136 is not admitted.

7          MS. RIFKIN:  It's not?

8          THE CLERK:  I don't have it admitted.

9          MS. RIFKIN:  Okay.

10         THE CLERK:  Can you point me to the date it was

11    admitted?

12         MS. RIFKIN:  May I approach?

13         THE COURT:  Yes.

14         (Exhibit handed to witness.)

15    BY MS. RIFKIN:

16    Q.    Dr. Wagner, I have given you what's been marked

17    Plaintiffs' Exhibit 1200, which is a copy of the Mental

18    Health Services Delivery System Program Guide.

19         Are you familiar with this document?

20    A.    I'm aware of its existence.

21    Q.    Have you seen it before?

22    A.    I'm sorry?

23    Q.    Have you seen it before?

24    A.    I don't have a direct recollection.

25    Q.    But you're aware these are the guidelines that cover

670

1  the delivery of mental health services in your Mental Health

2  Crisis Bed, for example?

3  A.     The guidelines I stated are the guidelines that I

4  recall knowing about.

5  Q.     I'm asking you a different question because basically

6  I'm trying to establish whether you are aware these

7  guidelines exist.

8  A.     I would have to see what the guidelines are.

9         THE COURT:  Is there a stipulation that the document

10  is what it purports to be, Mr. Sharma?

11         MR. SHARMA:  Yes, Your Honor.

12         THE COURT:  It's established that these are the

13  Mental Health Services Delivery Guidelines.

14         You may proceed from there.

15         MS. RIFKIN:  Thank you.

16         Plaintiffs move Exhibit 1200 into evidence.

17         THE COURT:  Received.

18              (Whereupon, Plaintiffs' Exhibit 1200 received

19               into evidence.)

20  BY MS. RIFKIN:

21  Q.     Dr. Wagner, if you could, turn to the page that's

22  marked at the bottom 12-5-16 of this exhibit.

23  A.     Yes.

24  Q.     If you could, look under H, Clinical Restraint and

25  Seclusion?

671

1    A.        Yes.

2    Q.        The first sentence says:

3              (Reading:)

4              Restraint and/or seclusion are special treatment

5              procedures used to protect the safety of

6              inmate-patients who pose an immediate danger to

7              themselves or others by restricting their ability to

8              inflict injury by limiting body movement or by

9              containing them in a safe environment.

10             (Reading concluded.)

11             Are you aware of that as the purpose for clinical

12   restraint in your Crisis Bed Unit?

13   A.        Yes.

14   Q.        Going towards the end of the page, the last paragraph

15   on the page starts:

16             Restraint and/or seclusion shall never be used as

17             punishment or for convenience of staff.

18             (Reading concluded.)

19             Are you aware of that guideline?

20   A.        Yes.

21   Q.        Dr. Wagner, you testified earlier this morning that

22   prior to this cell extraction Inmate A refused to recognize

23   staff in the Crisis Bed Unit; is that correct?

24   A.        Frequently.  That's correct.

25   Q.        I'm sorry?

672

1    A.        Frequently.

2    Q.        And he refused to speak with staff?

3    A.        That's correct.

4    Q.        And he ignored attempts to engage with him?

5    A.        That's correct.

6    Q.        Is it your opinion that he was capable of making

7    decisions at that time?

8    A.        He was not capable of making decisions at that time.

9    Q.        So he wasn't capable of rationally deciding how he

10   was going to respond to different staff at that time?

11   A.        He was not.

12   Q.        Was he capable of rationally responding -- rationally

13   determining how he would respond at the time he was in

14   restraints?

15   A.        In my opinion, no.

16   Q.        So he couldn't have complied with the criteria that

17   you gave him to get out of constraints?

18   A.        That is true.

19   Q.        If we can go back to the exhibit that I gave you that

20   I believe is marked Plaintiffs' Exhibit 1157.

21             Could you turn to page 165.

22             THE COURT:  I'm sorry.  Page what?

23             MS. RIFKIN:  Page 165.  I'm sorry.

24             THE COURT:  Can I have it back, Madam Clerk.

25             Thank you.

673

1          THE WITNESS:  Yes.

2     BY MS. RIFKIN:

3     Q.      This is a declaration that you wrote in support of

4     involuntary medication for Inmate A; is that correct?

5     A.      Correct.

6     Q.      And you reported at that time -- let's see.  This is

7     dated July 25th, 2012; is that right?

8     A.      That's right.

9     Q.      And that was one of the days -- that was the day

10    after the cell extraction; is that right?

11    A.      That's right.

12    Q.      And one of the days that Inmate A was still in

13    five-point restraints; is that correct?

14    A.      Correct.

15    Q.      And under Axis V here it says Global Assessment of

16    Functioning 12?

17    A.      That's right.

18    Q.      That was your assessment?

19    A.      Yes.

20    Q.      And Global Assessment of Functioning is a scale from

21    zero to 100; is that correct?

22    A.      Correct.

23    Q.      And a functional person is functioning, it has been

24    testified to earlier in the proceedings, upwards of 80.

25            Is that accurate?

674

1    A.       Most of the time that's accurate.

2    Q.       And what is the cutoff for being considered gravely

3    disabled?

4    A.       Probably in the 20s.

5             So 12 is A remarkable low GAF score, wouldn't you

6    agree, Doctor?

7    A.       Absolutely.

8    Q.       And if you can, turn to the next page of your

9    declaration, page 166 in this exhibit.

10            THE COURT:  Before you leave that, was a Global

11   Assessment of Functioning made prior to the -- at some time

12   closely associated with the cell extraction?

13            THE WITNESS:  Yes.  I mean, this was completed the

14   day after his cell extraction.  It was not initiated prior to

15   his cell extraction.

16            THE COURT:  What I'm trying to establish is whether

17   or not it is reasonable to assume for the court to understand

18   that the inmate's condition was something close to 12 at the

19   time that the cell extraction occurred?

20            THE WITNESS:  That's right.

21            THE COURT:  All right.

22   BY MS. RIFKIN:

23   Q.       And to pursue that point a little further, can you

24   turn to page 123 of your exhibit in front of you.

25            THE COURT:  123?

675

1          MS. RIFKIN:  123, your Honor.

2          THE COURT:  All right.

3          THE WITNESS:  I have it here.

4     BY MS. RIFKIN:

5     Q.     This is a mental health summary that is dated July

6     18th, 2012; is that accurate?

7     A.     That's accurate.

8     Q.     And where it says Axis V there and says 25, that's

9     referring to the GAF score; is that correct?

10    A.     That's right.

11    Q.     So this evaluation on July 18th, 2012, assessed

12    Inmate A as having a GAF of 25 on that date; is that right?

13    A.     That's right.

14    Q.     So six days prior to the extraction, Inmate A had a

15    GAF score that, according to what you just told us, placed

16    him as gravely disabled; is that right?

17         MR. SHARMA:  Objection.  Misstates the witness's

18    testimony.

19         THE COURT:  She's asking whether that's right.  The

20    witness can say "yes," "no," or whatever is appropriate.

21         THE WITNESS:  So you're what you're asking is?

22         MS. RIFKIN:  I can rephrase.

23    BY MS. RIFKIN:

24    Q.     A few moments ago I asked what the cutoff is for

25    being gravely disabled in terms of a GAF score.  You said --

676

1    I think you said mid-20s.

2         Is that accurate?

3    A.    That's accurate.

4    Q.    So Inmate A was rated as having a GAF score of 25 on

5    July 18th.  And I'm, I guess, trying to confirm that's in the

6    mid-20s, which is what you just told us would be gravely

7    disabled; is that right?

8    A.    Not everybody with a GAF score of 25 is gravely

9    disabled.

10    Q.    But Inmate A was, right?

11    A.    Yes.

12    Q.    Okay.  And if you can, turn back to page 166 of the

13    exhibit.

14    A.    166?

15    Q.    That's right.

16         THE COURT:  I'm sorry.  166 of?

17         MS. RIFKIN:  The same exhibit, Your Honor,

18    Exhibit 1157.

19         THE WITNESS:  Yes.

20    BY MS. RIFKIN:

21    Q.    In the middle of paragraph 7, under "Grave

22    Disability," there's a sentence that says that he could not

23    engage in a cogent conversation with any staff.

24         That's what you wrote, correct?

25    A.    That's right.

677

1    Q.      That accurately describes Inmate A's state of mind

2    while he was in the Crisis Bed Unit or his ability -- ability

3    to engage in -- Let me start over.

4            That sentence, you would agree, is an accurate

5    assessment of Inmate A during the time he was in the crisis

6    bed?

7    A.      That was true until he was medicated.

8    Q.      Okay.  So up until then, from July 1st to July 24th,

9    when he was cell extracted, that would be an accurate

10   description?

11   A.      Yes.

12   Q.      And if you can, turn to page 168.

13   A.      Yes.

14   Q.      Under paragraph 16 you wrote:

15           (Reading:)

16           He's clearly flagrantly psychotic.  He cannot accept

17           any information from treatment or custodial personnel

18           because of his grossly psychotic and disorganized

19           condition.

20           (Reading concluded.)

21           That's also an accurate assessment at the time he was

22   in the crisis bed, from July 1st until time of the cell

23   extraction, correct?

24           That's your assessment of his condition during the

25   time he was in the crisis bed; is that right?

678

1   A.      That would need to be qualified.

2   Q.      Is it an accurate description of Inmate A on July

3   24th prior to the cell extraction?

4   A.      Very nearly.

5   Q.      What time period were you specifically referring to

6   with this sentence?

7   A.      That would describe his status on that day.

8   Q.      On the day you wrote this, July 25th?

9   A.      Yes.

10  Q.      After the cell extraction?

11  A.      Yes.

12  Q.      While we was still in five-point restraints?

13  A.      That was the condition even before he was in

14  five-point restraints.

15  Q.      But this is -- if you -- if this was his description

16  on July 25th, that's while -- he was in five-point restraints

17  for all of July 25th; isn't that correct?

18  A.      He was in that state prior to July 25th.

19  Q.      So he was in the state that you just described prior

20  to July 25th as well?

21  A.      With qualifications.

22  Q.      What is the qualification, Dr. Wagner?

23  A.      The qualification is that there are instructions or

24  information that he cannot process, such as he cannot process

25  data involving medications, the advantages and the

679

1    disadvantages of medications.  That's too complex.

2        However, he can process a direct and very brief

3    instruction like:  Accept the handcuffs.

4    Q.    Could he process:  Come to the cell door so I can

5    talk to you?

6    A.    Yes.

7    Q.    But you said just a minute ago that he wasn't capable

8    of making rational decisions.

9    A.    I guess I don't understand.

10   Q.    Are you aware that in addition to the cell extraction

11   Inmate A received a Rules Violation Report as a result of

12   this incident?

13   A.    I have been told he had.

14   Q.    Were you aware that he was assessed 90-days

15   forfeiture of credit, assessed 30-days loss of privileges and

16   referred to the ICC for review for Ad. Seg. placement or SHU

17   placement?

18       MR. SHARMA:  Objection, Your Honor.  Outside the

19   scope of direct.

20       THE COURT:  Overruled.  You may answer.

21       THE WITNESS:  Again, I have -- I've been told that.

22   It is not that I have seen that document personally.

23       THE COURT:  My understanding, and if I'm wrong, just

24   tell me, it is okay, is that in this process of deciding

25   whether or not to punish the inmate, when he's mentally ill

680

1    there is supposed to be a psychiatric contribution?

