1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0O---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11         Defendants.

12    _____/

13

14

15                      ---o0o---

16

17              REPORTER'S TRANSCRIPT

18          RE:  EVIDENTIARY HEARING

19          WEDNEDSDAY, OCTOBER 23RD, 2013

20

21                      ---o0o---

22

23

24

25    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        APPEARANCES

 2                        ---o0o---

 3    FOR THE PLAINTIFFS:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5           SAN FRANCISCO, CALIFORNIA  94104

 6           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7           BY:  LORI RIFKIN, ATTORNEY AT LAW

 8

 9           K&L GATES LLP
              4 EMBARCADERO CENTER, SUITE 1200
10           SAN FRANCISCO, CALIFORNIA  94111

11           BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

12           BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

13

14    FOR THE DEFENDANTS:

15            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
16            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
17
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
20

21

22                        ---o0o---

23

24

25
```

1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6      DR. JOHN LINDGREN (Previously Sworn)

7          Cont'd Direct Exam. by Mr. Russell           755
           Cross-Examination by Ms. Rifkin              758
8          Redirect Examination by Mr. Russell          794
           Recross-Examination by Ms. Rifkin            794
9

10

11     MICHAEL STAINER

12         Direct Examinatin by Mr. McKinney            796
           Cross-Examination by Ms. Cesare-Eastman      909

13

14

15

16                             ---o0o---

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3    PLAINTIFFS'
      EXHIBIT NO              DESCRIPTION                   EVD
 4
         23                Inmate C Records                901
 5
         46                Inmate EE Records               898
 6
         47                Inmate FF Records               900
 7
        159                Exh. 8 to Sharma Dec.           914
 8
       1174                Dr. Lindgren CV                 782
 9
       1201                Aug. 2013 Coleman Rpt excerpt   784
10
       1202                USDOJ Civil Rts. Div. findings  772
11

12

13

14

15

16

17

18

19

20

21

22

23

24                            ---o0o---

25
```

```
1                          EXHIBIT INDEX

2                            ---o0o---

3    DEFENDANTS'
     EXHIBIT NO            DESCRIPTION                  EVD
4
       I              Calif. Code of Regs., Title 15,
5                     Use of Force Regs.               803

6      J              Stainer Dec.                      855

7      L              OIG Semi-Annual Report
                      July-Dec. 2012 Excerpt            860
8
       M              OIG Semi-Annual Report
9                     Jan.-June 2013 Excerpt            875

10
       N              OIG Semi-Annual Report
11                    Jan.-June 2012 Excerpt            881

12

13

14

15

16

17

18

19

20

21

22

23                           ---o0o---

24

25
```

755

1                    SACRAMENTO, CALIFORNIA

2              WEDNESDAY, OCTOBER 23RD, 2013 - 9:30 A.M.

3                         ---o0o---

4          THE CLERK:  All rise.

5          Court is now in session.

6          The Honorable Lawrence K. Karlton presiding.

7          THE COURT:  You may be seated everyone.

8          Good morning.

9          THE CLERK:  Calling Civil S-90-520, Coleman et al.,

10   versus Brown, et al.

11          THE COURT:  Mr. Russell.

12          MR. RUSSELL:  Good morning, Your Honor.

13       CONTINUED DIRECT EXAMINATION OF DR. JOHN LINDGREN

14   BY MR. RUSSELL:

15   Q.     Good morning, Dr. Lindgren.

16          When we broke yesterday, we were talking about

17   referrals to the Department of State Hospitals.  DSH.  Based

18   upon your experience as a senior psychiatrist, as well as

19   your work at the Stockton facility, what inmates can be

20   referred?

21          THE COURT:  Can be should be, ought to be?

22          MR. RUSSELL:  Pardon?

23          THE COURT:  Who can be referred?

24          Anybody in the world?

25          Who ought to be?

756

1          Tell us about that, sir.

2          THE WITNESS:  Sure.  Generally speaking, patients

3    that are referred to DSH are those mental health patients or

4    people that might have contact with the mental health service

5    in CDCR are those patients that might benefit from a longer

6    term stay or longer treatment in a setting where they can

7    receive mental health services that have frequent contact

8    with a variety of disciplines.

9          And for patients that are referred to DSH, the person

10   who is referring the patient or the team generally has the

11   notion that the patient could benefit from a longer

12   treatment.

13   BY MR. RUSSELL:

14   Q.     And Dr. Lindgren, I think that you partially answered

15   this question, but my follow-up question is why would you

16   refer?

17         Why would a clinician refer somebody to a Department

18   of State Hospitals facility?

19   A.     So they could refer a person who was designated as

20   EOP.  They could refer a person currently in a Mental Health

21   Crisis Bed.  And for a person being referred from EOP it

22   would be so they could have more intensive and longer-term

23   treatment in the hopes that longer-term treatment could

24   reduce their symptoms or better stabilize their symptoms.

25         If referred from the Crisis Bed Unit, similarly the

757

1    hope is that a longer-term treatment would benefit the

2    patient and perhaps reduce or stabilize their symptoms.

3    Q.    And I think you have anticipated my last question on

4    this subject, and that is what is the point of referring

5    somebody to DSH care?

6    A.    If you can --

7         THE COURT:  That's what I just said.

8         Right?

9         Go ahead.  Answer.

10        THE WITNESS:  If a patient is able to have more

11   frequent mental health contacts with mental health providers,

12   and be monitored more closely for longer, then they're,

13   depending upon the patient's presentation and symptoms and

14   diagnosis, there is a chance that patient would benefit from

15   that, from that treatment, that is they would benefit from

16   having more frequent contacts with mental health providers of

17   different disciplines for longer periods of time.

18        And it would also allow, in that setting where

19   treatment is for a longer period of time, allow treatment

20   plans and targets to reflect that longer stay so that you

21   could make goals that are a week from now, a month from now,

22   six months from now, and work towards those goals in that

23   setting in the hopes that the patient's symptoms would

24   improve or that that patient would stabilize or perhaps

25   become more functional.

758

1        MR. RUSSELL:  Thank you, Dr. Lindgren.

2        I don't have any other questions right now.

3                    CROSS-EXAMINATION

4   BY MS. RIFKIN:

5   Q.     Good morning, Dr. Lindgren.

6   A.     Good morning.

7   Q.     You're a current employee of CDCR; is that right?

8   A.     Yes, ma'am.

9   Q.     And you're testifying here today as part of your

10  employment for CDCR; is that right?

11  A.     Could you restate?

12  Q.     You've been asked to testify here because you're an

13  employee of CDCR; is that correct?

14       THE COURT:  You're now asking him to speculate on

15  what defense counsel had in mind.

16  BY MS. RIFKIN:

17  Q.     Is it your understanding that you are testifying here

18  today as part of your employment for CDCR?

19  A.     I think so.

20  Q.     You can look at me, not at your counsel.

21  A.     Yeah.  I think so.

22  Q.     Okay.

23  A.     In truth, I'm not sure I exactly understand the

24  phrasing, but I am employee of CDCR.

25  Q.     You were asked to testify here today in your role as

759

1    an employee of CDCR; is that right?

2    A.    Yes.  I think so.

3    Q.    And you were asked last Friday to testify in these

4    proceedings here?

5    A.    Are you asking when I was first contacted about this

6    or --

7    Q.    Yes.  When you were asked to testify in these

8    proceedings here.  Last Friday, correct?

9    A.    I think it was Wednesday.

10   Q.    Wednesday.

11   A.    I'm not sure.  I think maybe Wednesday night, around

12   maybe 8:00 p.m.

13   Q.    When was your last physical day at the Stockton

14   facility, Dr. Lindgren?

15   A.    Probably about two weeks ago, ten days ago, something

16   like that.

17   Q.    And on your resume you list your experience at

18   Stockton as ending in September 2013; is that incorrect?

19   A.    I finished in -- around -- my official start date was

20   last Monday which I think was the 14th or 15th of October.

21   Q.    But when was your actual last day at the Stockton

22   facility?

23   A.    Physically it was probably around maybe October 10 or

24   October 11, give or take.

25   Q.    So you were asked last Wednesday night to testify at

760

1    these proceedings?

2    A.       Yes.   I'm not sure -- in truth, I'm not sure the

3    decision was made on Wednesday night, but there was the

4    discussion of testimony on Wednesday night.   I'm not sure

5    when it was decided that I was going to testify.   I'm not

6    sure.

7    Q.       And you testified yesterday that you did research in

8    the past five days about the effects of OC spray on patients

9    with serious mental illness; is that right?

10   A.       I definitely did a search for any relevant

11   literature.   I would say that, you know, I'm not -- I'm not a

12   medical librarian so I may have some inability to catch every

13   piece of literature.   But I did what I thought was an

14   effective search of the available literature.

15   Q.       And you did that search after you were asked to

16   testify in these proceedings?

17   A.       Yes.

18   Q.       And you didn't find anything?

19   A.       No.   I found some -- I found a lot of discussions and

20   found some attempts to summarize information.   And it's just

21   that this sort of compiling this sort of data is challenging,

22   so it is not surprising that there is not a wealth of

23   scientific data around that specific question of use of OC in

24   mental health settings.

25   Q.       I believe yesterday you testified you didn't find any

761

1    articles about this at all; isn't that right?

2    A.    I don't think I found any sort of classic scientific

3    articles.

4        THE COURT:  The question now is whether or not you

5    said yesterday that you didn't find any articles.

6        If you remember.

7        THE WITNESS:  Sure.  I would define "articles" as

8    scientific articles that are sort of very databased.  So of

9    those I did not find any good representation, but I saw what

10   I would call discussions or essays.

11   Q.    So you therefore concluded that there is no long-term

12   harm to patients with serious mental illness as a result of

13   the use of OC spray; is that correct?

14   A.    Well, I think I testified that I didn't find evidence

15   in the parolees that I treated and also that there wasn't

16   sort of compelling evidence in the sort of discussions or

17   essays that I read.

18       Then also, you know, in the discussions that I read

19   it was sort of a common conclusion that you cannot discuss

20   the use of OC spray or conclusions around that without

21   comparing it to the alternative.

22       So I would say that generally I did not, in that

23   setting, that is talking with parolees, my experience at CHCF

24   Stockton, then also looking at the essays, I, myself, did not

25   find compelling evidence that there was permanent,

762

1  psychological damage to people.

2  Q.      But yesterday you testified that there is no -- that

3  the scientific literature establishes that there is no

4  long-term harm to patients with serious mental illness as a

5  result of the use of OC spray; isn't that correct?

6  A.      I think I said that there wasn't much scientific

7  data, and that I found no evidence.

8  Q.      Do you have a list of the documents that you reviewed

9  on the effects of OC spray in preparation for your testimony

10 here today?

11 A.      I don't have a list, but I might be able to remember

12 some of them.

13 Q.      Do you have copies of those documents?

14 A.      I have some copies.  Some I was just doing on the

15 computer, reading them.

16 Q.      Google Search?

17 A.      Sort of.  And other things.

18 Q.      Okay.

19 A.      But I could mention the main ones --

20         THE COURT:  Nobody is -- sir, this is not a general

21 discussion.  You're to answer the questions.  If there is

22 further need, your counsel will come back and redirect and

23 ask you about them.

24         All right?

25         THE WITNESS:  Yes, sir.  Thank you.

763

1    BY MS. RIFKIN:

2    Q.      What other documents did you review in preparation

3    for your testimony here today?

4    A.      I did some review of documents that focused on

5    medication adherence or compliance.

6    Q.      What documents were those?

7    A.      Generally speaking, some review articles that compile

8    data from studies on adherence.

9    Q.      I'm sorry.  Can you be more specific.

10         Some review studies that compile data about

11   adherence?

12   A.      They're called meta-analysis.

13   Q.      Adherence to what?

14   A.      Adherence to medications.  Compliance with taking

15   medications in those patients that are schizophrenic or have

16   similar diagnosis.

17   Q.      Had you previously considered yourself an expert on

18   that topic, Dr. Lindgren?

19   A.      I think I am an expert on it because I have 19 years

20   of treating those patients, which is chronically mentally ill

21   patients.  In other words, that is sort of the focus of my

22   career.  And then I also have --

23   Q.      Go ahead.

24   A.      -- postgraduate -- postgraduate training in research

25   which allows me to more critically read and scrutinize

764

1  scientific articles.

2        And then also that postgraduate experience had a

3  focus on schizophrenia and psychotic disorders and treatment

4  of those disorders.  And this is sort of integral to that.

5  Q.      Were those --

6  A.      -- to that field.

7  Q.      Was that experience in inpatient settings?

8  A.      I've had experience in a variety of settings that

9  include inpatient settings at state hospitals, inpatient

10 settings at community hospitals, at county mental health

11 centers, which, again, focus on that population, in nonprofit

12 organizations which focus on that population, then most

13 recently within the Department of Corrections which also

14 tends to focus on that population, that is folks with chronic

15 mental illness and refractory symptoms.

16 Q.      What other documents did you review or videos in

17 preparation for today?

18        THE COURT:  Did you review any other documents?

19        THE WITNESS:  I looked at -- I read a little bit

20 about pain -- pain in chronic mental illness and mental

21 health patients.

22 BY MS. RIFKIN:

23 Q.      Did you read what you would consider "scientific"

24 articles?

25 A.      Yes.

765

1    Q.      Peer reviewed?

2    A.      Yes.  And I also reviewed, although I knew some about

3    this already, I reviewed some articles about memory.  And

4    those two are scientific articles.

5    Q.      So you reviewed articles, and that's the basis of the

6    information that you gave in your testimony yesterday?

7    A.      I think the basis of my testimony was, you know, the

8    fact that I completed a two-year psychopharmacology research

9    institute -- research fellowship that focused on

10   schizophrenic and psychotic disorders, that I've worked in a

11   variety of settings that include state hospitals, small

12   county hospitals, nonprofits, mental health centers, and also

13   most recently the Department, and I think that it's based on

14   the sort of scientific knowledge that I've acquired over the

15   last 19 or 20 years, as well.

16   Q.      Did you review any videos in preparation for today?

17   A.      Yes.

18   Q.      How many?

19   A.      I think seven.

20   Q.      And who selected those videos?

21   A.      The attorneys I was working with.

22   Q.      Were these videos of use of force?

23   A.      Yes.

24   Q.      Can you tell me which inmates -- by code name which

25   videos you reviewed?

766

1      I can supply you with the inmate code sheet if your

2 counsel has not.

3 A.      I definitely reviewed A, B, C, D.  And I think I

4 reviewed E.  And then I review two others, and I don't know

5 what their letter designation is.

6 Q.      Did you review any other documents in preparation for

7 your testimony today?

8 A.      I reviewed, I guess what would be called,

9 declarations and the testimony of Dr. Kaufman.  And I was

10 provided with what I think were excerpts from the medical

11 record of patients A, B, C and D.  And I think that's all.

12 Q.      Did you review anything else in preparation for your

13 testimony today?

14 A.      I think I reviewed other testimony that contained

15 some of Dr. Kaufman's testimony, but it is possible that it

16 included testimony of other people as well that may have

17 occurred minutes before Dr. Kaufman's testimony.

18 Q.      Apart from these seven videos you watched -- the

19 seven videos you watched, were they all of cell extractions?

20 A.      Yes.

21 Q.      Apart from these seven videos that you watched, have

22 you otherwise observed any cell extractions personally that

23 use OC spray?

24 A.      No.

25 Q.      So you have never been physically present at a cell

767

1  extraction where OC spray was used?

2  A.      No.

3  Q.      And yesterday you testified that OC spray for cell

4  extractions is preferable to a hands-on approach based on

5  your experience working in state hospitals; is that correct?

6  A.      Yes.  And also sort of summarizing the essays that I

7  read also.

8  Q.      But the only basis for your personal experience on

9  that is your experience working in state hospitals; is that

10  correct?

11  A.      I think that sort of observation or opinion made by

12  me is paying attention to my experience in the state

13  hospitals, coupled with the essays that I read, coupled with

14  the videos that I have viewed.

15  Q.      Your only personal experience with cell extractions

16  comes from your experience in Stockton and other state

17  hospitals that you have worked in; is that correct?

18  A.      Yes.  And in the state hospitals I would not say that

19  they were cells, they were room extractions perhaps.

20  Q.      But yesterday you said that they were cell

21  extractions?

22  A.      I'm not sure -- or I don't recall, but if I did, in

23  the state hospital there were rooms.

24  Q.      So your experience at Stockton with two cell

25  extractions and your experience in the state hospitals with

768

1  room extractions, that fairly represents your own personal

2  experience with extracting seriously mentally ill people from

3  their housing settings; is that accurate?

4  A.    Yes.  And certainly, you know, I have -- within the

5  state hospital I was involved in those incidents not

6  infrequently.

7  Q.    Which state hospital are you referring to,

8  Dr. Lindgren?

9  A.    Worked at Dorothea Dix Hospital in Raleigh, North

10  Carolina and also John Umstead in Butner, North Carolina.

11  Also, in addition to the time spent as an employee there, my

12  residency training, a lot of that occurred at Dorothea Dix

13  Hospital.  And then also my psychopharmacology research

14  fellowship, the first year was spent at John Umstead Hospital

15  and the second year was spent at Dorothea Dix Hospital, both

16  state hospitals.

17  Q.    And I believe you said yesterday that how to approach

18  patients who are not taking their medications is something

19  that you were trained for during your residency for four

20  years; is that right?

21  A.    I just -- what I was trying to imply is somewhat

22  integral to every day psychiatry practice in that many of our

23  patients, both folks that have chronic mental illnesses, and

24  even folks that have sort of minor psychiatric symptoms,

25  we're often, you know, constantly, all day, every day,

769

1    providing the risks and benefits of medications, providing

2    alternatives, trying to convey to the patient what we think

3    would be perhaps the best choice given their symptoms and

4    what is available.  So it is something that we do every day

5    all day.

6    Q.      Right.  Dr. Lindgren, I'm trying right now to

7    understand the basis on which you're providing your opinions

8    as an expert, which was what you have been proffered as by

9    defendants here.  So my questions are aimed at just

10   understanding what your basis is so I'm going to ask that

11   again.

12          THE COURT:  Go ahead.  The doctor is telling you that

13   the basis for his testimony is his years of experience.

14   BY MS. RIFKIN:

15   Q.      I guess let me try and reframe the question a little

16   bit.

17          Yesterday you proffered your analysis of how to

18   appropriately approach a patient who is not taking the

19   medication; is that accurate?

20   A.      Could you restate.  I'm lost in the words.

21   Q.      Yesterday one of the opinions that you offered was

22   about how to appropriately approach patients with serious

23   mental illness who are not taking their medications; is that

24   accurate?

25   A.      Yes.  But I think that is --

770

1          THE COURT:  The answer is?

2          THE WITNESS:  Yes.

3   BY MS. RIFKIN:

4   Q.     And you said that the basis of your knowledge for

5   that is this is how psychiatrists are trained during their

6   residency for four years; is that correct?

7   A.     Yes.

8          MS. RIFKIN:  May I approach the witness, Your Honor?

9          THE COURT:  Yes.

10         (Exhibit handed to witness.)

11  BY MS. RIFKIN:

12  Q.     Dr. Lindgren, I have handed you what's been marked

13  Plaintiffs' Exhibit Number 1174.  This is a copy of your CV

14  provide by defendants' counsel.

15         Is this an accurate CV?

16  A.     I think so.  The only thing that I would change is

17  perhaps at the very top the CHCF Stockton should be omitted

18  because I'm now working at Elk Grove.

19         And I think that on the second page, towards the end

20  of the page, perhaps where it says "Chief Psychiatrist CHCF

21  Stockton" that should be October 2012 to October 2013.

22  Q.     And when you were chief psychiatrist at Stockton,

23  what unit were you chief psychiatrist for?

24  A.     I was for -- our mental health program was to focus

25  on the Mental Health Crisis Bed Unit and also provide mental

771

1   health support to those patients on the medicine service.  So

2   at CHCF Stockton there are -- again, they are accepting

3   patients now.  They're not yet at 100 percent.  But there is

4   a large population of medical patients.  And a fraction of

5   those patients have CCC and EOP designations, and we provide

6   psychiatric support to those patients as well.

7   Q.     You oversaw the Mental Health Crisis Bed Unit at

8   Stockton; is that accurate?

9   A.     Yes.  And I -- you know, specifically my authority

10  and supervision was over the senior psychiatrists and staff

11  psychiatrists.  So I did not have authority over all

12  disciplines.

13  Q.     And when did the Mental Health Crisis Bed Unit at

14  Stockton accept its first patient, Dr. Lindgren?

15  A.     I don't know the precise date, but I think it was

16  early August.

17  Q.     Is it accurate to say that by the time you left 11

18  patients had been in the Mental Health Crisis Bed at

19  Stockton?

20  A.     I don't know the exact number, but I think that --

21  I'd have to think it was more.

22         Could I expound?

23  Q.     No.  Not right now.

24         THE COURT:  As I say, your attorney will have an

25  opportunity to redirect if they believe it necessary, and I

772

1    assume they'll communicate before they make a decision.

2              You may proceed, ma'am.

3              MS. RIFKIN:  May I approach the witness, Your Honor?

4              THE COURT:  You may.

5              (Exhibit handed to witness.)

6    BY MS. RIFKIN:

7    Q.      Dr. Lindgren, I've handed you what's been marked

8    Plaintiffs' Exhibit 1202.  This is a report that's provided

9    by CDCR to the Special Master in this case and to plaintiffs'

10   counsel.

11             And there is a cover letter and what's attachment 6

12   to the report.  If I can ask you to turn to --

13             THE COURT:  You're going to ask him questions about

14   the content?

15             MS. RIFKIN:  Yes.

16             THE COURT:  Do you move the matter into evidence so

17   you can do that?

18             MR. RUSSELL:  Yes, Your Honor.  No objections.

19             THE COURT:  All right.  That is your motion, ma'am?

20             MS. RIFKIN:  Yes, Your Honor.

21             THE COURT:  Received.

22                  (Whereupon, Plaintiffs' Exhibit 1202 received

23                   into evidence.)

24   BY MS. RIFKIN:

25   Q.      If you can, turn to the second to last page.  At the

773

1    bottom there's a marking.

2          Page 152, bottom right-hand corner.

3    A.      I see a page 152.

4    Q.      Okay.  At the top it says California Health Care

5    Facility Stockton CHCF Mental Health Crisis Beds.

6          Do you see that?

7          MHCB?

8    A.      I see -- in truth, I'm not sure I'm on the right

9    page.

10         152?

11   Q.      That's right?

12   A.      Look at the top in the middle of the page?

13         THE COURT:  Look at the left-hand corner.  You'll

14   see --

15         THE WITNESS:  Yes, I do.  I see that, yes.  Uh-huh.

16   BY MS. RIFKIN:

17   Q.      And this is a list of patients in the Mental Health

18   Crisis Bed for August 2013 for your facility; that's correct,

19   right, Dr. Lindgren?

20         MR. RUSSELL:  Objection, Your Honor.  Lacks

21   foundation.  Calls for speculation.  There is no evidence

22   that Dr. Lindgren has seen this document.

23         THE COURT:  Well, yes.  That objection is well-taken.

24         But you've conceded that the document is in evidence

25   because it represents your -- I don't mean you personally --

774

1    but CDCR's report to the Special Master.  And therefore, it

2    is in evidence.

3              And I expect the only question is where do you see

4    August?

5    BY MS. RIFKIN:

6    Q.        I'm sorry.  It says at the top for the period of

7    August 1st, 2013 to August 31st, 2013.

8              THE COURT:  I see that now.

9              Do you want him to count the number of people?

10   BY MS. RIFKIN:

11   Q.        I'm asking you if looking at this list, this is the

12   list of patients in the crisis beds?

13             THE COURT:  He's never seen this document apparently.

14             Have you ever seen this document?

15             THE WITNESS:  No.

16   BY MS. RIFKIN:

17   Q.        But you did oversee the Crisis Bed Unit for 2013; is

18   that right, Doctor?

19   A.        I oversaw the psychiatrists that work in the crisis

20   bed, yes.

21   Q.        So you don't know if this list of eleven patients

22   represents the patients that were there during the time that

23   you oversaw the unit in August?

24   A.        In truth, I don't know because I'm not sure I can

25   accurately read this page.  I don't know how to interpret

775

1    the -- I can tell you how the patients were admitted and how

2    quickly, if that would help.

3         THE COURT:  The question is, does -- this document

4    suggests that there are only eleven patients during August.

5    And the question, I suppose, is do you have any reason to

6    doubt the accuracy of this document, whether you have seen it

7    before or not?

8         THE WITNESS:  I would say I don't have any reason to

9    doubt it, but I don't -- in truth, I have trouble

10   interpreting the document.

11        THE COURT:  All right.

12   BY MS. RIFKIN:

13   Q.    Do you know how many patients the Mental Health

14   Crisis Bed Unit at Stockton had total by the time that you

15   left?

16   A.    I'm not sure.  I can explain to you how fast we

17   accepted patients if you like.

18   Q.    But you don't know how many patients were admitted in

19   the unit you were chief psychiatrist for?  Approximately?

20   A.    I would say approximately 30.

21   Q.    And there were two cell extractions that you reported

22   that you were personally authorized?

