1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12    _____/

13

14

15                          ---o0o---

16

17                     REPORTER'S TRANSCRIPT

18                   RE:  EVIDENTIARY HEARING

19                 THURSDAY, OCTOBER 24TH, 2013

20

21                          ---o0o---

22

23

24

25    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                          APPEARANCES

 2                          ---o0o---

 3     FOR THE PLAINTIFFS:

 4             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
 5             SAN FRANCISCO, CALIFORNIA  94104

 6             BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7             BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

 8             BY:  LORI RIFKIN, ATTONEY AT LAW

 9             BY:  THOMAS NOLAN, ATTORNEY AT LAW

10             BY:  JANE KAHN, ATTORNEY AT LAW

11

12             K&L GATES LLP
               4 EMBARCADERO CENTER, SUITE 1200
13             SAN FRANCISCO, CALIFORNIA  94111

14             BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW

15             BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

16

17     FOR THE DEFENDANTS:

18              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
19              13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
20
               BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
21
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
22
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
23
               BY:  MARTINE D'AGOSTINO, DEPUTY ATTORNEY GENERAL
24

25                          ---o0o---
```

1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6      MICHAEL STAINER (Previously Sworn)

7          Cont'd Cross-Exam by Cesare-Eastman          942
           Redirect Examination by Mr. McKinney         978
8          Recross-Examination by Ms. Cesare-Eastman    986
           Further Redirect Exam. by Mr. McKinney       992
9

10

11     DR. BENNIE F. CARTER

           Direct Examinatin by Ms. D'Agostino          994
12         Cross-Examination by Mr. Bien               1019
           Redirect Examination by Ms. D'Agostino      1067
13

14

15

16                             ---o0o---

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                    (916) 446-6360

1                    EXAMINATION INDEX

2                        ---o0o---

3    FOR THE PLAINTIFFS:

4        EXAMINATION:                              PAGE

5

6      JEANNE WOODFORD

7        Direct Examination by Ms. Stone-Manista      1072

8

9

10

11                       ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        EXHIBIT INDEX

 2                         ---o0o---

 3   PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION                EVD
 4
      1001            New Client Code Sheet           942
 5                    (Sealed)

 6    1007            114-A Logs Reviewed by Woodford 1095

 7    1011            Plata Evaluation               1112

 8    1057            Sept. 2013 COMPSTAT Report     1081

 9    1060            Clinical Rounds Ad. Seg,
                      July 2013                      1092
10
      1086            Death Row Population Chart,
11                    Jan. 2013                      1077

12    1106            Photo of East Block, SQ        1088

13    1167            Inmate JJJ Record Excerpts     1059

14

15

16

17

18

19

20

21

22

23

24

25                         ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

938

