1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF CALIFORNIA

3                           ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                         CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15                         ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                 RE:   EVIDENTIARY HEARING

19                 FRIDAY, OCTOBER 25TH, 2013

20

21                         ---o0o---

22

23

24

25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926

```
 1                        APPEARANCES

 2                        ---o0o---

 3

 4   FOR THE PLAINTIFFS:

 5          ROSEN, BIEN, GALVAN & GRUNFELD, LLP
            315 MONTGOMERY STREET, TENTH FLOOR
 6          SAN FRANCISCO, CALIFORNIA  94104

 7          BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8          BY:  THOMAS NOLAN, ATTORNEY AT LAW

 9          BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

10

11

12

13   FOR THE DEFENDANTS:

14           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
15           13OO I STREET
             SACRAMENTO, CALIFORNIA  95814
16
            BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
            BY:  MANEESH SHARMS, DEPUTY ATTORNEY GENERAL
18
            BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
19

20                        ---o0o---

21

22

23

24

25
```

```
 1                      EXAMINATION INDEX

 2                         ---o0o---

 3   FOR THE PLAINTIFFS:

 4       EXAMINATION:                              PAGE

 5

 6     JEANNE WOODFORD (Previously Sworn)

 7       Cont'd Direct Exam by Ms. Stone-Manista     1137
         Cross-Examination by Mr. Sharma             1146
 8       Redirect Examination by Ms. Stone-Manista   1172

 9

10

11

12

13

14

15                     EXAMINATION INDEX

16                        ---o0o---

17   FOR THE DEFENDANTS:

18       EXAMINATION:                              PAGE

19

20     DR. ERIC MONTHEI

21       Direct Examination by Ms. Vorous           1175
         Cross-Examination by Mr. Bien              1245
22

23

24                        ---o0o---

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                          EXHIBIT INDEX

2                            ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION                    EVD
5
       1004          Jan. 25, 2012 CDCR Memorandum
6                    & Email Re:  SCCP                      1284

7

8                            ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1135

```
 1                    SACRAMENTO, CALIFORNIA
 2              FRIDAY, OCTOBER 25TH, 2013 - 9:30 A.M.
 3                          ----oOo---
 4          THE CLERK:  All rise.
 5          Court is in session.
 6          The Honorable Lawrence K. Karlton presiding.
 7          THE COURT:  Yes, counsel.
 8          MR. MCKINNEY:  Your Honor, before we get started this
 9   morning, can we be heard on one matter related to the court's
10   order?
11          THE COURT:  Yes.
12          MR. MCKINNEY:  Your Honor, we would like to seek
13   clarification about the court's order from Wednesday
14   regarding the use of force videos.  We've studied this order
15   many times, and I'm trying to understand the intent between
16   paragraph 2, on the one hand, which requires the plaintiffs
17   to maintain all copies of the redacted videos, but then
18   paragraph 5, which would then allow anyone --
19          THE COURT:  Well, once the redacted videos become
20   part of the court record, particularly given what the Ninth
21   Circuit just did, once they become part of the record they're
22   part of the public record.  And if they want to copy the
23   redacted tapes, there is nothing we can do about it, it is
24   now part of the public record.
25          MR. MCKINNEY:  Well, Your Honor, I think no one had a
```

1136

1  chance to brief this.  It wasn't in plaintiffs' motion so

2  there are a couple of issues we would like to address.

3      One is the videos, even though redacted, continue to

4  identify the inmate by face and reflect details of the mental

5  health condition.  And in the Ninth Circuit briefing, the LA

6  Times indicated that they already had the identifying

7  information regarding these inmates.

8      So it is a simple matter of putting two and two

9  together to have the full picture identifying these inmates,

10 which is a concern.

11     It relates to the inmates and --

12     THE COURT:  It's a concern of yours.  It is a concern

13 of mine.  It is a concern of the plaintiffs.  It is no

14 concern of the court that reviews this court's orders.

15     Thank you, sir.

16     I understand your anxiety.  I would not have made the

17 ruling I made if I were free to make some other ruling.  It's

18 just here we are with our piccolo.

19     MR. MCKINNEY:  Your Honor, can we have some time to

20 bring a motion to file redacted copies under seal?

21     THE COURT:  You can do anything you want, but I'm

22 going to make it clear.  My own view -- you know, if you want

23 to file more paper, you can.

24     MR. MCKINNEY:  I can make an oral motion, Your Honor.

25 We move to file redacted copies under seal.

1137

1    THE COURT:  Denied.  I'm not happy about it, but

2    denied.

3    I'm sorry.  Do you want to talk me out of it,

4    Mr. Bien?

5    MR. BIEN:  No.

6    THE COURT:  All right.  Let's go.

7    CONTINUED DIRECT EXAMINATION OF JEANNE WOODFORD

8    MS. STONE-MANISTA:

9    Q.    Good morning, Miss Woodford.

10    Miss Woodford, in your opinion could CMF convert one

11    of its existing units into an Intermediate Care Program for

12    the condemned?

13    A.    Yes.  It's my opinion --

14    MR. SHARMA:  Objection.  I apologize.  I didn't mean

15    to yell.

16    Objection, Your Honor.  Lack of foundation.  Calls

17    for speculation.

18    THE COURT:  Overruled.

19    THE WITNESS:  Yes.  It's my opinion that CMF could

20    have an ICF Program for death row inmates.  I base that on

21    the opinion that they have licensed beds there, they already

22    handle high-security inmates, and this seems like a really

23    good time to establish a program there because it is my

24    understanding that they're actually moving inmates from the

25    ICF Program to the new facility at Stockton.

1138

1    So there is available space, there is staffing, and

2    if custody wants to augment that staffing, they're certainly

3    free to do that.

4    Q.    In your opinion could Salinas Valley also convert one

5    of its existing units to an ICF Program for condemned?

6    A.    Yes.  For the same reasons, they too are moving

7    inmates, as I understand it, from the ICF Program to the new

8    facility at Stockton.  It too is a secure facility.

9    Both facilities have electric fences.  Both

10   facilities are used to classifying these inmates on an

11   individual basis, high-security inmates, and are able to

12   appropriately handle them in those programs.

13   Q.    Miss Woodford, while you were warden of San Quentin,

14   did you send condemned inmates to other facilities for

15   medical or mental health care?

16   A.    Yes.  Quite often in fact.  In fact, we sent inmates

17   to other prisons for physical therapy for long periods of

18   time and things like that.

19   If medical staff told me there was an inmate that

20   needed to be sent somewhere for mental health care or medical

21   care, then it was my job to be sure it was done.

22   Q.    Miss Woodford, have you evaluated the Specialized

23   Care Program at San Quentin from a prison management

24   perspective?

25   A.    Yes, I have attempted to do that.  What I found is

1139

1    that it really is an ad hoc program.  I mean, I give credit

2    to the San Quinten staff for trying to do something given the

3    limitations that they have and without a departmental

4    response to the problems of housing and treating and managing

5    death row, but it still is an ad hoc program.  And it is

6    really unclear whether it is the program inside the

7    healthcare facility, does it include the outpatient program?

8        It's being done in ten unlicensed beds.  When I read

9    the expert report in the Plata case, the recent report, they

10   point out the problems with the lack -- with the cut in staff

11   that has happened at San Quentin.

12        They also point out that death row is a growing

13   problem from a medical point of view, and that inmates are

14   being confined in the hospital above the acuity level for

15   that license.

16        So when you look at the whole picture, and all of the

17   problems with managing the condemned, whatever San Quentin is

18   trying to do at this point is a short-term solution, if that.

19   It certainly isn't a long-term solution to a growing problem.

20        And, you know, why would you create a program that is

21   not licensed when you already have existing programs that

22   have met court scrutiny, that are capable of handling

23   high-security inmates that need more mental health care.

24   Q.     And when you referred to a cut in staff, do you mean

25   in custody staffing or in clinical staffing or both to your

1140

1    knowledge?

2    A.      Both according to the Plata Report, and according to

3    what staff told us when we went to San Quentin for a tour.

4    Q.      Miss Woodford, based on that recent tour and your

5    other recent work, have you arrived at any recommendations

6    concerning the provision of mental health care to the

7    condemned inmates?

8    A.      Yes, I have.

9            MR. SHARMA:  Objection, Your Honor, as to relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  First, in view of what I saw at San

12   Quentin, and the fact that so many inmates are not

13   participating in services, also in view of the one suicide

14   that I reviewed that occurred in North Seg. where that inmate

15   hadn't been seen by mental health staff since 1990, I think

16   that there needs to be a review of all death row inmates to

17   determine whether they have a mental illness.

18           And that's really important for staff to understand

19   what programs they need to put in place today.  And it is

20   also important for long-term planning for death row because

21   it is only going to continue to grow.

22           So I think that would be the first step.

23           And then I also think that it is really important

24   that wherever death row inmates are housed, that training

25   is -- that there is training put in place for the staff that

1141

1    will be treating and providing custody coverage for the death

2    row inmates.

3            I think that there is many myths about death row

4    inmates.  And I heard the doctor testify yesterday, and I

5    heard some of those myths.  So I think it is really important

6    for people to understand the character of who are these death

7    row inmates.  The expansion of special circumstances has put

8    many different types of inmates on death row.

9            And then I also think that there needs to be

10    attention to the Program Guides as it pertains to the

11    practices at San Quentin.  They're not doing the mental

12    health rounding on a daily basis for all of the death row

13    inmates, and they are segregated inmates.

14            Then in addition to that, I think that there needs to

15    be a much more concerted effort for custody and mental health

16    staff and healthcare staff and headquarters to talk about

17    these issues and talk about what's necessary to provide for

18    the current treatment of death row inmates and a long-term

19    plan because there isn't a long-term plan in place now.

20            THE COURT:  I don't know whether you were present for

21    any of Mr. Stainer's testimony, but he's obviously an

22    intelligent man, has a desire for things to work.

23            His exclusive background is custody.  He now has

24    responsibilities that are broader than custody, but, you

25    know, you know what you know.  And I don't mean that

1142

1  disrespectfully.

2       It seems that one of the concerns that have grown out

3  of this hearing is trying to understand -- not understand --

4  but to deal with what appears to me to be the inevitable

5  problem that a prison is concerned with, and that's custody.

6  That's what it exists for.

7       But we have now this terrible situation in which

8  about upwards of a third of the population are mentally ill

9  people.  It is a hospital setting -- it should be a hospital

10  setting, and clearly that hasn't happened.  And I don't think

11  it is a question of bad faith, it is just the difficulties.

12       At some point I'm supposed to order something, and I

13  am truly wondering what it is that I could do that is useful

14  given what I see to be the problem of background.

15       You know, Mr. Stainer is a very bright guy, but he

16  had no idea of what I meant by "prison culture."  I don't

17  know what to do with all of this.  You've got a lot of

18  experience, and somehow or other have come to overcome your

19  custody background, which I think must be unusual.  I don't

20  mean that, again, as criticism.  It is what people do.

21       I don't have any idea -- that may be overstating it,

22  but not by much.

23       I have no firm idea whether there is anything useful

24  I could do.  And I put that to you because I really would

25  like your thoughts.

1143

1    THE WITNESS:  Well, I have given this a lot of
2    thought.  You know, my thinking comes from working at the
3    prison.  You know, I've had to watch, as an example, been
4    present as the manager for a cell extractions.  At the end of
5    that, when you don't feel good about what we did, you know
6    that you have to search for other answers.

7         And I'm not going to tell you I find those answers.
8    I think that it has been an evolution, and I do understand
9    why we now have some very good parameters for use of force.

10        But as with everything, sometimes you go too far.
11   And when we put those parameters in place, we lost some of
12   our discretion.

13        And then I also think that -- so we need to start
14   with the beginning of the process.  And I describe it this
15   way.  I had some of the mental health staff in my office one
16   day.  I said, I don't understand this.  I see an inmate
17   walking towards the cliff.  I call you guys, you say that you
18   can't do anything, he's not bad enough.  He gets one leg over
19   the cliff, we call you guys, you say that he's still not bad
20   enough.  We have to wait until the inmate is falling off the
21   cliff to say that he's a danger to self, danger to others,
22   gravely disabled.

23        Now I have lawyers tell me, well, they are not
24   interpreting that correctly.  So in my mind, if the mental
25   health staff is correct, then we need to rewrite the laws

1144

1  about when you can intervene for an inmate who is

2  incarcerated because we wait until they are too bad.

3       THE COURT:  See, that's what happened with Doctor --

4  the lawyers are now going to hear all about what I'm

5  thinking, but it is really important.

6       Dr. Wagner, I thought relatively candidly, said:

7  Yeah.  I let them sit in the cell until they decompensate to

8  a place in which I could get an order that says force him to

9  medication.

10      On the one hand, that seems to me remarkable for a

11  doctor to do.  On the other hand, they feel constrained.  On

12  the third hand, if you will, Dr. Wagner, to a very large

13  degree, simply resigned his judgments to custody.  He just

14  didn't know.

15      I don't know how to even begin to address that.

16      The question is -- Excuse me.  I'm repeating myself.

17  I don't know what I could -- you know, I think that people

18  are in good faith.  That's not the issue.  But I don't know

19  how to address what seems to me to be the problem that we've

20  been discussing.

21      THE WITNESS:  So I think reviewing the law and really

22  trying to define what it means.  Because you know what

23  happens is, I've been a correctional officer, you call mental

24  health staff because you see an inmate who you believe is in

25  trouble, they come and say they can't do anything.  So then

1145

1   you stop calling because you already know the answer.

2          So, you know, it's really a problem that gets bigger.

3   And until we understand how this law should be applied, or if

4   the law needs to be changed so that we can do better

5   treatment of people in prison, I think that's a big

6   problem.

7          From there I do think that when you do have to

8   extract an inmate who is mentally ill, I think you need a

9   different process.  And I think that process on a planned

10  extraction should begin with a IDTT kind of meeting where you

11  look at the central file, you look at the disciplinary

12  record, you look at whether he's been extracted in the past

13  and what happened during that extraction, is this inmate

14  developmentally disabled on top of his mental illness, all of

15  that information.

16         And the team should talk about it and really think

17  about the best strategy.  Because there were times where I

18  was wondering why did we have to follow this procedure when

19  this is an inmate that if we just open the cell door, walked

20  in, we can probably walk him out of the cell.

21         But that isn't allowed in the way that it is designed

22  now so I think we should bring experts together in designing

23  a mental health process for dealing with inmates that are in

24  the cell.

25         You know, I had a captain come to me one day and say

1146

1   that we got the inmate out, the mentally ill inmate.  I said

2   did you have to extract him?  He said, that, no, we used

3   chocolate.  I said, buy more chocolate.

4        Really, the rules don't allow us to think like that.

5   It was very courageous of this captain to really, you know,

6   try to find another method.  And with some of these inmates

7   who are mentally ill, more carrots and less sticks really

8   does work.

9        I don't know if I'm keeping on forum.

10       THE COURT:  No.  No.  I think what you are saying to

11  me is what I tried to suggest to Mr. Stainer, which is

12  there's got to be a great deal more interplay between mental

13  health people and custody people.

14       And that also turns on questions of the competence of

15  the mental health people, but that's yet another question.

16       I'm sorry to have interrupted, ma'am.

17       You may proceed.

18       MS. STONE-MANISTA:  Your Honor, I have no further

19  questions for the witness.

20       THE COURT:  All right.  Thank you.

21                    CROSS-EXAMINATION

22  BY MR. SHARMA:

23  Q.    Good morning, Miss Woodford.  My name is Maneesh

24  Sharma.  I believe we may have met once or twice in the past.

25  A.    Yes.  Hello.

1147

1    Q.      How are you doing today?

2    A.      I'm fine.  Thank you.

3            How are you?

4    Q.      Doing okay.

5            Miss Woodford, I just want to start briefly with your

6    background.  It's my understanding that you were initially a

7    custodial officer with CDCR; is that correct?

8    A.      Yes.  I started as a correctional officer.

9    Q.      Okay.  And then you progressed along the ranks of

10   CDCR until you were eventually appointed director of CDCR?

11   A.      The highest rank I held in CDCR was undersecretary.

12   Q.      Thank you.

13           And Miss Woodford, again, just for the record, you're

14   not a mental health clinician?

15   A.      That's correct.

16   Q.      And you haven't received any specialized training in

17   mental health care?

18   A.      Other than the training I received with the

19   Department of Corrections as mandated by the courts and the

20   various court cases, yes.

21   Q.      So that's the training that's provided to the

22   majority of CDCR employees, or whatever role you were playing

23   at that time in CDCR, the training you received was mandated

24   by the court?

25   A.      Yes.  That's true.

1148

1    Q.      Okay.  And Miss Woodford, have you ever supervised an

2    intermediate care facility?

3    A.      No, I have not.

4    Q.      Miss Woodford, are you aware if other states, aside

5    from California, provide what is termed "Intermediate Care

6    Facility Level of Care" to death row inmates?

7    A.      No, I don't know that.

8    Q.      Thank you.

9            Miss Woodford, if I could ask you to open -- I

10   believe there is a binder that's specifically for your

11   testimony.  And I believe it is Plaintiffs' Exhibit 1007.

12   A.      Yes.

13   Q.      Miss Woodford, can you just identify, using -- again,

14   I believe there is a list of inmate-patient identifiers we

15   have -- which inmate-patient this document refers to?

16   A.      Where's the list?

17           MR. SHARMA:  Your Honor, may I approach the witness?

18           (Exhibit located for witness.)

19   BY MR. SHARMA:

20   Q.      Again, Miss Woodford, I'm sure you're aware to please

21   identify the inmate by letter designation?

22   A.      ZZZ.

23   Q.      Thank you.

24           Miss Woodford, when you were working with CDCR, did

25   you supervise any administrative segregation units?

1149

1    A.      Yes, I did.

2    Q.      Isn't it correct that in an administrative

3    segregation unit the inmates are typically not allowed to

4    move around their tier or exit their cells without custody

5    escorts and in restraints?

6    A.      Yes.  That's typically how they're run.

7    Q.      And that's true --

8    A.      -- in California.

9    Q.      -- in California, correct?

10          Right.  And that's true for essentially all

11   administrative segregation units in California; isn't that

12   correct?

13   A.      Yes, that's true.

14   Q.      And isn't it also true, Miss Woodford, that in what's

15   been referred to as the North Segregation Unit for Condemned,

16   that the condemned are allowed to move around their tier

17   without restraints and allowed to interact with other inmates

18   without custody escorts?  And by other inmates I refer to

19   other condemned inmates in that unit; isn't that correct?

20   A.      The unit is designed for that purpose, but they're

21   still not out and about and around staff so it still is a

22   segregated unit.  They don't freely -- they don't freely exit

23   their cell or leave for work assignments as a General

24   Population Unit does.

25   Q.      But within that unit are the inmates -- the condemned

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1150

1  inmates in North Segregation, during the day, allowed to exit

2  their cell and move around the tier and interact with other

3  condemned inmates on that tier?

4  A.      That's true.

5  Q.      And so that would be different than a typical

6  administrative segregation unit; isn't that correct?

7  A.      It is different than other administrative

8  segregations in California, yes.

9  Q.      Miss Woodford, you also testified that when you were

10  a warden at San Quentin, and in your experience I think also

11  from your visit at San Quentin, that condemned inmates are

12  escorted through general population by custody officers; is

13  that correct?

14  A.      That's correct.

15  Q.      And isn't it true, Miss Woodford, when condemned

16  inmates are escorted through general population that the

17  guards escorting will shout "Escort," and that will direct

18  other inmates to move and keep their distance away from the

19  inmate being escorted?

20  A.      That's true of any inmates under escort, even if it

21  is Reception Center inmates or Ad. Seg. inmates.  That is

22  true all over the Department of Corrections.

23  Q.      Right.  So let me ask it this way then.  When you

24  were warden at San Quentin, was there a possibility that a

25  condemned inmate would be moving through a General Population

1151

1    Unit, without an escort, such that another inmate could come

2    up and interact with that condemned inmate -- a non-condemned

3    inmate, I should say, could interact with that condemned

4    inmate?

5    A.       No.

6             THE COURT:  You followed the question?

7             MR. SHARMA:  I apologize, Your Honor.

8             THE COURT:  That's all right.

9    BY MR. SHARMA:

10   Q.       And isn't it true, Miss Woodford, that when you were

11   warden at San Quinten, and also when you were director, that

12   condemned inmates are not allowed to go to yard with

13   non-condemned inmates?

14   A.       They have been in the past, but currently no, they're

15   not.

16   Q.       When you say "in the past," was that during the time

17   you were warden at San Quentin?

18   A.       No.  But during my time at San Quentin, when there

19   were fewer death row inmates and we were Level IV, non-death

20   row inmates and death row inmates would go to the same

21   exercise yard.

22   Q.       So as warden it was your policy that condemned

23   inmates would not attend yard with general population

24   inmates?

25             That's correct?

1152

1  A.      That was the policy.  I mean, death row had grown and
2  now filled three buildings.
3  Q.      And as warden you had authority over that policy; is
4  that correct?
5  A.      I don't think that I could just on my own change the
6  policy.  There would be discussion with headquarters.
7  Q.      Did you ever have a discussion with headquarters
8  about changing that policy?
9  A.      No, I didn't see the need to do that.
10  Q.      Thank you.
11          Miss Woodford, I believe you testified that when you
12  were warden at San Quentin, you would defer to mental health
13  staff as to whether a condemned inmate needed to be
14  transported to another facility for mental health care; is
15  that correct?
16  A.      Yes.  That's correct.
17  Q.      And when you were warden, were inmates allowed to be
18  transferred to the Acute Psychiatric Program -- actually,
19  Your Honor, if I may withdraw.
20          Miss Woodford, are you aware at the time you were
21  warden at San Quentin whether there was an Acute Psychiatric
22  Program at the California Medical Facility?
23  A.      Yes, there was.
24  Q.      And were condemned inmates transferred to that
25  program when you were warden?

