1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0o---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11         Defendants.

12    _____/

13

14

15                          ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                TUESDAY, OCTOBER 29TH, 2013

20

21                          ---o0o---

22

23

24

     Reported by:  MICHELLE L. BABBITT, CSR. No. 6357
25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                          APPEARANCES

 2                          ---o0o---

 3    FOR THE PLAINTIFFS:

 4            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5            SAN FRANCISCO, CALIFORNIA  94104

 6            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7            BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

 8            BY:  JANE KAHN, ATTONEY AT LAW

 9            BY:  THOMAS NOLAN, ATTORNEY AT LAW

10

11            K&L GATES LLP
              4 EMBARCADERO CENTER, SUITE 1200
12            SAN FRANCISCO, CALIFORNIA  94111

13            BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

14

15

16    FOR THE DEFENDANTS:

17             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
18             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
19
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
20
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
21
               BY:  JESSICA KIM, DEPUTY ATTORNEY GENERAL
22

23                          ---o0o---

24

25
```

1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6      DR. ERIC MONTHEI (Previously Sworn)

7        Cont'd Cross-Exam by Mr. Bien              1294
         Redirect Examination by Ms. Vorous        1360
8        Recross-Examination by Mr. Bien           1369
         Further Redirect Exam. by Ms. Vorous      1376
9

10

11

12

13

14                             ---o0o---

15

16

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                           ---o0o---

 3    PLAINTIFFS'
      EXHIBIT NO              DESCRIPTION              EVD
 4
       1008              Aug 15, 2011 CDCR Email
 5                       & Status Rpt.                 1321

 6
       1012              Jan 2013 CDCR Internal Email  1316
 7
       1031              25th SM Report Jan 18, 2013   1343
 8
       1043              Feb 10, 2011 SCP Rpt.         1305
 9
       1044              Feb 10, 2011 Budget Change
10                       Proposal                      1306

11     1131              Dec 2010 Monthly Data         1346
                         (Sealed)
12
       1133              Feb 2011 Monthly Data         1346
13                       (Sealed)

14     1135              Aug 2013 Monthly Data         1335

15     1144              Jan 2011 Monthly Data         1369

16     1145              Jan 2011 Monthly Data         1369

17     1146              Jan 2011 Monthly Data         1369

18     1148              July 2013 Monthly Data        1346
                         (Sealed)
19
       1152              Audit                         1339
20

21

22

23

24

25                           ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3    DEFENDANTS'
      EXHIBIT NO          DESCRIPTION              EVD
 4
         O            DHSDS Program Guide
 5                    Revision 2009               1363

 6

 7

 8

 9

10

11                         ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           SACRAMENTO, CALIFORNIA

2      TUESDAY, OCTOBER 29, 2013; 1:30 P.M.

3                  ---o0o----

4

5                  ERIC MONTHEI

6   Recalled as a witness on behalf of the defendants herein, was

7   previously sworn, examined, and testified as follows:

8              CROSS-EXAMINATION (CONTINUED)

9   BY MR. BIEN:

10  Q.     Do you still have Exhibit 1004 up there?

11  A.     I do.

12  Q.     This is the memo you wrote in early 2002 --

13  January 25, 2012?

14  A.     Correct.

15  Q.     If you could turn to page 5, please.

16  A.     (Witness complies.)

17  Q.     The top bullet deals with staffing and the memo

18  states, quote, (Reading:)

19              Resolving the understaffing of our current CTC

20              and specialized care for the condemned, along

21              with no staffing for the condemned population as

22              a whole has developed into a multi-year struggle

23              that remains unresolved.

24         That was the situation you were facing in

25  January 2012, wasn't it, doctor?

1    A.        It is.

2    Q.        Two bullets down, I quote, (Reading:)

3                      It is not cost effective to establish a five-bed

4                      ICF.  An estimated 20 staff are needed and

5                      annual cost of $1.8 million.

6         One of the things under consideration, doctor, in

7    early 2012 is establishing an ICF program in San Quentin,

8    wasn't it?

9    A.        My memory is that establishing a local ICF was one of

10   the considerations being discussed.

11   Q.        Then further down the middle page, quote, (Reading:)

12                     Staffing was attempted to be produced for the

13                     original specialized care project.  Not only did

14                     the needed number of clinical and correctional

15                     staff positions never become established, the

16                     original three, quote, to get things started,

17                     unquote, were eliminate.

18                     Daily CEO and headquarter calls over several

19                     months achieved nothing in terms of being able

20                     to hire for over 12 months.  Given the same

21                     headquarters, procedures and staff are in place

22                     today and that the budget and personnel

23                     processes are worse and further out of the

24                     control of CDCR regarding hiring, it is

25                     virtually assured no staff will actually be able

1    to be hired in a timely or permanent manner.

2    Dr. Monthei, in early 2012 you had tremendous

3    difficulty achieving the staffing that you had requested for

4    your programs at San Quentin for the condemned.

5    Isn't that correct?

6    A.    That is correct.

7    Q.    And some of the staff that you had been allocated had

8    been lost, had been removed?

9    A.    Correct.  By virtue of -- my memory is through the AB

10   109 process --

11   THE COURT:  I have no idea what the AB 109 process is,

12   doctor.

13   THE WITNESS:  Yes, Your Honor.

14   AB 109 was assembly bill 109, which referred to the

15   overall reduction of CDCR population, and, accordingly, there

16   was reduction in staff associated with reduction in

17   population.

18   THE COURT:  Because it had so many people to meet

19   every need; right?  Not quite?

20   THE WITNESS:  No, Your Honor.

21   THE COURT:  You may proceed, sir.

22   MR. BIEN:  Thank you, Your Honor.

23   Q.    You note a little further down, (Reading:)

24        Notably, all positions promised have now been

25        eliminated and psychologists terminated.  The

1                    specialized care psychiatrist, UCSF, dual board
2                    certified forensic psychologist has received a
3                    layoff letter.  Furthermore, the CTC weekend
4                    psychiatrist has been laid off and a CTC
5                    psychologist position was redirected to another
6                    prison, further underscoring the unlikelihood of
7                    adequate resources being established in the a
8                    sustainable manner.
9          Turning to the top of the next page, page 6, you say,
10    (Reading:)
11                   A final position is, quote, anything needed,
12                   we'll find a way to make it happen.  Despite
13                   intense Coleman monitor scrutiny, 18 months of
14                   internal redirects and several all parties
15                   reports, headquarters has not provided relief
16                   despite a year's worth of documented requests.
17                   Due to a lack of custody positions, the
18                   condemned group room and additional group yard
19                   that we originally proposed remain unused.  With
20                   this lack of responsiveness in place, a
21                   concerted effort with meaningful change that is
22                   realized at the local level is essential to a
23                   successful ICF.
24          In January 2012, doctor, you had been working on this
25    project since December of 2010.

1            Correct?

2     A.        That's correct.

3     Q.        Is it accurate -- is that an accurate position of how

4     you felt at that time about your support from headquarters in

5     terms of actual resources for this program?

6     A.        This document in general is an accumulation of

7     multiple opinions, perceptions and positions held by numerous

8     individuals.  There was a general sense that this was one of

9     the items that we were continuing to struggle with.

10          THE COURT:  You wouldn't have signed your name to the

11    memo if you personally did not agree; is that right, sir?

12          THE WITNESS:  Well, Your Honor, this memo was produced

13    at the direction of an individual who was then a statewide

14    director and it was for purposes that served to orient him in

15    terms of the topics that were being discussed.

16          To be blunt, it was somewhat of an uncomfortable memo

17    for me to produce, so many much so that I provided some

18    clarifying language at the beginning of this memo and the

19    intro paragraph to assure anybody who would read it at some

20    point down the road that it was neither a memo that

21    represented my opposition or my support.  It was simply my

22    fulfilling a request.

23          THE COURT:  I think what you just told me, but maybe

24    I'm wrong, is that some new person was put into an

25    administrative position, asked you what the condition was,

1    and you prepared this memo in response.

2         Is that correct so far?

3         THE WITNESS:  No, Your Honor.

4         THE COURT:  Tell me again.

5         THE WITNESS:  Yes, Your Honor.

6         It is true that there were several directors, but at

7    this point, we had had a statewide director who had been in

8    place for some time, but even during his course of being a

9    statewide director, there became a point where he was having

10   difficulty with his memories and difficulty tracking the

11   different conversations being produced in a multiple of

12   forms.

13        So this request was primarily generated by him to me

14   in order to assist him with tracking all of the various

15   aspects, criticisms, concerns, concepts that had historically

16   been discussed so he would have an easier time tracking the

17   information.

18        THE COURT:  I'm not sure I understand what you're

19   telling me.

20        Are you telling me that, in fact, although this memo

21   came from you, it didn't really reflect your views?

22        THE WITNESS:  Yes, Your Honor.  To the degree that in

23   the beginning I clarified this memo by saying these items are

24   proffered as a tool to ensure collective success and are not

25   designed to be taken as a position paper, specifically, it

1    should be noted that this document neither represents my

2    support nor our opposition.

3        THE COURT:  I suppose we can go one by one through

4    each of the things that have been mentioned and find out

5    which things you didn't believe were true.

6        Mr. Bien, I mean, if you force me, I'll do it, but it

7    appears to be easier if you do it.

8        MR. BIEN:  I think we've asked him about several of

9    them, Your Honor.

10       THE COURT:  All right.  At some point, I mean -- never

11   mind.  Go ahead.

12   BY MR. BIEN:

13   Q.    Dr. Monthei, going back to page 5, the points here

14   about staffing were facts; is that correct?

15       In other words, that look in the middle of the page,

16   staffing was attempted, didn't happen, you lost positions.

17       Are all those true facts?

18   A.    That is representative of my opinion at the time.

19   Q.    It's actually what happened; correct?  These are not

20   opinions.

21       Positions were lost?

22       THE COURT:  Take it one at a time.

23       Were positions lost?

24       THE WITNESS:  Yes, they were.

25       THE COURT:  Was recruiting not filling the spots that

1    were needed?

2         THE WITNESS:  During the AB 109, San Quentin was

3    facing a net loss of positions, so there were no necessarily

4    recruitment efforts to fill positions.  We're in the process

5    of downsizing, Your Honor.

6         THE COURT:  You may proceed, Mr. Bien.

7    BY MR. BIEN:

8    Q.    Dr. Monthei, you participated in requests that were

9    made to Sacramento, to headquarters or legislature, for

10   specific funding for this program that were not funded at the

11   level you requested.

12        Is that correct?

13   A.    That is correct.

14        THE COURT:  You didn't ask for more money than you

15   needed or did you?

16        THE WITNESS:  No, Your Honor.

17   BY MR. BIEN:

18   Q.    Some of your requests were turned down altogether,

19   correct, or postponed?

20   A.    Correct.

21        THE COURT:  Having been postponed, you now had some

22   success in obtaining those that had been postponed?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Tell me what was postponed and that you

25   were able to eventually succeed in.

 1          THE WITNESS:  There's a different administration in

 2     place today.  There was a different appreciation for the

 3     services that we were wanting to provide to this population

 4     and different dynamics at play that led to the ten beds being

 5     designated for this program and staffing associated with it.

 6          In essence, we were previously in a position where --

 7          Your Honor, it may help if I give this answer some

 8     context.  May I back up a little?

 9          THE COURT:  At this point, I am so puzzled I'll be

10     happy for you to explain to me what you think is going on.

11          THE WITNESS:  Thank you, Your Honor.

12          So prior to my arrival at San Quentin and different

13     administrations, what I had found upon first arriving at San

14     Quentin, there was no staffing for the condemned population.

15     It was unique to the extent that in every staffing matrix

16     that I had available to me upon my reentry into state

17     service, it appeared that staffing in its entirety had been

18     left off.  I believe it was unintentional and inadvertent --

19          THE COURT:  No.  I believe that you think everybody is

20     really just a swell fella, but we can leave that out.  I want

21     to know what happened.  I'm sorry.  I don't mean to be

22     speaking sharply.  My apologies.

23          I want to know what happened, please, in your view.

24          THE WITNESS:  So we began the process of requesting

25     staff, and through the official channels that we would, in

1    order to remedy a base staffing package for the condemned

2    population and later to add to that base staffing the

3    necessary services to provide enhanced services.

4         As the administration changes came and went, there was

5    a different appreciation of the degree to which our requests

6    were seen as favorable or unfavorable.

7         At this time, there were proposals that were being

8    submitted to the Senate Finance Committee.  They were being

9    approved and disapproved at different degrees.  At the end of

10   the day, we felt that the staffing that we needed for the

11   specialized care for the condemned was inadequate for that

12   purpose, which led us to redirect several resources in house

13   in order to provide a service that we still believed was

14   needed.

15        THE COURT:  Proceed, Mr. Bien.

16        MR. BIEN:  Thank you, Your Honor.

17   Q.   Dr. Monthei, the ten-bed OHU for the condemn is full;

18   correct?

19   A.   Yes, sir.

20   Q.   What's the plan for dealing with the remaining need

21   for condemned prisoners who may need that level of care that

22   your providing in the OHU?

23   A.   So we're enhancing the services that are available to

24   those that are outside the OHU, and we envision it will be

25   continuous rotation of individuals, in and out of the OHU in

1    order to provide the enhanced services.

2            We are approximately six months into the utilization

3    of these ten beds, and we are currently i the process of

4    discharging our first patient in order to bring in the next,

5    but there's, in general, a continuous evaluation of those who

6    are most critical so we can prioritize the services we want

7    delivered for those we believe most in need of those

8    services.

9    Q.    You testified in your deposition that you did not know

10   how the number ten, who came up with the number ten in the

11   OHU.

12           Is that still correct?

13   A.    Yes.

14   Q.    You didn't participate in that process, whether it be

15   five beds, ten beds or 20 beds, did you?

16   A.    I did not.

17   Q.    Did you see any study to determine what the need was

18   for that level of care for the condemned?

19   A.    I have not seen a study, no.

20   Q.    So your plan is simply to stick with the ten and

21   rotate people in and out, your current plan?

22   A.    Our current plan involves the totality of services

23   available to the condemned population in the same spectrum

24   I've described.  Now, continued use of those ten beds, along

25   with any other avenues that may happen to be realized along

 1    the way, are certainly things we will continue to use.  So it

 2    is our plan to continue providing enhanced services, both

 3    outside of the OHU and inside the OHU.

 4          THE COURT:  When you said outside the OHU, that means

 5    East Block; is that right?

 6          THE WITNESS:  Yes, sir.

 7    BY MR. BIEN:

 8    Q.    You don't have a plan to develop another new housing

 9    area for EOPs other than the ten-bed OHU?

10    A.    Not that I'm aware of.

11          MR. BIEN:  May I approach, Your Honor?

12          THE COURT:  Yes.

13          MR. BIEN:  Plaintiff's Exhibit 1043 is an e-mail from

14    Sharon Aungst to William Sullivan, Eric Monthei, Nathan

15    Stanley, Judy Burleson.  The subject, "BCP justification,"

16    dated February 10, 2011, and it's attached to a three-page

17    memo.

18          I'd like to move this into evidence, Your Honor.

19          THE COURT:  Received.

20                      (Whereupon, Plaintiff's Exhibit 1043

21                      was received into evidence.)

22          MR. BIEN:  Plaintiff's Exhibit 1044 is another e-mail

23    from Sharon Aungst to the same group.  It's actually about an

24    hour earlier the same evening, February 10, 2011, and it also

25    attaches a three-page memo.

1          I'd like to move that into evidence, Your Honor.

2          THE COURT:  Received.

3                              (Whereupon, Plaintiff's Exhibit 1044

4                              was received into evidence.)

5     BY MR. BIEN:

6     Q.     Dr. Monthei, in February 2011, did you participate in

7     an effort to draft a budget change proposal or request for

8     funding for the specialized -- specialized care program for

9     the condemned?

10    A.     I did participate.

11    Q.     And you helped in drafting this document, the attached

12    documents?

13    A.     Depending on which document we're referring to.  There

14    are sections that I drafted and sections I did not.

15    Q.     Returning to 1043, who is Sharon Aungst at this time?

16    It says here she's chief deputy secretary.

17           Is that correct?

18    A.     Yes.  She had several positions.  I was going to say

19    either secretary or undersecretary.  Chief secretary sounds

20    correct.

21    Q.     Looking at 1043, reading the e-mail it says,

22    (Reading:)

23                    Hi, all.  Here is the latest version.  Eric, I

24                    decided to go with, quote, with benefit from,

25                    unquote, since we don't accept that as a

1              criteria for referral.  And in parens, and no

2              one else in the free world does either, close

3              paren.

4         Do you know Sharon Aungst was referring to by the

5    "would benefit from" language?

6    A.    I do not.

7    Q.    If you turn to the second page of 1043 --

8         THE COURT:  Before you go, I take it you received

