1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15                      ---o0o---

16

17                 REPORTER'S TRANSCRIPT

18                RE:  EVIDENTIARY HEARING

19           WEDNESDAY, OCTOBER 30TH, 2013

20

21                      ---o0o---

22

23

24
     Reported by:  MICHELLE L. BABBITT, CSR. No. 6357
25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                        APPEARANCES

 2                        ---o0o---

 3    FOR THE PLAINTIFFS:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5           SAN FRANCISCO, CALIFORNIA  94104

 6           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7           BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

 8           BY:  JANE KAHN, ATTONEY AT LAW

 9           BY:  THOMAS NOLAN, ATTORNEY AT LAW

10

11           K&L GATES LLP
              4 EMBARCADERO CENTER, SUITE 1200
12           SAN FRANCISCO, CALIFORNIA  94111

13           BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW

14

15

16    FOR THE DEFENDANTS:

17            STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
18            13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
19
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
20
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
21
              BY:  JESSICA KIM, DEPUTY ATTORNEY GENERAL
22

23                        ---o0o---

24

25
```

1                        EXAMINATION INDEX

2                            ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                              PAGE

5

6      DR. PAUL BURTON

7        Direct Examination by Ms. Vorous          1382
         Cross-Examination by Mr. Nolan            1454
8        Redirect Examination by Ms. Vorous        1533
         Recross-Examination by Mr. Nolan          1540
9        Further Redirect Exam. by Ms. Vorous      1545
         Further Recross-Exam. by Mr. Nolan        1546

10

11

12

13

14

15                           ---o0o---

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3   PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
 4
      1121a            Prisoner DDD Medication
 5                     Record Excerpts             1529
                       (Sealed)
 6

 7    1139            Prisoner FFFF Record Exceprts  1487

 8

 9                          ---o0o---

10

11

12

13

14

15

16                        EXHIBIT INDEX

17                          ---o0o---

18   DEFENDANTS'
     EXHIBIT NO            DESCRIPTION              EVD
19

20      P               Dr. Paul Burton CV         1387

21
        R               Medical Records            1429
22

23

24

25                          ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1    SACRAMENTO, CALIFORNIA

2    WEDNESDAY, OCTOBER 30, 2013; 9:30 A.M.

3    ---oOo---

4

5    **MS. VOROUS:**  Defendants call Dr. Paul Burton.

6    PAUL BURTON

7    called as a witness on behalf of the defendants herein, was

8    sworn, examined, and testified as follows:

9    THE CLERK:  You do solemnly swear that the testimony

10    you are about to give to this court in this proceeding is the

11    truth, the whole truth and nothing but the truth, so help you

12    God?

13    THE WITNESS:  I do.

14    THE CLERK:  Take a seat, spell your last name, speak

15    directly into the microphone.

16    THE WITNESS:  Good morning.  Dr. Paul Burton,

17    B-U-R-T-O-N.

18    DIRECT EXAMINATION

19    **MS. VOROUS:**

20    Q.    Good morning.

21    A.    Good morning.

22    Q.    You're a licensed medical doctor; is that correct?

23    A.    That is correct.  Licensed to practice medicine n two

24    states, California and New York.

25    Q.    When were you first licensed?

1    A.     2007.

2    Q.     When did you become licensed to practice medicine in

3    California?

4    A.     The following year, 2008.

5    Q.     Doctor, you are currently employed by CDCR as a senior

6    psychiatrist supervisor at San Quentin.

7           Is that correct?

8    A.     Yes.

9    Q.     How long have you worked in San Quentin?

10   A.     In total about four and a half years.  I started in

11   San Quentin in July of 2009 and I've had a variety of

12   positions at that institution.  The last two and a half

13   years, I've worked almost exclusively with the condemned

14   treatment program.

15   Q.     At some point were you also a fellow at San Quentin?

16   A.     Yes.  After residency, I completed a forensic

17   psychiatry fellowship at the University of California

18   San Francisco.  One of the rotation sites of that fellowship

19   at that time was San Quentin State Prison.

20          For two days a week for a year I rotated there as a

21   fellow, became so interested in working with that population

22   that I decided to sign up for full-time service after the

23   completion of my training.

24   Q.     Doctor, at some point, you moved from a staff

25   psychiatrist to a senior psychiatrist supervisor.

1           Is that correct?

2    A.      That is correct.

3    Q.      When did that happen?

4    A.      It happened actually just this month, October 1st is

5    when I first officially became a senior psychiatrist.

6    Q.      As a psychiatrist in San Quentin between 2009 and 2011

7    what were your duties?

8    A.      I had a variety of different duties during this first

9    two years.  For my first year, I was part of the involuntary

10   medication consultation service, so myself and a colleague

11   would do a variety of involuntary medication petitions and

12   court testimony when necessary.

13          I also worked with non-condemned population for that

14   first year in the outpatient clinic, basically managing

15   medications, doing risk assessments, admitting people to the

16   hospital when necessary, continuing them at their current

17   level of care, if indicated, changing their level of care, if

18   indicated.

19          Following my outpatient experience, I began to work in

20   the inpatient unit.  We call it the mental health crisis bed.

21   It's also called the correctional treatment center.  I was

22   responsible for being the inpatient psychiatrist for inmates

23   that were transferred to San Quentin from other institutions

24   for the sole purpose of getting inpatient psychiatric

25   treatment.

1          **THE COURT:**  What is your relationship to Dr. Monthei?

2          THE WITNESS:  Dr. Monthei is the Chief of Mental

3    Health and thus my supervisor.  I'm the psychiatrist.

4    **MS. VOROUS:**

5    Q.    As a staff psychiatrist from 2011 until just this past

6    month, what were your duties?

7    A.    Yes.  At the end of 2011 or at the end of 2010 --

8    sorry -- I started a new telepsychiatry service.  Then in

9    April of 2011, I was offered an opportunity to become the

10   staff psychiatrist for the condemned treatment program.  So

11   in April of 2011 until just October of this year, I was a

12   staff psychiatrist exclusively working for the condemned.

13   Q.    Was this a full-time position?

14   A.    Yes, it was.  Often full-time plus, extra time.

15   Q.    Doctor, during that time, was your office located in

16   East Block?

17   A.    Yes.  One of the unique things about the condemned

18   treatment program in addition to all of the services that we

19   offer in the new medical building, which was just built four

20   years ago, my office and my teammates' office, the five

21   psychologists who I work with, is actually on the East Block

22   housing unit.

23          You may say why is that?  What's the purpose for that?

24          **THE COURT:**  Nobody has asked you that yet.  I bet you

25   that's the next question, though.

1          THE WITNESS:  You're probably right, Your Honor.

2    MS. VOROUS:

3    Q.     So what is the purpose of having your office on East

4    Block?

5    A.     Rather than bringing the inmate to mental health, we

6    brought mental health to the inmate.  One of the important

7    things about having doctors in the community in which the

8    condemned reside is that we're closer to both them as well as

9    the correctional officers that work with them every day.

10         If there's an issue on the unit, might not even be an

11   emergency, but maybe an issue that the correctional officer

12   have noted and they want professional consultation on, we're

13   right there.  If there's a patient who requests to see us,

14   they can simply ask us as we walk the tiers every morning.

15         East Block, as has been testified earlier, is a pretty

16   big unit.  There's about 500 inmates there.  So what myself

17   and my teammates have done, in the mornings, we will walk

18   each of the ten tiers, five on two sides, just to check in,

19   make sure folks are doing okay.

20         Maybe they don't have a scheduled appointment that

21   day, but if something is up or if they want to talk about

22   something or we feel they can benefit from an add-on

23   appointment, because we're there, we're able to catch it

24   earlier before it becomes a crisis.

25   Q.     Are you board certified?

1    A.    Dual certified by the American Board of Psychiatry and

2    Neurology in psychiatry as well as forensic psychiatry.

3    Q.    As a forensic psychologist, do you have experience in

4    conducting forensic examinations?

5    A.    Yes.  That was one of the other focuses of the

6    forensic fellowship, so I'm trying to do a variety of

7    criminal forensic evaluations as well as civil forensic

8    evaluations.

9         **MS. VOROUS:**  May I approach the witness?

10        THE COURT:  Yes.

11   **MS. VOROUS:**

12   Q.    Doctor, I've handed you what has been marked as

13   Defendant's Exhibit P.

14        Is this your current curriculum vitae?

15   A.    Yes, it is current as of October 21st of this year.

16        **MS. VOROUS:**  Request that Exhibit P be admitted into

17   evidence.

18             **THE COURT:**  Received.

19                  (Whereupon, Defendant's Exhibit P was

20                  received into evidence.)

21   **MS. VOROUS:**

22   Q.    Doctor Burton, have you reviewed Dr. Stewart's

23   testimony in this hearing?

24   A.    Yes, I have.

25   Q.    And have you included his declaration that he has

1    filed in support of the plaintiffs' motion with respect to

2    the San Quentin condemned population?

3    A.    I did have a chance to review that as well.

4    Q.    And you're aware that he toured San Quentin in

5    February 2012; correct?

6    A.    I'm aware of it.  I didn't see him that day, but I'm

7    aware that he was there.

8    Q.    And are you aware that during the tour he interviewed

9    or attempted to interview seven condemned inmates that were

10   receiving services under the specialized care program?

11   A.    Yes.  Based on my review of his declaration as well as

12   testimony he attempted to meet with seven individuals.

13   Q.    And, doctor, somewhere up there there should be a list

14   of the inmates identified by letters.

15         Do you have that in front of you?

16   A.    I do.

17   Q.    Is it your understanding, based on your review of the

18   testimony, that he interviewed the inmates identified as CCC,

19   DDD, EEE, FFF, and GGG?

20   A.    Yes, it's my understanding he attempted to interview

21   those five inmates.

22         **THE COURT:**  I'm sorry.  Hang on.  Okay.  Thank you.

23   **MS. VOROUS:**

24   Q.    Did he also attempt to interview inmates identified as

25   HHH and III?

1    A.        Yes, that is my understanding as well.

2    Q.        Are you familiar with the seven patients?

3    A.        Very much so.  In fact, I've been their psychiatrist

4    since April 2011 up until earlier this year.  Quite familiar.

5    Q.        And, doctor, you've been present during Dr. Monthei's

6    testimony and you've heard his testimony which respect to

7    services that are provided through the specialized care plan.

8              Correct?

9    A.        Yes.

10   Q.        You're familiar with that term and the services that

11   are provided as part of that plan?

12   A.        Very familiar.  I have been the psychiatrist for the

13   specialized care for the condemned care program, so I'm

14   intimately familiar with not only the services and not only

15   these patients, but how these patients have responded to the

16   services provided.

17   Q.        In February 2013 were all seven of these patients

18   receiving services through the specialized care plan?

19   A.        Could you please repeat the date?

20   Q.        February 2013.

21   A.        Yes.  At that time, they were all receiving

22   specialized care for the condemned services.  In February,

23   the first patient was admitted to the OHU version of the

24   specialized care for the condemned program.  That was DDD.

25   Q.        Doctor Stewart testified that he spent approximately

1    one to two hours visiting the condemned program and during

2    that time period was able to interview five of the seven

3    patients.

4         Based on these patients -- based on your being these

5    patients treating psychiatrist, do you believe that that was

6    sufficient amount of time to interview these five patients?

7    A.     No, I do not.  I believe in his declaration or in the

8    testimony, Dr. Stewart mentioned that he had spent up to a

9    maximum of 20 minutes each with each of these individuals.

10   20 minutes is quick for a medication check up appointment,

11   let alone a forensic evaluation.

12        In order to fully understand these very complex and no

13   question mentally ill individuals, you have to spend a lot

14   more than 20 minutes.  Number one, just to go through the

15   standard things in a psychiatric evaluation, a mental status

16   exam and detailed history, you can't do that in 20 minutes.

17        But perhaps more importantly for these inmates in

18   particular, they don't respond to change or new faces that

19   well.  When I started working with them two and a half years

20   ago, it took a few weeks before they would even open up to

21   me.  That's one of the unique aspects about people that are

22   in condemned row.  They don't respond that way to well

23   change.

24        In addition, six of these seven individuals have

25   primary psychotic disorders in which paranoia is one of the

1    more prominent symptoms, so meeting a new guy asking a bunch

2    of questions about their treatment, I can imagine they

3    weren't that forthcoming in response to Dr. Stewart,

4    especially given the fact it was 20 minutes maximum.

5         It seemed to me like a very abbreviated evaluation

6    from which very strong conclusions were drawn.

7    Q.    Are you familiar with Penal Code, Section 2602

8    governing involuntary medication?

9    A.    Very familiar with it.

10   Q.    Does Section 2602 outline the requirements for

11   obtaining a voluntary medication order?

12   A.    Yes.

13   Q.    What are those requirements?

14   A.    2602 came in effect January 1st, 2012, which replaced

15   the old Keyhea law that previously had set the rules, if you

16   will, for involuntary medications for California State

17   inmates.

18        Penal Code 2602 is, essentially, if the psychiatrist

19   determines an inmate is gravely disabled and unable to give

20   an informed consent, if the psychiatrist determines that an

21   inmate is a danger to self or if a psychiatrist determines

22   that an individual is a danger to others, if those issues are

23   due to a mental illness and the psychiatrist thinks that

24   psychiatric medications are appropriate treatment, having

25   weighed the risks, benefits, and alternatives, the

1    psychiatrist may submit a petition to the court,

2    administrative law judge will hear the evidence and

3    eventually rule on whether or not the criteria for

4    involuntary medications have been met.

5         I'm familiar with this because during my time on

6    condemned row, I tripled the inmates that were on involuntary

7    medication orders.

8         In addition, I've taught psychiatry fellows,

9    psychiatry residents, medical students and psychology interns

10   about involuntary medication orders in the California

11   Department of Corrections.

12        I've also oriented a variety of new psychiatrists to

13   this procedure, spoken to several administrative law judges

14   about 2602 because it is a new law and I wanted to further my

15   understanding, and I've discussed it quite a bit with the

16   Office of Legal Affairs.

17   Q.    In order to obtain an involuntary medication order

18   does the danger to self or others need to be emergent?

19   A.    Yes, it does.

20   Q.    Why do you believe that?

21   A.    Well, it's consistent with most standards for

22   involuntary medications.  There was a time in psychiatry

23   where there wasn't due process requirements, where,

24   essentially, inmates or patients in the community could be

25   involuntarily medicated without their consent.  Those times

1   have changed.

2          Now there's more of a balance between patient safety

3   and what the doctor thinks is best versus civil rights and

4   patient rights.  So most jurisdictions, both in the community

5   and in prison, have either an emergent, an acute, or an

6   imminent requirement for dangerousness in order for

7   involuntary psychiatric medications to be administered in an

8   ongoing fashion.

9   Q.     You mentioned that during your time on death row, the

10  number of involuntary medications tripled?

11  A.     That's correct.

12  Q.     What impact, if any, did that have on the patient's

13  behaviors that were in the condemned unit?

14  A.     Well, for the patients that were put on involuntary

15  medications, for the most part, it treated the mental illness

16  and reduced their level of dangerousness.  In many cases,

17  those who are gravely disabled are no longer gravely

18  disabled.  We have had a number of treatment successes.

19          **THE COURT:**  Some words are being used, which I'm not

20  sure -- well, I don't know what they mean.

21          In this context, what does "emergent" mean?

22          THE WITNESS:  "Emergent" means without the addition of

23  medications, there could be either dangerousness to self or

24  to other people, so self harm or violence towards others or

25  grave disability.  The person's not eating.  They're not

1    bathing.  They're not showering.  They're smearing feces, for

2    example, and that concern is in the short term.  You're

3    worried about those things happening in a period of days to

4    weeks as opposed to months and years, which would be

5    non-emergent.

6         **THE COURT:**  You indicated that everybody that you were

7    treating on -- I think this is what you said.  If not, just

8    tell me.  Everybody that you were treating in the condemned

9    section in East Block was gravely disabled.

10         Is that correct?

11         THE WITNESS:  No, that is not correct, Your Honor.  I

12    can explain if you would like me to.

13         THE COURT:  Please.

14         THE WITNESS:  There's a small subsection of the

15    condemned population who was gravely disabled.  For each of

16    those individuals, if they met the legal definition of

17    "involuntary medications," Penal Code 2602, if an

18    administrative law judge signed a court order, that small

19    minority of patients who met grave disability criteria are

20    now on involuntary medications and have improved.

21         Out of the total condemned population, approximately

22    two percent are on involuntary medications.

23         **THE COURT:**  My question, I gather was not well taken,

24    well expressed.

25         What I'm asking you is:  Were the people that you were

1    treating, was everybody in East Block that you were treating

2    gravely disabled?

3            THE WITNESS:  No.

4        **THE COURT:**  So there is a group of folks that were

5    gravely disabled and there was a group of folks that had

6    mental illnesses of sufficient character so that they needed

7    psychiatric help?

8            THE WITNESS:  Yes.  Like any community, there's a

9    variety of mental illnesses and severity.  A small minority

10   have severe mental illness, some have mild mental illness.

11   Most folks on condemned row have no mental illness.

12       **THE COURT:**  I'm not worried about most.  I'm worried

13   just about the people who are mentally ill and fall into the

14   Coleman class because they are gravely mentally ill.

15           You've indicated that you've tripled -- I don't mean

16   to interrupt your examination, but I'm not sure -- I'm sure I

17   don't know what I'm asking.

18           Of those folks who are gravely mentally ill, whether

19   emergent or actually in the state already that required

20   involuntary medication, you've indicated that at least some

21   of those folks, the involuntary medication has had a

22   substantial benefit.

23           Is that right?

24           THE WITNESS:  That is correct.

25       **THE COURT:**  When you say a "substantial benefit," does

1    that mean those folks are no longer gravely mentally ill or

2    at least they're not a danger to themselves or others?

3           THE WITNESS:  That's a good question.  The first

4    criteria for treatment success is whether or not they're

5    still a danger to self, others or gravely disabled.  Many of

6    those individuals have severe mental illness.  They've

7    improved, no question, yet they still have symptoms of their

8    chronic mental illness.

9           **THE COURT:**  I think now I understand where you are in

10   testimony.

11          You may proceed, ma'am.

12   **MS. VOROUS:**

13   Q.    Just to follow up on one of the questions that the

14   Judge just asked you, inmates that are on East Block include

15   inmates that are at the CCCMS level of care.

16          Correct?

17   A.    Yes.  We currently have approximately 150 inmates at

18   the CCCMS level of care.

19   Q.    There are additional inmates at the enhanced

20   outpatient program level of care, that are not receiving

21   services under the specialized care plan.

22          Correct?

23   A.    Yes, there are 14.

24   Q.    If I'm understanding your testimony correctly, you

25   don't believe that all of the inmates that are at the CCCMS

```
 1    level care or EOP --

 2         MR. NOLAN:  Objection.  Leading.

 3    MS. VOROUS:

 4    Q.     -- are gravely disabled?

 5         THE COURT:  That's probably leading, but you can

 6    answer.

 7         THE WITNESS:  The vast majority of patients at a CCCMS

 8    or EOP level of care have never been gravely disabled or are

 9    they gravely disabled.  There is a small minority that are

10    gravely disabled.  If it's due to mental illness, I have them

11    on a voluntary medication order.

12    MS. VOROUS:

13    Q.     Doctor, are there any inmate patients that you're

14    aware of on East Block that meet Penal Code 2602 requirements

15    that are not on involuntary medication?

16    A.     Not that I'm aware of, no.

17         THE COURT:  He hopes not.

18    MS. VOROUS:

19    Q.     Doctor Burton, Dr. Stewart testified during the

20    hearing relating to involuntary medication that, quote,

21    (Reading:)

22              It is not necessarily up to the treating

23              psychiatrist to interpret the law and then say:

24              Well, he doesn't qualify, close quote, and also,

25              quote, that it is the responsibility of the
```

```
 1                    treating psychiatrist to put forward this based

 2                    on data, as we already have, and let the

 3                    administrative law judge make the decision.

 4                    Period.  End quote.

 5          Do you agree with that statement?

 6   A.     I strongly disagree with Dr. Stewart's

 7   characterization of psychiatrists need to at least be

 8   familiar with the law.  Board certified and forensic

 9   psychiatry is a subspecialty which specializes in the

10   interaction between the mental health system and the legal

11   system with a particular focus on mental health law.

12          A psychiatrist in 2013 needs to be familiar with the

13   laws in the psychiatrist's practice and jurisdiction, not

14   just about involuntary medications, but:

15                    What is the criteria for civil commitment?

16                    What is the duty to warn or protect a third party from

17   violence from one's patient?

18                    What are the limits of confidentiality?

19                    When can confidentiality be breached in certain

20   circumstances?

21                    And, as you point out:  What is the criteria for

22   involuntary medications?

