1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12    _____/

13

14

15                        ---o0o---

16

17                   REPORTER'S TRANSCRIPT

18                RE:  EVIDENTIARY HEARING

19              THURSDAY, OCTOBER 31ST, 2013

20

21                        ---o0o---

22

23

24

      Reported by:  MICHELLE L. BABBITT, CSR. No. 6357
25    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                          APPEARANCES

 2                          ---o0o---

 3   FOR THE PLAINTIFFS:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
 5           SAN FRANCISCO, CALIFORNIA  94104

 6           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7           BY:  KRISTA STONE-MANISTA, ATTORNEY AT LAW

 8           BY:  JANE KAHN, ATTONEY AT LAW

 9           BY:  THOMAS NOLAN, ATTORNEY AT LAW

10

11

12

13   FOR THE DEFENDANTS:

14            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
15            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
16
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
18
              BY:  JESSICA KIM, DEPUTY ATTORNEY GENERAL
19

20                          ---o0o---

21

22

23

24

25
```

1                    EXAMINATION INDEX

2                        ---o0o---

3   FOR THE DEFENDANTS:

4       EXAMINATION:                                PAGE

5

6    DR. CHRISTOPHER WADSWORTH

7       Direct Examination by Ms. Vorous          1550
        Cross-Examination by Mr. Nolan            1602
8       Redirect Examination by Ms. Vorous        1644
        Recross-Examination by Mr. Nolan          1648
9

10

11

12

13

14                        ---o0o---

15

16                    PROCEEDINGS INDEX

17                        ---o0o---

18

19    PROCEEDINGS:                                 PAGE

20

21      Closing Argument by Mr. Bien              1660

22

23

24                        ---o0o---

25

```
 1                        EXHIBIT INDEX

 2                         ---o0o---

 3   PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
 4
     10e              Prisoner E Medical
 5                    Record Excerpts            1602
                      (Sealed)
 6
     1001             Inmate Key Revision         1651
 7

 8   1046             April 13, 2012 SCP Concept Paper  1654

 9   1074             Docs Re: 10-9-08 Suicide    1655

10   1076             Docs Re: 6-16-09 Suicide    1655

11   1077             Docs Re: 8-28-10 Suicide    1653

12   1078             Docs Re: 12-20-10 Suicide   1656

13   1079             Docs Re: 11-17-11 Suicide   1655

14   1080             Docs Re: 5-27-12 Suicide    1655

15   1081             Docs Re: 8-26-12 Suicide    1655

16   1100             Photo @ SQ 328 Adjustment
                      Center Group Cages          1651
17
     1101             Photo @ SQ 329 Adjustment
18                    Center Group Cages          1651

19   1178             Dr. Patterson Excerpts      1643

20

21                         ---o0o---

22

23

24

25
```

```
1                          EXHIBIT INDEX

2                            ---o0o---

3    DEFENDANTS'
     EXHIBIT NO            DESCRIPTION                EVD
4

5       S            Dr. Christopher Wadsworth CV      1553

6
        T            Prisoner E Medical Records        1592
7

8

9

10                           ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   SACRAMENTO, CALIFORNIA

 2            THURSDAY, OCTOBER 31, 2013; 9:40 A.M.

 3                        ---o0o---

 4

 5          THE CLERK:  Calling civil case 90-520, Coleman versus

 6   Brown.

 7          THE COURT:  Ms. Vorous.

 8          MS. VOROUS:  Defendants would like to call Christopher

 9   Wadsworth to the stand.

10          THE COURT:  Come around to be sworn, sir.

11                   CHRISTOPHER WADSWORTH

12   called as a witness on behalf of the defendants herein, was

13   sworn, examined, and testified as follows:

14          THE CLERK:  You do solemnly swear that the testimony

15   you are about to give to this court in this proceeding is the

16   truth, the whole truth and nothing but the truth, so help you

17   God?

18          THE WITNESS:  I do.

19          THE CLERK:  Please have a seat, spell your full name

20   for the record and speak into the microphone.

