```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                            ---O0O---

 4        BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

 5

 6   RALPH COLEMAN, et al.,

 7          Plaintiffs,

 8   Vs.                            CASE NO. CIV. S-90-0520 LKK

 9   EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12   _____/

13

14

15                            ---o0o---

16

17                      REPORTER'S TRANSCRIPT

18                   RE:  EVIDENTIARY HEARING

19                  FRIDAY, NOVEMBER 1ST, 2013

20

21                            ---o0o---

22

23

24
     Reported by:  MICHELLE L. BABBITT, CSR. No. 6357
25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
```

```
 1                           APPEARANCES

 2                           ---o0o---

 3    FOR THE PLAINTIFFS:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5           SAN FRANCISCO, CALIFORNIA  94104

 6           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7           BY:  JANE KAHN, ATTONEY AT LAW

 8

 9

10    FOR THE DEFENDANTS:

11            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
12            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
13
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
14
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
15

16

17                           ---o0o---

18

19

20

21

22

23

24

25
```

1                    PROCEEDINGS INDEX

2                       ---o0o---

3

4     PROCEEDINGS:                              PAGE

5

6         Closing Argument by Ms. Vorous       1697

7         Final Closing by Mr. Bien            1733

8

9

10

11

12

13

14

15                      ---o0o---

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1695

```
 1                        SACRAMENTO, CALIFORNIA
 2                 FRIDAY, NOVEMBER 1ST, 2013 - 9:30 A.M.
 3                             ---o0o---
 4            THE CLERK:  Please, remain seated.
 5            Court is now in session.
 6            THE COURT:  Miss Vorous.
 7            MR. BIEN:  Your Honor, can I just -- before we begin,
 8    I wanted to bring to the court's attention that the
 9    videotapes that were made public yesterday, unfortunately, at
10    least one of them that was -- that's now been posted, was not
11    redacted appropriately, and inmate names are out.  This was
12    Inmate A.
13            We've given defendants four references on the tapes
14    that were not audio audited.  All the correctional officers'
15    names are gone, but the inmate name is not.
16            We'd ask the court to reseal the tape that's been
17    made public.  I've called both news media.  They're
18    considering editing themselves.  But this is not done
19    properly, Your Honor, and we'd like them to start -- try
20    again on the public tape.
21            THE COURT:  The problem is the tapes are out.  People
22    have apparently --
23            MR. BIEN:  They're out.
24            THE COURT:  People have read them.  I don't know how
25    they got them, but they got copies of them, which is
```

1696

1   perfectly proper.  I mean, they're documents.

2          I don't know that there is anything we can do that

3   makes any sense at this point.

4          Sir?

5          MR. RUSSELL:  Your Honor, we are willing to take back

6   the redacted disk and have CDCR look at it again.

7          THE COURT:  To be candid with you, I don't know that

8   it makes any sense to put everybody to that work, but I

9   suppose we could to prevent future inappropriate distribution

10  of the unredacted one.

11         All right.  The court will order that A be returned.

12  That's number one.

13         Number two, what is it?

14         MR. RUSSELL:  Your Honor, I suggest -- it is all on a

15  single disk.  I suggest we take back the disk and go through

16  all six of them again.

17         THE COURT:  All right.

18         MR. BIEN:  Your Honor, I have personally spoken with

19  the two outlets that I know, the two reporters.  The

20  Sacramento Bee and LA Times did pick it up last night.  I've

21  asked them, and they both are considering editing.  So I've

22  done everything I can.

23         THE COURT:  Terrific.  Thank you.

24         MR. BIEN:  Thanks.

25         THE COURT:  Miss Vorous.

1697

1    MS. VOROUS:  Thank you, Your Honor.

2    Your Honor, Plaintiffs told the court yesterday that

3    the system has taken away the tools for San Quentin to

4    provide appropriate care to the condemned population.  These

5    tools being, one, an Intermediate Care Facility Program, two,

6    an Acute Program, and three, an Enhanced Outpatient Program.

7    Were this to be true, it would be of great concern, but it is

8    not.

9    First and foremost, plaintiffs' request for

10   affirmative relief related to the ten OHU beds assumes that

11   there is a requirement for an ICF Program for the condemned.

12   The term "Intermediate Care Facility" or "ICF level

13   of care" appears to be a product of the Program Guide.  When

14   Dr. Stewart was asked whether an ICF level of care as defined

15   in the Program Guide was unique to California, he testified

16   that he didn't know enough about all the programs in other

17   states to answer the question accurately, and was only able

18   to identify two states where condemned inmates have access to

19   a full range of mental health services.

20   No one disputes that the State does not offer a

21   Department of State Hospital run ICF Program for the

22   condemned population.  This is not new, and Miss Woodford

23   admitted this was the case when she was warden at San Quentin

24   and also as the undersecretary of the department, yet did not

25   seek to create a separate program at DSH for the acute

1698

1   population.

2           THE COURT:  I must confess, I don't want to interrupt

3   you, I am completely -- well, I suppose when I read the

4   text -- the report, I can get a more accurate picture.

5           But my understanding -- I'm asking you not telling

6   you, I really mean it -- is that the DSH takes, as far as

7   condemned are concerned, takes only so-called "acute"

8   conditioned patients.

9           Is that right or wrong?

10          MS. VOROUS:  That is accurate, Your Honor.  As far as

11  I know, there never has been a program.

12          THE COURT:  Okay.  So now the question is, does the

13  State provide -- Let me change that.

14          The Program Guide contemplate levels of care, and the

15  acute being the most -- those who are in most trouble.  The

16  Mental Health Crisis Beds being, as I understand it, people

17  who are having a crisis, but it's not contemplated that it is

18  of such a severity that it requires DSH -- I want you to stop

19  me whenever I'm wrong because I'm just -- and below that

20  there are two levels contemplated by the Program Guide.  One

21  is CCCMS.

22          MS. VOROUS:  Yes.

23          THE COURT:  And the other is Intermediate Care.

24  Those are the four levels contemplated by the Program

25  Guide.

1699

1    MS. VOROUS:  Well, there is the Enhanced Outpatient

2    Program which is above the CCCMS level of care.

3    THE COURT:  I'm sorry.  I didn't hear you.

4    MS. VOROUS:  There's the Enhanced Outpatient Program,

5    which is above the CCCMS level of care.

6    THE COURT:  Right.

7    MS. VOROUS:  In the Program Guide there's specific

8    reference to a treatment program for the condemned at that

9    level of care.

10    So I wasn't involved in the discussions around the

11    2006 Program Guide, but on its face it does appear there was

12    consideration taken to provide a separate program for the

13    condemned at the EOP level of care.

14    THE COURT:  Okay.

15    MS. VOROUS:  But beyond that, it is -- there is no

16    specific reference that the Department of State Hospitals

17    operate an ICF Program for the condemned.

18    THE COURT:  I understand that.

19    I suppose what I'm asking you -- I don't want to

20    interrupt, but I'm really finding difficulty in understanding

21    how all these categories interrelate, if at all.

22    The EOP Program addresses people who are quite

23    seriously ill.  The CCCMS is the least -- while all mentally

24    ill, are the persons who are least impaired by their mental

25    condition.

1700

1       I think we all agree to that?

2           MS. VOROUS:  Yes, Your Honor.

3           THE COURT:  And the question is, when we say you've

4    got to have care for the EOPs, it is distinct from the care

5    accorded to CCCMS patients or those who require crisis beds.

6           I gather that the plaintiffs are simply calling that

7    ICF, Intermediate -- I don't know what it stands for.

8           MS. VOROUS:  Intermediate Care Facility.

9           THE COURT:  ICF.  That's right.  Okay.

10          And whether we name it that, whether we give it that

11   name or some other name, it is the specialized care required

12   for persons who are suffering at the EOP level.

13          MS. VOROUS:  Yes, Your Honor.  I think that's exactly

14   my point, is the question before the court is whether or not

15   prison officials are providing, you know, adequate care to

16   the condemned inmates regardless of the label.

17          THE COURT:  Okay.

18          MS. VOROUS:  Under the Eighth Amendment, prison

19   officials must provide ready access to adequate mental health

20   care by either staff physicians or outside physicians or

21   facilities.

22          Again, as I just stated differently, what that means

23   is that defendants are required to provide care that meets

24   their needs regardless of how one might label that level of

25   care.

