1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15                          ---oOo---

16

17                    REPORTER'S TRANSCRIPT

18                 RE:  EVIDENTIARY HEARING

19                TUESDAY, NOVEMBER 5TH, 2013

20

21                          ---oOo---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                        APPEARANCES

 2                        ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  LORI RIFKIN, ATTORNEY AT LAW

 9            BY:  JANE KAHN, ATTORNEY AT LAW

10
              K&L GATES LLP
11            4 EMBARCADERO CENTER, SUITE 1200
              SAN FRANCISCO, CALIFORNIA  94111
12
              BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW
13
              BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW
14
              BY:  JON MICHAELSON, ATTORNEY At LAW
15
              BY:  RANJINI ACHARYA, ATTORNEY AT LAW
16

17

18    FOR THE DEFENDANTS:

19             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
20             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
21
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
22
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
23

24

25                        ---o0o---
```

1                        EXAMINATION INDEX

2                            ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6      STEVE MARTIN

7        Direct Examination by Mr. McKinney         1752
         Cross-Examination by Mr. Bornstein         1848
8

9

10

11

12

13                           ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        EXHIBIT INDEX

2                          ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
5

6      33a              Inmate Q Records           1800

7      33b              Inmate Q Records           1800

8      33c              Inmate Q Records           1800

9

10

11

12

13

14                         ---o0o---

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2                         ---o0o---

 3

 4    DEFENDANTS'
      EXHIBIT NO            DESCRIPTION                EVD
 5

 6     K               Martin Audit Observations      1776

 7     AA              Martin CV                      1755

 8     AE              Incident Report                1831

 9     AF              Incident Report                1832

10     AG              Incident Report                1833

11     AH              Incident Report                1792

12     AI              Incident Report                1834

13     AJ              Incident Report                1836

14     AL              Incident Report                1835

15

16

17                         ---o0o---

18

19

20

21

22

23

24

25
```

                                                              1751
1                    SACRAMENTO, CALIFORNIA

2            TUESDAY, NOVEMBER 5TH, 2013 - 10:30 A.M.

3                        ---o0o---

4            THE CLERK:  All rise.

5            Court is now in session.

6            The Honorable Lawrence K. Karlton presiding.

7            THE COURT:  Please, be seated everyone.

8            Call the case.

9            THE CLERK:  Calling Civil Case S-90-520, Coleman,

10   et al., v. Brown, et al.

11           THE COURT:  Yes, sir.

12           Call your next witness, sir.

13           MR. BORNSTEIN:  I didn't know if you wanted us to

14   make our appearances or not.

15           THE COURT:  Oh, no.  If I did that, then all of you

16   folks would have to state your appearance.

17           MR. MCKINNEY:  Good morning, Your Honor.

18           Defendants call Steve Martin.

19           THE COURT:  Mr. Martin, come around and be sworn.

20           THE CLERK:  Raise your right hand.

21                        STEVE MARTIN,

22   was thereupon called as a witness herein by the Defendant,

23   and having been sworn to tell the truth, the whole truth and

24   nothing but the truth, was thereupon examined and testified

25   as follows:

1752

1        THE CLERK:  Please, take a seat.

2        State your name, spell your last name, and speak

3   directly into the microphone.

4        THE WITNESS:  My name is Steve Martin, M-a-r-t-i-n.

5                      DIRECT EXAMINATION

6   BY MR. MCKINNEY:

7   Q.      Good morning, Mr. Martin.

8   A.      Good morning.

9   Q.      Could you please briefly describe your background for

10  the court?

11  A.      I began my work in corrections in 1972 as a

12  correctional officer for the Texas prison system.  I worked

13  at a maximum security facility and also worked at the single

14  facility at the time for female felons.

15       I left service to complete my master's degree in

16  correctional administration.  Did so, and thereafter received

17  appointment as a U.S. Probation and Parole Officer.  Worked

18  in the Southern District of Texas, McAllen.  Transferred to

19  Tulsa where I went to law school while working as a U.S.

20  Probation Officer.

21       Completed my law degree.  Went to -- last year of law

22  school worked in the Tulsa County DA's Office defending the

23  sheriff and his jail administrators.

24       Left that position.  Returned to the Texas prison

25  system in the Legal Counsel's office.  Became General Counsel

1753

1   to the Texas prison system and board, Chief of Staff to the

2   Director.  Held those positions and left in the mid-1980s.

3         Worked as a Special Assistant Attorney General to the

4   Chief of the Enforcement Division of the Texas Attorney

5   General's Office that defended the state prison system in

6   litigation.

7         Contemporaneous with that, I was on the adjunct

8   faculty of the University of Texas School of Law and

9   co-taught a course in institutional reform litigation.

10        Left that position after I also co-authored a book on

11  the Texas prison litigation while on the faculty.

12        Left that position, went into private practice.

13  Stayed in that firm for almost precisely one year and left to

14  create a solo practice.

15        That initially was a law practice, but evolved into

16  purely correctional consulting work that I have done since

17  1987.

18        I've worked in a variety of positions in these 30

19  years as a plaintiff's expert and defendant's expert.

20        I've worked for approximately 15 years for the U.S.

21  Department of Justice, Civil Rights Division, Special

22  Litigation Section, conducting CRIPA investigations and also

23  monitoring CRIPA cases.

24  Q.    Mr. Martin, you are currently still in your

25  correctional administration consulting practice?

1754

1    A.        I am.

2    Q.        You have been retained by the State in this case to

3    consult on issues with respect to use of force; is that

4    correct?

5    A.        That's correct.

6    Q.        And also with respect to the inmate disciplinary

7    process?

8    A.        That's correct.

9              THE COURT:  May I ask you, sir, to pull that

10   microphone in front of you.

11             I think that's one of the problems we're having.

12             (Microphone adjusted.)

13             Okay.  There you go.

14   BY MR. MCKINNEY:

15   Q.        Let's talk about your training and experience.  If

16   you can, turn to Exhibit AA in the witness binder.

17             It's been marked for identification as Defendants'

18   Exhibit AA.

19             What is this document?

20   A.        Will you give me a moment, counsel.  I have to put on

21   some reading glasses here, if you'll indulge me.

22   Q.        Yes, sir.

23   A.        AA appears to be my CV.

24             MR. MCKINNEY:  Your Honor, I would like to move

25   Exhibit AA into evidence.

1755

1         THE COURT:  Received.

2             (Whereupon, Defendants' Exhibit AA received into

3             evidence.)

4   BY MR. MCKINNEY:

5   Q.      Have you been qualified as an expert on corrections

6   issues before this court?

7   A.      I have.

8   Q.      When was that?

9   A.      Approximately 25 years ago in the Gates v. Duekmejian

10  litigation.

11  Q.      What was the nature of your qualification in that

12  case?

13  A.      Conditions, classification, segregation issues at the

14  facility.

15  Q.      And have you been qualified as an expert in other

16  California courts?

17  A.      I have.

18  Q.      In what cases?

19          MR. BORNSTEIN:  Your Honor, we're not challenging

20  this expert's qualifications, if that will speed things up so

21  we can get to the substance.

22          THE COURT:  Satisfied, sir?

23          MR. MCKINNEY:  Yes, Your Honor.  We would tender

24  Mr. Martin as an expert on use of force and the inmate

25  disciplinary process.

1756

1    THE COURT:  Any voir dire?

2    MR. BORNSTEIN:  No, Your Honor.

3    THE COURT:  Court will so find, and the witness may

4    express opinions within the area of his expertise.

5    You may proceed.

6    BY MR. MCKINNEY:

7    Q.    Mr. Martin, you've done work for plaintiffs in the

8    past; is that correct?

9    A.    I have.

10    Q.    And can you describe that work?

11    A.    I've been retained by the Prison Office in a number

12    of cases over the years, including Madrid v. Gomez, Thompson

13    v. Animoto, the caloric litigation.  Those mainly come to

14    mind.

15    I've been retained by the K&L Gates firm in a use of

16    force matter in the State of Maryland at their supermax

17    facility.

18    I believe that Bien and Rosen were associated with

19    the Gates case, if memory serves me.

20    Q.    Are you currently acting as monitor or special master

21    on use of force issues?

22    A.    I am.

23    Q.    Where is that?

24    A.    I was just recently appointed as court monitor in the

25    American Virgin Islands conditions case.  I am monitoring a

1757

1   facility in the Mississippi Department of Corrections,

2   Walnut Grove facility, which includes a use of force element.

3          I'm also a court monitor in the Bellevue and Elmhust

4   hospitals in New York City that house New York City

5   detainees, and I monitor the use of restraints and

6   applications of force at those two facilities.

7   Q.      Let's talk about your work in this case.

8          What were you retained to do?

9   A.      To conduct a review of the use of force -- staff use

10  of force practices, policies in the CDCR, and also the

11  practices within the RVR system, the disciplinary system, as

12  they relate to the mental health assessment process.

13  Q.      How many total use of force incidents have you

14  reviewed?

15  A.      It's approaching, if not in excess, of 700.

16  Q.      When did you begin your work in this case?

17  A.      The latter part of 2011.

18  Q.      What's one of the first things you did when retained

19  as a consultant?

20  A.      To review the State regs as they relate to these

21  subject matter areas, and also the -- what's referred to as

22  the DOMs, the Department of Operation Manual policies related

23  to these areas.

24  Q.      If I could have you look at what's been previously

25  entered into evidence as Defendants' Exhibit I, which should

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1758

1  be in front of you on the desk.

2  A.    I'm with you.

3  Q.    Are you familiar with this document?

4  A.    I am.

5  Q.    What is this?

6  A.    It's Title 15, the California Code of Regulations.

7  And I believe it contains the passages on use of force

8  starting with Section 3268.

9  Q.    If I could also have you take a look at Exhibit J,

10 which has been previously entered into evidence.

11       THE COURT:  Hang on.  Before you go on, I is in

12 evidence, Madam Clerk?

13       THE CLERK:  Yes.

14       THE COURT:  And J is in evidence?

15       THE CLERK:  Yes.

16       THE COURT:  All right.

17 BY MR. MCKINNEY:

18 Q.    This is the declaration of Michael Stainer.

19       If you could, turn to Exhibit A in that document.

20       Do you recognize that document?

21 A.    Yes.

22 Q.    What is that?

23 A.    That would be the DOMs.

24 Q.    You reviewed both of these documents as part of your

25 initial work in the case; is that right?

1759

1    A.        In great detail.

2    Q.        Would you say you're familiar with California's Use

3    Of Force Policy?

4    A.        I would say I am.

5    Q.        In your opinion, how does California's policy compare

6    with the use of force policies in other states?

7    A.        It is a, relatively speaking, rather sophisticated,

8    elaborate structure, elaborate in various aspects.

9             One that really I think is pronounced is the

10   multi-tiered system of review where you have command review.

11   You have a dedicated use of force coordinator review.  That

12   position, I would add, is unusual in the trade to have a

13   full-time dedicated use of force coordinator.

14            Thereafter, to have a full-scale review by high

15   ranking staff of every single incident that occurs, be they

16   minor, be they major, be they significant, be they

17   insignificant, to have every single one of those incidents --

18   those packets that sometimes can run 100 pages, and routinely

19   run 40 and 50 pages, to have that set level of review is as

20   elaborate as I have seen in American corrections prisons.

21   Q.        Focusing your attention back on Exhibit J, if I can

22   have you turn to Section 51020.12.2.

23            THE COURT:  I'm sorry, sir.  J?  What do you want?

24            MR. MCKINNEY:  A particular provision in the

25   Department Operations Manual.

1760

1      THE COURT:  I understand.  What is that provision?

2      MR. MCKINNEY:  Section 51020.12.2.

3      It's on page 320 of the excerpt.

4      THE WITNESS:  I found it.

5  BY MR. MCKINNEY:

6  Q.      Are you familiar with this provision?

7  A.      Yes.  The Controlled Use of Force Involving the

8  Seriously Mentally Ill.

9  Q.      Basically, what does this provision require?

10 A.      Well, it creates provisions that relate obviously to

11 SMIs.

12 Q.      When you say "SMI," what are you referring to?

13 A.      I'm sorry.  Seriously mentally ill.

14 Q.      Is this type of provision common in other states in

15 your experience?

16 A.      It is not.

17 Q.      And on this same document, turning to Section

18 51020.11.2, are you familiar with this provision?

19 A.      Well, I can't find this provision, counsel.

20      I'm sorry.

21      MR. MCKINNEY:  May I approach the witness?

22      THE WITNESS:  What's the title?

23      I'm with you.  I'm sorry.

24 BY MR. MCKINNEY:

25 Q.      Mr. Martin, are you familiar with this provision?

1761

1  A.      I am.

2  Q.      And during his direct testimony, plaintiffs' expert

3  described this provision as a flaw in the policy.

4          Do you agree with that?

5  A.      I don't agree with it as I understand what his

6  interpretation and its application is.  I don't relate well

7  to "the flaw."  He was very critical of it in the manner in

8  which he read it that it could be applied by CDCR staff.

9          I disagree with that assessment.

10  Q.      Can you explain that a little bit, how it is

11  interpreted?

12  A.      He interprets it --

13          MR. BORNSTEIN:  I object to the form of the question.

14          How it is interpreted by him?

15          THE COURT:  The point is this is a question of how he

16  understood the testimony that he's about to criticize.  It is

17  relevant so that I understand what it is that the dispute is

18  about.

19          You may proceed, sir.

20          THE WITNESS:  Thank you, Your Honor.

21          That it permits officers an unfettered manner to use

22  OC spray regardless of whether there is a need to use OC

23  spray.  And that it therefore can be used in more of a

24  punitive, corporal manner, that being absent a need and use

25  would be corporal, punishment.

1762

BY MR. MCKINNEY:

1   Q.      Did you find that to be the case?

2   A.      It is not the case.  It is not a proper reading of

3   it.  I found in its application through incidents that the

4   CDCR does not interpret it in that manner.

5            In fact, I found instances in which they have

6   officially found that in the review process and subjected the

7   offending officer to training and whatever sanctions.  I

8   can't recall specifically, but they are interpreted in a

9   manner that those provisions do, in fact, place limitations

10  on the use of OC spray in a food port situation.

11  Q.      We'll examine of some those cases later today, but

12  staying with the policy, what is the State's policy with

13  respect to requiring that force be used in a particular

14  sequence?

15  A.      They do not have a prescribed, as it is referred to

16  in the trade, continuum of force where one must exhaust one

17  rung before one proceeds to the second rung.

18  Q.      Is that appropriate in your opinion?

19  A.      I do not support in my work those continuums.  No.

20  Q.      Why is that?  What are the issues with requiring a

21  continuum of force?

22  A.      They become rather mechanistic.  They're somewhat

23  artificial in the real world application.  They can create

24  hesitancy.  They can create confusion.

1763

1    If the operator is concerned and dwelling on, "Have I

2    exhausted this before I do that," that if you have sound

3    guidance and principles of the core understanding of when an

4    application of force is appropriate in terms of the threat

5    and in terms of the amount of force appropriate, et cetera,

6    that those continuums are more of a hindrance in their

7    application than they are a help.  That has been my

8    experience.

9    Q.    Are you familiar with California's policy with

10    respect to use of pepper spray in CDCR?

11    A.    I am.

12    Q.    First of all, can you put pepper spray in context in

13    the continuum of use of force?

14    THE COURT:  He just indicated he's opposed to the

15    notion of continuums of the use of force so that is not going

16    to get you very far, Mr. McKinney.

17    THE WITNESS:  Thank you.

18    THE COURT:  You might want to rephrase.

19    MR. MCKINNEY:  Let me rephrase, Your Honor.

20    BY MR. MCKINNEY:

21    Q.    Mr. Martin, in the various options of force that are

22    available under the California policy, where does pepper

23    spray fit?

24    A.    The starting point in describing it is that -- before

25    I categorize it, it is not an impact weapon.  It's a

1764

1  non-lethal weapon that does not rely on its impact, that's

2  physical impact, such as a 40 millimeter, such as a taser,

3  such as a baton.

4         That element of it puts it in a less serious option

5  in terms because you gauge options in their potential impact

6  of harm on the subject.

7         So as you move up that harm scale, so to speak, from

8  impact weapons to lethal weapons, various holds that are very

9  dangerous, that's what gauges where it lies on a scale.

10        And because it is -- does not involve hard impact,

11 strikes, et cetera, it is a lesser form of force vis-a-vis a

12 baton, a taser, a 40 millimeter projectile, a closed fist.

13 No question, it is a lesser form of force than those options.

14 Q.     Have you been involved in cases as an expert or

15 otherwise where you have found a pattern and practice of

16 unnecessary excessive force?

17 A.     I have.

18 Q.     How many of those cases, if you can estimate?

19 A.     I would say certainly more than three, maybe as many

20 as seven of pattern and practice cases.

21        I've been involved in untold use of force plaintiff,

22 individual damage cases, a number probably in excess of 60 or

23 so.

24 Q.     What do you normally see in a case where you find a

25 pattern and practice of unreasonable force?

