1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     RALPH COLEMAN, et al.,

7          Plaintiffs,

8     Vs.                          CASE NO. CIV. S-90-0520 LKK

9     EDMUND G. BROWN JR., et al.,
      et al.,

10

11         Defendants.

12    _____/

13

14

15                      ---o0o---

16

17              REPORTER'S TRANSCRIPT

18            RE:  EVIDENTIARY HEARING

19          WEDNESDAY, NOVEMBER 6TH, 2013

20

21                      ---o0o---

22

23

24

      Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25    Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
1                         APPEARANCES

2                          ---o0o---

3

4    FOR THE PLAINTIFFS:

5              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
6              SAN FRANCISCO, CALIFORNIA  94104

7              BY:  MICHAEL BIEN, ATTORNEY AT LAW

8              BY:  LORI RIFKIN, ATTORNEY AT LAW

9              BY:  JANE KAHN, ATTORNEY AT LAW

10
               K&L GATES LLP
11             4 EMBARCADERO CENTER, SUITE 1200
               SAN FRANCISCO, CALIFORNIA  94111
12
               BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW
13
               BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW
14
               BY:  JON MICHAELSON, ATTORNEY At LAW
15
               BY:  RANJINI ACHARYA, ATTORNEY AT LAW
16

17

18   FOR THE DEFENDANTS:

19              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
20              13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
21
                BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
22
                BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
23

24

25                         ---o0o---
```

1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6     STEVE MARTIN

7        Cont'd Cross-Exam by Mr. Bornstein          1878
         Redirect Examination by Mr. McKinney        1978
8

9

10

11

12

13                             ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        EXHIBIT INDEX

2                          ---o0o---

3

4    DEFENDANTS'
     EXHIBIT NO            DESCRIPTION              EVD
5

6      U                  Martin Notes              1980

7

8                          ---o0o---

9

10

11

12

13

14                       EXHIBIT INDEX

15                         ---o0o---

16

17   PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
18
       160              OIG Use-Of-Force Rpt.
19                      Jan-Jun 2012               1928

20     1085             Website Report             1912

21

22

23

24

25                         ---o0o---
```

```
 1                         EXHIBIT INDEX

 2                          ---o0o---

 3

 4      PLAINTIFFS'
        EXHIBIT NO          DESCRIPTION              EVD
 5

 6       100              Vorous Dec.                2013

 7       101              Ex. 1 to Vorous Dec.       2013

 8       102              Ex. 2 to Vorous Dec.       2013

 9       103              Kaufman Dec.               2013

10       104              Photos                     2013

11       105              Appendex A Kaufman Dec.    2013

12       106              Appendix B Kaufman Dec.    2013

13       107              Appendix C Kaufman Dec.    2013

14       108              Woodford Dec.              2013

15       109              Photos w/Woodford Dec.     2013

16       110              Appendix A Woodford Dec.   2013

17       111              Appendix B Woodford Dec.   2013

18       113              Ex. 1 to Vail Dec.         2013

19       114              Ex. 2 to Vail Dec.         2013

20       115              Ex. 2 to Vail Dec.         2013

21       116              Ex. 4 to Vail Dec.         2013

22       117              Ex. 5 to Vail Dec.         2013

23

24                          ---o0o---

25
```

```
1                              EXHIBIT INDEX

2                                ---o0o---

3

4      PLAINTIFFS'
       EXHIBIT NO            DESCRIPTION              EVD
5
          119            Ex. 7 to Vail Dec.           2014
6
          120            Ex. 8 to Vail Dec.           2014
7
          121            Ex. 9 to Vail Dec.           2014
8
          122            Ex. 10 to Vail Dec.          2014
9
          123            Ex. 11 to Vail Dec.          2014
10
          125            Rifkin Dec.                  2015
11
          126            Ex. 1 to Rifkin Dec.         2015
12
          127            Ex. 2 to Rifkin Dec.         2015
13
          128            Ex. 3 to Rifkin Dec.         2015
14
          129            Ex. 4 to Rifkin Dec.         2015
15
          130            Ex. 5 to Rifkin Dec.         2015
16
          131            Ex. 6 to Rifkin Dec.         2015
17
          132            Ex. 7 to Rifkin Dec.         2015
18
          133            Ex. 8 to Rifkin Dec.         2015
19
          134            Ex. 9 to Rifkin Dec.         2015
20
          135            Ex. 10 to Rifkin Dec.        2015
21
          136            Ex. 11 to Rifkin Dec.        2015
22
          137            Ex. 12 to Rifkin Dec.        2015
23
          138            Ex. 13 to Rifkin Dec.        2015
24

25                               ---o0o---
```

```
 1                            EXHIBIT INDEX

 2                              ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO              DESCRIPTION                EVD
 5
         139              Kahn Dec.                     2015
 6
         140              Ex. 1 to Kahn Dec.            2015
 7
         141              Ex. 2 to Kahn Dec.            2015
 8
         142              Ex. 3 to Kahn Dec.            2015
 9
         143              Ex. 4 to Kahn Dec.            2015
10
         144              Ex. 5 to Kahn Dec.            2015
11
         145              Ex. 6 to Kahn Dec.            2015
12
         146              Ex. 7 to Kahn Dec.            2015
13
         147              Ex. 8 to Kahn Dec.            2015
14
         149              Day Dec.                      2015
15
         150              Martin Dec.                   2015
16
         151              Sharma Dec.                   2015
17
         152              Ex. 1 to Sharma Dec.          2015
18
         153              Ex. 2 to Sharma Dec.          2015
19
         154              Ex. 3 to Sharma Dec.          2015
20
         155              Ex. 4 to Sharma Dec.          2015
21
         156              Ex. 5 to Sharma Dec.          2015
22
         157              Ex. 6 to Sharma Dec.          2015
23
         158              Ex. 7 to Sharma Dec.          2015
24
25                              ---o0o---
```

```
1                          EXHIBIT INDEX

2                            ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO          DESCRIPTION              EVD
5
       161          Ex. 10 to Sharma Dec.        2015
6
       162          Ex. 11 to Sharma Dec.        2015
7
       163          Ex. 12 to Sharma Dec.        2015
8
       164          Ex. 13 to Sharma Dec.        2015
9
       165          Ex. 14 to Sharma Dec.        2015
10
       166          Ex. 15 to Sharma Dec.        2015
11
       167          Stainer Dec.                 2015
12
       168          Stein Dec.                   2015
13
       169          Allison Dec.                 2015
14
       170          Rifkin Dec.                  2015
15
       171          Ex. A to Rifkin Dec.         2015
16
       172          Ex. B to Rifkin Dec.         2015
17
       173          Ex. C to Rifkin Dec.         2015
18
       174          Ex. D to Rifkin Dec.         2015
19
       175          Ex. E to Rifkin Dec.         2015
20
       176          Kaufman Dec.                 2015
21
       177          Ex. A to Kaufman Dec         2015
22
       178          Ex. B to Kaufman Dec.        2015
23
       179          Fama Dec.                    2015
24

25                           ---o0o---
```

```
1                          EXHIBIT INDEX

2                            ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION                EVD
5
       182               Appendix A to Kaufman
6                        Sup. Dec. (Sealed)            2015

7      183               Appendix B to Kaufman
                         Sup. Dec. (Sealed)            2015
8

9

10                           ---o0o---

11

12          ***FOLLOWING EXHIBITS ORDERED SEALED***

13

14   Plaintiffs:
     4A, B, C, D
15   8E
     10D
16   12A, B, C, D
     23a, b, d
17   25a, b, c
     46
18   47

19   Defendants:
     A       AE
20   C       AF
     D       AG
21   E       AH
     F       AI
22   G       AJ
     H       AL
23

24

25                           ---o0o---
```

1          SACRAMENTO, CALIFORNIA

2      WEDNESDAY, NOVEMBER 6, 2013; 9:30 A.M.

3              ---o0o---

4

5              STEVEN MARTIN

6  Recalled as a witness on behalf of the defendants herein, was

7  previously sworn, examined, and testified as follows:

8              CROSS-EXAMINATION (CONTINUED)

9  BY MR. BORNSTEIN:

10  Q.     Good morning, Mr. Martin.

11  A.     Good morning.

12  Q.     I want to start with the question that Judge Karlton

13  left you with, left us all with yesterday.

14         Okay?

15  A.     Yes, sir.

16  Q.     If I understood it correctly, Judge Karlton was asking

17  you for your help in balancing the needs of ensuring the

18  safety and security of the prison or prison environment with

19  respect to how to accommodate or to treat severe mentally ill

20  people.

21         Right?

22  A.     Yes, sir.

23  Q.     The tension.  You've got rules.  You've got to enforce

24  those rules, and yet you've got human beings that are clearly

25  suffering mental illness, which in many cases, make them

1    unable to process information in the same way or to follow

2    those rules in certain respects.

3            Correct?

4    A.       Yes.   The question I think is:  Can you help us with

5    that balancing question?  Can you help us with a solution to

6    that problem?  I think that was the court's question.

7            Have you given that some thought?

8    A.       Yes.

9            THE COURT:  Over the years.

10           THE WITNESS:  Yes, sir.  I will attempt to help.  I'm

11   not going to warrant that I can.  Obviously, I've given this

12   a great deal of thought, went to bed thinking of it, woke up

13   at 5:24 thinking of it, and knowing we have limited time, I'm

14   going to try to make my remarks as succinct and to the point

15   that I can, but you can't reduce a question of that magnitude

16   to a two-minute soliloquy or whatever.

17           As His Honor made reference, there are some number of

18   inmates that are mentally ill in CDCR.  He referenced 30,000.

19   I don't know what that number is, but we all agree it is a

20   very significant number, as it is in most prison systems.

21   But what I would first note in talking about that number is

22   that there are obviously graduations of mental illness.

23           We have the gravely disabled, which are defined by

24   California state law.  I believe I understand what that

25   definition is, and those folks are not able to conform to

1    orders or function in situations in which less severe folks

2    and healthy folks can.

3         Then you have seriously mentally ill, which in the

4    psychiatric correctional mental health care community has a

5    definition that, in my view, is slightly different than how

6    it's defined in CDCR.  That is, I believe EOP inmates

7    typically are considered for purposes, certainly some of the

8    regulations that I've reviewed to be SMIs.

9         I don't know if that's true, but I'm invading an area

10   I have limited expertise in.  I just raise that for the

11   court, because what I concentrate on in jurisdictions is

12   SMIs.  Those folks require clearly higher levels of services

13   and these issues of mental health assessments are definitely

14   in play, no question.

15   Q.    When you're referring to our perfect storm chart when

16   you're gesturing?

17   A.    Yes, I am, counsel.

18   Q.    Okay.

19   A.    So what does that mean?

20         It means that there is some healthy proportion of the

21   30,000 that I believe operationally and functionally and

22   practically in administration of prisons are better

23   characterized as inmates with mental health conditions as

24   opposed to mentally ill inmates.

25         Those inmates, many of whom function adequately in the

1    prison environment, not to say they don't need services.

2    It's to say that their condition is such that they can

3    function.  They're not dysfunctional in the prison

4    environment.

5         The seriously mentally ill inmate is more prone to be

6    dysfunctional in a prison environment, unable to cope as

7    others do.  The gravely disabled simply can't.  They can't

8    function.  But I believe what's happened here, to some

9    extent, is at least the program guide creates this vast

10   array, almost dazzling array of services across the board to

11   anybody that gets the label of CCCMS, EOP or whatever.

12        What that does, in my view, is it dilutes service

13   delivery.  It dilutes resources.  So we're trying to do too

14   much for too many.  When you get in that situation, Inmate A

15   can indeed fall through the cracks.  But it's been my

16   experience in this case, having reviewed 700-plus instant

17   reports and 500-plus RVRs, that the seriously mentally ill

18   and the gravely disabled are few in number in that universe

19   of what I reviewed.

20        I don't know what they are in the population, but I

21   think I would make a plead to the court and to the parties

22   that we carefully distinguish when we're talking about a

23   category of these 30,000 mentally ill what we're talking

24   about.

25        It's somewhat -- I love analogies.  It's somewhat

1    analogous to alcoholics.  You have alcoholics that

2    successfully abstain.  That may be because they're attending

3    AA or whatever.  Those people function well and should be

4    probably a little bit left alone if they're functioning well.

5    Let's don't worry about them if they're doing well.  Let's

6    just support them in going to AA and so forth.

7         You've got a second category that are sometimes

8    dysfunctional and sometimes need services.  Those people need

9    to be shuttled and channeled in.  And then you've got some

10   that are wholly dysfunctional because they are severe

11   alcoholics and they need a level of services.

12        At any given time, if you're dealing with alcoholics

13   in the CDCR, you need to distinguish those things and channel

14   your resources accordingly.  So I have the impression here

15   that over time these services are so elaborate and so

16   widespread and apply to so many people, that it is very

17   difficult for an agency to deliver that, and the tension

18   comes somewhat from this.

19        You've got all these requirements that are

20   health-based requirements and you have managers that are

21   non-healthcare professionals that really are responsible for

22   the 24/7 management of these folks, not one hour of therapy

23   where the clinician is there, but a 24/7 operation.

24        They're the ones that have to apply the force.

25   They're the ones that are subjected to untoward behaviors.

1    They're the ones that conduct the disciplinary hearings.

2    They're the ones that run the 24/7 seg.  So naturally,

3    there's tension.  Understandable.  It cannot be otherwise

4    unless there is, in my view, more of a channeling of

5    resources to those that are the real high maintenance.

6         I've had two occasions in which to apply this

7    principle recently, in a state system and in a single

8    facility, and the facility had high assault rates, high use

9    of force, high placements in seg, leading to this perfect

10   storm type scenario.

11        I'm monitoring that.  I went in and asked the

12   operators and said, "I want you to give me a data run that

13   gives me those mentally ill designated inmates that have the

14   most use of force and RVRs," and I got that run.  We were

15   able to determine that a large, large majority of these

16   events were generated by this few number of people.

17        So we worked with the operators and the department and

18   we got a number of those people transferred to a facility

19   that had a higher level of services.  The assault rates, use

20   of force, were reduced dramatically within a 90-day time

21   period by just removing --

22        I know we're talking about a much greater magnitude

23   here.  That was a single facility.  We did the same thing in

24   the state facility where I said, "I want to know every youth

25   that has been involved in more than three use of force

1    applications in the past 12 months and everyone who has been

2    involved in more -- had more than a Level 1 disciplinary,"

3    isolated on those people and got them channeled.

4        So I'm real bothered by a number, a huge number that

5    says 30,000.

6        THE COURT:  I don't want to interrupt because what

7    you're saying is your view of how to try and address this

8    problem.  The constitution requires adequate medical care for

9    persons who are mentally ill.  That's the baseline.  It is

10   certainly reasonable, not only reasonable but probably

11   necessary, to distinguish between the levels of care that are

12   needed.

13       Having said that, it doesn't follow that we can then

14   just ignore the folks that are CCCMS because it's apparent,

15   at least in my experience in this case, that those folks will

16   at some point decompose.  But that's not really what happens.

17   They require higher levels of care on an unpredictable but

18   almost certain basis.

19       So the notion, it appears to me, but I'm asking you

20   because you've had a lot of experience in this area, the

21   notion that we can sort of say:  Okay.  All of those -- by

22   the way, you're not alone in your view, but my law clerk --

23   never mind.  That's internal stuff and I shouldn't be talking

24   about it.

25       It seems to me you can't simply say:  Well, we'll just

1   wait until they behave in a way that's unacceptable and then

2   we deal with them, because, you're just inviting -- first of

3   all, it's unconstitutional, but beyond that, as a practice

4   matter, it puts -- it appears to me to put an enormous strain

5   on the custodial system.

6        I simply -- if we can ever get finished with

7   testimony, I'm really looking forward to the lawyers telling

8   me what I'm supposed to be worried about, trying to address

9   what seems to me to be an extraordinarily difficult problem

10  to deal with.

11       THE WITNESS:  The most difficult problem in American

12  corrections.

13       THE COURT:  I believe that.

14       THE WITNESS:  It would hard to argue with the most

15  difficult problem.

16       THE COURT:  It's been suggested to me on more than one

17  occasion, that there are at any one time 5,000 -- I find that

18  number just shocking -- but 5,000 people who are seriously

19  mentally ill in any sense of the word.

20       So you've got to deal with those folks and with

21  appropriate medication.  And God willing and the river don't

22  rise, some of those folks will come down to EOP status,

23  conceivably CCCMS, but while they're coming down, other

24  people are going up.  And the problem just -- I don't want to

25  say it's hopeless, because I'm not allowed to say that.

1    There's a solution for every problem.  We all know that,

2    don't we?

3         But I don't know what that -- if there is such a

4    solution, other than expending large sums of energy and

5    resources on trying to minimize the number of people who wind

6    up extremely mentally ill, seems to me an inevitable

7    consequence of the way mental health works and how little we

8    really understand about how it works.

9         MR. BORNSTEIN:  Your Honor, if I could --

10        THE COURT:  I'm sorry.  I shouldn't be -- you're

11   right.  I'm wrong.

12        THE WITNESS:  Counsel, may I?

13        THE COURT:  I did the wrong thing.  I'm making a

14   speech.

15        Go ahead.

16        MR. BORNSTEIN:  I was fine with all of that.  I was

17   trying to help, based on what I heard Mr. Martin say, that

18   there might be some things in that that perhaps might help

19   the conversation that you're having.

20        THE COURT:  Please go ahead and answer.

21   BY MR. BORNSTEIN:

22   Q.   Mr. Martin, the issue really that I think you've

23   identified is one in which you need to get units where there

24   are mentally ill inmates working cohesively with mental

25   health staff and custody staff on a 24/7 basis.

 1          Right?

 2    A.     I would agree with that, yes.

 3    Q.     There needs to be -- that requires them, I think the

 4    words you used, were going shoulder to shoulder and looking

 5    at people and problem solving as problems arise.

 6          Right?

 7    A.     Yes, sir.

 8    Q.     And that kind of commitment is one that is currently

 9    not in California right now.  They have units that are

10    custody driven 24/7, and mental health people will come in

11    and out of those units with possible exceptions maybe in the

12    mental health crisis beds.

13          Right?

14    A.     To my limited understanding, yes.

15    Q.     And even in the mental health crisis beds units, there

16    still is -- we saw it in some of the videos -- there seems to

17    be a disconnect between the practitioner, the mental health

18    practitioner and connection with the inmate in terms of

19    service delivery or developing rapport or in terms of the

20    clinical interventions that don't require use of force.

21          Correct?

22    A.     I want to be real careful in responding to those kinds

23    of questions that seem to assume that what we've seen in some

24    isolated cases is the pattern and practice.

25    Q.     Let's talk about the cases we've got.  If you want to

1    expand beyond that, that's fine, but I would like to talk

2    about the 17 videos because there we see what we see.

3         Right?

4    A.    Yes, sir.

5    Q.    Eleven of those 17 videos involve people that were

6    CCCMS.

7         Did you know that?

8    A.    I knew their categories.

9    Q.    Ten of those 17 videos involved people that needed to

10   be medicated whose conditions were such that they needed to

11   be medicated.

