1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7         Plaintiffs,

8   Vs.                          CASE NO. CIV. S-90-0520 LKK

9   EDMUND G. BROWN JR., et al.,
    et al.,
10

11         Defendants.

12   _____/

13

14

15                        ---o0o---

16

17                  REPORTER'S TRANSCRIPT

18               RE:  EVIDENTIARY HEARING

19              THURSDAY, NOVEMBER 7TH, 2013

20

21                        ---o0o---

22

23

24
    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25  Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                          APPEARANCES

 2                            ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  LORI RIFKIN, ATTORNEY AT LAW

 9

10
              K&L GATES LLP
11            4 EMBARCADERO CENTER, SUITE 1200
              SAN FRANCISCO, CALIFORNIA  94111
12
              BY:  JEFFREY L. BORNSTEIN, ATTORNEY AT LAW
13
              BY:  MEGAN F. CESARE-EASTMAN, ATTORNEY AT LAW
14
              BY:  JON MICHAELSON, ATTORNEY At LAW
15
              BY:  RANJINI ACHARYA, ATTORNEY AT LAW
16

17

18    FOR THE DEFENDANTS:

19             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
20             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
21
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
22
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
23

24

25                            ---o0o---
```

1                        PROCEEDINGS INDEX

2                            ---o0o---

3

4    PROCEEDINGS:                                    PAGE

5

6        Closing Argument by Mr. Bornstein          2019

7        Closing Argument by Mr. McKinney           2045

8        Final Closing Arg. by Mr. Bornstein        2073

9

10

11

12                           ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         EXHIBIT INDEX

2                           ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION               EVD
5

6      1085               Website Report              2045

7

8

9

10

11

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    SACRAMENTO, CALIFORNIA

2              THURSDAY, NOVEMBER 7, 2013; 9:35 A.M.

3                         ---oOo---

4

5          THE COURT:  Mr. Bornstein.

6          MR. BORNSTEIN:  Thank you, Your Honor.

7          THE COURT:  I'm going to tell both sides, there are a

8    couple hundred exhibits that have been filed, and I know you

9    expect me to read every one and digest it, but I also have

10   other cases.

11         At the end of the day, I expect a list of ten

12   documents from each side that they believe are indispensable

13   for the court to have reviewed.

14         You may proceed, Mr. Bornstein.

15         MR. BORNSTEIN:  Thank you, Your Honor.

16         On the document issue, I want to start by telling the

17   court that the key documents for the court are in the -- are

18   the incident reports, the IERC reports and the RVR reports

19   for the inmates who were forcibly extracted from their cells.

20         THE COURT:  As I said, at the end of the day, you'll

21   give me a list of what their numbers are.  I'm not going to

22   go chasing them down.

23         You may proceed, sir.

24         MR. BORNSTEIN:  Thank you.

25         Your Honor, today what I want to do with you is to

1    talk about this case and what I believe the key is going

2    forward, and that is to expand the toolbox of options for

3    working, dealing with severely mentally ill inmates in

4    California.

5          What the evidence has demonstrated in this case is

6    that you have a system that is based on pepper spray, based

7    on command and control, that is based on expandable batons,

8    that is based on a custody-dominated culture that, as all of

9    the experts have said, needs to be changed.  It needs to be

10   changed in some long-range ways and also in some short-term

11   ways.

12         THE COURT:  I want to stop you.

13         One of the problems in this case, and I think it is --

14   I know that the defendants will point it out to me in any

15   event, but I might as well point it out to you because it's a

16   difficulty that you have.

17         Beyond doubt, the system is not perfect, to say the

18   least.  The question is:  Having found constitutional

19   violations in the past and probably the possibility of

20   constitutional violations in terms of this case, the question

21   is:  Am I limited addressing those issues which are

22   constitutionally deficient or having found the constitutional

23   deficiency, does the remedial power go to trying to make the

24   system not only consistent with the constitution but

25   consistent with good practice and good sense?

1            MR. BORNSTEIN:  Your Honor, it is our position once

2      you have found the threshold that the remedy can be broader

3      than the constitutional minimum.  In fact, you've got -- the

4      evidence demonstrates in this case that the state's own

5      expert has found that there is lack of trained and competent

6      correctional officers.

7            So even by definition under the state's view of what

8      reasonable force is, there is no reasonable force if you

9      don't have trained and competent people that are exercising

10      their authority and using it.

11            What we believe is that if, from the evidence, there

12      is a problem that the state knew or should have known about,

13      if they only would have looked at their own data, they didn't

14      do it.  They deliberately chose not to do it.  They've been

15      under this court's jurisdiction for many more years than I

16      can even begin to count.

17            They were supposed to provide data to the Special

18      Master, and Mr. Stainer testified, in his view, the data they

19      supplied was faulty, and yet they haven't even corrected

20      that.

21            They have supposedly in their COMPSTAT system the

22      ability to tract every use of force incident, whether its

23      against Coleman class members or other people, whether its an

24      immediate or controlled use of force, whatever the factors

25      are, they chose deliberately to ignore their own data, and

1    that, in and of itself, is the key problem that they have to

2    deal with.

3            Mr. Stainer has come into this court, and I want to

4    give him credit, because what he did was, whether it's

5    because he's a practical person and saw the handwriting on

6    the wall or whatever other reason, he did the right thing.

7            He said because this court released six videos that

8    showed horrific treatment of inmates, even though he would

9    not admit that he too shared those sentiments that they were

10   horrific and they shouldn't have happened, he at least had

11   the decency and professionalism to say:  Your Honor, you're

12   right.  We need to go back and look at our policies and

13   procedures, even though we've ignored -- I'm saying this.  He

14   didn't say this -- even they they've ignored the Inspector

15   General's recommendation since 2011 to change their pepper

16   spray policies and other use of force policies, even though

17   their own expert spent 15 months, although I have serious

18   concerns about his methodology, which we saw yesterday, and

19   I'm not quite sure what he looked at or what he did, but in

20   any event, he did say:  You've got to change your policy and

21   procedures, and those were ignored.

22           At least finally he said:  We're trying to try to do

23   something, so even he recognizes that there needs to be

24   changes.

25           The problem is where you have a state with the

1    authority that this state has and the responsibility to

2    provide constitutionally adequate care for all of its

3    inmates, but in particular severely mentally ill inmates, and

4    by their own acknowledgement 30 percent or so of their prison

5    population is made up of inmates with special needs, special

6    mental needs that need to be accommodated, that need to be

7    dealt with, and they've deliberately chosen not to do that,

8    it is the court's responsibility to step in.

9        It is the court's responsibility to say to doctors

10    like Dr. Wagner:  You cannot as a matter of practice allow an

11    inmate to decompensate in his cell because you don't think

12    you can go and get a voluntary -- involuntary medication

13    order.  That is unacceptable.

14        You cannot, as they did Inmate E, you cannot simply

15    know that an inmate comes in from Napa State Hospital and

16    needs help and cell extract him more than once and not give

17    him the kind of treatment that he needs and then use those

18    incidents to give and meet out disciplinary sanctions, even

19    though the state's own expert deliberately chose not to look

20    at the data based on his own testimony yesterday, if you

21    listen to what he said about the perfect storm and you listen

22    to the elements of it, had he looked at the data, he would

23    have found it in the State of California.

24        THE COURT:  Let me talk a little bit about that

25    because -- ask a question or two about that.

 1        Some of it is relatively simple -- relatively simple

 2   to reach, such as the OIG report, on the disparity in the use

 3   of force against mentally ill and GP, except even that

 4   doesn't really reflect the reality because the population

 5   difference is so large, and we can get to that.

 6        But there's a lot of other stuff where it's very

 7   difficult to know where the evidence is not at all clear.

 8        Yesterday on redirect the defendant asked Mr. Matthews

 9   (sic):  Have you found any cases in which the punishment was

10   entirely vacated because of mental illness?

11        Mr. Matthews (sic), I believe, said "some" or some

12   word like that.

13        MR. BORNSTEIN:  Martin, Mr. Martin.

14        THE COURT:  What did I say?

15        MR. BORNSTEIN:  Matthews.

16        THE COURT:  Mr. Martin said "some" or something like

17   "some" or something like that.  It is the end of the day and

18   you were tired and nobody said:  How many?  That's important

19   because the question is, it seems to me, a question of

20   pattern and practice, that there were difficult to understand

21   individual judgments, I think has been proven beyond a

22   reasonable doubt and to a moral certainty.

23        But the defendants make the argument that those are

24   individual cases and one ought not to generalize to a pattern

25   and practice, and that's not an unworthy argument if we don't

 1    know, and I assume that there are somewhere available just

 2    those numbers, but nobody asked.

 3            MR. BORNSTEIN:  Let me respond to that.

 4            THE COURT:  Please.

 5            MR. BORNSTEIN:  Thank you.

 6            The problem is they don't track those numbers.  They

 7    do not exist in their system.  They don't look at their data

 8    that way.  They're not interested, or haven't been, of what

 9    are we doing as it relates to Coleman class members.

10            Are we using force excessively?

11            How is our RVR working?

12            Are we punishing them for their mental illness?

13            Are the senior hearing officers taking into

14    consideration mental health concerns, either in the charging

15    decisions or in the mitigation or accommodation or tailoring,

16    I think Mr. Martin talked about, in their punishment?

17            If they are, how are they?

18            And if they're not, why aren't they?

19            There's nobody monitoring that or looking at that.

20    What they do, as Mr. Martin said, they check boxes.  The

21    court says:  Special Master, said send us your data, give us

22    the number of use-of-force incidents against mental health

23    inmates.  So they give the data.  They say it's wrong data,

24    but they give the data.

25            On the RVRs, if it's there, there's different ways

1    they report it.  You saw when we tried to calculate it from

2    their own statistics or numbers that they presented, there

3    was a claim by the defense that somehow we had gotten it

4    wrong.  Well, if we got it wrong, it's because that's how

5    they reported it to the Special Master.

6         The point that their own expert made is they're not

7    looking for patterns and practice.  They're not looking to

8    see what is happening on the ground.  They're not looking to

9    understand why in RJ Donovan do we have a -- it's backwards.

10   It's the way it should be, that the proportion of force used

11   is much more in ratio with the inmate population, whereas in

12   many of the other institutions, it's the other way.

13        Why is that?  What is going on down at RJ Donovan that

14   we can learn from or take and figure out how to expand that

15   to our institutions?

16        On the other hand, why is it that the court has just

17   ended supervision of Pelican Bay and Mr. Martin says he's

18   disturbed by the fact that there are 180 use-of-force

19   incidents in which only six were controlled.  He's like:  Why

20   is that?

21        Then he said:  Some of them, if I drilled down, I

22   couldn't really tell, but it looked like there were some

23   number of them that shouldn't have been immediate.  They

24   should have been controlled.  But he didn't do the study for

25   the judgments he needed to make.

 1              I want to get to your question directly.  He did say

 2      what he said at the end of the day, and you're right.  We

 3      didn't go back and ask him, because what he said earlier in

 4      the day is that there were -- he looked at 440 RVRs.

 5              Now, he didn't track them for any particular incident,

 6      but he looked at 440.  In none of those did he find that

 7      somebody had it diverted or had their punishment completely

 8      wiped away.  What he found was there were tailoring and

 9      mitigation, and that's what we found.

10              If you look through the evidence we have on the 17

11      videos -- and I apologize for this.  You limited us to six.

12      We were prepared to do 17 -- there were records we didn't

13      move into evidence, but we were prepared to on all 17,

14      because they were all horrific, and those were the only

15      videos that we have given, that we had access to of cell

16      extractions.

17              Mr. Stainer, to his credit, said he found another 122

18      that I think are problematic that I'm looking at and I want

19      to make sure I understand them.  We've never seen those.

20              What we've never seen though, on every one of those

21      videos, and I can only assume that the state agrees with us

22      that they're horrific because they didn't want to show any of

