1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7          Plaintiffs,

8   Vs.                          CASE NO. CIV. S-90-0520 LKK

9   EDMUND G. BROWN JR., et al.,
    et al.,

10

11          Defendants.

12   _____/

13

14

15                    ---o0o---

16

17               REPORTER'S TRANSCRIPT

18            RE:  EVIDENTIARY HEARING

19          TUESDAY, NOVEMBER 19TH, 2013

20

21                    ---o0o---

22

23

24

    Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25  Reported by:  KATHY L. SWINHART, CSR NO. 10150

```
1                          APPEARANCES

2                           ---o0o---

3

4    FOR THE PLAINTIFFS:

5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
6            SAN FRANCISCO, CALIFORNIA  94104

7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

8            BY:  AARON FISCHER, ATTORNEY AT LAW

9            BY:  JANE KAHN, ATTORNEY AT LAW

10

11

12

13   FOR THE DEFENDANTS:

14            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
15            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
16
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
19

20                          ---o0o---

21

22

23

24

25
```

```
 1                        PROCEEDINGS INDEX

 2                           ---o0o---

 3

 4    PROCEEDINGS:                              PAGE

 5        Opening Statement by Mr. Bien         2089

 6

 7

 8

 9                           ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          EXAMINATION INDEX

2                              ---o0o---

3

4     FOR THE PLAINTIFFS:

5         EXAMINATION:                                    PAGE

6

7      DR. CRAIG HANEY

8         Direct Examination by Mr. Fischer           2112
          Voir Dire Examination by Ms. Vorous         2141
9         Direct Examination Cont'd by Mr. Fischer    2143

10

11

12

13

14                             ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                         EXHIBIT INDEX

2                          ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO          DESCRIPTION              EVD
5
       2000          Inmate Code (Sealed)         2112
6
       2001          Haney Expert Dec. 3/14/13    2114
7
       2002          Haney Expert Dec. 5/6/14     2114
8
       2003-2032     Photos                       2118
9
       2033          Group Therapy Schedule       2180
10
       2035          Chart                        2143
11
       2036          Chart                        2143
12
       2037          Chart                        2143
13
       2038          2000-2013 Data               2143
14
       2039          Chart                        2118
15
       2040          9/16/13 Length of Stay Report 2202
16
       2041          Summary                      2203
17
       2042          SHU Profiles                 2218
18
       2043          Chart                        2218
19
       2044          Chart                        2219
20
       2045          Chart                        2222
21
       2046          Sanchez Article              2230
22

23

24                         ---o0o---

25

2085

                    SACRAMENTO, CALIFORNIA

1          TUESDAY, NOVEMBER 19TH, 2013 - 10:30 A.M.

2                          ---o0o---

3          THE CLERK:  All rise.

4          Court is now in session.

5          The Honorable Lawrence K. Karlton presiding.

6          THE COURT:  Please, be seated everyone.

7          THE CLERK:  Calling Civil Case S-90-520, Coleman,

8     et al., versus Brown, et al.

9          THE COURT:  Counsel, approach the podium.  State your

10    appearance for the record.

11         Actually, I need Miss Vorous and Mr. Bien for the

12    first things we've got to deal with.

13         Miss Vorous.

14         MR. BIEN:  Michael Bien on behalf of plaintiffs'

15    counsel.  I'm here with Jane Kahn and Aaron Fischer.

16         MS. VOROUS:  Debbie Vorous on behalf of defendants.

17         THE COURT:  Folks, the first issue that we've got to

18    deal with is the plaintiffs' motion in limine relative to the

19    question of the nonretained witnesses.

20         And I'm not quite certain I understand what

21    plaintiffs are asking for, but I think at least one of the

22    requests, Mr. Bien -- maybe I'm misreading it -- but one of

23    the requests is to modify -- not modify, but to restrain the

24    court's consideration in the previously completed hearing

2086

1  relative to the nonretained experts.

2        Am I correct that that's what you are seeking, as

3  well as the future?

4        MR. BIEN:  As we pointed out in our post-trial brief

5  and it's the same issues as in the motion in limine, the

6  quandary the court faced in the last trial about nonretained

7  experts, we had waived and we continue to waive our argument

8  about notice.

9        THE COURT:  Thank you.  That's all I wanted to hear

10  you say.

11        MR. BIEN:  Yes.

12        THE COURT:  Because my view is you had waived.

13  Therefore, I'm not going to worry about it as to the past.

14        The next problem we have to deal with is the future,

15  and it is not clear to me where we go.

16        The defendants say:  Look, we didn't supply you with

17  the notice 90 days before trial because, after all, this

18  isn't a trial.  It is a hearing.  I mean, it feels like a

19  trial, it looks like a trial, but it is a hearing.

20        I assume, as do both the plaintiff and defendant,

21  that the rule applies to these hearings as well.  I think

22  you're both right as to that.

23        The question is what we do about it.

24        And the defendants make offers which seem to me, if

25  they were made 60 days ago, would be fine, not only fine, it

2087

1  would be appropriate -- well, it would be 90 days, but

2  whatever -- but here we are and this is the first day of

3  trial and we've got to figure out what to do.

4       Let me tell you what is certainly not the final order

5  but something that I have been considering.

6       I have been considering, and it is my intention in

7  light -- Let me start from there.  In light of what I'm

8  finding to be the difficult issues of writing the disposition

9  of the last hearing, which involves questions the complexity

10  of which I didn't appreciate until the hearing, but there is

11  a lot of -- I mean, it is difficult.  It is taking a lot of

12  time and energy.  I know you don't believe it, but there are

13  one or two other cases I'm responsible for.

14       I am -- I was thinking pretty seriously, particularly

15  at the urging of both the court reporter and my law clerk,

16  that we have hearings three days a week.  And if we do that,

17  it seems to me there are two days -- it seems to me, but I'll

18  be happy to hear you folks tell me what the real world is --

19  that in two days a week you can arrange to provide the

20  plaintiffs with the statements that are required and the

21  plaintiffs to make judgments about whether they want to

22  depose people.  And if so, they do them on Monday and

23  Tuesday.

24       I can see Mr. Bien shaking his head.

25       Does that seem reasonable to you, ma'am?

2088

1          MS. VOROUS:  Yes, Your Honor, that seems

2     reasonable.

3          THE COURT:  All right.

4          Well, maybe that solves the problem.

5          Thank you very much.  That is very helpful.

6          The court will now rule beginning next week that it

7     will have hearing -- we're not here next week.  It is

8     Thanksgiving.

9          The next time we meet -- the next week we meet will

10    be on Wednesday, Thursday and Friday.  And I think there is

11    no inconvenience to the plaintiff because obviously you've

12    got to put on your case before defendants do, so they'll have

13    the statements to you, you can make the depositions in time

14    to get it all done.

15         Do you agree, Mr. Bien?

16         MR. BIEN:  I do agree, Your Honor.

17         THE COURT:  That's convenient for you as well?

18         MS. VOROUS:  Yes, Your Honor.

19         THE COURT:  Good.  That will be the order.

20         MR. BIEN:  Thank you.

21         THE COURT:  Thank you, folks.  That was really

22    helpful.

23         Let's talk about where we go now.

24         Mr. Bien, my view is we ought to start the hearing

25    and get on with the evidence.

2089

1          MR. BIEN:  We have scheduled three witnesses that we

2     feel we can complete this week.  That will be three of our

3     four experts.  One, Mr. Austin, cannot be done until in

4     defendants case, and they've agreed to that.

5          THE COURT:  All right.

6          Well, that's where we begin.  I want to remind the

7     parties that they are to provide the opposite parties not

8     less than 24 hours before the time the witnesses are called

9     who they propose to call.

10          You may proceed, Mr. Bien, and call whoever it is you

11     are calling.

12          MR. BIEN:  We're going to start with an opening

13     statement, Your Honor, if that's okay?

14          THE COURT:  Fine.  I mean, all I've had is this much

15     paper about what you think the case is about, but go ahead.

16     If you think you need more, go ahead.

17          (Binders handed to court and counsel.)

18          I'll be sure to read all of that between now and

19     lunch.

20          You may proceed, sir.

21          MR. BIEN:  Your Honor, defendants knowingly and

22     deliberately housed thousands of prisoners with serious

23     mental illness in dangerous segregation units for

24     extraordinarily long periods of time.

25          Defendants do this even though they have been

2090

1    repeatedly informed that their segregation policies and

2    practices cause prisoners with serious mental illness

3    unnecessary and avoidable pain, suffering, irreparable harm,

4    and all too often, death by suicide.

5         Defendants themselves, as well as outside experts and

6    consultants, have identified the risks of housing prisoners

7    with serious mental illness in these units.

8         By these motions, plaintiffs request a series of

9    orders that will finally bring these unconstitutional,

10   inhumane and unnecessary practices to an end.  California is

11   an outlier in its extensive use of segregation to house

12   prisoners with mental illness.

13        It's the same theme, Your Honor, that we've seen in

14   all of these evidentiary hearings, the custodial practices,

15   punishing the mentally ill, interfering with any possibility

16   of treatment, making mental illness worse.

17        Eighteen years have passed since this court entered

18   judgment finding that, quote:

19        Defendants' policies and practices with respect to

20   housing of class members in administrative segregation and in

21   segregated housing units violate the rights of class members.

22        The court's findings were based on Magistrate Judge

23   Moulds' 1994 findings and recommendations.

24        I quote:

25        Placing mentally ill inmates in administrative

2091

1    segregation or segregated housing units exacerbates the

2    underlying mental illness, induces psychosis, and increases

3    the risk of suicide...

4         Defendants and their employees recognize the danger

5    to mentally ill inmates from housing in segregated housing

6    units, particularly Pelican Bay SHU.  Nonetheless, defendants

7    continue to house mentally ill inmates in these units.

8    Defendants' use of administrative segregation and segregated

9    housing at Pelican Bay SHU and statewide to house mentally

10   ill inmates violates the Eighth Amendment.

11        As required by principles of federalism, this court

12   has, to date, relied on the defendants' state officials to

13   develop and implement plans to remedy these constitutional

14   violations.

15        Despite numerous additional orders by this court and

16   countless recommendations by the Special Master, defendants'

17   current segregation policies and practices, 18 years later,

18   have failed to remedy these constitutional violations.

19        The Supreme Court's direction in this very case is

20   clear, quote:

21        A federal court may not allow constitutional

22   violations to continue simply because a remedy would involve

23   intrusion into the realm of prison administration.

24        Defendants' remedial plan from day one in this case,

25   over the objections of plaintiffs, has been to remedy the

2092

1  constitutional violations by bringing mental health care into

2  the segregation units rather than by removing the mentally

3  ill from these units.

4      In 1997 the Special Master said that defendants' plan

5  for segregation can only work, quote, if there are meaningful

6  efforts to limit the duration of the stay of the seriously

7  mentally ill inmates in administrative segregation.

8      In 1999 the Special Master reported that despite

9  defendants' representations, quote, a substantial number of

10 seriously mentally disordered inmates spend an inordinately

11 long period of time in administrative segregation.

12     He also found that there were staffing shortages.

13     That began, Your Honor, a serious of orders from this

14 court to force defendants to do what they had promised to do

15 to actually bring the treatment into those segregation units.

16     In 2000 the Special Master reiterated that even the

17 full implementation of staffing planned under the court's

18 orders would not address the violations:  "Keeping seriously

19 mentally disordered inmates out of administrative segregation

20 as often as possible and moving them out as rapidly as

21 possible" was the critical part of the solution that was

22 missing.

23     The most controversial part of defendants'

24 segregation practice was the decision to keep even the most

25 seriously ill patients, patients at the EOP level of care, in

2093

1    segregation, with a promise that CDCR would bring the

2    necessary mental health care into these harsh segregation

3    units.

4          In 2001 the Special Master expressed his grave doubts

5    about this practice in his 8th Report.

6          Much has been written over the past two decades, this

7    is a quote, to validated the deleterious impact of

8    confinement in administrative segregation on sound minds.

9    Simply to immerse fragile EOP inmates in such an environment

10   for extended periods, even while providing adequate mental

11   health care, arguably tiptoes on the boundaries of cruel and

12   unusual punishment.  To immerse them in administrative

13   segregation without providing ready access to a significantly

14   heightened level of mental health services pretty clearly

15   crosses that boundary.

16         In 2013 plaintiffs will demonstrate in this trial

17   that we're well over that boundary.  It is unconstitutional.

18   We are not delivering care in these units, and we're not

19   removing even EOPs from these units.

20         Despite numerous orders of this court and

21   recommendations by the Special Master, the defendants must

22   take steps to reduce the length of stay for Coleman Class

23   Members in segregation as much as possible.

24         Defendants have persisted with this failed and

25   dangerous model.  After 18 years, it is time to declare this

2094

1    experiment a failure.  The plaintiff class should not be

2    required to wait any longer for defendants to fix the

3    long-standing violations.  Human lives are at stake and pain

4    and suffering persists for thousands of prisoners with mental

5    illness who are today, in November 2013, still trapped in

6    CDCR's dangerous segregation units.

7        Since plaintiffs filed this motion several months

8    ago, there have been six more suicides in CDCR segregation

9    units.  Without a meaningful remedy, the future will

10   doubtlessly and sadly bring more of the same.

11       By some measures the problem now is worse than ever.

12   While CDCR's overall prison population has dropped

13   significantly as a result of the three-judge court's orders,

14   the number of CDCR prisoners with mental illness housed in

15   segregation has actually increased during the same time

16   period.

17       Your Honor, the first exhibit in this binder is a

18   chart, Exhibit 2037, that shows the population in segregation

19   of the mentally ill from the period April 2000 to todate.

20   The top line, the green line, shows CCCMS in ASU.  And it is

21   an increasing number over this time period even though the

22   population -- the overall population, as Your Honor knows,

23   has dropped substantially.

24       The same is true for the red line, which is CCCMS in

25   SHUs.

2095

1    The blue line is EOPs in ASUs.

2    The purple line at the bottom is EOPs in PSUs.

3    Each of those populations has been steady or growing

4    in the same period when the overall population has dropped

5    substantially.

6    Lengths of stay for prisoners with serious mental

7    illness in segregation also remains extremely long.  And

8    there are no time limits under defendants' plans.

9    The history for the remedial process for segregation

10   violations in this case is relevant to this hearing.  The

11   evidence will show that defendants established their own

12   remedial plan for segregation over the objections of

13   plaintiffs and against the advice of the Special Master.

14   Defendants set extremely low standards for themselves

15   in the Program Guides for segregation practices, but have

16   been unwilling or unable to achieve even those low standards.

17   Numerous court orders have been required to address

18   untold obstacles and delays.  For example, in March 2007,

19   this court ordered defendants to "examine more effective ways

20   for reducing the length of stay of EOP inmates in

21   administrative segregation, alternative methods of mental

22   health treatment, the use of different housing and/or service

23   models for particular categories of EOP administrative

24   segregation inmates; and any other strategy or approach

25   likely to better serve the treatment needs of EOP

2096

1    administrative segregation inmates."  Docket 2158.

2           Nothing material came out of that order.  The same

3    practices remain.

4           Plaintiffs will demonstrate that in 2013 defendants

5    are still not providing minimally adequate mental health care

6    for the prisoners with serious mental illness in segregation,

7    and the defendants' policies and procedures, even if they

8    were fully implemented, are insufficient to overcome the

9    harsh custodial conditions of punishment and humiliation that

10   are the hallmarks of the segregation units.

11          The existing Program Guide standards must be modified

12   to strictly and clearly limit lengths of stay in segregation

13   for those with mental illness, and to exclude prisoners with

14   serious mental illness from all SHU programs, not just the

15   Pelican Bay SHU.

16          Defendants' policies and procedures for segregation

17   have no time limits whatsoever even for the EOPs.

18          Your Honor, the next chart, which is a large one that

19   opens up, sets forth the model -- it sets forth from the

20   Program Guide for CDCR's segregation units.

21          The first column is the ASUs regular segregation

22   units.  They exist at 32 of the 33 prisons.  As of the most

23   recent data we have from defendants in September 2013, there

24   were 1875 CCCMS prisoners in these units and 32 EOPs.

25          Coleman Class Members are allowed in ASUs.  As the

2097

1    court may remember, they're excluded from ASUs called

2    "Stand-Alones" which were built later in the case.  Program

3    Guide 12711 excludes all Coleman Class Members from the

4    Stand-Alones, but they are permitted into the ASUs.

5         The next category are the EOP ASU Hubs.  And this was

6    the plan of defendants to bring treatment into the ASUs

7    rather than remove the EOPs from ASUs.  As of September 2013,

8    there were 519 EOPs in these units.  They're at eleven

9    different prisons.

10        There are no time limits for CCCs in the regular

11   ASUs.  There are no time limits for EOPs in the EOP ASU Hubs.

12        There is a requirement that when defendants make

13   someone an EOP, and they're in the regular ASU, they have to

14   transfer them to an EOP ASU Hub within, I think it is, 30

15   days.

16        Then there are the SHUs.  As Your Honor knows, there

17   are -- the Pelican Bay SHU has an exclusion order that flowed

18   from Madrid and the original orders in this case.  That's set

19   forth at Program Guide 1281 to 1283.

20        As of September of 2013, there were 734 CCCMS

21   prisoners in the SHUs and two EOP prisoners.

22        How is this?

23        Because we have other SHUs besides Pelican Bay.  We

24   have a SHU in Corcoran.  We have a SHU in Tehachapi.  We have

25   a SHU at Sac, and a SHU for women at CIW.  These SHUs do not

2098

1   exclude Coleman Class Members.

2          EOPs, when they're identified in these SHUs, are

3   moved to units called PSUs.  But CCCMS can stay in SHUs

4   forever, and they literally do.  You can have lifetime

5   indeterminate SHU terms in the Corcoran or Tehachapi, Sac or

6   CIW SHU.

7          The final part of this segregation strategy for the

8   prisoners with mental illness is PSU.  And PSU is parallel to

9   the EOP Ad. Seg. Hub.  It is a SHU where treatment has been

10  brought in.

11         These exist at three locations, Pelican Bay, Sac, and

12  CIW.  All of these segregation units have more in common than

13  they have in their differences.

14         In both the ASUs and the SHUs, prisoners are locked

15  in their cells 24 hours a day, sometimes 22, 23 hours a day.

16  They're entitled to, under Title 15, very minimal yard time,

17  either one hour five times a week, or a total of ten hours in

18  three separate yard periods.

19         What the evidence will show, Your Honor, is that

20  those numbers are rarely met and frequently missed by

21  defendants.  So yard time is difficult.

22         Yard occurs in all of these programs in walk-alone

23  yards.  These are cages -- outdoor cages.

24         Treatment occurs in all of these units in treatment

25  modules or cages, many of them in non-confidential settings.

2099

1          Meals are eaten in your cell.

2          As Your Honor saw from the videos -- the use-of-force

3     videos, you don't leave your cell without being cuffed.

4     There is very little programming and activity.  In fact, very

5     few prisoners within these units have access to TVs or

6     radios.  In fact, many of the ASUs don't even have electrical

7     capability to even provide TVs and radios.

8          Welfare checks, living, breathing, custody checks to

9     make sure people are alive and not in distress are provided

10    now due to orders of this court, but only in the first 21

11    days of housing in ASUs.  But the evidence will show that

12    even that minimal requirement, far below ACA standards, is

13    not being met.

14          In SHUs and PSUs, that standard is not even applied.

15    They don't even do welfare checks.

16          Treatment is minimal in these units, even in the

17    units for EOPs.  The goal is to achieve ten hours a week in

18    these caged units.

19          What the evidence will show, Your Honor, is that to

20    access treatment, many of the treatment locations require

21    that the inmates be strip-searched on the way to treatment

22    and on the way back from treatment.  To go to yard, you're

23    strip-searched on the way to yard and on the way back from

24    yard; quite a disincentive to accessing mental health care.

25          Again, as we'll show from the evidence, all treatment

2100

1  is in cages, all one-on-one contacts with clinicians are in

2  cages or cell front.

3         Many of the treatment modules, cages, are in open

4  dayroom floors, non-confidential orally or visually; quite a

5  disincentive to treatment.

6         Between 2001 and 2007 this court issued a number of

7  specific orders addressing segregation and the EOP Ad. Seg.

8  Hubs including staffing ratios, programming space needs,

9  lengths of stay, psych-tech rounding requirements, population

10  caps at certain EOP Hubs and several orders addressing the

11  high rate of suicides in CDCR segregation units.

12         Nothing was done voluntarily.  Nothing has ever been

13  done voluntarily to bring care to these units to solve these

14  problems.

15         After repeated findings by the Special Master that

16  the suicide rate in segregated housing was extraordinarily

17  high, more than half of all the suicides in CDCR were

18  occurring in segregation units, which house less than 10

19  percent of the population, many of the court's orders have

20  been directed to suicide prevention measures.

21         June 9, 2005, there was an order to remove large mesh

22  ventilation screens in certain ASU cells that were suicide

23  hazards.  There was an order to require CDCR custodial

24  officers to provide CPR and life support when the State had

25  entered into a contract allowing them not to provide CPR and

2101

1    life support.

2          On June 8th, 2006, the court ordered defendants to

3    develop a plan based on recommendations made by suicide

4    prevention experts to address the escalating number of

5    suicides in segregation.  A summit was held that summer.

6    Data, policies and procedures were reviewed and discussed.

7    Recommendations were made.

8          CDCR, however, rejected critical life-saving

9    recommendations and agreed to only some of the

10   recommendations which now, seven years later, have yet to be

11   successfully implemented.

12         For example, the suicide prevention expert panel in

13   2006 recommended that CDCR retrofit suicide-safe intake cells

14   for housing prisoners in their first two to three weeks in

15   segregation.

16         Instead, CDCR only agreed to retrofit a far smaller

17   number of cells to cover the first 72 hours in segregation.

18         On March 8th, 2013, Prisoner 9 committed suicide in

19   the Folsom ASU less than eight hours after he was placed in

