1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---OO0---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7           Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12    _____/

13

14

15                          ---o0o---

16

17                     REPORTER'S TRANSCRIPT

18                   RE:  EVIDENTIARY HEARING

19                WEDNESDAY, NOVEMBER 20TH, 2013

20

21                          ---o0o---

22

23

24
     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  KATHY L. SWINHART, CSR NO. 10150

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
                315 MONTGOMERY STREET, TENTH FLOOR
 6              SAN FRANCISCO, CALIFORNIA  94104

 7              BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8              BY:  AARON FISCHER, ATTORNEY AT LAW

 9              BY:  JANE KAHN, ATTORNEY AT LAW

10              BY:  MARGOT KNIGHT MENDELSON, ATTORNEY AT LAW

11

12

13

14    FOR THE DEFENDANTS:

15               STATE OF CALIFORNIA, DEPT. OF JUSTICE
                 OFFICE OF THE ATTORNEY GENERAL
16               13OO I STREET
                 SACRAMENTO, CALIFORNIA  95814
17
                 BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
                 BY:   JESSICA KIM, DEPUTY ATTORNEY GENERAL
19

20

21                           ---o0o---

22

23

24

25
```

```
1                          EXAMINATION INDEX

2                              ---o0o---

3    FOR THE PLAINTIFFS:

4         EXAMINATION:                                  PAGE

5

6      DR. CRAIG HANEY

7         Direct Examination Cont'd by Mr. Fischer      2240
          Cross-Examination by Ms. Vorous               2319
8

9

10

11

12

13                             ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         EXHIBIT INDEX

 2                           ---o0o---

 3

 4   PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION               EVD
 5
        2034        Record Excerpt Prisoner WW        2239
 6
        2047        CDCR Suicide Data                 2239
 7
        2048        Chart - ASU Suicides              2242
 8
        2049        Analysis Results-CDCR Suicides    2244
 9
        2050        Record Excerpt Prisoner GG        2246
10
        2051        Record Excerpt Prisoner O         2262
11
        2052        Record Excerpt Prisoner V         2266
12
        2054        APA Position Statement            2285
13
        2055        UN Statement Re: Torture          2286
14
        2058        Chart-Length of Stay              2300
15
        2059        Chart-Length of Stay              2305
16
        2061        Chart-Length of Stay              2313
17

18

19                         ---o0o---

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3

 4    ***PER STIPULATION BY ALL PARTIES ON NOVEMBER 22ND, 2013,

 5    PAGE 2580, LINE 13, DEFENDANTS' EXHIBITS WILL BE DESIGNATED

 6    BY TRIPLE LETTERS.***

 7

 8

 9
      DEFENDANTS'
10    EXHIBIT NO           DESCRIPTION                  EVD

11      A            Mental Health Removal Chrono       2328
                     (Sealed)
12
        B            Interdisciplinary Progress Notes   2332
13                   (Sealed)

14      C            Vorous Dec. Supp. Reply            2339
                     (Sealed)
15
        D            Interdisciplinary Progress Notes   2344
16                   (Sealed)

17      E            Incident Report                    2352
                     (Sealed)
18
        F            Interdisciplinary Progress Notes   2354
19                   (Sealed)

20

21                          ---o0o---

22

23

24

25
```

2236

1                    SACRAMENTO, CALIFORNIA

2            WEDNESDAY, NOVEMBER 20, 2013, 9:34 A.M.

3                         ---o0o---

4            THE COURT:  Mr. Fischer.

5            MR. FISCHER:  Good morning, Your Honor.

6            At the end of yesterday's hearing, you had asked about

7    a production of documentation -- production of certain

8    materials.  I have those materials, if I may approach.

9            THE COURT:  Yes.

10           MR. FISCHER:  Your Honor, this relates to Exhibit

11   2047 --

12           THE COURT:  Right.

13           MR. FISCHER:  -- an e-mail and chart.

14           The first document is plaintiffs' requests which were

15   served on defendants.  You'll see a number of the requests have

16   to do with segregation and so forth.  The second document is

17   the response from defendants which identifies what documents

18   are being produced in response to that request.  The third

19   document is -- because it's electronic, we can only provide a

20   screen shot of the document in question.

21           Just to cut to the chase, it -- the document was

22   produced in response to Exhibit 37 according to defendants'

23   letter, which relates to administrative segregation.  And so if

24   there's any questions about authentication of the document or

25   so forth, we hope that resolves this.

2237

1          With respect to the meaning of the data on the chart

2    that Dr. Canning, the suicide prevention coordinator for CDCR,

3    had created --

4          THE COURT:  Stop talking.

5          MR. FISCHER:  Go ahead.

6          THE COURT:  Did you say document production No. 37?

7          MR. FISCHER:  That's what defendants said it relates

8    to.  Now, there's obviously other information, there's a whole

9    host of information on the chart.

10         THE COURT:  And where does it say that it's in response

11   to 37?  I mean, you've asked for all documents --

12         MR. FISCHER:  Of course.  It's a complicated

13   production.

14         In the final bullet on page 2 of the letter, it

15   identifies on disk seven --

16         THE COURT:  All right.

17         MR. FISCHER:  -- in the second line --

18         THE COURT:  Okay.

19         MR. FISCHER:  Yeah.

20         THE COURT:  Ms. Vorous, I mean, these things all appear

21   to be quite complicated, but it seems relatively

22   straightforward that you -- I don't mean you personally, your

23   office -- provided Exhibit 37 pursuant to this request.

24         MS. VOROUS:  Your Honor, it appears that that's the

25   case.  This request asked for documents associated with the

1    provision of 30-minute welfare checks in administrative

2    segregation.

3            THE COURT:  Yeah, and apparently that's not what they

4    were responding to because it asked for any document of any

5    kind and blah, blah, blah.  So the fact that you specified it

6    as responsive to No. 37 seems to me irrelevant.

7            MS. VOROUS:  I agree, Your Honor.  And we did object on

8    the basis of the discovery rules associated with the

9    admissibility as I indicated yesterday.

10           In addition, I would just like to add that this e-mail

11   does not indicate that this data was created by Dr. Canning.

12   The e-mail refers in particular to suicide data with respect to

13   a particular inmate.  So --

14           THE COURT:  Let me say I understand, but with the

15   greatest of respect it appears to me -- and maybe it's

16   inevitable under the circumstances -- to be a relative

17   confusion as to what the documents are and where they were

18   created other than it's clear that they're your documents and

19   were created by you.

20           The Court will order the three documents that -- I

21   guess there are three documents -- that were just handed up by

22   the plaintiffs be marked as Court's Exhibit No. 1, 2 and --

23   actually I suppose I could make them one exhibit, Madam Clerk,

24   or whatever is convenient.

25           THE CLERK:  What would you like me to mark them?

2239

1          THE COURT:  Court's exhibit.  The objection is

2     overruled.

3                    (COURT'S EXHIBIT 1 MARKED

4                    FOR IDENTIFICATION.)

5          THE COURT:  You may proceed, Mr. Fischer.

6          MR. FISCHER:  Your Honor, I would move into evidence

7     the documents in Exhibit 2047.

8          THE COURT:  This is 2047?  Yes, it is received; is it

9     not?  I thought it was four eight.  Hang on.

10          MR. FISCHER:  I'll get to four eight in just a moment.

11          THE COURT:  Oh, four seven.  It is received.

12                    (PLAINTIFFS' EXHIBIT 2047

13                    ADMITTED INTO EVIDENCE.)

14          MR. FISCHER:  Before I continue, Your Honor, one

15     oversight on my part.

16          Yesterday Dr. Haney discussed the record for prisoner

17     WW, Exhibit 2034, and I neglected to ask that it be moved into

18     evidence.

19          THE COURT:  2034 is received.

20          MR. FISCHER:  Thank you.

21                    (PLAINTIFFS' EXHIBIT 2034

22                    ADMITTED INTO EVIDENCE.)

23     /////

24     /////

25     /////

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

2240

1                          CRAIG HANEY,

2    was thereupon called as a witness herein by the Plaintiffs, and

3    having been previously sworn to tell the truth, the whole

4    truth, and nothing but the truth, was thereupon examined and

5    testified further as follows:

6                    DIRECT EXAMINATION (Continued)

7    BY MR. FISCHER:

8    Q.      Dr. Haney, yesterday you were discussing your review of

9    administrative segregation prisoner suicides, ah, for prisoners

10   with safety concerns.

11           I'm directing your attention now to Exhibit 2047, the

12   chart.  If you can unfold it in your binder.

13   A.      Yes.

14   Q.      Can you discuss what you found to be relevant to your

15   analysis on this issue in this chart.

16   A.      Yes.

17           Dr. Canning and his staff have entered a -- around the

18   middle of this chart labeled at the very top of the column

19   YASU, they've labeled the reasons for particular prisoner

20   placement in the administrative segregation unit, indicating

21   either behavior, by which I assume he meant disciplinary

22   behavior --

23           THE COURT:  I'm sorry, sir.  I don't know where you're

24   looking.

25           THE WITNESS:  I'm sorry, Your Honor.

2241

1           If you look across the top --

2           THE COURT:  Yeah.

3           THE WITNESS:  -- the very top of the labels, about

4    two-thirds of the way across there is a label that labels the

5    column that says YASU.

6           THE COURT:  Hang on.  YASU.  Okay.

7           THE WITNESS:  Then beneath that, that entire column,

8    and then it continues of course onto the next two pages, it has

9    an entry for the reason why the particular prisoner was placed

10   in administrative segregation.

11          And the -- for the most part, the labeling involves

12   simply either behavior or safety.

13          THE COURT:  Right.

14          THE WITNESS:  There are a few other instances in which

15   it appears to be a combination.

16          So if you look down, for example --

17          THE COURT:  No, I understand.

18          THE WITNESS:  Okay.

19          So all I did was a very simple calculation.  I went

20   through that column, and I counted the number that indicated

21   safety, that the person was placed in administrative

22   segregation for safety reasons, and then compared that to the

23   non-safety placements.

24          A couple of them were impossible to determine, and so I

25   obviously couldn't characterize them one way or the other.  And

1    then, to be conservative, there were some that indicated safety

2    and behavior.  I counted them as behavior, non-safety.

3    Q.    BY MR. FISCHER:  Dr. Haney, directing your attention to

4    Plaintiffs' Exhibit 2048.

5         Does this chart represent your counting of that -- that

6    information?

7    A.    Yes, it does.

8         MR. FISCHER:  Your Honor, I'd ask that Plaintiffs'

9    Exhibit 2048 be moved into evidence.

10        THE COURT:  Received.

11                        (PLAINTIFFS' EXHIBIT 2048

12                        ADMITTED INTO EVIDENCE.)

13   Q.    BY MR. FISCHER:  Dr. Haney, what findings are

14   represented in this chart?

15   A.    Well, the very basic and obvious finding that as many

16   or indeed slightly more -- although I'm not sure it's not a

17   significant difference, but slightly more of the administrative

18   segregation suicides were undertaken by prisoners who had been

19   placed in administrative segregation for safety reasons.  That,

20   of course, doesn't take into account the nine that couldn't be

21   interpreted.  But obviously the breakdown suggests that it is

22   roughly an equivalent amount of those who were in for behavior

23   versus those who were in for safety.

24   Q.    Dr. Haney, in the course of your review, did you have

25   the opportunity to see if CDCR had done an analysis of the data

1    that you just described?

2          MS. VOROUS:  Objection, Your Honor.  I'd just raise the

3    same objection as yesterday.  The scope -- this line of

4    questioning is beyond the scope of testimony that was

5    previously produced by Dr. Haney and that we've had an

6    opportunity to question him on.

7          THE COURT:  The objection is overruled.  I mean, this

8    is straightforward.  He's going to say he gave it to him and he

9    got no response or some such thing.

10         You may proceed.

11         THE WITNESS:  Yes.  I reviewed -- Dr. Canning analyzed

12   these data, and it was his chart, appears to be his chart.  His

13   office produced it.  And he has -- he's written a report in

14   which, among other things, he discusses exactly the issue that

15   I broke down these data on that are depicted in this graph.

16   Q.    BY MR. FISCHER:  Dr. Haney, turning your attention to

17   Plaintiffs' Exhibit 2049, the cover e-mail from Amy Eargle to

18   Robert Canning dated February 8th, 2013.  The subject is the

19   report to share at work group, and the attachment to that

20   e-mail is entitled CDCR suicides, results of recent analysis.

21         And just to be clear, if we go to page 4, the analysis

22   at the bottom has named Robert Canning, Ph.D., suicide

23   prevention coordinator, and Chris Yi, Y-I, BA, analyst.  And

24   it's dated January 25th, 2013.

25         Is this the report you just referred to?

2244

```
 1   A.      Yes, it is.

 2   Q.      What if anything in this report is relevant to the

 3   discussion that we've been having?

 4   A.      Well, Dr. Canning makes a number of interpretations in

 5   analyses of the data on the chart, but the key paragraph for

 6   purposes of this discussion is on page 2.

 7          Down near the bottom of page 2 of his report, in the

 8   paragraph that begins finally --

 9          THE COURT:  Wait, it's not received into evidence yet.

10   You want to move it, sir?

11          MR. FISCHER:  Yes, please.  2049.

12          THE COURT:  Give me just a moment.

13          Received.  Go ahead.

14                     (PLAINTIFFS' EXHIBIT 2049

15                      ADMITTED INTO EVIDENCE.)

16          THE COURT:  Please continue, Doctor.

17          THE WITNESS:  And the -- the paragraph indicates

18   essentially what I have been talking about.  First of all, that

19   there are many inmates housed in ASU placed there for

20   non-disciplinary reasons, but rather there for safety concerns.

