1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                       ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6  RALPH COLEMAN, et al.,

7         Plaintiffs,

8  Vs.                          CASE NO. CIV. S-90-0520 LKK

9  EDMUND G. BROWN JR., et al.,
   et al.,
10

11        Defendants.

12  _____/

13

14

15                       ---o0o---

16

17                   REPORTER'S TRANSCRIPT

18              RE:  EVIDENTIARY HEARING

19            THURSDAY, NOVEMBER 21ST, 2013

20

21                       ---o0o---

22

23

24

25  Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                        APPEARANCES

 2                        ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
 6           SAN FRANCISCO, CALIFORNIA  94104

 7           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8           BY:  AARON FISCHER, ATTORNEY AT LAW

 9           BY:  JANE KAHN, ATTORNEY AT LAW

10           BY:  MARGOT MENDELSON, ATTORNEY AT LAW

11

12

13    FOR THE DEFENDANTS:

14            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
15            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
16
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
19

20

21                        ---o0o---

22

23

24

25
```

1                        EXAMINATION INDEX

2                            ---o0o---

3    FOR THE PLAINTIFFS:

4        EXAMINATION:                                    PAGE

5

6      DR. CRAIG HANEY

7        Cont'd Cross-Exam by Ms. Vorous              2405
         Redirect Examination by Mr. Fischer          2449
8        Recross-Examination by Ms. Vorous            2441

9

10

11

12

13

14

15                           ---o0o---

16

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                           ---o0o---

 3

 4    ***PER STIPULATION BY ALL PARTIES ON NOVEMBER 22ND, 2013,

 5    PAGE 2580, LINE 13, DEFENDANTS' EXHIBITS WILL BE DESIGNATED

 6    BY TRIPLE LETTERS.***

 7

 8

 9

10    DEFENDANTS'
      EXHIBIT NO            DESCRIPTION                EVD
11

12      G                 Inmate O Record             2412

13      H                 Clinical Evaluation Report
                          by Dvoskin, Moore & Scott   2421
14

15

16

17

18

19

20

21                          ---o0o---

22

23

24

25
```

1                    SACRAMENTO, CALIFORNIA

2              THURSDAY, NOVEMBER 21, 2013; 9:30 A.M.

3                         ---o0o---

4

5                        CRAIG HANEY

6    Recalled as a witness on behalf of the plaintiffs herein, was

7    previously sworn, examined, and testified as follows:

8                   CROSS-EXAMINATION (CONTINUED)

9    BY MS. VOROUS:

10   Q.    Good morning, Doctor.

11   A.    Good morning.

12   Q.    When I left off yesterday, I was starting to ask you

13   about Plaintiff's Exhibit 2054.

14         MR. BIEN:  Can we interrupt for one second just as a

15   matter of scheduling.  We have Dr. Stewart to follow Dr.

16   Haney.  We're concerned that he won't finish today.  It's

17   possible he would, but we're concerned he won't.  We want to

18   give the court the option of being dark this afternoon or

19   we're willing to start him today and complete him the first

20   week in December.

21         THE COURT:  Let me say, and I don't mean this

22   disrespectfully, we have never gone close to any date that

23   we've set, and you might as well send Dr. Stewart home and

24   we'll be dark this afternoon, and that's the way it is.

25   That's fine -- it's not fine.

1          MR. BIEN:  Or he could come and start his direct and

2     maybe finish it today.

3          THE COURT:  Sir --

4          MR. BIEN:  Thank you, Your Honor.

5     BY MS. VOROUS:

6     Q.     Doctor, have you found Plaintiff's Exhibit 2054?

7     A.     Yes, I have.

8     Q.     And this is the APA statement that you were

9     referencing yesterday.

10         Is that correct?

11    A.     Yes.  Yes, it's their position on segregation of

12    prisoners with mental illness.

13    Q.     Correct.  And this physician statement, although it

14    uses the term "serious mental illness" does not define it.

15         Correct?

16    A.     It does not exclusively define it here in this case,

17    it does not.  It makes reference to studies that have defined

18    it, so, for example, it says on the second page, (Reading:)

19              Studies have consistently indicated that 8 to

20              19 percent of prison inmates have psychiatric

21              disorders and functional disabilities and

22              another 15 to 20 percent require some form of

23              psychiatric intervention.

24         So by reference, there is a least a reference to

25    studies in which serious mental illness is defined.

1          MS. VOROUS:  Your Honor, I just move to strike.

2          THE COURT:  Overruled.

3          You may proceed.

4     BY MS. VOROUS:

5     Q.     For purposes of this article, segregation is defined

6     as a person being locked in their cell for 23 hours or more

7     per day.

8          Correct?

9     A.     Yes.  That's on page 2.  That's a sentence on page 2

10    which defines "segregated confinement."

11    Q.     And this article also indicates that, (Reading:)

12               Inmates with a serious mental illness who are at

13               a high risk of -- excuse me -- high suicide risk

14               or demonstrating active psychiatric symptoms,

15               should not be placed in segregation housing, but

16               instead should be transferred to an acute

17               psychiatric setting for stabilization.

18          Correct?

19    A.     Yes, yes, very important recommendation.

20    Q.     Isn't that what CDCR does with seriously mental

21    inmates in segregated housing, they transfer them to acute an

22    hospital setting?

23    A.     Absolutely not.  I described yesterday a number of

24    cases in which there were prisoners with high suicide risk

25    who were languishing in administration segregation cells.

1    Some of them had been recommended for transfer.  They were

2    waiting and waiting and deteriorating and decompensating.  In

3    other instances, they had psychotic symptoms and they weren't

4    even on the list to be transferred.

5    Q.    That's based on what the inmates told you; correct?

6    A.    No, it's based on the records.  It very clearly -- we

7    talked yesterday about somebody with a very high suicide risk

8    that was in the records that we discussed.  He was in an

9    administration segregation cell and he had been waiting there

10   for months to be transferred to a more appropriate bed, not

11   to a hospital, but a more appropriate bed.

12   Q.    Correct.  But when he did exhibit his severe

13   psychiatric symptoms, he was transferred out and moved to a

14   mental crisis bed.

