1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12    _____/

13

14

15                        ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                 FRIDAY, NOVEMBER 22ND, 2013

20

21                        ---o0o---

22

23

24

     Reported by:  MICHELLE L. BABBITT, CSR. No. 6357
25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR

```
 1                        APPEARANCES

 2                         ---o0o---

 3    FOR THE PLAINTIFFS:

 4            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 5            SAN FRANCISCO, CALIFORNIA  94104

 6            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 7            BY:  MARGOT MENDELSON, ATTORNEY AT LAW

 8            BY:  JANE KAHN, ATTORNEY AT LAW

 9            BY:  AARON FISCHER, ATTORNEY AT LAW

10

11

12

13    FOR THE DEFENDANTS:

14             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
15             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
16
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
18

19

20                         ---o0o---

21

22

23

24

25
```

1                        EXAMINATION INDEX

2                           ---o0o---

3    FOR THE DEFENDANTS:

4        EXAMINATION:                                    PAGE

5

6     DR. EDWARD KAUFMAN

7        Direct Examination by Ms. Mendelson          2450
         Cross-Examination by Mr. McKinney            2515
8

9

10

11

12

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3   PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION                 EVD
 4
        2201              Prisoner B Records             2495
 5
        2203              Prisoner F Records             2499
 6
        2205              Prisoner N Records             2467
 7
        2208-2219         Photos of Seg. Units           2453
 8

 9

10                            ---o0o---

11

12

13

14

15                          EXHIBIT INDEX

16                            ---o0o---

17   DEFENDANTS'
     EXHIBIT NO              DESCRIPTION                 EVD
18
19      JJJ               Prisoner F Records             2551

20

21

22

23                            ---o0o---

24

25
```

```
 1                    SACRAMENTO, CALIFORNIA

 2            FRIDAY, NOVEMBER 22ND, 2013 - 9:30 A.M.

 3                         ---o0o---

 4          THE CLERK:  All rise.

 5          Court is now in session.

 6          The Honorable Lawrence K. Karlton, United States

 7   District Court Judge, presiding.

 8          THE COURT:  Please, be seated everyone.

 9          MS. MENDELSON:  Good morning, Your Honor.  We'd like

10   to start by noting a correction to one of our exhibits.

11          THE COURT:  Hang on.

12              (Brief pause.)

13          You are?

14          MS. MENDELSON:  Margot Mendelson.

15          THE COURT:  Yes, ma'am.

16          MS. MENDELSON:  On Tuesday we filed the Inmate Code

17   as under seal as Plaintiffs' Exhibit 2000.  It has come to

18   our attention that one of the inmates about whom Kaufman --

19   Dr. Kaufman intends to opine was omitted from the list.

20          We have -- we've already provided an updated code,

21   but I wanted to note it for the record.

