1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---O0O---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7         Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11        Defendants.

12    _____/

13

14

15                    ---o0o---

16

17               REPORTER'S TRANSCRIPT

18             RE:  EVIDENTIARY HEARING

19           WEDNESDAY, DECEMBER 4TH, 2013

20

21                    ---o0o---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                              APPEARANCES

 2                              ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
 6              SAN FRANCISCO, CALIFORNIA  94104

 7              BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8              BY:  MARGOT KNIGHT MENDELSON, ATTORNEY AT LAW

 9              BY:  AARON FISCHER, ATTORNEY AT LAW

10

11

12    FOR THE DEFENDANTS:

13               STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
14               13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
15
                BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
16
                BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
17
                BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
18

19

20                             ---o0o---

21

22

23

24

25
```

1                        EXAMINATION INDEX

2                            ---o0o---

3

4    FOR THE DEFENDANTS:

5        EXAMINATION:                              PAGE

6

7      DAVID LEIDNER

8          Direct Examination by Ms. Vorous        2582
           Cross-Examination by Mr. Bien           2598
9

10

11     ROBERT FISCHER

12         Direct Examination by Mr. Sharma        2648
           Cross-Examination by Mr. Fischer        2664
13

14

15

16                           ---o0o---

17

18

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3

 4     PLAINTIFFS'
       EXHIBIT NO            DESCRIPTION                EVD
 5

 6       2520          Suicide Report for Prisoner 4    2695
                       (Sealed)
 7
         2569          Summary - Outpatient Population  2627
 8                     (Sealed)

 9       2574          CDCR Plan Excerpt                2622
                       (Sealed)
10
         2585          Corcoran Mgmnt Rpt.              2678
11
         2592          CDCR Length of Stay Data         2604
12                     (Sealed)

13       2596          Prisoner F, Length of Stay       2638
                       (Sealed)
14
         2597          Prisoner E, Length of Stay       2636
15                     (Sealed)

16       2598          Prisoner D, Length of Stay       2631
                       (Sealed)
17

18

19

20

21

22                            ---o0o---

23

24

25
```

```
 1                    SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, DECEMBER 4, 2013; 9:35 A.M.

 3                          ---oOo---

 4

 5          THE COURT:  Call your next witness.

 6          MS. VOROUS:  Good morning.  Defendants call Dr. David

 7     Leidner.

 8          THE COURT:  Come around to be sworn, sir.

 9                        DAVID LEIDNER

10     called as a witness on behalf of the defendants herein, was

11     sworn, examined, and testified as follows:

12          THE CLERK:  You do solemnly swear that the testimony

13     you are about to give to this court in this proceeding is the

14     truth, the whole truth and nothing but the truth, so help you

15     God?

16          THE WITNESS:  I do.

17          THE CLERK:  Take a seat, state your name.  Spell your

18     last name and speak directly into the microphone.

19          THE WITNESS:  My name is David Leidner, L-E-I-D-N-E-R.

20                      DIRECT EXAMINATION

21     BY MS. VOROUS:

22     Q.    Good morning, Dr. Leidner.

23     A.    Good morning.

24     Q.    What is your current title with CDCR?

25     A.    I'm a senior psychologist specialist.
```

1   Q.      How long have you been in this position?

2   A.      Since 2009.

3   Q.      What are your duties as a senior psychologist

4   specialist?

5   A.      I compile data regarding mental health treatment in

6   CDCR and generate reports that are used by schedulers,

7   clinicians, managers at institutions, also management at

8   headquarters, as well as staff from other branches of CDCR.

9   Q.      Doctor, you're a psychologist; correct?

10  A.      That's correct.

11  Q.      When did you obtain your Ph.D.?

12  A.      1999.

13  Q.      Where did you obtain it?

14  A.      At George Washington University in Washington, D.C.

15  Q.      Are you currently licensed in California?

16  A.      Yes, I am.

17  Q.      Doctor, would you please describe your current

18  qualifications for your current position with CDCR.

19  A.      My Ph.D. in clinical psychology involved fairly

20  rigorous training in statistics and research methods,

21  including several years as a research assistant for the

22  George Washington University of Medical School where I

23  analyzed psychosocial data.

24          I was also adjunct faculty at the university as a

25  statistics consultant.  I taught statistics at the community

 1    college, and since 2009 I've analyzed data statewide for

 2    CDCR.

 3    Q.      Prior to starting your current position, did you hold

 4    any other positions within CDCR?

 5    A.      Yes.  I worked as a clinician in the California Men's

 6    Colony and moved on to doing their Coleman compliance data

 7    analysis.

 8    Q.      Tell us what you mean by that.

 9    A.      I did their smaller version of what I do now.  I

10    compile data on mental health treatment and then I generate

11    reports for the Coleman round visits.

12    Q.      Doctor, can you please describe what you mean by

13    managing data or the system of data management that you

14    currently do as part of your position --

15            THE COURT:  I'm sorry.  I must interrupt for a moment.

16    I was under the -- it just occurred to me it's my fault.  I

17    was under the impression I was going to get a report this

18    morning concerning the members of the Coleman class who were

19    in administrative segregation who had not committed any

20    impropriety.

21            Is that not going to happen today?

22            MS. VOROUS:  Your Honor, it's my understanding that

23    there is a memorandum that is supposed to be ready for

24    distribution today.  I do not have it right now.

25            THE COURT:  All right.  That's fine.

 1              I'm sorry.  The reason I said this, I know I'm going

 2    to get a call from the other judges on the three-judge court

 3    about extending the period of time for compliance, and that

 4    turns to some significant degree upon whether or not you're

 5    addressing this problem.

 6              All right.

 7              MS. VOROUS:  Not with this witness though, Your Honor.

 8              THE COURT:  That's fine.

 9    BY MS. VOROUS:

10    Q.        So, Doctor, just to go back to my prior question, if I

11    can restate it.

12              Can you please explain for the court the system of

13    data analysis that you manage.

14    A.        Certainly.  It starts with the data sources, and we

15    get data from a lot of different sources, most notably the

16    Mental Heath Tracking System, MHTS Net, also other sources of

17    data, for example, the Strategic Offender Management System

18    called SOMS.

19              CQIT is another one that's coming online that we're

20    also getting data from, a lot of other places too, medication

21    data, things like that, also further down the line, the

22    Electronic Health Record System.  So those are all sources of

23    data for us.

24              I compile it, that data gets sent, and we keep it in

25    what I call a data warehouse.  They get all compiled there,

 1    and from there, I write the programs that generate different

 2    reports on these data that are used by -- we have about 730

 3    unique users per months, 20,000 views of these reports per

 4    month.

 5         It's effectively a website you can go to and run

 6    reports on, for example, the length of stay of patients.

 7    That's what I think we would be talking about today.  But

 8    also things like patient history or current due dates for

 9    patients, things like that.

10    Q.    Let's go back to the Mental Health Tracking System,

11    MHTS.net.

12         When was that developed?

13    A.    I think development started on that in 2009, and then

14    was rolled out to the institutions in 2010.

15    Q.    Would you describe what it was developed for, the

16    purpose of MHTS.net?

17    A.    It was developed as an data entry tool to track

18    clinical contacts, mostly appointments, things like that,

19    referrals, things like that.

20    Q.    Are you still working on MHTS.net?

21    A.    It's a constantly improving system, so we're

22    continuously getting feedback on it and updating it.  It's

23    been live and functioning since 2010.

24    Q.    Doctor, can you also describe what the Strategic

25    Offender Management System is.

1   A.       That is a custody system used primarily, to my

2   understanding, to track inmate location and status.

3   Q.       Do you know when that was implemented?

4   A.       I believe that was around 2011 or in that year that it

5   went live at the institutions.

6   Q.       You also mentioned CQIT.

7   A.       Yes.  The Continuous Quality Improvement Tool.  That's

8   something the Mental Health Department created to gather more

9   detailed information on Mental Health Treatment Services.

10  It's the onsite visits that we're doing.

11  Q.       How long have you been working on that project?

12  A.       So I would say about a year for six months.  About a

13  year ago we worked with the Coleman court monitors to develop

14  that tool.

15  Q.       Doctor, you also talked about taking all of the data

16  sources and putting them in some sort of, I believe you said,

17  aggregate warehouse.

18  A.       "Data warehouse" is my term for it.

19  Q.       Describe what that is as well, please.

20  A.       Physically, it's a couple of computer servers who have

21  very large hard disks so that you can store a lot of

22  information.  So information from all these data sources is

23  stored in its own separate area and there's a program you can

24  use to pull the data together and run all sorts of analysis

25  on it and generate the reports that are being used.

1    Q.      Doctor, do you program the reports that are being

2    used?

3    A.      I do.

4    Q.      How many types of reports are available?

5    A.      It's an always evolving system.  Currently I counted

6    31 such reports.  They run the range from all sorts of

7    different things, from sort of realtime application where you

8    want to know what to do for a given patient at a given time,

9    to historical performance over time kind of reports.

10   Q.      And through this process are the reports available for

11   managers at CDCR to use?

12   A.      Yes, they are.  They're available at any time.  You

13   just go to the website and run them and set the parameters,

14   date ranges, whatever you want to get the information that

15   you would like.

16   Q.      Are they also available for use by clinicians at

17   individual institutions?

18   A.      Yes.  Like the current due dates report that tells you

19   when things are due for giving the patients, that's used

20   quite a bit by clinicians at the institutions on a daily

21   basis.  Other reports are used by schedulers on a daily

22   basis.

23   Q.      Are there any limitations with the reports that can be

24   generated?

25   A.      Yes.  So, for example, the data we have in terms of

1    inmate's housing in different areas only goes back to April

2    of 2008.  We don't have data prior to that.  Another

3    limitation is we're missing some of the data in terms of when

4    patients have discharged CDCR for older patients, so that's

5    something we're working to fill in the gaps on that.  Those

6    are two limitations.

7    Q.    Is CDCR currently doing anything to continue improving

8    its reporting capabilities?

9    A.    Yeah.  We have a pretty lively continuous quality

10   improvement cycle.  I run a webinar every week for at least

11   an hour and a half, usually longer, with whomever wants to

12   come, so that's typically managers and users from the field

13   and headquarters.

14         They give me feedback and ask me questions about the

15   reports, and based on what they tell me, I will modify the

16   reports, create new reports, whatever needs to be done.

17   That's an ongoing cycle.

18         We have not a very parallel system set up for the

19   Mental Health Tracking System itself, which is one of the

20   data sources where we do, effectively, the same thing.

21   Q.    Doctor, if I could draw your attention to what's

22   previously been marked as Plaintiffs' Exhibit 2040 in the

23   binder in front of you.

24         THE COURT:  In evidence, Madam Clerk?

25         THE CLERK:  Yes.

```
 1   BY MS. VOROUS:

 2   Q.      Doctor, do you recognize this report?

 3   A.      I do.

 4   Q.      Describe what it is.

 5   A.      This particular one is telling me the length of stay

 6   at a given institution for patients who are in segregated

 7   housing on September 16, 2013, and the most recent length of

 8   stay for those patients as of September 16th.

 9   Q.      Do you know how this report was created?

10   A.      I do.

11   Q.      How?

12   A.      Based on the model I told you where data are

13   aggravated in this warehouse, I wrote the code that generates

14   a generic length of stay that can be used by users to do all

15   sort of things.

16           A typical example would be, say, in a given month, how

17   many patients have been in my crisis bed and for how many

18   days, so how many census days, for example, in a given month

19   my crisis bed has been used.  So that report was used to

20   generate this particular version, these particular data.

21   Q.      Did you write the program to use to generate this

22   report?

23   A.      Yes, I did.

24   Q.      What is the purpose of this report?  And, again, I'm

25   referring to the Plaintiffs' Exhibit 2040.
```

1    A.        So this specific one?

2    Q.        Yes.

3    A.        This report could be -- I guess it was generated for

4    the court, but the information it gives you, for example, I

5    can see where a given patient arrived at an institution, the

6    date they most recently arrived in that segregated housing,

7    whether at that institution or prior, and then the date that

8    they became that level of care.

9            If I'm looking a CCCMS patients, the date they became

10   CCCMS.  I can use those dates to determine either how long

11   they've been at that housing or how long they've been at that

12   institution or at that level of care.  This particular length

13   of stay column here shows you how long they've been at that

14   institution in that housing at that level of care.

15   Q.        You indicated that this report -- strike that.

16           I believe you indicated that this report was generated

17   from a larger report that you created?

18   A.        That's correct, yes.

19   Q.        What was the purpose of the larger report?

20   A.        The larger report is, again, a general purpose report.

21   So it depends on what parameters you set for it and what it

22   will tell you.  So you could ask it to tell you all sorts of

23   things about patients, length of stay in segregated housing.

24   Q.        Was the report created for use by managers within the

25   prison system?

 1   A.       Yes.  It's used specific -- it was created primarily

 2   for the use at the institution level, for institution

 3   managers to sort of see how long -- how their particular

 4   housing unit is being used, how many beds are taken per

 5   night, whose coming and going during any given date range.

 6   Things like that.

 7   Q.       Is this a mental health generated report?

 8   A.       Yes, it is.

 9   Q.       Doctor, if you would just look at the first page of

10   this report as an example.  I believe you've already covered

11   some of this, but in looking at, I think it would be the

12   fifth column over to the right, the institution arrival

13   date --

14          THE COURT:  May I interrupt?  It would be helpful, if

15   you can, to put up the report so that I can follow what's

16   being said; otherwise, I have to go find it in those hundreds

17   of documents.

18          If you can't do it, that's fine.

19          Thank you, ma'am.

20   BY MS. VOROUS:

21   Q.       Looking at the column that's entitled Institution

22   Arrival Date, that's the date that the inmate that we're

23   talking about here whose name has been redacted arrived at

24   Avenal State Prison.

25          Correct?

1    A.      Yes.  They're most recent arrival to Avenal.

2    Q.      And the next column, the Program Arrival Date, would

3    that be the date that the inmate was placed in administrative

4    segregation?

5    A.      Right.  The most recent arrival to administrative

6    segregation, whether it occurred at that institution or a

7    prior institution.

8    Q.      Looking at the next column, the Level of Care Date, is

9    that the date that the particular inmate became designated as

10   an inmate in the CCCMS level of care?

11   A.      Correct.  The most recent time they became CCC,

12   whether or not that occurred at that institution or prior.

13          THE COURT:  How do you know, sir, that it's CCCMS

14   instead of EOP or something else?

15          THE WITNESS:  Under Program Level of Care, that column

16   tells me which program -- that's ASU -- and which level of

17   care, CCCMS, which we're referring to.

18          THE COURT:  I see.

19          THE WITNESS:  If we flip through --

20          THE COURT:  I see it.

21   BY MS. VOROUS:

22   Q.      Can you explain how the length of stay is calculated

23   for different scenarios in terms of institution arrival date

24   or program arrival date or level of care date?

25   A.      Because this report was basically created for the kind

1    of an institution level view.  It's going to say:  Well, at

2    your institution, what's the length of stay of this patient's

3    most recent stay at your ad seg at CCC?

4         So at this stage, the length of stay is going to say:

5    I'm going to start counting from the most recent of these

6    three days; in other words, when they were at your

7    institution and in ad seg and CCC.

8         So all three conditions.  So you have to start at the

9    most recent date to do that.

10   Q.    Why would it be important to start counting from the

11   date the inmate arrived at the institution?

12   A.    At the institution level, they're very interested in

13   what day did they become CCC and ad seg because that triggers

14   a lot of rules for the program guides that we're responsible

15   for following through and providing services and so forth.

16        So those dates can be very important at the

17   institution level.

18   Q.    Doctor, if a clinician at -- again, using Avenal State

19   Prison as an example wanted to know how long a particular

20   inmate had been in segregation outside of Avenal, so, for

21   instance, if they had previously been in administrative

22   segregation in a different prison, is there a report

23   available that the institution can run to find that out?

24   A.    For a given patient?

25   Q.    Yes.

1    A.      Yes.  There's a much more formative report on an

2    individual patient level that will tell me the full history,

3    not just administration segregation, but the crisis bed stays

4    and whatever else they've been up to five years ago.

5    Q.      By looking at this report, if a clinician wanted to

6    see if an inmate had been in segregation prior to arrival at

7    their institution, they could look at previous dates as well.

8            Correct?

9    A.      I could look at the program arrival date here and see

10   that they had been in administrative segregation at another

11   place prior to coming to me, yes.

12   Q.      Doctor, for purposes of this report, what happens if

13   an inmate is moved from, say, for instance, security housing

14   unit or SHU or administrative segregation?

15   A.      That would reset the program arrival date in this

16   report.

17   Q.      Is that important for CDCR purposes to have it reset?

18   A.      Yeah, sure, for the same reason for the level of care;

19   in other words, when they go to SHU or to ad seg, that

20   triggers a set of rules that we need to make sure we're

21   adhering to.  And, of course, it may also indicate to a new

22   treatment team that this is now a patient under our care.

23   Q.      Doctor, is this report working as it was designed to

24   work?

25   A.      It is.  For the institutions it is, yes.

1   Q.     How do you know this?

2   A.     Based on the feedback I get basically from the weekly

3   meetings.  I hear about it pretty quickly when a report isn't

4   working as designed or isn't meeting the needs of our certain

5   users.

6   Q.     Doctor, why have you not programmed a report that

7   shows consecutive segregation stays at different prisons and

8   reported that as a total in the Length of Stay column?

9   A.     I haven't been asked.  Nobody has asked for that

10  particular report.

11         THE COURT:  Nobody cares.

12         THE WITNESS:  I'm actually assuming there are other

13  reports that cover that information.

14         THE COURT:  Or nobody cares.

15         THE WITNESS:  Possibly.

16  BY MS. VOROUS:

17  Q.     Do you think this type of report would be a meaningful

18  report?

