1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0O---

4       BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7           Plaintiffs,

8    Vs.                           CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11          Defendants.

12   _____/

13

14

15                         ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19               THURSDAY, DECEMBER 5TH, 2013

20

21                         ---o0o---

22

23

24

25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
     Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  JANE KAHN, ATTORNEY AT LAW

 9            BY:  AARON FISCHER, ATTORNEY AT LAW

10            BY:  THOMAS NOLAN, ATTORNEY AT LAW

11

12

13    FOR THE DEFENDANTS:

14             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
15             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
16
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
18
               BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
19
               BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
20

21

22                          ---o0o---

23

24

25
```

1

2

3                    EXAMINATION INDEX

4                       ---o0o---

5

6   FOR THE DEFENDANTS:

7       EXAMINATION:                                    PAGE

8

9    ROBERT FISCHER

10       Cont'd Cross-Examination by Mr. Fischer        2711
         Redirect Examination by Mr. Sharma             2739
11       Recross-Examination by Mr. Fischer             2750
         Further Redirect Examination by Mr. Sharma     2753
12

13

14   PABLO STEWART

15       Direct Examination by Mr. Nolan                2757
         Cross-Examination by Mr. Fischer               2839
16

17

18

19                       ---o0o---

20

21

22

23

24

25

```
 1                         EXHIBIT INDEX

 2                          ---o0o---

 3

 4      PLAINTIFFS'
        EXHIBIT NO           DESCRIPTION              EVD
 5

 6      2106 thru 2119   Photos from Prison Tours     2785

 7         2120          Chart                        2802

 8         2121          Prisoner H Suicide Rpt.      2822

 9         2122          Prisoner H Health Exceprts   2822

10         2126          Prisoner 8 Suicide Rpt.      2809

11         2127          Prisoner 8 Health Records    2809

12         2132          Prisoner R Suicide Rpt.      2828

13         2134          ACA Standards                2829

14         2136          Prisoner V Health Records    2774

15         2137          Prisoner DD Health Records   2793

16         2138          Prisoner EE Health Records   2795

17         2140          Prisoner SS Health Records   2819

18         2142          Prisoner W Health Records    2835

19         2496          CSP-SAC Psych. Handbook      2836

20         2526          Prisoner 7 Suicide Rpt.      2719
                         (Sealed)
21
           2540          Prisoner 15 Suicide Rpt.     2719
22                       (Sealed)

23

24

25                          ---o0o---
```

1            SACRAMENTO, CALIFORNIA

2        THURSDAY, DECEMBER 5, 2013; 9:30 A.M.

3                  ---oOo---

4

5              DR. ROBERT FISCHER

6  Recalled as a witness on behalf of the defendants herein, was

7  previously sworn, examined, and testified as follows:

8            CROSS-EXAMINATION (CONTINUED)

9  BY MR. FISCHER:

10  Q.      Good morning, Dr. Fischer.

11  A.      Good morning, Mr. Fischer.

12  Q.      When we ended yesterday, we were discussing Prisoner

13  GG who you had discussed in your direct testimony, and you

14  had mentioned that the clinician for Prisoner GG had

15  petitioned three correctional counselors, including by

16  informal e-mail, to try to get Prisoner GG out of

17  administrative segregation because it was causing stress and

18  distress to the prisoner.

19        Do you recall that?

20  A.      I do.

21  Q.      That prisoner was waiting transfer to a non

22  -segregation bed.

23        Do you recall that as well?

24  A.      Yes.

25  Q.      What this clinician had done, this isn't a standard

1    practice in the institution.  This is something that this

2    particular clinician had taken upon herself to try to help

3    her patient.

4         Is that right?

5    A.    That's correct.

6    Q.    And you would agree that this clinician went to great

7    lengths to help her patient in this way.

8         Correct?

9    A.    Yes, she did.

10   Q.    And you would also agree that Prisoner GG,

11   unfortunately, nonetheless, stayed in administrative

12   segregation for about seven or eight months.

13        Is that right?

14   A.    I don't recall the total time or seeing a calculation

15   on that.  I think it was toward the end of the period in the

16   notes I reviewed and when she petitioned counselors to have

17   him removed, so I don't think he stayed seven months beyond

18   that time, but he might have been there for a seven-month

19   total.

20        At the end of that time, she was petitioning to get

21   him removed.

22   Q.    You agree that's in the August clinical notes you

23   discussed yesterday?

24   A.    Yes.

25   Q.    And the reason that he was in ad seg for this long, as

1    you said yesterday, is because it's a custody decision as to

2    when he leaves ad seg ultimately?

3    A.      That's correct.

4    Q.      I want to turn your attention to Plaintiffs'

5    Exhibit 2040 in front of you right there.  It's already in

6    evidence.  This is the redacted version of the September 16,

7    2013, MHTS.net data on length of stay for mentally ill

8    prisoners in segregation.

9           I'll turn your attention to page 22 of the document.

10    It's possible the odd number pages are assigned a page

11    number, but you should be able to find it.

12    A.      Yes.

13    Q.      Do you see that there starting with the fourth line,

14    the institution is identified as Corcoran?

15           Do you see that on the far left?

16    A.      I do.

17    Q.      These are individuals in the Corcoran segregation

18    units with length of stay.  You can see at the far right

19    starting from 20 days moving on up.

20           Correct?

21    A.      Correct.

22    Q.      You agree that there's about 30 entries per page.

23           Do you see that there?

24    A.      Appears to be correct.

25    Q.      And Corcoran runs from page 22 in this document to

 1    about the middle page on page 41.

 2              Do you see that there?

 3              MR. SHARMA:  Objection as to lack of foundation.

 4    There's been no indication that this witness has ever seen

 5    this document.

 6              THE COURT:  Whether he's seen it or not, I think he's

 7    being questioned about the content, which is already in

 8    evidence.  To the extent that he can read, he can certainly

 9    testify.

10              THE WITNESS:  Yes, page 22 through about a third of

11    the page of 41.  19 pages.

12    BY MR. FISCHER:

13    Q.    As you can see on pages 40 and 41 that you're looking

14    at right now, there are numerous individuals with lengths of

15    stay running into the thousands of days.

16    A.    I see that, according to the report.

17    Q.    My question is:  From the mental health side, for

18    individuals with longer lengths of stay in segregation at

19    Corcoran, is there any special enhanced treatment program for

20    these individuals?

21    A.    I do know that these toward the end are SHU of CCC not

22    EOP.  I'm sorry.  What was your question?

23    Q.    We'll start with the SHU you're looking at right now.

24              Among the SHU individuals with lengthy stays that stay

25    more than a year, is there any special program of enhanced

1    treatment for those particular mentally ill prisoners on the

2    case load?

3          THE COURT:  Do you know whether they're mentally ill.

4    Let's start there.

5    BY MR. FISCHER:

6    Q.    On the left, they're identified to as CCCMS, so I'm

7    only referring to these.

8          Thank you for the clarification.

9          THE COURT:  I don't have the document in front of me.

10         MR. FISCHER:  Of course.

11   Q.    Do you want me to repeat the question, Doctor?

12   A.    I was looking at the data.  Maybe we can come back to

13   that.  The case managers are aware, cognizant of the inmates

14   on their case load and generally how long they have been in

15   the SHU.  Usually they have been in the case load for a long

16   period of time, so they know from their inmates how long

17   they've been in the SHU.

18         So they are alerted, and, of course, many of them that

19   are in SHU have been there a long time doing long SHU times.

20   So they're aware as part of their clinical cognizance, their

21   clinical treatment, they're aware of those that have been

22   there six months or a year, two years, eight years, whatever,

23   and they take that into account in their monitoring, their

24   assessment.

25   Q.    But there's no particular enhanced treatment as part

1    of the system at Corcoran?

2    A.      No.  But, of course, if an inmate got into distress,

3    as I indicated before, they would see them more than the

4    regulated once every 30 days.  They might see them every

5    other week, for example, any contacts, if necessary.

6            THE COURT:  They might or might not?

7            THE WITNESS:  Correct.  They might, based on their

8    clinical status.

9    BY MR. FISCHER:

10   Q.      Turning your attention to page 27, the last 15 or so

11   pages of Corcoran mentally ill prisoners in segregation for

12   longer than 20 days, most of that page is ad seg EOP.

13           Do you see that?

14   A.      Page 27?

15   Q.      Yes, sir.

16   A.      Yes, except for the last two are SHU.

17   Q.      Those lengths of stay run up to 605 days for ad seg

18   EOPs.

19           Do you see that?

20   A.      I do.  I'm looking at the days here.

21   Q.      Dr. Fischer, for those ad seg EOP inmates, is the

22   situation the same that clinicians may be cognizant of the

23   length of stay for those individuals, but there's no

24   particular specialized treatment program for those

25   individuals for longer lengths of stay?

1    A.      I'm just looking at the dates from '11 to early '12.

2    It would be about half a year, and yet it shows 605 days

3    length of stay.  I don't mean to throw stones at our data

4    collection, but the length of stay may be less than indicated

5    here.

6    Q.      My question is just for individuals with lengthy stays

7    in the ad seg EOP, there's no particular specialized

8    treatment program for those individuals.

9            Correct?

10   A.      EOP is already receiving extensive program, including

11   groups and so forth that we covered yesterday.  So the answer

12   is no.

13   Q.      They may or may not receive -- as with the SHU, CCCMS

14   inmates, they may or may not receive enhanced treatment based

15   on their longer length of stay.

16           Correct?

17   A.      No.  It would have been based on their clinical

18   presentation.

19           THE COURT:  I'm interested in what you said that the

20   clinician would know the length of stay because he would be

21   talking to the inmate.  It follows, therefore, that the

22   collection of this data is not for the benefit of the

23   clinician.  It must be to provide information to somebody

24   else.

25           Is that right?  Just as a practical matter, as a real

1    world matter?

2              THE WITNESS:  Yes.

3              THE COURT:  Do you have any idea who that might be,

4    like the court or the Special Master or somebody?

5              THE WITNESS:  I would think they would be interested

6    parties in length of stay.

7              THE COURT:  Thank you.

8              THE WITNESS:  Of course the clinician does have

9    access.  They don't see these reports, but they have access

10   to the length of ad seg in the tracking system and so forth.

11             THE COURT:  You may proceed, Mr. Fischer.

12             MR. FISCHER:  May I approach?

13             THE COURT:  Yes.

14   BY MR. FISCHER:

15   Q.    I've handed you two exhibits marked for identification

16   as Plaintiffs' Exhibit 2526 and 2540.  I've also directed

17   your attention to Plaintiffs' Exhibit 2000.  These documents

18   have not been redacted, but I'm going to ask that they be

19   referred to by prisoner number.

20             Exhibit 2526 is Suicide Prisoner 7, and 2540 is

21   Suicide Prisoner 15.  I'll be referring to them with those

22   identifiers.

23             Understood?

24   A.    These are listed on Exhibit 2000?

25   Q.    Yes.  I'll walk you through.  It shouldn't been a

1    problem.

2         Your Honor, these are CDCR suicide reports for two

3    inmates' suicides in segregation units at Corcoran, and I ask

4    they be admitted, Plaintiffs' Exhibits 2526 and 2540, under

5    seal.

6         MR. SHARMA:  Outside the scope of direct.  There was

7    no testimony about suicides.

8         THE COURT:  There simply was no testimony about

9    suicides.

10        MR. FISCHER:  This isn't just about suicide.  This is

11   about the quality of the care in the segregation units, the

12   identification, the delivery of treatment, the cooperation of

13   custody, all of which are issues in these suicide reports.

14        THE COURT:  You may proceed.

15        Objection is overruled.

16        MR. FISCHER:  I move these to be admitted under seal.

17        THE COURT:  Received under seal.

18                        (Whereupon, Plaintiffs' Exhibits 2526

19                        and 2540 were received into evidence

20                        under seal.)

21        MR. FISCHER:  Thank you.

22   Q.   Dr. Fischer, in the last 15 months there have been

23   three confirmed suicides at Corcoran.

24        Are you aware of that?

25   A.   That sounds correct.

1    Q.    All these were in segregation units at Corcoran?

2    A.    I recall at least two.  The third I would have to

3    refer to the report.

4    Q.    The SHU prisoner, Prisoner 4 that we referred to

5    yesterday, that was also a SHU suicide.

6          Do you recall that individual?

7    A.    I recall him, yes.

8    Q.    Turning your attention first to Plaintiffs' Exhibit

9    2540, this is regarding Prisoner 15, whose date of death was

10   August 28, 2012, and the housing type was security housing

11   unit.

12         Do you recall reviewing this suicide report?

13   A.    I do.  I've not reviewed it for a while.

14   Q.    Do you recall that this inmate's suicide was at the

15   institution?

16   A.    I recognize the name, which I will not state.

17   Q.    This individual was in the SHU on an indeterminate SHU

18   term and had been there since about 2003.

19         Is that correct?

20         Turn to page 9, the institutional data.

21         MR. SHARMA:  Objection.  The witness has testified

22   that he doesn't have a personal knowledge or recollection.

23   To the extent that counsel continues to ask about this

24   document, we're --

25         THE COURT:  He's publishing the document through this

1    witness, and your argument is that's inappropriate, except

2    that it deals with matters that he apparently -- not

3    apparently, he did testify all through yesterday, and this is

4    cross-examination after all.

5              The objection is overruled.

6    BY MR. FISCHER:

7    Q.    Dr. Fischer, do you see on here this individual had

8    been in the SHU since 2002 or 2003?

9    A.    Yes.  Ad seg in February of '02, SHU term June of '04,

10    yes.

11    Q.    He was on a SHU term as a gang associate?

12    A.    He was validated as an associate, yes.

13    Q.    So he had an indeterminate SHU term, meaning no date

14    he would be getting out, no date certain that he would be

15    getting out of SHU?

16    A.    That's what it states, yeah.

17    Q.    Turning your attention to page 13, just to help

18    refresh your recollection as to this particular patient --

19    incidentally, this patient was on the case load.  This was a

20    CCCMS patient.

21              Correct?

22              It states such on page one of the document.

23    A.    I believe from his name and looking at the information

24    before, he was, yes.  It states he was CCCMS level of care.

25    Q.    In turning your attention to page 13 of the document,

1    2011 where it states, quote, (Reading:)

2              Inmate patient made contact with the IGI unit --

3    and IGI, incidentally, stands for the Institutional Gang

4    Investigators Unit --

5              and offered to provide information

6              about the Mexican Mafia's operations inside and

7              outside of prison.  His motivation was to become

8              a critical informant for prison, state and

9              federal authorities in exchange for release from

10             prison.

11        Do you see that there?

12   A.    I do.

13   Q.    The IGI, that's a custody arm; correct?

14   A.    Yes.  I'm sorry.  I see that.

15   Q.    Turning your attention to the following page, page 14,

16   this recalls the events in the day and leading up to the day

17   of the suicide.

18        In the middle of the page, it states, quote,

19   (Reading:)

20             Housing officers informed IGI the inmate patient

21             refused to exit his cell for a meeting with the

22             Los Angeles County Sheriff's Department.

23             Members of the IGI went to the inmate patient

24             cell and found him on the cell between the two

25             bunks underneath his mattress.  The inmate

1              patient appeared fearful and stated he was not

2              coming out of his cell.

3         Do you see that in the middle of the page?

4    A.    Yes.

5    Q.    In the next entry it states, quote, (Reading:)

6              IGI staff informed housing officers of the

7              inmate patient's unusual behavior and refusal to

8              exit his cell and asked the officers to monitor

9              him.  The IGI staff also informed the housing

10             attendant.

11        Do you see that there?

12   A.    Is that in the same section under August 28th?

13   Q.    August 28th, mid-afternoon in the next box.

14   A.    Yes, 8-28, mid-afternoon.

15   Q.    You recall reviewing this report?

16   A.    Yes.  Way back.

17   Q.    You recall just a few hours later the inmate was found

18   in full rigor mortis in his cell having committed suicide?

19   A.    (Reading:)

20             Walking in his cell with the light on at

21             1410 hours.

22        Then as you refer, (Reading:)

23             They found him in his cell unresponsive about

24             two hours later.

25        Is that what you're referring to?

1    Q.    Uh-huh.  On the next page, page 15, the third line

2    down it states, (Reading:)

3                    Detailed nursing documentation indicated that

4                    the inmate was in full rigor and had dependent

5                    lividity, and his body was cold to touch.

6    A.    Page 15?

7    Q.    Page 15, third and fourth line?

8    A.    First paragraph?

9    Q.    Uh-huh.

10    A.    I'm looking for the time on this.

11    Q.    I'm just asking -- I just read -- ask you if you've

12    seen that particular sentence regarding him being in full

13    rigor mortis when found?

14    A.    I do see that, yes.

15    Q.    Do you know whether the inmate was monitored after IGI

16    had informed the housing unit and housing lieutenants of

17    concerns about this individual's behavior?

18    A.    Apparently he was checked on at 1410.  I don't know --

19    I have not reviewed the custody logs, so I don't know how

20    often he was monitored after that time.

21    Q.    But the fact he was in full rigor mortis when he was

22    found suggested I that he hadn't been seen in a while.

23          Correct?

24    A.    I'm not an a medical officer.  I don't know --

25          THE COURT:  This is a matter of some concern.

1          You would check and try to find out if that was a

2     matter of concern as to the adequacy of the behavior of your

3     colleagues and custody; you would try to find out what "being

4     in full rigor mortis" means, wouldn't you, sir, when you

5     first reviewed this in your capacity as supervisor?

6          THE WITNESS:  Yes.

7          THE COURT:  You knew -- even if you don't have the

8     exact numbers of hours, you knew that it was a prolonged

9     period between the actual suicide and the time that he was

10    discovered.

11         Right?

12         THE WITNESS:  Correct.

13         THE COURT:  So you must have done something about

14    that.  What did you do?

15         THE WITNESS:  I believe part of the findings -- I

16    would have to check the report again, but I believe part of

17    the findings was correct.  I have -- I know we had a lot of

18    training and recommendations that came out of this and I

19    believe there was training of the correctional officers and

20    institutional staff with regard to monitoring and logging

21    under these circumstances.

22         THE COURT:  So your testimony there was a response and

23    the response was further training?

24         THE WITNESS:  From my memory.  I believe in the last

25    section here under "Recommendations" -- if I could refresh my

1    memory?

2              THE COURT:  Sure.  Go ahead.

3              MR. FISCHER:  May I inquire, Your Honor?

4              THE COURT:  Yes.

5    BY MR. FISCHER:

6    Q.    Dr. Fischer, you're aware that individuals in

7    administrative segregation units receive living, breathing

8    welfare checks for the first 21 days.

9              Correct?

10   A.    Yes.

11   Q.    In this individual, because he had been in the SHU for

12   about ten years at the time was not receiving living,

13   breathing welfare checks at the time of his death.

14             Is that right?

15             MR. SHARMA:  Objection.  Calls for speculation.

16             THE COURT:  I mean he was the supervisor.  He must

17   know what the program was.

18             The objection is overruled.

19             If you don't recall, you can say that, but --

20             THE WITNESS:  I don't recall the exact rounding by

21   correctional officers in the SHU, whether it's hourly or a

22   different timeframe.  That's my answer to that portion.

23   BY MR. FISCHER:

24   Q.    With respect to the 21-day welfare checks in the

25   administrative segregation unit --

1    A.      Not to somebody in SHU who has been there well over

2    21 days.

3    Q.      Just based on your experience working as the Chief of

4    Mental Health at Corcoran, one of the reasons to do these

5    custody welfare checks is to discover someone when they're in

6    the process of harming themselves or attempting suicide.

7            Is that correct?

8    A.      That's correct.

9    Q.      Dr. Fischer, I'm going to turn your attention to

10   Plaintiffs' 2526 in evidence under seal.  And as consistent

11   with the inmate code, I'll be referring to this prisoner as

12   Suicide Prisoner 7.

13           Now, this prisoner was not assigned a mental health --

14   if you turn to page 3 of this document, this prisoner was not

15   assigned a code under the mental health system at the time of

16   his death.

17           Correct?

18   A.      Not a participant in the mental health system, yes.

19   Q.      But he was in the administrative segregation unit?

20   A.      Try to -- I believe this was the one who in ASU-1.

21   Q.      That's the stand alone ASU?

22   A.      That's correct.

23   Q.      His date of death is April 29, 2013?

24   A.      Correct.

25   Q.      Do you recall this inmate's suicide?

1  A.      Yes.

2  Q.      This particular inmate had been placed in the ASU

3  after having a fight with his cellmate.

4          Do you recall that?

5  A.      Yes.

6  Q.      Do you recall the investigation leading to findings

7  that this individual had been having trouble sleeping, had

8  reported feeling he was going crazy in the days prior to that

9  fight in placement in ASU?

10 A.      Vaguely.  I would have to review the report again to

11 refresh my memory.

12 Q.      Let me help you.  If you could turn to page 6.

13 A.      (Witness complies.)

14 Q.      In the middle paragraph, starting at the third line,

15 it reads, quote, (Reading:)

16              During times of stress, his paranoid beliefs

17              intensified --

18 A.      The third full paragraph?

19 Q.      The large paragraph in the middle of the page.

20 A.      Okay.

21 Q.      The third line of that paragraph, quote, (Reading:)

22              However, during times of stress, his paranoid

23              beliefs intensified.  This had been a life-long

24              pattern for the inmate and was

25              typically associated with violent behavior

1                        outcome.

2    A.        I'm sorry.  I'm not following with you.  Looking at

3    the third full paragraph, the large one?

4    Q.        The large paragraph.

5    A.        "Inmate blank was transported to Western Medical

6    Center."

7              Is that the one?

8    Q.        Page 16.  I'm sorry.

9    A.        Okay.

10   Q.        The large paragraph, middle of the page.

11   A.        Okay.  The sentence beginning "however"?

12   Q.        Yes.

13   A.        Okay.

14   Q.        So this individual was undergoing some mental illness

15   symptoms at the time which led to violent behavior.

16             Do you agree that's the finding of the reviewer?

17   A.        You're speaking about the stress and the noise on the

18   cellblock?

19             What was the second part of the question, please?

20   Q.        (Reading:)

21                  At this point, symptoms of mental illness were

22                  manifested and that led to the violent behavior,

23                  the fight with the cellmate.

24   A.        I agree about the symptoms.  I don't know about the

25   sequence between that and the violence.

1    Q.       The next paragraph, first sentence, CDCR suicide

2    reviewer found, quote, (Reading:)

3                   The day before his death, the inmate's inability

4                   to cope with his increasing symptoms of mental

5                   illness, which are exacerbated by his lack of

6                   sleep, led to a familiar outcome for him, dash,

7                   a violent attack against the person whom he

8                   identified as causing his difficulties.

9    A.       I see that.

10           THE COURT:  This raises a question which I have

11   reserved from myself because nobody seemed to care.  It

12   appears to me, but I'm not a professional in your field, that

13   all of that sounds like somebody who ought to be reviewed for

14   the question of whether he is CCCMS, at least at this period

15   of time.

16           Is that right or wrong, sir?

17           THE WITNESS:  Yes, I agree.  He should have been

18   reviewed -- referred and reviewed.  I'm trying to -- I

19   believe -- was he on the mainline before he ended up in

20   ASU-1?

21           In any case, had these symptoms been known, expressed,

22   that he self-referred, that the correctional officers

23   referred him, he should have been reviewed from a mental

24   health standpoint.

25           THE COURT:  This raises the question some of your

1    colleagues in the past have -- to tell you the truth, all of

2    them -- have indicated that mental illness is essentially or

3    can be essentially cyclical.  You start at CCCMS and wind up

4    an EOP and then you get stabilized and go back.

5            In your view, is that realistic?

6            THE WITNESS:  No, Your Honor, I would not agree with

7    that.  We have many inmates that are GP level of care.  They

8    may go into CCCMS temporarily with an adjustment disorder,

9    which is a mild disorder that many people on the street have,

10   and they may get treatment and support, and after awhile,

11   they stabilize, get better, and then graduate, if you will,

12   and get discharged from CCCMS and go back to mainline or

13   non-mental health population.

14           We have some stay at CCCMS on a stable basis for quite

15   awhile.  It really is more rare that they become worse and

16   become EOP and cycle.  I've not seen that.

17           THE COURT:  All right.  That's your experience.

18           Thank you, sir.

19   BY MR. FISCHER:

20   Q.      Dr. Fischer, just to continue to refresh your

21   recollection for all our purposes, if you can turn to

22   page 17, and starting near about a third of the way down the

23   page where it identifies the three aspects of this case that

24   are of concern.

25   A.      Yes.

1    Q.    The first bullet is, quote, (Reading:)

2                    The lack of knowledge prior to April 29, 2013,

3                    the date of death, of CDCR mental health staff

4                    of the inmates well documented and available

5                    history of mental illness.

6          I think you testified yesterday when an individual

7    comes into administrative segregation a screening is done.

8          Correct?

9    A.    Well, this inmate was in -- I'm trying to refresh my

10   memory.  He was in ASU-1, which does not house inmates who

11   are in the mental health system.  He was -- this person was

12   not a participant in the Mental Health Service Delivery

13   System.  That's why he was in ASU-1.  So at the time of this,

14   he was not a patient in the CCCMS program.

15         It appears, as I recall without checking this, it was

16   on the mainline.  He was free to walk around status and not

17   in the mental health population, and I believe that's where

18   the assault took place.

19         But at that time, he was not being seen.  He was not

20   in the mental health system and not being seen.  Now, had he

21   self-referred on these issues, then he would have been

22   evaluated.

23         THE COURT:  But the question is whether or not he was

24   screened when he was placed in ASU-1?

25         THE WITNESS:  ASU-1?  Yes, there he was rounded on

1    daily --

2            THE COURT:  No.  No.  The question is a question of

3    screening.

4            THE WITNESS:  Yes, he's screened by the psych techs

5    when he comes into that unit, initially on day one screened.

6            THE COURT:  Somehow or other, according to this

7    reviewer, they didn't discover what I think was read as a

8    well -- I don't have the words in front of me.

9            MR. FISCHER:  Well documented and historical mental

10   illness.

11           THE WITNESS:  If I may respond?

12           THE COURT:  Sure.

13           THE WITNESS:  A psych tech would have done a

14   screening, for example, a 31-item questionnaire, as we

15   discussed yesterday, which would have asked -- that typically

16   would have been -- she would have asked about this

17   information, asked the inmate whether he had a history of

18   mental illness, how he was feeling at the time.

19           The inmate would not necessarily have responded fully,

20   and sometimes they do not disclose their exact history.  He

21   or she would not have reviewed the chart or the file of this

22   inmate.  That would not be done by the psych tech at that

23   screening, but she would screen for visible signs of anxiety,

24   distress and so forth, ask the inmate about his history, look

25   for signs of anxiety, depression and so forth, but would not

1    have reviewed the records, for example.

2    BY MR. FISCHER:

3    Q.    Because the inmate may not disclose history of mental

4    illness, that's a reason why it's important to do a file

5    review as part of the screening prior to placement in

6    segregation.

7         Correct?

8    A.    It would help to do that.  We do it on those in the

9    mental health system.  We don't do a full review on those

10   placed in ASU-1 who are GP level of care.

11   Q.    Doctor, just to go back to one thing you said before,

12   if this person had been identified as needing to be on the

13   case load, he wouldn't have been placed in the stand-alone

14   ASU.

15        Correct?

16   A.    He would not have been.  That's correct.

17   Q.    Per program guide requirement?

18   A.    That's correct.

19   Q.    Going down to the second bullet on page 17 where it

20   reads, quote, (Reading:)

21             Environmental issues also contribute to this

22             case.  Prior to Prisoner 7's suicide, his

23             housing unit was unusually loud.  There was

24             considerable noise coming from a plumbing issue

25             throughout the housing unit.  Additionally, an

