1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                         ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11         Defendants.

12    _____/

13

14

15                         ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                FRIDAY, DECEMBER 6TH, 2013

20

21                         ---o0o---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
1                        APPEARANCES

2                          ---o0o---

3

4    FOR THE PLAINTIFFS:

5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
6            SAN FRANCISCO, CALIFORNIA  94104

7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

8            BY:  JANE KAHN, ATTORNEY AT LAW

9            BY:  AARON FISCHER, ATTORNEY AT LAW

10

11

12   FOR THE DEFENDANTS:

13            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
14            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
15
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
16
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
17
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
18

19

20                         ---o0o---

21

22

23

24

25
```

```
 1                      EXAMINATION INDEX

 2                          ---o0o---

 3

 4    FOR THE DEFENDANTS:

 5        EXAMINATION:                              PAGE

 6

 7     KATHLEEN ALLISON

 8        Direct Examination by Ms. Vorous         2872
          Cross-Examination by Mr. Fischer         2987
 9

10

11

12

13

14

15                          ---o0o---

16

17

18

19

20

21

22

23

24

25
```

```
1                        EXHIBIT INDEX

2                          ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION                EVD
5

6      2481              Corcoran Health Care Eval.
                         in Plata v. Brown              2907
7

8

9

10
     DEFENDANTS'
11   EXHIBIT NO            DESCRIPTION                EVD

12
       LLL               Allison Declaration          2881
13
       MMM               Construction Photographs     2885
14
       NNN               Title 15 Code of Regs        2897
15
       OOO               Notice of Change to Regs     2904
16
       PPP               11-26 Ad. Seg. Statistics Rpt. 2921
17
       QQQ               12-4 Ad. Seg. Statistics Rpt.  2927
18
       RRR               Memo to Associate Directors
19                       Dec. 3,2013                  2966

20     SSS               Charts Re:  Population        2943

21     TTT               Charts Re:  Population        2946

22     UUU               Schematic of housing types    2966

23

24                         ---o0o---

25
```

1          SACRAMENTO, CALIFORNIA

2          FRIDAY, DECEMBER 6, 2013; 9:30 A.M.

3                  ---oOo---

4

5          THE COURT:  Before we commence this morning's

6     proceedings, two things:  We're going to have to close this

7     afternoon at 4 o'clock.  There's another three-judge court

8     telephone conference.  I'm sorry, but that's how it goes.

9     That's number one.

10         Number two, somebody indicated to me that the

11    secretary is here and that he would be willing to discuss

12    further the problem of the nondisciplinary ad seg folk.  My

13    own sense of it is that I understand what's going on.  Unless

14    there's something new that I should be conveying to my

15    colleague, I don't want to take the secretary's time for no

16    reason.

17         MS. VOROUS:  Your Honor, we will provide additional

18    testimony from the deputy director that of the offer was open

19    in case you had additional questions you wanted to ask the

20    secretary.

21         THE COURT:  Fine.

22         MS. VOROUS:  Defendants would call Kathleen Allison.

23                  KATHLEEN ALLISON

24    called as a witness on behalf of the defendants herein, was

25    sworn, examined, and testified as follows:

1          THE CLERK:  You do solemnly swear that the testimony

2     you are about to give to this court in this proceeding is the

3     truth, the whole truth and nothing but the truth, so help you

4     God?

5          THE WITNESS:  Yes, I do.

6          THE CLERK:  Take a seat, state your name, spell your

7     last name and speak directly into the microphone.

8          THE WITNESS:  Kathleen Allison, A-L-L-I-S-O-N.

9                     DIRECT EXAMINATION

10    BY MS. VOROUS:

11    Q.     Good morning.

12    A.     Good morning.

13    Q.     What is your current title?

14    A.     Deputy Director for Facility Support for the Division

15    of Adult Institutions for CDCR.

16    Q.     How long have you been in this position?

17    A.     Since April of 2012.

18    Q.     Would you describe your overall job duties as deputy

19    director.

20    A.     The Deputy Director Facilities Support is responsible

21    for the population management unit, program support unit,

22    classification services, case records, the policy

23    standardization unit and litigation unit.

24    Q.     What is the policy standardization unit?

25    A.     The policy standardization unit was recently created

1   in the last couple of years to consolidate -- has various

2   functions.  It functions to community resource managers

3   oversight.  It does policy standardization to make sure that

4   there's a representative from DAI on all policy decisions,

5   and they review all the policies as well as the litigation

6   aspect of it as it relates to court compliance for Clark,

7   Coleman and Plata.

8   Q.    Ms. Allison, before becoming the deputy director for

9   the division of the adult institutions, did you hold any

10  other position within the division?

11  A.    Yes, ma'am.  I was the associate director for the

12  Female Offender Program and Specialized Housing for a short

13  time.

14  Q.    Ms. Allison, when did you first start working for

15  CDCR?

16  A.    In 1997 -- I'm sorry.  1987.  I apologize.

17  Q.    And at that point, what was your position within CDCR?

18  A.    I was hired at Avenal State Prison as a medical

19  technical assistant, which is a fancy name for a nurse with a

20  badge.

21  Q.    Would you describe your job duties as a medical

22  technical assistant.

23  A.    A medical technical assistant was responsible for

24  providing the initial care to all offenders.  We were

25  assigned on the yards.  Back then, there was one medical

```
 1    assistant on the clinic, so we ran the clinic.  We ran a sit
 2    call line every morning.  We ran pill lines.  We assisted the
 3    doctors in procedures, and we also provided -- we were also
 4    assigned to the segregation units to do daily rounds and
 5    administer medication.
 6    Q.    You had mentioned the position involving nursing.
 7          Is that a job -- at that point was that a requirement
 8    of the position?
 9          THE COURT:  What was a requirement?
10    BY MS. VOROUS:
11    Q.    That she be a nurse.
12    A.    I started at a time that there were many -- the
13    original classification was designed for military corpsmen,
14    and that's why it had the title it did, and then they gave it
15    peace officer status so that they didn't have to have
16    augmentations of the officers in the clinics with us.
17          But I was hired at a time when the Board of Nursing
18    came in and said, military corpsmen, this is California.
19    They're acting beyond the scope, so some had training at the
20    level of an LVN, some had training at RN, and, therefore,
21    they made it a combined class where it was either LVN or RN,
22    registered nurse.
23    Q.    Are you a registered nurse?
24    A.    Yes, I'm a registered nurse.
25    Q.    What other positions did you hold while working at the
```

1    Avenal State Prison?

2    A.        I was a senior medical technical assistant followed by

3    a community resource manager and a litigation coordinator

4    acting for approximately one year.

5    Q.        Ms. Allison, at some point did you move from working

6    at Avenal State Prison over to the substance abuse treatment

7    facility?

8    A.        Yes.  I transferred in 2002.  I promoted April 2002.

9    I was appointed as a Correctional Health Services

10   Administrator II.

11   Q.        At some point did you become a healthcare manager at

12   the substance abuse treatment facility?

13   A.        Yes, ma'am.  Approximately September of 2002 I was

14   appointed as an acting healthcare manager for approximately

15   two years.

16   Q.        What did that position entail?

17   A.        Overall management of all healthcare services, so that

18   would include mental health, dental and medical.

19   Q.        How long did you work at the substance abuse treatment

20   facility?

21   A.        Until I reported to headquarters in November, 2011.

22   Q.        Can you briefly describe the positions that you held

23   after your position as the healthcare manager.

24   A.        I promoted to associate warden and I was first

25   assigned as associate warden of health care.  I did that for

1    approximately two years, which at the time was a new

2    classification for the implementation of the inmate medical

3    services program and the access to care units.

4         I later went on to be associate warden over the

5    housing to include two administration segregation units as

6    well as two level II yards.  One was SNY, one was GP.

7    Q.    Would you describe the two administrative segregation

8    unit yards that you oversaw.

9         THE COURT:  Where were they?

10        THE WITNESS:  At the California Substance Abuse

11   Facility and State Prison at Corcoran.  One was a regular 270

12   design, so it was the original design that housed

13   approximately 150 inmates.

14        The other was a stand-alone units, which housed

15   approximately 175 inmates with only mental health being in

16   the 270 design unit.

17   BY MS. VOROUS:

18   Q.    What were your duties associated with managing these

19   two segregation units?

20   A.    My primary responsibility was monitoring the care and

21   treatment of all inmates within the unit, also federalization

22   to ensure that their cases were processed timely.  Those were

23   my two primary responsibilities.

24   Q.    Did your responsibilities include review of an

25   inmate's placement within segregation?

1    A.        Yes.  I frequently had to review what we call the

2    segregation orders to ensure that the placement was

3    appropriate, and I also acted as the chair of the Institution

4    Classification Committee.

5    Q.        Can you explain what that role is.

6    A.        The Institutional Classification Committee has to

7    evaluate all the case factors for every single inmate

8    presented.  They must see everybody within the first ten days

9    of arrival into administrative segregation to make a

10   determination whether retention is appropriate or find a

11   release option for the offender.

12             You're looking at the various case factors as it

13   relates to why he's placed there and making a determination

14   how long, what next steps need to be done, whether it be an

15   investigation, whether it be an RVR process, those types of

16   things.

17             You're also determining appropriate housing for that

18   offender, whether it be double cell or single cell as well as

19   yard status.

20   Q.        At some point did you become the warden of the

21   substance abuse facility?

22   A.        Yes, I did.  I became the warden in 2009.

23   Q.        What were your duties as a warden of this facility?

24   A.        Overall care of every offender within the facility.  I

25   mean all of the -- a warden's job is quite large, as you can

1  imagine.  We are the custodian of care, and so to ensure that

2  all of their needs are met, both custodial-wise and make sure

3  they have appropriate access to healthcare, but it's overall

4  for all inmates and all staff.  I was responsible for them

5  and all the programs within the facility.

6  Q.    Ms. Allison, when you were at the substance abuse

7  treatment facility, were you involved in any activation

8  projects that involved creating new programs for mentally ill

9  inmates?

10  A.    Yes, ma'am.

11  Q.    Describe what projects you were involved in.

12  A.    I was approached in early -- maybe mid-2009 to

13  activate a level III EOP program, and we were in the process

14  of discussions in trying to figure out the best place and the

15  best place for treatment.  It was at the same time that we

16  lost a lot of our program funding, and we had these

17  absolutely beautiful buildings designed for substance abuse

18  treatment.

19        So I was able to convince my boss at the time to come

20  and look at them.  I felt they were the best option, and I

21  was able to convince the then director of mental health to

22  come down and look at them as well.

23        Everyone agreed because those buildings are built with

24  group treatment space within the building, individual

25  treatment space and they were large open spaces unlike

1    anything he's we had within our system.  Based on that, I was

2    able to convince them to activate our level II EOP program.

3           We ultimately ended up with a level II SNY program and

4    a level II dual diagnosis, which was for mental health and

5    substance abuse.

6    Q.    What does the SNY stand for?

7    A.    Sensitive needs yards.

8    Q.    Do you recall how many beds were activated as part of

9    the sensitive needs yard expansion?

10   A.    88.

11          THE COURT:  I'm sorry.  Now I've now lost of the

12   timeline.

13          When was this taking place, please?

14          THE WITNESS:  June 2009, approximately.

15          THE COURT:  I just wanted to get some feel about when

16   you were working.

17          You may proceed.

18   BY MS. VOROUS:

19   Q.    Since the initial activation of the sensitive need

20   yard beds for the EOP population, do you know whether there's

21   been additional beds added for that population?

22   A.    No.

23          THE COURT:  No, you don't know?  Or, no, there weren't

24   any additional beds?

25          THE WITNESS:  No additional beds, to my knowledge.

