1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF CALIFORNIA

3                            ---O0O---

4        BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15                            ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19               WEDNESDAY, DECEMBER 11TH, 2013

20

21                            ---o0o---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  KATHY L. SWINHART, CSR NO. 10150

```
 1                        APPEARANCES

 2                         ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  AARON FISCHER, ATTORNEY AT LAW

 9            BY:  JANE KAHN, ATTORNEY AT LAW

10            BY:  MARGOT MENDELSON, ATTORNEY AT LAW

11            BY:  LISA ELLS, ATTORNEY AT LAW

12

13

14

15    FOR THE DEFENDANTS:

16            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
17            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
18
              BY:  MARTINE D'AGOSTINO, DEPUTY ATTORNEY GENERAL
19
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
20
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
21
              BY:  MENEESH SHARMA, DEPUTY ATTORNEY GENERAL
22

23                         ---o0o---

24

25
```

1                        EXAMINATION INDEX

2                            ---o0o---

3    FOR THE PLAINTIFFS:

4        EXAMINATION:                                    PAGE

5

6     JAMES AUSTIN

7        Direct Examination by Ms. Ells              3005
         Cross-Examination by Ms. D'Agostino         3086
8

9

10    DR. VICTOR JORDAN

11       Direct Examination by Mr. Sharma            3102
         Cross-Examination by Ms. Mendelson          3119
12       Redirect Examination by Mr. Sharma          3150
         Recross-Examination by Mendelson            3168
13

14

15

16                           ---o0o---

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2                          ---o0o---

 3

 4   PLAINTIFFS'
     EXHIBIT NO           DESCRIPTION              EVD
 5
       2135          Austin Reply Declaration       3008
 6
       2301          Underlying Population Data      3010
 7
       2302          Population Chart                3037
 8
       2303          Underlying Population Data      3037
 9
       2305          Population Chart                3010
10
       2385          CIM's Management Report         3120
11
       2386          Office of the IG Rpt. Nov. 2008 3129
12
       2398          Coleman Monthly Rpt.
13                   Dec. 10, 2013 (Sealed)          3135

14     2617          Prisoner L Psychiatry Progress
                     Note                            3140
15

16

17                          ---o0o---

18

19

20

21

22

23

24

25
```

3004

```
 1                    SACRAMENTO, CALIFORNIA

 2            WEDNESDAY, DECEMBER 11th, 2013 - 9:30 A.M.

 3                          ---o0o---

 4          THE CLERK:  All rise.

 5          Court is now in session.

 6          The Honorable Lawrence K. Karlton presiding.

 7          THE COURT:  Please, be seated everyone.

 8          Good morning.

 9          Where are we?

10          MS. ELLS:  Good morning, Your Honor.  My name is Lisa

11   Ells.  I'm counsel for plaintiffs.  I call Dr. James Austin

12   to the stand.

13          THE COURT:  What happened to -- I'm sorry, I've

14   forgotten the name -- Miss Allison?

15          MS. ELLS:  My understanding is that because

16   Dr. Austin has relatively limited availability, he would

17   start today.

18          THE COURT:  Okay.  It is okay with me.  I don't care.

19   Everybody has got limited availability.

20          I'm sorry, ma'am.  Your name is?

21          MS. ELLS:  My name is Lisa Ells.  I'm counsel for

22   plaintiffs.