2            THE WITNESS:  That's right.

3            THE COURT:  Did you make a psychiatric contribution?

4            THE WITNESS:  No, I did not.

5            THE COURT:  But you were his treating physician?

6            THE WITNESS:  I was his treating physician.  Somebody

7    else --

8            THE COURT:  Right.  It doesn't matter.

9            THE WITNESS:  No, sir.  Not me personally.

10           THE COURT:  Anybody who wanders around --

11           THE WITNESS:  Whoever gets the assignment.

12           THE COURT:  Right.  Okay.

13           THE WITNESS:  They have all the information that's

14   available about the inmate.

15           THE COURT:  Including all of the qualifications that

16   you didn't write down?

17           THE WITNESS:  That's right.

18           THE COURT:  How did they get those?

19           THE WITNESS:  They can look in the record.

20           THE COURT:  No.  You didn't write down the

21   qualifications that you are talking about now, that he could

22   understand brief -- Never mind.  I'm sorry.

23           THE WITNESS:  I understand what you are saying.

24   That's right.  I did not write that down.

25           THE COURT:  So he couldn't have known that, whoever

681

1  he or she was?

2          THE WITNESS:  That's right.

3  BY MS. RIFKIN:

4  Q.      Is it your opinion that when Inmate A didn't cuff up

5  after the custody officers ordered him to, he was being

6  willfully defiant?

7  A.      I guess I can't speak to his motive.

8  Q.      You said he should have been able to respond to an

9  order like that?

10          THE COURT:  He didn't say that.  It's the reasonable

11  implication from what's been testified, but he didn't say

12  that.

13  BY MS. RIFKIN:

14  Q.      Did you think he should have been able to respond to

15  an order to cuff up at that time?

16  A.      Yes.

17  Q.      You testified earlier this morning that you saw no

18  evidence of harm to Inmate A as a result of the cell

19  extraction; is that correct?

20  A.      That's correct.

21  Q.      Would you agree that subjecting, in your words, a

22  "clearly flagrantly psychotic patient" to a violent cell

23  extraction can exacerbate symptoms of mental illness?

24  A.      Yes.

25  Q.      Did you see evidence of that in Inmate A?

682

1    A.       Did I see evidence of that when in what?

2    Q.       Did you see evidence of exacerbation of Inmate A's

3    mental health systems following the cell extraction and

4    five-point restraints?

5    A.       He was flagrantly psychotic before he was cell

6    extracted.  He remained flagrantly psychotic after his cell

7    extraction.

8    Q.       Can subjecting a patient to that kind of violence

9    make him more paranoid if paranoia was one of his symptoms or

10   diagnoses?

11           MR. SHARMA:  Objection.  Calls for speculation.

12           THE COURT:  No.  That's his field -- purportedly his

13   field of expertise.

14           You may be seated.

15           You may answer.

16           THE WITNESS:  Yes.  It can exacerbate paranoid

17   ideation.

18   BY MS. RIFKIN:

19   Q.       Can you turn to page 229 of the exhibit in front of

20   you.

21           I'm sorry.  Page 184.  I'm sorry about that.

22   A.       Yes.

23   Q.       And this is an Interdisciplinary Treatment Team

24   Progress Note for the Crisis Bed Unit; is that right?

25   A.       That's right.

683

1    Q.      You're one of the doctors -- one of the members of

2    that Interdisciplinary Treatment Team?  You're listed in that

3    at number 1?

4    A.      That's right.

5    Q.      And this is dated July 31st, 2012?

6    A.      That's right.

7    Q.      And under Assessment there is a note that says:

8            (Reading:)

9            Says he's afraid we'll hurt him if he comes out to

10           see us.

11           (Reading concluded.)

12           Is that a description of a fear that Inmate A had

13   expressed to the treatment team?

14   A.      I'm sure that's accurate.

15   Q.      Okay.  If you can, turn to page 188.

16   A.      I have it here.

17   Q.      This is a note dated August 1st, 2012?

18   A.      Yes.

19   Q.      And there's a note:

20           (Reading:)

21           Inmate-patient reported:  I need you to order me some

22           more food.  Is it your desire to see me starve.  Why

23           did you come here today?  You want to see me get

24           killed.

25           (Reading concluded.)

684

1          That would be information that the inmate expressed
2     to the crisis bed team contact?
3     A.     I'm sorry.  Expressed what?
4          THE COURT:  That's what he said at this time as far
5     as you could tell as recorded in this note?
6          THE WITNESS:  Yes.  I mean, that's quoting him.
7          THE COURT:  Yeah.  But that's quoting him, and it
8     appears -- Well, okay.  Go ahead.
9     BY MS. RIFKIN:
10    Q.     You would agree that these are expressions about
11    Inmate A's fear, that if he comes out of the cell something
12    bad is going to happen to him?
13    A.     I agree.
14    Q.     Can you turn to page 229 of the exhibit in front of
15    you.
16         THE COURT:  I'm sorry.  What page?
17         MS. RIFKIN:  Page 229.
18         THE WITNESS:  I have it here.
19    BY MS. RIFKIN:
20    Q.     Okay.  This is a note dated August 20th, 2012.  This
21    note would be part -- this is part of Inmate A's medical
22    file; is that right?
23    A.     That's right.
24    Q.     And this note says that there's scarring on his left
25    wrist and left hand.

685

1          That's what's written at the bottom of the page; is

2     that correct?

3     A.      Yeah.  I agree that's what it says there.

4     Q.      If you can, turn to page 240 please.

5     A.      I have it here.

6     Q.      Okay.  This is a Health Care Services Request Form.

7          This is something that's completed by a patient who

8     wants medical attention; is that accurate?

9     A.      That's right.

10    Q.      This one is dated August 26th, 2012; is that right?

11    A.      That's correct.

12    Q.      And Inmate A wrote:

13         (Reading:)

14         Also my hand from my wrist is numb from handcuffs.

15         I still have the handcuff marks.  This happened about

16         one month from now.

17         (Reading concluded.)

18         Would you agree that Inmate A there is complaining

19    about pain in his hand and wrist from the handcuffs at the

20    time of the cell extraction, approximately one month before

21    that time?

22         MR. SHARMA:  Objection, Your Honor.  The document

23    speaks for itself.  There is no evidence that this witness

24    authored this document.

25         THE COURT:  He's being asked.

686

1          I take it that these documents are part of the team

2     analysis of whatever is happening at the time they make the

3     note, correct?

4               THE WITNESS:  That's right.

5               THE COURT:  And you're responsibility as head of --

6               THE WITNESS:  However, I was not caring for him at

7     that time.

8               THE COURT:  You were not?

9               THE WITNESS:  I was not.

10              THE COURT:  I see.

11              THE WITNESS:  He was discharged from the inpatient

12     service on August 14th.

13              THE COURT:  All right.  The objection now appears to

14     be well-taken.  I mean, the document speaks for itself and

15     you can argue it.  But this witness is not -- has no

16     connection with this particular entry apparently.

17          That's correct, you have no relationship to this

18     document at all?

19              THE WITNESS:  That's right.

20     BY MS. RIFKIN:

21     Q.      But Dr. Wagner, you testified earlier that you

22     reviewed medical records, including records for Inmate A

23     prior to his admission to the treatment unit and what

24     happened to him after the treatment unit in preparation for

25     today; isn't that correct?

687

1   A.      That's right.

2           THE COURT:  Didn't you review -- I'm sorry.

3           Did you review this particular document?

4           THE WITNESS:  I'm sure I saw it.  I'm not sure that I

5   read the whole thing.

6   BY MS. RIFKIN:

7   Q.      Were you given the entire file for Inmate A to

8   review?

9   A.      The best I know, yes.

10  Q.      Dr. Wagner, earlier this morning you testified about

11  what happens when you are interviewing an inmate-patient in

12  the Crisis Bed Unit and the inmate-patient is in the

13  treatment module or the cage and the inmate becomes agitated.

14          Do you recall that?

15  A.      That's not an example of this patient, but yes, I

16  recall that.

17  Q.      All right.

18          And you testified that at that point your usual

19  practice is you leave and the custody staff takes over and

20  deescalates the situation; is that accurate?

21  A.      Accurate.

22  Q.      Are you trained in clinical deescalation techniques?

23  A.      Not specifically.

24  Q.      And I think you testified earlier that you have been

25  a treating clinician in the Corcoran Crisis Bed Unit for five

688

1   and a half years; is that right?

2   A.      Five years.

3   Q.      Five years.

4           In your review of the medical files for Inmate A, or

5   in your independent knowledge of Inmate A, are you aware of

6   what happened when to him as far as his mental illness when

7   he was discharged from the Crisis Bed Unit back to the EOP

8   Ad. Seg. Unit in August 2012?

9   A.      I don't understand the question.

10  Q.      I'm sorry.

11          Let's go to page 120 of the document in front of you.

12          So the note dated -- this page is Interdisciplinary

13  Progress Notes.  These are notes made by clinicians as they

14  would interact or assess with Inmate A; is that accurate?

15  A.      That's correct.

16  Q.      While he was in the Crisis Bed Unit; is that correct?

17  A.      Correct.

18  Q.      And July 15th there is a note.  And it's from --

19          THE COURT:  July 15th?

20          MS. RIFKIN:  15th.

21          THE COURT:  I'm in the wrong place.  What page?

22          MS. RIFKIN:  Page 120.

23          THE COURT:  Okay.  Page 120.

24  BY MS. RIFKIN:

25  Q.      There's a note from a different clinician on July

689

1  15th, 2012, who saw Inmate A.  And under D -- I'm sorry.  Is

2  that a "P" for "Plan"; is that right?

3  A.      I'm sorry?

4  Q.      There's S-O-A-P-E.  Then under the note for July

5  15th, 2012, there is -- that is a "P"; is that right?

6  A.      That's right.

7  Q.      That's for "Plan"?

8  A.      Yes.

9  Q.      And it says:

10         (Reading:)

11         Continue treatment.  He's not taking prescribed

12         medications and his functioning seems impaired at

13         Mental Health Crisis Bed level of care.

14         (Reading concluded.)

15         Is that accurate?

16  A.      That's right.

17  Q.      And when you -- then the next note is July 16th, and

18  that's your note; is that right?

19  A.      That's right.

20  Q.      And you would have reviewed the previous clinician's

21  note from July 15th at that point?

22  A.      I usually do.

23  Q.      And you note there on July 16th, 2012, that you

24  will -- actually, can you go ahead read that note, please?

25  A.      (Reading:)

690

```
 1              Refused to exit cell for interviews.  Remained
 2              motionless in his cell.  No response to knocking and
 3              yelling.  Cell neat.  Not showering.  Clearly very
 4              psychotic, but refusing medication.  No acute
 5              requirement for meds.  Will consider options.
 6              (Reading concluded.)
 7    Q.       And at that point, July 16th, Inmate A had been in
 8    the crisis bed for 16 days; is that accurate?
 9    A.       That's accurate.
10    Q.       But you testified earlier that you didn't consider
11    the option of referring him to inpatient psychiatric
12    hospitalization at the Department of State Hospitals; is that
13    accurate?
14    A.       That we didn't?  No.  No.
15             Referral to state hospitals is always in the -- it's
16    always a consideration for every patient that we see.
17    Q.       But you decided not to refer him?
18    A.       That's right.
19    Q.       Are you aware that -- Let me reframe.
20             Isn't it accurate that after Inmate A was discharged
21    back to the EOP Unit at Corcoran, he once again decompensated
22    and became suicidal?
23    A.       I was not aware of that specifically.
24    Q.       Is it accurate he was eventually referred by the
25    psychiatrist in the EOP Unit to the Department of State
```

691

1    Hospitals for inpatient psychiatric hospitalization?

2    A.        That's accurate.

3    Q.        And he was eventually admitted to the ICF Care

4    Program at Salinas Valley in November; is that accurate?

5    A.        I was not aware of which one he was referred to, but

6    I wouldn't argue with the referral.

7    Q.        And it's correct he was ultimately admitted to the

8    unit in November, more than four months after he was admitted

9    to your Crisis Bed Unit in July?