23   A.    Only one.  I think there were perhaps two cell

24   extractions that may have occurred in that area that I had

25   some authority over or influence over.  And there was only

776

1    one cell extraction that I was involved in the discussion and

2    planning for.  And that cell extraction was actually located

3    on the medicine service.

4         THE COURT:  So that cell extraction did not involve a

5    person with mental health problems as far as you know?

6         THE WITNESS:  No.  No.  They did.  The person was --

7    had a primary problem of medical problems, and they were

8    located on the medicine service.  But in addition to their

9    medical problems, they had psychiatry problems as well.

10        THE COURT:  Okay.  Now you're saying "they" as if

11   there were two.

12        Were both of them persons with medical problems which

13   also had psychiatric issues?

14        THE WITNESS:  I'm not familiar with the -- I'm not

15   familiar with the second cell extraction that someone

16   mentioned to me.  The only cell extraction that I'm familiar

17   with is just one person that was on the medicine service.

18        THE COURT:  And were you physically present when that

19   occurred?

20        THE WITNESS:  I was not in the room viewing the cell

21   extraction.

22        THE COURT:  All right.

23        I guess while we're worrying about that, I'm not sure

24   why, as far as you know was OC spray used to accomplish the

25   cell extraction?

777

1    THE WITNESS:  Not the one that I was involved in the

2    discussion.

3    THE COURT:  Thank you.  Okay.

4    BY MS. RIFKIN:

5    Q.    And yesterday you testified that there was no

6    long-term harm to prisoners with mental illness in CDCR as a

7    result of the use of force because none of them had ever

8    mentioned this to you when you were treating them on parole;

9    is that accurate?

10   A.    It's accurate that I, in my work in parole, and

11   working with the parolees, I didn't see evidence of long-term

12   psychological damage from use of OC spray to extract someone

13   from a cell.  And specifically, people did not mention this

14   to me as a stressor.

15   Q.    Did you review the custody records for the parolees

16   that you treated when you were a psychiatrist?

17   A.    Only some.

18   Q.    You reviewed some custody records?

19   A.    Yes.  So we would be provided with a summary, and

20   then if need be, we would ask for additional information and

21   it would be sent to us from the prison.

22   Q.    Did any of those custody records you reviewed ever

23   include a use of force?

24   A.    Not that I remember.  In truth, they would not send

25   us every piece of paper on the inmate.  They would send us

778

1  something that was mental health specific.

2  Q.      So you don't know if any of those parolees that you

3  treated while you were a psychiatrist for parolees ever

4  experienced a use of force while in prison, do you?

5  A.      Not certain.

6  Q.      So your conclusion that they wouldn't suffer --

7           THE COURT:  Please, you'll make an argument at the

8  end.

9  BY MS. RIFKIN:

10 Q.      Dr. Lindgren, doesn't it happen quite frequently that

11 people are traumatized by experiences without being able to

12 identify the specific source of the trauma?

13 A.      I think -- Can you restate?  The question seems very

14 general.  Could you restate?

15 Q.      Sure.

16          THE COURT:  Does that mean you can't answer the

17 question or you don't know what it means?

18          THE WITNESS:  I don't know what it means.

19          THE COURT:  Okay.

20          THE WITNESS:  I do -- I am able to answer -- I'll try

21 as hard to answer your question.  I just don't understand it.

22 BY MS. RIFKIN:

23 Q.      I don't want you to answer a question you don't

24 understand.  I'll try and rephrase.

25          In your experience as a treating psychiatrist, you

779

1    treat people --

2          THE COURT:  Let me start with something even more

3    fundamental.

4          I think you have told me -- and if I'm wrong that's

5    perfectly all right -- that psychiatrists frequently don't

6    know what caused the mental illness.

7          THE WITNESS:  Yes.  It's believed that much of mental

8    illness or almost all of it is genetically driven.

9          THE COURT:  Okay.  So your personal view is that the

10   things that happened to people may not have any mental health

11   consequences because it's essentially genetically driven?

12         THE WITNESS:  No.  No.  So even in schizophrenia, a

13   person has a genetic disposition for schizophrenia.  And it

14   is thought other insults to that person in their teens and

15   such may cause that to precipitate.

16         THE COURT:  So then it is -- is it correct that

17   trauma is frequently a precipitating event in the

18   manifestation of serious mental illness?

19         THE WITNESS:  Trauma can be a precipitant, especially

20   in things like posttraumatic stress disorder.

21         THE COURT:  In our case mostly what I have heard

22   about is schizophrenia and paranoia.

23         I don't mean to be taking over the testimony.  I'm

24   trying to understand what this witness's view of his

25   profession are.

780

1        As to schizophrenia and trauma, is it equally true --

2    I didn't mean to put the words in your mouth.

3        Is it true -- is it correct that trauma may be a

4    precipitating event in the manifestation of schizophrenia or

5    paranoia?

6        THE WITNESS:  I think that any stress could

7    precipitate mental illness or symptoms.

8        THE COURT:  Okay.  And so it's not unreasonable to

9    say, when we're talking about stressors, that trauma is a

10   stressor?

11       THE WITNESS:  Yes.

12       THE COURT:  Now you can ask your question because it

13   assumed all of that, and I didn't know whether any of that

14   was true.

15   BY MS. RIFKIN:

16   Q.    Okay.  So having established, I guess, that trauma

17   can be a stressor that affects someone's mental illness -- is

18   that accurate based on what you just testified?

19   A.    Trauma could precipitate or perhaps --

20       THE COURT:  Exacerbate.

21       THE WITNESS:  Yes.  Uh-huh.  And certainly I can

22   speak also to -- I'll wait for you to ask questions, but

23   post-traumatic stress disorder is an example.

24       THE COURT:  We're trying to limit ourselves to what

25   has been discussed in this case so far.  As far as I know

781

1    post-traumatic stress has not been one of the issues.

2    Schizophrenia and paranoia apparently are the -- well, I

3    ought to ask you about that.

4         As far as you know, and recognizing that you really

5    may not have this information at hand, is schizophrenia

6    and/or paranoia the predominant mental health conditions in

7    inmates in CDCR.

8         THE WITNESS:  I think in the inmates in

9    inmate-patients in CDCR, they run the full spectrum of

10   possibilities.  So there are folks that have very minor

11   mental health problems, such as perhaps depression that is

12   completely treated, versus schizophrenia that might be

13   chronic or refractory.

14        THE COURT:  We're dealing with people who are Coleman

15   class members.  Therefore, they are people with serious

16   mental illnesses.

17        As to those folks, is the predominant illnesses the

18   result of schizophrenia and paranoia?

19        THE WITNESS:  I think -- I don't think so.  I think

20   it runs the gamut.

21        THE COURT:  All right.  Okay.

22   BY MS. RIFKIN:

23   Q.    Many of these inmates' diagnosis also include, for

24   example, bipolar disorder; is that accurate?

25   A.    Bipolar disorder is included in the list, but I

782

1   think, again, it is sort of a wide spectrum of patients and a
2   wide spectrum of diagnoses.
3   Q.       To go back to what we were just discussing, people
4   can experience symptoms of mental illness as a result of
5   experiencing trauma, right?
6   A.       It's possible for a person to have symptoms due to
7   stress.
8   Q.       Due to a stressor?
9   A.       A stressor.
10  Q.       And these patients aren't always able to identify the
11  link between the symptoms that they're experiencing and that
12  stressor, correct?
13  A.       When psychotically disorganized, yes, they have
14  trouble linking cause and effect.
15  Q.       And Doctor, if I can return your attention to what's
16  been marked Plaintiffs' Exhibit 1174, your resume, I believe
17  you testified just a few minutes ago that you received --
18           THE COURT:  I don't know that this was moved into
19  evidence.
20           Apparently it was not.  Do you want to move it in?
21           MS. RIFKIN:  Yes.  I'm sorry.  I would like to move
22  it into evidence.
23           THE COURT:  Received.
24               (Whereupon, Plaintiffs' Exhibit 1174 received
25                 into evidence.)

783

BY MS. RIFKIN:

Q.      You testified earlier that besides your experience in
Stockton, your inpatient training occurred at John Umstead
and Dorothea Dix Hospital in North Carolina, right?

A.      Well, I did inpatient work at John Umstead and
Dorothea Dix Hospital and also at UNC Hospital in
Chapel Hill.  And I also did work at a county hospital that
was in Smithfield, North Carolina.  So I worked there.  They
had a small inpatient unit.

Q.      And you're aware that in 2001 the Civil Rights
division of the US Department of Justice opened an
investigation into both the Umstead Hospital and the Dorothea
Dix Hospital and found widespread constitutional violations
including inadequate mental health treatment, inappropriate
use of restraints and seclusion, and inappropriate treatment
to ensure the safety of patients?

A.      I'm not aware of that specifically.

Q.      Are you aware of the investigation?

A.      I don't think I was aware of that specific
investigation.

Q.      Were you aware of these findings?

A.      I'm not -- in truth, what you are telling me, I
don't -- I have not heard of it before.  I would be happy to
review any sort of documents around that if you want me to.

        MS. RIFKIN:  May I approach the witness?

784

1            THE COURT:  You may.

2            (Exhibit handed to witness.)

3            MS. RIFKIN:  Your Honor, I would like to move what's

4    been marked Plaintiffs' Exhibit 1201 into evidence as a

5    public record from the United States Department of Justice

6    Civil Rights Division under Rule 201 -- I'm sorry -- under

7    Rule 8038(a).

8            MR. RUSSELL:  Your Honor, defense objects on the

9    grounds of relevancy.

10            THE COURT:  That objection is overruled.

11            Received.

12                (Whereupon, Plaintiffs' Exhibit 1201 received

13                 into evidence.)

14    BY MS. RIFKIN:

15    Q.      Dr. Lindgren, if you can look at the document that's

16    been marked Plaintiffs' Exhibit 1201, the facilities listed

17    in the first paragraph of this document about the

18    investigation are Dorothea Dix, Broughton, Cherry and John

19    Umstead.

20            Dorothea Dix and John Umstead are the places you

21    referred to that you were trained at; is that right?

22    A.      Yes.

23    Q.      And if you can, turn to page 17 -- I'm sorry -- 17 of

24    this document.

25    A.      Yes.

785

1    Q.      Can you read the first paragraph under sub (b)?

2    A.      The section entitled Inappropriate Use Of Restraints

3    And Seclusion?

4    Q.      Yes?

5    A.      (Reading:)

6            Restraint and seclusion policies and practices

7            depart substantially from generally accepted

8            professional standards throughout all four hospitals.

9            Restraints and seclusion are emergency interventions

10           to be used only when other interventions fail to

11           prevent imminent danger to self or others.  All four

12           hospitals failed to develop and implement policies

13           and procedures to appropriately limit the use of

14           restraint and seclusion to emergency situations.

15           (Reading concluded.)

16           Do you want me to continue?

17   Q.      Yes, please.

18   A.      (Reading continued:)

19           Documentation and analysis of restraint and seclusion

20           is particularly deficient at all four hospitals.

21           Rarely is adequate justification documented for

22           restraint and seclusion orders.  Staff often fail to

23           identify the factors precipitating restraint and

24           seclusion and lack an understanding of less

25           restrictive measures that could be utilized to handle

786

1              patients' behaviors.  As a result, patients are

2              placed inappropriately in restraint and seclusion

3              when alternative less intrusive interventions are

4              available.  Patient records uniformly revealed a

5              lack of objective recorded criteria for the patient's

6              release from restraint or seclusion.  The lack of

7              criteria results in patients remaining in restraint

8              and seclusion long past the point according to

9              accepted professional practice when release should

10             occur.  In addition, critical post-episode debriefing

11             information analyzing the use of restraint and

12             seclusion either is omitted or terse, vague and

13             generalized.  This, in turn, has led to the overuse

14             of restraint and seclusion because the hospitals are

15             not analyzing incidents to determine what, if

16             anything, can be done differently.

17             (Reading concluded.)

18    Q.      If you can turn to page 8, please?

19             THE COURT:  Page 8?

20             MS. RIFKIN:  Yes.

21    BY MS. RIFKIN:

22    Q.      If you can, read just the first paragraph under 2(a),

23    Patients Exhibiting Behavior Problems.

24    A.      (Reading:)

25             Behavior management planning and psychological

787

1          services are inadequate at North Carolina's four

2          state-operated psychiatric hospitals.  Of the records

3          reviewed, we found numerous patients with recurrent

4          behavioral problems, including self-injurious

5          behavior, who were not receiving appropriate

6          behavioral management.

7          (Reading concluded.)

8    Q.    Dr. Lindgren, you testified that you reviewed seven

9    videos of cell extractions in preparation for your testimony

10   here today?

11   A.    Yes.

12   Q.    And I believe yesterday you already testified that

13   you thought that the cell extraction for Inmate A was

14   appropriate and not objectionable; is that correct?

15   A.    I think that it was preferred over the alternative

16   for certain.  And I'm not an expert on the administration or

17   introduction of OC, but I think that it was appropriate to

18   extract the patient so that they could be treated and

19   medicated.

20   Q.    Do you think any of the cell extractions in the seven

21   videos you reviewed were inappropriate?

22         MR. RUSSELL:  Objection, Your Honor.  Vague and

23   ambiguous.  Also lacks foundation.

24         THE COURT:  Overruled.

25         THE WITNESS:  I think that, generally speaking,

788

1    extracting the patient in those seven videos that I looked

2    at, the patient did have to be extracted, and that it was

3    appropriate to extract the patient.

4    BY MS. RIFKIN:

5    Q.    Do you think how the extraction was performed, in the

6    seven videos you reviewed, was acceptable?

7         MR. RUSSELL:  Your Honor, "acceptable" is vague and

8    ambiguous, but it also exceeds the scope of direct

9    examination and the purpose for which this witness was

10   offered.

11        MS. RIFKIN:  I can be more specific.

12        THE COURT:  I don't understand, but the attorney is

13   willing to rephrase.  We don't have to worry about it.

14   BY MS. RIFKIN:

15   Q.    Based on your understanding of acceptable clinical

16   practices, do you think that any of the cell extractions of

17   the seven videos you reviewed were inappropriate?

18        MR. RUSSELL:  Your Honor, it is same objection.

19   Dr. Lindgren is a psychiatrist.  I think the question is much

20   broader than just involving psychiatry.

21        THE COURT:  Well, but the question deals specifically

22   with his -- as I understand the question, with his role as a

23   psychiatrist.

24        From a psychiatrist's point of view, conceding

25   apparently -- nobody apparently disagrees that cell

789

1  extraction was appropriate -- the question is whether or not

2  the means involved were appropriate.

3          Do you have an opinion about that from a psychiatric

4  point of view?

5          THE WITNESS:  I would qualify it as saying I'm not an

6  expert at administration or introduction of OC spray.  I

7  think it was appropriate to extract the patients, and

8  certainly the use of a strategy to use OC spray instead of

9  physical sort of restraint is probably preferred, but I don't

10  know that I am expert enough to comment specifically on every

11  element of the extraction, such as the sort of method of

12  introduction of OC and things like that.

13  BY MS. RIFKIN:

14  Q.      But you're expert enough to evaluate whether OC spray

15  versus other methods of cell extraction are preferable in

16  terms of harm to patients?

17  A.      I can say, generally speaking, that OC spray would be

18  preferable to a physical altercation.

19  Q.      Generally speaking, based on what?

20  A.      Based on, I guess, my experience in removing patients

21  from their rooms and seeing --

22  Q.      Your experiencing removing --

23          THE COURT:  Ma'am, you interrupted.

24          MS. RIFKIN:  I'm sorry.  Go ahead.

25          THE WITNESS:  And witnessing patients get

790

1    accidentally injured or staff accidently injured, and then

2    coupled with what seems to be the consensus in the essays and

3    discussions that, you know, physical altercation is to be

4    avoided.

5    BY MS. RIFKIN:

6    Q.      And your experience removing patients from their

7    rooms is based on your experience, as you testified

8    yesterday, in the state hospitals in North Carolina, correct?

9    A.      Yes.

10           MS. RIFKIN:  No more questions.

11           MR. RUSSELL:  No further redirect, Your Honor.

12           The witness can be released.

13           THE COURT:  Before you are released, sir, I'm puzzled

14    by -- never mind whether I'm puzzled.

15           Let's take a number of examples.

16           We have a patient in A, as I understand it, who is

17    hallucinating, thinks he's being manipulated by outside

18    forces of some kind, apparently, more specifically, some sort

19    of people from outside or above him or something.

20           Now you introduce into that circumstance four or five

21    guys who are dressed in to say the least unusual gear.

22           It is your view that wouldn't have any effect, the

23    fact that he's got these hallucinations to begin with and the

24    people he's confronting are all dressed in this strange garb,

25    is irrelevant to whether or not there would be long-term

791

1    trauma?

2          THE WITNESS:  Right.  I don't think there would be

3    long-term trauma.  Also, your know, I've occasionally or

4    rarely witnessed a patient injury a staff person by biting

5    them.  And so --

6          THE COURT:  I understand.

7          THE WITNESS:  -- you would like to be protected.

8          THE COURT:  I understand there are perfectly good

9    reasons for that garb.  Indeed, when you were asked whether

10   it would adversely affect the patient, you answered, "Look,

11   we're trying to protect the staff," which was not responsive

12   but nobody cared so I let it go.

13         But my question is just as a matter -- I understand

14   common sense is what tells us the world is flat.

15   Nonetheless, just as a matter of psychiatric knowledge, your

16   perception -- or your testimony is that that experience would

17   have -- would not have any -- it would not be a traumatic

18   effect?

19         THE WITNESS:  No.  That garb would not contribute to

20   a traumatic effect.  I think that patients who are cogent

21   understand what it is for, and then folks that might be

22   horribly psychotic might not remember it.

23         THE COURT:  That's the second or third time we talked

24   about memory.  I'm not clear what all that means.

25         People sometimes can't verbalizing their memories.

792

1    That doesn't mean they don't remember things.  Or is that

2    wrong?

3            THE WITNESS:  No, you are correct.  Yes.

4            THE COURT:  Of course.

5            I'm sorry.  I didn't mean that as if I knew something

6    because I don't.

7            So the fact that somebody is not verbalizing their

8    memory doesn't mean that they don't have the memory?

9            THE WITNESS:  It is possible.  Yes.

10            THE COURT:  Okay.  And I think that satisfies my

11    understanding of at least some of this testimony.

12            Let me go on to another subject.

13            If a person is suffering a severe mental

14    schizophrenic event -- I guess that's what you call it?

15            THE WITNESS:  Uh-huh.

16            THE COURT:  Among the things that is going on is he's

17    completely disorganized.  He can't integrate the experiences

18    around him.

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Does that depend upon the nature of the

21    experience or of the illness -- or the severity of the

22    illness, or is the illness of such a character that you may

23    be able -- may -- anybody may -- as a general matter does

24    that disorganization extend to whatever is going on around

25    him or is it somehow or other limited?

793

1          I don't know whether my question is very good.

2          THE WITNESS:  I'm not sure I understand the

3     question.

4          THE COURT:  Fair enough.

5          As part of the consequence of this disorganization, I

6     think you've established for me, that it means he really

7     can't integrate the experience and rationally respond to it.

8          THE WITNESS:  Yes.  He can't sort of, in a sense,

9     process.

10         THE COURT:  Process.

11         And the inability to process would extend to the

12    gamut of the experience.  It isn't that he doesn't understand

13    this, but he does understand that or so on and so forth?

14         THE WITNESS:  Right.  I would -- you know, it would

15    depend on the severity of the symptoms and the type of the

16    symptoms.  But I think what you're referring to is folks that

17    are extremely disorganized as a result of their

18    schizophrenia.  And when they are extremely disorganized,

19    they're, in a sense, universally unable to process.

20         THE COURT:  Thank you, sir.  That helps a lot.

21         And it is clear, I think nobody disputes, that

22    Patient A at the time of the cell extraction was extremely

23    disorganized.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  My questions invite questions of counsel.

794

1          Plaintiff?

2               MS. RIFKIN:  Yes.  One.

3               THE COURT:  Hang on.

4          I'm sorry for keeping you here.  I really needed to

5     understand what the testimony was.

6               MR. RUSSELL:  I have one.

7               THE COURT:  Sure.

8                         REDIRECT EXAMINATION

9     BY MR. RUSSELL:

10    Q.    I think it relates to the questions that His Honor is

11    ask you.

12          Going to Inmate A, do you have an opinion as to what

13    would be more injurious, allowing the psychotic episode to

14    continue or using whatever means were available to have the

15    inmate medicated?

16    A.    It is always best to treat.

17    Q.    Rather than to allow the event to continue on?

18    A.    Yes.  Rather than to allow the symptoms to continue.

19                        RECROSS-EXAMINATION

20    BY MS. RIFKIN:

21    Q.    I believe you testified yesterday it is always better

22    to treat as soon as possible rather than allow the symptoms

23    to continue; is that correct?

24    A.    Yes.

25               THE COURT:  Or the person to decompensate, which is

795

1    what happened to A?

2            THE WITNESS:  Yes.

3    BY MS. RIFKIN:

4    Q.      And then just the court's questions about memory, I

5    wanted to ask you, when Dr. Wagner was testifying yesterday

6    about his note while Inmate A was in restraints, and

7    Dr. Wagner read his note from Trial Exhibit 1147, page 142,

8    regarding Inmate A, "He claims he doesn't remember what

9    happened yesterday which is untrue, acutely psychotic people

10   remember events very well," you disagree with Dr. Wagner

11   about that?

12           You can look at me.

13   A.      I think that it depends on the patient, but certainly

14   folks that are very psychotic frequently don't remember the

15   details of their psychotic episode.

16   Q.      Or events that happened to them, is what you said

17   earlier?

18   A.      Yes.  Uh-huh.

19           MS. RIFKIN:  No more questions.

20           THE COURT:  May the witness be released?

21           MR. RUSSELL:  Yes, Your Honor.

22           MS. RIFKIN:  Yes, Your Honor.

23           THE COURT:  Thank you.

24           You may step down, sir.  You are free to go or stay,

25   as you choose.

796

1      Before you call your next witness, why don't we take

2   a 15-minute recess.

3      MR. MCKINNEY:  Thank you, Your Honor.

4      (Off the record at 10:40 a.m.)

5      (On the record at 11:00 a.m.)

6      THE CLERK:  Please, remain seated.

7      Court is back in session.

8      THE COURT:  Call your next witness, sir.

9      MR. MCKINNEY:  Your Honor, defendants call Michael

10  Stainer.

11      THE CLERK:  Thank you.

12               MICHAEL STAINER,

13  was thereupon called as a witness herein by the Defendant,

14  and having been sworn to tell the truth, the whole truth and

15  nothing but the truth, was thereupon examined and testified

16  as follows:

17      THE CLERK:  Please, take a seat.  State your name,

18  spell your last name and speak directly into the microphone.

19      THE WITNESS:  Michael Stainer, S-t-a-i-n-e-r.

20               DIRECT EXAMINATION

21  BY MR. MCKINNEY:

22  Q.    Good morning, Mr. Stainer.

23  A.    Good morning.

24  Q.    You're currently employed by CDCR?

25  A.    Yes, I am.

797

| 1 | Q. | What is your current position? |

1  Q.    What is your current position?

2  A.    I'm assigned presently as the Acting Director for

3  Division of Adult Institutions.

4  Q.    How long have you held that position?

5  A.    I was assigned to this position on August 1st of this

6  year.

7  Q.    And what other positions have you held within CDCR?

8  A.    I was a correctional officer.  I was a correctional

9  sergeant.  I was a correctional lieutenant.  I was a

10  correctional counselor II supervisor.  I was a correctional

11  captain, a facility captain, an associate warden over all of

12  the major divisions within the institution.

13       I was a chief deputy warden.  I was a warden.  I was,

14  for a very short stint, an associate director over the high

15  security mission.  And I was appointed as deputy director in

16  July of 2012 for the Division of Adult Institutions.

17  Q.    How long in total have you been employed by CDCR?

18  A.    Almost 27 years.

19  Q.    And within your positions within the institutions can

20  you generally describe at which institutions you were

21  employed?

22  A.    I began my career in January of 1997 at the

23  California Correctional Institution in Tehachapi.  I remained

24  there as a correctional officer, sergeant, lieutenant, CC-II,

25  that's Correctional Counselor II, and supervisor until

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

798

1    October of 2002 when I promoted to captain at California

2    State Prison Los Angeles County.

3            I came back to Tehachapi CCI in, I want to say,

4    June 2004 as a captain, and I remained there appointed as

5    associate warden, thereafter chief deputy warden, then I was

6    appointed as the warden of California Correctional

7    Institution.

8    Q.      We're going to be talking about a few terms during

9    your testimony.

10           Have you served as an incident commander.

11   A.      I have.

12   Q.      What is the role of the incident commander?

13   A.      The incident commander has overall responsibility for

14   the control, containment, the isolation and resolution of any

15   incident, whether it be a one-on-one fight to a large-scale

16   riot to a controlled use-of-force situation.

17   Q.      Have you also served as senior hearing officer?

18   A.      I have.

19   Q.      What is the role of a senior hearing officer?

20   A.      The role of a senior hearing officer is to ensure the

21   due process of the inmate with regard to the adjudication of

22   a Rules Violation Report, to render a finding based upon the

23   preponderance of the evidence, and then subsequent

24   assessments of penalties -- appropriate penalties if the

25   inmate's found guilty and -- or appropriate disposition

799

1   whether the inmate's found guilty or not guilty.