```
 1              SACRAMENTO, CALIFORNIA
 2         THURSDAY, OCTOBER 24TH, 2013 -9:30 A.M.
 3                    ---o0o---
 4         THE CLERK:  All rise.
 5         Court is now in session.
 6         The Honorable Lawrence K. Karlton presiding.
 7         THE CLERK:  Please, be seated everyone.
 8         Good morning.
 9         MR. BIEN:  Your Honor, before we start with the
10    witnesses, there is a dispute we want to bring to your
11    attention again about the tapes, I'm sorry to say.
12         They have not been filed or supplied to us.  And
13    we've also just learned from defense counsel that they are
14    making additional changes to the tapes that were played in
15    court, not the first three, which do need to be redacted, but
16    the second three that were redacted.
17         And so the tapes -- we thought the second three were
18    finished since they had been played in court.  The first
19    three we agree had -- work needed to be done on them.
20         MR. MCKINNEY:  Your Honor, our clients are redacting
21    both the audio and the identifying video information.  In
22    other words, the names of the officers on the back and
23    front.
24         THE COURT:  Yes.
25         MR. MCKINNEY:  I think, given the shifting sands
```

939

1    here, we ought to be given that opportunity to --

2            THE COURT:  I'm sorry.  Given the?

3            MR. MCKINNEY:  -- the way the sands are shifting here

4    with the Ninth Circuit's order and this midnight motion they

5    filed, that we be given the opportunity to redact both the

6    video and sound from these.

7            THE COURT:  I don't have any problem with that.

8    Counsel's concern, it appears -- I mean, it may be

9    legitimate.  I don't know.  But as to the matters which are

10   before the court, having been played, they can be filed under

11   seal.  And then you can redact the rest of it, and then

12   they'll have an opportunity to do a comparison.

13           That, I don't, think is a big problem.

14           But we have another problem, which is the plaintiffs'

15   assertion that they need the tapes physically to examine them

16   for the purpose of cross-examination.

17           I don't think that deals with this witness; am I

18   right, Mr. Bien?

19           MR. BIEN:  Again, this is something we would have

20   liked to have.  As soon as we get them, we would appreciate

21   it.  It is too late for this witness and tomorrow, but --

22   perhaps maybe for tomorrow, but certainly for Mr. Martin we

23   need the tapes.

24           THE COURT:  We're going to get the tapes to you

25   before Mr. Martin.  He shows up November 5th.

940

1           MR. BIEN:  We would like them in our possession so we

2    can work --

3           THE COURT:  Sir, we'd like world peace.  I'll order

4    that tomorrow.  Right now I'm busy with something else.

5           I mean, there are limitations on what we can

6    practically do.  I mean, this brings up a whole series of

7    problems.  I'm not going to keep the witness on the stand

8    while we talk about them.  I expect we'll talk about them at

9    the end of the day and try and figure out what is the

10   sensible thing to do.

11          And I'm not sure -- I'm sure I do not know what that

12   is.  I will be happy to -- that's much too strong -- I'm more

13   than willing to hear what the lawyers think the progress of

14   this case is.

15          Just to give you a heads-up, so when we get to

16   talking about it you can understand, my own view, subject to

17   your discussion, is that I'm going to need time between the

18   conclusion of this phase of the motion practice and Ad. Seg.

19   to write.

20          I mean, this is a very difficult, in my view, case.

21   And I would like to think about what I'm doing and not just

22   out of desperation write anything at all.

23          But that really does create other problems in timing

24   because I can't begin writing until Mr. Martin shows up.  And

25   I respect your input that you might give me -- I'll wait

941

1  until counsel can pay attention to what the court is

2  saying.

3           MR. MCKINNEY:  Your Honor --

4           THE COURT:  Never mind.  Never mind.  You may retire.

5           MR. MCKINNEY:  Thank you.

6           THE COURT:  Not only is that discourteous -- never

7  mind.

8           Ma'am, you may proceed.

9           MS. CESARE-EASTMAN:  Your Honor, before I begin,

10  there is one exhibit issue I would like to clear up.

11           THE COURT:  Yes.

12           MS. CESARE-EASTMAN:  We had previously conditionally

13  entered Plaintiffs' Exhibit 1001, which is the Inmate Key.

14           THE COURT:  I'm sorry.  Oh, yes.

15           MS. CESARE-EASTMAN:  We've actually prepared a new

16  version of that exhibit where we've taken off the references

17  to the declaration.  So I would now like to enter that into

18  evidence.

19           THE COURT:  Have you shown that to defense counsel?

20           MS. CESARE-EASTMAN:  I have.  They have approved it.

21           THE COURT:  That's fine?

22           MR. MCKINNEY:  That's correct, Your Honor.

23           THE COURT:  All right.  That will be received and

24  substituted for?

25           MS. CESARE-EASTMAN:  What had been conditionally

942

1    entered as Plaintiffs' Exhibit 1001.

2            THE COURT:  So this will be the new 1001.

3            MS. CESARE-EASTMAN:  Yes.

4                (Whereupon, Plaintiffs' Exhibit 1001 received

5                 into evidence.)

6            MS. CESARE-EASTMAN:  This does contain confidential

7    inmate information.

8            THE COURT:  You want it under seal?

9            MS. CESARE-EASTMAN:  Yes.

10           THE COURT:  That will be the order.

11           MS. CESARE-EASTMAN:  May I approach?

12           THE COURT:  Yes.

13           CONTINUED CROSS-EXAMINATION OF MICHAEL STAINER

14   BY MS. CESARE-EASTMAN:

15   Q.      Good morning, Mr. Stainer.

16   A.      Good morning.

17   Q.      Do you agree pepper spray can cause injury?

18   A.      I have not seen evidence to that.

19   Q.      And CDCR also does not believe that OC spray causes

20   injury, correct?

21   A.      When a person is exposed to OC pepper spray, on the

22   7219, which is a form that denotes injuries, it is a Medical

23   Unusual Occurrence Form, pepper spray exposure is not denoted

24   as an injury.

25   Q.      You would agree pepper spray can cause pain and

943

1    suffering, correct?

2    A.      I believe pepper spray can cause irritation and

3    discomfort, yes.

4    Q.      Do you believe it can cause pain and suffering?

5    A.      I do not believe that.  Those are pretty strong

6    words, counsel.

7    Q.      So your answer is "no"?

8    A.      No.

9    Q.      You observed the 17 videos that were produced to

10   plaintiffs in this case, correct?  The controlled use of

11   force videos?

12   A.      That's correct.

13   Q.      When you saw those videos, did you observe the

14   inmates experiencing pain?

15   A.      I observed different -- each of the videos was

16   different.  I wouldn't go as far to say I observed the pepper

17   spray causing pain.

18   Q.      But you're aware that pepper spray can kill, correct?

19   A.      I'm aware there have been incidents where people

20   have.  I have never personally experienced that, nor read any

21   specific incidents about that, but I believe it has occurred.

22   Q.      And it has occurred at CDCR, correct?

23   A.      I am not personally aware of that.

24   Q.      Have you reviewed the OIG's semi-annual report from

25   January to June 2012?

944

1   A.      I'm sure I have.

2   Q.      I believe it is Defendants' Exhibit N.  I believe you

3   testified yesterday you had reviewed it, correct?

4   A.      I'm sure I've reviewed that report.

5           MR. MCKINNEY:  Objection, Your Honor.  I'm not

6   certain there has been any testimony with respect to this

7   exhibit.  It was not entered in.

8           I would like to withdraw that exhibit actually as

9   presented in error.  If plaintiffs want to reenter that

10  exhibit, that is fine.

11          THE COURT:  Why should we do that?  If you care, I'll

12  let you withdraw it, and you may tender it, but --

13          MR. MCKINNEY:  There is no foundation at this point,

14  let's put it at that.

15          If she wants to use the same denomination, that is

16  fine.

17          MS. CESARE-EASTMAN:  Your Honor, it is a public

18  record.

19          THE COURT:  I understand.  I don't know what's been

20  said.

21          The motion to withdraw is denied, just because it

22  makes no difference.

23          You may proceed.

24          MS. CESARE-EASTMAN:  Thank you.

25  ///

945

1    BY MS. CESARE-EASTMAN:

2    Q.      Do you have that exhibit in your possession?

3    A.      What are the dates of that again?

4    Q.      It is the Semi-Annual Report from January to June

5    2012.

6    A.      Yes, I have that.

7    Q.      Can you please to turn to page 139.

8            THE COURT:  I'm sorry, counsel.  I'm fumfering here.

9              (Brief pause.)

10           Go ahead.

11   BY MS. CESARE-EASTMAN:

12   Q.      Do you see the section entitled Facts Of The Case?

13   A.      I do.

14   Q.      Can you please read the last sentence in that

15   section?

16   A.      "At the Correctional Treatment Center," starting

17   there?

18           THE COURT:  "An autopsy report..."

19   BY MS. CESARE-EASTMAN:

20   Q.      "An autopsy report..."

21   A.      Okay.

22   Q.      On page 139.

23   A.      I see.

24           (Reading:)

25           An autopsy report revealed that the inmate died as a

946

1           result of multiple pepper spray exposures.

2           (Reading concluded.)

3    Q.      This was an incident from 2008?

4    A.      That's correct.

5    Q.      And you were not aware of this incident?

6    A.      I was not specifically aware of the details of this

7    incident, no.

8           THE COURT:  Were you aware that an inmate had died

9    and that the autopsy report stated that the inmate had died

10   as a result of multiple pepper spray exposures?

11          THE WITNESS:  I am now, Your Honor.

12          THE COURT:  I understand.

13          All right.  Go ahead.

14          You may proceed.

15          MS. CESARE-EASTMAN:  Thank you.

16   BY MS. CESARE-EASTMAN:

17   Q.      You can put the exhibit away.

18          I want to talk for a second about Inmate A.

19          Do you understand who that is?

20   A.      I do.

21   Q.      And you reviewed the video and the paperwork

22   associated with that controlled use of force event?

23   A.      I reviewed the video twice and I've done a cursory

24   review of the paperwork, yes.

25   Q.      And there is no evidence in the video or paperwork

947

1    that Inmate A was ever decontaminated after being exposed to

2    OC spray, correct?

3    A.        I believe that is correct.

4    Q.        Do you know why that wasn't done?

5    A.        I do not.

6    Q.        Should it have been done?

7    A.        There are some occasions in which decontamination can

8    be bypassed per our own policy.

9    Q.        Was this one of them?

10   A.        It may have qualified.  It was not explained that I

11   read so I would be assuming.

12   Q.        At a minimum shouldn't staff have taken cold, wet

13   towels and patted the skin to provide him some relief?

14             MR. MCKINNEY:  Objection.  Calls for speculation.

15             THE COURT:  Overruled.

16             THE WITNESS:  That could have been an option.

17             THE COURT:  No.  The question is, if you don't

18   decontaminate somebody who has been pepper sprayed, is the

19   alternative, at a minimum, that you ought to be patting him

20   down with a wet towel -- or wet towels?

21             THE WITNESS:  That is an option, Your Honor.  There

22   are several ways to decontaminate.  Simply removing the

23   person from the area and providing fresh air, in which in

24   this case could, while it was not outside air, is a form of

25   decontamination.

948

BY MS. CESARE-EASTMAN:

Q.      This inmate was left in those restraints for 72
hours, correct?

A.      That's what's been testified to, yes.

Q.      And as far as you know, he was never decontaminated,
correct?

A.      I do not know whether he was or was not.

        THE COURT:  There is no evidence in the -- obviously,
the video doesn't show him being decontaminated.  And the
question is, if you know, if you recall -- well, you said you
only cursorily examined the written work anyhow.

        You have no recollection whether decontamination
occurred as reported in the written report?

        THE WITNESS:  That's correct.  And if by the time the
incident commander called a stop to this incident, and
reports were submitted, there is no evidence that the staff
had done any further decontamination other than removing him
from the area.

        THE COURT:  All right.

BY MS. CESARE-EASTMAN:

Q.      I want to now focus on the issue of balancing the
institutions' duel need to maintain order and accommodating
the needs of a seriously mentally ill inmate.

        You would agree that allowing an inmate to
decompensate in his cell is not appropriate?

949

1        MR. MCKINNEY:  Objection.  Calls for medical

2    opinions.  It is beyond the scope of this witness's

3    knowledge.

4        THE COURT:  You know, this is a very interesting

5    problem, which I was going to ultimately discuss with the

6    witness as well.

7        In his present position, although his entire

8    experience has been in custody, in his present position he's

9    also responsible for the provision of medical care, that is

10   supervision, I don't mean personally, but supervision.

11       The objection is overruled.

12       You may restate your question.  Because I think this

13   is a very -- you may restate your question.

14   BY MS. CESARE-EASTMAN:

15   Q.     Would you like me to restate the question?

16   A.     Please.

17   Q.     You would agree that allowing an inmate to

18   decompensate in his cell is not appropriate?

19   A.     I would agree with that.

20   Q.     And CDCR produced to plaintiffs 17 use of force

21   videos in this case, correct?

22       MR. MCKINNEY:  Objection.  Misstates the record.

23       THE COURT:  Well, she said "is it correct."  If it is

24   incorrect, I suppose the witness will say so.  But I thought

25   that had been established at least five or six times in the

950

1    course of this trial.

2    BY MS. CESARE-EASTMAN:

3    Q.      Is that your understanding, Mr. Stainer?

4    A.      It is my understanding there are 17 videos that were

5    discussed during this case.

6    Q.      To clarify, those are all controlled use of force

7    videos?

8    A.      That's correct.

9    Q.      And you testified yesterday that you reviewed them

10    all, correct?

11    A.      I have viewed each of the 17 videos.

12    Q.      Now, in ten of those 17 videos the inmate was subject

13    to a cell extraction for either forced medication or to be

14    moved to higher level of care; is that your recollection?

15    A.      I believe that's correct.

16    Q.      In other words, he was extracted from the cell for

17    his own good or for treatment of some kind?

18    A.      That would be a correct assumption.

19    Q.      And you testified that in your experience as an

20    incident commander, you were generally successful in

21    establishing a dialogue with inmates during some of these

22    types of situations, correct?

23    A.      I think I was more successful than having to resort

24    to controlled force.  Probably at least for every situation,

25    ten times or nine times out of ten we were able to avoid the

951

1    use of controlled force just based upon dialog and

2    communication.

3    Q.      What techniques did you use that were successful?

4            THE COURT:  May I interrupt?

5            Most of those cell extraction, I'm assuming -- maybe

6    I'm wrong -- that they were general population rather than

7    persons who are within the Coleman class; is that right, sir?

8            THE WITNESS:  It was definitely a mixture of both.

9    The institution I was working at, we had a large population

10   of Coleman, mostly at CCCMS level.

11           THE COURT:  So it would appear to me sensible to

12   restrict your questions to the Coleman Class unless you find

13   some importance in contrasting the results.

14           You may proceed, ma'am.

15           MS. CESARE-EASTMAN:  Yes, Your Honor.  I'll rephrase.

16   BY MS. CESARE-EASTMAN:

17   Q.      In the situations as incident commander where you

18   were able to talk somebody successfully out of their cell, in

19   a situation where they needed to be removed from their cell

20   for additional treatment, what techniques did you use that

21   were successful?

22   A.      Simple communication.  I mean, every inmate is

23   different.  You talk to the inmate.  You see -- you try to

24   determine, you know, what their motives are, what is going

25   through their mind.

952

1           There are some situations where there is no dialogue

2    to be had.  It is like you're going to do the controlled use

3    of force.  There is no way around it unfortunately.

4    Q.       In the situations where you were successful, about

5    how long would you spend talking to the inmate?

6    A.       It would vary from, you know, five minutes to 20

7    minutes, even longer, if that's what it took.  As long as the

8    inmate's willing to talk.  You know, kind of like my training

9    through, you know, conflict resolution, you know, if you keep

10   that person talking, then you're gaining ground.

11   Q.       So approaching a cell front and merely ordering a

12   seriously mentally inmate to repeatedly cuff up is not the

13   type of dialogue that you are talking about?

14   A.       That's not how the process begins.

15   Q.       But that would not be within your expectation of what

16   would work in a situation like that?

17   A.       Sometimes that's how it starts, but, you know,

18   that's -- that's not called intervention.

19   Q.       Now, you reviewed the video of Inmate E.

20           Do you recall which video that is?

21   A.       Yes.

22   Q.       And in that video, at the beginning of the video,

23   Inmate E was at the cell front discussing with officers his

24   belief he was being held illegally, correct?

25   A.       I believe I recall that, yes.

953

1   Q.     So he was at the cell front attempting to communicate

2   with custody staff, correct?

3   A.     Correct.

4   Q.     Was it appropriate in that video for custody staff to

5   speak over him and read an admonition rather than try to

6   engage and listen to what he was saying?

7   A.     I believe at that point -- and again, you know, going

8   back, we are -- I think we testified to this earlier --

9   you're at that point.  We're not talking about everything

10   that's occurred before then.

11        At that point we have tried all the intervention

12   techniques, the communications to try to have a different

13   resolution to this incident.

14        At this point you're on video and everything else to

15   that point has failed.  You're going to give him his last

16   orders to cuff up and proceed.

17   Q.     But didn't you just say that as long as an inmate is

18   willing to talk you should continue to engage with him before

19   using force?

20   A.     When you're getting somewhere, yes.  I did say that.

21   I don't necessarily believe that situation is the type of

22   situation I was referring to though.

23   Q.     In any of the 17 videos, including the six shown in

24   court -- I'm sorry.  I should back up.

25        For all of the 17 videos, did you review the IERC

954

1    review process paperwork?

2    A.      Again, I've looked it over.  I've not done the full,

3    you know, deep dive through every word of every report which

4    is part of -- in order to fully assess the IERC report, I

5    need to do a full analysis of every report.

6    Q.      In any of the IERC paperwork associated with the 17

7    videos, including the six shown in court, did the IERC ever

8    recommend further review?

9    A.      I do not believe so, no.

10   Q.      To your knowledge was any officer involved in any of

11   those 17 incidents ever formally disciplined?

12   A.      There were trainings completed, but not formal -- if

13   you call formal discipline, I would assume you're referring

14   to an averse action?

15   Q.      Yes.

16   A.      I don't believe that was the case in any of the

17   videos.

18   Q.      In any of the 17 IERC reviews, did anyone ask how or

19   why staff had allowed the situation to escalate to a point

20   where force had to be used?

21   A.      I don't believe that's the normal question that's

22   asked during the IERC, how staff allowed that to escalate.

23          Staff made many attempts to deescalate the situation

24   prior to getting to the point it was at that we had to use

25   the controlled force.

955

1    Q.       The IERC is more an of a review than investigation?

2    A.       IERC is a review committee.

3    Q.       And when an incident is referred for investigation,

4    it is referred to OIA, the Office of Internal Affairs?

5    A.       The incident is submitted to the Central Intake Unit,

6    which is a function of the Office of Internal Affairs.

7    Q.       That's who actually performs an investigation,

8    correct?

9    A.       That's who reviews the circumstances and determines

10   whether or not an investigation should be conducted, if it

11   meets criteria for an investigation or if there is enough

12   evidence for a direct action.

13   Q.       Are you familiar with the OIG's most recent report

14   that came out in October of this year?

15   A.       Yes, I am.

16   Q.       In that report the OIG mentions the fact that the

17   funding for the Office of Internal Investigations has been

18   drastically reduced in recent years, correct?

19   A.       I believe there is a reference to that.

20   Q.       Do you believe that is a problem?

21   A.       I have not made that assessment.

22   Q.       In any of those IERC reviews, was it suggested that

23   custody could have worked more closely with mental staff

24   health to intervene earlier before an inmate became so

25   distraught?

956

1          MR. MCKINNEY:  Objection.  Vague and ambiguous.

2          THE COURT:  Overruled.  You may answer.

3          THE WITNESS:  I did not read that in any of those,

4    nor is there any allegations that that wasn't the case

5    either.

6    BY MS. CESARE-EASTMAN:

7    Q.     Have you ever observed a mental health clinician talk

8    an inmate into cuffing up and exiting the cell voluntarily?

9    A.     Many times.

10   Q.     What techniques were successful in those instances

11   that you observed?

12   A.     Again, just communications with the inmate.  The

13   inmate has to have a -- probably the most important part of

14   anything that we do when providing this intervention is

15   having an inmate that is willing to go through this

16   intervention process.

17         THE COURT:  Or capable of going through it.

18         THE WITNESS:  In rare cases I've seen them where

19   they're, again, maybe not.

20   BY MS. CESARE-EASTMAN:

21   Q.     In your experience does a successful clinical

22   intervention last more than 30 seconds?

23   A.     Most times.

24   Q.     So is it your view that once the camera is on, in a

25   controlled use of force event, force is going to be used

957

1    regardless of whether the inmate's still willing to talk?

2    A.       No.  Many times we've gone up to the cell after

3    believing this is our last resort.  However, we go up to the

4    cell and we give those final orders and the inmate complies.

5    Q.       Would you agree that requiring a seriously mentally

6    ill inmate to cuff up and be strip searched every time he

7    leaves his cell, even for treatment, is going to discourage

8    him from leaving the cell?

9            MR. MCKINNEY:  Objection.  Relevance.  This has

10   nothing to do with use of force.

11           THE COURT:  Overruled.  You may answer.

12           THE WITNESS:  I believe we have policies with that

13   regard.  And I believe it is for the safety of all the staff.

14   And I believe there is appropriate policy.

15           I'm -- we hold groups all the time.  I've seen the

16   allegations or the complaints that this is a barrier to

17   treatment, but I've not seen evidence to that fact.

18           THE COURT:  You didn't see the video where it appears

19   that's a barrier to treatment -- to compliance because the

20   inmate is concerned about whether or not he's going to be

21   forced into a homosexual relationship?

22           THE WITNESS:  I did see that video, sir.

23           THE COURT:  But you don't think that was at least

24   some evidence that under certain circumstances the strip

25   search is a barrier to compliance?

958

1         THE WITNESS:  I believe that was a very unusual

2    circumstance.

3         THE COURT:  We understand -- well, I don't know that

4    it is.

5         THE WITNESS:  I'm not dancing around the subject,

6    with all due respect.  I've seen those allegations.  I've

7    heard those complaints.  I've not seen evidence that's a

8    barrier.

9         THE COURT:  Including the video that we just have

10   been discussing?

11        You didn't see that as, at least, some evidence that

12   in that circumstance the strip search was a barrier?

13        THE WITNESS:  In that particular incident that inmate

14   was vocalizing a fear.

15   BY MS. CESARE-EASTMAN:

16   Q.    But would you agree an inmate who is receiving

17   treatment or participating in treatment is less likely to

18   decompensate to the point where these types of controlled use

19   of force incidents are necessary, correct?

20        MR. MCKINNEY:  Objection.  Calls for medical opinion.

21        THE COURT:  No.  I think it really deals with his

22   experience.  And the point is, he's had a very wide range of

23   experiences, including being an incident commander, having

24   participated.

25        No.  The objection is overruled.

959

1        You have to restate the question because I'm sure the

2   witness doesn't recall.

3        I don't recall, and I just read it.

4   BY MS. CESARE-EASTMAN:

5   Q.    Sure.  Can I have the question read back?

6        (Whereupon, the record was read as requested.)

7        THE COURT:  You know what, having heard it again, I

8   agree.  The objection is sustained.

9   BY MS. CESARE-EASTMAN:

10  Q.    Do you believe that by the time a situation

11  deteriorates to the point where a controlled use of force is

12  necessary, against a seriously mentally ill inmate, that it

13  represents some type of failure in CDCR's management of a

14  population that should be addressed?

15  A.    No, I don't.

16  Q.    Shouldn't the goal of any review process be to figure

17  out how to avoid that situation the next time?

18  A.    That's something that is looked at at the committees.

19  Absolutely.  As a warden I looked at that, you know, with

20  every case.

21  Q.    But IERC review process, as you just testified to,

22  doesn't ask the question of how an event happened or why it

23  happened, correct?

24  A.    I believe, and I don't mean to be argumentative, I

25  thought you asked if the IERC questions how somebody

960

1  decompensated to the point where controlled use of force was

2  necessary.

3  Q.      You're right.  That was a bad question.

4          The IERC process does not review how or why an inmate

5  was allowed to decompensate to the point where use of force

6  was necessary?

7  A.      They might look at the situation as a whole.

8  However, I'm not sure I really understand.

9          I have never looked at something like that, I'll say

10 that.

11 Q.      Okay.  Fair enough.

12         CDCR's current use of Use Of Force Policy does not

13 provide different guidelines for use of force for inmates who

14 refuse to comply with an order versus inmates who cannot

15 comply with an order, correct?

16 A.      There is nothing written that specifically addresses

17 that.

18 Q.      For example, if an inmate had fallen in his cell and

19 broken his leg, CDCR would not use pepper spray to come to

20 the door in order to cuff up, correct?

21 A.      That's correct.

22 Q.      We discussed cell extraction for inmates who are

23 being involuntarily medicated or transferred to a higher

24 level of care.

25         Has CDCR considered a ban to pepper spray in those

961

1    circumstances?

2    A.        No.

3    Q.        Is it planning to?

4    A.        No.  Not to my knowledge.

5    Q.        Has CDCR ever considered developing a separate Use Of

6    Force Policy for seriously mentally ill inmates?

7    A.        Not a separate Use Of Force Policy, no.

8    Q.        So yesterday defense counsel showed you RVRs for

9    several inmates, correct?

10   A.        That's correct.

11   Q.        And you testified that the RVRs had been mitigated in

12   some way based on the mental health assessment finding that

13   the mental illness contributed to the RVR, correct?

14   A.        That's correct.

15   Q.        And that resulted in fewer days loss of credit and

16   possibly fewer -- or possibly reduction in loss of

17   privileges, correct?

18   A.        That's what I read, correct.

19   Q.        But there are other forms of punishment that can

20   result from an RVR?

21   A.        Okay.

22   Q.        Each of those inmates we discussed yesterday was

23   referred to the ICC for reclassification and segregation

24   units, correct?

25   A.        No, not necessarily.  Most of those offenses didn't

962

1    qualify for a segregated housing unit term.

2    Q.        That is something that can result from an RVR?

3    A.        Depending upon the offense, yes.

4    Q.        And I believe it was Inmate BB that was charged with

5    assaulting an officer, correct?

6    A.        BB?

7              THE COURT:  BB.

8              MS. CESARE-EASTMAN:  BB.

9              THE COURT:  Boy-boy?

10   BY MS. CESARE-EASTMAN:

11   Q.        Yes.  Boy-boy.

12   A.        I believe that is correct, yes.

13   Q.        He was actually referred for DA referral, correct?

14   A.        I'm trying to remember the specific case.

15             THE COURT:  If you need to refresh your memory, feel

16   free to do so, sir.

17             Do you have -- He's got it.  Never mind.

18   BY MS. CESARE-EASTMAN:

19   Q.        I believe this is Exhibit 43.  If you would, turn to

20   page 2.

21   A.        Okay.

22   Q.        At the bottom it says:  Refer to ICC for program

23   review.

24             Correct?

25   A.        Yes.

963

1    Q.       And that's to determine whether or not this inmate

2    should face a SHU term?

3    A.       That's correct, based upon the offense.

4    Q.       I would direct your attention to page 9.  This is the

5    Mental Health Assessment, correct?

6    A.       Yes.

7    Q.       For question 2 the box is checked "Yes," and in the

8    clinician's opinion the inmate's mental disorder appeared to

9    contribute to the behavior that lead to the RVR, correct?

10   A.       That's what it states, yes.

11   Q.       And the clinician goes on further and explains:

12            (Reading:)

13            Inmate-patient is severely mentally ill.  His

14            condition renders him out of touch with reality and

15            responding to internal stimuli on a frequent basis.

16            His perceptions are distorted.  He has very limited

17            interpersonal skills.

18            (Reading concluded.)

19            Is that correct?

20   A.       Yes.

21   Q.       In question 3 the clinician found that if the inmate

22   was found guilty of the offense, there were mental health

23   factors the officer should consider in assessing the penalty.

24            Correct?

25   A.       Yes.

964