1153

1  A.       Yes, they were.

2  Q.       And were you aware of what security procedures were

3  in place at that time for those condemned inmates at the

4  Acute Psychiatric Program?

5  A.       No, I was not.

6  Q.       When you were director or undersecretary of CDCR,

7  were you aware of what security procedures were in place for

8  condemned inmates at the Acute Psychiatric Program?

9  A.       I was not aware of the specifics, no.

10  Q.       And Miss Woodford, if I could ask you just briefly to

11  turn to your declaration.  I believe it is Plaintiffs'

12  Exhibit 1002.

13  A.       Yes.

14  Q.       Again, just to clarify, Miss Woodford, do you know

15  where in your declaration you discuss the security procedures

16  at the Acute Psychiatric Program?

17  A.       No.  I would have to read through the declaration.

18  Q.       Okay.  The reason I ask, Miss Woodford, is I have

19  read through the declaration, and I couldn't find reference

20  to it so I was hoping you could help point me there if you

21  knew.

22          Actually, you know what?  I'm sorry, Miss Woodford.

23  I'll go ahead and withdraw that.  Let me ask a different

24  question.

25          Miss Woodford, at what time did you become aware of

1154

1   the current security procedures at the Acute Psychiatric

2   Program at the California Medical Facility?

3             THE COURT:  That assumes she is aware of it now.

4             Are you aware of it now, ma'am?

5             THE WITNESS:  Yes, I am.

6             THE COURT:  When did you become aware of it?

7             THE WITNESS:  When I read the exhibit of

8   Miss Brewer's deposition testimony.

9   BY MR. SHARMA:

10  Q.      I'm sorry.  I just didn't hear.  Miss Brewer, I

11  thought?

12  A.      I believe that's her name.

13  Q.      Do you think it was maybe Miss Bachman?

14  A.      Miss Bachman.

15  Q.      That's okay.  I forget names as well.

16          Could you give us maybe a time frame for when that

17  was in terms of month and year?

18  A.      So probably in the last three or four weeks.

19  Q.      Okay.  Relatively recently --

20  A.      Relatively recently, yes.

21  Q.      -- you became aware of that?

22          Miss Woodford, you testified about the use of ten

23  beds in the OHU Unit at San Quentin for the Specialized Care

24  Program.

25          Do you recall that?

1155

1    A.      Yes.

2    Q.      And Miss Woodford, are you aware of whether the

3    Receiver -- the Federal Receiver in the Plata case has

4    approved the use of those ten beds for that purpose?

5    A.      It's my understanding that the Receiver did approve

6    the use of those ten beds.

7    Q.      Okay.  Thank you.

8            And do you have any understanding of whether the

9    Special Master in this case had input into the use of those

10   ten beds for that program?

11   A.      I do not.

12   Q.      Miss Woodford, going back to the issue of -- again,

13   at the time that you were warden, I believe you testified

14   that you saw no need for the Condemned Unit to be using the

15   same yard as the General Population Unit, correct?

16   A.      That's correct.

17   Q.      And did you see any reason -- did you have any

18   reasons for why the condemned shouldn't use the same yard as

19   the general population?

20   A.      Well, I don't think that I ever talked about the fact

21   that death row inmates should be on the same yard as general

22   population inmates.

23   Q.      Is it your belief that death row inmates should not

24   be on the same yard as general population inmates?

25   A.      In terms of housing, I think death row should be

1156

1    separate from the general population.  But when you are

2    talking about small programs for medical or mental health,

3    that's a different issue.

4    Q.    I understand that, Miss Woodford.  I just -- again,

5    my question was, so it is your opinion that in terms of

6    housing, condemned population should be housed separately

7    from general population inmates?

8    A.    Yes.  I think it is a very specialized program that

9    should be housed separately from the general population.

10   Yes.

11   Q.    Again, Miss Woodford, if I could ask you, you started

12   to provide some comments about small groups or specialized

13   programs.

14         Miss Woodford, have you ever run a group treatment

15   for a mental health program?

16   A.    No, I have not.

17   Q.    And Miss Woodford, isn't it true that at the time

18   that you were undersecretary and secretary of CDCR, you never

19   sought to change a policy that would -- any policy

20   prohibiting or allowing inmates -- condemned inmates to

21   participate in any type of group treatment with non-condemned

22   inmates?

23   A.    No, I did not.

24         THE COURT:  Would you wait just a minute, please?

25         (Brief pause.)

1157

1        Okay.  Now I understand.  Go ahead.

2        THE WITNESS:  But what I might say, I do think I need

3    to say --

4    BY MR. SHARMA:

5    Q.    I do apologize.  Again, there is no question pending.

6    I'm sure your counsel on redirect will be able to raise that.

7    I don't mean to be rude.

8    A.    That's fine.

9    Q.    Thank you.

10       Miss Woodford, when you were warden at San Quentin,

11   could condemned inmates -- again, let me lay the foundation

12   here.

13       Are you aware, Miss Woodford, when you were warden at

14   San Quentin, whether there was an Intermediate Care Facility

15   at Salinas Valley State Prison?

16   A.    I believe that there was an Intermediate Care

17   Facility at Salinas Valley.  I'm not sure of the date that

18   opened, but I think there was, yes.

19   Q.    Around the time you were warden of San Quinten?

20   A.    I believe so.

21   Q.    How about around the time you were director of the

22   CDCR?

23   A.    I'm certain that it was open when I was the director

24   of CDCR.

25   Q.    And during those time periods, Miss Woodford, could

1158

1  condemned inmates go to the Intermediate Care Facility at

2  Salinas Valley State Prison?

3  A.      Could condemned inmates go?

4  Q.      Were they allowed to be transferred there?

5  A.      They weren't, no.

6  Q.      Isn't it true, Miss Woodford, that you did not change

7  that policy at the time that you were director or

8  undersecretary of CDCR?

9  A.      So I'm not sure that I had an understanding that

10  inmates couldn't go at that time.  I mean, I don't know that

11  it was brought to my attention that mental health staff

12  thought inmates should go to the Intermediate Care Program

13  from the Condemned Unit at that point in time.

14  Q.      At this point in time are you aware of any mental

15  health staff within CDCR who believe that condemned inmates

16  need to be transferred to the Intermediate Care Facility?

17  A.      I'm not aware of that.  But I'm not aware that there

18  was ever a discussion about that.

19  Q.      Thank you.

20         Miss Woodford, at time that you were warden San

21  Quentin State Prison, do you know what the population was at

22  San Quentin State Prison?

23  A.      The highest population that I remember, and it

24  changed because of the Reception Center, was 6200 inmates.

25  Q.      And do you know what the current population of San

1159

1    Quentin State Prison is?

2    A.      I saw a document, I believe a week ago, that showed,

3    I believe, it was at 4200 or a little bit more than that.

4    Q.      And Miss Woodford, isn't it true that condemned

5    inmates are always housed in a single cell?

6    A.      That is true.

7    Q.      And Miss Woodford, I believe you testified that on

8    East Block there are 500 cells; is that correct?

9    A.      That was an estimate, yes.

10   Q.      Okay.  And Miss Woodford, are you aware currently of

11   how many inmates are participants in the Mental Health

12   Delivery System -- excuse me -- how many condemned inmates

13   are participants in the Mental Health Delivery System at San

14   Quentin State Prison?

15   A.      I have seen the numbers, but I don't recall them as I

16   sit here today.

17   Q.      Does it sound close to maybe -- well, let me ask it

18   this way.  Is it under 500?

19   A.      Yes.

20   Q.      Is it's under 400?

21   A.      Yes.  I believe so.

22   Q.      Okay.

23   A.      If I were to give an estimate of what I recall, it is

24   probably around a little over 200 inmates at either the EOP

25   or CCCMS level of care.

1160

1  Q.      Miss Woodford, do you have an understanding of the

2  difference between EOP level of care and the CMS level of

3  care?

4  A.      Yes, I do.

5  Q.      And is that understanding based on your knowledge of

6  the policies concerning what's provided to a CCCMS inmate?

7  A.      It is based on the Program Guides and what is

8  required for EOP inmates and what is required for CCCMS

9  inmates, and then the requirements for their housing.

10         As an example, having run a Reception Center, we had

11 time constraints for transferring inmates from the Reception

12 Center to appropriate treatment programs.

13 Q.      Thank you.

14 A.      Then I also know it from the departmental level,

15 understanding we had EOP -- separate EOP programs at

16 facilities for inmates.

17 Q.      Okay.  Thank you, Miss Woodford.

18         But you don't have an understanding of the

19 differences in mental health diagnosis that might cause

20 someone to be placed in EOP as opposed to CCCMS; isn't that

21 correct?

22 A.      That's correct.

23 Q.      Miss Woodford, I believe you testified that the last

24 time you were at San Quentin was during the site visit in

25 February 2013; is that correct?

1161

1    A.       That is correct.

2    Q.       And Miss Woodford, was it your opinion after that

3    site visit, that in comparison to your previous experiences

4    with San Quentin, that the mental health care -- or the

5    mental health programs -- the overall programs at San Quentin

6    had greatly improved from the last time you had been at San

7    Quentin?

8    A.       It is true.  There was definitely more staff.  There

9    were improvements.  But there were also other problems that

10   had gotten bigger in my opinion.

11   Q.       Miss Woodford, if I can refer you back to Plaintiffs'

12   Exhibit 1007.

13            Miss Woodford, did you review the medical or mental

14   health charts for this inmate?

15   A.       Yes, I did.

16   Q.       And in those medical or mental health charts did you

17   see records of interaction with mental health staff?

18   A.       I actually don't recall.

19   Q.       Okay.  Did you correspond -- I guess if you don't

20   recall whether you saw those interactions, I can't ask that

21   question.  I'll withdraw.  I apologize.

22            So Miss Woodford, given the fact you don't recall any

23   records of mental health interaction, you don't know whether

24   mental health staff were seeing this inmate during the times

25   that you contend he was not accepting showers or going to

1162

1    yard; isn't that correct?

2    A.    I don't know.

3    Q.    Thank you.

4         Miss Woodford, you referred to the Program Guide.

5    Just so we're clear, are you referring to the Coleman Program

6    Guide?

7    A.    Yes.

8    Q.    Okay.  And you've also referred to certain licensing

9    requirements for mental health or medical beds.

10        Could you just direct me as to what you're referring

11   to there, what licensing requirements?

12   A.    Well, I'm aware that the each of the healthcare

13   facilities have a different license, like CTC.  And so that I

14   know San Quentin has a license.  And from reading the Plata

15   Report I understand that license allows them to do a certain

16   level of medical care --

17   Q.    I apologize for interrupting --

18        THE COURT:  Then don't.

19        MR. SHARMA:  Correct, Your Honor.

20        Please, continue.

21        THE WITNESS:  According to the report I read by the

22   Plata experts, they were treating inmates within the

23   healthcare facility above their licensed level -- who had

24   medical issues that were above the licensing level of that

25   facility.

1163

1    BY MR. SHARMA:

2    Q.      Okay.  Do you know what agency or entity determines

3    those licensing levels?

4    A.      I certainly did at one time, but I don't know.

5    Q.      Do you know where either in Federal law or California

6    State law those licensing requirements are located?

7    A.      I do not.  I actually worked at headquarters a long

8    time ago for about six months helping write some of those

9    licensing requirements when the department was seeking to

10   have a CTC license.  But as I sit here today I don't recall

11   them.

12   Q.      Okay.  Miss Woodford, are you -- is it your

13   understanding that in CDCR institutions can implement local

14   operating procedures?

15   A.      Can institutions?

16   Q.      Yes.

17   A.      Yes, they can.

18   Q.      And is it your understanding that that is an

19   appropriate -- based on your experience as director and

20   undersecretary that local operating procedures are

21   appropriate for the mission of each institution?

22   A.      As long as they are in compliance with departmental

23   rulings and other requirements established by courts.

24   Q.      Do you know if there is any local operating

25   procedures dealing with condemned inmates at San Quentin?

1164

1   A.      Yes, there is.

2   Q.      Do you know the title of that local operating

3   procedure?

4   A.      I don't remember the number of it, but it is a

5   condemned manual.

6   Q.      Have you recently reviewed the condemned manual?

7   A.      No, I have not.

8   Q.      So then you have no way of knowing whether those

9   local operating procedures do, in fact, comply with court

10  orders and Federal law, correct?

11  A.      No, I do not.

12  Q.      Thank you.

13          Miss Woodford, yesterday I believe you testified

14  about the use of COMPSTAT, which is a tracking program used

15  at headquarters; is that correct?

16  A.      Yes, I did.

17  Q.      And have you spoken, I guess recently, since February

18  2013, have you spoken to anybody at headquarters about

19  COMPSTAT?

20  A.      No, I have not.

21  Q.      So it is correct then, Miss Woodford, you don't know

22  what headquarters is doing with COMPSTAT in regards to the

23  condemned population?

24  A.      I know that it is not on their COMPSTAT report, but

25  other than that I don't know if they're changing the report

1165

1    or have some plans to do something differently with the

2    condemned, if that's your question.

3    Q.     Yes.   Thank you.

4          Miss Woodford, I believe the court asked you some

5    questions regarding cell extractions, and you mentioned that

6    you had been part of some cell extractions during your time

7    at CDCR.

8          Is that correct?

9    A.     That is correct.

10   Q.     Miss Woodford, have you been asked to offer your

11   opinion as to the cell extractions at issue in this matter?

12   A.     No, I have not.

13   Q.     And you have not viewed any of the videos of the cell

14   extractions in this matter?

15   A.     Well, I was actually present in the warden's

16   conference room at San Quinten where some of the videos were

17   being played, so I did see pieces of them.  But other than

18   that, no.

19   Q.     But as you sit here today, you have no opinion

20   overall as to whether cell extractions are conducted properly

21   within CDCR with regards to mentally ill inmates?

22   A.     Well, I can't say that.  I do have opinions about it.

23   But it isn't based on my recent review of material or videos.

24   That's true.

25         MR. SHARMA:  Your Honor, if I could take a moment or

1166

1    two?

2         (Counsel confers with cocounsel.)

3    BY MR. SHARMA:

4    Q.    Miss Woodford, I believe you testified earlier that

5    you were present during some of Dr. Carter's testimony.

6         He was a clinician at the APP Program at the

7    California Medical Facility?

8    A.    That's correct.

9    Q.    And Miss Woodford, do you also recall when Dr. Carter

10   referred to six condemned inmates at that -- who at various

11   times have been within that program?

12   A.    I heard part of his testimony regarding the six

13   inmates, yes.

14   Q.    Right.  Miss Woodford, have you reviewed the records,

15   the mental health or custody records, for any of those six

16   inmates?

17   A.    Well, I don't know who all the six inmates are.  I

18   have reviewed the record of one of them.

19   Q.    So --

20   A.    I was able to determine that from his testimony, that

21   I had seen the record of one of them, yes.

22   Q.    To your knowledge have you reviewed the record of any

23   other inmate who was transferred to the Acute Psychiatric

24   Program?

25   A.    I may have.  I don't know the names of those inmates.

1167

1    Q.       Thank you.

2             Miss Woodford, I believe it was your testimony

3    yesterday that, you know, as warden of San Quentin, as the

4    director, as the undersecretary, you were intimately involved

5    with the Condemned Program while within CDCR.

6             As the manager -- as the warden you had ultimate

7    responsibility over the condemned population?

8    A.       As the warden that's certainly true.

9    Q.       And don't you think that then as warden it would be

10   important for you to know what security procedures were in

11   place when a condemned inmate was transferred out of your

12   institution?

13   A.       I was aware of the security procedures that were in

14   place for transferring the inmate to the other facility.

15   Q.       But you weren't aware of the security procedures that

16   were in place when that condemned inmate was being treated at

17   that facility?

18   A.       I assumed that they had a program.  I mean, right or

19   wrong, that's what I did.  I assumed they had a program -- a

20   mental health program, and the inmates were sent there to

21   participate in that program, and that the custody staff would

22   provide the appropriate custody.

23            Because any time you received an inmate, you make an

24   individual decision.  You look at that inmate, their

25   behavior, and you make a decision about your custody

1168

1    procedures.  And so I would expect that that would have

2    occurred anywhere a death row inmate is transferred.

3    Q.      Miss Woodford, I believe you testified about the

4    condemned population, that in your experience some of those

5    condemned population are what you characterized as Level I or

6    Level II; is that correct?

7    A.      I said they behave like a Level I or Level II, just

8    as inmates who come into the system with life without

9    possibility of parole are very compliant in their behavior

10   within the institutional setting.

11   Q.      Right.  And Miss Woodford, there are also inmates on

12   condemned population who behaved, for example, like a Level

13   IV; is that correct?

14   A.      That's absolutely correct.

15   Q.      And Level IV is if highest custody level at San

16   Quentin State Prison -- or sorry -- within CDCR; is that

17   correct?

18   A.      That is correct.  That's why you have to make

19   individualized decisions about inmates based on their

20   behavior.

21   Q.      But again, Miss Woodford, when you were warden of San

22   Quentin, or when serving as direct or undersecretary of San

23   Quentin, did you ever attempt to put a policy in place that

24   would make an individualized determination that a condemned

25   inmate who may be behaving like a Level II could be mixed in

1169

1   with general population inmates?

2   A.       No.  My response to that was to seek the building of

3   a new death row.  And that's what I thought was the right

4   response for the changing needs of death row inmates.

5   Q.       Miss Woodford, in your experience as warden of San

6   Quentin State Prison, can condemned inmates be a target for

7   violence from non-condemned inmates?

8        THE COURT:  Is it possible, I suppose he's asking.

9   Anything is possible.

10  BY MR. SHARMA:

11  Q.       I'm not asking that.  I'm actually asking based on

12  Miss Woodford's experience, if that's what she -- if she --

13       THE COURT:  Was that a concern?  Is that what you are

14  asking?

15       MR. SHARMA:  Yes.

16       THE WITNESS:  Well, certainly inmates can have

17  enemies or there can be high-profile inmates.  So you have to

18  look at the individual case factors of the inmates.

19       And, you know, there certainly are a few on death row

20  who have high notoriety, but that's not the majority.

21  BY MR. SHARMA:

22  Q.       I understand.

23       Miss Woodford, is maybe one of the individual case

24  factors you might have to look at the fact that they are a

25  condemned inmate, or is that not an individual case factor to

1170

1  examine?

2  A.     Well, I think you have to look at that, but most of

3  the death row inmates are not high notoriety cases.

4         Off the top of your head, can you name five or six of

5  them?

6         There is only a few who have that kind of notoriety

7  where you have to be really concerned about them being around

8  other inmates.

9  Q.     Miss Woodford, the court asked a couple of questions

10 about prison culture, if I could just follow up on that a

11 bit.

12        Again, I'm not the expert, but in a prison culture is

13 an inmate's conviction something that other inmates seek to

14 know about?

15        THE COURT:  I mean, that assumes a whole world.

16        MR. SHARMA:  I'll withdraw, Your Honor.

17        THE COURT:  All right.  Or you can rephrase.

18        Go ahead.

19        MR. SHARMA:  Thank you.

20 BY MR. SHARMA:

21 Q.     Miss Woodford, referring back I believe that you

22 testified that there were going to be -- or it is your

23 understanding that there are either custody or cuts in

24 medical staff at San Quentin State Prison; is that correct?

25 A.     Yes, that is correct.

1171

1  Q.      And are you aware that the Receiver in Plata has been

2  implementing a program to redefine the amount of medical

3  staff that are necessary for each institution following

4  realignment?

5  A.      I'm not aware of that program.  I'm just aware of

6  what I read in the Plata expert report said there had been

7  cuts in staffing that was causing a problem.

8          MR. SHARMA:  A brief moment, Your Honor.

9          (Counsel confers with cocounsel.)

10 BY MR. SHARMA:

11 Q.      Miss Woodford, isn't it true that inmates can be a

12 target based on their commitment offense?

13 A.      Yes.  That is true.  That's true for general

14 population inmates.  It is true for all inmates.  That's why

15 you have to classify them and put them into situations where

16 they're safe.  And you make those assessments every time you

17 move an inmate.

18 Q.      And again, Miss Woodford -- well, isn't it true -- I

19 believe I may have asked the question again, I do apologize

20 if it is cumulative -- isn't it true at the time you were

21 warden, at time you were director or undersecretary, there

22 were no efforts made to make an individualized assessment of

23 a condemned inmate such that they could be housed in a

24 general population setting?

25 A.      No.  That wasn't a consideration.

1172

1     MR. SHARMA:  Thank you.

2     Nothing further at this time, Your Honor.

3                    REDIRECT EXAMINATION

4  BY MS. STONE-MANISTA:

5  Q.     Miss Woodford, first, what did you want to say

6  regarding small programs for medical care when counsel

7  wouldn't let you finish?

8  A.     What I wanted to say is that I think that the issue

9  becomes their mental illness if you are talking about a small

10 program for the mentally ill.  And I think you are, in the

11 small programs, where you have information about the inmates,

12 you have direct supervision --

13     MR. SHARMA:  Objection, Your Honor.  At this time the

14 witness is testifying directly about something that requires

15 medical background to opine.

16     THE COURT:  You proceed, ma'am.

17     THE WITNESS:  -- and you can get the input from

18 mental health staff as to how they're doing, that it would be

19 quit appropriate to have inmates who were condemned and

20 non-condemned in a program.

21 BY MS. STONE-MANISTA:

22 Q.     Miss Woodford, regarding Plaintiffs' Exhibit 1007, if

23 we can turn to that for just a moment, these are the 114-A

24 logs as you testified for Prisoner ZZZ.  Should these logs

25 record contacts with mental health staff?