9    1043?

10        THE WITNESS:  According to the e-mail it was sent to

11   me.  I don't recall having received this, but it clearly

12   looks like it was sent to me.

13        THE COURT:  Would it be your custom to receive a memo

14   from a person high in administration which contained language

15   you had no idea what it meant and not to inquire?

16        THE WITNESS:  No, Your Honor.  My suspicion is at the

17   time I received this, which it looks like I did, I had an

18   understanding of what benefits from -- implied or referred

19   to, but sitting here in the moment, I do not.

20        THE COURT:  All right.

21   BY MR. BIEN:

22   Q.    If you look back at 1044, perhaps that will clarify.

23   And go to the second page of the document, doctor.

24        THE COURT:  I'm sorry?  What do you want me to look

25   at?

1        MR. BIEN:  1044, and the first page after the e-mail,

2   Your Honor.

3        THE COURT:  All right.

4   BY MR. BIEN:

5   Q.     Look under "Recap of CDCR and DMH Collaborative

6   Action," Dr. Monthei, the earlier version had the language,

7   (Reading:)

8                On or about October 7, 2010, CDCR agreed to

9                provide the Coleman Special Master with

10               corrective measures in addressing the condemned

11               inmate patients for referral to an ICF.

12       Do you see that, doctor?

13  A.     Yes.

14  Q.     If you turn to the later version, Exhibit 1043, the

15  same place, "Recap of CDCR and DMH Collaborative Action."

16       Do you see that, doctor?

17       The language is changed in the later version to,

18  (Reading:)

19               Corrective measures in addressing the condemned

20               inmate patients who would benefit from an ICF

21               level of care.

22       Do you see that?

23  A.     I do.

24  Q.     Does that refresh your recollection as to what Ms.

25  Aungst was referring to in her e-mail to you?

1    A.      It does.

2    Q.      What is that?

3    A.      It was the language that was originally proffered was

4    changed to language that she found more acceptable.

5    Q.      She says, (Reading:)

6            Eric, I decided to go with "would benefit from"

7            since we don't accept it as a criteria for

8            referral.

9       Did you understand her to be referring to the criteria

10   that the Special Master and defendants and plaintiffs had

11   agreed to for referrals to ICF level of care?

12   A.      I'm sorry?  Could you repeat the question.

13   Q.      Did you understand that Ms. Aungst was referring to

14   the criteria in the 7388B form for considering referrals to

15   ICF level of care?

16   A.      Yes.

17   Q.      Did you understand that she was expressing her

18   disagreement with those criteria for the basis of considering

19   a referral?

20   A.      I'm not sure.

21   Q.      Looking again at the final version, 1043, look at

22   "High Risk Need."  I'll quote, (Reading:)

23            On or about 2006 Through 2011, up to 31

24            condemned inmate patient were identified as

25            those who would benefit from an ICF level of

1                  care with another 13 being monitored for

2                  possible inclusion.  Approximately 20 percent, 6

3                  of 31 inmate patients, who would have benefitted

4                  from an ICF level of care have effected suicide.

5        Dr. Monthei, did you supervise this collection of data

6   from the condemned inmate patients at San Quentin for the

7   purpose of this sentence here in this memo?

8   A.      I don't recall having done that, but it is something

9   within my role, so I'm relatively certain I would have been

10  the individual who would have overseen it at that time.

11  Q.      And you agree that that's what the data showed at the

12  time this memo was written in February of 2011?

13           MS. VOROUS:  Objection.  The witness has stated he

14  doesn't recall collecting this data.

15           THE COURT:  No.  He said he doesn't recall writing

16  that.

17           You may answer.

18           THE WITNESS:  Over the course of time, there were

19  multiple screenings and assessments that were being done

20  specific to the condemned unit, and the variance associated

21  with who would and would not be appropriate for enhanced

22  services vary dramatically from a low of four to a high of

23  approximately 31.

24           So I am familiar with the general evolution of the

25  assessments, the screenings and the various individuals

1  coming in to provide opinions.

2  BY MR. BIEN:

3  Q.     You participated in drafting this document and you

4  accepted it.

5         You didn't tell Ms. Aungst this was wrong, did you?

6  A.     I did not.

7  Q.     Farther down in that paragraph, the memo states,

8  quote, (Reading:)

9              Inmates in the condemned housing unit are at

10             higher risk of psychiatric deterioration and/or

11             suicide on holidays, evenings and weekends.  The

12             provision of continuous services provides ICF

13             compatible intervention for those who would have

14             been referred to DMH ICF but for their condemned

15             status.

16        How many of the six suicides happened on weekends, Dr.

17  Monthei?

18        THE COURT:  Or holidays, whatever.

19  BY MR. BIEN:

20  Q.     Or holidays?

21  A.     I don't recall.

22  Q.     Did any of them?

23  A.     I simply don't recall.

24  Q.     The proposal that the department was making in

25  February of 2011 was to enhance EOP care from five days a

 1    week services to seven days a week services.

 2            Isn't that correct?

 3    A.      That's correct.

 4    Q.      And you felt that was an important step in helping

 5    these patients manage the conditions in the condemned unit

 6    and their mental health problems?

 7    A.      I did.  I felt we had a need that could be -- that

 8    could benefit from having additional services, which included

 9    different days and different hours.

10    Q.      Turning to the next page of Exhibit 1043, it has a two

11    at the bottom right.

12            Under Anticipated Result of BCP Denial, quote,

13    (Reading:)

14                    To date there is no court order; however,

15                    denying the BCP will result in CDCR having to

16                    discontinue the SQSP enhanced program and then

17                    anticipate that the plaintiffs will make good on

18                    their promise to file a motion to require CDCR

19                    to transfer inmate patients who could benefit

20                    from ICF level of care to SVSP.

21            Did you understand, Dr. Monthei, at this time, that

22    the -- do you agree that the alternative to funding this BCP

23    would be the possibility that the court would order

24    defendants to open a program for condemned ICF care at SVSP?

25    A.      So again, this document, some of which --

1           THE COURT:  No.  Never mind that the document was a

2    product of everybody.  The question is your view.

3           Were you at the time concerned that the plaintiff's

4    would move and the court would order the opening of SVSP to

5    condemned prisoners?

6           Yes?  No?

7           THE WITNESS:  No, that was not a concern of mine.

8    BY MR. BIEN:

9    Q.    Next paragraph, (Reading:)

10               Absent this program, CDCR will not be able to

11               testify in court the needs of the condemned

12               inmate patients are being made at SQSP.

13               Accordingly, it is likely that CDCR would

14               ultimately be ordered to transfer inmates to

15               Salinas Valley State Prison, SVSP, at a cost in

16               excess of $200,000 bed ICF bed per year.

17           You disagreed that was a possibility at that time?

18    A.    I understood that in the context of the conversations

19    that were being held, it was a possibility.  It was not my

20    opinion nor was it something that I would have engaged in.  I

21    did not draft either of those paragraphs.

22    Q.    Turn to the top of the next page, page 3, (Reading:)

23               At SVPP, the A Wing in Treatment Center 1 is

24               comprised of ten single man sells which would be

25               the most appropriate wing for conversion to

1                    treatment of the condemned.  SVPP could provide

2                    this placement using current staff levels but

3                    would require additional staffing of

4                    correctional officers providing one-to-one

5                    staffing on a 24/7 basis.

6          Who on the team who was preparing this memo providing

7     that information, Dr. Monthei?

8     A.     I don't know.

9     Q.     Have you been to SVPP and looked at the A Wing?

10    A.     I have not.

11    Q.     Under conclusion, quote, (Reading:)

12                    The rather inexpensive strategy CDCR has

13                    proposed of adding a few positions and serving

14                    inmates at SQSP will result in a cost avoidance

15                    of approximately 170,000 per bed per year.  ICF

16                    beds cost at least $200,000 per ICF bed per year

17                    while costs to provide care in psychiatric

18                    service units are approximately $30,000 per bed

19                    per year.  The additional staff requested will

20                    slightly increase this cost per bed per year.

21         So this alternative of enhancing EOP care at San

22    Quentin for the condemned was a dramatic cost savings over

23    the alternative of establishing an ICF program.

24         Is that correct?

25    A.     Assuming that information is accurate, there appears

1    to be a cost savings.

2    Q.    Are you aware of anything inaccurate in that memo, Dr.

3    Monthei?

4    A.    I have no way of knowing whether the financing, the

5    bed, the other alternatives that are being discussed in here

6    are accurate or not.  There were subject matter experts

7    involved from finance and other entities that I assume

8    contributed to this document.  I simply do not know.

9        MR. BIEN:  May I approach, Your Honor?

10        THE COURT:  Yes.

11        MR. BIEN:  Plaintiff's Exhibit 1012 is an e-mail dated

12    January 31, 2013.  It's an e-mail string, and then the last

13    e-mail in the string is from a Diana Martinez, also dated

14    January 31, 2013.

15        We'd like to move 1012 into evidence.

16        MS. VOROUS:  Objection, Your Honor, the first part of

17    this exhibit, the first e-mail on the first page is hearsay.

18    There's no indication that this e-mail was either forwarded

19    to or reviewed -- there's no indication it was provided to

20    Dr. Monthei.

21        THE COURT:  Well, the question isn't whether or not

22    the doctor saw it, if you want to question him about it, that

23    may raise questions, but there is no doubt, I take it, Ms.

24    Vorous, this is what it purports to be.

25        MS. VOROUS:  That's correct, Your Honor.

1          THE COURT:  The document is received into evidence.  I

2     don't know whether you can -- you can try to question him,

3     but if he never received it, we're going to have some

4     difficulties.

5                         (Whereupon, Plaintiff's Exhibit 1012

6                         was received into evidence.)

7          THE COURT:  Doctor, did you -- well, this indicates

8     you also have written a response.

9          MS. VOROUS:  Your Honor, my objection was to the first

10    e-mail, not the second e-mail.

11         THE COURT:  I see.  There are two, I guess.

12         In any event, it's all been received and you may

13    proceed, sir.

14         MR. BIEN:  Thank you, Your Honor.

15    Q.    Just to put this in context, as of December of 2012,

16    the specialized treatment for the condemned program at San

17    Quentin was provided to prisoners in their cells.

18         Is that correct, Dr. Monthei?

19    A.    No.

20    Q.    What's not correct about that?  Sometimes they went to

21    MHCB and sometimes they went to APP.

22         Is that correct?

23    A.    That's correct.

24    Q.    You didn't have any other treatment space or housing

25    space -- let me back up.

1    You didn't have any housing space in the specialized

2  treatment program for the condemned in December of 2012

3  dedicated for housing EOPs?

4  A.    That is correct.

5  Q.    And then after the meeting you discussed with the

6  Special Master and representatives from headquarters and

7  plaintiff's counsel in December of 2012, the department

8  agreed to establish some sort of a dedicated housing space as

9  an addition to the program.

10    Is that correct?

11  A.    Yes.

12  Q.    The decision was made not to establish an ICF program

13  at San Quentin but to establish a different kind of program.

14    Is that correct?

15  A.    Depending on how you define ICF.

16  Q.    I define ICF as a licensed program that meets state

17  licensing requirements for intermediate care facility for

18  inpatient hospitalization.

19    Did you establish that kind of program in San Quentin

20  in the ten beds?

21  A.    We did not establish a licensed facility.

22  Q.    You didn't establish a licensed program at all.

23    Is that correct?

24  A.    Specific to the specialized care for the condemned, we

25  did not establish a licensed facility for that purpose for

1    this program.

2    Q.    And Diana Martinez is the Standard Compliance

3    Coordinator for the San Quentin Correctional Treatment Center

4    at the time she wrote this e-mail in January 2013.

5          Is that correct?

6    A.    That is.

7    Q.    One of her responsibilities was preserving licensing

8    for the CTC at San Quentin?

9    A.    Correct.

10    Q.    If you turn to her original e-mail, which begins four

11    pages from the back of Exhibit 1012, she informed you and

12    others that it would be possible to establish a licensed ICF

13    in that space on the fourth floor of that ten-bed space,

14    didn't she?

15    A.    In part, yes.

16    Q.    She explained to you that both the ICF programs at CMF

17    and Salinas Valley State Prison operate under CTC licenses.

18          Is that correct?

19          THE COURT:  What is CTC?

20          MR. BIEN:  It's a correctional treatment center

21    license, Your Honor.

22          THE COURT:  Thank you.

23    BY MR. BIEN:

24    Q.    Did you understand that, Dr. Monthei?

25    A.    Yes.

1    Q.    She also expressed that proceeding with an unlicensed

2    program in that space, in her opinion, put at risk San

3    Quentin's CTC license.

4          Is that correct?

5    A.    That is.

6    Q.    If you look on page 2 at the bottom, this was an

7    e-mail that you wrote later in the day after receiving her

8    e-mail a couple hours later.

9          Is that correct?

10   A.    It is.

11         THE COURT:  I'm sorry?  Page 2.

12         MR. BIEN:  Page 2 of the memo on the bottom.

13         THE COURT:  I got it.  Thank you.

14   BY MR. BIEN:

15   Q.    And at this time in January 2013 Diana Toche and Tim

16   Belavich were superiors in the health care administration in

17   Sacramento to you?

18   A.    Yes, sir.

19   Q.    You were forwarding her report to them; is that

20   correct?

21   A.    It is.

22   Q.    And you said, (Reading:)

23              Please see below.  This report is consistent

24              with my previous concerns towards our current

25              correctional treatment center standards and

1          compliance coordinator.

2          Skipping down, you quoted her as saying to you,

3    (Reading:)

4              The day you open an ICF for the condemned is the

5              day you lose the CTC license, unquote.

6          Is that what Ms. Martinez had said to you?

7    A.    That was the thrust of her concern that generated the

8    aforementioned e-mail.

9    Q.    Looking back at the first page, did you have a lengthy

10   conversation with Diana Toche about this project after you

11   sent this e-mail on to her?

12   A.    Not that I recall.

13   Q.    Did Mr. Martin have a conversation with you?

14   A.    I do recall having a conversation with Mr. Martin.  I

15   wouldn't characterize it as lengthy.

16   Q.    Who was Mr. Martin in January of 2013?

17   A.    I believe at that time, he was working on the finance

18   side of the house.  The direct position, I'm not certain of.

19          MR. BIEN:  Plaintiff's Exhibit 1008 is an e-mail from

20   Dr. Monthei to Sharon Aungst dated August 15, 2011.  Subject

21   is "All Parties Status Report."  And attached to it is a

22   multi-page document entitled "Brief Status Report Specialized

23   Care For the Condemned."

24          We move this into evidence, Your Honor.

25          THE COURT:  Received.

1          (Whereupon, Plaintiff's Exhibit 1008

2          was received into evidence.)

3   BY MR. BIEN:

4   Q.     Dr. Monthei, is this an e-mail report you authored in

5   August of 2011?

6   A.     I did in conjunction with members of my management

7   team.

8   Q.     If you turn to the second page of the document where

9   the brief status report begins, under "Executive Summary,"

10  the last sentence, (Reading:)

11          Specifically, the direction provided by local

12          custody administration has resulted in the

13          deterioration of treatment, the decompensation

14          of patients and present concerns consistent with

15          deliberate indifference.

16          Is it correct, Dr. Monthei, that in this status

17  report, you were reporting to Sharon Aungst concerning

18  obstacles to your program that you had encountered with

19  custody of San Quentin?

20  A.     That is correct.

21  Q.     Turning to page 2 of the memo, do you see the

22  reference to Kern population?

23  A.     I do.

24  Q.     And it says 18 EOP patients and 22 CCCMS patients.

25          Were those patients you considered to be part of the

1    patients receiving enhanced services under the specialized

2    care for the condemned?

3    A.      I did.

4    Q.      And is it correct that 18 was less than all of the EOP

5    patients at that time?

6    A.      That's my understanding.

7    Q.      And 22 was far less than all the CCCMS patients time?

8    A.      That is also my understanding.

9    Q.      I know it changes, but it is correct you have 130, 140

10   CCCMS in the condemned program at any given time as an

11   estimate?

12   A.      That's a fair average.

13   Q.      And you've had from 20 and then you reported last week

14   38 EOP, is that kind of the range?

15   A.      It's also a fair average.

16          THE COURT:  I'm confused.  Let me read.

17          I'm sorry, doctor, I don't understand.

18          What is the 130 or 140 are all of the people in the

19   condemned status who are either EOP or something else; is

20   that right?

21          THE WITNESS:  Your Honor, we've always had somewhere

22   more than 100, less than 200 CCCMS condemned patients.  It

23   tends to average 130, 150 CCCMS.

24          THE COURT:  When you say that there were 20 to 28

25   EOPs, what is that, sir?

1    THE WITNESS:  Again, for EOP we tend to at any given

2    time have between 20 and 40 EOPs.

3         THE COURT:  As to those EOPs, you've got ten beds in

4    the new unit?

5         THE WITNESS:  Yes, Your Honor.

6         THE COURT:  The rest of them are being treated -- are

7    the rest of them being treated?

8         THE WITNESS:  Absolutely.

9         THE COURT:  Being treated in the East Block?

10        THE WITNESS:  No, Your Honor.  They're being housed in

11   East Block, but the treatment is for all patients provided in

12   the Central Health Services Building, the newer building that

13   I described including the he EOPs that remain housed on East

14   Block.  We provide them for services on East Block, but the

15   vast majority of the them occur in the Center Health Services

16   Building.

17        THE COURT:  I don't mean to interrupt your

18   questioning, but I just don't understand what I've being

19   told.

20        What distinguishes the EOP in the new unit from those

21   that are still housed in East Block?

22        THE WITNESS:  Those that are housed in the OHU receive

23   all the same services that they would have otherwise received

24   or that people that are in East Block receive, but in

25   addition to that, they have another realm of services that