23                    If one is not even familiar with the criteria, you run

24   the risk of involuntarily medicating somebody who doesn't

25   meet the legal criteria, which many psychiatrists, myself
```

1    included, would consider unethical, or, in some cases,

2    illegal.  A psychiatrist could be charged with battery if you

3    involuntarily medicated a competent adult refusing treatment.

4    Q.      Dr. Stewart also testified, quote, (Reading:)

5                What is happening at San Quentin time and again

6                is that the clinicians are saying:  Let's don't

7                bother with this, because I know somehow Dr.

8                Monthei can read the administrative law judge's

9                mind and knows that, in fact, this person

10               doesn't qualify for involuntary medication.  End

11               quote.

12   Is that happening at San Quentin?

13   A.      Not at all.

14   Q.      How do you know that?

15           **THE COURT:**  Because he's doing it.

16           THE WITNESS:  I couldn't have said it better myself,

17   Your Honor.  I also want to point out the statue itself,

18   Penal Code 2602, in the statute it states:

19       When a psychiatrist determines an inmate is gravely

20   disabled.  When a psychiatrist determines an inmate is danger

21   to self.  When a psychiatrist determines an inmate is a

22   danger to others.  Only then may a petition be submitted.

23       Of course, ultimately, that is the administrative law

24   judge's final decision, but if the psychiatrist doesn't even

25   think the person is a danger to others, how would a judge

1    think that?

2    **MS. VOROUS:**

3    Q.    I'd like to turn your attention to the individual

4    inmate cases that we identified a few minutes ago and

5    consider first inmate CCC.

6         Are you familiar with this inmate?

7    A.    Yes, very familiar.

8    Q.    He is currently one of the -- excuse me.

9         Is CCC currently housed in one of the ten outpatient

10   housing beds?

11   A.    Yes, he is.

12   Q.    Would you describe what patient CCC was like when you

13   first started treating him?

14   A.    Yes.  I first started treating CCC in April of 2011.

15   He's been at San Quentin awhile.  He arrived in 2000.  He's a

16   46-year-old man with a history of schizophrenia, disorganized

17   type.  Bottom line:  Major mental illness.  In addition, he

18   has an antisocial personality disorder, which has not been as

19   prominent as the schizophrenia as of late.

20        When I first treated CCC, in addition to evidence that

21   he was hearing auditory hallucinations, voices, he also had a

22   variety of very odd and detrimental delusional beliefs.  In

23   particular, he believed that trash and apple cores and

24   wrappers had monetary value.  He also believed that if he was

25   to hold onto this trash in his cell, he would be able to save

1    money to afford a criminal appeal for his capital sentence.

2           What did this result in?

3           This resulted in him hoarding trash.  It was quite

4    remarkable.  Back in 2011, he had hoarded so much trash in

5    his cell, it was up to his knees in East Block.  We

6    hospitalized him.  We initiated -- at that time it was the

7    Keyhea law.  So we initiated a Keyhea application under grave

8    disability criteria.  The administrative law judge agreed

9    with us.  He was initiated on involuntary medications, and we

10   noted some improvements in regards to his cleanliness.

11          **THE COURT:**  Before you go on, when you say he was

12   hospitalized, what do you mean?  I'm now discovering -- never

13   mind.  Tell me what you mean by "hospitalized."

14          THE WITNESS:  I was referring to the mental health

15   crisis bed at San Quentin.

16          **THE COURT:**  At San Quentin?

17          THE WITNESS:  The acute hospitalization unit.

18          **THE COURT:**  My understanding is that there are acute

19   hospitalizations, there are mental health crisis beds and

20   there are others.

21          Is there an acute hospitalization program at San

22   Quentin?

23          THE WITNESS:  Let me clarify.  At San Quentin, we have

24   CCCMS level of care, EOP level of care.  For the condemned,

25   we have the specialized care for the condemned program at EOP

1    level of care.  That program runs in East Block as well as in

2    the OHU.  We also have the mental health crisis bed, which is

3    also referred to as a correctional treatment center.  It's a

4    licensed 17-bed inpatient unit that is designed for

5    psychiatric emergencies.

6         We have operations within the Department of State

7    hospitals as well.  That would be the acute psychiatric

8    program.

9         **THE COURT:**  Is that at San Quentin or are the inmates

10   suffering and requiring that level of hospitalization sent to

11   another facility?

12        THE WITNESS:  Yes.  DSH, Department of State Hospitals

13   acute is in Vacaville.

14        **THE COURT:**  When you say, "requires hospitalization,"

15   what you mean is the crisis beds?

16        THE WITNESS:  That's what I was referring to in that

17   situation, yes.

18        **THE COURT:**  I'm sorry.  I don't mean to interrupt, but

19   these are things I just don't know.

20        If an inmate that you've been treating is referred to

21   the crisis bed because it's a crisis, do you continue to

22   treat him or he is treated by doctors at the crisis bed unit?

23        THE WITNESS:  I continue to treat him.

24        **THE COURT:**  All right.  I think that's what I need to

25   know.

1          You may proceed.

2          There are psychiatrists -- I was about to say

3     shrinks -- psychiatrists at the crisis bed unit?

4          THE WITNESS:  Currently there are.  We have three

5     psychiatrists permanently assigned to the crisis bed unit.

6          **THE COURT:**  On what basis is it determined that the

7     treating physician who referred the patient, if you know,

8     continues to treat at the crisis bed rather than the

9     psychiatrists who are at the crisis bed unit?

10         THE WITNESS:  For the condemned in particular, we

11    noted that continuity was extremely important.  As noted

12    earlier, the condemned population, I believe that has

13    something to do with the culture of condemned row and just

14    the amount of time that some of the guys have been

15    incarcerated there.  They don't adapt that well to new faces.

16         So at a time of crisis when you really need to get in

17    and help someone, it would not be fortuitous to have a new

18    psychiatrist meet somebody for the first time.

19         For the condemned program, we always have a member of

20    the condemned treatment program be the psychiatrist for the

21    condemned upon admission into the mental health crisis bed.

22         **THE COURT:**  I have been told in the course of this

23    trial that the maximum time a patient can remain at the

24    crisis bed unit is 14 days.

25         Is that true of the folks that are referred at San

1    Quentin?

2        THE WITNESS:  There's no hard maximum.  I believe we

3    strive to keep people under ten days, but oftentimes we have

4    people that go above that.  It all depends on how the patient

5    is doing.

6        We base the date that they're discharged, how long

7    they're in the crisis bed on the individual.  If they are

8    ready to be discharged, they are discharged.  If that's in a

9    few days or few weeks, it all depends on how the patient is

10   doing.

11       **THE COURT:**  In other hospitals, I am told, that at

12   least the expectation is that if the patient has been

13   referred to the crisis unit does not respond adequately

14   within the 14 days -- I think that's what I've been told.

15   Maybe I'll find out in oral argument -- then he is referred

16   to the acute, to the hospitalization acute unit.

17       That is not the circumstance -- if it's true

18   elsewhere, that's not the circumstance at San Quentin?

19       THE WITNESS:  If I may explain?

20       THE COURT:  Yes.

21       THE WITNESS:  It's my understanding if a patient

22   remains in a mental health crisis bed beyond a period of ten

23   days, then consideration of referral to a DSH facility should

24   occur.  It doesn't mean a referral has to be made, but a

25   formal documented consideration of a DSH acute referral needs

 1    to occur and that happens for our patients like it does for

 2    other patients within the CDCR.

 3              **THE COURT:**  Thank you.

 4    **MS. VOROUS:**

 5    Q.       Doctor, what is inmate CCC's condition like now?

 6    A.       Yes.  After we initiated the involuntary medication

 7    order, got him on an antipsychotic medication, Risperidone,

 8    he improved.  He was no longer collecting as much trash.  He

 9    was showering every so often.  He wasn't in crisis.  He was

10    okay enough, but not great.  He was refusing a variety of

11    groups, therapeutic yards and individual appointments while

12    he was housed in East Block.  He kind of plateaued off.

13              In February 2013 with the new OHU-based specialized

14    care for the condemned program, he was the second patient

15    that was admitted.  The reason he was admitted was not only

16    did he have a major mental illness, schizophrenia, not only

17    was he at an EOP level of care, but he had resisted

18    engagement in treatment.

19              Yeah, he would take his meds.  Yeah, he would tell us

20    things were okay, but he wasn't truly engaged in the work

21    that needed to be done to improve him beyond this level that

22    he had been at.  He's no longer gravely disabled, but still

23    wasn't good enough.

24              We admitted him to the specialized care for the

25    condemned program and he's really blossomed.  This is a man

1    who had never come out of his cell for any groups or any

2    mental health yards.  Currently he averages coming out of his

3    cell 16 hours a week, at least for the months of August and

4    September.  Sometimes he's over 20, sometimes a little less,

5    but an average of 16 hours a week.

6         His cell no longer has any trash.  He himself bathes

7    on a consistent basis.  He looks good.  He is continuing to

8    take his medications.  It's a significant improvement.  I

9    attribute that to the specialized care for the condemned

10   program.

11        I know these terms have been thrown around a lot, but

12   specifically for this patient, what I think has worked is the

13   positive reinforcement model that we employ in the

14   specialized care for the condemned program.  When patients

15   engage in healthy behavior, they're rewarded for it.

16        For example, with Mr. CCC, if he was to go to a group

17   or a mental health yard or to come out to meet with his

18   therapist, he would he get a credit for that.  We call it an

19   incentive credit.  If he accumulates enough of these

20   incentive credits, he can trade in the credits for various

21   goodies or treats that we have available in a catalog for

22   him.  It could be a shoelace, a candy bar.

23        But for a low-functioning patient like Mr. CCC, I

24   think that has been the key.  In addition to the 24/7 nursing

25   care, the intensive involvement of the SCCP staff that are

1    based in the OHU, I truly believe that token economy, that

2    positive reinforcement model has worked well for CCC, given

3    the severity of his mental illness.  He's doing great, the

4    best I've seen in the two and a half years I've been working

5    with him.

6         **THE COURT:**  At present he's voluntarily taking his

7    medication --

8         THE WITNESS:  He's still under a court order, so he

9    doesn't resist.  I would say he's currently assenting to take

10   the medications orally.  He has not required an injection

11   medication for refusing an oral medication since we initiated

12   the order in April 2011, but he is still technically

13   involuntary taking medications, given that we've renewed the

14   court order a couple of times.

15        That is a good goal.  And one of my goals is to

16   eventually get them to the point where they develop the

17   insight and improved judgment to recognize:  You know what?

18   I have a mental illness.  You know what?  These medications

19   could actually help with that mental illness.

20        I have been able to successfully get several patients

21   off of involuntary medication orders, and to this day, they

22   continue to take medications voluntarily.  That's my goal for

23   Mr. CCC, as well as the other patients on involuntary

24   medication orders.

25   /////

1    **MS. VOROUS:**

2    Q.    Dr. Stewart also testified that in some of the cases

3    he reviewed including CCC that the GAF scores we're basically

4    in changed.

5          What is a GAF, G-A-F?  What does that mean?

6    A.    GAF stands for global assessment of functioning score.

7    It's basically a score from 0 to 100.  0 being bad.  100

8    being good that is a quick and dirty reference to how someone

9    is functioning.

10          It's a scale that most psychiatrist don't pay too much

11   attention to any more.  It's basically been usurped by a

12   number of organizations that need to do quick and dirty

13   evaluations, most notably insurance companies because it

14   really hasn't been validated in the literature.

15          Dr. Stewart, I noted in his testimony he made a really

16   big deal about this score.  In fact, he referenced this

17   number as evidence that someone wasn't doing better, whereas

18   in the same document there were a variety of sections that

19   described in plan English that the guy was doing better.

20          I'm not sure why he put so much weight on the GAF

21   score, given that there's volumes and volumes of documents

22   that demonstrate that CCC and other patients are actually

23   doing much better with the specialized care for the condemned

24   program.

25   Q.    Is the GAF score still -- strike that.

 1              May I approach the witness, Your Honor?

 2              THE COURT:  Yes.

 3     **MS. VOROUS:**

 4     Q.    I've handed you what has been marked Defendant's

 5     Exhibit Q.  It's a two-page document.

 6              Can you describe what this document is?

 7              **MR. NOLAN:**  I would like to object.  We had an

 8     agreement that Ms. Vorous would provide use with the

 9     documents that she was going to use in this testimony and we

10     were not provided with this 24 hours in advance.

11              **THE COURT:**  Ms. Vorous?

12              **MS. VOROUS:**  He's correct, Your Honor.  I forgot about

13     that.  We can go on without that.  I'm fine.

14              **THE COURT:**  All right.

15     **MS. VOROUS:**

16     Q.    Doctor, are you familiar with the DSM-IV?

17     A.    Yes, I'm familiar with that, the DSM-IV TR as well as

18     the new version of the DSM, the Fifth Edition which just came

19     out in May of this year.

20     Q.    Do you have any understand of the position that's

21     taken in the DSM-V with respect to GAF scores?

22     A.    I do.

23     Q.    What is that understanding?

24     A.    The American Psychiatric Association has recommended

25     and has actually removed the GAF from the current diagnostic

1    and statistical manual which is the book that tells

2    psychiatrists how to make diagnosis.  They said it

3    conceptually lacked clarity and that basically there was no

4    empiric research to demonstrate that it was of any utility.

5        This was consistent with my not only assessment of the

6    graph, but a number of my colleagues.  It's basically a

7    distinct component of the psychiatric evaluation that the APA

8    has officially removed.

9    Q.    Let's move on to inmate DDD.

10        Are you familiar with this inmate as well?

11    A.    Yes, very familiar.

12    Q.    He is also in one of the ten outpatient housing unit

13    beds?

14    A.    He is, the first one admitted actually.

15    Q.    In your mind, has there been anything significant in

16    the past year with respect to a change in his mental health

17    condition?

18        **THE COURT:**  We don't care what is in your mind.

19        Do you have an opinion, doctor?

20    **MS. VOROUS:**

21    Q.    Do you have an opinion?

22    A.    Several opinions that can be summarized.  He's doing

23    significantly better.  This is a man at his worse several

24    years ago before I was psychiatrist was the poster child for

25    grave disability.  In previous years, prior to my time

1    working with him, he refused to shower, refused to bathe for

2    months.  He would have rotting food in his beard.  He would

3    not engage in any mental health services.  This is before.

4            Where is he now?

5            He showers multiple times a week.  He's orally taking

6    the gold standard treatment for schizophrenia, a medication

7    called Clozapine.  It was hard to get him to take that.  For

8    many years he refused orally medication so we were forced to

9    give him injection medications which significantly limited

10   the treatment options we had.

11           Last year via positive reinforcement model, I was able

12   to get him to take oral medications which opened up the

13   option for Clozapine, also called Clozaril, and he's had a

14   very good response to that medication.

15           In addition, he's responded quite well to the milieux

16   within the OHU specialized care for the condemned program.

17   For a guy who would not come out of his cell at all for any

18   groups, he now averages over 15 hours of out-of-cell mental

19   health treatment per week.

20           He's frequently communicating with us.  One of the

21   interesting components of his presentation is he chooses not

22   to speak.  He can comprehend completely well.  He can

23   communicate via head nods, head shakes, shoulder shrugs.  He

24   frequently writes us notes and communicates that way.

25           When I first started working with him, I was worried

1    about why this guy wasn't talking.  I negotiated a

2    neurological workup.  He refused at first.  Ultimately, we

3    were able to locate his brother who now serves as his

4    healthcare proxy.  His brother consented to a full

5    neurological workup.

6         Fortunately, his brain from a neurological prospective

7    looks good.  The MRI was clean.  The neurologist did not

8    believe that the lack of speech was due to a neurological

9    condition, but rather to a psychiatric illness.  That's what

10   I thought was the case, but before I attributed it to that

11   definitely, I wanted to know for sure, and the neurological

12   evaluation confirmed that.

13   Q.    How does he communicate in writing?

14   A.    We frequently give him paper and pens and he writes

15   down his requests and gives them to us.  I should point out

16   that he's spoken to me on a few occasions so he does have the

17   ability to speak.  He chooses not to, but he frequently would

18   ask to return to East Block to return to his condemned cell.

19        He'll ask for things.  "I need more paper."  "I need a

20   legal pad."  He'll vocalize a lot of his direct requests,

21   whereas the other information he tends to communicate via

22   writing.  He completely comprehends though.

23        I've tested his understanding in a variety of ways

24   over the years and can definitely communicate what's going on

25   inside via nods and shakes meaning "yes" and "no."  So it's a

1    lot of direct questions.  You can't do any open-ended

2    questions with him unfortunately.

3    Q.      Do you have any opinion as to why this particular

4    patient would want to return to East Block?

5    A.      This particular patient arrived on death row in San

6    Quentin in 1987.  He was a young man at the time.  I believe

7    that he considers East Block his home.  He is familiar with

8    the inmates.  He's familiar with the officers.  He's familiar

9    with the cell itself.  He actually has communicated to us the

10   exact cell he wants on the first tier bay side.  He has the

11   number.

12          Despite the improvements that he's obtained in the

13   OHU, he still wants to go back to the place he's called home

14   for the past 26 years.

15   Q.      What is it about his current condition that has

16   resulted in a decision at this point in time to not send him

17   back to East Block?

18   A.      He's doing better, but there's still more work to do.

19   He was admitted to the program in February 2013.  We're up

20   about eight months into the OHU hospitalization.  The intent

21   of this program is to be up to 24 months.  Sometimes people

22   will be in this setting for longer than 24 months.

23          What we would like to do is make sure that he's able

24   to care for himself independently in East Block.  We would

25   also like him to be able to vocalize his concerns more

 1    frequently.

 2         We've had a variety of meetings with custody, medical

 3    and nursing and they're on board with our plan as well.  He

 4    is one of, if not the most sickest men on condemned row, and

 5    we're very satisfied and impressed with the improvement we've

 6    seen up to this point, but he has not yet plateaued off.  He

 7    continues to improve.

 8    Q.    Next, I would like to talk for a few minutes about

 9    inmate GGG.

10         Are you familiar with this inmate as well?

11    A.    Yes, I am.

12    Q.    He is, as well, is currently in one of the ten    OHU

13    beds; is that correct?

14    A.    That's correct, he was admitted in June of this year.

15    Q.    Did you review Dr. Stewart's testimony with regard to

16    GGG?

17    A.    Yes.

18    Q.    With respect to inmate GGG, at some point in time, was

19    a determination made to seek an involuntary medication order

20    for him?

21    A.    Yes, it was.

22    Q.    Explain how that decision was made.

23    A.    Certainly.  So Mr. GGG is a unique case, if you will,

24    very pleasant, personable individual who has never tried to

25    hurt himself other than the commitment offense, doesn't have

1    have an extensive history of violence, has been disciplinary

2    free for the majority of time at San Quentin.

3         His primary mental health issue is his disorganized

4    schizophrenia.  He's very confused.  His thinking is

5    confused.  Sometimes his behavior is somewhat confused.  His

6    dress is much more different than other inmates, but he's not

7    in any distress.  He's actually quite happy with it.

8         He attends groups once in a while, but you get a sense

9    when you tell him something, nothing really sticks for a long

10   term.  For the initial two years that I worked with GGG, I

11   strongly considered involuntary medications; however, he

12   didn't meet the criteria for grave disability, danger to self

13   or danger to others.

14        He could have benefited from medications, in my

15   opinion, but didn't meet the definition for it based under

16   the Keyhea law or the 2602 law.

17        That all changed in August of this year.  In August of

18   this year, in my opinion, due to his mental illness, due to

19   his disorganization, he defecated in an area in his room

20   outside of the toilet.  Basically, he pooped on the floor and

21   pooped on the sink.

22        That same day we filed papers to initiate involuntary

23   medications based on grave disability criteria.  The

24   administrative law judge agreed with us, and he's been on a

25   antipsychotic since August of this year.  He's had a pretty

1    good response.  He no longer defecates in areas outside of

2    the toilet.  His grooming has improved.  He showers

3    consistently.  He still is confused and disorganized at

4    times, but we're only two months into treatment.  We're still

5    tentrating up the antipsychotic, so we are thus far impressed

6    with his response to treatment.  No side effects up to this

7    point as well.

8         **THE COURT:**  I'm sorry.  You said something about

9    you're doing something with his medication -- what did you

10   say, sir?

11        THE WITNESS:  I probably said --

12        **THE COURT:**  I don't care what you said.  What are you

13   doing.

14        THE WITNESS:  We are increasing his dose of the

15   medication over time, tentrating the dose up.

16   **MS. VOROUS:**

17   Q.    Are you familiar with inmate HHH?

18   A.    Yes, I am.

19   Q.    How long has inmate HHH been on involuntary

20   medications?

21   A.    I initiated his petition in July of 2011, so that

22   would be two years and three months.

23   Q.    What was the impact from the involuntary medication

24   with respect to this patient?

25   A.    It was very good.  HHH is on an involuntary medication

1    order not because of grave disability.  He's always been able

2    to take care of himself okay.  He's on it because of a danger

3    to others.  He's a pretty violent man.  Initially in the

4    eighties he was convicted of murdering multiple people in

5    Los Angeles.

6            When serving his life sentence for that conviction, he

7    murdered his cellmate.  That's why he was eventually tried

8    and convicted of murder one with special circumstances and

9    sentenced to death row.

10           During his incarceration history, there's been

11   frequent episodes of violence.  In the late eighties, early

12   nineties, he was hospitalized at the Department of State

13   Hospitals and attacked another patient.  During one of his

14   criminal court proceedings, he attacked his own attorney,

15   stabbed that individual in the face with a sharp wire object.

16           With officers -- he's frequently gassed officers.

17   That's a correctional term for when an inmate throws fluids

18   on a staff member.  He's battered officers.  This behavior

19   had been going on for pretty much the eighties, nineties,

20   2000s.

21           In 2011 I had just started working in East Block, and

22   myself and the other members of the condemned treatment

23   program had our finger on the pulse of the unit.  What

24   happened one morning is that an officer was passing out

25   breakfast trays, just a routine, daily aspect of incarcerated

1    life, and Mr. HHH threatened to bust the officer in the face.

2          We heard about that, immediately hospitalized him in

3    the mental health crisis bed and initiated in 2011 a Keyhea

4    petition under danger to others criteria.  I should point out

5    he wasn't becoming violent just because -- he wasn't violent

6    because he was bored.  He wasn't violent because he was a

7    psychopath.  He was violent because of his mental illness.

8          He has an extensive history of schizophrenia, has a

9    variety of paranoid illusions and would frequently assume

10   people were either saying bad things about him or about to do

11   bad things to him when they actually were not.  That was just

12   his paranoid perception based on the schizophrenia.

13         In 2011 we initiated antipsychotic medications.  He's

14   been on them two years, three months.  He's had a great

15   response.  For a man with his history of violence, he hasn't

16   even threatened to hurt anyone else, let alone become violent

17   with someone else.

18         In the past, he would also yell and scream from his

19   cell for hours on end.  A lot of what he would say would be

20   rationally derogatory statements to a point where he

21   accumulated a variety of enemies in East Block.  This can

22   lead to serious repercussions.

23         He no longer yells and screams.  He actually meets

24   with his primary clinician for extended periods of time up to

25   40 minutes.  He is still not at the point where he's coming

1    out to groups or mental health yards.  That's still one of

2    the treatment goals, but for a man who is on an involuntary

3    medication order for violence, he has not even considered

4    violence in the two-plus years since he's been on it, I'm

5    happy with that result.

6    Q.    Doctor, are all ten of the inmates that are in OHU

7    beds on involuntary medication?

8    A.    No.  Eight of the ten are not.  The remaining two

9    voluntarily take their medications.  In the past, those two

10   who are now taking medications voluntarily had been on

11   involuntary medication orders.

12   Q.    Considering whether to make a referral of a patient on

13   East Block to one of the ten outpatient housing unit beds,

14   what is considered by the treatment team?

15   A.    A variety of things.  Most notably the severity of

16   mental illness.  They have to be at EOP level of care, but if

17   your mental illness is severe enough, you're going to be at

18   an EOP level of care.

19        In addition to that, we want to match the treatment

20   program to the patient.  So one of the criteria that we've

21   looked at is patients who traditionally don't want to engage

22   in services, patients who are doing okay.  They don't need

23   hospitalization criteria but aren't coming out of their cells

24   to go to groups, yards.  Patients CCC and DDD are great

25   examples of that.