21          THE WITNESS:  Christopher Wadsworth,

22   W-A-D-S-W-O-R-T-H.

23          THE COURT:  Ms. Vorous.

24   /////

25   /////
```

```
 1                          DIRECT EXAMINATION
 2    MS. VOROUS:
 3    Q.      You're currently a medical doctor; is that correct?
 4    A.      Correct.
 5    Q.      How long have you been a medical doctor?
 6    A.      I graduated from medical school in 2005.
 7    Q.      Are you currently licensed to practice medicine?
 8    A.      Yes, in both California as well as in Florida.
 9    Q.      When were you licensed to practice medicine in
10    California?
11    A.      2010.
12    Q.      Do you currently work for the Department of
13    Corrections and Rehabilitation at San Quentin?
14    A.      I do.
15    Q.      How long have you worked at the San Quentin State
16    Prison?
17    A.      Since approximately March of 2011.
18    Q.      Describe the positions that you've held since you
19    started working at the prison in March of 2011.
20    A.      I worked as a staff psychiatrist for the inmate
21    patients at San Quentin State Prison.  I had worked in
22    outpatient settings.  I had worked in the mental health
23    crisis bed setting, and ultimately beyond just the staff
24    psychiatrist responsibilities, I then moved into more
25    supervisory capacities beginning in October of 2012, when I
```

1    began as the Medical Director of our Correctional Treatment

2    Center at San Quentin State Prison.

3         Then I was moved into the Acting Chief Psychiatrist

4    role since January of this year, 2013, and formally moved

5    into that position as the chief psychiatrist in November of

6    2013.

7         **THE COURT:**  I'm sorry.  How are you related to Dr.

8    Burton and Dr. Monthei?

9         THE WITNESS:  Dr. Burton and Dr. Monthei are part of

10   our overall management team on the mental health team.  Dr.

11   Monthei is the chief of the overall Mental Health Department,

12   and then our Mental Health Department includes a chief

13   psychiatrist, and that would be my responsibility and my

14   position, and then Dr. Burton is our senior psychiatrist

15   within the prison.

16        **THE COURT:**  Okay.  He's one step below you in the

17   administrative regimen; is that right?

18        THE WITNESS:  You're referring to Dr. Burton?

19        THE COURT:  Yes.

20        THE WITNESS:  Yes.

21   **MS. VOROUS:**

22   Q.    Doctor, as acting and now as the chief psychiatrist,

23   what are your duties?

24   A.    Overall administrative functions for those psychiatric

25   services that are provided within the prison and simply can't

1    be limited, though, to oversight of psychiatrists.  Our

2    program is, as has been mentioned, multidisciplinary as in

3    multiple respects in other prisons, and thus I am involved

4    with the overall management of a variety of disciplines

5    within San Quentin's delivery of mental health services.

6    Q.    What were your duties as the medical director of the

7    CTC which is the correctional treatment center -- is that

8    correct?

9    A.    That's correct.

10   Q.    That's also known as the mental health crisis bed

11   unit?

12   A.    That's correct.

13   Q.    Please describe what your duties were in that

14   position.

15   A.    Again, overall management of those who were providing

16   our clinical services, the multidisciplinary teams, overall

17   decision-making when there would be any disagreements.  There

18   were administrative issues as well, interfaces with our

19   pharmacy department, outside hospitals in the community,

20   dealing with authoring policies and procedures and just

21   maintaining our licensure and endorsement through the

22   California Department of Public Health.

23        **MS. VOROUS:**  May I approach the witness, Your Honor?

24        THE COURT:  Yes.

25   /////

1    **MS. VOROUS:**

2    Q.    I've handed you what has be marked Defendant's Exhibit

3    S.  Can you describe what this document is.

4    A.    This is my most recently updated curriculum vitae as

5    of early October of this year.

6         **MS. VOROUS:**  I would like to move this exhibit into

7    evidence at this time, Your Honor.

8         **THE COURT:**  Received.

9                        (Whereupon, Defendant's Exhibit S was

10                       received into evidence.)

11   **MS. VOROUS:**

12   Q.    Doctor, you were here during Dr. Monthei's testimony;

13   correct?

14   A.    Yes.

15   Q.    He had testified recently that the mental health staff

16   at San Quentin -- excuse me.  Let me start over again.

17        He had testified that mental health staff at San

18   Quentin occasionally perform mental health screenings of the

19   entire death row population.

20        Do you recall that testimony?

21   A.    I do.

22   Q.    Do you recall any screenings that occurred prior to

23   the most recent screenings in 2013?

24   A.    Yes.

25   Q.    Were you involved in any of those screenings?

1    A.      I was involved in the most recent one he had

2    previously mentioned that occurred earlier this month, if I

3    recall correctly, and the one that occurred before that one

4    also occurred in October, but it was in 2012.

5    Q.      Why did the screening in 2012 occur?

6    A.      We had a unique situation present itself as San

7    Quentin at that time.  In the November election of 2012

8    Proposition 34 was on the ballot.  It was a voter initiative

9    measure that was going to possibly overturn California's

10   death penalty.

11   Q.      At that time, why did you believe it would be

12   important to screen this population?

13   A.      Multiple reasons.  What we were facing was this

14   population that is very unique to San Quentin State Prison.

15   The condemned row inmates who had provided multiple forms of

16   feedback to their mental health providers, correctional

17   officers would hear language on the yard that there was a

18   genuine apprehension and a genuine concern on their part,

19   mostly for actually losing the death penalty.

20          For the death penalty being overturned, these inmates

21   on condemned row were concerned enough in the months that

22   preceded the election that we elected to screen the

23   population, the entire condemned row population for any

24   mental health symptoms that may have been developing as the

25   election approached.

1     We closely monitored in the weeks leading up to it and

2     we actually provided onsite coverage through the election

3     night, the day before it, the day of the election, the night

4     of the election, and the following day just to be sure that

5     there weren't going to be any mental health symptoms related

6     to either direction that the vote may have gone.

7     The primary concern was that the population was going

8     to negatively react to the death sentence being overturned;

9     however, there was a smaller minority that we were aware of

10    that was going to be concerned if the death penalty remained.

11    So we just were keeping our preverbal finger on the pulse, if

12    you will.

13    Q.     Were you involved in the work that was done in

14    preparation for the screen that you've just described?

15    A.     Yes.  I was involved in the work that was done, the

16    design of the kind of screen we were going to do, as well as

17    I can't even quantify the amount of research that I had put

18    into really identifying whether our concerns were founded, if

19    they were evidence based.

20    Did we have any real history of something like this

21    having occurred in a comparison population?

22    Was there something that we could use to then guide

23    the screen that we were going to do?

24    We just didn't know how intensely we were going to

25    screen and to what degree we should be prepared for a

1    negative impact, if any.

2    Q.    What sources of information did you attempt to find or

3    review as part of your preparation?

4    A.    Part of my preparation was to review the relevant

5    medical literature using some of the standard search engines

6    that would scour the journals, looking through law reviews,

7    to be quite frank.

8        There wasn't a lot of information that was readily

9    available in medical journals.  There was a little bit more

10   related to some of the overturned death sentences and a

11   follow-up of some of those inmates over time, mostly in law

12   reviews.

13       We even turned to some of the states at that time.

14   There had been five states that had overturned the death

15   penalty and turned to some of those particular states and the

16   clinicians that were involved in the administration of their

17   mental health care services on their death row population to

18   determine what did they do?

19       What was their outcome?

20       What was the general sense that they were experiencing

21   at the time?

22   Q.    Did you review the article that was authored by Dr.

23   Tartaro that Dr. Stewart mentioned during this testimony?

24   A.    I did.

25   Q.    Did you review any other data from the Bureau of

1  Justice?

2  A.    Yes.  You bring up an interesting point.  The article

3  that was mentioned by Dr. Stewart, authored by Dr. Tartaro

4  was published in 2002.  I found that article and used some of

5  the statistics that were available within.

6        They included some of the ones cited by Dr. Stewart,

7  and in looking more closely at that information, it was

8  gathered and published by the Bureau of Justice statistics

9  through the Department of Justice.  And although they ended

10  in 1999 for that particular study that was published in 2002,

11  there are actual updated annual reports on those that are

12  under death sentences around the country.

13        At the moment, the most essentially available

14  information goes through 2011.  At the time that I was

15  designing or researching this particular topic -- this is in

16  August and September of 2012 -- the most recently available

17  report was from 2010.

18  Q.    What type of information do those reports include?

19  A.    They're not brief.  They contain quite a bit of

20  information in terms of number of inmates that are under

21  sentence of death around the country, number of inmates per

22  state, number of inmates that have been executed.

23        It includes a tally of the number of months that one

24  spends on death row, at least from a national average

25  prospective in terms of sentence to actual execution.

1     It also includes a number of deaths that have occurred

2  on death row, aside from those that had been executed.  It

3  includes natural death causes as well as suicides.

4  Q.    In looking at the data, was there anything in

5  particular that you were looking for?

6  A.    Yes.  In general, again, the design, the motivation

7  for me looking for as much data as I could find was just to

8  determine if there was any demographically available

9  information about mental health symptoms.  In this case the

10  only one that is identified as a mental health symptom, I

11  suppose, would be the outcome of a suicide.

12     So that was useful information for me at the time,

13  just to add more information to that, that I was considering

14  for this particular project.  But overall, it actually became

15  something that I stayed updated with because it is relevant

16  information to be able to compare our population, not just in

17  California, but the population at San Quentin on death row

18  and compare that population to what's going on in other

19  states.

20  Q.    Doctor, do you have in front of you the trial exhibit

21  binder for Dr. Stewart?  That might be the one open.  I'm not

22  sure.

23  A.    Yes.

24  Q.    If you would turn to tab BB, which is the last tab in

25  the binder, and this is Plaintiff's Trial Exhibit 1014.

1      **THE COURT:**  Is it in evidence, Madam Clerk?

2      THE CLERK:  I'm looking to see.  How is it labeled?

3      **MS. VOROUS:**  Plaintiff's Exhibit 1014.

4      THE CLERK:  Yes, sir.  It was admitted on the 16th.

5      **THE COURT:**  You may proceed.

6   **MS. VOROUS:**

7   Q.      Doctor, if you would turn to page 16.

8   A.      (Witness complies.)

9   Q.      This document -- maybe before you turn to page 16,

10  confirm page 1.  This is a supplemental declaration of Pablo

11  Stewart in support of plaintiff's motion, dated September 27,

12  2013.

13          Is that correct?

14  A.      Correct.

15  Q.      If you would look at page 16, starting at line 10.

16  The sentence that starts in the middle of line 10, quote,

17  (Reading:)

18              While there is some national fluctuation in

19              suicide rates, and this is a relatively narrow

20              time period, this rate is a cause for concern

21              calling for heightened suicide prevention

22              efforts among the condemned, particularly given

23              that the national suicide rate per 100,000 state

24              prisoners in recent years has been steady at

25              approximately 16 per 100,000.

1         Do you believe -- in your opinion, is the comparison

2    that Dr. Stewart is making to the national suicide rate is an

3    appropriate comparison?

4    A.      I don't find it to be helpful.  I think it establishes

5    what is already known, that that rate of suicides is well

6    known and well established to be higher amongst death row

7    inmates than it is among other inmates, and in this

8    particular case, the national rate of all state prisoners is

9    cited.

10        All state prisoners would include, clearly, those that

11   are not sentenced to die.  They would include people getting

12   out in a month.

13        **THE COURT:**  I'm sorry.  I don't have the exhibit in

14   front of me.  I thought it dealt with death inmates.

15        Would you read the sentence and tell me whether I

16   misunderstood what you're saying.

17        THE WITNESS:  Yes, Your Honor.

18        (Reading:)

19             While there is some national fluctuation in

20             suicide rates, and this is a relatively narrow

21             time period, this rate is a cause for concern

22             calling for heightened suicide prevention

23             efforts among the condemned, particularly given

24             that the national suicide rate per 100,000 state

25             prisoners in recent years has been steady at

1           approximately 16 per 100,000.

2           **THE COURT:**  I had understood that to say, but

3   apparently -- I misunderstood that to say that the suicide

4   rate among condemned is higher than the national suicide

5   rate, which I don't know whether it means the national

6   suicide rate of the condemned or all prisoners, but, in any

7   event, it's a matter of concern because of the heightened

8   rate of suicides among whoever is being -- among the

9   condemned.

10          Is that right?

11          THE WITNESS:  It is a higher rate among the condemned.

12  It is clear just from the statistics I have reviewed from the

13  Bureau of Justice statistics that the rates cited here by Dr.

14  Stewart does not relate to the national rate of suicide for

15  death row inmates.

16          The national rate of suicide for death row inmates

17  between the years 2000 to 2011 has never been as low as 16

18  per 100,000 and certainly not been steady, so neither of

19  those particular descriptors would apply to the national rate

20  of suicide for death row inmates.

21          The rate that is cited by Dr. Stewart here is 285 per

22  100,000.  That's what he is using as what he's comparing to a

23  non-death row population.  It includes death row, but a

24  larger body of non-death row inmates.

25          **MS. VOROUS:**  Your Honor, if I may, I should have asked

1    the doctor to read the prior sentence in the declaration.

2    That would put it in better context.

3        **THE COURT:**  Go ahead.

4    **MS. VOROUS:**

5    Q.    Do read the first sentence that references the 285.

6    A.    (Reading:)

7                Using a population figure of 700, this

8                translates into a suicide rate of 285 per

9                100,000 prisoners for death row inmates at San

10               Quentin over the last two years.

11       **THE COURT:**  You may proceed.  Maybe it gets clearer.

12       You may proceed.

13   **MS. VOROUS:**

14   Q.    So, Doctor, did you find during your research that

15   comparing a rate for suicides in a death row environment was

16   a comparable -- was comparable to a rate in the non-condemned

17   population?

18   A.    No.  It includes a selection bias.  And, if I may,

19   what I mean by that, Your Honor, by definition, the inmates

20   that are included amongst the pool of those that have been

21   condemned, they have, in general, as compared to the

22   non-death row population, they have in general committed more

23   violent offenses.

24       They have higher rates of personality disorders and

25   substance use disorders.  They have higher rates of certain

 1    kinds of personality disorders, where although they are

 2    present, although you could find those in the death row

 3    inmates in a higher proportion and a higher degree than

 4    non-death row inmates, they don't wish to participate in

 5    mental health care.  Those are found, in general, in higher

 6    rates amongst the death row population.

 7         The other factor that I mentioned, the substance use

 8    disorders as well as the more violent offenses, those are

 9    risk factors.  Those are risk factors for suicide.  We know

10    those exist.

11         **THE COURT:**  I'm sorry, doctor.  I am certain that I am

12    not getting what you're telling me.  It's my fault.

13         You have a greater number of persons with these

14    various problems being prone to violence, having substance

15    abuse factors and other such things.  I should have -- I

16    would have understood that those are factors which contribute

17    to the reason that there are higher risks of suicide among

18    death penalty inmates than the general population.

19         Is that right or wrong?

20         THE WITNESS:  That is correct.

21         **THE COURT:**  All right.

22         So whatever the reason, the point is, and perhaps

23    these are reasons to be considered, but so what?  The

24    ultimate question is who commits suicide and at what rate, as

25    if I'm telling you something which is wrong, because I don't

 1    even understand, it would appear to me that whatever the

 2    factors are, the absolute reality is there are more folks in

 3    death penalty situations that commit suicide than the general

 4    population, and that's a significant thing to know.

 5         THE WITNESS:  If I can use an analogy that certainly

 6    supports what you're saying and possibly clarifying it a

 7    little further.

 8         If, for example, we look at a population of people who

 9    are admitted to an intensive care cardiac unit because of

10    very severe heart problems that they're having and compare

11    them to the entire State of California, and we then say there

12    appears to be a higher rate of people in ICU that are having

13    more heart problems.

14         And although that may be true, it also may be true

15    that they are getting excellent care and excellent services.

16         **THE COURT:**  The question is not what care they're

17    getting.

18         The first question is not -- I'm sorry.  I know I

19    sound like I'm telling you things, and I don't really mean to

20    be.  At the end, there's always a question, even if there

21    isn't a question mark apparent.

22         The question of what care people are getting is a

23    different question than the first question, which is:  Is

24    there a disparity?

25         The answer is, yes, there is a disparity.

1          Then the question becomes, I assume, given the

2     disparity, are there requisites for more intensive care, more

3     intensive rounding, so to speak -- not so to speak,

4     speaking -- all of the things which might address that

5     disparity?

6          Isn't that right?

7          THE WITNESS:  Where I definitely would say it's right,

8     Your Honor, is that we do have, just by virtue of this

9     preselected population higher risks; however, I'm not certain

10    that means any more services than what may already be offered

11    would be preventable, necessarily to the outcome that we all

12    know on a nationwide level, and it's not specifically

13    California.  It is an unfortunate outcome that does occur

14    with a higher frequently amongst that population.

15          **THE COURT:**  I'm going to take a crude example -- not

16    example, but hypothetical.  You got a bunch folks who might

17    commit suicide.  One thing that you could do if you had the

18    resources and the will and the concern, you could round every

19    15 minutes, and there's no doubt that -- strike that.

20          Isn't it true that it's more likely under such

21    circumstances that suicides and deaths from suicide,

22    attempted suicides, would be reduced just by virtue of the

23    fact that there would be people around to say, "Oh, my gosh.

24    This guy is about to hang himself" or is hanging himself.

25          These are, I think, commonsense questions, but I know

1    commonsense says the world is flat.

2        THE WITNESS:  We wish that there were more available

3    pieces of information regarding suicide prevention.  It is a

4    complex outcome that involves sociocultural components,

5    biologic of genetics --

6        **THE COURT:**  Of course.

7        THE WITNESS:  The answer to the specific change you

8    mention there, with every 15-minute rounding, I believe that

9    at the moment, that kind of care, we have access to that with

10   our CTC, the correctional treatment center at San Quentin.

11       We would have access to it via virtue of physician

12   orders, psychologist orders in the OHU setting, and we would

13   have access to that type of rounding in the acute DSH.  And

14   when indicated when the factors are there that necessitate

15   admission to any of those three facilities, they are

16   provided.

17       **THE COURT:**  I'm sorry.  I know I'm interrupting your

18   examination, but this seems of some significance so I can

19   understand what the doctor is saying.

20       I have not heard, but maybe I have not understood what

21   I've been hearing, that the frequent rounding that I have

22   suggested goes on, for instance, in Vacaville and those

23   facilities, is generally available at any lower rate -- lower

24   level of care, including acute, much less CCCMS, whatever it

25   is.

1          Am I wrong?  Is that routinely the case in your

2     institutions in San Quentin?

3          THE WITNESS:  Where we would have every 15-minute

4     rounding available at San Quentin is within the CTC

5     automatically.  That's the correctional treatment center.

6     Automatically that exists.  By virtue of our 24-hour nursing

7     presence on the OHU, we can, by virtue of our orders, request

8     it should we feel it is clinically indicated.

9          **THE COURT:**  Setting aside the wisdom of whether or not

10    we ought to wait until people demonstrate they're about to

11    kill themselves, setting that aside -- that's the kind of

12    thing I'm going to have to worry about if this case ever ends

13    your -- testimony now is that people admitted to the CTC are

14    getting rounding equivalent to those that they would get in

15    the acute care facilities?

16         THE WITNESS:  At a minimum, Your Honor.  It is a

17    requisite of the admission to our correctional treatment

18    center that they're at a minimum on the suicide precaution.

19    That comes with the mental health crisis bed designation.  We

20    can go further than that.

21         **THE COURT:**  Anybody can do anything.  The question is

22    what do we expect and what is actually going on?

23         I just want to be sure that I understand.  If a

24    condemned patient is found to be in crisis and is moved to

25    the CTC -- which is the crisis bed, as I understand it?

1          THE WITNESS:  That's correct, yes, sir.

2          **THE COURT:**  -- he will at least be observed at the

3    same rate that he would be in an acute facility?

4          THE WITNESS:  I qualify that only with I know for sure

5    at San Quentin we do queue 15 minutes, so every 15-minute

6    rounds at a minimum, and I believe that to true at the

7    program at the Department of State Hospitals, although I am

8    not specifically involved with that.

9          **THE COURT:**  I understand that.

10         Thank you, ma'am.

11   **MS. VOROUS:**

12   Q.    Doctor, in your research did you also look at the

13   suicide rates of condemned indicates on death row and compare

14   it to the rates in California?

15   A.    I did.  It highlights one of the features about this

16   particular rate that makes it difficult to be too reactive to

17   fluctuations in this particular number.  We're talking about

18   number of suicides, and just by the standard designation used

19   in epidemiology we say number per 100,000 people.

20         So when that's applied to a very small population, we

21   can have wide changes in the suicide rate that may not

22   necessarily be indicative of inadequate care, poor resources

23   that were available.  And, as an example, I would be extreme

24   for a moment and just say if we have a population of two, and

25   one of those people commits suicide, then the suicide rate

1    for that condemned row of two people is 50,000 per 100,000.

2         It sounds dramatic.  It wouldn't necessarily change

3    what would have been offered to those two people.  Maybe

4    everything was appropriate and that's why, of course, an

5    individual case-by-case review would need to be conducted to

6    determine what kind of care was offered.

7         Those kinds of changes, those kinds of minor

8    fluctuations were present in some of the other states.  For

9    example, Montana in 2004, their suicide rate was 25,000.

10   They had a death row of four people and one of them committed

11   suicide.  If we use that number to really guide or dictate

12   the kind of care we provide, it will lead us chasing our

13   tails endlessly.

14        **THE COURT:**  So that your view, as I understand it, is

15   that these figures which have been developed nationally by

16   the Department of Justice as a way of trying to understand

17   what's going on are simply useless and we ought to just

18   ignore them and do our best without reference to what's

19   happening elsewhere or what the national average is?

20        It's certainly true that Montana only has four, but I

21   would assume as an example that Alabama has many more people

22   relative to population on death row than Montana does.

23        The theory is that it all works out ultimately as an

24   average, and that's all we're talking about, but that's

25   wrong?

1       THE WITNESS:  The part I would disagree with, Your

2   Honor, those numbers are useless.  They are not useless, but

3   I don't think they alone should be used in the way that may

4   have been indicated in Dr. Stewart's testimony.

5       The examples I'll use for that, there was an

6   artificially chosen or selected time period of 22 months that

7   was book-ended, if you will, by a suicide to begin and a

8   suicide to end it.  That would not be the way that would be

9   the most appropriate comparison when his comparison was to

10  rates, for example, on the national level for non-death row

11  inmates.

12      **THE COURT:**  I don't mean to be disrespectful.  Believe

13  me, I don't, but it seems to me that any time period that you

14  take is arbitrary.  It may be 12 months, but why would

15  12 months been better that 22 months or 6 months or

16  30 months?  You've got to find some number.

17      When you find that number, granted, it's arbitrary,

18  but so would any other number be.

19      THE WITNESS:  Yes, Your Honor.  In that same regard,

20  the way the suicide rate was calculated by Dr. Stewart, I've

21  actually gone through state by state, year by year for the

22  annual suicide statistics that could be created using this

23  same figure.

24      And since '97, there's approximately 34 different

25  times that there's been a state suicide annual rate for death

 1    row populations.

 2        **THE COURT:**  Certainly things will fluctuate and they

 3    probably will fluctuate as much by virtue of the phases of

 4    the moon as they will for other reasons, and I don't mean

 5    literally.  I just mean that there are so many factors that

 6    you can't really identify one or the other.

 7        But the question, as I understood it that Dr. Stewart

 8    was attempting to address, was:  Look.  Given an arbitrary

 9    number of months that are at stake, given all of the

10    variables that we can't know or account for, nationally, this