1701

1    By comparison, plaintiffs must prove evidence of an

2    current and ongoing constitutional violations in order to

3    receive affirmative relief under the Prison Litigation Reform

4    Act.  They have not.

5    Plaintiffs also appear to believe that in order to

6    provide appropriate mental health care in the ten outpatient

7    housing unit beds they must be licensed.  But as this court

8    certainly knows, defendants have successfully operated Mental

9    Health Crisis Beds and Intermediate Care Programs in

10   unlicensed facilities.

11   In fact, the most recent example is at Vacaville

12   where the parties agreed and the court approved activating

13   110 unlicensed that are labeled ICF beds in the L-Wing.

14   THE COURT:  But the issue is, as I understand it,

15   ma'am, yes, you can operate an unlicensed facility as long as

16   it doesn't provide certain levels of care, but when you reach

17   certain levels of care, like prescribing the medication that

18   begins with a C, that can only be done in connection with a

19   licensed facility apparently.  And that's being done,

20   apparently, in the ten bed OHU.

21   MS. VOROUS:  Your Honor, we would disagree.

22   The ten beds are in an outpatient housing unit.

23   They're not considered inpatient.

24   When you're looking at providing care that would

25   normally fall under Title 22, whether that's in a Mental

1702

1    Health Crisis Bed Unit, or in a facility that provides

2    intermediate or acute care, as an inpatient facility, then

3    that's true, the parties are bound by the Title 22 licensing

4    requirements, but those requirements do not apply to an

5    outpatient facility.

6         THE COURT:  But you can't call it an outpatient

7    facility when the doctor says that, no, we intend these for

8    people who are going to be remaining six months to, I think

9    he said, 24 months.

10        I mean, you can't just -- to quote Mr. Bien, you

11   can't call a cat a dog and make it a dog.

12        If people are in the facility, and are going to be

13   there for an extended period of time for treatment, at some

14   point you have to say -- you can call it an outpatient

15   treatment facility if you choose, but the reality is it's

16   providing long-term care and dispensing medications which are

17   only, I gather under the licensing provisions, permitted with

18   a license.

19        I mean, this is not -- I don't mean this

20   disrespectfully.  This is not a word game.  It is a question

21   of what -- I think that this is right.  It may be that you

22   can call a dog a cat, and by virtue of that make him a cat,

23   but that seems just highly unlikely.

24        MS. VOROUS:  Well, Your Honor, we can -- we'll

25   address this further in our written briefing.  I'm not aware

1703

1   of any policy or law or regulation that would prohibit the

2   State from offering the type of services and the treatment

3   modalities they are offering in this facility.

4        THE COURT:  Well, see, either that's so or it is not

5   so.  If you're right, that is one set of realities.  If

6   you're wrong, it is another.

7        Mr. Bien used as an example, the prescription of --

8   Mr. Bien, what's the --

9        MR. BIEN:  Clozaril.

10       THE COURT:  Clozaril.  And says that under some

11  licensing provision that can only be done with a license.

12       MS. VOROUS:  Your Honor, that is not accurate.  I

13  don't know whether that was what Mr. Bien said or not.  There

14  is a policy that was put in place by CDCR to address the

15  initiation of Clozaril within CDCR facilities.

16       Previously, Clozaril was initiated by the Department

17  of State Hospitals in their facilities in order to address

18  the waitlist issues.  The parties agreed that CDCR clinicians

19  had, you know, the competence to initiate Clozaril within

20  their facilities.

21       It's true that the policy itself does state that

22  Clozaril should be initiated in a Mental Health Crisis Bed.

23  In this case it was initiated in the Outpatient Housing Unit,

24  but not -- that was in November of 2012, it was prior to the

25  initiation of these ten designated beds.

1704

1      But I think -- the question is there's no requirement

2   under the law that it has to be initiated in a Mental Health

3   Crisis Bed.  It is true that in this situation the clinicians

4   who initiated the Clozaril for mental health reasons, for

5   clinical reasons with respect to this particular patient,

6   made a decision to initiate it.  And I believe Dr. Burton

7   testified that it was the door right next to the Mental

8   Health Crisis Bed Unit.  But that's not a legal

9   requirement.

10          THE COURT:  That's irrelevant.

11          MS. VOROUS:  It is irrelevant.

12          THE COURT:  Something is or isn't required.  And as

13   best I can tell, the statute or the regulations will govern.

14   And if the regulations prohibit some conduct, you have two

15   choices.  You can comply with the regulations or amend the

16   regulations, but you can't just say, well, we've got these --

17   would it not seem to you remarkable that you could have a

18   regulation that says you can't do X and then proceed to do X?

19          I mean, that can't be.  Well, I mean, it can.

20   Anything is possible.  But it's unlikely that is proper or

21   lawful.

22          But your point, setting aside individual treatment

23   modalities which may have taken place in the past, is that

24   given the fact that this is an outpatient facility --

25   although I must tell you, I'm really anxious to understand

1705

1    why it is called an outpatient facility given the doctors'

2    testimony of what the doctors expect the facility to be used

3    for -- I mean, other than calling it an outpatient -- I'm

4    sorry.  I don't want to interrupt your argument.  This stuff

5    is crucial.

6         Other than calling it an outpatient facility, what

7    makes it an outpatient facility?

8         MS. VOROUS:  Well, Your Honor, I'm not an expert on

9    Title 22 requirements, but my understanding is that Title 22

10   does address licensed correctional treatment centers which

11   include the programs that we've been talking about.

12        And there are certain things within Title 22 that are

13   required in order to operate a licensed inpatient program.

14   And some of those are physical design, some of them are

15   staffing.  There is other things.  But there is nothing, at

16   least that I'm aware of, that states that in an unlicensed

17   facility the State cannot offer a certain level of care.

18        THE COURT:  Again, I'm just -- what you are saying, I

19   think now, which I -- maybe I'm wrong, but it appears to me

20   different than what you started out saying, which is it

21   doesn't matter whether it is an outpatient or inpatient

22   facility.  As long as we're not -- as long as we're not

23   providing services requiring a license under 22, we're

24   perfectly free to proceed, even if we're keeping people six

25   years to six months to two years.

1706

1     Is that what you are saying, ma'am?

2         MS. VOROUS:  No, Your Honor.

3         THE COURT:  Sorry.

4         MS. VOROUS:  Certainly defendants have looked at

5    this, and, you know, they've considered whether or not

6    there's any, you know, regulations or other laws that would,

7    you know, prohibit them from offering the services.

8         I think all I'm saying is that you can't just -- that

9    under Title 22 there are certain requirements in order to

10   license a unit, and you have to meet all of these

11   requirements.

12        I'm not -- I don't know whether or not the ten beds

13   meet all of the physical requirements and other things that

14   are required under Title 22, but I don't that the law

15   necessarily should be read to say that if you don't meet all

16   the requirements, you still can't provide a certain level of

17   care.

18        THE COURT:  I think that we're putting the horse

19   before the cart, but I may be wrong.

20        Title 22 requires, as I understand it -- Mr. Bien can

21   tell me later that he doesn't agree because he gets to

22   respond -- but Title 22 says if you're going to do certain

23   things, provide certain services to mentally ill patients,

24   you got to have a license.

25        Mr. Bien made a big to-do -- I thought appropriately,

1707

1    maybe I'm wrong -- about the fact that the OHU is not

2    licensed.  And his suggestion was it had to be licensed

3    because you were providing certain services that Title 22

4    requires be administered only in licensed facilities.

5            If that is wrong, of course we're in an entirely

6    different question.  The question is whether sensible people

7    would require a license, and the answer may well be no.

8            But that's different than the question of what either

9    the statute, the regulations or even the practice of doing

10   certain kinds of -- providing certain kinds of services

11   doesn't mandate the license.

12           I think I understand your position.  I'll try it once

13   more.  Tell me again if I've got it wrong.

14           Your position is Title 22 does require certain

15   services to be administered only in licensed facilities.  But

16   this facility, not because it is outpatient or inpatient or

17   anything else, simply doesn't provide those kinds of

18   services?

19           No?

20           You don't agree?

21           MS. VOROUS:  I think, Your Honor, they provide the

22   same type of services, but there's more to Title 22 than

23   simply the type of services.  There's certain requirements

24   that relate to physical plant.  There's requirements that

25   relate to things that go beyond the core mental health

1708

1   service.  That's where I think I'm trying to draw the line,

2   and I'm not doing it very well.