1765

1    A.      Not what I normally see, counsel, it's what I have

2    seen in every single one is this, is a pattern and practice

3    of impact injuries, injuries resulting from the use of closed

4    fist strikes, impact weaponry.  Injury associated with the

5    use of force tactic, the tactic being maybe closed fist.

6    You'll have a pattern and practice of injuries associated, of

7    course, with the needless overuse of impact weaponry.

8    Q.      Did you find that pattern and practice in California?

9    A.      It does not exist.  It does not exist in my review.

10   Q.      You are currently doing work in Los Angeles County;

11   is that correct?

12   A.      I am.

13   Q.      Can you describe the nature of your work there?

14   A.      I was asked and retained as a plaintiff's expert in a

15   case involving five plaintiffs that were subjected to cell

16   extractions.

17   Q.      And what did you find in that case?

18   A.      That in five cell extractions on a single day, that

19   those five inmates sustained in excess of 100 impact

20   injuries, most of which were to their heads, upper regions of

21   their body.

22   Q.      How does that compare to what you have found in

23   California?

24   A.      That I have not found anything in the totality of

25   every single incident that I have reviewed that even comes

1766

1    close to that single extraction incident.

2            In other words, I have not found but on rare

3    occasions where, number one, closed fist or impact weaponry

4    was used.  Certainly closed fist.  Let me limit it to that.

5    That is, indeed, very, very, very rare.  And in those rare

6    instances, no serious injury sustained by the subject.

7    Q.      And are you aware when California's Use Of Force

8    Policy was implemented?

9    A.      My understanding is it sits before us February of

10   2010.

11   Q.      Is that significant?

12   A.      It's very significant in my view having spent a

13   career in institutional reform cases.

14   Q.      What is significant about it?

15   A.      Number one, it is a very complex structure being

16   implemented in the second largest prison system in the U.S.,

17   and for years was the largest.  It spreads across 33

18   institutions, 40,000 plus employees, 130,000 inmates.

19           In institutional terms, that is a relatively short

20   period of time from point of embarking on implementation to

21   present day in an institutional bureaucratic setting.

22           A structure of that complexity will understandably

23   require constant monitoring, revisions, tinkering, to make

24   sure that in its application it is doing what the

25   administration and what the law, quite frankly, requires it

1767

1    to do relative to use of force.

2           So that is to say certainly some of what I have seen

3    and the recommendations I have made were, I think,

4    predictable and are more directed to refining that structure

5    in its application now that the agency has had some number of

6    months actually working with it.

7    Q.    Staying with your initial work on the case, did you

8    conduct site visits?

9    A.    I did.

10   Q.    How many site visits did you conduct?

11   A.    I believe they numbered 11 or 12.

12   Q.    And during the site visits, what did you do to

13   evaluate use of force in this case?

14   A.    Well, I did in each instance pre-site visit work to

15   prepare for my site visit work, identifying and reviewing

16   incidents that I wanted to address while I was on site.

17          So I had done that pre-site work.  I had reviewed any

18   local policies, practices and procedures that I could.

19          Then once on site, typically I began with a meeting

20   with the use of force coordinator.  She or he is kind of the

21   hub of the use of force structure at the facility level.

22          And I would try to understand what documents that

23   were maintained in that office and how accessible they were,

24   video availability and access.

25          Tried to understand her relationship with the IERC,

1768

1   the Institutional Review Committee, and attempted to see when

2   that was going to be set while I was there so I could

3   participate or attend that.

4        And then I would set about to literally reviewing

5   incidents that I would select on site and incidents that I

6   had previously selected from the materials I had received.

7   And I would just slog through that material with all the time

8   I had.

9        And maybe that would include reviewing some videos.

10  It would include some follow-up questions on incidents that I

11  had reviewed about which I had questions.  It, on occasion,

12  would try to track down whether there was a closure or

13  resolution on a matter that was identified as a problem and

14  maybe referred for investigation.

15       Where I could, I attended the IERC meetings.  I

16  interacted with, oftentimes, deputy wardens that had

17  particular experience or obligation in their use of force.

18       Then with RVRs, I did basically the same type of

19  approach except I tried to interview both clinicians that

20  were completing the mental health assessment and disciplinary

21  hearing officers, usually lieutenants.  If they had an RVR

22  coordinator, I certainly tried to meet with and interview the

23  coordinator.

24       And then I reviewed literally hundreds and hundreds

25  of RVRs at virtually every facility and would thereafter,

1769

1    where time allowed, have follow-up interviews with clinicians

2    and/or hearing officers to flush out patterns or questions I

3    had with the review of the actual RVRs.

4    Q.    Did each of the institutions you visited have a use

5    of force coordinator?

6    A.    Yes.

7    Q.    What were your impressions of the coordinators that

8    you interviewed and worked with?

9    A.    Competent.  Knowledgeable.  Burdened with processing

10   paperwork that must be diminishing your beautiful redwoods.

11   It is just incredible the paper that is churned through that

12   office, just that office, just one element of operation.

13        And how they assemble that and assess it and make

14   recommendations and prep it for this committee is, quite

15   frankly, beyond me that they do the job that they do.

16   Q.    When you say "burdened," did you have any issues

17   understanding or getting copies of the reports on use of

18   force?

19   A.    No.

20   Q.    Can you describe the reports beyond a burden on the

21   institutions?

22   A.    I don't understand the question.

23   Q.    How extensive and detailed are the reports?

24        THE COURT:  Well, I thought that the question -- I'm

25   sorry -- that the answer referred to the volume of cases that

1770

1    these coordinators were dealing with.

2             Is that right, sir?

3             THE WITNESS:  Correct, Your Honor.

4    BY MR. MCKINNEY:

5    Q.      Beyond the volume, how detailed are the reports?

6    A.      They're very detailed.  Again, relatively speaking in

7    the trade, they allow a reviewer, more often than not, the

8    vast majority of the time to have enough facts in that report

9    to formulate a fairly credible understanding of the event so

10   it can, indeed, be given a credible review.

11   Q.      Did you find the reports credible?

12   A.      Yes.

13   Q.      Self-critical?

14   A.      Yes.

15   Q.      How does that compare to other states?

16   A.      Well, I've been in some states where in some large

17   systems to where the reports are just not informative and

18   certainly not of a nature to allow an independent reviewer to

19   understand what happened and make decisions on the

20   appropriateness of that particular event.

21   Q.      Mr. Vail testified -- when I say "Mr. Vail," do you

22   understand who I am referring to?  Plaintiffs' expert?

23   A.      I do.

24   Q.      He testified that the reports were difficult to come

25   by.  Was that your experience?

1771

1    A.       That is just absolutely -- I don't understand the

2    comments.  I'm not going to characterize it.

3             THE COURT:  It may be who hired one and who hired the

4    other.

5             We don't know.

6             You found no difficulty.  He found difficulty.

7             MR. MCKINNEY:  We can speculate I suppose.

8             MR. BORNSTEIN:  We don't need to speculate.

9             THE COURT:  Sir?

10            MR. BORNSTEIN:  I'm sorry, Your Honor.  I object to

11   counsel's comments.

12            THE COURT:  You know, I know the difference between a

13   question and a comment.

14            You may proceed, sir.

15   BY MR. MCKINNEY:

16   Q.       Mr. Martin, you testified that you sat in on the

17   Institutional Executive Review Committees on how many

18   occasions?

19   A.       Four, maybe five.

20   Q.       What are your impressions of that process?

21   A.       That, again, given their docket or their workload and

22   their other responsibilities, that they're able to at various

23   depth, depending on the particular facility, attention

24   fairly detail attention to an individual incident, many of

25   which, in my view, should not be put before that body.

1772

1      It is my view that if the system was structured in a

2  way where you ensured that serious matters were before that

3  body that really merited review and were able to screen the

4  less serious events and have them wrapped up at a lower

5  level, that that process would be much more effective in

6  terms of quality reviews.

7      I would say it is more structured to quantity, to

8  moving cases through their review committee because they have

9  a lot of them.

10  Q.    And the Inspector General made a recommendation in

11  this regard about streamlining the process.

12      Are you familiar with that recommendation?

13  A.    I am.

14  Q.    Do you agree with that recommendation?

15  A.    Obviously, counsel, I do.

16  Q.    And did you also -- you testified you interviewed

17  senior hearing officers.

18      Can you describe the role of the senior hearing

19  officer?

20  A.    Well, to conduct hearings for disciplinary purposes.

21  Q.    What were your impressions of those officers in your

22  tours throughout the system?

23  A.    I was impressed with them.  They seemed to be

24  professional.  They seemed to be committed to their position,

25  and that the position held some degree of pride in that

1773

1  correctional setting.  Because, you know, they're sitting in

2  a position somewhat to act as a judge, and that's a position

3  that I found across the US that officers tend to value and

4  take seriously.

5         So it's pretty consistent with what I found in most

6  places that do a good job of processing disciplinary

7  hearings.

8  Q.     Mr. Martin, based on this initial review work, did

9  you make any findings, first of all, with respect to use of

10 force?

11 A.     I did.

12 Q.     What did you find?

13        THE COURT:  What did he find?

14 BY MR. MCKINNEY:

15 Q.     What was your opinion?

16 A.     My opinion is there does not presently exist a

17 systemic pattern and practice of excessive or unnecessary

18 force in the CDCR.

19 Q.     During your work, before the State filed the

20 termination motion in this matter, did you prepare

21 recommendations?

22 A.     I did.

23 Q.     Were those done in written form?

24 A.     They were done in both written form and verbal.

25 Q.     Were those recommendations based on a systemic

1774

1   pattern or practice?

2   A.      Those recommendations were based on having found that

3   there was not.  That notwithstanding that finding, that there

4   were important matters related to the administration of staff

5   on use of force that I believed needed improvement and

6   attention to insulate or ensure in a prophylactic matter that

7   the agency not run afoul or cross that line into an

8   unconstitutional operation.  And I believe those were,

9   because of that finding, relevant as an internal matter to

10  the agency operators.

11  Q.      Were you encouraged to provide that sort of input?

12  A.      It was practically a condition precedent to my

13  retention.

14  Q.      Mr. Martin, if I can have you look at what's been

15  marked for identification as Defendants' Exhibit K, which

16  should be one of the loose documents in front of you.

17          Do you recognize this document?

18  A.      I do.

19  Q.      What is it?

20  A.      Well, the top page --

21          MR. BORNSTEIN:  It's not included in the binder I

22  have.

23          MR. MCKINNEY:  That's correct.  This was previously

24  marked when Mr. Stainer was on the stand.

25          MR. BORNSTEIN:  It is not in the record?

1775

1         MR. MCKINNEY:  Correct.  It is marked for

2  identification.  As soon as he authenticates it, I will move

3  it into evidence.

4         MR. BORNSTEIN:  I would like a copy of it.

5         THE COURT:  Sir, do you have a copy to give him?

6         MR. MCKINNEY:  I don't, Your Honor.

7         It was previously passed out when Mr. Stainer was on

8  the stand.

9         THE COURT:  I have no doubt.  Do you know how many

10  documents people have marked and passed out.

11         We can all stop and spin forever looking for it.  You

12  are to find a copy to give him now.

13         Ladies and Gentlemen, this is not appropriate.

14         MR. MCKINNEY:  Your Honor, I'll move on for the

15  moment.

16         THE COURT:  Good.  All right.

17         MR. MCKINNEY:  I'm sure plaintiffs will return to

18  this topic ad nauseam.

19         MR. BORNSTEIN:  Your Honor --

20         THE COURT:  Forget it, will you.

21         I have a copy, if you want to give it to counsel.

22         MR. MCKINNEY:  May I approach, Your Honor?

23         THE COURT:  Yes.

24         MR. BORNSTEIN:  I have it.

25         THE COURT:  Do you have it now?

1776

1    Never mind.  He's got it now.

2    BY MR. MCKINNEY:

3    Q.    Mr. Martin, what is this document?

4    A.    It basically is a packet containing my

5    recommendations and also what I have titled as Coleman Audit

6    Use Of Force Observations, but attached thereto are the

7    recommendations both with respect to use of force and the RVR

8    process.

9         THE COURT:  You want to move that, sir?

10        MR. MCKINNEY:  Yes, Your Honor.

11        THE COURT:  Received.

12        (Whereupon, Defendants' Exhibit K received into

13         evidence.)

14   BY MR. MCKINNEY:

15   Q.    Mr. Martin, what is shown on the first page of this

16   document?

17   A.    Under two subheadings, the first being Audit

18   Methodology, the second being Observations on use of force.

19   Q.    Does that accurately reflect your methodology as of

20   that time?

21   A.    It does.

22   Q.    When was this document prepared, if you recall?

23   A.    I don't recall.

24   Q.    Was it before or after you completed your work in the

25   initial phase?

1777

```
 1   A.        It was after.
 2   Q.        And are those observations consistent with your
 3   observations?
 4   A.        Yes.  They are my observations, counsel.
 5   Q.        Thank you, Mr. Martin.
 6             If you could, turn to the second page, looking at
 7   that first recommendation.
 8   A.        Yes, sir.
 9   Q.        What is that recommendation in a nutshell?
10   A.        Revisit Referral/Investigation Requirements Per Use
11   of Force Regs 51020.
12   Q.        What was the reason that you made this
13   recommendation?
14   A.        Again, as I referenced, the complexity of the system
15   and its relatively newness, that you have to have mechanisms
16   by which you are constantly identifying issues and problems
17   where you can take corrective measures where appropriate and
18   to educate through those mechanisms your subordinates as to
19   what these regulations actually mean in their applied sense.
20             It is through a robust review process that you can do
21   that because you're giving instant feedback to those people
22   that are direct participants and witnesses in these events.
23   And the more robust that process is within the review
24   structure, probably the less the investigation process is
25   critical, although it is always critical, just less critical.
```

1778

1        Or you can refer in a robust fashion issues,

2   unresolved issues or issues about which you have questions

3   for the investigative process, and through that process you

4   will have findings.  And those findings, if they are that

5   there is excessive force or unnecessary force or procedural

6   problems, that's how you correct those problems.

7        So it's not by happenstance that that is -- that in

8   these enumerated recommendations that's number one.  And

9   nobody has really asked me why it is number one.

10       It is number one because it is absolutely the bedrock

11  of the administration of staff use of force because to the

12  extent it works as it should, you are constantly

13  self-correcting and addressing in a serious manner in those

14  cases in which you have excessive force, you are imposing

15  sanctions on those offenders to control use of force.

16  Q.       Based on your review, did you find that the system

17  was not operating as it should systemically?

18  A.       Yes.  Obviously, these recommendations were important

19  and in my professional view are necessary.  But they're

20  necessary to better the system.  They're necessary to improve

21  the system.  They're necessary to insulate the system.  They

22  are necessary to self-correct.  They're necessary to make the

23  operators and managers more able to concretely administer and

24  monitor this very, very difficult component of a prison

25  system.

1779

1        If it's not one, it is certainly in the top three of

2   any list of complexity in managing a large-scale prison

3   operation is control of force.

4   Q.      Were your recommendations communicated to the

5   Department?

6   A.      They have been communicated ad nauseam.

7   Q.      And is the Department taking action?

8           MR. BORNSTEIN:  Object.  Lack of foundation.

9           THE COURT:  If he knows.

10          Do you know?

11          (Court Reporter indicates she didn't hear the

12           answer.)

13          THE COURT:  The question was:  Do you know?

14          The answer was:  I know.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  My question is:  How do you know?

17          THE WITNESS:  Thank you.

18          I have had recent meetings, both in person and

19   telephonically, that indicate to me that the administrators

20   are beginning to deal with this matter and these

21   recommendations in a concrete fashion.

22          And not only recently, but prior to there were

23   discussions and meetings, et cetera, in which my

24   recommendations were discussed.

25   ///

1780

1    BY MR. MCKINNEY:

2    Q.    Let's turn now to your work done in the context of

3    this motion.

4         Are you familiar with Mr. Vail's work in this case?

5    A.    I believe I am.

6    Q.    Did you review the declaration that Mr. Vail

7    submitted on March 14th related to the State's termination

8    motion?

9    A.    I did.

10   Q.    Did you also review the declarations that Mr. Vail

11   submitted both in support and in the reply to the plaintiffs'

12   current motion?

13   A.    Yes.

14   Q.    Did you also review the documents that the State

15   produced to plaintiffs in this proceeding?

16   A.    I did.

17   Q.    What work have you done with those documents to

18   prepare for your testimony?

19   A.    I have now completed a review of 377 incidents that,

20   as I understand it, and has been represented to me, were

21   provided to the plaintiffs' expert, Mr. Vail, for his review.

22   Q.    And what institutions do those reports cover?

23   A.    I believe San Quentin, Lancaster, Kern Valley and

24   Corcoran.

25   Q.    What time periods are covered by those incidents?

1781

1    A.        July 2012 through May 2013.

2    Q.        And did you categorize those reports in any way?

3    A.        I drafted what I believe to be a profile or relevant

4    findings from that review, yes.

5    Q.        Can you summarize what you found in those 377

6    reports?