12        Right?

13   A.    That sounds -- yes, it's consistent.  I don't know the

14   specific 9, 10, versus 8, 11.

15   Q.    What we don't see, you told me, and I know we've got

16   books of paper, books of paper in this case with incident

17   reports and IERC reports and RVR reports on every one of

18   those incidents.

19        Right?

20   A.    I guess you do.

21   Q.    You've seen them; you gone through them?

22   A.    Yes, sir.

23   Q.    A lot of these come from your files we were lucky

24   enough to get copies of.

25        Right?

1     A.     Yes, sir.

2     Q.     You go through and read them and you see copious

3     detailed notes in here about the fact that when things

4     happen:  Inmate A, July 24, at 1200 hours, he refused to take

5     his involuntary medication.

6          And then at 1225 hours, a psychologist responded and

7     provided clinical intervention successfully.

8          1240:  OC pepper spray clearance is given.

9          1326:  Video camera introductions are made.

10          1328:  Lieutenant reads the admonishment, telling him

11     he'll go on management status we'll use pepper spray.

12          Then it's one; right?  That's what we see in all these

13     records, don't we?

14          MR. MCKINNEY:  Objection.  That's not a question.

15     There's no question pending.

16          THE COURT:  He just finished saying, "That's what we

17     see in all" -- and you were so anxious to wait, you didn't

18     hear the question.

19          MR. MCKINNEY:  He was reading from one document which

20     we don't know what that document is.

21          THE COURT:  I do.  The question:  Is that typical of

22     the records that you had reviewed that they're detailed as to

23     what occurred without any consideration of the mental state

24     of the inmate?

25          THE WITNESS:  It's accurate to say in most of the

1    incident reports I reviewed, you have that time chronology,

2    steps.  That's true.

3    BY MR. BORNSTEIN:

4    Q.    Okay.  And what you've described to me, and if I've

5    got it wrong, please tell me, you've told me that what

6    California does is check the boxes.

7         Right?

8    A.    Yes, I have said that.

9    Q.    You believe that?

10   A.    I believe that, yes, I do.

11   Q.    When you talked yesterday on direct examination with

12   Mr. McKinney and you talked about the elaborate system that's

13   in place, it's a check-the-box system, isn't it?

14   A.    It lends itself to that type of application, in my

15   view.

16   Q.    Because what you have said repeatedly is the only way

17   you keep from having this perfect storm scenario that we're

18   seeing here in '95 is if you drill down on an individual

19   basis and you find out what is going on with this inmate in

20   this cell.

21        Right?

22   A.    That's my view.

23   Q.    You need to get people working together, clinical

24   people with custody people to do that.

25        Right?

1    A.     Yes.

2    Q.     You believe that the interdisciplinary team approach

3    is really what is required, even you're dealing with mentally

4    ill people?

5           THE COURT:  Severely.

6    BY MR. BORNSTEIN:

7    Q.     Severely mentally ill people.

8    A.     And certainly gravely disabled, I think the

9    interdisciplinary approach is absolutely critical.

10   Q.     Okay.  Where you've got a policy that says clinical

11   intervention is necessary before you go in and use controlled

12   use of force, which California does, you can interpret that

13   many different ways.

14          Can't you?

15   A.     Yes.

16   Q.     One way, and the way you've seen in the reams of

17   paperwork you've had the opportunity to review, primarily is

18   a person, psych tech, psychologist, whoever is there,

19   attempts the clinical intervention.

20          Right?

21   A.     Correct.

22   Q.     No record that you can see, at least in the incident

23   reports or IERC reports of anyone after the fact saying:  How

24   did we get to this place where we have this person in this

25   cell who needs to be involuntary medicated?

1          We don't have that question being asked during these

2     reviews, do we?

3     A.     I would not have looked at the records that may have

4     told me that.

5     Q.     Well, I'm just talking about the IERC records because

6     there is a question.

7     A.     Right.

8     Q.     What does it say?  Let's look at the question.  I

9     don't want to mislead you.

10    A.     I'll take care of that, counsel.

11    Q.     You told me accuracy is very important.

12         In these reviews, you got a first-level manager

13    review, second-level manager review, and then you have the

14    IERC review and the questions may vary a little, but they ask

15    things like:  State the threat reasonably perceived by the

16    responsible officials.

17         Right?

18    A.     Yes, sir.

19    Q.     What steps were taken to avoid the need for the use of

20    force or to minimize the amount of force used.

21         Right?

22    A.     Correct.

23    Q.     And those -- in answering those questions, what you

24    find, what you found when you went through these, the answers

25    are all perfunctory.  Here is Inmate A, (Reading:)

1                    Was counseled by staff to exit his cell and was

2                    afforded a cooling-off period.  Clinical

3                    intervention was attempted with negative

4                    results.

5              That's the kind of stuff you see; right?

6       A.    Typically, yes.

7       Q.    Then you see the videotape and they tape the clinical

8       intervention with, "Hi.  I'm psych tech Mary Francis, and I'm

9       going to try clinical intervention."  And she dutifully walks

10      up to the cell.  We don't really know what is being said, but

11      it's usually not very long, and then she walks back up.

12      "Sorry.  Clinical intervention was not successful" and then

13      force is on.

14            Right?

15      A.    In the seven --

16      Q.    17 videos.

17      A.    Most of them, some healthy number, yes.

18      Q.    All of them; right?

19      A.    I can't testify to all of them.  A healthy number is

20      what I reviewed.

21      Q.    You're right.  Because there was one or two where

22      there wasn't that perfunctory attempt recorded on the video,

23      so I stand corrected, but let's go forward with this.

24            What you don't see is saying, I want the IDT, the

25      interdisciplinary team to get in front of me, the warden, and

1    I want to understand why did this happen, why were we forced

2    to use force?"

3              You don't see that, do you?

4    A.    You do not see an examination beyond kind of the list

5    to look behind what was the level of clinical intervention.

6    As it real?  Was it perfunctory?

7              You do not generally see that type of examination.

8    Q.    You have been part of this case since August of 2012.

9              Is that right?

10   A.    No, since October of --

11   Q.    Excuse me.  October of 2011.

12             This case has been going on, I'm told, since '90?

13   A.    That's my understanding.

14   Q.    Your expertise all of the years of being a Special

15   Master, of being an expert, can you help me to understand how

16   it is that those questions are not being asked?

17   A.    Well, two things immediately come to mind that I want

18   to remind you of that this policy regs were not implemented

19   until February of 2010.

20   Q.    I want to stop you there because I think you're wrong.

21             The use of force policy that we're talking about comes

22   out of Title 15, California Code of Regulations 3286.

23             Correct?

24   A.    Correct.

25   Q.    And that's been on the books, as far as I can tell,

1    from '99?

2    A.    I was speaking more of the ultimately approved Madrid

3    going statewide in February, as I understand, from a

4    declaration by Mr. Fama.  That's what I'm basing that on, one

5    of your attorneys.

6    Q.    Let's talk about that.

7          There certainly have been corrections and changes that

8    are made as a result of the Madrid litigation, but that

9    litigation was over I think -- wasn't it over in the

10   nineties, late nineties?

11   A.    You mean the trial of the case was.  The remedial

12   phase of the case wasn't over until --

13   Q.    The idea somehow that these policies have been put

14   into place in 2010 and just need some tinkering, is that your

15   testimony?

16   A.    No, that's not my testimony.  My testimony is that you

17   have the fully realized final set of policies, DOMs, put into

18   place somewhere in 2010, a lot of which were in place and

19   have been around.

20         The point I was trying to make is that that requires

21   very vigorous, active monitoring by the facility

22   administrators and, hopefully, higher levels, to identify

23   areas that need to be improved, one of which would be the

24   example you used, what is the quality of clinical

25   intervention in use of force, because with respect to inmates

1    with mental illness, it is an absolute critical element to

2    that.

3         So I would want to be looking at that as a warden and

4    have some knowledge:  Is it the perfunctory walk up to the

5    cell front and say, "Are you going to conform?"

6         No.  That's unacceptable.  If we don't have mechanisms

7    in place, either at the facility level where that warden is

8    not picking that up, you hope it's picked up by higher level

9    detached reviewer.

10        I know I would -- how long do you think it would take

11   me to figure out that I need to take corrective measures on

12   the quality of the clinical intervention?

13   Q.    You would be --

14        THE COURT:  It doesn't happen.

15        THE WITNESS:  It's not happening as it should, no.

16        THE COURT:  And after the testimony of Mr. Stainer,

17   who was an intelligent man, dedicated, I think, it appears,

18   dedicated to his duties, what comes through is:  I've had a

19   whole lifetime of custody.  That what I've done all my life.

20   Now I'm in this very high position, but all my experience is

21   custody.

22        And when you start asking me about mentally ill, I'm

23   going to tell you:  Oh, gosh.  The guy was threatened with

24   being sent out of state, so he had a condition which put him

25   into CCCMS.

1          I don't condemn him for that.  It's just obvious that

2     he doesn't have any experience which allows him to understand

3     the nature of this problem.  I don't know that there's any

4     way -- how do you fix that?  You can't fix that.

5          I'm sorry.  I'm making speeches again.

6          THE WITNESS:  Well, I think I've spent 40 years in

7     custody environments and I do not have mental health care

8     expertise.  I have obviously a lot of exposure, and I can

9     assure you that I am aware as a correctional administrator,

10    if you're dealing with a seriously mentally ill inmate in a

11    potential use of force situation, that you should rely

12    heavily on whatever resources are available to possibly avoid

13    that.

14         Now, if Mr. Stainer has not figured that out, and I'm

15    basing that on what you're told me, we've got a serious

16    problem, because I can tell you that in these incident

17    reports that I've reviewed, hundreds and hundreds of them, I

18    came to have a problem with:  Do we really have substantive

19    quality routine clinical interventions?

20         My answer is:  I don't believe they're doing it

21    routinely.  So why can we not -- why has it not happened that

22    we're looking at these matters substantively?

23         I believe in part because we've created, as you've

24    made reference earlier, to what I call a checklist audit type

25    of approach that doesn't lend itself or require these

1    administrators to come to terms with what the core objectives

2    of all of this is.  This is one single objective:  Either

3    eliminate the need for the force and exhaust everything you

4    can when you're dealing with somebody in this condition or if

5    you have to use force, to use that force which is the minimal

6    amount to neutralize that.

7          Those are the core substantive objectives.  If these

8    administrators don't understand that and they're not

9    reviewing this, these matters with this thought in mind,

10   you're going to get the 30-second:  Are going to cuff up?

11   No.  Check that box off, and they did it, and you process it

12   on through when it's functioning properly when it is, in

13   fact, not.

14         What else can I say?

15   BY MR. BORNSTEIN:

16   Q.    Let me direct you to some statistics then and see if

17   this helps the conversation.  I'm showing you what's

18   previously in evidence as Exhibit 62C.

19         Can you see that okay on your screen?

20   A.    Yes, sir.

21   Q.    Now, this shows the percent of Coleman class members

22   in various prison institutions, and the use of force

23   incidents for the Coleman monitoring round 25 that were

24   prepared by the State of California officials and presented

25   to the Special Master.

1          Okay?

2     A.    Yes, sir.

3     Q.    And you've read those reports; correct?

4     A.    Yes, sir.

5     Q.    And Mr. Stainer testified that the statistics may not

6     have been accurate in what was presented to the Special

7     Master.

8          Did you know that?

9     A.    Yes.

10    Q.    Shocking in and of itself from my perspective.

11         Do you agree?

12    A.    I wouldn't use the term quite that strong, "shocking."

13    Q.    But if you look at what was reported, you can at least

14    see that there are a higher percentage of use of force

15    incidents involving or relating to mental health case member,

16    class members in most of the institutions in California.

17         Correct?

18    A.    That would be correct.

19    Q.    And now times they're double; correct?

20         THE COURT:  It would appear so.

21         THE WITNESS:  Yes.

22    BY MR. BORNSTEIN:

23    Q.    What I want to point out:  Isn't this the kind of data

24    that you would expect competent prison administrators to be

25    monitoring?

1    A.      Yes.

2    Q.      And what you're monitoring it for, I assume from what

3    you've said, is what is going on in these particular

4    institutions, the good and the bad.

5            Right?

6    A.      Yes.

7    Q.      And, in effect, you have told us in the context of

8    RVRs, if we go to the RJ Donovan Correction Facility, you've

9    actually told us in the context of RVRs, the thing you were

10   struck by there is there was actually team work going on

11   between the mental health staff and the custody staff in the

12   way they were administering the RVR system.

13           Correct?

14   A.      Correct.

15   Q.      You didn't see that in the other 11 institutions that

16   you went to; correct?

17   A.      I didn't see it at the level I certainly saw it at RJ

18   Donovan.

19   Q.      What you told me was the best way of affecting change

20   in a prison setting is to look at what seems to be going

21   right as much as you look at what seems to be going wrong.

22           Right?

23   A.      Amen, brother.

24   Q.      Then you've told me you've got to then use that data

25   and that information, drill down and then try to apply that

1  to other places.

2       Right?

3  A.      That's what I do.

4  Q.      If you look at RJ Donovan in terms of what we're

5  talking about here, you can see there is a higher percentage

6  of class members, but proportionately a lower level of use of

7  force incidents compared to what their ratio would otherwise

8  be.

9       Right?

10  A.      Yes, sir.

11  Q.      We don't know why that is, do we?

12  A.      I don't.

13  Q.      But it is the kind of thing you would expect people in

14  California trying to figure out, wouldn't you?

15  A.      I would.

16  Q.      And, in fact, the thing that you found in the 17

17  videos that we have in this case, none of those were referred

18  for any independent investigation, were they?

19  A.      That is correct.

20  Q.      In fact, the problem, as you've put it, the bedrock of

21  the use of force system is ensuring the integrity of reviews

22  of use of force?

23  A.      Yes.

24  Q.      That means not just having a warden and his committee

25  go through and say:  Yup.  The paperwork looks good.  We're

1    good to go.

2           That's not what you're talking about, is it?

3    A.     It is not.

4    Q.     You're talking about real criteria, real

5    investigations, somebody outside the chain of command in an

6    institution.

7           Right?

8    A.     I would prefer to have the substantive review done at

9    the facility level, and all but the real serious events that

10   need detached investigation, somebody sustained an injury or

11   there's a lot of OC used or whatever, because you want to

12   keep the corrective action as close to where it occurs and

13   hold the warden, make him accountable, and so I believe

14   robust review and rely on them to take corrective action is

15   the preferred way.

16          And then any of those incidents that involve serious

17   allegations, injury, excessive use of weaponry, inconsistent

18   reports, whatever, that those should then go to a detached

19   entity, because they've got serious ramifications, not only

20   in terms of disciplinary actions, but in terms of harm to a

21   person.

22   Q.     But let's follow that.

23          You need somebody who's looking at what the warden is

24   doing and saying:  You know, take these 17 videos.  We're

25   pumping a lot of pepper spray in these cells.  Is that what

1    we want to be doing?

2         You need somebody with the commonsense to pick that

3    up, don't you?

4    A.    You need some mechanism, whatever the number is, and I

5    believe it's relatively small.  But the thing, as I told you

6    and you've already given back to me that I find most

7    disturbing, is that none of these 17 incidents were referred

8    or corrective action taken within the IERC.

9         That that occurred is bad enough, and, hopefully,

10   they're as few in number, as I believe them to be, but in a

11   system of this size, you're going to have those kind of

12   events.

13        But what is so bothersome and so disturbing is that no

14    -- this sophisticated IERC with all these ranking

15   administrators experienced as Director Stainer is, could read

16   these reports and not at least question the amount of spray

17   or the tactics used and/or refer those, because until you're

18   getting that type of action, you're not substantively

19   reviewing the cases.  You're simply processing them.

20        It's apparent to me that it was early on, and I quite

21   frankly was hoping that we would find as few cases as we did.

22   I said:  If this is the review they're doing and there is a

23   pattern and practice of excessive force, it's going to be

24   thrown right in the laps of all these wardens that conduct

25   these IERCs, because this material has been reported.  It's

1    been videotaped, and it's there for all the world to see.

2    Q.    It's not being reported in the sense of it's not being

3    recognized?

4    A.    It is not being reviewed properly, and in some cases

5    referred properly, therefore, not investigated, and,

6    therefore, no corrective action being implemented.

7    Q.    Correct.  No teachable moments; is that right?

8    A.    There is some level of that occurring.

9    Q.    "Don't videotape the person's genitals."

10    That's the teachable moment you get; right?

11    A.    Typically, in that realm, yes.

12    Q.    You've got a guard saying -- pardon my language --

13    "fucking pussy" about the inmate, Inmate E, after he's

14    sprayed repeatedly in his cell.

15    There's no corrective or disciplinary action taken

16    against that guard to your knowledge, is there?

17    A.    To my knowledge --

18    MR. MCKINNEY:  Objection.  That misstates the

19    testimony, misstates the evidence in this case.

20    THE COURT:  I don't know why you say that.

21    MR. BORNSTEIN:  Maybe I have the wrong inmate.

22    MR. MCKINNEY:  Mr. Vail testified this was a

23    discussion between the officers.

24    MR. BORNSTEIN:  I'll clarify the question, Your Honor.

25    Q.    The tape says, the tape shows the officer coming out

1    of the cell and he turns to the camera, dead-on to the camera

2    and says, "Fucking pussy."

3            Right?

4    A.    Yes, sir.

5    Q.    So tell me, should that officer have been counseled at

6    least?

7    A.    In my view, it would have been considerably -- the

8    sanctions would have been considerably more than a

9    counseling.

10   Q.    Why?

11   A.    To send a message to every person at that facility

12   that that level of gross unprofessionalism is not permitted.

13   Q.    And you've got to do that, because if you don't, you

14   institutionalize what you call "terrible institutional

15   practices."

16           Right?

17   A.    Well, it's the path to institutionalizing in a culture

18   that lends itself to harm, to institutionalized harm.

19   Q.    Exactly.  I want to talk about your comments about

20   pepper spray and whether pepper spray is injurious or not.

21   A.    Yes, sir.

22   Q.    I showed you an article you're quoted in from Human

23   Rights Watch about, in fact, an inmate you reported on who

24   died after he was pepper sprayed.

25           Correct?

1   A.      Yes.

2   Q.      Tell us about that.

3   A.      That was an incident, a combination of factors

4   involving, obviously, OC spray, but the use of a spit mask,

5   some positional tactics that compromised breathing, that

6   those things came together and the inmate died as a result of

7   that application of force.

8           In a nut shell, that's it.

9   Q.      In particular, you said that after they got him down

10  on his stomach, restrained him, he died of a fixation.

11          Right?

12  A.      Yes, sir.

13  Q.      After the pepper spray?

14  A.      Yes, sir.

15  Q.      It is potentially lethal if you don't do it right?

16  A.      Certainly a gross misuse of pepper spray in

17  combination with other factors, such as in that case with the

18  spit mask and prone pressure on the bellows that shut down

19  the breathing, in that sense it can be.  In that case, I

20  think there was a relationship between the use of the spray

21  and the spit mask.

22  Q.      I did not see you say anything about a spit mask in

23  the quote that they had in --

24          THE COURT:  You want to argue with the witness?

25          MR. BORNSTEIN:  No, I don't.  I apologize.  Let me

1    start over.