23      the videos in court to disprove it, that there were -- the

24      same policies and procedures were in play as it relates to

25      those cell extractions.

1          In other words, you had people, ten of the 17 were

2    decompensating or needed involuntary medication.  They pulled

3    their cart up to the doors or the prison cell and they have

4    their canisters of pepper spray, the fire extinguisher size

5    down to the crowd control MK-9 and the grenades, and they do

6    the same things you saw in those other videos.

7          Then they take the people out and then they punish

8    them.  They give them RVRs.  They sometimes impose that

9    unregulated off-the-book management status where they take

10   all their stuff away.

11         And, according to the testimony from Ms. Allison that

12   we've given the court, which hasn't actually come into

13   evidence -- it's in evidence, but you haven't heard, she

14   says:  As a matter of practice, pending the RVR, unless

15   somebody is in the mental health crisis bed and we can't move

16   them there, we'll put people in ad seg or SHU up to 45 days

17   while we go ahead and figure out what the RVR should be.

18         So They're punished in that regard.  Even if you don't

19   call it punishment, it's punishment, especially for mentally

20   ill who shouldn't be, by every expert who's testified before

21   this court, should not be in segregated environment with lack

22   of programing and lack of treatment.

23         THE COURT:  You know, I think you're wrong, with due

24   respect, because the case has been very long and things come

25   and things go.  The doctor that preceded Dr. Woodward --

1          MR. BORNSTEIN:  Dr. Stewart?

2          THE COURT:  I'm sorry?  What?

3          MR. BORNSTEIN:  Is it Dr. Stewart?  I was talking

4    about the experts who testified.

5          THE COURT:  Yes.  Whichever doctor that was, and I'll

6    have to find it in my notes.  I mean, I found it hard to

7    believe, but his view was what was going on at Pleasant

8    Valley and CMF was a different regimen of treatment in which

9    people were intensely being isolated and intensely being, as

10   a matter of medical judgment, intentionally being in a

11   situation in which they've had very little contact with other

12   human beings.

13         Essentially, most of us would say "segregation,"

14   although Dr. Woodward found that hard to say.  In any event,

15   we have these kinds of difficulties in the case.

16         My problem is how to resolve them, and you're going to

17   tell me; right?

18         MR. BORNSTEIN:  I am, but I want to give you one

19   question and answer that was in the testimony yesterday from

20   Mr. Martin on the question that you asked.

21         This is your question to him.  This in the transcript

22   on page 1951, starting at line 14, going to line 18.  Your

23   question was (Reading:)

24              But in your view, did you see any in your

25              review?  Did you see any systemic or systematic

1              consideration of mental health as diverting the

2              inmate from some form of sanction?

3              Answer:  I did not, Your Honor.

4         I want to address you directly on how to expand the

5    toolbox of options.  I use that as a theme because I couldn't

6    help it, but I was struck by the cart being taken up to the

7    cell door.  It looked like almost like an operating cart in

8    an emergency room where the doctors come in, trying to do

9    something to help, and they bring their cart out, except in

10   this case, of course, what was on the cart were those pepper

11   spray canisters of all makes and models and grenades and all

12   that type of thing.

13        If you listen to the testimony, giving Mr. Stainer the

14   benefit of the doubt, if you say he comes from a custody

15   prospective, that's his basis for understanding the world,

16   but when you listen to what Dr. Kaufman said, when you listen

17   to what Dr. Stewart said, former warden Woodford, what she

18   had to say, when you listen to what Mr. Vail says, when you

19   listen to even Mr. Martin, what they say, they all say the

20   same thing:  You've got to change your approach when you're

21   dealing with severely mentally ill people.  You need to

22   create a partnership between mental health staff on the one

23   hand and custody staff on the other hand.

24        THE COURT:  Let me interrupt.

25        One of the things that struck me as quite remarkable

 1    was the treatment pattern and the custody pattern in the OHU

 2    at San Quentin, clearly, something very different is going

 3    on.

 4         Nobody -- again, what one of the doctors said is:

 5    Yes, we've got a very good working relationship with custody,

 6    and it's accomplished, among other things, by having regular

 7    joints meetings and other such things.

 8         It's difficult for me to try to understand how you can

 9    expand that kind of program, which works when you've got ten

10    beds to -- I don't know how many beds.  I'm sure it's

11    somewhere in the testimony -- but probably over a hundred

12    beds in the CMF or so, and it appears to me, but I don't

13    know, that they present different -- not simply in degree,

14    but in kind, problems.

15         MR. BORNSTEIN:  I understand.

16         I think, again, I want to go back to the testimony

17    from the experts, and what I heard and what I believe is

18    sound correctional practice in the mainstream is:  You've got

19    to have, as Mr. Martin said, you've got to have the mental

20    health people and the custody people standing

21    shoulder-to-shoulder working together.

22         You've got to have interdisciplinary treatment teams

23    who have responsibility for the care and well being,

24    scheduling, treatment, discipline, whatever, of an inmate

25    under their care.

1          You can start by taking the most seriously mentally

2     ill where you've got only mentally ill inmates in those

3     housing units, EOP perhaps, MHCB beds, mental health crisis

4     beds, where you've got perhaps the DSH, the hospital beds,

5     where really the care needs to be or the custody needs to

6     really be secondary to the care or at least on par with the

7     care.

8          You have them work together to tell, empower them so

9     they have ownership of what's going on in their units.

10    They're not sort of ships passing in and coming out.  They're

11    in control of the units working together.  I believe that's a

12    long-term solution, but it has to start somewhere.

13         So if the OHU is working, why is it working there?

14         What is going on there?

15         How can we expand that on a pilot program basis to one

16    of our other units?

17         I've never been to RJ Donovan, but I can tell you from

18    the data there is something going on there, putting aside the

19    21 strikes from the expandable baton that seem to be

20    problematic, but I want to concentrate on the positive here,

21    they seem to be doing something where they're talking to each

22    other and they're communicating with each other.

23         I think that's a really good thing.  I think that's

24    the kind of program that they have to try.  But where they

25    don't cognitively get it, where they don't actually say to

1    themselves:  You know what?  Houston, we have a problem.

2    That makes it impossible for them to independently solve the

3    problem.  So they're starting to get it, but after all this

4    time, they're just starting to get it?  I don't understand

5    that.

6            So what do we do?  What do you do?  What are we asking

7    you to do?

8            I have some suggestions on some immediate things that

9    I would recommend and longer-term things, and what we're

10   talking about, I think, is more of a longer-term process.

11   But I think it's the crux of the matter:  Finding a way that

12   you develop true partnerships in those units that are dealing

13   with severely mentally ill inmates so that you set the tone,

14   you set the rules, you eliminate some of the barriers to

15   treatment that the state's expert talked about.

16           Do you really need to strip-search people in and out

17   every time they go from the treatment cage back to their

18   cells?

19           Do you really need treatment cages all the time?

20           Are there other programs or are there other things we

21   can do as part of our treatment team?

22           You make the interdisciplinary team, when there is a

23   crisis, respond.  You don't just have a psych tech or

24   somebody who doesn't know the person go in and say:  Okay.

25   Cuff up or they're going to come and get you.  Please

1    cooperate.

2         You have the team there.  What is going on?  You grade

3    them, if you will.  Every time there's a crisis, you hold

4    them accountable for it, because it's a failure of their

5    treatment program.  Now, that doesn't mean you fire people

6    because there's a failure, but you're looking for coachable,

7    teachable, trainable moments.

8         That's what's missing in the system.  Nobody is trying

9    to do that.  They're not drilling down.  And if they are

10   trying to do it at the OHU or RJ Donovan or some of these

11   other places, organically grow it, organically bring it from

12   one institution to the other.

13        You've got to have these overall principles or

14   concepts in mind.  I said I would give you some immediate

15   things I think you should do.  If they start throwing things

16   at me, you'll know that I'm off basis here, I heard what

17   Mr. Stainer said.  He found 122 other instances of controlled

18   use of force that are problematic.

19        I think the court needs to order the CDCR to require

20   any cell extraction of a severely mentally ill or a Coleman

21   class member should be forwarded to Mr. Stainer on a realtime

22   basis so that he has access to that information and can

23   evaluate it in the short term.

24        Similarly, I believe those same instances of use of

25   force need to be forwarded to the Office of Internal

1    Investigations -- excuse me.  OIA.  Sorry.  So that they can

2    know about them, and even if they're not part of the

3    mandatory referrals, they're on notice about them and they

4    can at least bring to bear the independent kind of

5    investigation that may be necessary in case there's a slow

6    response by state officials.

7         I think that there needs to be immediate training on

8    whatever Mr. Stainer's expectations are.  He wrote a memo

9    back in September of 2012 and said:  I expect everybody to

10   live up to my expectations and I expect the wardens to train.

11   You have his own experts saying they're inept, they're at

12   marginally best, incompetent.  That's not cutting it.

13        So they need to train them.  Tell them:  We cannot be

14   treating people like this, if that's what he believes.  And

15   if he doesn't believe it, I want you to ask him why he

16   doesn't believe it.  We cannot be using force the way we are

17   against severely mentally ill people.  We have to find a

18   different way to do it and make them train on that.

19        I think they need to immediately have those IDTs be

20   part of the process, as part of the controlled use of force

21   process, so that the people that are a part of this program

22   that are trying to work with folks can be part of the process

23   of dealing with the break down, dealing with the

24   decompensation, dealing with the lack of reality.

25        I think that Mr. Stainer also needs to be instructed,

1    whether it's him or one of his other people, to collect

2    meaningful data and provide it to the Special Master in a

3    form that is easily understandable that will tell us how many

4    use-of-force incidents by institution, maybe even by shift,

5    maybe even by housing unit, whether they involve class

6    members, and if they do, what was the precipitating event and

7    what is the force used, and what, if any, action was taken at

8    the institutional level to discuss, to train, to coach, to

9    learn, to identify ways that maybe we could do it better

10   without having to use force.

11         Same thing on the RVR side.  They have to find away to

12   modify their processes and procedures in at least two ways.

13         First, they've got to provide meaningful staff

14   assistance, hopefully mental health staff assistance, who can

15   help advocate for inmates during this process.  That includes

16   ensuring that they're not being punished if the behavior is

17   because they're not capable of making better choices.

18         Look.  If they're mentally ill and they know better

19   and they do it anyway, maybe that's mitigation, maybe it's

20   not completely diversion, but they've got to at least try to

21   do that.

22         Second, Mr. Stainer has got to ensure that CDCR is

23   monitoring those outcomes:

24         What are we doing?

25         Are we getting good clinician input in this case?

1          Are our hearing officers being able to take that into

2     consideration and are they doing that?

3          What are the sanctions that we're meting out?

4          And to the extent they've -- he told us when he

5     testified:  Well, we've got a range of sanctions for certain

6     custody things where you can go from like the minimum

7     mandatory, it sounded like, or sentencing guidelines in a

8     criminal case, you can have a range from the low to the high.

9     They need to have a safety hatch that provides for some sort

10    of further mitigation or diversion.

11         THE COURT:  I'm going to interrupt you again.  I'm

12    doing quite well that every time I want to stop you, I don't.

13    There are two problems with what I think you've said, and I'm

14    not sure that they matter as a constitutional matter,

15    assuming that there is a constitutional violation and not

16    just plain incompetence and stupidity.

17         What you're proposing, I think, although the state has

18    not made this argument and perhaps they know better -- I'm

19    sure they know better than I do.

20         What you're proposing is very time consuming, very,

21    very expensive, and the question that really I don't know how

22    to address is, on the one hand, the absolute constitutional

23    right, as an example, not to be punished for conduct that you

24    can't control, and on the other hand, what I'm guessing --

25    guessing isn't right -- I'm leaning towards because of the

1    testimony, you have people who will have serious mental

2    illnesses but have the ability to conform themselves to the

3    conduct that's required, and discriminating between them