20   segregation, contrary to policy, and in a cell that had not

21   been retrofitted for suicide safety.  The limited number of

22   retrofitted intake cells at Folsom were all full.

23         Dr. Robert Canning, defendants' senior psychologist

24   in charge of suicide prevention efforts, had previously been

25   informed that the shortage of intake cells had led to

2102

1  suicides.  One of his analysts wrote to him in December 2012

2  about a similar suicide at Avenal in their Ad. Seg. in June

3  2012.

4      Prisoner 20, who was identified as CCCMS committed

5  suicide in a regular Ad. Seg. cell on the second day in

6  segregation.  Again, all of the intake cells were full when

7  he arrived.

8      The analyst, Mr. Yi wrote as follows, quote:

9      Considering how we've had no suicides since 2008

10  among those inmates who were housed in any one of those ASU

11  intake cells, this type cell is, indeed, effective, serving

12  its purpose.  Is there a plan in place to build more intake

13  cells?

14      The evidence will show that there is no plan, and

15  once again this known risk of serious harm and death due to

16  shortages of intake cells persists today.

17      The suicide prevention expert panel, after noting how

18  little outdoor exercise was being provided in CDCR

19  segregation units, recommended the minimum requirements for

20  outside yard established by Title 15 be met.

21      Defendants, after various reports by the Special

22  Master, and requiring, again, this court to order them to do

23  it, finally agreed to construct sufficient yards and hire

24  sufficient staff so that the minimum requirements of Title

25  15 -- again, just five hours a week of yard -- could be met.

2103

1          But defendants convinced this court not to include in

2     its order that they build yards for the SHUs, the PSUs and

3     death row.  Defendants represented to the court that they

4     would address the shortage of yards for SHU and PSU and death

5     row without court orders in the normal budget process.

6          Plaintiffs will demonstrate they reneged on this

7     promise.  In fact, lack of yard remains a problem in many

8     segregation units.

9          In the CDCR Suicide Report for Prisoner 25 who died

10    in March 2012 in the Tehachapi SHU, the extreme deprivation

11    of outdoor exercise was identified as an additional stressor

12    in the prisoner's conditions of confinement in the harsh SHU

13    setting.

14         Defendants had offered this prisoner yard only 14

15    times in the eight months prior to his death.  Fourteen

16    times.

17         This prisoner had not lost his yard privileges as

18    punishment for misconduct, but instead as a consequence of

19    CDCR's continued overcrowding and continued shortages of the

20    most minimum resources necessary to sustain human life in

21    prison, a few hours a week of yard in a small cage that

22    requires two strip searches each time you go.

23         This is not a luxury, but to deny even that basic

24    right, some fresh air, some out-of-cell time is torture and

25    violates fundamental human rights that even prisoners

2104

1    possess.

2          The response to this report from CCI Deputy Warden of

3    the suicide report dated July 25th, 2012, confirmed the

4    prisoner had received only these 14 days of yard in eight

5    months.

6          He wrote, quote:

7          The compliance with the departmental standards

8    regarding Security Housing Unit yard time is a

9    departmental-wide issue.  Currently CCI Facility B has 32

10   individual exercise modules.  These are shared by eight

11   housing units which house in excess of 750 inmates.  The

12   audit further showed that in the same time period there were

13   a total of 79 days in which yard was not afforded to inmates

14   in Facility B due to modified yard, weather conditions and/or

15   training which exasperated the lack of yard time for all

16   inmates.

17         The deprivation of even minimum hours of outdoor yard

18   was identified by CDCR as a significant additional stressor

19   for Prisoner 25, but how many others of these 750 men in this

20   Tehachapi SHU suffered or decompensated in the same time

21   period?  How many have been permanently harmed?

22         As of September 2013 defendants reported that the

23   Tehachapi SHU housed 199 CCCMS and one EOP Coleman Class

24   Member.

25         The CIW SHU had 83 CCCMS Coleman Class Members.  The

2105

1    Corcoran SHU had 83 -- I'm sorry -- the Corcoran SHU had 431

2    CCCMS and one EOP.  And the Sac SHU had 18 CCCMS.

3            As was demonstrated in the trial that we just

4    completed, San Quentin's death row is also short of exercise

5    yards.

6            The same suicide prevention panel recommended that

7    CDCR create separate units for prisoners who are moved from

8    the general population because of safety concerns or other

9    non-disciplinary reasons.

10           These non-disciplinary units would be designed to

11   provide those prisoners, who have done nothing wrong, with

12   more privileges, freedom, activities and out-of-cell time.

13           Defendants rejected this recommendation and still

14   today house large numbers of prisoners in their

15   administrative segregation units, who are there for no fault

16   of their own, mixed together with disciplinary prisoners, for

17   their protection and safety, for administrative convenience

18   or due to shortages of beds caused by continued overcrowding.

19           Defendants have acknowledged that 20 to 30 percent of

20   the administrative segregation population today are there for

21   non-disciplinary reasons.  This practice affects every day

22   hundreds of prisoners with mental illness across the state at

23   any given time.

24           The same panel in 2006 also recommended CDCR reduce

25   the lengths of stay in segregation for all prisoners and

2106

1    especially prisoners with mental illness.

2         Defendants made various promises to look at their

3    practices, to monitor their practices, but did not agree to

4    any time limits.  And those promises have not resulted in any

5    substantial changes in lengths of stay for prisoners with

6    mental illness in segregation.

7         The same panel recommended that defendants implement

8    ACA standards for 30-minute custody welfare or wellness

9    checks for all prisoners in segregation and secured housing

10   units for all days that they're in these units, not for a

11   limited period of time.

12        Again, defendants initially refused to do any

13   30-minute rounding as too costly and too difficult.  Finally,

14   defendants agreed to do 30-minute welfare checks, but only

15   for the first 21 days in administrative segregation units.

16   And again, more than seven years later, they have not

17   successfully implemented even this limited program.

18        Emergency response failures, failures to do CPR,

19   failures to save someone in the midst of a suicide attempt

20   continue to be identified by both defendants in their own

21   suicide reviews and the Special Master as contributing to

22   high numbers of suicide in segregation.

23        This panel also recommended increasing access to

24   entertainment devices such as radios and television.  In

25   April 2007, the then director of the Division of Adult

2107

1    Institutions stated, and I quote:

2          The CDCR has a commitment to the court in regards to

3    Coleman v. Schwarzenegger.  This commitment is in response to

4    court concerns over sensory deprivation and suicide trends in

5    the ASUs.  It is important that we take an immediate, active

6    role in addressing these issues rather than waiting for

7    additional direction from the court.

8          More than six years later, a significant percentage

9    of administrative segregation units in CDCR don't even have

10   the capability to provide prisoners with radios or

11   televisions.

12         In the SHU and the PSU, Coleman Class Members have to

13   wait a year to even be eligible for devices and can lose them

14   for minor disciplinary infractions.

15         CDCR's segregation units have various names, but all

16   are characterized by separation from the general population,

17   harsh custodial conditions, restrictions on movement, 23

18   hours or more per day locked in a cell, meals in the cell,

19   toileting in the cell.

20         THE COURT:  How much longer are you going to go,

21   Mr. Bien?

22         MR. BIEN:  About ten more minutes.

23         THE COURT:  You may proceed.

24         I'm not clear as to how this is different from all

25   the papers that you have filed, but so be it.

2108

1          You may proceed.

2          MR. BIEN:  I'll try to skip through, Your Honor.

3          Today CDCR houses 3500 Coleman Class Members in SHU

4    and administrative segregation.  Expert testimony from

5    Dr. Craig Haney, Dr. Pablo Stewart and Dr. Edward Kaufman,

6    will establish that housing prisoners with mental illness in

7    segregation in these units continue to cause unnecessary and

8    avoidable pain and suffering.

9          These units are punishment and not treatment.  It's

10   the same findings that the court made 18 years ago.  It's

11   time to end these practices once and for all.  And Your

12   Honor, only bright-line rules, time limits, and exclusion

13   orders will ever remedy these problems.

14         Your Honor, we talked a lot in the prior trial about

15   Steve Martin's "Perfect Storm."  Only by breaking the rules,

16   including the segregation rules that permit mentally ill

17   prisoners to remain in these units, will this cycle of the

18   Perfect Storm ever be broken.

19         Once a mentally ill prisoner is housed in these

20   units, even for safety, even for no fault of their own,

21   they're -- they can be caught up in the same problems that he

22   identified.  Poor treatment.  Isolation.  Seclusion.  Very

23   strict rules.  You break a rule, you stay in longer.  You're

24   punished with lack of yard, lack of activities.  The cycle

25   gets worse.  By this motion we hope to get the kind of orders

2109

1  that can finally break the cycle once and for all.

2        Defendants have received advice not only from this

3  independent panel but from their own termination experts that

4  they ignored about their segregation practices.

5        Their segregation experts, Drs. Dvoskin, Moore and

6  Scott, describe administrative segregation as, I quote, a

7  high-risk environment.  They were concerned with the high

8  rate of suicides in the segregation units.

9        Quote:

10        Because the environment is not therapeutic, the

11  placement of EOPs in these units should occur only when

12  absolutely necessary for the safety of staff or inmates, and

13  only for as long as is absolutely necessary.

14        For EOPs they were even more strident.  Quote:

15        In those cases, housing inmates with serious mental

16  disorders should be as brief as possible and as rare as

17  possible.

18        They criticize strip-search policies.  They criticize

19  use of cages for treatment.  They said there is no reason to

20  treat people who are in administrative segregation for

21  non-disciplinary reasons in cages.

22        Dr. Dvoskin testified at his deposition, quote:

23        Long-term housing in segregation may cause

24  psychological harm.

25        Dr. Moore testified that she had worked in 12

2110

1    different states and had never seen individual mental health

2    treatment given in cages.

3           CDCR's own suicide prevention experts, their own

4    experts who are charged with reviewing suicides and making

5    recommendations, recommended that, quote:

6           Placing inmates in segregation for safety concerns

7    was a dangerous practice.

8           This is Dr. Canning writing in January of 2013:

9           Many inmates who are housed in ASU at the time of

10   their deaths are placed there not for disciplinary reasons,

11   but for safety reasons.  Placement in ASU of already fearful

12   inmates may only serve to make them more fearful and anxious.

13          According to defendants' own reports to this court

14   and the Special Master, as of the most recent time period,

15   more than 700 prisoners, including more than 150 EOPs have

16   been in segregation for more than a year and some for more

17   than five years.

18          We will demonstrate, however, once again, that

19   defendants are manipulating and under-reporting this

20   information to the Special Master.

21          THE COURT:  You've told me that at least three times

22   in writing, sir.  I think you must either end this or say

23   something new.

24          I'm sorry.  I don't mean to be -- yes, I do.  I mean

25   to be quite serious.

2111

1          MR. BIEN:  Okay.

2          THE COURT:  Thank you, sir.  You may retire.

3          MR. BIEN:  Thank you, Your Honor.

4          THE COURT:  Miss Vorous, do you desire to make an

5    opening statement?

6          MS. VOROUS:  Not at this time, Your Honor, but we

7    would like to reserve that right at the beginning of

8    defendants' case if necessary.

9          THE COURT:  That will be the order.

10          Do you want to call a witness or do something else?

11          MR. FISCHER:  Plaintiffs call Dr. Craig Haney.

12          THE COURT:  You are?

13          MR. FISCHER:  My name is Aaron Fischer for

14    plaintiffs.

15          THE CLERK:  Please, raise your right hand.

16                    CRAIG HANEY,

17    was thereupon called as a witness herein by the Plaintiffs,

18    and having been sworn to tell the truth, the whole truth and

19    nothing but the truth, was thereupon examined and testified

20    as follows:

21          THE CLERK:  Please, take a seat.

22          State your name, spell your last name and speak

23    directly into the microphone.

24          THE WITNESS:  My name is Craig William Haney,

25    H-a-n-e-y.

2112

1          MR. FISCHER:  Your Honor, before I begin, I marked as

2     Plaintiffs' Exhibit 2000 an inmate-patient code so the

3     experts can refer to inmate-patients by code rather than by

4     their true names.

5          May I approach?

6          THE COURT:  You may.

7          I take it, Mr. Fischer, you do not want to move this

8     into evidence, or do you want to put it into evidence under

9     seal?

10          MR. FISCHER:  If Your Honor prefers, it can go into

11     evidence under seal.

12          THE COURT:  That will be the order.

13               (Whereupon, Plaintiffs' Exhibit 2000 received

14                into evidence.)

15                          DIRECT EXAMINATION

16     BY MR. FISCHER:

17     Q.     Good morning, Dr. Haney.

18     A.     Good morning.

19          MR. FISCHER:  Before I begin asking you a few

20     questions, just to notify the court, plaintiffs have filed a

21     number of Dr. Haney's expert reports with the court in the

22     Coleman case, including two this year.

23          I want to highlight those for the record.  The first

24     is his March 14th, 2013 report in the termination

25     proceedings.  That is Docket 4378.  And then the May 6, 2013,

2113

1  expert declaration regarding this motion, Docket 4581.

2       Dr. Haney's qualifications and experience are

3  outlined in those reports, in the March 14 report in

4  paragraphs 2 to 20 and in the May 6, 2013, declaration at

5  paragraphs 2 to 7.

6       I'd also just like to highlight the relevant

7  paragraphs in the March 14th, 2013, report for purposes of

8  this motion.  They're set forth primarily at Docket 4378 at

9  paragraphs 36 to 50, 55 to 56, 69 to 94, 107 to 110, 115 to

10  121, 124, 132 to 153, 163 to 171, 178 to 186.

11       THE COURT:  Is there no end to this?

12       MR. FISCHER:  I'm almost there.

13       THE COURT:  This is preposterous.

14       MR. FISCHER:  Okay.  I'll continue, Judge.

15       THE COURT:  Do you offer him as an expert?

16       MR. FISCHER:  We do.

17       THE COURT:  In what field do you offer him as an

18  expert in?

19       MR. FISCHER:  An expert in conditions of confinement,

20  including with respect to segregated housing of mentally ill

21  prisoners.

22       THE COURT:  Do you desire to voir dire concerning his

23  expertise?

24       MS. VOROUS:  No, Your Honor.

25       THE COURT:  The court will find he's an expert and

2114

1  may express opinions relative to those matters.

2          You may proceed, counsel.

3          You may proceed, counsel.

4          MR. FISCHER:  Thank you, Your Honor.

5          THE COURT:  Try to get to the evidence.

6          MR. FISCHER:  I shall.

7          I would like to move in the two declarations.

8          THE COURT:  Received.

9          What are the numbers?

10          MR. FISCHER:  2001 is the March 14th.

11          THE COURT:  Tell me what the numbers are.

12          MR. FISCHER:  And 2002.

13          THE COURT:  Received.

14              (Whereupon, Plaintiffs' Exhibits 2001 and 2002

15               received into evidence.)

16          THE COURT:  Ladies and Gentlemen, this court is very

17  busy.  Much of what has happened this morning is

18  unacceptable.

19          You may proceed, sir.

20  BY MR. FISCHER:

21  Q.     Dr. Haney, have you toured any CDCR segregation units

22  this year?

23  A.     Yes, I have.

24  Q.     And what institutions have you toured?

25  A.     I toured the segregation units at Mule Creek State

2115

1    Prison, at the California Institution For Men in Chino,

2    California, Corcoran State Prison, and the facility known as

3    CCI Tehachapi.

4    Q.      Doctor, you mentioned Mule Creek as well?

5    A.      Yes.

6    Q.      What was the purpose of those tours, Dr. Haney?

7    A.      I was retained to evaluate conditions of confinement,

8    and in particular, whether or not conditions of confinement

9    at those facilities had changed in light of the reduction in

10   population.

11          It was my understanding there was a termination

12   motion before the court, and I had evaluated some of these

13   facilities earlier with respect to overcrowding, and I was

14   asked to come back and evaluate whether or not changes had

15   taken place and in particular concentrate on segregated

16   housing units in those facilities, which I did.

17   Q.      Thank you.

18          Can you describe some aspects of your review as part

19   of those tours?

20   A.      Yes.  I reviewed an extensive number of documents

21   before I conducted the tours, that included the Special

22   Master's reports about the particular facilities that I was

23   visiting, there were statistical documents, various

24   Department of Corrections' summary documents having to do

25   with things like suicide, overcrowding reduction, staffing

2116

1    levels and so on.

2         In addition to that, I actually conducted -- when I

3    conducted the tours, oftentimes we were given additional

4    information by the staff.  So I collected the documentation

5    which was handed to us in the course of the tour.

6         I conducted the tours.  In the course of the tours I

7    was asked to identify particular scenes in the prisons that I

8    thought would be appropriate to photograph.  So I directed

9    correctional officers who were accompanying us with a camera

10   to take photographs of particular parts of the prison.

11        I conducted interviews, typically also in addition to

12   writing the names of the prisoners who I talked to, their

13   Department of Corrections numbers, so that documents could be

14   requested afterwards.

15        We did request those documents.  I reviewed them.

16   They were provided to us.  We -- your office copied them.  I

17   subsequently reviewed them.

18        There was a great deal of document review in addition

19   to the tours themselves.

20   Q.   Dr. Haney, during your tours did you speak with staff

21   at the institutions regarding any of the inmate-patients that

22   you reviewed?

23   A.   Yes.  We did ongoing conversations in the course of

24   the tour.  We were accompanied on the tour by a number of

25   staff members.  From time to time I talked with staff members

2117

1    about particular inmates.

2            There were a few occasions in which an inmate

3    appeared to be in acute distress.  And so in these few

4    occasions I talked to the clinical staff about a particular

5    inmate.

6            We received information as we went through the tour

7    from the staff, in addition to a briefing which we typically

8    had as the day began each morning at each facility.

9    Q.      Dr. Haney, during your tours of the CDCR segregation

10   units, did you have any photographs taken?

11   A.      I did.  Yes.  I directed or requested a number of

12   them taken.

13   Q.      Dr. Haney, can you look at that in your binder.

14           MR. FISCHER:  Your Honor, you also have it, the

15   exhibits in the same binder.

16           THE COURT:  Do defendants have a copy of the binder?

17           MR. FISCHER:  They do.

18           THE COURT:  You may proceed.

19   BY MR. FISCHER:

20   Q.      The exhibit numbers I want to direct your attention

21   to are 2003 through 2032.

22           Dr. Haney, are those photographs that you just

23   referred to that you had directed taken during your tours?

24   A.      Yes.  Some of them.  There were quite a few

25   photographs taken.  These are some of the photographs.  Yes.

2118

1              MR. FISCHER:  Your Honor, I would ask Exhibits 2003

2    through 2032 be moved into evidence.

3              THE COURT:  Hearing no objection, they are received.

4                   (Whereupon, Plaintiffs' Exhibits 2003 through

5                    2032 received into evidence.)

6              MR. FISCHER:  I would ask that as Dr. Haney describes

7    them, permission to publish them.

8              THE COURT:  You may proceed.

9              If you publish them, then I don't have to look for

10   them.

11             Go ahead.

12   BY MR. FISCHER:

13   Q.     Dr. Haney, before we turn to photographs, can you

14   describe some of the significant features of CDCR segregated

15   housing units that you considered and found to be significant

16   in the course of your review?

17   A.     Yes.  These segregated housing units go, Your Honor,

18   by a number of different terms and names, but they are all

19   extremely isolating environments.

20             They are environments that really deprive the

21   prisoners who are contained in them of meaningful social

22   contact at almost every level.

23             There is an unusual feel about a prison housing unit

24   in which the prisoners are rarely allowed out of their cells.

25   So there are dayroom areas and so on that are empty where no

2119

1  activity is taking place, where all the prisoners are living

2  their lives inside their cells.

3        Indeed, the prisoners in all of these units, whether

4  administrative segregation or security housing units are

5  basically living their lives inside their cells 22 to 23

6  hours a day at best in most instances, which means, of

7  course, that they eat and sleep and defecate in their cells.

8        They're denied contact visits so they can go for

9  months or years without having the opportunity to touch

10  another human being with affection.

11        They are rarely let out of their cells.  And when let

12  out, they are placed in restraints before they leave their

13  cells.

14        They are, in addition, strip-searched if they leave

15  the actual housing units in which they are confined.

16        So this means if they are escorted to an exercise

17  area which is separated from the housing unit, they will be

18  strip-searched both when they leave and when they return.

19        If they happen to be taken to a treatment area which

20  exists outside of the housing unit, they will be

21  strip-searched before they leave that unit, they will be

22  strip-searched on the way back, to and from treatment.

23        The exercise areas themselves are euphemistically

24  referred to as "yards," but in fact they share a common

25  caged-in feeling.  Prisoners in these units exercise --

2120

1   typically exercise in individual exercise cages.  The

2   exception to that is Pelican Bay where the exercise area is

3   an individual, concrete, enclosed area.

4        The treatment which the prisoners receive is in some

5   ways similar to the exercise limitations which are imposed on

6   them, which is to say they receive treatment as well in

7   cages -- in the individual treatment cages.

8        Sometimes this cages are individual cages that are

9   arrayed on the dayroom floor.  Sometimes they are -- there

10  are several cages in a semicircle or in a row that ostensibly

11  provide opportunities for group treatment.

12       But these cages exist even in the separate, dedicated

13  treatment area separate from the housing units.  So

14  oftentimes in these units there will be individual cages and

15  collections or clumps of cages inside the treatment units.

16       Basically, prisoners are never outside of or free of

17  being either confined in their cells or confined in a cage or

18  in restraints being escorted to one place or another.

19       It is, in many respects, a desperate and despairing

20  existence.  People are in pain in these units.  They express

21  it.  It is not surprising.  There is large literature which

22  documents the effects of living like this on even normal,

23  healthy people.  The effects are all the more acute for

24  people who are suffering from mental illness.

25  Q.       Dr. Haney, you mentioned some of your opinions as to

2121

1    conditions in the segregated units.

2         Did you reach any other overall conclusions regarding

3    the placement of prisoners in these CDCR segregated housing

4    units?

5    A.    Yes.  I reached conclusions with respect to the

6    mentally ill who are in these environments which, as I

7    alluded to a moment ago, in my opinion, are suffering even

8    more than normal, healthy people suffer in these kinds of

9    environments.

10        The reasons for that are relatively straightforward.