21          And also he opines, and I would agree, that placement

22   in ASU of already fearful inmates, i.e. inmates who have safety

23   concerns, may only serve to make them even more fearful and

24   anxious, which may precipitate, as I said, a state of panic,

25   desperation, and the urge to die.
```

1    Q.      BY MR. FISCHER:  Dr. Haney, did you observe mentally

2    ill prisoners in ASU yourself during the tours earlier this

3    year?

4    A.      Yes.  Many, many, many.

5    Q.      Are there any particular individual cases that stick

6    out in your mind?

7    A.      Yes.

8    Q.      Can you describe.  And just to assist the Court, I'll

9    refer Dr. Haney and Your Honor to Plaintiffs' Exhibit 2050.

10          THE COURT:  2052?

11          MR. FISCHER:  2050, marked for identification at this

12   point.

13          THE COURT:  Oh, I see.  It was just hidden.  Okay.

14          THE WITNESS:  This is a prisoner who I saw at the

15   Corcoran State Prison when I visited there and interviewed

16   prisoners on the 19th of February.

17          He told me that he had a long mental health history

18   that dated back to before he came to prison.  And he said that

19   he was in ad seg for safety reasons, not for disciplinary

20   reasons.  He said that he had gotten to Corcoran a few weeks

21   earlier and had been placed in ad seg because he had safety

22   concerns, but he hadn't gotten his property.  He was concerned

23   about where it was.  I did look into his cell.  There was

24   virtually nothing in there.

25          And he told me that he had been to the mental health

1    crisis bed unit as recently as December.  I saw him in

2    February.  He said he had been to the MHCB in December for

3    cutting himself.  He showed me some of the scars.

4          I subsequently looked at his records and --

5    Q.    Dr. Haney, are those records contained at 2050?

6    A.    They are, yes.

7          MR. FISCHER:  I'd ask that Plaintiff's Exhibit 2050 be

8    moved into evidence.

9          THE COURT:  Received.

10                    (PLAINTIFFS' EXHIBIT 2050

11                    ADMITTED INTO EVIDENCE.)

12   Q.    BY MR. FISCHER:  Please continue, Dr. Haney.

13   A.    In fact, some of the records described his state of

14   mind not long before I saw him.  So I saw him February 19th.

15   On February 8th, a clinician reported that this particular

16   inmate had a history of mental health issues, that he was

17   currently very angry and violent, and that he was yelling and

18   threatening -- threatening staff obviously in a very agitated

19   and angry state.

20         He later on, on the 27th of February -- now this is

21   after I've seen him -- reports, or the clinician reports that

22   he has racing thoughts, agitation, restlessness, trouble with

23   sleep each night, yet he's not on any medication.

24         Later and farther down in this report, it says, he

25   tells clinician I'm here in ad seg for safety reasons, but I

2247

1    have no safety concerns.  He's volatile.  He's -- having just

2    met with his physician, a little later, there's a clinical

3    report in -- this is in March.  He reports a history of

4    multiple suicide attempts.  It lists four or five of them in

5    previous years.  So obviously this is a person who has serious

6    mental health issues all through this period of time he's in

7    administrative segregation.

8         He's upset about the fact he's there.  He originally

9    was placed there for safety concerns.  He now claims he doesn't

10   have any.  But he's obviously very agitated and obviously being

11   retained in administrative segregation.

12        A little bit -- further analysis of him reports that he

13   has -- again, this is a clinical analysis by CDCR staff.  He

14   has a number of chronic risk factors for suicide, and it also

15   notes his suicide gestures in the past.

16        In March, about a month after I saw him, he had --

17   again, a clinical report that he has mental health complaints

18   including auditory hallucinations, anxiety, depressed mood.

19   He's angry, hostile, uncooperative, makes excessive demands.

20   He has a history of multiple suicide gestures, multiple ACH

21   admissions.

22        THE COURT:  What is OCH, if you know, sir?

23        THE WITNESS:  I believe that's acute care hospital,

24   Your Honor.

25        THE COURT:  Oh, ACH.  I'm sorry.

1          THE WITNESS:  He is later in June, still in

2    administrative segregation.  He has exhibited cell-side

3    symptoms, mood disorder and paranoia.  He -- these reports

4    continue.  He continues to be upset, continues to complain

5    about his placement.  He is still retained in administrative

6    segregation.

7          We're now into June.  Remember I saw him in February.

8    Ah, he had been there for a little while after having come from

9    a mental health crisis bed, mental health crisis bed to

10   administrative segregation for safety concerns.  He's

11   complaining about obviously reacting badly to administrative

12   segregation.

13         By the end of June, a clinician reports his being in

14   lock-up seems to have a fatiguing effect on him, and he has

15   much time on his hands to consider negative issues.  And,

16   indeed, I'm sure he does because there's very little else for

17   him to do in administrative segregation.

18         He seems to project blame on mental health and to help

19   him to cope.  So he's obviously asking them and is angry at

20   them because they don't have -- they don't seem to be able to

21   help him to cope, and they don't know what they could do to

22   help him to cope.

23         THE COURT:  Other than getting him out of ad seg.

24         THE WITNESS:  Exactly, Your Honor, which they're not

25   empowered to do.

1          And that's exactly what occurs through the clinical

2     staff the next month.  They -- they see him in July.  Now we're

3     many months into this.

4          The clinician writes this inmate's condition seems to

5     have worsened, and he is more angry and frustrated than ever.

6     His being in lock-up for so long appears to be a major

7     contributor to his distress.  His anger over not getting

8     treatment he has found helpful has made it difficult for him to

9     get any help at all.

10          And so it continues -- I mean, this goes on through

11     August.  They talk about later on, a little bit later in

12     August, the clinician begins to explore the possibility of

13     making a recommendation that he be moved to -- to -- out of

14     administrative segregation.  He's asking the clinicians to help

15     expedite his transfer.

16          Again, remember, he's there not because of a

17     disciplinary infraction.

18          THE COURT:  We got it.  We really got it.

19          THE WITNESS:  Now we're in August.  He's been in

20     lock-up for seven months without any 115s.  This is a clinical

21     report.

22          This writer -- this is the clinician writing.  This

23     writer wants to write a chrono indicating that continued

24     lock-up is adversely affecting inmate's mental state.  Writer

25     chrono next week and request co-signature from the supervising

2250

1    psychologist.  And, in fact, eventually he ends up being moved

2    out of the unit.

3         I couldn't find in the records any indication that that

4    chrono had actually been written.  But, in fact, the clinician

5    certainly recognizes exactly the problem the inmate himself was

6    voicing, that not just this inmate but many inmates voiced,

7    many of them in a very vulnerable mental state, but housed in

8    administrative segregation with seemingly no time limit.

9         Part of his frustration when he talked to me was he

10   didn't know when he was going to get out or what he could do to

11   get out.  And --

12        THE COURT:  As far as you know, the placement of --

13   asking you, not telling you -- the placement of this inmate and

14   others who were being placed there for safety or other than 115

15   reasons, is this decided by custody, and it is custody's

16   obligation -- not obligation, but responsibility to get them

17   out if a clinician tells them, look, this is very bad for the

18   mental health of the inmate?

19        Is that your understanding, sir?

20        THE WITNESS:  It's not my understanding, Your Honor.

21   And I can't say that that's not the case.  I've seen little or

22   no evidence of it occurring.

23        I think the clinical staff -- in the records that I

24   reviewed, I don't recall clinical staff having made that

25   recommendation about getting somebody out of ad seg.

2251

1        THE COURT:  Despite the fact that they recognize being

2   in ad seg is adversely affecting the mental health of the

3   inmate?

4        THE WITNESS:  Yes.  Yes.  Most of the time, the

5   entries -- even when there is that recognition, the entries are

6   assist inmate in developing coping mechanisms or some kind of

7   clinical entry along those lines.

8        Now, obviously if the inmate deteriorates sufficiently

9   that he needs to be moved into a mental health crisis bed or a

10  higher level of care, of course, they can make that decision.

11  But in terms of getting this inmate out of ad seg because it's

12  having an adverse impact, I saw virtually none of that.  I

13  don't recall having seen chronos to that effect.  And obviously

14  in this case it was talked about, but the record didn't reflect

15  or at least I couldn't find any chronos indicating that that

16  had actually been done.

17       THE COURT:  Can you account -- I don't know why I ask.

18  I suppose you can't.

19       Is there any indication in any of the records that you

20  reviewed relating to the reason that you found that clinical

21  staff is not advising custody that this guy, he's got to get

22  out of ad seg because it's having adverse effects?

23       THE WITNESS:  I see no documentation to that effect.

24       My impression of this is, having talked to people and

25  looked at -- and spent a fair amount of time looking at records

2252

1    and touring these institutions, is that there are custody

2    decisions and there are mental health decisions, and they are

3    oftentimes treated very separately.  And the issue of whether

4    or not somebody is going to be retained in ad seg is largely

5    viewed as a custody decision, even if the justification for it

6    is a non-behavior or safety related concern or even a lack of

7    bed concern.

8            THE COURT:  In the last hearing we heard about joint

9    custody mental health -- I don't know that meetings is the

10   right word -- conferences.  They met together, and it was a

11   regular routine occurrence, and apparently that had some

12   significant effect on the way at least that San Quentin

13   decisions were being made.

14           Is it your -- well, I mean, who knows what the answer

15   is.

16           Doesn't it seem likely to you -- likely is too strong.

17           Doesn't it seem not unreasonable to expect that joint

18   meetings might have the same effect in these kind of cases?

19           THE WITNESS:  It does, Your Honor.  And certainly

20   assuming that the clinicians feel empowered to make

21   recommendations about that sphere of that inmate's life in

22   prison; in other words, to make a recommendation which would

23   have a custody related implication.

24           And my sense is that, as I said earlier, I think there

25   is more of a dividing line between jurisdictions, if you will,

2253

1      then there should be.

2            THE COURT:  Okay.  I understand.

3            Sorry I interrupted you, Mr. Fischer.

4            MR. FISCHER:  Of course.

5      Q.      Doctor, as you've testified, this individual was

6      identified as having safety concerns on the yard.

7            What -- in your opinion, what should happen for an

8      individual like this once those safety -- such safety concerns

9      are identified?

10     A.      Well, clearly he needs to be taken to a -- a safe area

11     or unit in the prison, and that might even be in an

12     administrative segregation unit where he's kept for a very

13     brief period of time.  But then that inmate, and inmates like

14     him, need to be moved to an environment where, ah, they're not

15     being deprived of all of the other aspects of their -- of their

16     treatment, of their daily life, et cetera.

17           It -- you know, as we've talked at length now, and I

18     won't keep repeating it, but administrative segregation is a

19     very severe environment.  It places -- fragile, vulnerable,

20     mentally ill prisoners, and now one who has got safety concerns

21     and therefore is more fragile even, needs to be in an

22     environment in which there is an opportunity for him to receive

23     the kind of treatment he was receiving in the main line or in a

24     general population setting, to have activities to engage in and

25     so on, clearly to do that under circumstances where he's safe

2254

1    and secure.

2         But you see by this case and a number of the others

3    that I saw, some of them I've talked about, how a person in

4    this situation deteriorates over time, and it adds and worsens

5    the already vulnerable condition and threatened condition that

6    they're in.

7    Q.    Dr. Haney, based on your knowledge and experience in

8    other systems, are there systems able to move individuals with

9    safety concerns into units different than the administrative

10   segregation units you've described?

11   A.    My experience is this is a very unusual phenomenon in

12   California, keeping what ordinarily would be called protective

13   custody inmates in the same unit as prisoners who are there for

14   disciplinary or behavior related, ah, issues.  That is to say

15   certainly keeping them any long period of time.

16        Most -- sort of basic correctional practice suggests

17   that that's a bad mix for various reasons.  To have people who

18   are there because they've been threatened, in environments

19   where they may be near groups of people who might, in fact, be

20   threatening is generally just regarded -- the mental health

21   issues aside -- generally regarded as a questionable practice.

22        Again, it could be done on an expedient basis if you've

23   got to move somebody out of the yard, you've got to know where

24   else to put him to keep him safe.  And administrative

25   segregation is a lockdown unit.  You can assume he's going to

1    be safer there than elsewhere.  But there also typically is an

2    urgency to moving that person into a more appropriate

3    environment, one that is not an administrative or lockdown

4    setting.

5    Q.    Dr. Haney, you've mentioned a few times now prisoners

6    with mental illness being placed in ASU for lack of bed.

7         Can you explain what you mean by that.

8    A.    Well, lack of bed doesn't only mean lack of a safety

9    bed.  It means a number of different things, as I learned in

10   these tours.  It can mean a lack of bed in the institution.

11        So you may have prisoners who otherwise would be in

12   general population, either reception center prisoners or

13   prisoners from a main line general population housing unit,

14   there's not enough space in the prison to hold them, so they

15   get shunted into administrative segregation where they are

16   treated almost identically with other administrative

17   segregation prisoners.

18        There was also a practice, I saw it most clearly

19   demonstrated in CCI Tehachapi, of bringing security housing

20   unit prisoners -- these were prisoners who were in a security

21   housing unit because they would be serving a term, a

22   disciplinary term as a sanction.  The term is over.  Instead of

23   releasing them to the general population, which is what having

24   finished a security housing unit term ordinarily would lead to,

25   they're put instead as a matter of routine into an

1   administrative segregation unit awaiting transfer to somewhere

2   else in the system, oftentimes for months on end.  These are

3   not short-term placements, and there are many of them.

4          So, for example, in the administrative segregation unit

5   that I toured in CCI, over half of the prisoners in that

6   administrative segregation unit were there awaiting a bed

7   somewhere else in the system, having already finished their SHU

8   term.  So they could spend three, four years in a lockdown

9   security housing unit, finish that term and come out, and

10  instead of coming out and going to a main line, coming out and

11  going into another lockdown unit where they wait for an

12  indefinite period of time.

13         Again, these are guys all complaining that not only am

14  I here in this place, I'm not sure why I'm here, but I don't

15  know when I'm going to get out or how I'm going to get out or

16  what I can do to get out.

17  Q.     Dr. Haney, among the individuals you just described,

18  does that include mentally ill prisoners?

19  A.     Yes.  Again, those were the only ones I spoke to.  So,

20  yes, it did.

21  Q.     Dr. Haney, I'm going to have you explain what's in the

22  photograph in Plaintiffs' Exhibit 2019, which is already in

23  evidence.

24         Can you describe what's in this photograph and how it's

25  relevant to this analysis.

2257

1    A.      Yes.

2           This is a photograph of the housing census board in the

3    administrative segregation unit in Cypress Hall.  This is a

4    board that, for the most part, correctional officers refer to,

5    which tells them who is in which cells in the unit and why.

6           So you can see at the very top, there is a legend which

7    has colors, and then it indicates the labels of who is in these

8    categories, essentially what the color coding refers to.  So

9    you can see some of them -- so new ad seg intake, the very

10   middle, for example, that would be a faint blue color.

11          If you look at the board as a whole, if you step back

12   from it as I did when I first saw it, you're struck by the fact

13   that this board is dominated by kind of the light pink or

14   salmon-colored series of cards, each referring to a prisoner in

15   a cell, and then a purple card or a purple-colored card.

16          So I wanted to know who all these people were, because

17   they clearly virtually filled the administrative segregation

18   unit.  And I looked up on the legend, and it says they are

19   either SNY LOBs or GP LOBs.  That's indicated, again, on the

20   top row all the way over on the right.  The salmon or light

21   pink color is SNY LOB.  GP LOB is the purple color.

22          I stood there for a minute or so trying to figure out

23   what LOB meant.  I've been in prisons a lot, and I'm used to a

24   lot of the terminology and acronyms and so on.  And I

25   thought --

1           THE COURT:  Lack of beds.

2           THE WITNESS:  Yeah, that's what it turns out.

3           I asked finally asked the correctional --

4           THE COURT:  It means lack of beds.  Please, go on.

5           THE WITNESS:  Yeah, lack of beds.

6           So I asked what it meant.  We don't have any beds for

7      these guys, so we stuck them in ad seg.  Sure enough, that was

8      the case.

9   Q.      BY MR. FISCHER:  Doctor, did you learn --

10          THE COURT:  What does the salmon represent?

11          THE WITNESS:  These are SNY, apparently sensitive needs

12     yard, lack of bed prisoners.

13          THE COURT:  Okay.  What is the purple?

14          THE WITNESS:  GP lack of --

15          THE COURT:  General population.

16          THE WITNESS:  General population.

17          THE COURT:  Thank you.  You may proceed.

18   Q.     BY MR. FISCHER:  Dr. Haney, did you learn what the

19     conditions of confinement were for these LOB prisoners in this

20     segregation unit?

21   A.     Yes, I did.

22          They were housed in Cypress Hall, which is a -- is one

23     of the administrative segregation units in the California

24     Institution for Men.  They were living in that -- in that unit

25     much like the other prisoners in administrative segregation in

2259

1     that unit.  They were subject to, for the most part, the same

2     rules and regulations and restrictions.

3          The mentally ill prisoners who were in that unit as a

4     result of lack of bed, and there were a number of them,

5     received their mental health or clinical contact under the same

6     circumstance as administrative segregation prisoners did, even

7     though they were not themselves technically administrative

8     segregation prisoners.  And they, as I said, were subject to

9     the same basic deprivations as the prisoners in that unit.

10         THE COURT:  Sir, is there any tag which says this

11    person is legitimately here because of disciplinary problems?

12    What color would those be?

13         THE WITNESS:  Those are on my -- would be the

14    orange-colored ones.  And that you see a little on the -- up

15    near the upper left corner, just down a little bit from the

16    top.  And then you see at the very bottom there are a whole row

17    of prisoners who appear not to be either kind of LOB.

18         So they appear to be -- if you look up at the top, the

19    designation appears to be, just to the left of the LOBs, ad seg

20    SNY.

21         THE COURT:  Very quickly counting, there appear to be

22    12 rows down and I don't know how many across.  But people who

23    are there for legitimate disciplinary reasons don't seem to

24    equal an entire row; is that right?

25         THE WITNESS:  Yes, that's correct.

2260

1          THE COURT:  You may proceed, counsel.

2   Q.      BY MR. FISCHER:  Dr. Haney, did you inquire as to

3   whether these LOB prisoners received the safety welfare checks

4   like other ASU prisoners?

5   A.      I was told that they did not.

6   Q.      And did you inquire as to whether these LOB prisoners

7   received an ASU suicide risk screening when they come into this

8   unit?

9   A.      I was told again that they did not.  They were

10  technically not considered administrative segregation

11  prisoners, so they weren't subject to those administrative

12  segregation precautions even though they were living in an

13  administrative segregation unit.

14  Q.      Dr. Haney, what was your impression -- did you speak

15  with some of these prisoners who were LOBs?

16  A.      I did.  I spoke to a number of them, five or six of

17  them.

18  Q.      Were they class members?

19  A.      Yes.  Yeah, that was how I was given access to them.

20  Q.      What was your impression of these prisoners when you

21  spoke with them?

22  A.      They were in very bad shape.  They -- first of all,

23  they were confused about why they were in administrative

24  segregation.  They complained about the treatment there.  They

25  complained about the restrictions, the property and other

 1   restrictions.

 2          They complained about the fact that they were subject

 3   to the same rules and regulations with respect to outdoor yard.

 4   So they exercised in an administrative segregation yard.

 5          They also received their clinical contacts in a

 6   treatment cage inside -- actually in an area that I showed a

 7   photograph of yesterday.  And, you know, several of them said

 8   this is just difficult for me to deal with.  I don't know -- I

 9   don't know what's happening here.  I don't know why I'm here.

10          One inmate said that he -- inmates in administrative

11   segregation have their eating utensils taken, and he didn't

12   have any, and he said he was eating his food with his I.D.

13   card.  And, you know, they were both upset with the conditions

14   of their confinement, but also upset about being confused about

15   why they were there.

16          MR. FISCHER:  Dr. Haney, can you turn to Plaintiffs'

17   Exhibit 2051.  These are inmate-patient records.

18          As long as we're moving into this section of the

19   exhibits, for the record, 2050 that was discussed earlier by

20   Dr. Haney is prisoner GG.  The records are redacted, so just

21   for the record it's prisoner GG.

22          THE COURT:  I'm sorry.  Prisoner GG?

23          MR. FISCHER:  GG was Exhibit 2050.

24          THE COURT:  Is it CG or GG?

25          MR. FISCHER:  GG, girl girl.

1    Q.      Dr. Haney, Plaintiffs' Exhibit 2051, are these records

2    of an individual who you met with inside the CIM unit you've

3    been describing?

4    A.      Yes.

5            MR. FISCHER:  Your Honor, I'd ask that 2051 be moved

6    into evidence.

7            THE COURT:  Received.

8                            (PLAINTIFFS' EXHIBIT 2051

9                            ADMITTED INTO EVIDENCE.)

10   Q.      BY MR. FISCHER:  Dr. Haney, can you describe the

11   experience briefly with this Haney prisoner O.  Can you

12   describe his experience in the ad seg.

13   A.      This is prisoner O?

14   Q.      Correct.

15           THE COURT:  I'm completely lost.  I though you told me

16   this was GG.

17           MR. FISCHER:  I hadn't -- for the record, 2050 that we

18   spoke about a few minutes ago hadn't been identified, so I took

19   the opportunity to identify it.  2050 is GG.  2051 is O.

20           THE WITNESS:  Prisoner O was a prisoner who I saw in

21   CIM, this facility we've been talking about, on the 12th of

22   February of this year.

23           He told me that he was housed in ad seg.  He was a

24   CCCMS prisoner housed in ad seg, and he said to me I don't know

25   why I'm here.  I'm being treated like I'm in reception, but

2263

1    I've already been through reception.  I'm being treated like

2    I'm an ad seg prisoner, but I've had no disciplinary violation.

3         He was sent to CIM in April of the -- of the preceding

4    year.  He'd been there for nine months, but for reasons that he

5    said he didn't understand, he was sent suddenly to ad seg.

6         He talked about, ah, how the idleness or inactivity was

7    getting to him; that he didn't have a television set in ad seg.

8    According to him, he went out to yard no more than about once a

9    week.

10        And he said that it was particularly difficult for him

11   because he felt he had been doing reasonably well, programming

12   reasonably well on the main line prison yard that he was on.

13   But that now that he's in ad seg, he's not coping so well.

14   He's not stable.  He said I've had thoughts of killing myself

15   in ad seg, and I struggle to get my brain to calm down in this

16   very difficult setting.

17        I looked at his records, and the records indeed

18   reflected many of the same things.

19        He -- I saw him in February.  In March, just about two

20   or three weeks after I saw him, he wrote a chrono requesting to

21   see a psych -- he misspelled it -- to see a psychologist.  I

22   need help, he said.  This was on the 8th of March.  And the

23   description of what he had to say about it is I'm going crazy

24   waiting to find out what's going on.  And he reported having

25   been moved from A yard and has not been told where he'll be

1    re-housed or when he'll be re-housed.  It continued, this saga

2    continued into March.

3          There's another contact where he's described as having

4    an anxious mood, reporting frustration over his current

5    situation, reported being moved out and not knowing why or when

6    he will be re-housed.  This is on the 15th of March.

7          By April, the middle of April, a clinician describes

8    his mental state, his mental illness history saying that --

9    reporting that he's had episodes of depression since age four.

10   He stated that his depression is constant if he does not take

11   his medication.  It's reported that he tried to kill himself

12   earlier, not currently, that he tried to hang himself.  So he

13   obviously is a person with past suicide attempt history.  And

14   he finally is moved by the middle of April.

15         And there's a notation at the bottom that, since he's

16   been moved, he is not reporting any symptoms, that he's been

17   moved to A yard, back to A yard, and that he's pleased with his

18   transfer.  But, in between, there is a kind of four- or

19   five-month period of him being in acute stress, obviously a

20   vulnerable prisoner, a prisoner with a very long suicide

21   history talking about thinking about suicide when he's in

22   administrative segregation because of the pressure and the

23   stress under which he's being kept, again, an apparent lack of

24   bed transfer without any real explanation and without any real

25   expectation when he would be released from that administrative

1    segregation unit.

2    Q.    BY MR. FISCHER:  Dr. Haney, based on your expertise and

3    your review of this particular prisoner, was this prisoner

4    placed at risk of psychological harm based on his placement in

5    administrative segregation?

6         MS. VOROUS:  Objection, Your Honor.  I believe that's

7    beyond the scope of this witness's expertise.  He's not a

8    clinician, and to the extent he's providing opinions with

9    respect to a diagnosis, we object on that basis.

10        THE COURT:  He can certainly report what the clinician

11   said, but he's already done that.  You may proceed.

12   Q.    BY MR. FISCHER:  Dr. Haney, I want to turn to one

13   additional issue that you mentioned, which was inmate-patients

14   who were moved from a SHU into an administrative segregation

15   unit pending transfer that you just discussed a moment ago.

16   A.    Yes.

17   Q.    Are there any specific inmate-patients that stick out

18   in your mind that illustrate this issue?

19   A.    Yes, there are.

20   Q.    And turn your attention to Plaintiffs' Exhibit 2052.

21   These are records for Haney prisoner V, V as in very.

22        Dr. Haney, are these the mental health records for the

23   prisoner that you're referring to?

24   A.    They are.

25        MR. FISCHER:  Ask that they be moved into evidence,

2266

1    Your Honor.

2              THE COURT:  Received.

3                        (PLAINTIFFS' EXHIBIT 2052

4                        ADMITTED INTO EVIDENCE.)

5    Q.    BY MR. FISCHER:  Dr. Haney, can you briefly describe

6    your review of this inmate-patient's experience.

7    A.    I can.

8              This is a prisoner who I saw at the California

9    Institution for Men, but he had been at CCI Tehachapi, and the

10   story actually for him begins at Tehachapi.  When I saw him, he

11   talked to me about having been in the administrative

12   segregation unit at Tehachapi earlier.  I saw him in February.

13   As I said, I visited CIM on February 12th.

14             He said that he became very upset when he was at

15   Tehachapi because he had been kept in the harsh segregation

16   unit, the administrative segregation unit there for some six

17   months, and his mental health deteriorated significantly while

18   he was there.  He was transferred to CIM, which is where I saw

19   him, because of that.  They have a mental health crisis bed

20   unit at CIM.  They don't have one at CCI.  When he deteriorated

21   so badly, they sent him to CIM.

22             He said that he was -- at the time when he left CCI,

23   having been in administrative segregation, he was very

24   suicidal.  He said he wanted to kill himself.  And the reason

25   he said was he was desperately frustrated.  He had been already

2267

1    validated or approved to go to an SNY bed at Kern Valley and

2    yet was retained in the administrative segregation unit at CCI.

3    And he said it was very difficult for him to -- to tolerate the

4    lockdown conditions there.

5         Actually when he talked to me about this, he became

6    emotional in talking about how difficult it was.  He said when

7    he was in his ad seg cell at CCI, he rarely left his cell.  He

8    said because, in large part -- and this is what he indicated

9    was the reason, he was strip-searched when he left the unit.

10   And so he decided that he wouldn't -- that he didn't -- that he

11   wouldn't go to treatment because he didn't want to undergo the

12   strip search.  As he put it to me everything, squat, cough,

13   everything, indicating that this procedure was something that

14   he felt was humiliating and deterred him from getting treatment

15   while he was waiting to be transferred somewhere else.

16        And so he ended up deteriorating.  There is suicidal

17   behavior, it's reflected in the records, and he gets sent to --

18   he gets sent to CIM.

19        When you saw him, he was in a mental health crisis bed,

20   but that too was a very difficult circumstance to be in.  He

21   was getting more mental health care, or at least attention, but

22   he talked about what really are very severe cells in the mental

23   health crisis bed unit.

24        These are basically suicide prevention cells, and he

25   talked about how very depressing it was there, that it was cold

2268

1    in the cells.  He said he was having a hard time with the

2    isolation in the mental health crisis bed, too.  He said I like

3    to talk to people, but I hear voices.  But when I talk to

4    people, it calms the voices down.

5         He was on a list to go to a DMH facility.  He didn't

6    know which one he was going to go to or when.  Obviously it

7    traumatized him in the mental health crisis bed, and they sent

8    him on somewhere else.

9         He told me that he didn't like the treatment cages in

10   the unit and that he felt that the bars were coming in on him

11   when he was in them, so he tried -- avoided them for that

12   reason in part as well.  He was a prisoner in some distress.

13        Of course, I made a point of looking at his records,

14   and essentially what he told me was bourne out by the records

15   themselves.

16        He reported a week before the suicide attempt at CCI --

17   so this is in January, late January of 2012.  Excuse me, 2013.

18   I saw him in February about a month later.

19        He reported, I need to see my case worker.  I'm having

20   a hard time.  He makes the request, but there -- but there is

21   nonetheless a suicide attempt which occurs after that, in which

22   he apparently breaks off his glasses and swallows part of them

23   and apparently sticks another part of them into his stomach,

24   into his abdomen.

25        And he -- there's a rules violation report which

2269

1    reports that and describes what happened.  He's taken to a

2    hospital for an X-ray.  They X-ray him.  They reveal that there

3    is a piece of metal that's observed in his intestines, and he

4    is taken -- that's when the order is given to take him to a

5    mental health crisis unit, and he's transferred to CIM.

6    Q.     Dr. Haney, you mentioned in that description a rules

7    violation report.  Can you explain what you mean by that?

8    A.     Well, this inmate was written up for the suicide

9    attempt.  He got a rules violation for breaking his glasses and

10   using them in an attempted suicide.  He ended up being

11   convicted of that rules violation and receiving a sanction,

12   receiving punishment for it.

13          Oddly enough, it didn't -- it didn't appear to me that

14   there was any clinical evaluation indicating that this rules

15   violation was related to his mental health condition, even

16   though --

17          THE COURT:  When he was found guilty of this rules

18   violation, he was put back into the same segregated housing

19   unit because that's the punishment?

20          THE WITNESS:  Well, it would have been except that he

21   was, because of this suicide attempt, now being taken to a

22   mental health crisis bed.

23          THE COURT:  But eventually he's going to be put in a

24   segregated housing unit.

25          THE WITNESS:  Eventually that would be a very likely

2270

1  outcome.  Although, in this particular case, as you'll see, he

2  ends up getting worse rather than better.

3          THE COURT:  No, I understand that.  But if the crisis

4  bed unit stabilizes him, they're going to put him into the very

5  unit that caused him to attempt to commit suicide to begin

6  with.

7          THE WITNESS:  That would be my expectation, and that's

8  exactly what I saw in other cases, a similar or parallel kind

9  of process in which somebody is stabilized, and then they get

10  back in exactly the same situation that precipitated or

11  provoked the suicide attempt or the decomposition.

12  Q.      BY MR. FISCHER:  Dr. Haney, one question on the

13  disposition of the rules violation report.

14          Did -- was it determined whether this individual's

15  mental illness contributed to the behavior that led to the

16  rules violation?

17  A.      Ah, well, it -- what the rules violation report

18  indicated is that the inmate did not display bizarre, unusual

19  or uncharacteristic behavior, indicating a possible mental

20  disorder.  So there was no evaluation done of him to indicate

21  whether or not there should be a mitigation of punishment or

22  guilt in this instance.

23          So even though he was understood to be a Coleman class

24  member, the correctional officer who responded to the suicide

25  attempt indicated that this didn't have anything to do with his

2271

1    mental health history or problems, and so there was no

2    mitigation of punishment on the basis of his mental health

3    status.

4    Q.      Dr. Haney, directing your attention to page 13 of 27,

5    the final rules violation report, the disposition.

6            Is there any other information in there regarding

7    consideration of his mental health condition?

8    A.      Yes.  Yes, there is.

9            He -- it indicates that he lost credit for the offense

10   and lost his dayroom privileges as a result.  So he was found

11   guilty, and he was in fact sanctioned for the behavior.

12           He was -- if I have read this correctly, he was at a

13   California medical facility, he was at a hospital facility

14   because he had deteriorated so badly at the time of the

15   disposition of his rules violation report where they found him

16   not only guilty, but not having a mental health explanation or

17   motivation --

18           THE COURT:  Sure.  Of course, of course.  Lots of

19   people are put in hospitals who have no problems.  I mean, I

20   don't understand why you're surprised.

21           Go ahead.

22   Q.      BY MR. FISCHER:  Dr. Haney, are you --

23           THE COURT:  You know what, let's stop for a moment.

24   That remark was inappropriate.

25           We're going to take our morning recess.  Fifteen

1    minutes.

2             (Recess taken at 10:28 a.m.)

3                       ---o0o---

2273

1          (Back on the record at 10:50 a.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Mr. Fischer.

5          MR. FISCHER:  Thank you.

6    BY MR. FISCHER:

7    Q.      Dr. Haney, are you aware that since the filing of

8    plaintiffs' motion, defendants have issued a new policy on

9    non-disciplinary status of prisoners in segregation?

10   A.      Yes, I have.

11   Q.      Have you reviewed that new policy?

12   A.      Yes, I have.

13   Q.      And have you reached an opinion as to the

14   appropriateness of that new policy?

15   A.      Yes, I have.

16   Q.      What is that opinion?

17         MS. VOROUS:  Objection, Your Honor.  I raise the

18   objection that Dr. Haney has not previously provided any

19   reports with respect to his opinion on --

20         THE COURT:  Of course not.  It was just filed

21   subsequent to the motion.

22         You may proceed, sir.

23         THE WITNESS:  Your Honor, it's an explicit

24   recognition that prisoners who are in administrative

25   segregation for non-disciplinary status warrant being treated

2274

1    differently in the administrative segregation units that

2    they're in.

3         But it really makes very limited, very modest

4    modifications in their conditions of confinement.

5         It provides them with modestly more access to

6    property, modestly more access to canteen and telephones.  As

7    I read it, really virtually nothing else.

8         So all of what I have been talking about in terms of

9    the adverse conditions of confinement, especially for Coleman

10   Class Members, caged treatment, caged exercise, limited

11   out-of-cell time, lack of contact visits, no time limits for

12   the amount of duration or the stay in the administrative

13   segregation unit, all of those things still apply.  There is

14   no modification to any of that, of what I would regard as the

15   fundamentals of the conditions of confinement.

16        And there is no special mention or special

17   modifications made for Coleman Class Members.  The status of

18   mentally ill prisoners who are in administrative segregation

19   for non-disciplinary reasons is not explicitly addressed at

20   all.

21   BY MR. FISCHER:

22   Q.   Dr. Haney, yesterday the court asked you a few

23   questions about the feasibility of a solution to some of the

24   issues that you've raised given CDCR's system and the amount

25   of prisoners in the system.

2275

1      Beyond what you testified to yesterday, do you have

2  any additional opinions as to the feasibility of a solution

3  to these issues?

4  A.      Yes.  Yes, I do.

5      I am mindful of the court's expressed concern of the

6  population pressures that the system faces and the number of

7  mentally ill prisoners there are in the system.

8      I reflected last night really on what's the size of

9  the group of people that we're talking about.  And we have

10  been addressing what are very serious concerns for mentally

11  ill prisoners, of whom there are many in the system, but a

12  subset of that group, a relatively -- fortunately a

13  relatively small subset of the group, the mentally ill

14  prisoners in the system who are in isolated or segregated

15  confinement.

16      And in fact, as to that group, it is a relatively

17  small number of people compared to the overall population of

18  the system.  So if you add together all of the people who we

19  are talking about, all of the mentally ill prisoners in

20  segregated confinement, it is a little more than 3,000

21  prisoners.

22      A sizable number to be sure, but in comparison to

23  125,000 prisoners in the entire system, in a system that has

24  34 prisons, 34, for the most part, large prisons, being able

25  to accommodate the pressing, urgent mental health needs of

2276

1  these mentally ill prisoners who are in isolation, seems to

2  me more feasible when the total scope of the system's

3  capacity is taken into account.

4          And if you look even more narrowly at those prisoners

5  who are the most mentally ill, the EOPs, the number is even

6  smaller.

7          So that targeted remedies, targeted solutions which

8  prioritize the EOPs and then move on to the CCCs really

9  involves, again, comparatively, compared to the large number

10 of people in the system and the relative capacity of the

11 system to accommodate 125,000 prisoners, we're talking about

12 EOPs who are significantly at risk at a number that's less

13 than a thousand.

14         So again, as to these prisoners, the 3,000 overall,

15 plus or minus a few hundred, and the EOPs, a much smaller

16 group, it would seem to me that the capacity of the system to

17 address this issue is there if the urgency of the problem is

18 also recognized.

19 Q.     Dr. Haney, you testified yesterday that other state

20 systems don't have the same number of prisoners and

21 particularly the same number of mentally ill prisoners in

22 their systems.

23         How does that fact factor into your analysis?

24 A.     Well, in a similar way.  I mean, there are -- there

25 are economies of scale.  Large systems have large capacities,

2277

1    and even an overcrowded system has lots of places, yards,

2    spaces that can be converted, as small systems have, with

3    relatively few prisons, have relatively few options in terms

4    of where they would put people.

5            So it is just to acknowledge the fact that we're

6    talking about, in comparison to the overall capacity of this

7    system, a relatively small number of people who have the kind

8    of urgent, pressing needs we've been talking about.

9            And so with that in mind, it does not seem, if the

10   need is recognized, to necessarily in any way overwhelm the

11   capacity of the system to respond to it given the comparative

12   size of the problem.

13   Q.      Dr. Haney, have you formed an opinion regarding what

14   changes are necessary with respect to the length of stay of

15   prisoners with mental illness in the administrative

16   segregation units to address the harms you've been

17   discussing?

18   A.      Yes, I have.

19   Q.      And what is your opinion?

20   A.      Well, I've already voiced the opinion that people who

21   are placed in these units for non-behavior or

22   non-disciplinary reasons should be expedited, removed as

23   quickly as possible, in a matter of days, not weeks or

24   months, or in some instances years.

25           But beyond that, I believe that the adverse

2278

1    conditions of confinement which exist in these units place

2    all mentally ill prisoners at significant risk of harm, and

3    that it makes very good sense to do what many other systems

4    have done, which is to implement time limits on the amount of

5    time that a mentally ill prisoner is permitted to be in an

6    administrative segregation unit.

7           THE COURT:  Of course that's an improvement.  I mean,

8    if it were to take place, it would be an improvement.  But

9    there is a more fundamental question, which is -- and I think

10   this is very difficult.  It is one thing to talk about the

11   mentally ill who are being placed in administrative

12   segregation because they don't have a bed.  I mean, that's a

13   problem which can and should be addressed immediately.  But

14   when you are talking about mentally ill folks who are subject

15   to further sanction because of misbehavior, something has got

16   to happen.  The system -- I take that back.  I don't even

17   know if that's true.

18          Is it correct that the system must have some way of

19   responding -- appropriately responding to misbehavior of

20   persons who are mentally ill?

21          THE WITNESS:  Yes.  Of course I believe that's

22   true.

23          THE COURT:  And do you have an opinion as to what

24   appropriate sanctions, recognizing mental illness might be

25   employed -- might appropriately be employed by prison

2279

1    authorities?

2            THE WITNESS:  Yes.  What I would recommend, and this

3    is a recommendation of national organizations that have

4    studied this as well, the American Bar Association, the

5    American Psychiatric Association, is to first of all place

6    time limits on the amount of time that somebody can be placed

7    in what we call, in California, administrative segregation.

8            To remind the court, administrative segregation was

9    and is intended to be a temporary placement.

10           It has devolved in California to something quite

11   different.  It devolved into a system in which prisoners

12   spend as much time in administrative segregation as they

13   spend in disciplinary segregation in other systems, a status

14   that is supposed to be temporary in the California system.

15           And that's even more acute a problem for the mentally

16   ill.  So the notion of time limits on administrative

17   segregation is really to expedite their movement through what

18   is supposed to be a temporary status.

19           If they are found guilty of a disciplinary violation,

20   and they are sanctioned with a security housing unit term,

21   then I would recommend a whole different set of

22   considerations ought to come into play.

23           As the court undoubtedly knows, there is an exclusion

24   order in place for mentally ill prisoners who have been sent

25   to Pelican Bay.  I see no reason why that same kind of

2280

1    exclusion order wouldn't apply to the other security housing

2    units.

3              THE COURT:  I'm sorry.  I don't want to interrupt,

4    but I'm trying to think about what we're talking about.

5              You have a mentally ill prisoner who clearly has

6    disobeyed important, significant rules.  You're going to have

7    to put -- you're going to have to sanction him.

8              You, yourself, as I understand it, recognize that

9    perhaps the only sanction really available is segregated

10   housing, although you say for some limited period of time.

11             Is that fair?

12             THE WITNESS:  It is fair, but not only a limited

13   period of time, segregated housing in an environment that is

14   designed to address the treatment needs of that prisoner.

15             And again, this is something that is being done

16   across the country.  There are exclusion orders in place in

17   many state systems.  And they're an alternative to exactly

18   the dilemma that the court poses.

19             It is not to not sanction them -- not to not sanction

20   a mentally ill prisoner, but to send them to a place where in

21   addition to being separated from the rest of the prisoner

22   population, they're receiving mental health treatment,

23   they've receiving the kind of treatment that their level of

24   care requires.

25             THE COURT:  In California that would -- asking you.

2281

1    In California that would require a significant reshuffling of

2    the system to provide such a place.  And you would be sending

3    people from 33 prisons to a central place that could provide

4    them with both the appropriate sanction and mental health

5    care.

6                  Is that what you are saying?

7                  THE WITNESS:  Yes.  But let me clarify.

8                  The only reason somebody is in administrative

9    segregation, in theory, is that they have -- is all the

10   reasons we've been talking about.  They have safety concerns

11   or non-disciplinary issues, and that's a separate issue, a

12   separate category of people.

13                 THE COURT:  I understand that.

14                 THE WITNESS:  The other people who are in

15   administrative segregation are technically not there for

16   punishment.  They're not -- they're there until their

17   disciplinary sanction has been decided and their punishment

18   has been meted out.

19                 And that punishment could be, if it is a minor

20   disciplinary infraction, it could be loss of privileges.  We

21   talked about a few of those cases where somebody loses their

22   canteen or something for a period of time, or dayroom or

23   whatever.

24                 But if it is a more serious disciplinary infraction,

25   it can involve a security housing unit term.  Then they get

2282

1    sent to the longer term security housing unit environment, of

2    which there are four for men and one for women.  They already

3    come from 33 prisons from around the system.

4        THE COURT:  But the difference is there would be, as

5    I understand what you are proposing, there would be

6    limitations on the length of time they could be punished, and

7    there'd have to be mental health caretakers in the

8    institution.

9        THE WITNESS:  Yes.  To address the mental health

10   needs, yes.

11       THE COURT:  At least part of that problem might be --

12   someday we'll get to oral argument, and I can ask Miss Vorous

13   what the position of the state is -- but there's a problem.

14   The state has problems with recruiting and keeping

15   psychiatrists and psychologists.  It is hardly surprising.

16   These are unpleasant places to be.

17       Does this not compound the problem; you've got to

18   hire people for yet another specialized unit?  And is it

19   practical?

20       THE WITNESS:  Your Honor, I would suggest it is more

21   practical than what we are currently doing.

22       What we are currently doing, you've heard examples of

23   it, probably too many examples, we're currently allowing

24   these folks to languish in administrative segregation units

25   and to receive very compromised treatment.

2283

1        THE COURT:  I'm setting that aside.  We're talking

2   about the SHU.  We're talking about somebody who is being

3   punished.

4        THE WITNESS:  Right.  So we already have psychiatric

5   service units which are set up to address those people on a

6   limited basis.

7        What I'm suggesting is that has to be expanded.  And

8   in addition, to expedite the movement out of the

9   administrative segregation units of the mentally ill so they

10  don't deteriorate worse until they get the appropriate access

11  to care.

12       So in the long run this may very well be not only

13  even a more humane approach, but a more efficient -- more

14  cost-efficient approach.  Because you are getting people more

15  quickly to the services that they need so they don't

16  decompensate so you don't have to deliver, as in the case of

17  the last man, because he's in the administrative segregation

18  unit, he ends up now in a Mental Health Crisis bed and then

19  off to a hospital somewhere.

20       If he had been handled earlier in a different way,

21  much of that could have been avoided.

22       THE COURT:  I understand.

23       Mr. Fischer.

24  BY MR. FISCHER:

25  Q.    Dr. Haney, we'll turn to the SHUs momentarily, but I

2284

1    want to turn your attention, just for another minute, back to

2    the administrative segregation units.

3          Plaintiffs have requested in their motion a 30-day

4    time limit for EOP prisoners housed in these administrative

5    segregation units.

6          Do you have an opinion regarding this request?

7    A.    I think it's sensible and defensible.

8          It's well within what various national organizations,

9    ABA, American Psychiatric Association, et cetera, have

10   recommended.

11         They recommend against putting mentally ill people in

12   segregation or isolation at all, but if they're there, they

13   recommend no longer than 30 days to three to four weeks.  And

14   I would agree with that.

15   Q.    And a similar question.  Plaintiffs have requested in

16   their motion a 60-day time limit for the CCCMS prisoners

17   housed in the administrative segregation units.

18         Do you have an opinion as to that request?

19   A.    Again, with the understanding there is nothing

20   magical about these numbers, and on the assumption that the

21   CCCMS prisoners are less acutely disturbed than the EOP, it

22   seems to me, again, that this is a sensible and defensible

23   time limit.

24   Q.    You just mentioned a couple of organizations, the

25   ABA.  Can you tell us what the ABA is?

2285