15          Correct?

16   A.    No.  In the most extreme cases, and that is part of

17   the problem, there is a practice or a pattern of essentially

18   waiting for people who have these kind of serious problems to

19   decompensate sufficiently so a threshold is then reached and

20   then they are moved out for higher level of care, which is a

21   very dangerous practice, to wait until they decompensate to

22   the most extreme levels.

23   Q.    Doctor, if you would look at Exhibit 2055.

24   A.    Yes.

25   Q.    This is the article or publication that you referenced

1    that relates to opinions by Juan Mendez; correct?

2    A.    Yes.

3    Q.    And to your understanding, Mr. Mendez is an attorney

4    advocate; correct?

5    A.    No.  He's the United Nations Special Rapporteur on

6    Torture.  He evaluates tortured conditions throughout the

7    world and makes recommendations, reports regularly to the

8    United Nations on the existence of torture in different parts

9    of the world.

10         He also, in the course of that evaluation and the

11    course of that reporting process, reported to the United

12    Nations in a resolution concerning solitary confinement

13    specifically.  So among the practices that are considered

14    torturous, certain kinds of solitary confinement is as well,

15    and he's commented on that in his capacity as a UN

16    representative.

17    Q.    So yesterday you had testified he had evaluated or

18    looked at California's segregation system, but you understand

19    that he's never visited any of the prisons in California.

20         Correct?

21    A.    No, I did not opine that he had evaluated California

22    prisons.  The article talks about his desire to evaluate

23    California prisons and to understand some of what he has

24    heard about the segregated confinement that exists here, but

25    I'm well aware of the fact that he has not been permitted by

1    the Department of Corrections to evaluate those conditions.

2    Q.    So your understanding is that this publication

3    coincided with the hunger strike and related security housing

4    unit claims at Pelican Bay State Prison?

5          Correct?

6    A.    I don't know what you mean by "coincide."  There was a

7    comment about it and that was what the article was written

8    about.  It's part of what made, I guess, his views on

9    solitary confinement current because there was an ongoing

10   hunger strike.  This is a position, certainly, that he has

11   had for a while.

12         I was at the United Nations when the resolution was

13   under consideration and was on a panel with him with other

14   representatives from the United Nations talking about his

15   findings with respect to solitary confinement.  He's had this

16   position for several years.

17   Q.    Doctor, I'd like to draw your attention to Inmate O.

18         Inmate O was one of the inmates you interviewed at

19   Mule Creek State Prison during your February 12, 2013 tour.

20         Is that correct?

21   A.    No, I think Inmate O was at the California Institution

22   for Men.  He was one of the lack of bed prisoners.

23   Q.    It was your understanding he was pending transfer to a

24   special needs yard bed?

25   A.    No, that wasn't my understanding.  He was confused

1    about his status and that's part of what I wrote about and

2    that's part of what I testified about; that he had been -- he

3    said, "I don't know exactly why I've been moved here."  He

4    had been through the system, he had been in another prison.

5    He came back.

6         He felt like he was being placed in the reception

7    center again, then he was moved to an ad seg unit and he was

8    talking to me about his frustration over the confusion about

9    his status and the fact that he was being deprived of what he

10   thought were rights and treatment rights as a Coleman class

11   member and the adverse conditions in the ad seg unit he was

12   confined in.

13   Q.    It's correct you didn't ask anyone to clarify what his

14   status was?

15   A.    I don't think I did, no.  We were talking to the lack

16   of bed prisoners.  I think I interviewed four or five of them

17   and then we moved onto another unit.  I did, of course,

18   review his records.

19        MS. VOROUS:  May I approach the witness, Your Honor?

20        THE COURT:  Yes.

21        My courtroom deputy has indicate we'd now have an F in

22   evidence and this is marked F as well.

23        MS. VOROUS:  That's my error.  I apologize.  It should

24   be G.

25        THE COURT:  All right.

1   BY MS. VOROUS:

2   Q.      I've handed you what has been marked as Defendant's

3   Exhibit G.

4           Is this one of the records you reviewed for Inmate O?

5   A.      Yes.

6           MS. VOROUS:  I ask that this document be admitted into

7   evidence under seal.

8           THE COURT:  Received under seal.

9                           (Whereupon, Defendant's Exhibit G was

10                          received into evidence under seal.)

11  BY MS. VOROUS:

12  Q.      Doctor, this mental health progress notes reflects a

13  service date that was ten days after your visit, correct, a

14  date of February 22, 2013?

15  A.      Yes, I was on CIM on the 12th.

16          THE COURT:  I'm sorry?

17          THE WITNESS:  It would be up in this corner right

18  here.

19          THE COURT:  All right.

20  BY MS. VOROUS:

21  Q.      Isn't it correct that as of the date of this service,

22  the inmate reported he was doing well?

23  A.      Yes.  This appears to be a meds review.  This is a

24  psychiatrist and they're talking about his medication and he

25  reports that medication is working well, he denies auditory

```
 1   and visual hallucinations.
 2   Q.     And the psychiatrist under the "objective" section
 3   also notes that, (Reading:)
 4               He does not seem distressed, depressed,
 5               anxious, psychotic or a danger to himself or
 6               others at this time.
 7          Is that correct?
 8   A.     Yes, he does.  Of course this is the same inmate that
 9   a week or so later writes a chrono that I testified about
10   yesterday, (Reading:)
11               I need to see a psychologist.  I need help.
12               I'm going crazing waiting to find out what's
13               going on.
14          And then that continues through the whole series of
15   subsequent contacts reflected in the record of this man
16   saying to people repeatedly that he doesn't know what's
17   happening, he's frustrated, stressed.  He doesn't know why he
18   is where he is, essentially what he said to me.
19   Q.     Correct.  I'm asking you about this particular record.
20   A.     Yes.
21          THE COURT:  It indicates something quite different,
22   but given the other pattern -- I might as well tell you.  My
23   own judgment is that it's as likely as not that the
24   psychiatrist simply got it wrong, or it may be, of course, on
25   this particular day, suddenly he had a break in what seems to
```

1    be the pattern of his status.

2            But either way, you may proceed, ma'am.

3    BY MS. VOROUS:

4    Q.      Doctor, I'd like to draw your attention to Inmate G.

5            THE COURT:  I'm sorry?

6    BY MS. VOROUS:

7    Q.      Doctor, I don't believe there's any reports that you

8    provided for Inmate G?