22          THE COURT:  You may proceed.

23          Yes, Miss Mendelson.

24          MS. MENDELSON:  Your Honor, plaintiffs call

25   Dr. Edward Kaufman.
```

2449

```
 1          Plaintiffs have previously offered a number of
 2    Dr. Kaufman's reports --
 3          THE COURT:  You want to wait until he is sworn or
 4    just keep talking?
 5          MS. MENDELSON:  Happy to wait.
 6          THE CLERK:  Raise your right hand.
 7                    EDWARD KAUFMAN,
 8    was thereupon called as a witness herein by the Plaintiffs,
 9    and having been sworn to tell the truth, the whole truth and
10    nothing but the truth, was thereupon examined and testified
11    as follows:
12          THE CLERK:  You may have a seat.
13          Please, state your name, spell your last name and
14    speak directly into the microphone.
15          THE WITNESS:  Edward Kaufman, K-a-u-f-m-a-n.
16          THE COURT:  Miss Mendelson.
17          MS. MENDELSON:  Yes.  I'd just like to note that
18    plaintiffs have offered a number of Dr. Kaufman's
19    declarations into evidence in this case.  The declarations
20    and their attachments have already been entered into evidence
21    on November 6th, 2013, as ten separate exhibits.  They were
22    Exhibits 103 through 107, Exhibits 176 through 178, and
23    Exhibits 181 through 183.
24          THE COURT:  Okay.
25          MS. MENDELSON:  Plaintiffs offer Dr. Kaufman as an
```

2450

1  expert in forensic psychiatry.

2          THE COURT:  Is there any desire to voir dire before

3  we proceed?

4          MR. MCKINNEY:  No, Your Honor.

5          THE COURT:  Court will find that the witness is

6  qualified to opine concerning matters of forensic

7  psychiatry.

8          You may proceed.

9                    DIRECT EXAMINATION

10 BY MS. MENDELSON:

11 Q.     Dr. Kaufman, which prisons did you visit in

12 connection with your termination declaration?

13 A.      Initially, I visited the California Correctional --

14 the Central California Women's Facility, CCWF, the California

15 Institution For Men, CIM, and Corcoran.

16         Later, in the use-of-force case, I visited the

17 California State Prison in Sacramento.

18 Q.      And what types of units did you visit?

19 A.      I visited reception, administrative segregation at

20 Corcoran, the SHU or the secure housing unit, the general

21 population when Coleman Class inmates were housed there, and

22 the MHCB.

23 Q.      When you said you visited administrative segregation

24 units, were those administrative segregation hubs, EOP hubs

25 or other administrative segregation units?

2451

1          MR. MCKINNEY:  Objection.  Leading.

2          THE COURT:  Stop it.  Yes, you may answer.

3          I'm sorry.  I didn't mean to say that.

4          It is overruled.  You may proceed.

5          THE WITNESS:  Okay.  I believe there was an EOP hub

6   among them, yeah.

7   BY MS. MENDELSON:

8   Q.     What is the foundation for your opinions on

9   segregation for the mentally ill?

10  A.     I'm sorry.  Can you repeat that question?

11  Q.     What is the foundation for your opinions on the use

12  of segregation for the mentally ill?

13          MR. MCKINNEY:  Objection, Your Honor.  Assumes facts

14  not in evidence.  We don't know the expert's opinions at this

15  point.

16          THE COURT:  First of all, she's just asking -- I

17  don't think there is any doubt he was offered as an expert to

18  opine.

19          Sit down.

20          The objection is overruled.

21          What is the basis for the opinions you are about to

22  express, sir?

23          THE WITNESS:  During these visits I interviewed many

24  inmates in each of these facilities.  I reviewed their

25  medical records, correctional records, particularly RVRs.

2452

1          I talked to mental health staff.  I talked to

2     correctional authorities, such as wardens.  I talked to

3     correctional officers on the units, mental health staff at

4     various levels.

5          I reviewed a multitude of materials, the Special

6     Master's report, many declarations by experts for the

7     plaintiffs, as well as the defendants.

8          I have a clinical practice in psychiatry, and I'm a

9     medical director of a facility which is an alternative to

10    incarceration.  And I speak to my patients there who are

11    former inmates.

12         And I have over 50 years of experience in psychiatry,

13    including direct experience in many correctional settings.

14    And I also have served as an expert in correctional settings

15    in many states in this country.

16    BY MS. MENDELSON:

17    Q.     Did you formulate an overall opinion about CDCR's use

18    of segregation for the mentally ill?

19    A.     I did.  And it is hard to give an overall opinion

20    without either getting too brief or too long.  And I'm sure

21    there will be many aspects of my opinion that will be

22    expressed.

23         But basically I think that it's cruel and inhumane,

24    that it is a tragedy to treat mentally ill human beings, many

25    of whom are in great emotional pain and decompensation, in a

2453

1    setting that is as inadequate and potentially dangerous as

2    these mental health settings.

3    Q.      Dr. Kaufman, could you please look at Exhibits 2208

4    through 2219 in your binder.

5            Are these the photographs taken at your direction

6    earlier this year in CDCR segregation units?

7    A.      Yes, they are.

8            MS. MENDELSON:  Plaintiffs move to admit Exhibits

9    2208 through 2219.

10           MR. MCKINNEY:  Your Honor, without looking at all the

11   exhibits which were just given to us before the hearing, the

12   one objection I want to raise is that the caption is

13   argumentative at this point.

14               (Brief pause.)

15           THE COURT:  Well, I've now gone to 2213 and -- the

16   objection is overruled.  They are received.

17               (Whereupon, Plaintiffs' Exhibits 2208 through

18                2219 received into evidence.)

19           MS. MENDELSON:  Your Honor, may I have permission to

20   publish the image?

21           THE COURT:  Yes.  You may proceed.

22               (Exhibit published.)

23   BY MS. MENDELSON:

24   Q.      Dr. Kaufman, what are we seeing in this photo?

25   A.      As the caption states, it's the security housing unit

2454

1    or SHU, Unit 4B, at Corcoran.

2            And what you see there is a row of cells, and across

3    from the cells is a holding cell.  It's notable that the

4    floor across from the cells has no tables, no chairs.  And

5    that's because the inmates that are housed there are not

6    permitted to socialize directly.

7            And in these rather small cell spaces the inmates

8    that I spoke to spend 22, 23 hours a day.  And these are

9    inmates who are often very severely mentally ill with very

10   severe psychiatric illness.  And this kind of physical

11   environment is not conducive to their mental health and puts

12   them in danger of decompensation and depression with

13   increasing suicidal ideation.

14   Q.      What did you learn about inmates' access to

15   programming in these units?

16   A.      The inmates that I spoke to said that it was

17   extremely limited, that there was limited access to yard and

18   limited access to therapeutic or recreational activities.

19   Q.      And what did you learn about the lengths of stay in

20   this unit?

21   A.      Well, the three inmates that I will be referring to

22   in this unit had lengths of stay of 13 years, 13 years and

23   five years.

24           Just astonishingly long lengths of stay for people

25   with severe mental illness.

2455

1    Q.      And what did you observe about their mental

2    conditions?

3    A.      Well, there's three different inmates which I'll be

4    talking about, but they had very severe psychiatric

5    diagnoses.

6    Q.      How did they describe their experiences in the unit?

7            THE COURT:  He's already -- well, you may answer,

8    Doctor.

9            You're asking a general question when he's indicated,

10   at least twice, that he's going to talk about each of these

11   people individually it seems to me.  It is your case.  Do it

12   any way you want to botch it.

13           THE WITNESS:  Would you repeat the question, please?

14   BY MS. MENDELSON:

15   Q.      Why don't we move to the next photo.

16   A.      Okay.

17   Q.      This is Exhibit 2209 in your binder.

18              (Exhibit published.)

19           Dr. Kaufman, what are we seeing in this photo?

20   A.      These are prisoners in the cages or therapeutic

21   modules.  I think these are not considered therapeutic

22   modules, but rather holding cages.

23           And they're being held there for a strip search.  And

24   inmates who leave this unit are strip-searched every time

25   they leave the unit regardless of where they're going, and

2456

1    then they're strip-searched again when they return.

2         The cages are across the way from the cells so that

3    these inmates can be observed during the strip searches.

4         The two correctional officers that are there are in

5    full outfits.  We talk about what's standard on their belts

6    and I'm not sure what is on their belts specifically.  The

7    correctional officer to the left has on his head, I believe,

8    a spit protection mask.

9         And the inmates are waiting to be transported so that

10   they can go to various kinds of activities.  It might be a

11   therapy group, it might be a dental appointment or a doctor's

12   appointment.  And when they leave, they are always escorted

13   by two officers.

14   Q.    Can you describe for the court the general level of

15   acuity of the EOP patients you encountered in the segregation

16   unit?

17   A.    Well, in general they're quite psychotic, some of the

18   sickest psychiatric patients seen anywhere.

19   Q.    What kind of diagnoses have you encountered among

20   these inmates?

21   A.    There are a lot of schizophrenic diagnoses, often

22   paranoid schizophrenic.  Also a lot of major depression

23   diagnoses.  Often major depression with psychotic features.

24        Sometimes there's a crossover between those two

25   diagnoses which is a schizoaffective disorder in which an

2457

1    individual has symptoms of both schizophrenia and affective,

2    which means emotional usually depressive episodes, but

3    sometimes also manic episodes which when severe often seem

4    similar to schizophrenia.

5    Q.      What kinds of behaviors are typical of those

6    diagnoses?

7    A.      Hallucinations.  Often threatening hallucinations.

8    Command hallucinations, which are particularly troubling

9    because the inmate is haunted by voices which tell him to

10   hurt other people sometimes, sometimes to hurt himself.

11          Any individual who has command hallucinations to hurt

12   himself is at very high risk often for suicide.  There's a

13   lot of paranoia.

14          You'll see detailed delusional systems often of

15   correctional officers.  All kinds of delusions.  Delusions

16   about correctional officers torturing people, putting poison

17   in their food.  Often inmate psychotic patients have

18   delusions about sexual attacks.

19          And so -- and sometimes when they regress even

20   further, the facilities to regress are so bare and sparse

21   that they resort to smearing feces and eating feces or

22   smearing blood.

23   Q.      How would you characterize the mental health needs of

24   these individuals?

25   A.      I'm sorry.  Repeat the question.

2458

1   Q.      How would you characterize the mental health needs of

2   these individuals?

3   A.      Their mental health needs are at the top of

4   neediness.  They're the most psychotic individuals, and they

5   need extremely intensive, comprehensive care.

6           And also I think, more importantly, they need

7   prevention before they get there.  They need daily

8   psychotherapy, daily recreation.

9           They need therapeutic contact with clinical staff and

10  other human beings.  And when deprived of that, they are at

11  great risk for regressing to the kind of behaviors that I

12  just mentioned.

13  Q.      Do you have an opinion about the conditions in EOP

14  Ad. Seg. units for the patients you are describing?

15  A.      I feel that they fall far below the level needed to

16  treat these patients.

17  Q.      Could you please turn to Exhibit 2210 in your binder.

18              (Exhibit published.)

19  Q.      Can you describe this photo, Dr. Kaufman?

20  A.      This is an exercise cage for prisoners in segregation

21  at Corcoran.  Actually, it's a group of cages.  They are

22  barren.  They are probably maybe three to four times the size

23  of a cell.

24          There's no materials to have recreation in there.

25  There is no ball to throw around or -- I didn't see any that

2459

1    had cards or anything.

2            And when we saw inmates in these, it did give an

3    opportunity for inmates to kind of shout across their

4    exercise cage to the next one on other sides of them.

5    Q.     How did the inmates with whom you speak describe

6    their access to the yard?

7    A.     They described it as limited.  They are

8    strip-searched before going in, they were strip-searched

9    coming back out.  They generally claimed to me they got out

10   there about once a week, if that, under most circumstances.

11   Q.     Do you have an opinion as to whether outdoor physical

12   exercise is relevant to mental health treatment?

13   A.     Well, I think it is essential obviously.  It's -- and

14   when it is done well, it's done in a group with a skilled

15   recreational therapist.  Or even in some cases, with more

16   disturbed inmates, one-on-one with a skilled recreational

17   therapist.

18   Q.     And do you have an opinion about the role of

19   socialization in mental health treatment?

20   A.     Well, I think therapeutic socialization is incredibly

21   important.  I think therapeutic human touch is incredibly

22   important.

23           And we will see in many of these inmates the

24   recommendations of the correctional mental health staff are

25   for social contact.  And without social contact you often get

2460

1  regression.

2          If these people do not have external stimulation with

3  other human beings, it leads them to turn further and deeper

4  into their own psychotic inner selves.

5          So just quite simply, the less contact they have with

6  the outside world, the more likely they are to hallucinate

7  and have delusions.

8  Q.      Can you please turn to Exhibit 2019 in your binder.

9              (Exhibit published.)

10         MS. MENDELSON:  Your Honor, this photo has been

11 previously admitted into evidence during Dr. Haney's

12 testimony.

13 BY MS. MENDELSON:

14 Q.      Dr. Kaufman, what are we seeing in this photo?

15         MR. MCKINNEY:  Objection.  Cumulative of Dr. Haney's

16 testimony.  There is no reason for the court to hear this

17 repetitively.

18         THE COURT:  I don't know that it is repetitive.  I

19 mean, if the doctor is simply going to say that it's listing

20 who is who and what is what, I suppose that may be

21 repetitive.  But if it has some relevance to who he examined

22 or why he examined them, it would not be.

23         You may answer, Doctor.

24         THE WITNESS:  Just to be brief, this is the Ad. Seg.

25 Cypress Hall housing census board at CIM where the lack of

2461

1   bed inmates -- and some inmates actually identified

2   themselves as "I'm lack of bed" rather than even their

3   name -- are marked with purple or pink cards.

4           And it was just very striking to me to see the vast

5   majority of the inmates housed here were in a "lack of bed"

6   category, be it purple or pink, seeing that the purples and

7   the pinks far outnumbered any other designation of inmate.

8           MS. MENDELSON:  Thank you.

9           (Exhibit published.)

10  BY MS. MENDELSON:

11  Q.      Dr. Kaufman, is this the housing unit you were

12  talking about?

13  A.      Yes.

14  Q.      Can you describe this unit, please?

15          THE COURT:  Will you tell me what the exhibit number

16  is, please.

17          MS. MENDELSON:  2028.

18          THE COURT:  Thank you.

19          You may proceed.

20          THE WITNESS:  This is the administrative segregation

21  unit on Cypress Hall at CIM.  This is the unit for which that

22  board represented the designations of the inmates.

23          Again, it is similar-sized cells with limited access

24  to external light, a holding cell across the way.

25          When these individuals are here on LOB, they have no

2462

1    mental health screening.  They don't have welfare checks.

2    And this was confirmed by staff on the unit that we spoke to.

3    BY MS. MENDELSON:

4    Q.    Dr. Kaufman, did you meet mentally ill inmates in

5    this setting?

6    A.    Yes.

7    Q.    How did they describe the conditions of their

8    confinement?

9    A.    They described a lot of limitations in this

10   environment.  Several inmates said that they didn't get a

11   chance to cut their toe nails -- and one of them had

12   bizarrely long toe nails -- they didn't get a chance to cut

13   their hair, and that in contrast to the unit across the way,

14   the showers were ice cold.  And, in general, that their

15   activities were extremely limited.

16   Q.    In your opinion what is the psychiatric effect of

17   placing mentally ill prisoners in this setting for reasons

18   unrelated to discipline?

19   A.    Well, it's inhumane.  It is anti-therapeutic and it

20   is dangerous.

21   Q.    Why is it anti-therapeutic?

22   A.    Well, because they're locked up in cells without

23   human contact, with limited therapeutic contact.  They are in

24   their cells 22 or so hours a day.

25         Just for some of the reasons that I mentioned before.

2463

1    Q.      In your termination declaration you opined about a

2    CCCMS inmate you met in this unit, Prisoner N?

3    A.      Yes.

4    Q.      What was Prisoner N's mental health diagnosis?

5    A.      I think I need to go to the --

6    Q.      Your notes?

7    A.      Yeah.  To my notes.

8            His primary diagnosis was that of schizoaffective

9    disorder, depressive type.

10   Q.      What were his symptoms?

11   A.      He had auditory hallucinations in the form of

12   commanding whispers.  He had multiple past suicide attempts,

13   including jumping off of a freeway, overdosing on --

14   actually, a freeway overpass, I think it was on the 10

15   Freeway, and an overdose on pills.  Also a history of

16   self-mutilation, cutting himself, burning cigarettes on his

17   arms.

18           He had had multiple admissions into the MHCB, which

19   is when the Mental Health Crisis Bed unit.

20   Q.      How did he describe the conditions in the Ad. Seg.

21   unit?

22   A.      Again, some of the things that I mentioned, the

23   freezing cold showers and so on.  Also he had no phone calls,

24   no personal packages.

25           He stated that he had yard once a week and sometimes

2464

1  if there had been an escape attempt, it would be even less.

2          He had a broken light in his cell, and that he had --

3          THE COURT:  A what, sir?

4          THE WITNESS:  A broken light in his cell.  And in

5  order to turn the light on, he had to call custody.  And

6  sometimes it was very hard to get them to come to turn his

7  light on or off.

8  BY MS. MENDELSON:

9  Q.      How was Prisoner N's mental condition?

10 A.      Well, he was quite disturbed.  He said that the

11 voices in his head had intensified since he had been in Ad.

12 Seg.

13         He was very troubled because he didn't know when he

14 would get out.  He said he had a lot of trouble tolerating

15 being in there.

16         He had gone to the MHCB on four different occasions,

17 and each time, of course, he was returned to the conditions

18 which drove him to the MHCB.

19         And this is an inmate who actually shared that he

20 would express suicidal ideation because going to the -- it

21 would get him to the MHCB, and there, in the MHCB, at least

22 he would have someone to talk to.

23 Q.      Based on your experience, are these symptoms typical

24 of a patient experiencing mental health decompensation?

25 A.      Well, I think certainly the hallucinations with

1   commanding whispers and with intensifying voices -- it is

2   interesting, as mentally ill people who have hallucinations

3   get worse, their hallucinations often transition from

4   whispers to louder voices.  So the voices were intensifying

5   in the Ad. Seg. unit.

6   Q.     You mentioned that Prisoner N went to the MHCB

7   because he wanted to talk to a doctor.

8          How would you evaluate the risk of suicide for

9   individuals who communicate thoughts of self-harm in order to

10  address other issues?

11  A.     I think it is a very important point because I think

12  too often inmates for whom there's almost a manipulative

13  aspect to their suicide, are the ones who are at greater risk

14  for suicide.

15         So, you know, there's a caveat that says that the

16  people who talk about suicide don't commit it.  That is not

17  true in my experience.

18         The incidence of actual successful suicide or death

19  from attempted suicide is actually much higher in individuals

20  who have talked about suicide and who have used suicide.

21         And I think it's just an indication of the

22  desperation that a mentally ill individual feels in this

23  setting that there is no one to talk to, he doesn't -- he has

24  inadequate therapeutic contact, and he's willing to go to the

25  MHCB.  And I believe it was this inmate who said that the

2466

1  conditions there really aren't much better, but at least he

2  gets to talk to a doctor every day.

3  Q.    Do you know why Prisoner N was in the Ad. Seg. unit?

4  A.    He was there for his own safety.  And also he had

5  been labeled as a snitch, and he was a target.  And so he was

6  designated as A SNY, somebody who needs -- he was a special

7  needs yard.  And he was placed in the Cypress Hall Ad. Seg.

8  unit.

9  Q.    You said mentally ill prisoners placed in the Ad.

10 Seg. unit for non-disciplinary reasons do not receive living,

11 breathing checks, known as welfare checks, or mental health

12 screening.

13       Did anyone explain why?

14       MR. MCKINNEY:  Objection.  There has been no such

15 testimony.  Also leading.

16       THE COURT:  Objection is overruled.

17       You may answer, Doctor.

18       THE WITNESS:  Simply they said LOBs don't get those

19 checks.

20       THE COURT:  Who told you that?

21       THE WITNESS:  One of the officers on the unit.

22 BY MS. MENDELSON:

23 Q.    What is your opinion about this policy?

24 A.    Well, I mean it is obvious he's a severely disturbed

25 individual.  It is absurd because he's called an LOB instead

2467

1    of an Ad. Seg. patient that he should be deprived of these

2    minimal things to check on his welfare.

3    Q.    Can you please turn to Exhibit 2205 in your binder.

4          Dr. Kaufman, are these medical records for Prisoner

5    N?

6    A.    Yes.

7          MS. MENDELSON:  Your Honor, plaintiffs move to admit

8    2205 into evidence.

9          THE COURT:  Received.

10             (Whereupon, Plaintiffs' Exhibit 2205 received

11              into evidence.)

12   BY MS. MENDELSON:

13   Q.    Dr. Kaufman, could you please direct your attention

14   to page 1, Section O.

15         What are the clinician's observations?

16   A.    The clinician, who in this case is a licensed

17   clinical social worker, was informed that the patient was

18   suicidal.  The patient-inmate was taken out of his cell,

19   handcuffed and placed in a treatment modular.

20         Patient was recently discharged from MHCB on 6-19-12

21   after being in the infirmary for four days.

22         Patient reports:

23         (Reading:)

24         I just can't take being in here, Ad. Seg.

25         Patient discussed suicidal ideation with a plan

2468

1          to beat himself against the head on the wall or hang

2          himself.

3          (Reading concluded.)

4    Q.        Dr. Kaufman, what is a "treatment modular"?

5    A.        That's that cage-like structure that we've seen

6    samples of earlier.

7    Q.        What is your opinion about the way this situation was

8    handled?

9          THE COURT:  What situation?

10   BY MS. MENDELSON:

11   Q.        What was your opinion about the custodial handling of

12   Prisoner N's crisis?

13          THE COURT:  Did you understand that Prisoner N's

14   situation was in crisis rather than a long-term, serious

15   mental illness?

16          THE WITNESS:  I do.  And, you know, the need is --

17   the immediate need is to have the inmate be safe.  And

18   that -- that's ostensibly the reason why the inmate is

19   handled in this way.

20          But many, if not most, if not all the inmates I

21   talked to, feel degraded when they're -- when they express

22   suicide ideation and the first thing that happens to them is

23   that they're bound, hand and foot, and put in a treatment

24   module.

25          You know, in the outside psychiatric world we don't

2469

1   treat human beings that way.  You know, if they're suicidal

2   like that, we place them in a situation where we have what we

3   call a one-on-one.  And someone is within arm's length of

4   them.  Or we put them in safety cells where they can't hurt

5   themselves.

6           But for the inmates I spoke to, and in my psychiatric

7   opinion, it is degrading, dehumanizing and many of them say

8   that it makes them feel more suicidal.

9   BY MS. MENDELSON:

10  Q.      Dr. Kaufman, when was this record generated?

11  A.      6-20-12.

12  Q.      Which unit was Prisoner N housed in at the time?

13  A.      He was in Cypress Hall Ad. Seg. unit.

14  Q.      When did you interview Prisoner N?

15  A.      It was in February of this year.

16  Q.      Which unit was he in at that point?

17  A.      He was in the CIM, SNY.  Or in the Cypress Hall unit,

18  yeah.

19  Q.      Have you had an opportunity to review the updated

20  medical records for Prisoner N?

21  A.      I did.

22  Q.      Can you please turn to page 7 of Exhibit 2205?

23          Do you remember -- or do your notes reflect where

24  Prisoner N was housed at this point?

25          THE COURT:  I take it you mean by "at this point," at

2470

1   the time of the interview?

2         MS. MENDELSON:  Of this record.  Excuse me.

3         THE WITNESS:  I know he was transferred out of

4   Ad. Seg. just --

5   BY MS. MENDELSON:

6   Q.      That's fine.

7         Can you interpret this record for us, please,

8   particularly the section starting with Section S.?

9   A.      Here he's talking about -- or they're quoting him and

10  he says that he had difficulty tolerating being locked up in

11  Ad. Seg., that he had multiple crisis bed placements in May

12  June and July, and the last placement was in September.

13        He stated now that he has been transferred out:

14        (Reading:)

15        I feel good.  I have my good days and bad days.  I'm

16        not as depressed as I used to be.

17        (Reading concluded.)

18        He also reported:

19        (Reading:)

20        I'm not hearing voices as much as I used to.

21        (Reading concluded.)

22        And he's more aware that they are not real.

23        And his voices had increased in the past after his

24  brother's death.

25  Q.      What is your opinion about this record?

2471

1    A.      What it demonstrates is that when he is out of the

2    Ad. Seg. unit and in a different facility that is not so

3    restrictive and anti-therapeutic, that his hallucinations

4    improve.

5    Q.      What's the date of this record?

6    A.      4-22-13.

7    Q.      Dr. Kaufman, can you describe the psychiatric effects

8    of psychiatric decompensation?

9    A.      That, in general, each episode of decompensation

10   sensitizes the individual psychologically and neurologically

11   to having more episodes and more severe episodes.

12          It's been proven that each succeeding psychotic

13   episode does some measurable damage to the brain, and, as I

14   said also, predisposes them not only to more severe and

15   more -- not only to more severe episodes in the future, but

16   also to more frequent episodes in the future.

17   Q.      Did Prisoner N's circumstances inform your overall

18   opinion about segregation in CDCR's segregation units for the

19   mentally ill?

20   A.      Well, it confirms, at least in this slice of the

21   individual's life, that he goes from an environment which he

22   finds very painful, very distressing, in which his psychosis

23   increases, and when he goes to a less restrictive, more

24   therapeutic environment, that his psychosis gets better.

25   Q.      Dr. Kaufman, in your termination declaration you

2472

1    opined about mental health treatment spaces in segregation

2    units.

3            Can you please turn to Exhibit 2011.

4            (Exhibit published.)

5            Dr. Kaufman, what are we seeing in this photo?

6    A.      Well, this is a part of the Cypress Hall Ad. Seg.

7    unit again.  And that table is the table where the treatment

8    team meets.  And in the back are treatment cages where

9    inmates are placed for perhaps group therapy or perhaps

10   individual therapy.

11           And then on either side of the table are offices.

12   I'm not sure what those offices would be used for.  If they

13   have treatment cages inside of them, then they might be used

14   for individual therapy.

15           It doesn't look like there are ceilings over those so

16   it is possible that a session with an inmate might be

17   overheard if it was in there.

18   Q.      What is the purpose of IDTT meetings?

19   A.      Well, that's the Interdisciplinary Treatment Team,

20   and the purpose is to discuss the inmate's psychological

21   state.  And that is for various members of the treatment team

22   who represent various disciplines, like psychiatrist,

23   psychology, social work, recreational therapists, psychiatric

24   technicians, to get together to plan for the inmate.

25           And then the purpose is for the inmate to come into

2473

1    the meeting and participate in the meeting and to sign off on

2    the treatment plan.

3    Q.      Did you see this room in use?

4    A.      Yes, I did.

5    Q.      What did you observe?

6    A.      Well, I observed many clinical staff at the meeting,

7    I believe approximately six to eight clinical staff.  I think

8    there was one corrections person in authority who was at the

9    meeting.

10           And then kind of at the -- as we're facing this unit,

11   at the back of the unit, there were a few correctional

12   officers, I believe they were female, sitting in the back.

13           There were nine inmates that day who were discussed

14   and who were invited to the treatment team meeting, and not a

15   single one came.

16   Q.      Did you talk to the prison staff about those

17   treatment refusals?

18   A.      I did.

19   Q.      What did you learn?

20   A.      They said that it was the inmate culture.  They told

21   me that -- I think the plaintiffs' experts have commented on

22   the fact as well, I think even the Special Master, that

23   inmates don't attend.  And with a shrug of their shoulders

24   they said that it's the inmate culture that they don't come.

25   Q.      Do you have an opinion about the cause of these

2474

1    treatment refusals?

2    A.      Well, I think it's unfortunate.  It seems to reflect

3    a negative attitude on the part of the inmates about this

4    process.  Perhaps that they feel that if they were to go

5    there and participate that it wouldn't affect the outcome at

6    all, or maybe they're just generally feeling hopeless that

7    they can change the situation.

8           But it's -- I think it's an unfortunate outcome

9    because I think this is theoretically very valuable.  And it

10   is, in some ways, an enormous waste of staff time to have

11   eight staff members sitting around a table to meet with an

12   inmate who never comes.

13   Q.      In your opinion what should a mental health clinician

14   do if a patient refuses treatment?

15   A.      Well, I think it goes back to something that I said

16   in this courtroom before.  It really begins with developing a

17   therapeutic relationship and a therapeutic alliance.  If you

18   have a trusting, therapeutic alliance, the patient is not

19   going to refuse to come.

20          You know, my thought about it would be it's so

21   important that you could have the team come to the inmate,

22   but then there wouldn't be a confidential space to have the

23   discussion if you took it to a cell block.

24   Q.      In your opinion are patient refusals relevant to

25   their mental health condition?

2475

1    A.       Well, it's indicative of their pessimism about the

2    therapeutic process, and that they're also not participating

3    in a treatment plan that has the potential to enhance their

4    treatment.

5    Q.       Can you please turn to Exhibit 2211?

6             (Exhibit published.)

7             What are we seeing in this photo?

8    A.       Well, it says "Property/Supply Storage."  And what it

9    actually is, it is the door to the group treatment room in

10   the SHU at Corcoran.

11            It isn't very inviting to therapy.  The implication

12   there is, you know, that there's going to be property there,

13   not people.

14   Q.       Can you please turn to Exhibit 2212.

15            (Exhibit published.)

16            Can you please describe this photo?

17   A.       Well, you open that door, and this is what you see.

18   And this is a group treatment room for the prisoners in

19   segregation.  And it consists of maybe a module or two beyond

20   the seven modules that you can see.

21            The room is harshly lit with a large pipe at the top.

22   But more striking to me is this row of cages.

23            I was really struck the first time I saw this as a

24   group treatment room.  I could hardly believe it, frankly,

25   that this was group treatment.

2476

1          Some of the later rooms I saw I thought were even

2     worse, but the whole idea of trying to do group therapy in

3     this kind of setting is anathema.  I just don't see how there

4     can be meaningful therapeutic interaction.  I don't see how

5     it facilitates interaction with the therapist or therapeutic

6     interaction with each other.

7          The groups that I saw that took place in these kinds

8     of settings, there might be a television set in front of

9     them, and they would watch a movie that didn't seem to have

10    any innate therapeutic value.

11         I saw one -- one of the moves was a Bob Marley movie,

12    which I think the inmates enjoyed, and I thought it was a bit

13    of humanity, but it's not group therapy.

14    Q.     Dr. Kaufman, have you facilitated group therapy

15    sessions for mentally ill patients before?

16    A.     Yes.  In many settings.

17    Q.     What are the goals of group therapy?

18    A.     Well, for each individual at various stages of mental

19    illness you are looking at a different goal.  So the first

20    goal is that you're looking at individual treatment needs,

21    and you're trying to put people into a group that are at

22    similar levels of needs.

23         And then one common type of group with the level of

24    mental illness I saw would be one that teaches basic coping

25    skills; how to deal with anxiety, how to deal with stress,

2477

1    how to deal with hallucinations, and, in some cases, even how

2    to perform basic activities of daily living.

3         When you get inmates at a somewhat higher level or

4    get a basic concept of trust in the group, you're going to

5    deal with expressions of feelings, how to express positive

6    feelings to each other, how to express angry feelings to each

7    other without going out of control.

8         So you try to have people at similar levels of

9    dysfunction and similar needs in a group.  And then you try

10   to have them progress into levels of function.  So you might

11   start off with how do you deal with the hallucinations, how

12   do you deal with suicidal feelings, what are other options.

13        Then you might progress to how to deal with feelings

14   of anger or even caring and support for each other.

15   Q.    Did you form an opinion about the use of cages for

16   group therapy?

17   A.    The use of what?

18   Q.    Cages.

19   A.    Like I said, I was astonished in the beginning.  I

20   think that the only thing cages accomplish is it makes it

21   very difficult for people to hurt each other or the

22   therapist.

23        Now, every time I begin group therapy with a new

24   group, I say that there are two basic guidelines in this

25   group:  No one is supposed to hit each other or in any way to

2478

1    hurt each other physically, and whatever we say in this group

2    is totally confidential and it doesn't leave this room.

3         And I've never been in a group where there was

4    physical violence.  And just this simple admonition, that it

5    is not permitted, has always been enough.

6    Q.    Have participants in your group been high-custody

7    inmates or individuals leaving high-custody settings?

8    A.    Well, when I did group therapy at Lewisburg Federal

9    Penitentiary that was a maximum facility.

10        In my clinic now where I work, which as I said before

11   is an alternative to incarceration, many of the patients have

12   been in state prisons.  And one of them recently was a CCC in

13   a SHU at Corcoran.

14   Q.    Can you turn briefly to Exhibit 2213.

15             (Exhibit published.)

16        What are we seeing in this photo?

17   A.    These are treatment cages or modules for group

18   therapy in the segregation unit, Building 504, of the Central

19   California Women's Facility that we saw in February of 2013.

20        And once again, there are the same cages.  You can

21   see that there is a seat there that's small, but it does

22   provide a sitting space, that there are actually some direct

23   openings.

24        But the cages are -- they're not in a semicircle.

25   And in fact, we were told by correctional staff there that

2479

1    they hadn't been used yet.

2    Q.      Do you know why?

3    A.      I believe that they just hadn't been approved.  I

4    think it was to set up an EOP hub there, but they hadn't been

5    approved for the EOP hub yet so there was no use of the cages

6    to attend therapy.

7    Q.      Can you describe the rest of the unit that these

8    cages were in, what kinds of prisoners were in that unit?

9    A.      Well, this is a unit that was a real multi-purpose

10   unit.  There were death row inmates on one side.  There

11   was -- the bottom tier was all death row, and it was set

12   apart from the rest of the unit by a screen.

13          And then the second floor of that unit had some death

14   row inmates as well, but with less socialization than the

15   bottom floor.

16          There were also CCCs there in Ad. Seg. and EOPs in

17   Ad. Seg.  So there were -- there was quite a wide variety of

18   inmates in this one segregation unit.

19   Q.      What is your opinion about having such a wide variety

20   of inmates in a segregation unit?

21   A.      I think that any time you have a variety of inmates,

22   the privileges for the inmates get very confusing and so they

23   end up being limited, that the most restricted inmates end up

24   dominating the level of freedom and flexibility for the

25   entire unit.

2480

1   Q.      To your knowledge did the caging practices for women

2   in segregation differ from the caging practices for men in

3   segregation?

4   A.      The actual caging practices, not to my knowledge.

5   Q.      What is your understanding of CDCR's policy regarding

6   the use of cages for group therapy in segregated housing

7   units?

8   A.      That all group therapy has to either be -- in

9   segregated housing units has to be in cages or in the ATOM

10  chairs.

11  Q.      What is your opinion about this policy?

12  A.      My basic opinion about this policy is that it's a

13  potentially destructive one, that it greatly interferes with

14  therapy.

15          I think that the burden of proof should be that an

16  inmate requires an ATOM chair or an inmate requires a

17  therapeutic modular cage in order to have therapy.

18          When you put everybody in these cages, it is very

19  destructive to therapy.  Sure there might be an inmate or two

20  that can't be trusted, that could be dangerous.  Fine.  You

21  do that therapy, you know, in some kind of safe setting.

22          But I've treated these people with equal levels of

23  care in all kinds of settings, and I can't ever recall

24  needing to put somebody in a module, and, in some cases, to

25  shackle his or her hands and feet while I do the therapy

2481

1   while -- even though they're in a cage.

2           It is just -- it is just totally unnecessary as a

3   general practice.  Sure, maybe occasionally you have to do

4   it, but prove that you need to do it, don't do it for

5   everybody.

6   Q.      You mentioned ATOM chairs, Alternative Treatment

7   Option Module chairs.  Can you turn to Exhibit 2214, please.

8               (Exhibit published.)

9           Is this what you were referring to?

10  A.      Yes.

11  Q.      What did you observe about the ATOM chair?

12  A.      Well, it is interesting in this picture that the two

13  inmates on either end have their hands underneath that very,

14  very heavy metal plate, and the inmate in the middle has his

15  hands on top.

16          I think apparently he's not secured by the metal

17  plate.  But they're all -- they all have their hands and feet

18  shackled.

19          And maybe it is for the purposes of the photograph,

20  but they're all looking straight ahead.  But the way these

21  chairs are arranged, it is hard for them to look at each

22  other.  I mean, there is just such a level of distrust so

23  that -- there is this pane of glass that you'll see to the

24  right of each inmate, which is presumably to keep the inmates

25  from spitting at each other.

2482

1          Again, I've done group therapy for 50 years.  I've

2    never had anybody, regardless of the setting or their level

3    of dysfunction, spit at each other.

4          So sure, if you have somebody who has a potential to

5    spit on another inmate, you have to prevent that from

6    happening.  Again, everybody has it.  And again, everybody is

7    shackled and secured.

8          THE COURT:  Doctor, you mentioned several times the

9    security provisions employed.  I don't really understand what

10   you are saying when you say "I've done this for 50 years, I

11   have never had it before."

12         Have you treated patients in security housing units

13   before or administrative segregation units?

14         THE WITNESS:  I set up programs in the New York City

15   prison system for inmates that were in those levels of

16   housing.  When I was in the Lewisburg Federal Penitentiary as

17   their chief of psychiatric services, I performed group

18   therapy.  Inmates were brought to my office.

19         I don't really recall if there were inmates from Ad.

20   Seg. that were brought to my office.  I don't really

21   remember.  I've certainly done it with inmates who have been

22   in that setting.

23         THE COURT:  Can I -- I'm sorry.  I'm going to

24   interrupt, Ms. Mendelson.

25         Can I ask you, you've been around a lot of prisons

2483

1    apparently, and you've apparently never seen these cages used

2    in California; is that correct?

3            THE WITNESS:  That's correct.

4            THE COURT:  And these ATOM chairs are equally rare in

5    other prisons?

6            THE WITNESS:  In my experience.  We'll have other

7    correctional experts who have more contemporary opinions

8    about that than I do.

9            THE COURT:  Have you indicated that in your opinion,

10   as I understand it, these devices actually interfere with

11   meaningful treatment.

12           Is that correct?

13           THE WITNESS:  Yes.

14           THE COURT:  I want to go back to something I've

15   inquired about from one of your other experts.

16           I mean, we begin with these are prisons.  These are

17   people who have disobeyed society's standards.  That's why

18   they are there.

19           Well, of course, I was about to say that now there

20   are additional problems because they're people who have

21   broken prison regulations, but, of course, these are people,

22   many of whom are there, because there is no bed.

23           What I hear you saying, and what I heard Dr. Haney

24   say yesterday, seems to suggest that there should be, at

25   least at minimum, a more refined examination of the prisoner

2484

1    to determine what level of security is necessary.

2          Is that your view?

3          THE WITNESS:  That's exactly right.

4          THE COURT:  In a prison system as huge as

5    California's, is that a practical reality?

6          I mean, can it be done efficiently and sensibly?

7          THE WITNESS:  Well, you know, like some of the

8    prisons that I went into in this case, there was one where

9    over half of the psychologists were all on prolonged sick

10   leave.  Or there was another with an enormous shortage of

11   psychiatrists.  And if you don't have all the people that you

12   need, you can't do it.

13         And part of the reason that people go out on

14   prolonged sick leave, part of the reason it is so hard to get

15   psychiatrists, is because of the conditions.

16         I don't think you could pay me enough money for me to

17   ever try to do group therapy in that kind of setting.  If I

18   walked into that setting and said that I would like to do a

19   group here, you know, I'll evaluate everyone and I'll see

20   whether they need to be in an ATOM chair or not, I don't

21   think anybody would let me right now.

22         And I also think, you know, you need different

23   physical facilities.  You need to renovate the plants.  You

24   need to take that storage room and, you know, put some chairs

25   in it.

2485

1          THE COURT:  Different problem.  I know we're going to

2     get to that because I've seen the pictures already and

3     Dr. Haney also mentioned it.  But your view, as I hear what

4     you have just said, which is new, is that, look, part of the

5     reality of the difficulty recruiting adequate mental health

6     providers is nobody wants to work in -- not nobody -- very

7     few people are going to want to work in conditions as severe

8     as this.

9          Is that your view, sir?

10         THE WITNESS:  Yes, it is.

11         THE COURT:  So that the conditions themselves in your

12    view are significant limitations in the ability to make

13    discrete judgments about inmates because you don't have

14    people because the conditions are so severe?

15         THE WITNESS:  That's part of it.  And if I can take

16    this a little bit further too, I think that the mental health

17    staff in these situations sometimes get co-opted by custody,

18    or they get frustrated maybe arguing with custody about more

19    freedom for inmates, and they kind of give up.  And then

20    their attitudes, as I've seen in some of the medical records

21    that I reviewed, they become more custodian in their

22    approach.

23         And if I go back to some of the RVRs in the

24    use-of-force case, how many times can you make a

25    recommendation that an inmate's mental illness contributed to

2486

1    his crime and see -- his crime within the prison -- and see

2    that the individual loses 30, 60 days, 365 days of good time,

3    and feel like your contributions make a difference to the

4    care of the inmates.

5            So I think the staff sometimes burn out and give up.

6            THE COURT:  I want to go back to my initial question

7    and your response to it.  I think it is not unimportant.

8            Setting aside those folks who just give up and burn

9    out and so forth, I have always been puzzled about who would

10   be willing to be a psychologist or psychiatrist in a prison.

11           The lawyers have heard me say that you've got to be

12   crazy to want to work in one of those places, but as a

13   serious matter, even people who would be willing to do so,

14   for a variety of reasons that human beings are willing to do

15   difficult work, your view, I take it, is matters such as

16   individualized assessments of prisoners to determine what

17   level of security is necessitated is simply defeated by the

18   very nature of the conditions in which the prisoners are

19   being treated?

20           Is that fair?

21           THE WITNESS:  It is.  But it still could be done.  I

22   mean, some of the clinicians that I talked to were excellent.

23   They were well trained.

24           One of my best friends, who I trained when I was a

25   director of training at UCI, has worked in one recently.  And

2487

1    some of these people are very capable of making this kind of

2    assessment.

3          THE COURT:  I just want to understand what your view

4    is because it's important for me to try to understand if I

5    ever get to writing about this thing, where we are.

6          I thought I heard you say, just a little while back,

7    that the conditions of security themselves result in

8    people -- many people not wanting to work in them, even if

9    they're willing to work in prisons.  So these are just too

10   extreme, and thus limiting the real world ability to have

11   assessments.

12         That's not to say there aren't individual physicians

13   or psychologists who would be willing and able.  The question

14   is whether or not -- no -- I mean, there are many questions.

15   A question is the difficulty recruiting -- in your view is

16   the difficulty recruiting and retaining professionals

17   affected by the severity of the conditions as you see them?

18         THE WITNESS:  Absolutely.

19         THE COURT:  Thank you.

20         You may proceed, ma'am.

21   BY MS. MENDELSON:

22   Q.    Dr. Kaufman, you also opined about confidential

23   treatment in treatment spaces.

24         Can you please turn to Exhibit 2216?

25             (Exhibit published.)

2488

1          THE COURT:  I'm sorry.  I'm about to get scolded by

2     my courtroom reporter.  I should have taken my morning

3     recess.  We'll take it now please.

4          Fifteen minutes.

5          (Off the record at 10:55 a.m.)

6                        ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                THE COURT:  Ms. Mendelson.

 2     BY MS. MENDELSON:

 3     Q.     Dr. Kaufman, you spoke earlier about IDTT meetings.

 4            What is your opinion about the roles of those meetings

 5     in treatment planning?

 6                MR. MCKINNEY:  Objection and answered.

 7                THE COURT:  Overruled.  If it's been asked and

 8     answered.  I don't remember.

 9            You may proceed to answer, Doctor.

10                THE WITNESS:  Well, that meeting is just what it says.

11     It's a treatment plan meeting, and what they decide is what's

12     the proper level of treatment for this individual.  They

13     could be granted the authority to assess what level of

14     restraint or protection an individual needed when they were

15     having group therapy.

16            These are trained mental health clinicians.  The room

17     where it was taking place where I say, there were six or

18     eight people, some of them knew the inmates reasonably well

19     and they could be utilized to come to a decision as to

20     whether an inmate needed to be in a therapeutic module or an

21     ATOM chair or whether the individual could have group therapy

22     with less physical constraints on him.

23     BY MS. MENDELSON:

24     Q.     What factors would you recommend they consider?

25     A.     They would have to look at an individual status.  They
```