19  A.     I think it's meaningful on an individual level, so I

20  got a patient and I want to know:  How long has this person

21  been in segregation over the course of a long period of time

22  and also what has happened to them?  Have they gone to crisis

23  bed or OHU or DHS or whatever?

24         I don't want to see row after row of patients.  I want

25  to look at one particular patient and see what is going on

1    for them, and we do have that report, of course, because that

2    is very important information.

3    Q.      Doctor, since taking this position in 2009, have you

4    been asked to generate certain kinds of reports?

5    A.      Right now we're up to 31 such reports.  So I get asked

6    every week for something new.

7    Q.      Have you programmed reports in response to requests

8    you've received from headquarters?

9    A.      Yes.  Quite a few of them.

10          MS. VOROUS:  No more questions, Your Honor.

11          THE COURT:  Before you go, I just want to be sure, I

12   think you said something important, but I may have

13   misunderstood it.

14          You're a doctor at Avenal and you've got a patient in

15   administration segregation and this report tells you when he

16   arrived what his medical status was and how long he's been

17   there.  But if you're a treating physician, a clinician -- I

18   assume, but don't know -- that it's fairly important to know

19   how long he's been in administrative segregation over the

20   last six months, as an example?

21          This report doesn't do that but there is a report that

22   does do that?

23          THE WITNESS:  That's correct, Your Honor.

24          THE COURT:  Thank you.

25   /////

1                          CROSS-EXAMINATION

2    BY MR. BIEN:

3    Q.      Good morning, Dr. Leidner.  My name is Michael Bien.

4    I'm one of plaintiffs' counsel.

5    A.      Good morning.

6    Q.      You still have 2040 in front of you?

7    A.      I do.

8    Q.      It's correct that the length of stay column on this

9    report is programmed to provide the smallest possible number?

10   A.      Yes.  It takes the most recent of these three dates

11   and takes the difference between that and September 16th and

12   reports that as the length of stay.

13   Q.      And I thought you said at one point that you generated

14   this report for the court.

15           Is that correct?

16   A.      My understanding is this particular report was printed

17   out for the court.  I did not design this report for the

18   court, no.

19   Q.      What is your understanding of -- when you said it was

20   made for the court, what do you mean by that?

21   A.      My understanding is that this particular printout that

22   was given to you or the court was printed out to give to the

23   court.  It's a general report that can be set to run however

24   you would like it to -- not however, but within certain

25   parameters.

1          It was run and that particular output was then sent to

2     the court.  That's my understanding, but I'm not completely

3     clear on the process.

4     Q.    Who asked you to run this report?

5     A.    I did not run this report.  I wrote the code that

6     generates -- I wrote the code for the report that was used on

7     the website to generate this data.

8     Q.    Did you design this particular report?

9     A.    It's -- I designed the report that spit out the data

10    that was run and then someone else took that data and put it

11    into a spread sheet, I think, and that's what you're looking

12    at here.

13          THE COURT:  Now I am confused.

14          MR. BIEN:  I'm confused too, Your Honor.

15    Q.    You said you've created 31 reports and this is one of

16    them?

17    A.    Yes.  I've created 31 reports that exist on a website

18    and users can come and run those reports based on information

19    they put into those reports, the date ranges and so forth,

20    and then take that data and do what they will with it.  I run

21    the report, take the data and put it in this format.

22    Q.    Were you asked to create the -- you just testified

23    about the Length of Stay column.

24    A.    Yes.

25    Q.    Did you create that length of stay or did somebody

1    else create that?

2    A.      I wrote the code, yes.

3    Q.      So you made the choice that the smallest, shortest

4    date would be put there?

5    A.      Yes.

6    Q.      Who asked you to do that?

7    A.      I designed it that way based on user request, because

8    the general concept of the report is based on what you're

9    asking it.  It's going to tell you the length of stay for

10   those parameters.  So this was report was run so it said:

11   Please tell me how long somebody has been at a given

12   institution at that program most recently.

13          You can use this report to, for example, say over some

14   period of time:  How long has somebody been in ad seg total?

15          THE COURT:  But that would be a different format?

16          THE WITNESS:  It would, yes.

17   BY MR. BIEN:

18   Q.      No one has asked you to do that?

19   A.      No one has asked me to do that, no.

20   Q.      Do you know what court order this particular report is

21   responsive to?

22   A.      I do not know that.

23   Q.      Even though you were the Coleman compliance person at

24   CMC for many years?

25   A.      That's correct.

1    Q.       You're at headquarters and you do not know what court

2    order you're responding to?

3    A.       I do not.

4    Q.       Do you know there are court orders requiring length of

5    stay for Coleman class members in segregation?

6    A.       I'm not particularly aware of those.  I guess I would

7    have to see them to tell you if I'm aware of a specific one.

8    Q.       Are you -- you are aware of materials that are

9    gathered for the Special Master for tours?

10   A.       In a general sense, yes.

11   Q.       Weren't you responsible for that at CMS?

12   A.       At the time I was, yes.

13   Q.       So, not in a general sense, you actually knew about

14   it, didn't you?

15   A.       Yes.  I knew about the requirements at that time for

16   those particular rounds, yeah.

17   Q.       You were one of the people responsible for gathering

18   the data and generating it?

19   A.       Yes.

20   Q.       You understood there were court orders and requests

21   from the Special Master and you had to generate accurate

22   information?

23   A.       Right.  What I understood was the monitors are coming

24   and here's the list of the reports that we have to generate.

25   I wasn't aware of the specific court orders that related to

1     specific requests.

2          THE COURT:  Well, who told you that these are the

3     kinds of reports that you've got to give to them?  Somebody

4     told you.

5          THE WITNESS:  We get a letter from headquarters.  It

6     would be a memo:  Provide this information, and we would do

7     it in these big binders.

8          THE COURT:  Can you tell me, if you recall, who at the

9     headquarters gave you the list of reports that had to be

10    delivered, if you recall?

11         THE WITNESS:  I don't recall.  In fact, usually it was

12    handed to me by the director -- the Chief of Mental Health at

13    my institution would pass it on to me, so I'm not sure where

14    it came from exactly.

15    BY MR. BIEN:

16    Q.    Has anybody told you what this particular report is,

17    2040?

18    A.    I became aware of this particular report after last

19    week's hearing on it.

20    Q.    Before that, you did not know anything about it?

21    A.    I was not aware of this particular one, no.

22    Q.    Do you know why CDCR chose to change its length of

23    stay reports in the last few months?

24    A.    I don't know exactly.  My understanding was the data

25    used to generate the reports prior was not very reliable or

1    had problems with reliability, so they wanted to use this

2    report because the data are more reliable.

3    Q.    Who told you that?  Where did the understanding come

4    from?

5    A.    I honestly can't recall who told me specifically, but

6    it was during conversations about this report since it came

7    to light, to my attention, that this had been generated.

8    Q.    Give me some names.  You don't know anybody's names?

9    A.    That I was speaking with?

10    Q.    Yes.

11    A.    Ms. Vorous, and I spoke with Judy Burleson.  She was

12    involved in the conversations.

13    Q.    Who is Judy Burleson?

14    A.    I don't know her exact title, but she is one of the

15    managers at headquarters in mental health.  I'm afraid I

16    don't know her exact title.

17    Q.    Do you understand there was a prior length of stay

18    report generated by HCOPO, Healthcare Population Group?

19    A.    Right.  Well, I know now, yes.

20    Q.    You did not know anything about that report?

21    A.    Prior to a week ago, not really.

22    Q.    But you're the senior specialist in charge of

23    compiling all data and information for CDCR?

24    A.    No, I'm not in charge of compiling all data for CDCR.

25    I do that, but I'm one of the people who do that.

1    Q.    Since 2009, what has been your responsibility?

2    A.    Compiling data and making it available in reports, but

3    I don't generate all reports used by mental health nor do I

4    have all the data.

5          MR. BIEN:  May I approach, Your Honor?

6          THE COURT:  Yes.

7    BY MR. BIEN:

8    Q.    This is Plaintiffs' Exhibit 2592.  It's dated June 28,

9    2013.  It's a report that's provided to plaintiffs and the

10   Special Master about length of stay of class members in ad

11   seg, SHU and PSU.  This is a portion of it.  It comes in

12   monthly documents.

13         Your Honor, we would like to move this into evidence

14   under seal.

15         THE COURT:  That will be the order.

16                         (Whereupon, Plaintiffs' Exhibit 2592

17                         was received into evidence under

18                         seal.)

19   BY MR. BIEN:

20   Q.    Have you seen this report before, Dr. Leidner?

21   A.    I have not.

22   Q.    Do you know what the Health Care Placement Oversight

23   Program is?

24   A.    I do.

25   Q.    What is that?

1    A.      My understanding is that they monitor length of stay

2    basically in different housing areas related to mental health

3    or health care, I guess, in general.

4    Q.      Do you have access to their data in terms of your

5    warehouse?

6    A.      I don't believe that I do.

7    Q.      You're saying you use a different source of data than

8    what HCPOP uses?

9    A.      I believe so.  I can't speak authoritatively on the

10   source of data that HCPOP uses.  I think it may be different.

11   I use things like the Mental Health Tracking System and the

12   Strategic Offender Management System, which is where I get my

13   housing information.

14   Q.      You generate the report, 2040, and the housing

15   information comes from SOMS, the custody system?

16   A.      Yes.

17   Q.      You don't have that information at MHTS.net?

18   A.      No, its imported from SOMS.  Custody kind of handles

19   all the information about movement.

20   Q.      And what about Institution Arrival Date?

21   A.      That also is from SOMS.

22   Q.      Program Arrival Date?

23   A.      SOMS.

24   Q.      Level of Care Date?

25   A.      That's MHTS.net.

1    Q.      So the only information you're adding here is the

2    level of care date from SOMS?

3    A.      I'm sorry.  Could you restate the question?

4    Q.      This report is taking all that information from SOMS?

5    A.      Yes.

6    Q.      And then incorporating the level of care information?

7    A.      Yes, correct.

8    Q.      And you don't know where the HCOPO information came

9    from?

10   A.      I do not.

11   Q.      Do you know of any other source for bed number and

12   location for inmates besides SOMS?

13   A.      No.  Not any more.  There used to be an old system,

14   but I'm not aware of anything other than SOMS that provides

15   that.

16   Q.      Why do you think your report is more accurate than

17   this report that was used until just a couple of months ago?

18   A.      I don't know that because I don't know the details of

19   the HCOPO data, why it was determined to be inaccurate.

20   Q.      You personally didn't determine that there was

21   anything wrong with HCOPO report, did you?

22   A.      I did not.  I haven't seen this until today.

23   Q.      Has anyone informed you that they reviewed the HCOPO

24   report and determined it was inaccurate?

25   A.      Well, as I said, it was mentioned in the conversations

1   we had about this new report the last week or so.

2   Q.      Prior to that, you had never heard any critique about

3   the HCOPO report?

4   A.      I think I have.  I think I heard that -- I'm trying to

5   remember what I heard exactly.  Other than there was

6   something wrong with the data, I can't recall specifically

7   what the concern was.

8   Q.      Was there something wrong with the housing information

9   in the data, the data from SOMS?

10  A.      I think it was about the length of stay, the way that

11  the total length of stay was being calculated.  I'm

12  remembering.  Sorry.  More specifically, if the patient

13  changed cell beds, then the length of stay would start over.

14  That's my understanding.

15          THE COURT:  So the problem is -- I'm asking you, not

16  telling you because -- never mind.

17          A guy is in Avenal and he's in bed eight, if that's

18  where he is, and for whatever reason, they move him to bed

19  ten.  Your report says he's been X number of days in Avenal

20  administrative segregation counting from ten not from eight?

21          THE WITNESS:  So this current report will count both.

22  It doesn't reset when the cell bed changes.

23          THE COURT:  I thought you just told me it did.

24          THE WITNESS:  He's been asking me about the HCOPO

25  report, which is the old report.  He was asking me what's the

1    problem with that.  My best --

2          THE COURT:  I see.  So you're saying that you

3    understood that the HCOPO report would have started counting

4    all over again, and you're not doing that?

5          THE WITNESS:  That's correct.  That's my

6    understanding.  I can certainly say we're not doing that in

7    this report here.

8          THE COURT:  Can you account for the fact that it

9    appears fairly clearly -- I've just glanced at it -- that

10   there appears to be many more lengthy stays in the HCOPO

11   report than yours?

12         Can you account for that?

13         THE WITNESS:  I don't know the specific reason, but I

14   believe it's probably because the new report resets the clock

15   whenever -- in this case, when you move institutions or let's

16   say you go to a crisis bed and come back, that resets the

17   clock.

18         Again, that's because this report was really designed

19   for that kind of purpose, not for overall length of stay.

20         THE COURT:  As far as you know -- I'm sorry.  I don't

21   mean to interrupt.  Yes, I do.

22         As far as you know, is there presently any system

23   which actually generates how long the person has been in

24   administration segregation or in SHU?

25         THE WITNESS:  As I said, on a case-by-case basis.  So

1    for a given patient, there is a report you can run that will

2    show you where this patient has been for the last five years.

3    I can add up the numbers and tell you exactly how long he's

4    been in SHU or PSU or ad seg.

5            THE COURT:  But, you know, it might seem important to

6    know if you're generating the report for the court and for

7    the Special Master how long the person has been in ad seg.

8            Yes, there's been a break because he's been sent to a

9    mental crisis bed, but he's going back in ad seg and it's

10   really that length of time that matters, but that report is

11   simply not being generated?

12           THE WITNESS:  That's correct.

13           THE COURT:  Thank you, sir.

14   BY MR. BIEN:

15   Q.      Am I correct, Doctor, that you have not attempted to

16   determine your new report, 2040, is more accurate than 2592,

17   the report being used until June 2013?

18   A.      I've spent a fair amount of time evaluating the data

19   in my report based on what it's designed to do.  I've not

20   compared it against the HCOPO report or not.

21   Q.      You don't know if it's an improvement or not?

22   A.      I don't know.

23   Q.      If you look at the bottom of the HCOPO report, there's

24   some footnotes on 2592.

25           Do you see that on the bottom left?

1    A.      I do.

2    Q.      The second footnote says (Reading:)

3              Because the tracking of the mental health

4              recommendation date began on February 10, '98,

5              each mental health level of care assigned prior

6              to this date is not reflected.

7         Is that the same problem you have in your report?  You

8    can't go back further -- you said actually even a shorter

9    amount of time; right?

10   A.      Right.  For housing, we can't go back before April of

11   2008 and that's to know if they're in ad seg or not.  In

12   terms of level of care, I'm not particularly aware, but, I

13   believe, yes, there is some beginning date that we can't go

14   before to track level of care.  I don't know what that date

15   is.  It's certainly before 2008.

16   Q.      Then the last footnote says (Reading:)

17              Validity of this report has not been established

18              in over ten years.  Aging clock resets when an

19              inmate is moved from one cell to another within

20              the same treatment/custody setting.

21   A.      Yes.

22   Q.      Is that the problem you were just talking about?

23   A.      Yes, there it is.

24   Q.      Now, in this report, 2592, they provide information

25   about bed number.

1              Do you see that column?

2    A.       Yes.

3    Q.       And that information -- do you know how to read a bed

4    number?

5    A.       Roughly.

6    Q.       Isn't it correct that within that bed number, you can

7    determine not only which particular cell they're in and which

8    bunk in the cell, if it's a double cell.

9              Is that correct?

10   A.       Yes.

11   Q.       Upper or lower?

12   A.       Correct.

13   Q.       The last indicator there, but also which housing unit

14   they're in?

15   A.       You can -- it's an interesting question.  You can

16   determine the physical building and tier and so forth they're

17   in; however, that doesn't necessarily tell you what housing

18   unit, whether segregation cell or mainline cell or SHU cell,

19   because those are not necessarily split up the same way.

20             Sometimes two cells are used for multiple purposes.

21   So in one point it might be a mainline cell, and then later

22   or for a different patient, it may be in an ad seg cell or

23   it's being used for that at time or whatnot.

24   Q.       But that information can be used for a particular

25   moment in time.  If you're looking at June 2013 and you

 1    happen to know something about Avenal, which you can find

 2    from a public website, you might know the A unit has a

 3    particular program.  For example, you can tell whether it's a

 4    segregation unit or general population unit.

 5            Is that right?

 6    A.      Not very reliably.  In the sense that the A unit may

 7    have both types of cells or three types of cells in it so you

 8    would need to know more specifically, and even an individual

 9    cell can be used for different programs at different times.

10    Q.      This trial is about segregation; okay?

11    A.      Okay.

12    Q.      So let's talk about -- you remember CMC; you worked

13    for there awhile?

14    A.      Yes.

15    Q.      I'd like to turn to CMC, R107, 4592.

16    A.      I got it.

17    Q.      This report is only reporting about people in

18    segregation and we only included placements greater than

19    90 days.

20    A.      Uh-huh.

21    Q.      If you look for CMC and you look at the reference to

22    B, do you know what that's a reference to?

23    A.      B quad, and in this case, building four.

24    Q.      And that's a segregation unit?

25    A.      Apparently it is now.  At the time when I was there, I

1   believe the top two tiers were and the bottom tier, sometimes

2   it was and sometimes it wasn't, depending on ad seg capacity.

3   So the B quad building for first floor may have been ad seg.

4   It may not have been, meaning I couldn't use the bed number

5   to determine whether that person was ad seg or not.

6   Q.      These were all on the fourth floor?

7   A.      No, that refers to the building, but the floor is in

8   here somewhere.

9   Q.      Anyway, your report, the new report 2040 doesn't

10  include any information about bed number or housing unit?

11  A.      It includes information about -- I think by "housing

12  unit," you mean a specific tier or building or something

13  versus administration segregation?

14  Q.      That's correct.  But you just said someone could be in

15  administration segregation status and they could be somewhere

16  else?