```
 1                      inmate had been yelling at night.  Both issues

 2                      may have contributed to the inmate's stress

 3                      level.

 4            Do you see that there?

 5   A.       I see it.

 6   Q.       And then the third bullet discusses the psych tech

 7   screening that you discussed earlier.

 8            Do you see that there?

 9   A.       I'm looking at it, yes.  (Reading:)

10                      The inmate refused to come out of the cell.

11                      Refused to complete the questionnaire cell

12                      front.  Sleep issue.  Psych tech completed a

13                      mental staff referral after talking to him.

14            So she did pick up on the symptoms.

15            (Reading:)

16                      Classified as urgent and then to emergent.

17   Q.       So, Dr. Fischer, it says here that this particular had

18   reported current hallucinatory experiences symptoms and a

19   plea for sleep aid to the psych tech during this screening.

20            Is that correct?

21   A.       I'm looking for hallucinations.  Where is that part?

22   Q.       Last line of page 17?

23   A.       I see that.

24   Q.       The psych tech had done a mental health referral as a

25   result of this interaction.
```

1              Correct?

2    A.        Yes.

3    Q.        But it goes on to state that she didn't -- the psych

4    tech did not place the prisoner on constant observation

5    pending a response from a clinician.

6    A.        Correct.

7    Q.        That violates the program guide requirement to do so?

8    A.        Correct.

9    Q.        In this case, the psych tech had also had the prisoner

10   self administer the 31-item questionnaire, fill it out

11   himself.

12             Do you recall that?

13   A.        I see that.

14   Q.        That violates the program guide?

15   A.        Correct.

16   Q.        Do you recall that one of the other concerns

17   identified by the CDCR suicide reviewer was inadequate

18   emergency response in this case?

19             I'll refer you to the bottom of page 19.

20   A.        Number?

21   Q.        Number three under the "Problem" column.

22   A.        With regard to the emergency response bag?

23   Q.        Uh-huh?

24   A.        I see that.

25   Q.        Another issue in this case was the adequacy of the

1    emergency response for this individual.

2    A.    I see that.

3    Q.    Going back to page 16, Dr. Fischer, one last question.

4    In that middle paragraph that you read earlier, one other

5    line I want to direct your attention to.  This is just prior

6    to his death he had, quote, (Reading:)

7              Expressed his fear he was going crazy and said

8              he did not want to live if he was crazy.

9        This is the last two lines of that big middle

10   paragraph on page 16.

11   A.    Yes, I see that.

12   Q.    Would you agree that this individual should have been

13   identified as requiring mental health services and placed in

14   a unit other than the ad seg unit where he was placed?

15   A.    We don't see to whom he expressed these fears.

16   Without seeing the whole context, was this to his cellmate?

17   It obviously wasn't to a mental health individual or wasn't a

18   referral, so I don't see the context for this.

19        Maybe if I read the whole thing, I'll see that.

20   Q.    Dr. Fischer, my question --

21   A.    "Expressed to his cellmate.  Expressed his fear."

22        I assume it was to his cellmate in the context a few

23   lines above.

24   Q.    Dr. Fischer, you would agree that this individual

25   should have been identified as needing mental health

1    treatment and not placed in the segregation unit.

2          Correct?

3          MR. SHARMA:  Objection.  Asked and answered.  Calls

4    for speculation.

5          THE COURT:  Both of the objections are overruled.

6          You may answer, sir.

7          THE WITNESS:  If he had been identified prior to going

8    into the ASU-1 unit as having these symptoms, which would

9    have been on the mainline where he was before, then he would

10   have been -- I'm speculating based on the symptoms --

11   admitted to the mental health system.

12         If that were the case, he would not have been put in

13   ASU-1.  But given the actuality of the events, the inmate was

14   a GP, non-mental health inmate, so then the form and

15   procedure for him to go into ASU-1, which takes non-mental

16   health inmates, and then, of course, he should have been

17   fully screened when he got there.

18   BY MR. FISCHER:

19   Q.    Under the current system, it was in a sense,

20   reasonable to place him in this particular unit?

21   A.    Exactly.  The procedure was followed.  He was not

22   mental health at the time.  He was put in ASU-1.  A lot of

23   the inmates out there have symptoms we're not aware of, even

24   in GP.

25         MR. FISCHER:  On moment, Your Honor.

```
 1                              (Whereupon, a conference was held

 2                         between Mr. Fischer and Mr. Bien.)

 3              MR. FISCHER:  No further questions.

 4                         REDIRECT EXAMINATION

 5   BY MR. SHARMA:

 6   Q.     Dr. Fischer, for the suicide reports that plaintiffs'

 7   counsel were just asking you about, do you know whether these

 8   reports are prepared by individuals employed by the

 9   Department of Corrections?

10   A.     Yes, they are, often retired annuitants, yes.

11   Q.     If I could turn you to Plaintiffs' Exhibit 2526,

12   which, I believe, was the suicide report we were just

13   discussing.

14   A.     Yes.

15   Q.     If I could turn you to page 18.

16   A.     Yes.

17   Q.     There's a section about two-thirds down the page

18   that's entitled "Recommendations."

19   A.     Yes.

20   Q.     Generally, do you know what the purpose of this

21   section in a suicide report is for?

22   A.     It is to highlight the problem issues, areas that can

23   be identified for improvement, and to lay out an improvement

24   plan that typically involves training to assure that these

25   events don't happen again.
```

1    Q.      And, to your knowledge, in the context of this suicide

2    report, do you know whether these recommendations were

3    followed through at Corcoran?

4    A.      Yes.  I believe the last column and another document

5    summarizes what training is done.  It documents it,

6    memorializes it through training, through training sheets and

7    so forth, and indicates the appropriate activities have been

8    taken by the appropriate disciplines, nursing, custody,

9    whatever, and those training issues are always done and

10   addressed and documented.

11   Q.      Thank you.

12           Dr. Fischer, I think you can put aside that exhibit

13   now.

14           Just a moment, Your Honor.

15           Dr. Fischer, if you could locate Plaintiffs' Exhibit

16   2585.  It's a separate document.  This was previously marked

17   and admitted.  It's the mental health management report for

18   Corcoran.

19           Your Honor, may I approach?

20           THE COURT:  Sure.  We've got another copy for you,

21   Doctor.

22           THE WITNESS:  Thank you.

23   BY MR. SHARMA:

24   Q.      Doctor, do you recall testifying about the contents of

25   this management report?

1    A.      Yes.

2    Q.      If you look at the cover page, does this report

3    indicate when this tour was conducted or when this visit that

4    produced this management report was conducted?

5    A.      Yes, August of 2012.

6    Q.      If I could have you turn to page 4 of 16.  These are

7    the page numbers at the bottom of the page.

8    A.      Yes.

9    Q.      Doctor, under the heading entitled "Institutional

10   Mental Health Staffing and Telemedicine," there's a date

11   period indicated.

12           Correct?

13   A.      Yes.

14   Q.      What is that date period?

15   A.      January 1st to June 30th of 2012.

16   Q.      Doctor, to your knowledge, it is the case the

17   information contained in this report is based on information

18   from that time period?

19   A.      From that six-month period in early 2012, yes.

20   Q.      And, Doctor, if you could turn to page 10 of 16 -- I

21   apologize, 12 of 16.  If you could briefly review the

22   information contained in the first paragraph at the top.

23   A.      Regarding the hub?

24   Q.      Yes.

25   A.      (Witness complies.)

1    Q.      Doctor, do you recall testifying about certain reasons

2    for cell-front contacts yesterday?

3    A.      Yes.

4    Q.      And do you recall testifying about what's been

5    categorized as patient -- provider initiated cell-front

6    contacts?

7    A.      Yes.

8    Q.      Is it correct that yesterday you testified that some

9    data you reviewed indicated that this number had dropped to

10   10 percent?

11   A.      That is correct.  By about a third, yeah.

12   Q.      And, Doctor, do you know for that period of data when

13   the provider initiated cell-front contacts were 10 percent

14   what your current staffing was at that time?

15   A.      Well, because of how we collect the data, it's lagged

16   a little bit so that we get full data.  It would have been

17   two or three months previous to now.  At that point, our

18   staffing was still well understaffed.

19           Perhaps at that point, 20 to 25 percent understaffed,

20   under our allocation, because we had not brought on all the

21   staff I referred to until rather recently, so the staffing

22   was still pretty low at that point, yes.

23   Q.      And, again, as you just indicated, you testified

24   yesterday that currently staffing is higher at Corcoran.

25           Correct?

1   A.      Very recently, within the last month or six weeks,

2   we've been successful in bringing the staffing up, yes.

3   Q.      Doctor, during the time that the staff was below the

4   allocation, could you describe the efforts that you're aware

5   of that staff made to increase that staffing?

6   A.      The efforts to increase the staffing?

7   Q.      Yes.

8           THE COURT:  That wasn't done by the local staff; that

9   was done by headquarters?

10          I'm asking you, not telling you.

11          THE WITNESS:  Well, it used to be done by local.  Now

12  we have the assistance of regional in running the

13  certification lists and recruiting and putting together the

14  interview panels.

15          THE COURT:  So it's still true that basically -- I'm

16  asking you, not telling you -- that basically recruiting is

17  being done locally with some assistance from headquarters?

18          THE WITNESS:  Local and regional.  That's my

19  understanding.

20          THE COURT:  All right.

21          In that regard, where is Corcoran?

22          THE WITNESS:  Where is Corcoran?

23          THE COURT:  I asked you first.

24          THE WITNESS:  You've never visited?

25          THE COURT:  I have not.

1              THE WITNESS:  It's in the Central Valley of California

2    approximately midway between Fresno and Bakersfield.  Three

3    and a half hours from here.

4              THE COURT:  In your view with your experience -- I'm

5    sorry to interrupt, but it seems to me this is a problem

6    we'll have to deal with at some point -- would you expect to

7    have more difficulty in recruiting for an institution located

8    where Corcoran is as contrasted with San Quentin where

9    psychiatrists can live in San Francisco?

10             THE WITNESS:  You're absolutely correct.

11             THE COURT:  In your view, is that a significant

12   problem?

13             THE WITNESS:  It's very significant.  You're exactly

14   right.  It's more difficult to get people to come to the

15   dusty Central Valley of California with the bad air and so

16   forth than it is to San Francisco, Los Angeles or the coast.

17   That's one of the reasons we lose recruits to the other

18   institutions and have difficulty having people come and stay

19   in Corcoran.

20             THE COURT:  In that regard -- I don't mean to

21   interrupt, but this is obviously something we're going to

22   have to think about when we get to writing.

23             Recognizing that problem, which I assume should be

24   recognized by headquarters as well, would it not appear

25   appropriate to try and locate EOP hubs, as an example, in

1    places where there's likely to be an easier job staffing?

2         Do you understand what I'm asking you?

3         THE WITNESS:  I understand the question.  I believe

4    there are five or six EOP hubs.  I may be mistaken.  I

5    believe the one in Corcoran is not the only one.  I think

6    there are others in the more populated area.

7         THE COURT:  I don't mean this disrespectfully.  I

8    really don't.  Wouldn't it suggest to you, given the

9    difficulty recruiting and retaining staff, that placing an

10   EOP hub at Corcoran is probably not the best idea that one

11   might have about where to place them and how large they

12   should be and so forth?

13        You see what I'm asking you, sir?

14        THE WITNESS:  Yes, sir, I do.  I hadn't quite thought

15   of it that way, to be honest.  I agree it is easier to staff

16   in other locations.

17        THE COURT:  Okay.  Thank you, sir.

18        I would appreciate -- I know we're never going to get

19   to final argument.  I understand that.  But if we ever do,

20   that would be a topic that we ought to be thinking about and

21   how to distinguish between individual failures, such as may

22   have occurred in the two cases we discussed, and the systemic

23   failure, and in some sense, it doesn't matter.  People are

24   dying and that's not appropriate.

25        But there's a question what in the real world the

```
 1    court can do or even the institution can do, and I recommend
 2    to you that those would be appropriate topics for final
 3    argument as well.
 4          I'm sorry, Mr. Sharma.  You may proceed.
 5    BY MR. SHARMA:
 6    Q.     If I may, Doctor, are you aware of what security level
 7    Corcoran is classified as an institution?
 8    A.     Most of it is maximum security level VI.  Most of the
 9    yards are level VI.  We have only one level III yard.
10    Q.     Thank you.
11          Dr. Fischer, do you know whether groups are mandated
12    for CCCMS inmates by the program guide?
13    A.     They are not my knowledge.
14    Q.     I want to ask a few more questions about the staffing.
15          I believe yesterday you testified there is one
16    psychiatrist currently staffed to the EOP administrative
17    segregation hub?
18    A.     Yes.
19    Q.     And in your experience, is that, given the number of
20    patients that are treated in the EOP ad seg hub, is that
21    staffing clinically appropriate?
22    A.     Yes.  In my view and understanding, yes.
23    Q.     And given the number of clinicians currently staffed
24    to the EOP ad seg hub, is that staffing clinically
25    appropriate?
```

1    A.        Yes.  To be honest, we are looking to add one more to

2    that program when we get the additional people on board.

3    Q.        And, Dr. Fischer, in your experience, when inmates are

4    placed into a segregated housing environment -- and I'm

5    asking about mentally ill inmates -- do they all experience

6    that placement or does it impact their mental health exactly

7    the same for each patient?

8    A.        No, of course not.  It's very visualized.

9    Individuals, all of us and all of them, have different coping

10   skills, different strengths, different abilities to deal with

11   the stress of living in that environment.

12        Some do very well.  Some prefer SHU terms and even ad

13   seg.  Some prefer the safety in the SHU and not having to

14   walk the mainline.  Some come into ad seg and are relieved

15   because they've voluntarily rolled up themselves for security

16   issues, safety issues that they feel.

17        They feel, often feel endangered on the yard for a

18   variety of reasons and they seek the protective custody of ad

19   seg voluntarily and feel less stressed once they hit that

20   setting.

21   Q.        I believe you testified earlier about something that's

22   called an IDTT.

23   A.        Yes.

24   Q.        What does that stand for?

25   A.        Interdisciplinary Treatment Team meeting.

1    Q.       What are the purpose of those meetings?

2    A.       To present and thoroughly review the case of each

3    inmate on an individual basis in order to ascertain where

4    they are, what their symptomology is, what the appropriate

5    diagnosis is, what the appropriate treatment plan is, how it

6    should be changed, what they're doing, what needs to be

7    changed in the treatment plan, if anything, whether the

8    current care is appropriate or whether they need a higher or

9    lower level of care.

10        To that end it has input from all the appropriate

11   disciplines, case managers, psychiatry, correctional

12   counselors there representing custody and bringing in the

13   custody factors.

14   Q.       Dr. Fischer, if during the IDTT it appeared an inmate

15   might need, for example, more clinical contacts, is it your

16   experience that clinical staff at Corcoran would adjust the

17   treatment plan to address the inmate's individual needs?

18   A.       Absolutely.  All the time.  We often, as I indicated,

19   will give more than the minimum required contacts going into

20   the program guide, see the inmate more often.  They are very

21   conscientious about providing that care if necessary.

22   Q.       Dr. Fischer, if I could ask a few follow-up questions

23   about the new EOP ad seg treatment space.

24        Yesterday I believe you testified to the individual

25   clinical contact rooms.

1    A.    Yes.

2    Q.    And when patients are seen in those rooms, are they

3    housed within the treatment modules?

4    A.    No, they are not.

5         THE COURT:  So where are they?  That's the room with

6    the glass between them -- I see.  I'm sorry.  I knew that.  I

7    just got away from it.

8         THE WITNESS:  The new setup, yeah.

9         THE COURT:  Go ahead.

10   BY MR. SHARMA:

11   Q.    And, Dr. Fischer, you also testified yesterday about

12   the groups that are provided to patients in the EOP ad seg

13   hub.

14   A.    Yes.

15   Q.    Do you have an estimate of throughout the day how

16   often groups are running for that program?

17   A.    I do.  We are currently running three groups a day in

18   each of four separate treatment rooms for a total of 12

19   groups a day.

20   Q.    I believe you testified yesterday each of those groups

21   are scheduled to run two hours.

22   A.    That's correct.

23   Q.    And, Dr. Fischer, during the course of your experience

24   as Acting Chief Psychologist for inmates in the EOP ad seg

25   hub, do you know how many treatment hours were scheduled on

1  average for those inmates?

2  A.      Yes.  In the hub, we were scheduling 12 to 14 hours is

3  a ball park average.

4          THE COURT:  12 to 14 hours of what?

5          THE WITNESS:  Scheduled per inmate of clinical, mental

6  health --

7          THE COURT:  No.  I understand.  12 to 14 hours a day?

8  A week?  A month?

9          THE WITNESS:  A week.  Yes, 12 to 14 clinical hours a

10 week.

11 BY MR. SHARMA:

12 Q.      Does that exceed or fall below the program

13 requirements?

14 A.      It exceeds it.

15         MR. SHARMA:  Brief moment, Your Honor.

16                         (Whereupon, a conference was held

17                         between Mr. Sharma and Mr. McKinney.)

18         MR. SHARMA:  Nothing further, Your Honor.

19         MR. FISCHER:  I have three questions.

20                     RECROSS-EXAMINATION

21 BY MR. FISCHER:

22 Q.      At Corcoran, they're still at 40 percent vacancy for

23 psychiatrists; is that correct?

24 A.      It's a little less now, and then recently we brought

25 on a few new psychiatrists.

1    Q.    Do you know what the vacancy rate is?

2    A.    I would say now it's probably three out of 11, so --

3    Q.    In the high twenties?

4    A.    Approximately.  It takes into account our staff as

5    well as the registry psychiatrists that we use, so it's our

6    functional vacancy.

7    Q.    Dr. Fischer, are you aware that the program guide

8    requires CCCMS inmates, including those in ad seg, are to

9    receive, quote, "Group therapy when deemed clinically

10   appropriate"?

11   A.    Group in CCC?  I had not recalled that from the

12   program guide.

13   Q.    Would the program guide refresh your recollection?

14   A.    Yes.

15         MR. FISCHER:  May I approach?

16         THE COURT:  Yes.

17         THE WITNESS:  I see that.

18   BY MR. FISCHER:

19   Q.    I'm referred the doctor to the program guide,

20   page 12-7-7.  This is the chapter on administration

21   segregation.  Part G is the CCCMS care section.

22   A.    Yes.

23   Q.    You see that there?

24         Does that refresh your recollection that group therapy

25   is required when deemed clinically appropriate?

1    A.      Yes.  I stand corrected.

2    Q.      That's not appropriate where no groups are provided;

3    correct?

4    A.      Yes.

5    Q.      Right now at Corcoran, EOP ad seg inmate patients are

6    not receiving ten hours of treatment per week.

7            Is that correct?

8    A.      EOP ad seg?

9    Q.      Uh-huh.

10   A.      They are.  They are receiving well over.  The last

11   numbers I looked at, they are receiving 11 hours per week per

12   clinic treatment per inmate.

13   Q.      Is that the scheduled time?

14   A.      We have scheduled time and then we allow for

15   cancellations, which is usually about an hour on average, so

16   we end up with a result that offered.  So we might have

17   12 hours offered, one hour -- 12 hours scheduled.  We lose

18   one hour for cancellation and we end up with the result of

19   11 hours actually offered.

20   Q.      And the amounts of time that EOP inmate patients in

21   the ad seg unit at Corcoran attend treatment, that is below

22   ten hours.

23           Is that correct?

24   A.      As an average, it is because there is some refusal of

25   inmates by groups, so that is correct.

1    Q.    Are you aware that at the Corcoran EOP ad seg hub has

2    one of the highest refusal rates in the system?

3    A.    I've not reviewed that systemwide for quite awhile, to

4    be honest.

5            MR. FISCHER:  No further questions.

6            MR. SHARMA:  Briefly, Your Honor.

7                          REDIRECT EXAMINATION

8    BY MR. SHARMA:

9    Q.    Dr. Fischer, do you still have the program guide in

10   front of you?

11   A.    Yes.

12   Q.    If you could refer again to page 12-7-7 under Section

13   G, could you look at the second -- I won't say paragraph, but

14   that second line after the first paragraph that starts with

15   "The treatment intervention."

16   A.    "May include the following"?

17   Q.    Yes.  Could you read that aloud?

18   A.    (Reading:)

19                The treatment intervention shall meet the

20                guidelines set forth in the MHSDS program guide,

21                CCCMS chapter three, and may include the

22                following.

23   Q.    What is the next header after that?

24   A.    "Required treatment.

25   Q.    And then could you please read what's under "Required