```
 1              MS. VOROUS:  May I approach the witness?
 2              THE COURT:  Yes.
 3   BY MS. VOROUS:
 4   Q.     I've handed you what's been marked as Defendants'
 5   Exhibit LLL.
 6              Do you recognize this document?
 7   A.     Yes ma'am.
 8   Q.     What is it?
 9   A.     Is it is declaration.
10              THE COURT:  It's your declaration filed in opposition
11   to the plaintiffs' motion relating to housing, et cetera.
12              Is that correct?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  Move it?
15              MS. VOROUS:  Yes, Your Honor.
16              THE COURT:  Hearing no objection, it's received.
17                            (Whereupon, Defendants' Exhibit LLL
18                             was received into evidence.)
19   BY MS. VOROUS:
20   Q.     Ms. Allison, are you familiar with the different types
21   of segregation units that CDCR operates throughout the prison
22   system?
23   A.     Yes.
24   Q.     Briefly describe what those units are.
25   A.     Administrative segregation.  We have security housing
```

1    units as well as the psych services unit.

2    Q.    The administrative segregation units house general

3    population as well as what we've been referring to as the

4    CCCMS population.

5         Is that correct?

6    A.    Yes.

7    Q.    And then there is also 11 units in the system that

8    house enhanced outpatient population inmates that are placed

9    in segregation; so in other words, EOP administrative seg

10   hubs?

11   A.    Yes, ma'am.

12   Q.    Is it your understanding that one more unit for the

13   enhanced outpatient population is coming on board with the

14   activation of the new DeWitt Nelson Project in Stockton?

15   A.    Yes, ma'am.

16   Q.    Do you know when that project is expected to be

17   activated?

18   A.    I know in 2014, but I'm not sure of the exact month.

19        THE COURT:  Hang on just a moment, please.

20        Is the EOP opened in Stockton assigned to hold

21   segregated housing EOPs or just anybody who needs that form

22   of care?

23        THE WITNESS:  It's my understanding they will house

24   both GP and administrative segregation EOP inmates.

25        THE COURT:  Thank you.

1    BY MS. VOROUS:

2    Q.    Ms. Allison, are you aware that the plaintiffs'

3    experts conducted a number of tours of CDCR prisons in early

4    2013?

5    A.    Yes.

6    Q.    Did you participate in any of those tours?

7    A.    Yes, I did.

8    Q.    Do you recall which ones?

9    A.    We were on the road for a while.  San Quentin, CSP

10   Sacramento, Kern Valley State Prison, Corcoran State Prison,

11   CCI Tehachapi, California Correctional Institution,

12   California Institution for Men, CIM.  I want to say

13   California's Correctional Women's Facility.  I've toured so

14   many for different reasons, it's hard to isolate it just for

15   that.

16   Q.    Subsequent to those tours, have you visited additional

17   prisons to visit their EOP ad seg units?

18   A.    Yes, ma'am.

19   Q.    Have you visited all of the prisons that had the EOP

20   ad seg units?

21   A.    I'm trying to remember the list in my mind.  Yes.  I

22   think I've seen them all now, yes.

23   Q.    Ms. Allison, you've already testified that you are

24   familiar with the new construction project at the DeWitt

25   Nelson facility.

1           Are you familiar with the other construction projects

2    that CDCR has completed over the past couple of years?

3    A.      Yes, ma'am.  As they relate to access to care

4    buildings and to mental health buildings.  Yes.

5           MS. VOROUS:  May I approach the witness, Your Honor?

6           THE COURT:  You may.

7    BY MS. VOROUS:

8    Q.      Ms. Allison, I've handed you what has been marked

9    Defendants' Exhibit MMM.

10          Are you familiar with this packet of documents?

11   A.      Yes, ma'am.

12          MS. VOROUS:  Request to move the Exhibits MMM into

13   evidence.

14          THE COURT:  I'm sorry, ma'am.  It's not clear what

15   these are.  These appear to be a bunch of photographs

16   relating to construction.

17          Is that right, ma'am?

18          THE WITNESS:  Yes.

19          MR. FISCHER:  I will object that the captions are

20   testimony and in some respects argumentative in nature.

21          THE COURT:  Every time somebody puts in something,

22   that's the objection.

23          The objection is overruled, but the court will

24   recognize the character of the captions.

25          You may proceed, ma'am.

1              (Whereupon, Defendants' Exhibit MMM

2                   was received into evidence.)

3    BY MS. VOROUS:

4    Q.     Ms. Allison, I've published the first page of Exhibit

5    MMM.

6              Can you explain to the court what this document

7    represents?

8    A.     This document is a picture of the final construction

9    that was provided by facilities management.  It is 20-bed

10   psychiatric services unit which includes a renovation of

11   about 3,500 feet of the existing housing unit.

12             THE COURT:  Where is it located, ma'am?

13             THE WITNESS:  At the California Institution for Women.

14   BY MS. VOROUS:

15   Q.     When was this project completed?

16   A.     January 2011.

17   Q.     Is it correct that it represents a new 20-bed

18   psychiatric services unit?

19   A.     Yes, ma'am.

20   Q.     Ms. Allison, if you look at the second photo in this

21   packet, would you describe what that photo represents?

22   A.     It's a picture of the hallway to include all of the

23   beds, the housing unit type cells for that unit.

24   Q.     And, again, it's the new PSU unit at the California

25   Institution for Women?

1    A.      Yes.

2    Q.      Ms. Allison, if I could draw your attention to the

3    third photograph, if you would describe that photograph as

4    well, please.

5    A.      That is an interior picture of the cell at the

6    California Institution for Women, the PSU unit.

7    Q.      Ms. Allison, I've put up the next document in this

8    exhibit.  At the top it's entitled CMF EOP Treatment and

9    Office Space Project.

10          Would you describe this project, please?

11   A.      Yes, ma'am.

12          This project is an EOP treatment and office space

13   building.  It's actually built on the exterior of THE

14   California Medical Facility at Vacaville.

15   Q.      When was this project completed?

16   A.      May of 2013.

17   Q.      Ms. Allison, does this treatment and office space

18   facility include space for the EOP ad seg population at CMF?

19   A.      Yes, ma'am.

20   Q.      Ms. Allison, if I can draw your attention to the next

21   photograph.  This is a photograph that has a date of

22   January 14, 2013.  It's CMF EOP ad seg and the label at the

23   bottom.

24          What you describe this photograph, please.

25   A.      This is a room that's utilized for the

1    interdisciplinary treatment team at CMF EOP in their ASU

2    unit.

3    Q.    Describe what an interdisciplinary team is, please.

4    A.    It is a team that is comprised of clinicians in

5    custody, clinicians including a psychiatrist, offenders case

6    manager, the correctional counselor and other staff that may

7    have direct contact with the inmate, sometimes includes

8    correctional officers, sometimes nurses, those that interact

9    on a daily basis with the inmate to make an overall

10   assessment of his needs at that time.

11   Q.    Ms. Allison, if I could draw your attention to the

12   next photograph in this exhibit.  At the bottom, it's

13   identified as a CMF EOP ad seg with the identification of the

14   O wing.

15         Would you describe what this photograph is?

16         THE COURT:  Identified as the what?

17         MS. VOROUS:  O wing.

18         THE WITNESS:  This is a panoramic view of the group

19   modulars within that section to provide group treatment to

20   ASU EOP offenders.

21   BY MS. VOROUS:

22   Q.    Ms. Allison, if you could look at the next document in

23   this exhibit.  At the top this is identified as COR EOP ad

24   seg.

25         Does that represent Corcoran State Prison, EOP ad seg

1    unit?

2    A.      That represents Corcoran State Prison Segregation

3    Treatment and Office Space Unit.

4    Q.      Please explain what this document shows.

5    A.      The picture on the left is a picture of what I'm

6    familiar with, the individual treatment rooms, and then on

7    the right, it appears to be a group, possibly a group room or

8    actually with the television it might be a rec therapist

9    room.

10   Q.      When was this new treatment and office space facility

11   completed?

12   A.      May 2013.

13   Q.      Ms. Allison, moving on to the next photograph in this

14   exhibit at the bottom, there's an identification.  Again, the

15   Corcoran EOP ad seg indication of one-on-one interview rooms.

16          Was that what you were just referring to as the

17   interview rooms?

18   A.      Yes, ma'am.  This is the cell side of it, yes.

19   Q.      Can you explain what you mean by the "cell side of

20   it," how these interview rooms work?

21   A.      The new constructional design is you have a corridor.

22   One side of the entrance allows for the offender to enter.

23   The other side of the corridor allows the clinician to enter,

24   and within there there's a glass in between them similar to

25   our noncontact visiting rooms.

1    Q.    Ms. Allison, I've shown you the next photograph in

2    this exhibit and this also indicates that it's a photograph

3    of the one-on-one interview room.

4          Can you explain what this photograph represents.

5    A.    Yes, ma'am.  This is, again, at Corcoran.  This is the

6    other side of that picture.  We saw the cell.  This is where

7    the offender will sit.  You see the microphone there in the

8    center.  Unlike the visiting rooms where they have to hold a

9    phone, this is a just microphone in the clear glass to be

10   able to see his clinician on the other side.

11   Q.    Is it your understanding these interview rooms are

12   used for individual clinician contacts?

13   A.    Yes, ma'am.

14   Q.    Ms. Allison, I would like you to look at the next

15   photograph.  This is the Corcoran EOP ad seg unit and this

16   indicates it's a group therapy room.

17         Is that correct?

18   A.    Yes, ma'am.

19   Q.    Can you explain what this picture is showing.

20   A.    It's showing a variety of treatment modulars at

21   various sizes, one to show -- I know there's at least one

22   ADA, Americans with Disabilities Act, modular in there, so

23   it's quite larger, but it's six, seven, that I can best tell

24   from the picture treatment modulars.  So they can have

25   approximately seven inmates at any given time in a group

1    therapy session.

2    Q.    Ms. Allison, I'd like to draw your attention to the

3    last photograph that we have with respect to the Corcoran EOP

4    ad seg facility, and this appears to be another photograph of

5    the recreational therapy room.

6    A.    Correct.

7    Q.    What is this photograph showing?

8    A.    It's showing a treatment modular along with the white

9    board where they might have discussions, a television, if

10    they're going to be showing any kind of videos of any kind.

11    Q.    Ms. Allison, are you familiar with the new treatment

12    and office space project at California State Prison

13    Los Angeles or Lancaster?

14    A.    Yes, ma'am.

15    Q.    And what I've just put up on the projector right now

16    is a document that references this project.

17          Is that accurate?

18    A.    Yes, ma'am.

19    Q.    Please explain what that's is.

20          THE COURT:  I'm worried about the record now.  Is this

21    in that group of -- I'm sorry -- MMM?

22          MS. VOROUS:  Yes, Your Honor.

23          THE COURT:  We have not numbered -- I suppose nothing

24    can be done now.  It's too late.  That's okay.  The point is,

25    this is a photograph that's found in the package in MMM?

 1              MS. VOROUS:  Yes, Your Honor.

 2              THE COURT:  You may proceed.

 3              THE WITNESS:  This is a picture of multiple pictures

 4    of the treatment and office space project for Lancaster EOP

 5    program, and it was originally designed for general

 6    population EOP.  A decision was then made to change that

 7    scope and make it for administration segregation EOP inmates

 8    to be able to move the EOPs closer to the building.

 9              So the EOPs will be moving into D5, which is adjacent

10    to this building, to be able to have access to this beautiful

11    new building because they felt they had enough treatment

12    space for its other GP inmates on the yard already.  It was

13    another space converted for them.

14    BY MS. VOROUS:

15    Q.     And, Ms. Allison, the original construction of this

16    project was complete in the summer of 2012.

17           Is that accurate?

18    A.     Correct.

19    Q.     In order to convert the facility for use as an

20    administration seg unit for the EOP population, was the state

21    required to retrofit the facility?

22    A.     Yes, ma'am.

23    Q.     Can you describe what those retrofits involved?

24    A.     Retrofits involved the one-on-one treatment rooms to

25    insure that there were adequate cuff ports, to ensure that

1     there were adequate groups models available, as well as

2     modifications to the existing building to house ASU, EOP

3     inmates in D5.

4     Q.      When is the projected date of completing the

5     retrofits?

6     A.      March 2014.

7     Q.      I'm going to show you the next photograph in

8     Defendants' Exhibit MMM.  This is identified as the LAC EOP,

9     ASU Treatment Unit.

10          Can you describe what this photograph is showing.

11    A.      Yes.  This would be a group treatment room when all of

12    the treatment modulars are installed.

13    Q.      Moving onto the next photograph, this has a date stamp

14    of June 13, 2012, from the LAC EOP ad seg facility.

15          What does this photograph represent?

16    A.      Clinical treatment office space for the clinicians.

17    Q.      Ms. Allison, do you know whether the state or LAC is

18    currently using this facility at this point for

19    administrative purposes?

20    A.      I have so many institutions, I'm trying to remember.

21    I'm not sure.

22    Q.      Ms. Allison, I'm showing you the last photograph in

23    Exhibit MMM with respect to the LAC EOP ad seg facility.

24          Can you explain what this photograph represents.

25    A.      It's a large room.  The intended purpose is for IDTT.

1    Q.    Ms. Allison, are you familiar with the new treatment

2    and office space project at California State Prison

3    Sacramento that was recently completed for the psychiatric

4    service unit population?

5    A.    Yes, ma'am.

6    Q.    I've shown you the next document in Exhibit MMM that

7    represents this project.

8          Is that correct?

9    A.    Yes, ma'am.

10    Q.    Can you describe what that project is.

11    A.    It's a very large building, 22,000 square feet.  The

12    pictures below are showing where the left-hand-side picture,

13    says 120A.  That is a room designation, and that is the

14    offender side of the individual treatment rooms.  That's a

15    view from outside of it.

16          Then the next photograph is a hallway and the building

17    is very large, and I can't remember if this is just the

18    clinical side of those -- the other side of this picture

19    where the clinician enters or the actual office space.

20    There's many office space and many individual treatment rooms

21    within this building.

22    Q.    Ms. Allison, I'm going to have you skip the next

23    document in Exhibit MMM and go on to the photograph that is

24    labeled Sac PSU Treatment Center Group Room.

25          Have you found that?

1    A.       Yes.

2    Q.       Can you describe what this is as well, please.

3    A.       This is a group treatment room that houses, from best

4    I can count on the photograph, approximately seven treatment

5    modulars for group therapy.

6    Q.       Ms. Allison, I'm going to go back to a comment you

7    made with respect to the interview room at the Sac PSU.

8             Is that type of construction something that CDCR is

9    making part of all of its new construction projects?

10            THE COURT:  Do you understand the question, ma'am?

11            THE WITNESS:  Yes, I do.

12            THE COURT:  Okay.

13            THE WITNESS:  To my knowledge, that's the design that

14   the facility management has chosen for all of the new

15   construction for administrative segregation treatment.  Those

16   phone booth types would not be necessary for a

17   nonadministration segregation unit, just so we're clear.

18            MS. VOROUS:  I apologize.  I don't think my question

19   was very clear.  I believe you answered it.

20   Q.       So, in other words, for purposes of individual

21   therapy, clinicians would not be using or the facility would

22   not be using the therapeutic treatment modules.

23            Is that accurate?

24   A.       For administrative segregation inmates, yes.

25            THE COURT:  Hang on.  I don't understand.

1          MS. VOROUS:  Let me try again.

2          THE COURT:  Is it your present testimony that the

3     cages are only being used in the group therapy, not in

4     individual clinical context?

5          THE WITNESS:  Correct.

6          MS. VOROUS:  For the new construction, Your Honor.

7     That's the point I was trying to make.  With the new

8     facilities coming online, that's what CDCR is doing.

9     Q.    Ms. Allison, if you turn to the next photograph in

10    Exhibit MMM, and at the bottom this indicates Sac PSU cell.

11         Can you describe why this photograph is in the packet.

12    A.    Yes, ma'am.  There were conversions made to the Sac

13    PSU to make them single cell as well as suicide resistance.

14    The red in there is just for security reasons, so we

15    highlight to look for certain things that there was something

16    on that wall, a bunk where that was before, and then the desk

17    and then, of course, the bookshelf.

18    Q.    Ms. Allison, I've now shown you another photograph in

19    Exhibit MMM of the Sac PSU cell.

20         This appears to be a picture of a door?

21    A.    The exterior door -- the actual cell door.

22    Q.    Why is it important to show the court this

23    representation of the Sac PSU?

24    A.    It was to have a clear representation of all of the

25    different construction that's been accomplished in the last

1    couple of years.

2    Q.    What construction has been accomplished with respect

3    to the Sacramento PSU cells or the unit itself?

4    A.    The cells have been retrofitted, and all of them are

5    single cell.  Obviously, it's been freshly painted.  I don't

6    know all that has been done to them.  I have a whole laundry

7    list of things they do, so I'm not exactly sure.

8    Q.    Moving on to the next photograph in MMM, this is also

9    a photograph of the Sac PSU cell.

10           Is that correct?

11   A.    Correct.

12   Q.    And looking at the depiction in this photograph, what

13   does it represent?

14   A.    It's from within the cell looking out of the cell into

15   the day room, let's say.  Let's say the inmate's view.

16   Q.    The inmate would have a view through the window as

17   well as the door.

18           Is that correct?

19   A.    Yes, ma'am.

20   Q.    Ms. Allison, I've now put up what is the last

21   photograph in Defendant's Exhibit MMM.  This is also a

22   photograph of the Sac PSU cell.

23           Is that correct?

24   A.    Yes, ma'am.

25   Q.    What is important about this photograph?

1    A.    The electrical that has been installed in that unit.

2    There's four electrical outlets.

3    Q.    Do all of the PSU units within CDCR's prison have

4    electrical capabilities?

5    A.    Yes.

6    Q.    Do all of the security housing units or the SHUs have

7    electrical capabilities?

8    A.    Yes.

9          MS. VOROUS:  Your Honor, may I approach the witness?

10         THE COURT:  Yes.

11   BY MS. VOROUS:

12   Q.    Ms. Allison, I've handed you what has been marked

13   Defendants' NNN.

14         Do you recognize this document?

15   A.    Yes, ma'am.

16   Q.    Describe what it is, please.

17   A.    This is the California Code of Regulations, Title 15,

18   and the section, Article VII is for segregated housing.

19   Q.    Ms. Allison, do these regulations outline the reasons

20   why an inmate may be placed in administrative segregation?

21   A.    Yes, ma'am.

22         MS. VOROUS:  I would move to admit NNN into evidence.

23         THE COURT:  Hearing no objection, it's received.

24                    (Whereupon, Defendants' Exhibit NNN

25                     was received into evidence.)

1   BY MS. VOROUS:

2   Q.      Where within Title 15, Article VII do the regulations

3   outline the reasons why an inmate maybe placed within

4   administration segregation?

5   A.      3335(a) and (b.)

6   Q.      What are those reasons?

7   A.      (Reading:)

8              When an inmate's presence in an institution

9              general population presents an immediate threat

10             to the safety of inmate or others in dangerous

11             institutional security or jeopardizes the

12             integrity of an investigation of alleged

13             misconduct or criminal activity.

14  Q.      Three different reasons you've identified; correct?

15  A.      Yes, ma'am.

16  Q.      The first one that you mentioned, threat to the safety

17  of inmate or others, could you give us an example of what

18  that might look like.

19  A.      That's to all inmates it means a threat.  Let's say

20  he's conducted an assault on another inmate, so we have to

21  separate him.

22  Q.      What about an inmate, for instance, who has a drug

23  debt and is afraid to remain on the yard, would that

24  situation fall within this first reason for placement in

25  segregation?

1    A.      Yes, ma'am.

2    Q.      The second reason you mentioned was endangers

3    institutional security.

4            Please give me an example of what that might involve.

5    A.      Could have been attempted escape.  There's certainly a

6    variety of reasons.

7    Q.      And the third category, which was jeopardizing the

8    integrity of on-going investigations into serious misconduct

9    of criminal activity, what would be an example that would

10   fall into that category?

11   A.      Gang activity, drug activity.  Those are the primary

12   reasons.

13   Q.      Would that include gang validation investigations, for

14   example?

15   A.      Yes, ma'am.

16   Q.      Ms. Allison, who within CDCR or the prison has the

17   authority to authorize placement of a prisoner into

18   segregation?

19   A.      It must be at the level of lieutenant or above has the

20   authorization for placement into administrative segregation.

21   Q.      Is there any documentation required --

22   A.      Can you repeat the question?

23           THE COURT:  She wants to know about documentation

24   relative to administrative segregation.

25   /////

1    BY MS. VOROUS:

2    Q.      For placement?

3    A.      Yes.  There is a segregation order commonly called a

4    114(d).

5    Q.      Explain what that is.

6    A.      A 114(d) is an explanation why the offender is being

7    placed in administrative segregation.  It outlines general

8    reasons why.  It has to fit one of the categories and it also

9    has to give him enough information so he can start providing

10   his own defense to that.

11          There's a variety of checks and balances on that

12   document to ensure that he has -- if he needs a staff

13   assistant or staff investigation, if an investigator needs to

14   be assigned or that we have effective communication.

15          There's multiple boxes on that document, but it's to

16   ensure his due process rights.

17   Q.      When you refer to "his" --

18   A.      His or her.  I apologize.

19   Q.      We're referring to the offender or inmate; correct?

20   A.      Yes, ma'am.

21   Q.      This document you've just been describing, is that

22   something that's required immediately upon entrance or

23   placement into an administrative segregation unit?

24   A.      Yes.  The inmate has to receive his order -- if I

25   could refer to this, I think it's within 24 hours, but I

1   would have to double check.

2   Q.     Please do and indicate what section you're referring

3   to.

4   A.     It is Section 336 subcategory (d), (Reading:)

5              A copy of the 114 with the order portion

6              completed will have been given to the inmate

7              prior to placement in administrative

8              segregation, but no later than 48 hours after

9              segregation.

10  Q.     After the initial step is taken once an inmate is

11  placed within segregation that you've just described, when is

12  an inmate next seen by a correctional official?

13  A.     On the next business day he's seen at a captain level

14  or higher for administration review of that segregation

15  order.

16  Q.     What's the purpose of that review?

17  A.     To determine the need for continued retention; for

18  example, if an inmate has, let's say, safety concerns, the

19  captain tries to figure out if there's another yard within

20  that facility he could go to, and then he's released.

21         It's also to make a determination if the inmate needs

22  an investigative employee assigned to him and also to

23  determine his cell status, meaning double cell or single cell

24  prior to ICC.

25  Q.     At this stage is it common for the correctional

1     captain to discharge the inmate back to the prior housing or

2     to another location within the prison?

3     A.     Yes, ma'am.

4     Q.     Is the review of the segregation order that you have

5     just been discussing, is that the process that's outlined in

6     Section 3337 of Title 15?

7     A.     Yes, ma'am.

8     Q.     What happens if retention in administrative

9     segregation is approved at this initial review?

10    A.     The inmate is retained until he's seen by the

11    institutional classification committee within ten days.

12    Q.     Is that review process the review by the Institutional

13    Classification Committee also set out in Title 15?

14    A.     Yes, ma'am.

15    Q.     What section is that?

16           Let me draw your attention to 3338.

17    A.     3338(a) would be the classification hearing.

18    Q.     What is the purpose?

19    A.     To review the factors for the placement; for

20    example -- and to make a determination whether an inmate

21    needs to be retained or released.  To ensure that it's for an

22    appropriate reason, if it's for disciplinary, if it's a

23    SHUable offense.

24           Not all disciplinaries are what we call SHUable that

25    would subsequently result in a security housing unit.  So

 1    let's say minor RVRs would not require that, and so, first of

 2    all, it's make a decision to retain or release.  If retained,

 3    to kind of figure out when will the next time they see them,

 4    if it needs to be investigated, assign it to somebody to

 5    investigate.

 6         There is a variety of things that are done in a

 7    classification committee, but each is individual based on

 8    that offender's case record.

 9    Q.    What are some of the reasons why an ICC may determine

10    that there is a need for a continued retention in

11    administrative segregation unit?

12    A.    It could be pending investigation into criminal

13    activity.  It could be pending investigation into safety

14    concerns.  It could be for outrageous -- I mean, something

15    that is significant enough that will result in a District

16    Attorney referral.

17    Q.    Would it also include classification of an inmate for

18    transfer to a sensitive needs yard, for example?

19    A.    If an inmate has claimed that he has safety concerns,

20    we have to evaluate what those safety concerns are.

21    Sometimes it could be due to his commitment offense and it's

22    clearly understood why he has safety concerns, so we could

23    immediately make a recommendation for transfer.

24         But if it requires an investigation as to why he has

25    safety concerns, sometimes that does take a little longer

1    because I have to assign it to the facility captain on the

2    yard to conduct that investigation or the investigative

3    services unit to conduct that investigation.

4         That could be a variety of reasons.  He could have old

5    crime partners that showed up on the yard.  He could show

6    drug debts.  There's a variety reasons why inmates have

7    safety concerns.

8    Q.    That would include resolution of nondisciplinary

9    reasons as well?

10   A.    Yes, ma'am.

11        MS. VOROUS:  Your Honor, may I approach the witness?

12   Q.    Ms. Allison, I've handed you what has been marked as

13   Defendants' Exhibit OOO.

14        Do you recognize this document?

15   A.    Yes ma'am.

16   Q.    Describe what it is, please.

17   A.    This is the notice of change to regulations and it

18   cites specific Sections, 3044, 3190, 3282 and 3335.

19        MS. VOROUS:  Defendants request that Defendants'

20   Exhibit OOO would moved into evidence.

21        THE COURT:  Received.

22                         (Whereupon, Defendants' Exhibit OOO

23                         was received into evidence.)

24   BY MS. VOROUS:

25   Q.    Ms. Allison, are these regulations currently in

1    effect?

2    A.    Yes, ma'am.

3    Q.    When did they become effective?

4    A.    The effective date was December 24th where it was

5    signed by Administrative Office of the Law, and then the

6    publication date is October 18, 2013.

7    Q.    Do you recall when the department started working on

8    development of new regulations?

9    A.    Yes, ma'am.

10    Q.    When was that?

11    A.    I'm trying to think.  I was tasked with making this

12    happen shortly after our new secretary arrived, so I want to

13    say that would have been early 2013.

14    Q.    We've talked a little about a term that's been used,

15    "nondisciplinary segregation."

16          Is that term defined within the new regulations?

17    A.    Yes, ma'am.

18    Q.    Please tell me what regulation is defining the term

19    "nondisciplinary segregation."

20    A.    It's in the initial statement of reasons, which is

21    approximately four, five pages down.

22          THE COURT:  I just went past that.  Hang on.

23          THE WITNESS:  We have to make things very complicated.

24          THE COURT:  Looking at the page numbers on the bottom

25    right, what page are you looking at?