23          THE COURT:  Yes.

24          THE CLERK:  Remain standing and raise your right

25   hand.
```

3005

1                          JAMES AUSTIN,

2     was thereupon called as a witness herein by the Plaintiffs,

3     and having been sworn to tell the truth, the whole truth and

4     nothing but the truth, was thereupon examined and testified

5     as follows:

6              THE CLERK:  Please, take a seat.

7              State your name, spell your last name and speak

8     directly into the microphone.

9              THE WITNESS:  James Austin, A-u-s-t-i-n.

10                        DIRECT EXAMINATION

11    BY MS. ELLS:

12    Q.      Dr. Austin, please briefly describe your educational

13    background.

14    A.      I have a bachelor's, master's degree and Ph.D. in

15    sociology.

16    Q.      Dr. Austin, what is your current title?

17    A.      I'm the president of a non-for-profit research

18    organization called the JFA Institute.

19    Q.      What does that institute focus on?

20    A.      We are contracted by a variety of county, state and

21    federal agencies to conduct research on correctional

22    population issues.

23    Q.      Dr. Austin, have you ever personally worked in a

24    correctional setting?

25    A.      Yes.

3006

1    Q.       When was that?

2    A.       From 1970 to 1975 at the Stateville and Joliet

3    Penitentiary.

4    Q.       Did you work in a segregation unit while you were

5    there?

6    A.       I did.

7    Q.       Dr. Austin, please describe your experience working

8    with states and other jurisdictions to safely lower their

9    segregation populations.

10   A.       Since approximately 2000, the year 2004 or 2005, I've

11   worked in 12 jurisdictions.  The first would be Ohio state,

12   Ohio Department of Corrections.  I was retained by the

13   Attorney General to work with them on a lawsuit that was

14   filed against their supermax penitentiary.

15           I then was retained in Mississippi by the Department

16   of Corrections and the Attorney General's Office to work with

17   the ACLU on reaching a settlement on their use of solitary

18   confinement at the Parchment facility.

19           And I then was retained by the Colorado Department of

20   Corrections to do an assessment of their administrative

21   segregation system and to implement several reforms for them

22   to complete.

23           I then proceeded to do studies for the Maryland

24   Department of Corrections, the New Mexico Department of

25   Corrections, the Oklahoma Department of Corrections and the

3007

1    Kentucky Department of Corrections, to do assessments of

2    their solitary confinement/administrative segregation

3    systems.

4            More recently I've been retained by the Attorney

5    General of New York on a matter -- a pending lawsuit they

6    have with the New York ACLU on the use of solitary

7    confinement.

8            The same -- in the same situation I'm currently

9    retained by the Indiana Department of Corrections and

10   Attorney General's Office to help the department reach

11   settlement to their use of solitary confinement.

12           And in Georgia I have been retained by the Department

13   of Corrections to revamp their disciplinary system and use of

14   solitary confinement.

15           The last piece work I'm involved with is with the

16   U.S. Bureau of Prisons.  I've been retained by the U.S.

17   Bureau of Prisons to conduct a major assessment of their use

18   of solitary confinement.

19   Q.      Dr. Austin, have you done any work on correctional

20   planning issues in California specifically?

21   A.      Yes.

22   Q.      What have you done?

23   A.      This goes back to the 1980s.  I've done research

24   projects when I was formally employed by the National Council

25   on Crime and Delinquency.  We did studies of parole board

3008

1    decision-making.  We did evaluations of the CDCR inmate

2    classification system.

3           I was appointed to the expert panel that was convened

4    about four or five years ago to do research and give counsel

5    on prison population reductions.

6           Then I have been retained by the Prison Law Project,

7    Mr. Specter, as part of the three-judge panel case.

8    Q.    Dr. Austin, were you previously qualified as an

9    expert before the three-judge court?

10   A.    I was.

11          MS. ELLS:  We offer Dr. Austin today as an expert on

12   correctional planning and management.

13          THE COURT:  Do you desire any voir dire?

14          MS. D'AGOSTINO:  No, Your Honor.

15          THE COURT:  The court will find he's an expert and

16   may express opinions in that field.

17          You may proceed, ma'am.

18          MS. ELLS:  Your Honor, we offer his August 23rd,

19   2013, reply declaration, which is Docket Number 4762, into

20   evidence as Exhibit 2135.

21          THE COURT:  Received.

22               (Whereupon, Plaintiffs' Exhibit 2135 received

23                into evidence.)

24          MS. ELLS:  His qualifications are attached and

25   described in his CV as Exhibit A to that declaration.

3009

1            All of the exhibits that I'll be referring to today

2    are before you in a binder labeled "Dr. Austin Segregation."

3    BY MS. ELLS:

4    Q.    Dr. Austin, as part of your review in preparation for

5    your expert report in this matter, did you look at the size

6    of the population in segregated housing in California?

7    A.    I did.

8    Q.    Why did you do that?

9    A.    Well, whenever I look at any state, the first thing I

10    do is try to get a sense of how many people are in

11    segregation status by the type of statuses and see how that

12    compares with other jurisdictions.

13            It kind of gives me an overall impression of what the

14    situation is and what the issues are that need to be

15    addressed.

16    Q.    Dr. Austin, did you also examine the size of the

17    population of mentally ill prisoners housed in segregation

18    and what type of units they were housed in?

19    A.    I did.

20    Q.    I would like to direct you to what's been marked as

21    Exhibit 2305 entitled "Number Of Segregated Populations By

22    Type Segregation Status."  This is the same chart that's in

23    your declaration at page 6.

24            Does this chart reflect your analysis of the

25    segregation population?

3010

1    A.      It does.

2    Q.      Please turn to tab 23 -- the tab for Exhibit 2301

3    which contains excerpts of data from various sources provided

4    by defendants about the segregation population.

5            Is this the data you relied on in creating

6    Exhibit 2305?

7    A.      Yes.  These are the documents I relied upon.

8            MS. ELLS:  Your Honor, we move to introduce into

9    evidence Exhibit 2305 and the underlying data,

10   Exhibit 2301.

11           THE COURT:  Received.

12               (Whereupon, Plaintiffs' Exhibits 2305 and 2301

13                received into evidence.)

14           MS. ELLS:  May I publish this, Your Honor?

15           THE COURT:  Yes.

16               (Exhibit published.)

17   BY MS. ELLS:

18   Q.      Dr. Austin, this chart shows the segregated

19   population as almost 11,000 people or about 9 percent of the

20   total CDCR population.

21           Do you have an opinion on that?

22           THE COURT:  On what?  Whether or not it is accurate

23   or --

24   BY MS. ELLS:

25   Q.      Do you have an opinion as to the appropriateness of

3011

1    that proportion as to the overall population?

2    A.        Well, what strikes me is the 9 percent.  That is --

3    compared to other jurisdictions that I work in, with some

4    exceptions, that's a high percentage.

5    Q.        And what would a typical segregation population be

6    after you've worked to reform the population in other states?

7    A.        The states that I've been working in, we've been very

8    successful in reducing the populations.  They are generally

9    getting down to the 3-to-4-percent range.

10            Now, within this chart the other striking statistic

11   is what is the called ASU, which is about 6,600 people.

12            And that's -- in California terminology they call

13   that administrative segregation.  It's supposed to be a

14   temporary kind of holding pattern, and that is extremely

15   large.  So that is very significant.  And then you'll --

16   which is not too atypical, but it is large.  Here, in

17   California, a significant proportion of the people with

18   mental illness, EOP, are in segregated housing.  So 21

19   percent of the EOP population is segregated.  Again, most of

20   them are in the ASUs.

21            Then if you look at the CCCMSs, a very large

22   percentage of people there total, that's 21 percent, 28,000

23   inmates are CCCMS.  That's a large percentage for a state

24   system.  Nine percent of that population is segregated.  And,

25   again, a very large percent is in the ASUs status.

3012

1          So the things that are striking me immediately is the

2     overall percentage of the population as segregated, and then

3     this very large population in ASU status.

4          THE COURT:  Let me interrupt for just a moment.

5          MS. ELLS:  Of course.

6          THE COURT:  Is it correct that the percentage of

7     mentally ill prisoners -- inmates, is higher in California

8     than in most states?

9          THE WITNESS:  Well, like in the states I'm working

10    in, it looks like it is higher.

11         THE COURT:  Okay.

12         THE WITNESS:  Again, there is some issues about how

13    you measure it.  But I would say it's certainly not below

14    average and probably higher.

15         THE COURT:  I'll let you examine.  At the end of

16    this, if you haven't reached where I'm concerned, I'll ask

17    again.

18         I'm sorry.  I don't want to interrupt.

19         You may proceed.

20         MS. ELLS:  Of course, Your Honor.

21    BY MS. ELLS:

22    Q.    Dr. Austin, this chart also shows EOPs are 4 percent

23    of total population, but 21 percent of the segregated

24    population.

25         Does that strike you as appropriate?

3013

1    A.       Well, it's a concern.   The appropriateness has to do

2    with why are they going into segregation?   What's the basis

3    for the segregation?   How long are they staying?   What kind

4    of services are they getting?   Are they getting better or

5    not?

6            It is a concern that is disproportionate.   So there

7    is a disproportionate number of the EOP population in a

8    segregated housing unit.   So one would be very concerned

9    about the quality, then, of the services being provided in

10   that setting.

11   Q.       You mentioned that you worked with Mississippi to

12   reduce their segregation population safely.

13           Could you please describe the segregation population

14   before and after your work there as a percentage of the

15   overall population?

16   A.       Well, in Mississippi, when we started the work with

17   the department, there were approximately 1300 inmates in

18   their -- it would be your SHU.   Okay.   They would call it

19   administrative segregation.   You call it a SHU.   They were

20   long-term segregation.

21           And we went through a process of analyzing each case.

22   We formed teams with the Department of Corrections.   We went

23   in and reviewed each case for two reasons.   One was to see

24   are the people there that shouldn't be there to begin with.

25   Two, are there people there that had been there too long and

3014

1  are suitable for release.

2         And the rest of the people we started building a

3  program for them, a step-down program, so they could earn

4  release out of the unit in a timely manner.

5         We also separated quickly inmates who were segregated

6  who had mental illness.  They were transferred to a

7  specialized unit where they go through their own step-down

8  program.

9         So all of that was part of the reform.  And at the

10  end of the day, it took about a year, but the population

11  dropped from 1300 to about 350.

12  Q.    Dr. Austin, you mentioned that there were two

13  separate step-down programs.  What was the purpose of those

14  programs?

15  A.    The purpose of the programs were to get away from the

16  concept of sentencing people to segregation for fixed amounts

17  of time, which is what Mississippi and several states have

18  been doing.

19         So we moved to a system of, if you get a serious

20  disciplinary report, you would get a short -- relatively

21  short period of what we call disciplinary segregation.

22  Q.    Of approximately how long?

23  A.    The maximum is 40 days.  That's the maximum you can

24  get in Mississippi, 40 days, regardless of what you have

25  done.  At the end of the 40 days -- let's say you assaulted

3015

1  an officer or inmate, then a decision is made, is this person

2  dangerous.

3  Q.     Who makes that decision?

4  A.     The institution reviews the case, and then if they

5  feel the person needs to go into long-term segregation, then

6  they fill out paperwork.  And that is sent to the central

7  classification unit for review, and the deputy director would

8  make the ultimate decision.

9        That's an important point in these reforms that I

10 have done.  We start centralizing this process, and we limit

11 the authority of who can be authorized to admit and release

12 people to a single entity in the central office.

13 Q.     Dr. Austin, when you just referred to "long-term

14 segregation," is that the phased step-down program you

15 referred to earlier?

16 A.     Right.  That would be the step-down program In

17 Mississippi it consists of three phases.  Each phase can last

18 up to 90 days or more.

19 Q.     Or less?

20 A.     It can be less.  You can actually start someone in

21 Phase II.  An important part is not to have a cookie-cutter,

22 everyone goes through the same process.  There is

23 individualization that goes on.  So if staff people feel this

24 person doesn't need to spend 90 days in the first phase, then

25 they'll move them up quickly to Phase II.  There are inmates

3016

1  who are starting at Phase II because they don't need to go to

2  Phase I.

3          So there is some individualization, but the basic

4  approach is three phases, 90 days each.  The inmate is told

5  up front that this is what you have to do to get out of here.

6  Q.      What types of things are those things that they have

7  to do?

8  A.      It's mostly conduct and participation in programs.

9  Q.      So they need to modify their behavior?

10  A.      They have to modify their behavior, and they have to

11  demonstrate it has been modified for a substantial period of

12  time.  But what is key here is that it is not a program where

13  you may be released.  You shall be released.

14          I like to use the example of it is like going to law

15  school.  You take three years of work, and you're not --

16  after three years of coursework you're not told you may

17  graduate, you shall graduate.  So it is the same promise.

18  Inmates respond to that.  Staff respond to that.  There's

19  certainty in the program.

20          There are exceptions.  There's a small number of

21  inmates who have done pretty bad things.  They've killed

22  people in prisons, or they are very significant risk for the

23  institutional safety, and they will stay in Phase III.  They

24  can work down to Phase III, but they will not be released for

25  many years.

3017

1  Q.      How does Phase III compare to a general population

2  setting in terms of programming?

3  A.      Phase III is the lowest level.  So there's -- it

4  tries to mimic what in California you would call your Level

5  IV general population setting.  Because we're trying to test

6  the inmate to see are they able to function without

7  restraints, being out of their cells six, seven hours a day,

8  participating in programs.

9          It is controlled, obviously, small numbers, but they

10  are given the privileges that you would expect or pretty much

11  you would find in general population for a closed or Level IV

12  inmate.

13  Q.      Dr. Austin, you mentioned earlier that the maximum

14  term in disciplinary segregation that you can get in a state

15  like Mississippi is 40 days; is that right?

16  A.      Correct.

17  Q.      And you said that after that some proportion of

18  prisoners return to a general population directly without

19  going through that step-down program that you just described?

20  A.      Correct.

21  Q.      Approximately what percentage of inmates, after that

22  40-day fixed term or less in disciplinary segregation return

23  to a general population setting?

24  A.      It's the vast majority.  It would be in the 80- or

25  90-percent range.

3018

1    Q.      So approximately 10 to 20 percent of the people that

2    go into this short, fixed amount of time in disciplinary

3    segregation go directly back to a general population setting?

4    A.      That's correct.

5            They may be going to -- say they were classified for

6    medium security because of their conduct.  That's now

7    changed.  Their classification is reassessed so some of them

8    will be elevated to what they would call closed custody and

9    be transferred to that situation.

10           But yeah, the philosophy there is you have done

11   something wrong, we're going to punish you.  It is not just

12   segregation.  They also restrict -- do visitation

13   restrictions.  They'll take commissary.  There may be work

14   details you have to do.  So they are doing a variety of

15   nonsegregation kinds of punishments to kind of get their

16   attention.

17   Q.      In general population, is that --

18   A.      In general population.  But while in segregation

19   also, you know, they have those restrictions imposed as well.

20   Q.      Okay.  And that's in that short 40-days-or-less

21   period?

22   A.      Right.  Right.

23           The vision I think people need to get that seems to

24   work in these states is two forms of segregation.

25           Well, let me complicate it just a little bit.

3019

1             There's a predisciplinary hearing form of

2    segregation.  And this is what California would call ASU,

3    administrative segregation.  So you have been written up for

4    a ticket.  And it's a severe ticket so they'll put you into

5    temporary -- what they would call temporary segregation until

6    your case is resolved by the disciplinary committee.

7             Now, that doesn't happen to most people.  Most people

8    that get the ticket, they stay in their cell, they stay in

9    their unit.  But what is key here is their disciplinary

10   hearing is heard very quickly.

11   Q.     This is in other states, not California, right?

12   A.     It doesn't appear to happen in California, but in the

13   states I'm working with, this is what happens.  This is one

14   of the first things we start doing is make that disciplinary

15   system happen quickly.

16            We want swift and certain punishments.  We don't want

17   a punishment that happens 30, 40, 60 days or longer down the

18   road because it doesn't seem to have much impact.

19            So there are those people that are kind of like

20   pretrial, so to speak, but very few.  If they are in

21   pretrial, they're going to be heard very quickly.

22   Q.     When you say that they're in pretrial, you mean that

23   they're actually moved out of their housing unit during the

24   pendency of an RVR and put in segregation until it is

25   resolved?

3020

1    A.        That's correct.

2    Q.        So that's a relatively short, small population?

3    A.        Very small, and it is a very short time frame.  They

4    will be heard quickly.

5              Then if you are found guilty and the disposition says

6    segregation time, then you go into what they would call

7    disciplinary segregation.  That's the one that has 40 days.

8    In Georgia, it is 30 days.  The most you can get in New York

9    is 30 days.

10             So these are that kind of time frame's punishment,

11   hardly any services unless you have mental health issues.

12   They are providing those services.  But basically it is a

13   punishment you are getting.

14   Q.        Dr. Austin, you mentioned the outer time frame is 30

15   to 40 days in those states.  Do most of the people that go

16   into the disciplinary segregation units in the states you

17   work with serve that amount of time, or are they there for

18   less time?

19   A.        It's a variety.  You know, it all depends on the

20   nature of the offense.  But it is rare that you would see

21   them doing -- the 30 to 40 would be reserved for assaultive

22   behavior, they would tend to get the full 30 or 40 days.

23             So the last form of segregation is then, again, as I

24   mentioned, when they finish their disciplinary segregation --

25   although this could actually happen prior to finishing it

3021

1    because if the offense is so severe and the person is so

2    dangerous, they will request a transfer to the Special

3    Management Risk Long-Term Segregation Program.

4    Q.    Is that the program that you described as phased?

5    A.    That's a step-down program So what's important, which

6    is different from California, you do not get a term, you get

7    admission to the program.

8         THE COURT:  Doctor, this is all very important, but I

9    have a particular concern, which deals with mentally ill

10   people in Ad. Seg. and disciplinary segregation.

11        During the course of this hearing we discovered that

12   there were a large number of mentally ill people in Ad. Seg.

13   And although it was very difficult to even understand what

14   they were doing there -- I mean, there was things like, "Gee,

15   we can't figure out where to put them," and other things

16   which, you know, I accept it because we had to get an

17   immediate solution.

18        But the immediate solution, which, again, I suppose

19   just depended upon the fact that the state said that this is

20   what we can do, EOPs, people who are really, really sick can

21   remain in -- I mean, this is the reform -- can remain in

22   administrative segregation for up to 30 days.

23        I mean, it is going to take them 30 days to figure

24   out where to put them.  And CCCMS, which includes folks who

25   are sick, and potentially EOP if the stressors are too great,

3022

1    what is it now?  60 days?  I've forgotten.

2              MR. BIEN:  Sixty.

3              THE COURT:  Sixty days.

4              Is there any reason on God's green earth those

5    numbers make sense?

6              THE WITNESS:  No, they don't.  There is no reason for

7    people to be held in that status for those periods of time.

8              In the states I work with, they are -- an EOP, as I

9    understand it, they are moved immediately to the appropriate

10   mental health treatment facility, within 24 hours they move

11   them.

12             THE COURT:  Thank you, sir.

13   BY MS. ELLS:

14   Q.    Dr. Austin, returning to the reforms that you have

15   helped other states implement, you mentioned a phasedown

16   program for -- specifically for the mentally ill that is

17   separate from the phasedown program that is applied to

18   non-mentally ill prisoners.

19             Is that the type of reform that you have instituted

20   in other states?

21   A.    Yes.  So going back to once a determination is made

22   that this person needs to go into long-term segregation, then

23   there's a screening done by the mental health people that

24   said:  All right.  This person, their behavior is because of

25   their mental health -- mental illness.  They need to go to

3023

1   our mental health unit.

2   Q.      And Dr. Austin, who designs and runs the program in

3   that long-term phased mental health program?

4   A.      The ones that I have been working with is operated

5   and controlled by the clinician, usually a psychiatrist, who

6   is running that program.

7           When I say running it, runs it completely.

8           So the only function of security there is to help the

9   psychiatrist and the clinicians deliver the services in a

10  safe manner.  But it is the director and her or his

11  associates that are determining who goes to the program, what

12  phase they go to, who progresses, and who gets released.

13          So this is an important part of the solution, I

14  think, is security in that role is simply there to provide

15  security.  They are not -- they do not influence the

16  decision-making process of whether you go into the program or

17  what phase you go to and when you come out of the program.

18          THE COURT:  Doctor, in that regard one of the issues

19  in these cases is the role of security.  Who defines what

20  appropriate -- what is appropriate security once you're in a

21  mental health status?

22          THE WITNESS:  Right.  Again, the clinician would

23  determine that.  He or she is not acting in isolation.  There

24  is a close relationship obviously with security because it is

25  to everyone's benefit that the place be safe.

3024

1          THE COURT:  Right.

2          THE WITNESS:  So --

3          THE COURT:  Let me give you an example.  In one of

4    the hospitals, a condemned prisoner -- California condemns

5    people right and left, we just don't kill them.  You can't --

6    if the mentally ill inmate, who is a condemned prisoner, has

7    to be taken down the hall for some reason, it requires three

8    security guards, you've got to be belly chained, and

9    everybody else has to be locked in their cells.

10          And as best I can tell, that's a security

11    determination made by security, you know.  I can't imagine,

12    but I don't know, whether mental health has any input into

13    that at all.  But that's the kind of thing.

14          Who decides that you have to have three guards, you

15    got to be belly chained, you got to lock everybody else in

16    the cells and so forth?

17          In the places where you have been working, if the

18    person is mentally ill, that's a decision for the clinician?

19          THE WITNESS:  Correct.  Now, the clinician, again, is

20    working in concert with security on these, but what you just

21    described seems to be quite --

22          THE COURT:  Quite remarkable.

23          THE WITNESS:  -- quite remarkable forms of restraints

24    being used.  And I would -- but what I have seen, for

25    example, in New Mexico, which I think has a really good

3025

1    system where the psychiatrist runs the program, he will

2    instruct the security people to take his restraints off, I

3    need to talk to him.  They'll determine, when we move this

4    person, whether we use restrains or not.

5            One of the reasons they do this is because in these

6    segregation units -- people don't realize this until they

7    spend time -- but going through the restraint process often

8    discourages inmates from coming out of their cells.  They

9    don't want to go through it.  It's like going through TSA,

10   the airport.  If you can avoid it, you try to.

11           THE COURT:  Of course.

12           THE WITNESS:  So clinicians are aware of that so they

13   want to facilitate getting people out of the cells.

14           Now, what California is doing is not unusual.  When I

15   first started, you know, you see a lot of restraints going

16   on.  But you got to start loosening up so that -- you know,

17   generally, when you get to these phases, Phase III for

18   example, which I talked about, there is no restraints being

19   used.  Inmates are coming out of their cells.  They simply

20   walk freely down to the -- they have earned and progressed.

21           I think what strikes me is a blanket policy that

22   under all circumstances, regardless of the risk that this

23   person poses, we are going to impose this level of security.

24   And I think that's counterproductive in terms of getting the

25   treatment delivered to the inmate.

3026

1              THE COURT:  Thank you, ma'am.

2    BY MS. ELLS:

3    Q.      Dr. Austin, in states that you have work with that

4    had the kind of blanket security restrictions you just

5    described, when they -- did they modify those policies after

6    working with you?

7    A.      Yes.  Again, it happens through the phase program,

8    but I'll give you an example.

9              Right now in Indiana where I am working, I have a

10   recommendation on the table right now, which I hope they

11   accept, that when they move inmates in their step-down

12   program from mental health, they have two officers.  And the

13   inmate's handcuffed, they escort him about 50 feet to the

14   treatment room, then take the restraints off, and he's in the

15   room with the therapist.

16             And both I and the warden looked at that and said, Is

17   this really necessary?  He said, Probably not.  It is tying

18   up two officers.

19             The people we are talking about have been in the

20   program for several months, and they're doing fine.  They're

21   about to be released to the general population.  So if

22   they're going to act out, we would rather have them act out

23   in a controlled environment then when they get out in general

24   population.

25             So there's -- you know, there's this give and take.

3027

1    But yeah, it is one of things we look at right away is, you

2    know, can we use some reasonable security practices that will

3    facilitate the treatment, if it is going to be delivered

4    effectively to the client.

5            This is the whole point of the treatment, you know.

6    We're trying to get treatment to reduce the risk to make the

7    place safer, to make the staff safer, to make the inmate

8    safer.  If we can't deliver the treatment effectively, we're

9    not going to get that.  We may have counterproductive

10   results.  We actually may make the situation worse.  So thus

11   far it seems to work pretty well.

12   Q.     Have the states you've work with that modified their

13   policies like you're describing seen any increase in violence

14   in their institutions?

15   A.     No.

16   Q.     Dr. Austin, can you describe briefly some of the

17   motivation that states have for wanting to reduce their

18   segregation populations?

19   A.     Litigation.  Ohio State was being sued.

20   Mississippi -- it is interesting, Mississippi, New York and

21   Indiana, they have lawsuits that have been entered, but they

22   have suspended them to give me and the associates that I work

23   with time to develop a plan that both sides would agree to.

24           These are not long-term plans.  These are, at most,

25   12-month plans.  So they suspend the litigation and allow us

3028

1    to do our thing.

2         We try to get the attorneys out of the room so we can

3    do the work we need to do.  And it is very close

4    relationships with the Department of Corrections.

5         I always have a person assigned to me who is a very

6    high-level deputy director who is behind me, and we are

7    working very closely together.  And the people I bring in are

8    very seasoned correctional people.  They've worked in

9    correctional system for many years.  They've worked in Ad.

10   Seg. units so they know what they are doing too.

11        So the things we do, we have great confidence they

12   will work.  But that's the basic process we go through.

13        If I could just add, the first thing that we do,

14   which I don't see yet in California, is a very good analysis

15   of who is in these beds for what reasons.

16        I can't tell what is the conduct that's produced

17   admission to the ASU or SHU or why they're staying so long.

18   So we do that analysis very quickly.

19        A very good thing about California is the information

20   systems I have work through with the three-judge panel.  It

21   is a very good, sophisticated data system.  You can learn a

22   lot about these people through the analysis.

23        But I just wanted to add that they just don't kind of

24   jump in and start doing things.  You spend a couple of

25   months, at most two months, you know, looking at the

3029

1   populations that are being targeted.  And you start trying to

2   figure out why are they staying so long, why did they get

3   admitted, and what can we do to change that.

4   Q.    Dr. Austin, what are some of the things you do to

5   change that?

6   A.    Well --

7   Q.    For the population that's already in segregation when

8   you get to a state?

9   A.    So I'll talk about Mississippi and Colorado, which

10  are two pretty good success stories.

11        The first thing we do is we'll go and do an audit of

12  everyone that's there.  And we're looking for two things.

13  Like I said, we're looking at why are they there.  What was

14  the reason, what was the behavior that produced their

15  admission to segregation.

16        And we go through the cases, and we put those cases

17  in a pile and say that these people don't need to be here.

18  They never should have been admitted here.  No need for them

19  to be here.  That's a pile of inmates.

20  Q.    What type of people are those?

21  A.    Basically they're in for a nonviolent offense.  It

22  did rise to the level of did they pose a danger.  So again,