10   A.        I don't know.

11   Q.        Are you aware that Inmate A was assessed as doing

12   very well in the Inpatient Psychiatric Hospitalization

13   Program?

14   A.        He was assessed as doing very well in the inpatient

15   program?

16   Q.        Is that accurate?

17   A.        I don't know.  I don't have that information.  I did

18   not review the records from the state hospital.

19   Q.        But you reviewed Inmate A's medical file?

20            MR. SHARMA:  Objection, Your Honor.  Asked and

21   answered.

22            THE COURT:  I'm sorry.

23            MS. RIFKIN:  I'll move on, Your Honor.

24            THE COURT:  All right.

25   ///

692

BY MS. RIFKIN:

Q.     If you can, turn to page 284 of the document in front of you.

A.     Yes.

Q.     This is a Discharge Summary that is provided by the DSH back to CDCR when DSH discharges an inmate-patient back to CDCR; is that right?

       MR. SHARMA:  Objection, Your Honor.  Lack of foundation as to this particular page and this particular document.

       THE COURT:  Well, I mean, there are two sides to that.  On the one hand I assume that he's not treating the patient.  On the other hand he's testified that he's reviewed the file.

       When you reviewed the file, did you get this far, Doctor?

       THE WITNESS:  Yes, it was in the file.  Yes.

       THE COURT:  All right.

       MS. RIFKIN:  Your Honor, Dr. Wagner testified this morning that he saw that Inmate A was not harmed by the --

       THE COURT:  You may proceed.  Don't argue with me.

       MS. RIFKIN:  Okay.

BY MS. RIFKIN:

Q.     If you can, turn to page 287, which is page 4 of the Discharge Summary.

693

1    A.      Yes.

2    Q.      If you could, read the third -- or second complete

3    paragraph on the page, "Patient had positive"?

4    A.      (Reading:)

5            Patient had positive participation and attendance

6            in his groups.  He demonstrated no significant

7            behavioral problems since he transferred to the DMH

8            Salinas Valley Program.  Patient was compliant with

9            recommended treatment, including medications and lab

10           work and other diagnostic work ups.  He was routinely

11           monitored for medication side effects and response to

12           treatment.  Dosage adjustments were made as needed.

13           Education on medication prescribed, indications,

14           risks versus benefits, and treatment options were

15           discussed in IDTs and at the time of other

16           interactions with patient.

17           (Reading concluded.)

18   Q.      Reading that note as a CDCR psychiatrist, would you

19   agree that that note indicates that Inmate A did quite well

20   in the inpatient care at Salinas Valley?

21   A.      I have that impression, yes.

22   Q.      If you can, turn to page 281.

23           THE COURT:  You want to go back to 281?

24           MS. RIFKIN:  Yes.

25           THE WITNESS:  I have it here.

694

BY MS. RIFKIN:

Q.     This is the Individualized Treatment Plan for Salinas
Valley.  It says:

         (Reading:)

         Discharge process will begin several weeks prior to
         the parole date.

         (Reading concluded.)

         Is that consistent with your understanding that
patients are discharged from the Department of State
Hospitals back to CDCR facilities in advance of their parole
dates?

         MR. SHARMA:  Objection, Your Honor, both as to
relevance and outside the scope of direct.

         THE COURT:  Well, the problem is the witness's
judgment that it makes no -- it had no long-term effect.

         It is not clear to me, however, counsel, what this
comment has to do with the issues in the case.

         What does it have to do, from this witness's point of
view?

         MS. RIFKIN:  Inmate A paroled in February 2013.  He
had to be released back from inpatient care in advance of
that parole date.  But he didn't get to inpatient care until
November 2012 because he wasn't referred for months.

         And this case is about -- I mean, this is about the
clinical response or the custodial response to people in

695

1    acute mental distress.

2         THE COURT:  Well, do you have experience or knowledge

3    sufficient to answer the question about whether this is the

4    routine process, Doctor?

5         THE WITNESS:  No, I don't have any knowledge or

6    experience with that.

7         THE COURT:  All right.

8         MS. RIFKIN:  No more questions.

9         THE COURT:  Redirect?

10        MR. SHARMA:  Yes, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MR. SHARMA:

13   Q.    Good afternoon, Doctor.

14   A.    Good afternoon.

15   Q.    I want to briefly just discuss, I believe, what's the

16   GAF, which I apologize if I got it wrong, is the Global

17   Assessment.  I don't recall what F stands for?

18   A.    Functioning.

19   Q.    Global Assessment Functioning.

20         And Doctor, is it possible for a person --

21         THE COURT:  Anything is possible.

22         MR. SHARMA:  I apologize, Your Honor.

23   BY MR. SHARMA:

24   Q.    Actually --

25         THE COURT:  Is it likely?  Is it conventionally

696

1    understood?

2          What do you want to ask?

3          MR. SHARMA:  That's the question.

4          Thank you, Your Honor.

5    BY MR. SHARMA:

6    Q.    Is it likely or conventionally understood that a

7    patient can still be functional --

8          MR. SHARMA:  Actually, I'm going to withdraw the

9    question, Your Honor, if I may.

10         THE COURT:  Sure.

11         MR. SHARMA:  Thank you.

12   BY MR. SHARMA:

13   Q.    Doctor, I just want to refer you in Plaintiffs'

14   Exhibit that you have been going through, the stack of

15   papers, if I could briefly refer you to page 289.

16   A.    Yes.

17         MR. SHARMA:  Your Honor, if you can let me know.

18         THE COURT:  Go ahead.

19         MR. SHARMA:  Thank you.

20   BY MR. SHARMA:

21   Q.    Turning to the line that states Mental Status At

22   Release, could you just read the next line down from there

23   starting with "General"?

24   A.    (Reading:)

25         General Appearance, Attitude, Cooperation:

697

1          Cooperative adequately groomed, good eye contact.

2          (Reading concluded.)

3    Q.     Doctor, if we could then turn to the heading titled

4    DSM IV DIAGNOSES.

5          If you could, read the sentence under that heading

6    for Axis V?

7    A.     Axis V GAF score is 28.

8    Q.     So then, Doctor, my question would be that

9    considering the GAF score that's shown on this document, is

10   it surprising, from a clinical perspective, that the patient

11   would have, as shown in the document, been cooperative,

12   adequately groomed, have good eye contact?

13   A.     You are saying is that GAF consistent with the mental

14   status examination; is that what you are saying?

15   Q.     That is what I'm asking, yes.

16   A.     It can be.

17   Q.     Thank you.

18          Doctor, I think you can put away those pages now.

19   A.     Thank you.

20   Q.     Thank you.

21          Doctor, you testified that after the inmate -- or

22   Inmate-patient A was extracted on July 24th he was placed

23   into five-point restraints?

24   A.     Yes.

25   Q.     I believe you just, you know, during

698

1    cross-examination went over your notes regarding those

2    five-point restraints?

3    A.        That's right.

4    Q.        And I believe one of the criteria that you were

5    asking for in those notes was that the patient acknowledge

6    the behavior that led to the cell extraction?

7    A.        That's right.

8    Q.        Could you please explain for the court, and for

9    myself as a layperson, why that's important?

10   A.        The inmate can very frequently have erroneous ideas

11   about what happened and why the treating people intervened in

12   his behavior.  So if he can acknowledge that, then that's a

13   very great step toward his insight, number one.  But in the

14   instance here, it's also a step in the direction of safety in

15   releasing him from restraints.

16   Q.        And Dr. Wagner, I believe you previously testified

17   that at the time you determined Inmate A needed to go on

18   involuntary medication, you believed that if he had not been

19   placed on involuntary medication he could possibly die; is

20   that correct?

21   A.        Yes.

22   Q.        And Dr. Wagner, when you made the decision to retain

23   the inmate on five-point restraints, what were your concerns

24   about what might happen if he was released from those

25   five-point restraints?

699

1   A.      As stated in my records that are in the chart, I was

2   concerned about his recurrent behavior which resulted in the

3   very difficult and complicated, and in my view, somewhat

4   dangerous cell extraction.

5   Q.      Thank you, Dr. Wagner.

6           Dr. Wagner, when you made the decision to retain

7   Inmate A in five-point restraints, was that done to punish

8   him?

9   A.      No.

10  Q.      And was it done for the convenience of staff?

11  A.      No.

12  Q.      Thank you.

13          Dr. Wagner, I do want to discuss, I believe without

14  having to refer back to the notes, that the notes showed that

15  you saw the inmate, I guess, roughly four hours after he had

16  been extracted from the cell.

17          Is that correct?

18  A.      That's correct.

19  Q.      And at that time that you saw the inmate, did you

20  observe any OC spray on his body?

21          THE COURT:  Did you look?

22          Let's start with that.

23          MR. SHARMA:  Yes.

24          THE WITNESS:  Yes.  I saw his whole body.  His

25  genitals were covered up at that time, but I could see his

700

1    body.

2            THE COURT:  The question is whether or not you saw OC

3    spray on his body four hours afterwards?

4            THE WITNESS:  I don't remember exactly.  I mean, I

5    saw him almost immediately after he was placed in restraints,

6    and then I saw him four hours later.

7            I don't actually have a recollection of the status of

8    his body at that time.

9    BY MR. SHARMA:

10   Q.      Did you observe, from a clinical perspective, any

11   signs of distress from the inmate-patient that would

12   indicate --

13           THE COURT:  He was in five-point --

14           MR. SHARMA:  Your Honor, if --

15           THE COURT:  Ask your question.

16   BY MR. SHARMA:

17   Q.      -- that would indicate he was suffering the effects

18   of OC spray at that time?

19   A.      No.  There were no indications that he was suffering

20   from the effects of the spray.

21   Q.      And did the patient express to you at that time,

22   again four hours after, that he was still suffering from some

23   side effect or some ill effect from the OC spray?

24   A.      No.

25   Q.      Thank you.

701

1              Doctor, I want to -- Sorry.

2              I believe that you have testified, and there have

3    been some documents introduced, that demonstrate at some

4    point in July that yourself and the other members of the

5    treatment team determined that the inmate-patient should be

6    discharged from the Mental Health Crisis Bed.

7              Is that correct?

8    A.      That's right.

9    Q.      And there's also been testimony that decision to

10   discharge was eventually rescinded?

11   A.      That's right.

12   Q.      Could you please explain why it was rescinded?

13   A.      Because of a deterioration in his functioning level.

14   Q.      And perhaps -- I apologize.  I should have asked this

15   first.

16             Could you please explain why yourself and the other

17   treatment team thought it was appropriate to discharge the

18   patient at that time?

19   A.      When he entered, he was in a psychotic state.

20   However, he did not present information that would qualify

21   him for involuntary medications.  He consistently refused

22   medications, and at that point it seemed he was fundamentally

23   stable for the time he was in the inpatient unit.

24             So discharge to a treatment program with a high

25   degree of clinical follow up would be appropriate in a

702

1   person -- even though they weren't functioning in a

2   non-psychotic way would be appropriate.

3   Q.      Thank you, doctor.

4           Doctor, again, if you could explain for the court,

5   and for myself as a layperson, what is the level of care

6   provided at the Mental Health Crisis Bed level, I guess in

7   terms of if there is gradient of inpatient care, hospital

8   care, what kind of care is provided in the Mental Health

9   Crisis Bed?

10  A.      It is a very, very high level of care.

11  Q.      If we're comparing it to, say, the community setting

12  outside of prison, is there a type of care that would be

13  higher than the Mental Health Crisis Bed that you can think

14  of?