2   Q.      We'll also be talking about the Institutional

3   Executive Review Committee.

4           Are you familiar with that?

5   A.      I am.

6   Q.      What is the role of that committee?

7   A.      The role of the Institutional Executive Review

8   Committee is to review all incidents of use of force, to

9   review the actions of staff before, during and after the use

10  of force, to review each of the different review levels that

11  have been completed to ensure the appropriateness of them, as

12  well as to -- you know, we're looking at the need for the

13  force, was the force that was applied, was that appropriate

14  to the situation.

15          Again, all actions of staff before, during and after,

16  and rendering any findings relative to that as far as

17  follow-up or, you know, actions that are necessary.

18  Q.      Have you served a role on that committee?

19  A.      I have.  I have been a participant, as well as a

20  chair, both in the role of the chief deputy warden as well as

21  warden.

22  Q.      Can you briefly describe the Division of Adult

23  Institutions, what their mission is?

24  A.      The Division of Adult Institutions is CDCR's division

25  that oversees all of the 34 adult prisons, both male and

800

1  female offenders, the 42 camps, all contract beds, whether

2  they be in state or out of state, all of the support services

3  with regard to the adult institutions, whether they be the

4  Classification Services Unit, Population Management, Program

5  Support Unit.  You know, just basically anything that has to

6  do with the adult institutions.

7  Q.      As the director what are your responsibilities?

8  A.      Long and very far.  I could probably talk for quite a

9  bit here today, but I think I'll tell you what my duty

10 statement states.

11         I do have overall responsibility for the operation

12 and administration of the 34 adult institutions, the 42

13 camps, and all the contract beds within.

14         I formulate policy and procedures and review and

15 implement with regard to the operation and the administration

16 of these facilities.

17 Q.      And who did you supervise directly?

18 A.      I directly supervise two deputy directors.

19 Q.      And who do they supervise?

20 A.      One deputy director of facility operations directly

21 supervises four associate directors.  Each mission has an

22 associate director over it.

23         The other deputy director of support would directly

24 supervise an assistant deputy director and indirectly

25 supervise all the division heads or the department heads

801

1    within the Support Services Unit, which has all of our -- I

2    mentioned them earlier -- the Classification Services Unit,

3    Population Management, the budgetary functions within the

4    operations.

5    Q.      Are you familiar with the statewide Use Of Force

6    Policy?

7    A.      I am.

8    Q.      What makes up that policy within CDCR?

9    A.      What makes up that policy?

10   Q.      What are the documents that comprise the policy?

11   A.      First and foremost is the California Code of

12   Regulations, commonly referred to as Title 15.  Section 3268

13   speaks to the use of force.

14          We also have the Department of Operations Manual,

15   Section 51020.  Sometimes I'll get it mixed up.  Sometimes

16   I'll say 52010, but it is 51020.

17   Q.      As the director of the Division of Adult

18   Institutions, what are your expectations with respect to use

19   of force?

20   A.      Force --

21          THE COURT:  I don't know what means.  His personal --

22   You're about to object -- his personal expectations or what

23   the expectations are as his position as an official as to

24   what he expects.

25          MR. MCKINNEY:  The latter.

802

1    BY MR. MCKINNEY:

2    Q.      In your role as director, what are your expectations

3    for the Department?

4    A.      That both 3268, Title 15, as well as the DOM 51020,

5    that talks about how we apply the Title 15, that those be

6    followed, they be adhered to.

7            Force is, unfortunately, necessary on occasion within

8    our business, but yet only the necessary amount of force be

9    utilized when appropriate.

10   Q.      What is your role as the director in implementing the

11   policy?

12   A.      I have overall responsibility to ensure that it is --

13   you know, the policy is appropriate and that it is followed.

14           MR. MCKINNEY:  May I approach the witness, Your

15   Honor?

16           (Exhibit handed to witness.)

17   BY MR. MCKINNEY:

18   Q.      Mr. Stainer, showing now what's been marked for

19   identification as Defendant's Exhibit I, do you recognize

20   this document?

21   A.      It appears to be a photocopy of the -- I guess the

22   cover page of our Title 15 or the California Code of

23   Regulations.

24   Q.      Does this include the sections that are the Use Of

25   Force Policy under Title 15?

803

1  A.      Yes.  3268 Use of Force is included in this document.

2          THE COURT:  I'm sorry.  Give me a moment.  I'm still

3  looking.

4              (Brief pause.)

5          MR. MCKINNEY:  Page 118 of the document.

6          THE COURT:  118.  Yes.  Thank you.

7          MR. MCKINNEY:  The excerpt.  Yes.

8          THE COURT:  What page is it, sir?

9          MR. MCKINNEY:  Page 118 on the bottom of the page.

10  Right after the table of contents, Your Honor.

11          THE COURT:  Please, forgive me.

12              (Brief pause.)

13          MR. MCKINNEY:  Your Honor, at this time I would like

14  to move Exhibit I into evidence.

15          THE COURT:  Hearing no objection it is received.

16          But I'm still struggling to find out where it is.

17          There is no objection, it is received.

18              (Whereupon, Defendant's Exhibit I received into

19               evidence.)

20          THE COURT:  Just give me one more moment.

21          THE COURT:  3268 Use of Force is at page 118.  Is

22  that correct, sir?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Okay.  Now we're all together.

25          Go ahead.

804

```
 1   BY MR. MCKINNEY:

 2   Q.     Mr. Stainer, does the policy define reasonable force?

 3   A.     It does.

 4   Q.     What is that definition?

 5   A.     As read:

 6          (Reading:)

 7          The force that an objective, trained and competent

 8          correctional employee, faced with similar facts and

 9          circumstances, would consider necessary and

10          reasonable to subdue an attacker, overcome

11          resistance, effect custody, or gain compliance with a

12          lawful order.

13          (Reading concluded.)

14          MR. MCKINNEY:  May I approach the witness again, Your

15   Honor.

16          THE COURT:  I'm sorry, sir.

17          MR. MCKINNEY:  May I approach?

18          THE COURT:  Sure.

19          (Exhibit handed to witness.)

20   BY MR. MCKINNEY:

21   Q.     Mr. Stainer, showing you now what's been marked for

22   identification as Defendants' Exhibit J, are you familiar

23   with this document?

24   A.     Yes.

25   Q.     What is the document?
```

805

1    A.       This is my declaration with regard to this case.

2             MR. MCKINNEY:  I would just like to remark for the

3    record, Your Honor, this is Docket Number 4708-1 filed with

4    the court on July 24th, 2013.

5    BY MR. MCKINNEY:

6    Q.       Mr. Stainer, if I can turn your attention to Exhibit

7    A of the document.

8             What is this document?

9    A.       This is the excerpt from the Department of Operations

10   Manual, specifically DOM Section 51020, our Use Of Force

11   Policy.

12            THE COURT:  I'm sorry, sir.  Tell what DOM stands

13   for?

14            THE WITNESS:  DOM stands for Department Operations

15   Manual.

16            THE COURT:  Thank you.

17   BY MR. MCKINNEY:

18   Q.       Mr. Stainer, is there a specific provision regarding

19   use of force against an inmate with serious mental illness in

20   this manual?

21   A.       There is.

22   Q.       If I could turn your attention to Section 51020.12.1.

23   A.       I believe it is .2.

24   Q.       Pardon me. So .2.1  Thank you, Mr. Stainer.

25   A.       It's .12.2.

806

1   Q.      Is this the provision you were just referring to?

2   A.      Controlled Use Of Force Involving Seriously Mentally

3   Ill?

4   Q.      Yes.

5   A.      Yes.  51020.12.2.

6           THE COURT:  I am unable to locate it.  It is my

7   fault.  Not anybody else's.

8           What page am I looking at at the bottom?

9           MR. MCKINNEY:  For the court's reference it is page

10  320 at the bottom, page 5 of 15 of the document on the top.

11          THE COURT:  Okay.

12  BY MR. MCKINNEY:

13  Q.      Mr. Stainer, what does this provision require?

14  A.      If we were to use -- if I can paraphrase?

15          THE COURT:  I'm sorry.  I have Controlled Use Of

16  Force Video Recording.  But that --

17          MR. MCKINNEY:  It's the section immediately

18  thereafter, right below, .12.2.

19          THE COURT:  Oh, okay.  I'm sorry.  I see.

20  BY MR. MCKINNEY:

21  Q.      Go ahead, Mr. Stainer.  If you can, summarize what

22  the provision requires?

23  A.      In essence, this provides additional safeguards and

24  requirements that we must follow if there is a controlled

25  use-of-force situation and the inmate is designated as

807

1  seriously mentally ill.

2  Q.      What are those requirements?

3  A.      First and foremost, a licensed healthcare

4  practitioner -- I'll just read the bullets -- designated by

5  the healthcare manager shall be consulted prior to use of

6  chemical agents.

7        Clinical intervention by a licensed practitioner

8  shall be attempted.  And the clinical intervention shall also

9  proceed the extraction of any inmate who is being extracted

10 upon the written order of a medical doctor, psychiatrist or

11 psychologist to facilitate a change in housing for treatment

12 purposes.

13       The clinician shall attempt to verbally counsel the

14 inmate and persuade the inmate to voluntarily come out of the

15 area without force.  These efforts shall continue during the

16 cool down period.

17       And whenever circumstances shall permit, the

18 clinician shall be a mental health provider, i.e. a

19 psychiatric technician, licensed clinical social worker,

20 psychologist or psychiatrist.

21 Q.      In all of this specific provision does the remainder

22 of the Use Of Force Policy continue to apply to inmates with

23 serious mental illness?

24 A.      It does.

25 Q.      Mr. Stainer, does CDCR's policy require the force be

808

1    used in any particular sequence?

2    A.      No, it does not.

3    Q.      Why is that?

4    A.      Every situation in its own is a very dynamic

5    situation.  They're all individual.  So to say that, you

6    know, to use this force option as opposed to that force

7    option, just it doesn't work.  It places inmates in jeopardy,

8    it places staff in jeopardy.

9    Q.      And instead does the policy require discretion be

10   given to the officers?

11   A.      Yes, it does.

12   Q.      Is that appropriate in your experience?

13   A.      In my experience it is.

14   Q.      Are there reasons it might not be appropriate to have

15   a specific sequence where force must be used?

16          MS. CESARE-EASTMAN:  Objection, Your Honor.  The

17   questions are leading.

18          MR. MCKINNEY:  It is a "yes" or "no" question, Your

19   Honor.

20          THE COURT:  The objection is overruled.

21          You may answer.

22          THE WITNESS:  Can you repeat that, please?

23   BY MR. MCKINNEY:

24   Q.      Yes.  Is there anything inappropriate about requiring

25   an officer to use force in a particular sequence?

809

1   A.      I can think of a couple of situations just off the

2   top of my head.

3   Q.      Go ahead.  Describe those.

4   A.      Well, for example, again -- well, let me back up here

5   a bit.

6           The situation, the dynamics surrounding it, we

7   provide options to the staff members, different force

8   options.  They have to review all of the circumstances

9   occurring within that situation and then make the best

10  decision on what is the best appropriate use of force option.

11          If we stated that you must always use physical force

12  first, then OC or other chemical agents, and then less lethal

13  impact rounds and then OC, or anything in that nature, we're

14  actually taking away from the options that the person has.

15  And it may not be the best option for that particular

16  scenario.

17          And what ends up happening is, you know, the incident

18  is allowed to continue because either A, that force option

19  may not be appropriate for that situation, therefore, it is

20  not effective and we end up getting inmates seriously injured

21  because we're unable to stop the conduct occurring.

22          If we said you must always use pepper spray before

23  you use your baton, in close quarters you end up

24  contaminating yourself or exposing yourself, or maybe your

25  partner, and then the situation, again, is allowed to

810

1    continue.  You actually put yourself at greater risk.

2            So again, it's -- the officer or the staff member

3    utilizing the force option is the required to select the most

4    appropriate force option and at that point justify and

5    articulate why it is they used what they used.

6    Q.      What does the policy require before an officer uses

7    any of the force options?

8    A.      In most all cases it's definitely preferable and

9    recommended that we are to provide verbal orders.

10   Q.      And in your experience do officers comply with that

11   and use verbal orders?

12   A.      In almost every situation.

13   Q.      How effective is that?

14   A.      Sometimes it is effective.  Sometimes we're able to

15   avoid the use of force totally with verbal orders.

16   Q.      What is the State's policy with respect to use of

17   pepper spray?

18   A.      Pepper spray may be used, the minimum amount

19   necessary to achieve compliance with the order is the

20   expectation, if that's what you're asking.

21   Q.      Does the current policy provide guidance with respect

22   to how much pepper spray an officer may use?

23   A.      Present policy does not.

24   Q.      In your view would it be a good idea to add such a

25   limitation?

811

1  A.      Based on the few things that have been happening, we

2  are actually in the process of revising our Controlled -- the

3  section within this DOM that speaks to the Controlled Use Of

4  Force.

5  Q.      If you can briefly describe those revisions?

6          THE COURT:  What is coming or what is?

7  BY MR. MCKINNEY:

8  Q.      What's coming?

9  A.      Presently what we proposed, and we are in the process

10  of setting up a meeting of the Joint Use of Force Committee

11  to review the recommended revisions, but there will be a

12  limit -- this is a specific controlled use of force.

13          There will be a mandatory waiting period between

14  applications of OC.  There will be a maximum amount of

15  duration of spray per application.  There will be maximum

16  applications of product in totality.

17          We're also looking at the -- that's specific to use

18  of OC.  There's other aspects of this that we're looking at

19  as well.

20  Q.      Are you familiar with cell extractions?

21  A.      Yes, I am.

22  Q.      Describe your experience and familiarity with cell

23  extractions?

24  A.      I have -- I have been a participant as a -- I guess

25  today we would refer to it as a response supervisor.  That

1   would be the correctional sergeant actually on the cell

2   extraction team.

3          I have been an incident commander in numerous cell

4   extractions.  I have been an on-site manager in numerous cell

5   extractions.  And I have been -- you know, reviewed cell

6   extractions.  Not so many as part of the reviewing for the

7   IERC or the Institutional Executive Review Committee because

8   there weren't that many happening.

9   Q.     Have you been trained in cell extractions?

10  A.     I have been trained.

11  Q.     What was that training?

12  A.     I actually -- I attended probably two or three

13  in-service training classes at California Correctional

14  Institution in Tehachapi as an officer, as well as sergeant,

15  with regard to applying the local operating procedure

16  regarding cell extractions.

17         And then as a lieutenant I actually -- and a captain,

18  I actually wrote the lesson plan at Tehachapi and revised the

19  operational procedures.

20         THE COURT:  You said something which I think is the

21  first time I have heard it.  In addition to the Title 15 and

22  the DOM, the institutions have their own regulations

23  concerning the application of force -- or generally, I mean,

24  is that true?

25         THE WITNESS:  It would be site specific.  And back

813

```
 1    then, prior to -- when I say "back then," it was a few years
 2    ago, sir.  What institutions would have to day would be a DOM
 3    supplement so -- but it would address site-specific processes
 4    because while the DOM, you know, talks about, you know, some
 5    specifics, there are other specifics that we need to entail
 6    such as, you know, the specific duties of each of the
 7    officers, where we might stage, you know, where you would
 8    submit as evidence, what particular armaments are approved at
 9    that particular institution.
10            But they cannot supersede it.  It can go narrower.
11            THE COURT:  No.  I understand.  I just wanted to know
12    whether there was yet another group of regulations that might
13    bear upon the questions that I'm facing.  And the answer is
14    yes, there are?
15            THE WITNESS:  Yes.
16    BY MR. MCKINNEY:
17    Q.      Just one follow-up question.
18            Can you describe the role of the wardens in
19    implementing of the use of force policies statewide?  Or at
20    their institution, to correct that question.
21    A.      Well, the wardens are to ensure, number one, that
22    their institution is in compliance and remains in compliance,
23    that there staff actions are within compliance of, you know,
24    the Title 15 and the Department Operations Manual, as well as
25    if they have any local supplements to the Department
```

814

1    Operations Manual, that they do not exceed the guidelines

2    provided by the Department Operations Manual.

3         Reviewing the use of force incidents, and again

4    taking appropriate action when necessary when the rules or

5    the DOM is violated.

6    Q.    Returning to the testimony about cell extractions,

7    have you been a training instructor relating to cell

8    extractions?

9    A.    I taught one year at the local institution.

10   Q.    In your experience when does a cell extraction become

11   necessary?

12   A.    There's several circumstances that could occur.  I

13   think, you know, one that's been at heart here, of course, is

14   the person who is refusing, you know, medication that's been

15   ordered.  You could have an inmate that is refusing the

16   lawful order to relocate.

17        Quite frankly, what I experienced a lot was an inmate

18   that would cover up his cell door window, you know, whether

19   it be over protest or other reasons, and he wouldn't respond

20   to staffs' orders, basically preventing us from doing the

21   most basic correctional functions, counting him and ensuring

22   his safety within that cell.

23   Q.    In your view are cell extractions routine?

24   A.    No, they're not routine.  No.

25   Q.    As the director, have you recognized any trends with

815

1  respect to the frequency of cell extractions over time?

2          MS. CESARE-EASTMAN:  Objection, Your Honor.  Lacks

3  foundation.

4          THE COURT:  Overruled.   You may answer.

5          THE WITNESS:  Cell extractions, when I was a

6  lieutenant and captain and sergeant, seemed to be a frequent

7  occurrence.

8          Over the years I would like to say, and based upon my

9  review of our data that we do keep, they've actually

10  decreased in number.

11  BY MR. MCKINNEY:

12  Q.    What steps must be taken before a cell extraction

13  occurs?

14          THE COURT:  I'm sorry.  The question I think asks

15  what he does.  And I think you no longer do personal cell

16  extractions, correct, sir?

17          THE WITNESS:  Well, I don't.  Although, sometimes I

18  wish maybe I would have been there.

19  BY MR. MCKINNEY:

20  Q.    Let me restate that.  As a matter of departmental

21  practice, what are the steps that must be taken before a cell

22  extraction occurs?

23          THE COURT:  Hang on.

24          MS. CESARE-EASTMAN:  Your Honor, the question is

25  vague, referring generally or to cell extractions involving

816

1   mentally ill.

2           THE COURT:  Objection is overruled.

3           You may answer.

4           THE WITNESS:  Would you like me to -- I guess I have

5   a question answering from, like, the incident commanders

6   perspective of what steps are taken prior to?

7   BY MR. MCKINNEY:

8   Q.      That's appropriate.  Yes.

9   A.      Okay.  So once the incident commander becomes aware

10  of a situation that may actually roll into a controlled

11  use-of-force situation, probably what's already occurred is,

12  you know, the correctional officer has encountered the

13  situation to begin with and has taken a number of steps.

14  They've tried communicating with the inmate to find out

15  what -- you know why what is occurring is occurring, if

16  there's anything that the correctional officer can do to

17  remediate the situation.

18          At that point, if the correctional officer is

19  unsuccessful, then the sergeant would go report to the unit.

20  And these are all non-emergent situations that we are talking

21  about.  If there was an emergency, we would take a totally

22  different approach to the situation.

23          The sergeant would go to the unit, wherever, and

24  again attempt that communication, talk to the inmate if the

25  inmate's willing to communicate.  You know, find out what the

817

1    issues are.  Again, if there is anything we can do to

2    remediate.

3         By the time it would come to my attention as the

4    incident commander, again those attempts would have failed to

5    gain compliance, to have the inmate uncover the window or,

6    you know, maybe, you know, submit to restraints so he can be

7    moved or submit to medication.

8         At that point I would, you know, make a

9    determination.  I would review the inmate's history, you

10   know, what I knew.  And most of the time I would know who the

11   inmates are and, you know, what their histories are.  Maybe

12   we've had similar occasions and, you know, acts from the

13   inmate in the past.

14        I would know his mental health status, whether or not

15   he's a participant, you know, whether at the CCCMS level or

16   at the enhanced outpatient level.

17        And if that's the case, then I would be in

18   communication with the mental health department so we can get

19   a clinician over so they can begin to talk to the inmate.

20        Then I would approach the cell in the interim.  As

21   the incident commander, I would talk to the inmate.  A lot of

22   times I stood at the cell door and, you know, the window's

23   covered up, and, you know, the inmate, you know, is refusing

24   to uncover the window.  And I would simply tell them, you

25   know, uncover your window, talk to me.  If you don't like

818

1    what I have to say -- I mean, there is nothing -- you're on

2    that side.  There is nothing that is going to prevent you

3    from covering the window back up.

4          Almost without fail the inmate would uncover the

5    window.  We would communicate.  That allows me to visualize

6    what is going on inside that cell, ensure he's not in there

7    doing any type of self-injurious behavior, as well as also

8    looking at a tactical perspective as well.

9          If I do have to -- if we're ultimately unsuccessful

10   in gaining compliance from this inmate, I want to know --

11   inmates, they will create barricades within their cells.  We

12   commonly refer to something as spider webbing where they are

13   taking sheeting and clothing and blankets, and they're

14   creating like a spider web.

15         It's a barrier between the cell door and where the

16   inmate might be located, thus preventing staff from actually

17   getting to him without literally taking our cut-down tools

18   that we have for suicide response and literally cutting

19   through the material so we can get to the inmate should we

20   need to.

21         And hopefully I'm successful in doing that.  But if

22   not, then we're relying upon the clinician at this point to

23   talk to the inmate, you know, hopefully -- you know, again if

24   the inmate is a mental health participant.

25         If the clinician is not successful, we're also

819

1    checking with the medical department.  We want to make a

2    determination of does the inmate have any type of medical

3    conditions that might be contraindicated to use of OC pepper

4    spray.

5           And they would advise us whether there are or are not

6    any of those conditions.  And based upon the situation, we

7    may override.  You know, if medical makes the recommendation

8    that, you know, the inmate has asthma.  So at that point,

9    based upon the situation, you know, it's a custody decision

10   whether or not to use pepper spray even though -- then I have

11   to get a manager's approval to proceed.

12          And some of this is happening simultaneously.  Some

13   of it is not happening simultaneously.  The officer, the

14   sergeant and lieutenant do not approach the cell door at the

15   same time.

16          And in between we're always providing cool off

17   periods for the inmate.  So long as he's not engaged in

18   self-injurious behavior, time is on our side with this.  It

19   really is.  The last thing we really want to do is engage in

20   a cell extraction.  It is not fun for anybody.  It is not.

21          So if we can get him to comply without having to

22   resort to this, it is best for everybody, best for him, best

23   for the staff, best for the program.  Because a lot of times

24   it also turns into -- it's an incident.  And incident

25   management is -- part of that is control and containment.

820

1    And you do not want to have, you know, 29 different

2    activities going on around you while you're dealing with

3    something that could evolve into an emergent situation.

4          So you are slowly shutting down the programs around,

5    and it is impacting inmates' other activities that -- you

6    know, the showers or whatever else you might have going on.

7    It starts to impact those activities.

8    Q.      Are interventions by custody staff sometimes

9    successful?

10   A.      Most of the time they are successful.

11   Q.      What about interventions by clinicians?

12   A.      A lot of times those are successful.

13   Q.      In those cases is there a video of that successful

14   intervention?

15   A.      No.

16   Q.      Is there a report generated when a use of force is

17   avoided?

18   A.      No.

19   Q.      And are you familiar with the videos that have been

20   played here in court, Mr. Stainer?

21   A.      I am.

22   Q.      All of the things you just testified to, that

23   precedes what is shown on the video; is that correct?

24   A.      There's probably from an hour to four hours to five

25   hours of activities that go on prior to actually going on the

821

1   camera and watching the incident commander start to introduce

2   the team.

3   Q.      And in the cell extraction situations, is there a

4   preference for using a particular force option within the

5   department?

6   A.      I would say there is definitely a practice, and based

7   on my experiences, a preference absolutely.

8   Q.      What is that preference?

9   A.      Almost in all situations, if we can gain compliance

10  through the use of OC products, then that is what we would

11  like to do.

12  Q.      What is the reason for that?

13  A.      Having been through all types of extractions, I

14  would -- my experience is that it is not safe for the inmate

15  to have to actually physically enter that cell and use force

16  to subdue him.  It's a lot safer for the inmate, and it is

17  definitely safer for staff.

18          It's actual -- to actually enter a cell, you know, I

19  believe, you know, it's been referred to as a lot of things,

20  but the personal protective equipment that staff have to don

21  to ensure their safety -- sometimes, if we go into the cell,

22  we don't know if the inmate has a weapon.  Sometimes we know

23  he has a weapon.  Sometimes we can be reasonably assured he

24  doesn't have a weapon.  But in most all cases we have no idea

25  whether that inmate has a weapon.  Even if he's laying on the

822

1   floor, they feign type things.  You know, that's happened.

2   But, you know, the staff are required to wear that equipment.

3        And when you stack up, you know, four correctional

4   officers of varying weights, even just say, you know, 150

5   pounds -- and I'm sure you know, you toured the prisons, we

6   all eat well, that is probably an understatement -- but four

7   correctional officers is 600 pounds.  When you enter that

8   cell with a shield and baton and a handcuff officer and a leg

9   iron officer, at best it is controlled chaos.  And that's

10   best case scenario.