1    Q.       The clinician says:

2             (Reading:)

3             Offense, RV, could have taken place due to

4             inmate-patient's perception of events.

5             (Reading concluded.)

6             Correct?

7    A.       Correct.

8    Q.       Now, if you can turn your attention to page 4.

9    A.       Okay.

10   Q.       There's a section called DA Referral, correct?

11   A.       Correct.

12   Q.       This matter was referred to the Monterey County

13   District Attorney's Office for possible felony prosecution,

14   correct?

15   A.       Correct.

16   Q.       Has CDCR ever considered banning ICC or DA referrals

17   when there's a finding by a mental health clinician that the

18   inmate's mental illness contributed to the behavior giving

19   rise to the RVR?

20            MR. MCKINNEY:  Objection.  Calls for speculation.

21   Vague as to time.

22            THE COURT:  Ever.  Ever isn't vague.

23            As far as you know?

24            THE WITNESS:  As far as I know, no.

25   ///

965

BY MS. CESARE-EASTMAN:

1

2  Q.      Does CDCR have any plans to consider something of

3  that nature in the future?

4  A.      I cannot speculate as to what we might consider.  I

5  know that is something that we are not speaking about at this

6  very moment.

7          I should rephrase.

8          It is something that I am not engaged in

9  conversations with anybody.  I do not know if those talks are

10  going on outside of my arena.

11  Q.     So yesterday you referenced a September 12, 2012,

12  memorandum that you issued involving the use of pepper spray

13  during controlled use of force situations, correct?

14  A.     Correct.

15  Q.     Do you now agree that your memo is not as effective

16  as you wanted it to be?

17  A.     No, I don't really have that.  I think we can go

18  farther.  However, I'm not going to tell you that it was not

19  effective.

20  Q.     And the incident giving rise to that memorandum

21  involved an inmate at Corcoran who was subjected to 40 bursts

22  of pepper spray from a MK9, four OC vapor grenades and two

23  T16 grenades while locked in a cell, correct?

24          MR. MCKINNEY:  Your Honor, can I be heard on this

25  issue?

966

1           THE COURT:  Yes.

2           MR. MCKINNEY:  This incident refers to the work done

3    by the defense expert, Steve Martin, in preparation for the

4    termination proceedings.

5           If the plaintiffs want to open the door to this

6    evidence, that's fine.  But my understanding is the court is

7    not permitting evidence done by our expert leading up to his

8    termination report.

9           THE COURT:  I don't know where you got that idea.

10          MR. MCKINNEY:  Your Honor, I believe it will be your

11   April 5th order.

12          THE COURT:  Maybe there really is an order that says

13   that.  If so, I certainly don't mean to interfere with

14   cross-examination of this witness relative to that particular

15   incident.

16          If I have said that in the April 5th, it was not

17   intended -- it was not intended to prevent cross-examination

18   of the other witnesses.

19          You may be seated.

20          You may answer, if you can, sir.

21          THE WITNESS:  I believe that is the incident I was

22   referring to yesterday.

23   BY MS. CESARE-EASTMAN:

24   Q.    And this incident came to CDCR's attention because of

25   Mr. Martin's review, correct?

967

1    A.        Mr. Martin brought that to the undersecretary, yes.

2    Q.        So the IERC review did not flag this incident as

3    something that needed to be further reviewed?

4    A.        No.

5    Q.        Do you consider the amount of spray used in that

6    incident to be excessive?

7    A.        I consider the amount of that spray was within our

8    policy.  However, it was obvious that at some point it was

9    not effective.

10   Q.        So you do not consider that amount of spray to be

11   excessive?

12             THE COURT:  Just a minute.

13             There is a difference between whether it violates

14   your regulations which may provide, who knows, whipping.

15             The question is, is it -- is it appropriate -- no

16   matter what your regulations say -- that 40 bursts with all

17   of that other stuff?

18             THE WITNESS:  Well, at some point it was obvious that

19   pepper spray was not effective, and they should have made

20   other alternative decisions relative to the use of force

21   options.

22   BY MS. CESARE-EASTMAN:

23   Q.        So too much spray was used in your opinion?

24   A.        For that situation, the spray was not effective and

25   they continued using it, yes.

968

1    Q.      Is there a difference between "too much" and

2    "excessive"?

3           THE COURT:  Please.  Go on.  Next.

4    BY MS. CESARE-EASTMAN:

5    Q.      In the 17 videos you reviewed that were produced to

6    plaintiffs in this case, a number occurred after you issued

7    your memorandum, correct?

8    A.      Some were after the 12th, yes -- September 12th.

9    Q.      And did you find any of those issued after the

10   memorandum to be problematic?

11   A.      I felt they could have been handled better -- with

12   better tactics.

13   Q.      Yesterday you testified regarding your understanding

14   of each institution's management status practices, correct?

15   A.      Correct.

16   Q.      Management status should not be used for punishment,

17   correct?

18   A.      That's correct.

19   Q.      Do you -- is it your understanding that the threat of

20   management status is included in the admonition read to most

21   inmates before being extracted from their cells?

22   A.      I've seen it.  I'm not going to tell you that it is

23   most.

24   Q.      You don't consider that a punitive use of management

25   status?

969

1    A.      No.  I consider that an advisement.

2    Q.      Isn't the effect the same, that the inmate's

3    punished?

4    A.      No.  No.

5    Q.      I would like to turn your attention to the video

6    involving Inmate D.

7            Do you know who that is?

8            THE COURT:  Boy?

9            MS. CESARE-EASTMAN:  D as in dog.

10           THE COURT:  D.

11           THE WITNESS:  Yes.  I do know who that is.

12   BY MS. CESARE-EASTMAN:

13   Q.      Have you reviewed the paperwork surrounding that

14   incident, the Incident Report and IERC?

15   A.      Cursory.

16   Q.      Is it your understanding that that was a situation

17   where an inmate was feeling suicidal and the techniques you

18   discussed previously worked, they were able to get him out of

19   his cell without an extraction and into a holding cage to be

20   reviewed, correct?

21   A.      Correct.

22   Q.      And then he was informed that he would receive

23   management status, correct?

24   A.      That's what the inmate stated, yes.

25   Q.      And you don't find that punitive?

970

1   A.      No, not at all.  And I'll qualify that answer, if

2   you'll allow me.

3   Q.      I've asked my question.  Thank you.

4           CDCR headquarters does not maintain any data

5   regarding each institution's compliance with its own use of

6   force reporting requirements, correct?

7   A.      That is kind of broad.  What we do is we monitor the

8   time frames within our COMPSTAT report.  It monitors

9   institutions and their adherence to completing the review

10  within 30 days.

11  Q.      So you maintain -- CDCR headquarters maintains data

12  regarding how long the reviews are taking, but doesn't

13  maintain data as far as how many reviews at each level are

14  complete and accurate, correct?

15  A.      That's correct.

16  Q.      CDCR is not independently auditing the IERC review

17  process to see how many use of force incidents are going

18  through all levels of review with incomplete information,

19  correct?

20  A.      CDCR is not.

21  Q.      And CDCR does not track how many use of force

22  incidents are misclassified as an emergency that should have

23  been controlled, correct?

24  A.      CDCR is not tracking that.

25  Q.      And similarly, CDCR does not track emergency versus

971

1  controlled use of force as it relates to MHSDS inmates?

2  A.      We do track emergency versus controlled use of force

3  incidents.  However, we do not -- there is not a subcategory

4  of mentally ill versus non-mentally ill.

5  Q.      You testified earlier this month before a Joint

6  Assembly Committee, correct?

7  A.      I did.

8  Q.      And the problem you explained to the legislature

9  during that hearing is that CDCR does not have a big enough

10 database to analyze all the data they have available; is that

11 correct?

12         MR. MCKINNEY:  Objection.  Beyond the scope of

13 direct.  Relevance.

14         MS. CESARE-EASTMAN:  Your Honor, what information

15 CDCR is able to maintain and track is very relevant to this

16 case.

17         THE COURT:  I understand.

18         The question is whether or not in direct there was

19 any discussion about records, and there was.

20         You may answer the question, sir.

21         THE WITNESS:  With reference to that testimony, I was

22 speaking specifically to the security threat group.  I was

23 not speaking to anything else.  And we do not have a database

24 that is capable of tracking the information that the Joint

25 Legislative Committee was asking.

972

1    BY MS. CESARE-EASTMAN:

2    Q.      CDCR is not tracking use of force incidents against

3    mentally ill inmates on a systemwide basis, correct?

4    A.      Actually, we do have some tracking with regard to

5    that that is also contained within our COMPSTAT report.

6    Q.      Your COMPSTAT reports don't differentiate between

7    mentally ill inmates and general population inmates, correct?

8    A.      What it does is it lists specific numbers of

9    incidents, what type of incidents those are.  And then at the

10   bottom of that particular, at the bottom.

11           But within those fields it also tracks how many

12   mentally ill inmates were involved in incidents involving the

13   use of force, as well as not involving the use of force.

14   Q.      And does somebody at CDCR currently break down that

15   data and review it?

16   A.      We are looking at it.  We would like it to be broken

17   down a little bit further.

18   Q.      Does CDCR break down use of force incidents that

19   occur against the mentally ill by institution?

20   A.      That information is available by institution.

21   Q.      I'll sorry.  I didn't mean to cut you off.

22           Is anyone looking at it?

23   A.      The associate directors are completing reviews of

24   that information.  Wardens look at that information every

25   month.  The information though -- again, I'm not sure it is

973

1   going to tell us what collectively we would all like to be

2   able to look at that information.

3        THE COURT:  Well, you certainly want to know that

4   some institution is having many more incidents of use of

5   force against -- involving the mentally ill than most of the

6   institutions.  I mean, just common sense says that is

7   something you would like to know.

8        THE WITNESS:  Yes, I do concur with that.  However,

9   in the manner in which the data is tracked it doesn't really

10  provide the full picture so we're looking at that.

11  BY MS. CESARE-EASTMAN:

12  Q.    What would you need to provide the full picture?

13  A.    Several more pages of data fields and the ability to

14  track that.

15  Q.    And CDCR is not currently tracking it?

16  A.    At this point, in the manner in which that

17  information is gathered, it is not.  It doesn't allow us to

18  break it down in the manner in which we would like to.  We

19  are looking at how, but at this point we don't have that.

20  Q.    Is CDCR currently tracking RVR information against

21  mentally ill inmates on a systemwide basis?

22  A.    We do.

23  Q.    So you are tracking the percentage of RVRs that are

24  issued to mentally ill inmates on a systemwide basis?

25  A.    Again, within COMPSTAT reports it tells us how many

974

1    RVRs were issued per institution, per month, as well as how

2    many of those RVRs involve mentally ill inmates.

3            Unfortunately, kind of like the use of force

4    scenarios, it really doesn't break that information down far

5    enough because it doesn't tell us what categories those

6    mentally ill inmates were involved in.  It's just simply how

7    many.

8    Q.      And CDCR does not maintain any data concerning the

9    use of mental health assessments in the RVR process, correct?

10   A.      Not at the statewide level.

11   Q.      So CDCR is not tracking whether a mental health

12   assessment was considered?

13   A.      Not at the headquarters level, not within the

14   Division of Adult Institutions anyway.

15   Q.      And not how it was considered?

16   A.      Nor that.

17   Q.      Or whether the hearing officer followed the

18   clinician's recommendations?

19   A.      Nor that.

20   Q.      Is CDCR tracking how often pepper spray is used

21   against mentally ill inmates for failing to follow orders?

22   A.      Not specifically.

23   Q.      Is it tracking how often pepper spray is used against

24   mentally ill inmates for refusing to leave their cells for

25   mental health evaluation?

975

1    A.       Not specifically.

2    Q.       Or because they refuse to be transferred to a higher

3    level of care?

4    A.       Not specifically.

5    Q.       Are you familiar with the Mental Health Management

6    Reports that were submitted by each institution in connection

7    with the Special Master's 25th round of monitoring?

8    A.       I am aware of that report -- or those reports.

9    Q.       Are you familiar with the self-reported percentages

10   of use of force incidents that occurred against the mentally

11   ill at each of those institutions?

12   A.       I'm aware of the numbers that are reported.

13   Q.       Are you aware of the number from Sac, for example,

14   that 94 percent of use of force incidents occurred against

15   mentally ill?

16   A.       I'm aware that that is a number that has been quoted.

17   Q.       As a prison administrator do you find that number

18   concerning?

19   A.       I don't really believe those numbers are accurate.

20   Q.       The numbers that are self-reported by the

21   institutions, you don't feel those are accurate?

22   A.       I actually have done some comparisons myself

23   utilizing the COMPSTAT reports that are directly uploaded off

24   DERC (phonetic), number one.  And DERC is our incident

25   reporting system.

976

1          Those numbers -- again, I -- you know, without

2    knowing specifically how they were collected, and I

3    understand we submitted those numbers, we, CDCR, however, the

4    numbers that I have gleaned, I don't see that percentage

5    occurring.

6    Q.      So it is your position that CDCR submitted incorrect

7    information to the Special Master?

8    A.      I question the data, and I question -- we are

9    actually working on how that information was collected and

10   how it was submitted and whether or not it was accurate or

11   not.

12   Q.      Yesterday we discussed the proposed regulations

13   regarding pepper spray.

14          Have you discussed your concerns regarding pepper

15   spray with the Special Master?

16   A.      I have not.

17   Q.      Do you have any plans to do so?

18   A.      I'm not against it.

19   Q.      You agree with the judge that what we've been

20   discussing in this trial are very difficult issues, correct?

21   A.      I struggle with the issues.

22   Q.      And do you have any objection to working with the

23   Special Master and his experts to examine CDCR's use of force

24   policies?

25   A.      I haven't considered that.

977

1   Q.      Would you be open to it?

2   A.      I would be open to anything if we can make our -- our

3   goal is to have a better policy for all.  Our goal is to

4   provide guidelines.  And even, you know, the policy that was

5   written yesterday was a good policy.  We can make it better.

6   The policy that we come up with tomorrow, we can -- you know,

7   as we continue to work, it is a living, breathing policy.

8   I'm not against taking input.

9   Q.      So CDCR is open to working with the Special Master to

10  examine CDCR's Use of Force and RVR policies and propose

11  revisions?

12          MR. MCKINNEY:  Objection, Your Honor.  This calls for

13  a legal conclusion.  This is one of the ultimate issues in

14  this case related to plaintiffs' request for relief.

15          THE COURT:  The objection as stated is overruled.

16  But it's a common sense thing.  The witness is going to say:

17  Of course I'm anxious to hear everybody tell me everything

18  because I have nothing but time.

19          Go ahead.

20          MS. CESARE-EASTMAN:  Your Honor, may I have a minute?

21          THE COURT:  You may have two.

22          (Counsel confers with cocounsel.)

23          MS. CESARE-EASTMAN:  Your Honor, I have no further

24  questions for this witness.

25          THE COURT:  Redirect.

978

1          MR. MCKINNEY:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. MCKINNEY:

4     Q.     Good morning, Mr. Stainer.

5     A.     Good morning.

6     Q.     During cross you referenced successfully intervening

7     with inmates in crisis through dialogue.

8           When does that dialogue occur?

9     A.     Throughout the process.  It starts with the

10    correctional officer, and then if that is not successful, it

11    goes to the correctional sergeant, then to at that point the

12    lieutenant.

13          But, you know, all through the process, prior to

14    actually formulating a team, assembling the team, receiving

15    managerial approval to proceed with the controlled use of

16    force.  And sometimes literally hours before those events

17    take place.  It is something we want to avoid, so we put in

18    the efforts.

19    Q.     Is all of that dialogue recorded on the video?

20    A.     No.

21    Q.     In fact, if an intervention is successful, is there a

22    video at all?

23    A.     No.  We would have stacks of videos because this is

24    something we do every day.

25    Q.     And there was a reference to once the cameras have

979

1    turned on, does that always result in a complete video?

2    A.        I'm not sure I understand.

3    Q.        Once the cameras are on, is there always a videotape

4    produced even if the intervention is successful?

5    A.        No.  Once the cameras are on, unless it actually

6    evolves into a use of force, no incident's actually occurred

7    so the tape wouldn't be submitted as evidence.  We've would

8    probably recycle that tape is actually what we do, if that's

9    what you're asking.

10   Q.        Thank you.

11             Either with respect to Inmate B or -- well, start

12   there.

13             Why are strip -- why is an inmate required to strip

14   down?

15   A.        It's a safety issue.  We bring the inmate out of the

16   cell.  Even though he's handcuffed, you know, we've seen

17   evidence of inmates that have had weapons concealed within

18   the waistband of their boxers.

19             So it is a safety issue.  He's handcuffed behind his

20   back.  He could easily, as officers are going down to place

21   the leg irons, leg restraints on the inmate at the cell door,

22   he could easily retrieve, if he's got a slashing weapon, and

23   cut somebody.  We have seen that occur.

24   Q.        In your viewing of the video with respect to

25   Inmate B, is that what was occurring?

980

1    A.       The staff wants him to strip out to ensure safety,

2    yes.

3    Q.       With respect to Inmate BB, based on the files that

4    you have looked at, do you have an understanding why this was

5    referred to the district attorney?

6    A.       In most cases institutions have a memorandum of

7    understanding with the district attorney that all cases of

8    battery against a peace officer are automatically referred to

9    the district attorney.

10           It's totally up to the district attorney to evaluate

11   all the circumstances within that incident and decide whether

12   or not they want to prosecute.

13   Q.       The charge for Inmate B, was that a crime?

14   A.       That was.  That was a felony offense.

15   Q.       Do you know if the district attorney took any action

16   in that case?

17   A.       I don't have that information.

18   Q.       Because mental health may contribute to an incident,

19   does that mean they should not be held accountable?

20           MS. CESARE-EASTMAN:  Objection, Your Honor.  Leading.

21           THE COURT:  Certainly is.

22           You may answer the question despite the fact it is

23   leading.

24           THE WITNESS:  I believe that there have to be rules,

25   and inmates need to follow rules.  I believe there are some

981

1    cases, probably few and far between, and we may have seen

2    evidence there where, you know, it's kind of -- there are

3    probably some cases out there where we should question the

4    accountability of the inmate.  But I do believe those are few

5    and far between, if that makes sense.

6    BY MR. MCKINNEY:

7    Q.      There was some testimony about the use of an

8    advisement that includes a statement about management status.

9            Do you recall that?

10   A.      I do.

11   Q.      Is an advisement a use of management status?

12   A.      I'm sorry?

13   Q.      In other words, if the inmate is advised that he may

14   be placed on management status, does that necessarily mean he

15   is placed on management status?

16   A.      No.

17   Q.      Do you know whether Inmate C was placed on management

18   status?

19   A.      I don't know.  Actually, I probably don't believe

20   that he was because I think he used products within his cell

21   later on that day to cover up his windows again.

22           MS. CESARE-EASTMAN:  Your Honor, this is beyond the

23   scope of cross.  I was referring to Inmate D.

24           THE COURT:  Objection is overruled.

25           You may proceed, counsel.

982

BY MR. MCKINNEY:

Q.      Mr. Stainer, who audits reports through the review
process once it's gone through the Institutional Executive
Review Committee?

A.      The Office of Inspector General.

Q.      You mentioned in your testimony that CDCR does track
mental health assessments.

        How is that tracked?

A.      Actually, they don't track them at headquarters.  In
the field, however -- I mean, I think it is important to note
that the same managers that complete the review of the
completed RVR, that's the audit process of it, you know,
those are not farmed out among all the managers.  So if we're
showing trends of not following good processes with regard to
considering the mental health assessment, you know, and the
doctor's input into this, then, you know, those issues are,
you know, caught and hopefully addressed.

Q.      Did the Department write a memorandum addressing this
issue?

A.      With regard to the audit process of RVRs?

Q.      Tracking RVRs or use of force?

A.      Not -- I'm not sure.

Q.      Mr. Stainer, are you aware that Mr. Martin,
defendants' expert, put his recommendations in writing?

A.      I am.

983

1           MR. MCKINNEY:  May I approach the witness, Your

2     Honor?

3           THE COURT:  You may.

4           (Exhibit handed to witness.)

5     BY MR. MCKINNEY:

6     Q.      Mr. Stainer, do you recognize this document that has

7     been marked for identification as Defendants' Exhibit K?

8     A.      I do.

9     Q.      What is this document?

10    A.      These are the our expert's recommendations -- and

11    observations.

12    Q.      What is reflected on the first page of this document?

13    A.      These are his Coleman Audit Use of Force

14    Observations.

15          MS. CESARE-EASTMAN:  Objection, Your Honor.  The

16    Audit Use of Force Observations are not his recommendations.

17    It's outside the scope of cross.

18          THE COURT:  I have no idea, but he's going to testify

19    on November the 5th, God willing and the river don't rise.

20    What's the point of this?

21          MR. MCKINNEY:  Very well, Your Honor.  I'll move on.

22          I did want to ask Mr. Stainer about one of the

23    recommendations, if I may?

24          THE COURT:  Okay.

25    ///

984

BY MR. MCKINNEY:

1  
2   Q.    Mr. Stainer, looking at the first recommendation on

3   the second page of the document, are you familiar with that

4   recommendation?

5   A.    I am.

6   Q.    Can you summarize what's in this recommendation?

7   A.    Mr. Martin actually states that per our DOM Section

8   51020.17.7, that we only mandatory refer when it comes to use

9   of force incidents, deadly force, grave bodily injury, or

10  serious bodily injury.

11  Q.    Do you agree with that?

12  A.    That's accurate.

13  Q.    Is that consistent with the incidents that are

14  investigated?

15  A.    Those are mandatorily referred for investigation.

16  However, the institution, all the way up through the IERC, at

17  each level of review, the reviewer can recommend that the

18  incident be referred for investigation.  Nothing bars

19  anything else from being referred, just these are mandatory.

20  Q.    And does that occur?

21  A.    It does.

22  Q.    Mr. Stainer, are there incidents that escape critique

23  by the Institutional Review Committee?

24  A.    No.

25       MR. MCKINNEY:  One moment, Your Honor.

985

1          (Counsel confers with cocounsel.)

2    BY MR. MCKINNEY:

3    Q.      Just to clarify from one of counsel's objections, are

4    you aware of whether Inmate D was placed on management

5    status?

6    A.      You know, I'm sorry.  When I answered that question I

7    was actually referring to Inmate D.

8    Q.      Okay.  So your testimony --

9          THE COURT:  Now I think both the reporter and I are

10   having trouble.

11         D as in dog?

12         MR. MCKINNEY:   Inmate D as in dog.

13   BY MR. MCKINNEY:

14   Q.      I'll ask you the question again for clarity of the

15   record.

16         Do you know whether Inmate D was placed on management

17   status?

18   A.      I don't know that.

19   Q.      Finally, Mr. Stainer, with respect to Inmate A, are

20   you aware this inmate has paroled?

21   A.      I think I have heard that, yes.

22         MR. MCKINNEY:  No further questions, Your Honor.

23         MS. CESARE-EASTMAN:  Your Honor, I have a few quick

24   questions.

25         THE COURT:  Let's take our afternoon recess.  We'll

986

1    reconvene in 15 minutes.

2              (Off the record at 10:45 a.m.)

3              (On the record at 11:10 a.m.)

4              THE CLERK:  Please, remain seated.

5         Court is now in session.

6              THE COURT:  Counsel.

7                        RECROSS-EXAMINATION

8    BY MS. CESARE-EASTMAN:

9    Q.        Mr. Stainer, you were just asked about Mr. Martin's

10   recommendation number 1, correct?

11   A.        I was.

12   Q.        And one of part of that recommendation was that

13   certain use of force events should be subject to mandatory

14   referring rather than discretionary referral?

15   A.        That's correct.  He made a number of recommendations

16   or instances that should be added to the list of mandatory

17   referrals.

18   Q.        One of those instances was a situation where an

19   unarmed inmate in cell was subjected to great amount of

20   chemical agents via multiple delivery systems such as MK9,

21   MK46 and grenades, correct?

22   A.        He refers specifically to that.

23   Q.        And that's currently discretionary, correct?

24   A.        That is.

25   Q.        And none of the 17 videos you viewed in this case

987

1    were referred for investigation, correct?

2    A.      It does not appear that's the case.

3            MS. CESARE-EASTMAN:  All right.  Thank you.

4            THE COURT:  Can I ask you some questions.

5            I'm sorry.  Yet more?

6            MR. MCKINNEY:  No, Your Honor.  I was ready to

7    release the witness.

8            Please, proceed.

9            THE COURT:  Good.  Good.

10           You're an undersecretary?

11           THE WITNESS:  I'm an acting director, sir.

12           THE COURT:  I'm sorry.

13           You're an acting director.  I don't know how to ask

14   this question.

15           Are there other acting directors that have functions

16   different than yours?

17           THE WITNESS:  There are other departmental directors,

18   yes.

19           THE COURT:  In particular, is there a director

20   responsible for medical care -- or that's one his functions,

21   whether he has others or not.

22           THE WITNESS:  We have a Director of CCHCS, which is

23   California Correctional Healthcare System under the Receiver.

24           For mental health we have a deputy director whose

25   sole function right now is our class action.  We are very

988

1    busy with the Coleman Case, sir.

2         THE COURT:  Some of what's going on, my tentative

3    judgment is, there is some difficulty integrating an

4    understanding of mental health problems with correctional

5    problems.  And is there some way that some -- there is some

6    institutional -- is there some institutional procedure for

7    ensuring that considerations of mental health are integrated

8    into the correctional process?

9         THE WITNESS:  I believe so.  If I can comment on

10   that?

11        For example, in our --

12        THE COURT:  Please, do.

13        THE WITNESS:  In our administrative segregation units

14   and in our security housing units, clinicians and psychiatric

15   techs who make daily rounds --

16        THE COURT:  I understand.  I'm asking a different

17   question.  I'm saying at a higher level.

18        At the level in which the institutional judgments are

19   being made, is there some -- I don't know if coordination is

20   the right word -- but some way that you folks are talking to

21   one another when you are making judgments?

22        As an example, one of the things the plaintiffs are

23   pressing for is some segregation of the regulations between

24   the general population and the mental health.  I think that's

25   one of the things that they're pressing for.

989

1          Is there some way institutionally, at the level that

2     you're operating at, or higher if that's the case, in which

3     there's some consideration as to whether that's appropriate

4     or not?

5          Do understand what I'm asking?

6          THE WITNESS:  There's been a lot of talk about that.

7     It's difficult.

8          THE COURT:  Who makes the decision of "yes," "no,"

9     "maybe."

10          THE WITNESS:  I think I'm in a position to, you know,

11     to consider everything, and then take that information to the

12     undersecretary and the security.  Some decisions are well

13     within my authority.  Other decisions I have to run up.

14          THE COURT:  If you have to run up a decision, such as

15     this one, is it appropriate to attempt to segregate or

16     provide additional -- provide that the mental health issues

17     be separately considered, would you do that or does it have

18     to be come from the undersecretary?

19          THE WITNESS:  I think ultimately I would review that,

20     and then take that to the undersecretary and possibly the

21     secretary.

22          What I'm hearing you say, Your Honor, is there is

23     probably a whole lot we can do to work together, but it is

24     difficult.  Just my perception, in these type circumstances,

25     it is difficult to reach a hand across and say can we do this

990

1    and work together to get to where we need to be.

2          THE COURT:  In any event, there is no formal process

3    by which, when you make these kind of decisions, someone with

4    a mental health background has been consulted?

5          Your judgment is:  Look, I've got to do it, and