1173

1  A.      Yes, they should record that contact.  There is one

2  note on January 7th, 2013, that says, "Seen by psych and

3  cleared."  So it certainly in that case noted the one contact

4  that's present on the 114-A.

5  Q.      As you recall, was that the only contact noted for

6  this inmate in this time period?

7  A.      Yes.  It was the only not that I recall.  I'll look

8  really quickly to be sure.

9          Yes, it is.

10 Q.      And if you recall, is this inmate a participant in

11 the Mental Health Services Delivery System?

12 A.      I believe he is, yes.

13 Q.      Miss Woodford, you testified regarding local

14 operating procedures.  To your knowledge can local operating

15 procedures override the Coleman Program Guide as applied to a

16 particular population?

17 A.      To my knowledge they cannot.

18         MS. STONE-MANISTA:  Thank you.

19         I have no further questions.

20         MR. SHARMA:  Nothing, Your Honor.

21         THE COURT:  May the witness be released?

22         MS. STONE-MANISTA:  Yes, Your Honor.

23         MR. SHARMA:  Yes, Your Honor.

24         THE COURT:  Thank you, ma'am.

25         You may step down.  You are free to go or stay, as

1174

1    you choose.

2         Are plaintiffs prepared to rest, or do you have a

3    additional witnesses?

4         MR. BIEN:  We don't have additional witnesses.  We

5    would like to clarify some exhibits at some point.  Besides

6    that we have no more witnesses.

7         THE COURT:  So you're resting?

8         MR. BIEN:  We're resting on the death row, yes.

9         THE COURT:  As far as the two issues of excessive

10   force and death penalty?

11        MR. BIEN:  Right.  Besides clarifying exhibits we've

12   submitted, yes.

13        THE COURT:  Fine.

14   Ma'am?

15        MS. VOROUS:  Defendants would like to call Dr. Eric

16   Monthei, please.

17        THE CLERK:  Please, raise your right hand.

18                      ERIC MONTHEI,

19   was thereupon called as a witness herein by the Defendant,

20   and having been sworn to tell the truth, the whole truth and

21   nothing but the truth, was thereupon examined and testified

22   as follows:

23        THE WITNESS:  Please, take a seat.

24        State your name, spell your last name and speak

25   directly into the microphone.

1175

1     THE WITNESS:  Good morning, Your Honor, Ladies and

2 Gentlemen.  May it please the court, my name is Eric Monthei,

3 E-r-i-c, M-o-n-t-h-e-i.

4                    DIRECT EXAMINATION

5 BY MS. VOROUS:

6     Q.     Good morning, Dr. Monthei.

7     A.     Good morning.

8     Q.     Dr. Monthei, what is your current occupation?

9     A.     I am a clinical and forensic psychologist.

10    Q.     Who is your current employer?

11    A.     I'm currently employed by the California Department

12 of Corrections and Rehabilitation.

13    THE COURT:  May I suggest that you want to turn that

14 microphone to you instead of away.

15    Thank you, sir.

16    THE WITNESS:  Yes, Your Honor.

17 BY MS. VOROUS:

18    Q.     Where are you currently working?

19    A.     I'm currently working at San Quentin State Prison.

20    Q.     What is your current title at the prison?

21    A.     Chief of Mental Health at San Quentin State Prison.

22    Q.     You're a licensed psychologist; is that correct?

23    A.     That is correct.

24    Q.     How long have you been the Chief of Mental Health at

25 San Quentin State Prison?

1176

1    A.       Approximately, six or seven years.

2    Q.       Please, describe your duties as the Chief of Mental

3    Health?

4    A.       Sure.  I'm generally responsible for the overall

5    oversight of the Mental Health Services Delivery System, and

6    that includes approximately 150 staff members, approximately

7    a dozen supervisors, and all the missions associated with

8    San Quentin.

9            Right now we have several missions.  One of them

10   includes the provision of mental health services to the

11   condemned population.

12   Q.       Dr. Monthei, do you know how many inmates are

13   currently housed in what is referred to as "East Block"?

14   A.       I do not have a specific number, but approximately

15   500.

16   Q.       Are inmates housed in East Block screened for mental

17   health concerns when they enter the East Block unit?

18   A.       They are, but they're actually screened prior to

19   that.  Upon arrival of a condemned inmate to San Quentin,

20   there's an intake and evaluation period that occurs.  So

21   during the initial intake and evaluation period a rather

22   thorough mental health evaluation is completed prior to the

23   inmate-patient ever arriving on East Block.

24   Q.       After an inmate arrives on East Block, are there

25   other opportunities for inmates to be identified by staff as

1177

1    potential candidates for mental health treatment?

2    A.      Absolutely.

3    Q.      And can you describe what those opportunities are?

4    A.      Sure.  So we have a multitude of things.  There are

5    general psychiatric technician rounds that occur on a regular

6    basis.  There are staff assigned to the unit that provide

7    mental health services that routinely do screens.

8           From time to time we sweep the entirety of the

9    condemned population.  That's occurred approximately half a

10   dozen times in the six or seven years that I have been there.

11          There are opportunities associated with the

12   Interdisciplinary Classification Committee, the

13   Interdisciplinary Treatment Team process.  There are

14   referrals made both on a formal and informal basis.

15          There are several meetings designed to facilitate the

16   exchange of information.  Some of the meetings occur on the

17   unit directly with the officers who are assigned to that unit

18   with, as well, the clinicians assigned to that unit.

19          There are other meetings associated with the specific

20   disciplines, so meetings associated with the Healthcare

21   Access Unit, for example, and any challenges, concerns that

22   they may have.  The Mental Health Program Subcommittee.

23          Custody regularly attends my management meetings that

24   occur twice a week.  Having the chief deputy attend my

25   meeting isn't an uncommon occurrence.

1178

1    There are several ways.  I'm certain that I'm not

2  identifying all of them, but there are several redundant

3  processes in place.

4  Q.    Doctor, you mentioned a sweep of all the condemned

5  inmates in East Block.  Can you describe the most recent

6  sweep, what did that entail?

7  A.    So the most recent sweep probably occurred within the

8  last month or so.  It was a general outreach that we do from

9  time to time for all members of the condemned population.

10    During the last screening it entailed clinicians

11  literally making a face-to-face contact with every member

12  associated with the condemned population regardless of where

13  they happened to be housed.

14    During that contact a progress note was completed, a

15  referral form was provided to the inmate-patient with

16  instructions how to request services, either as a

17  self-referral or as referral by virtue of interacting with

18  one of the officers or one of the clinicians, as well as a

19  pamphlet that described overall mental health services and

20  services that are available within the institution just to

21  ensure awareness.

22  Q.    Did that sweep also include what we've referred to as

23  the Carson Unit?

24  A.    It did.

25    THE COURT:  I assume you're going to ask him what a

1179

1    Carson meeting is?

2              MS. VOROUS:  Carson Unit.

3              THE COURT:  Carson Unit?

4              MS. VOROUS:  Yes.

5    BY MS. VOROUS:

6    Q.      The Carson Unit is the administrative segregation

7    unit at San Quentin that houses the Enhanced Outpatient

8    Program population; is that accurate?

9    A.      Carson is an administrative segregation unit, and we

10   did include that during the most recent sweep.

11   Q.      And the sweep that you conducted in the Carson Unit

12   was similar to the sweep that you did for the condemned

13   population?

14   A.      It was identical.  We swept both units simultaneously

15   over the course of approximately a week.

16   Q.      Dr. Monthei, do you know how many condemned inmates

17   are currently designated as part of the Mental Health

18   Services Delivery System?

19   A.      I don't haven't a specific number.  It is

20   approximately 25 percent of the overall population.  I do

21   receive daily briefings in terms of the overall census.  I

22   simply have not reviewed that briefing today.

23   Q.      Do you know, if you know, how many of the 25 percent

24   are at the Enhanced Outpatient Program level of care?

25   A.      I do not know off the top of my head.  There are

1180

1    approximately 35 EOPs within the Condemned Program.  There

2    are approximately an equal number in the Ad. Seg. Hub portion

3    of the program.

4         We also have some EOPs that are currently housed in

5    the Mental Health Crisis Bed that vary from, literally, hour

6    to hour.

7    Q.    Dr. Monthei, that was the next question I was going

8    to ask you, whether San Quentin has a Mental Health Crisis

9    Bed Unit?

10   A.    We do.

11   Q.    Would you please describe that unit?

12   A.    Sure.  The unit is a 17-bed unit.  It is within the

13   Central Health Services Building, commonly referred to as

14   CHSB.  It's a relatively new, less than four years,

15   state-of-the-art building.  It is the best of everything the

16   State has to offer.

17        The Mental Health Crisis Bed specifically is located

18   on the fourth floor of that building.  And we serve as the

19   Mental Health Crisis Bed for the entirety of the state.

20        THE COURT:  For the entirety of the state?

21        THE WITNESS:  Yes, Your Honor.

22   BY MS. VOROUS:

23   Q.    Can you also describe --

24        THE COURT:  Before you go ahead, I take it, I don't

25   know, but I take it that what that means is you're not merely

1181

1    serving the mental health needs of the condemned, but other

2    prisons as well may be coming to your Mental Health Crisis

3    Bed Unit; is that correct?

4            THE WITNESS:  That's correct, Your Honor.

5            THE COURT:  All right.

6    BY MS. VOROUS:

7    Q.    Would you please describe the treatment and office

8    space that's available within the new central healthcare

9    facility?

10   A.    I would be happy to.

11           So it is a five story building.  Intake is located on

12   the very first floor.  We have several mental health offices

13   that are located on the first floor that assist with the

14   reception and release process of intake.

15           The second floor is, in its entirety, mental health.

16   So mental health will occupy -- I'm not sure of a specific

17   number, but there are dozens, if not 100 offices located on

18   the second floor.

19           And within that are treatment space also provided for

20   Ad. Seg, Condemned, GP, Reception Center, the entire mix of

21   the population of which we serve.

22           Moving up to the third floor would be medical.  We

23   don't have mental health offices on that floor.

24           Moving up to the fourth floor we would have the

25   Mental Health Crisis Bed and the Outpatient Housing Unit.

1182

1    And mental health staff, again, occupy offices on the fourth

2    floor associated with each of those programs.

3          THE COURT:  We're going to take our morning recess.

4    Fifteen minutes.

5          (Off the record at 10:50 a.m.)

6          (On record at 11:10 a.m.)

7          THE CLERK:  Please, remain seated.

8          Court is now in session.

9          THE COURT:  Miss Vorous.

10   BY MS. VOROUS:

11   Q.    Dr. Monthei, before the break we were talking about

12   the new healthcare facility building at San Quentin, and you

13   had talked about what types of services were offered on the

14   fourth floor.

15   A.    Correct.

16   Q.    What treatment and office space is available for

17   patient treatment on the fourth floor?

18   A.    So on the fourth floor we have a combination of the

19   Mental Health Crisis Bed, which currently composes ten beds

20   on that floor, and an Outpatient Housing Unit, which

21   comprises the remaining 33 beds.

22          On the floor there are several offices, several

23   Interdisciplinary Treatment Team rooms, several

24   Classification Committee rooms, two dayrooms, a yard specific

25   to that floor.

1183

1    Q.      Are those facilities that you just described

2    available for treating inmates with mental health conditions?

3    A.      Yes, they are.

4    Q.      Doctor, are you familiar with the Program Guide

5    criteria for what we've been calling the CCCMS level of care?

6    A.      I am.

7    Q.      Describe what the criteria are for that level of

8    care?

9    A.      By virtue of the Program Guide there is different

10   requirements associated with frequency of contact, including

11   criteria opportunities that are available, placement into the

12   program, removal from the program.

13           In general it defines a level of mental illness on a

14   spectrum -- on a larger spectrum of mental illness.

15   Q.      Now, are you familiar with the Program Guide

16   requirements for inmates designate as the Enhanced Outpatient

17   Program level of care?

18   A.      I am.

19   Q.      Describe what those requirements are?

20   A.      So in general it refers to the same type of criteria,

21   entrance criteria, diagnostic criteria, entrance and removal

22   by virtue of placement, different frequencies in terms of

23   contacts.

24           And again, on a spectrum of mental health, the EOP is

25   viewed as being more mentally ill as relative to the CCCMS

1184

1    population.

2    Q.      Are the terms CCCMS and EOP used in the Coleman

3    Program Guide to designate certain levels of care?

4    A.      Yes.

5    Q.      As the Chief of Mental Health, do you oversee the

6    provision of treatment to inmates that are at the CCCMS level

7    of care?

8    A.      I do.

9    Q.      Do you know whether or not San Quentin prison-wide is

10   providing or is meeting the program requirements for mental

11   health treatment to inmates at the CCCMS level of care?

12   A.      I do.  We are.

13   Q.      Yes.  How do you know that?

14   A.      Well, we have several structures in place, both

15   locally and on a statewide basis.  So locally we have a very

16   robust, continuous quality improvement program where we

17   self-scrutinize all our in-house operations on a weekly basis

18   by virtue of the Mental Health Program Subcommittee tied to

19   the quality improve, and informally through mental health

20   management meetings, healthcare access unit and other

21   meetings designed to be funnels of information.

22           Outside of all the in-house data-driven systems we

23   use to monitor it, we then roll up our data on a fairly

24   regular basis.  A lot more of it has become automated by

25   virtue of MHPS.net.  And the same information is captured and

1185

1  placed on statewide-dashboards, both as a relative comparison

2  of how we're doing not only at San Quentin, but within the

3  various programs, but also how San Quentin compares to other

4  institutions at large.  Historically, we've done very well.

5  We've been outperforming many institutions.

6            THE COURT:  Before you go on, you spoke about MHPS.

7            What is that, sir?

8            THE WITNESS:  Yes, Your Honor.  MHPS, Mental Health

9  Program Subcommittee.

10  BY MS. VOROUS:

11  Q.       You also referenced MHPS.net.  Can you explain what

12  that is?

13  A.       MHPS is the Mental Health Tracking System, and "net"

14  just refers to the process of it having been linked on a

15  statewide network as opposed to it being locally based, which

16  it was just within the last few years.

17  Q.       Is the mental health treatment that is currently

18  being provided to the inmates at the Enhanced Outpatient

19  Program level of care meeting Program Guide requirements as

20  well?

21  A.       Absolutely.  So for San Quentin our EOP population is

22  an EOP Hub population.  So we're not designated as an EOP

23  facility.

24            So we receive -- we have EOP patients by virtue of

25  them coming into our Reception Center, and then at some point

1186

1    through the reception process being identified as an EOP.

2            Now, at that time our duty becomes to provide them

3    with a level of appropriate services until such time as

4    they're transferred and received by us to the receiving

5    institution.  That institution would then have an EOP main

6    line facility that would continue the treatment.

7            So specific to the EOP Hub that we operate, for the

8    last several months not only has San Quentin been providing

9    Coleman-related requirements, we've exceeded every comparable

10   EOP Hub in the state by a wide margin.

11   Q.     Dr. Monthei, from your experience as a chief of

12   mental health, are you -- do you have an opinion as to

13   whether all of the inmates that are at the CCCMS level of

14   care are seriously mentally ill?

15   A.     I do have an opinion.

16   Q.     What is your opinion?

17   A.     They're not.  You know, there seems to be, based on

18   some of the testimony that I've heard up to this point, a

19   misrepresentation of many things.

20           There's, in my opinion, been some pretty egregious

21   testimony up to this point.  But mental illness is on a

22   spectrum, and within that spectrum there are a continuity of

23   mental illness.

24           There's been, I believe, a mischaracterization that

25   any Coleman Class Member is, by virtue of being a Coleman

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1187

1   Class Member, suffering from a serious mental illness.

2           That is simply not the case.  We have many members

3   who are Coleman Class Members by virtue of being in the CCCMS

4   Program who are absolutely not seriously mentally ill, but

5   who still are mentally ill and may require services.  But

6   they may be intermittent, they may be fluctuating or

7   vacillating.  It may be very situational-based.

8           A prime example would be a GP inmate who has

9   otherwise no history with mental health, not only at San

10  Quentin, but no mental health history in his history at all,

11  who receives a notification in the mail that his wife's

12  divorcing him.

13          We consider that bad news.  And we may place the

14  person in a CCCMS by virtue of medical necessity.  We may

15  provide supportive services to help the individual

16  successfully transition out of CCCMS back into the GP

17  population.

18  Q.      Dr. Monthei, I believe you have heard testimony that

19  both inmates at the CCCMS level of care, as well as at the

20  EOP level of care, are housed within East Block.

21          Is that accurate?

22  A.      I have.

23  Q.      Where are the inmates in the EOP level of care housed

24  within the East Block?

25  A.      So in general they're housed within the first three

1188

1    tiers of East Block.  It is a five-tier housing unit.  We do

2    not house any mental health participants on the fourth or

3    fifth tier simply by virtue of heat meds and the medical

4    complications associated with not only heat meds for

5    psychiatric reasons, but for medical reasons as well.

6         Now, within these three tiers we have an absolute

7    working relationship with the officers and custody throughout

8    the institution.  So as it stands, the EOP are -- some of

9    them are chunked, some of them are grouped in dyads, some of

10   them are much larger, some of them are separated.  Those

11   decisions, from my standpoint, are being made for clinical

12   reasons.

13        I am currently of the opinion that custody would be

14   more than willing to move the patients anywhere we want them

15   to.  So hypothetically, if we wanted all EOP to be first bar,

16   first tier, I do not believe that custody would have a

17   problem moving the patients for us, but there's a unique

18   dynamic associated with the condemned population that adds to

19   the clinical utility of working with them on an individual

20   basis.

21   Q.    So what would be a reason that you would want to

22   house an inmate at the EOP level of care in -- I believe you

23   used the term, you know, chunk, outside of that area?

24        Maybe we should have you explain that first.

25        THE COURT:  I would like you to tell me what you mean

1189

1    by "chunked" and the other word was -- I'm sorry.  I lost it.

2         Well, chunked, and some are grouped -- and some are

3    separated.  Will you tell me what you mean by the three

4    categories that you are describing?

5         THE WITNESS:  Sir, I apologize for the testimony not

6    being clear.

7         What I'm referring to is our ability to have EOP

8    patients housed on various tiers within East Block, and then

9    not only within the tiers, but the specific location on the

10   tier as to whether an EOP could be housed immediately next to

11   another EOP who is immediately housed next to another EOP

12   versus not making that decision.

13        THE COURT:  I'm sorry.  I'm still not clear, but it

14   is my fault, not yours.

15        You use the word "chunked."  And I gather that what

16   that means is that from your perspective it would be all

17   right to have EOP patients housed next to each other?

18        THE WITNESS:  Perhaps "cluster" would be a better

19   word.

20        THE COURT:  All right.  They're still separated in

21   separate cells, but they are -- the cells are clustered so to

22   speak; is that right?

23        THE WITNESS:  At times that is correct, Your Honor.

24        THE COURT:  Then you have people who are separated,

25   which I take it means they're not -- I don't know why I'm

1190

1  telling you, you tell me.

2          What does a separated housing situation mean?

3          THE WITNESS:  So in this context it may mean that an

4  EOP individual may not have an EOP or CCCMS member on either

5  side of him, he may have a GP condemned member to his right

6  and a GP condemned member to his left.  And in that context

7  I'm referring to isolated.

8          THE COURT:  And you use the word "grouped," which I

9  had understood you to say was distinctive from the situation

10 in which they're chunked, in which there are a significant

11 number of EOPs housed next to one another.

12         When you say "grouped," what does that mean?

13         THE WITNESS:  It's a synonym for cluster.

14         THE COURT:  It's the same as clustered.

15         Okay.  Thank you.

16 BY MS. VOROUS:

17 Q.      Doctor, did you also use the term "dyad"?

18 A.      I did.

19 Q.      Okay.  Would you explain that what means as well?

20 A.      Referring to having two EOPs housed next to each

21 other.  But again, having those two not being housed to

22 another EOP, another CCC, and perhaps being housed to a GP.

23 Q.      What would be a reason that you or a mental health

24 clinician would elect to have an EOP inmate housed

25 separately?

1191

1    A.      Sure.  So in general the average length of stay for

2    the members that we've had on the condemned population is

3    approximately 25 years.  So over the course of 25 years

4    patients develop a unique sense of ownership associated with

5    the unit, what they perceive to be their house, their

6    neighborhood.

7           Over the course of approximately 25 years they

8    establish unique relationships, both friendly and unfriendly.

9    They refer to them as neighbors.  There are situations in

10   which, unfortunately, family members have been on the unit,

11   and the family members would prefer to be housed next to each

12   other, but not be housed around others.

13          There are clinical reasons why we may place somebody

14   who we believe is capable of functioning at a higher level

15   next to a GP because the GP is almost taking a mentoring

16   relationship with that individual and helps facilitate that

17   individual's day-to-day functioning.

18          Outside of some of the clinical reasons, there's more

19   truly neighborhood reasons.  Some patients want to be closer

20   to the showers because they want to shower first.  Some

21   patients want to be on the higher tiers because it is warmer.

22   Some people want to be the on lower tiers because it is

23   cooler.  Some want to be closer to the officer because they

24   have more requests.  Some want to be further away.

25          There's -- the amount of examples are neverending.

1192

1    But the clinicians who are housed on that unit work hand in

2    hand with the patients and the officers to determine what

3    would be in that individual's, in that specific case, best

4    clinical interest.

5    Q.      From your perspective, as Chief of Mental Health at

6    San Quentin, does mixing the EOP inmates in the Condemned

7    Unit with the general population inmates impact the mental

8    health?

9    A.      In my opinion it does not.

10   Q.      From your perspective, as Chief of Mental Health at

11   San Quentin, does mixing the CCC with EOP inmates impact

12   either category of inmates with respect to their mental

13   health conditions?