```
 1   are available to them.  So they also have separate groups

 2   just for that population, separate yards for that separation,

 3   a separate day room for the population, so on and so forth.

 4           THE COURT:  I understand they're getting different

 5   services, but what distinguishes when a person is found --

 6   strike that.

 7           It isn't random that somebody is an EOP is left in --

 8   maybe I'm wrong.

 9           Is it random that a person is left in East Block for

10   housing rather than in the new central building?

11           THE WITNESS:  No, Your Honor.  We take --

12           THE COURT:  That's what I'm trying to understand.

13           THE WITNESS:  Understood, Your Honor.

14           So we take the members of the specialized care for the

15   condemned.  Each week the treatment on the East Block ranks

16   their mental illness in terms of severity and creates almost

17   a ranking, and those individuals that are most severe in

18   terms of mental illness are the ones that we put into OHU.

19           THE COURT:  I got you.  I understand.

20           What you're telling me, we try to find the most

21   severely, most severe mental illness and put them in the OHU,

22   and the rest of the folks, no matter how severe, there's no

23   room for them and they're left in East Bay, housed in East

24   Bay.

25           Is that a fair understanding?
```

1          THE WITNESS:  It's a fair understanding, Your Honor.

2          THE COURT:  Mr. Bien.

3    BY MR. BIEN:

4    Q.    How long have you been full at ten in the OHU, doctor?

5    A.    I don't know the exact time.  We started a gradual

6    transition when the beds came on line, so it was a slow

7    movement from patients on East Block into OHU beds until such

8    time as we filled them.

9          Once we filled them, they've been full since that

10   date, but I don't know the date.

11   Q.    Why don't you continue to add more beds if you have

12   more need?

13   A.    Right now I believe the ten beds we have for the

14   specialized care is meeting our needs.  I'm also not quite

15   certain I have the authority to expand beyond that if we had

16   a greater need, but at this time, I don't feel that we have

17   that need.

18   Q.    Is there a wait list established by your program?

19         You said you rank them every week.  What do you do

20   with that ranking?

21   A.    We discuss it in multiple forms.  We discuss that in

22   our management meetings.  The members of the Condemned

23   Treatment Program discuss it in the interdisciplinary team.

24   There's a discussion of those who are housed in the OHU, how

25   their severity compares to somebody who isn't, how long

1    somebody has been in their specific program, the likelihood

2    of their ability to transition back, given another person who

3    we may want to admit into that program.

4         It's a rather constant assessment that encompasses

5    both the individuals that we believe are next in line to move

6    over as well as the individuals that we believe are next in

7    line to return.

8    Q.    Is there a wait list, Doctor?

9    A.    There isn't a wait list in the capacity I believe

10   you're referring to.

11   Q.    Do you have patients identified who you would put in

12   those beds if another bed opened up?

13   A.    We do.

14   Q.    How many?

15   A.    Right now we have one.

16   Q.    As we sit here today, does the specialized care for

17   the condemned program include all of EOPs at San Quentin or

18   just a portion of them?

19   A.    A portion of them.

20   Q.    Does the specialized care program for the condemned at

21   San Quentin include all of the CCCs at San Quentin in the

22   condemned program?

23   A.    No.

24   Q.    Does it include any?

25   A.    It has in the past.  I do not believe as I sit here

1    there are any CCCMS patients that it included in the

2    specialized care for the condemned.

3    Q.    Turn to the next page of Exhibit 1008.

4    A.    (Witness complies.)

5    Q.    Doctor, in August of 2011, the local custody

6    administration responsible for the condemned unit made some

7    changes in their operations.

8         Is that correct?

9    A.    That is correct.

10   Q.    And in the middle page you kind of spell out these six

11   steps that happened.  In Item 2 it appears that one of the

12   changes was that you would be required to ducat patients two

13   days in advance for groups.

14        Is that correct?

15   A.    At the time this was authored, that is correct.

16   Q.    And before this change, you were not required to ducat

17   patients for groups.

18        Is that correct?

19   A.    That is correct.

20   Q.    Item 3 in this paragraph you mention that patients

21   will no longer be allowed to refused directly to a

22   clinician's cell front.

23        Did you understand that to mean if a patient had an

24   appointment with a clinician and the patient decided not to

25   come, they would have to be extracted and brought to the

1    appointment and then refuse the appointment?

2    A.    They would be required to be transported from East

3    Block to the clinical office in the CHSB in order to refuse

4    within the CHSB.

5            THE COURT:  Or to refuse?

6            THE WITNESS:  That is correct.  No extractions were

7    done for this purpose.

8            THE COURT:  You mean everybody just came out -- they

9    weren't sick enough to refuse, to at least come out and be

10   taken to the office of the clinician to say, "No thank you"?

11           THE WITNESS:  I'm sorry, Your Honor.  I wasn't

12   following the question.

13           THE COURT:  You're saying there were no cell

14   extractions to accomplish this purpose?

15           THE WITNESS:  Correct.

16           THE COURT:  I take it none of those people were so

17   sick they were unable to understand that they had to come out

18   and go to the office to refuse?

19           THE WITNESS:  That is correct.

20           THE COURT:  Aside from the fact that that doesn't make

21   any sense -- that doesn't seem to be sensible -- how do you

22   account for the fact that you were able to achieve this, what

23   I think of as a fairly remarkable circumstance, whereas in

24   the Salinas Valley there is cell extraction all the time

25   because they won't come out?

1          Do you have any idea why that is so, why the

2     difference exists?

3          THE WITNESS:  Mental health staff working on the unit

4     were of the opinion that it was not clinically indicated for

5     an extraction to occur or to have these individuals escorted

6     in order to refuse an appointment.

7          They were either compliant in coming out of their

8     cells and being transported in order to refuse their

9     appointment or they were issued a 115 for refusing an order

10    to move, but we did not participate in an inmate being

11    extracted for this purpose.

12          THE COURT:  I understand you to be saying -- and if I

13    don't understand you, please feel free to tell me that, no, I

14    still haven't gotten it right.

15          What I think you are saying is if a guy wouldn't come

16    out, it was the staff's opinion that, okay, you won't come

17    out.  We won't go in for cell extraction for perfectly good

18    psychiatric or psychological reasons.  Instead, we'll leave

19    it to custody to deal with that situation as they require.

20          Is my understanding accurate?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  Thank you, sir.

23    BY MR. BIEN:

24    Q.     You mention that one of the problems was that 115s

25    were issued, rule violations reports were issued for

```
 1    prisoners who refused clinical appointment?

 2    A.      Yes.  They were initially issued and later litigated

 3    by mental health staff.

 4    Q.      Farther down in that page you say, (Reading:)

 5                    Presently, the MHSDS remains concerned about the

 6                    direction provided by local custody

 7                    administration and the potential deterioration

 8                    of our patients who may receive disciplinary

 9                    action resulting in the loss of privileges.

10            There is a footnote two here, (Reading:)

11                    Condemned patients issued a 115 are immediately

12                    moved from grade A to grade B status pending ICC

13                    disposition.  Grade B patients are placed on

14                    property restriction, reduced recreational yard,

15                    reduced contact visits, limited property

16                    canteen, reduced phone use, et cetera.

17            You were concerned that the disciplinary process --

18    that this custody change that had occurred in August of 2011

19    would result in punishments for patients who refused mental

20    health treatment.