```
 1              Because we have 24/7 services, a positive
 2   reinforcement model, we really want to engage patients who
 3   traditionally have not been engaged in mental health
 4   treatment.  So those are the individuals who have been
 5   prioritized to go to the specialized care for the condemned
 6   program in the OHU first.
 7              Of note, all ten of the individuals have primary
 8   psychotic disorders.  Schizo something, either schizophrenia
 9   or schizoaffective disorder.  These guys have major mental
10   illness.
11   Q.     Doctor, are you familiar with the standard of care in
12   the community for mentally ill inmates?
13   A.     Yes, I am.
14   Q.     And how are you familiar with that standard?
15   A.     I've worked in a variety of community settings, public
16   hospitals in the past, federal hospitals, two VA hospitals in
17   New York and San Francisco.  I worked in private hospital
18   settings, community clinics, state hospitals in the past.  In
19   New York I worked at Kirby Forensic Hospital.
20   Q.     In your opinion, are the inmates that are in the ten
21   OHU beds getting care that is about above the standard of the
22   community?
23   A.     Yes, in my opinion for those ten inmates it is an
24   above the community standard.
25   Q.     Are you familiar with the care that is provided to the
```

1    other EOP inmates that are housed on East Block?

2    A.    Yes, I am.

3    Q.    And in your opinion are those inmates receiving care

4    that is above the standard of care in the community?

5    A.    For their diagnosis and current illness, yes.

6    Q.    Do clinicians on East Block consider referrals to the

7    acute program operated by the Department of State Hospitals

8    at Vacaville as part of a regular interdisciplinary treatment

9    team meeting?

10   A.    Yes, we consider it all the time.  We just referred a

11   guy to Vacaville last week.

12   Q.    Are there clinicians in the -- that are treating the

13   inmates in the ten outpatient housing unit beds considering

14   referrals to the acute program as part of their regular

15   meetings as well?

16   A.    They're considering it, but we've had such success

17   with the OHU program that we are not intending on referring

18   those patients in the short term.  Things can change in the

19   world of mental health, but we've really seen some dramatic

20   improvement in these patients.

21        It's something were quite excited by.  For the first

22   time in many years, sometimes decades, these patients are

23   coming out engaging in groups.  They're attending their

24   sessions, taking their medications and they're getting

25   better.

1          Their psychotic symptoms are decreasing.  It might

2     seem like a small thing.  They're showering more, eating

3     regularly.  These activities of daily living that most people

4     take for granting, for those individuals are very difficult

5     hurdles to overcome.  They're overcoming them and responding

6     to treatment.

7          So right now, rather than changing their treatment, we

8     want to stick with what's working.

9     Q.     Another inmate that Dr. Stewart identified in his

10    testimony is one of the seriously mentally inmates he

11    interviewed on East Block was inmate FFF.

12         You familiar with inmate FFF?

13    A.     Yes, very familiar.

14    Q.     According to Dr. Stewart's testimony, inmate FFF has

15    been referred and received treatment in the acute program at

16    Vacaville.

17         Is that your understanding as well?

18    A.     Yes.  In total in the four years that FFF has been on

19    condemned row she has been referred to the acute program at

20    DSH seven times.  The most recent time was earlier this year.

21    Q.     Why was in inmate FFF a good candidate for referral --

22         **THE COURT:**  That assumes that she was a good --

23         **MS. VOROUS:**  Let me ask that question.

24    Q.     Was she a good candidate for referral to the acute

25    program at the State Hospital Program?

1    A.      Yes, she was.

2    Q.      Why was she a good candidate?

3    A.      I think it might be helpful for me to explain to the

4    court the differences between the OHU specialized care for

5    the condemned program and the Department of State Hospitals

6    Acute Program.  They're very different programs and we do

7    have those two treatment options for patients at that level

8    of care at East Block.

9            I already described the OHU treatment for the

10   specialized care for the condemned.  High stipulation, high

11   energy program.

12           **MR. NOLAN:**  Objection.  I don't think that he has

13   established a foundation for his knowledge about the acute

14   program.

15           **THE COURT:**  Establish a basis for his understanding.

16   I think it's obvious.

17   **MS. VOROUS:**

18   Q.      Do you have an understanding of the acute program at

19   Vacaville?

20   A.      I do have an understanding of the treatment that's

21   received.  I've spoken with a variety of the clinicians,

22   patients treated there.  I've been able to observe which

23   patients respond well to that type of treatment and which

24   patients don't.  I've never worked there though.

25           **THE COURT:**  You may proceed.

1        You were asking why FFF was a good candidate for

2    hospitalization at Vacaville.

3    **MS. VOROUS:**

4    Q.      Yes.  If you can answer that question, please.

5    A.      The specialized care for the program at the OHU is a

6    high stimulation environment.  We actively reward people for

7    engaging in treatment.  We offer group seven days a week

8    throughout the day.  Some of the groups for people in the OHU

9    and East Block.  There is a lot of activity, hustle and

10   bustle in the OHU program.

11       Who does that high stimulation work for?

12       People who traditionally are not engaged in treatment.

13   People who are low stimulation individuals, CCC, DDD, folks

14   who don't want to engage in treatment, folks who would rather

15   just sit in their cell all day.

16       That's very different from the DHS acute environment.

17   That is no stimulation.  There's not a lot of activity for

18   the condemned.  There's not a lot of groups, not a lot of

19   yards.  They still get medication and therapy, but there's a

20   lot of quiet time.

21       That type of environment can be helpful for some

22   individuals.  Patients who are already highly stimulated,

23   yelling, screaming, cutting, acting out, in general, who have

24   not a primary psychiatric disorder, but perhaps a personality

25   disorder like FFF has, substance use issues, getting in

 1    fights on the yard which may or may not be related to mental

 2    illness, but somebody who could benefit from some quiet time

 3    actually does well in DHS acute.  At least we've seen some

 4    good results as we have with FFF.

 5         That type of patient wouldn't do as well for the

 6    specialized care in the OHU, which is designed for folks that

 7    want to stay to themselves and very low energy to begin with.

 8    Q.    In your experience working at San Quentin, are there

 9    differences between the condemned and non-condemned

10    population as far as their mental health treatment needs?

11    A.    Yes and no.  The disorders are technically the same,

12    but there are a number unique cultural aspects that creates

13    different treatment approaches.

14    Q.    Can you explain what those approaches would be.

15    A.    Yes.  One of the unique aspects of the condemned

16    population is it's a very tight knit group.  Unlike inmates

17    under other sentencing levels, lifers are people who have

18    determinate sentences.

19         Condemned inmates stay at San Quentin.  They're not

20    used to being transferred all over to the state, level II,

21    level III, not used going from Central Valley to High Desert.

22    They've been at San Quentin fir the vast majority of their

23    10, 20, sometimes 0 years.  It's a very tight knit

24    population.

25         You know who your friends are.  You know who your

1    enemies are.  You know who the officers are.  You're also

2    very familiar with the doctors, but a number of these inmates

3    consider San Quentin for better or worse home.  That's a

4    unique aspect in that it's a tight knit population that can

5    relate to one another and root for one another.

6         Another unique difference with the condemned

7    population is, we are not strangers to attorneys.  In fact,

8    each of our inmates at some point, most of them current have

9    an ongoing criminal appeal.

10        Why is that important?  How does that factor into

11   treatment?

12        It's very important.  Their criminal appeal attorneys

13   serve as an advocate for the inmates, support.  They give the

14   inmate a job basically.  It's not uncommon to walk the tiers

15   of condemned row to hear an inmate working on a typewriter,

16   working on the aspect of the appeal.  It gives them purpose,

17   direction.

18        A lot of times they consult with each other.  There

19   are a number of inmates who have obtained law degrees.  At

20   least that's what they tell me and consult each other to work

21   on each other's criminal appeals.  That aspect is unique to

22   condemned row.

23        Finally, there's meaning for these individuals and the

24   fact that they've all been sentenced to death by the people

25   of the State of California.  I think it's important for

1    individuals in those circumstances to be around others who

2    are in that circumstance as well because that's something

3    that even myself as a psychiatrist who works with those folks

4    doesn't completely comprehend.

5         I think you have to be around other people who are

6    also in that situation, and that provides for a tremendous

7    amount of understanding and support.

8    Q.    Dr. Burton, Dr. Stewart testified there's a

9    subpopulation of inmates within the California Department of

10   Corrections that should always have to be placed in a

11   hospital setting.

12        Do you agree with that statement?

13   A.    I disagree completely with that statement.  There was

14   a time in psychiatry when we would lock people up for years

15   on end, sometimes decades in state hospitals and throw away

16   the key.  Fortunately those times are over --

17        THE COURT:  We don't have any state hospitals.

18        THE WITNESS:  In part.  There's also now laws and

19   courts that oversee these things.  Individuals have due

20   process rights.  This month marks the 50th anniversary of

21   President Kennedy signing the Community Mental Health Act.

22   The days of locking people up in state hospitals indefinitely

23   without any chance of coming back to their community, coming

24   back to their home are fortunately over.

25   /////.

1    MS. VOROUS:

2    Q.    Are you familiar with inmate WWW identified on the

3    index view in front of you?

4    A.    Yes, I am.

5    Q.    And are you also familiar with the fact that this

6    inmate took his life in April of this year?

7    A.    Yes, I am.

8         **MS. VOROUS:**  May I approach the witness, Your Honor?

9         **THE COURT:**  You may.

10   **MS. VOROUS:**

11   Q.    Doctor, you have in front of what's been marked as

12   Defendant's Exhibit R.

13        Are you familiar with these records that are contained

14   within Exhibit R?

15   A.    Yes, I am.  I authored most of them.

16   Q.    With respect to the ones that you have not authored,

17   have you reviewed them?

18   A.    Yes, I have.

19   Q.    Are these record kept in the normal course of business

20   at San Quentin?

21   A.    Yes.

22        **MS. VOROUS:**  Your Honor, we request to move these

23   records into evidence under seal.

24        **THE COURT:**  I take it these are the medical records.

25   Are they?

1              THE WITNESS:  Yes.

2              **THE COURT:**  Received under seal.

3                        (Whereupon, Defendant's Exhibit R was

4                        received into evidence.)

5    **MS. VOROUS:**

6    Q.     Dr. Burton, were you one of inmate's WWW treating

7    clinicians when he was at San Quentin?

8    A.     Yes, I was his treating psychiatrist between

9    April 2011 and April 2013 until he died.

10   Q.     And at some point after becoming his treating

11   psychiatrist in April 2011, did you review his prior mental

12   health records?

13   A.     Yes, I reviewed them in their entirety.

14   Q.     And, doctor, Exhibit R, as you've mentioned, contains

15   your psychiatry notes.

16          Is that correct?

17   A.     Yes, it does.

18   Q.     And the records that are within Exhibit R do not

19   constitute the entirety of this patient's mental health

20   records.

21          Is that fair?

22   A.     Yes, that is fair.

23   Q.     Are you able to estimate the extent of this inmate's

24   mental health records from when he first entered San Quentin

25   up until the time he took his life?

1    A.        There are extensive records.

2    Q.        Doctor, are you aware in January 2010 this inmate

3    blinded himself?

4    A.        Yes, very familiar.

5    Q.        Are you familiar with the mental treatment that he

6    received prior to this incident that occurred in

7    January 2012?

8    A.        Yes, I'm familiar with it.  I wasn't his treating

9    psychiatrist at that time, but I reviewed the records and

10   discussed it with the patient himself.

11   Q.        Describe his treatment up until January of 2010?

12   A.        WWW arrive in 2005, was placed at a CCCMS level of

13   care, for some time was prescribed an antipsychotic

14   medication, Risperidone, had an okay response but decided to

15   stop it.

16            Up to that point, although he had been depressed in

17   the past and there was some concern over delusion thinking,

18   there was no frank history of self injury or suicide

19   attempts.

20            **THE COURT:**  It's quarter of.  We'll take our 15-minute

21   recess.

22                              (Whereupon, a break was taken at

23                              10:46 a.m.)

24                              (Nothing Omitted.)

25   /////

1431

1       (On the record at 11:05 a.m.)

2       THE CLERK:  Please, remain seated.

3       Court is now in session.

4       THE COURT:  Be seated.

5       Miss Vorous.

6   BY MS. VOROUS:

7   Q.    Doctor, we were talking about Inmate WWW's treatment

8   prior to his blinding himself in January 2012.

9       Moving beyond that, what happened next with respect

10  to Inmate WWW's treatment?

11      What was the next thing that happened after he

12  blinded himself in January 2010?

13  A.    He was hospitalized at the San Quentin Mental Health

14  Crisis Bed immediately following the self-injurious act that

15  resulted in his blindness.

16      Following that hospitalization, he was transferred to

17  the Medical OHU at San Quentin.  At that time, given the

18  acuity of his mental illness, as well as the acuity of his

19  self-inflicted physical illness, the doctors needed to

20  balance the physical and mental health needs of the patient.

21      The physical needs had to be accomplished in the

22  Medical OHU.  They had access to equipment and staffing that

23  are more suited for acute medical issues.

24      He was housed in the Medical OHU, which is literally

25  right next to the Mental Health Crisis Bed.  There is one

1432

1   door that separates the two units.  It is on the same floor,

2   the fourth floor, of the new hospital building.

3          He was hospitalized there until being transferred to

4   Kentfield Hospital, which is a community hospital.  After he

5   went to Kentfield Hospital, he was transferred to Corcoran

6   where he remained until December of 2010, approximately ten

7   months after the blinding episode.

8          He then returned to San Quentin State Prison in

9   December of 2010.  At the time of his return he was

10  rehospitalized in the Mental Health Crisis Bed, not because

11  he was in crisis at that time, just given the severity of the

12  act that had occurred ten months prior to that date we wanted

13  to make sure that he was going to be okay upon his return to

14  San Quentin.

15         He was, and the doctors at the time discharged him

16  back to East Block at an EOP level of care.

17         I picked up his treatment in April of 2011.  So this

18  would have been a year and three months after the blinding

19  episode, or five months after he returned to San Quentin

20  following the extended stay at Corcoran.

21  Q.     Doctor, at the time that Inmate WWW returned to

22  San Quentin and was placed in the Mental Health Crisis Bed,

23  did he meet the criteria for involuntary medication?

24  A.     He did not specifically because he was voluntarily

25  taking medications at that time.  In order to meet the

1433

1    criteria for involuntary medications, you need to have

2    refused medications.

3         Also, at that time, this would have been under the

4    Keyhea law.  It was a very old law.  I'm glad they replaced

5    it.  Technically, he wouldn't have met the Keyhea criteria at

6    that time if he had refused medications simply because he did

7    not commit the self-injurious act on an inpatient unit.

8         Fortunately, under the 2602 law, that is no longer a

9    factor.  But the good news is that Inmate WWW voluntarily

10   took meds at that time.

11   Q.    Between April 2011, when you started treating

12   Inmate WWW -- I believe you may have just said his name.

13         THE COURT:  It will be stricken from the record.

14         THE WITNESS:  My apologies, Your Honor.

15   BY MS. VOROUS:

16   Q.    From the time you started treating Inmate WWW in

17   April 2011 up to January 2012, what did his treatment consist

18   of during that time period?

19   A.    When I first met WWW, April 2011, I was struck by how

20   little insight he had into his mental illness.  This was a

21   man who, a year and three months prior to that, had blinded

22   himself by shoving pens into his eyes, yet he refused to even

23   acknowledge that he had an issue with anxiety, an issue with

24   depression.

25         His main focus was on his physical pain.  This was

1434

1  not the first time he brought up physical pain issues.  This

2  had been a common theme throughout the previous six years he

3  had been at San Quentin.

4      The interesting component to his variety of

5  musculoskeletal complaints, hip pain, foot pain, back pain,

6  is that they had been evaluated by the medical department.

7  He had received MRIs.  He been referred to orthopedic

8  surgery.  No one could find a physical cause for his pain so

9  medical was stumped.

10     When I met this individual, in reviewing the medical

11 records, in speaking with him, I became concerned that in

12 addition to his schizophrenia, he may have a somatoform

13 disorder.  That's a condition in which someone's emotional

14 pain is not recognized at a conscious level so they

15 experience the emotional pain physically.

16     THE COURT:  The name of the illness is what?

17     THE WITNESS:  Somatoform disorder.

18     THE COURT:  Thank you, sir.

19     THE WITNESS:  You're welcome.

20     He was resistant to any consideration that he really

21 needed any form of mental health treatment.  Certainly, at

22 that time, was refusing psychiatric medications.

23     He wasn't in crisis.  This was a year and three

24 months after the blinding episode.  I knew about that so I

25 knew this guy was higher risk than most our patients, but

1435

1   there had been no recurrent self-injurious behavior.

2           He was eating okay, sleeping okay, not suicidal, not

3   wanting to harm himself again.  His brother was housed next

4   to him, and they had a good brotherly relationship.  He was

5   occasionally going to yard.

6           I knew this was going to be a challenging patient so

7   the approach I took early on was I downplayed the role

8   that -- the fact that I was a psychiatrist and overplayed the

9   role that I was a M.D.  I was a medical doctor who

10  specializes in the mind and tried to plant some seeds that,

11  regardless of the cause of his pain, it must be stressful to

12  be in so much pain and for the medical department not to find

13  a cause or treatment for that pain.

14          So I planted some seeds early on.  He refused

15  psychiatric medications despite me recommending them.  His

16  psychologist started to work with him and met with him on a

17  weekly basis to discuss some relatively neutral topics.  I

18  really wouldn't consider it therapy, more to build rapport.

19  So they would talk about issues in the news, they would talk

20  about some activities and games that WWW enjoyed.

21          It was more just to build some bridges, to build

22  rapport, which is often what you need to do in difficult

23  cases like this in order to get him to trust us.

24          Eventually, in January 2012, that trust and rapport

25  paid off.  In January 2012 his psychologist approached me and

1436

1   said:  Dr. Burton, I've got something that you need to see

2   immediately.  It is WWW.  He didn't use the letters, but

3   said:  I need a consult.

4       WWW stated at that point that for the past several

5   days to weeks he had the belief that in addition to the

6   physical pain symptoms which persisted, that paranormal

7   entities or ghosts were tormenting him and actually

8   controlling various parts of his body.  In particular, he

9   felt they were controlling his penis, and they were causing

10  him to have spontaneous erections and ejaculation that he was

11  very distressed by.

12      He also felt that they were inserting thoughts in his

13  head about sexual images, he used the term "orgies," that he

14  was very distressed by.  He was a very sexually regressed

15  individual.  But because of his concern over these paranormal

16  entities and ghosts, he believed that the way to get them to

17  go away would be to stop giving them the fuel that they fed

18  upon.  Their full was his fuel.  Food.  Water.  So he said

19  that in order to get the ghosts to go away, he had stopped

20  eating and drinking.

21      I recognized this as a very different presentation

22  from the previous assessments of WWW.  This was an acute

23  psychotic episode.

24      I met with WWW for about 45 minutes with his

25  psychologist in East Block, and then transferred him to the

1437

1    Triage and Treatment Area.  We call it the TTA.  In the

2    prison system it functions as an emergency room.  I sent him

3    to the emergency room.  I escorted him over with the officer

4    and had a second 45 minute evaluation with WWW in the

5    emergency room.

6         I found it interesting that, despite his theory that

7    this was a paranormal entity, a ghost, a spirit, he was

8    bringing this up to mental health and asking mental health

9    doctors for assistance with it.

10        At some level, even though he wouldn't verbalize it,

11   he recognized that this was related to a mental illness.

12        In the emergency room, the TTA, I strongly

13   recommended the initiation of antipsychotic medications,

14   specifically Zyprexa.  He was also quite distraught by these

15   paranormal entities so he was anxious as well.  And I thought

16   that an antianxiety medication, such as Ativan or Lorazepam

17   in the short-term, would also be a benefit.

18        I discussed the risks and benefits of these

19   medications with WWW.  He understood, and he consented.  He

20   agreed to start the medications.

21        I gave him the first dose of the antipsychotic stat

22   in the emergency room.  I also discussed with him the

23   concerning feature that he hadn't been eating or drinking.

24   He wanted to eat and drink.  He was actually hungry, but he

25   was worried about giving the paranormal entities fuel.

1438

1    So we agreed that he would resume eating that day,

2  that now he wasn't alone, he had the mental health team, his

3  psychologist, his psychiatrist, other members of his team on

4  his side.  He was now getting medications that could help

5  repel the paranormal entities so he no longer had to employ

6  his limitation of food intake in order to get them to go

7  away.

8    He agreed to resume eating following these

9  discussions and my strong recommendations to do so, and he

10  started eating again that night.  He started drinking again

11  that night.

12    And you could see it, just by telling us about these

13  issues that he had been dealing with on his own for some

14  time, his anxiety decreased.

15    I discharged him back to East Block on what we call a

16  five day follow up, which is a formal way for mental health

17  to closely follow someone as an outpatient.

18    I stayed late that day.  It was probably about six

19  o'clock after he left the emergency room.  I saw him first

20  thing the next morning.  He was already doing a little bit

21  better.

22    He said the paranormal entities were still there and

23  still inserting sexual images but were no longer controlling

24  his penis or his erectile function.  Also he ate.

25    He continued to be compliant with the medications as

1439

1    an outpatient.  And I see that day, January 25th, 2012, as

2    the turning point.  That's when he first really became a

3    patient in the mental health system.

4           Why is that?

5           Because he had an issue that he at some level

6    recognized was related to his mental health treatment.  He

7    came to mental health.  We responded.  We gave him treatment.

8    The treatment worked.

9           In the next few weeks I increased the dose of his

10   Zyprexa medication.  And following every increase, the

11   symptoms improved to the point where the paranormal

12   entities -- he still believed they were there, that's pretty

13   common for people with delusions, the memory of the delusion

14   persists -- but they were no longer interfering with his

15   daily life, they were no longer inserting sexual images, no

16   longer controlling his physical symptoms.

17   Q.    Doctor, if you would, look at Exhibit R.

18   A.    Yes.

19   Q.    The mental health records for Inmate WWW.

20          And the first two pages, do these notes represent

21   your notes from your visit with Inmate WWW on January 25th,

22   2012?

23   A.    Yes.

24   Q.    And the notes following would be pages 3 and 4.

25          Do those represent your follow up with this patient

1440

1    the day after?

2    A.      Yes.  The morning after the emergency room visit,

3    yes.

4    Q.      And Doctor, at the time of the visit with Patient

5    WWW, on January 25th, 2012, was he considered for admission

6    into the Mental Health Crisis Bed Unit?

7    A.      Yes, he was.

8    Q.      And why was he not admitted?

9    A.      Well, I recognize this as a key point, and I outlined

10   this in my note as well, but I strongly considered both

11   Mental Health Crisis Bed admission as well as five day follow

12   up at an EOP level of care.

13          I was encouraged by the fact that for the first time

14   Mr. WWW was agreeing to psychiatric medications.  He was also

15   agreeing to start eating and drinking again.

16          He also very much did not want to go to the Crisis

17   Bed Unit.  He said that if he was to go up there, he would be

18   angry, and he wouldn't follow up with mental health.  He

19   would be -- he would see it as a way in which we violated his

20   trust.

21          So I had to weigh his safety, and I was concerned

22   about that, versus the ongoing treatment needs that would be

23   much more probable for him to comply with should we send him

24   back to East Block on a five day follow up.

25          In the end, it was the right call.  Ultimately, there

1441

1    is a sad outcome to this story, but his suicide was 15 months

2    after this emergency room assessment.

3        In that 15-month period he had been admitted -- he

4    was admitted twice to the Mental Health Crisis Bed for other

5    events related to his physical pain.

6        But January 25th, 2012, is when he initiated

7    psychiatric medications on a voluntary basis and got a good

8    response to them.

9    Q.    Doctor, moving ahead to the summer-fall of 2012, what

10   happened with Inmate WWW in the summer and fall of 2012.

11   A.    Yes.  So WWW intentionally ingested pain medications,

12   opiates, as well as heroin, which is an opiate.  According to

13   him this was to not only treat the pain that he believed was

14   from a physical perspective -- we strongly believed it had a

15   psychological origin -- but he ingested these pain

16   medications not just to treat this pain, but to draw

17   medical's attention to his suffering and to his pain.

18       This is of note because his stated reason for

19   blinding himself was because he was dissatisfied with

20   medical's treatment of his foot pain.

21       So this became a theme for him.  When he perceived he

22   was having pain, and he became frustrated because the medical

23   department said, "Hey, WWW, there is no physical cause for

24   it," he would try to engage in extreme measures of

25   self-injury in order to draw attention to his plight.

1442

1    He was admitted to the crisis bed twice, once in

2    August, once in late September of 2012, for intentional

3    ingestions of pain medications, according to him not to kill

4    himself, but to draw attention to the pain issues.

5    At this point his psychologist and I recognized this

6    is a higher risk case.  It was already high risk.  Now he's

7    continuing to engage in this behavior.  Now it is a bit of a

8    pattern.  We placed him on the high risk list for suicide.

9    Even though these weren't suicide attempts, his

10   ingestions and the stabbing out of the eyes weren't because

11   of his intention to die, but for those other issues, he was

12   still at evaluated risk for hurting himself because of poor

13   judgment.

14   We also increased his level of care back to EOP.  A

15   previous psychiatrist had dropped it to CCCMS.  And we

16   recognized that we have to intensely coordinate services with

17   the medical department in order to address his pain.

18   We did that.  We had a variety of conferences with

19   his primary care clinician, we had a deparment-wide

20   conference with the chief medical officer at San Quentin

21   State Prison, and we acknowledged that this pain was due to

22   his somatoform disorder given that multiple diagnostic tests

23   and specialist consults had ruled out a physical cause.

24   So okay.  Now, how do we treat it?

25   We followed the appropriate standard of care

1443

1   recommendations for someone who has somatoform disorder.  We

2   emphasize to medical that you have to validate his pain,

3   without giving it a cause, without giving it a label, at

4   least acknowledge that this guy is experiencing pain.

5           That was done and was successful.

6           In addition, I began to coordinate the prescription

7   of psychiatric medications and framed it to WWW as a way to

8   treat his pain.

9           There are some studies that show that medications

10  such as Venlafaxine, also known as Effexor, and other

11  medications in that class, are effective for neuropathic

12  pain.  I explained this to Mr. WWW.  He understood.

13          I also explained to him that these medications are

14  good for anxiety and depression.  He understood that.

15          He didn't think he was anxious or depressed, but at

16  times could acknowledge that the pain led to some transient

17  anxiety and depressive feelings.  I was able to get him to

18  comply with the Effexor medication based on this manner.

19          In addition, the medical doctor, the primary care

20  clinician, reinforced the same message to WWW, that the best

21  medication for his pain would be the medications that his

22  psychiatrist, I, was prescribing.

23          In addition to Effexor, I prescribed him Remeron,

24  another antidepressant medication.  And the third medication

25  was Zyprexa, the antipsychotic that had assisted in the past

1444

1    in resolving the psychotic symptoms of the paranormal

2    entities.

3          So he was on not one, not two, but three psychiatric

4    medications on a voluntary basis for the immediate six months

5    prior to his suicide.  And essentially, the medications

6    worked.

7          The paranormal entities were no longer controlling

8    his body.  He was eating and drinking fine.  His anxiety was

9    significantly reduced.  He wasn't depressed by his own

10    account or on mental status exam or observations of how he

11    presented.

12          He also started to improve in his functioning.  He

13    started to attend mental health yards.  He was attending up

14    to three mental health group yard activities, where we have

15    recreational therapy, things of that sort, three of those a

16    week.

17          He began to make new friends, which is a sign of

18    mental health, on his regular inmate yard.  He began to

19    develop a romantic relationship with a woman who had come to

20    see him in the visitation area.  Once again, another good

21    sign of improved mental health functioning.

22          He was doing quite well.  The pain itself, whereas

23    before, according to him, it was debilitating, crippling,

24    times he said that my foot pain is so bad I can't get up and

25    come to the appointment, the foot pain had completely

1445

1    resolved.

2         The groin pain, which had been another issue for him

3    in the past, completely resolved.

4         The wandering pain complaints moved up to his

5    shoulder.  He still complained of very mild shoulder pain.

6    He was a very analytical guy.  He liked to look at numbers.

7    He described his shoulder pain as being two out of ten, with

8    one being very minimal, ten being the worst in the world.  So

9    he had two out of ten, very mild shoulder pain, but that was

10   it.

11        He was engaged in a variety of therapeutic exercises

12   that are very similar to yoga.  That was also an important

13   part of his treatment to assist in the pain.

14        But the pain, after many years of his own suffering,

15   had gotten better to the point where it was no longer a

16   primary focus of his treatment.

17        It was at that point, in the spring of 2013, that he

18   began engaging in what most people would consider more

19   traditional therapy topics with his psychologist.

20        Rather than being haunted by these ghosts and

21   paranormal entities, rather than suffering from the pain that

22   he was no longer experiencing, he was talking with his

23   psychologist about some of the day-to-day reality-based

24   difficulties of being on death row.  What it was like.  What

25   his prospects were for the future.

1446

1        He was finally up to the point of health where he was

2   engaged in therapy at a non-psychotic level, at a

3   reality-base level.  In the spring of 2013 the symptoms had

4   improved, his functioning had improved.

5        About a week or two before his suicide his brother,

6   who was housed right next to him, actually stopped me on the

7   tier to thank me.  I was little surprised.  I said:  Well,

8   what are you thanking me for?  He said:  I have never seen

9   WWW look this good in my entire life.  Thank you.

10       You can imagine our shock when on a Sunday night in

11  April we were told that WWW hung himself.

12  Q.      Doctor, if I can stop you right there and just go

13  back with a couple of other questions about WWW's course of

14  treatment.

15       In Dr. Stewart's testimony he criticized the fact

16  that, at least during the summer-fall of 2012, staff at

17  San Quentin did not consider WWW for involuntary medication.

18       Do you agree with that criticism?

19  A.      No, I don't.  We definitely considered WWW for

20  involuntary medications.

21       THE COURT:  There wasn't an occasion to.  He was

22  taking the medication as you indicated.

23       THE WITNESS:  Exactly.  For the six months prior to

24  his suicide, he was voluntarily taking not one, not two, but

25  three psychiatric medications.

1447

1    You know, there is no magic to involuntary

2    medications.  The pills are the same, whether voluntary or

3    involuntary.  In fact, you often get more bang for your buck

4    if the patient takes them voluntarily.  If they think they

5    are going to work, if they believe there is something to the

6    medications, guess what?  They will work a little bit better

7    than if you force under a court order someone to take

8    medications.

9    I saw in Dr. Stewart's testimony, he kind of made a

10   big deal about the involuntary medication issue with WWW.

11   It's essentially a moot point.  He was on three psychiatric

12   medications for the six months immediately prior to his

13   suicide.  Even if he had been on an involuntary medication

14   order, he would have been on the exact same medications.

15   I fail to see the relevance in that argument.

16   Q.    Dr. Burton, Dr. Stewart also criticized staff's

17   failure to refer WWW to acute care at the Department of State

18   Hospitals.

19   Do you -- let me ask this first.  Was a referral to

20   acute care considered for Inmate WWW?

21   A.    Yes, it was.

22   Q.    And why was the referral not made?

23   A.    Well, as described before, the Department of State

24   Hospitals Acute Program is appropriate treatment for a

25   certain type of patient.  It is a very low stimulation

1448

1    environment.  There is not a lot of groups.  There is not a

2    lot of yards.

3        At that time, in the summer and fall of 2012, WWW was

4    not engaged in groups, was not engaged in yards.  We wanted

5    him to be.  So rather than sending someone who already didn't

6    want to engage in treatment to a facility where there wasn't

7    a lot of group or yard treatment, we took a different

8    approach.

9        We beefed up his outpatient specialized care EOP

10   treatment.  We coordinated his care with the medical

11   department.  We coordinated his care with the nursing

12   department.  We developed a treatment contract with WWW.

13   Obviously, it is not legally binding.  It is a therapeutic

14   tool that basically instructed him to not overdose on pain

15   medications or any medication, it instructed him to remain

16   compliant with his prescription medications, to attend

17   therapeutic yards, to attend some groups, and to meet with

18   his therapist in the office in a confidential setting at

19   least once a week.

20       We were also cognizant of the fact that, somewhat of

21   a unique situation, WWW's brother was housed right next to

22   him.  And they had a very complex relationship, but I think

23   it is fair to say they loved each other very much and were

24   positive supports for each other.  And by removing WWW from

25   his brotherly support, that was one variable we took into

1449

1    consideration when we decided not to refer him to DSH Acute.

2    Q.        In treating Prisoner WWW, did you ever engage in

3    department-wide conferences to discuss his mental health

4    treatment?

5    A.        Yes.  I personally engaged in two department-wide

6    conferences.  One I already brought up.  It is when we also

7    invited the medical department, when we were really trying to

8    formally integrate his care, to provide him with total

9    mind-body medicine.  The second was just for the mental

10   health clinicians department wide.

11            This was a very challenging case, a unique case,

12   someone with serious mental illness who traditionally had not

13   been engaged in treatment.  We were looking for advice and

14   opinions from our colleagues.

15   Q.        Doctor, if you would look at tab S of the binder that

16   is sitting to your left, the Dr. Stewart exhibits.

17   A.        The big one?

18   Q.        Yes.

19            THE COURT:  What is the exhibit number, if you know?

20            MS. VOROUS:  Exhibit 1138b and 1138c.

21            THE COURT:  Thank you.

22   BY MS. VOROUS:

23   Q.        Tab S?

24   A.        Tab S.  Okay.

25            Okay.  Tab S.

1450

1  Q.      Doctor, Exhibit 1138b represents one timeline for

2  Prisoner WWW and Exhibit 1138c represents a second timeline

3  for Prisoner WWW.

4          Do you see that?

5  A.      I do.

6  Q.      In your opinion -- let's start with 1138b.

7          In your opinion does this timeline represent the full

8  treatment that was provided to Prisoner WWW during his stay

9  at San Quentin State Prison?

10 A.      No, it does not.  This is essentially a lowlight reel

11 of his treatment at San Quentin.  It omits a number of

12 important factors, including the fact that he was on three

13 medications at the time of his suicide.

14         It omits the fact that he was engaged in mental

15 health treatment with his therapist, as well as up to three

16 mental health yards per week.

17         It includes some information which is accurate, but

18 there's significant omissions from this.

19 Q.      Doctor, looking at Exhibit 1138c, the same question,

20 does this timeline represent the care that was provided to

21 Prisoner WWW during his stay at San Quentin Prison?

22 A.      Again, it's quite incomplete.  For example, January

23 to March 2013 it lists Pre-suicidal Mental Status Changes.

24         I can tell you what those changes were.  He was a lot

25 better.  He was no longer psychotic.  He was less anxious.

1451

1  He was no longer depressed.

2          He was at the point where he wasn't worried about his

3  penis being controlled by ghosts.  He was worried about, what

4  is my life going to be like on death row for the next 30

5  years?  He was up to that point where he was worried about

6  reality-based concerns.

7          So yes, technically he did have pre-suicidal mental

8  status changes.  His mental status improved.

9  Q.      Doctor, were there any acute red flags for the

10  suicide?

11          THE COURT:  Were there any acute red flags?

12          MS. VOROUS:  Yes.

13          THE COURT:  You may answer, Doctor.

14          THE WITNESS:  There were no acute red flags for this

15  suicide.  Obviously, given his history of the pen incident,

16  as well as the two ingestions of pain medications, we were

17  worried about his chronic risk for self-injury.

18          We had placed him on the high list for suicide

19  because of these prior acts, but there were no acute red

20  flags.

21          In fact, he was doing tremendously better than six

22  months prior to that.

23          THE COURT:  What is the effect of placing him on a

24  high risk for suicide as you just mentioned?

25          THE WITNESS:  Yes.  It's a formal way to acknowledge

1452

1    that mental health is taking a special interest in this

2    patient.  So we include that in the chart to communicate to

3    other clinicians that this person is someone that, if he

4    starts to talk about wanting to end his life, take it very

5    seriously, admit him immediately to the crisis bed.

6            THE COURT:  But it doesn't involve, as an example,

7    rounding to make sure that he's still alive?

8            I'm sorry.  I don't mean to be so crude, but, I mean,

9    that's not part of what occurs when you say he's on "high

10   risk"?

11           THE WITNESS:  In regards to rounding, he would have

12   been an EOP inmate, so he would have been getting a lot more

13   rounding than most individuals.

14           THE COURT:  How many roundings was he getting?

15           THE WITNESS:  That I'm not sure.  As an EOP inmate,

16   it is quite frequent.  I'm not sure of the actual frequency

17   by psychiatric technicians.

18           THE COURT:  But it is not every 15 minutes the way it

19   would be at Vacaville, as an example?

20           THE WITNESS:  Right.  Q15 minute checks would be

21   reserved for hospital-type environments.

22           THE COURT:  You may proceed.

23           MS. VOROUS:  One moment please, Your Honor.

24           (Counsel confers with cocounsel.)

25           MS. VOROUS:  No further questions for this witness,

1453

1    Your Honor.

2            THE COURT:  Before there is cross-examination, I've

3    got to ask you a question that I meant to ask Dr. Monthei,

4    but it was at the end of the day and I lost it.

5            The OHU ten beds -- there is a whole range of

6    questions about them, but let me start with the one that I

7    simply don't understand at all.

8            There is no -- it is not a licensed facility?

9            THE WITNESS:  That is my understanding, yes.

10           THE COURT:  My understanding of the statute is that

11   you can't perform -- just tell me if I'm wrong, it is okay --

12   you can't provide the kind of care that you are providing

13   without a license?

14           Is that correct, as far as you know?

15           THE WITNESS:  Currently we're providing a very high

16   level of care to those ten patients in the OHU.  And I

17   personally, as well as my teammates, would continue to

18   provide that high level of care with or without a license.

19           THE COURT:  I respect that entirely.  I'm asking you

20   a different question.

21           Well, ultimately the question is, why doesn't

22   somebody go get a license?

23           THE WITNESS:  I'm the treating psychiatrist for these

24   guys.  I'm not as familiar with those administrative-type

25   decisions.

1454

1        THE COURT:  You're the wrong guy.  I should have

2   asked Dr. Monthei, and I let it get away from me.

3        The other thing that I did ask Dr. Monthei, and he

4   answered as best he could, do you understand -- and if you

5   don't, that's all right -- that ten beds that have been

6   allocated are subject to reversion to physical medicine?

7        THE WITNESS:  I have not heard of that.

8        THE COURT:  Good enough.

9        So as far as you know there are no plans if that sad

10  circumstance occurs?

11       THE WITNESS:  As far as I know, no.

12       THE COURT:  Fine.  Thank you, sir.

13       Cross-examination.

14                   CROSS-EXAMINATION

15  BY MR. NOLAN:

16  Q.     Good morning, Doctor.

17         Good morning, Your Honor.

18  A.     Good morning.

19  Q.     So I definitely don't think I have time to get

20  through my questions before lunch, but I'll get started with

21  some questions about your testimony.

22         You testified that the number of condemned on

23  involuntary medications in East Block tripled after you

24  arrived on East Block, correct?

25  A.     Yes.  That is correct.

1455

1   Q.    Could you estimate the change in the actual number of

2   individuals?

3   A.    Certainly.  When I arrived on East Block, based on my

4   memory, there were five individuals on involuntary medication

5   orders.  Currently we have 14 individuals in the condemned

6   population on involuntary medication orders.

7         However, there is one individual who was on an

8   involuntary medication order and transferred to county jail.

9   It is my understanding that his capitol hearing was happening

10  again.  It was being rescheduled due to some unrelated legal

11  issues.  But he left San Quentin on an involuntary medication

12  order.

13        In addition, there were two other individuals during

14  that period that was mentioned that I initiated on

15  involuntary medication orders, and after that initial period

16  had ended -- it used to be six or 12 months, currently it is

17  12 months -- I did not seek renewal because not only did they

18  improve, but they developed the insight to no longer refuse

19  medications.  And they continue to be on voluntary

20  medication.

21        So in total it went from five to 17.  Although

22  technically, right now, there is only 14 people currently at

23  San Quentin on involuntary medication orders who are

24  condemned.

25        Approximately a tripling.

1456

1    Q.       What was the time period for that?

2    A.       April early 2011 until September of this year.

3    Q.       So essentially through better surveillance of this

4    population you were able to identify 12 additional people who

5    needed involuntary medications?

6    A.       Well, there were a few changes.  The law changed,

7    number one.  The Keyhea law was very restrictive.  Penal Code

8    2602 still is restrictive on the dichotomy between patient

9    safety and civil rights.  2602 is still heavily weighed on

10   the side of patient rights and civil rights, but less so than

11   the Keyhea law.  So that freed us up a little bit.

12            I do think that with us being on East Block, us being

13   the condemned treatment program, we're able to catch things

14   whereas in the past, perhaps, they had not been caught.

15            In addition, I tend to be pretty aggressive with

16   involuntary medication orders.  I consider it my ethical

17   responsibility.  If I have a patient with major mental

18   illness who meets the legal criteria for involuntary

19   medication, they will be put on an involuntary medication

20   petition pending decision by the administrative law judge.

21   Q.       Is it your opinion that your discovery of these 12

22   cases reflects, to some degree, inadequacies in the care of

23   these individuals before you arrived?

24   A.       I wouldn't state that.  However, because I was based

25   in East Block, because the law changed, because we have a

1457

1    close working relationship with custody and other

2    disciplines, we're able to pick up data and observations that

3    in previous decades psychiatrists may not have been able to

4    pick up on.

5    Q.    Doctor, have you ever used the provisions of Penal

6    Code 2602 for emergency involuntary medications?

7    A.    Yes.

8    Q.    How often?

9    A.    I don't have an actual number, but most of my

10   petitions, when I say most, at least 80 to 90 percent, have

11   been under emergency criteria.

12   Q.    Doctor, you talked a little bit about GAF scores.  I

13   believe you said that they were a subjective, kind of rough

14   measure; is that fair?

15   A.    You know psychiatry, to many degrees, is a softer

16   science.  We don't have blood tests, we don't have x-rays.

17   So I think previous APA work groups tried to objectify

18   certain aspects of a patient's presentation so they came up

19   with this zero to 100 scale, which essentially has been

20   removed in this edition of the Diagnostic and Statistical

21   Manual.  It looks objective, but it is really not.

22   Q.    Right.  But CDCR still uses that score, right, on its

23   forms and in placing people at different levels of care?

24   A.    They do.  They do.  Right now is a transitional time

25   between DSM-4-TR and DSM-5 which was just released in May of

1458

1  this year.

2      So it's -- the GAF is on its last legs.  It is about

3  to go extinct, but technically it is still required on forms.

4  That's why we complete it.

5  Q.    Is the -- there are some objective bench marks in the

6  scoring, right?  For instance, isn't it true somebody who is

7  psychotic can't have a score higher than 40; is that right?

8  A.    Yes.  They do give some guidelines in the old version

9  of DSM-4 in regards to what a score between 80 and 90 means,

10  what a score between 30 and 40 means.

11  Q.    And there's some guidelines in the Program Guides,

12  right?  Like in the section on Mental Health Crisis Beds,

13  isn't it true that it says that typically somebody in a MHCB

14  will have a GAF less than 30?

15  A.    You know, that's one of the problems with the GAF.

16  In addition to CDCR policies and procedures indicating a

17  certain GAF means a certain treatment, private insurance

18  companies have done that as well.

19      That's one of the primary issues.  They wouldn't

20  reimburse someone for mental health treatment if a GAF wasn't

21  at a certain level.  I'm glad the American Psychiatric

22  Association has recommended removal of the GAF.

23  Q.    Doctor, that's not an issue -- the insurance issue is

24  not an issue in the prison context, right?

25  A.    True.

1459

1   Q.      Also, Doctor, isn't it true that if this is a

2   subjective measure, it is the subjective view of your

3   clinicians that is being represented, right?

4   A.      It would be.  You know, in working with these

5   clinicians, in being one of these clinicians, we tend to

6   emphasize in our documentation actual words when we describe

7   our patients.

8           So in each of the documents in which a GAF is

9   indicated, there is a paragraph where in plain English we put

10  down how the patient is doing, are they responding to

11  treatment.  You know, there is a little jargon thrown in

12  there, but for the most part it is plain English.  And we

13  tend to emphasize that more than the numerical GAF score.

14  Q.      Doctor, when you were discussing Prisoner DDD, you

15  discussed his extensive history of violence, correct?

16  A.      DDD?

17          No.  I believe that was a different patient.

18  Q.      I believe you said that it was DDD who you obtained a

19  Keyhea for because he threatened to punch of an officer?

20  A.      That was HHH.

21  Q.      So then when discussing --

22          THE COURT:  HHH was not -- you never, as far as I

23  know, maybe I'm wrong, no one ever questioned you about HHH.

24  So somehow other we got DDD and HHH confused, I think.

25          MR. NOLAN:  I may have.  It is possible I wrote it

1460

1    wrong or possible maybe you misspoke when describing that.

2         You did also speak, I think, later a little bit about

3    HHH so --

4         MS. VOROUS:  Your Honor, I did ask him questions

5    about HHH.

6         THE COURT:  All right.

7    BY MR. NOLAN:

8    Q.    So just correcting myself, because it is wrong either

9    way, so when discussing HHH, you mentioned his extensive

10   history of violence, correct?

11   A.    Yes.

12   Q.    And I think you were saying that history was relevant

13   to your sort of emergent consideration under Penal Code 2602

14   of his dangerousness to others, right?  So that when he said

15   that I'm going to punch a guard, that was enough to make him

16   a danger to others, right?

17   A.    That, combined with the severity of his

18   schizophrenia, his mental illness, yes.

19   Q.    So the long history is relevant to the emergent

20   consideration of his dangerousness, right?

21   A.    In that situation, because it was an emergency, at

22   that moment he was threatening to assault a correctional

23   officer, I think you do have to consider one's history.

24        Now, history doesn't determine what you're going to

25   do in that moment.  If someone has a significant history for

1461

1    violence or self-injury in their past, of course you take

2    that into consideration, but one's history doesn't determine

3    if the present is an emergency or not.

4    Q.      Although, I take it you wouldn't initiate a Keyhea

5    for most inmates who threaten to punch a guard?

6    A.      Well, fortunately that doesn't happen all that often

7    in East Block.  But for each of those situations I would

8    evaluate the individual, their history, whether or not they

9    had a mental illness, was he just having a bad day and

10   grouchy, or was he paranoid, were the voices in his head

11   telling him to punch the guard.

12         It would be a very case-by-case evaluation.

13   Q.      So Doctor, I think you testified that Prisoner HHH

14   has done well in the OHU Specialized Care Program?

15   A.      Yes.  Relative to not being in the OHU.

16   Q.      But isn't it true that he doesn't go to groups, that

17   he denies he's mentally ill, and you can't really engage him

18   about mental health because he's in such denial about his

19   mental illness?

20   A.      Yeah.  Out of all of the patients that have been

21   mentioned, HHH is the one that does not engage in over ten,

22   or for that matter, 14 hours of out-of-cell treatment per

23   week.

24         The success for HHH is that he's been compliant with

25   his court ordered medications for two years.  For a man with

1462

1    his extensive history of violence -- in fact, last time he

2    was at DHS he assaulted another patient -- he hasn't even

3    threatened to hurt someone in the two-plus years.

4          He's always kept himself very clean and orderly.

5    That hasn't been an issue, and that hasn't changed, but he

6    has not yet develop appropriate insight into his mental

7    illness.

8          Keep in mind, he's only been up there eight months,

9    and the program is designed for a length of stay between six

10   and 24 months.

11         What he is doing now, which is an appropriate step

12   towards developing insight, is he's actually having

13   conversations with mental health clinicians.

14         A few years ago, you would walk by his house, and he

15   would yell some profanities and scream at you.  Now he wants

16   to talk about television shows, he wants to talk about the

17   book he's reading, he want to talk about his conversation

18   with his mother.

19         It is not therapy per se, but it is definitely a step

20   in the right direction.  He's developing more trusting

21   relationships with mental health clinicians.

22         THE COURT:  Sir, the question was, it is still true

23   that HHH is denying his mental illness.  And the answer to

24   that question is "Yes, that's true."

25         THE WITNESS:  Yes, that is true, Your Honor.

1463