11    is how many people die in the condemned population and this

12    is the number that are dying in California.

13        Yes, these are crude tools, but they're the tools we

14    have.

15        THE WITNESS:  I would agree with that, Your Honor, and

16    that's why these numbers are helpful and not absolutely

17    useless.  But in order to be a little more relevant, there

18    can be minor considerations that do occur.

19        As a way then to highlight how they could be

20    misleading, I would again come back to this idea since '97

21    there have been times, an annual suicide rate as calculated

22    using this standard epidemiologic way, there have been

23    approximately 34 times between '97 and 2011 where a state has

24    had an annual suicide rate reported.

25        California has been amongst that consideration for

1    that time period six different times.  It's rate, aside from

2    one year, was the lowest in the nation when you consider the

3    annual suicide rate of a death row population.

4        Of those states that have had a suicide on their death

5    row, California's rate was the lowest.  This is why, however,

6    I would argue the information I only presented in this

7    fashion in that way to just highlight how it can be

8    misleading; that that shouldn't necessarily lead us to pat

9    ourselves on the back saying we're doing a great job.

10       That's why we're always considering what changes we

11   need to make, what services we can offer, and, ultimately, I

12   did take this statistical information one step further to

13   give really a lot more relevant picture and helpful

14   information.

15       I believe we may cover that.

16       **THE COURT:**  Apparently we will.

17       You may proceed, ma'am.

18   **MS. VOROUS:**

19   Q.    What then did you do with the data that you gathered

20   through this research project?

21   A.    As I mentioned, I looked at each individual state, the

22   annual suicide rate and realized that we were having --

23       **MR. NOLAN:**  Objection.  We have not been provided with

24   any of this data or the analysis.

25       **THE COURT:**  The witness is being tendered as an

1    expert, I suppose.  That would require a report being

2    delivered to the other side.  Nobody has -- you've never

3    gotten to tender him as a witness, but you handed me S, which

4    clearly demonstrates that he is.

5            You have not asked that he be found to be an expert,

6    but you've handed me his curriculum vitae, which I assume you

7    didn't do just for fun.  You did it because it demonstrates

8    his expertise.

9            **MS. VOROUS:**  Yes, that's correct.  Under Rule 26 as a

10   party employee who is tendering -- presenting evidence as an

11   expert, there is no requirement --

12           **THE COURT:**  That's the second time you've said that,

13   and the last time they agreed so everybody went away, but I'm

14   going to look at Rule 26 because it certainly is true that an

15   employee can testify as to experiences, et cetera, but this

16   is different.  This, I would have thought, this is a much

17   broader --

18           **MS. VOROUS:**  I did not bring my code.  I think it's

19   26(c).  I would also add this witness is a rebuttal witness

20   to Dr. Stewart's September 27th declaration and the testimony

21   he provided.

22           **THE COURT:**  I understand what you're saying, but,

23   again, I don't know that there's some sort of relief from the

24   rule if it's a rebuttal expert, but let me look.  As I said

25   the first time you raised this, it's conceivable that I just

1     am wrong and we ought to stop and find out what we're talking

2     about.

3                  (C) of Rule 26 says, (Reading:)

4                        Witnesses who do not have to provide a written

5                        report:  Unless otherwise stipulated or ordered

6                        by the court -- and the court didn't know

7                        anything about this -- if the witness is not

8                        required to provide a written report because

9                        he's not been specially retained, this

10                       disclosure must state, one, the subject matter

11                       in which the witness is expected to present

12                       evidence under Federal Rule 702, 703 and 705,

13                       and a summary of the facts and opinions to

14                       which the witness is expected to testify.

15             That's what it says.

16             It goes on to say, it's 90 days beforehand and what

17     have you.

18             Someone wanted to say something?

19             **MR. NOLAN:**  Yes, Your Honor.

20             We had an agreement to share documents for witnesses

21     on direct.  She's not using these documents, but he's clearly

22     used them.  It's very hard for us to -- also, he hasn't been

23     shown to be qualified.

24             THE COURT:  Oh, bushwah.  Yes, she should have

25     tendered him and then you would have a chance to voir dire,

 1    but it's clear he's perfectly qualified.  I'm sorry.  I

 2    didn't mean to -- yes, I did.  Here we are -- unless I'm

 3    misreading this and you're not really objecting -- I mean,

 4    you objected and it appears to me that objection, while not

 5    precisely right because this is a person retained -- not

 6    retained, specially retained, nonetheless there must be a

 7    report given and it must be given at least 90 days

 8    beforehand.

 9            Is that your position or not your position?

10        **MR. NOLAN:**  That is our position, Your Honor.

11        **MS. VOROUS:**  I don't have it in front of me.  I did

12    not bring it.  My understanding of that rule, there is no

13    requirement of a written report.

14        **THE COURT:**  I understand that, but this is a witness

15    where there is no requirement that he provide a written

16    report, but then it says, however, if the witness is required

17    to provide -- (Reading:)

18                If a witness is not required, disclosure must

19                state the matter that the witness is expected to

20                present to the summary of the facts and the

21                opinions to which the witness is expected to

22                testify.

23            Obviously, if -- obviously?  I don't know what was in

24    the minds of the plaintiff, but if I were the plaintiff's

25    lawyer and I got a notice 90 days beforehand, I would sure as

1    heck want to depose the guy, and they've had no opportunity,

2    apparently, to depose him, because they never heard of him

3    until today.

4        **MS. VOROUS:**  If I may --

5        **THE COURT:**  This is a serious matter.  This man has

6    significant evidence which potentially affects in a serious

7    way the outcome of this litigation.  If the world were

8    perfect I would say:  Let's take a break, and you give them

9    the stuff, and then we'll come back in 90 days.  But we're

10   not going to do that, obviously.

11       **MS. VOROUS:**  We didn't know this issue would be raised

12   90 days ago.  It was not raised until a supplemental

13   declaration was filed after briefing had long closed by Dr.

14   Stewart on September 27th.

15       We then brought a motion in limine to try to exclude

16   this evidence and were unsuccessful.  He testified that the

17   day the motion was denied, the day after.

18       We then told the plaintiff's attorneys that we would

19   be bringing Dr. Wadsworth to testify as rebuttal to the

20   statistical information declared by Dr. Stewart.

21       If we would have known this 90 days ago, we would have

22   disclosed him.

23       **THE COURT:**  I understand that.  That's why courts

24   exist.  If there is this kind of question and argument, you

25   better come to the microphone because we're going to spend

 1    some time.  There are rules that people are supposed to

 2    follow.  I really don't know what to do.

 3         On the one hand, to be frank with you, it may well be

 4    that this is very important information that affects the

 5    outcome of the case, of this aspect of the case.

 6         On the other hand, you can't be disadvantaged, and I

 7    don't know what to do.  I'm not going to stop the trial.  I

 8    keep calling this a trial.  It's an evidentiary hearing, but

 9    it really is a trial.  For you to take a deposition at this

10    rate, I can't do that.  It's not possible.

11         This is really ironic because I have a number of cases

12    in which there are these statistical disagreements.  Neither

13    side has provided an expert to tell me what is going on.

14         I know what the position --

15    **MR. NOLAN:**  We did have notice for a few days that he

16    was going to talk about the article that Dr. Stewart had

17    mentioned, this 2002 article, but we did not know he was

18    performing his own study and didn't have any of the

19    underlying data.

20         THE COURT:  I understand precisely what you're saying.

21    With all due respect to both sides, this is not a case where

22    you have to ask yourself -- every good lawyer when he has

23    important evidence, the first thing he asks himself is:  How

24    do I get it in?

25         I'm sorry.  I'm just thinking out loud.  That's silly.

1    I'm sorry.

2         MR. NOLAN:  Your Honor, can I say something?  We

3    could -- could we have him testify and cross-examine him and

4    then respond on this issue in our trial brief?

5         THE COURT:  Well, if you're willing to do that -- are

6    you willing to withdraw the objection?  That's fine, more

7    than fine with me.

8         MR. NOLAN:  Yes.  We still object to the evidence

9    potentially -- we still want to preserve our ability to

10   object in our briefing afterwards.

11        THE COURT:  We'll get the evidence in and we'll worry

12   at the trial brief as to whether or not I should consider it.

13   That's very cooperative and I appreciate your gesture.

14        You may proceed, Ms. Vorous.

15        MS. VOROUS:  Please read back the last question.

16                      (Whereupon, the requested portion of

17                      the record was read.)

18   MS. VOROUS:

19   Q.    Please answer that question.

20   A.    Realizing that these annual death row suicide rates

21   were providing very fluctuant levels, I wanted to further

22   understand:  Is there a way that we can use them to be more

23   instructive?

24        One of the features I became well versed in is that

25   there was a large disparity between the amount of time one

 1   would spend on death row in terms of the national average

 2   from sentence date to execution date.  There was a large

 3   disparity between the national number and the number that was

 4   assumed to be by law reviews now.  I'm getting this from

 5   research into law reviews, what was assumed to be the rate

 6   from date of sentence to execution in California.

 7        The reason that was important is because the amount of

 8   time that one spends on death row could then be factored into

 9   that consideration of annual suicide rates so that something

10   more instructive could come out of it.

11        A state that has a very low death row suicide rate,

12   for example --

13        **THE COURT:**  Until everybody quits so nobody gets a

14   chance to commit suicide.

15        THE WITNESS:  Exactly.  To say it in that way, I think

16   would be appropriate.  And then if you lengthen the amount of

17   time that one spends on death row and every day of your life

18   you're thinking about suicide, for example, to be extreme

19   about it, then it stands to reason, the longer you remain

20   alive and on death row, the higher the chances that you will

21   affect suicide.

22        **THE COURT:**  The problem with that, at least as far as

23   the condemned population -- that's who we're talking about --

24   as an example, your colleague yesterday attributed the

25   suicide of prisoner WWW to having conquered all of his

1    psychiatric symptoms through appropriate treatment and

2    medication, and so then the very long-term inmate, said, "Oh,

3    my goodness.  I'm on death row and going to be here the rest

4    of my life.  That's not satisfactory."  And so he killed

5    himself because he was facing reality rather than all of the

6    illusions that had been generated by his psychiatric

7    condition.

8         I think the answer to that, all of this, is if you're

9    smart enough and careful enough, you can always find

10   variances which demonstrate that the averages that people are

11   taking simply don't account for the reality.

12        What that says is ultimately is statistics don't teach

13   us anything.

14        THE WITNESS:  Again, this kind of figure is generally

15   used to apply to populations that are much larger than the

16   national number of death row inmates.  The national number of

17   death row inmates is smaller than some high schools.  It's

18   around 3,000 inmates.  That's smaller than some high schools.

19        There may be several suicides one year in a particular

20   high school.  Certainly that number may be useful to examine

21   it, but if compared to the year prior, it quadrupled the rate

22   but only represented, in effect, three additional suicides.

23        I don't think it would mean the same kind of changes

24   in analyses that are being considered in this court.  That

25   just because this rate may have been elevated for this

1    population, that is not just unique by virtue of being on

2    death row, but by virtue of being on death row for much

3    longer than any other state.

4         **THE COURT:**  But the problem of that is -- I don't know

5    that there is a problem.  But one possible response to that

6    sort of analysis is that when you're dealing with death row

7    inmates who are sufficiently ill, they're too busy with their

8    internal stimuli to realize they're on death row.  It doesn't

9    matter that they're there ten years, 15 years, more.

10        It's on those rare occasions when there's successful

11   psychiatric treatment so that the people are no longer -- the

12   problem I just described to you, so that there are variances.

13   There's always variances.

14        It suggests that examining the variances rather than

15   the average will demonstrate that there are no figures that

16   will ultimately be helpful in the kind of question that I'm

17   faced with here.

18        THE WITNESS:  In the kind of question you're faced

19   with, Your Honor, I just offer the information to you as the

20   trier of fact to consider that this extra piece of

21   information may be far more instructive than the existing

22   rate without that special consideration.

23        I just wanted to add that Dr. Burton's testimony that

24   you're referring to from yesterday, already we're talking

25   about a relatively rare event in terms of suicide.  The kind

1    of depth and understand that Dr. Burton has of his patient

2    population is very unique.  The conclusions that he has drawn

3    about inmate WWW's suicide are not necessarily a projection

4    about the concerns that we should have.

5        **THE COURT:**  I understand, but that's my point.  I'm

6    talking as if I had made a decision, which I have not made,

7    but for purposes of our conversation, I'm really trying to

8    explore, no disrespect intended, the value of the analysis

9    that you're making.

10       Ultimately, it seems to me, it may be that too great

11   an emphasize on the unique characteristics of a given

12   population fails because within that unique group there is so

13   much variance that you can't tell anything anyhow.

14       Which reminds me of another recent statistical case I

15   had.  Some day you and I will have a drink and I'll tell you

16   about that.  It was fascinating.

17       I think I understand your view and I think without

18   even hearing the cross-examination I sort of understand the

19   difficulties in trying to be -- to examine too closely.

20   That's not to say it isn't useful.

21       THE WITNESS:  One of the things I comment on what you

22   just mentioned is absolutely having a knee jerk response to

23   every single variation you may be able to find under this

24   micro inspected population -- it's already small -- my goal

25   was to look for constants in the population and not look at

1    the individual variations.

2          And one of the constants was the length of time spent

3    on death row in this state is far greater than the average

4    rate in the nation.  So that's why I would offer it as

5    something that should be considered when looking at what is

6    the real rate.

7          If we're going to use a number, consider that, please.

8    And ultimately what those numbers show is that the population

9    in California, so not just San Quentin, inclusive of the

10   females at Chowchilla, the rate when you include the length

11   of time on death row is below the national average.

12   Sometimes the national average is 50 percent greater.

13         **MR. NOLAN:**  Objection.

14         **THE COURT:**  Overruled.  You may explore a bit how he

15   came to that conclusion or not.  It's your case.

16   **MS. VOROUS:**

17   Q.    Doctor, how did you come to the conclusion you just

18   testified to?

19   A.    Using the very available Bureau of Justice statistics

20   information and the last figures that I just cited you, would

21   be relevant to the years 2009, 10, 11, and I just chose the

22   last three to apply this particular piece, this particular

23   change to the statistic.

24         Because starting around 2009, that's when I see some

25   of the evidence in periodicals, in law reviews that the

1    average length of time that one spends on death row in

2    California is somewhere between 20 and 25 years.  In fact,

3    most of the articles I saw erred on the side of 25 years.

4         So what I did was analyzed the number of months,

5    according to those articles available, one would then spend

6    on death row from sentence to execution and arbitrarily and

7    just fairly chose a number in the middle, 22.5 months, which

8    was 270 months.

9         I compared then California's rate of number of

10   suicides per 100,000, that rate the same way Dr. Stewart

11   obtained the rate of 285.  I used the rate that was available

12   from California 2009, 10, 11, and did one additional feature,

13   which was divide that rate by the number of months spent on

14   death row, and so that would be dividing it by the 270.

15        And so you can just think about fractions.  The larger

16   you make your denominator, the smaller that rate is.  It

17   basically is adjusting.  Maybe there is a higher rate before

18   you account for these number of months, but the number of

19   months must be considered, and so it will knock it down if

20   there are large number of months compared to one population

21   versus another.  That was the case.

22        And so the numbers then for every other state annual

23   average for the national rate length of time from sentence to

24   execution is available through the Bureau of Justice

25   statistics through the DOJ, and I don't recall those numbers

1    off the top of my head, but the calculations are performed in

2    the exact same way.  The annual rate in terms of the suicide

3    rate per 100,000 is then divided by the length of time from

4    sentence to execution in months as it applies to the nation.

5         One particular feature that was worth considering here

6    from my perspective is that that annual rate, that average of

7    sentence to execution length, was inclusive of California.

8    It included California and it was weighing it down, not in a

9    small way.  It was skewing it towards California's very polar

10   end because it does represent one quarter of the nation's

11   death row inmates.

12        And because the length of time for one quarter of the

13   inmates in the country was longer than every other state in

14   the country, I then adjusted the sentence to execution length

15   for the states that are non-California states.

16        Either way, even if that last piece is not done, it

17   does show, if you just use the annual rate, I think that's a

18   very reasonable approach.  If you would like to not consider

19   California's contribution to how that rate could be skewed in

20   California's direction, even when that's not done, it still

21   shows that the rate of suicides in California considerate of

22   the number of months from sentence to execution, it still

23   shows that California is right on par with the national rate

24   and not substantially elevated, as was indicated by the rate

25   in the 22-month monitoring period designed by Dr. Stewart.

1          **THE COURT:**  I promised my courtroom deputy I wouldn't

2     allow this to happen again.  It's 10:45.  We'll take a

3     15-minute recess.

4                              (Whereupon, a break was taken at

5                              10:47 a.m.)

6                              (Nothing Omitted.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     /////

25     /////

1587

1           (On the record at 11:00 a.m.)

2           THE CLERK:  Please, remain seated.

3           Court is in session.

4           THE COURT:  Ms. Vorous.

5    BY MS. VOROUS:

6    Q.      Doctor, when did you start looking at the suicide

7    statistics as part of your position at San Quentin State

8    Prison?

9    A.      I'm sorry.  Related to the condemned row population?

10   Q.      Yes.

11   A.      Specifically, it started in August of 2012, again,

12   with the awareness we had the looming election in November of

13   2012 and wanting to begin preparations for whatever measure

14   we would employ.

15   Q.      Did your review of this information -- review and

16   evaluation of this information continue after the election?

17   A.      Yes.  It just provided open lines of communication

18   with some of the relevant data that was very applicable to

19   the unique population we've got.  So just to have comparative

20   statistics available to us, I did continue with finding, for

21   example, the 2011 Annual Report from the DOJ.

22   Q.      Doctor, at some point after you completed your

23   evaluation research, a screening occurred with respect to the

24   inmates on death row, correct?

25   A.      Yes.

1588

1  Q.      And how, if at all, did the work that you had

2  completed play into that screening?

3  A.      Ultimately we ended up choosing parameters and an

4  intensity that wasn't necessarily guided by the research I

5  performed.  Ultimately the research and comparison from other

6  states just said that we don't really have a cause for

7  concern.  I didn't find any relevant statistics that were

8  going to guide the care.

9        However, we employed a pretty intense response just

10  in anticipation of something we couldn't possibly predict and

11  was relatively unknown.  So we were -- we conducted

12  individual interviews, largely at the cell front, though many

13  were done in office.  An outreach program provided just our

14  routine information about the Mental Health Services Delivery

15  System at San Quentin.

16        And then for the 24 hours preceding, as well as 48

17  hours after the election, we were actually present on East

18  Block with either social workers, psychiatrists or

19  psychologists around the clock, just in case we were going to

20  hear of something in the moment to which we would need to

21  respond.

22  Q.      And what was the outcome of the screen?

23  A.      Ultimately, the concern we had with the election

24  would have been if the death sentence was overturned, though

25  we did have a smaller concern with if it wasn't overturned.

1589

1    As we all know, the death sentence still exists.  And so we

2    didn't have any urgent referrals.

3        Although our presence was there, it's impossible to

4    say how many we possibly mitigated, but we certainly didn't

5    need any urgent referrals.  And I believe there was a small,

6    single digit number of the condemned row population that was

7    then enrolled in our CCCMS, the lower level of outpatient

8    care, for our mentally ill population.

9    Q.    Doctor, I would like to move on to a different

10   subject, and this relates to Inmate E.

11       If you can, look and see if you have the inmate

12   indicator up in the stack of documents.

13       Are you familiar with Inmate E?

14   A.    Yes.

15   Q.    And have you reviewed Dr. Stewart's testimony with

16   respect to Inmate E?

17   A.    I have.

18   Q.    And are you aware that there was an incident on

19   November 15th, 2012, that required that Inmate E be removed

20   from his cell?

21   A.    I'm aware of that.

22   Q.    And at that time Inmate E was at San Quentin State

23   Prison, correct?

24   A.    That's correct.

25   Q.    Based, I believe, on what you have testified to

1590

1    already, you were the medical director of the Mental Health

2    Crisis Bed Unit on that date; is that correct?

3    A.        That's correct.

4    Q.        And as the medical director, how are you involved in

5    the patient care for inmates that -- excuse me -- as medical

6    director, how were you involved in patient care for inmates

7    that are housed in the Mental Health Crisis Bed Unit?

8              THE COURT:  I'm sorry.  Now I think you have asked

9    two different questions.

10             He was in charge at some point in the crisis bed on

11   that date, the date of the cell removal.  And he's now in a

12   supervisorial position.

13             What are you asking about, which of those two roles?

14             MS. VOROUS:  His role when he was the medical

15   director of the Mental Health Crisis Bed Unit.

16             THE COURT:  All right.

17             MS. VOROUS:  I apologize, Your Honor.

18             THE WITNESS:  My role was to directly supervise the

19   provision of care -- of mental health care, the oversight of

20   services that were also gathered in consultation from our

21   primary care physicians for the inmates that are on our

22   17-bed Correctional Treatment Center, the Mental Health

23   Crisis Bed.

24             And at times I was involved in consultations directly

25   preceding their admission to our unit, in some ways involved

1591

1    with the circumstances surrounding their admission, as well

2    as at other times on the other end of their admission and

3    their discharge I'm involved in some level of determination

4    of what kinds of care people will receive.

5    BY MS. VOROUS:

6    Q.      Was part of your responsibility to review the mental

7    health records of inmates in that unit?

8    A.      Yes.  And in addition to what I have already

9    described, I also attended daily morning rounds on every

10   weekday at the Correctional Treatment Center, sometimes

11   weekends, where we review every single clinical case of the

12   inmates who are admitted to our unit.  And then I will also

13   review charts at that time.

14           MS. VOROUS:  May I approach the witness, Your Honor?

15           THE COURT:  Yes.

16           (Exhibit handed to witness.)

17   BY MS. VOROUS:

18   Q.      Doctor, I've handed you what's been marked as

19   Defendants' Exhibit T.

20           Can you describe what Exhibit T represents?

21   A.      Exhibit T appears to represent a compilation of

22   medical records from multiple facilities related to Inmate E.

23   Q.      And have you reviewed these records, Doctor?

24   A.      Yes.

25   Q.      Doctor, when did Inmate E arrived at San Quentin

1592

1    State Prison?

2           THE COURT:  If you're going to ask him about the

3    contents, you have to move it into evidence, ma'am.

4           MS. VOROUS:  Your Honor, I would like to move Exhibit

5    T into evidence at this time.

6           MR. NOLAN:  We have no objection.  We ask it be under

7    seal.

8           THE COURT:  That will be the order.

9               (Whereupon, Defendants' Exhibit T received into

10               evidence.)

11   BY MS. VOROUS:

12   Q.      Doctor, when did Inmate E arrive at San Quentin State

13   Prison?

14   A.      October 24th of 2012.

15   Q.      Did Inmate E receive any mental health services on

16   the day he arrived at the prison?

17   A.      He did.

18   Q.      Would you describe what those services were?

19   A.      Certainly.

20           As part of our standard evaluation when an inmate

21   does arrive to San Quentin, they're processed through our

22   Reception and Release.  And in that particular area of the

23   prison they have a mental health evaluation, a primary care

24   provider evaluation, sometimes there's a dental evaluation.

25   And these services were all offered to Inmate E.

1593

1    In addition, at that time of his mental health

2  evaluation upon his arrival to San Quentin, the psychologist