3        I apologize.

4        THE COURT:  I understand that Title 22, if you have

5   to comply, requires a variety of other facilities.  But the

6   question is, when does the licensing provision kick in?

7        Does it kick in just because you say -- does it not

8   kick in just because you call it an outpatient facility, or

9   is there substance to the regulation?

10       I suppose at this point further effort is not going

11  to get us anywhere.  I'm just going to have to read Title 22

12  and try to make sense out of it.

13       Hopefully Mr. Bien will give me his version, and in

14  any event, I think I understand what you are saying.

15       I think you just -- but to be frank with you, I think

16  you got it backwards.

17       You are saying, look, you have to have certain space

18  of facilities, what have you, but that is only because it's a

19  facility governed by Title 22, and what we've got to do is

20  figure out when that happens.

21       Okay.  I understand your position.

22       Go ahead.

23       MS. VOROUS:  Your Honor, we'll address that in the

24  written brief as well.

25       Again, putting aside, if we can, just the license

1709

 1    issue, the Specialized Care Plan for the Condemned does meet

 2    the inmates' needs.

 3        Dr. Monthei, Chief of Mental Health at San Quentin,

 4    testified to a full compliment of mental health staff,

 5    multi-disciplinary assessments, treatment, modalities,

 6    availability of 24-hour nursing care, and dayroom and

 7    supervised yard access for these patients in the ten OHU

 8    beds.

 9        Dr. Monthei, who is familiar with what the Program

10    Guide outlines for ICF care, did testify, as the court

11    acknowledged, that the Specialized Care Plan meets, and in

12    some cases, exceeds the level of services that are outlined

13    in the Program Guide for intermediate care facility care.

14        Dr. Burton, a board-certified --

15        THE COURT:  You know, that raises the next question.

16    I'm sorry to keep interrupting you.

17        MS. VOROUS:  That's fine.

18        THE COURT:  These are all kinds of very difficult

19    problems.

20        I don't remember whether it was Dr. Monthei or

21    whether it was Dr. Burton, or maybe both, simply denied the

22    existence of a waiting list.  And the reason for that was, if

23    we had a waiting list, we'd have all kinds of problems so we

24    don't have a waiting list.  And we've only got one person

25    ready to go into the bed and that's because -- into the OHU

1710

1    and that's because one guy's going out.

2         But that doesn't make a waiting list.

3         A waiting list is defined, I should imagine -- and if

4    it isn't, I'm defining it -- as persons who are in need of

5    the kind of care that is being provided in the OHU, but who

6    can't get those services in the OHU because there is only ten

7    beds.

8         Now, nobody, as best I can tell -- and maybe I'm

9    wrong about this, and this is another issue we're going to

10   have to look at the transcript fairly carefully for -- I

11   don't believe -- asking you, not telling you -- I don't

12   believe that anybody has testified there aren't such people

13   presently in East Block.

14        Maybe I'm wrong.  Do you know, and if not, that's

15   perfectly okay.

16        MS. VOROUS:  My recollection of Dr. Burton's

17   testimony was that he did testify that there was no one in

18   East Block, other than the gentleman that was identified,

19   that needed the services that were offered.

20        THE COURT:  Okay.  Maybe that's what he said.

21        All right.

22        MS. VOROUS:  Your Honor, just to address that issue a

23   little bit more, when you look at the number of inmates that

24   are in the Condemned Program at the Enhanced Outpatient

25   Program or EOP level of care, I believe Dr. Monthei or

1711

1  Dr. Burton testified as of this week it was 35.

2          And when you look at the number of EOP inmates, that

3  being 35, you compare it to the number of beds they set aside

4  for this population needing the type of services that are

5  offered, it does make sense to select ten beds.

6          I'm not sure how best to address that, but it was

7  something that was discussed prior to the dedication.  The

8  doctors have indicated that, you know, given their patient

9  load, given the knowledge of the type of symptoms that these

10  patients exhibit, and understanding that initially there

11  would be an increase in need for those beds, but then there

12  would take a period of time for the patients to stabilize --

13  that may not be the right term -- but to actually get their

14  arms around it and figure out really what do we need here,

15  they, at this point in time, fully believe that this is going

16  to be the right balance for the number of enhanced patients

17  that are currently in the unit.

18          THE COURT:  Okay.  Your view -- you may be right

19  about the testimony.  I'm anxious to hear what Mr. Bien says.

20  Ultimately, I suppose, I've got to read the testimony myself.

21          Your view is that given the number of EOP patients --

22  persons in the condemned unit, 30, I think it is, crisis beds

23  and ten of these OHU beds will suffice to meet the needs for

24  that population?

25          That's your view?

1712

1    MS. VOROUS:  Yes.

2    THE COURT:  That's your view of the testimony?

3    MS. VOROUS:  Yes.  Combined with the availability of

4    acute services through the Department of State Hospitals.

5    THE COURT:  Okay.  Yes.  All right.

6    MS. VOROUS:  Dr. Burton, a board-certified forensic

7    psychiatrist, who has treated the patients at San Quentin

8    since 2009 and condemned patients since 2011, provided

9    testimony that demonstrates the overwhelming evidence of

10   substantial and astonishing improvements seen in the seven

11   seriously mentally ill inmates receiving services in the ten

12   OHU beds.  And in particular, the seven inmates I'm referring

13   to are the seven inmates that Dr. Stewart had testified to in

14   his testimony.

15   THE COURT:  With all due respect, that testimony cuts

16   both ways.

17   You know, a part of this problem is -- and I

18   expect -- I don't know what Mr. Bien will say -- I find that

19   both Dr. Burton and Dr. Wadsworth are credible witnesses.  I

20   don't credit some of their testimony, but mostly they're

21   people that I feel comfortable with, at least as I sit here

22   now.

23   But you see, you say, "Look, these people were so

24   sick, these seven were so sick that we had to move them into

25   OHU," which itself just raises all kinds of, to me, warning

1713

1    signs, "and they've made remarkable progress."

2         Well, that's just wonderful.  But what it does is

3    raise questions about how many other people are out there who

4    could use these services and can't get them.

5         And I know that -- and this is one of those things

6    where I'm not sure I credit the witnesses.  He or

7    Dr. Wadsworth, I think one or the other said:  No, there's

8    nobody out there who has these needs.

9         It just doesn't sound probable that it just happens

10   that ten beds solves all the problems.  It is difficult to

11   credit.

12        And I don't mean that to say that people are

13   intentionally committing perjury.  Of course not.  But, you

14   know, people -- I've said several times during this hearing,

15   you know, they come to identify with their institutions and

16   want to demonstrate how well they are doing.  And they see --

17   in that context they see what they need to see.

18        Anyway, I'm having this conversation with you because

19   I think you're entitled to know, as is Mr. Bien, my concerns

20   so that you can address them.

21        Go ahead, Miss Vorous.

22        I'm sorry to keep interrupting you, but this is

23   critically important stuff.

24        Go ahead.

25        MS. VOROUS:  Your Honor, I would like to address that

1714

1    as well.

2          One of the other things that has happened over the

3    past couple of years is that there has been an improvement in

4    the services that are provided to the inmates on East Block,

5    and that includes additional services that are provided under

6    the Specialized Care Program.

7          So if you'll recall, when the witnesses were talking

8    about the number of EOP inmates, we had three categories.  We

9    had the ten that are currently in the OHU beds, we had

10   another, I believe it was, 12 or 13 that were receiving

11   additional services in the unit through the Specialized Care

12   Plan, and one at the time that was in the Mental Health

13   Crisis Bed, and the other, I believe, ten were receiving

14   Enhanced Outpatient Program care as required by the Program

15   Guide.

16         So while I understand the court's concern, there also

17   has been substantial testimony presented that the care that

18   is being provided to these patients not only meets, but

19   exceeds Program Guide requires for EOP inmates.  And, in

20   fact, that the inmates that are receiving additional

21   services, you know, are providing appropriate care.

22         In fact --

23         THE COURT:  Wait.  Okay.  Go ahead.

24         MS. VOROUS:  In fact, just too highlight the care

25   that is being provided, as Your Honor will recall, Dr. Burton

1715

1    testified that in his opinion the inmates on East Block were

2    not only receiving appropriate care, but they were receiving

3    care above that required in the community.  In other words,

4    above the community standard.