7              MR. BORNSTEIN:  Your Honor, I object.  This appears,

8    based on what the witness has just said, that the time

9    frame --

10             THE COURT:  Do you want to talk at the mic?

11             MR. BORNSTEIN:  I object.  What the witness has just

12   described is a time frame, as far as I know, that is beyond

13   the scope of the materials that we've been provided with.

14   And if it is something and -- and something beyond what he's

15   testified about in the depositions that we've taken of him.

16   So I don't know what the foundation is for it or what he's

17   saying or where these documents come from if they're

18   different than what we've been here for.

19             MR. MCKINNEY:  Your Honor, can I briefly remind the

20   court of the chronology of this motion?

21             THE COURT:  You certainly can.  I have no idea.

22             MR. MCKINNEY:  Mr. Martin was deposed July 24th.

23   After that time, beginning in August, the plaintiffs started

24   seeking discovery.  They sought all these documents.

25   Extensive documents were produced in a matter of weeks.

1782

1        Mr. Vail testified to all those documents following

2    his deposition.  They never asked for another deposition of

3    Mr. Martin.

4        THE COURT:  Mr. Vail?

5        MR. MCKINNEY:  Yes.  Mr. Vail did testify about these

6    documents.  Most these documents --

7        THE COURT:  I understand what you are saying.

8        MR. MCKINNEY:  This is in rebuttal.

9        THE COURT:  Hang on.  I want to be sure I understand

10   what you are saying.

11       Please, come to microphone.

12       You are saying that the plaintiffs' expert reviewed

13   these incidents and testified about them?

14       MR. MCKINNEY:  Correct, Your Honor.  The majority of

15   these documents, which are included in this witness binder,

16   were produced in the February to March time frame, along with

17   the termination motion.

18       That's not subject to dispute.  If they didn't want

19   to dispose him on that, they had the documents.  There is no

20   issue here.

21       MR. BORNSTEIN:  The documents came, as I understood

22   it, on September 24th and 25th.  We were supposed to start

23   trial on September 25th.

24       Okay.  There was a dump of documents.

25       What Mr. Vail testified about were incidents that

1783

1    came from Mr. Martin's files, from the materials that

2    Mr. Martin had available to him.  And to the extent that

3    there were additional materials that the State had provided

4    that we were able to get as a result of the tours that we

5    were -- had to do separately and through various discovery

6    requests that we made, those were the materials that he had

7    available to him.

8            So he did not -- and the court issued an order --

9            THE COURT:  Stop.

10           MR. BORNSTEIN:  Sorry.

11           THE COURT:  I'm going to say it again.  I understand

12    lawyers get wound up, but when the court starts talking, you

13    have to stop.

14           MR. BORNSTEIN:  My fault.

15           THE COURT:  I don't know what you are saying.

16           The "he" you're referring to is Mr. Martin or

17    Mr. Vail?

18           MR. BORNSTEIN:  Mr. Martin.  So --

19           THE COURT:  All right.  Just stop.

20           Now I got to go back and find what you are saying

21    because I've completely lost track.

22               (Brief pause.)

23           MR. BORNSTEIN:  May I add one more thing?

24           THE COURT:  No.  I don't know what you guys are

25    saying.  Of course you will in a moment.  I'm just trying to

1784

1   process what you guys are saying.

2          As I understand it, Mr. McKinney, and you tell me if

3   I've got it wrong, what you have asked the witness about are

4   documents that were supplied to the plaintiffs in connection

5   with the so-called termination motion.

6          MR. MCKINNEY:  Correct.  The vast majority.  There

7   may have been one or two incidents produced in the -- we can

8   look at the prefixes.  They were produced in March or

9   February of this year.

10         THE COURT:  Mr. Bornstein?

11         MR. BORNSTEIN:  I have no objection to those

12  documents or those materials, but I want -- the way it is

13  coming out -- the facts are that the termination motion,

14  there were certain materials that we have been trying to get

15  from the State, and it was very difficult to get them.

16         We got them, and we used what we could in order to

17  rebut their evidence as part of that.

18         From the work that we did there, it opened up this --

19  these incidents that led us to file this affirmative motion.

20         There was a data dumb of documents in September, and

21  I believe the court ordered that we were not supposed to show

22  them to our expert because we were getting right -- it was

23  right at trial so we didn't because we weren't supposed to

24  because we had a choice of --

25         THE COURT:  Obviously.

1785

1     I have no recollection of the order, but if that's

2  what I ordered because -- you know, I'm going to say what

3  I've observed about other aspects of this trial.  This is a

4  living process.  It is going on and on and on with no

5  objection.

6     I mean, obviously it goes on and on, but we have to

7  sort of put a stop and say that this is what we're

8  considering because otherwise we'll never have material to

9  make a judgment on.

10     Now, I'm told by plaintiff at some point -- and I

11  don't recall if I did or not -- at some point I said:  Stop.

12  This is where we're going to try the case.

13     Is that true, Mr. McKinney?

14     MR. MCKINNEY:  No, Your Honor.  There is a clear

15  transcript on this.  First of all, there is no order.

16     Second, the plaintiffs made that choice.

17     The court was very clear, and they made that choice,

18  but it was not going to preclude Mr. Stainer from testifying

19  about the RVR process.

20     That was the context, I believe, that this arose in.

21  And there was certainly no order by the court.

22     THE COURT:  He's not talking about once we were in

23  this trial.

24     Mr. Bornstein, do I understand you to say that the

25  place where the court said "Stop, this will be the only

1786

1  material considered," was in connection to the termination

2  hearing or in connection to this hearing?

3          I want to say, because I can hear myself, I know that

4  the defendants disagree, my view is this is a continuation of

5  the issues justifying -- denying justification for the

6  termination.

7          But your view is that the order, whatever order you

8  say I made, was it in connection with Mr. Stainer's testimony

9  or earlier?

10          MR. BORNSTEIN:  No.  I thought it had to do, Your

11  Honor, with whether to continue the trial or not.  And the

12  issue was that I thought -- again, I'm speaking secondhand

13  because I was not on that call with the court -- but my

14  understanding was --

15          THE COURT:  Who was on that order?

16          MR. BORNSTEIN:  I believe Mr. Bien was.

17          MR. MCKINNEY:  I was on the call too, Your Honor.

18  There was no such order.

19          THE COURT:  Hang on.

20          MR. BIEN:  My best recollection, Your Honor, is that

21  we agreed that Mr. Vail would not make use of the documents

22  produced on the 28th or 29th of September.

23          We gave up the right to use that for Mr. Vail because

24  they came so late because the alternative was to postpone the

25  beginning of the trial.

1787

1    I don't think there was a clear order that would

2    preclude the use of those documents, even by Mr. Martin, or

3    by other witnesses down the road.

4    I think really what we are expressing is that to the

5    extent Mr. Martin has done a new study, we didn't get notice

6    of that.

7    THE COURT:  No.  No.  Don't go away, Mr. Bien.

8    Your best recollection, when was that telephone

9    conversation?

10   MR. BIEN:  I think it was the week before the trial,

11   couple days before.  But we were dealing with some of the

12   motions in limine and issues I think even about the tapes too

13   at that time.

14   MR. MCKINNEY:  Your Honor, maybe we can clarify with

15   Mr. Martin.  To the extent we are talking about documents

16   after September 28th and 29th, that is not the body of

17   documents we're referring to.  We're talking about Mr. Vail's

18   file here.

19   THE COURT:  If you're willing to say that we're going

20   to restrict the witness's testimony to matters preceding

21   September the 28th, I gather that is no problem; is that

22   right, Mr. Bornstein?

23   MR. BORNSTEIN:  Yes, that's correct.

24   THE COURT:  All right.

25   And Mr. McKinney, that's what you say?

1788

1    MR. MCKINNEY:  I believe that is correct.

2    THE COURT:  All right.  I will tell Mr. Martin.

3    Mr. Martin, you can hear what is going on here, and

4    we can spend at least another hour or two, and it is a simple

5    thing to do.

6    Anything that was considered by you subsequent to

7    September the 28th shall not be testified to.

8    Do you got it?

9    MR. MCKINNEY:  Your Honor, I think we need to clarify

10   that.  It should be consideration of documents produced to

11   the plaintiffs after September 28th, not that he considered

12   it.

13   THE COURT:  How would he know what was given to

14   plaintiffs?

15   MR. MCKINNEY:  Because he did -- Mr. Martin, can you

16   explain what you did?

17   THE COURT:  Why don't you do that.

18   That might help.

19   BY MR. MCKINNEY:

20   Q.    Can you explain the documents that you reviewed in

21   preparation for this proceeding?

22   A.    I can.

23   Q.    Please, do so.

24   A.    I received incident reports on four CDs in March that

25   were represented to me to be those incidents that had been

1789

1    provided the plaintiffs.

2          THE COURT:  And that's what you're testifying about?

3          THE WITNESS:  I've had them in my position --

4          THE COURT:  Please, don't make a speech.  Just tell

5    me, is that what you are testifying about?

6          THE WITNESS:  Yes, it is.

7          THE COURT:  All right.

8          Are you satisfied?

9          MR. BORNSTEIN:  Yes.

10          THE COURT:  Thank you.  Please, go on.

11          MR. MCKINNEY:  Thank you, Your Honor.

12    BY MR. MCKINNEY:

13    Q.    Again, Mr. Martin, how many total incident reports

14    did this cover?

15    A.    377 by my count.

16    Q.    And before the objection you testified that you had

17    profiled those incidents.  Can you summarize that?

18    A.    Yes.  That approximately 200 of those incidents, or

19    53 percent, were fight interventions, most of which involved

20    various applications of OC delivered via MK9 and OC grenades.

21          A modest number involved use of the 40 millimeter

22    block gun typically used with sponge rounds in open yard

23    fights.

24    Q.    In your view, with respect to that category, is that

25    an appropriate use of force?

1790

1  A.      Yes.

2  Q.      Go on.

3  A.      Secondly, that 88, or 23 percent, did not involve

4  chemical agents at all.

5          Approximately 29, or 7 percent, involved the use of

6  the expanded baton.  However, not a single one involved

7  strikes to vital areas of the body.  And most occurred after

8  OC was deployed during the course of a fight intervention.

9          THE COURT:  Sir, I don't mean to interrupt, but I

10 fear that we're off on yet another issue.

11         This case deals with the -- as I understand the

12 plaintiffs' claims -- well, it is the only claims they could

13 make -- this deals with the excessive use of force against

14 persons who have been categorized as having a severe mental

15 condition.  Those are the only things I'm really interested

16 in.

17         How many of the 377 involved persons categorized with

18 as having a severe mental illness?

19         THE WITNESS:  All of them, Your Honor, or I wouldn't

20 have been reviewing them.

21         THE COURT:  I see.  Okay.  I misunderstood.

22 BY MR. MCKINNEY:

23 Q.      Mr. Martin, when you say "serious mental illness,"

24 are you defining that as a member of the Coleman Class?

25 A.      Yes.

1791

1       THE COURT:  Okay.  I misunderstood.  Fine.  Go ahead.

2   See those are -- Never mind.

3       Go ahead.

4       THE WITNESS:  I assumed.

5       THE COURT:  You assumed one and I assumed the other.

6   It turns out whatever it turns out.

7       Go ahead, sir.

8       THE WITNESS:  Thank you.

9       I believe I'll pick up where I left off.

10      A single incident involved the application of a

11  closed fist, hard impact strike.  This I would note was an

12  incident in which the inmate was either successful or near

13  successful in taking the OC canister away from the officer.

14  And the officer responded with, I believe, multiple closed

15  fist head strikes.

16      So that is to say out of 377 incidents approximately,

17  that there was this single instance of a hard impact strike

18  being deployed.

19  BY MR. MCKINNEY:

20  Q.    Mr. Martin, if I could direct your attention to

21  Exhibit AH.

22      If I can approach your clerk, I have an extra copy of

23  the binder.

24      THE COURT:  We've go it here.

25  ///

1792

1    BY MR. MCKINNEY:

2    Q.    Mr. Martin, referring to what's been premarked as

3    Exhibit AH, do you recognize this Incident Report?

4    A.    I do.

5    Q.    Is this the Incident Report you were just referring

6    to?

7    A.    It is.

8          MR. MCKINNEY:  Your Honor, at this time I would like

9    to move Exhibit AH into evidence.

10         THE COURT:  Hearing no objection, it is received.

11             (Whereupon, Defendants' Exhibit AH

12              received into evidence.)

13   BY MR. MCKINNEY:

14   Q.    Mr. Martin, if you can, continue your description of

15   this incident.

16   A.    There were three incidents.

17         MR. BORNSTEIN:  Your Honor, it does need to be under

18   seal because it is not redacted.

19         THE COURT:  Thank you.

20   BY MR. MCKINNEY:

21   Q.    Mr. Martin, is the fact that you found one incident

22   involving a closed fist strike, is that remarkable in your

23   view?

24   A.    It is in my experience, yes, in a system that houses

25   serious felons.

1793

1    Q.    Was the use of force appropriate in this particular

2    incident given the circumstances?

3    A.    I'm not prepared on my reading of the incident packet

4    to conclude that it was inappropriate.

5    Q.    Thank you.  Continue.

6    A.    There were three incidents in addition to those

7    placed in evidence in this matter, as I understand what's

8    been placed into evidence, in which large amounts of OC were

9    deployed.

10         One of these involved a very calculated and

11   persistent resistance.  A second involved a serious yard

12   fight in which the amount was commensurate with the number of

13   individuals involved in the fight.  And the third involved an

14   inmate who had totally blocked the views of his cell.

15         There were four instances in which COs were subjected

16   to spittle or spat upon that found their targets on the COs.

17   Three additional COs were subjected to gassers, which found

18   their target.

19         In none of these seven incidents was there evidence

20   of any reprisal or retaliation force which, in my experience,

21   when officers are spat upon, and when officers are subject to

22   gassers, that sometimes in their force application, that that

23   application goes beyond what is necessary to neutralize the

24   threat.  And it is what I characterize as retaliation or

25   reprisal force.

1794

1    So it suggests to me that these officers in these

2    particular incidents are exercising professional restraint in

3    their disposition of these potentially harmful assaults on

4    their persons.

5    Q.    Based on your review -- are there any other

6    categories?

7    A.    Those are my general, what I have thought might be

8    relevant and helpful to the parties and to the court in

9    understanding applications of force, other than the six or so

10   that have been put into evidence, that there are daily,

11   serious applications of force involving Coleman Class Inmates

12   that are disposed of in an appropriate manner.  And they, in

13   my view, represent the large, large majority of force applied

14   as to the Coleman Class Inmates.

15   Q.    And is your review of the 377 incidents consistent

16   with what you reviewed in connection with the termination

17   proceeding?

18   A.    Very consistent.

19   Q.    Mr. Martin, are you familiar with the six videos that

20   have been introduced into evidence here?

21   A.    I am.

22   Q.    First of all, plaintiffs made reference to 17 videos.

23         Have you reviewed all of those videos?

24   A.    I have.

25   Q.    Do you have an opinion about whether the six videos

1795

1    are representative of staff use of force within CDCR?

2    A.      I don't believe they are.

3    Q.      And compared to the 377 incidents from the

4    plaintiffs' investigation, how would you describe the six

5    incidents that have been played in court?

6    A.      As isolated aberrations, anomalies, outliers.  They

7    do not, in my view, represent the vast majority of incidents

8    which is near now 700.  They are not representative of that

9    body of incidents.  Objectively, I just don't see how they

10   are.

11   Q.      Are the six videos representative of the remaining

12   eleven videos that make up the 17?

13   A.      I don't think they're even representative of that.

14   Q.      In your opinion do some of the videos show the use of

15   more pepper spray than maybe there should have been?

16   A.      Without doubt.

17   Q.      Were you able to reach any conclusion that any of

18   those incidents constituted unnecessary use of force?

19   A.      There's three of those that there would be a very

20   strong presumption that not only was excessive chemical agent

21   deployed, but that also translated to a finding or would

22   translate to a finding of excessive force, which I think I

23   try to be careful in distinguishing those elements.

24   Q.      And those two or three incidents, are they

25   representative of the use of force in CDCR?

1796

1    A.       Those three, by any measure which I'm familiar, in my

2    review they are not.

3    Q.       And similarly, in your earlier review, did you come

4    across incidents that raised concerns about the amounts of

5    force used?

6    A.       I did.

7    Q.       And can you estimate the number?

8    A.       I wrote a memo in April, fairly early on in my work,

9    that had six incidents that I had issues with and thought

10   merited more attention than they garnered.

11           I don't believe all of those were OC incidents.  I

12   believe two were the use of the expandable baton.

13   Q.       Were those incidents you followed up on at the time

14   of your reviews?

15   A.       I don't understand, "follow up on"?

16   Q.       Did you speak with -- did you speak with the

17   institution, first of all?

18   A.       I did.

19   Q.       Did you speak with headquarter staff about any of

20   those incidents?

21   A.       That's the reason I reduced my observations to

22   written form is so I could transmit them for appropriate

23   distribution in the agency.

24   Q.       Based on the number of incidents that you found that

25   raised some type of issue, is this different from other

1797

1   systems of comparable size?