2    Q.      One of things that you do notice is that people that

3    are agitated, mentally ill, many times struggle irrationally

4    when they're trying to be restrained.

5            Right?

6    A.      I don't think it's irrational.  It's what I refer to

7    as survival resistance or panic.

8    Q.      Because they don't really understand what is happening

9    to them?

10   A.      Other than their life is threatened with this force.

11   Q.      And that can sometimes scare correctional officers in

12   to overreacting and acting more aggressively.

13           Right?

14   A.      It's what I described as an escalating dynamic of a

15   force event where pressure is applied that is answered by the

16   subject with resistance, defensive resistance, panic

17   resistance.  And as that resistance becomes elevated, it is

18   perceived by the officers as continued to resistance and then

19   they elevate their force, and it's a cycling up of both

20   resistance by the subject and response by the officers that

21   can reach a fatal point.

22   Q.      You also have reviewed generally the Office of

23   Inspector General reports in this case?

24   A.      Yes.

25   Q.      And did you look at the one that came out in October

1    of 2012, which I believe is Defendant's N, as in Nancy?

2            Do you remember seeing that?

3    A.      I believe I have.

4            MR. BORNSTEIN:  May I approach, Your Honor?

5            THE COURT:  Yes.

6    BY MR. BORNSTEIN:

7    Q.      I'll show you page 139 of Defendant's N.

8            THE COURT:  Is it in evidence, Madam Clerk?

9            THE CLERK:  Yes.

10           THE COURT:  You may proceed.

11   BY MR. BORNSTEIN:

12   Q.      That is an incident report -- let me give you a minute

13   or two to familiarize yourself with it.

14   A.      Generally understand.

15   Q.      Okay.  What it shows is that there was an incident in

16   2008 when an inmate died after he was pepper-sprayed.

17           Correct?

18   A.      Correct.

19   Q.      And for whatever reason, the incident was not

20   discovered or reported on until 2010?

21   A.      I take that to be true.

22   Q.      In fact, if you want, I will read it for you.

23           May I?

24           THE COURT:  Yes.

25           MR. BORNSTEIN:  Thank you.

1          MR. MCKINNEY:  We object on basis of lack of personal

2     knowledge.  If counsel wants to read the report, he can do

3     that during argument.  It's in evidence, Your Honor.

4          THE COURT:  My assumption is he's trying to ask

5     questions about it.

6     BY MR. BORNSTEIN:

7     Q.    It says in the report -- first it says on August 16,

8     2008, that's when the incident happened.

9          Correct?

10    A.    Correct.

11    Q.    And then it says (Reading:)

12               The OIA central intake reviewed this matter and

13               referred it back to the hiring authority for

14               action without any an investigation on

15               September 15, 2008.  The hiring authority did

16               not make investigation and disciplinary

17               determinations until November 17, 2010, over two

18               years later.

19    A.    Okay.

20    Q.    That's not appropriate, is it?

21    A.    It is not.

22    Q.    It violates the bedrock concept of an effective use of

23    force system.

24         Doesn't it?

25    A.    It does.

 1    Q.      There's another -- California has reported at least

 2    one other death from pepper spray.

 3            May I approach, Your Honor?

 4            THE COURT:  You may.

 5            MR. BORNSTEIN:  This is Exhibit 1085 for

 6    identification.

 7    Q.      Are you aware of the fact that California keeps track

 8    of condemned inmates who have died since 1978 on its website

 9    and other places?

10    A.      I couldn't have told you that, no.

11    Q.      Have you seen a document like this before?

12    A.      Oh, yeah.

13    Q.      And if you look, it gives you the name of an inmate;

14    right?

15    A.      Yes.

16    Q.      It gives you the date the inmate died?

17    A.      Correct.

18    Q.      And then it gives you the cause; correct?

19    A.      Yes.

20    Q.      Usually suicide is one; right?

21    A.      Correct.

22    Q.      Natural causes is another?

23    A.      Correct.

24            MR. MCKINNEY:  I'll object to this line of questioning

25    as no foundation for this document.

1            THE COURT:  That objection appears well taken.  I have

2    no idea where it comes from or what it's about.

3            MR. MCKINNEY:  This was never shown to us before

4    today.  For all I know, plaintiff's counsel prepared this.  I

5    just don't know.  I don't know.

6            MR. BORNSTEIN:  I'll make an offer of proof where it

7    comes from and maybe we can go forward.

8            THE COURT:  While you're doing that, Mr. McKinney,

9    there has been in this proceeding since its termination at

10   least a number of statements made by your side, which I'm

11   sure you would like to take back, and at least one or two

12   that the plaintiffs ought to want to take back.

13           I have made a great effort to ignore all of that and I

14   would urge everybody to behave themselves.

15           Thank you, sir.

16           MR. BORNSTEIN:  Your Honor, my offer of proof is this

17   comes from the CDCR website and was printed out.  This is as

18   of October 7, 2013.  It was printed out this morning.

19           THE COURT:  Somebody can testify to that?

20           MR. BORNSTEIN:  I can put Ms. Rifkin on the stand to

21   do that.

22           THE COURT:  In light of that offer of proof, Mr.

23   McKinney, do you continue to object?

24           MR. MCKINNEY:  No.  Your Honor, there is still no

25   authentication of this document, but --

 1              THE COURT:  It comes from your website.

 2              MR. MCKINNEY:  We can check that.  All we would ask is

 3      the courtesy that they would tell us they're using a

 4      document, but with counsel's offer, we may proceed.

 5              THE COURT:  You may proceed.

 6              MR. BORNSTEIN:  Subject to us doing that, I move it

 7      into evidence.

 8              THE COURT:  I'll conditionally accept it, subject to

 9      you putting Ms. Rifkin on the stand to say, "I did it."

10                              (Whereupon, Plaintiff's Exhibit 1085

11                              was received into evidence.)

12      BY MR. BORNSTEIN:

13      Q.     Number 27 on this list, do you see that?

14      A.     I do.

15      Q.     It says, (Reading:)

16              Heart attack after pepper spray exposure.

17      Right?

18              MR. MCKINNEY:  Objection.  Relevance.  The date is '97

19      of this incident.

20              THE COURT:  The objection is overruled.

21      You may proceed.

22      BY MR. BORNSTEIN:

23      Q.     So it's not the same as impact kinds of injuries, but

24      it can cause death if it's not used appropriately.

25              Correct?

1    A.       I think it's fair to say it could be a precipitating

2    factor in a use of force incident that may result in an

3    in-custody death.

4    Q.       Okay.  One of the things that is critical from your

5    perspective is not to use crowd control canisters of pepper

6    spray in those cells where you've got an unbarricaded unarmed

7    mentally ill inmate.

8             Correct?

9    A.       That would be correct.

10    Q.       On the issue of the expandable baton --

11             THE COURT:  We're about to start another issue.  It's

12    10:30.  We'll take our morning recess.

13             15 minutes.

14                              (Whereupon, a break was taken at

15                              10:28 a.m.)

16                              (Nothing Omitted.)

17

18

19

20

21

22

23

24    /////

25    /////

1914

1    (On the record at 10:50 a.m.)

2    THE CLERK:  Please, remain seated.

3    Court is now in session.

4    THE COURT:  Please, remain seated.

5    Mr. Bornstein.

6    MR. BORNSTEIN:  Thank you, Your Honor.

7  BY MR. BORNSTEIN:

8  Q.    Mr. Martin, right before the break I started to ask

9  you about the expandable baton.  I want to put that into

10 context for my next question.

11    Okay?

12 A.    Yes, sir.

13 Q.    I pointed out R.J. Donovan as being an institution

14 where you found good cooperation between the mental health

15 staff and the custody staff, at least as it relates to the

16 RVR process, correct?

17 A.    Correct.

18 Q.    But you also found a disturbing number of expandable

19 baton impact strikes in your review of R.J. Donovan's

20 records, correct?

21 A.    Correct.

22 Q.    Tell us about that, please?

23 A.    Well, I did, as you know, a survey of the use of the

24 expandable baton across some number of institutions, I

25 believe six.  And I looked specifically at that usage at

1915

1   those six facilities as to frequency, and then beyond that

2   the instances in which it was used for fight interventions

3   and after exhaustion of OC.  That's what my aim was because

4   that's the pattern I thought -- I believed that I could

5   objectively show.

6           Having done that, R.J. Donovan had a greater

7   frequency of use and a frequency that wasn't in sync with the

8   exhaustion of OC and then use.

9           I had, prior to that survey, identified some

10  incidents in my review of R.J. Donovan that raised some

11  issues with respect to use of the expandable baton.  And so

12  that survey reinforced or supported my earlier observations

13  that I would look at how the operators at R.J. Donovan

14  believe the expandable baton should be used and is being

15  used.

16  Q.      What you found at R.J. Donovan was that the baton was

17  used 21 times, correct?

18  A.      Counsel, I have no problem taking your

19  representations as true, but --

20          THE COURT:  Is it 21 times in what?  A year?  A

21  month?

22          THE WITNESS:  Exactly.  I need my document to answer

23  those questions, Your Honor.

24  BY MR. BORNSTEIN:

25  Q.      Your notes?

1916

1    A.    Yes.

2    Q.    Okay.  And that would be -- I think the State moved

3    those in.

4         You are talking about your Heartland Recommendations

5    and your notes?

6    A.    I'm talking about -- recall I did a survey that you

7    were provided a copy of.  In my second deposition is where we

8    talked about this thing in detail.  That's where that data

9    you just cited, I'm fairly confident, comes from, that

10   document.  And I don't have it at hand, nor do I have it

11   memorized.

12        MR. BORNSTEIN:  May I approach, Your Honor?

13        (Documents handed to witness.)

14   BY MR. BORNSTEIN:

15   Q.    I'm handing you a stack of papers that are your notes

16   from your second deposition.  And --

17        THE COURT:  No need to put them into evidence.  He

18   can use any document to refresh recollection.

19        MR. BORNSTEIN:  I just wanted you to know what he was

20   doing.

21        THE COURT:  Yes.  I appreciate that.

22        (Witness reviews documents.)

23        THE WITNESS:  I don't see those in here.  I have them

24   with me, counsel, in my brief case.  I know that I produced

25   them.  I'm thumbing through so I can't warrant that they're

1917

1    not in here.

2         MR. BORNSTEIN:  If it will help you, and you have

3    them in the courtroom, I would ask you to get them so we can

4    get to the issue, if the court will indulge us?

5         THE WITNESS:  May I?

6         THE COURT:  Of course.

7         (Witness retrieves notes.)

8    BY MR. BORNSTEIN:

9    Q.    Okay.  You got your notes?

10   A.    I do.

11   Q.    So what your data showed was that at the Substance

12   Abuse Treatment Facility, there were 42 incidents for July to

13   October 2012, correct?

14   A.    Correct.

15   Q.    The use-of-force incidents in which the baton was

16   used was twice, one for a fight intervention and once for

17   attempted homicide?

18   A.    Correct.

19   Q.    And then number 6 was R.J. Donovan where there was a

20   higher frequency of use at R.J. Donovan, right?

21   A.    Correct.

22   Q.    And then the remaining institutions were fairly

23   consistent with the data that was provided system-wide by the

24   OIG?

25   A.    Correct.

1918

1   Q.      And for R.J. Donovan, for that period July to October

2   2012, there -- it was used 21 times versus Corcoran where it

3   was used seven times?

4   A.      Correct.

5   Q.      And what you really wanted to know is what the actual

6   unit administrators, what they're doing differently at R.J.

7   Donovan versus the other institutions, right?

8   A.      Yes.

9   Q.      And you would start by trying to identify those.  And

10  you thought most of them were mentally impaired people that

11  were the subject of these baton strikes, correct?

12  A.      Correct.

13  Q.      And you believed that there should probably be a

14  slightly higher standard of use if the operator knows that

15  he's dealing with a mentally impaired person, correct?

16  A.      What's the source for that?

17  Q.      Your testimony on July 23rd, 2013.  It is on page 71,

18  line 4 through 12.

19          I'm happy -- Do you have a copy of your deposition

20  there?

21  A.      Yeah, I don't know where.

22  Q.      I'll read it to you.

23          THE COURT:  I'm sorry.  Which deposition?

24  BY MR. BORNSTEIN:

25  Q.      July 23rd, 2013.

1919

1    A.      Is that up here, counsel?

2    Q.      I'll read it.  That is okay.

3            THE COURT:  Page and line, please?

4            MR. BORNSTEIN:  Page 71, starting at line 4 through

5    line 12.

6            THE COURT:  Yes, sir.

7            MR. MCKINNEY:  Your Honor, I would request that a

8    copy be provided to the witness.  This is a piece of

9    testimony that covers five pages, and he's picking out seven

10   or eight lines.  The answer covers five pages.

11           MR. BORNSTEIN:  For this particular purpose --

12           THE COURT:  Gentlemen -- you may proceed.

13           MR. BORNSTEIN:  Thank you.

14           THE COURT:  If you want to further elucidate when it

15   becomes your chance to redirect, just let the witness know

16   what he said elsewhere.

17           You may proceed.

18           MR. BORNSTEIN:

19           (Reading:)

20           You start trying to identify those, and then you

21           look -- I think most of these are mentally impaired.

22           And do you -- my first probably issue that I would

23           want to see is I think there should probably be a

24           slightly higher standard of use if the operator knows

25           that this is a mentally impaired person and he's

1920

```
 1              engaged in some type of resistance.  Because, again,

 2              it may be more often than not ineffective or simply

 3              escalate a situation as opposed to intervention.

 4              (Reading concluded.)

 5   BY MR. BORNSTEIN:

 6   Q.      Do you remember saying that?

 7   A.      That certainly sounds like something I would say.

 8   Q.      Okay.

 9   A.      I embrace it.

10   Q.      Pardon me?

11   A.      I embrace it.  If I didn't say it, I agree with it.

12   Q.      And that's one of -- that in particular is one of the

13   reasons that you are concerned about having the expandable

14   baton as standard issue in California prisons, correct?

15   A.      That would be an element in that general proposition,

16   yes.

17   Q.      And what you didn't see in your survey, because you

18   didn't have that opportunity, you weren't able to actually

19   drill down to answer your own question as to why are they

20   using it more in Corcoran -- or excuse me -- in R.J. Donovan

21   than they are in the other six -- five or six places --

22   institutions that you looked at in California, right?

23   A.      That's correct.

24   Q.      But that's the kind of thing that a competent prison

25   administrator should be asking, that question, correct?
```

1921

1    A.      I believe so.

2    Q.      And you also, though, note in the Inspector General's

3    reports, don't you, that there are many times where he will

4    list individual disciplinary outcomes, right?

5    A.      Correct.

6    Q.      He's got statistics in the front of his reports,

7    right?

8    A.      Correct.

9    Q.      He's got individual outcomes, right?

10   A.      Yes.

11   Q.      Have you ever been able to trace back an individual

12   outcome to any of the 700-plus incidents that you looked at?

13   A.      I didn't specifically take on that task to do.

14   Q.      Well, just looking at the incident numbers, you can't

15   tell because he uses a different incident number, doesn't he?

16   A.      Yes.

17   Q.      There is no way to correlate it back, is there?

18           MR. MCKINNEY:  Objection.  Calls for speculation.

19           THE COURT:  He's asking whether or not the witness

20   has any way of correlating.  That's the fair import of the

21   question.

22           You may answer.

23           I mean, the answer is "yes" or "no."

24           THE WITNESS:  I believe you're right.

25   ///

1922

1    BY MR. BORNSTEIN:

2    Q.      Okay.  At least when you and I last talked in July,

3    you had not found even one fully completed disciplinary

4    action against any officer for any use-of-force incident, had

5    you?

6    A.      In those that I reviewed?

7    Q.      Correct?

8    A.      That is correct.

9    Q.      700-plus incidents?

10   A.      Well, the 310 that I did and the 377, that would be

11   correct with those two, I guess.

12   Q.      All right.

13          And discipline is one -- effective discipline of

14   staff is one of the six key factors that you have set out

15   that need to be in any effective use-of-force system,

16   correct?

17   A.      Correct.

18   Q.      And if you don't have that sixth factor, effective

19   discipline, the whole thing falls apart for the reasons that

20   you testified to briefly this morning, correct?

21   A.      Well, yeah, it does.  To the extent that you have

22   incidents that call for such sanctions, it does.

23   Q.      Well, the only way you know that is if you

24   investigate them and somebody makes a finding based on an

25   investigation, right?

1923

1    A.       Correct.

2    Q.       And what you found in California is, they've got all

3    of these layers of reviews, but not a lot of investigation?

4    A.       They do not refer cases with the frequency for

5    investigation that I found in my work, in a system of this

6    size and frequency of use of force, generating a low level of

7    referrals.

8    Q.       You have seen from the General Inspector's reports

9    that he is constantly pointing out holes in the system as far

10   as lack of referrals, right?

11           Let me rephrase that question.

12           Let me direct you to Exhibit 159, which is a

13   Use-Of-Force Report from the Office of Inspector General, May

14   2012.

15           This is in evidence.

16           Do you have one?

17           MR. BORNSTEIN:  May I approach and see if I can help?

18           THE COURT:  Yes.

19           (Exhibit located for witness.)

20   BY MR. BORNSTEIN:

21   Q.       So showing you Exhibit 159, it's the Office of

22   Inspector General Report, Use-Of-Force Within The California

23   Department of Corrections and Rehabilitation, July through

24   December 2011, right?

25   A.       Yes.

1924

1  Q.       And if we look -- if we look on page 16, there is a

2  page entitled "Addressing Allegations Of Unreasonable Force,"

3  right?

4  A.       Correct.

5  Q.       And he says there are two ways that they can be

6  processed, correct?

7  A.       Yes.

8  Q.       One is there may be -- that if an inmate verbally

9  alleges they were a victim of unreasonable use of force, then

10  the allegation is evaluated in the same way as all other

11  use-of-force incidents culminating with a final review by the

12  institution's executive review committee.

13         Right?

14  A.       Correct.

15  Q.       And then he says that if anyone, including an inmate,

16  claims verbally or in writing to have witnessed unreasonable

17  use of force, or if an inmate submits a written appeal on a

18  form, then the institution conducts an appeal inquiry and the

19  findings are required to be reviewed by the executive

20  committee.

21         Right?

22  A.       Correct.

23  Q.       But he says that he, that the OIG, evaluated during

24  this time period, July through December 2011, 268 allegations

25  of unreasonable force that occurred during 2011 at 29

1925

1    institutions.

2         Correct?

3    A.        Correct.

4    Q.        And he found only 55 percent of those allegations

5    were reviewed by an executive review committee.

6         Correct?

7    A.        Correct.

8    Q.        So I'm not great at math, but doesn't that mean that

9    nearly half escaped review?

10   A.        That would be consistent with my mathematical

11   abilities.

12   Q.        Okay.  And he -- what's frustrating about his

13   reports, that you have seen, is you can't -- he doesn't

14   follow through with this.

15        When you go to the next report, he doesn't tell you:

16   Well, here's what happened.  I was able to follow-up and find

17   out.  In those 268 reports, here's what happened.