4    requires, I think, very careful consideration of the

5    circumstance and so on and so forth.

6         It seems to me, maybe I'm wrong, but it seems to me

7    very time consuming, very expensive, and how does the need to

8    have resolution, because after all, this is a prison and you

9    can't wait six months to -- it would seem to me, and maybe

10   the state will disabuse me of this, but it seems unlikely

11   that consistent with good custodial practice, you can't wait

12   six months and spend a lot of money trying to figure out

13   which and what is what.

14        How does that play in?

15        MR. BORNSTEIN:  I think I understand, and what I would

16   say is this:  I'm not talking about waiting six months.

17   They've got an existing system in place.  They're doing

18   something different in RJ Donovan.  Because, again, according

19   to the raw numbers, according to the data we were able to

20   get, there seems to be -- the disproportionate impact doesn't

21   seem to be there at RJ Donovan.

22        I'm not quite sure whether -- what all is going on,

23   but they can figure that out.  What I'm saying is:  Use the

24   existing system, but tell them, find a way to see if you can

25   get it to work better.  Find a way to have meaningful staff

1    assistance to help mentally ill people and track what you're

2    doing so that you can look for the patterns and practices so

3    you can see how it's working.

4         All I'm saying, when you look at the evidence we've

5    been able to develop, we see a pattern and practice that is

6    similar to the perfect storm, even if the state is going to

7    come back and tell you:  Oh, yeah, but Look what we did with

8    Inmate A.  We gave him back some of his time later on.  You

9    don't see that, Your Honor.

10        There is a process, and I understand there is a

11   process to give back good-time credit if you wait 180 days

12   and you haven't had another incident, you can earn back your

13   good-time credits so long as it's timely and all that.  I've

14   got that.  We're not talking about that because you've still

15   be punished.

16        We're saying:  Come on.  Find a way.  Use your own

17   experts.  Find a way to work with people and treat them as

18   people, treat them as mentally ill people that need help

19   instead of the way that we've seen them on the videos.

20        I just want to kind of go to a couple of additional

21   things, the four things that in broad strokes that we believe

22   the evidence demonstrates need to be changed, the

23   fundamentally flawed policies and procedures which we've

24   talked a lot about, the experts have talked a lot about and

25   we've had a little bit of discussion about here.

1          It starts with:  Your own expert says you've got to do

2     things differently.  Why aren't you doing that?  Why didn't

3     you consider it?  What are you doing now?

4          I think that responsible prison administrators need to

5     collect, but not just collect, they've got to analyze their

6     own data.  It's their responsibility or it should be their

7     responsibility.

8          It's their deliberate indifference to that

9     responsibility that brings us here, and that's just wrong.

10    It's unconstitutional and it's wrong on a human level.  They

11    have to run their system.  They've got to find a way to do

12    it, and that starts by collecting and understanding data, not

13    just sort of checking boxes and sending out reports and

14    whatever.

15         What is going on?  Tell me, what is going on?

16         I think that this ultimately is the key for them to

17    fix their problems, this multidisciplinary training and

18    ownership.  There's no reason they couldn't train

19    multidisciplinary teams to work more effectively with

20    mentally ill people.

21         I know there is a very strict procedure in terms of

22    how to get training done, and I'm not suggesting that the

23    court substitute a new procedure for whatever the existing

24    processes are, but they need to be thinking about this.

25         This problem that you've identified repeatedly through

1       your questions of having a population, a sizeable population

2       of severely mentally ill people in your prison doesn't seem

3       like it's going to change for the better in the foreseeable.

4       If anything, it appears that it's going to get worse.  They

5       have got to find ways of dealing with that problem.

6             This is the way that the experts have said you need to

7       do it.  Former Warden Woodford's, sometimes it takes

8       chocolate instead of pepper spray.  They've got to be able to

9       think in ways that allow them to get successful outcomes and

10      minimize force.

11            Finally, on the RVR process, they're already doing

12      mitigation.  Mr. Stainer -- and there's at least one

13      instance.  I saw one instance where there was a problem, due

14      process problem or something.  They couldn't find a guilty

15      whatever.  So they did a chrono instead of going through it

16      or something.  They could do things like that.

17            In other words, their system if they chose to, could

18      allow them to use a chrono instead of an RVR for people that

19      are seriously mentally ill.  They can mitigate.  They can

20      accommodate.  Some of them do.  Some of them don't.  But

21      nobody is watching it and nobody is monitoring it and nobody

22      is ensuring it's systemic.

23            THE COURT:  Let me raise another -- I think these are

24      delicate problems and they're very difficult, but we have,

25      according to Mr. Martin, one doctor who never finds, ever

1    that the mental illness affected the judgment.  It's sort of

2    incredible.

3         On the other hand, you have Dr. Wagner, who, to tell

4    you the truth, I wouldn't be surprised if he were the guy --

5    I'm not suggesting he was.  I don't know.  But part of this

6    thing is if you have interdisciplinary team composed of

7    people who aren't very good, it doesn't help you.

8         MR. BORNSTEIN:  I understand.  You hit upon a huge

9    problem in your questioning of Mr. Stainer.  In the outside

10   world, if you've got a bad doctor, people aren't going to go

11   to that doctor.  There's going to be Yelp reviews about the

12   doctor or whatever the equivalent is for doctors.  It's still

13   tough to get any information out of the state, Medical

14   Licensing Board, but we'll put that aside.

15        There is a way that people find out and there are ways

16   that economic pressure can be brought to bear to deal with

17   it.

18        Prison is different.  You've got to have the people

19   managing it, people looking at it.  That's why I say, if you

20   have CDCR officials who are charged with the responsibility

21   of looking at these things, why aren't they picking up the

22   fact that why is it that this particular clinician never

23   finds mental illness to be a factor in any of these

24   disciplinary things?

25        Why is that?

1          Maybe we need to work with this person and the same

2    way the rest of us are worked with or we work with others.

3    What is it you're looking for?  How are you doing these

4    things?  But that requires people invested in making it

5    happen.

6          The problem we've got here, Your Honor, is that the

7    state has done what it thinks it needs to do in the minimal

8    way possible to satisfy the court, get out from under the

9    court's jurisdiction.  That was the point of their

10   termination motion.  We're done.  We don't need to do any

11   more because we've got a pattern and practice kind of opinion

12   from our expert, so we're done.

13         That's what they did.  Instead of saying:  You know

14   what?  There are things that are still not done, there are

15   still continuing constitutional problems and issues, there

16   are still things that we need to do, because what Mr. Martin

17   said yesterday was, he called them best practices, but they

18   aren't best practices.  They're heartland practices.  They're

19   competent correctional practices.

20         You need competent administrators who are vested in

21   making the system work.  You need them to be able to manage.

22   You need them to be able to analyze.  You need them to be

23   able to bring to bear the kind of management systems that the

24   rest of us expect, because there isn't anybody else out there

25   protecting severely mentally ill inmates except for the court

1    and the Special Master, and that's an unfair burden on both.

2         The state cannot be undermining those important

3    watchdog functions.  They've got to be helping to ensure that

4    they're providing constitutional adequate medical care and

5    mental health care, and they're not doing it.

6         I'm happy to answer any other questions the court has

7    and I'm happy to talk about any of the evidence.

8         THE COURT:  That's fine.  Thank you.

9         We'll take our morning break.  15 minutes, ladies and

10   gentlemen.

11                        (Whereupon, a break was taken at

12                         10:24 a.m.)

13        THE COURT:  Before you begin, Mr. McKinney, I'm told

14   by my courtroom deputy that one of the exhibits that have

15   been conditionally received, they failed to put on, whoever

16   it was that was going to demonstrate it, and you said you

17   didn't care anyhow.

18        MR. MCKINNEY:  We did discuss that before they closed,

19   so that is right.

20        THE COURT:  What is the number?

21        MR. BORNSTEIN:  1085.

22        THE COURT:  Everybody agrees that's in?

23        MR. MCKINNEY:  Yes.

24        MR. BORNSTEIN:  Yes.

25        THE COURT:  Received.

1                    (Whereupon, Plaintiff's Exhibit 1085

2                    was received into evidence.)

3              MR. MCKINNEY:  What this case is all about and what

4    you've heard over the past several weeks, as plaintiff's

5    counsel put it, they're trying to expand the toolbox.  Of

6    course, if you have a tool box, you can always have newer,

7    better, more expensive tools, but that does not mean that

8    your existing tool box is inadequate.

9              The court asked:  Aren't we driving at perfection

10   here?  And that's what the plaintiffs are driving at.  I

11   understand that, but the testimony you've heard, the evidence

12   shows that the plaintiffs have not come close to carrying

13   their burden of establishing a systemwide need for this court

14   to issue further remedial orders.

15             There's been no evidence presented in this proceeding

16   of a pattern and practice of unnecessary or excessive force

17   against the mentally ill within CDCR.  There's been no

18   evidence that staff used force against the mentally ill for

19   the purpose of inflicting pain or punishment.

20             The opposite is true.  Force is used to ensure that an

21   inmate is receiving necessary medication to make sure they're

22   put into the right mental health housing unit, to make sure

23   that they're being evaluated and ultimately receiving

24   appropriate mental health care.

25             There's been no evidence that CDCR punishes inmates

1    because of their mental illness.  Plaintiffs have not come

2    close to demonstrated a systemic constitutional problem.  In

3    fact, they've not come close to demonstrating a systemic

4    problem, Your Honor.

5              THE COURT:  Let me interrupt for a moment.  I take it

6    you that disagree, I think you've said you disagree, having

7    found unconstitutional violations way back when and having

8    been in the remedial process -- I'm making it up -- 20 years

9    or so, your view, I think, is that that's insufficient to

10   test -- not to test, but to justify further orders of the

11   court in this context?

12             MR. MCKINNEY:  That's absolutely correct.

13             First of all, the plaintiffs have not come forward in

14   terms of carrying their burden to justify systemic relief,

15   but under the PLRA, the court needs to looking at a current

16   and ongoing federal law violation.

17             I think the court has before it both the use of force

18   and the disciplinary process are adequate.  You've heard

19   systemic evidence by the one person whose looked at this on a

20   systemwide basis, and that's Mr. Martin.

21             Again, the court needs to have a current and ongoing

22   federal law violation.  Again, even if the court were to find

23   some federal law violation systemically, which I don't think

24   we have here, the court would need to narrowly tailor any

25   relief to that particular violation.

1          THE COURT:  I absolutely understand what you're

2    saying, but this -- it's something I've thought about a lot

3    when the termination motion came along, and that is the

4    relationship between the initial finding of an

5    unconstitutional violation.

6          Obviously, once you find it, you've got to do

7    something about it.  That's the remedial phase.

8          The question is:  At what point does the justification

9    for a remedial phase terminate?

10          You're right.  Obviously nobody -- I think nobody

11    really seeks perfection.  I understand your argument, but

12    they certainly seek what they perceive to be -- what the

13    plaintiff's perceive to be substantial remedial orders from

14    the court.

15          I think it's a very difficult problem and I think I'm

16    having a little trouble even articulating it, but it's clear

17    that, in my view, there's been considerable improvement.  I

18    have no doubt about that.  Whether or not there's a showing

19    of present unconstitutional violation is a two-prong

20    question.

21          One, we had, it seems to me -- I want to warn you,

22    everything I'm saying in the course of this is not a final

23    judgment, because when I sit down to try to think about it,

24    although it's very difficult, but the remedial phase --

25    that's the question I want to ask you:

1          When does the condition suffice so as to justify the

2     termination of the remedial phase?  That's exactly what I'm

3     asking.

4          MR. MCKINNEY:  That is ultimately your decision.  We

5     believe that --

6          THE COURT:  That doesn't help me.

7          MR. MCKINNEY:  Back in March, we think we brought

8     forward the evidence on these particular issues:  Use of

9     force and the disciplinary process that showed systemically

10    that there is no pattern and practice of unnecessary

11    excessive force against Coleman class members.

12         Mr. Martin, since that time, did an extensive body of