11   These are difficult, painful, stressful environments for

12   human beings to live in.

13        More fragile and vulnerable mentally ill prisoners

14   are more susceptible to the pains of this kind of

15   confinement, to the painful nature of their existence, the

16   stressful nature of the confinement.  They are more likely to

17   break down in the face of this kind of overwhelming stress

18   and deprivation.

19        In addition, people who are mentally ill are placed

20   in environments in which the environments themselves mimic or

21   create parallel reactions in even normal people.  And when

22   these parallel reactions are similar to the symptoms of the

23   mental illness, then that exacerbates or adds onto the mental

24   illness.

25        Let me explain what I mean by that.

2122

1          Normal, healthy people who are confined in these

2     environment oftentimes feel depressed and hopeless.  A

3     prisoner who enters this environment already having been

4     diagnosed with clinical depression is thus being subjected to

5     an environment that adds on to that already preexisting

6     depression.

7          Prisoners who have impulse disorders as part of the

8     mental illness are being placed in environments that

9     frustrate and render impulsive even normal, healthy people.

10    So subjecting them to that kind of additional level of

11    frustration aggravates and exacerbates the underlying mental

12    illness.

13         People who are diagnosed with psychotic disorders

14    have a difficult time managing their internal stimuli, their

15    internal mental state.

16         People who are placed in these environments who are

17    normal and healthy will report that they too have a difficult

18    time managing their internal stimuli.  They find their mind

19    wandering.  They find they have racing thoughts.  They get

20    anxious.

21         If somebody has a preexisting disorder in which they

22    can't -- that the feature of the disorder is they can't

23    manage their internal life, placing them in an environment

24    where all they have is an internal life, that is they have no

25    life outside that cell, is profoundly disorienting and

2123

1    disrupting for them.

2           And I encountered all of these things taking place in

3    these units.  In prisoner after prisoner that I interviewed

4    they talked about the pain of this existence, of the

5    difficulties that they were confronting.

6           I only spoke to mentally ill prisoners of course, and

7    they were overwhelming in talking to me about --

8    overwhelmingly consistent in talking to me about what was

9    happening to them in this environment.

10          The other thing which you see and I saw in the cases

11   of the people who I interviewed and in the files that I

12   reviewed, a pattern which is not unique to the mentally ill,

13   but what you see more vivid and more often is I heard

14   allusions made earlier to a "Perfect Storm."

15          I like to think of it as a kind of destructive cycle,

16   but it has the same dimensions to it.  Mentally ill prisoners

17   oftentimes find stress of just general prison confinement

18   difficult.  They may act out and get a rule violation.

19          In the California system this means that they will

20   end up in an administrative segregation unit or a security

21   housing unit.  But the stress of that kind of confinement

22   oftentimes exacerbates the mental illness, and they act out

23   even more or they deteriorate in the face of it.

24          They may -- one form the cycle takes is they get more

25   disciplinary violations, and that leads them to even longer

2124

1    periods of time being placed in this disciplinary-punishment

2    kind of environment.

3        The other thing that happens, the other kind of

4    circle that takes place is they can decompensate in the face

5    of this stress.  The decompensation leads them sometimes to

6    be placed in another unit, whether a Mental Health Crisis Bed

7    or Department of -- or a mental health facility, where they

8    may be stabilized.  But then they end up being returned to

9    the very environment which is exacerbating their mental

10   illness.

11       This cycle repeats itself.  Decompensation, taken to

12   an environment where they can be stabilized, returned to the

13   severe environment of deprivation in the segregated housing

14   unit, and the decompensation cycle begins again.

15       The other feature that I encountered in these units,

16   and it is not surprising, but is very problematic, the way in

17   which the units themselves are structured and run, Your

18   Honor, make it very difficult to deliver meaningful,

19   effective mental health care.

20       THE COURT:  That's another subject, and I'm sure

21   counsel will inquire as to it.

22       You may proceed, counsel.

23   BY MR. FISCHER:

24   Q.    Dr. Haney, did you reach any overall conclusions

25   regarding the ability to deliver mental health treatment in

2125

these segregated housing units in CDCR?

A.      Yes.  In my opinion the impediments, as they
currently exist, are insurmountable.

        The environments themselves are simply not set up to
allow mental health treatment to occur in a meaningful way
within the segregated housing unit itself.

        I've already alluded to or described the treatment
cages.  We'll talk about them I guess, again, when we show
the photographs, but these are environments that do not allow
for confidential treatment.  They don't allow for the kind of
give and take between a therapist and a prisoner-patient that
make would make the prisoners comfortable to receive the
treatment.

        The kind of security procedures which are used, we've
already talked about the strip searches for prisoners taken
outside of the unit to receive the treatment.  In theory, a
good thing.  But they have to be strip-searched before they
leave.  They are strip-searched when they come back.  Even
when they go to a dedicated treatment area elsewhere in the
prison, they find themselves in cages and in these kinds of
very constrictive arrangements.

        It's difficult, if not impossible, for even the best
intentioned, well-meaning, dedicated correctional treatment
staff or personnel to overcome those kinds of obstacles to
treatment.  And what -- indeed, what I saw suggested they're

2126

1    very clearly not overcoming them.

2    Q.      Dr. Haney, did you reach any overall conclusion based

3    on your review of the overall population of mentally ill

4    inmates in segregation?

5    A.      Yes.  Especially given everything I've said about

6    what these kinds of environments do to people who are

7    mentally ill and how difficult it is to provide even a basic

8    minimum of treatment to them, it's my opinion that there are

9    far too many people in these units, far too many mentally ill

10   inmates housed in these units.

11          The department appears to depend to a degree on the

12   use of these units to manage the mentally ill population in

13   the prison system, and that has not abated as the population

14   has reduced.

15          In addition, these people, the too many of them who

16   are there, are kept there for far too long a period of time.

17   So as you will see, Your Honor, they're not subjected to

18   these very, very harsh, punitive conditions for brief periods

19   of time, these are not transitional units, if you will, these

20   are units where people spend months and sometimes years

21   experiencing the kinds of conditions I've described.

22   Q.      Dr. Haney, I went to ask you a few questions about

23   each of the types of segregation units you reviewed.

24          Are you familiar with CDCR's administrative

25   segregation units?

2127

1    A.      Yes.

2    Q.      Did you tour these units during your tours earlier

3    this year?

4    A.      I did at each of the four prisons I visited I toured

5    administrative segregation units, yes.

6    Q.      Incidentally, have you toured CDCR segregation units

7    previously to the four tours you described earlier?

8    A.      Yes.

9    Q.      When was that?

10   A.      It was in 2007-2008, as I recall.

11   Q.      And what was the impetus for those tours?

12   A.      It was in conjunction with an evaluation of the

13   conditions of overcrowded confinement and whether or not the

14   overcrowding was the primary cause of a number of other

15   constitutional issues or problems that existed in the prison

16   system.

17   Q.      Turning now to the CDCR ASUs or the administrative

18   segregation units, have you reviewed the Title 15 regulations

19   regarding these units?

20   A.      Yes.

21   Q.      And what do they tell you about the intended use of

22   these ASUs?

23   A.      The most important thing they tell you is these are

24   intended as temporary units.  They're intended for temporary

25   confinement, ostensibly to deal with an immediate problem,

2128

1   either a conflict or a security concern or a potential threat

2   to an inmate, which is -- which requires that inmate to be

3   removed from his ordinary or normal housing unit and confined

4   on a temporary basis until the prison system can find a safe

5   and appropriate bed for this prisoner elsewhere, either

6   elsewhere in that prison or elsewhere in the prison system.

7   Q.      Dr. Haney, based on your review, how are these CDCR

8   administrative segregation units used in reality for

9   prisoners with mental illness?

10  A.      Well, in reality there are two very serious problems

11  with the way in which they're being used for mentally ill

12  prisoners.

13         The first is that they appear to be being used as

14  almost storage units for prisoners who don't have beds

15  elsewhere in the system.  That is to say they're not there

16  for disciplinary reasons, not because there is any

17  disciplinary issue or conflict which is being investigated,

18  but rather the system itself, for various reasons, doesn't

19  have an appropriate bed for this particular prisoner.

20         It may be a prisoner who is intended to be

21  transferred somewhere else or it may be a prisoner who simply

22  doesn't have a bed in the institution itself.  And this lack

23  of bed is what is leading the -- what is justifying this

24  placement in a very harsh administrative segregation unit.

25         The other area of grave concern is the length of time

2129

1  which people are spending in these units.  These are not --

2  contrary to Title 15, these are not being used as places of

3  temporary confinement.

4        I encountered people who were in these units for

5  months.  Some of the prisoners were being held in them for

6  more than a year.  Again, not because they had committed a

7  disciplinary infraction, not because they were be punished,

8  ostensibly because they were being punished, but rather

9  because there was no appropriate bed elsewhere in the system

10  for them.  And they were sitting in this otherwise very

11  deprived, very painful unit waiting to be housed somewhere

12  else.

13        THE COURT:  Do you understand this to be at least in

14  part -- I'm asking you, not telling you, I don't know -- in

15  part the result of the overcrowding so that there isn't ease

16  in shifting people to other places?

17        Is that your understanding?

18        THE WITNESS:  I think, Your Honor, much of it is.

19  There is still, despite reduction in overcrowding, there is

20  still a lack of beds -- appropriate beds in the system.

21        So you've got people who have been endorsed to go

22  elsewhere, but there is no bed available at that other

23  facility.  And so they sit in administrative segregation as a

24  kind of stop gap solution.

25        THE COURT:  I'm sorry.  I'm going to take the Doctor

2130

1    off to an entirely different place than I think -- well, than

2    I know you're -- One of the problems of the three-judge court

3    was trying to fix a number.  Any number is in some sense

4    arbitrary, but we try and make some judgment about it.

5              There was testimony which the court found simply

6    incompatible with reality, that you wanted to keep prisoners

7    at 100 percent because that way you really could just move

8    people with ease and avoid very problems that you are talking

9    about.

10             We arrived at the figure of 137.5 mostly as trying to

11   compromise all of the conflicting needs.  You know, these are

12   prisons after all.

13             Is it your view, as you sit here now, that if they

14   could reach 137.5, there would be such a -- asking you, not

15   telling you -- such a substantial reduction in population

16   that the problems of freely moving people who need it without

17   placement in ASUs at the extreme levels of confinement would

18   be possible?

19             THE WITNESS:  As someone who sympathizes with the

20   court's dilemma in this regard, having participated in

21   exactly that process of trying to come up with that number,

22   let me say two things.

23             One is that I think arriving at the target of 137.5

24   percent would improve the process by which putting people in

25   the appropriate beds can happen.

2131

1          I also think that something else has happened in the
2    course of the overcrowding, and somehow this to needs to be
3    broken through in addition to reducing the overcrowding per
4    se.  That is I believe that as a result of the overwhelming
5    overcrowding which the system faced through the early 2000s
6    up until the three-judge court's order, the California
7    Department of Corrections has used segregation to manage
8    problems, and in particular has used segregation to manage
9    the problem of what to do with mentally ill prisoners in the
10   absence of appropriate treatment space and appropriate
11   treatment resources elsewhere in the system.

12          As you'll see, even though the overcrowding has been
13   reduced, the use of segregated housing for mentally ill
14   prisoners has increased or at least stayed the same over the
15   period of time.

16          I think that's a residue of a system that was so
17   overwhelmed with numbers that it had to make a kind of
18   expedient decisions about what to do with people, housing
19   people in clearly inappropriate place, putting mentally ill
20   prisoners in segregation because that was a quick solution
21   and keeping them there because they couldn't find a bed
22   elsewhere.

23          And that, I'll call it a culture for lack of a better
24   word, that practice, that way of approaching these problems,
25   in thinking about mental patients who are prisoners in

2132

1    security rather than treatment terms, remains.  It persists.

2         So these units are still run as though they are

3    expedient units in an overwhelmingly overcrowded system.

4    There's still too much overcrowding in the system.  That is

5    clear.  But I think in addition to remedying that

6    overcrowding, something needs to be done to break that

7    approach to handling the mentally ill, who are really

8    suffering in these environments.

9         That may have been the only thing we could have done

10   in the early 2000s, but now as population is coming down, it

11   presents us with an opportunity or really even maybe a

12   responsibility or demand to do it different, to do it better,

13   to do it in a way that really does respond to their needs.

14        THE COURT:  Thank you.

15        I apologize, counsel, for taking the Doctor away from

16   your testimony, but there are reasons why I wanted to know

17   the answer.

18        You may proceed.

19        MR. FISCHER:  Your Honor, this is an important

20   section so for consistency I'm going to move the Doctor to

21   this subject matter because we also think it is important.

22   BY MR. FISCHER:

23   Q.   Dr. Haney, you were talking about your analysis of

24   population trends vis-a-vis overcrowding.

25        I want to focus your attention on that if that is

2133

1    okay.

2           As part of your review, did you look at the

3    population trends for prisoners with mental illness in CDCR

4    segregation units over time?

5    A.      I did.  Yes, I did.

6           MS. VOROUS:  Objection, Your Honor.  Population

7    trends were not the subject of Dr. Haney's declaration and/or

8    deposition testimony.  So to the extent this line of

9    questioning goes beyond his previous testimony, we would

10   object on that basis.

11          MR. FISCHER:  My response, Your Honor --

12          THE COURT:  Yes, please.

13          MR. FISCHER:  In Dr. Haney's March 2013 expert

14   declaration he discussed quite a bit the comparisons in terms

15   of segregation population, overall population, overcrowding

16   and the interaction of those things with conditions in

17   segregation units.  And this just elucidates that opinion.

18          THE COURT:  That objection is overruled.

19          You may proceed.

20   BY MR. FISCHER:

21   Q.      Dr. Haney, what was the reason for your wanting to

22   look at the population trends of mentally ill prisoners in

23   CDCR segregation units as part of your review?

24   A.      Well, it connects to what His Honor and I were just

25   talking about.

2134

1    The expectation that I, and I believe other people

2    had, with respect to the effects of the reduction in

3    overcrowding was that a number of the problems that were

4    encountered in 2007 and 2008 would be more readily remedied

5    or addressed once the population began to decrease and once

6    it had, in fact, decreased at a significant level.

7    And I think in some respects there are ways in which

8    that has happened, but this particular area, it appeared to

9    me as I went on these tours, not to reflect that.

10   And I was interested in whether or not there were

11   data -- system-wide data.  I looked at four prisons.  I was

12   struck with what I was seeing in those prisons about the

13   number of mentally ill prisoners who were in the segregated

14   housing units and the numbers that I was being told about,

15   how long they were staying there, that perhaps this wasn't

16   changing, that this was not being remedied in a way that was

17   commensurate with the reduction in population.

18   So I asked for and got the data with which to compile

19   an analysis of the population changes over time for the whole

20   system, and in particular whether there were reductions in

21   the total population of mentally ill prisoners in the system,

22   and then what was happening with the segregation of the

23   mentally ill in the prison system as the overall population

24   was being reduced to see whether as the population was

25   reduced that the number of mentally ill was coming down and

2135

1    the number of mentally ill in segregated housing was coming

2    down proportionately.

3         So that was the question I asked of the data, and

4    that's the analysis I provided you.

5    Q.    Dr. Haney, what data did you rely upon for this

6    analysis you just described?

7    A.    So these -- the data are presented in tab 2038.  And

8    it's data that comes -- there were actually a couple of

9    source of data.  Some of it was from the Department of

10   Corrections website.

11        There's overall population data which is provided on

12   a weekly basis.  To summarize it we -- I presented it here on

13   a quarterly basis, but it is part of the Department of

14   Corrections website database historical archive which gives

15   you the population figures over time.

16        So one of the charts I'm going to show you is overall

17   population.  That comes from that website.

18        There's also a break down of where prisoners are and

19   where the mentally ill prisoners are in this system and

20   whether and how many of them there are in the system.

21        So you're able to calculate the total number of

22   mentally ill prisoners in the system.  And that's on another

23   chart that I will show you in a moment.

24        And then it is possible to, from other data that the

25   department provides, to develop calculations of where they

2136

1    are in the system, how many mentally ill prisoners are in

2    different housing units.  So how many of them are in

3    administrative segregation, how many of them are in security

4    housing units.

5          So with all the department's data is it is possible

6    to look at changes over time.  I picked 2000 just because it

7    allows us to chart the increase in population that was taking

8    place between 2000 and around 2007-2008 when the three-judge

9    court issued its order.  And then there were the significant

10   reductions in population that took place after that.  So

11   we've -- I've got charts here which illustrate that from the

12   year 2000 up until 2013.

13         So overall population, mentally ill, and then where

14   the mentally ill are in the system with respect to segregated

15   housing.

16   Q.    Doctor, I would like to turn your attention to

17   Exhibits 2035, 2036, 2037.

18         Are those the charts you're referring to?

19   A.    Yes, they are.

20         MR. FISCHER:  Your Honor, I would like to move into

21   evidence 2035, 2036, 2037, the three charts, as well as the

22   underlying data Dr. Haney explained to the court at 2038.

23         MS. VOROUS:  Objection, Your Honor.  We would object

24   to all of these charts.  The first time we saw these charts

25   was Friday afternoon.

2137

1        I don't believe there has been any foundation that

2   these charts were created by Dr. Haney.  We have not had an

3   opportunity to question him on any of these charts.

4        THE COURT:  I will provide you with voir dire right

5   now if you want as to how they were accomplished and so

6   forth.

7        I thought I understood it.  The doctor seems to be

8   testifying he took it all essentially from your own data.

9        But if you want to examine, I certainly will permit

10  you to do so.

11       MS. VOROUS:  Yes, Your Honor, I would like to.

12       THE COURT:  All right.

13                    VOIR DIRE EXAMINATION

14  BY MS. VOROUS:

15  Q.     Dr. Haney, let's start with chart 2035.  Did you

16  personally create this chart?

17  A.     Yes.  I did it in conjunction with some paralegals at

18  Mr. Fischer's office, but I selected the data, described the

19  analysis, and checked the numbers that were inputted, and

20  essentially created it.  Yes.

21  Q.     When did you create it?

22  A.     Well, I worked on it over the last couple of weeks

23  actually.

24  Q.     Doctor, let's look at Plaintiffs' Exhibit 2036.

25  A.     Yes.

2138

1    Q.      And did you create this chart as well?

2    A.      Yes.

3    Q.      And again, was this created with the assistance of

4    plaintiffs' paralegals?

5    A.      Yes.  I requested the data.  The data was provided.

6    It's Department of Corrections' data and the sources of which

7    are in the subsequent tab.

8            I instructed the data that needed to be inputted.  I

9    checked the inputting of the data.  I supervised the graphing

10   of the data.  We used an Excel Program.  So you input the

11   data and it produces an analysis or summary.  There is a

12   graphing feature.  You can have it graph the data.  That's

13   what I did.

14   Q.      And again, when did you complete this chart -- or

15   work with plaintiffs' counsel to complete the chart?

16   A.      I completed it.  I worked with them and it was over

17   the last couple of weeks.

18   Q.      Doctor, did you do an analysis of data from, let's

19   say, April 2001 to September 2013?

20   A.      I believe it was an analysis that began in April of

21   2000.  I started -- I selected 2000 as the beginning point.

22   Q.      Why did you select 2000?

23   A.      I mean, because it allowed me to track the increase

24   in population so you could see the trend that began in 2000.

25   You know, I had a question about how far to go back.  I know

2139

1    the population was increasing even before then.  I thought we

2    needed a beginning point.  So that seemed to me to give us a

3    good snapshot of what the population looked like in 2000 and

4    how it increased over time until it reached the crisis point

5    in 2007-2008.  Then, of course, I took it from 2008 up until

6    the present.

7    Q.    Doctor, how did you calculate that there was an

8    increase of -- a 73 percent increase in the total mental

9    health population between 2002 and 2013?

10   A.    Simply by comparing the numbers, by comparing the

11   number of people -- the number of people who were in these

12   units.

13        If you're talking about 2037, it's the overall --

14   it's the overall number.  For example, the overall number, if

15   you are looking at the CCCMS population in administrative

16   segregation, you look at the number who were in

17   administrative segregation in April 2000 and you compare that

18   to the number who were there in October or September of 2013.

19   Q.    Did you calculate the increase?

20   A.    Yes.  I mean, obviously the statistics program

21   calculated it, but it's an Excel Program.  And, you know,

22   it's a fairly straightforward calculation.

23        I had some other calculations that I was playing

24   with, but they were far too complicated.  They were difficult

25   for me to explain, and they didn't graph in a particularly

2140

1    clear way, having to do with percentages and so on.  So I

2    thought this was just a much more straightforward way to

3    present the data.

4    Q.    Let's look at Exhibit 2037.

5          THE COURT:  I'm going to stop you because we've

6    reached noon, and perhaps you can -- well, we've reached

7    noon.  We'll reconvene at 1:30.

8          (Off the record at 12:00 p.m.)

9                       ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2141

1          SACRAMENTO, CALIFORNIA

2      TUESDAY, NOVEMBER 19, 2013, 1:36 P.M.

3                  ---o0o---

4          THE COURT:  Ms. Vorous, you were on voir dire.  You may

5    continue.

6          MS. VOROUS:  Thank you, Your Honor.

7                  CRAIG HANEY,