```
 1   A.       American Bar Association.

 2   Q.       And the APA?

 3            THE COURT:  Goodness.  I know you think I'm ignorant,

 4   but that is an insulting question.

 5            You may proceed.

 6   BY MR. FISCHER:

 7   Q.       Let me turn you then to 2054 marked for

 8   identification.

 9            Dr. Haney, is this the APA statement you were

10   referring to just a moment ago?

11   A.       Yes, it is.

12   Q.       Okay.

13   A.       The first sentence is self-explanatory.  It talks a

14   bit later on the second page about what prolonged segregation

15   means.

16   Q.       Okay.  Turning to Exhibit 2055, can you explain --

17            THE COURT:  You wanted Exhibit 2054 entered?

18            MR. FISCHER:  Yes.  I move 2054 into evidence.

19            THE COURT:  Received.

20                (Whereupon, Plaintiffs' Exhibit 2054 received

21                 into evidence.)

22   BY MR. FISCHER:

23   Q.       Dr. Haney, can you describe what is in Plaintiffs'

24   Exhibit 2055?

25   A.       Yes.  This is a statement or a report about the
```

2286

1    United Nations Special Rapporteur on torture.  And a man

2    named Juan Mendez, who is the UN's essentially secretary,

3    monitoring torture conditions throughout the world, who has

4    taken a very strong stand on the use of solitary confinement

5    internationally, as well as having opined about its use in

6    the United States.

7             Mr. Mendez recommends against the use of solitary

8    confinement, but he also recommends limiting it, if it must

9    be used, to no more than 14 days.

10   Q.      Has this UN body looked at the California segregation

11   system, to your knowledge?

12   A.      Yes.  Special Rapporteur Mendez has, yes.

13   Q.      And just briefly, are you aware of his findings?

14   A.      Well, he's opined grave concerns about what he

15   perceives to be the overuse of segregation in California.

16   And it's a concern I share.

17             MR. FISCHER:  Your Honor, I would like to move in

18   2055 into evidence.

19             THE COURT:  Received.

20                  (Whereupon, Plaintiffs' Exhibit 2055 received

21                   into evidence.)

22   BY MR. FISCHER:

23   Q.      Dr. Haney, I want to turn back to the issues

24   regarding the SHU.

25             THE COURT:  Before you leave 2055, has Mr. Mendez

2287

1    defined what conduct falls within the scope of torture when

2    you're dealing with prisoners and prisons?

3            Has he done that?

4            THE WITNESS:  Yes.  Yes, he has.

5            THE COURT:  Can you tell me what he says torture is?

6            THE WITNESS:  Torture is a condition of confinement

7    which inflicts pain or harm on a prisoner and does so without

8    any penological purpose.

9            THE COURT:  Okay.  So there are two functions.  One,

10   it's intended to impose pain?

11           THE WITNESS:  Yes.

12           THE COURT:  And two, there is no penological

13   justification?

14           THE WITNESS:  Yes.  Although he doesn't use the

15   same -- I've given you this in sort of conventional

16   constitutional terms.

17           He, I think, is more -- I don't think he focuses on

18   the intention as much as US law does.  I think in his opinion

19   he's reached the conclusion that the use of solitary

20   confinement or other forms of torture, whether intended or

21   not, should be prohibited.

22           And as to the penological purpose, I think he

23   recognizes that there are certain circumstances under which

24   very limited forms of even solitary confinement need to be

25   used, but in his case, what he would recommend, is that it

2288

1   not be used for any longer than 14 days, no matter what the

2   penological purpose or justification.

3           THE COURT:  And we talked about the American Bar

4   Association.  Have they discussed this issue in terms such

5   that we can derive an understanding of what they understand

6   torture to be?

7           THE WITNESS:  I don't think they've defined it as

8   torture.  They've rather talked about harm, risk of harm.

9   And so they set out a guideline of 30 days -- no more than --

10  first of all, they recommend against putting mentally ill

11  prisoners in segregation at all, and if it must be done, no

12  more than 30 days.

13          And they also recommend an absolute limit of a year

14  for disciplinary segregation of even non-mentally ill

15  prisoners based on the potential for harm.

16          THE COURT:  I'm not at all clear what the law is, and

17  I'll have to figure all of that out when all of this ends,

18  but it seems to me that there's sort of a conundrum that

19  can't be resolved.

20          We start with the purpose of prison, and at least a

21  major purpose is just to get people who are going to hurt

22  other people or steal from other people out and away and

23  confined.

24          Beyond that there is a purpose of punishment.  You

25  have done something that society regards as worthy of

2289

```
 1    punishment, and we're going to impose punishment.  I do that
 2    every Tuesday.
 3         And the whole question of why we put mentally ill
 4    people in prison, I mean it is just -- it's apparently all
 5    over the country now and nobody understands -- strike that.
 6         But the mentally ill appear to me to -- I'm sorry.
 7    I'm completely disrupting your examination.
 8         The mentally ill represent a different order of
 9    problem.  I mean, it's clear to me that people may be
10    dangerous, even though -- maybe especially because they're
11    mentally ill.  And so the isolation function -- whether it
12    ought to be in prison is a different question, but that's
13    been decided by other people -- but then they're in prison,
14    and at least it's arguable that their conduct is frequently
15    unrelated to what people who aren't nuts would do because
16    they're mentally ill.  That's the whole point.
17         I'm really trying to get you to talk to me about what
18    seems to me to be an almost -- I don't know how to resolve
19    the problem, which is you can't tolerate their misbehavior,
20    but, on the other hand, you have to mitigate whatever
21    punishment might be appropriate because they are mentally ill
22    and assuming the mental illness contributes to their conduct,
23    but you still can't tolerate that kind of behavior.
24         And it appears to me -- I don't mean this
25    disrespectfully.  I hope you believe that.  I don't know how
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2290

1    you impose punishment, deserved and appropriate, which

2    doesn't contribute ultimately to exacerbating their mental

3    illness.

4         I don't know whether -- but it just seems to me to be

5    an almost insoluble question.  And I'm asking you to please

6    feel free to extend your answer.  Don't feel the necessity of

7    shortness.

8         THE WITNESS:  That is, in a lot of ways, the

9    conundrum.  I think it is perhaps more easily solved than it

10   may appear.

11        I think, first of all, especially with the mentally

12   ill, but obviously with anybody who is being punished, there

13   are limits to what the sanctions can be.

14        And if they put a person who is being sanctioned at

15   an unreasonably grave risk of harm, then that sanction needs

16   to be modified, that needs to be a guidepost or guideline or

17   limit to what can be done, even though under other

18   circumstances that might seem to be expedient, it might seem

19   to accomplish the goal, that if we know, as we know about

20   solitary confinement, that it is harmful to people who have

21   mental illness, then that needs to restrict what we do, how

22   often we turn to that sanction.

23        So it would suggest, for example, that we consider

24   other sanctions, that we only go to solitary confinement or

25   segregation as a very last resort, that we limit how we do

2291

1    it.

2        It also seems to me in the case of the mentally ill

3    that we don't not sanction them, but we sanction them under

4    circumstances and in a way which doesn't exacerbate the

5    mental illness and indeed provides them with an opportunity

6    to even get better.

7        Because part of what is happening in these units is

8    that not only are they be subjected to severe conditions of

9    confinement that we have every reason to believe exacerbates

10   the mental illness, they are not being provided even remotely

11   with the kind of treatment and care they need in order to

12   both overcome the mental illness and to get the behavior

13   under control so they don't continue to incur disciplinary

14   infractions.

15       And so it seems to me that you can accomplish both of

16   those things by expediting movement out of these units so

17   they're not there very long or too long to be harmed and move

18   them into environments where they still may be sanctioned in

19   the sense that they're not freely walking the yard as other

20   prisoners in general population are, they may have

21   limitations placed on property and so on, but it is done in a

22   therapeutic context.  Because we recognize, first of all,

23   that these people are too vulnerable to be left in standard

24   isolation units.  And secondly, they very much need treatment

25   or they're going to deteriorate in the sanctioned environment

2292

1   we've placed them in.

2         So again, to point to the PSUs as the beginning of a

3   model how that might be done, it takes -- it is a sanction,

4   but it is a sanction that also takes into account or should

5   take into account -- whether or not it does, I don't know --

6   but the idea of it takes into account the notion that these

7   people are being sanctioned, but not like everybody else.

8         They have special vulnerabilities and they have

9   special needs.  Those two things get lost sight of in the

10  units that we've been talking about.

11        They have vulnerabilities to the conditions -- the

12  harsh conditions that they are under and their needs get

13  either ignored or not adequately addressed.  Ignored is

14  probably too strong a word, but not addressed in a way that

15  is adequate or commensurate with the nature or amount of need

16  they have.

17        That, it seems to me, is what kind of remedy is

18  called for here.

19        THE COURT:  Thank you, sir.

20        Mr. Fischer.

21        MR. FISCHER:  Thank you.

22  BY MR. FISCHER:

23  Q.   Dr. Haney, I want to turn back for a moment.  You

24  mentioned the five SHUs in the CDCR system.

25        First, have you been to the Pelican Bay SHU?

2293

1    A.       I have.

2    Q.       Can you describe your knowledge of the Pelican Bay

3    SHU?

4    A.       It dates back to not long after the Pelican Bay SHU

5    was opened.  I think the first time I was there was in 1989

6    or 1990.

7             I was there many times after that in the 1990s.  I

8    was an expert in the Madrid case.  I spent a lot of time at

9    the institution interviewing prisoners, inspecting

10   conditions.

11            I have been back several times since then, most

12   recently in the early 2000s, to actually see the facility,

13   tour the facility.  Then, you know, I go from time to time to

14   interview prisoners, as recently as last spring.

15   Q.       You discussed earlier that you toured the institution

16   at Corcoran and CCI Tehachapi.  Did you visit the SHU units

17   during your tours earlier this year at those two

18   institutions?

19   A.       Yes.

20   Q.       Have you turn to Plaintiffs' Exhibit 2020.  This is

21   already in evidence.

22            Doctor, I'm going to ask you to briefly walk us

23   through a series of three photos, 2020, 2021 and 2022.

24            THE COURT:  Are you going to put them up so I don't

25   have to try and find them?

2294

1          MR. FISCHER:  Of course.

2          THE COURT:  All right.

3               (Exhibit published.)

4          THE WITNESS:  2020 is a photograph of one of the

5     security housing units at the California Correctional

6     Institution at Tehachapi.

7               It is representative of the security housing units in

8     Tehachapi.  The security housing units tend to be relatively

9     small units, closed, confined units.  You can see here that

10    this particular unit has solid steel doors on it.

11              The door on the right by the stairwell is a -- opens

12    onto a shower.

13              You can see to the left treatment cages which are

14    actually not in use.  These are -- I mentioned yesterday that

15    Tehachapi was a facility that once had treatment cages on the

16    dayroom floor in some of the units, but they've gone to a

17    different model.  These are treatment cages that were once in

18    use but are no longer.

19              (Exhibit published.)

20              2021, it shows that more clearly.

21              It is my understanding, and this was explained to me,

22    I believe, by Dr. Walsh, as I said yesterday, that these were

23    once in use, but the Special Master had concerns about the

24    privacy or confidentiality of the treatment contact that took

25    place.  So they're still there on the dayroom floor, but not

2295

1    in use for clinical contacts.

2              (Exhibit published.)

3         Again, this is a different view, a different side of

4    the housing unit.  This gives you the whole -- we looked at

5    the right side, now we're looking at the left side.  You can

6    see they're relatively small, contained units.

7         Prisoners in security housing units live under

8    circumstances that are similar to the circumstances that we

9    described for the administrative segregation units.

10        The difference is largely that they're there for

11   longer.  They are intending to be there for longer.  So there

12   are prisoners who are in security housing units for periods

13   of not months, but years, sometimes many years, sometimes

14   decades.

15   BY MR. FISCHER:

16   Q.    Dr. Haney, directing your attention to Plaintiffs'

17   Exhibit 2032, can you describe what is in that photo?

18             (Exhibit published.)

19   A.    2032 is a different configuration of a security

20   housing unit at Corcoran this time.  So again, a relatively

21   small, contained unit.  Not as small and contained as the

22   ones at CCI, but again you can see a fairly severe

23   environment.

24        There are no dayroom floor activity tables,

25   et cetera, because these are prisoners who have no access to

2296

1  outside of their cell activities other than their hour and a

2  half or so of outdoor exercise.  And if they're participating

3  in any kind of a clinical program, to the extent that's

4  available, they would participate in that.

5          But there are no other congregate activities.  They

6  eat, sleep and perform all their bodily functions in their

7  cell.  And they do this essentially around the clock with the

8  exception of the respites I described.

9  Q.     Dr. Haney, the last set of photographs I'm going to

10  have you describe briefly are 2023 through 2026.

11          Starting with 2023.

12              (Exhibit published.)

13  A.     These are outdoor exercise cages that are used for

14  prisoners in segregation at Corcoran.

15          There are a number of these out in the outdoor area

16  of Corcoran.  They're individual exercise cages.  You can see

17  in some of them an individual prisoner is in the cage.

18          There is no equipment or exercise opportunities

19  except for the space itself.  So, you know, prisoners will

20  walk or do calisthenics or whatever they can manage in the

21  exercise cage.

22              (Exhibit published.)

23  A.     2024 is a photograph of exercise cages at CCI

24  Tehachapi.  Again, you get a feel for pretty much the same

25  kind of design, maybe slightly different.

2297

1          There are many of them at both of these institutions

2    because there are large populations of prisoners in

3    segregated housing, especially security housing units.