9    A.      Yes.  Inmate G.

10   Q.      I would like you to confirm that you did not produce

11   any records in the binder that you're using at the hearing

12   with respect to Inmate G.

13   A.      That may be correct.  I'm not sure.  I just looked in

14   the area where I've tabbed Inmate G, and I don't see any

15   records, so I may not have provided them.  I obviously talked

16   about him in my March declaration.

17   Q.      You read his records as well; correct?

18   A.      Yes, of course.

19   Q.      In your direct testimony, you indicated you met

20   prisoner G while he was on the yard at Mule Creek State

21   Prison and he told you he was in the management unit.

22           Is that correct?

23   A.      He told me that he had been in the management unit,

24   yes.  I don't recall whether he was in it at the time I

25   interviewed him or not.  I believe he was and I believe he

1    had been placed there for an encounter he had with

2    correctional officers in which he was engaged in self harm,

3    he was pepper-sprayed when he made a motion or movement that

4    suggested he was going to tear his sheet in his cell and hang

5    himself.

6    Q.    Doctor, do you know why this inmate had been in

7    administration segregation?

8    A.    I don't recall specifically.  I'm sure I read it in

9    his file.

10    Q.    Do you understand that he was in the unit -- in the

11    administrative segregation unit for disciplinary behavior?

12    A.    That doesn't contradict my recollection.  I think I

13    testified about his passage back and forth through various

14    levels of care from a hospital to a MOHU to a CTC and so on

15    and so forth.  We talked about his deterioration and his

16    cycling through, getting worse, getting mildly better, being

17    returned to administration segregation, decompensating and so

18    on.

19    Q.    Doctor, with respect to this particular inmate, Inmate

20    G, you don't have any reason to believe that while he was in

21    the administrative segregation unit he was not getting

22    program guide required care for EOP inmates.

23         Correct?

24    A.    First of all, program guide care for EOP inmates does

25    not include being placed in a management cell like the one we

1    saw yesterday and like the one I saw at Mule Creek.  I can't

2    imagine why anybody who is mentally ill could or would be

3    placed in a cell like that.  I'm sure that's not authorized

4    by the program guide.

5         But, secondly, there is reason to believe that Inmate

6    G, like the other inmates in that ad seg were not getting all

7    of the program guide mandated treatment given the severity of

8    his illness.  I mean, this is a person who was waiting to be

9    transferred, who had been cycling back and forth between a

10   MOHU, DHS facility he wanted to get to.  It's hard to imagine

11   how he could be getting an appropriate level of care in that

12   unit.

13   Q.    Doctor, if he was waiting to transferred -- strike

14   that.

15         If he was in an administrative segregation unit, EOP

16   hub for disciplinary reasons, he wouldn't necessarily be

17   waiting to be transferred anywhere.

18         Correct?

19   A.    It would depend on his level of decompensation.

20   Here's a person who just before I saw him threatened to hang

21   himself, was pepper-sprayed by correctional officers.  We

22   talked a moment ago about suicidal patients being immediately

23   transferred to hospitals.  You asked me whether or not,

24   wasn't that the case that the CDCR did that?

25         Here's your example of a case where they clearly

1    didn't do that.  He was pepper sprayed, not taken to a

2    hospital, pepper sprayed and put in a management cell after a

3    suicidal gesture.

4         That's hardly the American Psychiatric Association

5    recommendation for what ought to be done and hardly program

6    guide level of care.

7    Q.    Doctor, you testified that you had conducted a study

8    of inmates in secured housing units at Pelican Bay State

9    Prison.

10        Correct?

11   A.    Yes.

12   Q.    That was in the 1990s at some point?

13   A.    Yes.  It was preceded Madrid versus Gomez litigation.

14   It was in conjunction with it.

15   Q.    This was done as an expert for the plaintiffs;

16   correct?

17   A.    Yes.

18   Q.    And it included a random sample of certain number of

19   inmates; correct?

20   A.    Yes.  100 inmates who were selected randomly for the

21   roster of prisoners confined in the security housing unit

22   there.

23   Q.    And is it correct that your study did not compare

24   findings to any other group within the prison?

25        Is that accurate?

1    A.       Implicitly it did, yes.  When I had written about it,

2    as I did on a couple of occasions, what I did was to

3    implicitly compare what was known about the incidence of

4    these kinds of symptoms or the prevalence of these kinds of

5    symptoms in other populations, including population of

6    prisoners.

7    Q.       You didn't look at any of the inmate mental health

8    records that you interviewed as part of your study at Pelican

9    Bay.

10         Correct.

11    A.       Yes, we did.

12    Q.       Doctor, you've never published a study of a prison

13    system outside of California.

14         Correct?

15    A.       It depends on what you mean by "a study."  I read a

16    lot about prisons and I take into account a lot of

17    experiences I've had in a lot of different prison

18    experiences.  I wrote on article, for example, about the

19    culture or the environment that gets created in segregation

20    units like the ones we've been talking about that was based

21    largely on my experience in Massachusetts.

22         So I have incorporated all of that information in the

23    writing that I do and in the analysis I do of these units.

24    Q.       Doctor, at your deposition on July 10th of this year,

25    I asked you the question:

1              "With respect to any study that you've conducted

2              of prison systems outside of California, have

3              you published any of those studies?"

4         And indicated:  "No."

5         Do you recall that testimony?

6    A.    I don't recall it specifically, but if I did not

7    qualify it, I should have qualified it in the way I just did.

8    I've been to segregated housing units all over the country.

9    Obviously, when I write about those things, I take that

10   study, the study of those systems into account.

11        When you say "a study," that can mean a number of

12   different things, but, certainly, I don't separate that

13   information out and not take it into account in the several

14   dozen systems I've evaluated or done systematic observations.

15        THE COURT:  Ma'am, the appropriate thing to do is if

16   you think that something is impeaching is to let counsel on

17   the other side and the court, for that matter, know which

18   page and line you are going to read from so that everybody is

19   on the same page and there can be an objection if there is an

20   assertion it's not impeaching or being read out of context.

21        This is the second time you haven't done that.  I'm

22   asking you, please, to follow convention.