 1    could look at what the individual was in ad seg for, if it

 2    was for his own protection or for some minor kind of drug

 3    charge or a telephone possession or something like that and

 4    review the history of violence, review the potential for

 5    violence.

 6         There's a lot of mental health assessments on

 7    violence, but, particularly, you look at why they're put in

 8    ad seg, and you look at their institutional history, the type

 9    of crime that got them in there, so you can make a pretty

10    good assessment as to whether somebody needs to be in a

11    constrained physical setting to have their group therapy.

12         Once again, it should be the burden of proof to say

13    that the individual needs it, not that everybody that is put

14    in there and as long as their in ad seg, the only therapy

15    they get is in a cage or an ATOM chair.

16    Q.    If the team were to determine that a restraint device

17    were necessary, what would you recommend?

18    A.    Well, you could start off with a less intensive kind

19    of approach.  I've heard that some other prison systems have

20    used these tether chairs, which are the traditional kind of

21    chair that you often see in correctional settings with a

22    round table in the middle and a series of attached chairs,

23    and the inmate could just have their feet tethered and their

24    arms free to express their feelings.

25         There is enough staff around that if somebody goes out

1    of control, it could be prevented immediately.  But, again,

2    you start a group like this with the expectation that there

3    isn't going to be any violence.  You get an agreement there

4    isn't going to be any violence and a trained clinician can

5    see if violence is brewing and cut it off before it happens.

6         So there are ways to have a group therapy in less

7    restrictive settings which do not result in harm to people.

8    Q.    On the subject of treatment, you also opined about

9    cell-front clinical contacts.

10        How did you learn about the occurrence of cell-front

11   clinical contacts?

12   A.    Well everybody admits that there's a lot of cell-front

13   contact that goes on for therapy.  The inmates admit it.  The

14   mental health staff.  You see it consistently in their

15   records.  Correctional staff admits it.  It's a very frequent

16   occurrence for a therapeutic contact to be cell front only.

17   Q.    Were you able to determine why?

18   A.    There are many reasons why given in the records I

19   reviewed and inmates I talked to that these are cell front.

20   One is that there aren't transport officers available.

21   Another is that there is an influx of inmates and not enough

22   mental health staff to go around.

23        Along those same lines, there's a shortage of staff

24   and/or excessive inmates and there isn't time to take the

25   inmate out and see them.  Then also I've also read that

1    sometimes there aren't confidential spaces that are

2    available.  So there are all kinds of administrative and

3    custodial reasons that result in cell-front therapy, which

4    is, I think, very important if -- I think it is very, very

5    difficult to do meaningful therapy at a cell front.

6          The walls are thick.  There is a little food port.

7    Very little opportunity for eye contact except through fuzzy

8    glass.  You have to shout through the food port often or it

9    just doesn't make for any kind of meaningful interaction,

10   and, you know, the poor therapist usually is standing outside

11   the cell, and after 10 or 15 minutes of shouting and

12   standing, they're going to move on.

13         So I think cell-front contacts are inherently briefer

14   than when you see somebody in a confidential space.

15   Q.    In your termination declaration you discuss Prisoner B

16   in CCWS ad seg unite?

17         THE COURT:  What?  V.

18         MS. MENDELSON:  B, like boy.

19   Q.    What level of care was Prisoner B?

20   A.    She was a CCCMS ad seg.

21   Q.    How long had she been in ad seg when you met her?

22   A.    She had been in ad seg for 19 to 20 months.

23   Q.    What was her diagnosis?

24   A.    Her diagnosis in the file is major depressive

25   disorder, Post Traumatic Stress Disorder and personality

 1    disorder.  She did have a lot of paranoia and visual

 2    hallucinations suggestive of a more severe diagnosis.  You

 3    can have hallucinations and paranoia with major depression,

 4    but then the diagnosis would then have to be called major

 5    depression with psychotic features.  Either that diagnosis or

 6    perhaps schizoaffective or schizophrenic.

 7    Q.     How would you assess her need for mental health

 8    treatment?

 9    A.     People with this diagnosis need a very high level of

10    mental health treatment.

11    Q.     Why?

12    A.     Well, because, as I've said --

13           THE COURT:  They're sick.

14    BY MS. MENDELSON:

15    Q.     Can you please turn to Exhibit 2201 in your binder.

16           THE COURT:  Doctor, before we go to that, I have a

17    sort of impression from all these hearings that I'm having

18    that the various classifications of inmates is very porous

19    and they're not fixed.  It's not clear that -- also I am

20    told, and you do you agree, that a mental illness tends to be

21    cyclical?

22           You start at one level of impairment and wind up

23    somewhere else, and with medication, you may come down again,

24    but that in general, people with severe mental illnesses are

25    in a cyclical posture?

1          THE WITNESS:  I would say that's essentially true,

2    that they will often cycle.  If they're not treated, the

3    spiral is more on a downward level, but that's correct to say

4    that somebody might vacillate between what would be

5    considered CCC and EOP.

6          So that the same individual might be seen in one

7    classification at one time and then go back and forth

8    between.

9          THE COURT:  People who are CCCMS, they're ill

10   obviously, otherwise, they wouldn't be classified at all, but

11   they're not so sick as EOPs, as a general standard, although

12   they may cycle into them?

13         THE WITNESS:  As a general standard, I think EOPs in

14   general are quite mentally ill.  I think the CCCs there's a

15   variation.  I think there are some CCCs, who at various

16   stages of their illness, are not severely mentally ill, and

17   there are many CCCs are who sicker than many EOPs.

18         But in general, EOPs are sicker than CCCs.

19         THE COURT:  Thank you, sir.

20   BY MS. MENDELSON:

21   Q.    Are the records in Exhibit 2201 the medical records

22   you reviewed for Prisoner B?

23   A.    Yes.

24         MS. MENDELSON:  Your Honor, plaintiffs move to admit

25   2201 into evidence.

1            MR. MCKINNEY:  No objection.

2            THE COURT:  Received.  But she's named, so it's under

3    seal?

4            MS. MENDELSON:  They're redacted.

5            THE COURT:  Fine.  You may proceed.

6                            (Whereupon, Plaintiff's Exhibit 2201

7                             was received into evidence.)

8    BY MS. MENDELSON:

9    Q.    Directing your attention to page 1, a progress note

10   dated July 26, 2013, completed at CCWF.

11           The section starting with patient contact under S, can

12   you please summarize it for us.

13   A.    (Reading:)

14                    The patient contact occurred at cell front

15                    because of the lack of escorting officers due to

16                    ICC.

17           I don't know what "ICC" is, but "lack of escorting

18   officers."

19   Q.    Turn to page 2, please, stated December 3, 2012,

20   interdisciplinary progress note at CCWS.