17  A.      Yes.  The new report does not include cell bed

18  information or housing information.

19  Q.      If you wanted to know, for example, if an EOP -- you

20  know there are requirements under Coleman that EOP patients

21  when they're in segregation be moved to ad seg EOP hubs.

22          Are you aware of that?

23  A.      Yes.

24  Q.      You're aware that there's a timeframe for that?

25  A.      I am aware of that, yes.

1    Q.      Does your report provide any useful information for

2    that purpose?

3    A.      This particular report we're looking at here?

4    Q.      The new one, 2040?

5    A.      It can be run to provide very useful information on

6    that, and this particular version of it -- let me see.  I

7    could go to my ad seg EOP and look at their length of stay at

8    the current institution, and I could see anyone over 30 days

9    is someone who's been there beyond the timeframe.

10          I would look at the program arrival date and if that

11   preceded the institution arrival date, I could start counting

12   from that date if I wanted.

13   Q.      But this report doesn't tell you whether or not the

14   person has been moved to an ad seg EOP hub or not.

15          Correct?

16   A.      Because this report is split up by institution, I do

17   know whether they're in a hub institution or not.

18   Q.      But not all beds in a -- Corcoran has both a regular

19   ad seg and an EOP ad seg hub?

20   A.      That's correct.  I could not tell that from this

21   report.

22   Q.      So this report does not allow someone looking at it,

23   for example, Special Master or plaintiffs' counsel, to know

24   whether or not EOPs have been moved from 30 days to ad seg

25   EOP hubs?

1    A.      That's correct, this report won't tell you that.

2    Q.      It also doesn't tell you whether EOPs with SHU terms

3    have been moved within the timeframes to PSUs, does it?

4    A.      I think perhaps that one would -- let's see.  EOP with

5    SHU terms?  No.  I could see how long an EOP had been in ad

6    seg.  I couldn't tell if they were supposed to be moving to

7    SHU or not.

8    Q.      So those Coleman requirements, that information isn't

9    available here?

10   A.      No, not on this report.

11           THE COURT:  As far as you know, is there any report

12   anywhere that could inform plaintiffs' counsel or the Special

13   Master or defense counsel as to whether or not there's been

14   compliance with the requirements of the Coleman order?

15           THE WITNESS:  There are reports.  There is a report

16   that reports on -- let me think about this.  On an individual

17   level, I can look and see for a given patient.  On an

18   aggregate level, I'm not aware of a report that does that.

19   BY MR. BIEN:

20   Q.      No one has asked you to create such a report?

21   A.      There is a request to add a flag, a rule, that will

22   flag people who are in, for example, EOP non-hub units for

23   more than 30 days to be moved.  That is certainly something

24   I'm working on.

25   Q.      Who asked you to do that?

```
 1    A.       Headquarters.

 2    Q.       When?

 3    A.       I don't recall.

 4    Q.       Last two weeks?

 5    A.       No, no.  Before that.  I don't know how long it's

 6    been.

 7    Q.       2013?

 8    A.       Obviously, I don't remember.

 9             THE COURT:  This case has been going on for --

10    starting from the termination, date a couple of months at

11    least.  You know better than I do.  I suppress those facts.

12             Coincidental, with the beginning of this lawsuit, do

13    you think?

14    BY MR. BIEN:

15    Q.       This segregation motion?

16    A.       No.  We've known about this requirement for a long

17    time.  As we build our systems, we're reporting on more and

18    more requirements.  This is a tricky one, so I think it's

19    been on the list for longer than a few months and certainly

20    something I've know about that we should be reporting on for

21    a while.  Unfortunately there's so many other things, we get

22    to them in sequence.

23    Q.       You haven't gotten to this one yet?

24    A.       That's correct.

25    Q.       Not a priority?
```

 1    A.       It is a priority, but there are a lot of other

 2    priorities too.

 3    Q.       Turning back to 2040, the new report, the Program

 4    Arrival Date, I'm a little confused about that.

 5             You see that column?

 6    A.       Yes.

 7    Q.       I thought you testified it was the most recent arrival

 8    in ad seg at that institution or at a prior institution?

 9    A.       That's correct.

10    Q.       So this is an area where you're trying to track how

11    much time the patient has been in ad seg.

12             What's the purpose of this column, from your

13    understanding, Doctor?

14    A.       So the reason the report would put out something like

15    this is perhaps because the user is interested in when they

16    came to any ad seg and did that occur prior to or after they

17    came to my institution?  I'm thinking about an institution

18    user, so this would tell me when that occurred.

19             The data is important to include in the report,

20    because, specifically, even if I'm just interested in ad seg

21    inmates at my institution, for whatever reason, I want to

22    look at the program arrival date to see whether that might

23    have happened after they arrived at my institution or before.

24             I have to have that data to make that sort of

25    calculation.

1    Q.      Are you aware of any -- why do you think that's

2    important information for a clinician to have?

3            THE COURT:  If you know.

4    BY MR. BIEN:

5    Q.      If you know.

6    A.      If I've got a guy at my institution whose in ad seg, I

7    want to know when they arrived at ad seg in my institution.

8    And, clearly, if they came from a mainline cell, when they

9    come to ad seg, that starts a whole series of events that we

10   need to follow up on.

11   Q.      Why would you want to know if they had been at ad seg

12   at a prior institution?

13           I'm not sure I understand.

14   A.      This report has got this because it needs that

15   information to determine where to start the clock.  In

16   general, as a clinician, I want to know every program that my

17   patient has been in, which this report doesn't tell me.

18           I use a different report to see:  Oh, they were in SHU

19   back in Corcoran in 2010.  Then they went to ad seg.  Then

20   they went to crisis bed.  Then they went to DHS, and then

21   came back.  I want the whole story.  I'm not going to see

22   that here, and that's not the intent of this report.

23   Q.      I still don't understand this column Program Arrival

24   Date.

25           Can you explain what information is reflected here?

1    A.      The information reflected here is when they last --

2    they mostly recently moved into an ad seg unit, wherever that

3    was.  But it's there because this report -- this report is

4    still trying to tell you how long they've been at ad seg at

5    your institution.  But to figure that out, they have to have

6    the ad seg start date, wherever that was.

7    Q.      Why?

8    A.      So it can determine where to start the clock.

9    Q.      If you were at ad seg at Kern Valley before you came

10   to Avenal, how does that affect things?

11   A.      For this report it doesn't.  The computer then

12   knows -- I know that he was ad seg the minute he hit the door

13   at Kern Valley.  I know the minute he hit the door at Kern

14   Valley, he was in my ad seg, so I'll start the clock when he

15   hits the door at my institution, versus if he came into Kern

16   Valley as a mainline and then moved to ad seg a month later.

17          I know I need to actually start the clock a month

18   later when he moves.  Either way, I'm trying to determine how

19   long he was at ad seg at Kern Valley.  That's what this

20   report is telling me.

21          THE COURT:  To that end, the report isn't telling him

22   how long he was in ad seg at whatever institution -- whatever

23   institution he had been at?

24          THE WITNESS:  That's correct.  The length of stay

25   isn't trying to tell you, although you could take that date

1    obviously and make this attraction yourself.

2    BY MR. BIEN:

3    Q.      If somebody had been at ad seg at a prior institution

4    and then are transferred to your ad seg at your institution,

5    the clock, does it start again or they don't have to worry

6    about certain things because they've already been done at ad

7    seg?

8    A.      In terms of rules, no.  It depends on the rule.  A

9    large number of rules apply here.  Generally, most of them

10   will restart when they come to your institution because it's

11   a new arrival for you.  It's a new ad seg for the patient, so

12   all that means is we have to make sure to see them quickly

13   and reassess them and so forth.

14   Q.      Now, am I correct that you said that this, the new

15   report will reset the clock, the length of stay clock if a

16   prisoner goes to a mental health crisis bed?

17   A.      Yes, that's correct.

18   Q.      So then when they come back, you'll have a new length

19   of stay starting?

20   A.      You will.

21   Q.      And why do you think that's -- why did you program it

22   like that?

23   A.      So, again, because the purpose of this report, as I

24   programmed it, was simply it tell you -- it can do a lot of

25   things, but in this case it can tell you when did they last

1    most recently enter the ad seg at your institution.

2         However, I could use this report if I entered

3    different values to tell me over the last year how long have

4    they been at ad seg total.  It could tell me something like

5    that.

6         THE COURT:  While we're waiting, when you change this

7    report from the previous report to this status, did you

8    inform -- I suppose you wouldn't do that.  Somebody else

9    would -- but as far as you know, was anybody like the Special

10   Master or defendants' lawyers, plaintiffs' lawyers informed

11   about the significance changes?

12        THE WITNESS:  I'm not aware of the process that led to

13   switching from the old report to the new one, so I don't

14   know.

15        THE COURT:  Fair enough.  If you don't know, you don't

16   know.  You can't be charged with something if you don't know

17   it.

18   BY MR. BIEN:

19   Q.    Doctor, I put in front of you a May 1, 2008 letter

20   from Robin Dezember, Chief Deputy Secretary, Correctional

21   Health Care Services, to Special Master Lopes, a copy to Lisa

22   Tillman, Deputy A.G., which enclosed a series of reports.

23        I have not included all the reports that were attached

24   to this letter.  I have not included the report that's number

25   two, the ad seg unit enhanced outpatient status report of

1      May 1, 2008.

2              These reports were -- are you aware of plans in 2008

3      to focus on reducing lengths of stay of EOPs and ad segs and

4      getting them to the right locations like EOP ad seg hubs?

5              MS. VOROUS:  Objection.  Beyond the scope of direct.

6      Relevance as well as completeness.  Counsel has indicated

7      he's only included certain things within his packet.

8              THE COURT:  The objection is overruled because it

9      seems to me quite critical to know what's being communicated

10     to the Special Master in this whole process.

11             You may proceed.

12             MR. BIEN:  Move this in evidence as 2574.

13             THE COURT:  Received.

14                             (Whereupon, Plaintiffs' Exhibit 2574

15                             was received into evidence.)

16     BY MR. BIEN:

17     Q.      Back in 2008 you were working at CMC; is that correct?

18     A.      Yes.

19     Q.      You were part of the -- one of your jobs was to help

20     with Coleman compliance?

21     A.      That's correct.

22     Q.      Were you aware of an effort at that time to reduce

23     lengths of stay of EOPs in ad seg units and to move them to

24     where they needed to be in the ad seg EOP hubs?

25     A.      I don't recall a specific plan or initiative, no.

```
 1   Q.      If you could turn to --

 2           THE COURT:  You're going to start on a new issue.

 3           We're going to take our morning recess.

 4           15 minutes.

 5           MR. BIEN:  Thank you, Your Honor.

 6                           (Whereupon, a break was taken at

 7                           10:45 a.m.)

 8                           (Nothing Omitted.)

 9                           ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2624

1           (On the record at 11:05 a.m.)

2           THE CLERK:  Please, remain seated.

3           Court is now in session.

4           THE COURT:  Mr. Bien.

5           MR. BIEN:  Your Honor, first I just want to point out

6    that 2574, I request that be put under seal.  It has inmate

7    names in it.

8           THE COURT:  That will be the order.

9           MR. BIEN:  Then the parties have agreed to replace

10   Plaintiffs' Exhibit 2000, which is the inmate code sheet,

11   with a new one.  We found an error, and we're adding new

12   names.

13          THE COURT:  You may.

14          MR. BIEN:  We've given that to defendants, and I

15   wanted to provide the court with a new copy.

16          THE COURT:  Thank you.

17   BY MR. BIEN:

18   Q.      Dr. Leidner, if you can, turn to page -- the second

19   page of 2574, the document we were looking at right before

20   the break.

21   A.      Okay.

22   Q.      Were you aware -- are you currently aware there are

23   requirements in Coleman for defendants to work on reducing

24   length of stay of EOP patients in segregation?

25   A.      No, I'm not specifically aware of that.  No.

2625

1    Q.      Are you aware of Coleman requirements to move EOP

2    patients from regular Ad. Seg. Units to Ad. Seg. EOP Hubs?

3    A.      Yes, I'm aware of that.

4    Q.      And you're aware that that has been something that

5    defendants have been working on complying with for some time?

6    A.      I'm aware, yeah, that it's been a requirement for

7    some time.

8    Q.      At the bottom of the second page of this document,

9    which is the Ad. Seg. Unit Enhanced Outpatient Program Status

10   Report of May 1, 2008, if you look at that paragraph that

11   starts at the bottom, the second sentence:

12           (Reading:)

13           Initially, there was some confusion at the ASU EOP

14           hubs regarding how to calculate the length of stay --

15           THE COURT:  I'm sorry.  I'm not -- I obviously

16   haven't gotten the right page.  I'm on page 2 --

17           MR. BIEN:  Sorry.  The paragraph at the bottom.  The

18   last paragraph on the bottom of the page.

19           It is actually page 1, I'm sorry, Your Honor, the

20   second page of the document.

21           THE COURT:  Okay.  Hang on.

22               (Brief pause.)

23           All right.

24   BY MR. BIEN:

25   Q.      In the second sentence it says:

2626

```
 1          (Reading:)

 2          Initially, there was some confusion at the ASU EOP

 3          hubs regarding how to calculate the length of stay.

 4          Some institutions restarted the length of stay

 5          time clock when an inmate-patient was placed into a

 6          Mental Health Crisis Bed or went out to court, and

 7          then returned to ASU EOP.  Other institutions did not

 8          restart the time clock even when an inmate-patient

 9          was transferred to a Department of Mental Health

10          inpatient program.  Another issue related to data

11          collection was that some institutions initially did

12          not count ASU EOP inmates not directly assigned to

13          the ASU EOP hub in the data.  In order to clarify the

14          requirement, Joseph Moss, Associate Warden General

15          Population III/IV, provided the following direction

16          to the field on April 8, 2008:

17          Short interruptions in ASU stay, such as assignment

18          to a Mental Health Crisis Bed, are not to result in

19          restarting the count of days in ASU.

20          (Reading concluded.)

21          Doctor, are you aware of the direction from

22     headquarters as to how lengths of stay are to be tracked?