```
 1    treatment."
 2    A.      (Reading:)
 3                   Regular monitoring of symptoms by LPTs, daily
 4                   rounds -- which we do -- individual contact
 5                   every week by the PC or more frequently as
 6                   clinically indicated -- which we do --
 7                   medication, treatment and monitoring of
 8                   compliance by psychiatric and nursing staff --
 9                   which we do.
10    Q.      What is the next header after that?
11    A.      It is "Other Treatment Activities.
12    Q.      And under that heading is the provision about group
13    therapy falls.
14             Is that correct?
15    A.      That's correct.
16    Q.      And, Doctor, we briefly just spoke about the
17    attendance of inmates for treatment.
18             Do you recall testifying yesterday about inmates who
19    may refuse to come out of their cell for treatment?
20    A.      Yes.
21    Q.      And I believe you testified that one reason might be
22    strip searched, correct, or at least that's what's been
23    reported to you?
24    A.      Yes.
25    Q.      What are other reasons that you're aware of --
```

1          THE COURT:  My goodness.  You said short.

2          MR. SHARMA:  This is the last question, Your Honor.

3   Q.      Are there any other reasons that have been reported to

4   you by the inmates for why they might refuse to come out of

5   their cell for treatment?

6   A.      Sometimes they're involved in activities in their

7   cell.  They may be exercising, watching a TV program.  They

8   may be writing a letter.  They may just not feel like coming

9   out for group activities at that time.

10          MR. SHARMA:  Nothing further, Your Honor.

11          MR. FISCHER:  No further questions.

12          THE COURT:  May the witness be released?

13          MR. SHARMA:  Yes, Your Honor.

14          MR. FISCHER:  Yes.

15          THE COURT:  You may step down.  You're free to go or

16   stay, as you choose.

17          We'll take a 15-minute recess.

18                          (Whereupon, a break was taken at

19                          10:49 a.m.)

20                          (Nothing Omitted.)

21                          ---o0o---

22

23

24

25

2756

1          (On the record at 11:14 a.m.)

2          THE CLERK:  Remain seated.

3          Court is back in session.

4          THE COURT:  You are?

5          MR. NOLAN:  Tom Nolan for plaintiffs.

6          THE COURT:  Mr. Nolan.

7          MR. NOLAN:  Your Honor, plaintiff would like to call

8    Dr. Pablo Stewart.

9          THE COURT:  Come around and be sworn, sir.

10          THE CLERK:  Please, raise your right hand.

11                    PABLO STEWART,

12    was thereupon called as a witness herein by the Plaintiffs,

13    and having been sworn to tell the truth, the whole truth and

14    nothing but the truth, was thereupon examined and testified

15    as follows:

16          THE CLERK:  Please, take a seat.

17          State your name, spell your full name and speak

18    directly into the microphone.

19          THE WITNESS:  My name is Pablo Stewart, P-a-b-l-o,

20    S-t-e-w-a-r-t.

21          MR. NOLAN:  We would like to offer Dr. Stewart's

22    testimony today as an expert in forensic psychiatry.

23          THE COURT:  His CV is where?

24          MR. NOLAN:  His CV is attached to his March 14th,

25    2013, Termination Declaration as Exhibit A, I believe.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2757

1        THE COURT:  Does defendant desire to voir dire?

2        MR. RUSSELL:  No, Your Honor.

3        THE COURT:  Court will find that the witness is an

4    expert qualified to testify in the matters within the field

5    of psychiatry.

6        You may begin, sir.

7                      DIRECT EXAMINATION

8    BY MR. NOLAN:

9    Q.      Dr. Stewart, what work did you undertake to

10   investigate conditions in California prisons this year?

11   A.      I went on tours at a number of prisons at the

12   beginning part of the year.

13   Q.      And which prisons did you visit?

14   A.      I visited Salinas Valley State Prison, CSP Sac., CSP

15   Los Angeles County, R.J. Donovan and San Quentin.

16   Q.      Doctor, did all five of the prisons you visited have

17   EOP Administrative Segregation Hubs?

18   A.      Yes.

19   Q.      Doctor, what is an EOP Ad. Seg. Hub?

20   A.      EOP Ad. Seg. Hub is a physical location where EOPs

21   that are serving administrative segregation terms are housed.

22   Q.      Are there any specific treatment requirements for EOP

23   Ad. Seg. Hubs?

24   A.      Well, the EOP treatment requirements, either in the

25   hub or any place else in the system, remain the same.

2758

1    However, when they're in these hubs, then they get weekly

2    manager case contact and daily psych-tech rounds.

3    Q.      Did you also visit any regular administrative

4    segregation programs?

5    A.      Yes, I did.

6    Q.      And where were those programs?

7    A.      Those were at Salinas Valley, at R.J. Donovan, and at

8    Los Angeles.

9    Q.      Did you also visit some stand-alone segregation

10   units?

11   A.      Yes.  I believe the stand-alone was at Salinas Valley

12   and -- I'm blanking where the other stand-alone might be.

13   Q.      Doctor, do you know what are the stand-alone Ad.

14   Segs.?

15   A.      Stand-alone Ad. Segs. are basically what the term

16   implies, sort of separate buildings that are administrative

17   segregation units where the mentally ill or people on the

18   mental health caseload are excluded from being housed there.

19   Q.      And Doctor, are there -- are you aware whether there

20   are special treatment requirements for CCCMS prisoners in

21   administrative segregation?

22   A.      CCCMS get weekly case manager contact and, again,

23   daily psych-tech rounding.

24   Q.      And are there --

25           THE COURT:  Before you go ahead with that, there is,

2759

1    in my view -- I'm not quite certain what we are talking

2    about.

3            Most of the Ad. Segs. don't have bars.  They have

4    solid doors.

5            THE WITNESS:  Yes, Your Honor.

6            THE COURT:  And there is a food port.  And there's a

7    narrow window, as I understand it.

8            THE WITNESS:  Correct.

9            THE COURT:  What does it mean to have a contact under

10   those circumstances?

11           What do they do?  Look in the window and say:  Oh,

12   you're still alive?

13           THE WITNESS:  Basically that's what the contacts are.

14           The welfare checks are there to make sure the person

15   is alive.  Then there's other types of checks.  There is

16   custody checks that don't even have to see the body.  I mean,

17   the person could be under the blanket.  They count it as a

18   check.

19           THE COURT:  But beyond that, I mean we talk about

20   they're having a weekly case manager contact.

21           What does that mean?

22           THE WITNESS:  Based on my tour of these Ad. Seg.

23   Units, Your Honor, the weekly case manager contacts are when

24   you're supposed to meet with your case manager or primary

25   clinician, not a psychiatrist, usually a psychologist or

2760

1   social worker, I believe.  They're supposed to occur in a

2   confidential setting, and they're supposed to be for an hour.

3           THE COURT:  Okay.  So as to those, the inmate is --

4   the patient-inmate is supposed to be taken out of his cell,

5   strip-searched, taken to this contact where he's supposed to

6   get an hour's worth of contact of some kind with somebody who

7   has got some sort of training?

8           THE WITNESS:  That's what supposed to happen, Your

9   Honor.  And oftentimes these primary clinician contacts occur

10  at the cell front also.

11          THE COURT:  And if that occurs, he's shouting through

12  the door?

13          THE WITNESS:  You're sort of shouting through the

14  side of the door, the best way you can make some sort of

15  contact.  It is difficult to hear and difficult to also

16  see.

17          THE COURT:  In any event, could it possibly be of any

18  use?

19          THE WITNESS:  I would have to say, Your Honor, that

20  these cell-front contacts are not of any use.  And if

21  anything, I don't know, from the patient standpoint they're

22  almost, you know, insulting, that this is what you would do

23  where you're trying to have this intimate -- and I use that

24  word purposely -- interaction with a person.  And yet you are

25  there, and the windows are usually fogged over from use of

2761

1   people scraping them over the years.  And you say, How are

2   you?  They say, Well, I'm okay.  This sort of thing back and

3   forth, I find it very inadequate.

4           THE COURT:  I'm sorry I interrupted, Mr. Nolan.

5           MR. NOLAN:  Oh, no.  Thank you.

6   BY MR. NOLAN:

7   Q.      Sort of continuing on in that line of thought,

8   Doctor, but maybe looking more broadly, in your prison tours

9   this year did you learn about the availability of

10  confidential treatment spaces?

11  A.      Yes.

12  Q.      In these EOP Ad. Seg. programs?

13  A.      Correct.

14  Q.      And what did you learn about that, Doctor?

15  A.      I learned that there was sort of a general lack of

16  confidential treatment spaces.

17  Q.      And was that true in most of the prisons or all of

18  the prisons that you visited?

19  A.      It was true for all of them, yes.

20  Q.      And were there differences in terms of the

21  availability of confidential space for groups in the

22  different prisons you visited?

23  A.      Yes.  In two of the prisons, at R.J. Donovan and

24  Los Angeles, actually the groups were occurring on the

25  dayroom floor.

2762

1        This is -- again, the word "hub" implies like some

2   sort of big, fancy place, but what it is is a housing unit in

3   a prison.

4        And they have these cages, that I call them, that's

5   what they are, and they're trying to do groups there on the

6   dayroom floor where people are walking around.  There is

7   business going on, guards are coming back and forth,

8   et cetera.

9        And two of the places where I visited -- or excuse

10  me -- three of them, Salinas Valley, Sacramento and

11  San Quentin, had group rooms located off of the unit itself.

12  Q.      Did those three prisons still have problems with the

13  adequacy of the available confidential treatment space?

14  A.      Yes, for the individual primary clinician contacts.

15  Q.      Did you learn anything about why some of these -- was

16  CSP Sacramento one of the places that had treatment spaces

17  off the unit?

18  A.      Yes.

19  Q.      And did you learn anything about why treatment hours

20  were low in some of those EOP Ad. Seg. programs?

21  A.      Well, I think what was stated in the prior testimony

22  about the strip search.  You think about it.  You're in a

23  isolated cell, and in order to go to your group you have to

24  be handcuffed and escorted out, and then you're stripped.

25        And I'm not aware exactly if it is on the way out or

2763

1    the way back or somehow, but it is involving strip searching.

2           Then you're made to sit in these cages that are small

3    and uncomfortable.  Then you're attending these groups, based

4    on my experience, that not all of them are very helpful.  A

5    lot of them involve showing videos, training videos, or even

6    popular movies or old TV reruns.  Then you go back to your

7    cell.

8           But in the meantime I had many patients -- excuse me

9    -- many inmates complain to me that while they were away at

10   group, their cells would be searched, and their stuff would

11   be gone through.

12          And so I think all of those things contribute to the

13   difficulties in providing the full number of required hours

14   of treatment.

15   Q.     So Doctor, did you also learn about the availability

16   of confidential space for clinician interactions?

17          You spoke a little bit about this already.

18   A.     Yes.  You know, in the 25th Report the Special Master

19   reported that over half, or I believe it was 59 percent of

20   the -- excuse me -- that all of the eleven hubs use

21   nonconfidential spaces.  And that Salinas Valley, in

22   particular, had 59 percent of contacts occurring in

23   nonconfidential spaces.

24          THE COURT:  Can I interrupt.  I'm sorry.  This is a

25   problem that I have been thinking about for some time.

2764

1           There are two institutional purposes.  One is, after

2     all, a prison.  These people committed crimes, and they are

3     being punished by virtue thereof.  And the other is, because

4     of the lack of adequate hospitalization and otherwise,

5     they're mental institutions with large numbers of sick

6     people.  And somehow or other those two functions have to be

7     served, and it is not at all clear to me how that can be

8     done.

9           But going back to what you indicated earlier, that

10    the prisoners are sometimes reluctant to go to group or even

11    contact with their primary clinician because when they come

12    back their cell has been searched, but that's a function of

13    the fact that it is a prison.

14          It isn't clear to me, and Doctor, I think this is

15    probably outside your field as well, but I wouldn't mind

16    having a brief conversation about stepping back and trying to

17    think about what it is that's really going on.

18          Do you see any way that both functions can be

19    appropriately -- I'm sorry.  This is completely outside of

20    your questioning, but I've got an expert here about it, and

21    it is about a problem I'm having a great deal of difficulty

22    trying to think through.

23          Can you think of how these -- Strike that.

24          Let me start by asking:  In your view can both of

25    those functions be served?

2765

1          THE WITNESS:  I believe they can, Your Honor.  Now, I

2     think you very accurately described the dilemma and the

3     competing forces here, that you have probably the largest

4     number of seriously mentally ill people in the State of

5     California that happen to be housed within a prison system.

6          THE COURT:  Not happen to be.  That's where we send

7     sick people nowadays.

8          THE WITNESS:  You're right, Your Honor.  So they're

9     there.  They're in a prison setting.  And the prisons are not

10    mental health institutions.

11         And so it's this balance.  And I think right now, in

12    my opinion, and my view of going around to these prisons, it

13    seemed there are attempts at providing mental health care,

14    but at this point the pendulum has swung way on the side of

15    custody, and it be being a prison and security -- and I'm all

16    for security.  I worked in jail settings.  I go into prisons.

17    So I understand the need for security.  But right now it's

18    security heavy and mental health light, if you will.

19         THE COURT:  Some might think that even if that were

20    true as a general matter, that's as much a function of the

21    historical process by which we send mentally ill people to

22    prison, but it doesn't change the character of the

23    institution itself.

24         You see what I'm --

25         THE WITNESS:  Yes.  I understand, Your Honor.

2766

1          THE COURT:  It may be, as drastic and sad as it is,

2     it may be that that historical background can't be changed.

3     And even if people of goodwill would want them to, it is

4     just, look, you got a lot of people who have committed

5     crimes, are violent, et cetera, and now you've got a whole

6     bunch of people who are very, very sick.

7          And you said, look, it's all swung one way.  And in

8     some sense that's a historical accident, I think, but is

9     there any practical way for the prison to serve in a

10    significant way the fact that it is also now a mental

11    institution?

12         THE WITNESS:  Yes.  I understand the dilemma, Your

13    Honor.

14         You know, my thoughts on this were -- are that the

15    overall quality of mental health care needs to really be

16    ramped up.  Because it is my opinion, and we go and see these

17    people, seeing how sick they are, seeing the quality of care

18    they are getting, which is very poor, that would be the first

19    intervention, to somehow increase the quality of the care,

20    and at the same time becoming more realistic about what the

21    security needs really are.

22         So we have a person who's mentally ill and needs

23    protective custody.  Why does that person need to be put in a

24    disciplinary unit?

25         THE COURT:  That's yet another problem.  But see --

2767

1          THE WITNESS:  That's an example, Your Honor.

2          THE COURT:  I mean, my view of that is that a great

3    deal of that, as wrong as it may be -- well, it is, not may

4    be -- as wrong as that is, that's as much a function of the

5    historical character that these started as prisons and it is

6    only in the last 20, 25 years, whatever it is, maybe more,

7    30, that they've also become mental institutions.

8          So, you know, they don't even have places to put

9    them, at least that's what they say.

10          And it isn't really malevolent.  It isn't that people

11    want to hurt -- one could explain this without believing that

12    they're in the process of hurting people and want to do that.

13          Is the answer -- I'm asking you, not telling you,

14    really I'm serious -- that this is simply a very long-term

15    process of trying to requalify the nature of the institution

16    and recognizing that it has now got this other very separate

17    function?

18          Is that the answer?

19          Is that the reality?

20          THE WITNESS:  I think it is the current reality, Your

21    Honor.  I don't believe it has to be the long-term reality.

22          THE COURT:  All right.  Tell me about that.

23          THE WITNESS:  I think it requires really stepping out

24    of how the thinking is now, where it is prison security,

25    security prison, strip search, cell searches, handcuffs,

2768

1  these sorts of things.

2          I believe you could provide a reasonable quality -- a

3  constitutional quality of mental health care, having the

4  overall institution safe and secure, and still provide a lot

5  better quality of care.

6          But it would require -- how can I say this, Your

7  Honor?

8          It would almost require the people in charge not

9  being correctional people because the correctional people,

10  God bless them, came up in the correctional system.  They are

11  thinking correctional.  I understand that.  But it would

12  require a whole new way of looking at this.

13          We now have a mental institution here.  How do we do

14  this and keep everybody safe.  And bring in people that

15  aren't bound by this correctional history.  And let's think

16  about it creatively, providing security and mental health

17  care.  I think it can be done.  That's the struggle.

18          Because when I go into these institutions, Your

19  Honor, it is clear who is running the show.  You know, it's

20  the custody staff.  And when you go into the Ad. Seg. Units

21  with these really sick people, it's a custody unit, it is a

22  disciplinary unit.

23          The mental health staff are there, but the people

24  that are really dictating what happens are the custody

25  people.  And I think that's where -- that's our inroad to try

2769

1   to change this system.

2          THE COURT:  That's probably a function broader than

3   this lawsuit or any lawsuit on its own that's going to

4   accomplish that, but I understand what you have said.

5          I'm sorry I interrupted, Mr. Nolan.

6          MR. NOLAN:  Thank you, Your Honor.

7   BY MR. NOLAN:

8   Q.     So just following up a little bit, Doctor, during

9   your tours you interviewed a number of mental health staff in

10  these segregation units --

11  A.     Yes.

12  Q.     -- and treatment units?

13         And you did a lot of record reviews, including some

14  custody records relating to mentally ill prisoners, correct?

15  A.     I did.

16  Q.     And so based on those experiences, did you form an

17  opinion as to whether mental health staff feel empowered to

18  influence these kind of basic condition issues and housing

19  issues and things like placement in Ad. Seg.?

20  A.     I have some very practical examples where mental

21  health staff were impotent to change what committees were

22  going to decide and placement of people and SHU terms and

23  these sorts of things.

24         And in general, the mental health staff that were

25  able to speak with me in a candid way made it very clear

2770

1    that, you know, custody calls all the shots.

2    Q.      Did you see any evidence of close cooperation in

3    these units between custody and mental health staff?

4    A.      You know, I certainly -- I don't mean to paint it as

5    that they were opposing each other, but -- there was degrees

6    of cooperation.  But when it came to a mental health decision

7    versus a custody decision, there was no question of what

8    would win out on that -- in that duel.

9    Q.      I think we'll get to some of those examples in the

10   course of your testimony today.

11          I wanted to ask you why it is important -- sort of

12   one last issue on the confidential treatment space issue --

13   why it is important to have confidential treatment spaces in

14   the actual housing units where these EOP Ad. Seg. prisons

15   are?

16   A.      You know, as I was discussing with the court, a

17   psychiatric interview -- a mental health psychiatric

18   interview requires candor between the patient and the

19   provider.  And when you're having to speak loudly on a prison

20   tier, through a crack in a door, to try to understand whether

21   someone is suicidal or the voices are less or their

22   delusional thought processes have gotten better, it's

23   impossible, let alone there is no confidentiality during the

24   groups either.

25   Q.      Doctor, based on your tours overall, are you

2771

1    concerned about the numbers of very severely mentally ill

2    prisoners you encountered in these EOP Ad. Seg. Units?

3    A.      Yes.  The answer to the question is yes.

4            I don't mean to paint my tours as some sort of

5    epidemiological study of prevalence rates of mentally ill in

6    segregated units, but what I can testify to very clearly is

7    that I was taken back by the number of seriously mentally ill

8    people housed in these segregated units.

9            By seriously mentally ill, I'm talking about people

10   that are symptomatic from serious psychotic disorders and

11   serious mood disorders.

12   Q.      Doctor, were you also concerned about the length of

13   stay in segregation for the individual people that you

14   interviewed?

15   A.      Yes.

16   Q.      Doctor, do you know why it is that so many seriously

17   mentally ill prisoners end up spending long periods in

18   segregation?

19   A.      Well, it is like -- I believe it is Steve Martin in

20   the use of force portion of these hearings that called it a

21   "perfect storm," something to that effect.

22           You have people that are seriously mentally ill, and

23   seriously mentally ill people have behavior that is not

24   conducive to being in a prison setting.  They're invariably

25   going to have rule violations because of their mental

2772

1    illness.

2            So then they are placed in Ad. Seg. Units, which

3    are -- I believe that the Special Master, in one of his

4    reports, called it the antitherapeutic effect of being within

5    a segregated housing unit.

6            So you get the mentally ill people, who had bad

7    behavior because of mental illness, and now they're in a

8    place where they're likely to become worse.

9            And so they may continue to act badly.  They may pick

10   up new 115s.  They're going to have prolonged segregation

11   sentences that are going to be longer.  They may pick up a

12   SHU term.  They may pick up new criminal charges.  Again, due

13   to mental illness and being placed in these housing

14   situations.

15           And so that's -- I mean, that's sort of my take on

16   that, is that you get people that almost get stuck in these

17   units because of their mental illness.

18   Q.      Doctor, is there an example that stands out in your

19   mind of a prisoner that illustrates this?

20   A.      Yes, there is.  Prisoner V.

21   Q.      Could you tell me a little bit about his case?

22   A.      Well, Prisoner V -- it was quite serendipitous that I

23   learned about Prisoner V on my tour.  I was interviewing

24   inmates on the general population EOP yard, and it was at a

25   group.

2773

1        And I had the opportunity to talk to these gentlemen,

2    and they reported to me how upset they were about what had

3    happened to this one inmate.  And they went on to describe

4    this person, that was he was an EOP on the GP yard, and they

5    noted him becoming increasingly psychotic.

6        And they finally said prior to the time that this

7    individual did assault another inmate, but in the time

8    leading up to that, they noted he was shouting incoherently

9    in the yard, he would come out and take -- they described him

10   as being shirtless and shouting psychotic nonsense to no one

11   in particular, and that they were concerned the staff didn't

12   do anything to intervene.

13       And then the guy ended up assaulting another inmate

14   so then he gets put into Ad. Seg.

15   Q.    Doctor, were you able to meet with Prisoner V when

16   you were at Salinas Valley?

17   A.    Again, it just so happened that he was in Ad. Seg. on

18   the day of my tour when I found out about this event that had

19   occurred several weeks prior to my being there.

20       And I went to go see him in Ad. Seg.  And he was as

21   advertised.  He was psychotic and agitated and shouting and

22   screaming to me about how I stopped my medications because I

23   know if I read more, the reading would be better than taking

24   the meds.

25       He was shouting about how lonely he was, and he was

2774

1    demanding he have a cellmate because he needed someone to

2    speak to.  So he was in a pretty agitated, psychotic state

3    when I saw him.

4    Q.      Did you feel that he was at the appropriate level of

5    care at that time?

6    A.      Well, on the day that I saw him, I had serious

7    questions about his ability to be maintained in anything

8    other than a Mental Health Crisis Bed setting.  And also I

9    was concerned that he may need referral to a DSH program for

10   further stabilization.

11   Q.      Doctor, did you review any records concerning

12   Prisoner V?

13   A.      Right.  There was -- I did.  There were two sets of

14   records generally.  There were the records that I was able to

15   review at the time of my report back in March of this year,

16   and then in preparation for this testimony I was able to

17   review other records.

18          MR. NOLAN:  Your Honor, Exhibit 2136, which is in the

19   binder that we provided, is excerpts of records for Prisoner

20   V.  These were produced by defendants in September, and I

21   would like to move this exhibit into evidence.

22          MR. RUSSELL:  No objection, Your Honor.

23          THE COURT:  Received.

24              (Whereupon, Plaintiffs' Exhibit 2136 received

25               into evidence.)

2775