```
1              THE WITNESS:  Page 1.

2              THE COURT:  Page 1.  Okay.

3              MS. VOROUS:  Of the initial statement of reasons.

4              THE COURT:  Okay.  We'll have to take our morning

5    recess.  15 minutes, ladies and gentlemen.

6              MR. MCKINNEY:  May I address the court?  This relates

7    to the three-judge court issue.

8              THE COURT:  Okay.  Hang on.

9              Off the record.

10                           (Whereupon a discussion was held off

11                           the record.)

12                           (Whereupon, a break was taken at

13                           10:44 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

2907

1           (On the record at 11:00 a.m.)

2           THE CLERK:  Please, remain seated.

3           Court is now in session.

4           MR. FISCHER:  Your Honor, one housekeeping matter.

5           THE COURT:  Yes, Mr. Fischer.

6           MR. FISCHER:  On Wednesday, December 4th, we had --

7   plaintiffs had moved to admit Exhibit 2481.  And I believe

8   there is confusion in the record as to whether it was

9   admitted.  The court had indicated it was already admitted.

10  I spoke with defense counsel, and just to make the record

11  clear, we move to admit Exhibit 2481.

12          THE COURT:  Granted.

13              (Whereupon, Plaintiffs' Exhibit 2481 received

14               into evidence.)

15          THE COURT:  Miss Vorous.

16  BY MS. VOROUS:

17  Q.    Miss Allison, right before the break we were talking

18  about the new regulations and the definition of

19  nondisciplinary segregation.  I would like to go back to

20  that.

21          Were you able to locate the definition within the new

22  regulation packet?

23  A.    Yes.  I found a more concise definition.  It's within

24  the body on page 7 of this document.

25  Q.    Is that the statement -- or excuse me -- the Initial

2908

1   Statement of Reasons?

2   A.      It is -- yes.  It is part of the Initial Statement Of

3   Reasons.  And it starts at the text of the section changes,

4   but it would be page 7, Section 3335(b), the middle of the

5   page.

6   Q.      What is the definition of "nondisciplinary

7   segregation"?

8   A.      The definition of nondisciplinary segregation means:

9           (Reading:)

10          Segregated housing placement for administrative

11          reasons to include, but not limited to:

12          ASU placement for safety concerns, investigations not

13          related to misconduct or criminal activity, and/or

14          being a relative or an associate of a prison staff

15          member.

16          (Reading concluded.)

17  Q.      So essentially there is three different categories of

18  nondisciplinary segregation; is that fair?

19  A.      Yes, ma'am.

20  Q.      Miss Allison, is an inmate with safety concerns

21  automatically placed in administrative segregation?

22  A.      As soon as an inmate states that he has safety

23  concerns, the facility -- the highest custodial person of the

24  facility, either a captain or lieutenant, depending upon time

25  of day, will attempt to resolve those safety concerns.

2909

1          Sometimes they'll have to, you know, What's the

2    problem?  Let's talk about it?  Depending upon how serious it

3    is, if it's minor in nature and it's a miscommunication,

4    he'll oftentimes try and get the two inmates together and

5    say, Okay, let's work this out.  We're all grown-ups.

6          And then they would sign -- each of them would sign a

7    chrono indicating, Okay, we're okay now, and go on about our

8    business.

9          Sometimes he'll move them to different housing.  It

10   is just sometimes when you live in a cell together, they

11   sometimes don't get along.  Somebody might snore.  It could

12   be something very simple.  So, you know, reassign them to a

13   different housing unit within that same yard, or he'll try

14   and find another housing unit within the same institution.

15   Q.      And in your experience are these efforts often

16   effective?

17   A.      Absolutely.  Every day.

18   Q.      Going back to the initial institutional

19   classification hearing, the ICC hearing that we've discussed

20   earlier that must occur within ten days of placement in

21   administrative segregation, is that hearing handled

22   differently depending on whether an inmate is placed in

23   segregation for disciplinary as compared to nondisciplinary

24   segregation?

25   A.      Yes.  In the fact that we're trying to see if we can

2910

1    resolve whatever those concerns are.

2          Let's say they weren't able to be resolved at the

3    lieutenant and captain level, at those two review levels, but

4    the warden could think of other options, have discussions

5    with the inmates, figure out, okay, what's the issue, and

6    come up with another option for that inmate to, you know,

7    like I said, possibly go to another kind of yard or

8    something.

9          You know, so you're digging a little bit deeper as

10   soon as possible to try and get them to the least restrictive

11   housing as possible.

12   Q.    Does CDCR consider it important to release the

13   nondisciplinary segregation category of inmates as quickly as

14   possible?

15   A.    Absolutely.  Always have.

16   Q.    What factors are -- what are the factors that custody

17   would have to consider in making a placement decision for

18   inmates that are in nondisciplinary segregation for safety

19   reasons?

20   A.    You have to review the inmate's central file to

21   include -- and some of the most important pieces of this are

22   his other enemy concerns.  There is a document within the

23   file that addresses all the inmate's concerns.  And it is

24   called an 812 and 812-C Confidential.  So he may not know of

25   enemies, but other inmates have claimed him as enemies.

2911

1    So we have to do a cross-check, and we have to run

2    each and every inmate that has -- let's say he has 15

3    enemies.  We have to run a cross-check to find out where all

4    those inmates are realtime today to make sure that we don't

5    put him in greater harm's way by moving him.  That's one of

6    the steps that we have to do.

7    Q.    Are there other factors, such as an inmate's custody

8    level or medical or mental health condition, that are taken

9    into account?

10   A.    Absolutely.  You have to make a determination that

11   you find the right location, meaning whether it be a Level

12   II, III, IV, SNY, general population, or if he has needs, EOP

13   treatment, CCC treatment.  If he is a high-risk medical or

14   medium-risk medical there are only specific locations he can

15   go.  You overlay that with other disability concerns whether

16   it be developmental disabilities or physical disabilities.

17         So it's not as easy as it sounds just to move him.

18   It is very, very complicated.  And we have an entire sheet

19   that we have to go through every single time to make sure

20   that we address every single issue and that we find the right

21   location for the inmate to go to.

22   Q.    What about the inmate's custody level?

23         In other words, CDCR classifies inmates according to

24   custody levels I through IV?

25   A.    Correct.

2912

1   Q.      Does that come into play as well?

2   A.      Oh, absolutely.  Absolutely.  I have to -- I cannot

3   place an inmate, let's say he's Level II, in a Level IV

4   facility.  I have to keep him within his facility.

5           I can request what I call an override or an

6   underride, meaning I can go one level above or below,

7   depending upon the circumstances, but I cannot go more than

8   that for his own safety.

9   Q.      For inmates that are in administrative segregation

10  for disciplinary reasons, does the ICC consider the inmate's

11  mental health in making a decision as to assess a security

12  housing unit term, for instance?

13  A.      Absolutely.  There's a representative from mental

14  health that sits on every single ICC.  They provide us a

15  summary of what happened in IDTT and voice any concerns.

16          Also I would like at the inmate's 115 to see if there

17  were concerns noted on that document for this specific act at

18  the time of the incident, the Rules Violation Report was

19  written.  There is a mental health evaluation associated with

20  that.  I would be evaluating that, as well as soliciting

21  input from the clinician.

22          And that's oftentimes part of our mitigation

23  determination, or even totally you can suspend a SHU term or

24  you can assess and suspend at the same time you assess it as

25  a mitigation factor.

2913

1   Q.    Miss Allison, after the initial ICC hearing that

2   we've been discussing, the ten-day hearing, does the

3   committee continue to review an inmate's placement in

4   segregation?

5   A.    Yes, ma'am.

6   Q.    Would you describe the process for the continued

7   review, please?

8   A.    Okay.  Every individual has a specific time for the

9   type of offense that he's in there for.  For example, if he's

10  in there for pending investigation, for whatever reason, I

11  give the facility or investigative services no more than 30

12  days to complete that investigation.  So I will see that

13  inmate again within that 30-day period to make an assessment.

14        One of our checks and balances in our classification

15  system, which is complex, it is a very complex system we've

16  built with many checks and balances, is when I see an

17  offender -- and I say "I" as the chairperson of the

18  committee, bear with me -- when anyone sees somebody in ICC,

19  they make a referral to what we call the Classification

20  Services Representative for approving that decision.

21        That is the director's final checks and balances on

22  every single inmate that is placed in administrative

23  segregation so there is an extra set of eyes, let's say, on

24  that case.

25        So the inmate comes in.  He has safety concerns or

2914

1    he's pending investigation, whatever the case may be.  We

2    assign it, evaluate, report back within 30 days.

3         Now, obviously our new memo will change that

4    timeline, but historically that's how we've done it.

5         It goes to the CSR for approval of that 30-day

6    extension in administrative segregation.  We see the offender

7    back within 30 days, then make a determination of where do we

8    go from here.  And that's for one example.

9         There's other examples.  Let's say he's pending a

10   Rules Violation Report.  Depending upon the level of the

11   Rules Violation Report will depend upon how much time I ask

12   for -- or the committee asks for.

13        For example, I have to take into consideration what

14   the offense was for.  Let's say it is for a riot, and he's

15   had no priors.  I always look at what we call the projected

16   Minimal Eligible Release Date.  Let's say he's found guilty,

17   worst case scenario, what would it be?  And I'm going to use

18   a riot for example.

19        I would not afford -- I would say I want to see this

20   case back in 45 days.  Some I see him back in 45 days, some

21   in 90 days because it is more egregious behavior and I know

22   that, you know, the potential for a longer SHU term for, you

23   know, serious misconduct, assault on staff or whatever.  So I

24   would see that offender back in 90 days.

25        There's also -- if he's like, say, conducted an

2915

1   in-cell murder, I may retain him and request an extension up

2   to 180 days pending the district attorney processing and

3   trial time.

4   Q.      Miss Allison, you used the acronym "CSR"?

5   A.      I'm sorry.  Classification Services Representative.

6   Q.      Describe what that position is?

7   A.      They are at a Correctional Counselor III level.  They

8   are the most technically proficient people in our

9   classification services.  And they review every single case

10  that is moved within the state to ensure all the checks and

11  balances are done between the -- you know, when an

12  institution recommends transfer.

13          They review all general population, as well as

14  administrative segregation cases.  They work out of

15  headquarters for the Classification Services Unit.

16  Q.      Miss Allison, the timelines that you just described,

17  are those contained within Title 15, as well?

18  A.      Yes, ma'am.

19  Q.      And is that Section 3335?

20  A.      Yes, ma'am, starting 3335(d).

21  Q.      Thank you.

22          Miss Allison, I would like to kind of move on to the

23  next step in the review that occurs in the context of the

24  disciplinary process.

25          What happens if an inmate is found guilty at the

2916

1    Institutional Classification Hearing of a serious offense,

2    such as murder or assault?

3        What's the next step that takes place?

4    A.    I would like to clarify that.

5        The committee does not assign guilt or not guilt.

6    That is done by a hearing officer.  That is done on the

7    facility.  So once a Rules Violation Report is heard by a

8    hearing officer, lieutenant level for serious misconduct,

9    then once a decision is made and the RVR is completed, it is

10   referred back to the classification committee for final

11   adjudication, meaning final determination of, let's say, if

12   it requires a SHU-able offense.

13   Q.    What's the process if there's a referral to the

14   district attorney?

15   A.    An inmate can either proceed with his administrative

16   process within CDCR and have that hearing heard, or he has a

17   legal right to waive that pending the outcome of the legal

18   process through the district attorney.

19       If he waives that, then we would hear the RVR and

20   proceed.  If he chooses not to waive, then we have to hold

21   the adjudication of that Rules Violation Report basically in

22   abeyance until the district attorney has rendered a decision.

23       Once the decision is made from the district attorney,

24   we have 30 days to bring him back to committee to finalize

25   our processes.

2917

1    Let's say it's -- depending upon, and at any time --

2    I want to make sure I'm clear -- the committee's

3    responsibility is to identify what that projected MERD is,

4    Minimal Eligible Release Date, from SHU would have been for

5    that particular offense.  Let's say it was assault on staff

6    versus murder.

7    Well, if the DA is taking too long, I'm still going

8    to release him based on that projected MERD, assuming, you

9    know, whether it happened or not.  You know what I mean?

10    Even if he's found -- even if he's found -- so how do

11    I say it?

12    So the clock doesn't start from the time I hear from

13    the district attorney.  The clock starts from the time of the

14    offense.

15    Q.    Correct.  So if there is a delay in receiving a

16    determination from the district attorney, the inmate may

17    still be released from administrative segregation placement

18    even though the determination is pending?

19    A.    Correct.  Correct.

20    Obviously, unless it is for something in a worst-case

21    scenario, murder, then, of course, I generally obviously hear

22    from the DA long before the MERD would be expired for that.

23    Q.    Miss Allison, does the Division of Adult Institutions

24    track inmates' length of stay within administrative

25    segregation units?

2918

1    A.    Yes, ma'am.

2         THE COURT:  You use the documents that we heard about

3    a couple of days ago that was created by a member of your --

4    I don't know if it's your staff, but somebody's staff -- and

5    it includes resetting the date every time somebody is moved

6    somewhere?

7         THE WITNESS:  I think you're referring to mental

8    health documents.  My documents would be different.  I use it

9    as -- Let me clarify.

10        We have what we call a COMPSTAT tracking system for

11   administrative segregation inmates, which every single inmate

12   that is placed in administrative segregation is keyed into

13   the system.  And I'm very, very involved to ensure the

14   compliance with utilizing that system.

15        Prior to the COMPSTAT system, each and every

16   institution maintained their own tracking of their cases.

17   It's always been a requirement that institutions monitor

18   their cases for proper bed utilization.  So my purpose of

19   that is for bed utilization.

20        Now, it would not calculate out administrative

21   segregation time and SHU time.  Those are two separate.  So

22   if they're being combined or in mental health every time the

23   bed moves.

24        So mental health has their own system, which is for

25   mental health treatment.  They go based on level of care

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2919

1    changes.  I go based on placement.

2          So they make a move to five different cells within

3    that unit, but I am maintaining his entire time in

4    administrative segregation.  The clock does not reset.

5    BY MS. VOROUS:

6    Q.    Your tracking is maintained through -- I believe you

7    described it as a "tracking log" or "tracking system"?

8    A.    It is a computerized tracking system that was

9    developed by the Classification Services Unit a couple of

10   years ago.  I was a warden when it came out.  And it's a very

11   complex system that requires a lot of data input into the

12   system.

13         And the expectation is that upon entrance into the

14   ASU and upon retention, because he may not be retained

15   because the captain could release him, then he's keyed into

16   that system with basic case factors, reason for retention --

17   excuse me -- reason for placement, there is a code for that,

18   and then there is a reason for retention, which is a separate

19   code.

20         So for example, nondisciplinary segregation is now --

21   it is a classification designation, and that's a code placed

22   into that computer.

23         And there is a variety of codes.  There's, I want to

24   say, 20 or 30 different codes that we have as to reasons why

25   someone is placed in administrative segregation.  And so it

2920

1    tracks all of those case factors.

2        I'm able to pull reports -- it's on my computer --

3    every day.  I have since kind of developed a more usable,

4    workable document for the wardens because the system was so

5    complex.  It's like, what do we really need to manage our

6    cases versus what correctional counselors may need to manage

7    their cases.  So I kind of brought it up a little bit to

8    where it is manageable for the wardens.

9        It's a document that I use on a daily basis to track,

10   and it gives me every single inmate by level of care.  For

11   example, if he's mental health, I can screen those out at the

12   top of my report.  And it automatically calculates the length

13   of stay for me within that document.

14       MS. VOROUS:  May I approach the witness, Your Honor?

15       (Exhibit handed to witness.)