23  they got their segregation time.  They got segregated.  That

24  was disciplinary segregation.  The question is why did they

25  go to the next step, which is long-term.

3030

1          The only real reason you should be going to long term

2     is that you pose a substantial risk to the institution and

3     the staff and the inmates.

4          So that's a small number of inmates.  There's lots of

5     fights that go on, unfortunately, in prisons, you know.

6          Good.  We hit them with disciplinary segregation.  We

7     elevate the security level, but we keep them in general

8     population.  You know, we move them around, and we do what we

9     can to keep that under control.  We deal with them.  But

10    there are those that are out of control, dangerous, and they

11    need to be put in a controlled environment.  That is a

12    special population.

13         So anyway, we do that audit, look at why they went

14    there.  Then we look at people who have been there for a long

15    time.  We usually find a significant number of people have

16    been there too long.

17         Part of it they are picking up what we call, you

18    know, minor, nuisance tickets.  They keep on picking up these

19    tickets.  These are not tickets that you could go to

20    segregation for, but it's keeping them in segregation.

21         So there are people that you'll find have had no

22    tickets for a long time, off of gang members.  And we

23    reevaluate their gang membership.  So that's another pile of

24    inmates that we get out.

25         So through that audit process, generally we get a

3031

1   pretty substantial reduction in the population.  So now what
2   we've got left are the people that deserve to be there and
3   need to go through the step-down program.

4        And the step-down program the way -- because most
5   inmates want to get out and get back to general population,
6   they start participating in it.

7        And so by participating in, let's say, a nine-month
8   step-down program a significant number get through in nine
9   months.  So now the length of stay is being shortened.

10        All right.

11        So in Colorado, that's exactly what we did.  We
12   talked about Mississippi, went from 1300 to 350.  And in
13   Colorado, when I started there, they had 1400 in Ad. Seg.
14   units.  I just spoke with the research director this morning
15   actually, and they're now down to 650.

16        So these are big reductions in the segregation
17   populations without an associated increase in institutional
18   violence or assaults.

19        So it's basic.  Nothing too complicated.  Build
20   incentives for inmates to behave.  The vast majority of them
21   will behave.

22        For the mentally ill inmates, they need to go into a
23   similar program, but they need to get their treatment.  And
24   that treatment, just to reemphasize, and the operation of
25   that unit is controlled by mental health professionals.

3032

1    Q.      Dr. Austin, you mentioned various phases where, as

2    you move through them with good behavior, an inmate would

3    have more privileges.

4          At any snapshot moment of you going into one of those

5    phased programs, what stage of privileges are most of the

6    people there in?

7    A.      Most of them are going to be in what we call Phase II

8    and III.

9    Q.      Are those more or less restrictive?

10   A.      Less restrictive.  So they are less -- Phase I is

11   the most restrictive.  That's where you're coming out of a

12   cell in restraints.  You may get, you know, one or two hours

13   a day.  Services may be delivered to you at the cell.  When

14   you come out, you come out by yourself for an out-of-cell

15   contact.  So we're starting with basic stuff.  The basic

16   thing there is the behavior we are trying to address.

17         After three months of good behavior, then they'll go

18   to Phase II.  And now the level of restraints is reduced,

19   more privileges, more time out of cell, more responsibility

20   to participate in more programs.

21   Q.      Dr. Austin, just to be clear, the phases you're

22   describing are for a program that is for the non-mentally ill

23   am I right?

24   A.      It is for both.

25         Both programs are the same dimensions.  The

3033

1    step-downs are the same, except in one you have got mental

2    health services as the focus there, to treat the behavior.

3    And the mental health program, which will be for your class,

4    Coleman Class, that program is run by mental health

5    professionals.

6           The long-term segregation program, that's run by

7    security.

8    Q.      And can the clinicians in the mental-health-focused

9    phased program modify the steps as appropriate for somebody's

10   mental illness?

11   A.      Yes.  They can do whatever they think is appropriate.

12   They can move the person up or down.  They can accelerate the

13   release or, you know, slow down the release.

14          They're basically controlling it based on the

15   person's progress, which is their behavior.  I mean, I keep

16   coming back, this is behavior we're trying to fix.  We're

17   trying to get these inmates to behave.  Their behavior was

18   out of line, it was dangerous, it was threatening.

19          We need to get them to stop doing that so that's what

20   we're trying to deal with.

21          THE COURT:  Doctor, you're describing a program that

22   is significantly different than what is going on in

23   California today.

24          California, in general, when you're talking about

25   sending people to Ad. Seg., et cetera, you know, and they're

3034

1   mentally ill, and there's a mental health person who

2   advises -- or expresses an opinion, I'm not sure he

3   advises -- expresses an opinion as to whether or not the

4   conduct was conduct significantly caused by mental illness or

5   that it was a contributing factor.

6          One of your previous experts, however, said, you

7   know, it really depends upon the heft of the opinion, that is

8   whether or not somebody is paying attention to it.

9          In your programs apparently it is the doctors who are

10  making the decisions so it is not a question of whether or

11  not somebody is going to pay any attention to them?

12         THE WITNESS:  That's correct.

13  BY MS. ELLS:

14  Q.     Dr. Austin, just going back to the earlier step in

15  the model, which is the very short-term 30- to 40-day maximum

16  stay in a disciplinary unit, for the mentally ill people, for

17  instance, for somebody who has an assault because his mental

18  illness makes him believe another inmate is an alien, would

19  that person receive the same punishment as somebody who was

20  not mentally ill in terms of their stay in the short-term

21  disciplinary segregation?

22  A.     Well, if he's -- I take it -- I'm not a psychiatrist,

23  but it sounds like he is psychotic or something.  They will

24  remove him.  There will be a mental health professional at

25  the disciplinary hearing.  If that inmate starts behaving and

3035

1    saying those kinds of things, basically that mental health

2    professional is going to say we're going to ship him

3    immediately to our mental health unit.  We're not going to

4    put him in the disciplinary seg.  That is not helpful.  He is

5    out of control so he moves in 24 hours.

6    Q.    Dr. Austin, returning briefly to the reasons that

7    states are motivated to -- the goals states have in reducing

8    their segregation populations, why do states want -- besides

9    litigation, why would they want to reduce their segregation

10   populations?

11          THE COURT:  It is costly.

12          THE WITNESS:  It is costly.  They are very expensive

13   units to operate.  They're difficult to staff.  A lot of

14   people don't want to work in them so it is hard to find those

15   gifted people that want to work in them.

16          And they need to anchor the safety of the system in

17   these units.  So, you know, you need to have an effective

18   segregation system because it's these inmates that can

19   disrupt everything for the rest of the population.

20          So litigation, safety, and cost are probably the

21   three things that is motivating them to make changes.

22   Q.    Do they have any particular motivations with respect

23   to the mentally ill in segregation?

24   A.    I'm not sure about motivations.  I think it is a

25   recognition now that unless they treat these people, they're

3036

1  not going to get any improvement in their conduct.  That's

2  the best way I can answer your point.

3  Q.    Are you aware of any general dangers associated with

4  housing mentally ill prisoners in traditional

5  nontreatment-oriented segregation units?

6  A.    Well, they will -- likely they're going to

7  decompensate.  They're going to stay for very long periods of

8  time.

9        You're saying that they're in traditional segregation

10  and not getting effective treatment?

11  Q.    Yes.

12  A.    They're probably going to get worse over time and

13  that's -- I've been in those units where the inmates are just

14  pounding on the doors, there is no treatment.  It is a very

15  difficult situation.  You know, it is the worst situation

16  actually to watch that happen.

17  Q.    And is it the worst situation as a correctional

18  matter?

19        Does it pose particular problems as a correctional

20  matter?

21  A.    Well, it's going to be resource -- it is going to be

22  heavy resources that you have to be spending.  You have to

23  create cells.  These are single cells now you're probably

24  talking about.  Not double cells.  So it is a drain on the

25  resources of the system, and it's very costly.

3037

1    Q.      Thank you, Dr. Austin.

2            I would like to turn briefly back to this chart in

3    front of you, which is Plaintiffs' Exhibit 2305.

4            Did you ever look at more recent data than this?

5    A.      Yes.

6    Q.      I would like to direct you to what's been marked as

7    Exhibit 2302 which is entitled "Number Of Segregated

8    Populations By Type Of Segregation Status."  And it's dated

9    December 9th, 2013.

10           Does this chart reflect your updated analysis of the

11   segregation population?

12   A.      Yes.  It's the updated analysis, and it is based on

13   the same sources that I used before.

14   Q.      And are those sources found at Exhibit 2303 in your

15   binder?

16   A.      Yes, they are.

17           MS. ELLS:  Your Honor, I move into evidence

18   Exhibit 2302 and the underlying data found at 2302.

19           THE COURT:  Received.

20               (Whereupon, Plaintiffs' Exhibits 2302 and 2303

21                received into evidence.)

22           MS. ELLS:  May I publish, Your Honor?

23           THE COURT:  Yes.

24               (Exhibit published.)

25   BY MS. ELLS:

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3038

1    Q.      Dr. Austin, please explain what this updated chart

2    shows and why it is relevant to your analysis.

3    A.      It is exactly the same categories in the earlier

4    table.  They've been updated to reflect the population, this

5    is a snapshot population, again, as of December 9th, 2013.

6          Although the percentages are not changing very much,

7    you will notice there is an increase in the EOP population.

8    In the prior table it was 4493, now it is 4538.

9          In ASU -- EOPS and ASU, that has increased from 569

10   to 612.

11   Q.      Is that particular change of significance to you?

12   A.      Well, there is some other data I've been looking at,

13   and despite the reduction in the state prison population

14   which resulted in part from realignment, we're not seeing an

15   associated decline in the mental health populations.

16         So this is -- it's kind of giving some question about

17   the extent to which the system itself is generating mental

18   illness.

19         One of the things I have done, I have looked at

20   the -- I get data files as part of my role with the

21   three-judge panel to look at trends in the prison population.

22   And if you look at admissions into the system, which is

23   reduced, you can see what was their mental health code at the

24   time of admission into the system.  And I can now look at

25   releases out of the system and look at those same mental

3039

1  health codes.

2       What you are seeing -- what I'm seeing is substantial

3  increases in the numbers of people that, when they exit, a

4  much larger number of them are now in a mental health code.

5  So something is happening while incarcerated that is

6  producing a -- unless they've changed the definition of how

7  they screen people.

8       THE COURT:  Let's assume they haven't.  So many of

9  these problems seem to me very difficult because what's

10  happened, at least in California, and from what you have

11  indicated maybe elsewhere, you have a prison system.  The

12  prison system's purpose is to punish people for failing to

13  adhere to society's standards.  Perfectly legitimate purpose.

14       But what we have done is we've imposed upon that

15  system incarceration of the mentally ill because we don't

16  know what else to do with them so we put them in prisons.

17       Very sensible way of proceeding.  But anyway, we're

18  doing it.

19       It is hardly surprising -- I was about to express an

20  opinion to the expert.  Please, excuse me.

21       Do you find it surprising that people entering a

22  prison system, which has a significant mental health

23  population, are faced with stressors of such a nature that it

24  is likely to leave at least some folks nuts?

25       THE WITNESS:  It's not surprising.

3040

1          THE COURT:  No.  It just seems to me inevitable.

2          THE WITNESS:  The other factor, which we haven't

3    discussed, but I have to say it, in other systems I've work

4    in, the other things that we have done is reduced the prison

5    population.

6          And I know reductions have occurred, and I am very

7    much aware of the reductions, but it is still crowded.  And I

8    think you're still seeing the effects of a crowded prison

9    system.

10          You can't move people as fast as you should.  You

11    can't put them in spots as quickly as you need to.  These are

12    all things that interfere with delivery of treatment

13    services.

14          THE COURT:  One of the things that -- to say it

15    permitted me is really not right -- I accepted the 30- and

16    60-day term for getting people out -- at least there is a

17    maximum term now -- getting them out of nondisciplinary ASU

18    because I recognize how overcrowded the system is, and, you

19    know, legitimately they may have problems moving people.

20          But that problem -- I'm asking you.  Isn't that

21    problem simply trying to rationalize the population?

22          If you've got a fixed number of cells, you got to

23    figure out who's got to go into them.  And other people have

24    got to -- you got to find something else to do with them.

25          Is that wrong?

3041

1          THE WITNESS:  I don't think it is all hopeless here.

2     I think that we can -- I think a good analysis -- We're

3     talking about the sensitive needs yards, right?

4          I mean, these people -- it's a matter of looking at

5     that ASU population.  So those that need protection.  Okay.

6     But I worked in states.  And a lot of states, when someone

7     says that I need protection, they just don't put them into

8     segregation.  They'll sometimes confine them to their cell or

9     their unit.  Depends what's the nature of the danger is here.

10          Or they will ship them to -- I'll give you a good

11     example.  In Mississippi they have protective custody units.

12     So when you are being investigated for do you need protective

13     custody, they don't put you in segregation.  They'll put you

14     in a protective custody unit pending outcome of the

15     investigation.  So you have moved.

16          And by doing that the continuation of services

17     continues.  The inmate can continue to participate, get

18     milestone credits, which reduces the length of stay,

19     et cetera.

20          There are some options here I think we could look at,

21     which is taking other units and declaring them as sensitive

22     needs.  I understand there is like 30-some thousand inmates

23     now, if I'm correct on that, that are in these sensitive --

24     what they call sensitive needs yards.

25          These are the inmates that want to program.  I think

3042

1   they want to do their time.  They don't want to be hassled.

2   They don't want to be assaulted.

3          And so I think the more we build that up -- I would

4   ramp that up as much as I can, as quickly as I can.

5          So I think there is some portion of those ASUs that

6   could be transferred there immediately, rather than sit in an

7   ASU, especially for the mentally ill ones, for 30, 60 days,

8   where we know the delivery of the treatment services is

9   difficult just because of the security that's imposed there.

10         We know there is high suicide rates in those units.

11  They're not -- from what I can see, they're not good places

12  to deliver mental health services.

13         So the premise should be, what's the least

14  restrictive place we can put these people, trying to avoid

15  any form of segregation placement.

16         And I don't have the solution for you today, but I do

17  think it is there.  And it is very -- because, again, you can

18  see in my resume, I'm doing this in a bunch of states.

19         Once the commitment is made at the very top, it

20  happens.

21         THE COURT:  Thank you, sir.

22  BY MS. ELLS:

23  Q.     Continuing on that topic, Dr. Austin, have you work

24  with other states that initially put protective-custody-type

25  inmates in their segregation units?

3043

1    A.      I have.  I have work with states that they were doing

2    that.  One of the first things we do is pull them out.

3    Q.      And you mentioned one of the alternatives would be to

4    confine an inmate to their cell.

5            What's the advantage of that over transferring them

6    to administrative segregation?

7    A.      Well, from the inmate's perspective, it's a place

8    he's familiar with, he's not going into a place where you

9    have -- whenever your move you're in restraints, if you leave

10   the unit, come back, you get strip-searched.  You probably

11   have some more access to the mental health services that

12   you're receiving already.

13           Again, this is a temporary -- I want to make this

14   clear.  In these other states, they move on these

15   investigations very quickly.

16   Q.      By that do you mean investigations into enemy

17   concerns?

18   A.      Yes.  You know, what's the nature of -- by quickly,

19   you know, within a week or two, they are making a decision

20   where do we need to put this person.

21           And they are definitely trying -- on a safety issue

22   they are -- you either are going to put them in a protective

23   custody unit as quickly as they can, or if it is not a

24   situation where they need to do that, they'll put them in a

25   housing unit where there are similarly situated inmates, the

3044

1   staff know who they are, they're all there because of the

2   same reason, but they are in general population.

3          THE COURT:  We'll take our morning recess.

4          Fifteen minutes.

5          (Off the record at 10:35 a.m.)

6                        ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (On the record.)

2          THE COURT:  Ms. Ells.

3    Q.      BY MS. ELLS:  Dr. Austin, you were just discussing the

4    fact that you helped other states reform their practice of

5    housing protective custody inmates in administrative

6    segregation.

7          Did you see -- did any of those states see an increase

8    in violence when they stopped that practice?

9    A.      No.

10   Q.      Dr. Haney testified earlier in this trial that the

11   percentage of Coleman class members in segregation units has

12   increased dramatically even as their percentage of the overall

13   prison population has remained steady in recent years.

14         Do you draw any particular conclusions about that?

15   A.      Well, it would -- it would lead to -- it's two possible

16   conclusions.  One is that, ah, they are spending longer periods

17   of time in segregation status.  So if you look at a cohort of

18   people that get admitted to segregation, if they are staying

19   longer and longer over time, then their size is going to rise

20   disproportionately to the overall growth in the prison

21   population.

22         The other thing which I alluded to before is the

23   possibility that the conditions in the prison system, and I

24   would have to say the crowded conditions, are contributing to

25   these people's mental health condition, and it's actually

1    resulting in more people -- people who were not labeled as CCCs

2    or EOPs when they came to prison now, through some period of

3    their incarceration, fall into that condition and are so

4    labeled.  So more people are being admitted into that status

5    and are producing higher populations.

6    Q.      What about the fact that, although there are higher

7    populations of people that are mentally ill -- according to

8    this chart that's in front of you, Exhibit 2302, for instance,

9    the EOP population is four percent of the entire population,

10   but 21 percent of EOPs are in segregation.

11          Does that strike you as unusual?

12   A.      It doesn't strike me an unusual in the sense that it's

13   pretty typical in any segregated population you'll see, you

14   know, significant proportions of that population have mental

15   health issues, and that's what's triggering it.

16          What's unusual is the size of that.  That's a large --

17   the 21 percent you're talking about?  The 21 percent is a

18   fairly significant size of the segregated population.

19          Further analysis would have to be done to figure out

20   how long they're staying.  You know, what -- is the treatment

21   having any positive impact?  We know their behavior was bad

22   when they came in.  The treatment is designed, I would hope, to

23   reduce that disruptive behavior, so we should see them exiting

24   out in a relatively timely manner.

25          Is that happening?  I don't know.  I can't tell from

1    this information.

2    Q.     Dr. Austin, are the states that you've worked with to

3    implement reforms seeing proportionate drops in segregation

4    populations of mentally ill and non-mentally ill?

5    A.     Yes.  Both populations start dropping as the step-down

6    programs get implemented.

7    Q.     And are they approximately proportional in their drop?

8    A.     Ah, I can't say exactly, but I believe they are.  I

9    believe they are.  I haven't heard to the contrary, that we're

10   dropping the non-mental health population, but the mental

11   health population is staying at the same level.

12   Q.     Okay.  And would you expect to hear that if that was

13   happening?

14   A.     Yes.

15   Q.     Dr. Austin, I'd like to talk to you next about the

16   population of prisoners that are awaiting transfer and housed

17   in administrative segregation during that process.

18          Kathleen Allison, the deputy director of DAI, testified

19   that it takes 30 days or more after ICC determines that someone

20   needs to transfer to actually endorse them to another prison,

21   and then additional time after that to move them.

22          Is that appropriate in your view?

23   A.     No.

24   Q.     Why not?

25   A.     It just should not take that long to effect the

3048

1    transfer.

2        This is a very important principle in corrections,

3    which is that time is money, time is safety.  We need to move

4    people to where they're supposed to be as quickly as possible.

5    And this is what -- gets back to my original point about I

6    would say the extremely large size of that ASU population

7    which, because of those kinds of policies, is requiring people

8    to spend too much time in that status.

9        By everyone's agreement, they're not supposed to be

10   there.  They should be in a different setting.  So the longer

11   you keep them in that kind of a setting in particular, which is

12   basically a punitive, highly controlled setting, certainly

13   cannot be beneficial, especially for people that have mental

14   illness.

15       So it's a lose/lose situation.  It's a lose situation

16   for the inmates.  It's a lose situation for the staff.  It's a

17   lose situation for the whole system.  We need to get these

18   people to where they're supposed to be.

19       If we don't have the beds, we need to find ways to

20   create the beds.  There are beds out there.  We just may need

21   to redefine what these beds are and make them work.  I've seen

22   this happen.

23       You know, we take units in other states that used to be

24   segregation and reprogram those beds into general population

25   beds.  You can run a general population unit out of an old

1    segregation unit.  It's possible to do that.  But it takes

2    commitment for that to happen.

3        THE COURT:  But there are particular problems, it seems

4    to me, with doing that quickly.  I really need your -- as an

5    example, almost all of the -- as I understand it, all of the

6    segregated units, whether ASU or SHU, they all have got solid

7    doors with narrow windows and food ports because they're

8    feeding these people, et cetera.  Now, in general population

9    you don't have that, and there's a good reason why you don't,

10   you people move out and so forth.

11       But to convert those -- I'm asking you, not telling

12   you, believe me.  But to convert those units into general

13   population units with specialized needs like treatment

14   facilities or something it seems to me would take time and

15   money.  Am I missing the point?

16       THE WITNESS:  No, you're absolutely right.  And I've

17   never seen the units.  I'm sure on cross that's going to be

18   raised.  You know, I've never been to these units, so I'm not

19   in a position to say how feasible the cost would be.

20       I can just say that in other systems, they look to --

21   I've seen them take the doors and take them off.  I've seen

22   them just say the doors will be open, this is going to be a

23   different kind of unit --

24       THE COURT:  I see.

25       THE WITNESS:  -- and they do that kind of stuff.  So

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3050

 1    there's different ways you can approach it.

 2          But I go back to the point, there has to be a very

 3    careful analysis of who these people are, why they're there.

 4          As I understand the ASUs, I mean, it is -- it is like a

 5    tumor in the system right now.  It's hemorrhaging to me, and

 6    it's -- it's causing people to be in the wrong place.  And --

 7    and part of this is crowding.  I have to come back to that,

 8    Your Honor.  The -- the failure to hit the target is causing

 9    problems, and it's going to continue to cause problems until we

10    start hitting those targets in the three-judge order.

11          But also some of these policies that allow them to take

12    their time -- if you set a deadline of 30 days, it's going to

13    be 30 days on average.  It's not going -- that's what happens,

14    I know that.  So the policy should read as soon as possible,

15    you know.  And I don't see why those transfers can't be

16    effected a lot sooner.

17          THE COURT:  Let me take off my Coleman hat and put on

18    my three-judge court hat, because what you've just said really

19    worries me.

20          Would I like to talk to you in private, but -- all

21    right.

22          There are negotiations going on which conceivably would

23    postpone meeting the 137.5 for two years because other things

24    are going to happen that at least some people think are

25    sufficiently beneficial to justify that.

1          I don't know that you can answer this without having a

2     full picture of what's being offered.  Okay.  The answer is

3     there's no way for you to sensibly answer the question.

4          THE WITNESS:  Well, I'll put it this way.  Regardless

5     of what happens with those negotiations, I have yet to find a

6     system where we can't make improvements.

7          THE COURT:  Understood.

8          THE WITNESS:  And that's what I would -- I would take.

9          And I have to say, I've met and been with a lot of the

10    California correctional officials.  I know Jeff Beard quite

11    well.  Very talented, smart people.  I just think we need to

12    get committed to solving some of these problems.

13         I believe, regardless of what the three-judge order is,

14    we can shrink this population.  We can reduce the violence

15    that's going on in these units.  We can reduce the suicides.  I

16    say that because it's happened.  It's happened in several

17    places, and the recipe is always the same.

18         So, sure, I think, you know, reducing another 10,000

19    would be of immense help to us.  And I would urge the

20    three-judge panel to get that done as soon as possible.

21         Because these other states that I have worked in, one

22    of the things they did -- or Mississippi, before we started

23    this work, they repealed, the legislature repealed the

24    85-percent truth in sentencing portion for people convicted of

25    drug and non-violent crimes.  That -- that gave us the room to

3052

1    run the system.

2          THE COURT:  California legislators may not be that

3    liberal.

4          THE WITNESS:  I understand.  Or smart.

5          THE COURT:  Or smart.

6    Q.     BY MS. ELLS:  Dr. Austin, one more question about the

7    people that are housed in segregation awaiting transfer to an

8    appropriate bed.

9          What are -- are there any alternatives to putting those

10   people in administrative segregation while they're waiting?

11   A.     Can you repeat the question?  I'm sorry.

12   Q.     Yes.

13         For the people that are housed in administrative

14   segregation while they're waiting for the right bed to open up,

15   and they're waiting for the process to go -- the 30-plus days

16   to actually transfer them once that bed is identified, is there

17   any alternative to putting those people in administrative

18   segregation while that process is playing out?

19   A.     Well, the only option really is -- there are two

20   options.  You can either keep them in their current location

21   with some kind of designation so that security staff that are

22   housing that inmate knows this person is waiting to go.  So

23   there may be restrictions on them going out for recreation or

24   job assignment.  It depends what the nature of the issue is.

25         I think, you know, the smartest thing is to start

3053

1    expanding the sensitive needs pop -- what the department is

2    already doing.  They're kind of recognizing -- I think that's

3    one of the successful parts of what they're doing is

4    creating -- is basically redefining yards.  And the more that

5    they can do that -- we're not talking -- again, we're talking

6    about the Coleman class here.  So let's go back to the numbers

7    that we're talking about.

8            There is 1,860, correct, as of December 9th that are in

9    ASUs.

10    Q.      Of the CCCs.

11    A.      Of the CCCs.  Of the CCCs.  I'm just focusing of those

12    folks.  There's only 612, so a total of about 2,400.

13            So I'm not saying all of them, but I'm saying I think

14    we can start finding alternative spots for them to go to a lot

15    sooner.

16            Now, as that happens, the ASU population starts

17    dropping.  Overflow beds are not needed any more.  We've got

18    overflow, right?  We have -- we've created some segregation

19    beds that weren't designed as segregation beds, so that starts

20    making the problem less severe.  And that's strictly moving the

21    bodies faster, not allowing certain people to come in, keeping

22    them where they're at until a bed becomes available, and then

23    transferring them directly to that bed.

24            Again, you have to look at it case by case, but it's

25    just such a large group that is in this temporary purgatory

3054

1   kind of situation that -- and are not there for a disciplinary

2   reason.  They're there for a non-disciplinary reason.

3   Q.      Thank you, Doctor.

4           I'd like to move next to the portion of the people in

5   administrative segregation that are there pending adjudication

6   of an RVR.

7   A.      Yes.

8   Q.      You state in your declaration at page 10, paragraph B,

9   that CDCR take 45 days or more to investigate and resolve RVRs.

10  A.      Yes.

11  Q.      Is that an appropriate length of time?

12  A.      Absolutely not.

13  Q.      Why?

14  A.      Well, to give you the standards that other states use,

15  usually within seven or ten business days the case needs to be

16  disposed of, often sooner than that.  And the reason -- this is

17  not just we're just trying to do this.  The reason is to have

18  immediate consequences to that inmate for their behavior.