15          THE COURT:  Hang on.

16          THE WITNESS:  No.

17          MS. RIFKIN:  Objection.  Beyond the scope of cross.

18          THE COURT:  The answer will stand.  You may proceed.

19          MR. SHARMA:  Thank you.

20  BY MR. SHARMA:

21  Q.      Doctor, I believe there was also -- you also

22  testified that a decision was made to not refer the patient

23  to DSH care during July when you were treating the patient.

24          Is that correct?

25  A.      That's right.

703

1   Q.      Can you explain why that decision was made?

2   A.      In the first instance, that is before his discharge,

3   he seemed to be stable.  And referring him to DSH would not

4   have been helpful to him, that is there was nothing for DSH

5   to do.

6           He was resistant to taking medications.  He had not

7   demonstrated criteria that would qualify for an involuntary

8   medication.  So in that instance, there was no reason in my

9   opinion to refer him to DSH.

10  Q.      Thank you.

11          And Doctor, if I could ask you a few questions about

12  the treatment after -- you testified that the inmate was

13  placed on involuntary medications after the cell extraction,

14  correct?

15  A.      That's right.

16  Q.      And could you just testify generally as to the status

17  of his mental health after he was placed on this involuntary

18  medication?

19  A.      It improved.  Clearly it improved steadily after

20  that.

21  Q.      And during that improvement period, did the

22  inmate-patient ever agree to come out of the cell to meet

23  with the treatment team?

24  A.      Yes.  He came out regularly.

25          MR. SHARMA:  A brief moment, Your Honor.

704

1              (Counsel confers with cocounsel.)

2    BY MR. SHARMA:

3    Q.      Doctor, I'd ask you to turn to Plaintiffs' Exhibit.

4    It's the Mental Health Services Program Guide.  I apologize

5    if I'm incorrect.  I believe it was 1200.

6              THE COURT:  Madam Clerk?

7              MR. SHARMA:  Sorry.  I believe it was Plaintiffs'

8    Exhibit 1200.

9    BY MR. SHARMA:

10   Q.      Doctor, if you could, turn to page number 12-5-1.

11             THE COURT:  May I have the exhibit?

12             THE WITNESS:  Yes.

13   BY MR. SHARMA:

14   Q.      Doctor, looking at the third paragraph on the page,

15   starting with "The MHCB"?

16   A.      Yes.

17   Q.      Could you please read that sentence and the next

18   sentence?

19   A.      (Reading:)

20             The MHCB has a length of stay up to ten days.  The

21             chief psychiatrist or designee must approve

22             exceptions to the length of stay.

23             (Reading concluded.)

24   Q.      And Doctor, is that statement consistent with your

25   understanding of how you're to treat patients in the Mental

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

705

1    Health Crisis Bed setting?

2    A.    Yes.

3         MR. SHARMA:  Nothing further at this, time Your

4    Honor.

5         THE COURT:  Recross?

6         MS. RIFKIN:  No further questions, Your Honor.

7         THE COURT:  Doctor, one thing.  The chief

8    psychiatrist or his designee must approve exceptions to

9    length of stay.

10        Did that happen?

11        THE WITNESS:  I would have been the designee at that

12   point.

13        THE COURT:  Is that -- I mean, were you appointed the

14   designee or just that's the way the system worked?

15        THE WITNESS:  That's the way the system works.

16        THE COURT:  Okay.  So you can be a designee without

17   being designated?

18        THE WITNESS:  I guess you could say that.  I was

19   never officially designated that.

20        THE COURT:  I understand.

21        My questions invite questions of counsel?

22        MR. SHARMA:  No, Your Honor.

23        MS. RIFKIN:  No, Your Honor.

24        THE COURT:  May the witness be released?

25        MR. SHARMA:  Yes, Your Honor.

706

1          MS. RIFKIN:  Yes, Your Honor.

2          THE COURT:  Thank you, sir.

3          You may step down, sir.  You are free to go or stay,

4     as you choose.

5          I think we'll take our afternoon recess, then we'll

6     proceed after that.

7          (Off the record at 2:55 p.m.)

8          (Back on the record at 3:11 p.m.)

9          THE CLERK:  Please, remain seated.

10         Court is now in session.

11         THE COURT:  Call your next witness, sir.

12         MR. RUSSELL:  Good afternoon, Your Honor.  Defendants

13    call Dr. John Lindgren.

14         THE COURT:  Come around and be sworn, sir.

15         THE CLERK:  Raise your right hand.

16                     JOHN LINDGREN,

17    was thereupon called as a witness herein by the Defendant,

18    and having been sworn to tell the truth, the whole truth and

19    nothing but the truth, was thereupon examined and testified

20    as follows:

21         THE CLERK:  Please, take a seat.

22         State your name, spell your last and speak directly

23    into the microphone.

24         THE WITNESS:  John Lindgren, L-i-n-d-g-r-e-n.

25    ///

707

1                            DIRECT EXAMINATION

2    BY MR. RUSSELL:

3    Q.       Good afternoon, Doctor.

4             Doctor, are you a psychiatrist?

5    A.       Yes.

6    Q.       And are you a board-certified psychiatrist?

7    A.       Yes.

8    Q.       Can you tell us where you were educated?

9    A.       I did my medical school at the University of Virginia

10   in Charlottesville.  I did my psychiatry training at the

11   University of North Carolina in Chapel Hill.  And then I also

12   did a two-year psychopharmacology research fellowship at UNC

13   Chapel Hill.

14   Q.       What is your present employment?

15   A.       I work for CDCR, and I currently occupy the Senior

16   Psychiatrist Specialist position in Elk Grove.

17   Q.       Briefly, what are your responsibilities as a senior

18   psychiatrist in Elk Grove?

19   A.       I support recruitment and hiring and retention.  I

20   also have a focus on quality management.  And I also sit on a

21   variety of committees such as peer review and other

22   committees.  And I also provide some support and consultation

23   to the institutions.

24   Q.       Before doing that, were you working at a CDCR

25   institution?

708

1    A.      Yes.  I worked at CHCF Stockton.

2    Q.      That's the new healthcare facility?

3    A.      Yes.

4    Q.      How long were you there?

5    A.      I joined that team in October 2012 and worked there

6    until October 13, 2013.

7    Q.      So you've just recently been in your new position?

8    A.      Yes.

9    Q.      What were you doing, in a general sense, out at the

10   Stockton facility?

11   A.      I was the chief psychiatrist.  And I was part of the

12   activation team that wrote policies and recruited and hired

13   staff.

14           And also I then directed psychiatric care there

15   starting in July of this year when we received our first

16   patients.

17   Q.      Before you worked at the new Stockton facility, what

18   were you doing?

19   A.      Just prior I worked as the chief psychiatrist for

20   Parole Outpatient Clinic.  And prior to that I worked as a

21   staff psychiatrist for Parole Outpatient Clinic.

22   Q.      As the staff psychiatrist for the Parole Outpatient

23   Clinic, what did you do?

24   A.      I provided psychiatric care to parolees.

25   Q.      And how long did you do that?

709

1    A.        For approximately four and a half years.  And I might

2    also add that even after I took on some of the chief

3    psychiatrist responsibilities at Parole Outpatient Clinic, I

4    continued to see patients in that role.

5    Q.        And during that time, when you were both the staff

6    psychiatrist and the chief psychiatrist, how many patients do

7    you think that you treated?

8    A.        I roughly had probably 4000 patient encounters or

9    contacts.  And some of those were follow-up appointments.  So

10   I probably saw approximately 1200 patients total over four or

11   four and a half years.

12   Q.        And these are all patients who had completed a term

13   in a CDCR prison; is that correct?

14   A.        Yes.

15   Q.        Given your experience in working with inmates or

16   inmate-patients who have been released from prison, does the

17   use of force or use of force incidents in prison cause

18   significant lasting injury to these patients' mental health

19   conditions?

20   A.        No.

21   Q.        And can you explain your answer?

22        MS. RIFKIN:  Objection, Your Honor.  There has been

23   no foundation established for this witness to give these

24   opinions.

25        THE COURT:  The problem is these are all

710

1    psychiatrists, and particularly if he's in parole, he's got

2    to be concerned with whether -- well, let me -- I suppose I'm

3    just assuming something.

4         Would one of your responsibilities be, either as a

5    supervising psychiatrist or as a treating psychiatrist,

6    whether or not their experiences in prison exacerbated their

7    psychiatrist condition?  Would that be something you are

8    concerned with?

9         THE WITNESS:  Yes.

10        THE COURT:  You may answer that question.

11        I think you answered the question before the

12   objection.

13        The objection is overruled.

14        You may proceed.

15   BY MR. RUSSELL:

16   Q.    Dr. Lindgren, on what do you base that statement,

17   that use of force incidents do not exacerbate mental health

18   conditions?

19        THE COURT:  I mean, before you answer that question,

20   they never exacerbate; is that your testimony?

21        THE WITNESS:  I think they never exacerbate.

22        THE COURT:  Okay.  You may answer the question.

23        THE WITNESS:  So my answer would be based on the

24   patients that I saw in Parole Outpatient Clinic.  So I

25   followed these patients, some of them, for years.  I spoke to

711

1    them about their stressors.  They describe to me both

2    current, recent and remote stressors.

3          And they -- the patients that I treated represented

4    the full spectrum of inmates within our prison system.  So,

5    in other words, this included patients that were perhaps

6    suffering from serious, chronic psychiatric conditions, and

7    the range also included patients who might have had very

8    minor psychiatric conditions or minor symptoms but were very

9    much dangerous and violent or exhibited violence and had

10   convictions because of their violence previously, such as

11   folks with gang affiliations.

12         So I treated a whole spectrum of patients that was, I

13   think, a large number of patients, and I think an accurate

14   representation of the patients in our prisons.

15         And I met with some of these patients many, many

16   times over the course of their treatment in parole.  And they

17   describe to me many times stressors that might have occurred

18   to them either that week or last year or 20 years ago.  And

19   no patient ever mentioned this to me.

20         Additionally, I would -- I also think that the

21   literature or the science also supports this conclusion.

22   Folks with very chronic mental illness, such as

23   schizophrenia, they have memory deficits.  And folks that

24   study memory, they break memory into different types of

25   memory.

712

1          Amongst those schizophrenia folks or schizoaffective

2     folks, these people that have very chronic and recurring

3     psychotic symptoms or problems, they have deficits in what is

4     called episodic memory and autobiographical memory and

5     working memory.

6     Q.     Let me stop you there, Doctor.

7          When you say deficits in autobiographical memory,

8     what are you saying as a layperson, that they can't remember

9     things?

10    A.     It means compared to an average person or a

11    population of average folks, they remember episodes that they

12    witness or they remember episodes about themselves slightly

13    less well than average.

14         And certainly I, in my experience, both treating

15    parolees and then also I have worked in other settings, such

16    as state hospitals in other states, and dealt with this

17    population for many years, upwards of 19 or 20 years, and

18    many times folks during a psychotic episode will not have

19    good recollection for what occurred or what they did during

20    their psychosis.

21         THE COURT:  I'm not quite certain that I understand

22    what you are saying.

23         It seems, I would assume -- but if I'm wrong please

24    tell me, it is okay -- that what a person remembers and talks

25    about to his psychiatrist -- change that -- what a person

713

1    talks about to the psychiatrist and what actually happened

2    and what he might remember but not articulate could be two

3    different things.

4            Is that right?

5            THE WITNESS:  Could you restate that?

6            THE COURT:  Sure.  I'm not sure I am right.

7            People remember things and talk about them, but those

8    aren't the only things they remember.  There may be things

9    that they remember -- that they remember in a fashion, as an

10   example, that they don't talk about, not because they don't

11   remember them, but because they don't talk about them for a

12   variety of reasons.