11        It has -- it results in injuries, sometimes lasting

12   injuries.  We don't go in there to inflict injuries, but it

13   is kind of like you don't go in there half speed either.

14   Because if you go in half speed, you end up getting hurt and

15   could end up in a more precarious situation.

16        So OC pepper spray, the goal is to gain compliance

17   through the OC pepper spray and hopefully, you know, the

18   effects wear off rather quickly through the decontamination

19   process.

20   Q.     Let's talk about that.

21        In your experience what are the effects of being

22   exposed to pepper spray?

23   A.     Temporary burning of the skin.  Irritation of the

24   eyes.  Coughing.  Tickling.  Burning of the nose and throat.

25   Q.     And how long does that last generally?

823

1   A.      I've seen it -- I've seen an inmate, as soon as we

2   got him out of the shower and back into his cell, he was

3   refusing orders again, and, you know, give me more.

4          I have seen an inmate, you know, maybe we've had to

5   shower him a couple of times, you know, provide him the water

6   decontamination a couple of times.

7          But generally, you know, 45 minutes at the most, you

8   know, and all the effects within a couple of hours, you know.

9   You might have some lasting -- it kind of feels like -- once

10  the initial decontamination takes place, my experience,

11  through my being exposed to OC pepper spray, both directly

12  and indirectly, kind of feels like, maybe, a mild sunburn is

13  how you feel.  But that goes away after, you know, an hour,

14  hour and a half.

15  Q.      On how many occasions have you been exposed to pepper

16  spray?

17  A.      Well, through, I guess, cross-exposure, you know

18  during controlled use of force incidents, as well as

19  emergent -- we call it today immediate use of force

20  incidents -- I've had my share of exposures.  I've been

21  directly exposed once by an inmate.

22  Q.      Plaintiffs' expert has suggested that pepper spray --

23  or testified that pepper spray should not be used on inmates

24  with serious mental illness.

25          Do you agree with that?

824

```
 1   A.      I --

 2   Q.      You can answer.

 3   A.      I think that it has to be determined upon the

 4   situation.  I believe that the incident commander has to

 5   review all the circumstances of that situation, take in mind

 6   what mental health staff are saying about the inmate, take in

 7   mind what the medical staff are saying about the inmate's

 8   medical condition, then make the appropriate decision on how

 9   to best proceed to accomplish the goal with the least risk of

10   injury to that inmate.

11   Q.      He further testified that staff should go in with a

12   hands-on approach.

13           Would that be appropriate?

14           MS. CESARE-EASTMAN:  Objection.  He's misstating the

15   expert's testimony.

16           MR. MCKINNEY:  I would refer the court to the

17   transcript at page 541, lines 18 through 21.

18           THE COURT:  I don't have the document in front of me.

19           Maybe I can figure it out anyhow.

20           MR. MCKINNEY:  If they're withdrawing that argument,

21   we'll stipulate, and I'll move on.  But I believe they are

22   advocating a hands-on approach, Your Honor.

23           THE COURT:  Well, I don't understand the question.

24           "He further testified," by that you mean Mr. Vail; am

25   I right?
```

825

1          MR. MCKINNEY:  Yes.

2          THE COURT:  (Reading:)

3          Mr. Vail further testified that staff should go in

4          with a hands-on approach.  Would that be appropriate?

5          (Reading concluded.)

6          MS. CESARE-EASTMAN:  Your Honor, I request that the

7    entire portion of that testimony be read into the record so

8    it is not cited out of context.

9          MR. MCKINNEY:  I can restate the question.

10   BY MR. MCKINNEY:

11   Q.     Mr. Stainer, in your opinion would it be appropriate

12   for officers to go in with a hands-on approach?

13   A.     Based on my experiences, as well as what I've

14   observed, and discussions I've had with various entities, I

15   think there are occasions that it would be appropriate to

16   actually go into the cell without the use of other chemical

17   agents.

18          I think, you know, specifically this is going to be

19   addressed as well, this is part of the recommended revisions

20   to our policy, is we do have situations with -- specifically

21   with regard to the mentally ill where, you know, a person can

22   be, for lack of a better term -- and I'm not a doctor so I

23   can't state that, you know, and tell you when this actually

24   occurs -- but, you know, we around the table referred to it

25   and we all know what it means, is catatonic.

826

1          You know, the inmate is nonresponsive.  He's leaning

2     up against the wall.  He's staring off into space.  Can we

3     just go in there and cuff him up and bring him out so he can

4     be treated?

5          I think there's a couple of situations that we

6     encounter on a regular basis within that environment that

7     that's all together possible, versus the inmate who is

8     mentally ill and aggressive or threatening or, you know, has

9     a propensity to, you know, resist.

10          And, you know, our Use Of Force Policy and every

11     departments' -- I can't say every departments -- but, you

12     know, the norm is that, you know, when you use force to

13     overcome resistance that means you're using that much more

14     force that that person is using to overcome that resistance

15     and subdue them.

16          So some of the videos I have seen, you know, I don't

17     know that any of those would qualify, but I have seen

18     situations in the past, and some of the other things that

19     I've been reviewing, that I definitely believe that, you

20     know, sometimes I think we -- and the other reason for the

21     revisions of our policy is I think sometimes, you know, the

22     staff out there aren't really using ever bit of common sense

23     and every bit of training and experience necessary to make

24     those appropriate decisions.  So we're going to tighten down

25     those guidelines quite a bit.

827

1   Q.      On that point would you agree there are instances

2   when pepper spray is used and it doesn't appear to be

3   effective, but it continues to be used?

4   A.      Yes.  Those have definitely occurred.

5   Q.      And in your experience does that occur with

6   frequency?

7   A.      No.  No, it doesn't.

8   Q.      Is it systemic in your view?

9   A.      It is not systemic.  But nonetheless, I believe

10  additional -- more stringent guidelines are necessary to

11  avoid even the one or two or handful of cases that might

12  occur and what might occur tomorrow.

13  Q.      And are you familiar with the pepper spray product

14  called the MK9?

15  A.      I am.

16  Q.      What is that?

17  A.      MK9 is a 13-ounce canister.  It comes in various

18  forms.  It can come in a streamer product.  It can come in a

19  fogger product.  It can come in a foam product or in a vapor.

20  You know, it comes in different forms.  It is 13 ounces is

21  what it holds.

22  Q.      If I can refer you to Plaintiffs' Number 69, which

23  should be in one of the binders behind you.

24  A.      69?

25  Q.      Yes.  Do you have it?

828

1  A.      I do.

2  Q.      Referring to the first page, what's shown here?

3          THE COURT:  I don't have 69 in front of me so -- I'm

4  not going to go looking for it.  Tell me what it looks

5  like.

6          THE WITNESS:  It's a -- Sorry.  Is there a button on

7  this?

8          (Microphone adjusted.)

9          THE WITNESS:  Your Honor, what this is, it's a page

10 and depicts four different canisters of OC pepper spray, the

11 MK3, the MK4, the MK9 and the MK46.

12 BY MR. MCKINNEY:

13 Q.      Is this consistent with the types of pepper spray the

14 Department currently uses?

15 A.      Yes.

16 Q.      If you could, turn to page 4 of this exhibit.

17         THE COURT:  Is 69 in evidence, Madam Clerk?

18         THE CLERK:  Yes, it is.

19         THE COURT:  All right.

20         THE WITNESS:  Okay.  With the page I described as

21 being 1 --

22 BY MR. MCKINNEY:

23 Q.      Correct.  The fourth page.

24 A.      All right.

25 Q.      What's on this document?

829

1    A.      This is the product specifications of the Defense

2    Technology's MK9 aerosol protector can, a hose and wand.

3    Q.      What are the appropriate methods for use of this

4    product according to the manufacturer?

5    A.      The MK9 HV canister, with hose and wand, is primarily

6    used in crowd management situations, cell extractions and

7    tactical situations, such as confined space, detection

8    denial, and require the ability to control the amount of OC

9    delivered over doors, through windows, through food slots,

10   ventilation systems, referring to use of it with the wand on

11   occasion.

12   Q.      So this would be appropriate for use in a cell

13   extraction according to the manufacturer; is that correct?

14          MS. CESARE-EASTMAN:  Objection.  He is misstating the

15   document and the witness's testimony.

16          MR. MCKINNEY:  I'm asking if that's correct.

17          THE COURT:  Objection is overruled.

18          You may answer.

19          THE WITNESS:  Based on my experience, as well as what

20   I'm reading within the product specification, it describes

21   its use within cell extractions.

22   BY MR. MCKINNEY:

23   Q.      And turning to the following page, the last page of

24   this exhibit, what's reflected on this page?

25   A.      This is, again, the Defense Technology's product

830

1  specification.  This is the MK46 H, meaning horizontal,

2  aerosol projector.

3  Q.    Is this currently allowed to be used under the

4  policy?

5  A.    Presently it is.

6  Q.    Are changes being considered with respect to this?

7  A.    One of the recommended revisions to the policy is

8  that the MK46 would not be utilized in either whether it be

9  individual holding cell extractions or in our normal-sized

10  cells for extraction purposes.

11  Q.    As part of your duties as director, do you review use

12  of force videos?

13  A.    On occasion I do.

14  Q.    What occasions?

15  A.    As a normal course of business, I may review a video

16  when it comes to the departmental -- the Deadly Force Review

17  Board if there is a video depiction of use of force that

18  occurred.

19        Normally I do not.  You know, with the director's

20  level Executive Review Committee, I normally am not part of

21  that.  That is usually chaired by the associate director.

22        If there is something significant, then yes, I need

23  to see it, then I will view it.

24  Q.    You mentioned the Department Executive Review

25  Committee.  What is that committee?

831

1   A.      That is the level above the Institutional Executive

2   Review Committee.  So certain cases would be designated for

3   review at the -- or automatic reviews by the director's level

4   Executive Review Committee.

5           Others can be just, you know, based upon the

6   situation, where just -- I think over the last two weeks I've

7   actually designated three use of force incidents for review

8   at the director's level.

9   Q.      And you have reviewed -- what videos have you

10  reviewed in connection with this litigation?

11  A.      I reviewed once, I believe, you know, all, I think,

12  17 or -- 16 or 17 that were, you know, being considered.  And

13  then I reviewed a second time what I believe are the six that

14  have been admitted or shown.

15  Q.      And are those videos a representative sample of use

16  of force within CDCR?

17          MS. CESARE-EASTMAN:  Objection, Your Honor.  Lacks

18  foundation.

19          THE COURT:  Overruled.  You may answer.

20          THE WITNESS:  There is a couple of them that are

21  actually, you know, with regard to the actual application of

22  force, that are good.  And those should be and are the true

23  representative of what is taking place out there.

24          A couple of them honestly are, you know, one of the

25  reasons we'll be revising our policy to provide additional

832

1    guidelines.

2          But I do believe that even the ones that have, you

3    know, concerns are not representative of as a whole.  I

4    believe those are, again, isolated cases with no real

5    evidence of this being systemic.

6    BY MR. MCKINNEY:

7    Q.      Let's talk a bit about the decontamination process.

8          Under policy what is the decontamination practice at

9    CDCR?

10   A.      The policy -- can I refer to the policy?

11         THE COURT:  Of course you can.

12   BY MR. MCKINNEY:

13   Q.      If that can help you, of course.

14   A.      There's really two methods when it comes to OC, and

15   it is air or water, removing the person from the contaminated

16   area, removing the contaminated clothing, providing them

17   fresh air decontamination, and water is the preferred and the

18   authorized process.

19   Q.      And how long if -- if decontaminated water, how long

20   does it take to decontaminate?

21   A.      It varies.  It varies, you know, based upon the

22   amount of exposure versus the -- you know, everybody has a

23   different reaction to OC.  Some people are able to withstand

24   a lot of OC.  Other people, the slightest hint, and they're

25   coughing. I think we saw different depictions of that within

833

1    the videos.

2         But some people, you know, they're under water for --

3    you know, when I say under water, they're being provided

4    water decontamination, cool running water.  And, you know,

5    within 30 seconds they're okay, saying:  I'm okay.  I'm okay.

6    We don't dictate how long that takes place.  We let the

7    inmate tell us.

8         There's occasions where we've had -- I think even one

9    of the videos depicts it -- where the inmate was provided

10   fresh water decontamination.  He was removed from the shower.

11   It's not that he couldn't open up his eyes based on what he

12   stated, but he didn't want to open up his eyes yet.  And I

13   think he complained, and we put him back under the water

14   because he needed more.

15        You know, we got a bad habit of saying, you know,

16   that we provided copious amounts of water.  And, you know,

17   that's -- you know, it is not really a true statement

18   because, you know, how long?  But nonetheless, the inmate

19   dictates to us.

20        Some inmates don't want water.  Some inmates refuse

21   decontamination all together, in which case there is another

22   set of protocols that take place with that if he's within the

23   cell.

24   Q.   Just looking at the policy, this is the Department

25   Manual which was Exhibit A to your declaration, and looking

834

1    at Section 51020.15.2, is that the provision that applies to

2    decontamination?

3    A.    That section, I believe, is general guidelines.  And

4    that would be referring to all chemical agents to include,

5    you know, what's commonly referred to as tear gas.

6          The next section, 15.3, refers specifically to OC.

7    Q.    Thank you.

8          Would you agree that it should take up to a half hour

9    under water to decontaminate from the pepper spray exposure?

10   A.    I have never seen that.  I have never had that occur.

11   I have done some research in the past, and I know, even

12   looking at, you know, some MSDS sheets, and I believe they

13   are conservative, they talk about flushing the eyes for up

14   to -- almost everything is fresh air, with the exception of

15   actually ingesting the product.

16         But with eyes, if you have direct application to the

17   eyes, you know, the MSDS sheets that I was able to, you know,

18   view in the past, state 15 minutes of flushing of the eyes,

19   removing contact lenses, soft lenses must be thrown away,

20   hard contacts can be washed and reused.

21         But that is not -- you know, I believe that is

22   conservative.  Again, if I had an inmate that needed 15

23   minutes of decontamination, you know, with water, we would do

24   that because the last thing we want to do is, you know,

25   exacerbate the process and continue the process.

835

1          The idea is to get him, you know, water, get him

2     relief from the situation and, you know, hopefully let him

3     quickly recover.

4     Q.      And would it be appropriate to place an inmate who

5     has just been extracted into a shower cell?

6     A.      That's not my preferred method.  We saw that on the

7     videos utilizing the shower.  But again, you know, it works

8     in those situations.

9     Q.      Would it be appropriate to enclose an inmate into a

10    shower cell that has just been extracted?

11    A.      I made that mistake once.

12    Q.      What happened?

13    A.      We ended up extracting him from the shower.  So

14    again, we learn from our mistakes.

15          If you just had an inmate that was exhibiting this

16    type of recalcitrant behavior or aggressive behavior, you've

17    got control of the situation, we want to maintain control of

18    the situation, so after he's been extracted why would I then

19    unsecure him and put him into another area where I am likely

20    to have to repeat everything we just did and again subject

21    him to injury and staff to injury, plus providing him the

22    means to decontaminate while you're applying pepper spray.

23          At that point we're going to be using physical force,

24    which is going to place him at greater risk of injury.

25    Q.      Just as an example, are you familiar with the inmate

836

1   identified as Inmate E at San Quentin?

2   A.      I think I am.  Is there a legend I can review?

3           MR. MCKINNEY:  May I approach the witness, Your

4   Honor?

5           (Exhibit handed to witness.)

6           THE WITNESS:  Thank you.

7   BY MR. MCKINNEY:

8   Q.      Just for identification purposes, that is a copy of

9   the legend prepared by plaintiffs.

10          Do you now have Inmate E in mind?

11  A.      Yes, I'm aware of that.  I know what video we're

12  talking about.

13  Q.      After extracting him, would it have been appropriate

14  to place him in a shower cell?

15  A.      I don't believe so, not based upon his behavior.

16  Q.      And you mentioned earlier the right -- or inmates

17  sometimes refuse.

18          Does an inmate have the right to refuse to

19  decontaminate?

20  A.      Absolutely.

21  Q.      Does that occur?

22  A.      It does.

23  Q.      Let's take a look at some of the cases related to the

24  videos that plaintiffs have shown here in court?

25          THE COURT:  We've reached noon and you're about to

837

1    start on a new matter that will take some time.  We'll

2    reconvene at 1:30.

3           (Off the record at 12:00 p.m.)

4           (On the record at 1:30 p.m.)

5           THE CLERK:  Please, remain seated.

6           Court is now in session.

7           THE COURT:  Mr. McKinney.

8           MR. MCKINNEY:  Thank you, Your Honor.

9    BY MR. MCKINNEY:

10   Q.     Good afternoon, Mr. Stainer.

11   A.     Good afternoon.

12   Q.     Just a couple of questions following up from the

13   morning session.

14          You testified about the MK46, and you testified about

15   taking that out of the options for cell extractions; is that

16   right?

17   A.     That's correct.

18   Q.     What is the reason for that?

19   A.     Well, the MK46 is a streamer-type product, puts out a

20   large volume, 46 ounces of product.  And it's -- being a

21   streamer product, it needs to make contact with, you know,

22   directly the eyes, the nose, the mouth, the facial area of

23   the person of -- if you want it to be effective.

24          In most cases in a cell extraction the inmate is

25   moving about.  He's not allowing you to do that.  It is not

838

1    an effective product to be used in that type of a situation.

2          It also, per the specification of the manufacturer's

3    specification sheet, it's got, you know, a recommended

4    minimum distance of ten feet.  That's not quite -- you know,

5    most the cells are anywhere from ten-and-a-half, 11, 12 feet

6    deep.  You know, you may run the risk of some soft tissue

7    damage, and we just don't want to use that product any more.

8    It is not effective.

9    Q.    You also testified about the incident commander and

10   the officers having certain knowledge about mental health at

11   the time of extraction.

12         What are the officers actually aware of that point?

13         THE COURT:  Obviously, you don't know what they know.

14         What are they supposed to be aware of given the

15   regulations and the DOM?

16         THE WITNESS:  Two things that I think most of the

17   staff -- well, one thing that everybody has the information

18   readily available to them, and that is whether or not they

19   are a participant in the Mental Health Services Delivery

20   System, whether that be the CCCMS level or EOP level or a

21   higher level of care.  So that's general knowledge that we

22   always want to concern ourselves with.

23         The other thing the officers may know is, and they

24   should know in almost all cases, unless he's a new arrival to

25   the unit, is what's normal behavior for the inmate, what

839

1    maybe the pattern of behaviors of have been.

2         These are officers assigned to the unit.  They know

3    what the inmate's potential is.  They know what is usual

4    behavior, what is unusual behavior, what's normal, what's

5    bizarre-type behaviors for that particular inmate.

6    Q.       Would they have detailed records or knowledge about

7    the mental health treatment?

8    A.       No, they shouldn't.

9    Q.       Mr. Stainer, how many cell extractions have you

10   personally been involved with?

11   A.       It's nothing that I have ever counted.  I mean, it is

12   not like a tally.  By virtue of my assignments within the

13   prison system, security housing, Ad. Seg., as well as where I

14   have been a manager over those units, I would say, just to

15   estimate, either as sergeant maybe about 15, but as an

16   incident commander well over 100.  Probably under 200, but

17   probably into the hundreds.  And combining everything

18   together, probably over 200.  And I'm talking sergeant,

19   lieutenant, as the incident commander, as well as on-site

20   manager, well over 200 controlled use of force situations.

21   Q.       This morning you also testified about making some

22   recommended changes to policy.

23        What are -- what is the reason for the changes?

24   A.       It all started last year.  CDCR hired an expert.  The

25   expert, after making some observations, had some

840

1    conversations with Miss Terri McDonald, our former

2    Undersecretary of Operations.

3            MS. CESARE-EASTMAN:  Objection, Your Honor, this is

4    hearsay.

5            THE COURT:  Overruled.  He's asking why -- I mean,

6    obviously he's the -- he's the chief executive officer.  He's

7    entitled to say why.

8            I assume you made the initial decision to change the

9    regulations?

10           THE WITNESS:  In conjunction with my undersecretary,

11   yes, sir.

12           THE COURT:  You may proceed.

13           The objection is overruled.

14           THE WITNESS:  So Miss McDonald had conversations with

15   me based upon what Mr. Martin, our expert, had initially

16   brought to her and his observations.  And mostly it had to do

17   with the amount of OC product being utilized within the

18   cells, the waiting period, not giving an effective period of

19   time to be effective.

20           So, you know, she and I talked for a while and tried

21   to, you know, determine the best way to approach this

22   situation, knowing that it is very, very difficult in these

23   situations to throw out a very, very hard and fast set of

24   rules.

25           Every situation is dynamic.  What works in this

841

1  situation may not work in the next situation, even though by

2  appearances -- sorry -- I know I was going fast --

3      THE COURT:  You're way beyond the question, which is

4  what occasioned your determination to change the regulations?

5  BY MR. MCKINNEY:

6  Q.    Let me interpose a question.

7      Did you take any specific actions following those

8  discussions with Miss McDonald about pepper spray?

9  A.    After much consideration I authored a memorandum.

10 Q.    If you can take a look at the exhibit that's been

11 entered into evidence as Plaintiffs' Number 118, which should

12 be on the cart in front of you.

13     THE COURT:  Is it in evidence, Madam Clerk?

14     THE CLERK:  Yes.

15     THE COURT:  You may proceed, sir.

16 BY MR. MCKINNEY:

17 Q.    Mr. Stainer, is this the memo that you just referred

18 to?

19 A.    It is.

20 Q.    Was there anything specific that precipitated this

21 memo?

22 A.    It was two things.  One was a specific case brought

23 forward by Mr. Martin, and then we did an executive or

24 director level review of that case.

25 Q.    In your view was that incident systemic or isolated?

842

1   A.      It's -- at the time we wanted to make sure it was

2   isolated.  I don't believe that to be systemic based on what

3   I have seen.

4   Q.      Can you briefly describe what's in the memo?

5   A.      This memo addresses two things.  Number one -- let me

6   back up to as well.

7           The other part of this is also recommendations from

8   the Office of Inspector General.  In one of their semiannual

9   reports they also speak to a recommendation that the

10  Department look at the amounts of pepper spray that we're

11  utilizing during the cell extractions, as well as the review

12  process that takes place after use of force incidents.

13          Okay.

14          So with this memo I was addressing, in essence, you

15  know, two things.  One, the one particular extraction that we

16  viewed, there was a large number -- or a large number of

17  applications of OC product.

18          There was, in my opinion and my experience,

19  insufficient time between those applications to actually, you

20  know, allow the product to work, make a determination whether

21  or not the product was effective.

22          It became evident that the OC was not going to be

23  effective in this situation.  Yet, you know, by all

24  appearances the incident commander continued to utilize OC

25  product.

843

1          So what the memo did is we talked about expectations

2     with regard to the amount of OC used, allowing sufficient

3     time for the OC product to work, as well as, you know,

4     utilizing common sense.

5          You know, a lot of times when you are approaching

6     these situations it is almost like, you know, the college

7     football coach or the pro football coach or youth football

8     coach, you have a game plan.  And should everything go

9     according to plan, this is what should work.  Yet you get out

10    there and in the first quarter, first set of downs, your game

11    plan goes south because they threw something at you that you

12    weren't prepared for.

13         You have to be able to adjust in these dynamic

14    situations so the expectation is that the incident commanders

15    would utilize their experience, their training, as well as

16    common sense, to be able to adjust to these situations and

17    make a determination that there may come a point that you

18    have to move on to a different use of force option, which

19    very well may be the greater of the two evils, you know,

20    the -- you know, entering into the cell and using physical

21    force to subdue a combatant.

22    Q.    Did you take any action to ensure that this -- the

23    guidance in this memorandum was being followed?

24    A.    I think at first sight, when you read this

25    memorandum, I think, you know, depending upon who the reader

844

1    is, they can probably come up with a whole bunch of different

2    ideas as to what this really means.

3         And knowing that there could be different perceptions

4    as to what this memorandum means -- one habit we have in CDCR

5    is to simply come up with a policy directive or an

6    expectation or a change in the manner in which we do things,

7    and we draft a memorandum, and we send it out to all the

8    wardens via email, and we tell them to please, you know, be

9    advised that this is a new process, train your staff and go

10   forward.

11        I didn't want that to happen with this.  I did not

12   want anybody to have any different perception as to what I

13   actually meant by this memorandum so the first thing I did is

14   I sat down with each of the associate directors in a group,

15   and I provided them copies of the memorandum, and I explained

16   to them exactly what I meant and what my expectations were to

17   leave nothing to the perception and let somebody else come up

18   with an idea what I meant about this.

19        Once it was clear that they all understood what was

20   going on, we had a wardens meeting which we have, you know,

21   three to four times a year.  We bring all the wardens

22   together at a central location for about two-and-a-half days,

23   and we, you know, spend that time talking about the issues.

24        So, again, not to belabor the subject, during this

25   wardens meeting we usually have mission break outs where each

845

1    of the wardens, within a specific mission, would meet with

2    their associate director.  And this was no different.

3         During the mission break outs the associate directors

4    had sufficient copies to provide to their wardens within

5    their mission wherein that message was relayed, what the

6    meaning of this memorandum is, what the intent of it is.