6    that's the way it is.

7          THE WITNESS:  Actually, we work very well with our

8    partners.  For example, not to rehash the testimony, but when

9    I spoke about the proposed revisions on the Use Of Force

10    Policy, we had a well-respected clinician on the team with

11    custody to work together so we could address all facets of

12    this issue.

13          THE COURT:  Is that a typical or atypical event?

14          THE WITNESS:  We consider that to be -- in this

15    situation I would like to consider it typical.  They are a

16    vested stakeholder in what we are doing here, and they have

17    great input that must be considered.

18          THE COURT:  My questions invite questions of counsel.

19          Plaintiff?

20          MS. CESARE-EASTMAN:  Yes, Your Honor.  I have one

21    quick question.

22          THE COURT:  All right.

23                    CONTINUED RECROSS-EXAMINATION

24    BY MS. CESARE-EASTMAN:

25    Q.    The Joint Use Committee is who considers all policy

991

1    revisions regard use of force, correct?

2    A.      They are the -- any proposed revisions --

3    recommendations for revisions are presented to the Joint Use

4    of Force Committee for their consideration and

5    recommendations at that point.

6    Q.      And the members of that committee are determined by

7    statute?

8    A.      By the policy, yes.

9    Q.      And the statute does not require a member of mental

10   health, correct?

11   A.      No.  However, in this case it could be other members.

12   And in this case you're specifically talking about this

13   policy --

14   Q.      I'm talking generally.

15   A.      Generally?

16           No, it doesn't, I don't believe, without referring to

17   it, that it calls for a member of the mental health

18   providers.

19   Q.      IERC committees at each institution also do not

20   contain a member of mental health, correct?

21   A.      Not specifically.

22           MS. CESARE-EASTMAN:  Okay.  Thank you.

23           MR. MCKINNEY:  Your Honor, just one question to

24   address counsel's questions, then I would like to ask a

25   couple of questions related to your questions.

992

FURTHER REDIRECT EXAMINATION

BY MR. MCKINNEY:

Q.      Mr. Stainer, why doesn't the IERC include a mental health clinician?

A.      It's not that they don't include them.  There are some mandatory members, and it can be a person, whether they be from healthcare, from medical, or the mental health field, as well as a member of the committee.

Q.      What is the focus of the committee and what they look at?

A.      They look at the actions of staff before, during and after the use of force to ensure it was within policy, if there is any further action that needs to be required.

Q.      In considering the court's questions, just a couple of follow-up questions.

        What is the collaboration between custody on the one hand, and mental health on the other at the headquarters' level?

A.      I think we work very closely with our partners in mental health.  I think we're all moving towards the same goal, which is treatment of people, not just prisoners, class members, but people as a whole.

Q.      You mentioned one of your deputy directors.  Is that part of her focus on the custody side?

A.      We actually have her working on that in absolute

993

1    collaboration.

2    Q.        And what's your understanding of that collaboration

3    at the institutional level?

4    A.        I think we rely upon each other to do our job.  We

5    cannot fulfill our mission in the custody arena, and they

6    cannot fulfill their mission in the mental health arena

7    without that collaboration.

8              And we work together.  And with rare exception --

9    there are exceptions.  I won't say it is a perfect world, but

10   for the most part there is a very, very good relationship and

11   good communications.  Specifically, the rank and file staff

12   that are out there, boots on the ground every day, dealing

13   with the issues we have to deal with, great collaboration as

14   a whole.

15   Q.        I'm not certain if this is within your purview or

16   your deputy director's purview but I'm going to ask because

17   it might address one of the court's questions.

18             Are you aware of the collaboration between all the

19   parties, including custody, mental health, the Special Master

20   Team and the plaintiffs in developing the RVR process?

21   A.        I'm aware that there are some collaborations, yes.

22   Q.        Who would be most familiar with that on the custody

23   side at CDCR?

24   A.        At this point Deputy Director Kathleen Allison.

25             MR. MCKINNEY:  I don't have any further questions.

994

1          THE COURT:  May the witnessed be released?

2          MS. CESARE-EASTMAN:  Yes, Your Honor.

3          MR. MCKINNEY:  Yes, Your Honor.

4          THE COURT:  You may step down, sir.

5          You are free to go or stay, as you choose.

6          MS. D'AGOSTINO:  Your Honor, we would like to call

7   Dr. Bennie Carter to the stand.

8          THE CLERK:  Thank you.

9                    BENNIE F. CARTER,

10  was thereupon called as a witness herein by the Defendant,

11  and having been sworn to tell the truth, the whole truth and

12  nothing but the truth, was thereupon examined and testified

13  as follows:

14          THE CLERK:  Please, take a seat.

15          State your name, spell your last name and speak

16  directly into the microphone.

17          THE WITNESS:  My name is Dr. Bennie F. Carter,

18  C-a-r-t-e-r, B-e-n-n-i-e.

19                    DIRECT EXAMINATION

20  BY MS. D'AGOSTINO:

21  Q.     Good morning, Dr. Carter.

22  A.     Good morning.

23  Q.     Please, state your occupation?

24  A.     I'm a psychiatrist.

25  Q.     And where are you a psychiatrist?

995

1   A.      I work with the Department of --

2           THE COURT:  No.  It's a problem with this equipment.

3           (Microphone adjusted.)

4           THE WITNESS:  I work with the Department of State

5   Hospitals at Vacaville State Hospital.  I'm currently a staff

6   psychiatrist on Unit Q3, which is the acute care ward that

7   provides care to inpatients, but notably for the provision of

8   care to the condemned population.

9   BY MS. D'AGOSTINO:

10  Q.      How long have you held this position?

11  A.      I was assigned to Q3 since July of last year, so one

12  year and three months.

13  Q.      And you're licensed to practice medicine in

14  California; is that correct?

15  A.      Yes, I am.

16  Q.      Are you licensed in any other states?

17  A.      Also in the District of Columbia.

18  Q.      Where did you obtain your medical degree?

19  A.      From Temple University in Philadelphia.

20  Q.      What year?

21  A.      1977.

22  Q.      How long have you been employed with CDCR?

23  A.      About two years.

24  Q.      How long have you been employed at the Vacaville

25  Facility?

996

1    A.        For a two-year period.

2    Q.        What are your current duties?

3    A.        As a psychiatrist.  My role -- I'm a medical doctor

4    and mental health specialist.  My role is the diagnostic

5    evaluation and the medication stabilization of our mentally

6    ill individuals on our unit.  Plus my role is to coordinate

7    the activity on the treatment team level.

8    Q.        And you said that you managed the Q3 Unit; is that

9    right?

10   A.        I'm one of the -- I don't manage it.  I'm one of the

11   psychiatrists, one of two.

12   Q.        And how many other employees work in the Q3 Unit?

13   A.        There are two psychiatrists, a psychologist, two

14   social workers, a dietitian, a recreation therapist, a senior

15   RN.  There is one RN per shift.  There is three shifts.  And

16   there are approximately four to five MTAs that work on the

17   shift per day.

18            In addition we have consultants who come in.  We have

19   senior MTAs.  We have a neurologist.  We have a nurse

20   practitioner who comes in.  So there are various other

21   individuals that come and help provide care.

22   Q.        And do you supervise any of these individuals?

23   A.        We work in a collaborative manner.

24   Q.        On average, how many patients are under your care?

25   A.        Average, 15.

997

1    Q.      Who is your direct supervisor?

2    A.      Doctor Richard Lipon is the medical director.

3    Q.      I'm sorry.  He's the medical director?

4    A.      The medical director.  Dr. Richard Lipon, L-i-p-o-n.

5    Q.      Is he the medical director of the Vacaville facility?

6    A.      He's director of mental health -- Medical Director of

7    Mental Health at the Vacaville facility.

8    Q.      So you said that you worked in Q3.

9            Is there a name for Q3?

10           Is there a name for the program under which Q3

11   operates?

12   A.      It's the Acute Psychiatric Program.

13   Q.      And what is the purpose of the Acute Psychiatric

14   Program?

15   A.      Stabilization of -- the patients are referred to us

16   from any of the 32 state prisons.  We provide care to men,

17   but we do not provide care -- we don't provide care to any of

18   the women in the -- in custody.

19   Q.      You said "stabilization."  What do you mean by

20   "stabilization"?

21   A.      People come to us with various emotional, physical,

22   psychiatric, psychological issues.  We diagnose what is going

23   on.  And we -- our goal is to restore function so that they

24   can operate within the environment to which they'll return.

25   Q.      Does the APP, meaning the Acute Psychiatric Program,

998

1  serve inmates at all classification levels?

2  A.      Yes, we do.

3  Q.      And how many beds are there in the APP?

4  A.      I'm not sure how many beds totally.  There's --

5  Q.      Let me back up.  How many beds are in your unit?

6  A.      Thirty beds in our unit.

7  Q.      How many units are there?

8  A.      There's S1, S2, P1, P2.  P3 might be coming on board.

9  Q.      So far I have four.

10  A.      There's Q1, Q2 and Q3.  That's approximately seven, I

11  think.  Maybe eight.

12  Q.      Okay.  Could you please describe the layout of your

13  unit?

14  A.      Our unit is a long corridor coming from the entry

15  going to the end.  You'll first come into a security station.

16  The nursing station is on the left.  There is a dayroom.

17  Beyond that would be offices for the social worker.  There's

18  a station for the custodian.  There are psychiatric offices.

19  There is an office for the recreational therapist.  Then

20  there are 30 cells on the -- toward the end of the corridor.

21  Q.      You mentioned a dayroom.  How large is the dayroom?

22  A.      The dayroom is probably two-thirds of the size of

23  this courtroom.

24  Q.      And you mentioned 15 cells.  Could you describe the

25  cells?

999

1          THE COURT:  I thought he said 30.

2          THE WITNESS:  Thirty cells, yeah.

3    BY MS. D'AGOSTINO:

4    Q.     I'm sorry.  Thirty cells.

5    A.     The cell would be probably about an eight-by-ten

6    rectangle, maybe six-by-nine approximately, with a ten foot

7    ceiling.

8          There's a window that provides a view to the outside

9    world at the end of the cell, the back end.  Then there's a

10   metal door with -- at the front end of the cell which has two

11   rectangular windows which are approximately two-and-half,

12   three feet tall, about eight inches wide, with a thin

13   striation so they can talk through the cell door.

14         And then there is a slide gate on to which the

15   inmates are receiving their food, and also if they need to be

16   handcuffed.

17   Q.     And you mentioned the window inside the cell.  That's

18   an exterior window?

19   A.     That's an exterior window.

20   Q.     Are there any other features of the cell?

21   A.     There is a platform for the bed, and there is also a

22   toilet-sink combination with a lighting fixture and a

23   reflective surface as a mirror.

24   Q.     And you mentioned there is a window on the door of

25   the cell?

1000

1   A.      There are two windows on the door.

2   Q.      And from those windows can the inmates see outside

3   into the hallway?

4   A.      Yes.  The view would probably be about an angle like

5   this, which is more than 45 degrees.  And when the door's

6   closed, you can see at least three of the other cells in

7   front of you.

8   Q.      I want to go back to your description of the layout

9   of the unit.

10          Does the unit have any other special features?

11  A.      Yes.  We have wire mesh partitions.  There are

12  actually five of them that are stationed strategically

13  throughout the longitudinal axis of the ward so that when

14  they are closed, you can section off various parts of the

15  ward.

16  Q.      What is the purpose of those gates, if you know?

17  A.      I was told they're used exclusively when we have

18  condemned individuals to provide a means of separation, but

19  to afford them the opportunity to be able to get to the areas

20  that are necessary once they leave their cells, such as

21  dayroom or to a treatment room if you were to have an EKG, to

22  the showers, to other areas like that.

23  Q.      When you say "a means of separation," what do you

24  mean?

25  A.      When a condemned individual leaves the cell, there is

1001

1    three correctional officers, at least three, that will

2    accompany them.  The gate is -- a grill gate is selected that

3    will -- first the area of operation is defined.  If they want

4    to go to the furthest most interior part of the unit where

5    they'll make a phone call, there is a grill gate.

6              So they'll enter that section, and that grill gate is

7    closed.  And that provides a secure containment area around

8    the cell phone -- around the pay phone.

9              If they're going to the dayroom, a grill gate in

10   front of the dayroom and behind the dayroom will be closed so

11   that they'll have an opportunity to be contained within the

12   area immediately around the dayroom.

13   Q.     Who, if anyone, are they contained from?

14   A.     They're actually contained from the other inmates.

15   Q.     And "by other inmates," what do you mean?

16          THE COURT:  Other inmates.

17          THE WITNESS:  There are 30 -- on average about 30, we

18   call them inmate/patients, that are on the unit.  So that the

19   purpose of this is to separate them from the other

20   inmate/patients on the unit.

21   Q.     Do you mean non-condemned?

22   A.     Yes.  I'm sorry.  Non-condemned inmates.

23   Q.     Please describe the program in the APP for a typical

24   inmate-patient?

25   A.     For a typical, we get a referral from one of the

1002

1    state prisons.   There is referral package that is sent to our

2    CAT Team, Clinical Assessment Team.   Then we're notified by

3    the Clinical Assessment Team that an admission is pending.

4         The patient will come in and is brought into the

5    receiving area and is then brought up to our unit.   We bring

6    them into the dayroom and in a multidisciplinary approach we

7    interview the individual, and we construct an initial

8    treatment plan.

9         They are then brought into their individual cells.

10   And depending upon what their medical and psychiatric needs

11   are, we determine what we do.

12        Most all of my patients receive some initial blood

13   work, an EKG.   We take a history and do a physical.   And we

14   typically start them on some type of psychotropic medications

15   or continue the psychotropic medications that were begun

16   prior to them coming to our facility.

17   Q.     Is there an observation period when an inmate first

18   arrives at the APP?

19   A.     Yes.   The entire period is observational plus

20   therapeutic.   And we modify our treatment plan based upon

21   their behavior, based upon their response to treatment.   And

22   it's an ongoing assessment.

23   Q.     Is there a treatment plan that is put into place

24   initially when an inmate first arrives?

25   A.     Yes.

1003

1   Q.      What is that?

2   A.      We call it our 72-hour treatment team conference or

3   treatment team plan.  We reevaluate the individual.  Each of

4   the -- in the individual professional disciplines evaluate

5   the patient.  On the tenth clinical day we reconvene with the

6   patient and we modify the plan.

7           After the tenth day, we then -- the next formal

8   review would be the 30th day.  Based upon individual needs,

9   we can see an individual as often as necessary.

10  Q.      How does an inmate-patient progress through the

11  program at the APP?

12  A.      Depending upon behavior, and also whatever limits

13  there may be, we -- we evaluate things like their behavior,

14  their compliance with medication, any other mitigating

15  factors which will make them a potential pathogen or

16  potential danger to others or put them in a situation where

17  they could potentially be victimized.  We assess them.

18          Initially, they come out individually to program,

19  which means they'll come out using -- they're handcuffed when

20  they come out to watch TV in the dayroom.  We assess their

21  behavior while out of the cell.  And after, on average, two

22  to three periods of watching TV or watching a video, then

23  they come out without handcuffs for another two to three

24  times.

25          If that is successful, then we advance them to what

1004

1  is called a small group.  A small group is a group in which

2  they are in the room with three or less -- three or fewer

3  individuals.  We observe their behavior and how they interact

4  with others.  If they continue to progress, ideally they'll

5  go towards a large group.

6       In a large group there is about seven -- less than

7  seven inmate-patients.  If they successfully complete that

8  phase of socialization, then they go to the yard.

9       There are other large groups such as recreational

10  therapy group, social worker groups.  That's called a step

11  program.

12  Q.    So how does that step program that you just described

13  differ from the program that condemned inmate-patients

14  progress through?

15  A.    The condemned only stay on the first level.  They

16  come into the dayroom handcuffed.  Every place they go, if

17  they go to the showers, they go handcuffed.  If they go to an

18  EKG, they are physically restrained with handcuffs.

19  Q.    Do you have an understanding why condemned patients

20  are subjected to a different treatment program than

21  non-condemned inmate patients?

22       MR. BIEN:  Objection.  Can we have the foundation

23  first?

24       THE COURT:  Where did you get your understanding,

25  sir?

1005

1    THE WITNESS:  Through conversations with the

2    correctional officers and conversations with the

3    psychologists and the other team members.

4        My understanding is that there's an agreement between

5    CDCR and the Department of State Hospitals that people who

6    have been designated as being condemned shall be maintained

7    in handcuffs.

8    BY MS. D'AGOSTINO:

9    Q.    Are there any other inmates that are consistently in

10   handcuffs?

11   A.    Yes.  If there is anybody who is impulsive,

12   potentially dangerous, they are maintained in handcuffs.  If

13   they've assaulted staff, if they've assaulted other inmates,

14   they are maintained in handcuffs.

15   Q.    Would they be segregated in the same manner as

16   condemned inmate-patients?

17   A.    Everything except the grill gates.  They shower

18   alone.  They'll watch TV alone.

19   Q.    And going back to the condemned inmate-patients, do

20   you -- is there a safety risk in allowing them to program

21   with non-condemned inmate-patients?

22   A.    Absolutely.  One of the functions in the prison is to

23   do due diligence, to protect a vulnerable person.  When your

24   hands are cuffed behind you or to your side, you're at risk

25   of being assaulted.  And in a prison environment, there are

1006

1  certain celebrity inmates that will give you street cred by

2  assaulting them.

3          So if you have a vulnerable person whose hands are

4  restrained, that puts them at risk.  And the part of the

5  segregation, as I am told by and as I've observed, is to

6  protect a vulnerable person.  Not only is this done with the

7  condemned, but any inmate that comes into the facility, as

8  they're walking down the main line, they're accompanied by

9  two correctional officers.  Any inmates that may be on the

10 periphery of the corridor, the correctional officers will

11 scream "Escort," and those inmates must rise and turn their

12 face away from the center of the corridor toward the wall,

13 which would mitigate against anybody attacking or stabbing or

14 assaulting a person who is vulnerable.

15 Q.      So that procedure you just described, it applies to

16 all inmates under escort with handcuffs?

17 A.      Absolutely.  Anybody coming into the facility or

18 leaving the facility.

19 Q.      And to your knowledge, do condemned inmate-patients

20 walk through the facility under escort?

21 A.      Yes.  But an additional defense is added in.  They

22 will actually clear the corridor if a condemned inmate comes

23 in.

24 Q.      And you said that other inmate-patients will travel

25 through the facility under escort?

1007

1  A.      Absolutely.

2  Q.      Who makes the determination -- within Q3 who makes

3  the determination that a non-condemned inmate-patient needs

4  to be handcuffed at all times?

5  A.      It's a collaborative decision, but usually led by the

6  correctional officers.

7  Q.      Do you have input on that decision?

8  A.      Absolutely.

9          THE COURT:  I think what you are saying, but I may be

10  confused, is that the condemned are always handcuffed and the

11  decisions about handcuffing other people are made by this

12  committee?

13          THE WITNESS:  By the Multi-Interdisciplinary

14  Treatment Team, yes.  Correct.

15  BY MS. D'AGOSTINO:

16  Q.      You mentioned one of the reasons that condemned

17  inmate-patients are segregated from the other inmate-patients

18  in the unit is because they are vulnerable and need

19  protection?

20  A.      Absolutely.

21  Q.      Are there any other risks in programming the two

22  groups together?

23  A.      They also have demonstrated predatory behavior, and

24  so we segregate them to prevent them from being a risk to

25  more vulnerable other inmate-patients.

1008

1    Q.      When you say "predatory behavior," what do you mean?

2    A.      As a general rule, the individuals that we see as

3    condemned are much higher functioning.  We have some pretty

4    low functioning individuals on our unit.  And we've seen

5    where they have encouraged the more vulnerable inmates to

6    cover up, to act out, to go on hunger strikes, to essentially

7    manipulate them for less than therapeutic reasons.

8    Q.      You said that the condemned are higher functioning.

9    What do you mean by that?

10   A.      Illness is a combination of the virulence of an

11   illness and -- I'm sorry -- functioning is a combination of

12   the virulence of the illness and the individual.

13          If an individual is typically younger or doesn't have

14   any other conditions, such as chronic, physical illness, then

15   they're functioning at a higher point in the food chain.

16   They're more capable of negotiating reality.  They have

17   higher executive function.  So they can make better decisions

18   about their own lives, and they're more capable of

19   manipulating people, places and things.

20          The inmates that I have reviewed, the cases I

21   reviewed, the six, the average age was 34 years old.  The

22   psychiatric conditions that brought them to our unit would be

23   considered more mild and not the chronically debilitated

24   individuals that one would typically see in a long-standing

25   mental health system.

1009

1    I looked at the six individuals that came over the
2    past year.  I think of the six summaries I reviewed, the
3    first was admitted in April.  So these individuals, their
4    treatment spanned from April to today.

5    Their diagnoses are more mild.  Of the six, 33
6    percent had a mild depression, 50 percent of them came with a
7    diagnosis of either an adjustment reaction, which is
8    essentially a life situational problem, or malingering.

9    And 86 percent, five out of six, had substance abuse
10   disorders or antisocial personality disorder.

11   Q.    Just to clarify, the six you are talking about are
12   condemned?

13   A.    Six condemned inmates.

14   Q.    Did you treat these six?

15   A.    I treated two out of the six.

16   Q.    So in your experience, would you say, as a general
17   matter, condemned inmates are higher functioning than the
18   rest of the inmate-patients you treat at Q3?

19   A.    Absolutely.

20   Q.    And do you have an understanding of why this is?

21   A.    Our psychologist told us in conversations with the
22   treatment facility at San Quentin -- there's a specialized
23   unit at San Quentin.  So the most problematic and severely
24   mentally ill folks aren't retained in that treatment
25   facility.

1010

1      MR. BIEN:  Objection, Your Honor.

2      THE COURT:  Overruled.  You may proceed.

3      THE WITNESS:  And that they send us people who have

4  more the behavioral acting out situations.  One of our

5  inmates came because he got high on methamphetamine and was

6  acutely intoxicated.

7      So they're more -- people are problematic when it

8  comes to interpersonal relationships, when it comes to

9  exploitation and maladaptive behavior.

10      So they've shown predatory behavior in death row, and

11  they come to us.  And they continue because this is a

12  life-long pattern of maladaptive behavior.  They are not

13  going to change because they make a geographic relocation

14  from San Quentin to Vacaville.

15  BY MS. D'AGOSTINO:

16  Q.      Do you provide alternative therapies for condemned

17  patients?

18  A.      Absolutely.  We try to compensate for the spacial

19  limitations, for the restrictions on their mobility by coming

20  to them rather than having them come out.

21      The standard practice on our unit is for a MTA to

22  make rounds every 15 minutes.  And every 15 minutes is an

23  opportunity to interact with a professional 96 times within

24  the course of a day.

25      If they happen to be somebody who is on suicide

1011

1    precaution, then the standard practice is for them to be seen

2    in intervals of ten minutes, which is six times an hour for

3    someone to come and check in on them, which is 144 times in a

4    24 hour period.

5           In addition to that, we have -- they do come out to

6    the dayroom, and they see us based upon their needs and their

7    issues.  But we also have cell-side evaluation by myself and

8    the other psychiatrist, by the psychologist by the social

9    workers, by the recreational therapist, by the dietitian, and

10   on some rare occasions by, like, clergy and other ancillary

11   help.  Our registered nurses go to check in on them.

12          We provide all our patients some type of reading

13   material, just on general topics like anger management,

14   things like depression and things.  But if they have

15   specialized needs, and oftentimes they do, individual needs,

16   we will provide additional reading material and educational

17   materials to the condemned.

18          So as an example, one of our condemned was buddhist.

19   So he was given a lot of information on buddhism.  And when

20   they have a particular need that they need to express

21   themselves that's private, then we bring them out of the cell

22   into the dayroom.  And we discuss those needs there and

23   maintain their confidentiality.

24   Q.     So you mentioned cell-side check-ins with various

25   members of your staff.

1012

1    How often do those occur for condemned

2 inmate-patients?

3 A.    They occur more often.  I can't give you a ballpark

4 number.  I would say quite a bit more than for the regular

5 population.

6 Q.    Can you estimate at all as to how often it occurs for

7 regular population?

8 A.    Okay.  Well, the social workers make daily rounds.

9 The dietitian probably makes weekly rounds.  We make, as a

10 psychiatrist, it depends on the individual's needs.  I would

11 say maybe two to three times a week.  The psychologist

12 probably daily.  The RNs will make some type of cell-side

13 evaluation every shift, which is three times a day.  And the

14 med tech assistant, MTAs, they will make those rounds, as I

15 say, anywhere from 96 to 144 times.

16    If the person happens to be on one-to-one, if they're

17 imminently suicidal or dangerous to others, then they are

18 placed on one-to-one.  So we actually have a nurse, a member,

19 usually a MTA, sitting on a chair outside of the door with

20 continuous monitoring of that individual.

21 Q.    So just to be clear, I asked you the number of

22 cell-side contacts for non-condemned inmate-patients.

23    Is it your belief that condemned inmate-patients have

24 more cell-side contacts than what you just described?

25 A.    Yes.

1013

1  Q.      You also mentioned private dayroom time.  How

2  frequently do condemned inmate-patients receive private

3  dayroom time?

4  A.      It depends on their needs.  They come -- treatment is

5  scheduled for Tuesday evening, Thursday evening, Saturday and

6  Sunday.  So I'm not physically present for those periods.

7         But I do know that, from my patients, we've brought

8  them out during the day when I'm there.  But it depends on

9  their needs.

10        As I say, as they come they're often mildly

11 dysphoric.  They are usually not disabled.  And because of

12 the way the program is structured, there is a referral

13 process from the time of some incident to the time that they

14 physically arrive to our facility.  Oftentimes they've made

15 some accommodations to the situation that would have -- that

16 necessitated the referral.

17        So it really depends on how dysphoric or how upset

18 they are, what are their psychological needs.  Our role is

19 not to provide comprehensive care.

20        THE COURT:  Not to provide?

21        THE WITNESS:  -- comprehensive -- the kinds of things

22 that you normally see on television, where there is an ah-ha

23 moment, and you are exploring deep, intrapsychic issues.

24 That is not really the role of the acute care facility.  The

25 role is just to get them back on their feet so that they can

1014

1  go back and function where they belong.

2        I guess an example would be if somebody broke their

3  leg.  We act like an emergency room, and we would put on a

4  cast and help them learn how to walk.  Then there is a period

5  in which they are kind of healing.  And once we know they're

6  strong enough to be able to go home, then we send them home,

7  which may be the EOP, Enhanced Outpatient Program.  They may

8  go back.  They'll go back to their sending facility.

9  BY MS. D'AGOSTINO:

10  Q.    So I want to go back to something you said earlier

11  about how oftentimes inmate-patients will make accommodations

12  to the situation that necessitated their referral.

13        Do you remember that?

14  A.    Yes.

15  Q.    What did you mean by that?

16  A.    As I said, 50 percent of them have the diagnosis of

17  adjustment disorder.  What it means is there was a particular

18  situation that made them upset, anxious, depressed, worried.

19  But because they have pretty strong ego strength, which is

20  the will, the capacity to be able to negotiate reality and

21  fix themselves, oftentimes they're pretty well resolved, and

22  they've made peace with the situation that made them upset.

23        And it can be things like conflict with staff from

24  the referring facility, or they may have gotten bad news from

25  home.  Those type of situations.  So by the time they get to

1015