14          THE COURT:  I'm sorry.  I didn't understand your

15   question.

16          You may answer, sir.

17          THE WITNESS:  It does not.  Now, my answer may be

18   different if those decisions were being made entirely absent

19   clinical input, but in the current reality the housing

20   decision are made through the ICC process hand in hand with

21   custody determinations and discussions that occur on a

22   frequent basis.  The decisions that are being made I would

23   characterize as deliberate as opposed to unintentional.

24   BY MS. VOROUS:

25   Q.      Where do the inmates that are housed in East Block

1193

1    who are members of the Coleman Class receive mental health

2    treatment?

3    A.    So they would receive treatment in a variety of

4    locations.  So some of the patients would receive therapeutic

5    yard on either the group yards or walk alone yards.  And that

6    would be associated with the yards most close in proximity to

7    their housing and the situation on East Block.

8          They have the option of meeting with clinicians on a

9    rather informal basis on the unit.  And we have staff on the

10   unit.  We do have offices on the unit.  It's not the

11   preferred method, but it frequently alleviates not making a

12   contact to somebody who otherwise would have refused

13   services.

14         The majority of services occur in the Central Health

15   Services Building.  On the second floor there's both group

16   rooms and individual offices where treatment is provided.

17   But it is not uncommon for somebody who would otherwise

18   refuse individual treatment to be persuaded by the clinician

19   who is working on the unit to walk down a tier or to walk

20   over a couple of cells in order to have an informal

21   appointment in an office located on the tier, but still

22   behind a closed door in a therapeutic module, in a

23   confidential setting, just not as ideal.

24         THE COURT:  I'm not quite certain -- I'm quite

25   certain I'm not certain.  Was that referring to folks who are

1194

1    housed in the East Block or people who are in the new

2    facility?

3         THE WITNESS:  My answer was referring to those that

4    are housed on East Block, Your Honor.

5         THE COURT:  Thank you.

6    BY MS. VOROUS:

7    Q.    Dr. Monthei, is there adequate space at San Quentin

8    to provide mental health care to the condemned inmate

9    population housed on East Block?

10   A.    Yes, there is.  Once, again, it wasn't always the

11   case.  As I mentioned, we have a state-of-the-art building

12   that is less than four years old.  And within that space we

13   have ample treatment space to provide services to the

14   entirety of the prison population.

15        It is literally a state-of-the-art building.  Shinny,

16   tiled, waxed floors.  Lights that automatically come on when

17   you enter the rooms.  Flat screen televisions hanging on the

18   walls.  Newly revised Coleman therapeutic modules.  Network

19   computers.  Phones in every office.  It is an ideal treatment

20   setting.

21   Q.    Inmates that are housed in the administrative

22   segregation unit, do they also have the ability to receive

23   mental health services in the new facility you've just been

24   discussing?

25   A.    Absolutely.  We provide, in a similar manner, all

1195

1    mental health services within that building, with very much

2    in place the same type of safety net measures for the various

3    populations.

4         To use an example, there isn't a requirement that

5    should somebody refuse an appointment that the clinician go

6    out and make contact with that individual, but there is a

7    local policy that we've established to ensure that whenever

8    somebody does not attend or is a no show or refuses an

9    appointment, that they do receive follow up prior to close of

10   business to ensure that the person is not refusing for

11   reasons associated with a mental illness that would not allow

12   him to participate, as opposed to somebody who is just sick

13   and says that I don't want to come out that day.

14        And in those same examples the individuals would be

15   persuaded, to the best of the clinician's ability, to come

16   out and meet with somebody on an office on that tier, even if

17   the person wasn't feeling necessarily that well, unless the

18   person is isolated for reasons that would present a

19   contraindication.

20   Q.    Dr. Monthei, you've been present during some of the

21   testimony that has been given in this hearing, and you're

22   familiar with the term Specialized Care Plan, correct?

23   A.    I am.

24   Q.    What is that?

25   A.    So we refer to it as the SCCP, Specialized Care for

1196

1    the Condemned Program.  It is an overarching aspect of

2    services that are provided to the condemned.

3         If we think about it, there's a Condemned Treatment

4    Program, and that would be the entirety of the program.  Then

5    within that there would be a spectrum of mental illness.  A

6    spectrum of mental illness would range from GP all the way

7    through the ranges of, perhaps, Mental Health Crisis Bed or

8    an acute referral.

9         On that same spectrum are those individuals that are

10   CCCMS, EOP, those individuals that could benefit from

11   enhanced EOP services.  So we use the Specialized Care for

12   Condemned to refer to enhanced services that are being

13   provided to the EOP population.

14        It is a biopsychosocial.  It's a word that really

15   combines three main components, the biology of the

16   individual, the psychology and the sociology of the

17   individual.  It's a holistic approach.

18        We use it in an assertive community-based model as a

19   means of outreach, of providing enhanced services that are

20   similar to an assertive community-model designed to minimize

21   referrals to a higher level of care that are designed to

22   mitigate, to the degree possible, the severity of one's

23   mental illness by providing more services.

24   Q.   Currently there are inmates that are at the EOP level

25   of care who are receiving mental health services under the

1197

1    Specialized Care Plan, correct?

2    A.        Correct.

3    Q.        And we've talked about the ten beds that are part of

4    the Outpatient Housing Unit.  Are there other inmates at the

5    EOP level of care within East Block who are also receiving

6    services through the Specialized Care Plan?

7              THE COURT:  I think I've lost something or I'm

8    getting confused.

9              How many beds are there for -- how many crisis beds

10   are there?

11             THE WITNESS:  There are 17, your Honor.

12             THE COURT:  Okay.  And the ten beds that counsel just

13   referred to are different than the 17 beds; is that right?

14             THE WITNESS:  That's correct, Your Honor.

15             THE COURT:  That is correct?

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  All right.  To what end are the ten beds

18   dedicated?  Who occupies them?

19             THE WITNESS:  The ten beds are currently occupied by

20   ten condemned EOP members.

21             THE COURT:  I think you've answered me, but I think

22   I'm still confused.

23             Are there additional beds for condemned EOP patients?

24             THE WITNESS:  There are, Your Honor.

25             THE COURT:  That's part of the 30 up stairs?

1198

1    THE WITNESS:  In part, Your Honor.

2    May it please the, court, I would be happy to

3    explain.

4    THE COURT:  Yeah.  Please.

5    THE WITNESS:  There's been some testimony that may

6    have led you to have the opinions that you have.  The

7    Specialized Care for Condemned at some point in testimony has

8    been described as referring just to ten beds, and that's

9    simply not the case.

10    There are ten beds that are a part of the Specialized

11    Care for Condemned Program.  Those ten beds are located on

12    the fourth floor adjacent to the Mental Health Crisis Bed

13    within the 33 beds that occupy the fourth floor.

14    So on the entirety of the fourth floor would be 17

15    Mental Health Crisis Beds, ten Specialized Care for the

16    Condemned beds and 23 medical OHU beds.

17    THE COURT:  Thank you.

18    BY MS. VOROUS:

19    Q.    Dr. Monthei, do you know how many Enhanced Outpatient

20    Program inmates that are currently housed on East Block are

21    receiving services through the Specialized Care Plan?

22    A.    I do.  It changes, but right now approximately 13.

23    Q.    When was the Specialized Care Plan for Condemned

24    developed?

25    A.    That's going to depend a little bit on how you look

1199

1    at it.

2         So I've been at San Quentin approximately six or

3    seven years.  Upon my arrival to San Quentin there was an

4    in-house identification that we had some patients we wanted

5    to provide additional services for.  And I felt it was

6    incumbent upon me to begin taking steps to provide those

7    services.

8         So there's about a gradual transition of increasing

9    and identifying those individuals that can benefit from

10   enhanced services for a long period of time.

11        In approximately November of 2010, this became -- or

12   my understanding is that it began to receive the attention of

13   stakeholders beyond San Quentin.  So it became a topic of all

14   parties' meetings and other things that I began participating

15   in on an infrequent basis.

16        So November 2010, to my memory, is the first time

17   that I was asked to codify some of the work that we had been

18   doing over the course of the last many months and began

19   discussing that in a larger, all-parties' group, with members

20   of the plaintiffs, I believe the prison law office, the

21   special monitor, the court monitor, his experts, DAI, members

22   of the receivers office and legal.  It was representative of

23   an all parties meeting.

24   Q.    When would you consider - I'll call it maybe the

25   first version of the Specialized Care Plan - that did not

1200

1    include the ten beds that are in the OHU as implemented?

2    A.        Could you restate the question?

3         THE COURT:  Yeah.  I don't blame you.

4    BY MS. VOROUS:

5    Q.        You indicated that the first time that you started

6    codifying and bringing this idea to stakeholders was in

7    November of 2010, I believe.

8         So my question is, at some point after that did you

9    actually implement what you were working on in order to start

10   providing those services to the inmates within the Condemned

11   Unit?

12   A.        I don't believe to the degree that you're asking.  So

13   the services that we begun providing, we begun providing

14   prior to November 2010.

15        But moving forward, beyond November 2010, there was a

16   constant evolution of the services that we were providing.

17   It never became an issue of:  You're not providing the

18   services and effective this date we'll begin.

19        It was a gradual increase of services.  As different

20   members of related stakeholders would weigh in, we would

21   receive opinions and some constructive criticism, some

22   feedback.  We would actively take that information back.

23   We'd work on it.  We'd evolve the process and continue moving

24   forward.  So there wasn't a date by which we just said:

25   Begin.  It had already begun.

1201

1    Now, along that same transition there are days where

2    improvements were made, but they were made in conjunction

3    with multiple stakeholders.  So some of those improvements

4    involved the increase in staffing associated with the

5    program, the increase in the use of beds available from the

6    receiver's office, more formalizing and codifying of how

7    we're going to approach the Specialized Care for the

8    Condemned services.  You know, capture it in a document.

9    Much of that work, I was under the impression, was

10   supported by the related stakeholders as we were engaging in

11   that process.

12   Q.    So let's go back a little bit and talk some more

13   about, you know, what the Specialized Care Plan is about.

14   I mean -- and I believe you testified earlier that

15   it's based on a model of assertive community treatment; is

16   that accurate?

17   A.    It is.

18   Q.    And what does that mean?

19   Explain what a model of assertive community treatment

20   is?

21   A.    So for us it is an outreach program.  It is providing

22   services in, what we're defining, as a community.  So the

23   members of East Block absolutely refer to East Block as their

24   neighborhood.  They refer to their cells as their house.  We

25   refer to it as their community as part of this program.

1202

1    So part of it involves meeting the needs of the

2    individual regardless of level of care and providing that

3    service in an effort to help the individual return to a

4    higher level of functioning.

5    So you may have a EOP or CCCMS who is vacillating

6    between the two.  We would identify why that individual is

7    vacillating between the various levels of care and provide

8    services that would allow that person to function for a

9    longer period of time within the CCCMS so that person does

10   not have to vacillate between EOP and CCCMS.

11   We take that same approach with EOPs who are looking

12   at Mental Health Crisis Bed placements or EOPs that have

13   acute referrals.

14   It is an outreach plan.  It is designed to increase

15   services, to mend the uniquely tailored needs of the

16   individual with the clinician in a manner that allows that

17   clinician to provide that service.

18   Q.    Do you believe that this model is an appropriate

19   model to use with the condemned population?

20   A.    I do.  For those reasons, as well as, you know,

21   reasons that are articulated within the Program Guide.

22   If you look within the Program Guide for, you know,

23   the requirements, there is EOP, CCCMS, ICF, you're going to

24   find that within the Specialized Care for the Condemned

25   Program we're not just meeting these items, we're exceeding

1203

1  those items.  But we're exceeding them in a manner that

2  allows the clinical utility of the individual to stay

3  connected to his neighborhood, to stay involved in the

4  relationships, for lack of a better term, that that

5  individual has with his neighbors, his friends, his

6  colleagues for potentially the last 25 years on average.

7  Q.      So it is your opinion then, that providing the

8  services near the inmate's home, as I believe you called it,

9  would be clinically indicated?

10  A.      For this population.  And this is a unique

11  population.  But in this situation, for this population, that

12  is absolutely the case.

13  Q.      Dr. Monthei, just looking at the time period between

14  November 2010 that we were just talking about, and up through

15  the end of December 2012, would you describe the types of

16  services that were being provided to inmates housed on East

17  Block as part of the Specialized Care Plan?

18  A.      The type of services included the spectrum of

19  services available.  They included psychology contacts,

20  psychiatry contacts, recreational therapy contacts, social

21  worker contacts.

22          These contacts occurred in different therapeutic

23  milieus, therapeutic yard, therapeutic groups, individual

24  appointments, screening, rounding, a lot of informal

25  outreach.

1204

1     Sometimes it wasn't necessary for a particular

2   individual to receive five psychology appointments in the

3   course of a week, but the person did benefit from a

4   psychologist swinging by to check on the person on a daily

5   basis.

6         John Doe, how are you doing today?

7         Everything okay?

8         Is there anything I can do for you?

9         We still have an appointment scheduled for next week.

10        Are you going to be okay until our scheduled

11        appointment comes around?

12        Some would view this as informal and nominal contact,

13   but it -- that would underscore or underestimate the

14   therapeutic utility of the patients knowing that clinicians

15   are there and available for them.

16   Q.    How do staff on East Block determine whether to

17   provide specialized services to inmates housed in that unit?

18   A.    So I don't have the document in front of me, but

19   there was a point in time in which we had what was

20   reminiscent of an all parties meeting that occurred at San

21   Quentin.  And members of the plaintiffs and members from the

22   Attorney General's Office and CDCR legal, members from

23   headquarters, mental health staff from San Quentin, the

24   Special Master and his experts, were all in attendance.  And

25   we developed, as a group, some of the thoughts we had on who

1205

1    would be appropriate to receive enhanced services and what

2    that criteria might look like.

3         It was, to a large degree, out of this work group

4    that we took the recommendations, and then we expounded upon

5    them and put together a working document that we can refer to

6    that helps describe these services.

7    Q.    And Doctor, I think you might be jumping just ahead

8    of me a little bit.  I just want to make sure that you're

9    answering the question that I intended to ask you and maybe

10   didn't ask it the way I should.

11        If a patient is not in one of the ten OHU beds, but

12   they're still on -- I mean, they're residing in East Block,

13   at that point what do clinicians look at to see whether

14   enhanced services or specialized services should be provided

15   to an inmate that is living on East Block?

16   A.    Sure.  And it does blend with the answer that I gave.

17   So within that we look at some of the same things that came

18   out of that meeting I described, which is the level of

19   functioning at an EOP level, the amount of attendance and

20   refusal, how the person is not only functioning in terms of

21   compliance with various appointments, but functioning in

22   terms of daily living skills, adherence to medication, a lot

23   of objective measures associated with how many RVRs the

24   individual has received, how many 115s the person has

25   received, whether from a custodial standpoint the individual

1206

1  is compliant with orders on the unit, whether they're

2  attending showers and yards.

3       All of these things become meaningful clinical data

4  the clinicians use to identify whether there is a specific

5  individual that isn't functioning at a level we would like

6  that individual to be functioning at.

7       THE COURT:  Let me interrupt for a moment because,

8  again, I'm reasonably certain I'm not following.

9       You've been talking about treatment of people who are

10 in East Block, and you have indicated that you think it is

11 not a wise thing to move them if you didn't have to because

12 they have these perceptions of neighborhood, et cetera.

13      Are there criteria under which people in East Block

14 are moved to the new building?

15      THE WITNESS:  There would be, Your Honor.

16      THE COURT:  Can you describe, in a general way, when

17 it is perceived that's the necessary thing to do?

18      THE WITNESS:  Yes, Your Honor.

19      So in general we would use some of the same objective

20 and clinical measures that I have just testified to, yet

21 within that the clinicians would also prioritize by clinical

22 severity those individuals that were most ill.  And those

23 individuals that are most ill would be the ones we would

24 first refer to the specialized care beds that are within the

25 OHU.

1207

1          THE COURT:  Okay.

2          And I don't know the answer to this, perhaps you can

3    tell me this as well, if the person is moved out of East

4    Block to the -- I don't know what to call it -- the new

5    building, because he's obviously sicker than treating in the

6    East Block, that would be appropriate?

7          I take it that's correct so far?

8          THE WITNESS:  In part, Your Honor.

9          There are individuals who are more ill, when compared

10   to other members that are currently on East Block, but

11   there's also a new realm of treatment opportunities that

12   become available in the new building that we believe will

13   work hand in hand with those individuals who are most ill.

14         THE COURT:  Okay.  But the essential criteria -- I

15   think I hear you saying is that the essential criteria for

16   moving a condemned prisoner from East Block to the new

17   building is he is sicker than the treatment that is available

18   appropriately on East Block so you move them to the new

19   building where there is a chance for greater treatment or

20   different treatment?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  All right.

23         But, as I understand it, the intention is that that

24   inmate remain in the new building only long enough to get him

25   stabilized, then you want to send him back to East Block,

1208

1  correct?

2      THE WITNESS:  Correct in theory, but not as in the

3  manner the previous testimony has lead you to believe.

4      THE COURT:  Tell me.

5      THE WITNESS:  It is the case we would like the

6  individual to be ultimately returned to a higher level of

7  functioning.  And in our eyes the ability for that individual

8  to return to life on East Block, to return to his

9  neighborhood, rejoin his community, is a goal of ours.

10     But it is not necessarily the case that we're looking

11 to get the person on their feet and returned as quickly as

12 possible.  We envision that the average length of stay for

13 somebody that we admit into these beds will be somewhere

14 between six months and two years.  And during the course of

15 six months to two years we will provide the person with the

16 skills necessary to reintegrate.

17     THE COURT:  Okay.  That's a point which may

18 differentiate your treatment expectations with other

19 institutions, and I don't care about that.  We'll worry about

20 that if and when we ever get to argument, which I doubt we

21 will.

22     You've got somebody six months to two years, I mean

23 that's the expectation.  It may even be longer?

24     THE WITNESS:  If necessary, yes, Your Honor.

25     THE COURT:  And it may be shorter?  Probably not?

1209

1    THE WITNESS:  Probably not.

2    THE COURT:  Fair enough.

3    This interruption in the -- I don't know exactly what

4    to call it -- the neighborhood concept is necessitated by

5    virtue of the degree of illness of the inmate, correct?

6    THE WITNESS:  Again, Your Honor, not to the degree

7    that's been testified to.  If it may please the court, I

8    would be happy to explain.

9    THE COURT:  Yeah.  Please.

10    No, actually you can't.  We'll see you at 1:30 and

11    you can explain it then, if you will.  But no one will

12    remember what we were talking about so we'll have to start

13    all over.

14    Reconvene at 1:30.

15    (Off the record at 12:00 p.m.)

16    (On the record at 1:30 p.m.)

17    THE CLERK:  Please, remain seated.

18    Court is now in session.

19    THE COURT:  Doctor, I think I'm going to stop

20    questioning and let Miss Vorous get on with her case.

21    You may proceed, ma'am.

22    BY MS. VOROUS:

23    Q.    Good afternoon.

24    A.    Good afternoon.

25    Q.    When we left for lunch you were talk about a

1210

1    neighborhood concept.

2         Do you recall that?

3    A.    I do.

4    Q.    Can you explain what that means?

5    A.    So it is referring to the manner in which not only

6    mental health is viewing East Block or the meaningfulness to

7    the patients, but also the manner in which the patients also

8    view this housing unit as their neighborhood, their

9    community, their house.

10   Q.    And in your opinion is it important to have a

11   community on death row?

12   A.    You know, for any other population may answer my be

13   very different, but for this population, given the unique

14   nature of it, it is a California-specific phenomenon.

15        We have a very large death row, the largest in the

16   country, if not the world, a very long length of stay in

17   which they're incarcerated in the same housing area.  And

18   those, coupled with an aging population, the developing of

19   mental illness and medical concerns, the relationships they

20   form, both with one another, with officers and with

21   clinicians, is absolutely a meaningful consideration in my

22   opinion.

23   Q.    Doctor, I want to go back to a question I asked you

24   earlier and just see if we can clarify for the record.

25        The question related to the number of inmates that

1211

1    are currently in the Condemned Program that are at the EOP

2    level of care.

3           Do you remember that?

4    A.      I do.

5    Q.      Do you know as of today, for instance, how many

6    inmates fit into that category?

7    A.      Yes, I do.  There are 37 EOPs in the entirety of the

8    Condemned Program.

9    Q.      And how many of those 37 are currently housed in the

10   ten Outpatient Housing Unit beds?

11          Are they all full?

12   A.      Yes.  There are ten in ten beds.

13   Q.      And are any of the other, I guess it would be the

14   remaining 27 EOP inmates, receiving services on East Block

15   through the Specialized Care Plan?

16   A.      Yes.

17          THE COURT:  So none of them are in the new building;

18   is that right?

19          THE WITNESS:  What is not correct, Your Honor.

20          THE COURT:  All right.  How many are?

21          THE WITNESS:  There's 37 EOP in the Condemned

22   Program, 23 are participants of the Specialized Care for

23   Condemned.  Of the 23, ten are housed in the OHU portion of

24   CHSB, 13 are housed in East Block, one is currently housed in

25   the Mental Health Crisis Bed.

1212

1    THE COURT:  Thank you.

2    MS. VOROUS:  May I approach the witness, Your Honor?

3    (Exhibit handed to witness.)

4    THE WITNESS:  I'm realizing I made an error in my

5    testimony.  Of the 13 on East Block there are -- of that pool

6    of 13 there are currently 12 on East Block and one of the 13

7    is currently in the Mental Health Crisis Bed for a total of

8    37 not 38.