21            Isn't that correct, Dr. Monthei?

22    A.      That is correct.

23    Q.      Turning to page five of this document, Dr. Monthei,

24    you report that in the section title "Decompensation of

25    Sensitive Psychiatric Patients," (Reading:)
```

1              SQSP specialized care for the condemned contains

2              severely and persistently mentally ill patients.

3              Currently the specialized care for the condemned

4              team is closely monitoring 20 patients who have

5              experienced an increase in notable mental health

6              conditions beyond irritability or frustration.

7         You go on for --

8         THE COURT:  I'm sorry.  I'm on five, but I don't --

9         MR. BIEN:  The middle of the page, "Decompensation of

10   Sensitive Psychiatric Patients."

11        THE COURT:  I see.  Thank you.

12   BY MR. BIEN:

13   Q.    Dr. Monthei, you go on to actually describe what you

14   described as changes in decompensation in patients that you

15   contributed, at least in part, to this custodial practice.

16        Is that correct?

17   A.    That is.

18        THE COURT:  Have those problems been resolved?

19        THE WITNESS:  Absolutely.

20        THE COURT:  Tell me how they've been resolved, sir.

21        THE WITNESS:  They were resolved in many ways.  The

22   custody administration responsible for this change in

23   operational procedures is no longer at San Quentin, and not

24   only have the things that he put in place been remedied, but

25   we've been able to not only return to the program that we've

1    had, but we've been able to expand the program into areas

2    that previous custody administrations were uncomfortable

3    with.

4            THE COURT:  You may proceed, sir.

5    BY MR. BIEN:

6    Q.    Is it correct, Dr. Monthei, it's still the fact that

7    when a condemned patient is issued a 115, they're immediately

8    removed from grade A to grade B status?

9    A.    One of the changes that happened is the coordination

10   with custody during the issue of a 115.  So as part of not

11   only going back to baseline, there's a change in issuing of

12   115; however, once the 115 is issued, it is correct, a

13   condemned inmate patient is removed from grade A to grade B

14   pending disposition absent a strong clinical contraindication

15   to the contrary.

16   Q.    So it's correct that when a condemned patient is

17   issued a 115, they're immediately removed from grade A status

18   to grade B status.

19           That hasn't changed?

20   A.    It has changed to the extent that absent a strong

21   clinical indication to the contrary, it is possible for a

22   grade A condemned inmate patient to be issued a 115, and

23   through the interactions with custody and the mental health

24   clinicians for that individual not to be moved to grade B

25   pending disposition.

1    THE COURT:  Of course it's possible.  What is -- if

2    you know, what is your best judgment as to how often 115s are

3    issued which result in moving patients from grade A to grade

4    B?

5    THE WITNESS:  Its a very rare occurrence, Your Honor.

6    THE COURT:  You attribute that to the interchange

7    between mental health staff and custody?

8    THE WITNESS:  I attribute it to that as well as the

9    officers and the clinicians also attribute it to that.

10   BY MR. BIEN:

11   Q.    Are patients in the specialized treatment program

12   assigned to specific treatment groups, Dr. Monthei?

13   A.    They are.

14   Q.    You're aware that the Special Master in his 25th

15   report, one of this critiques was the groups they observed

16   were ad hoc; in other words, people would volunteer for a

17   group on a particular day rather than being assigned to a

18   particular group.

19         Has that practice changed?

20   A.    I believe you're mischaracterizing the nature of the

21   report.  There are some groups that are formalized and

22   they're scheduled and that continues.  We also have what

23   individuals in mental health refer to as open groups.  So the

24   open groups are not necessarily scheduled groups.  They're

25   groups that patients can attend in addition to whatever their

1    normal schedule happens to be.

2         Aside from that, we still have the process in place

3    whereby if we have a group that was scheduled to have,

4    hypothetically, using round numbers, ten patients in that

5    group and there are two refusals, we will then go back to the

6    members in terms of acuity and begin canvassing in order of

7    acuity to fill those two spots.

8         To some degree, it still exists, but in that capacity.

9    Q.    You still have open groups where people could join a

10   group -- since they're not walking around, they're asked by

11   clinicians to come to a group on a particular day?

12   A.    We do.

13   Q.    That may not be a group they've ever been a part of

14   before?

15   A.    They may not.  That's correct.

16   Q.    It may not be a group that's on their treatment plan?

17   A.    That is correct.

18        MR. BIEN:  Plaintiff's Exhibit 1135 is an excerpt from

19   monthly documents provided by defendants to the Special

20   Master and copied to the plaintiff's counsel dated October 2,

21   2013.  The excerpt is a section about ad seg clinical

22   rounding.  We've included just the San Quentin portion.

23        We move this into evidence, Your Honor.

24        THE COURT:  Hearing no objection, it's received.

25   /////

1              (Whereupon, Plaintiff's Exhibit 1135

2              was received into evidence.)

3    BY MR. BIEN:

4    Q.    Are you familiar with the requirements for ad seg

5    clinical rounding in the program guide?

6    A.    I am.

7    Q.    And is this a rounding that takes place by psychiatric

8    technicians?

9          Is that correct?

10   A.    There is a piece for the psychiatric technicians.

11         THE COURT:  Say again.

12         THE WITNESS:  There is a piece for the psychiatric

13   technicians.

14   BY MR. BIEN:

15   Q.    Are they the clinicians that actually do rounding in

16   ad seg units?

17   A.    From a clinical standpoint, psychiatric technicians do

18   rounds.  Clinicians being psychologists and social workers

19   also do rounds and custody does rounds.

20   Q.    But this particular report that's part of Plaintiff's

21   Exhibit 1135 has to do with psychiatric rounding?

22   A.    That's correct.

23   Q.    If you look at -- if you go five pages in, do you see

24   a chart for the adjustment center, doctor?

25   A.    Yes.

1    Q.    Do you understand this to reflect whether or not

2    rounding occurred each day during the month of August 2013?

3    A.    I do, and it did.

4    Q.    How do you know that?  How does this chart show that?

5    A.    The first column indicates the date and the month.

6    Whether the psychiatric technician round was completed by

7    virtue of verifying that the round took place and a log was

8    kept on the unit, whether the psychiatric technician signed

9    in and out properly associated with that log, and whether the

10   communication between the correctional officers and the psych

11   techs occurred in conjunction with that rounding, this

12   document shows that each of those events occurred during the

13   totality of the month.

14   Q.    If you turn to the next page, this is for the Carson

15   ad seg unit?

16        THE COURT:  I'm sorry.  I am now lost.  Is this the

17   next to last page we're talking about that you've asked the

18   doctor to look at?

19        MR. BIEN:  No.  It's five pages from the end, Your

20   Honor, four pages.  "Carson" in the upper right.

21        THE COURT:  Hang on.

22   BY MR. BIEN:

23   Q.    Dr. Carson is the ad seg unit for non-condemned at San

24   Quentin.

25        Is that correct?

1   A.      It is.

2   Q.      But there is still a requirement for rounding in that

3   unit?

4   A.      Correct.

5   Q.      You're responsible for that as Chief Mental Health?

6   A.      Yes.

7   Q.      And the next page -- let's skip to second to the last

8   page, which is East Block.

9           Is that correct?

10  A.      It is.

11  Q.      And this also reflects rounding every day?

12  A.      It does.

13  Q.      And then the last page is North Segregation, which is

14  also a condemned unit?

15  A.      It is.

16  Q.      And why is there rounding only on two days of that

17  month?

18  A.      To reflect the twice a month rounding that we do on

19  that unit.

20  Q.      And isn't rounding required to be daily for all

21  segregation units under the program guide?

22  A.      For administration segregation units, you are correct.

23  Q.      Isn't North Segregation a segregation unit?

24  A.      Not in the conventional sense.

25  Q.      You don't treat it as a segregation unit for rounding;

1    is that correct?

2    A.    Correct.  North Seg and East Block are not segregation

3    units.

4    Q.    How did you come up with twice a month rather than

5    once a year or once a month?

6    A.    So the rounding that we do for the totality of the

7    condemned that are not a grade B and D adjustment center are

8    above and beyond any program requirements, so we conduct

9    relatively thorough rounding throughout East Block because of

10   the nature of the unit and the program that we have there.

11         North segregation is a very different unit, but we

12   still want to have a presence on the unit.  So we decided

13   that that presence would formally come in a manner of twice a

14   month and then informally come on an as-needed basis.

15         THE COURT:  Since you don't round, when do you know

16   it's needed?

17         THE WITNESS:  There are still many clinics that occur

18   on the unit.  So medical has a clinic, nursing has a clinic,

19   and officers are also on a unit.  We are in constant exchange

20   of information with each of those providers.

21         THE COURT:  It's 3 o'clock.

22         15-minute recess, please.

23                         (Whereupon, a break was taken at

24                         2:57 p.m.)

25                         (Nothing Omitted.)

1339

1    (Back on the record at 3:15 p.m.)

2    THE CLERK:  Please, remain seated.

3    Court is now in session.

4    THE COURT:  Mr. Bien.

5    MR. BIEN:  Thank you, Your Honor.

6  BY MR. BIEN:

7  Q.    Dr. Monthei, can you turn to Exhibit 1152.  It was

8  one of the first two I gave to you.

9        It's a document that was attached to Dr. Monthei's

10 supplemental reply motion on termination.  It was Exhibit 9Y.

11        It wasn't in the pile.  It was there before the

12 break, Dr. Monthei.

13        Did you find it?

14 A.    No.

15    MR. BIEN:  May I assist, Your Honor?

16    THE COURT:  Please.

17    (Exhibit located for witness.)

18    MR. BIEN:  Your Honor, we move this into evidence

19 as --

20    THE COURT:  I thought it had been.

21    MR. BIEN:  As Plaintiffs' 1152.

22    THE COURT:  In any event, it is now received.

23        (Whereupon, Plaintiff's Exhibit 1152 received

24         into evidence.)

25 ///

1340

1    BY MR. BIEN:

2    Q.      Dr. Monthei, this was an audit conducted of mental

3    health PT Rounding in February of 2013?

4    A.      Yes.

5    Q.      And who is Robert Lippincott?

6    A.      Mr. Lippincott is our senior psychiatric technician.

7    Q.      Going down to the first page, it says San Quentin has

8    five lockup units, correct?

9    A.      Correct.

10   Q.      And it lists those five segregation units:

11   Adjustment Center, Carson, Donner -- I guess part of Donner;

12   is that right?

13   A.      At times.

14   Q.      Is that an overflow unit?

15   A.      It is.

16   Q.      And then East Block and North Segregation.

17           Then it says:  (Reading:)

18           Clinical Rounding is schedule as follows.

19           Adjustment Center:  All inmates daily.

20           Carson:  All inmates daily.

21           Donner:  All ASU overflow inmates daily.

22           Then for East Block:  EOP and CCCMS Grade B inmates

23           daily.  And all other inmates twice monthly.

24           (Reading concluded.)

25           Is that correct?

1341

1   A.       Correct.

2   Q.       And do you understand that to be what San Quentin is

3   doing for rounding?

4   A.       I do.

5   Q.       So if someone is not in the caseload -- not in the

6   mental health caseload, and they're living in East Block,

7   their rounding is twice monthly?

8   A.       Correct.  Compared to any other GP population that

9   has no rounding at all.

10  Q.       And the same North Segregation, these are condemned

11  inmates living in the unit, and they get rounded twice

12  monthly?

13          THE COURT:  It says "all inmates," not necessarily

14  condemned.

15  BY MR. BIEN:

16  Q.       It is only a condemned unit; is that correct,

17  Dr. Monthei, North Seg?

18  A.       The North Segregation portion is condemned.

19  Q.       And on East Block, a CCCMS Grade A inmate is only

20  rounded twice monthly?

21  A.       As a GP inmate who would be rounded on twice monthly,

22  correct.

23  Q.       And on East Block a Grade A EOP inmate would only be

24  rounded twice monthly?

25  A.       As a GP, correct.

1342

1    THE COURT:  But, doctor, I mean, the truth is that a

2  condemned inmate who is a member of the class, but Grade A,

3  isn't like a GP.  He's somebody else.  He's condemned and

4  he's part of the class; isn't that right?

5    Am I missing the point again?

6    THE WITNESS:  You may be, Your Honor.

7    It is not that I'm not drawing a distinction between

8  a member of the class or not a member of the class.  I

9  clearly believe that EOPs and CCCs are class members

10 regardless.

11    There is a distinction being drawn between where

12 these individuals are administrative segregation or general

13 population inmates.

14    THE COURT:  I understand -- Oh, I see.  You're saying

15 even though they're EOP or CCCMS, if they're Grade A you do

16 not believe that there is any necessity to round more than

17 twice a month?

18    THE WITNESS:  I'm saying I do not believe it is

19 necessary for them to be rounded on twice a month, and twice

20 a month is above and beyond any other EOP GP unit statewide.

21 They simply do not receive any rounding whatsoever.

22    THE COURT:  All right.

23 BY MR. BIEN:

24 Q.    That's because those are -- in other prisons EOP GPs

25 are not in segregation units; is that correct?

1343

1   A.      That is correct.

2   Q.      If an EOP in another prison was in a segregation