```
 1   BY MR. NOLAN:
 2   Q.      Doctor, isn't it also true that you are in the
 3   process of discharging Prisoner HHH from this program?
 4   A.      No, not at all.
 5   Q.      I was under the impression that Dr. Monthei had
 6   testified, or at least in his deposition that was the case.
 7           Is there a different patient in the process of
 8   discharge?
 9   A.      A completely different patient who is in the process
10   of being discharged.
11   Q.      Does he have a code on the Inmate Code Sheet?
12   A.      Let me check.
13           (Witness reviews exhibit.)
14           Yes, he does.
15   Q.      Who is that?
16   A.      That is UUU.
17           THE COURT:  This might be an appropriate time to take
18   our luncheon break.
19           We'll reconvene at 1:30.
20           MR. NOLAN:  Thank you.
21           (Off the record at 11:55 a.m.)
22                              ---o0o---
23
24
25
```

```
 1                    SACRAMENTO, CALIFORNIA

 2          WEDNESDAY, OCTOBER 30, 2013; 1:35 P.M.

 3                        ---oOo---

 4

 5                        PAUL BURTON

 6   Recalled as a witness on behalf of the defendants herein, was

 7   previously sworn, examined, and testified as follows:

 8                 CROSS-EXAMINATION (CONTINUED)

 9   MR. NOLAN:

10   Q.     Good afternoon, Doctor.

11   A.     Good afternoon.

12   Q.     Have you referred patients to the acute program at

13   CMF?

14   A.     Are you speaking of the DSH acute program?

15   Q.     Yes.

16   A.     Your question is:  Do I?

17   Q.     Have you referred patients to that program?

18   A.     Yes, I have.

19   Q.     Was prisoner FFF your patient?

20   A.     Yes.

21   Q.     And prisoner FFF went to the acute program this

22   spring; correct?