3  was concerned with the symptoms he was exhibiting.  And thus,

4  she referred him to our -- the equivalent of our emergency

5  room, the Treatment and Triage Area, TTA, for consideration

6  of admission to our inpatient unit in the Correctional

7  Treatment Center.

8  Q.    And Doctor, can you just identify which documents in

9  Exhibit T that you are referring to by Bates stamp number

10  that represent the services that were provided to Inmate E on

11  the day of his arrival?

12  A.    Certainly.

13    Bates stamp number 8 represents a document that was

14  received from San Francisco County from which this inmate had

15  been transferred.

16    Bates stamp number 9 --

17    THE COURT:  Hang on, Doctor.

18    THE WITNESS:  Certainly.

19    THE COURT:  Okay.  I'm with you.

20    THE WITNESS:  All right.  So after Bates stamp 8,

21  Bates stamp 9 references the standard screening form that was

22  employed at the time of his evaluation and mental health

23  screening on arrival to San Quentin.

24    Bates stamps number 10 and 11 represent the Suicide

25  Risk Evaluation Form that was performed by the psychologist

1594

1    who evaluated him upon arrival to San Quentin.

2           Bates stamp number 12 and 13 reference the

3    evaluations that were performed by the primary care members

4    of our team.

5           Bates stamp number 15 just demonstrates what's called

6    a chrono, essentially a communication form that was issued on

7    the date of his arrival by the evaluating psychologist at the

8    time that she wanted him seen in our emergency room for

9    further consideration of possible inpatient care.

10   Q.     Doctor, this patient was, as you indicated,

11   considered for inpatient care.  But a decision was made at

12   that time not to admit him to the Mental Health Crisis Bed;

13   is that correct?

14   A.     That's correct.

15   Q.     Was he then seen for five day follow ups after his

16   initial evaluation in the emergency room?

17   A.     He was.  And so later documentation will show that he

18   was seen in the TTA, and the on-call psychiatrist who was

19   alerted to his condition at that time elected to have this

20   inmate housed in his outpatient -- the regular housing

21   unit -- I don't mean to say outpatient -- just the regular

22   housing unit where he was assigned and not in a clinical

23   setting.

24          However, the on-call psychiatrist at that time did

25   feel that sufficient evaluation should be ongoing, and thus

1595

1    ordered a five day follow up.

2    Q.    What was this inmate's course of treatment between

3    October 25th, the day after he arrived, and November 14th

4    2012?

5    A.    Inmate E was seen multiple times, in excess of ten

6    times during that short three-week period.  There was a

7    consistent concern that was evolving that his behavior,

8    although not representative of any acute concern for injury

9    of his self, injuring others, or grave disability, there was

10   an evolving concern that his symptoms were worsening.  And he

11   exhibited hostility and aggression and just a blanket refusal

12   of all services offered, not simply mental health care, but

13   those offered by the primary care physicians, those offered

14   by dentistry, as well as those offered as part of the

15   standard programming.

16   Q.    At some point did staff make a determination that

17   Inmate E needed to be removed from his cell for further

18   medical evaluation?

19   A.    I'm sorry.  Would you please repeat the question,

20   Miss Vorous.

21   Q.    At some point after he arrived at San Quentin, did

22   staff make a determination that he needed to be removed from

23   his cell for further mental health evaluation?

24   A.    Yes.

25   Q.    When?

1596

1      THE COURT:  Was Inmate E an condemned prisoner or a

2  member of the general population?

3      THE WITNESS:  As I recall it, Inmate E was housed in

4  our administrative segregation, a non-condemned inmate.

5  BY MS. VOROUS:

6  Q.     Doctor, do you know when the determination was made

7  that this inmate should be removed from his cell for further

8  mental health evaluation?

9  A.     I do.  On November 15th of 2012, which was also the

10  date of his admission to the Mental Health Crisis Bed or

11  Correctional Treatment Center.

12  Q.     And before November 15th did staff attempt to

13  intervene in order to obtain the inmate's cooperation in

14  voluntarily leaving his cell for a mental health evaluation?

15  A.     Yes.  This is most clearly outlined in the items that

16  are dated on the day prior to his admission to CTC, so dated

17  November 14th.  And they reflect Bates stamps number 35 and

18  37.

19      These were evaluations performed by one of our

20  psychologists at San Quentin.  And the note does reflect that

21  there's strong consideration for admission or at least

22  further evaluation -- mental health evaluation because of

23  evolving concerns that he might pose a danger to others.

24      And it also demonstrates that there was a

25  collaborative effort involving custody officials with regards

1597

1  to the particular extraction that was going to occur.

2  Q.      And as I believe you have already indicated, Inmate E

3  was then removed from his cell on November 15th, 2012, and

4  admitted to the Mental Health Crisis Bed Unit?

5  A.      That's correct.

6  Q.      Was he evaluated in the Mental Health Crisis Bed

7  Unit?

8  A.      He was.

9  Q.      What did that evaluation involve?

10  A.      That evaluation involved contact with our

11  Multi-Disciplinary Team, including nurses, including

12  correctional counselors, including psychiatrists, including a

13  psychologist.

14          It included consultation with the group -- the entire

15  providing group for the Correctional Treatment Center during

16  our morning meeting discussions.

17          It involved a consideration of the events that had

18  directly preceded his admission.

19  Q.      At the time that Inmate E was removed from his cell

20  and evaluated in the Mental Health Crisis Bed Unit, were

21  staff aware that he had previously received treatment at Napa

22  State Hospital?

23  A.      At some point during his admission it's clear from

24  the documentation that there was some awareness that his

25  hospitalization in Napa State Hospital had occurred.

1598

1    However, the documentation from Napa State Hospital

2  had not been received at the time of his admission.

3  Q.    At some point were you able to receive the

4  documentation from Napa State Hospital?

5  A.    At some point at San Quentin we received that

6  documentation.  The documentation arrived to our facility

7  after his discharge from that unit.

8  Q.    What process did you go through to obtain the

9  documentation from Napa State Hospital?

10  A.    We have a Department of State Hospital coordinator

11  who works closely with obtaining records and works with our

12  referrals both to and from the Department of State Hospitals,

13  and she was involved in attempting to obtain these records

14  while he was on the Correctional Treatment Center.

15    One of the difficulties that occurs as a deference,

16  again, to patient rights and patient confidentiality, is

17  without a release of information, or without some urgent or

18  emergent indication for obtaining the records, we're not at

19  liberty to get them.  It's, you know, a patient's right

20  issue.

21    And ultimately, during the course of his

22  hospitalization, at the time that the treating psychologist

23  and psychiatrist were aware that this hospitalization had

24  occurred, they did not feel that he lacked the capacity to

25  consent for release of those records or that an urgent enough

1599

1    situation existed such that we would obtain those records

2    against his will.

3    Q.        But at some point, and based on the records that are

4    part of Exhibit T, San Quentin was able to obtain them and

5    evaluate them, correct?

6    A.        Ultimately that that's correct, yes.

7    Q.        After Inmate E was seen in the Mental Health Crisis

8    Bed, was he then seen for five day follow up?

9    A.        He was.

10    Q.        Dr. Wadsworth, I believe you have already testified

11    that you reviewed Dr. Stewart's testimony in this hearing; is

12    that accurate?

13    A.        Yes.

14    Q.        Do you agree with his testimony that this inmate

15    should have been involuntarily medicated right after staff

16    removed him from his cell in November 2012?

17    A.        I do not.

18    Q.        And why do you not agree?

19    A.        There was the concern at the time of the actual

20    extraction that there was sufficient evidence of

21    dangerousness to others that the appropriate intervention was

22    going to need -- had to be for evaluation to occur that he

23    was going to be removed from his cell.

24              However, once that evaluation was able to occur, more

25    appropriately, more fully and more comprehensively on our

1600

1    Correctional Treatment Center Unit, there was not found to be

2    sufficient criteria for any of those involuntary indications

3    where the patient's rights are taken away from him in order

4    to administer medications.

5    Q.    Dr. Stewart also testified that the November cell

6    extraction could have been avoided if upon his arrival at

7    San Quentin this inmate was given a thorough examination.

8          Do you agree with that testimony?

9    A.    It's impossible to know what could have occurred had

10   he consented to a more thorough mental health evaluation, but

11   the situation that existed for us at that time, and again

12   following appropriate procedures for obtaining records and

13   collateral information, we simply did not yet have that

14   information available to us, that his chronic and severe

15   mental illness existed, to that degree especially.

16   Q.    Doctor, do you agree that it was necessary to remove

17   him from his cell in order to obtain a better mental health

18   evaluation of his current condition?

19   A.    I do.  It was a careful consideration involving

20   several disciplines.  I was aware of the conversations that

21   were ongoing.  I was not involved in the actual decision just

22   by virtue of him not having been on my unit yet.  However, I

23   was aware that these conversations were ongoing.  And based

24   upon the totality of the circumstances, and weighing all

25   risks, benefits and alternatives, I believe it was the most

1601

1    appropriate intervention at that time.

2    Q.       Doctor, is there anything in Inmate E's mental health

3    records that you have reviewed that show that the November

4    2012 cell extraction led to any increase in his mental health

5    symptoms or condition?

6    A.       No.  After he left the Correctional Treatment Center,

7    he was continuously evaluated by the mental health department

8    in a variety of settings over time until his ultimate

9    discharge and transfer to Department of State Hospitals.

10           A review of his past medical records demonstrates

11    that the kind of worsening that we would witness over the

12    ensuing months after his discharge from the Correctional

13    Treatment Center in November 2012, the symptoms that he

14    subsequently exhibited, are very consistent with the past

15    medical records that we were able to later obtain, regarding

16    the degree of mental illness, the degree by which he was

17    impacted by those symptoms.

18           And this was not anything unlike his previous

19    experiences when he had threatened harm against his lawyer in

20    the courtroom, threatened the judge in the courtroom as part

21    of his psychotic illness, kicked, bit and spit on staff at

22    the Department of State Hospitals.

23           This was not at all what we saw at San Quentin.  His

24    behavior that we saw in the months after his discharge in

25    November 2012 was not at all inconsistent with what we had

1602

1    observed in the records.

2            MS. VOROUS:  Just a moment, Your Honor.

3            (Counsel confers with cocounsel.)

4            MS. VOROUS:  No more questions, Your Honor.

5            MR. NOLAN:  Your Honor, I apologize, but we have our

6    own set of records for the same prisoner.

7            We previously entered an exhibit with his records,

8    Plaintiffs' Exhibit 10d.  These records are going to be

9    Plaintiffs' Exhibit 10e.

10           They are redacted to remove the inmate names.  We

11   ask -- I would like to move it into evidence.

12           THE COURT:  You want to substitute for the --

13           MR. NOLAN:  No.  In addition.

14           THE COURT:  All right.  That will be the order.

15           (Whereupon, Plaintiffs' Exhibit 10e received into

16            evidence.)

17                         CROSS-EXAMINATION

18   BY MR. NOLAN:

19   Q.      Good morning, Doctor.

20           You were here during the testimony of Dr. Lindgren;

21   is that correct?

22   A.      A portion of it.  My understanding is that he had

23   testified on more than one day, but I was here for one of it.

24   Q.      Were you here when he testified that many times

25   individuals with severe, chronic mental illness don't recall

1603

1    what happens to them in their psychotic state?

2            THE COURT:  No, he didn't say many times.

3            I'm sorry.  Go ahead.  There's no objection.  It must

4    be that's what he said.

5            THE WITNESS:  I don't recall, Mr. Nolan.

6    BY MR. NOLAN:

7    Q.      So even if you weren't here, do you agree with that

8    statement, that generally individuals with severe, chronic

9    mental illnesses, like bipolar disorder, don't remember what

10   happens to them during a psychotic episode?

11   A.      And I suppose I would get hung up on the term

12   "generally."  I don't think that there can be a blanket

13   application made or even a majority of circumstances.

14           I think that it is individual and case-by-case

15   regarding the level of impairment that a particular inmate's

16   severe illness may afford.

17   Q.      Fair enough.

18           So Doctor, did you review the video of Prisoner E's

19   cell extraction?

20   A.      I did not.

21   Q.      Do you think that Prisoner E was psychotic during the

22   November 15th cell extraction?

23   A.      I did not view the video.

24   Q.      Just based on your clinical experience with him,

25   right?  You were in contact with him the next day.  Do you

1604

1    think he was psychotic at that time?

2    A.      The discharge diagnosis that was offered by his

3    treatment team indicated that there was a psychotic disorder

4    present.  And although I did not evaluate him myself at that

5    time, I would later evaluate him in May, I stand by the

6    evaluation that was performed by that Multi-Disciplinary Team

7    that he had the presence of a psychotic disorder.

8    Q.      Do you agree that that was the -- that captured

9    his -- that was the full diagnosis of his condition?

10   A.      That what was the full diagnosis?

11           I'm sorry.

12   Q.      In other words, you diagnosed him more recently; is

13   that correct?

14           You did a longer assessment and evaluation in, I

15   believe, May of 2013?

16   A.      That's correct.

17   Q.      And isn't it correct that you diagnosed him as

18   potentially having Bipolar Disorder 1?

19   A.      I believe that was among the considerations.  There

20   were -- what is often the nature of a severe and chronic

21   mental illness, and it is especially highlighted by this

22   case, Your Honor, is that the symptoms, especially when we

23   just could not access records until we got them, and what

24   information we had, inclusive of our observations of the

25   inmate, both in the housing unit and on our inpatient unit

1605

1    during that first month of his stay at San Quentin, we simply

2    didn't have enough information.

3        And even somebody who has a very clearly diagnosed,

4    from prior records, severe mental illness, it may not become

5    apparent.  It may come and go.  It may present some months

6    and in other months be sufficiently diminished so that if you

7    take that cross-sectional evaluation, you won't be able to

8    get an accurate diagnosis.

9        In this case, during his CTC admission, Dr. Stewart

10   incorrectly stated that he was not provided with a diagnosis

11   that involved psychosis.  He actually was.

12       And again, I would stand by our Multi-Disciplinary

13   Team because they diagnosed him with what is generally

14   considered a more mild psychotic illness than something like

15   schizophrenia, but it is consistent with everything that we

16   were able to see and the kinds of symptoms that we were able

17   to gather.

18       MR. NOLAN:  Your Honor, I would move to strike his

19   answer as nonresponsive.  I asked whether he had made this

20   diagnosis --

21       THE COURT:  That motion is granted.

22       MR. NOLAN:  -- of Bipolar 1.

23       THE COURT:  We have a great problem, particularly in

24   this trial, for reasons that I don't know.

25       People are having a lot of trouble answering the

1606

1  question rather than making a speech.  And I don't mean

2  that -- yes, it was disrespectful, but you've got to listen

3  to the question and answer the question.

4        The counsel who called you will have an opportunity

5  to question you further if there is a need to expand on the

6  answer that you have given.

7        The question was what, Mr. Nolan?

8  BY MR. NOLAN:

9  Q.     The question was whether you more recently have

10  diagnosed or your staff have more recently diagnosed

11  Prisoner E as having Bipolar 1 Disorder?

12  A.     I don't recall what the diagnosis was that I applied

13  in May of 2013.

14  Q.     Doctor, if you could, turn to page 30 and 31 of the

15  exhibit I gave you, which is Plaintiff's Exhibit 10e.

16        This is a treatment plan -- I'm sorry.  This is the

17  referral to the Acute Inpatient Program.

18        THE COURT:  I don't know how to read these numbers.

19        MR. NOLAN:  I'm using the numbers in the

20  upper-right-hand corner.  My apologies.

21        THE COURT:  All right.

22  BY MR. NOLAN:

23  Q.     This appears to be, starting on page 30, a February

24  25th referral to the acute program at CMF.

25        THE COURT:  Is that right, Doctor?

1607

1    BY MR. NOLAN:

2    Q.      Is that correct?

3    A.      Yes.

4    Q.      And I believe that the diagnosis on page 31 under

5    Axis I says:

6            (Reading:)

7            Bipolar 1 Disorder.  Most recent episode manic.

8            Severe with psychotic features.

9            (Reading concluded.)

10           Is that correct?

11   A.      That is correct.

12   Q.      At this time that was your working diagnosis; is that

13   correct?

14           MS. VOROUS:  Objection.  The witness hasn't testified

15   he prepared or has reviewed this particular document.

16           THE COURT:  Did you, Doctor?

17           THE WITNESS:  I don't recall this particular

18   document.

19           THE COURT:  Well, somebody prepared it.  Somebody on

20   your staff, I take it?

21           I mean, I didn't introduce it.

22           THE WITNESS:  I believe this is from plaintiffs'

23   side.  I'm not certain, Your Honor, if it's in Defendants'

24   exhibits.

25           THE COURT:  So you are raising questions about the

1608

1    authenticity of the document?

2         THE WITNESS:  No, Your Honor.  I'm just commenting on

3    whether or not I had reviewed it.

4         THE COURT:  Sir, turn to page 29, I guess.

5         Well, I don't know.

6         I understood, but I may be wrong, that 29 is one side

7    of the document and 30 is another.

8         Is that wrong?

9         That's what it appears to be, but that could be

10   wrong.

11        Can you tell or do you know?

12        THE WITNESS:  Are you asking me, Your Honor?

13        I'm sorry.

14        THE COURT:  Yeah.  I'm just asking you whether this

15   is the front and back of the same document?

16        THE WITNESS:  I believe, from what I can gather using

17   the upper-right-hand corner numbers starting on page 30, I

18   believe that's the first page.

19        THE COURT:  I see.

20        THE WITNESS:  I base that on the upper-left-hand

21   corner that then says page 1 of 4.

22        THE COURT:  Okay.  Then this, whichever way it goes,

23   on page 29 there is a signature which I can't read, and I

24   don't know whether you can read it, but it appears to be --

25   the name and title would be appearing directly ahead of it.

1609

1      Is that right?

2          THE WITNESS:  Yes, Your Honor.  I would agree.

3          THE COURT:  And who is Janet Gutierrez, I guess it

4      is?  I'm not sure.

5          THE WITNESS:  Gorewitz.  I agree it is difficult to

6      read.  It is G-o-r-e-w-i-t-z.  She's one of our staff

7      psychologists.

8          THE COURT:  And from putting all of this together, it

9      appears -- it appears that she's the person who prepared

10     these documents; is that right?

11         THE WITNESS:  That is correct.  As well as the

12     psychiatrist, Dr. Ponath, whose signature appears on page 33.

13         THE COURT:  What it says is "Bipolar 1 Disorder,"

14     et cetera, et cetera.  And you didn't prepare this, but I

15     assume that these are all members of your staff.

16         Is that right?

17         THE WITNESS:  That's correct, Your Honor.

18         THE COURT:  And would you have any reason to doubt

19     that that's what they found at the time?

20         THE WITNESS:  I wouldn't.  He was also out in one of

21     the housing units at this time and not on the Correctional

22     Treatment Center and so -- but I don't have any reason to

23     doubt that's the diagnosis applied at that time by those

24     providers, Your Honor.

25         THE COURT:  Thank you.

1610

1           You may proceed.

2           MR. NOLAN:  Thank you, Your Honor.

3   BY MR. NOLAN:

4   Q.    Also, if you can turn to page 43 to 45 of this

5   document, this looks to be the most recent treatment plan

6   that we received from September 4th, 2013.

7           And it indicates on page 3, which is 45 of the

8   numbering, that his diagnosis is "Bipolar Disorder, Most

9   Recent Manic Episode with Psychotic Features."

10          Is that right?

11          Is that what it says, Doctor?

12  A.    Yes.

13  Q.    And do you recognize the signature of the IDTT

14  leader, Mr. Pollard, on that page?

15  A.    I do, yes.  Dr. Pollard is one of our psychologists.

16  Q.    If you could, turn for a minute to page 19.

17          This is a discharge summary for Prisoner E from DSH

18  Acute Program in Vacaville dated July 29th, 2013.

19          And if you could, look at page 22, which is the

20  fourth page of that summary.

21          I want to call your attention to the fifth line down

22  where it says that this individual reported that he was

23  pepper sprayed because, quote:

24          (Reading:)

25          "they kept asking me to leave the cell."

1611

1          He focused upon the pepper spray grenades and "a five

2          gallon pressure tank of wet spray that they used for

3          crowd control."  He then went on to describe being

4          pepper sprayed and then being admitted to the MHCB

5          Unit on 11-25-2012.  He alleged he was also pepper

6          sprayed while he was in the MCHB Unit.  He described

7          these incidents were the result of "I demanded to

8          speak to the San Francisco Sheriff's Department."

9          Based on this document, Doctor, do you think he

10   recalled being pepper sprayed six months later?

11   A.     Yes.  Consistent with the individual analysis of

12   these cases, it appears that in this case he certainly

13   retained that memory.

14   Q.     Is it true, Doctor, that leaving somebody in a

15   psychotic state for an extended period of time can harm their

16   long-term prognosis?

17          THE COURT:  That's why you have people treated

18   because otherwise they're going to decompensate, right?

19          THE WITNESS:  Yes.  Yes, sir.  Yes, Your Honor.

20   BY MR. NOLAN:

21   Q.     Also isn't there some correlation between the length

22   of time somebody is left psychotic and untreated and their

23   future likelihood of becoming psychotic again?

24   A.     I won't be able to recall the specific studies, but

25   just based upon knowledge, training and experience, yes.

1612

1   Q.    Okay.  Isn't it true that custody staff told mental

2   health staff that Prisoner E was much less cooperative after

3   the November cell extraction?

4   A.    If I may qualify, I do recall seeing those,

5   Mr. Nolan.  And what I don't want to be lost on this issue

6   is, that is what the custody officers reported.  And they

7   have eyes on him 24/7 on the housing unit.  It's valid and

8   valuable material that we use in our own evaluation.

9        We certainly have to consider that it is not coming

10  from someone with the skills and training to provide any kind

11  of standard mental health evaluation, but this was consistent

12  with somebody who has a severe baseline mental illness as it

13  had presented in the state hospital beforehand.

14       THE COURT:  I'm going to say it again, Doctor, it's

15  really necessary for you to respond to the question and to

16  stop.

17       If there is more to be said, Miss Vorous will, I'm

18  sure, extract it from you.

19       THE WITNESS:  Thank you, Your Honor.

20       MR. NOLAN:  Thank you, Your Honor.

21       THE COURT:  I think the answer is, "Yes, that's what

22  custody said."

23       THE WITNESS:  Correct.  That is what the correctional

24  officers mentioned.

25  ///

1613

1   BY MR. NOLAN:

2   Q.      Doctor, if you could, turn to page 15 of Exhibit 10E.

3           This appears to be a progress note or evaluation from

4   April 5th, 2013.  This is the fourth page.

5           I just want to call your attention to the third

6   paragraph where it says:

7           (Reading:)

8           When I interviewed custody staff in Carson, I

9           was informed that the inmate-patient was much more

10          interactive and cooperative prior to the cell

11          extraction on November 15th, 2012.  Custody staff

12          reported inmate-patient's attitude and

13          behaviors significant decompensated following cell

14          extraction.  One officer stated, "Every since that

15          extraction, he's gone downhill.  His trust is a lot

16          less since the extraction."

17          Is that what it says, Doctor?

18  A.      That's what it says.

19  Q.      Did this kind of information, to your knowledge,

20  affect the willingness of the treatment team to order a

21  subsequent cell extraction for Prisoner E?

22  A.      Absolutely not.  We're always concerned that there is

23  a negative impact, and we're aware of the kind of force

24  and/or disregarding of one's rights to be free of that kind

25  of injury or interaction.  And so it's not the specific

1614

1    instance.  We were already aware of waiting until the very

2    last possible moment and under the absolutely necessary

3    situation to proceed.

4    Q.      Doctor, were you part of the team that decided to

5    cell extract Prisoner E on November 12th -- I'm sorry --

6    November 15th, 2012?

7    A.      I was aware that the discussions were going on.

8    Q.      Having reviewed the records, do you agree with the

9    clinical decision to cell extract him?

10   A.      Having the benefit of hindsight by us, and exposure

11   to all of the collateral records that we now know exist, even

12   given that bias that they did not have access to at that

13   time, I do agree that it was necessary to get this gentleman

14   treatment, that he needed to avoid those long-term

15   consequences to which you previously alluded.

16   Q.      Do you also agree with the clinical decision to

17   discharge him back to the Carson Unit on November 16th

18   unmedicated?

19   A.      Excluding hindsight bias, and knowing to what

20   information those providers had access, I do agree with their

21   decision to discharge Inmate E from the Correctional

22   Treatment Center using the same principle of the least

23   restrictive environment is all that we can offer.  We cannot,

24   against their will, in the absence of something more imminent

25   or debilitating, intervene.

1615

1    Q.      Doctor, could you take a look at page 36 and 37.

2            This is the November 16th, 2012, Mental Health Crisis

3    Bed Discharge Summary.

4            Have you found it?

5            THE COURT:  You are about to enter into another

6    long-term discussion.  We'll reconvene at 1:30.

7            MR. NOLAN:  Thank you, Your Honor.

8            (Off the record at 11:55 a.m.)

9                          ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1616

1    (***PAGE 1616 BLANK - NO PROCEEDINGS MISSING***)