5         THE COURT:  Of course I'm not sure that makes any

6    difference because you don't have to be a genius to recognize

7    that being in a prison will generate -- it's a very --

8    they're in prison.  And that will, itself, demonstrate the

9    existence of what the doctors called "stressors," which don't

10   exist in the community at large, so that there is fairly

11   reasonable expectation that the sick will be sicker in prison

12   than elsewhere.

13        Nobody said that, but common sense -- of course, I'm

14   not sure how much common sense really helps guide us in these

15   programs -- in these questions.

16        Anyhow, I'm sorry.  I didn't mean to interrupt you.

17        Go ahead.

18        MS. VOROUS:  Dr. Burton also explained the emergent

19   requirement related to involuntary medication orders and

20   demonstrated that in all the cases raised by Dr. Stewart, the

21   staff not only followed the law, but respected the patient's

22   due process rights in deciding whether to seek or not seek

23   involuntary medication orders.

24        Lastly, Dr. Burton, as well as Dr. Monthei, testified

25   how the condemned population differs from the non-condemned

1716

1    population and explained that given their unique situation

2    within the prison system the continuum of care that the State

3    currently has in place to provide long-term treatment within

4    their home and community is not just clinically appropriate,

5    but desirable.

6            THE COURT:  Okay.

7            MS. VOROUS:  Plaintiffs argue that housing the

8    inmates in the ten OHU beds is dangerous.  They argue

9    providing specialized care in an unlicensed unit is illegal

10   and that there are no policies or procedures governing the

11   services.

12           We have already discussed the legal issue, but I

13   think it is worth while to talk a little bit about the

14   assertions that the care is dangerous and that there are no

15   policies or procedures governing the services.

16           With respect to dangerousness, plaintiffs argue that

17   Dr. Stewart's testimony regarding inadequate care associated

18   with the seven inmates receiving services through the

19   Specialized Care Program somehow proves that the State is

20   putting those inmates in danger by not sending them to an

21   inpatient hospital setting at the Department of State

22   Hospitals -- excuse me -- operated by the Department of State

23   Hospitals.

24           But Dr. Stewart's testimony is entitled to little

25   weight with respect to these issues for several reasons.

1717

1    One, he has not treated patients in over 15 years, he has

2    very limited experience in treating incarcerated individuals

3    and has never treated condemned patients.

4          He had extremely limited contact with the inmates on

5    death row and completed only a cursory record review of those

6    inmates' files.

7          He apparently has a misunderstanding of the current

8    requirements for involuntary medication orders under Penal

9    Code Section 2602.  And his opinions appeared primarily to be

10   based on GAF scores, G-A-F, rather than detailed written

11   descriptions of the patient's program and a patient's

12   progress in the Specialized Care Plan.

13         Dr. Stewart also visited the ten OHU beds when they

14   first opened and had very limited knowledge of the services

15   offered to the inmates in those beds.

16         In his May 16th, 2013, declaration, Dr. Stewart

17   testified that what is required for those seven class members

18   at San Quentin is the breadth and treatment programs that are

19   available in an ICF Program level -- in an ICF level of care

20   as outlined in the Program Guide.

21         Dr. Stewart's trial testimony, as well as

22   Dr. Monthei's and Dr. Burton's testimony, does establish, as

23   we've already discussed, that the breadth of programs that

24   are currently available in the beds are the same as those

25   available in a standard ICF DSH Program.

1718

1    Plaintiffs also argue that the program is
2    understaffed and improperly resourced and that staff are not
3    properly trained.
4    The plaintiffs' evidence consists of three
5    headquarter-generated reports relating to staffing, one that
6    is from February 2011 that reflects high staffing levels
7    prior to realignment, a second from March 2012 that reflects
8    the decrease in staff due to ongoing realignment, and a third
9    from January 2013 that reflects an overall decrease in staff
10   but increase in clinical staff.
11   As explained by Dr. Monthei, he was able to restore
12   positions affected by realignment and gain additional staff
13   to support the new Specialized Care Program.
14   What is surprisingly absent from the evidence that
15   plaintiffs offered is a submission of any recent staffing
16   reports that would, in fact, identify the current staffing
17   levels at San Quentin.
18   Regardless, Dr. Monthei has testified that current
19   staffing is sufficient to provide the mental health care to
20   meet the inmates' needs in East Block, as well as the entire
21   condemned program.
22   As far as training, there can be no question that the
23   mental health staff at San Quentin are highly trained,
24   competent and dedicated professionals.
25   With respect to plaintiffs' argument that there are

1719

1    no policies and procedures governing the services in the ten

2    Outpatient Housing Unit beds, that is incorrect.

3         Dr. Monthei testified to the detailed plan for the

4    ten beds that San Quentin put in place after meetings with

5    the Special Master and plaintiffs' counsel in early December

6    2012.

7         THE COURT:  But that's precisely -- I mean, that's

8    just being worked out when the termination motion was filed

9    and everything stopped.

10        So, I mean -- Well, all right.  I understand your

11   position.

12        MS. VOROUS:  Yes, Your Honor.  And to address that,

13   the Special Master has -- or did, I should say, reschedule --

14   or schedule another tour at San Quentin that was set for

15   August of this year but has postponed that.

16        THE COURT:  In light all of this.

17        I mean, that's another problem that I wish both of

18   you to address.

19        These situations, as the court understands them,

20   simply aren't static.  They're ongoing.  People are making

21   judgments.  People are quitting.  People are being hired.

22   And the Special Master's efforts are directed towards moving

23   the program along.

24        It seems to me that -- I don't mean this -- I mean,

25   this is the reality.  There is nothing you can do about it.

1720

1    Trials sort of stop the process and say:  This is where we

2    are.  Let's examine this.

3         And the benefit of the Special Master -- I recognize

4    that the defendants may not accept this -- but he's in a

5    position to deal with the ongoing reality and not the court,

6    which is sort of stuck with saying that this snapshot is what

7    is really going on when this snapshot is simply a freeze of a

8    moment.

9         And I'm not sure -- as you know from my order

10   regarding Pleasant Valley, I felt constrained about issuing

11   orders other than telling the Special Master, "Go out, look

12   at what is going on, tell me what needs to be done now,"

13   because that was a recognition of the ongoing nature of

14   providing care.

15        I'm sorry.  I'm thinking about what I'm doing and not

16   letting you talk.  But in some ways -- Go ahead.  I'm sorry.

17   I'm really thinking about my role.

18        It is more difficult than I think either counsel

19   appreciates.  I don't mean that badly.  It just means you're

20   not sitting where I'm sitting.

21        Go ahead.

22        MS. VOROUS:  Yes.  If I can address that just a bit

23   further.

24        Your Honor, the Special Master had scheduled

25   additional prison tours in connection with his 26th Round,

1721

1    and San Quentin was the first prison that was on that

2    schedule.  And that was to take place in August of this year.

3         The Special Master, in consultation with the parties,

4    agreed to postpone that so that he could follow up on

5    repiloting CDCR's quality improvement audit tool at eight

6    institutions, which is currently ongoing, as well as to have

7    his team members go out and evaluate the Department of State

8    Hospitals' programs.

9         The defendants are not, you know -- certainly are not

10   opposed to the Special Master continuing his monitoring of

11   the entire San Quentin program.  In fact, the Special Master

12   has been extremely complimentary over the past several years

13   of their treatment programs.

14        THE COURT:  That is so.  And one of the benefits of

15   not having this kind of hearing, which to be candid, you

16   folks forced by the termination motion, was that I didn't

17   have to issue orders which, you know, define things.

18        Well, never mind.  That's just another set of

19   problems.

20        I know of no way -- and I might as well tell the

21   plaintiffs this -- I don't know whether I don't know, but

22   frequently after one of these hearings my feeling is very

23   much that I've just got to tell the Special Master we've seen

24   these kinds of problems, I'm sure there are others that I'm

25   not aware of, go out and tell me what to do.  You've got the

1722

1    experts and so forth.

2         And I must tell you, Mr. Bien, and I'm certainly not

3    threatening anything, I don't mean that, but there is a

4    reality problem about what I should do which interferes with

5    the ongoing evolution of treatment programs.  And it is a

6    concern I have.