2   A.      No, with this caveat.  The CDCR has obviously elected

3   to rely on a particular tactic, that being OC spray, to a

4   heightened degree, I believe, to minimize direct hands-on

5   engagement with subject inmates.  It is a particular style.

6   It's a particular tactical approach.

7           Given that, you're going to have a higher incidence

8   of application of OC spray.  That is kind of commonsensical

9   to say that.  But what it tells us is, given their reliance

10  on OC spray for a huge variety of actions, all the way from

11  yard fights to cell extractions, et cetera, this number that

12  we're speaking about is, in my view, low.

13          Notwithstanding the large amounts used in a couple of

14  incidents, I'm not diminishing that, but in terms of shear

15  number of incidents relative to the total incidents it is a

16  small number.

17  Q.      Are you familiar with Mr. Vail's conclusions with

18  respect to use of force --

19  A.      I am.

20  Q.      -- in this case?

21          Do you have an opinion about the methodology he used

22  to reach that conclusion?

23  A.      I do.

24  Q.      What is that opinion?

25  A.      That his conclusions are not based, I think, on

1798

1  certainly a cornerstone of reliability, and that is that you

2  have sufficient evidence in facts and data to formulate your

3  conclusions.

4  Q.    For example, Mr. Vail opined that CDCR's policies and

5  practices result in a practice of immediate infliction of

6  pain and punishment.

7        Do you agree with that?

8  A.    No.

9  Q.    Did you find even a single incident where that

10 occurred?

11 A.    The single instance in which I did not find, but I

12 reviewed that immediately called into question my finding

13 that I didn't find a single one, was Mr. Vail in, I believe,

14 it was the May declaration assessed an incident in which he

15 had reviewed a video and observed two inmates being thrown

16 and dragged and that that was excessive and unnecessary.

17 Q.    Mr. Martin, if I could refer you in plaintiffs'

18 binders, back behind you on the cart, to Exhibit 33.

19       MR. MCKINNEY:  May I approach the witness, Your

20 Honor.

21       THE COURT:  You may.

22       (Exhibit located for witness.)

23 BY MR. MCKINNEY:

24 Q.    Mr. Martin, referring you to what's been marked as

25 Plaintiffs' Exhibit Number 33 for identification --

1799

1    THE COURT:  Is it in evidence?

2    MR. MCKINNEY:  I do not have to move that into

3  evidence.

4    THE COURT:  No.  No.  Wait.

5    MR. MCKINNEY:  I apologize, Your Honor.

6    THE COURT:  I had understood all of the affidavits --

7  you're referring him to an affidavit; are you not?

8    MR. MCKINNEY:  No, Your Honor.  This is an Incident

9  Report marked in plaintiffs' binders.

10    THE COURT:  I'm sorry.  It is not in evidence.

11  BY MR. MCKINNEY:

12  Q.    Mr. Martin, is this the incident you're referring to?

13  A.    Yes.

14    MR. MCKINNEY:  At this time I would like to move

15  Exhibit 33 into evidence.

16    THE COURT:  I don't know what it is.  I don't have it

17  in front of me.

18    MR. MCKINNEY:  This is in the plaintiffs' binder.

19    THE COURT:  Just tell me what it is.

20    MR. MCKINNEY:  An incident report from LAC Prison

21  that Mr. Martin was testifying about.

22    It's a Use of Force Incident Report.

23    THE COURT:  From?

24    MR. MCKINNEY:  Los Angeles County Prison.

25    THE COURT:  Sir, objection?

1800

1    MR. BORNSTEIN:  No.  I would like the whole tab,

2  Exhibit 33, so it would be a, b and c.  It should be under

3  seal because it is not redacted.

4    MR. MCKINNEY:  Agreed.

5    THE COURT:  Received.  33a, b and c, under seal.

6    (Whereupon, Plaintiffs' Exhibit 33a, 33b, 33c

7    received into evidence.)

8  BY MR. MCKINNEY:

9  Q.    This refers to Inmate Q.  I ask you not use the

10  inmate's name in any reference to this report.

11    Can you describe what occurred in this incident?

12  A.    It was a cell extraction involving two inmates that

13  was a pretty high-level extraction due to the circumstances

14  or conditions just prior to the cell extraction.

15  Q.    And what did Mr. Vail testify in his declaration

16  about this incident?

17  A.    That the video reflected that these two inmates, once

18  extracted from their cells, were thrown to the ground and

19  dragged and that constituted unnecessary and excessive force.

20  Q.    Did you have an opportunity to review that video?

21  A.    I did.

22  Q.    What did you find when you reviewed the video?

23  A.    That in fact that the two inmates were restrained and

24  taken to the ground in an appropriate manner.  And I would,

25  in fact, give them high marks in the way they conducted that

1801

```
 1   continued restraint.  And that there was under no

 2   construction a throwing or dragging that certainly rose to

 3   the level of excessive and unnecessary force, which had that

 4   been accurate, that would have been an element of

 5   maliciousness which always greatly concerns me.

 6   Q.      Did Mr. Vail correct his testimony?

 7   A.      He did.

 8   Q.      How was that done?

 9   A.      Through a footnote in a subsequent declaration

10   retracting that observation.

11   Q.      Are you familiar with Mr. Vail's testimony concerning

12   the murder of a correctional officer by an inmate in

13   Washington?

14   A.      I am.

15   Q.      How are you familiar?

16   A.      I'm a retained expert in that matter.

17   Q.      Can you describe briefly your work in that case?

18   A.      Reviewing --

19           MR. BORNSTEIN:  Your Honor, I object.  It is

20   irrelevant.

21           THE COURT:  Well, the problem is it was discussed by

22   Mr. Vail in the course of his testimony.

23           MR. BORNSTEIN:  On cross-examination there was

24   questioning about it, I guess, to try and impeach him in some

25   manner.
```

1802

1    THE COURT:  If you thought it was inappropriate, you

2    should have objected.  You didn't.  It is in.

3    You may proceed, sir.

4    THE WITNESS:  In reviewing the circumstances related

5    to the death of that officer.

6    BY MR. MCKINNEY:

7    Q.    As a result of that case did the Washington

8    Department take any action?

9    A.    Well, they did.  They invited a National Institute of

10   Corrections Technical Assistance Team to evaluate and assess

11   the operation of that facility in the wake of that death and

12   made a recommendation that the officers at that facility

13   should have some better support in the way of defensive

14   equipment if isolated as that officer was.  And in fact, made

15   a recommendation that OC spray should be made available to

16   the personnel at that facility.

17   Q.    Mr. Martin, based on your review in total, I'm going

18   to ask your opinion on a number of things.

19   First, did you reach a conclusion about whether there

20   was a pattern and practice of unnecessary, excessive force

21   against inmates with mental illness within CDCR?

22   A.    Did I reach an opinion?  Yes.

23   Q.    What is that opinion?

24   A.    That there's not.

25   Q.    Did you reach an opinion generally with respect to

1803

1    the CDCR population?

2    A.       As to?

3    Q.       Pardon me.

4             As to whether there's a pattern and practice of

5    excessive or unnecessary force?

6    A.       I did.

7    Q.       What is that opinion?

8    A.       That there's not.

9    Q.       You already testified during your review you found

10   cases that were not consistent with your systemic opinion,

11   correct?

12   A.       Correct.

13   Q.       Have we identified those cases in total?

14            THE COURT:  What do you mean "are they identified"?

15   BY MR. MCKINNEY:

16   Q.       Have you discussed the total number of cases that you

17   found that were inconsistent with the systemic opinion?

18            THE COURT:  With whom?

19            MR. MCKINNEY:  In his testimony prior.

20            THE COURT:  I'm sorry.

21            THE WITNESS:  I'm not going to warrant that I've

22   identified ever incident.

23   BY MR. MCKINNEY:

24   Q.       How many cases did you see, if you can estimate, that

25   were not consistent with your systemic opinion?

1804

1  A.       Including plaintiffs' incidents?

2           THE COURT:  All incidents apparently is the question.

3           MR. MCKINNEY:  Correct.

4           THE WITNESS:  Thank you, Your Honor.

5           I would say they number no fewer than 12, and maybe

6  as many as 20, about which there are serious -- or there is

7  substantial evidence within those, whatever number they are,

8  of excessive and unnecessary use of chemical agents and/or

9  other non-lethal weaponry that likewise provide evidence that

10 they may, indeed, represent instances of unnecessary and

11 excessive application of force.

12 BY MR. MCKINNEY:

13 Q.       Over what time period does that cover, both your

14 initial review and the subsequent review?

15 A.       My review I had incidents, I believe, from November

16 2011 through October 2012.

17 Q.       And the review of the plaintiffs' files, that

18 extended through May 2013, I believe you testified?

19 A.       It did.

20 Q.       Third, did you reach an opinion about whether CDCR

21 has heightened safeguards --

22          THE COURT:  I'm going to have to cut you off here.

23 You're at noon.  I've got a personal matter that I've got to

24 attend to.

25          We'll reconvene hopefully at about two o'clock.

1805

1    MR. MCKINNEY:  Thank you, Your Honor.

2    THE COURT:  Stand in recess.

3    (Off the record at 12:00 p.m.)

4                    ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    SACRAMENTO, CALIFORNIA

 2              TUESDAY, NOVEMBER 5, 2013; 2:00 P.M.

 3                         ---O0O---

 4

 5         THE COURT:  Madam Clerk, you want to put something on

 6    the record?

 7         MR. MCKINNEY:  Just for the record, we have relodged

 8    with the court the redacted versions of the six videos that

 9    have been introduced into evidence in this proceeding.

10         THE COURT:  Thank you, sir.

11         You may proceed.

12         MR. MCKINNEY:  Thank you.

13         MR. BORNSTEIN:  Can we get a copy of the new version

14    so we have one?

15         MR. MCKINNEY:  Yes.

16         MR. BORNSTEIN:  Thank you.

17                        STEVEN MARTIN

18    Recalled as a witness on behalf of the defendants herein, was

19    previously sworn, examined, and testified as follows:

20                   DIRECT EXAMINATION (CONTINUED)

21    BY MR. MCKINNEY:

22    Q.    Before the break, you were testifying about the number

23    of incidents where you found a potential use of too much

24    spray.

25         Do you recall that testimony?
```

1    A.      I do.

2    Q.      And you referred to between 20 and 20 incidents in

3    that category.

4            Is that correct?

5    A.      I believe I do.

6    Q.      When you say potentially too much spray was used, does

7    that equate, in your opinion, to a finding of unnecessary

8    excessive force?

9            MR. BORNSTEIN:  I'm going to object to the form of the

10   question.  It's leading.

11           THE COURT:  Well, it is leading, but it's easy enough

12   to rephrase.

13           How do you relate those 12 to 20 of the notion, if at

14   all, to the notion of excessive force, sir?

15           THE WITNESS:  I would want to look at the

16   circumstances in each case seeking whether there were

17   explanations for what would appear to be too much chemical

18   agent.  Absent explanations, then one might very well

19   conclude that they were indeed excessive instances of

20   excessive force.

21   BY MR. MCKINNEY:

22   Q.      Did you conclude that in any of these instances?

23   A.      Yes.

24   Q.      How many?

25   A.      I believe at least three.

1    Q.      And can you identify those inmates?  We'll talk about

2    a few cases, but can you identify those inmates as you sit

3    here?

4    A.      I believe Inmate E.  I believe Inmate A.  I believe

5    Inmate B, and there was an inmate I don't know his --

6            THE COURT:  Code number.

7            THE WITNESS:  Thank you, Your Honor.

8            -- his code number, but it's an incident that I

9    identified earlier on in my investigation in which 40-plus

10   bursts were deployed on a fairly seriously ill offender.

11   BY MR. MCKINNEY:

12   Q.      Did you bring that incident to the attention of the

13   department?

14   A.      Immediately upon reviewing and formulating some

15   preliminary observations, I did.

16   Q.      Were actions taken by the department?

17           MR. BORNSTEIN:  Objection, Your Honor.  It's leading.

18   There's no foundation.

19           THE COURT:  The objection is overruled.

20           Do you know whether actions were taken by the

21   department?

22           THE WITNESS:  I don't, counsel.

23   BY MR. MCKINNEY:

24   Q.      Are you familiar with the September 12th memorandum

25   written by Mr. Stainer?

1    A.      I apologize.  One was noticed in April.  That was in

2    September.  I had an opportunity to communicate and discuss

3    that particular incident with some additional incidents that

4    I believe led to a meeting that I had with Mr. Stainer in

5    which -- well, sorry.  I'm a bit confused here.  If I may

6    back up.

7         There was a briefing telephonically with high-ranking

8    California officials after April in which I discussed this

9    incident with some others and my concerns related thereto.  I

10   then met in person with some high-ranking officials,

11   including the undersecretary, in which I again related my

12   concerns in some level of briefing on those individual

13   incidents.

14        In November during a site visit, I met with Mr.

15   Stainer who obviously had been in some consultation

16   discussions with undersecretary McDonald after the September

17   meeting and had produced a memorandum --

18        THE COURT:  You mean Mr. Stainer produced a

19   memorandum?

20        THE WITNESS:  Correct, Your Honor.  He did not have

21   that -- if memory serves me, he did not have a copy of that

22   memorandum with him, but basically briefed me on the sum and

23   substance.

24        I don't know whether I was delighted, but I was

25   encouraged to hear that memorandum had been done.  Upon my

1    return to Austin, you shared a copy of that memorandum with

2    me in November of 2012.

3    BY MR. MCKINNEY:

4    Q.      Let's discuss a couple of opinions.

5            Have you have reached an opinion whether CDCR has

6    heightened safeguards to ensure that inmates in mental

7    illness are not subjected to unnecessary subjective force?

8    A.      Do they have heightened safeguards?

9    Q.      Correct.

10   A.      They in deed do.

11   Q.      Did you reach an opinion whether staff used force

12   maliciously or sadistically against inmates?

13   A.      I did.

14   Q.      What is that opinion?

15   A.      Certainly not as a pattern and practice.

16   Q.      Did you form opinions about CDCR's rules violation

17   process?

18   A.      I did.

19   Q.      What are those opinions?

20   A.      That they have in place policies structured by which

21   during the course of disciplinary hearings that offender's

22   mental status or an offender with mental illness that must be

23   addressed in terms of the hearing and whether there are

24   accommodations to that illness that should be considered and

25   in some cases applied to that offender in the discharge of

1    that disciplinary hearing violation or the resolution,

2    rather, as opposed to discharge.

3    Q.    Let's discuss some of the specifics issues that have

4    been raised in the context of this motion.

5          Did you look at use of the baton within CDCR?

6    A.    I did.

7    Q.    And when did you start looking at that issue?

8    A.    The moment that I learned that it was a standard issue

9    on a duty belt in the CDCR.

10   Q.    Why was that an issue?

11   A.    Immediate accessibility of weaponry impacts, I

12   believe, it's use in a system.

13   Q.    Based on your review, how frequently is the baton used

14   within CDCR?

15         THE COURT:  Well, he doesn't know that.

16         In terms of the mentally ill, how frequently is the

17   baton used?

18   BY MR. MCKINNEY:

19   Q.    Thank you.

20         Based on your review in those 700 cases,

21   approximately?

22   A.    I don't know that I'm comfortable with "frequently."

23   Q.    How is the baton used within CDCR?

24   A.    Thank you.

25         It's used in two primary ways, based on my review; one

1    is when there is a targeted or a threatened targeted assault

2    on another, certainly an officer, in which that officer uses

3    that in a traditional classic sense as a defensive weapon to

4    ward off or neutralize, immobilize that threat.

5         The second primary way in which it's used in CDCR is

6    in a fight intervention, typically, when OC spray has been

7    ineffective in terminating that assault and they have -- they

8    resort to strikes, multiple strikes oftentimes to nonlethal

9    areas of the body, lower limbs, ankles, calves, muscle mass

10   and the thigh.

11   Q.     In your view, are those appropriate uses of the baton?

12   A.     I struggle with this issue and continue to and

13   acknowledge that I have not seen the pattern of the use of

14   the baton in other systems or facilities that I saw in CDCR.

15   So it was somewhat a practice in which I did not have to

16   address either as a monitor or expert.

17        So my first impression was that there wasn't

18   sufficient guidance in either the regs or training materials

19   to the officer that the manner in which it was being

20   practiced is permissible, so that was a threshold issue to me

21   that:  Does the CDCR endorse and support the practice that we

22   see?

23        In thinking through that of making a recommendation

24   that there should be more guidance, of course I believe I had

25   to deal with the issue whether it was permissible, and it is

1    just my opinion -- obviously, I would defer to the parties

2    and the court as to how they resolve this -- if it's defense

3    of others and they've exhausted lesser means, then the use of

4    the expandable baton, in my view, is appropriate because the

5    alternative is this.

6         That they go hands-on with two potentially violent

7    inmates and they become part of that altercation by putting

8    hands-on as opposed to having an instrument that keeps at

9    least some distance, so in my view, this is a practical, real

10   approach.

11        While I do not like hard impact weaponry, I'm at a

12   loss to say what I would have them do, other than what

13   they're doing.  As long as it's trained, as long as it's

14   enforced and made clear that even in those circumstances

15   there are limitations on the use of that baton because it is

16   an impact weapon.

17   BY MR. MCKINNEY:

18   Q.    Plaintiff's expert offered an opinion the baton is

19   used with disturbing frequency.

20        Do you agree with that?

21   A.    I believe that to be without foundation in the

22   materials of his that I reviewed, and having reviewed it

23   myself, I believe substantively, I most certainly disagreed

24   with his finding.

25   Q.    In the 377 incidents you reviewed, how many involved

1    impact of the baton?

2    A.        Approximately 29.

3    Q.        What were those situations?

4    A.        Those situations I just described in the main fight

5    interventions in which OC spray had been used prior to the

6    use of the baton.

7    Q.        In your opinion, would it be a good idea to remove the

8    baton from CDCR?

9    A.        You mean just a blanket removal?

10   Q.        Correct.  Would that be a good idea?

11   A.        I think it would be an ill advised idea.

12   Q.        Why is that?

13   A.        Number one, they've incorporated it into their

14   practice, so it's something they're comfortable with and used

15   to.  So if you're going to remove it, you better doggone well

16   have something immediately in place that is comparable,

17   because I've seen situations over the years in which that

18   type of thing is done when it's created a vacuum that is

19   quickly filled by sometimes unwanted actions.

20        Can you place limitations on it in terms of where it

21   is to be available on the duty belt?

22        Sure you can.  If you're into a minimum custody

23   facility or you have parts that are minimum custody and there

24   are low level incidents of force and when you have that force

25   they're not serious, I think to the extent you can, you ought

1    to always de-arm, be it batons, grenades, whatever.  If they

2    have limited utility, why do you want them?  There's too many

3    thinks that can go awry when you have them.

4          So, yes, I would certainly encourage CDCR to explore

5    whether there might be a way to use the baton in a more

6    directed way in which it has obvious direct frequent utility

7    in that particular environment.

8    Q.    In your opinion, who should be making those

9    determinations?

10   A.    Competent managers, corrections administrators, of

11   course.  Who else would make it, counsel?

12   Q.    Let's talk a little more about the use of pepper

13   spray.

14         Are you familiar with Mr. Vail's opinions regarding

15   use of pepper spray?

16   A.    I am.

17   Q.    Do you agree that use of pepper spray by CDCR staff

18   systematic results in excessive force?

19   A.    I do not.

20   Q.    What are the issues with that sort of conclusion?

21   A.    I can't answer that question.

22   Q.    Why do you disagree?

23   A.    Well, number one, it tactically in the trade is

24   effective.  It's an accepted piece of weaponry that has some

25   real advantages in its use.  One, as I said earlier, it's not

1    an impact weapon.  It allows distance between the subject and

2    the officer, which almost always works to the advantage of

3    both, quite frankly, both the subject and the officer as

4    opposed to direct engagement.

5          Secondly, it has very temporary effects on the

6    subject, temporary in a relative sense versus an abrasion,

7    fracture, physical type of injury that obviously can cause

8    all kinds of complications.  It typically takes that out of

9    play.  The effects of it can be very much ameliorated very

10   quickly through proper decontamination, timely

11   decontamination.

12         Its basic ingredient is a cayenne pepper resin that

13   gives a great yield of discomfort, irritation and pain,

14   burning sensation, that doesn't have lasting effects but can

15   be an extremely effective, distracting to where you can

16   quickly neutralize the subject.

17   Q.    How long do the effects last, in your experience?

18   A.    Well, it will last about as long as you can get that

19   person decontaminated, but absent that, there -- it starts

20   dissipating within a matter of minutes, the effects.

21         It's not to say that they're gone, but depending on

22   where the subject has been sprayed, in the eyes and nose and

23   mouth, versus a thigh, versus some other area of the body,

24   one causes burning sensation on the body.  It's just a

25   burning sensation, and the other gives the impression of

1    obstructed breathing, and, of course, pain in the eyes.

2    Q.    Did you review of the testimony of Dr. Kaufman given

3    last month?

4    A.    Yes.

5    Q.    Dr. Kaufman first expressed an opinion that pepper

6    spray not be used at all with inmates with mental illness.

7          Do you have an opinion on that?

8    A.    Sure do.

9    Q.    What is that opinion?

10   A.    Silly.

11   Q.    Why is that?

12   A.    Unknowing, possibly dangerous.  I could use a lot of

13   words, but most importantly what would he have them do in the

14   alternative in the real world of having to pierce a barrier

15   and neutralize an inmate?  Talk him to death?

16   Q.    In your view would it be possible for a nurse to walk

17   into a cell of a serious --

18         THE COURT:  You certainly are leading now.

19         Try again.

20   BY MR. MCKINNEY:

21   Q.    Let me offer you a hypothetical, Mr. Martin.

22         Assume that an inmate has flooded his cell, covered

23   himself with feces, has smeared feces on his body.  Is it

24   realistic to expect that a nurse will walk into that cell

25   with a shot in hand to administer that medication?