18        He doesn't tell you things like that, does he?

19        MR. MCKINNEY:  Objection.  Calls for speculation.

20   Assumes facts not in evidence.

21        THE WITNESS:  Well, so the record is as clear as it

22   can be, you have conflated two mechanisms, counsel.

23        This refers to allegations.

24   BY MR. BORNSTEIN:

25   Q.        Correct.

1926

1    A.       Your earlier question was -- we were talking about

2    referrals for investigation of incidents reviewed by the

3    IERC.  They're two separate mechanisms we are talking about

4    here.

5    Q.       Well, we're talking about the way they get reviewed

6    is, if somebody makes a claim that there's unreasonable force

7    used, they're supposed to be reviewed by the institution's

8    executive review committee.

9            Right?

10   A.       Yes.

11   Q.       And what he is saying is, during this calendar year,

12   2011, 55 percent of the allegations weren't reviewed by the

13   executive review committee.

14           That's what he is saying?

15   A.       That's an issue.  I'm just saying that this is a

16   separate issue from what you and I were earlier talking

17   about.  I just want the record to be clear.

18   Q.       I agree.  I'm sorry for not giving you clearer

19   driving instructions.

20           THE COURT:  Do you know, sir, whether in the next

21   report the OIG tries to tell us what happened?

22           THE WITNESS:  I don't believe these reports generally

23   do that.

24           THE COURT:  Thank you, sir.

25   ///

1927

BY MR. BORNSTEIN:

1    Q.      And as far as you know, having reviewed that and

2    other reports by the Inspector General, he is not tracking

3    specifically incidents relating to inmates who are mentally

4    impaired or are mental health class members, correct?

5    A.      Correct.

6    Q.      And as we've said, neither is anybody else apparently

7    in California?

8         THE COURT:  Is that correct, as far as you know?

9         THE WITNESS:  Yes, sir.

10   BY MR. BORNSTEIN:

11   Q.      All right.  Then I want to show you -- the next

12   report has not been moved into evidence, but it's the

13   Use-Of-Force Report within the California Department of

14   Corrections and Rehabilitation, January through June 2012.

15        It is dated October 2012, and it is Plaintiffs'

16   Exhibit 160 for identification.

17        Do you have that in front of you?

18   A.      I do.

19   Q.      And is that, in fact, a true and accurate copy of the

20   Inspector General's report for the time period that I just

21   talked about?

22   A.      It appears to be, yes.

23        MR. BORNSTEIN:  Your Honor, I move Exhibit 160 into

24   evidence.

1928

1           THE COURT:  Hearing no objection, it is received.

2                (Whereupon, Plaintiff's Exhibit 160 received into

3                evidence.)

4    BY MR. BORNSTEIN:

5    Q.      If you turn to page 4 in this report --

6            MR. MCKINNEY:  Your Honor, I request a copy of this

7    exhibit.

8            MR. BORNSTEIN:  I'm sorry.  I thought we passed them

9    out beforehand.

10           Sorry.  She gave me the copies.  I apologize to

11   counsel and to the court.

12           (Copies handed out.)

13   BY MR. BORNSTEIN:

14   Q.      Page 4, I want to zoom in on this chart up here at

15   the top.

16           THE COURT:  You can take that underlining off.

17           MR. BORNSTEIN:  Yes.  Sorry.

18                (Exhibit published.)

19   BY MR. BORNSTEIN:

20   Q.      So here is a chart in which he, the Inspector

21   General, is reporting from the previous period, and that

22   would be the July through December 2011 period, correct?

23   A.      Correct.

24   Q.      And then the current period, January through June

25   2012, right?

1929

1    A.    Yes.

2    Q.    And he's finding that there were unreasonable

3    use-of-force incidents in the current period of 45

4    allegations, right?

5         MR. MCKINNEY:  Objection.  This misstates the

6    document.

7         He's misrepresenting what this table shows, Your

8    Honor.

9         MR. BORNSTEIN:  Let me start over.

10   BY MR. BORNSTEIN:

11   Q.    These are requests for an investigation of use of

12   force by allegation, correct?

13   A.    Correct.

14   Q.    And they're saying there was unreasonable

15   use-of-force allegations where an investigation was requested

16   45 times during the January through June 2012 period,

17   correct?

18   A.    Correct.

19   Q.    And the prior period it was 43, correct?

20   A.    Correct.

21   Q.    You've got to say "yes" or "no"?

22   A.    I said correct.  I'm sorry.

23   Q.    That's okay.

24        And he gives the increase or decrease, and there were

25   two extras, right?

1930

1    A.      Yes.

2    Q.      The failure to report use-of-force witnessed in the

3    current reporting period he noted as allegations of 57 where

4    there were requests for investigation, right?

5    A.      Correct.

6    Q.      Up from 33 during the prior period, correct?

7    A.      Correct.

8    Q.      That's a disturbing number and trend?

9            Isn't it?

10   A.      Well, yes.

11   Q.      Why?

12   A.      It's my view that a failure to report a use of force,

13   either witnessed or obviously a participant, is among the

14   most serious failures --

15   Q.      So --

16   A.      -- of a correctional officer.

17   Q.      So what at least is happening here, I guess, is more

18   people are saying that other people are not reporting it, and

19   we should investigate it, I guess, is what the good takeaway

20   from this would be, right?

21   A.      That there was an allegation by an inmate that

22   officer X witnessed use of force and failed to report, that

23   is what I take that to mean.

24   Q.      And at least -- Okay.  So basically there's still a

25   problem then with officer X not reporting it, at least by

1931

1   allegation?

2   A.      By allegation.

3   Q.      Okay.  And somebody needs to follow up on that, don't

4   they?

5   A.      Yes.

6   Q.      Do you know if anybody in CDCR does that?

7   A.      I don't know.

8   Q.      If you turn to the next page, which is page 5, the

9   Inspector General talks about his review of Use-Of-Force

10  Incident Report Packages, correct?

11  A.      Yes.

12  Q.      And he says that there were -- the OIG evaluated 783

13  incidents and found 92 percent of the related reports

14  adequately describe the need to use force.

15          Right?

16  A.      Where is that, counsel?

17          I'm sorry.

18  Q.      Right where the magnifying glass is.

19          Do you see that on page 5, "The OIG evaluated"?

20          In the left-hand column.

21  A.      Am I on right page?

22          THE COURT:  Come up, please.

23          (Counsel confers with witness.)

24          MR. MCKINNEY:  Your Honor, I move to strike the prior

25  testimony of page 4 since the witness did not have the

1932

1    exhibit in front of him.

2         THE COURT:  I don't know what's happened.

3         Mr. Bornstein?

4         MR. BORNSTEIN:  I thought he had the right document

5    in front of him, and I guess he didn't so I will --

6         THE COURT:  I'm confused as to the prior testimony.

7         MR. BORNSTEIN:  That is from what I displayed.

8         THE COURT:  Okay.  So that stays.  All right.

9         (Document handed to witness.)

10         THE WITNESS:  Page 5?

11         MR. BORNSTEIN:  Yes.  Sorry.

12    BY MR. BORNSTEIN:

13    Q.    There you go.  Sorry about that.

14          Right there it says that the OIG evaluated 783

15    incidents and found 92 percent of the reports adequately

16    describe the need to use force, right?

17    A.    Yes.

18    Q.    But during the -- he said that 71 percent of the

19    incidents in the current period appropriately describe the

20    actual force used, right?

21    A.    Correct.

22    Q.    So again, does that mean that 29 percent of the

23    incident reports didn't adequately describe the force used?

24         MR. MCKINNEY:  Objection.  Calls for speculation.

25    He's being asked what the OIG meant by this.

1933

1    THE COURT:  The document speaks for itself, sir.

2    You can argue about it if we ever get there.

3    MR. BORNSTEIN:  Okay.

4    MR. BORNSTEIN:

5    Q.    You agree that when you talk about investigations,

6    that is something different than the OIG reviews, correct?

7    A.    Yes.

8    Q.    And you know that that's done by the Office of

9    Internal Affairs, right?

10   A.    Yes.

11   Q.    And did you notice in the most recent OIG report that

12   the budget for the Office of Internal Affairs has been cut?

13   A.    I was aware of that.

14   Q.    And in fact, if you don't have the right people,

15   trained personnel who are able to respond and investigate

16   incidents, you're not able to have an effective disciplinary

17   procedure, are you?

18   MR. MCKINNEY:  Objection.  Lacks foundation.  Assumes

19   facts not in evidence.

20   THE COURT:  I don't agree with either objection.

21   The objection is it's simply argument and that

22   objection is sustained.

23   MR. BORNSTEIN:  Okay.

24   MR. BORNSTEIN:

25   Q.    Would you agree, sir, that having trained

1934

```
1    inspectors --
2           THE COURT:  -- an adequate number of trained
3    inspectors would solve -- would be appropriate in having an
4    appropriate system of review?
5           MR. BORNSTEIN:  Thank you, Your Honor.
6           THE WITNESS:  It's critical to that, of course.
7    BY MR. BORNSTEIN:
8    Q.     In your most recent conversations with Mr. Stainer --
9    By the way, when were those?
10   A.     I had some on Monday of this week.
11   Q.     And did you talk about that?
12   A.     We talked about my first recommendation.
13   Q.     And that being the need for there to be a better
14   criteria for investigations?
15   A.     For both review and referral of use-of-force
16   incidents, yes.
17   Q.     And did Mr. Stainer and you talk about the fact that
18   the Inspector General had reported that there were budgetary
19   cuts to the Office of Internal Affairs that could impact
20   that?
21   A.     I can't recall which one of us may have raised that,
22   but it was in passing by one of us that if there is an
23   increase number of referrals, that's going to increase the
24   burden on the investigative entity, that would be internal
25   affairs, which my understanding was there have been some
```

1935

1   budget reductions.

2   Q.      Okay.  Do you know whether or not, putting aside the

3   budgetary issues, does the Office of Internal Affairs look

4   specifically at the issue of use of force against mentally

5   impaired inmates?

6   A.      I have no knowledge of that.

7   Q.      You also, based on the work that you have done, were

8   concerned about immediate versus controlled use of force,

9   correct?

10  A.      Correct.

11  Q.      And immediate use of force is supposed to be used

12  only if there's some imminent harm that needs to be stopped,

13  right?

14  A.      Yes.

15  Q.      And you were particularly concerned about what you

16  saw at Pelican Bay?

17  A.      Yes.

18  Q.      And this is after the court was no longer supervising

19  Pelican Bay, correct?

20  A.      That's my understanding.

21  Q.      And tell us, please, what you found?

22  A.      I was provided a data run that identified incidents

23  of force for a recent period of time, which escapes me right

24  now, but is a fairly recent period of time at Pelican Bay, in

25  which they distinguish between the number of applications of

1936

1  force by controlled versus immediate.

2  Q.      And what you found was -- this would actually have

3  been from January to October 2012?

4  A.      That seems correct.

5  Q.      And you found 180 incidents, right?

6  A.      Correct.

7  Q.      Of which 174 were characterized as "immediate

8  applications of force"?

9  A.      Correct.

10  Q.      And you disagreed?

11  A.      Well, after I saw that data while I was on site, that

12  created a flag for me that I wanted to scrutinize these

13  incidents at this facility especially carefully as to

14  immediacy and need for force versus calculated force.

15          And because I was more closely scrutinizing those

16  incidents for that purpose, I identified fairly quickly a

17  number of incidents that were categorized as "immediate" that

18  I believed there was evidence that they could have been

19  managed through "controlled force," which began to explain

20  what I thought was an exceptionally high number of immediate

21  applications of force.

22  Q.      Well, in fact, you went further.  You believed that

23  they clearly and objectively should not have been considered

24  "immediate," they should have been "controlled"?

25  A.      The fashion in which I do my work, that's probably

1937

1    true.  I'm a little bit conservative.

2    Q.      And has anybody -- since you raised those concerns,

3    has anybody responded to them from the State of California?

4           MR. MCKINNEY:  Objection.  Calls for speculation.

5           THE COURT:  As to your knowledge has anybody

6    responded?

7           You brought this to the attention of who, if you

8    recall?

9           THE WITNESS:  I brought it to the attention of the

10   current Secretary of Corrections because he happened to be

11   with me at Pelican Bay.

12          THE COURT:  As far as you know, has there been any

13   response to that discovery?

14          THE WITNESS:  Not to my knowledge.

15   BY MR. BORNSTEIN:

16   Q.      Did Mr. Stainer bring it up in your conversation on

17   Monday?

18   A.      No.

19   Q.      In your work that you do, is it fair to say that you

20   were very disappointed in the lack of interest that the State

21   had in your recommendations until recently?

22   A.      I don't know that I would frame it like that.  I

23   would -- I was disappointed that -- yes.

24   Q.      It was more than that because -- it was way more than

25   disappointment because I asked you:  Well, what should I ask

1938

1    Judge Karlton?  If you were here, if you were available, what

2    should I ask him to do?  And you said:  Well, I would start

3    by having him order the responsible state officials to come

4    into this courtroom and explain why they haven't enacted the

5    very reasonable suggestions of their own expert.

6           Isn't that what you said?

7    A.     I believe in substance, if not pretty close on, yes.

8    Q.     And you said that if anybody would have asked you,

9    you would have gone way beyond the five recommendations you

10   made, you would have been able to come up with significantly

11   more if they actually valued and wanted to use your services

12   in that way, didn't you?

13   A.     I'm not going to agree with that.

14   Q.     Which part?

15   A.     The way you frame that.

16   Q.     You're not going to agree that you could have come up

17   with more than five?

18   A.     No.  I agree with that.

19   Q.     Okay.

20   A.     I don't want to suggest that I'm seeking more work.

21   That's the last dog gone thing I want in this state.

22   Q.     All right.

23          I want to continue with our conversation about the

24   Perfect Storm.  And we've talked about, you know, boxes 1 and

25   2 where we've got the inmate who is in a cell, who needs to

1939

1    have -- who is in some restricted conditions, something

2    happens, force needs to be used, usually in California at

3    least pepper spray, and then what happens after that.

4         Okay.  So what's where I want to go next.

5    A.    Okay.

6    Q.    In your work did you come across this unregulated

7    Management Status concept?

8    A.    You first asked me about that at the -- my initial

9    deposition.  At that time I had not.  I just didn't know what

10   you were talking about.

11   Q.    In other words, when you went to the institutions

12   that you went to, they hadn't shown you anything about

13   Management Status as being a sort of sanction they also could

14   impose, correct?

15   A.    Correct.

16        MR. MCKINNEY:  I'm going to object to this line of

17   questioning as beyond the line of direct.

18        There were no questions about Management Status

19   whatsoever.  The witness also testified he has no personal

20   knowledge about Management Status.

21        THE COURT:  I will be candid with you, direct was so

22   long ago I have no idea of what the extent is.  I'll accept

23   your representation that there was no discussion.

24        The problem with that is that this is

25   cross-examination in which the plaintiffs apparently seek to

1940

1    demonstrate, that despite direct, there are significant

2    problems which this witness is aware of and which throw doubt

3    upon what might otherwise be the picture depicted in direct

4    examination.

5              MR. BORNSTEIN:  I can rephrase, if it will help.

6              THE COURT:  I doubt it will.  It is going to deal

7    with management, and the objection is management was never --

8    Management Status was never mentioned in direct.

9              MR. BORNSTEIN:  I think I can cure that with one

10   question, maybe two.

11             MR. MCKINNEY:  Your Honor, I mean, the witness has

12   further testified, and being the only person that's examined

13   the system before the court, that he did not encounter it.

14   So to the extent counsel wants to ask him speculative

15   questions about Management Status, it is a waste of time.

16             THE COURT:  I'm going to allow the questioner's

17   suggestion that he can cure the problem.  I don't know

18   whether he can or not.

19             Go ahead.

20   BY MR. BORNSTEIN:

21   Q.      Okay.  You looked at three things as part of your

22   review, right?

23             First, you looked at the Use-Of-Force Regulations,

24   correct?

25   A.      Correct.

1941

1    Q.      You looked at the Operations Manual, that has the --

2    that is supposed to enact the Use-Of-Force Regulations,

3    right?

4    A.      Correct.

5    Q.      And you looked at the Local Operating Procedures,

6    right?

7    A.      Correct.

8    Q.      And they didn't show you Management Status as a tool,

9    did they?

10   A.      No.

11   Q.      And you looked at the RVR process, right?

12   A.      Correct.

13   Q.      And there was nothing about Management Status that

14   was in the RVR process either, was there?

15   A.      That's correct.

16   Q.      And to the extent that you looked at the videos, you

17   saw that there were many times an officer who would give what

18   they call an admonishment to the inmate before they would go

19   in and use their spray and whatever else they do, right?

20   A.      Yes.

21   Q.      And he would say, in certain institutions, like

22   Corcoran, and also some of the other ones that we've seen:

23   You're advised that if we have to use force, you're going to

24   be placed on Management Status.

25           Right?

1942

1    A.      I recall that at least in one or two episodes.

2    Q.      So whatever it is, it is not part of the formal

3    procedures that they shared with you?

4            MR. MCKINNEY:  Objection.  Lack of personal

5    knowledge.  Calls for speculation.

6            THE COURT:  Overruled.

7            THE WITNESS:  In those documents that you referenced,

8    that is correct.

9    BY MR. BORNSTEIN:

10   Q.      Well, there are some references in the documents.  In

11   fact, Inmate D is shown to be placed on Management Status for

12   ten days, right?

13   A.      What I was answering, counsel, I'm sorry, I wasn't

14   clear, is in the regs -- the Use-Of-Force Regs, the RVRs --

15   what else?

16   Q.      Local Operating Procedures?

17   A.      Right.  That is not in there.

18   Q.      Right.  Okay.

19           THE COURT:  The objection is overruled.

20           You may proceed.

21           MR. MCKINNEY:  I'm anticipating the next question.

22           THE COURT:  Sir?

23           MR. MCKINNEY:  I'll sit down, Your Honor.

24   BY MR. BORNSTEIN:

25   Q.      I want to talk about the RVR process.

1943

1    What you have seen is whenever an order is given to

2    cuff up, and an inmate refuses, that can lead to force,

3    right?

4    A.    It can.

5    Q.    And whenever an inmate refuses an order to cuff up,

6    not only can it lead to force, it can also lead to a

7    disciplinary charge for obstructing or disobeying a peace

8    officer, correct?

9    A.    Correct.

10    Q.    And you saw hundreds of them.  What did you say you

11    looked at?  I thought it was 440, but now you're saying there

12    are more?

13    A.    Of?

14    Q.    RVRs.

15    A.    I saw in excess of 400 or so.

16    Q.    And you saw this pattern, right, what I just

17    described?

18    A.    Well, I saw instances.  You know, counsel, when I was

19    looking at the RVRs, I didn't know -- well, I did know

20    because I read through the description, the narrative, that

21    generally made reference to an application of force.

22    It wasn't a force report, of course.  So yes, I saw

23    quite a number.  I'm sorry.

24    Q.    Then what ends up happening is there are two things.

25    Depending on who the inmate is, there may be a Mental Health

1944

1    Assessment Form, right?

2    A.      Correct.

3    Q.      And that's mandatory, or at least it has been for EOP

4    and above?