13    work.  He looked at -- the use-of-force incidents through May

14    of this year, 377 in total, and came to the same systemic

15    conclusions.  So, Your Honor, I think you need to be looking

16    at the system.  Once the system is adequate, that's where the

17    relief should stop on this issue.

18         Now can the state improve?  Of course.

19         Are there still issues?  Yes.

20         Plaintiffs have come into this court, picked the

21    number.  They say 17.  They put six into evidence.  Of those

22    six, I would submit to the court that one of those involved

23    an inmate with serious mental illness who may have not been

24    able to comply with an order.  So, really, they brought this

25    case seeking systemic relief based on a class of one.

 1          THE COURT:  I don't think that's right.  Even if it

 2    was, this whole problem is so subtle, what you're saying and

 3    maybe its right, if the court finds that the present

 4    progress -- I don't know how to articulate this.

 5          Tell me again when you think the remedial process may

 6    be terminated and the matter turned over to the state?

 7          What is the point, or is or there a point or what?

 8          What do you understand?

 9          MR. MCKINNEY:  Let me try to put this in the context

10    of the plaintiff's motion rather than whether or not the

11    court has to terminate relief altogether.  It's whether or

12    not --

13          THE COURT:  We're talking about these issues.

14          MR. MCKINNEY:  The issue is whether there is a need to

15    issue further remedial orders.  In the use of force context,

16    plaintiffs have the burden of coming forward with a systemic

17    pattern and practice regarding the use of force against the

18    mentally ill.  If they don't do that, there's no basis for

19    the court to issue further relief.

20          THE COURT:  If the court finds -- and, again, I don't

21    want anybody to misunderstand I'm finding anything.  I'm just

22    trying to understand.  If the court finds that there is in

23    place a system which would appropriately regulate the use of

24    force, but that it has failed at various places and times, is

25    that enough to continue remedial relief or that's just one of

1    the realities of life?

2         MR. MCKINNEY:  I don't believe it's sufficient for the

3    court to issue further orders on the state of the evidence

4    before the court in this case.

5         THE COURT:  Use my hypothetical.  Yes, there is a

6    system in place which the state has employed, which, if

7    appropriately followed and not just simply checking boxes,

8    would be sufficient to appropriately regulate the use of

9    force, but that there are at least occasions in which that

10   appears not to happen.

11        Is that sufficient or insufficient?  As I said

12   earlier:  Look.  There's always going to be slips.

13        MR. MCKINNEY:  That is insufficient.  The forum for

14   those particular cases, for example, Inmate A would be to

15   bring an individual lawsuit.

16        Inmate E, he too could bring an individual lawsuit if

17   he felt his Eighth Amendment Rights were violated in that

18   case.  Whether he has or not, I don't know.  That is the

19   forum, I believe.

20        THE COURT:  You see, that's unrealistic.  Prisoner

21   A -- I don't know what his condition is now, but in my view,

22   and I'm almost certain I'm going to say this in the opinion,

23   was it was apparent from the video that this mental condition

24   precluded him from conforming to the order, to the proper

25   order.

1      And to say that his remedy lies -- you know, this very

2    sick person, his remedy lies in filing his own lawsuit, come

3    on, or finding a lawyer to file it?  Not likely.

4      That's the same thing with E.  Those aren't realistic

5    alternatives.

6      MR. MCKINNEY:  Respectfully, I have to disagree with

7    that.  Inmate A, no question at the time of the cell

8    extraction he was profoundly sick.  He is now paroled.  At

9    some point he recovered to the point --

10     THE COURT:  And God willing and the river doesn't

11   rise, it was within a year or two or three, and so what?

12   He's got to pull himself together, find a lawyer.  Nobody in

13   his right mind thinks that filing these cases is easy.  All

14   you've got to do is look at our statistics.

15     You know, it's not a realistic expectation.  And so

16   what?  The answer may be that's a tragedy, but, you know,

17   life is filled with tragedy, and it's not enough to justify a

18   systemic order.  That's one way of looking at it.

19     The other way of looking at it is it demonstrates the

20   need to have some system that ensures constitutional

21   obedience.

22     I'm sorry to keep interrupting you, but I think these

23   are very difficult problems and I just don't know -- I

24   understand what you're saying.  I think what you're saying

25   is:  Look, Judge -- if I'm not, please tell me -- the

1    remedial process can continue, but further -- but there's no

2    demonstration that further orders are appropriate.

3         Is that what you're saying?

4         MR. MCKINNEY:  Absolutely correct, Your Honor.

5         As you know, the Special Master is monitoring the use

6    of force.  He's monitoring the RVR process.  As part of the

7    continuous quality improvement order that the court issued,

8    they're working on tracking RVR data --

9         THE COURT:  All of that stuff sort of disappeared

10   because you filed a termination motion, and maybe the answer

11   is that the best the court can do, maybe, and I know this

12   won't satisfy the plaintiffs, is to tell the Special Master:

13   Go back and start all over -- I don't mean start all over,

14   but pick up from where you were, everything was stalled and

15   proceed, because that's the other thing that the plaintiffs,

16   I think, have not addressed, which is, this is a living

17   process.

18        It's continually changing, continuing evolving, and

19   the problem with these kinds of hearings is it sort of s

20   lockstep.  It says this picture is the world, and tomorrow

21   morning, it's not the world.

22        MR. MCKINNEY:  I could not agree with that more.  It's

23   absolutely a living process.  I think you heard from Mr.

24   Martin, these policies have been the comprehensive now in

25   statewide policy that came out of Madrid is only a couple

1    years old, so we are looking at periods of time to go back to

2    2011.  We've looked at 700 cases.  We found between 6 and 17

3    incidents that raise some sort of issue, but these things

4    have to have time to work out.

5           As you heard from Mr. Stainer, and I really disagree

6    with counsel's characterization that this was driven by this

7    lawsuit --

8           THE COURT:  He himself said it was one of the --

9           MR. MCKINNEY:  Of course, but this is the process the

10   state went out and hired a consultant.  He gave them

11   opinions, systemic, that the clients, CDCR, believed would

12   justify moving to ask this court to change the nature of the

13   remedial phase, if not terminate it altogether.

14          He also, by our request, was critical of the system.

15   He provided recommendations that while the plaintiffs may

16   think they're not being considered, this is a living process.

17   There are discussions, as Mr. Martin said, that have

18   continued throughout the entire period of Mr. Martin's

19   evaluation.

20          You heard from Mr. Stainer up on the stand, and I

21   think you believe that he is a competent corrections

22   official, and --

23          THE COURT:  I absolutely believe that, and I also

24   believe, and this is part of the problem -- I don't mean this

25   disrespectfully.  He's a competent person doing a very

1    difficult job, but his entire background is custodial.

2    That's what he knows and that's what his concern was.

3         He's now in a position that requires him to much more

4    broadly think about the problem, and, I mean, he said things

5    on the stand which make you -- make me worry, not that he's

6    incompetent, but he doesn't perceive the nature of the

7    problem with sufficient -- not seriousness.  That's not the

8    right word -- but sufficient sympathy with the need to

9    address it.

10        I mean, he said something I thought was very

11   dramatically, although nobody seemed to care except me.

12   Whatever the question was, his response was:  Well, you know

13   as an example, somebody is told that they're going to be

14   shipped out of state, so they then become upset, and that

15   makes them CCCMS.

16        You know, that simply isn't the world.  Those people

17   are people who are ill.  They are able to reside -- they

18   don't need specialized -- the theory is that they are capable

19   of living like a general population status.  And it isn't

20   just because you're upset because some particular thing

21   happened, although the two doctors that I think highly of

22   both spoke of stressors.

23        It is not clear to me exactly what a stressor is, but,

24   apparently, it is some event which will trigger significant

25   changes in the mental condition of a particular patient.

MICHELLE L. BABBITT, OFFICIAL COURT REPORTER -- MBABBITT@CAED.USCOURTS.GOV

1          MR. MCKINNEY:  I think this really goes to the

2    definitions in the program guide, CCCMS includes a large

3    number of people.  I think you heard from Mr. Martin that it

4    may be too broad; in other words, this dazzling array of

5    services is brought to too many people.

6          The fact of it is, there are inmate patients who come

7    in and out of the CCCMS category because of a temporary

8    mental health anxiety, depression, et cetera.  I think that's

9    what Mr. Stainer was getting at.

10         Although it's somewhat beyond the scope of this

11   proceeding, these broader conditions, it is part of it.  I

12   think the court's point goes more to collaboration between

13   custody and mental health.  I think you've heard evidence

14   that that is occurring at the headquarters level.

15   Mr. Stainer has told you in the work group he's put together

16   to address these policy issues, that there is a mental health

17   condition.

18         You heard from Mr. Martin that he saw a collaboration

19   between custody and mental health staff throughout the

20   system.  Mr. Stainer testified in the vast majority of cases,

21   either custody or a clinician is involved in intervention

22   that results in coaxing the inmate out of the cell before the

23   need to use force becomes necessary.

24         So we're dealing with a very -- in these cell

25   extractions, plaintiff has brought forward, a very small

1    subset of force within California.

2         THE COURT:  I will reserve my -- I'll ask it this way.

3    Nobody has explained to me and I don't blame anybody.  I did

4    not ask either.

5         Why is the OHU process apparently working?

6         Nine months, they've had no cell extractions at all.

7    I find that a pretty remarkable achievement.  You know,

8    somebody ought to go to them and say:  Say, docs, what are

9    you doing and how do we, if we can -- I mean, there is a

10   problem that it's ten beds.  And I understand that's a

11   specialized situation, but is it possible to learn from

12   whatever they're doing, whatever it is that they're doing,

13   and expand it to a broader program?

14        MR. MCKINNEY:  Yes.  I think that is something the

15   department can explore, but is it a basis for this court to

16   issue a further order that goes to best practice?

17        No, it isn't.

18        Let's look at the systemic data.  I don't know if

19   counsel didn't hear Mr. Stainer correctly or something else,

20   but Mr. Stainer testified he gathered every videotaped use of

21   force incident for a ten-month period, and that total, in a

22   system that houses 120,000 inmates, 30,000 of those in the

23   Coleman class, the total was 122 over a ten-month period.

24        These were not the cases that were problematic.  This

25   is every controlled use-of-force incident.  That is an

1    average of three and a half per institution over a ten-month

2    period.  These are not huge numbers.

3          I think you, although this was brought in the context

4    of plaintiff's motion, you do see that evidence, and you've

5    seen the evidence in this proceeding of systems working

6    pretty well.

7          You saw it at Corcoran.  Inmate A is an aberration, an

8    exception, but Dr. Wagner did testify that in his time there

9    have been 40 cell extractions or 40 incidents where they

10    could have gone to a cell extraction, but they avoided the

11    extraction in 30 of those incidents.

12          Again, I think the court is seeing that evidence of

13    collaboration between mental health and custody.

14          I wanted to clear up the notion that Mr. Martin found

15    ineptness or lack of training systemwide.  As he testified on

16    redirect, and I think the deposition transcript is very clear

17    on this, he was testifying about the seven inmates that he

18    had viewed jointly with Mr. Vail the day before his

19    deposition.

20          In some of those cases, yes, that's what he saw, an

21    incompetent officer or inept or somebody that needed

22    training.  In one of those instances, training was given.

23    But, again, we're talking about a handful of exceptions.

24    These are the aberrations.  These -- out of 700 incidents

25    that have been available to the parties since February of

1    this year, they picked these six aberrations.  They could

2    have shown others.

3            THE COURT:  They picked 17.  I allowed them to go to

4    six because, otherwise, it's like the number of exhibits they

5    filed.  At some point real life as to intervene.

6            MR. MCKINNEY:  I agree.  We would have liked to have

7    entered more of the incidents that we think were done

8    appropriately and by the book in which no questions should be

9    asked, which we think are among those 17, but, again, I

10   understand what the court is facing here.

11           The court has heard all the systemic evidence.  There

12   is a comprehensive, well-defined policy in place.  There's no

13   reason to change the policy itself.  There is mandatory

14   reporting requirements.  If nothing, I would hope that the

15   court has gathered through the incident reports the officers

16   are self-critical.  They are reporting the force used.  I

17   don't think there's any question that the force used is being

18   reported completely inaccurately and perhaps too much.

19           There is a review system that goes through both the

20   incident commander through several levels of review all the