8    was thereupon called as a witness herein by the Plaintiffs, and

9    having been previously sworn to tell the truth, the whole

10   truth, and nothing but the truth, was thereupon examined and

11   testified further as follows:

12               VOIR DIRE EXAMINATION (Continued)

13   BY MS. VOROUS:

14   Q.    Dr. Haney, just a couple more questions with respect to

15   the exhibits we've been discussing, including Plaintiffs'

16   Exhibit 2037.

17         Doctor, wouldn't you agree that you did not discuss

18   population trends dating back to 2000 in either of your

19   declarations that you submitted in this case?

20   A.    No, I wouldn't agree.  I -- I submitted a declaration

21   in March which talked about overcrowding, the effects of

22   overcrowding, made reference to the analysis of the court's

23   opinion in 2007 and 2008, and my own analysis of the effects of

24   overcrowding on many of the things that I talked about in that

25   declaration.  So I didn't prepare a chart like this, but I

2142

 1    certainly talked about overcrowding trends and the impact of

 2    the increased overcrowding that had been taking place in the

 3    preceding years.

 4    Q.      But your discussion didn't go back to 2000; isn't that

 5    correct?

 6    A.      Well, it certainly did.  I talked about increased

 7    overcrowding.  I -- I made reference in the 2013 report to my

 8    analysis in 2007 and 2008.  And that certainly was an analysis

 9    which talked at length about the effects of the increased

10    overcrowding in the Department of Corrections.

11          In fact, I think I even in that 2007-2008 report went

12    all the way back to the 1990s talking about population trends.

13    I referred to all of that in the 2013 report.

14    Q.      Okay.  And with respect to your deposition that was

15    taken on I believe July 10th, 2013, of this year, you did not

16    produce these graphs at that time either, correct?

17    A.      No, I didn't.  I constructed them over the last month

18    or so, as I testified earlier.

19          MS. VOROUS:  No further questions.

20          THE COURT:  Objection or not?

21          MS. VOROUS:  Yes, Your Honor, I'm still objecting on

22    the same basis.

23          THE COURT:  Overruled.

24          You may proceed, Mr. Fischer.

25          (Off-the-record discussion with Courtroom Deputy.)

 1                THE COURT:  As I understand it, they haven't been

 2      offered into evidence yet.

 3                MR. FISCHER:  I will offer them shortly.

 4                THE COURT:  All right.

 5                MR. FISCHER:  Your Honor, I would ask that Exhibits

 6      2035, 2036 and 2037, the three charts, as well as the

 7      underlying data that the doctor described at Exhibit 2038 be

 8      moved into evidence.

 9                THE COURT:  Received.

10                     (PLAINTIFFS' EXHIBITS 2035 through

11                     2038 ADMITTED INTO EVIDENCE.)

12                MR. FISCHER:  And, Your Honor, may I have permission to

13      publish?

14                THE COURT:  Yes, they're in evidence.

15                     DIRECT EXAMINATION (Continued)

16      BY MR. FISCHER:

17      Q.       Dr. Haney, if I could direct your attention to Exhibit

18      2035.

19               Can you please explain what this chart shows and why

20      it's relevant to your analysis.

21      A.       Yes.

22               It's a graphic depiction of the changes in the overall

23      population in state institutional population in the California

24      prison system beginning in 2007, and you can see it peaks in

25      around July, October of 2007.  That's when there was activity

2144

1   by the three-judge court and a lot of litigation surrounding

2   the issue of overcrowding.

3        I picked the year 2000 because that's sort of the

4   halfway point in this -- in this trend.  So if you view that,

5   that midpoint as when it was at its highest, the population,

6   then going back to 2000 was -- is sort of back the equal number

7   of years before then and then after that.

8        You can see a consistent drop in population from 2007

9   on.  The very steep drop occurs in October 2011, January 2012.

10  I would attribute this to the implementation of a number of

11  things, but particularly AB 109.  And you see the population

12  going down, umm, dipping below 125,000.

13  Q.    Okay.  I'm going to direct your attention now to

14  Exhibit 2036.

15       And, Dr. Haney, same question.  Could you walk us

16  through what this chart shows and why it's relevant to your

17  analysis.

18  A.    So this is a calculation of the total mental health

19  population in the system for the same exact time period,

20  derived from largely the same data, but all from Department of

21  Corrections data.

22       And what it shows is that, quite surprisingly to me,

23  ah, the mental health population has not decreased

24  correspondingly.

25       So if you -- if you think about the graph we just

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

2145

1    looked at, the overall population, you see that there was a

2    fairly consistent and -- and fairly steep decrease in

3    population beginning in the mid 1970s -- or excuse me -- two

4    thousand seventy -- in 2007.  That's not matched by -- there is

5    no corresponding decrease of the mental health population.  And

6    in fact, as you can see, the mental health population continues

7    to increase from 2007 peaking, what appears to be a peaking

8    point in around 2011.

9            It drops a bit and begins to go back up, but it's

10   not -- it's not a trend line that looks anything at all like

11   the trend line of the overall population.

12           Significant to me, because I would have expected this

13   to look very different.  I would have expected there to have

14   been not necessarily a one-to-one correspondence, but a rough

15   matching or an approximation of the -- of the population trend

16   lines for the mentally ill that related in some significant way

17   to the population trend lines for the overall prisoner

18   population.  That's clearly not the case.

19   Q.      Have you been able to draw any conclusions from the

20   lack of decrease during this time period?

21   A.      I have some hypotheses, but I need to be honest and say

22   I'm not sure how to distinguish between them.

23           It is possible that there was -- there is for some

24   reason an increase in the number of mentally ill prisoners

25   coming into the system.  I don't have any data to suggest that

2146

1    that's the case, but that's one possible explanation for why

2    that number would continue to increase and then begin to level

3    out, even though the overall population was decreasing.  That

4    is that there was a change in the mix of prisoners coming into

5    the system.  That's possible.

6            The other possibility is that for some reason mentally

7    ill prisoners are staying in the system longer.  That is

8    perhaps because they're getting higher numbers of rules

9    violations which are extending their time in prison.  But --

10   but perhaps, for whatever reason, they're not going out the

11   other end of the system as quickly as non-mentally ill

12   prisoners are.

13           And the other possibility is some number of prisoners

14   who are becoming mentally ill in prison, and that they -- and

15   that they therefore would increase or help to explain the

16   increase or at least not decrease the overall number.

17           It may some combination of those three.  There may some

18   fourth hypothesis that I haven't considered.  Without more

19   data, I'm hard-pressed to figure that out.

20           I tried hard, I looked at whatever available data was

21   there, and I just don't have the information with which I could

22   provide a credible interpretation of why that's the case.  It's

23   a bit of a mystery frankly.

24   Q.      Dr. Haney, now turning your attention to Exhibit 2037,

25   the third of the three charts.  This is the chart entitled

1    MHSDS population and segregation for the same time period.

2          Can you describe what's in this chart?

3    A.    Yes.

4          This is a chart of grave concern to me.  Because what

5    it indicates is that the numbers of mentally ill prisoners who

6    are housed in some form of segregation not only increased over

7    time and didn't decrease, but increased at a rate which is

8    greater than the rate of increase in the mental health or

9    mentally ill population overall.

10          So if I could just direct you for a moment back to

11    2036.  You can see that my calculation of the difference from

12    2000 to 2013 reflects a 73-percent increase overall in the

13    population of the mentally ill in the Department of

14    Corrections.  If you go back now to 2037, you see that each one

15    of those percentage increase calculations is higher, in some

16    instances much higher, but every one of them is higher.

17          THE COURT:  Will you help me, please, Doctor.  I'm

18    having trouble reading.

19          Tell me what the four lines represent, if you will.

20          THE WITNESS:  Yes.

21          The four lines represent the overall number of -- for

22    example, if we look at the green line, Your Honor, at the top,

23    these are the number of CCCMS patients in administrative

24    segregation.  And it starts with 2013.  There are somewhat less

25    than a thousand of them.

1          Excuse me.  It starts with 2000.  If you look at the

2    far left, April 2000, there are somewhat less than a thousand

3    of them in CCCMS and administrative segregation.  You can see

4    that this -- and these are numbers that are plotted, so we did

5    it on a quarterly basis.

6          So illustrated here are the increase in the number of

7    the CCCMS prisoners in administrative segregation.  And by

8    October of 2013, you can see that there are just short of 2,000

9    in administrative segregation.  That represents a 110-percent

10   increase overall, almost a doubling of the number of mentally

11   ill prisoners who are CCCMS prisoners in administrative

12   segregation.

13         So the overall number of prisoners in the system

14   increased by seventy -- mentally ill prisoners increased by 78

15   percent, but the number in administrative segregation increased

16   at an even greater rate.  And therein I think is -- is an

17   indication, it's not dispositive, but it is an indication of

18   something I alluded to earlier, which is the Department of

19   Corrections' dependency on the use of segregation to manage the

20   mentally ill population and its increased use of those

21   techniques.

22         You can see it increases for the CCCMS in ad seg quite

23   dramatically.  Even though there is a decrease in the overall

24   overcrowding in the system, it doesn't decrease at all.  There

25   are -- as I said, there are nearly twice as many or more than

2149

1    twice as many CCCMS ad seg prisoners in 2013 as there were in

2    the year 2000.

3          And there are similar kinds of increases.  You can

4    see -- for example, Your Honor, if you look at the blue line,

5    this is -- this represents the number of EOP, the most

6    seriously mentally ill in administrative segregation, and that

7    number has increased 401 percent or four times in 2013 the

8    number of those patients in administrative segregation in 2000.

9          And -- and the amounts of increase are, as I said,

10   greater than the overall increase of mentally ill prisoners in

11   the system.  Suggesting that not only are there more mentally

12   ill prisoners in the system, but even disproportionately more

13   of them are being placed in either administrative segregation

14   or security housing or psychiatric services unit.

15   Q.      BY MR. FISCHER:  Dr. Haney, walk us through the last

16   two lines, the red line and I believe the purple line, just for

17   the benefit of the -- of the Court.

18   A.      Sure.

19          So let's start at the bottom, the purple line.  This is

20   not surprisingly the lowest number.  These are the EOP

21   population in the security -- the psychiatric services unit.

22   It's a small number of prisoners to begin with, but you can see

23   that even this number has increased considerably over this

24   13-year period of time.  It's -- it's essentially doubled over

25   this period of time.

1          And, you know, in a certain sense what's most troubling

2     is the last part of these graphs in each case.  Because there

3     is -- there is no decrease -- you have a decrease in the

4     overall prisoner population.  It's not going down for the

5     mentally ill prisoners who are being placed in segregation.

6          THE COURT:  Let me ask you this.  You've indicated

7     that, for whatever reason, we may not know the reason, the

8     number of mentally ill prisoners has not decreased despite the

9     decrease in population.

10         Is the increase in the placement of mentally ill

11    prisoners in segregated housing, does it reflect on a

12    one-to-one basis, so to speak, the number of mentally ill in

13    the population generally?

14         THE WITNESS:  No.  That's the troubling part.

15         It is -- these increases on the graph that is on the

16    board now, these increases are all greater, some of them quite

17    a bit greater.  So the overall increase in mentally ill was 70

18    some percent.  Every one of these increases is much more than

19    71 percent.  Some of them, as I said, are 400 percent.  In

20    other instances, the number has doubled.

21         So that's the area of concern, that there appears to be

22    a disproportionate use of segregation for the mentally ill over

23    time that can't be accounted for by their increased number in

24    the population.

25         THE COURT:  Thank you, sir.

2151

1    Q.      BY MR. FISCHER:  Dr. Haney, are there time limits for

2    how long prisoners with mental illness are in these

3    administrative segregation units?

4    A.      No, and that's also one of the very serious problems.

5    There are no time limits at all.

6    Q.      I'm going to turn your attention back to the ASU or

7    administrative segregation specifically.

8            Are there any differences with respect to the

9    conditions of confinement for the mentally ill in

10   administrative segregation as compared to the non-mentally ill

11   in administrative segregation?

12   A.      Essentially no.  And by that I mean they live in

13   housing units that are virtually indistinguishable.  The

14   exercise areas are indistinguishable.  And in all respects, in

15   terms of the way the units themselves are run, the mentally ill

16   are treated essentially the same way that administrative

17   segregation prisoners are treated who are not mentally ill.

18           The exception to that is in what are called EOP ad seg

19   hubs.  These are supposed to be essentially treatment

20   environments for the most seriously mentally ill, the EOP

21   prisoner-patients who are in administrative segregation.

22           In those units, the physical layout of the unit itself

23   is identical to the other ad seg units, but they typically have

24   superimposed upon them treatment cages.  So the difference is

25   that in those ad seg hubs, you will see on the dayroom floor of

2152

1    the housing unit some configuration of treatment cages where

2    the EOP prisoners are supposed to receive treatment, either

3    individual treatment in an individual treatment cage or what is

4    typically a semi-circle of cages, four or five of them, that

5    are in a row where -- again, where therapy is supposed to --

6    group therapy in this case would take place.

7            Otherwise it's the same.  It's the same environment.

8    It's the same set of procedures, ah, the same strip search

9    policies, the same limited exercise, the same lack of

10   programming of any other kind that any -- any administrative

11   segregation prisoner would be subjected to.

12   Q.     Dr. Haney, can you describe the setting for, first,

13   group treatment provided to mentally ill prisoners in the ASUs.

14           THE COURT:  I thought he just did.  Am I right?

15           THE WITNESS:  Yeah.

16           The only wrinkle would be that there are -- in some of

17   the facilities, there are separate dedicated areas of the

18   prison where the EOP prisoners in an EOP ad seg hub will be

19   taken, escorted off the dayroom floor to a treatment area.

20   Those treatment areas are -- are configured separately from the

21   dayroom.

22           They -- the treatment still takes place typically in

23   the treatment cages, either individual treatment -- for

24   example, if an EOP prisoner in administrative segregation is

25   taken to his clinician for one-to-one contact, that too will

1    take place in a treatment cage.  Many clinicians have

2    individual cages in their office.  So the prisoner is let in,

3    put in the cage, and that individual contact will take place

4    that way.

5         The other, the only other configuration -- and I know

6    we have photographs of this later -- is some of the prisons --

7    the one I saw was in Corcoran -- are experimenting with the use

8    of what is called an atom chair, A-T-O-M chair.  And this is a

9    different way of seating a prisoner for group therapy that

10   involves them sitting in a special chair, being basically

11   restrained in that chair.  And that's being experimented with

12   as an alternative to the use of cages.

13        But other than that -- and then the one other very

14   minor exception, and I think this is the only prison where I've

15   heard that it's been done, one prison, CCI Tehachapi has

16   converted the non-contact attorney visiting rooms -- so these

17   are little booths where they're divided by glass, and there's a

18   telephone, and the clinicians see their patients for one-to-one

19   contact that way.  That's not group treatment, but it's

20   one-to-one clinical contact.  That's the only prison that I've

21   heard -- it's the only one I've seen, and it's the only one

22   I've heard that that's being done in.

23   Q.     With respect --

24        THE COURT:  Here's the problem that I'm sure Ms. Vorous

25   will explore much more thoroughly.  But, you know, these are

1    prisoners.  They are people who have committed crimes.  They're

2    mentally ill.  It's not unreasonable to believe that they may

3    well be dangerous, not just to themselves, but to their

4    clinicians or whoever.

5           If you can't put them in cages because that's not

6    humane, and you can't put them in the chairs because that's

7    even more restrictive, what do you do?

8           THE WITNESS:  This is -- this is an excellent question,

9    and I can tell you fortunately a number of states have answered

10   it in a much more humane way.

11          So there are -- first of all, it's -- I think it's

12   important to provide an opportunity for people to demonstrate

13   that, even though they are prisoners and even though they're

14   mentally ill and they may be dangerous, that they are not.  So

15   that's one issue that we could put to the side.

16          Not everybody is equally dangerous, and not everybody

17   is --

18          THE COURT:  Before we leave that, there's a question of

19   administrative -- I don't know that the State is going to say

20   this.  I mean, really I should wait for their questioning, but

21   it occurs to me.

22          There's a question of administrative efficiency.

23   You've got all of these people who have -- I mean, very large

24   numbers who have got to be treated.  And to do individual --

25   and it is at least arguable -- well, I'll leave it at that

1  because I don't know how else to express it -- that it's

2  administratively not only inefficient, but a terrific burden

3  and slows down the whole process by trying to individualize

4  assessments of whether or not people are truly dangerous.  And

5  the CDCR process of just saying, look, they're prisoners,

6  they're mentally ill, some of them have real histories of

7  danger, we're just going to take a carte blanche attitude.  I

8  don't know that that's appropriate medically, but you can see

9  how a system might arrive at that.

10        Now you've indicated to me that there are states that

11  have nonetheless done individualized assessment.  Do they have

12  anywhere near the population that California has of mentally

13  ill?

14        THE WITNESS:  Nobody has anywhere near that population

15  with the possible exception of the federal system, so I would

16  certainly concede that economy of scale.

17        But there are two issues, I think.  And I fully concede

18  the point that you made.  I think it's -- it's unsalable.

19  That's obviously a concern.

20        Two things.

21        One is that the -- that the initial determination may

22  be difficult to do.  But over time, other systems have allowed

23  people to demonstrate that they don't need the kind of

24  confinement and constraining and restraints that are -- that we

25  not only apply here as a matter of course, but then never

2156

1  relinquish no matter how well behaved, no matter how treatment

2  compliant, no matter how involved in their treatment they are,

3  a prisoner is.  An ad seg prisoner is an ad seg prisoner, and

4  the treatment is delivered one way and one way only.  So that's

5  the first problem.

6          The second problem is that there are ways to take into

7  account the security and safety concerns, but which are not as

8  dehumanizing and degrading as the use of treatment cages.  For

9  example, a number of systems have tables around which they

10  conduct group therapy.  They are referred to typically as

11  tethered tables because the prisoner will be tethered to the

12  table so that they can't leave the table.  They -- they're

13  basically secured in a -- they can't touch each other.

14          THE COURT:  Well, what we do here in the courtroom when

15  we --

16          THE WITNESS:  Exactly.

17          THE COURT:  Okay.

18          THE WITNESS:  Exactly.

19          THE COURT:  Thank you, sir.  I'm sorry to have

20  interfered.

21          MR. FISCHER:  Of course.

22  Q.      The same prisoner who is mentally ill not in

23  segregation, do they receive treatment in a treatment cage as a

24  matter of course?

25  A.      No, absolutely not.

2157

1           So you have -- it's their administrative segregation

2      status which, as we'll see in a minute, does not necessarily

3      have anything to do with their -- a heightened level of

4      dangerousness.  Many of them are in ad seg not because they've

5      done anything wrong, but because the prison itself doesn't have

6      a bed for them to be housed appropriately.

7      Q.      Dr. Haney, based on your declaration and prior

8      testimony, you've been in these CDCR segregation units over the

9      course of several decades.

10          Has CDCR always used the cages as you observed them

11     earlier this year during your tours?

12     A.      No.  They've -- I first remember seeing them in the

13     early 1990s at Pelican Bay, and they were unusual.  They were

14     unusual in corrections.  We -- they have proliferated in the

15     California system, and they're now all over the units that I

16     visited.  And they're not -- this is very -- this is very

17     uncommon.

18          It's not the case that other systems don't have them,

19     Your Honor, they do, to deal with precisely the issue you were

20     alluding to earlier.  There are -- even in systems that have

21     tethered tables, there are some prisoners who demonstrate

22     that's not appropriate for them.  So they exist in other

23     systems, but they are not -- they're not the treatment modality

24     of choice.  They're not the only treatment modality which is

25     used.  They're used in special cases.

2158

1        Here we use them exclusively or virtually exclusively

2    in the absence of any more humane and less degrading

3    alternatives.

4    Q.      Dr. Haney, did you speak with inmate-patients about

5    their receiving treatment in these cages?

6    A.      Yes.

7    Q.      What did you learn from those discussions?

8    A.      Well, they say the obvious.  I've been using the terms

9    "inhumane" and "degrading," and it's an inference based on not

10   just looking at the cages, but also an inference based on

11   talking to prisoners who say, many of them, I don't want to get

12   out of my cell, to go from this cage that I'm living in to go

13   into another cage.  I'm not comfortable.  I don't like it.

14   It's degrading.  I refuse treatment in part as a result of

15   this.

16        And, again, keep in mind this happens even on an

17   individual level.  So prisoners are being taken out for a

18   one-to-one contact with a clinician.  That one-to-one contact

19   is going to take place with a prisoner being in a cage that's

20   inside that clinician's cell.

21        And, you know, I've had prisoners say I've never --

22   that's -- I can't do that.  It's -- it's just degrading, and I

23   don't want -- I don't want to do it.

24        Now, many of them do.  Many of them submit to it, they

25   force themselves to do it.  But it is -- needless to say, it's

1    far from ideal.  They do it in spite of the way they're being

2    treated, not because of it or it being sort of a neutral

3    component to the treatment process.

4         MR. FISCHER:  Dr. Haney, I will now have you walk

5    through a few of the photos that are already in evidence.  The

6    first I'm going to direct your attention to is 2003.

7         This is already in evidence, Your Honor.

8    Q.   Dr. Haney, can you walk us through what is in this

9    photograph.

10   A.   Yes.

11        This is a photograph that I asked to be taken on the

12   dayroom floor of an administrative segregation unit at Mule

13   Creek State Prison.  This is an EOP hub, one of the EOP

14   treatment units, administrative segregation units.  And you can

15   see what is a very common sight in many of the prisons that