4                    (Exhibit published.)

5          Again, here's a photograph, 2025, of CCI exercise

6    cages, a slightly different area on the outdoor exercise area

7    at Tehachapi.

8          But, again, the segregated prisoners, the security

9    housing unit prisoners and the administrative segregation

10   unit prisoners exercise in these kinds of cages.

11                   (Exhibit published.)

12         2026 same thing, just a different angle, different

13   set of exercise cages.

14   Q.    Dr. Haney, how would you compare the Pelican Bay SHU

15   with the other CDCR SHUs that you have visited and reviewed?

16   A.    It is, in many respects similar, if not identical in

17   terms of the oppressive nature of the environment, the

18   severity of the conditions of confinement to which prisoners

19   are exposed.

20         They are confined in their cells for the hours of the

21   day that I described earlier.  It is true of all the SHU

22   units.

23         The same policies and procedures apply to SHU

24   prisoners there as apply in any of the other SHUs in the

25   Department of Corrections.

2298

1    The only difference is an architectural difference in

2    the design of the interior unit of the institution.  Pelican

3    Bay prisoners don't have an outside window.  Prisoners in

4    these other security housing units have a thin strip of

5    window inside the cell.

6    Instead, in Pelican Bay there is a skylight-type

7    arrangement inside the housing unit.  They call them pods at

8    Pelican Bay.  Inside the pods the natural light comes into

9    the pod through a skylight.  That's the architectural

10    difference for the most part.

11    I'm not an architect, so when I say "architectural

12    difference," I'm probably not using that term correctly.  But

13    there is a slight difference in the way the cells are

14    arrayed, but not much of a difference.

15    They're small units, a lot like the first SHU unit we

16    looked at in Tehachapi where there are two short rows of

17    cells that went out in different directions.  It is more

18    reminiscent of that than it is that long line of cells in

19    Corcoran.  But otherwise, they're pretty much the same.

20    And then the outdoor exercise area is different.  In

21    Pelican Bay there is a concrete enclosed area that provides

22    prisoners with a glimpse of the overhead sky but no visuals

23    of the surrounding environment.  Whereas in Corcoran and

24    Tehachapi, as we've just seen, there are outdoor exercise

25    cages where the prisoners exercise.

2299

1      Other than that, they're very similar environments.

2  Q.    Do you have an opinion as to whether those

3  differences you just described significantly impact the

4  experience of prisoners with mental illness in these units?

5  A.    I don't believe there is much of a difference.  I can

6  imagine some prisoners preferring the cages to the concrete,

7  enclosed space and vice versa.  But the actual day-to-day

8  existence of the prisoners in these security housing units

9  does not seem to me to vary very much.

10     They're subject to the same kind of deprivations,

11  limited contact, et cetera.

12  Q.    Dr. Haney, did you review length-of-stay data for

13  mentally ill prisoners in the SHU units?

14  A.    Yes.

15  Q.    I would like to turn your attention to Plaintiffs'

16  Exhibit 2058.

17     Does this chart reflect your analysis of that length

18  of stay data?

19  A.    Yes, it does.  These are -- this is a chart that I

20  composed that's based on the data we talked about yesterday

21  with respect to length of stay and constructed in the same

22  way as the other length-of-stay charts were constructed.

23  Q.    Can you describe your findings that are depicted on

24  this chart?

25  A.    Well, you can see that the length of stay in a

2300

1    security housing unit, and we've got CCCMS in here because

2    EOPs are not supposed to be in the other -- in a security

3    housing unit, is longer.

4         A very relatively small number of people are there

5    for the shorter period of time, the 20 to 90 days.  You've

6    got a much bigger population of people in particular who are

7    there for over a year.

8         Again, keep in mind this is a snapshot.  These are

9    not maximums.  This is not the total length of stay that

10   anybody necessarily will endure there.

11         MR. FISCHER:  Your Honor, I would like to move

12   Plaintiffs' 2058 into evidence.

13         THE COURT:  Received.

14              (Whereupon, Plaintiffs' Exhibit 2058 received

15               into evidence.)

16   BY MR. FISCHER:

17   Q.    Dr. Haney, are you familiar with the Pelican Bay SHU

18   exclusion order?

19   A.    Yes, I am.

20   Q.    Can you explain what the SHU exclusion order is?

21   A.    It's an order which was entered into after the Madrid

22   versus Gomez decision was rendered.  And it was a way to

23   address the court's concern that mentally ill prisoners

24   should not be confined an in environment as severe as Pelican

25   Bay SHU, but that they needed to be housed somewhere which

2301

1  addressed the appropriate security concerns.

2          So an exclusion order was devised excluding certain

3  categories -- diagnostic categories of people who were not

4  permitted to be placed in Pelican Bay and who the Department

5  of Corrections had to put somewhere else.  Many of them went

6  to the Psychiatric Services Unit at Pelican Bay.  But in any

7  event, they couldn't go into the Pelican Bay SHU.

8  Q.      Do you know generally the basis or the reason for

9  this exclusion?

10  A.      Yes, of course.  It was out of recognition that the

11  mentally ill prisoners would be harmed by that environment,

12  and, therefore, should not and could not go into it.

13          And the categories of people who would be harmed by

14  it were defined, agreed upon, and there was a master

15  appointed.  And the order was entered, and they did basically

16  a sweep at Pelican Bay evaluating many of the people who were

17  there and identifying people who needed to be moved from the

18  institution as a result of the Madrid decision.

19  Q.      Do you know why the other CDCR SHUs were not subject

20  to this exclusion order?

21  A.      Yes.

22          THE COURT:  The litigation gave rise to an order.

23          THE WITNESS:  Exactly.

24          THE COURT:  Wow.

25  ///

2302

1    BY MR. FISCHER:

2    Q.      Dr. Haney, based on your knowledge of the CDCR SHUs

3    and the Pelican Bay exclusion order, do you have an opinion

4    as to whether there should be a similar exclusion and

5    exclusionary criteria for mentally ill prisoners in the other

6    CDCR SHUs?

7    A.      Yes, I do.

8            And the answer is there certainly should be.

9            Other than the jurisdictional issue, it never seemed

10   to me as though there was a rationale for not including the

11   mentally ill -- or excluding the mentally ill from these

12   other security housing units.

13           The conditions of confinement, as I said earlier, are

14   as severe in virtually all respects.  The same concerns, in

15   my opinion, need to be brought to bear for mentally ill

16   prisoners who might be placed in one of those security

17   housing units and who, therefore, should not be.

18           THE COURT:  Sir, I'm now going to talk about

19   philosophy, I suppose.

20           My view has been, generally speaking, that it's

21   CDCR's responsibility to ensure constitutionally satisfactory

22   conditions in the prison.  So that almost invariably

23   absolutely what I have done is ordered the Special Master --

24   I've ordered CDCR to consider whatever the problem is and the

25   Special Master to contribute to that process.

2303

1          What I hear you saying, and if I hear you wrong, I'll

2     be pleased to know that, is that the situation is of such a

3     crisis that I ought not to delay or defer, I ought to just

4     issue an order.

5          Is that your view?

6          THE WITNESS:  That is my very strongly held view,

7     yes.

8          THE COURT:  Thank you, sir.

9     BY MR. FISCHER:

10    Q.    Dr. Haney, the chart that you just described shows

11    there are approximately 700 caseload prisoners in the CDCR

12    SHUs right now other than Pelican Bay.

13         Do you have an opinion as to how CDCR can safely

14    house that number of individuals -- or rehouse that number of

15    individuals if a SHU exclusion order is entered?

16    A.    Well, I would say, first of all, that kind of

17    exclusion order ought to also include or prompt, I guess, is

18    better way to put it, the Department of Corrections to

19    consider whether or not the people who are currently in

20    security housing unit need to be there.

21         It is possible to get a security housing unit term,

22    and even a long term, even an indeterminate term for

23    infractions that are not necessarily serious, violent

24    infractions.

25         You can get a security housing unit term for refusing

2304

1   a cellmate.  Not a good thing to do, and I'm not suggesting

2   that it ought to be ignored, but whether or not it justifies

3   a security housing unit term, it seems to me, is something

4   that ought to be carefully considered, particularly in the

5   case of mentally ill prisoners who are being considered for

6   exclusion from that institution.

7        So it is very possible that 700 or so people don't

8   necessarily need to be there.  And when tasked with the

9   responsibility of figuring out where they need to go instead,

10  that number will dwindle.  That's been the experience in

11  other systems where they have reduced the population of

12  people in isolation.  They've done it by looking carefully at

13  whether, in fact, people who are there really need to be

14  there.

15       And when they've looked carefully at whether they

16  really need to be there, not whether they committed an

17  infraction that technically under the rules justifies their

18  being there, rather whether they need to be there, then the

19  actual number of people who need this kind of confinement

20  tends to be reduced.

21       And then beyond that, obviously there needs to be the

22  creation of enough space where appropriate kinds of treatment

23  can be delivered to these seriously mentally ill prisoners,

24  recognizing that, in fact, in many instances they may need

25  some kind of sanction and some kind of separation.  But their

2305

1    treatment needs and their mental health status can't be

2    compromised in the course of ensuring that.

3    Q.      Dr. Haney, have you also reviewed length of stay in

4    the Psychiatric Services Unit?

5    A.      Yes, I have.

6    Q.      Turning your attention to Exhibit 2059.

7            Is that the chart that depicts your review of the

8    data?

9    A.      Yes, it is.

10           MR. FISCHER:  Your Honor, I ask 2059 be put into

11   evidence.

12           THE COURT:  Received.

13               (Whereupon, Plaintiffs' Exhibit 2059 received

14                into evidence.)

15   BY MR. FISCHER:

16   Q.      Dr. Haney, do you have concerns about prisoners with

17   unidentified mental health treatment needs in the CDCR

18   segregation units?

19   A.      Yes, I do, a very serious concern.

20   Q.      Can you describe the basis on which you form such an

21   opinion and your specific concern?

22   A.      Yes.  I have spent a long time studying how people

23   are affected by living in isolated confinement, not just

24   mentally ill prisoners.  And one of the ways I've gone about

25   doing that is by taking a random sample of prisoners who are

2306

1    in an isolated housing unit, usually a large random sample of

2    100 or so who are selected off the roster of the prison

3    itself who are in isolation.

4         Some of them are mentally ill.  Some of them are not.

5    This is something I did at Pelican Bay in conjunction with

6    the Madrid litigation.

7         Then, engaging in a systematic structured interview

8    with them in which, among other things, I discuss with them

9    the symptoms of psychological distress, the symptoms of

10   psychological disorder, which they may be experiencing.

11        One of the things that experience has underscored for

12   me -- and I have done it not just at Pelican Bay but states

13   across the country, with now literally hundreds of

14   prisoners -- is that there are many prisoners who are

15   deteriorating in these environments, but are deteriorating in

16   such a way that it is virtually impossible for the custody

17   staff or mental health staff to identify this deterioration.

18        Even for those prisoners who are getting a kind of

19   observational check in the course of the day, even sometimes

20   by mental health staff who will go by and do welfare checks

21   on prisoners, prisoners in these environments, when they

22   begin to deteriorate, not mentally ill to begin with, but

23   beginning to deteriorate in the face of this kind of

24   confinement, oftentimes recede back into themselves and have

25   learned how to act fine and learned how to basically

2307

1    appropriately answer the sort of perfunctory questions that

2    get asked of them by the staff, who after all have many other

3    things to do, and silently begin not just to suffer, but

4    silently begin to deteriorate in these environments.

5            And I've been surprised at the number of people who

6    are not identified by the correctional staff or the mental

7    health staff, but who, nonetheless, have developed very

8    serious problems, maybe some serious forms of

9    psychopathology, but serious forms of psychopathology that

10   don't necessarily manifest themselves in outward ways that

11   somebody recognizes.

12           I guess the only thing I would add to that is, taking

13   into account the fact that because of the way these

14   environments are run, people -- prisoners do very little so

15   there is very limited opportunity for correctional or mental

16   health staff to identify an overt observable problem because

17   there are so few opportunities to actually have meaningful

18   interaction or see a prisoner actually engaging in behavior

19   so that you could identify a change in their behavior or

20   identify some problem in their behavior.

21           If this happens in normal human social interaction,

22   somebody begins to act strangely, we pick this up quickly

23   because we're used to how they normally act.

24           There is so little interaction in these environments

25   that it is difficult to observe that kind of deterioration.

2308

1   So those are people who aren't on anybody's mental health

2   caseload or mental health screen, but who, nonetheless, may

3   be suffering.

4           And some of those people, not all of them, but some

5   of those people are prime candidates for developing more

6   serious forms of psychopathology, perhaps even becoming

7   suicidal in the process.

8   Q.      Dr. Haney, how can this issue be addressed?

9   A.      It can be addressed in the way that many states do it

10  and in a way that the American Correctional Association

11  recommends, which is to do mental health screens of the

12  inmate population who are in long-term segregation.

13          So these are evaluations that are done, confidential

14  evaluations, the prisoner is taken out and is subjected to a

15  mental health evaluation by a qualified mental health

16  professional in which they form an assessment, basically a

17  kind of diagnostic status evaluation or analysis of each

18  prisoner in the institution, whether they have been

19  identified as on the mental health caseload or not, to pick

20  up exactly this kind of problem.

21          The ACA recommends, the American Correctional

22  Association, recommends this be done every 90 days.  Some

23  states do it more often, some states do it less often.  But

24  it is a recognition of the fact that these environments can

25  be harmful even to otherwise seemingly healthy people who

2309

1    didn't have any mental health problems when they went in.

2    Q.      Dr. Haney, do you know what a segregation safety

3    welfare check is?

4    A.      Yes.

5    Q.      Can you explain briefly what it is?

6    A.      I think it is referred to as a living, breathing

7    check, wherein the staff checks on individual inmates to make

8    sure that they're not engaged in self-harm, they've not

9    attempted suicide, that they're living and breathing.

10   Q.      Are you aware of any national correctional standards

11   for the use of welfare checks for prisoners in segregation?

12   A.      That they need to be done on a regular and continuous

13   basis throughout the period of time that somebody is in

14   segregated or isolated housing.

15   Q.      And do you know CDCR's practice as to safety welfare

16   checks for individuals in segregated housing?

17         MS. VOROUS:  Objection, Your Honor.  I asked

18   Dr. Haney specifically about this in his deposition, and he

19   indicated that he was not going to render opinions on

20   30-minute welfare checks in segregation or security housing

21   units.

22         THE COURT:  Mr. Fischer?

23         MR. FISCHER:  I'd ask Miss Vorous to show me the

24   deposition cite.

25         (Counsel confer.)

2310

1        THE COURT:  While you folks are working it out, we're

2   going to take a somewhat earlier recess.

3        We'll reconvene at 1:30.

4        (Off the record at 11:55 a.m.)

5                        ---o0o---

2311

1          SACRAMENTO, CALIFORNIA

2      WEDNESDAY, NOVEMBER 20, 2013, 1:34 P.M.

3                 ---o0o---

4          THE COURT:  Mr. Fischer.

5          MR. FISCHER:  Thank you.

6                 CRAIG HANEY,

7  was thereupon called as a witness herein by the Plaintiffs, and

8  having been previously sworn to tell the truth, the whole

9  truth, and nothing but the truth, was thereupon examined and

10 testified further as follows:

11              DIRECT EXAMINATION (Continued)

12 BY MR. FISCHER:

13 Q.     Dr. Haney, in the course of your review, did you look

14 at the length of stay of prisoners in administrative

15 segregation prior to the date they committed suicide?

16 A.     Yes, I did.  I looked at an analysis that Dr. Canning

17 had done, and I used that as a basis for making my chart.

18 Q.     And are you referring to the analysis discussed earlier

19 today at Exhibit 2047?

20 A.     Yes, exactly.

21 Q.     Okay.  Can you just briefly describe how you gathered

22 your information for your analysis.

23 A.     Yes.

24         THE COURT:  2047 is in evidence; is it not?

25         MR. FISCHER:  It is in evidence, and I can post it for

2312

1    you, Judge.

2              THE COURT:  All right.  You may proceed.

3              Oh, that's 2047.

4              MR. FISCHER:  Yeah.

5              THE COURT:  Okay.

6              THE WITNESS:  I mentioned earlier that Dr. Canning had

7    entered a lot of, I thought, very useful information on the

8    chart.  One of the things that he did was to arrange the

9    suicides that had occurred in the order of length of stay.

10             So if you look at the very -- at the far right column

11   that has numbers in it, the last one that has any numbers in

12   it, at the very top there are the initials LOS.  That refers to

13   length of stay.  And he's -- so he's ordered these not by the

14   date of the suicide, but rather in the order of the prisoner's

15   length of stay inside the administrative segregation unit.  And

16   that lends itself to an analysis of the relationship between

17   length of stay and suicidality.

18   Q.    BY MR. FISCHER:  And this is a three-page document.

19   A.    Yes.

20             So you can see that the range goes from the, on the

21   very first page, 0.33 -- that obviously is less than a day --

22   all the way to the very end.  And you'll see on page 3 -- there

23   we go -- that the next to last entry is 730.

24             The reason there's one added at the end, 1.5, is that

25   was recently added after the chart had already been completed.

1    So that last one is out of order, but the rest of them are in

2    order.

3    Q.      And just to clarify, you didn't adjust the chart in

4    that manner, did you?

5    A.      No, no.  No, I didn't.  The chart was -- the chart was

6    provided in this form.  I'm simply saying that that was a

7    recently added suicide which explains why it's out of order in

8    Dr. Canning's presentation.

9    Q.      Okay.  Dr. Haney, as far as your analysis -- I'm having

10   you turn now to Plaintiffs' Exhibit 2061, marked for

11   identification right now.

12          Does this chart reflect your analysis of Dr. Canning's

13   data?

14   A.      Yes, a very basic analysis which I did.

15          MR. FISCHER:  And move into evidence Plaintiffs'

16   Exhibit 2061, Judge.

17          THE COURT:  Received.

18                         (PLAINTIFFS' EXHIBIT 2061

19                          ADMITTED INTO EVIDENCE.)

20          THE WITNESS:  This chart breaks out, in a very

21   straightforward way, the number of suicides that were -- that

22   were committed by prisoners who had been in administrative

23   segregation 21 days or less and the number 21 days or over.

24   And you can see they're roughly -- roughly equivalent in terms

25   of the actual number of suicides.

2314

1    Q.      BY MR. FISCHER:  Dr. Haney, what if any conclusion did

2    you draw from this analysis?

3    A.      That suicidality or the likelihood of committing

4    suicide continues over time.  That it is more concentrated in

5    the beginning, but certainly doesn't abate in a significant way

6    over time.  That persons are at risk of committing suicide even

7    after 21 days, including well after 21 days in administrative

8    segregation.

9            THE COURT:  Well, actually do we know that?  Or is it

10   just -- I'm asking because I -- is it just as likely that the

11   people in more than 21 days entered perfectly -- well, not

12   perfectly -- but understood why they were there and so forth,

13   but somewhere along the line developed despair and then

14   committed suicide?

15           THE WITNESS:  Yes, it's possible.  And I -- and it's

16   impossible from the data to determine the course of

17   suicidality.  The breakdown is simply 21 days or under, 21 days

18   or more.  How somebody might deteriorate over time and so on,

19   the data don't allow me to make an interpretation of that.

20           MR. FISCHER:  Dr. Haney, just a few more questions for

21   you.

22   Q.      Have you reached an overall opinion as to whether CDCR

23   segregation policies and practices cause substantial risk of

24   harm for prisoners with mental illness?

25   A.      Yes, I have.

2315

1    Q.       And can you say what that overall opinion is?

2    A.       Yes, I believe very clearly that they do.  And much of

3    what I've testified to reflects that opinion and conclusion.

4    Q.       Can you clarify the bases for this overall opinion.

5    A.       Yes, of course.

6             I've -- this is an issue, as alluded to earlier, that

7    I've been studying for a very long time and something I've

8    written about fairly extensively.  There is a large literature,

9    and my contribution to it is very small in the overall scheme

10   of things, but there's a large literature which speaks to the

11   harm of putting people in isolated or solitary confinement.

12   Harms which include things like people suffering or

13   reflecting -- manifesting symptoms of depression, problems with

14   impulse control, anger, rage, frustration.  Prisoners report

15   anxiety.  Some prisoners have a very extreme anxiety reaction

16   after very short periods of segregation.  Others develop

17   anxiety over time.  The literature speaks to that.

18            We've just been talking about suicide, suicidality, how

19   the percentage of suicides occur in isolated, segregated type

20   housing.  And the literature speaks to that as well.  So that's

21   a context for understanding what happens to people in these

22   environments.  It's only a context.

23            Obviously, in this case, I looked at the facts of this

24   case and these particular places.  And what I was able to

25   identify is that in these particular places, there are

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    conditions that exist that are the kinds of conditions that

2    people who have produced this literature and written about the

3    harms of solitary confinement are speaking about.  These are

4    harsh conditions.  There's very little to abate or ameliorate

5    the isolation to which prisoners in California are subjected.

6          These are the kinds of conditions that the professional

7    organizations that I talked about have expressed concerns over.

8    I mentioned the ABA, the APA.  There are others.  The American

9    Public Health Association.  The Commission on Safety and Abuse

10   in America's Prisons, a bipartisan commission that looked at

11   conditions of confinement throughout the United States in 2005

12   and reached the conclusion that segregation should be limited

13   and never used for the mentally ill.

14         Based on this kind of literature and addressing these

15   kinds of conditions -- so these are very harsh conditions in

16   these units.  They -- they are harsh conditions that have --

17   that are known to have harmful effects.

18         And indeed the prisoners that I interviewed talked

19   about the -- the pain and the harm that they were experiencing.

20   Some of the harm is harm that they could voice.  Some of the

21   harm is harm that you're able to see as you trace their history

22   through these units as I did in some of the records that I

23   referred to earlier today.  Some of the harms are reflected in

24   the suicidality and, again, the fact that there's still a very

25   high rate of suicide in this system and concentrated, much of

2317

1    it concentrated in the administrative segregation units,

2    isolated segregated housing.

3            This harm, this pain is voiced.  Not just was it voiced

4    to me, it was oftentimes voiced to the clinicians with whom

5    prisoners are speaking and, again, in the records.  As I

6    illustrated in some instances this morning, there were

7    notations in the records about the stress or the harm, the

8    damage that the isolation was doing to the prisoner.

9            And the final point and the final part of my conclusion

10   is that there is a psychologically sound framework for

11   understanding why this is the case.  There is nothing really

12   from a psychologist's perspective surprising about this.

13           We understand from multiple different spheres of study

14   that depriving people of social interaction is a -- a harmful

15   experience.  It's difficult for people to endure.  People

16   experience negative effects from it when it's done in a

17   concentrated way as it's done in these units.

18           And there is nothing psychologically mystifying or

19   mysterious about the fact that many already mentally ill people

20   who are experiencing this kind of stress and this kind of

21   difficulty also express the harm, express the pain and are

22   damaged by it.

23   Q.      Dr. Haney, is it your opinion that the types of harm

24   that you're describing are limited to the period that a person

25   is housed in these segregation units?

 1    A.       Not necessarily.  One would hope that would be the

 2    case.  But part of what we know about human behavior is that

 3    you can change the conditions that people are in, and sometimes

 4    they take the residue or the effects of that, the marks or the

 5    psychological scars, if you will, into other settings and

 6    situations.  It's not -- it's not the case that people

 7    instantly recover from a trauma which they have experienced or

 8    damage that's been done.

 9             I have spent a lot of time interviewing people who have

10    come out of isolation units, some of them out of California

11    units as well as others, and they talk about how difficult it

12    is for them to re-integrate into society.  To go from isolated

13    confinement -- and many of them, many prisoners in California

14    that I've interviewed talk about developing social anxieties.

15    They're isolated from people for so long, and then they're in

16    an environment where they're around a lot of people, and it's

17    terrifying.

18             And some of them overcome it, and some of them don't.

19    But -- but we don't, none of us change instantly just because

20    the conditions under which we're living or the stressors to

21    which we've been subjected suddenly disappear.

22             MR. FISCHER:  One moment, Your Honor.

23             Your Honor, I have no further questions at this time.

24             THE COURT:  Hang on, Ms. Vorous.

25             (Off the record.)