23        You may proceed, ma'am.

24        MS. VOROUS:  May I approach the witness, Your Honor?

25        THE COURT:  You may.

1              I think we've got it wrong again.  The last exhibit is

2    G.  This should be H, I assume.  I'm asking you, not telling

3    you.

4              MS. VOROUS:  Yes.  I had them renumbered.  I had them

5    numbered incorrectly to start with.

6              THE COURT:  All right.  H.

7    BY MS. VOROUS:

8    Q.    Doctor, I've handed you what has been marked as

9    Defendant's Exhibit H.

10             Do you recognize this document?

11   A.    I do.

12   Q.    Is this the expert report that you testified to

13   yesterday that you had reviewed that was written by

14   defendant's experts?

15   A.    Yes.  It's among the many documents that I reviewed.

16             MS. VOROUS:  I'd like to move this into evidence.

17             MR. FISCHER:  We object.  This report has already been

18   excluded.  We lodged our objections putting this into

19   evidence before.

20             MS. VOROUS:  Your Honor, the witness has already

21   testified he's relied upon the report.

22             THE COURT:  No, I don't know if he said he relied upon

23   the report.  He said he reviewed it.  But, in any event, have

24   I excluded this somewhere?

25             MR. FISCHER:  This is the report from the termination

1    proceedings.

2              THE COURT:  Okay.

3              The objection is sustained.

4              MS. VOROUS:  I would then ask to move to strike the

5    plaintiff's motion since they quote this report throughout

6    their entire motion and rely on it for purposes of this

7    hearing.

8              THE COURT:  That's a different -- see, if you just

9    told me that earlier, I might have ruled otherwise.

10             It appears that you have relied upon, it according to

11   counsel.  Do you acknowledge that?

12             MR. FISCHER:  We haven't relied on it.  There are

13   certain admissions in the report as to problems --

14             THE COURT:  So we have to take it all in context, and

15   the court withdraws it's previous order and it will be

16   received.

17                              (Whereupon, Defendant's Exhibit H was

18                               received into evidence.)

19   BY MS. VOROUS:

20   Q.    I have questions on the other inmates you interviewed

21   during your tour.  Mule Creek State Prison was the tour you

22   conducted on February 17th of this year.

23             Is that correct?

24   A.    Yes.

25   Q.    You interviewed several inmates in the EOP ad seg hub;

1    correct?

2    A.    Yes.

3    Q.    Are you aware that since your tour, two of the EOP

4    prisoners, E and F have since transferred to special needs

5    yards?

6    A.    Let me -- I'm not necessarily aware of that.

7          Will you direct me to the paragraphs in my declaration

8    where these prisoners are discussed?

9    Q.    I'm asking you whether you are aware since you

10    provided your declaration they've transferred?

11    A.    I may or may not be.  I don't recall specifically

12    whether or not they've been transferred, so I thought I would

13    try to refresh my recollection about who they are by looking

14    at my declaration.  I don't have to do that.  I don't recall

15    each one of those initials verbatim, so I'm not sure who

16    we're referring to.

17          MS. VOROUS:  If I can just have a moment, Your Honor,

18    I'll get the paragraph numbers.

19    Q.    You reference paragraph E in paragraph 83 of your

20    declaration.

21    A.    Okay.  So this is the prisoner who had been waiting

22    for three months in the ad seg unit for safety concerns?

23    Q.    Yes.

24    A.    I'm not aware that he was transferred.  I would hope

25    that he was.  I don't know, obviously, when he was

1    transferred.

2    Q.    Inmate F is also in paragraph 83?

3    A.    Yes, again, I don't have records indicating whether or

4    not he was transferred or if he was, when.

5    Q.    The third inmate, Inmate H, which you discuss in

6    paragraphs 91 Through 94, are you aware that he also is an

7    EOP SNY program?

8    A.    I am not.  I would hope he was transferred.  He was in

9    grave condition when I talked to him.  This was a person who

10   was actively, floridly psychotic, yelling out of his cell.  I

11   was told by his clinician he did not come out of his cell for

12   therapy.  I had a long discussion with his clinician, and if

13   he's been moved, I'm delighted to hear that because he was

14   clearly suffering.

15        THE COURT:  What is a MY program?

16        MS. VOROUS:  SNY.

17        THE COURT:  Okay.  What is SNY?

18        MS. VOROUS:  Special needs yard.

19        THE COURT:  Both the court reporter and I misheard

20   you.  All right.  SNY.

21   BY MS. VOROUS:

22   Q.    Doctor, looking at your February 23, 2013 tour at

23   California Corrections Institution, here you interviewed, I

24   believe, six inmates that were in the security housing unit.

25        Is that correct?

1   A.      I should point out, counsel, I refer to, in my

2   declaration, a certain number of inmates.  Those are not the

3   only inmates I've spoke to.  I spoke to a number of inmates

4   in the course of the tour and obviously selected certain ones

5   as illustrative.

6           So I'm not sure how many I actually spoke to.  I

7   certainly talked about a number of them as illustrating

8   certain kinds of issues or problems.  I talked to in the

9   security -- we're talking now about CIM and the

10  administrative segregation unit.

11  Q.      No, CCI.  California Correctional Institution.

12  A.      Okay.  And in that ad seg unit, I talked to --

13          THE COURT:  She's saying in a SHU.

14  BY MS. VOROUS:

15  Q.      In a SHU, yes.

16  A.      I talked to several inmates in the SHU who are

17  referenced in my report and other inmates in the SHU who are

18  not.

19  Q.      The six that are referenced in your report, are you

20  aware that only two of those inmates are still housed within

21  the security housing unit?

22  A.      Well, I'm -- no, not specifically I'm not.  Two of

23  them were EOPs who shouldn't have been in the security

24  housing unit at also, so I would hope they had been moved.

25  Q.      With respect to the two that were EOP, is it your --

1    you don't have any reason to believe that they were not

2    transferred within program guide timelines; correct?

3    A.      Well, I'm not sure.  I would have to look at my report

4    to see how long they had been there.  One of them was in such

5    distress that I actually talked to the clinical staff about

6    him.  They don't know how long he had been there waiting for

7    transfer.

8          The other person had been there a little longer, and

9    I'm not sure how long he had been there waiting for transfer.

10   I'd have to look at the report to know specifically how long

11   he had been there and whether or not, given when he was

12   transferred, and I don't know when he was, whether that met

13   program guide targets or goals.