21           How would you characterize the section under S?

22   A.    (Reading:)

23                    Mental health contact occurred at cell front to

24                    manage the large influx of mental health

25                    patients in at ad seg while understaffed and to

```
 1                   meet the requirement of weekly case management
 2                   for all ASU MH patients.
 3     Q.     And on page 3 of the record dated January 28, 2013,
 4     there is also an interdisciplinary progress note.
 5     A.     (Reading:)
 6                   Mental health contact occurred at cell front
 7                   because of the lack of available confidential
 8                   space.  Patient reported her mood is despairing.
 9     Q.     Finally, on page 4, this is a mental health treatment
10     plan dated February 5, 2013.
11            Can you please give us a sense of the clinical
12     summary, Section 3.
13     A.     (Reading:)
14                   The patient's treatment process was also
15                   impacted by patient refusals, holidays, and
16                   modified programing due to a significant
17                   increase in mental health inmates in the ASU.
18                   The increased number of mental health patients
19                   occurred because of the closure of VSPW.
20                   Although there was a high number of cell-front
21                   contacts over the last quarter, the patient
22                   participated in the basic functional
23                   assessment.
24            So we see here all of the many reasons why the context
25     of cell front and brief and less frequent.
```

1    Q.        What is your opinion on the effect of Prisoner B?

2    A.        That she's just not getting enough therapy and that

3    her despair is related to that, and also she's somebody

4    that's been diagnosed with depression, and now she's

5    hallucinating, so she's getting worse.

6    Q.        These records are from CCWF.

7              Are they consistent with what you learned in the

8    segregation units you toured in the other facilities?

9    A.        Yes, there's absolutely consistent.

10   Q.        You started your testimony today by describing the

11   conditions in the Corcoran SHU.

12             Your termination declaration discusses Prisoner F,

13   like Frank, who you interviewed in one of the two Corcoran

14   SHU units you visited.

15             Is that correct?

16   A.        Yes.

17   Q.        What was Prisoner's F level of care?

18   A.        He was CCCMS at the time of the interview.

19   Q.        How long had he been in the SHU when you met him?

20   A.        13 years.

21   Q.        How did you know that?

22   A.        He told me, and it was also corroborated by review of

23   the records.

24   Q.        Do you know why he was in the SHU?

25   A.        He had an indeterminate sentence there for gang

1   association.

2   Q.      What was his diagnosis?

3   A.      Paranoid schizophrenia and also its notable that he

4   was on involuntary medication or Keyhea for an extensive

5   period of time.

6   Q.      What does this indicate?

7   A.      It indicates that an individual is at a high level of

8   psychosis and that his psychosis is such that he's not

9   capable of deciding whether he needs medication or not, so he

10  is given medication even though he doesn't want it, and in

11  most cases, that medication is long-acting intermuscular

12  medication, which lasts 30 days and provides antipsychotic

13  medication for a one month period at a time.

14  Q.      How did Prisoner F describe his mental condition to

15  you?

16  A.      He stated that he started hearing voices in 2004,

17  which was four years after he had entered the SHU, and the

18  voices are typical paranoid voices saying they're going to

19  get you over and over.  And also he had planned to kill

20  himself the month before I interviewed him, and when I asked

21  him why, he said because he saw no way out of the SHU.

22  Q.      Had Prisoner F been consistent at the CCCMS level of

23  care when you met him?

24  A.      No.  He alternated between EOP and CCC, and he also

25  went to the MHCB for about two weeks shortly before I saw him

1    too.

2    Q.    Could you please turn to Exhibit 2203 in your binder.

3          Are these the mental health records you reviewed for

4    Prisoner F?

5    A.    Yes.

6          MS. MENDELSON:  Your Honor, plaintiffs move to admit

7    2203 into evidence.  It's also redacted.

8          THE COURT:  Received.

9                        (Whereupon, Plaintiff's Exhibit 2203

10                        were received into evidence.)

11   BY MS. MENDELSON:

12   Q.    Could you turn to page 4 and summarize the document.

13   This a mental health crisis bed discharge summary dated

14   February 13, 2013.

15   A.    Yes, I have it.

16         MR. MCKINNEY:  Objection.  The document speaks for

17   itself.  This also is not related to segregation placement as

18   counsel has just stated.

19         THE COURT:  Objection is overruled.

20         You may proceed, counsel.

21   BY MS. MENDELSON:

22   Q.    How did Prisoner F characterize his mental state in

23   this document?

24   A.    He said that he was feeling suicidal and hopeless,

25   that he had been taking his Invega injection.  That's a

1    long-acting form of antipsychotic Risperdal, but he started

2    to hear voices again and that he had a plan for suicide to

3    wet his clothes and make a noose.

4    Q.    What was his date of admission to the MHCB?

5    A.    January 28, 2013.

6    Q.    His date of discharge?

7    A.    February 13, 2013.

8    Q.    It states his global assessment of functioning when

9    admitted was 29.

10        Can you assess that?  What does that mean?

11   A.    That's a very, very low assessment of functioning.

12   That's somebody who basically is incapable of caring for

13   himself or providing for any kind of basic needs.

14   Q.    And this document says that the discharge GAF was 0.

15   How would you assess that?

16   A.    I believe that's the basic GAF that he needed to

17   discharge from the MHCB.  It's the barest minimum of ability

18   to function.

19        THE COURT:  Doctor, I've heard evidence in the course

20   of these hearings that this functional letter system is very

21   imprecise, very -- not very valuable.

22        Would you agree with that?

23        THE WITNESS:  I would.

24        THE COURT:  All right.

25        THE WITNESS:  But in a general framework, it's useful,

1    but the difference between 49 and 51 is extremely arbitrary.

2    BY MS. MENDELSON:

3    Q.    How did Prisoner F describe the MHCB in talking to

4    you?

5          MR. MCKINNEY:  Objection.  Relevance.

6          THE COURT:  Overruled.  You may answer.

7          THE WITNESS:  He said it was very difficult to be in a

8    cage there, but the good part for him was, and I mentioned

9    this before, that he got to see a doctor every day.  He got

10   to talk to someone and engage in a meaningful therapeutic

11   contact or maybe it was just being able to talk to someone.

12   BY MS. MENDELSON:

13   Q.    Turning briefly to Exhibit 2217, a photo exhibit, this

14   photo says it's the MHCB treatment space at Corcoran.

15         How would you evaluate this photo?

16   A.    Well, it seems to be quite a multipurpose room.  There

17   are two desks there.  If it's a space for two clinicians,

18   obviously, one has to leave if there's a session, and there's

19   a cage, therapeutic module where an interview takes place.

20         It's a small room, so at least unless the therapist

21   moves him or herself to the extreme end of the room, they're

22   at least going to be close enough to the inmate patient so

23   there's some feeling of contact.

24   Q.    Can you tell me where Prisoner F was placed after

25   leaving the Corcoran MHCB?

1    A.    He was returned to the SHU where I interviewed him.

2    Q.    Did you formulate an opinion about prisoners'

3    placement after leaving the MHCB?

4    A.    This is the real problem with the system and it

5    happens a lot, and that's -- here's an inmate, because of

6    psychosis, suicidal intent, goes to a mental health unit.  At

7    least theoretically, his GAF goes from 29 to 50, so he's

8    functioning at a healthier level, so he leaves the mental

9    health crisis bed and he goes back to the same conditions,

10   which caused him to be in the SHU.

11         So this, I guess it's been called second return, this

12   is a very frequent problem where an inmate leaves MHCB and

13   goes back to the toxic psychotogenic or suicodogenic

14   environment that drove him them.

15         MR. MCKINNEY:  Objection.  Move to strike.  The doctor

16   is speculating about the reasons why the inmate may or may

17   not have gone to a crisis bed unit, which is, in fact

18   contradicted by the exhibit.

19         THE COURT:  I have no idea what you're talking about.

20   The objection that he's returning to the precise place that

21   contributed to his being moved to MHCB, if that's wrong, I

22   bet you'll cross-examine him about it.

23         The objection is overruled.

24         You may proceed.

25   /////

1    BY MS. MENDELSON:

2    Q.    Dr. Kaufman, on page 4 of the medical record, this is

3    the mental health crisis bed discharge summary, can you read

4    the first section after "response to treatment and

5    rationale" --

6    A.    What section are we in now?

7    Q.    2203, page 4, and we're looking at the section,

8    (Reading:)

9            Response to treatment and rationale for any

10           change in diagnosis.

11    If you can read that first sentence and explain it to

12    us.

13    A.    (Reading:)

14           Upon admission, the patient denied any custody

15           issue that could have made him depressed.

16    Q.    How would you evaluate that statement?

17    A.    I think he was attempting to deny that he was

18    manipulating to get into MHCB.

19    Q.    Can you explain that?

20    A.    I think that it's a frequent occurrence that

21    individuals -- we've talked about this before.  They will try

22    to manipulate their environment to get out of the MHCB, and

23    sometimes they'll threaten suicide because that's --

24           THE COURT:  Out of the MHCB or get in?

25           THE WITNESS:  To get into the MHCB, out of ad seg.

1    Sometimes they'll threaten suicide or sometimes it will be

2    maybe to avoid some consequence from custody.  So he's trying

3    to convince them that it's because he has genuine mental

4    problems.

5    BY MS. MENDELSON:

6    Q.     Did Prisoner F's medical records reflect whether he

7    received higher level of care at other time during issue

8    term?

9    A.     Yes, they do.

10   Q.     Can you explain this, please?

11   A.     Pardon?

12   Q.     Levels of care.

13   A.     That he's alternated between CCC and EOP.

14   Q.     And to your knowledge, was Prisoner F placed back into

15   the SHU after these placements?

16   A.     Yes.  He's been in the SHU 13 years except when goes

17   to the MHCB.

18   Q.     What is your opinion about placement of mentally ill

19   individuals in the SHU?

20   A.     I think that they should basically never been in the

21   SHU; that it's not -- for one thing, it's absolutely not a

22   therapeutic environment, and I just can't conceive of why a

23   severely mentally ill inmate whose either hallucinating and

24   in a decompensated state of schizophrenia or severely

25   depressed or suicidal should ever been in the SHU.

1          Now, we look at maybe some of the CCCs that are at a

2     lower level of mental illness and say:  Well, why shouldn't

3     they be in the SHU?

4          Because as we've seen, they cycle between lower and

5     more severe levels of mental illness.  If you put somebody

6     CCC into the SHU and they decompensate further.  So it's just

7     a totally inhumane environment and it's dangerous for them to

8     be there, and their chances of suicide there are greater

9     there than being anywhere else.

10    Q.    Was prisoners F's experience consistent with other

11    prisoners you met or read about?

12    A.    Yes.

13          THE COURT:  Doctor, what are you going to do?  These

14    folks may be mentally ill, but they're in a prison, and

15    prison requires relatively strict rules.  These people will

16    apparently consistently violate those rules.

17          What are the prison officials supposed to do?

18          THE WITNESS:  In part, they violate these rules

19    because of their mental illness.  You have to take something

20    like that into consideration.  When somebody smears feces on

21    their cell because they're so psychotic, you don't take

22    60 days good time away from them, for instance.  You look at

23    it as a sympton of severe mental illness.

24          But to answer your question as to what to do, you need

25    a specialized kind of facility to treat these individuals and

 1   then you need something which doesn't seem to exist.  You

 2   need a gradual step down of some kind so that --

 3          THE COURT:  So that people see there's a way out of

 4   whatever, whether it's a SHU or some other specialized unit?

 5          THE WITNESS:  One aspect of a stepdown is absolutely

 6   what you say, because part of the trauma of being in the SHU

 7   for 13 years is never thinking you're going to go out.

 8   That's absolutely essential, but also a stepdown is

 9   therapeutic.

10          You say to somebody:  You go to all your assigned

11   activities and you participate.  You go to a Bob Marley movie

12   and you comment on it and discuss it and show you've been

13   paying attention, and you get more privileges.  And then you

14   stay out of trouble for another week or two and then you open

15   up with your therapist and you get more privileges.

16          And so the stepdown rewards good behavior and it also

17   rewards therapeutic work and therapeutic improvement and also

18   rewards the individual becoming less dangerous to himself and

19   others.

20          You create an environment where not only the inmate

21   can see there's a way out of the SHU, but they see by

22   behaving in a progressively more appropriate way and

23   participating in therapeutic activities, they get to do more

24   and more.

25   /////

1    BY MS. MENDELSON:

2    Q.      Am I correct you've reviewed the CDCR inmate report

3    for an inmate we will call Suicide Prisoner 3?

4    A.      Yes, I have.

5            MR. MCKINNEY:  Objection.  This is not the subject of

6    any of Dr. Kaufman's reports.  We have no knowledge of this,

7    that he was going to testify to this issue until a day or two

8    when plaintiff noticed us.  It's beyond the scope of anything

9    this doctor has testified to in the past.

10           THE COURT:  I need to know something about going on.

11   I thought I knew, but apparently it's not so.  The general

12   rule, of course, is that an expert must provide a written

13   opinion which is delivered to the other side so they can take

14   a deposition and know what the testimony is going to be.

15           Is that not what's happened in this case?

16           MS. MENDELSON:  Your Honor, Dr. Kaufman has submitted

17   three declarations to the court and he has opined extensively

18   on suicide.  This particular suicide took place on August 19,

19   2013, and the report on which he is basing his opinions in

20   part was issued on October 22, 2013.

21           MR. MCKINNEY:  This expert has issued two declarations

22   subsequent to August 19th.  They both focused on use of

23   force.  The only report that the plaintiffs rely on for

24   purposes of segregation is Dr. Kaufman's March 14th

25   declaration, and we've received nothing in terms of a written

1    report from this expert related to issues in this proceeding

2    since March 14th.

3         THE COURT:  I've heard words about declarations which,

4    obviously, are different than what's contemplated in the

5    ordinary course of the use of an expert.

6         I gather that you folks have agreed somehow or other

7    -- ands it's perfectly all right with me.  I just don't know.

8    -- that the affidavits supplied by the expert in support of

9    the motion are to be treated the same as if they were

10   reported in the ordinary course and in accordance with the

11   federal rules.

12        That's fine with me.

13        What I hear now -- I am correct that's what you've

14   been doing?

15        MR. MCKINNEY:  That's right.  There was an agreement

16   with respect to certain inmates, but there's two issues in

17   particular, and this is one of them that this is completely

18   outside the scope of any report.

19        MS. MENDELSON:  Your Honor, suicide has been part of

20   Dr. Kaufman's areas of discussion in his first March

21   termination declaration.  He opined extensive about suicide

22   in administration segregation units and suicide risks in

23   administrative segregation units.

24        THE COURT:  That's perfectly all right and it's

25   perfectly all right for him to testify about it.  This is, as

1    I understand it, ma'am, to obtain evidence about a specific

2    suicide or suicide event.  Your explanation why that was not

3    supplied to the defendants is it happened very late, to which

4    the defendants say:  He's already provided evidence about

5    matters subsequent to whatever the date was anyhow.

6         Is that fair statement?

7         MR. MCKINNEY:  He submitted two declarations in

8    September.  There was nothing that would have prevented the

9    plaintiffs from filing a further supplemental report, and

10   they didn't.

11        MS. MENDELSON:  Those declarations were specific to

12   the use of force, and, therefore, he did not look at a

13   suicide in the administration segregation units, which

14   occurred after --

15        THE COURT:  The objection is sustained.

16        We will have our luncheon recess.  Reconvene at 130.

17                        (Whereupon, the luncheon recess was

18                        taken at 11:59 a.m.)

19                        ---o0o---

20

21

22

23

24

25

2510

1          (Back on the record at 1:30 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Ms. Mendelson.

5          MS. MENDELSON:  Your Honor, we would request the

6    court reconsider allowing Dr. Kaufman to testify about

7    updated evidence related to suicides in segregation.

8          Yesterday, when defendants objected to the testimony

9    of Drs. Stewart and Kaufman, we understood the court to have

10   ruled that relevant, current information would be admitted at

11   this trial unless really new and different.

12         That's in the transcript.

13         THE COURT:  That certainly was true, but the

14   question -- you better come to the microphone, although you

15   may not get a chance to talk because I may just rule in your

16   favor anyhow.

17         The problem is, as I understand it, that the witness

18   has provided two affidavits subsequent to the date that was

19   relevant and never even alerted the defendants that the topic

20   that you are -- that you would like to go into was going to

21   be discussed.

22         MS. MENDELSON:  Your Honor, that is not the case.  We

23   received the suicide report in the ordinary course of

24   business from defendants on October 22nd.  Dr. Kaufman's last

25   declaration was filed on September 23rd.

2511

1      Also this issue is one on which he's opined

2  extensively, decompensation in segregation.  This suicide

3  relates to a death in EOP Ad. Seg. so this is particularly on

4  topic.

5      We notified defendants of our intention to use the

6  report on Tuesday when we provided all the disclosures.

7      THE COURT:  The plaintiffs claim that this is not

8  true, that he filed affidavits, documents that you could

9  treat as notice of the intent to use the document, and that

10  they only received it in October or something.

11      MR. MCKINNEY:  Your Honor, October 22nd was a month

12  ago.  I mean, they certainly could have filed a supplemental

13  report, a supplemental declaration.  They chose not to.

14  Instead, they said we're relying on his March 14 declaration.

15  That's the only place in the record where Dr. Kaufman

16  expressed opinions relevant to this hearing.

17      He has filed two subsequent declarations, both of

18  which go to use of force, but he certainly could have.  And

19  he told us at deposition in September, two months ago, he had

20  no opinions on segregation and hadn't reviewed anything yet,

21  yet he went ahead and reviewed a bunch of stuff and we got no

22  declaration.

23      MS. MENDELSON:  Your Honor, this is the defendants'

24  document, not ours.  It is no unfair surprise.  They provided

25  it to us.  And this is the updated information we need to

2512

1    present our case.

2         THE COURT:  Whether you need it to present your case

3    or not is not the issue.  The issue is whether it is fair and

4    whether or not you could have notified the defendants and

5    chose not to.

6         I mean, I'm really perfectly aware of the fact that

7    everybody is terrifically busy trying to prepare for this

8    case.  Although, I must say that every day somebody else who

9    I never saw before is questioning.

10        Court's ruling will stand.

11        You may proceed, ma'am.

12   BY MS. MENDELSON:

13   Q.     Dr. Kaufman, did any of the prisoners you interviewed

14   at CCWF discuss strip-search practices?