23     A.     No.

24     Q.     In your system -- this new system that just went into

25     effect a month or so ago, restarts the clock whenever a
```

2627

```
 1    Coleman Class Member in segregation goes to a crisis bed?
 2    A.      On this report, that's correct.
 3            THE COURT:  Or a hospitalization?
 4            THE WITNESS:  Right.  Anything outside of Ad. Seg.
 5    BY MR. BIEN:
 6    Q.      Isn't it correct that your new report also restarts
 7    the clock if the patient in Ad. Seg. is CCC and is required
 8    to move to EOP, the clinicians decide he's getting more
 9    severely ill and he requires EOP care?
10    A.      Right.  Yes.  That's correct.  In that case the level
11    of care date would change, but the program arrival date would
12    stay the same.
13    Q.      But the length of stay information would go down?
14    A.      That's correct.
15    Q.      I put in front of you, Doctor, Plaintiffs' Exhibit
16    2569.
17            MR. BIEN:  Your Honor, I've already distributed these
18    around.
19            This is the same document as Plaintiffs' Exhibit 2040
20    but unredacted, and we move that it be admitted but under
21    seal, Your Honor.
22            THE COURT:  Received.
23                (Whereupon, Plaintiffs' Exhibit 2569 received
24                 into evidence under seal.)
25    BY MR. BIEN:
```

2628

1   Q.      So Doctor Leidner, you understand that 2569 is the

2   same document as 2040, the only difference is we've now shown

3   the patient names and CDCR numbers?

4   A.      Yes.

5   Q.      I've also provided you with Plaintiffs' Exhibit 2000

6   which is a code sheet we refer to when discussing individual

7   patients, and you have that in front of you?

8   A.      Yes, I do.

9   Q.      Okay.  So if you could, take a look at 2569.  And if

10  you can, turn to page 77.  That's for the institution Sac.

11          Do you have that there, Doctor?

12  A.      I do.

13  Q.      And if you turn to -- if you look down -- about

14  halfway down, you look for Prisoner D, do you see that name?

15  A.      Just a second.

16          Yes, I do.

17  Q.      Okay.  And he's at Sac. and he's in the ASU EOP?

18          THE COURT:  I need the 2000 after all.  I didn't

19  understand.

20          MR. BIEN:  I'm sorry, Your Honor.

21          THE COURT:  My fault.  I told her not to give it to

22  me.

23          MS. VOROUS:  Excuse me, Your Honor.

24          I'm unclear as to what you're referring to, Mr. Bien.

25          MR. BIEN:  Okay.

2629

1           (Counsel confer.)

2           MR. BIEN:  So Your Honor, on the third page of the

3    code sheet, Plaintiffs' Exhibit 2000, we've identified some

4    new prisoner names for use for today's session.

5           THE COURT:  Okay.  So you want me to go to page 3?

6           MR. BIEN:  Of the code sheet.

7           THE COURT:  Yeah.

8           MR. BIEN:  And the first prisoner I'm referring to is

9    Length of Stay, Prisoner D.

10          THE COURT:  Right.  Okay.

11          MR. BIEN:  Okay.  And he can be found on page 77 of

12   2569.

13   BY MR. BIEN:

14   Q.    He's the first ASU EOP listing there; is that

15   correct, Dr. Leidner?  You see him there?

16   A.    Yes, I do.

17   Q.    Okay.  And based on this report, can you tell me what

18   this report shows about Length of Stay, Prisoner D?

19   A.    Okay.  So I'm seeing that it reports his length of

20   stay as 20.6 days.  So that would be based on taking the most

21   recent of Institution Arrival, Program Arrival and Level of

22   Care Date.  In this case, Level of Care Date on 8-27-2013.

23          So the difference -- and I'm assuming the calculation

24   is correct -- between September 16 and August 27 is 20.6

25   days.

2630

1   Q.      So this report is showing that this prisoner has a

2   length of stay of 20.6 days in the EOP -- as EOP in Sac.,

3   right?  In segregation?

4   A.      The most current uninterrupted stay, yes.

5   Q.      Does it tell you whether or not he's in the Sac. ASU

6   EOP Unit?

7   A.      No.  It just tells you he's in Ad. Seg. housing

8   somewhere in Sac.

9   Q.      We don't know at this point whether he's gotten to

10  the right place?

11  A.      That's correct.  We do not from this report.

12  Q.      Okay.  Now, if you look at Exhibit 2598, it's a

13  one-page exhibit that's in that pile there; do you see that

14  one there?  2598?

15          I have given you a couple of them.  They're not

16  necessarily in great order.

17  A.      The stand looks like my desk now.

18          THE COURT:  Okay.

19          THE WITNESS:  One second.  96.  99.  Got it.

20  BY MR. BIEN:

21  Q.      Okay.  If you look at the third entry down, do you

22  see that same prisoner?

23  A.      I do.

24          MR. BIEN:  Okay.  I would like to move -- Exhibit

25  2598 comes from, again, defendants' monthly documents.  It's

2631

1    the old HCPOP report, June 28th, 2013.

2              We move this into evidence, Your Honor.

3              THE COURT:  You want it under seal?

4              MR. BIEN:  Yes, please.

5              THE COURT:  That will be the order.

6              (Whereupon, Plaintiffs' Exhibit 2598 received

7                  into evidence under seal.)

8    BY MR. BIEN:

9    Q.    So Doctor, from 2598, isn't it correct that the same

10   prisoner had been at Sac. as a CCC in Administrative

11   Segregation for 410 days?

12             MS. VOROUS:  Objection, Your Honor.  Lack of

13   foundation.  I don't believe there has been any testimony

14   that this witness is familiar with this particular document

15   or the information in it or its accuracy.

16             THE COURT:  I thought -- what is this document?

17             I thought this came from the defendants.

18             MR. BIEN:  It is.  Your Honor, it is the HCPOP

19   report.  It's the report that his new report replaced.

20             THE COURT:  Objection is overruled.

21             I mean, is there any doubt that that's what it is,

22   ma'am?

23             MS. VOROUS:  No, Your Honor.  But he's asking

24   questions of the witness and he's never even reviewed this

25   document, and he's already indicated he's not familiar with

2632

1    the reports.

2            THE COURT:  I understand.

3            You may proceed, Mr. Bien.

4            THE WITNESS:  I'm sorry.  Could you repeat the

5    question?

6    BY MR. BIEN:

7    Q.    From looking at -- you see the entry for the same

8    prisoner on this report, 2598?

9    A.    I do.

10   Q.    Okay.  And what does this show as to where he was

11   housed and what his status was?

12   A.    So this shows how long -- well, I don't know the

13   specifics of this report.  I'm presuming what it is saying is

14   that he was in Ad. Seg. as a CCC for 410 days, which is --

15           THE COURT:  408.

16           THE WITNESS:  408?

17           MR. BIEN:  410.

18           THE COURT:  You're right.

19           THE WITNESS:  I see 410.

20           So for 410 days as a CCC.  You know, the other report

21   is reporting on his time as EOP.

22   BY MR. BIEN:

23   Q.    Right.  And if you look at the mental health, the

24   column MH Rec. Date --

25   A.    Yeah.

2633

1    Q.      -- on 2598?

2    A.      Yeah.

3    Q.      That matches up with your Program Arrival Date on

4    your new report, right?

5    A.      I don't know.  Let's see.

6    Q.      On 2569.

7    A.      Hold on.

8            Right.  Looks like it.

9    Q.      Okay.  So you've reset the clock in your new report

10   to 20 days for this man who, as of June 28th, had already

11   been 410 days possibly in that same bed?

12   A.      Right.  As a CCC.  And then, you know, one

13   possibility here is he changed to EOP.  Actually, we know he

14   changed to EOP on 8-27 from something, presumably CCC.  So

15   that resets the clock.

16   Q.      So he got sicker?

17   A.      He got sicker, yes.

18           THE COURT:  But it is fair -- I'm asking you, I think

19   it is fair, but I just want to be sure, somebody reading your

20   report would have no idea he had spent 410 days in Ad. Seg.

21   as a CCCMS?

22           THE WITNESS:  That's very correct.  Somebody reading

23   this report would not.  Any clinician, I would assume, is not

24   going to use this report to do treatment.  They're going to

25   look at the patient's history.  The reports would show, which

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2634

1    we have, exactly how long he had been wherever he's been.

2        THE COURT:  The problem is that this report is being

3    delivered to the Special Master as a statement of who's in

4    Ad. Seg. and for how long.

5        THE WITNESS:  Okay.  Understood.

6    BY MR. BIEN:

7    Q.    If you turn back to 2569, the big unredacted

8    document, and look at page 78, just one more page there?

9    A.    Okay.

10       THE COURT:  What page did you want him to turn to?

11       I'm sorry.

12       MR. BIEN:  78.

13       THE COURT:  Okay.

14   BY MR. BIEN:

15   Q.    Okay.  On the code sheet, Length of Stay, Prisoner E,

16   do you see that name?

17       And then if you go one, two, three, four -- five

18   down, do you see that same information on page 78?

19   A.    Just one second.

20       Got him.

21   Q.    Okay.  So this Length of Stay, Prisoner E, is also at

22   Sac., correct?

23   A.    Correct.

24   Q.    And he's --

25   A.    On September 16.

2635

1   Q.      As of September 16th?

2   A.      Yep.

3   Q.      He's in the PSU Program?

4   A.      Correct.

5   Q.      Which is a program for EOPs, right, with SHU terms?

6   A.      Correct.

7   Q.      Okay.  And can you explain to me what your report

8   shows about him?

9   A.      My report shows that this patient has a length of

10  stay of 20.3 days, which is counting from -- looks like the

11  Program Arrival Date of August 27th, 2013.  That's the most

12  recent of the three dates.

13  Q.      Okay.  And so that's -- and the Level of Care Date is

14  earlier than that, right?

15  A.      Yeah.  Right.  Meaning that he became EOP prior, back

16  in April of that year.

17  Q.      Okay.

18  A.      Or most recently became EOP back in April.  May have

19  been EOP prior as well.

20  Q.      Again, if you turn to a single page, Exhibit 2597.

21          Do you have that there?

22  A.      I do.  I see the patient.

23  Q.      You see the patient?  That's the third one down?

24  A.      Right.

25          MR. BIEN:  your Honor, we move this into evidence,

2636

1    2597, again under seal.  It's from, again, defendants' same

2    kind of report, Length of Stay Report.

3             THE COURT:  Received.

4                  (Whereupon, Plaintiffs' Exhibit 2597 received

5                   into evidence.)

6             THE COURT:  This is the previous report, the HCPOP,

7    whatever it was?

8             MR. BIEN:  This one actually is the new version.  The

9    first time it came out was in August.

10   BY MR. BIEN:

11   Q.     Is that correct?  This is the same report that you

12   helped design, Doctor?  This format?

13   A.     This is the first time I'm seeing this one, the

14   August 16th, so I'm not positive.  It looks the same.

15   Q.     Okay.  It's got the same columns?

16   A.     Yes.  Right.

17   Q.     Do you have any reason to think --

18   A.     Same format.

19   Q.     Do you think it is a different report?

20   A.     No, I don't think that.

21   Q.     So can you explain from this report what it said as

22   of August 16th for this same prisoner?

23   A.     It says the length of stay is 94.4 days, and that's

24   counting from -- what would that be counting from?

25             So the Program Arrival Date of May 14th, 2013 --

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2637

1    Q.      And at this point --

2    A.      -- Is the most recent one.  Yeah.

3    Q.      At this point he was in the ASU EOP Program?

4    A.      Yes.  Right.  Yes.

5    Q.      Okay.  So for this prisoner can you explain the

6    difference between the August 16th report and the September

7    16th report for him?

8    A.      Right.  So not having had a chance to actually look

9    at this patient's history, I can't say for certain, but I'm

10   going to presume what happened was he was in administrative

11   segregation most recently so -- on August 16th he was in

12   administrative segregation, and he had most recently arrived

13   there on May 14 so the clock started then.

14           Then September 16 we find him in PSU.  And he had

15   arrived there on 8-27, right after the last report.

16           So now he's moved on, and now it is reporting about

17   his current stay in PSU.

18   Q.      But he had been -- as of August 16th he'd had 94 days

19   as an EOP in the ASU Unit at Sac., right?

20   A.      I'm looking here at the Institution Arrival Date of

21   12-3.  Yeah.  Uh-huh.  Right.  So 94 days in Sac. ASU.

22   Q.      Then your report on September 16th shows him with a

23   20-day length of stay in the same prison, but in the PSU

24   Program?

25   A.      Correct.

2638

1    Q.      And then on that same page, page 78, one more

2    prisoner here on that page, Length of Stay, Prisoner F, as in

3    Frank.

4            And he's -- you can find him about one, two, three,

5    four, five -- nine up from the bottom.

6    A.      Okay.  I see him.

7    Q.      Okay.  Can you tell me what the September 16th, 2013,

8    report shows for Length of Stay, Prisoner F?

9    A.      Right.  It shows that he was PSU-EOP, Length of Stay

10   27.3 days.  So the clock starts on 8-20-2013 when he

11   arrived -- most recently arrived at Sac.

12   Q.      Okay.  And can you turn to Exhibit 2596, a one-page

13   exhibit?

14           THE COURT:  2596 is in evidence or not?

15           MR. BIEN:  It is not, Your Honor.  We would like to

16   move this into evidence.  Again, it's the same report one

17   month earlier.

18           THE COURT:  Received under seal.

19               (Whereupon, Plaintiffs' Exhibit 2596 received

20                into evidence under seal.)

21   BY MR. BIEN:

22   Q.      You'll find him, again, about ten or 11 up from the

23   bottom.

24   A.      Okay.  I see him.

25   Q.      Okay.  And can you tell me what this report shows his

2639

1    status as of August 16th, 2013?

2    A.        This one shows that he was PSU-EOP 87.5 days.

3    Q.        This was at Pelican Bay State Prison?

4    A.        Yes.  Thank you.  Pelican Bay.

5    Q.        Okay.  So in August he was in the PSU at Pelican Bay,

6    correct?

7    A.        Correct.

8    Q.        He had been there for 87.5 days?

9    A.        Yeah.

10   Q.        Okay.  Then in September -- your September 16th

11   report shows he's now at Sac., right?

12   A.        Correct.

13   Q.        But he's still in the PSU?

14   A.        Right.  It shows his Program Arrival Date as May

15   21st, indicating that he had actually been in the SHU prior

16   to coming to Sac.

17   Q.        Okay.  But your Length of Stay now is 27.3 days?

18   A.        Yes.  Right.  In that column.

19   Q.        Even though he was in the PSU for 87 days as of

20   August in Pelican Bay, you're now showing 27 days as of

21   September in Sac.?

22   A.        Correct.

23   Q.        Okay.  You explained there was some time limitation

24   going back in time for your data; is that correct?

25   A.        That's correct.  It doesn't go back before April

2640

1    2008.

2    Q.      So if someone has been -- if you want to know about

3    someone, a class member, who may have been in a SHU program

4    for ten years, 20 years, you can't help out on that?

5    A.      You can get that information, but not from the

6    reports that I generate.

7    Q.      You can't automatically generate that report?

8    A.      Correct.

9    Q.      Are you aware of a critique by the Special Master of

10   MHTS.net in his most recent report in August of this year?

11   A.      I don't think I am.

12   Q.      Has anyone informed you that he was concerned that

13   certain institutions were not entering the data

14   appropriately?

15   A.      Yes, I did hear about that.  Yes.

16   Q.      Okay.  And do you agree that's -- that --

17           THE COURT:  The program is only as good as the data

18   that's been entered?

19   BY MR. BIEN:

20   Q.      Yes.  Garbage in, garbage out.  Have you heard that

21   expression?

22   A.      I certainly have.

23   Q.      What steps have you taken to assure the information

24   in MHTS.net is accurate?

25   A.      So we do report regularly and review regularly at

2641

1    headquarters, you know, reports that report on first the --

2    how long it's taking, for example, to close appointments.

3    And if it goes below a certain threshold, it comes up as

4    red -- red or yellow.  If it is above, it is a green.

5           So we're looking at that, as well as the fact that if

6    you're not entering data that are being measured by these

7    reports, they'll come up as being way out of compliance.  And

8    so that also gets noted and alerts both headquarters and the

9    institution that these data are not being entered.

10   Q.     If you turn to page 41 of 2569 for a second.

11          THE COURT:  I'm sorry.  What page, sir?

12          MR. BIEN:  Page 41.

13   BY MR. BIEN:

14   Q.     If you look at the third, fourth, fifth entries, do

15   you see that the length of stay for those patients is all

16   1987 days?

17   A.     Yes, I see that.

18   Q.     And all program arrival dates are April 9th, 2008?

19   A.     Yes.  Correct.  I see that.

20   Q.     Do you understand why those dates are the same for

21   those individuals?

22   A.     I do.  That is the date we started for which we

23   have -- for which our data starts regarding housing.

24   Q.     So you don't know how much -- how long these men have

25   actually been in the Pelican Bay SHU?

2642

1    This is the maximum that your program will list?

2    A.    On this report, yes.

3    Q.    You don't have any footnote that explains that on

4    this document, do you?

5    A.    No.

6    Q.    So this information is inaccurate?

7    THE COURT:  It's accurate as to what it states.  It

8    is simply inaccurate as to the real world?

9    BY MR. BIEN:

10   Q.    Is that correct?

11   A.    Can you --

12   Q.    Well, this doesn't really -- for these men, this does

13   not reflect their program arrival date, does it?

14   A.    No, it does not.

15   Q.    So the length of stay could be substantially longer

16   than what's reflected here?

17   A.    We know it is at least April 9th, 2008, and likely

18   before that.  Right.  It would be an incredible coincidence

19   if it was actually that date that it happened.

20   Q.    Do you see any reason why the State of California, in

21   running its prisons, would want to know accurate information

22   about length of stay of mentally ill prisoners in

23   segregation?

24   A.    Sure.  Sure.

25   Q.    Why?

2643

1    A.      Well, because length of stay -- how long you have

2    been in segregation matters.  It certainly impacts, you know,

3    mental health.

4    Q.      Has anyone asked you to create a report that would

5    accurately reflect how long class members have stayed in

6    segregation?

7    A.      You mean over the entire history of --

8    Q.      Of their incarceration, yes?

9    A.      Yeah.  No.  No one has.

10   Q.      Would you have the ability to do that, Doctor?

11   A.      I would have to look at -- well, I can tell you from

12   my data I couldn't tell you before April 2008, from the data

13   I have.  I've gone as far back as I could go.

14   Q.      Have you inquired whether there is data prior to

15   April 8th, 2008?

16   A.      No, I haven't.

17           MR. BIEN:  I have no further questions, Your Honor.

18           MS. VOROUS:  No further questions, Your Honor.

19           THE COURT:  May the witness be released?

20           MR. BIEN:  Yes, Your Honor.

21           THE COURT:  Miss Vorous?

22           MS. VOROUS:  Yes, Your Honor.

23           THE COURT:  You may step down, sir.  You are free to

24   go or stay, as you choose.

25           MS. VOROUS:  Your Honor, you had inquired earlier

2644

1    about the State providing some information with respect to

2    the nondisciplinary segregation.  We do have some information

3    that will be available shortly, but --

4         THE COURT:  I need it before lunch.  Is that

5    possible?

6         MS. VOROUS:  Yes.  We believe it is possible.  The

7    question we have is we do have another witness.  We were

8    going to call Dr. Fischer.  Do you want us to wait on

9    Dr. Fischer?

10         THE COURT:  No.  No.  Go ahead with Dr. Fischer.

11         Let me tell you what is going on so everybody is

12    aware.

13         The three judge -- I'm certain this is all right to

14    say in public.

15         The three-judge court had a telephone conference

16    Friday -- last week, right after the testimony, about the

17    number of Coleman members who were in segregated housing who

18    had not committed any offense.  And the purpose of the

19    three-judge court, among other things, was to deal with the

20    question of certain ongoing efforts at settling this case.

21    Whether that is even possible is beside the point.

22         As I'm sure all of you know, Justice Siggins has been

23    kind enough to undertake that terribly difficult task.

24         I explained to my colleagues what I had understood

25    the facts were and indicated that as far as I was concerned

2645

1    there could be no extension as long as those people remain in

2    Ad. Seg.  And when Justice Siggins came on the phone, I told

3    him that was my view.  He indicated he understood and would

4    talk to the Governor's Office and get back to me.

5         The next day -- I'm confused about the days, but the

6    next day he called to tell me that the people in the

7    Governor's Office understood the nature of the problem and

8    that they were working up a solution and that it would be

9    communicated to me today.

10        And the reason it was going to have to be

11   communicated to me today was because we're having another

12   three-judge court meeting about the whole problem of

13   extending time and whether it can be done under these

14   circumstances.

15        So I need the report or whatever you are giving me.

16   And the other problem is that today is the judges' meeting of

17   the Eastern District, and then right after that there is

18   going to be a telephone conference.

19        So I need the report.  I need to be able to read it

20   before this happens so I can say this is what the State is

21   now representing will be done or not done.  I mean, whatever.

22        And I don't know whether it is possible that you're

23   going to be able to get it to me.

24        MS. VOROUS:  Yes.  We have people coming over right

25   now.  So I think the question is just the timing for