```
 1   BY MR. NOLAN:

 2   Q.      Doctor, turning to 2136, are these some of the

 3   updated records you reviewed for this prisoner?

 4   A.      Yes, they are.

 5   Q.      So Doctor, what did you learn from these records

 6   about what happened to Prisoner V?

 7   A.      What I had learned is that it was pretty much what

 8   the other inmates told me, that he's an EOP inmate and that

 9   he stopped taking his meds and that he became increasingly

10   psychotic and ended up assaulting someone.

11           He even had a brief MHCB stay prior to the assault,

12   but that was -- he stayed a day or two, then was discharged.

13   Q.      Doctor, was there a 115 --

14           THE COURT:  You don't mean CB.  He was in a Mental

15   Health Crisis Bed?

16           THE WITNESS:  MHCB.

17           THE COURT:  All right.

18           THE WITNESS:  The crisis bed.

19   BY MR. NOLAN:

20   Q.      Doctor, was there a 115-X Mental Health Assessment

21   prepared for this prisoner?

22   A.      Yes.  And I'm sorry, just to finish off the previous

23   question, that I reviewed the records, and it documented that

24   he suffered from schizoaffective disorder.

25   Q.      And then the next question again was whether you
```

2776

1    reviewed a 115-X Mental Health Assessment for this prisoner?

2    A.    Yes, I did.

3    Q.    Could you tell me what that is?

4    A.    My understanding of what a 115-X is, is an

5    opportunity for a mental health staff person -- I believe

6    they don't allow the primary clinician of the individual in

7    question, but someone else -- to evaluate the individual and

8    then make a recommendation to the hearing board regarding

9    whether or not the charges or the sentence should be

10   mitigated because of mental health concerns.

11   Q.    Doctor, is the document on page 1 of Exhibit 2136 the

12   115-X for Prisoner V?

13   A.    Page 1?

14         Yes.  It is the 115-X I reviewed.

15   Q.    Could you tell me what the clinician who drafted this

16   document found?

17   A.    He found that the mental health factors -- I'm

18   reading from the Findings part in the 115-X.

19         He said:

20         (Reading:)

21         Mental health factors seem to very strongly

22         contribute to the inmate-patient's alleged acting out

23         behavior.  The inmate-patient would need staff

24         assistance to help ensure he understands the

25         proceedings.  If found guilty, it is recommended that

2777

```
 1              the hearing officer considering an Administrative 115

 2              or verbal counseling given the severe and sudden

 3              mental health crisis the inmate-patient was

 4              experiencing at the time of the incident.

 5              (Reading concluded.)

 6              THE COURT:  I'm sorry.  The exhibit that we're

 7    looking at is what, Mr. Nolan?

 8              MR. NOLAN:  2136.

 9              THE COURT:  36.  I can't read my own handwriting.

10              Thank you.  Go ahead.

11    BY MR. NOLAN:

12    Q.    Doctor, could you also read the box above that that

13    discusses the interview with the primary clinician that this

14    doctor conducted?

15    A.    It says:

16              (Reading:)

17              Consistent with the unit health record, primary

18              clinician reports inmate-patient was doing quite well

19              until he quit his meds over a month ago.  Since then

20              he has been decompensating and has only recently

21              agreed to consider meds again.  DSH referral was

22              being considered.  Housing officers report that the

23              inmate-patient talks nonsense frequently, seems

24              confused, and is easily agitated.

25              (Reading concluded.)
```

2778

1    Q.     So Doctor, if you could, turn to page 9 of Exhibit

2    2136.

3    A.     Yes.

4    Q.     Did you also review this document in preparing for

5    today?

6    A.     Yes.

7    Q.     And do you have an understanding of what this

8    document is?

9    A.     This is, I believe, the committee hearing -- the

10   disciplinary committee that reviewed this incident.

11   Q.     And could you read the description of how his

12   disciplinary infraction was resolved starting with the second

13   paragraph, "Subject was placed in ASU on 1-26"?

14   A.     (Reading:)

15          Subject was placed in ASU on 1-26-13 for battery on

16          an inmate.  The RVR has been heard and subject was

17          found guilty as charged.

18          (Reading interrupted.)

19          Forgot.  I didn't change my glasses.

20          That's better.

21          (Reading continued:)

22          ICC elects to assess and impose a midrange three

23          month SHU with a MERD 4-4-13 for the RVR dated

24          1-26-13, Battery On An Inmate.  ICC found no

25          mitigating factors.  ICC notes aggravating factors

2779

```
 1              are present, but they were over five years old.

 2              Therefore, ICC elects to not aggravate the SHU term

 3              and assess the midrange due to the subject's

 4              disciplinary hearing.  ICC considered the Mental

 5              Health Assessment when assessing the SHU term.

 6              (Reading concluded.)

 7   Q.     I think that's probably enough, Doctor.  Thank you.

 8   A.     Okay.

 9   Q.     So based on this do you have an understanding, and

10   also just based on your knowledge from your tours, what the

11   different consequences were to Prisoner V from this rules

12   violation?

13   A.     Yes.

14              MR. RUSSELL:  Objection, Your Honor.  Lacks

15   foundation and is outside the scope of Dr. Stewart's

16   expertise.  He's a forensic psychiatrist.  Now he's being

17   asked about correctional results from --

18              THE COURT:  That's precisely the point, sir.

19              The objection is overruled.

20              You may answer, sir.

21              Your assessment is that the fact that there was a

22   mental health report indicating that that was a major

23   contribution to the event, if not the cause of it, was not

24   regarded as significant by the ICC?

25              THE WITNESS:  Yes, Your Honor.  That's exactly right.
```

2780

1    THE COURT:  I could have figured that out for myself,

2   but it is better it be in the record.

3    THE WITNESS:  Thank you, sir.

4   BY MR. NOLAN:

5   Q.    So I was asking what the different consequences were

6   of this kind of a rules violation finding that he was guilty?

7   A.    Again, from the records that I reviewed, it showed he

8   had a three month SHU term, he lost 60 days credit, and he

9   had an increase in custody points.  And that his punishment

10   was not mitigated because of his mental health issues.

11    THE COURT:  And your assessment, Doctor, as I

12   understand it, this was a demonstration of how custody

13   concerns overcame any mental health issues that might

14   otherwise be considered?

15    THE WITNESS:  That's one of the factors, Your Honor,

16   yes, after the event.

17    THE COURT:  Yes.

18    THE WITNESS:  But there is also the whole point of if

19   these untrained prisoners can note a guy becoming

20   increasingly psychotic and have concern for him on the unit,

21   on the yard, and there was no mental health staff that noted

22   that, no custody staff noted that.

23    They could have intervened.  This whole thing could

24   have been avoided by proper mental health intervention when

25   this person started to decompensate.

2781

1          THE COURT:  Thank you, sir.

2    BY MR. NOLAN:

3    Q.       Shifting gears a little bit, Doctor, I want to step

4    back for a minute and ask you about how you went about

5    identifying people for interviewing on your tours.

6    A.       Well, when we showed up at the institutions, we asked

7    for a variety of lists.  You know, for example, people that

8    were waiting to be housed in the DSH, people that had

9    recently been returned from DSH, a number of mental health

10   caseload people, mainly EOPs, that were housed in the

11   segregated units, and then also the lengths of stays of the

12   people that were housed on the mental health units.

13          And so that was sort of our morning meeting, if you

14   will.

15          Then going onto the segregated units, I just went up

16   to a variety of custody staff and I said, You know, who are

17   your people here that are the most mentally ill, in your

18   opinion?  And they gave us some names.

19          And what I found interesting was that often the names

20   that the custody staff gave me in their opinion were the most

21   mentally ill people in the units, that corresponded with the

22   people that had been there the longest.  There was

23   significant overlap of that.

24   Q.       Did you draw any conclusions based on that?

25   A.       Well, I think just based on that -- I don't mean

2782

1    that's some sort of big double-blind clinical study, but just

2    based on that you've got to consider that length of stay in

3    the segregated units has something to do with people becoming

4    more mentally ill.

5    Q.      Is that consistent with your experiences in forensic

6    psychiatry in general?

7    A.      My experiences working with incarcerated individuals

8    and being involved with incarcerated mentally ill individuals

9    shows -- demonstrates to me that people that go to segregated

10   housing, without mental illness, without being mentally ill,

11   often develop mental illness during the course of their stay.

12           And people that are mentally ill, have a history of

13   mental illness that are assigned to a segregated unit, often

14   become much worse from a mental health standpoint.

15   Q.      Doctor, are there any characteristics of segregation

16   units that present particular challenges to mentally ill

17   prisoners?

18   A.      Well, there's a variety of ones.  First of all, I

19   just -- we've talked about it, but I think it is worth

20   repeating, that these are disciplinary units.  These are not

21   treatment units.  So they are places that people are sent for

22   punishment.  And it's very difficult or, I would say

23   impossible, to provide adequate mental health care in a unit

24   that is a punishment unit.

25           You know, the worst thing you could do for someone

2783

1    who is mentally ill is isolate them.  And these are isolation

2    units.  People spend the majority of the time in their cell.

3             There's lack of purposeful activity.  There is not a

4    lot for these people to do.  So I think those, among other

5    things, contribute to the difficulties for the mentally ill

6    on these units.

7    Q.       Doctor, from a psychiatric perspective, are there

8    particular concerns about seclusion in these units?

9    A.       You know, again, I harken back to my experience of

10   working in treatment settings.  Seclusion of a mentally ill

11   individual is a major decision whether or not to seclude

12   someone for their own safety or for safety of staff.

13            And when a mentally ill patient, in a hospital-type

14   setting, is secluded, it requires a physician's order.  It

15   requires all these checks and balances going into place where

16   you have to go in there every so often and make sure that

17   they're okay, et cetera, et cetera.  And the physician has to

18   continue to write these seclusion orders.

19            And, you know, in these settings, where I had the

20   same degree of mentally ill people I encountered in these

21   segregated units, when we would seclude people, we would do

22   it for hours at a time, not days, weeks or even years.

23            So it's a very significant issue in the treatment of

24   the mentally ill.

25   Q.       Doctor, did you learn about any custody interaction

2784

1    issues on your tours that mentally ill inmates in these units

2    would find particularly challenging?

3    A.        Well, some of the ones we talked about already.

4    Again, they're punishment units.  When they leave their

5    cells, they have to be cuffed.  The treatment they receive is

6    done in these very uncomfortable settings, cages, where it is

7    hard for people to sit down.

8         I had one individual at CSP Sacramento, a very large

9    man, that told me when he's cuffed in one of these standing

10   cages, he's unable to sit down because of just the physical

11   structure of them so he ends up standing up the entire time.

12        You know, as you mentioned earlier about the strip

13   searching and the cells being searched, those sorts of

14   issues.

15   Q.        Doctor, did you instruct staff to take photographs on

16   your tours?

17   A.        I did.

18        MR. NOLAN:  Your Honor, Plaintiffs' Exhibits 2106

19   through 2119 are photographs taken by defendants at

20   Dr. Stewart's request during the tours.  Defendants also

21   Bates stamped these photos.  I would like to offer all 14 of

22   these photographs into evidence as Plaintiffs' Exhibits 2106

23   through 2119 inclusive.

24        MR. RUSSELL:  Your Honor, we have no objection to the

25   photographs themselves, but each of these photographs have a

2785

1    little bit of argument on them with the narrative

2    descriptions of what they are.

3        THE COURT:  Hang on.  Let me look at them and see

4    what we are talking about.

5        MR. RUSSELL:  Not all of them.  Some of them do.

6        MR. NOLAN:  Your Honor, the captions were the

7    captions used in the March 14th declaration of Dr. Stewart

8    for those photographs, but I actually did edit them all to

9    try to make them as objective as possible.

10        THE COURT:  I will receive them and any descriptions

11    I will review as the witness' description of what is being

12    depicted.

13        MR. NOLAN:  Thank you, Your Honor.

14            (Whereupon, Plaintiffs' Exhibits 2106 through

15             2119 received into evidence.)

16        THE COURT:  You may proceed, counsel.

17        Well, you know, it is noon, and we're going to take

18    our break.  I really have a rule against going into the noon

19    hour, but you're here.

20        The problem is -- no.  Let's take lunch.

21        We'll reconvene at 1:30.

22        MR. NOLAN:  Thank you, sir.

23        (Off the record at 12:00 p.m.)

24                    ---o0o---

25

```
 1                    SACRAMENTO, CALIFORNIA

 2              THURSDAY, DECEMBER 5, 2013; 1:30 P.M.

 3                         ---oOo---

 4

 5              MR. NOLAN:  Your Honor, before we broke for lunch, I

 6    believe you had admitted the 14 photos.  I would like to

 7    publish them one at a time and ask Dr. Stewart about them.

 8              THE COURT:  All right.

 9                        DR. PABLO STEWART

10    Recalled as a witness on behalf of the plaintiffs herein, was

11    previously sworn, examined, and testified as follows:

12                   DIRECT EXAMINATION (CONTINUED)

13    BY MR. NOLAN:

14    Q.    This first photo, Plaintiffs' Exhibit 2106, can you

15    explain what is shown in this photograph?

16    A.    This is the EOP ad seg hub at CSP Los Angeles County,

17    and you can note those -- the cages are set up for where

18    group would take place, and you'll see the proximity of staff

19    walking, working there, proximity to the cells, and just note

20    above, above on the right, that's where the gunner sits.

21              So the way it's set up there, it doesn't provide any

22    sort of confidentiality for any kind of mental health care.

23              THE COURT:  Appears to be the same thing except from a

24    different view.