16   BY MS. VOROUS:

17   Q.    Miss Allison, I've handed you what's been marked as

18   Defendant's Exhibit PPP.

19       Do you recognize this document?

20   A.    Yes, ma'am.

21   Q.    Would you describe what it is, please?

22   A.    This is one of the reports that I asked my staff --

23   my direct special assistant to produce for me out of the

24   COMPSTAT tracking system.  We produce it on a weekly basis,

25   and it helps me to determine the average length of stay.

2921

1    This particular one is broken down by mental health,

2    non-mental health inmates, as well as their median length of

3    stay.

4        Let's say -- it's taking out the outliers, the

5    long-term gang guy that's pending validation versus the

6    short, you know, in-there-for-ten-day guys.

7        So it kind of takes those out and gives you a more

8    median range.

9        MS. VOROUS:  Move to admit Defendants' PPP into

10   evidence.

11       THE COURT:  Received.

12       (Whereupon, Defendants' Exhibit PPP received into

13       evidence.)

14   BY MS. VOROUS:

15   Q.    So looking at this particular report, it was

16   generated on November 26th; is that correct?

17   A.    Yes, ma'am.

18   Q.    And if you could, explain what's represented in the

19   chart that is on this document?

20       First, just identify by row labels, count of inmates

21   and the length of stay and the median?

22   A.    Okay.  Obviously, the first row is "CCCMS," which is

23   mental health.  "Clear" is obviously no mental health issues.

24   "DMH" are inmates that are at Department of Health Services,

25   and they're using the old DMH code, but are designated as

2922

1    administrative segregation.  We still expect them to track

2    those case files.  Then Enhanced Outpatient Program and

3    Mental Health Crisis Beds.

4           The second is totals for each of those --

5           THE COURT:  I'm sorry, ma'am.  I'm trying to follow

6    you, and I'm not succeeding.

7           THE WITNESS:  Okay.

8           THE COURT:  You have Row Labels, CCCMS?

9           THE WITNESS:  Yes.  And there is 1800.

10          THE COURT:  That means there are 1858 CCCMS inmates

11   in -- is it just administrative segregation or both

12   administrative and SHU?

13          THE WITNESS:  Just administrative segregation.

14          THE COURT:  All right.

15          Then the average length of stay is 114 days; is that

16   right?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  And the median stay is 84?  Median stay

19   is 84?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  I understand that.  I don't understand

22   what you were talking about earlier.

23          Go ahead.

24   BY MS. VOROUS:

25   Q.     Then with respect to the EOP inmates, as of November

2923

1    26th there was a total of 621, correct?

2    A.      Yes.  Understand that every single document -- I mean

3    this particular -- they're all points in time so that's that

4    particular day.

5           This was in the middle of the week because of the

6    Thanksgiving holiday, if I recall the dates.  And I typically

7    run these reports on a Friday following committee so I have

8    the most current.

9           I mean, the data is current, and it is real, but it

10   would not capture guys that would be released, for example,

11   this day, the following day.  You know, typically we run

12   committees on Thursday in an institution.

13   Q.      And as of this point in time, November 26th, the

14   average length of stay for EOP was 94 and the median 61?

15   A.      Correct.

16   Q.      From your perspective as a deputy director --

17          THE COURT:  Wait.  Wait.  Before you leave this,

18   MHCB, I'm assuming, means Mental Health Crisis Bed?

19          THE WITNESS:  Yes.

20          THE COURT:  You don't have -- Strike that.

21          Do you have Mental Health Crisis Beds in segregated

22   housing?

23          THE WITNESS:  No, sir.  Thank you for clarifying.

24          Those are inmates that are in a Mental Health Crisis

25   Bed that happen to be what we call max custody.  So I still

2924

1    have to monitor their case factors.

2         How do I explain this?

3         They're escorted as if they're in administrative

4    segregation, but they are in a treatment facility.

5    BY MS. VOROUS:

6    Q.      In a Mental Health Crisis Bed facility?

7    A.      Correct.  Or DMH.

8            THE COURT:  All right.

9    BY MS. VOROUS:

10   Q.      Miss Allison, from your perspective as a deputy

11   director, is it important to look at the median?

12   A.      Well, it's important to look at the median, but it is

13   also important to look at everything as it relates to the

14   length of stay to identify any particular concerns.

15           I look at the median so I have an overall, making

16   sure the institutions are managing their cases.  And then it

17   helps me also identify kind of the outliers and which ones

18   need more focus.

19           If I have an institution that has an inmate that's

20   difficult to place, I have to make an intervention.  I have

21   to provide them that additional support, myself or the

22   Classification Services Unit, to find the right location.

23           If I have inmates that -- if I have several guys

24   pending gang validation, I go directly to the gang staff and

25   say, Hey, I need you guys to get to this institution, it has

2925

1    to be a priority, I have too many guys sitting there waiting

2    for you.  That's how I utilize this as a management tool.

3    That's one of the ways I utilize it.

4    Q.    You mentioned gang debriefing, I believe you said.

5    Is that one reason why an inmate may stay in segregation

6    longer than initially anticipated?

7    A.    The top three reasons for inmates remaining in

8    segregation the longest are gang, are pending district

9    attorney, or are serving a SHU term or SHU placement.

10   Q.    Why would an inmate remain in segregation longer than

11   anticipated pending a district attorney determination?

12         THE COURT:  Because the district attorney didn't get

13   around to doing what's he's supposed to do.

14         Let's go.  There are some things that are so self --

15   Sorry.  Go ahead.  It is your case.

16   BY MS. VOROUS:

17   Q.    Miss Allison, it's my understanding that there's a

18   difference in how an inmate may respond to a pending DA

19   determination; there is a difference between a waiver or

20   postponement of a hearing.

21         Does that impact the time that an inmate may stay in

22   segregation pending determination from a DA?

23   A.    No matter what, we look at the projected MERD so --

24   whether the inmate has waived his RVR hearing or not.  So I'm

25   still looking at the projected MERD.  But obviously these

2926

```
 1   guys, if it is serious enough to go to the district attorney,

 2   it certainly has a lengthier SHU term.

 3              MS. VOROUS:  May I approach the witness, Your Honor?

 4              THE COURT:  You may.

 5              (Exhibit handed to witness.)

 6   BY MS. VOROUS:

 7   Q.    Miss Allison, I've handed you what's been marked

 8   Defendants' QQQ.

 9              Do you recognize this document?

10   A.    Yes, ma'am.

11   Q.    Would you please describe what this document

12   represents?

13   A.    This is -- as we filter out all of the fields within

14   the COMPSTAT tracking system, I can run a very narrow report

15   for reason for placement into administrative segregation.

16              And so these guys were -- I'm sorry.  The reason for

17   retention.  I apologize.  Because only ICC can designate

18   somebody, not nondisciplinary.

19              Nondisciplinary segregation is an ICC classification

20   action.  Only ICC can approve nondisciplinary.  So these are

21   inmates that have been approved by the classification

22   committee as being nondisciplinary, broken down by the

23   various levels of care.

24   Q.    Miss Allison, was this a report that you requested be

25   prepared for your use?
```

2927

```
 1    A.      Yes.  I monitor all of the -- as the
 2    implementation -- because we're still in the implementation
 3    stage of the nondisciplinary segregations, they are very new,
 4    I monitor the numbers.  And I also monitor, when I go out to
 5    the institutions, to ensure the inmates get their property
 6    and everything accordingly.
 7            MS. VOROUS:  Your Honor, defendants would like to
 8    move into evidence QQQ.
 9            THE COURT:  Received.
10            (Whereupon, Defendant's Exhibit QQQ received into
11              evidence.)
12    BY MS. VOROUS:
13    Q.      Miss Allison, if you would, look at the first chart
14    on page 1 of this document.  At the top it has "NDS LOS by
15    MHSDS LOC"?
16            At some point we'll get rid of the acronyms.
17    A.      I'm sorry.  I do these reports for my purposes, and I
18    know what it means.
19    Q.      Will you explain what it means?
20    A.      Nondisciplinary Segregation Length of Stay by Mental
21    Health Delivery System Level of Care.
22    Q.      And below that you have a table -- or excuse me -- a
23    column with Row Labels.
24            Explain that column, please.
25    A.      Nondisciplinary Segregation Level of Care for CCCMS
```

2928

1   and EOP inmates.  Within those rows you have it broken down

2   for -- we have two different codes.  Again, it's our coding

3   system so please bear with me.

4           NDS:100 is safety concerns.  NDS:101 is safety

5   concerns -- or excuse me -- nonsafety concerns and other.

6   For example, it could be a family member, it could be a SHU

7   kickout, a variety of reasons why they're coded and placed in

8   NDS:100.

9   Q.      So would the NDS:100 and NDS:101 capture the three

10  categories of inmates that we talked about earlier that fall

11  within the definition of nondisciplinary segregation?

12  A.      Yes, ma'am.

13  Q.      Again, that's the new regulation, Section 3335(b),

14  correct?

15  A.      I'm going to check.

16          Yes, ma'am.

17  Q.      What does the term "Clear" mean that you have listed

18  here in the first table?

19  A.      They're not designated mental health at all.

20  Q.      There's also a category for Mental Health Crisis Bed

21  as well.  Can you explain that?

22          THE COURT:  I'm sorry.  Your question was?

23  BY MS. VOROUS:

24  Q.      To explain the category for Mental Health Crisis Bed?

25  A.      Those are inmates that are placed in administrative

2929

1    segregation, but they're not in administrative segregation,

2    they're in a Mental Health Crisis Bed at that point in time

3    that day.

4    Q.    And because there's an NDS classification of 100, or

5    code, that means they would be within the safety category?

6    A.    Correct.

7    Q.    What does the term "Select" mean for purposes of this

8    chart?

9    A.    "Select" means that is an error in the -- that there

10   are so many checked boxes within the system that they checked

11   NDS:101, but it did not -- it gave me a retention code, but

12   not a placement code.  So it is an anomaly that we have to

13   find out exactly what else is going on with that one

14   offender.  And I have staff looking into that right now.

15   Q.    Okay.  Miss Allison, a minute ago when I asked you

16   about the different codes, the NDS:101, I believe you

17   mentioned that inmates that may have a family member at the

18   institution would fall within that code; is that correct?

19   A.    Yes, ma'am.

20   Q.    Can you explain what that means?

21   A.    Inmates that, let's say, have a family member or

22   associate, high school friend, whatever, if it is deemed to

23   be a potential threat to the safety of the inmate because

24   other inmates find out about it, or to the staff member, then

25   we have to, one, protect the staff member and protect the

2930

1    inmate.

2            Inmates get pressured from other inmates if they find

3    out they have old friends, Hey, go talk to Johnny and help us

4    get in whatever, you know, contraband.

5            And so we would have to protect them, and we make

6    immediate transfers on those guys right away to get them out

7    of the institution for their safety.

8    Q.      You also mentioned, I believe, the term "SHU kickout?

9    A.      I'm sorry.

10   Q.      Can you explain that, please?

11   A.      Yes, I will.

12           There's a variety of reasons why -- SHU kickout

13   inmates, once they've completed their SHU term, they are no

14   longer considered -- they have served their time.  So now if

15   they have -- let me elaborate -- let me be clear.

16           For example, let me use Tehachapi SHU for example.

17   Tehachapi SHU houses SHU inmates, and they have two Level II

18   SNY yards.  So upon completion of the SHU, I can't

19   necessarily -- I can't send them to that Level II SNY yard

20   because they're a Level IV GP.  Most of the SHU kickouts

21   require 180-designed housing so I can't necessarily release

22   them that moment.

23           So I have to place them -- either retain them in SHU

24   or place them in administrative segregation pending transfer

25   to that Level IV institution.

2931

1    Q.      Miss Allison, when you referenced Tehachapi, are you

2    referring to the California Correctional Institution?

3    A.      Yes.  Thank you.  Sorry.

4    Q.      If we can, go back to QQQ, the first chart on page 1

5    of this document under the column count of "CDCR Number."

6            Do you see that?

7    A.      On the top?

8    Q.      Yes.  It's the first table.

9    A.      Oh, I'm sorry.

10   Q.      If you can, explain what the numbers in the first

11   table represent.

12   A.      A total of 188 CCCMS.  Then it is broken down by the

13   two different categories, 100 and 101.  Clear, 362 non-mental

14   health inmates.  Out of that 279 are safety, 90 are others.

15   EOP, 42 inmates; 34 of them are safety, 8 are others.

16           Mental Health Crisis Bed, 5.  Then all 5 are safety.

17   Then Select, the one anomaly.

18   Q.      And the second table on the page is just the

19   restating of the information with respect to the CCCMS and

20   EOP patients, correct?

21   A.      Yes.  Yes.

22   Q.      And this document is dated December 4th, 2013.

23           Is that the data you've just been discussing as of

24   December 4th?

25   A.      Yes.

2932

1    Q.      Miss Allison, if you would turn to the second page of

2    Defendants' Exhibit QQQ.

3            Do you have that in front of you?

4    A.      Yes, ma'am.

5    Q.      Would you please explain the table that is

6    represented on page 2?

7    A.      Again, it came out of the COMPSTAT tracking system.

8    It is nondisciplinary inmates pending transfer.  So those are

9    inmates that the system can tell me if they're pending

10   transfer and how many of those there are.

11           And then the caption below, we drill down even

12   further, and it says out of the 66 CCCMS and EOP with a

13   retention code -- remember I talked about placement and

14   retention codes -- for pending transfer 47 of them have the

15   Classification Services Representative endorsement to

16   transfer on record, which means that all the checks and

17   balances have been done.

18           And so we can -- now our transportation unit gets

19   involved as far as, you know, the movement around the state,

20   which is another very complex process when you're moving

21   offenders all around the state every day.

22           THE COURT:  It is 12 o'clock.  We'll reconvene at

23   1:30.

24           (Off the record at 12:00 p.m.)

25                       ---o0o---

```
 1                     SACRAMENTO, CALIFORNIA

 2              FRIDAY, DECEMBER 6, 2013; 1:30 P.M.

 3                          ---oOo---

 4

 5                       KATHLEEN ALLISON

 6   Recalled as a witness on behalf of the defendants herein, was

 7   previously sworn, examined, and testified as follows:

 8                  DIRECT EXAMINATION (CONTINUED)

 9   BY MS. VOROUS:

10   Q.     Good afternoon, Ms. Allison.

11   A.     Good afternoon.

12   Q.     When we broke for lunch, we were talking about

13   Defendants' Exhibit QQQ, and I had directed your attention to

14   the second page of this exhibit.

15          If you could find that again, please.

16   A.     Yes, ma'am.

17   Q.     What does it mean when an inmate with NDS

18   classification is pending transfer?

19   A.     Those are inmates that have been seen by the committee

20   and have been referred for transfer to the CSR.

21          We've had a total of 53 CCCMS.  Of that 53, 30 of them

22   are referred for an SNY bed, and 22 have been referred for a

23   GP bed, general population bed, and it further breaks down to

24   10 SNY EOPs and 10 or -- excuse me -- three general

25   population EOPs, for a total of 13.
```

```
 1              THE COURT:  The definition of an EOP is that he's not

 2    going to function in a general population setting.

 3              How can that be?

 4              THE WITNESS:  I'm sorry, sir.  There's general

 5    population for a mental health classification, meaning he has

 6    no mental health issue.  General population on a custodial

 7    side means he's nonSNY.  He's a regular inmate on a regular

 8    yard before we ever created SNY series.

 9    BY MS. VOROUS:

10    Q.    Would he be transferred to an enhanced outpatient

11    program mainline bed?

12    A.    Yes.

13    Q.    So, in other words, he's an EOP inmate who is leaving

14    administrative segregation and going to an EOP program on the

15    mainline?

16    A.    Yes, ma'am.  Of the 66 that are pending transfer, 47

17    of those have already been evaluated by our classification

18    service representative.

19    Q.    What is the status of the inmates that have not been

20    endorsed by the classification service representative?

21    A.    The code indicates to me that the case has been seen

22    by a committee and has been referred to the classification

23    services representative for final review.

24              The process typically would be that the institutional

25    classification committee makes a referral to the CSR.  The
```

1    counseling staff then have 30 days to prepare that case to go

2    to the CSR for final checks and balances.

3          Once the CSR has approved and endorsed that case to

4    the appropriate location for the inmate to go to, then it

5    gets transferred to the bus, what we call a bus, so we notify

6    population management we need a bus for a particular offender

7    to go to X institution.

8    Q.    Ms. Allison, if you look back at page 1, there's an

9    identification of 42 EOP inmates that have the NDS

10   classification code.

11   A.    Yes, ma'am.

12   Q.    As you compare that to the second page, there's

13   identification of 13 EOP inmates that are pending transfer.

14         Do you see that?

15   A.    Yes.

16   Q.    Can you explain why the difference between the 42 --

17   excuse me.  Explain why the balance of the EOP inmates that

18   are NDS cannot transfer immediately.

19   A.    They are still -- understand that this tracking system

20   tracks them from day one for their entire time in

21   administrative segregation.  I don't know if this is a

22   caption of day one that they're still pending evaluation of

23   the safety concerns.

24         It could be pending evaluation and investigation of

25   safety concerns or it's pending, you know, final

1    classification process to include the ICC to make the

2    recommendation to the CSR.

3    Q.    So, in other words, those inmates would fit in the

4    process that we've already been describing throughout today

5    in terms of the review once an inmate is placed in

6    administrative segregation?

7    A.    All of these inmates, all of the EOP and CCC, will

8    fall under a new process I have identified to expedite that

9    process.

10   Q.    That's the memo that you mentioned earlier today?

11   A.    Yes, ma'am.

12         MS. VOROUS:  May I approach the witness, Your Honor?

13         THE COURT:  Yes.

14   BY MS. VOROUS:

15   Q.    Ms. Allison, I've handed you what has been marked

16   Defendants' Exhibit RRR.

17         Is this the memo you were just referring to?

18   A.    Yes, ma'am.

19         MS. VOROUS:  At this time, we would like to move

20   Exhibit RRR into evidence.

21         THE COURT:  Received.

22                   (Whereupon, Defendants' Exhibit RRR

23                    was received into evidence.)