19          Ideally -- ideally, and I see this in a lot of states

20  that we're working with, the ticket is written, and that person

21  is seen either the next day or two or three days later.  Often

22  what happens, there's an investigator assigned to the case to

23  investigate the -- if it's a serious offense, get statements

24  from people, et cetera, et cetera.  But that investigator also

25  acts somewhat as a prosecutor and will offer a deal to the

1   inmate.  If you agree to plead guilty, we're going to avoid you

2   going into segregation.

3   Q.      And what type of punishment might that sort of guilty

4   plea entail?

5   A.      Loss of privileges, loss of a visit, ah, extra work

6   duties.

7   Q.      But all of those would be carried out while they

8   remained in their unit?

9   A.      Right.  Right.  They don't go to segregation.  It's in

10  lieu of going to segregation.

11          So we've gotten the punishment.  The inmate has agreed,

12  okay, I'll do that.  There's also a promise I'm not going to

13  act like that again.  So these kinds of informal kinds of

14  sanctions are very effective if they're done properly.

15  Q.      CDCR places everybody accused of offenses that could

16  carry a SHU term in administrative segregation pending

17  resolution of that violation.  According to Title 15, that

18  includes things like indecent exposure.

19          Are those appropriate types of crimes to move somebody

20  to administrative segregation for while they're being resolved?

21  A.      No.  The purpose of -- of what I would call temporary

22  segregation pre-disciplinary hearing is the person poses a risk

23  of further violence or further assaultive behavior.  So those

24  are the people that would go into, again, the pre-adjudication

25  kind of segregation status.

3056

1          Behind that, though, again, is the fact that they will

2     dispose of those cases very quickly so the length of time in

3     that segregation status is pretty quick.  It's not 40 days.  40

4     days is extremely a long time, and that's going to -- and it

5     is.  It is clearly stacking up the ASU population.

6     Q.     So do I understand you correctly that people that are

7     not accused of violent crimes shouldn't be moved into

8     administrative segregation --

9     A.     Absolutely.  I'm sorry.

10    Q.     -- during the pendency of their RVR?

11    A.     Yes.

12    Q.     Thank you.

13          You also say on page 10, paragraph B of your

14    declaration, that the input of mental health clinicians should

15    be considered in resolving RVRs and that prisoners shouldn't be

16    punished for conduct that is a manifestation of mental illness.

17          How would clinicians play a role in resolving RVRs?

18    A.     Well, first of all, if someone on the caseload, CCC or

19    EOP is on a caseload and gets written up for a misbehavior, the

20    clinician or the person that has this person on their caseload

21    is notified that your client has been involved in this

22    situation.  That gives some time for that person to meet with

23    him, get an understanding of what happened here, what was the

24    problem, was it your medication, you know, whatever was going

25    on.

1        And then that clinician -- well, in all cases, in all

2    cases there has to be clearance by a mental health person that

3    the inmate is suitable to in effect stand trial for the -- for

4    the disciplinary report.

5        But --

6    Q.      What do you mean by that?

7    A.      That he's competent, that he's not -- he's able to

8    understand the charges.

9    Q.      And if he's not, what would you recommend?

10   A.      Well, the hearing then is suspended until such time

11   that, after treatment, he can understand the charges or she can

12   understand the charges.  So they suspend the hearing.

13   Q.      And would there be circumstances in which that type of

14   person would no longer be charged for the violation?

15   A.      That can be worked out.  Again, it depends on the

16   nature of the charge.

17       Now, if that person has assaulted someone, I think what

18   typically will happen, if it's because -- and they think it's

19   because he's gone into a severe mental health crisis, he or she

20   will go, again, to the special program step-down unit.

21   Q.      And by that you mean the one that's focused on mental

22   health?

23   A.      Right.  And because that person is going to spend

24   several months in that program, if he had gotten the highest

25   term -- and disciplinary segregation would be 30, 40 days --

3058

1    it's kind of a moot point.  He's been removed, he's gone into

2    treatment, and so there's no need -- now they might impose a

3    sentence based on what's on his record, and that 30 days of

4    segregation time was ordered.  But in lieu of that time, he was

5    transferred to the special management unit.

6        THE COURT:  Is there any reason, in your view -- I

7    mean, this is a very complex problem of trying to meld the

8    needs of the prison for order and obedience to regulations, et

9    cetera, and the fact that these folks are mentally ill.

10       Is there any down side to the prison saying, look, yes,

11   there was an assault, but the assault was a result of the fact

12   that he thought that the person was Lucifer because he was

13   undergoing a serious psychotic break.  Is there any, in your

14   view, down time -- not down time, but bad result if the prisons

15   are able to respond that way?

16       THE WITNESS:  I don't think so.  Because what we have

17   done with that person, we've removed him immediately from

18   general population, so safety has been enhanced.  We cannot

19   afford to keep that person in the general population, so now

20   we've got him segregated.  Now the question is, what do we do

21   with him while he's segregated?

22       And he's going to be segregated for a substantial

23   period of time while he gets the treatment.  And he's going to

24   have to demonstrate that his behavior is going to be acceptable

25   before he gets released.

3059

1          So the alternative is to say, okay, we'll put you in

2     punishment segregation for a period of time, and then what?  Do

3     we bring him back out untreated?  No, we still need to get --

4     we still need to get him treated.

5          THE COURT:  So your view is that there's no down side

6     to the prison recognizing that at least some prisoners'

7     behavior is essentially the consequence of their mental illness

8     even if it's very severe and represents a severe violation of

9     the rules.

10          THE WITNESS:  I don't think there's any down side at

11     all.  If I'm a correctional officer, I want to see that person

12     removed.  In his present state of mind, he's a danger to me and

13     my fellow officers, so I need to get him removed.  We've

14     achieved that.

15          Now we're going to provide treatment, and we're going

16     to put him in a program that ensures when he comes out again,

17     ah, he's not going to pose that risk to us.

18          That's -- when I was in corrections and when I worked

19     in corrections, that's the number one issue, safety, safety,

20     safety.  This is what these programs are designed to do, is to

21     make the place safer, not more dangerous.

22          Another issue here on these complications, especially

23     in California, is there are people -- it's not just the safety

24     of institutions, but the safety of the public out there.

25     Mental illness is one of the strong predictors that CDCR has

3060

1        discovered is a factor in recidivism.

2                THE COURT:  Sure.

3                THE WITNESS:  I'd be surprised if we don't find some

4        significant number of inmates being discharged with mental

5        illness directly to the streets.  And I think that's -- that's

6        awful.  That's an awful practice.

7                You know, we need to find some way to have some

8        decompression so that, when they are released, not only have we

9        gotten some treatment, but also when we turn them over, you

10       know, that local officials know we have a person here that

11       poses a potential danger to the public now, and we need to do

12       something with him upon release.

13               THE COURT:  Assume for a moment that one thought that's

14       being kicked around is, yes, we extend the 137.5 for two years,

15       but one of the things that we do is we ensure, as an example,

16       that mentally ill people are discharged into circumstances that

17       allow for treatment, which is now not really.

18               Is that a worthwhile trade-off in your view?  Or is

19       that too difficult a question to answer?

20               THE WITNESS:  I'd have to see part of the deal, but it

21       makes total sense that you would do that.

22               I know there are counties, I think there's four

23       counties that have been authorized to accept inmates as a

24       re-entry so many months before their release dates.  Which

25       would ease the crowding situation for CDCR, but, more

3061

1    importantly, I think these counties would be willing to set up

2    mental health protocols.  So when they get them, they continue

3    the treatment.  And when they come out, the treatment is

4    continued.

5           It -- it is unconscionable that we would just discharge

6    people, you know, who are at such a high risk, and we know --

7    and we know they are a high risk.  It's like we don't care.

8    You know, they're out of our system so, you know, damn to the

9    rest of everyone.  So I think we need to fix that.

10          THE COURT:  Ms. Ells.

11   Q.     BY MS. ELLS:  Dr. Austin, have you worked with states

12   to reform the amount of time that prisoners accused of rules

13   violations spend in segregation while their RVR is being

14   adjudicated before it has been adjudicated?

15   A.     You have to repeat that.

16   Q.     Certainly.  Sorry.

17          Have you worked with states to reform their practice of

18   housing people that have pending RVRs in segregation to

19   reduce -- or to take them out of that setting?

20   A.     Yes.  The most recent one would be Georgia, where they

21   were taking 30 to 40 days to dispose of cases, and most of

22   those people were being held in what would be a temporary

23   segregation.  So we picked six prisons where this was happening

24   a lot.  They volunteered to participate because they were

25   complaining they had a backlog of people that had to get into

1    this temporary segregation.

2          So it was like an arbitrary, well, this guy needs to go

3    in, so we'll just let this guy go out.  So no one is really

4    doing their full segregation time which, again, starts

5    deteriorating the whole swift and certain deterrent effect.

6          So we worked with the disciplinary committees, the

7    chairs, and the wardens.  And we said we want to set a

8    standard.  We want all of these cases disposed of in no later

9    than 10 days.  And we did that for about a six- to eight-month

10   period.

11         And the results were, ah, they were able to do it.  The

12   backlog disappeared.  They have sufficient disciplinary

13   segregation space now to do the disciplinary.  They're very

14   pleased.

15         Part of the -- part of the solution, by the way, was

16   also being able to restrict visits, which they had ruled out.

17   They didn't restrict -- like if you do a violation, your

18   visitation could be denied for a month or two.  That appeared

19   to be a big weapon in terms of these inmates.  So that threat

20   of visitation seemed to have a big -- big plus.

21         But basically what they did, they expedited the

22   disciplinary process.  They negotiated deals.  They worked with

23   the staff on, you know, what people get charged for.  There is

24   a lot of discretion an officer has on what they write someone

25   up for.  Is it assault or is it something else?

1          So that is a recent example of, very successful, moving

2     these cases faster, reducing the segregated population, and

3     having a positive result.

4     Q.     And has there been any increase in violence in the

5     institutions that you've worked with --

6     A.     No.

7     Q.     -- on those reforms?  Thank you.

8          Dr. Austin, I'd like you to turn to Exhibit NNN in your

9     binder, which are the sections of -- of Title 15 that pertain

10    to segregated housing.

11         If you could turn to page 163.

12         THE COURT:  I'm sorry.  I do not seem to have -- oh,

13    yes, I do.

14         MS. ELLS:  Sorry.  The letters follow the numbers.

15         THE COURT:  I've got it.  Okay.

16    Q.     BY MS. ELLS:  So are you on page 163, Dr. Austin?

17    A.     Is this Title 15?

18    Q.     Yeah.

19    A.     Is that page 155?

20    Q.     If you look at the bottom, flip a little further in on

21    that exhibit.

22         THE COURT:  And you want him on 163?

23         MS. ELLS:  Yeah.

24         THE WITNESS:  Okay.

25         THE COURT:  I'm not there yet.

3064

1        MS. ELLS:  Okay.

2        THE COURT:  Okay.

3   Q.       BY MS. ELLS:  Dr. Austin, I'd like to talk to you a

4   little bit about the SHUs, which are California's disciplinary

5   segregation units.

6        What you're looking at here is a chart on page 163

7   entitled SHU Term Assessment.

8        Should all of these types of offenses that are listed

9   in this chart require SHU terms?

10  A.       No.

11  Q.       What types of offenses should require a SHU term?

12  A.       Well, the SHU term should be limited to acts of

13  violence or serious injury, threats of that kind of behavior.

14  It is the most serious forms of inmate misbehavior is what

15  we're looking for here.  Participating in a riot, organizing a

16  riot.

17       Usually in the states I work with, we'd end up with

18  about five or six, the most of which is assault, sexual

19  assault, physical assault with a weapon resulting in serious

20  injury.

21  Q.       And murder obviously would --

22  A.       Murders would fit in there as well.

23  Q.       Do other states require prisoners to serve disciplinary

24  sentences for non-violent offenses?  The states that you've

25  worked with to institute reforms.

1   A.      Well, they would do the short-term disciplinary

2   segregation.  They might get five days, ten days, something

3   like that, but they don't fall into a SHU term.

4   Q.      So --

5   A.      They would not be getting any kind of a SHU term or a

6   long-term segregation term.

7   Q.      So SHU terms in California can be -- the range on this

8   chart shows between three months at the low end and upwards of,

9   for instance, 60 months for certain offenses.

10          Are those appropriate terms for a disciplinary

11  segregation?

12  A.      Well, the way I would explain this, the California

13  model that you're presenting here is like the New York and

14  Illinois model, where they -- it's almost like determinate

15  sentencing on disciplinary conduct.  And, again, the programs

16  that we are using gets rid of this, and so you don't get

17  sentenced to a fixed amount of time.  You get committed to a

18  program.

19          And so the punishment --

20  Q.      But --

21  A.      Let me just --

22  Q.      Sure.

23  A.      Because it's kind of an important distinction here.

24          Now in Illinois and New York, the way that they -- they

25  have something like this.  I'm not sure that the lengths are

1    the same.  But what they do is they have an informal system

2    called time cuts.  So what they're doing is they're cutting

3    these times based on good conduct.  So it's kind of like a

4    modified step-down program.  They -- but the logic is like a

5    step-down program.

6           I don't believe I've read anywhere, and I may be wrong,

7    in Title 15 where they allow for those cuts based on good

8    conduct.

9           Now, the American -- the Association of State and

10   Correctional Administrators, which is the professional

11   organization of state correctional administrators, has issued

12   principles about this kind of a policy.  And they basically

13   have said that it should not be based on fixed terms of

14   punishment.  It should be based on the risk that that person

15   poses to the general population and to the staff.

16          So the danger of this stuff is people just get

17   released, having experienced a longer period of punishment, and

18   their risk could be the same.  And we have no way of keeping

19   them locked up, it seems to me.  It seems like once you finish

20   your term, you're -- they're required to release you and put

21   you back.  I guess they could put you into the ASU for a few

22   months, and that's maybe what they're doing.  But this seems to

23   be, to my way of thinking, A, a dangerous way of handling this

24   kind of conduct; and an expensive way.

25          Because the other thing that happens here, which you

1    haven't talked about, is while you're in these units, you can

2    start picking up more time, start stacking the time, and you

3    can stack up some time, you know, for other kinds of conduct.

4           So this is why we're trying to, in the work that we do

5    with states, we're trying to get away from this kind of an

6    approach.  And -- and rather than have these fixed terms of

7    punishment, an admission to a program that requires the inmate

8    to demonstrate -- they don't have to demonstrate anything here.

9    They just have to do their time.

10          I like the other program.  To me it's a safer program.

11   They have to demonstrate that they have earned the right to be

12   returned back to general population.

13   Q.     Dr. Austin, you mentioned earlier that in the types of

14   reforms that you recommend, there's typically a sentence of no

15   more than 30 to 40 days in disciplinary segregation capped hard

16   at that deadline, and then people are either returned to

17   general population or, if they continue to be a risk to the

18   institutional safety, some small proportion would go to this

19   phased step-down program that you recommend.

20          In California, in these SHU terms -- the minimum on

21   this chart is two months for even the most minor SHU-able

22   offense.  Is that -- and there is no real step-down program in

23   the SHUs.

24          Is that appropriate correctional practice in your view?

25   A.     No.

1          Like, for example, indecent exposure and sexual

2     misconduct, refusal to accept assigned housing, these are --

3     and the devil is in the details, again, in this -- in this --

4     in this stuff.

5          I have -- in Illinois, I worked on a segregation system

6     where we had a lot of inmates being written up for refusing to

7     accept housing, and it turned out to be a gang situation.  So

8     gangs had gained control of housing units, tiers.  And inmates

9     were asked to go down there who were not part of that gang, and

10    they refused because the gang controlled that unit.  So you're

11    refusing?  Okay.  We're going to put you in segregation.

12    That's what they would do.  They would punish that inmate for

13    refusing a housing assignment when the real problem was that

14    the institution had lost control of those tiers.

15         So we had to get control of those tiers, and we did.

16    And so that particular incident went away.

17         In general, though, that kind of offense is not a

18    SHU-able offense in any of the places I've worked.  You know,

19    you might get disciplinary segregation, a short -- but probably

20    not.  You're probably going to get loss of privileges, maybe

21    some good time taken away, whatever they can do on informal

22    stuff.  But this is not worthy of placement in a SHU in other

23    systems.

24    Q.    And if it was assigned -- if there was something that

25    would be an offense that would result in a SHU term in those

1   states, would they typically spend as long as these sentences

2   recommend?

3   A.      Well, not -- no.  I mean, it depends --

4   Q.      Pardon me.  In a non-phased program.  In just

5   traditional disciplinary segregation without any phasing.

6   A.      Oh, no.  No.  These -- these numbers are quite large.

7   Like I said, 30, 40 days is the max that you spend.

8   Q.      Dr. Austin, under --

9   A.      Let me just add something.

10          When I first started in corrections back at Stateville,

11  the most you got in isolation -- they called it isolation.  The

12  hole we called it.  The most you got was 15 days.  And we've

13  just kind of -- you know, we've extended this stuff so much now

14  in our correctional practices, it's -- it's quite amazing.

15          And the research is clear you get the same result.

16  Whether you put someone in punishment for 30 days, three

17  months, nine months, 12 months, you get the same result, which

18  is not a good result.  You know, so why are we doing that?

19  Q.      And why is that?  Why do you get the same result?  What

20  do you take from that?

21  A.      Well, you're not -- you're not dealing with the

22  underlying problem that's producing that behavior.  So you're

23  just warehousing them in segregation.  And when they come out,

24  they come out pretty much the same as they went in.

25          Now, I am of the opinion that, you know, I like to keep

1    hitting these guys with short-term hits, work the case, work

2    the inmate, move them up to higher security.  You want to

3    misbehave?  Keep on going.  Now you get to a certain threshold

4    where you are now posing a real risk to other people.  Now

5    you're going to go into my program, and you're going to stay

6    there until you start behaving.

7            So I want to put the onus back on the inmate, you know,

8    to start behaving.  I'll give him that opportunity.  But if he

9    continues to misbehave in that program, he's going to stay in

10   Phase I for a long time.

11           What happens, because they're humans, they don't want

12   to stay there too long so they have to start behaving, and they

13   start coming out.

14   Q.      And in these states that you've worked with to shorten

15   the period of time that somebody stays in a traditional

16   segregation unit with no phased program --

17   A.      Uh-huh.

18   Q.      -- have they seen any rise in violence in the

19   institution or rules violations?

20   A.      No.

21   Q.      And would you expect that with shortening sentences,

22   but applying them very quickly after an offense?

23   A.      Yeah.  You definitely would not see any rise.  The most

24   likely outcome is that it's going to remain the same.

25           We've yet to do longitudinal studies of people that

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    have gone through the long-term step-down programs.  That

2    research has not been done.

3            THE COURT:  Ms. Ells, this is terrifically interesting,

4    and it bears upon all kinds of other problems.  But, you know,

5    my charge is mentally ill, and I hardly ever hear that in your

6    questions.

7            MS. ELLS:  I understand, Your Honor.

8    Q.      Dr. Austin, do mentally ill people -- are there

9    additional effects or impacts on people with mental illness who

10   serve time in California SHUs that you're aware of?

11   A.      Well, I guess the best I can say is that they have

12   fairly high suicide rates, ah, in those units.  That's the

13   obvious information I've read, you know, from the special

14   reports.

15   Q.      And, Dr. Austin, in your declaration on page 14, in

16   paragraphs 47 through 57, you discuss your opinion that CCCMS

17   prisoners should be excluded from the SHUs that we've just been

18   discussing.

19           Why is that?

20   A.      Because they have significant, as I understand it, Axis

21   I mental health disorders.  And they are receiving treatment

22   in -- prior to them being admitted, they were receiving

23   treatment.  That treatment needs to continue.

24           It needs to continue in a dedicated mental health unit,

25   not in a punitive segregation unit; or a unit that is having a

1   hard time delivering the services; is having a hard time

2   getting the inmates out of the cells the required 10 or 12

3   hours, whatever it is; a hard time on keeping the staff fully

4   complimented there; a unit that is not controlled by mental

5   health professionals in terms of what is the proper treatment

6   for this person.

7   Q.      Dr. Austin, the SHUs right now house both CCCMS -- with

8   the exception of Pelican Bay, the SHUs hold both CCCMS and

9   non-mentally ill prisoners.

10          Would it be inappropriate correctional practice to

11   simply bring some more mental health treatment into that mixed

12   unit?

13   A.      No.  You want to separate, you want to pull those

14   mental health, those triple -- CCCs --

15   Q.      Yes.

16   A.      -- we're talking about?  You would want to pull them

17   out of that environment.

18          Now, if you do that -- and this is the experience of

19   New York, which they did that.  They pulled all of their mental

20   health inmates out of their SHUs, and they are reporting -- and

21   you're free to contact them -- that there's been a tremendous

22   drop of disruption and violence in their SHUs once they pulled

23   the mental health inmates out and put them in a specialized

24   treatment program.

25   Q.      And has it been their experience that both the SHU

3073

1   without mentally ill people in it and the special mental health

2   unit are easier to run what they're separate like that?

3   A.      Absolutely.  Absolutely.  They're safer, they're much

4   safer.

5   Q.      Dr. Austin, defendants have claimed in this case that a

6   blanket SHU exclusion for CCCMS mentally ill prisoners would

7   greatly diminish the deterrent effect of the SHU.

8           In your view, is that right?

9   A.      For CCC or anyone with a mental health condition,

10  deterrent effect is of questionable value.  It's -- it's their

11  mental illness that is -- I'm not going to say it's causing it,

12  but it's a big influence.  So you can pour as much deterrence

13  on them as you want, and you probably won't get that much of a

14  positive result.

15          They probably have been punished a lot in their lives,

16  so I think what's been missing is effective treatment.  So I

17  think a better option for us is to put them in a treatment

18  setting rather than a punitive setting.

19  Q.      In the states that you've worked with, when somebody

20  has entered a segregated housing unit without any noticeable

21  mental illness problems and then begun developing mental

22  illness in those units, what do those states do with that

23  person?

24  A.      Well, that's assessed.  They pick that up through

25  regular assessment.

3074

1          For example, Indiana requires every 30 days everyone in

2     their SHUs has to have an out-of-cell assessment by a mental

3     health professional to ensure that there's no decompensation

4     going on.  Where that is detected, that person is transferred

5     immediately to the mental health unit for assessment and

6     stabilization.  And then they'll make a decision, okay, is this

7     long term?  Is this an episodic situation?  Maybe the person

8     could be returned.  But that, again, is going to be controlled

9     by the mental health clinician in terms of what to do with that

10    inmate.

11    Q.     And have those states seen any increase in violence

12    when they've instituted those kinds of reforms, pulling

13    mentally ill people out of their traditional disciplinary

14    segregation units?

15    A.     No.  I think they would probably report, if they hadn't

16    done that, they would have seen more disruption in those units.

17    Q.     Dr. Austin, California has a practice in its

18    segregation units where all mental health treatment is provided

19    to inmates in cages or treatment modules with no distinction

20    among the mentally ill as to that policy.

21          Is that a necessary and appropriate correctional

22    policy?

23    A.     I believe it's unnecessary.

24    Q.     Why is that?

25    A.     I believe the cages should be used only as a last

1    resort.  So when an inmate is acting out when you try to bring

2    them out for treatment or sessions, and they become disruptive,

3    then, because you have to keep the treatment going, the safest

4    way to do that is to put them in the cage.  So rather than that

5    being the first level of security, it would be the last level.

6         I'm more familiar with tethering systems which are used

7    initially.  They create cells, tables, desks which they're

8    tethered to.  They have some movement of their hands.  You have

9    a more normal dialogue with the treatment provider.  If in that

10   setting someone starts acting out, then the next time they come

11   out they're going to go to the cage.  And they're going to be

12   told you're going to stay in the cage until you promise you're

13   not going to act out again.  And if the treatment starts -- you

14   know, he starts stabilizing, he starts indicating, yes, I'm

15   willing to behave, take him out of the cage and bring him back

16   to the tethering.

17        We're going to have to get this person under control,

18   and they're not going to spend the rest of their life in a

19   cage, so we need to take steps that avoid that cage as much as

20   possible.  It should be the last resort kind of control that we

21   use, not the first.

22        And it should not be a blanket measure for everyone

23   regardless of their need for it.  That obviously is

24   counterproductive.

25   Q.    And who should make the determination as to whether or

1    not somebody needs to be tethered or in a cage for mental

2    health treatment?

3    A.      The clinician.

4    Q.      And are you working or have you worked in any other

5    states that have employed this tethering method?

6    A.      Yes.

7    Q.      And in those states, is it necessary for security to

8    have a correctional officer in the same room when treatment is

9    being provided?

10   A.      Not always.  In some cases, they're there.  In most

11   cases, they're not there.

12   Q.      And when they're there, are they physically in the room

13   or are they outside the room looking in?

14   A.      Well, if they can have a room that has glass.  And the

15   tethering system is set up so basically the inmate can't do

16   much except fall on the floor and flail, so he's not going to

17   go anywhere.  So the officer, obviously he has some kind of way

18   to look inside so that the conversation can be confidential.

19   And that's an important part, as I understand it, in the

20   treatment process.

21   Q.      And do you work with any states that use cages in the

22   same way California does in terms of having it be a blanket

23   policy?

24   A.      No.  I'm not -- there are some that started that way,

25   but they've stopped it.  And so, no, I'm not aware of places,

3077

1     any other place in my mind where the cage is universally

2     applied to all mentally ill inmates who are in a segregated

3     unit.  It's always based on as needed.

4     Q.     And do you work with any states that don't ever use a

5     cage in their system?

6     A.     I can't -- I cannot tell you definitively.  I think

7     Mississippi does not use cages, but I can't report

8     definitively.

9            I think they -- a lot of them had the cages developed,

10    and they still may have them in reserve.  But -- so I can't

11    really tell you that there are states that have abandoned the

12    cages completely.

13    Q.     Dr. Austin, I'd like to direct you to your declaration

14    at page 17, paragraph 56.  In that paragraph, you discuss

15    states like Kentucky, Illinois and Mississippi that you say

16    don't use cages.

17           Could you clarify what you mean by that?

18    A.     Well, they don't -- they have them, but they don't use

19    them.  So -- now, for example, I'm familiar with the Tamms

20    facility in Illinois.  They had cages.  They've closed down

21    that facility.  So now all of the inmates are at Pontiac where

22    they did not have cages.

23           So these are places -- I know they don't use the cages

24    for the treatment.  They may have some physically on their --

25    in their facilities.  I believe Kentucky does not.  I believe

1    Kentucky has no cages in their system.

2    Q.      And in the phased step-down program that you discussed

3    earlier that's targeted -- or contains only mentally ill

4    people, is it possible in that -- in the types of states you've

5    worked with to move out of any sort of restraint in clinical

6    contacts with proper, good behavior?

7    A.      Can you repeat that question again?

8    Q.      Yeah.  Sorry.

9            THE COURT:  I didn't get that.

10           MS. ELLS:  It was very unclear.  Excuse me.

11   Q.      In the phased step-down programs that you've worked

12   with that are targeted at mental illness, can a mentally ill

13   person ever show through behavior in that program that they

14   don't need to be restrained at all for mental health contacts?