13           True?

14           THE WITNESS:  Yes.

15           THE COURT:  And to say that a schizophrenic has

16   memory retention problems, I would assume, is different than

17   saying they're able to articulate those memories that they

18   find distressing; is that right?

19           THE WITNESS:  Yes.

20           THE COURT:  All right.  You may proceed.

21   BY MR. RUSSELL:

22   Q.    Let me stop you there.  I want to back up a little

23   bit.

24           Given your knowledge of in-prison care, were there

25   various levels of inmates that you were treating when you

714

1    were working in the Parole Unit?

2    A.      Yes.

3    Q.      What were those -- what were the levels of care of

4    the parolees that you were treating?

5    A.      All right.  So when an inmate-patient paroled, then

6    they carried with them their mental health designation of

7    either CCCMS or EOP.

8            And certainly some of those folks during their

9    incarceration would spend time in Mental Health Crisis Beds

10   or in other levels of care.  But when they came to parole, we

11   still had some access to their care or notes or summaries of

12   those.  And we were paying attention to the fact that these

13   folks had either an EOP or CCC designation.

14   Q.      What significance did that have for you in treating

15   those folks?

16   A.      For us it, generally speaking, helped guide our

17   treatment with regard to frequency of contact.  But we did

18   have to tailor things to the individual because sometimes a

19   person would come to us with an EOP designation, but they

20   might actually be quite stable and doing well, perhaps

21   because they were compliant with their medications.

22           They may have had an EOP designation because they

23   were on more than one medication, or they may have had an EOP

24   designation because they had previously had severe

25   psychiatric symptoms.

715

1          And then we would also treat folks that are CCC

2    designation.  And sometimes those folks, even though they had

3    a CCC designation, would require more frequent appointments,

4    which we would give them.

5          So we would follow the EOP and CCC designation to

6    guide us to help us determine how frequently to see them,

7    especially in the beginning, coupled with our initial

8    evaluation, but we would also try and tailor things to the

9    patient's needs.

10   Q.    So when you were doing this work, again in

11   layperson's terms, which is what I understand, what was the

12   goal of your treatment?

13         What were you trying to do for those inmates whether

14   they were had an EOP designation or CCCMS designation?

15         MS. RIFKIN:  Objection, Your Honor.  Relevance to

16   this motion.

17         THE COURT:  Overruled.  You may answer.

18         THE WITNESS:  We were trying to -- POC tries to

19   provide whatever mental health care is needed for the

20   parolee, trying to minimize symptoms and improve their

21   function.

22         THE COURT:  Did you have a copy of their medical

23   records after they had been released, that is the records

24   that would have been accumulated while they were in prison?

25         THE WITNESS:  Sometimes yes and sometimes no.  We

716

1    always had summaries, and then we often would request the

2    medical record.

3    BY MR. RUSSELL:

4    Q.      You earlier talked about, I think you call it, the

5    stressors that they would describe, whether it was something

6    that happened the week before or 20 years earlier.

7           Can you describe a little bit more of what you are

8    talking about?

9    A.      You know, sometimes people had been the victim of

10   violence.  Sometimes people had certain family stressors that

11   weighed on them.  Sometimes they had losses that they had

12   suffered, either recently or in the distant past.  Sometimes

13   they described losses and restrictions related to their legal

14   entanglements.  Just a variety.

15   Q.      And what was the point of talking about these

16   stressors?

17   A.      Part of it was to allow the person to give us as much

18   information as possible and tell us what they think was

19   important and what we should focus on.  And it helped us

20   guide treatment, myself, as a psychiatrist, and also

21   clinicians, such as psychologists and social workers, who

22   might be meeting with the patient solely for psychotherapy

23   reasons.

24          So I think this would be, you know, common in any

25   sort of mental health setting where you're trying to get the

717

1    entire picture and discover what is important to the patient

2    and discover what is possibly contributing to their problems.

3    Q.     So in doing this you would rely upon things that they

4    would tell you.

5          Would you also try to draw out information from them

6    to determine what stressors there might be?

7    A.     Yes.

8    Q.     And in doing that was there ever an instance in which

9    a patient related to you that having been exposed to pepper

10    spray while in prison was a stressor?

11    A.     No, they never did.

12    Q.     Is there any evidence to suggest that the use of

13    pepper spray causes any kind of organic brain damage?

14    A.     No scientific evidence.

15    Q.     Is there any scientific evidence to suggest that a

16    use of force incident that doesn't involve -- that doesn't

17    involve a head or brain injury causes long-term mental health

18    problems?

19    A.     No evidence.

20          MS. RIFKIN:  Objection.  Lack of foundation.

21          THE COURT:  No.  He's now asking him whether the

22    witness has sufficient knowledge to answer the question.

23    That's the implication and the answer stands.

24          I'll have to evaluate how seriously -- how much

25    weight to give to it, but the answer stands.

718

1          You may proceed.

2    BY MR. RUSSELL:

3    Q.      During this trial we've talked -- we've heard

4    something talked about recurrent psychotic episodes.

5          Is it -- again, based upon your experience, have

6    inmates -- or former inmates and now parolee patients related

7    to you, or did you -- Well, strike that.

8          Based on your experience did you observe what you

9    would describe to be recurrent psychotic episodes in your

10   patients that were related to use of force incidents?

11   A.      No psychotic symptoms or psychotic episodes in my

12   patients were related to use of force incidents.

13          THE COURT:  In your view it would never be so?

14          THE WITNESS:  No.  It would never be so.

15          THE COURT:  Doesn't matter how severe?

16          THE WITNESS:  I'm certainly paying most attention to

17   the topic of cell extraction which may include use of OC

18   spray.

19          THE COURT:  It wouldn't matter that somebody who was

20   incapable of responding to a command to "cuff up" was just

21   repeatedly exposed over and over again to OC spray until

22   somebody finally figured out, "Gee, this isn't getting us

23   anywhere," and then they go in and get him, you wouldn't

24   regard that as having any long-term effect?

25          THE WITNESS:  No.  In fact, I think that -- I think

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

719

1    that the alternative is to that, which I have witnessed in

2    other settings such as state hospitals, which is running into

3    the room with several people to have a physical altercation

4    which could accidentally cause an injury that might be a

5    permanent physical injury to a patient.  And that, I think,

6    would be definitely bad.

7            THE COURT:  Of course it is bad.

8            THE WITNESS:  Or possibly I meant lasting.  So I

9    think that as you described trying to extract someone, and

10   then the person not complying and using OC spray, is a much

11   preferred alternative to risking injury -- physical injury to

12   the patient.

13           THE COURT:  Even though it becomes evident that the

14   use of the OC spray is having no effect on getting the guy

15   out?

16           THE WITNESS:  Right.

17           THE COURT:  Keep on doing it?

18           THE WITNESS:  I think that, you know, I would have

19   to -- I would have to -- I couldn't say a sweeping, sweeping

20   conclusion, but I would say that the scientific evidence also

21   concludes that folks with primary thought disorders, like

22   schizophrenia and schizoaffective disorder, have a higher

23   than average threshold for pain or noxious stimuli.

24           This has been shown in data as recently as 45 years

25   ago.  And it has even been shown in the data that relatives

720

1  of folks with schizophrenia, these relatives have a higher

2  than average threshold for pain.

3      THE COURT:  So it doesn't matter if you're inflicting

4  pain because they just have a higher ability to resist and

5  therefore it is okay?

6      THE WITNESS:  I don't think -- I wouldn't say that it

7  is okay, but I would say that there might be -- I simply

8  offer this because sometimes a person -- we might see the use

9  of OC spray one time and the person might have a reaction

10  that is quite immediate.  And they might then be motivated to

11  immediately comply.  But there might be some -- and again I'm

12  not making sweeping statements -- but there might be

13  sometimes --

14      THE COURT:  It sounds like you are making sweeping

15  statements.  That's all right.  Go ahead.

16      THE WITNESS:  I just meant maybe not in 100 percent

17  of the time.  I just meant that there are times when we hear

18  of schizophrenic patients having a higher threshold for

19  noxious stimuli.

20      THE COURT:  I'm going to ask again because I want to

21  know whether you think this is appropriate.

22      Well, there are two questions.  Whether it is

23  appropriate, and two, whether it is long-lasting -- or

24  permanent or whatever or even temporarily exacerbating.

25      Let me ask you that.  Maybe I don't know.  Not only

721

1    maybe, I don't know.

2         People can have -- persons with serious mental

3    illnesses can have events which are exacerbating, but is it

4    your testimony that they nonetheless, at least as to some

5    people, it will not have a lasting effect?

6         THE WITNESS:  Yes.  That's my --

7         THE COURT:  But is it also your testimony, I think,

8    that they'll have exacerbated responses to things that are

9    happening to them, but they will never be long-term?

10         THE WITNESS:  In my experience -- I've not heard of

11    any long-term consequences in my experience.

12         THE COURT:  You may proceed, sir.

13    BY MR. RUSSELL:

14    Q.    Let's talk a little bit about what I think you were

15    discussing with regard to hands-on use of force.

16         What are the risks to long-term mental health in a

17    situation where hands-on use of force is being used in a cell

18    extraction?

19    A.    So if the only option is to have several people run

20    into the room or the cell to try and physically restrain

21    someone, then relative to other options or choices that would

22    have the highest risk of possible accidental injury to the

23    patient.

24         And myself, having worked in a state hospital where

25    that was occasionally done if the patient was uncooperative

722

1    or agitated, I have seen instances when a patient would be

2    accidentally injured or a staff person might be accidentally

3    injured or perhaps the -- I have seen when the patient was

4    successful at purposely targeting a staff person and injuring

5    a staff person.

6    Q.      In your experience what can be the consequences of

7    this kind of a physical injury to long-term mental health?

8    A.      I didn't follow those patients long-term, but I can

9    say that with all -- with many psychiatric patients, if they

10   have a permanent physical injury or ailment or permanent

11   pain, it can be something that they are bothered by and

12   preoccupied with.

13          So I can say that, based on my experience with this

14   patient population, having a permanent physical injury can be

15   unnerving for them, and they can be come preoccupied with

16   it.

17   Q.      There's also been testimony about the precautions

18   that are used when the cell extractions have taken place in

19   prison, and we've earlier talked about the stressors related

20   to you or that you have drawn out from the patients.

21          In your experience do patients suffer long-term

22   mental health effects from the precautions that are used by

23   staff such as protective clothing or face masks?

24   A.      I've seen no evidence.

25   Q.      And would you -- would this be the kind of stressor

723

1    that would be related to you or that you would seek to draw

2    out from a patient to try to determine if it were a long-term

3    or a long-lasting mental health problem?

4           THE COURT:  The objection that it is leading and

5    suggestive is sustained.

6           Try again, Mr. Jenkins (sic).

7           Have you seen any evidence relating to the long-term

8    effective of such matters.

9           THE WITNESS:  No.  I have never seen any evidence of

10   the long-term effect of the protective clothing worn.

11   BY MR. RUSSELL:

12   Q.    Have you had -- is there any positive effect to

13   that -- to the protective clothing or face masks being used?

14          MS. RIFKIN:  Objection.  Leading.

15          THE COURT:  Is there any effect one way or another of

16   people going in with gas masks that cover their face and

17   clothing and so forth, one way or another any effects?

18          THE WITNESS:  Yes.  I think that the protective

19   clothing prevents the staff from being contaminated sometimes

20   with feces, and the elbow pads and knee pads protect the

21   staff from being injured during the process.