7         And then during that break out session I went from

8    group to group to group to group, within all four missions,

9    and made sure the message was clear, that the intent of this

10   is that there does come a point.

11        You know, first allow that pepper spray to work.

12   Second, there may come a point in these situations that the

13   paper spray is not effective.  And if the fifth application

14   didn't work, or the tenth, what makes you think the eleventh

15   is.  People do have different tolerances, but generally you

16   reach a point where with the odd person it is not going to be

17   effective.

18   Q.    Have you taken any other actions to determine whether

19   this memorandum has had any impact in the institutions?

20   A.    In August -- late August we asked for every

21   controlled use of force that had been all the way through the

22   Institutional Executive Review Committee from October

23   through -- well, I want to tell you probably through

24   mid-June -- would have allowed those packages to go all the

25   way through the Institutional Executive Review Committee to

846

1    be forwarded to headquarters where we can review them and

2    make a determination as to whether or not, you know, is there

3    a systemic issue, are people adhering to what the

4    expectations were, or do we have, you know, additional

5    problems that we need to address further.

6    Q.    How many total incidents were there during that time

7    period?

8    A.    I'm going to guess that 122 is the number that I keep

9    referring to of the incident packages with videos that we

10   received.

11   Q.    And what has been done or is being done with the

12   videos currently?

13   A.    At this point a captain, my special assistant, has

14   been assigned.  He and I sat down.  He knows what these

15   expectations are and what the intent of this memorandum is.

16   He reviewing each of those incidents and the videos.  And one

17   ones that he thinks need further review are being set aside

18   so we can look at further at this point.

19   Q.    Have any findings been made at this point?

20   A.    There is a handful.  You know, I'm going to say a

21   handful that, you know, do need a little further looking into

22   as far as, you know, the application, the waiting, the number

23   of applications and where somebody may not have really gotten

24   what the expectations of this is.

25        And that pretty much solidified the fact that, you

847

1    know, even after the memo, even with the handful -- and

2    understanding we're trying to reach 40,000 employees out

3    there of differing experiences, different training, the

4    guidelines need to be a little bit firmer.

5    Q.    Let's talk about a couple of the specific examples

6    that plaintiffs have presented.

7          If I could have you first turn to tab 2 in the

8    plaintiffs' binders.  This relates to Inmate A.

9          THE COURT:  What's the exhibit number?

10         Do you know, counsel?

11         MR. MCKINNEY:  This is Exhibit 2, Your Honor.

12   Plaintiffs' Exhibit 2.

13         THE COURT:  Thank you.

14   BY MR. MCKINNEY:

15   Q.    Mr. Stainer, are you familiar with this particular

16   incident?

17         THE COURT:  He hasn't gotten there yet, counsel.

18         There he goes.

19         THE WITNESS:  I believe this is Inmate A.

20   BY MR. MCKINNEY:

21   Q.    Have you reviewed the video related to this incident?

22   A.    Yes, I have.

23   Q.    Did you also take a look at the reports that underlie

24   that incident?

25   A.    Not as in depth as I would like to have, but yes,

848

1    I've glanced through them.

2    Q.    Do you have an understanding of what threat was

3    presented by this inmate?

4    A.    Yes.

5    Q.    What was that?

6    A.    At this point, based upon the inmate's mental health

7    status, he had been deemed a threat to himself should he not

8    be removed from the cell based upon his refusal to accept

9    medication for his own safety.

10   Q.    And the reports reflect that the floor was wet.  Do

11   you have an understanding of why that was so?

12   A.    Yes.  He had evidently been able to flood the cell,

13   whether through the sink or toilet it is unknown, but to put

14   water onto the floor.  And it is my understanding there was

15   also the possibility -- the real possibility there was fecal

16   material, as well as probably some urine mixed in with that

17   water.

18   Q.    And under those circumstances, is an intervention

19   appropriate?

20   A.    I'm not sure.

21   Q.    Is a cell extraction appropriate under these

22   circumstances?

23   A.    Yes.  If he refuses all attempts to, you know,

24   persuade him out of the cell, then he's been ordered to

25   receive involuntary medication, then it would be appropriate.

849

1  Q.      Looking at the reports and video, do you have an

2  opinion about the amount of pepper spray used?

3  A.      I think -- I mean, overall I still -- I believe that

4  the pepper spray was a better choice based upon the totality

5  of the situation.

6          As far as the amount, I think there probably came a

7  point where they probably could have -- you know, again, this

8  is all Sunday morning -- or Monday morning quarterbacking and

9  looking at everything, having the luxury of looking at

10 things.  I think ultimately they did use a sufficient

11 quantity of OC.  I think there probably came a point at some

12 point that, you know, they may have had to make the choice

13 to, you know, go in and get him as opposed to continuing to

14 spray.

15         I don't consider what I saw to be outside of the

16 expectations of this memorandum, to be honest with you.  I

17 think my biggest thing, again, it is Monday morning

18 quarterbacking, but there came a point where the inmate was

19 attempting to comply with the orders and put his hands out of

20 the food port, both of them, and I think they had an

21 opportunity to secure his wrists but they didn't take

22 advantage of that and the situation exacerbated itself, you

23 know, so...

24 Q.      Let me have you now take a look at Exhibit 4.  This

25 relates to Inmate B.  I believe this has also been entered

850

1    into evidence.

2    A.    Okay.

3    Q.    Are you familiar with the incident?

4    A.    Yes, I am.

5    Q.    Have you reviewed the video for this incident?

6    A.    I did.

7    Q.    Have you also had an opportunity to take a look at

8    the underlying reports?

9    A.    Yes.

10   Q.    In this case what was the threat presented by the

11   inmate?

12   A.    It was my understanding he had been ordered moved to

13   a higher level of care.  And so, therefore, he was refusing

14   all orders, as well as refused all the intervention attempts

15   throughout the chain of command, as well as mental health, to

16   move to a different location and receive a higher level of

17   care.  Therefore, being allowed to remain in that situation

18   would eventually pose a potential threat to himself.

19   Q.    In this incident is it correct that the inmate had at

20   some point barricaded himself?

21   A.    Yes.  He was utilizing -- he was obviously probably

22   not -- I'm just -- I won't make an opinion, but he was

23   utilizing objects from within the cell to attempt to block

24   the application of pepper spray.

25         He had blocked the bottom of the door obviously with

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

851

1    some type of clothing or towels or bedding.  He was also

2    utilizing what appeared to be a mattress or maybe a pillow to

3    attempt to stop the staff from opening the food port to apply

4    product within the cell.

5         I believe this was also the inmate that had a

6    container in his right hand that, when staff would attempt to

7    breach the food port to apply the product, he would rush

8    forward.  And at one point during the video you could

9    actually see him dip that carton into the toilet.

10        And so I don't know what was in that toilet.  It

11   could have been clear water, it could have been full of urine

12   and feces.  So there was, you know, additional threats going

13   on in the situation.

14   Q.    Under the circumstances you just described, was it

15   appropriate to have the inmate removed from the cell?

16   A.    Yes.

17   Q.    In reviewing these reports and the accompanying

18   video, do you have an opinion about the amount of pepper

19   spray used in this circumstance?

20   A.    I think some of the applications they did very, very

21   good applications.  They allowed some period of time between

22   to give it a chance to work.

23        I do think at one point they had the opportunity to

24   cuff up the inmate and -- you know, but he -- he was refusing

25   to strip out, which is their policy.  So he's continuing to

852

1    refuse orders.  However, at that point I -- personally I

2    probably would have brought him out of the cell.

3    Q.    If we can just take a look at one more.  This is

4    Inmate F at Exhibit 12 in the binder.  I believe this also

5    has been entered into evidence.

6          Mr. Stainer, are you familiar with the incident?

7    A.    Yes, I am.

8    Q.    Have you reviewed the video associated with this

9    incident?

10   A.    I have.

11   Q.    And have you reviewed the -- or had an opportunity to

12   look at the underlying reports?

13   A.    Yes.

14   Q.    Can you briefly describe what was -- what occurred in

15   this incident?

16   A.    Yes.  In this particular case the inmate was under

17   court order, Keyhea, to receive medication.  He was refusing

18   to take the medication.

19   Q.    Did an extraction become necessary at some point?

20   A.    Yes.

21   Q.    What were those circumstances?

22   A.    Well, the inmate, being under Keyhea for involuntary

23   medication, as for his own safety, they petition the court.

24   They received a court order to involuntarily medicate the

25   inmate.

853

1          In this case he was refusing those, and so,

2     therefore, it is presumed that he would become a threat to

3     himself or possibly others should he continue to take -- or

4     refuse to take the medication.

5          Clinical staff indicated he needs to take the

6     medication.  Therefore, we need to get compliance with that

7     and bring him out of the cell.

8     Q.     Under the facts, as described in the reports here,

9     was it appropriate to remove the inmate from the cell?

10    A.     Yes.

11    Q.     And in reviewing this, do you have an opinion about

12    the amount of spray pepper spray used in this incident?

13    A.     I thought this was a very good example of what the

14    norm should be with regard to the application of OC.  I

15    believe in this case there was two short bursts with some

16    time in between each of those bursts that allowed the product

17    to work.  The inmate complied with the orders, and he was

18    placed in restraints and removed from the cell and

19    decontaminated.  He received his medication.

20         My only criticisms with this one were probably the

21    fumbling with the keys to get the door open.

22    Q.     Mr. Stainer, earlier there has been testimony about

23    an exception to the Use Of Force Policy for controlled use of

24    force involving the food port.

25         Are you familiar with that?

854

1   A.      I believe -- are we talking about using immediate

2   force when an inmate won't allow us to shut the food port?

3   Q.      Is that your understanding of what the policy

4   permits?

5   A.      Yes.

6   Q.      Why is that?

7   A.      Well, several reasons.  A, when an inmate won't allow

8   us to shut the food port, first, it is not just immediate

9   force, but, you know, we tell the inmate he needs to

10  relinquish control of the food port so we can shut it.  We

11  won't physically shut it while his hands are out.  We're

12  going to create injuries with that.

13          We warn the inmate that if he fails to obey the

14  orders, we would use pepper spray.  And if he continues to

15  refuse, we would use pepper spray to force him to relinquish

16  control of the food port.  Then we shut the food port.

17          By allowing that food port to remain open, it

18  literally inhibits our ability and places other inmates

19  within that building, their safety at danger.  It places the

20  safety of staff at risk.

21          Inmates -- you know, we saw some examples of what

22  they're able to do.  But we've had inmates that will throw

23  liquid out of the food port.

24          Literally, for cells on each side of that cell, it

25  almost shuts down the entire activities.  We can't run

855

1   showers, we can't run committee, we want run medical lines,

2   we can't run mental health lines because it is a danger to

3   bring another inmate out of that cell adjacent to whatever

4   food port is open.

5           And so therefore, you know, rather than go through

6   the whole process of, you know, the controlled use of force

7   process, we need to continue on with our business.  And, you

8   know, that food port being left open presents a threat to the

9   safety of staff, as well as other inmates within that area.

10  Q.     I believe during his testimony plaintiffs' expert

11  described this -- well, first of all, let me point you to the

12  policy.  If you can, turn back to your declaration which was

13  marked for identification as Exhibit J.

14          MR. MCKINNEY:  At this point, Your Honor, I would

15  like to move Mr. Stainer's declaration into evidence.  I did

16  not do that this morning.

17          THE COURT:  Received.

18              (Whereupon, Defendants' Exhibit J received into

19              evidence.)

20  BY MR. MCKINNEY:

21  Q.     If I can have you turn to Section 51020.11.2.

22          Is that the applicable policy?

23  A.     Yes, it is.

24  Q.     Plaintiffs' expert described this as a flaw in the

25  policy.

856

1          Do you agree with that?

2    A.      No, I don't.

3    Q.      Why is that?

4    A.      I think plaintiffs' expert referring to this as a

5    flaw indicated that, again, looking at staff with great

6    suspicion, that they're out there using inappropriate force.

7    I've not seen any evidence to state that.

8          Staff that use force, any force, immediate, they are

9    to articulate what threat was present.  You know, there is

10   witnesses to the events.  You know, there has been no

11   evidence that this is an inappropriate use of force.

12         Again, that's what I believe the context of the

13   plaintiffs' expert was, is that it allows staff to

14   arbitrarily use force.  And it is not arbitrary.  That open

15   food port presents a threat, again, to the safety of the

16   staff and other inmates in the area and inhibits our ability

17   to run program for the other inmates within that area and

18   provide them the services they have coming.

19   Q.      Mr. Stainer, what is CDCR's policy with respect to

20   the baton?

21   A.      The baton is like any other non-deadly force option.

22   It is -- depending upon the situation, the person -- I don't

23   want to get ahead of you.  Are we talking about our policy

24   with regard to its use.

25   Q.      Thank you.

857

```
 1    A.       All right.  I'm sorry.

 2    Q.       Yes, sir.

 3    A.       Again, it is another non-deadly force option.  It's

 4    no -- it's not looked at different than physical force,

 5    chemical agents, whether it be the CN or pepper spray,

 6    whether they be our less lethal -- or non-deadly impact

 7    rounds from the 37 millimeter or the 40 millimeter launchers.

 8    It is a force option.

 9             It is up to the person yielding that force and

10    utilizing that force to make the determination of what is the

11    appropriate force option for any given circumstance, and then

12    justify and articulates its use and how it was used, justify

13    the threat and articulate what caused them to use that force

14    option.

15    Q.       What type of baton is used within CDCR?

16    A.       It is commonly referred to as MEB, M as in Mary, E, B

17    as in bravo.  And it's initials for Monadnock, the brand

18    name.  It is an expandable baton.

19    Q.       Can you compare that to a non-expandable baton?

20             Is it a hard instrument?

21             Can you describe what it is?

22    A.       It is a -- folded up it is -- probably get the

23    dimensions wrong -- it is probably about an inch to an inch

24    in half diameter, the handle portion of it.

25             It compacts and extends.  And extended it is probably
```

858

1    close to two feet long.  And it's probably in three, four

2    portions -- or segments, I should say.

3          So when it extends, then it collapses.  Kind of like

4    an expandable-collapsible fishing rod from back in the old

5    days, a backpacker's rod.

6    Q.    Thank you.

7          Are you aware of instances where the baton has been

8    used intentionally to strike an inmate within a target area?

9    A.    In a --

10   Q.    First of all, do you understand the term "target

11   area"?

12   A.    We have approved zones that we would -- you know,

13   impact zones.  And we have zones that are, you know,

14   considered out of bounds, off -- you know, we're not supposed

15   to specifically target that area outside of a deadly force

16   situation.

17   Q.    Can you describe those zones just generally?

18   A.    Well, you know, the head of course, the neck, throat.

19   You know, stay away from, you know, the chest area, you know,

20   with our impact rounds.

21   Q.    Are you aware of any instances where a baton was

22   intentionally used by an officer against an inmate in one of

23   those target zones?

24   A.    I'm not personally aware, no.

25          MR. MCKINNEY:  May I approach the witness, Your

859

1  Honor?

2         THE COURT:  Yes.

3         (Exhibit handed to witness.)

4  BY MR. MCKINNEY:

5  Q.      Mr. Stainer, I've shown you a document which has been

6  marked for identification as Plaintiffs' -- I'm sorry --

7  Defendants' Exhibit L.

8         Are you familiar with this document?

9  A.      I am.

10 Q.      What is this document?

11 A.      This is the Semi-Annual Report from the Office of the

12 Inspector General for the reporting period of July through

13 December 2012.

14 Q.      Can you generally describe the role of the Inspector

15 General with respect to use of force in CDCR?

16 A.      Yeah.  The Inspector General provides independent

17 oversight to our use of force, the use of force specifically.

18        They will -- any critical incidents involving the use

19 of force, whether it be the use of deadly force or

20 significant injuries to inmates that are likely due to the

21 use of force, head injuries, they will roll out to the

22 institution.  Or they have the option of rolling out there.

23 They are notified any time we have one of those critical

24 incidents.

25        A lot of times they will actually respond to the

860

1    institution, look at the sequence of events, try to, you

2    know, ensure that, you know, CDCR is doing what they're

3    supposed to do.  And they'll report on it, whether or not we

4    followed policies.

5         They also sit in and review our use of force, IERC,

6    or Institutional Executive Review Committee.  They will sit

7    in on that to monitor that we are -- you know, our findings.

8    They also make recommendations as to, you know, whether or

9    not we covered everything.

10        MR. MCKINNEY:  At this time, Your Honor, I would like

11   to move Defendants' Exhibit L into evidence.

12        THE COURT:  Hearing no objection, it is received.

13            (Whereupon, Defendants' Exhibit L received into

14              evidence.)

15   BY MR. MCKINNEY:

16   Q.    Mr. Stainer, if I could have you turn to page 203 of

17   this document.  If I can focus your attention to the first

18   full paragraph.

19        What does the OIG say about intentional baton strikes

20   within CDCR?

21        THE COURT:  I don't know how you know what is 203,

22   counsel.  My copy is -- doesn't appear to be paginated.

23            There are pages -- I see.

24        MR. MCKINNEY:  There should be a Bates number 781

25   corresponding to page 203 of the report.

861

1          THE COURT:  I've got it.

2          MR. MCKINNEY:   Thank you.

3          THE WITNESS:  So in this paragraph what they're

4    speaking to is discussing the department level of scrutiny

5    needed when unconventional deadly force -- what we mean by

6    unconventional deadly force is when a non-deadly force option

7    is utilized as deadly force.  So in this case an intentional

8    strike to the head with the baton or aiming for the head with

9    the 40 mm direct impact rounds.  So they're talking about

10   that subject.

11         And certain weapons are classified.  They use the

12   terminology of less lethal and trainings provided to the --

13   you know, talking about the training with regard to what are

14   the impacts zones for the intended target areas.

15         And they contend that any intentional blow to the

16   head, even if it doesn't result in serious injury, is still

17   potentially out of policy and potentially a crime, even if

18   there is no justification to use deadly force, which we

19   concur with.

20         And then they go on to say:

21         (Reading:)

22         While no such incidents occurred during this

23         reporting period, they have occurred in the past with

24         mixed response.

25         (Reading concluded.)

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

862

1           So they're basically indicating during that reporting

2   period no intentional or unintentional head strikes had

3   occurred.

4   Q.      What is the time period covered by this report?

5   A.      July through December 2012.

6   Q.      In the next paragraph what does the Inspector General

7   say about unintentional strikes from these types of weapons?

8   A.      That during this time period there were two

9   unintentional strikes involving batons.

10  Q.      Again, that would cover this same six-month period?

11  A.      Correct.

12  Q.      When a baton strike to a target zone occurs within

13  CDCR, what actions does the Department take?

14  A.      When it's a baton strike to the head or a

15  non-approved target area, two things occur.  A, you know, the

16  person that did it has to explain what's going on and

17  articulate what occurred that led to the impact occurring to

18  that area.

19          The other thing we do is we do notify OIG, and we

20  also notify OIA.

21  Q.      Can you define that those terms?

22  A.      OIG is the acronym for Office of Inspector General

23  OIA is Office of Internal Affairs.  Because we want to --

24  what we would like to do is, you know, should this turn into

25  something that it is not, we want to be able to have -- when

863

1    I say that, should this turn into something where the officer

2    did something wrong, the person using force did something

3    wrong, we don't want to refer this, you know, a month and a

4    half later after we get done with all the reviews.

5         While the evidence is fresh we want the Office of

6    Internal Affairs, as well as the Office of the Inspector

7    General, to be aware of the circumstances and make a

8    determination if they want to have staff respond to the

9    institution so that they can review the circumstances and

10   determine whether or not they need to work with the

11   institution to open up an investigation.

12   Q.    Plaintiffs' expert testified that the baton should

13   only be used for defensive purposes.  What is your

14   understanding of what that term means?

15   A.    I think the baton is used in defensive circumstances.

16   It is used in defense of others.  It is kind of like -- you

17   know, the baton is used as either a self-defense force option

18   or it is utilized in defense of another.

19         So I guess we can play on words, but the fact of the

20   matter is it is used as a defense weapon.

21   Q.    Mr. Stainer, if I can direct your attention to

22   Plaintiffs' Exhibit Number 67 in the binders.

23         THE COURT:  In evidence, Madam Clerk?

24         THE CLERK:  Yes.

25   ///

864

1    BY MR. MCKINNEY:

2    Q.      Do you have this in front of you Mr. Stainer?

3    A.      I do.

4    Q.      Do you recognize this photo?

5    A.      I don't recognize the photo.  I know what the photo

6    is.

7    Q.      What is it?

8    A.      This is what appears to be two correctional officers

9    escorting an inmate in the Pelican Bay SHU.  The inmate's in

10   waist chains.  I'm not sure whether or not this is the

11   C-Facility or the D-Facility SHU.  I can only tell you it is

12   Pelican Bay because it's the only design like that in our

13   state.

14   Q.      Is it inappropriate or in any way surprising to you

15   that the officer depicted on the left is holding a baton?

16   A.      Absolutely not.

17   Q.      Why is that?

18   A.      That's good safety protocol.  That's probably part of

19   their operational procedure and Post orders that when you are

20   escorting an inmate, that you will have the baton drawn.

21   Q.      Does the inmate pose any threat to staff?

22           THE COURT:  How would he know?

23           MR. MCKINNEY:  Mr. Vail testified about this, Your

24   Honor.

25           THE WITNESS:  Again, you don't know.  That's why you

865

1    have your baton out.

2          You know, we can say:  Well, the inmate's in waist

3    chains.  He's manacled to a chain around his waist.  What

4    threat could he possibly pose to two staff members?

5          There is two reasons that officer has the baton out.

6    Number one, to protect this inmate.  While the halls look

7    inevitably -- invariably empty, you can also see doors as you

8    look down through the perspective of this picture, as it

9    vanishes into the distance.

10         Now, the appropriate, protocol when doing an escort

11   like this, is as you come up to a door, as there's anybody

12   coming out of the door, they open the door and shout

13   "Escort."

14         So you alert everyone around you that you have an

15   inmate under escort.  That is for that inmate's safety, as

16   well as anybody else in the area.

17         But mistakes do happen, somebody -- can you hear

18   everything, and, you know, did they yell it loud enough?

19         We could come around a coroner and this inmate could

20   come face-to-face with an enemy of his.  And then, you know,

21   this inmate does not have on leg irons, which is not

22   normal -- I mean that's normal during just normal escort

23   through the corridors.

24         However, you know, I don't know if this inmate's a

25   marshal arts expert.  He can turn -- I mean, it is quick as

866

1    we can blink our eyes.  He can do a spin kick and kick one of

2    the staff members.

3          So in this case I guess I'll answer two questions.

4    It is appropriate that his baton is out and in -- you know,

5    that it can be utilized for two purposes very quickly.  One,

6    to protect this officer and his partner from this inmate, as

7    well as to protect this inmate or another inmate they might

8    run into from each other.

9    Q.    Would you agree with the statement by plaintiffs'

10   expert that giving officer the baton as part of their duty

11   belt contributes to a climate of violence?

12   A.    No.  I think -- I don't know how that is because the

13   violence occurs prior to the use of the baton.

14         And just to back up real quick too, I mean, you know,

15   does this inmate pose a threat?

16         He's handcuffed.  What possible threat can he pose?

17         I'll just call your attention that yesterday

18   morning -- or yesterday midday at Corcoran State Prison,

19   within the SHU, we had an inmate who was supposedly

20   handcuffed.  Somehow he was unable to do undue the handcuffs

21   and stabbed the correctional officer five times in the neck

22   and throat.  And he was handcuffed.

23         MS. CESARE-EASTMAN:  Your Honor, I move to strike

24   that last portion of the witness's testimony.

25         THE COURT:  Overruled.  You may proceed.

867

BY MR. MCKINNEY:

1    Q.      Mr. Stainer, let's talk for a moment about the

2    reporting requirements for use of force incidents.

3            Are you familiar with the reporting within CDCR?

4    A.      With regard to use of force and incident reports?

5    Q.      Correct?

6    A.      Yes, I am.

7    Q.      Can you describe CDCR's process for reporting use of

8    force?

9    A.      The policy and the expectation is that anybody that

10   uses or witnesses the use of force shall complete a report.

11   And it is generally completed on the 887-C Form.

12   Q.      What is required to be documented in a use of force

13   report?

14   A.      For the witnesses, specifically what they observed.

15   Who did what, what did they see, if they saw the threat.

16   There are specific observations.

17           For the person utilizing force, they would document

18   the threat that led to them -- that led them to utilize

19   force.  They would document the specific force that they

20   used.

21           For example, if they used a baton, what -- what was

22   their target impact area?  Where did the baton actually

23   strike?  How many strikes?  What type of a strike did they

24   utilize?

868

1        For the person, you know, utilizing OC spray, you

2    know, again, what was the threat?  What did you do?  You

3    know, what type of spray did you spray?  You know, where did

4    you aim at?  Did you strike that area?  Was the force

5    effective?  Then any other actions that you did.

6    Q.      Mr. Stainer, is it possible to understand a use of

7    force incident by viewing the video alone?

8    A.      I think you can get an idea, but it doesn't tell the

9    whole story.  And it is two dimensional.

10   Q.      What's missing?

11   A.      Everything -- well, with regard to what we saw or

12   what we have all seen, I think what we're missing is

13   everything that led up to that, all the actions of staff

14   prior to, you know, actually being in that situation.