```
 1    us, many of them are pretty well accommodated.  They say:

 2    Yeah, I still feel a little bad, but I was just mad that day.

 3    And I just let it out, but right now I'm okay.

 4            So once they come to us, we assess where they are at

 5    that point in the continuum.

 6            Just as a general statement, condemned individuals

 7    are -- their ego strength is stronger, more in tack, more

 8    sophisticated than a person who really needs an inpatient

 9    unit.

10            I don't know --

11            THE COURT:  I don't understand, Doctor.  People are

12    being referred to you because they're in acute distress.

13            THE WITNESS:  Yes.  Usually some acute situation.

14    There are mild, moderate and severe distress.  There are some

15    people who are in temporary distress, some people are in

16    chronic distress.  But the condemned are usually the

17    subpopulation that would have the milder stressors that are

18    time limited.

19            And so a significant amount of them have pretty well

20    accommodated prior to the arrival to our unit.

21    BY MS. D'AGOSTINO:

22    Q.      Dr. Carter, if you can estimate on the whole for all

23    your inmate-patients how frequently inmate-patients arrive at

24    the unit and are suicidal?

25    A.      To our unit?
```

1016

1   Q.      Yes.

2   A.      I would estimate about a third would have suicidal

3   ideations.

4           THE COURT:  We've reached noon.

5           We'll reconvene at 1:30.

6           (Off the record at 12:00 p.m.)

7           (On the record at 1:30 p.m.)

8           THE CLERK:  Please, remain seated.

9           Court is now in session.

10          THE COURT:  Counsel.

11          You may proceed, ma'am.

12  BY MS. D'AGOSTINO:

13  Q.      Good afternoon.

14  A.      Good afternoon.

15  Q.      Earlier I asked how long you had been employed by

16  CDCR.  You're, in fact, employed by the Department of State

17  Hospitals; isn't that right?

18  A.      That's correct.

19  Q.      So when you stated that you had been employed by CDCR

20  for the past two years, you have, in fact, been employed by

21  the Department of State Hospitals for two years?

22  A.      Absolutely.  Correct.

23  Q.      So we were talking about the condemned patients at

24  the Acute Psychiatric Program.

25  A.      Yes.

1017

1  Q.      And I just -- my next question is, are there

2  differences in clinical outcomes for condemned patients?

3  A.      Versus non-condemned patients?

4  Q.      Yes.

5  A.      No.  There is no -- there is really no difference in

6  the outcome.  We have been able to provide the stabilization

7  services necessary to successfully return them to

8  San Quentin.

9          THE COURT:  Now, the question was different.

10 San Quentin implicates death penalty persons.  I thought the

11 question was, was there any difference in outcome as to

12 non-death penalty persons?

13         Was that the question?

14         THE WITNESS:  There is no difference in the non-death

15 penalty -- the non-condemned versus condemned patients.

16 There is no difference in the treatment outcome.

17         The length of stays are almost identical.  As a

18 matter of fact, the number of prescriptions in the condemned

19 population is, on average, less than the non-condemned

20 population.

21         The staff at San Quentin seems able -- they're expert

22 at making accurate diagnoses.  So oftentimes the medications

23 they come on they're maintained on, they improve.  There is

24 no difference.

25         Every two weeks we have utilization management

1018

1   meetings where we look at utilization issues.  And the

2   hospital -- I think at DMH the average length of stay is 69

3   days.  For our units it is about 65 to 68.  For the six

4   condemned individuals that I reviewed, their average length

5   of stay is about 60 days, which may underrepresent because

6   I'm using the dates on the discharge summary, which is the

7   date we refer them to corrections for them to return them to

8   the facility.  It may take days, up to weeks to return to the

9   facility, so they're actually there longer than the average

10   of 60 days.

11           But the treatment outcomes, by any measure, for the

12   non-condemned and condemned are about the same.  There are

13   some outliers in the non-condemned in that they have chronic,

14   disabling disease that makes them much more difficult.

15    BY MS. D'AGOSTINO:

16   Q.     So what you just talked about, I believe, are some

17   treatment outcomes.  And would length of stay be a treatment

18   outcome or way of evaluating a clinical outcome?

19   A.     Length of stay, return to function, a reduction in

20   anxiety, increasing capacity to be able to negotiate reality.

21   There are various measures of treatment outcome.

22   Q.     Okay.  And based on those other measures that you

23   just mentioned, are condemned patients, do they have -- are

24   there differences in clinical outcomes versus condemned and

25   non-condemned?

1019

1   A.      No.

2           THE COURT:  He just said no.

3   BY MS. D'AGOSTINO:

4   Q.      Is the care offered to condemned patients

5   therapeutically appropriate?

6   A.      Yes.

7           MS. D'AGOSTINO:  I have no further questions.

8                       CROSS-EXAMINATION

9   BY MR. BIEN:

10  Q.      Good afternoon, Dr. Carter.

11  A.      Good afternoon.

12  Q.      My name is Michael Bien.  I represent all of your

13  patients.

14          Before we turn to your studies you did before coming

15  here today, I want to ask you more about what actually

16  happens with condemned patients on Q3.

17          By the way, you've been on Q3 since July 2012?

18  A.      Yes, that's correct.

19  Q.      Where did you work before that?

20  A.      I was at DMH on P-2, which is an acute unit.

21  Q.      Okay.  And there is no condemned on P-2?

22  A.      There is no condemned on P-2.

23  Q.      So your knowledge about condemned practices on Q3

24  begins with July 2012?

25  A.      Correct.

1020

1    Q.      Okay.  And before you worked for DSH where did you

2    work?

3    A.      I worked at Saint Elizabeth's Hospital in Washington,

4    D.C.

5    Q.      Did you work with the condemned at Saint Elizabeth's

6    Hospital?

7    A.      No, I did not.  I worked with forensic patients

8    though.  The last five years at Saint Elizabeth's I worked

9    with forensic patients, no condemned.

10   Q.      A patient on Q3 who comes from the condemned unit at

11   San Quentin, they're treated differently than the other

12   patients on Q3?

13   A.      In that they don't --

14   Q.      "Yes" or "no"?

15   A.      Yes.

16   Q.      Okay.  And they cannot participate in the step

17   program?

18   A.      They participate on the first level.

19   Q.      They can't move up the steps, they just stay at the

20   bottom?

21   A.      Correct.

22   Q.      But the other patients, as their treatment

23   progresses, one goal is they will move up the steps; is that

24   correct?

25   A.      That's correct.

1021

1  Q.      And those additional steps involve participation in

2  activities such as small groups and large groups?

3  A.      Correct.

4  Q.      And it also includes access to dayroom and yard and

5  greater hours?

6  A.      That's correct.

7  Q.      And it also involves -- allows access to the dayroom

8  without cuffs -- handcuffs; is that right?

9  A.      That's correct.

10  Q.      And isn't one of the goals of your step program to

11  encourage patients in your program to manage their behaviors

12  that were getting them into difficulties before?

13  A.      That's correct.

14  Q.      And those behaviors involved the relationships with

15  other people, other patients, correct?

16  A.      Other patients, staff, family, yes.

17  Q.      But you, by keeping someone at step one, you're not

18  able to observe their relationships with other patients; is

19  that correct?

20  A.      That's correct.

21  Q.      And you're not able to put them into a group like you

22  do other patients?

23  A.      We can observe they're relationship with other

24  patients in that they communicate with the other patients

25  across the hallway.

1022

1    They don't sit in the circle, but they do talk and

2  relate and exchange stories about being in CDCR and reveal

3  secrets to each other by way of either talking to the cellie

4  next to them or the cellie across the way.  They don't sit in

5  the same circle, but --

6  Q.    You do that as a managed program?  You have inmates

7  talk to each other inside their cells across to other inmates

8  as part of group therapy?

9  A.    No.

10 Q.    No.  That's not a therapeutic program, is it?

11 A.    It's socialization.  The purpose of the step program

12 is socialization for low-functioning individuals.  So

13 although they may not participate in it, they may also not

14 benefit from it because they're actually much higher

15 functioning.  And they may not need to learn how to sit in a

16 circle getting along with other people.

17    Most the issues --

18    THE COURT:  I'm really quite confused about that.

19 You said sort of the same things earlier.

20    You understand that at CDCR there are a variety of

21 classifications of mentally ill patients?

22    THE WITNESS:  Yes, I'm aware.

23    THE COURT:  You understand, as an example, that a

24 simple -- I don't mean simple, but a crisis management is

25 supposed to go to a facility that's designed to address their

1023

1  crisis situation?

2          THE WITNESS:  Yes.

3          THE COURT:  That's not why people get sent to your

4  hospital, correct?

5          THE WITNESS:  They come to our hospital because in

6  the recent past they've had some type of crisis-like

7  activity.

8          THE COURT:  You don't think there are people being

9  sent to your hospital because they're chronically very

10 seriously ill.

11         THE WITNESS:  Yes, they are.

12         THE COURT:  So they're different?

13         THE WITNESS:  They're different.

14         THE COURT:  Than what you have been describing?

15         THE WITNESS:  Those are non-condemned.  Somebody who

16 has chronic schizophrenia for years --

17         THE COURT:  But none of the condemned are people who

18 have chronic mental illnesses?

19         THE WITNESS:  They have mild chronic mental

20 illness.

21         THE COURT:  And they get sent to the hospital because

22 they have mild --

23         THE WITNESS:  Because they had a decompensation.  As

24 I said, they come -- one came because he was kidney

25 intoxicated.  He told them --

1024

1    THE COURT:  Where do you get the idea that they're

2    sort of sending them to handle what are relatively minor

3    crises rather than their profound illness?

4    THE WITNESS:  The patients that we have received do

5    not have profound crisis based or debilitating ilness.

6    THE COURT:  All right.  That's your testimony.

7    BY MR. BIEN:

8    Q.    Doctor, just to clarify this, you spoke about doing

9    some study.

10    Just so the court knows, we don't know anything about

11    this study.  I'll find out about it now.  Nothing has been

12    given to us.  We didn't know about this witness until last

13    week.

14    When did you perform this study?

15    A.    It is not a study.  I did an analysis of the

16    patients -- the six patients that have been hospitalized on

17    Q3 within the time I was there.

18    Q.    So your sample is the six patients that you've taken

19    care of.  Okay.

20    A.    No.  The six patients that have been hospitalized.  I

21    took care of two of them, Dr. Shaza (phonetic) took care of

22    the other four.

23    Q.    Okay.  And when did you do this study?

24    A.    This study?

25    Q.    It is not a study.  When did you do this work?

1025

1   A.      Yesterday, day before yesterday, just being looking

2   at their treatment outcomes, just looking at various

3   parameters so that I could be a more helpful witness.

4   Q.      And when you determined the average age of patients

5   on death row, did you look at the statistics published by

6   CDCR on its website as to the age of people on death row?

7   A.      No, I did not.  I looked at the average age of the

8   patient -- condemned patients that came to Q3.

9   Q.      You looked at those six people?

10  A.      Exactly.

11          THE COURT:  I just want to be clear because I'm,

12  frankly, quite surprised by what you are saying.

13          It is your understanding that people who are

14  chronically ill are being referred -- that people who are

15  chronically ill are not being referred to your facility by

16  virtue of their long-term long illness?

17          That's your testimony?

18          THE WITNESS:  My testimony is that individuals who

19  are chronically ill thus far have not been included in the

20  population of the condemned.  That population is higher

21  functioning.

22          THE COURT:  I understand your testimony.

23          You ought to rest, but I understand you are going to

24  have further cross.

25  BY MR. BIEN:

1026

1    Q.      You've had more than one condemned patient on Q3 at a

2    time, Doctor?

3    A.      Yes.

4    Q.      Okay.  Why don't you do a group for two or three at a

5    time?

6    A.      They didn't want it.  At that time -- it was most

7    recently we had three condemned individuals, and they just

8    didn't want to be bothered.

9    Q.      None of them wanted to come out and participate in a

10   group?

11   A.      No, they did not.

12   Q.      When did --

13   A.      There is no structure to provide for that given the

14   limitations.

15           My understanding is that when you have that type of

16   individual, there are individual modules.  There are wire

17   mesh modules that allow them to be able to program.  But

18   there are -- no such modules occur or exist on Q3.

19   Q.      So you actually treat your patients on Q3 without

20   these cages normally?

21   A.      If they're non-condemned.

22   Q.      They could come from -- they could be LOP, right?

23   A.      Correct.

24   Q.      They could be a gang leader from the Pelican Bay SHU?

25   A.      Correct.

1027

1    Q.      They could have killed five people in the last two

2    weeks, but they're not condemned, and you treat them outside

3    of cages, right?

4    A.      Right.

5    Q.      These people, who come from death row, you treat

6    differently?

7    A.      Yes.

8    Q.      And that's based on their sentence?

9    A.      That's based on the --

10    Q.      Is that based on their sentence?

11          Do you do an individual risk assessment, Doctor?

12    A.      No, it is not based on their sentence because we have

13    individuals who have life sentences.  It is based on there

14    legal standing as a condemned versus non-condemned

15    individual.  And so we are directed to provide an alternative

16    form of treatment for people who condemned.

17    Q.      Okay.  Do you treat other patients differently based

18    on their legal status?

19    A.      Yes.

20    Q.      What other patients?

21    A.      If an individual, say, is somebody who is a --

22    somebody who is a sex offender status, who has a tendency to

23    do indecent exposure, somebody who has -- there are, as I am

24    sure you know, placement points.  If we have somebody who has

25    a propensity to get into fights, if we have an individual on

1028

1    a unit who has been hospitalized 42 times, he comes in and he

2    says if you put me in a group, I'm going to fight somebody --

3            (Reporter requests the parties speak one at a time.)

4    BY MR. BIEN:

5    Q.      That based on -- I'll let you finish.

6    A.      So there is a complex set of criteria we use.  It is

7    mostly behavioral.

8    Q.      All right.  You don't evaluate condemned inmates by

9    their behavior to determine whether or not they can

10   participate in groups or go to the dayroom without cuffs, do

11   you?

12   A.      We evaluate all patients based on the behavior, but

13   we are constrained given the fact that some of the

14   individuals are condemned.  And so custody's determination is

15   that they should be in this protected subgroup.

16   Q.      You don't -- Doctor, you don't have a choice about

17   this, do you?

18            I mean, you have been told that the rule is

19   condemned -- these are the rules for condemned.

20            Have you seen the policy?

21   A.      I have not seen the policy.  I've been -- we've

22   discussed it.  Yes, I'm aware.  And yes, I've been instructed

23   this is how they'll be treated.

24   Q.      Okay.  Were you told that it was okay to perform a

25   group for three condemned together if you had three together?

1029

1   A.      I was not specifically told that.

2   Q.      Okay.  Do you know who Ellen Bachman is?

3           THE COURT:  You were specifically told the opposite,

4   correct?

5           THE WITNESS:  Yes.

6           I have never had three condemned patients.

7   BY MR. BIEN:

8   Q.      You've had two?

9   A.      I've had two, but not at the same time.  But it just

10  happened that the time we had three, all three of them were

11  under the care of a different psychiatrist.

12  Q.      CDCR had three at once?

13  A.      Yes.

14  Q.      And they didn't provide groups because the rule is

15  that any time a condemned inmate is out of their cell,

16  everyone else is locked up; is that correct?

17  A.      That's correct.

18  Q.      So if the condemned inmate is in the dayroom, all the

19  other patients have to be locked in their cells?

20  A.      That's correct.

21  Q.      And the rule is -- so I won't use an adjective.

22          The rule actually prohibits two condemned inmates

23  from coming out together, doesn't it?

24  A.      I don't know.  I don't know.

25  Q.      Have you ever seen two condemned inmates come out

1030

1    together?

2    A.      No.

3    Q.      Have you ever been to the special treatment program

4    at San Quentin?

5    A.      I never have.

6    Q.      Do you have any firsthand knowledge about that

7    program?

8    A.      I do not.

9    Q.      Have you read anything about it, any policy manuals?

10           MS. D'AGOSTINO:  Objection.  Beyond the scope of

11   direct.

12           THE COURT:  Overruled.  You may answer.

13           THE WITNESS:  No, I have not.

14   BY MR. BIEN:

15   Q.      Doctor, isn't it correct that sometimes patients who

16   are stabilized in your program are discharged not back to

17   their sending institution, but to the ICF Programs, the

18   Intermediate Acute Programs at CMF or at another facility,

19   such as Salinas Valley?

20   A.      Yes.  That's correct.

21   Q.      Okay.  Isn't one of the tools you have as a doctor

22   to -- as you said, your job is to -- in the acute unit is to

23   stabilize them, get them ready, diagnose them, then they mend

24   that broken leg in another place, right?

25   A.      Correct.

1031

1    Q.      Okay.  And for mental illness, that might be in a

2    place where they can get more groups, more activities.  And

3    some of your patients, in fact, have required long stays in

4    ICF Programs after they've been discharged from APP?

5    A.      That's correct.  But I think we're using the term

6    "groups" generically.  There are higher-functioning groups.

7    There are ego-supportive groups.

8            Most the groups that I'm aware of in the intermediate

9    program are actually ego-supportive-type programs for people

10   who have long-term problems.  Just -- it runs the gamut.

11           Like there is L2.  L2 is an intermediate program, but

12   these are individuals who just can barely wash themselves.

13   Most the time, you know, they're extremely debilitated

14   individuals.  So a group for them is all together different

15   than a group for a higher-functioning population.

16   Q.      Like the condemned, right?

17           They don't need any of that, right?

18   A.      Exactly.

19   Q.      Do you know how long the waitlist has been for the

20   APP Program over the last few months?

21   A.      For APP?

22   Q.      Yes.

23   A.      I don't know the length of the wait.  My

24   understanding is that the highest number of individuals

25   waiting to come in has reached -- I think the highest I

1032

1  remember being told was 30.

2  Q.    You're aware that it currently takes -- can take from

3  weeks, to even more than a month, for a patient to be -- in

4  2013 for a patient who is accepted into the APP Program to

5  actually be transferred there?

6           MS. D'AGOSTINO:  Objection.  Lack of foundation.

7           THE COURT:  He's asking whether he's aware of it.

8           THE WITNESS:  No, I'm not aware of the time.

9  BY MR. BIEN:

10 Q.    Okay.  Are you aware that patients in 2013 have been

11 referred to the APP, they've been accepted -- in other words,

12 their packages have been reviewed by DSH and been accepted --

13 and they haven't been able to be transferred because there

14 aren't enough beds at the moment?

15           MS. D'AGOSTINO:  Objection.  Beyond scope of

16 direct.

17           THE COURT:  Overruled.  You may answer.

18           THE WITNESS:  Typically, when they talk about a delay

19 in transferring from Mental Health Crisis Bed or CCC to APP,

20 it is usually a issue of custody, other issues besides the

21 lack of an acute bed.

22 BY MR. BIEN:

23 Q.    You guys got lots of empty beds?

24 A.    No, we do not.  I don't know the census of the number

25 of empty beds in APP.  I just know that pretty quickly, when

1033

1    our beds become empty, they become full.

2    Q.       My point is you're aware that there has been, in

3    2013, a delay between the time -- let's say inmate clinicians

4    at San Quentin evaluate somebody, decides he needs APP care,

5    fill out the form, send the form, accept him, there is a

6    delay from that moment until the patient can actually be

7    transferred to APP.

8         You are aware that delay is longer than the standards

9    of defendants in this court have agreed to for those

10   transfers?

11   A.       I'm not aware.  I don't know what the standard of

12   what the defendants have agreed to.

13   Q.       Okay.  Are you aware that it has been up to a month

14   for patients to get from San Quentin?

15        THE COURT:  He's already testified that he's not

16   aware of that.

17        MR. BIEN:  Okay.

18        Can I help the witness find a binder over there?

19        THE COURT:  Sure.

20        (Exhibit located for witness.)

21        MR. BIEN:  Your Honor, I would like to question the

22   witness about one of the condemned patients that has been in

23   his unit in the last couple of months, and this patient is

24   in -- his records are in Pablo Stewart's binder at tab F.

25        THE COURT:  Tab doesn't help me at all.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1034

1     MR. BIEN:  It is Exhibit 1115.

2     THE COURT:  Which is in evidence?

3     All right.  You may proceed.

4  BY MR. BIEN:

5  Q.     Do you see tab F there, Doctor.  And it's -- we have

6  an inmate code system.

7     MR. BIEN:  May I approach?

8     (Document given to witness.)

9  BY MR. BIEN:

10 Q.     So if you could, refer to this patient as inmate --

11 as Patient FFF, please.

12 A.     Okay.

13 Q.     Doctor, do you recall treating this patient?

14 A.     I recall him being treated.  He wasn't my patient.

15 He was a patient of the other psychiatrist.

16 Q.     But this is one of the patients who was in the review

17 of six patients that you testified about today?

18 A.     That's correct.

19 Q.     And how did you characterize this patient's illness

20 in your results?  Where did this patient come in?

21 A.     Can you explain the question, where he comes in?

22 Q.     You said you kind of divided up the condemned

23 patients in this group of six into various categories.

24 A.     Yes.

25 Q.     And what did you -- where did you put this patient in

1035

1    the category?

2    A.      He had a substance abuse disorder and mild

3    depression.

4    Q.      What was the first?  I didn't catch that.

5    A.      He had a substance abuse disorder and a mild

6    depression.

7    Q.      You think it was inappropriate for the San Quentin

8    psychiatrists to send this patients to you for care?

9    A.      I can't answer that question about the state that the

10   patient was in at the time of referral.  He was a gentleman

11   who had chronic dysphoria because he really wanted a sex

12   change operation.  So his dysphoria had to do with the fact

13   that he was dissatisfied with who and what he was.

14   Q.      Can you turn to -- if you look, there is page numbers

15   on the lower left -- page 1536, please.

16           Do you have that in front of you, Doctor?

17   A.      Yes, I do.

18   Q.      Is this the Discharge Summary?

19   A.      Yes, it is.

20   Q.      Okay.  And is the document that -- one of the

21   documents you reviewed before you came here today?

22   A.      Yes, it is.

23   Q.      Okay.  And if you go down to the -- seven lines up

24   from the bottom in the paragraph marked Three Chief

25   Complaints - Reason For Admission.

1036

1    Do you see that area?

2    A.    Seven lines from the bottom begins with the word

3    "and."

4    Q.    Let's see.

5    Why don't you go one line up where it says -- begins

6    with "He says..."

7    By the way, did you know whether this patient prefers

8    to be addressed as "he" or "she"?

9    A.    I have no direct knowledge of his preference or her

10    preference.

11    Q.    It is our understanding that the patient prefers to

12    be referred to as "she" and I'll do that.

13    A.    Okay.

14    Q.    Can you read what it says here?

15    A.    The line beginning which word?

16    Q.    With "He" unfortunately.  Go ahead.

17    A.    Seven lines from the bottom -- seven lines from the

18    top?

19    Q.    Seven lines from the bottom -- eight lines, "He says

20    that..."

21    A.    Okay.  All right.

22    I assume you're saying -- I'll move this over so my

23    voice can get captured.

24    (Reading:)

25    He says that he did not have any motivation but feels

1037

1    motivated now to get out of here.

2         (Reading concluded.)

3    Q.    Can you continue?

4    A.    (Reading continued:)

5         He says he did not want to come to this facility, had

6         to have a Vitek hearing.  He feels he was getting

7         more programming at San Quentin and feels more

8         restricted here.

9         (Reading concluded.)

10   Q.    Okay.  Do you know what a Vitek hearing is?

11   A.    Yes, I do.

12   Q.    What's a Vitek hearing?

13   A.    It's a hearing in order to determine whether or not

14   the individual needs to be forced to be transferred from one

15   facility to another against their will.

16   Q.    Is it correct this patient -- one of the problems

17   that the mental health staff felt this patient was

18   experiencing was suicidality?

19         MS. D'AGOSTINO:  Objection.  He already testified he

20   has no personal knowledge of this patient.  He did not treat

21   him.

22   BY MR. BIEN:

23   Q.    Based on your review of the records?

24         THE COURT:  Well, okay.  You don't want me to rule

25   so -- you would like me to rule, however?

1038

1       MS. D'AGOSTINO:  Yes.

2       THE COURT:  These questions are not questions for

3   your personal knowledge because you didn't treat him, but you

4   did review the records for the purpose of coming here to

5   testify.

6       THE WITNESS:  Yes.

7       THE COURT:  You may ask your question again, sir.

8   BY MR. BIEN:

9   Q.      Was one of the problems that resulted in this patient

10  being transferred to APP suicidality?

11  A.      I don't know if it was suicidality.  I know he had

12  suicidal ideations.  There are people who say they want to

13  kill themselves who, in fact, don't want to.  And the final

14  conclusion of his treating psychiatrist was that he had a

15  mild chronic depression.

16  Q.      Okay.  But it is correct that one of the problems

17  that led to his transfer to your unit, to Q3, was

18  suicidality?

19  A.      Correct.  The assessment of suicidality.

20  Q.      The next page, if you look at Item 6, Hospital

21  Course, it's page 1537:

22          (Reading:)

23          Patient was placed on suicide precaution at time of

24          his arrival to Q3 because he reported feeling

25          depressed and refused to contract for safety for

1039

1      several days.

2          (Reading concluded.)

3   A.     Where are we?  Can you --

4   Q.     The next page under paragraph 6.

5   A.     Yes.

6   Q.     Okay.  Is that what it says there?

7   A.     That's what it says.

8   Q.     You have no doubt that's what happened, right?

9   A.     I have no doubt that's what happened.  But it's the

10  common operating procedure.  Everybody that comes there is

11  placed on suicide precaution.

12  Q.     This says that he was placed on suicide precaution

13  because he said he was feeling depressed and refused to

14  contracted for safety for several days.

15         So as far as you know the clinician's made an

16  intelligent, appropriate, professional decision to place him

17  on suicide precautions?

18  A.     Yes.

19         As I remember he came because he banged his head.  If

20  a person demonstrates self-destructive behavior that the

21  individual has demonstrated chronically, and is on some level

22  cognitively aware that behavior is not going to essentially

23  kill them, they'll be placed on suicide precaution, not that

24  they're suicidal, but the fact that increases the amount of

25  monitoring that that individual will receive.

1040

1    So being placed on suicide precaution doesn't mean

2    that you are suicidal.  It means we want to monitor you much

3    more closely in the event that you are suicide, homicidal,

4    have self-interest behavior.

5    There are individuals that cut themselves all the

6    time.  And later on they'll say:  I know it wasn't going to

7    kill me.  I was angry, and I just acted out.

8    This individual, I know he came in with a vertical

9    laceration on his forehead from having banged his head

10   repeatedly against the cell wall.  He had actually had some

11   hypertrophy of his forehead, which is a chronic formation of

12   scar tissue, because he had done it so often.

13   So the probability of him actually participating in

14   something that has a high degree of lethality was very low in

15   this individual.

16   Q.    Isn't that behavior of self-injurious behavior

17   something that should be treated in an acute psychiatric

18   hospital?

19   A.    Not necessarily.  If it's chronic injury -- we have

20   individuals who come in their 60s who started cutting

21   themselves when they were teenagers.  There are certain

22   conditions --

23   Q.    You don't encourage that behavior, do you?

24   A.    You don't have to encourage it.  I don't encourage a

25   heart attack.  But in order to get a person into, let's say,

1041

1    a heart smart lifestyle, you don't necessarily put them into

2    an acute coronary care unit.

3         You know that there are certain conditions that are

4    chronic that require education and lifestyle changes.  That

5    takes years to change a person's behavior.  We're just trying

6    to stand them back on their feet and get them back to where

7    they can function.

8    Q.      Something quick and dirty?

9    A.      No.  Not quick and dirty.  Something that is

10   appropriate, that is -- and is measured based upon the

11   person's physical and psychological needs.

12   Q.      Are you aware this patient had also cut herself with

13   a piece of plastic while in the MHCB?

14   A.      Yes.

15   Q.      So there was two recent self-injurious behaviors the

16   doctors were concerned about?

17   A.      Yes.

18   Q.      Now --

19   A.      This individual also had attempted to cut off her

20   genitalia in the past.  So in comparison to what they were

21   doing at the time of this hospitalization, this is, although

22   self-injurious, again, it's a measure of the probability of a

23   lethal outcome.  And the injuries that were on her arm and on

24   her forehead were non-lethal injuries.

25   Q.      So it sounds like you have read the file a bit more.

1042

1    Isn't it correct that this patient attempted to cut

2  off her penis and was hospitalized with a very serious

3  injury?

4  A.    Yes.  In the past.

5  Q.    Okay.  So the person has made some pretty serious

6  self-injurious behavior, would you agree?

7  A.    In the past.

8  Q.    Everything is in the past, doctor, nothing has

9  happened yet.

10  A.    I'm sorry.  In the distant past prior to this last

11  hospitalization.

12    Mental illness -- some mental illnesses are episodic,

13  some are chronic, and there are waxing and waning levels of

14  severity based upon where a person is emotionally, ego

15  strengths, what current stressors, are they on medications.

16    So just to say that, you know, once you had a heart

17  attack and so you couldn't climb the stairs means that

18  forever you're disabled -- this individual, when she was

19  admitted, had an up-and-down course throughout the course of

20  the hospitalization.

21    And actually in this document it said that the reason

22  why she said she did what she did is because she didn't want

23  to go back to San Quentin.

24  Q.    Which thing did she do?

25  A.    The reason why she was saying she had suicidal

1043

1    ideations.  I think that if I can review that part --

2    Q.    Doctor, let me -- I'm going to move on to my

3    questions, please.

4          MS. D'AGOSTINO:  Objection.  He's not allowing the

5    witness to finish his answer.

6          THE COURT:  Hang on.

7          THE WITNESS:  Under the section -- at the end of the

8    section that is called Recommendations for Physical and

9    Psychiatric Follow-up.

10   BY MR. BIEN:

11   Q.    This is page 01540?

12   A.    Yes.  1540.  Although Inmate FFF prefers to be called

13   she, it is written he.  I'm going to read what's here.

14         THE COURT:  That's fine.

15         THE WITNESS:  (Reading:)

16         Mr. Blank has reached maximum benefit for the APP.

17         He has had a period of sustained stable mood that

18         has been free of mood symptoms and self-injurious

19         behavior.  He is relatively high functioning and

20         intelligent.  He has not been observed responding to

21         internal stimuli and has not been observed internally

22         preoccupied.  He is organized and coherent in his

23         thinking.  Although he reports hearing voices, he is

24         quite organized and free of the other associated

25         symptoms of psychosis.  It is very likely that he

1044

1     misinterprets ruminating thoughts of his abusive

2     stepfather for auditory hallucinations.  It is very

3     unlikely that Mr. Blank is psychotic.

4     He does have a persistent depressant mood.  This is

5     likely the result of his incarceration and desire for

6     gender reassignment which produces a feminizing

7     outward appearance that, among other things, serves

8     to alienate and isolate him in the prison setting and

9     adds to his depressed mood.

10    He also offers inconsistent mood symptoms and

11    presentations depending on the setting in which he's

12    being evaluated.  He has a history of rejecting help

13    and giving mixed messages to staff about his motives

14    for improvement.  In, addition he's been observed

15    manipulating staff.  His demonstrated that ability to

16    present as more ill and volatile in order to serve

17    his needs.

18    He has been generally compliant with medications but

19    has refused medication on a few occasions.  It is

20    highly recommended that he continue his psychotropic

21    medications to minimize his volatile unpredictable

22    behavior, including his self-injurious behavior.  He

23    should follow up with a psychiatrist on a regular

24    basis.  He should be enrolled in --

25    (Reading interrupted.)

1045

1    THE COURT:  You're going to have to speak more

2    slowly, Doctor.

3    THE WITNESS:  I'm sorry.

4    (Reading continued:)

5    He should be enrolled in therapeutic groups to

6    address his poor coping skills and poor frustration

7    tolerance.

8    He is not a good candidate for intermediate

9    programming due to his manipulative and

10    self-rejecting behavior.

11    (Reading concluded.)

12    BY MR. BIEN:

13    Q.    It says "help rejecting"?

14    A.    Yes.  Help rejecting behavior.

15    Somewhere, perhaps in the body, where they talk

16    about --

17    THE COURT:  There are no questions.  You're a

18    witness.  You have to wait for somebody to ask you a

19    question.

20    THE WITNESS:  Okay.

21    BY MR. BIEN:

22    Q.    Doctor, isn't it correct that this patient could not

23    go to an acute intermediate hospitalization no matter what

24    the doctor recommended?

25    A.    Yes.  That's correct.

1046

1  Q.      Can you turn to page 1543.  This is -- this appears

2  to be -- it's dated -- this appears to be the referral from

3  San Quentin, March 27th, 13, which is actually on the

4  previous page, 1541.  This is the referral from the

5  San Quentin psychiatrist to APP.

6          If you look on 1543 in the middle, in their opinion

7  this patient had -- you look where it says Axis I, Axis II.

8          (Reading:)

9          Axis I:  Major Depressive Disorder, Severe with

10         Psychotic Features.

11         (Reading concluded.)

12         That was the opinion of the San Quentin staff when

13 they sent the patient, correct?

14 A.      That's correct.

15 Q.      Now, this patient -- if you turn a few pages further,

16 page 1624 -- this patient has been discharged back to

17 San Quentin.  I guess he was at the APP for several weeks.

18         This is now dated July 23rd, 13.  Do you see that?

19 A.      Yes.

20 Q.      Okay.  And according to the San Quentin psychiatrists

21 who are now treating this patient, if you go down on 1624,

22 they're identifying auditory hallucinations, depression and

23 anxiety for this patient.

24         Is that correct?

25 A.      That's correct.

1047

1    Q.       And they're prescribing Zyprexa, Abilify --

2    A.       Abilify, A-b-i-l-i-f-y.

3    Q.       Thorazine.  Effexor --

4    A.       Effexor.

5    Q.       Effexor.

6    A.       E-f-f-e-x-o-r.

7    Q.       Remeron.

8            MS. D'AGOSTINO:  A belated objection, Your Honor.  I

9    don't think the witness has testified he reviewed this

10   document.

11           THE COURT:  My understanding is that he reviewed

12   these documents for the purpose of making his judgment.

13           Is that wrong?

14           THE WITNESS:  That's wrong.  I did not review this.

15   I reviewed the Discharge Summary.

16           THE COURT:  Okay.

17           MR. BIEN:  Your Honor, it's relevant as to whether or

18   not his opinion that this patient was not psychotic and

19   didn't have a major depression.

20           THE COURT:  Well, he's testified as to that.  And

21   yes, you may proceed on that basis.

22   BY MR. BIEN:

23   Q.       Okay.  Doctor, are these appropriate medications to

24   prescribe for a patient who has major depression and auditory

25   hallucination and anxiety?

1048

1    A.      Yes.

2    Q.      If you turn to the next page 1626 -- actually two

3    pages -- the current -- as of July 23rd the psychiatrist in

4    San Quentin, Dr. Burton, B-u-r-t-o-n, has diagnosed this

5    patient with Major Depressive Disorder - Moderate, Psychotic

6    Disorder NOS and Polysubstance Dependence.

7            Do you see that for Axis I?

8    A.      Yes.

9            MS. D'AGOSTINO:  Objection.  He's misrepresenting the

10   document.

11           THE COURT:  Ma'am?

12           MS. D'AGOSTINO:  Objection.  Counsel is

13   misrepresenting the document.  Dr. Burton did not sign this

14   document.

15           THE COURT:  He didn't say he signed it.

16           MS. D'AGOSTINO:  He purported to give a diagnosis

17   that Dr. Burton had given.

18           THE COURT:  He did that.  It appears that's what the

19   document represents.  I don't have it in front of me.

20           MR. BIEN:  It's true that his signature doesn't

21   appear on this page, Your Honor.

22           THE COURT:  All right.

23           But I'm not quite certain what point we're making

24   here.

25           You know, Mr. Bien, tell me why we're having this

1049

1    discussion.  It appears there is serious disagreement among

2    various psychiatrists, the people who referred Patient FFF to

3    the hospital, and the discharge by the psychiatrist, who is

4    not this witness, and then the treating physician in

5    San Quentin.

6         But I don't know what that proves about this case.

7    Tell me.  I'm sorry.  I know you have some thought of its

8    relevance, but frankly it's escaping me.

9         MR. BIEN:  Your Honor, it's unclear from this program

10   whether or not the APP team is able to do their job

11   appropriate and really evaluate these patients and diagnose

12   them.  I'm not going to say they're --

13        THE COURT:  I see.

14        MR. BIEN:  So this patient was sent for certain

15   purposes.  Giving psychiatric care when the guy is locked in

16   their cell, I don't think they're able to appropriately

17   evaluate it.  The patient wanted to leave as quickly as they

18   could.

19        THE COURT:  Whether it was quick or slow, the fact is

20   that two psychiatrists disagree.  And this psychiatrist, of

21   course, has had -- is not the treating physician.

22        MR. BIEN:  I'll move on from this.

23        THE COURT:  Yes.  I mean, I agree with you that

24   there's a dispute.  I have no way of judging who is right.

25   And I don't know so what's the point?

1050

1       I mean, there is a serious disagreement about

2  function.  And the treating physician apparently thinks that

3  the guy is just really fine and dandy, and the psychiatrist

4  in San Quentin doesn't agree.

5       But I'm more troubled, to be frank with you, about

6  the notion that the doctor has testified that these people

7  are referred to the hospital because they have mild

8  stressors.  That seems to me to be a very serious problem.

9  BY MR. BIEN:

10  Q.    Let's follow up on that issue, Dr. Carter.

11       Have you brought to your superior's attention your

12  opinion that San Quentin mental health staff are

13  inappropriately referring patients to the APP.

14       MS. D'AGOSTINO:  Objection.  That misstates the

15  witness's testimony.

16       THE COURT:  No.  That's a conclusion as to what

17  the -- but it isn't clear to me.

18       Doctor, why do you think people are referring people

19  to the hospital?

20       Why are they sending them because they've got these

21  minor stressors?

22       THE WITNESS:  I hope I can clarify this.

23       THE COURT:  Please, do.

24       THE WITNESS:  May I use a non-psychiatric example

25  perhaps.

1051

1      A major fraction in the leg is different in a person

2  who is old and debilitated versus someone who is young and

3  athletic.  Exactly the same fracture causes a different

4  degree of disability.

5      The gentleman that come -- that I have seen, that I'm

6  aware of that have come from the condemned ward at

7  San Quentin are high-functioning individuals.  So the rate of

8  their recovery is a lot faster, a lot better than -- so the

9  stressor itself that tipped him over and caused the acute

10  issue, I can only go by the information that was referred to

11  us in the conversations we had with the clinicians.

12      It's not that -- I don't know what happens at

13  San Quentin.  I have no reason to believe that there isn't

14  due diligence with respect to their patients, and I have the

15  utmost respect for my colleagues.  We can disagree.  We can

16  have differences.

17      THE COURT:  Absolutely.  That's why I was cutting

18  Mr. Bien off because it appears that there is just a

19  disagreement.

20      I mean, not just, but that there is a disagreement

21  between psychiatrists.

22      But my question is much more directed towards your

23  understanding of why people are being referred to the

24  hospital.

25      Clearly, if there is a an emergency crisis, there

1052

```
 1   are -- there is an institution for that, which is the crisis

 2   bed units.