9    BY MS. VOROUS:

10   Q.    Thank you.

11         Doctor, I've just handed you a document that is

12   titled Exhibit C to the Supplemental Declaration of Pablo

13   Stewart in Support of Plaintiffs' Motion for Enforcement of

14   Court Orders.

15         This, for the court's reference, is Plaintiffs' Trial

16   Exhibit 1014.

17         Do you recognize this document?

18   A.    I do.

19   Q.    Can you describe what this is, please?

20   A.    This is our latest working document associated with

21   the Specialized Care for Condemned Program.  It's part of

22   what I described as the ongoing evolution of the efforts that

23   have been put into this.

24         I originally indicated that the first time I was

25   asked to codify something like this was approximately

1213

1  November of 2010.  Since then multiple revisions as a working

2  document have been generated.  This is the last document that

3  was generated January, February of this year.

4  Q.    And can you explain how this particular document came

5  about?

6  A.    Well, I don't have the date off the top of my head,

7  but in what I referred to as being reminiscent of all parties

8  meeting that occurred at San Quentin, there were several

9  suggestions that came out of what informally appeared to be a

10 work group associated with developing the program, its

11 objective, what type of patient would be included in it.  And

12 that was used as a foundation in which we then elaborated

13 upon and created this document.

14 Q.    Is this document specific with respect to the ten

15 beds that are in the OHU?

16 A.    It does include the ten beds that are within the OHU.

17 Q.    Doctor, does this document outline the process that

18 staff -- mental health staff on East Block would follow to

19 initiate a referral for a patient to one of the ten

20 Outpatient Housing Unit beds?

21 A.    It does.  It provides a general framework from which

22 they can conceptualize the enhancement and services that are

23 available and the manner in which people can begin to

24 approach that and make the referrals and transition people

25 from one area to another area to receive a different type of

1214

1   services.

2   Q.      Does the plan also provide an opportunity to

3   coordinate treatment to continue in the Condemned Unit?

4   A.      Absolutely.  So there's a spectrum of illness that

5   we've referred to.  The overarching program we refer to as

6   the condemned treatment program.  So within the condemned

7   treatment program is going to be a spectrum of level of care

8   and a spectrum of services available to the patients, from GP

9   to CCC to EOP to Specialized Care for Condemned to MHCB to

10  DSH Acute.  And that would capture the spectrum of services

11  that are within the condemned treatment program.

12          And then a narrower subset would be the Specialized

13  Care for Condemned that we envision as being enhanced greater

14  than EOP, but less than an acute crisis, such as MHCB or a

15  DSH acute referral.

16  Q.      How many days a week are services offered to the

17  inmates that are housed in the ten Outpatient Housing Unit

18  beds?

19  A.      Seven days a week, two shifts, second watch and third

20  watch, weekends and holidays.

21  Q.      Is an Interdisciplinary Treatment Team one component

22  of this Specialized Care Plan?

23  A.      Yes, it is.

24  Q.      Can you -- Let me back up.

25          What is the responsibility of that team?

1215

```
 1   A.      So the document reads:
 2           (Reading:)
 3           The responsibility for overall treatment planning
 4           rests with the SCCP coordinator or designee,
 5           and is formulated in the IDTT.  The IDTT develops an
 6           individualized treatment plan, which includes
 7           therapeutic services and an individualized incentive
 8           program.  The Interdisciplinary Treatment Team
 9           provides an opportunity for coordinated treatment
10           between the fourth floor SCCP and the Condemned EOP
11           Treatment Program.  Initial and routine IDTTs
12           prescribe services and activities aimed at addressing
13           the identified problems.  Prescribed services will be
14           delivered...
15           (Reading interrupted.)
16           And it goes on to describe the manner in which.
17           In general, stepping back from this document, the
18   IDTT is the team that's responsible for the formulation and
19   delivery of treatment that's tailored to the specific
20   individual.
21   Q.      Doctor, can you identify, using the Bates stamp at
22   bottom of the document, which pages or page you were just
23   reading from?
24   A.      Bates page 25 of 50, Monthei-04.
25   Q.      Who are the team members of the Interdisciplinary
```

1216

1     Treatment Team?

2     A.      It's a multidisciplinary team, so it includes a

3     senior psychiatrist, senior social worker, line psychiatrist,

4     line social worker, line psychologist, mental health RN,

5     licensed psychiatric technician, a member of custody.

6     Usually it's either a member of the Healthcare Access Unit or

7     a member of the officer that's working either on the unit or

8     on the floor.

9     Q.      Does the program also include a -- or does the

10    program description, I should say, also include a Positive

11    Incentive Program?

12    A.      It does.

13    Q.      Would you describe what that program is?

14    A.      It's a modified behavioral incentive-based program.

15    It's very reminiscent of a token economy system that many

16    people are familiar with.

17            The general principle of it is tailoring the needs

18    and providing incentives for the individual who perhaps

19    wouldn't otherwise participate in services a means by which

20    to reconsider his engagement.

21    Q.      Doctor, what are the types of services that are

22    provided to inmates in the Outpatient Housing Unit beds?

23    A.      So the treatment services begin in what's labeled as

24    Monthei-06.  It describes the Interdisciplinary Case

25    Conferences that are available, and it briefly describes the

1217

1  Positive Incentive Program.

2         Then it goes on to describe the treatment services

3  that include the PC contacts, the psychiatry contacts, the

4  recreational services, the Interdisciplinary Treatment Team.

5  It goes on for several pages listing multiple activities.

6         In general, it's a full spectrum of mental health

7  services analogous to what you would find in an ICF-type

8  program.  It's a multidisciplinary, multiservice-oriented

9  approach that includes both groups and individual yards, both

10  therapeutic and non-therapeutic.

11         But one of the things that makes this program unique

12  is its continuous tie to the community.  So in this sense we

13  have, to some degree, a protest, taking some mentally ill

14  patients out of East Block and rehousing them into what would

15  appear to be a hospital-type setting.

16         And they're very eager to return to East Block.  And

17  one of our goals is to increase their functioning to the

18  degree where they too can function on East Block, but

19  function on East Block in a more appropriate manner, being

20  less ill than they were prior to coming over to the hospital.

21         So one of the things we do is we worked out some very

22  unique, creative, coordinated efforts with custody that allow

23  the individuals, who have a new realm of services available

24  to them by virtue of being in the hospital, to not only

25  receive services on the fourth floor, but to receive services

1218

1  on the second floor and receive services on East Block.

2         So we keep them enrolled in many of the same

3  treatment activities that they were in.  We don't pull them

4  out of their community, but we provide them with enhanced

5  services that aren't readily available within their

6  community.

7         THE COURT:  I'm not quite sure what that means,

8  Doctor.

9         Are they actually leaving East Block or not?

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  Yes, they are leaving?

12        THE WITNESS:  They're leaving East Block for the

13  purpose of being rehoused, but returning to East Block for

14  many different types of activities.

15        THE COURT:  Please, forgive me.  I'm really having

16  trouble.

17        These are people that are sufficiently ill that you

18  need to take them out of East Block for the services that are

19  available in the new building; is that fair?

20        THE WITNESS:  That's fair, Your Honor.

21        THE COURT:  But what I think I heard you say is that

22  somehow -- I'm really not clear -- there is some way of

23  trying to provide services that would otherwise be in East

24  Block?

25        I don't know what you mean.

1219

1    THE WITNESS:  May I explain?

2    THE COURT:  Please.  Yes.

3    THE WITNESS:  So while in the ten beds associated

4  with the OHU, they have a separate yard that is specific for

5  them in the OHU, a separate dayroom they can use, separate

6  groups and individual appointments that are specific to the

7  CHSB.

8    THE COURT:  You have to speak in the microphone,

9  otherwise Cathie will come up and stab you.

10    Go ahead.

11    THE WITNESS:  However, they also have friends on East

12  Block and a community.  So there was a yard that they were

13  assigned to on East Block.  We keep them enrolled in that

14  yard.

15    There were activities that they were engaged in on

16  East Block.  To the degree possible, we not only provide them

17  redundant services, if you will, in the Specialized Care

18  Program on the OHU in an enhanced manner, but we also provide

19  that link to them so they can continue to socialize with

20  their peers, continue to socialize both in group settings and

21  therapeutic milieus and therapeutic yards and sometimes,

22  simply, custody yards.

23    THE COURT:  I'm certain I'm being very dense.

24    There are group activities which exist for prisoners

25  in the East Block; is that right or wrong?

1220

1    THE WITNESS:  That's correct, Your Honor.

2    THE COURT:  As an example, there are yards that East

3    Block inmates can mingle on with other East Block inmates?

4    THE WITNESS:  That's correct, Your Honor.

5    THE COURT:  Now you have taken people out of that and

6    put them into the OHU, the ten beds, and that has its own

7    yard as I understand; is that correct?

8    THE WITNESS:  Yes, Your Honor.

9    THE COURT:  So how do you get them back into the yard

10   that you've called, for better or worse, a community yard?

11   THE WITNESS:  We escort them over in the same manner

12   we would have East Block EOPs that come over to the second

13   floor for a group, let's hypothetically say anger management.

14   So you have an EOP who was in anger management while

15   housed on East Block.  We move them over to the OHU.  We are

16   going to keep them in that anger management group.  So when

17   the patients from East Block come over to the second floor,

18   we're going to escort this individual from the fourth floor

19   to the second floor so he can also attend that group.

20   THE COURT:  Let me go back to my simpleminded

21   problem.

22   Is the inmate in the OHU not using the OHU yard, but

23   is using, for better or worse, the community yard, or is he

24   using both?

25   THE WITNESS:  He's using both, Your Honor.

1221

1    THE COURT:  Okay.  Now I understand.

2    Go ahead.

3    BY MS. VOROUS:

4    Q.    Doctor, is 24-hour nursing care available to the

5    inmates that are in the ten OHU beds?

6    A.    It is.

7    Q.    Can you explain how that would work given the

8    location of the ten beds on the fourth floor of the Central

9    Health Services Building?

10   A.    Sure.  So the fourth floor is a combined unit.  As we

11   described it's a combination of Mental Health Crisis Beds,

12   Specialized Care for Condemned beds and medical OHU beds.

13   Within the fourth floor there are two nursing

14   stations.  The nursing stations are staffed by virtue of

15   beds, which isn't uncommon.  It is relatively common in

16   standard hospital settings.

17   So that mix continues to be staffed 24 hours a day,

18   seven days a week, for the purpose of providing nursing

19   services to the entirety of the floor, including the members

20   of the Specialized Care for Condemned.

21   Q.    Up to this point have you had any inmates discharged

22   from one of the ten OHU beds?

23   A.    We have not at this time.  So approximately six

24   months ago we began admitting patients into the Specialized

25   Care for the Condemned Program.

1222

```
 1          We are currently in the process of working up and
 2    developing a more robust discharge plan for one specific
 3    individual who has been with us a little over six months in
 4    the Specialized Care for the Condemned Program who the
 5    clinicians, the officers, nursing, uniformly across the
 6    institution there is acknowledgment that this person has
 7    greatly improved.
 8          Nevertheless, we're still want to ensure as we
 9    transition the person back that we're doing so in a
10    meaningful manner, and we're providing the same type of
11    supportive services that may be needed as the person begins
12    his transition back to East Block.
13    Q.      Doctor, do you have any understanding of how the ten
14    OHU beds came about that are being used for the Specialized
15    Care Plan services?
16    A.      Can you restate the beginning of the question?
17    Q.      Do you have an understanding of how those ten beds
18    came about?
19    A.      I do.
20    Q.      What is your understanding?
21    A.      That it was a joint agreement between the Receiver's
22    Office, members of the Special Master's Team and the
23    plaintiffs.
24    Q.      How is mental health staffing organized for the San
25    Quentin Mental Health Condemned Program?
```

1223

1  A.      I have done everything in my ability to provide the

2  structure which would allow the mental health clinicians at

3  San Quentin to have superior knowledge when it comes to the

4  provision of mental health services within a forensic

5  population.

6  Q.      Doctor, can you explain what the staffing model looks

7  like for the condemned population?

8  A.      Sure.  It consists of approximately 18-and-a-half

9  direct positions and another six supportive positions.  They

10 range in disciplines of approximately one senior

11 psychiatrist, two senior social workers, two-and-a-half

12 psychiatrists, six psychiatric technicians, four recreational

13 therapists, one mental health RN, one clinical social worker

14 trainee, two senior psychologists.

15         I'm not sure if I'm being redundant, but there is

16 approximately 24-and-a-half total positions that either

17 directly or indirectly provide supportive services to the

18 Specialized Care for the Condemned.

19 Q.      Can you explain the difference between the positions

20 that provide direct support or indirect support?

21 A.      So the staff that provide direct support would be the

22 ones who are actively engaged in the Condemned Treatment

23 Program either by providing services directly or coordinating

24 their services.

25         The supportive services, as I'm describing them, has

1224

1    to do with what we've developed as a Continuous Quality

2    Improvement Plan.  So there is a small team that assists with

3    quality assurance compliance, outcome measures and things

4    associated to ensure that the work we're doing isn't just

5    being done for the sake of compliance, but is having a

6    meaningful impact in the lives of the patients we're

7    treating.

8    Q.       Does the model -- the staffing model that you have

9    put in place use a team approach?

10   A.       Absolutely.

11   Q.       Explain what that approach is?

12   A.       I'm not sure where to start.

13   Q.       Summarize.

14   A.       So we're structured by teams.  So we have -- we are

15   organized and function slightly different than the other 32

16   institutions by virtue of being divided into teams that

17   provide a service and having the patients come to us in the

18   CHSB, which is in contrast to having what many institutions

19   have, which is an Interdisciplinary Treatment Team located on

20   the unit that provides the full spectrum of services while on

21   that unit.

22           Now, we have a slight hybrid of it.  So on the one

23   hand we have a Quality Management Team that assists the

24   entire department with quality assurance, compliance, so on

25   and so forth.

1225

1    One of the other teams that we have is a Reception

2    Center Team that assists with receiving and release and all

3    the functions associated with that.

4        THE COURT:  You're going way too fast.

5        THE WITNESS:  One of the other teams that we have is

6    a Condemned Treatment Team.  It provides services associated

7    with the Condemned Treatment Program.  Same thing for the

8    Mental Health Crisis Beds.  So we're organized by function in

9    some degree and by team.

10    Now, the hybrid comes into place when we look at the

11    Specialized Care for the Condemned Program.  In that manner

12    we kind of deviate from our own exceptionalism by also having

13    staff assigned to East Block.

14    So we have staff assigned to East Block for the

15    purpose of -- purposes of providing services on East Block as

16    part of the Condemned Treatment Program.

17    We have staff assigned to the fourth floor, also for

18    the purposes of providing services to the Specialized Care

19    for the Condemned, people housed in the OHU, but it is part

20    of a larger Condemned Treatment Program that serves the

21    entirety of the mental health needs associated from the

22    spectrum of services that I described, from GP to Mental

23    Health Crisis Bed.

24    The one last piece of this is the manner in which our

25    clinicians also deviate with acute admissions.  So what

1226

1   you'll find at many of other institutions is a referral and

2   acceptance to a Mental Health Crisis Bed is, in essence,

3   entering a hospital, entering a new institution.

4           If we have a patient at San Quentin that enters our

5   own Mental Health Crisis Bed, they are, in essence, leaving

6   San Quentin and entering a Mental Health Crisis Bed, a state

7   hospital bed, if you will.

8           When it comes to the condemned patient, we have the

9   clinicians follow their patients through all aspects of the

10  levels of care.  So if we have a clinician working with an

11  EOP, and that EOP improves to the degree that they become a

12  CCCMS, he's going to have the same psychologist, the same

13  social worker, the same psychiatrist.

14          If the person decompensates and gets worse and

15  becomes more ill and is needed to be admitted to a Mental

16  Health Crisis Bed, there are certainly staff associated with

17  the crisis bed that can provide services on an

18  as-needed-basis, but for the most part the staff follow their

19  patients into the crisis bed, same psychiatrist, same

20  psychologist.

21          So there is a rather fluid transition and

22  understanding of the patients throughout the levels of care

23  associated with their illness.  And that's a unique feature

24  for the condemned.  It has, in my opinion, really assisted in

25  the improvements that we've seen.

1227

1   Q.      As the chief of mental health, is it your opinion

2   that there's adequate staff to provide mental health services

3   to the condemned population?

4   A.      Yes.

5   Q.      If there was a problem with the ability of the

6   current staff to provide the services, would you know about

7   that?

8   A.      I would.  I would know about it.  And it would be

9   incumbent upon me to do something about it.

10          The reality is, when we got authorization to move

11  forward with utilizing the ten beds in OHU, we envisioned a

12  reality where we're going to be providing more services than

13  have historically been available on East Block in and of

14  itself.  So we did ask for additional staffing.  We did

15  receive additional staffing.

16  Q.      So if there was a concern with the number of --

17  strike that.

18          If there was a concern raised by one of your

19  clinicians on East Block with respect to the number of

20  clinicians available to treat the population, how would you

21  know that?

22          Would they bring that to you?

23  A.      I have an open door policy.  At San Quentin the

24  clinician very well may come through my door and relay that

25  information to me.

1228

1    To put this into context, it's not uncommon for

2    dozens of clinicians, across the disciplines, to enter my

3    office at any given time throughout the day with a concern, a

4    recommendation, sometimes a criticism, feedback on a change

5    we made.  So it is entirely feasible that the information

6    could be relayed to me in that manner.

7    It's much more likely the case that it would come

8    through one of the systems that we have in place to provide

9    general oversight, not only to the Condemned Program, but to

10   the department as a whole.

11   We have two management meetings that occur each week.

12   The management meeting is attended by all supervisors from

13   all programs.  Each of the supervisors have team meetings

14   that occur at least weekly.  Some hold team meetings multiple

15   times a week.

16   There's a Healthcare Access Unit and a Mental Health

17   Program Subcommittee meeting, each of which occur on a weekly

18   basis.  We have a very robust quality management, continuous

19   quality improvement process in place at San Quentin.

20   The Special Master and his team are very aware of the

21   manner in which we collect data, present data, and, you know,

22   provide various reports associated with our compliance.

23   It's one of the things that we do exceptionally well.

24   Q.    Doctor, if I'm understanding your testimony

25   correctly, is it the case that you may have clinicians that

1229

1    are assigned to the condemned population that follow their

2    patients from East Block into the ten Outpatient Housing Unit

3    beds?

4    A.      That's correct.

5            In addition to that, they may have been their

6    treating clinicians at CCCMS.

7            You can envision a reality where there is an

8    insidious onset of a mental illness in which the person

9    decompensates from a non-severely mentally ill member, who

10   may be part of the Coleman Class by virtue of being CCCMS,

11   who rapidly becomes one of our acute patients in the crisis

12   bed.

13           Should that be the case, the treating clinician would

14   follow the individual in the same manner that I would hope

15   your physician would follow you if you were going into some

16   type of crisis and needed care that was above and beyond the

17   standard care that you may receive in a routine physical.

18   Q.      As the Chief of Mental Health at San Quentin, do you

19   hold yourself out as having high standards for your staff?

20   A.      Yeah.  But I would like to put it into context, if I

21   may?

22           So I was raised in a military household.  Father's a

23   Marine.  I grew up in a "Yes, sir," "No, sir," "Yes, ma'am,"

24   "No, ma'am" household.  I also come from a family of business

25   owners.

1230

1    In the here and now I'm the only member of my family

2    who is not self-employed, and I was prior to returning to

3    state service.

4    So those two things combined probably play a vital

5    role in my management style.  I have a rearing in which I

6    have expectations, and I expect those expectations to be

7    adhered to.  There are meaningful rewards and meaningful

8    criticism should the expectations not be met.

9    At the same time I also understand what it takes to

10   run a successful business in the private sector.  And to the

11   degree possible, I run the mental health at San Quentin like

12   a business, it just so happens to be the business of

13   healthcare.

14   Q.    What is your opinion on the qualifications of the

15   treatment team for the condemned?

16   A.    I believe the treatment team for the condemned

17   population has superior knowledge when it comes to the

18   provision of mental health services to that population.

19   When it comes to the members of my management team, I

20   believe that the members of my management team have superior

21   knowledge in the rules, regulations, policies, procedures and

22   laws that govern that practice.

23   There's a high degree of training and expectations

24   that I have, and we work very well together.

25   I've found that San Quentin has come a long way in

1231

1   the short amount of time I have been there, and we've

2   achieved a level of success that many who have known San

3   Quentin for much longer than I have report they didn't

4   believe was achievable at San Quentin.

5          I don't think we're done.  I think we have made a

6   tremendous amount of improvements.  I think we can continue

7   to evolve and continue to do better.  We have an outstanding

8   department and an outstanding team.  I'm very proud of the

9   work they do.

10  Q.     At San Quentin is there a peer review process that is

11  in place with respect to mental health clinicians?

12  A.     There is.  We have a peer review process that is

13  discipline specific.  So each discipline would have their own

14  peer review process.  That's the case.

15         I was going to correct myself because there was a

16  time in which we only had one of one discipline, and we

17  didn't have a peer review process for that single person

18  because there was only --

19         THE COURT:  There is nobody to do peer review with.

20         THE WITNESS:  That's correct.  But since then we've

21  certainly hired more.  We do have a peer review process for

22  each discipline.

23  BY MS. VOROUS:

24  Q.     Do you know whether there is a statewide process in

25  place for peer review?

1232

1  A.       There are several credentialing processes in place

2  for mental health providers.  The peer review process that we

3  implement locally is part of a -- I don't know if it is a

4  requirement, but I'm certain it is a statewide expectation.

5  Q.       And the expectation would be to do what you are doing

6  locally; is that fair?

7  A.       Correct.  There is a -- my understanding is that

8  there is a statewide expectation for individual institutions

9  to develop and implement the peer review process specific to

10  the disciplines in order to provide an extra layer of quality

11  assurance.  That's far from the only measure we have in

12  place.