3   unit, they would be rounded daily?

4   A.      Just like in our institution, correct.

5   Q.      But East Block is not a segregation unit?

6   A.      It is not.

7   Q.      Okay.  Can you turn to --

8           MR. BIEN:  Your Honor, during the break I gave a lot

9   more exhibits over.

10  BY MR. BIEN:

11  Q.      Turn to 1031, please, an excerpt from the Special

12  Master's 25th Round Report.

13          MR. BIEN:  We move this into evidence, Your Honor.

14          THE COURT:  Received.

15              (Whereupon, Plaintiffs' Exhibit 1031 received

16               into evidence.)

17  BY MR. BIEN:

18  Q.      Dr. Monthei, did you find that?  It is about a

19  half-inch think.  It is the big thick one there.

20  A.      I did.

21  Q.      Okay.  It's correct that the Special Master in the

22  25th round -- in his 25th round report included an extensive

23  evaluation of the Specialized Care Program for Condemned

24  Inmates at San Quentin; is that correct?

25  A.      They did.  In a manner that was very unique from

1344

1    historic roundings.

2    Q.       Okay.  And is it correct that the Special Master Team

3    reported on two tours of San Quentin related to the

4    Specialized Treatment Program, one in August of 2012, then

5    another one in December of 2012?

6    A.       Correct.

7    Q.       And they both -- they both evaluated the program.

8    And we've included in the back excerpts of individual patient

9    reviews the Special Master Team made.  And many of these

10   patient reviews, Dr. Monthei, included evaluations both in

11   August, and then for the same patient again in December of

12   2012.

13          Is that correct?

14   A.       Yes.

15   Q.       And again, as of the last time the Special Master

16   evaluated the program in December of 2012, you had no program

17   in the OHU, they were evaluating the program only in East

18   Block; is that correct?

19   A.       That is.

20   Q.       Could you turn to exhibit -- actually a group of

21   three exhibits, 1131, 1133 and 1148.

22          These are all, again, excerpts from the Coleman

23   monthly reports.  1131 is from January 28th, 2011, cover

24   letter.  1133 is from the March 30th, 2011, cover letter.

25   And 1148 is from September 4th, 2013, cover letter.

1345

1      And what we've included inside is a report for

2  patients -- caseload patients over 90 days in segregation,

3  just the section for San Quentin.

4      MR. BIEN:  We'd like to move these into evidence,

5  Your Honor.

6      MS. VOROUS:  Objection, Your Honor relevance.  This

7  hearing is not about length of stay in administrative

8  segregation units.

9      In addition, we have two -- at least two of these

10  documents are from 2011.  They're not even current

11  information.

12      THE COURT:  The objection about what the subject of

13  this hearing is is overruled.  But I suppose there is a

14  question -- Sir, I would take it to be a serious question

15  that these don't reflect current realities because there have

16  been changes in the program.

17      Is that your point, Miss Vorous?

18      MS. VOROUS:  Yes.  But also, Your Honor, if I can

19  just add, this is also beyond the scope of direct.

20      But with respect to changes in the program, as far as

21  I know we're not looking at, nor have we briefed, length of

22  stays within administrative segregation units.  We've been

23  talking about the condemned units.

24      THE COURT:  The issue that was explored extensively

25  in the course of direct dealt with whether or not the program

1346

1  established meets constitutional standards.  Therefore, all

2  of these questions concerning length of stay and the

3  rounding, et cetera, are not beyond the scope, although not

4  directly addressed.

5          The other question about whether or not these reflect

6  current -- the current situation appears to arise directly

7  from the date of these documents, Mr. Bien.

8          MR. BIEN:  May I respond, Your Honor?

9          THE COURT:  Yes, of course.

10         MR. BIEN:  I'm just making a point about reporting.

11 There was a change in the reporting from San Quentin And I'm

12 showing what the reporting was as of January 2011 and what it

13 is now.

14         That's all I'm going to do.

15         And it relates exactly to these issues of condemned

16 housing, and it will be brief.

17         THE COURT:  The objection is overruled.  The

18 documents are received.

19             (Whereupon, Plaintiffs' Exhibits 1131, 1133 and

20              1148 received into evidence.)

21         MR. BIEN:  And these need to be under seal, Your

22 Honor, 1131, 33 and 48.  They include --

23         THE COURT:  Specific names.

24         MR. BIEN:  Patient names.  And I need to keep them

25 in.

1347

1    THE COURT:  They will be placed under seal.

2    By MR. BIEN:

3    Q.    Dr. Monthei, if you can, look on 1131.

4    Have you seen this report before, Dr. Monthei, this

5    kind of report?

6    THE COURT:  This kind of report or this report?

7    BY MR. BIEN:

8    Q.    In January 2011, had you reviewed a copy of the

9    report that was provided to the Special Master?

10   A.    No.

11   Q.    Have you ever seen this kind of reporting that's made

12   to the Special Master of length of stay in Ad. Seg.?

13   A.    No, I haven't.

14   Q.    Turning to page R10-50.

15   THE COURT:  I'm sorry.  In which?

16   MR. BIEN:  I'm sorry.  The second page of 1131, your

17   Honor.

18   BY MR. BIEN:

19   Q.    Do you notice in the upper left this is a report for

20   San Quentin then CCCMS patients?

21   Do you recognize patients on this list, without using

22   their name, Doctor, as being patients in the condemned

23   program at San Quentin as of, I think the date is, December

24   of 2010 when this page was printed out?

25   A.    I do not recognize all of the names.  I do recognize

1348

1   several.

2   Q.      Okay.  And if you go over to the bed number, do you

3   understand the abbreviations used there EB3 or EY4?

4          Do you know what that refers to?

5   A.      Yes, I do.

6   Q.      What's EB refer to?

7   A.      East Block.

8   Q.      And is the -- what's the 3 refer to?

9   A.      Third tier.

10  Q.      And EY, what does that refer to?

11  A.      East Yard.

12  Q.      Is that the other side of East Block?

13  A.      It is.

14  Q.      So it is two parts of the same building?

15  A.      It is.

16  Q.      Okay.  And is the 4 the fourth tier?

17  A.      It is.

18  Q.      So that means that patient -- that the prisoner was

19  housed on the fourth tier of East Block as of this date?

20  A.      It does.

21  Q.      Now, if you go further over --

22         THE COURT:  Before you pass over this one, then

23  there's AC1 and AC2.

24         What is that supposed to stand for, if you know,

25  Doctor?

1349

1    THE WITNESS:  Adjustment Center.

2    THE COURT:  Thank you, sir.

3    THE WITNESS:  Yes, Your Honor.

4    THE COURT:  Now, where do you want him to go,

5    Mr. Bien?

6    BY MR. BIEN:

7    Q.    If you move over further to the right, it lists a

8    column of number of days in bed.

9         Do you see that column?

10   A.    I do.

11   Q.    Do you understand that to be the number of days that

12   this prisoner had been in that cell?

13   A.    I'm not familiar with that column.  Typically that

14   column refers to not just the length of stay in a particular

15   bed, but at an institution.  And it looks like this report

16   may be different from other reports that I have seen.

17   Q.    Okay.  If you turn, the next page are more CCCMS,

18   R10-51.

19        Then on the second to last page of this exhibit there

20   are some EOPs.

21        Do you see that, Doctor?

22   A.    I do.

23   Q.    And would you agree that some of those EOPs are

24   condemned prisoners?

25   A.    I would.

1350

1    Q.       Okay.  And do you recognize some of them?  Some of

2    them are in the Special Treatment Program -- the Specialized

3    Condemned Program?

4    A.       They are.

5    Q.       Okay.  And again, that lists that some of them are

6    housed in East Block; is that correct?

7    A.       It does.

8    Q.       And some in the Adjustment Center?

9    A.       On page R10-53 I do not see any housed in the

10   Adjustment Center.

11   Q.       Actually, go to R10-52.  Do you see the EOPs there?

12   A.       I do.

13   Q.       And some of those are condemned?

14   A.       They are.

15   Q.       And the one,  two -- fourth down is a condemned who

16   is housed in the Adjustment Center; is that correct?

17   A.       That is.

18   Q.       And his days in bed is listed as 1389; is that

19   correct?

20   A.       That is correct.

21   Q.       Now, if you turn to Exhibit 1133, this is the same

22   report from two months later.  Actually, if you turn to the

23   fourth page in, R10-40 on the bottom, is San Quentin's

24   section.

25            Do you see that there?  It begins with EOP?

1351

1   A.      I do.

2   Q.      And then it goes on to CCCMS.

3           And if you look at San Quentin EOP, it lists for the

4   first three on R10-40 that they're in the Adjustment Center,

5   correct?

6   A.      Correct.

7   Q.      Then you turn to the next page, and it's R10-41,

8   San Quentin Now it is Reception Center CCCMS.  They're in C.

9   Is that Carson, the C?

10  A.      It is.

11  Q.      Do you know why San Quentin stopped reporting East

12  Block information to the Special Master as of early 2011?

13          MS. VOROUS:  Objection, Your Honor.  In terms of the

14  San Quentin reporting to the Special Master, this witness has

15  testified he's not seen these reports before.

16          In addition, at the bottom they indicated they are

17  generated by the Health Care Placement Oversight Program.

18          THE COURT:  The objection that he hasn't seen these

19  documents appears to be well-taken, sir.

20          If there were a general question about reporting,

21  that might lie, but it doesn't in this case because the

22  witness says I've never seen those reports so how could he

23  possibly know why they changed the reporting method?

24          MR. BIEN:  I can ask him if he knows of any decision

25  made to stop reporting information to the Special Master

1352

1   about East Block as a segregation unit?

2           THE WITNESS:  I do not.

3           MR. BIEN:  And the last document is from September

4   2013, 1148.

5           It just -- it just reflects the same information, the

6   absence of information, Your Honor.

7   BY MR. BIEN:

8   Q.      Dr. Monthei, let's be clear, the Specialized Care

9   Program for the Condemned provides an EOP level of care;

10  isn't that correct?

11  A.      It provides services to those who are at the EOP

12  level of care commensurate with services that are equivalent

13  to an ICF, if not more so.

14          MR. BIEN:  Your Honor, if I may refer to his

15  deposition?

16          THE COURT:  Give the date and -- not the date, but

17  the page and line to counsel.

18          MR. BIEN:  Page 24, line 2 through 6.

19          THE COURT:  Hearing no objection, you may proceed.

20          MS. VOROUS:  Your Honor, I wasn't sure there was a

21  question pending.  He was just --

22          THE COURT:  No.  You may proceed.

23          MR. BIEN:  (Reading:)

24          QUESTION:  What level of care does the Specialized

25          Care Program provide?

1353

1     (Reading interrupted.)

2     THE COURT:  What line?  Page 24, line?

3     MR. BIEN:  Line 2.

4     THE CLERK:  I think I might have given you the wrong

5  one.  Hold on.

6     THE COURT:  Oh, Volume II.

7     This is Volume I.

8     They're both Volume I.  Okay.  Now I'm completely --

9  tell me what line -- what page and line?

10     MR. BIEN:  Page 24, line 2.

11     THE COURT:  Page 24, line 2.  Okay.  Hang on.

12     You may proceed.

13     MR. BIEN:  (Reading:)

14     QUESTION:  What level of care does the Specialized

15     Care Program provide?

16     MISS Vorous:  Objection as to level of the care,

17     vague and ambiguous.

18     THE WITNESS:  EOP.

19     (Reading concluded.)

20  BY MR. BIEN:

21  Q.    Doctor, the treatment goal for patients in the OHU

22  part of the Specialized Treatment Program is not to fall

23  below an EOP standard; isn't that correct?

24  A.    That is.

25  Q.    And there is no specific hours' goal for patients in

1354

1    the OHU for treatment hours?

2    A.      We use the ten hour requirement for the EOPs as our

3    floor with the expectation of additional services, but we do

4    not set -- actually, I take that back.  I believe we do set a

5    goal of being approximately 15 hours.

6           MR. BIEN:  Your Honor, page 48, line 15, please.

7           (Court reviews deposition testimony.)

8           THE COURT:  Why do you think that's different than

9    what the witness has just testified to?

10          There is no objection from the defense, but it seems

11   to me neither impeaching nor new matter.

12          I don't understand.  Am I missing the point?

13          MR. BIEN:  Your Honor, he testified that there was a

14   goal of 15 hours.  And here he says there is no goal -- there

15   is no specific goal at all.

16          THE COURT:  It says, reading on 20:

17          (Reading:)

18          The requirement would be not to fall below EOPs

19          standards considering that it is an EOP program.  But

20          on top of that, they're provided with enhancements so

21          they all receive well-above EOP requirements.

22          There isn't necessarily requirement...

23          (Reading concluded.)

24          And it goes on and on.

25          Defendant hasn't objected, but I don't understand.

1355

1    MR. BIEN:  Okay.

2    MR. BIEN:

3    Q.    Dr. Monthei, you're not familiar with the State

4    Regulatory Standards for an ICF Program; is that correct?

5    A.    That is correct.

6    Q.    You didn't visit ICF programs for the purpose of

7    designing your program in the OHU?

8    A.    No, sir.  I did not.

9    Q.    The specialized treatment, ten bed OHU shares nursing

10   staff with the medical OHU;  isn't that correct?

11   A.    Yes, that is correct.

12   Q.    So there is no nursing staff that are dedicated

13   solely to the ten bed unit; is that correct?

14   A.    The nursing staff are dedicated to the floor, and the

15   ten beds are on that floor.  So it depends on -- we're

16   splitting hairs in terms of definitions associated with

17   "dedicated to the beds."  They're dedicated to every bed on

18   that floor, including the ten beds.