23   A.     That is correct.  That was FFF seventh admission to

24   the DHS over the past four years.

25   Q.     Did prisoner FFF complain about her experience in the
```

1    program?

2    A.    Well, FFF stated that she preferred the East Block

3    environment.  We saw a good treatment response to the DSH

4    acute environment.  Since FFF has returned in the last four

5    to five months, FFF has not banger her head or superficially

6    cut herself, which has been a chronic concern.

7    Q.    Is that a "yes" or "no"?

8    A.    FFF prefers the East Block environment.  She did have

9    some critiques of the DSH program.  I think "complain" might

10   be too strong of a word, but would prefer to remain in the

11   East Block.

12   Q.    What was her critiques of the acute?

13   A.    Well, FFF is a very social patients.  She likes to

14   engage in groups, engage in mental health treatment yards,

15   would like to attend regular custody hearings.  Some of those

16   opportunities are much more limited at DSH acute relative to

17   the East Block specialized care program.

18   Q.    There's no group therapy; right?

19   A.    That is my understanding, no group therapy for the

20   condemned.

21   Q.    Is group beneficial to your clients?

22   A.    For many of them there is.  There is no 100 percent

23   "yes" or "no" answer, but for many of my patients, it is

24   beneficial and FFF has benefitted from the group therapy and

25   the specialized care program.

1    Q.      So is it true that was value of that acute referral

2    was reduced for prisoner FFF because there was no group

3    therapy in that program?

4    A.      Not the at all.  FFF at the time of referral was

5    engaging in repeated self injurious behavior, repetitive head

6    banging.  This is while in the crisis bed.  That was an

7    emergency that persisted while in the mental health crisis

8    bed.

9           For a situation like that, we will refer FFF or any

10   other patient to DHS acute.  In that low stimulation DHS

11   acute environment, FFF responded well, returned to East Block

12   in good spirits and is doing very well, compliant with

13   involuntary medications, groups, going to yards, is quite

14   happy.

15          We're in the process of lowering the dose of one of

16   the antipsychotics given the improvements we've seen over the

17   past four or five months since she returned.

18   Q.      You are also precluded from referring death row

19   patients to intermediate inpatient care.

20          Is that correct?

21   A.      What do you mean by "precluded"?

22   Q.      You cannot refer them to intermediate inpatient care;

23   correct?

24   A.      Well, it's my understanding that an intermediate DHS

25   facility does not exist for the condemned.

1        **THE COURT:**  Which means you can't refer them?

2        THE WITNESS:  Yes, that is my understanding.

3   **MR. NOLAN:**

4   Q.      Is it true that some chronically suicidal patients,

5   putting aside prisoner FFF, would benefit from group therapy

6   in an inpatient setting?

7   A.      Restate the question.  Putting aside FFF --

8   Q.      Is it true that some chronically suicide patient would

9   benefit from group therapy in an inpatient hospital setting?

10  A.      I think some patients could benefit from inpatient

11  hospitalization.  Some patients could benefit from group

12  therapy.  It depends on the individual and the issues they

13  have at that time.

14  Q.      So that's a "yes," some patients could benefit from

15  group therapy and an inpatient hospital program?

16  A.      It depends on the person and where --

17      **THE COURT:**  Sir, the question was:  Would some of your

18  patients or any patients, I guess, benefit from such a

19  program?  The answer to that -- I think you're about to tell

20  us again, yes, some patients would, but I want to qualify

21  that with a lot of other words that have nothing to do with

22  question.

23      Now, repeat the question, sir.

24  **MR. NOLAN:**

25  Q.      So, doctor, are there some chronically suicidal

1    patients who would benefit from group therapy in an inpatient

2    hospital setting?

3    A.        Some, yes, I'm sure there are some.

4    Q.        That's my question.

5              Doctor, do understand that for non-death row patients

6    your fellow clinicians at San Quentin are able to refer them

7    to an intermediate inpatient hospital program?

8    A.        That is my understanding, yes.

9    Q.        So in a sense, you're denied the option of sending

10   your sickness death row patients to either the full acute

11   hospital program with the groups or to an intermediate

12   hospital program.

13             Correct?

14             **MS. VOROUS:**  Objection.  Argumentative.

15             **THE COURT:**  I don't think that's an argumentative

16   question.

17             THE WITNESS:  We do have an option that non-condemned

18   do not have, and that's the specialized care for the

19   condemned program.

20   **MR. NOLAN:**

21   Q.        Now, let me ask you a little bit about that.

22             So you are the primary psychiatrist for the

23   individuals housed in the specialized care program for the

24   condemned in the OHU.

25             Correct?

1    A.      Let me qualify.  I was until October 1st of this year

2    when I became the senior psychiatrist.  Now I supervise the

3    psychiatrist who is the direct treating psychiatrist for

4    those individuals in the specialized care for the condemned

5    program in the OHU.

6    Q.      So for all of these questions, unless I specify, I'm

7    interested in your experience as the direct treating

8    psychiatrist until a month ago.

9    A.      Understood.

10   Q.      Do you also refer patients into the OHU specialized

11   care program?

12   A.      Yes, I did.

13   Q.      And what are the referral criteria?

14   A.      Well, first of all, they have to have a severe and

15   persistent mental illness.  That is obvious.  In addition,

16   they need to be at an EOP level of care in East Block or

17   other outpatient condemned housing units.

18          The criteria we specifically look for is not just that

19   they have an mental illness or an EOP level of care, but that

20   traditionally, historically they haven't fully engaged in

21   treatment.  These would be patients like I described earlier,

22   CCC, DDD, folks who have are offered groups and yards for

23   quite some time but have consistently refused.

24          It's those refusers of services that we try to

25   prioritize to the high energy, high stimulation, high reward

1    SCCP OHU environment.

2    Q.      Are there written referral criteria?

3    A.      Yes, there is.  There's a written referral followed by

4    an intake assessment by the SCCP coordinator.

5    Q.      There's a written referral form.

6            Is that what you're saying?

7    A.      We tend to complete the referral on what we call a

8    7230, just a regular progress note, after which the

9    coordinator does an intake assessment and determines, based

10   on our referral, if the person could benefit from SCCP OHU

11   services.

12   Q.      The program is currently full; correct?

13   A.      Correct.  Ten beds, and they're filled with ten

14   patients.

15   Q.      Is there a waiting list for the program?

16   A.      We have one patient who, over the course of this

17   summer, evolved to the point where he could benefit from SCCP

18   OHU services, so we don't use the term "wait list," but as

19   soon as patients UUU is discharged, and that's going to be

20   pretty soon, that other patient will take that bed.

21   Q.      When you say he evolved to the point where he could

22   use, do you mean he decompensated to the point he needs a

23   higher level of care?

24   A.      It's an interesting case.  I could explain if the

25   court would like me to.

1   Q.      I would just like to know if she decompensated or not;

2   "yes" or "no"?

3   A.      He improved in many ways.  The one way he did not

4   improve is he no longer wants to attend groups.  Earlier in

5   the year he was floridly manic, floridly psychotic, thought

6   he was going to become the next Pope and move to Vatican,

7   very delusional and psychotic.  It got to a point where he

8   was assaulted by another inmate because he was yelling.

9          We hospitalized him.  I initiated a 2602 application.

10  That order was granted by the judge.  No with involuntary

11  antipsychotic medications, his mania has resolved, his

12  psychosis has resolved, but he has become somewhat more

13  withdrawn and is not engaged in groups, does not want to come

14  out in yards.

15         So in the clinical sense, he's improved.  His symptoms

16  have gotten significantly better.  Just because his symptoms

17  have improved, we're not stopping there.  We want him to

18  engage in more treatment services.  That's why he's become a

19  candidate for the specialized care for the condemned program

20  in the OHU.

21  Q.      Do you have any other patients that you would refer to

22  the specialized care program if there were beds available?

23  A.      Not at this time.  We always consider.  In fact, every

24  week we get status reports in regards to how many groups,

25  yards, individuals are attending while in the East Block

1  program.  Also, I work closely with the psychologists, rec

2  therapists, psychologists, psychiatric technicians to get

3  updates, general clinical updates in regards to how patients

4  are doing.

5  Q.    That's a "no"?

6  A.    At this time, there's that one individual.  That is

7  it.

8        **THE COURT:**  Well, are there other people in your

9  experience before becoming supervisor who had conditions

10  sufficient -- you've indicated you don't have a back list,

11  heaven forfend -- no, that wasn't a joke.  You're under oath.

12        Are there other people in East Block with conditions

13  such that if you had 20 beds you would be referring them?

14        THE WITNESS:  Not at this time, Your Honor.

15  **MR. NOLAN:**

16  Q.    If you could take a look at the inmate key code, I

17  want to ask you whether you're familiar with three prisoners

18  on the list.

19        The first one would be prisoner KKK.

20  A.    Yes, I am.

21  Q.    Second one would be LLL?

22  A.    Yes, I am familiar with LLL.

23  Q.    The third one would be VVV?

24        **THE COURT:**  I'm sorry?

25        **MR. NOLAN:**  V, as in Victor, VVV.

1           THE WITNESS:  Yes.

2    **MR. NOLAN:**

3    Q.     Is one of those three the individual that's waiting to

4    into the program?

5    A.     No.  In fact, all three of those folks were

6    successfully hospitalized at DHS acute.  This calendar year

7    had a good response to the DHS acute, and because of that

8    treatment as well as the ongoing treatment in East Block,

9    would not be current candidates for SCCP OHU services.

10   Q.     Were any of those three individuals sent to the acute

11   program because of a bad batch of drugs earlier this year?

12   A.     Let me look at their names once again.

13          One of them was methamphetamine and likely bath salt

14   use contributed heavily to the development of a nuance of a

15   psychotic disorder.  This is someone who doesn't have major

16   mental illness, but in the context of using a tremendous

17   amount of methamphetamine, developed voices, developed

18   delusions, became assaultive with staff, made a bunch of

19   suicidal statements, was treated at DHS acute.

20          I believe they diagnosed this individual with

21   stimulant dependence or amphetamine dependence and was

22   discharged back.  They concurred with our assessment that

23   underneath the acute effects of the substances, he didn't

24   have a major mental illness.

25   Q.     Doctor, you also treat patients in East Block;

1    correct?

2         **THE COURT:**  He did.

3    **MR. NOLAN:**

4    Q.     You also treated until a month ago, treated patients

5    in East Block; correct?

6    A.     Yes.  That's where my office was located.

7    Q.     During that time, did you also treat East Block

8    patients who were in the specialized care program?

9    A.     Yes.

10   Q.     Did you also treat EOPs in East Block that were not

11   part of the specialized care program?

12   A.     Yes.

13   Q.     Did you treat any CCCMS in the East Block who were not

14   part of the program?

15   A.     Not part of the specialized care program?

16   Q.     Or any CCCMS, I guess, in East Block.

17   A.     Yes, I did treat CCCMS in East Block.

18   Q.     Did you treat any non-condemned prisoners until a

19   month ago?

20   A.     In the past, between 2009 and April 2011, I treated

21   almost exclusively non-condemned patients, out patient and

22   inpatient and telepsychiatry settings.

23   Q.     How many patients did you have on your case load until

24   a month ago?

25   A.     It was approximately 175 patients up until a month

1   ago.

2   Q.      You were the primary prescriber for all 175?

3   A.      I was the psychiatrist for the condemned treatment

4   program.  In addition to myself, there's a psychiatrist who

5   works with the condemned on the inpatient unit.  We have a

6   weekend psychiatrist.  We have five psychologists.  I don't

7   know the number of rec therapists.  We recently expanded

8   those, but there are plenty of recreational therapists.

9   Q.      You were the primary psychiatrist for all 175

10  patients?

11  A.      Not all were on psychotropic medications, but I was

12  the psychiatrist for consultation should the question of

13  whether or not they needed psychiatric medications come up.

14          **THE COURT:**  So your whole -- I'm certain I don't

15  understand.  You have 175 patients that you are the primary

16  psychiatrist, but you are only actively involved if there's a

17  question of whether or not the psychotropic medication should

18  be prescribed?

19          THE WITNESS:  Yes.  The psychologist or primary

20  clinician is typically the go-to person for weekly therapy,

21  check ups, things of that sort.  If there's an issue that

22  goes beyond the expertise of a psychologist, a medical

23  condition or the need to initiate medications, then I would

24  be consulted.

25  /////

1      **MR. NOLAN:**

2      Q.      That's a large case load; right?

3              So you're -- you would be treating as the primary

4      psychiatrist ten EOP specialized care prisoners in the OHU,

5      another 35 EOPs in East Block, I believe, roughly?

6      A.      With the development of the specialized care for the

7      condemned program in OHU this year, we got additional

8      staffing, so there was a second psychiatrist whose duties

9      were exclusive to the specialized care for the condemned

10     program in the OHU.

11             I continued to see my patients up there and would

12     consult with that psychiatrist, given that I've worked with

13     these guys for the last couple of years.

14     Q.      So in addition to that, you would still be the primary

15     psychiatrist for the 35 EOPs and all the CCCMS prisoners in

16     the condemned program; right?

17     A.      Of the 37 current EOPs, ten are in the OHU program.

18     That would leave 27 that are not in the OHU program, who are

19     either in East Block or the adjustment center.

20             **THE COURT:**  This morning -- and I asked this

21     specifically because I did not understand -- you indicated

22     that you were the treating psychiatrist even though the

23     patient had gone to the OHU.

24             Do you remember that this morning?

25             THE WITNESS:  I have been for some patients.

1      **THE COURT:**  So that testimony was not completely

2    accurate?

3      THE WITNESS:  Correct me if I'm wrong, but I believe

4    the question was for the crisis bed not the OHU.  In the

5    crisis bed we have a psychiatrist there.  I continue to be

6    the psychiatrist.

7      **THE COURT:**  The ten beds -- let me ask it.  What are

8    the ten beds -- who occupies the ten beds?

9      THE WITNESS:  The ten EOP patients in the specialized

10   care for the condemned program.

11     **THE COURT:**  They're there because, unlike the other

12   people in the East Block, something is different.

13     What is different?

14     THE WITNESS:  What is different with those ten

15   individuals is that in addition to their major mental

16   illness, traditionally they have refused to engage in mental

17   health treatment.  These are the refusers of services in East

18   Block.

19     THE COURT:  I'm not sure whether I am understanding

20   you.  Those are not crisis beds or are they crisis beds?

21     THE WITNESS:  They are not crisis beds.  When I use

22   the term "crisis bed," I'm referring to the mental health

23   crisis bed, also known as the correctional treatment center.

24   Those are 17 beds for both condemned and non-condemned

25   patients.

 1          THE COURT:  Physically where are those?  In the new

 2   hospital?

 3          THE WITNESS:  The OHU program and the crisis beds are

 4   literally right next to each other, only a door separates the

 5   two.

 6          **THE COURT:**  So when you said this morning that you

 7   continue to be the psychiatrist for your patients that had

 8   been referred to the hospital, you're referring to the ten

 9   beds or are you not?

10          THE WITNESS:  This morning I was referring to the

11   crisis beds.  For the new ten-bed program, since that was a

12   new program and we got additional staff allocated to that

13   program, I've been involved and treated some of those

14   patients.  But as the new staff became oriented, they have

15   taken on more of the primary treating responsibilities for

16   the ten-bed program.

17          Currently in my new position, I'm not the treating

18   psychiatrist for any of them.

19          **THE COURT:**  All right.

20   **MR. NOLAN:**

21   Q.     Prior to a month ago when you became the senior, you

22   would follow your patients into to the OHU program; right?

23          Is that correct?

24   A.     For DDD I did up until recently.

25   Q.     I think I saw notes you would write, regular treatment

1    notes for these prisoners or some of them?

2    A.    Yes.

3    Q.    So your case load would include the 37 EOPs -- 27 in

4    the OHU, it would include 130 CCCMS, some large proportion

5    are on medication, but you need to see them in any event,

6    correct, at certain frequencies?

7          And then it would also include the patients that you

8    followed into the OHU or in the 17-bed MHCB; correct?

9    A.    Yes, in 2011 and 2012 that was correct.  At the end of

10   2012, beginning of 2013, with the staff assignment that came

11   with the SCCP program, we were able to expand staff, so now

12   we have psychiatrists for the condemned in the new program in

13   the OHU as well as the psychiatrist who is a member of the

14   condemned treatment program who sees them when they're in the

15   crisis bed.

16         In 2011 and 2012 that was not the case.  It was

17   myself.  At that time, there was no ten-bed OHU program.

18         Hopefully that clarifies things.

19   Q.    East Block is a segregation unit; correct?

20   A.    East Block, as far as I've been told from a custody

21   perspective is GP or general population unit.  I view it as

22   death row.  I view it as a unique unit that has a lot of

23   characteristics of both GP as well as other units that are in

24   San Quentin.

25   Q.    Are you familiar with the requirements for psych tech

1    rounding for administrative segregation units?

2    A.    With administrative segregation units, I am not.  I've

3    never worked exclusively in ad seg or administrative

4    segregation units.

5    Q.    You're not aware that there is daily psych tech

6    rounding for segregated inmates?

7    A.    No.

8    **MS. VOROUS:**  Objection, Your Honor.  Beyond the scope

9    of direct.

10    THE COURT:  Well, that's overruled, but he's already

11    answered the question.  He said "no."

12    THE WITNESS:  When it comes to the policies and

13    procedures side of things, I'm not as familiar with that.

14    I've heard that mentioned, but I wouldn't want to say under

15    oath that I definitely know that's the case.

16    **MR. NOLAN:**

17    Q.    Are you aware that on East Block the grade A, sort of

18    higher privilege inmates, are treated as -- did not get psych

19    tech rounding but the grade B are rounded daily?

20    A.    For psych tech rounding, I'm not aware of the actual

21    frequency that occurs, but I think, relatively speaking,

22    grade A inmates receive less rounding than grade B.  I would

23    agree with that.

24    Q.    Are you familiar with differences in the level of

25    CCCMS case manager contacts for grade As and grade Bs?

1481

1    A.        Yes.

2    Q.        So grade As are visited by their case manager every 90

3    days, approximately, at least that's the requirement?

4    A.        If there CCCMS, it's a minimum requirement of once

5    every 90 days.  If someone needs a little more assistance,

6    certainly it can be more frequently than that.

7    Q.        If their grade B, they get that contact weekly; is

8    that correct?

9    A.        That is correct.

10    Q.        Are aware that's similar to -- the grade B requirement

11    is the same requirement that exists for ad seg prisoners?

12    A.        I was not aware of that similarity.  I'm aware of the

13    frequency of grade B psychology appointments.

14    Q.        East Block condemned prisoners are escorted everywhere

15    they go outside their cells in restraints?

16    A.        Yes, I'm aware of that.

17    Q.        Also, is it true that inmates do not have jobs outside

18    of East Block?

19    A.        They used to.  We used to have a condemned row inmate

20    porter system.  About a year, year and a half ago that was

21    suspended.  The rumors in East Block is that may be started

22    up again soon, which I would be in favor of.

23    Q.        Right now they do not have jobs outside of East Block

24    or on East Block apparently.

25              Correct?

1    A.    That is my understanding.

2    Q.    They never had jobs outside East Block; correct?

3    A.    To my knowledge, at least since 2011, they never had

4    jobs outside of East Block.  I'm not sure about before 2011.

5    Q.    They don't have access to day rooms; correct?

6    A.    The inmates in OHU --

7    Q.    East Block.  I'm just asking you about East Block

8    here.

9    A.    What do you mean by "day room"?

10    Q.    Day room in most prisons is a room, an interior room

11    where prisoners can socialize and watch TV and have free

12    recreational times.

13          **THE COURT:**  You're not familiar with the term "day

14    room"?

15          THE WITNESS:  I am.  I just want to make sure I

16    understand his question.

17          **THE COURT:**  What is your understanding of "day room"?

18          THE WITNESS:  A room in which patients can socialize

19    with each other in an informal setting.  It would be a room

20    where television could be watched, board games played.

21          THE COURT:  Essentially what Mr. Nolan just said.

22          THE WITNESS:  Yes.

23          **THE COURT:**  His question was:  Are day rooms available

24    to East Block prisoners?

25          THE WITNESS:  East Block prisoners, there's no day

1    room.  They do have recreational yard, but no day room.

2    **MR. NOLAN:**

3    Q.    Isn't it also true that many East Block prisoners only

4    have access to what are called walk alone yards?

5    A.    Some do, that's a custody determination.  Their yard

6    status.  The two options are walk alone yard versus a group

7    yard.  In addition to that we offer mental health

8    recreational yards for folks who are in the mental health

9    program.

10    Q.    So the answer is, "yes," some only have access walk

11    alone yards?

12    A.    Yes.  Some only have access to custody walk alone

13    yards.

14         **THE COURT:**  Is that true of mental patients as well?

15    I'm not clear.

16         THE WITNESS:  It's my understanding that custody takes

17    mental health information into account when making the

18    custody yard assignments and there are some mental health

19    patients that are in a walk alone custody yard.

20         **THE COURT:**  As far as you know, are there condemned

21    mental health patients who are in -- I think you called them

22    group yards -- but yards where they can socialize?

23         THE WITNESS:  Yes, there are.

24    **MR. NOLAN:**

25    Q.    Do you know how often they get to the yards where they

1    can socialize?

2    A.    I'm not as familiar with the custody yard frequency.

3    It's several times per week, but I don't know exactly the

4    number of days per week.

5    Q.    There was some testimony that condemned prisoners in

6    North Block have greater access to privileges.

7          Is that your opinion or do you know that to be true?

8    A.    In North Seg?

9    Q.    North Seg.  Sorry.

10   A.    Yes.  From a custody perspective, they have more

11   freedoms, if you will.  They're able to socialize more in an

12   informal manner.  It's still a secure unit, but they're able

13   to socialize with each other outside of their selves.

14   Q.    There's no mental health patients in the North Seg

15   unit?

16   A.    Currently that's the case.  I've been up there for

17   psychiatric consultations and I've met with almost all of the

18   patients in North Seg during screening and rounding

19   proceedings, but as of right now, there's no one currently in

20   North Seg in a mental health level of care.

21   Q.    And you don't -- but you don't know whether or not

22   there's a firm policy excluding them?

23   A.    I haven't seen the policy.  I have been told that

24   people can be at North Seg and in a mental health level of

25   care.

1    Q.    How many people are in North Seg?

2    A.    I don't know the exact number.  I want to estimate

3    between 150 and 200.

4    Q.    And it's just a coincident that none of them are

5    mentally ill?

6    A.    I'm not sure why that's the case.  I've met with them.

7    I've done consultations with patients up there.  At this

8    time, the patients who are at San Quentin and are in a level

9    of care are either in East Block, the adjustments center, the

10   crisis bed unit or the SCCP OHU unit.

11   Q.    Do you see patients sometimes in East Block at their

12   cell fronts?

13   A.    Yes.

14   Q.    Prisoner FFFF, four Fs, the end of the list.  I

15   apologize.  The three FFFs is also one of your patients.

16   A.    Yes, four F.

17   Q.    Isn't it correct that he was seen cell front in East

18   Block for about the last year and a half before his death and

19   only seen cell front?

20         **MS. VOROUS:**  Objection.  Beyond the scope of direct.

21         **THE COURT:**  No.  Direct has to do with the quality and

22   nature of the care.

23         The objection is overruled.

24         You may answer, doctor.

25         THE WITNESS:  I know that he preferred to be seen cell

1    front by me.  Off the top of my head, I can't remember if

2    other members of his treatment team saw him cell front or the

3    office.  I know for me I had seen him cell front most

4    recently, yes.

5    **MR. NOLAN:**

6    Q.    Is it also true he was a grade A?

7    A.    Yes.

8    Q.    He was not given daily psych tech rounds; correct?

9    A.    He was grade A and CCCMS, so it's my understanding he

10   would not have daily psych tech rounds.

11   Q.    His case manager saw him every 90 days?

12   A.    A minimum of 90 days.  He was sent to the adjustment

13   center a while back and he was seen more frequently when he

14   was in the adjustment center by his case manager, the

15   psychologist.

16         Grade A East Block would be a minimum of 90 days.

17   Q.    Is it also true that FFFF took his own life on October

18   5, 2013?

19   A.    That is my understanding, yes.

20   Q.    So one thing I would like to show you -- may I

21   approach?

22         These are treatment records produced by defendants for

23   prisoner FFFF, and I would like to move them into evidence.

24         **THE COURT:**  Hearing no objection, they're received.

25   /////

1              (Whereupon, Plaintiff's Exhibit 1139

2              was received into evidence.)

3    **MR. NOLAN:**

4    Q.    If you could take a look at fourth page, 00367 is the

5    Bates number.

6    A.    Okay.

7    Q.    This note says that he was seen in the office for a

8    therapy session in the first line.  In my review of the

9    records, this is the last time that I saw that he had

10   actually come out of his cell for a treatment meeting --

11           **THE COURT:**  I must be looking at the wrong number.

12   00067?

13           **MR. NOLAN:**  No 367.

14           **THE COURT:**  It will take me forever to find it.  I

15   just turned to the right one by mistake.

16           Go ahead.

17   **MR. NOLAN:**

18   Q.    It says:  "IP," meaning inmate patient, "Seen in

19   office for therapy session."

20           Is that correct?

21   A.    Yes, I do see that.

22   Q.    This was the last time for either a case manager or

23   psychiatry contact that he came out of his cell.

24           Does that sound correct to you?

25   A.    I would have to review the records in full to

1    completely verify that.  This was his psychologist who

2    authored this note.  I would have to review the records to

3    fully answer that question.

4    Q.    You don't have any recollection one way or another

5    whether he's come out of his cell to meet with you since the

6    year and a half of this note?

7    A.    With me?  When I first started working with this

8    individual, he was having some inner ear issues being

9    addressed by medical.  We were making some medication

10   changes.  Recently though, he's preferred to meet cell front

11   with me for follow-up appointments, check ups, things of that

12   sort.

13   Q.    I'd like to call your attention to the document -- the

14   page 00071.  I would like to read the section under the "O"

15   for "objective."

16         Is that what it stands for?

17   A.    "O" stands for "objective."

18   Q.    (Reading:)

19              Reports he is eating, sleeping regularly, but

20              has stopped attending yard due to a problem with

21              a peer on the yard, and as this peer has

22              connections, he feels likely to get involved in

23              trouble if he attends.  He denied any

24              hallucinations or paranoia and did not present

25              as manic, hypomanic or depressed, though he did