```
 1              SACRAMENTO, CALIFORNIA

 2         THURSDAY, OCTOBER 31, 2013; 1:45 P.M.

 3                   ---oOo---

 4

 5            CHRISTOPHER WADSWORTH

 6   called as a witness on behalf of the defendants herein, was

 7   previously sworn, examined, and testified as follows:

 8              CROSS-EXAMINATION (CONTINUED)

 9   MR. NOLAN:

10   Q.     Doctor, before we broke for lunch we were discussing

11   the decision to discharge prisoner E from the MHCB after one

12   day following his cell extraction on November 15th.

13          You indicated before we broke that one of the reasons

14   San Quentin returned inmate E to the Carson unit on

15   November 16th was your legal duty to return him to the least

16   restrictive environment.

17          Is that correct?

18   A.     Correct.

19   Q.     Isn't it true you were returning him to the Carson

20   unit is that it was an administration segregation unit?

21   A.     That was the custodial unit.  In terms of the clinical

22   indication, he did not belong on inpatient mental health

23   unit.

24   Q.     Is that a less restrictive environment that an MHCB

25   unit?
```

1    A.      That would depend on your definition of "less

2    restrictive."  I would believe historically the stigma that

3    goes along with being on an inpatient mental health unit when

4    one doesn't need to be there has been frequently brought up

5    as an element that is restrictive about an inpatient

6    environment when it's not necessary.

7    Q.      So "Yes" or "no," do you think it's a less restrictive

8    environment?

9    A.      I think it depends.

10    Q.      If you could turn --

11         **THE COURT:**  No, no, no.  You know, restriction -- is

12    it less restrictive, more restrictive over the same as being

13    placed in East Block?  Let's take that as an example.

14         THE WITNESS:  I'm sorry, Your Honor, the comparison to

15    East Block, this gentleman was not condemned.

16         **THE COURT:**  I'm sorry.  GP.

17         THE WITNESS:  Yes, sir.  I believe Mr. Nolan's

18    comparison was the inpatient CTC at San Quentin versus the

19    administration segregation unit.

20         **THE COURT:**  Setting aside whatever Mr. Nolan is asking

21    you -- words have meaning.  Remarkable to me.

22         Was Carson more or less or the same restrictive or you

23    don't know as general population?

24         THE WITNESS:  I simply don't think there's a universal

25    answer to that question, Your Honor, with all due respect.

 1                **THE COURT:**  Well, okay.  That's your view, and I've

 2       got to decide what that means, what that does to the rest of

 3       your testimony.

 4                You may proceed, Mr. Nolan.

 5                **MR. NOLAN:**  Thank you, Your Honor.

 6       Q.       If you could turn to pages 36 and 37 of Exhibit 10E.

 7       This is a two page mental health crisis bed discharge summary

 8       prepared on November 16, 2012, and signed by Dr. Jeffers.

 9                I want to call your attention to a few things.  The

10       discharge diagnosis on page 36 is, (Reading:)

11                        Access I, delusional disorder, erotomania.

12                        Access II, rule out personality disorder,

13                        NOS, with obsessive and paranoid type.

14                And then I want to call your attention to page 37

15       where it says at the end of the first full paragraph,

16       (Reading:)

17                        There is a personality type which borders on

18                        obsessive and paranoid, but no psychotic

19                        symptoms.

20                Doctor, based on these portions of the discharge

21       summary, do you think Dr. Jeffers questioned whether prisoner

22       E had a treatable mental disorder?

23       A.       Would you please repeat the question?

24       Q.       Based on this information, do you think Dr. Jeffers

25       questioned whether this patient's symptoms were due to a

1    mental disorder or due to a personality disorder?

2    A.      I think both of those are mental disorders.

3    Q.      Do you think it was due to an -- do you think he

4    questioned whether the Axis I disorder was causing his

5    symptoms or possibly due to a personality disorder?

6          MS. VOROUS:  I would just object on the basis of

7    speculation.

8          THE COURT:  No.  One of the doctor's functioning is to

9    read these reports and make judgments about them.

10         I assume that's one of the things that you do; right,

11   doctor?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  The question either can or can't be

14   answered.

15         THE WITNESS:  Please repeat it again, Mr. Nolan.

16         THE COURT:  Looking at these documents, do you believe

17   that Dr. Jeffers doubted that the witness had a psychotic

18   disorder rather than a personality, whatever the alternative

19   was?

20         THE WITNESS:  No, I don't.

21   MR. NOLAN:

22   Q.      Do you have an interpretation of what he meant when he

23   said there was a personality type involved which borders on

24   excessive and paranoid, but no psychotic symptoms?

25   A.      Yes.

1    Q.      What is that?

2    A.      Dr. Jeffers was indicating there is a personality

3    type.  It involved which borders on obsessive and paranoid.

4    Then also, the way I'm interpreting, there is a personality

5    type that does not involve psychotic symptoms.

6    Q.      So I want to call your attention to the next paragraph

7    where Dr. Jeffers writes, (Reading:)

8                    It is in my opinion that at this point he does

9                    not meet the needs for this level of care.  He

10                    is not suicidal, not homicidal and not gravely

11                    disabled; however, with the fact that he has a

12                    been a priority case, I feel he needs to

13                    continue in the mental health program.

14          So, doctor, based on that statement, it appears that

15    he's questioning whether he even needs to be in the mental

16    health program.

17          Correct?

18    A.      No.

19          THE COURT:  He says, "I feel he needs to continue in

20    the mental health program."

21          MR. NOLAN:  He says, "Just with the fact he has been a

22    priority case I feel."

23          THE COURT:  Whatever reason.  Never mind.  Let's just

24    get this over with.

25    /////

1    **MR. NOLAN:**

2    Q.    Doctor, I want to call your attention to the

3    statement, the last statement in the third box, where it

4    says, (Reading:)

5              It would be interesting in getting the 1370

6              paperwork and evaluation.

7         That indicates he did not have the Napa State Hospital

8    discharge summary at the time he discharged this individual.

9         Correct?

10   A.    That's correct.

11   Q.    I would like you to take a look at that Napa discharge

12   summary, which is on page 3, the first page of it.

13        **THE COURT:**  Doctor, before we leave that topic, and I

14   don't know what the ethical obligation is or even what the

15   practice is, but you have somebody who's sick.  How sick,

16   apparently, is not clearly established, but he's sick.

17        You know that he's been to Napa State Hospital.  You

18   have no idea -- I don't mean you personally.  Your staff.

19   You have no idea why he was there and what the content of his

20   behavior or his mental state was while he was there.

21        As an ethical matter, is it appropriate, therefore, to

22   just ignore what you don't know and treat what you have?  Or

23   are you obligated to say:  Gee.  I better wait and get this

24   and find out whether or not the guy is homicidal or

25   something?

 1         THE WITNESS:  It's a great question.  We pursued in

 2    this case getting the records through our DHS coordinator as

 3    soon as we were aware they were available; however, we did

 4    have to give deference to the judgment of the clinical

 5    treatment team that at the time that we had him on the CTC,

 6    not at the time that he was being extracted, but literally

 7    once we were able to perform an adequate mental health

 8    evaluation, the feeling of the treatment team at that time

 9    was, although we know he's been to DHS, we still need to get

10    a records release from this person consenting for the doctors

11    here at San Quentin to view my confidential medical

12    information.

13         We had to give that priority to him.  He did not lack

14    that capacity.

15         **THE COURT:**  You got the medical records from the

16    hospital eventually and you didn't go to ask him anything,

17    you just used them; right?

18         THE WITNESS:  Ultimately we were able to get the

19    actual records.  There was the judgment of whoever had asked

20    for those records that it was a clinically indicated need.

21         **THE COURT:**  Of course.

22         THE WITNESS:  But it went beyond the clinic need.  The

23    clinic need always exists to consider records if they're

24    available, but their availability is dependent upon a

25    patient's consent.  If they have the capacity to consent and

1    if it's not an emergent or dangerous situation.

2         **THE COURT:**  But what happened in this case -- I'm

3    sorry, Mr. Nolan -- what happened in this case, as far as we

4    know, there's no indication that I am aware of that the

5    patient ever consented or was even asked.

6         Once you got the records, you did what docs do with

7    records, which is you read them to evaluate them to see what

8    to do.  Not necessarily what to do, but the totality of the

9    history.

10        That's what happened?

11        THE WITNESS:  Correct.  Once we got the records, we

12   were able to include that in our consideration.

13        **THE COURT:**  Right.  So the suggestion that you made,

14   which is the doctor didn't wait for them because he had to

15   get consent, A, they didn't even ask for consent, but, B,

16   they never felt any need to do so because the person was

17   obviously sick and his mental health records were significant

18   in trying to figure out where he was and what was happening

19   to him.

20        THE WITNESS:  It's a delicate balance that we deal

21   with daily.  It's a frequent question we have with regards to

22   at what point do we subvert what a patient has as their right

23   or their interest, and just because he had a mental illness

24   does not mean that he cannot maintain a confidentiality of

25   his records, even though they would have been helpful to us.

1          **THE COURT:**  I understand that abstract judgment and

2     may even be right.  I don't know.  But this was -- it was not

3     pertinent to this witness' treatment at San Quentin because

4     you did what I was calling what any doctor would do, but

5     apparently that's not so, but those considerations were not,

6     as far as I can tell, of significance in examining the

7     records from Napa when you finally got them.

8          And so the suggestion that you could release him to

9     whatever level you were going to release him without knowing

10    his history seems to be contradicted by what you actually

11    did.

12         I'm not criticizing.  I'm trying to understand.

13         THE WITNESS:  Sure.  And I hope we can help each other

14    understand.  What we did, and I recall this specific person's

15    admission, was we wanted to get the records; however, by the

16    time he was actually physically on the unit and we were able

17    to more appropriately interact with him as Dr. Jeffers was,

18    Dr. Jeffers felt that he had the capacity to consent to

19    whether or not we could get the records.

20         Though we were aware of the admission to DSH before

21    us, because by virtue of the DHS cooperator, we just knew he

22    had been there, but we did not have consent for the records.

23    It wasn't until four days after he left that we were actually

24    able to get our hands on those records.

25         THE COURT:  I will say the same thing and you will

1    respond the same way.  We're not going to get anywhere.

2         You may proceed, Mr. Nolan.

3    **MR. NOLAN:**

4    Q.    Doctor, if we could look at page 3 at the discharge

5    summary from Napa State Hospital, there's a fax line across

6    the top of it that I presume indicates when you did obtain

7    these records.

8         Correct?

9    A.    Correct.

10   Q.    That was five days after you discharged him; correct?

11        Presumably there wasn't any big mental status change

12   in those five days that allowed him to suddenly consent.

13        Is that correct?

14   A.    In the judgment of the person who obtained these

15   records, there was a condition that existed that went beyond

16   his ability to consent.

17   Q.    Do you have some kind of legal basis for thinking --

18   have you ever gotten legal advice that you need consent to

19   get a medical report from a sister state agency, the

20   Department of Mental Health?

21   A.    Yes.

22   Q.    You've been told that by CDCR legal?

23   A.    I've been told that.  I don't know by whom, but we

24   also have the right to release forms, release of information

25   forms that do pertain to the Department of State Hospitals.

1    Q.      In any event, he never signed such a form; is that

2    correct?

3    A.      Correct.

4    Q.      So, doctor, I would like to call your attention to a

5    couple of thinks that might have been discovered if the form

6    had been obtained before he was discharged.

7            If you look at page 8, there's a discussion of his

8    discharge medication, and below that it says individual

9    generally -- (Reading:)

10                Individual has been generally medication

11                compliant and is court ordered for psychotropic

12                medications.

13           Is that correct?  Is that what it says?

14   A.      That's what it says there.

15   Q.      If you look a little earlier on page 6, I believe, if

16   you look at the third full paragraph, it says, (Reading:)

17                Prisoner E was not been on any psychotropics in

18                jail, but is now court ordered for medications.

19           Do you see that?

20   A.      It doesn't say that.

21   Q.      In the third full paragraph?

22   A.      You said it said "prisoner," and it says "mister,"

23   which is reflective of his pretrial status at this point.  He

24   was a 1370 pretrial --

25   Q.      I'm trying to use our code.  You can see his name is

1    blacked out there.

2         But you see it says he was on involuntary medications

3    at Napa and not on them at the jail, so he had to be placed

4    on them at Napa.

5         Correct?

6    A.    Correct.  It does not apply to his post conviction

7    status.

8    Q.    No.  I'm asking you about the involuntary medications.

9         Is it correct this indicates that he -- he was

10   referred from the jail to Napa because he was incompetent to

11   stand trial?

12        Correct?

13   A.    That was my understanding.

14   Q.    This says that while he was in the jail before he came

15   to Napa -- this is written by the Napa discharging

16   clinician -- he had not been on any psychotropics, and it

17   says now he's on psychotropics, court ordered.

18        So that shows that he had an involuntary medication

19   order under Penal Code 2602 from Napa.

20        Correct?

21   A.    That's incorrect.  He was not convicted, thus his

22   involuntary medication, as I understand it, would only apply

23   post conviction and not preconviction.

24        **THE COURT:**  It's your understanding that someone who's

25   not been convicted is not subject to the process of obtaining

1    an order requiring involuntary medication?

2          Is that your understanding?

3          THE WITNESS:  The order pursuant to Section 2602 of

4    the California Penal Code.

5          THE COURT:  Your view that complies only to convicted

6    persons?

7          THE WITNESS:  Yes, Your Honor.

8    **MR. NOLAN:**

9    Q.    Aren't the same standards used in civil commitments --

10         **THE COURT:**  Good point.

11   **MR. NOLAN:**

12   Q.    -- for somebody under Penal Code 1370?

13   A.    Yes.  My only point was to answer the specific

14   question you had asked.  He was not on court-ordered

15   involuntary medication at the time that he arrived to San

16   Quentin.

17   Q.    How do you know that?

18   A.    This particular order he couldn't have applied because

19   he was post conviction by the time he arrived at San Quentin,

20   and the involuntary medication order likely wouldn't apply to

21   his post conviction status.

22         **THE COURT:**  Your understanding is that upon

23   conviction, a civil commitment order permitting involuntary

24   medication expires?

25         THE WITNESS:  That, and I'm not aware of the length

1    and/or duration of this particular involuntary medication

2    order that may have occurred during this pretrial status.

3    Either way, I do know he went directly from the jail

4    institution where he was in San Francisco to San Quentin.

5    There was no opportunity to have done a PC 2602 due process

6    hearing that we discussed at length yesterday.

7    **MR. NOLAN:**

8    Q.    Isn't it relevant to a decision whether or not you

9    might have considered doing a Penal Code, Section 2602

10   petition yourself that he had been previously involuntarily

11   medicated?

12   A.    That would have been among the weight of the evidence

13   we would consider, but since we didn't have any evidence that

14   he was acutely dangerous to himself, acutely dangerous to

15   others or gravely disabled, we would not have, even with

16   these records in our possession, would not have initiated

17   involuntary medications at that time.

18   Q.    You say you had no evidence he was seriously

19   chronically ill?

20   A.    I said even with that evidence in our possession at

21   that time in November of 2012, we would not have initiated an

22   order for involuntary medications pursuant to Section 2602.

23   Q.    Can I call your attention to page two of this

24   document, which is a suicide risk evaluation.  On the second

25   page -- this is done by Temkova.

1        Is that a staff person you recognize the name of?

2   A.      Yes, Dr. Temkova was one of our staff psychologists.

3   Q.      This was completed on October 24, 2012, the day he

4   arrived at San Quentin, three weeks before his cell

5   extraction.

6        It says here, it gives him a high chronic risk and a

7   high acute risk of suicide; right?  Which suggests the doctor

8   thought he was a danger to himself; correct?

9   A.      I'm sorry.  There were several questions there.

10  Q.      One question.  The fact that he was given a high

11  chronic risk and a high acute risk of suicide, does that

12  suggest that the doctor may have felt he was a danger to

13  himself?

14  A.      At that particular moment.

15  Q.      And it also says under "justification of risk level,"

16  (Reading:)

17              No protective factors.  Poor judgment.  Poor

18              insight.  Not medicated, extremely paranoid and

19              suspicious.  Appears to be a danger to others.

20       Is that correct?

21  A.      That's correct.

22  Q.      So that's one of the other standards for involuntary

23  medication; correct?

24  A.      That is correct.  At that time, that was the way it

25  was viewed.  This person was evaluated by multiple other

1   clinical providers within hours of this assessment, and it

2   was not found to be the present symptom.  This was an astute

3   clinician evaluating an inmate upon arrival and within

4   minutes needing to make a determination and judgment, and she

5   did so.

6           Then the clinical providers who evaluated in the

7   ensuing hours did not feel that level of acuteness acuity

8   existed.

9   Q.      It turned out she was correct, didn't it?

10  A.      Not at that time.

11  Q.      Do you know if there were additional cell extractions

12  of prisoner E following the November 2012 extraction?

13  A.      I do.

14  Q.      Can you tell me when those were and why they were

15  done.

16  A.      Inmate E was housed in a non-clinical environment

17  throughout the spring, and as we approached the end of April,

18  there did begin to -- concerns began to develop that one of

19  those criteria for taking away his rights to determine what

20  kinds of care he receives, they presented themselves and they

21  became more clear, and as we --

22  Q.      Could I ask you about each of the subsequent cell

23  extractions?  I don't mean to interrupt you, but I think it

24  might be a more efficient way --

25  A.      He asked me why.  I apologize.

1          **THE COURT:**  Maybe he did say why.  When those were and

2     why they were done.  That's what you asked, sir.

3          You may continue, sir.

4          THE WITNESS:  As the symptoms began to develop and it

5     became more apparent that it was of such a severity and

6     acuity, which is the nature of a chronic and severe mental

7     illness, that it will over time untreated in its untreated

8     state begin to develop and manifest in such a way that it is

9     no longer indicated that this particular patient can

10    determine for themselves what to do without risking harm to

11    themselves or others.

12         As we approached the end of April, those concerns were

13    clearly evident to the outpatient treatment team that was

14    providing his care, and, ultimately, it was felt to be

15    necessary to have this gentleman placed, once again, into our

16    inpatient mental health psychiatric unit, mental health

17    crisis bed unit, and he was placed there.

18         There were subsequent extractions too.

19    Q.    First time was April 25, 2013; is that correct?

20    A.    That represents the second time overall.

21    Q.    I'm talking about the subsequent ones to the

22    November ones.

23         Right, that was the second time overall; correct?

24    A.    Correct.

25    Q.    And then there was a third time on May 2nd, inside the

1       MHCB to administer a TB test.

2            Is that correct?

3       A.      Yes.

4       Q.      And there was a use of force, not a cell extraction on

5       May 14th in order to administer involuntary medications.

6            Is that correct?

7       A.      I don't recall the specific date, but that's accurate

8       that it was a use of force, not a cell extraction for the

9       purposes of involuntary medications.

10      Q.      Are you aware that prisoner E received numerous 115

11      rule violations between the November cell extraction and the

12      time he was transferred to acute care around May 25?

13           **MS. VOROUS:**  Objection, Your Honor, beyond the scope

14      of direct.

15           **THE COURT:**  Overruled.

16           You may answer, doctor.

17           THE WITNESS:  I'm aware that he received multiple

18      115s.

19      **MR. NOLAN:**

20      Q.      Does the number 16 sound correct to you?

21      A.      I just don't know the exact number.

22      Q.      Are you aware that many of these RVRs were for

23      refusing a ducat, a pass to leave his cell for a medical

24      appointment?

25      A.      Once we had awareness of his condition, they were

1    successfully mitigated by mental health, yes.

2    Q.    How were may mitigated?

3    A.    In terms of the 115 hearing, the presence of one of

4    the mental health clinicians, as I understand it, who had

5    performed the evaluation to determine mental health had

6    played a part in the particular violation that was being

7    alleged.

8    Q.    This is just for one cell extraction or for one rules

9    violation report?