7         You know, you have to know that.

8         Yes, ma'am.  Go ahead.

9         I don't mean to encourage you to keep talking if you

10   have said what you have said.

11        MS. VOROUS:  No.  I do have a few more points, Your

12   Honor.

13        Just to follow up on the court's comments in terms of

14   what the Special Master would find, I do think in this case,

15   based on the testimony, that what he will find is a very good

16   program that is being offered not just to the inmates that

17   are in the ten OHU beds, but to all the inmates that are

18   currently housed in East Block.

19        Plaintiffs also raise an issue before the court, the

20   acute program at Vacaville, and have indicated that the

21   system has taken away acute care for the condemned.

22        Again, they rely on Dr. Stewart for this claim, but

23   the Dr. Stewart's testimony with respect to the acute program

24   is conflicting.

25        On the one hand, he is critical of San Quentin

1723

1  clinicians for failing to refer condemned inmates and other

2  inmates to the acute program, but then, on the other, he

3  indicates that the care that is provided to them once they

4  are at the program is inadequate.

5       You know, Dr. Stewart, however, did not review any of

6  the mental health records or treatment records for condemned

7  inmates that had recently been at the acute program at

8  Vacaville.

9       In other words, his opinion appears to be based

10  solely on the fact that condemned inmates, while in the acute

11  program at Vacaville, cannot participate in group therapy.

12       THE COURT:  Well, it is a lot more than that.

13       Some of the testimony is very difficult for the court

14  to understand.

15       As I indicated to you earlier -- I don't know whether

16  I indicated it to you earlier.  I take it back.

17       Some of it sounds Medieval.  The notion that you

18  are -- that the only time a life prisoner can be moved

19  everybody else must be locked up and there is some custody

20  person shouting "Dead Man Walking" ought to stun ordinary

21  people.

22       And I will be frank with you, it was stunning.

23       MS. VOROUS:  Your Honor, I can't comment on that.  I

24  have no idea where that information came from or, you know,

25  who heard that information.

1724

1    THE COURT:  Nobody disagreed that's what happened --
2   that's what happens.  It just raises -- I mean, it is part of
3   plaintiffs' problem, which is do you want to really send
4   people to institutions that are behaving that way?

5    I am assuming that's a custody -- I can't imagine
6   that it is a medical judgment.  It has got to be a custody
7   judgment.  Aside from what it suggests about the relationship
8   between custody and medical, I mean, it's certainly, I will
9   be frank with you, it is very concerning to the court about
10  ordering people to institutions that are behaving that way.

11   I suppose the answer that Mr. Bien will give me when
12  he responds is:  That's right, Judge.  That's why you've got
13  to order them to change.

14   MS. VOROUS:  Your Honor --

15   THE COURT:  Go ahead.

16   MS. VOROUS:  Like I said, it's difficult for me to
17  respond to testimony that that comment was made.

18   THE COURT:  Apparently that's the way it is done.  I
19  mean, the testimony before the court indicates that's the way
20  it is being done.  There is no testimony that's not being
21  done today.

22   All right.

23   MS. VOROUS:  With respect to the custodial
24  restrictions that are in place at Vacaville, defendants have
25  provided declarations from the wardens at San Quentin,

1725

1  California Medical Facility and Salinas Valley Psychiatric

2  Program that explain the importance of the restrictions.

3          And Warden Chappell from San Quentin further

4  testified that condemned inmates in East Block are subject to

5  the same escorting restrictions as those inmates in the acute

6  program at Vacaville.

7          But I think the question before the court is whether

8  or not, aside from those restrictions, the inmates that are

9  in those programs are receiving appropriate care.

10         THE COURT:  But Miss Vorous, you could give people

11  the best care in the world, and if you were doing things that

12  clearly contraindicated concern with their mental health

13  well-being, the level of care has got to be viewed in terms

14  of their treatment otherwise -- and whether their treatment

15  otherwise constitutes stressors.

16         Well, yes, you understand what I'm saying?

17         MS. VOROUS:  I do, Your Honor.

18         I think that, as testified by Dr. Carter, as well as

19  by Dr. Burton, the acute program at Vacaville does provide a

20  viable and important resource for the condemned inmates in

21  the continuum of care we've been talking about.

22         You know, Dr. Carter testified to the wide range of

23  services that are provided to the inmates that are in the

24  program and indicated that they're not as isolated as

25  Dr. Stewart suggests.

1726

1          He also testified from a clinical perspective the

2     outcome is the same for condemned as well as non-condemned

3     inmates that are treated in the acute program.

4          Dr. Burton, who discussed Inmate FFF, who was a

5     seriously mentally ill inmate who had repeated admissions to

6     the acute program at Vacaville and also is one of the seven

7     inmates that Dr. Stewart has raised as part of his testimony,

8     has received positive results in the program and was

9     extremely complimentary of the care provided to this

10    particular inmate.

11         Plaintiffs also raise another new issue, and this is

12    the idea that there is no EOP program for the condemned

13    population and that East Block should be treated like an Ad.

14    Seg. Unit.  Also, in addition, that the EOP program lacks

15    supervision and that there are no LPT's, Licensed Psych-Tech

16    rounds.

17         The Program Guide has always recognized that a

18    separate EOP Program exists for condemned inmates in East

19    Block.  We entered into evidence Defendants' Exhibit O which

20    is the cover page to the section in the Program Guide that

21    talks about the housing for condemned inmates at the EOP

22    level of care.

23         In addition, Dr. Monthei testified that the mental

24    health services that are provided to both CCCMS inmates and

25    EOP inmates in East Block meets or exceeds the Program Guide

1727

1    requirements.

2            He also talked about the new treatment and office

3    space that is available to inmates in the -- excuse me --

4    the treatment and office space available to the condemned

5    inmates in the new central health care services building.

6            While it is true that the Program Guide does set

7    forth separate, you call them units, in prisons for EOP

8    patients, and that there are requirements that the State not

9    commingle EOP inmates at the EOP level of care with the CCCMS

10   level of care or general population, those same requirements

11   are not in place with respect to the condemned population.

12           In fact, as Dr. Monthei testified, given this unique

13   population and the fact that this unit has been most of --

14   has been home to these inmates, some of them for many, many,

15   many years, that there are benefits to having inmates at the

16   enhanced outpatient level of care in the same unit and

17   commingling, participating in groups, going to yards with

18   other inmates so that those inmates can either act as mentors

19   or receive, as we call it mentee benefits, from other

20   inmates.

21           Plaintiffs also attempt to argue that San Quentin

22   has, for financial reasons, converted East Block from an

23   Administrative Segregation Unit to a General Population Unit.

24           This, as well, is incorrect.

25           East Block has never been considered an

1728

1   Administrative Segregation Unit.  It has always been a

2   General Population Unit and has been -- and uses the

3   Adjustment Center as the Administrative Segregation Unit.

4           Just like in a prison system, inmates are housed in

5   East Block units.  And in some cases, for behavioral reasons,

6   they may be moved to segregation.  And that would be in the

7   Administrative Segregation Unit.

8           Nonetheless, staff have voluntarily made the decision

9   to mimic the same type of policies and procedures one would

10  find in an Administrative Segregation Unit.

11          You know, although plaintiffs speculated that if this

12  court required San Quentin mental health and custody staff to

13  treat East Block line an Ad. Seg. Unit tremendous lives would

14  be saved, it is just that, it is speculation.

15          Likewise, the statement that the State converted East

16  Block from an Ad. Seg. to GP Unit lacks any support in the

17  record.

18          Nor is there any evidence at all that staffing in

19  East Block is not as high or higher than what would be in an

20  Administrative Segregation Unit.

21          Finally, with respect to this issue, inmates at the

22  Enhanced Outpatient Program level of care that are housed in

23  East Block do receive daily licensed psychiatric tech rounds

24  similar to the Administrative Segregation Unit.

25          It would simply not make sense to treat the inmates

1729

1    who are housed in East Block or in North Segregation as if

2    they were housed in an Administrative Segregation Unit

3    similar to inmates in the normal prison system.  They are

4    not.  They are a different population.  They are in a

5    designated unit based on their crime.

6          For those reasons no further changes to the Program

7    Guide requirement with respect to the outpatient housing --

8    excuse me -- with respect to the EOP housing or treatment for

9    the condemned population are necessary or warranted.