```
 1   A.      I don't know --

 2           THE COURT:  The answer is:  It's unlikely?

 3           THE WITNESS:  Yes, sir.  Thank you, Your Honor.  I'll

 4   stand with his answer.

 5           THE COURT:  In your view.

 6           THE WITNESS:  Yes, exactly.

 7   BY MR. MCKINNEY:

 8   Q.      Let's talk a little bit about controlled use of force

 9   situations.  First of all, you're familiar with controlled

10   use of force in the California system.

11           Is that correct?

12   A.      I am.

13   Q.      Did you see evidence that custody staff consult with

14   clinicians prior to use of force?

15   A.      Yes.

16   Q.      Did you see evidence of deescalation by custody staff?

17   A.      Yes.

18   Q.      Did you see evidence of clinical intervention?

19   A.      Yes.

20   Q.      Did you see evidence of a waiting or a cooling-off

21   period?

22   A.      Yes.

23   Q.      Did you find the staff make efforts to avoid the use

24   of force?

25   A.      Yes.
```

1    Q.      How often does that, those efforts, how long does that

2    play out?

3    A.      Sometimes for a very significant period of time, hours

4    and hours and hours.

5    Q.      In your review, where did you find that evidence?

6    A.      Where did I find the evidence?

7    Q.      Did you find it in the videos?

8    A.      No.  I found it in reviewing the incident reports and

9    timelines.

10   Q.      Let's take a look at some of the videos that have been

11   introduced into evidence.

12           First of all, Inmate A.

13   A.      Yes, sir.

14   Q.      What did you review for this particular inmate?

15   A.      The video multiple time and the incident packet

16   including the IERC review.

17   Q.      And just for purposes of identification for the

18   record, this has been entered into evidence as Plaintiff's

19   Exhibit 2.

20           If I could have you turn to Exhibit AB in your witness

21   binder.

22   A.      (Witness complies.)

23   Q.      What is this document?

24   A.      AD in my binder?

25   Q.      AB, as in boy.

```
 1              THE COURT:  What did you say?

 2              MR. MCKINNEY:  AB, as in boy.

 3              THE WITNESS:  Okay.

 4    BY MR. MCKINNEY:

 5    Q.      What is this document?

 6    A.      (Reading:)

 7                  Declaration of Steve J. Martin in support of

 8                  defendant's opposition to motion related to use

 9                  of force and disciplinary measures.

10    Q.      If I could focus you on paragraph 16 of your

11    declaration.

12    A.      Okay.

13    Q.      Is this the same incident referring to Inmate A?

14    A.      It is.

15    Q.      Can you discuss what occurred in this incident with

16    respect to Inmate A, based on your review.

17    A.      It was a cell extraction in which I believe it was a

18    forced meds.

19              MR. BORNSTEIN:  If the witness is just going to read

20    what's in his declaration --

21              THE COURT:  That objection seems well taken.

22    Obviously, if we ever get to it, you can tell me that I ought

23    to look at paragraph 16 because it sets forth the witness'

24    beliefs concerning A.

25              However, if you have something that you want to
```

1    specifically ask him, feel free to do so.

2           MR. MCKINNEY:  It was to orient the court and for

3    clarify of the record, Your Honor.

4    Q.    Do you have an understanding why the floor was wet in

5    this incident?

6    A.    Yes.

7    Q.    Why was that?

8    A.    The inmate had flooded his cell.

9    Q.    Was there a threat presented by this inmate?

10   A.    Multiple threats.  Just shear resistance to a lawful

11   order; however, there's the issue of ability to conform

12   because he may have been seriously mentally ill.  But in

13   terms of executing a safe securing of this inmate, the cell

14   was flooded and there was some belief, if not evidence, that

15   the flooding contained fecal matter and that there was fecal

16   matter on his person.

17          So there was an obvious biohazard issue that officers

18   are not going to want to directly engage that subject unless

19   they absolutely have to.  That is, open the door and lay

20   hands and possibly take him to the floor, flooded cell,

21   slippery, hazardous fecal matter and secure him.

22   Q.    In your opinion, was it appropriate to have Inmate A

23   removed from his cell?

24   A.    Yes.

25   Q.    During his direct, Mr. Vail testified that the

 1    clinical intervening did not last very long.

 2          Do you agree with that?

 3    A.    I don't agree or disagree.  I don't recall.

 4    Q.    Do you recall whether there was an additional

 5    intervention beyond what's depicted in the video?

 6    A.    Oh, yes.  There was that, of course.  But prior to

 7    their entry, yes.

 8    Q.    What is your opinion with respect to the use of pepper

 9    spray with respect to Inmate A?

10    A.    That --

11          MR. BORNSTEIN:  It's been asked and answered, I

12    thought.

13          THE COURT:  Overruled.

14          You may answer.

15          We know what the answer is, but go ahead and put it on

16    the record.

17          THE WITNESS:  There was a point at which the command

18    staff should have disengaged the use of weaponry that

19    obviously was not achieving the tactical goal, because it not

20    only was obviously ineffective, it could have reached the

21    point of endangering that inmate through its sheer volume.

22    BY MR. MCKINNEY:

23    Q.    Would it have been appropriate for officers to have

24    immediately gone in with a hand on approach?

25    A.    I believe that would have been ill advised to do that.

1    Q.    Why is that?

2          THE COURT:  For all the reasons he's testified to at

3    least twice.

4          You may proceed, sir.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Now I'm just trying to get this over with,

7    not that it will ever been over with.  You're just one

8    element -- never mind.

9          Go ahead, counsel.

10   BY MR. MCKINNEY:

11   Q.    Mr. Martin, based on your review, how does the

12   involving Inmate A compare relatively to the other incidents

13   that you've reviewed?

14   A.    In the main, it's certainly not representative of what

15   I reviewed.

16   Q.    Have you seen other incidents similar to this one?

17   A.    Yes.

18   Q.    Those are the ones you've talked about, the three or

19   four that you've referenced; right?

20   A.    Yes.

21   Q.    Let's talk about Inmate B for a moment.  This has been

22   into evidence as Plaintiff's Exhibit 4.

23         Looking at your declaration, Mr. Martin, is this the

24   incident described in paragraph 18 of your declaration?

25   A.    It is.

1    Q.      Can you describe the applications of pepper spray in

2    this incident and whether or not they were successful?

3    A.      Well, the first application was described as a

4    malfunction.  The second application was impeded by a blocked

5    mattress.  The third application was through the top of the

6    cell.  The fourth supposedly hit the mattress in the wall,

7    and the fifth, a barricade removal device directed straight

8    into the cell was applied.

9            So there were five separate applications, as I

10   understand it.

11   Q.      Two of those were not -- the first two were not --

12           THE COURT:  Sir, honestly, you're going to lead him

13   and counsel will stand up and I'll have to sustain and we'll

14   be here forever.

15           MR. MCKINNEY:  Okay.

16   Q.      Was there a threat represented by this inmate?

17   A.      Yes.

18   Q.      What was that threat?

19   A.      Aside from his resistance to a lawful order, I believe

20   he also was observed with a gasser or possibly a gasser.

21   Q.      When you say a "gasser," what are you referring to?

22   A.      Some container filled with unknown liquid, everything

23   from water to a toxic matter.

24   Q.      In your opinion, was it appropriate to have the inmate

25   removed from his cell?

1    A.    Yes.

2    Q.    Let's talk about inmate D.  This is a Plaintiff's

3    Exhibit 18.

4         Referring to your declaration, is this the incident

5    discussed at paragraph 17 of your declaration?

6    A.    It is.

7    Q.    What did you review for his particular incident?

8    A.    The incident reports and the video.

9    Q.    Did officers -- what did the officers do in this case?

10   A.    This offender was in a holding cell, holding well,

11   actually.  My best description is a holding cage, open

12   barred, and there was an ongoing discussion between he and a

13   clinical -- let me amend that.

14        It wasn't a discussion.  The clinical worker was

15   listening to this offender plead his case, I think is a fair

16   description, and that went on for some number of minutes, and

17   it kind of escalated up and down.  And at one point on the

18   tape, I'm talking about he closed his fist and pumped it into

19   his other hand and was using some rather profane language

20   just immediately prior to their application of OC spray.

21   Q.    When you say "he," who are you referring to?

22   A.    I'm sorry.  The subject inmate.

23   Q.    In your opinion, is that a threat that necessitated

24   the use of force?

25   A.    Doggone right it is.

1    Q.      In your opinion, was this an excessive use of force?

2    A.      I could not conclude that.  I probably would have

3    severely critiqued it in a manner of letting the officers

4    know they were perilously close.  I would not conclude that

5    because they were precipitating parts of that event that I

6    think could have been handled better, but at the moment that

7    he is threatening and resisting physical gestures and so

8    forth, they needed to get that wrapped up and get him where

9    he was going.

10   Q.      In your opinion, was this inmate coherent?

11   A.      Yeah, he clearly was in my view.

12   Q.      Was he capable of complying with an order?

13   A.      Yes.

14   Q.      What about Inmate B, was he capable of complying with

15   an order?

16   A.      I don't honestly know.

17   Q.      Let's talk about Inmate F, Plaintiff's Exhibit Number

18   12.

19           Do you have that inmate in mind?

20   A.      Yes.

21   Q.      Are you familiar with this incident?

22   A.      Yes.

23   Q.      What did you review for this incident?

24   A.      Video and incident report package.

25   Q.      And did you make any conclusion based on your review

```
 1    of this incident?

 2    A.      The conclusion I did make, I could not conclude it was

 3    excessive force.

 4    Q.      Why is that?

 5    A.      Well, it was an effective use, tactical operation,

 6    number one, without a large amount of OC spray being used.

 7    And as my notes suggest, it was a forced med, so there was

 8    some level of immediacy in play there to get him medicated.

 9    Q.      Looking at Inmate I, this is at Plaintiff's Exhibit 8,

10    and I believe this is discussed in paragraph 19 of your

11    declaration.

12            Is that correct?

13    A.      Correct.

14    Q.      What did you do to evaluate this incident?

15    A.      Again, the instep package, IERC materials, and the

16    video.

17    Q.      Were there attempts to de-escalate the situation in

18    this particular case?

19    A.      Yes.

20    Q.      How long did that last?

21    A.      I have it noted in my declaration as from the point

22    the inmate refused to exit the cell to the point application

23    of force was three and a half hours.