5    A.      Correct.

6    Q.      And I think for CCCMS it is if there were bizarre

7    behavior?

8    A.      Correct.

9    Q.      Although it may be they are doing more of that now;

10   do you know?

11   A.      I don't know.

12   Q.      Okay.  The mental health --

13   A.      In addition to CCCMS, counsel, for some certain

14   offenses.

15   Q.      Right.  If it was going to be a SHU-able offense?

16   A.      Correct.

17   Q.      Okay.  And you reviewed those Mental Health

18   Assessment Forms, correct?

19   A.      Correct.

20   Q.      And you found that sometimes the clinicians did a

21   good job of explaining what was actually going on for the

22   inmate, right?

23   A.      Correct.

24   Q.      Whether their mental health caused or contributed to

25   the incident that led to the use of force or the failure to

1945

1    obey an officer, right?

2    A.      Correct.

3    Q.      And sometimes they didn't?

4    A.      Correct.

5    Q.      I think you told us about at least one clinician, I

6    don't remember which institution right now, maybe you can

7    help me, that never found any incident where the inmate's

8    mental health contributed to the behavior at issue.

9    A.      That's correct.

10   Q.      Which institution was that?

11   A.      I believe it was CMF.

12   Q.      That would be the California Medical Facility.

13           Where is that?  Is it one of the ones that you went

14   to?

15   A.      It was the one that was close to Sacramento.

16   Q.      Okay.  They have a lot of mental health people,

17   Coleman people in that institution?

18   A.      They did in that institution, yes.

19   Q.      And that surprised you, didn't it?

20   A.      It didn't surprise me.  It kind of bothered me.

21   Q.      That the clinician wasn't doing his job?

22   A.      Right.

23   Q.      Did you see any evidence of anybody in the

24   administration taking some action against that clinician?

25   A.      I'm sure I debriefed on that.  I don't know what

1946

1    occurred.

2    Q.      Okay.  That was -- the second part of the form is

3    designed to give guidance to the hearing officer as to

4    whether punishment should be mitigated, right?

5    A.      That's one of the considerations.

6    Q.      Was there another one?

7    A.      Well, in my review substantively I broke it down into

8    mitigation versus what I call tailoring a disposition to be

9    consistent with the mental health conditions.

10         They're two different -- the latter, in my view, is

11   not mitigation.  It is accommodation of mental health.

12   Q.      What you're saying --

13   A.      That's my artificial -- that's my manner in which I

14   approached that.

15   Q.      It doesn't explicitly say that on the form, but you

16   found that there were certain times where clinicians would

17   actually say that I recommend that you don't take away

18   privileges because it could further isolate this inmate and

19   it could, therefore, lead to a further decompensation or

20   whatever, right?

21   A.      Precisely.  That's what I referred to as "tailoring,"

22   which I think is classic accommodation under the law.

23   Q.      But what you were concerned about was that there was

24   no tracking or ability of the state to track outcomes, right?

25   A.      That's correct.

1947

1    Q.      And except for the R.J. Donovan facility, you found

2    that the hearing officers weren't really communicating with

3    mental health staff about, "Here's what we did in this

4    particular case," or those outcomes?

5            They weren't even talking about them, were they?

6    A.      I found varying levels of communication between the

7    clinical staff and custody as to how that mental health

8    assessment process was working.

9    Q.      The reason you liked the Donovan program was because

10   actually the chief psychologist was reviewing every one of

11   the reports and actually providing that kind of interface or

12   dialogue opportunity, right?

13   A.      Yeah.  They literally would meet frequently.  I mean,

14   I met with them, both custody and clinical, and it was very

15   evident to me that these folks worked hand in glove with

16   respect to this issue.

17   Q.      Not the same in the other 11 institutions you

18   visited, correct?

19   A.      I didn't certainly see it to the level in the

20   remaining institutions that I saw it at R.J. Donovan.

21   Q.      That's why you pointed it out as being one that

22   people ought to be looking at as perhaps giving help to

23   solving some of these problems, right?

24   A.      What I would have done, had I been either monitoring

25   or working with the agency, is go:  Go visit the R.J. Donovan

1948

1  folks and do what they do.

2  Q.      On the Mental Health Assessment Form there's also no

3  place for -- it is hard to monitor because they don't have a

4  check or box where you can fill in here's the hearing officer

5  saying that here's what I did based on the mental health

6  clinician's recommendation, here's how I took it into

7  consideration or here's what I did, right?

8  A.      That's correct.

9  Q.      You made that recommendation and so far as it has not

10  been accepted, right?

11  A.      I don't know that it has.  I don't know the status of

12  that recommendation.

13  Q.      You made it when?

14  A.      Well, at least in August of 2012.

15  Q.      Has it happened today, as far as you know?

16  A.      As far as I know, no.

17  Q.      Now, one of the other things that happens in this

18  hearing is that if you're seriously mentally ill, they give

19  you a staff assistant.

20          Right?

21  A.      Yes.

22  Q.      And the purpose of that staff assistant is to help

23  you understand the process?

24  A.      Yes.

25  Q.      And it is a custody staff person, usually like

1949

1    somebody who works for the hearing officer, right?

2    A.    Typically, yes.

3    Q.    They don't use clinical staff for that, do they?

4    A.    I don't believe they do.

5    Q.    They don't have anyone advocating for the person

6    based on their mental health issues during the hearing, do

7    they?

8    A.    Is that a requirement?

9    Q.    I'm not asking whether it is a requirement.  I'm

10    asking you whether they do or they don't?

11    A.    They do not.

12    Q.    So what you get is a staff assistant who will fill

13    out a piece of paper that goes in the hearing packet saying

14    that I met with this inmate, I explained to him what the

15    rules are and what's happening and what's going on and what

16    his rights are, and they sign off and that's that, correct?

17    A.    Correct.

18    Q.    Do you think it would be helpful in this process of

19    having someone who could actually advocate for the inmate

20    where mental health is a factor in the behavior?

21    A.    I would have to say yes, because I've observed such

22    systems where that's been helpful.

23          Is it required?

24    Q.    I didn't ask you that.

25          It would be helpful, wouldn't it?

1950

1  A.      It's been my experience that those advocates really

2  can assist a mentally impaired person in the disciplinary

3  hearing process.

4  Q.      Not just that person, they can assist the hearing

5  officer too, right?

6  A.      Ultimately, counsel, if they can assist the inmate,

7  it assists the whole process.  It all works in concert.

8  Q.      So that kind of helps you kind of maybe break some of

9  the cycle down here, right?

10  A.      Certainly could with respect, without qualification,

11  I think, to seriously mentally ill inmates that have a

12  genuine impairment that is interfering with their thought

13  process because, as you know, procedural due process is not

14  uncomplicated.

15  Q.      Okay.  The point is that -- Strike that.

16          Sounds argumentative.  Let me start over.

17          So what we have today in California is a system where

18  through the RVR process, the way it exists, it is up to the

19  hearing officer first to decide whether to -- how to take

20  into account or whether to take into account the mental

21  health factors in fashioning a remedy, right?

22  A.      Correct.

23  Q.      And then there are guidelines that we understand

24  exist for -- well, depending what the level of offense is,

25  you can take away so much good time credit, and there is a

1951

1  range, then where in that range the hearing officer goes

2  could be influenced by mental health factors, right?

3  A.      Correct.

4  Q.      There is not a process or procedure in California

5  where they will divert someone from this disciplinary

6  process, in other words a suspended sentence or, you know, a

7  diversion.  They don't do that, do they?

8          MR. MCKINNEY:  Objection.  Misstates evidence.

9  Assumes facts not in evidence.

10         Mr. Stainer directly testified to the contrary.

11         THE COURT:  I'm sorry.  I don't believe that is

12  correct.  But maybe I'm wrong, and we'll hear about it in

13  argument.

14         But in your view did you see any -- in your review,

15  did you see any systemic or systematic consideration of

16  mental health as diverting the inmate from some form of

17  sanction?

18         THE WITNESS:  I did not, Your Honor.

19  BY MR. BORNSTEIN:

20  Q.      Do you think that the formal RVR process could

21  benefit from having that as a possibility?

22  A.      Well, counsel, maybe I'm confused.  It's a late date

23  to be confused on this issue, I readily admit if I am, but I

24  understood the Mental Health Assessment Form was an attempt

25  to determine that issue, that is in some cases the assessment

1952

1    would result in that inmate being entirely diverted from the

2    entire process.

3    Q.      But you never saw that happen, did you?

4    A.      I don't believe I did.  If I did, it was a rare, rare

5    case.

6    Q.      It should happen, shouldn't it?

7    A.      Counsel, I just explained what I think that form is

8    for.  Yes, it should happen.

9    Q.      Okay.  To complete the circle, the way the system has

10   worked in the reviews of the records you have seen, you have

11   the hearing and then there's a sanction, right?

12   A.      Correct.

13   Q.      Loss of good time credit, correct?

14   A.      Yes.

15   Q.      Almost always?

16   A.      Very, very, very frequently.

17   Q.      And then maybe privileges, including contact with

18   others, right?

19   A.      Correct.

20   Q.      Then there's almost always a referral to the

21   Institutional Classification Committee, right?

22   A.      I did not track that systematically.  Quite often

23   there were referrals.

24   Q.      And that is for purposes of imposing either Ad. Seg.

25   or SHU terms, right?

1953

1    A.      Yes.

2    Q.      That's even after somebody comes out of a Mental

3    Health Crisis Bed.  Did you observe that?

4    A.      I believe I did on occasion, yes.

5    Q.      Did you also look at the testimony from the State's

6    witness, Miss Allison, who said that whenever there is one of

7    these incidents that leads to force, there is usually Ad.

8    Seg. or SHU used to isolate that person during the 45 days or

9    so before -- after the incident, but before the hearing takes

10   place before the hearing officer?

11           MR. MCKINNEY:  Objection.  Argumentative.  There is

12   no -- assumes facts not in evidence.

13           THE COURT:  I'm absolutely chagrined.  I don't know

14   whether that was the testimony or not.

15           MR. BORNSTEIN:  It's in the deposition we marked and

16   have submitted.

17           THE COURT:  I see.

18           MR. BORNSTEIN:  Maybe he's reviewed it.  Let me ask

19   him that.

20           THE COURT:  That's a different question.

21   BY MR. BORNSTEIN:

22   Q.      All right.  Did you review her deposition testimony?

23   A.      I don't believe I have it.  Did she do a declaration?

24   Q.      She may have done a declaration too, but I don't know

25   if it was in there.

1954

1    A.        I recall the declaration.

2              MR. BORNSTEIN:  Was it in there?

3              I don't know.

4    BY MR. BORNSTEIN:

5    Q.        Is that, what I described, this concept of placing

6    inmates in Ad. Seg. or the SHU pending this disciplinary

7    process, is that something that at least you understand

8    happens in California?

9              MR. MCKINNEY:  Objection.  Vague and ambiguous.  If

10   this is limited to -- just vague and ambiguous, Your Honor.

11             THE COURT:  I don't find anything vague and ambiguous

12   about it.

13             In your experience is that what happened?

14             THE WITNESS:  There are certain offense behaviors

15   that pending disposition of the offense behavior they are

16   placed in a segregated setting.

17   BY MR. BORNSTEIN:

18   Q.        Also many times, depending what the offense is, there

19   can be a referral to the district attorney for another crime,

20   right?

21   A.        Correct.

22   Q.        Are you familiar at all with the system in California

23   whereby CDCR actually funds district attorneys and public

24   defenders to prosecute and defend these inmate referrals?

25             THE WITNESS:  I'm not --

1955

1          MR. MCKINNEY:  Objection.  Beyond the scope of

2     direct.  Not relevant.

3          THE COURT:  Overruled.  Do you know?

4          THE WITNESS:  I'm not, Your Honor.

5          THE COURT:  Fair enough.

6          Just in case anybody is confused, that doesn't make

7     it so.  As we explain to jurors, the comments of counsel are

8     only relevant in terms of the response.

9          You may proceed, Mr. Bornstein.  I don't know.  It

10    may be true.

11         MR. BORNSTEIN:  No.  I understand my question is just

12    a question.

13         THE COURT:  All right.

14    BY MR. BORNSTEIN:

15    Q.    The result of this cycle that you have seen in the

16    reviews that you have looked at is that inmates who are

17    involved -- seriously mentally inmates who are involved in

18    the cycle may end up in higher segregated units with limited

19    treatment and limited programs, right?

20    A.    They could end up in more restricted settings.

21    Whether those restricted settings have more limited treatment

22    programs I have absolutely no knowledge.

23    Q.    Because you didn't look at it?

24    A.    Because I did not look at it.

25    Q.    And they didn't ask you to look at it?

1956

1       THE COURT:  Well, if they asked you to look at it,
2   you would have.
3       THE WITNESS:  Your Honor, I looked at some
4   preliminary documents on that issue.
5       THE COURT:  Okay.  So you did do some investigation?
6       THE WITNESS:  Yes, sir.
7   BY MR. BORNSTEIN:
8   Q.    Why didn't you do more?
9   A.    It was very late in this litigation, and --
10  Q.    You mean to get the termination motion filed?
11  A.    No.  No.  No.  This was after the termination motion
12  disposition and you had filed for further relief on Admin.
13  Seg.  I was asked to look at some documents on that issue.
14      MR. MCKINNEY:  Your Honor, I'm going to object to any
15  further questioning on this and assert the privilege on this.
16      This is an issue that Mr. Martin has not been
17  disclosed as an expert witness on.
18      THE COURT:  It is your witness.
19      MR. MCKINNEY:  Correct, Your Honor.  We did ask him
20  to look at some of these issues, segregation recently on a
21  consulting basis.  He's not been disclosed for that purpose.
22  It is privileged, Your Honor, and not subject to --
23      THE COURT:  Why is it privileged?
24      MR. MCKINNEY:  One, it is not subject to disclosure
25  under Rule --

1957

1    THE COURT:  Stop.  It is not privileged.  It is
2    inappropriate because it was not the scope of the
3    examination, and it is not relevant to the issue before the
4    court at this time.

5    Is that what you are saying?

6    MR. MCKINNEY:  That's absolutely correct.  And
7    Mr. Martin is not offered as a witness in the upcoming
8    proceedings, which is what he is previewing here.

9    THE COURT:  I understand.

10    Gentlemen, there are two aspects of this.  There is
11    the aspect of whether Ad. Seg. is appropriate, and there is
12    the question of whether or not in the use-of-force process
13    one of the consequences may be further isolation in Ad. Seg.

14    Clearly, as to the latter matter, it would be
15    appropriate.  But you really have not done enough
16    investigation to make any sensible comment?

17    THE WITNESS:  Absolutely.

18    THE COURT:  All right.

19    The objection on the basis that there is no personal
20    knowledge is sustained.

21    You may proceed.

22    BY MR. BORNSTEIN:

23    Q.    You would agree, however, that treatment for mentally
24    ill patient-inmates in Ad. Seg. is relevant, isn't it?

25    THE COURT:  I'll decide what's relevant.

1958

1    You may proceed, sir.

2    MR. BORNSTEIN:  I think it is almost lunchtime.

3    THE COURT:  It is as a matter of fact.

4    MR. BORNSTEIN:  Let me try.

5    THE COURT:  Get your last question.

6    MR. BORNSTEIN:  Okay.  Thanks.

7    BY MR. BORNSTEIN:

8    Q.    Mr. Martin, would you agree that when you're dealing

9    with seriously mentally ill people, where they're in these

10   restricted housing units, forcing them to strip search and be

11   cuffed up every time they come in or out of their cell can

12   lead to further disciplinary problems?

13   MR. MCKINNEY:  Objection.  Beyond the scope of

14   direct.

15   THE COURT:  Overruled.  You may answer.

16   THE WITNESS:  Well, of course it can.

17   BY MR. BORNSTEIN:

18   Q.    And you, in your practice, have always tried to find

19   ways to limit strip searching to the extent you can within

20   the safety of the institution, correct?

21   A.    I have.

22   MR. BORNSTEIN:  This would be a good time to take a

23   break, Your Honor.

24   THE COURT:  Reconvene at 1:30.

25   THE WITNESS:  Thank you.

1959

1    (Off the record at 11:55 a.m.)

2    ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    SACRAMENTO, CALIFORNIA

 2            WEDNESDAY, NOVEMBER 6, 2013; 1:30 P.M.

 3                         ---OOO---

 4

 5                        STEVEN MARTIN

 6   Recalled as a witness on behalf of the defendants herein, was

 7   previously sworn, examined, and testified as follows:

 8                  CROSS-EXAMINATION (CONTINUED)

 9   BY MR. BORNSTEIN:

10   Q.      Mr. Martin, in your own work in this case, you found a

11   disparity in the number of use of force incidents against

12   mental health class members than against general non-class

13   members?

14           Right?

15   A.      Correct.

16   Q.      In fact, you originally looked at 270 use of force

17   incidents?

18   A.      Close, yes.

19   Q.      About 70 to 75 percent of them involved use of force

20   versus mentally ill inmates.

21           Correct.

22   A.      General population versus mentally ill?

23   Q.      Yes.

24   A.      Yes.

25   Q.      Overall, obviously higher than their percentage in the
```

1    institutions you were at?

2    A.    Yes.

3    Q.    I'm going to show you your notes.  Maybe you can --

4    what you did was you literally just calculated the numbers.

5         Right?

6    A.    Yes, the number of incidents reports I had, and then I

7    noted whether they were class members or general population.

8    Q.    Okay.  So first you did was this LAC?

9    A.    Yes, Lancaster.

10   Q.    How many -- mental health is your shorthand for class

11   members?

12   A.    Yes.

13   Q.    And GP is your shorthand for non-class members?

14   A.    Yes.

15   Q.    In LAC, how many use of force incidents did you find

16   against class members?

17   A.    25.

18   Q.    This was during what period of time?

19   A.    That would have been --

20   Q.    This would have been in 2011 to 2012?

21   A.    Yes, November 2011 to May 2012.

22   Q.    So November, May 2012.  Okay.

23        25 class members had use of force used against them;

24   right?

25   A.    Yes.

1    Q.    How about in the same period for general population

2    non-class members?

3    A.    Seven.

4    Q.    Next institution is which one, Chino?

5    A.    Yes.

6    Q.    C-H-I-N-O?

7    A.    That's how I spell it.

8    Q.    How many mental health class members got use of force

9    used against them?

10    A.    19.

11    Q.    And then non-class members?

12    A.    15.

13    Q.    Next institution was?

14    A.    Pelican Bay.

15    Q.    How many?

16    A.    30 MH, two GP.

17    Q.    30 is, again, class members, two non-class members?

18    A.    Yes.

19    Q.    The next one?

20    A.    CMC.

21    Q.    That's the California Medical Center.

22          How many did they have?

23    A.    26 on the MH side and two on the GP.

24    Q.    And then the next one was the SAT at the substance

25    abuse facility treatment?

```
 1    A.      Yes.