21   way up through the executive review committee that include

22   the warden and the use of force coordinators.  Mr. Martin

23   testified these are very competent individuals within the

24   system looking at these use of force issues.

25           Now, are there situations where an officer checks the

1    box and unfortunately it alludes review?  Yes, that does

2    happen.

3            Is this systemic?  Mr. Martin who looked at it says

4    no, there's not a systemic issue here.  On top of that,

5    you've got Internal Affairs, and the declaration of John Day

6    shows cases are being investigated, resulting in discipline

7    of various levels up to and including six terminations in

8    2012.

9            I would submit to the court that the system for

10   looking at use of force is comprehensive.  It's complete.

11   It's working.

12           Are there cases where it doesn't work?  Of course, but

13   in a system of this magnitude, they exist and they will be

14   found.  The department, I think, is evolving and moving

15   forward to address those issues.  In our view, there's no

16   need for the court to intervene in that process.

17           I want to speak to the data for a minute.  There's

18   been a lot of discussion over the data.  Although counsel

19   didn't talk about the chart that they prepared during Mr.

20   Martin's cross-examination, I want to be clear with the court

21   because there's some confusion yesterday, quite a bit.

22           That's a tally that Mr. Martin prepared as he was

23   preparing his report back in January of what he had looked

24   at.  Of course we asked him to focus on Coleman.  It wasn't

25   designed to be all or --

1          THE COURT:  I have finally revised my -- not revised,

2     but resolved myself I have no idea what that is and it's not

3     going to be -- plaintiff not withstanding, it's not going to

4     be significant evidence of anything.

5          It was very difficult for me to understand why and how

6     he did things, but the one thing I'm certain about is it

7     doesn't really reflect on the question of the mal

8     appropriation of the use of force.  But that question is --

9     there is evidence that the court can rely on as to how

10    disproportionate the level of forces.

11         Now, there is an argument, which nobody has made and

12    I'm not sure would prevail, but there is an argument that

13    says of course we're using more force in the mentally ill,

14    because, as a general matter, they are less able to respond

15    appropriately and get on with it.

16         Maybe that's true.  Maybe that's the reason and maybe

17    it isn't.

18         MR. MCKINNEY:  First of all, that is absolutely true,

19    and if you look at the declarations Mr. Martin has submitted

20    in these proceeding, he will say that in particular, his

21    declaration submitted in opposition to this motion, he does

22    say -- to this motion, to the plaintiff's motion --

23    throughout the understand there is a disparate impact of both

24    use of force and contact with the disciplinary process.

25         THE COURT:  I've got to tell you, that doesn't tell me

1    anything.  My sense from what Mr. Martin was saying and also

2    just from general reading and so forth is that we are not

3    respecting the consequences of imprisoning so many sick, sick

4    people.  I don't know if any other institutions are subject

5    to constitutional rigger or not, but the fact that other

6    people aren't doing well is hardly an argument that

7    supports --

8         MR. MCKINNEY:  I understand, and these are broader

9    societal issues.  I think the evidence that has been

10   presented, the inmates are receiving mental healthcare, and

11   for the most part, pretty good mental healthcare, if not

12   excellent mental health care.  You saw it in San Quentin.

13   You see it throughout the system in the vast improvements

14   that have occurred over the years in the system.

15        One caution on the data, the plaintiff's exhibits, the

16   court should not accept those as fact.  These are argument,

17   prepared by the plaintiff's attorneys from amalgam of various

18   sources.

19        The data is reported to the Special Master.  The

20   Special Master reports on use of force and the rules

21   violation process.  He issued the report for the 25th round.

22   With respect to the RVR process, he noted a couple of cases

23   where prisons provided updated information as part of the

24   tour.  So obviously that would not become part of what

25   plaintiff has presented in their exhibits.

1          Also noted that a handful of prisons were having

2     issues with documenting or reporting requirements.  So,

3     again, the management reports which come before may have been

4     subsequently corrected or addressed.

5          In the report itself, there was no finding that in any

6     of the prisons there were concerns with the RVR process.  The

7     Special Master is looking at that process.  We're not

8     suggesting that that be tinkered with; in fact, we're saying

9     the court should simply go no further.

10          With respect to use of force, again, the report

11     addressed one prison, and that prison was Corcoran, which is,

12     obviously, the subject of many of the incidents because it's

13     one of the four prisons that plaintiff's expert went to.

14          The report mentioned 165 use-of-force incidents for

15     the period of January 1st through June 30th of 2012, and

16     reported that Corcoran maintained appropriate tracking of

17     use-of-force incidents.  The institutional data indicated

18     that among 165 incidents, 112 or 68 percent involved mental

19     health inmates.

20          THE COURT:  Stop for a moment.  I just lost you.

21          Okay.  Go ahead.  I just lost the numbers.

22          MR. MCKINNEY:  I may have speed up.  Sorry.

23          That number was slightly down from the 74 percent

24     reported in the preceding monitoring period.  The report also

25     notes the required clinical intervention occurred for the

1   incidents that required cell extractions.  Staff training on

2   clinical intervention continued.  That's on page 220 of the

3   Special Master's report.

4        Based on all this, plaintiff's charts are of very

5   little evidentiary value.

6        THE COURT:  That's there argument.

7        MR. MCKINNEY:  That's the point I wanted to make, Your

8   Honor.

9        With respect to clinical intervention, there's been a

10  lot of misconceptions, I think, offered by the plaintiffs,

11  and I think that's because their expert never looked at what

12  occurred prior to the time that the videotape started

13  running.

14       So what you see on those tapes, we would agree, that

15  is not a clinical intervention, but what you're seeing is the

16  very final attempt in a process that plays out over hours,

17  sometimes over days.

18       In the case of Inmate A, it was a process that was

19  taking place over weeks where Inmate A was in a hospital

20  unit, in a hospital bed with access to nursing care in the

21  CTC at Corcoran.  They continued to work with him over a

22  matter of weeks before finally an incident occurred where he

23  flooded his cell, began to play with feces in the cell,

24  smeared himself with the feces, and it was at that point that

25  the emergent situation occurred that allowed the doctor to

1    say:  We need to put this man on medication.  We need to do

2    it emergently and we need to get him out of the cell.

3         As Dr. Wagner testified, this was a unique situation

4    from both a clinical and custody perspective.  Very

5    difficult, difficult situation.

6         Inmate E, you also saw a clinical intervention

7    occurring over a matter of weeks.  From the time that the

8    inmate first arrived at San Quentin, the doctors were working

9    with him to try to get him out of the cell.  In a period of

10   three weeks, he seen more than ten times, as what's reflected

11   in the medical records.

12        So the clinical intervention is occurring.  It's not

13   what's happening on the tapes.  There's a lot more going on

14   than what occurs on the tapes.

15        Briefly, all the evidence is focused on the cell

16   extractions.  Plaintiffs have made allegations regarding

17   batons and other forms of weapons in the CDCR.  There's been

18   no evidence before the court on that.  Again, were the court

19   to find something systemic here, which we don't believe

20   exists, the evidence has been limited to a particular

21   scenario.

22        I think the facts show here the baton is not used with

23   any frequency within CDCR.  Mr. Martin did a study.  He found

24   that it was preceded by exhaustion of other methods of force

25   and was used in appropriate circumstances, defense of an

1    officer or defense of another inmate during a fight, so

2    basically to intervene in a life-threatening situation.

3           The OIG has reported on baton usage and found that the

4    baton is not used intentionally.  On only two occasions in a

5    six-month window in a report that is in evidence was there an

6    unintentional strike that hit a potentially lethal target

7    area of a person's body.

8           So in our view, what this all adds up to is the

9    evidence shows that out of the Coleman class there is one,

10   perhaps two inmates that were unable to comply with an order.

11   There certainly is nothing systemic here.  These are issues.

12          At one point the court made reference to a doctor who

13   may not -- actually, during Mr. Martin's testimony, are there

14   doctors of this nature in the system based on the testimony?

15          There are.  There's been no evidence of what the

16   department has done or is doing to address that.

17          THE COURT:  On the other hand, sir, being serious

18   about it, you're trying a lawsuit.  That's a glaring problem.

19   If the department were doing something, I betcha you would

20   have put somebody on the stand to tell me that.

21          You know, sometimes the absence of evidence is just as

22   persuasive as the presence of evidence.

23          MR. MCKINNEY:  This is antidotal.  We're talking about

24   system --

25          THE COURT:  That's different.

1          MR. MCKINNEY:  We could have wasted another day of the

2     court's time rebutting an antidotes.  We're trying to focus

3     on the system.  Systemically, when it comes to the doctors,

4     there a peer review process in place.  There is credentialing

5     process in place.  The Special Master and his team were a

6     part of that process.

7          They were also part of other training involving

8     collaboration between mental health and custody staff.  There

9     are a lot of really good things going on in the system.

10    While it's really easy to point out the faults, those cases,

11    those aberrations and say:  Why don't we put some more tools

12    in the toolbox because money is no option; right?

13         There has to come a point where the system is

14    adequate, it's appropriate, it's addressing the needs,

15    safeguarding the mentally ill from unnecessarily having force

16    used against them, that there is discipline being imposed.

17         With respect to the inmates that discipline is

18    mitigated in appropriate circumstances, as counsel pointed

19    out, Inmate A had his credit forfeiture was taken away, the

20    court has evidence before it with respect to Inmate E that he

21    did receive those types of chronos, counseling memos that

22    fall short of being part of the RVR process.  Those were in

23    the defendant's exhibits.

24         The system is working, Your Honor.  Will there be

25    cases that fall outside the bounds?  Yes, there will be, and

1    the venue for that is, I think, an individual lawsuit, the

2    appeals process.  Inmates A and E are represented by these

3    attorneys.  They could have brought it in that forum.  We

4    don't think there's any need for further relief.

5            If I could address briefly the incidents that -- the

6    relief that plaintiff's requested, that list that they put

7    there at the end of the argument.

8            First of all, with respect to the long-term solutions,

9    changing the policy, we disagree in the strongest terms that

10   there's any need to change the policy itself based on a

11   handful of exceptions.

12           Collect and analyzing data, this is being done.  It's

13   being reported to the Special Master.  It is being further

14   developed and enhanced, is my understanding.

15           Multidisciplinary training.  That has occurred.  There

16   has been collaboration training between custody and mental

17   health.  That was a long effort involving the Special Master

18   and his team.  It included prisons such as Corcoran who were

19   the focus of that effort to bring mental health and

20   collaboration training.

21           While this may be a pinpoint in time, the evidence

22   we're looking at here, the system continues to develop and

23   evolve, including training on collaboration.

24           With respect to the immediate relief, the irony here

25   is that the state is doing these things.  I'm not sure

1    there's any room for the court to act.  I address the videos

2    that Mr. Stainer is already looking at, the 122.  Again,

3    those were not problematic videos, but he's looking at those.

4         To the extent he finds an incident that would require

5    referral for investigation, the policy is in place that makes

6    those referrals mandatory, and the evidence has shown that

7    they are referring incidents above and beyond what is

8    required by the policy.

9         So there's no need for the Office for Internal Affairs

10   or the Office of Inspector General to review all of the

11   videos.  That would be a waste of time, and, frankly,

12   directly inconsistent with the Inspector General's

13   recommendation that the department review less of the

14   incident reports that are currently being reviewed.

15        As Mr. Martin pointed out, more than half of

16   use-of-force incidents are immediate use of force where

17   there's a fight between inmates, quickly broken up, and

18   there's no need for the Executive Review Committee, except in

19   the rare circumstance to focus on those.

20        Instead, they should be focusing on the more serious

21   use-of-force incidents.  But, in event, sending all those

22   videos, problematic or not, having the OIA review all the

23   videos is not a wise or necessary use of time or resources.

24        Training on expectations with respect to Mr. Stainer's

25   September 12, 2012 memo, Mr. Stainer's testimony was clear.