16   I've been in in California.  You see a row of individual

17   treatment cages.

18        I was referring His Honor a moment ago to individual

19   treatment cages inside clinicians' offices, but sometimes

20   individual clinical contact takes place out on the dayroom

21   floor of the housing units.  So this is in a housing unit.

22        And you see that there are three different -- three

23   prisoners in these individual cages.  Two of them are receiving

24   their clinical contact with a mental health staff person.  The

25   third person on the left is either having finished or waiting,

1    waiting for his.

2           You get the sense here, I think, of how this looks and

3    some -- and you can perhaps imagine how it might -- must feel.

4           You can also get the feel here for another complaint

5    that prisoners sometimes voice, which is that these are not

6    necessarily confidential contacts, that there -- that the cages

7    are close enough so that they're not entirely certain that

8    they're not being overheard.  And they sometimes report that

9    they can overhear the clinician of the other -- talking to the

10   other person.

11          You can see in this particular photograph the man who

12   is sitting at the far left, ah, really has nothing to -- to

13   preoccupy him or distract him except the conversation which is

14   taking place to his left.  And for a number of prisoners, this

15   is -- this adds to the problematic nature of the -- of the

16   treatment cages themselves.  These are supposed to be

17   individual, confidential therapeutic contacts, and they're I

18   think it's fair to say compromised by the manner and the way in

19   which they're done.

20   Q.     Doctor, I'm going to have you turn to the next three

21   exhibits and speak about them in sequence, 2004, 2005 and 2006.

22   They're already in evidence.

23          If you could just take us through these photos and how

24   they're significant to your analysis.

25   A.     Yes.

1    These were photographs that I asked to be taken in the

2  same housing unit, Your Honor.  These are in the Mule Creek ad

3  seg EOP unit.

4    I mentioned that in the EOP hubs, these -- the ad seg

5  units that have EOP prisoners who are mandated by the program

6  guide to receive group therapy, that there are -- that many of

7  these hubs have treatment cages out on the dayroom floor.  This

8  is what that looks like.  This is a housing unit.  You can see

9  the cells, of course, in the background.

10    And these are the treatment cages in the foreground.

11  This is the semi-circle of cages which is a very common scene

12  or sight inside these ad seg hubs.

13    You can see that the treatment, such as it is, is

14  taking place in the open dayroom floor.  And the prisoners, of

15  course, are confined in cages.  The therapist would sit in

16  front of that semi-circle and engage in the conversation with

17  his or her group.

18    The next photograph, 2005, is a different view of that

19  same administrative segregation unit.  You can see the real

20  sort of predominance of those cages in the -- in the middle of

21  that dayroom floor.  It is a crowded, ah, congested area.

22  Crowded and congested not by people, but rather by the

23  equipment, the cages and so on that are sitting on the floor.

24    You can see that there is a television monitor, ah, to

25  the left in front of the cages.  It is often the case that

2162

1    videotapes are shown in the course of the -- the therapeutic

2    groups which take place.  So a source of some -- some concern

3    on the part of prisoners who report not so much a structured

4    psychotherapeutic activity taking place, but rather watching

5    videotapes, sometimes watching the same videotapes, umm, more

6    than once.

7        My experience was that this was common.  I saw a fair

8    amount of this.  The groups that I saw oftentimes involved

9    showing videotapes of one or another kind.  They weren't

10   always, ah, tapes with any obvious educational benefit to them.

11       You can see on this particular video console or cart

12   the movie Titanic is one of the films presumably being used in

13   this group session.

14       You also -- if I can turn the Court's attention back to

15   2005.  You can see an area that I'll refer to later as a

16   vestibule where there are management cells which are located on

17   this unit.  They are located behind the cages.  And I point

18   them out here because you can see, with the cages sitting where

19   they are, arranged as they are, how difficult it is to see

20   behind that area into where the management cells are.

21   Q.    Dr. Haney, we'll talk about management cells later in

22   your testimony.  There's one more group therapy photo that I'd

23   like you to describe.  It's Exhibit 2007.

24       If you can just walk us through what's in the photo --

25   it's already in evidence -- and tell us why it's significant to

1    your analysis.

2    A.      This is a photograph that I asked to be taken at CCI.

3    This is the prison at Tehachapi.  This is a group therapy area

4    which is used for prisoners who are in the security housing

5    unit and in administrative segregation.

6         It is my understanding -- I asked -- I was told this is

7    the only group therapy area at Tehachapi or at CCI for ad seg

8    and SHU or security housing unit prisoners.  It is in a hallway

9    or an open area outside the old dining hall facility.  The

10   dining hall I was told was no longer in use.

11        So it's a big open space, ah, where here the treatment

12   cages that are ostensibly intended for group, the only ones at

13   the facility for segregated prisoners who have access to group,

14   rather than being in a semi-circle, it's in a long line.

15        The reason that's -- the reason that's notable is

16   because it's difficult to imagine how genuine group therapy

17   could take place with prisoners who were in one of those

18   straight line of eight cages.  Clearly the prisoner in cage one

19   couldn't possibly see or hear anything being said by the

20   prisoner in cage eight.

21        Added to that problem, in this particular area, there

22   is a loud fan which -- which circulates air in the -- in this

23   hallway, and it was very difficult even to hear.  When I came

24   upon this scene, there was a therapist who was standing out in

25   front of the three men in these cages.  She was about 10 or so

1    feet away.  I stood about 10, maybe 15 feet away from her and

2    was actually having a hard time hearing her from my vantage

3    point.  So the acoustics in this particular area of the prison

4    were terrible.

5           You know, the prisoners, the three prisoners who were

6    in their cells or their cages told me they could hear the

7    therapist.  But I can't imagine that it would have been

8    possible or very easy for a therapist to be able to talk to as

9    many as eight prisoners.

10          So this particular place is in many respects even more

11   problematic, it's even more poorly designed and even more

12   ill-suited to the provision of group therapy than even the --

13   the pretty sub-par arrangements that exist on the dayroom

14   floors of these EOP hubs.

15   Q.     Dr. Haney, I want to turn your attention to Exhibits

16   2008 and 2009, already in evidence.

17          If you can walk us through what's contained in these

18   two photos and how they're significant to your analysis.  I'll

19   start with 2008.

20   A.     These -- this is a photo that I asked to be taken from

21   inside one of the -- one of the treatment cages.  These are --

22   these are the newer -- these are the newest cages that I saw.

23   These are cages that are located inside the Corcoran treatment

24   area for ad seg EOP prisoners.  So this is an area that

25   prisoners are brought to from their ad seg housing unit.

1          This is the process I referred to earlier where they're

2     strip-searched and taken to a place outside of their housing

3     unit.  This is a treatment center for them, but, as I also said

4     earlier, it's dominated by these cages.

5          And these are the newer cages.  So unlike some of the

6     older, smaller ones, this is new.  This is sort of the best

7     case scenario being inside a cage, I guess that's another way

8     to put it, so I wanted a photograph from inside the cage.

9          It ended up being difficult to get this photograph

10    because I asked the correctional officer who was taking the

11    photographs to take a photograph from inside the cage, and I

12    was told that the correctional officers don't want to go in the

13    cages.  And it actually took a minute or two to resolve this --

14    resolve this difficulty.  I had offered to take the photograph

15    myself from inside the cage, but then finally there was an

16    administrator who was with us who instructed the officer to go

17    into the cage and take the photograph, and he fortunately did.

18         So these photographs, this photograph and the next one,

19    2010 -- excuse me -- 2009, are photographs that are taken from

20    inside --

21         THE COURT:  I'm not sure what I'm seeing.  This looks

22    like glass.  The others look like mesh.  Am I not seeing

23    something?

24         THE WITNESS:  There are different configurations, Your

25    Honor.  And, yes, there are -- some of them have mesh.  Some of

2166

1    them have a thick plexi outer covering.  Some of them -- these

2    newer ones have a more easier to see through material that

3    they're -- that they're created with.  But you can see above

4    there's -- the mesh is also at the top, and it covers the

5    unit -- or excuse me -- covers the cage.

6    Q.    BY MR. FISCHER:  Dr. Haney, did you step inside the

7    treatment cages during your tours?

8    A.    Yes, I stepped inside several of them just to see what

9    it looked like, what it felt like.  And so this particular

10   photograph was taken after I stood inside of it and then asked

11   for the photograph to be taken, to get a feeling, to capture

12   visually what the prisoners feel inside these -- inside these

13   cages.

14   Q.    Dr. Haney, you testified just a few minutes ago about

15   the slightly different policy at CCI Tehachapi.

16         Do you know why CCI Tehachapi has a slightly different

17   way that they deliver their individual treatment to segregated

18   prisoners?

19   A.    Yes.

20         The unit at Tehachapi did have cages, two treatment

21   cages on the dayroom floor.  However, I was informed that the

22   Special Master had concerns about the privacy of the prisoners.

23   These units at Tehachapi are relatively small, and there was

24   nowhere -- no way to place the cages on the unit that were not

25   within earshot of prisoners who were in their cells.  So when

1    the Special Master saw that, he advised them that they could no

2    longer use cages on the dayroom floor.

3         They didn't have -- they had limited other space in

4    which to do that kind of individual contact, so they -- that's

5    the unit -- that's the prison that converted the attorney

6    visiting rooms to use for placing -- where individual clinical

7    contact could take place.

8    Q.    Doctor, do you know whether the use of the treatment

9    cages is any different for inmate-patients in administrative

10   segregation for disciplinary reasons as opposed to

11   non-disciplinary reasons?

12   A.    Yes, I do know, and this is a quite extraordinary

13   thing.

14        There are, I assume we'll talk about, many people in

15   administrative segregation not because they've done anything

16   wrong, but because they either may have safety concerns or

17   because there's lack of a bed, they've been transferred

18   somewhere else and are in some kind of a holding pattern in ad

19   seg.

20        If they're one on a mental health caseload, if they are

21   a Coleman class member and they are in administrative

22   segregation for non-disciplinary reasons, they still receive

23   their treatment in a cage.  They still are subjected to the

24   strip-search procedures when they're taken out of their unit.

25   If their exercise area is some distance from their housing

1    unit, they undergo a strip search to and from that as well.

2    They are treated, for obvious intents and purposes, as if they

3    are an administrative segregation prisoner there for

4    disciplinary reasons even though they're not.

5    Q.      Dr. Haney, do you know whether CDCR uses these

6    treatment cages in a blanket way for segregated prisoners for

7    medical appointments?

8    A.      They do not.

9            I -- in the course of the tours and in my other contact

10   with CDC units or prisons, I've seen medical treatment that is

11   delivered without the use of cages.  Medical contacts occur on

12   a face-to-face basis.  The prisoner may be restrained, but the

13   medical contact is done without the use of -- without the use

14   of cages.  It's only the mental health contact which is done in

15   the ways that I've described.

16   Q.      Dr. Haney, I want to direct your attention to Exhibit

17   2010, already in evidence.

18           If you can just walk us through this photo and also the

19   significance to your analysis.

20   A.      I alluded earlier to the use of an alternative at

21   Corcoran State Prison in the treatment area, the ad seg hub for

22   EOP patients, and this is that alternative.

23           This is the atom chair.  It is a -- you know, it's

24   fairly self-evident what happens.  A prisoner is brought in in

25   restraints, put in the chair.  They're restrained in the chair,

1    and then that -- the desk apparatus is bent down across them so

2    that their -- their freedom of movement is constrained

3    obviously.  And that's where they receive, ah, their group

4    therapy.

5           This is a photograph of one of them, but to the -- and

6    you can see to the left of that is a cage, but to the right of

7    this photograph are several other atom chairs.  So that it is

8    possible alternative, and I actually witnessed prisoners to be

9    sitting in those chairs in a group session rather than being in

10   cages.

11   Q.     Did you reach an opinion as to the appropriateness for

12   these atom chairs for treatment?

13   A.     Yes, I did.

14          It is, I think, a good idea done badly.  Prisoners

15   report that these are uncomfortable.  They report that when --

16   that when that desktop flap comes down, that it -- that it is

17   very uncomfortable to sit there for any period of time.

18          You can see that the chair, the seat on the chair

19   itself is made out of solid metal.  You know, it couldn't look

20   or be less inviting.

21          It -- I say it's a good idea done badly because there

22   are systems in which a different kind of a chair, a much more

23   comfortable chair is used, where the real purpose of this is

24   just to have a prisoner in a chair unimpeded by a cage or

25   fencing or a window that they have to look through, but also to

2170

1   be restrained.  There's also a safety concern.

2          You can do that with far less hardware and far

3   less restriction than is -- than is done in this -- in this

4   particular alternative.

5          So, you know, some prisoners prefer them to the cages,

6   and others prefer the cages because they -- as they say, these

7   chairs are just too uncomfortable to sit in for 20 minutes, a

8   half hour.

9   Q.     Dr. Haney, I have just a couple more photographs on

10  this topic, and then we'll move on to the next.  The next

11  exhibit is 2011, already in evidence.

12         Dr. Haney, can you discuss what's in this photo.

13  A.     Yes.

14         This is the treatment team meeting space and treatment

15  area for the administrative segregation unit at the California

16  Institution for Men, Chino.  It is an area that both contains,

17  ah, the space where the Interdisciplinary Treatment Team

18  meets -- that's the table in the middle.  It also contains a

19  series of offices, individual offices that surround the table.

20  Those are the enclosed spaces.  Each one of those offices has

21  an individual treatment cage inside of it.

22         And then you can see on the back wall a row of

23  treatment cages, ah, which are used both for holding prisoners,

24  but also I was told are used for group therapy.  So prisoners

25  are brought in here and, you know, a number of them will stand

1    or sit in the cages in the back, and a group therapy session

2    can take place.

3    Q.      Dr. Haney, when you visited this unit, did you observe

4    any treatment activities occurring?

5    A.      No, I didn't observe any treatment activities

6    occurring.

7            I visited this facility with Dr. Kaufman, and we had

8    been told in the morning that there would be an IDTT team

9    meeting, an Interdisciplinary Treatment Team meeting in this

10   room at a particular time or hour during the day.  So we made a

11   point of trying to be there at that time when that -- when that

12   meeting was scheduled to take place.

13           We did, we did arrive there.  There was an

14   Interdisciplinary Treatment Team there sitting around these two

15   tables, some 10 or 11 of them.  And they were -- they were

16   quite dispirited because they had scheduled nine prisoners to

17   come out for their IDTT meeting, and they had been refused by

18   all nine of them.

19           And so we had expected to be able to watch one of these

20   meetings, and we obviously couldn't because none of the

21   prisoners agreed to come out.

22           And we had a conversation with them about the

23   difficulties of delivering treatment in an environment like

24   this, the difficulties that they were experiencing not just

25   with their IDTT meetings, but with prisoners coming to

2172

1    treatment at all.  And they -- the chief psychologist told me

2    in the course of a day they were having about a 50-percent

3    refusal rate that prisoners just didn't want to participate.

4         And I believe that this atmosphere -- it's captured in

5    part by the photograph, but really not quite the full nature of

6    this.  Being in that room, being surrounded by these cages is

7    something that is -- that when you stand in the middle of it is

8    quite impressive.  And the prisoners that I talked to were

9    troubled by what that -- what that environment was like, how it

10   felt.  And it's not hard to see why.

11   Q.    Finally on this topic, Dr. Haney, Exhibit 2012.

12   A.    Yes.  This is a photograph that I asked to be taken of

13   an area outside of the administrative segregation unit.

14        You may recall a few earlier photographs, the ones that

15   were done of the administrative -- excuse me -- the EOP ad seg

16   hub at Mule Creek that had all of the cages on the dayroom

17   floor that I was showing.

18        I had a conversation with the staff about their desire

19   for more dedicated treatment space, treatment space outside of

20   the dayroom where they could attempt to provide more consistent

21   treatment and under more hospitable circumstances.  And they

22   told me that there was -- this was their hope, that this

23   particular area had been committed as it says.  The label says

24   the planned location for the new administrative segregation

25   office treatment space.

1          I -- my recollection was that this has been in the

2     works for a long time.  I -- I think I remember seeing this

3     space in 2007.  But, in any event, I was told that the

4     construction for this space is slated to begin sometime in

5     2014.

6          It's -- it's worth noting, first of all, that it is an

7     acknowledgement of the obvious, that these units need much more

8     treatment space than they have, that the people who have to

9     function under these circumstances, the staff as well as the

10    prisoners, understand the need for a better, more accommodating

11    place in which to try to deliver treatment, and that this is a

12    long time in coming.

13         This is not a new need.  It's one that's been there for

14    a while.  The unit that I showed you the photographs of, C-12,

15    was one I was at before.  The photographs that were taken in

16    that unit in 2007 are almost identical.  That unit has hardly

17    changed between 2007 and 2013.  So the need for new treatment

18    space was there certainly as early as 2007, if not earlier, and

19    yet it still isn't forthcoming.

20    Q.        Dr. Haney, I'm going to turn now to the topic of strip

21    searches of mentally ill prisoners in the administrative

22    segregation unit.

23         Did you observe this practice during your tours earlier

24    this year?

25    A.        Yes, I did.

1        I observed it taking place at some length in Corcoran,

2   where I watched -- Corcoran is the facility where I described

3   earlier, Your Honor, that there is a new treatment area that is

4   being created, but it's -- it's across the yard from the

5   housing unit where the -- where the EOP prisoners are housed.

6   So this means, because they're going to have to leave their

7   housing unit in order to go to treatment, by administrative

8   rules, they are required to be strip-searched before they leave

9   their housing unit.

10       So I watched the EOP patients come down onto the

11  dayroom floor.  There were -- there were cages on the dayroom

12  floor, individual cages where prisoners would go.  And then

13  they would be strip-searched, submit to a strip search.  There

14  were a number of them, I think five or six of them the day I

15  was there, and I watched the whole process take place.

16       They submitted to the strip searches.  They then

17  were -- put their clothing back on.  They were placed back in

18  restraints.  They obviously were taken to the cages in

19  restraints.  They were strip-searched.  The restraints were put

20  back on.  They were taken out of the cages, and then they were

21  marched across the yard, the large prison yard.

22       There were a number of other prisoners out there the

23  day that we were there.  They were escorted in restraints by

24  correctional officers across the yard to the mental health

25  treatment area where, depending upon how -- how they were going

2175

1    to receive their treatment, they were either going to have to

2    be shackled again or not.

3            But, in any event, this process was then repeated when

4    they came back.  So when they came back to their housing unit,

5    they had to be strip-searched again in those same cages in that

6    unit before they could go back to their cells.

7    Q.     Dr. Haney, do you know if that practice is unique to

8    the Corcoran administrative segregation unit?

9    A.     No.  I happened to have seen it there that day, but

10   in -- in any of the units where a mental patient-prisoner is

11   leaving -- who's in segregation is leaving the housing unit,

12   that's the process or procedure which is used with them no

13   matter the reason that they're in that administrative

14   segregation unit.

15   Q.     Doctor, did you form an opinion as to the impact of

16   this practice on prisoners with mental illness in

17   administrative segregation?

18   A.     Yes, I did.

19           And my opinion is perhaps an obvious one, that this

20   serves as a disincentive for people to engage in treatment.

21   The strip searches experienced by prisoners is, not

22   surprisingly, humiliating and degrading.  They don't like to

23   submit to them, and they see this as an impediment to receiving

24   treatment.

25           And this is, you know, an opinion shared by the -- by

2176

1    the -- by the Department of Corrections termination experts.

2    Dr. Kaufman opined on this issue.  The Special Master, I

3    believe, has also talked about it as a deterrent to treatment

4    and suggesting that the Department explore alternatives.

5    Having seen it in practice, I can certainly understand why

6    people have expressed those concerns.

7    Q.     Dr. Haney, do you have an opinion as to how, if at all,

8    this practice should change with respect to the mentally ill

9    prisoners in segregation?

10   A.     Well, it is unclear to me what the purpose of a strip

11   search is under a circumstance or situation like that.

12          What is happening is that prisoners are being taken out

13   of their cell and taken to treatment.  I can imagine why for

14   certain prisoners who have demonstrated that they represent a

15   risk or a problem or a danger, why it might be on an individual

16   case basis.  If a particular prisoner has done something in the

17   course of that process that would -- that would suggest that he

18   needs this special precaution then, of course, that makes sense

19   to do.  But to do it as a blanket policy?

20          These prisoner-patients are walked under the watchful

21   eye of correctional officers to treatment and walked back.

22   It's hard to understand why this requires a strip search both

23   coming and going.

24   Q.     Doctor, I'm going to turn now to some issues regarding

25   the amount of treatment provided in the administrative

2177

1    segregation unit.

2         Did you reach an opinion as to the sufficiency of the

3    amount of treatment provided in the administrative segregation

4    units that you reviewed?

5    A.    Yes, I did.

6    Q.    What is that opinion?

7    A.    This was a very serious problem, Your Honor.

8         Prisoner after prisoner complained about the lack of

9    adequate group time.  In the case of the EOP prisoners, what

10   they said was they were not getting anywhere near the program

11   guide mandated 10 hours.  This is pretty much well documented

12   by the Special Master.  Very few of the prisons come even close

13   to the target of 10 hours of out-of-cell time.

14        The CCCMS prisoners who are supposed to receive group

15   contact or group therapy on a clinically indicated basis are

16   really receiving virtually nothing.  They've complained about

17   it.  I did my best to check on it at the different facilities