2319

1                  THE COURT:  Ms. Vorous.

2                           CROSS-EXAMINATION

3     BY MS. VOROUS:

4     Q.      Good afternoon, Dr. Haney.

5     A.      Good afternoon.

6     Q.      Dr. Haney, during your direct examination, you talked a

7     little bit about your experience in evaluating conditions in

8     segregation units throughout the country.

9             And you've done that as a social psychologist, correct?

10    A.      Yes.

11    Q.      So you're not a clinical psychologist; is that correct?

12    A.      Yes, I don't treat or diagnose.

13    Q.      And you've never worked in a correctional setting; is

14    that correct as well?

15    A.      Just as a consultant.  I've never been a direct

16    employee working in a prison.  I've consulted with correctional

17    systems.

18    Q.      So it would be fair then to say that you have -- you're

19    not trained to identify a psychiatric harm or diagnosis

20    inmates?

21    A.      Well, it depends what you mean by psychiatric harm.

22    I've been a psychologist for 35 years.  I've studied and

23    written a book about the pains of imprisonment, so I certainly

24    do and have over that 35-year period of time assessed harm that

25    people are experiencing, pain that they're undergoing and so

2320

1    on.

2            I've -- I don't diagnose them psychiatrically.  So what

3    kind of psychiatric illness they may or may not suffer from is

4    not within my province to render an opinion about, and I don't.

5    Q.      And, Doctor, you've -- in the course of your

6    professional career, you've never testified on behalf of a

7    prison system, correct?

8    A.      No.  I was a witness for the United States a number of

9    times as a party in prison condition cases, but never for

10   the -- for the prison system itself.

11   Q.      And the four prisons that you visited in preparation

12   for your March 2013 declaration I believe we've identified as

13   Mule Creek, California Institution for Men, Corcoran and

14   California Correctional Institution, correct?

15   A.      Yes, it is.

16   Q.      And you spent one day at each of those prisons; is that

17   correct?

18   A.      Yes.

19   Q.      And you interviewed, as you've said, interviewed

20   inmates as part of your tours?

21   A.      I did.

22   Q.      And those inmate interviews would last between five and

23   15 minutes; is that correct?

24   A.      It varied.  I didn't time them.  I can't say that some

25   of them didn't last longer than that.  Occasionally I did a

1    brief cell front interview that may have lasted five or so

2    minutes.

3    Q.      You've talked just a little bit about talking with

4    correctional officers about security risks.

5            When asked in your deposition, you'll recall, as to any

6    discussions with correctional officers with respect to

7    management cells and other security housing units, you told me

8    you only could recall doing that on one occasion; is that

9    correct?

10   A.      No.  If I said that in my deposition, that was

11   incorrect.  I mean, I had several conversations with

12   correctional officers in -- about management cells in

13   particular.  There were two prisons that had management cells

14   in them, so I certainly talked to correctional officers in at

15   least those two places.

16           I talked with correctional officers about a number of

17   different things as we went through units.  It didn't -- it

18   didn't necessarily pertain to a particular inmate, but it

19   certainly had to do with routines in the unit, what particular

20   areas were used for.  You know, when you're -- when you tour a

21   prison, you're very much dependent on the correctional staff to

22   explain things to you and where things are, what they're used

23   for.  So this was an ongoing process of conversation.

24   Q.      With respect to the particular inmates that you

25   interviewed, is it correct that you didn't speak to

2322

1    correctional officers about those inmates' security risks to

2    the institution?

3    A.      About the security risks issue, I don't -- I'm not

4    sure.  I don't -- I don't specifically remember.  That kind of

5    conversation I didn't have very much, if I had it at all.

6    Q.      Let's talk about Mule Creek State Prison first.

7            At Mule Creek, you visited the EOP ad seg hub, correct?

8    A.      Yes.

9    Q.      And you don't recall the amount of time that you spent

10   visiting that hub; is that correct?

11   A.      I don't recall exactly.  I think I spent a fair amount

12   of time in that hub.  That was the place, Your Honor, where

13   there were the treatment cages and so on that we showed a

14   number of photographs from, and I -- there were several

15   prisoners in there with whom I spoke.

16           I recall asking for inmate records.  I thought that was

17   a fairly extended amount of time in that unit.  I don't

18   remember how much it was, though.

19   Q.      And you didn't record any of the time that you spent in

20   any of the units during your tours, correct?

21   A.      I did not, no.

22   Q.      While you were at Mule Creek State Prison, you didn't

23   observe any groups that took place in the administrative

24   segregation unit hub, correct, or the EOP hub?

25   A.      I'm not sure if there was a group taking place there or

2323

1    not.  I don't think so.

2    Q.      Your tour at California Institution for Men, that took

3    place on February 12th, 2013; is that correct?

4    A.      Yes, I believe that's right.

5    Q.      And California Institution for Men does not have an

6    enhanced -- I guess we've been referring to it as the EOP ad

7    seg hub, correct?

8    A.      Yes, that's what I recall.

9    Q.      And it doesn't have a psychiatric services unit or PSU

10   either.

11          So with respect to your tour at CIM, is it fair to say

12   you focused on the administrative segregation units that housed

13   the CCCMS inmates?

14   A.      I would say it's fair to say I concentrated on them,

15   but I also went to other units at the California Institution

16   for Men.  So I went to the reception center area, interviewed

17   some of the staff, psychological mental health staff in the

18   reception center area.  I went to the mental health crisis bed

19   unit, interviewed some people there including a number of

20   prisoners, one of whom I talked about at some length earlier

21   today.

22          There was also a -- a general population housing unit

23   that I visited at the end of the day where there was an --

24   there were two EOP prisoners housed, Your Honor, as I recall,

25   and I interviewed at least one of those.

2324

1    Q.       So in looking through your declaration, I added up that

2    you spoke to, I believe, 11 inmates while you were at CIM.

3             Does that sound reasonable to you?

4    A.       It's possible.  I -- I didn't count them.  They are --

5    they are identified in my declaration.  I just -- I didn't do a

6    count.

7    Q.       So just based on what you've said, with respect to the

8    entirety of the inmates that you interviewed at CIM, isn't it

9    fair to say very few of those would have included the inmates

10   that were housed, CCCMS inmates that were housed in a

11   segregation unit?

12   A.       No.  I interviewed a whole group of CCCMS inmates who

13   were housed in administrative segregation -- prisoner O,

14   prisoner P, prisoner Q, prisoner R.  All of the prisoners who

15   were in that -- in that Cypress Hall unit that His Honor saw a

16   photograph of earlier today were housed in the administrative

17   segregation unit.

18   Q.       And I believe prisoners Q and R were two of the

19   prisoners that you identified as being housed in Cypress Hall

20   due to lack of beds, correct?

21   A.       Yes.  That's -- that's what they described to me.

22   That's how they were designated on the -- on the roster on the

23   wall that the officers used.

24   Q.       Let's first talk about prisoner O, one that you

25   mentioned that you interviewed in ad seg.

2325

1            And he was a CCCMS prisoner, correct?

2    A.      Let me -- let me turn to my report on prisoner O.

3            Yes, he was a CCCMS prisoner who I saw in the ad seg

4    unit.

5    Q.      He was one of the -- strike that.

6            This prisoner told you that he was only getting one --

7    getting TR one day a week, correct?

8    A.      He said --

9            THE COURT:  TR?  What does TR mean?  He was getting --

10           MS. VOROUS:  To yard.  I'm sorry.

11           THE COURT:  He was getting -- the record is TR.  What

12   did you mean?

13           MS. VOROUS:  Getting to go out to yard one day a week.

14           THE COURT:  Oh, to yard.

15           MS. VOROUS:  I'm sorry.

16           THE COURT:  We have it TR.  To yard.

17           THE WITNESS:  He told me he would get yard once a week

18   at best in the ad seg unit.

19   Q.      BY MS. VOROUS:  And it's correct that you didn't speak

20   with any correctional officer to verify that statement?

21   A.      No.

22   Q.      Doctor, did you review this inmate's mental health

23   records after your visit to CIM?

24   A.      Yes.

25           MS. VOROUS:  Your Honor, I'm going to move on.  I'm

2326

1    having a hard time finding my exhibit for this inmate.

2    Q.    Let's talk about inmate V.

3    A.    V --

4    Q.    V.

5    A.    -- as in Victor?

6    Q.    Yes.

7          This is also an inmate that you spoke to at CIM,

8    correct?

9    A.    Yes.

10   Q.    Doctor, you understand that California Institution for

11   Men does not have a mental health crisis bed unit, correct?

12   A.    I -- he was in a crisis bed unit.  I'm not sure what

13   exactly its official designation is.  I understood him to be in

14   an MHCB in that -- in that facility.  He was in a specialized

15   area, a specialized treatment area.  It may have been a CTC or

16   something different.  I understood it to be a mental health

17   crisis bed.

18   Q.    Do you have reason to believe that it was for -- for

19   mental health versus medical?

20   A.    Yes.  Yes, I do.  It was for mental health.

21         Dr. Jordan was with me and explained to me what each --

22   each side of that particular unit was devoted to.  There

23   were -- there were clinicians in the unit.  They were wearing

24   this very unusual face shield that they wear in that unit.  He

25   was very clearly a mental health patient.

1    Q.      Okay.  While this inmate was in administrative

2    segregation, do you know whether he remained CCCMS the entire

3    time that he was in the unit?

4    A.      I don't know.  He was on the list to go to a DMH

5    facility.  His level of care might have changed in CIM once

6    that -- once that authorization or approval had been given.  I

7    would -- I would expect it to, but I don't know whether or not

8    it took place.

9    Q.      Doctor, I believe that you testified that this was one

10   of the inmates that had been in an administrative segregation

11   unit at CIM for several months; is that correct?

12   A.      Yes.

13   Q.      And while he was in the segregation unit at CIM, do you

14   know whether his mental health level of care changed so that he

15   was no longer CCCMS?

16   A.      Again, I don't -- I don't recall from the records.

17   Again, as I testified this morning, this is a man who

18   deteriorated in administrative segregation at CCI.  He

19   deteriorated so badly that they needed to transfer him to an

20   acute care unit.  They didn't have one there, so he was

21   transferred to CIM to receive additional care.  His status

22   might have changed at that point when he engaged in the -- in

23   the suicide attempt.

24   Q.      And that was at the end of January 2012, correct?

25   A.      Yes.  It was just before I saw him.  He had been at

1    CCI.  He was then transferred to CIM.  I saw him at CIM in that

2    unit we're talking about.

3    Q.     I apologize.  I think I said 2012.  I meant January

4    2013.

5    A.     Yes, I understood you to say 2013 as well.

6           MS. VOROUS:  May I approach the witness, Your Honor?

7    Q.     Doctor, I've marked what has been handed to you as

8    Defendants' Exhibit A.  It's a mental health removal chrono.

9    A.     Yes.

10   Q.     Have you seen this document before?

11   A.     I suspect I have.  It was part of his records.

12   Q.     And if you would look at A under the -- there's four

13   numbers listed, A, B, C, D.  If you would look at A.

14          THE COURT:  You're about to ask him questions about the

15   content?

16          MS. VOROUS:  Yes.

17          THE COURT:  You want to move it into evidence?

18          MS. VOROUS:  Yes, I'd like to move it into evidence.

19          THE COURT:  Hearing no objection, it's received.

20                        (DEFENDANTS' EXHIBIT A

21                         ADMITTED INTO EVIDENCE.)

22   Q.     BY MS. VOROUS:  Doctor, if you'd take a look at A.

23   That has a check or an X in the box next to it.

24          Do you see that?

25   A.     Yes.

2329

1   Q.      And is it accurate that, at least according to this

2   removal chrono, this inmate as of November 9th, 2012, had been

3   in remission and free of psychotropic medication for six

4   months?

5   A.      Yes, that's what it indicates.

6   Q.      Okay.  And as a result of that, he was taken off of the

7   mental health caseload; is that accurate?

8   A.      That's also what it indicates, yes.

9           THE COURT:  I don't suppose that you have any reason to

10  know, but perhaps you do.

11          You read A and you read D, and D seems to suggest that

12  there is some other process which a patient might complete in

13  order to be discharged.  Do you have any idea of how A and D

14  relate?

15          I mean, A seems to suggest that he hasn't completed --

16  I don't know whether it suggests that or not -- may suggest

17  that he hasn't completed a crisis bed program, but,

18  nonetheless, he's been free -- has been in remission and free

19  of psychotropic medication and is thus released.

20          Do you have any idea what these distinctions are, if

21  any?

22          THE WITNESS:  I think that the first one suggests that

23  his -- that his symptoms have abated so he's described simply

24  as in remission.

25          I think that the latter one means that he's undergoing

1    some particular program, and it's implied, I think from that --

2    and maybe that's the confusion -- that he is also symptom free

3    or in remission.

4            THE COURT:  Okay.  Okay.  Who knows.  I was hoping

5    somebody might have discussed this with you.

6            THE WITNESS:  No.

7            THE COURT:  All right.  You may proceed, ma'am.

8            MS. VOROUS:  May I approach the witness?

9            THE COURT:  Before we leave A, he is released, or

10   discharged I guess is the word they use, from mental health

11   crisis beds 11/19/12.

12           And when did you interview him?

13           THE WITNESS:  I saw him in February of 2013, Your

14   Honor.

15           THE COURT:  And this document is generated -- do you

16   know where this document was generated, sir?

17           THE WITNESS:  It says ICC.  I'm not sure if that means

18   CCI or a different facility.  He's clearly in an administrative

19   segregation unit.  That's what the ASU means.  I don't -- I

20   don't know.  Maybe Ms. Vorous knows.

21           THE COURT:  Where did you interview him?

22           THE WITNESS:  I interviewed him at CIM, but he had come

23   from CCI.

24           THE COURT:  Okay.

25           THE WITNESS:  So I'm assuming that ICC actually means

2331

```
 1    CCI, but I'm not certain.  You may know.
 2            THE COURT:  When you reviewed him -- interviewed him,
 3    he was back in administrative segregation?
 4            THE WITNESS:  When I saw him, he was in crisis.  So
 5    what happened is, after this, he goes back to administrative
 6    segregation where he's waiting pending a transfer.  He
 7    decompensates again.  That's when there's a suicide attempt.
 8    He's moved then to CIM because he's in crisis.  After this has
 9    happened, I saw him at CIM when he was clearly in crisis.
10            THE COURT:  All right.  I understand now.  Thank you,
11    sir.
12            MS. VOROUS:  Okay.
13    Q.      So at least in November 2012 he was at CIM, and his
14    clinicians had determined that he was not in need of mental
15    health care, correct?
16    A.      I don't think he was at CIM.  I think --
17    Q.      I'm sorry.  CCI.
18    A.      Yes, I believe if that's what we're to interpret ICC to
19    mean.  But that's correct, yes.  He's still back in the
20    administrative segregation unit, of course, the unit which he
21    reported to me later was causing him so much stress.
22    Q.      Correct.
23            THE COURT:  What happens, as I understand what
24    everybody is saying, he's in a crisis bed unit at CCI.  He is
25    symptom free for six months, although he's still in
```

2332

```
1    administrative segregation.

2            Can you tell --

3            THE WITNESS:  No, he wasn't in a crisis bed.  That may

4    be the confusion.  He's just in administrative segregation but

5    on the mental health caseload.

6            THE COURT:  Okay.

7            THE WITNESS:  In November, he's taken off of that

8    mental health caseload because he's been symptom free.  Within

9    a month, he's back in crisis and on his way to CIM because he

10   needs a higher level of care.

11           THE COURT:  Thank you, sir.

12           MS. VOROUS:  Doctor, if you'll look at what's been

13   marked as Defendants' Exhibit B.

14   Q.      And, Doctor, have you seen this document before?

15   A.      Yes, I believe I have.  It's part of his records, which

16   I reviewed.

17           MS. VOROUS:  Ask that this document be moved into

18   evidence.

19           THE COURT:  Received.

20                       (DEFENDANTS' EXHIBIT B

21                       ADMITTED INTO EVIDENCE.)

22   Q.      BY MS. VOROUS:  Doctor, at the bottom it's dated

23   1/8/2012.  Do you have any understanding if that's an error, if

24   that should be dated 1/8/2013?

25           MR. FISCHER:  Objection.  She's asking the witness to
```

1    speculate as to --

2            THE COURT:  No, she's asking whether he has any

3    information which would generate -- which would demonstrate

4    this was in error.  Either he has such information or he

5    doesn't, and either way it's perfectly okay.

6            THE WITNESS:  I don't.

7            THE COURT:  All right.

8    Q.    BY MS. VOROUS:  Doctor, do you know when inmate V -- or

9    let me ask you this way.

10           Do you know if at some point inmate V asked to be seen

11   again by mental health and placed back on medication?

12   A.    I'm -- the reason I'm pausing is I'm looking at his

13   records.

14           I don't -- I don't know exactly when he made that

15   request.  It's not reflected in the records I have here.

16           I know early in February is when there was the suicide

17   attempt at CCI, but I don't know -- I don't have the records in

18   front of me that pertain to the period since November when he

19   was taken off the mental health caseload and early February

20   when he attempted to commit suicide.  I don't know.  I don't

21   have his records here.

22   Q.    And are you aware that at some point prior to his

23   attempt to take -- his attempted suicide that he was put back

24   on caseload and was receiving mental health services?

25   A.    Again, I don't -- let me look at the records I have

2334

1    here.  That could very well be the case.

2         I -- so I have on February 1st he was placed on suicide

3    watch.  He was admitted to the OHU actually on January 31st.

4    This is a note which is dated February 1st.  So at least by

5    that point, CCI understood that he was -- he was deteriorating.

6    It may have happened before that.  I don't have -- I don't have

7    the records that reflect that.  If there are such records, I

8    would have reviewed them.

9    Q.    So it's fair to say that when this inmate started

10   deteriorating, he was referred outside of CIM and was treated

11   in a mental health crisis bed, correct?

12   A.    Yes.  As I've said, when he attempted suicide, they

13   realized that he was in crisis, he needed a higher level of

14   care, and he was sent to a crisis bed at CIM.  That's where I

15   saw him.

16   Q.    And you have no evidence that after he was released

17   from the mental health crisis bed he was sent back to the CCI

18   administrative segregation unit, correct?

19   A.    I don't recall where he was sent back to.  I think I

20   went through this this morning, the whole history of his -- the

21   whole history of his process.

22         He did not get immediately well.  He -- he went from

23   CIM to a state hospital, a DSH facility.  He was at the DSH

24   facility when his rules violation charge was decided against

25   him.  And then sub -- after that, he was -- he was returned I

2335

1    believe to CCI.  And I don't recall whether he went back to

2    administrative segregation or not.  It's not -- I don't have

3    that record.

4    Q.    So, as far as you know, he may have returned and been

5    placed in general population or a special needs yard bed,

6    correct?

7    A.    Yes, it's possible.  You know, that would be -- given

8    the frustration he was experiencing in administrative

9    segregation and what it appears to have led to, that would

10   clearly be called for.  And hopefully that's what happened.

11   Q.    Let's talk a little bit about your visit at Corcoran.

12   A.    Okay.

13   Q.    And I believe on direct that you testified that you

14   attended one group in the enhanced outpatient program

15   administrative segregation unit that involved inmates that were

16   using the new atom chairs, correct, A-T-O-M?

17   A.    Yes.

18   Q.    That was the only group that you attended at that

19   prison, correct?

20   A.    I recall also having -- I think we attended a group

21   briefly that was taking place in the secured -- in the -- near

22   the security housing unit, security housing unit area.  This

23   was an unusual arrangement where there was a treatment area

24   that was behind a door that was labeled storage utility.  And I

25   have a recollection of there being group cages in there, and I

2336

1    think there may have been a group taking place in there, or

2    maybe it was just ending.

3           So there might have -- my recollection is there was

4    that additional group.  There was a person who was conducting

5    the group or showing a video.  I remember it was a commercial

6    video rather than an educational video.  And it was in an

7    awkward, odd place in -- as I say, behind a door that was

8    labeled storage utility room.

9    Q.     But no other groups in the administrative segregation

10   for the EOP population?

11   A.     No, not that -- not that particular facility.  Just

12   that one you referred to.

13   Q.     Doctor, you also talked about inmate GG who you also --

14   or who you interviewed while you were at Corcoran, correct?

15   A.     Yes.

16   Q.     And you toured Corcoran on February 19th, 2013?

17   A.     Yes.

18   Q.     Doctor, did you review this inmate's medical -- or

19   excuse me -- mental health records before you drafted your

20   March 2013 declaration?

21   A.     I'm sure I did.

22   Q.     All right.

23   A.     I tried to review all of them that I made reference to

24   in the declaration, and I believe I got to all of them.

25   Q.     And, Doctor, you had testified that this inmate told

2337

1    you that he had received little to no assistance from staff

2    while he was in administrative segregation; is that accurate?

3    A.      Yes.  He was complaining about his property, and he

4    said he didn't have -- he hadn't had his medications, and he

5    was concerned about his status.

6            This was a guy who, as you know, is in ad seg for a

7    non-disciplinary reason, was frustrated over it, and that's

8    what he was talking to me about.

9    Q.      Did you confirm any of his comments with staff at the

10   prison?

11   A.      Well, I looked in his cell, and he didn't appear to

12   have his property.  And I was mostly interested in his level of

13   frustration and what he was telling me about how he was feeling

14   and the frustration he was feeling because he was in this

15   administrative segregation unit and hadn't done anything wrong.

16   That was sort of the thrust of the comments that he was making

17   in a very agitated way.  He was very upset about this.

18   Q.      Did you review his mental health records to see what

19   treatment he had received since he had been in the

20   administrative segregation -- in the administrative segregation

21   unit setting?

22   A.      Well, I'm sure if they were in his records I would have

23   seen them.  He had only gotten there a few weeks earlier, so I

24   didn't make a notation in here about whether or how much

25   treatment he had gotten because he hadn't been there for very

1    long.  So I didn't know how much there was, and I didn't make a

2    notation of it here.  But if it was in the file, I certainly

3    reviewed it.

4    Q.    So are you aware that between his arrival at Corcoran

5    on March -- excuse me -- January 3rd, 2013, and your visit on

6    February 19th, this inmate had had approximately 30 clinical

7    contacts?

8    A.    If it was indicated in his file, I'm sure I read it.  I

9    don't know what those clinical contacts refer to.  That's

10   certainly what he was describing to me as the kind of mental

11   health attention he was getting.

12        If you mean there was psych-tech rounding, something

13   like that, that's very possible.  He didn't describe having

14   gotten any meaningful clinical contact at least during the

15   period of time that he was at that facility.

16        MS. VOROUS:  Sorry.  Are we on -- I think we're on D,

17   correct?

18        THE CLERK:  No, the next one is C.

19        MS. VOROUS:  C?

20        Your Honor, may I approach the witness?

21        Doctor, I've handed you what has been marked as

22   Defendants' Exhibit C.  And I'll represent to you that this was

23   submitted in the context of defendants' termination motion.  It

24   was attached to a confidential declaration that was filed under

25   seal with respect to prisoner GG.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

2339

1          If you can look at the --

2          THE COURT:  Have you seen this before, Doctor?

3          THE WITNESS:  Yes, I'm sure I have, Your Honor.

4          THE COURT:  All right.

5          THE WITNESS:  It looks familiar.

6          MS. VOROUS:  Request that this be admitted.

7          THE COURT:  Received.

8                         (DEFENDANTS' EXHIBIT C

9                         ADMITTED INTO EVIDENCE.)

10         MR. FISCHER:  Your Honor, I would just ask that these

11   Exhibits A through C be admitted under seal.

12         THE COURT:  That will be the order.

13         MR. FISCHER:  Thank you.

14         MS. VOROUS:  That was going to be my request as well.

15   Thank you.

16   Q.    Doctor, if you would look at the second page of this

17   document.  It's Bates stamp 321.

18   A.    Yes.

19   Q.    And you can see, third line up from the bottom, there's

20   a notation of a clinical contact on January 4th, 2013.

21         THE COURT:  Hang on.  January 4th, 2013, is that what

22   you said?

23         MS. VOROUS:  Yes.

24         THE COURT:  Oh, dear.  Where am I supposed to look?  I

25   don't see that, but I'm sure I just don't know where to look.