14   Q.      So you just don't know is what you're saying?

15   A.      If you could give me information when he transferred,

16   I would be happy to look at it and make a determination how

17   long he had been there.

18   Q.      That information wasn't provided to you by plaintiff's

19   counsel in preparation for your trial testimony, the

20   information as to where these inmates are currently located?

21   A.      I think in some instances it was because I was -- part

22   of what I was talking about in their case was the period of

23   time they had spent in the segregation waiting to be

24   transferred to an appropriate bed.

25          In this particular instance, much of the problem here

1  was that these people were in SHU and had deteriorated in SHU

2  in the first place.

3  Q.    And the fact that they deteriorated was caught by

4  clinicians and they were elevated to an EOP level of care,

5  and at least as far as you know, scheduled to be transferred,

6  you just don't know when?

7  A.    I don't know when, no.

8  Q.    Are you aware that two of the other prisoners have

9  been transferred to special needs yards?

10  A.    I'm not aware of the transfer history of the

11  prisoners.  Again, I would be happy to look at it and look at

12  whether or not they were transferred in program guide

13  mandated timeframes.

14  Q.    Doctor, you indicated that you didn't include several

15  of the -- didn't include your interviews with several of the

16  inmates you discussed in your declaration.

17      Correct?

18  A.    I don't understand what you mean.

19      THE COURT:  You just testified that you talked to some

20  prisoners that were not included in your declaration.

21      THE WITNESS:  Yes.  They're reflected in my notes,

22  but, for example, we talked yesterday about how many groups I

23  had seen in Corcoran, and I had a conversation with some

24  prisoners in Corcoran who were in treatment cages in that

25  utility room.

1          I did not include them in the report.  The report was

2     already long and I had to make some judgments about which

3     particular inmates to talk about specifically.

4     BY MS. VOROUS:

5     Q.      Doctor, were there any inmates at all that you

6     interviewed that had positive comments that you did not

7     include in your report?

8     A.      No.  In fact, I included some positive comments in my

9     report.  I think I referenced yesterday Dr. Jenson, and I

10    talked in my report about the fact that there were prisoners

11    who spoke highly of her.  In fact, I made a point of seeking

12    Dr. Jenson out because some of the prisoners on her case load

13    spoke highly of her.  That's in my report.

14         There was another inmate I interviewed who said he had

15    a positive experience with his clinician.  He just did not

16    see him enough, that the clinician only spent 20 or so

17    minutes with him a week.  I put clearly in the report that he

18    had a positive feeling or positive experience with his

19    clinician.

20         So, no, if you're asking me:  Did I cherry pick

21    negative examples?  The answer is no.

22         MS. VOROUS:  Can I just have a minute, Your Honor?

23                    (Whereupon, a conference was held at

24                     defense counsel table.)

25         MS. VOROUS:  No further questions, Your Honor.

1          THE COURT:  You gave me a figure yesterday.  I have

2     misplaced it.  It's not unimportant in the three judge court

3     meeting that we're having next week.

4          As of the date of your report, how many members of the

5     Coleman class were in administration segregation awaiting --

6     because there was no bed or was there for a non-punitive

7     reason?

8          THE WITNESS:  Your Honor, I only gave you an estimate

9     of that number.

10          THE COURT:  I understand.

11          THE WITNESS:  So the estimate is based on two things.

12     One is what I calculated to be the total number of Coleman

13     class members in segregation, and that number is a little bit

14     over 3,300.  It depends on the timeframe.  That was in the

15     context of talking about how large a problem is, the

16     confinement of Coleman class members in segregated housing of

17     any kind.

18          Then the other number that I used as a way to estimate

19     waiting for a bed or being in for non-disciplinary purposes

20     was from a Department of Corrections official who estimated

21     20 to 30 percent were in segregated housing, and I believe

22     that specifically administrative segregation, 20 to

23     30 percent of those are awaiting bed placement for various

24     reasons elsewhere.

25          THE COURT:  Thank you, sir.

```
 1                          REDIRECT EXAMINATION

 2    BY MR. FISCHER:

 3    Q.      Dr. Hanley, Ms. Vorous asked you about certain inmate

 4    patients in segregation asking to be removed from the mental

 5    health case load.

 6            Did you encounter such cases?

 7    A.      Yes, I encountered a couple of them, and there was

 8    very trouble reasons they gave for it.

 9    Q.      Did you arrive at a conclusion based on these

10    discussions and your review?

11    A.      Yes.  We have been talking at length about the

12    harshness of the conditions in the segregated housing units

13    and their impact on the prisoners, particularly those

14    awaiting transfer elsewhere.

15            Some of the prisoners believe that their mental health

16    status, the fact that they're Coleman class members, make it

17    difficult for them to transfer, and it's part of what

18    indirectly is the reason they're being retained in

19    administration segregation.

20            So some of them have, and I think I read from a record

21    yesterday where someone was saying, "I want to get off the

22    mental health case load," and some of the prisoners have

23    voiced that the motivation for this is they feel if they get

24    off the mental health case load, it will be easier for them

25    to find a bed elsewhere or easier for the CDCR to find a bed
```

1    elsewhere for them in the system.

2         It's troubling because if this a widespread belief and

3    perceived as a way of getting out of administration

4    segregation, prisoners with mental illness who otherwise need

5    treatment and need whatever services they can get as Coleman

6    class members feel motivated to try to convince clinicians

7    that they no longer need these services, not because they

8    really don't need them, but because the conditions of their

9    confinement in segregated housing are so severe that anything

10   that will facilitate their transfer is worth trying.

11   Q.    Dr. Hanley, Ms. Vorous also asked you about something

12   called a 90-day review for EOP prisoners and administrative

13   segregation.

14        Are you familiar with this practice?

15   A.    Yes, I am.

16   Q.    Do you have an opinion as to the appropriateness of

17   this practice?

18        First can you describe what the practice is.

19   A.    The practice is that there is a mechanism and

20   procedure where a prisoner who has been kept in

21   administration segregation for 90 days is supposed to trigger

22   a precipitative review at a higher level in the CDCR, an

23   administrative review to see whether or not it is necessary

24   and possible to transfer this person out of administration

25   segregation to a more appropriate bed.