15   A.     Yes, they did.

16   Q.     What did they have to say?

17   A.     They said that it was humiliating, degrading, that it

18   reawakened prior experiences of having been sexually abused,

19   and that as a result of it, they often declined out-of-cell

20   activities, including therapy.

21   Q.     In what circumstances would these individuals need to

22   be strip-searched?

23   A.     Excuse me?

24   Q.     In what situations were these individuals

25   strip-searched?

2513

1    A.        Every time they left the cell block for any activity.

2              THE COURT:  And coming back.

3              THE WITNESS:  And coming back again.

4              THE COURT:  I've only heard that at least 14 or 15

5    times.  I mean, it is really new to me.

6              You may proceed, ma'am.

7    BY MS. MENDELSON:

8    Q.        Dr. Kaufman, what is your opinion about this

9    practice?

10   A.        That it should not be done as a routine matter, that

11   it should be exclusively performed only when there is a clear

12   and important reason to strip search.

13             It should not be universal.  It should be only for an

14   indication or some grave demonstration that it has to be

15   done.

16             THE COURT:  And you are expressing that opinion based

17   as a matter of your judgment about -- you tell me instead

18   of -- you tell me.  Why are you -- what is your rationale or

19   basis, that's what I want to say, for that?

20             THE WITNESS:  Because in the majority of the cases it

21   is unnecessary, and it results in inmates being traumatized.

22   And it results in their refusing the therapy and other

23   activities that they desperately need.

24             THE COURT:  This is another one of those places in

25   which there is a serious custody -- sometimes you can't

2514

1    figure out why custody is doing the things they are doing,

2    but this, I think, is fairly straightforward.  And again, it

3    becomes a question -- I am going to formulate a question, but

4    the problem is I'm trying to think it through.

5          Custody, as I take it, strip searches everybody

6    because they have had experiences in which officers have been

7    injured or people make weapons out of good knows what, and so

8    they just have a routine that says if you're in Ad. Seg. or

9    any segregated housing, we're going to strip search you to be

10   sure.

11         Your view, I think, is that the harm occasioned by

12   that practice outweighs whatever custody rationale otherwise

13   exists.

14         Is that fair?

15         THE WITNESS:  You know, I am very aware of the

16   dangers to custody, of people being able to smuggle things

17   back and forth.  But, you know, particularly when an

18   individual is in Ad. Seg. because of a lack of bed, it seems

19   to me that it is unduly punitive and anti-therapeutic to do

20   it because if they were in population, it wouldn't be done.

21         THE COURT:  I was just about to say the fact that if

22   they're in general population it isn't done suggests to you,

23   particularly for people in Ad. Seg., that are only there for

24   reasons that are non-punitive, there is no reason to think

25   that they're any more dangerous.

2515

1          Is that what you are suggesting?

2          THE WITNESS:  Yes.

3          MS. MENDELSON:  I have no further questions, Your

4    Honor.

5          THE COURT:  Thank you, ma'am.  You may retire.

6          You may not want to because I may be asking questions

7    which are going to invite others.

8          I think this is a difficult -- everything in this

9    case is difficult, but I think this is particularly

10   problematic.  And -- No.

11         Your answer is that the proof is in the pudding, and

12   the fact of the matter is that they would be in general

13   population except for some reason which is not relevant to

14   whether or not they're dangerous.

15         Thank you.  I have answered my own question.

16         THE WITNESS:  Exactly.  Thank you.

17         THE COURT:  Mr. McKinney.

18         MR. MCKINNEY:  One moment, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. MCKINNEY:

21   Q.    Good afternoon, Dr. Kaufman?

22   A.    Good afternoon.

23   Q.    My name is Patrick McKinney.  I represent the

24   defendants in this matter.

25         Dr. Kaufman, you did not submit a declaration in

2516

1    support of this motion; is that right?

2    A.    That's correct.

3    Q.    And you did sign a declaration dated March 14, 2013,

4    right?

5    A.    That's correct.

6    Q.    And that was in support of plaintiffs' opposition to

7    the State's termination motion filed back in January,

8    correct?

9    A.    Yes.  In that I dealt with the potentially damaging

10   effects to the mentally ill of being in segregation.

11   Q.    And that report was wrote in collaboration with

12   plaintiffs' counsel; is that right?

13   A.    Correct.

14   Q.    In fact, plaintiffs' counsel wrote the first draft of

15   that report; is that right?

16   A.    We went back and forth.  Yeah.

17   Q.    And you also signed a declaration dated August 23rd

18   of this year; is that right?

19   A.    I could check the exact date, but no doubt.

20   Q.    And that was in support of plaintiffs' reply brief

21   related to use-of-force issues, correct?

22   A.    Correct.

23   Q.    Then you signed a third declaration dated September

24   13th -- September 23rd; is that right?

25   A.    Which date was it?

2517

1  Q.      September 23rd?

2  A.      Yes.

3  Q.      And that was also in support of the reply to the

4  use-of-force motion, correct?

5  A.      Yes.

6  Q.      You also testified before this court last month on

7  October 2nd; is that right?

8  A.      Yes.

9  Q.      Your testimony was related solely to use-of-force

10 issues in that hearing; is that right?

11 A.      Yes.

12 Q.      Doctor, you have not reviewed any studies or

13 literature regarding the impact of segregation on the

14 mentally ill since the 1970s; is that right?

15 A.      That's not totally correct.  You know, subsequently I

16 have reviewed some of the literature.  I've reviewed some of

17 the literature cited in Dr. Craig Haney's declaration.  So I

18 have reviewed some of that literature subsequently.

19 Q.      That was done subsequent to your deposition on

20 September 21st?

21 A.      Yes.

22 Q.      And at deposition back in March you testified that

23 you weren't aware of any research or literature that supports

24 the idea that group therapy is required in a prison

25 administrative segregation unit.

2518

1    Do you recall that testimony?

2    A.    Yes.

3    Q.    This morning the judge made a comment that you had

4    been around a lot of prisons, but you have not been around a

5    lot of prisons, at least recently; is that correct?

6    A.    I've been in prisons in about eight states over the

7    years.  And recently I interviewed an inmate who had just

8    been at a maximum security California prison, but he had been

9    temporarily removed from the prison.  And I interviewed him

10   in Sacramento at the city prison.  You know, I looked at many

11   issues involving his case.

12         But except for this year, I haven't been in a prison

13   in probably -- well, let me correct that.  I've gone to jails

14   and prisons over the last decade to interview inmates who

15   were either my patients and I was following up on them or as

16   evaluations for the court.  But I haven't been investigating

17   or evaluating conditions in prisons for at least a decade up

18   until February of this year.

19   Q.    And the prior system that you did investigate was the

20   California system; is that right?

21   A.    I've also been involved with Pennsylvania, New York,

22   Texas, Oregon, Utah.  Through the years I have been an expert

23   in -- and Washington, D.C. -- in systems in all of those

24   places.

25   Q.    When you say "through the years," you mean 30 years

2519

1  ago, correct?

2  A.      Well, most of those evaluations were 20 to 30 years

3  ago.

4  Q.      Doctor, you were asked by plaintiffs' counsel to

5  render opinions about the care provided within CDCR, correct?

6  A.      Yes.

7  Q.      And you were measuring that care against a community

8  standard; would you agree with that?

9  A.      No.    I measured it against the prisons -- well, the

10  two systems where I worked, the federal system at Lewisburg

11  Federal Penitentiary, and also the New York City jail system,

12  and my recollection of some of these other systems that I

13  evaluated in the past.

14  Q.      So you were at the Lewisburg Penitentiary between

15  1964 and 1966; is that right?

16  A.      That's correct.

17  Q.      And you were at the New York system also in the late

18  60s into early 70s; is that right?

19  A.      No.    It was early 70s only.

20  Q.      Pardon me.

21          And you did not apply a deliberate indifference

22  standard to the care being provided in CDCR; is that right?

23  A.      I feel that's a legal term, and I have so testified

24  in depositions.

25  Q.      You have not worked in a segregation unit; is that

2520

1  right?

2  A.      Well, at Lewisburg we had a segregation unit.  And I

3  saw many of the inmates that were in that unit.  But my

4  office was not located in that unit.

5  Q.      You have been in private practice since 1978, if I

6  read your CV correctly; is that accurate?

7  A.      No.  I've been in private practice since I left

8  Lewisburg Federal Penitentiary in 1966.

9  Q.      Doctor, you toured three prisons, correct, to support

10  your opinions with respect to the systems in CDCR; is that

11  right?

12  A.      That was part of what I did to evaluate it, yes.

13  Q.      You went to California -- the Central California

14  Women's Facility?

15  A.      Yes.

16  Q.      The California Institution For Men?

17  A.      Yes.

18  Q.      And Corcoran, correct?

19  A.      Yes.

20  Q.      And you did not use an audit tool of any sort when

21  you evaluated these institutions; is that right?

22  A.      Did I what?

23  Q.      Did you use an audit tool or --

24  A.      An audit tool?

25  Q.      Yes.

2521

1    A.       No, I did not.

2           THE COURT:  How did you select or how was it that you

3    came to visit these three prisons as against the other 33 or

4    whatever there is?

5           THE WITNESS:  Well, they were selected, I think, by

6    plaintiffs' counsel.  And in part they were dependent on my

7    schedule and the schedule of the other experts.  So they were

8    divided among us.

9           THE COURT:  Okay.

10   BY MR. MCKINNEY:

11   Q.       And during those tours you visited general population

12   units; is that right?

13   A.       Yes.

14   Q.       Reception center units?

15   A.       Yes.

16   Q.       Administrative segregation?

17   A.       Yes.

18   Q.       Security housing units?

19   A.       Yes.

20   Q.       I said Mental Health Crisis Bed units, you did visit

21   those?

22   A.       Yes.

23   Q.       And you did not visit the security housing unit at

24   Pelican Bay, correct?

25   A.       Correct.

2522

1  Q.      You also did not visit the psychiatric services unit

2  at Pelican Bay?

3  A.      Correct.

4  Q.      You did not visit the security housing unit at the

5  California Correctional Institution at Tehachapi; is that

6  right?

7  A.      I visited Tehachapi in the 1990s, but not on this

8  occasion.

9  Q.      And you're not expressing opinions about the CCI

10  security housing unit today; is that right?

11  A.      Any opinions I have would go back to my observations

12  in 1992 or so.

13  Q.      And you did not visit the security housing unit at

14  the California Institution for Women; is that right?

15  A.      That's correct.

16  Q.      And you did not visit the security housing unit at

17  CSP Sacramento?

18  A.      I'm not sure whether it was -- what units

19  specifically that I interviewed the two inmates there that I

20  did.  I don't remember which unit it was, sir.

21  Q.      But you didn't evaluate the SHU while you were at Sac

22  Prison?

23  A.      No.

24  Q.      And you didn't visit the psychiatric services unit at

25  CSP Sacramento either, did you?

2523

1    A.    No.

2    Q.    And there is no security housing unit at the Central

3    California Women's Facility; is that right?

4    A.    I'm not sure.  I assume not.

5    Q.    There's also no security housing unit at the

6    California Institution For Men; is that right?

7    A.    Correct.

8    Q.    And at Corcoran you visited the security housing

9    unit; is that right?

10   A.    Yes.

11   Q.    And you also visited the EOP Ad. Seg. hub there?

12   A.    Yes.

13   Q.    And are you aware that a new treatment facility,

14   including office space and treatment areas, has been

15   constructed at Corcoran and opened in the summer of this

16   year?

17   A.    I'm not sure if I knew it was opened then.  I heard

18   that it was being planned.

19   Q.    At the time of your visit to the Central California

20   Women's Facility, there was no EOP Ad. Seg. hub unit; is that

21   right?

22   A.    Yes.

23   Q.    And you didn't go to any of the other ten EOP Ad.

24   Seg. hubs throughout the state; is that right?

25   A.    Correct.

2524

1    Q.      And each of your visits lasted one day?

2    A.      Correct.

3    Q.      And through those visits you formed opinions about

4    crisis bed care; is that right?

5    A.      Yes.

6    Q.      Medication management?

7    A.      Yes.

8    Q.      Use of force, which you testified about earlier?

9    A.      Yes.

10   Q.      The disciplinary process?

11   A.      Yes.

12   Q.      Staffing?

13   A.      Yes.

14   Q.      Treatment space?

15   A.      Yes.

16   Q.      Recordkeeping?

17   A.      Yes.

18   Q.      Quality of mental health treatment?

19   A.      Yes.

20   Q.      Quantity of mental health treatment?

21   A.      Yes.

22   Q.      Relationships between custody and mental health?

23   A.      Yes.

24   Q.      And now you've offered opinions about segregated

25   housing?

2525

1    A.      Correct.

2    Q.      And these opinions are all based on the same three

3    tours, correct?

4    A.      And all of the other things that I mentioned,

5    initially.

6    Q.      During the tours you spoke to inmates?

7    A.      Yes.

8    Q.      I think you spoke to a total of 20 inmates; is that

9    right?

10   A.      I believe I spoke to more than that, but I wrote

11   about somewhere between 16 to 20.

12   Q.      Some you chose not to include in the report?

13   A.      Yes.

14   Q.      The inmates you spoke to included inmates at the

15   CCCMS level of care?

16   A.      Yes.

17   Q.      Inmates in the enhanced outpatient program?

18   A.      Yes.

19   Q.      Inmates in the crisis bed units?

20   A.      Yes.

21   Q.      For the inmates you interviewed, you generally agreed

22   with the diagnosis given the inmate by the CDCR clinician; is

23   that right?

24   A.      Well, very often there was more than one diagnoses,

25   and I would say that I would agree with at least one of the

2526

1    diagnoses most of the time.

2    Q.      And the inmates you interviewed, to the extent they

3    were accepting medication, were taking the medication

4    prescribed by their CDCR clinician; is that right?

5    A.      I believe in my report there are some examples of

6    inmates not getting medication for administrative reasons,

7    lack of staffing or inmates tonguing medication.

8            So, you know, if I can go back to that report, I

9    think I would -- I could easily cite many instances where

10   they didn't get their medication.  But, by and large, I think

11   they got their medication.

12   Q.      If an inmate cheeks or tongues the medication, they

13   received it, correct?

14   A.      Well, it behooves any person who administers

15   medication to be sure that the medication is ingested and not

16   cheeked.

17   Q.      Certainly.  I just want to understand your testimony

18   there.  And do you recall when deposed in a deposition that

19   you stated that "inmates, by and large, receive their

20   medication," correct?

21   A.      Yes.  I think I just said that.

22           MS. MENDELSON:  Can you please provide the page

23   number of that deposition cite?

24           THE COURT:  It doesn't make any difference.  He's

25   agreed.  But you're right, you know, you're supposed to let

2527

1    the other side know.

2         MR. MCKINNEY:  If he didn't recall, Your Honor, I

3    would certainly go that route.

4         THE COURT:  I understand.

5    BY MR. MCKINNEY:

6    Q.    Doctor, none of the inmates you spoke with received

7    no mental health care; is that right?

8    A.    That's correct.

9    Q.    Focusing in on the inmates in segregated housing

10   units, they were selected by the plaintiffs' counsel for you

11   to interview; is that right?

12   A.    Not totally.  I think, you know, we'd go on a unit,

13   and, you know, we'd kind of ask around a little bit who has

14   been here a while or it depends on maybe who just came back

15   from the MHCB.  Or we just -- sometimes we just walked onto a

16   unit and just stopped by some cell blocks -- some cells and

17   just started talking to some inmates that were Coleman Class

18   inmates.

19         So I think it was -- there were many ways that the

20   inmates were chosen, but those were some of the ways they

21   were chosen.

22   Q.    And the fact that someone had been in segregation for

23   a lengthy period of time, that was one criteria?

24   A.    At some point.  But some of the people that were in

25   there for what we determined to be 13 years were not inmates

2528

1    that we found in that way.  We just found them arbitrarily.

2    Q.      You determined -- for the inmate that had been in

3    segregation for 13 years, you didn't go back and review 13

4    years of his records, did you?

5    A.      We didn't have 13 years of records available to us.

6    We had records available probably only about a year or so

7    back.

8    Q.      So you did not review the 13 years of records?

9    A.      No.

10   Q.      When you went out to one of these units, were inmates

11   also selected based on staff telling you that this was an

12   inmate who has experienced significant problems or issues?

13   A.      I think there may have been a few that we selected on

14   that basis.

15   Q.      That would include identification by custody

16   officers?

17   A.      Correct.

18   Q.      And that would indicate to you some awareness of the

19   fact about the inmates in their unit; is that right?

20   A.      Yes.  Custody officers have some awareness of mental

21   health needs of their inmates.

22   Q.      How long did your interviews with the inmates last?

23   A.      I would say in the range of 20 to 45 minutes,

24   probably the average was more in the upper range.

25   Q.      So almost one full day out of the three days was

2529

1    interviewing inmates?

2    A.       Well, each day we spent as much time was we could

3    interviewing inmates.

4    Q.       You also reviewed the pages of the medical records

5    for the inmates provided to you by plaintiffs' counsel; is

6    that right?

7    A.       I read some medical records on the units, and then I

8    read a great many medical records provided later that I

9    reviewed at my leisure.

10    Q.       In addition to interviews, you also interviewed --

11    interviews with inmates, you also interviewed correctional

12    administrators?

13    A.       Correct.

14    Q.       Clinical staff?

15    A.       Yeah.  I hesitate to use the word "interviewed" for

16    correctional administrators or clinical staff.  I wouldn't

17    say I interviewed them, but I spoke with them and gathered

18    information from them.

19    Q.       You also spoke with clinical staff?

20    A.       Yes.

21    Q.       Did you interview certain clinical staff?

22    A.       Again, I don't like the word "interview."  I spoke

23    with many clinical staff.

24    Q.       Can you -- are these just brief discussions?

25             I'm trying to understand the distinction.

2530

 1  A.      I would say they were -- yeah, they were brief

 2  discussions.  They weren't pointed, focused interviews, no.

 3  Q.      And you also spoke with correctional officers?

 4  A.      Yes.

 5  Q.      You sat in on Interdisciplinary Treatment Team

 6  meetings?