2646

1    Dr. Fischer.

2              THE COURT:  I understand.

3              MR. MCKINNEY:  Your Honor, if I may?

4              There is a memorandum that the State has -- that

5    CDCR's issued, and we will provide you a copy.

6              And I don't know.  We would prefer not to do this on

7    the record today.  We didn't understand.  We would be calling

8    a witness on this issue.  We're certainly happy to give you

9    this information.

10             THE COURT:  Yeah.  I put that on the record.  Maybe I

11   shouldn't have done that.  All right.  I did.

12             I mean, if it is coming, I don't want you to start

13   the witness, then they walk in the door and I say that I got

14   to read this, you know, and interrupt the conversation -- the

15   testimony.  That's not fair.

16             MR. MCKINNEY:  Your Honor, I spoke with the client at

17   11:30, and they were just leaving CDCR on F Street.  They

18   should be here momentarily.

19             THE COURT:  All right.

20             There is no point in starting with Dr. Fischer.  When

21   it arrives, give it to Ana and she'll bring it in to me.

22             We'll take up Dr. Fischer -- you know, I don't know

23   when because I don't know how long.

24             Ana, did Sally indicate -- I know she didn't -- how

25   long the conversation -- it is going to be at 1:30?

2647

1           THE CLERK:  I don't know, Judge.

2           MR. BIEN:  Can we go off the record?

3           THE COURT:  We're off the record.

4           (Discussion held off the record.)

5           (Off the record at 11:40 a.m.)

6           (On the record at 11:41 a.m.)

7            THE COURT:  We'll reconvene at 1:30.  When you get

8     the report, make sure I get the report.

9           MR. MCKINNEY:  Yes, sir.

10          (Off the record at 11:42 a.m.)

11                              ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2648

1          (Back on the record at 1:45 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Call your next witness, sir.

5          MR. SHARMA:  Good afternoon, Your Honor.  Maneesh

6    Sharma for defendants calling Doctor Robert Fischer.

7          THE COURT:  Come around and be sworn, sir.

8          THE CLERK:  Please, take the witness stand and remain

9    standing.

10                    ROBERT FISCHER,

11   was thereupon called as a witness herein by the Defendants,

12   and having been sworn to tell the truth, the whole truth and

13   nothing but the truth, was thereupon examined and testified

14   as follows:

15         THE CLERK:  Please, take a seat.

16         State your name, spell your last name and speak

17   directly into the microphone, please.

18         THE WITNESS:  My name is Robert Fischer,

19   F-i-s-c-h-e-r.

20                    DIRECT EXAMINATION

21   BY MR. SHARMA:

22   Q.    Dr. Fischer, where are you employed?

23   A.    I'm employed by California State Prison Corcoran,

24   Corcoran, California.

25   Q.    And what is your current role with the California

2649

1    State Prison at Corcoran?

2    A.       My current role is senior psychologist supervisor.

3    Q.       And where did you receive your training as a

4    psychologist?

5    A.       I received my PhD in 1973 from Columbia University in

6    New York City.

7    Q.       And how long have you been employed at Corcoran?

8    A.       I've been employed a total of ten years, the first

9    four years as a contract psychologist, and then since '07 as

10   a state employee.

11   Q.       And before you entered into your current position as

12   senior staff psychologist, did you hold another position at

13   Corcoran?

14   A.       I did.  For about 17 months I was acting chief

15   psychologist at Corcoran from June of 2012 to last month,

16   November of 2013.

17   Q.       And as acting chief psychologist, what was the scope

18   of your duties?

19   A.       I supervised the five major programs -- mental health

20   programs via senior psychologists that supervised those

21   programs.  I supervised the seniors.

22            Those programs consisted of the two EOP programs, the

23   EOP main line and EOP Ad. Seg. known as the hub, the two

24   CCCMS programs, the CCC main line and the CCC Ad. Seg., and

25   also the SHU program which had CCC inmates in it.

2650

1    Q.    And Dr. Jordan (sic), are you familiar with the

2    current staffing for the mental health program in those five

3    programs at Corcoran today?

4    A.    I am.  Today they are improved from where they were

5    over the 17 months that I was acting chief.  During most of

6    that period and during the time of the Coleman tour, I think

7    in early 2013, perhaps around February, at that time the

8    staffing was at about 70 percent with a 30 percent vacancy in

9    our clinical positions, that is our clinicians represented by

10   psychologists and social workers.

11          The two other disciplines actually had a little bit

12   higher vacancy rate.  The rec. therapists had about a 50

13   percent vacancy rate, our psychiatrists about a 40 percent

14   vacancy rate.  Averaged out it was 65 percent when taking in

15   all disciplines.

16   Q.    Dr. Fischer, what is the current staffing at

17   Corcoran?

18   A.    Fortunately we've done a lot better.  In the last six

19   or nine months we've been able to recruit successfully and

20   hire and get applicants to come to Corcoran.  And now I would

21   say we're at about 90 percent occupancy.

22          We're still down some on rec. therapists and

23   psychiatrists.  We are almost fully staffed with regard to

24   social workers and psychologists.

25   Q.    Okay.  And Dr. Fischer, where do inmates who are in

2651

1    the EOP Ad. Seg. Hub currently receive treatment?

2    A.       They currently receive treatment in a brand-new

3    building that was commissioned and opened in June of this

4    year called the EOP Treatment Building.

5              It is on the 3A Yard.  It's a two story building.

6    Did you want me to describe it or go on?

7    Q.       Please, go on and describe the building.

8    A.       The first floor is dedicated entirely to the services

9    provided to the inmates.  It consists of eight one-on-one

10   treatment rooms, rooms available for one-on-one, which are

11   set up with -- actually with a window in between.

12             The inmate -- these are all segregated inmates so

13   they are brought in by the cops coming into one side of the

14   room, clinicians enter from the other side.  They're able to

15   communicate with the inmates through the window.  Of course

16   there are microphones so they can hear each other.  The

17   clinician has access to a computer.  So that is a nice

18   improvement from what they had before.

19             That ground-level floor also includes five group

20   rooms -- new group rooms with holding cells in them,

21   treatment modules, to conduct the groups -- the EOP groups.

22             There are also two large meetings rooms on the ground

23   floor.  One is used for our Interdisciplinary Treatment Team

24   meetings, in which, of course, the inmate is present.

25             And then, of course, the correctional officers are

2652

1    also stationed downstairs in a space at the platform for

2    security purposes.

3         The top floor is dedicated entirely to offices --

4    staff offices.  There's probably about 18, I would say,

5    employees that reside on the second floor consisting of EOP

6    clinicians, some -- a few CCCMS clinicians, the two program

7    supervisors, one for CCC, the other for the EOP Ad. Seg., and

8    also some psych-techs that provide group services for the

9    inmates.

10   Q.    And Dr. Fischer, could you please describe the mental

11   health staff who are assigned to the EOP Administrative

12   Segregation Hub?

13   A.    Yes.  Currently there are six clinicians.  They're

14   all clinical psychologists.  There is a staff psychiatrist

15   who is dedicated entirely to the population in the hub.

16        There are two or three rec. therapists who provide

17   groups.  There are also four psych-techs that provide group

18   services for the hub population.

19        Then separate from that population that I just named

20   there are also other psych-techs that do rounding on the EOP

21   inmates every morning.  About 7:30 they eyeball each inmate

22   in their cell and check on their well-being.  So they're

23   available to check on the inmates and make referrals as

24   necessary.

25   Q.    Dr. Fischer, could you please describe the treatment

2653

1   that's offered to the EOP Ad. Seg. Hub inmates at Corcoran?

2   A.      Yes.  They receive a combination of Case Management

3   Services from their primary clinicians.  Those are delivered

4   at least weekly according to the Guide.

5           They receive contact -- clinical contact, of course,

6   by the psychiatrist, Dr. Knight, as necessary, at least

7   monthly, typically more often, as referred or as requested.

8           There's also an extensive group program in the EOP

9   Hub.  They provide 56 groups actually per week.  And these

10  are provided primarily by rec. therapists.  And this helps us

11  comprise at least our ten hours of offered clinical services

12  to inmates.  Sometimes it is more.

13          Those services are a combination of the clinical

14  services I mentioned from the case manager, the psychiatrist

15  and the group services.

16  Q.      And could you please describe the type of groups that

17  are offered to these inmates?

18  A.      Yes.  The content of the groups varies from stress

19  management, current events, coping skills, cognitive

20  thinking, appropriate non-criminal thinking.  Groups of that

21  type.

22  Q.      And how long are these groups typically scheduled

23  for?

24  A.      They're scheduled for two hours each.

25  Q.      And Dr. Fischer, could you please describe the

2654

1   treatment that's provided to CCCMS inmates housed in

2   segregated housing?

3   A.      Yes.  They receive weekly case management contacts by

4   their primary clinician.  They also receive the rounding by

5   the psych-techs.  Every morning psych-techs round on all

6   segregated inmates daily.

7           At this time the CCC population is not receiving

8   groups currently.

9   Q.      And why is that that they're not receiving groups

10  currently?

11  A.      It is based primarily on space availability -- lack

12  of space availability.

13  Q.      And Dr. Jordan (sic), do you know --

14          THE COURT:  Dr. Fischer.

15          MR. SHARMA:  I'm sorry.  I apologize.  I believe that

16  is the second time I have done that.

17          I do apologize, Dr. Fischer.

18          THE WITNESS:  That's okay.  He works in one of our

19  programs so...

20  BY MR. SHARMA:

21  Q.      Dr. Fischer, do you know, from a mental health

22  standpoint, the make up of inmates within the Corcoran SHU,

23  what their mental health status is as CCCMS as opposed to

24  EOP?

25  A.      Yes.  The inmates in the SHU are only CCCMS level of

2655

1    care.  If they should -- if their behavior should change such

2    as they need more clinical services, they're taken to team

3    and occasionally to EOP.

4         It doesn't happen too often, but they do -- if they

5    should decompensate, if they should need more services, then

6    their level of care can be changed to EOP.  And then they are

7    moved from the SHU into the EOP Ad. Seg. Program.

8    Q.    And Dr. Fischer, could you please describe the

9    treatment that's provided to those inmates within the SHU at

10   Corcoran?

11   A.    The SHU, according to the Guide, receive contact from

12   their case manager at least monthly, at least every 30 days,

13   sometimes more often based on their need.

14        Sometimes inmates make self-referrals, and then they

15   are ducated or scheduled to be seen.  And sometimes the

16   clinician on their own, if they think the inmate needs

17   additional support, see them more often than every 30 days.

18        They're also seen by psychiatry at least every three

19   months, more often if necessary.

20   Q.    Dr. Jordan (sic), for the inmates in the EOP Ad. Seg.

21   Hub, do you know if in addition to their clinical contacts

22   they receive other out-of-cell time?

23   A.    I'm sorry.  I was distracted by my new title of

24   Dr. Jordan.

25        Can you repeat the question, please.

2656

1    Q.        I apologize.

2              Dr. Fischer, for those inmates in the EOP Ad. Seg.

3    Hub, in addition to their clinical contacts, do they receive

4    other out-of-cell time?

5    A.        They do.  They receive yard.  I think usually three

6    times a week -- three or four times a week they receive yard

7    activities where they have -- usually in a walk alone yard.

8    Showers, of course, are out-of-cell.  But these are the

9    primary non-clinical activities I'm aware of.

10   Q.        And do you know if inmates within the EOP Ad. Seg.

11   Hub are single celled or double celled?

12   A.        They're both, depending on custody factors and so

13   forth.  I would guess maybe it is 50/50.  I haven't counted

14   the cells, but that's a rough guess.

15             I also asked the direct program supervisor that

16   question, and his estimate also was about 50 percent single

17   celled and 50 percent double celled.

18   Q.        And do you know if inmates within the EOP Ad. Seg.

19   Hub are allowed to possess any entertainment or recreational

20   devices?

21   A.        They are.  Within Ad. Seg. they are allowed to have

22   both TVs and radios, and many of them do.

23   Q.        And does the institution provide any entertainment or

24   recreation device within the EOP Ad. Seg. Hub?

25   A.        They do.  In addition to the in-cell appliances the

2657

1    inmates may have -- may have purchased, they've also put up

2    large flat screen TVs within the living building at 3A03.

3    That's the building in which they reside.

4        They put up three flat screen TVs that are visible to

5    the three sections of the building so the inmates can see and

6    hear those TVs from their cells on the tier where they live.

7    They can look out the window and see and watch the football

8    game or whatever.

9    Q.    And Dr. Fischer, do you know if the CCCMS inmates who

10   are housed in segregation at Corcoran, that is in the Ad.

11   Seg. Unit, do you know if they're single celled or double

12   celled?

13   A.    Again, both, depending on a variety of factors.  And

14   again, my guesstimate would be about 50/50 between single and

15   double cell.

16   Q.    Are they also allowed to have entertainment devices

17   within their cells?

18   A.    They are.  They do also have appliances such as TVs

19   and radios.

20   Q.    And Dr. Fischer, are you familiar with what's known

21   as the ATOM chair, A-T-O-M?

22   A.    Yes, I am.  We did a trial pilot study based on the

23   use of that chair for about 15 months, I think in early 2012

24   to about the middle of 2013.

25   Q.    And what was the result of that pilot study?

2658

1   A.      The result was the data was collected from three

2   stakeholders, the clinicians, the inmates themselves, and the

3   custody staff.

4           The clinicians and the inmates prefer by about a

5   two-thirds margin, that is two-thirds of them prefer the

6   traditional treatment modules, the stand up holding cells.

7   About 80 percent of the custody officers prefer the

8   traditional modules.

9           So in other words, the lesser portion, either

10  one-third or 20 percent, prefer the -- like the ATOM chair.

11  Q.      Do you have an understanding of why those two-thirds

12  of inmates preferred the treatment modules over the ATOM

13  chairs?

14  A.      From the comments that I remember seeing, the

15  treatment modules gave them more ability to move around.

16  They're standing.  They can stretch.  They can sit on the

17  stool.  They can put their arms over their head and stretch.

18  There is much more mobility within the traditional treatment

19  module.

20          The ATOM chair pardon me -- has them attached by

21  their ankles and their legs to the chair.  Although there is

22  some slack obviously to those limbs, they are in a seated

23  position.  There is less ability to move around.  You can't

24  move your arms over your head.  There's not as much

25  flexibility or movement in the ATOM chair.  But, of course,

2659

1    they're seated, and they don't have the cell in front of

2    them.

3    Q.      And Dr. Fischer, in your time at Corcoran have you

4    worked with custody staff?

5    A.      With custody staff?

6            I have worked a lot with custody staff.  Over ten

7    years.

8    Q.      And could you please describe the relationship that

9    you have had with custody staff as a mental health clinician?

10   A.      I've always found it to be excellent.  I really have.

11   Over the course of ten years I have worked with all levels of

12   custody.

13           When I first started, I worked as a clinician

14   carrying caseloads in almost all the programs for four years.

15   So I worked in Ad. Seg. main line, EOP, CCC and Crisis Bed.

16   I worked all the programs.  I always had excellent

17   relationships with custody, both the floor cops and escort

18   staff charged with the getting inmates to meet with us, to

19   meet our ducats.  I interacted there with sergeants and

20   lieutenants.

21           As I moved up into a senior position and acting chief

22   for a while, I interfaced with other levels of custody, with

23   the lieutenants, with the yard captains, associate wardens,

24   wardens, really all the way up the chain throughout Corcoran

25   for ten years.

2660

1    I've always had an excellent rapport, excellent

2    relationship with them.  I found that as long as you, you

3    know, showed respect and understanding for what they did,

4    that it was returned.

5    I often found the cops went out of their way, and

6    they do now.  If a clinician wants to see somebody in

7    addition to who is ducated, the escort staff will say:  All

8    right.  They're not ducated.  We can't see them now at nine

9    or ten o'clock or whatever, but we'll be glad to add them on

10    for you at the end of the line.  So they would add them on

11    and allow the clinician to see the inmate.

12    I always found them, you know, very aware of the

13    needs of mental and dental and medical, the three major

14    lawsuits, and very cognizant at all levels.  You know, the

15    upper level, the warden and AW, are very aware of the need to

16    deliver services, mental health and medical, to the

17    inmate-patients.

18    The escort captain in charge of making sure the

19    escorts are carried out, the ducats appropriately, took great

20    steps to make sure his cops were there and doing what they

21    should on time and cooperating.

22    Q.    And Dr. Fischer, in the segregation units is there

23    something that's referred to as a "morning huddle"?

24    A.    Yes, there is.  And that assists us in exchanging

25    information and being on the same page.

2661

1        Within the segregated buildings there is a huddle

2   between the psych-techs and the clinician representative and

3   typically the sergeant -- building sergeant.

4        They'll get together in the morning and review any

5   new arrivals that may have come in overnight, the status of

6   any particular inmates where status may have changed, things

7   we should be alerted to or aware of.

8        From a mental health standpoint they might point out

9   an inmate that is maybe -- seems to be having trouble, that

10  needs our attention.  That gets logged by the sergeant in the

11  building.

12       So there is interchange of information about the

13  inmate-patients, and the cops, the correctional officers

14  sometimes will bring to our attention somebody that needs

15  help because they, quite honestly, spend more time with them

16  than we do.

17       They are with them eight hours a day.  They feed

18  them, shower them, know them well.  They will say:  Inmate so

19  and so seems to be under particular stress now.  Maybe, you

20  know, he could benefit by being seen by you.

21       So they'll have a good handle on his behavior and are

22  quite willing to cooperate with mental health and, you know,

23  recognize that we are there for a specific and a good

24  purpose.

25       MR. SHARMA:  Your Honor, may I a brief moment?

2662

1          (Cocounsel confer.)

2     BY MR. SHARMA:

3     Q.      Dr. Fischer, if I could ask you to refer to

4     Plaintiffs' Exhibit 2000, which is the Inmate-patient Code

5     Sheet.

6          MR. SHARMA:  Your Honor, may I approach?

7          THE COURT:  Yes.

8          (Exhibit located for witness.)

9     BY MR. SHARMA:

10    Q.      Dr. Fischer, are you familiar with the inmate that's

11    been identified as Haney Prisoner GG?

12    A.      Yes.  GG.  I'm looking for it on this sheet, but --

13         THE COURT:  You want to --

14         THE WITNESS:  Yes, I see it.

15         THE COURT:  Okay.  He's got it.

16    BY MR. SHARMA:

17    Q.      And Dr. Fischer, if I could ask you to turn to

18    Plaintiffs' Exhibit Number 2050, which should be in that

19    binder before you.

20    A.      Yes, I have it.

21    Q.      Okay.  And Dr. Fischer, if you could briefly review

22    the pages within this exhibit and confirm whether you have

23    reviewed these pages before?

24    A.      Yes, I have.

25    Q.      Okay.  And Dr. Fischer, if I could have you turn to

2663

1  page 17 of the exhibit?

2  A.      Yes.  Page 17.

3  Q.      Dr. Fischer, are you familiar with what level of care

4  Inmate GG was receiving at this time?

5  A.      CCCMS.

6  Q.      And Dr. Fischer, in your experience and your

7  practice, if a patient at the CCCMS level of care within a

8  segregation unit was undergoing some kind of mental

9  decompensation, what are the options available to clinicians?

10  A.      Well, first typically the clinician would volunteer

11  to see them more often than the mandated weekly meetings.

12  Might see them for a second meeting twice a week, spend more

13  time with them, attempt to help him to stabilize.

14          They typically set up a special appointment with the

15  psychiatrist to have him investigate either being placed on

16  meds or having their meds adjusted perhaps.

17          If that course of action did not create improvement

18  or lead to improvement, they could take the inmate to the

19  team meeting and consider elevating his level of care to EOP.

20  Q.      Based on your review of the documents in Plaintiffs'

21  Exhibit 2050, did this clinician ever recommend increasing

22  this inmate's level of care?

23  A.      As I recall, she did not.

24  Q.      Thank you.

25          And Dr. Fischer, if I could ask you to turn back to

2664