25    /////
```

1    BY MR. NOLAN:

2    Q.      Is that right, Doctor?

3    A.      Yes, but a different angle on it.

4    Q.      That was 2107.

5    A.      This is a ground-level shot of the groups, group area,

6    and you can see the cages and you can see the television

7    there in front of the area.

8    Q.      Just for the record, this is Exhibit 2108; correct?

9    A.      Yes.

10    Q.      Did you see groups going on in this unit?

11    A.      I did not see groups going on in this unit.

12    Q.      Did you interview --

13    A.      I interviewed prisoners of their experience in the

14    groups, and they talked about -- I don't want to say

15    overreliance, but the very common fact that many of the

16    groups are TV groups.  Some of them would be instructional

17    videos and much of them are also popular shows that they were

18    showing them.

19    Q.      Do you have an opinion about the appropriateness of

20    the settings shown in these photographs for mental health

21    groups?

22    A.      I do.  I don't think this is appropriate at all for

23    group therapy or any kind of therapy, for that matter.  It

24    provides the set -- the setting itself doesn't provide for

25    any visual or auditory confidentiality.

1          One of the benefits of group therapy, what makes it

2     such a powerful treatment modality, it allows individuals to

3     experience how they are in a group and to interact with other

4     people within the group.  As can see here, that's fairly

5     impossible to do given the way it's set up.

6     Q.     Doctor, this is 2109.

7            Is this a similar view?

8     A.     It is.  What this shows is the proximity of these,

9     where they place these cages to the working area.  This is a

10    working disciplinary pod of the prison and it shows the

11    shelves.  You can see behind, they're a part of the area

12    where staff is walking around and doing their daily routine.

13    Q.     Doctor, do you have an opinion about the use of these

14    cages for therapy?

15    A.     I think I mentioned it really prevents a person from

16    having the benefit of group therapy.

17    Q.     Doctor, do you also have an opinion about the use of

18    these cages for suicide watch?

19    A.     Yes.  I am aware that these cages are used on the

20    units to hold people that are suicidal, that complain of

21    being suicidal, designated being suicidal.  They can be there

22    for up to a number of hours.  They're cuffed, they're in

23    their boxer shorts and standing in these cages.

24    Q.     Doctor, this is Plaintiffs' Exhibit 2110.

25           Could you tell us what this photograph shows?

1    A.       These are just other cages that are there on the floor

2    of the prison unit that were there extensibly for the

3    meetings with their primary clinician or cage manager.  The

4    one all the way on the left is being used as a broom closet

5    too.

6    Q.       Do you also have an opinion about whether these are

7    appropriate locations for clinical contacts?

8    A.       I do.  It goes back to what I was just saying about

9    the group therapy, the location.  It provides no

10   confidentiality.  We mentioned earlier about how the intimate

11   nature of psychiatric intervention with patients, and I don't

12   see how that's possible, given this setting.

13   Q.       This is Plaintiffs' Exhibit 2111.

14            Could you tell us what is shown in this photograph?

15   A.       One of the inmate cells in the ad seg unit in

16   Los Angeles County.  What I came to find out is that this

17   intake cell is also used as an alternative placement for

18   suicidal prisoners.

19   Q.       And is that an appropriate placement?

20   A.       Just as with the cages, harsh placements like this, to

21   me, act as a very strong disincentive for people to be open

22   and honest about any suicidal feelings they may have.

23   Q.       What is different about these intake cells than

24   regular ad seg cells?

25   A.       The intake cells have been retrofitted or refitted to

 1    eliminate any potential places for suicide to occur.  The

 2    vents are designed differently.  They're supposed to be

 3    suicide proof.

 4    Q.      Doctor, did you interview any prisoners in this unit?

 5    A.      Yes, I did.

 6    Q.      Was there anything about these interviews or

 7    particular interviews that stands out to you?

 8    A.      Again, my overall impression of interviewing people at

 9    LAC was that the people were very ill, suffering from major

10    psychotic or mood disorders, very symptomatic, and there was

11    more than just a couple.  It was many.

12    Q.      Doctor, did you obtain any information during or after

13    your tours about the treatment hours in this unit?

14    A.      Yes, I did.

15    Q.      And what was that?

16    A.      That the data that I was given, it covered basically

17    the period of November, December, beginning part of January,

18    showed that here in LAC they were getting less than ten

19    hours.  They were getting 6.35 for the EOP groups.

20    Q.      In your opinion, is that an appropriate amount of

21    treatment?

22    A.      Well, one, it isn't even -- doesn't meet the minimum

23    standards set in the program guide.

24            And, two, if anything, as we talked about already,

25    these harsh disciplinary units make it even more important to

 1    provide as much care as possible.

 2           So, if anything, a person, mentally ill person placed

 3    in one of these segregated units would necessarily need more

 4    than the minimal as laid out in the program guide.

 5    Q.    Doctor, this is Exhibit 2112.

 6           Is this another view of the same cells?

 7    A.    This is another view of the intake cell that's used

 8    for alternative placement.

 9    Q.    Moving on to photographs from RJ Donovan, this is our

10    Exhibit 2113.

11           Could you tell us what is shown in this photograph.

12    A.    An ad seg unit designated in an EOP hub, the cages is

13    where the groups supposedly would take place.

14    Q.    Doctor, how about this photograph, this is Plaintiffs'

15    Exhibit 2114.

16    A.    Again, what this shows is sort of to the left, from

17    where that last view was, you can see also in close proximity

18    to the group rooms is the primary clinician offices, which

19    are basically room dividers put on the floor of the prison

20    unit, and the area above them is where the gunner stands.

21    Q.    This is Plaintiffs' Exhibit 2115.

22           Can you explain what this shows?

23    A.    A close-up of the picture that we just saw, and these

24    are offices used by primary clinicians.  You can see the cage

25    there.  That's where the weekly contacts supposedly are

1      taking place.

2      Q.      Doctor, did you interview EOP patients in this unit?

3      A.      Yes, I did.

4      Q.      Are there examples of a particular case or cases that

5      stand out in your mind from this unit?

6      A.      There was a couple of cases that really stood out in

7      my mind.  One, in general, just as with Los Angeles County,

8      there were numerous seriously mentally ill individuals that I

9      encountered.  Two stuck out in my mind, the first one being

10     prisoner -- I believe his he's designated as DD.

11     Q.      Could you tell me a little bit about Prisoner DD.

12     A.      When I saw him at RJ Donovan, it was February 12th.

13     He had been in the ad seg unit for seven months.  He was an

14     EOP prisoner.  He had a history of 15 DSH hospitalizations

15     prior to the time that I saw him.  He had eight at Vacaville,

16     and six at Patton State.

17            He was chronically psychotic.  He has a delusional

18     system of these two voices of two women that were directing

19     him how to act and how to be in his cell.  They were telling

20     him to turn his lights off and don't come out of his cell.

21     They said, "If they refer you to DHS, don't go, because

22     people won't respect you there."

23            He was a very ill individual.

24     Q.      So, Doctor, Plaintiffs' Exhibit 2137 is excerpts from

25     the updated records for Prisoner DD.  These were produced by

1    defendants at the end of September, 2013.

2              Your Honor, we would like to move those into evidence.

3              THE COURT:  I'm sorry?  What were the numbers?

4              MR. NOLAN:  Plaintiffs' Exhibit 2137.

5              THE COURT:  Hearing no objection, they are received.

6                        (Whereupon, Plaintiffs' Exhibit 2137

7                        was received into evidence.)

8    BY MR. NOLAN:

9    Q.      Doctor, from these records, do you learn what happened

10   to this prisoner after you saw him on February 12th?

11   A.      Yes.  He had been referred to Atascadero State

12   Hospital to DHS a week after I saw him.  He was basically

13   admitted there.  While he was there in the DHS hospital, he

14   had his Keyhea removed as danger to self.

15           He was placed on suicide watch and actually had a

16   suicide attempt while he was there.  He was noted to be real

17   psychotic, referring to himself as the Prophet Samuel.

18   Q.      Has Prisoner DD returned from DHS yet, to your

19   knowledge?

20   A.      Yes.  The notes from DHS noted that he was much

21   improved.  He had gotten better by being in the hospital and

22   that he was returned back to ad seg unit.

23   Q.      So he went back to the same unit that we've just seen

24   the photographs of?

25   A.      That's my understanding, yes.

1    Q.       What were your overall concerns about prisoner's DD

2    case?

3    A.       My overall concerns were, one, he was a very ill

4    individual who was allowed to basically stay in his cell.  He

5    had become a cell dweller.  He was not coming out for groups.

6    He was not coming out for yard.  That was allowed to occur.

7            I found no evidence from the records I reviewed and

8    from speaking with him that people had done anything to try

9    to engage him in treatment, especially given the fact that he

10   had all these multiple hospitalizations in his record.  It

11   appeared that his degree of mental disability required him to

12   be in the inpatient setting.

13   Q.       Doctor, were there any noteworthy individuals you

14   interviewed in the ad seg unit at RJD?

15   A.       There was another one, Prisoner EE.  This individual

16   had also been in the ad seg unit about seven months by the

17   time that I saw him in February and he was another individual

18   that was very psychotic.  He was talking about he was working

19   for the Department of Treasury.

20           He couldn't talk to us because he was a treasury agent

21   and he only communicates through technology, and that it was

22   evident that he wasn't going out to too many thinks also.

23   Q.       Did you see any evidence whether he was referred to

24   DHS?

25   A.       He was.  He was initially transferred to CMC with the

1    plan to transfer him to Atascadero State Hospital.

2    Q.    Doctor, were you able to review subsequent medical

3    records for Prisoner EE?

4    A.    Yes.  And he had had his -- he continued to be fairly

5    psychotic while he was at CMC, but he was able to be moved to

6    EOP yard after awhile.

7    Q.    So Plaintiffs' Exhibit 2138 is excerpts from the

8    updated records.  I would like to move to admit these into

9    evidence.

10          THE COURT:  What number?

11          MR. NOLAN:  2138 and updated medical records for

12    Prisoner EE.

13          THE COURT:  Received.

14                         (Whereupon, Plaintiffs' Exhibit 2138

15                         was received into evidence.)

16    BY MR. NOLAN:

17    Q.    Doctor, do you have any overall concerns about the

18    case of Prisoner EE?

19    A.    You know, in reviewing the records, it showed that he

20    was attending approximately 10 percent of his treatment

21    activities, but, yet, staff did not refer him to DHS at that

22    point.  This was in February, right after my tour of RJ

23    Donovan, and then later on, it turned out he was at 9 percent

24    of his treatment participation.

25          I don't know how that happened, but then it was after

1    that that they decided to refer him to DHS.

2    Q.    Did you learn anything about treatment hours during

3    your tour of RJD's EOP ad seg unit?

4    A.    Yes.

5    Q.    What did you learn?

6    A.    They were getting about five hours a week in the EOP

7    ad seg or EOP inmates.

8    Q.    Did you talk to any inmates in the group setting in

9    this unit?

10    A.    Yes, I was able to talk to a group that had ended.  I

11    remember I was waiting for the group to end.  It was about a

12    quarter to the hour and the group ended at quarter till, and

13    so I had an opportunity to speak to all these guys that were

14    still in their cages.

15        They were telling me they basically got one group a

16    day for about five hours a week.

17    Q.    Did you have any other concerns about the treatment

18    program at RJD?

19        Did you learn about something called a "group hold"

20    while you were there?

21    A.    Yes.  In speaking with this group of inmates that had

22    just finished one of their groups for the day, they had told

23    me something about a group hold.  Then when I inquired about

24    that, it turned out that either mental health staff or

25    custody staff could put a, quote, group hold on an individual

1    and keep him from attending groups.  Had to stay in his cell.

2    They were punishing him.

3    Q.      Do you have an opinion about this form of discipline?

4    A.      They were punishing this individual for being mentally

5    ill by withdrawing treatment, which I think there are so many

6    things wrong with that, it's hard to encapsulate that in one

7    sentence.

8    Q.      Doctor, moving on to the photographs from Salinas

9    Valley, Plaintiffs Exhibit 2116, could you tell us what is in

10   this photograph?

11   A.      This is an off unit, EOP ad seg -- they call it a

12   treatment area, but it used to be an old storage room that

13   they lined up the cages like this.  This is where the EOP

14   inmates would attend group.

15   Q.      Did you learn anything about the availability of

16   treatment space generally during your tour of Salinas Valley?

17   A.      Yes.  They especially talked about the lack of

18   confidential treatment space.

19   Q.      Did you learn how many hours of treatment EOP ad seg

20   prisoners received?

21   A.      Getting around five hours a week, just as they had

22   been at RJ Donovan.

23   Q.      Did you have any evidence that the prisoners were

24   getting five hours a week?

25   A.      You know, I didn't.  During the course of my day

1    there, I didn't spend the whole day in this treatment area,

2    but I didn't see any evidence that there were groups going

3    on.

4    Q.       Doctor, this is Plaintiffs' Exhibit 2117.

5            Is this another photograph -- could you describe

6    what's in this photograph?

7    A.       Again, this is another one of the areas where EOP

8    inmates at Salinas Valley would participate in group

9    treatment.  It's the same sort of deal.  Cages are lined up

10   there and you can see the TV in this view.

11   Q.       Doctor, this is Plaintiffs' Exhibit 2118.

12           This is from CSP in Sacramento?

13   A.       Yes, it is.

14   Q.       Can you describe what this photograph depicts?

15   A.       This is a cage that was placed basically in a hallway.

16   You can see to the left of it there's a door that goes into

17   the housing unit.  This was in a hallway that was between the

18   different housing units.  I've come to learn this is the cage

19   where suicidal inmates were held until such time as they were

20   placed in alternative placements.

21   Q.       Doctor, while you were at CSP Sacramento, did you

22   observe anybody being held in a cage like this?

23   A.       Yes.  At CSP Sacramento, because of the lack of

24   appropriate places to put suicidal patients, they had to

25   develop a team called a crisis triage team.  What this group

1    did was had a list of people that were suicidal and tried to

2    find spots for these people to be.

3            We went to that office.  It was about mid-day and they

4    told us that someone had been -- someone found to be suicidal

5    was waiting to be evaluated for suicidality, who had been in

6    the PSU and was being held in a cage.

7            So we went over there and saw this individual.  There

8    was a person in a cage stripped down to their boxers,

9    handcuffed, waiting to get their mental health evaluation.

10   Q.    How long had Prisoner I been kept in that cage?

11   A.    We were there mid-day, so I believe it was a little

12   afternoon, 12:15 or so.  According to the records, that

13   prisoner had been there since 9:15 that morning, so at least

14   three hours at that point.

15   Q.    Do you have an opinion regarding the use of this type

16   of cage for suicidal prisoners?

17   A.    I think the picture speaks for itself how

18   inappropriate it is for suicidal prisoners.

19           But, again, if you have someone who at that point

20   their existence, they feel taking their life is a reasonable

21   alternative, and then you're asking them -- not asking them,

22   you're making them stand in a cage like this, handcuffed, in

23   their underwear while they're awaiting mental health

24   evaluation, I think it's exceedingly inappropriate.

25   Q.    This is Plaintiffs' Exhibit 2119.

1          Is this just another photograph of one of the cages,

2    Doctor?

3    A.       Yes.

4    Q.       Doctor, did you learn about how many treatment hours

5    patients were receiving in the PSU and the EOP ad seg units

6    at CSP Sacramento?

7    A.       Yes, I did.

8    Q.       What did you learn?

9    A.       That it was, again, right around five hours, 5.4 hours

10   per week at the time of my tour.

11   Q.       Did you find similar problems with inadequate

12   treatment hours at all the EOP ad seg units you visited?

13   A.       In all the EOP ad segs I visited, they were not

14   meeting the minimum requirements of the program guide.

15   Q.       Did you also learn anything about the length of groups

16   offered in the EOP ad seg units you visited?

17   A.       Several of the groups -- all the groups I was able to

18   visit, there were, I believe, three different groups.  Each

19   one of them was reportedly started late and ended early.  It

20   started after the hour and then it ended before the hour and

21   they were given credit for an entire hour of treatment.

22   Q.       Did also learn anything about treatment hours in the

23   EOP ad seg units at prisons you did not visit?

24   A.       Yes.  In the Special Master's 25th report, he talked

25   about 10 of 11 EOP hubs failed to provide the ten hours per

1    week of treatment.

2    Q.    In preparing for your testimony today, did you review

3    any updated data concerning treatment hours in EOP ad seg?

4    A.    I did.  I reviewed a report by Mr. Belavich, and it

5    covered the period June 2013.  There were several things from

6    that data that I gleaned.

7    Q.    Doctor, if you look at what's been marked at

8    Plaintiffs' Exhibit 2120, this is a chart from the report by

9    Dr. Belavich.

10          Is this the chart you're referencing, Doctor?

11   A.    What page?

12   Q.    2120.

13   A.    The page of the exhibit?

14   Q.    It should be one page.

15   A.    Okay.

16   Q.    Is this the chart that you were referencing?

17   A.    Yes, that was the chart I was referencing.

18   Q.    Doctor, what's the time period covered by this chart?

19   A.    The time period of this chart is basically June of

20   2013, the 1st to the 28th.

21   Q.    What does this chart show?

22   A.    It lists the institutions that have an EOP hub and

23   then it has different categories as far as the group

24   treatments.

25   Q.    And as to the -- is there a particular column or rows

1    as to the prisons that you have talked about today that shows

2    what the treatment is that's being offered?

3    A.    The one from a clinical standpoint, the only one that

4    makes any difference to me -- I shouldn't say it like that.

5    The most important from the clinical standpoint is the number

6    of hours a patient actually attends.  It was that column that

7    I paid special attention to.

8    Q.    What does this chart show for the four EOP ad seg

9    units we've talked about today?

10   A.    Again, this is during the month of June, 2013.  RJ

11   Donovan, they had an attendance rate of 6.11 hours per week.

12   Sacramento was 4.86, Salinas Valley 5.17, and LAC 17.1 --

13   7.66.  Excuse me.

14   Q.    I believe the box below that is for LAC.

15   A.    7.73.  I stand corrected.

16   Q.    Did you have any concerns about treatment refusal

17   rates based on this chart?

18   A.    Yes, I did.

19        THE COURT:  I'm told by the clerk that Exhibit 2120

20   has not been admitted into evidence.

21        MR. NOLAN:  I would like to move to admit this into

22   evidence.

23        THE COURT:  Received.

24              (Whereupon, Plaintiffs' Exhibit 2120

25              was received into evidence.)

1    BY MR. NOLAN:

2    Q.       Did you have any concerns about treatment refusal

3    based on this chart?

4    A.       There was what I consider a fairly high rate of

5    refusal for the different programs that I visited.

6    Q.       Were there any in particular?

7    A.       The one that stands out to me is Sacramento where they

8    had 6.7 hours refused and 4.86 hours attended, so there was

9    more refusals than there were attended in Sacramento.

10   Q.       Do you have any opinions based on your tour there of

11   the possible reasons for that high refusal rate?

12           MR. RUSSELL:  Objection.  Calls for speculation.

13           THE COURT:  It's within his professional expertise.

14           You may give your opinion, sir.

15           THE WITNESS:  Sacramento was one of the places that

16   had the group rooms outside of the housing unit.  So in

17   thinking about the high rate of refusal, again, we've talked

18   a little bit about -- we've got to think what the whole

19   process is to get somebody to attend group.

20           They have to get cuffed up.  They are searched,

21   stripped out, either going or coming or both ways, escorted

22   across the yard and made to sit in these cages.  They're made

23   to attend group, and then the whole process starts in reverse

24   again.

25           So in just thinking about all of the different aspects

1    of that, one would have to really consider the onerous nature

2    of getting out of your cell and doing that.  And we talked

3    also about how, for reasons that are beyond my understanding,

4    that custody seemed to have led to lengthy cell searches when

5    people are out going to group.  So somehow in the prisoner's

6    mind, attending treatment is somehow related to having their

7    cell searched.

8         And then you've got to consider the quality of the

9    group.  I mean, if you're going to go through that much

10   hassle to get to a group, treatment, then the group better be

11   worth your while.  So all of those things are factors that

12   I -- my opinion would be that there's such a high rate of

13   refusals there in Sacramento.

14        THE COURT:  But that situation is apparently the same

15   for all of the hubs save and except if it's outside of the

16   residence.

17        Why would that be any different, if you can tell?

18        THE WITNESS:  I can't tell exactly why it would be

19   different in Sacramento.  I'm just looking at the numbers and

20   trying to understand having seen these places.  It would seem

21   that it was more challenging to get people from the housing

22   unit to a place to get treatment.

23        You can't help but consider that the quality in groups

24   wasn't very good.

25   /////

1    BY MR. NOLAN:

2    Q.    Doctor, are you aware of any differences in these

3    custodial policies when the treatment is on the unit or off

4    the unit?

5    A.    No, I do not.

6    Q.    Doctor, have you formed an opinion about the

7    relationship between segregated units and suicides?

8    A.    Yes, I have.  My opinion is that segregated units are

9    a high-risk factor for inmates at CDCR.

10    Q.    Doctor, did you review the most recent report of the

11    Special Master's suicide expert, Dr. Patterson, concerning

12    this issue?

13    A.    Dr. Patterson had reviewed suicides for the first half

14    of 2012, and systemwide there were 15 inmates that had

15    committed suicide.  Out of those 15, seven of them, seven of

16    the suicides occurred in segregated units, six in ad seg and

17    one in a SHU unit.

18        So that's about 45 percent of the suicides during that

19    period occurred in segregated housing.

20    Q.    Doctor, if you could look at the second document in

21    your binder, which is Exhibit 2049, which was previously

22    admitted, I believe, have you reviewed this document?

23    A.    Yes.

24    Q.    Doctor, what is significant about this document?

25    A.    This document was done in-house by a Dr. Canning, and

1    it reviewed suicides in the Department of Corrections over an

2    extended period of time.  It reviewed suicides from 2007

3    through 2012, so five, six-year period.

4        What the findings were is that during that timeframe,

5    45 percent of all suicides that occurred in the Department of

6    Corrections occurred in segregated housing units, 35 percent

7    occurred in the administrative seg units, and an additional

8    10 percent occurred in the PSU, SHU units and the condemned

9    units.

10    Q.    At the top of page 2, it says, (Reading:)

11                Since the beginning of 2007, 49 percent of

12                inmates who died by suicide had spent less than

13                29 days at ASU at the time of their death.

14        What is the significance for you of that statistic?

15    A.    There's a couple of things to think about in looking

16    at that statistic.

17        First of all, it appears the first 21 days are an

18    especially high-risk time for people in segregated units.

19    But if 49 percent committed suicide within the first 21 days,

20    that means 51 percent committed suicide in the remaining time

21    they were in the ad seg unit.

22        Although the first period is especially high risk,

23    there's no free pass.  They've got equal numbers of people

24    killing themselves, even if they had been in ad seg for

25    extended periods of time.

1    Q.    Is the 21-day period significant for CDCR policy?

2         MR. RUSSELL:  I need to object at this juncture.  This

3    document was produced, at least was dated February of 2013.

4    This is not a document that's ever been discussed in any of

5    Dr. Stewart's --

6         MR. NOLAN:  This is in Dr. Stewart's declaration.

7         THE COURT:  Sir, it requires you just restrain

8    yourself until the objection has been completed.

9         MR. RUSSELL:  This document, I do not believe, is

10   discussed in Dr. Stewart's March 2013 declaration that is the

11   basis for his testimony here today.

12        THE COURT:  Sir?

13        MR. NOLAN:  This is discussed on this exact point in

14   his declaration.  It may take me a minute to find it.

15   Paragraph 180 of page 63 of this declaration.

16        Do you want me to read the paragraph?

17        THE COURT:  No.  Give counsel a moment to read it.  If

18   it's correct, we'll apologize.

19        MR. RUSSELL:  It does mention this report.  What it

20   does is essentially point out the statistics that Dr. Stewart

21   has testified to just now, but that's the extent of the

22   declaration.

23        THE COURT:  You may sit down.

24        You may proceed.

25        MR. NOLAN:  Thank you, sir.

1    Q.        On that Exhibit 2049 on page 2 at the bottom, he says,

2    quote, (Reading:)

3                        Finally, data collected by suicide evaluators

4                        found that many inmates who housed in ASU at the

5                        time of their deaths are placed there not for

6                        disciplinary reasons, but for safety reasons.

7                        Although there are many complexities surrounding

8                        these situations, it is worth noting that

9                        placement in ASU of already fearful inmates may

10                       only serve to make them even more fearful and

11                       anxious, which may precipitate a state of panic,

12                       desperation and the urge to die.

13        Doctor, do you agree with the concerns expressed in

14   this paragraph?

15   A.        I certainly do.

16   Q.        Doctor, did you review suicides where this was an

17   issue?

18   A.        Yes.  One suicide in particular was, I believe, the

19   designation is number eight, Suicide Number 8, a person who

20   died on April 15th of this year at L.A. County.

21   Q.        How did you learn about this case?

22        MR. RUSSELL:  Your Honor, at this juncture I do need

23   to object.  Inmate 8 is definitely an inmate who is not

24   discussed in Dr. Stewart's earlier declaration.  It's new

25   testimony that we're going to find out here today if it's

```
 1   allowed.

 2   BY MR. NOLAN:

 3   Q.      Doctor --

 4           These are related to his existing, very clearly

 5   opinions.  We gave notice 20 days ago that he would talk

 6   about this suicide.

 7           THE COURT:  You may proceed, sir.

 8           You may sit, sir.

 9           MR. NOLAN:  Plaintiffs' 2126 is the suicide report for

10   Prisoner 8.  I would like to move this into evidence.

11           THE COURT:  Over objection, it is received.

12                             (Whereupon, Plaintiffs' Exhibit 2126

13                             was received into evidence.)

14   BY MR. NOLAN:

15   Q.      Doctor, is this the report you reviewed?

16   A.      Yes.

17   Q.      Did you also review individual records for Prisoner 8?

18   A.      Yes.

19           MR. NOLAN:  2127 is excerpts of reports from the

20   medical records produced by defendants for Suicide Prisoner

21   8.  I would also like to move to admit these into evidence.

22           THE COURT:  Received.

23                             (Whereupon, Plaintiffs' Exhibit 2127

24                             was received into evidence.)