24   BY MS. VOROUS:

25   Q.    Ms. Allison, would you describe what directives are

1    given in this memorandum for transferring mental health

2    inmates that are classified as nondisciplinary segregation

3    inmates.

4    A.      Yes, ma'am.  It provides direction to the institutions

5    that (Reading:)

6                    All nondisciplinary segregation inmates at the

7                    level of enhanced outpatient program shall be

8                    released or transferred from administrative

9                    segregation within 30 days of ASU placement,

10                   and NDS inmates at the CCCMS level of care

11                   shall be released or transferred within 60 days

12                   of placement.

13        It further goes on to talk about some internal

14   processes, when I talked about the classification services

15   representative.  The case has to be -- go through ICC and has

16   to be referred for transfer on the 20th day.  This says 20th

17   calendar day and the 40th calendar day for CCCMS.  EOP is the

18   20th day and CCC is 40.

19             (Reading:)

20                   Any cases that go beyond that must be reported

21                   to their respective associate director.  I will

22                   be also monitoring these cases.

23   Q.      Has the Division of Adult Institutions taken any

24   action to implement this memo?

25   A.      Yes, ma'am.

1    Q.      What actions have been taken?

2    A.      We have provided training to all of the wardens via

3    conference call and with an expectation that they provide

4    training to all their classification staff as well.

5    Q.      Ms. Allison, I apologize.  I may have asked you this

6    already.

7            What is the date of this memorandum?

8    A.      December 3, 2013.

9    Q.      When was the directive given to staff with respect to

10   implementing this memo?

11   A.      If I recall, it was Wednesday afternoon of this week,

12   which would have been the 4th maybe.

13   Q.      Ms. Allison, I would like to go back and talk a little

14   bit about the sensitive needs yards.

15           From a clinical -- from a custodial perspective, how

16   would you describe the special needs yards?  What's the

17   intent of that type of custody classification?

18   A.      The original intent is -- of course, I was not part of

19   the management discussions when it was created, but my

20   understanding and experience of them was originally designed

21   for inmates that struggled living with mainline inmates.

22           For example, some inmates, based on their commitment

23   offense, for example, an inmate that is in for crimes against

24   children, sex crimes, those inmates typically struggled in

25   our environment, and inmates that didn't want to participate

1    in the gangs oftentimes wanted to get away from them because

2    of the pressure, so it was created basically for those

3    primary reasons.

4         It's evolved, as we know over time, and now inmates

5    come to us from the county jail requesting sensitive needs.

6    It's almost bled over to the county jail systems.

7    Q.    As far as you know, is this classification unique to

8    the California Prison System?

9    A.    Yes, ma'am.

10   Q.    Has the need for sensitive need yards increased over

11   the past couple of years?

12   A.    Absolutely.

13   Q.    Do you have an understanding of why there's been an

14   increased need?

15   A.    We modified the need based on the demand, actually.

16   The reality is inmates find it is a more comfortable

17   environment to live.  They don't have the same pressures.

18   They don't have the same level of violence necessarily, and

19   so we've accommodated those needs over time as we've

20   identified a need based on the population at any particular

21   level, whether it be level II, level III, level VI.  We've

22   had to increase them based on that.

23   Q.    Has CDCR over the past couple of years changed its

24   classification system?

25   A.    Yes, ma'am.

1    Q.    Can you explain what that change involved.

2    A.    The inmate classification score system changed about

3    the time we did realignment.  We saw significant changes, not

4    only in our population, but all levels of population.  For

5    example, many inmates had mandatory minimums.  For example,

6    inmates with life without the possibility of parole had a

7    mandatory minimum to stay at level VI, closed custody for X

8    number of years.  I think it was 15.

9          So we took away a lot of the mandatory minimums and

10   said, if there is a positive program -- and I think we

11   lowered it down to five years, if I recall.  We also changed

12   the score system slightly.  So we saw a significant decrease

13   in the level VI population.

14         It lowered their custody level to III.  Level III went

15   to level II, and so on, so we saw a significant decrease and

16   we're still trying to make recommendations for conversions of

17   yards because of that, because we still see the need.

18         We run various reports to ensure what we call at a

19   level report based on their classification score to make sure

20   the inmates are based in their right level, because the lower

21   the level, generally the more privilege you have, would be a

22   general rule.

23   Q.    Ms. Allison, in your experience has the change in the

24   classification scoring system impacted the need for special

25   needs yards throughout the system?

1    A.      Yes.  We've seen -- we've seen where we've needed to

2    modify, let's say, from a level VI to a level III yard

3    sensitive needs, so we've made those corrections accordingly.

4    But, yes, it has impacted.

5            MS. VOROUS:  May I approach the witness, Your Honor?

6            THE COURT:  Yes.

7    BY MS. VOROUS:

8    Q.      I've handed you what has been marked as Defendants'

9    Exhibit SSS.

10   A.      Yes, ma'am.

11           MS. VOROUS:  Your Honor, prior to starting Ms.

12   Allison's testimony, I spoke with plaintiffs' counsel and we

13   agreed to stipulate to a change in the title to this

14   document.  So what what we like to do is change the caption

15   so it states:  Systemwide Sensitive Needs Yards Population by

16   Year.

17           THE COURT:  I'm not going to change this.  You're

18   going to provide me a copy to substitute for the one that's

19   in evidence.

20           All right?

21           MS. VOROUS:  Yes.

22           THE COURT:  All right.

23   BY MS. VOROUS:

24   Q.      Ms. Allison, do you recognize this document?

25   A.      Yes, ma'am.

1    Q.    Would you explain what it represents, starting with

2    page one.

3    A.    This document is sensitive needs yards -- based on the

4    total number of sensitive needs yards for EOP and for CCC,

5    keeping in mind that would also include GP -- no, I'm sorry.

6    Q.    I was going to ask you a question about that.

7          So the population that you've just mentioned would

8    represent all of the sensitive needs yard population

9    throughout the system?

10         Correct?

11   A.    Correct.

12         THE COURT:  Irrespective whether they're Coleman class

13   members or not?

14         THE WITNESS:  Exactly.

15   BY MS. VOROUS:

16   Q.    If you could describe what page two represents.

17   A.    This is the CCCMS population by year for each

18   institution's sensitive needs yards and for CCC as well,

19   irrespective of their mental health needs.

20         So, for example, in 2008 we had 23,000 beds at the end

21   of 2008.  At the end of 2012, we had 32,000, and then we

22   anticipate by the end of December 2013, we'll have 34,627

23   beds.

24         MS. VOROUS:  I would ask at this time to admit

25   Defendants' SSS into evidence.

1              THE COURT:  Received.

2                            (Whereupon, Defendants' Exhibit SSS

3                            was received into evidence.)

4         THE WITNESS:  I want to make sure, clarify these are

5    actual population numbers.

6    BY MS. VOROUS:

7    Q.    Ms. Allison, how does CDCR determine where to create a

8    sensitive needs yard?

9    A.    You have to determine what the needs are at any given

10   time.  For example, we have -- if we need level II yards,

11   what's the best institution that can accommodate that, and

12   keeping in mind all of the different factors that we may need

13   to address with that.

14        For example, do we need an ADA institution that's out

15   of the valley fever endemic area?

16        Do we need to accommodate high risk medical?

17        So we take all kinds of factors to determine what

18   yards we will convert at any particular institution.

19   Q.    If you could look at page two --

20        THE COURT:  Before you go on, I missed the last words.

21   You were saying to determine what yards will convert in any

22   particular institution?

23        THE WITNESS:  Right.  We have to identify what's the

24   best institution to convert a yard to sensitive needs.

25   /////

1    BY MS. VOROUS:

2    Q.    Ms. Allison, if you would look at page two of Exhibit

3    SSS, the page with the identification of the institutions.

4    A.    Yes, ma'am.

5    Q.    If I can draw your attention to the last institution,

6    VSP, is that Valley State Prison?

7    A.    Yes, ma'am.

8    Q.    Based on this chart, it appears that in 2012 and again

9    in 2013, additional beds were added at that prison.

10        Is that correct?

11   A.    Yes.  That institution used to be Valley State Prison

12   for Women.  It was converted to a level II SNY male facility,

13   and we activated -- it was in the process of activation in

14   December of '12.  It's fully activated now.

15   Q.    Do those yards as well include inmates at the CCCMS

16   level of care?

17   A.    Yes, ma'am.

18   Q.    Ms. Allison, before leaving Exhibit SSS, can you tell

19   us when this document was created?

20   A.    Yes.  It was created this week.  It took our research

21   staff a long time to create it for me.  I want to say it was

22   Wednesday of this week or Thursday -- no, yesterday morning.

23   Yesterday morning I had the final document.  I had a draft

24   the night before.

25   Q.    That would be December 5th?

 1    A.      Yes, ma'am.

 2            MS. VOROUS:  May I approach the witness?

 3            THE COURT:  Yes.

 4    BY MS. VOROUS:

 5    Q.      Ms. Allison, if I could draw your attention to what's

 6    been marked as Defense Exhibit TTT.

 7            Do you recognize this document?

 8    A.      Yes, I do.

 9    Q.      Would you describe what it is.

10    A.      This is a sensitive needs EOP program and it's by year

11    since we started the sensitive needs classification 2008, the

12    population then to current.  This would be the population at

13    the end of 2008 to current.

14    Q.      Just for purposes of clarification, the population

15    numbers that are reflected in Exhibit TTT are also included

16    in Exhibit SSS.

17            Is that correct?

18    A.      Yes.

19    Q.      So --

20    A.      Subcategory of those.  To highlight the --

21    Q.      That was going to be my next question.

22            The purpose in creating the second graph is to

23    highlight the population with respect to the EOP sensitive

24    need yards inmates?

25    A.      Right.  We've increased from approximately 600 to over

1    1,400 beds throughout 2008 to current, and we're still in the

2    process of activation.  So those numbers would not be

3    reflected here, the complete activation.

4            MS. VOROUS:  I would move to admit Defendants' Exhibit

5    TTT into evidence.

6            THE COURT:  Received.

7                            (Whereupon, Defendants' Exhibit TTT

8                            was received into evidence.)

9    BY MS. VOROUS:

10   Q.    Ms. Allison, if you would turn to page two of Exhibit

11   TTT.

12          Do you have that in front of you?

13   A.    Yes.

14   Q.    For purposes of clarification, the chart on page two

15   represents all sensitive needs yards -- strike that.

16          Not all the institutions that are on page two have

17   actual designated special needs yards.

18          Is that fair?

19   A.    They don't all have an EOP program.

20   Q.    So there are some institutions that are reflected in

21   this chart that may currently be housing an enhanced

22   outpatient program inmate that is in the process of being

23   transferred to a designated EOP sensitive needs yard?

24   A.    Correct.

25   Q.    Ms. Allison, you mentioned a minute ago that CDCR was

 1   in the process of, I believe you said, converting or creating

 2   another EOP sensitive needs yard.

 3          Can you explain that conversion.

 4   A.     Yes, ma'am.  Originally, Salinas Valley was scheduled

 5   to be a level VI SNY EOP, and when we evaluated all the

 6   numbers after the classification scores have all been

 7   recalculated, we realized that what we needed was a level III

 8   SYN EOP, and so we are converting Salinas Valley's 150 beds

 9   at Salinas Valley to a level III EOP SNY.

10   Q.     If you look at page two for Salinas Valley, in the

11   column for December 13th, it currently shows 37.

12          Do you see that?

13   A.     Correct.

14   Q.     Based on your testimony, that will increase to

15   approximately 150?

16   A.     Yes.  You see Valley State Prison is almost at full

17   capacity.  I think their full capacity is 168 or 169, so

18   they're almost at full capacity, and that was a new program

19   that we created just this year.

20   Q.     Ms. Allison, since becoming the associate director for

21   the Division of Adult Institutions in November 2012, have you

22   been involved in examining ways to reduce length of stay in

23   administrative segregation units?

24   A.     Yes, I have.  As the deputy director of the Division

25   of Adult Institutions, I oversee the population management

1    unit which would encompass administrative segregation units.

2    Q.      Earlier today you talked a little bit about the

3    various types of reports that are currently being generated

4    that allow you to track length of stay and segregation.

5           Do you remember that testimony?

6    A.      Yes, ma'am.

7    Q.      Can you explain what process you followed to review

8    length of stay on a weekly basis.

9    A.      Utilizing our COMPSTAT tracking system, I have

10   internally developed just the key elements of that.  That

11   report has probably 50 different fields.  I don't need to

12   know all those issues.  I've isolated out what I need to

13   review, the name, the number, the reason for placement, the

14   length of stay, what the current status is of the case and

15   whether it's been referred to the CSR.  So I review each

16   institution's report.

17          I have conference calls with the wardens.  I try and

18   get them done every other week, so biweekly.  But weekly, I

19   get reports.  I ask for additional -- let me make sure I'm

20   clear.

21          I utilize the COMPSTAT tracking system to provide me

22   overall reports for length of stay broken down by

23   institution.  I also ask for the medium on all of those and

24   drill down further, asking for the individual reports that

25   has every single inmate within that institution in

1    administrative segregation and all their individual case

2    factors, and I review those.

3        I have conference calls with the warden, with any

4    institution that has beyond a 90-day length of day.

5    Q.    Through this process have you found that your review

6    has allowed you to identify issues with particular prison's

7    lengths of stay?

8    A.    Absolutely.  That's how the level II SNY EOP program

9    was created, because I saw numerous inmates waiting to

10   transfer.  So, okay.  We fixed that.

11       We've also identified the gang issues, which I think I

12   discussed earlier, a particular institution that had several

13   inmates pending gang and they were at the top of the list to

14   get attention from the group working on the STG's

15   evaluations -- security threat groups.  So I will ask them to

16   go down there.

17       I've identified institutions that have struggled with

18   the classification being cleared through the classification

19   services representative.  I've had to send down teams to a

20   particular institution to assess them and provide training

21   and clean up cases.

22   Q.    And has that recently occurred with respect to one

23   particular institution?

24   A.    Yes, ma'am.  Lancaster, California State Prison,

25   Los Angeles.  I had a team down there for three weeks.  They

1    had to report to me every day how many cases they were able

2    to process, and then at the end of that, they provided

3    training.  So not only were the Lancaster staff in

4    tandem with the --

5         And I picked the best in the state.  All the

6    classification experts, the top in the business, to go down

7    there and assist them and provide training.

8    Q.    As a deputy director have you delegated responsibility

9    to every warden within the system to review length of stay in

10   segregation units?

11   A.    Absolutely.  That's part of a warden's day-to-day job.

12   They need to know -- they have to have bed utilization.  We

13   have to ensure that we are managing our beds effectively and

14   that we are processing inmates timely.

15   Q.    In addition to the development and the review of

16   administrative segregation reports, have you taken any other

17   action as a deputy director to address segregation lengths of

18   stay within the CDCR prison system?

19   A.    It is an ongoing process.  We've seen marked

20   improvement.  I mean, at one time we were at 125 and 112 for

21   EOP, and now we're down to 90 days.  Obviously, this new memo

22   will make it even better.

23        I provide support to the institutions if they have a

24   particular issue with the case to help them navigate through

25   that case.  I'm also looking for the outliers in that to try

 1    and figure out what is the particular problem and help

 2    resolve those issues.

 3    Q.      Does headquarters have any sort of work order that

 4    addresses or looks at length of stay on an ongoing basis?

 5    A.      Absolutely.  That's how I first got involved in this.

 6    When I first came to headquarters, I was appointed to an

 7    administrative segregation work group.  It's a collaborative

 8    meeting with the Division of Adult Institution and mental

 9    health to include the mental help deputy director as well as

10    clinicians.  We meet on a monthly basis.

11    Q.      What is the purpose of the work group?

12    A.      We identify -- we created the work group I, as a

13    collaborative effort to -- the work group was created before

14    I went to headquarters in November of 2011.  I don't know how

15    long it was around before I was there.  I was just appointed

16    as the co-chair in November 2011, but the work group --

17    initially, my first interaction with it was we were looking

18    at all of our length of stay reports.  We were looking at all

19    of our wait list members.

20            For example, our transferring an inmate to an EOP hub

21    within 30 days.  We had a significant wait list in 2011.  We

22    were able to reduce that because of our constant efforts

23    working with HCPOP and POP management, population management,

24    healthcare population management, and DAI population

25    management are also on this meeting.

1          We work out any of the bugs that we need to work out

2     and identify any particular issues, if we need to convert a

3     yard or we need to provide some additional support.  There's

4     been no wait list for transferring to the EOP hub since

5     April 2012.  We monitor that through this committee on a

6     monthly basis.  I know there's other people that monitor

7     realtime, but it's reported out to us.  That's one of our

8     functions.

9          We have other functions.  We look at suicide

10    prevention efforts.  A lot of the policies that have been

11    developed in the last year or so have been because of that

12    work group.  The nondisciplinary segregation, the hand-wind

13    radios, Guard One was also part of that work group.

14         All the different strategies to improvement mental

15    health delivery with -- improve all conditions within the

16    segregation unit for mental health inmates and others because

17    they have the natural effect of them.

18    Q.    Ms. Allison, you mentioned the 30-day timeline for

19    transferring inmates -- for transferring EOP inmates into a

20    administration segregation unit hub.

21         Does CDCR track that information on a regular basis?

22    A.    Healthcare population management unit does, yes, and

23    each institution does.  As a warden, I knew exactly how many

24    EOP inmates I had to ensure they got there within the

25    30 days.

1    Q.      We've been talking about the regulatory process for

2    reviewing inmates upon arrival into segregation and deciding

3    whether to retain them in segregation.

4          As the deputy director for DAI, is it important for

5    correctional officials to have adequate time to complete this

6    process?

7    A.      Absolutely.

8    Q.      Why is that?

9    A.      There are so many factors for the inmate's own safety

10   that we have to consider.  We have to consider all the enemy

11   concerns, we have to consider the best placement for that

12   person as well as to ensure if it's disciplinary that we

13   process that case, ensure his due process rights are

14   afforded.

15   Q.      Would it be a concern for you as the deputy director

16   if an inmate in seg for disciplinary reasons was released

17   before this process could be completed by staff?