15   A.      Oh, yes.  I mean, when you -- when you get to the lower

16   phases, you're generally not restrained at all.

17           This is very important.  The final phase, they're not

18   restrained in any way, shape or form.  They come out for their

19   services, they're escorted perhaps, but they report to the

20   room.  Again, we are trying to test them to see if they're

21   ready to go back to general population.

22           So if we have an inmate who has spent the last 90 days

23   in Phase III unrestrained, is saying all the right things, is

24   behaving properly, that's a good product.  Now this person is

25   ready to go.

1           And they're not going to go to a Level I, Level II

2      facility.  They are more than likely going to go to a Level IV

3      facility.  So that itself is another buffer in the system.  And

4      when they come out, the staff knows what they're getting.  I'm

5      getting a graduate out of the mental health unit, and so they

6      know we gotta kind of watch this person to make sure they don't

7      start acting out again.

8           So I think there's a number of checks and balances here

9      that really provides a lot of safety to everyone involved.

10     Q.     And in the states that you discussed in your

11     declaration and today that don't routinely and always require

12     mental health treatment in cages while in segregation, are

13     those more dangerous units or have they become more dangerous

14     units after not -- after ceasing their blanket policy?

15     A.     No.

16     Q.     And do you think that there is any reason that you're

17     aware of that California needs -- is special in some way and

18     needs to continue using cages?

19     A.     Not that I can see.

20          I mean, the inmates -- I'm pretty familiar with the

21     profile of the inmates in the California system.  They're not

22     atypical from other inmates in other states that I have worked

23     in.  I've worked in some pretty big states with some pretty

24     difficult inmate populations.

25          I think the thing that just has always struck me about

3080

1    California -- sorry to say this -- is the crowding that goes on

2    and the reaction, the steps the staff have taken to deal with

3    that level of crowding, which I think has produced a lot of

4    fear in the system.  And that fear needs to get removed, and I

5    think these programs help do that.  Ah, reducing the crowding

6    would certainly help a long way.

7    Q.    Dr. Austin, we've been discussing a lot of reforms that

8    you've helped other states institute.

9          Is there anything that you're aware of about

10   California's population in prison that would prevent California

11   from implementing those reforms safely?

12         And I'm talking about all of the reforms you've talked

13   about.

14   A.    I would say no.  The only difficulties we're going to

15   have is figuring out the logistics of putting people in

16   different places.

17         I think the first group I would go after is the ASU

18   population.  I would -- I would attack that population

19   aggressively to see how we can find ways to get them out of --

20   especially the non-disciplinary ones.  There's just no good

21   reason -- that's not helping us at all.  And I think there are

22   some opportunities there to do that rather quickly.

23         The SHUs is a longer term effort.  Building step-down

24   programs takes more time.  There would be a transition for the

25   Coleman class in particular.  The Coleman class, it would be

 1    creating something different.

 2              I've read through the manual on the -- on the P --

 3    Q.      PSU?

 4    A.      -- PSU manual, and there you have the beginnings of a

 5    step-down program.  There are some things I would change about

 6    it, with due respect, but you have the beginnings of that.

 7              And you have the beginnings of step-down I think in

 8    some of the indeterminate SHUs, which are not part of the

 9    Coleman class.  But you begin to see some seeds being sprinkled

10    here that are step-down like.

11    Q.      In that second reference to the indeterminate SHU, do

12    you mean the security threat group?

13    A.      Yes.

14    Q.      The four-year program for security step group -- people

15    to step down?  Is that what you're referring to?

16    A.      Yes.  An example there is the four years.  I mean,

17    that's just an extremely long period of time, unnecessarily

18    long period of time to get someone to -- to determine has he

19    renounced his gang membership.  It's just completely

20    unnecessary to take four years to do that.

21    Q.      And, Dr. Austin, turning back to the nature of

22    California's population in prison, has realignment changed the

23    nature of that population in some way that's made it more risky

24    to implement these reforms?

25    A.      Well, to my way of thinking, it's actually less risky.

3082

1    Q.      Why is that?

2    A.      It's an older population.  Ah, you have a lot of

3    long-termers that are in the system.  Age is probably the best

4    predictor of institutional misconduct, so we have larger

5    pools -- the pre-alignment population actually was younger and

6    friskier and, you know, not that bad.  But I think there's

7    tremendous opportunities in this population.

8            It's a much more stable population.  We've stopped the

9    churning of the parole violaters.  We used to have 110,000

10   people coming into the system.  It's now 30,000.  30,000, huge

11   reduction.  So we can manage this.  The pace is a much, much

12   slower pace now, and so we have a better opportunity here.

13           I think the big problem is figuring out these beds and

14   how we can convert some of these beds into different kinds of

15   purposes.

16   Q.      And when you said that the pre-alignment population in

17   CDCR was more young and frisky, how does that correlate with

18   dangerousness?

19   A.      Well, they score higher on the risk assessment.  A

20   sizable number of them were -- had mental health issues.  A lot

21   of them are just starting their careers.

22   Q.      By that do you mean their criminal careers?

23   A.      Their criminal careers.

24           So, yeah, I've been -- I just think in many ways we

25   could describe this population now as a safer population to

3083

1   manage and also to release to the streets.

2   Q.      And so if I'm understanding you correctly, there's

3   nothing different about California's population than the other

4   states that you've worked with to successfully implement

5   reform.  Is that your opinion?

6   A.      That's my opinion.

7   Q.      Now, you made reference earlier to the PSU handbook,

8   which is a document that defendants showed you at your

9   deposition and asked you to opine on.

10          Could you turn to 2496 in your binder.

11          So, is this that document that they showed to you at

12  your deposition?

13  A.      Yes.

14  Q.      And on pages zero oddly, zero to five, it describes a

15  behavioral incentive program.

16          Is that the step program that you were briefly

17  mentioning earlier?

18  A.      My mike -- oh, here it is.

19  Q.      Yeah, you're good.

20  A.      Page --

21  Q.      So it's actually I think the third page in on this PDF,

22  and it starts at zero and goes for five pages.

23  A.      Yes.  Yes.

24          THE COURT:  There's a button, for some reason, that you

25  gotta hit every once in a while.

3084

 1              THE WITNESS:  Okay.

 2              (Off the record.)

 3              THE WITNESS:  Thank you.

 4    Q.      BY MS. ELLS:  You mentioned that this type of program

 5    is a start toward the phased kind of program that you've been

 6    discussing, but not all the way there.

 7              What are the concerns you have about this particular

 8    phased program?

 9    A.      Well, it's not clear who is controlling it.  So, again,

10    it should be controlled by a psychiatrist or someone of that

11    background.

12              The -- the conditions that the service is being

13    provided, each step should show fewer restraints for the inmate

14    coming out for services.  So when you get down to steps three

15    and four, you know, I would expect to see no restraints for

16    them.

17              And then it's not clear that you're guaranteed to be

18    released upon completion of the fourth phase, so that would be

19    the last component.  Again, that's an essential part of the

20    step-down, that the inmate needs to know there is certainty

21    that I will released if I do what you want me to do.

22              If the inmate falls in a category because what you've

23    done is so dramatic and dangerous, you will not get that

24    guarantee, and you tell the person the furthest you can go is

25    Phase IV and then we're going to put you in a holding pattern

1    and you may well spend years there because you murdered

2    someone, or you tried to murder someone, then that needs to be

3    communicated.

4         You just can't have this little guessing game that's

5    going on, am I going to get out and when am I going to get out?

6    It has to be very -- they actually get a release date when they

7    enter the program that says, upon completion, if you do this.

8         Now, a lot of them don't do it because, you know, they

9    start acting out, they start -- so their dates get pushed back.

10   And as they do that, their dates are communicated to them.  So

11   those are the differences that I see.

12        I believe on the treatment itself they would -- if

13   they're using cages in each of the four phases, that would be

14   totally opposite of what other places do.  The cages would only

15   be used as a last resort, not the first resort.

16        THE COURT:  It's noon.  We'll take our recess.  We'll

17   reconvene at 1:30.

18        (Lunch recess taken at 11:58 a.m.)

19                        ---o0o---

20

21

22

23

24

25

3086

1              (On the record at 1:30 p.m.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Miss Ells.

5     BY MS. ELLS:

6     Q.      Dr. Austin, when we broke last we were discussing SHU

7     terms.  Title 15 allows for indeterminate SHU terms.  Is it

8     appropriate to assign people indeterminate sentences to

9     disciplinary units that lack a step-down program?

10    A.      No.  The indeterminate part is okay, but you have to

11    have the step-down program which provides the structure which

12    allows the inmate to get out based on his behavior or her

13    behavior.

14    Q.      And the indeterminate sentence in a step-down program

15    is acceptable because people can work their way out and they

16    will get out --

17    A.      That's correct.  I'm sorry.  That's correct.

18              MS. ELLS:  Thank you.

19              I don't have any further questions.

20                      CROSS-EXAMINATION

21    BY MS. D'AGOSTINO:

22    Q.      Good afternoon, Dr. Austin.  My name is Martine

23    D'Agostino.  I'm a Deputy Attorney General.

24              We met before.  I just have a couple of questions for

25    you.

3087

1          Dr. Austin, you have a Ph.D.; is that correct?

2   A.     I do.

3   Q.     So you're not a medical doctor?

4   A.     I am not.

5   Q.     And you have worked in a prison?

6   A.     I have.

7   Q.     And you last worked in a prison in 1975?

8   A.     Yes.

9   Q.     But you are not a sworn peace officer?

10  A.     No.

11  Q.     And you have never been a sworn peace officer; is

12  that correct?

13  A.     That's correct.

14         THE COURT:  Never mind.  Go ahead.  Keep it up.

15  BY MS. D'AGOSTINO:

16  Q.     Dr. Austin, it's your opinion that segregated housing

17  is overused in CDCR; is that correct?

18  A.     Yes.

19  Q.     But you did not visit a CDCR facility prior to

20  writing your report?

21  A.     That's correct.

22  Q.     And you have never been in an administrative

23  segregation unit in California; is that correct?

24  A.     That may or may not be true.  I did tour a couple of

25  facilities, but I don't recall being in one so you may be

3088

1   correct there.

2   Q.      And prior to preparing your report, you did not

3   interview any inmates?

4   A.      That's correct.

5   Q.      And you didn't review any data showing what rule

6   violations inmates in CDCR are serving indeterminate SHU

7   terms for, did you?

8   A.      I did not.  I would add, I have never seen any such

9   documents so I don't know if they exist.  But you're correct,

10  I have not reviewed such data.

11  Q.      So I think you also stated earlier that it is your

12  opinion that it is not feasible to bring mental health

13  services into segregated housing units; is that correct?

14  A.      No, I don't think I said that.  If I did, I -- it's

15  not the best way to do it.  So the mental health services

16  should be delivered in a mental health unit that is designed

17  for that purpose.

18  Q.      But you didn't visit any PSUs?

19  A.      I have not visited a PSU.

20  Q.      Nor any EOP Hub?

21  A.      I have not visited any CDCR facilities that have

22  segregated housing.

23  Q.      So that means you haven't observed treatment in a

24  treatment module?

25  A.      That's correct.

3089

1   Q.      And you haven't observed group therapy?

2   A.      That's correct.

3   Q.      And you haven't observed an Interdisciplinary

4   Treatment Team meeting?

5   A.      That's correct.

6   Q.      So are you basing your opinion that it is not

7   effective to bring mental health services into segregated

8   housing units on plaintiffs' experts' reports?

9   A.      Well, I did review those reports, but also most of my

10  testimony, I think, relies on what I have done in other

11  states where I have observed segregation units and treatment

12  being delivered in those units.

13  Q.      You've also stated that lengths of stay in California

14  are too long in part because under Title 15 they're designed

15  to be temporary; is that correct?

16  A.      Can you restate that?

17          I'm not sure what you mean by "temporary."

18  Q.      Sure.  Well, you've also stated today and previously

19  that the lengths of stay in Ad. Seg. in CDCR are too long

20  because in CDCR they're designed to be temporary?

21  A.      I'm not sure what you mean by "temporary."  I would

22  say they're too long in terms of those upper ranges that are

23  out there that I think are in the five, six-year range.

24  Q.      So you think they're too long even for disciplinary

25  violations such as an assault on another inmate?

3090

1    A.        Yes.  They are too long for a disciplinary

2    segregation sanction.  They are too long.

3    Q.        So under your model, disciplinary segregation terms

4    should be 30 days or less?

5    A.        They would be 30 days or less.

6    Q.        But you testified previously that murder is a special

7    category which goes on a specialized track; isn't that right?

8    A.        Well, in the case of a murder, let's say an officer

9    is killed or another inmate is killed, under the scheme I

10   presented they would get the maximum time allowed, which

11   would be 30, 40 days, whatever it would be in the provision.

12            That person would be removed from the population and

13   placed into long-term segregation and would remain there for

14   quite a long time.  They would fall into that category of

15   inmates who, based on what they've done, because it is so

16   horrific, their behavior in the unit is no longer relevant.

17            Let me give you an example, if I might?

18            One of the gentleman that I interviewed in Kentucky

19   where I've done work, this is an inmate who murdered twice

20   when he was in the community.  So on the second murder he got

21   life without possibility of parole.

22            He went to prison.  It was like his third time in

23   prison, and he proceeded to kill his cellmate.  So now he had

24   killed three people, and he was put into long-term

25   segregation.

3091

1       He remained there for quite a long time.  He did

2   approximately seven years of solitary confinement, but then

3   he worked his way out of that program.

4       The warden released him -- this is at Kentucky State

5   Penitentiary -- released him back to the general population.

6   But he's in a maximum security general population, and today

7   he's in charge of the rescue dog program.

8       So it's an example of someone who did the worst you

9   can do, which is kill another inmate or staff person, spent a

10  long time in segregation, but has now been returned to the

11  general population.

12      This is being done not by outside or a lawsuit, this

13  is done by the correctional people in Kentucky, and it

14  appears to be working.  So every case is different.

15      There are people in Ohio that I interviewed who

16  participated in the riot in Ohio.  They are still in

17  segregation.  They're probably going to stay there perhaps

18  for the rest of their lives, but they have moved down, which

19  is the lower step level.  And so they have quite a bit of

20  freedom within that supermax facility, but they're not coming

21  out.  So those are kind of the examples of people who have

22  done very horrific things.

23      But I also have to say that the vast major of people

24  going to segregation are not murdering people.

25  Q.      You haven't looked at the murder rates within CDCR,

3092

1  have you?

2  A.      The murder rates of whom?

3  Q.      Any murder rate of -- among -- by inmates in CDCR,

4  have you?

5  A.      I have not seen the official murder rates, no.

6  Q.      So you've stated previously that while most inmates

7  should serve disciplinary terms of no more than 30 days, some

8  may need to be sent to a different segregated housing unit, I

9  think you've called it a "specialized management unit," if

10 they pose a threat to institutional security; is that right?

11 A.      That's correct.

12 Q.      And one of the reasons for that is that they need to

13 be incapacitated until they demonstrate good behavior; is

14 that correct?

15 A.      That's correct.

16 Q.      And that includes mentally ill inmates?

17 A.      That's correct.

18 Q.      And that determination is based in part on the

19 judgment of prison staff as to whether they think an inmate

20 poses a risk to the institution?

21 A.      That's correct.

22 Q.      You mentioned the facility in Ohio where you worked,

23 and you discussed the step-down program there.

24          Isn't it true that an inmate can remain in that

25 step-down program indefinitely if his behavior does not

3093

1    improve?

2    A.      In all of these step-down programs, they would remain

3    in segregation if their behavior does not improve.

4    Q.      And you also made reference to the inmates who

5    participated in the riot that precipitated the building of

6    that facility; is that right?

7    A.      Yes.

8    Q.      And those inmates are not participating in that

9    program, are they?

10    A.      They participated in the program so they've been

11    stepped down, but they are not being released.  The part they

12    are not eligible for is the release because of what they have

13    done.  So that's the difference.

14          But it is part of the program, which is very explicit

15    to those inmates, that regardless of what you do, you're

16    going to stay in this unit for a long time.

17    Q.      And you said previously that the purpose of step-down

18    programs is to provide inmates a way to earn release through

19    good behavior; is that right?

20    A.      Yes.  That is correct.

21    Q.      So you also spoke about the work you did in

22    Mississippi.  And I think part of your work included

23    reviewing the case of each inmate housed in that unit to

24    determine who should be released.

25          Is that right?

3094

1  A.      We looked at each inmate to see, are there inmates

2  that should have been sent there to begin with and are there

3  inmates that have been there too long that should be

4  released.

5  Q.      Are you aware that in Mississippi prison officials

6  were not bringing any treatment into the unit prior to your

7  work there?

8  A.      They were bringing some treatment.  It was not very

9  structured.  So one of the major reforms there was to

10 identify the inmates that had mental illness.

11         And they tried to do treatment within the unit and

12 they soon abandoned that and created a specialized treatment

13 facility which is the East Mississippi Facility.

14         And they transferred all of those inmates.  Those are

15 what they call SMI inmates.  They all have been transferred

16 to East Mississippi.

17 Q.      And prior to your work there, there were inmates who

18 were held in that unit who had no misconduct reports; is that

19 correct?

20 A.      That's correct.

21 Q.      And some of them had received misconduct reports

22 simply for refusing to work; is that right?

23 A.      That's correct.

24 Q.      And when you originally began working in that unit,

25 there was a population of 1,300?

3095

1    A.      That's correct.

2    Q.      And ultimately a couple hundred of those were sent to

3    a specialized mental health unit?

4    A.      That's correct.

5    Q.      And when you stated earlier "SMI," you meant serious

6    mental illness?

7    A.      That's correct.

8    Q.      The Mississippi facility also had more general

9    conditions of confinement problems; isn't that right?

10   A.      There were -- yeah.  The facility itself had some, I

11   guess what you would call, architectural issues.

12           Is that what you mean?

13   Q.      Well, you're aware the unit was infested with

14   mosquitos?

15   A.      Yes.

16   Q.      And it had unsanitary plumbing?

17   A.      It had that.

18   Q.      And inadequate medical and dental care?

19   A.      That's correct.

20   Q.      So you've also talked a bit about swift recidivism --

21   excuse me -- swift punishment reducing recidivism.  And it's

22   your opinion that it does reduce recidivism; is that true?

23   A.      Yes.

24   Q.      You've never conducted a study of the recidivism rate

25   of inmates released from segregation housing in CDCR, have

3096

1    you?

2    A.        I have not.

3    Q.        And then you say that RVRs should be adjudicated in a

4    minimum of seven days, I believe?

5    A.        Ten days.  I would prefer seven.  In a few days, but

6    the maximum -- I can only speak to where it is occurring, so

7    in Georgia, where I've been working, they reached a ten

8    day -- it was ten business days they reached as their limit.

9    But within a week or two is certainly, I think, what is

10   desired.

11   Q.        You're aware that in California inmates can elect to

12   postpone their RVR hearing while they await a decision by the

13   DA whether to prosecute their case --

14   A.        Yes.  Sorry.

15   Q.        It's okay.

16             Is that a "yes"?

17   A.        That's a yes.

18   Q.        You're also aware that when Coleman Class Members are

19   charged with an RVR, a mental health clinician is present at

20   the RVR hearing?

21   A.        I believe I was aware of that, yes.

22   Q.        So at the time of your deposition you hadn't reviewed

23   any documents about the step-down program that exists within

24   CDCR; is that right?

25   A.        Are you referring to the PSU?

3097

1    Q.    No.  I'm referring to the STG program, which I

2    believe you mentioned in your testimony?

3    A.    I was aware that there is a step-down program, I

4    think, at the time of my deposition.  And I haven't really

5    studied that program.  I'm aware that it exists.

6    Q.    And you hadn't reviewed any documents concerning the

7    case-by-case reviews of inmates serving indeterminate SHU

8    terms currently?

9    A.    I have not.

10    Q.    So you didn't include that analysis in your report?

11    A.    Well, I could not.  I mean, I didn't have access to

12    that information.

13    Q.    Are you aware that it is publicly available on the

14    CDCR website?

15    A.    No, I'm not aware of that.

16    Q.    And isn't it true that CCCMS inmates could be serving

17    indeterminate SHU terms?

18    A.    I understand there is an indeterminate option.  I'm

19    not sure how it is used so I didn't comment on that, but I'm

20    aware there is a clause in Title 15, I believe, that says

21    that you can receive an indeterminate sanction.

22        Now, because of my involvement in other work in

23    California, I know that there is a gang program, that these

24    gang members are in for an indeterminate period of time, and

25    they can step their way down.  I think the program takes at

3098

1   least four years to complete, something like that.

2         That's the extent of my knowledge of the program.

3   Q.      So are you aware that it is not a renunciation

4   program?

5   A.      I haven't studied the program, ma'am.

6   Q.      And I guess that means you're not aware that the

7   minimum term under the step-down program is three years?

8   A.      I'm not aware of that.  If that is the minimum

9   number, I'll take your word at it.

10        If that is what it is, I would say that's excessive,

11  but I'll take your word that it is three years.

12  Q.      So you mentioned the step-down program in

13  Mississippi.  Isn't it true that an inmate in Mississippi

14  would need to program disciplinary free for two years before

15  even participating -- I'm sorry.  Can I strike that and

16  rephrase?

17        Isn't it true that an inmate in Mississippi, who is

18  in segregated housing as a result gang validation, would need

19  to program for two years without disciplinaries before

20  participating in the step-down program?

21  A.      I'm not aware of that clause.

22        THE COURT:  Assuming that it is true?

23        THE WITNESS:  Assuming it is true, that she's saying

24  they have to be in segregation for two years before they can

25  enter the gang renunciation program, if that's what it is, I

3099

1   would disagree with it.  But I'm not aware that's the

2   situation in Mississippi.

3   BY MS. D'AGOSTINO:

4   Q.      In your report you stated that you believed CDCR's

5   policy of conducting unclothed body searches on all inmates

6   in administrative segregation was inappropriate; is that

7   right?

8   A.      Yes.  I think you're speaking of the requirement that

9   when they leave the unit and come back to the unit they are

10  strip-searched.  Yes.

11  Q.      You've never worked in a state that has that policy;

12  is that right?

13  A.      That's correct.

14  Q.      And you've never talked to any CDCR inmates in

15  administrative segregation housing about how they feel about

16  that?

17          THE COURT:  He's already testified he hasn't talked

18  to any inmates in CDCR.  The question is impertinent.

19          You may proceed, ma'am.

20  BY MS. D'AGOSTINO:

21  Q.      You have never conducted a study of the rate of

22  contraband confiscated in CDCR, have you?

23  A.      I have not.

24  Q.      Inmates also resent cell searches, don't they?

25  A.      Well, that's not always the case.  There are inmates

3100

1    that, for their own protection, they want to make sure the

2    housing unit is safe so they don't oppose other people's.  As

3    long as they are not hiding stuff, they're all in favor of

4    other cells being searched from time to time to make sure

5    there are no weapons or contraband in the unit.

6           So I don't think it is true that all inmates resent

7    it.  I think they may resent it when it happens to them when

8    they think it is not justified or just part of a pro forma

9    process.  But I'm sure there are some inmates who resent it,

10   yes.

11   Q.      You believe inmates would resent having their own

12   cell searched though?

13   A.      In general, you know, they don't like it.  But it

14   depends how it is done by the officers.  If it is done

15   professionally, if it is not done to harass people, if it is

16   done on a basis of the need to do that, then I don't think

17   they would resent it.

18           MS. D'AGOSTINO:  May I just have one moment?

19           (Cocounsel confer.)

20   BY MS. D'AGOSTINO:

21   Q.      Dr. Austin, I just have a couple more questions.

22           You mentioned SMI, the seriously mentally ill

23   category used in Mississippi; is that right?

24   A.      Yes.

25   Q.      How is that defined?

3101

1    A.      I couldn't tell you in terms of psychiatric

2    terminology, but it would be, I think, equivalent to at least

3    your EOPs, then also a good portion of your CCCMS.

4            They're Axis I, significant disorders.  They have to

5    be removed by policy from the general population to receive

6    treatment in a specialized unit.

7    Q.      Did you work with Steve Martin in Mississippi while

8    you conducted your work there?

9    A.      Mr. Martin and I were appointed as co-monitors in the

10   consent decree over the facility at Walnut Grove.  So we have

11   been working together as co-monitors for the past year.

12   Q.      Are you aware Mr. Martin previously testified that

13   the category of SMI would not include CCCMS inmates as they

14   are defined in California?

15   A.      I'm not aware of that.

16           MS. D'AGOSTINO:  I have no further questions.

17           MS. ELLS:  No redirect, Your Honor.

18           THE COURT:  May the witness be released?

19           MS. ELLS:  Yes, Your Honor.

20           THE WITNESS:  Thank you, Your Honor.

21           (Brief pause.)

22           THE COURT:  Who is next?

23           What are we doing?

24           MR. MCKINNEY:  Your Honor, I don't know if plaintiffs

25   are resting.  If they are, we'll proceed.

3102

1          You have no more witnesses?

2          I want to make sure you are resting.

3          MR. BIEN:  We have no more witnesses, Your Honor.

4          THE COURT:  You're resting?

5          MR. BIEN:  We're resting.

6          THE COURT:  You may proceed.

7          MR. SHARMA:  Thank you, Your Honor.

8          Defendants call Dr. Victor Jordan.

9          THE CLERK:  Please, remain standing.

10                        VICTOR JORDAN,

11  was thereupon called as a witness herein by the Defendants,

12  and having been sworn to tell the truth, the whole truth and

13  nothing but the truth, was thereupon examined and testified

14  as follows:

15          THE CLERK:  Please, take a seat.

16          State your name, spell your last name and speak

17  directly into the microphone, please.

18          THE WITNESS:  Dr. Victor Jordan, J-o-r-d-a-n.

19          THE COURT:  Mr. Sharma.

20                        DIRECT EXAMINATION

21  BY MR. SHARMA:

22  Q.      Dr. Jordan, what is your doctorate for?

23  A.      Clinical psychology.

24  Q.      And when did you receive your degree in clinical

25  psychology?

3103

1    A.      1992.

2    Q.      And where are you currently employed?

3    A.      The California Institution For Men State Prison in

4    Chino.

5    Q.      And what is your current position there?

6    A.      I'm the chief psychologist and chief of mental

7    health.

8    Q.      And how long have you been employed at the California

9    Institution For Men?

10   A.      Over 21 years.

11   Q.      And when you first started at the California

12   Institution For Men, what was your position?

13   A.      Staff psychologist.

14   Q.      And during your time at the California Institution

15   For Men, have you worked as a staff psychologist in the

16   administrative segregation unit?

17   A.      Yes, I have.

18   Q.      How long would you estimate you worked there?

19   A.      Five years as a staff psychologist.

20   Q.      Did you work there in any other capacity?

21   A.      Yes.  I worked there as a senior psychologist

22   supervisor.

23   Q.      And currently as -- how long have you been serving as

24   the chief of mental health at CIM?

25   A.      Approximately, three and a half years.

3104

1   Q.      What is the scope of your duties as chief of mental

2   health?

3   A.      To ensure that we administer the Mental Health

4   Service Delivery System within the California Institution For

5   Men, to supervise all classifications within the mental

6   health department, meet all obligations that are required of

7   us.

8   Q.      And Dr. Jordan, have you had any other experience

9   working as a psychologist or working with populations outside

10  of the correctional population?

11  A.      Yes, I have.

12  Q.      Please, briefly describe that?

13  A.      I served a volunteer year at the Los Angeles County

14  University of Southern California Medical Center working in

15  the mental health hospital there.

16          I worked at the El Centro Human Services Corporation,

17  a program for primarily monolingual Spanish-speaking

18  families, children, adolescents in East Los Angeles.

19          I worked for the Homeless Mentally Ill Offender

20  Program in Los Angeles, the Conditional Release Program in

21  Los Angeles County, the Mentally Ill Offender Program in

22  Los Angeles County.

23          I've also worked for the Epilepsy Society.  I

24  completed training at Metropolitan State Hospital for one

25  year, Patton State Hospital for one year, and an externship

3105