22          THE COURT:  That's what counts here?

23          THE WITNESS:  Yes.  Because the process of

24   restraining a patient, if necessary, is sort of -- at its

25   best sort of finely choreographed.  And the staff need to

724

1   feel somewhat secure in the notion that they will not be

2   contaminated or that they will not be easily injured so that

3   they can participate in the restraint process as quickly and

4   efficiently and effectively as possible.

5   BY MR. RUSSELL:

6   Q.      As part of your work in the Parole Unit, did the

7   former inmates, your patients, talk about their experiences

8   with correctional mental health staff?

9   A.      Yes.

10  Q.      What did they relate to you?

11  A.      In parole --

12          MS. RIFKIN:  Objection.  Hearsay, Your Honor.  Calls

13  for hearsay.

14          THE COURT:  Overruled.  But it is a very interesting

15  question.  I am very interested to see what the answer is.

16          You may answer, sir.

17          THE WITNESS:  In parole, as expected, because we're

18  under the umbrella of CDCR, our staff sometimes change

19  positions.  So some of our staff had previously worked in the

20  prison, and then might work in parole next year, and then

21  maybe two years later they might work in a different prison

22  because of a change in their life circumstance or something.

23          So sometimes our patients would find out that there

24  was a parole clinician or psychiatrist working somewhere

25  else, and they would say:  Please say hello to so-and-so for

725

1    me.  They really helped me.  I like that person.  Or:  Is

2    there any way you can get a message to this person?  Tell

3    them thanks for this.  Something like that.

4            THE COURT:  It's always affirmative?  Always?

5            THE WITNESS:  With the people in the -- in that

6    instances, in that circumstance, where they were talking

7    about the people, it was always positive.

8            THE COURT:  Always positive?

9            THE WITNESS:  Yeah.

10           I might add also that, you know, generally speaking,

11   sometimes patients are affected by their psychosis.  And they

12   become paranoid.  And of course there are rare instances when

13   patients are trying to get medications that we somewhat

14   restrict because of their addictive potential.

15           But generally speaking, many of the patients get

16   along quite well with the mental health staff and think they

17   are there to help them.  And they tend to be generally very

18   friendly with the exception of those folks who might be

19   suffering at the time from a specific psychotic break.

20   BY MR. RUSSELL:

21   Q.      Doctor, you have earlier talked about medication.  As

22   part of your work in the Parole Unit would you prescribe

23   psychotropic medication?

24   A.      Yes.

25   Q.      And basically what's the purpose of prescribing

726

1    medication?

2    A.      So a lot of the folks we saw, they had a variety of

3    psychiatric symptoms.  It might vary from depression or

4    anxiety.  They might have a bipolar disorder or

5    schizophrenia.  They needed the medications to either keep

6    their symptoms from returning or to treat their symptoms.

7            Occasionally we would have other patients with very

8    chronic symptoms that might smolder or continue continuously,

9    but still the medications were helpful.  They might function

10   better on the medicines.  So we would provide that to our

11   parolee patients.

12   Q.      Do patients have the right to refuse medication?

13   A.      Yes.

14   Q.      Why would a patient who has been prescribed

15   medication for his mental health stop taking it?

16   A.      Sometimes it might be side effects.  And we try to

17   counter that by offering alternatives.  Sometimes the patient

18   lacks insight.  Many times with schizophrenics and

19   schizoaffective folks, very, very frequently they lack

20   insight into their psychiatric symptoms and lack insight into

21   the need for their medications.

22           Their lack of insight and understanding is so great

23   that it almost borders on delusional or defies logic.  It's

24   very hard for some of these schizophrenic patients to ever

25   understand that they have symptoms and need medications.

727

1          There have even been studies 20 years ago where they

2   would videotape a schizophrenic during an episode, when this

3   patient was exhibiting horrible psychotic symptoms, and then

4   show them that tape maybe a month or two or three months

5   later in an attempt to improve their insight.  And they would

6   look at the tape and say:  That is not me.

7          So sometimes we think of lack of insight as if we

8   were talking about an acquaintance.  But this insight or the

9   degree is so extreme that it defies logic.  And they're not

10  able to sort of ever really understand their symptoms or

11  their the need for medications.

12         There were other studies around compliance also where

13  folks tried to utilize all different types of strategies to

14  get schizophrenic patients to comply with their medications

15  and sort of very heroic attempts to education them and review

16  with them.

17         And then those fraction of patients that were taking

18  the medications, they were interviewed later and asked:  Why

19  are you taking your medications?

20         And people thought or expected that they would say:

21  It's because of the hour long group on medication benefits

22  that occurs every Tuesday.

23         But these folks said:  It is because my mom wants me

24  to take them.

25         So they, after heroic measures to improve their

728

1    insight, they were still taking their medications mostly to

2    sort of stay in the good graces of their family.

3    Q.    I think you described this ability about what you do

4    when you have a patient who won't take their medication.

5         What's the accepted clinical response?

6    A.    Well, this is something that, you know, is basically

7    we train for during our residency for four years, and we just

8    try to approach the problem from several directions

9    simultaneously, trying to discuss what their concerns are,

10   what their complaints are, what their preferences are, if

11   there are alternative medications that they would prefer,

12   providing them with sort of the rational, why, how this helps

13   your symptoms, how this might prevent previous problems that

14   you have had.  And we just sort of, depending upon the

15   setting, just continue with that strategy.

16   Q.    What happens -- what can happen ultimately if a

17   patient continues to refuse to take medication that's been

18   prescribed?

19   A.    Depending upon the diagnosis and the history, but

20   certainly with schizophrenic folks, their symptoms will

21   return.

22         Approximately -- after one psychotic episode,

23   approximately 70 percent of folks -- after their symptoms

24   have improved, approximately 70 percent of folks, if they

25   stop their medicines, their symptoms will reliably come back.

729

1          With the folks we treat, and these are patients that

2     have had multiple episodes -- multiple episodes of psychosis,

3     those folks, almost every time when they stop their

4     medicines, their symptoms will return.  Perhaps not that day

5     or that week, but they might return in a month or two months.

6     Q.     What's the long-term result in your experience of

7     multiple psychotic events when, for example, a patient

8     refuses to take medication?

9          THE COURT:  I don't understand the question.

10         The witness just said what happens, the symptoms

11    return.

12         Is that not responsive to your question?

13         MR. RUSSELL:  It was a bad question.  I'll try to

14    reask it.

15         THE COURT:  All right.

16         THE WITNESS:  I understand your question.

17    BY MR. RUSSELL:

18    Q.     I don't think the Judge did.  Let me try again.

19         You've talked about how the symptoms return if

20    somebody doesn't take their medication.  Is there a long-term

21    impact to those recurrent symptoms?

22    A.     Yes.

23    Q.     What is that?

24    A.     So it's been studied that -- and again, these -- it

25    is sometimes hard to perfectly translate to this setting or

730

1    that setting, but there have been very successful studies

2    that documented that in first break schizophrenics, people

3    who have been psychotic just once, the longer that they were

4    psychotic -- and this would be comparing something like two

5    months versus 12 months or something like that -- the longer

6    that they're psychotic, the more long-term damage there might

7    be to them.  In other words, they may not be able to return

8    to their baseline level of functioning.

9         Then there have been other studies that show that

10   folks that have suffered multiple psychotic breaks, with more

11   psychotic breaks it is more likely that they will not be able

12   to return to their previous baseline of functioning.

13        So this sort of informs us and motivates us to try to

14   do what we can to treat people as best we can as quickly as

15   we can, while at the same time working within the confines of

16   the system.  In other words, you're not always able to force

17   medications.  People do have a right in certain settings to

18   refuse medications.

19        And then, even if a person is refusing medicines, and

20   their symptoms return, sometimes their symptoms are not --

21   don't reach a threshold that you could force medications.

22        So we want generally to treat people as best we can

23   as fast as we can, paying attention to sort of the

24   restrictions of the confines of our setting.

25   Q.       Given your recent work with former inmates, does the

731

1    correctional setting itself play into inmates' decisions to

2    not take psychotropic medication?

3    A.      I think that, generally speaking, within our prisons,

4    both in California and other states, there is a prison

5    culture that is hard to change and hard for us to control

6    where inmates or inmate-patients do sometimes resist

7    correctional officers because it helps them maintain

8    credibility amongst their peers.

9              So that general culture certainly has some effect on

10   interactions with inmates or inmate-patients, those

11   interactions between the inmate-patient and the provider, or

12   the inmate-patient and the correctional officer.  Sometimes

13   the inmates are affected by the prison culture, that is the

14   culture of them and their peers.

15             THE COURT:  But never correctional folks?

16             They don't develop any adverse attitudes by virtue of

17   their position and experience?

18             THE WITNESS:  I have been working for the Department

19   for just five or six years, and certainly there's a mix of

20   folks working so I couldn't make sweeping conclusions.

21             THE COURT:  But your general view is, that's not a

22   problem?

23             THE WITNESS:  I have -- I worked at CHCF Stockton

24   from October of 2012 until about a week ago.  And I would

25   say -- I'm not an expert on all of the facilities because I

732

1    haven't worked at all of them -- but I would say at Stockton

2    there is a very good attitude.

3         THE COURT:  I want to posit a hypothetical to you.

4         A seriously schizophrenic, with paranoid -- I'm

5    sorry, I don't know what the terms are -- but he's got

6    paranoid problems as well, he won't come out of the cell, and

7    it's been determined that it is necessary to get him out of

8    the cell because they have to give him psychotropic

9    medication which he's unwilling to take.  But he's so

10   seriously ill that he really can't respond to the order to

11   cuff up.

12        But the custody just keeps dumping OC spray into him,

13   and somehow or other they finally decide that this guy is --

14   he's not going to respond, and they go in and they bring him

15   out.

16        Well, you haven't seen, I take it, the video of the

17   extraction of Inmate A, have you?

18        THE WITNESS:  I have viewed the videos.

19        THE COURT:  Okay.  As to video A, do you think there

20   was anything inappropriate in the way it was done?

21        THE WITNESS:  I don't think inappropriate.  I think

22   that the patient was suffering from horrible psychotic

23   symptoms.  It's possible that the patient could have posed a

24   physical risk to staff, and the patient definitely needed

25   treatment.  And think I it reasonable that they try to get

733

1   some restraint on the patient and try to get the patient to

2   comply using OC.

3        I think that when they were able to get some

4   restraint, specifically one handcuff on, and it looked as if

5   things were not progressing, then they moved to the next

6   step.

7        THE COURT:  But you don't think that -- your view is,

8   given the totality of the circumstances, it was a perfectly

9   reasonable way to proceed?

10        THE WITNESS:  I think the alternatives are more

11   suboptimal.  So I think, for instance, going in there with a

12   group of folks to try and restrain him physically without

13   having any restraint on the person at all is more suboptimal.

14        I also think that, you know, sort of waiting for

15   hours or days was also suboptimal.

16        THE COURT:  We weren't talking -- Well, okay.  You

17   answered the question.

18        You may proceed.

19   BY MR. RUSSELL:

20   Q.    Dr. Lindgren, despite everything that is done, there

21   are times in which inmates don't take psychotropic

22   medication, correct?

23   A.    Yes.  It is actually very frequent among certain

24   populations.  So among schizophrenic folks, over the course

25   of their illness, a recent study showed that as much as 41 or

734

1   49 percent of patients for some period of time do not take

2   their medications.  It is very frequent among certain

3   populations.

4   Q.      In some of those instances you need to seek a court

5   order to have -- to administer the medication; is that

6   correct?

7           MS. RIFKIN:  Objection.  Leading.

8           THE COURT:  Well, it is leading.

9           MR. RUSSELL:  I'll rephrase, Your Honor.

10          THE COURT:  Well, okay.  Go ahead.  Rephrase.

11          Is there ever any circumstance in which it is

12  necessary to seek court authority to provide involuntary

13  medication?