15        I think a lot of the videos could be definitely

16   better camera work, actually show what is going on in the

17   cell.  A couple of them do show it, but a couple of them

18   don't.

19        You know, what are the -- you know, you can see a lot

20   with that video camera when used appropriately.

21   Q.      Are you familiar with the review process for use of

22   force incidents within CDCR?

23   A.      Yes, I am.

24   Q.      Can you describe that process?

25   A.      Well, the first review process takes place when the

869

1   first line supervisor were to just review the report itself

2   and accept the report for what it is or ask for clarification

3   or additional information.

4        Once all reports are received by the collective

5   staff, then the incident commander will complete the first

6   level of review.  It is called the Incident Commander's

7   Critique.

8        They, on a standardized format, are answering several

9   formatted questions, you know, with regard to, you know, the

10  type of force used, what was the threat.

11       And after collectively looking at everybody's report

12  and the incident in totality, they would answer the questions

13  of were the staff's actions before, during and after the use

14  of force, he'll answer those questions individually within

15  compliance with policy.

16       And they will also answer whether or not there is any

17  follow-up action needed.  And they also have the option of

18  referring that for a higher level of review by the outside --

19  by making a recommendation for possible inquiry and referral

20  for investigation should there be any, you know, significant

21  violations of policy.

22       Once that review is complete, then it would go to the

23  first level manager review, which is normally completed by

24  the facility captain over that particular area or a captain

25  over that particular area.

870

1      The captain would, again, look at every single

2  report, the same thing the incident commander looked at, and

3  they would also look at the Incident Commander's Critique and

4  make sure that the incident commander captured everything.

5      At each of those levels they also have the

6  opportunity to ask staff, when appropriate, if there is any

7  additional or clarifying information if necessary.

8      That's when they would actually specifically fill out

9  a form asking specific questions of the staff member who

10  authored that report, you know, for that additional

11  information or clarification of what they submitted.

12      At that point the captain would also complete a

13  different form, but containing a lot of the same questions.

14  So, again, it's a redundant process, ultimately answering,

15  again, those same three questions individually, the staff's

16  actions before, during and after force, were they within

17  policy.  And again, is there any follow up or any further

18  action warranted.

19      After that review is completed it goes to the second

20  level manager which normally is the associate warden over

21  that particular area, where, again, reviewing the entire

22  incident package and everybody's reports, having the

23  opportunity to ask for clarifying additional information, and

24  again to complete a third critique of the incident.

25      It's morphing of the same questions, but, again,

871

1  definitely the same three questions, before, during and after

2  the use of force, judging staff's actions and any follow-up

3  information.

4        From that point it goes to the use of force

5  coordinator wherein the package is prepared for presentation

6  to the Institutional Executive Review Committee.

7  Q.    Which incidents are reviewed by the Institutional

8  Executive Review Committee?

9  A.    Every single use of force report.

10 Q.    That would include both immediate and controlled use

11 of force?

12 A.    Yes.

13 Q.    You mentioned that the reviewers are looking as to

14 whether force was compliant with policy.  What do you mean by

15 that?

16 A.    That it conforms within the DOM, as well as the Title

17 15, that there was a threat present, that the force utilized

18 was appropriate for the situation, that it was not

19 unnecessary, that it was not excessive.

20 Q.    Are issues identified during the review process?

21 A.    They are.

22 Q.    What types of issues?

23        THE COURT:  We've been told several times what the

24 report requires of the persons filling it out.

25        What else is there to say?

872

```
 1              I mean, they look at the causes of the force, what
 2    happened during the course, and what happened afterwards.
 3              What else do you want to know?
 4    BY MR. MCKINNEY:
 5    Q.        I'm asking what sorts of problems may be identified
 6    through that review process.
 7    A.        All kinds of mostly small problems.  You know, they
 8    failed to adequately document the holding cell logs, which
 9    we're required to, you know, ever 15 minutes check on that
10    inmate and log that we checked on that inmate, you know, in
11    which case we do training for.
12              It's all the way up through, you know, this force was
13    unnecessary and we're referring it for investigation and/or
14    adverse action and anything in between.
15              Most issues are resolvable due to training -- through
16    the training process.  However, some issues definitely rise
17    well above that, and we take the appropriate action.
18    Q.        You mention -- in discussing the committee, was there
19    a recommendation made regarding the use of force incidents
20    that should be reviewed by the committee?
21    A.        I think what you might be referring to is the
22    recommendation from the Office of Inspector General.
23    Q.        What was that recommendation?
24    A.        The Office of Inspector General indicated that the
25    institutions are having -- some institutions are having
```

873

1    problems meeting the 30-day mandate.

2        And what the 30-day mandate is, is from the date of

3    the incident, all the way through the executive level of

4    review, that we must have -- we have to complete that review

5    within 30 days of the incident.

6        What the Inspector General stated is that we have

7    some very simple incidents with no issues identified, and it

8    might be something like two inmates fighting and we give

9    orders to get down.  They refuse the orders, and we give a

10   quick burst of pepper spray and then they obey the orders.

11       And all the reports are, you know, good.  There is no

12   allegations of unnecessary or excessive force.  You know,

13   there is no issues identified, and yet we spend 15 minutes

14   talking about it at the IERC.

15       The Inspector General felt that was a waste of time,

16   and when we have incidents like that, we can do something

17   that they refer to as the Consent Calendar.  And rather than

18   go -- it would still get all the same levels of review, every

19   single level of review, outside of the IERC.

20       So when I said earlier that after the first three

21   levels of review are complete that it would then go to the

22   use of force coordinator, well, they still do that, but

23   rather than the use of force coordinator taking up 15 to 20

24   minutes at the IERC table of the full committee, inclusive of

25   OIG, at that point they would simply schedule a meeting with

874

1   the warden and/or the warden's designee, the chief deputy

2   warden, nothing lower than that, where they would present the

3   case to that person.  And at that point it could be signed

4   off.

5          MR. MCKINNEY:  May I approach the witness, Your

6   Honor?

7          THE COURT:  Yes.

8          (Exhibit handed to witness.)

9   BY MR. MCKINNEY:

10  Q.     Mr. Stainer, showing you what's been marked as

11  Defendants' Exhibit M for identification, do you recognize

12  what this document is?

13  A.     Yes.  It appears to be an excerpt of the most recent

14  Semi-Annual Report published by the Office of Inspector

15  General for the period February through June 2013.

16         MR. MCKINNEY:  Your Honor, at this time I would like

17  to move Defendants' Exhibit M into evidence.

18         MS. CESARE-EASTMAN:  Your Honor, I object.  This is

19  an incomplete version of that document.

20         THE COURT:  I'm sorry, ma'am.  I didn't hear you.

21         MS. CESARE-EASTMAN:  I said this is an incomplete

22  version of that document.

23         THE COURT:  Well, apparently this is all that they

24  think is relevant.

25         Do you have any reason to think that there are

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

875

1  portions of this document that have not been included which

2  would somehow or other modify what the topic was or the

3  recommendations?

4          MS. CESARE-EASTMAN:  Well, Your Honor, without

5  knowing what Mr. McKinney's questions are going to be, the

6  portions that are omitted contain three appendices that

7  include all the incidents that the OIG reviewed in preparing

8  this report.

9          THE COURT:  This is a -- this is an excerpt dealing

10  with the monitoring of the use of force.  It's not a report

11  about who, what, when and where as to an individual use of

12  force.

13          The objection is overruled, and it is received into

14  evidence.

15          You may proceed.

16              (Whereupon, Defendants' Exhibit M received into

17               evidence.)

18  BY MR. MCKINNEY:

19  Q.      Directing your attention to page 8 of the report, in

20  looking at the second full paragraph -- I'll give you a

21  moment to get that there.

22          Mr. Stainer, is this an accurate description of the

23  recommendation that you just testified about?

24  A.      Yes.  Kind of makes me sound long-winded, doesn't it?

25  Q.      Mr. Stainer, has this recommendation been

876

1  implemented?

2  A.      No.  As a matter of fact, I had it on my desk today

3  to go over to the Office of Administrative Law for approval

4  of a pilot program, but I had problems with the forms so I

5  sent it back to the author.

6  Q.      Do you have a time frame of when this may be

7  implemented?

8  A.      Hopefully, when I am done with this assignment that

9  I'm presently on right now, those forms may have been altered

10  so I can get that signed off and up to where it needs to go.

11          One important thing I would like to say about this

12  process is that we look at things that would disqualify it

13  for this, again, Consent Calendar or abbreviated process, or

14  something that would allow it to be bypassed at the, you

15  know, the formal IERC.  So there cannot be any allegations.

16  There cannot be -- it cannot be a controlled use of force.

17  It cannot be any deadly force.  And the inmate cannot be a

18  participant in the mental health system in order to qualify

19  for this abbreviated process.

20  Q.      So Coleman Class Members would continue to receive

21  the full review?

22          THE COURT:  I promise you, you'll be permitted to

23  testify if you want.

24          MR. MCKINNEY:  My apologies.

25          THE WITNESS:  Coleman Class Members will not be --

877

1    incidents involving force against Coleman Class Members would

2    not be eligible.  They would still have to be seen at the

3    formal IERC.

4    BY MR. MCKINNEY:

5    Q.      Mr. Stainer, are you familiar with the use of force

6    coordinators?

7    A.      The position, yes.

8    Q.      What is their role?

9    A.      Their role is to ensure that the completed incident

10   package is prepared for presentation to the IERC.  They

11   actually present the package, the incident to the IERC.  And

12   they complete a critical analysis of the use of force,

13   prepare the forms for signature by the warden.

14   Q.      Did they also track use of force incidents?

15   A.      They do.

16   Q.      Which institutions have a use of force coordinator?

17   A.      All institutions have at least one use of force

18   coordinator.

19   Q.      Are you familiar with the Deadly Force Investigation

20   Team?

21   A.      I am.

22   Q.      What is that?

23   A.      The Deadly Force Investigation Team is a team

24   comprised of the Office of Internal Affairs agents.  And any

25   time that deadly force is utilized within the institutional

878

1  setting, within the confines of the community by a

2  correctional peace officer, or, you know, within paroles,

3  then they would actually dispatch a team to go out and

4  complete the investigation into the events surrounding that

5  use of deadly force.

6  Q.      Are there other types of incidents that are

7  investigated?

8  A.      By the Deadly Force Team or by the --

9  Q.      Let me take back that question.

10        Can you describe the investigation teams' review

11  process or investigation process?

12        THE COURT:  The Deadly Force Investigation Team?

13        MR. MCKINNEY:  I'm sorry.  Yes.  I'm being unclear.

14        THE WITNESS:  Again, upon an incident involving the

15  use of deadly force within -- we'll stay within the

16  institution setting -- they would dispatch a team to the

17  site.  They would complete an investigation in conjunction

18  with the local ISU.  And ISU is the Investigative Services

19  Unit.

20        What they would do normally is a lot of the field

21  work, but then the agents would respond to the site.  They

22  would take over the investigation as far as coordinating it.

23  They would collect the evidence.  They would review the

24  evidence.

25        They would actually interview.  Usually this is

879

1    broken into two aspects.  One team is there for criminal, and

2    another team is specifically for the admin side of the case.

3          They review all aspects of it, and they compile an

4    investigation.  They interview all witnesses.  They interview

5    the subject, which is the person utilizing the deadly force.

6    And then they compile the report, and then they present it to

7    the Deadly Force Review Board.

8    BY MR. MCKINNEY:

9    Q.    If I can direct your attention back to Exhibit M, the

10   last exhibit, the October 2013 Report.

11         Stay on that same page, page 8.

12         How many incidents did the Inspector General review

13   during this period?

14         THE COURT:  How many incidents are reported to have

15   been reviewed?

16         MR. MCKINNEY:  Thank you.  Yes.

17         THE WITNESS:  It's reported in this document that the

18   OIG attended 271 use of force meetings for a total of 1617

19   incidents were evaluated.

20   BY MR. MCKINNEY:

21   Q.    Turning to the next page, the first paragraph, can

22   you read the last sentence of that first paragraph?

23   A.    (Reading:)

24         In the cases reviewed, the Department found actual

25         force used was within policy 95 percent of the time

880

1          at adult institutions, 96 percent of the time within

2          juvenile facilities, and 100 percent of the time in

3          parole regions.

4          (Reading concluded.)

5    Q.    With respect to adult institutions, is that

6    consistent with what the Department reported?

7          THE COURT:  If you know?

8          THE WITNESS:  I'm not sure what we reported.

9    BY MR. MCKINNEY:

10   Q.    Can you read the first sentence of the following

11   paragraph?

12   A.    (Reading:)

13          In 99 percent of adult institution-monitored cases

14          the OIG ultimately concurred with the use of force

15          committee decisions.

16          (Reading concluded.)

17   Q.    Mr. Stainer, for a moment I would like to talk to you

18   about videotaping of incidents.

19          Which use of force incidents are recorded by video?

20   A.    It's mandated that all controlled use of force

21   situations or occurrences are videotaped.  We do have some

22   surveillance systems that capture, by virtue of location,

23   immediate use of force occurrences.

24          MR. MCKINNEY:  May I approach the witness, Your

25   Honor?

881

1          THE COURT:  Yes.

2          (Exhibit handed to witness.)

3   BY MR. MCKINNEY:

4   Q.     Mr. Stainer, showing you now what's been marked as

5   Defendants' Exhibit N for identification, do you recognize

6   what this report is?

7   A.     This is another one of the Office of Inspector

8   General's Semi-Annual Reports.  This time it's for the period

9   of January through June 2012.

10          MR. MCKINNEY:  At this time, Your Honor, I would like

11   to move Defendants' Exhibit N into evidence.

12          THE COURT:  You're going to object again?

13          The court wants to be clear, I'm receiving it not

14   because -- not for the truth of the matters contained

15   therein, but that this is a report received by CDCR.  And

16   it's relevant as to that effect.

17          It is received.

18              (Whereupon, Defendants' Exhibit N received into

19               evidence.)

20          THE COURT:  That was true of M as well.

21          I thought I said it, but I'm not sure I did.

22          MR. MCKINNEY:  Very well.  These are public documents

23   prepared by the Office of Inspector General.

24          THE COURT:  I just said --

25          MR. MCKINNEY:  Understood.

882

1   BY MR. MCKINNEY:

2   Q.      Mr. Stainer, if I could focus your attention to page

3   9 of this report.  That discusses the videotaping

4   requirements.

5   A.      I'm not sure I'm on the right page.

6           MR. MCKINNEY:  May I approach the witness one more

7   time, Your Honor?

8           (Counsel confers with witness.)

9           MR. MCKINNEY:  I'll come back to this, Your Honor.  I

10  apologize.  We have the incorrect report here.

11          THE COURT:  Good time to have our afternoon recess.

12          Fifteen minutes.

13          (Off the record at 2:45 p.m.)

14          (Back on the record at 3:05 p.m.)

15          THE CLERK:  Please, remain seated.

16          Court is now in session.

17          THE COURT:  Mr. McKinney.

18          MS. CESARE-EASTMAN:  Your Honor, before we begin,

19  there is an issue that came to our attention during the break

20  that we would like the court to address.

21          THE COURT:  Come to the podium.

22          MS. CESARE-EASTMAN:  Your Honor, during the break

23  Mr. McKinney indicated that he is going to be questioning

24  Mr. Stainer regarding the RVR process.

25          THE COURT:  RDR?

883

1          MS. CESARE-EASTMAN:  RVR.  The Rules Violation Report

2     process.

3          However, Mr. Stainer explicitly stated in his

4     deposition that he would not provide any such testimony and

5     that subject is not addressed in his declaration.

6          MR. MCKINNEY:  As to the motion, that is correct at

7     the time, we did not intend to offer Mr. Stainer on the

8     inmate discipline issue.

9          However, because the plaintiffs came back in their

10    reply with a brand-new expert, and then had Mr. Vail testify

11    on the stand about RVR processes, when on the motion they

12    offered all the evidence through attorney declaration, it

13    became necessary for us to offer Mr. Stainer for this

14    purpose.

15         THE COURT:  You know, folks, this is the second or

16    third time we've had questions about what representations

17    were made and then an assertion that some how or other things

18    change and therefore we're entitled to ignore our previous

19    representations without notice.

20         I can't permit that.  I can't permit that.

21         I mean, I want to tell you, folks, I think that there

22    are some serious questions which I find extraordinarily

23    difficult.

24         I've been warned by my staff that I ought not to make

25    judgments until all the evidence is in, particularly

884

1  Mr. Martin, and I think that is right, but there -- there are

2  issues that have been tendered that are very -- it seems to

3  me very difficult.  And, you know, I want to get as much

4  information as I can before I make a judgment.

5      On the other hand, I can't permit you -- I can't

6  permit either side to take advantage of the other by not

7  providing them with the information beforehand so they can

8  take reasonable depositions and so forth.

9      The fact that you represented that you were not

10  going -- that this witness was not going to testify about the

11  review process -- the RVR process, I'm sorry, it's

12  definitive, I can't permit you to go forward.  That's despite

13  the fact that I really --

14      MR. MCKINNEY:  Your Honor, I do think it would be

15  helpful to the court.  And I would renew our request that you

16  strike the declaration of Edward Kaufman because he was

17  offered for the first time on reply with no notice whatsoever

18  that he was an expert brought forth for the very first time.

19      THE COURT:  That motion is denied.

20      I'm not going to go through this.

21      You may proceed, sir.

22      MR. MCKINNEY:  Thank you, Your Honor.

23      THE COURT:  The problem -- Go ahead.

24      Look, I want to tell you something.  I need as much

25  information as I can get, and I would like to hear what the

885

1  witness has to say about the problem.  The problem is that it

2  is disadvantageous to plaintiffs and I'm not going to order

3  that he subject himself to a further deposition.

4        I don't know how to proceed.  To tell you the truth,

5  I really -- but I agree.  There is a fairness competent that

6  has to be dealt with as well.

7        MR. MCKINNEY:  Your Honor, again, on the reply brief

8  they brought in such essentially a new motion.  We had no

9  opportunity to brief that.

10        THE COURT:  Thank you.

11        MR. MCKINNEY:  I would have submitted a declaration

12  from Mr. Stainer at that point.  We had no opportunity.

13        THE COURT:  Why didn't you?

14        MR. MCKINNEY:  Briefing was closed.

15        THE COURT:  Why didn't you ask for it?

16        Why didn't you say what you are telling me now?

17        MS. CESARE-EASTMAN:  Your Honor, after conferring

18  with cocounsel, despite the risk of prejudice to plaintiffs,

19  we'll go ahead for the convenience of the court and allow

20  Mr. Stainer to be questioned on RVR.

21        THE COURT:  All right.  They've withdrawn the

22  objection so you can proceed.

23        MR. MCKINNEY:  Thank you, Your Honor.

24  BY MR. MCKINNEY:

25  Q.    Mr. Stainer, before the break you were testifying

886

1    about the video recording process.

2         Plaintiffs' expert testified that in the immediate

3    use of force context someone should run and get a camera.

4         Do you agree with that?

5    A.    I don't.

6    Q.    Why is that?

7    A.    Simply we don't have the staff to do that.  And two,

8    when you've got a situation going on, and to actually take

9    somebody and have them run away from that instead of -- to go

10   pick up a camera instead of running to that, whether to the

11   aid of an inmate or staff members or to break up a

12   significant occurrence, it just doesn't seem to make sense to

13   me.

14   Q.    In your view what is the purpose of having video

15   cameras within CDCR regarding use of force incidents?

16   A.    It documents evidence.

17   Q.    What effect does turning the cameras on have on the

18   officers?

19         THE COURT:  The officers are going to respond by

20   being more careful.  Some people are not going to give a

21   damn, and who knows which one is which.

22         Is that about the size of it?

23         THE WITNESS:  I think that's three-quarters of it.

24         Truthfully, I always interpreted the decision was in

25   order to document the inmate's behavior, not the staff.  But

887

1    it works both ways.  Absolutely.

2    BY MR. MCKINNEY:

3    Q.      Are you familiar with what's been termed "management

4    status"?

5    A.      Yes.

6    Q.      What is that?

7    A.      Management status is actually a collection of -- we

8    have precautions that fall within the management status

9    realm, as well as management cell status.

10        The precautions are -- right now they are local

11   operating procedures to the institutions.  Not all

12   institutions have them.  The majority of institutions do have

13   a local operating procedure that details security

14   precautions, as well as management status.

15        In these operating procedures what they do is they

16   define a set of behaviors and then the precaution we would

17   take in response to those set of behaviors, such as an inmate

18   who spits on staff or other inmates or threatens to spit on

19   staff or other inmates.

20        MS. CESARE-EASTMAN:  Your Honor, the testimony lacks

21   foundation.  There is no evidence he's reviewed these

22   policies, that they're available.

23        THE COURT:  Well, I think that it is true, that he

24   ought not to be testifying about local procedures unless he's

25   reviewed them personally.

888

1          And also they're not in evidence and there is no way

2     to check -- no disrespect intended -- to check the testimony.

3          That objection is sustained.

4          You may proceed.

5     BY MR. MCKINNEY:

6     Q.     Mr. Stainer, what is your familiarity with management

7     status?

8     A.     I actually wrote the operational procedure for

9     California Corrections with regard to this.  And we're in the

10    process of collecting all -- matter of fact we have received

11    from every institution that has this process their local

12    operating procedure.

13         We're in the process of reviewing it for

14    consistencies and we are going to come out with a formatted

15    operational procedure for each institution to, again, fill in

16    only site specific issues so we have a consistent application

17    of those processes, making sure that appropriate due

18    processes are in place for the inmates, and checks and

19    balances for the applications of these precautions in the

20    management cell status.

21    Q.     Does CDCR use management status in lieu of the Rules

22    Violation Report process?

23         MS. CESARE-EASTMAN:  Objection, Your Honor.  He just

24    testified he hasn't reviewed the policies.

25         THE COURT:  That's not what he said.  He says they're

889

1    in the process of being reviewed by his office.

2            I don't suppose you're reviewing them personally, are

3    you?

4            THE WITNESS:  Personally I'm not.  I've delegated

5    that duty to my deputy directors and associate directors.

6            THE COURT:  The objection is well-taken.

7            You may proceed.

8    BY MR. MCKINNEY:

9    Q.    Does CDCR use management status in lieu of the rules

10   violation process?

11           MS. CESARE-EASTMAN:  Same objection.

12           THE COURT:  Now he's asking about what CDCR does.

13   He's CDCR for this question.

14           You may answer.

15           THE WITNESS:  The rule violation process is actually

16   a process to hold -- or hold a hearing to determine an

17   inmate's guilt or innocence -- guilt or not guilt with regard

18   to a specific violation of a rule.

19           Management Status or Security Precaution is indirect

20   response to a set of threatening behaviors, to stop those

21   behaviors from continuing, if that makes sense.

22           THE COURT:  The problem with that, sir, assuming in

23   good faith that's what is intended, you can see how easily it

24   will expand to every -- you know, I'm not going to bother

25   having a hearing and going through all of that process, I'm

890

1   just going to tell the guy bad things are going to happen to

2   you and be done with it.

3           Isn't that the danger?

4           THE WITNESS:  Well, I do -- I understand everything

5   you are saying, Your Honor.

6           If an inmate -- again, if an inmate commits a

7   misbehavior, and he has the due process associated with, you

8   know, the hearing, and any sanctions taken against him if

9   found guilty.  These are more precautions.  So if an inmate

10  threatens or kicks an officer --

11          THE COURT:  No.  I understand perfectly well what you

12  said the distinction is.

13          All I'm asking you is, isn't it a significant danger

14  that permitting, essentially an unreviewed process, that

15  ultimately has a punitive aspect to it, undermines the whole

16  procedure that you have established for hearings and so

17  forth?

18          Do you understand what I'm asking you?

19          THE WITNESS:  Yes, I do.  And that's the whole idea

20  of maybe -- maybe I don't understand, but if I could explain?

21          The whole process of us reviewing these procedures,

22  and then making sure that there are those safeguards in place

23  as to who can actually sanction this precaution, who has to

24  review it, how long the person can be placed on that

25  sanction.  And, you know, again, if it needs to be extended,

891

1    why, a certain set of behaviors.  That way it would stop, you

2    know, if it is occurring, the arbitrary placement of an

3    individual, on those type of sanctions.

4            THE COURT:  I think what you are telling me is that,

5    much like the use of force regulations that are being

6    reviewed and some revised, that's the same process that's

7    going to happen in this management process?

8            THE WITNESS:  Yes.  We want to make sure we're doing

9    the right thing.

10            THE COURT:  Right.  But it's a matter in process.

11            You're not at a place yet where you can say we've

12    actually reviewed it and we're satisfied that we've got a

13    system?

14            THE WITNESS:  Correct.

15            THE COURT:  All right.

16            I think there's nothing else to be said about it.

17    They're working their way towards it, and that's where we

18    are.

19    BY MR. MCKINNEY:

20    Q.    Do you agree with that?

21    A.    Absolutely.  And we'll be working our way to it in

22    very short order.

23    Q.    Mr. Stainer, have you found evidence that CDCR is

24    punishing inmates because of their mental illness?