 3           THE WITNESS:  Absolutely.

 4           THE COURT:  So all of these people that are coming to

 5   you --

 6           THE WITNESS:  Have been medicated.  They have been

 7   stabilized up to a certain degree, but they have not reached

 8   baseline.  So they may be in a sub-acute phase.  So when they

 9   come to us, it depends the nature of the illness that got

10   them into the Mental Health Crisis Bed, whether they're

11   taking their medications, other things like that.

12           If they are highly-functional individuals, who are

13   taking their medications and following the therapeutic

14   modality of the treatment team, more than likely they will

15   come to us in a much better state than individuals who is

16   coming in and not cooperative with care.

17           So I'm not contending that the San Quentin staff is

18   cherry-picking the individuals.  I don't want to leave that

19   impression.  I cannot speak -- I have never been to

20   San Quentin.  I don't know what goes on at San Quentin.

21           My understanding is they are sending the patients and

22   the Mental Health Crisis Bed facilities are sending the

23   patients who have not been totally stabilized to us.

24           And when you compare the population of those who are

25   condemned versus those who are not condemned, typically the
```

1053

1    ones who are condemned are healthier.  Their recovery is

2    faster.

3            The ones who are not condemned are the chronic people

4    who you off see on TV, the people with the chronic,

5    debilitating issues.

6            THE COURT:  Your understanding, as I understand what

7    you are saying -- if I'm wrong, feel free to say, no, that's

8    not what I'm saying -- is that the people that are being

9    referred to you are, on the whole, not chronically sick, not

10   chronically having psychiatric problems?

11           THE WITNESS:  Some of them have chronic psychiatric

12   problems, but psychiatric problems is a spectrum.  If you

13   have, let's say, dysthmia, which is of the diagnoses,

14   dysthmia is like Charlie Brown walking with a cloud of misery

15   over his head.

16           So if you, as a child, witnessed the murder of your

17   mother, started drugs at 12, have been in and out of foster

18   care, you may be chronically depressed, but you're the

19   walking wounded, your functional.

20           There are some who --

21           THE COURT:  There are people, after all, who are

22   catatonic.

23           THE WITNESS:  Absolutely.

24           THE COURT:  Who are so disorganized by virtue of

25   their --

1054

1    THE WITNESS:  And they're not coming from

2    San Quentin.

3    THE COURT:  They're not coming to you?

4    THE WITNESS:  No, they're not.

5    THE COURT:  All right.  That's your testimony.

6    BY MR. BIEN:

7    Q.    Have you reported to your superiors -- I guess you're

8    doing it now because it is public testimony -- but before

9    today did you share with your superiors any feedback for

10   utilization review or anything else about your opinion about

11   referrals from San Quentin?

12         "Yes" or "no"?

13   A.    No.  There is no need for --

14   THE COURT:  Okay.

15   MR. BIEN:  Your Honor, I would like to mark

16   Plaintiffs' 1167, medical records of another patient in the

17   APP.

18   BY MR. BIEN:

19   Q.    Doctor, if you can refer to this patient by the code

20   JJJJ?

21   A.    Yes.

22   Q.    Do you recall being the attending psychiatrist for

23   this patient in the APP?

24   A.    Yes, I do.

25   Q.    And this most recent hospitalization for this patient

1055

1  began in May of 2012?

2  A.      I'm not sure when it began.

3  Q.      What's your best recollection?

4          THE COURT:  Well, isn't there somewhere in this set

5  of documents an indication of when it was?

6          MR. BIEN:  Yes.

7  BY MR. BIEN:

8  Q.      If you turn to page 3780, Doctor.

9  A.      Yes.  I see 3780.  I don't see the date.

10         THE COURT:  Right up in the right-hand corner,

11  Doctor.

12         THE WITNESS:  That's the date of admission to

13  intermediate.

14  BY MR. BIEN:

15  Q.      Okay.

16  A.      He was admitted to acute.  And after he was

17  stabilized -- if this is the same hospitalization that I

18  recall, he was admitted then to a long-term treatment

19  program.

20         So the date of 5-1-2012 would reflect the first date

21  in an intermediate treatment environment.

22         He went to acute on 3-7-12.

23  Q.      3-7-12.  Thank you.

24         That's what I thought.  I just couldn't find the

25  spot.

1056

1    You were in the P-2 Unit at that point?

2    A.    That's correct.

3    Q.    Okay.  And is it correct he was on a Keyhea Order for

4    involuntary medication?

5    A.    Yes.

6         MS. D'AGOSTINO:  Objection.  Lack of foundation.

7         THE COURT:  He's asking whether that's true.

8    BY MR. BIEN:

9    Q.    You were his attending psychiatrist?

10        Doesn't it say that on page 3780?

11   A.    Yes, I was his attending psychiatrist.  I don't have

12   my discharge summary so all I have here are is the

13   information from the HCITC, which is the High Custody Inmate

14   Treatment center.

15   Q.    If you would read from 3780, and if look up from the

16   bottom, Dr. Carter, is that a reference to you?

17   A.    Yes.

18   Q.    This purports to quote your discharge summary,

19   doesn't it?

20   A.    Yes.  I guess it summarizes my discharge summary.

21   Q.    Could you read that sentence, the whole paragraph,

22   please?

23   A.    (Reading:)

24        Dr. Carter is attending psychiatrist at the APP P-2.

25        Wrote in discharge summary:  Prison JJJJ had a

1057

1    hospital course which was essentially uneventful.

2    (Reading interrupted.)

3    So that was a time from 3-7 to his admission at 5-1,

4  those two months we're talking about.

5    (Reading continued:)

6    He quickly and easily attended to the ward routine

7    and maintained appropriate behavior.  He Did not

8    evidence any acting out behavior, and he did not

9    display any self-injurious behavior.  He was

10    medication adherent.  He advanced through the step

11    program which allowed him to gradually receive

12    privileges until he could come out into --

13    (Reading interrupted.)

14    This is Dr. Wiltse so his grammar -- I'm going to

15  read it verbatim.

16    It says:

17    (Reading:)

18    Gradually received privileges until he could come out

19    into level socialization groups without the need for

20    hand or leg restraints.  He functioned as an active

21    participant.  At the completion of his treatment, he

22    denied having ideations, plans or intentions.  He did

23    not have homicidal ideation.  He denied having

24    auditory or visual hallucinations.

25    (Reading concluded.)

1058

1  Q.      It has an end quote.

2          So Doctor, this patient, when he was admitted to the

3  APP, unlike death row patients, participated in the step

4  program?

5  A.      That's correct.

6  Q.      And he was able to progress up the steps?

7  A.      That's correct.

8  Q.      And he was able to get to treatment without hand or

9  leg restraints after a while?

10 A.      That's correct.

11 Q.      And you consider that to be a positive part of his

12 program -- his progress through those levels?

13 A.      Yes.

14 Q.      And he also participated in groups; is that correct?

15 A.      That's correct.

16 Q.      And that was also part of the treatment that you

17 prescribed for him?

18 A.      That's correct.

19 Q.      And then at the completion of his treatment in the

20 APP --

21         THE COURT:  Hang on.  It is not clear that 1167 has

22 been admitted.

23         Move to admit?

24         MR. BIEN:  Move to admit.

25         THE COURT:  Granted.  Granted retroactively.

1059

1    You may proceed.

2        (Whereupon, Plaintiff's Exhibit 1167 received

3         into evidence.)

4    THE COURT:  Thank you, Ana.

5  BY MR. BIEN:

6  Q.    At the completion of his treatment, you didn't send

7  him back to his treating institution; is that correct?

8  A.    That's correct.

9  Q.    You referred him to the ICF Program at CMF, the

10 Intermediate Psychiatric Hospitalization Program?

11 A.    Correct.

12 Q.    You thought he would benefit from that treatment?

13 A.    Correct.

14 Q.    And he spent almost a year in that program?

15 A.    I don't know the discharge date.

16 Q.    Okay.  You know he spent quite a while there, more

17 than several months?

18 A.    I don't know how long he stayed in ICF.  I have to

19 find the discharge date.

20 Q.    If you turn back to page 3777, this is a printout --

21 DSH printout.

22        Have you seen something like this before?

23 A.    Yes.

24 Q.    Does this show that he, for this particular admission

25 at CMF, he stayed from May 1, 12, and discharged on September

1060

1   5th, 2013?

2   A.      Yes.

3   Q.      This man has actually had 19 admissions to DSH

4   programs since he's been in CDCR as a prisoner?

5   A.      Correct.

6   Q.      Is it correct that one of the behaviors that you were

7   working on with this patient was self-injurious behaviors?

8   A.      Yes.

9   Q.      Those are not suicidal behaviors in his case?

10  A.      He had both.

11  Q.      He had both.  But he was hurting himself in a way

12  that wasn't likely to kill himself?

13  A.      That's incorrect.  He, on one occasion, became so

14  psychotic that he bit into his -- this is called antecubital

15  fossa.  He literally took out a chunk of his tissue to the

16  point where he was spilling blood onto the ground.

17          As you pointed out, he had 19 hospitalizations, which

18  speaks to a much more virulent individual.  And a symptom

19  does not a syndrome make.

20          There are some people who have coughs because they

21  have post-nasal drip, and some people have coughs because

22  they have cancer.  Because they have a symptom in common does

23  not mean that their disease is equivalent.

24          This individual, Prisoner JJJJ, was somebody who was

25  extremely volatile.  As I said, he had been cutting on

1061

1   himself to the point where he was cutting into his arteries,

2   he was cutting into -- he had actually had some construction

3   on his antecubital fossa.  He's had transfusions because of

4   it.  And his intrapsychic state was so fragile he would just

5   explode under just minimum stressors.

6              So yes, I suspect that the length of stay in the ICF

7   was a function of how ill he is.  You can have people who

8   have periods of stability, and then go through a period of

9   instability and back and forth, such as people with bipolar

10  disorder.  They can be come extremely manic.  We stabilize

11  them and they become highly functional citizens.

12             But just the waxing and waning is the nature of the

13  illness.  So sometimes you catch them at a bad state,

14  sometimes you don't.

15  Q.     He was a maximum security, maximum custody, Level IV,

16  high-security prisoner, wasn't he?

17  A.     I would have to -- let me see if I can --

18  Q.     If you turn to page 3790.

19  A.     According to this he is Level IV with 452 points.

20  Q.     Right.  And to get to Level IV you need about 50

21  points?

22  A.     I don't know how many points you need.  He was --

23  according to this he was maximum security.

24  Q.     Take a look at page 3790.

25  A.     This is the Social History.

1062

1  Q.     At the top where it says "Custody Level," does it say

2  "Maximum"?

3  A.     Yes, it says maximum.

4  Q.     And --

5         THE COURT:  You're going to be with this witness

6  sometime yet, Mr. Bien?

7         MR. BIEN:  A few more minutes, Your Honor.

8         THE COURT:  Really, a few more minutes?

9         It is all right.

10        MR. BIEN:  Yeah.  Why don't we take the break.  I'll

11 finish right after.

12        THE COURT:  All right.  Fifteen minutes.

13        (Off the record at 2:45 p.m.)

14        (On the record at 3:06 p.m.)

15        THE CLERK:  Please, remain seated.

16        Court is in session.

17        MR. BIEN:  Thank you, Your Honor.

18 BY MR. BIEN:

19 Q.     Dr. Carter, I put in front of you the binder again.

20 It is Exhibit 10d which is already in evidence.

21        And if you could, turn to page 8996.  The code for

22 this patient is E.

23        Okay?

24 A.     Yes.

25 Q.     Okay.  And from 8996 through 9004 is a discharge

1063

1    summary that you prepared?

2    A.        That's correct.

3    Q.        And is that your signature at 9004?

4    A.        Yes.

5    Q.        Is this patient -- this is a non-condemned patient

6    who came from San Quentin to the APP for treatment?

7    A.        That is correct.

8    Q.        Okay.  And if you turn to page 9002, that's a section

9    of your summary that talks about the hospital course of

10   treatment; is that correct?

11   A.        That's correct.

12   Q.        And is it correct that one of the things that

13   happened during this patient's course of treatment was that

14   he asked to go off his meds for a while to try?

15   A.        Yes.

16   Q.        Okay.  And is it correct that he was unsuccessful, in

17   your opinion, when he was off his meds?

18   A.        That's correct.

19   Q.        If you look in the middle paragraph there, there's --

20   I'm quoting:

21            (Reading:)

22            Staff reported that the inmate-patient impulsively

23            stood up during television viewing despite being

24            repeatedly directed to remain seated.

25            (Reading concluded.)

1064

1    Do you recall that incident?

2    A.    Yes.

3    Q.    Okay.  And was that one of the reasons that you

4    decided to -- he was under a Keyhea Order?

5    A.    That's correct.

6    Q.    So you were able to require him to take his

7    medications again?

8    A.    That's correct.

9    Q.    And once you reinstated his medications, did the

10   course of his treatment improve?

11   A.    Yes.

12   Q.    And did he participate in the step program?

13         I'm looking at the bottom of the second to last

14   paragraph.

15   A.    He -- as I remember, Inmate E refused to participate

16   in the step program.  He was paranoid.

17   Q.    I'm reading -- if you go to the same page, 9002,

18   Doctor, the second to last paragraph on the page, the last

19   two sentences I'll read:

20         (Reading:)

21         His psychiatric medications were reinitiated on June

22         21, 2013, and the inmate-patient's behavior was

23         carefully monitored.  It was decided by the

24         Multi-Interdisciplinary Treatment Team that the

25         inmate-patient should be cautiously programmed in the

1065

1    step do to his potential for aggressive behavior

2    towards others.

3    (Reading concluded.)

4   Q.    Doctor, when this patient came to you, did he report

5   to you that he had been pepper spray repeatedly at

6   San Quentin?

7   A.    Yes, he did.

8   Q.    If you turn to page --

9    MS. D'AGOSTINO:  Objection.  It's beyond the scope of

10   direct.

11    THE COURT:  Well, the problem is that the scope of

12   the direct was that --

13    MS. D'AGOSTINO:  Your Honor, he didn't testify about

14   any pepper spray.

15    THE COURT:  I understand.  It isn't true every time I

16   stop to collect my thoughts that that's an invitation for

17   further argument.

18    MS. D'AGOSTINO:  I'm sorry.

19    THE COURT:  Hang on.

20    Hang on.  The problem is what the scope of direct

21   dealt with is the adequacy of the program for condemned

22   persons as contrasted with others.

23    But this appears to be, Mr. Bien, a legitimate

24   objection that you're now going beyond that to discuss some

25   other issues, namely pepper spraying, et cetera.

1066

1    MR. BIEN:  I'm asking whether the patient reported

2    the symptoms to him.  That's all.

3        It's written in in the document.  I guess --

4    THE COURT:  I don't doubt that it is written in the

5    document.  The question is, is it relevant to --

6    MR. BIEN:  Whether it relevant to his treatment, I

7    was going to ask the doctor if this was something that was

8    relevant to his treatment for this patient and then just

9    contrast.

10       THE COURT:  I'm tired.  The objection is sustained.

11       You may proceed.

12   BY MR. BIEN:

13   Q.    Doctor, is it correct that you've been subjected to

14   professional discipline for unprofessional conduct?

15   A.    Yes.

16   Q.    And you completed your probation for that in 2005?

17   A.    No.  No.  From 2001 to 2003 I was on probation

18   because I gave a card to one of my patients who

19   misrepresented that as an intimate relationship.

20       It was fully investigated, and it was found to be

21   inappropriate, that allegation was dismissed.  But just

22   because I gave a card, the card said, essentially, "Welcome

23   To The Struggle."

24       That was a resolved issue.  That's the only time I've

25   ever been disciplined in 36 years of being a physician.  That

1067

1  is correct.

2          MR. BIEN:  No further questions, Your Honor.

3          THE COURT:  Redirect?

4          MS. D'AGOSTINO:  Yes, Your Honor.

5                    REDIRECT EXAMINATION

6  BY MS. D'AGOSTINO:

7  Q.      Dr. Carter, I have a few more questions.

8          Could you please describe the process of how a

9  condemned inmate arrives at the APP?

10 A.      They're identified at the referring facility.

11         MR. BIEN:  No foundation, Your Honor.

12         THE COURT:  He has no foundation as to how they

13 arrive, is that the objection?

14         MR. BIEN:  Yes.

15         THE COURT:  I assume you have, but are you familiar

16 with the method by which people arrive at the APP?

17         THE WITNESS:  Yes.

18         THE COURT:  You can answer the question.

19         THE WITNESS:  They're identified when the referring

20 facility is having need for psychiatric intervention.  They

21 are then usually referred to CTC or the Mental Health Crisis

22 Facility.

23         There they're evaluated, put on medications.  And if

24 they -- some of them are stabilized and returned to the

25 referring facility.  Others are --

1068

1    THE COURT:  No.  The question was quite narrow.  How

2  do they get there?

3    And the answer is somebody referred them?

4    THE WITNESS:  Yes.

5    THE COURT:  All right.

6  BY MS. D'AGOSTINO:

7  Q.    I think you testified they come from CTC or a Mental

8  Health Crisis Bed; is that correct?

9  A.    That's correct.

10 Q.    Do you think that the referrals of condemned patients

11 you have seen are appropriate for the level of care at APP?

12 A.    Yes.

13 Q.    Why then, in your view, are condemned inmates

14 arriving at the APP in a healthier state than non-condemned

15 inmates?

16 A.    They are a healthier population.  Their ability to

17 adapt to stress, their physical state, their length of

18 illness, the degree of illness, all the prognostic signs are

19 positive for them just as a population.

20    I guess an example would be if you're doing surgery

21 on a group of Olympic athletes, compared to doing surgery on

22 a group of people from a nursing home in excess of 90 years

23 old, that population will have a more rapid recovery.  They

24 can sustain the psychological stressors that are apparent.

25 They are just healthier people.

1069

1    Q.      Do you have a belief or understanding as to why that

2    population, the condemned inmates from San Quentin, are

3    healthier?

4    A.      Yes.

5    Q.      What is that?

6    A.      They are higher functioning.  In order for them to be

7    able to do some of the things that they do to other people,

8    they've got to be to move people, places and things.  They

9    are more manipulative.  They're smarter.  They're more

10   cunning.

11          These are the people who have perfected and honed

12   predatory behavior, versus somebody who has got what we call

13   diminished ego functioning.

14          Ego functioning is your ability to move people,

15   places and things.  So the ability of somebody who is

16   mentally retarded to ascend to the board room is diminished

17   versus somebody who has got a MBA from MIT.  They are

18   different individuals.

19          So the people who have the chronic, debilitating

20   mental illness are often, you know, like the chronic people

21   with high schizophrenia.  There is something called a

22   downward drift, where they will lose jobs, they can't

23   maintain interpersonal relationships, and so they fall out.

24   They often wind up homeless or are on some disability role.

25          And usually, when they commit crimes, the crimes are

1070

1  typically property crimes, where a homeless person with
2  chronic schizophrenia will break into someone's garage in
3  order to stay -- get out of the rain, or they may go to a
4  7-Eleven and steal food because their survival skills are
5  diminished.
6          They fall through a safety net, and they're often
7  pulled out and sent to chronic care facilities.  And so it
8  will be -- from my experience it would atypical for them to
9  be able to plan some of the heinous crimes, to execute it, to
10 cover the tracks, to even have a car to get someplace.
11 They're individuals who are much, much, much lower
12 functioning individuals and there are some people who are
13 high functioning individuals.
14         A high functioning individual is somebody who has a
15 greater likelihood of being CEO of Apple.  Somebody who has
16 got lower functioning abilities is somebody who is more than
17 likely going to fall to the lower levels of the social
18 economic scale.
19         MS. D'AGOSTINO:  Thank you.
20         I have no further questions for this witness.
21         MR. BIEN:  He's excused, Your Honor.
22         THE COURT:  May the witness be excused, ma'am?
23         MS. D'AGOSTINO:  Yes.
24         THE COURT:  You are free to go or stay, as you
25 choose, sir.

1071

1       MS. STONE-MANISTA:  Your Honor, my name is Krista

2   Stone-Manista for plaintiffs.  It is tough, one I know.

3       THE COURT:  You're not on here either.

4       MS. STONE-MANISTA:  Last name is Manista,

5   M-a-n-i-s-t-a.

6       Plaintiffs would like to call Jeanne Woodford.

7       THE CLERK:  Raise your right happened.

8               JEANNE WOODFORD,

9   was thereupon called as a witness herein by the Plaintiff,

10  and having been sworn to tell the truth, the whole truth and

11  nothing but the truth, was thereupon examined and testified

12  as follows:

13      THE CLERK:  Take a seat.  State your name and spell

14  your last name for the record.

15      THE WITNESS:  Jeanne Woodford.  Last name spelled

16  W-o-o-d-f-o-r-d.

17      MS. STONE-MANISTA:  Your Honor, Miss Woodford has

18  offered a declaration in this matter at Docket Number 4380

19  filed on March 14th, 2013.  This is in binder before you as

20  Plaintiff's Exhibit 1002.

21      I would like to move that into evidence at this

22  time.

23      THE COURT:  All the exhibits were received into

24  evidence yesterday when you weren't here.

25      MS. STONE-MANISTA:  Thank you, Your Honor.

1072

1    THE COURT:  My courtroom deputy says, yes, that's

2    true, but I don't have a key of which ones are which.  After

3    this case is -- after this hearing is over, counsel for both

4    sides are going to have to approach Ana so she can record

5    them.

6    You may proceed, ma'am.

7    MS. STONE-MANISTA:  Thank you, Your Honor.

8    Her real qualifications can be found in paragraph 2

9    through 13 of that declaration.

10   As Your Honor knows, she's has previously been

11   qualified as a custodial expert and offered testimony in this

12   case and before the three judge court.

13   THE COURT:  Do you move that she be so found in this

14   case?

15   MS. STONE-MANISTA:  Yes, Your Honor.

16   THE COURT:  Do the defendants desire to voir dire?

17   MR. SHARMA:  Not as to Miss Woodford's custodial

18   expertise, Your Honor.

19   THE COURT:  The court finds she's an expert and may

20   testify as to those matters within her expertise.

21   You may proceed.

22   MS. STONE-MANISTA:  Thank you.

23                    DIRECT EXAMINATION

24   BY MS. STONE-MANISTA:

25   Q.    Miss Woodford, has plaintiffs' counsel asked you to

1073

1  provide opinions concerning the mental health care provide to

2  condemned inmates?

3  A.      Yes, they have.  I've been asked to offer opinions

4  regarding the ability of San Quentin to provide mental health

5  care for condemned inmates.

6        I've also been asked to provide an opinion as to

7  whether there are procedures in place for identifying inmates

8  who are condemned who have mental health issues.

9        I've also been asked to provide an opinion regarding

10 whether San Quentin has sufficient staff and space to provide

11 mental health care.

12       In addition to that, I was also asked to offer my

13 opinion as to whether the blanket policy of not allowing

14 condemned inmates into the intermediate care programs is

15 appropriate, and whether the custodial restrictions on acute

16 care at CMF is appropriate for condemned inmates.

17 Q.      And on what basis did you form your opinions on those

18 matters?

19       THE COURT:  Years and years of experience.

20       You may proceed.

21 BY MS. STONE-MANISTA:

22 Q.      Miss Woodford, have you been provided with additional

23 documents to review since you completed your declaration in

24 March?

25 A.      Yes, I have.

1074

1  Q.      Specifically, did you review additional records for
2  certain inmates?
3  A.      Yes.  I received additional records for ten death row
4  inmates.
5  Q.      And since March have you reviewed any deposition
6  testimony that is relevant to your opinions today?
7  A.      I reviewed the deposition testimony of the warden of
8  San Quentin, along with some exhibits, and the testimony of
9  Miss Bachman from CMF, along with exhibits.
10 Q.      Miss Woodford, do you have specific work experience
11 involving condemned inmates?
12 A.      Yes.  I started at San Quentin in 1978, and I was
13 there for over 26 years.  I worked with death row inmates in
14 a variety of classifications that I held as a correctional
15 officer, as correctional counselor, and in management
16 positions at San Quentin, including captain, associate
17 warden, chief deputy warden and warden.
18 Q.      And when you later moved to CDCR headquarters, were
19 you involved in decisions concerning condemned inmates?
20 A.      I was involved in decisions concerning all inmates
21 within CDCR, but yes, there was specific questions concerning
22 condemned inmates.
23         In particular, while I was warden at San Quentin, I
24 had managed to get approval to build a new death row for
25 San Quentin inmates.  While I was in headquarters in my

1075

1    position as director and undersecretary, the project had gone

2    over budget.  So there was discussions about obtaining

3    funding.  We did receive approval for additional funding to

4    continue that project.

5    Q.    When was the new death row project first approved?

6          MR. SHARMA:  Objection, Your Honor.  Relevance.

7          THE COURT:  I'm darn if I understand why it is

8    relevant, but maybe it is.

9          Ma'am?

10          MS. STONE-MANISTA:  Your Honor, Miss Woodford will

11    testify in part as to the space available to provide mental

12    health treatment at death row, and in particular as to

13    whether the additional program, whether there is room.