13  Q.       You mentioned a credentialing process that's in

14  place.  Can you describe that, please?

15  A.       So for the most part every discipline has their

16  licensing board, be it recreational therapist, social worker,

17  psychologist or psychiatrist.  So there's a level of

18  compliance that they need to meet just by virtue of their

19  board.

20       But assuming that they met the board requirements,

21  they apply for a position within CDCR, their application goes

22  in several different areas, in almost a parallel track.  One

23  of the tracks is a credentialing track.

24       So we are physically unable to hire somebody until

25  such time as they have been vetted through this credentialing

1233

1  process.  Then after the credentialing process, there is a

2  recredentialing that occurs through the state every two

3  years.

4          But that is separate from any additional requirements

5  that the specific board may have of that specific individual.

6  That's just an added layer of oversight the state provides by

7  virtue of being a CDCR mental health clinician.

8  Q.      Doctor, you were present when Dr. Stewart testified,

9  correct?

10  A.      I was.

11  Q.      And did you hear his testimony with respect to the

12  quality of mental health care providers at San Quentin State

13  Prison?

14  A.      I did.

15  Q.      Do you agree with his testimony?

16  A.      Not at all.  I found his testimony to be extremely

17  nonobjective.  It was plagued with a multitude of biases.  It

18  lacked a basic foundation or an understanding that one would

19  expect in a forensic expert.

20          In my opinion the global testimony deviated from a

21  responsible, prudent, professional standard.

22  Q.      Doctor, there also appeared to be some confusion with

23  respect to the Specialized Care Plan itself, and I just want

24  to clarify for the court that this is a plan that has been

25  developed locally and it is not dictated by State regulation,

1234

1    correct?

2    A.      That's correct.  Our only requirement for the

3    condemned population comes by virtue of the Program Guide.

4    We could very easily rest upon the Program Guide and say that

5    we are going to use that as the means by which we approach

6    this population.

7    Q.      I just want to verify because I think there may have

8    been confusion with the court.

9            This is not something that is set out in Title 15,

10   for instance, it is not dictated by State regulation?

11   A.      This is not an expectation of any State regulation,

12   Title 15, Title 22, nor is it a requirement of OP-608,

13   Operational Procedure 608.

14   Q.      What is Operational Procedure 608?

15   A.      OP-608 is, in essence, the equivalent of everything

16   we just mentioned that's specific for the condemned.  It

17   governs the overall services.  From a custodial standpoint it

18   is their reality.

19   Q.      In other words, it's a separate policy that relates

20   to the condemned that's outside of Title 15?

21   A.      That's correct.

22   Q.      Doctor, do you know whether the specialized services

23   that have been provided within the Condemned Unit have

24   impacted the overall condemned population in any way?

25   A.      It has.

1235

1  Q.      How has it impacted the overall population?

2  A.      It has in a few different ways.

3         In general, we have seen a reduction of some of those

4  things that you would expect to see a reduction in and an

5  increase in those things you would expect to see an increase

6  in.  There has been a varying degree of interest associated

7  with mental health services in general.

8         You know, I keep saying that this is a unique

9  population, and I'm really at a loss in my ability to impress

10  upon people how unique the population is.

11        That's one of the things that I probably struggle

12  with with related stakeholders more than anything else, is

13  this notion that this is unlike any other forensic

14  population, not just within CDCR, but this is unlike any

15  population within the country.

16        So within that there has been a historic pushback, if

17  you will.  When you consider the length of stay for the

18  condemned inmates, upon my arrival there the feedback I got

19  from patients was to the extent of:  What can you do or

20  provide or structure for me that I haven't already completed

21  in the course of my 30 years of being here?  I've completed

22  AA and NA, anger management.

23        They gave us a litany of things that they've engaged

24  in over the course of the years.  They were done.  They

25  wanted nothing to do with mental health.

1236

1    In the here and now we are actively engaged in a
2    process of expanding services because we've reached a point
3    where we don't have enough space for the treatment that we're
4    providing to accommodate all the interests that we have.
5    For San Quentin, this population, that is a very nice problem
6    to have.
7    Q.    Prior to 2013, how often, to your knowledge, were
8    patients referred to the Acute Program at Department of State
9    Hospitals -- or condemned patients on average?
10    Do you know?
11    A.    How often?
12    You know, there was a time when I was generating
13    reports for related stakeholders.  I don't know that
14    information off the top of my head.
15    I can speak to general trends, but I don't know the
16    specific numbers as I sit here.
17    Q.    What are the general trends or what have the general
18    trends been since you've been the Chief of Mental Health at
19    San Quentin?
20    A.    Sure.  So in general, specific to mental health -- or
21    DSH acute referrals, in general we've seen a decrease of DSH
22    acute referrals.
23    Now, along with that decrease has been intermittent
24    spikes in referrals.  But in the grand spectrum of referrals
25    being made to DSH Acute, it's still less than before hand.

1237

1    THE COURT:  Less than before?

2    THE WITNESS:  Yes, Your Honor.

3    THE COURT:  All right.  I just didn't catch the last

4    word.  Okay.

5    BY MS. VOROUS:

6    Q.    And recently, this past spring, did you see a spike

7    in referrals to the Acute Program at the Department of State

8    Hospitals?

9    A.    We did.

10   Q.    And to your knowledge, did this spike have anything

11   to do with the services that were being provided on East

12   Block?

13   A.    They did not.

14   Q.    Do you have any understanding of what led to the

15   spike in the referrals?

16   A.    I do.

17   Q.    Explain what your understanding is.

18   A.    Sure.  This may also help clarify some of

19   Dr. Carter's testimony as well.

20        Earlier in this part of the year there were a couple

21   of things that happened.  One was an incident that occurred

22   on East Block that led some of the clinicians to be

23   hypervigilant in terms of their care and their treatment to

24   the mental health participants.

25        Along with that was what every patient self-reported

1238

1   to mental health clinicians as there being a bad batch of

2   meth on the unit.

3          There was, unfortunately, a large degree of referrals

4   that we made to DSH Acute, some of which were for patients

5   who had very little or no mental illness that we did refer to

6   DSH Acute in part because of the drug-induced psychosis, the

7   homicidal and suicidality that they exhibited during the

8   course of intoxification.  That led to some referrals.

9   Q.     Did the same spike in referrals occur with respect to

10  the Mental Health Crisis Bed Unit?

11  A.     It did.

12  Q.     Are inmates that are housed on East Block, who are

13  not within the Mental Health Services Delivery System,

14  observed for conditions that might be indicative of mental

15  illness?

16  A.     Yes.

17  Q.     Explain how that observation occurs?

18  A.     So it would occur by virtue of having clinicians on

19  the unit.  It would occur by virtue of the officers and their

20  wellness checks, by psychiatric technicians and their checks.

21         It is not -- to use an example that I have already

22  used, you have a EOP on East Block who hypothetically is in

23  the middle of the second tier who refuses his appointment

24  over in the CHSB.  The clinician, at least at San Quentin, is

25  going to do a cell front face-to-face meeting with that

1239

1    individual before close of business.

2         In the course of that clinician walking down the

3    tier, that clinician may be stopped seven or eight times

4    before he ever gets to the patient he intends to see.

5    It's part of what goes into the frequency of contacts.

6         But there's several formal and informal structures.

7    What I am describing are really more informal structures.

8         The formal structures come by virtue of the custody

9    checks, the psychiatric technician checks, the inmate

10   self-referral, the officer referral, the staff referral.

11        Nursing and medical each run a clinic on East Block.

12   It is not uncommon for us to get referrals from nursing

13   following a routine blood draw or medical following a routine

14   exam.  All of those add to the degree of communication and

15   sharing of information.

16   Q.    Doctor, a minute ago you mentioned in response to my

17   question on the spike of referrals to the Acute Program and

18   Mental Health Crisis Bed Unit that there was an incident that

19   occurred.

20        Can you explain what that incident is -- or was?

21   A.    There was a suicide on the unit.

22   Q.    And what was it about this suicide that you believe

23   led to an increase in the number of referrals to the Mental

24   Health Crisis Bed Unit and Acute Unit?

25   A.    Well, I think it goes in conjunction with what was

1240

1  reported to us as being a bad batch of drugs on the unit.  I

2  think that is most likely the predominant reason for it.

3      But I don't want to take away from the fact that

4  secondarily there may have been -- I would have -- I would

5  expect there to be some degree of hypervigilance when you

6  have who appeared to be a relatively well-functioning

7  individual, who had been working with his primary clinician

8  for many years, who had, what I'll describe, as a very good

9  therapeutic relationship with him, who while shortly after

10  going on vacation committed suicide.

11      I'm not sure of the exact dynamic that would have for

12  the clinicians there working so closely with the patients,

13  but I don't want to underestimate the notion that it may have

14  led one to be more hypervigilant.

15      THE COURT:  When you say "a bad batch of drugs," you

16  don't mean the drugs that you're prescribing, you mean the

17  illegal drugs that were on block; is that right?

18      THE WITNESS:  That's right, Your Honor.

19      THE COURT:  All right.

20  BY MS. VOROUS:

21  Q.    Dr. Monthei, at some point in the beginning of 2012,

22  and I believe January 2012, did you prepare a memorandum with

23  respect to the Specialized Care Plan?

24  A.    I prepared a memorandum.  I don't recall it being

25  specific to the Specialized Care Plan.  It was a

1241

1    conglomeration of many different things associated with the

2    specialized care.  Yes, I did.

3    Q.    Could you explain the reason why you prepared that

4    memorandum?

5    A.    In short, I was directed.

6    Q.    And just in summary, what was the substance of the

7    memorandum?

8    A.    So at this point there is -- my memory is that

9    locally San Quentin had been engaging in the process of

10   identifying and providing enhanced services to the condemned

11   population.  And while doing this at some point it became a

12   focal point or an agenda item for multiple stakeholders.

13        That led to dozens, if not hundreds, of different

14   conversations, emails, meetings, teleconferences, concerns,

15   criticisms, you name it.  And there were very few common

16   denominators that were able to attend all of the multiple

17   things that happened.

18        I certainly wasn't there for all of them, but I was

19   viewed as somebody who had attended enough that I could

20   extrapolate the information from all these different

21   meetings, teleconferences, emails, calls, et cetera, and

22   capture it in a document with the intent of taking all these

23   pieces of information that were coming out in all these

24   multiple different forums and consolidating them so there

25   would be a single, meaningful conversation that addressed all

1242

1   the different issues with all the relevant stakeholders.

2   Q.      Was that at a point where there was still discussion

3   as to how these services would be put in place or continued,

4   I should say, with going forward with treatment for the

5   condemned?

6   A.      What was in this was a little bit of everything.

7   That's definitely a part of it.  All the details associated

8   with if, when, how, where, what does it look like, feel like,

9   under what criteria.

10          It was a -- really it was almost like opening up a

11  Pandora's Box and getting so much collateral information that

12  it was difficult for any single person to manage it all.

13          MS. VOROUS:  Can I have a moment, Your Honor?

14          (Counsel confers with cocounsel.)

15          MS. VOROUS:  Your Honor, may I approach the witness?

16          (Exhibit located for witness.)

17  BY MS. VOROUS:

18  Q.      Doctor, I've handed you a binder that has been

19  identified as Jeanne Woodford Witness Exhibits and directed

20  your attention to the tab 1004?

21  A.      Yes.

22  Q.      Is this the memo that you were referring to?

23  A.      It is.

24          THE CLERK:  I don't have it in.

25          THE COURT:  1004.

1243

1    THE CLERK:  I don't have that in evidence.

2    MS. VOROUS:  It has not been admitted, Your Honor.

3    THE COURT:  All right.

4  BY MS. VOROUS:

5  Q.    Doctor, does San Quentin have in place any processes

6  to address suicides when they occur on the Condemned Unit?

7    MR. BIEN:  I'm sorry.  I didn't --

8    THE COURT:  I had a problem understanding the

9  question also.

10    Will you restate it, ma'am?

11    MS. VOROUS:  Yes.

12  BY MS. VOROUS:

13  Q.    This is not about that letter.  I apologize.

14    The question is whether San Quentin has in place any

15  processes to address suicides when they occur on the

16  Condemned Unit?

17  A.    I'm not sure that it is fair to say that we have a

18  standing process.  We have an informal process in which we

19  engage in on an as-needed-basis, that we view -- let me step

20  back -- that we assess on a case-by-case basis.  And if

21  clinically indicated, we then take appropriate action.

22  Q.    Do you hold monthly SPR-FIT meetings?

23  A.    We have monthly SPR-FIT meetings.  We have monthly

24  suicide prevention committee meetings, which is separate from

25  SPR-FITs.  We also have high-risk case conferences and

1244

1    difficult patient management meetings, all of which assess or

2    involve the notion of addressing high-risk patients and/or

3    suicidality.

4    Q.    Would you explain what SPR-FIT stands or?

5    A.    It is SPR-FIT, Suicide Prevention Response Focus

6    Improvement Team.

7          MS. VOROUS:  Just a moment, Your Honor.

8          (Counsel confers with cocounsel.)

9    BY MS. VOROUS:

10   Q.    Doctor, can you explain what you do in a SPR-FIT

11   meeting?

12   A.    So the SPR-FIT meetings are a headquarters-generated

13   statewide-generated review meeting.  It typically occurs via

14   webinar or video conference.  And it is a statewide review of

15   all trends and data associated with the State of California,

16   specifically the Department of Corrections, and specifically

17   within that suicide prevention.

18         It reviews trends, data, if there were effected

19   suicides throughout the state.  If so, the demographics

20   associated with it.

21         It's an educational suicide prevention designed to

22   not only inform all institutions of current risk factors that

23   may be there, but also to engage in a conversation throughout

24   the state on case specific examples that are used to almost

25   elicit constructive criticism and feedback and look at it

1245

1    from the standpoint of, in this context, are there any

2    suggestions from anybody in the field associated with the

3    type of patient that may present in the same or similar

4    manner.

5    Q.      Doctor, in your opinion are the condemned inmates at

6    San Quentin receiving adequate mental health care?

7    A.      Absolutely.

8    Q.      And the reason is, I'm assuming, based on everything

9    you have testified to today?

10   A.      It is.

11           MS. VOROUS:  No more questions, Your Honor.

12           THE COURT:  We'll take our afternoon recess.

13           Fifteen minutes.

14           (Off the record at 2:45 p.m.)

15           (On the record at 3:00 p.m.)

16           THE CLERK:  Please, remain seated.

17           Court is now in session.

18           THE COURT:  Mr. Bien.

19                          CROSS-EXAMINATION

20   BY MR. BIEN:

21   Q.      Good afternoon, Dr. Monthei.

22   A.      Good afternoon.

23           THE COURT:  Hold on a second, Mr. Bien.

24           (Brief pause.)

25   BY MR. BIEN:

1246

1    Q.      Dr. Monthei, you have -- as you described it you have

2    a complex mission at San Quentin that you're responsible for;

3    is that correct?

4    A.      It is.

5    Q.      You're responsible for the Reception Center, the Ad.

6    Seg. Program, including an Ad. Seg. EOP Hub; is that correct?

7    A.      That is correct.

8    Q.      And the Reception Center has a Reception Center EOP

9    Program?

10   A.      Yes.

11   Q.      And the Ad. Seg. EOP Hub, is that in Carson?

12   A.      Yes.

13           THE COURT:  Excuse me, gentlemen.

14           You may answer, sir.

15           THE WITNESS:  It is.

16   BY MR. BIEN:

17   Q.      That's a segregation unit, correct?

18   A.      Correct.

19   Q.      Okay.  And the Ad. Seg. EOP Hub is a unit where EOPs

20   in segregation are supposed to be transferred to so they can

21   get EOP care; is that correct?

22   A.      No.

23   Q.      What is your understanding of what an Ad. Seg. EOP

24   Hub is under the Coleman Program Guide?

25   A.      An Ad. Seg. EOP Hub is not a program that patients

1247

1    are transferred to.  It's a program in which services are

2    provided pending their transfer to an EOP main line facility.

3    Q.      Okay.  You understand that there are Ad. Seg. Units

4    that are not Ad. Seg. EOP Hubs; is that correct?

5    A.      Yes.

6    Q.      Okay.  And if an EOP under the Coleman standards is

7    in a regular administrative segregation unit, what does the

8    Coleman Program Guide require happens to that inmate?

9    A.      That the EOP be processed for transfer.

10   Q.      All right.  And where would they be transferred to?

11   A.      They could be transferred to a hub for a short-term

12   hold pending transfer to an EOP main line facility.

13   Q.      Okay.  I think we're in agreement.  An Ad. Seg. EOP

14   Hub is a place where EOPs in Ad. Seg, while they're in

15   Ad. Seg. are supposed to be transferred to; is that correct?

16   Or remain in to get treatment?

17   A.      Yes.

18   Q.      Okay.  And your point was it is not a permanent

19   placement; is that correct?

20   A.      That is correct.

21   Q.      So in a normal non-condemned situation, people are

22   not permanently housed in Ad. Seg. Units; is that correct?

23   A.      I'm not sure.

24   Q.      Okay.  What did you mean by your Ad. Seg. EOP Hub not

25   being a permanent placement?

1248

1    A.      I meant that they are designed to be transferred to

2    an EOP main line facility.

3    Q.      Okay.  Putting aside the Condemned Unit, you don't

4    have a main line unit at San Quentin; is that correct?

5    A.      That is correct.

6    Q.      So you're -- again, outside of the Condemned Unit,

7    you have some EOPs that are found in Reception, one group is;

8    is that correct?

9    A.      Yes.

10   Q.      And you also have some EOPs who would be in the

11   Carson Unit who would be in your EOP Ad. Seg. Hub?

12   A.      Correct.

13   Q.      Okay.  On the Condemned Unit you have obviously, as

14   we've heard, the full gamut of human beings who happen to be

15   condemned; is that correct?

16   A.      Yes, sir.

17   Q.      And they include people with mental health diagnoses

18   and people who don't have mental health diagnoses?

19   A.      Correct.

20   Q.      And they include people who are in the -- have

21   disabilities and might be identified in the Armstrong Class

22   too in condemned?

23   A.      Possibly.

24   Q.      Do you have any wheelchair riders, for example?

25   A.      We do.

1249

1   Q.      Any people who are vision impaired?

2   A.      I'm not personally aware of condemned patients we

3   have that are vision impaired, but I can't imagine that we

4   would not.

5   Q.      The man who committed suicide was vision impaired,

6   wasn't he, in March 2013?

7   A.      He was.

8   Q.      And you also have men on the Condemned Unit who are

9   developmentally disabled identified for services through the

10  Clark Program?

11          MS. VOROUS:  Objection, Your Honor.  Relevance.  Not

12  sure what this has to do with --

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  I believe so.

15  BY MR. BIEN:

16  Q.      On the mental health program, what came through to me

17  today, Dr. Monthei, I think to everyone, that you are -- have

18  been extremely creative and dedicated.  And as you said, you

19  came up with some very special deviations to address this

20  population in developing the programs that you and your team

21  have developed for the condemned.

22          It is not even a question.  More of a statement.

23          THE COURT:  I didn't know that.

24          Go ahead.

25          THE WITNESS:  Even though it is not a question, I

1250

1    appreciate it.  And I don't think it is something specific to

2    me.  I believe that the members of the management and the

3    department are equally passionate about the work they do.

4    But I thank you.

5    BY MR. BIEN:

6    Q.      You have done this with severe limitations.  For

7    example, your program for the condemned does not have a EOP

8    program that's like all other EOP programs; is that correct?

9    It's different?

10   A.      It is different.

11   Q.      Okay.  Other EOP programs are in units that are

12   sheltered from other CCCs and main line inmates; isn't that

13   correct?

14   A.      For the most part, I believe so.

15   Q.      That's what the Program Guide requires for EOP

16   programs, that they be sheltered programs?

17           I know there is an exception for San Quentin

18   condemned, but isn't that what the requirement is for EOP

19   programs for all other prisons?

20   A.      For the most part, I believe so.

21           I believe there may be some exceptions, but I'm not,

22   as I sit here, able to speak to whether those exceptions may

23   or may not be accurate.

24   Q.      And your program -- when you came to this program,

25   you knew that access to inpatient psychiatric care at the

1251

1   intermediate level was not an option for your patients; is

2   that correct?

3   A.       For which population?

4   Q.       For the condemned?

5   A.       For the condemned population that is correct.

6   Q.       Did you also come to learn that access to the Acute

7   Psychiatric Program at CMF was different than what other

8   patients -- non-condemned patients experienced?

9   A.       I was eventually made aware of that.

10  Q.       How were you made aware of that?

11  A.       To be blunt, patient report.

12  Q.       What kind of information did you hear from patients

13  about their experiences in the APP, Dr. Monthei?

14           MS. VOROUS:  Objection.  Beyond the scope of direct.

15           I did not discuss the Acute Psychiatric Program

16  available for the condemned.

17           Hearsay, as well, Your Honor.

18           MR. BIEN:  He's responsible for all mental health in

19  the program, and he actually talked about this issue in his

20  declarations, Your Honor.

21           THE COURT:  You may proceed.

22           THE WITNESS:  The reports that I heard from patients

23  were that they were held to a different custody standard than

24  other patients that were at DSH Acute at the same time.

25  ///

1252

1  BY MR. BIEN:

2  Q.      Did you hear that they were not allowed out of their

3  cell except in cuffs?

4  A.      I did.

5  Q.      Okay.  They were not provided with group treatment?

6  A.      I did.  But at times there was also an

7  acknowledgement that they were not allowed out for group

8  treatment because there would have been a group of one.

9          THE COURT:  But that's also because the condemned

10  weren't permitted to receive group treatment with

11  non-condemned prisoners, correct?