19   Q.    They are dedicated to the ten bed OHU and the other

20   40 beds on that floor?

21   A.    That is correct.

22   Q.    There are 50 beds?

23   A.    That is correct.

24   Q.    Nurses in the ten bed OHU Unit do not perform rounds

25   every 15 minutes, 24/7, for patients in the ten bed OHU, do

1356

1  they?

2  A.      I am aware that nursing conducts rounds in order to

3  ensure the wellness and safety of all who are housed.  I am

4  not familiar with the frequency in which that occurs.

5  Q.      And you're also not familiar about whether or not

6  they do 15-minute safety or rounding checks; is that correct?

7  A.      I'm certain they do do rounding checks on a specific

8  interval when ordered to do so.  We have it within our realm

9  of authority to order such.  Outside of any order, they would

10  default to the standard for the floor.  And I'm not familiar

11  with what that standard is in terms of frequency.

12  Q.      So there isn't a standard requirement in the ten bed

13  OHU that every patient be rounded by a nurse every 15

14  minutes, 24/7?

15  A.      There is not.

16  Q.      And are you familiar with that being the requirement

17  for an ICF program, Doctor?

18  A.      I am not.

19  Q.      You don't know one way or the other?

20  A.      That is correct.

21  Q.      Because you don't know much about ICF program

22  standards, do you?

23  A.      Well, the question previously had to do with rules

24  and regulations associated with an ICF, which I'm less

25  familiar with as opposed to the clinical services that are

1357

1  available within a ICF.

2         And our approximation of the ten beds associated with

3  the specialized care for the condemned was designed to

4  approximate the service delivery, not necessarily the rules

5  and regulations that I was previously asked about.

6  Q.      Both programs provide medication, correct, ICF and

7  your program?

8  A.      Yes.

9  Q.      They both provide beds, places for people to sleep?

10 A.      Yes.

11 Q.      Okay.  They both provide doctors of some level?

12 A.      Yes.

13 Q.      And they both provide some level of therapy; is that

14 correct?

15 A.      That is.

16 Q.      Both group and individual?

17 A.      They both provide group and individual, correct.

18 Q.      And all those things are also true about your EOP

19 program, aren't they -- your regular EOP?

20         THE COURT:  When you said "they both," I assumed that

21 was including his EOP program.

22         What else could it mean.

23         MR. BIEN:  I was talking about the OHU, specifically

24 the ten bed OHU.

25         THE COURT:  I see.  All right.

1358

1       Now you're talking about?

2  BY MR. BIEN:

3  Q.      The regular EOPs are not in your Specialized

4  Treatment Program, but they also receive the same things,

5  medication, group therapy, individual therapy; is that

6  correct?

7  A.      EOPs also receive individual and group and medication

8  as you indicated; that is correct.

9  Q.      Does the Specialized Care Program -- what are we

10 calling it now?

11      Does the Specialized Care for the Condemned Program,

12 SCCP, provide services, Dr. Monthei, to all Coleman Class

13 Members in the condemned unit?

14 A.      I'm not sure that I understand the question.

15      Are you asking if the services are available?

16 Q.      Are they all in -- Is there certain patients that are

17 in the program and certain patients that are not in the

18 program?

19 A.      That is correct.

20 Q.      Prisoner WWW, who committed suicide in the spring of

21 2013, was not in the program; is that correct?

22 A.      That is my understanding.

23 Q.      Okay.  Why not?

24 A.      As I've indicated, there are discussions that occur

25 on the unit that have to do with the Interdisciplinary

1359

1    Treatment Team level of acuity and those that are working

2    hand-in-hand with the patients to make case-by-case

3    determinations in terms of who is or who is not referred to

4    the program by virtue of degree of illness.

5           It would have been a treatment team decision for the

6    members of the Condemned Treatment Program who were working

7    with Patient WWW.

8    Q.    Do you know whether or not he was considered for the

9    Specialized Care Program?

10   A.    I do.

11   Q.    Was he?

12   A.    He was.

13   Q.    Was he on a waitlist for the program when he

14   committed suicide?

15   A.    Not to my knowledge.

16   Q.    Was he rejected from the program?

17   A.    My understanding is that the Condemned Treatment Team

18   did not feel that he was appropriate for the program.

19   Q.    Isn't it correct that -- was he -- you mentioned

20   earlier today there is a rank ordering of the EOPs as to who

21   is the most seriously ill and the more seriously ill would

22   get into the program; is that correct?

23   A.    That is correct.

24   Q.    So he didn't get far enough up on the rank to get

25   into the program?

1360

1  A.      I don't believe he was ever considered a participant

2  of the program.

3          MR. BIEN:  No more questions, Your Honor.

4          THE COURT:  While they're all getting their papers

5  together, I assume that -- may I shouldn't -- but he, WWW,

6  was also not considered for referral to a ICF Program; is

7  that right, if you know?

8          THE WITNESS:  I do not know whether he was considered

9  for referral to ICF.

10         THE COURT:  All right.

11         MS. VOROUS:  Just one moment, Your Honor.

12             (Brief pause.)

13                       REDIRECT EXAMINATION

14  BY MS. VOROUS:

15  Q.      Good afternoon, Dr. Monthei.

16  A.      Good afternoon, Miss Vorous.

17  Q.      Doctor, on cross-examination you were asked about a

18  death that on occurred in the Mental Health Crisis Bed Unit

19  at San Quentin involving an inmate on suicide watch.

20          Do you recall that?

21  A.      I do.

22  Q.      When did that death occur?

23  A.      Approximately, 2010.

24  Q.      And I believe you also testified that as a result of

25  this death, corrective action was taken against the person

1361

1   responsible for conducting the suicide watch; is that

2   accurate?

3   A.      It is.

4   Q.      And can you describe the -- strike that.

5           What position was that person in?

6   A.      The person assigned to provide direct observation

7   during that time was a certified nursing assistant, CNA.

8   Q.      Doctor, were you responsible for hiring the CNA?

9   A.      I was not.

10  Q.      And were you responsible for supervising the CNA?

11  A.      I was not.

12  Q.      And who was responsible for supervising the CNA?

13  A.      The chief nursing executive.

14  Q.      Do you know who was responsible for supervising the

15  chief nursing executive?

16  A.      I believe from the chief nursing executive the

17  reporting relationship went to the CEO of Region and through

18  an administrative chain ending in the Receiver's Office.

19  Q.      Doctor, when we were here last you were discussing

20  the 23 inmates at the EOP level of care in the Condemned Unit

21  that were part of the Specialized Care Plan.  And ten of

22  those inmates are in the designated OHU beds, and 12 are

23  receiving services on East Block, and one is in the Mental

24  Health Crisis Bed Unit.

25          You would agree that those -- all 23 of those inmates

1362

1   are seriously mentally ill; is that fair?

2   A.      It's very fair.  They're very ill individuals.

3           MS. VOROUS:  May I approach the witness?

4           (Exhibit handed to witness.)

5           THE WITNESS:  Thank you.

6   BY MS. VOROUS:

7   Q.      Doctor, I've handed you what's been marked as

8   Defendants' Exhibit O.

9           Do you recognize this document?

10  A.      I do.

11  Q.      Can you describe what it consists of?

12  A.      It's the 2009 Revision of the Mental Health Service

13  Delivery System Program Guide.  It is a much larger document

14  that describes the totality of services available within

15  varying institutions depending on their mission.

16  Q.      If you turn to page 2 of the document, describe what

17  that is as well?

18  A.      This looks to be the beginning of the condemned

19  section of the Program Guide.

20  Q.      The first paragraph is EOP Housing for Condemned

21  Inmate-Patients; is that fair?

22  A.      Yes.  The first paragraph describes the difference

23  between the men and women of this classification.

24          THE COURT:  Are you moving O?

25          MS. VOROUS:  Yes.

1363

1    THE COURT:  Received.

2         (Whereupon, Defendants' Exhibit O received into

3          evidence.)

4  BY MS. VOROUS:

5  Q.    In the second paragraph, does it describe the

6  difference in the identification of inmates that are housed

7  in the Adjustment Center, as well as in the East Block?

8  A.    It does.

9  Q.    How does it describe the difference?

10  A.    (Reading:)

11        During the orientation period, inmate-patients are

12        identified as either Grade A Condemned, (housing and

13        program closely related to GP setting) or Grade B

14        Condemned (housing and program closely related to

15        administrative segregation setting).

16        (Reading concluded.)

17  Q.    Grade B, are those the inmates that are generally

18  housed in the Adjustment Center?

19  A.    They are.

20  Q.    Doctor, considering the mental health program at

21  San Quentin as a whole, do you have an opinion as to whether

22  inmates that -- strike that.

23        Doctor, regardless of whether the Condemned Unit is

24  classified as a general population or administrative

25  segregation unit, in your opinion are the inmates within that

1364

1   unit receiving appropriate mental health care?

2   A.      They are.

3   Q.      Doctor, on cross-examination you were asked several

4   questions related to the January 2012 memorandum that you

5   prepared at the direction of headquarters staff.

6           And in that memo you identified data with respect to

7   staffing, correct?

8   A.      I did.

9   Q.      At some point in time did you receive the -- receive

10  sufficient mental health staff to offer services to the

11  Specialized Care Program that you believe are adequate for

12  the condemned population?

13  A.      We did.

14  Q.      Can you explain the process that you went through

15  between January 2012 and today to conclude that you have

16  sufficient staff to provide the services for those patients?

17          THE COURT:  Before you get to that, I'm not quite

18  clear as to what the question is.

19          At some point you requested a certain number of

20  personnel, and as I understand it, at that time you were

21  denied.

22          Have you had those people now restored -- I mean -- I

23  don't mean the people, but the positions?

24          THE WITNESS:  We have had the positions that were

25  taken down restored and additional positions authorized.

1365

1    THE COURT:  Now you can ask.

2    BY MS. VOROUS:

3    Q.    Doctor, what steps were taken to have the initial

4    positions restored and additional staff added to your

5    compliment of professionals at San Quentin mental health

6    professionals?

7    A.    During this time period there was a change in mental

8    health administration.  There was people from different

9    classifications who transitioned out and other people who

10   transitioned in.

11          As I have historically done, I don't raise my hand

12   very often.  When I do raise my hand, it is because I have a

13   need.  And I take it upon myself to make the connections with

14   the individuals that can fulfill whatever the need may happen

15   to be.

16          During this time period, I followed many of the same

17   processes that we've done in the past with much more

18   favorable results.

19   Q.    Doctor, you were also asked some questions about

20   Plaintiffs' Exhibit 1008, which is August 15th, 2011, email

21   attaching a brief status report with respect to the

22   Specialized Care for the Condemned.

23          If you could locate that exhibit, please.

24   A.    I have it.

25   Q.    On page 3, under Local Custody Administration, the

1366

1    memo identifies six concerns with respect to custody.

2            Do you see that?

3    A.      Yes.

4    Q.      And what did you do to attempt to resolve the custody

5    concerns that are identified in this memo?

6    A.      In general, the attempts to resolve this issue were

7    no different than any other attempts that I make to resolve

8    any issue.  It always begin at the local level, dialogue and

9    discussion with the respective administration responsible to

10   effect change.

11           If I'm unsuccessful in effecting change at the local

12   level, I follow my chain of command and elevate whatever the

13   concern or issue may happen to be until such time as there is

14   a decision that satisfies every stakeholders mutual

15   satisfaction.

16   Q.      At some point the concerns were resolved, is what I

17   believe you testified to earlier this afternoon; is that

18   correct?

19   A.      It is correct.

20   Q.      How long did it take before you were able to --

21           THE COURT:  Well, that assumes that he did anything.

22           As I understand it, the reason that things finally

23   worked out is the guy who was running custody and making life

24   miserable for everybody left or was no longer there.

25           THE WITNESS:  It is true he left, but it is also true

1367

1    that we remedied the situation prior to his departure.

2              THE COURT:  How did you do that?

3              THE WITNESS:  By adhering to the chain of command

4    until such time as relative stakeholders provided direction

5    to restore the program.

6              THE COURT:  Okay.  So even though he was there, at

7    some point people in his chain of command said "Stop doing

8    it"?

9              THE WITNESS:  That's fair, Your Honor.

10             THE COURT:  All right.

11   BY MS. VOROUS:

12   Q.      How long did it take for that to happen?

13   A.      Approximately, two weeks.

14   Q.      And during this time period, was there any condemned

15   inmate that you were aware of who was part of the -- or was

16   receiving services through the Specialized Care Program that

17   had their status changed from Grade A to Grade B?

18   A.      There were no members that had their status changed.

19   There was some efforts to have their status changed, but

20   Mental Health either avoided or mitigated that from