```
 1                      admit to having depressed thoughts at times and

 2                      stated he does have transient suicidal ideation

 3                      with no plan or intent about once a month.

 4            Doctor, were you aware of this note?

 5      A.    Yes, I was.  It continues, (Reading:)

 6                      Stated he would never harm himself because he

 7                      cares about his mother and his children.  Talked

 8                      about relationships with children, and he

 9                      recently spoke to his son, though his daughter

10                      had not spoken with him in years.

11      Q.    Was his report that he had transient suicidal ideation

12      once a month of concern?

13      A.    Yes.  Given his bipolar disorder, not otherwise

14      specified, I think it's significant that he wasn't depressed

15      or manic, the two poles of bipolar disorder.  Transient

16      suicide ideation is not too uncommon, but given the fact he

17      did not have intent, what that means is he didn't intend to

18      kill himself.  He did want to kill himself nor did he have a

19      plan to kill himself.  That is reassuring.

20      Q.    I'd like to have you take a look at FFFF 00023 --

21      Sorry.  This is 000023.  This is an interdisciplinary

22      progress note dated September 17, 2003.

23            It says, (Reading:)

24                      I don't have anything to say.  I don't want to

25                      talk to you.  I don't like your agenda.  I'm not
```

1           going to talk about that.  I don't want to ever

2           talk to you again.  I don't like you mental

3           health people.  Inmate patient presented as

4           initially flat and guarded.  When queried as to

5           how he's doing, he became mildly irritable and

6           he resented the question being asked.  Inmate

7           patient reported no thoughts of harming self or

8           others but was irritable and somewhat hostile.

9           His speech suggested paranoid thinking as he

10          alluded to an agenda and also complained that

11          the mental health contacts are too frequent,

12          though patient hasn't been seen since July 5th.

13          Patient would not elaborate on what he meant by

14          this agenda.  Patient did not comply with

15          further questioning.  Patient was not agitated

16          and did an appear aggressive but more paranoid

17          and irritable.

18      In the next line it says, (Reading:)

19          He's requested a new clinician.  The clinician

20          has known him over three years and always has

21          had good relationship, though pass couple of

22          contact, he's been more withdrawn and did not

23          engage.  While he does not present as an acute

24          risk, his paranoia and lack of engagement are

25          concerning.  Case was discussed with treatment

1                       team, including psychiatrist and mental health

2                       supervisor.  Psychiatrist plans to see patient,

3                       and team made decision to maintain primary

4                       clinician at this time.

5           There's no treatment we have following this time, so I

6    wondered what happened after this note?

7    A.      Of the three notes that you've wanted me to reference,

8    all three were authored by the same psychologist.  I don't

9    have the exact dates, but approximately one week before this

10   note by the psychologist -- this note was authored

11   September 17th.

12          About a week to a week and a half before that, I had

13   seen this patient FFFF and he did state that he was more

14   grouchy, more irritable.  He requested that the dose of his

15   Depakote medication be increased, which I did.  The order was

16   followed.  He received a higher dose.

17          I also ordered some routine blood test to make sure

18   that with the increased dose of the medication, he was

19   tolerating it well.  No liver function tests that was

20   abnormal.  I wanted to check that the medication level was

21   appropriate, which it was.

22          So I saw him about a week before this note, but I did

23   not see him after this note.

24   Q.      This note was from 9-17, and it says that you were

25   planning to see him, but you didn't see him in the next --

1          He took his own life on October 5th; is that right?

2    A.    I wanted to at least give the medication change time

3    to kick in prior to doing a reassessment of future medication

4    changes.

5    Q.    Was there any consideration at this time of giving him

6    a higher level of care?

7    A.    No.  At this time, because the primary clinician did

8    voice his observations to the team, we were discussing

9    perhaps changing him to a different psychologist --

10   Q.    I'm just asking if you considered raising his level of

11   care:  Yes or no?

12   A.    At that time, no, it was not an acute consideration.

13   Q.    Doctor, aside from preparing for your testimony in

14   this case, have you ever been provided with a copy of a

15   suicide review conducted by headquarters?

16   A.    Aside from preparation for this case suicide review

17   from headquarters?  Let me think.

18         No, I have not.

19   Q.    Are you concerned about the fact there have been five

20   suicides of condemned prisoners at San Quentin in the last

21   two years?

22   A.    Yes.  That is quite unfortunate.  I knew two of those

23   five.  Two of the five were my patients, and prior to earlier

24   this year, I hadn't had a patient who had taken their own

25   life.  So "surprised" is one word.  I'm also sad from the

1    loss of those guys.

2    Q.    I'm sure this is a terrible experience for you and I

3    do want to say I'm not looking to point fingers but

4    understand if there are systemic issues to make people safer

5    in these programs.

6         Doctor, it's true that death row prisoners at general

7    are a high risk population for suicide?

8    A.    There's been some studies that have been published in

9    the literature that does show that the general rate of

10   completed suicides is higher for condemned row inmates

11   nationwide than it is for non-condemned inmates nationwide.

12   Q.    Do you agree that they're a higher risk population for

13   suicide or not?

14   A.    I believe that there's a lot of different factors, but

15   if you look just at the custody status on death row versus

16   off death row, I think it's fair to state that in general the

17   condemned death row population is at slightly higher risk for

18   suicide than non-condemned.

19   Q.    Have you ever participated in suicide risk evaluation

20   training since arriving at San Quentin?

21   A.    Yes, I have.

22   Q.    When?

23   A.    The most recent time was earlier this year.  I

24   completed the training and I also was a trainer for several

25   other people.  That was the most recent time.  I've done it a

1    few times over the course of my career at San Quentin, but

2    the most recent was earlier this year.

3    Q.     It was the same training?

4    A.     The most recent one was more interactive.  You were in

5    a room with a patient and there was a mentor, suicide

6    training mentor in the room with you.  There were three of us

7    there.  They observed the entire interaction, so the

8    interview, how the data for the suicide risk assessment was

9    collected.

10          And then after the patient left the room, we would

11   discuss the formulation of the suicide risk assessment as

12   well as the completion of the necessary documentation.

13   Q.     Who is your mentor?

14   A.     At the time it was my supervisor, the senior

15   psychologist for the condemned treatment program.

16   Q.     Who is that?

17   A.     Dr. Rachel Chen.

18   Q.     Doctor, you were the treatment team leader for

19   prisoner WWW; correct?

20   A.     I was the psychiatrist for WWW, correct.

21   Q.     Does that not make you the treatment team leader?

22   A.     I believe on one of the documents, the 7388, it has a

23   line where treatment team leader is indicated, and as the

24   psychiatrist, I complete that line.  We don't use that term

25   on a day-to-day basis.  I'm the psychiatrist of the team.

1    Q.    When did you start as prisoner WWW's psychiatrist?

2    A.    When I began working in East Block exclusively, and

3    that would be April 2011.

4    Q.    So I want to call your attention to a description of

5    prisoner's WWW medication and function in the spring of

6    2,012.  This is from the suicide report from prisoner WWW,

7    which is in this binder at tab T.

8         **THE COURT:**  What exhibit is it?

9         **MR. NOLAN:**  1082.  I believe it's already been

10   admitted.

11   Q.    I want to call your attention the second to the last

12   paragraph.  It says, (Reading:)

13              On January 25, 2012, he was sent to the TTA

14              following complaints that ghosts is or spirits

15              of unborn controlled his body.

16   A.    I'm sorry.  I have T, but what page?

17   Q.    Page 9.

18   A.    Okay.  I'm with you.  Second to the last paragraph?

19   Q.    Yes.  (Reading:)

20              Although not admitted to MHCB, he was scheduled

21              for a five-day follow-up and agreed to take

22              Zyprexa, 10 milligrams.  The dosage gradually

23              increased to 30 milligrams a day until the

24              inmate began to refuse it, complaining of dry

25              mouth.  By March 22, 2012, the Zyprexa was

```
 1                   totally discontinued.  A trial of Zoloft was
 2                   started on April 4th but also discontinued by
 3                   April 10, 2012.  The psychiatrist's notes
 4                   indicated that he considered involuntary
 5                   medication but felt the inmate did not meet
 6                   criteria.
 7          Do you make the decision not to refer prisoner WWW for
 8   involuntary medications at this time?
 9   A.     At the time of April 10, 2012?
10   Q.     Yes.
11   A.     Yes.
12   Q.     Just to clarify that passage I read, prisoner WWW
13   stopped taking his Zyprexa but continued to take Zoloft and
14   then he stopped that too?
15   A.     Yes.  With WWW, as testified to earlier in January of
16   that year, he was concerned about the ghosts controlling his
17   body et cetera.  He was compliant voluntarily with Zyprexa
18   for two months; however, the treatment worked.  It worked so
19   well, WWW didn't think he needed the treatment any more.
20          He almost treated it like an antibiotic.  The
21   infection resolved so I no longer needed the medications.
22   It's not uncommon for patients with psychotic disorders to
23   agree to treatment during the period of exacerbated symptoms,
24   but after the treatment is working and the symptoms have gone
25   away, they do stop treatment from time to time.
```

1    Q.    In your experience at San Quentin have you ever

2    recommended somebody for involuntary medication under PC 2602

3    and lost the hearing?

4    A.    Lost the hearing?  What do you mean --

5         **THE COURT:**  The administrative law judge didn't agree

6    with you that it was appropriate to require involuntary

7    medication.

8         THE WITNESS:  On one occasion, I petitioned for

9    involuntary medications for both danger to self as well as

10   grave disability criteria.  The judge did not agree with the

11   grave disability argument but did agree with the danger to

12   self argument.

13   **MR. NOLAN:**

14   Q.    The answer is, no, you've never lost the involuntary

15   medication petition?  You were able to give him involuntary

16   medication?

17   A.    At the conclusion of the hearings there was a court

18   order signed by the judge authorizing involuntary medication.

19   Q.    When prisoner WWW had somatic delusions that you

20   described earlier, those were psychotic symptoms.

21        Correct?

22   A.    Correct.

23   Q.    Do you agree, given his history of self harm in regard

24   to his somatic delusions, those symptoms were of particular

25   concern at this time in spring of 2012?

1    A.    Yes.  Even without the symptoms getting worse, over

2    the many years, even prior to me working with WWW, he was

3    very fixated on his pain.  I would characterize that as being

4    exclusively due to a somatic form disorder.

5         When he would get more psychotic, the pain issues and

6    the bodily issues would reach a delusional level where he

7    would come up with a delusional explanation for the physical

8    symptoms he was experiencing.

9         Yes, we did take it into account.  That's why after he

10   stopped the Zyprexa, I recommended a trial of Zoloft.  He

11   agreed to that for about a week and then stopped it.  I'm not

12   sure if it's in this document, but shortly after that, we

13   initiated a trial of Prolixin.

14        In July of that year, we started Effexor as well as

15   Zyprexa.  After we had tried a few other things, he said,

16   "You know what, Dr. Burton, I like the one you originally

17   started me and on," and we restarted the Zyprexa, which had

18   been effective in the first place.  And I was glad that he

19   was reconsenting to start that again, given the positive

20   treatment response he had to it early in 2013.

21   Q.    Wasn't that in August he started taking that again

22   after his first overdose?

23   A.    July or August.

24   Q.    May have been after the first overdose?

25   A.    The summer of 2012.

1          **THE COURT:**  In relation to the first overdose, was it

2     before or after the overdose?

3          THE WITNESS:  I cannot remember.  I believe we started

4     Effexor and Zyprexa prior to the overdose, and continued with

5     those medications after the overdose.  Later on in the year,

6     we added Remeron, a third medication to that regimen.  So he

7     was on Effexor, Zyprexa and Remeron.

8     **MR. NOLAN:**

9     Q.     For one second, I want to go back to the somatic

10    delusions.  It's true, isn't it, when he blinded himself in

11    2010, his somatic delusions were very intense; he was

12    complaining quite a lot about his pain.

13         Correct?

14    A.     I wasn't his doctor at that time, but based on my

15    review of the chart, it seemed as if he wanted to draw

16    attention to the physical pain that did not have a physical

17    etiology.  It didn't seem to me like at that time it was at

18    the point where there were paranormal entities or ghosts

19    controlling his body, but it seems as, yes, he was very

20    preoccupied and fixated on the physical pain issues.

21    Q.     Isn't it true that after he blinded himself, he

22    claimed sticking the pens in his mid brain cured his pain

23    issues in 2010?

24    A.     Based on my review of the chart, I do believe there

25    was a comment like that.

 1   Q.      And in 2010 he was off his antipsychotic medication,

 2   had gone off it in the fall of 2009.

 3           Is that correct?

 4   A.      I think it was Risperdal, but both antipsychotic

 5   medications.  He had stopped his antipsychotic prior to the

 6   pen incident.

 7   Q.      Those were two kind of red flags in future treatment

 8   of him; is that right, him going off his meds and his somatic

 9   delusions being intense?

10   A.      Yeah.  That's why I spent so much time trying to

11   improve his insight and provided him with psycho education in

12   regards to the importance of psychiatric medications.  I

13   agree, he does a lot better when he takes his psych meds.

14           For his last six months of his life, he was fully

15   compliant with the medications.  It wasn't easy to get him to

16   that point.  It took a lot of collaboration between myself

17   and nursing and medical, but we got him to the point where he

18   was fully complainant with good doses of psychiatric

19   medications for the last six months of his life.

20   Q.      In tab J, which is Plaintiff's Exhibit 1138, these are

21   treatment records for prisoner WWW, and I believe they were

22   previously admitted.  If you could look at page WWW 00080.

23   A.      Okay.  80 --

24   Q.      This is a treatment note written by you, I believe

25   from July 18, 2012?

1    A.      That's correct.

2    Q.      So I would like to call your attention to a few

3    things.  First of all, the second line it says that he was

4    CCCMS level of care at this time.

5            Is that right?

6    A.      Yes, based on my memory he was CCCMS at that time.

7    Q.      At the S subjective section it says, (Reading:)

8            Inmate reports several weeks --

9            What is that abbreviation?

10   A.      H slash O, that's the medical abbreviation for history

11   of.

12   Q.      Increasing foot pain, BL?

13   A.      Bilateral, both feet.

14   Q.      (Reading:)

15            -- that has lead to the increased ambulation.

16            Of note, this specific complaint as well as a

17            variety of other undiagnosable somatic

18            complaints have been a recurrent theme with this

19            inmate patient.  Decreased ambulation has led to

20            the exacerbation of chronic back, neck and

21            shoulder pain.

22   So at this time his somatic complaints were pretty

23   activated; correct?

24   A.      That is correct.  Summer 2012 that was a primary focus

25   of our treatment with him.

1    Q.    At that time, further down, around eight lines from

2    the bottom, it says, (Reading:)

3              More somatically preoccupied.  Likely somatic

4              delusions.

5    A.    Yes.  It looks like the psychotic symptoms, the

6    ghosts, the paranormal entities were not a focus at this

7    time.  He was eating and drinking well, but we were back to

8    the focus on the psychosomatic pain.

9    Q.    It says, (Reading:)

10             However, somatic preoccupation slash delusions

11             have recurred and resulted in anxiety, insomnia,

12             isolation.

13        And then the very last two lines are, (Reading:)

14             Is refusing AP -- which I take it means

15    antipsychotics?

16    A.    Correct.

17    Q.    (Reading:)

18             And does not meet the PC 2602 criteria.  Ideally

19             would be on an antidepressant and an

20             antipsychotic.

21        Correct?

22    A.    Yes.

23    Q.    So at this time prisoner WWW was not started on

24    involuntary medications; correct?

25    A.    That is correct.  According to this note, we

1    voluntarily started him on Effexor, 37.75 milligrams a day

2    for three days followed by an increase of up to 75 milligrams

3    a day.

4    Q.    Is that an antipsychotic?

5    A.    It's not.  It's an antidepressant.  It has some

6    benefit for neuropathic pain, so we were trying to work with

7    the patient and address not only his mental health symptoms,

8    but also his complaints of pain with the medication that

9    could accomplish both goals.

10   Q.    At this time he was not referred to a higher level of

11   care; is that correct?

12   A.    Not on this date.  Shortly afterward he was, but not

13   on this date.

14   Q.    I believe that was in response to an overdose;

15   correct?

16   A.    Following his ingestion of the opiate medications that

17   he obtained on the yard --

18   Q.    Is that correct or not?

19   A.    Is what correct?

20   Q.    What you just said.  You said you had started him on

21   some other medications.  That was after his overdose;

22   correct?

23          I'm asking about the date of this document, which is

24   July 18, 2012.

25          **THE COURT:**  Well, I don't know what your question is.

1    **MR. NOLAN:**

2    Q.      So my question about this time:  He is not referred to

3    a higher level of care at this time; correct?

4    A.      On this time on this date, no, he was not.

5    Q.      He is not even made EOP at this time; correct?

6            He was still CCCMS?

7    A.      On this date, once again, that is correct.

8    Q.      Next, on August 4, 2012, he was taken to Marin General

9    following an overdose; correct?

10   A.      If I could check my records to make sure so I can

11   definitively state correct or not.  My next note was five

12   days later, July 23rd.  He was still on the Effexor

13   medication.  We continued it.  The note after that was two

14   days later, July 25th.  That was the date we started the

15   antipsychotic medication, Prolixin, 2.5 milligrams twice a

16   day, low dose, initial dose, and we also increased the

17   Effexor to 112.5 milligrams once a day on July 25th.

18   Q.      I'm not asking you about any of that.  Your attorney

19   can give you a chance to fill in any missing pieces.

20           I'm asking you whether or not he overdosed on

21   August 4th?

22   A.      That is my -- that sounds correct, yes.

23   Q.      I wanted to ask you about in tab J, Exhibit 1138 at

24   pages 75 and 76.

25           There's a suicide risk assessment that I believe was

1    authored by you?

2    A.    1138.

3    Q.    It's tab J.  This is all the records for WWW in this

4    exhibit.  It's at pages 75 and 76.

5         Do you see that?

6    A.    I do, yes.

7    Q.    So on page 76, you see it finds prisoner WWW has a

8    moderate risk chronic risk and a low acute risk of suicide.

9         Is that correct?

10    A.    Yes.

11    Q.    In the justification risk level it says, quote,

12    (Reading:)

13              No recent past suicide attempts.  No recent

14              intentional self-injurious ideation slash SIB,

15              which means self-injurious behavior.

16         So wasn't the blinding of himself in 2010 an act of

17    intentional self-injurious behavior?

18    A.    Yes, it was, and that's why I indicated his chronic

19    risk for suicide was moderate.  The part you just quoted said

20    no recent intentional self-injurious ideation.  Given the

21    blinding episode happened two and a half years ago, I wasn't

22    referring to that as recent, but it was a significant past.

23    That's why his chronic risk was moderate.

24    Q.    You also said, (Reading:)

25              No intentional self-injurious ideation or

1          self-injurious behavior.

2          You didn't consider the overdose self-injurious

3    behavior?

4    A.    No recent, once again.

5    Q.    It had been two days before this.

6    A.    His intent was not to hurt himself.  His intent was to

7    draw attention to the medical department to his ongoing

8    plight with this physical pain that no one could diagnose or

9    treat.

10         **THE COURT:**  How do you know that, sir?

11         THE WITNESS:  That's what he told us, Your Honor.

12         **THE COURT:**  I understand that's what he told you, but

13   as a lay person who knows nothing about these things, Dr.

14   Stewart described the self blinding as the most terrible

15   event he had seen in his entire practice.

16         Is that a fair characterization -- never mind.

17         Do you find that was one of the most extreme acts of

18   self mutilation in your practice or is that sort of what

19   happens?

20         THE WITNESS:  Its fortunately quite rare.

21         **THE COURT:**  It's extraordinary, isn't it?

22         THE WITNESS:  It is pretty extraordinary.  That's one

23   of the reasons we prioritized WWW as a patient to keep a very

24   close eye on.  That's why we spent a lot of time with him,

25   Your Honor.

1          **THE COURT:**  Do you perceive the words -- let's go back

2     before I get off on that.

3          So he's had this really extraordinary, I would say,

4     horrifying self mutilation two years before and he takes an

5     overdose and he says, "No, I didn't do that to hurt myself,

6     but I did that to get medical attention."

7          You say that's true because that's what he said?

8          THE WITNESS:  It's part of it, but it's what he

9     overdosed on.  He overdosed on pain medications, medications

10     whether you have a physical pain or not can increase the pain

11     threshold or decrease pain.

12          Number two, it was consistent with his somatic

13     preoccupation that he had been talking about for many months

14     prior to this.  It wasn't the first time he brought it up,

15     but it was consistent with the overall themes that he had

16     presented.

17          **THE COURT:**  You did not think:  Yes, it may be he's

18     trying to draw attention to his physical condition, but given

19     his history, I've got to worry about whether or not the real

20     reason was he wanted to end it all?

21          You didn't think that was a significant risk?

22          THE WITNESS:  We definitely considered it.  After the

23     hospitalizations, we increased his level of care to EOP.  We

24     placed him on the high risk list for suicide.  Even though he

25     was denying these were suicide attempts, we knew about how

1    extreme his behavior had been in the past.

2        We had, as mentioned earlier, pretty extensive

3    conferences, both at a department-wide level as well as on an

4    individual level with his medical providers.

5        We very much recognized that this was a very mentally

6    ill individual who had the capacity to seriously injure

7    himself as he had done in 2010.  And to a lesser extent, with

8    the overdoses in 2012, we were taking this case very

9    seriously and put in a lot of time and effort to give him the

10    treatment that he needed, one part of which was ongoing

11    compliance with psychiatric medications, which after he

12    assumed compliance with for a long-term basis, actually did

13    the job.

14        The sciatic symptoms --

15        **THE COURT:**  It didn't do the job because he offed

16    himself.

17        THE WITNESS:  That's the surprising aspect of this

18    case, Your Honor.

19        **THE COURT:**  I'm sorry.  I didn't mean to interrupt

20    you, Mr. Nolan.

21        **MR. NOLAN:**  No.  Thank you.  Appreciate it.

22    Q.    Doctor, I just want to clarify.  You said you put him

23    on the high risk list, but you didn't do that until after the

24    second overdose.

25        Correct?