10   A.    I don't know the number, Mr. Nolan.

11   Q.    Do you know whether any of these were ultimately

12   rescinded and his credits restored?

13   A.    I don't.

14   Q.    I want to talk briefly about the suicide rate issue.

15         I'd like you to look at tab R in the binder in front

16   of you, Plaintiff's Exhibit 1137.

17         I'd like to move that into evidence?

18         THE COURT:  I don't know what it is.

19         **MR. NOLAN:**  A 2002 article by David Lesser and

20   Christine Tartaro, that the doctor talked about in his

21   direct, which is called Suicide on Death Row.

22         **THE COURT:**  It's already in.

23   **MR. NOLAN:**

24   Q.    This study covers '76 to '99; correct, 23 years?

25   A.    That's correct.

1    Q.    You criticize selection bias and Dr. Stewart's use of

2    the last 24 months of suicides.

3          Correct?

4    A.    No, that's not correct.

5    Q.    What was the bias or the consideration that you

6    objected to in terms of that?

7    A.    Is his confronting comparison of a select 22 months of

8    recent San Quentin death row activity and comparing that to

9    this article, whose most recent information was 1999, thus he

10   compared portions of 2011 Through 2013 to other state's death

11   row expenses in the years preceding this millennium.

12   Q.    Focus for a minute on this study before you.

13         Do you agree with the methodology of this 2002 study?

14   A.    Any particular portion of the methodology you would

15   like to ask about?

16   Q.    Do you agree with -- you read it; right?

17   A.    I did read it, but the exact particulars of the

18   methodology?

19   Q.    The whole thing.  Do you think it's a valid study?  Do

20   you think it's what it purports to be?

21   A.    I think its useful information.

22   Q.    This study doesn't contain any adjustment for length

23   of stay on death row; correct?

24   A.    Not that I can see.

25   Q.    Have you found any scientific study that does so?

1    A.      That does what?  I'm sorry?

2    Q.      That establishes a correlation or makes an

3    adjustment -- let me ask it the first way -- establishes a

4    correlation between length of stay on death row and suicide

5    risk?

6    A.      I haven't.  And the reason I believe that's true is

7    because the large disparity between California and the other

8    states hasn't occurred until we reached the millennium, which

9    this article is before this millennium.

10   Q.      But the answer is, no, you haven't found any study

11   that finds a correlation between length of stay on death row

12   and risk of suicide?

13   A.      Correct.

14   Q.      And so what do you base your conclusion that there is

15   such a correlation on?

16   A.      My goal in my strategy in utilizing the most recent

17   data that's available through 2011 as opposed to 2009, I

18   wanted to use the data and apply it in meaning ways because

19   it wasn't about a courtroom decision for me, but it was about

20   the clinical care of our population.

21         **THE COURT:**  The question is not what your motivations

22   were.  The question was:  On what basis do you assert the

23   correlation that you've expressed here?

24         THE WITNESS:  The correlation would be that there is a

25   massive disparity between the length of stay on California's

1    death row as compared to all other --

2         **THE COURT:**  No.  That it makes a difference.

3    **MR. NOLAN:**

4    Q.    Right.  That basically, your premise is:  The longer

5    you've been on death row, the higher your risk of suicide is.

6         Correct?

7    A.    No.  My premise was to add that variable in to be

8    extra information to be considering when we're looking at

9    meaningful, useful --

10   Q.    When you considered it, did you find any correlation

11   between length of row on death row and suicide?

12   A.    That's not now the data was analyzed.  I didn't ask

13   that question.

14   Q.    So you didn't do any regression or statistical methods

15   to try to establish a correlation like that?

16   A.    No.  Ultimately, I was just looking for information.

17   Q.    Do you agree that death row has a higher --

18   individuals on a death row have a higher suicide risk than

19   individuals that are not on death row?

20   A.    I do.

21   Q.    And it's also your opinion California has a higher

22   risk of suicide because of the long stays on death row.

23        Is that your opinion?

24   A.    No.  I believe the longer one stays in a high risk

25   environment, the longer one's risk overall.  The more

1    exposure there is to a particular --

2    Q.    Doctor, just to be clear, the way the risk is

3    expressed in standard statistics is a rate per 100,000 per

4    year.

5         Correct?

6    A.    In a standard way, that's correct.  For a non-standard

7    population, some sort of adjustment needs to be made to

8    consider this.

9    Q.    It's not like you're --

10   A.    Or per 22 months per Dr. Stewart.

11   Q.    I don't think that's an accurate representation of his

12   testimony.

13        **THE COURT:**  Is there any evidence that you've

14   accumulated that the people who remain on death row are more

15   likely to commit suicide than people who have been on death

16   row a shorter period of time?

17        THE WITNESS:  So the two comparison populations I have

18   are California and then everybody else.  Comparing those two

19   populations, the rate on California's death row is higher, as

20   we have all heard from other testimony --

21        THE COURT:  The question is:  Look.  You've got a

22   population.  They come into San Quentin and they stay there

23   for 20, 25 years.

24        Are people who have been there 18 years more likely to

25   commit suicide than people who have been there five years or

1    do you know?

2              THE WITNESS:  I don't know.

3              THE COURT:  Thank you, sir.

4    **MR. NOLAN:**

5    Q.     Doctor, isn't the relevant fact not even one of

6    comparison but just the fact it's a very high rate on death

7    row, the suicide rate?

8    A.     I think all of the information that we can gather is

9    relevant, including comparative analyses of data as Dr.

10   Stewart did, but I just took it a step further.

11   Q.     This rate gives you notice there's a very high risk on

12   death row for suicide.

13          Correct?

14   A.     A higher than the general incarcerated population,

15   yes.

16   Q.     And, for example, administration segregation units are

17   another high risk area?

18   A.     Higher than the general population.

19   Q.     Would you agree you should be doing everything you can

20   in each of these areas, both ASU and the condemned unit, to

21   prevent suicides given these risks?

22   A.     I believe that we should be doing as much as we can,

23   while also balancing a patient's rights to be free of

24   treatment should they so choose.

25   Q.     Are you providing the same level of enhanced care for

1    condemned CCCMS prisoners in East Block as you provide in

2    segregation?

3    A.      Although my function at the moment, Your Honor, and,

4    Mr. Nolan, is chief psychiatrist, the overall familiarity I

5    have is with the entire administration segregation has been

6    limited, and, in fact, I've been primarily involved with

7    crisis bed as well as the condemned population in general.

8           Now, as I transition firmly into that chief

9    psychiatrist role, I expect to have the familiarity moving

10   forward, but at the moment, I'm not able to give you

11   conclusive facts about the administrative segregation

12   population.

13          **MR. NOLAN:**  Plaintiffs would like to introduce a new

14   Exhibit 1175 filed under feel.  This is the summary of the

15   last ten years of condemned suicides based on suicide reports

16   and on the Special Master's reports.  We provided this

17   previously to defendants.

18          **MS. VOROUS:**  Objection, Your Honor.  This is a summary

19   that has been compiled by the plaintiff's attorneys.  It

20   relates to suicides clear back to 2004.  Attached to it are

21   what looks like a mixture of data that includes executive

22   summaries of old suicides as well as excerpts from the

23   Special Master's reports.

24          We have no objection to counsel referring to the items

25   that are already in the record, but with respect to the other

1    documents, we object on the grounds of relevance, and we also

2    object on the grounds of --

3         **THE COURT:**  You object on grounds that this is a

4    summary and there's no evidence as to how it was compiled by

5    who and by what method was used to compile it?

6         Correct?

7         **MS. VOROUS:**  Correct.  We also object to the relevance

8    of some of the documents attached.

9         **MR. NOLAN:**  Can I explain?

10        **THE COURT:**  You can certainly explain.

11        **MR. NOLAN:**  It is a summary.  Everything that is in

12   here is in an attached document.  It's a face sheet of the

13   listed suicides.  There's 11 of them, which gives the date of

14   the death and location, and confirms those persons are

15   condemned.  This is information the defendants have provided

16   us in this case.

17        **THE COURT:**  I absolutely believe you.  The question

18   is, if it's a summary, there are standards which have to be

19   meet for it to be introduced and you haven't done that.

20        **MR. NOLAN:**  We'll withdraw it then.

21        **THE COURT:**  If you want to tell me you will do it, you

22   can tentatively admit it and you can somebody to get up here

23   and say:  My name is Sarah Jones.  I'm a paralegal, and I

24   counted.  If you don't do that, you can't introduce them.

25        **MR. NOLAN:**  We can use this in argument and avoid

1       that.

2                   THE COURT:  Good enough.

3                   MR. NOLAN:  I would also like to introduce Plaintiff's

4       Exhibit 1178, which is excerpts of the most recent report of

5       Dr. Patterson at docket 4376.

6                   May I approach?

7                   THE COURT:  Hearing no objection, it's received.

8                               (Whereupon, Plaintiff's Exhibit 1178

9                               was received into evidence.)

10      MR. NOLAN:

11      Q.      I want to call your attention to one of the charts in

12      this report.  If you look for page 45, it's the page right

13      after that.  The page number is harder to find on page 46.

14              This is a chart that is titled Suicides in CDCR

15      Institutions By Facility, '99 to 2,002.

16                  THE COURT:  I'm sorry.  Page 45?

17                  MR. NOLAN:  46.

18                  THE COURT:  I'm sorry.

19      MR. NOLAN:

20      Q.      This chart shows of all of the 33 CDCR institutions.

21      San Quentin ranks fourth in terms of the highest number of

22      suicides during this period.

23              Correct?

24      A.      It does.

25                  MR. NOLAN:  Can I have a minute, Your Honor?

1          **THE COURT:**  You may have two.

2                          (Whereupon, a conference was held

3                          between Mr. Nolan and Mr. Bien.)

4          **MR. NOLAN:**  No further questions, Your Honor.

5                          REDIRECT EXAMINATION

6   **MS. VOROUS:**

7   Q.      Good afternoon, Doctor.

8   A.      Good afternoon.

9   Q.      You were asked a couple of questions that brought up

10  the concepts of least restrictive environment.

11          Can you explain what your understanding of those terms

12  is.

13  A.      Certainly.  It applies to treatment setting and that

14  the very least restrictive treatment setting should be what

15  is offered a patient in order to maximize their civil

16  liberties, their autonomy, and take away the notion of

17  parental medicine, that at one time did exist when doctors

18  were able to make decisions without informed consent, without

19  discussing risks, benefits, and alternatives, and sometimes

20  without even considering whether or not they met discharge

21  criteria.

22          **THE COURT:**  You didn't seem to have any trouble with

23  the words "restricted environment" in this question.

24          Is there something about this question which defines

25  "restricted environment" for you?

1          The answer is "no."

2          You may proceed.

3    **MS. VOROUS:**

4    Q.    The question you were asked related to whether or not

5    mental health crisis bed environment is more or less

6    restricted than administrative segregation unit environment.

7    A.    I recall.

8    Q.    Can you explain your answer?

9    A.    Yes.  Thank you.

10          My difficulty, Your Honor, I wasn't trying to be

11    obstinate or evasive.  It was just that dependent on a

12    particular patient's needs, not even whether or not they meet

13    that least restrictive environment in an inpatient setting

14    criteria, but it just may be that a particular patient, it

15    may be more restrictive to be in administrative segregation,

16    but for another, it may be more restrictive to be in an acute

17    inpatient mental health facility.

18          That's was all I intended to imply.  I certainly

19    didn't mean to be evasive.  It is certainly dependent upon

20    the characteristics of each individual patient, and it's

21    very, very tough to evaluate and give a blanket answer to

22    such a question.

23    Q.    Doctor, once staff received the records from Napa

24    State Hospital, were they considered -- were the records

25    considered as part of inmate E's treatment going forward?

 1   A.      Absolutely.  It was mentioned in a lengthier progress

 2   note by his treating psychologist and moving forward was a

 3   big piece of the puzzle that we considered as we did begin to

 4   see his symptoms evolve.  We did begin to recognize, even

 5   with the history of chronic mental illness, we didn't see any

 6   of that criteria in November, yet it became more evident the

 7   longer he went untreated.

 8           The longer he went, the more clearer it became, and we

 9   used that Napa discharge summary to give us an idea of just

10   what he was capable of when he is psychotic and when he is

11   untreated.

12           We conducted multiple case conferences.  We had a

13   department-wide conference at one point.  We had thorough

14   consideration of placement into the Department of State

15   Hospitals.  We involved other treatment providers who weren't

16   even part of his treatment team to get consultation and

17   opinions related to the best place for this gentleman.

18           One of the very prominent themes that figured into

19   every single conversation was:  What is the less restrictive

20   for this particular gentleman?  It is not an easy decision,

21   as has been clearly outlined, but we do believe that we

22   waited until it became absolutely necessary to intervene and

23   some of those criteria -- and to take away his right to be

24   free of mental health treatment, because he decidedly wanted

25   to remain free of mental health treatment.  We only waited

1    until that transgressed to intervene.

2    Q.    Looking at the records from Napa State Hospital and

3    looking at Exhibit T, page 1, does that indicate the date of

4    discharge from Napa State Hospital?

5    A.    It does.

6    Q.    And what is that date?

7    A.    February 14, 2012.

8    Q.    He had been discharged from the hospital at least nine

9    months before he arrived at San Quentin, approximately nine

10    months.

11          Is that accurate?

12    A.    Approximately ten months.  He didn't arrive at San

13    Quentin until October.  Pardon me.  Eight months.  I'm not

14    doing math correctly up here.

15    Q.    Dr. Stewart in his testimony indicated that Napa State

16    records were real clear --

17          **MR. NOLAN:**  Objection.  That's beyond the scope of

18    cross.

19          **THE COURT:**  Overruled.

20          You may proceed.

21    **MS. VOROUS:**

22    Q.    Let me start over.

23          You testified that the Napa State records were real

24    clear that this person was suffering from bipolar disorder

25    with psychotic features and responded to a relatively low

1    dose of antipsychotic medication, and, in addition, if the

2    clinicians had been aware of that fact, that a lot of this

3    other stuff could have avoided.

4           Do you agree with that statement?

5    A.     I don't.  Ultimately, many of the places where Dr.

6    Stewart was talking about the records would have been helpful

7    in avoiding some of the care provided at San Quentin.  There

8    was still a time when inmate E was refusing our services, yet

9    did not meet any criteria to take away that right of his to

10   refuse treatment.

11          Regardless of what a record said from a past event,

12   whether eight months ago or 8 years ago, it doesn't matter.

13   At the moment we saw him, he had not risen to a level where

14   we had the authority to take away his rights, his

15   constitutional and civil liberties.

16          **MS. VOROUS:**  No more questions.

17          **THE COURT:**  Recross?

18                       RECROSS-EXAMINATION

19   **MR. NOLAN:**

20   Q.     So prisoner E was referred for treatment in the acute

21   psychiatric program at Vacaville in February 2013.

22          Is that correct?

23   A.     That's correct.

24          **MS. VOROUS:**  I will object.  This is beyond the scope

25   of redirect.

1    **THE COURT:**  You folks can each continue to do that and

2    continue to get the same ruling.

3    You may continue, Mr. Nolan.

4    **MR. NOLAN:**  Thank you.

5    Q.    Is that correct?

6    A.    That's correct.

7    Q.    But he didn't actually transfer until May 20; correct?

8    A.    It was in May.  I don't recall the particular day, Mr.

9    Nolan.

10   Q.    Is it also true that you asked DMH to expedite the

11   transfer?

12   A.    His treating team did.

13   Q.    He was on a waiting list and they refused the request

14   to expedite the transfer?

15   A.    It's correct that we did everything in our power to

16   expedite his transfer, including this conference that you're

17   talking about called a CCAT.  That was conducted and our

18   request was declined, but certainly there was that attempt

19   made.

20   Q.    Do you recall that there was a wait list of 25 people?

21   A.    I don't recall the wait list number.

22   Q.    Do you recall roughly the size of the wait list?

23   A.    I don't.  I really don't.

24   **MR. NOLAN:**  No further questions, Your Honor.

25   **MS. VOROUS:**  No questions.

 1          **THE COURT:**  May the witness be released?

 2          **MR. NOLAN:**  Yes, Your Honor.

 3          **MS. VOROUS:**  Yes.

 4          **THE COURT:**  You may stay or leave, whatever you wish.

 5     Defendant now rest?

 6          **MS. VOROUS:**  Yes, Your Honor.

 7          **THE COURT:**  Rebuttal?

 8          **MR. BIEN:**  Our rebuttal is to offer some additional

 9     documents into evidence.

10          **THE COURT:**  Hang on.

11     You may proceed.

12          **MR. BIEN:**  Exhibit, first two photos, the first thing

13     you have on top is Exhibit 1001, and the latest inmate key,

14     which we would like to replace the earlier keys, which would

15     be under seal and update the information.

16     We would like to replace 1001 for the prior ones.

17          **THE COURT:**  Any objection?

18          **MS. VOROUS:**  Yes, Your Honor, to the extent it adds

19     several more inmate indicators that plaintiff has not

20     presented any evidence regarding.

21          **THE COURT:**  Well, there's a lot of people they haven't

22     done that with.

23          **MR. BIEN:**  It's just a list.

24          **THE COURT:**  I understand.

25     The objection is overruled.

1          1001 is received as a substitution for the previously

2    marked 1001.

3                              (Whereupon, Plaintiff's Exhibit 1001

4                              was received into evidence to replace

5                              the previously marked Plaintiff's

6                              Exhibit 1001.)

7          **MR. BIEN:**  Two photos --

8          **THE COURT:**  I don't have any photos.

9          **MR. BIEN:**  These two photos were taken as part of Ms.

10   Woodford's tour on February 26, '13.  They were provided to

11   defendants and referred to in her declaration, and they are

12   photos of the adjustment center treating room.

13         **THE COURT:**  Hearing no objection, they're received.

14                              (Whereupon, Plaintiff's Exhibits 1100

15                              and 1101 received into evidence.)

16         **MR. BIEN:**  There's also --

17         **THE COURT:**  That is 1100 and 1101.

18         **MR. BIEN:**  Two other documents in Ms. Woodford's

19   binder, one more photo, 1165, and then there's a suicide

20   report which is Exhibit 1077, received under seal.

21         **THE COURT:**  You folks remember I have ordered and

22   received all of the affidavits, and I had assumed, maybe I

23   should be more explicit that that would include any

24   attachments to them.  It would appear to me that some of this

25   may not be necessary, but let's get the record straight, not

1   that anybody in the Ninth Circuit is going to read the 11,065

2   documents or more that you've marked into evidence. Maybe

3   someday I will discuss with you why both sides do what they

4   do, but that's not here or there.

5           All right. 1165 is received, and 1177 is under seal.

6           **MR. BIEN:** 1165 is under seal.

7           **THE COURT:** And 1077 is received.

8           **MS. VOROUS:** I'm sorry. I apologize.

9           THE COURT: I just assume that was so.

10          **MS. VOROUS:** 1165, I don't believe was attached to Ms.

11  Woodford's declaration, and I don't believe it was testified

12  to during the course of this hearing.

13          The other document 1077, I do not know if this was

14  attached to Ms. Woodford's deposition.

15          **THE COURT:** I've got the declaration here.

16          **MR. BIEN:** Whether it's attached or not, it was

17  referred to and it's one of the foundations for her opinion,

18  and that's why we wanted to introduce it.

19          Which one are you objecting to?

20          THE COURT: She said she doesn't know what the two

21  documents are and whether or not they were referred to in

22  evidence. Neither do I.

23          **MR. BIEN:** You're not objecting to the photo?

24          THE COURT: No. The photos are in.

25          **MS. VOROUS:** I am objecting to Exhibit 1165.

 1          MR. BIEN:  That's a photo.

 2          THE COURT:  Oh, I'm sorry.  It's not two photos I

 3    received in evidence.  It's something else?

 4          MS. VOROUS:  That's correct.

 5          THE COURT:  You say it was received in evidence.  I

 6    don't see any photos.

 7          MR. BIEN:  1165 is in Ms. Woodford's binder.  The last

 8    page of the binder is Exhibit 1165.

 9          THE COURT:  I've got the wrong binder.  It's up here.

10    Now --

11          MR. BIEN:  We'll withdraw 1165.

12          THE COURT:  It's out.  1077?

13          MR. BIEN:  1077 is a suicide report for BBBB and

14    referred to in her declaration.

15          THE COURT:  DDDD?

16          MR. BIEN:  B, as in boy.

17          THE COURT:  It's received under seal.

18                    (Whereupon, Plaintiff's Exhibit 1077

19                     was received into evidence under

20                     seal.)

21          MR. BIEN:  The next document, Exhibit 1046, which was

22    prepared by Dr. Monthei, is a report about specialized care

23    for the condemn.

24          MS. VOROUS:  We have no objection, Your Honor.

25          THE COURT:  Received.