10         Plaintiffs also request that defendants, under the

11   guidance of the Special Master, conduct a sweep of class

12   members on death row and at the EOP level of care or higher

13   to determine whether they need a higher level of care.

14         This request is not only unnecessary, but plaintiffs

15   have presented no credible evidence that class members on

16   death row and at the EOP level of care or higher are being

17   deprived of adequate care to justify such a request.

18         Plaintiffs point to one 114-A referenced by

19   Miss Woodford in her testimony as support for screening.  But

20   Miss Woodford testified that she had not reviewed this

21   particular inmate's mental health records, and for that

22   reason she could not know whether or not this inmate had

23   received mental health treatment during the time that she was

24   questioning.

25         One cannot generalize the quality of care of the

1730

1    entire prison based on one case.

2            Plaintiffs also reference a suicide that occurred in

3    2010, Inmate BBBB referenced as Plaintiffs' Exhibit 1077.

4            This inmate was not a class member.  And even so the

5    suicide report found that the death was proximately related

6    to a final court proceeding commuting his death sentence to

7    life without parole.

8            The second suicide they reference also relates to a

9    non-class member, Inmate CCCC referenced in Exhibit 1079.

10            In this case the report found evidence to suggest

11    that security checks were not being done on time.  As a

12    result, CDCR did change its policies to include welfare

13    checks to ensure the safety of inmates on East Block.

14            Dr. Monthei testified to the extensive screening

15    processes that take place upon a condemned inmate's arrival

16    at San Quentin, the screening that takes place to identify

17    mentally ill inmates, and the training and collaboration that

18    occurs between mental health and custody and the recent

19    mental health reviews of all inmates, not just in East Block,

20    but also in administrative segregation.

21            Plaintiffs attempt to discredit Dr. Monthei by

22    referring to his trial testimony regarding housing in East

23    Block.  Dr. Monthei, at pages 1187 and 88 of the transcript

24    testified that in general inmates at the EOP level of care

25    are housed within the first three tiers and that, quote:

1731

1      (Reading:)

2      We do not house any mental health participants on the

3      fourth or fifth tiers simply by virtue of heat meds

4      and the medical complications associated with not

5      only heat meds for psychiatric reasons, but for

6      medical reasons as well.

7      (Reading concluded.)

8      A June 10th, 2013, psychiatry note that plaintiffs

9   reference in Exhibit 1130, page 88, for Prisoner FFFF, who is

10  a CCCMS who died earlier this month, and is signed by

11  Dr. Burton states, quote:

12      (Reading:)

13      Compliant with Depakote.  D-e-p-a-k-o-t-e.  Denies

14      SE.

15      (Reading interrupted.)

16      I believe this is -- I'm not going to guess what

17  that means actually.

18      But the important part is that the note continues on

19  and states:

20      (Reading continued:)

21      Reports he continues to do well and adjusted to

22      housing changes from 5B to 3Y due to medical

23      prescription heat meds.

24      (Reading concluded.)

25      So in other words, this inmate, who was at the CCCMS

1732

1    level of care, was placed on heat meds and was moved down to

2    the third tier, just as Dr. Monthei testified was the policy

3    in East Block.

4            The accumulation of evidence, as testified to by

5    Dr. Monthei, Dr. Burton, Dr. Carter and Dr. Wadsworth,

6    demonstrate that the continuum of care available to inmates

7    in East Block in particular, and throughout the prison,

8    ranging from the CCCMS level of care, to acute patient

9    admissions, more than satisfies the Eighth Amendment.

10           Plaintiffs have failed to prove that prison and

11   hospital officials are acting with deliberate indifference to

12   condemned inmates' needs by failing to transfer them to the

13   Department of State Hospital for intermediate health care

14   treatment.

15           Thank you, Your Honor.

16           THE COURT:  We'll take our morning recess and have

17   closing after that, Mr. Bien.

18           MR. BIEN:  Thank you, Your Honor.

19           THE COURT:  Fifteen minutes.

20           (Off the record at 10:40 a.m.)

21                           ---o0o---

22

23

24

25

1        **THE COURT:**  Mr. Bien.

2        **MR. BIEN:**  Good morning, Your Honor.

3        THE COURT:  You don't know where to start, is that

4   what you're saying?

5        **MR. BIEN:**  I'll go backwards and start with your more

6   recent thoughts.

7        THE COURT:  Can I direct your attention to at least

8   two things which I think we have to worry about.  The

9   defendants say:  Yes, the OHU is not licensed but it doesn't

10   require to be licensed.

11        Your response is:  Look.  They have at least provided

12   services which, as I understand it, which require a license

13   under Title 22.

14        Is the defendant's answer saying:  Fine.  We'll stop

15   providing those services even if they're needed?

16        **MR. BIEN:**  Can I respond to that?

17        **THE COURT:**  Yeah.  No, I say it for fun.

18        **MR. BIEN:**  First of all, the program guides refer to

19   OHUs, and that's Chapter 12530 of the program guide, and it

20   limits what's provided in an OHU and time limits for OHUs and

21   it talks about what a crisis bed is and actually refers to

22   provisions of Title 22.  Each part of the program guide in

23   this section cites in the MHCB section provisions of

24   Title 22.

25        And I think my point is, first of all, this could be

1    licensed.  It actually is a licensed building where they've

2    suspended the license, number one.

3          There's no -- unlike a lot of things we encounter in

4    this case, there's no actual construction obstacle or other

5    obstacle.

6          Number two, they know it could be licensed.  I

7    introduced evidence of that.  They just made a choice.  What

8    goes with licensing that they don't want to do is it brings

9    on all of this burdensome requirements like 24-hour nursing,

10   other things which are actually spelled out here.

11         Why do I refer to licensing?

12         This court is not here to enforce state law, and I'm

13   not asking you to do that, but it's a set of regulations

14   designed for patient safety and to understand things.  I'm

15   using it as a reference.

16         **THE COURT:**  No, Mr. Bien.  As you know, all through

17   the trial I kept asking myself and just never got around to

18   asking the people who might answer why this licensing is not

19   accomplished, and your answer is very simple:  Judge, if they

20   license, it causes significant increases in dollars, which

21   they don't have.

22         **MR. BIEN:**  Right.  But the other point about that,

23   Your Honor, is that we have a -- the reason I say it's

24   dangerous is not because I think the doctors aren't trying

25   their best to help the patients.  What is dangerous is we

1    have an ad hoc system going on now for the condemned.  Some

2    parts of the program guide they follow; some are excepted.

3    Some levels of care they have access to; others they don't.

4    That element they admit as of three years ago people were

5    just sitting in their cells.  Things have improved and I want

6    to acknowledge that.  They have improved there.

7         It's dangerous because nobody knows the level of care

8    people are at.  We don't know how many people are in need,

9    and there are really two choices.  Either they follow the

10   levels of care and use the system that works for other human

11   beings and then work out exceptions for the unique condemned

12   population or they invent a whole new system that has to be

13   -- which they may want to do.  I think they have a choice

14   there.

15        If they're inventing a whole new system, it's going to

16   have to be evaluated in a whole new way.  I think they're

17   doing a little of this and a little of that.

18        I think Your Honor's point is well taken.  Things have

19   changed since the Special Master was there in December.  They

20   probably changed since Dr. Stewart was there in February.  I

21   don't know and defendants chose not to introduce any written

22   evidence of what their actual current staffing is.

23        They didn't do it.  I introduced the evidence I have.

24   Dr. Monthei made a statement and I heard the statement.  I

25   don't really know what that means and I'm concerned.  I know

1    he tries his best, and I'm not doubting that.

2         This is an environment of limited resources, as we all

3    know and every prison, every public agency is under

4    tremendous pressure, even this federal court, and I'm

5    concerned:  Do they have the appropriate resources to take

6    care of these patients?

7         I also want to address, Your Honor, again, here I'm

8    retracting something that you quoted in the testimony that

9    you think is in -- you might have misheard or taken out of

10   time context.  Jeanne Woodford testified that when she was a

11   warden, which was quite a while ago, a death row patient

12   reported that dead man walking statement was made back to her

13   and then she called the CMF warden at that time which might

14   have been more than ten years ago, and it was corrected.

15        **THE COURT:**  I don't remember that as corrected.  Thank

16   goodness.

17        **MR. BIEN:**  That kind of statement and practice, I

18   don't even think it was intentional then.  That was a custody

19   officer a little bit wrong.  The practice is though everyone

20   is locked up.