24    Q.      Was also clinical intervention occurring during this

25    time?
```

1  A.     Yes.

2  Q.     Let's talk about a few other examples.  If I could

3  have you turn to Exhibit 20 in the plaintiff's exhibit

4  binder.

5  A.     (Witness complies.)

6         MR. BORNSTEIN:  What was the number?

7         THE COURT:  20.

8         Is it in evidence, Madam Clerk?

9         THE CLERK:  20 is in evidence of 20A1, 20E1, 20C1,

10 20A2, 20B2 and 20C2, so I don't know.

11        THE COURT:  Well, all of those are in evidence and

12 restrict yourself to those letters, subparagraphs as to 20,

13 if you can do that, Mr. McKinney.

14        MR. MCKINNEY:  I think we'll be focusing on just on

15 20A, Your Honor.

16        THE COURT:  All right.

17 BY MR. MCKINNEY:

18 Q.     Mr. Martin, are you familiar with this particular

19 incident?  This refers to Inmate J.

20 A.     Yes.

21 Q.     Can you describe what you saw in your review of this

22 incident.

23 A.     I will have to refresh my memory.

24 Q.     When the inmate was removed from the cell, was pepper

25 spray used in this incident?

1    A.      Counsel, I just said I had to review --

2    Q.      I'm sorry.  I didn't understand.  Please take a

3    moment.

4    A.      (Witness reviews document.)

5            Your question?

6    Q.      Can you describe the force used in this incident.

7    A.      There was some hands-on force in order to move the

8    inmate, and then he was moved -- there was some continued

9    resistance after he was moved and restrained, and then OC

10   spray was used in the inmate's facial area.

11   Q.      What was the threat represented by the inmate at the

12   time the OC spray was used?

13   A.      It appears that he was just continuing to resist and

14   pull on a triangle chain, lanyard.

15   Q.      In your view, did this represent an inappropriate use

16   of OC spray?

17   A.      I need to study this, counsel.  I'm just not where I

18   need to be to answer that question.  Sorry.

19           THE COURT:  That's all right.

20   BY MR. MCKINNEY:

21   Q.      Let's look at a few of the examples in the witness

22   binder before you.

23           Why are these incidents selected that are in this

24   binder?

25           MR. BORNSTEIN:  Objection.  Lack of foundation.

1    THE COURT:  It's his binder and he's asking why they

2    were put into it.

3    MR. BORNSTEIN:  It's the Martin binder?  I'm sorry.  I

4    wanted to make sure which binder we're talking about.

5    BY MR. MCKINNEY:

6    Q.    Go ahead, Mr. Martin.  The exhibits in the witness

7    binder, why were those incidents selected?

8    A.    Those were incidents that, in my review of the 377

9    incidents discussed earlier, that I believe had some

10   relevance in trying to establish a context for those

11   incidents in terms of other representative incidents of the

12   whole, as opposed to selecting what were clearly some very

13   aggravated incidents and focusing on those, especially in a

14   systemic case.

15   Q.    Let me return to tab AE in the binder.

16   A.    Okay.

17   Q.    Are you familiar with this incident?

18   A.    Yes.

19   Q.    And why was this incident -- what is represented in

20   this incident?

21   A.    This incident I wasn't aware of until I reviewed --

22   THE COURT:  I don't have a CE.

23   MR. MCKINNEY:  AE, Your Honor.

24   THE COURT:  Okay.

25   THE WITNESS:  -- until recently, and it obviously

1    jumped off the page for me for this reason.  One of the first

2    incidents that I found in my review that bothered me was this

3    inmate that had been subjected to 40-plus bursts of OC spray.

4    This incident in AE occurred subsequent to that in which I

5    couldn't help but note the decision was made not to use

6    chemical agents because Inmate X has proven to be immune to

7    them on a prior cell extraction.

8         I just thought it was relevant that as bad as that

9    was, they didn't do it a second I'm.

10        MR. BORNSTEIN:  Just for the record, that's Inmate L,

11   not Inmate X.

12        THE WITNESS:  Sorry, counsel.  I just made that up.

13        MR. BORNSTEIN:  I know.  I wanted the record to be

14   clear.

15        THE WITNESS:  You're correct.

16        MR. MCKINNEY:  I would like to move Exhibit AE into

17   evidence.

18        THE COURT:  Hearing no objection, it's received.

19                      (Whereupon, Defense Exhibit AE was

20                      received into evidence.)

21   BY MR. MCKINNEY:

22   Q.    Mr. Martin, turning your attention to the next tab in

23   the binder, AF.

24   A.    Yes.

25   Q.    Are you familiar with this incident?

1    A.      I am.

2    Q.      What does this incident represent?

3    A.      It represents an incident in which a psych tech was

4    spat upon with mucus in her face and that the matter was

5    resolved basically with the use of a spit mask and without

6    any significant force.

7    Q.      Are you familiar with the CDCR policy involving

8    application of spit mask?

9    A.      Yes.

10   Q.      In your view, is that an appropriate policy?

11   A.      It is.

12   Q.      In your opinion, was the application of the spit mask

13   here appropriate?

14   A.      I think rather obviously.

15           MR. MCKINNEY:  I'd like to move Exhibit AF into

16   evidence.

17           THE COURT:  Received.

18                      (Whereupon, Defense Exhibit AF was

19                      received into evidence.)

20   BY MR. MCKINNEY:

21   Q.      Mr. Martin, turning to the next tab in the binder,

22   Exhibit AG.

23   A.      Yes, sir.

24   Q.      Are you familiar with this incident?

25   A.      I am.

1    Q.      Why was this incident selected?

2    A.      There's been a good deal of discussion of clinical

3    intervention and its success or lack thereof, and this was an

4    instance in which clinical intervention was clearly

5    successful in restraining the inmate, and once the inmate was

6    let out, he attempted to head butt the staff.

7    Q.      What occurred after that, after the inmate attempted

8    to head butt staff?

9    A.      He was taken to the wall and himself injured promptly

10   from the wall.

11   Q.      Was pepper spray used?

12   A.      It was not.

13           THE COURT:  Maybe you did and I did not mark it, if

14   you haven't, are you moving in AG?

15           MR. MCKINNEY:  I would like to move AG into evidence.

16           THE COURT:  Received retroactively.

17           MR. MCKINNEY:  Thank you, Your Honor.

18                          (Whereupon, Defense Exhibit AG was

19                          received into evidence.)

20   BY MR. MCKINNEY:

21   Q.      Mr. Martin, we've talked a little bit about the policy

22   involving the food courts.  I'd like to turn to a few

23   examples.

24           If you can turn to Exhibit AI in the binder.

25   A.      (Witness complies.)

1    Q.    Are you familiar with this incident?

2    A.    I am.

3        MR. MCKINNEY:  I would like to move Exhibit AI into

4    evidence at this point.

5        THE COURT:  Hearing no objection, it's received.

6                    (Whereupon, Defense Exhibit AI was

7                    received into evidence.)

8    BY MR. MCKINNEY:

9    Q.    Mr. Martin, can you describe what occurred in this use

10   of force incident?

11   A.    Very quickly, a gasser was thrown on two officers

12   hitting him in the facial neck areas.  One of the two

13   officers used one burst of OC spray, took the inmate away

14   from the cell front.

15   Q.    Did they successfully close the food court?

16   A.    Yes.

17   Q.    Was that use of force appropriate in these

18   circumstances?

19   A.    I believe it was.

20   Q.    Turn to the Exhibit AL.

21   A.    (Witness complies.)

22   Q.    Are you familiar with this incident?

23   A.    I am.

24        MR. MCKINNEY:  I would like to move Exhibit AL into

25   evidence.

1          THE COURT:  Hearing no objection, it's received.

2                    (Whereupon, Defesne Exhibit AL was

3                    received into evidence.)

4    BY MR. MCKINNEY:

5    Q.    Can you describe this incident, Mr. Martin?

6    A.    This is an incident in which an officer used OC spray

7    in a food court situation, and upon review of the IERC, they

8    concluded it was inappropriate use because I think quite

9    correctly, they concluded there was no -- this is -- should I

10   gave the Bates?

11   Q.    If you have a reference?

12   A.    DEXP, as in Paul, 097319.  It's the first page of the

13   IERC critique, and they conclude under the threat, reasonably

14   perceived section as follows (Reading:)

15                    There's what no immediate threat to staff as the

16                    inmate was contained in an exercise module and

17                    was walking away from officer.  The immediate

18                    need for force was not necessary, and they

19                    required the officer -- that training be

20                    provided to the officer.

21   Q.    Mr. Martin, if I could refer you to Bates page 097346

22   on the back of this packet.

23   A.    Okay.

24   Q.    What is this document, first of all?

25   A.    It's a manager's review, second level.

 1   Q.    And looking at the comments, what is reflected?

 2   A.    That this issue was identified at that level that the

 3   staff use of force was not in compliance.

 4   Q.    If I could refer you to Exhibit AJ now, Mr. Martin.

 5   A.    (Witness complies.)

 6   Q.    Are you familiar with this incident?

 7   A.    I am.

 8         MR. MCKINNEY:  I would like to move Exhibit AJ into

 9   evidence.

10         THE COURT:  Received.

11                        (Whereupon, Defense Exhibit AJ was

12                         received into evidence.)

13   BY MR. MCKINNEY:

14   Q.    Mr. Martin, can you describe what occurred in this

15   incident.

16   A.    This was a situation in which inmate had his hand in

17   the food court.  He attempted to grab the OC canister.  The

18   officer used OC spray.  The committee found that that was an

19   inappropriate use, that he, again, could have retreated, and

20   they required remedial training for this officer.

21         THE COURT:  It's 3 o'clock.  We'll take our afternoon

22   recess.

23         15 minutes, ladies and gentlemen.

24                        (Whereupon, a break was taken at

25                         2:54 p.m.)

1837

1    (Back on the record at 3:20 p.m.)

2    THE CLERK:  Please, remain seated.

3    Court is now in session.

4    THE COURT:  Sit, sir.

5    Mr. McKinney.

6    MR. MCKINNEY:  Thank you, Your Honor.

7  BY MR. MCKINNEY:

8  Q.    Mr. Martin, are you familiar with California's

9  procedure and practice for videotaping use of force

10  incidents?

11  A.    Yes.

12  Q.    How does that process compare with other

13  jurisdictions with which you're familiar?

14  A.    I think well or favorably.

15  Q.    What are the reasons that controlled use of force

16  incidents are videotaped?

17  A.    To provide an objective record of what occurred in

18  the incident.

19  Q.    Is California accomplishing that objective?

20  A.    I believe they are.

21  Q.    Do you have an opinion about whether the mere fact of

22  turning on the cameras has an impact on the officers?

23  A.    I believe it does.  They tend to be consciously aware

24  that there is an objective record being made and likely act

25  more in accord with how they're required to act.

1838

1    Q.      You were an expert in the Madrid versus Gomez

2    litigation, correct?

3    A.      I was.

4    Q.      In what capacity?

5    A.      In two different areas.  One, application of force.

6    Two, inmate-on-inmate violence, primarily in-cell violence in

7    their high security units.

8    Q.      Can you compare use of force at the time of Madrid to

9    now?

10          MR. BORNSTEIN:  I object to the form of the question

11    to the extent it extends beyond severely mentally ill

12    inmates.

13          THE COURT:  That appears to be a reasonable

14    objection, Mr. McKinney.

15          This trial is not about everything going on in the

16    prison, thank goodness, but the objection is sustained.

17          You may proceed.

18    BY MR. MCKINNEY:

19    Q.      Mr. Martin, during Madrid did you look at use of

20    force incidents involving inmates with mental illness?

21    A.      I did.

22    Q.      In comparing those incidents, can you compare use of

23    force then and now?

24    A.      The style then was heavy reliance on impact weaponry

25    in combination with chemical agents.

1839

1    Q.    Let's talk about reporting for a moment.

2         Do you have an opinion about the quality of the

3    reporting on use of force within CDCR?

4    A.    I found it to be good.

5    Q.    You have discussed your opinions on the review

6    process already.  Are you aware of other forms of oversight

7    on use of force within California?

8    A.    There's the OIG.  Obviously, there is the IERC.

9    There is the Office of Internal Affairs, when they are

10   brought into play would be oversight.

11        I believe there's some central office oversight set

12   up through the procedures to review incidents.

13   Q.    How does the oversight in California compare with

14   other jurisdictions with which you're familiar?

15        THE COURT:  You know, I let the first question go

16   because I figured it would -- I let it go.

17        What difference does it make if everybody is acting

18   in an even worse fashion?  What possible difference could it

19   make?

20        The court's objection is sustained.

21        You may proceed, sir.

22        MR. MCKINNEY:  Okay, Your Honor.

23   BY MR. MCKINNEY:

24   Q.    Mr. Martin, do CDCR administrators approve

25   inappropriate force within CDCR?

1840

1        MR. BORNSTEIN:  No foundation.

2        THE COURT:  I mean, the question is, in terms of your

3   review relative to mentally ill patients, can you express an

4   opinion as to whether CDCR administrators approve of

5   inappropriate use of force?

6        That's the question you wanted to ask right, sir?

7        MR. MCKINNEY:  Yes, Your Honor, that will work.

8   BY MR. MCKINNEY:

9   Q.    Did you understand the question, Mr. Martin?

10  A.    I believe I do.

11       THE COURT:  The answer is:  No, they don't approve

12  because, by golly, they don't.

13       Right?

14       THE WITNESS:  I disagree with all respect.

15       THE COURT:  I'm sorry.  Go ahead.

16       The question is whether -- I'm sorry.  I've forgotten

17  who you asked about.

18       THE WITNESS:  I may be confused.

19       THE COURT:  The question is whether CDCR

20  administrators approve of inappropriate use of force against

21  mentally ill patients.

22       That's the question?

23       MR. MCKINNEY:  I would add, "on a systemic basis."

24       THE COURT:  All right.  Good.

25       THE WITNESS:  Important addition, counsel.

1841

1      No.

2  BY MR. MCKINNEY:

3  Q.      Talking about inmate discipline and rules violation

4  process, Mr. Martin, in your experience do hearing officers

5  take into account an inmate's mental health in imposition of

6  discipline?

7  A.      They consider it, yes.

8  Q.      In your opinion are inmates punished for their mental

9  illness?

10          THE COURT:  No, I don't think that is a question the

11  witness can answer.  He can say punishment is meted out or

12  not to mentally ill patients, but that generalized question

13  has no meaning.

14          But you may ask:  In your review do you find that

15  reviewers take into account -- not reviewers, but you know

16  who I mean -- take into account mental illness of prisoners

17  when reviewing the use of force?

18          THE WITNESS:  That's the question?

19          THE COURT:  Is that the question?

20          MR. MCKINNEY:  Can I have that read back?

21          THE COURT:  Go ahead and state your question.

22          MR. MCKINNEY:  Can we have your question read back.

23  I think it's a good question.  There is one part I didn't

24  track.

25          THE WITNESS:  I think it is a good question.

1842

1          THE COURT:  I thought that it was bad.  Apparently

2     not.

3          (Whereupon, the record was read back as requested.)

4          THE WITNESS:  I haven't found evidence that they

5     routinely do, if I'm understanding the question.

6          MR. MCKINNEY:  I'm not sure.

7     BY MR. MCKINNEY:

8     Q.     We're talking about the rules violation process?

9     A.     Use of force, counsel, is what that question was.

10          Am I confused?

11          THE COURT:  Well, no.  The question is, you have this

12     review process, which arises out of the use of force as I

13     understand it, correct?

14          MR. MCKINNEY:  We can certainly talk about that.  If

15     that is the question, that's fine

16          THE COURT:  I don't want to put words in your mouth.

17          MR. MCKINNEY:  We had moved on to the rules violation

18     process.

19          I think Mr. Martin answered the question you asked

20     which was consistent with his testimony so -- I'm sorry --

21     Mr. Stainer's testimony.

22     BY MR. MCKINNEY:

23     Q.     Let me back up.

24          Mr. Martin, currently in the review process for use

25     of force issues is mental health -- is consideration of the

1843

1    inmate's mental health status taken into account?

2    A.      I haven't found that it was or has been.

3    Q.      Would it be appropriate to do so understanding what

4    the IERC does?

5    A.      If I may ask whether I understand the question.

6            Are you asking that there should be somewhat of a

7    separate determination made with respect to the application

8    of force in the instance in which the subject is mentally

9    ill?

10   Q.      That's one way to put it, yes.

11   A.      Theoretically, that sounds mighty nice.  I'm at a

12   loss to suggest how that might actually be incorporated into

13   that decision because applications of force concern

14   themselves with the circumstances of a threat and how that

15   threat was managed and the response thereto.

16           To the extent that the mental illness was connected

17   to the resistance and was a product of, you still would

18   assess what that actualized resistance was.

19           I'm maybe not just able to handle that question.

20   Q.      I think you answered the question.

21           Turning back to the rules violation process, a number

22   of opinions have been offered about the classification

23   process.

24           Are you familiar with that process in CDCR?

25   A.      Yes.

1844

1    Q.    Are classification decisions punishment?

2    A.    They're not.

3    Q.    Why do you say that?

4    A.    An administrative decision is to assist in how to

5    manage that offender, not how to punish or impose sanctions

6    on the offender.  That's a different process.

7         THE COURT:  But the result may be punishment?

8         THE WITNESS:  Absolutely.  Certainly.

9         THE COURT:  Certainly.

10        THE WITNESS:  Yes.  It could have that effect.

11        THE COURT:  You may proceed, sir.

12   BY MR. MCKINNEY:

13   Q.    If an inmate is convicted for a serious violation of

14   rules, such as assault on an officer, should they not be held

15   accountable simply because they're a Coleman Class Member?

16   A.    Certainly they should be held accountable, with due

17   consideration for their status as a class member, that being

18   mental illness.

19   Q.    Mr. Martin, based on your review of both use of force

20   and the rules violation process, in your view is there a need

21   for the court to order the remedial orders requested by

22   plaintiffs?

23   A.    There, in my view, is a need for them to take some

24   corrective measures to insulate or create a bright-line