 2    Q.      How much did they have?

 3    A.      12 on the MH and four on the GP.

 4    Q.      What's the next one?

 5    A.      CMF.

 6    Q.      What does that stand for?

 7    A.      California Medical Facility.

 8    Q.      What do they have?

 9    A.      Nine on the MH side and 12 on the GP.

10    Q.      What's the next one?

11    A.      CSP Sac.

12    Q.      What did they have?

13    A.      Six on MH, five on the GP.

14    Q.      What's the next one?

15    A.      RJ Donovan or with RJD as we have it there.  Six on

16    the MH, ten on the GP.

17    Q.      What is the next one?

18    A.      Centinela.

19    Q.      Do they have any class members in Centinela?

20    A.      I don't think I saw any.  I didn't review any use of

21    force for class members.

22    Q.      To your knowledge, are there supposed to be in

23    Centinela by the program guide?  In other words, is there

24    supposed to be class members in Centinela?

25    A.      I don't know.
```

1    Q.    But there's zero?

2    A.    I didn't find any.

3    Q.    You didn't find any against anybody else you looked

4    at, either non-class members?

5    A.    I looked at use of force incidents in Centinela.

6    Q.    But you didn't put a number down?

7    A.    That's right.

8    Q.    Then what's the next one?

9    A.    CCWF.

10   Q.    What's that stand for?

11   A.    Women's facility.

12   Q.    California Correctional Facility for Woman or

13   something?

14   A.    Yes.

15   Q.    How many?

16   A.    20 on the MH side.

17   Q.    How about non?

18   A.    I don't have anything there, so I guess it would be

19   zero.

20   Q.    The next one was Corcoran?

21   A.    Corcoran.

22   Q.    How many for use of force against mental health?

23   A.    Nine.

24   Q.    How about non-class members?

25   A.    Five.

1    Q.    Salinas?

2    A.    I believe 27 -- 22.  I'm sorry.

3    Q.    I couldn't read it either.  22 or 27.  Looks like 22

4    from the marks?

5    A.    Yeah.

6    Q.    How about non-class members?

7    A.    None.

8    Q.    And then the last one, San Quentin?

9    A.    San Quentin.

10   Q.    Class members?

11   A.    21.

12   Q.    Non-class members?

13   A.    Zero.

14   Q.    So the totals were?

15   A.    I have 205 and 62.

16   Q.    That was based on your own review of reports and then

17   making your own sort of notes about what you're reviewing?

18   A.    Yes.

19   Q.    So the data is there.  If an official in the State of

20   California wanted to track it, they have the ability to track

21   it, don't they?

22   A.    Of course.

23   Q.    These incidents that you're talking about here are

24   controlled use of force incidents, right, or any use of

25   force?

1    A.      Any use of force.

2    Q.      That's what you looked at?

3    A.      Yes.

4    Q.      The incidents that -- when we talk about the 17 videos

5    that are here in this case, those are only controlled use of

6    force videos.

7            Right?

8    A.      Yes.

9    Q.      There are substantially more use of force incidents in

10   the State of California that are immediate and not

11   controlled.

12           Correct?

13   A.      Correct.

14   Q.      And, in fact, when you went -- that's what concerned

15   you in part about Pelican Bay?

16   A.      Correct.

17   Q.      The reason for that is, tell us.

18   A.      Well, it was just the very high percentage of

19   incidents that ran in excess of what obviously 90 percent,

20   whatever that would be.  Probably 94 percent seems to stick

21   in my mind, that that was just a very high percentage of all

22   of the use of force incidents for that period being

23   immediate.

24   Q.      Bad question.

25           The reason that it's of concern is not just the

 1    numbers, it's the fact that immediate use of force is harder

 2    to review than controlled use of force because there's no

 3    video.

 4         That's one thing; correct?

 5    A.    I would generally agree with that statement, yes.

 6    Q.    Number two, immediate use of force means that the sort

 7    of built-in protections in the regs, cooling-off period,

 8    clinical intervention, all of those bells and whistles that

 9    are supposed to add extra protections, throw them out the

10    window because they don't apply.

11         Correct?

12    A.    Correct.

13    Q.    Number three, you testified to earlier these officers

14    are supposed to be on their best behavior when the camera is

15    on; who knows how they're acting when it's not.

16         Correct?

17    A.    Correct.  But there's a fourth that's the most

18    critical of all.

19    Q.    Thank you.

20         What is it?

21    A.    If you review those and determine some number should

22    have been calculated, you know what you're, in essence,

23    saying.

24    Q.    What are you saying?

25    A.    That some number would fall into a category of

1    unnecessary force.

2    Q.    Why is that?

3    A.    Because if you could have waited and taken time,

4    distance and delay, the force obviously was not necessary.

5    Q.    And you explained that to the state officials, your

6    concerns about that?

7    A.    That was my primary concern, because that's what I was

8    asked to look at, the systemic pattern and practice of

9    excessive force.

10    Q.    Is it your testimony that there is a pattern and

11    practice of systemic use of force in Pelican Bay?

12    A.    No.  Because I looked at -- probably, if memory serves

13    me, I found three to five cases out of the immediate category

14    case that I believed could have been calculated applications

15    of force.  I certainly did not reach any firm conclusions on

16    those cases.

17        I was trying to get a handle on whether there was some

18    instances of them not using calculated when they should have.

19    Q.    You did not reach an opinion one way or the other?

20    A.    I had an opinion.  I had a concern, obviously.

21    Q.    Got it.

22        You agree that -- I know we talked about this briefly,

23    but I want to frame the question -- the armament that

24    California equips its guards with is unprecedented in any

25    institution that you've seen throughout the 50 United States.

1          Correct?

2    A.    What's the question?  I'm not sure I heard it.

3    Q.    The armament that California equips its custody

4    officers with is unprecedented throughout the 50 United

5    States.

6          Correct?

7    A.    I have not seen another facility or system that has a

8    combination of lethal and nonlethal weaponry that the State

9    of California uses inside its institutions.

10   Q.    I think you were at 40 or 50 states visiting

11   institutions; right?

12   A.    Somewhere in that neighborhood, yes.

13   Q.    California prisoners, are they more dangerous then the

14   prisoners in all of these other systems?

15   A.    I can't believe that they are.

16   Q.    You know they're not?  You said so, didn't you?

17   A.    I probably did, yes.

18   Q.    And, in fact, you gave me an example of the guys in

19   Texas back in your home, they're just as dangerous as

20   anybody, aren't they?

21   A.    Typically, there's not substantial differences in the

22   threat levels, violence levels, whatever, between the

23   populations that I'm aware of.

24   Q.    I started on this and I did not finish, and I want to

25   finish.  There were six factors that you said are critical in

 1    any legitimate use of force policy.

 2            Right?

 3    A.      Yes.

 4    Q.      The first:  You have to have regulations that are

 5    consistent with sound correctional practices.

 6            Right?

 7    A.      Correct.

 8    Q.      And that includes then the sound correctional

 9    practices that you've recommended.  They should be part of

10    regulations.

11            Right?

12    A.      Yes.

13    Q.      Number two:  There needs to be comprehensive training.

14            Correct?

15    A.      Correct.

16    Q.      That means in this case both custody and clinical

17    staff.

18            Right?

19    A.      In the Coleman case, absolutely.

20    Q.      And it should include joint training with them working

21    together.

22            Correct?

23    A.      That's the best way.

24    Q.      It should be -- did the State of California share with

25    you the training materials that they used for their custody

1    staff?

2    A.      I saw some at the local level.

3    Q.      Did you see how much time that they spend training

4    their guards on how to deal with seriously mentally ill

5    inmates?

6    A.      I can't say that I recall seeing that.

7    Q.      Did you ask for that kind of information?

8    A.      I don't know that I did.

9    Q.      That's an important component in breaking the perfect

10   storm, isn't it, making sure you have trained people who know

11   how to deal with seriously ill inmates?

12           Right?

13   A.      Yes.

14   Q.      Number three:  You've got to have strict compliance

15   with reporting requirements.

16           Correct?

17   A.      Yes.

18   Q.      And the reason for that is otherwise you end up with

19   institutional bad behavior because people think they can get

20   away with stuff.

21   A.      Speaking in terms of administration, you do not have a

22   source to accurately and reliably review the event.

23   Q.      And also failure to report can institutional a code of

24   silence?

25   A.      That's true.

1972

1    Q.       Number four:  You've got to have effective supervisory

2    review of all use of force incidents.

3             Right?

4    A.       By.

5    Q.       "Effective," that includes the drilling down concept

6    of how do we get ourselves into this situation where force

7    needed to be used to begin with.

8             Correct?

9    A.       Well, we discussed this and I want to make sure

10   there's a macro, so to speak inquiry, to be made at the IERC

11   as to what did we as clinical interventions did we exhaust on

12   a Coleman class member.  That's incident specific.

13   Q.       Right.  But you're talking about a real look, not a

14   check-the-box look?

15   A.       Right, a substantive look.  I assume that.  I don't

16   talk about box checking.  That doesn't mean anything to me,

17   but there's a macro-level inquiry that goes at a higher level

18   of the facility, probably joined with the higher levels of

19   the health care facility of some of these incidents that

20   we're seeing at this facility, a product of our inadequate or

21   marginal or whatever it might be of delivery of mental

22   healthcare services.

23            But those are entirely separate lines of inquiry that

24   should not be, in my view, confused.  You shouldn't be doing

25   the macro examination at the IERC level.

1    Q.    What you should be doing, going to micro level, what

2    you should be looking for:  Are there certain patterns or

3    practices or concerns that are happening in our institution?

4         Right?

5    A.    Right.  Why else would you convene a committee of

6    high-ranking officials that sit week in and week out to look

7    at these things if they're not charged with seeing patterns

8    that emerge?  Why are you doing this?

9    Q.    If you're at LAC and you're seeing:  We have 25 use of

10   force against mental health class members and only seven

11   against others, is there some reason?  What's going on here?

12        MR. MCKINNEY:  Objection.  Lack of foundation.

13        THE COURT:  No.  He's really asking.  It's a bad

14   question.

15        What he's really asking:  Shouldn't the people at that

16   institution be asking the question as to whether or not there

17   is a reason that there's this excessive use of force on

18   mental health patients?

19        THE WITNESS:  I would alter that one way, if I may.

20        THE COURT:  Sure.

21        THE WITNESS:  I would drop the word "excessive"

22   because that's a finding --

23        THE COURT:  Fair enough.  Use of force.

24        THE WITNESS:  Absolutely, you're quite right at that

25   point.

1    BY MR. BORNSTEIN:

2    Q.    You look for patterns; right?  Is it happening in more

3    an EOP; right?

4    A.    You look for all these things we talked about,

5    frequent use of baton, frequent use of MK-46 versus MK-9.  Is

6    there injuries?  You look at what a competent, professional

7    looks at in the trade that knows what he or she is doing.

8    It's not rocket science what I do or I wouldn't be doing it.

9    Q.    You've talked about some of your recommendations.  One

10   of the things we haven't talked about is these canisters of

11   pepper spray.

12         You told them you've got to weigh those canisters;

13   right?

14   A.    My recommendation was, yes.

15   Q.    The reason you told them that was because when you're

16   shooting a spray out of an MK-9, one second burst could be

17   substantially more than a little personal MK-3 or MK-4.

18         Right?

19   A.    A one-second burst of the respective canisters, MK-9

20   clearly disperses a greater amount of chemical agent.

21   Q.    The only way you can really measure too much spray if

22   you know how much spray is being sprayed?

23   A.    That was my idea.  It would help them set somewhat of

24   a concrete standard or guide, yes.

25   Q.    Mr. Stainer says it's too operationally difficult to

1975

1    weigh canisters.

2            Did he tell you that?

3    A.    I don't know whether it was the specific weight.  He

4    discussed he did not believe it was viable to way canisters

5    in CDCR.

6    Q.    Does it work in other institutions or did you make

7    this up out of whole cloth?

8    A.    No.  In one case I recommended that the system do it

9    and they did it.  In another case, they were doing it when I

10   examined that facility.  That's how I got the idea for one to

11   the other.

12   Q.    So the idea is if you're paying attention to little

13   things like that, it's a big thing when you look at videos

14   and you see massive quantities; you shouldn't have that.

15           If you're paying attention, you shouldn't have that?

16   A.    Shouldn't have what?

17   Q.    Massive quantities going into a cell.

18   A.    The reason I recommended they have some guide or

19   weighing is because I don't like relying on imprecise

20   pejorative words like "massive."  I do not like that word.

21   Q.    You prefer I use a different word than "massive"?

22   A.    Not you, counsel.  I'm not directing it at you.  It's

23   imprecise.  It doesn't inform us when the rubber meets the

24   road and you're going to rack somebody up on a major

25   disciplinary charge and possibly fire them, are you harming

1    some inmate because you've used too damn much spray?

2    Q.    It makes it hard do that if you don't know, doesn't

3    it?

4    A.    That's what I'm trying to convey.

5    Q.    You also believe that and you told -- strike that.

6          You also believe that CDCR should be required to do a

7    comprehensive and substantive analysis and review of its

8    entire system to begin to find and build upon remedial

9    building blocks.

10          Right?

11   A.    I would want to see a transcript of what I was

12   responding to there.

13   Q.    I'll read it to you.  This is Volume I, page 67 -- I'm

14   not going to be able to read you that one, am I?

15          Let me try Volume II.  This is at Volume II, 67,

16   starting at line 16, continuing to 68 --

17          THE COURT:  There is no line 68.

18          MR. BORNSTEIN:  Page 68.

19          THE COURT:  I thought you said line 68.

20          MR. BORNSTEIN:  Page 68, line 4.

21          MR. MCKINNEY:  I don't see how this is impeaching.  If

22   he wants to ask a question, he can do so.

23          THE COURT:  The witness says, "I don't want to affirm

24   that statement unless I know what I was responding to," so he

25   was inviting it.

 1          You may proceed, counsel.

 2    BY MR. BORNSTEIN:

 3    Q.    The question was:  What exactly would you want that

 4    mandate to say?

 5          There's an objection.

 6          You said, (Reading:)

 7                The witness:  I would want it crafted and framed

 8                in a fashion where I would be charged first and

 9                foremost with doing a very comprehensive and

10                substantive analysis and review of the entire

11                system, keeping in mind, counsel, I only looked

12                at 11 institutions onsite.  I looked at material

13                from additional two.  I looked at some material

14                that Mr. Vail reviewed.  So very, very

15                limited, and I don't know that some of the

16                patterns and some of the things I've seen to the

17                extent they're evident at other institutions.

18          MR. MCKINNEY:  I would like a ruling on the objection

19    in the deposition transcript here.  I would also renew the

20    objection that this calls for speculation.  The question was

21    what Mr. Martin might do if he were the Special Master.

22          THE COURT:  I honestly don't know what the context is.

23    I'm not sure if any of it makes any difference in the long

24    run.

25          I'm going to overrule the objection because I don't

1    know that it makes any difference.

2        Thank you, sir.

3    BY MR. BORNSTEIN:

4    Q.    Is that --

5        THE COURT:  That's the end of it.  Get on to the next

6    question.

7    BY MR. BORNSTEIN:

8    Q.    In your -- from your -- from a safety perspective,

9    from the guard, prison guard safety perspective, is it your

10   opinion that guards and custody officers can safely operate

11   in a prison like California's without all the weaponry that

12   they have?

13   A.    Yes.

14   Q.    And do they, in fact, do that in almost every other

15   system --

16       THE COURT:  That's been established.

17       You may proceed, counsel.

18       I'm sorry.  I don't mean to cut you off, but I am

19   cutting you off because this is dreadfully repetitive.

20       MR. BORNSTEIN:  I hate to end on an objection from the

21   court, but I am done.

22       Thank you.

23                        REDIRECT EXAMINATION

24   BY MR. MCKINNEY:

25   Q.    Good afternoon, Mr. Martin.

1  A.      Good afternoon.

2  Q.      Let's start with this exhibit counsel showed you a

3  moment ago.

4          Could you read the first three paragraphs?

5          THE COURT:  What is the exhibit that you're talking

6  about?

7          MR. MCKINNEY:  I'm not sure.

8          MR. BORNSTEIN:  It's not an exhibit.

9          MR. MCKINNEY:  I would like to mark this as the next

10  defendant's exhibit, if I may.

11          MR. BORNSTEIN:  It's his notes.

12          THE COURT:  All right.  Just minute.  You want it

13  marked next?  What is that?

14          MR. MCKINNEY:  Defense Exhibit U.

15          THE COURT:  The witness' notes that he made in the

16  course of his investigation?

17  BY MR. MCKINNEY:

18  Q.      What is this document, Mr. Martin?

19  A.      This is a document I prepared just immediately prior

20  to the start of the draft of the Rule 26 report.

21  Q.      Can you read the first three paragraphs?

22          THE COURT:  You want to move it in?

23          MR. MCKINNEY:  Yes, move U into evidence.

24          THE COURT:  Received.

25  /////

1980

```
 1                      (Whereupon, Defense Exhibit U was

 2                      received into evidence.)

 3           THE WITNESS:  (Reading:)

 4                  CDCR has in place a comprehensive, extensive

 5                  system to minimize and control the use of

 6                  unnecessary and excessive staff use of force.

 7                  CDCR has in place heightened system safeguards

 8                  to ensure inmates with mental illness are not

 9                  subjected to unnecessary and excessive force.

10                  CDCR has in place a well defined, valid and

11                  predictable process to reasonably accommodate

12                  inmates whose mental health status requires

13                  consideration.

14           And there is a word I can't read previous to that --

15      (Reading:)

16                  -- when adjudicated Rules Violation Reports.

17           It is a rough draft.

18      BY MR. MCKINNEY:

19      Q.      That's consistent with the opinions in your report,

20      overarching opinions?

21      A.      Yes.

22      Q.      We're looking at six elements that counsel walked you

23      through with respect to the use of force system.