```
 1    They have trained the wardens.  He sat down or his deputy sat
 2    down with the wardens during a meeting that occurred shortly
 3    after issuance of the memo.  There has been training.  As Mr.
 4    Stainer testified, there's more work to be done to further
 5    clarify the expectations with respect to a use of pepper
 6    spray within California prisons.  That work is continuing, at
 7    it's something that the department is competent and willing
 8    and able to carry forward.
 9          The plaintiff's request immediately that the IDTT be
10    part of the process in a cell extraction.  Again --
11          THE COURT:  I just want to say that I don't know what
12    the Court of Appeals -- somebody will appeal this, whichever
13    way I go, and they're going to be confounded by all of these
14    acronyms, and I have no idea what they're going to do.  I've
15    made the order, as you know, that any time a brief is filed,
16    you give me a list of all of the acronyms, but nobody is
17    going to do that in this kind of extended hearing.
18          That's got nothing to do with this.  It just occurred
19    it me.
20          MR. MCKINNEY:  I share the court's comments.  We've
21    tried to be very cognizant of not using acronyms, but there
22    are so many.
23          At any rate, the interdisciplinary team, they have
24    requested that they become a part of the cell extractions,
25    and this is occurring.  This simply reflects the plaintiff's
```

1    unwillingness to look at the interventions that occurred

2    prior to the running of the videotape.  The treating

3    clinician is involved.  Many of these occur on crisis bed

4    units where an IDTT occurs once every 72 hours.

5         These inmates are constantly being reviewed by the

6    doctors who treat them and have certainly been a part of the

7    decision and effort to intervene before a cell extraction is

8    ordered.  It was certainly evident in the cases of Inmates A

9    and E in this case.

10        Finally, the other immediate request was to collect

11   data.  I think I've addressed that in the longer-term

12   solutions.  The data is being reported, collected, shared,

13   and that continues to be enhanced as the department moves

14   forward.

15        As we've discussed, Your Honor, in light of the fact

16   that there's been no showing here of a systemic federal law

17   violation, no pattern and practice, there's no need or reason

18   for the court to take further action.  That action is best

19   left to the correctional and the mental health experts within

20   the department.

21        The court received evidence from competent

22   administrators, competent clinicians capable of addressing

23   these exceptions and identifying and addressing issues that

24   they find here in the policy.  Those are being addressed.

25   They have been addressed.  They're starting to be addressed

1    through the discussion with the state's expert.

2         This motion was brought some time ago, and what it is

3    is the state continues to evolve, but as Mr. Stainer

4    testified, they intend to modify the policy to add a

5    mandatory waiting period between applications of pepper

6    spray, a maximum duration for the OC product.  They're also

7    planning to remove the MK-46 from use in cell extractions.

8         These are big changes the department is making and

9    will certainly, I think, address the idea of one or more of

10   these exceptions that's been presented in these proceedings

11   being within policy, move outside the policy in most, if not

12   all, of these cases.

13        The system is a good system, both with respect to use

14   of force and disciplinary policy.  There's been no systemic

15   showing by the plaintiff that there's any need for further

16   remedial orders.

17        Thank you, Your Honor.

18        THE COURT:  Mr. Bornstein, we're going to take a break

19   because there's apparently some problems with the court

20   reporter's system.

21        I think it's very important for you to help me with

22   your view as to whether there is a systemic failure rather

23   than individual failures, which we've seen, and how -- I

24   think it's a very difficult problem.  I will tell both

25   lawyers, it's not clear to me where my authority is in terms