18   that we visited, and their complaints appear to be accurate,

19   that there is basically little or nothing being offered to the

20   CCCMS prisoners.

21        Now, I recognize that there's not a program guide

22   mandated number of hours.  But surely some of them have

23   clinically necessary or needed treatment hours that they ought

24   to be provided with, and yet it's just not happening.

25        I was told in many of the places in conversations with

2178

1    staff it's not happening either because they don't have space

2    or they don't have staff or they lack both.  It was not out of

3    a recognition that it wouldn't be a good idea.  You know,

4    virtually everybody I talked to in the staff told me that it

5    was a very good idea and that they used to do it.

6         I remember I talked to Dr. Bola at Corcoran, who was

7    running the mental health crisis area at Corcoran.  We had a

8    long conversation about it, and she said we used to do it, we

9    used to be able to provide it, it's very important, it's very

10   good, but we just can't do it any more.  We don't have the

11   staff.  So it's not that they don't recognize it as, well, they

12   just don't have the resources.

13   Q.    Dr. Haney, you mentioned clinically necessary treatment

14   for CCCMS prisoners.

15        Do you know what the program guide guideline is for

16   treatment of CCCMS prisoners in administrative segregation?

17   A.    It is, again -- well, there is -- a check for prisoners

18   and their psych background takes place every day, and there is

19   a clinical contact that is supposed to take place weekly.  And

20   the group treatment which they receive is supposed to take

21   place on a clinically necessary or a clinically as needed

22   basis.

23        For the EOPs, it's basically the same clinical contact,

24   the same psych background.  But, in addition, they're supposed

25   to receive the 10 hours of out-of-cell structured therapeutic

2179

1    activity.

2    Q.    Dr. Haney, I want to direct your attention to

3    Plaintiffs' Exhibit 2033.

4          Dr. Haney, what is shown in this document?

5    A.    When I was at --

6          THE COURT:  You want to put the document on the screen?

7          MR. FISCHER:  I can publish --

8          THE COURT:  Oh, it's not in evidence?

9          MR. FISCHER:  It's not in evidence.

10         THE COURT:  I'm sorry.  Get it into evidence first.

11         MR. FISCHER:  Let's do that first.

12         THE COURT:  My apologies.  I didn't know.

13         THE WITNESS:  When I was at the California Correctional

14   Institution at Tehachapi, I was asking the clinical staff about

15   treatment groups and whether they were providing them and, if

16   they were, where they were providing them.

17         You may recall that I showed you a photograph earlier

18   of a -- of a hallway that was outside of a large -- what used

19   to be the old chow hall at Tehachapi and the treatment cages

20   that were in a row, eight of them, and I talked about the

21   difficulty of having group treatment.  So I was asking if there

22   were other places where group treatment took place and so on.

23         They said they had a schedule of the group treatment

24   that was -- that was offered at Tehachapi.  And so I asked if I

25   could have a copy of it, and they graciously gave it to me.

1          MR. FISCHER:  Just to -- sorry to interrupt.

2    Q.      Is 2033 the document that they provided to you?

3    A.      Yes, that's the document.

4          MR. FISCHER:  I'd ask that this be moved into evidence,

5    2033.

6          THE COURT:  Received.

7                         (PLAINTIFFS' EXHIBIT 2033

8                          ADMITTED INTO EVIDENCE.)

9          MR. FISCHER:  Permission to publish, Your Honor.

10          THE WITNESS:  And this -- to me it was notable because

11    it really underscored the lack of treatment available to CCCMS

12    prisoners who, as I mentioned several times earlier, are

13    entitled to or ought to receive group therapy as clinically

14    indicated.  And I had wondered what that translated into in

15    terms of the amount of time which was being provided at this

16    institution.

17          The only -- the relevant groups are the first three.

18    They are the ones which are intended for the administrative

19    segregation prisoners.  And the rest of the groups are the SHU

20    groups.  I'm going to concentrate on administrative segregation

21    for a moment.

22          There are, at Tehachapi or CCI, 101 CCCMS and five EOP

23    prisoners in the administrative segregation unit.  So that's

24    106 prisoners total.  Most of them are CCCMS obviously.

25          There are three groups total which are offered to

1    administrative segregation prisoners at all at the institution,

2    and two of them, the second two are offered every other week.

3    So that means that each week there's only two groups that are

4    available, that are offered, and there are 106 prisoners who

5    might avail themselves of these groups.

6         So I did a simple calculation as a way of underscoring

7    how little treatment is available in the group format for CCCMS

8    prisoners simply by calculating the amount of minutes that are

9    available per prisoner in this environment.

10        So if it's a -- let's assume -- if you assume the group

11   goes for a full hour -- and some do, some don't, but let's

12   assume they do.  And assume there are six prisoners who going

13   to attend those groups.  I was told that virtually never

14   happens.  You may remember the photograph I showed you earlier

15   had three prisoners in the group.  But let's assume the group's

16   full, they actually have six prisoners.  That's the most

17   anybody could remember.

18        So there are about -- there are 120 group treatment

19   minutes available a week, two groups, one hour each.  Times six

20   prisoners, that's 720 treatment minutes.  But if you divide

21   that by 106 prisoners who are available to receive that

22   treatment, you come up with 6.85 treatment minutes per week per

23   prisoner.

24        Now, obviously that's not how the treatment is

25   dispensed, but I made the calculation really just to underscore

1    how little treatment is available, how little group treatment

2    is available for the people who are locked in these units day

3    in and day out with virtually no other activity.  I mean, this

4    is, other than yard, the only thing that they will be getting

5    out of their cells to do.  And there are 6.85 treatment minutes

6    available assuming, you know, they all -- as many of them as

7    can take advantage of this.

8            So it just underscored for me, that particular

9    calculation underscored for me how rare, how scarce a commodity

10   these -- these treatment minutes are for -- for all of the

11   prisoners, but especially for the CCCMS not mandated under the

12   guide to get any and aren't getting any.

13           THE COURT:  We'll take our afternoon recess.  Fifteen

14   minutes.

15           (Recess taken at 2:43 p.m.)

16                         ---o0o---

17

18

19

20

21

22

23

24

25

2183

1              (On the record at 3:05 p.m.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Mr. Fischer.

5    BY MR. FISCHER:

6    Q.      Dr. Haney, we were just discussing the amounts of

7    treatment being provided to ASU prisoners at CCI Tehachapi.

8              Did you speak with any inmate-patients who were in

9    the administrative segregation unit at CCI Tehachapi?

10   A.      Yes, I did.

11   Q.      What did you learn about their experience with mental

12   health treatment at CCI?

13   A.      Well, they voiced a concern that was consistent with

14   something I said just before we took the break, which was

15   there was very little treatment being offered to them.

16             Several of them told me that when it was offered,

17   they tried to do it, they tried to take advantage of it, but

18   it happened infrequently.  Some of them said that they

19   weren't -- that they weren't able to do it anywhere near as

20   much as they wanted to do it.

21             They talked to me about not being able to get out of

22   their cell for anything else, and that's something I also

23   referred to earlier, and that if it was available, they would

24   take advantage of it, but that it simply wasn't available.

25             This was entirely consistent with what people

2184

1    throughout the four prisons that I talked to told me.  One of

2    the things that was striking was the extent to which they

3    talked about wanting treatment, virtually to a man talking

4    about wanting treatment, but wanting it under circumstances,

5    being delivered under circumstances where they felt they

6    could actually get it, that they could actually benefit from

7    it.

8        So even a prisoner who said that I don't want to come

9    out of my cell for the cages, I don't like the cages, if I

10   would say to him:  Do you want treatment?  Do you feel like

11   you need treatment?  They virtually all said:  Of course.  I

12   just can't manage it in the cages, I just don't want to get

13   it that way.

14       And it was really striking the extent to which

15   virtually everybody said I know I need help, I need -- I just

16   need to get help for what my problems are.

17       This was an unusual population in that sense, the

18   degree to which so many people said some version of exactly

19   that to me.

20   Q.    Based on your review of all the tours you toured and

21   data you reviewed, do you have an opinion as to the adequacy

22   of the amount of treatment being provided to mentally ill

23   prisoners in ASUs?

24   A.    As I said earlier, nowhere near enough.  The mandated

25   ten hours a week is not -- is a target that is not being hit

2185

1    for the EOP prisoners.

2            Setting aside even for a moment the content of those

3    groups, which oftentimes the prisoners reported, and I

4    witnessed, was questionable, the shear number of hours.

5            You know, I should add in my opinion the ten hours a

6    week, which is decided upon as a Program Guide mandated for

7    the EOPs generally, given the severity of the conditions of

8    confinement in these units, it is probably not enough if you

9    take into account the fact that these are prisoners who are

10   not getting much of anything else.

11           So in a regular, main line housing unit, an EOP

12   prisoner of course would not only be getting the ten hours of

13   mandated treatment, but that prisoner might very well be in

14   an educational program and a vocational training program.  He

15   might have a job.  He might have access to the gym in the

16   prison, et cetera.

17           An EOP prisoner in the Ad. Seg. Hub is either going

18   out to a caged yard for, at best, a couple of hours a day,

19   and maybe getting an hour of treatment every other day or so

20   and nothing else and living under the very severe

21   circumstances that we've looked at.

22           So really for me it raises questions about whether or

23   not that ten hours, which is not met, is anywhere near enough

24   when you take into account that that's all they're going to

25   get.

2186

1          And again, as I've already commented, for the CCC

2    prisoners, they're probably not even getting that.  They're

3    probably not getting anything close to, if any, group

4    treatment.  So for them the program is essentially nothing at

5    all.

6          They're getting a weekly clinical contact.  They're

7    getting exercise.  And otherwise, they're living their lives

8    in their cells.  And these are -- needless to say, these are

9    mentally ill prisoners.

10   Q.     Dr. Haney, in the course of your reviews, did you

11   observe any cells called "management cells" in the ASU?

12   A.     Yes, I did.

13   Q.     Can you explain what a management cell is?

14   A.     Well, it had to be explained to me.  I wasn't

15   familiar with it.  I don't remember having encountered it

16   before.  I might have, and if I had, I had forgotten it when

17   I saw it again.

18          Management cells are punishment cells inside the

19   administrative segregation units.  These are cells where

20   somebody who has acted up or done something in the Ad. Seg.

21   Unit is taken.

22          Given the way they appear, they're fairly clearly

23   intended for not only controlling the prisoner, but also as a

24   punitive sanction imposed upon them for something they've

25   done on the unit.

2187

1    Q.      Can mentally ill prisoners be placed in these

2    management cells?

3    A.      Not only can they be, I saw them.  I interviewed

4    mentally ill prisoners in them.

5    Q.      Do you know what, if any, guidelines there are for

6    the use of these management cells in the ASU?

7    A.      Well, I looked at Title 15, and I asked you to look

8    because you're the lawyer because I thought maybe I had

9    missed it.

10          And all I could find was a mention of them, but not

11   any description of how they're supposed to be used, when

12   they're allowed to be deployed, whether there are any time

13   limits for use and so on.

14          I couldn't find any real analysis or set of

15   guidelines for what how they're governed.

16   Q.      Dr. Haney, I'm going to show you a few photographs

17   already in evidence and have you walk us through them.

18                (Exhibit published.)

19          Dr. Haney, I'm going to direct your attention first

20   to Exhibits 13 through 17.  These are photos in a series so

21   I'm going to have you discuss them together, if that's okay.

22          As you are talking through the exhibits, if you can,

23   let me know which photo you're talking about and I'll try and

24   put the correct one on the screen.

25   A.      Okay.  Well, I'll talk first about 2013.

2188

1           (Exhibit published.)

2           This is a photograph of one of the cells that I was

3    just referring to.  This is a management cell in the EOP Ad.

4    Seg. Hub in C-12 -- Housing Unit C-12 at Mule Creek State

5    Prison.

6           This, Your Honor, to remind you, is the housing unit

7    we showed photographs of where the treatment cages are on the

8    floor, and there is a partition around the treatment cages in

9    a semicircle.

10          I took a lot of photographs in that particular unit.

11   This is a photograph of one of the management cells.

12          I mentioned, when we were looking at those treatment

13   cages, that there was a vestibule behind the treatment cages

14   where there were management cells.

15          These are the management cells.  These are the places

16   where prisoners who have engaged in disruptive behavior in

17   the administrative segregation unit are taken and are held.

18          If you turn to 2014, again these are very similar

19   pictures.

20               (Exhibit published.)

21          This is essentially the same.  A little bit different

22   angle, but I think on the same cell.

23          2015 is a different administrative segregation

24   cell.

25               (Exhibit published.)

2189

1        You can see this one appears to be have been

2   occupied.

3        And 2016 is a little closer look with the perspective

4   on where these cells are.  So if you look behind the

5   treatment cage on the left, you can see in the background

6   there is a kind of window.

7                (Exhibit published.)

8        It's in the interior of the housing unit.  That

9   window looks onto the vestibule.  That's how it is referred

10  to in the unit.  And in that vestibule is where these

11  management cells are.  So it is an area set back from the

12  rest of the housing unit.

13       When I expressed some concerns to the correctional

14  staff about whether or not this was problematic because it

15  seemed like it was sort of a double level of isolation, not

16  only were they isolated in their cells, but now they were set

17  off from the housing unit itself, the correctional officers

18  told me that they actually thought it was beneficial because

19  if prisoners were disruptive, then you couldn't hear them

20  back there.  So it was an appropriate place to put them

21  because it actually quieted the noise if they were being

22  disruptive.

23       That may well be the case, but it also seemed to me

24  to come at some -- at some price in safety for the inmates

25  who were placed back there.

2190

1        And the next one, 2017, gives a little bit better

2   perspective on what that looks like.

3            (Exhibit published.)

4        So that is looking through the window into the cell.

5   So you can get a sense of what it looks like as you look from

6   the outside into the cell.

7        These are very -- needless to say, all of the cells

8   in this unit are isolation or segregation cells.  These are

9   prisoners who are all confined to their cell.  But these

10  management cells go a step further.

11        One of the prisoners described it to me as bottom of

12  the barrel.  And it certainly felt and looked like that.  And

13  as I said earlier, there were -- I was told that mentally ill

14  prisoners were placed in these cells, can be placed in them.

15  And in fact, I interviewed some who were.

16  Q.    Did you interview an EOP prison housed in one of

17  these management cells in the Mule Creek ASU?

18  A.        Yes.  Yes, I did.

19  Q.    Can you recall that individual's case and describe it

20  for the court?

21  A.        I can.  This is Prisoner G.  He's discussed in

22  paragraphs 88 to 90 of my March report.

23        But I actually encountered Prisoner G outside of that

24  management cell, and he was on the yard.  And he seemed to be

25  in some distress.  And he came over to the gate of the yard

2191

1    outside of the administrative segregation unit, and he

2    started to talk to me about how difficult it was for him.

3         And I hadn't made the connection that he was in a

4    management cell yet, but he started to talk to me about how

5    difficult it was for him in this unit, how he was having

6    mental health problems.

7         He said:  I can't take the cell that I'm in.  It is

8    so small it feels like it is closing in on me.  So I started

9    to interview him.

10        He reported to me that he had been housed in this

11   cell for -- housed in the administrative segregation unit for

12   five months, and that the experience was getting to him.  And

13   that he had gotten into trouble in the unit and been put in a

14   special cell.

15        When I asked him about what kind of trouble he had

16   gotten into, he said:  Well, I was banging my head.  I was

17   out of control, and I wanted to kill myself.  And I put a

18   sheet around my neck as though I was going to hang myself.

19   And the officers pepper sprayed me and took me to a

20   management cell.

21        And so I made -- I talked to him for a little while

22   longer, and I went back and looked at the cell.  He was in

23   one of the cells we just showed you the photographs of, Your

24   Honor.  And then I made an attempt to get to the bottom of

25   what I could with respect to his particular situation in the

2192

1    unit.

2         And I learned that he had been in the unit for, as he

3    said, about five months.  But it was five months during which

4    time he went through a kind of a cycle of deteriorating,

5    stabilizing a little bit, deteriorating again.

6         He was certainly described as very depressed.  He

7    kept asking for a higher level of care.  There were some

8    notations in his records suggesting that he was asking the

9    staff to move him to a different facility, perhaps to a DSH

10   facility, but the staff didn't feel he was quite impaired

11   enough to do that.

12        There were notations in the file that suggested that

13   they had been moving him back and forth between an

14   administrative segregation cell in that unit and a MOHU cell,

15   a kind of crisis bed cell on the unit.  But that they -- at

16   one point there is a notation suggesting that it didn't make

17   sense to move him out of the MOHU into a regular

18   administrative segregation cell because he was just going to

19   deteriorate again.

20        So the decision was made to leave him in the MOHU

21   cell, which is a -- in that particular unit is a cell on that

22   unit, but also a very bear and barren cell, not too much

23   unlike the management cell that we just showed you

24   photographs of.

25   Q.    Did you review the MOHU units inside the ASU?

2193

1   A.      I did.  Yes, I did.  As I say, they were grim,

2   barren, devoid of furniture.  You know, a place where you

3   would keep somebody perhaps very temporarily if they were an

4   immediate suicide risk, but certainly not something you would

5   leave anybody in for any period of time.

6           Sure enough, the records indicated there was, as he

7   described to me, this suicide attempt.  He threatened to hang

8   himself.  He was pepper sprayed by the correctional officers,

9   and then he was taken to the management cell.

10          And that's where I saw him.  And it was difficult to

11  tell from the records how long he had been -- how long he

12  stayed there, but it was clear that it was more than a few

13  days.

14  Q.      In your opinion is this an appropriate course for

15  this type of inmate?

16  A.      I mean, no.  You need to look at the cell and imagine

17  what it would be like for a mentally ill prisoner in crisis.

18          This was a person who had just attempted suicide,

19  whose mental health history in the unit made it clear he was

20  in distress.

21          Whether or not he warranted a higher level of care, I

22  will defer to the clinicians on that issue.  But he obviously

23  was in an incredible amount of distress and despair.  I could

24  tell when I talked to him he was.

25          He had attempted -- there was an attempted suicide.

2194

1    Whether it was a gesture or serious attempt, hard to tell,

2    But this was a man who was in distress and despair.

3         It's hard to imagine anything more distressing and

4    despairing than that cell, even for a healthy person.  To put

5    a mentally ill person in there, a mentally ill person in

6    crisis and leave him there for days, seems to me, just to be

7    fundamentally wrongheaded and part of the kind of

8    correctional response to mental health issues that I think,

9    unfortunately, dominates many of these units.

10   Q.    Dr. Haney, I want to turn your attention to 2018

11   that's already in evidence.

12        If you can, describe what's contained in this

13   photograph and what you find significant about it.

14             (Exhibit published.)

15   A.    This is another management cell.  I discovered them.

16   By discovery, I don't mean there was any attempt to hide

17   them, but I wasn't aware of what they were.

18        And as I was touring an administrative segregation

19   unit in the California Correctional Institution in Tehachapi,

20   I saw at the bottom about eight or so cells that looked

21   different from the others, that is to say looked different

22   inside.

23        They didn't have any furniture in them.  They didn't

24   have -- you can see from this photograph the cell itself

25   looked bear and barren.  So aside from the pictures, which

2195

1    are up on the wall, there is pretty much not much else in

2    that cell.  No bunk.

3             So I asked what the cells were, and I was told by the

4    correctional captain who was touring with us that these were

5    management cells, and that they were used for much the same

6    purpose as the management cells that had been described to me

7    at Mule Creek.

8             If a prisoner had done something wrong or was acting

9    up in the administrative segregation unit, they were placed

10   in these management cells.

11            The captain -- I believe Captain Mundy (phonetic)

12   told me that people spend about ten days on average in these

13   cells, typically not much more than that, but it wasn't

14   uncommon for somebody to spend ten days.

15            I looked in it and asked for a photograph to be taken

16   of this particular cell.

17   Q.    Did you speak with the individual inside this cell?

18   A.    Yes, I did.

19   Q.    Was this individual a Coleman Class Member?

20   A.    He was.  Yes, he was.

21   Q.    Did you reach any conclusions or observe anything

22   significant about his case?

23   A.    Well, his case was another case of somebody who had

24   been placed in administrative segregation, had -- was

25   frustrated because of his placement in administrative

2196

1   segregation and told me that he was in administrative

2   segregation for non-disciplinary reasons.

3           He was getting increasingly frustrated about being

4   there and not knowing what was going to happen to him.

5           He, in a fit of frustration, began to kick the door.

6   He was pepper sprayed.  In fact, the write-up for that

7   indicated that the officer who responded emptied a canister

8   of pepper spray on him.

9           He eventually was placed in restraints and taken to

10  the management cell, and that was where I encountered him.

11  Q.      Doctor, did you review records for this individual?

12  A.      I did, yes.

13  Q.      Can I turn your attention to Exhibit 2034.

14          Just for the record, were referring to -- the inmate

15  code for this individual is Prisoner WW.

16          Dr. Haney, Exhibit 2034, is this an excerpt of the

17  records that you reviewed for this individual?

18  A.      Yes.  Yes, it is.

19  Q.      If you can, talk us through your conclusions about

20  this individual using the records as you see appropriate.

21  A.      Yes.  He's an inmate whose records indicated, and he

22  actually told me, and I wrote it in my March report, that he

23  had been waiting in Ad. Seg. for about a year.  And that he

24  was in Ad. Seg. not because of a disciplinary infraction, but

25  rather waiting for transfer.

2197

1    He had been endorsed to be transferred somewhere