2340

```
 1          I'm on the second page.  And where else am I supposed

 2   to look?

 3          MS. VOROUS:  If you look at the bottom, there is -- the

 4   bottom two lines show January 2nd and January 3rd entries for

 5   SATF.  And then starting the third line up, it's a January 4th,

 6   2013 entry.  To the right it has facility Corcoran.

 7          Do we have the right exhibit?

 8          THE COURT:  Hang on.

 9          I'm on the second page.  It says at the top inmate

10   history date range.

11          MS. VOROUS:  Yes.

12          THE COURT:  Okay.  Now you want me to look at MHCB stay

13   history?

14          MS. VOROUS:  No.  I'm wanting to have you look at the

15   date of all of the visits for this particular inmate between

16   January 4th, 2013, and February 19th, 2013.

17          THE COURT:  January 4th.  I don't have -- 12, 12, 12,

18   12, 11.  This is really embarrassing because I just absolutely

19   do not see --

20          (Counsel conferring.)

21          MS. VOROUS:  I'm sorry.  Did I give you the wrong --

22          THE WITNESS:  No, the page before.

23          THE COURT:  Oh, no wonder I couldn't understand what

24   you were saying.  Okay.  Now I'm with you.

25          MS. VOROUS:  I apologize.  I thought I indicated Bates
```

1    stamp 321.

2         THE COURT:  My fault.  Go ahead.

3    Q.    BY MS. VOROUS:  So, Doctor, do you see on page -- or

4    Bates stamp 321 of Exhibit C the various clinical contact

5    entries from January 4th, 2013, up through February 15th, 2013?

6    A.    Yes.  But this also indicates that most of these

7    occurred when he was in a mental health crisis bed, right?  So

8    these are MCHB or MHCB, which is what I alluded to in my

9    declaration, that he had been in a crisis bed.  I don't doubt

10   that he would have gotten a lot of clinical contact then.  But

11   what he was talking to me about is what had happened after.

12   Q.    He was talking to you about what happened after he was

13   removed or taken out of the mental health crisis bed?

14   A.    Yes, and I think I indicated that pretty clearly.

15        He said he was in ad seg.  When I saw him, he was

16   talking about what had happened to him in ad seg.  And I made a

17   notation in the declaration that this -- that the inattention

18   about which he was complaining occurred despite the fact that

19   he had been in a mental health crisis bed unit as recently as

20   December.

21        It turns out that it actually may have -- it appears

22   from the records you just showed me that it continued

23   through -- through almost to February.  He said to me a couple

24   of weeks before I got here, and this indicates that as of, say,

25   February 7th they're doing an IDT in the mental health crisis

1    unit on him.

2          So most of that clinical contact would have occurred

3    when he was in crisis, which makes perfect sense, but doesn't

4    speak to the concern that I voiced here and that he voiced to

5    me, that now he was in administrative segregation having come

6    out of a mental health crisis bed unit, and he wasn't getting

7    very much attention.

8    Q.    Well, Doctor, you saw this inmate on February 19th, but

9    yet it does show that on February 12th and again on February

10   13th and again on February 15th he was seen by a medical

11   doctor, or at least an M.D.  I'm not sure if that's a

12   psychiatrist or a psychologist, but Dr. Wang on two occasions

13   and Dr. Humeid on a third occasion.

14   A.    Yes.  This could very well have been medication

15   check-in, et cetera.  Obviously a person who had been in a

16   mental health crisis bed unit would be on medication.  I

17   believe he was when I saw him.

18   Q.    So, Doctor, are you aware that after this inmate was

19   released from the mental health crisis bed, that he had

20   continued to deny mental health condition -- mental health

21   concerns and asked staff on multiple occasions to remove him

22   from the CCCMS level of care?

23   A.    Yes, and I think I may have even referred to that in my

24   description of him.

25          He was trying to get out of administrative segregation,

1   and it appears from the records that he -- you know, in one of

2   the records that I noted this morning or that's in the file.

3   This is June of 2013.  This inmate is extremely focused on

4   getting off the mental health delivery system.  He's not

5   getting the meds he needs and so on.

6          So he finally wasn't probably being treated, partly

7   what was keeping him in ad seg, and he wasn't getting -- and he

8   wasn't getting the treatment that he needed.  And it appears

9   that he felt it was a bad trade, he was being kept in ad seg

10  plus he wasn't getting the benefits of being on the mental

11  health care delivery system caseload.

12  Q.     And you're referring to his subjective complaints that

13  were recorded on a mental health record, correct?

14  A.     Yes.  Yes.  Those are on the mental health record, not

15  in my -- not in my declaration.

16         MS. VOROUS:  Your Honor, may I approach the witness?

17         Doctor, I've handed you what's been marked as

18  Defendants' Exhibit D.

19  Q.     Have you seen this document before?

20  A.     Yes.  Again, I'm sure I have.  I would have seen it

21  more recently.  This was a document entered into his records

22  after I filed my declaration.

23  Q.     And --

24         THE COURT:  So you may not have seen it?

25         THE WITNESS:  I may not have seen it before I wrote my

2344

1    declaration, but I've seen it since.

2        THE COURT:  Okay.

3        THE WITNESS:  I looked at records after that to prepare

4    for today's hearing.

5        THE COURT:  You're moving it, ma'am?

6        MS. VOROUS:  Yes, Your Honor.

7        THE COURT:  It's in.

8                         (DEFENDANTS' EXHIBIT D

9                         ADMITTED INTO EVIDENCE.)

10   Q.    BY MS. VOROUS:  And, Doctor, this chart note is not

11   included in the documents that are part of your binder you've

12   been referring to, correct?

13   A.    No, I didn't -- I didn't include them or comment on

14   this document.

15   Q.    Doctor, if you'd look at the assessment for this

16   patient.  And this progress note is dated July 1st, 2013.  Look

17   under the assessment column.

18        Do you see that?

19   A.    Yes.

20   Q.    And at least at this point in time, on July 1st, 2013,

21   his treating clinician felt that the inmate's condition had not

22   changed, correct?

23   A.    Yes.  Correct.

24   Q.    And he continued to evidence irritation at being in the

25   CCCMS level of care.

2345

```
 1    A.      Yes.
 2            Again, I mean, this is entirely consistent with what
 3    I -- with what I just said.  I mean, this is a person who is
 4    still in administrative segregation for non-disciplinary
 5    reasons.
 6    Q.      I understand that.
 7            Doctor, what I'm asking you, though, is that at least
 8    as of this date on July 1st, 2013, his clinician felt that his
 9    condition had not changed from what it had been previously.
10    A.      Yes.  It says above this is a weekly contact.  He spoke
11    to him cell front.  This is a cell front contact.  He declined
12    out-of-cell contact.  So it's a relatively proforma encounter
13    with his clinician.  And he is still stuck in ad seg.
14    Q.      And at some point, as you testified to earlier today, I
15    believe it was today versus yesterday, this same clinician,
16    Dr. -- I'm not sure I'm pronouncing his name correctly --
17    Becich, B-E-C-I-C-H, made a determination that this inmate
18    should be removed from administrative segregation due to his
19    mental health condition, correct?
20    A.      Well, let me check that.  I want to make sure that's
21    true.
22            THE COURT:  Where do you see that, ma'am?
23            MS. VOROUS:  Your Honor, I'm asking --
24            THE COURT:  Oh, you're not --
25            THE WITNESS:  Yes.  So here are the -- this is from
```

1    8/23/13.  He seems to view mental health as a real negative as

2    we aren't helping him.

3            THE COURT:  I'm sorry, sir.  Will you speak into the

4    microphone.  I can't --

5            THE WITNESS:  I'm sorry.  I'm leaning over this paper,

6    and it's impaired my --

7            THE COURT:  I understand.

8            THE WITNESS:  So he says he -- this is the clinician

9    talking about him.  He seems to view mental health as a real

10   negative.  We aren't helping him in the way he seems to most

11   need help by getting the meds that helped him, by getting him

12   his DDP, his developmental disability placement.

13           And then down further, this Dr. Becich, or however he

14   says it, says that he consulted with his, Becich's supervising

15   psychologist about his report requesting assistance mental

16   health could provide to help expedite his transfer due to an

17   effect continued lock-up was having on his mental health.

18   Q.      BY MS. VOROUS:  So it's accurate, Doctor, that at that

19   point this clinician, who had just seen him in the beginning of

20   July, made a determination that he or she should take action

21   and contact a sergeant or correctional officer to try to

22   arrange movement out of the unit?

23   A.      Well, that's what this statement implies.  As I

24   testified earlier today, I didn't see any follow-up indication,

25   at least written indication that that had happened.  But

2347

1    certainly here's the recognition that this is having a negative

2    effect on him, just as I said it was having a negative effect

3    on him in February.

4    Q.      And you have no reason to believe that it did not

5    happen and that he was not removed from the unit, correct?

6    A.      I don't have any reason to believe one way or the other

7    whether this happened or not.  I think it's certainly a

8    well-intentioned entry, the intentions are good.  And if the

9    follow-up occurred, all the better.

10   Q.      So at least in this case, the process that CDCR has in

11   place to remove CCCMS inmates from an administrative

12   segregation unit and place them at a higher level care if

13   necessary appears to have worked?

14   A.      No.  That's terrible.  He -- this is a man who came out

15   of a mental health crisis bed unit and was put in

16   administrative segregation.  I saw him in February.  He was

17   saying I can't take this, I'm not getting any help.  There are

18   periodic mentions of exactly that along the way.  That was in

19   February.  The beginning of February was the suicide attempt.

20   August 29th -- August 23rd, excuse me, there is finally some

21   movement on the part of mental health to get him out of this ad

22   seg.  He's still in ad seg.

23         And eventually he gets out on -- I think by the 29th or

24   something he's moved, and he's at the California medical

25   facility with an uncertain outcome.  I'm not sure why he's

1    there.   The records didn't indicate why he's there.   He might

2    have had another crisis as a result of having been six months

3    in this ad seg unit for non-disciplinary reasons.

4              I see that as a failure, not a success.

5    Q.      So wouldn't you agree that the same clinician who's

6    been treating him would be in a better position to judge if and

7    when this inmate's mental health condition required that he be

8    moved out of the administrative segregation unit?

9    A.      I don't -- I don't know.   I don't -- I don't know what

10   Dr. Becich thought up until the point he wrote this.   There are

11   indications earlier on that the clinicians are recognizing the

12   frustration.   I read some earlier comments well before this

13   that he was -- that the inmate was frustrated, that he felt

14   mental health was the problem, not the solution.   He was

15   complaining about being in administrative segregation.

16             So I don't know why it took Dr. Becich until --

17             THE COURT:   That assumes that Dr. Becich was the

18   treating physician.   For all we know, he just came on the

19   scene.

20             THE WITNESS:   I don't know, and I don't know what he

21   did after that either, which also is in doubt.

22             So I don't -- I don't know how much contact with him he

23   had or why it took him until the end of August to get this man

24   out of this unit that he had been complaining about and

25   deteriorating in after a mental health crisis bed admission

2349

1    before -- right before he was placed in ad seg.

2    Q.      BY MS. VOROUS:  Do you know if Dr. Becich was this

3    inmate's treating clinician?

4    A.      I don't know.  There are some entries from him

5    elsewhere, his name on some of the documents, not all of them.

6    Q.      Doctor, are you aware that in the EOP ad seg hubs that

7    custody and mental health have what are called morning meetings

8    where they talk about all of the inmates that are in the unit

9    that have mental health conditions?

10   A.      Yes, I'm aware it's done with the psych-techs and

11   custody staff on a daily basis.

12   Q.      And are you also aware that there are daily psych-tech

13   rounds that are conducted in administrative segregation units?

14   A.      Yes.  It's program guide guidelines, yes.

15   Q.      Doctor, you also visited California Correctional

16   Institution, correct?  And that was also in February of 2012?

17   A.      Yes.

18   Q.      And California Correctional Institution doesn't have an

19   enhanced outpatient EOP hub, correct?

20   A.      That's my recollection, yes, it does not have that.

21   Q.      And they don't have a mental health crisis bed unit

22   either, correct?

23   A.      No, they don't.  And we talked about that earlier,

24   someone having to be transferred to CIM, a prisoner having to

25   be transferred to CIM because they didn't have one there,

2350

1    prisoner V.

2    Q.      Okay.  Doctor, I'd like to talk about prisoner WW.

3           This is also one of the prisoners that you interviewed

4    during your visit to the California Correctional Institution,

5    correct?

6           THE COURT:  Before we go to WW, I am having quite a lot

7    of difficulty understanding what happened to prisoner GG.

8           It would appear to me that there is no custody reason

9    for that person to be in administrative segregation.  He was

10   there, from the records, for reasons unrelated to a

11   disciplinary act.  So custody should have -- it would appear

12   that custody has no reason to want to keep him there.

13          THE WITNESS:  Correct.

14          THE COURT:  And we're told that there's a meeting

15   between the psych-techs and custody every morning.  Of course,

16   we don't know whether anybody ever communicated to custody that

17   they ought to move him because he's deteriorating in ad seg.

18          I don't know whether a psych-tech -- I mean, I know

19   it's a person specially trained for this position -- I was

20   going to say has any influence in these morning meetings except

21   there's no -- custody has no reason to keep him there.

22          Well, of course you don't know and I don't know whether

23   the psych-tech said, look, let's move this guy.

24          Okay.  Never mind.  I'm just trying to think through

25   the implications of the question, and I don't have an answer

2351

1    because I don't know what went on.

2            You may proceed, ma'am.  I'm sorry I interrupted you.

3            MS. VOROUS:  No, Your Honor.  I was just looking for

4    something that might be helpful, but I'll have to come back to

5    that.

6            THE COURT:  That's fine.  Go to WW.

7            I assume you want D under seal as well; is that

8    correct?

9            MS. VOROUS:  Yes.

10           THE COURT:  That will be the order.

11   Q.      BY MS. VOROUS:  Doctor, did you review prisoner GG's

12   mental health records before you drafted your March 2013

13   declaration?

14   A.      Are we on GG or WW?

15   Q.      Oh, I'm sorry.  WW.

16   A.      Yes, I did.

17   Q.      And when you interviewed prisoner WW, he indicated to

18   you that he was under management status, correct?

19   A.      Yes.  Yes, he did.

20           THE COURT:  I'm sorry.

21           THE WITNESS:  I'm sorry.  Yes, he did.

22   Q.      BY MS. VOROUS:  Did he tell you why he was on

23   management status?

24   A.      I think he told me it was because he was kicking --

25   kicking the door.  I believe he was banging on the door, he got

1    a 115, and he was moved to his management cell.  I think that's

2    the explanation he gave me, I'm not sure.  That's my

3    recollection of it.

4    Q.    Did you follow up with correctional officials to find

5    out if that was in fact the case why he was in management

6    status?

7    A.    No.  It didn't matter to me why he was there.  I was

8    concerned about his mental health while he was there and what

9    he was going through while he was in that cell.

10          MS. VOROUS:  May I approach the witness, Your Honor?

11          THE COURT:  Yes.

12          MS. VOROUS:  Doctor, I've handed you what's been marked

13   as Defendants' Exhibit E.

14   Q.    Have you seen this crime incident report before?

15   A.    Yes, I remember it very well.  Now that I've seen it, I

16   recall it distinctly.

17   Q.    If you'll turn to page --

18          THE COURT:  You want to move it into evidence?

19          MS. VOROUS:  Yes, I do.

20          THE COURT:  Received.  Under seal, I believe; is that

21   correct?

22          MS. VOROUS:  Yes, that's correct.

23          THE COURT:  All right.

24                    (DEFENDANTS' EXHIBIT E

25                     ADMITTED INTO EVIDENCE.)

2353

1   Q.      BY MS. VOROUS:  Doctor, if you'll turn to page 2 of the

2   crime incident report.

3   A.      Yes.

4   Q.      If you'll look under the conclusion at the end of the

5   second page.

6   A.      Yes.

7   Q.      Do you see where it's indicated that the sergeant had

8   noted a strong odor of alcohol coming from the prisoner?

9   A.      Yes.

10  Q.      And that the prisoner would not cooperate with the

11  interview?

12  A.      Yes.  He declined to be interviewed.

13  Q.      And that he also refused to provide a urine sample?

14  A.      Correct.

15  Q.      Wouldn't this information be important to know in

16  making a determination as to whether or not it was appropriate

17  for someone to be placed on management status on a temporary

18  basis?

19  A.      No, not at all.

20          He wasn't convicted of intoxication.  There was no --

21  there was no alcohol seized from his cell.  His rules violation

22  makes no mention of an alcohol offense.  That's not what he was

23  written up for.  This report confirms exactly what I said in my

24  report, he was kicking on the cell door.  He was pepper-sprayed

25  for that.  And he described the frustration that led to him

```
 1    kicking the door.

 2           He was -- he was a person who had been in ad seg for a

 3    year awaiting a transfer that had already been approved.

 4    Q.     And you saw this inmate on February 22nd, correct?

 5    A.     I did.

 6           MS. VOROUS:  May I approach the witness, Your Honor?

 7           Doctor, I've handed you what's been marked as

 8    Defendants' Exhibit F.

 9    Q.     Have you reviewed this progress note before?

10    A.     Yes.

11           MS. VOROUS:  Your Honor, I'd like to move this note

12    into evidence.

13           THE COURT:  Received.

14                       (DEFENDANTS' EXHIBIT F

15                        ADMITTED INTO EVIDENCE.)

16    Q.     BY MS. VOROUS:  And this progress note, at least

17    according to the date that's on it, was completed the day

18    before your visit, correct?

19    A.     Yes.

20    Q.     And according to the clinician who saw this inmate on

21    March 21st, he reported that he was doing good?

22           THE COURT:  This says the date is 2/21/13.  Have I

23    missed the point?  I'm certain I have, but --

24           MS. VOROUS:  No, Your Honor.  That was my mistake.

25           THE COURT:  Oh, okay.
```

2355

1    Q.      BY MS. VOROUS:  This visit was on February 21st, 2013,

2    the day before your visit, correct, Dr. Haney?

3    A.      Yes.

4    Q.      And according to this progress note, the inmate stated

5    that he was doing good?

6    A.      Yes.  That's what it says at the top.

7    Q.      Okay.  And further that he was reporting no current

8    stressors?

9    A.      Yes.  That's what Dr. Jensen reports.  He's awaiting

10   transfer to KVSP.

11   Q.      Given his comments to you the following day, did you

12   speak with Dr. Jensen about this inmate's condition?

13   A.      No, I didn't have to.  Her -- her reports eventually

14   report a deteriorating mental condition.  And she too, along

15   with the other clinicians who saw him, begin to report that

16   there are current stressors.

17           I don't know whether he didn't talk to Dr. Jensen about

18   the things he talked with me about.  He saw her the day before.

19   He opened up to me.  He opened up apparently to her and others

20   later on because there are subsequent clinical contacts with

21   him that reflect that he now does have current stressors, and

22   they become concerned over the frustration that he's

23   experiencing in administrative segregation awaiting his

24   transfer.

25   Q.      And once they became concerned, they took action,

2356

1    correct?

2    A.      Well, I don't -- I'm not sure how -- I mean, I don't

3    know how quickly they took action, but they -- eventually he

4    was -- eventually he was moved, but it took months.

5            I mean, here's a note from Dr. Jensen just a month

6    later.  So we're talking about February, right?

7    Q.      Yes.

8    A.      This is March 25th, 2013.  This is like a month after I

9    saw him.  Current stressors, ASU placement, awaiting transfer

10   to KVSP, one year, four months.  That's her notation.

11           He's not doing well.  I'm really frustrated.  I just

12   want to get to KVSP and get a job.  I would finally like to

13   transfer down south so I can be where my family people are.

14   That's her.  So he's apparently finally begun to open up to

15   her, too, and eventually he's transferred.

16           This note is a year and four months into his segregated

17   housing for no other reason than that they can't find a bed for

18   him at Kern Valley.

19   Q.      And that's your assumption based on what you've read,

20   correct?  You don't know the reasons why he had not been

21   transferred for a year and four months.

22   A.      No, you're right.  The most important point is that he

23   hadn't been transferred.  Why he hadn't been transferred after

24   having been endorsed is speculation on my part, you're right.

25           THE COURT:  What seems to me of some concern is he

1    apparently, when speaking to a clinician that's supposed to be

2    treating him, says everything is hunky-dory and the next day to

3    somebody who is essentially a stranger, although maybe he --

4    did he know who you were in the sense that you were working for

5    the plaintiffs rather than for the defendants?

6         THE WITNESS:  Yes, I told him that I was there with

7    Coleman lawyers.

8         THE COURT:  So maybe that's the distinction that led --

9    or is that speculation?

10        THE WITNESS:  It's very possible.

11        And also I think -- but I think that the point Your

12   Honor is making is a more general one, that sometimes these

13   minimal clinical contacts don't surface all of the information

14   that might be relevant to developing some understanding about

15   how somebody is being adversely affected by their conditions of

16   confinement.

17        My critique here is not of Dr. Jensen, whom you

18   actually may recall that I praised in my declaration, but

19   rather that the circumstances under which these clinical

20   contacts are taking place don't necessarily promote a lot of

21   exchange of information, and it took a while for this

22   information to eventually surface.

23        Dr. Jensen did eventually get it, she did note it, and

24   at some point a year and a half more into this he's eventually

25   transferred.

2358

1           THE COURT:  Let's take our afternoon break.  Fifteen

2    minutes.

3           (Recess taken at 2:57 p.m.)

4                        ---o0o---

2359

1          (Back on the record at 3:18 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Miss Vorous.

5    BY MS. VOROUS:

6    Q.     So Doctor, it is correct that you did not tour the

7    psychiatric services unit or the security housing unit at

8    California State Prison Sacramento, correct?

9    A.     Yes, that's correct.

10   Q.     And you did not tour the security housing unit at the

11   California Institution for Women?

12   A.     No, I didn't.  I toured it when it was at Valley

13   State a few years ago, but not since it has moved.

14   Q.     And you've not toured the psychiatric services unit

15   at California Institution for Women either?

16   A.     Correct.

17   Q.     And you haven't toured the psychiatric services unit

18   at Pelican Bay State Prison, correct?

19   A.     Not for years.  I toured it not long after it opened,

20   but I haven't seen it since then.

21   Q.     So Doctor, you're not providing opinions with respect

22   to the security housing units or the psychiatric services

23   units that you have not yet toured, correct?

24   A.     No.  Only insofar as the conditions are the same or

25   similar, but I haven't seen them.  I have no opinion on

2360

1    whether or not they are.

2    Q.        Doctor, you visited two prisons that have the EOP Ad.

3    Seg. hubs, correct?

4    A.        Correct.

5    Q.        You're aware that there's eleven hubs throughout the

6    system, correct?

7    A.        Yes.  Exactly.

8    Q.        And you haven't toured any of the other nine?

9    A.        No.  I toured the two we've talked about.

10    Q.        So you have no basis to render any opinion with

11    respect to the conditions or the care that's provided within

12    those units, correct?

13    A.        No.  To the extent to which it is fundamentally

14    different or different in some significant way, I wouldn't

15    know that.

16            The procedures are the same.  It is my understanding

17    that the Program Guide procedures specify the same kind of

18    treatment under the same conditions.

19            I've read the Special Master's report on all of those

20    institutions and can note that there are similar concerns

21    expressed in those institutions, but I have not seen them

22    myself.  And I didn't write about them in my declaration.

23    Q.        Doctor, if I can draw your attention to Plaintiffs'

24    Exhibit 2037.

25    A.        Yes.

2361

1  Q.      And this is the MHSDS population and segregation

2  chart that you testified to about yesterday, correct?

3  A.      Yes.

4          THE COURT:  Now, as far as incarceration of prisoners

5  who are there for reasons other than violation, that chart

6  reflects that reality in all of the Ad. Segs. whether you

7  visited them or not, correct?

8          THE WITNESS:  Yes.  It's my understand there is

9  nothing unique about the use of Ad. Seg. for those people

10 specific to the places I saw.  My understanding is it is a

11 systemwide policy.

12         THE COURT:  Ma'am.

13 BY MS. VOROUS:

14 Q.      So Doctor, in this chart, as you discussed, you noted

15 several increases in mental health population in segregation

16 between April 20 -- excuse me -- April 2000 and September

17 2013, correct?