1          I talked yesterday about the fact that I thought some

2     transfer guidelines were important.  I thought there were

3     many instances of this not being adhered to, people

4     languishing for longer periods of time than certainly

5     90 days.

6          But the other concern I have is 90 days is a very long

7     period of time to leave an EOP inmate in an administrative

8     segregation unit.  First of all, these are the most acutely

9     ill patients in the system.  These are people with an awful

10    disability, and they're being -- they're not even being

11    reviewed for transfer at this higher level until they've

12    spent 90 days.

13         To put 90 days in context, I testified yesterday the

14    American Bar Association has recommended 90 days as the

15    absolute maximum amount of time a mentally ill inmate should

16    be in segregated housing at all.  90 days.

17         So the department is waiting three times that

18    period --

19    Q.    You said the ABA recommended 90 days limit.  Is that

20    what you meant?

21    A.    30 days, I'm sorry.  They recommended 30 days.  The

22    90 days is three times that before there's even a review

23    which is precipitated and it's not necessarily one that will

24    result in a transfer.

25         So this is just an example of how far out of whack it

 1    seems to me these procedures have gotten and how long term

 2    stays in administrative segregation Coleman class members

 3    have become.

 4    Q.      Do you have an opinion on how such a practice could be

 5    improved with respect to EOP prisoners in long term

 6    administration segregation?

 7    A.      By drastically shortening the timeframe for expedited

 8    transfers and moving them to appropriate housing units more

 9    urgently.

10    Q.      Dr. Haney, Ms. Vorous also asked you about CDCR's

11    practice with respect to mentally ill prisoners in

12    segregation that decompensate during their stay in

13    segregation that require a crisis level or inpatient level of

14    care.

15           My first question:  Do you believe that such a

16    practice is appropriate at CDCR?

17    A.      Well, I think moving prisoners who decompensate is

18    very appropriate.  Moving them in a rapid, expedited fashion

19    would be even more appropriate, and I encountered and

20    testified yesterday about a number of instances in which that

21    wasn't done.

22           But I also think it's important to take into account

23    this issue of cycling that I talked about in the very first

24    day of testimony that prisoners who decompensate are

25    typically treated at a higher level of care and then returned

1    to the very segregated environments that may have

2    precipitated the decompensation.

3         I think that practice is very problematic.  It's

4    problematic to wait for somebody to decompensate.  It's

5    problematic to wait so long after they've decompensated to

6    put them in the appropriate level of care, and it may very

7    well be inappropriate to return them to the very environment

8    that precipitated the decompensation?

9    Q.    Based on your review, did you find that CDCR was

10   achieving the goal of providing timely access to higher

11   levels of care for inmate patients who decompensate in

12   segregation?

13   A.    No.  I testified about some examples.  There were

14   other examples of people who were waiting, who clearly needed

15   a higher level of care but weren't getting it and were

16   oftentimes confined under very severe conditions while they

17   were waiting for get those transfers.

18   Q.    Do you have an illustrative case in mind you could

19   share?

20   A.    Yes.  One case in particular I did not talk about

21   yesterday but illustrates this.  The term was used the other

22   day, and I don't know who used it, "perfect storm."  I think

23   about it in terms of kind of a downward cycle or spiral.

24   There was one case in particular that I thought illustrated

25   it in a very disturbing way, frankly.

1          This was the case of a prisoner who was referred to in

2     the declaration as Prisoner A who I interviewed at Mule Creek

3     State Prison in the ad seg unit.

4     Q.     Doctor, just for the record and for counsel and the

5     court, Prisoner A is discussed in your March declaration at

6     paragraphs 86 and 87?

7     A.     Yes.  He's an EOP prisoner who was in the EOP ad seg

8     hub.  I think I saw him first at his cell.  He seemed very

9     disoriented and uncomfortable.  When I asked him if I could

10    interview him outside of his cell on a more confidential

11    basis, he agreed and he came out to one of the treatment

12    cages on the day room floor.

13         He told me he had been diagnosed with PTSD and that he

14    was a sensitive needs yard prisoner.  He had sensitive needs

15    or safety concerns.  He appeared to be very psychotic.  When

16    I talked to him, he appeared to go in and out of coherence,

17    but he did tell me that he was having a very hard time in his

18    unit.  He said, "I'm just trying to hold on."  He was very

19    emotional when he talked to me.

20         His medical records, in fact, indicated that he had

21    been in that unit deteriorating over the proceeding several

22    months as he waited to be transferred for an appropriate bed

23    for EOPs within the CDCR.

24         In October -- I saw him in February.  In October, the

25    preceding year, he was admitted to a mental health crisis

1    bed, having at least two prior admissions.  He was described

2    as severely disturbed, including eating his own feces.  He

3    remained in the mental health crisis bed for several weeks,

4    but then was sent back to an ad seg unit in November.

5           By the time of a treatment plan that was entered in

6    December of 2012, he was described as confused, disorganized

7    psychotic and delusional and getting worse.  He is still in

8    the ad seg unit.  He was referred for inpatient level of

9    care.

10          On January 7th, his condition had worsened further.

11   He was referred to a higher level of care to the Department

12   of State Hospitals Acute Psychiatric Program, APP.

13          On January 16, 2013, a few weeks before I saw him,

14   there was an interdisciplinary team note indicating he was

15   floridly psychotic and delusional and running around naked,

16   mopping the floor with his underwear.

17          Two weeks after that, he was placed in a management

18   cell, one of those cells I showed you a photograph of

19   yesterday, while he was still on the list to be transferred

20   to a state hospital and had just recently been running around

21   naked, mopping the floor with his underwear.

22          I saw him on the 7th of February, not long after he

23   had been in the management cell, and he was in terrible

24   shape, clearly not the kind of prisoner who could, in good

25   conscience, let alone psychiatric practice or standards, be

1    kept in a management cell or left in administration

2    segregation housing unit.

3        Here is a guy who's been identified for now several

4    months as needing a higher level of care and being on a list

5    to be sent to an intermediate care facility or a Department

6    of State Hospital APP program, and just a little bit before I

7    saw him, he had been in a management cell in an ad seg unit.