 7  A.      Yes.  I recall two specifically that I sat in on.

 8  Q.      Which were those?

 9  A.      There was the one at CIM that I talked about before,

10  and then there was one that was in a Mental Health Crisis Bed

11  unit.  I could find it, if it was necessary, but --

12  Q.      That's okay, Doctor.

13          Are you familiar with the report submitted by the

14  State's experts related to the termination motion?

15  A.      I've skimmed it a while ago.

16  Q.      Doctor, if I could have you turn to paragraph 96 of

17  your declaration.  It is Exhibit 103.

18  A.      What page is that on?

19  Q.      Page 31.

20          THE COURT:  103 is in evidence, Madam Clerk?

21          THE CLERK:  I have to check.

22          THE WITNESS:  I have it.

23          MR. MCKINNEY:  One moment, Doctor.  The clerk is

24  checking.

25          THE CLERK:  Do you know when it was admitted?

2531

1              MR. MCKINNEY:  It is on the docket.

2              MS. MENDELSON:  It was introduced on November 6th

3      into evidence.

4              THE COURT:  You may proceed.

5      BY MR. MCKINNEY:

6      Q.      Doctor, looking at the second sentence of this

7      paragraph you quote the State's report, correct?

8      A.      Yes.

9      Q.      And are you aware of the overall opinions of the

10     State's experts related to segregation issues?

11     A.      I'm aware of some of them, yes.

12     Q.      Are you aware of the opinions of the State's experts

13     that few, if any systems, have the diligent provision and

14     self-monitoring of mental health that currently exists within

15     CDCR, and more importantly that the clinical care itself

16     places CDCR in the upper echelon of state mental health

17     systems?

18              Are you familiar with that opinion?

19     A.      I don't recall it.

20     Q.      Can I ask you take a look at Exhibit H, which was

21     entered into evidence yesterday.  It should be there.

22              May I approach the witness, Your Honor?

23              THE COURT:  You may, but what's the point?

24              If he doesn't recall it, he doesn't recall it.

25              (Exhibit located for witness.)

2532

1          THE COURT:  Well, okay.  I guess my suggestion that

2     it's irrelevant doesn't count.

3          You may proceed, Mr. McKinney.

4     BY MR. MCKINNEY:

5     Q.     Doctor, are you familiar with this report?

6     A.     I don't think so.

7     Q.     So when you prepared your declaration on March 14th

8     rebutting this report, you weren't aware of the report?

9     A.     I read it back then, but it's been a while.  I really

10    don't recall it right now.

11    Q.     Doctor, if I could have you turn to page 21 of the

12    report.

13          Looking at the opinions:

14          (Reading:)

15          All CCCMS inmates we identified in ASU were provided

16          appropriate services and periodically assessed to

17          evaluate if they needed a higher level of care.

18          (Reading concluded.)

19          Were you aware of that opinion?

20    A.     I have a vague recollection of that.

21    Q.     Again, Doctor, from on that same page, the experts

22    opine that:

23          (Reading:)

24          Inmates who are awaiting --

25          (Reading interrupted.)

2533

1          MS. MENDELSON:  Objection as to relevance.

2          THE COURT:  Yes.  The objection is overruled, but the

3    court's own objection, which is you're going to put your own

4    people on who are going to say whatever it is you want to say

5    that's in the report, so you may proceed to something that's

6    relevant to the direct examination.

7          You may proceed, sir.

8          MR. MCKINNEY:  Very well, Your Honor.

9    BY MR. MCKINNEY:

10   Q.     Doctor, you're aware that psychiatric technicians

11   conduct daily rounds in the administrative segregation units?

12   A.     Yes.

13   Q.     That rounding provides an opportunity for inmates to

14   seek contact with the clinician, correct?

15   A.     It provides an opportunity, but many of the inmates

16   that I spoke to about it say that it's very cursory and that

17   it is kind of a shouting back and forth through the cell

18   wall.  There isn't really an opportunity to reveal how

19   they're feeling.

20   Q.     I know when you were last here you expressed an

21   opinion about the quality of psychiatric technicians

22   generally.

23          Did you talk to the psych-techs to verify that

24   statement -- those statements?

25   A.     I did speak to one of the psych-techs briefly.  I

2534

1    didn't quiz him.  What stands out, and I thought it was

2    admirable, although not mental health screening, he said he

3    would give the inmates puzzles from time to time.

4         THE COURT:  In any event, you don't have to interview

5    a psych-tech to say that it involved shouting through a food

6    port or something of that sort.

7         Correct, sir?

8         THE WITNESS:  Right.  I also don't like being -- the

9    statement that I don't have a high view of psychiatric

10   technicians, I'm not sure I say that.  I know some

11   psych-techs that are extremely competent.  I don't know why

12   that was attributed to me.

13        MR. MCKINNEY:  It's in the transcript, sir.  I don't

14   know either.

15   BY MR. MCKINNEY:

16   Q.    Are you aware of the Special Master's reports related

17   to administrative segregation?

18   A.    You know, once again, it's an extensive report.  And

19   I read it initially, and I was very impressed with many

20   aspects of it.  I doubt that I could quote it now so if

21   you're going to ask me a question about it, we'll have to

22   refer to some specific place.

23   Q.    He issued his 25th Round Report in January of this

24   year.  Are you aware of that?

25   A.    I did review that.

2535

1  Q.      And at the Central California Women's Facility he

2  reported that inmates are seen timely on arrival at the

3  administrative segregation unit.

4          Are you aware of that?

5  A.      I don't specifically recall that.

6  Q.      And that EOP inmates were seen weekly by their

7  primary clinician 94 percent of the time.

8          Are you aware of that?

9  A.      That sounds contrary to my experience, but I'm

10  willing to look at it, if it was stated in writing.  But it

11  wasn't my experience a month later.

12  Q.      The Special Master also reported in administrative

13  segregation at the Central California Women's Facility nearly

14  all psychiatric interviews occurred in a private setting.

15          Are you aware of that statement?

16  A.      I am aware of that.  I found it unbelievable.

17  Q.      Doctor, you did not personally observe a cell-front

18  contact at CCWF, did you?

19  A.      No.  Nor did I observe a confidential contact.

20  Q.      Your opinions were based on the notes that you looked

21  at on direct related to Inmate B; is that right?

22  A.      There was also -- I believe it is Inmate A who said

23  the same thing about cell-front contacts.

24  Q.      You are aware that CCWF has confidential treatment

25  space, correct?

2536

1  A.      You know it must have because I saw notes stating

2  that they couldn't take the patient to the confidential

3  treatment space because of several constraints that I

4  mentioned.

5  Q.      Show you a document, Doctor.

6         MR. MCKINNEY:  May I approach the witness, Your

7  Honor?

8         THE COURT:  Only to get this over with.

9         Go ahead.  Never mind.

10        It is easier to just get it done.

11        (Exhibit handed to witness.)

12 BY MR. MCKINNEY:

13 Q.      Doctor, showing you a document that's been marked as

14 Defendants' Exhibit I for identification.

15        THE COURT:  I'm sure that marking is wrong because

16 I'm pretty sure -- maybe I'm wrong -- that you've gone

17 beyond.  What was the last exhibit marked by defendants?

18        THE CLERK:  H.

19        THE COURT:  Okay.  So it is right.  Okay.

20        MR. MCKINNEY:  Thank you, Your Honor.

21 BY MR. MCKINNEY:

22 Q.      Doctor, I'll represent to you this is a declaration

23 filed by the chief psychologist at CCWF on the reply with

24 respect to the State's termination motion.

25        Did you review this document at any point in

2537

1  preparing your testimony?

2  A.      I don't recall it.

3  Q.      So you're not aware of the statement by the chief

4  psychologist that --

5          THE COURT:  Sir, he says he doesn't recall it.  Now

6  you're seeking to introduce evidence which there's no support

7  for because he doesn't recall it.  If you want to call this

8  lady, that's, of course, your privilege.

9          Please, go on.

10         MR. MCKINNEY:  Yes, Your Honor.  The doctor's

11 awareness of --

12         THE COURT:  Please, go on.

13         MR. MCKINNEY:  Yes, Your Honor.

14 BY MR. MCKINNEY:

15 Q.      Doctor, you interviewed four inmates at CCWF,

16 correct?

17 A.      Yes.  I think that's correct.

18 Q.      And one of those inmates was a condemned inmate; is

19 that right?

20 A.      That's correct.

21 Q.      And are you aware that none of the inmates that you

22 interviewed are currently in administrative segregation?

23 A.      I have no knowledge of that either way.

24 Q.      Let's talk about Inmate A.

25         In your declaration you stated that she was placed in

2538

1    segregation because of paucity of appropriate housing.

2            Do you recall that?

3    A.      Can you refer me to the page of my declaration where

4    I say that?

5    Q.      Yes.  Paragraph 110.

6            MR. MCKINNEY:  Again, Your Honor, this is Exhibit

7    103.

8            THE WITNESS:  I made that statement.

9    BY MR. MCKINNEY:

10   Q.      Is it correct she told you that someone with whom she

11   had problems at a prior institution spotted her in the yard?

12   A.      Correct.

13   Q.      And she also told you that she heard voices that gave

14   her commands to lash out; is that right?

15   A.      Where's that in my --

16   Q.      I believe you testified to this in deposition.

17   A.      Okay.  I believe that's correct.

18   Q.      And while Inmate A was in segregation, are you aware

19   she readily attended groups?

20   A.      You know, my statement about that -- about her is

21   line 13 and 14, which states:

22           (Reading:)

23           Prisoner A was desperate for transfer to somewhere

24           she can receive group treatment.

25           (Reading concluded.)

2539

1          So that implies to me her experience was that she
2    wasn't getting groups.
3    Q.      That's based on her statement to you?
4    A.      Correct.
5    Q.      Are you aware she regularly attended groups?
6    A.      I don't know the answer to that question.
7    Q.      And you're not aware she's now housed in a general
8    population unit; is that correct?
9    A.      That's correct.
10   Q.      Inmate A was at the CCCMS level of care; is that
11   right?
12   A.      Yes.
13   Q.      Let's talk about Inmate C briefly.  She was also at
14   the CCCMS level of care?
15   A.      What paragraph is that?
16   Q.      I believe 32 and 171.
17   A.      171 is talking about Prisoner D.  I'm sorry?  D?
18   Q.      Pardon me.  I meant to refer to C.
19   A.      C.
20           She said -- Prisoner C's file -- this is on page
21   56 -- states that her clinical contact took place at her
22   cell-front due to modified program.
23   Q.      The question was, are you aware she's a CCCMS inmate?
24   A.      What was the other page I mentioned her?
25   Q.      32 is my note, but --

2540

1    A.        Page or paragraph?

2    Q.        Paragraph 32.

3    A.        Yes.  She was CCC.  And in this case it wasn't what

4    she said, but that the medical records reflect that she was

5    seen at cell-front by her clinician because the prison was

6    short of staff escorts.

7    Q.        Doctor, are you aware she's now housed in the general

8    population at the California Institution for Women?

9    A.        No, I'm not.

10    Q.        You testified about Inmate B who is at the CCCMS

11    level of care also, correct?

12    A.        Yes.

13    Q.        Are you aware she's no longer in administrative

14    segregation?

15    A.        No, I'm not aware of that.

16    Q.        And is it your understanding she was placed in

17    administrative segregation due to a history of violence

18    towards others?

19    A.        I would have to review my files on that.  I don't

20    recollect that.

21              Is that Inmate B?

22    Q.        Correct.

23    A.        This is the individual that had been in Ad. Seg. for

24    19 to 20 months.

25              She's also been -- I wrote that she's been described

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2541

1    as "agitated, depressed and angry" so...

2            MR. MCKINNEY:  Move to strike as nonresponsive.

3            THE COURT:  Motion is granted.

4            Well, no.  Actually you asked what he knew.  He just

5    recited what he knew.

6            The court vacates its last order.  You may proceed.

7    BY MR. MCKINNEY:

8    Q.      The question was, are you aware that Inmate B was in

9    administrative segregation due to violence?

10   A.      No.  I was not aware of that.

11   Q.      And that, in fact, she had attempted to murder

12   another inmate?

13   A.      I don't recall that.

14   Q.      And she manufactured a weapon?

15   A.      I don't recall.

16   Q.      And was wearing gloves at the time she was caught?

17           Were you aware of that?

18   A.      No.

19           THE COURT:  By the way, sir, you can't testify -- I

20   mean you can.  I'll let you get on the stand, and Miss Vorous

21   can ask you any question you want.

22           MR. MCKINNEY:  Your Honor, I understand.  These are

23   just questions --

24           THE COURT:  Sir, I'm going to tell you, what you have

25   been doing -- and I assume it has something to do with me

2542

1    since I'm deciding this case -- and I'm telling you it is not

2    effective to state forth things you believe if the witness

3    doesn't know anything about them.

4            You may proceed.  I understand.  Now you're telling

5    me:  Look, I don't know what he knows.

6            All right.  You may proceed.

7    BY MR. MCKINNEY:

8    Q.    Doctor, you're aware that Inmate B was seen by a

9    doctor every other week; is that right?

10   A.    She had a clinical contact every other week.  I'm not

11   sure of the degree of the person.

12   Q.    She was also seen by a psychiatrist on a monthly

13   basis?

14   A.    I didn't check to see that she was seen every month,

15   but I think that was the goal.  Yeah.

16   Q.    And you stated in your declaration that she received

17   ten hours of yard time per week while in segregation.

18           Do you recall that?

19   A.    What page is that on?  Where did I say that?

20   Q.    Paragraph 163.

21   A.    153?

22   Q.    163.

23           I have the wrong reference.  Pardon me.

24   A.    You want to tell me the line?

25   Q.    Let me come back to that.

2543

1          I'm sorry.  It is -- I'll come back to that, Doctor.

2          Let's talk about Corcoran for a moment.

3          You toured Corcoran on February 19th; is that

4     correct?

5     A.     Yes.

6     Q.     And Dr. Haney was also a part of that same tour?

7     A.     Yes.

8     Q.     Are you aware of the Special Master's report with

9     respect to Corcoran?

10    A.     I reviewed it.

11    Q.     And that he found 100 percent of inmates received a

12    comprehensive assessment prior to their initial

13    Interdisciplinary Treatment Team meeting?

14    A.     I don't recall that.

15    Q.     Inmates received at least weekly primary clinician

16    contacts?

17    A.     I don't recall that.

18    Q.     Nearly 60 percent of inmates attended at least ten

19    hours of structured therapeutic activities per week?

20    A.     I don't recall that.

21          The Special Master reported that a clear majority of

22    inmates preferred the therapeutic module to the alternative

23    treatment chair.

24          Are you aware of that?

25    A.     Yes.

2544

1    Q.      That the quality of groups observed by the Special

2    Master's experts was good?

3    A.      That was contrary to the groups I observed, but I

4    don't recall it.

5    Q.      Also that inmates reported satisfaction with

6    programming in the EOP Ad. Seg. hub?

7    A.      I don't recall that.  That was contrary to my

8    observations and of the inmates I spoke to.

9    Q.      Inmates reported they had access to a psychiatrist?

10   A.      Often it was not enough access, but they did have

11   some access, yes.

12   Q.      And they also had access to a primary clinician?

13   A.      Often it was not enough, but they had access to a

14   primary clinician.  And often the contacts were not

15   confidential or were too brief or were cell-front or were not

16   on a weekly basis.

17   Q.      They could be better?

18   A.      Correct.

19   Q.      And the Special Master also reported that medication

20   management issues were not present.

21          Are you aware of that?

22   A.      I believe I cited quite a few medication management

23   issues.  And I could reread that part of my report, but I

24   think we've talked about that.  I would be glad to.

25   Q.      I want to be sure I understand your testimony about

2545

1    the Ad. Seg. hubs.

2         You stated that all of the EOP inmates you

3    encountered were acutely psychotic; is that right?

4    A.    The ones that I interviewed, I believe so.  Acutely

5    psychotic or a history of acute psychosis.

6    Q.    How many were acutely psychotic in the present?

7    A.    I would have to go over my notes on each one.  If you

8    want me to name each one, I'll look at the file and report on

9    which ones were acutely psychotic and which ones weren't.

10        I just remember a very high level of acuity within

11   the inmates I spoke to.  And I would be glad to break that

12   down if you want to take the time and go over everybody

13   again.

14   Q.    So none of the inmates you interviewed were stable on

15   their medication?

16   A.    Not that I recall.

17   Q.    You did not see a single inmate who was smearing

18   feces while in the prisons; is that right?

19   A.    I certainly saw them on the videotapes.

20        I recall that I had seen inmates who had recently

21   smeared feces.  I didn't see any fecal smearing while I was

22   there, but I know it was in the clinical histories of some of

23   the inmates I saw.

24   Q.    And you didn't see a single inmate who was smearing

25   blood; is that right?

2546

1   A.      I did not, no.  I saw that in the files that I

2   reviewed for the use-of-force case.

3   Q.      Which files were those?

4   A.      I don't recall at this point.

5   Q.      You testified this morning about an inmate who only

6   got out to yard once per week; is that right?

7   A.      Yes.

8   Q.      Who was that?

9   A.      I think that was -- again, I can go back over this,

10  but most of the inmates I spoke to said that they rarely went

11  to the yard.

12  Q.      But you don't recall which one told you he went out

13  once per week?

14  A.      I can go back over that.  I think when Miss Mendelson

15  interviewed me, I mentioned an inmate that that was true for.

16  If you want me to take the time, I can.

17  Q.      You believe it is in your declaration?

18  A.      It's in my declaration, and I think it was -- I

19  mentioned it earlier this morning too.

20  Q.      You didn't identify that inmate.  I'm asking you now.

21  A.      Yeah, I think I did.

22  Q.      Let's not take the court's time.

23  A.      Yeah.  Okay.  I said it this morning.  We can go back

24  over everything I said in the morning again, and I can find

25  which inmate that was.

2547

1    Q.      Hopefully just a few things.

2            So that comment was based on a discussion with the

3    inmate, correct?

4    A.      That's correct.

5            So you do remember I said it.

6    Q.      You didn't tell me who the inmate was.  It was a

7    discussion.  I understand that.  But you did not verify that

8    statement through the logs, for example?

9    A.      I don't recall whether it was in the logs or the

10   medical record.