```
 1    Plaintiffs' Exhibit 2000.
 2            It's the separate sheet.
 3    A.      Oh, yes.  Thank you.
 4    Q.      And if I could ask you to refer to what's been
 5    identified as Kaufman Prisoner F?
 6            THE COURT:  As in Frank?
 7            MR. SHARMA:  F as in Frank, Your Honor.
 8            THE WITNESS:  Yes.
 9    BY MR. SHARMA:
10    Q.      Are you familiar, looking at this inmate's name, of
11    course without repeating it, are you -- do you recognize this
12    inmate's name?
13    A.      Yes, I do.
14    Q.      And to your knowledge is this inmate currently housed
15    at Corcoran?
16    A.      No, he's not.  I believe he was moved to Kern Valley.
17            MR. SHARMA:  Nothing further at this time, Your
18    Honor.
19            THE COURT:  You're, Mr. Fischer?
20            MR. FISCHER:  Yes, Your Honor.
21                          CROSS-EXAMINATION
22    BY MR. FISCHER:
23    Q.      Good afternoon, Dr. Fischer.
24    A.      Good afternoon, Mr. Fischer.
25    Q.      As the judge indicated, I am Aaron Fischer.  I'm
```

2665

1   plaintiffs' counsel.

2        As far as I know at this point, we're not related.

3   A.    At least I'll be able to remember your name.

4   Q.    And in return I will remember yours as well.

5        Dr. Fischer, you mentioned the new Corcoran EOP

6   treatment space?

7   A.    Yes.

8   Q.    And do you know when that opened?

9   A.    June of this year.

10  Q.    And it is being used for treatment and office space

11  for the EOP Ad. Seg. population?

12  A.    It is being used for treatment space for the inmates

13  and also as an office space upstairs for the clinicians.

14  Q.    This is just for the EOP Ad. Seg. Program?

15  A.    The one variance there is they have -- upstairs they

16  have office space.  They have two offices that are used for

17  the CCCMS Ad. Seg. clinicians.  There are four CCC clinicians

18  that are upstairs.  There are six EOP clinicians upstairs,

19  plus other staff.  And the only way in which -- it's used

20  almost entirely for treatment space for EOP Ad. Seg.  The

21  only variance to that is the large IDTT meeting room, which

22  is used for team treatment, is used to do IDTT treatment team

23  for the CCC population.

24        So they bring the inmate into that team meeting.

25  That's the only time the inmate -- a CCC inmate would come

2666

1   into that building.  Otherwise, the CCC inmates are seen in

2   their living facility.

3   Q.      So CCCMS Ad. Seg. inmates don't receive group

4   treatment?

5   A.      Exactly.  They do not.

6   Q.      And the CCCMS SHU population doesn't receive group

7   treatment?

8   A.      No, not at all.  CCC SHU population is on the other

9   side of the prison and does not use that building at all, and

10  doesn't receive -- you asked about group treatment.  The

11  SHU -- the CCC SHU do receive minimal groups.  It is not

12  mandated by the Program Guide, but we volunteered to do

13  groups for the SHU population when we have the rec. therapist

14  to do so.

15  Q.      So for the CCCMS SHU population, I believe you

16  testified earlier, in your declaration of March 23rd, 2013,

17  that they may receive group treatment as much as once per

18  month?

19  A.      Exactly.

20  Q.      That is only recreation therapy?

21  A.      It's run by a recreation therapist.  That's correct.

22  Q.      So there is no social worker or psychologist run

23  groups for the CCCMS SHU?

24  A.      That is correct.

25  Q.      So even if clinically indicated, those CCCMS

2667

1    prisoners in the SHU wouldn't receive groups on anger

2    management?

3    A.        Correct, they would not.

4    Q.        Or on coping strategies?

5    A.        No.  Although, having said that, the rec. therapists

6    are experienced facilitators.  So I think often -- I haven't

7    seen their content guide recently, to be honest, but they

8    certainly have the ability.  Because these are the same rec.

9    therapists that teach groups in the SHU -- excuse me -- in

10   the EOP Program.  So they're familiar with the content areas

11   I mentioned before that are given in the EOP Hub Program.  So

12   I'm sure that they do use that content with the SHU inmates,

13   the coping skills, decision-making, stress reduction,

14   relaxation, et cetera.  That's what they know and deliver.

15   Q.        This new EOP Ad. Seg. treatment space is in a

16   separate building from the EOP Ad. Seg. housing unit; is that

17   correct?

18   A.        Yes.  It is it is a brand-new, two-story building.

19   Brand-new.  Located right behind the living facility.  Easy

20   to walk them from the living facility into the treatment

21   building.

22   Q.        Do the EOP Ad. Seg. inmates going to group treatment

23   have to go outside to reach this building?

24   A.        Yes.  It is a nice, short walk out the back of the

25   building.

2668

1    Q.      But even with the new treatment space, are the EOP

2    Ad. Seg. prisoners still subjected to strip searches prior to

3    leaving the building for group treatment; do you know?

4    A.      Yes, they would be.

5    Q.      And they continue to receive strip-searches upon

6    returning from group treatment to their housing unit; is that

7    correct?

8    A.      That's my understanding, yes.

9    Q.      When the CCCMS Ad. Seg. and SHU prisoners go to their

10   IDTT team meetings in this treatment space you've described,

11   they also are subjected to strip-searches when they leave the

12   building?

13   A.      Will you repeat the question.  I think you

14   combined CCCMS and Ad. Seg. --

15   Q.      Let me separate it out.

16   A.      -- and the SHU.

17   Q.      With respect to the CCCMS Ad. Seg. population at your

18   institution --

19   A.      Right.

20   Q.      -- when they go to the treatment space for their IDTT

21   meeting, do they also receive a strip search prior to leaving

22   the building?

23   A.      Yes, they do.

24   Q.      And they receive a strip search when they come back

25   from the IDTT treatment meeting?

2669

1   A.      Yes.

2   Q.      I may be a little slow, but let's try not to talk

3   over each other.

4           I apologize.

5           With respect to the CCCMS SHU prisoners, do they have

6   IDTT meetings in the new treatment space?

7   A.      The SHU?

8   Q.      Yes.

9   A.      No.  The SHU is entirely on the other side of the

10  prison.  It is a very great distance on the other side of the

11  prison so they don't use the new EOP treatment building at

12  all.

13  Q.      Do they receive their IDTT treatment meeting inside

14  the housing unit?

15  A.      Yes.  Inside their SHU housing building.

16  Q.      Is it on the dayroom floor there?

17  A.      No.  It is in a committee room that they use for

18  committees, for ICC and IDTT.

19  Q.      Dr. Fischer, are you aware of the State's termination

20  expert's recommendation that the strip-search policy, to do

21  strip-searches going and coming from all segregated prisoners

22  at Corcoran, be reviewed?

23          MR. SHARMA:  Objection, Your Honor.  Outside the

24  scope of direct.  Relevance.

25          THE COURT:  It's clearly relevant.  But he's outside

2670

1    the scope of direct.

2          Well, the problem is that the entire testimony

3    concerns the adequacy and propriety of treatment in Ad. Seg.

4    and the SHU.

5          No.  I'm going to allow the question to stand.

6          Do you have the question in mind, Doctor?

7          THE WITNESS:  I do.

8          I'm not aware that it was -- that the strip-search

9    policy be reviewed by some higher authority.

10   BY MR. FISCHER:

11   Q.    Has anyone from CDCR headquarters communicated to you

12   any recommendation to review the strip-search policy at

13   Corcoran?

14   A.    No.

15         THE COURT:  In any event, apparently that's not a

16   medical decision, that's a custody decision, Doctor?

17         THE WITNESS:  That is correct, Your Honor.

18         THE COURT:  As a matter of policy, if you know, would

19   custody consult with medical about such an issue?

20         THE WITNESS:  No, they would not.  That would be

21   custody procedure.

22   BY MR. FISCHER:

23   Q.    Based on your experience in the Corcoran segregation

24   units, have you noticed any indications that this

25   strip-search policy may be a disincentive for attending

2671

1    treatment?

2    A.      Yes.  I have heard inmates say that they -- some of

3    them object to being strip-searched and sometimes for that

4    reason don't come out to group all the time, even sometimes

5    decline to come out for one-on-one treatment in their

6    out-of-cell confidential sessions.  Sometimes they do

7    indicate they don't feel like being stripped down.

8    Q.      In your opinion, if custody were to ask you, would

9    you recommend the policy be reviewed?

10           MR. SHARMA:  Objection, Your Honor.

11           THE COURT:  It's speculative.  The objection is

12   sustained.

13           You may proceed.

14           The fact of the matter is they're not going to

15   consult with him.  That's what the doctor said.

16           You may proceed, sir.

17   BY MR. FISCHER:

18   Q.      Dr. Fischer, you spoke a little bit about the ATOM

19   chair pilot?

20   A.      Yes.

21   Q.      Do I understand you correctly that the pilot has been

22   completed?

23   A.      Yes, it has.  It ran about 15 months at Corcoran.

24   From, I think, around February of 2012 to June of 2013.

25   Approximately for about 15 months we collected data during

2672

1  that time.  It was terminated the middle of 2013.

2  Q.      Since that time no -- do I understand correctly that

3  no patients have been treated with the use of the ATOM chair?

4  A.      That's correct.  They were all moved out of the

5  Corcoran institution.

6  Q.      Is there any plan to do another pilot to explore

7  other alternatives to the treatment cages?

8  A.      The holding cells?

9          Not that I know of.  I don't know of another pilot

10  using the ATOM or other chairs.

11          I will volunteer, perhaps ill-advisedly, but I heard

12  they were conducting another pilot at a different institution

13  with the ATOM chairs also.  I may be incorrect.  But I think

14  they wanted a different population to look at it and give

15  their opinion.

16  Q.      And you testified before that the patients -- more

17  patients preferred the holding cages as opposed to the chairs

18  because they found the chairs to be restrictive; is that

19  correct?

20  A.      The holding cells we call them.  Holding cells.

21          THE COURT:  We understand you call them that.  The

22  Supreme Court has called them a cage.

23          THE WITNESS:  Have they really?

24          THE COURT:  Yes.

25          THE WITNESS:  Okay, Your Honor.  We try to put it

2673

1  less animalistic and more humanistic, but I understand what

2  you are saying, sir.

3           THE COURT:  You may proceed, sir.

4  BY MR. FISCHER:

5  Q.      Has there been any discussion in the new treatment

6  space at the institution to try something called tether

7  tables to provide treatment to mentally ill prisoners in

8  segregation?

9  A.      I'm not familiar with that, Mr. Fischer.

10 Q.      Are you aware of the tether table being used in other

11 states --

12 A.      No, I'm not.

13 Q.      -- to provide treatment?

14 A.      No, I'm not.

15 Q.      Dr. Fischer, as part of your role at the institution,

16 are you involved in the Special Master tours and providing

17 information to the Special Master?

18 A.      Yes, I am.  I was involved in the tour last February

19 at Corcoran.

20          MR. SHARMA:  Objection, Your Honor.  Outside the

21 scope of direct.

22          THE COURT:  Overruled.  You may proceed.

23 BY MR. FISCHER:

24 Q.      Have you been involved in the 25th Round of

25 monitoring done by the Special Master?

2674

1    A.       Yes, I was.

2    Q.       During the 25th Round of monitoring by the Special

3    Master, were you aware the Special Master found the chairs to

4    be awkward and uncomfortable for the patients being treated

5    in the chairs?

6    A.       I'm not aware specifically of seeing that finding,

7    but it is consistent with the findings of the stakeholders.

8    Q.       Is there any discussion, either at the institution

9    or, to your knowledge, at headquarters, about adjusting the

10   chair to provide a less restrictive alternative?

11   A.       Not that I'm aware of.

12   Q.       Dr. Fischer, I want to talk about the specific EOP

13   Ad. Seg. population for the next few minutes.

14   A.       Okay.

15   Q.       Am I correct that there are about 100 EOP Ad. Seg.

16   prisoners at Corcoran presently?

17   A.       That is correct.

18   Q.       And you testified earlier there's one psychiatrist

19   that's in charge of the EOP Ad. Seg. population?

20   A.       Correct.

21   Q.       And so doing the obvious math, that's about a

22   100-to-1 ratio of patients to psychiatrist?

23   A.       For that psychiatrist who sees them at least monthly,

24   that's correct.

25   Q.       Has there been any discussion about lowering that

2675

1   ratio of patient to psychiatrist?

2   A.       Not that I'm aware of.  We have different caseloads

3   and different programs in psychiatry.  And we are short of

4   staff, as I indicated before, by about 40 percent in the

5   discipline of psychiatry.  So we are doing the best we can

6   with our staff.

7   Q.       Of course.

8            Are you aware of the Court and Special Master's

9   concern about psychiatrist-to-patient ratios in the DSH

10  programs?

11           MR. SHARMA:  Objection, Your Honor.  Outside the

12  scope of direct.  Relevance to this witness.

13           THE COURT:  Relevance is overruled.  But it does

14  appear to me to be outside the scope, no matter how broadly

15  you construe --

16           MR. FISCHER:  They discussed staffing at the

17  institution.  I'm trying to probe his understanding of

18  staffing trends and what's desirable for providing care.

19           THE COURT:  You may answer, sir.

20           THE WITNESS:  I'm not aware of any specific ratios or

21  suggestions at other institutions.  No.

22  BY MR. FISCHER:

23  Q.       In the EOP Ad. Seg. population of about 100 you said,

24  do you know approximately how many there in the Corcoran EOP

25  Ad. Seg. are there for non-disciplinary reasons right now?

2676

1    A.       I do not.

2    Q.       Do you know -- are you aware of any prisoners being

3    there for non-disciplinary reasons?

4    A.       I really don't have that information.  I know

5    sometimes they do roll-up for safety reasons on their own,

6    but I don't have that access.

7             Custody has access to those that roll-up for that

8    reason, that go to Ad. Seg. for self-proclaimed safety

9    reasons, but I don't have any idea what the percentage or

10   number is.

11   Q.       Do you think it is important for your clinical staff

12   to have access to information as to the reason for an EOP

13   being placed in Ad. Seg.?

14   A.       I would say it usually comes out.  I think the answer

15   is yes.  It usually comes out as the clinician discusses it.

16   The inmate-patient usually volunteers that they are there for

17   safety reasons or somebody dropped a kite on them, for

18   example.  Or they will let them know that they're there for

19   an RVR, a Rules Violation Report.

20   Q.       So the clinician might get it if the inmate

21   self-reports?

22   A.       Anecdotally, yes.  Self-reported.

23   Q.       As part of the clinical staff at the prison, as part

24   of their standard practice, do they inquire as to whether a

25   patient is there for non-disciplinary reasons?

2677