25   /////
```

1    BY MR. NOLAN:

2    Q.    Are these the same records you reviewed in connection

3    with this suicide?

4    A.    Yes, they are.

5    Q.    Doctor, I believe you might have said when and where

6    this suicide took place.

7    A.    In Los Angeles County on April 15th of this year.

8    Q.    Could you tell me about this patient and why he was in

9    the particular unit.

10   A.    This inmate was in protective custody.  He was a CCCMS

11   inmate.  He was placed into the administrative segregation

12   unit in January of 13, January 2013.  Of note, he had had a

13   mental health crisis bed stay for suicidal ideation in

14   October of 2012.

15   Q.    Do you know -- do you have an understanding what

16   happens when a person needs protective custody?

17   A.    My understanding is that for any number of reasons,

18   it's not safe for them to be in a mainline unit, so they're

19   designated protective custody and placed -- unfortunately,

20   they're placed in ad seg units.

21   Q.    It's the same ad seg unit where people --

22   A.    Yes, that's what I meant.  They're placed in a

23   disciplinary punishment unit for needing protective custody.

24   Q.    Doctor, what else did you learn from these records in

25   the suicide report about this suicide?

1    A.      Well, that this individual started not participating

2    in yard or even showers.  He was noted to become increasingly

3    psychotic.  He was complaining that the voices were shouting

4    at him.  He was even seen with cotton stuck in his ears to

5    keep the voices out.

6         Staff noted he was very paranoid about taking

7    medication, so he was becoming increasingly psychotic during

8    this time on the ad seg unit.

9    Q.      If you look at the end of the suicide report on pages

10   16 and 17 of Exhibit 2126, the CDCR reviewer notes some

11   problems with this case.

12        Correct?

13   A.      Correct.

14   Q.      What were the problems?

15   A.      The problems, as noted in the suicide report, is that

16   the person came into the administrative segregation unit as a

17   CCCMS, was decompensating, and there was delay to transfer

18   him to a higher level of care, to an EOP level of care.  That

19   was one of the problems.

20        Another problem was problem with medication

21   compliance.  There was failure to refer back to the

22   psychiatrist the fact that this person was not taking his

23   medications.

24        Finally, there was noted there was some documentation

25   problems, especially in the SRE.

1    Q.      What does SRE stand for?

2    A.      Suicide risk evaluation.

3    Q.      So, Doctor, if you take a look at Exhibit 2127 at

4    pages 33 and 34, is that the relevant suicide risk

5    assessment?

6    A.      Yes.

7    Q.      Did you form an opinion about this suicide risk

8    assessment?

9    A.      Yes, I did, actually.  When they're looking at -- even

10   in the suicide risk assessment, there's a risk for chronic

11   risk factors for suicide and acute risk factors for suicide.

12   On this particular evaluation, it's a check.  So you check

13   "yes" or "no."

14           "No" was checked for current or recent psychotic

15   symptoms, which was not true.  He was psychotic.  It was

16   checked "no" for increasing isolation, which was also not

17   true.  It was checked "no" for single cell placement.  The

18   cells in ad seg are single cell placements.

19           It was checked "no" for negative staff interaction,

20   and this is a person who had become increasingly paranoid

21   thinking that the staff were going to kill him.  That was

22   also checked "no."

23           Finally, there's a desire to die, and they said "no,"

24   where clearly he had expressed overt suicidal ideations and

25   wishes to die.

```
 1              THE COURT:  But, Doctor, this comes back to what
 2    appears to me to be a problem, which is, you've got to
 3    distinguish between people who aren't doing their job, which
 4    this indicates was the case, from a system that fails because
 5    it's inadequate.
 6              From what I can see -- I can't see anything, but what
 7    would appear, there is a system in place which could have and
 8    should have identified the problem with this inmate patient,
 9    and somebody doing the job didn't do it well.
10              Is that a fair evaluation of this situation?
11              THE WITNESS:  I think on one level of evaluation, Your
12    Honor, you're absolutely right.  There is a, quote, system in
13    place that should supposedly do what it's supposed to do, but
14    as we're finding case after case, they're not able to do
15    that.
16              So it's either everyone in the Department of
17    Corrections is incompetent, which I don't believe, or that
18    the system itself makes it impossible for otherwise competent
19    well-meaning people to do their job.
20              THE COURT:  You've indicated a point which I had not
21    understood, which is your view is reviewing this case is
22    symptomatic of what you perceived in reviewing other suicide
23    reports.
24              Is that right?
25              THE WITNESS:  Other suicide reports, Your Honor, and
```

1    other just trying to do what the system calls for, not just

2    in suicide, but in other ways also.

3            THE COURT:  All right.  That can be, obviously -- I

4    didn't mean that.  That can be, on the one hand, failure to

5    train, on the other hand, people who are not really competent

6    to do the job, on the other hand, deliberate indifference.

7            Do you have any -- I don't know how you could identify

8    it, but would you be able to express what is, in your view,

9    likely to be the source of this problem?

10           THE WITNESS:  Yes, Your Honor.

11           Throughout the course of my evaluations, and I've been

12   involved in this for many years, as the court knows, I

13   initially thought that it was the fact that you have

14   incompetent people that are improperly supervised and

15   inadequate training.  That's where I stopped for a while

16   because I kept running into these same sort of things.

17           After awhile and meeting people and going to the tours

18   and talking to staff and -- God bless them.  Some of them are

19   trying their best -- I came away now from appreciating that

20   you cannot do mental health care in a segregated unit.  The

21   presence of mentally ill in the segregated unit prevents --

22   that's not said right.

23           No matter how good your system is, you can't do mental

24   health care in a segregated unit.  That's what I've come to

25   have a very firm opinion on now, Your Honor.

 1          THE COURT:  This goes back to what we started with

 2    when you first started testifying, which is the difficulty of

 3    running a mental institution in a prison.

 4          I assume there are still states, maybe I'm wrong,

 5    where there actually are hospitals rather than prisons that

 6    they put their mentally ill in.

 7          Are you familiar with any of those?

 8          THE WITNESS:  I'm familiar with New York State has a

 9    situation where mentally ill prisoners are sent to a

10    hospital.  In California, we send mentally ill prisoners to

11    hospitals, but not exclusively.

12          THE COURT:  Your view, as I understand it, is that you

13    can't do mental health in a segregated housing unit, but that

14    doesn't explain simply checking the wrong box on every

15    occasion.

16          THE WITNESS:  That doesn't completely explain it, Your

17    Honor, yes, absolutely.  But, again, if this were an isolated

18    example, one clinician at one facility, we would say, "We've

19    got to get that person, send them back to school, give them

20    better supervision," et cetera, et cetera.

21          But this is -- in all the hubs I visited, we're

22    running into problems like this.  Not exactly this problem,

23    but similar problems.  So that's why I feel very confident

24    expressing my opinion to the court about how mental health

25    can't be provided in segregated housing units.

```
 1              THE COURT:  I hear what you're saying, but I just
 2     don't understand it.  Perhaps further examination will
 3     clarify the problem.
 4     BY MR. NOLAN:
 5     Q.     Doctor, in this case are you aware whether this
 6     prisoner was coming out of his cell for treatment?
 7     A.     I'm aware he was not.
 8     Q.     Do you have any sense of what part of his treatment
 9     was done cell front?
10     A.     In reviewing the records, I believe I noted -- and I
11     don't have the exact time period, but it's not an extended
12     period of time, because he went into the ad seg in January
13     and killed himself in April.  I counted at least 16
14     cell-front visits.
15     Q.     Do you think that fact alone could be responsible for
16     some of the errors in this case?
17              MR. RUSSELL:  Objection.  Calls for speculation.
18              THE COURT:  This is his opinion that he's qualified to
19     express.
20              You may do so, sir.
21              THE WITNESS:  It speaks to what I was discussing with
22     the court that the setting itself doesn't allow for the
23     proper provision of mental health care.
24     BY MR. NOLAN:
25     Q.     You may have mentioned other problems, but were there
```

1    any other problems in your review of this case that you

2    noted?

3    A.    I mentioned about the delay in getting the person

4    designated to be an EOP.  The fact that he was displaying

5    overt signs of psychotic decompensation is something I saw

6    throughout my tours, and it shows an institutional tolerance

7    for mental illness, where in any other setting, a person who

8    is so psychotic, complaining, "The voices are shouting at

9    me," and they have to go to the extent of putting objects in

10   their ears to block out voices would be moved to a higher

11   level of care immediately, but yet he's allowed to be there.

12   Q.    Moving on to a different topic, Doctor, in the course

13   of your reviews, did you identify any problems with patients

14   discharged from DSH to segregation units?

15   A.    I encountered a variety of examples where people had

16   been treated in a DHS hospital and returned back to

17   administrative segregation units.

18   Q.    And was that a problem?

19         THE COURT:  The doctor says you can't get adequate

20   care.  Obviously, it's a problem.

21         Is there any problem beyond that problem?

22         THE WITNESS:  Well, yes, Your Honor.  Besides the fact

23   of the obvious that I don't feel you can do proper mental

24   health care in a segregated unit, it speaks to, you know, a

25   lack of an appreciation of -- you stabilize somebody in a

 1   hospital and why in the world would you send that person back

 2   to the place that very likely caused the need to be in the

 3   hospital in the first place?

 4          But, yet, it happens again and again.

 5   BY MR. NOLAN:

 6   Q.     Doctor, were there particular examples of this

 7   phenomenon that stand out in your mind?

 8   A.     Yes, a couple.  In Sacramento I had a chance to see a

 9   person, a patient referred to as SS.  Briefly, he had been in

10   the Salinas Valley Psychiatric Inpatient Program, the DHS

11   program, for about four or five months in 2012.

12          He was then returned from the DHS in Salinas Valley to

13   the Psychiatric Services Unit in Sac and was there from

14   December until February of 2013.  He needed to go to the MHCB

15   in February, where he was referred back to THE Salinas Valley

16   DSH unit.

17   Q.     Doctor, can you explain what the Psychiatric Services

18   Unit is?

19   A.     Psychiatric Services Unit, my understanding, is a unit

20   where mentally ill patients, people in the mental health case

21   load go to serve the SHU term.

22   Q.     Is it just EOPs or EOPs and CCCMS?

23   A.     My understanding is just people on the mental health

24   case load, but that includes both categories.

25   Q.     Doctor, did you review more recent records for

```
1    Prisoner SS?

2    A.      Yes.

3            MR. NOLAN:  Exhibit 2140 is excerpts from the health

4    and custody records of Stewart, Prisoner SS.

5            I would like to move this exhibit into evidence.

6            THE COURT:  Received.

7                            (Whereupon, Plaintiffs' Exhibit 2140

8                             was received into evidence.)

9    BY MR. NOLAN:

10   Q.      Doctor, are these some of the records you reviewed for

11   Prisoner SS?

12   A.      Yes.  I think I got ahead of myself.  In review of

13   these records, I saw he had been referred back to Salinas

14   Valley Inpatient Program.  He was admitted in May of this

15   year.

16           THE COURT:  Doctor, there's a psychiatric problem.

17   There's a prison problem.  People don't go to the SHU unless

18   they've committed some serious violation of the rules and

19   regulations of the prison.

20           If you have a mentally ill prisoner who has committed

21   a serious violation, what do you do?  You can't -- from your

22   testimony, you can't put him in the SHU because you're going

23   to drive him even crazier, but what do you do?

24           What does the institution have as a vehicle to say you

25   can't do whatever kind of conduct it was?
```

 1         THE WITNESS:  Your Honor, I think as was demonstrated

 2    by the testimony earlier about Prisoner V, we had a person

 3    who committed a significant rule violation because of an

 4    inadequately treated mental illness and then got a SHU term

 5    because of that.

 6         So, yes, people go to the SHU for doing serious crimes

 7    or violations in the prison system, but how many of those

 8    people had committed those offenses due to improperly treated

 9    mental illness?

10         Then we have people that were improperly treated

11    mentally ill who then had rule violations and then are sent

12    to a place where, as the court mentioned, they're going to

13    get worse, they're going to get crazier.  It doesn't make any

14    sense.

15         To answer your question, sir, to have an appropriate

16    level of mental health intervention outside the segregated

17    units that would --

18         THE COURT:  There are people who commit violations who

19    aren't mentally ill and aren't caused by it.  We have to

20    recognize that that occurs.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Is it your testimony you don't believe

23    that anybody who is mentally ill who has committed a rules

24    violation falls within that other category?

25         THE WITNESS:  I did not say that, Your Honor.  I would

 1    say that I'm not aware of to what extent the people from the

 2    mental health case load have committed rule violations that

 3    weren't directly involved with the poor mental health care.

 4         Now, I'm not so naive as to not admit that there are

 5    people who are on the mental health load and are capable of

 6    doing rule violations that has nothing do with their mental

 7    illness.

 8         THE COURT:  But you're advocating, at minimum, a very

 9    careful discrimination between the two, if it's possible?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  You may proceed, counsel.

12    BY MR. NOLAN:

13    Q.    Doctor, did you also review any suicide reports where

14    this issue of cycling back and forth between DHS and

15    segregation units was an issue?

16    A.    It was another one besides the inmate we just

17    discussed.  It was -- again, this is at RJ Donovan.

18    Q.    I was asking you about suicide reports.  We're going

19    to skip over that one.

20    A.    Oh, yes.

21    Q.    So were there such suicide reports where this cycling

22    between DHS and segregation was an issue?

23    A.    Yes.  I'm referring to Prisoner H.

24         MR. NOLAN:  Plaintiffs' Exhibit 2121 is excerpts

25    from -- is the suicide report prepared by the CDCR's internal

 1   suicide reviewer for Prisoner H.

 2           I'd like to move this document into evidence.

 3           THE COURT:  Received.

 4                           (Whereupon, Plaintiffs' Exhibit 2121

 5                           was received into evidence.)

 6   BY MR. NOLAN:

 7   Q.     Did you review this report?

 8   A.     Yes, I did.

 9   Q.     Did you also review Prisoner H's medical records?

10   A.     I did.

11           MR. NOLAN:  Plaintiffs' Exhibit 2122 is excerpts from

12   medical records for Stewart Prisoner H.

13           I'd like to move them into evidence.

14           THE COURT:  Received.

15                           (Whereupon, Plaintiffs' Exhibit 2122

16                           was received into evidence.)

17   BY MR. NOLAN:

18   Q.     Doctor, what were your concerns about the suicide of

19   Prisoner H?

20   A.     Well, we first heard about this gentleman because he

21   killed himself at Salinas Valley State Prison a couple of

22   days prior to my tour of Salinas Valley.  He had evidently

23   had been in administrative segregation unit for around

24   18 months, and this was over the years 2009, 2010.  He was

25   initially placed in ad seg for protective custody.

```
 1              While he was in the ad seg unit, he developed major
 2    depressive disorder to the extent where he was transferred to
 3    the DHS program at Salinas Valley.  He basically spent the
 4    year of 2011 in Salinas Valley Psychiatric Program.
 5              At the beginning of 2012 he was transferred to
 6    Atascadero State Hospital where he went the year of 2012 at
 7    Atascadero State Hospital.  While Atascadero, he was being
 8    treated with a variety of psychotropic medications, including
 9    antipsychotics and antidepressant medication.
10              From Atascadero State Hospital, he was returned from
11    the administrative segregation unit at Salinas Valley on
12    January 16th and he killed himself on January 24th.
13    Q.      So after two years in an inpatient hospital, he went
14    back to the segregation unit?
15    A.      Yes.
16    Q.      Did the suicide report identify particular problems
17    with this case?
18    A.      There was one thing that I found very curious that the
19    suicide report mentioned.  There is a form in the medical
20    report called the MAR, which stands for Medication
21    Administration Report.  It's exactly what the name implies.
22    It's a record of what medications a person is getting, when
23    they're getting them, who administers to them, et cetera,
24    et cetera.
25              So it's a record of a person taking medications.  That
```

1    form or that portion of the medical record was somehow

2    missing from the record, which I just find curious.  There's

3    no ability of any reviewers to determine whether or not this

4    person's medication that he was taking at Atascadero had been

5    continued on the ad seg unit, Salinas Valley.

6        The suicide report also noted on what they call the

7    bus screen, which is when the person is first seen when they

8    come off the bus, that he was talking about -- the inmate was

9    complaining of hearing voices telling him to harm himself.

10        The last criticism in the suicide report was of the

11    suicide risk evaluation that occurred that found that the

12    inmate had no safety concerns.  Remember, he was first put in

13    ad seg for protective custody and that he was not psychotic

14    at all.

15        THE COURT:  We'll take our afternoon recess.

16    15 minutes.

17                    (Whereupon, a break was taken at

18                    2:43 p.m.)

19                    (Nothing Omitted.)

20

21

22

23

24

25

1                           CERTIFICATION

2

3       I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                             /s/ MICHELLE L. BABBITT
                              MICHELLE L. BABBITT CSR #6357
10                            Official Court Reporter
                              United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2825

1          (On the record at 3:05 p.m.)

2          THE CLERK:  Please, remain seated and come to order.

3     Court is now back in session.

4          THE COURT:  Mr. Nolan.

5          MR. NOLAN:  Thank you, Your Honor.

6 BY MR. NOLAN:

7 Q.     Dr. Stewart, I believe that you have a correction

8 that you wanted to make regarding your testimony before the

9 break?

10 A.     Yes.  I was confused about the PSU and who can go to

11 that.  I understand that's EOP only.  I was confused because

12 there are some other rules in the system about CCCMS can go

13 to certain SHU units and are excluded from others.  That was

14 my error.

15 Q.     Thank you.

16        Doctor, before the break there was some discussion

17 between you and the judge about whether -- about remedies in

18 this case, and I wanted to ask you about -- for the problems

19 we've been discussing.

20        Do you have an opinion whether mentally ill

21 individuals should be excluded from segregation units?

22 A.     I do.  I feel they should be excluded from the

23 segregation units.

24 Q.     And why is that?

25 A.     Because of all the information we have, suicides

2826

especially, where 35 percent of the suicides in the entire
system are occurring in a relatively small population, as
well as we know that people get worse -- their mental illness
gets worse when they are there.  For that and other reasons I
would say that we know that these units are toxic for the
mentally ill.

So the court was asking me what about people who
commit crimes in prison.  I'm not saying to not discipline
them, but discipline them in places where we know it isn't
going to make their mental illness worse while disciplining
them.

There is any number of remedies -- I mean
discipline -- that could be administered; loss of time, sent
to a higher segregated -- a higher custody prison.  You know,
all these different sorts of things.  It could be done.  But
don't house them in a place that we know is toxic for them.

Q.    Would removing privileges be another discipline --
form of discipline?

A.    There is any number of things that can be done such
as removing privileges in a clinically sensitive manner that
can be effective.  So I'm not saying that people shouldn't be
disciplined for bad behavior that isn't due to mental
illness.

Q.    Thank you, sir.

Doctor, moving on to another topic, did you form an

2827

1    opinion about the adequacy of the CDCR welfare checks in the

2    units you visited -- the segregation units you visited?

3    A.      Yes.

4    Q.      What is your opinion?

5    A.      Well, the welfare checks -- during the course of

6    my tours I learned that the welfare checks were supposed to

7    be done randomly, with no greater time between them than a

8    half hour, but they were often done on a very predictable

9    schedule.

10          They were done five minutes after the hour, and then

11    they repeated again 35 minutes after the hour.  And that was

12    not the purpose of these.  That's not how it was designed to

13    happen.

14    Q.      Did you have any problem with the -- I understood you

15    to testify earlier that the welfare checks were limited to 21

16    days?

17    A.      Yes.  And the fact that they're limited to 21 days is

18    a problem.  We had discussed about the suicide report -- the

19    in-house suicide report looked at, you know, approximately

20    half the suicides occurred the first 21 days, which meant the

21    other half were occurring after 21 days.

22          So if you look at this from a clinical standpoint,

23    there is no safe time for people in the Ad. Seg. as far as

24    suicide goes.

25    Q.      Were there particular suicides you've reviewed where

2828

1  these issues were concerned?

2  A.      There was one suicide I reviewed where the welfare

3  checks were an issue, and those were patients P, Q and R.

4  Q.      So there were three of them?

5  A.      There were three of them from my termination report.

6  Q.      Was there one of those in particular that stands out

7  to you?

8  A.      There was one in particular that spoke to this issue

9  of welfare checks within 21 days because -- it was Patient R

10 that committed suicide on the 22nd day.

11         MR. NOLAN:  Plaintiffs' Exhibit 2132 is the suicide

12 report for Prisoner R, also listed as Suicide Prisoner 27.

13         I would like to move the report into evidence.

14         THE COURT:  3132.

15         MR. NOLAN:  2132.

16         THE COURT:  Received.

17             (Whereupon, Plaintiffs' Exhibit 2132 received

18              into evidence.)

19 BY MR. NOLAN:

20 Q.      Doctor, have you reviewed this report?

21 A.      Yes, I have.

22 Q.      Doctor, what does this report conclude?

23 A.      This suicide report talked about the suicide being a

24 very well planned-out effort on the part of the person who

25 killed themselves, and they were waiting for the 21 day

2829

1   period to end.

2   Q.      Doctor, do you agree with the CDCR policy of limiting

3   welfare checks to the first 21 days of a prisoner's stay in

4   segregation?

5   A.      No, I do not agree with that policy.

6   Q.      Are there any national standards concerning this

7   issue that you're aware of?

8   A.      Well, there's a national standard, the NCA standard,

9   National Correctional Association, that talks about welfare

10  checks in segregated units occurring the whole time that

11  someone is there.

12  Q.      Doctor, if you could look at Exhibit 2134, this is a

13  section from the American Correctional Association's

14  Standards for Correctional Institutions, 4th Edition.

15  A.      American Correctional Association.

16          MR. NOLAN:  I would like to move this into evidence.

17          THE COURT:  Received.

18              (Whereupon, Plaintiffs' Exhibit 2134 received

19               into evidence.)

20  BY MR. NOLAN:

21  Q.      Under the -- Doctor, under the Supervision heading on

22  page 71, the first section there is Standard 4-4257?

23  A.      Yes.

24  Q.      Is that the standard to which you're referring?

25  A.      Yes.

2830

1   Q.      So that standard reads, quote:

2           (Reading:)

3           Written policy, procedure and practice require that

4           all special management inmates are personally

5           observed by a correctional officer at least every 30

6           minutes on an irregular schedule.  Inmates who are

7           violent or mentally disordered or who demonstrate

8           unusual or bizarre behavior receive more frequent

9           observation.  Suicidal inmates are under continuing

10          observation.

11          (Reading concluded.)

12          Doctor, what would this standard require for EOP

13  inmates in administrative segregation units?

14  A.      It would require that EOP inmates would be -- would

15  have a welfare check more frequently than every 30 minutes.

16  Q.      Is there any time limitation in the standard?

17  A.      Yes.  There wouldn't be a 21 day time limit on it.

18  It would be the whole time they're in the segregated unit.

19  Q.      Doctor, is there a suicide that you reviewed which

20  illustrates the importance of this issue?

21  A.      Yes.

22  Q.      A more recent one?

23  A.      Prisoner 5.

24          MR. NOLAN:  So Plaintiffs' Exhibit 2124 is the

25  suicide report for Prisoner 5, and I would like to move this

2831

1   report into evidence.

2          MR. RUSSELL:  Again, Your Honor, defendants object.

3   This is a report and records for which we have no expert

4   disclosure report, declaration or anything.

5          MR. NOLAN:  Your Honor, the specific opinions about

6   inadequate welfare checks were in Dr. Stewart's termination

7   report, paragraphs 241 to 254.

8          At paragraph 252 he said, quote:

9          (Reading:)

10         In my opinion it would greatly enhance the safety of

11         prisoners in these units to conduct these wellness

12         checks at least every half hour for the duration of

13         every prisoner's stay in administrative segregation.

14         (Reading concluded.)

15         It also relates to the issue of inadequate safety

16   cells in the segregation units which was discussed in

17   paragraphs 255 to 262 of his report.

18         THE COURT:  The objection is not that the topic

19   wasn't addressed, but that this particular piece of evidence

20   contained in 2124 has not been revealed to the defendants so

21   that they could prepare -- I take it that's what you are

22   saying -- prepare for cross-examination.

23         MR. RUSSELL:  That's correct, Your Honor.  This is --

24   yes.

25         THE COURT:  Objection sustained.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2832

1          MR. NOLAN:  We did give them notice of the intent of

2   Dr. Stewart to testify about this 20 days ago.  We also wrote

3   a letter ten days ago that discussed the way that this

4   suicide -- I have copies with me -- that this particular

5   suicide relates to a bunch of different opinions already

6   expressed.  It is a new example.

7          THE COURT:  The objection is sustained.

8          You may proceed.

9          I'm assuming -- before -- I'm assuming this report

10  was not created so recently that you couldn't have given

11  adequate notice at the time?

12         What's the date of the report?

13         MR. NOLAN:  This report is dated August 9th, 2013.

14         THE COURT:  The objection is sustained.

15         You may proceed.

16         MR. RUSSELL:  Your Honor, in that regard I would

17  renew the objection with regard to the exhibits --

18         THE COURT:  The objection is sustained.

19         You may proceed.

20         I mean the original determination by the court is not

21  reconsidered.

22         You may proceed, Mr. Nolan.

23  BY MR. NOLAN:

24  Q.     Doctor, on your tours did you also observe problems

25  with the adequacy of the number of suicide-proof intake

2833

1  cells?

2  A.      Yes.

3  Q.      Do you know what CDCR policy is with respect to those

4  cells?

5  A.      That when a person first arrives on the Ad. Seg.

6  Unit, they're placed into an intake cell.

7  Q.      Doctor, did you count the number of intake status

8  prisoners in cells in any of the ASU units you visited?

9  A.      During my tour of the R.J. Donovan facility, in the

10  Ad. Seg. units they have little sheets of paper that are pink

11  that say "Intake" on them.  And they're taped up on cells.

12  And I just kind of went around both units that I went on and

13  counted them.

14          And in the EOP Hub and the Ad. Seg. Unit, where CCCMS

15  were housed with along with GP inmates, there were a total of

16  72 of those pink sheets on cells.  There were 72 people on

17  intake status.  And I was informed that there were only 16

18  intake cells, all of which were located in the EOP Hub.

19  Q.      Doctor, did you ask staff in other segregation units

20  you visited about the adequacy of the number of suicide-proof

21  intake cells?

22  A.      You know, at Salinas Valley I also asked staff.  And

23  they informed me there weren't enough intake cells for all

24  the people on intake status.

25  Q.      So Doctor, I'm going to move on to discuss the PSU.

2834

1    Doctor, I believe you already discussed the case of

2  someone who didn't do well in the PSU Unit at CSP Sacramento

3  and had to be moved to a DSH Unit, correct?

4  A.    Yes.   That was Prisoner SS.

5  Q.    Were there others who you interviewed on your tours?

6  A.    There was another gentleman in the PSU, Prisoner W.

7  Prisoner W had been in Ad. Seg. since June of 2012.

8  Q.    At what prison?

9  A.    He had been in the Ad. Seg. at Salinas Valley since

10  June 2012.  I saw him on my tours in January 2013.  This is

11  in the PSU.  And I noted him to be --

12  Q.    You saw him in the PSU or Salinas Valley?

13  A.    Excuse me.  That he had been in -- it was at Salinas

14  Valley.  I apologize.

15    And when I evaluated him, he was hostile, psychotic,

16  refusing meds.  He was in pretty bad shape.

17  Q.    Do you know where he had been before coming to the

18  Ad. Seg. Unit?

19  A.    I'm drawing a blank.  I believe he was in the PSU for

20  refusing a cellmate.

21    So Doctor, Exhibit 2142 --

22  A.    Yes.

23  Q.    -- is excerpts from Prisoner W's medical records.

24    MR. NOLAN:  I would like to move those into evidence.

25    THE COURT:  Received.

2835

1            (Whereupon, Plaintiffs' Exhibit 2142 received

2             into evidence.)

3    BY MR. NOLAN:

4    Q.     Doctor, are these some of the records you reviewed?

5    A.     Yes.  I apologize.  I saw him in the Ad. Seg. Unit at

6    Salinas Valley.  Then I subsequently reviewed records.  I

7    learned about what happened to him after the Ad. Seg. Unit at

8    Salinas Valley.

9    Q.     So he went to the Ad. Seg. Unit -- he went to the PSU

10   after you saw him?

11   A.     Yes.

12   Q.     So Doctor, could you briefly remind us what the PSU

13   is?

14   A.     It's the Psychiatric Services Unit where EOP inmates

15   are sent to serve a SHU term.

16   Q.     And so Prisoner W would have gone to the PSU because

17   he was EOP and he received a SHU term, correct?

18   A.     Correct.  I believe his offense was refusing to have

19   a cellmate.

20   Q.     Doctor, were there any suicides you reviewed which

21   raised concerns about mentally ill prisoners in the PSU?

22   A.     Yes.  It was Prisoner 10.

23          THE COURT:  Prisoner?

24          THE WITNESS:  Number 10.

25   ///

2836