18   A.      Absolutely.  It's kind of hard to explain the

19   prison -- I don't know -- the environment or culture, but

20   inmates also monitor what's happening with other inmates, so

21   I have to ensure that his complete RVR is heard.

22          Because if an inmate is released too early, let's say

23   the inmates know he was locked up.  Say five inmates were

24   locked up and we were to release a couple, it would appear to

25   the other inmates he told on them.

1    So we have to ensure that everybody goes through their

2    full processes to ensure the safety of all the inmates.

3    Q.    Ms. Allison, I'd like to change topics for just a

4    little bit and discuss the availability of reading materials

5    and appliances within segregation units.

6    Does CDCR have a policy regarding reading materials

7    for inmates in segregation units?

8    A.    Yes.

9    Q.    What is that policy?

10    A.    That reading material is available to the inmates.

11    There's various mechanisms.  Some institutions have the rec

12    therapist take the cart of books.  There's an exchange.

13    There's a total number that are allowed.  I can't remember

14    the exact numbers, but it's three books or something, and

15    they can exchange either one-for-one exchange or

16    three-for-three exchange, but that reading materials are

17    available.

18    Some institutions the officers are the one taking them

19    down the tiers, but at any time an inmate can say, "I'm

20    finished with this book.  Can I get another one?"  If staff

21    has time, they exchange that book for him or her.

22    Q.    Does CDCR have a policy with respect to electrical

23    appliances, the availability or use of electrical appliances

24    within in administrative segregation units?

25    A.    Yes.  If they have electrical available, the

 1    expectation is they provide electrical appliances.  Let me

 2    rephrase that.  The inmate is allowed his own electrical

 3    appliance if he has one.  We do not provide the televisions.

 4    If he has one in his personal property, he is provided that.

 5    Most inmates have them.

 6    Q.    For those units that do not have electrical

 7    capabilities, is the department looking at other alternatives

 8    to provide inmates with, I believe you mentioned earlier,

 9    radios?

10          Can you explain that?

11    A.    Yes.  Through the brainstorming of our administrative

12    work group, we were all talking about this issue and trying

13    to figure out other ways, and somebody threw out:  What about

14    a camping radio?

15          What's that?

16          Somebody said:  It's like a hand-crank radio.

17          I don't know.

18          So we researched the technology.  It did not come in

19    clear technology, so we reached out to the vendor to see if

20    he would be willing to create it in clear technology.

21          Then, of course, he sells it to others who we purchase

22    it from.  It's very complicated.  So we were able to

23    basically have one pretty much made for the department.  We

24    afford the inmates -- basically, it's a small AM/FM radio

25    that has an internal battery which is hand-wound or cranked,

1    and I want to say about four-hour-life on one crank,

2    continuous crank, and it has a very high intense,

3    high-powered internal antenna on those as well, because some

4    of our locations are very remote.

5    Q.     Has the department ordered these radios?

6    A.     Yes.  We have ordered them and received them.

7    Q.     How many did you order and receive?

8    A.     2,500.

9    Q.     How are you going to distribute the radios?

10   A.     The radios will be distributed to the inmates upon

11   completion of the captain's review, meaning the

12   administrative review, to see if we're going to retain them

13   or release them.  If the decision is made to retain them,

14   then the inmates will be loaned a radio.

15          They can also purchase the radios through their own

16   canteen processes, but we will loan them a radio in 21-day

17   increments.  For example, if an inmate gets his own personal

18   property following institutional classification committee,

19   then he won't need our radio any more.  He'll have his own

20   appliance.  So if they have electrical within the cell.

21          We obviously gave more radios to those administrative

22   segregation units that did not have electrical and we gave

23   less to the ones that did have electrical.

24   Q.     I believe you've already testified that all of the

25   psychiatric service units as well as the security housing

1    units have electrical availability within those units?

2    A.    Yes, ma'am.

3    Q.    Does the department also offer recreational

4    opportunities to inmates that are housed within

5    administrative segregation?

6    A.    They go to their yard, yes.

7          THE COURT:  Go to their?

8          THE WITNESS:  Yards, outdoor yard activities.

9    BY MS. VOROUS:

10    Q.    Did those occur within -- I think we used the term --

11    small management yards or walk-alone yards?

12    A.    We have walk-alone yards or small management yards.

13    They're used the same, but we have all large group yards.

14    Some institutions still use group yards to facilitate yards.

15    It just depends on the institution and the factors,

16    understanding that you have to very carefully select the

17    groups for those yards to limit the violence potential.

18    Q.    Ms. Allison, we've discussed the actions that

19    correctional officials take to place and review inmate's

20    housing within administrative segregation.

21          Is there anything else that correctional officials do

22    with respect to monitoring inmates with respect to mental

23    health issues?

24    A.    Along with our collaborative partners in mental

25    health, we have morning meetings called huddles where the

1    correctional officers, the sergeant, lieutenant, along with

2    the clinician, oftentimes the LPT in the unit, will get

3    together in the morning and discuss cases.

4        If anybody has a particular concern, anybody that,

5    "Hey, this guy is not showering.  I don't know what's wrong

6    with him."  "This guy did not eat" or "This guy is all of a

7    sudden refusing yard when he normally goes to yard," those

8    are some of the custodial things we would be bringing up,

9    somebody is acting strange, whatever the case may be.

10        So they will have a conversation about those.  Mental

11   health with share wth us anybody that they have particular

12   concerns about within that unit.

13   Q.    Correctional officers have the ability to refer

14   inmates for mental health evaluation if they feel there's a

15   need to as well?

16   A.    Absolutely.  They all know where their chronos are.

17   They know how to fill them out, but I will say, because we

18   have licensed psychiatric technicians in those units every

19   single day and clinicians, depending on the level of care for

20   that particular institution, whether it be CCCMS or EOP, how

21   much activity is going on the building, they will oftentimes

22   grab us and say, "Hey, come over and talk to this guy for

23   me."

24   Q.    During the years that you worked in administrative

25   segregation units, did you have an occasion to see this type

1    of referral process working?

2    A.    Every day.

3    Q.    Ms. Allison, do custody staff complete welfare checks

4    on inmates housed in administrative segregation?

5    A.    Yes.

6    Q.    Would you describe those checks, please.

7    A.    In this past year, we've gone through another change

8    as it relates to our welfare checks, and I apologize.  I

9    don't remember off the top of my head exactly when we

10   implemented this.  I want to say it was August.

11       The welfare check process prior to Guard One, we did

12   go to a three checks per hour not to exceed 30 minutes.  We

13   completed the Guard One installation in the end of August.

14   So by September, we had implemented every institution to have

15   an electronic tracking system to verify the checks.

16       There is a sensor on each and every segregation door

17   and there is a pipe which has a computer chip within it.

18   It's very heavy, industrial device that goes up, and the

19   officer must connect the pipe with the sensor on the door.

20   It gives me realtime of the cell, the officers doing the

21   check, and the second that the -- the minute and the second

22   the check is done on that door.

23       In addition to checking the door, they have to utilize

24   a pad, let's say, that has various buttons on it that

25   indicate the level of activity.  For example, if an inmate is

1    sleeping, the officer will take the device and hit the sensor

2    on the door, connect it to the pad.  And, say, if he's

3    sleeping, if he's reading, if he's exercising, whatever level

4    of activity he's doing within the cell -- and I want to say

5    there's six different options -- he has to hit the sensor on

6    that for each inmate within that cell for upper and for

7    lower.

8    Q.    If I could draw your attention to what's been marked

9    as Defendants' Exhibit LLL.  That's your declaration.  It

10   will be in the stack there somewhere.

11   A.    Okay.

12         MS. VOROUS:  May I approach the witness, Your Honor?

13         THE COURT:  Yes.

14   BY MS. VOROUS:

15   Q.    Ms. Allison, if I could draw your attention to Exhibit

16   C to your declaration, and it's towards the back of Exhibit

17   LLL, and at the top there's a stamp with document 4713-3

18   filed 7-24-13.

19         Page 1 of 17, have you found that?

20   A.    Yes.

21         THE COURT:  I have not, but go ahead.  Hopefully I'll

22   find it.  Page 3 of 17, is that what you wanted?

23         MS. VOROUS:  Yes.  Let's go to page 3 of 17.

24         THE COURT:  All right.

25

1    BY MS. VOROUS:

2    Q.    Ms. Allison, this is a memorandum that's dated May 28,

3    2013.  Is this the change in policy direction that you were

4    just discussing?

5    A.    Yes.  This was the interim measure prior to the

6    implementation of Guard One.  There's multiple factors within

7    this, so it's kind of preparing everybody for Guard One as

8    well as adding an additional security check process.

9    Q.    If we can back up a little bit.  I want to go back and

10    make sure its clear to the court and to the record exactly

11    what this memor is doing.

12         So one of the things that you talked about was

13    increasing the number of welfare checks that occurred per

14    hour.

15    A.    Yes.  It used to stay 30 minutes at irregular

16    intervals, and this is a clear direction that it is to be at

17    three checks per hour, not to exceed 30 minutes to get the

18    irregularity on the natural.

19    Q.    This is a check that occurs for the first 21 days that

20    an inmate is in administrative segregation unit.

21         Correct?

22    A.    Correct, unless the clinician recommends it to extends

23    beyond the 21 days.

24    Q.    Is the -- strike that.

25         Is the ability of the clinician to recommend the

1    extension beyond 21 days also something that is new as part

2    of this memo that we've just been talking about, May 28, 2013

3    memo?

4    A.    Yes, ma'am.

5    Q.    Ms. Allison, you also discussed that this memo also

6    changes requirements with respect to custody staff conducting

7    security checks.

8    A.    Yes.

9    Q.    And what is the change that's been brought about by

10   this memorandum?

11   A.    This memorandum requires 30-minute security checks in

12   all of our segregated units to include ASU, PSU and SHU.

13   Q.    What do those checks involve?

14   A.    It's a visual check looking for obvious signs of

15   misconduct, somebody who's injured, somebody attempting to

16   escape, faulty equipment.  It also includes security of

17   making sure the doors are closed.  There's no obvious signs

18   of anything.

19   Q.    A personal observation?

20   A.    A visual check?

21   Q.    Yes.

22   A.    I would call that a personal observation yes, visual,

23   you and I.

24   Q.    This new addition of the 30-minute security check, is

25   this a check that will continue indefinitely for the term of

1    an inmate's placement in segregation?

2    A.      Yes, ma'am.

3    Q.      You've already described Guard One, but just had a

4    couple of follow-up questions on that.

5            When was Guard One implemented?

6    A.      The final installation was August 29th.  I gave all

7    the institutions approximately 30 days to provide the

8    training, so September of 2013.

9    Q.      You indicated does that mean all the prisons now have

10   the ability -- let me back up.  All of the prisons are now

11   using Guard One in their administrative segregation units?

12   A.      Yes.

13   Q.      Given the fairly recent completion of the installation

14   of Guard One, are you finding that there is still more work

15   that needs to be done with respect to the actual track and

16   monitoring of checks that are conducted through Guard One?

17   A.      What I've identified, because I can look at Guard One

18   on my computer, I want to be able to have a report, and I can

19   pull up a report of any given institution and how many checks

20   done on each cell, upper and lower on my desk.

21           But what I don't have realtime is who is the 21-day

22   guy, so I'm working on a report for that.

23   Q.      Ms. Allison, if I could draw your attention back to

24   what's been marked as Defendants' Exhibit OOO.

25           This is the new regulation packet?

1    A.    Yes, ma'am.

2    Q.    In addition to defining inmates that are placed in

3    administration segregation for nondisciplinary reasons, do

4    the regulations modify the current Title 15 regulations in

5    any other manner?

6    A.    It does as it relates to their privileges, primarily

7    with the privileges.

8    Q.    Would you explain what those changes are.

9         If you need to refer to the regulations --

10    A.    No, I'm pretty familiar with them.  The inmate will

11    revert back to his, what we call work group privilege group,

12    meaning his credit earning status he had before and his

13    privilege group that he had before.

14         For example, privilege group A comes with specific

15    allowable property, allowable canteens, those types of

16    things.  For example, like a reception center inmate doesn't

17    have as much property, because he's brand new, as a person

18    that's been around a long time in privilege group A.

19         He's working, functioning on the yard, programing well

20    with no concerns, and so he's afforded all of his privileges

21    that he had on the yard as it relates to his personal

22    property, his canteen and to include telephone calls.

23    Q.    Do the regulations say anything about efforts by a

24    particular institution to try and cluster inmates with a

25    nondisciplinary segregation unit?

1    A.      Yes.

2    Q.      What are the regulations with respect to this issue?

3    A.      They say when practicable and feasible, it's easy to

4    do on a lot of our 180 design administrative segregation

5    units that are clustered into a specific section.  Our 270

6    design units, which is all open, one big room with cells

7    lining around the room.  We ask them to at least cluster them

8    as best as possible within the right side or the left side.

9            They pick a section and that's their in dyads section,

10   and that's to prevent one -- the inmates can talk to one

11   another, and then also the transportation of contraband

12   between nondisciplinary inmates and disciplinary inmates.

13           MS. VOROUS:  May I approach the witness, Your Honor?

14           THE COURT:  Yes.

15   BY MS. VOROUS:

16   Q.      Ms. Allison, I've just handed you what has been marked

17   Defendants' Exhibit UUU.  This consists of four pages.

18           Can you explain what this exhibit includes?

19   A.      This is a schematic of the different types of housing

20   I was just talking about, the 180 design.  The reason for the

21   name is the visual from the control booth.  This has 180

22   degree visual.  The control booth is large enough for the

23   officers to see 180 degrees from one end to the other.

24           And then our 270 design --

25           THE COURT:  I'm sorry.  Has this been introduced into

1    evidence?

2              MS. VOROUS:  No, Your Honor.

3              THE WITNESS:  I'm so sorry.

4              THE COURT:  You're moving it?

5              MS. VOROUS:  Yes.

6              THE COURT:  Received.

7                        (Whereupon, Defendants' Exhibit UUU

8                        was received into evidence.)

9    BY MS. VOROUS:

10   Q.    You're referring to the first page?

11   A.    Correct.  That is 180 housing lower-level plan, which

12   in this plan, it has the sections.  So in each given housing

13   unit -- this is showing to me that there's two housing units

14   there, each housing unit having three separate sections.  My

15   recall, they vary from 132 cells -- no.  I'm sorry.

16         I can't remember how many cells in each section.

17   Maybe it's 62.  But they're broken into sections, and so we

18   would, for example, at a 180 design, and I've seen them since

19   we've implemented in dyads, so they have all of their

20   nondisciplinary segregation inmates in this section.

21   Q.    In what section?

22   A.    Let's say a particular section A --  I'm sorry.  I'll

23   slow down.  As you read the picture, it would go -- if you

24   look straight ahead at the picture -- I'll go to the forward

25   one.  The far left, it says "Day Room."  That would be a

1    section A in that housing, the middle section B, and the far

2    right is section C.

3            You can see that they have different number of cells

4    within there.  I just can't remember the exact number of

5    cells within those units.  And it also talks about the common

6    areas in between in this picture.  For example, there's a

7    medical office in each of the buildings as well as an officer

8    section.

9            There is a kitchen and dining hall, which in most of

10   these we've converted to some kind of treatment space.  Then

11   you go off to the other section, which is a mirror image of

12   that.

13   Q.    If you would turn three pages in, and that's a

14   representation of a 270 housing design.

15           Is that correct?

16   A.    Yes.

17   Q.    Can you explain why it would be more difficult to

18   cluster in the 270 design?

19   A.    It's wide open, as you can see.  There's no dividers

20   of any kind within that section.  So we do try to pick, and,

21   let's say, pick a -- we go to the bottom left corner, which

22   we would still call section A, but it has no division, no

23   walls dividing it.

24   Q.    Page two, this is just showing a first floor and

25   second floor of the respective design?

1    A.    Yes, ma'am.

2    Q.    Ms. Allison, we were talking earlier about some of the

3    new construction projects that CDCR has brought online for

4    treating EOP inmates in administrative segregation.  You

5    discussed a couple of occasions where the department has

6    now -- the facilities include individual interview rooms, and

7    in those cases, there's no need for therapeutic treatment

8    modules.

9         Do you recall that testimony?

10   A.    Yes, ma'am.

11   Q.    When an inmate is placed in those confidential

12   interview rooms, are they restrained in any way?

13   A.    No, ma'am.  In those pictures, you could see there was

14   a cuff port.  Once an inmate is placed in there, his cuffs

15   are removed through the cuff port and he has full freedom of

16   movement within that entire space.

17   Q.    In those prisons where the individual conference rooms

18   are not available, what purpose does a therapeutic model

19   serve from a custody prospective?

20   A.    It affords the clinician and the inmate one-on-one

21   private time.  All those treatment modulars have been

22   designed to where, unlike a typical holding cell where it's

23   totally made out of mesh and you can't necessarily see

24   clearly, it's made with plexiglass on three sides of it for

25   audio as well as visual.

 1             They're much much larger to where the inmates can sit

 2    down, where a typical holding cell may not have a seat.

 3    They're much larger.  I don't know the exact dimensions, but

 4    they're significantly larger.

 5    Q.       Within segregation units, is it correct that groups

 6    also take place with inmates that are held -- placed within a

 7    therapy treatment module?

 8             Correct?

 9    A.       Yes.  That's how we facilitate groups within

10    administrative segregation, yes.

11    Q.       Do the groups take place without the presence of a

12    correctional officer in the group treatment room?

13    A.       Yes.

14    Q.       Without using a therapeutic treatment module in that

15    situation, would there be a requirement to have a custodial

16    officer present?

17    A.       Yes.  For the security of the inmates as well as the

18    staff leading the group.

19    Q.       When an inmate is taken out of an administrative

20    segregation unit for a medical or dental appointment, for

21    instance, are they seen within a therapeutic treatment

22    module?

23    A.       Obviously, dental, no.  Some of the clinics do have

24    treatment modulars within them, the treatment space, but

25    oftentimes a physician would want to physically examine

1    somebody, so they're on a table versus in a treatment

2    modular.

3    Q.      In those cases is the correctional officer present in

4    the room?