```
1    at Loma Linda University Medical Center, Traumatic Brain
2    Injury Unit.
3            And I teach occasionally, evening classes, for Argosy
4    University, and I serve as a consultant for a business in the
5    community when needed periodically for emergency services.
6    Q.      Thank you.
7            Dr. Jordan, could you please describe the mental
8    health program at CIM in the segregated units?
9    A.      Yes.  We have two units that include the
10   administrative segregation unit.  And we service the CCCMS
11   and EOP patients that are within the administrative
12   segregation unit.
13           The unit is split in between two units.  We have
14   mental health offices on each side that are referred to as
15   Palm Hall and Cypress Hall.
16           Within the program I have five primary clinicians,
17   which are psychologists and social workers.  I have one
18   psychiatrist.  I have one senior psychologist supervisor.  I
19   have one recreational therapist, one office technician and
20   four licensed psychiatric technicians and their supervisor
21   within the program.
22   Q.      And what is the current number of inmates receiving
23   mental health services within the segregation unit?
24   A.      Today we have 83 CCCMS patients and three EOP
25   patients.
```

3106

1    Q.      And Dr. Jordan, is CIM what's referred to as an

2    EOP -- if I could withdraw, Your Honor.

3            Dr. Jordan, are you familiar with the term "EOP Ad.

4    Seg. hub"?

5    A.      Yes.

6    Q.      And is CIM an EOP Ad. Seg. hub?

7    A.      No, it is not.

8    Q.      So for the EOP patients that are currently within

9    your segregated unit, are you aware of whether they are

10   scheduled to be transferred to an EOP Ad. Seg. hub?

11   A.      Yes.  They should all be transferred within 30 days.

12           THE COURT:  While he's looking, 30 days from receipt

13   in the unit or --

14           THE WITNESS:  Thirty days from being identified as

15   EOP level of care.

16           THE COURT:  When you receive them in Ad. Seg., aren't

17   they already defined as being EOP?

18           I'm asking you.  I don't know.

19           THE WITNESS:  No.  Not necessarily.

20           Some come in maybe at a CCCMS level of care.  Some

21   have not yet been identified or just returned from a county

22   jail.  So as soon as we identify them, that's when the clock

23   starts for us.

24           I'm sorry.  Some may also convert from CCCMS to an

25   EOP.

3107

1          THE COURT:  Sure.

2   BY MR. SHARMA:

3   Q.     Dr. Jordan, could you please provide -- or please

4   describe the regimen of care provided to the CCCMS inmates

5   within the administrative segregation unit at CIM?

6   A.     We treat the CCCMS and EOP the same.  Everyone is

7   received and we complete an intake assessment, complete a

8   treatment plan, complete a suicide risk assessment.

9          We may or may not have to do testing for the Clark

10  Program to see if there is any cognitive deficits.

11         Once we establish their -- that intake work, then

12  they're scheduled for Interdisciplinary Treatment Team, where

13  they are seen by the treatment team.

14         Then, thereafter, they'll be seen every week by a

15  primary clinician.  They'll be seen every four to six weeks

16  by a psychiatrist, and they'll receive daily tier rounds by

17  licensed psychiatric technicians.

18         They'll also receive in-cell activities by the

19  recreational therapist who provides services both in the

20  clinical area and on the tiers, passes out books and art

21  supplies.  For example, golf-sized pencils, pieces of paper.

22  Q.     Dr. Jordan, previously in this matter there's been

23  some testimony about, say, solitary confinement.

24         What do you understand the term "solitary

25  confinement" to include?

3108

1    A.      I would imagine -- I have never seen that, but I

2    would imagine somebody --

3           THE COURT:  If you have never seen it, that's the end

4    of that story.

5           THE WITNESS:  We don't have that, not at CIM.  We

6    don't have solitary confinement.

7    BY MR. SHARMA:

8    Q.      And Dr. Jordan for --

9           THE COURT:  That is because you have these daily

10   rounds, as an example?

11          THE WITNESS:  Yes.  My understanding -- yes, we have

12   those rounds, but also we don't have the type of cells where

13   they're isolated from all stimulation.

14          THE COURT:  You don't have the cells that, as we've

15   been told -- or I have been told are typical with a solid

16   door and, at best, a long window along the side?

17          THE WITNESS:  Yes.  They have -- it is a solid

18   cell-front door and there's windows on the sides of them.  I

19   think there is also one in the middle.  There is a few

20   windows on them.

21          I didn't think of that as solitary confinement

22   because they often have other inmates in the cell with them,

23   and you can hear what is going on in different rooms and out

24   on the tier.

25          So I was thinking of solitary confinement as almost

3109

1  sensory deprivation.  But we don't have that.

2          THE COURT:  I'm sorry.  Something you just said, I

3  don't think I understood.

4          Are there double cells in your unit -- double-celled?

5          THE WITNESS:  No, there is not.

6          THE COURT:  Right.

7  BY MR. SHARMA:

8  Q.      Dr. Jordan, you mentioned that there is a suicide

9  screening form that's conducted for inmates within the

10 segregated unit?

11 A.      Yes, I did.

12 Q.      And to your knowledge, within the past -- or excuse

13 me, not to your knowledge.

14          Within the past two years has there been a suicide

15 within the segregated unit at CIM?

16 A.      No, there has not.

17 Q.      Dr. Jordan, I believe you testified that inmates

18 within the segregated -- inmates within the Mental Health

19 Delivery System in the segregated units at CIM receive

20 weekly -- are offered weekly contacts with a clinician; is

21 that correct?

22 A.      Yes, I did.  I also failed to mention the group

23 therapy.

24 Q.      Can you please describe the group therapy that's

25 offered to inmates in the segregated unit?

3110

1    A.      We have approximately four group therapies on the

2    weekends with psychiatric technicians.  We have several group

3    therapies with a recreational therapist.  And we have two

4    group therapies with a psychologist and a student intern or

5    student -- or practicum student.  We have both interns and

6    practicum students at CIM.

7    Q.      Can you please explain in a little more detail what

8    the students or these practicum students are at CIM?

9    A.      They're students from accredited universities that

10   are receiving part of their clinical training at the

11   institution.  So they come in, and they sit with a

12   psychologist.

13          All their work is supervised by a psychologist and a

14   senior psychologist supervisor -- a senior psychologist

15   specialist in their assessment and treatment of the mentally

16   ill inmates.

17   Q.      And are these students in addition to the staff that

18   you previously described that are assigned to the segregated

19   units?

20   A.      Yes.

21   Q.      And Dr. Jordan, in your experience how would you

22   describe the staffing levels for the segregated units at CIM

23   right now?

24   A.      Very rich.  I make sure that I have -- that program

25   always gets the priority.  As you asked, we have not had a

3111

1    suicide in Ad. Seg. in many years.  I can't even recall the

2    last time we had a suicide there.

3        So I keep it very richly staffed so there is plenty

4    of opportunity for mental health treatment within the unit.

5    Q.    Dr. Jordan, you testified that administrative

6    segregation inmates are housed within two units.  I believe

7    you defined them as Cypress and Palm?

8    A.    Yes.

9    Q.    And to your knowledge does Cypress serve any other

10   purpose within the institution?

11   A.    Yes.  It serves almost as a multi-purpose type of

12   unit.

13   Q.    And what other type of inmates might be housed in

14   Cypress?

15   A.    It is used as a reception center overflow for the

16   reception center.

17   Q.    And are those inmates who are housed as reception

18   center overflow treated as administrative segregation

19   inmates?

20   A.    No, they're not.

21   Q.    Could you please describe how their treatment is

22   different?

23   A.    Yes.  They're placed in their as reception center

24   inmates while awaiting a bed in the reception center.  And

25   those patients are not treated by the Ad. Seg. mental health

3112

1  staff.  They're treated by the clinical staff in the main

2  general population clinic.

3         So they leave that unit to go to their appointments

4  at the main clinic, the general population reception clinic.

5  They also go out to yard activities in the general population

6  yard, and they eat on a different unit -- on a different

7  reception center unit.

8  Q.     And to the extent that any of these reception center

9  overflow inmates receive treatment in the other areas you

10 specified, are they treated in what are known as "treatment

11 modules"?

12 A.     No, they're not.  They're reception center inmates.

13 The treatment modules are only used in the administrative

14 segregation and within the mental health crisis bed, if

15 it's -- if they're a danger.

16 Q.     Dr. Jordan, were you present when plaintiffs and

17 their expert, Dr. Haney, came to tour and visit CIM?

18 A.     Yes.

19 Q.     And at that time was Cypress being used for reception

20 center overflow?

21 A.     Yes.

22 Q.     And at that time was the program, as you just

23 described it, such that reception center inmates -- overflow

24 inmates were not being treated as segregated inmates?

25 A.     Correct.  They were not being treated as

3113

1    administrative segregation.  They were allowed to go -- leave

2    the clinic -- or leave the unit to go to the clinic and to go

3    to the general population yard and to eat on another unit.

4    Q.    And Dr. Jordan, during that tour by plaintiffs'

5    counsel and their experts, how long would you estimate they

6    spent at CIM?

7    A.    I believe one day.

8    Q.    And how many areas of CIM do you estimate they

9    toured?

10   A.    I think they toured at least three facilities

11   comprising several different programs.

12   Q.    Dr. Jordan, for a CCCMS inmate, who's not in

13   administrative segregation, how often are they required to

14   have clinical contacts with the clinician?

15   A.    They are required to be seen at intake, and then

16   thereafter every 90 days by a primary clinician, either a

17   psychologist or social worker.  And then if they are taking

18   medication, every four to six weeks they're seen by a

19   psychiatrist.

20         They may or may not attend group therapy.  Annually

21   we review their treatment plan.

22   Q.    So when a CCCMS inmate is placed into segregation,

23   there's significantly more clinical contacts; is that

24   correct?

25   A.    Yes.

3114

1    Q.      And Dr. Jordan, in your experience, both working

2    within the segregation unit at CIM and as a supervisor, do

3    you feel that effective treatment is being provided for

4    inmates who are housed within the segregation unit at CIM?

5    A.      Yes.  Very definitively, yes.

6            MR. SHARMA:  A brief moment, Your Honor.

7            (Cocounsel confer.)

8    BY MR. SHARMA:

9    Q.      Dr. Jordan, there was earlier testimony about the

10   lack of suicides within the segregated unit at CIM.

11           In your experience do you have an opinion or belief

12   as to what explains the lack of suicides?

13   A.      I believe I do for CIM specifically.

14   Q.      Could you please explain?

15   A.      We are overly inclusive of mental health patients.

16   If there is any question of whether or not a patient may or

17   may not have an Axis I qualifying mental disorder, we likely

18   include those patients.  We don't take a chance.

19           We also include patients who have a situational

20   crisis, who don't have an Axis I disorder.  We use the

21   medical necessity category that we're allowed to use.  So

22   somebody may just be having a stressful situation, bad news

23   about something, having a bad day, we go ahead and include

24   them in the Mental Health Service Delivery System there to

25   receive the same level of care as any other CCCMS or EOP

3115

1    patient.

2          We spend a lot of time on staff development.  We're

3    the only prison that has accredited training for

4    psychologists and social workers from the American

5    Psychological Association and the California Board of

6    Behavioral Science.

7          So we do a lot of, I believe, exceptional training

8    with our staff.  We do a lot of staff development.  We -- I

9    think -- we also bring in students.  We try to do everything

10   we can to raise the standards of a professional environment

11   and academic environment just to instill that quality among

12   our treatment team staff.

13         We have an excellent supervisor, and I believe the

14   staff in Ad. Seg. are just an exceptional group.

15   Q.      And Dr. Jordan, in your role as chief of mental

16   health, do you work with custody staff to perform your

17   duties?

18   A.      Yes, I do.

19   Q.      And could you please describe the relationship that

20   you have had with custody staff?

21   A.      Generally, very good.  There is sometimes exceptions.

22   Generally, fairly positive.  I try to include them in any

23   activity that may be occurring.  So generally, very good.

24   Q.      And Dr. Jordan, you described there may be

25   exceptions.  What do you do when there are exceptions?

3116

1    A.        Exceptions in?

2    Q.        In your relationship, if there is a negative

3    relationship with custody staff?

4    A.        I'm about as direct as you can get.  I usually pull

5    the staff member aside, the correctional officer or

6    correctional counselor, and I deal with them very directly.

7             I try to resolve it with them at the lowest level.

8    If not, I will take it to their boss unashamedly.  I do want

9    to make sure that we run a very clean, good program.

10            I worry about CIM and the program there.  I have

11   devoted myself to that program.  So I do not want anything

12   bad that would affect our patients, our data.

13            I worry every day about that place so I'm not going

14   to let something that it is impinging on my program get in

15   may way.  I will deal with it directly.

16   Q.        Dr. Jordan, if I could ask you to refer to what's

17   been marked and previously admitted as Defendants' Exhibit

18   RRR.

19            It should be in that stack before.

20            You if I can approach, Your Honor?

21            (Exhibit located for witness.)

22            Dr. Jordan, are you familiar with this document?

23   A.        Yes, I am.

24   Q.        And how are you familiar with this document?

25   A.        I believe it was within approximately one week ago

3117

1    this was sent to all the wardens and chiefs of mental health,

2    and we were asked to conduct an immediate conference call,

3    statewide-conference call.

4           And we went through the memorandum, what's expected

5    of us, and were told to immediately implement this.

6    Q.      And Dr. Jordan, if you could please just read the

7    title of the memorandum?

8    A.      "Nondisciplinary Segregation Enhanced Outpatient

9    Program And Correctional Clinical Case Management Services

10   Release Or Transfer Timelines."

11   Q.      And Dr. Jordan, since the time that you have had that

12   conference call to discuss this memorandum, have you taken

13   any steps to ensure compliance with this memorandum?

14   A.      Yes.  I have done a variety of things.  I immediately

15   contacted the staff in administrative segregation and

16   explained to them the purpose of this.

17          And I conducted a conference call with some of our

18   clerical staff that work in Ad. Seg. and the senior

19   psychologist supervisor in Ad. Seg. to explain the

20   importance.  In fact, I entitled the email "I Can't Explain

21   The Importance Of This Enough."

22          And I also got a call from the warden of the

23   California Rehabilitation Center at Norco, that prison,

24   because we also treat the mentally ill patients from the CRC

25   prison that come to our Ad. Seg.

3118

1     She asked as soon as we identify a patient in EOP or

2  CCC if she could get -- immediately send a copy of that

3  chrono -- the paperwork -- I'm sorry -- the paperwork that

4  would indicate level of care and upload that information into

5  our mental health tracking system immediately so that they

6  would also get a -- be able to transfer their patients within

7  the required time frame.

8     I also sent the email out to the entire mental health

9  department and explained the importance of this.  And then I

10  talked to the office technician that handles the paperwork to

11  explain to her the importance of expediting this paperwork.

12     And also within my work I also indicated it wasn't

13  just nondisciplinary, it is really all Ad. Seg. inmates, for

14  the importance of making sure we expedite that paperwork.

15     I also talked to the Correctional Counselor III and

16  asked her if she was experiencing any difficulty getting our

17  paperwork.  And she indicated there wasn't, that she was

18  getting all our paperwork timely.

19     And then I have this scheduled for the next

20  departmental meeting on January, I believe, 29th, 2014, to go

21  over this with the mental health department again.

22     MR. SHARMA:  Nothing further at this time, Your

23  Honor.

24     THE COURT:  Cross-examination.

25  ///

3119

1                         CROSS-EXAMINATION

2    BY MS. MENDELSON:

3    Q.      Hi, Dr. Jordan.  I'm Margot Mendelson.  We met at CIM

4    in February.

5    A.      Yes.

6    Q.      You testified about weekly primary clinician contacts

7    for mentally ill inmates in CIM's Ad. Seg. Unit?

8    A.      Yes.

9    Q.      And primary clinician contacts are intended to be

10   confidential, right?

11   A.      Correct.

12   Q.      As a mental health clinician you would agree that

13   cell-front contacts between a primary clinician and a mental

14   health patient limit the quality of the treatment provided?

15   A.      Yes.

16   Q.      And at CIM you would agree that most of the mental

17   health contacts in the Ad. Seg. Unit between a primary

18   clinician and a mental health patient occur at cell front?

19   A.      No, they don't.

20           MS. MENDELSON:  May I approach?

21           (Exhibit handed to witness.)

22   BY MS. MENDELSON:

23   Q.      Dr. Jordan, you have before you what's been marked as

24   Exhibit 2385, CIM's Mental Health Delivery System Management

25   Report?

3120

1    A.      Yes.

2    Q.      For the Special Master's 25th Round?

3    A.      Yes.

4            MS. MENDELSON:  Plaintiffs would move this document

5    be entered into evidence.

6            THE COURT:  Received.

7                (Whereupon, Plaintiffs' Exhibit 2385 received

8                 into evidence.)

9    BY MS. MENDELSON:

10   Q.      Dr. Jordan, could you please turn to page 17?

11   A.      Yes.

12   Q.      I'm looking at the section that's marked "ASU-CCCMS"?

13   A.      Yes.

14   Q.      It reads:

15           (Reading:)

16           86 percent of the inmate-patients received at least

17           weekly individual PC contacts.  36 percent of the

18           time they were seen in a confidential setting, and 62

19           percent of the time they were seen cell front.

20           (Reading concluded.)

21   A.      Yes.

22   Q.      (Reading:)

23           Reasons for nonconfidential contacts include 48

24           percent inmate-patient refusals; 4 percent custody

25           lockdowns; .3 lack of escort officers; and 45

3121

1    percent unspecified or staff decision.

2    (Reading concluded.)

3    So at least at the time of this management report you

4    would agree that there is a 62 percent cell-front contact

5    rate?

6    A.    Yes.    That's what I meant, at that time it was 62

7    percent.  Not at the current time.

8    Q.    Have you provided data to show a new rate at the

9    current time?

10   A.    I have data to show the current rate.

11   Q.    Is that available?

12   A.    Yes.    I have some data with me.

13   Q.    Okay.

14   A.    It's important I track this pretty feverishly so I'm

15   always tracking that.  Plus we conducted different quality

16   improvement teams to try to increase that number, which is

17   why I have that data with me.

18   Q.    You're aware that the cell-front mental health

19   contacts -- the high rate of cell-front mental health

20   contacts at CIM is a long-standing problem?

21   A.    We're required to do cell fronts by the licensed

22   psychiatric technicians.  We're supposed to afford every

23   inmate an opportunity for a confidential contact.

24   Q.    I should clarify.  I'm talking about primary --

25   A.    The primary clinician should occur only within the

3122

1  confidential setting.  It's only when they refuse do we go up

2  to the cell to make sure they're okay.

3  Q.     You are aware that in the 20th Round the Special

4  Master reports there was a concern that only 39 percent of

5  these contacts were taking place?

6  A.     Which round?

7  Q.     This would be the 20th Round?

8  A.     The 20th Round?

9  Q.     Uh-huh.

10  A.     I don't have that 20th Round data.

11  Q.     Again, in the 23rd Round --

12  A.     Yes.

13  Q.     -- this was a concern, and the 25th Round?

14  A.     I concede for the 25th I just can't remember.

15  Q.     And it is your testimony this problem is solved?

16  A.     That this problem is what?

17  Q.     Solved?

18  A.     No.  It is not solved.  We've done -- we've devoted a

19  lot of time for quality improvement teams to come up with

20  avenues to increase the -- to reduce the refusal rate and

21  increase the participation rate for those contacts.  So yeah,

22  we've devoted a lot of time.

23  Q.     And I want to ask you about the part that reads that

24  45 percent of the nonconfidential contacts are due to

25  unspecified or staff decision.

3123

1          Could "staff decision" mean the mental health

2     clinician ran out of time?

3     A.     No.  There is no -- mental health staff don't run out

4     of time.  They're on a work category that they're not on a

5     time that they have to get the work done.

6     Q.     And could it mean a clinician simply lacked

7     sufficient treatment space for a confidential encounter?

8     A.     We have sufficient treatment space.

9     Q.     So --

10    A.     I'm not sure what number you are looking at.

11    Q.     I'm looking at the number that says that 45 percent

12    of the reasons for nonconfidential contacts are for

13    unspecified or staff decision.

14    A.     I'm sorry.  Are you still under ASU-CCCMS?

15    Q.     That's right.

16    A.     I don't see --

17    Q.     I'm sorry.  48 percent.  Excuse me.

18    A.     Sorry.  Okay.  Yeah.  48.

19           Yes, I see that 48 percent unspecified or staff

20    decision.  Yes.

21    Q.     Dr. Jordan, you have discussed the refusal rates also

22    for Interdisciplinary Treatment Team meetings --

23    A.     Yes.

24    Q.     -- among mentally ill inmates in CIM in the Ad. Seg.

25    Unit?

3124

1    A.        Yes.

2    Q.        This is a long-standing problem in CIM, correct?

3    A.        Yeah.  It ranges in different percentages, yes.

4    Q.        In fact, the Special Master, plaintiffs' experts and

5    defendants' termination experts have all pointed out these

6    high refusal rates, correct?

7    A.        Yes.

8    Q.        And your explanation for the high refusal rates is

9    that approximately 40 percent of the inmates in Ad. Seg. are

10   Hispanic and informed the treatment staff they will not come

11   out for IDTT due to directives given by Hispanic gang

12   leaders, right?

13   A.        Yes.

14   Q.        Is it your testimony all of the Hispanic inmates on

15   the mental health caseload at CIM's Ad. Seg. are answerable

16   to gang leaders?

17   A.        No, they're not.

18             Not all Hispanics answer to them.

19   Q.        And yet that accounts for the treatment refusals

20   among Hispanic inmates at CIM's ASU?

21   A.        I don't believe that accounts for all of it at all.

22   I believe there is other reasons.

23   Q.        Such as what?

24   A.        Just last Thursday and Friday I was up on the tiers,

25   cell-front, in Ad. Seg. with the Lindsay Hayes expert, the

3125

1    suicide expert.

2            We walked the tiers, and we went cell-by-cell with a

3    psychiatric technician.  And the psychiatric technician would

4    ask them whether or not they're going to come out for their

5    appointment that day.  When some of the inmates said they

6    would not, I would inquire as to why.  And just a variety of

7    different responses.

8            And also, just from working there so many years, I've

9    just talked to some of the inmates for some of the reasons

10   why.  So no, it is not just because of direction from the

11   Hispanic gang.  There is a variety of different reasons.

12   Q.      And these refusals persist?

13   A.      Right now the refusal rate for a patient to come to

14   an IDT has been ranging from 40 to 60 percent of the patients

15   refuse to come to a team meeting.  And 40 percent of the

16   patients refuse to come for a primary clinician contact.

17   So we do have 60 percent of the patients do come out for a

18   primary clinician contact.

19   Q.      Are you aware that the Special Master's 25th Report

20   observed that there was little engagement with the inmate and

21   minimal discussion of clinical interventions at an observed

22   IDTT team meeting at CIM's ASU?

23   A.      Was that in the Special Master report?

24           Okay.

25           I recall some of that.  I didn't remember which

3126

1    report.

2    Q.        This could be a reason for high refusal rates, right?

3    A.        I think -- well, I've talked to the staff for some of

4    their engagement and what they did when observed by some of

5    the experts or monitors.  Basically, some of the staff -- the

6    comment -- I guess the question you asked is lack of

7    meaningful interaction, but I would say that's far from the

8    truth.  Our staff provide very meaningful treatment to a very

9    difficult patient population in a different type of

10    environment, and they do their absolute best.

11        Sometimes when observed by monitors, people get very

12    nervous.  They're not sure.  People explained to me that they

13    were very nervous.  But to characterize it as lack of

14    meaningful treatment is completely erroneous.

15        We provide very meaningful treatment, and I have many

16    examples of success cases in some of the most worst inmates,

17    difficult, problematic, violent, non-treatment compliant that

18    we have done a lot of rehabilitation with.  So we have a lot

19    of success cases also.

20    Q.        You're aware that in addition to the Special Master's

21    findings, defendants' termination experts found that the lack

22    of IDTT attendance in CIM's Ad. Seg. Unit indicates mentally

23    ill inmates are having difficulty forming therapeutic

24    alliances with their treatment staff?

25    A.        Unfortunately, the experts only spent one day

3127

1    reviewing the entire prison and really didn't, I don't

2    think -- I think the gentlemen were very credible, fantastic.

3    However, it's really complicated.  There are multi-missions.

4    It is very large.

5             They only spent one day there, and they took one

6    snapshot of one day.  And it also doesn't match up with the

7    current data we have.  So I think it was a bit misleading to

8    believe that somehow, taking one look, defines our mental

9    health program in Ad. Seg.

10   Q.      And you're aware that was a quote from defendants'

11   termination experts?

12   A.      Not sure which folks you're referring to.

13   Q.      Dr. Jordan, in recent years there was a plan to

14   renovate the Ad. Seg. Unit at CIM, right?

15   A.      Yes.

16   Q.      And those planned renovations included more

17   confidential treatment space?

18   A.      Yes.

19            MR. SHARMA:  Objection, Your Honor outside.  The

20   scope of direct.

21            THE COURT:  Overruled.

22   BY MS. MENDELSON:

23   Q.      And more space for group treatment in the Ad. Seg.

24   Unit?

25   A.      Yes.

3128

1    Q.       And more office space for the ASU clinicians?

2    A.       Yes.

3    Q.       That plan was cancelled, right?

4    A.       Correct.

5    Q.       And there's currently no approved and budgeted plan

6    to renovate the ASU facility at CIM?

7    A.       Correct.

8    Q.       Dr. Jordan, you would agree that the CIM prison

9    itself is in need of repairs?

10   A.       1938 construction.  Some areas are newer than others.

11   I would say in Ad. Seg. we do have areas with sufficient

12   confidential treatment space and other areas that are less

13   than ideal.  But yes, CIM needs more -- further improvement,

14   and they are receiving quite a bit of funds for certain

15   improvements.

16   Q.       In the Ad. Seg. Unit?

17   A.       No.

18            MS. MENDELSON:  Permission to approach.

19            (Exhibit handed to witness.)

20   BY MS. MENDELSON:

21   Q.       Dr. Jordan, I've handed you Exhibit 2386 which is a

22   report about CIM by the Office of the Inspector General dated

23   November 2008?

24   A.       Yes.

25            MR. SHARMA:  Your Honor, objection.  Well, I'll wait

3129

1    for a question, I apologize, but objection as to relevance.

2    It is a 2008 document.

3            THE COURT:  Well, let's move -- I assume you're going

4    to ask to move it into evidence?

5            MS. MENDELSON:  That's correct.

6            THE COURT:  The objection is it is outdated?

7            MS. MENDELSON:  Your Honor, Dr. Jordan was treating

8    at that time.  If it is outdated, he can tell me.  I'm asking

9    about long-standing problems at CIM.

10            THE COURT:  Objection is overruled.  It is received.

11               (Whereupon, Plaintiffs' Exhibit 2386 received

12                into evidence.)

13            You may proceed.

14    BY MS. MENDELSON:

15    Q.    Can you please turn to page 2 of this report.

16          I'm looking at the second paragraph where it reads.

17          (Reading:)

18          The department and state Legislature are aware that

19          CIM has fallen into an unacceptable state of repair

20          due to years of neglect.

21          (Reading concluded.)

22          It goes on to state that an outside consultant

23    determined, quote:

24          (Reading:)

25          If funding is not dramatically increased, CIM's

3130

1          condition will reach a level of degradation that

2          independent facilities managements throughout the

3          industry would recommend demolishing and

4          replacing the entire institution.

5          (Reading concluded.)

6      Working under those conditions creates challenges for

7  mental health clinicians, doesn't it?

8  A.      Yes.

9  Q.      Looking further down the page where it reads:

10          (Reading:)

11          While our evaluation of the warden's performance was

12          mostly positive, staff surveys and interviews reveal

13          CIM's employees are deeply concerned about the

14          institution's poor condition.

15          (Reading concluded.)

16      Do these working conditions -- are these working

17  conditions at CIM a factor in hiring mental health

18  clinicians?

19  A.      I don't believe I understand the question, but I

20  don't believe so.  If you're saying does the condition of the

21  environment prevent us from hiring qualified individuals, no.

22      We are able to hire the most qualified and probably

23  better qualified because of our proximity to Los Angeles, our

24  relationships with the universities, our student intern and

25  practicum programs.  We have a lot of relations with the

3131

1  community so we actually hire, I think, the most exceptional

2  in the state because of our ability to be near the accredited

3  schools.

4  Q.    Are you aware that the last round, the 25th Round

5  Management Report states that the ASU program was chronically

6  understaffed?

7  A.    Yes.

8  Q.    Dr. Jordan, the cells in CIM's Ad. Seg. Unit lack

9  electrical capacity, right?

10  A.    Yes.

11  Q.    So inmates held in CIM's Ad. Seg. Unit do not have

12  access to electronic appliances such as TVs?

13  A.    Correct.

14  Q.    And there is no current approved and funded plan to

15  address this problem?

16  A.    I don't know.  I only know about the -- I don't know

17  about that.

18  Q.    And as a mental health clinician you would agree

19  electronic appliances can reduce sensory deprivation for

20  mentally ill inmates in segregation?

21  A.    Yes.

22  Q.    Dr. Jordan, you're also aware the Special Master's

23  25th Round Report found that incoming administrative

24  segregation inmates at CIM are not consistently housed in

25  suicide-proof intake cells?

3132

1    A.      Yes.

2    Q.      And this is due to --

3    A.      Suicide resistant cells, yeah.

4    Q.      And this is due to a lack of sufficient intake cells?

5    A.      Yes.  And other reasons too.

6    Q.      And CIM is still unable to place all new arrivals to

7    the Ad. Seg. in suicide resistant cells?

8    A.      Yes.

9    Q.      Dr. Jordan, would you agree with defendants'

10   termination experts that the placement of mentally ill

11   inmates in administrative segregation should be as rare as

12   possible and as brief as possible?

13   A.      I'm sorry.  The question?

14   Q.      Would you agree with defendants' termination experts

15   that placement of mentally ill individuals in Ad. Seg. units

16   should be as rare as possible and as brief as possible?

17   A.      I'm not sure if I can answer all of that.

18           It should be as short as possible, but it is the only

19   location we have at times to place a patient in if they're

20   also administrative segregation, if I'm understanding your

21   question correctly.

22   Q.      From a clinical perspective, extended placement in

23   segregated housing can be harmful to some seriously mentally

24   ill inmates, right?

25   A.      To some.

3133

1    Q.      As chief of mental health do you review length of

2    stay data for the Ad. Seg. programs you supervise?

3    A.      Some data I do review.

4            MS. MENDELSON:  Permission to approach?

5            Permission to approach?

6            THE COURT:  Yes.

7            (Exhibit handed to witness.)

8            THE COURT:  Well, let's take our afternoon recess.

9            Fifteen minutes.

10           (Off the record at 2:40 p.m.)

11                          ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (On the record.)

2          THE COURT:  Ms. Mendelson.

3   Q.     BY MS. MENDELSON:  Dr. Jordan, before the break you

4   testified that you reviewed length of stay data for your

5   administrative segregation units?

6   A.     Yes.

7          May I clarify something earlier?  Excuse me.

8          Earlier, I didn't want to confuse anybody, but I may

9   have given the impression that within our administrative

10  segregation, the inmates are single-celled.  They are -- excuse

11  me.  They are not.  The cells are actually double-celled except

12  for the intake cell.  There may be somebody on single status

13  but, no, there is always an effort to double-cell inmates.  In

14  fact, any inmate that has a mental illness problem that

15  involves suicide, the mental health clinicians always recommend

16  double-cell housing.

17  Q.     I've handed you an excerpt from the Coleman monthly

18  data released yesterday, which I have marked as Exhibit 2398.

19         Do you have that up there?  No?

20  A.     Not yet.

21  Q.     Okay.

22         MS. MENDELSON:  Your Honor, plaintiffs request that

23  this be admitted under seal.

24         THE COURT:  Received under seal.

25  /////

 1                      (PLAINTIFFS' EXHIBIT 2398

 2                      ADMITTED INTO EVIDENCE.)

 3   Q.      BY MS. MENDELSON:  Dr. Jordan, can you please turn to

 4   page 12 of the document entitled EOP and CCCMS ASU slash SHU

 5   slash PSU length of stay report.

 6   A.      Yes.

 7           THE COURT:  I'm sorry.  I'm not there.

 8           I don't -- oh, I see.  Hang on.  I misunderstood what

 9   was going on.

10           Page 3, yes.  All right.

11           MS. MENDELSON:  Page 12.

12           THE COURT:  Page 12?

13           MS. MENDELSON:  Twelve.

14           THE COURT:  No wonder I couldn't find it.

15           Yes, ma'am.

16   Q.      BY MS. MENDELSON:  Dr. Jordan, I would ask you to avoid

17   using inmate names for the record.

18   A.      Okay.

19   Q.      So about ten lines up from the bottom, you'll see that

20   this is the institution at CIM.  And there are four individuals

21   for whom the length of stay is reported respectively 460 days,

22   606 days, 762.5 days, and 880.4 days.

23           Let's start with the first inmate of these four listed

24   with a length of stay of 460 days.

25           This individual is CCCMS, correct?

3136

1    A.        According to this data, yes.

2    Q.        You're not familiar with this individual?

3    A.        No, I'm not.

4    Q.        You don't know if that individual is still in CIM's

5    ASU?

6    A.        I -- I don't know.

7    Q.        For the individual listed with a 606-day stay, also

8    CCCMS?

9    A.        Yes.

10   Q.        Do you know if this individual is still in CIM's ad seg

11   unit?

12   A.        No, I don't.

13   Q.        And the following two with 762 days and 880 days, more

14   than two years?

15   A.        Those are not there.

16   Q.        So these inmates were released directly to the street

17   from the ad seg unit?

18   A.        No, I don't know what happened to them.  I know they're

19   not in our ad seg.

20             THE COURT:  And, of course, you don't know whether

21   these dates are accurate because they're reset every time

22   somebody moves.

23             THE WITNESS:  Yes.

24             THE COURT:  So the 880 days may, for all you know, be

25   double that.

3137

1           THE WITNESS:  Yes.

2    Q.      BY MS. MENDELSON:  These lengths of stay are of concern

3    to you as a mental health clinician?

4    A.      Yes, lengths of stay are of concern.

5    Q.      Dr. Jordan, as a mental health clinician, you would

6    agree that strip-searching can be psychologically damaging to

7    some inmates with a history of sexual abuse?

8    A.      Yes.

9    Q.      Can a mental health clinician at CIM's ad seg override

10   strip-search procedures based on an individual assessment of

11   harm?

12   A.      I -- I don't believe we've ever had to have that

13   encounter with somebody who's been sexually assaulted.  We have

14   in other cases, asked them not to in other cases.

15   Q.      Has that been successful?

16   A.      Yes.

17   Q.      So you are able to override a strip-search requirement?

18   A.      No, not usually.

19           Ah, in some exceptional cases of somebody -- the only

20   time I've seen it is when we're sending somebody to our

21   infirmary, and the person just is -- it would be best just to

22   keep them in their clothes without stripping them to their

23   boxers.  Ah --

24   Q.      As a matter of course, no individual assessment is

25   undertaken for inmates in administrative segregation as to the

3138

1    necessity of strip-searching?

2    A.        Not that I'm aware of.

3    Q.        Over the course of your career, you've certainly

4    attended many IDTT meetings?

5    A.        Yes.

6    Q.        And both custody officers and mental health clinicians

7    are present at these meetings?

8    A.        Generally, yes.

9    Q.        And they have the necessary files, they have the

10   patients' files and records with them?

11   A.        Ah, the correctional counselors are required to have

12   records with them.  And the clinicians have their records with

13   them.

14   Q.        So this would provide an opportunity for an individual

15   assessment of the need for strip-searching?

16   A.        Not in IDT.

17   Q.        Why?

18   A.        IDT, ah, we don't address that within the IDT.

19            THE COURT:  Well, you don't address it anywhere.

20            THE WITNESS:  Correct.  Only if there's an issue of

21   suicide and we're sending somebody over.

22            MS. MENDELSON:  It's not addressed anywhere.  Okay.

23   Q.        Dr. Jordan, you testified about mentally ill inmates in

24   Cypress Hall at CIM?

25   A.        Yes.

1    Q.      I believe you called it a multi-purpose unit?

2    A.      Yes.

3    Q.      Cypress Hall is officially designated as an

4    administrative segregation unit, correct?

5    A.      Yes.

6    Q.      And you testified that Cypress Hall is being used as an

7    overflow reception center unit; is that correct?

8    A.      Part of the unit is used as that, yes.

9            MS. MENDELSON:  Permission to approach?

10           THE COURT:  I think this has already been received in

11   evidence.

12           MS. MENDELSON:  It is.  It is.

13           THE COURT:  All right.

14   Q.      BY MS. MENDELSON:  Was Cypress Hall being used as an

15   overflow reception unit in February when plaintiffs' experts

16   toured?

17   A.      I believe so, yes.

18   Q.      Dr. Jordan, you were on plaintiffs' experts tour, so

19   you saw this board in Cypress Hall's ad seg unit, correct?

20   A.      Yes.

21   Q.      And is it your testimony that all of the individuals

22   with LOB cards in this photo were actually reception center

23   overflow?

24   A.      Can you ask that one more time, please?

25   Q.      So you'll notice on the photo, with the cards at the

3140