14          THE WITNESS:  Yes.

15  BY MR. RUSSELL:

16  Q.      Can you describe when those instances arise?

17  A.      It's when a person either poses a risk to themselves

18  or to others due to their mental illness or that person is

19  gravely disabled and reached a threshold where they are --

20  where it is predicted they're going to suffer further because

21  of their, for instance, inability to care for themselves.

22          And also people pay attention to the likelihood that

23  this will not improve without treatment.  So if a person is

24  gravely disabled to the point that you now predict that they

25  are at risk and you also conclude that it is unlikely to

735

1    improve.

2    Q.      And do you always need to wait for a court order in

3    order to be able to do that?

4    A.      It depends on the setting.  There are, again,

5    depending upon the setting, there are -- it is possible to

6    sometimes give a person a one-time dose if it is an

7    emergency.  But generally speaking, for sort of short-term or

8    medium or long-term administration of forced medicines you

9    need to have court authority.

10   Q.      Does the need to obtain a court order to give people

11   medication involuntarily, in your experience, working in a

12   state hospital, as well as working with --

13           THE COURT:  Sir, wherever you are going, questions

14   not testimony.

15           MR. RUSSELL:  I apologize, Your Honor.

16   BY MR. RUSSELL:

17   Q.      Does obtaining a court order, is that an indication

18   of bad psychiatric treatment?

19   A.      No.  And it's frequent.  Again, these patients, the

20   course of their illness, it sometimes waxes and wanes.  And

21   even after investigation and trying to figure it out, we

22   never understand why certain symptoms get worse and get

23   better.

24           Sometimes a person might even be perfectly compliant

25   with their medication for a year, then all of a sudden have

736

1   exacerbation of their symptoms.  We don't know why.  So these

2   things are sometimes unexplainable and certainly not due

3   to -- related to bad care or something like that.

4   Q.    I think you earlier testified that you had reviewed

5   the video of Inmate A, correct?

6   A.    Yes.

7   Q.    Have you also reviewed records relating to Inmate A?

8   A.    Yes.

9   Q.    Were there attempts to do, what I think you earlier

10   described, to essentially talk the patient into taking

11   medication before the cell extraction depicted on video -- on

12   the video?

13   A.    Yes, I think so.  But I would say that I did review

14   the records with an eye towards looking for any evidence of

15   long-term psychological damage following the incident.  So I

16   don't have the records memorized.

17   Q.    Sure.

18        Incidentally, the inmates -- for example, the inmate

19   depicted in the video, Inmate A, is that inmate -- would you

20   consider that inmate to be the same as a state hospital

21   patient?

22   A.    I think generally one should not try to draw

23   parallels between our population of inmate-patients in prison

24   versus or compared to the patients in a state hospital, for

25   instance a general ward.

737

1          And that is because by virtue of the process, the

2     folks that are in the prison, very many of them have a

3     history of violence.

4          So while sometimes you can perhaps draw individual

5     examples, like I treated someone at the state hospital who

6     was previously an inmate or something like that, generally

7     speaking, looking at the population and the group as a whole,

8     the folks that are inmate-patients in our prison system very

9     likely have a higher propensity for violence versus, say,

10    looking at a group of patients in an adult general state

11    hospital ward.

12    Q.     You've worked in a state hospital, correct?

13    A.     Yes.

14    Q.     I think that was in North Carolina?

15    A.     Yes.

16    Q.     The patients in that state hospital had committed a

17    crime, correct?

18    A.     There were some folks on a forensics ward.  You know,

19    not on the general ward.  Occasionally there might be a

20    person on the general ward who was there because they did not

21    have the capacity to proceed to trial.  But again, that would

22    be sort of the exception or rarity.

23         Most of the patients on the general adult ward did

24    not have significant legal entanglements or significant legal

25    history.

738

1  Q.      And I believe that you had earlier said you reviewed

2  records of Inmate A to determine if there were a long-lasting

3  impact on his mental health condition as a result of the cell

4  extraction depicted in the video.

5          What did you find?

6  A.      I didn't see any evidence of long-term mention of any

7  psychological damage directly related to the extraction.

8  Q.      I believe that you have you also reviewed the video

9  of an inmate who has been designated as Inmate D?

10 A.      Yes.

11 Q.      And Inmate D's records were marked in this court as

12 Exhibit 18, and the video is Exhibit 19.

13         This is the inmate, if I recall correctly, who was in

14 a holding cell --

15 A.      Yes.

16 Q.      -- when he was required to be extracted by the use of

17 pepper spray.

18         Do you have that in mind?

19 A.      Yes.

20 Q.      Did you come to any conclusions reviewing that video

21 of the inmate's ability to follow directions or orders?

22 A.      Yes, I did come to conclusions.

23 Q.      What were those?

24 A.      I think that the patient was and demonstrated that he

25 did understand requests.  He also was able to clearly

739

demonstrate sort of a very, for him, sort of logical plan and

sequence that he was sort of verbalizing and telling the

staff and telling the other inmates.

You know, it seemed at the time -- you know, myself

viewing the video, it seemed that at the time that patient

was not exhibiting sort of primary or severe mental illness

symptoms.

He seemed to be angry and have sort of a very sort of

thoughtful and logical plan to sort of convey his anger and

take a stand.  So I think that that was fairly clear from the

video.

Q.      Can inmates who are being treated for mental health

conditions be, and particularly an inmate like the one

depicted in that video, Inmate D, can they be expected to

comply with rules and orders?

A.      Yes.

May I expound on one of my answers?

Q.      Yes, of course, Doctor.

A.      So in viewing that video I did -- I did take some

notes as to what the patient said during the video.  And, you

know, the patient was upset because certain items were

restricted.

And the patient said, and he was speaking to the

other inmates that were within earshot, he was saying:

I'm going to have them cell extract me from the cage

740

1   to make them work because nobody else handled the situation.

2          Go get the spray.  I want them to spray me.

3          I will continue to do this continuously.

4          And then he was, perhaps for dramatic effect, calling

5   out to the warden.  He said:  Warden -- then he identified

6   himself -- I will be doing this continuously.  I will have

7   everyone doing this continuously.  Let's go.  Let's get

8   rolling.  I'm all good.

9          And then through that video, after the gentleman

10  was -- sort of towards the end of that extraction process

11  from the holding cell he said:  I love it.  And I'm going to

12  do it again.  And he said:  They are -- he was referring to

13  the correctional officers, and at this time he was talking

14  to, I guess, his inmate peers that were within earshot -- he

15  says:  They're working.  They're working 9 to 5.

16         And he then, in another video, he was later that day

17  extracted again as perfectly predicted by his statements.

18         MS. RIFKIN:  Objection, Your Honor.  The video has

19  been introduced and speaks for itself.  And we were given no

20  documents or chance a examine this witness's notes or

21  documents about the videos he reviewed.  We've been given no

22  notice.  And he's -- the video has already been played in

23  court.  We can play it again.

24         THE COURT:  I have no idea of what objection -- I

25  think what you are saying is that this witness was tendered

741

1    as an expert, and therefore they, the defendants, were

2    obligated to provide you with a report which would have

3    covered the matters just referred to.

4         MS. RIFKIN:  Either he's being tendered as an expert

5    or being tendered specifically in rebuttal to Dr. Kaufman's

6    testimony, which is what they told us.  And he's --

7         THE COURT:  Ma'am, I don't care whether he is in

8    rebuttal or not.  The only way he can rebut is by being an

9    expert capable of rebutting because he's in the same field.

10        You know, I'm the soul of patience, as everybody

11   knows -- that's sarcasm, sir, in case you didn't get it --

12   but if the objection is that he's an expert and that you were

13   entitled to a report which included his expert opinion, that

14   may be cognizable.  Just getting up and saying, Gee whiz,

15   isn't.

16        MS. RIFKIN:  If I can rephrase?

17        We object to the fact this witness is being offered

18   as an expert.  We weren't given a declaration, a chance to

19   depose him, nor has he been qualified as an expert.

20        THE COURT:  All three objections are well-taken, I

21   assume, unless there is some something that happened that the

22   plaintiffs have forgotten.

23        MR. RUSSELL:  Well, Your Honor, Dr. Lindgren is

24   testifying in response to the declaration provided by

25   Dr. Kaufman, as well as his testimony here in the evidentiary

742

1    hearing.

2         The declaration was offered as part of the reply

3    brief.  And so defendants did not have an opportunity to

4    respond to that in any way.

5         THE COURT:  I will say to you what I just said to

6    Miss Rifkin, I am the soul of patience, but I really want you

7    to respond.

8         If he's being tendered as an expert, you are

9    obligated under the rules to provide the opposing counsel

10    with a report that sets forth what it is to be expected he

11    will testify to.

12         MR. RUSSELL:  Your Honor, he is --

13         THE COURT:  One of your colleagues is about to find

14    the Local Rule -- not the Local Rule -- the Federal Rule.

15    Perhaps he can enlighten me.  Perhaps I'm in error.  I don't

16    think I am, but occasionally it occurs.

17         MR. RUSSELL:  I believe Dr. Lindgren is being offered

18    in rebuttal to --

19         THE COURT:  I don't care why he's being offered.

20         MR. RUSSELL:  Your Honor, he's also an employee of

21    CDCR.  And my understanding is that Rule 26 does not require

22    a party-affiliated witness to provide a written report.

23         THE COURT:  Even if he's testifying as an expert?

24         MR. RUSSELL:  I believe that is true, Your Honor.

25         THE COURT:  Well, maybe I don't remember the rule.

743

1    Maybe I'm in error.

2              (Brief pause while research is conducted.)

3              Ma'am, it is not clear to me why I'm doing your

4    work.

5              MS. RIFKIN:  Your Honor, if he's being offered as an

6    employee, nonretained expert, I withdraw my objection.

7              THE COURT:  Okay.  I don't know that it makes any

8    difference, but she's withdrawing the objection.

9              MS. RIFKIN:  The objection that I would not withdraw

10   is as to whether Dr. Lindgren is qualified as an expert.

11             THE COURT:  Well, I mean, they've laid the groundwork

12   that he was educated in the field, he did post-doctoral work

13   in the field, that he's been an expert -- I mean that he's

14   been a practicing psychiatrist for years.

15             You're right.  They have tendered him, and you should

16   have been given a right to cross-examine.  I will permit you

17   to cross-examine now if you think it is going to do you any

18   good.

19             MS. RIFKIN:  Yes, I would like to voir dire the

20   witness, Your Honor.

21             THE COURT:  All right.

22                       VOIR DIRE EXAMINATION

23   BY MS. RIFKIN:

24   Q.        Dr. Lindgren, you testified that you worked at

25   Stockton from October 2012 to October 2013; is that correct?

744

1   A.      Yes, ma'am.

2   Q.      And Stockton only began accepting patients in July of

3   2013?

4   A.      Yes.

5   Q.      Did you personally treat any of those patients in

6   those three months?

7   A.      I was involved in their treatment in that I had to

8   supervise the psychiatrists and also had to help organize

9   treatment plans for challenging patients, and that I attended

10  treatment team meetings with patients.  And I also worked

11  hand-in-hand with the psychiatrists who were starting there

12  as of June-July.  Things like that.  So we did the treatment

13  together as was needed.

14  Q.      You didn't carry a caseload at Stockton, correct?

15  A.      I did not personally carry a caseload.

16  Q.      And prior to your experience at Stockton, you have

17  never worked in any other CDCR prison; is that correct?

18  A.      No.  I never worked inside a prison.

19  Q.      In fact, you have never worked inside any prison at

20  all; isn't that right?

21  A.      Depends on your definition.  I certainly worked

22  inside CHCF Stockton.