25    A.    No, I have not.

892

1    Q.      If you became aware of such incidents, what actions

2    would the Department take?

3    A.      The matter would be investigated with everything we

4    had.  And if the -- if that was found to be the case, the

5    appropriate actions would be taken against the staff

6    responsible.

7    Q.      Based on your review and your work and your position,

8    is there a pattern and practice of staff using force

9    unnecessarily against inmates with mental illness?

10   A.      I have not seen a pattern and practice to that, no.

11   Q.      Is there a pattern and practice of staff using

12   excessive force against patients with mental illness?

13   A.      I have not experienced that.

14   Q.      Mr. Stainer, are you familiar with the State's policy

15   with respect to inmate discipline?

16   A.      I am.

17   Q.      If I could turn your attention back to the first

18   exhibit, the Title 15 exhibit.  I believe it is Exhibit I.

19          First of all, if an inmate violates the rules at the

20   institution, how can that be handled?

21   A.      It can be handled in a number of ways, everything

22   from a verbal counseling, all the way up to a serious Rule

23   Violation Report.

24   Q.      If I could direct your attention to page 142 of this

25   exhibit, looking at Section 3317.

893

1          What is described in this section?

2     A.     3317 is headed Mental Health Evaluations For

3     Disciplinary Hearings.

4     Q.     When is that required, the mental health evaluation?

5     A.     According to this section inmates that are designated

6     as participants in the Mental Health Delivery System, any EOP

7     Mental Health Crisis Bed, or in this case they refer to it as

8     DMH, but the Department of State Hospital level of care who

9     receive a Rule Violation Report, we refer that RVR over to

10    the clinician who will complete a 115-MH, which is an

11    assessment form.

12    Q.     Are there any additional categories not reflected in

13    this section where an inmate receives a mental health

14    evaluation?

15    A.     Yes, there is.  They're not incorporated into the

16    rules.  However, in, I want to say, May of 2001 -- also -- I

17    would like to also say that according to this rule, any CCCMS

18    level of care inmate who violates a rule and has bizarre and

19    unusual behavior would also be referred for the mental health

20    assessment.

21          In May of 2001 -- I want to say it was May, best of

22    my recollection, based upon meetings between CDCR and the

23    Special Master, it was determined that we would add some

24    categories to that, and that is it is mandatory for any CCCMS

25    level inmate who receives a Division A, B or C offense would

894

1    receive the mental health assessment.

2          I believe it was November -- possibly October -- I

3    believe it was November of 2011, we added another category

4    from mandatory mental health assessment.  And that was a

5    CCCMS level inmate who received a RVR that, if found guilty,

6    could result in the assessment of a Security Housing Unit

7    term.

8    Q.    Turn to the next section, Section 3318.  What's

9    described in this provision?

10   A.    3318 describes the assistance to inmates for serious

11   rule violations.  It covers the sections with regard to the

12   assignment of an investigative employee, as well as a staff

13   assistant to inmates who qualify.

14   Q.    If I can direct your attention to Section 3323.

15         This is page 146 of this exhibit.

16         Are you familiar with this provision?

17   A.    I am.

18   Q.    What is describe generally?

19   A.    3323 is a disciplinary forfeiture schedule.  What

20   this section describes or delineates is based upon the act,

21   how that RVR would be classified.  And based upon the

22   classification, if found guilty, you know, what level of

23   disciplinary action with regard to forfeiture of credits it

24   would fall into, if that makes sense.

25   Q.    Just an example, what is the penalty for battery on a

895

1    peace officer not involving a weapon?

2    A.      Battery on peace officer not involving a weapon is a

3    Division B Offense.  And if found guilty of that, you would

4    lose between 121 and 150 days forfeiture of credits.

5    Q.      What about battery or assault on a staff member?

6            THE COURT:  It speaks for itself.

7            Get on.

8    BY MR. MCKINNEY:

9    Q.      Mr. Stainer --

10           THE COURT:  I'm sorry.

11           MR. MCKINNEY:  That's fine, Your Honor.  I will move

12   on.  I appreciate that.

13   BY MR. MCKINNEY:

14   Q.      Is this provision applied mandatorily?

15   A.      Yes.  If the person -- if the inmate is found guilty,

16   you must assess between the low or the high end of the credit

17   forfeiture scale.  You cannot exceed, you cannot go beyond

18   and you cannot go under.

19   Q.      Is that applied on a standard basis statewide?

20   A.      It is.

21   Q.      Let's take a look now at some of the evidence that

22   plaintiffs submitted with their motion.  If I can have you

23   first turn to Plaintiffs' Exhibit 43.

24           This relates to Inmate BB.  I believe this has been

25   admitted into evidence.

896

1          THE COURT:  I'm going to order that all of the

2     affidavits that have been tendered in support of this

3     motion -- this is an unusual situation.  Ordinarily we do it

4     on affidavit.  As this hearing demonstrates, you can't do

5     that without having some basis for credibility.

6          So we have all of these affidavits, and some of them

7     are in evidence, some of them aren't.  If there is no

8     objection from either party, I will order all of them into

9     evidence.

10         MR. MCKINNEY:  No objection, Your Honor.

11         MS. CESARE-EASTMAN:  No objection, Your Honor.

12         THE COURT:  That will be the order.

13         You may proceed.

14         MR. MCKINNEY:  Thank you.  I will represent to the

15     court that, unless I note an exception, each of these

16     exhibits was attached to a declaration submitted by

17     plaintiffs in this matter.

18         THE COURT:  All right.

19     BY MR. MCKINNEY:

20     Q.    First of all, Mr. Stainer, looking at the first page

21     of this exhibit, can you describe the incident here?

22     A.    In reviewing this it appears that Inmate BB was being

23     charged with battery on a peace officer with a weapon during

24     this incident.

25         It appears that while doing the trash and tray pick

897

1    up the correctional officer approached the cell occupied by

2    the inmate, and upon opening the food port the inmate threw

3    the tray through the opened food port striking the officer in

4    the right side of the lower abdomen, then reached out of the

5    food port and grasped the food port door.

6    Q.      If I can focus your attention on the fourth page of

7    this exhibit, 108029.

8            Do you have that page?

9    A.      I do.

10   Q.      Does that reflect the hearing officer mitigated the

11   penalty?

12   A.      Yes.  Two things occurred with this.  Number one, it

13   was originally classified as battery on a peace officer with

14   weapon.  The hearing officer appropriately determined that

15   the throwing of the food tray and striking the officer did

16   not qualify as a weapon and reduced the penalty or the

17   specific act to battery on a peace officer.

18           The hearing officer mitigated this in two ways based

19   upon the clinician's recommendation.  Number one, he did not

20   impose any -- he or she, I'm not sure who heard this -- did

21   not impose any loss of privileges, keeping in mind

22   consideration of the mental health assessment by the

23   clinician.  And they also imposed the low end of the credit

24   forfeiture scale.

25   Q.      Mr. Stainer, if I can direct your attention to tab

898

1    46.

2            THE COURT:  What is the exhibit number?

3            MR. MCKINNEY:  It's Plaintiffs' Exhibit 46 for

4    identification.  Plaintiffs' Exhibit 46.

5            THE COURT:  46.

6            Is that in evidence?

7            You want to move it?

8            MR. MCKINNEY:  I would move this into evidence.  It

9    was an exhibit to the Rifkin Declaration.

10           THE COURT:  Hearing no objection, it is received.

11               (Whereupon, Plaintiffs' Exhibit 46 received into

12                evidence.)

13   BY MR. MCKINNEY:

14   Q.     Mr. Stainer, have you had an opportunity to review

15   this incident?

16   A.     Yes.

17   Q.     And for purposes of identification, this relates to

18   Inmate EE.

19   A.     Correct.

20   Q.     Looking at the first page, can you describe this

21   incident?

22   A.     Yes.  This says Inmate EE was escorted to the

23   medication room so that the inmate could be medicated.

24           The inmate received one injection, and as the LVN was

25   preparing the second injection, the inmate kicked the LVN in

899

1    the left buttocks.  The inmate was then escorted from the

2    area and returned to the cell.

3    Q.      What was the charge?

4    A.      Battery on a non-peace officer, Division B Offense.

5    Q.      Turning to page 111673.

6    A.      Okay.

7    Q.      What is reflected on this document?

8    A.      This is the mental health assessment or violation

9    report as completed by a clinician.  The clinician has

10   indicated what level of care the inmate-patient is in.  They

11   have reviewed the circumstances.  They have made a

12   determination as to whether or not the inmate would

13   experience difficulty in understanding the disciplinary

14   process.

15          They made opinions whether or not the inmate's mental

16   disorder appeared to contribute to the behavior that lead to

17   RVR, in which case they have indicated yes.

18          And if inmate is found guilty, are there any mental

19   health factors the hearing officer should consider when

20   assessing penalty, and the clinician also indicated yes.

21   Q.      Turning to the preceding page, 111672, did the

22   hearing officer mitigate the penalty in this case?

23   A.      Yes.  The hearing officer has indicated that due to

24   the inmate-patient's mental health level of care status, as

25   well as taking into consideration the assessment form,

900

1  they've assessed the lowest end of the credit forfeiture

2  scale.  And it does not appear any other penalties were

3  assessed.

4  Q.    Now, Mr. Stainer, directing your attention to

5  Plaintiffs' Exhibit 47, this relates to Inmate FF.

6        I would again request this be moved into evidence.

7        THE COURT:  47 is received into evidence.

8        Go ahead.

9            (Whereupon, Plaintiffs' Exhibit 47 was received

10             into evidence.)

11 BY MR. MCKINNEY:

12 Q.    Mr. Stainer, there are two tabs here.  Under the

13 first tab, if you could, describe the incident in this case?

14 A.    In this case it appears that Inmate FF was -- when

15 the licensed psychiatric tech walked by the cell -- by

16 Inmate FF, the psych tech observed the inmate sitting on the

17 floor masturbating while looking at the staff members.

18 Q.    And under the second tab, if you can turn to the

19 second page, this is the tab marked RVR, page 105648.

20        Can you describe this incident?

21 A.    This appears to be the actual Rule Violation Report

22 of what I just described.  The first document appeared to be

23 an 837-C Incident Report authored by that employee.

24 Q.    So we're looking at the same incident here; is that

25 correct?

901

1   A.      I believe so, yes.

2   Q.      Turning to the preceding page, does this reflect that

3   mental health provided input?

4   A.      Yes, it does.

5   Q.      If I could direct your attention to the last page of

6   this, ending 654.

7           Did the hearing officer mitigate the penalty here?

8   A.      Yes.  The hearing officer indicates that after

9   reviewing the mental health evidence via the Mental Health

10  Assessment Form and upon consideration of all evidence

11  contained within that form, the senior hearing officer

12  elected to assess the lesser time and assessed the low end of

13  the credit forfeiture scale for this offense.

14  Q.      If I could now have you turn your attention to the

15  second binder.  This is Plaintiffs' Exhibit 23.

16          THE COURT:  In evidence, Madam Clerk?

17          THE CLERK:  Yes.

18          THE WITNESS:  You said 23?

19  BY MR. MCKINNEY:

20  Q.      Yes.  Tab 23.

21          THE COURT:  All of 23 is received into evidence.

22              (Whereupon, Plaintiffs' Exhibit 23 received into

23               evidence.)

24  BY MR. MCKINNEY:

25  Q.      This is Inmate C, just for reference, Mr. Stainer.

902

1              If you could, turn to the third page of this document

2       ending 12374.

3              Can you describe the incident reflected in this

4       document?

5       A.       In this case the inmate is charged with willfully

6       delaying a peace officer.  The inmate refused to take their

7       medication.  It appears the inmate was under Keyhea.

8       Q.       Turning to the first page of this document -- of this

9       exhibit, what's reflected here?

10      A.       Referring to the Mental Health Assessment Request?

11      Q.       Yes, sir.

12      A.       Okay.  Yes.  It's a Mental Health Assessment.  Again,

13      the clinician's provided input with regard to this offense.

14      Q.       If I can have you turn to the page marked ending

15      12382.

16             These are out of order, but it is towards the back of

17      the tab.

18      A.       I have that.

19      Q.       Does this reflect the hearing officer mitigated the

20      penalty?

21      A.       Yes, it does.  Yes.  They assessed a Division D

22      Offense, between 61 and 90 days, and the hearing officer

23      assessed the low end of that, 61 days.

24      Q.       If I could also have you turn your attention to

25      Defendant's Exhibit C, which should be on the cart there.

903

1          MR. MCKINNEY:  May I approach the witness, Your

2     Honor?

3          THE COURT:  Yes.

4          Mr. McKinney, if this is further evidence that the

5     penalty was mitigated, I don't need any further evidence as

6     to that.  And we will have, I hope, a meaningful discussion

7     about whether any penalty ought to be assessed when somebody

8     is nuts, but we'll never get there, I'm certain, because this

9     will go on forever.

10          MR. MCKINNEY:  I don't intend to go on forever.  I

11     will move on.  I'll do one more after this.  I think I need

12     to clear up testimony, but I'll move on.

13     BY MR. MCKINNEY:

14     Q.     Mr. Stainer, can you tell us what's reflected in

15     Defendant's Exhibit C?

16     A.     What I'm looking at is an Application for Restoration

17     of Credit Form.

18     Q.     Does that reflect the credits were, in fact, restored

19     or was some credit restored in this incident?

20     A.     What it appears is that the inmate -- usually these

21     are completed one form at a time for each specific Rule

22     Violation Report.  What I can read off this form is that the

23     inmate submitted for credit restoration on four separate

24     offenses, and there was deemed one of the RVRs eligible for

25     restoration and which credits were restored.

904

1          MS. CESARE-EASTMAN:  I'm sorry.  Are you talking

2     about Defendants' C1 or C2?

3     BY MR. MCKINNEY:

4     Q.     I was going to clean that up.

5          What is the date of the RVR where the credit was

6     restored?

7     A.     The RVR that I'm looking at that was restored was the

8     one dated August 2nd, 2012.

9     Q.     Turning back to tab 23 in the binder, RVR Number 2?

10    A.     Yes.  The RVR dated August 2nd, 2012, Log Number

11    3A1208-002 would have been the one wherein the credits were

12    restored, 90 days.

13    Q.     Thank you, Mr. Stainer.

14          If you can also take a look at Defendants' Exhibit H,

15    which should also be on the --

16          THE COURT:  If you're about to depart this --

17          MR. MCKINNEY:  One more, Your Honor, if I may?

18          THE COURT:  No.  There will be no more.

19          Mr. Stainer --

20          THE WITNESS:  Yes, sir.

21          THE COURT:  This is, I think, a very complex and

22    difficult kind of problem.  Obviously you've got to have

23    people obey the rules, if they can.

24          I think that's just self-evidence.

25          The problem is that at least -- let me go back.

905

1          I've heard the words that approximately one-third of

2     the entire prison population are Coleman Class Members.

3          Is that your rough understanding?

4          THE WITNESS:  Between 25 percent and one-third is

5     probably fair, Your Honor.

6          THE COURT:  That's a huge number of people for you to

7     have to deal with.

8          THE WITNESS:  I agree.

9          THE COURT:  And they're sick.  You know, it raises

10    questions about the criminal justice system, but that's

11    beyond the scope of this hearing, thank goodness.

12         I have a tentative judgment, but it is very

13    tentative, and if we ever get through with this case, I might

14    actually make a judgment, but there's a very difficult

15    balance that has to be drawn.

16         On the one hand, you have to have people obey the

17    rules.  On the other hand, it is clear there are some people

18    that can't obey the rules because they have mental problems

19    that interferes with their ability to conform their behavior

20    to the rules that are required.

21         I think that tension is what really underlies all of

22    this discussion we've had about giving people back 30 days or

23    60 days instead of saying:  Look, the guy couldn't do it, and

24    what are we doing here?

25         How can you -- No.

906

1          How do you try and balance, if at all, the two

2     extremes here, on the one hand the need to have people obey

3     the rules, and on the other hand there are people who simply

4     can't obey the rules?

5          What do you do?

6          THE WITNESS:  First of all, we talk about the number

7     of Coleman Class Members that are within our system.  I

8     think -- you know, I think it has been testified to, you

9     know, to classify them all as seriously mentally ill, just

10    based on my experience and observations, I don't think we

11    can.

12         I think we've seen some examples within these videos

13    of some inmates that are seriously mentally ill and are

14    having -- are in crisis.

15         Then on the other hand, you know, we've -- that's why

16    we have our different levels of care.  Of course, I don't

17    have to tell you this.  You live this.

18         But, you know, we also have inmates in the CCCMS

19    level, with just that level of anxiety, who they don't want

20    to transfer out of state so they have anxiety, and they're

21    entered into the program.

22         THE COURT:  I'm talking about, if we look at the

23    videos, it appears to this court, despite what at least one

24    doctor has said -- and you're not responsible for the medical

25    care, I mean, they've got their own docs and hopefully

907

1  they've got some way of reviewing their competence -- maybe

2  I'll ask you about that.  Do you know, is there some peer

3  review that goes on to find out whether a doc can find the

4  front door?

5           THE WITNESS:  I think we have -- the vast majority of

6  our medical staff are A-1.  I really do.

7           THE COURT:  That's not the question.

8           THE WITNESS:  I think we have that in all walks of

9  life, though, as well.

10          THE COURT:  I understand that.  The question,

11  however, is different.

12          If a doctor is incompetent out in the community, he

13  either is very good at hiding his incompetence, therefore he

14  continues to get patients, or he gets sued a lot and

15  eventually gives up or there are other ways.

16          Now we're dealing with your responsibility to provide

17  adequate medical care for inmates, and that's a

18  constitutional requirement.

19          If you know -- it's not a question of whether most of

20  your folks are good -- hopefully that's true -- is there some

21  peer review system under which -- here, again, there's a

22  tension because you can't -- it is hard to deep psychiatrists

23  working for you so when you get one you want to keep them --

24  but is there some peer review that says:  Gee, this guy

25  doesn't seem to have -- he's not only not very good, he's

908

1    really not doing his job.

2            Is there some system, if you know?

3            THE WITNESS:  I'm not that familiar with those

4    processes, sir.

5            THE COURT:  Fair enough.  Okay.

6            Setting aside that problem, because that's another

7    problem in the mental health assessment, you're relying on a

8    clinician, you know, and that means you got to hope that

9    clinician knows what he's doing.

10           Setting that aside, you have circumstances in which

11   people have not obeyed the rules and have not obeyed the

12   rules because they really are incapable of making rational

13   judgments about it.

14           I'll give you an example.  You've got a guy who's got

15   a court order requiring him to make his medication.  And he

16   is resisting that and kicks the guy in the behind apparently.

17           It would appear to me that's sort of pretty much

18   evidence that he doesn't really -- that he can't put together

19   what's going on.  And yes, you mitigate, but he's still

20   punished.

21           How do you rationalize that?

22           THE WITNESS:  It's a struggle.  One aspect is this

23   inmate is so incapacitated that we have to use force in order

24   to medicate him.  And the other aspect is we hold him

25   accountable for his behavior.

909

```
 1          I get it, and I wish I had the answer in my pocket.
 2   If I did, we probably wouldn't be here right now.
 3          THE COURT:  Amen.
 4          All right.  This is really a conversation I want to
 5   have with counsel, if we ever get to the end of this case,
 6   because I think that's a crux question in this use of force
 7   issue, balancing legitimate needs against legitimate
 8   incapacity.  And I don't know how you do that.  And as the
 9   witness said -- as Mr. Stainer said, if we had the answer, we
10   could all go home.
11          But that's really ultimately what this -- well, I
12   don't know about ultimately, but it is certainly a major
13   issue about which we have to contend.
14          All right.  I'm sorry I wasted everybody's -- no, I
15   didn't.  It was useful having this conversation.
16          You may proceed, sir.
17          MR. MCKINNEY:  Your Honor, at this point I don't
18   think I have any further questions for this witness
19          THE COURT:  Good for you.
20          THE COURT:  You're Miss Cesare-Eastman?
21          MS. CESARE-EASTMAN:  Yes, Your Honor.
22                            CROSS-EXAMINATION
23   BY MS. CESARE-EASTMAN:
24   Q.     Good afternoon, Mr. Stainer.
25   A.     Good afternoon.
```

910

1    Q.      Can I turn your attention to what's been marked as

2    Defendant's Exhibit J.  It's your declaration.

3            Turn your attention to Exhibit A.

4            THE COURT:  I thought you said J?

5            MS. CESARE-EASTMAN:  It is Exhibit A to the

6    declaration.

7            THE COURT:  Exhibit A to Declaration J.

8            MS. CESARE-EASTMAN:  Yes.

9    BY MS. CESARE-EASTMAN:

10   Q.      Page 317 of that document.

11           Do you see a definition there for a "Unnecessary

12   Force"?

13   A.      I do.

14   Q.      Would you please read that definition?

15   A.      (Reading:)

16           Unnecessary Force:

17           Unnecessary force is the use of force when none is

18           required or appropriate.

19           (Reading concluded.)

20   Q.      You've seen all six of the videos that have been

21   entered into evidence in this case, correct?

22   A.      I have.

23   Q.      And you have reviewed the incident reports that

24   accompany those videos?

25   A.      Not as in depth as I would have liked to.  I watched

911

1    the videos.

2    Q.    Have you reviewed any of the IERC reviews for those

3    videos?

4    A.    Briefly.

5    Q.    Is it your opinion that any of those six videos

6    demonstrates unnecessary force?

7    A.    I think if any one of those six videos even came

8    close to that, it would have been Inmate B.

9    Q.    So it is your testimony that the video depicting

10   Inmate B does demonstrate unnecessary force?

11   A.    No.  My testimony was if any of those videos were to

12   come close to unnecessary force, it would have been Inmate B.

13   Q.    So your testimony is that none of the videos exhibit

14   unnecessary force?

15   A.    I believe -- No not -- No.  No.  I don't believe that

16   they exhibit unnecessary force.

17   Q.    Can you read the definition of "Excessive Force"?

18   A.    (Reading:)

19         Excessive Force:  Excessive force is the use of more

20         force than is objectively reasonable to accomplish a

21         lawful purpose.

22         (Reading concluded.)

23   Q.    Do you believe the use of force depicted in any of

24   those six videos shows excessive force as defined by CDCR's

25   policy?

912

1    A.        Not as defined by our policy, no.

2    Q.        Do you believe it otherwise exemplifies excessive

3    force?

4    A.        No.  I think there might have been better ways of

5    doing things, but that is tactics.  And again, we plan on

6    addressing that with our policy revisions which provide

7    additional guidance.

8    Q.        We discussed CDCR's pepper spray policy during your

9    deposition in August in this case, correct?

10   A.        I believe we did.

11   Q.        And did we discuss the State's expert, Mr. Martin's,

12   proposed changes to the CDCR's Use Of Force Policy regarding

13   pepper spray?

14   A.        We did discuss the recommendations.

15   Q.        And you testified that CDCR believes its current

16   policies adequately control the amount of pepper spray used

17   on inmates, correct?

18   A.        I did testify to that, I believe.

19   Q.        And that was on August 15th, 2013?

20   A.        That's correct.

21   Q.        Mr. Stainer, you testified during -- your direct

22   examination that there were two things that led to CDCR's

23   decision to change its Use of Force Policy recording pepper

24   spray, correct?

25   A.        I believe I did.  There was a chain of things.  I

913

1     testified to what that was.

2     Q.      And one of them was Mr. Martin's recommendation, and

3     the other one was the OIG finding; is that correct?

4     A.      Correct.  As well as -- Okay.

5               MS. CESARE-EASTMAN:  Your Honor, may I approach?

6               THE COURT:  Yes.

7               (Exhibit handed to witness.)

8               THE COURT:  I thought we had a copy of this already.

9               Am I wrong?

10              MS. CESARE-EASTMAN:  I'm not sure we have this one,

11    Your Honor.

12              THE COURT:  All right.  Okay.

13              You want to mark this as whatever it is?

14              MS. CESARE-EASTMAN:  Yes, Your Honor.  This has been

15    premarked as Plaintiffs' Exhibit 159.

16              THE COURT:  Okay.

17    BY MS. CESARE-EASTMAN:

18    Q.      Mr. Stainer, do you recognize that document?

19    A.      Yes, I do.

20    Q.      Is that the OIG's report on Use of Force dated May

21    2012?

22    A.      Yes.  For the reporting periods of July through

23    December of 2011.

24              MS. CESARE-EASTMAN:  Your Honor, I would like to move

25    that exhibit into evidence.

914

1          THE COURT:  Received.

2               (Whereupon, Plaintiffs' Exhibit 159 received into

3                evidence.)

4          MR. MCKINNEY:  Your Honor, may I comment?

5          This is cumulative.  We've entered the reports for

6     the last 12-to-18 months.  We're getting a little far a

7     field.  It is a relevance objection.

8          THE COURT:  If it is an objection, it is overruled.

9          You may proceed.

10    BY MS. CESARE-EASTMAN:

11    Q.    Can I turn your attention to page 19 of that report.

12          What is titled on that page?

13    A.    Status Of Prior Recommendations.

14    Q.    Can you read the first paragraph, please, that begins

15    "In the OIG's..."?

16    A.    (Reading:)

17          In the OIG's November 2011 Use of Force Report, the

18          OIG made five recommendations to the Department.  The

19          Department's 2011 Corrective Action Plan, which is

20          updated annually, includes the following

21          implementation status for the five recommendations.