14          THE COURT:  I understand.  The objection is

15    overruled.

16          You may proceed.

17          THE WITNESS:  So it was approved in either 2002 or

18    2003 somewhere in that time frame.

19    BY MS. STONE-MANISTA:

20    Q.    Why did you seek approval for this expansion?

21    A.    Well, I wasn't the first warden to try to seek

22    approval for a new death row.  It happened a couple of times

23    before and had not gone anywhere.

24          But I personally sought approval because as warden I

25    knew only too well how limited our space was for death row

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1076

1  inmates, and that it was a growing population.  And that the

2  complexities of death row were also increasing because that

3  population was aging.

4       Many of the inmates on death row had mobility

5  impairment.  We were unable to provide cells to meet these

6  needs.  There was a growing population of inmates with mental

7  illness.  And I knew that we had didn't have the staff or the

8  facilities to provide care for that population.

9       And then I also knew that we didn't have an adequate

10  number of exercise yards so that inmates could receive the

11  amount of exercise they should get.  So it was a combination

12  of all those things.

13  Q.    And how did the proposed expansion meet those needs?

14  A.    Well, when I was involved in the planning of the

15  mental health -- of new death row, we looked at all of those

16  issues, what we would need for treatment space.

17       We also considered that death row, again, is a very

18  complex part of San Quentin.  And we also looked at how

19  inmates behaved within death row.  And because of the

20  limitations at San Quentin, we're really only able to

21  classify them to into two classifications, Grade A, Grade B,

22  when in reality there are many inmates on death row whose

23  behavior, if they didn't have the death penalty, would allow

24  them to be Level II, as an example.

25       So in designing the new death row we had the thought

1077

1    in mind that it would be smaller units, and we would be able

2    to have inmates out of their cells, more involved in work

3    programs in some cases, things like that.

4    Q.    And to your knowledge was the proposed new death row

5    ever built?

6    A.    No, it was not built.  In fact, Governor Brown ended

7    the project because of budgetary reasons for the State of

8    California.

9    Q.    Miss Woodford, please turn to the tab marked 1086 in

10   the binder before you.

11         Do you recognize this chart?

12   A.    Yes, I do.

13   Q.    Can you tell me where from where this chart was

14   drawn?

15   A.    So the chart comes from the Legislative Analyst's

16   Office, and it's a chart that shows the growth of death row

17   from before 1980 through 2010.  The chart was published in

18   January of 2013.

19         MS. STONE-MANISTA:  Your Honor, this chart is

20   Plaintiffs' Exhibit 1086 in the binder before you.

21         Plaintiffs would like to move it into evidence at

22   this time.

23         THE COURT:  Hearing no objection, it is received.

24              (Whereupon, Plaintiff's Exhibit 1086 was received

25               into evidence.)

1078

1    THE COURT:  1086.  Why can't I find it?

2    Hang on.

3    There it is.  Okay.  Thank you.

4    BY MS. STONE-MANISTA:

5    Q.    What factors have contributed to the continued growth

6    in death row's population over time?

7    A.    Well, death row inmates continue to arrive at

8    San Quentin at the rate of between two and four a month

9    depending on the year.

10    And there's only been 13 executions in the state.

11    There hasn't been an execution since -- in over six years.

12    And very few death sentences are overturned.  And there's

13    very few deaths on death row.

14    Q.    To your knowledge are there any current plans for an

15    expansion of death row to meet the needs of the growing

16    population?

17    A.    To my knowledge there is no plans to build a new

18    death row, but from my inspection of San Quentin and talking

19    with the warden, we know that death row is about to outgrow

20    its current three housing units.

21    And so the warden told us that he submitted a

22    proposal to Sacramento, to headquarters, to expands death row

23    to another housing unit at San Quentin.

24    MR. SHARMA:  Objection, Your Honor.  Move to strike.

25    That testimony is hearsay.

1079

1    THE COURT:  It does appear to be hearsay, ma'am.

2    MS. STONE-MANISTA:  Your Honor, she's an expert

3  witness.  She can testify as to the --

4    THE COURT:  She can testify as to the reasons she

5  holds the opinion, and they may include hearsay so I suppose

6  in that sense the objection is not well-taken.

7    But you know, again, it is a question of how much

8  weight a particular piece of evidence will be given.

9    You may proceed, ma'am.

10  BY MS. STONE-MANISTA:

11  Q.    Miss Woodford, when was inspection of San Quentin to

12  which you just referred?

13  A.    It was in February of 2013.

14  Q.    To your knowledge are there any particular

15  difficulties faced by CDCR headquarters in planning for the

16  needs of the growing death row population?

17  A.    Well, there appears to be because when I had the

18  conversation with the warden at San Quentin, I mean, I could

19  hear the frustration in his voice.  I knew that only too

20  well.

21    You know, death row, while it is a big issue with

22  many complexities, it isn't one that headquarters really

23  gives a lot of attention to.

24    And, you know, there is some real problems that are

25  only growing at San Quentin.  And I've mentioned some of

1080

1    them, an aging population, inmates with disabilities on death

2    row, and not having the facilities to accommodate them,

3    growing mental health issues.

4         And so it really appears that headquarters hasn't --

5    isn't fully comprehending the problems that need to be solved

6    at San Quentin.

7    Q.     Miss Woodford, please turn to tab 1057 in the binder

8    before you.

9         Are you familiar with this report?

10   A.     Yes, I am.

11   Q.     Can you tell us what this report is?

12   A.     So this is what is called a COMPSTAT Report.  It's

13   data that is provided by each of the prisons.  As the

14   undersecretary, when I was the undersecretary of the

15   California Department of Corrections, I started this process.

16        So the intent of this report is to provide data and

17   information from each of the prisons so that headquarters

18   could understand what problems exist within these facilities.

19        And then there was to be a meeting.  The field staff

20   would come up to Sacramento when I was there, and there would

21   be discussions about what was working and what wasn't

22   working.

23        And the hope was that having field staff and

24   headquarters staff together, we could arrive at solutions to

25   the many problems that these wardens face out in the field.

1081

1    MS. STONE-MANISTA:  Your Honor, this report is

2    Plaintiffs' Exhibit 1057.  Plaintiffs would like to move it

3    into evidence at this time.

4    MR. SHARMA:  Objection, Your Honor.  We haven't had

5    the opportunity to -- withdrawn, Your Honor.  I apologize.

6    THE COURT:  Received.

7    (Whereupon, Plaintiffs' Exhibit 1057 was received

8    into evidence.)

9    BY MS. STONE-MANISTA:

10   Q.    Miss Woodford, is this report one basis for your

11   opinion that the information available to headquarters about

12   death row is insufficient?

13   A.    Yes, it is.  When you look at the information from

14   San Quentin, it doesn't even include the category of

15   condemned or death row.

16   And when I was at San Quentin, I asked the warden

17   about that.  And he said that it was a headquarters'

18   document, and he didn't have an explanation for why death row

19   information wasn't included in this COMPSTAT Report.

20   Then further, when I asked questions of both him and

21   the chief deputy whether the numbers included the inmates on

22   death row, they weren't able to answer that question.  And I

23   think the warden also spoke of that in his deposition.

24   Q.    And to your knowledge, are the meetings to which you

25   referred, at which this data would be discussed, do those

1082

1    still take place in Sacramento?

2    A.      It is my understanding they don't.  This really has

3    become very much a paper review.  You know, I took from what

4    the warden had to say that there was very little being done

5    with the COMPSTAT Report at this point in time.

6    Q.      I would like to turn and talk about the existing

7    housing units for death row inmates at San Quentin.

8            If you will turn to the tab labeled 1099 in the

9    binder before you.

10           It is 1099.

11           Do you recognize this photograph?

12   A.      Yes, I do.

13           MS. STONE-MANISTA:  Your Honor, this photograph is

14   previously entered into evidence as Plaintiffs' Exhibit 1099.

15   It is in the binder before you today.

16           The version in the binder before you today is

17   slightly corrected only to add the information in the

18   bottom-left coroner, specifically that the photograph was

19   taken in June 2012 and that the copyright belongs to Nancy

20   Mullane.  So 1099 is in evidence, Your Honor.  This is a

21   corrected version only.

22   BY MS. STONE-MANISTA:

23   Q.      Miss Woodford, what is depicted in this photograph?

24   A.      So this is a photograph of East Block death row on

25   the bay side.

1083

1    Q.    And to your knowledge, how many condemned inmates

2    live in this housing unit?

3    A.    So around 500 inmates -- condemned inmates live in

4    the East Block.

5    Q.    How do you arrive at that number?

6    A.    Well, there's -- as I recall, there is a little over

7    500 cells in the East Block.  And the condemned inmates are

8    all single celled so that's how many inmates are housed in

9    this unit.

10   Q.    And how many tiers of housing are there on East

11   Block?

12   A.    So this is a very old housing unit, built in, I

13   believe, in the 1920s.  So it is that five tier unit design,

14   a design that isn't used any more anywhere in the country

15   that I'm aware of.  But it is five tiers.

16   Q.    So there are roughly 500 inmates in roughly 500 cells

17   in this one building?

18   A.    That is correct.

19   Q.    Do you have an opinion about how well this unit

20   functions as a housing unit for death row?

21         MR. SHARMA:  Objection, again, as to relevance.  This

22   case concerns specifically inmates suffering from mental

23   illness.  This is turning into generally about the condemned

24   population.

25         THE COURT:  I assume you'll get to the issue in this

1084

1  case in due course and this is preliminary.  On that basis I

2  will permit it to proceed, but at some point you got to get

3  to the case, ma'am.

4          MS. STONE-MANISTA:  Yes, Your Honor.

5          THE WITNESS:  So it is a very difficult unit to

6  operate.  It's very chaotic.  You're trying to run many

7  programs in there.  You have Condemned Grade A housed who are

8  not a part of the mental health program.  You have Condemned

9  Grade B inmates housed in this unit.  You have inmates who

10 are part of the mental health program, many EOPs, many CCCMS.

11         You also have inmates with mobility impairment and

12 other disabilities housed within this facility so it is

13 really big, really noisy and quite chaotic.

14 BY MS. STONE-MANISTA:

15 Q.     So you mentioned that inmates who are in the Mental

16 Health Services Delivery System live in this unit; is that

17 correct?

18 A.     That's correct.

19 Q.     Do they live in any particular area of this unit?

20 A.     So the effort, as we were told during my inspection

21 of San Quentin by staff, is to keep as many of EOP as

22 possible on the first tier of the yard side of East Block.

23 But they do overflow into the other tiers.

24         And then it wasn't clear to me how they're housing

25 CCCMS.  It appears that they're housed all over the unit.

1085

1    Q.      So specifically, in your experience, does East Block

2    work well as a housing space for condemned EOP inmates?

3            MR. SHARMA:  Objection, Your Honor.  This witness has

4    not been qualified as an expert on mental health treatment.

5            THE COURT:  The objection is overruled.

6            You may answer, ma'am.

7            THE WITNESS:  No.  In fact, when I was the warden,

8    the Department of Corrections made the decision that they

9    were going to utilize East Block as an EOP Hub for the

10   Department because at that point in time the East Block not

11   only housed condemned inmates, it also housed Ad. Seg.

12   non-condemned inmates.

13           And I was so concerned about the decision of

14   headquarters, that I appealed the decision.  And headquarters

15   sent down some staff to look at the issues that I raised

16   about this building, because I was able to give them examples

17   of inmates who had been placed in Crisis Care or the Acute

18   Care Program at Vacaville only to return to this unit and

19   decompensate so quickly.

20           So as a result of my appeal, the Department decided

21   not to make it an EOP Hub for the Department, but that it

22   would continue to house inmates from the Reception Center who

23   are EOP and needed Ad. Seg. care as well as condemned EOP

24   inmates.

25           MR. SHARMA:  Your Honor, defendants object.  I would

1086

1  move to strike that testimony on the basis of relevance.

2      Miss Woodford is testifying about her experience

3  several years ago.  I don't -- defendants don't see the

4  relevance to the case it is today.

5      THE COURT:  Denied.  You may proceed, ma'am.

6  BY MS. STONE-MANISTA:

7  Q.    Miss Woodford, in your experience, are there

8  particular risks of housing mentally ill condemned inmates on

9  the fourth and fifth tiers of this building?

10 A.    Well, on the fourth and fifth tier it gets to be very

11 hot.  So yes, for inmates who are on heat meds or other

12 medications sensitive to heat it is a problem.

13      In addition to that, when you have an emergency on

14 the fourth and fifth tier of a housing unit like this, where

15 you have to carry inmates downstairs, it's very difficult so

16 responding to emergencies becomes a problem.

17 Q.    Miss Woodford, do mentally ill inmates who live on

18 East Block have access to yard space?

19 A.    Yes, they do.

20 Q.    Where do they access yard space?

21 A.    Well, if they're assigned to one of the group

22 yards -- there are six group yards on the bay side of East

23 Block.  They would go to yard in one of those group yards.

24      If they're assigned to walk alone yard, they would

25 attend yard on the yard side of the East Block.

1087

1   They have, on what's called the upper yard at

2   San Quentin, several single exercise cages.  And mentally ill

3   inmates would go to yard in those cages.  And those cages are

4   located under a tin roof so there is very little sunlight

5   that they're exposed to.

6   Q.     Are the group yards used by multiple condemned

7   inmates at any given time?

8   A.     Yes, they are.  You know, during our visit we saw 30

9   to 40 inmates on each of the group yards.

10  Q.     Miss Woodford, please turn to the tab labeled 1106 in

11  the binder before you.

12         Do you recognize this photograph?

13  A.     Yes.  It's one of the group yards on the bay side of

14  East Block at San Quentin State Prison.  It's the group yards

15  that are utilized by Grade A condemned inmates.

16  Q.     Do you know when this photograph was taken?

17  A.     This photograph was taken the day of our inspection.

18  When we were there, there were inmates out in the yard, but

19  this was taken after the inmates were returned to their cell.

20  So when we were there, they were pretty crowded yards, as

21  they were when I was the warden at San Quentin.

22         THE COURT:  I'm sorry, ma'am.  As far as I know,

23  that's not in evidence.  Do you want to move it?

24         MS. STONE-MANISTA:  1106.

25         THE COURT:  1106.  Am I wrong, Madam Clerk?

1088

1    THE CLERK:  Give me one second.

2    MS. STONE-MANISTA:  I don't believe it is in

3  evidence.

4    THE CLERK:  It is not.

5    THE COURT:  Do you move it.

6    MS. STONE-MANISTA:  Yes, sir.

7    THE COURT:  Court will receive it retroactive to the

8  initiation of questioning.

9    (Whereupon, Plaintiffs' Exhibit 1106 was received

10    into evidence.)

11    MS. STONE-MANISTA:  Thank you.

12  BY MS. STONE-MANISTA:

13  Q.    Based on what you saw in February, did there appear

14  to be adequate numbers of these group yards for the current

15  population of East Block?

16  A.    No, there did not appear to be adequate numbers of

17  yards for death row inmates.

18  Q.    You mentioned a few minutes ago that these are yards

19  used by Grade A inmates.

20    What does it mean to be a Grade A condemned inmate?

21  A.    So Grade A condemned inmates are inmates who are able

22  to conform with the rules and are given as many privileges as

23  general population inmates as possible.

24    Those privileges are things like canteen draw,

25  telephone calls.  And when I was the warden, Grade A

1089

1    condemned inmates were allowed to go to yard seven days a

2    week, for up to six hours.  But because of overcrowding in

3    this unit they now are only allowed to go to yard every other

4    day, and it is for four hours.  So these yards continue to be

5    overcrowded.

6    Q.    Do Grade A inmates live in segregated housing units?

7    A.    All death row inmates are in segregated housing

8    units.  Just when you look at how it is managed, it's clearly

9    they're in segregation.  They're in their cell unless they're

10   in restraints and escorted to the exercise yard or escorted

11   to medical appointments or visiting, things like that.

12   Otherwise, they're confined to their cell.

13        They're isolated from the general population or

14   segregated from the general population.  So all death row is

15   considered administrative segregation.

16   Q.    If a condemned inmate is not Grade A, what other

17   grades of classification exist?

18   A.    If they're not Grade A, they're Grade B.  And Grade B

19   death row inmates are inmates who are treated like SHU

20   inmates.  So they have limited privileges, limited access to

21   telephones.  They're in entitled to ten hours of yard a week.

22   And so their privileges are much more restricted.

23   Q.    Are there particular documents that you rely upon to

24   monitor inmates in segregation units?

25   A.    Yes.  There's many documents that you rely upon, and

1090

1  one of the most important ones is the 114-A.

2  Q.      What is the 114-A?

3  A.      So the 114-A is a document that is completed for

4  every inmate in segregation.  And it's the document that is

5  utilized to keep track of how they're doing.  So it documents

6  whether they been offered exercise yard, whether they've

7  accepted or refused it.  It documents whether they've been

8  offered showers, whether they accept or refuse it.  It

9  documents their meals.  It documents any unusual behavior.

10        So it provides really valuable information to know

11  whether, one, custody is offering the services that they're

12  supposed to offer, and two, whether the inmate is

13  participating in those services that you would think every

14  inmate would participate in.

15        And the 114-A is such an important document that it's

16  reviewed during every classification hearing.

17  Q.      And did you review 114-As in February?

18  A.      Yes, I did.  I reviewed numerous 114-As during my

19  inspection at San Quentin.

20  Q.      And what generally did you find when you reviewed

21  114-As in February?

22        THE COURT:  You're fading out, ma'am.

23  BY MS. STONE-MANISTA:

24  Q.      What generally did you find when you reviewed 114-As

25  in February?

1091

1    A.       So what I found was that many of the inmates weren't

2    being offered yard at all.  And I found unusual -- when they

3    were offered yard, an unusual number of inmates, in my

4    opinion, were refusing yard.

5            And there were inmates that were refusing showers and

6    refusing other services that were being offered to them.

7    Q.       We've discussed East Block at San Quentin.  Are there

8    other housing units where condemned inmates are housed?

9    A.       Yes.  There are two other housing units, and there

10   are also inmates housed in the hospital.  But there are two

11   other housing units, that's North Seg -- North Segregation

12   and the Adjustment Center.

13   Q.       And approximately how many inmates are in those

14   housing units?

15   A.       So North Seg houses 68 Grade A condemned inmates.

16   And the Adjustment Center can house up to 102 Grade B

17   condemned inmates.  But the Adjustment Center also houses

18   non-condemned administrative segregation inmates.

19           THE COURT:  Ma'am, I am the very soul of patience.

20   This is a question about medical -- about adequate care for

21   mentally ill patients.  So far I haven't heard word one about

22   it.

23           Pretty soon I'm going to tell you to sit down.  Why

24   don't you get to the issue.

25           MS. STONE-MANISTA:  Yes, Your Honor.

1092

1   THE COURT:  Issues.

2   BY MS. STONE-MANISTA:

3   Q.    Miss Woodford, let's turn to Plaintiffs' Exhibit 1060

4   in the tab before you.

5   A.    Yes.

6   Q.    Are you familiar with this report?

7   A.    Yes.  I've reviewed this report.  It's a report of

8   clinical rounds in Ad. Seg. at San Quentin.

9   Q.    And you testified that all condemned units are in

10  administrative segregation units?

11  A.    That is correct.

12        MS. STONE-MANISTA:  Your Honor, this report is

13  Plaintiffs' Exhibit 1060 in the binder before you, and

14  plaintiffs would like to move it into evidence at this time.

15        THE COURT:  I'm sorry.  10?

16        MS. STONE-MANISTA:  1060.  Yes, Your Honor.

17        THE COURT:  Give me a moment.  I don't know why I'm

18  having so much trouble.

19        1060 is received.

20            (Whereupon, Plaintiffs' Exhibit 1060 received

21             into evidence.)

22  BY MS. STONE-MANISTA:

23  Q.    Miss Woodford, what did you find when you reviewed

24  this report?

25  A.    What I found was that mental health staff are doing

1093

1    clinical rounds in the administrative segregation units at

2    San Quentin to include the Adjustment Center, Carson section,

3    and donor section.  And it reflects that they're doing

4    custody -- I'm sorry -- doing rounding in the East Block, but

5    it also reflects that in North Seg that they're not doing

6    rounding on a daily basis, that they're doing rounding only

7    twice a month.

8         And from my inspection at San Quentin, in talking to

9    staff, even though this document reflects that they're doing

10   rounding in the East Block on a daily basis, there is some

11   question whether they're actually doing rounding for Grade A

12   condemned inmates who are not participants in the mental

13   health program.

14   Q.    And what is your understanding of the Program Guide's

15   requirements for inmates who live in segregation units?

16   A.    That there's supposed to be mental health rounding on

17   a daily basis.

18   Q.    Miss Woodford, as a custody officer was it part of

19   your job duties to refer inmates who appear to be in need of

20   mental health services for referral?

21   A.    Yes, it was.

22   Q.    And how would you make such referrals?

23   A.    Well, it would depend on the circumstances.  But if I

24   saw an inmate in classification who appeared to be in need of

25   mental health treatment, he may be hearing voices or may have

1094

1  expressed suicide ideations, we might have the inmate

2  escorted over to mental health.  Or we would call the Mental

3  Health Department and ask someone to come see that inmate.

4  Q.      On what factors would you base your determination of

5  the need for such a referral?

6  A.      Well, conversations with the inmate.  But also in

7  reviewing the 114-A, if we saw evidence on the 114-A that the

8  inmate wasn't participating in offered services, if they

9  weren't going to yard, as an example, or if they weren't

10  accepting showers, or -- you would look at the 114-A, then

11  look at their appearance as well, and then you would know you

12  would need to refer that inmate for a mental health

13  evaluation.

14  Q.      And the 114-A should be maintained on every inmate in

15  a segregated housing unit; is that correct?

16  A.      It's a requirement of the Department of Corrections

17  that 1 114-A be maintained on every inmate in a segregated

18  housing unit.

19  Q.      If you'll please turn to the tab labeled 1007 in the

20  binder before you.

21  A.      Yes.

22  Q.      Are those 114-A logs you mentioned?

23  A.      Yes.  It is my understanding this is a redacted

24  version of one 114-A that I reviewed.

25          MS. STONE-MANISTA:  Your Honor, the unredacted

1095

1    version of these 114-A logs are already on file as an exhibit

2    to a confidential declaration at Docket Number 4411.

3            Plaintiffs would like to move these redacted copies

4    into evidence as Plaintiffs' Exhibit 1007.

5            THE COURT:  Received.

6                (Whereupon, Plaintiffs' Exhibit 1007 received

7                    into evidence.)

8    BY MS. STONE-MANISTA:

9    Q.    Miss Woodford, generally what did you see when you

10   reviewed these 114-As in February?

11   A.    Well, this -- the 114-As on this particular inmate

12   begin in October of 2012 and proceed through 2013.  And what

13   I saw is an inmate who was never being offered yard.  So we

14   don't know whether the inmate was refusing yard.

15           I also saw that the inmate was routinely refusing

16   showers.  In fact, during the time period that this 114-A

17   covers, he only accepted showers, I believe, on five

18   occasions.

19           And then in 2013 he actually started -- or actually

20   in December of 2012 he actually started refusing meals.  And

21   it just appeared this inmate was really decompensating.

22   Q.    Miss Woodford, is this an inmate whom you would have

23   referred for a mental health evaluation had you encountered

24   him?

25           THE COURT:  I have no idea what you are saying,

1096

1    ma'am.

2    BY MS. STONE-MANISTA:

3    Q.    Miss Woodford, is this an inmate whom you would have

4    referred for a mental health evaluation had you encountered

5    him at San Quentin?

6    A.    Absolutely.

7    Q.    Does it appear to you that he was referred as quickly

8    as you would have referred him?

9    A.    No.  In fact, he went all of October, all of

10   November, and all of December.  It wasn't until January that

11   he was seen by -- it says:  Seen by psych and cleared on

12   January 7th, 2013.

13   Q.    Thank you.

14         Miss Woodford, to your knowledge can condemned

15   inmates be hospitalized in acute inpatient psychiatric

16   programs at the Department of State Hospitals?

17   A.    Yes, they can.

18   Q.    Are you aware of any restrictions upon the

19   programming for condemned inmates in acute psychiatric

20   programs?