12          THE WITNESS:  That's my understanding, Your Honor.

13          THE COURT:  Right.

14          MR. BIEN:  Your Honor, may I approach?

15          (Exhibit handed to witness.)

16  BY MR. BIEN:

17  Q.      Dr. Monthei, let me just authenticate this document.

18  This is Plaintiffs' Exhibit 1153.  We have redacted it to

19  remove the prisoner name and the code is IIII.

20          It is a letter that my office received from a patient

21  in the APP that was written approximately September 3rd,

22  2013.

23          Dr. Monthei, is this patient a member of the

24  condemned population of San Quentin?

25  A.      He is.

1253

1  Q.    Okay.  And is it correct that he was recently

2  referred to the Acute Psychiatric Program at CMF where he --

3  I'm not sure he's still there right now, but he's been there

4  for a month or two?

5        MS. VOROUS:  Objection, Your Honor.  I don't believe

6  that this document has been properly authenticated.  So to

7  the extent that Dr. Monthei is being asked to read from what

8  this document states, we would object on that basis, as well

9  as hearsay.

10       THE COURT:  Miss Vorous, I'm sorry, but you're going

11 to have to just speak up.

12       As I understand it, your objection is that the

13 document has not been properly authenticated; is that right?

14       MS. VOROUS:  Yes.  And to the extent that counsel is

15 asking Dr. Monthei to read from the document rather than his

16 own personal knowledge as to this particular inmate.

17       THE COURT:  This has to do, I assume, with whether or

18 not a patient of Dr. Monthei's has made objections or

19 comments similar to those, I assume that's why you are doing

20 it?

21       MR. BIEN:  That's correct, Your Honor.

22       THE COURT:  The objection is presently denied.  But I

23 don't know what happens when that question is asked

24 eventually.  I suppose it will be.

25       You can sit, ma'am.

1254

1      You haven't moved it yet.

2      MR. BIEN:  I haven't.  I'll move it into evidence.

3      THE COURT:  Well, now the objection is that it is not

4  properly authenticated.

5      As far as I know, you might have just had one of your

6  subordinates write this letter.

7      MR. BIEN:  I can --

8      THE COURT:  I understand that is unlikely, but all

9  I'm saying is it is a problem of authentication.

10     MR. BIEN:  I authenticate it as a letter I received

11 in my office.  There is a postmark and envelope, and I

12 have -- the name matches up.

13     I can ask about it without putting it into evidence.

14     THE COURT:  That's what I think you better do.

15     MR. BIEN:  Okay.

16 BY MR. BIEN:

17 Q.    Dr. Monthei, if you look at the second -- have you

18 had a chance to read the letter?

19 A.    I have.

20 Q.    Okay.  If you look at the second paragraph, the

21 patient says --

22     THE COURT:  Sir, it is not in evidence.  You can't

23 ask him about the content.  I don't know how to say that

24 otherwise.

25     MR. BIEN:  Okay.

1255

1    THE COURT:  You can ask him whether or not these

2    things are things that have been reported to him.

3    BY MR. BIEN:

4    Q.    Have you had patients, Dr. Monthei, complain to you,

5    or your staff, complaints that were brought to your

6    attention, that when they were in the APP Program at CMF,

7    they were denied dayroom or telephone access?

8    A.    No.

9    THE COURT:  You know, Mr. Bien, I don't want to tell

10   you how to run your case, but we've already had the evidence,

11   even from Dr. Carter, that everything that is said in this

12   letter is exactly what happens to condemned persons.

13   BY MR. BIEN:

14   Q.    The question is, I guess, you had --

15   MR. BIEN:  I think it is important to know what he

16   knows about the complaints.  That's all.

17   THE COURT:  Okay.  If that's what you're seeking,

18   then, of course, you may proceed.

19   BY MR. BIEN:

20   Q.    Have patients told you that they didn't want to go

21   back to the APP because they found it to be such a

22   restrictive experience compared to their experience at San

23   Quentin?

24   A.    Yes.

25   Q.    In your opinion, as a clinician, do the conditions in

1256

1    the APP Program, as reported to you by patients, tend to

2    discourage them from accepting that level of care?

3              MS. VOROUS:  Objection, Your Honor.  Again, beyond

4    the scope of direct.

5              THE COURT:  Overruled.  You may answer.

6              THE WITNESS:  I'm simply not sure.  I know there are

7    some preconceived opinions specific to DSH Acute.  And the

8    degree to which those opinions impact their willingness to go

9    there, I'm just not sure as to what degree that plays itself

10   out.

11   BY MR. BIEN:

12   Q.        How about with your staff?

13             Are you aware that your staff are less likely to

14   refer to the APP because they understand that their patients

15   are not going to get the same kind of care that other

16   patients get in the APP?

17   A.        Not as stated.  I understand that there's a concern

18   that some staff have that is very similar to the question

19   that you asked, which led to corrective action to ensure that

20   those who meet the requirements are processed through the

21   acute referral mechanisms, up to and including a Vitek

22   hearing if need be.

23   Q.        This relates to your testimony about the tragic

24   suicide earlier this year and the effect it had to your

25   program?

1257

1    A.     In part.

2    Q.     And do you think before that event that there may

3    have been at least some tendency for your staff not to refer

4    patients to that program due to these factors that we've

5    discussed?

6          MS. VOROUS:  Objection.  Calls for speculation.

7          THE COURT:  He's asking if he knows whether there was

8    staff that were reluctant to refer for the reasons specified.

9          You may answer.  If you know, say "Yes."  If you

10   don't know, say "I don't know" or whatever.

11         THE WITNESS:  I do not know.

12   BY MR. BIEN:

13   Q.     But you thought that some behavior changed after the

14   suicide in March?

15   A.     Yes.  Specifically, the treating psychologist took

16   this death very hard.  He took it very personally and was

17   having a very hard time in reconciling the role he played in

18   providing therapeutic services to this particular individual.

19   Q.     Did you, as a manager -- I thought I detected in your

20   past answer, heard you say that you worked on making sure

21   that when people met referral criteria that they were

22   referring and also doing Vitek hearings, which are -- what

23   are Vitek hearings for?

24   A.     It's a hearing where we are soliciting an

25   administrative law judge for permission to require somebody

1258

1    to be placed in a hospital.

2    Q.      So a Vitek hearing is for involuntary

3    hospitalization, someone who refuses hospitalization?

4    A.      That is correct.

5    Q.      Keyhea is for involuntary medication?

6    A.      Correct.

7    Q.      Did you, as manager, did you feel there was a need to

8    counsel or work on the issue of staff referring for both

9    Keyhea hearings and Vitek proceedings if a patient meets that

10   criteria?

11   A.      If I heard your question correctly, the answer is no.

12   Q.      You thought it was going fine before?

13   A.      I believe that appropriate PC-2602 referrals were

14   being made when needed and that appropriate referrals to DSH

15   Acute was being made when needed.

16           I also understood there was a concern specific to a

17   single psychologist.  And the concern I had was that it

18   would -- it is a very close-knit team.  They function almost

19   as a military unit.  And I was concerned that it may lead to

20   the rest of the team being hypervigilant.  So some training

21   was done, some services -- counseling services were offered.

22   Proactive corrective measures were put into place, not

23   reactive corrective measures.

24   Q.      What testimony that you heard in the trial did you

25   consider to be egregious?

1259

1    A.      One of the examples that stands out has to do with a

2    patient that was proffered during Dr. Stewart's testimony.

3    And during his testimony he indicated that there was a

4    patient -- I don't have his testimony, I'm not reading from

5    it -- but to summarize it to the best of my memory, that

6    given a specific incident, that incident should dictate the

7    course of treatment from that moment forward, foreseeably

8    forever.

9           So imagine, if you will, a beautiful, young bride who

10   gives birth to the family's first child, who following birth

11   develops postpartum depression.  And during the depression,

12   in a moment of weakness, effects a suicide attempt or a

13   suicide gesture.  Who then, applying the same policies and

14   procedures that Dr. Stewart would apply, is then

15   involuntarily hospitalized and involuntarily medicated from

16   that moment forward for the rest of her life.

17          I find that to be egregious because the standard that

18   gets applied to mental health isn't a separate standard for

19   the condemned.  It is a single standard that is applied no

20   differently to the condemn than it is to my family member or

21   a family member of anyone sitting in this court.

22          The notion that one would be so willing to violate

23   the civil liberties of due process of those who are on

24   condemned row, despite the limitations placed upon

25   practitioners by virtue of PC-2602, is one example of

1260

1   something I found egregious.

2   Q.      Did you find Dr. Carter's testimony about the

3   characteristics of the condemned population to be egregious

4   at all?

5          THE COURT:  I don't know about egregious.

6          Did you find it accurate?

7          No, you didn't?

8          THE WITNESS:  I did not find it accurate, but I have

9   a context to put it in where I believe I understand his

10  testimony.

11         I also understand that he was given numerous

12  opportunities to correct the record and failed to do so.  So

13  as it states, no, I do not agree with it.

14  BY MR. BIEN:

15  Q.      Would you agree that there should be more

16  collaboration between the San Quentin mental health staff and

17  the CMF mental health staff about characteristics of the

18  condemned population?

19  A.      Your question implies that there isn't dialogue, and

20  I'm certain that there is dialogue.  Not by me, but there is

21  dialogue that occurs from the treating clinicians at each

22  respective site.

23         The degree to which one of my staff and/or Dr. Carter

24  or another treating physician engage in that dialogue is

25  unclear to me, but it's certainly an expectation that I have

1261

1  of my staff.  And I would be surprised to learn that my staff

2  are faltering on that expectation.

3  Q.     Have you made any efforts to remove the restrictions

4  on APP care that you learned about at CMF?

5  A.     Not that I can recall.

6  Q.     Your MHCB Unit has condemned and non-condemned in the

7  unit at the same time; is that correct?

8  A.     That is correct.

9  Q.     You have groups for condemned in your condemned EOP

10  programs; is that correct?

11  A.     Yes.  Our condemned EOP programs have many groups.

12  Q.     You testified about what you called a "sweep."  Was

13  this a mental health screening of the condemned population,

14  Dr. Monthei?

15  A.     I believe that's a fair characterization.

16  Q.     Was there a protocol for the sweep?

17  A.     No.

18  Q.     Did you use a screening instrument?

19  A.     Excuse me.  Let me take that back.

20       My memory is that there is an LOP that we utilize.

21       I'm misspeaking.  Excuse me.  There is not a policy.

22  Q.     Did you stop all other activities to do this effort?

23  How long did it take?

24       THE COURT:  Well, you now asked two questions.

25  BY MR. BIEN:

1262

1    Q.      I asked two.

2            How many days or weeks --

3            THE COURT:  Or hours or whatever it took.

4    BY MR. BIEN:

5    Q.      How long did it take to do what you called "the

6    sweep" that occurred?

7            Was it in August?

8    A.      It's probably within the last month --

9    Q.      Okay.

10   A.      -- for the latter question.  For the former question,

11   it took approximately a week, somewhere in the neighborhood

12   of 40 hours to complete the screenings, evaluations, whatever

13   manner we want to characterize them, and another several days

14   in order to review and process the documentation.

15   Q.      So 40 hours for what person or persons or

16   professionals?

17           Was it -- how many people were involved in the

18   effort?

19   A.      Approximately 30 to 40.

20   Q.      And what types of professionals were involved?

21           Were there any professionals?  Who did it?

22           I don't know who did it.

23   A.      Mental health clinicians.  So in this context mental

24   health clinicians would be psychiatrists, psychologists,

25   social workers.

1263

1    Q.      And was this a -- did everyone do it together at the

2    same time?  How did this happen?

3    A.      So this particular screening, I've testified

4    previously through the course of my deposition, that we don't

5    have a standard policy for screening of the condemned.

6            This particular screening came by as much as through

7    opportunity as anything else.  So for this last round of

8    screenings the events that were occurring had to do with the

9    institution being on modified program from a custody

10   standpoint, and it had to do with flu vaccinations occurring

11   from a medical and nursing standpoint.  And it had to do with

12   some statewide-systemic flaws that we were having in MHPS and

13   our ability to capture the day to day work.

14           Given the dynamics that were playing itself out,

15   ultimately I made the decision to keep a skeleton crew

16   running the vital operations, the on-call, the emergency

17   room, receiving and release, medication appointments, so on

18   and so forth, while redirecting the remainder of clinical

19   staff in the department to engage in a sweep because it had

20   been some time since, my memory was, that we did our last

21   one.

22   Q.      And what were the instructions to clinicians in this

23   effort?

24           You said they distributed a pamphlet, right?

25   A.      Yeah.  My memory is that there was a mental health

1264

1    progress note that's referred to as a 7230 completed for each

2    contact that was made.

3        There was a mental health referral form provided to

4    every patient that was screened, along with a conversation in

5    terms of how one can access mental health services.

6        It was mostly reported that we were telling inmates

7    and patients what they already knew, but it was an exercise

8    that I felt could be of benefit anyway.

9        And we also provided them with a mental health

10   pamphlet that generally described the mental health services

11   available specifically at San Quentin.

12   Q.    You're aware that there is a 31 question screening

13   form developed by the Department for screening for mental

14   illness?

15   A.    I am.

16   Q.    Is that used in Reception as part of the reception

17   process, one of the places?

18   A.    That's correct.

19   Q.    Is it also used before patients are admitted --

20   before prisoners are sent to ad. seg. units; is that correct?

21   A.    That is also correct.

22   Q.    And that is designed to identify signs and symptoms

23   of mental illness and perhaps suicidality in prisoners; is

24   that correct?

25   A.    That is correct.

1265

1  Q.      And you didn't use that form in this process?

2  A.      I chose not to use that form.  And the State has

3  chosen to revise that form in order to come up with something

4  that is more appropriate for the screening of those with a

5  mental illness.

6  Q.      What was the result?

7          Did you analyze the information that came out of this

8  sweep?

9          THE COURT:  He doesn't mean you personally.  He means

10  you and your staff or somebody.

11  BY MR. BIEN:

12  Q.      It may be him personally.

13          Did San Quentin, under your direction, or you,

14  analyze this information, Doctor?

15  A.      San Quentin did.  I did not.

16  Q.      Okay.  And are you aware of the results?

17  A.      I'm not aware of the specific results.

18  Q.      Were there any condemned prisoners that were referred

19  for mental health -- further mental health evaluation as a

20  result of this process?

21  A.      I don't recall.  There were a handful of referrals

22  that came out of it.  So if I may speak in general terms,

23  there were some referrals from people already on caseloads

24  who were referred to their clinician for a follow up as a

25  request, John Doe saying:  I'm fine, but I would like to

1266

1    meet.  I'm scheduled to meet with Jane Doe next week.  Can I

2    meet with her tomorrow instead?

3          So we would process those type of referrals.

4          My memory is that there were very few, if any,

5    non-mental health patients that were referred for evaluation.

6    It was more the case that they were people within the mental

7    health system that were referred for follow up.

8    Q.    Did you feel this was a valuable thing to do, Doctor,

9    the screening of condemned population?

10   A.    You know, I want to say I wouldn't have done it if I

11   didn't believe it to be valuable.  There is a -- I guess it

12   depends how you look at it.  I believe that the effort was

13   worthwhile given the dynamics that were currently unfolding

14   during the course of that week.

15         That's one way to look at it, to say that there is a

16   staff on the unit, there is a presence, information being

17   shared.  How could that ever be a bad thing?

18         On the other hand, one could look at it from the

19   other perspective and say, what was the outcome?

20         There weren't many referrals.  Everyone reported that

21   for the main stay the status quo was okay.  Clinicians knew

22   their patients.  People not in the mental health system

23   didn't belong in the mental health system.

24         I guess it depends how you look at it.  If I had to

25   do it over again, I would do it the same.

1267

1    Q.      Do you think there should be some sort of -- you said

2    you had done it six times since you've been chief of mental

3    health?

4    A.      Approximately.

5    Q.      Do you think it should be a routine part of the

6    Condemned Program, that there be these kind of periodic

7    evaluations of the population?

8    A.      You know, again, my testimony would be the same.  On

9    the one hand I want to say how could information hurt?  On

10   the other hand, my best memory is that there just wasn't much

11   feedback from the Condemned Unit.

12           Most of the feedback that I received from clinicians

13   who swept the Condemned Unit were really kind of put off at

14   the notion we were providing them with information they were

15   already well aware of.  They almost found it kind of

16   insulting.  So I guess I'm not entirely sure how to answer

17   that question.

18           As I sit here, I'm mixed in my emotions.

19   Q.      Are you aware that there are persons in the Condemned

20   Unit that arrived there prior to any Coleman requirements for

21   screening?

22   A.      Yes.

23   Q.      So if there was a screen required going into

24   Ad. Seg., they didn't have it when they went in; is that

25   correct?

1268

1    A.        Perhaps I misunderstood the question.

2             When we have a condemned arrival --

3             THE COURT:  No.  He's talking about persons put on

4    the Condemned Unit prior to Coleman, and as to those people

5    the question was they did not receive any screening.

6             Is that right?

7             I think you said "yes."

8             THE WITNESS:  I did not understand the question.

9             I do not know if that's the case.

10   BY MR. BIEN:

11   Q.        When's the last time you recall doing one of these

12   sweeps or screens prior to this one you just did a few weeks

13   ago?

14   A.        I don't have a good memory of it.  It was a topic of

15   conversation the other day in which we were talking about

16   closing out the appointments from the screening, and somebody

17   brought to my attention that this was the second screening

18   that we've done in the last 12 months.  So I am assuming we

19   did another one within the last 12 months, which means they

20   may not be occurring every year.

21            My memory is that from year to year there is an

22   opportunity in which we can redirect staff and look at a

23   population that everyone perceives to be a higher risk than

24   other populations.  And toward that effort, I'm in favor of

25   it.

1269

1    Q.      You agree that the condemned population is a higher

2    risk population, don't you, Doctor?

3    A.      I believe that's one of the unique features about it.

4    Q.      And one of the high risks for the condemned

5    population is suicide?

6    A.      I'm not as briefed on the statistics associated with

7    death row suicides as some testimony that will come following

8    me, but my understanding is that there is a higher rate of

9    suicide in general associated with the Condemned Unit, not

10   just at San Quentin but across the country.

11   Q.      And that's true for San Quentin, true?

12   A.      I believe so.

13   Q.      You know your suicide rate is higher than the average

14   for the rest of the state?

15   A.      I understand that's a comparison of apples and

16   oranges.  That's not a valid statistical comparison.

17   Q.      You've had five suicides on the Condemned Unit in the

18   last two years?

19   A.      Is that a statement or question?

20   Q.      Isn't that correct?

21   A.      I believe so.

22   Q.      And there's a sixth man who died on suicide watch in

23   MHCB, and that was ruled by the coroner to be an overdose,

24   not a suicide; is that correct?

25   A.      I'm not sure who you are referring to.

1270

1    Q.       You don't remember a suicide that occurred in the

2    MHCB while someone was on suicide watch?

3    A.       Not if the question is as the question is stated.

4          My memory was there was a drug overdose that

5    occurred.  I don't recall a suicide having occurred.

6    Q.       I misstated my question.

7          You recall there was a drug overdose in the MHCB and

8    the person died?

9    A.       Yes.

10   Q.       Okay.  And you also recall that person was on suicide

11   watch at the time that they were discovered?

12   A.       Yes.

13   Q.       And you recall there was a problem with the emergency

14   response to that event?

15   A.       I don't recall the specifics.

16   Q.       Did you take any measures to address issues of

17   suicide watch in the MHCB after that event, Doctor?

18   A.       Yes.

19   Q.       What did you do?

20   A.       I believe in this example we took adverse action.

21   Q.       Adverse action against who?  No name, but what

22   person?

23   A.       The employee that was less than diligent in his or

24   her responsibilities to provide observation.

25   Q.       Do you agree that suicide is one of the indicias we

1271

1  should look at to see whether or not the Condemned Program is

2  receiving appropriate mental health services?

3  A.     My opinion would be no.  However, if that was going

4  to be used as a measure of mental health services, then I

5  would need to have an accurate comparison of how the

6  condemned population at San Quentin compares to other

7  condemned populations in other states.  And I believe there

8  will be testimony specific to that at some point after you're

9  done with me.

10 Q.     There's another unit that I didn't hear much

11 testimony about today on death row which is called the

12 Adjustment Center.

13        Are you aware of that unit, Doctor?

14 A.     I am.

15 Q.     The Adjustment Center is a unit where prisoners can

16 serve SHU terms; is that correct?

17 A.     I don't know.

18 Q.     Is the Adjustment Center a place where condemned

19 inmates can be sent who are being disciplined?

20 A.     Yes.  The Adjustment Center is viewed as the Ad. Seg.

21 for the condemned.

22 Q.     You're responsible for mental health services in that

23 unit also?

24 A.     Correct.

25 Q.     And are Coleman Class Members housed in that unit?

1272

1    A.       From time to time, yes.

2    Q.       And is there any prohibition on EOP Coleman Class

3    Members being sent to the Adjustment Center?

4    A.       I'm not aware of a prohibition.

5    Q.       So if a Coleman Class Member is given an RVR and is

6    EOP and is sent to the Adjustment Center, they're not sent

7    to -- Let me try that again.

8             Dr. Monthei, there's no PSU for the condemned, is

9    there?

10            You know what a PSU is?

11   A.       I do.

12            Not that I'm aware of.

13   Q.       PSU is a program where an EOP is sent under the

14   Program Guide if they have to serve a SHU term; is that

15   correct?

16   A.       Yes, sir.

17   Q.       Okay.  And that's because there's a prohibition in

18   Coleman for EOP patients spending time in SHU units; is that

19   correct?