21   occurring.

22   Q.      Doctor, you also testified that currently there's one

23   patient on East Block who has been identified for placement

24   in one of the ten outpatient housing unit beds; is that

25   correct?

1368

1    A.       It is.

2    Q.       At this point are San Quentin staff in the process of

3    discharging any of the patients from the ten beds?

4    A.       They are.  We have a patient who has been

5    participating in the program for approximately six months,

6    and staff are actively working on both the discharge of one

7    patient and the acceptance of another patient simultaneously.

8    Q.       Dr. Monthei, has the Special Master evaluated the

9    San Quentin Mental Health Program since December of 2012?

10   A.       I'm not certain.  Not to my knowledge.

11   Q.       Doctor, does training currently occur between mental

12   health and correctional officers for death row inmates?

13   A.       It does.

14   Q.       Can you describe what that training is?

15   A.       There's a multitude of trainings, but the clinicians

16   and the officers assigned to the Condemned Treatment Program

17   work hand-in-hand with each other very well.

18            We provide a regular series of OJTs associated with

19   things that are applicable to the Condemned Treatment

20   Program, as goes specifically with those officers.  Then

21   there is larger trainings that occur that are

22   institution-wide and not simply specific to the officers who

23   would come into contact with the Condemned Treatment Program.

24            So with the Condemned Treatment Program, you have two

25   groups of officers.  You have those that have a work station

1369

1    or a post assigned to the unit, and then you have the health

2    care access unit, which is a roving team of officers that

3    escort patients from location to location.  And we provide

4    outreach training to both groups.

5              MS. VOROUS:  May I have adjust a moment, Your

6    Honor.

7              THE COURT:  Yes.

8              (Counsel confers with cocounsel.)

9              MS. VOROUS:  No more questions.

10                        RECROSS-EXAMINATION

11   BY MR. BIEN:

12   Q.    Dr. Monthei, in front of you there should be three

13   more exhibits that deal with staffing.

14             MR. BIEN:  I just want to respond to this one point,

15   Your Honor.

16             So there are 1144, 1145 and 1146.

17             Each is part of the Coleman monthly documents.

18             1144 is dated February 25th, 2011.

19             1145 is March 1, 2012.

20             1146 is March 1, 2013.

21             THE COURT:  Move them?

22             MR. BIEN:  I move them into evidence.

23             THE COURT:  Received.

24                  (Whereupon, Plaintiff's Exhibits 1144, 1145 and

25                   1146 received into evidence.)

1370

1    BY MR. BIEN:

2    Q.      Dr. Monthei, if you'll turn in 1144 to page 4, this

3    is a staffing chart provided for San Quentin.

4            And then the last page of the exhibit is taken from a

5    different part of the monthly documents, and it reflects the

6    Coleman Class Members housed at all facilities by prison.

7            If you look up one, two, three -- four lines from the

8    bottom, you see the Coleman Class Members at San Quentin.

9            Do you see that, Doctor?

10   A.      I do.

11           THE COURT:  I don't.  I'm looking at 1144.

12           MR. BIEN:  Start with the last page, Your Honor, the

13   last page of the document.

14           THE COURT:  Okay.  Hang on.  Let me get there.

15           Okay.

16           MR. BIEN:  The page should say Summary Of Outpatient

17   Population then San Quentin is the fourth institution from

18   the bottom.

19           THE COURT:  Okay.

20   MR. BIEN:

21   Q.      Then moving across, Dr. Monthei, it shows the current

22   population of CCCMS as 1172.

23           Do you see that?

24   A.      I do.

25   Q.      Okay.  Then farther over the current population of

1371

1   EOP is 134.  And then the total is 136.

2          Do you understand that to be showing that your

3   population that you are responsible for back in February of

4   2011, is 1306?

5   A.      So I haven't seen this document before.  I believe

6   that I do understand what this document is reflecting, but I

7   don't believe that it captures all of those that I'm

8   responsible for.

9   Q.      That's because you also have to provide services for

10  non-Coleman Class Members at the institution; is that

11  correct?

12  A.      In part.

13  Q.      Okay.  Turning back to the staffing page, one page

14  back, this is the information that the State of California

15  reports to the Special Master about San Quentin staffing each

16  month for mental health staff.  And it reflects positions for

17  Authorized, Established, Filled, Vacant.

18         Do you see that?

19  A.      I do.

20  Q.      Have you seen a report like this before, Dr. Monthei?

21  A.      I have.

22  Q.      So as of the date of this report, and there's a date

23  that says February 23rd, 2011, you had 137.56 positions

24  established.

25         Do you see that?

1372

1      MS. VOROUS:  Objection, Your Honor.  I believe this

2  is beyond the scope of redirect.  My questions were limited

3  to efforts that were made between January 2012 and the

4  present to obtain staffing for the Specialized Care

5  Program.

6      THE COURT:  I'm assuming that this is preliminary to

7  getting there.

8      MR. BIEN:  Yes, it is, Your Honor.

9      THE COURT:  On that basis you may proceed.  But I

10  don't see the number.

11      MR. BIEN:  So I'm looking at the total at the bottom,

12  Your Honor.

13      THE COURT:  I see.  Okay.

14  MR. BIEN:

15  Q.      Then filled you had 109.45 for that month?

16  A.      I do see that.

17  Q.      Okay.  And then you also had some extra positions

18  farther over to the right.  These are Registry and Hires.  So

19  you actually had another 11.0725 bodies as of that report; is

20  that right?

21  A.      Not exactly.

22  Q.      Okay.  What's wrong with what I just said?

23  A.      It's 10, not 11.

24  Q.      I was giving you credit for the Hires column.  I

25  don't know if that meant the person was there.

1373

1    Do you know what the "Hires" column means to the

2    right?

3    A.    I do.

4    Q.    What is that?

5    A.    In process.

6    Q.    In process.  Okay.

7    So you really had the 10.0725 are the people that you

8    had actually working that month; is that correct?

9    A.    Correct.

10    Q.    So there is 109.45 positions filled, plus this ten,

11    plus a little bit of Registry.  So you had 119, 120 positions

12    then, right?

13    A.    Approximately.

14    Q.    And you had -- turning to the next page you had 1306

15    Coleman Class Members approximately at that time; is that

16    correct?

17    A.    Yes.

18    Q.    Now, let's look a year later at Exhibit 1145.  Turn

19    four pages in.  This is where the San Quentin staffing report

20    starts.

21    Do you see that, Dr. Monthei?

22    And it goes onto the next page.

23    So I'm going to look at the second to last page of

24    the document which has the totals, and there has been a

25    substantial reduction in your positions in that one year.

1374

1    You're now authorized with 107.1.

2         Do you see that?

3    A.     I do.

4    Q.     Then Established is 108.5.  So you have more

5    positions established than authorized, and only the

6    government can explain that.

7         You have 82.1 positions filled, plus a Registry of

8    6.96.  So now you have approximately 89 positions, right?

9    And the last time you had 119, the year before.

10        Is that correct?

11   A.     According to this document.

12   Q.     Okay.  And then if you look at the next page, you

13   have had a population reduction.  We're now talking about

14   post-realignment so there has been a reduction at San Quentin

15   is that correct?  In early 2012?

16   A.     This document reflects that the realignment is still

17   in process.

18   Q.     Right.  And your mental health population as of

19   January 6, 2012, the last page of the document, shows 1031

20   CCCMS; is that correct?

21   A.     That is what the document says.

22   Q.     And 74 EOPs for a total of 1115.

23        So your population dropped from 1306 to 1105, and

24   your mental health staffing has dropped from 119 to 89; is

25   that correct?

1375

1    A.      According to the point in time in which these

2    documents were generated, yes.

3    Q.      That's about the time you wrote the document that we

4    talked about before where you were discussing losing

5    positions and how difficult that was for you; is that

6    correct?

7    A.      It is.  The AB-109 realignment necessitated losing

8    positions faster than the population was being reduced.

9    Q.      Okay.  They were better at reducing positions than

10    they were at reducing prisoners?

11          MS. VOROUS:  Objection.  Misstates his testimony.

12    Argumentative.

13          THE COURT:  The objection that it is argumentative is

14    sustained.

15          You may proceed.

16    BY MR. BIEN:

17    Q.      Turning to Exhibit 1146, we're now jumping ahead to

18    March of 2013.

19          Turning to the last page of the document, you have

20    1032 CCCMS; is that correct?

21    A.      Yes.

22    Q.      And 45 EOPs?

23    A.      Yes.

24    Q.      And 1077 total?

25    A.      Yes.

1376

1    Q.       So there has been a slight drop in the mental health

2    population from 1105 to 1077 in that year.

3            Then if you look at the staffing though, it is one

4    page back, you have 106 established positions, only 75.6

5    filled, plus a Registry of 1.49.

6            That's less than 77 positions, Doctor?

7    A.       According to this report.

8    Q.       Okay.  Now, the condemned population wasn't reduced

9    during realignment, was it?

10   A.       It was not.

11           MR. BIEN:  Thank you.  No more questions.

12           THE COURT:  I'm holding you here because I'm hoping

13   we'll get this done and you can go home, but there is no

14   guarantee that's ever going to happen.

15           THE WITNESS:  Yes, Your Honor.

16                     FURTHER REDIRECT EXAMINATION

17   BY MS. VOROUS:

18   Q.       Dr. Monthei, if you would, look at Exhibit 1146?

19   A.       Yes, ma'am.

20   Q.       And do you have an explanation as to the percentage

21   of vacancies at this point in time as of January 2013?

22   A.       I do.  It's relative depending on how you're looking

23   at this and what specific position you are referring to.

24           The document, in general -- unfortunately, I might

25   tell the court what it already knows.  Percentages are based

1377

1    on averages.  Averages are most easily skewed by outliers,

2    and outliers impact the way in which the averages are either

3    presented in a favorable or unfavorable manner.

4          In this situation it is not simply looking at the

5    percentages, it is looking at the specific clinical positions

6    that are available and whether we're seeing a net increase or

7    decrease in the clinical positions.

8          Associated with this document are also things such as

9    warehouse workers, custodians, cooks, correctional

10   counselors, and things that are being taken down or

11   realigned.

12         Sometimes a position, such as a correctional

13   counselor, isn't simply disappearing by virtue of a position.

14   It is being taken off my roster, and it is being added to a

15   roster on the custody side of the house.

16         So in that example it would show, perhaps, a 100

17   percent reduction according to my staffing spread sheet with

18   only a position being added to a custody roster, so on and so

19   forth.

20         We're also in the process of -- at this time we were

21   beginning the transition of the additional SCCP positions,

22   not all of which were officially reflected.  At least in this

23   document there are other positions that are reflected.

24         This is approximately five versions outdated.  There

25   are approximately five more current versions.

1378

1    Q.      This is dated January 18th, 2013, correct?

2    A.      Correct.

3    Q.      Just one more question.

4            Looking back at Exhibit 1144, you were asked, I

5    believe, to verify at that time the number of EOPs at

6    San Quentin were 134 as compared to January 18th, 2013, where

7    the number of EOPs were 45.

8            Do you see the difference?

9    A.      I'm sorry.  Document 1144 and?

10   Q.      1146.  The last page of 1146.

11   A.      Okay.

12   Q.      Doctor, between February 25th, 2011, and January

13   18th, 2013, the population of EOP prisoners at San Quentin

14   decreased from 134 to 45, correct, based on what these

15   documents show?

16   A.      That is correct.

17   Q.      And would you agree that the EOP population within

18   San Quentin is one of the most highest utilizers of mental

19   health services?

20   A.      They are.

21           MS. VOROUS:  No more questions.

22           MR. BIEN:  No more questions, Your Honor.

23           THE COURT:  I'm sorry.  I have to ask you some

24   questions myself.

25           THE WITNESS:  Yes, Your Honor.

1379

1    THE COURT:  I have been informed, and if it is -- and

2    if you don't believe it is so, just tell me, that the ten

3    beds that you are using in the OHU were originally intended

4    for physical -- persons with physical problems, and through

5    the largesse of the Receiver, were dedicated to your

6    population.

7        Do you know that to be true or not?

8    THE WITNESS:  I know it to be true that they were

9    designated.

10    THE COURT:  Okay.  Are you aware -- if you're not,

11    that the perfectly okay.

12    THE WITNESS:  Yes, Your Honor.

13    THE COURT:  -- that there are pressures to return

14    those ten beds to physical medicine?

15    THE WITNESS:  I am.

16    THE COURT:  And have you made any provisions should

17    that occur?

18        The Receiver is resisting that, but it may happen

19    anyhow.  What are you going to do if you lose the ten beds?

20    THE WITNESS:  Not that I have vetted with anyone, but

21    that -- we have had discussions associated with that locally

22    contained within my management team alone.

23    THE COURT:  So you are at least thinking about if the

24    worst happens what you're going to do?

25    THE WITNESS:  Yes, Your Honor.

1380