```
1   A.      I believe so, yes.  That sounds correct.

2   Q.      After this first overdose, he was also not referred to

3   the specialized care team on East Block, was he?

4   A.      At that time, we didn't have the OHU program, the

5   ten-bed program in 2012.  He was a member of the specialized

6   care for the condemned program, however, in East Block.  That

7   was the only aspect of the program that existed back then.

8   Q.      He was a member after the first overdose?

9   A.      After he became EOP.

10  Q.      Is that reflected in the treatment notes anywhere

11  where someone becomes part of that program?

12  A.      Now we have a more formalized process.  At that time,

13  we did not.  I would have to review the reports to see if

14  it's reflected.

15  Q.      So the next thing that happened to him on

16  September 26th, he had a second overdose.

17          Correct?

18  A.      That date sounds approximately right.  It was late

19  September.

20  Q.      And at that time, am I correct that you decided not to

21  refer him to DHS.

22          Correct?

23  A.      We strongly considered it.  Myself, his psychologist,

24  other members of the treatment team, at the end we decided

25  against a DHS acute referral at that time.
```

1    Q.      Did negative past experiences with DHS acute referrals

2    influence your decision at that time?

3    A.      Our understanding of the services they offered did.

4    This was a gentleman who was not coming out to groups or

5    mental health yards.  He had a close relationship with his

6    next-door neighbor who was his brother.  He was still

7    complaining a lot about the physical pain issues.

8            Rather than sending him to DHS acute, a low

9    stimulation environment, we decided to integrate his overall

10   care with the medical department.  We really insisted that he

11   attend therapeutic yards, which he started to do.

12   Q.      You had him mentored in a treatment contract; right?

13           Maybe we can take a look at that.

14   A.      We did.  What page?

15   Q.      Page 61 of Exhibit 1138, which is tab T.

16   A.      Okay.

17   Q.      At this time, he agreed to 15-minute weekly session

18   with his case manager.

19           Is that correct?

20   A.      Yes, that is correct.

21   Q.      Focusing on the actual treatment going forward and not

22   his promises in terms of hurting himself, he also agreed to

23   attend 20 DBT group sessions, which I take it corresponds to

24   dialectical behavioral therapy group sections with Dr

25   Parecki?

1    A.      He did.  You skipped over points two through five.

2    Q.      Those are just promises not to hurt himself or

3    overdose or take illegal medications.

4            I'm just focusing on treatment going forward that he

5    agreed to; right?

6    A.      Right.

7    Q.      He agreed to the one-hour groups; is that correct?

8    A.      90 minutes at that time.

9    Q.      Then agreed to Monday and Friday therapeutic yards;

10   correct?

11   A.      At that time he did agree to those therapeutic yards,

12   correct.

13   Q.      Would the DBT group be twice a week?

14   A.      Once a week.

15   Q.      Once a week for 90 minutes?

16   A.      Yes.

17   Q.      So he would have been agreeing to three hours and

18   45 minutes of treatment a week.

19           Correct?

20   A.      More or less.  Three separate group activities in

21   addition to his therapy appointments, in addition to his

22   appointments with me and in addition to the psychiatric

23   medications.

24   Q.      In this agreement, instead of being sent to DHS acute,

25   he agreed to three hours and 45 minutes of therapy a week,

1    even though he's an EOP and the standard is ten hours a week.

2           Is that correct?

3    A.    The reason we didn't put in the contract ten hours of

4    treatment per week, we wanted to take it in baby steps.  This

5    was a guy who wasn't doing anything.  We didn't want to say:

6    You have to go to ten hours a week or two hours a day.

7           Rather to get his foot in the door, we wanted him to

8    engage in some services, which he did.  He very much enjoyed

9    the therapeutic yards.

10          A few months after this he hadn't attended the DBT

11   groups, but instead had substituted an additional therapeutic

12   yard for the DBT group, and we thought that was a fair trade

13   off.

14   Q.    Did you ever review the notes that would track whether

15   he was going to the yard three times a week?

16   A.    On occasion I would.

17   Q.    Was he?

18   A.    It was my understanding that he was going to some

19   groups or some yards per week, up to a maximum of three.  I

20   don't believe he was going to three every week, but it was up

21   to three.

22   Q.    You agreed to this fairly minimal level of treatment

23   and he did not comply with the treatment?

24   A.    Relative to where he was a few months earlier where he

25   wasn't agreeing to do anything, this was a significant

1    increase.  Granted, it is below the ten hours that we do

2    recommend and offered to WWW, but this is indicative to the

3    treatment he received, which was a significant increase

4    relative to a few months earlier.

5    Q.    To try to wrap up about prisoner WWW, in the spring of

6    2013, I wanted to ask you -- it's your testimony, I think

7    earlier, that a somatic form disorder is one where emotional

8    pain expresses itself as physical pain.

9         Is that basically it?

10   A.    That's a conceptual abbreviated form of it.

11   Q.    Prisoner WWW had this condition; correct.

12   A.    In my opinion, he met the diagnostic criteria for

13   schizophrenia.  Even after the schizophrenia symptoms were

14   controlled, he still had physical pain symptoms.  So

15   underneath the schizophrenia, he had a secondary diagnosis,

16   which was a somatic form disorder not otherwise specified.

17        He had a third personality disorder not otherwise

18   specified with a lot of avoidance and dependent traits.

19   Q.    Am I correct that in the spring of 2012 prisoner WWW's

20   physical pain started to resolve itself?

21        Is that correct?

22   A.    In the spring of?

23   Q.    2013.

24   A.    Yes.

25   Q.    If a patient's pain starts to vanish who has this

1    conditions, is it important to look for and treat any kind of

2    emotional pain that would be coming to the surface instead of

3    being expressed in physical pain?

4    A.    Yes, it is.

5    Q.    So I just want to call your attention to the same

6    exhibit, at page 8 of that exhibit.

7    A.    Yes, the note.

8    Q.    Treatment note from Dr. Murphy, his case manager from

9    March 1, 2013.

10         When it says, under "Subjective," it has what I take

11    it to be a quote from prisoner WWW saying, (Reading:)

12              "Life is always terrible.  Why do you ask me how

13              I feel?  I'm always terrible.  It never changes.

14              I want you to stop asking me that.  He said,

15              "Okay.  You can keep asking me that.

16         Were you aware of these kinds of expressions in the

17    spring of 2013 that the prisoner was making?

18    A.    Yes, I was.  I saw him three days before this as well

19    as on February 26th and I was in frequent communication with

20    the psychologist.  I was seeing him frequently as an EOP

21    patient and he was expressing concerns over reality-based

22    condemned life.

23         He was upset over the fact that he now realized that

24    he was incarcerated on condemned row and would be there for

25    some time.  I think previously the psychotic symptoms when he

1  was worried about the ghosts and the spirits controlling his

2  body, that was the main focus.  It distracted him from the

3  reality-based concerns.  When he was worried about the

4  physical pain, that distracted him from the reality-based

5  concern.

6      He was in tone with reality.  He was upset over these

7  things, but not clinically depressed.

8  Q.    Did you make any changes in response to these concerns

9  in the spring of 2013?

10 A.    Changes?  He was doing well.  He wasn't depressed --

11     **THE COURT:**  He was depressed.  I thought you just

12 finished telling me by virtue of the elimination of the

13 psychotic, he was now concentrating on the reality of being

14 in prison forever in a condemned process.

15     You don't think that was depressed?

16     THE WITNESS:  I don't think he was clinically

17 depressed.  I don't think he met the criteria for major

18 depressive disorder.  He was intermittently distraught over

19 his prospects, but when I would see him, he did not appear to

20 be dysphoric when I would meet with him.

21     He did not look depressed.  He didn't have downcast

22 eye contact.  He wasn't frowning.  He wasn't tearful.  He

23 didn't have slow body movements.  To me, he denied he was

24 feeling depressed.

25     He was bummed out he was on death row, no question.  I

1    think without the other distractions, the pain and the

2    psychotic symptoms, he was fully faced with reality, and that

3    was a primary focus in his therapy, to try to find some

4    meaning in life on death row.

5          A lot of our patients do it.  Some of them it takes

6    quite a bit of time to find that meaning, but it is possible.

7    We have countless examples.  And we were trying to get him to

8    the point that even in his state being a blind inmate on

9    death row, life would have some meaning.

10   **MR. NOLAN:**

11   Q.     In this period he was grade A; is that correct?

12   A.     Yes.

13   Q.     His treatment was the three and a half hours a week of

14   yard and case management contact and then he would be rounded

15   by a psych tech twice a month?

16   A.     I want to sigh that for EOP inmates it's daily in a

17   condemned unit, but I don't want to state because I don't

18   know for a definitive fact.  He was grade A EOP, so he would

19   be rounded on at the frequency for grade A EOP East Block

20   condemned inmates.

21   Q.     I want to talk to you about the patients in the OHU

22   specialized care program.  I want to ask you --

23        **THE COURT:**  Before you depart from WWW, I would

24   assume, but don't know, that there was a fair amount of

25   soul-searching after he died?

1          THE WITNESS:  Tremendous amount.  We reviewed his

2   case.  We had a conference with the entire department.  I'm

3   not surprised that at some point in his life WWW killed

4   himself.  I'm very surprised he killed himself that day.

5   Patients aren't supposed to kill themselves when they're

6   doing better and engaging in treatment.

7          It was a surprise.

8      **THE COURT:**  Am I hearing you right that your thought

9   now or then was that -- not then because you didn't do it

10  then, that after the suicide, your conclusion was that a

11  major factor in the suicide was that he had, by virtue of

12  relief from his other symptoms, come to face the reality of

13  being a condemned prisoner?

14         THE WITNESS:  I don't know that for a fact.  That's my

15  opinion in knowing the patient and trying to put together the

16  pieces of this scenario.

17     **THE COURT:**  It raises in a dramatic fashion a question

18  that I've got to try to deal with and I don't know how.  The

19  folks, the condemned prisoners are facing the possibility of

20  death, although that perhaps is retreating significantly over

21  the years, but in any event, imprisonment in a fairly

22  restricted environment.

23         Is that condition one which causes -- I'm sorry.  I

24  don't mean to interrupt you, but I've got an expert and I

25  need to hear what he has to say about it.

1          Is that condition one which would suggest or require

2     some treatment that would not be available to GP population

3     generally; they don't face that problem?

4          THE WITNESS:  Yes, Your Honor.  I think you need to

5     have unique treatments that are designed specifically for

6     condemned populations given by treatment providers are who

7     very accustomed to working with condemned inmates and are

8     very familiar with the issues that condemned inmates deal

9     with on a day-to-day basis.

10         **THE COURT:**  You indicated that somewhere back in your

11    testimony that at least some of your condemned patients come

12    to accept their condition and find meaning in their life

13    anyhow.

14         I think that's what you said.

15         THE WITNESS:  By "condition," I mean their death

16    sentence.

17         **THE COURT:**  Is there any way to distinguish between

18    those who somehow or other manage to do so -- I can't imagine

19    anybody doing that, but I accept your view that it happens --

20    is there some way of being able to discern why some people

21    are able to do that and some people aren't?

22         Is there something generally that informs that

23    acceptance of their situation?

24         THE WITNESS:  That's a great question, Your Honor.

25    I'm still trying to figure that out.  There are some signs

1    that individuals who have the ability to socially connect

2    with others, regardless of the environment in which they are

3    currently residing, if you have that social connectivity,

4    whether it be with your neighbors or pen pal or spouse that

5    you only get to see in visitation, but you have a connection,

6    those factors can be quite protective and can also help find

7    meaning.

8         We have a number of inmates, patients, who are active

9    in political issues in regards to the overall issues of

10   capital punishment in general.  Several inmates are actively

11   involved and write poems and documents for a variety of

12   websites.

13        And that type of social connectivity, social activism

14   is a positive mental health prognostic factor, in my opinion.

15        **THE COURT:**  Is it fair to say -- I'm asking you not

16   telling you -- is it fair to say -- this sounds disrespectful

17   and I don't intend to it to be -- that psychiatric care

18   doesn't appear to be a major factor in whether people come to

19   adjust to their condition or not, their condemned condition

20   or not?

21        THE WITNESS:  I think it depends on the individual.

22   The vast majority of folks on condemned row do not have major

23   mental illness.  There are some that do, and for those who

24   do, I would consider psychiatric, more generally healthcare,

25   to be essential for their ability to achieve fulfillment and

 1    meaning in life.

 2            **THE COURT:**  Thank you, doctor.

 3            I didn't mean to interrupt, Mr. Nolan.  I guess I did.

 4    **MR. NOLAN:**

 5    Q.     Moving to discussion of the first patient in the

 6    specialized care program in the OHU --

 7            **THE COURT:**  My courtroom deputy, God bless her,

 8    noticed what time it is.

 9            We will take our afternoon break.  15 minutes, folks.

10                          (Whereupon, a break was taken at

11                          3:01 p.m.)

12                          (Noting Omitted.)

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

1521

1            (On the record at 3:15 p.m.)

2            THE CLERK:  Please, remain seated.

3            Court is now in session.

4            THE COURT:  Mr. Nolan.

5            MR. NOLAN:  Thank you, Your Honor.

6   BY MR. NOLAN:

7   Q.    So Doctor, isn't it correct that Prisoners CCC, DDD,

8   and EEE, were each essentially cell dwellers for the last few

9   years?

10            THE COURT:  Were what?

11            MR. NOLAN:  Cell dwellers.  They stayed in their

12   cell.

13   BY MR. NOLAN:

14   Q.    They stayed in their cell for the last few years they

15   were housed in East Block?

16   A.    They refused to engage in mental health services that

17   were offered to them, like groups and therapeutic yards.

18   That was one of the reasons they were the first three

19   admitted to the new OHU program.

20   Q.    I want to call your attention to Plaintiffs' Exhibit

21   1118, tab E, Bates stamp 1277.

22            I'm sorry.

23            Did I give you the right -- yeah.  1277.  I gave you

24   the right tab, tab E?

25   A.    Tab E, yes, 1277.

1522

1    Q.       This is a --

2             THE COURT:  1118 is in evidence?

3             THE CLERK:  Yes, it is.

4             THE COURT:  All right.

5    BY MR. NOLAN:

6    Q.       This is an August 29th, 2013, Treatment Plan.  And it

7    says in Section 8, near the bottom, that quote:

8             (Reading:)

9             Prior to SCCP admission, inmate was extremely

10            isolated and had very few out-of-cell hours.

11            (Reading concluded.)

12            That's what it says, correct?

13   A.       Correct.

14   Q.       So I wanted to ask you a little bit about prisoner,

15   CCC -- well, I'll ask you one question about those three

16   individuals.

17            So isn't it true that these individuals were all

18   identified for inpatient care because they -- I'm sorry --

19   for the new program because they were believed to require

20   intermediate inpatient care?

21   A.       No.  They were identified because they had major

22   mental illness, were at an EOP level of care, and

23   consistently had refused offered treatment services when

24   residing in East Block.

25   Q.       Okay.  Doctor, I want you to look at a treatment team

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1523

1    level of care decision for Prisoner CCC.  This is in tab C,

2    which is Plaintiffs' Exhibit 1119 at 000295.

3        I believe you signed this level of care decision on

4    that page, correct?

5    A.      Yes.

6            This is Patient CCC.

7    Q.      Yes.  Sorry.  Did I misspeak?

8    A.      Right.  I'm just double-checking.

9    Q.      This -- it says in the handwritten -- I'm sorry.  It

10   says in the typed portion, under 7-A, that because of

11   inmate-patient's enrollment in the SCCP, a higher level of

12   care is not indicated.

13           Doctor, does that mean if there were not a

14   Specialized Care Program, he would be referred to a higher

15   level of inpatient care?

16   A.      Not necessarily.  What this states is that because

17   he's responding so well to the OHU SCCP Program there's no

18   need to consider it at this time because of his improvements.

19   Q.      So at the bottom of this page, just above the name,

20   which has been blacked out, it says:  Did the inmate-patient

21   attend IDTT?

22           The answer is "No."

23           Then it says:  If "no," enter the reason for not

24   attending.  And it says "Refused."

25           Is that correct?

1524

1  A.      That is correct.  This patient has been averaging 16

2  hours of out-of-cell mental health treatment --

3  Q.      I'm just asking if that's correct?

4          THE COURT:  Sir, we'll never get out of here unless

5  you answer the question and stop.  If there is more to be

6  said, Miss Vorous will have an opportunity ask you.

7  BY MR. NOLAN:

8  Q.      Sir, if you could, turn to the August 23rd Treatment

9  Note at page 419?

10  A.      419?

11  Q.      This is a treatment note from Dr. Murthy.

12          Do you see it?

13  A.      Yes, I do.

14  Q.      At the end of the first line it says that

15  Prisoner CCC was internally preoccupied when seen cell front

16  by Murthy; is that correct?

17  A.      Let me find that section.

18          Yes, I do see that.

19  Q.      Also do you see the last sentence where it says:

20          (Reading:)

21          Schizophrenia, paranoid type, with history of

22          catatonic features, currently at medicated baseline,

23          however, past four weeks he's been more overtly

24          psychotic and has not engaged much with clinician.

25          (Reading concluded.)

1525

1    A.      I do see that.

2    Q.      So on August 23rd, 2013 Prisoner CCC --

3            THE COURT:  So you're now going to repeat it.

4            What a good idea.

5            MR. NOLAN:  I'll try not to do that.

6            Sorry, sir.

7    BY MR. NOLAN:

8    Q.      So I would like to move on to Prisoner DDD.

9            Prisoner DDD is mute, correct?

10   A.      Selectively.  He's spoken to me on a few occasions,

11   but for the most part he communicates via nonverbal methods.

12   Q.      Meaning he has impairment in communication, correct?

13   A.      Well, he communicates via nonverbal methods fine.  He

14   chooses not to speak the vast majority of the time.

15   Q.      Are you saying that choosing not to speak doesn't

16   impair his communication?

17   A.      He elects to invoke a different type of

18   communication.  His verbal communication is certainly less

19   than ideal, but overall he is able to communicate his needs.

20   Q.      Doctor, can you please look at tab D, Plaintiffs'

21   Exhibit 1121?

22   A.      Yes.

23   Q.      At page 1775.

24           THE COURT:  Can we go back to what you just said

25   because I'm not sure I understand.

1526

1    Are you saying that his nonverbal communication is,

2    in essence, equivalent to whether he would be able --

3    equivalent to his verbalizing?

4    THE WITNESS:  I don't know if I would use the term

5    "equivalent."

6    THE COURT:  Of course not.

7    THE WITNESS:  He is able to express --

8    THE COURT:  I understand.  He can tell you, "Gee, I

9    would like to go to the bathroom."  But, you know, we really

10   expect people to do more than that.

11   THE WITNESS:  I agree.  At the top of his -- of the

12   treatment plan that we have for him is that he start to

13   speak.  That's going to be criteria number one for him to be

14   returned to East Block, in my opinion.

15   THE COURT:  So when Mr. Nolan asks you whether or not

16   there was -- I've forgotten the words you used.

17   MR. NOLAN:  Impairment in communication.

18   THE COURT:  -- impairment in communication, the

19   answer should have been "yes"?

20   THE WITNESS:  Understood, Your Honor.

21   THE COURT:  I'm asking you.

22   THE WITNESS:  Oh.  There is impairment in his ability

23   to volitionally verbally communicate.

24   THE COURT:  Which means there's -- there's an

25   impairment in his ability -- in his --

1527

1      MR. NOLAN:  -- in his ability to communicate.

2      THE COURT:  -- in his ability to communicate?

3      THE WITNESS:  There is no neurological.  There's no

4  physical impairment.

5      THE COURT:  I believe that as well.  We've gone

6  through that.

7      The fact is -- and I don't mean this

8  disrespectfully -- but the guy's nuts.  And by virtue of that

9  he has impairment in his communication.

10      It's really -- I think it is very straightforward;

11  isn't that right?

12      THE WITNESS:  It is fair to say he does have

13  impairment in his verbal communication.

14      THE COURT:  Thank you, sir.

15      Go ahead.

16      MR. NOLAN:  Thank you.

17  BY MR. NOLAN:

18  Q.     So if you could take a look at 1775?

19         Are you on that page?

20  A.     Yes.  Tab D, 1775.

21  Q.     So I just want to call your attention to the

22  statement -- this is a case manager note, I believe,

23  cell-front note by Dr. Adams?

24  A.     Miss Adams who is a social worker and Dr. Rosnik who

25  is a psychologist.

1528

1    Q.    And so the second full paragraph says:

2          (Reading:)

3          No change in symptom presentation - catatonic

4          symptoms, flat affect, mutism, stiff body posture,

5          poor eye contact.  Continued compliance with

6          schedule, improved hygiene.  Cell messy, some food

7          particles.

8          (Reading interrupted.)

9          This is a August 15th, 2013, note.

10         Just continuing:

11         (Reading continued:)

12         ...some food particles.  No indication of suicidal

13         ideation or homicidal ideation.  Stated with nodding,

14         shaking of head.  Preference to refrain from

15         interaction with others.  Does not participate in

16         groups, but engages in perseverative writing as per

17         baseline.

18         (Reading concluded.)

19         Is that what it says?

20    A.    That is what this notes says, yes.

21         MR. NOLAN:  Your Honor, I would like to introduce a

22    new exhibit, Plaintiffs' Exhibit 1121a.  They're some

23    additional excerpts from Prisoner DDD's medical records that

24    weren't in our original records.  They have to be

25    confidential.

1529

1      THE COURT:  You want them to be filed under seal?

2      MR. NOLAN:  Yes.

3      THE COURT:  See how --

4      MR. NOLAN:  Sorry.

5      THE COURT:  Never mind.  Go ahead.

6      MR. NOLAN:  I would like them to be moved into

7  evidence.

8      THE COURT:  Received.

9          (Whereupon, Plaintiffs' Exhibit 1121a received

10          into evidence.)

11      THE COURT:  While you're doing that, Mr. Nolan, I am

12  expressing my frustration because nobody seems to be able to

13  answer -- ask a question directly or even state something

14  directly, that's both the lawyers and the witness.  And we

15  will be here forever if we all don't start exercising some

16  discipline.

17          You may proceed, sir.

18          I don't need your response.

19          (Exhibit handed to witness.)

20  BY MR. NOLAN:

21  Q.      Doctor, you started Prisoner DDD on Clozaril,

22  correct?

23  A.      Yes, I did.

24  Q.      You earlier called it, I believe, a gold standard

25  medication, correct?

1530

1  A.      Yes.  In the treatment of schizophrenia it is widely

2  accepted by psychiatrists internationally as the best

3  medication for schizophrenia.

4  Q.      It's also a very dangerous medication, correct?

5  A.      It has a lot of potential benefits, and with that

6  come a lot of potential risks.

7  Q.      So there are some special protocols for starting

8  somebody on Clozaril because of those risks, correct?

9  A.      There certainly are.

10  Q.      When was this prisoner started on Clozaril?

11  A.      I don't have the date of the month.  I know it was

12  December 2012.

13          It was during the early part of the month.

14  Q.      I believe, if you look in this document -- sorry.

15  I'm trying to find the first date.

16          Does it seem correct to you that it was around the

17  29th of November 2012?

18  A.      Yes.  It looks like that was the date.  November 29th

19  was the first order of Clozapine.

20  Q.      Is that the note on page 1022?

21  A.      Going back to tab D?

22  Q.      No.  In this new exhibit.

23          THE COURT:  What difference does it make?

24          For goodness sake, gentlemen.

25          I'm sorry.  I'm sorry.

1531

1    No.  Let's stop for a moment.  I'm losing my temper.

2    That's inappropriate.

3         (Brief pause.)

4    You may proceed, sir.

5    BY MR. NOLAN:

6    Q.    Doctor, was Prisoner DDD housed in OHU at the time?

7    A.    He was, yes.

8    Q.    Are you aware that CDCR policy requires Clozaril

9    initiation to be done with the patient in a licensed MHCB or

10   DSH Hospital for the first seven to ten days?

11   A.    Yes, I am aware of that.  I discussed it with the

12   chief psychiatrist, who gave his approval to start it in the

13   OHU given that it is the fourth floor.

14        Mr. DDD had been housed in the Medical OHU for

15   several months prior to the creation of the Specialized Care

16   for Condemned Program in the OHU so it was a unique case.

17        And given the fact that the OHU has 24/7 nursing

18   monitoring, given the fact that there's a medical doctor, an

19   internal medicine physician on-site, the chief psychiatrist

20   at that time instructed me to initiate it in the OHU.

21   Q.    Doctor, isn't it true that Prisoner EEE -- switching

22   to another person.

23   A.    Okay.

24   Q.    You can look him up on the code sheet if you need to.

25        He is not doing as well as when he first came into

1532

1  the OHU program?

2  A.     Well, he's waxed and waned.  Depends on your

3  definition of "not doing as well."

4         He hasn't hurt anyone.  He hasn't assaulted staff,

5  which has been a primary issue in the past.  His grooming is

6  good.  He showers regularly.  He keeps his house clean.  In

7  August and September he was averaging over 17 hours of

8  out-of-cell mental health treatment per week.

9  Q.     Doctor, if you could, look at tab E.

10        There's a treatment note which is Exhibit 1118, and

11 there is treatment note at page 1332.

12 A.     1332.

13 Q.     This is a treatment note from August 30th, 2013.

14 A.     Yes.

15 Q.     Just about a month ago, little more.

16        I just want to call your attention to the statement

17 in the third paragraph at the end where it says:

18        (Reading:)

19        Inmate-patient is not doing as well as when he first

20        arrived in the SCCP.  His hygiene is worse and he is

21        less cooperative.

22        (Reading concluded.)

23        Is that what it says?

24 A.     That's what it says on this one note from two months

25 ago.

1533

1    MR. NOLAN:  No further questions, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. VOROUS:

4    Q.    Dr. Burton, you described a high risk list during

5    your testimony.

6    Can you describe what that means when someone is on

7    the high risk list?

8    A.    Yes.  At San Quentin we've developed a list of

9    inmates who clinicians believe are at higher risk for hurting

10   themselves.  This list is distributed to all mental health

11   staff electronically via email so all clinicians have a sense

12   of who to be extra careful with and pay extra attention to

13   should they present to the TTA or other treatment areas.

14   In addition, there's a suicide prevention coordinator

15   who continuously monitors the records of these patients, who

16   occasionally will meet with these patients, and who is

17   responsible for coordinating that list.

18   We also have a high risk team who offers additional

19   recommendations for people that are on the high risk list.

20   Usually, although not always, significant past

21   suicide attempt or method of self-injury is one of the

22   primary criteria to place someone on the high risk list.

23   Q.    By placing someone on the high risk list, does it

24   mean that any given -- at any given time they might commit

25   suicide?

1534