```
 1                    (Whereupon, Plaintiff's Exhibit 1046

 2                    was received into evidence.)

 3         MR. BIEN:  Exhibit 1074 is a suicide report for

 4   prisoner LLL who committed suicide on October 2008.

 5         THE COURT:  There's no testimony about it.  I know

 6   nothing about it.  Obviously, the defendants have had no

 7   opportunity to question the nature.

 8         Is it produced by the defendants?

 9         MR. BIEN:  Yes, and it was something we were going to

10   summarize in the chart, the suicides that occurred in this

11   period.

12         THE COURT:  It's been produced by the defendant, so

13   there's no basis for arguing its authenticity, and its

14   relevance, apparently, Ms. Vorous, is part of the record that

15   the plaintiff's propose to argue?

16         MR. BIEN:  Yes, Your Honor.  I think this witness just

17   testified about suicides over a period of time at San

18   Quentin, and we would like to put in from 2006 to the

19   present.

20         THE COURT:  And any other rational.

21         MR. BIEN:  Others have been discussed.

22         THE COURT:  I'm sorry?

23         MR. BIEN:  This particular one I think was discussed

24   and may have been discussed --

25         THE COURT:  Received.  Let's go.
```

 1                              (Whereupon, Plaintiff's Exhibit 1074

 2                              was received into evidence.)

 3          **MR. BIEN:**  1079 is prisoner CCCC, who committed

 4   suicide in November of 2011.

 5          THE COURT:  The same argument.  It's all part of the

 6   picture of suicides that have existed.  But the problem is,

 7   these are records produced by the defendant so they can't

 8   argue that they aren't properly founded, but --

 9          **MR. BIEN:**  They were discussed in Ms. Woodford's

10   declaration, paragraphs 61 through 64.

11          THE COURT:  Received.

12                              (Whereupon, Plaintiff's Exhibit 1079

13                              was received into evidence.)

14          **MR. BIEN:**  Plaintiff's Exhibit 1080 concerns a suicide

15   on May 27, 2012, and the prisoner DDDD and --

16          **THE COURT:**  Received.

17                              (Whereupon, Plaintiff's Exhibit 1080

18                              was received into evidence.)

19          **MR. BIEN:**  1081, suicide of prisoner HHHH, which was

20   discussed in testimony, plaintiff's Exhibit 1081.

21          THE COURT:  That's another report by the defendants?

22          MR. BIEN:  Yes.

23          **THE COURT:**  Received.

24                              (Whereupon, Plaintiff's Exhibit 1081

25                              was received into evidence.)

1    **MR. BIEN:**  Plaintiff's Exhibit 1078 concerns the death

2    of an inmate in the MHCB on suicide watch as discussed in the

3    testimony.

4        **THE COURT:**  I may be wrong, but I thought that had

5    already received.  If it hasn't, it's received.

6                        (Whereupon, Plaintiff's Exhibit 1078

7                        was received into evidence.)

8        **MR. BIEN:**  And the final one is Plaintiff's

9    Exhibit 1076, prisoner GGGG.  It's a suicide that occurred in

10   June 2009.

11       **THE COURT:**  Received.

12                       (Whereupon, Plaintiff's Exhibit 1076

13                       was received into evidence.)

14       **MR. BIEN:**  The only other matter I have, Your Honor,

15   is deposition excerpts.  These have been filed.  Defendants

16   have responded.  We would propose -- obviously, we don't want

17   to read them into the record.  We can provide them to you in

18   whatever form you like.

19       **THE COURT:**  Don't say that.

20       **MR. BIEN:**  These respond to the declarations, some of

21   the declarations of witnesses that did not appear at trial

22   who we had an opportunity to take depositions of.  Defendants

23   have had a chance to supplement and also file objections.

24       **THE COURT:**  Look.  I don't know what you folks are

25   doing.  I've now managed to completely distort Ms. Woodford's

1657

1    deposition.

2         Madam Clerk, would you take this away from me before I

3    throw it against the wall.

4         You want to put in deposition testimony for people who

5    have not appeared in trial and have not otherwise been

6    subject to cross-examination and that the defendants had no

7    opportunity to cross-examine because, after all, a deposition

8    is a deposition, a method by which we seek evidence.

9         I assume you object, Ms. Vorous?

10        **MS. VOROUS:**  Yes, Your Honor.

11        MR. BIEN:  Your Honor, that's not correct.  Defendants

12    have put in declarations, which you've admitted.  This is our

13    cross-examination of these witnesses.  We haven't had a

14    chance to provide you --

15        **THE COURT:**  I misunderstood.  The defendant put in

16    declarations, and this is deposition testimony of the same

17    witnesses?

18        **MR. BIEN:**  Yes.

19        **THE COURT:**  All right.  Those are received.

20                         (Whereupon, Plaintiff's Exhibits,

21                          declarations, were received into

22                          evidence; no exhibit numbers stated.)

23        THE COURT:  I don't know who's going to read any of

24    this stuff, but that's all right.  Keep putting stuff into

25    the record.  I don't know who you think is going to read it,

1    me, the Court of Appeals or the Supreme Court, but let's get

2    it all out.

3            **MR. BIEN:**  There are also excerpts that we offer as

4    admissions.  For example, Dr. Bellavich, who did not testify

5    at trial on some subjects, I think there are some of those.

6            Is that correct?

7            **THE COURT:**  No, I'm not good to admit that.

8            **MR. BIEN:**  Defendants filed objections.

9            **THE COURT:**  I'm not going to admit it.

10           MS. KIM:  We filed written objections about the

11   testimony of Dr. Monthei who testified here -- deposition

12   excerpts of Dr. Monthei who testified.

13           **THE COURT:**  Right.  He was here.  If you wanted to

14   cross-examine him based on the deposition, you were free to

15   do so.  You did not do that.

16           Is that right?

17           **MR. BIEN:**  Yes, Your Honor.

18           THE COURT:  Good.  It's out.

19           **MR. BIEN:**  They're admissions of a party.

20           **THE COURT:**  Good.  It's out.

21           You may proceed.

22           **MR. BIEN:**  We rest.

23           **THE COURT:**  The parties will within the next five days

24   provide the courtroom deputy with exhibit numbers for all of

25   the affidavits that were received into evidence so that we

 1       can have it organized.

 2              All right.  We're finished with all of that.  The

 3       question is argument?  This is argument concerning the

 4       adequacy of medical care being received by people on -- the

 5       condemned prisoners at San Quentin.

 6              First we'll take a break because the courtroom deputy

 7       needs it, and, frankly, so do I, but let me ask:  I don't

 8       know how long this is going to take.  My inclination is to

 9       get started and go to 4:30 and then pick up whatever has to

10       be picked up tomorrow.

11              Would you rather all just go tomorrow?  What is your

12       pleasure?  Plaintiff?

13              **MR. BIEN:**  I'm hoping we can finish today.  If the

14       court -- it's long.  I'll finish whatever you need to do.

15              **THE COURT:**  The answer is:  We'll start today and

16       complete it tomorrow.

17              I'm going to say again what I said yesterday.  Not one

18       date that was ever predicted by the parties was ever kept.  I

19       don't say that as criticism.  I simply say it so I can

20       evaluate what you propose.

21              We'll start in 15 minutes.

22                             (Whereupon, a break was taken at

23                             2:53 p.m.)

24                             (Nothing Omitted.)

25       /////

1660

1    (On the record at 3:20 p.m.)

2    THE CLERK:  Please, remain seated.

3    Court is now in session.

4    THE COURT:  Before we start argument, I want to

5    know -- I keep meaning to ask the witnesses, and by the time

6    they leave I'm so tired I forget.

7    Does anybody know why the OHU does not have a license

8    and what effect it has, if any, on their ability to provide

9    services?

10    MR. BIEN:  I intend to address that in my argument,

11    Your Honor.

12    THE COURT:  All right.  Well, good.  If you're going

13    to address it in your argument, fine.

14    Thank you, ma'am.

15    Mr. Bien.

16    MR. BIEN:  I'll address it first, if I can.

17    THE COURT:  That's all right.  Whatever you need to

18    do.

19    MR. BIEN:  Your Honor, as to the ten bed OHU at

20    San Quentin, it's our contention that it is an illegal,

21    unlicensed and dangerous program.

22    As the Plata experts reported, San Quentin's OHU is

23    providing services at a higher level of care than it's

24    licensed to do, both in the medical OHU and the mental health

25    OHU.

1661

1    This is dangerous.  It not only violates licensing

2  standards, but it is dangerous for patient safety.

3    The history of this unit is that there is a 50-bed

4  licensed CTC in this fancy, multi-hundred-dollar-building.

5    For a reason that I don't understand, the Receiver

6  and defendants decided to suspend the CTC license as to the

7  medical beds.  The MHCB remains licensed.

8    So we have what's called a "suspended license" so it

9  is a facility that qualifies for CTC licensing, but they have

10  informed the licensing authorities that they only wish to

11  operate 17 beds as a licensed facility.  That's the MHCB, and

12  we understand that to be operating appropriately as a MHCB.

13  We have no evidence of any problems.

14    When one operates in a licensed facility, there are

15  regulations about what you can do in the suspended part of a

16  licensed facility.  And you can't just merely go ahead doing

17  the things that you used to be licensed for in an unlicensed

18  part of the facility.

19    And that's what is happening right now with this ten

20  bed OHU.  And that's why the person responsible for

21  compliance with state licensing laws wrote to her superiors,

22  including Dr. Monthei, and it is Exhibit 1012 --

23    THE COURT:  I know.

24    MR. BIEN:  And she said this is wrong.

25    THE COURT:  She said you are endangering the license

1662

1    that you got.

2          MR. BIEN:  Right.  But she's also saying there is a

3    solution.

4          THE COURT:  Get a license.

5          MR. BIEN:  No.  Under the same license you can

6    operate an ICF.  You tell them:  I want to operate an ICF.

7    They'll come in and make sure you're complying with ICF

8    standards.

9          That is exactly what they do at Salinas Valley.

10   That's what they do at CMF.  They operate under a CTC

11   license, and you're allowed to operate other kinds of mental

12   health facilities under that license.

13         And I contend -- we contend that the evidence shows

14   that the State made a choice, they didn't want to spend the

15   money for death row prisoners.  They don't want to spend the

16   money to operate an appropriate mental health program for

17   these men.

18         That is wrong.

19         THE COURT:  Let me ask you, because I don't know.  We

20   had very little evidence about anything other than -- well,

21   is it your contention that, in fact, they are providing less

22   adequate services because they don't have a license, or

23   simply they shouldn't be providing services because they

24   don't have a license?

25         What are you telling me?

1663

1    MR. BIEN:  The license reflects the fact that there

2  is a certain level of services available in a facility.  Now,

3  they may be doing for a particular patient, a particular day,

4  a particular job, but, for example, we have evidence of

5  initiating Clozaril.  Under protocol -- by the way, Your

6  Honor, if we did this at trial, this is something that's

7  supposed to happen in a licensed facility.

8    Now, there was testimony this was approved, but there

9  is no evidence in the record.  I looked through the record.

10  There is no evidence anyone approved of this, and I think it

11  would be wrong.

12    Twenty-four hour nursing is one of the definitions of

13  a requirement for licensing.  If the patient requires 24/7

14  nursing, they're supposed to be in a licensed facility.  They

15  don't have real 24/7 nursing.  They have someone around, but

16  not The Real McCoy that is required.

17    There are other things that are traditionally done in

18  licensed facilities.  Initiation of involuntary psychiatric

19  medication.  Use of restraints.

20    I don't know if they are doing those things in the

21  OHU, or only doing them in MHCB, but they are next door.  And

22  what happens is it's spill over.  And that's exactly what the

23  licensing authorities don't want, not because of some

24  technical requirement, but there is a patient safety issue.

25  Do you have the right staff, policies and procedures to

1664

1    operate this unit?

2          In terms of what we should do, what we are asking to

3    do about this unit, it's difficult for me and I know it is

4    going to be difficult for you.

5          There is no question that the patients on this unit

6    are getting better care there than they're getting when left

7    back in their horrible cells in East Block.

8          You know, certainly Dr. Monthei and his staff should

9    be credited for finally, after several years of pressure,

10   moving these men somewhere where they can get better care.

11         It is not the level of care they require.  And it is

12   also -- it's ad hoc system, Your Honor.  There is no -- we

13   don't have any policies and procedures for this.  It's an

14   OHU.  OHUs are supposed to be limited, you know.

15         So I don't want to shut it down until we have a place

16   for these men to go, but, on the other hand, I'm very

17   concerned about the propriety of the care being provided

18   there.

19         Also here we have tremendous resources being put on

20   treating these men in this unit, in a place that's under

21   resourced, and they're trying to provide a higher level of

22   care than there is a staff for or trained for or have

23   facilities for.

24         What should be happening is we remove the barriers to

25   inpatient care and get them to the places they're supposed to

1665

1   go and let these talented staff treat the people they're

2   supposed to be treating.

3        THE COURT:  Let me talk to you for a moment because

4   of the whole problem of where they go.

5        If I were pressed, and I may be when I sit down to

6   write, the level of sophistication, concern and skill

7   demonstrated by the people at San Quentin, as you compare

8   them to the folks that they brought from Vacaville or from

9   wherever the heck it was, SVP, I mean, if I had a loved one

10  who needed treatment, I sure wouldn't want them comparatively

11  to go to SVP versus San Quentin.

12        That's a real world.  And if I have to make orders --

13        MR. BIEN:  So here's what we're asking, Your Honor.

14  First, ICF hospitalization.  They need to establish a unit.

15  They have to understand their need.  If they want to keep

16  this population segregated from everyone else, they need to

17  open a ten or 20 bed ICF Unit.

18        I would agree with you that right now Salinas Valley

19  is not the place.  It has the right security level, but I

20  would rather they go -- CMF is being emptied out to fill up

21  Stockton.  They have empty wings.  The warden, as you'll see

22  in his declaration -- they didn't bring him here to testify

23  so the only testimony in the record here is Jeanne

24  Woodford's -- that CMF has a higher security than

25  San Quentin, it has an electric fence, there is no reason

1666

1    they can't set up a wing for the condemned.

2          Number one.

3          THE COURT:  You've got to staff it.  I mean --

4          MR. BIEN:  They already have -- they are emptying it

5    out to go to Stockton.  They just have to keep some of the

6    staff there.  I'm not saying they're going to snap their

7    fingers, but it could be done in a couple of months.

8          That's number one.

9          Number two, the doctor that you were referring to,

10   Dr. Carter from CMF in the APP, the one who testified about

11   his great knowledge of condemned row and the patients,

12   presumably he has skills, he's operating on a 1-to-15 ratio

13   in a well operating unit.  The problem is the restrictions.

14         There is a single document.  Again, the only

15   testimony about that document in this trial was Jeanne

16   Woodford and Pablo Stewart -- Well, Dr. Carter obviously

17   addressed it.  He didn't say whether it was right or wrong,

18   he just said this is what he operates under.

19         He thinks these people are the most dangerous people

20   in the world.  He knows that because of what they're

21   sentenced to.  And of course they handle, you know, Pelican

22   Bay gang leaders and multi-murderers and LWOPs.  Each one

23   comes into the APP and is individually evaluated for risk,

24   both by custody and by mental health.

25         We do not have any problem with the APP other than

1667

1    this custody restriction, and I think it needs to be removed.

2    And that would deal with one problem that's plaguing

3    San Quentin.  These doctors legitimately don't want to send

4    their patients to this place.

5            THE COURT:  Let's talk about that for a moment,

6    Mr. Bien.

7            I assume, although I don't have any recollection of

8    the testimony to this effect, that the remarkable

9    restrictions that are being imposed are custody driven rather

10    than medically driven.

11           As I say, I don't believe there is any evidence to

12    that effect, but it seems clear from the nature of the

13    restrictions, people shouting "Dead Man Walking" and other

14    things that you wouldn't believe in the 21st Century, that

15    all feels like custody.

16           If I have to make a decision that says that's custody

17    driven, the first thing that a Court of Appeals is going to

18    say is:  Where is the evidence for that?

19           And the evidence for that is simply my 20 years of

20    experience in prison litigation, which is enough for me, but

21    I'm not at all sure it is enough for the Court of Appeals.

22           So if I'm going to order that, and if it is ambiguous

23    as to what the source is, whether it is medical or custody,

24    there's a whole serious question about -- I mean, I would not

25    feel comfortable -- well, I might in these circumstances, but

1668

1    generally speaking I would not feel comfortable in ordering

2    the discontinuance of a medically driven set of regulations

3    concerning segregation, concerning locking people in their

4    cells when anybody is walking down the hall, all of that sort

5    of thing.

6         You see what I'm saying?

7         MR. BIEN:  So, Your Honor, there is evidence.  Again,

8    defendants choose not to bring here Ellen Bachman who is the

9    head of the Department of State Hospitals.  They have her

10   declaration, and we introduced the deposition excerpts.

11   That's why I wanted to do that.  Also the warden of

12   San Quentin, and we introduced his deposition excerpts.

13        We also -- again, I'll reargue the point now, we also

14   wanted to introduce the warden of San Quentin who was

15   deposed -- they choose not to bring him here -- because he

16   talked about the fact that at San Quentin they don't have

17   these restrictions.  They allow people -- but you heard other

18   testimony about that.

19        THE COURT:  I'm not worried about that.

20        MR. BIEN:  Okay.

21        THE COURT:  It's the other side of it.

22        MR. BIEN:  So --

23        THE COURT:  I see what you are saying.  If they

24   didn't do it in San Quentin, then it can't be a medical

25   judgment, it's got to be a custody judgment, and I can rest

1669

1  assured that what I'm dealing with are orders that might

2  reasonably be subject to court order.

3        MR. BIEN:  For example, the warden of CMF testified

4  that he called the warden of San Quentin to see if it was

5  okay to have death row patients in groups with each other.

6        And the warden of -- I think the warden of

7  San Quentin said that that's what they did there.

8        And anyway --

9        THE COURT:  No.  Please don't tell me about stuff I

10  don't have any evidence on.

11        MR. BIEN:  The point is that we think the evidence

12  shows it is a custodial policy.  It is reflected in an

13  agreement between DSH and CDCR for that unit.  And Ellen

14  Bachman, who runs the DSH program, says it is up to the

15  warden.

16        THE COURT:  All right.  That's important to know.

17        MR. BIEN:  Okay.  We think, again, that the evidence

18  shows it is possible to open an ICF Unit in one of these

19  places.  We think CMF is probably the best location.  But,

20  again, that is something that's up to defendants' discretion,

21  I assume.

22        If they want to open a unit at San Quentin, and they

23  can demonstrate they can do it, that's for them.  But, you

24  know, I think the evidence unfortunately is that San Quentin,

25  at this moment, may not have room to open this.

1670

1      THE COURT:  There's another problem, which I've tried

2  to explore with the chief there, but all he could say was

3  "we're planning."

4      I mean, it is not unimportant that these ten beds in

5  the OHU, whether licensed or not, they are providing medical

6  care they otherwise wouldn't be able to provide.  But those

7  ten beds are really dedicated to physical medicine, and

8  they're being used by medical care solely at the discretion

9  of -- or the -- I used the word largesse, and that is really

10  the case, the good relationship between the Receiver and the

11  Special Master.

12      But there are, as we all know, I suppose it is not of

13  record, but we all know that there is significant pressure on

14  Judge Henderson to recapture those beds and then what?

15      MR. BIEN:  Right.

16      THE COURT:  So I mean there's --

17      MR. BIEN:  And they're full.  They're full.  There is

18  no evidence here of how they came up with the ten.  I think

19  it was a convenience.

20      THE COURT:  Ten fingers.

21      MR. BIEN:  Exactly.

22      Your Honor, there was also an assertion here by

23  Dr. Monthei that plaintiffs' counsel, the Special Master and

24  Receiver, all approved of this ten bed unit.  That is not

25  true, and the 25th Report is evidence of what happened.

1671

1    The last official report on the subject is we met in

2  December of 2012 with Dr. Monthei and high officials and the

3  Special Master Team.  At that point they were only providing

4  treatment in East Block.  There is no place.  We were begging

5  them to do something.

6    What we wanted them to do was open an ICF Unit.  They

7  said, well, maybe they can get ten beds, and they were

8  supposed to come back with a plan in January -- their final

9  plan with approval.

10    On January 7th, 2013, you know what happened.  And we

11  have never heard anything further from defendants, nor has

12  the Special Master.  So there has never been a plan for this

13  program.  We haven't been back, the Special Master hasn't

14  been back.

15    THE COURT:  Look -- look, I hear from my Special

16  Master once every four days that something was in the works,

17  and it all terminated because of the unjustified -- I'm

18  sorry, Miss Vorous, but that's exactly how I feel -- motion

19  to terminate.  And everything stopped.  Nobody would do

20  anything because it was all going to go away.

21    And then, as everybody knows, the litigation on the

22  termination turned quite personal and unpleasant.  And I

23  don't know that we've ever recovered fully from that.

24    But I'm not sure that that matters all that much.  I

25  mean, the why is beside the point at this stage.

1672

1    MR. BIEN:  We have evaluated -- the only evaluation

2  of this program, from an outside perspective, is Dr. Stewart.

3    He went there in February of 2013.  It was open.  And

4  then he reviewed records in August of all the patients that

5  defendants identified as being in that program.  And he

6  testified about the course of their treatment over time.

7    His opinion was that these patients, some of them had

8  some slight improvements, some of them had declines, but all

9  of them really needed a higher level of care than what they

10  were in.  They were in this ad hoc, bizarre place, which we

11  think is dangerous.

12    I'm not taking anything away from the San Quentin

13  staff trying.  They have a terrible task, Your Honor.  They

14  have no access to a real APP.  They have no access to ICF

15  level of care.  They really don't have an EOP program there.

16    You are made EOP, and you're left in your cell in

17  East Block.  There is no EOP where you get supervision and

18  rounding.  It is just a category.

19    The other thing we discovered, and it was as shocking

20  to me as maybe it was to you here, is that by a magic waving

21  of the wand, East Block and North Segregation, some of the

22  harshest segregation units in California, scary places, have

23  become general population units.

24    And the more I looked at the evidence, Your Honor,

25  and the more I listened to these witnesses, the more I

1673

1    realized the implications of that are startling.

2         First of all, all the funding for mental health care

3    and custody services for the mentally ill is driven by

4    whether you're in general population or whether you're in

5    administrative segregation.

6         All of the funding.

7         There is no funding for rounding by custody or by

8    Psych-Techs.

9         In the administrative segregation unit, every single

10   person, caseload or not caseload, every single person is

11   rounded every single day, seven days a week, by a Psych-Tech.

12   Every single person, Your Honor.

13        They're not doing that because it is general

14   population.

15        In the administrative segregation unit custody is

16   required to round every 30 minutes.

17        THE COURT:  Where do I have evidence of that?

18        MR. BIEN:  It's in the Program Guide and the

19   administrative segregation sections of the Program Guide.

20        The implications, for example, are that if you are a

21   CCCMS patient, and you are in an Ad. Seg. Unit, you have to

22   see your case manager once a week.

23        By calling these units general population units, they

24   have to see their case manager once every 90 days, once a

25   week to once every 90 days.

1674

1    We realized, Your Honor, at trial in this case, in

2    1993 in your opinion, but since then, in developing the

3    Program Guides, if you look at the administrative segregation

4    section, it has a whole series of requirements -- this is

5    defendants' plan to address the constitutional violations --

6    a whole series of requirements for Ad. Seg.  None of these

7    are being applied, as far as we can tell, in East Block and

8    North Seg.

9    You asked one of the witness, I think it might have

10   been Dr. Burton, what is it we can do for the people who are

11   not mentally ill on death row to reduce suicide.

12   He said something about socialization and activities

13   and maybe they have a purpose.  Now, all those are wonderful,

14   but there is something much more direct we could do.

15   We could tell defendants that -- what I said is if I

16   called my dog a cat, he could still be a dog.  East Block is

17   a segregation unit.  No matter what they call it, it is a

18   segregation unit.

19   If they merely required San Quentin mental health and

20   custody staff to treat East Block like the segregation unit

21   it is, tremendous numbers of lives would be saved.