21        The very disturbing testimony you heard from Dr.

22   Carter about the APP he is following a written policy that in

23   evidence that everyone agrees is a policy worked out

24   custodially between the warden and DHS.  We think that policy

25   can be adjusted.  We think that CMF clinicians and the warden

1    have the ability to handle these patients in the APP in a far

2    more appropriate manner where they can actually access APP

3    care.

4          What Dr. Burton testified about is the limited utility

5    of the APP for San Quentin psychiatrists.  If someone needs a

6    low stimulation environment, in other words, if they can be

7    treated locked in their cell and just really their medication

8    adjusted, it's okay.

9          As Your Honor knows, the APP is a rich, intensive

10   program with multiple other options.  We think that can be

11   fixed.  Again, we think it's going take some education of CMF

12   and decisions how to change that and certainly the custodial

13   concerns have to be balanced, but we think it has to be more

14   done individualized rather than an absolute rule that

15   everyone from the condemned row has the same rule.

16          As to -- I'm sorry.  Go ahead.

17          **THE COURT:**  You comment on the defendant's assertion

18   that the East Block treatment has been significantly improved

19   by virtue of the specialized care program.

20          **MR. BIEN:**  There certainly is evidence in the record

21   that the specialized care program, the patients who are in

22   it, which is less than all of the other EOPs.  I think that's

23   undisputed.  They take a sub group of the EOPs.  Those people

24   are getting more care than they were getting before.

25          They are still not -- remember Dr. Monthei explained

1    that their either clumped or dyad or -- that they're mixed in

2    with everyone else, which we think defeats one of the major

3    purposes of an EOP program.  We think they should be asked

4    whether they can structure a program where they can have a

5    location in the East Block and may be in a location in the

6    adjustment center where they put EOPs to be observed.

7          These patients are getting more than they were getting

8    before, but they're still not getting anywhere near EOP level

9    of care, these people in East Block.  As far as I can,

10   they're not being offered -- they testified something, but I

11   didn't see records showing that they're getting ten hours a

12   week of real services.

13         Is it improved?

14         Your Honor, it's definitely improved from where it

15   was, when we first raised this issue several years ago.

16   We're three years into this process, Your Honor, and they're

17   barely moving.

18         Again, if termination hadn't happened, we may have

19   progressed and maybe we can get back to that, but I think it

20   needs to be in a far more focused way.  I don't want to

21   interfere with the good work going on there.  I want to make

22   sure that they have the resources that they need.

23         It may be that we need to do something for the --

24   obviously, the condemned are not going to treated just like

25   everyone else.  They're not going to go willy-nilly around

1   the system.  Even Ms. Woodford testified she understands the

2   custodial needs in some cases to have a segregated program

3   for the condemned, so that's why we are advocating for an ICF

4   program that's solely for the condemned, a small unit at the

5   CMF, or if they want to do it somewhere else, somewhere else.

6        But coming back from the APP and ICF and being put

7   into the East Block or the adjustment center, which is what

8   happens now, these are segregation units and that part of the

9   program guide is not being followed.

10       There is no -- I want to point out that there is a

11  special part of the program guide for the condemned.  It only

12  refers to the EOP program.  There's no exception in the ad

13  seg provisions for the condemned.  There's no exception in

14  the CCCMS parts for the condemned.  So we have this situation

15  where perhaps we've all -- we too have not focused enough on

16  this population, and I take responsibility for that too, Your

17  Honor.

18       But they're not -- they're not meeting any of these

19  standards.  So either they invent something completely new,

20  which may be okay, or they explain which parts of these

21  program guides they're going to follow.

22       If they're not going to follow, what are they going to

23  replace that service with?

24       People need to be rounded, as Your Honor pointed out.

25  There needs to be observation.  I think that's simply not

 1    happening.  There's tremendous confusion about condemned.

 2    It's sort of like they're special, they're different and,

 3    therefore, we're going to be ad hoc.

 4         I think what I would recommend is that some of these

 5    things can be done and must be done.  We would request in an

 6    order that says you must remove this blanket restriction and

 7    come up with a new policy in APP, you must develop an ICF

 8    level of care somewhere, and you must address what's going

 9    on, and perhaps what we recommend with the supervision and

10    help of the Special Master.

11         We have demonstrated, we think the record will show,

12    that there needs to be a full mental health evaluation of

13    that population.  We did not ask just for the mental health

14    population.  We asked for everyone to be evaluated.  The

15    evidence is that some of these men have not been evaluated in

16    years, sometimes decades, and that's wrong.

17         I think that there needs to be a look.  They may be

18    perfectly fine, but there needs to be a true mental health

19    evaluation.  That means not going up to the cell to see how

20    they're doing, but a true evaluation that is supposed to be

21    done when you're in ad seg on a screening.

22         **THE COURT:**  This raises the other question which I

23    made myself a mark about, you assert, perhaps not without

24    reason, that the condemned in East Block are, in effect, in a

25    segregated unit, no matter what the defendants call it, but

1    we know that there there's an adjustment center, which is

2    really where they put folks who they perceive to be required

3    either for disciplinary or other reasons to be segregated.

4         So there is some apparent distinction between in East

5    Block or true segregation unit or do you disagree?

6         **MR. BIEN:**  Only with the last assertion.  I think

7    there is more depravation in East Block than -- I'm sorry.

8    There's more depravation in the adjustment center than in

9    East Block.  But as Ms. Woodford pointed out, some of the

10   mentally ill don't have possessions in East Block either.

11        **THE COURT:**  That's the B folks?

12        **MR. BIEN:**  The B folks.  You can be in East Block and

13   be -- don't forget.  It's still -- the basic segregation

14   rules are still in effect in East Block.  You're not -- you

15   don't get out of your cell unless you're pulled out.  You

16   don't go every day even.

17        It's really the same rules as a segregation unit, and

18   under their standards these are segregation units.  Half the

19   documents I showed you show they're segregation units.  They

20   used to show that up until December 2010.  In Coleman they

21   were listed as segregation units.

22        In the rounding audit that we introduced that was

23   attached to Dr. Monthei's declaration, it says we have five

24   lockup units and lists all five:  Carson, Donner, East Block,

25   North Seg and Adjustment Center.

1    So I just think we need to say: Come on, guys. The

2    reason we have a segregation section in the program guide is

3    not because we're being convenient with your classifications.

4    It's because there is a tremendous risk to human beings who

5    are in segregation, and that's what this court found.

6    So, again, the name -- if they want to change the

7    programing in East Block, that's another alternative. If

8    they want to make a true general population unit, that would

9    be another solution, but it has to be some more time out of

10   cell.

11   **THE COURT:** But the defendants take the not

12   unreasonable position, I think -- maybe I'm wrong, but I

13   think it's not unreasonable -- that the condemned are a

14   special group and that by virtue of having been convicted and

15   sentenced to death, requirements exist which you can't just

16   convert East Block into GP because it is different and it

17   addresses a different population.

18   That seems to me to be a perfectly sensible reality.

19   Whether or not because part of the way of addressing that

20   reality is imposition of standards applicable to segregation

21   turns it into a segregation unit, it's not a word play

22   problem. It's a realistic problem.

23   On the one hand, there are reasons; on the other hand,

24   the result is that as a general matter, segregation unit

25   standards apply.

1           **MR. BIEN:**  I think that, Your Honor, your point is

2    well taken and I think that's exactly what I'm saying.  If

3    they're going to say that East Block is different than a

4    normal segregation unit and different than general population

5    unit, then we need to decide which administrative segregation

6    requirements should apply and which shouldn't and why,

7    because these are for Eighth Amendment safety and health

8    considerations.

9           **THE COURT:**  Can I interrupt you?  Can I ask you to

10    come to the microphone for a moment, Ms. Vorous?

11           As I understand what the plaintiff is saying, the

12    plaintiffs recognize that these are specialized groups.

13    They -- I think Mr. Bien recognized that some particularized

14    segregation aspects probably should be required.

15           I think what they are saying, but it's not clear to

16    me, is that that's up to you.  You can do that, but you have

17    to justify -- are you saying justify generally or as to

18    particular persons or what are you saying?

19           **MR. BIEN:**  I'm suggesting that one way through this

20    maze might be to say:  Let's look at these three housing

21    units, Adjustment Center and East Block and North Seg, and

22    decide what they are.