25   between constitutionally suspect actions and good

1845

1    correctional practice.

2         The issues I believe have been framed properly for

3    the agency officials through this hearing, through

4    recommendations, et cetera.

5         They are competent to address those issues and to put

6    into place corrective measures to improve their system.  They

7    are best situated to do that, if they are willing in assuming

8    levels of confidence, which I believe are there, that they

9    should be allowed to devise those corrective measures,

10   sharing them with all the world.

11        And if they meet and address those issues, then

12   they're invested in having done that work on their own.  And

13   it all will be subject to external and internal monitoring.

14        Do they fail to do that, there's no doubt in my mind

15   what is likely to happen.

16   Q.   When you say --

17   A.   If they can't see it, then they're in trouble.

18   Q.   When you say "they," you're referring to?

19   A.   Agency officials.

20   Q.   Plaintiffs have asked the policy be revised to

21   prohibit use of pepper spray against inmates with mental

22   illness in their cells or similar environments.

23        Do you agree with that?

24   A.   I do not.

25   Q.   They also asked the policy be revised to prohibit use

1846

1    of batons against inmates with mental illness.

2           Do you agree with that?

3    A.      I do not.

4    Q.      Have you reviewed the testimony from Mr. Stainer

5    regarding the steps that -- or proposed revisions that CDCR

6    is making or intends to make to the policy?

7    A.      Did I what?

8    Q.      Pardon me.

9           Are you familiar with the testimony from Mr. Stainer

10   concerning the proposed revisions to the Use Of Force Policy?

11   A.      Yes.

12   Q.      And in your opinion are these appropriate in concept?

13   A.      I don't know that I'm sufficiently familiar to answer

14   that question.  I know what I have been advised of is a step

15   or steps in the right direction consistent with some

16   recommendations that I have made.

17          To see how they are fully realized, simply I'm not

18   going to bless, join, endorse until I'm able to responsibly

19   study those in a written form.

20   Q.      But these are steps forward in a process?

21   A.      Certainly.  Certainly are.

22   Q.      The plaintiffs have also suggested that in an

23   immediate use of force context that an officer run and go

24   grab a camera and tape the incident.

25          In your opinion, is that appropriate?

1847

1    A.       Again, it depends on how you operationalize that.  If

2    it is at the expense of delay, where you have an imminent

3    enforcement necessity, it is folly to suggest that would be a

4    good course of practice.

5            If a regulation says that when practical bring to

6    bear videotape, and you do it, you do what is reasonable.

7    You do not delay compelling action to neutralize aggression

8    to get it on tape.

9    Q.       Mr. Martin, at some point during your work in this

10   case did plaintiffs' counsel make remarks about your work in

11   a public forum?

12           MR. BORNSTEIN:  Your Honor, I object to this.  It is

13   irrelevant.  It is also --

14           THE COURT:  Prejudicial.

15           MR. BORNSTEIN:  Prejudicial.

16           MS. VOROUS:  Your Honor, I agree.  It was extremely

17   prejudicial.  In fact, defamatory.

18           MR. BORNSTEIN:  Well, I disagree with that.

19           THE COURT:  Whether it is defamatory or

20   prejudicial -- I mean, defamatory is not an appropriate

21   objection.

22           The question is does it lend anything to this case,

23   and the answer that people disagree very strongly is beside

24   the point.

25           You may proceed, sir.

1848

1    MR. MCKINNEY:  Your Honor, will I be permitted to ask

2    the witness questions?

3    THE COURT:  No.  The objection is sustained.

4    MR. MCKINNEY:  One moment.

5    (Counsel confers with cocounsel.)

6    MR. MCKINNEY:  No further questions at this time,

7    Your Honor.

8    MR. BORNSTEIN:  Your Honor, may I have a moment?

9    Thank you.

10    (Brief pause.)

11                    CROSS-EXAMINATION

12    BY MR. BORNSTEIN:

13    Q.    Mr. Martin, do you remember me, Jeff Bornstein,

14    right?

15    A.    Yes, sir.

16    Q.    So I want to start where you stopped, on the issue of

17    cameras.  And I want -- the issue, as I understand your

18    answer, was where it's -- where it is practical, and it is

19    reasonable, having the ability to film an immediate use of

20    force would be helpful, correct?

21    A.    Yes.

22    Q.    And many institutions now are equipping their

23    officers with cameras for that purpose, right?

24    A.    The technology is available.

25    Q.    And that's a good thing?

1849

1    A.    Yes.

2    Q.    You were asked in various indirect ways about

3    concerns that you have with the way in which CDCR uses force

4    against mentally ill inmates, correct?

5    A.    Correct.

6    Q.    And that there are things that need to be done, in

7    your view, to change the way in which CDCR uses force against

8    mentally ill inmates, correct?

9    A.    Correct.

10   Q.    And I would like to spend time talking about that

11   this afternoon.  Okay?

12   A.    Your examination, counsel.

13   Q.    Thank you.

14         First thing I would like to understand from you, sir,

15   is the situations that we have by videotape, as far as you

16   understand, those are 17 videotapes of controlled use of

17   force, meaning where an inmate was in a cell and therefore,

18   by policy, it needed to be videotaped, correct?

19   A.    I believe that's correct.

20   Q.    And those -- that, as far as you understood, is the

21   universe?

22         In other words, those are all the controlled use of

23   force videos for at least the period that the requested that

24   Mr. Vail was able to gather as part of his reviews, correct?

25   A.    I don't know.

1850

1    Q.      Were you given other controlled use of force videos?

2    A.      I viewed some on site.

3    Q.      More than the 17?

4    A.      Other than the 17.

5    Q.      Yes?

6    A.      Yes.

7    Q.      And were those in your files?

8    A.      You mean notes?

9    Q.      Yeah.

10   A.      Where I made them they were.

11   Q.      All right.

12           And in those other videos that you watched, were they

13   cell extractions like the 17 that we've seen?

14   A.      They were.

15   Q.      And did they have the same issues that you've

16   commented on in these, of tactics that seemed like they were

17   less than what they should have been?

18   A.      Likely so, counsel.  That's why I probably viewed

19   them.

20   Q.      And in saying that, the problem really is the line

21   between what is excessive or unnecessary force from a

22   constitutional standpoint and from a practice standpoint -- a

23   best practice standpoint is a very thin line; isn't that

24   true?

25   A.      Let me distinguish a term so we can -- I mean, I want

1851

1    the best information available to the court.

2           I regret using the term "best practice" because that

3    implies literally the best.  I wished I had used the term

4    "sound correctional management practices" because there is

5    a -- there can be a considerable gulf between literal best

6    practices and the constitutional line, less so with sound

7    correctional practice, that line or that gulf is much more

8    narrow as I use it in my work, if that helps?

9    Q.      Yes.  So when we look at your recommendations, and we

10   listen to your testimony about best practices, what you're

11   really talking about are sound, mainstream correctional

12   practices?

13   A.      That would be fair.

14   Q.      All right.  You were hired when by the State

15   approximately?

16   A.      I believe September or October of 2011.

17   Q.      And you understood at that time that you were working

18   with the State so that they could file a motion to terminate

19   the court's oversight of the prison system, at least as it

20   related to mentally ill inmates; is that correct?

21   A.      That is flatly incorrect.

22   Q.      So you didn't know that?

23   A.      I did not know that.

24   Q.      When did you find that out?

25   A.      When I rendered my findings on the systemic pattern

1852

1    and practice.

2    Q.       When did you do that?

3    A.       Initially, in August.

4    Q.       Of 2012?

5    A.       You're correct.

6    Q.       All right.

7            And it was at that time that you made your -- or

8    prior even to that time that you made your concerns known

9    about the practices that needed to be reformed or changed,

10   correct?

11   A.       Counsel, I started making them prior to that.

12           THE COURT:  Let me interrupt because I'm sure I

13   misunderstand.  You were hired in September or October of

14   2011?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  You wouldn't have made your

17   recommendations in August.  August precedes September and

18   October.

19           THE WITNESS:  2012, Your Honor.

20           THE COURT:  All right.

21           THE WITNESS:  You're quite right.

22   BY MR. BORNSTEIN:

23   Q.       Basically, you worked for 11 months or so with a

24   bunch of other -- not a bunch -- several other experts that

25   the State had hired, right?

1853

1   A.      Correct.

2   Q.      And you rendered your opinion that there was no

3   pattern and practice of use of force violations that rose to

4   a constitutional level, right?

5   A.      Sometime probably in August of 2012.

6   Q.      Okay.  But what you did find were a series of

7   concerns -- serious concerns about the way in which

8   California was treating its mentally ill inmates, correct?

9   A.      You're correct, counsel.

10  Q.      And in fact, you are the person who told me about the

11  "perfect storm," right?

12  A.      I shared some ideas on that with you, yes.

13  Q.      And I going to show you a diagram which has been

14  premarked as Exhibit 95 for evidence.

15          It is a blowup.

16          MR. MCKINNEY:  Objection, Your Honor.  This is

17  argument.

18          THE COURT:  I have no idea.  As soon as somebody

19  asks -- at least puts it up, I'll be able to have a better

20  idea.

21          MR. BORNSTEIN:  Okay.  I'll do that.

22          I was going to ask him.

23  BY MR. BORNSTEIN:

24  Q.      Does this diagram, which has been a blowup of what we

25  premarked as Exhibit 95, does this illustrate the opinion

1854

1    that --

2         THE COURT:  Sir --

3         MR. BORNSTEIN:  I'm sorry.

4         (Counsel steps back to podium.)

5         MR. MCKINNEY:  Your Honor, since the question

6    started, there is no foundation.

7         THE COURT:  Let's get the question out, then you can

8    tell me why it ought not to be permitted.

9    BY MR. BORNSTEIN:

10   Q.    Does this diagram illustrate your opinion about the

11   use of force -- the perfect storm as relates to mentally ill

12   inmates?

13        MR. MCKINNEY:  Objection.  Counsel is arguing.  This

14   is lack of foundation, lack of authentication.  This was

15   prepared by plaintiffs' counsel.

16        THE COURT:  All of those objections are overruled.

17        I mean, the question is does this reflect his

18   opinion.

19        The answer is either "yes" or "no" or "partly" or

20   something, but it is a question of his opinion.

21        Yes, sir, you may answer.

22        THE WITNESS:  This reflects, through a good deal of

23   experience in other systems, what can happen in systems in

24   which mentally ill inmates are not properly managed.

25        I did not render an opinion as to whether this

1855

1    dynamic is in full force and effect in CDCR.

2    BY MR. BORNSTEIN:

3    Q.    Fair enough.

4          Does this describe what can happen in a prison system

5    involving mentally ill inmates?

6          THE COURT:  Stop.  You want to object?

7          No, you didn't.  Okay.

8          MR. MCKINNEY:  I will object.  It's been asked and

9    answered.

10          THE COURT:  Overruled.

11          THE WITNESS:  It does, yes.

12   BY MR. BORNSTEIN:

13   Q.    And what I would like now to do is kind of walk

14   through it so we understand it.  And then we can talk in

15   terms of how it fits in with the facts that you have

16   evaluated and that are before this court.

17          Okay?

18   A.    Yes, sir.

19          THE COURT:  Yes.

20          MR. MCKINNEY:  Again, Your Honor, lack of foundation.

21          THE COURT:  Lack of foundation can't possibly be an

22   appropriate objection.

23          The witness has already said:  Yes, I believe.  I

24   mean, I understand his opinion to be that I believe that this

25   is a dynamic that exists and negatively impacts the

1856

1   appropriate treatment of mentally ill inmates.

2        MR. MCKINNEY:  In other systems, correct, Your Honor,

3   but the relevance to this proceeding --

4        THE COURT:  It is just like -- the objection is

5   overruled.

6        You may proceed.

7   BY MR. BORNSTEIN:

8   Q.    Okay.  So the first factor in what you have called

9   the "perfect storm" relates to the level of confinement for a

10  mentally ill inmate, correct?

11  A.    It does.

12  Q.    Please, explain that.

13       THE COURT:  You have a running objection, and they

14  are overruled.

15       MR. MCKINNEY:  Your Honor, this is a different issue.

16  We don't have a copy of this exhibit.

17       MR. BORNSTEIN:  Yes, you do.  It is Exhibit 95.

18       MR. MCKINNEY:  We don't have a copy.

19       MR. BORNSTEIN:  Sure you do.

20       MR. MCKINNEY:  It's in the binders?

21       THE COURT:  It is no shame not to know, counsel.

22  There are thousands of exhibits, and I say again what I've

23  said before, I look forward to the Ninth Circuit saying that

24  they've read every one of those exhibits and digested them

25  fully because, of course, that's how I am.

1857

1    MR. BORNSTEIN:  Your Honor, I would like to move this

2    into evidence for illustrative purposes at this point.

3    MR. MCKINNEY:  Objection.

4    THE COURT:  The objection is sustained.

5    It is illustrative, and on that basis you may proceed

6    to use it.

7    MR. BORNSTEIN:  All right.

8    BY MR. BORNSTEIN:

9    Q.    We're starting with the level of confinement or the

10   way in which a mentally ill inmate is confined?

11   A.    Yes, sir.

12   Q.    Please explain the significance of that as far as the

13   perfect storm is concerned?

14   A.    It's been my experience, through study and direct

15   observation and et cetera, et cetera, that an inmate that is

16   mentally impaired, that is confined in highly restrictive

17   in-cell time, that is to say in excess of 20 hours a day,

18   that he or she has difficulty in coping with that highly

19   restricted environment vis-a-vis a healthy, advantaged

20   person.

21   And that that will begin at some point to manifest

22   itself through a variety of behaviors, some of which are

23   nuisance violations, some of which are threatening behaviors.

24   And if they rise to a certain level, a threat in which an

25   application of force comes into play, then that occurs.

1858

1     That typically is followed by disciplinary action

2   related to whatever gave rise to the use of force, refusal to

3   obey an order or assault or whatever it might be.  So that

4   gives rise to a disciplinary action, that if it is serious

5   enough or cumulatively dealt with, that is to say other

6   related priors that notch that up, then that offender may

7   find him or herself placed for even a longer term of

8   confinement in a highly restricted setting in which you then

9   are into a cycle of behaviors that are untoward and manifest

10   themselves, again in a variety of ways of violations, to

11   where that time is extended, to where you have placed that

12   offender in a situation in which he simply cannot cope on a

13   daily basis without decompensating, without struggling more

14   and more, which again manifests itself in the difficult task

15   of managing that offender.

16   Q.    And now with respect to that I want to break it down

17   a little bit.

18        In Inmate A's case, as part of your work here, you're

19   aware of Dr. Wagner's testimony that he allowed that inmate

20   to decompensate in his cell for three weeks?

21        MR. MCKINNEY:  Objection.  Misstates the testimony.

22        THE COURT:  I doubt that it misstates his testimony.

23   You may proceed, sir.

24        It was one of the things -- never mind.

25        Yes, you may answer, sir.

1859

1    THE WITNESS:  I reviewed that testimony.  And yes,

2    that's the similar meaning that I drive from that.

3    BY MR. BORNSTEIN:

4    Q.    And is that the appropriate way to treat a mentally

5    ill inmate who needs medication or who needs to be cared for

6    as far as a correctional expert's position is concerned?

7    A.    I'm glad you add that last clause.

8          I do not believe so as a corrections administrator.

9    I would have to have quite a convincing case made by a health

10   care professional that that was an appropriate circumstance

11   with respect to that inmate.

12   Q.    In Dr. Wagner's case, did he make that convincing

13   argument to you from the testimony you read?

14   A.    No.  But I don't know that I'm competent to render a

15   decision -- an opinion on his assessment.

16   Q.    I'm only asking you as far as your expertise as a

17   correction administrator.

18         Would you expect somebody like the deputy director,

19   Mr. Stainer, to react to an inmate who is allowed to

20   decompensate in his cell for three weeks?

21         THE COURT:  The objection that it is speculative

22   because it asks, you know, what Mr. Stainer would do.

23         And the point has been made -- well, no.  I suppose

24   it is -- do we know whether or not Mr. Stainer actually

25   reviewed the tragic A story?

1860

1      I don't know.

2      MR. BORNSTEIN:  He reviewed all the videos.  I'll

3  proffer this to the court.  My recollection of his testimony

4  is that he reviewed them and did not find any of them to be

5  excessive.

6      THE COURT:  I understand.

7      MR. BORNSTEIN:  Or unnecessary.

8      THE COURT:  This is a different question.

9      Doctor Stainer's testimony was not part of the video.

10     MR. BORNSTEIN:  You mean Dr. Wagner's testimony.

11     THE COURT:  Yes.  Dr. Wagner.

12     MR. BORNSTEIN:  Okay.  I'll move on.

13  BY MR. BORNSTEIN:

14  Q.     You understand from your work that pepper spraying a

15  mentally ill inmate can sometimes cause a reaction in that

16  inmate different than someone who is not suffering from

17  mental illness, correct?

18  A.     I do.

19  Q.     Tell us about that, please.

20  A.     Well, I've had some experience with use -- a good

21  deal of experience with use of OC spray on severely mentally

22  ill.  Gravely disabled is the term I think in California.

23     But in other jurisdictions, where it's plain the

24  inmate has lost his or her capacity to conform their behavior

25  to an order, that I think it has highly, highly limited use

1861

1    on that type of inmate unless there is a very high level of

2    harm imminent to interrupt.

3            That doesn't include mere resistance to an order.

4    That is not -- I'm talking about a level of harm that is

5    imminent to himself, herself or staff.  Then it is a tactical

6    option that can interrupt that without grave effect.  But it

7    is used to get him to conform.

8            Fine distinction, counsel.  I want it very clear what

9    I'm testifying to.  Used to get him to conform, I don't think

10   it has utility.

11   Q.      Well, go ahead.