24              You found that the facilities are governed by both the

25      statewide and a local policy for use of force.
```

1981

```
 1              Correct?
 2    A.        Correct.
 3    Q.        Also that the policy has heightened safeguards to
 4    protect against unreasonable use of force?
 5    A.        It does.
 6    Q.        And that officers undergo comprehensive training with
 7    respect to use of force.
 8              Correct?
 9    A.        I don't know --
10              THE COURT:  You've already testified you don't know
11    what the extent of training is.
12              Is that right?
13              THE WITNESS:  I did not exam that to the extent I
14    would need to.
15    BY MR. MCKINNEY:
16    Q.        You testified on direct about the review process.
17              Correct?
18    A.        Yes.
19    Q.        And it's comprehensive?
20    A.        Yes.
21    Q.        And there's oversight of use of force within the State
22    of California.
23              Correct?
24    A.        Yes.
25    Q.        Mr. Martin, you spent hours over the last couple of
```

 1    days looking at this chart before us.

 2         Based on your review in this case, do you have an

 3    opinion about whether the so-called perfect storm is

 4    occurring in California?

 5    A.     I have an opinion that I don't know.

 6    Q.     And you have not looked at -- you did not trace use of

 7    force in those incidents into the RVR process?

 8    A.     I did not systematically do that, no.

 9    Q.     You also did not look at all of the classification

10    processes, did you?

11    A.     I did not.

12         THE COURT:  One moment, please, sir.

13         I don't know what the question means?  You did not

14    trace use of force in those incidents in the RVR process, and

15    you answered, "I did not systematically do that."

16         What didn't you systematically do, sir?

17         THE WITNESS:  Systematically looked at use of force

18    incidents and their processing through the use of force

19    review and referral structure.  The RVR process was separate

20    and apart.

21         THE COURT:  Okay.  I think I now understand what

22    you're saying.

23         You looked at the RVRs?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  What didn't you do?

1983

1        THE WITNESS:  I could have taken the use of force

2    incident report that I reviewed and track it through the

3    other parts of the system to see if he was charged, and then

4    to go to the RVR system and follow up with what the

5    disposition was, and then ultimately to be able to form some

6    opinions, then I would see what they did with that after the

7    disposition of the RVR in classification terms, did it result

8    in a SHU?

9        THE COURT:  I understand.

10        THE WITNESS:  That's what I did not do.

11    BY MR. MCKINNEY:

12    Q.    You were hired by the state to look at both use of

13    force and the disciplinary process objectively.

14        Would you agree with that?

15    A.    Yes, I was.

16        MR. BORNSTEIN:  I'm sorry to be so late.  I object to

17    the form of the question.  It's argumentative.

18        THE COURT:  The question is in.

19        Overruled.

20        You may proceed.

21    BY MR. MCKINNEY:

22    Q.    You were asked to present issues and concerns that you

23    found; is that correct?

24    A.    Yes.

25    Q.    You were asked to give recommendations?

1984

```
 1    A.      Yes.

 2    Q.      And we also asked that you provide systemic opinions;

 3    is that correct?

 4    A.      Yes.

 5    Q.      Plaintiffs' counsel has spent some time trying to

 6    explore blur of the line between the systemic, on the one

 7    hand, and recommendations on the other.

 8            MR. BORNSTEIN:  Your Honor --

 9            THE COURT:  You're about to object that he's

10    speculating as to what you were trying to do and all of that,

11    and, yes, that objection is sustained.

12            The record should reflect that I just didn't make it

13    up.  Counsel had actually risen.

14            MR. MCKINNEY:  Yes, Your Honor.

15    Q.      Mr. Martin, do your recommendations change your

16    systemic opinions about use of force?

17    A.      No.

18    Q.      And do your recommendations change your systemic

19    opinions about the disciplinary process?

20    A.      No.

21    Q.      Was the State bound to implement your recommendations

22    immediately?

23    A.      No.

24            THE COURT:  They weren't bound to implement them at

25    all; correct?
```

```
1              THE WITNESS:  Yes, sir.

2              THE COURT:  They could spend a lot of money and ask

3      you to come do things and then say, "All right.  That's what

4      he recommended, but I think I'll go to lunch"?

5              THE WITNESS:  Correct.

6      BY MR. MCKINNEY:

7      Q.     Counsel asked you a series of questions about pepper

8      spray implying that it's a lethal weapon.

9              Do you agree with that?

10             THE COURT:  Objection is sustained.  You may ask, of

11     course, directly:  Does the witness think that use of the

12     spray is a lethal weapon?

13             THE WITNESS:  It is not classed as such.

14     BY MR. MCKINNEY:

15     Q.     Do you agree with the idea that pepper spray in and of

16     itself causes death?

17     A.     I don't know it to do that.  I don't know of any

18     experience in which I'm personally aware that it has.

19     Q.     In the RVR process, in addition to reviewing the

20     reports, you also interviewed clinicians?

21     A.     Did.

22     Q.     You interviewed officers?

23     A.     I did.

24     Q.     Did you find that inmates were timely referred, were

25     appropriate for mental health assessments?
```

1    A.    I did.

2    Q.    What did you find when a clinician made a

3    determination that mental health did impact the behavior?

4          What did you find on a systemic basis?

5    A.    That it was considered by the hearing officer in the

6    disposition of the case.

7    Q.    Did you review the RVRs that were submitted with the

8    plaintiff's motion attached to the declaration of Ms. Rifkin?

9    A.    I did.

10    Q.    How many were there, if you recall?

11    A.    I don't recall.

12    Q.    What occurred in those cases?

13    A.    Almost, I think without exception, some type of

14    mitigation or tailoring of the disposition.

15    Q.    By virtue of the fact an inmate has a mental health

16    condition, does that render them incapable of complying with

17    an order?

18    A.    Of course not.

19    Q.    In the majority of cases that you reviewed, did you

20    reach any conclusions about whether inmates were capable of

21    complying with orders?

22    A.    I saw rare instances when I was able to conclude from

23    the information I had at hand that they were not.

24    Q.    Whether they were aware that they were violating the

25    rules?

1987

1    A.      Same.

2    Q.      In those type of cases, is it appropriate to hold the

3    inmate accountable for his actions?

4    A.      Yes.

5    Q.      Would you expect to see mitigation under those

6    circumstances, mitigation of the penalty?

7    A.      In what circumstance?  Maybe I've lost you.

8    Q.      Where the inmate is both aware of the his actions and

9    the penalty has been imposed, would you expect to see

10   mitigation under those circumstances?

11   A.      I think you could.

12           MR. BORNSTEIN:  Lack of foundation.  I object.

13           THE COURT:  I expect that all of this has to do with

14   the witness' review.  I mean, obviously, he isn't testifying

15   about things that -- hopefully, you aren't testifying about

16   things you haven't looked at.

17           THE WITNESS:  I certainly am not, Your Honor.

18           MR. BORNSTEIN:  The question as framed is ambiguous

19   and it doesn't really give a foundation for it.

20           THE COURT:  Where the inmate is both aware of his

21   actions and the penalty has been imposed, would you expect to

22   see mitigation?

23           There's nothing ambiguous about that question.

24           THE WITNESS:  I believe in certain circumstances you

25   still could if he had a mental health condition.

1    BY MR. MCKINNEY:

2    Q.       As an example, in a case where too much pepper spray

3    may be used, can that still justify the issuance of an RVR?

4    A.       Yes.

5    Q.       And if the force used was too much, again, should the

6    RVR be dismissed under those circumstances?

7    A.       Not necessarily pursuant to a blanket rule.

8    Q.       In California what did you find in terms of custody

9    staff and mental health staff working together?

10   A.       I certainly did not detect what I would call a kind of

11   evident disconnects or conflicts or counterproductive

12   attitudes that were articulated, which, a lot of times, you

13   do see that very thing.

14           I saw evidence that at varying levels that there was

15   good communication.  I saw at other institutions that both

16   parties were seeking and wishing there was better

17   communication.  What one might expect in a system this size,

18   different institutions were different personnel.

19   Q.       During the cross-examination, there was testimony

20   about clinical intervention not occurring.

21           What was that in reference to?

22   A.       I took it to be in reference to the videotaped

23   incidents in which that clinical worker, almost as an

24   immediate prelude to the cell extraction, attempting to

25   intervene.

1989

```
1    Q.      Is the attempt depicted on the tape?

2    A.      Correct.

3    Q.      And in your review, did you find other evidence of

4    clinical intervention?

5    A.      Almost always there would be attempts previous to

6    what --

7            THE COURT:  No, there would be reports of attempt.

8            THE WITNESS:  Thank you, Your Honor.

9            I'll adopt His Honor's answer.

10   BY MR. MCKINNEY:

11   Q.      That the reports reflect attempts --

12   A.      Yes.

13   Q.      And the medical documents similarly reflect?

14   A.      Yes.

15           MR. BORNSTEIN:  I object to the last answer.  He did

16   not review any medical records by his testimony.

17           THE COURT:  I take it he means by that the responses

18   to the medical -- whether or not mental condition affected

19   the -- whether or not that mental condition affected an

20   appropriate mitigation.

21           That's what you're talking about; right?

22           THE WITNESS:  Yes.

23   BY MR. MCKINNEY:

24   Q.      In the case of Inmate A, are you aware of how long the

25   clinical intervention occurred as reported?
```

1    A.    Absent -- not the clinical intervention on the tape?

2    Q.    Yes.

3    A.    I don't recall specifically there were intervention

4    attempts prior to that videotape reported.

5         THE COURT:  That was the by the doctor who allowed him

6    to sit there and decompensate.

7         Is that right?

8         THE WITNESS:  I saw some of that in the transcript I

9    reviewed.

10        THE COURT:  You may proceed.

11   BY MR. MCKINNEY:

12   Q.    You also reviewed the reports, correct, Mr. Martin?

13   A.    Yes.

14   Q.    On the 17 videos during your testimony, there was

15   discussion about referrals for investigation.

16        Do you recall that?

17   A.    There was a question of whether I knew about how many

18   had been referred.

19   Q.    Correct.

20        In your review, should all of those incidents be

21   referred?

22   A.    They should not have.

23   Q.    Some would require no intervention?

24   A.    Correct.

25   Q.    And in other cases, could the issues be addressed

1    other ways?

2    A.    I'm sure, of course, what I want this --

3         THE COURT:  Let's be specific.

4         THE WITNESS:  Exactly.

5         THE COURT:  I think it was E where they threw grenades

6    in and using the largest canisters and so forth, you didn't

7    think that should be referred --

8         THE WITNESS:  I obviously thought that should be

9    referred.

10        THE COURT:  And A --

11        THE WITNESS:  Yes.

12        THE COURT:  You know.  All you had to do was look and

13   see the guy couldn't respond.

14        THE WITNESS:  Absolutely.

15        THE COURT:  Should that be reviewed?

16        THE WITNESS:  Should have been referred.

17        THE COURT:  Referred.  And neither one of those was

18   referred?

19        THE WITNESS:  That is correct.

20        THE COURT:  You may proceed, counsel.

21   BY MR. MCKINNEY:

22   Q.    But others did not need referral; correct?

23   A.    There were others I would not have referred for

24   investigation.  No basis to.

25   Q.    And in your review of the incidents, did you find

1992

```
 1   cases that were referred for investigation?

 2   A.      In the cases I reviewed?

 3   Q.      Correct.

 4   A.      Yes.

 5   Q.      Did you trace those through the process or were you

 6   unable to do that?

 7   A.      I tried to trace some of them.  I did not

 8   automatically follow each referred incident that I saw.

 9   Q.      Were you able to determine outcomes from any of those

10   incidents or where in the process they were?

11   A.      Not what I call an ultimate outcome where the

12   investigation was completed, a violation sustained and

13   disciplinary action imposed and ratified or affirmed or

14   whatever the process is in California, the administrative

15   procedures.

16   Q.      But those incidents were proceeding through the

17   investigative process?

18   A.      They were.

19           THE COURT:  Who's investigating them now?

20           THE WITNESS:  Internal Affairs.

21           THE COURT:  Right.

22   BY MR. MCKINNEY:

23   Q.      There was testimony early yesterday about cameras

24   being given to the officers in the immediate use of force

25   situation.
```

```
 1              Is that typical in any other jurisdiction you've

 2    experienced?

 3    A.       Not to my knowledge, but I hardly have a comprehensive

 4    survey of that because I've only been through X number of

 5    institutions in the past six, twelve months, whatever.

 6    Q.       So this is an emerging incident?

 7    A.       I believe it to be, yeah.  I haven't seen any using

 8    that technology yet.

 9    Q.       You testified about inmates with serious mental

10    illness who may have a different than normal reaction to

11    pepper spray.

12              Do you recall that?

13    A.       I don't.

14    Q.       Higher tolerance?

15    A.       Yes.

16    Q.       Can you clarify the nature of the mental health

17    conditions you're referring to when someone might be -- when

18    they might have a higher tolerance?

19    A.       I don't know at this moment.  I can't answer that.  I

20    don't know.

21    Q.       There was testimony this morning about gradations of

22    mental illness.

23              In your review, how many inmates would you describe as

24    gravely disabled?

25    A.       I saw very rare instances of it in my review of my
```

1994

```
 1    incidents.

 2    Q.      How many inmates that you would deem incapable of

 3    processing information?

 4    A.      At that level?

 5    Q.      Right.

 6    A.      Again, very, very isolated instances.

 7    Q.      Throughout your review, did you find there was a

 8    culture of violence within CDCR?

 9    A.      No.

10    Q.      Did you find there was a culture of institutionalized

11    harm within CDCR?

12    A.      No.

13    Q.      In the controlled use of force context, part of your

14    testimony was that officers should employ time and distance.

15            Correct?

16    A.      Correct.

17    Q.      Did you generally find that officers employ time in

18    the controlled use of force context?

19    A.      Yes.

20    Q.      Did they employ distance?

21    A.      Yes.

22    Q.      With respect to Inmate A, for example, did they employ

23    time and distance?

24    A.      Yes.

25    Q.      Counsel asked you about imminent threats to security
```

1    that would justify use of force.

2            Would an imminent threat to safety justify use of

3    force?

4    A.      Of course.

5    Q.      As an example, did Inmate A present an imminent threat

6    to his safety?

7    A.      I believe he did.

8    Q.      There was discussion in your testimony yesterday about

9    officers lacking training or ineptness or referral to your

10   deposition testimony.

11           Do you recall that?

12   A.      I do.

13   Q.      What was that in reference to?

14   A.      Thank you for asking to clear that up.  That was in

15   reference to some of these incidents.  It was not systemic

16   observation, because I don't know and I don't testify to

17   things I don't know, counsel.

18   Q.      What had you done the day prior to your last

19   deposition?

20   A.      What had I done what?

21   Q.      Did you go to San Quentin on the day prior?

22           What was done at San Quentin?

23   A.      We watched videos.

24   Q.      Who was there?

25   A.      I believe the plaintiff's expert and two of

1996

```
 1    plaintiff's attorneys, both of whom are sitting at counsel

 2    table.

 3    Q.      Did you understand those questions at the deposition

 4    to be directed towards that review?

 5    A.      Yes.

 6    Q.      Are you familiar with the declaration that was

 7    submitted by Kathy Allison in this matter?

 8    A.      Yes.

 9    Q.      Are you familiar with the data presented in that

10    declaration?

11    A.      Yes, generally.

12    Q.      Do you understand that that data shows all incidents

13    involving an mentally ill inmate where force was used?

14    A.      Yes.

15    Q.      That would include whether the inmate with mental

16    illness was either the aggressor or the victim.

17            Correct?

18    A.      Correct.

19    Q.      Counsel put up this chart based on your notes and

20    what's now been entered as Defendant's Exhibit U.

21            Do you have a recollection how this data was

22    collected?

23    A.      I do.

24    Q.      What is that recollection?

25    A.      A combination of selected incidents from the log's
```

1997

 1    pre-site visits based on a number of factors, such as the

 2    level of weaponry employed was one factor.  So there was a

 3    selection made there.  There was a selection of just random

 4    incidents made at that same cut.  Then when I went onsite, I

 5    would typically get some more recent incidents.

 6         THE COURT:  In the final analysis, so we can cut

 7    through all of this because we'll be here for at least six

 8    weeks, do these figures represent your best understanding of

 9    whether or not force was used and against whom at each of

10    these institutions?

11         THE WITNESS:  In my methodology, yes.

12         THE COURT:  Thank you.

13    BY MR. MCKINNEY:

14    Q.    But they were not intended to be a representative

15    sample across the institution; correct?  Some were selected?

16    A.    Yes.

17         THE COURT:  Now I am confused.  I don't understand.  I

18    asked you and you said, "Yes, these are the numbers."

19         Now, there's a suggestion that there's some other --

20    something other that you didn't consider.  I don't know what

21    that something else is.

22         MR. MCKINNEY:  I was trying to address this through

23    the question, but without slipping into argument, since we

24    were involved in the selection process, at some point we only

25    asked for mentally ill inmates, so it can't be

1998

```
 1     representative.  It's not --
 2          THE COURT:  I don't understand.  I sincerely say I
 3     don't understand.
 4          MR. MCKINNEY:  Some of the last tours, Salinas and San
 5     Quentin, we only asked for mentally ill use of force
 6     incidents at those institutions.
 7          THE COURT:  That's why there's zero on the other side?
 8          MR. MCKINNEY:  Correct.
 9          THE COURT:  I got that.
10          What does that have to do with the price of eggs in
11     China?
12          MR. MCKINNEY:  The plaintiffs are trying to represent
13     a random or representative sample, and I just want to make
14     clear it's not.
15          THE COURT:  Maybe you understand something that I
16     don't understand.  It is certainly true if you did not get
17     the numbers as to the people and the general population
18     against whom the force was used, then you can't compare them.
19     But that doesn't -- does that in some way that I don't
20     understand undermine the legitimacy of the other numbers?
21          THE WITNESS:  No.  What I think created the confusion
22     there has been some earlier data about the disparity of
23     applications of force on the Coleman class, that there's
24     greater numbers.
25          THE COURT:  Right.
```

 1              THE WITNESS:  And that's what that data is.  This does

 2    not have anything do to with that data set.  I believe

 3    counsel -- I'm not going to --

 4              THE COURT:  Now I really don't understand.  You

 5    know -- we may have to take a recess because I know that

 6    you're both speaking English, but it's not getting into my

 7    head.

 8              You go to an institution.  The first one I can't read

 9    from here --

10              THE WITNESS:  Lancaster.

11              THE COURT:  And you say for this period of time, how

12    many uses of force did you have and they give you that

13    number?

14              THE WITNESS:  Yes.

15              THE COURT:  Then you say:  How many of the victims of

16    the use of force -- and I don't mean "victims" in a

17    pejorative way -- were mentally -- were persons with mental

18    illness, and how many were in the general population?

19              THE WITNESS:  That was also on the log sometimes.

20              THE COURT:  Right.

21              And that's what you wrote down?

22              THE WITNESS:  Right.  That's what I made my selection

23    from, that log, and, obviously, I was more interested in the

24    Coleman class, so I picked a whole lot of those.

25              THE COURT:  I don't know what "pick" means.

2000

1              THE WITNESS:  I selected them because they were

2     designated as CCCMS or EOP.

3              THE COURT:  I understand.

4              But what you did -- I'm really believe I don't

5     understand.  That somehow or another --

6              MR. MCKINNEY:  May I try one more time, Your Honor.

7              THE COURT:  No.  You've been of no use whatsoever.  No

8     disrespect -- a lot of disrespect, but not intended.

9              You go to the institution.  You say:  From this date

10    to this date, I want all the logs of use of force?

11             THE WITNESS:  Correct.

12             THE COURT:  Then you count the number of people who

13    were classified as Coleman class members and you wrote that

14    down?

15             THE WITNESS:  No.  I absolutely do not.

16             THE COURT:  Tell me.

17             THE WITNESS:  I take the log and I identify the

18    incidents that I want to look at from purely use of force,

19    because the level of force used, either weaponry or whatever,

20    that's the first cut I highlight.  Those were OC, batons, 40

21    millimeters.  I want to identify the highest level of force

22    used, irrespective of anything else.

23             Then I would go back through and say:  All right.

24    Were those CCCMS or EOPs?  If they were, they almost always

25    got on my list.

2001

 1          THE COURT:  Almost always got on your list?

 2          THE WITNESS:  I didn't look at every one of them.  I

 3    did not have the time.  I looked at what I thought were the

 4    most serious levels of force on the Coleman class.

 5          THE COURT:  Then measured that in the same way against

 6    the general population?

 7          THE WITNESS:  Right.  I picked some number of the same

 8    for general population.

 9          THE COURT:  Okay.  All I'm trying to understand, and

10    it just seems so simple, but, obviously, it isn't.

11          Now, as I understand it, you didn't look at every

12    incident which involved the use of force; you only looked at

13    incidents that you perceived to be serious?

14          THE WITNESS:  At a minimum, I did that.

15          THE COURT:  All right.

16          And -- I just don't understand.  There were

17    obviously -- now I understand.  There were uses of force of

18    such inconsequential exertion that you didn't bother counting

19    them?

20          THE WITNESS:  I didn't get them on my list.

21          THE COURT:  All right.  All right.

22          I had assumed, and you told me, whether it's right or

23    wrong, that this list constituted your assessment of the

24    application of serious force for the period of time that was

25    in question.