```
1    of remedial orders once we find the constitutional violation.

2            I am mindful, although I shook my head at the time of

3    Justice Aliotta's comment then, we were relying on evidence

4    17 years old.  He was wrong.  He didn't understand the

5    process, but he's not wrong about how long we have been

6    struggling with this problem and what are the limits, what

7    are the constitutional limits of this court's jurisdiction

8    relative to remedial orders.

9            We'll talk about all of that this afternoon.

10           Stand in recess.  We will return at 1:15.

11           Is that convenient to everybody?

12           MR. BORNSTEIN:  Yes, Your Honor.

13                           (Whereupon, a break was taken at

14                           11:38 a.m.)

15

16

17

18

19

20

21

22

23

24    /////

25    /////
```

2073

1          (Back on the record at 1:30 p.m.)

2          THE CLERK:  Please, remain seated.

3          The court is now in session.

4          THE COURT:  Mr. Bornstein.

5          MR. BORNSTEIN:  Thank you, Your Honor.

6          I want to deal first with your constitutional

7    question and your authority.

8          Originally, you found unconstitutional treatment of

9    mentally ill inmates.  And in part, it was based on the way

10   in which the State used force and discipline and how it

11   harmed mentally ill inmates.  It exacerbated their mental

12   illness.  And what we have shown in this case is that that

13   continues today.

14         What you have, what Dr. Kaufman said, what he

15   testified to was the tasers that have been band by this court

16   have now been replaced with pepper spray, but the inmates

17   continue to suffer pain and suffering unnecessarily.  And

18   they do that because the State has a Use-Of-Force Policy and

19   Practice that does not account for or accommodate the special

20   needs of mentally ill inmates.  It's a one-size-fits-all

21   policy.

22         Mentally ill people are being harmed by force and

23   disciplinary policies unnecessarily.  That includes mass

24   quantities of pepper spray.  It includes expandable batons

25   for pain compliance.

2074

1           The State has failed.  And the testimony from the

2    State's person in charge, Mr. Stainer, has said that he has

3    not considered to date, and does not intend to consider, is

4    not planning to consider, is not going to address use of

5    force and disciplinary policies and procedures specifically

6    as they relate to mentally ill inmates.

7           Neither the IERC, the OIA, the OIG, or any other

8    acronym, agency, division, whatever, none of them are focused

9    on that issue.  None of them will be focused on that issue

10   unless the court issues a specific order.

11          We have demonstrated --

12          THE COURT:  Let me go back.

13          I think what you are saying is, yes, 20 years ago you

14   found that, but today -- found mental health -- inappropriate

15   application of force to mental health, but today this trial

16   has demonstrated that that's so.

17          MR. BORNSTEIN:  Correct.

18          THE COURT:  Now, the government responds by saying:

19   Look, certainly there have been mistakes.  That's inevitable

20   in an institution of this size.  But if you look at the

21   overall picture, the tapes represent unfortunate deviances

22   from a policy that essentially does not permit

23   unconstitutional use of force.

24          MR. BORNSTEIN:  Right.  I want to address that.  I

25   will.

2075