2  else, but there was no -- that bed wasn't available.

3  Q.    Doctor, do you know if he had been endorsed to

4  another segregation unit?

5  A.    No.  He had been endorsed to Kern Valley State Prison

6  to a main line prison.  And he told me that he had been

7  endorsed multiple times, that the endorsement had expired and

8  that they renewed it.  And he was still waiting and it was

9  over a year.  He was in administrative segregation -- in a

10  very severe administrative segregation unit.

11    I may or may not have mentioned, many of these Ad.

12  Seg. Units, Your Honor, don't even have electrical outlets

13  for electrical appliances.  So when we're talking about

14  people being in their cells essentially around the clock,

15  they're in their cells essentially around the clock with

16  nothing to distract them, with no electronic devices with

17  which to even pass the time of day.

18    He said I was getting really frustrated.  At one

19  point, as I said earlier, he kicked the door, and that was

20  reflected in the records.  So the records indicated that he

21  had, in fact, done that.

22    He wasn't doing anything else other than kicking the

23  door.  He was pepper sprayed.  When he finally stopped

24  kicking the door, after he had been pepper sprayed, he was

25  taken out and placed in a management cell.

2198

1          Interestingly enough, he was given a disciplinary

2     write-up for kicking the door.  It was not one which was

3     judged to be related to his mental health condition, even

4     though he made it fairly clear, and the subsequent records

5     underscored the fact that what had led to him kicking the

6     door was his frustration, his frustration at being locked in

7     his cell and waiting for a bed elsewhere in Ad. Seg. through

8     no fault of his own.

9          But when the case was analyzed, there was no referral

10    based on mental health considerations, and so he was, in

11    fact, given a disciplinary write-up or violation and was

12    convicted.  It included loss of privileges, no electronic

13    appliances, et cetera.

14         And he was placed in a management cell, which meant

15    that the frustration he was experiencing as a mentally ill

16    prisoner, locked in an administrative segregation cell,

17    through no fault of his own, which led to this outburst,

18    resulted in him being placed in an even worse cell, under

19    even more severe conditions of confinement, a management

20    cell, very likely even worsening even more his mental

21    condition and his level of anger and frustration.

22         And that was certainly the person that I encountered

23    when I saw him in this management cell, filled with

24    frustration, filled with anger.  And, you know, filled with

25    concern over what was going to happen to him.  He was very

2199

1    worried he was going to get a SHU term because of the door

2    kicking incident and so on.

3        Fortunately, that didn't happen, but he was retained

4    in the management cell for a while.  And he, in fact,

5    continued to be held in isolation or segregation -- in

6    administrative segregation for months.

7        So after this event, after this act of frustration,

8    after he had been there for more than a year, the records

9    indicate that he was retained in administrative segregation.

10        Finally the clinical staff, who's having contact with

11    him, who are trying to be helpful, start to indicate in the

12    records that he is awaiting transfer now a year and three

13    months.

14        And then eventually they start talking about this as

15    a current stressor in his life.  And they indicate in

16    March -- I saw him in early February -- by the middle of

17    March he's saying:

18        (Reading:)

19        I just received my fifth endorsement -- my fifth

20        endorsement to another prison, to a main line prison

21        at Kern Valley.  And it doesn't expire until July.

22        If I don't transfer by the time my fourth endorsement

23        expired, I will go on a hunger strike.  I mean, I

24        just don't know how much more of this I can take.

25        (Reading concluded.)

2200

1      That's him talking to a clinician about a month and a

2  half after I saw him.

3      The clinician says:

4      (Reading:)

5      Current Stressors:  ASU placement.  Awaiting transfer

6      to Kern Valley State Prison.  One year three months.

7      (Reading concluded.)

8      Then end of March, same thing:

9      (Reading:)

10     I'm really frustrated.  I just want to get to Kern

11     Valley State Prison and get a job.

12     (Reading concluded.)

13     Again, an indication that current stress are the ASU

14  placement and awaiting placement to Kern Valley State Prison,

15  one year, four months.

16     It goes on.

17     He continues to express these kinds of concerns.  You

18  know, he's still there into April.

19     So there's a guy who has done nothing wrong, has been

20  endorsed to go somewhere else, has been placed in -- despite

21  his mental health condition has been placed in a very severe

22  administrative segregation environment.

23     He acts out and is punished by being placed in the

24  management cell.  He tells his clinician that I'm frustrated,

25  I need to get out of here, I'm not making it here.  And he's

2201

1    retained.  And this goes on for several more months before

2    he's finally transferred.

3    Q.      Dr. Haney, were you surprised to see mentally ill

4    prisoners in these management cells?

5    A.      Yes.  Yes, I was.

6            I was surprised to see anyone in these management

7    cells, but certainly mentally ill prisoners.

8    Q.      Dr. Haney, I want to turn to another topic now.  The

9    topic is lengths of stay in CDCR segregation units for

10   mentally ill prisoners.

11           Did you review length of stay data for CCCMS and EOP

12   prisoners in the segregation units in CDCR?

13   A.      I did.

14   Q.      I'd ask you to turn to Exhibit 2040 right now just

15   marked for identification.

16           Dr. Haney, what does this 100-page document contain?

17   A.      It contains length of stay data -- length of stay

18   data for Coleman Class Members who are in administrative

19   segregation, security housing or a psychiatric services unit.

20           So length of stay data for mentally ill

21   prisoner-patients in segregated housing.

22   Q.      And who compiles and provides this data?

23   A.      This data are compiled by the Department of

24   Corrections, and they're part of the Coleman monitoring

25   reporting process.

2202

1    Q.      And do you know the date of this data?

2    A.      I asked for the most recent data available.  And at

3    the time I did this analysis that was September 16th, 2013,

4    and that's indicated on the top of the exhibit.

5            MR. FISCHER:  Your Honor, I ask to move into evidence

6    Exhibit 2040.

7            THE COURT:  Hearing no objection, it is received.

8                (Whereupon, Plaintiffs' Exhibit 2040 was received

9                  into evidence.)

10   BY MR. FISCHER:

11   Q.      Dr. Haney, I want you to turn your attention to

12   Plaintiffs' Exhibit marked for identification 2041.  And can

13   you describe what's in this document?

14   A.      Yes.  This is a document that's similar to the

15   document that I referred to earlier that I used in the

16   earlier calculations of the numbers of mentally ill prisoners

17   in the different housing units -- the different types of

18   housing units.

19           So this is, again, mental health population by

20   institution.  And it allows you to total the total or

21   aggregate number of mentally ill prisoners there are of the

22   different levels or categories of mentally ill prisoner to

23   get overall totals -- a group total for the number of

24   prisoners who are in the system, if you will.

25   Q.      Does that break down the data by mentally ill

2203

1   prisoners in certain types of segregation units?

2   A.      Yes.  It gives you the total population, and then it

3   gives you the individual housing units where they're

4   confined, administrative segregation, general population,

5   reception center, SHU, et cetera.

6           MR. FISCHER:  Your Honor, I would like to move into

7   evidence Plaintiffs' Exhibit 2041.

8           THE COURT:  Received.

9               (Whereupon, Plaintiffs' Exhibit 2041 received

10                 into evidence.)

11  BY MR. FISCHER:

12  Q.      Dr. Haney, based on the data in the two exhibits,

13  2040 and 2041, did you conduct an analysis of length of stays

14  of mentally ill prisoners in the segregation units?

15  A.      Yes, I did.  I was interested in not only the

16  conditions under which the prisoners were confined, which

17  we've been talking about, but how long they were there,

18  whether these were, in fact, places of short-term confinement

19  or whether Coleman Class Members were actually spending more

20  than a short period of time in these units.

21           I heard from the prisoners that I interviewed about

22  lengths of stay, but that was prisoners I talked to at four

23  institutions.  I knew that systemwide the data were

24  available.  So I asked for it, you provided it to me, and

25  I've analyzed it.

2204

1    Q.    Did you create any charts based on your analysis?

2    A.    Yes.

3    Q.    I would like to turn your attention to Plaintiffs'

4    Exhibit 2039.  It is entitled CCCMS and EOP and Segregation

5    Length of Stay as of September 16th, 2013.

6         Is this one of the charts you created, Dr. Haney?

7    A.    Yes.

8         MR. FISCHER:  I would ask to move into evidence

9    Exhibit 2039.

10        THE COURT:  Hearing no objection, it is received.

11            (Whereupon, Plaintiffs' Exhibit 2039 received

12             into evidence.)

13        MR. FISCHER:  Your Honor, permission to publish the

14    chart?

15        THE COURT:  Yes.

16            (Exhibit published.)

17   BY MR. FISCHER:

18   Q.    Dr. Haney, can you describe what is shown in this

19   chart?

20   A.    This is a calculation of lengths of stay based on the

21   Department of Corrections' data.

22        I have broken it down from the shorter lengths of

23   stay, 20 to 90 days, and compared it to the longer stays, 91

24   days to over a year.

25        What it shows obviously is that there are a

2205

1    substantial number of Coleman Class Members, CCCMS and EOPs,

2    who are in segregation for 90 days or more.

3         You may note that if this begins at 20 days, that's

4    because the department doesn't report data for those who have

5    been in segregation for less than 20 days.

6         But in any event, you can see that those who are in

7    these segregated housing units are in there for a

8    considerable period of time, many of them over 90 days, and a

9    number of them for over a year.  So these are not places of

10   short-term confinement as it were.

11   Q.    Doctor, is the data that's represented in this chart,

12   do you know whether it is the total length of stay that a

13   mentally ill prisoner spends in segregation as opposed to a

14   snapshot?

15   A.    No.  It is a snapshot.  There were no data that

16   allowed me to provide an overall length of safe.  It requires

17   historical data for particular prisoners over time.  At the

18   time there was no easy way to get that.

19        This is a snapshot.  This is on that day, September

20   16th, 2013, these are the percentages of the people -- or

21   numbers of people who had been in the administrative

22   segregation, security housing, that long a period of time.

23        Not total length of stay.  Not average length of

24   stay.  A snapshot at that particular point in time.

25   Q.    Dr. Haney, in the course of your analysis of the

2206

1  segregation length of stay data for Coleman Class Members,

2  did you have any concerns about the accuracy of the data that

3  CDCR provides?

4  A.      Yes.  I became --

5          THE COURT:  Ma'am?

6          MS. VOROUS:  Objection, Your Honor.  This line of

7  questioning goes beyond what this witness has provided in his

8  prior declaration testimony, as well as his deposition

9  testimony.

10         He's not provided opinions with respect to accuracy

11  of data or lengths of stay within segregation units.

12         THE COURT:  Mr. Fischer?

13         MR. FISCHER:  Your Honor, Dr. Haney has opined

14  throughout his declaration, and in prior testimony, about

15  length of stay.  For purposes of preparing his declarations

16  and also for preparing for this hearing he's endeavored to

17  analyze the most current data available.  In the course of

18  doing so --

19         THE COURT:  -- he came to some conclusions.

20         MR. FISCHER:  -- and I would like to ask him about

21  that.

22         In his previous declaration, the March declaration,

23  he analyzed this same data that CDCR provides.  Obviously not

24  the September data because we hadn't gotten to September at

25  that point.

2207

1          THE COURT:  No.  I understand that it is not a

2    question of the data itself.  It is a question of an opinion

3    which I assume is going to be negative as to its accuracy.

4          MR. FISCHER:  What I can say, Your Honor --

5          THE COURT:  No.  I really wasn't inviting further

6    argument.

7          MR. FISCHER:  Okay.

8               (Brief pause.)

9          THE COURT:  Why don't you just ask the questions, and

10   I will rule on that after I receive and see whether -- Go

11   ahead and ask the questions you were going to ask.

12   BY MR. FISCHER:

13   Q.    Okay.  Well, Doctor, can you answer whether you had

14   concerns about the accuracy of the data?

15   A.    Yes.  I was interested in analyzing the systemwide

16   data, and so I asked for and was provided with the data.

17         When I began to do the analysis however, I

18   encountered some really very serious anomalies in the data

19   itself that raised questions about whether or not the numbers

20   that I had been provided and the calculations I was doing

21   were not gross underestimates of the lengths of stay because

22   of the peculiar way in which I discovered the data were

23   reported and because of the way in which certain kinds of

24   caps or limits appeared to be placed on the lengths of stay.

25         So I investigated further by looking at individual

2208

1    records and found that, in fact, there was really an

2    extraordinary underestimate in certain cases where prisoners

3    had been in for a period of many years in segregated housing

4    and yet they were -- their length of stay was estimated at

5    only less than a year, 200 or so days.  And the further I

6    dug, the deeper the concern became.

7          So I identified in the course of this analysis a

8    whole series of anomalies having to do with the way in which

9    the data themselves are reported and how it was possible to

10   demonstrate gross undercounting in individual cases where a

11   person had been in for, as I said, many years, and the

12   department's reporting is a very drastic undercount, by a

13   factor of many years, of the length of time they've actually

14   been in segregation.

15         THE COURT:  Well, this is very important evidence,

16   and defendants argue that they've never heard of it up until

17   now, it is not in any of his previous statements.

18         It obviously wasn't in his deposition because nobody

19   asked him because they don't know it existed.

20         I'm going to receive the evidence.  Counsel for the

21   defendants are free to put on any contrary or rebuttal

22   evidence in the course of their case.

23         I realize that isn't a complete remedy for the

24   absence of advance notice, but it seems to me, given the way

25   we're going to try cases, three days at a time, there ought

2209

1    to be enough opportunity to obtain rebuttal evidence if it

2    exists.

3           You may proceed, counsel.

4           THE COURT:  But I want to be clear, this is

5    critically important evidence so I'm receiving it.  It is not

6    to be taken as a general precedent for springing new evidence

7    on the defendants.

8           You may proceed, Counsel.

9    BY MR. FISCHER:

10   Q.     Doctor, I want to turn your attention back to

11   Plaintiffs' Exhibit 2040 already in evidence.

12          This is the length of stay report that you described

13   earlier.  It's been redacted to remove identifying

14   information of the inmate-patients.

15          MR. FISCHER:  I would ask permission to publish the

16   first page, Your Honor.

17          THE COURT:  I'm sorry.  What, sir?

18          MR. FISCHER:  I'd ask permission to publish?

19          THE COURT:  Of course.  It's been received in

20   evidence.

21               (Exhibit published.)

22   BY MR. FISCHER:

23   Q.     Dr. Haney, using the chart, can you describe some of

24   the anomalies, the word you used, in terms of the length of

25   stay data for Coleman Class Members?

2210

1    A.        Yes, I can.

2            The start of this concern was demonstrated or

3    surfaced on page 41 of Exhibit 2040.  And as I was going

4    through these data and preparing to analyze them, I noticed

5    that there appeared to be a cap, an absolute number or limit

6    above which the length of stay never went.

7            If you look at page 41, from the 3rd to the 7th

8    number down, when you look at the length of stay data in the

9    far right-hand column -- you marked it on the screen -- this

10   is 1987 days.  That's the longest amount of time reported for

11   length of stay.  That translates into about 5.4 years.

12           I had encountered people who had been in the security

13   housing unit certainly much longer than that.  And so I

14   couldn't -- I asked you and I tried to get clarification from

15   people, how could this be capped at 1987 -- at 1987 days when

16   clearly there were people who had been in segregation --

17           THE COURT:  According to you.

18           THE WITNESS:  Yes.  Exactly, Your Honor.

19           THE COURT:  That's a different thing than actually

20   being there.

21           THE WITNESS:  Absolutely.

22   BY MR. FISCHER:

23   Q.        Dr. Haney, let me ask you one question about that.

24           Did you -- in your review did you identify any

25   specific inmate-patients who had been in segregation longer

2211

1   than the 1987 days reported here?

2   A.      Yes, I did.

3           So one of them in particular who I interviewed in my

4   tour, Prisoner DD, I encountered in the security housing

5   unit.  He informed me he had been in the security housing

6   units for 23 years.  That was confirmed by the warden of the

7   institution.

8           So I looked, and I thought, well, where's Inmate DD.

9   In fact, Inmate DD is on page 35.  He's was an inmate who was

10  at Corcoran when I interviewed him.  He is the fourth

11  prisoner down on page 35.

12               (Exhibit published.)

13          Obviously his name and number has been redacted, but

14  I was able to identify him before it was redacted.  And he's

15  reported here as having spent only 269.1 days in segregated

16  housing.  Clearly a gross underestimate of the amount of time

17  he was in segregated housing.

18          So that peaked my interest even more, and I continued

19  to try to get to the bottom of how or why this could be

20  reported in such a profoundly understated way.

21          There were other examples of it as well.  The more I

22  dug, the broader the problem appeared to become.

23  Q.      Dr. Haney, turning back to page 1, do you have any

24  specific concerns about the way that length of stay is

25  reported based on your review?

2212

1    A.        Yes.  So if you look at page 1, this is just an

2    example of it.  I started then to actually question the

3    calculations -- all the calculations that were being made,

4    and I realized in looking just at page 1, just at the first

5    three entries on page 1, that the department is apparently

6    reporting the data in different ways.

7            In other words, the calculation is made in a way that

8    appears to always take the shortest amount of stay and report

9    that as the length of stay.

10           Let me illustrate what I mean by that.

11           You can see in the columns that have dates on them,

12   there are three labels.  There's Institutional Arrival

13   Date -- or Institutional Arrival Date -- excuse me -- Program

14   Arrival Date and Level of Care Date.

15           In theory the relevant column is the middle one,

16   Program Arrival Date.  That's the point at which a person got

17   into the segregated housing.  Okay.

18           And indeed, for the very first entry there, that's

19   how it is reported.  Note that the date of these data are

20   September 16th.  This man arrived the 18th of August.  They

21   report the length of stay at 29.6  days.  It's essentially

22   the difference between the 18th of August and the 16th of

23   September.

24           However, the next inmate has a Program Arrival Date

25   of July 5th, from July 5th to September 16th is more than two

2213

1    months.  It should be over 60 days.  Instead it is reported

2    as 33.6, which appears to be a calculation which is based on

3    the Institution Arrival Date, not Program Arrival Date.

4        So here's a person who was in the program and in

5    segregated housing for two months, but he's reported as

6    having only been in for a month.

7        If you look at the next person, here's a person,

8    again, who arrived in the program on July 26th.  It is

9    September 16th.  This is about a 50 or so day stay.  There

10    the report apparently is based on Level of Care Date, August

11    6th.

12        So in each instance what appears to be happening is

13    whatever the lowest number is, whether it is Institutional

14    Arrival Date, Program Arrival Date or Level of Care Date,

15    that's the number which is used in the calculation.

16        You know, I should add even the Program Arrival Date

17    in a certain sense understates or may very well, in many

18    cases, understate the amount of time a person has been in

19    segregation.

20        Because if they moved, say, from administrative

21    segregation to a Mental Health Crisis Bed, or moved to a

22    Department of Mental Health Facility, and then they come back

23    into segregation, the clock is reset, even though their

24    actual conditions of confinement may not have changed

25    dramatically.

2214

1          Or if they moved from a SHU to an administrative

2   segregation unit, that's a change in the program, but they're

3   still in segregated housing.  Yet the department resets the

4   clock, as if the person had just come to segregated housing.

5          These are small differences.  You know, we're talking

6   here -- I mean, in one instance it was a difference of 30

7   days.  So if there are many of those kinds of errors, that

8   would result in, nonetheless, even though it is 30 days here,

9   30 days there, a fairly significant underreporting of the

10  amount of time.

11         In other instances it is just a few days, but this

12  consistent reporting of the smallest number of length of stay

13  over a large number of cases could result in significant

14  underreporting.

15         And matched against what I showed you earlier about

16  somebody who had been in for 23 years and was reported as

17  having been in for less than a year, it raised real questions

18  for me about the reliability of these data and whether

19  they're really systematically, not necessarily intentionally,

20  but systematically underreporting.

21  Q.     Dr. Haney, did you have the opportunity to review any

22  other individual cases of prisoners with mental illness in

23  segregation and compared their length of stay to the data on

24  this chart?

25  A.     Yes.  Yes, I did.

2215

1    Q.        I'll direct you to Plaintiffs' Exhibit 2042 marked

2    for identification.

3              Can you explain what is contained on this chart?

4    A.        Well, I was provided with this data a month or so

5    ago.  It was when I was in the process of really having some

6    serious questions about how these length of stay data were

7    being reported.

8              And I had been given this to read -- your office gave

9    it to me to read, not necessarily for purposes of using it in

10   the calculation of length of stay, but as I read through the

11   descriptions, these were security housing unit prisoners who

12   had been in security housing for a very long time.

13             So I wondered what was reflected for them in these

14   length of stay data, whether or not the length of stay data

15   that the department provides that we've just been talking

16   about, that big, long list of inmates and length of stay

17   calculations, how these particular inmates, who had been in

18   segregated housing for a very long time, as documented in the

19   department's own documents, how they were reported in length

20   the of stay data.

21             Once again there were very dramatic underestimates or

22   underreporting taking place in each of these three cases.

23             MS. VOROUS:  Objection, Your Honor.  Belated

24   objection.  The witness answered more than the initial

25   question that was asked by counsel, but I am raising a

2216

1  similar objection.  This witness has never testified to this

2  particular prisoner, nor to the other two he just

3  mentioned.

4      THE COURT:  The objection is overruled.  I've

5  indicated that this line of question is of importance to the

6  court, and I will receive it.  So the objection is overruled.

7      I am concerned, counsel -- well, I don't know what

8  we're going to do about it.

9      I am relying on counsel for the defendants to provide

10  such rebuttal evidence as exists, but, you know, we're just

11  piling on further duties.

12      The first duties I don't feel bad about because

13  that's a result of their failure to provide the notice

14  required by the Federal Rules, but this is an entirely