18 A.      Yes.  In each of the categories.

19 Q.      And the prior chart, which is Exhibit 2036, also

20 shows a increase in the total mental health population from

21 April 2000 to April 2013, correct?

22 A.      It does.

23 Q.      In fact, it shows an increase of 14,321 inmates over

24 a 13-year time period, correct?

25 A.      I haven't -- I would have to do -- Yes.  That's

2362

1   what's indicated in the very middle of that chart.  This is

2   2036, a 73 percent increase from 2000 to 2013.

3   Q.      With respect to the increase in the mental health

4   population in segregation, I've added up the numbers.  I'm

5   not sure if you have, but I believe that they total 1950.

6           Does that sound right?

7   A.      It might be right.  I'm looking at it now.  So it

8   would be -- if you look at 2037, it would be 982, 337, 441

9   and 190.  That looks to me like close to 2000.

10  Q.      In fact, nearly half of those include the CCCMS

11  population, correct?

12  A.      Yes.

13  Q.      Doctor, given the high increase in the number of

14  mentally ill inmates in the prison system over this time

15  period, wouldn't you expect to see an increase in the number

16  of mentally ill inmates placed in segregated units as well?

17  A.      It's hard to answer that simply.  I would expect

18  there to be increases.  I wouldn't expect those increases to

19  be greater than the increase in the overall mental health --

20  or mentally ill population.

21          So I would expect at worse there to be proportionate

22  increases that corresponded to the increase in the overall

23  population.

24          What the purpose of this graph was to show was that

25  the increases in segregation are even greater than the

2363

1    increase in the overall population -- mentally ill

2    population.

3    Q.     So looking at the EOP Ad. Seg. population increase of

4    441, for instance, where you've noted a 401 percent increase?

5    A.     Yes.

6    Q.     Those numbers look to reflect an increase from, you

7    know, approximately, I guess, 80 inmates or so in 2000 as

8    compared to a little over 500 in 2013, correct?

9    A.     Yes.

10          THE COURT:  Hang on because I don't understand the

11    question.  My problem.

12               (Brief pause.)

13          Okay.  Now I got it.

14    BY MS. VOROUS:

15    Q.     So wouldn't it make sense then, Doctor, if you're

16    going to start with such a small number, that when you do add

17    an additional 500 inmates to that number, as compared to say,

18    for instance, the overall population of 14,000, that you're

19    going to show a percentage increase that is much, much

20    greater?

21    A.     Well, yes.  That's but what a percentage increase is.

22    That's the calculation of how much that population increased

23    over the same period of time.

24          If there wasn't an increased use of segregation for

25    the mentally ill, as this chart depicts in every category,

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2364

1    then that increase would correspond to the increase in the

2    overall population, in this case 73 percent.

3            If they're increasing proportionately, if you start

4    out with a small group, as the large group increases, the

5    small group should increase proportionate to the increase in

6    the large group unless there is a change between them.

7    That's what this is designed to illustrate.

8    Q.      Doctor, you're aware during the same time period that

9    the State expanded the number of enhanced outpatient

10   administrative segregation unit beds for the mentally ill

11   population?

12           THE COURT:  I'm sorry.  Again, hang on.

13           Okay.  You may answer.

14           Do you have the question, Doctor?

15           THE WITNESS:  I do.

16           I would assume.  I would hope that they would have

17   increased the number of beds because you've got an increase

18   in population of enhanced outpatient prisoners, including at

19   a much higher rate than increasing in the general prisoner

20   population, being placed in Ad. Seg. units.

21   BY MS. VOROUS:

22   Q.      And they also increased the amount of treatment and

23   office space, correct?

24   A.      In some instances, yes.

25   Q.      So Doctor, if you look at -- again at Plaintiffs'

2365

1    Exhibit 2037, and you look around the 2007 time frame,

2    wouldn't you agree that would be kind of the height of the

3    prison overcrowding?

4    A.    Yes.

5    Q.    So --

6    A.    I mean, if you look back at the earlier graph, it

7    shows that a lot clearer.  If you look at 2035, that's the

8    overall population.  And that peaks, as I said yesterday, at,

9    you know, sometime in 2007.

10   Q.    And if you look at the chart for the EOP Ad. Seg.

11   from approximately that 2007 time frame to today, wouldn't

12   you agree that it's remained fairly flat or the trend would

13   be that it would be fairly flat?

14   A.    It's relatively flat, yes.  It hasn't -- it hasn't

15   decreased, which is what I was saying yesterday I would have

16   expected.  I wouldn't have expected an increase under any

17   circumstances.  I would have expected it to be proportionate.

18        And, in fact, given what I think everyone expected

19   would be the impact of the reduction in overcrowding overall,

20   my prediction would have been, if I hadn't seen the numbers,

21   that it would actually be decreasing at a rate greater than

22   the trends for the mentally ill and more corresponding with

23   the overall reductions in population.

24   Q.    So wouldn't you agree, that despite an increase in

25   the overall numbers of mental health or -- Strike that.

2366

1      Wouldn't you agree, that despite the increase in the

2 number of inmates that were added to the mental health

3 caseload system, that the numbers of inmates in EOP Ad. Seg.

4 remained relatively stable?

5 A.      No.  No.  I mean, look, you're conflating two

6 different trends.  There is an increase over all of 73

7 percent of the mental health population in the system.

8      If you look at 2037, in every single category the

9 increases are greater for the mentally ill in segregation.

10      If you want to concentrate on just the last few

11 years, there's been a decrease in the total mental health

12 population.  That's not matched by significant decreases in

13 these other categories.  They remain flat at best.

14      So again, what this appears to say is that there

15 is -- the use of segregation for the mentally ill is a

16 practice that was put in place in part -- I think in large

17 part to deal with the overcrowding problem.  The overcrowding

18 problem has now abated in part, but the change in practices

19 are not taking place.

20 Q.      Again, Doctor, you use the term "appears."  That's

21 speculation, correct?

22      I mean you don't know that the use of segregation was

23 put in place to manage overcrowding?

24 A.      No.  That's my interpretation of what I saw in 2007

25 and the interviews that I conducted in 2007.  That was a

2367

1    management device that was used to manage an overwhelming

2    overcrowding problem.  And I wrote about that in 2007.

3    Q.    And now six years later you don't know that that's

4    still the case, do you?

5    A.    What I know is that the use of segregation has not

6    abated even though the overcrowding problem has.  And that

7    was the issue that I was concerned about and that I am

8    concerned about.

9    Q.    And Doctor, you're not a statistician, correct?

10   A.    No.  I do statistics.  I teach research methods.  You

11   can see how hard it was for me to add those numbers, you

12   know.  So no, I'm not a statistician.

13         THE COURT:  It doesn't take a statistician to notice

14   that the population is going down, but not in Ad. Seg.

15         THE WITNESS:  Yes, Your Honor.

16   BY MS. VOROUS:

17   Q.    Doctor, if you look at Plaintiffs' Exhibit 2044?

18   A.    Yes.

19   Q.    This is the chart that you prepared to reflect the

20   number of EOP inmates in Ad. Seg. based on their length of

21   stay, correct?

22   A.    Yes.  It's that snapshot data that I talked about

23   earlier.

24   Q.    Okay.  And wouldn't you agree, looking at this chart,

25   that the large majority of the inmates that are in Ad. Seg.

2368

1   as of September 16th, 2013, have been in there less than 90

2   days?

3   A.      Yes.  That's clearly what that shows.

4   Q.      Are you aware that there is requirements in Coleman

5   that staff look at inmates in administrative segregation

6   units that have been in segregation for over 90 days?

7   A.      Yes.

8   Q.      Do you have any reason to believe those practices are

9   not -- or those evaluations are not occurring?

10  A.      No.  No.  What I talked about is not necessarily

11  whether those evaluations are occurring, but what happens

12  next, whether people are actually being moved.

13  Q.      And again, just looking at this chart, you don't know

14  the reasons for why inmates have been in administrative

15  segregation for over 90 days, correct?

16  A.      Not as reflected in the data.  But I already talked

17  about a number of prisoners who have been kept in

18  administrative segregation for lack of bed or because of

19  safety concerns, not because of disciplinary infractions.

20  And they would be interspersed in these numbers as well.

21  Q.      And you don't know how many inmates would fit into

22  the category that you're describing that are shown on this

23  chart, correct?

24  A.      No.  Except that by my experience it is not

25  infrequent for that to happen.

2369

1   Q.      And again, your experience is based on your

2   interviews with inmates that were in the EOP Ad. Seg. hubs in

3   two prisons, correct?

4   A.      Yes.

5   Q.      Doctor, you don't know the -- Strike that.

6           Aside from your testimony with respect to your

7   knowledge of the Program Guide requirements for inmates that

8   are in these administrative segregation unit hubs, you don't

9   know what type of mental health care staff were providing to

10  the inmates that are in these units over 90 days, correct?

11  A.      Well, only insofar as I've already testified about

12  the nature and the circumstances and the amount of contact

13  that prisoners are getting in these units, and what I

14  described as, in my opinion, deficiencies in terms of the

15  settings themselves and in terms of amounts.

16          That's a view which is shared not just by myself, but

17  by the Special Master.  I mean, that report covers all of

18  these units and talks about the failure for these units to

19  hit the target of ten hours a week in these Ad. Seg. hubs.

20  Not just the ones I saw, but others in the system as well.

21  Q.      Doctor, are you aware the Program Guide requirement

22  for the administrative segregation unit hubs is that the

23  prisons schedule ten hours a week of therapeutic activity?

24  A.      I believe there is some debate or discussion about

25  the difference between scheduling and offering and actually

2370

1   receiving that ten hours.

2        Obviously, the goal ought to be for people to

3   actually receive it.

4   Q.    Correct.  And that would be clearly a laudable goal.

5   But whether you look at "scheduled" or "offered," there can

6   be a big difference between what a prison may schedule or

7   offer and what an inmate actually receives in terms of care,

8   correct?

9   A.    Yes.  And there are a couple of issues there.  One is

10  the difference between scheduling and offering is something

11  that's under the institution's control.  So scheduling and

12  offering ought to be very close to one another.  And it is my

13  understanding, again from the Special Master's report, as

14  well as my own experience, that's not always the case.

15        Then the slippage between offering and actually

16  receiving is also, it seems to me, the institution's

17  responsibility.

18        We've talked about the inhospitable circumstances

19  under which this treatment takes place.  Simply offering

20  treatment, if it is offered under circumstances or in

21  settings where people are unlikely to avail themselves of it,

22  really, to my mind, sort of defeats the spirit of the Program

23  Guide even though it may technically be in compliance.

24  Q.    Wouldn't you agree that there are inmates who may

25  refuse treatment that has absolutely nothing to do with the

2371

1    fact that they don't want to be treated in a therapeutic

2    treatment module?

3    A.       Yes.  I didn't encounter very many of them, but of

4    course they exist.  Yes.

5    Q.       They may, just for whatever reason, feel like they

6    don't want to go to a group on a particular day because

7    they're tired, for instance, correct?

8    A.       Yes.  My only point is that's probably more likely to

9    happen if those groups are taking place in cages rather than

10   in more hospitable therapeutic settings.

11   Q.       Doctor, if the prison didn't use a therapeutic

12   treatment module, wouldn't that require that a correctional

13   officer, or two correctional officers perhaps, depending on

14   the number of inmates that are part of a group, be present

15   during that group?

16   A.       No, not necessarily at all.

17   Q.       So you would expect that a clinician would hold a

18   group with individuals that are in an Ad. Seg. unit without

19   having any correctional officers present and no security for

20   those prisoners?

21   A.       Well, I mean, first of all, the therapeutic modules,

22   as you call them, don't obviate the necessity of having

23   correctional staff nearby.

24           They are nearby.  I have seen them nearby.

25           Using an alternative to this, which is what most

2372

1    other systems do, does not require correctional officers to

2    be present in the group or at the group.

3          I mean, I've described earlier the fact that

4    prisoners can be safe and secure and restrained in settings

5    that don't require the use of a cage.

6          I don't see any real difference from that from a

7    security perspective from the use of those treatment cages.

8    You have a prisoner who is restrained who certainly cannot

9    offer -- be a threat to the therapist in the same way that

10   prisoners who are in these cages are not.

11         And so I don't see why that would require any

12   additional correctional officer presence.  Certainly in the

13   vicinity, but there are correctional officers in the vicinity

14   now.

15   Q.    Doctor, in your deposition I'd asked you whether or

16   not you had done a study on how many states provided

17   treatment to mentally ill prisoners in administrative

18   segregation units.

19         Do you remember that?

20   A.    Yes.

21   Q.    And you told me you had not done one?

22   A.    No.  I haven't done a nationwide study of that issue.

23   No.

24   Q.    So in asking you to tell me which states that you

25   were aware of that provided alternative types of treatment,

2373

1    you were only able to identify three states, correct?

2    A.      I don't remember how many I identified for you.  I

3    can tell you that the use of cages is very rare.  And that's

4    an opinion which I have heard that it's been expressed by

5    many people who I know who have seen other systems and who

6    have come to California and been shocked by what they see in

7    terms of the -- I think Dr. Moore, the State's -- one of the

8    State's termination experts said she had worked at 14 states

9    and had never seen a state that used these kinds of cages

10   anywhere as much as near as California does.

11           There's A wide experience and this is very unusual.

12   Q.      Didn't Dr. Moore testify it was also very unusual for

13   other states to even provide group therapy to inmates that

14   were in administrative segregation?

15   A.      Well, I don't remember whether she testified about

16   that or not.  Many states, as you know, don't put mentally

17   ill patients in these environments so of course they wouldn't

18   be providing treatment in them because they have been

19   excluded from being in these kind of units.

20   Q.      And for those states that do, wouldn't you agree that

21   it is unusual for them to provide treatment?

22   A.      No.  That's not been my experience.  I mean, I've

23   been involved in working with state correctional systems in

24   creating treatment spaces for people who are in segregated

25   housing.

2374

1              And there -- Massachusetts is a good example where

2      we've created an alternative treatment space that does not

3      depend on the use of these cages which provides treatment for

4      people in other kinds of settings.

5              I talked about the tether table.  Colorado is another

6      example of it.  I didn't -- it is not a system I designed,

7      but it is a system I'm familiar with.

8              They have -- they have taken their mentally ill

9      prisoners out of administrative segregation and put them a

10     residential treatment program.

11             When I was there in the spring, there were very few

12     cages anywhere to be seen, and they were mostly holding

13     cages.  And the treatment took place at tables inside the

14     dayroom floor of the facility where prisoners were restrained

15     at the tables.  But there were no cages on the dayroom

16     floors.

17             THE COURT:  Doctor, while Miss Vorous is looking for

18     her further questions, the cages are unique to California?

19     Essentially that's your testimony?

20             THE WITNESS:  The widespread use of them, Your Honor.

21     They certainly exist elsewhere, but -- first of all, if

22     they're used, they're used on a kind of case-by-case basis.

23     If for some reason or other a person is inappropriate to be

24     at a tether table, they might use a cage, but it is not

25     across the board.

2375

1    THE COURT:  And it is your testimony, I believe, that

2    the use of the cages is an impediment to appropriate

3    treatment because people don't want to be in them?

4    THE WITNESS:  Yes.

5    THE COURT:  Other than the question of whether mental

6    health care is subordinated to custodial concerns, can you

7    think of any reason why these cages are used if people find

8    that they are impediments?

9    THE WITNESS:  Other than following and extending a

10   practice that was put in place some time ago, I can't think

11   of another reason.

12        It seems to me to be kind of an institutional

13   inertia, that it has been done in the past, we have a greater

14   need, let's do what we've been doing.  The cages proliferated

15   throughout the system.

16   THE COURT:  But mental health clinicians -- well, of

17   course, you don't know what they think.

18        You've had no occasion to talk to -- maybe you

19   have -- to talk to clinicians and ask them what do you think

20   about this and why aren't you changing it?

21   THE WITNESS:  Not in this round I didn't, no.  I

22   didn't have an opportunity to do that.  I've had those

23   discussions in the 2007 tours that I conducted, and there

24   were a number of concerns expressed about them.

25   THE COURT:  But in 2007 the overcrowding was so

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2376

1    overwhelming that whatever you did and however bad it was it

2    was better than -- well, I mean it is what you could do or

3    what people thought you could do.

4            THE WITNESS:  Agreed.

5            THE COURT:  All right.

6            Miss Vorous.

7    BY MS. VOROUS:

8    Q.      Doctor, you testified that you spoke with some of the

9    inmates who were part of the group that you observed at

10   Corcoran that were using the ATOM chairs, correct?

11   A.      Yes.

12   Q.      Are you aware that surveys that have been completed

13   as part of that pilot program have indicated that there are

14   many inmates who do not feel safe in these chairs?

15   A.      I'm aware that some inmates don't feel safe in those

16   chairs.

17   Q.      Are you familiar with an article that was written, I

18   believe in 2006, by Dr. Metzner and Dr. Dvoskin that

19   discusses the use of therapeutic treatment modules in

20   California prisons?

21   A.      I'm not sure.  I know both of them.  And I know a lot

22   of what they write.  I'm not sure that I have seen that

23   particular article.  I may have.

24   Q.      Do you know whether they have voiced their opinion

25   that by using the therapeutic treatment modules it avoids the

2377

1    use of or the requirement of having correctional officers

2    present in the treatment room with the clinician?

3    A.      I don't know if they've voiced that opinion or not.

4    If they have, I'd want to know exactly what they meant by

5    that because I can see no earthly reason why that would be

6    the case as long as there are other kinds of less onerous,

7    less intrusive restraints -- less onerous and intrusive, but

8    nonetheless effective restraints being used.

9    Q.      And you would agree that having a correctional

10   officer or two correctional officers in a group treatment

11   room would potentially inhibit the confidentiality of the

12   group, correct?

13   A.      I would never do it.  Of course.  I don't think

14   prisoners would participate in it.  But I don't think that's

15   the alternative we have.

16   Q.      Doctor, in discussing the issue of inadequate number

17   of beds in the system, or lack of beds, I believe that you

18   referred to that term, you identified a couple of different

19   categories.

20           One of them was the use by California Institution For

21   Men of what they called LOB, lack of beds, correct.

22   A.      Yes.

23   Q.      Were you aware that the inmates that were -- Strike

24   that.

25           Were you aware that CIM had placed inmates into

2378

1  Cypress Unit from the Reception Center as an overflow unit?

2  A.      I'm aware that some of them were.  Some of them were

3  part of the overflow problem at CIM, yes.

4  Q.      Wouldn't you agree that those particular inmates were

5  given privileges that they would have received otherwise in

6  the Reception Center, such as going out to yard, going to

7  breakfast, those types of things?

8  A.      No.  I mean, they received some things that were not

9  standard administrative segregation, but they were minimal.

10  They got to go to breakfast, but they ate their other meals

11  in their cell.

12          For the Coleman Class Members, the most important

13  thing I talked about is they were receiving their therapeutic

14  contact in cages.  That's not ordinarily the way it occurs in

15  the Reception Center.

16  Q.      Do you know how long those inmates were in Cypress

17  Unit pending return back to Reception Center for processing?

18  A.      I would have to look at my declaration.  I don't.

19  Some of them -- they were all very frustrated.  I don't know

20  exactly how long they had been there.  Some of them had been

21  there, from what I recall, not a particularly short period of

22  time, a few months or so.  And they were very agitated about

23  it.

24  Q.      And I believe, based on what you've already testified

25  to, there were two inmates that would fit into this category,

2379

1    Inmate Q and R, correct?

2    A.       No.   I think I said there were more inmates than

3    that.   If I remember correctly, I thought there were a few

4    more than that.   Inmates O, P, Q and R were the lack of bed

5    inmates that I spoke to at CIM.

6        They weren't the only ones on the Coleman caseload,

7    but they were the ones I spoke to.

8    Q.       Correct, Doctor.   I'm just trying to make a

9    distinction between those that you talked to that had been

10   placed in the unit pending processing through the Reception

11   Center versus the inmates that you understood were placed in

12   there because of a need to move to a special needs yard bed.

13   A.       Okay.   So I was putting all of the lack of bed people

14   together.   You could break it out.   And I'll accept your

15   representation there were two of them who were from the

16   Reception Center.

17   Q.       And with respect to those two, you don't know how

18   long it was before they were moved back to the Reception

19   Center or out to the yard, correct?

20   A.       No.   I didn't see them after that.   I don't remember

21   from the records what was reflected about when they left that

22   unit.

23       THE COURT:   I'm confused.   Were the people that were

24   put into Ad. Seg. because there were no beds in the Reception

25   Center Coleman Class Members?

2380

1          THE WITNESS:  Yes.  Yes, Your Honor, they were.

2          THE COURT:  Oh, okay.

3          THE WITNESS:  I only spoke to Coleman Class Members.

4    Everyone I have been talking about is a Coleman Class

5    Member.

6          THE COURT:  All right.

7    BY MS. VOROUS:

8    Q.      Did you speak to any of the correctional officers

9    about their use of that unit as an overflow for Reception

10   Center inmates?

11   A.      I'm not sure I did.  I might have had a discussion

12   with them when we were looking at that board.  There was a

13   correctional sergeant who was explaining to me what was on

14   that board and who was who.

15          I think there was perhaps even an indication on the

16   board itself that some of the people were from the Reception

17   Center.  We might have discussed what that was all about.

18   Q.      And the other two -- the other two inmates, they were

19   in the category of inmates that were waiting for a special

20   needs yard bed or SNY bed, as we've been describing?

21   A.      Yes.  I think so.  Yes.

22   Q.      And Doctor, isn't the term "special needs yard" a

23   custody designation?

24   A.      Yes.

25   Q.      And that's a determination as to a custodial need to

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2381

1    be placed in a different type of environment.  It has nothing

2    to do with their mental health care, correct?

3    A.      Well, the designation that this person needs to be in

4    a special needs yard is not premised on their mental health

5    status, if that's what you mean.

6    Q.      Doctor, are you aware that the State recently

7    activated nearly 200 new special needs yard beds for EOP

8    inmates at Valley State Prison?

9    A.      No.  I'm aware that the department is changing and

10   opening new yards and creating new designations for the yards

11   often, and this particular one is not one that I have any

12   particular knowledge about.

13   Q.      Are you aware of how many SNY beds the department

14   currently has for EOP inmates?

15   A.      Not offhand.  I could look it up.  I haven't -- I

16   haven't opined about it.  I could certainly find that answer.

17   Q.      Would it surprise you to realize they have a capacity

18   of -- current capacity of 1362 beds in the system?

19   A.      It wouldn't surprise me.  I don't know what to make

20   of that number.

21   Q.      At the time you submitted your declaration in March

22   of 2012, did you know how many inmates at the EOP level of

23   care were being housed systemwide in an administrative

24   segregation unit pending transfer to a SNY bed?

25   A.      No.  There wouldn't have been anyway -- I don't think

2382

1    there would have been anyway to precisely calculate that.

2            I encountered many of them throughout the four

3    prisons that I toured.

4    Q.    And you encountered two at CIM, correct?

5    A.    Yes.  Are we talking just about EOP or anybody

6    awaiting transfer?

7    Q.    Let me back up.

8            At CIM you encountered two that were CCCMS waiting

9    transfer?

10   A.    Okay.  I have to look through my notes to calculate

11   how many of them I encountered.

12   Q.    At Mule Creek State Prison you encountered four or

13   five maybe, or do you know?

14   A.    Perhaps.  I don't know.  If you want me to give you a

15   precise count, I can't do that from memory, but I can

16   certainly look through my declaration, if you want, and count

17   them.  It is not a calculation I made.

18   Q.    Do you know -- do you recall how many inmates at

19   Corcoran that you encountered in the EOP Ad. Seg. unit that

20   were pending transfer to an SNY bed?

21   A.    I don't recall specifically.  Again, I would have to

22   look at my declaration and tally or count up the numbers of

23   them there were.

24   Q.    Doctor, wouldn't you agree that there's some

25   categories of inmates who are difficult to place due to their

2383

1    commitment offense, custody level or other factors, that no

2    matter how many beds the State had for SNY designations, they

3    still may have difficulty placing those inmates?