8        These are the kinds of egregious problems that I

9    encountered.  They were not difficult to find.  I didn't have

10   to go look for them.  They were there.  I did not know

11   anything about prisoner A until I went to that unit and had

12   an opportunity to interview him and review his records, but

13   that pattern of essentially waiting until people

14   decompensate, people in severe conditions of segregation who

15   are fragile and can't take that kind of pressure

16   decompensating and then waiting to find a bed to put them in

17   once they've decompensated is part of the pattern that was of

18   such concern and addressed in my declaration.

19        MR. FISCHER:  One moment, Your Honor.

20   Q.    Defendant's counsel asked you about a number of the

21   individuals you've discussed in your testimony, and I just

22   want to ask you about one of them.

23        Turning your attention to Defendant's Exhibit D, which

24   I believe refers to prisoner GG who you met at Corcoran.

25   A.    I'm not sure I have that up here.  Defendant's

1    Exhibit D?

2    Q.     Defendant's Exhibit D, do you have a copy?

3    A.     I should have it.

4    Q.     Just to focus your attention, this is the individual

5    that you saw at Corcoran that had been waiting for transfer

6    for several months and Dr. Becich had been seeing him.

7    A.     Yes.

8    Q.     Defendant's Exhibit D you were asked about the

9    assessment that this inmate's condition has not changed.

10   That's a quote.  And the quote continues, (Reading:)

11                 He continues to evident irritation at being at

12                 being in CCCMS and his condition has not

13                 worsened.

14        That's on July 1st, 2013.

15        I'd like to turn your attention to this record for

16   this individual in plaintiff's exhibit already in evidence

17   2050, page 12, of that exhibit.  This is a similar progress

18   noted dated June 27, 2013, the previous week from the note in

19   Defendant's Exhibit D?

20   A.     Yes.

21   Q.     I think I may have talked about this yesterday as

22   well.  You describe the inmate patient's condition at this

23   time on June 27th, just a few days before, the same

24   clinician, Dr. Becich, had found his condition had not

25   changed?

 1    A.      Yes.  This is the condition that had not changed

 2   (Reading:)

 3                    He was irritable and depressed.  He was

 4                    oppositional, contrary.  Basically shuts off

 5                    input from others.  He continued perseverating

 6                    and repeating about the problems of being CCCMS.

 7                    He was slightly disheveled, walked back and

 8                    forth in his cell continuing to repeat basically

 9                    the same issues.

10        I went on to say that appears to continue to have

11   mental health issues.  Then Dr. Becich offers the

12   observation, and I think this is what I quoted yesterday,

13   (Reading:)

14                    His being in lockup seems to have a fatiguing

15                    effect on him.  He has much time on his hands to

16                    consider negative issues.  He seems to project

17                    blame on mental health to help him cope.

18        That's the condition that he was in.  It hadn't

19   changed a week later.

20   Q.      Doctor, I just have another question or two.

21        Ms. Vorous asked you about the scope of your opinions

22   as to CDCR segregation practices and the impact on prisoners

23   with mental illness.

24        Can you just clarify:  Is your opinion a systemwide

25   opinion?

1    A.        Yes, it's absolutely a systemwide opinion.

2    Q.        Can you clarify the basis for the systemwide opinion?

3    A.        Yes.  I relied on in my March declaration on a vast

4    number of documents that had been provided to me by your

5    office dealing with the current conditions of confinement

6    systemwide.

7            They included -- and in addition to the documents you

8    gave me in preparation for that report, you had been

9    regularly giving me documents, systemwide documents,

10   including the Special Master's report, at least since I

11   testified in the 2007-2008 overcrowding proceeding.

12           So I'm well aware of what the systemwide issues are,

13   and what the Special Master has said about problems

14   throughout the system.

15           I certainly wanted some firsthand experience to see

16   for myself directly conditions of confinement in a number of

17   the units and interview prisoners about what it was that they

18   were experiencing.  Obviously, in my declaration, I focused

19   on the information which I gathered directly, but it was by

20   no means the only information I considered and it was by no

21   means the only bases for my report.

22           These are issues I frankly have been studying for

23   30 years in this system, dating back to locking at practices

24   of segregation as early as the eighties in the Toussaint

25   case.

1              I understand what the issues are.  I understand how

2       they've been changing.  It's an area of scholarly interest as

3       well as legal interest.  So when I formulated my opinions,

4       both in that declaration and in the hearing over the last

5       several days, those opinions are based on that body of

6       knowledge.

7              It certainly -- I was informed by the tours that I

8       took and the information gleaned from those tours because

9       firsthand experience seemed to be quite important, and to be

10      able to convey to the court what I saw, what people said to

11      me, but it was entirely consistent with information that

12      other people had observed that appear in the Special Master's

13      report about many of the same kinds of problems.

14             There was nothing in those reports, that other

15      information that I reviewed to suggest that these four

16      prisons were outliers in any way.  They certainly weren't

17      selected by me because of that.  I thought they were

18      representative of places.  Some were places I saw in the

19      overcrowding proceeding, one of them was not, but these

20      problems and the units that I looked at and what I saw was

21      consistent with what the Special Master has written about.

22             These are statewide policies and procedures.  The

23      practices are followed, at least they're described as being

24      described by others in the same way I saw in the institutions

25      I evaluated.  And as described from prisoners not only in

1    those institutions but oftentimes in the course of my

2    interviews with them, we talk about patterns and practices at

3    other institutions that they had been, and indeed the records

4    themselves reflected patterns and practices at those other

5    institutions.

6         So the bases of the opinion is much greater than of

7    four inspections and the interviews that were done, even

8    though those were quite important and I used them to

9    illustrate the issues in my testimony.

10         MR. FISCHER:  One moment, Your Honor.

11         No further questions.

12         THE COURT:  Recross, Ms. Vorous?  I shouldn't ask.

13         MS. VOROUS:  I just have one question, Your Honor.

14                        RECROSS-EXAMINATION

15    BY MS. VOROUS:

16    Q.    Doctor, are you aware by virtue of the defendant's

17    2006 plan to address inmates in administration segregation

18    units that there's a requirement that the prisons must review

19    the status of all inmates in segregation units beyond

20    30 days?

21    A.    I don't recall that specific provision.  I'm not sure

22    what that means, "review," whether there's any kind of --

23    whether there's any kind of mandate that people have to be

24    transferred.  It's clearly not happening in all of the cases

25    that I've already described to you, at least not in any

1    meaningful way.