11   Q.      You're saying you did verify that statement?

12   A.      I don't recall whether I did or did not.

13   Q.      Are you also aware in the EOP Ad. Seg. hub that

14   custody and mental health meet each morning to discuss the

15   mental health patients in the unit?

16   A.      I am aware of that.

17   Q.      Let's talk about the security housing unit at

18   Corcoran.

19           You spoke with three inmates in the SHU at Corcoran;

20   is that right?

21   A.      Yes.

22   Q.      Are you aware of the Special Master's report with

23   respect to the SHU at Corcoran?

24   A.      Again, I doubt that I could quote it, but I reviewed

25   it.

2548

1    Q.       That he reported that 97 percent of inmates on

2    psychiatric medication were seen by a psychiatrist at least

3    quarterly?

4    A.       That's quite possibly true.  But this level of

5    disturbance on quarterly is absurd.  You know, the level of

6    the disturbance of the patients I saw in the SHU, the kind of

7    medications they were on, I would say weekly would be more

8    often appropriate than quarterly.

9    Q.       These are all CCCMS inmates; is that your

10   understanding?

11   A.       Yes.

12   Q.       The Special Master also reported that 93 percent of

13   inmates saw their clinician at least on a monthly basis.

14            Are you aware of that?

15   A.       Once again, I don't recall it, but the level of care

16   required for the high disturbances is much greater than

17   monthly.

18   Q.       For Inmate F you reviewed, again, the records

19   provided to you by plaintiffs' counsel; is that right?

20   A.       Yes.  I don't recall if I looked at the records while

21   I was there as well.

22   Q.       And he was at the CCCMS level of care?

23   A.       Correct.

24   Q.       He was in the SHU for a history of staff assaults; is

25   that right?

2549

1    A.      Well, no.  He's been in the SHU 13 years.  So I'm not

2    sure what the original offense was, but that does seem like

3    an awfully long time to be in the SHU.

4    Q.      He was also a validated gang member.  You testified

5    to that, correct?

6            THE COURT:  He didn't testify he was a validated gang

7    member.  He testified that somebody thought he was.

8    Different matter.

9            THE WITNESS:  Thank you.

10   BY MR. MCKINNEY:

11   Q.      That was the reason he was in the SHU that you

12   testified about, correct?

13   A.      That -- yes, that someone had said he was a gang

14   member.  Yeah.

15           MR. MCKINNEY:  May I approach the witness, Your

16   Honor?

17           (Exhibit handed to witness.)

18           (Clerk confers with court).

19           THE COURT:  We better tell the folks that.

20           Let's go off the record for a moment.

21           (Discussion held off the record.)

22           THE COURT:  Back on the record.

23   BY MR. MCKINNEY:

24   Q.      Doctor, showing you now what's been marked for

25   identification as Defendants' Exhibit JJJ, have you seen

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2550

1    these pages before?

2    A.       I've seen much of his mental health record.  I can't

3    say that I have seen all of these pages, but -- you know,

4    like some of them are after the time I interviewed him.  So

5    I'm familiar with some of them and not with others.

6    Q.       I'll represent to you that these were the documents

7    that defendants produced to plaintiffs in this matter related

8    to this inmate.

9         You may not have seen all of these pages; is that

10   correct?

11   A.       Yes.  Correct.

12   Q.       And are you aware that CDCR has a stepdown program

13   for inmates sentenced to the SHU with an indeterminate

14   sentence?

15   A.       I'm aware that that's been recently put into place.

16   I do want to say, just to clarify, I don't want anyone to get

17   confused, but that stepdown program has nothing to do with

18   the mental health stepdown I was describing earlier today.

19        But I am aware that for SHU inmates there is a pilot

20   project, I believe is the term, for a stepdown from the SHU.

21   Q.       What is your understanding of the difference between

22   what you described and the program?

23   A.       What I described was a program specifically dealing

24   with mentally ill inmates, to train them in coping skills so

25   that they could gradually learn to deal with a prison

2551

1  environment and hopefully, eventually, with external society.

2  But this program is just a program to determine more if an

3  individual has severed gang ties.

4        MR. MCKINNEY:  Your Honor, I would like to move JJJ

5  into evidence.

6        THE COURT:  Received.

7        MS. MENDELSON:  Plaitniffs request that be filed

8  under seal.

9        MR. MCKINNEY:  Agreed.

10        THE COURT:  Under seal?

11        MR. MCKINNEY:  Yes, Your Honor.

12        THE COURT:  Received.

13            (Whereupon, Defendants' Exhibit JJJ received into

14              evidence.)

15  BY MR. MCKINNEY:

16  Q.    Doctor, are you aware Inmate F consistently refused

17  his medications?

18  A.    I'm aware that was a problem.  I don't know whether I

19  would use the word "consistently" or not, but I'm aware it

20  was a problem.

21  Q.    You testified this morning about him being put on a

22  Keyhea.

23        Do you recall that testimony?

24  A.    Correct.

25  Q.    That process is because an inmate refuses medication;

2552

1    is that right?

2    A.      I defined the process, but that's the ultimate

3    reason, yes.

4    Q.      Was Inmate F on his medication when you interviewed

5    him?

6    A.      If he was still in the Keyhea he was, yes.

7    Q.      Are you aware that Inmate F is no longer in the SHU?

8    A.      I am.

9    Q.      And he's housed in the transitional housing unit at

10   Kern Valley State Prison?

11   A.      I am aware of that.

12   Q.      And do you understand that is a main line facility?

13   A.      Yes.

14   Q.      There is unrestricted yard at that unit?

15   A.      I assume so.

16   Q.      You testified this morning that when you interviewed

17   Inmate F, he articulated a plan to kill himself.

18           Do you recall that?

19   A.      Yes.  I recall that I said that.  That's right.  Yes.

20   It was by tearing up the bed sheets and using them as a

21   noose.

22   Q.      He told you the reason he wanted to kill himself was

23   that he didn't see a way out of the SHU; is that right?

24   A.      That's correct.

25   Q.      And you didn't do anything with his articulation of

2553

1    suicidal intent at that time, did you?

2    A.       No, not at that time.

3    Q.       Doctor, if we could, turn back to Exhibit 2203 in the

4    binder.

5         If I could have you turn to the fourth page that you

6    testified about this morning.

7         If I could point your attention to the first sentence

8    under Response To Treatment And Rationale For Any Change In

9    Diagnosis where it states:

10        (Reading:)

11        Upon admission the patient denied any custody issue

12        that could have made him depressed.

13        (Reading concluded.)

14        Correct?

15   A.       Yes.  I believe I discussed that.

16   Q.       You testified this morning that this statement

17   somehow indicates he was trying to prove he wasn't

18   manipulating?

19   A.       He was trying to prove that, yes.

20   Q.       He wasn't just trying to state that there was not a

21   custody issue that could have made him depressed?

22   A.       Yeah.  He could have been saying it for that reason,

23   too, yeah.

24        By the way, to clarify, there is a statement here he

25   was not on a court hearing for involuntary medication at that

2554

1    time.

2    Q.      At that time.  Okay.

3    A.      But he was still taking the kind of medication that

4    is typical of someone in a Keyhea, the four-week-long Invega

5    injection.

6    Q.      This morning you testified about the group room in

7    the Corcoran SHU.

8            That does reflect an effort to provide group

9    treatment to CCCMS inmates in the SHU, correct?

10   A.      It does describe an effort to do so.

11   Q.      And all the inmates that are there, again, they are

12   CCCMS inmates?

13   A.      Yes.

14   Q.      And that group room is a confidential treatment

15   setting, correct?

16   A.      Yes.

17   Q.      And you did testify that, although your belief is the

18   group should be somewhat different, the inmates were getting

19   group treatment there, correct?

20   A.      They were getting a group experience.

21   Q.      And that opinion is based on the fact that when you

22   were there, you saw them watching a Bob Marley movie?

23   A.      Correct.  Then there was one other popular movie that

24   I saw.

25   Q.      And you don't know what other groups were scheduled

2555

1    in that treatment room; is that right?

2    A.      That's correct.

3    Q.      Let's talk a bit about the California Institution For

4    Men.

5            You spoke to nine inmates at that institution; is

6    that right, Doctor?

7    A.      That sounds basically correct.

8    Q.      You went to that institution on February 12; is that

9    right?

10   A.      Yes.

11   Q.      And CIM does not have an EOP Ad. Seg. hub?

12   A.      Correct.

13   Q.      So your review focused on CCCMS inmates in

14   segregation; is that correct?

15   A.      Correct.

16   Q.      Of the nine inmates you spoke to, not all of those

17   inmates were housed in segregation; is that right?

18   A.      Yes.

19   Q.      And you expressed opinions about the lack of bed

20   category.  California Institution For Men is the only

21   institution where you found that; is that right?

22   A.      You know, I'd have to go over everything.  It

23   seems it was the only institution where I saw that as an

24   official category, but I think I talked to inmates in the

25   other institutions as well who were housed somewhere because

2556

1   of lack of a bed in an area for which they had been

2   designated.

3   Q.      You did not observe that at Corcoran?

4   A.      I didn't observe an LOB category.  But, again, I

5   could go over all of the inmates, and we could go over which

6   ones were housed in Ad. Seg. because there wasn't a bed in

7   their appropriate category.

8   Q.      Well, let's go back to some of those inmates then.

9           You testified about Inmate E, correct.

10          He's one of your SHU inmates at Corcoran?

11  A.      Yes.

12  Q.      And you're aware that Inmate E was in the SHU because

13  he was found with drugs in his cell?

14  A.      Again, he was in the SHU for 13 years, and at first

15  it was because of drugs in his cell.

16  Q.      He was also a validated gang associate, correct?

17  A.      I don't know if he was validated, but he was -- he

18  had an indeterminate sentence for gang association.

19  Q.      In deposition do you recall that you didn't recall

20  how many times Inmate E was seen by his clinician?

21          Do you recall that?

22  A.      I don't recall what I said about that.

23  Q.      Do you know how many times he was seen by his

24  clinician?

25  A.      I know he was seen for monthly mental health contacts

2557

1    because I know that at one point one of those contacts was

2    specifically at cell-front because of, quote, a shortage of

3    mental health staff.  And that was in a note that was dated

4    April 30th, 2013.

5    Q.      In your declaration you testified about Inmate H.  I

6    believe this is at paragraph 113.

7            Are you aware this inmate is no longer housed in

8    segregated housing?

9    A.      I'm not.

10   Q.      He's housed in a special needs yard?

11           THE COURT:  He just said he didn't know.  What more

12   is there to say other than -- Enough.

13   BY MR. MCKINNEY:

14   Q.      Inmate I, are you also aware this inmate is no longer

15   in segregated housing?

16   A.      I am not.

17   Q.      Inmate G, the third inmate that you interviewed in

18   the segregated housing unit, are you aware he's no longer in

19   the SHU?

20   A.      I am not.

21   Q.      At the California Institution For Men you went to

22   Cypress Hall; is that right?

23   A.      Correct.

24   Q.      You described that as a segregation unit?

25   A.      Correct.

2558

1    Q.       But you do realize Cypress Hall houses both

2    administrative segregation and reception center inmates?

3    A.       Yes.

4    Q.       And that reception inmates housed in that facility

5    are granted the same privileges granted to non-segregated

6    inmates; are you aware of that?

7    A.       No.

8    Q.       You did not speak to staff about use of Cypress Hall

9    as an overflow unit for reception center inmates?

10   A.       I don't recall that.

11   Q.       Doctor, you did not testify as to Inmate L this

12   morning; is that right?

13   A.       That's correct.

14   Q.       But you did interview him while you were at CIM?

15   A.       Yes, I did.

16   Q.       And are you aware this inmate is no longer in prison?

17   A.       No, I'm not.

18   Q.       Inmate N you did testify about, and this inmate is at

19   the CCCMS level of care, correct?

20   A.       Yes.

21   Q.       And you testified he was placed in administrative

22   segregation for his own safety; is that right?

23   A.       I believe so.

24   Q.       And the records indicate that he's incurred debts --

25   drug debts and was threatened by another inmate; is that

2559

1   right?

2   A.      Is that in my declaration.  I don't recall it.

3   Q.      I don't know.

4   A.      I don't recall it, that he had drug debts.  I don't

5   recall it.

6   Q.      Okay.  You referred to this inmate as a "lack of

7   bed," but he was there for his own safety, right?

8   A.      But he was designated to go to another level of care,

9   like an SNY.

10  Q.      He is now housed on a special needs yard, right?

11  A.      Correct.

12  Q.      He's been housed there since April of this year?

13  A.      I don't know when he was transferred.

14  Q.      And you did testify this morning he appeared to be

15  doing better in the special needs yard?

16  A.      I read that.

17  Q.      But you did not review the records before he went

18  into administrative segregation, correct?

19  A.      Correct.

20          Just -- I don't know if I made this clear or not with

21  him, but he was in administrative segregation for his own

22  safety.  He was labeled as a snitch, and he became a target.

23  That was why he was there to my knowledge.

24  Q.      Doctor, you testified this morning about the

25  Interdisciplinary Treatment Team process.  That process is

2560

1    designed to allow multiple disciplines to get together to

2    discuss the care provided to an inmate, correct?

3    A.      Yes.

4    Q.      And are you aware that within CDCR the clinicians

5    meet with the inmate separately prior to the treatment team

6    meeting?

7    A.      Yes.

8    Q.      Would you agree inmates have the right to refuse

9    mental health treatment?

10   A.      Depends on how sick they are.

11   Q.      So if they would qualify for an involuntary

12   medication order for example, clinicians could intervene; is

13   that what you are saying?

14   A.      Yes.

15           Also many of the refusals that I mentioned -- I think

16   I talked about reasons why there were refusals, you know,

17   refusals because people don't want a strip search, refusals

18   because people don't want to be in cages, refusals because

19   people don't have confidential treatment spaces where their

20   sessions are heard -- where their sessions could be

21   overheard, that they're not confidential.

22           I cited many reasons why inmates refuse.  If the

23   atmosphere were more therapeutic and the actual contacts were

24   more therapeutic, there would be fewer refusals.

25   Q.      What about pressure from gangs?

2561

1          THE COURT:  What about it?

2    BY MR. MCKINNEY:

3    Q.     Is that a reason why an inmate may not come out for

4    treatment?

5          THE COURT:  In your experience did anybody say that?

6          THE WITNESS:  I don't recall anybody saying that.

7    BY MR. MCKINNEY:

8    Q.     Did you speak with Dr. Jordan at CIM while you were

9    there?

10   A.     I did.

11   Q.     Are you familiar with the declaration he filed in

12   this matter in support of the State's reply brief in support

13   of the termination motion?

14   A.     I've seen parts of it.

15   Q.     Are you aware that he testified that a significant

16   portion of the inmates at CIM do not come out due to gang

17   pressures?

18   A.     I don't recall that.

19          MR. MCKINNEY:  May I approach the witness, Your

20   Honor?

21          (Exhibit handed to witness.)

22   BY MR. MCKINNEY:

23   Q.     Doctor, I'm showing you Dr. Jordan's declaration

24   filed on March 22nd.

25          THE COURT:  He's already -- I'm sorry.  Let's assume

2562

1  that the declaration says what it says.  The witness says

2  nobody ever said that to me.

3          MR. MCKINNEY:  Right.

4          THE COURT:  What's the point?

5          MR. MCKINNEY:  Well, has he looked and reviewed this

6  declaration --

7          THE COURT:  What difference does it make?

8          MR. MCKINNEY:  I don't want to argue, Your Honor.  I

9  believe it is germane to his opinions, but --

10          THE COURT:  No.  You may proceed, sir.

11          Don't worry about it, Doctor.

12  BY MR. MCKINNEY:

13  Q.      Doctor, are you aware that 40 percent of inmates in

14  the administrative segregation unit at CIM have informed

15  staff they do not come out for treatment due to gang

16  pressure?

17  A.      No, I'm not aware of that.

18  Q.      And that the remaining 60 percent do regularly come

19  out for treatment?

20  A.      I'm not aware of how regular that is.

21  Q.      Doctor, the treatment team concept does not exist in

22  the community, correct?

23  A.      It absolutely does.

24  Q.      So in your practice you get together with a

25  psychologist and a clinical social worker and other

2563

1    clinicians on a regular basis to discuss your patient's

2    treatment?

3    A.      I do at the clinic where I'm the medical director.

4    Q.      And the inmate is there -- the patient is there?

5    A.      That particular type of conference the patient is not

6    present for.

7    Q.      You testified that not having the patient there leads

8    to unfavorable outcomes this morning, correct?

9    A.      That was in that specific kind of team conference.

10   You're comparing two totally different team conferences.

11   Q.      I think that's my point.

12           And you testified about the inmates not coming out at

13   CIM, but on that day you were there, correct?

14           Were you there in the treatment setting?

15   A.      Yes.  We were there when nine inmates were invited

16   and didn't show up.

17   Q.      Dr. Haney was there, correct?

18   A.      Yes.

19   Q.      And a number of lawyers were there, correct?

20   A.      Yes.

21   Q.      Could that have had anything to do with the reasons

22   why they didn't want to come out?

23   A.      I don't want to speculate about that.

24   Q.      Not about that.

25   A.      But what I might add is that we were told that it was

2564

1    a habitual occurrence there, whether there were lawyers there

2    or not.

3            And that also I believe the defendants' witnesses

4    have also called attention to that, as has the Special

5    Master.

6    Q.    Doctor, with respect to the EOP population, you're

7    not aware of any jurisdiction in the United States that

8    provides more than ten hours of treatment, are you?

9    A.    You know, as I said before, I'm not really sure right

10   now of how many hours of treatment are done at other

11   institutions, but I think the California EOP situation is a

12   unique one.

13            THE COURT:  It is three o'clock.  We'll take our

14   afternoon recess.