```
 1    A.       I don't think so.

 2    Q.       Do you know how many EOP Ad. Seg. patients at the

 3    institution are there because they're waiting for transfer to

 4    a non-segregation bed?

 5    A.       No.  I don't have that information.

 6    Q.       Do you track length of stay data for EOPs in the

 7    administrative segregation unit at Corcoran?

 8    A.       We don't.  We don't track that.  Custody does.

 9    Q.       Do you know if primary clinicians are made aware of

10    the lengths of stay of the their patients in the EOP Ad.

11    Seg.?

12    A.       No.  They can ascertain it, you know, through

13    checking the tracking system.  For example, it shows when

14    they come into Ad. Seg.  So sometimes they're made aware of

15    how long their inmate-patient is in Ad. Seg.

16    Q.       But you're not aware of any standard practice for

17    clinicians to inquire as to the length of stay?

18    A.       No.  No report.  No formal report that I'm aware of.

19    No.  But again, you know, the inmate will let them know that,

20    you know, I just came in last night, or I've been here for

21    three months and I'm hoping to hear my rules violation and I

22    can get out of here.

23    Q.       So the inmate might self-report?

24    A.       Yes.

25    Q.       Dr. Fischer, you said that you assisted in the
```

2678

1   preparation for the Special Master tours; is that correct?

2   A.      That's correct.

3   Q.      And does that include preparing the Management Report

4   prior to the Special Master tours?

5   A.      I did assist in that report for the 25th Round.

6           MR. FISCHER:  May I approach, Your Honor?

7           (Exhibit handed to witness.)

8   BY MR. FISCHER:

9   Q.      Dr. Fischer, I've handed you Plaintiffs' Exhibit 2585

10  marked for identification at this point.

11          Is this the Management Report that you're referring

12  to?

13  A.      Yes, it is.

14  Q.      That's your name at the bottom of page 1?

15  A.      Yes, it is.

16          MR. FISCHER:  Your Honor, I move to admit Exhibit

17  2585 into evidence.

18          THE COURT:  Received.

19          (Whereupon, Plaintiffs' Exhibit 2585 received

20          into evidence.)

21  BY MR. FISCHER:

22  Q.      Still talking about the EOP Ad. Seg. Unit,

23  Dr. Fischer, are you aware of any -- you're aware that there

24  is a high number of clinical contacts done at cell front in

25  the EOP Ad. Seg. Unit?

2679

1   A.      Yes.  The number varies, but some are done at cell

2   front.  I'm sure the number is here.  As I recall it is

3   around 50 percent, give or take, that are cell front, maybe

4   less.

5   Q.      You said that you believe that some may be because

6   patients may not want to come out and be subjected to the

7   strip-search procedure; is that correct?

8   A.      I've heard that mentioned by the inmates.  I don't

9   know whether that's a majority of the reason, but I have

10  heard them mention that.

11  Q.      Exhibit 2585, which I just handed you, if I can

12  direct your attention to page 14 of 16 of the document.  So

13  these are the numbers at the bottom in the middle of the

14  page.

15  A.      Page 14?

16  Q.      Correct.

17  A.      I don't see numbers.  Are you talking about a table?

18          THE COURT:  No.  At the very bottom it says 12 of 16

19  or 13 --

20          THE WITNESS:  I see 14 of 16.  Is that what you said?

21  BY MR. FISCHER:

22  Q.      Yes, please.

23  A.      I don't see numbers on it.

24  Q.      I'm asking you to turn to the page right now.

25  A.      Oh, okay.

2680

1    Q.      I'll direct --

2    A.      Oh, okay.  I thought it was a table you're referring

3    to.

4    Q.      Starting on page 13, the previous page, you see the

5    section that runs onto the top of page 14, "ASU EOP (HUB)"?

6    A.      Yes.

7    Q.      Directing your attention to the top of page 14, the

8    end of the third line -- I'll start in the middle of the

9    second line where it says, quote --

10   A.      First paragraph now?

11   Q.      Second line on the page where it says, quote:

12          (Reading:)

13          54 percent of contacts took place in an out-of-cell

14          confidential setting and 46 percent of contacts were

15          cell front.

16          (Reading concluded.)

17   A.      I recall that, yes.

18   Q.      It goes on to say:

19          (Reading:)

20          Reasons for cell-front contacts included 26 percent

21          I/P (inmate-patient) refusals; 4 percent custody

22          lockdowns; and 16 percent provider initiated, which

23          includes running out of time, staff shortage and

24          staff absence.

25          (Reading concluded.)

2681

1          Have you tracked the data as to the number of

2    cell-front contacts that today are the result of provider

3    initiated cell-front contacts based on running out of time,

4    staff shortage or staff absence?

5    A.      We track it and report it every month.  At that time

6    we had an extreme staff shortage in EOP Ad. Seg.  If I

7    remember correctly from memory, I believe that percentage has

8    gone down a little bit since the numbers that are cited here.

9    And I think that provider initiated is now, as I recall,

10   around 10 percent, give or take, down from 16 percent.

11          Again, I don't have the documentation in front of me,

12   but that's my best memory.

13   Q.      It's improved a bit.

14          Did you or do you consider it a problem that

15   cell-front contacts be the result of a staff-related issue?

16   A.      Yes, I do.  I mean, ideally we would have the full

17   staffing which would help alleviate that problem.

18          THE COURT:  We're about to take a break, Doctor.

19          When we talk about cell fronts, cell fronts in the

20   various segregated housing, what do they look like?

21          Are they bars?  Are they solid doors?

22          THE WITNESS:  Yes.  It varies depending on the

23   housing setting.  Sometimes they are a solid door.

24          THE COURT:  Frequently, right?

25          THE WITNESS:  Pardon me?

2682

1          THE COURT:  Frequently?

2          THE WITNESS:  I would say frequently in Ad. Seg.

3          THE COURT:  How do you have cell-front therapy with a

4     solid door when you are shouting through the food port?

5          THE WITNESS:  It is a challenge.  Actually, they

6     don't open the food port for security reasons.  But you end

7     up talking to the inmate through the crack in the door where

8     the door closes with the cement.  So you have to talk through

9     that crack in the door which is --

10          THE COURT:  Very effective.

11          THE WITNESS:  It is a challenge, yes.

12          THE COURT:  Let's take our afternoon recess.

13          (Off the record at 2:45 p.m.)

14                         ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                        (Back on the record at 3:00 p.m.)

2            THE COURT:  Mr. Fischer.

3    BY MR. FISCHER:

4    Q.        With respect to the ATOM pilot, when that was

5    completed, was a report written?

6    A.        I believe one was, yes.

7    Q.        And do you know whether that report was provided to

8    the Special Master and plaintiffs' counsel?

9    A.        I'm not sure of the answer to that.  I don't know.

10   Q.        Do you know if the institution asked permission of the

11   Special Master to remove the ATOM chairs from Corcoran?

12   A.        I don't know the answer to that.

13   Q.        Do you know if the institution or headquarters

14   notified the Special Master or plaintiffs' counsel about the

15   removal of the ATOM chairs from the treatment space at

16   Corcoran?

17   A.        I don't know the specific answer to that.

18   Q.        I asked you a few questions about if you knew how many

19   nondisciplinary mentally ill prisoners are in the segregation

20   units at Corcoran, and you said you weren't sure.

21            Do you remember that?

22   A.        Yes.

23   Q.        Do you know if any mentally ill prisoners are

24   currently in any of the segregation units at Corcoran but

25   have not been categorized as administrative segregation, that

1    is to say, that they're being placed in the ad seg building

2    as sort of an overflow?

3    A.      Obviously I don't have firm data on this.  Again, I

4    believe that may occasionally be the case for a short time

5    period, but I'm not sure.

6    Q.      In your declaration it says -- docket 4429, dated

7    March 22, 2013.  I may have misspoken earlier and said March

8    23rd, but March 22nd, 2013, in paragraph 28 you state, quote,

9    (Reading:)

10                   Many of the inmates housed in the administrative

11                   segregation unit have mental illness.  Some of

12                   those inmates are there due to lack of bed space

13                   outside of the unit, where, if available, they

14                   would be sent to.

15           Do you recall that from your declaration?

16    A.      I recall saying that and declaring that, yes.

17    Q.      Do you know whether those types of mentally ill

18    prisoners are characterized as administrative seg prisoners

19    at Corcoran?

20    A.      Were those non-mentally ill?

21           THE COURT:  No.  Mentally inmates who are in Corcoran

22    ad seg unit because there is no other place to put them, are

23    they designated as ad seg inmates?

24           I think that's your question.

25           MR. FISCHER:  That is.

 1                  THE COURT:  I don't know, designated by whom --

 2                  THE WITNESS:  I don't know the answer to that.

 3      BY MR. FISCHER:

 4      Q.      Do you believe if they're counted for purposes of the

 5      data produced at the institution as administrative

 6      segregation prisoners, for example, reported to MHTS?

 7      A.      I'm not sure of the answer to that.

 8      Q.      Are you responsible for the reporting of mentally ill

 9      segregation population numbers to headquarters?

10      A.      We do report segregation numbers, yes.

11      Q.      And you don't know whether the lack of bed mentally

12      ill prisoners in segregation are counted as segregation or

13      not for that report?

14      A.      Not to be argumentative, but I did not think it was

15      mentally inmates that were overflowed into ad seg.  I thought

16      it was occasionally non-ad seg inmates not in the mental

17      health population, but very temporarily put in ad seg housing

18      and removed within 24 hours.

19                  I'm not aware of -- you obviously have inmates at ad

20      seg that are not mentally ill inmates and we have some that

21      are mental health inmates, and so I'm not clear on the

22      distinction being made.

23      Q.      Just so I understand, you don't know one way or the

24      other whether the lack of bed mentally ill prisoners if

25      placed in segregation are reported as segregation inmates to

1    headquarters?

2         Am I right about that?

3    A.     I'm not even clear, for example, a mental health

4    inmate who is a mainline inmate would not to my knowledge

5    would be put in ad seg.  He would be kept on the mainline as

6    a mental health inmate.

7         THE COURT:  As far as you know, therefore, there are

8    no mentally ill inmates in ad seg who are not disciplinary,

9    as far as you know?

10        THE WITNESS:  That is correct.

11   BY MR. FISCHER:

12   Q.     Would you have concerns if they were, about their

13   mental health?

14   A.     Yes.

15   Q.     Why?

16   A.     We're talking non-mental health inmates --

17   Q.     No.  Mentally ill prisoners placed in ad seg for lack

18   of bed or other non-disciplinary reason?

19   A.     I'm not aware of mental health inmates placed in ad

20   seg.

21        THE COURT:  We understand that you don't know that

22   there are any.  Assume -- this is a hypothetical.  You've

23   indicated if there were such persons, you would be concerned

24   about that as a mental health issue; correct?

25        THE WITNESS:  Yes.

```
 1              THE COURT:  Sure you are.  That's not magic and that's
 2    because ad seg is a stressor, as you folks use that language.
 3              THE WITNESS:  Yes, Your Honor.  Maybe I'm belaboring
 4    the point, but we are talking about what type of inmates that
 5    are placed incorrectly in ad seg?
 6              THE COURT:  We didn't say "not correctly."  We said
 7    however it happens, they're nondisciplinary, but they are
 8    mentally ill and they're placed in ad seg.
 9              THE WITNESS:  Okay.
10              THE COURT:  As far as you know, there are no such
11    folks?
12              THE WITNESS:  That's correct.
13    BY MR. FISCHER:
14    Q.      But when a prisoner on the mental health case load is
15    placed in an ASU at Corcoran, do they receive a formal
16    screening?
17    A.      Oh, yes, absolutely.
18    Q.      Do they receive the same screening as a non-case load
19    prisoner, the 31 item questionnaire?
20    A.      Yes, they do.
21    Q.      And as part of that screening, is a full file review
22    done, mental health file review done for that inmate?
23    A.      Of a non-mental health?
24    Q.      Of a mentally ill prisoner entering segregation?
25    A.      Yes, of course.  A file review is done, screening is
```

1    done.

2    Q.    Who conducts the file review?

3    A.    The file review is conducted by their primary

4    clinician, whoever their case manager is, whoever they're

5    assigned to.

6    Q.    As part of that file review, do they conduct a full

7    file review of any past suicide attempts?

8    A.    Yes.

9    Q.    Any past crisis bed admissions?

10    A.    Yes.

11    Q.    Any past decompensation in the segregation units?

12    A.    They would review their clinical behavior in ad seg,

13    yes.

14    Q.    Is that file review recorded anywhere in the file?

15    A.    They make it part of their intake interview, and,

16    typically, they're treatment planning.  They indicate what

17    the past history has been, what the level of care has been,

18    whether they move from CCC or EOP or vice versa.

19    Q.    And if in the course of their screen, their interview

20    and their file review, if they find that a prisoner on the

21    case load has a history of decompensation or suicide attempts

22    in the ASU, is that clinician able to prevent that placement

23    in the segregation unit at Corcoran?

24    A.    No.

25    Q.    Because that's a custody decision?

 1    A.       Yes.  But, of course, their clinical history and

 2    behavior is noted.  The custody puts them in ad seg.  That's

 3    correct.

 4    Q.       Turning back to the exhibit that I gave you just

 5    before the break, 2585, this is the management report from

 6    the twenty-fifth round monitoring period.

 7             If you can turn to page 12 of that document.

 8    A.       (Witness complies.)

 9    Q.       Under "administrative segregation," parenthesis ASU

10    near the bottom of the page, do you see that there?

11    A.       Yes.

12    Q.       The fourth line beginning with "however," it reads,

13    quote, (Reading:)

14                     During the reporting period, only 44 percent of

15                     the IPs, inmate patients, received preplacement

16                     screening prior to placement in the ASU setting

17                     according to audits.  Staff have been trained

18                     and QIT is being trained to address this issue.

19             Then one sentence past that, it says, (Reading:)

20                     Those not receiving the screenings typically

21                     came from the SHU.

22             A few questions on this particular passage.

23             Are you aware of this historical problem with

24    screenings for individuals coming into the segregation units?

25    A.       Yes.

1    Q.      And has a follow-up report been done based on the QIT

2    on the issue.

3    A.      I'm not aware of the content of a follow-up report.

4    Q.      Do you agree that it's important that these

5    preplacement screenings be done for all inmates when they're

6    placed in the segregation unit at Corcoran?

7    A.      I do.  If I may add something about the percentage or

8    save it for redirect.  I'm not sure.  Part of the 44 percent

9    was that sometimes the audits were done, but they were not

10   scanned into the UHR.  They were not showing up in the UHR.

11   Q.      Might be a data issue?

12   A.      Exactly.  That was cleaned up as part of the QIT.

13   Q.      In the last sentence that I quoted for you, it says,

14   (Reading:)

15                   Those not receiving screens typically came from

16                   the SHU.

17           Do I understand correctly those are individuals that

18   had finished a SHU term and were being placed back into

19   administrative segregation?

20   A.      Correct.

21   Q.      Some of those inmates, those individuals are waiting

22   to placed in to a non-segregation bed?

23   A.      Correct.

24   Q.      Do you know whether those individuals are classified

25   as administrative segregation units for purposes of your

1    report?

2    A.    I believe they are if they're in ad seg, yes.

3    Q.    Do you know if similar preplacement screenings were

4    done for SHU inmates at Corcoran similar to what's being done

5    in the ASU?

6    A.    I know -- I believe they are, but I'm not positive.  I

7    believe when they go into that lockdown segregated facility,

8    they're also screened 31 item questionnaire, yes.

9    Q.    Do you agree it would be important to do such a

10   preplacement screening for new SHU inmates?

11   A.    Yes.

12   Q.    And based on your experience at Corcoran, if a

13   clinician having reviewed the screen and done the intake

14   interview and so forth determined that an inmate patient

15   could not tolerate the SHU setting, they wouldn't be able to

16   remove that individual from the SHU.

17         Is that correct?

18   A.    The mental health clinician would not be there.

19   Q.    Because that's a custody decision due to the SHU

20   placement?

21   A.    That is correct.

22   Q.    And once an individual is placed in SHU, and I'll

23   speak specifically to a CCCMS patient being placed in the

24   Corcoran SHU, there's no -- is there a formal re-evaluation

25   of the individual's mental health if they spent a certain

1    period of time in the SHU?

2    A.    Well, they are constantly evaluated, as we said, at

3    least monthly and rounded on by psych techs, so that if

4    anything clinically occurs, if they appearance or demeanor

5    gets worse and then they are re-evaluated, they can always

6    been taken to a team meeting and moved to a higher level of

7    care if necessary.  So they're constantly being evaluated.

8         Often -- not often, but often referrals are made by

9    psych techs.  Sometimes that occurs if the inmate becomes

10   suicidal, for example, which is slowly decompensation, so

11   then the clinical evaluation is made and a clinical move is

12   made, which would be to move them to the mental health crisis

13   bed.

14   Q.    For a CCCMS prisoner in the SHU, they were interviewed

15   at a treatment team meeting at some point, for example, with

16   a clinician present?

17   A.    Oh, yes.  That's done at least every 90 days, and,

18   again, at least monthly by the clinician.

19   Q.    And for non-case load patients, they don't have that

20   treatment team meeting or the clinical contact with a primary

21   clinician.

22        Is that correct?

23        MR. SHARMA:  Objection, Your Honor.  Outside the scope

24   of direct and not relevant as we're talking about non-case

25   load inmates.

```
 1                THE COURT:  That would appear to be the case.

 2                MR. FISCHER:  This goes to one of the issues in our

 3      motion regarding screening of individuals who decompensate in

 4      the SHU, the ability to identify those.

 5                THE COURT:  Whether or not they were classified as

 6      mentally ill at the time they went in?

 7                MR. FISCHER:  Yes, as there's been testimony that

 8      people decompensate in the SHU.

 9                THE COURT:  The motion is denied.

10                You may answer, Doctor.

11                THE WITNESS:  The question had to do with screening of

12      non-mental health inmates --

13                MR. FISHER:  Let me rephrase.

14      Q.      There's no treatment team meeting for non-case load

15      inmates in the SHU.

16                Correct?

17      A.      Correct.

18      Q.      And there's no monthly clinical contacts for non-case

19      load prisoners in the SHU?

20      A.      Correct, non-mental health inmates.

21      Q.      Am I correct that there's no formal screening for

22      non-case load SHU inmates no matter how long they stay in the

23      SHU?

24      A.      Aside from the rounding by the psych techs?

25      Q.      Correct.
```

1    A.    And the observation by custody and so forth?

2    Q.    Correct.

3    A.    That is correct.

4    Q.    Do you think that it would be a good idea have a

5    periodic reevaluation --

6          THE COURT:  The objection is sustained.

7    BY MR. FISCHER:

8    Q.    Dr. Fischer, over the past year are you aware of

9    difficulties in providing recreation time or out of cell

10   recreation time to mentally ill SHU prisoners at Corcoran?

11   A.    Out of cell -- of course, you said non-mental health.

12   Q.    Mentally ill prisoners in the SHU, their access to

13   yard --

14   A.    In the mental health program?

15   Q.    Yes.

16   A.    They get their yard time several times a week.

17   Q.    My question is if you're aware of any issues with

18   providing required yard time?

19   A.    No, I'm not.

20   Q.    Are you aware of any suicides in the SHU in 2013?

21         MR. SHARMA:  Objection.  Outside the scope of direct.

22         THE COURT:  Overruled.

23         You may answer.

24         THE WITNESS:  I don't remember the location of the

25   most recent suicide.  He might have been in the SHU.