```
 1   BY MR. NOLAN:

 2   Q.      And what did you conclude about his case?

 3           MR. RUSSELL:  Your Honor, again, Prisoner 10 is an

 4   inmate where we have no report or no declaration subsequent

 5   to the doctor's report of March 2013, similar to the inmate

 6   we discussed earlier.

 7           MR. NOLAN:  Again, this relates to -- we gave notice

 8   20 days ago of the intent to discuss this.  It is their

 9   documents that they've been long aware of.

10           THE COURT:  Objection is sustained.

11           You may proceed.

12   BY MR. NOLAN:

13   Q.      Doctor, in the course of your preparation for your

14   testimony, have you learned about efforts by defendants to

15   provide patients in PSU units with a way to get out of those

16   units?

17   A.      I'm aware that there's now a step program in place in

18   the PSU.

19           MR. NOLAN:  Plaintiffs' Exhibit 2496 is a document

20   produced by defendants entitled CSP Sac Psychiatric Services

21   Handbook.

22           I would like to move this document into evidence.

23           THE COURT:  Received.

24                  (Whereupon, Plaintiffs' Exhibit 2496 received

25                   into evidence.)
```

2837

BY MR. NOLAN:

Q.      Doctor, is 2496, is this the document that you
reviewed?

A.      Yes, it is.

Q.      Doctor, what did you conclude about the step program
described in this document?

A.      It's confusing to me.  You have mentally ill people,
and you ask them to do these very difficult tasks in a place
where we know they don't do well.

        And then, even if they're able to, I believe, get to
Step 4, you have to have a year of no rule violations, you
are taking your meds and attending a certain percentage of
groups.  And then even if you're able to do that, which in
the people that I evaluated who are in PSU I would doubt
their ability to do that due to their mental illness, but
even if you're able to do that theoretically, then it is up
to the discretion of the warden whether or not your SHU term
is going to be altered.

        So even going through the whole step process, it is
not a guarantee that it is going to have any positive effect
for you.

Q.      Doctor, when you visited CSP Sacramento, did you
speak with prisoners in the PSU?

A.      Yes.

Q.      Did you form an opinion about the conditions in that

2838

1   unit?

2   A.      They're consistent with the opinions that I've --

3   yes, I did form opinions.  They're consistent with the

4   opinions that I've expressed already about how I don't

5   believe that mentally ill should be placed in these

6   segregated units because of just the fact that the unit

7   themselves is so toxic.

8   Q.      Doctor, do you have any overall concluding thoughts

9   about these issues?

10  A.      I do.  In thinking about the tours I was really

11  struck, and I was thinking what I wanted to make sure the

12  court understood was how sick the people were that I saw in

13  the EOP Hubs, as well as the PSU.

14          These are not pedestrian-level guys.  These are very

15  ill individuals suffering from psychotic disorders and

16  suffering from severe mood disorders.

17          As I discussed earlier with the court, it is -- I

18  have arrived at the opinion that due to the toxic nature of

19  these settings, and toxic both to the patient and I believe

20  to the staff, that mentally ill people should be excluded

21  from these units.

22          Because in all the units that I went to, mental

23  health care wasn't able to be provided in the way it at least

24  even accorded to the standards set by the department.  They

25  weren't able to meet their own standards.  And I've come to

2839

1  understand that's because of the toxic nature of these

2  settings themselves.

3        So it remains my opinion that I believe mentally ill

4  should be excluded from these units.

5        MR. NOLAN:  Your Honor, can I have a minute to

6  consult with my cocounsel?

7        (Cocounsel confer.)

8  BY MR. NOLAN:

9  Q.    So Doctor, do you also think that mentally ill people

10  should be excluded from regular segregation units and from

11  the SHU in addition to PSU?

12        THE COURT:  I think the doctor said all segregated

13  units, correct?

14        THE WITNESS:  Yes, Your Honor.

15        MR. NOLAN:  I just wanted to make sure that was

16  clear.

17        Thank you, sir.  No further questions.

18                    CROSS-EXAMINATION

19  BY MR. RUSSELL:

20  Q.    Good afternoon, Doctor.

21  A.    Good afternoon.

22  Q.    We've met before.  My name is Jay Russell.

23  A.    Yes.  How do you do, sir?

24  Q.    Doctor, you just got done testifying that you don't

25  believe that inmates -- inmates in the Mental Health Services

2840

1    Delivery System should be in any segregated unit.

2         Do I understand that correctly?

3    A.     Correct.

4    Q.     That's a new opinion for you; is that correct?

5    A.     Well, it's an opinion that has been evolving over

6    time.  And it was confirmed by the tours of the particular

7    segregated housing units and in reviewing the records that I

8    already testified about.

9    Q.     Your deposition was taken after you conducted those

10   tours, correct?

11   A.     Correct.

12   Q.     And you were asked that question at your deposition.

13        Do you recall that?

14   A.     I don't recall that, but I'm not surprised if I was.

15        MR. RUSSELL:  Okay.  Excuse me, Miss Clerk.  We would

16   like to open up a transcript here.  It is the transcript of

17   Dr. Stewart.

18        THE COURT:  Page and line, counsel?

19        MR. RUSSELL:  Your Honor, we'll be referring to page

20   213, lines 2 through 11.

21        THE COURT:  All right.

22        You may proceed.

23        MR. RUSSELL:  Your Honor, may I read this into the

24   record?

25        THE COURT:  You may.

2841

1        MR. RUSSELL:  At page 213 of the deposition you were

2    asked on line 2:

3        (Reading:)

4        QUESTION:  Okay.  Is it your opinion that mentally

5        ill inmates shouldn't be housed in administrative

6        segregation at all?

7        ANSWER:  I believe that a system can be put in place

8        where they could be safely housed for short periods

9        of time.

10       QUESTION:  In lieu of administrative segregation?

11       ANSWER:  No.  In administrative segregation.

12       (Reading concluded.)

13   BY MR. RUSSELL:

14   Q.     From what I understand, that opinion has now changed;

15   is that correct, Dr. Stewart?

16   A.     You know, as you overheard in my discussions with the

17   court, it is an evolving opinion.  And it is different than

18   it was on that day, yes, absolutely.

19   Q.     But you haven't written a further report

20   substantiating that opinion, have you?

21   A.     I have not.  I have testified to that fact all day

22   today.

23   Q.     When you did these tours, apart from the tour at

24   Los Angeles County, Lancaster, each of these tours took a

25   single day, correct?

2842

1    A.    Correct.

2    Q.    And at Lancaster the tour took place over two days.

3    Those weren't full days, though, were they?

4    A.    They were like two three-quarter days.

5    Q.    Okay.  And part of what you did for those tours was

6    to meet with inmates, correct?

7    A.    Correct.

8    Q.    And you discussed the inmates that you met with in

9    your March 2013 declaration, right?

10   A.    Yes.

11   Q.    And none of the meetings with those inmates lasted

12   more than 30 minutes, did they?

13   A.    Probably not.

14   Q.    In fact, most of them were more like about ten or 15

15   minutes, correct?

16   A.    A little more than that.  Probably 15 to 20 minutes,

17   in that range, yes.

18   Q.    So in doing these inspections you also were looking

19   at issues related to use of force, correct?  You have been

20   here and testifying about that?

21   A.    I wasn't doing a use of force evaluation.  I have

22   testified to that because it happened to be -- the use of

23   force incident in question happened to be done on someone who

24   I had evaluated during my EOP tours at San Quentin.

25   Q.    But you did come here and testify about use of force,

2843

1    correct?

2    A.      In the basis that I had evaluated this person during

3    my EOP tours, yes.

4    Q.      And you were also reviewing elements of suicide

5    prevention on these tours, correct?

6    A.      Yes.

7    Q.      And the treatment of inmates in segregation units,

8    correct?

9    A.      Yes.

10   Q.      And the status of mental health treatment generally

11   at these prisons; is that correct?

12   A.      No.  Not the status of mental health in general

13   because I wasn't doing a general tour of the entire facility.

14   I was -- I had focused on the EOP units.

15   Q.      You did go into some of the other units, correct?

16           For example, at Lancaster you toured what's called

17   the main line administrative segregation unit; isn't that

18   correct?

19   A.      I believe so, yes.

20   Q.      And the opinions that you expressed and the

21   continuation of those opinions were all formed as a result of

22   everything you were doing during those one-day tours,

23   correct?

24   A.      Based on the accumulated data that I got from going

25   to five different places where, except for Los Angeles, I was

2844

1    there for one day, yes.

2    Q.       You also reviewed records that were provided to you

3    by the plaintiffs' counsel; is that correct?

4    A.       I reviewed records during my tours, and I reviewed

5    records that I had requested plaintiffs' counsel to get for

6    me.  Health records.

7    Q.       Did you ask to see anything apart from what was --

8    what you either saw at the facilities or was provided to you

9    by plaintiffs' counsel?

10   A.       Did I ask for anything else?

11   Q.       Yes.

12   A.       I don't believe so.

13   Q.       The records that you reviewed show that inmates

14   receive more mental health treatment in administrative

15   segregation hubs, at least -- well, the EOP inmates receive

16   more treatment in the administrative segregation hubs than

17   they do than in the general population; isn't that correct?

18   A.       You're going to have to show me that or demonstrate

19   that to me because I don't know that necessarily for a fact

20   right now.

21   Q.       You don't know one way or the other?

22   A.       Well, I don't -- when you say people in the GP, I'm

23   assuming EOP units?

24   Q.       Yes.

25   A.       Receive more care or less care than people in the Ad.

2845

1    Seg. units?

2    Q.      Correct.

3    A.      Again, I would have to be shown those numbers to

4    verify the veracity of that statement.  But also it doesn't

5    change the fact that the people in the Ad. Segs., which is a

6    much more toxic environment than GP, weren't getting the

7    minimum.

8            So, you know, there's problem with GP EOPs too, but

9    we're talking about the Ad. Seg.  That doesn't change

10   anything about how poor the care was in Ad. Seg.

11   Q.      When you talk about the amount of care that's being

12   received, I think you referred to the Program Guides.

13           The Program Guides talk about the amount of care

14   that's being offered; isn't that correct?

15   A.      I believe that's the term they use is "offered."

16   Q.      And the records that we've reviewed here today show

17   that, at least at the EOP Hubs, that the treatment that's

18   being offered comports with what is required under the

19   Program Guides; isn't that correct?

20   A.      As far as the strict letter of that, yes, they are

21   offering the minimum.  In some cases, more than the minimum.

22   But people weren't receiving that.

23   Q.      Right.  And you were speculating that, for example,

24   at Sacramento people were not showing up at the group

25   sessions because of, I think you said, the quality of the

2846

1   care; is that correct?

2   A.      Well, I said there was a lot of reasons.  I wasn't

3   speculating.  I formed, I believe, you know, an opinion on

4   why they weren't, that there was such a low rate of

5   attendance, especially at Sacramento.

6   Q.      What groups were being offered on the day that you

7   were at Sacramento?

8   A.      I can't -- you mean the name of the groups or

9   whatever?

10          I couldn't tell you that.

11  Q.      The therapy being provided?

12  A.      I can't tell you that.

13  Q.      Do you know what kinds of group therapy is provided

14  at Sacramento?

15  A.      There is a variety of groups, but I couldn't tell you

16  on the day I was there what particular groups were being

17  offered.

18          I know I sat within a group of people in the area

19  that they referred to as the "Taj Mahal," which is the unit

20  where people have to be taken from the hubs to receive any

21  kind of care.  So I don't know, to answer your question.

22  Q.      So you don't know the subject of the groups being

23  offered there?

24  A.      I don't remember that day, no.

25  Q.      Generally, do you remember the subject of the groups

2847

1    that are being offered?

2    A.      I know in speaking with staff that, you know, they

3    gave me the sort of standards, anger management, different

4    sort of substance abuse related things.  And I know in one GP

5    EOP unit, a group at Salinas Valley, one of the clinician's

6    was reading a book with the people in the group.  But then at

7    the same time I saw multiple examples of people being shown

8    videos, being shown reruns of movies, reruns of TV shows.

9    Q.      You've never offered specific suggestions as to how

10   to improve the treatment that is being offered in the Ad.

11   Seg. units, have you?

12   A.      I don't remember if I have been asked that specific

13   question.

14           THE COURT:  Well, to follow up on that, given your

15   view that the Ad. Seg. situation is, in your words "toxic,"

16   would any improvement in the services being offered make a

17   substantial difference?

18           THE WITNESS:  At this point, Your Honor, my opinion

19   is no.  At the time of my deposition, yes, I felt that with a

20   more robust program, with people, you know -- regardless of

21   what they say about offered and that it meets the standard,

22   the people weren't attending.  That's where the rubber hits

23   the road on all that stuff.

24           It was my opinion, at that time, that if there was a

25   more robust program, that it could possibly be done in

2848

1  Ad. Seg.

2          In preparing for the testimony today, in reviewing

3  the documents I have gone over, my own review, I've come to

4  the opinion I don't believe it can be.

5  BY MR. RUSSELL:

6  Q.      You have never been asked to develop any kind of a

7  treatment protocol for a mental health program in a prison,

8  have you?

9  A.      Not a prison.  Oh, excuse me.  Yes, I have.

10         I was especially asked by New Mexico Department of

11  Corrections to design a program for high-security, mentally

12  ill inmates in a SHU-type setting.  I have.

13  Q.      But you did not work in the new Mexico prison system,

14  did you?

15  A.      Well, I worked with them for a number of years.

16  Q.      But were you an employee of the New Mexico --

17  A.      I was being paid by the New Mexico Department of

18  Corrections to develop a system and ensure its

19  implementation.

20  Q.      You have never worked inside a prison as a

21  psychiatrist -- excuse me -- as a psychologist?

22  A.      Psychiatrist.

23  Q.      I apologize.  Psychiatrist.

24         Sorry.

25  A.      Well, you know, I don't want to mince words with you

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2849

1    here, but I worked for ten years under the supervision of

2    this court in the Gates Case.  And I was employed by -- I was

3    being paid by Vacaville CMF coming in as a consultant and

4    monitor.  I consider that that's working within a prison

5    system.

6    Q.    You are aware of the new nondisciplinary

7    administrative segregation program, correct?

8    A.    No.

9    Q.    And you have not reviewed any -- Well, never mind.

10         You've testified about inmates being placed in

11   administrative segregation for nondisciplinary reasons,

12   correct?

13   A.    Correct.

14   Q.    And generally those inmates are being placed there

15   for safety reasons, correct?

16   A.    Well, I understand that there are people there for

17   protective custody and also people that are, as is

18   demonstrated in some of those pictures, for alternate

19   placement, for suicidal -- for being suicidal.  They're also

20   placed in Ad. Seg.

21   Q.    These are the cells we saw the pictures of, correct?

22   A.    Correct.

23   Q.    And is it your understanding that inmates stay --

24   they're actually housed for lengths of periods of time in

25   those cells?

2850

1  A.      Not for extended periods of time, but they're

2  there for periods of time, periods of days, weeks possibly.

3  Q.      They're there -- Okay.

4          Is it your testimony that inmates with mental health

5  concerns should not be placed into protective custody?

6  A.      No.  That's not my testimony at all.  I believe that

7  people -- if people need protective custody, whether mentally

8  ill or not, they should receive protective custody, but just

9  not in a disciplinary unit where their mental illness is

10 going to get worse.

11 Q.      Isn't it true that to maintain the safety of inmates,

12 in many instances it is necessary to keep them away from

13 other inmates in the system?

14 A.      I couldn't agree with you more.  But why do you got

15 to put them in a disciplinary unit?

16         I mean, you're telling me the California Department

17 of Corrections can't ensure a number of inmates' safety that

18 doesn't require them being placed in a lockdown, segregated

19 unit?

20         Then we got to start from scratch, if that's the

21 case.

22 Q.      And like I said, you're not aware of the

23 nondisciplinary segregation program?

24 A.      I'm not aware of that.

25 Q.      Okay.  And if you did not -- if didn't maintain the

2851

1    safety of inmates, if you didn't, for example, in some

2    instances remove them from the population and segregate them,

3    if you weren't providing for their safety in that regard,

4    that would truly be a constitutional violation; would it not?

5    A.    I would think.  But as I just said earlier, why do

6    you need to segregate them, as you say, in a segregated unit

7    like Ad. Seg.?  I mean, there is a reason the inmates refer

8    to it as "the hole."

9    Q.    During your testimony you were shown a series of

10   photographs.  I think the first of those photographs related

11   to Los Angeles County, Lancaster, where we saw photographs

12   from up above on the tier and then on the ground floor.

13         I believe those start at Plaintiffs' Exhibit 2106.

14   A.    Okay.

15   Q.    And they continue on through Exhibit 2110.

16         While you were touring at Lancaster, were you shown

17   the new segregation space that's going to be used for the EOP

18   Ad. Seg. Hub?

19   A.    I don't believe so.

20   Q.    You don't recall having walked into a separate

21   facility through a gate that had been built out but had not

22   yet come online?

23   A.    Okay.  Thank you for the reminder about the gate.

24         Yes.  We walked into this area, and we walked into

25   a -- I don't know if we were able to actually get into the

2852

1    building because it was locked up.

2          Yes.  Thank you.  That was a reminder.  I did see a

3    building that was referred to as a new EOP Hub.

4    Q.      And that building provides for clinical space for

5    clinicians to meet with inmates?

6    A.      No.  I couldn't tell you.  I'm not even sure we went

7    inside.  I believe we went inside for a brief period of time,

8    but I couldn't tell you what was inside there.

9    Q.      You don't recall that being pointed out?

10   A.      I don't recall that.

11   Q.      Nor the confidential group session spaces within that

12   unit?

13   A.      Again, I just don't remember.

14   Q.      When you did these tours at Lancaster, as well as the

15   other facilities, you asked staff to pull inmates out,

16   correct?

17   A.      Correct.

18   Q.      And you asked staff to pull out the sickest and --

19   the sickest inmates who had the lengthiest stays in

20   administrative segregation; isn't that correct?

21   A.      Well, yes, but let me qualify that.

22          We went in there and got a variety of lists so we

23   knew who the length of stays were.  And I asked --

24   independent of that I asked staff who, in their view, the

25   sickest were.  Oftentimes they were the same people.

2853

1    Q.      And custody staff was readily able to identify those

2    people?

3    A.      Oh, yes.  Clearly.

4    Q.      So custody staff, as well as mental health staff,

5    were aware of the condition of inmates in the administrative

6    segregation units and the treatment that they were receiving,

7    correct?

8    A.      Yeah.  But see, that's the problem.  They were aware

9    of it, then nothing was being done.

10          These people were allowed to languish in their cells.

11   They were psychotic, not attending groups.  So yeah.  I mean,

12   on one level you're correct.  Custody staff knew who they

13   were, and the clinical staff were aware also.

14          But, you know, that one gentleman who heard voices of

15   these two women and everything else, was not coming out of

16   the cell, just real psychotic and ended up going to the

17   hospital shortly after my stay, yeah, they were aware of it

18   and they weren't doing anything for the guy.

19   Q.      Well, you didn't ask to have anybody pull out the

20   inmates who were doing well in Ad. Seg., correct?

21   A.      I did not ask that particular question, sir.

22          THE COURT:  You believe that there were such people?

23          THE WITNESS:  I did see some people, Your Honor, who

24   are EOPs who had just finished a group.  And they were all

25   standing in these cages.  I went around and talked to them

2854

1    for a while to find out how they were.  And they weren't as

2    symptomatic as the individuals I had pulled out.  So they

3    were doing a little better, yes.  I would say that.

4    BY MR. RUSSELL:

5    Q.      And then when you would have these inmates pulled

6    out, you would meet with them in a clinician's office; is

7    that correct?

8    A.      No.  Because remember, the clinicians' offices at

9    Los Angeles and R.J. Donovan were on the floors of the units,

10   and they had the cages there.  So we made a special effort to

11   go -- we needed a confidential space.  So they opened up some

12   other spaces.  Sometimes they kicked the custody officer out

13   who was sitting in a room, and I would interview them there.

14   So it wasn't a clinician's office necessarily.

15   Q.      And Lancaster is one of the places where you asked

16   for the sickest inmates to be brought out, correct?

17   A.      All the ones -- at all the hub units that I visited I

18   asked that.

19   Q.      And you would meet with those inmates in the

20   confidential space that you talked about, correct?

21   A.      Correct.

22   Q.      Do you recall an instance in which you met with an

23   inmate where you asked that the inmate be placed into a cage

24   or a therapeutic module?

25   A.      I particularly asked someone to be placed in a cage?

2855

1  Q.      Yes.

2  A.      Let me think.

3          To my memory, sitting here today, all of my

4  interviews took place face-to-face.  When I had them pulled

5  out of their cells, I would be sitting in this office.  And

6  the inmate -- they would turn the chair around, he would be

7  handcuffed behind his back, and they would sit him there.

8  And we would talk that way.

9          I know I interviewed people in cages, but I don't if

10 I particularly asked them to be placed in a cage.

11 Q.      You don't recall an instance in which there was an

12 inmate in the EOP Ad. Seg. Hub who had murdered a

13 correctional officer who you met with in one of the cages?

14 A.      Yes, I do remember that individual.  And when I asked

15 to see that person, they, the custody staff, would not allow

16 me to see him as I had been seeing the other people because

17 that was at Los Angeles.

18         And I had been seeing people without cages the whole

19 time I was there.  Then this individual, this was the only

20 way I was going to be able to see him, would be if he were

21 placed in a cage.  So I didn't have any choice in the

22 matter.

23 Q.      You didn't ask for him to be taken out, did you?

24 A.      I asked to see him as I had been seeing everyone

25 else, and it was the custody staff.  You know, the custody

2856

1    staff said that I couldn't do that.

2        Just speaking of that individual, right after I was

3    done seeing him, he was escorted out to his attorney -- the

4    attorney visiting area right after we took a break.  And we

5    went out there to the area where they had visiting attorneys.

6    He was visiting with his attorney in a confidential space

7    without being in a cage.

8    Q.    So it is my understanding from your testimony that

9    inmates -- given what you have described as the "toxic

10   environment" of administrative segregation, that inmates are

11   not to be -- they can be disciplined, but not disciplined by

12   way of placement for that kind of behavior?

13   A.    No.  Again, I want to be real clear.  I'm all for

14   security.  You've got to have security in prison, you got to

15   protect people, you got to protect staff.  I'm not saying

16   anything about that, that that shouldn't be the case.  Okay.

17   I want to be real clear on that.

18       But if you're going to discipline someone, why put

19   them in a setting where you know they're going to get worse,

20   where 35 percent of the suicides in the entire system take

21   place there in a very small population?

22       Why?

23       I'm just suggesting that you don't place them in a

24   place where we know they're not going to do well.

25       Discipline them.  Yeah.  Go ahead.  Discipline them

2857

1    however you can.  But not by putting them in a place where

2    their mental illness is not going to do well.

3    Q.    You have no concerns that discipline by things other

4    than placement, such as taking away visitation or taking away

5    property or taking away privileges, would have the same kind

6    of impact?

7    A.    It would certainly have an impact.  It would not have

8    the same impact by putting someone in these administrative

9    segregation units.

10   Q.    Is there any kind of documentation or study that you

11   can refer to that supports that?

12   A.    That supports what, sir?

13   Q.    The opinion that it is the placement itself, as

14   opposed to other means of discipline, that cause the toxic

15   environment that you are describing?

16   A.    It's the opinion that I based my study on.  So if you

17   want to look at my tours and my review of all of this

18   material, this is the personal study I conducted and saw what

19   the realities were.

20          So I don't need to see another study.  I know what I

21   experienced in the California Department of Corrections in

22   the EOP Hubs.

23   Q.    You haven't published this as any kind of a study,

24   have you?

25   A.    It's part of litigation.  I'm not allowed to do that.

2858

1      MR. RUSSELL:  Can you excuse me just for a second,

2   Your Honor.

3           (Cocounsel confer.)

4   BY MR. RUSSELL:

5   Q.      Dr. Stewart, are you aware of CDCR's policy or

6   reviewed CDCR's policy that requires inmates placed in

7   alternative housing to be moved within 24 hours?

8   A.      Yes.  I'm aware of that.  I'm also aware that doesn't

9   always occur.

10  Q.      But you are aware that is the policy that's in

11  existence today, correct?

12  A.      I understand that, yes.

13  Q.      They be moved within a 24-hour period of time?

14  A.      Correct.

15  Q.      And have you been provided any information on the new

16  policy regarding limits on the length of stay for

17  nondisciplinary segregation inmates?

18  A.      No, I'm not familiar with the nondisciplinary

19  segregation.

20  Q.      Doctor, you were asked questions about an inmate

21  identified as Inmate H.  And you were asked to take a look

22  not only at the suicide report, which was marked as Exhibit

23  2121, but also the medical records which were marked as

24  Exhibit 2122.

25  A.      Correct.

2859

1    Q.      And it is your testimony that this inmate, Inmate H,

2    may have committed suicide because after having been treated

3    at the Department of State Hospitals he was placed back in an

4    administrative segregation unit, correct?

5    A.      Sir, what I testified to was saying his history.  He

6    started off at Ad. Seg.  While in Ad. Seg. he developed a

7    psychiatric condition for which he needed -- he was placed in

8    a state hospital for a period of two years.

9            He returned back to the state prison to the Ad. Seg.

10   Unit.  Within ten days he killed himself.  That was my

11   testimony.

12   Q.      You know by reviewing the records that when he first

13   came back to that prison, to that institution, he was

14   actually placed in the Correctional Treatment Center, right?

15   A.      I don't recall that.  I have no reason to doubt that.

16   Q.      In your experience is that generally what happens to

17   the inmates so they can be reviewed for their for medical

18   conditions, as well as mental health conditions?

19   A.      In the CTC, yes.  It is an infirmary-type area where

20   they receive medical evaluations.

21           Now, sir, excuse me, but on that was it just as part

22   of his intake back into the prison?  Because I know that when

23   people come back through the prison they often stop through

24   these places.

25   Q.      Okay.  Right.  That's what I do believe the record

2860

1    shows.

2    A.       Okay.

3    Q.       And then he was cleared for administrative

4    segregation housing after that review in the Correctional

5    Treatment Center, correct?

6    A.       Okay.

7             I don't know that for a fact, but okay.  It is

8    possible.

9    Q.       My understanding is you reviewed these records?

10   A.       Yes, I did.  I didn't memorize them.

11   Q.       Okay.  I understand.

12            And is it your understanding that he was being

13   considered for housing in a special needs yard?

14   A.       It is my understanding that he was initially placed

15   in Ad. Seg. for protective custody reasons.  So that would

16   mean that he would be considered for a SNY.

17   Q.       A special needs yard?

18   A.       Correct.

19   Q.       When inmates go to a special needs yard, it would be

20   important for the correctional staff to make sure that

21   somebody is being placed on a yard that's not going to cause

22   the problems that would normally be seen or might be seen in

23   general population.

24            I mean, special needs is a special needs yard,

25   correct?

2861

1   A.      Correct.  I understand.  But while that is going on,

2   why do you house them in Ad. Seg.?

3   Q.      Well, he's being evaluated to be moved into a special

4   needs yard; isn't that correct?

5           Isn't that what these records showed?

6   A.      Correct.

7   Q.      And while he was in the administrative segregation

8   unit, he was seen multiple times by mental health staff,

9   correct?

10  A.      I understand that, yes.

11  Q.      In fact, the suicide report shows he was seen by

12  mental health staff several times on the day in which he

13  committed suicide, correct?

14  A.      Correct.

15  Q.      And there was an indication in the suicide report

16  that this inmate was concerned that he was not going to

17  receive adequate mental health treatment on a non-EOP yard;

18  isn't that correct?

19  A.      You would have to point that out to me, sir.

20          What exhibit number is that?

21  Q.      This is Exhibit Number 2121, the suicide report for

22  Inmate H.

23          THE COURT:  Do you have a specific place you can

24  point the doctor to?

25          MR. RUSSELL:  I apologize, Your Honor.  That's what

2862

1   I'm looking for.

2                (Brief pause.)

3   BY MR. RUSSELL:

4   Q.      I'm looking at page 12 at the bottom, the last bullet

5   point of this report -- I'm sorry -- the last bullet point on

6   page 12.

7   A.      Yes.

8   Q.      And the report stated -- and this is, I believe, on

9   the date that this inmate did commit suicide.

10          The psychologist who saw him immediately before that

11  was interviewed and the psychologist in that interview

12  reported that the inmate had expressed concern that he was

13  not going to be housed in an EOP specific program but rather

14  on a SNY that housed both GP and CCCMS inmates.

15          So isn't it true that one of the concerns that the

16  inmate expressed is that he was going to be moved from a

17  place where he was receiving EOP treatment?

18  A.      He didn't say that.  You know, first of all -- I'm

19  glad -- excuse me -- that you pointed that out.  To read the

20  entire note that you're reading, it said that the inmate had

21  an informal/undocumented contact with his primary clinician.

22  So there was no evidence in the chart.  This was something

23  that clinician said after the fact that the inmate was

24  saying.

25          So, you know, the rule in psychiatric care, medical

2863