5    A.      Generally, unless the doctor asks him to step out.

6    Q.      From a custodial perspective, is it necessary for all

7    inmates to receive services in a therapeutic treatment

8    module, even those that are classified nondisciplinary

9    segregation inmates?

10   A.      It's for their protection because they're in groups

11   with inmates who are disciplinary, and we also have SNY at

12   general population inmates in those units, the custodial

13   classification general population within those receiving

14   group therapy at the same time.

15   Q.      Does the department have a policy on cuffing inmates

16   that are provided treatment within therapeutic treatment

17   modules?

18   A.      Once they're secured within a module, their handcuffs

19   should be removed.

20   Q.      Ms. Allison, another policy that we've heard a lot of

21   testimony about is CDCR's strip policy that applies to

22   inmates that are housed within segregation units.

23          What is that policy?

24   A.      All inmates leaving or entering are required to be

25   stripped out to ensure that they don't have contraband or

1    weapons on them.

2    Q.    That includes general population as well as a CCCMS

3    inmate or an EOP inmate.

4          Correct?

5    A.    Yes.

6    Q.    In your years of experience, have you seen evidence

7    that strip searches act as a disincentive to medical or

8    mental health treatment?

9    A.    Not my experience.

10   Q.    Why would it also be important to maintain the strip

11   search policy with respect to those inmates that are -- that

12   fall within nondisciplinary segregation classification?

13   A.    There's a couple reasons.  One, an officer who is in

14   the practice of escorting inmates knows what his routine is

15   and what he has to get done to ensure the safety of everyone

16   within the unit, including himself.

17         There's also -- if a particular group was protected --

18   not protected.  How do I say that?  Was not required to do

19   that, they -- my concern they would be victimized by those

20   and forced to transport contraband for other inmates.

21   Q.    As the deputy director of the Division of Adult

22   Institutions, do you consider the department strip search

23   policy to be a critical component of prison security?

24         THE COURT:  Would you like to be sworn and testify,

25   ma'am?

1             MS. VOROUS:  No.  I'll move on.

2   Q.       Have you reviewed Dr. Haney's testimony --

3             THE COURT:  We're going to take our break now.

4   15 minutes.

5                         (Whereupon, a break was taken at

6                         2:47 p.m.)

7                         (Nothing Omitted.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2973

1          (On the record at 3:10 p.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Miss Vorous.

5    BY MS. VOROUS:

6    Q.      Miss Allison, if I can turn your attention back to

7    Defendants' Exhibit OOO, which is the regulation packet.

8          And if you would, turn to the section that's entitled

9    "Nondisciplinary Segregation Personal Property Matrix."

10         It looks like it is a little more than halfway into

11   the packet.

12   A.      Okay.

13   Q.      And page 1.

14         Were you involved in the development of the personal

15   property matrix for the nondisciplinary segregation regs?

16   A.      Yes, ma'am.

17         MR. FISCHER:  What page are you on?

18         MS. VOROUS:  I'm sorry?

19         MR. FISCHER:  What page are you on?

20         MS. VOROUS:  Page 1 of the --

21         MR. FISCHER:  Got it.

22         THE COURT:  Hang on.  Madam Clerk, did I hand you

23   OOO?

24         No?

25         THE CLERK:  I don't think so.  I'll look for it.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2974

```
1         THE COURT:  I've got it.  Thank you.
2   BY MS. VOROUS:
3   Q.     Miss Allison, if you would, turn to page 2 which at
4   the top is labeled "Personal Clothing for NDS Inmates."
5          Do you see that?
6   A.     Yes.
7   Q.     Can you describe the --
8          THE COURT:  I'm sorry.  I'm looking at OOO, page 2.
9   And you want me to look at what?
10         MS. VOROUS:  I'm sorry, Your Honor.  You need to look
11  about two-thirds of the way through this regulation packet
12  for the Nondisciplinary Segregation Personal Property Matrix.
13         THE COURT:  What page?
14         I see.  These aren't necessarily --
15         Go ahead.  I'll find it.
16         Go ahead.
17  BY MS. VOROUS:
18  Q.     So looking at page 2 of the property matrix, at the
19  top it's labeled "Personal Clothing For NDS Inmates."
20         Do you see that?
21         Underneath the column on the right for
22  "Nondiscplinary Segregation" there is an identification of
23  "Privilege Group."
24         Do you see that?
25         Can you explain what the difference is between the
```

2975

1   four columns under the Privilege Group title?

2   A.       Okay.  The first U is new intake inmates in a

3   reception center.  The second U is new reception center

4   inmates that are in the process of processing.  So once they

5   get a certain way through the process, they're allowed

6   additional privileges.

7           And then the Privilege Group A and B are the highest

8   privilege groups.  And group C is -- Privilege Group C is an

9   inmate while on the yard was not programming, he was refusing

10  to go to work or school or whatever the case may be.

11          But they're all preexisting privileges groups when

12  they were on the main line yard, when they were on the

13  facility before administrative segregation, so we broke down

14  their property accordingly to match up with what they were

15  allowed when they were on the yard.

16  Q.       Miss Allison, can you explain the difference between

17  the new regulations and how they apply to NDS inmates for

18  purposes of personal clothing -- Strike that.  Let me start

19  that question over.

20          Can you explain the difference between the new

21  regulations in the context of personal clothing and the

22  existing regulations?  What's the difference?

23  A.       With the NDS regulations we allow substantially more

24  property than we do for disciplinary segregation inmates.  So

25  you can go point by point through it.

2976

1          They are allowed up to six cubic feet, like they

2   would on the yard, and they're allowed additional personal

3   various items that regular segregation inmates are not

4   afforded.

5   Q.      So looking at the first one as I've indicated, the

6   personal clothing, is there anything in particular that has

7   been changed with the implementation of the new regulations

8   in the context of clothing?

9   A.      Yes.  For example, shoes.  They're allowed their

10  personal shoes.  They're allowed personal boxers.  They're

11  allowed their personal slippers, which I think the regular

12  inmates -- or the regular segregation inmates are allowed

13  their slippers.

14          They're allowed sweats, their own personal sweats.

15  They're not necessarily restricted to the state-issued boxer,

16  T-shirt and jump suit.  They're allowed their own thermals --

17  thermal underwear, their own personal T-shirts.

18          And there is additional items for females that are

19  allowed.  They're allowed their nightgowns, brassiere,

20  panties and robes.  None of the other inmates are allowed a

21  robe in administrative segregation.

22  Q.      Miss Allison, if you could, turn to next page which

23  is page 3.  This is "Personal Care/Hygiene For NDS Inmates."

24          Have you found that chart?

25  A.      Yes.

2977

1    Q.      Same question here, what is the difference in terms

2    of the additional privileges that are provided for NDS

3    inmates as a result of the new regulations?

4    A.      There are additional privileges, but it's hard

5    because the regular Ad. Seg., they did allow some of the

6    personal hygiene items.  But without having that matrix

7    side-by-side I'm not 100 percent sure exactly which ones they

8    are.

9           Off the top of my head I do remember things like lip

10   balm and a comb and hair brush, things that we didn't allow

11   because they would be considered weapon stock for other

12   inmates.  For these guys we did not consider that weapon

13   stock, potential for making weapons, but -- I don't have that

14   other matrix to compare it.

15          How we developed these regulations is we went through

16   the property matrix for everybody in administrative

17   segregation, and we made the decisions on what they were

18   allowed to have increased.  So 90 percent of it is increased.

19          There were some restrictions that we applied.  For

20   example, for things that would cause a security risk, for

21   example, Vaseline, I know we restricted that because of the

22   potential to slip the handcuffs.  And so we had to make sure

23   that, you know, we were careful to keep that in mind in the

24   development.

25   Q.      So in your estimation, 90 percent of the privileges

2978

1   that nondisciplinary segregation inmates would receive on the

2   main line, for instance, before placement in administrative

3   segregation, they'll now receive when they're in segregation?

4           Is that --

5   A.      Approximately, yes.  I mean, obviously without having

6   it, I couldn't merit it out.

7           For example, like the females, they're allowed

8   makeup, which the regular disciplinary are not allowed makeup

9   in administrative segregation.

10          I mean, obviously some of these are personal hygiene

11  items that everybody would have to have, a tooth brush and

12  toothpaste and those kinds of things.

13  Q.      Miss Allison, if I can have you flip forward a couple

14  more pages to page 7.

15          Here there's a chart that indicates "Games For NDS

16  Inmates."

17          Is that a change as well?

18  A.      Yes.

19          THE COURT:  I'm sorry.  The chart allows for what?

20          MS. VOROUS:  Games for inmates.  Page 7

21          THE COURT:  I'm on page 7.

22          THE WITNESS:  In the center.

23          THE COURT:  I see.  Yes.

24  ///

25  ///

2979

1    BY MS. VOROUS:

2    Q.      What is the change?

3    A.      That they're allowed cards, checkers, chess and

4    dominoes, which other administrative segregation inmates are

5    not.  They're allowed a wallet.  In addition, they're allowed

6    two electrical appliances versus one.

7    Q.      Is there also a change with respect to the

8    availability of books or other reading materials?

9    A.      It doesn't specify in here so I think they all get

10   equal.  If it didn't make a significant difference, I don't

11   think it got addressed.  So they're all allowed books.

12   Q.      Miss Allison, did you --

13   A.      I was just going to clarify on the phone calls.

14   They're also allowed phone calls based on their privilege

15   group also.

16   Q.      So are there any other items that stand out to you as

17   you've just now looked through the property matrix as changes

18   from the existing regulations?

19   A.      Drawing materials.  Colored pencils.  Those kinds of

20   things.

21   Q.      Anything else?

22   A.      I apologize.  I did find the books and magazines.

23          Yes.  It is up to ten.  So it was an increase.  So I

24   if I recall, others have five and nondisciplinary inmates and

25   Privilege Group A and B have ten.

2980

1    Q.      Miss Allison, did you review Dr. Haney's testimony as

2    part of this hearing?

3    A.      Yes, ma'am.

4    Q.      Are you familiar with his testimony regarding his

5    visit to Cypress Hall California Institution For Men?

6    A.      Yes, ma'am.

7    Q.      Are you familiar with how the California Institution

8    For Men was using Cypress Hall at the time of Dr. Haney's

9    visit to the prison back earlier in 2013?

10   A.      Yes, ma'am.

11   Q.      And were you part of the tour at that time, as well?

12   A.      Yes.

13   Q.      How was CIM using Cypress Hall at that time?

14           THE COURT:  I'm sorry.  How was?

15           MS. VOROUS:  CIM, California Institution For Men,

16   house using Cypress Hall?

17           THE COURT:  Go ahead.

18           THE WITNESS:  Cypress Hall is a building that was a

19   reception center building that later -- that was utilized for

20   administrative segregation overflow, but it was originally a

21   reception center building.  So it housed our reception center

22   inmates in there, and administrative segregation inmates in

23   there.

24   BY MS. VOROUS:

25   Q.      At this point does it still house administrative

2981

1  segregation inmates in Cypress Hall?

2  A.      Yes.

3  Q.      And does the institution still house overflow

4  reception center inmates in Cypress Hall?

5  A.      Yes.

6  Q.      At the time -- and I believe you answered this

7  question, and if not I want to make sure I'm clear -- at the

8  time that you visited with Dr. Haney, was the California

9  Institution For Men using Cypress Hall as an overflow for

10 reception center inmates?

11 A.      Yes, it was.  Cypress Hall -- the reason why it is

12 confusing is it's originally a reception center building, and

13 then when -- and they have to use it for Ad. Seg. overflow.

14 And not because the numbers of Ad. Seg. are high, but because

15 Palm Hall cannot house mental health inmates so they have to

16 have some mental health inmates in Cypress Hall.

17         But when SOMS, our electronic System Offender

18 Management System, our computerized system came in, they had

19 to designate the building so they went to the highest

20 custodial level.

21         But the inmates within that building -- the reception

22 center inmates within that building have full freedom of

23 movement.  As Mr. Haney said in his deposition, he saw them

24 walking to chow.

25 Q.      So those inmates were not subject to the same

2982

1  restrictions as inmates that were rightfully placed within

2  the unit for administrative segregation purposes?

3  A.    Correct.

4  Q.    Were the reception center inmates subject to

5  strip-searches?

6  A.    No.

7  Q.    Were they treated within therapeutic treatment

8  modules?

9  A.    No.

10  Q.    Miss Allison, Dr. Haney also testified that during

11  his tour one inmate told him that they had their eating

12  utensils taken away from them so he was eating with his ID

13  card.

14        Did you observe that?

15  A.    I did not.

16  Q.    And is that something that would be appropriate in

17  that type of unit?

18  A.    Absolutely not.  It doesn't make sense to me given

19  that in his deposition, not declaration -- wait, declaration

20  is before deposition, I'm new at this -- in his declaration

21  he witnessed them walking to chow.  And the warden, I think,

22  also did a declaration that they walked to chow.

23        So I don't know why this particular inmate would not

24  have had a utensil.  That does not make sense to me if he was

25  in the chow hall.

2983

1    Q.      Miss Allison, does CDCR have a policy for addressing

2    inmates discharged from a Mental Health Crisis Bed or a

3    Department of State Hospital Inpatient Program back into an

4    Administrative Segregation Unit or Security Housing Unit?

5    A.      There is no -- no.  I mean, everybody is a

6    case-by-case evaluation upon release, and it depends upon

7    what facility they're at and if they can house them, what the

8    inmate's individual case factors are and what the

9    institution's capabilities are upon release.

10   Q.      Miss Allison, if I could ask you to again refer to

11   Defendant's Exhibit LLL.

12           And at this time, if you could, look at Exhibit B,

13   which is about halfway through this packet.  And at the top

14   it's identified as document 4713-2, again filed 7-24-13.

15   This is on page 2 of 11.

16   A.      Yes.

17   Q.      And this document is a memorandum that's dated

18   March 21, 2013.

19           Is that correct?

20   A.      Yes, ma'am.

21   Q.      Can you explain what this document is?

22   A.      It's a pretty detailed memorandum.  It's direction to

23   correctional counsel staff and expectations.  And so it kind

24   of goes into a lot of detail on ensuring that an inmate that

25   is sent to Department of Health Services -- or Department of

2984

1   State Hospitals -- sorry -- the expectation is that any case

2   work related to that case is resolved as expeditiously as

3   possible.

4           And, I mean, I'm trying to summarize it because it's

5   very detailed.  But for example, if he's maximum custody,

6   it's to make sure that just because he's in DSH does not mean

7   that we stop processing his administrative segregation case

8   work.

9           So, for example, the Rules Violation Report still

10  needs to proceed.  We still need to proceed with the hearing.

11  And we still need to proceed with the classification actions

12  as relates to that inmate so upon release he goes to the

13  least restrictive housing as possible.

14  Q.    Miss Allison, I just want to make sure that I'm clear

15  on this.

16          We're talking about a case where an inmate initially

17  was in an administrative segregation unit or security housing

18  unit, was transferred to a Mental Health Crisis Bed or

19  Department of State Hospital program, and then is going to be

20  discharged back to either the prior housing or a different

21  housing?

22          Is that correct?

23          We're talking about the same thing?

24  A.    Right.  I just want to -- the whole point of this

25  memo is we don't wait until he's discharged to deal with that

2985

1   paperwork.  We deal with that paperwork while he's in the

2   Department of State Hospitals.

3        We have correctional counselors assigned to those

4   caseloads to ensure that all of his classification is still

5   processed while he's in DSH to ensure that he goes back to

6   the proper housing.

7        This is really primarily for inmates housed in

8   administrative segregation or -- yeah -- primarily

9   administrative segregation or SHU.

10  Q.    What's the process if an inmate -- Strike that.

11       What happens if CDCR is unable to complete the

12  processing of the paperwork before an inmate is released from

13  a Mental Health Crisis Bed or a Department of State Hospital

14  Inpatient Program?

15  A.    For example, if an inmate is released from the

16  Department of State Hospital, and let's say he's not

17  administrative segregation, but I don't have a yard on that

18  facility for him that can accommodate him -- let's say he's

19  SNY and all I have is main line inmates, I have to protect

20  him.

21       Or if he has -- he could -- just because he's --

22  we've completed his case file, let's say we've adjudicated

23  the RVR, but now he has a SHU term, he still has to complete

24  that SHU term or that SHU term has to be heard, whether it's

25  assessed or whether it is assessed and suspended, which is

2986

1    certainly a possibility, while at DSH.  So every single time

2    I may not be able to complete all of his case work for him

3    not to ever have a SHU again, is what I'm trying to say.

4           There are times where if it's a minor -- let's say it

5    is for a riot, a relatively minor SHU term, that should all

6    be adjudicated, the Rules Violation Reports have been heard,

7    and the SHU term should have been served and done and then

8    him being released back to a general population yard.

9    Q.    Are there occasions -- I'm sorry.  I thought you were

10   done.

11   A.    Go ahead.

12   Q.    Are there occasions where determinations are made

13   that it is not appropriate to release an inmate back to a

14   general population yard and they need to return to an

15   administrative segregation unit for instance?

16   A.    Yes.  If they have continued reasons for confinement,

17   for continued reasons for their administrative segregation

18   process.

19          For example, instead of the riot, we'll go to the far

20   extreme of he committed a murder.  He'd still have to serve

21   the remainder of that SHU term.

22          MS. VOROUS:  Just a moment, Your Honor.

23          (Cocounsel confer.)

24          MS. VOROUS:  No more questions, Your Honor.

25   ///

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2987

CROSS-EXAMINATION

1

2    BY MR. FISCHER:

3    Q.      Good afternoon, Miss Allison.

4            As you know I'm Aaron Fischer, plaintiffs' counsel.

5    We've been on the tours together.  We know each other fairly

6    well?

7    A.      Yes.

8    Q.      I want to direct your attention to Defendants'

9    Exhibit QQQ.  That's the December 4th, 2013, log summary on

10   the nondisciplinary segregation population.

11           Do you have that in front of you?

12   A.      Yes, sir.

13   Q.      Now, at the bottom of the page where it adds up CCCMS

14   and EOP nondisciplinary segregation, it has a grand total of

15   230?