```
 1    top, that many of these individuals, in fact most, are

 2    designated LOB.  There's a category for GP LOB, SNY LOB.  It's

 3    all the pink and purple cards.

 4    A.      Yes.

 5    Q.      Is it your testimony that these individuals were part

 6    of reception center overflow?

 7    A.      If it was -- if they're LOB, yes.

 8    Q.      Okay.

 9            MS. MENDELSON:  May I approach?

10            THE COURT:  Yes.

11            Is this also in evidence?

12            MS. MENDELSON:  Yes.

13            THE COURT:  All right.

14            MS. MENDELSON:  So, Dr. Jordan, I've handed you the

15    inmate code that we're using in order to avoid using inmate

16    names.  I want to ask you about prisoner L to Dr. Kaufman's

17    declaration.

18            I've also handed you some medical records for this

19    prisoner.

20            THE WITNESS:  Okay.  Yes.

21            MS. MENDELSON:  Plaintiffs request that Exhibit 2617,

22    the medical records, be entered into evidence.

23            THE COURT:  Received.

24                          (PLAINTIFFS' EXHIBIT 2617

25                          ADMITTED INTO EVIDENCE.)
```

```
 1    Q.     BY MS. MENDELSON:  Using the code, are you able to

 2   determine, Dr. Jordan, who prisoner L is?

 3   A.     Yes.

 4    Q.     Dr. Kaufman recorded that this individual was LOB at

 5   CIM at the time of his tour on February 12th, 2013.

 6           If you turn to page 1, you'll see that it states --

 7   this is a mental health progress note dated May 4th, 2012.

 8           It states:  The patient was admitted to the MHCB --

 9           THE COURT:  Excuse me.

10           MS. MENDELSON:  -- mental health crisis bed --

11           THE COURT:  Ma'am, you're talking about page 1.  It

12   says July 28th, 2012.

13           MS. MENDELSON:  Oh, I apologize.  2617 that is?

14           THE COURT:  Yes, ma'am.

15           MS. MENDELSON:  I'm looking at the very first page of

16   this exhibit, page 1.

17           THE COURT:  Well, let's start by saying do you mean

18   page 1 that's listed as page 1 or do you mean the first page of

19   the document?

20           MS. MENDELSON:  I apologize.  I mean the first page of

21   the document.

22           THE COURT:  All right.

23    Q.     BY MS. MENDELSON:  Dr. Jordan, you would agree that

24   this indicates that this individual came from CIM's A yard?