23  Q.      Apart from your experience at Stockton, you have

24  never worked inside any other prison; isn't that correct?

25  A.      Correct.

745

1    Q.      And you have never worked inside a jail; is that
2    correct?
3    A.      No, I have never worked inside a jail.
4    Q.      So you don't have personal experience with cell
5    extractions that take place in prisons and jails, do you?
6    A.      I have experience with extracting patients from
7    rooms.
8    Q.      But you just told us earlier that you can't draw
9    parallels between patients -- inmate-patients in prisons and
10   patients in civil institutions; isn't that right?
11   A.      What I said was it's not a good idea to make sort of
12   sweeping parallels when you are talking about the large group
13   of patients in a prison and a large group of patients in a
14   state hospital, but that you can use sort of -- you can use
15   specific examples.
16           For instance, there might be a patient in the state
17   hospital who was previously a prisoner.  Or there might be a
18   patient in the state hospital that has a legal entanglement,
19   such as inability to proceed to trial because of not having
20   the capacity.
21   Q.      But again, you have never personally witnessed a cell
22   extraction or a use of force in any CDCR institution other
23   than Stockton; is that right?
24   A.      Not other than in Stockton.
25           THE COURT:  Well, you didn't see any in Stockton

746

1    either, did you?

2            THE WITNESS:  I helped plan --

3            THE COURT:  I agree.  The question is whether you --

4            THE WITNESS:  No.  Because in Stockton the ones I

5    helped plan, we tried to limit those folks to the core people

6    on the team and then move other folks out of the way for the

7    process.  So I have not, with my eyes, witnessed an

8    extraction.  But I was involved in the decision-making

9    process and the planning.

10           THE COURT:  I'm confused anyhow.

11           Stockton began receiving patients when?

12           THE WITNESS:  July 2013.

13           THE COURT:  And you left when?

14           THE WITNESS:  About seven days ago.

15           THE COURT:  And was there a complete compliment of

16   patients by the time you left?

17           THE WITNESS:  No.  They are only at about -- they're

18   only at about -- depending upon the ward, only at about 40

19   percent or 45 percent.

20           THE COURT:  How many cell extractions of unwilling

21   patients and all of that were there during the period that

22   you were the supervising psychiatrist?

23           THE WITNESS:  I'm not sure how many total within the

24   entire institution, but I think there were two in those areas

25   that I had some influence over.

747

1          THE COURT:  All right.

2     BY MS. RIFKIN:

3     Q.      And you testified earlier about the -- the scientific

4     literature about the effects of use of force.

5          Have you completed an exhaustive review of the

6     scientific literature?

7          Let me rephrase.

8          Have you completed a review of the scientific

9     literature of the effects of pepper spray on mentally ill

10    prisoners?

11    A.      I looked for literature and I couldn't find it.

12    Q.      You couldn't find any?

13    A.      I couldn't find sort of relevant articles.  And I

14    would say that, generally speaking, I'm always trying to keep

15    abreast of the literature.  And I also look at -- you know,

16    for instance, even though I was familiar with it, I also

17    looked at literature around compliance and adherence.

18         And again, this was more just a general search and

19    review of these topics.  I'm somewhat familiar with them

20    around it here and somewhat familiar with some of the memory

21    literature.

22    Q.      When did you complete your search for literature

23    about the effects of pepper spray and OC spray on inmates

24    with serious mental illness?

25    A.      I just, I guess, reviewed things within the last five

748

1    days.

2          MS. RIFKIN:  Your Honor, we object to the tendering

3    of this witness as an expert on use of force that goes on

4    within CDCR institutions, as an expert on the effects of OC

5    spray and use of force on prisoners with serious mental

6    illness.

7          If he was going to testify specifically about the

8    videos he reviewed and his chart reviews, we don't object to

9    that, but we object to the tendering of him as expert on all

10   of these other broad areas for which he has no experience.

11         THE COURT:  The objection is overruled.  All of that

12   will go to weighing how much weight is to be given to the

13   witness's testimony.

14         You may resume, Mr. Jenkins.

15         Mr. Russell.  I'm sorry.  I don't know who

16   Mr. Jenkins is.

17         MR. RUSSELL:  That's okay, Your Honor.

18                CONTINUED DIRECT EXAMINATION

19   BY MR. RUSSELL:

20   Q.    Dr. Lindgren, we were talking a little bit about the

21   inmate who is identified as Inmate D and the video, this is

22   the one where he's in the holding cell.

23         And I had been asking you about whether inmates --

24   well, should inmates be -- inmates with mental health

25   disorders be required to comply with rules and orders?

749

1   A.      Yes.  I think that, generally speaking, that patients

2   who may have a mental health diagnosis or descriptor should

3   have to follow rules.

4   Q.      Why is that?

5   A.      These rules are put in place to maintain the safety

6   of the institution, specifically the safety of the inmates or

7   inmate-patients, as well as, generally speaking, inmates and

8   inmate-patients must have a set of rules or guidelines to

9   follow.  And there should be some structure to their -- to

10  their rules and their environment when possible.

11  Q.      In your experience in treating inmates who had been

12  in prison, does having those kind of rules and orders, does

13  it actually assist in their mental health treatment?

14          THE COURT:  The objection -- well, they don't care.

15          Go ahead.  You may answer.

16          THE WITNESS:  I think some structure is good, and

17  then also, you know, the inmate-patients within the umbrella

18  of corrections must have similar rules and consequences

19  because already within any system, no matter how much we try,

20  there are inmates that manipulate the system and try to move

21  from one population to another for secondary gain.

22          THE COURT:  Do you move to strike because it deals

23  with prisoners in prison and that's not his specialty?

24          MS. RIFKIN:  Yes, Your Honor.

25          THE COURT:  Motion is granted.

750

BY MR. RUSSELL:

Q.      Doctor, in treating -- both in treating patients as part of the Parole Unit, as well as working as a chief psychiatrist at headquarters now, are you familiar with patients who are transferred from institutions to Department of State Hospital facilities?

A.      Yes.

Q.      What is -- when are patients transferred to a DSH facility?

A.      Patients are transferred to a DSH program when it is predicted that they could benefit from a longer course of treatment.  So if -- and these sorts of decisions are sometimes inexact, but it's basically the treatment team's best guess that this person might benefit from an extended treatment.

Q.      Is referral to the Department of State Hospitals a higher level of care than what's provided for within the institutions?

A.      Compared to the Mental Health Crisis Bed, which has certain specific requirements regarding clinician-patient contact and notation, compared to Mental Health Crisis Bed, the DSH programs are not as intensive, their care is not as frequent, but it is longer.  So --

        THE COURT:  We talk about -- as I understand it we talk about acute referral.  That's always to DSH.

751

1              THE WITNESS:  Yes.

2              THE COURT:  And doesn't that suggest -- well, what

3      does the word "acute" mean to you?

4              THE WITNESS:  I think "acute," things like Mental

5      Health Crisis Bed, Acute and Intermediate, are sort of

6      arbitrary terms put on these different programs years ago.

7      And --

8              THE COURT:  They're just arbitrary, we really ought

9      not to pay attention to them in trying to figure out what

10     CDCR is doing?

11             THE WITNESS:  I think -- No.  I think it is --

12             THE COURT:  This is --

13             THE WITNESS:  -- somewhat confusing because, as an

14     example -- so as an example, in Stockton, when a patient is

15     sitting in a Mental Health Crisis Bed, the requirement is

16     that that patient be seen by a psychiatrist every three days.

17     And they must be seen by a clinician, which is either a

18     psychiatrist or a psychologist, or sometimes a social worker,

19     every day.

20             So if the patient were stabilizing in the Mental

21     Health Crisis Bed, then if the patient was doing pretty well,

22     they might see a psychiatrist on Monday, a psychologist on

23     Tuesday, another psychologist on Wednesday, then a

24     psychiatrist on Thursday, every three days.

25             Sometimes, especially when the patient arrives and

752

1    they're having more severe symptoms, as what would be

2    predicted in the early part of their stay, there might be

3    times when the patient is seen more frequently, maybe seen by

4    the psychiatrist every day.

5          And again, I don't have the -- I don't have the DSH

6    sort of guidelines memorized, but at CHCF Stockton we have

7    DSH programs that we refer to.  And certainly I interact --

8          THE COURT:  Why would you ever do that?

9          You are doing everything that anybody could ever want

10    in the Crisis Bed Unit.  Why would you ever refer them to a

11    DSH facility?

12          THE WITNESS:  At least -- I'm not -- I wasn't part of

13    the Department when the DSH programs were originally

14    conceived.

15          THE COURT:  So they're wrong as far as you are

16    concerned?

17          THE WITNESS:  Not wrong.  I think at CHCF Stockton

18    our DHS, sort of brothers and sisters, are partners in this

19    process.  We work closely with them.  I actually, you know,

20    for instance, talked -- while I was at Stockton I was serving

21    as the chief psychiatrist.  So I would talk to the DSH chief

22    psychiatrist and their seniors many times a week over

23    different topics.

24          But just as an example, and I would say that, again,

25    I'm not an expert on DSH guidelines, I don't have them

753

1    memorized, but in Stockton, on the acute unit of DSH, the

2    psychiatrist, according to their guide, must see -- or I'm

3    not sure what their guide is, but their practice is that they

4    see the patient once a week.

5        So you can see that compared to the crisis bed it is

6    more frequent.

7        THE COURT:  It is not nearly as effective so you

8    never refer anybody to DSH if you could help it?

9        THE WITNESS:  No.  We would.  Because what DSH offers

10   is -- again, the DHS folks and us are in a partnership.

11   Sometimes our folks will go over to work for DSH for a few

12   years.  And sometimes DSH people will come over to work for

13   us.  So they're oftentimes the similar psychiatrists.

14   Stockton has a DSH person starting with us in January.

15       So there is this interchange, but sort of within this

16   model, this attempt to sort of have some sort of predictable

17   and structured approach to providing different types of care

18   to these patients, the DSH folks, they provide longer term

19   care.  It's still termed "acute," but it might be for two or

20   three months.

21       Then their intermediate care might be -- again, I

22   don't know what their guide says -- but it might be for six

23   or 12 months.

24       THE COURT:  Or it might be something else.  Let's set

25   that aside because you don't know.

754

1     Given your view as to the efficacy of the Mental

2  Health Crisis Beds, have you made suggestions to amend the

3  guidelines.

4          THE WITNESS:  The guidelines --

5          THE COURT:  The answer is no?

6          THE WITNESS:  Well, no.  I think that because I was

7  part of that sort of operation, so I think that what was

8  referred to previously -- or previously today was the ten day

9  rule.  And, you know, in Stockton people stay there much

10  lodger than ten days.  And it simply requires the sort of

11  agreement of leadership.  And sometimes we refer people to a

12  DHS facility and they have no room, so they might stay on the

13  crisis bed until there is room.  It varies a bit.

14          THE COURT:  All of those things.

15          I'm going to ask you directly again.  Given your view

16  that the Crisis Bed Units provide better care than DSH, have

17  you made a suggestion at all in your present administrative

18  function to amend the guidelines?

19          THE COURT:  That's a "yes" or "no" answer, not a

20  speech.

21          THE WITNESS:  Not amend the guidelines.

22          THE COURT:  Thank you.

23          It is 4:30.  We'll see you all tomorrow morning at

24  9:30.

25          (Off the record at 4:30 p.m.)

1                        REPORTER'S CERTIFICATE

2                            ---o0o---

3

   STATE OF CALIFORNIA   )
4  COUNTY OF SACRAMENTO  )

5

6         I certify that the foregoing is a correct transcript

7  from the record of proceedings in the above-entitled matter.

8

9

10                   IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.

11

12

13    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25