22          (Reading concluded.)

23    Q.    Can you please read Recommendation Number 5?

24    A.    (Reading:)

25          The Department should ensure appropriate training for

915

1           pepper spray use during cell extractions, including

2           guidelines for assessing exposure elements, time and

3           effectiveness.

4           (Reading concluded.)

5    Q.     Can you read his response?

6           THE COURT:  No, not his response.  What the OIG says

7    the Department's Response was.

8           MS. CESARE-EASTMAN:  Thank you, Your Honor.  Yes.

9           THE WITNESS:  (Reading:)

10          The Department contends the current Use Of Force

11          Policy adequately controls the use of pepper spray.

12          (Reading concluded.)

13   BY MS. CESARE-EASTMAN:

14   Q.     That was as of May 2012?

15   A.     That is what is documented for the period from July

16   through December, and then they published the report in May

17   2012.

18   Q.     So I guess my question for you, Mr. Stainer, is what

19   exactly happened between August 15 and today that led the

20   Department to decide to change its Use Of Force Policy

21   regarding pepper spray?

22   A.     Well, again, I went through that on direct.  Number

23   one, it all started with the memorandum.  We began to collect

24   all the incidents that had occurred between the publication

25   and the distribution of the memorandum.

916

1            At that point, during the review process, we're still

2      finding some, a handful, that we're not seeing adequate

3      waiting periods.  We might see more pepper spray when it

4      might be obvious that the pepper spray is not going to be

5      effective.  And, you know -- plus, you know, let's not fool

6      ourselves.  This case has a little bit to do with it as well.

7            And when we look at things, if we need to change, is

8      it obvious?  We don't want things to happen.  We want to be

9      in control of this.

10            If I have incident commanders out there that are

11      making those decisions, based upon our policies, then maybe

12      we need more stringent guidelines out there with regard to

13      the use of OC products during these controlled use of force

14      situations.

15      Q.      Now, as of the date of your deposition in August, you

16      had not conducted any subsequent auditing to see what effect

17      your memo had had on CDCR's pepper spray practices, correct?

18      A.      That is correct.

19      Q.      This audit was conducted subsequent to that date?

20      A.      That is correct.

21      Q.      Did the audit include every CDCR institution?

22      A.      The audit included every controlled use of force that

23      occurred between the distribution of the memo, so for the

24      months of October, through -- and the cutoff is we only

25      wanted the reports that had been all the way through IERC

917

1    because we also want to review what the institution, what

2    each level of review completed.  So if it just occurred the

3    day prior, we didn't want that report.  We wanted to make

4    sure the institution had the opportunity to review that

5    entire circumstances and take any corrective action

6    necessary.

7            So if we called for it in late August, you can

8    assume, you know, we'll give them a bit of a hedge there,

9    that most of the -- it should be through June and probably

10   some into the mid-part of July that we should have received.

11   Q.      So after reviewing -- I'm sorry.  So just to clarify,

12   that period was October 2012 through June 2013?

13   A.      June into July, yes.  Yes.

14   Q.      And there were 122 total videos?

15   A.      Approximately 122.  That number sticks in my head.

16   Q.      How many involved Coleman Class Members?

17   A.      We did not make that distinction.

18   Q.      Why not?

19   A.      Because this policy was written for all controlled

20   use of force incidents.  And this captures Coleman as well.

21   It doesn't avoid Coleman Class Members.  It captures all

22   controlled use of force incidents.

23   Q.      And your determination, after reviewing those 122

24   videos, was that your memo did not sufficiently change CDCR's

25   practices involving waiting times between applications of

918

1    spray?

2    A.        No, that's not what I said.

3    Q.        Yet you decided to change your policy after this

4    review to have waiting periods defined by policy?

5    A.        Counsel, if we even have one case, like Inmate A, you

6    know, or Inmate B, or Inmate C or D or E, we don't want one

7    case.  If I have one incident commander out there that needs

8    additional guidelines and needs more firm guidelines as to

9    what is appropriate in this situation -- maybe the person

10   doesn't have the experiences I have.  And maybe they don't

11   know how to deal with those type situations.

12            My first cell extraction was not perfect.  I had to

13   learn through my experiences.  I'd hate to be out there

14   today.  We don't do as many as we used to do, which is a good

15   thing, quite honestly.

16            It is nothing that we ever look forward to.  It is a

17   lot of work.  However, if we even have one, much less four or

18   five, where maybe we don't wait long enough or maybe we use,

19   you know, pepper spray when it is obvious that pepper spray

20   is not going to be effective, then, you know what, I need to

21   write guidelines.  I need a policy that provides more

22   direction to that person so they can do the right thing.

23   Q.        Did IERC refer any of the 122 cell extractions you

24   reviewed for further review?

25   A.        I don't have that information.

919

```
1    Q.      Now, I want to discuss these proposed pepper spray

2    recommendations that you mentioned during direct.

3            Are they in written form?

4    A.      They are.  I have recommendations from a work group.

5    Q.      Is that in written form?

6    A.      I have some written recommendations from a work

7    group.

8    Q.      Did you bring those with you today?

9    A.      I did not.  They are not policy as of yet.

10   Q.      And you did not bring the drafts with you?

11   A.      I did not.

12   Q.      Can you list for me the specific changes to the

13   existing recommendations that this draft would make?

14   A.      I can tell you what is going to be put forward with

15   regard to the -- I don't know how to put it.

16           There will be a mandatory waiting period between

17   applications if OC is approved.

18           There will be a maximum duration of OC product when

19   sprayed into the cell.

20           There will be a maximum amount of products that we

21   are permitted -- or excuse me -- a maximum amount of

22   applications into the cell.

23           And barring anything unusual, then if it is

24   unsuccessful, then the person -- the incident commander needs

25   to consider making entry into that cell or alternatives to
```

920

1  the use of OC pepper spray.

2          There might be a situation where, even though we have

3  hit whatever the max determination is of applications, that

4  we may want to go ahead and if we can -- if that person at

5  that scene can justify it and have it approved with the

6  on-site manager -- there might be a situation, if we still

7  have an inmate in that cell, and he's barricaded, he's got a

8  weapon, do we still want to run in there, or maybe there are

9  some effects of the pepper spray.

10          There may be occasions where it can be violated, but

11  not just because they want to keep on, as has been referred

12  to, "pumping product" into the cell.

13  Q.      So if I'm hearing you correctly, the policy would

14  give a mandatory waiting period between applications, a

15  maximum duration of OC product per spray and a maximum number

16  of applications; is that correct?

17  A.      That's what I said, yes.

18  Q.      Anything else?

19  A.      I believe I testified that we're 99 percent -- well,

20  pretty much 100 percent sure that we're not having the MK46

21  as part of cell extractions when it comes to the regular, you

22  know, our normal-size housing unit cells, as well as

23  individual holding cells.

24  Q.      That's because it's difficult to aim the MK46 to hit

25  an inmate in the face, which is the proper application,

921

1    correct?

2    A.    Couple of reasons.  That is one reason, because it is

3    a steamer product.  In order for the streamer to be

4    effective, you need to hit the person in the face.

5         It is difficult to hit the inmate in the face.  The

6    product's just not effective with cell extractions most of

7    the time.

8    Q.    A MK46 contains approximately 46 ounces of OC spray?

9    A.    That's correct.

10   Q.    Did the Department -- is it making this policy change

11   because it determined that 46 ounces of spray is too much to

12   use during a single cell extraction?

13   A.    No.

14   Q.    Any other changes to existing policy we've not

15   discussed?

16        THE COURT:  These are proposed changes.  They haven't

17   been adopted yet.

18        MS. CESARE-EASTMAN:  Thank you, Your Honor.

19        THE WITNESS:  Those are the ones -- those are the

20   major changes.  There will be probably shoring up of some of

21   the other items with regard to videotaping, you know, and

22   what the expectations are with regard to videotaping.

23        We questioned a part of the policy that states CN and

24   CS for use in a cell has to be authorized by a chief deputy

25   warden or the warden.

922

1        And our question is by the team, as well as all the

2    way up through my chain, why we would ever put CN or CS into

3    a cell.  So that will probably be addressed.

4    Q.      To clarify, CN and CS is tear gas?

5    A.      CN is a tear gas we might use on a exercise yard, a

6    large group.  You know, it is -- basically, you know, it is

7    the mace, the tear gas.

8            CS is a more stronger tear gas agent only authorized

9    for use by special emergency response teams.

10   Q.      Any other proposed changes to these regulations?

11   A.      I think we're going to be addressing the manner in

12   which we remove inmates from cells, as far as what, you know,

13   their state will be as far as clothed or unclothed.

14   Q.      So whether an inmate would need to strip down before

15   being allowed to exit a cell during cell extraction?

16   A.      That's correct.  That whole part is absent in our

17   policy.  That needs to be addressed.

18   Q.      Are there any other proposed changes to regulations?

19   A.      Off the top of my head, these are the highlights.

20   Q.      Okay.  What mandatory waiting period is CDCR

21   recommending?

22   A.      At this point we have not zeroed in on what we

23   believe is appropriate.  We've got recommendations out there.

24   When you say "several minutes," and when the team queries,

25   you know, people about what do several minutes mean, you get

923

1  everything from two to 15 minutes.

2          You know, we believe, you know -- off top of my head,

3  you know, five sounds good.

4          THE COURT:  Ma'am, I'm sure that you have some

5  purpose in these questions, but to the extent that it helps

6  me decide where we're going to go, I don't understand it.

7          These are proposed regulations.  They may be

8  modified.  They may be changed.  Indeed, somebody may say

9  that you can't do that.

10          THE WITNESS:  Correct.

11          THE COURT:  That's the point?

12          MS. CESARE-EASTMAN:  Your Honor, I was trying to get

13  an idea of what CDCR thinks is appropriate.

14          THE COURT:  I'm sure that's important to you.

15          You may proceed.

16          MS. CESARE-EASTMAN:  Thank you, Your Honor.

17  BY MS. CESARE-EASTMAN:

18  Q.      Do any of the proposed regulations address seriously

19  mentally ill inmates in particular?

20          THE COURT:  That's important.

21          THE WITNESS:  One thing we're going to be addressing

22  is what I testified to earlier that, you know, barring

23  anything -- and again, these are proposed changes.  They have

24  to go through a committee so, you know -- then have to be

25  signed off by myself and the undersecretary before they go

924

1    forward.

2            It is quite a bit easier than the changes to our

3    California Code of Regulations.  However, there is still, per

4    our own -- I think we spoke about it at my deposition -- the

5    Joint Use of Force Review Committee.  This does have to be

6    presented to them and have their input and other

7    stakeholders.

8            One of the things we are definitely looking at is

9    when it comes to seriously mentally ill, I testified to this

10   earlier, like I said is does pepper spray need to be our

11   first option with these individuals.

12           It is going to be dependent upon their state and

13   history.  And, you know -- but, again, there will most

14   undoubtedly be something in this policy that is going to

15   address on how we deal with these so that we can provide that

16   guidance with those incident commanders and the on-site

17   managers on how best to proceed.

18   Q.      Is there anything in the proposed policy that would

19   limit whether spray would be a first option for --

20           THE COURT:  Ma'am, who knows what the regulations

21   will say.

22           Get on to another topic, if you have another topic.

23   BY MS. CESARE-EASTMAN:

24   Q.      When did the Department begin making these revisions

25   to the policies?

925

1    A.        Approximately three weeks ago, I want to say, we had

2    a work group report to headquarters where they were briefed

3    by myself, gave them a history, and asked them -- without

4    putting my own thoughts as to what I think things should

5    be -- I put that to them.  And they brought forth some

6    recommendations.

7    Q.        I'm sorry.  Who brought forth the recommendations?

8    A.        The work group.

9    Q.        Who is on that work group?

10   A.        Two wardens, a very experienced correctional captain,

11   and a mental health doctor.

12   Q.        Have those policy revisions been approved internally?

13   A.        No, they have not.

14   Q.        Have they been reviewed by Secretary Beard?

15   A.        They have.

16   Q.        Has he approved them?

17   A.        He's provided input.

18   Q.        But he's not approved a final draft?

19   A.        He's not approved a final draft.

20            THE COURT:  I am the soul of patience, but you have

21   exhausted my patience.  There will be no more questions about

22   the proposed regulations.  Period.

23            Have I made myself -- obviously, last time I didn't

24   make myself clear.

25   BY MS. CESARE-EASTMAN:

926

1  Q.      So a minute ago we were discussing the
2  recommendations that Mr. Martin made that you were familiar
3  with, correct?
4  A.      That's correct.
5  Q.      And these are recommendations regarding use of force?
6  A.      Correct.
7  Q.      Have you reviewed those recommendations?
8  A.      I have.
9  Q.      Was Mr. Martin ever asked to present those
10 recommendations to the Joint Use Committee?
11 A.      To my knowledge, no.  And to my knowledge -- I have
12 no knowledge as to whether he was or was not.
13 Q.      And the Joint Use Committee never formally considered
14 those recommendations?
15 A.      Not to my knowledge, no.
16 Q.      And to your knowledge the Joint Use of Force
17 Committee has no plans to do so in the future?
18 A.      That's not on any agenda that we've planned.
19 Q.      Let's discuss some of those recommendations.
20         Is it your understanding that currently the only use
21 of force incidents subject to mandatory referral to the
22 Office of Internal Affairs for investigation are those
23 involving death, deadly force, great bodily injury, GBI or
24 severe bodily injury, SBI?
25 A.      Okay.  I'll take your word for it for the mandatory,

927

1    without having that policy in front of me.

2    Q.      Mr. Martin's first recommendation was to expand the

3    types of incidents that are subject to mandatory referral to

4    OIA, correct?

5    A.      That is correct.

6    Q.      And CDCR chose to not formally consider that

7    recommendation?

8    A.      That recommendation was considered all the way up

9    through the then undersecretary.

10   Q.      Was that a formal process or informal process?

11   A.      I don't know that it was formal.  It was most likely

12   informal.

13   Q.      So CDCR chose not to formally consider that

14   process -- or I'm sorry -- consider that recommendation by

15   presenting it to the Joint Use Committee, correct?

16   A.      That's correct.

17   Q.      Is that because CDCR decided it was not necessary?

18   A.      That the recommendation was not necessary or was not

19   necessary to --

20   Q.      That Mr. Martin's recommendation was not necessary?

21   A.      I don't know why it wasn't referred to the Joint Use

22   of Force Committee.

23   Q.      Mr. Martin also made a recommendation concerning the

24   expandable baton, correct?

25   A.      Can you refamiliarize myself with that

928

1    recommendation?

2    Q.      I believe Mr. Martin pointed out that in the CDCR, I

3    believe it is DOM Section 51020, there is virtually no

4    guidance regarding the use of the expandable baton.

5            Is that your understanding of his recommendation?

6    A.      Yeah.    Yeah.    Yes, it is.

7    Q.      CDCR chose not to formally consider that

8    recommendation either, correct?

9    A.      Well, again, I think you have to put that into

10   context, what does that recommendation mean?

11           I mean, the expandable baton is listed as a use of

12   force option, correct?

13           And, you know, even then we have a complete lesson

14   plan where the staff are trained with its use, its

15   appropriate use, when to use it, when not to use it, how to

16   use it.  So I mean, that's pretty much, you know, the

17   criteria for use so I think it was our contention it already

18   exists.

19   Q.      So you felt Mr. Martin's recommendation was

20   unnecessary?

21   A.      I felt we were already meeting that mandate.   I

22   think, again, we get into that defensive, you know,

23   self-defense type of a thing again.

24   Q.      And Mr. Martin's third recommendation was regarding

25   CDCR's pepper spray policy, correct?

929

1   A.      With regard to weighing canisters?

2   Q.      I believe there were a number of different

3   recommendations?

4   A.      Again, it's been a minute since I reviewed those

5   recommendations.  So, you know, the one that jumps out at me

6   is, you know, the weighing of the canisters.

7   Q.      Has CDCR ever formally considered that

8   recommendation?

9   A.      We've talked about that, yes.

10  Q.      And that was a recommendation to weigh canisters

11  before and after use to determine how much spray was used in

12  a particular incident?

13  A.      That's correct.

14  Q.      Have you formally considered that?

15  A.      You mean by referring it to the Joint Use of Force

16  Committee?

17  Q.      Yes.

18  A.      No, we haven't.

19  Q.      And CDCR has no plans to do so in the future?

20  A.      Not to my knowledge, no.  The weighing of the

21  canisters is -- you know, again, what does that show?

22          If we -- it shows us how much.  It still doesn't tell

23  us was it too much, not enough, just right.  It's after the

24  incident.

25          But if we can put controls in as far as, you know,

930

1    with regard to controlled use of force, then as far as how

2    many seconds, you know, what length of duration of spray,

3    then that would be more appropriate so we can say what we

4    believe is appropriate as far as application.

5    Q.      Is it your understanding that CDCR declined to adopt

6    Mr. Martin's recommendation regarding weighing the canisters

7    because it found to be operationally difficult?

8    A.      Operationally difficult as well, yes, that's another

9    item.

10   Q.      But CDCR never asked Mr. Martin to how to accomplish

11   that weighing of the canisters, correct?

12           MR. MCKINNEY:  Objection.  Calls for speculation.

13   Assumes facts not in evidence.

14           THE COURT:  She's asking whether or not CDCR spoke to

15   Mr. Martin about it.  The answer to that question is "yes" or

16   "no."

17           As far as you know?

18           THE WITNESS:  I did not ask him.  I've had

19   conversations with Mr. Martin.  I did not ask him that

20   personally, no.

21           THE COURT:  As far as you know, did anybody else in

22   CDCR?

23           THE WITNESS:  I don't know if they did or not.

24   BY MS. CESARE-EASTMAN:

25   Q.      To your knowledge did you or anyone at CDCR ever

931

1    examine how other systems weigh their canisters before and

2    after use?

3    A.        No, we did not, not to my knowledge.  I did not

4    direct anybody to, and I did not.

5    Q.        Are you familiar with Mr. Martin's fourth use of

6    force recommendation in which he raised concerns that inmate

7    appeals were not being properly reviewed?

8             MR. MCKINNEY:  Objection.  Assumes facts not in

9    evidence.  Beyond the scope of direct, as well.

10            THE COURT:  You know, I don't know whether it is

11   beyond the scope of direct or not.  Obviously, Mr. Martin's

12   recommendations were discussed in direct for some reasons.

13            MS. CESARE-EASTMAN:  Your Honor --

14            THE COURT:  Yes.

15            MS. CESARE-EASTMAN:  Mr. Stainer testified on direct

16   extensively about the use of force process and all the

17   different ways that different use of force incidents can be

18   subject to external review.  One of the ways is through

19   inmate appeals.

20            THE COURT:  Fair enough.  You may proceed.

21            Did Mr. Martin -- but your question assumes something

22   not in evidence.

23            Did Mr. Martin indicate that there was a problem with

24   the review process?

25            THE WITNESS:  I'm not that familiar with that

932

1    recommendation.  That's something -- I mean, I know that

2    our -- actually, the most recent changes to our DOM were to

3    put into this a review process of staff complaints specific

4    to the use of force.

5         It is actually very strong and live.  It's healthy.

6    More healthy than it has ever been before, subject to levels

7    of review that it has never been subject to before.

8         THE COURT:  But the question is specifically.

9         If you don't recall --

10        THE WITNESS:  Yeah.

11        THE COURT:  -- that's what you say, you don't recall.

12        But do you recall Mr. Martin raising questions about

13   the adequacy or the efficacy of the review process?

14        THE WITNESS:  Again, without -- I'm sure they're

15   probably in one of these exhibits up here --

16        THE COURT:  The answer is:  As you sit here now, you

17   don't recall?

18        THE WITNESS:  No, I don't recall that.

19        THE COURT:  All right.

20   BY MS. CESARE-EASTMAN:

21   Q.    Have you reviewed the OIG Use of Force Reports?

22   A.    Yes.

23   Q.    Are you familiar with the OIG's finding in his May

24   2011 Report that nearly half of inmate appeals regarding use

25   of force escaped review?

933

1          MR. MCKINNEY:  Objection, Your Honor.  Relevance.

2     Assumes facts not in evidence.

3          THE COURT:  Well --

4          MR. MCKINNEY:  Talking about a May 2011 report at

5     this point.

6          THE COURT:  It must be late in the afternoon because

7     I'm sort of losing -- All right.

8          Let me start by saying that the question is whether

9     he's familiar with something that assumes that it is true.

10    You've got to ask him whether as far as he knows that is

11    true.

12    BY MS. CESARE-EASTMAN:

13    Q.    Well, let me direct your attention to Plaintiffs'

14    Exhibit 159, page 16.

15         For clarification, 159 is the May 2012 OIG Use Of

16    Force Report.

17         THE COURT:  I've got so many copies up here.

18         Well, that's all right.  Go ahead.

19         MS. CESARE-EASTMAN:  We just entered that into

20    evidence.

21         THE COURT:  I've got it.  Here it is.

22         MR. MCKINNEY:  Your Honor, I apologize.  I'm not

23    certain we have a copy of that.

24         MS. CESARE-EASTMAN:  I just gave you one.

25         MR. MCKINNEY:  I apologize.

934

BY MS. CESARE-EASTMAN:

Q.      Again, that was page 16.

        Can you read the bottom paragraph on the right-hand
side through the word "varied"?

A.      (Reading:)

        The OIG examined 268 allegations of unreasonable

        force reported through the adult institutions' inmate

        appeal process or through written or oral complaints

        from staff, members of the public, or inmates.

        Nearly half, 121, of the allegations of unreasonable

        force in our examination escaped executive committee

        review, and institutions' practices with respect to

        tracking these allegations varied.

        (Reading concluded.)

Q.      So the OIG found that nearly half of the allegations
of unreasonable force filed by inmates escaped review as of
May 2012, correct?

A.      As of December 2011 that was the report for that
reporting period.  We initiated a corrective action plan, and
I believe this process to have been addressed.

Q.      Has CDCR conducted any subsequent auditing to
determine how many inmate appeals are currently escaping
review?

A.      I personally have not.  I've not asked anybody to do
that.  However, this is something that the Office of

935

1    Inspector General looks at.

2    Q.       But the OIG hasn't reported on it since this report,

3    correct?

4    A.       They have not made a formal report with regard to

5    this specific subject.  They're actually waiting for us to

6    implement the -- this new use of force pilot program.

7    However, I meet monthly, and I get phone calls all the time.

8    And this is not something that I have been brought to my

9    attention, either myself or the former director prior to her

10    retirement, during our monthly meetings when we discuss a

11    plethora of subjects.

12           THE COURT:  It would appear to me -- I mean, I really

13    don't know how this process is supposed to work, but the OIG

14    says:  Gee, there appears to be a serious problem.

15           What does the agency, in your case, CDCR do in

16    response to such an observation?

17           THE WITNESS:  We review the causative factors of

18    whatever that problem might be.  In this case what we

19    found -- there was already a process in place, but the

20    biggest issue was a central tracking point, if I recall

21    correctly, to one person.

22           They were hitting the appeals office, the use of

23    force coordinator, all of these allegations.  They were going

24    to so many different points that we needed to zero that in

25    and have one central repository so we can ensure that the

936

1    appeal reviews were completed or the inquiries were completed

2    and then presented to the committee for final review.

3            THE COURT:  So what happened is you got this report,

4    and you attempted to respond by finding out why it happened

5    and how to correct it?

6            THE WITNESS:  That's correct, sir.

7            THE COURT:  In your view, that was sufficient?

8            THE WITNESS:  That corrective action plan was

9    discussed with OIG.  And they felt that action was

10   sufficient.  And we have not heard anything to the contrary

11   since.

12    BY MS. CESARE-EASTMAN:

13   Q.    Is CDCR currently tracking how many inmate appeals

14   escape review?

15   A.    If they escape review, how would we know they escape.

16         I don't understand the question.  We track appeals.

17         THE COURT:  OIG found some way.

18         THE WITNESS:  I understand.  I think, you know, no,

19   at this point we're not tracking anything that's escaped

20   review.

21   BY MS. CESARE-EASTMAN:

22   Q.    So CDCR does not know how many inmate appeals

23   currently escape appeal?

24   A.    Or if there are any.

25   Q.    I want to go back to Mr. Martin's recommendation

937

1    regarding pepper spray.

2           Is it your understanding that Mr. Martin considers a

3    MK9 a crowd control device?

4    A.      That is my understanding, yes.

5    Q.      But you do not?

6    A.      I do not.  I consider it -- it can definitely be used

7    as a crowd control device.  But if you look at the

8    manufacturer specs, or you go on the website, watch their

9    videos, they also talk about how it is utilized in cell

10   extractions as well.

11   Q.      Is that utilization in cell extractions, does that

12   involve a wand attachment?

13   A.      Either or.

14           THE COURT:  I'm sorry.  I don't know what a wand

15   attachment means?

16           I remember now.  I'm sorry.

17           THE WITNESS:  The rubber hose.

18           THE COURT:  Yes.  Okay.

19           It's 4:30.  We will reconvene tomorrow morning at

20   9:30.

21           Stand in recess.

22           (Off the record at 4:30 p.m.)

23                           ---o0o---

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10               IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.

11

12

13    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25