21   A.    Yes.  I reviewed the deposition of Miss Bachman,

22   along with exhibits, and as a part of that there was an

23   exhibit of the policy for that program.

24         MS. STONE-MANISTA:  Your Honor, the policy to which

25   Miss Woodford refers was admitted into evidence last week

1097

1   during the testimony of Dr. Stewart.

2           It's Plaintiffs' Exhibit 1140.  It's in the binder

3   before you today as well.

4   BY MS. STONE-MANISTA:

5   Q.      Miss Woodford, do you understand there are custodial

6   restrictions placed on condemned inmate-patients in the acute

7   program?

8   A.      At CMF, yes.  This policy is very detailed in the

9   restrictions that are in place for death row inmates when in

10  the Acute Care Program at CMF.

11  Q.      If you'll read for us under Roman Numeral II, Item A,

12  Number 3, if you'll read that provision of the policy for us,

13  please.

14  A.      (Reading:)

15          The patient shall not come into direct contact with

16          any other patient.  He shall be separated from other

17          patients by locked door or grill gate at all times.

18          (Reading concluded.)

19  Q.      Is it the policy at San Quentin, to your knowledge,

20  that condemned inmates may not come in direct contact with

21  any other condemned inmates?

22  A.      Absolutely not.  I talked about it earlier.  They're

23  on yards together.  And they're in contact with each other in

24  the visiting room and other places all the time.

25          And they're also escorted through general population

1098

1    inmates, the Reception Center inmates, when taken to other

2    areas of the prison such as visiting a health facility.

3    Q.       When condemned inmates are out on the yard together,

4    how are they supervised?

5    A.       Well, it depends on the unit.  There's two units --

6    there's three units when out on the yard.

7             In East Block there's a yard gun person that oversees

8    the death row inmates.  That's true in the Adjustment Center

9    as well.

10            And in North Segregation, it is actually true there.

11   There is a gun person up on the exercise yard that watches

12   the death row inmates.

13            But it's also important to note that in North

14   Segregation death row inmates are out on the tier together in

15   large numbers.  They're able to take themselves to the

16   telephone and to showers and whatever else they need to do

17   without escort.  And they're observed by gun men.

18   Q.       Given that experience, what is your opinion of this

19   policy that condemned inmates may not come into direct

20   contact with other inmate-patients?

21   A.       I think it is an unnecessary policy.

22   Q.       Why do you think that it is unnecessary?

23   A.       I think that there is a classification system, and

24   you base decisions about inmates based on their behavior.

25   That's what we do with death row inmates at San Quentin.

1099

1    Certainly that practice should be applied to the Acute Care

2    Program at CMF.

3          Many of these death row inmates behave, as I

4    mentioned earlier, like Level I inmates or Level II.  Some of

5    them have never had a discipline in their entire history.

6    Others have had minimal disciplinary histories.

7          And then there are others that have more serious

8    disciplinary histories.  Your response to that is to have

9    your proper custody staff necessary to provide them the

10   treatment they need.

11   Q.    If you'll read for us also under Roman Numeral II,

12   Item A, line 4 of this policy -- or Item 4?

13   A.    (Reading:)

14         When a condemned patient is out of his cell or his

15         cell door is open, the other patients must be locked

16         in their cells or separated from the condemned

17         patient by a locked grill gate or door.

18         (Reading concluded.)

19   Q.    In your opinion is this restriction necessary?

20   A.    No.  It's not necessary.

21   Q.    Is this restriction in place at San Quentin?

22   A.    No, it is not.  Again, death row inmates are escorted

23   throughout the facility, and there are general population

24   inmates and even Reception Center inmates at times in the

25   same area where death row inmates are being escorted.

1100

1     Q.      And if we can look on this policy under Roman Numeral

2     II, Letter B, Item 1, will you read just the two sentences of

3     that for us?

4     A.      Item B, Number 1?

5     Q.      Yes.

6     A.      (Reading:)

7             All treatment provided for a condemned patient will

8             be on a individual basis.  He shall not be allowed to

9             participate in group therapies or activities.

10            However, individual treatment shall be encouraged and

11            provided under direct supervision.

12            (Reading concluded.)

13    Q.      What is your opinion of this restriction on

14    programming?

15    A.      I think it is overly restrictive.  I think that, you

16    know, as we do at San Quentin, death row inmates are in

17    groups together.  And that certainly could be accommodated in

18    the Acute Care Program.

19    Q.      Do you find in general that there is any custodial

20    justification for the restrictions set forth in this policy?

21    A.      From my point of view there is no justification for

22    it.  This is a small treatment program.  And this program

23    includes very high risk inmates from Pelican Bay and other

24    places, inmates serving life without possibility of parole,

25    inmates who have far more extensive disciplinary histories

1101

1   than some of the death row inmates sent there now.  And

2   decisions about their programming should be based on their

3   behavior.

4   Q.      Do you have an opinion about the effects of these

5   unnecessary restrictions on acute care for the condemned?

6           MR. SHARMA:  Objection, Your Honor.  Again, this

7   witness is being asked to offer medical opinion.

8           THE COURT:  I didn't think that she was being asked

9   for medical opinion.  She was asking what kind of

10  consequences flow from it.  She certainly is qualified to

11  testify as to that.

12          You may answer, ma'am.

13          THE WITNESS:  I think it discourages inmates'

14  participation in these programs or wanting to go to these

15  programs for help.

16          I mean, I had an inmate who was on death row that was

17  sent to CMF for a medical reason.  He was terminally ill.

18  When he came back from his first round of treatment, he asked

19  to see me.  When I went to see him he said  that I don't want

20  to go back.  And I said, well, why not?  And he said that

21  when they escort me through CMF, they lockdown all the other

22  inmates and they yell dead man walking.

23          And, you know, I had to call CMF and say that you

24  really need to train your staff.  Death row inmates behave

25  like other inmates.  And those -- first off, yelling dead man

1102

1    walking is very inappropriate and the warden agreed.

2           But the kind of restrictions they had in place

3    discourages inmates from wanting to be sent to those

4    facilities.

5    BY MS. STONE-MANISTA:

6    Q.      In your experience from working with condemned

7    inmates and other high custody inmates, can you give an

8    opinion as to whether condemned inmates present different

9    custodial risks than other high security inmates?

10   A.      Again, I think death row inmates' behavior is very

11   similar to other inmates.  Some are very conforming.  Their

12   sentence doesn't determine how they will behave in prison, as

13   it doesn't with other inmates.

14          You have LWOP inmates who can be in general

15   population, then you have a small number who can't.  The same

16   is true with death row inmates.

17   Q.      Are condemned inmates as a group, in your opinion, at

18   any particular risk for the victimization by other inmates?

19          THE COURT:  For what?

20          MS. STONE-MANISTA:  Victimization.

21          MR. SHARMA:  Objection, Your Honor.  This is an

22   expert witness asked to an opinion that was outside the scope

23   of her declaration.  We've not received any supplemental

24   report concerning these opinions.

25          THE COURT:  I don't know what I'm going to do about

1103

1    this.  I just heard that about you -- your side.  Now it is

2    about this side.  I don't know what I did last time.

3            MS. STONE-MANISTA:  Your Honor, I'll withdraw the

4    question.

5            THE COURT:  Good.

6            MS. STONE-MANISTA:  Thank you.

7            THE COURT:  It relieves me of the need to make an

8    order.

9            You may proceed.

10   BY MS. STONE-MANISTA:

11   Q.      Miss Woodford, to your knowledge do condemned inmates

12   ever have their sentences overturned?

13           MR. SHARMA:  Objection, Your Honor.  Relevance.

14           THE COURT:  Overruled.  But, you know what, I mean, I

15   know you don't mean it, but some of your questions are

16   exceedingly insulting to me.  But that's all right.  It's

17   there.  You may answer.

18           Yes, some of them occasionally are?

19           THE WITNESS:  Yes.  Nearly 100 inmates have had their

20   sentence overturned.  I don't remember the exact number as we

21   sit here today, but it is close to 100.

22   BY MS. STONE-MANISTA:

23   Q.      What happens when that occurs?

24   A.      Depends on what sentence they get.  Most of them

25   receive life without possibility of parole.  And over 80

1104

1    percent of those inmates were sent to general population

2    Level IV prisons in the state.

3    Q.     Miss Woodford, to your knowledge can condemned

4    inmates be hospitalized in Intermediate Inpatient Psychiatric

5    Care Programs in the Department of State Hospitals?

6    A.     Currently there's a blanket policy saying that they

7    can't be.  But is your question could they be?

8    Q.     Can they at the present time?

9    A.     No, they cannot be at the present time.

10   Q.     In your opinion is there any custodial justification

11   for that bar?

12   A.     Not in my opinion, there is not.  I think that we

13   have to provide inmates with the treatment they need, and

14   then it is up to custody to decide what custody provisions

15   need to be in place.

16   Q.     You reviewed the central files of ten inmates in

17   February, correct?

18   A.     That is correct.

19   Q.     What was the purpose of that review?

20   A.     The ten files I reviewed were death row inmates who

21   had been identified as potential patients in the Specialized

22   Care Program at San Quentin.

23   Q.     What did you find when you reviewed those central

24   files?

25   A.     So I reviewed the files to determine what their

1105

1  disciplinary history was and to look at the classification

2  chronos to determine how these inmates behaved while on death

3  row at San Quentin.

4  Q.      And did you arrive at any opinions concerning whether

5  those inmates could safely participate in intermediate

6  inpatient care?

7  A.      Yes, I did.  I concluded that any one of those ten

8  inmates could safely participate in the Intermediate Care

9  Program.  Most of the inmates hadn't had serious

10  disciplinaries.  And the few that did, hadn't had serious

11  disciplinaries in many years.

12        There was one inmate who had recent disciplinaries,

13  but it seemed very much tied to his mental illness.

14  Q.      What, in your view, is the importance of an inmate's

15  disciplinary history?

16  A.      If an inmate's misbehaving within a prison setting,

17  they are giving a CDC-115, a disciplinary.  And when not

18  receiving 115s, that means that they're complying with the

19  rules, they are behaving, they're interacting, they're not

20  causing a problem with staff, they're doing what they're

21  supposed to do within the prison setting.

22        By the way, there was one inmate that never had a 115

23  in his entire time at San Quentin.

24  Q.      In your opinion is the overall security at DSH

25  intermediate facilities sufficient to allow condemned inmates

1106

1    to safely be hospitalized there?

2         MR. SHARMA:  Objection, Your Honor.  Lacks

3    foundation.

4         THE COURT:  That appears to be correct.  There is no

5    indication that the witness has familiarity with DSH's

6    security program, but you may inquire.

7    BY MS. STONE-MANISTA:

8    Q.    Miss Woodford, are you familiar with the security for

9    the DSH intermediate inpatient facilities?

10   A.    Yes.  I had been -- I have toured CMF and Salinas

11   Valley State Prison during my time at the Department of

12   Corrections as the director and as the undersecretary.

13   Q.    On the basis of your experiences at CMF and SVSP, in

14   your opinion is the overall security adequate to allow

15   condemned inmates to safely be hospitalized there?

16   A.    Yes, it is.  I mean, both at Salinas Valley and CMF

17   the facilities have undergone renovation.  Salinas Valley is

18   a much newer facility, and in many ways the security at both

19   of those facilities is far greater than anything that exists

20   as San Quentin, including the fact both of the facilities

21   have an electric fence, as an example.

22        MR. SHARMA:  Your Honor, defendants would renew their

23   objection and move to strike.  The witness testified her

24   experience is based on when she toured those facilities at

25   the time she was director, which I believe was in 2006.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1107

1  There's no basis for an a assertion about the current state

2  of these.

3       THE COURT:  I'll bet if there is any change, you'll

4  put somebody on to let me know.

5       You may proceed.

6       MR. SHARMA:  Thank you, Your Honor.

7       THE WITNESS:  The other thing, if I could, Your

8  Honor, is add that I know those facilities already accept

9  Level IV from Pelican Bay, and they accept high security

10  inmates from all over the department.  And the security risk

11  of death row aren't greater than those inmates.

12  BY MS. STONE-MANISTA:

13  Q.    Miss Woodford, are you aware of specific locations

14  within those facilities where an intermediate care program

15  for condemned could be operated?

16  A.    Well, I know that both wardens, the warden at Salinas

17  Valley State Prison, and the warden at CMF both identified

18  spaces within their facilities where an intermediate care

19  program could be located.

20       They both identified units that could house 16 death

21  row inmates in an intermediate care program.

22  Q.    Did the wardens express any concern about use of

23  those units for that purpose?

24       MR. SHARMA:  Objection.  Vague and ambiguous as to

25  time.  Defendants would also renew their objection that these

1108

1  matters are outside the scope of Miss Woodford's report.  And

2  defendants are happy to address any concerns the court may

3  have regarding our prior witnesses as opposed to this

4  witness.

5          THE COURT:  Thank you, sir.

6          There are two separate issues.  There is the issue

7  of -- I don't know, did you take the deposition of

8  Miss Woodford?

9          MR. SHARMA:  We took the deposition of Miss Woodford

10  back in March, I belive, Your Honor, during time of the

11  termination proceedings.

12          THE COURT:  Okay.  And you had no indication at that

13  time these were subjects that the witness would be questioned

14  about today?

15          MR. SHARMA:  Your Honor, again, I would just submit

16  that the scope of what the witness is testifying about today

17  is beyond the scope of the declaration that was used.

18          THE COURT:  I'm the very focus of patience, now

19  answer my question.

20          My question was, did you have no indication at the

21  time of the taking of the deposition that these questions

22  would be asked of the witness?

23          MR. SHARMA:  No, Your Honor.

24          THE COURT:  Ma'am?

25  ///

1109

1  BY MS. STONE-MANISTA:

2  Q.     Miss Woodford, in your opinion as a custodial expert,

3  could condemned inmates --

4         THE COURT:  I think you misunderstood.  It appears

5  that the defendants were put at a disadvantage in not knowing

6  these would be topics this witness would be inquired and

7  asked about, and therefore they didn't take a deposition.

8  Not that anybody would be surprised by what she's saying, but

9  that's another matter.

10        MS. STONE-MANISTA:  Your Honor, as an initial matter,

11 at no point since March have defendants asked to take an

12 additional deposition of Miss Woodford.

13        THE COURT:  That's because they had no idea that

14 there was a topic -- there were topics that were going to be

15 gone into that they had not reviewed at the time of the

16 initial deposition.

17        Folks, it gets later, and I begin to lose patience.

18 I apologize.

19        The objection is sustained.  You may go on to another

20 topic.

21        MS. STONE-MANISTA:  Yes, Your Honor.

22 BY MS. STONE-MANISTA:

23 Q.     Miss Woodford, should CDCR choose to operate an ICF

24 Program at San Quentin, as opposed to sending inmates

25 elsewhere, is that feasible in your view?

1110

1    A.        In my view, it is not.  San Quentin has very limited

2    space, and it has many missions.  And in order to operate a

3    program -- an ICF Program, you would have to utilize space

4    that's already being utilized for some other program.

5             It was clear while I was there it is very

6    overcrowded.  There isn't enough yards to get inmates to

7    exercise and to treatment.  So with the condemned population

8    continuing to grow, I just don't think it is possible.

9             THE COURT:  Let me ask you a question that probably

10   was not the subject of the deposition, but I want to know.

11            Obviously the three judge court, within a relatively

12   short period of time, is going to be forced to deal with the

13   whole problem of overcrowding again.

14            You have no way -- I understand that you really have

15   no way of knowing whether that will reach the folks in

16   San Quentin or not so you don't have any way of knowing

17   whether that would make any difference, I take it; is that

18   fair.

19            THE WITNESS:  Well, I mean I know that San Quentin

20   today has a thousand more inmates than when I was there

21   because they had to move inmates out of the Central Valley.

22   So overcrowding there has increased.  There wasn't, as far as

23   I know, a specific order of a population cap at San Quentin.

24            And no one ever addressed death row as the subject

25   matter, looking at whether we're able to provide the

1111

1    appropriate conditions of confinement that are necessary to

2    manage that population.

3        Because when inmates aren't going to yard, they

4    aren't getting the services they need, they act out and

5    decompensate.  And you end up with cell extractions.  You end

6    up with problems with inmates and staff.

7        And it is just not an issue that appears to be being

8    addressed at this point in time.

9        THE COURT:  And I suppose the answer is, who knows

10   what the future holds, right now the situation is such that

11   you couldn't put an intermediate care program anywhere

12   San Quentin in any event?

13       THE WITNESS:  Not without building a new building or

14   major renovation.  It concerns -- I was so concerned about

15   the growing population at death row and our inability to

16   safely house those inmates.  I was considered about my staff.

17   I was concerned about the inmates.  That's why I fought so

18   hard to get a new death row, you know.  And now that's not on

19   the drawing board any more.

20       THE COURT:  Ma'am.

21   BY MS. STONE-MANISTA:

22   Q.    Miss Woodford, please turn to tab 1011 in the binder

23   before you.

24   A.    Yes.

25   Q.    Do you recognize this document?

1   A.      Yes, I do.  It's the -- do you want me to say what it

2   is?

3   Q.      Yes, please.

4   A.      So it's the San Quentin State Prison Healthcare

5   Evaluation that was completed on March 18th, 2013, by the

6   court experts.

7            MS. STONE-MANISTA:  Your Honor, this report filed in

8   March in the Plata court is Plaintiffs' Exhibit 1011.

9   Plaintiffs would like to move it into evidence at this time.

10           THE COURT:  Hearing no objection, it is received.

11               (Whereupon, Plaintiffs' Exhibit 1011 received

12                into evidence.)

13  BY MS. STONE-MANISTA:

14  Q.      Miss Woodford, please turn to page 31 of this report.

15  A.      Yes.

16  Q.      Let's look at the one, two, three -- fourth paragraph

17  down.  Will you read that paragraph for us, please?

18  A.      (Reading:)

19          The 34 OHU beds are almost always at capacity.  Staff

20          reported that a decision has been made to redirect

21          ten OHU medical beds to mental health.  This will

22          require blocking oxygen and suction at the wall and

23          remodeling the rooms to be suicide preventive.  This

24          will reduce the OHU capacity from 34 to 24 medical

25          beds.  This is the ratio of six OHU beds per 1000

1113

1          inmates which is low given the medical mission of the

2          facility.  This was supported by our finding of

3          general population patients whose medical needs

4               warrants OHU placement.  Therefore, we believe

5     the          reduction in OHU medical bed capacity is

6               inappropriate.

7          (Reading concluded.)

8    Q.     Miss Woodford, do you agree with this assessment?

9    A.     Yes, I do.

10         MR. SHARMA:  Objection, Your Honor.  I apologize for

11   the delay.  Move to strike the answer.  That calls for

12   medical opinion.

13         THE COURT:  No, it doesn't.  The objection is

14   overruled.

15         I mean, the question asks from your perspective as an

16   expert in custodial matters does this appear to be

17   appropriate.  And the answer is "yes", correct?

18         THE WITNESS:  That's correct.

19         THE COURT:  You may proceed.

20   BY MS. STONE-MANISTA:

21   Q.     Miss Woodford, are there other areas of San Quentin

22   that appear to lack the physical capacity to operate an ICF

23   or even Specialized Care?

24         THE COURT:  The witness has testified there is no

25   space.  What else do you want her to say?

1114

1    BY MS. STONE-MANISTA:

2    Q.      Specifically, Miss Woodford, the use of yards at

3    San Quentin, did you have an additional opinion?

4    A.      Well, what I can say about that is during my

5    inspection, it was really clear that walk alone, Grade A

6    inmates and Grade B inmates were not receiving the ten hours

7    of exercise yard that they're supposed to be getting.

8            And that those yards were also supposed to be

9    utilized for the Specialized Care Program, as well as other

10   mental health programs, and there just isn't enough space to

11   do all of those missions.

12           In fact, the custody staff had told me that they were

13   reclassifying some inmates assigned to the walk alone

14   exercise yard, trying to get them back to the group yards, so

15   that they would have more walk alone yards for mental health

16   treatment.

17           And one of the inmates that I talked to, a death row

18   inmate, complained about that because he had been reassigned

19   from a walk alone yard.  She had been reassigned from a walk

20   alone yard to group yard and didn't feel comfortable with

21   that reassignment.

22           THE COURT:  Ma'am --

23           MS. STONE-MANISTA:  Your Honor, I have just one more

24   matter.

25           THE COURT:  Thank you.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1115

1       Guess what?

2       Never mind.  It's late.

3       You indicated that one of the problems with this lack

4  of exercise, as an example, is that it produces enough

5  tension that there is a substantial chance of people acting

6  out and endangering staff, endangering other people,

7  et cetera.

8       I'm assuming that anybody in the position of warden

9  would have those same anxieties.  If you know, have those

10 anxieties recently been communicated to headquarters?

11      If you know?

12      THE WITNESS:  I don't know.  I mean, I could tell the

13 warden was frustrated, but he didn't articulate what he had

14 conveyed to headquarters.

15      THE COURT:  Fair enough.

16      THE WITNESS:  You know, I would also like to say, on

17 the group exercise yards, they were so crowded when I was

18 there, the elderly inmates would say that they didn't feel

19 comfortable going out to those yards.  Those are the inmates

20 we would see quietly decompensating.  Those are the ones that

21 go unnoticed by staff.  That always created a great concern

22 for me.

23      THE COURT:  Now you may ask your questions, ma'am.

24      MS. STONE-MANISTA:  Thank you, Your Honor.

25      Your Honor, to return to your earlier ruling, I would

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1116

1    like turn back to Miss Woodford's March declaration which is

2    the first tab in the binder before you, 1002, page 21 of that

3    declaration.

4            THE COURT:  Hang on.

5            MS. STONE-MANISTA:  It is paragraph 47, your Honor.

6            THE COURT:  21 has 57 --

7            MS. STONE-MANISTA:  I'm sorry, Your Honor.  It's page

8    17 of the declaration pagination.  I was looking up top.  My

9    fault.

10           THE COURT:  Now you want me to look at 47?

11           MS. STONE-MANISTA:  Yes, Your Honor.

12           I just wanted to emphasize that Miss Woodford did

13   offer opinions in this declaration about the custodial

14   justification or the lack thereof.  And I quote:

15           (reading:)

16           ...for a categorical ban on transferring condemned

17           inmates to intermediate inpatient care at appropriate

18           high-security DSH facilities.

19           (Reading concluded.)

20           So that is, in fact, an opinion she offered well

21   before her deposition.

22           THE COURT:  The court will withdraw its previous

23   ruling.

24           Yes?  You want to tell me it didn't say that?

25           MR. SHARMA:  Your Honor, I can respond.  However, we

1117

1    would just say, again, Miss Woodford did testify about her

2    opinions regarding individualized assessments, which is what

3    this paragraph refers to.

4            There was no indication regarding the testimony about

5    the VPP Program, as well as the physical structure and layout

6    of these institutions.

7            THE COURT:  Thank you, sir.

8            Court withdraws its previous order.  You may explore

9    and question the witness about those matters, but not today.

10           We'll reconvene tomorrow at 9:30.

11           MS. STONE-MANISTA:  Thank you, Your Honor.

12           THE COURT:  Stand in recess.

13           (Off the record at 4:30 p.m.)

14                        ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                   (***PAGES 118 THROUGH 1134 DO NOT EXIST***)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2                           ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5


6
        I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25


                CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                            (916) 446-6360