20   A.       Yes, sir.

21   Q.       But that doesn't apply to San Quentin condemned; is

22   that correct?

23            Or you don't follow that at San Quentin?

24   A.       That wasn't my testimony.  I believe what I stated

25   was that the Adjustment Center is viewed as the Ad. Seg. for

1273

1   the condemned.  So it's foreseeable that a GP inmate could

2   receive an RVR and be moved by custody to an Administrative

3   Segregation Unit pending resolution of the RVR.

4   Q.      And there is also no -- there's no -- Okay.  You

5   don't go to PSU if you are EOP and you are sent for a SHU

6   term and you are condemned, right?

7          THE COURT:  I'm sorry.

8          MR. BIEN:  I'm using too many abbreviations.

9   BY MR. BIEN:

10  Q.      We're talking about a condemned inmate, Doctor.

11  They're in EOP, and they're sent to the Adjustment Center for

12  a SHU term.  They serve that time in the Adjustment Center;

13  is that correct?

14  A.      I don't know.

15  Q.      Do you have EOPs in the Adjustment Center?

16  A.      Yes.

17  Q.      And unlike the rest of your prison, the

18  non-condemned, you don't have an EOP Ad. Seg. Hub, a place

19  where you have special services for EOPs when they're in

20  segregation, do you, for the condemned?

21         THE COURT:  That is completely -- you started with GP

22  and wound up with condemned, and I have no idea what your

23  question is.

24         MR. BIEN:  I apologize.  Let me try again.

25  ///

1274

BY MR. BIEN:

Q.    EOPs can serve time in the Adjustment Center, to your knowledge there is no prohibition, correct?

A.    That is correct.

Q.    Okay.  And within the Adjustment Center do you operate a PSU like a special part of the Adjustment Center that is only for EOPs?

A.    We do not operate the Adjustment Center as a PSU.  We operate the Adjustment Center as an Ad. Seg. Unit.  We have a clinician assigned to the unit, and we have staff that provide follow-up care to their patients, be it Ad. Seg. or condemned, that may get locked up in the Adjustment Center. But in addition to staff following their patients, there is a stand alone psychologist who has an office in the Adjustment Center.

Q.    So the answer to the question is you have regular services in your Ad. Seg. in the Adjustment Center, but you don't have a dedicated PSU Unit there, right?

A.    That is correct.

Q.    You also don't have another Coleman requirement, which is an Ad. Seg. EOP Hub.  This is for an EOP who has to spend time in Ad. Seg. and has a special place to go, like you have in your Carson Unit, which is called an Ad. Seg. EOP Hub, where they can get mental health services?

        THE COURT:  I have no idea of what -- the objection

1275

1    is you don't know what he is saying?

2            That objection is sustained.

3    BY MR. BIEN:

4    Q.      You don't have an Ad. Seg. EOP Hub either in the

5    Adjustment Center, do you, Doctor?

6    A.      A patient who is an Ad. Seg. EOP could possibly be

7    housed within the Adjustment Center.

8    Q.      And they can be housed -- as is true with East Block,

9    they can be housed next to a CCCMS prisoner; isn't that

10   correct?  In the Adjustment Center?

11   A.      That is my understanding.

12   Q.      And they can also be housed next to a non-mentally

13   ill prisoner?

14   A.      That is my understanding.

15   Q.      Do you not consider East Block to be a segregation

16   unit, Doctor?

17   A.      My understanding, from custody administration at San

18   Quentin, is that they do not consider East Block to be an

19   Administrative Segregation Unit.

20           All of our systems and databases, everything

21   associated with the condemned population on East Block North

22   Seg. is consistent with the GP.

23   Q.      So you don't follow the Coleman rules that apply to

24   segregation units in the East Block?

25   A.      Which rules are you referring to?

1276

1   Q.      There is a whole slew of Coleman requirements for

2   administrative segregation.

3           Do you follow those rules in the East Block, or do

4   you follow general population rules?

5   A.      So we've made the decision to mimic the same type of

6   policies and procedures that one would stereotypically find

7   in an Ad. Seg. setting, but not because they're an Ad. Seg.

8   population.

9           We do so above and beyond Coleman requirements

10  because we believe they're potentially a higher risk

11  population than your non-condemned GP.

12  Q.      So you don't -- you feel the Coleman requirements,

13  let's say for Psych-Tech rounding, don't apply to Coleman

14  Class Members and non-Coleman Class Members housed in East

15  Block?

16  A.      We conduct Psych-Tech rounds.

17  Q.      My question was -- I thought you testified you do

18  that above and beyond Coleman requirements because it is not

19  really a segregation unit.  I wanted to clarify that.

20          Is that your testimony, Doctor?

21  A.      My testimony is that, based on conversations with

22  custody at San Quentin who classify inmates according to

23  various custody classification levels, that there are --

24  there is a condemned treatment protocol.

25          That condemned treat protocol is captured in OP-608,

1277

1   and they use that to provide general custodial oversight of

2   the population as a whole.

3         I am further under the understanding, based on these

4   conversations, that they refer to it as a GP.

5         It is not the mental health's role or responsibility

6   to make custody classification decisions in terms of whether

7   an inmate is a Level I, II, III, IV, Ad. Seg., GP.

8         We have various mechanisms in which we can provide

9   input based on our clinical opinions that they consider as

10  part of the deliberation process, but I operate the East

11  Block with the understanding of what I have been informed.

12  Q.    The characteristics of housing in the East Block

13  include being single celled?

14  A.    Yes.

15  Q.    Is that a higher risk for suicides, single cell?

16  A.    In almost every setting the answer is going to be

17  yes, and I have a hard time saying it is not for this

18  population.  But as a subnote it should be noted that the

19  patients on East Block absolutely, without a doubt, do not

20  want a cellmate.

21        THE COURT:  That really wasn't the question, Doctor.

22        THE WITNESS:  Sorry.

23        THE COURT:  And this is really quite difficult, but I

24  want you to listen to the question and answer it, if you

25  will, sir.

1278

1    THE WITNESS:  Yes, Your Honor.

2    BY MR. BIEN:

3    Q.    Do prisoners on East Block eat meals in their cells?

4    Those meals are brought to them?

5    A.    Yes.

6    Q.    And they only leave their cells under custodial

7    escort and cuffed?

8    A.    If on East Block, yes.

9    Q.    And they leave their cells for purposes -- for

10   specific purposes such as going to yard or going to an

11   appointment or the law library.

12   They don't have freedom just to leave their cells

13   when they want to leave their cells; is that correct?

14   A.    That's my understanding.

15   Q.    And your understanding is that they're not able to

16   have jobs outside of -- I don't know.  Do they have jobs at

17   all to your knowledge?

18   A.    I'm not certain.

19   Q.    Do you know of any East Block prisoners who have

20   prison jobs?

21   A.    There are porters on the unit.  I'm not sure whether

22   they are condemned or not.

23   Q.    Can they leave their unit to attend educational

24   programs?

25   A.    Not to my knowledge.

1279

1    Q.    Would you agree that whether or not custody is

2    calling that a segregation unit, that you, as a mental health

3    professional, need to treat that unit as a segregation unit

4    in terms of its characteristics for the population that lives

5    there?

6    A.    No.

7         THE COURT:  That is to say, the medical judgment as

8    to the characteristic of East Block is subordinated to

9    custody's determination as to whether or not it is a

10   segregation unit; is that your testimony, sir?

11        THE WITNESS:  It is.

12   BY MR. BIEN:

13   Q.    Let's talk about the Special -- what's the name you

14   have now?  I've seen several names.  The Specialized --

15   what's the name of the program you were talking about for the

16   condemned?

17   A.    Right now we're referring to it as the Specialized

18   Care for the Condemned Program or SCCP.

19   Q.    SCCP.

20        Did you testify that the latest plan that you talked

21   about with Miss Vorous in your direct was still evolving?

22   A.    That is correct.

23   Q.    And as you sit here today, it has not been approved

24   by Secretary Beard?

25   A.    Not that I'm aware of.

1280

1    THE COURT:  Would you have to have it approved by

2    Secretary Beard, as far as you know?

3    THE WITNESS:  Not to my knowledge.

4    BY MR. BIEN:

5    Q.    Secretary Beard came and visited the program in

6    December of 2012 at that meeting where I was present with the

7    Special Master Team; is that correct?

8    A.    That is.

9    Q.    Has he been in touch with you about it personally

10   since then?

11   A.    He has not.

12   Q.    Who is Dr. Belavich?

13   A.    I believe his current position is Acting Deputy

14   Director of Statewide Mental Health Services.

15   Q.    Has he approved a final version of the SCCP?

16   THE COURT:  There is no final version of the program,

17   as I understand it, Doctor?

18   THE WITNESS:  That is correct, Your Honor.

19   THE COURT:  I don't know where Mr. Bien is going, but

20   as I understood it, perhaps I don't, this program is really

21   simply the creation -- attempted creation of a treatment

22   program for those who are condemned.

23   Is that right?

24   THE WITNESS:  Yes, Your Honor.

25   THE COURT:  And would that require any approval by

1281

1    anybody other than you to put into place?

2         THE WITNESS:  Not entirely, Your Honor.  There were

3    decisions made involving the ten OHU beds that necessitated

4    interaction from the Receiver's Office.  There was staff that

5    I received that necessitated the involvement of Dr. Belavich.

6    But for the day-to-day operational aspects I believe it is

7    within my purview.

8         THE COURT:  I think what you just told me is the real

9    world may require you to talk to other people about what you

10   are doing, but putting this program into effect would be your

11   responsibility?

12        THE WITNESS:  I believe so, Your Honor.

13        THE COURT:  All right.

14        Sometimes, Mr. Bien, it helps to ask a direct

15   question.

16        MR. BIEN:  Okay.

17   BY MR. BIEN:

18   Q.    Doctor, the program has changed, as you testified,

19   over time; is that correct?

20   A.    That is correct.

21   Q.    Okay.  You say it started even before the Coleman

22   process focused on San Quentin condemned; is that right?

23   A.    Absolutely.

24   Q.    Okay.  When did you -- I'm confused.  Do you not know

25   when you started at San Quentin?  Roughly the date?

1282

1   A.      I believe it was approximately a November of six or

2   seven years ago.  So it was toward the end of the year six or

3   seven years ago.  I do not know my exact start date.

4   Q.      And so when you -- what were you doing to enhance

5   services in that time period?

6           THE COURT:  I'm sorry.  You're asking for an entire

7   history of the seven years?

8           MR. BIEN:  No.  I'll withdraw the question.

9           THE COURT:  Good idea.

10  BY MR. BIEN:

11  Q.      Let's jump ahead to 2010.  Okay.

12          Is it correct that in 2010 you were requested to

13  develop a specific program as a result of an agreement

14  reached at an all parties meeting in Coleman?

15          "Yes" or "no"?

16  A.      No.

17  Q.      Did you ever receive a request to develop a specific

18  written program that can be presented in Coleman reflecting

19  enhanced mental health services for the condemned?

20  A.      Yes.

21  Q.      And when did that happen?

22  A.      Approximately, November of 2010.

23          THE COURT:  It was in that meeting that you had with

24  the Special Master and the plaintiff and legal, right?

25          THE WITNESS:  As well as plaintiffs, Your Honor.

1283

1    THE COURT:  Yeah.  As I say, the plaintiffs.

2    That's where the decision was made to develop -- I

3    don't know whether you call it a protocol -- but develop a

4    written set of standards for the new program?

5    THE WITNESS:  Yes, Your Honor.

6    THE COURT:  Okay.

7    BY MR. BIEN:

8    Q.    You are aware that plaintiffs were contending that

9    the condemned population should have access to ICF level of

10   care in the fall of 2010 when you worked on this project?

11   THE COURT:  I have no idea.  That's a statement.  I

12   don't know what you're asking him.

13   Are you aware of the fact that the plaintiffs were

14   contending that condemned prisoners ought to have ICF care?

15   THE WITNESS:  Yes, Your Honor.

16   THE COURT:  When did you first become aware of that?

17   THE WITNESS:  Approximately, November of 2010.

18   THE COURT:  See how easy it is.

19   MR. BIEN:  Thank you, Your Honor.

20   BY MR. BIEN:

21   Q.    And did you understand that one of the reasons you

22   were developing this program, the SCCP, was to demonstrate

23   that there was no need for condemned inmates to access an ICF

24   level of care?

25   A.    That wasn't my exact understanding.

1284

1    Q.      What was your understanding as to the relationship

2    between what you were doing and the fact that condemned

3    inmates didn't have access to ICF level of care?

4            THE COURT:  If any?

5            THE WITNESS:  I did have a general understanding.  My

6    understanding is similar, that there was a dispute between

7    whether condemned could be referred to DSH-ICF.  And that was

8    running down a track of a legal disagreement.

9            Yet, despite that legal disagreement, I was being

10   asked to provide the services that I felt were clinically

11   indicated, regardless of whether it resembled a DSH-ICF

12   Program, something less or something more.

13   BY MR. BIEN:

14   Q.      Okay.  Let's turn to the memo that Miss Vorous

15   referred to.  It's the in the Miss Woodford binder, 1004, the

16   memo you wrote in January of 2012.

17   A.      Yes.

18           MR. BIEN:  I would like to move this into evidence,

19   Your Honor.

20           THE COURT:  Hearing no objection, it is received.

21                 (Whereupon, Plaintiffs' Exhibit 1004 was received

22                  into evidence.)

23   BY MR. BIEN:

24   Q.      You testified that you were directed to write this

25   memo, Doctor; is that correct?

1285

1   A.      That is correct.

2   Q.      Who directed you to write the memo?

3   A.      Dr. Scaramozzino.

4   Q.      And in the first paragraph on the first page it says:

5           (Reading:)

6           Per our conversation for your respective

7           consideration the below items may be of use in

8           deliberating the proposed Specialized Care for

9           the Condemned CTC Expansion.

10          (Reading concluded.)

11          Is it correct that in January of 2012 one of the

12  issues that you were asked to help the Department address was

13  whether or not the CTC should be expanded to house condemned

14  prisoners for mental health care?

15  A.      No.

16  Q.      Further down under, Current Practice, the second

17  bullet, do you recall that in -- that the Special Master Team

18  had identified five patients who they felt met the criteria

19  and would benefit from DMH-ICF services?

20  A.      I see that bullet.

21  Q.      You wrote that, right?

22  A.      Yes.

23  Q.      Okay.  And that was correct in that time?

24  A.      It was correct to the extent that was the information

25  reported.

1286

1    Q.      That's what the Coleman Special Master Team had

2    reported?

3    A.      That is my memory.  As a reminder, this document is a

4    conglomeration of many different things that I was directed

5    to put together, and it's going to read as a piecemeal memo

6    because of that.

7    Q.      At this point in time -- you started the program in

8    November of 2010; is that correct?

9            I know you announced a program to Coleman in November

10   2010?

11   A.      That's fair.

12   Q.      And at that time the program was only -- there was no

13   OHU portion, right?

14           It was bring the treatment to the patients in their

15   housing areas; is that correct?

16   A.      That is.

17   Q.      Okay.  And so the program was provided to patients in

18   East Block or in the Adjustment Center, wherever they may be

19   housed; is that correct?

20   A.      That is.

21   Q.      And that continued for all of 2011; is that correct?

22   A.      That is.

23   Q.      At this time the Special Master Team was suggesting,

24   and plaintiffs' counsel, that there needed to be, at least

25   for some of the patients, a dedicated housing unit, hopefully

1287

1   an ICF Unit, to house these patients; isn't that correct?

2   A.      That is my memory.

3   Q.      That's what this memo was addressed to, that issue?

4   A.      In part.

5   Q.      On the next page, the first full bullet on that page,

6   could you read that bullet, "Several other..."?

7   A.      I can.

8           (Reading:)

9           Several other condemned patients have already

10          received treatment at DMH APP Program for many

11          months (a higher level of care than ICF), and this

12          was less successful than the Specialized Care in

13          improving clinical symptoms and return to the housing

14          community.

15          (Reading concluded.)

16  Q.      Was one of the reasons, Doctor, that you have been

17  advocating to provide care for this population at San Quentin

18  is your dissatisfaction with the care that condemned

19  prisoners have received at DSH programs?

20  A.      It's fair to say that I had concerns.

21  Q.      Go down two more -- three more bullets.  Can you read

22  that bullet?  It begins "CHSB yard time..."?

23  A.      I can.

24          (Reading:)

25          CHSB yard time is already filled with 33 OHU patients

1288

1    and CTC patients.  There is a limit to yard hours due

2    to no yard after dusk.  Condemned and other inmates

3    cannot be on the yard at the same time.  Yard and

4    out-of-cell access time is a cornerstone of an

5    effective ICF Program.

6    (Reading concluded.)

7  Q.    You saw difficulties with yard access in bringing

8  part of your condemned population for housing in the CHSB; is

9  that correct?  At this point?

10 A.    So, again, this memo is not reflective of my

11 opinions.  This memo is reflective of my opinions combined

12 with the opinions of dozens of stakeholders that were

13 involved in different conversations at different points in

14 time.

15     However, at the time that this memo was written there

16 was a concern specific to yard time.

17 Q.    Okay.  Then at the top of the next page, page 3,

18 could you read that first bullet?

19     THE COURT:  I can't because it's -- the first line is

20 cut -- in my copy is covered.

21     Can you read yours, sir?

22     THE WITNESS:  I cannot.

23     THE COURT:  No.

24     MR. BIEN:  Okay.  I'll grab a better --

25     (Counsel locates readable copy.)

1289

1      THE COURT:  This is the copy that will be received

2  into evidence.

3      Oh, no.  This isn't the same document.

4      MR. BIEN:  I'm going to explain.

5      THE COURT:  What?

6      MR. BIEN:  Your Honor, this is the same document with

7  a cover email that was apparently not included in the copy

8  that was in Miss Woodford's binder.

9      It has the same exhibit number on it.  And if we

10 could replace this one with the other one?

11     THE COURT:  1014, this copy will become the --

12     MR. BIEN:  1004.

13     THE COURT:  Whatever I said.  Yes, 1004.

14     THE CLERK:  Let me mark it.

15     THE COURT:  You bet.

16     Yes, sir.  Now you want to go to --

17 BY MR. BIEN:

18 Q.     Dr. Monthei, can you read the top bullet on the top

19 of page 3?

20 A.     I can.

21     (Reading:)

22     It does not answer the core legal argument that

23     condemned inmates are refused equal treatment due to

24     their legal status.  "Separate, but equal" was

25     insufficient as a response to civil rights related to

1290

1    segregated schools, and it is likely to fall flat as
2    well in this case.
3        (Reading concluded.)
4  Q.    Turn to page 4, the third bullet down.  Actually,
5  second -- can you read the second bullet first, Dr. Monthei?
6  A.    I can.
7        (Reading:)
8        It is unclear how these beds would be differentiated
9        from the parallel argument of maintaining a patient
10       in an OHU for lengthy periods of time absent CTC
11       referral.
12       (Reading concluded.)
13 Q.    Doctor, under Program Guide standards there are
14 limitations on how long a patient can be housed in an OHU;
15 isn't that correct?
16 A.    That is correct.
17 Q.    Your program, as you explained to Judge Karlton, is
18 designed for long-term housing of patients for mental health
19 care in an OHU; is that correct?
20 A.    That is correct.
21 Q.    The next bullet -- can you read the next bullet?
22 A.    I can.
23       (Reading:)
24       We will at some point need to address real world
25       scenarios such as:  What happens when CTC beds are

1291

1    full and an acutely ill MHCB level patient has to be

2    in an OHU bed or sent out to another facility because

3    ICF beds are full?  What happens when ICF is full and

4    additional patients need ICF?  Under this approach

5    and depending on the definition of ICF-eligible

6    condemned patients, this number could exceed the 17

7    CTC beds that we would have available at San Quentin.

8    (Reading concluded.)

9    Q.    Right now you didn't set up a CTC, a licensed program

10   at San Quentin, did you, Doctor?

11   What we have now in 2013 isn't a program in the OHU,

12   correct?

13   A.    Our 17 MHCB beds are licensed.  The remaining 33 beds

14   have been suspended.

15   Q.    And the ten beds you are using for SCCP are not

16   licensed?

17   A.    They are --

18   Q.    They're operating in a place where there is a

19   suspended license, correct?

20   A.    Correct.

21   Q.    Okay.  And they don't meet MHCB standards, correct?

22   You're not trying to meet MHCB standards?

23   THE COURT:  Mental Health Acute --

24   BY MR. BIEN:

25   Q.    Mental Health Crisis Bed standards?

1292

1  A.      I'm not using those ten beds as a replacement to the

2  Mental Health Crisis Bed.

3  Q.      You're not meeting ICF standards in the care you're

4  providing in those beds either, are you, Doctor?

5  A.      No.  We are exceeding ICF standards.

6  Q.      Okay.  You have never -- when you designed this

7  program, you didn't look at ICF standards in connection with

8  what they require for their programs, did you?

9  A.      I did not.  But the work group that was in place at

10  San Quentin, that was reminiscent of the all parties meeting

11  I described, absolutely did consider that as part of the

12  foundation that led to the development of the current working

13  document.

14          THE COURT:  We've reached 4:40.  We'll reconvene

15  Tuesday at --

16          THE COURT:  Ten o'clock.

17          MR. BIEN:  Your Honor, may I raise --

18          THE COURT:  We've got lots to talk about.

19          Yes.  Go ahead.

20          MR. BIEN:  At lunch I was notified by -- off the

21  record?

22          THE COURT:  Yeah.  Sure.

23          (Discussion held off the record.)

24          THE COURT:  Back on the record.

25          After conversation with counsel it's determined we

1293

1    will convene Tuesday at 1:30.

2            (Discussion held off the record.)

3            (Off the record at 4:30 p.m.)

4                        ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2                                ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5


6           I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                    IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25