```
 1              THE COURT:  That's all I have.

 2              My questions invite questions?

 3              MR. BIEN:  No, Your Honor.

 4              MS. VOROUS:  No, Your Honor.

 5              THE COURT:  May the witness be released?

 6              MR. BIEN:  Yes, Your Honor.

 7              THE COURT:  Get out of here, sir, before somebody

 8      changes their mind.

 9              Stand in recess.  We'll reconvene --

10              THE COURT:  Yes, sir.

11              MR. BIEN:  I'm sorry to bring up this topic which

12      keeps on plaguing us, but we haven't received any tapes

13      whatsoever and it has been weeks.

14              THE COURT:  Well, I just ordered --

15              Go.  Go.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  I just ordered them the other day to give

18      it to you.

19              MR. BIEN:  You actually ordered it several weeks ago.

20      And we also have cross-examination next week of the witness.

21      We would really like to get the tapes so we can start the

22      process.

23              THE COURT:  When are you going to be able to give him

24      the tapes?

25              MR. MCKINNEY:  Your Honor, I understand that four of
```

1381

1   the tapes are completely redacted.  They will bring those

2   tomorrow.  The other two, there have been issues with

3   redactions.  But again, we're aiming for tomorrow for all

4   six.  At least four of them will be here tomorrow.

5          And Your Honor, just to correct the record, it has

6   not been weeks.  It has not been a week so --

7          THE COURT:  Why are you telling me?

8          MR. MCKINNEY:  For the record to be clear.

9          THE COURT:  All right.  You can both go outside and

10  make that argument.

11         MR. MCKINNEY:  Thank you, Your Honor.

12         THE COURT:  See you tomorrow morning at?

13         THE CLERK:  9:30.

14         THE COURT:  Off the record.

15         (Off the record at 4:30 p.m.)

16                         ---o0o---

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

   STATE OF CALIFORNIA  )
4  COUNTY OF SACRAMENTO )

5

6           I certify that the foregoing is a correct transcript

7  from the record of proceedings in the above-entitled matter.

8

9

10               IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.

11

12

13     /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
14         Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25