```
 1   A.      Certainly not.  Risk is just that.  It means that the
 2   long-term probability that they may engage in such behavior
 3   is increased, but there is no definites.  No one knows for
 4   sure what the future holds.  However, based on our
 5   assessments, certain patients are triaged at a higher level
 6   of risk than others.
 7   Q.      Doctor, you were asked a couple of questions about
 8   your caseload while you were on East Block.
 9           With respect to the CCCMS population, are the
10   majority of the CCCMS inmates on psychotropic medication?
11   A.      About half are, half aren't.  About 50/50.
12   Q.      If an inmate is not on psychotropic medication, what
13   role would you have in their care?
14   A.      Well, I would be present for the Interdisciplinary
15   Treatment Team meeting.  However, without the ongoing
16   prescription of a medication there would be no medications to
17   manage, so I wouldn't routinely see them a minimum of every
18   90 days as compared to a patient who was on a psychotropic
19   medication where I would see them at least once every 90 days
20   to check in to see if the meds are working, are there any
21   side effects, do we have to order labs, should we renew the
22   meds, change the dose.
23   Q.      And that 90-day-period is required by the Program
24   Guide, correct?
25   A.      That is correct.
```

1535

1    Q.       Doctor, with respect to Inmate WWW, you were asked

2    questions about the decision to offer -- offer may not be the

3    right term -- you were asked questions about a decision to

4    put in place a contract for mental health care with respect

5    to this patient, correct?

6    A.       That is correct.

7    Q.       Why do you believe that having a contract for this

8    patient was an appropriate mental health decision?

9    A.       Well, because of what was included in that contract.

10   At the core of that contract was that he promised not to

11   overdose on any prescription or illicit substances again.  He

12   agreed to take his psychiatric medications.

13           As I already testified to, he agreed to increase the

14   number of weekly mental health services.

15           We were getting creative with WWW.  We recognize this

16   was a patient who was at higher risk than the average

17   patient.

18           We recognized that DSH Acute would not be, most

19   likely, the most efficacious treatment environment for him so

20   we had to think of creative ways and to go above and beyond

21   in an attempt to improve his overall well-being and his

22   engagement in treatment.

23           The contract worked in a sense in that he did start

24   to engage in more mental health treatment.  He started taking

25   his meds, and subsequently his mental health symptoms

1536

1    improved because of the increased treatment that he received.

2    Q.      Just because he agreed to this contract, that doesn't

3    mean that additional mental health services could not be

4    provided or offered to him, correct?

5    A.      Correct.  Correct.  In many senses the contract was a

6    symbolic agreement between he, his psychologist and I, that

7    he would promise to engage in more mental health services.

8            He lived up to his end of the contract.  We continued

9    to offer him many more services than he actually received.

10   And in reality, he was getting out of his cell multiple times

11   a week to engage in mental health treatment services.

12   Q.      As his treatment progressed beyond the date that he

13   entered into the contract, did his involvement in treatment

14   increase as well?

15   A.      It did.  So in addition to attending weekly sessions

16   with his therapist, he began to discuss things that were more

17   internally difficult for him to discuss.

18           So he wasn't just a warm body in a seat.  He was

19   sitting down engaging in therapy.  He wasn't talking about

20   current events with his therapist.  He was talking about how

21   he felt on the inside.

22           He was opening up and seeking out treatment for some

23   of the conflicts that he was going through.

24   Q.      Doctor, did your -- Dr. Stewart testified it was just

25   a matter of luck that this particular inmate had not

1537

1  committed suicide during the course of his treatment after

2  his blinding himself in January 2010.

3          Do you agree with that statement?

4  A.      I don't.  Myself, my team, we spent many hours

5  thinking about a treatment plan for WWW, implementing the

6  treatment plan for WWW, and trying to improve his insight in

7  regards to what our recommendations were.

8          I believe Dr. Stewart made that comment in regards to

9  the January 25th, 2012, TTA visit.  He said it was pure luck

10  the guy didn't kill himself that day.

11          My note from that date accurately reflects my

12  thinking at that time.  I was very concerned about this

13  individual.  I weighed the risk and benefits of all the

14  available treatment options, including an admission to the

15  Mental Health Crisis Bed.

16          In the end, his initiation voluntarily of

17  antipsychotics and an anti-anxiety medicine, his agreement to

18  restart eating and drinking, his agreement to engage with

19  mental health for the next five consecutive days was a better

20  alternative than admitting him to the crisis bed at that time

21  given that he stated that he would be angry at mental health

22  if we were to do that.

23          Why is that a concern?

24          Because he could be very stubborn.  He had proven

25  that to us.  And if he was angry and refused treatment, then

1538

1    his condition would not improve over time.

2        In the end, the decision that we made at that time

3    proved to be the right one in that --

4        THE COURT:  He didn't kill himself right then and

5    there.

6        THE WITNESS:  It was 15 months after that date that

7    he did commit suicide.  But he initiated compliance with

8    psychiatric medications, he started to engage in mental

9    health services more, but ultimately, 15 months later, he did

10   kill himself.

11       Whether he was admitted to the crisis bed in January

12   2012 or not probably wouldn't have made a difference in

13   regards to what happened in April 2013.

14   BY MS. VOROUS:

15   Q.    So Doctor, if you would, look at tab T in the binder

16   in front of you.  This is Plaintiffs' Exhibit 1082.

17       THE COURT:  In evidence, Madam Clerk?

18       THE CLERK:  Yes.

19       THE WITNESS:  Tab T?

20   BY MS. VOROUS:

21   Q.    Yes.

22       If you would, turn to page 16 of this document.

23   A.    Yes.  Page 16.

24   Q.    Look at the bottom of page 16, the last paragraph.

25       Do you see that?

1539

1    What is your -- before I ask you a question about
2    that, what is your understanding of Inmate WWW's disposition,
3    for lack of a better word, on the day he took his life?
4    A.    Well, from a mental health perspective he was doing
5    much better than several months before that.
6          As testified to earlier, his psychotic symptoms had
7    resolved, the paranormal entities were gone.  The schematic
8    pain issues that plagued him for years had resolved almost.
9    He had mild shoulder pain, but it no longer affected his
10   functioning.
11         He was making new friends on the yard.  He was
12   meeting with a woman that he was romantically involved with
13   and visiting.  He had just finished watching a movie with his
14   brother, and they had just discussed it, according to
15   records, 20 minutes before he killed himself.
16         The nurse who handed out meds that night said he took
17   his medications and there were no changes in his presentation
18   that she detected.
19   Q.    And the reference to the movie with his brother is
20   what is reflected at the bottom of page 16 of the exhibit
21   we're looking at, correct?
22   A.    That is correct.
23         The brother actually stated that they were planning
24   on watching a second movie the next night, the day after that
25   WWW killed himself.  It was a surprise to not just us, but

1540

1    other staff and his family.

2    Q.      Doctor, are there some cases where an inmate receives

3    appropriate mental health treatment but might still take his

4    life?

5    A.      Yes.

6    Q.      Do you believe that this was the case with Inmate

7    WWW?

8    A.      I do.  His major mental illness symptoms were

9    adequately treated.  He was functioning at a much higher

10   level than he had functioned since he arrived at San Quentin

11   State Prison.

12          You know, I think he made a choice that was based on

13   reality.  It wasn't due to voices or demons or ghosts or

14   pain.  But I think he made a decision that I wish I could go

15   back and tell him to reconsider.  Obviously, we can't.  But

16   it was a decision based in reality to take his own life.

17          MS. VOROUS:  No further questions, Your Honor.

18                      RECROSS-EXAMINATION

19   BY MR. NOLAN:

20   Q.      Just a few quick questions.

21          Doctor, are custody staff notified of high risk

22   patients when placed on that list?

23   A.      You know, they don't receive the emails.  I believe

24   recently we are in the process of disseminating that list on

25   custody staff.  There has been discussions of that, but I

1541

1  don't know definitively if they receive it as of yet.

2  Q.      Does someone's placement on the high risk -- does

3  placement on the high risk list for suicide result in

4  enhanced custody rounding?

5          THE COURT:  Or any rounding?

6          Well, start with custody.  You're right.

7          THE WITNESS:  Not to my knowledge.

8  BY MR. NOLAN:

9  Q.      Does it result in increased Psych-Tech rounding?

10 A.      Not to my knowledge.  It would be the level of care,

11 his EOP designation, that would result in increased frequency

12 of Psych-Tech rounding.

13 Q.      Doctor, other than the meetings with you, WWW was not

14 actually provided with more services than the 3.25 hours

15 listed in his treatment contract, correct?

16 A.      Other than meetings with me?

17          Well, he continued to meet with me.  He met with his

18 psychologist.

19 Q.      That was in the contract, right?

20 A.      Yes.

21 Q.      So other than the hours specified in the contract,

22 which is 3.25 hours, and his meetings with you, were there

23 any additional services?

24 A.      He was offered a tremendous --

25 Q.      Provided.  Provided.  Were any additional services

1542

1  actually provided?

2  A.      That he was offered and received?

3          There were just the three yards, one yard substituted

4  for one of the groups as treatment.

5  Q.      That was in the treatment contract, right?

6  A.      In the contract it was one group and two yards.  We

7  thought that three yards and no groups would be a fair

8  trade-off.

9          MR. NOLAN:  No more questions, Your Honor.

10          THE COURT:  If WWW had been referred to DSH, he would

11  have been rounded once every 15 minutes.

12          Is that your understanding?

13          THE WITNESS:  I'm not as familiar with their

14  policies, but I believe that is the case.

15          THE COURT:  And if he was rounded every 15 minutes,

16  there's a -- I mean, the reason they do that is because it's

17  a safety measure?

18          THE WITNESS:  That's my understanding, yes.

19          THE COURT:  And as good as the program is in the OHU,

20  it just doesn't provide that level of safety for a person --

21  well, of course, he was in East Block anyhow.

22          Let me tell you what a layman would think.

23          THE WITNESS:  Okay.

24          THE COURT:  Then you can tell me why it is wrong.

25          Somebody who would do something as radical and as

1543

1    terrible as blinding himself, in the way this witness did,

2    not only blinding himself, but, you know, sticking these pens

3    in his eyes, and then overdoses -- and he's got a history of

4    attempted suicide and then overdoses, it would seem to me

5    that if you're trying to prevent him from killing himself,

6    you try and take some kind of measures that would ensure

7    people are watching to see that he didn't do it.

8         That's not right?

9         THE WITNESS:  Well, we increased his -- I would agree

10   with that.  We increased his level of care.  We provided him

11   with more services than he had received in the past.

12        THE COURT:  No.  No.  I was asking a very specific

13   question because it is obvious that the increased care and

14   all the other good things you did didn't prevent him from

15   killing himself.

16        The question is, if you know the things that you know

17   about WWW, don't you have -- never mind the medical and

18   ethical duty -- to ensure that somebody is watching him so he

19   doesn't do what he did?

20        I'm asking you, not telling you.  It just seems to

21   me, as a person, you know, who doesn't have any experience

22   with this, that it just seems very odd that's not what

23   happens.

24        THE WITNESS:  I would agree with that when he was

25   acutely decompensating or in a crisis or an emergency

1544

1   situation, most definitely.

2           THE COURT:  But if he seems to be improving, that's

3   enough to say -- not you personally, for the people in

4   charge -- to say:  Well, he's improving, we don't have to

5   keep watch on him.

6           THE WITNESS:  If he's improving to the point where

7   he's denying suicidal thoughts, denying thoughts to hurt

8   himself, looks good, is not exhibiting the symptoms

9   that previously when he had -- he would hurt himself, when

10  those symptoms that precipitated self-injurious acts were

11  absent, I think it would be fair at that time to consider a

12  decrease in the level of observation.

13          THE COURT:  See, I understand perfectly well that

14  when a person stops, when a person says, "Gee, I'm going to

15  kill myself," it is time to take action.

16          But I query whether if he says, "Oh, no, I'm not

17  going to kill myself," that we ought to take him seriously,

18  especially a person with -- I mean given what we know about

19  WWW.

20          THE WITNESS:  You're right in that if a patient such

21  as he were to say, "I'm going to hurt myself or kill myself,"

22  we would take that very seriously, but we have to take his

23  denial of those thoughts with a grain of salt given his

24  history.

25          THE COURT:  My questions invite questions of counsel?

1545

1    Miss Vorous?

2    MS. VOROUS:  Yes, Your Honor.

3                    FURTHER REDIRECT EXAMINATION

4    BY MS. VOROUS:

5    Q.    Two questions, Doctor.

6          In the months preceding Inmate WWW's death, would a

7    referral to the VPP Acute Program have been appropriate in

8    your opinion?

9    A.    Not in my opinion, no.

10   Q.    And if, in fact, a referral had been made, how long

11   would you have expected the treatment at VPP to have lasted?

12   A.    Approximately 90 days is my understanding of the

13   length of stay for that program.  He wasn't even at the point

14   where, based on his clinical presentation, he needed to go to

15   the Mental Health Crisis Bed, let alone the APP Acute

16   Program.

17   Q.    Doctor, if you can take a look, again, at Exhibit

18   T -- tab T, Plaintiffs' Exhibit 1082.

19         You might still have that opened to page 16.

20   A.    Yes.

21   Q.    Draw your attention to the last paragraph where it

22   states that:

23         (Reading:)

24         Custody made their last round at 2130 and the inmate

25         was alive in his cell.  The episode ended at 2200

1546

1          hours, at which time the inmate said good night to

2          his brother and reminded him they needed to watch

3          Life of Pi the following day.  Sometime in the next

4          quarter hour the inmate tied a sheet around the top

5          crossbar of the cell door, looping and twisting it

6          around his neck, and sat down facing the rear of the

7          cell.

8          (Reading concluded.)

9          Do you know at what time the next custody round took

10   place for this particular inmate?

11   A.      I don't know off the top of my head.

12          MS. VOROUS:  No further questions.

13                    FURTHER RECROSS-EXAMINATION

14   BY MR. NOLAN:

15   Q.      Doctor, isn't it true that after -- immediately after

16   the second overdose in September of 2012, you also felt that

17   referral to the acute program was not warranted?

18   A.      Well, I felt that among the available treatment

19   options, the risk/benefit ratio for other options outweighed

20   that of the risk/benefit ratio for the acute program.  We

21   considered it.

22   Q.      "Yes" or "no," did you think that a referral to the

23   acute program was appropriate at that time?

24   A.      If I had felt it was appropriate at that time, we

25   would have referred him.

1547

1    Q.      So "no" is your answer?

2    A.      At that time no, it was not my recommendation to

3    refer him to the acute program.

4            MR. NOLAN:  Thank you.  No further questions.

5            THE COURT:  May the witness be released?

6            Plaintiff?

7            MR. NOLAN:  Yes.

8            THE COURT:  Defendant?

9            MS. VOROUS:  Yes.

10           THE COURT:  You're free to go or stay, as you choose,

11   Doctor.

12           THE WITNESS:  Thank you, Your Honor.

13           THE COURT:  Folks, it is now four o'clock.  You've

14   got one more witness as I understand it?

15           MS. VOROUS:  Yes, that's correct.

16           THE COURT:  And our experience has been that as soon

17   as you have a witness, that's a day gone.  I don't mean that

18   disrespectfully, folks.

19           Well, we can go off the record because we're just

20   trying to figure out our timing.

21           (Discussion held off the record.)

22           THE COURT:  See you at 9:30.

23           MR. BIEN:  Your Honor, may I just say one more thing

24   on the record?

25           THE COURT:  On the record?

1548

1    MR. BIEN:  Yes, please.

2    THE COURT:  On the record.

3    MR. BIEN:  We have some good news on the tapes.  We

4  were provided with four tapes today, which will assist us in

5  preparing for cross-examination, but we don't have the last

6  two.

7    THE COURT:  He said he was going to get them to you

8  tomorrow or -- today or tomorrow.

9    MR. BIEN:  Do we have any news yet?

10    MR. RUSSELL:  I think tomorrow, Your Honor.

11    MR. BIEN:  Can we have that commitment --

12    THE COURT:  You can't have a commitment.  Just stop

13  it.

14    I mean, they're going to do their best.  If they

15  don't get it, you know, we're going to have to delay the

16  cross examination or whatever it takes.

17    Folks -- All right.  See you tomorrow.

18    (Off the record at 4:05 p.m.)

19                    ---o0o---

20

21

22

23

24

25

1549

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6
          I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10               IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3       I, Michelle L. Babbitt, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8

9                          /s/ MICHELLE L. BABBITT
                           MICHELLE L. BABBITT CSR #6357
10                         Official Court Reporter
                           United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25