22   We talked about -- one of the other things we're

23   asking for, Your Honor, is a comprehensive evaluation --

24   mental health evaluation screening of the population of death

25   row.

1675

1    The evidence in the record from Dr. Stewart, from

2    Miss Woodford, is that custody and mental health staff are

3    tolerating a high degree of dysfunction in this population.

4    You just get used to it.  You see the same person every day.

5    They gradually change, but they really haven't come out of

6    their cell for months.  They don't shower very often.  They

7    refuse a lot of meals.

8    She reviewed the 114-As, these documents that are

9    kept that keep track of what is happening with these men, and

10   she was shocked.

11   Some of these men, and apparently maybe a lot of

12   them, have never been evaluated for mental illness because

13   this is not a segregation unit, believe it or not.

14   Under Chapter 7 of the Program Guides, when you come

15   into a segregation unit, there is a screening -- a formal

16   screening.  Another one is done within 72 hours.

17   And usually outside of death row people come in and

18   out all the time.  They're screened many, many times in the

19   course of their CDCR lives.  They move around.  Each time

20   they get a screening.

21   On death row, some of these men have been in the same

22   location for years, decades.  They have not been screened.

23   And Your Honor, a screening is not -- there is

24   nothing wrong with what Dr. Monthei did and what

25   Dr. Wadsworth testified to today, walking around, walking

1676

1    down the tier, handling out pamphlets, checking in with

2    people.  That's great.  It is very commendable that they did

3    that around the election.

4         That is not a comprehensive screening for suicidality

5    and for mental illness.

6         We have a protocol for that, an agreed-to-protocol.

7    There is a form.  It has to be done in a confidential

8    location.  You sit down and ask a series of questions.  If

9    the person scores a certain way, you have a more

10   comprehensive evaluation.

11        And that's how you can find people who may have

12   developmental illness or may have slipped through the cracks.

13   They haven't done that.  It should be done.  And we think it

14   should be done on a regular basis.

15        THE COURT:  One of -- and I don't mean this

16   disrespectfully.  What we have are psychiatrists who

17   apparently their major function, at least in both San Quentin

18   and in Salinas Valley, is their primary function is medical

19   pharmaceutical.  And treatment and so forth, it appears to

20   me, has become essentially the province of the psychologist.

21   That may be how it is done in the outside world as well.

22        You know, I've forgotten why I started to say this.

23   Something you said invited me to.

24        I'm sorry.  It has gotten away from me.

25        Go ahead.

1677

1    MR. BIEN:  I was talking about the need for a

2  screening or evaluation.  And I wanted to point out that

3  Miss Woodford testified in her declaration about a suicide of

4  a non-Coleman Class Member, BBBB, in North Seg in August

5  2010.

6    This is at paragraph 62 of her declaration, which is

7  a Exhibit 1002.

8    According to the CDCR Suicide Report the prisoner had

9  no contact with mental health since 1990.  Nothing.

10    In addition, rigor mortis had set in reflecting a

11  failure in custodial security checks on the unit.  The

12  suicide report of his death is Exhibit 1077.

13    Here we have a screening problem and a custody

14  rounding problem.  If they rounded normally, Your Honor,

15  there wouldn't be rigor mortis.

16    Prisoner CCCC was another non-Coleman Class Member

17  who committed suicide on December 17, 2011.  The suicide

18  report is Exhibit 1079.

19    THE COURT:  May I interrupt?

20    We're about to have the same conversation I had with

21  some of my colleagues on the three judge court.

22    I don't have authority, and I'm certainly not seeking

23  it, to cure every problem that exists in the prisons.  My

24  responsibility is to Coleman Class Members.

25    Now, to the extent that Coleman Class Members are not

1678

1    being identified by virtue of failure to screen, assuming

2    that's the case, that is something that is within my

3    province.

4         The fact that non -- the great tragedy that

5    non-Coleman people are committing suicide, you know, that's

6    the warden's problem.

7         MR. BIEN:  We would contend that in each of these

8    cases, if you read the suicide report, there is evidence of

9    missed mental health problems.  I think that's why Your Honor

10   has ordered suicide prevention measures, especially in

11   dangerous units.

12        I agree that, you know, there is going to be some

13   people who commit suicide that we can't do everything about,

14   and some of them have no mental illness.  But we have -- we

15   can do better on rounding and on emergency response.

16        Prisoner CCCC was called a non-Coleman Class Member.

17   The suicide report is 1079.  The defendants' own suicide

18   report said that he had a history of mental illness and a

19   suicide attempt in county jail, but he was not placed in the

20   Coleman Class upon arrival at San Quentin in 1999.

21        Then he had no contact with mental health staff from

22   1999 to 2006.  From December 2006 to 2009 his only contact

23   was when they walked around after his suicide.

24        In other words, another thing they do, which, again,

25   is commendable, is when someone commits suicide on death row,

1679

1    they walk around and see if people are doing okay.

2              That is not a mental health evaluation, Your Honor.

3              He died on the fifth tier of East Block and was

4    found, again, with rigor mortis, indicating, according to the

5    CDCR Death Review, that he had been dead for several hours.

6    Custody checks on the fifth tier and supposed to be done

7    hourly, but were not done.  And they referred the custody

8    officers for discipline.

9              Dr. Stewart and many of the witnesses have testified

10   about the unfortunate suicide of WWW earlier this spring.  He

11   was not referred for inpatient psychiatric care.  Perhaps

12   because of the restrictions and Dr. Carter, or perhaps

13   because of what sounds to me like some doctors are having, in

14   my mind, and I would argue, Your Honor, an incorrect view of

15   the law of involuntary hospitalization and medication.

16             I want to remind this court that you found in 2005 --

17   I'm sorry -- 1995 -- we've been doing this a long time --

18   that it was an Eighth Amendment violation for defendants not

19   to initiate involuntary medication for patients who needed

20   it.

21             In other words, it's not just the rights -- the civil

22   rights that we've been hearing so much about today of the

23   patients that refuse, they have an Eighth Amendment right to

24   receive treatment.  And we think -- I think the balance is a

25   little bit out of whack.  From what we've been hearing from

1680

1    several doctors, it needs to be looked at.

2         But I also think that the APP, their experience with

3    Department of State Hospitals For Condemned, led them to the

4    decision, you know, not to refer.

5         And I understand that.  Why would you send your

6    patients into a segregation unit in Vacaville, you know.  So

7    that balance led to WWW maybe being left there.

8         But he also wasn't sent to MHCB.  And they made him

9    EOP, and he stayed there right next to the tier.

10        THE COURT:  The great tragedy that is epitomized by

11   WWW, it seems to me, really has a great deal to do with the

12   doctor's perception of what is happening.

13        I find Dr. Burton a credible witness.  I don't agree

14   with everything that he said obviously.  And, you know, part

15   of it is, you know, people come to identify with their own

16   institutions and my concentration camp is better than yours.

17        But, you know, he said -- when he said it, it seemed

18   to me to make sense, which is that they had been very

19   successful in dealing with WWW's psychopathology, and they

20   had arrived at a place where he could start dealing with the

21   reality instead of his internal demons.

22        And when he looked at his reality, which was I'm

23   going to spend the rest of my life in this awful place, you

24   know, that's not worth living, and he killed himself.

25        I mean, it's a horrific tragedy, but I credit

1681

1  Dr. Burton's testimony that it wasn't the result of a failure

2  in the medical -- in the psychiatric treatment.

3         And I bet money -- I mean this is a terrible thing to

4  say, but I bet money he got better treatment from Dr. Burton

5  than he would have gotten if they had sent him off to CDC or

6  whatever.

7         MR. BIEN:  To APP.  He may have.

8         It is not fair to either the doctors or patients on

9  death row that these tools, available to every other patient

10  in the system, and clinicians, are taken away from them.

11        Dr. Burton wanted to make him EOP and nothing

12  happened.  Nothing happens.  He stays in the same cell next

13  to his brother, who he thinks is the prophet, on a tier in

14  East Block, at the end of a tier.  There is no increased

15  supervision.  He gets seen slightly more often, but not very

16  much more often.  And he's not moved to a unit.

17        You asked, isn't there a place where he can be

18  supervised and rounded?  Yes.  Those are called EOP Units.

19  They don't have that on death row.  They need to have one of

20  those on death row.

21        And this idea that there is a difference between

22  Grade A and Grade B, that's a custody classification.  It

23  just means you have slightly more privileges or slightly less

24  privileges.  You're all in segregation.

25        THE COURT:  It is not so much slight.

1682

1    MR. BIEN:  I'm not saying it is not significant to

2    those people, but you need an EOP Unit where people can get

3    EOP level of care.

4         So they don't have EOP, they don't have APP, and they

5    don't have CMF.  And these doctors are winging it.  And

6    they're winging it without resources.  The evidence in the

7    record is that their resources were cut.  They have fewer

8    resources now than they had two years ago.

9         Dr. Monthei said:  Oh, now we've got everything we

10   need.  He said that to me last year, two years ago, three

11   years ago, four years ago.  It simply was not true.

12        At the same time he was saying that to us in our

13   meetings -- I understand he's a company man -- he was getting

14   shafted by headquarters.

15        It's not credible that he has resources that he

16   needs.  Plus we've discovered this fallacy in his funding.

17   They don't have the funding for Ad. Seg.  All of those death

18   row men are in Ad. Seg.  And if they acknowledged that,

19   automatically, under the ratios that are under the Program

20   Guide, under their own regulations and staffing ratios, under

21   the union contracts, if they said this was all Ad. Seg.,

22   suddenly the staffing would have to go up, or at least it

23   would be obvious what was missing.

24        I don't know if that would be enough, but it would be

25   a start.

1683

1        And I think it's not fair to the staff to make them

2    do what they are doing, but it's certainly dangerous and

3    unconstitutional for these men to be subjected to what they

4    are being subjected to.

5        In terms of Dr. Monthei's credibility, Your Honor, he

6    said there is no Coleman Class Members above the third tier

7    of East Block.

8        The evidence is to the contrary.  The most recent

9    suicide on death row just happened two, three weeks ago

10    during this trial.  Prisoner FFFF, he's CCCMS.  And when he

11    died, he was on the third tier of East Block, but the records

12    show he had been recently moved from the fifth tier.  In June

13    he was on the fifth tier, June of 2013.  That's Exhibit 1139,

14    pages 208 and page 88.

15        In addition, Exhibit 1031, the Coleman Report of Ad.

16    Seg. Stays Over 60 Days, shows 16 class members housed in

17    what's called EY4 or 5 or EB4 or 5.  And that refers to the

18    fourth or fifth tier of East Block on the bay or yard side.

19        That was the report.  The last one we had was from

20    December of 2011.  And you remember, Your Honor, they stopped

21    reporting that information that month.

22        Dr. Monthei didn't know why, and maybe he doesn't

23    know why, but that was the time that pressure was being

24    brought to bear on San Quentin about these issues.  That's

25    when he had just started the program.  That's when we're

1684

1    having meetings about San Quentin Death Row and suddenly this

2    information disappeared.

3            But the fact is, he's wrong.  They house Coleman

4    Class Members above the fourth or fifth tier.  Now, either he

5    doesn't know what is going on -- there is disorganization.  I

6    think it is a very crowded unit.  He may intend not to house

7    them above the fourth or fifth tier, but he does.  And that

8    is dangerous.

9            Miss Woodford testified that emergency response up

10   there is hard.  It is hot.  It violates the heat order, Your

11   Honor.  That's what is going on there.

12           Under the existing rounding that they are doing --

13   Your Honor, remember we talked with Dr. Monthei about that.

14   This is where it came out these are general population units.

15   They do more rounding for Grade B prisoners than they do for

16   Grade A prisoners.  Grade Bs are the ones who have gotten

17   into some trouble.

18           The five suicides that have occurred in the last two

19   years have all been Grade A prisoners.  I mean, I'm just

20   pointing out that that distinction isn't necessarily helping

21   at all.  We need to round everyone, and we need to provide

22   services to everyone.

23           Since San Quentin instituted the Specialized Care

24   Program in November 2010, the rate of suicides on death row

25   has continued at an extraordinarily high level.

1685

1    The Special Master has found that each death row

2 suicide in that period that he reviewed -- he didn't get to

3 review the last couple -- was preventable.

4    Miss Vorous correctly noted in her opening statement

5 that none of the recent suicides have been participants in

6 the Specialized Care for the Condemned Program.  But that's

7 precisely the point.

8    We too, Judge Karlton, along with the Special Master,

9 have tried in vain to determine who is part of this program.

10 They don't have any list.  There is nothing in the file that

11 says they're a member of this program.

12    The only people they have identified is they gave us

13 six or seven names at one point.  They now have ten people in

14 the beds.  They claim some of the EOPs in East Block are in

15 the program, but not all of them.

16    There is no criteria.  You asked what the criteria

17 was of several witness and you were told, "We take the most

18 ill."

19    What does that mean?

20    There is no list.  There are no standards.

21    We request that the court order the Special Master to

22 investigate and report on the ten bed OHU program at

23 San Quentin.  Again, we think it is a sensitive issue between

24 the Plata Receiver and Special Master.

25    Also, we're not saying close it down overnight.  I

1686

1  think that would be very dangerous.  I think we need to

2  understand who is there and why they are there and whether it

3  is safe.

4        THE COURT:  Mr. Bien, I have been thinking during the

5  course of this trial, and it may be incorrect, and that's why

6  I'm raising it with you, sometimes you're better off not

7  knowing because if you know, it winds up that you got to do

8  bad things.

9        The OHU, not licensed, which I simply don't

10  understand, and apparently are providing services which

11  Dr. Burton was very firm in saying that we're going to

12  continue to do them even if they aren't licensed, I mean

13  that's a decent human response to a tragedy.

14        And, you know, I have a great fear -- I mean, now I'm

15  going to have to do something because all of this has been

16  brought to my attention, and all of this was brought to my

17  attention because of the termination motion.

18        You know, here we are.

19        It seems to me -- well, I've just said the truth is

20  now I've got to do something.

21        All right.  I'm sorry.  I started to interrupt you.

22  I don't have anything to say really.

23        MR. BIEN:  Your Honor, the evidence is that the State

24  would rather not face up to death row, but it exists.  And

25  we're collectively responsible for, at least, the mental

1687

 1    health care for these men.

 2         The Governor decided to cancel the project to

 3    rebuild.  That's his right, I guess.  But they don't even

 4    report information about death row on their reports.  They've

 5    eliminated a lot of information from the Coleman reports.

 6         This is a special population.  I think everyone has

 7    acknowledged that these men are in a unique circumstance.

 8    But they're actually in more need of care, not less need.

 9         They have special needs beyond the average, but

10    they're not even getting the basic minimum Coleman standards

11    that we've agreed to for everyone else.  They're getting far,

12    far less.  We've proven that here, Your Honor, and we need to

13    address that.

14         The contention by Dr. Monthei -- I'm sure he believes

15    it in his heart -- that they're getting better care than any

16    ICF, is simply untrue.

17         He doesn't know anything about ICF.  He testified to

18    that in his deposition.  He didn't design or fund an ICF

19    Program.  The Special Master found they needed higher levels

20    of care than what he's giving.

21         And I want to point out what a real ICF Program is.

22    I know this court has heard testimony about Salinas Valley.

23    I want to reassure the court that not all the ICF programs

24    are being operated like that.

25         CMF ICFs are still operating at a high level.  The

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1688

1    evidence of that is Exhibit 1167.  That's the reason I did

2    that exhibit with Dr. Carter.

3         I contrasted his care and the care of that program

4    for a CDCR prisoner, high security, who is not condemned with

5    the care of the condemned.

6         And this prisoner, JJJJ, received care in both the

7    APP and ICF Program.  Dr. Carter thought this patient, when

8    he got a bit better, could benefit from the ICF Program.

9         Not an option for the condemned.

10        This patient got groups.

11        Not an option for condemned.

12        He went through their step program where he gradually

13   socialized and improved.

14        Not an option.

15        I want to point out on the fourth page of the

16   exhibit, page 67, shows that he was scheduled in May of 2013,

17   just a couple of months ago, JJJJ, was scheduled for 123.9

18   hours of therapeutic activities in the month.  That is 30

19   hours of care a week.  That's kind of what we've been telling

20   you is the real ICF standard.

21        It does exist.  It is a real level of care.  It is

22   not make believe.  And we need it for this population too.

23        There was testimony about the conflict with local

24   custody at San Quentin about care for the condemned.

25   Dr. Monthei -- Exhibit 1008 was Dr. Monthei's complaint about

1689

1    custody requiring his patients to have ducats and being

2    punished for not showing up.

3            You remember that, Your Honor?

4            He said it was resolved in two weeks, that problem.

5            The evidence shows it was not resolved in two weeks,

6    because if you look at the document itself, it wasn't.

7            But it raises larger issues.  If relations are so

8    wonderful between mental health and custody at San Quentin,

9    why did Dr. Monthei write to Sacramento Headquarters to get

10   the problem addressed?

11           Number two, the issue that was in conflict was

12   Dr. Monthei's plan for what he calls "volunteer open groups."

13   And what they do apparently is go into the unit, and for the

14   people in their Specialized Care Program, I guess, they see

15   who wants to come out to group today.  And it can be

16   different each day, who comes out.  And you can be assigned

17   to a different spot.  And they even said, if there is some

18   cancellations, there are some empty treatment cages, they may

19   ask other people to come in.

20           That is not appropriate group therapy.  Group therapy

21   is something -- maybe that's appropriate for a recreation

22   yard or a yoga yard or something, which is a valuable thing,

23   but group therapy is a place where there is a therapeutic

24   relationship with a clinician, and the people in the group

25   develop a relationship with each other and trust each other.

1690

1    There's testimony in the record and both Dr. Stewart

2  and Dr. Woodford referred to patients who were scared to go

3  to group because they didn't know who was going to be in

4  their group that day.  They're scared to come out.

5    This idea that death row is this wonderful community

6  where everyone is getting along and has these great

7  relationships -- obviously, it's a scary place.  These are

8  serious people.  There is no special needs yard, Your Honor.

9  If you're scared, if you're old, disabled, you have to go to

10 Ad. Seg. to get protection.

11   This is not a safe place.  And you can't have groups

12 where you're going to come out to your group and you don't

13 know who is going to be in the other cages with you.

14   That is not group therapy.  And that was the problem

15 that was identified.  And the Special Master commented on

16 that in his 25th Report.

17   I urge the court, as I know you will, the Special

18 Master's 25th Report contains an extraordinarily thorough,

19 detailed evaluation of this issue, it's the product of

20 several visits, multiple visits over a long period of time,

21 and also includes extensive evaluation of individual patients

22 over time, and I think it's significant evidence that must be

23 considered.

24   I didn't discuss it with the witnesses because it is

25 in evidence, but I think it is, perhaps, the most important

1691

1    thing that you can rely on in terms of what is really going

2    on there.

3         THE COURT:  Let me explore this with you for a

4    moment.

5         As a general matter, the court is not -- I won't say

6    authorized -- it would appear that if there are differences

7    of medical opinion, that's the reality.  But I'm in a

8    different situation.  In this case I'm sort of like a juror.

9    There is a battle of experts, and the jury has got to pick

10   one.

11        Part of what is going on here -- what may be going on

12   here is the Special Master's psychiatric experts are reaching

13   conclusions which are not in accord with the perceptions of

14   the docs at San Quentin.

15        And, you know, I've got to make some judgment about

16   who I'm more likely to give credence to, where there is a

17   really legitimate -- legitimate -- a real conflict in

18   opinion.

19        My guts -- I tell this to Miss Vorous, as well,

20   because I would like to hear from you when we get there, if

21   we get there -- is that if there is no choice beyond that

22   they're both docs, they both have credentials, maybe I'm

23   stuck with well, like everybody, people become identified

24   with their institutions, they reject comments which appears

25   to them to be critical, and thus in weighing the two

1692

1   opinions, if there is a distinction, there is a likelihood I

2   ought to go with the outside experts.

3        But what that does -- and I'm not saying that's not

4   what I'm going to do, to be frank with you -- but what that

5   does is suggest that everybody who is actually treating

6   patients is to be less trusted -- if that's the right word,

7   or right thought -- than people who come in from the outside.

8        And, you know, you don't have any responsibility.

9   You can, you know, express opinions freely because, after

10  all, you know, next week you're gone.

11       MR. BIEN:  Your Honor, I think it comes down to --

12  when we found the Exhibit 1043, the January 2011 Budget

13  Change Proposal, which we would have never seen but for the

14  termination, and that was where Dr. Monthei and Sharon Aungst

15  and others worked on their request for funding.

16       They were dealing with the assumption that we're

17  raising this legal defense.  Their claim is -- I don't

18  understand it at all -- that this Penal Code provision

19  prohibits them from sending people to ICF care.

20       It doesn't say that anywhere.

21       They send them to Corcoran.  They send them to Marin

22  General.  The one thing they can't send them to is ICF.  I

23  don't see that in there.

24       But they were told by whoever, I don't know, the

25  Governor or legal, this is the position.  And they are trying

1693

1    their best to defend that position.

2           But that budget change proposal says that we know

3    that there are patients that need ICF care.  We've done a

4    study over the last five years and 20 percent of them have

5    committed suicide.  That's what it says.

6           If I have just this one document, I win a deliberate

7    indifference case.  They know they need this level of care.

8           In the last five years the people who meet Coleman

9    standards for ICF care, 20 percent have killed themselves.

10   That's what they say in this document.

11          THE COURT:  What is exhibit number of that document?

12          MR. BIEN:  1043.

13          Then they ask not for an ICF level of care, they

14   actually say that we can do it cheap, we know now to fool the

15   Special Master and plaintiffs.

16          And guess what, they did.

17          I mean, they negotiated with us.  We went along.  Oh,

18   you're going to fix San Quentin.  We don't need to transfer

19   them.  We're going to set something up there.  We may not

20   call it ICF, but it will be just as good.

21          And they're telling each other we're going to do it

22   on the cheap because they don't really care about these human

23   beings.

24          That's really all I have to say.

25          THE COURT:  I'm sorry.  The one thing that I am

1694

1    convinced about after hearing the docs at San Quentin, as

2    contrasted with some other docs that we heard in this case,

3    is these are dedicated people.

4          MR. BIEN:  I agree with that.  I didn't mean to imply

5    that the doctors aren't doing their jobs.

6          The system has taken away these levels of care.  They

7    don't have those tools to use, and they're put in this

8    position.  And they are doing the best they can.  And they're

9    good employees trying to justify what they are doing, and

10   they may even believe that they are doing the best they can,

11   but they're told no APP care, no ICF care, no EOP care, no

12   funding for Ad. Seg.

13         It is not fair to them, and it is not fair to the

14   patients.

15         THE COURT:  Miss Vorous, I don't think there is any

16   point in starting when there is only ten minutes left.  I'll

17   take you tomorrow morning at 9:30.

18         Stand in recess.

19         (Off the record at 4:20 p.m.)

20                          ---o0o---

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5


6            I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10                   IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                            /s/ MICHELLE L. BABBITT
                             MICHELLE L. BABBITT CSR #6357
10                           Official Court Reporter
                             United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25