23           And if you're inventing a new category, they're not

24    really general population.  If they're saying they're not

25    really segregation, let's pick which standards should apply,

1    both from the mental health side and the custody side and

2    then maybe we can solve it that way.

3            **THE COURT:**  This is the kind of thing that in the past

4    the Special Master would have addressed, gotten you guys

5    together and addressed, try to work out a satisfactory

6    solution to both sides.

7            Is there something in the present system which you

8    believe does not require at least negotiation about what

9    you're doing?

10           **MS. VOROUS:**  Well, I think the defendant's position is

11   that the state with respect to the condemned population is

12   following the program guide.  They're following what is

13   already in place with respect to treatment policies and

14   procedures.

15           They have elected, as you've heard testimony, to go

16   beyond what they believe is required in East Block as a

17   general population unit.  They do the daily round distinction

18   for the enhanced outpatient program.  They have 30-minute

19   custody checks.  They have voluntarily adopted those things.

20           There has not been, from defendant's perspective, any

21   evidence that this difference in classification, whether its

22   general population or administrative segregation, has

23   impacted the quality of their mental healthcare.  So the

24   request that additional policies be developed or other

25   actions be taken, to me, I believe is necessary.

1          I'm not saying that the state wouldn't cooperate in

2     working through that, we just don't believe it's necessary.

3          THE COURT:  Thank you, ma'am.

4          The state takes the position, whatever we call it,

5     they're getting essentially the kind of treatment that is

6     required if it was a segregation unit.

7          I take it you don't agree with that?

8          **MR. BIEN:**  I think they're getting more than zero.  I

9     think they're doing twice a month rounding when there's no

10     rounding required.  Again, they've sort of acknowledged they

11     need more than what a true general population unit would

12     need.

13          **THE COURT:**  Everybody agrees that this is a

14     specialized group.  And that by virtue of that, some

15     adjustments must be made, although the state, apparently,

16     takes the position that the adjustments that we have made are

17     sufficient.

18          Your argument is it doesn't reach requisites for a

19     segregation unit, and the state says you're attributing to

20     their status, segregation status, because certain custody

21     requisites are being applied, but that's because of who they

22     are.

23          **MR. BIEN:**  Right.  I can point out, Your Honor, as I

24     did yesterday, the difference in mental health care is

25     astronomical between the word "segregation" and not under the

1    program guides.  So for the CCCMS, it's weekly contact with

2    the case manager versus every 90 days.  That's a tremendous

3    increase in contacts that's required.  There was testimony

4    that they do more than the minimum.

5            By the way, with all due respect to the doctors, each

6    one of the doctors said, "We have all the resources we need.

7    We don't need anything else.  All the policies are perfect

8    and everything is great, Your Honor.  We've got everything

9    under control."

10           I think you just need to -- but we think that -- I

11   guess what we're suggesting is that we need to look at these

12   places and we have to knowledge that these are different,

13   This is a different population, and maybe there needs to be,

14   just like there are some modifications, there's going to have

15   to be some modifications for the ICF program.

16           They're not going to integrate them with other

17   inmates.  Ms. Woodford said that they could be, but if they

18   choose custodially not to integrate them, they need to have a

19   separate unit.  I think how we deal with East Block, I think

20   that -- I think it's a segregation unit.  And they can call

21   it everything they want, but we have to look at it to protect

22   the lives of these people.

23           Segregation is the highest risk location for suicide

24   and we have that epidemic going on there.  I think that we

25   have to face up to the reality this is a condemned

1    population.  They are at an even higher risk than other

2    population and they need some changes in the existing

3    policies and procedures.

4         Again, we would say that the kinds of things that

5    we've suggested are doable.  They will save lives.  There is

6    movement and I think that is positive.  There has been some

7    movement by defendants on this population, but there is still

8    the obstacle of access to inpatient care.

9         I just point out that the provision that Ms. Vorous

10   referred to that has a special EOP section for the condemned

11   specifically says on page 12421 that EOP shall have access to

12   DMH inpatient level of care.  There's no exception for

13   inpatient care.  That was ever included in the program guide.

14        One other thing about Title 22, which you started out

15   with.  The way the regulatory scheme works, as I understand,

16   a psychiatrist provides medication and therapy in his office

17   also.  You don't equate programs by whether there's

18   medication or therapy.

19        For mental health, you look at the level of care and

20   some indicia.  And when patients are at an acuity level or an

21   illness level that requires things like 24-hour nursing,

22   long-term housing, as Your Honor pointed out, or crisis kind

23   of care, like involuntary medication or restraints, things

24   like that, that's what licensing looks to to say:  Hey, wait

25   a second, guys.  That's what we have a higher level of care

1    for.

2          It's like any doctor's licensed to perform brain

3    surgery, but you're not supposed to do it in your office.  I

4    think the way these different levels of care have meaning.

5          We've cooperated, Your Honor, with waiving licensing

6    standards several times in this case and Ms. Vorous pointed

7    to that.  Each time I know you must take a breath.  I take a

8    deep breath.  We're waiving a whole set of standards and

9    regulations and rules that have a purpose.  They're not just

10   silly.

11         That's all I'm saying about this program.  They might

12   be doing a great job, but I'm nervous when we're avoiding

13   this whole set of standards and when their own internal

14   person responsible for that building and the licensing says:

15   Hold on -- this was in January 13th -- hold on.  What are we

16   doing here?

17         So, again, I'm not saying close it down, but I think

18   we need to look at that issue seriously, obviously, with the

19   input of the Receiver and the Special Master and figure out:

20   What is going on?  Is it safe?

21         I'll suspect we'll find there's some patients that

22   should be transferred to a higher level of care.  There are

23   some patients that are probably there, and maybe we need to

24   have some rules that allows them to do this.  This violates

25   the OHU standards.

1          Maybe we need to say to the condemned:  You can do

2     this here, even though it's different.  But I think we have a

3     system that we've worked out and I think using the system in

4     the program guide would says license the ICF there if they

5     want to.

6          If that's what they choose to do, even if they're

7     overcrowded, and they can prove the can do it, they can move

8     some other population out of San Quentin.  Maybe they don't

9     want to have the transportation.  Those are their choices,

10    Your Honor.  They run the prison system, but it would

11    certainly be less expensive to provide the care at San

12    Quentin.

13         THE COURT:  Thank you, sir.

14         I'm smiling because the comments about doing things

15    less -- you may retire, Mr. Bien -- less expensively and more

16    efficiently invades every question that we have about the

17    prison litigation.  Some time I ought to record the telephone

18    calls I have with my two colleagues in the Three Judge Court

19    because it will sound so much like what we're doing here.

20         The matter will stand submitted.

21         I will tell you, I think this is a difficult problem.

22    I think I'll leave it there.  I'll say something else.  This

23    problem, like the Pleasant Valley problem, like the excess of

24    force problem, in each of these contexts, there has been a

25    significant improvement.

1          I recognize that when we are in a litigation mode,

2    those improvements aren't really determinative because the

3    question is:  What is left?  But I do want to just take the

4    opportunity to acknowledge, even if it hasn't come through my

5    opinions, because it's not relevant, great improvement is

6    significant.  It just doesn't mean that you've solved the

7    problem.

8          These are very intractable problems, and every once in

9    awhile, I muse about the fact that we've been 20 years and

10   we're still struggling with issues, that in some sense I

11   really can't understand why we can't solve, but that's in my

12   more optimistic mood.  Part of the problem is these are very

13   difficult, intractable problems.

14         I want to thank both sides for their useful

15   contributions, and I will do the best that I can.  I won't

16   take it under submission until you file your written briefs,

17   which I now think is two weeks from today?

18         **MS. VOROUS:**  Yes, Your Honor.

19         **MR. BIEN:**  Yes, Your Honor.

20         THE COURT:  Thank you, folks.  Stand in recess.

21         **MS. VOROUS:**  Just off the record can we discuss

22   scheduling?

23         THE COURT:  Yes.  Off the record.

24                        (Whereupon, proceedings concluded at

25                        11:31 a.m.

1                          REPORTER'S CERTIFICATE

2                              ---o0o---

3

   STATE OF CALIFORNIA    )
4  COUNTY OF SACRAMENTO   )

5

6
            I certify that the foregoing is a correct transcript
7
   from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.
11

12

13     /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
14         Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25