12   A.      Used to interrupt active, imminent harm, yes.

13   Q.      Okay.  But now -- but it needs to be used

14   appropriately?

15   A.      Absolutely.

16   Q.      It needs to be used by trained and competent

17   correctional officers?

18   A.      Absolutely.

19   Q.      It needs to be reviewed by supervisors who are

20   trained and competent?

21   A.      Absolutely.

22   Q.      Because otherwise, by definition, it is not

23   reasonable force, even under California's policies; isn't

24   that true, sir?

25   A.      I have a -- I don't know California law.

1862

1    Q.      Well, you read the policies, didn't you?

2    A.      Yes.

3    Q.      You read 3268?

4    A.      Yes.

5    Q.      Didn't you?

6            And Title 15 CCR?

7    A.      Yes.

8    Q.      Doesn't it lay out what the definition of what

9    reasonable force is in California?

10   A.      It does.  I just lost connection to the review.  You

11   seem to say if it is not reviewed, it is not reasonable?

12   Q.      No.  I'm saying if you don't have a trained,

13   competent, correctional officer in the first place, who is

14   doing the force, by definition, under California law, it is

15   not reasonable?

16           THE COURT:  Just say you don't know.

17           THE WITNESS:  I don't know, Your Honor.

18           THE COURT:  Good enough.

19   BY MR. BORNSTEIN:

20   Q.      And if you have a supervisor who is not trained or

21   competent, difficult for them to review it in terms of

22   whether it is reasonable or not, right?

23   A.      You're quite correct.

24   Q.      One of the things that you have said repeatedly in

25   this case is that you have found the level of training and

1863

1   competency of CDCR staff to be inappropriate, correct?

2           MR. MCKINNEY:  Objection.  Compound.  Misleading.

3           MR. BORNSTEIN:  I'll break it down.

4   BY MR. BORNSTEIN:

5   Q.      You have found that you do have not have well trained

6   correctional staff in the State, correct?

7   A.      I honestly don't think I have, counsel.  You may have

8   to refresh my memory.

9   Q.      I'll be happy to do that.

10          In your deposition --

11          THE COURT:  Give counsel page and line.

12          MR. BORNSTEIN:  This is the second, Your Honor --

13  second deposition, page 65.

14          THE CLERK:  Volume II?

15          MR. BORNSTEIN:  Yes.  This would be the one in

16  July -- July 23rd, 2013.

17          I'm starting at -- I'm going to ask a clarifying

18  question before I get there, Your Honor.

19          THE COURT:  All right.

20  BY MR. BORNSTEIN:

21  Q.      What you found in your review was that you did not

22  believe that CDCR staff acts with malicious and sadistic

23  intent in the way in which they use force, correct?

24  A.      Correct.

25  Q.      What you found instead was that you have seen -- what

1864

1   you saw was ineptness and a lack of competence, correct?

2   A.      That I do remember.

3   Q.      And that officers were not being supervised properly

4   as to tactics, correct?

5   A.      That is correct.

6   Q.      You do not believe that CDCR is as competent as you

7   think they should be?

8   A.      I would agree with that.

9   Q.      And you are actually amazed, I think was your word,

10  that custody staff are not well trained and are basically

11  negligent when it comes to force; isn't that true?

12  A.      I need to see that.  I don't -- I just don't recall

13  it.  I'm not saying I didn't say it, but I need to see it if

14  you're asking me to affirm it.

15          THE COURT:  Same deposition, counsel?

16          MR. BORNSTEIN:  Yes.  Page 136, your Honor, lines 19

17  through 23.

18          THE COURT:  Hang on.

19          MR. BORNSTEIN:  I'm sorry.

20          THE COURT:  We've got to give counsel an opportunity

21  to find it.  Not only counsel, I need to.

22          MR. BORNSTEIN:  Actually, I'm going to start at line

23  12 and go to line 23 on page 136.

24          THE COURT:  Line 12 through 23?

25          MR. BORNSTEIN:  Correct.

1865

1        THE COURT:  Hearing no objection, I guess you can

2    proceed.

3        MR. BORNSTEIN:  Thank you.

4        (Reading:)

5        QUESTION:  I have to tell you, that given the length

6             of time that there has been litigation in this case,

7             I'm amazed to hear you opine that these guards,

8             that's who you're talking about, right, custody

9             staff, are not well trained and basically negligent?

10        ANSWER:  I think you should be.  I agree with that.

11             I'm amazed too.

12        QUESTION:  I'm also amazed with all of this

13             litigation that their supervisors are also not

14             well trained?

15        ANSWER:  Counsel, I agree.  I agree with what you

16             have just said.  That's what I was making reference

17             to.  Where has everybody been in this case?

18        (Reading concluded.)

19        Now, when you asked the last question, "where has

20    everybody been in the case," what were you referring to?

21    A.        Referring to all parties.

22    Q.        What do you mean "where has everybody been in this

23    case," what does that mean?

24    A.        How has this matter been allowed to evolve or emerge.

25    Q.        What matter?

1866

1    A.        Purported or alleged systemic pattern and practice of

2    excessive force on mentally ill people.

3    Q.        You mean the use of crowd control OC pepper spray as

4    standard issue to custody staff?

5    A.        That's one element.

6    Q.        You mean having standard issue expandable batons that

7    custody staff have?

8    A.        That is another element.

9    Q.        You mean having grenades on their belts that custody

10   staff have as standard issue in California?

11   A.        Likewise.

12   Q.        All of those armaments in your practice, your

13   training, your judgment, are unprecedented in any other

14   system in this country, correct?

15   A.        That would be correct.

16   Q.        And by having them, the issue is that people will use

17   them?

18   A.        I state it slightly differently.

19   Q.        How do you state it?

20   A.        I'm getting ready to tell you, counsel.

21   Q.        Thank you.

22   A.        That if they're more immediately accessible for use,

23   that they will likely be used more.

24            THE COURT:  It's been suggested, sir, that the other

25   problem with all of that is that it creates -- please forgive

1867

1   me -- a culture of intimidation and a culture of -- they

2   didn't use the word violence, but I'll use it for now.

3           Do you agree that's a distinct possibility?

4           THE WITNESS:  It is a distinct possibility, but

5   that's more a product of a culture of violence in my view.

6   It doesn't have a lot to do with how they're armed.  It is

7   just more manifested that way.

8           THE COURT:  Let me -- let me -- a culture of

9   intimidation?

10          THE WITNESS:  That I would agree, just the visibility

11  of the armaments.

12          THE COURT:  All right.

13  BY MR. BORNSTEIN:

14  Q.      And from a practical standpoint, going back to this

15  chart, what you end up with is the sort of deescalation, the

16  verbal, persuasive human interactions that might deescalate

17  things are lessened when you have armaments like that

18  available to you based on your experience, correct?

19  A.      That probably would be based on my experience,

20  correct.

21  Q.      And so that then leads us to the second box, which is

22  you end up with a situation where you have got to use force,

23  where maybe if you had other relationships between the guard

24  staff and the inmate, clinical staff and the inmate, you

25  might not need to use force at all, correct?

1868

1    A.      That's correct, counsel.  Let me -- let me add

2    something there.

3           That's correct.  I mean, the better your delivery of

4    health care services are to mentally ill people, the less

5    management problems you have.

6           Okay.  To me that's a statement that's obvious.  It

7    is not arguable.

8    Q.      Okay.

9           THE COURT:  Just a minute.  The witness is not

10   finished.

11          MR. BORNSTEIN:  I agree.

12          THE WITNESS:  However, in those systems that are

13   failing to do that, and it gives rise to these unfortunate

14   and needless -- need to be careful when talking about

15   needless -- instances which are escalated in forces used, the

16   custody operator still has to do what he or she needs to do

17   at that moment in time to neutralize that threat.

18          THE COURT:  No.  We're assuming that we're not

19   dealing with threats.  We're assuming we're dealing with, as

20   an example, cell extraction.

21          MR. BORNSTEIN:  For involuntary medication

22   purposes.

23          THE COURT:  Or whatever.  And so there isn't that

24   immediate threat.  There is this frustration in the failure

25   to obey a lawful order.

1869

1    THE WITNESS:  Very good point.  Let me address that.

2    In a controlled setting, in which there is not

3    immediate enforcement necessity, in other words time and

4    distance can be employed to avoid the application of force,

5    then you're right.

6    If custody does not rely substantively -- I say

7    substantively -- believing that the clinical person or even a

8    civilian can present a very good chance to manage that in a

9    way to use force, yes, that is a failure.  That's a failure

10    that is especially acute with mentally impaired people.

11    THE COURT:  Let me interrupt.  I'm sorry I'm about to

12    interrupt the lawyer again.

13    MR. BORNSTEIN:  No.  Please.

14    THE COURT:  One of the things that we've had

15    testimony about are -- there's an OHU.  And very seriously

16    mentally ill people are in that OHU.  I mean, there are

17    three -- apparently there are three catatonics as an example.

18    Anyway, the doctor testified they have never had a

19    cell extraction in, what is it, the two years it's been in

20    operation?

21    MR. BIEN:  Since January.

22    January 2013.

23    THE COURT:  So it is really very short, but

24    nonetheless they've never had a cell extraction.  And nobody

25    asks them, including me I'm ashamed to say, how come?

1870

1      But the answer has got to be -- I don't know what it

2   has got to be.

3      It appears to be -- I mean, the doctor in charge is

4   an extremely able, sensible person, my impression.  And if

5   that's the level of care -- but he also talks about

6   interchanging and training with custody.

7      And the extraordinary thing is nobody asked him.

8   Look, what's giving rise to this case, among other things,

9   are the very powerful cell extractions.

10      I think what I'm trying to get at is, in your --

11   maybe we just don't have this experience enough to be able to

12   judge.

13      Is it your view, experience, knowledge, that careful

14   training of both custody and medical staff, and indeed they

15   have apparently joint meetings, makes a difference or can you

16   know?

17      THE WITNESS:  I really do.  I know it makes a

18   difference.  No question.

19      THE COURT:  Okay.

20      THE WITNESS:  It's how committed, both, not one or

21   the other, that they are equally committed, equally trained

22   and stand on common ground to achieve a singular purpose, and

23   that is to avoid the use of force unless it is absolutely

24   necessary to interrupt harm.

25      Anything short of that, they -- I have seen it played

1871

1    out in systems where they take as much time literally as they

2    need if they're in a secure area and there is not that

3    intimacy of harm.

4          With mentally impaired people, if you bring those

5    forces to bear, they know what to do.  It's just don't

6    interfere or complicate this medical course of action.

7          As long as it is not compromising your security

8    operation, we're going to pursue this medical course of

9    treatment.

10         THE COURT:  I'm sorry to interrupt.

11         MR. BORNSTEIN:  Please.

12         THE COURT:  I don't know exactly how this all plays

13   out, and I asked Mr. Stainer, and he answered me, that yes,

14   that's a very difficult problem.  But you have a mentally

15   impaired person, you're giving him orders that he clearly

16   doesn't understand.  Is the failure of the inmate to

17   comply -- you use the words imminent threat --

18         MR. BORNSTEIN:  Imminent threat, Your Honor.

19         THE COURT:  -- imminent threat to secure, is that

20   situation one?  Is that an imminent threat to security?

21         THE WITNESS:  No.  If he's simply refusing?

22         THE COURT:  Yep.

23         THE WITNESS:  More importantly, he can't conform.

24         THE COURT:  One would think, but --

25         THE WITNESS:  Then I don't think OC is appropriate.

1872

1        THE COURT:  Okay.  I'm sorry I interrupted, sir.

2        You have 15 minutes more.

3        THE WITNESS:  Did that answer --

4        THE COURT:  Yes, it does.  Yes, it does.

5   BY MR. BORNSTEIN:

6   Q.     So there is a distinction between a mentally ill

7   inmate that is not conforming, on the one hand, to one who is

8   deliberately willfully resisting on the other, would you

9   agree?

10  A.     Yes, sir.

11  Q.     And is there also a distinction between someone who

12  is in their cell, again not conforming or resisting, versus

13  an imminent threat?

14  A.     Oh, yes.  Especially with mentally impaired people.

15       THE COURT:  That's what we're talking about.

16       THE WITNESS:  Yes.

17  BY MR. BORNSTEIN:

18  Q.     So even if you have a policy that gives officers the

19  right to use force whenever an inmate disobeys a lawful

20  order, you need to take into consideration those factors of

21  the inmate's ability to comply or conform, correct?

22  A.     Without qualification.

23  Q.     Without qualification?

24  A.     Without qualification.

25  Q.     Okay.  And certainly if things have deteriorated so

1873

1   badly that you need to go in and do a cell extraction because

2   an inmate has decompensated and is, you know, just not there,

3   reality-wise they're just not there, would you charge them

4   with a rules violation on top of that?

5   A.      Of course not, counsel.

6   Q.      Well, you say that, but isn't that what happens in

7   California?

8   A.      I don't know the frequency that it has happened.  I

9   haven't looked at that issue.  If you're suggesting on this

10  one case and generalizing that is a standard practice, I

11  can't answer.  I haven't looked at it.

12  Q.      Let's look at what you did.  You looked at 440 RVR

13  packets, right?

14          THE COURT:  I thought it was 437, but who is

15  counting?

16          MR. BORNSTEIN:  Sorry.

17  BY MR. BORNSTEIN:

18  Q.      And didn't you -- and in any of those did you ever

19  find a hearing officer say:  Not guilty because of the mental

20  health status of the inmate?

21          Did you ever see that?

22  A.      Very isolated if I saw it.

23  Q.      When you and I were last together in July, you said

24  no.

25  A.      Well, okay.  You know, counsel, dealing with a lot of

1874

1    material here.

2    Q.      So the point is that you have seen instances where

3    they've mitigated some of the punishment, right?

4    A.      Yes, sir.

5    Q.      And you've seen -- basically, in other words, instead

6    of taking away all of the good time credit they could take

7    away, they've only taken away some of it, right?

8    A.      Yes, sir.

9    Q.      And I think Mr. Stainer said:  Well, we have a range

10   so they could do the low end of the range and take it into

11   consideration that way?

12           Right?

13   A.      Yes, sir.

14   Q.      But they don't track or monitor what they're doing as

15   it relates to that, do they?

16   A.      They don't.  I've made a recommendation related to

17   that.

18   Q.      Have they accepted your recommendation?

19   A.      I don't have any knowledge if they have.

20   Q.      How long ago did you make it?

21   A.      At least August of 2012.

22   Q.      Okay.  So over a year ago, right?

23   A.      Yes, sir.

24   Q.      Okay.  By the way, aside from Mr. Stainer's memo that

25   you said you first learned about in November of 2012, has the

1875

1    State of California today, as of today, adopted or

2    implemented any of the recommendations you made?

3    A.        Not to my knowledge.

4    Q.        And when you discussed your recommendations, did you

5    say what you told us today, that these really are heartland

6    correctional policies and practices that you need to do?

7    A.        This is what I said, and the way my mind works, this

8    is already in the record.  If you don't do these things, it's

9    like an automobile that is bugging out towards empty.  It is

10   running, and it is getting you from point A to point B, but

11   at any point in time you can run out of gas and the car

12   stops, the car stopping being the constitutional issue.

13           THE COURT:  Sir, I'm sorry to keep interrupting you.

14   These are very complicated questions.

15           I know why the State believes this, but -- believes

16   the opposite -- but I believe there has been significant

17   improvement in, God help us, the 20 years we've been doing

18   this.

19           I described it to my law clerk as, you know, if you

20   start behind the goal line, significant improvement gets you

21   to the 50 yard line.  And I think that's what you're saying

22   as well.

23           THE WITNESS:  It is.  It's a different analogy.  You

24   like football.  I like cars.

25           THE COURT:  But the problem is -- strike that.

1876

1    A problem may be that -- I don't know how to say this
2    that it won't get a lot of negative reaction from the State,
3    but I just don't know how.

4    The problem may be that custody -- I mean these are
5    prisons.  So obviously the first thing that people think
6    about is custody, how do you prevent bad things from
7    happening, how do you ensure the prison is a prison?

8    And that's legitimate -- it appears to me to be
9    legitimate.

10    But the problem is, for a variety of reasons, that up
11    to one-third of the inmates are people with severe mental
12    illnesses.  And it appears to me that that has not been taken
13    into consideration.  But I don't know how it could be.

14    And I would like you, if you can -- you know what,
15    you don't have to do it now because we're all going home.

16    Tomorrow you might address as an opening matter -- I
17    don't want to say how custody gets overruled because that's
18    not appropriate, but how a more realistic evaluation of that
19    third of their population can be accomplished.

20    We'll take our afternoon recess.

21    We'll reconvene tomorrow morning at 9:30.

22    THE CLERK:  9:30.

23    THE COURT:  9:30.  Thank you, gentlemen.

24    MR. BORNSTEIN:  May I ask, Mr. Martin has a number of
25    notes, and I would like to have opportunity to review them

1877

1  tonight because I haven't seen them yet.  And I know he's

2  done extra work since I took his deposition.

3          THE COURT:  I don't know.  Have you?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  If there's something new, I suppose you

6  have a right to look at it.

7          MR. BORNSTEIN:  And also -- never mind.

8          THE COURT:  Good.

9          MR. BORNSTEIN:  Thank you.

10          THE COURT:  See you all at 9:30 a.m.

11          (Off the record at 4:30 p.m.)

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6         I certify that the foregoing is a correct transcript

7

    from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25