```
 1                Is that right?

 2                THE WITNESS:  This was certainly the core material.

 3                THE COURT:  Okay.  I don't understand it, but maybe I

 4      don't; that that in anyway undermines the reasonable

 5      conclusion that there was a significant difference between

 6      the persons who were mentally ill and subject of force as

 7      against the general population.

 8                Is that wrong?

 9                THE WITNESS:  I don't think it is wrong.

10                THE COURT:  All right.

11                You may proceed, counsel.

12      BY MR. MCKINNEY:

13      Q.    You testified this chart could not be used to

14      determine disparity between -- for use of force between

15      general population and mentally ill.

16                Correct?

17      A.    I don't see how it could.

18                THE COURT:  Now I am completely -- I thought that what

19      I just asked you --

20                MR. MCKINNEY:  I want to be clear.  I want the record

21      to be straight.

22                THE COURT:  I don't care about the record.  I care

23      about my understanding.

24                MR. MCKINNEY:  I want you to understand as well.

25                THE COURT:  Thank you, sir.
```

 1             I asked you:  In any way, does whatever the selection

 2   process undermine the reasonable conclusion as to the

 3   disparity?

 4             And you said, "No."

 5             THE WITNESS:  I don't think this does.

 6             THE COURT:  Then he says:  You testified this chart

 7   could not be used to determine disparity?

 8             And you said, "Correct."

 9             THE WITNESS:  That's correct.

10             THE COURT:  How could they both be correct?

11             THE WITNESS:  Because this data set does not address

12   proportionality between the Coleman class and not.  The OIG

13   data, that's precisely -- and the Special Master said it's

14   precisely what it captures.

15             THE COURT:  Now I understand.  Now I think I

16   understand.

17             Clearly, there are fewer mentally ill patients then

18   there are general population patients?

19             THE WITNESS:  Correct.

20             THE COURT:  So you would expect that any more

21   generalized compilation would reflect, would note that

22   disparity, and, therefore, it would suggest a much more

23   serious application of force to mental health because there

24   are so many fewer of them than the general population?

25             THE WITNESS:  I believe I understand the question.  I

2004

```
 1    believe you're correct.  There's an overrepresentation of

 2    Coleman class members and use of force incidents.  They're

 3    just is.

 4              THE COURT:  That's what this demonstrates?

 5              THE WITNESS:  It does not demonstrate it.  It does

 6    not.  It is a different data set.

 7              THE COURT:  No, I understand it's a different data

 8    set, but what it does is diminish the disparity because it

 9    doesn't take into account the number of mentally ill versus

10    general population?

11              THE WITNESS:  I knew at the time I was doing this of

12    disproportionate -- I already figured that out because it had

13    been reported that there -- Coleman class members were

14    overrepresented in applications of force, so I knew I had to

15    have a lot of them.  That's what this is all about.

16              So for that reason, I selected in each one of these

17    instances mostly Coleman class members, but that was my

18    selection just off of a log.  Because there are greater

19    numbers, Lancaster 25 and 7, that's simply because I had to

20    look mostly at use of force as it applied to Coleman class

21    members.

22              Does that help?

23              THE COURT:  I'm going to try again because I just

24    don't understand what you're saying.

25              Apparently, during this period that you were looking
```

2005

 1    at, did you or did you not count the number of people who

 2    were subjected to force in both the general population and

 3    the mental health at whatever level you decided was of

 4    significance?

 5            THE WITNESS:  On these logs, I did not do that because

 6    I had other data.

 7            THE COURT:  So what was the purpose of this?

 8            THE WITNESS:  To review use of force incidents that

 9    Coleman class members were the subject of.  What was I going

10    to review?  If you want my assessment on the applied force,

11    I've got to review incidents and select incidents that were

12    valid --

13            THE COURT:  Sir, I understand.  But why did you bother

14    even counting any of the general population since that wasn't

15    your concern?

16            THE WITNESS:  Because one of the charges, one of the

17    allegations was that force was used more directed at Coleman

18    class members in similar situations than general population.

19            THE COURT:  I suppose we can continue this

20    conversation forever and I'm still not going to get it.

21            Go ahead, counsel.  I give up.

22            MR. MCKINNEY:  Your Honor, do you want to take a

23    break?

24            THE COURT:  No.  I want to get this over as fast as we

25    can.  I suspect we can't.  Five more minutes and we'll take

1    another break.

2          MR. MCKINNEY:  I was hoping we might be able to clear

3    this up.

4    Q.      Mr. Martin, would you expect to see a disparity

5    between mental health and non-mental health inmates within

6    any prison setting?

7    A.      In each instance in which I've had the data, I've

8    found that disparity.

9    Q.      In looking at the data in this case, is it unexpected

10    what you found?

11    A.      It's reasonably consistent or in the ball park with

12    what I've seen in other instances.

13    Q.      You testified a little bit about the RJ Donovan study

14    you did with respect to the use of the baton.

15          When was that study conducted?

16    A.      Just prior to my July deposition.

17    Q.      When was the underlying work done, the site visit and

18    the incident review?

19    A.      At RJ Donovan?

20    Q.      Yes.

21    A.      That was months before that.  It's in my report, but

22    it's months before it.

23    Q.      I think that's good enough.

24          That was done in connection with your work leading up

25    to your initial report for the termination motion?

```
 1              Correct?

 2    A.       Correct.

 3    Q.       Do you know whether CDCR has looked into use of the

 4    baton at RJ Donovan?

 5    A.       I don't.

 6    Q.       Are you familiar with the testimony of -- declaration

 7    of John Day, the Internal Affairs Director?

 8    A.       Yes.

 9    Q.       You're aware that 107 incidents were referred for

10    investigation in 2012 arising out of use of force

11    alligations?

12    A.       Based on his representations, yes.

13    Q.       And that various forms of discipline were imposed?

14    A.       Yes.

15    Q.       Including six cases which resulted in termination?

16    A.       Correct.

17              THE COURT:  We'll take our 15-minute recess.

18    Hopefully, my law clerk can explain to me what seems to be

19    inexplicable.

20                              (Whereupon, a break was taken at

21                              2:43 p.m.)

22                              (Nothing Omitted.)

23

24    /////

25    /////
```

2008

1          (On the record at 3:00 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Please, be seated everyone.

5          Let's do some more, Mr. McKinney.

6          MR. MCKINNEY:  Yes, Your Honor.

7    BY MR. MCKINNEY:

8    Q.     Mr. Martin, you were asked about the reporting in the

9    Inspector General's reports.  In your review, did you have

10   any issues with understanding the actual force used?

11   A.     No.

12   Q.     There were a series of questions about the staff

13   assistant, and I think counsel -- and you wanted to explain.

14          Can you explain the role of the staff assistant in

15   your view?

16   A.     To ensure that the charged inmate can fully

17   participate and understand the disciplinary hearing process

18   and what occurs during that hearing.

19   Q.     And is there any requirement that a staff assistant

20   should be an advocate?

21   A.     Not to my knowledge.

22   Q.     And is the State's policy and practice with respect

23   to a staff assistant -- first of all, are you familiar with

24   the policy and practice?

25   A.     Yes.

2009

1    Q.      Is it appropriate?

2    A.      Yes.

3    Q.      In the RVR process review, did you find Rules

4    Violation Reports where no punishment was imposed?

5    A.      I did.

6    Q.      Did you compare the need element in use of force, in

7    other words the need to use force, between Coleman Class

8    Members and non-Coleman Class Memebers?

9    A.      I look at the need element in every Use-Of-Force

10   Report I have ever reviewed in my 30 year career.

11           THE COURT:  Not the question, sir.

12           Forgetting that, when you reviewed the use of force

13   as to Coleman members, did you consider -- did you compare

14   the element of use of force with non-Coleman class members?

15           Well, that gets us back to this thing.

16           All right.

17           It doesn't matter.  If you can, answer the

18   question.

19           THE WITNESS:  Yes, I did look at the need with each

20   one of these incidents that I reviewed.

21   BY MR. MCKINNEY:

22   Q.      Is that a critical part of the analysis of use of

23   force?

24   A.      I think it's the first essential critical element in

25   any use-of-force inquiry.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2010

1    Q.       What did you find in CDCR?

2    A.       I found no difference in the need element between the

3    Coleman Class Members and the general population, that is to

4    say that there was some level of resistance, whether it be

5    refusal to obey an order or threats or whatever, in virtually

6    ever case that I saw, every case that I reviewed.

7    Q.       Did you find evidence that staff manufactured ways to

8    use force against Coleman Class Members?

9    A.       No.  I did not.

10           MR. MCKINNEY:  One moment, Your Honor.

11           (Counsel confers with cocounsel.)

12   BY MR. MCKINNEY:

13   Q.       One last question with respect to Inmate A.

14           Are you aware of evidence that -- maybe two

15   questions.

16           First of all, are you aware that he was -- forfeiture

17   credits was part of what he was sentenced to?

18   A.       Yes.

19   Q.       Are you aware those credits were restored at some

20   point?

21   A.       Yes.

22           MR. BORNSTEIN:  I object to the form of the question.

23   It is argument.

24           THE COURT:  Good.  You're withdrawing the objection.

25   You're just noting it because it is fun.

2011

1    Thank you, sir.

2    You are finished?

3    MR. MCKINNEY:  I have no further questions.

4    THE COURT:  Recross?

5    MR. BORNSTEIN:  I don't have any questions.

6    THE COURT:  May the witness be released?

7    MR. BORNSTEIN:  Yes, Your Honor.

8    MR. MCKINNEY:  Yes, Your Honor.

9    THE COURT:  You may step down.  You are free to go or

10   stay, as you choose.

11   MS. CESARE-EASTMAN:  Your Honor, before we continue

12   there are a few things we need to clear up regarding the

13   exhibit record.

14   THE COURT:  We're not there yet.  Take a deep breath.

15   Defendants rest?

16   MR. MCKINNEY:  Yes.  Other than the --

17   THE COURT:  Yes.  We'll work all of that out.

18   Any rebuttal?

19   MR. BORNSTEIN:  We've got some deposition summaries

20   that we've previously lodged -- excerpts that we want to move

21   into evidence.  And we've got some other -- there are some

22   other documents that we want to move into evidence.

23   THE COURT:  We'll talk about the documents in a

24   moment.

25   The suggestion that you want to put deposition

2012

1    testimony into evidence without an opportunity to

2    cross-examine the particular person or questioning the person

3    about it seems, to me, remarkable.  Maybe it is authorized.

4    Just in 34 years I've never had it happen before.

5            MR. BORNSTEIN:  What happened is the State offered --

6    there are certain declarations that they put in.

7            THE COURT:  Yes.

8            MR. BORNSTEIN:  We filed a designation of -- they

9    didn't call those people as witnesses.

10           THE COURT:  So you are putting that in as opposition?

11           MR. BORNSTEIN:  To rebut what they said.

12           THE COURT:  To rebuttal of the affidavits.

13           That's the problem with having considered all of the

14    affidavits, but I put them in so there you are.

15           I suppose that -- Counsel?

16           MR. MCKINNEY:  Yes, Your Honor.  It is a little bit

17    broader than what the plaintiffs have designated, and I think

18    the court has already addressed this issue with respect to

19    the condemned motion, is that the plaintiffs have designated

20    excerpts of depositions for witnesses who have testified

21    here.  And that's not appropriate.

22           MR. BORNSTEIN:  That's not what we're talking about.

23           MR. MCKINNEY:  It is in the designation.

24           MR. BORNSTEIN:  We dropped that.

25           THE COURT:  All right.  Okay.

2013

1          Let's go through what has to be cleaned up.

2          Plaintiff.

3          MS. CESARE-EASTMAN:  Your Honor, may I approach?

4          THE COURT:  Yes.  Who do you want to approach?

5          MS. CESARE-EASTMAN:  Just up there.

6          THE COURT:  Oh, my.  I'm sorry.  I'm losing...

7          Go ahead.

8          MS. CESARE-EASTMAN:  So Your Honor ordered all of the

9    declarations and exhibits thereto that had been previously

10   designated as exhibits admitted.

11         THE COURT:  Yes.

12         MS. CESARE-EASTMAN:  My understanding, from speaking

13   with Miss Rivas, is that we need to note what those are for

14   the record.

15         THE COURT:  All right.

16         MS. CESARE-EASTMAN:  That would be -- I've already

17   discussed this with defense counsel.

18         That would be Plaintiffs' Exhibits 100 through 111.

19         THE COURT:  Received.

20              (Whereupon, Plaintiffs' Exhibits 100 through 111

21               received into evidence.)

22         MS. CESARE-EASTMAN:  113 through 117.

23         THE COURT:  Received.

24              (Whereupon, Plaintiffs' Exhibits 113 through 117

25               received into evidence.)

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2014

1          MS. CESARE-EASTMAN:  119 through 123.

2          THE COURT:  I'm assuming that all of this has been

3     cleared with you so I'm --

4          MS. VOROUS:  Well, Your Honor, no.  The numbers we

5     received were like 100 to 147.

6          MS. CESARE-EASTMAN:  I haven't included the

7     declarations of Mr. Vail.  We previously admitted those.

8     That's where the gaps are.

9          MS. VOROUS:  As long as it covers all of the numbers

10    in the emails we discussed with the clerk, then we're fine.

11    Just the way you are presenting it, it didn't match up with

12    what I had.

13         THE COURT:  I have no idea what you are saying, and I

14    don't care.  If there is an objection, voice it.  If there is

15    no objection, let's go on.

16         Are there objections to what's been designated so

17    far?

18         MR. MCKINNEY:  No, Your Honor.  I think we had a

19    misunderstanding.

20         THE COURT:  All right.  Go on.

21         MS. CESARE-EASTMAN:  119 through 123.

22         THE COURT:  Yes.

23              (Whereupon, Plaintiffs' Exhibits 119 through 123

24               received into evidence.)

25         MS. CESARE-EASTMAN:  125 through 147.

2015

```
 1           THE COURT:  Received.
 2               (Whereupon, Plaintiffs' Exhibits 125 through 147
 3                received into evidence.)
 4           MS. CESARE-EASTMAN:  149 through 158.
 5           THE COURT:  Received.
 6           As I've told you before, I really look forward to
 7      anybody reading any of this stuff, but that's fine.
 8           God forbid that you practically try the lawsuit.
 9           What else.
10               (Whereupon, Plaintiffs' Exhibits 149 through 158
11                received into evidence.)
12           MS. CESARE-EASTMAN:  161 through 179.
13           THE COURT:  161 through 179.
14               (Whereupon, Plaintiffs' Exhibits 161 through 179
15                received into evidence.)
16           MS. CESARE-EASTMAN:  Finally, 182 through 183.
17           THE COURT:  182 through 183, all received.
18               (Whereupon, Plaintiffs' Exhibits 182 and 183
19                received into evidence.)
20           MS. CESARE-EASTMAN:  Your Honor, 182 through 183 are
21      exhibits to Dr. Kaufman's declaration filed under seal.  I
22      ask those be admitted under seal.
23           THE COURT:  That will be the order.
24           MS. CESARE-EASTMAN:  Then in addition, Your Honor, we
25      went through all the exhibits that had been admitted.  There
```

2016

1    were a few inmate records that were not admitted under seal.

2    I would like to clear that up for the record as well.

3           THE COURT:  Go ahead.

4           MS. CESARE-EASTMAN:  That would be Plainitffs' 4A, B,

5    C and D.

6           THE COURT:  Under seal.

7           MS. CESARE-EASTMAN:  Plaintiffs' 8E.

8           THE COURT:  Under seal.

9           MS. CESARE-EASTMAN:  Plaintiffs' 10D.

10          THE COURT:  Received under seal.

11          MS. CESARE-EASTMAN:  Plaintiffs' 12A, B, C and D.

12          THE COURT:  Received under seal.

13          MS. CESARE-EASTMAN:  Thank you, Your Honor.

14          Plaintiffs' 23a and b.

15          THE COURT:  Received under seal.

16          MS. CESARE-EASTMAN:  23d.

17          THE COURT:  I thought that's what you just said.  If

18   you didn't, it is received under seal.

19          MS. CESARE-EASTMAN:  23a, b, d.

20          THE COURT:  Received under seal.

21          MS. CESARE-EASTMAN:  25a, b, c.

22          THE COURT:  Same.

23          MS. CESARE-EASTMAN:  46.

24          THE COURT:  Same.

25          MS. CESARE-EASTMAN:  47.

2017

```
 1              THE COURT:  Oh, my goodness.  Same.

 2              I want to know whether anybody on the plaintiffs'

 3    side has read every one of these -- I'm sorry.  I'm sorry.

 4              MS. CESARE-EASTMAN:  Then --

 5              THE COURT:  No.  You have to stop.  I've got to catch

 6    my breath.

 7              (Brief pause.)

 8              Go ahead.

 9              MS. CESARE-EASTMAN:  Then for defendants' exhibits,

10    I've spoken about this with Miss Vorous already, that would

11    be Defendants' Exhibit A.

12              Defendants' Exhibits C, D, E, F and G.

13              THE COURT:  All received under seal.

14              MS. CESARE-EASTMAN:  I'm sorry.  And H.

15              THE COURT:  Also.

16              MS. CESARE-EASTMAN:  And then finally, Your Honor,

17    the exhibits defendants introduced yesterday, which would be

18    Defendants' AE, AF, AG, AH, AI, AJ and AL.

19              THE COURT:  All received.

20              MS. CESARE-EASTMAN:  Thank you, Your Honor.

21              THE COURT:  Do you have anything you need corrected,

22    sir or ma'am?

23              MR. MCKINNEY:  No, Your Honor.  We believe that takes

24    care of it.

25              (Clerk confers with Court.)
```

2018

1          THE COURT:  Don't ask me.  Talk to them after.

2          I don't believe I am in any condition to listen to

3     argument.  I will hear you tomorrow morning at 9:30.

4          I am anxious to hear you discuss Exhibits 100, 111,

5     113, 117, in detail, 119, 123, 125 to 147.

6          It is preposterous.  It's simply preposterous.

7          I'll see you tomorrow morning at 9:30.

8          I didn't mean what I said.  I was just trying to

9     point out something that nobody cares about, which is whether

10    or not the trier of fact can make sense out of this lawsuit.

11         Stand in recess.

12         (Off the record at 3:15 p.m.)

13                        ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                             ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6
             I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                      IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25