```
 1              THE COURT:  All right.
 2              MR. BORNSTEIN:  I just want to make sure that I want
 3      to deal with the legal issue first.  You have two bases to do
 4      it.  You have it both because it is still part of the
 5      remedial aspects of the violations you found, and no
 6      disrespect to Justice Alito, it is not based on 17-year-old
 7      evidence, it is based on current evidence, current practices.
 8              And I do want to take a moment, I know you said it is
 9      a snapshot in time, but I want you to also recognize that
10      we're talking about current practices and procedures.
11              Mr. Stainer has told you there are 122 videos out
12      there that he's found where he still has concerns about the
13      same thing.  We don't know exactly what is there, but he
14      still has concerns.
15              THE COURT:  About some of them.  He does not say --
16              MR. BORNSTEIN:  I know.  I don't know what they are.
17      I agree with you.  We just don't know.  But we do know the
18      policy and practice is the same.  We do know that he's
19      endorsed it.
20              He did not come in here and testify:  Your Honor, I
21      looked at those videos.  And I agree that there was
22      unnecessary and excessive force used against mentally ill
23      inmates in those videos.  But you know what?  That's not what
24      we're all about here in the State of California.
25              He didn't say that.
```

2076

1    He said -- in fact, every aspect of the agency said

2    that these are within our current, existing policies and

3    procedures.  There is nothing wrong with this.

4    Yes, I would like, he said, from a tactical

5    perspective, to maybe use a little less spray, maybe give a

6    little more waiting time, but the basic harm that is being

7    caused to the mentally ill people is the policy and practice

8    of the State of California today.

9    I'm going to say it.  They torture mentally ill

10   people by the way in which they do those cell extractions and

11   by the way they use force.  And they do it with conscious

12   disregard of their mental illness.  And they don't care in

13   the sense of focusing and finding specific solutions to deal

14   with mental illness and mentally ill people specifically.

15   The evidence demonstrates that these are not

16   outliers.  Mr. Vail testified, and he looked at all the same

17   things that Mr. Martin had in his files.  He looked at more

18   videos than Mr. Martin, and he said that these are systemic

19   violations.

20   He said that -- Mr. Martin said:  It's like a car

21   ready to peg out on empty.  He said:  You know, I told the

22   State.  I told the State's attorneys.  You know, I can't -- I

23   haven't done enough to find a pattern and practice here, but

24   I can tell you to me it is like a car, it is going down the

25   highway, it looks fine, but it is just about ready to run out

2077

1    of gas.  And at any point it could cross the line into

2    unconstitutional territory on a pattern and practice basis.

3    That's what he said.

4            And he had concerns about at least three

5    institutions, including Pelican Bay, based on immediate use

6    of force.

7            Dr. Kaufman said that it's the same practices that he

8    saw in 1993, just the weapon is different.

9            The data shows disproportionate impact against

10   mentally ill inmates, and the State has deliberately decided

11   to ignore the data.

12           Mr. McKinney got up here and talked to you about data

13   that was there for Corcoran.  If you look at the exhibits

14   that we prepared -- I'm going to use up two of my ten --

15   Exhibit 62C is the Prison Population and Use-Of-Force

16   Incidents for Coleman Monitoring Round 25.

17           If you look at it, it will show Corcoran.  And it

18   says 68 percent of use of force involved mental health

19   Coleman Class Members.  Their population in Corcoran is 31.5

20   percent.

21           So these are accurate.  This is accurate data and

22   shows the disproportionate impact.

23           The fact that the State has chosen not to analyze

24   that data is on them.  It is part of their conscious

25   deliberate indifference.

2078

1          And I want to point out one other thing.

2          The Special Master -- they give the Special Master

3    the 68 percent number.  They don't give him the population

4    numbers necessarily.  That's where we had to go and find them

5    in other data.

6          In other words, they don't -- they're not being

7    transparent.  They're doing the minimal that they're ordered

8    to do.

9          The policies permit -- current policies permit

10    excessive and unnecessary force.  Not one witness was called

11    by the State of California in this case and said -- even

12    their attorneys -- not one of them said:  My God.  I saw

13    those videos.  They're horrific.  Mr. McKinney came close

14    with one today.  They're horrific.  This should never have

15    happened in our State.  We're going to do something about it.

16          Not one.

17          You can't solve a problem if you don't consciously

18    even recognize that you have got one unless you're ordered to

19    do it.

20          They deliberately ignored their own expert.  They

21    deliberately ignored his own recommendations until Monday of

22    this week when Mr. Stainer called him up and said:  Yeah,

23    gee, I would like to talk to you about some of that stuff.

24          That is conscious disregard.

25          Mr. Stainer said even 40 sprays of pepper spray and

2079

1    four grenades used on Inmate L in this case, in 2011 or 2012,

2    whenever it was, I don't know off top of my head, was not

3    excessive or unnecessary force, it complied with California

4    policies and procedures.  Well, maybe tactics, maybe they

5    should have stopped before then, but it is not

6    unconstitutional in the way in which California defines

7    force.

8              And that is wrong.  That is wrong, and that's today.

9              It's inhumane the way they treat people who are

10   mentally ill.  It causes unnecessary pain and suffering.

11   It's no different than the tasers that also don't leave a

12   lasting injury according to them.  It's the same thing.

13             And Dr. Stewart and Dr. Kaufman said it interferes

14   with the therapeutic relationship and it exacerbates mental

15   illness.

16             And I want to point out one other thing.

17             We've heard repeatedly, without evidence, about all

18   of these hours of clinical intervention.

19             Oh, yeah.  You don't see that in the tapes.  You

20   don't see that.  It's all these hours.

21             Mr. Martin never looked at those records.  The people

22   who did, Dr. Kaufman and Dr. Stewart, have testified they're

23   not there.

24             There are not these hours of intervention for the

25   inmates whose records we were able to gather and we were able

2080

1  to look at.  And there's no proof to the contrary.

2          They can use words, the same way that they try to say

3  that, you know, administrative segregation is not

4  administrative segregation because we don't call it

5  administrative segregation.  But it does not make it so.

6          We gave you 17 examples of videos because that's all

7  we had.  That was the universe that they gave us.  We didn't

8  cherry pick anything.  And we would have played them all, if

9  you would have permitted it.

10          The State came in here and told you that the whole

11  thing is a complete waste of time, you shouldn't look at any

12  of them.

13          Had you not been courageous enough to look at those

14  videos, had you not released them to the public, there is no

15  doubt that Mr. Stainer would not today be even doing the

16  little bit that he's doing.

17          Why do I say that?

18          Because as of August of this year, when we took his

19  deposition, he wasn't preparing to do anything.  He had

20  rejected Mr. Martin's recommendations.  He had rejected the

21  OIG's recommendations.  There was no plan to do anything, but

22  for this trial, but for Your Honor's orders.

23          Mr. Martin testified that the State's failure to

24  track data, to analyze data, to ask appropriate questions

25  about how and why use of force happens is inexcusable from a

2081

1    sound correctional practices standpoint.

2              Again, deliberately closing their eyes.

3              If you do not issue an order here, what's going to

4    happen?

5              The State will interpret that to mean that you have

6    endorsed what we have demonstrated are inhumane and

7    unconstitutional practices.

8              Further, the Special Master will be without the

9    authority that he needs to force the State to and monitor the

10   State to do what it is they are required to do.  The Special

11   Master needs that authority from specific orders.

12             And I want to talk about what Mr. McKinney said:

13   Well, there's 125.  It doesn't happen that much.  There's

14   only three-and-a-half per institution roughly.  It is not

15   that big of a deal, he says, in so many words.

16             We have given very specific requests in our motion

17   about specific orders.  I talked about other things earlier

18   in my argument, but we've laid out from the beginning

19   specific orders.

20             If it is not that big of a deal, and there's only

21   three, then let's ban the use of pepper spray in all the

22   units where there are mentally ill inmates.

23             Let's teach guards Management of Assaultive Behavior

24   Practices.  That's, I think, been around since 1995 when you

25   first issued your order.  Let's teach them that.

2082

1          Let's stop the unnecessary and excessive use of

2     pepper spray and batons and other force that causes pain and

3     suffering to inmates who are mentally ill.

4          I want to now address the issue of cost because I

5     understand the court's reticence to spend the State's money

6     needlessly.  But I want to be clear, we're not asking the

7     court to build more hospitals.  We're not asking the court to

8     hire more staff.

9          What we are talking about is the cost of implementing

10    correctionally sound, constitutionally viable use of force

11    and disciplinary practices.  It is minimal.

12         The cost of changing the current training and

13    curriculum so there is more training than two hours, which is

14    what they do today, on dealing with how to deal with mental

15    illness, that is minimal.

16         The cost of tracking and analyzing data that

17    competent prison administrators should have been and should

18    be required to analyze and track anyway, just as a matter of

19    their jobs, is minimal.

20         The cost of modifying the RVR process to avoid

21    punishing inmates because of their mental illness, that

22    actually may even Save the state money.

23         If you don't start stacking loss of good time

24    credits, on top of loss of good time credits, on top of loss

25    of good time credits, like the Special Master found

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2083

1    inadvertently in Pleasant Valley I think it was, or

2    Salinas Valley and some of the other places that we've seen

3    where, despite Mr. McKinney's comments to you earlier today

4    that, Your Honor, we're just here to try and help people get

5    their medication and to treat them and, you know, sometimes,

6    unfortunately, we have to use force, I mean no disrespect to

7    Mr. McKinney, I know he's doing his job, but the point is if

8    that's the case, if really you're only doing it because there

9    is somebody suffering from mental illness, why would you give

10   them an RVR?

11        Why would you take away their good time credit?

12        Why would you punish them when they are incapable of

13   helping themselves because they need to be medicated

14   involuntarily because they don't know enough to take their

15   own medication?

16        The answer is, if you stop these practices, maybe

17   that will also help overcrowding.  Maybe that will also cut

18   down on the costs of continuing to house people that they

19   shouldn't be housing, who should be getting out but for their

20   mental illness.

21        And all of that, all of those costs, whatever they

22   are, are minimal in terms of the human cost, the pain and

23   suffering that inmates in this state, who are mentally ill,

24   have been suffering since before you first heard the first

25   motions in this case.

2084

1          It continued despite all of the efforts you have

2    made.  And I recognize, and I mean no disrespect by the

3    progress that you have recognized has happened, they still

4    have not dealt with this fundamental issue, and they will not

5    deal with this fundamental issue until and unless they are

6    ordered to do so.  And that is what we're asking you to do.

7          And there are strong evidentiary reasons that will

8    support both your legal and your factual decision to order

9    them to respond to these constitutional infirmities.

10          Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Bornstein.

12          I expect that it's in the interest of careful

13    adjudication that the court not make comments on the pending

14    matters.

15          I want to say to both sides that both sides have been

16    represented by competent counsel.  And if nothing else, we've

17    demonstrated how difficult -- well, the plaintiffs don't even

18    agree to that so I won't even say that yet.

19          Thank you very much, Ladies and Gentlemen.

20          We'll stand in recess.

21          MR. MCKINNEY:  Thank you, Your Honor.

22          MR. BORNSTEIN:  Thank you, Your Honor.

23          (Off the record at 1:50 p.m.)

24                        ---o0o---

25

1                          REPORTER'S CERTIFICATE

2                               ---o0o---

3
      STATE OF CALIFORNIA   )
4     COUNTY OF SACRAMENTO  )

5


6
             I certify that the foregoing is a correct transcript
7
      from the record of proceedings in the above-entitled matter.
8

9

10                     IN WITNESS WHEREOF, I subscribe this
      certificate at Sacramento, California.
11

12

13     /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                                (916) 446-6360

1                        CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25