15  different kettle of fish.

16      No.  The problem is this is very important evidence.

17      You may proceed, Counsel.

18  BY MR. FISCHER:

19  Q.    Dr. Haney, do you want to direct your attention to

20  Plaintiffs' Exhibit 2043.

21      If you can, just describe what is in this document

22  that's been marked for identification.

23  A.    Yes.  This is my attempt to graphically depict the

24  very significant underreporting that occurred in each of

25  these three cases.

2217

1          Each one of these, Haney Prisoner YY, ZZ and AAA,

2     refers to the prisoners in the previous exhibit whose cases

3     are described and whose security housing unit history is

4     described.

5          So the starting point of their time in the security

6     housing unit is identified in the Department of Corrections

7     document.  And so I was able to calculate the actual amount

8     of time that they spent.

9     Q.     Dr. Haney, before you go on, I want to make sure, did

10    you make this chart based on your review of the data?

11    A.     Yes.  Based on the earlier exhibit that we were

12    taking about, this is 2042, there are three prisoners

13    described here.

14         I began with the point in time at which they entered

15    administrative segregation, each of them.  They moved on to

16    very lengthy terms of security housing.

17         You can see in the document itself it reports

18    continuous security housing unit confinement in a number of

19    these instances.

20         We're talking about people many years in isolated

21    confinement and gross underreporting.  I mean, reporting of,

22    in one instance, in the case of Prisoner AAA, almost a

23    ten-fold of underreporting of the amount of time he actually

24    spent.

25         MR. FISCHER:  Your Honor, I would like to move into

2218

1   evidence Exhibits 2042 and 2043 and ask permission to publish

2   2043, the document he was just describing.

3          MS. VOROUS:  Your Honor, just for the record,

4   defendants object to both of these exhibits for the reasons

5   we've already identified.

6          THE COURT:  Received.

7               (Whereupon, Plaintiffs' Exhibits 2042 and 2043

8                received into evidence.)

9          You may proceed, Counsel.

10              (Exhibit published.)

11  BY MR. FISCHER:

12  Q.      Doctor, I'm sorry to interrupt you before, but if you

13  can, continue walking us through the chart.

14  A.      It was my fault.  I got ahead of myself.  I

15  apologize.

16          Again, these are graphic descriptions I prepared

17  illustrating the disproportionate and very significant

18  underreporting in the case of each of these three inmates.

19          You can see in the middle graph for Prisoner ZZ that

20  there is that 1987 cap placed on his time in segregated

21  housing.

22          I referred to that earlier.  That appears to be the

23  maximum amount of time that the department's data will

24  report.

25          But obviously, in this particular prisoner's case, it

2219

1    understates by 3169 days the actual amount of time he was in

2    segregated housing.

3         If anything, the disproportionate or underreporting

4    for Prisoner YY is even greater.  For some reason his -- in

5    his case it is capped at 1050, but this is a man who was in a

6    security housing unit and administrative segregation for 5233

7    days.

8    Q.    Doctor, do you know what institution these

9    individuals were housed in the security housing unit?

10   A.    It's indicated in -- it's indicated in 2042.  It is

11   Corcoran, I believe, for all of them.

12        Yes.  These are Corcoran SHU inmates.

13   Q.    Doctor, leaving this particular issue aside, using

14   the data in Exhibit 2040, did you do an analysis of the

15   length of stay for EOPs in the administrative segregation

16   units?

17   A.    Yes, I did.

18   Q.    If I can turn your attention to Exhibit 2044, is this

19   the chart you created based on that analysis?

20   A.    Yes.

21        MR. FISCHER:  I would like to move into evidence

22   Plaintiffs' Exhibit 2044.

23        THE COURT:  Received.

24            (Whereupon, Plaintiffs' Exhibit 2044 received

25             into evidence.)

2220

1           (Exhibit published.)

2    BY MR. FISCHER:

3    Q.      Dr. Haney, can you please explain what this chart

4    shows and why it is relevant to your analysis?

5    A.      Yes.  This is a graph that I prepared to visually

6    depict lengths of stay taking into account the underreporting

7    or underestimation that may compromise these data.

8           And it shows that the bulk of EOP prisoners are in

9    administrative segregation for 20 to 90 days, but there is a

10   significant number of them who also spend more than 90 days.

11   In fact, even some as much as a year or more.

12          Keep in mind that of course these are the most

13   seriously mentally ill prisoners, and these are very long

14   lengths of stay in administrative segregation units that are

15   severe and depriving in all the ways I earlier described.

16   Q.      Dr. Haney, during your tours did you personally

17   observe EOP prisoners in administrative segregation units for

18   lengthy periods of time?

19   A.      Yes.  I've already, I think, talked about Prisoner G

20   who was in administrative segregation for five months and who

21   was deteriorating badly in the course of it, but who,

22   nonetheless, had been kept there.  And he was asking to be

23   transferred somewhere else, but was, nonetheless, languishing

24   in administrative segregation, including in a management

25   cell.

2221

1    Q.      Did you have an impression of any other EOP

2    inmate-patients or more generally the EOP inmate-patients who

3    have been in administrative segregation for lengthy periods

4    of time?

5    A.      Yes.  There were a number of them.  I talked to a

6    number of them in the administrative or Ad. Seg. Hubs in the

7    several prisons that I visited where there were EOP hubs.

8            Again, these lengths of stay -- oftentimes the

9    lengths of stay had been prolonged not because of the

10   disciplinary history of the inmate, but because of a lack of

11   an appropriate bed elsewhere in the system.

12           THE COURT:  Obviously, the guy was there for 23

13   years.  It isn't an absence of a bed.  It is something else.

14           THE WITNESS:  Absolutely, Your Honor.  His case -- he

15   was not one of those that I was talking about.  In his case

16   obviously he had many, many disciplinary infractions and

17   certainly had done number of things which resulted in his

18   disciplinary retention in the security housing unit.

19   BY MR. FISCHER:

20   Q.      Doctor, did you review the same length of stay data

21   for CCCMS prisoners in the ASU?

22   A.      Yes.

23   Q.      Turn your attention to Exhibit 2045.

24           Does this chart represent your analysis of CCCMS

25   prisoners in the Ad. Seg.?

2222

1  A.      Yes, it does.  Again --

2          MR. FISCHER:  First I'd ask to move it into

3  evidence.

4          THE COURT:  Received.

5              (Whereupon, Plaintiffs' Exhibit 2045 received

6               into evidence.)

7              (Exhibit published.)

8  BY MR. FISCHER:

9  Q.      Go ahead, Doctor.

10 A.      Again, predominance of between 20 and 90 days, but

11 you can also see there is a sizeable number of CCCMS who are

12 there for more than 90 days and a number for over a year.

13          Again, keep in mind this is a snapshot at a point in

14 time.  These are not maximum amounts of time or limits, but

15 rather on this particular day, September 16th, this was the

16 breakdown -- numerical breakdown.

17 Q.      You spoke earlier about Prisoner WW at the CCI Ad.

18 Seg.

19          Is that the type of prisoner that would be included

20 in this sort of chart?

21 A.      Yes.  I recall he was there for a year and four

22 months, not on a disciplinary confinement, in administrative

23 segregation, waiting a bed elsewhere.  And it took a year and

24 four months to get him out of there.

25 Q.      Dr. Haney, you've alluded to a few times in your

2223

1    testimony today the idea of non-disciplinary status

2    segregation.

3          Can you explain what you mean by that and the ways

4    that manifests during your review?

5    A.      Yes, I can.

6          There were a large number of prisoners who I

7    encountered and interviewed who were in administrative

8    segregation for safety concerns, either they had expressed or

9    someone had expressed a safety concern about them.

10          And they had been placed in administrative

11    segregation, not necessarily an inappropriate placement for a

12    brief period of time, but they were there for months, in some

13    instances longer than months, awaiting transfer to a

14    sensitive needs yard somewhere else in the system, being

15    treated as if they were administrative segregation prisoners,

16    as if they were there on disciplinary status, which meant

17    that they basically were subject to the same routine, the

18    same conditions of confinement, the same restricted access to

19    treatment, the same strip-searching, the same caged yards as

20    all of the other prisoners who were in Ad. Seg.

21          This was true also for people who were in

22    administrative segregation for lack of bed, a lack of bed in

23    perhaps even in the prison they were housed in.

24          I encountered a large number of prisoners at one

25    institution, for example, who were in Ad. Seg. because the

2224

1    prison they were in didn't have enough beds for people in the

2    main line.  And so they put a very large number of people,

3    including mentally ill prisoners, in administration

4    segregation.

5         So these are the kind of non-disciplinary reasons

6    people end up in administrative segregation, and they can

7    stay there for a considerable period of time.

8    Q.    Dr. Haney, did you reach an opinion as to the

9    appropriateness of housing prisoners for safety concerns, as

10   you say, in the administrative segregation units?

11   A.    Yes, I did.  It's utterly inappropriate if it is done

12   on more than a very short-term basis.

13        Placing somebody who may be have been victimized or

14   may have been threatened with victimization in what is

15   essentially a punishment unit seems to me to be

16   inappropriate, psychologically and correctionally

17   inappropriate.

18        Yes, these prisoners need to be protected, but they

19   don't need to be protected by being placed in a unit in which

20   they're deprived of all their other rights.

21        And frankly, we're talking about mental patients who

22   are now not only vulnerable because they're mental patients,

23   but vulnerable because they have safety concerns, being

24   placed in an environment that we know is harmful to the

25   mental health of the mentally ill prisoners who are placed

2225

1    there.

2          So they are doubly at risk.  They go in as vulnerable

3    mental health prisoners, vulnerable mental health prisoners

4    who are now at risk and all the psychological burden that

5    carries with it, and they're placed in an environment in

6    which they're in isolation and locked in their cells

7    basically 23 hours a day.

8    Q.    Dr. Haney, do you have an opinion as to where these

9    mentally ill prisoners with safety concerns can be safely

10   housed?

11   A.    Yes.  They obviously need to be placed in a unit

12   where they're safe, but they need to be in a unit that

13   doesn't trade their physical safety for their mental

14   jeopardy.

15         In other words, what is happening now is they're

16   being placed in units in order to keep them physically safe,

17   which I completely applaud, but this is coming at the price

18   of putting them an in environment where their mental health

19   is being placed in jeopardy.  And that's a trade-off that I

20   think is unnecessary.

21         On a very, very short-term few-day basis perhaps, but

22   ultimately these are people who need to go to an environment

23   where they can be safe but kept at an appropriate level of

24   custody.

25         Somebody comes off the main line yard for no other

2226

1    reason that someone else has threatened them, or they've been

2    victimized and need to be kept safe, but doesn't need to have

3    all the rest of their rights deprived, doesn't need to have

4    all of their access to treatment compromised in the way it is

5    compromised inside an administrative segregation unit.

6          Somebody who may have been getting groups in the main

7    line or had other kinds of activities, may have had clinical

8    contacts the way clinical contacts ordinarily occur, sitting

9    face-to-face in a clinician's office, now find themselves,

10   because they're vulnerable, because they have safety

11   concerns, in an environment where they're subject to all of

12   the oppressive rules and regulations and conditions of

13   confinement that a person that has committed a disciplinary

14   infraction is being subjected to.

15         THE COURT:  Doctor, what is your best estimate, if

16   you have one, as to the number of Coleman Class Members who

17   are in segregated housing for non-disciplinary reasons?

18         Do you have --

19         THE WITNESS:  The best estimate I have, Your Honor,

20   is from Department of Corrections' documents which estimates

21   it at between 20 and 30 percent over all of prisoners who are

22   in administrative segregation for non-disciplinary reasons.

23         THE COURT:  And 20 or 30 percent of what?

24         THE WITNESS:  I believe it is -- I believe it is 20

25   to 30 percent over all of all the people who are in. --

2227

1        THE COURT:  Try to get that number if we know.

2        THE WITNESS:  I'm not sure I know that.

3        I can certainly see if I can determine it.

4        THE COURT:  That's all right.

5        In any event, it is a significant number of people?

6        THE WITNESS:  Yes.

7        THE COURT:  We've already had a conversation earlier

8   this morning, I guess -- yeah, I'm sure -- that there is no

9   room.  The whole place is overcrowded still despite the

10  three-judge court order.

11       There is no -- apparently there is no place to put

12  these people.  Even assuming, which isn't very hard to do,

13  that this violates the Eighth Amendment, what order could I

14  possibly make to cure the situation?

15       THE WITNESS:  Yes.  So we are between a rock and a

16  hard place, and I appreciate that.

17       I think that my recommendation would be to order the

18  Department of Corrections to create appropriate units, to

19  house these people under conditions in which they're safe but

20  where their rights are --

21       THE COURT:  I understand that.  That's what the

22  plaintiffs have already told me at least 14 times.

23       The problem is to do that they've got to segregate

24  the people who are in administrative segregation for

25  non-disciplinary reasons, and they've got to find a place to

2228

1    put them.  And as I understand what is being told to me,

2    there really is no way of their accomplishing such an order.

3          THE WITNESS:  It seems to me -- I thought about this

4    a lot.  I suspected you would ask this question.  There are

5    only two solutions to this problem.

6          One is a much more drastic reduction in population to

7    free up the beds in a system that is still congested.  There

8    is plenty of evidence of that.

9          The population reductions have not met the target,

10   and they have not freed up beds in this way and in lots of

11   other ways.  Or the creation of additional units.

12         This problem, it seems to me, can only be solved in

13   one of those two ways or some combination of the two of them.

14         THE COURT:  Defense, if we ever get to final

15   argument, I doubt that we will, but if we ever get there, I

16   urgently suggest that you think through what, if anything, is

17   appropriate to do.  And if appropriate, is possible to do.

18         You don't have to do it now obviously.  And if you

19   seek to demonstrate that the testimony I've been given today

20   as to the numbers and so forth is inappropriate, of course I

21   want to hear that evidence as well.

22         You may proceed, Mr. Fischer.

23         MR. FISCHER:  Thank you.

24   BY MR. FISCHER:

25   Q.    Dr. Haney, in your review did you find there was an

2229

1    awareness inside CDCR of concerns about the placement of

2    prisoners with mental illness in administrative segregation

3    for safety concerns?

4    A.      Yes.  I saw it reflected in a number of different

5    ways.

6            It was reflected in the opinions of the termination

7    experts who acknowledged that this was an inappropriate

8    placement of vulnerable prisoners, doubly vulnerable,

9    mentally ill and having safety concerns.

10           I saw a published article by an employee of the

11   Department of Corrections, Dr. Sanchez, in which he opines

12   exactly the same thing about the special vulnerability of

13   mentally ill prisoners who are at risk because they are --

14   because there are safety concerns being placed in an

15   administrative segregation environment which is -- which he

16   understands, I think correctly, is a very difficult place for

17   people to survive in and stabilize in under the best of

18   circumstances.

19           And it's not a subtle issue, and it has been

20   recognized by many people in the department, as well as

21   outside.

22   Q.      Dr. Haney, I want to direct your attention to 2046

23   for identification.

24           You mentioned a Dr. Sanchez article.  Is this the

25   Dr. Sanchez article you're referring to?

2230

1    A.      Yes, it is.

2             MR. FISCHER:  Move into evidence Plaintiffs' Exhibit

3    2046.

4             THE COURT:  Hearing no objection, it is received.

5                  (Whereupon, Plaintiff's Exhibit 2046 received

6                   into evidence.)

7    BY MR. FISCHER:

8    Q.      Dr. Haney, are there any specific portions of the

9    article you wish to highlight in terms of your discussion?

10   A.      Yes.  Dr. Sanchez begins on the very first sentence

11   of the very first page:

12             (Reading:)

13             Studies consistently show administrative segregation

14             units are high risk settings for inmate suicide.

15             (Reading concluded.)

16             And he develops that in a variety of ways throughout

17   the article, but on page 3 of the article, near the end of

18   the first full paragraph on page 3, he writes:

19             (Reading:)

20             Prisoners placed in the administrative segregation

21             units for their safety face similar stressors related

22             to being isolated.  They also may experience anxiety,

23             fear and paranoia associated with the initial safety

24             concerns that led to their placement in this unit.

25             (Reading concluded.)

2231

1          So the idea is one I expressed, that these are

2    difficult environments for healthy people.  They're

3    especially difficult for mentally ill people.  And they're

4    doubly difficult or triply (sic) difficult for mentally ill

5    people who have safety concerns which bring their own form of

6    psychological stress along with them.  And rather than the

7    stress being alleviated, they're placed in an environment

8    where it is exacerbated.

9    Q.       Doctor, are you aware of any CDCR analysis being done

10   on the relationship between placing safety-concerned prisons

11   in administrative segregation and suicide risk?

12   A.       Yes.  Yes, I am.

13   Q.       I ask that you turn your attention to Plaintiffs'

14   Exhibit 2047 marked for identification.

15          It is an exhibit and chart.  Can you describe what is

16   contained in these documents?

17   A.       Yes.  The document 2047 is a compilation that was

18   made for Dr. Canning -- Dr. Robert Canning who is the

19   Department of Corrections suicide prevention expert.

20          And there is a cover email to him which reports the

21   data which are being forwarded to him.  And then the rest of

22   2047 is a chart that Dr. Canning and his office prepared

23   analyzing a number of issues, but reporting data that, among

24   other things, addressed this issue of the frequency or

25   likelihood of suicide among prisoners who are placed in

2232

1    administrative segregation for safety concerns versus those

2    who are there for disciplinary concerns or disciplinary

3    reasons.

4    Q.      Dr. Haney, did you conduct a review of that analysis

5    done by Dr. Canning from CDCR?

6    A.      I did.

7    Q.      Turning your attention to Exhibit 2048, is that a

8    chart that reflects your analysis?

9    A.      Yes.  That's a chart that I prepared that reflects an

10   analysis, frankly a simple accounting, of Dr. Canning's data.

11          If you look back at Dr. Canning's chart, which is a

12   very informative chart and contains a lot of information,

13   that's the basis for that graphic.

14          MR. FISCHER:  Before you explain it, I would like to

15   move into evidence Plaintiffs' Exhibit 2047 and 2048.

16          MS. VOROUS:  Objection, Your Honor.  Again, these are

17   exhibits that were not part of Dr. Haney's prior testimony.

18          We also object to -- defendants object to Exhibit

19   2047.  It consists of hearsay and there is lack of foundation

20   as to what this document represents.

21          THE COURT:  Well, I'm told that Dr. Canning is the

22   CDCR person responsible for analyzing suicides.

23          Is there some dispute about that?

24          MS. VOROUS:  Your Honor, I don't dispute that he is

25   one of the individuals at CDCR responsible for analyzing

2233

1    suicides.  I think the objection is more to the fact of

2    whether this actually is an analysis.  Exhibit 2047 is a

3    cover email from an individual named Chris Yi to Dr. Canning

4    that is talking about information that's attached.

5            THE COURT:  I think what you are ultimately saying is

6    this is all hearsay and inappropriate on that basis?

7            MS. VOROUS:  Yes.

8            THE COURT:  Or not?

9            MS. VOROUS:  Yes, Your Honor.  But it is also -- I

10   don't see how this is an analysis, as it has been

11   characterized by counsel, for purposes of the testimony of

12   Dr. Haney.

13           THE COURT:  Well, I don't know what you are saying.

14   Hang on.

15               (Brief pause.)

16       I must confess to being perplexed about what the

17   document is.  I mean, it appears to be an email forwarding

18   the chart, I guess it is, or whatever, which also appears in

19   2047.

20           And I have no -- I mean, the objection is that it is

21   hearsay.

22           Well, that's not the objection, but that's an

23   objection that I'm raising.  I don't know what it is.  I

24   don't know who prepared it.  I don't know how accurate it is.

25           MR. FISCHER:  Your Honor, if I may?

2234

1          THE COURT:  Yes.  That's why I said what I said.

2          MR. FISCHER:  These were documents produced in the

3    course of the termination proceedings, discovery together,

4    the email and the chart by defendants.

5          They weren't Bates stamped, but they were produced to

6    plaintiffs.  There is another document that may explicate

7    what these things are that we are planning to present as

8    well.

9          I'm happy to hold off on entering this into evidence

10   until Dr. Haney has had an opportunity to discuss that as

11   well.  It may explicate the situation a bit.

12         THE COURT:  I'm now told, Miss Vorous, these are

13   documents you -- I don't mean you personally -- but your side

14   produced to the plaintiffs in the course of discovery

15   relative to the termination motion.

16         MS. VOROUS:  Your Honor, if, in fact, that's the

17   case, that does not necessarily mean that the documents are

18   admissible evidence in the course of a hearing or trial.

19         If they were responsive to a request, they may have

20   been produced absent --

21         THE COURT:  No.  I mean, if they were produced by

22   you, at worst they're, I guess, admissions against interest.

23   But in any event they are your records apparently.

24         I mean, I don't know.

25         Does anybody know what occasioned their production?

2235

1          I mean, if you ask him the question, "Send me any

2   piece of document no matter how far-fetched which bears upon

3   something that I care about," I would agree with Miss Vorous

4   that it would be unlikely.

5          If, on the other hand, the request was, "Send me all

6   the documents you have developed for specific purposes," then

7   it would appear to be admissible.

8          Does anybody know?

9          MR. FISCHER:  Your Honor, I don't have our request

10  for discovery dating from February, I believe, of this year,

11  but these documents are responsive to our specific request as

12  to suicide prevention efforts, suicide risk in administrative

13  segregation, and a few other related discovery requests that

14  we propounded at that time.

15         THE COURT:  It is 4:30.  I'm going to look forward to

16  starting tomorrow morning with you showing me what it is that

17  you asked for and what this was in response to.

18         MR. FISCHER:  Gladly.

19         THE COURT:  We'll stand in recess until 9:30 tomorrow

20  morning.

21              (Off the record at 4:30 p.m.)

22                        ---o0o---

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

   STATE OF CALIFORNIA  )
4  COUNTY OF SACRAMENTO )

5

6          I certify that the foregoing is a correct transcript

7

   from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
         CATHERINE E.F. BODENE, CSR NO. 6926
14       Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5

                           /s/ Kathy L. Swinhart
6                          KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25