4    A.      Well, I'm not sure what you mean by "difficulty

5    placing those inmates."

6            There are -- there are lots of facilities and lots of

7    yards in those facilities.  So it is a matter of identifying

8    the nature of the difficulty and creating yards to

9    accommodate the people who fit that category.

10           I'm not suggesting to you it is not a complicated

11   task, but this is what prison systems do.  They find safe

12   places for people based on what they're characteristics are,

13   things like the ones you just mentioned, their commitment

14   offense, their special needs, their mental health status.

15   That's part of what the mission is.

16   Q.      And so you're not saying that for those types of

17   inmates the department shouldn't put them in administrative

18   segregation for their safety, correct?

19           You're not suggesting they should be left in their

20   current housing environment?

21   A.      No.  I think I made it clear that when there is an

22   exigent circumstance, if somebody is vulnerable, has safety

23   concerns, that I concede that placing them, even in an

24   administrative segregation unit, even if they're a Coleman

25   Class Member, for a very brief period of time, is justified

2384

1    out of safety for the inmate.

2         But very quickly there is a point of diminishing

3    returns.  There physical safety is now traded for their

4    mental health stability.  That's the problem.

5         So we've talked about people who have been waiting

6    for a year and a half in order to get moved to yards that

7    they've been endorsed for.

8         It's appropriate to put them in administrative

9    segregation for a few days or so, but to keep them there for

10   a year and a half and place them in jeopardy, and many of

11   them we talked about deteriorated in the face of that, that's

12   not doing them any favor.

13        That may have reduced the safety concern in the

14   immediate time, but then over time these are people who

15   deteriorate.  And, you know, some of them end up in state

16   hospitals as we've talked about today.

17        Their safety and security has not been safeguarded by

18   that practice.

19   Q.    And the inmates we've been talking about today are

20   the four or five that you have identified, correct, and the

21   one example that you gave for -- I think the inmate in Ad.

22   Seg. for a year and a half or a year and four months?

23        THE COURT:  You've had people in there for 23 years

24   apparently.

25        MS. VOROUS:  Not in administrative segregation, Your

2385

1  Honor.

2       THE COURT:  I agree with you.  They're in SHUs and

3  administrative segregation and back and forth, and somehow or

4  other that makes it okay.

5       Okay.  You are right.

6       MS. VOROUS:  Your Honor --

7       THE COURT:  You may proceed, ma'am.

8       Restricting yourself to Coleman Class Members -- and

9  I don't know if you can do this without spending a lot of

10  time looking at your notes -- what is the longest time that a

11  Coleman Class Member has been in Ad. Seg. and not for a rules

12  violation?

13       THE WITNESS:  Well, we talked about one that was over

14  a year and a half.  And again, without looking at my notes,

15  that's the one that comes immediately to mind.  We discussed

16  it.

17       I may have encountered some that were two years or

18  more.  But we just talked about him earlier today.

19  BY MS. VOROUS:

20  Q.     And you indicated you may have encountered, but you

21  don't recall that, correct?

22  A.     But I want to point out that the inmates I talked

23  about are not the only ones who had this problem.  I mean, I

24  had to select for purposes of the hearing a few people to

25  talk about.

2386

1          If you read through my report, there are a lot of
2    inmates who have this kind of problem or similar problems
3    with stories as dramatic as the ones I presented, if not more
4    so.
5          So I don't want the mistaken impression to be left
6    that these are the only people for whom this was a problem.
7    There were a number of others.
8    Q.     Doctor, you've mentioned a couple of times
9    defendants' expert report in the context of discussing
10   inmates that were housed in administrative segregation units
11   pending transfer to a special needs yard, correct?
12   A.     Yes.  I recall that was one reference I made to it,
13   yes.
14   Q.     And you highlighted the fact that defendants' experts
15   had indicated that they felt it should be a priority to move
16   these inmates that are in administrative segregation units
17   out as quickly as possible, correct?
18   A.     Yes.  Move them to the front of the list, I think is
19   the phrase that I recall.
20   Q.     Okay.  Did you read the expert's entire report that
21   defendants submitted in the context of the termination
22   proceeding?
23   A.     Yes.  It was provided to me, and I read it.
24   Q.     So you're also aware that the defendants' experts
25   also opined that the care the State was providing to inmates

2387

1    at the CCCMS level in segregation units was appropriate,

2    correct?

3    A.    Yes.  And I disagreed with it for all the reasons I

4    presented.

5    Q.    You also realize the State's experts also opined that

6    the care that was being provided to inmates in administrative

7    segregation -- excuse me -- the care that was being provided

8    to enhanced outpatient program patients in administrative

9    segregation units was also appropriate, correct?

10   A.    Yes.  A conclusion with which I also disagree.

11   Q.    The same with respect to security housing units and

12   psychiatric services units?

13   A.    Yes.  Again, I disagree with the conclusions as to

14   security housing units.  I haven't opined much at all about

15   psychiatric services units.  I didn't inspect them or

16   interview prisoners in them.

17   Q.    Doctor, with respect to inmates in administrative

18   segregation units at the CCCMS level of care, you offered

19   testimony that some of the inmates that you talked to were

20   complaining because they were not getting to the groups they

21   would like to go to, correct?

22   A.    Yes.  They were -- mostly they said that groups

23   weren't being offered.  Or in some instances, when they were

24   being offered, they said there were limitations on how often

25   they could participate or whether they could participate.

2388

1          There were lots of different complaints about that.

2   Q.       Doctor, you didn't verify that the care that was

3   being provided to the inmates that you spoke to complied with

4   the Program Guide requirements, correct?

5   A.       Well, I think what I said earlier was I'm aware that

6   the Program Guide requirement is that groups should be

7   provided to CCCMS inmates as clinically necessary, but that

8   in many of the institutions they weren't being provided at

9   all.

10          And I thought it was hard to understand what

11  "clinically necessary" meant or means if it doesn't mean at

12  least some people need to be given these groups.

13          I also presented a calculation to suggest that at

14  least in one facility it would be hardly possible for more

15  than a few inmates to participate for an hour a week in CCCMS

16  groups because so few of them were offered.

17  Q.       So it is correct that the Program Guide states that

18  staff may provide groups as clinically indicated in addition

19  to other treatment modalities, correct?

20  A.       Yes.

21  Q.       So there is other options that are available to staff

22  besides groups, correct?

23  A.       Yes.  But it was groups that I was testifying about

24  and you asked me about.  The other clinical contacts they had

25  varied, and I reported that.

2389

1          In some instances they seemed to be satisfactory, in

2    other instances not.  But there was a consistent concern

3    about the lack of groups for CCCMS prisoners and, frankly,

4    for EOPs as well.

5    Q.     Doctor, you mentioned a minute ago that you gave an

6    example of inmates and you used some calculations to

7    factor -- or to come up with a number as to how many groups

8    inmates were getting or the minutes per week, I guess, is

9    what you described.

10          That was an example of 106 inmates in the

11    administrative segregation unit at CCI, correct?

12    A.     Yes.

13    Q.     And these were CCCMS inmates as well?

14    A.     Yes.

15          There might have been a few EOP inmates in that unit

16    as well.

17    Q.     Doctor, you have no evidence that the treating

18    clinicians for all 106 of these inmates felt that group was

19    clinically indicated for them, correct?

20    A.     No, I didn't.  I didn't do a systematic assessment of

21    that.  But I can tell you that is the one conversation I had

22    with a number of clinicians in the course of these tours

23    where they voiced concerns about their ability to provide

24    groups.  There is no disagreement among the clinicians about

25    providing the groups if they could.

2390

1          So the issue of clinically necessary, as I

2     understood, is in the context of what is possible.

3     Obviously, even if groups are clinically necessary, if it is

4     not possible to offer them, you can't do it.

5          So a number of clinicians, including a number that I

6     mentioned in my report, talked about:  We wish we could do

7     groups.  We understand they're helpful.  We used to be able

8     to do groups.  We no longer have the resources with which to

9     do it.  And they lamented that.

10         THE COURT:  Let me interrupt for a moment because it

11    seems to me that there is a -- well, I can't say about that

12    generally, but Mr. Stainer, who is the guy in some sense,

13    thinks that people get to be CCCMS category because they get

14    anxious about being transferred out of state.

15         Is that in any way typical of who gets classified as

16    CCCMS?

17         THE WITNESS:  It was not in my experience, Your

18    Honor.  I had the opposite experience.  With the

19    understanding that I'm not a clinician, I saw people who were

20    overtly very disturbed, clearly disturbed, who were CCCMS

21    inmates.  In some instances I was surprised that they were

22    only CCCMS and not EOP.

23         It is not a category of people who, in my experience,

24    have minor psychiatric or emotional issues.  Many of them

25    have long, long psychiatric histories.  Hospitalizations.

2391

1    Prior hospitalizations even in the CDCR.

2           Many of them -- some of them talked about numerous

3    suicide attempts, but they may have recently been stabilized

4    and they're in better shape now.  But they are also at risk

5    of deterioration or decompensation.

6           So they're judged now to be CCCMS, but they are, in

7    some instances, very much at risk or vulnerable to

8    decompensation.

9           So I had the opposite experience, that these were not

10   people with minor problems but rather were, in many

11   instances, very seriously mentally ill.

12          THE COURT:  My impression from the clinicians is that

13   your status as mental health is cyclical.  You may be

14   stabilized today and tomorrow, then for reasons that I have

15   not been able to quite identify, you're suddenly having quite

16   serious problems.  And then there are doctors that want you

17   to decompose completely so that they can get you medical

18   care, as remarkable as that appears to me to be.

19          But I can see you nodding your head that yes, being

20   classified as CCCMS is not some always category, that that's

21   who you are and that's where you'll stay?

22          THE WITNESS:  Exactly.  That line is permeable, that

23   line is a permeable one.  People can move back and forth

24   between it.

25          Unfortunately, a lot of the things that we've been

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2392

1    talking about in these two days explain why some of them move

2    from the lower level of care to the higher, more serious

3    level.

4         THE COURT:  Let me talk to you about that.  I was

5    waiting for what I assume to be expert testimony from the

6    defendants, if we ever get to their case, and I'm not sure

7    we're going to.

8         People talk about stressors.  And nobody has ever

9    defined a stressor.  It is like everybody knows what a

10   stressor is.

11        Well, I don't know what a stressor is.  I mean, I can

12   guess, but I assume it has some sort of technical meaning

13   within the profession.

14        Am I right or am I wrong?

15        THE WITNESS:  Well, I wish I could say it had more of

16   a technical meaning than you probably have in mind.  I think

17   it means to the psychologist what it means to most people.

18   Something which places you under pressure, something which

19   makes you tense, creates anxiety.

20        THE COURT:  Not every stress winds you up in some

21   sort of more serious category than you were.  I mean, you

22   could have stresses and still be CCCMS?

23        THE WITNESS:  Yes.  Absolutely.

24        THE COURT:  So is it really true that you can't

25   predict whether a particular stress is going to be so severe

2393

1  as to cause an alteration in what you should be classified

2  as?

3          You just don't know?

4          This stress for this person is much more serious than

5  it would be for that person?

6          THE WITNESS:  Yes.  I think there are general

7  stressors that we understand to be ones that place people at

8  risk of harm, at risk of decompensation, if we're talking

9  about a mentally ill person.

10         But these are generalities.  And they're very

11 difficult to apply to a particular person.

12         THE COURT:  A clinician treating somebody, even if he

13 knew what the stresses were, could not predict that these

14 stresses would be sufficiently severe so that he's going to

15 wind up in a EOP or, God forbid, acute status?

16         THE WITNESS:  Not with 100 percent certainty, except

17 in so far as we're taking into account what we understand to

18 be general principles of psychology, certain kinds of

19 stressors.

20         We've been talking about the stress of isolation.

21 Somebody who has gotten, you know -- who is experiencing the

22 stress of grief if they've lost a loved one and so on.

23         We know that person is at greater risk of certain

24 kinds of behavior.  They are at risk of suicide in a way

25 wouldn't be before.

2394

1          That person might be able to manage that grief

2    without succumbing to the stress of it, but there is a

3    heightened probability for that particular kind of stressor

4    to lead to a certain kind of behavior.

5          It not 100 percent accuracy, but it is taking into

6    account based on generalities that we know about how people

7    will react to certain kinds of stress, certain kinds of

8    pressure.

9          THE COURT:  I suspect I'm about to ask you a question

10   outside of your field.  Feel perfectly free to say:  No, I

11   don't know the answer.

12          If you're a clinician, and you've got a patient, and

13   that patient is suffering significant -- suffering stress

14   arising out of isolation, which is what we've really been

15   talking about here -- I heard you say, but maybe I didn't --

16   I heard you say that that is a stress that the clinician

17   ought to be concerned with because it has a higher

18   probability of causing more serious responses.

19          Is that right or wrong?

20          THE WITNESS:  Yes, it is.

21          And I'm saying that not in a clinical capacity, but

22   based on not only my understanding, but the understanding of

23   the American Psychiatric Association, all of those

24   organizations that I've referred to a couple of times.

25          It is based on the understanding that that is a

2395

1    particularly potential stress, that social isolation is a

2    harmful experience, not just in prison, but outside of prison

3    as well.

4         THE COURT:  And adequate, and by that I mean a

5    constitutional mental health system, would perceive that this

6    isolation stress is a potential stress of sufficient

7    seriousness as to cause reaction -- what's the word I'm

8    looking for -- not necessarily decompensation to the point of

9    schizophrenia, for instance, but significant change in one's

10   psychological status.

11        THE WITNESS:  Deterioration or damage which may or

12   may not change someone's diagnostic category or status, but

13   affects them in a significant way, and may, in fact, actually

14   change their diagnostic status or mental health

15   designation.

16        THE COURT:  This is very complicated because I think

17   you've already acknowledged that this is very much an

18   individual case, and the clinician may not have any reason to

19   note that "A" will decompose to a point where there is a

20   serious alteration as against "B" who somehow or other can

21   adjust to the stress?

22        THE WITNESS:  Yes, Your Honor.  So we're talking

23   about risk of harm.  We're talking about how grave is the

24   risk of harm to which you are exposing this particular

25   category of people.

2396

1          THE COURT:  Your view this is a serious risk?

2          THE WITNESS:  A very serious risk.

3          THE COURT:  Thank you, sir.

4          I'm sorry I interrupted, ma'am.

5     BY MS. VOROUS:

6     Q.     Doctor, just following up on a couple of questions

7     that the court asked, stressors can exist in general

8     population inmates as well, correct?

9     A.     Yes.  And they do.  They do.

10    Q.     And isn't it also true that an inmate at a CCCMS

11    level of care who is in an administrative segregation unit

12    may not only bounce up to an EOP or need a Mental Health

13    Crisis Bed, but also can go the opposite direction, go back

14    to general population?

15    A.     That's the goal.  I mean, that's the -- that's the

16    purpose towards which the treatment is supposedly working.

17    Q.     Doctor, following up on your opinion, you believe

18    that inmates with mental illness are at a greater risk of

19    harm if placed in isolation as compared to an inmate that

20    doesn't have a mental health condition, correct?

21    A.     Yes.

22    Q.     You would agree that, again, the nature of the mental

23    illness may make a big difference in the risk of harm,

24    correct?

25    A.     I'm not sure what exactly you mean by that.

2397

1    Q.      Well, if you have someone who is at a CCCMS level of

2    care, their risk of harm may be very different than someone

3    who is at an enhanced outpatient level of care, correct?

4    A.      It might be, but as in the discussion His Honor and I

5    just had, it is difficult to say with certainty about an

6    individual, especially in light of what I said earlier, that

7    CCCMS prisoners are not necessarily mildly mentally ill, some

8    of them are very seriously mentally ill and they have been

9    much more seriously mentally ill earlier.

10   Q.      And Doctor, when I asked you in your deposition

11   whether or not you had a clinical definition of what is

12   "seriously mentally ill," you indicated that you did not have

13   a definition based on a clinical -- or the clinical

14   understanding, correct?

15   A.      I don't recall what I said in my deposition.  I

16   don't -- there are -- there is a fairly standard definition

17   of it.  It actually matches up fairly well to the Pelican Bay

18   exclusion order.  That's the definition which is used in

19   most -- in most prison systems where they're defining what is

20   a "seriously mentally ill" person.  But it has different

21   meanings in different contexts.

22   Q.      Doctor, I just want to talk about the security

23   housing units for a couple of minutes.  And here I believe

24   you've testified you interviewed inmates at the security

25   housing unit at Corcoran, as well as at CCI, correct?

2398

1    A.       Yes.

2    Q.       And again, looking at your declaration, it is my

3    understanding that you interviewed approximately four inmates

4    at the Corcoran SHU.

5            Would that be accurate?

6    A.       Well, I may have.  I don't know how many I mentioned.

7    I'll have to look at my notes.  I -- I interviewed some

8    prisoners in the Corcoran SHU when we went into that utility

9    closet area where the group was taking place.  There were

10   prisoners in there.  I spoke with them generally, and I don't

11   know how many of them were reflected in my report.

12           But it likes here like there may have been actually

13   four -- looks like maybe five -- five prisoners mentioned in

14   my report from Corcoran from the SHU.

15   Q.       Do you know how many CCCMS inmates were housed in the

16   Corcoran SHU at the time you visited?

17   A.       I don't know.

18   Q.       Do you recall the number of inmates that you

19   interviewed in the Corcoran SHU?

20           THE COURT:  That's what you just asked.

21   BY MS. VOROUS:

22   Q.       I'm sorry.  The CCI SHU?

23   A.       I don't.  Again, I could calculate it from my notes.

24           Five, six, seven, something like that perhaps.  Maybe

25   more.

2399

1    Q.      So Doctor, your opinion that the State's security

2    housing units are so bad that the court should immediately

3    issue an order excluding all of the CCCMS inmates from the

4    SHUs is based on your interviews of maybe ten or 11 CCCMS

5    inmates housed in those SHUs?

6    A.      It is not based entirely on that, no.  I explained

7    earlier what the basis of my opinion was.

8    Q.      Including your inspection of those two units,

9    correct?

10    A.      Yes.

11            I also should say with respect to these inmates and

12    others that it was based on the consistency of the

13    information that I acquired.

14            These problems were evident.  They were clear, and

15    they were shared by the inmates that I talked to in different

16    facilities.

17    Q.      Are you aware that the Program Guide allows for

18    inmates at the CCCMS level of care, who are stabilized, to be

19    housed in a security housing unit?

20    A.      Yes.  I believe that's the case.  Yes.

21    Q.      So what you're advocating for is a change in the

22    Program Guide, correct?

23    A.      Yes.  As to that portion of it.

24    Q.      And you also understand that the Program Guide has

25    policies and procedures in place that allow for transfer of

2400

1    an inmate who decompensates in a security housing unit to a

2    psychiatric services unit, correct?

3    A.      Yes.

4    Q.      And you have no basis to believe that is not

5    occurring on a systemwide basis, do you?

6    A.      I haven't seen data to indicate whether it is

7    occurring or not, or how much it is occurring, or if it is

8    occurring as much as it should.

9    Q.      Doctor, you're not rendering an opinion that the care

10   that's been provided within the psychiatric services units is

11   inadequate, are you?

12   A.      No.  I have spoken about the Ad. Seg. units and the

13   security housing units, and I expressed my concerns about the

14   treatment that is and is not being provided there.

15   Q.      And one of your concerns about the treatment in the

16   security housing units is limited groups, correct?

17   A.      No.  My concern about treatment in the security

18   housing unit is, as I have already indicated, that I don't

19   believe mentally ill prisoners should be there.

20           The treatment which they receive is constrained and

21   constricted by the way in which it is being delivered, the

22   treatment cages that I have talked about, the limited number

23   of groups that are provided, and the severe potential for

24   damage of mentally ill prisoners in that kind of a harsh,

25   punitive environment.

2401

1   Q.      Is it also your opinion that therapeutic treatment

2   modules should not be used in a psychiatric services unit?

3   A.      It depends on how they're being used, whether there

4   is an alternative, it depends what else is going on in those

5   units.

6           I don't think those treatment modules are appropriate

7   for all of the reasons that I have described, and I think

8   there are many more appropriate alternatives that I would

9   advocate.

10  Q.      Doctor, if you would look at Plaintiffs' Exhibit

11  2054.

12          THE COURT:  I think you're about to start on another

13  topic.  It is 4:30.  We'll reconvene tomorrow at 9:30.

14          MR. FISCHER:  Your Honor, I just have one issue.

15  Dr. Haney has another case that he commitments to tomorrow.

16          THE COURT:  Please, come forward.  I have no idea

17  what you are saying, sir.

18          MR. FISCHER:  One issue I would like to raise is

19  Dr. Haney has commitments with another case in which he's

20  involved tomorrow.  I don't know how much longer Miss Vorous

21  has.  His availability is limited in the next few weeks.  He

22  could come back towards the end of trial.  I could let the

23  court know.

24          THE COURT:  No.  I'm afraid you're wrong.  He's here.

25  He's under this court's order, and he's going to stay until

2402

1    he's done.

2            This is impossible.

3            I'm sorry.  No disrespect, but it is just impossible.

4            MR. FISCHER:  Your Honor, one suggestion I will make,

5    what has been done in the previous trials, is to call him

6    back.

7            THE COURT:  What we did was people came.  When they

8    came, they stayed.  What you're proposing is that we stop, we

9    have two weeks from now so I have no idea of what Dr. Haney

10   said, and we'll reconvene and have further examination.

11           I'm sorry.

12           I responded too quickly.

13           I'm just measuring my own frustration.

14           See, you don't have to be in a cage to be frustrated,

15   Doctor.

16           THE WITNESS:  I understand, Your Honor.

17               (Brief pause.)

18           THE COURT:  Part of the problem is who would have

19   ever expected that we're into the second or third day and the

20   witness isn't off the stand.

21           You're excused for tomorrow, Doctor.  You'll come

22   back whenever -- I mean, I assume that you can come back

23   after you finish testifying wherever you are testifying?

24           THE WITNESS:  Yes.

25           THE COURT:  Hopefully that is not going to be another

2403

1    three, four days?  You don't know?  It may be?

2           THE WITNESS:  I will do my best to make as much time

3    as needed.  I appreciate the court's --

4           THE COURT:  It has got nothing to do with you.  It's

5    got to do with the lawyers.

6           MS. VOROUS:  Yes, Your Honor.  I mean, we can excuse

7    Dr. Haney, but with that in mind that also, to some extent,

8    impacts our ability to call rebuttal witnesses.

9           THE COURT:  Don't I know it.

10          THE COURT:  Is the other trial in California at

11   least?

12          THE WITNESS:  No, it isn't.  And what I was -- what I

13   was going to offer is if I could -- if I had some sense of

14   how long I was going to be here tomorrow, I could do my very

15   best to try to accommodate to that.  But there is a limit to

16   how much of that I can do.

17          THE COURT:  Ma'am, how long do you think you've still

18   got?  An hour or two?  Three?

19          MS. VOROUS:  I would hope no more than two hours.

20          THE COURT:  And you think that you'll have him off

21   the stand, even if there is redirect, by tomorrow noon?

22          MR. BIEN:  As long as she is done by noon.  I imagine

23   we'll have a short redirect of 30 minutes.

24          THE COURT:  Let's say no more than a day, sir.

25          THE WITNESS:  You know, the day -- a half-a-day would

2404

1  be -- is workable.  I can reschedule things.  The full day,

2  because I have to get out of state, is a little more

3  complicated.  But if I could be out of here by noon, if

4  that's feasible, I'll be here tomorrow.

5        THE COURT:  All right.  Whatever happens the witness

6  will be excused at noon.  And if we don't have him done,

7  we'll have to have him back.

8        Thank you, folks.

9        MR. BIEN:  Thank you, Your Honor.

10        MR. FISCHER:  Thank you, Your Honor.

11        (Off the record at 4:35 p.m.)

12                    ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

   STATE OF CALIFORNIA  )
4  COUNTY OF SACRAMENTO )

5

6
          I certify that the foregoing is a correct transcript
7
   from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

              CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                            (916) 446-6360

1

2        I certify that the foregoing is a correct transcript

3   from the record of proceedings in the above-entitled matter.

4

5

                            /s/ Kathy L. Swinhart

6                         KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25