2            MS. VOROUS:  No more questions, Your Honor.

3            THE COURT:  May the doctor be excused?

4            MR. FISCHER:  Yes, Your Honor.

5            THE COURT:  Ms. Vorous.

6            MS. VOROUS:  Yes, Your Honor.

7            THE COURT:  You're free to go, sir.  If I were you, I

8    would get out of here.

9            What are we doing now?  Is there something that we're

10   filling in with or are we dark or what?

11           MR. BIEN:  We told Dr. Stewart not to come, so we're

12   dark today.  Dr. Edward Kaufman is flying here now and be

13   here first thing in the morning, and we hope to be able to

14   complete him tomorrow and then we scheduled Dr. Stewart for

15   the first week in December.

16           MR. RUSSELL:  Your Honor, I'm glad that Dr. Stewart is

17   not here today.  There is something I want to bring up to the

18   court.

19           In preparing for Dr. Stewart's cross-examination that

20   I'll be conducting, Dr. Stewart -- neither Dr. Stewart nor

21   Dr. Kaufman provided reports or declarations for this

22   particular proceeding.  The declarations upon which the

23   plaintiffs are relying for purposes of this motion are the

24   declarations that were filed in March as part of the

25   termination proceedings.  We've heard Dr. Haney talk about

1    some of that today.  Those documents are already within the

2    record.

3          The plaintiffs ask the court to take notice of those

4    as part of this proceeding.

5          THE COURT:  Didn't we agree -- I'm confused from

6    hearing the hearing, so please forgive me.  I thought we had

7    agreed that all of the affidavits in support of the motions

8    were to be received in evidence?

9          MR. BIEN:  That's correct.

10          MR. RUSSELL:  No, that's true, Your Honor.

11          I'm not objecting to that.  These witnesses are now

12    going to appear and provide testimony without having offered

13    a subsequent report, anything since their March 14th

14    declarations.

15          I have a sense as to what Dr. Stewart is going to

16    testify to tomorrow.  We've been provided a list of the

17    documents that he's going to be shown.  Some of them do

18    involve inmates that have no appearance in that March 14

19    declaration.

20          My point is, I'll be doing a little of

21    cross-examination on the fly here in front of the court.  I

22    think the court has the testimony from both Dr. Stewart and

23    Dr. Kaufman that would need to consider this motion.

24          THE COURT:  Before we get to the problem of new

25    material, if there is anything that demonstrates the need for

1    the evidentiary hearing because of the need to make judgments

2    about credibility, this case demonstrates it remarkably.

3           At one point I was pointing out to myself and then

4    didn't make a note, so I've completely forgotten, how many

5    places plaintiff says A, defendant says B, and there's only

6    one way to resolve those.  So the notion that I would rely on

7    the declarations without more is just not what I'm going to

8    do.

9           The problem of new material is a serious problem, Mr.

10   Bien, and it is the continuing -- I was about to say "saga,"

11   and I didn't mean that.

12          MR. BIEN:  We've tried to address it, Your Honor, in

13   this way, and I just wanted to inform the court.  And

14   Mr. Russell is correct.  We have provided after motions to

15   compel, updated records for people.

16          We have -- rather than requiring the defendants to

17   prepare on all of the people, we gave them a list of the

18   particular inmates that we would testify about at the hearing

19   to limit the scope of what we're doing.

20          Any new information, for example, new monthly

21   documents from the defendant or new suicides --

22          THE COURT:  That sort of thing is inevitable.

23          MR. BIEN:  And I think defendants would correctly say

24   we need current information.  So we've tried to limit the

25   scope of new information.

1          If Mr. Russell -- you might be able to, Mr. Russell.

2     If you could point to something really new and different,

3     then it's a legitimate objection, and if it's unfair, that's

4     something we should take up, but we're trying to limb it to

5     just the same opinions but updated information.

6          THE COURT:  Mr. Russell, I have repeatedly said in the

7     course of this hearing and I don't remember which hearing

8     I've said it at, the problem is this is an ongoing process.

9     What we're doing is stopping the process to examine where we

10    are today.  That has both virtue and some problems to it,

11    obviously.

12         I'm not going to prevent the plaintiffs from using

13    documents demonstrating that the problems they refer to in

14    the previous declarations have continued or significantly

15    changed in there view to either the better or the worse, and

16    that goes with you as well.  You can take up whatever

17    documents you believe are useful.

18         I don't know what else to say.  It is a problem that

19    can't be solved other than the way you guys are trying to

20    solve it, and I don't find any fault with what is being done.

21         MR. RUSSELL:  I want to go back to a comment you made

22    just a second ago.  You say a witness will come in and say A,

23    and then a defendant witness will come in and say B.  In this

24    particular situation going forward, like I said, I have an

25    idea as to what A is going to be and what is going to be said

1    here in the next couple of days, but for us to be able to

2    respond to that and provide story B, as you've pointed out,

3    we have to essentially -- we're going to have to wait and see

4    what these witnesses say on Friday and then in a couple of

5    weeks.

6         THE COURT:  I don't know that that's correct because

7    what Mr. Bien has said, all they will be testifying to new is

8    the documents that you've provided them which support their

9    previous opinions.

10        As I understand what Mr. Bien is saying, there's not

11   going to something radically different than what's been said,

12   although they're going to be bringing it up, hopefully they

13   will be bringing it up to date.

14        If that's not the case, you folks have been free to

15   make objections and you will continue to do so.

16        MR. BIEN:  We will endeavor to try to identify

17   anything on that edge and provide a summary and trying to do

18   the best we can.  We're not trying to surprise anybody.

19        THE COURT:  I may not be be terrible happy about

20   things that have happened in this trial, but my own judgment

21   is both sides have acted with remarkable recognition of the

22   difficulties of the case, and I just expect that's going to

23   continue.

24        We will reconvene tomorrow morning at 930.

25        I am correct we're done for the day?

```
1              MR. BIEN:  Yes.

2              MR. RUSSELL:  Yes, Your Honor.

3                          (Whereupon, proceedings concluded at

4                          10:43 a.m.)

5                          (Nothing omitted.)

6                          ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25