15            (Off the record at 3:00 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                THE COURT:  Mr. McKinney.
 2   BY MR. MCKINNEY:
 3   Q.      We were discussing the IDTT meetings at CIM.
 4           Did you follow up with any of the nine inmates who did
 5   not come out of their cells for the meeting?
 6   A.      No, I did not.
 7   Q.      Doctor, is it your opinion that inmates with mental
 8   issues should not be housed in administration segregation?
 9   A.      Except in cases of extreme emergencies and briefly,
10   and with the possible exception of some extreme acts of
11   violence where it's absolutely necessary.
12   Q.      If the inmate's safety is at risk, is that an extreme
13   emergency?
14   A.      That's just the kind of situation -- well, depends on
15   the issue with the safety.  If it's somebody threatening him,
16   then he needs to be in a safe place, but not necessarily one
17   that's going to lead to psychosis and depression.
18           But if an inmate is suicidal, he doesn't belong in
19   that kind of unit except for a very, very short time until he
20   can be transferred to a place that is not only safe but
21   therapeutic.
22   Q.      What about if an inmate presents a threat to the
23   safety of other inmates?  Is that an emergency situation?
24   A.      I would say that's an emergency, yes, but, again, if
25   it's because of a mental illness, then he needs to
```

 1    immediately be placed in an appropriate psychiatric facility.

 2    Q.      If an inmate with a mental health issue, for example,

 3    murders another inmate, that inmate should not go into

 4    segregation.

 5            Is that your testimony?

 6    A.      I think that's a very broad question.  I think if

 7    somebody murders somebody, obviously there are certain

 8    punitive considerations that must take place, but that is

 9    really a very, very extreme situation, and, of course, there

10    are so many punitive considerations when somebody murders

11    someone, but it depends on the mental health of someone.

12            If it's someone with an overt psychosis whose

13    hallucinating and the voices told him to do it, that person

14    is really going to be at risk for suicide if you put him in

15    segregation where he can't be adequately monitored and cared

16    for.

17            So it's a very overly broad question that you have to

18    look at the specifics.  In no way do I negate the necessity

19    for punitive practices in our society and the correctional

20    system.

21    Q.      I think that's what we're trying to understand.

22            When you refer to an inmate with mental illness that's

23    in this category, is it someone that is floridly psychotic in

24    experiencing the types of hallucinations that you just

25    described?

2567

```
 1              Is that what you're referring to?
 2    A.       That's at the end of the spectrum that says this is a
 3    mental health issue and this guy needs to be in a really well
 4    equipped mental health facility to treat him and keep him
 5    from killing himself or somebody else.  Preventing him from
 6    killing somebody else won't solve the problem.
 7    Q.       If it takes a little time to get that floridly
 8    psychotic inmate into a setting where he's receiving that
 9    treatment, that's not okay to put him in that physical
10    setting.
11    A.       It depends on what a "little time" is.  If it's
12    13 years, that doesn't work.  If it's a year, that doesn't
13    work.  I mean, I saw statistics on how long inmates -- I
14    think it was Special Master's 25th report.  There were a
15    large number of inmates that were in ad seg for more than
16    90 days that were mentally.
17    Q.       But a larger number that were in there for less than
18    90 days.
19              Do you recall that?
20    A.       Yes.
21    Q.       And you are aware that inmates sometimes seek out
22    administration segregation to obtain self-imposed protective
23    custody status?
24    A.       Yes, I am.
25    Q.       In that situation, is it okay for the inmate to be
```

1    placed there if they have a mental health issue?

2    A.    It depends on the severity of the issue.  If they

3    are -- also it should only be temporary until an appropriate

4    facility can be found.  If an inmate is afraid for their

5    safety and it's totally delusional, than that inmate needs

6    mental health treatment as soon as possible.

7    Q.    Another inmate may have a preference for not having a

8    cellmate; correct?

9    A.    I saw a lot of examples of psychotic inmates that were

10   punished repeatedly because they refused a cellie because of

11   their psychosis.  I don't deny that somebody might not want a

12   cellie just out of choice or somebody might not want a cellie

13   because they've been attacked and beaten and almost killed by

14   a previous cellie, and I've seen that.

15          And --

16   Q.    By punishment, you're referring to --

17          THE COURT:  I don't think the witness has finished his

18   answer.

19          MR. MCKINNEY:  I'm sorry, Doctor.

20          THE COURT:  It appeared you hadn't finish.

21          THE WITNESS:  I hadn't, but I lost my train of

22   thought.

23          MR. MCKINNEY:  I apologize.  I think I lost my train

24   of thought as well.

25          THE COURT:  Let's all try to get on the train now.

1    BY MR. MCKINNEY:

2    Q.      Doctor, at deposition you testified your opinion is

3    that inmates with mental illness --

4            THE COURT:  Sir, ask the question, then you can read

5    the deposition.  That's the way we do it.

6    BY MR. MCKINNEY:

7    Q.      Doctor, is it your opinion that inmates with mental

8    illness should not be placed in prison, and, in fact, that

9    should be avoided wherever possible?

10   A.      I think it should be avoided wherever possible, but

11   sometimes its necessary.

12   Q.      You testified about strip searches this morning, and

13   the basis for those opinions is your tours to the three

14   facilities.

15           Is that correct?

16   A.      The basis for all my opinions go beyond my tours of

17   the three facilities.  It includes reviews of many, many

18   medical records, RVRs and review of the Special Master's

19   report, review of the other experts in the case.

20           So all of my opinions go beyond the three tours, but

21   most specifically what we're addressing here is my

22   observations in those three tours.

23   Q.      And the only policies you reviewed with respect to

24   strip searching were at those three prisons.

25           Correct?

1    A.      I reviewed the overall CDCR policies, and I wouldn't

2    want to be quoted word for word on any of those qualities,

3    but those policies are uniform throughout the system.

4    Q.      As you sit here, do you recall who you spoke with who

5    expressed a dissatisfaction with the strip search policy?

6    A.      Are you talk about inmates?

7    Q.      Correct.

8    A.      Inmate B, Inmate A, prisoner D, quickly those three

9    come to my mind.

10   Q.      Is it your opinion that inmates in segregation for a

11   non-disciplinary reason should not be strip searched?

12           Is that right?

13   A.      Unless there is another very good reason to strip

14   search them.

15   Q.      Those would be the direct reasons you testified to on

16   direct testimony, such as they had a weapon?

17   A.      Yes.

18   Q.      Or they were found with drugs in the cell?

19   A.      Yes.

20   Q.      Or they had assaulted someone?

21   A.      Yes.

22   Q.      But then they likely would not be in segregation for a

23   non-disciplinary reason.

24           Would you agree with that?

25   A.      It depends.

1    Q.      And is it your opinion that the department can have

2    some inmates in a unit that are subject to a strip search and

3    then other inmates in the same unit that are not subject to

4    strip search?

5    A.      I think that can be done.  I think there are some

6    custodial difficulties with that and that's why I'm more in

7    favor of a special treatment section in the prison where

8    everyone in that section is treated therapeutically.

9            The more mixtures you have, the more difficulties you

10   have.  We saw that facility, the woman's facility where there

11   were three very different kinds of inmates housed in the same

12   area.  We saw in Corcoran a yellow line down the middle of

13   the cell block.  Any time you have mixtures like that, it

14   makes for a more difficult handling.

15           But what I'm against is discriminating against people

16   just because there isn't a bed and depriving them of all

17   kinds of privileges and strip searching them when they go

18   anywhere when they haven't done anything.

19   Q.      Is incurring a drug debt and needing to go into

20   segregation for your own safety not doing anything?

21   A.      It is originally.  But, again, I'm not sure about the

22   validity of incurring the drug debt.  I didn't think you were

23   supposed to be able to buy and sell drugs in prison, but I

24   guess you can.

25   Q.      That would be something an inmate could secret into a

1    segregation unit if they're not subject to a strip search;

2    correct?

3    A.      Yes.  That's why you have to individualize it if you

4    have a suspicion for that.  But then again, you're strip

5    searching them every time they go anywhere twice.  I think

6    that's overdoing it.  They go out to another cage in the yard

7    and they're strip searched coming and going and they have no

8    history of secreting things.  I have to wonder why that is

9    necessary to subject everybody to that.

10   Q.      An inmate subject to strip search would likely not

11   coerce another inmate who is not subject to bring something

12   into the unit?

13   A.      There is a lot of coercion that goes on in the prison

14   about a lot of things and it's one of the major failings of

15   our California Prison System.

16   Q.      Are you aware that the state opened nearly 200 special

17   needs yard beds at Valley State Prison recently?

18   A.      No, I'm not.

19   Q.      Are you aware of how many special needs yards bed the

20   state operates?

21   A.      No, I don't know.  I'm only ware that there's a real

22   lack of special needs yard beds when I visited the

23   institution.

24   Q.      Are aware whether that persists today?

25   A.      No, I'm not.

1    Q.    Doctor, for an inmate that's difficult to place, he's

2    got safety issues, he can't go to particular yards, is it

3    unreasonable in your opinion to place that inmate in

4    segregated housing awaiting the placement?

5    A.    It depends on how long.  I think that if you put

6    somebody in ad seg who doesn't belong there and you subject

7    them to those condition and he doesn't know when he's getting

8    out, I think there's a real risk of deterioration.

9          I think if you need to house somebody there

10    temporarily, you need to get them out as soon as possible,

11    like within a few days.

12    Q.    Let's assume that's not possible, hypothetically

13    speaking, and is the alternative to leave the inmate in his

14    general population unit?

15    A.    Well, I'm talking about when there's a risk of mental

16    illness, you need units capable of handling these people, not

17    ad seg.

18    Q.    You're not aware of other jurisdictions that offer

19    group treatment in segregation; is that correct?

20    A.    I don't know what's offered today.  There are other

21    experts who I assume won't give their opinions on that.

22    Q.    You testified this morning, I believe, about your

23    belief that inmates are cuffed and shackled in the treatment

24    modules.

25          Did I hear that correctly?

```
 1    A.      Yes.

 2    Q.      You believe that's what occurs?

 3    A.      I believe that's what I saw.

 4    Q.      You observed an inmate in group therapy cuffed and

 5    shackled in a treatment module?

 6    A.      Yes.

 7    Q.      Where was that?

 8    A.      I'm not sure if it was Corcoran or CIM.  I'd have to

 9    correct my notes.

10    Q.      There are inmates who refuse treatments for reasons

11    that have nothing do with the treatment modules; is that

12    correct?

13    A.      Yes, I've talked about many of those other reasons.

14    Q.      And you're aware that the treatment modules were

15    approved by the Special Master six years ago?

16    A.      I don't know.

17    Q.      And that they were endorsed by one of the Special

18    Master's experts, Dr. Jeffrey Messner, a psychiatrist?

19            Are you aware of that?

20    A.      I don't know.

21    Q.      Would you agree that the modules remove the need to

22    have a correctional officer present in the treatment room?

23    A.      Yes.

24    Q.      And you also testified that Corcoran has explored the

25    use of the alternative treatment chair.
```

1              Is that right?

2    A.      Yes.

3    Q.      You were shown a picture.

4              Did you observe the ATOM chair in use?

5    A.      Yes, I saw the three inmates in the chair and spoke to

6    them about it.

7    Q.      And those inmates told you that they performed the

8    therapeutic models to the chair.

9              Is that right?

10   A.      I don't remember who said what about it, but my

11   experience was compatible with the report that said two out

12   of three prefer the module to the chair.

13   Q.      If an inmate does not feel safe in group treatment,

14   that would also be a deterrent to treatment.

15             Would you agree with that?

16   A.      It would be, but it would be something to be worked an

17   in intensive individual therapy to try to overcome their

18   fears.

19   Q.      Is it your opinion that you could have some inmates in

20   a group therapy session in a module, other inmates not in a

21   module?

22   A.      I wouldn't feel comfortable.  It wouldn't seem to work

23   for me.

24   Q.      They would all be unrestrained?

25             Is that what you're talking about?

1    A.       I'm talking about the tethered chair, mostly talking

2    about an individual assessment to see which inmates need

3    which kind of restraints and which don't, rather than putting

4    them all in modules.

5    Q.       If therapeutic modules were not used, wouldn't it be

6    necessary for an officer to be in the room?

7    A.       I was talking about this, the use of just a simple

8    foot tether, and a table and chairs which would -- again,

9    individuals would be evaluated as to suitability to

10   participate in this kind of restraint and to work their way

11   out of it, and it would not require an officer.

12           I'm not comfortable with an officer sitting in unless

13   the officer has received detailed mental health training and

14   is able to operate on a very high therapeutic level;

15   otherwise, officers tend to stifle communication on the part

16   of an inmate in therapy.

17   Q.       In fact, it would eliminate confidentiality as well;

18   right?

19   A.       That's correct.

20   Q.       I believe you just testified that some form of

21   restraint is necessary in the group setting, at least in the

22   segregated --

23   A.       I did not say that.  I said at times it may be

24   necessary to have a form that's less constraining, less

25   restrictive, less punitive, but that I would really want as

1    part of this stepdown idea for inmates to progress to a point

2    where they didn't need any tether.

3    Q.    So you again could have a situation where some inmates

4    are restrained and others are not?

5    A.    Not in the same group.  You want to have people at the

6    same level in many ways in a group.  It's not always

7    possible, but the more different kinds of homogeneity you

8    have in a group, the better the group functions.

9    Q.    This morning you testified that in the groups that

10   you've run, you tell the inmate that it's confidential and

11   it's not permitted to injure someone else.

12         That implies that they're not restrained; is that

13   correct?

14   A.    In that context, I wasn't talking about in a prison.

15   My contemporaneous groups are not in a prison; however, when

16   I was at Lewisberg and I conducted group therapy, and it was

17   a long time ago, but those were two basic premises that I

18   would begin the group process with.

19   Q.    But, again, your testimony here today is that in the

20   CDCR some form of restraint for a particular group is

21   either -- should either be done or not done, depending on the

22   individual factors?

23   A.    Yes.

24   Q.    Just a couple of other questions about the EOP program

25   at CCWF.  You testified that there were EOP inmates in

1    segregation at that prison.

2          Is that correct?

3    A.     I saw -- let me just be sure about that.  I would have

4    to look at everything.  I see EOP inmates in general

5    population and I saw an EOP non-ad seg group there, and then

6    there was no EOP hub in ad seg, although there was some

7    question about whether there was or not, and it seemed clear

8    that there was not.

9    Q.     All the inmates you interviewed in segregation were

10   CCCMS; right?

11         That would be A, B, and D, I believe?

12   A.     I saw C there.

13   Q.     The condemned inmate; is that correct?

14   A.     Yes.  She was CCC.

15   Q.     But A, B and D were all CCCMS; correct?

16   A.     D is a male, unless I'm getting confused between two

17   different inmates.

18   Q.     Yes, there was some confusion.  D is a female at CCWF

19   and then there was a second D who you did not testify to in

20   direct.

21         Correct?

22         MS. MENDELSON:  Please provide the paragraph numbers.

23         Mr. McKinney, could you please provide the paragraph

24   numbers for the witness?

25   /////

1    BY MR. MCKINNEY:

2    Q.      I believe it's Inmates A, B and C.

3            A is at 110, 111 and 142.

4            THE COURT:  I thought you were talking about D?  I

5    don't know.

6            MR. MCKINNEY:  I believe she was a condemned inmate,

7    but, hopefully, the doctor can clarify that.

8            THE WITNESS:  What's the question again?

9    BY MR. MCKINNEY:

10   Q.      Whether all the inmates you interviewed in segregation

11   at CCWF were at the CCCMS level of care?

12   A.      Prisoner A was EOP.  She was not CCC.

13   Q.      Okay.  B and C were CCCMS?

14   A.      Yes.

15   Q.      You talked about the therapeutic modules at CCWF.

16           You mentioned they weren't in use, but the reason for

17   that is because there was not yet an ad seg EOP hub at the

18   institution.

19           Correct?

20   A.      Yes.  I believe I've already testified to that.

21           MR. MCKINNEY:  One motion, Your Honor.

22           No further questions.

23           THE COURT:  Any redirect?

24           MS. MENDELSON:  No, Your Honor.

25           THE COURT:  May the witness be excused?

```
 1                    MR. MCKINNEY:  Yes.

 2                    THE COURT:  You may step down.  You're free to stay or

 3       go, as you choose.

 4                    THE WITNESS:  Thank you, Your Honor.

 5                    THE COURT:  My courtroom deputy tells me that we can

 6       safely, as I understand it, and, Anna, please tell me if I'm

 7       wrong, just renumber from Wednesday on.

 8                    Is that right?

 9                    MS. VOROUS:  We started on Tuesday.

10                    THE CLERK:  But you started admitting on Wednesday.

11                    MR. BIEN:  I think it's defendant's exhibits would be

12       renumbered.

13                    THE COURT:  Right.  So we have a stipulation that the

14       exhibits introduced from Wednesday on will be designated by

15       letters triple; in other words, AAA, BBB, et cetera?

16                    So stipulate?

17                    MR. BIEN:  Yes.

18                    MS. VOROUS:  Yes.

19                    MR. BIEN:  One other thing, we thought Defendant's

20       Exhibit F is not under seal, and there's no objection that it

21       will be under seal.

22                    THE COURT:  It will be placed under seal.  That's the

23       order.

24                    MR. BIEN:  You mentioned something about the

25       transcript numbers.
```

1          THE COURT:  This will solve the problem.

2          When do we reconvene?

3          THE CLERK:  Tuesday the 3rd --

4          MR. BIEN:  I thought you made it Wednesday.

5          THE CLERK:  That's right.

6          THE COURT:  Wednesday.

7          MR. BIEN:  We're shifting to defendants.

8          THE COURT:  As long as everyone is in agreement with

9     what we're doing.

10          MS. VOROUS:  We're in agreement.  We're trying to find

11     witnesses at this point because we had initially intended on

12     calling rebuttal witnesses to Dr. Stewart, but given the

13     shift, at this point we believe we have at least one, and

14     we're going to try to bring in a couple of more.

15          MR. BIEN:  Dr. Stewart is coming on Thursday.

16          THE COURT:  Off the record.

17                    (Whereupon, proceedings concluded at

18                    3:56 p.m.)

19                    ---o0o---

20

21

22

23

24

25

1                                    CERTIFICATION

2

3          I, Michelle L. Babbitt, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9                                    /s/ MICHELLE L. BABBITT
                                     MICHELLE L. BABBITT CSR #6357
10                                   Official Court Reporter
                                     United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                          ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6            I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10                   IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25