```
 1                 MR. FISCHER:  May I approach, Your Honor?

 2                 THE COURT:  Yes.

 3      BY MR. FISCHER:

 4      Q.      On Exhibit 2000, this individual is identified as

 5      Suicide Prisoner 4.  I'll refer to him as Suicide Prisoner 4

 6      and ask you to do the same.  This exhibit is marked 2520, a

 7      suicide report for Prisoner 4 in the Corcoran SHU.  It's

 8      dated August 30, 2013.

 9                 I ask it be moved into evidence under seal.

10                 THE COURT:  Received under seal.

11                         (Whereupon, Plaintiffs' Exhibit 2520

12                          was received into evidence under

13                          seal.)

14      BY MR. FISCHER:

15      Q.      Do you recall this suicide in the Corcoran SHU, Dr.

16      Fischer?

17      A.      I do.

18      Q.      I know some of this is a bit difficult to talk about

19      and I appreciate you doing so.

20                 On page 11 of the suicide report, quote, in the middle

21      of the page, (Reading:)

22                         A concern that emerged as a result of the review

23                          in the middle of the page.

24                 The bullet point.

25                 MR. SHARMA:  Objection.  Lack of foundation.  It's
```

 1    unclear whether this witness has reviewed this document.

 2              THE COURT:  Have you seen this document, sir?

 3              THE WITNESS:  Yes, I have.

 4              THE COURT:  You may proceed.

 5    BY MR. FISCHER:

 6    Q.    Dr. Fischer in the middle of the page it says,

 7    (Reading:)

 8                   It did not appear that the inmate was offered

 9                   ten hours of yard time each week.  In addition,

10                   the start and end times of yard are to be noted

11                   on the record, and that was done inconsistently.

12                   If the inmate did not receive the full amount of

13                   yard time per policy he should have been

14                   offered, it could have had a negative impact on

15                   his overall level of functioning, his mental

16                   health condition and decision-making abilities.

17          Do you recall this concern being identified?

18    A.    Yes, I do.

19    Q.    Do you know whether there were discussions among the

20    mental health staff at the institution about lack of yard

21    provided to inmates in the SHU?

22    A.    No, I'm not, aside from this report.

23    Q.    Are you aware of any other recommendations by mental

24    health or custody staff about the provision of yard for SHU

25    inmates at Corcoran in light of this suicide report?

```
 1    A.      No, I was not involved in those discussions.

 2    Q.      Dr. Fischer, you testified quite a bit about your very

 3    positive relationship with correctional officers at the

 4    institution.

 5            Do you recall that?

 6    A.      Yes.

 7    Q.      Over the course of the last year or year and a half,

 8    have there been periods where custody shortages or custody

 9    clinical coordination has been problematic with respect to

10    the provision of mental health care to segregation inmates?

11    A.      No major ones that I'm aware of, that I recall.

12    Q.      If I can turn your attention back to the management

13    report that you helped to prepare on page 4 specifically.

14            There is a table at the bottom of page, and I'm going

15    to focus your attention to the top of the page.  This, again,

16    is the management report prepared by Corcoran mental health

17    staff, including yourself.  It states, quote, (Reading:)

18                    Access to care issues continue to impact

19                    treatment, particularly in the SHU, CCCMS and

20                    ASU, CCCMS programs over the reporting period.

21                    The limited escort resources have become further

22                    strained due to the increased demand for medical

23                    and dental services.

24            And a further down it says, (Reading:)

25                    This has resulted in longer wait times for
```

2698

```
 1                       clinicians providing therapeutic services.

 2              Do you recall that being an issue in or about

 3    August 2012?

 4    A.      Yes.

 5    Q.      Do you recall any discussions at the institution about

 6    resolving these issues involving custody escorts?

 7    A.      Yes.  There was discussion on that matter.

 8    Q.      What steps were taken to fix the problem?

 9    A.      They work very hard on the scheduling of the allocated

10    officers that they did have providing healthcare escorts,

11    trying to make them more efficient in their ability to cover

12    the ducat lines and use their services more efficiently and

13    effectively.

14    Q.      Do you know whether there are still shortages with

15    respect to custody escort staff for Corcoran for the

16    segregation units?

17    A.      There was some minor shortage I'm aware of.

18    Q.      Does there continue to be a minor shortage of escort

19    staff for mentally ill and mental health treatment services

20    in the segregation units?

21    A.      Yes.  Although we have developed ways to work around

22    it and do the best we can, obviously.

23    Q.      Of course.

24              Have you made any requests from headquarters to

25    provide more custody escorts so mental health treatment can
```

1    be provided in the mental health treatment programs at

2    Corcoran?

3    A.      I have not.  Mental health has not, to my knowledge.

4    I know that our custody side of the house is working that

5    issue.

6    Q.      Is it also your understanding headquarters is also

7    aware of the issue?

8    A.      I don't know that and I can't speak to custody.

9              MR. FISCHER:  May I approach?

10             THE COURT:  Yes.

11   BY MR. FISCHER:

12   Q.      Dr. Fischer, this exhibit is marked Plaintiffs'

13   Exhibit 2481.  It's already in the record as Exhibit W to the

14   Kahn declaration at docket 4765 dated August 23, 2013.

15             If you turn past the slip page, this is the Corcoran

16   State Prison healthcare evaluation prepared by the Plata

17   Medical experts, dated July 29, 2013, and I ask it be

18   admitted into evidence.

19             MR. SHARMA:  Objection, Your Honor.  This issue --

20   relevance.  This deals with the medical care, not mental

21   health care.

22             THE COURT:  Sir?

23             MR. FISCHER:  If you'll allow me to just preview my

24   questions, it relates to the delivery of services, including

25   escort staff that you've been talking about in the

1    segregation units, and it's all types of treatment.  This

2    isn't limited to medical treatment.

3            THE COURT:  I don't know whether it is or not.  If the

4    document says it's true of everybody, we're fine; otherwise,

5    the objection appears well taken.

6            MR. FISCHER:  I'll be careful --

7            THE COURT:  Ask him.  I don't know.

8            You may proceed.

9    BY MR. FISCHER:

10    Q.    On page 6 of this document, the best way to look at it

11    is at the bottom right of the page.  Page 6 of the document,

12    at the bottom of the page, Dr. Fischer, it reads, (Reading:)

13                We also found that inadequate custody staffing

14                and/or cooperation adversely affected timely

15                medication administration in the SHU and

16                facility three general population.  In the SHU,

17                we observed and staff reported that custody does

18                not provide escorts for nurses to administer

19                medication in a timely matter.

20            Are you aware of this concerned by the Plata court

21    experts?

22            MR. SHARMA:  Again, objection.  There's no indication

23    that this relates to mental health treatment.

24            THE COURT:  The next question will be:  Is it true of

25    mental health as well?

```
 1              And the answer is either in your favor or in

 2    plaintiffs' favor and we'll be done with it.

 3              Are you -- well, the question is:  Is there a similar

 4    difficulty on the mental health side?

 5              THE WITNESS:  No, not that I'm aware of.

 6              MR. FISCHER:  Can I ask one more question, Your Honor?

 7              THE COURT:  Yes.

 8    BY MR. FISCHER:

 9    Q.      Is the administration of medication done through the

10    same pharmacy and same procedures, regardless of whether it's

11    a medical issue or psychiatric medication at the institution?

12    A.      Yes, basically.

13              THE COURT:  All right.  The answer in the document

14    speaks for itself.  The court will permit you to proceed.

15              MR. FISCHER:  I move to admit the document.

16              THE COURT:  It's in evidence already.

17              THE CLERK:  Yes.

18              MR. FISCHER:  Thank you.

19    Q.      Dr. Fischer, were you aware of this concern for

20    custody escort shortages and cooperation issue from any other

21    source during the summer of 2013?

22    A.      No.

23    Q.      On page 6, the middle of the page, the third full

24    paragraph where it states, quote, (Reading:)

25                   There are problems with access to care,
```

```
 1                    particularly in restricted housing units EG, SHU

 2                    and ASU.  Healthcare leadership reported that

 3                    patient refusal rates were high; and we believe

 4                    that some of the refusals are a result of

 5                    custody practices that negatively affect access.

 6          Dr. Fischer, were you aware of this concern?

 7          THE COURT:  Objection is sustained.

 8          You may proceed.

 9   BY MR. FISCHER:

10   Q.    Dr. Fischer, since July 29, 2013, have there been any

11   meetings at the institution involving you or any other

12   clinical staff about the ongoing concerns about access to

13   care?

14          MR. SHARMA:  Lack of foundation, misstates the

15   witness' testimony, and there's been no foundation with

16   respect that the witness has even reviewed this document.

17          THE COURT:  We're not talking about this document any

18   more.  The question is since July 29, 2013, have there been

19   meetings involving ongoing concerns about access to care, if

20   you know?

21          THE WITNESS:  No, not that I'm aware of.

22   BY MR. FISCHER:

23   Q.    Just one more question on this document.

24          THE COURT:  Is it on this document -- it doesn't

25   matter.  He said no anyhow.
```

1          MR. FISCHER:  This is my next question, and I will

2     move on, Your Honor.

3     Q.     Dr. Fischer, on page 26 of the document, on this page

4     it discusses the treatment refusals and the, quote, the high

5     rate of refusals.

6          I want to ask you if you're aware of any of these

7     issues identified in this report impacting the delivery of

8     care to mentally ill prisoners in the segregation units.

9          In the middle of the page, it says, (Reading:)

10              According to staff, custody won't wait for them

11              and -- let me back up one second.

12          It states, (Reading:)

13              A nursing supervisor reported that inmates

14              sometimes do not know when they are scheduled

15              for their appointment, and when custody comes to

16              escort them to the appointment, they are

17              surprised and not ready.  According to staff,

18              custody won't wait for them and state that they

19              are refusing their appointment.

20          My question is:  Are you aware of that being an issue

21     with respect to delivery of mental health treatment in the

22     segregation units at Corcoran?

23     A.     That they're not aware of their appointment and

24     sometimes refuse?  I'm not aware of that, no.

25     Q.     Are you aware of that historically being an issue with

1    any segregation mentally ill prisoners at Corcoran?

2    A.      No.

3    Q.      Another reason given in this report states, quote,

4    (Reading:)

5                 Staff reported that inmates refuse appointments

6                 because it may conflict with recreation, which

7                 is the one opportunity to leave their cell each

8                 day.

9         Are you aware of that being an issue with respect to

10    access of care for mental health treatment in the segregation

11    units?

12    A.      You're talking about mental health, the Plata

13    document?

14         MR. SHARMA:  I would just renew the objection to the

15    document.  There's been no foundation --

16         THE COURT:  The objection is well taken as to the

17    document, and I agree with you entirely, but you can ask the

18    question simply and straightforwardly.

19         Has there been a problem in conflicts between

20    treatment and yard time?

21         See how easy is it?

22         As far as you know?

23         THE WITNESS:  Occasionally, yes.

24    BY MR. FISCHER:

25    Q.      Have any steps been taken at Corcoran to address that

1    issue so individuals don't have a disincentive to access

2    treatment?

3    A.    Yes.

4    Q.    Are you aware of this problem continuing in certain

5    instances?

6    A.    Again, I don't typically have firsthand information to

7    that because I'm not running the program on the unit any

8    more, so what I would hear would be antidotal.  I do know we

9    did take steps to resolve that conflict.

10   Q.    Do you know whether the requirement that a cellmate --

11   of an inmate going out for treatment standing up against the

12   back of the wall of the cell until security procedures are

13   completed for the inmate being taken out of the cell acts as

14   any sort of disincentive treatment for mentally ill

15   prisoners?

16        MR. SHARMA:  Objection.  Calls for speculation.

17        THE COURT:  I don't know whether it calls for

18   speculation.  He may have direct information or may be able

19   to say, "I don't know" or whatever.

20        First of all, is it true that if there are cellmates,

21   they've got to stand up against the back of the wall until

22   security procedures have been accomplished, as far as you

23   know?

24        THE WITNESS:  It's been six years since I was on the

25   ground doing that and at cell front, so I really don't recall

```
 1   or don't know what the procedure is now.

 2          THE COURT:  Fair enough.

 3   BY MR. FISCHER:

 4   Q.     Going back to the treatment space for just a moment.

 5          Dr. Fischer, I believe you testified that no group

 6   treatment is provided to CCCMS ad seg prisoners in the new

 7   treatment space.

 8          Is that correct?

 9   A.     Correct.

10   Q.     Are individual contacts provided in that for treatment

11   space CCCMS ad seg prisoners?

12   A.     In the new EOP building, no, they are not.

13   Q.     They're provided in the housing unit?

14   A.     Correct.

15          THE COURT:  How are they provided?  Again, is the

16   provision that people are shouting through the cracks in the

17   door?

18          THE WITNESS:  No.  The one-on-one confidential

19   sessions which are always offered initially to the inmate are

20   conducted in the TTMs, treatment modules that we referred to

21   before, which are on the day room floor.

22          THE COURT:  Okay.

23          THE WITNESS:  Those have open mesh sound --

24          THE COURT:  I'm quite aware of what they look like,

25   sir, but, you're right.  Let's make the record clear.
```

```
 1              You may proceed.
 2    BY MR. FISCHER:
 3    Q.        The location of that IDTT meetings for CCCMS ASU
 4    inmates, do you remember where are those held?
 5    A.        Now, in the last month or so since the opening of the
 6    new building, the IDTTs are held in the new building.
 7    Q.        Okay.  In the new building when the IDTT meeting
 8    occurs, is it done at a table?
 9    A.        Yes.
10    Q.        Is the inmate restrained?
11    A.        The ad seg inmates are placed in the treatment module
12    in the holding cell where they can move around.  The inmates
13    are restrained at some point, yes.
14    Q.        This is at the interdisciplinary treatment meetings?
15    A.        Yes.
16    Q.        This is for the CCCMS prisoners in ad seg?
17    A.        Yes.
18    Q.        As well as the EOP prisoners in ad seg?
19    A.        Yes.  Correct.
20    Q.        And there's no way for them to work their way out of
21    that situation where they won't be treated inside the cage
22    for treatment.
23              Is that correct?
24    A.        I'm hesitating because I think they're given the
25    option of sitting in a chair, cuffed or being in the
```

1    treatment module, and I believe it was a recent

2    recommendation to allow them to be in the treatment module if

3    they wished, because it gave them the ability for more

4    movement.

5         Again, I'm not positive, because I haven't been at

6    those IDTTs for a while, but they're restrained, because

7    they're in either the chair or treatment module.

8    Q.    This is regardless of the reason that they've been

9    placed in segregation; correct?

10    A.    Yes.

11    Q.    You testified a little bit about Prisoner GG.

12         Do you recall that, Dr. Fischer?

13    A.    Yes.

14    Q.    You testified that based on your review of the

15    records, the clinician hadn't make a recommendation that this

16    individual be raised to the EOP level of care?

17    A.    I have not recommended that, correct.

18    Q.    And it's your understanding pursuant to the program

19    guide that this individual in the CCCMS ad seg, if their

20    level of care had been raised to EOP, they're supposed to be

21    moved to an EOP ad seg hub within 30 days?

22         Is that correct?

23    A.    Well, yes.  I'm not sure of the movements between and

24    among prisoners because we have a hub in Corcoran.

25    Typically, they're moved directly into our hub, EOP hub at

 1    Corcoran, in the next building, for example.

 2            So they're moved immediately upon being made EOP that

 3    day into the EOP hub program at Corcoran.

 4    Q.      Prisoner GG -- you didn't treat Prisoner GG; is that

 5    correct?

 6    A.      No.

 7    Q.      Did you ever attend an IDTT treatment meeting for

 8    Prisoner GG?

 9    A.      No.

10    Q.      Is it fair to say the first time you reviewed his

11    reports was in the last few days?

12    A.      Correct.

13    Q.      You never met with Prisoner GG?

14    A.      That's correct.

15    Q.      In reviewing Prisoner GG's records, would you agree

16    that the administrative segregation unit acted as a

17    significant stressor for his mental health?

18    A.      That's hard to say.  I know he presented subjective

19    complaints to that effect.  He was stressed by being in ad

20    seg.

21    Q.      The clinician agreed?

22    A.      The clinician agreed he was stressed remaining in ad

23    seg.

24    Q.      The options for the clinician would be to wait until

25    his condition reaches the level that he would need a higher

1  level of care, EOP or mental health crisis bed or hospital,

2  and then request that the individual be moved out.

3          Is that correct?

4  A.      That's one option.  She also took other steps -- she

5  took other proactive steps, as indicated in the notes.

6  Q.      To try to get the individual out of ad seg more

7  quickly?

8  A.      Yes.  She actually petitioned three of the

9  correctional counselors, Ryder, Ridgfield and Wyman, I think,

10  informally emailed them and made them aware of his status and

11  to try to get him moved up on the list or out of ad seg.

12          THE COURT:  My realtime is not working.

13          We will take the evening break and come back tomorrow

14  at 9:30.

15                          (Whereupon, proceedings concluded at

16                          3:50 p.m.)

17                          ---o0o---

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3          I, Michelle L. Babbitt, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                              MICHELLE L. BABBITT CSR #6357
10                            Official Court Reporter
                              United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2                        ---o0o---

 3
    STATE OF CALIFORNIA  )
 4  COUNTY OF SACRAMENTO )

 5


 6
            I certify that the foregoing is a correct transcript
 7
    from the record of proceedings in the above-entitled matter.
 8

 9

10                  IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```