```
 1    care, if it is not in the chart, it didn't happen.
 2           So noting that -- it doesn't say that he was so happy
 3    with the care he was getting in the Ad. Seg. Unit that he was
 4    concerned he was going to get less.  He just thought that --
 5    his concern was not that he was going to be housed in an EOP
 6    specific program.
 7           It says nothing about that he was in Ad. Seg. and was
 8    doing well and then was concerned he was going to go
 9    someplace else.
10    Q.     Going back to your earlier point, all of these bullet
11    points are notes from the date upon which this inmate
12    committed suicide, correct?
13    A.     Correct.
14    Q.     And the inmate was discovered at 17:16 so I guess
15    approximately 5:15 in the afternoon, correct?
16    A.     Correct.
17    Q.     And on that date he was seen by his PC, primary
18    clinician, at 8:40, correct?
19           Going to first bullet point?
20    A.     Yes.
21    Q.     Then he was seen by a psychologist at 10:30, correct?
22    A.     Well, during the ICC review.  The psychologist was
23    there during the ICC review, yes.
24    Q.     Then he went to a group session that day at 1:30,
25    correct?
```

2864

1   A.      Correct.

2   Q.      And then he was seen again at 2:00 p.m. by his

3   psychiatrist for his initial evaluation, correct?

4   A.      Correct.

5   Q.      And then he was seen again at 4:00 p.m. in this

6   informal contact with his primary clinician, correct?

7   A.      Correct.

8   Q.      And so it is your testimony that each and every time

9   that there's even an informal contact by a primary clinician,

10  who had seen the patient earlier in the day, that they are

11  supposed to note that down somewhere?

12  A.      Absolutely.  Yes.  Absolutely.  Every contact you

13  have with your clinician (sic), you need to write it down.

14          THE COURT:  Assuming, sir, that the record that's

15  just been read actually occurred, it would seem that there

16  was certainly adequate contact.

17          Is that wrong?

18          THE WITNESS:  On that day, Your Honor, yes.  He was

19  seen by a primary clinician.  He was seen by a psychologist

20  during ICC.  And he was seen by the psychiatrist.  Then he

21  was seen by his primary clinician later in the afternoon.

22          THE COURT:  Then he committed suicide?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  I mean, is there anything that could have

25  been done that wasn't done?

2865

1          THE WITNESS:  Well, first of all, not to be placed

2     back into an Ad. Seg. setting.  But per the suicide report,

3     Your Honor, they talked about problems with his medications

4     and that he was being prescribed an antipsychotic.

5          Is unclear whether he took more than one dose.  He

6     might have gotten a dose when he first came in, but then this

7     was on the 24th so he had been there eight days.  So he may

8     have been off that medication for eight days.  So the fact

9     that there was --

10          THE COURT:  We don't know that one way or the

11     other.

12          THE WITNESS:  We don't know that one way or the

13     other, but it appears from reading the psychiatrist note that

14     he was there for his initial psychiatric evaluation.  So,

15     again, it is unclear whether he took his meds.

16          THE COURT:  Okay.

17     BY MR. RUSSELL:

18     Q.     Doctor, you were also asked questions about an inmate

19     identified as Inmate R who committed suicide and whose

20     suicide report was marked into evidence as Exhibit 2132.

21     A.     Yes.

22     Q.     I think you earlier testified today that, among other

23     things, you had reviewed the reports that were written by

24     Dr. Patterson for the benefit of the Special Master, correct?

25     A.     Yes.

2866

1    Q.      And you're aware that Dr. Patterson reviewed this

2    particular suicide, right?

3    A.      I don't know that for a fact, but it is very possible

4    he did.

5    Q.      Are you aware that Dr. Patterson, in having reviewed

6    everything pertaining to this suicide, found that this

7    suicide was neither foreseeable nor preventable?

8    A.      Again, I'm not aware of Dr. Patterson's report on

9    this.  I just looked at the suicide report.

10   Q.      And this inmate, Inmate R, was not a member of the

11   Coleman Class, correct?

12   A.      I don't know that, sir.

13   Q.      Well, it says right on the very first page of Exhibit

14   2132, "Not A Participant In The Mental Health Services

15   Delivery System."

16   A.      Yes.  So he was not.

17          THE COURT:  But that doesn't demonstrate he shouldn't

18   have been.  It just demonstrates he wasn't.

19          MR. RUSSELL:  It demonstrates he was not.  That's

20   correct, Your Honor.

21   BY MR. RUSSELL:

22   Q.      You had been asked questions about welfare checks and

23   had referred -- I think you had referred to this inmate

24   because this inmate had committed suicide after the welfare

25   checks ended in administrative segregation?

2867

1    A.      Correct.

2    Q.      And you referred to the American Correctional

3    Association's guidelines --

4    A.      Yes.

5    Q.      -- which have been marked as Exhibit 2134.

6            And in particular, on the third page of that exhibit,

7    it is marked page 71 at the bottom, the section regarding

8    Supervision was written -- or read into the record.

9            Looking at that, this section is talking about

10   special management inmates, correct?

11   A.      Yes.

12   Q.      In all the other parts of this policy it talks about

13   inmates in segregation, correct?

14   A.      Yes.

15   Q.      So inmates who are special management inmates are

16   something different than segregation, correct?

17           THE COURT:  They may be in segregation as well.  I

18   mean, is there any indication that your special needs are not

19   in segregation?

20           MR. RUSSELL:  Well, I'm just looking at this

21   document, Your Honor.  They've chosen to use different words.

22           THE COURT:  All right.  Go ahead.  I don't know.

23           It would seem to me that a person who is mentally ill

24   is a special needs person.  Maybe that's not right, but that

25   seems to me -- is there a definition of "a special needs"?

2868

1          MR. RUSSELL:  The term here is "special management."

2          MR. NOLAN:  Your Honor, I believe it is defined on

3    the first page of this section.  I believe in the comment in

4    the first page it lists three different categories, all of

5    which fall under the category of special management.

6          So when they use "special management," they are

7    referring to people who are either in administrative

8    segregation, protective custody or disciplinary detention.

9    Those are all forms of special management.

10          THE COURT:  Okay.

11    BY MR. RUSSELL:

12    Q.     I'm not going to argue this point, Doctor, but it

13    does use a different phrase for this particular policy,

14    correct?

15          It does not use "segregation."  It talks about

16    "special management"; isn't that right?

17    A.     Correct.  It does use a different term.

18    Q.     It talks about inmates being personally observed,

19    correct?

20    A.     Suicidal inmates continually -- oh, personally

21    observed?

22    Q.     Correct.

23          Inmates who are suicidal should have more frequent

24    observation?

25    A.     Continuous observation, yes.

2869

1    Q.      There is nothing in here that talks about a welfare

2    check?

3            It doesn't use the phrase "welfare check," does it?

4    A.      It doesn't use that term.  You are correct.

5    Q.      Is it your belief that an inmate who is -- well, is

6    it your belief that an inmate who is suffering from mental

7    illness should be woken up every 30 minutes to do what's been

8    described as a "welfare check," to see that they're breathing

9    and alive?

10   A.      Well, you can do that without necessarily having to

11   wake somebody up.  Yes.  The answer to that question is yes,

12   but it doesn't necessarily imply that you are waking people

13   up out of sleep to do that.

14   Q.      Well, it's something other than personal observation,

15   correct?

16   A.      I don't understand.  I'm sorry.  I just don't

17   understand the difference you are trying to make.

18   Q.      Well, "personal observation" is different than what's

19   been defined in these proceedings as a "welfare check,"

20   correct?

21   A.      No.  Welfare checks are personal observations.  And

22   there's another category that you may be confused with is

23   custody checks.  When custody goes through, and if someone is

24   under the blanket, they're not going to do anything.

25   Q.      So is it your understanding that this policy provides

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2870

1    for a personal observation -- it says "by a correctional

2    officer."  Is it supposed to do done by somebody other than a

3    correctional officer?

4    A.      A welfare check can be done by a correctional

5    officer.  I was just trying to help you out here with maybe

6    your confusion about welfare versus breathing and waking

7    people up.

8            In the California Department of Corrections they talk

9    about custody checks, which are done by custody staff, that

10   don't require to see -- I think the term they use is "needing

11   to see flesh."

12   Q.      And you believe that that is not the equivalent of a

13   personal observation?

14   A.      Yes.  I believe that is different.

15           MR. RUSSELL:  Excuse me for a moment, Your Honor.

16           (Cocounsel confer.)

17   BY MR. RUSSELL:

18   Q.      And Doctor, are you aware that Dr. Lindsey Hayes has

19   been retained by the Special Master for a quality improvement

20   program for suicide prevention within CDCR?

21   A.      I'm certainly familiar with that name.  I'm not sure

22   exactly what Dr. Lindsey Hayes is tasked with.

23           MR. RUSSELL:  I have no other questions.

24           Thank you, Your Honor.

25           Thank you, Dr. Stewart.

2871

1          THE WITNESS:  Thank you.

2          MR. NOLAN:  Your Honor, we have no redirect.

3          THE COURT:  May the witness be released?

4          MR. NOLAN:  Yes.

5          MR. RUSSELL:  Yes, Your Honor.

6          THE COURT:  You may step down, sir.

7          You are free to go or stay, as you choose.

8          THE WITNESS:  Thank you, Your Honor.

9          MR. BIEN:  I don't think there are any further

10   witnesses for today.

11         THE COURT:  All right.  See you guys tomorrow at

12   9:30.

13         MR. MCKINNEY:  Your Honor, can we address scheduling

14   briefly?

15         THE COURT:  On the record or off the record?

16         MR. MCKINNEY:  We can go off the record.

17         THE COURT:  Off the record.

18         (Off the record at 4:20 p.m.)

19                           ---o0o---

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2                               ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6          I certify that the foregoing is a correct transcript

7
    from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2

3       I, Michelle L. Babbitt, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                              MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                              United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25