16   A.      Correct.

17   Q.      Now, this number significantly undercounts the actual

18   amount of mentally ill prisoners presently in administrative

19   segregation; would you agree with that?

20   A.      There are -- yes.  For -- there's other reasons,

21   disciplinary reasons and other reasons why an inmate is in

22   administrative segregation.

23   Q.      My question is, do you agree that the 230

24   nondisciplinary prisoners on the caseload, if that number

25   significantly undercounts the actual nondisciplinary mentally

2988

1    ill population in segregation?

2    A.      This is -- ICC has determined these inmates to be

3    nondisciplinary.  Now, I understand it is a very new policy

4    so -- I'm trying to think when it even came out.  In

5    med-September.  So then they had time to do training.  So

6    there are still inmates that still need to be classified.

7    Q.      So some of the individuals who are in administrative

8    segregation or on the caseload, who are there for

9    nondisciplinary reasons, have not been classified as such by

10   ICC yet because it is such a new policy; isn't that right?

11   A.      Yes.  There could be some, yes.

12   Q.      In the middle of the page, in the first box, there's

13   MHCB, and it has five nondisciplinary segregation.

14          Those are individuals who are in administrative

15   segregation but needed MHCB care, but are still at ASU

16   status, correct?

17   A.      Yes.  They are ASU max custody status currently being

18   housed in a Mental Health Crisis Bed, but ICC has designated

19   them to be nondisciplinary.

20   Q.      That should be added to the 230 as the number of

21   Coleman Class Members who are in administrative segregation

22   nondisciplinary at the bottom of the page?

23   A.      I would have to add the numbers of 188 and 42 to see

24   if they include those.

25   Q.      But they should be included?

2989

1   A.      Yes.

2   Q.      You also said that only ICC, for purposes of this

3   data, can classify an individual as nondisciplinary, correct?

4   A.      It's a classification designation.

5   Q.      And that classification happens at the ICC ten days

6   after an individual arrives in administrative segregation?

7   A.      Correct.

8   Q.      Is that ten working days or ten calendar days?

9   A.      Ten working days.

10  Q.      That could be more like two weeks?

11  A.      No.  I apologize.  It is ten calendar.  Thank you.

12  Q.      Okay.

13          So any nondisciplinary segregation caseload prisoner

14  who has been in administrative segregation for one to nine

15  days would not be counted in this number here?

16          THE COURT:  Not necessarily be counted.

17  BY MR. FISCHER:

18  Q.      Would not necessarily be counted in this number here?

19  A.      Correct.

20  Q.      And I think you testified before that the ICC may

21  meet for a particular inmate-patient.  If they've been

22  reviewed, say, in August, they may meet again either 30 days

23  later if the person is still there?

24  A.      Yes.

25  Q.      Or 60 days later?

2990

1    A.      Depending upon his case factors.

2    Q.      Or 90 days later?

3    A.      The majority of these are for safety concerns so the

4    time limit should be 30 days to complete the investigation.

5    Q.      But if an individual is still in administrative

6    segregation, at some point ICC will need to meet again?

7    A.      Yes.

8    Q.      So if there's a nondisciplinary segregation caseload

9    prisoner who had his initial ICC in late September, before

10   this new NDS regulation was implemented, and is still there

11   as of December 4th, that individual won't be counted on this

12   NDS caseload number chart, correct?

13   A.      That is possible, yes.

14   Q.      Please keep this exhibit in front of you, but please

15   also turn to Defendants' Exhibit OOO.  That's the Notice Of

16   Regulations as to nondisciplinary segregation as we were

17   talking about.

18           THE COURT:  Mr. Fischer, I want you to hold on for a

19   second.

20             (Brief pause.)

21           What I think I'm hearing -- well, what I know I'm

22   hearing is that there are a significant number, although we

23   don't know how many, class members in administrative

24   segregation that have not been counted for the chart's

25   purposes?

2991

1          THE WITNESS:  That have not been classified, and

2    therefore would not be reflective.  There could be a

3    potential, yes.

4          THE COURT:  I have a personal problem.  I have to

5    consult with my colleagues of the three-judge court within 45

6    minutes.  And I had felt fairly confident that what I had

7    been told, and I had conveyed, was accurate.  It is clear

8    that is not the case.

9          Do we have any idea -- is there any -- I think the

10   answer is, No, we just don't know.

11         There is no way for me to be able to convey to my

12   colleagues the dimension of the problem?

13         THE WITNESS:  I'm very familiar with our

14   administrative segregation COMPSTAT tracking system.  I

15   review those numbers almost on a daily basis.  This is a huge

16   focus of what I do because it's very important that we get

17   these inmates to the least restrictive housing as possible.

18         So there are inmates that -- understand this is a

19   code in a computer.  And so the code in the computer can only

20   be applied once he's seen by ICC.  So the first ten-day-guys

21   may not have been, so you could have a handful there.

22         You could have a handful that were -- I'm trying --

23         THE COURT:  -- that are in Mental Health Crisis Beds.

24   Would they be counted?

25         THE WITNESS:  Yes.  They would be counted.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2992

1          THE COURT:  All right.

2          And then there are these people who are, by virtue of

3     when they arrived, are not going to be counted because they

4     haven't gone to ICC yet?

5          THE WITNESS:  Correct.

6          THE COURT:  We don't know how many of those there

7     are?

8          THE WITNESS:  In any given institution you would

9     have, my experience, a couple of guys.

10          I'm trying to think of intake in a particular week.

11     It is not a significant number.  It is, you know,

12     approximately -- unless you had a major riot or something, it

13     could be approximately ten to 20 new intake inmates in any

14     given week that ICC is seeing.  But not all of those are for

15     nondisciplinary reasons.

16          I'm trying to think how to phrase this.

17          For example, there are certain codes.  When I look at

18     the codes, I question should those guys be NDS.  And there

19     are a handful of codes I question, Yeah, they probably should

20     be NDS, but have they gone back to committee?

21          But that's a handful of inmates at any particular

22     institution.

23          MR. FISCHER:  If I can finish?

24     BY MR. FISCHER:

25     Q.    Miss Allison, there are 33 CDCR institutions?

2993

1    A.      Correct.

2    Q.      You said there would be about ten to 20 with this

3    sort of status?

4    A.      That's a really, really, rough, rough.

5    Q.      So taking the lower estimate on that --

6    A.      Yeah.

7    Q.      -- that would be about 330 individuals?

8    A.      That are placed in administrative segregation with a

9    small percentage of those being nondisciplinary.  The

10   majority of inmates placed in administrative segregation are

11   disciplinary inmates.

12   Q.      But as you sit here today, you don't know what that

13   number is?

14   A.      No.  Understand that this is a point in time, and

15   that every single time that someone is placed in

16   administrative segregation, this data is uploaded for me --

17           (Court Reporter requests the parties speak one at a

18            time.)

19           THE COURT:  Go ahead.

20   BY MR. FISCHER:

21   Q.      So the data would be different today than from

22   December 4th?

23   A.      Certainly.

24   Q.      Of course.

25           I want to turn your attention to Defendants' OOO.  It

2994

 1   is the NDS new regulation which you said was implemented in

 2   October.

 3           Do you have that in front of you?

 4   A.      Yes, sir.

 5   Q.      Just going back to page 7, Section 3335, it's the

 6   same section that you discussed with Miss Vorous that defines

 7   what NDS is.

 8   A.      Yes, sir.

 9   Q.      And the three definitions of administrative

10   segregation -- or nondisciplinary segregation, excuse me, are

11   ASU placement for safety concerns, that's one.  Two,

12   investigations not related to misconduct or criminal

13   activity.  And/or three, being a relative and/or associate of

14   a prison staff member.

15           Do you see that there?

16   A.      Yes.

17   Q.      So this, for example, would not include individuals

18   who are in an ASU unit like Cypress Hall as overflow,

19   correct?

20   A.      Cypress Hall inmates are not considered

21   administrative segregation because they have full freedom of

22   movement.  Administrative segregation is a designation

23   because we've restricted their movement.

24   Q.      I understand.  But my question is, even though

25   they're in that Cypress Hall ASU unit, they're not included

2995

1  in NDS?

2  A.      They already have all their privileges and property

3  associated with their reception center privilege group.

4  Q.      I understand that is your testimony.  My question is,

5  just to clarify, those are not considered, for purposes of

6  this data on Defendant's Exhibit QQQ, NDS ASU inmates,

7  correct?

8  A.      Correct.

9  Q.      And there are also inmates that are placed in

10  administrative segregation based on a change in custody level

11  that requires a transfer to another institution, correct?

12  A.      Yes.  There are inmates placed -- there's multiple

13  factors.  You have inmates that for disciplinary reasons have

14  had their points raised, and they're no longer able to remain

15  on that particular yard due to their behavior, so not

16  necessarily what we call a SHU-able offense, but do need to

17  be moved.  It would not necessarily -- that's a case-by-case

18  review that only an ICC committee action can make.

19  Q.      But those are individuals who are not in segregation

20  because of any rule violation, correct?

21  A.      They would have had to have a rule violation to have

22  their points increased, yes.

23  Q.      But they're not placed in administrative segregation

24  because of the rule violation, that's not a SHU-able offense,

25  correct?

2996

1  A.      Correct.

2  Q.      But nevertheless, that individual, because their

3  custody level has changed, has now been -- may be placed in

4  administrative segregation pending transfer to another main

5  line yard at another institution, correct?

6  A.      It's rare, but yes, it can happen.

7  Q.      And those individuals wouldn't be included on this

8  NDS chart, correct?

9  A.      It could be either or depending upon their reasons

10 for their classification score change.

11        If an inmate -- it just depends upon the reasons, and

12 that's an ICC evaluation.

13 Q.      So it is possible that that person would not be

14 reflected in the NDS data, correct?

15 A.      I couldn't answer how the wardens are individually

16 applying that.  There's freedoms within the regulations to

17 make that individual case decision.

18 Q.      Individuals who have had their custody level lowered

19 such that they're at a lower security level, and thus need to

20 be transferred to another institution may also be placed in

21 administrative segregation pending that transfer, correct?

22 A.      When you say "lower," like say a SHU guy?

23 Q.      THE COURT:  From III to II.

24 BY MR. FISCHER:

25 Q.      Yeah.  From III to II?

2997

1    A.       Not necessarily.  I would maintain them on the yard

2    until he's transferred.

3    Q.       So you would maintain a Level IV inmate whose points

4    have been lowered to a Level II on the Level IV yard?

5    A.       It's rare that you would have an inmate go from Level

6    IV to Level II.

7    Q.       What about from Level III to Level II?

8    A.       I would remain him on Level III until transfer.

9    Q.       But there are individuals, for example, at Corcoran

10   where I think you said you visited, that are placed in

11   administrative segregation pending transfer to another

12   institution based on their change in custody level?

13   A.       They're on a higher level yard, not necessarily

14   administrative segregation.

15           They're treated -- I'm familiar with the few inmates

16   you are talking about that were on the Level I yard that had

17   a medical concern.

18           They were considered high-risk medical and we could

19   not leave them on the yard, but upon further review they were

20   not in administrative segregation, they were on a Level IV

21   yard programming separately from the Level IV inmates.

22   Q.       Miss Allison, there are also cases where an

23   individual who's on a SNY yard at CCCMS, who becomes an EOP

24   SNY and needs to be transferred to another institution that

25   can accommodate their EOP SNY need, correct?

2998

1    A.    Whenever an inmate has to change from CCC to EOP and

2    they do not have that capability at that institution, they

3    have to transfer, yes.

4    Q.    And some of those individuals will be placed in

5    administrative segregation pending that transfer?

6    A.    No.

7    Q.    They would remain in the CCCMS yard?

8    A.    Absolutely.

9    Q.    Miss Allison, do you track the length of stay data of

10   the NDS prisoners as well?

11   A.    I calculate all the length of stays.

12   Q.    But that length of stay date is not provided on

13   Defendant's Exhibit QQQ?

14   A.    Because I haven't broken it out, the length of stay

15   for NDS.

16        If you remember in my deposition, I do length of stay

17   for everybody.  I've now since broken it down by mental

18   health, but every institution individually has length of stay

19   data.

20   Q.    You're saying at the time of your deposition in July

21   you weren't looking specifically at mental health length of

22   stays in segregation, correct?

23   A.    We were doing subcategories, but I've drilled down

24   into it more since, yes.

25   Q.    Can I turn your attention to Defendant's Exhibit PPP.

2999

1    It's the one-page document entitled "Comparable Statistics

2    Administrative Segregation Unit Tracking Log Summary Dated

3    November 26, 2013."

4    A.      Yes, sir.

5    Q.      According to this chart the longest average length of

6    stay is among the CCCMS population.

7            Do you see that there?  114?

8    A.      Correct.

9    Q.      And the median of 84?

10   A.      Correct.

11   Q.      Which is higher than the non-mentally ill at 110

12   average length of stay and median 71.

13           Do you see that there?

14   A.      Yes.

15   Q.      And among the MHCB number, 32, a number of those

16   individuals were either CCCMS or EOP in Ad. Seg. prior to

17   becoming MHCB, correct?

18   A.      That's kind of assuming.

19   Q.      In your experience it is safe to say --

20   A.      They could have turned max custody -- administrative

21   segregation status while in a mental health crisis bed.  So I

22   don't have all the -- I mean, you're asking me to speculate.

23           The majority would have maybe converted, but I don't

24   know that.  I don't know what happened first, is what I'm

25   trying to say.

3000

1    Q.      So in your experience, in some cases, somebody's

2    behavior in the mental health crisis bed leads them to become

3    max custody?

4    A.      Correct.

5    Q.      Then they would be treated in cages and in full

6    restraints and so forth, correct?

7    A.      In treatment modulars and restraints, yes.

8    Restrained for escort purposes only.

9    Q.      Miss Allison, I want to turn back a moment to the

10   number of nondisciplinary segregation caseload prisoners.

11           Isn't it true that -- well, first let me start, in

12   December 2012 do you recall attending a Coleman meeting with

13   the Special Master and plaintiffs' counsel about

14   administrative segregation?

15   A.      I've attended a lot of meetings, yes.

16   Q.      Do you recall that meeting?

17   A.      I don't recall any specifics.  I'm sure you're going

18   to ask me a question, and I'll try.

19   Q.      Do you recall the Special Master asking you to report

20   particular data about caseload prisoners in segregation?

21   A.      I don't specifically recall that.

22   Q.      Do you recall reporting at that meeting, or any

23   meeting, the percentage of caseload prisoners being held in

24   administrative segregation for disciplinary and

25   nondisciplinary reasons?

3001

 1    A.       I don't specifically recall that, but if you -- I
 2    don't specifically recall that.
 3    Q.       Do you recall reporting to the Special Master and
 4    plaintiffs' counsel at that December 2012 meeting that 26
 5    percent of mental health caseload prisoners who are in
 6    segregation are there for safety concerns?
 7    A.       Safety is not necessarily nondisciplinary.  We need
 8    to be clear about that.
 9    Q.       Granted.  Okay.
10             Do you recall reporting to the Special Master and
11    plaintiffs' counsel that 26 percent of segregation caseload
12    prisoners were there for safety concerns?
13    A.       I mean, I would have to see where I said that.
14             Are there minutes?
15             Is there data that would support that?
16             I don't recall that specific number.  I mean, that
17    sounds approximately right.  But again, safety does not
18    necessarily mean nondisciplinary.
19    Q.       Do you recall reporting to the Special Master --
20             THE COURT:  I don't understand.  Wouldn't you
21    ordinarily -- I'm asking you.  I just don't understand how
22    this is working.
23             If it is -- if there is a safety concern, which
24    arises out of whatever disciplinary action, wouldn't you
25    classify him as a disciplinary ASU rather than a

3002

1  nondisciplinary?

2      THE WITNESS:  Absolutely.

3      THE COURT:  So the fact that you say 26 percent are

4  there for safety reasons would imply -- I'm asking you, not

5  telling you -- would imply they're there for safety reasons

6  rather than disciplinary and safety reasons?

7      THE WITNESS:  You could have an inmate that has

8  safety concerns because he assaulted somebody and he cannot

9  return to the yard because now all the other Southern

10 Hispanic inmates want to hurt him or he could have drug

11 debts.

12     THE COURT:  Set aside the drug debts for a moment.

13 This seems to me very simple, but apparently it isn't.

14     You've got a guy who assaulted another prisoner.

15 That is a -- if he ever gets to ICC, he's going into

16 disciplinary segregation, right?

17     THE WITNESS:  Correct.

18     THE COURT:  Now, he also has a safety concern because

19 having punched out this guy, this guy's friends are waiting

20 for him to come back so they can take their revenge?

21     THE WITNESS:  Correct.

22     THE COURT:  But that's not the reason that he's in

23 Ad. Seg.  He's in Ad. Seg. because he punched a guy out?

24     THE WITNESS:  Correct.

25     THE COURT:  You may proceed, sir.

3003

1  BY MR. FISCHER:

2  Q.      Miss Allison, at the December 12 Special Master

3  meeting on segregation, do you recall reporting to the

4  Special Master and plaintiffs' counsel that 15 percent of

5  mentally ill in segregation are there pending transfer?

6  A.      I don't specifically recall that.  Did I provide a

7  chart or notes?

8          That sounds approximately.  Certainly could be.

9  Q.      Do you recall reporting that 7 percent of mentally

10  ill in segregation were in the ASU pending investigations for

11  safety concerns?

12  A.      Again, I would have been using reporting codes.  I

13  don't specifically recall that.  Those sound like codes I

14  would be reporting off our COMPSTAT reporting system.

15  Q.      And that an additional 9 percent of mentally ill in

16  segregation were pending transfer for safety concerns?

17          THE COURT:  Excuse me a moment.  Apparently my watch

18  is not working again.

19          (Clerk and court confer.)

20          THE COURT:  We'll take it up tomorrow morning at

21  9:15.

22          MR. FISCHER:  Your Honor, we're glad to come in

23  Saturday, but --

24          THE COURT:  Wednesday at 9:30.

25          (Off the record at 4:00 p.m.)

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6
            I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```