25           The patient was admitted to the mental health crisis
```

1    bed on April 30th, 2012, from California Institution for Men, A

2    yard.

3              MR. SHARMA:  Objection, Your Honor, as to lack of

4    foundation and personal knowledge.  There's been no --

5              THE COURT:  I still don't see where you're reading

6    even.

7              Assuming that it says that somewhere, it says whatever

8    it says.  If you're going to ask a question about it, I suppose

9    we're going to have a problem, but -- the patient --

10   Q.    BY MS. MENDELSON:  You would agree that this individual

11   came from the main line, Dr. Jordan?

12   A.    Yes, it -- it indicates that he came from facility A.

13   Q.    Which is a main line facility at CIM?

14             MR. SHARMA:  Again, Your Honor, objection as to lack of

15   foundation and personal knowledge.  There's been no testimony.

16             THE COURT:  So far all she's doing is asking him to

17   affirm that the document says what it says.  If she asks him

18   anything about what he personally knows, we'll have to deal

19   with it then.  I don't know why we're doing that, but you may

20   proceed, ma'am.

21   Q.    BY MS. MENDELSON:  Dr. Jordan, reception center status

22   is the status that prisoners have when they first enter a

23   prison?

24   A.    Yes.

25   Q.    While processing is completed?

3143

1    A.      Yes.

2    Q.      And this individual came from the A yard, which is a

3    main line yard; is that correct?

4    A.      Yes.

5    Q.      Could you please turn to page 3, the third page.

6            In the top right corner it says page 3 of 7.

7    A.      Yes.

8    Q.      This document is an interdisciplinary progress group

9    treatment note dated August 19th, 2012.  It states that the

10   inmate, that prisoner L is in CH 105L.

11           That means Cypress Hall, correct?

12   A.      Yes.

13   Q.      And it states:

14           Per custody, inmate-patient unable to attend the movie

15   group because he is LOB and unable to mix with ad seg

16   inmates --

17   A.      Yes.

18   Q.      -- correct?

19           So this indicates that this individual is a status

20   called LOB.  Yes?

21   A.      Yes.

22   Q.      And that this means that he can't interact with

23   administrative segregation inmates or get some of the

24   privileges they have?

25   A.      Yes.

3144

1    Q.        And this individual, you also testified, is not from

2    the reception center.

3    A.        According to what the psychiatrist wrote -- I don't

4    know his actual status, but according to what the psychiatrist

5    wrote on a previous note, it looks like he came from --

6    actually it says the patient was admitted to the mental health

7    crisis bed from CIM.

8            So he could have been a reception center inmate placed

9    at the MHCB, which is within the --

10            THE COURT:  No, it says he is from A yard.  That would

11    indicate he's not from reception, wouldn't it?

12            THE WITNESS:  Correct.  It says he was admitted to --

13    okay.  So -- okay.  I believe I'm following.

14            THE COURT:  Go ahead.

15    Q.        BY MS. MENDELSON:  And if you'd turn to page 5 in this

16    document, which is a mental health evaluation dated May 28th,

17    2013.

18    A.        Yes.

19    Q.        It states:

20            He, prisoner L, indicated that he was on A yard

21    approximately one year ago, then sent to the MHCB due to his

22    safety because he was assaulted.

23    A.        I'm sorry.  This is dated 5/28/13?

24    Q.        That's right.

25    A.        And you're reading where?

1    Q.       Partway down in the O section.

2    A.       Okay.  All right.  I'm back there.  Thank you.

3    Q.       This indicates, again, that this individual came from

4    the A yard, not the reception center.

5    A.       Yes.

6    Q.       But you testified earlier that all of the people with

7    LOB cards in this photo were reception center.

8             Would you agree that these records identify this

9    individual as LOB?

10   A.       The question again?

11   Q.       Would you agree that this is an LOB individual?

12   A.       According to what I'm reading here, yes.

13   Q.       So this suggests that not all of the individuals

14   identified as LOB on that board were reception center overflow,

15   correct?

16   A.       Yes.

17   Q.       Are there any other kinds of inmates who are put in

18   this administrative segregation unit?

19   A.       Ah, yes.  I've seen other inmates, umm, put there again

20   temporarily for other purposes.  I don't know all of their

21   custody status.  But, yeah, I've seen other non-ad seg inmates

22   in that area.

23   Q.       You'd agree the timing of this suggests that this

24   individual went to -- came from A yard.  At least in August

25   2012, he was in Cypress Hall and was still in Cypress Hall in

1   February when Dr. Kaufman met him and toured CIM, correct?

2           MR. SHARMA:  Objection, Your Honor, calls for

3   speculation.

4           THE COURT:  Overruled.  She's asking if he can read

5   that -- if he can determine that from the documents that he's

6   possessed.

7           THE WITNESS:  It appears to be that.  There appears --

8   yeah, it appears to be that.  I'd have to spend more time

9   reviewing this, but it appears that he came from the main line

10  A facility and was placed there, went to the mental health

11  crisis bed, and then was there again, something like that

12  sequence.

13  Q.      BY MS. MENDELSON:  And Cypress Hall is in CIM's B yard,

14  correct?

15  A.      Yes.

16  Q.      The final document that I turned your attention to on

17  page 5 says that:

18          From there, he was sent to CIM B where he stayed until

19  he was transferred onto A yard on May 17th, 2013.

20  A.      Yes.

21  Q.      So this would suggest a length of stay of almost a

22  year, correct?

23  A.      Yes.

24  Q.      Do you have any reason to believe this individual had a

25  disciplinary infraction?

1    A.      I -- I have no idea about the case.

2    Q.      But you would agree he's described as an LOB?

3    A.      It appears to be that, yes.

4    Q.      Dr. Jordan, are prisoners on the mental health caseload

5    housed in Palm Hall ASU?

6    A.      Yes.

7    Q.      And they have been for the past year or so at least?

8    A.      I'm sorry.  The question?

9    Q.      Is that a recent change or have there been mental

10   health caseload individuals in Palm Hall for --

11   A.      Yes, they've always been there.

12   Q.      I want to ask you about the new non-disciplinary

13   segregation policy about which you've testified.

14   A.      Yes.

15   Q.      How many individuals does this apply to at CIM's ad

16   seg?

17   A.      With -- I'm not sure of the exact number custody wise.

18   As I mentioned, we have 83 CCCs and three EOPs today.  I don't

19   know how many this would apply to.

20           As I also said, though, when I referenced that, we do

21   this -- whether they're non-disciplinary or disciplinary, we

22   try to, the mental health department tries to expedite those

23   cases and get those chronos in either way.

24           Whether they're non-disciplinary or disciplinary --

25   Q.      With the goal of getting these individuals out of

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3148

1    administrative segregation?

2    A.      Correct.  Whether they're non-disciplinary or

3    disciplinary, our goal is to do what we can to meet the

4    required time frame.

5    Q.      And yet there's been testimony that several individuals

6    at CIM's ad seg unit have been in there well over a year?

7    A.      I don't know if -- I don't know.  I do know that, yeah,

8    we exceed the time frames at times, yes.

9    Q.      Are you familiar with the changed regulations which

10   called for expanding privileges for non-disciplinary

11   segregation individuals held in segregation units?

12   A.      I'm not sure what that refers to.  I may under some

13   other terminology.  I just don't know.

14   Q.      These are expanded privileges that, for example, state

15   that there would be greater property allowances for people who

16   are not in segregation for any fault of their own.

17   A.      Umm, no.

18   Q.      You're not aware of this?

19   A.      No.

20   Q.      So, to your knowledge, this hasn't been implemented at

21   CIM?

22   A.      I don't know.

23   Q.      You don't know.  Okay.

24           Finally turning back briefly to the photo here --

25   A.      Yes.

3149

1    Q.       -- the LOBs.

2           How many individuals would you say right now are in

3    reception center overflow at CIM's Cypress Hall unit?

4    A.       I -- I don't know exact number.  Umm, I was just there

5    on Thursday and Friday of last week with the other expert.  And

6    I know it fluctuates because I hear different numbers in the

7    warden's meetings.  I just don't know the exact number.  It

8    changes on a daily basis depending on intake.

9           Because it's also used for end routers, people going to

10   another prison but they have to spend a night at our place.

11   They may spend the time there.  Out-to-court returns, sometimes

12   when they come back in the middle of the night, they'll place

13   them in there.  So I just don't know the exact number.

14   Q.       So this is truly a multi-purpose unit, this

15   administrative segregation unit?

16   A.       Those -- yes.

17          MS. MENDELSON:  Just one moment, Your Honor.

18          (Defense counsel conferring.)

19   Q.       BY MS. MENDELSON:  Dr. Jordan, you testified about the

20   availability of electrical appliances in the administrative

21   segregation unit --

22   A.       Yes.

23   Q.       -- at CIM?

24          THE COURT:  Non-availability.

25          MS. MENDELSON:  Non-availability.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1   Q.      Are crank radios available to all of the inmates in

2   CIM's administrative segregation unit?

3   A.      Not yet.  We just received them along with the ear buds

4   that go with those.  The policy is forthcoming, but we just

5   received them within the last couple of weeks.

6   Q.      And at this moment, none of the mentally ill inmates in

7   CIM's administrative segregation unit have those crank radios?

8   A.      Correct, not yet.

9           MS. MENDELSON:  No further, Your Honor.

10          THE COURT:  Redirect, Mr. Sharma?

11          MR. SHARMA:  Yes, Your Honor.

12                          REDIRECT EXAMINATION

13  BY MR. SHARMA:

14  Q.      Dr. Jordan, counsel for plaintiffs just asked you about

15  the number of inmates who are housed in Cypress as RC overflow

16  or, as you said, housed overnight during a transfer.

17  A.      Yes.

18  Q.      Do you know whether any inmates who are on the mental

19  health delivery system are currently housed in Cypress as part

20  of reception center overflow?

21  A.      The practice is, if they are placed in there, they're

22  removed immediately, usually within the same day.  So if

23  they're a mental health reception patient, and they're placed

24  in the overflow reception, the mental health staff inform the

25  captain and the sergeant, and they move them out.

1    Q.        Thank you.

2            THE COURT:  Where do they move them to?

3            THE WITNESS:  They move them to a reception bed.  The

4    goal is to not have any mental health patient, even if they're

5    a reception, in the overflow cells just to keep them out of

6    that unit altogether.

7            THE COURT:  I can't resist.  Why?

8            THE WITNESS:  Because we just -- we prefer to keep all

9    mental health patients, if they don't need to be in that

10   housing unit, out of there.

11           It's easier for them to -- if you're -- if you're a

12   mental health patient, and you're in the overflow reception,

13   you're allowed to leave the unit to go to the regular clinic,

14   to go out to the yard.  But those beds are always used for

15   intake, so it's -- they just always like to use those beds for

16   intake.

17           And we want to try to group the mental health patients

18   on the units with the other mental health patients because we

19   provide other groups on the actual general -- actually go into

20   the units.  On the reception, we provide group therapy in the

21   reception center units.  So the practice is just to remove the

22   mentally ill from that environment altogether just to avoid any

23   issues with solid cell front door or anything else that would

24   be of a concern.

25           What --

1          THE COURT:  Go ahead.

2          THE WITNESS:  Mr. Sharma, may I add something?

3          MR. SHARMA:  Sure, please.

4          THE WITNESS:  The -- on the other units, the general

5     population reception center units within CIM, we have

6     clinicians that actually go down to the units and run group

7     therapy.  So we don't do that in the Cypress unit.

8          So if we can take a participant in the mental health

9     service delivery system and have them on one of those other

10    units, they may have an increased opportunity for more mental

11    health treatment.  We don't have that ability to provide extra

12    services in the Cypress unit.

13    Q.     BY MR. SHARMA:  And, again, Dr. Jordan, given the

14    population that's treated at CIM, which you testified is that

15    of CCCMS, are groups required by the program guide for that

16    population?

17    A.     For CCCMS?  Not -- not by program guide.

18    Q.     So that's something you do in addition to the program

19    guide?

20    A.     Yes, and if it's clinically indicated.

21    Q.     Dr. Jordan, there were a number of questions about

22    refusals.  And I want to just focus first on when an inmate --

23    when we're talking about cell-front contacts with an inmate.

24          Do you have the current -- what's your current

25    understanding of how often inmates are, umm, coming out for

1    confidential treatment as opposed to cell-front contacts?

2    A.      Currently 60 percent are coming out for their primary

3    clinician contact.

4    Q.      And to clarify, Dr. Jordan, is that 60 percent of

5    inmates or it's for 60 percent of contacts occurring outside

6    of -- in the confidential setting?

7    A.      60 percent of the patients that are in the mental

8    health service delivery system, 60 percent of them come out for

9    their weekly treatment with a primary clinician.

10   Q.      And, again, Dr. Jordan, does that mean -- I'm sorry.

11   I'll withdraw, Your Honor.

12        And, Dr. Jordan, I believe there were some questions

13   about, ah, some of the reasons that an inmate might refuse to

14   come out for that confidential treatment.

15        Could you please describe some of the reasons that

16   inmates have reported to you or that your staff have reported

17   to you.

18   A.      There's several different reasons.

19        I have -- during an ICC, I've -- always in ICC, we

20   always encourage the patient to come out for their service.

21   And I've had patients tell me, I'm doing fine, I really don't

22   want to come out.  Umm, the fellas -- this is from a

23   Hispanic -- don't want me to come down.

24        I've also seen a prison kite as they call it, a letter,

25   from the Hispanic inmates indicating that don't go out and talk

 1    to the doc.  It's a sign of weakness.  That happens

 2    occasionally.

 3            Some of the other reasons are that in the morning all

 4    patients are seen by the psychiatric technician, and the

 5    psychiatric technician checks up on the patient.  And then at

 6    that time, he or she will then ask them, are you going to come

 7    out today?  And the person says, no, I'm letting you know right

 8    now I'm fine, I don't need to see my psych again.

 9            So it's sometimes vague.  And as I said, last Friday --

10    Thursday and Friday I was there with them, and just a variety

11    of different reasons.  Some are just not interested or they

12    only want their medication.

13            Remember, these are primarily CCCMS inmates who,

14    although they have a qualifying mental disorder, are not doing

15    very badly.  They're seen quite frequently.  They're seen daily

16    by the psychiatric technicians.  In fact, they're seen seven

17    days a week by the psychiatric technicians, and they're seen

18    weekly by that psychologist, and some of them just don't want

19    to talk that much.  They usually just want medication.

20            Then, again, we do have a sizable portion, we have

21    approximately 60 percent who do come out and spend time with

22    us.  So it's just -- the refusal rate varies, umm, for a

23    variety of different reasons.

24            So that's why we did two different quality improvement

25    teams, one in 2011, I believe March of 2011, and one in March

 1    of 2013, coming up with ways to increase their -- to reduce the

 2    refusal rate and increase their rate of coming out for their

 3    visits.

 4           THE COURT:  But you never heard anybody say I'm not

 5    coming out because I'm going to be strip-searched going out and

 6    strip-searched coming back, right?

 7           THE WITNESS:  Correct.  I've never --

 8           THE COURT:  You've never heard it.

 9           THE WITNESS:  Yes.

10           Actually, patients in administrative segregation, when

11    patients exit their cell to come to see the psychologist or the

12    mental health staff, they're not strip-searched.  They're

13    only -- they are never strip-searched when they leave their

14    cell for us.

15           I'm sorry.

16           THE COURT:  Is that a local rule or how did that evolve

17    if you know?

18           THE WITNESS:  I've been there 21 years.  I've never

19    seen a patient strip-searched to see the clinician within the

20    unit.

21           THE COURT:  Okay.

22           MR. SHARMA:  Your Honor, if I could ask some clarifying

23    questions.

24           THE COURT:  Sure.

25    Q.    BY MR. SHARMA:  Dr. Jordan, for inmates at CIM who are

1  within the administrative segregation unit, do they receive

2  treatment for mental health conditions on that unit?

3  A.     Yes.

4  Q.     So then they are not strip-searched because they're

5  already receiving treatment, when they receive treatment with

6  their clinicians, within the unit?

7  A.     Yeah.  Within the unit, they are not strip-searched.

8         THE COURT:  Okay.  Go ahead.

9         MR. SHARMA:  Thank you.

10 Q.     And, Dr. Jordan, though, you did testify then that,

11 however, you've done some quality improvement teams to address

12 the rate of refusals.

13        Have you taken any other steps to try to address the

14 rate of refusals?

15 A.     Ah, yes.

16 Q.     Could you please describe those.

17 A.     We provide television.  If they come down to the

18 waiting area, we set up a television.  We also do an additional

19 book exchange down at the waiting area.

20        One of the reasons, one of the refusal rates is because

21 sometimes the patients don't want to wait long, so we give them

22 in-cell activities to do while they're waiting.  So they don't

23 like waiting in the waiting area for a long time.  That might

24 be one of the primary reasons that I've heard, they just don't

25 like sitting there waiting.

1          Because they come over, like, in a group, and they have

2     to wait, and then they're sent back in a group.  So they just

3     don't like some of the waiting time.  So we -- I'm sorry.  So

4     we've done the television.  Sometimes we play the radio.  We do

5     the book exchange.

6          Another thing that we've done is, if the inmate

7     believes that they're going to miss out on an activity like

8     going out to the yard or something like that, we just

9     reschedule their appointment.  So we're -- that's another thing

10    we've done, just made our -- even though we're supposed to see

11    them at specific times, we're extremely flexible in there.  So

12    if the patient has a choice between seeing his dentist or

13    physician or a correctional counselor and a psychologist or

14    yard and they choose to go to yard, we just reschedule the

15    times.  So we've been very flexible also.

16         For those -- sometimes for inmates that do come out

17    regularly, we try to give them an extra incentive group on the

18    weekend.  It's -- or football or baseball, sports on the

19    weekend to watch a game or something like that.  So we try to

20    do some incentives.

21    Q.    And, Dr. Jordan, in your experience, has any inmate or

22    any of your staff reported that an inmate is refusing treatment

23    because of the treatment modules?

24    A.    No.

25    Q.    And, Dr. Jordan, there were some brief questions about

1    some hand-crank radios.  Could you please describe in more

2    detail what those radios are and what their purpose is in the

3    segregation unit.

4    A.       Right.

5              Those hand-crank radios, as I indicated, we just

6    received them.  I think we received 110 within the last few

7    weeks and the ear buds that go with them.  Those are for the

8    mental health service delivery system patients in

9    administrative segregation.  I think there's some specific

10   criteria that we're waiting for, the policy.

11             But the idea is that for -- if you're in the mental

12   health service delivery system, you'll receive -- you'll get --

13   it will be checked out to you, a hand-crank radio, so that they

14   have some availability for some entertainment.

15   Q.       And, Dr. Jordan, I believe you testified that there is

16   currently 84 inmates on the mental health delivery system

17   inside CIM's segregation units?

18   A.       83 CCCMS and three EOP.

19   Q.       And to your knowledge, those inmates could be there for

20   both disciplinary and non-disciplinary reasons?

21   A.       Yes.

22   Q.       And, Dr. Jordan, there were some questions about length

23   of stay within the administrative segregation unit.

24             How -- and if I could just briefly turn your attention

25   to Plaintiffs' Exhibit 2398.

1   A.      Yes.

2   Q.      And, again, turning your attention to page 12 of 2398.

3           Now, Dr. Jordan, is the report -- the information

4   that's contained on page 12 of 2398, is this a report that you

5   use in your role as chief of mental health?

6   A.      No, not this report.

7   Q.      And, Dr. Jordan, I believe there were questions related

8   to two inmates.  It's the inmate -- we're about ten up from the

9   bottom that have the length of stay reported as 880.4.

10  A.      Yes.

11  Q.      And, Dr. Jordan, to your knowledge, is this inmate

12  still within any CDCR institution?

13  A.      I don't believe so.

14  Q.      And going up to the next inmate up on that line, again,

15  this is a length of stay of 762.5.

16          To your knowledge, is this inmate within any CDCR

17  institution?

18  A.      No.

19  Q.      And, Dr. Jordan, since you don't use this report, how

20  do you and clinicians on your staff track or know of an

21  inmate's length of stay within a segregated unit?

22  A.      The -- I don't specifically know specific cases.  I

23  have too many patients.  There's so much data.  But my clinical

24  staff do.

25          And when somebody is exceeding a transfer time frame,

1    and even if they're not exceeding a transfer time frame, the

2    clinicians do what's called an expedited chrono.  It's a way

3    that they can kind of rush the processing or make that request,

4    rather, of the correctional staff to process that case much

5    more rapidly.

6         That occurs throughout CIM.  There is a -- we call that

7    an expedited chrono.  We're trying to move that patient, even

8    if it's within the time frame, because we think it would be in

9    his best interest to go to a program.

10        So a CCCMS inmate, for example, even if they're -- we

11   are waiting for the 60 days to go, we think it might be in his

12   best interest to go in 30 days, we do that expedited chrono.

13   And we give those to a correctional supervisor, an actual --

14   those we actually give to a supervisor so that a supervisor has

15   it requesting that.

16        The other way is I look at aggregate data that we

17   receive telling us the length of stay, what the averages are.

18        Also, once a month, there's a meeting with the chief

19   deputy warden and one of my senior psychologist specialists and

20   a CC-3 to review all EOP cases.  At times, we'll also review

21   CCCMS cases that have been there long, but it's devoted really

22   to any EOPs.

23        And what they do is they look at EOP length of stay,

24   and at that time there might be a problem.  Umm, we have a high

25   co-morbidity with medical issues there.  We have a large

3161

1    medical population.  CIM has, I believe, the largest medical

2    population that are at high risk.  So sometimes we have to --

3    they'll ask us can you get a particular chrono or clear

4    something up with a physician to go ahead and make sure that

5    transfer occurs.

6         So that meeting serves as an opportunity for the senior

7    psychologist specialist to do something to try to move that --

8    any EOPs that are there for a long duration.

9    Q.     And, Dr. Jordan, again just focusing solely on the

10   CCCMS population in the segregated units at CIM.

11   A.     Yes.

12   Q.     In your experience, do all inmates deal with this

13   segregated environment in the same way?

14   A.     No.  And, in fact, that's why we have the different

15   categories of CCCMS and EOP.

16        We have -- it's a qualifying mental disorder to be in

17   the mental health service delivery system.  There's

18   approximately ten diagnoses that qualifies you to be in the

19   mental health service delivery system.  So it isn't that you

20   have the diagnosis of a serious mental disorder.  If you have a

21   serious mental disorder, you are in the mental health service

22   delivery system.  The issue is your global assessment of

23   functioning score.

24        So, for example, you can have a diagnosis of bipolar 1

25   disorder, and you could be very low functioning with bipolar 1

3162

1    or very high functioning.

2          We also have situational crises.  It's a way of

3    including somebody in the mental health service delivery system

4    even though they have absolutely no Axis I, no serious mental

5    disorder.  We have a lot of those inmates.  We include inmates

6    that don't have a serious Axis I mental disorder, but they have

7    some type of situational crisis.  And that's why we're so

8    overly inclusive in ad seg.  We basically just deal even with

9    patients with, umm, situational crises.

10          I did it myself last Friday.  I just included somebody

11   who does not have a serious mental disorder, but he's

12   distressed, he's elderly, and he requires medical services, and

13   it was a Friday.  So it was just one of our suicide prevention

14   efforts to go ahead and include him, we'll keep an eye on him

15   for a few weeks, and maybe later we'll decide to remove him.

16          Umm --

17   Q.      Thank you.

18   A.      Okay.

19   Q.      Dr. Jordan, I believe plaintiffs' counsel asked you a

20   question, and your response was that some inmates might --

21   there's a possibility they may decompensate in a segregation

22   environment at CIM.

23   A.      Yes.

24   Q.      And in your experience, when we say some, are we

25   talking many, few?  How many are some?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1   A.       Umm, a small percentage.

2            I have seen inmates, and I've experimented and have

3   seen that, or I've seen a patient with a -- with a serious

4   mental disorder arrive to ad seg, decompensate and

5   immediately -- we don't keep them in our ad seg.  We have a

6   mental health crisis bed with 36 beds over there.  Today the

7   population is only 25.  We always usually have vacancies.  And

8   right away we send them over to the mental health crisis bed.

9            They reconstitute, do better.  We send the person back

10  just to see what was going on, and the person actually

11  decompensated.  And I attributed that to the environment, the

12  administrative segregation environment.

13           However, I have only seen that on a small, extremely

14  small percentage, only on several occasions.

15           The majority of inmates, because they're not in our

16  administrative segregation that long, and because the

17  conditions aren't completely -- it's not complete sensory

18  deprivation.  They get a lot of contact from the mental health

19  department.  And because we err on the side of caution, we

20  don't keep anybody in there if they're not doing well at all.

21  Like I said, I think today we have eight extra empty beds in

22  the infirmary.  We can always send somebody over.

23           So we just -- we don't have the opportunity to really

24  see somebody -- as soon as they start to look bad or start to

25  decompensate or worsening of symptoms, we move them because we

1    don't want to take a chance overnight.

2    Q.    And, Dr. Jordan, I believe there were also some

3    questions about a therapeutic alliance between CIM clinicians

4    and their patients.

5          Can you define the term "therapeutic alliance"?

6    A.    Yes.  It's establishing a working relationship with a

7    therapist and working on your mental health problems.  And it's

8    a position of trust, where the patient trusts us as a helper to

9    go ahead and to address their mental health symptoms.

10         Part of the problems that we hear with this terminology

11   kind of thrown around about this refusal rate, if you're truly

12   mentally ill, many of the patients, many of the truly mentally

13   ill patients, just as they do in the community, just as you see

14   in downtown Los Angeles, they want absolutely nothing to do

15   with the mental health clinicians.  They truly believe that

16   there's nothing wrong with them.  So you hear these terms

17   thrown around that they're treatment noncompliant.

18         Well, a lot of the mentally ill, logically they don't

19   want to be seen by a clinician.  They don't believe anything is

20   wrong with them.  If they talk to a clinician, they're just

21   going to get labeled and pathologized.

22         The -- a lot of mentally ill do not want to be

23   identified as mentally ill.  It's a label, they don't like it,

24   so they refuse medication.  And that's fine.  They're trying to

25   show that I'm healthy, there's nothing wrong with me.

1          So truly a certain percentage of the mentally ill --

2     same thing in the community.  I have worked in the homeless

3     mentally ill offender program in downtown Los Angeles.  A lot

4     of the mentally ill don't want anything to do with a clinician

5     because it almost acknowledges that there's something wrong

6     with you.  They want to believe that they're healthy just like

7     you and I, so they strive to do that.  So we try not to -- we

8     can only push so far.

9          I hope -- I hope I answered that question.

10    Q.    Thank you.

11         Dr. Jordan, and that being said, in your experience,

12    are there some patients within the program that you are -- that

13    you and your staff are able to develop therapeutic alliances

14    with?

15    A.    Absolutely, as I indicated.  And we have had success

16    cases.

17         In fact, sometimes the patients that are considered

18    extremely problematic, they just refuse to work with any of the

19    staff, and they're an actual problem, those are some of the

20    cases that I will actually see.  And the first thing I do when

21    I go into that unit with them, I'll see them every single day.

22    And those inmates will yell at me, tell me to get away.  I'll

23    go up on the tier.

24         Eventually I can coax them into my office or one of the

25    offices there.  And the first thing I do is get them on the

1    phone with their family assuming that they're cleared and

2    there's no restraining order, and I get them connected with

3    their family right away.

4         I right away go into that helper role.  I get them

5    connected with family.  I get them thinking about the future.

6    Even if they're a lifer, I try to instill some sense of hope

7    that there is something positive to look forward to.  So we do

8    this as much as we can.  We try to get them connected.

9         And by the way, for purposes of rehabilitation, that's

10   what we need to do is connect them with a positive source in

11   the community, assuming the family member is not using

12   substances or doing something maladaptive.  So we work very

13   hard to do that.  And we -- you know, we'll do anything to try

14   to treat somebody and get them to behave well.

15        And I can't explain -- express enough, some of the most

16   difficult, obnoxious, hostile, threatening inmates.  I've never

17   backed down from a case.  Went there and inmates that are

18   lifers, they believe their life is over, and I do everything to

19   instill some sense of hope in them.

20        Because I do preach rehabilitation, and I do want them

21   connected with their family.  Because I truly believe that's

22   one of the most key indicators of rehabilitation, is that they

23   have a positive source in the community, something to think

24   about.  And, I mean, even if they're a lifer.

25        Most recently I had an inmate completely covered in

1    swastikas refusing to work with anybody, anybody that wasn't

2    white.  And, you know, I went in and let him know, hey, I'm a

3    Jew, and I'm going to help you.  And I did everything to get

4    him connected with family and his father, to get him to talk to

5    his daughter.  And I've even brought him students.  So we do

6    everything -- we're trying to do everything we can.

7           So, despite the refusal rate, there's a number of

8    things that we're trying down there because we have the staff,

9    and we have the students, and we have the knowledge to do it.

10   But some patients are naturally going to refuse treatment.

11   They just don't want to be identified as mentally ill.  It's

12   just a demeaning label to them.

13   Q.     Thank you, Doctor.

14          And I believe there was also some testimony about the

15   age of CIM as an institution.  I believe you testified that it

16   was built in the 1930s?

17   A.     1938 is what I was told.

18   Q.     And, Dr. Jordan, even given the challenges you

19   identified of working in an institution of that age, is the CIM

20   mental health staff providing care that meets the program guide

21   requirements?

22   A.     Yes.  We just received the tour, Lindsay Hayes, I

23   believe, and he himself indicated we're running a tight ship.

24          We haven't had -- our suicide rate is fairly low.  And

25   with such a large population of mentally ill, I -- and, by the

1    way, not all of the treatment space is that old.  Some of it is

2    much newer.

3            In fact, we took over a facility that was built for the

4    Youth Authority that also has solid cell front doors on it.  It

5    was built I think in the 1970s for the Youth Authority.  It's

6    two miles through our farm from our main facility.  And -- so

7    that's probably 1970s.

8            There's two mental health clinics that have been built

9    within the last 15 years, some of the newer structures.

10   There's some brand-new dorms that had been built.  So there's

11   also some new structures.

12           But, yes, we're providing the very best service

13   irregardless of the environment.

14           MR. SHARMA:  Thank you.  A moment, Your Honor.

15           (Plaintiffs' counsel conferring.)

16           MR. SHARMA:  Nothing further, Your Honor.

17           THE COURT:  Recross?

18           MS. MENDELSON:  Yes, Your Honor.

19                        RECROSS-EXAMINATION

20   BY MS. MENDELSON:

21   Q.     Dr. Jordan, CIM's policy is to strip-search all ad seg

22   inmates when going to yard, correct?

23   A.     When they go to yard, yes, I've seen them do that.

24   Q.     And when going to the MHCB?

25   A.     Yes.

1    Q.       Anytime they leave the housing unit, the building?

2    A.       Yes, anytime they leave the unit, anytime they leave

3    one of the ad seg units.

4    Q.       And you mentioned that ad seg inmates don't like to

5    wait for mental health groups on occasion?

6    A.       Yes.

7    Q.       Do they wait for groups in cages?

8    A.       Yes.  They wait in either the TTMs, the treatment

9    modules, or holding tanks.

10   Q.       But you've never heard an inmate complain about

11   treatment in a cage?

12   A.       Complain about treatment -- I don't believe so.  I

13   just -- I just don't recall.  I haven't heard that as something

14   significant.  I just haven't heard that.

15   Q.       But maybe they don't like to wait for groups in cages?

16   A.       I know they don't like to wait.  They hadn't -- I guess

17   maybe they don't like to wait in the tanks possibly.

18   Q.       You testified that there are transfer timelines for

19   CCCMS ad seg inmates; is that correct?

20   A.       Yes.

21   Q.       Such that they are expedited on occasion?

22   A.       Yes.

23   Q.       Where are they transferring to?

24   A.       Whatever program they're going to.  I don't often know

25   where they go.  But we try to get -- whether they're there for

3170

```
 1    non-disciplinary or disciplinary, we try to have them moved to

 2    wherever they're returning to or where they're going to go

 3    within the 60 days.

 4    Q.     Now, that's 60 days -- it's your understanding that

 5    that 60 days applies to all ad seg inmates --

 6    A.     All ad --

 7    Q.     -- at the CCC level?

 8    A.     All CCCMS for ad seg for 60 days.

 9    Q.     So it's your understanding that there's a time limit in

10    place for CCCMS ad seg inmates, not just non-disciplinary

11    inmates?

12    A.     Yes.

13    Q.     Do you think that's a good time limit?

14    A.     60 days?

15    Q.     For inmates in administrative segregation at the CCC

16    level.

17    A.     I've -- that's part of the agreement, the mental health

18    service delivery system agreement, 60 days.  Yes.

19           MS. MENDELSON:  No further, Your Honor.

20           THE COURT:  Further redirect?

21           MR. SHARMA:  Nothing further, Your Honor.

22           THE COURT:  May the witness be released?

23           MS. MENDELSON:  Yes, Your Honor.

24           MR. SHARMA:  Yes, Your Honor.

25           THE COURT:  You're free to go or stay as you choose.
```

1          THE WITNESS:  Thank you.

2          MR. RUSSELL:  Your Honor, we don't have any other

3    witnesses that we're going to call today.  We will be bringing

4    back Ms. Allison tomorrow.

5          THE COURT:  Very good.

6          We'll reconvene tomorrow at 9:30.  Stand in recess.

7              (Proceedings were adjourned at 3:53 a.m.)

8                        ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                              ---o0o---

3

    STATE OF CALIFORNIA   )
4   COUNTY OF SACRAMENTO  )

5

6
            I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                 IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5

                        /s/ Kathy L. Swinhart
6                       KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25