1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12    _____/

13

14

15                        ---o0o---

16

17                   REPORTER'S TRANSCRIPT

18                RE:  EVIDENTIARY HEARING

19            THURSDAY, DECEMBER 12TH, 2013

20

21                        ---o0o---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
1                            APPEARANCES

2                             ---o0o---

3

4    FOR THE PLAINTIFFS:

5             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
6             SAN FRANCISCO, CALIFORNIA  94104

7             BY:  MICHAEL BIEN, ATTORNEY AT LAW

8             BY:  MARGOT MENDELSON, ATTORNEY AT LAW

9             BY:  AARON FISCHER, ATTORNEY AT LAW

10

11

12   FOR THE DEFENDANTS:

13              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
14              13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
15
                BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
16
                BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
17
                BY:  MARTINE D'AGOSTINO, DEPUTY ATTORNEY GENERAL
18
                BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
19

20

21                            ---o0o---

22

23

24

25
```

1

2

3                          EXAMINATION INDEX

4                              ---o0o---

5

6     FOR THE DEFENDANTS:

7          EXAMINATION:                                    PAGE

8

9      KATHLEEN ALLISON

10         Cont'd Cross-Examination by Mr. Fischer      3172
           Redirect Examination by Ms. Vorous          3265
11

12

13     MICHAEL STAINER

14         Direct Examination by MS. D'Agostino        3268
           Cross-Examination by Mr. Bien               3315
15

16

17

18

19                              ---o0o---

20

21

22

23

24

25

1                           EXHIBIT INDEX

2                            ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO              DESCRIPTION                    EVD
5

6      2410              12-17-12 CDCR Memo
                         Re: Armstrong Class Members       3197
7
       2497              CA Admin. Law Reg. Action
8                        Re:  ATOM Chair                   3254

9      2584              2013 EOP ASU Census               3205

10     2611              Declaration of Allison            3261

11     2616              2012 EOP ASU Census               3205

12     2620              Declaration of Hysen              3239

13     2643              EOP Institutional Counts &
                         Bus Seat Requests -
14                       Oct. 28, 2013                     3214

15     2649              COMPSTAT Rpt.                     3175

16     2650              CDCR Operations Manual
                         Excerpt                           3248
17

18

19

20

21

22

23

24

25

1        SACRAMENTO, CALIFORNIA

2        THURSDAY, DECEMBER 12, 2013; 9:35 A.M.

3                ---oOo---

4

5                KATHLEEN ALLISON

6   Recalled as a witness on behalf of the defendants herein, was

7   previously sworn, examined, and testified as follows:

8        THE COURT:  I remind you, ma'am, you're still under

9   oath.

10        Mr. Fischer.

11               CROSS-EXAMINATION (CONTINUED)

12   BY MR. FISCHER:

13   Q.    Ms. Allison, we spoke on Friday about how the data in

14   Defendant's QQQ, the NDS mentally ill population data

15   excludes a number of mentally prisoners who are housed in ad

16   seg for nondisciplinary reasons, so I want to go back to

17   that.

18        That's Exhibit QQQ in front of you --

19   A.    I see it.

20        MR. FISCHER:  Permission to publish, Your Honor.

21        THE COURT:  Yes.  If it's in evidence -- I've been

22   meaning to tell you folks if it's in evidence, you just

23   publish it.  You don't need any further permission.

24   BY MR. FISCHER:

25   Q.    As you've testified, this data excludes those

1    individuals in ad seg for nondisciplinary reasons who have

2    not had their ICC meeting yet.

3            Correct?

4    A.      Their initial ICC, correct.

5    Q.      And this document is dated December 4, 2013.

6            Do you see that there?

7    A.      Yes.

8    Q.      That was a Wednesday?

9    A.      Yes.

10   Q.      As you testified, ICC meetings are on Thursdays each

11   week?

12   A.      Either Wednesday or Thursday, depending upon the

13   institution.

14   Q.      The previous week was the Thanksgiving holiday.

15           Correct?

16   A.      We would have run committees on Tuesdays and

17   Wednesdays then.

18   Q.      And this NDS population data also does not include

19   individuals housed at ad seg as overflow from other buildings

20   such as the CIM reception center.

21           Correct?

22   A.      It would include all overflow inmates that are

23   designated administration segregation.

24   Q.      But as we know from your testimony at Cypress Hall,

25   not individuals in those ad seg units are designated as

1    administrative segregation.

2         Correct?

3    A.       Again, as I stated the other day that building is RC

4    overflow, so one floor is administrative segregation, one

5    floor is RC.  Those inmates have full freedom of movement as

6    any other reception center inmates.  They are not considered

7    segregated housing.

8    Q.       So they're designated as ASU?

9    A.       They are not designated as ASU because they have full

10   freedom of movement.

11   Q.       This NDS data may also exclude individuals in ad seg

12   pending transfer.

13        Correct?

14   A.       There were, as I explained the other day, a handful,

15   and that handful was 16 EOPs -- there's various codes within

16   the tracking system.  What I did is I looked at those codes,

17   and they're codes that I considered that could be possibly

18   NDS.  I looked at those guys.

19        There were 16 last week.  That is now six.  Out of

20   that six, two are scheduled to transfer this week.  One of

21   them is a medical and return guy, so he's appropriately --

22   he's not NDS.  He's actually disciplinary but in a medical

23   bed at an institution, and there turned out to be three that

24   I've asked the wardens to go back and re-evaluate for

25   potential NDS.

1    Q.     Those 16 you referenced last week are already

2    identified as NDS?

3    A.     No, sir.

4    Q.     They are not.

5           Permission to approach?

6           Ms. Allison, I've handed you what's been marked as

7    Plaintiffs' Exhibit 2649 for identification.  This is a

8    13-month report updated through September 2013 of the

9    COMPSTAT DAI statistical report, which is available online.

10   These are selected pages I'll be referencing in my questions.

11          I move to admit the document, Your Honor.

12          THE COURT:  Hearing no objection, it's received.

13                           (Whereupon, Plaintiffs' Exhibit 2649

14                           was received into evidence.)

15   BY MR. FISCHER:

16   Q.     Now, Ms. Allison, page 1 of the exhibit about a third

17   of the way down the page this says CCI.

18          Do you see that on the left?  It says data on ad seg

19   or CCI?

20   A.     Yes.

21          THE COURT:  I'm sorry.  I don't see it.

22          MR. FISCHER:  In the gray column on the left side,

23   Your Honor, and then there's a number of ASU statistics on

24   here.

25          THE COURT:  I see it.

```
 1    BY MR. FISCHER:

 2    Q.      In the two columns above the yellow that I've marked

 3    or the rows, the rows are marked:  "ASU inmates endorsed for

 4    GP and ASU inmates endorsed for SNY."

 5            Do you see that on the left side?

 6    A.      Yes, sir.

 7    Q.      If you move to the right, in September 2013 it states

 8    there are 34 ASU inmates endorsed for GP and just below that,

 9    29 ASU inmates endorsed for SNY.

10            Do you see that there?

11    A.      Correct.

12    Q.      This is at the CCI institution?

13    A.      Correct.

14            THE COURT:  I see it says:  "ASU endorsed for general

15    population."

16            What were you asking?  I missed the point.

17            MR. FISCHER:  If you go to the far right for

18    September, that's the most recent data on the 13-month chart,

19    Your Honor.  "The number of ASU inmates endorsed for general

20    population is 34," and the row just below that:  "The number

21    of ASU inmates endorsed for SNY is 29."

22            THE COURT:  I got you.

23    BY MR. FISCHER:

24    Q.      Now, Ms. Allison, the NDS designation may not apply

25    for many of these inmates.
```

1              Is that correct?

2    A.      The memo didn't come out until October -- the end of

3    September, so they would not be included in this number.

4    You're correct.

5    Q.      But, also, this status of ASU inmates endorsed for

6    general population and for SNY even today would not

7    necessarily be counted in the NDS data.

8              Is that correct?

9    A.      They should be.

10   Q.      You testified under the new NDS regulation which

11   provided the definition that is being used to comply this

12   population data, that there are three identified categories

13   of NDS.

14             Do you recall that?

15   A.      Yes.

16   Q.      And the first is:  "ASU placement for safety

17   concerns."

18             Correct?

19   A.      I would have to refer to the document for the exact

20   language.

21   Q.      Exhibit OOO, which is right in front of you --

22             THE COURT:  Has OOO been received into evidence, Madam

23   Clerk?

24             MR. FISCHER:  It has.

25             THE CLERK:  Yes.

1    BY MR. FISCHER:

2    Q.    Ms. Allison, if you refer to page 7 of that document

3    in the middle of the page, the three categories under the new

4    regulation for NDS are, one, "ASU placement for safety

5    concerns," the third line.

6         Correct?

7    A.    Safety concerns not related to misconduct.

8    Q.    And, number two:  "Investigations not related to

9    misconduct or criminal activity."

10        Correct?

11   A.    Correct.

12   Q.    Number three:  "Being a relative or associate of a

13   prison staff."

14        Correct?

15   A.    Correct.

16   Q.    So none of the three categories explicitly include

17   prisoners in ad seg pending transfer.

18        Is that correct?

19   A.    We made it very clear on the conference call with the

20   wardens and our explanation on how we track is that once a

21   SHU term has been completed, they need to be converted to NDS

22   and receive all of those privileges.

23   Q.    So, Ms. Allison, my question is:  An inmate endorsed

24   for GP is not explicitly included as an NDS individual under

25   this regulation.

```
 1              Correct?

 2    A.        It would under our current direction, yes.

 3    Q.        Has a memo been issued to the field on this, with that

 4    direction that you just described?

 5    A.        It was part of the warden's training.

 6    Q.        That was the phone call?

 7    A.        The conference call, yes.

 8    Q.        So there's nothing in writing that states that NDS

 9    should include ASU inmates endorsed for GP.

10              Correct?

11    A.        Not that I recall.

12    Q.        There's nothing in writing that directs the field to

13    include ASU inmates endorsed for SNY.

14              Correct?

15    A.        Not that I recall.

16    Q.        We went over the data from CCI and a few other

17    institutions as to the number of ASU inmates endorsed for GP

18    and SNY based on the current data from September.

19              Ms. Allison, this is page 3 of the document, also on

20    the screen there.  The left side indicates that this is

21    Corcoran, COR, and the top two lines provide the data:  "ASU

22    inmates endorsed for GP."  If you go to the far right, in

23    September there were 12.

24              Do you see that there?

25    A.        Yes.
```

1    Q.    And just below that:  "ASU endorsed for SNY," there

2    were 18?

3    A.    Yes.

4    Q.    This is on page 5 of the document.  This is for the

5    institution LAC, Lancaster.  A third of the way down the

6    page, it indicates:  "ASU inmates endorsed for GP," and if

7    you look on the right, there were 10.

8          ASU inmates endorsed for SNY, there were 35.

9          Do you see that there?

10   A.    Yes.  We need to make sure we understand that these

11   are also at the point in time in September.  This is a

12   different day.  It's already December.  These would also

13   include non-class members.

14         THE COURT:  So that's an important point.  These

15   people would also include general population that have been

16   in SHUs and are now transferred -- pending transfer to

17   special need yards or to the general population?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  We don't know how many of those are in

20   this group that constitute overflow, if you will, or not

21   overflow, but --

22         MR. FISCHER:  Waiting for bed.

23         THE COURT:  -- waiting for transfer.  We don't know

24   what the division between Coleman members and other --

25         THE WITNESS:  Not in this document, no.

1              THE COURT:  Is there some document which discriminates

2      between them?

3              THE WITNESS:  I drill down a little more in the

4      documents I review for mental health, both EOP and CCC.

5              THE COURT:  All right.

6      BY MR. FISCHER:

7      Q.      Ms. Allison, do you know how many Coleman class

8      members are in ASU endorsed for transfer to GP or SNY?

9      A.      I would have to look at my tracking system to be able

10     to answer that.

11     Q.      On page 6 of the document in front you about halfway

12     down, this is the SATF institution.  About how way down the

13     page, it indicates ASU inmates endorsed for GP, and in

14     September, the number was 10, and ASU inmates endorsed for

15     and SNY, and the number was 12.

16             Do you see that there, Ms. Allison?

17     A.      Yes, sir.

18     Q.      Page 7 of the document, for SVSP, about a third of the

19     way down the page, number of ASU inmates endorsed for GP was

20     30 in September, and the number of ASU inmates endorsed for

21     SNY was 10 in September.

22             Do you see that, Ms. Allison?

23     A.      Yes, sir.

24             THE COURT:  I mean no disrespect, but as to each of

25     those people, we now know that at least some portion of the

1    that group, whether majority or minority, are non-class

2    members.

3         The point that you're making, which is that there are

4    at least class members that have not been counted has been

5    established, but I'm not quite sure since we don't know the

6    division between class members and non-class members how much

7    further this exhibit will take us.

8         MR. FISCHER:  Of course the document is in evidence so

9    I'll let it speak for itself and I'll move on, Your Honor.

10        Thank you.

11   Q.    Ms. Allison, you recall testifying in August 2013 the

12   last time you had checked the number of prisoners in ad seg

13   for nondisciplinary reasons was between 20 and 30 percent?

14   A.    That was an approximate guess.

15   Q.    We began discussing last Friday the December 2012

16   meeting with the CDCR, Special Master and plaintiffs' counsel

17   about ASU.  At that meeting, as we discussed, plaintiffs'

18   counsel, including me, were present and took careful notes on

19   your oral report on population data for mental health case

20   load prisoners in ASU.

21        Just so the record is clear, I want to read to you

22   what our report states and ask if you disagree with our

23   record of what you stated.

24        In December of 2012 you stated at that meeting that

25   about 40 percent of mental health case load prisoners in ASU

```
1    were there either for safety concerns or pending transfer.
2         Any reason to disagree with that?
3    A.    I don't recall those specific numbers.
4    Q.    Any reason to disagree with that report?
5         THE COURT:  She's saying she doesn't recall the
6    numbers.
7         Do you presently disagree with that?
8         THE WITNESS:  Yes.  Our current population and how I
9    track it, I track today.  I don't track a year ago.  I track
10   point and time today.
11        THE COURT:  What do you know today, what percentage,
12   if you know?
13        THE WITNESS:  Again, I think we're confusing safety
14   concern inmates with nondisciplinary status.  So this report
15   that we have on the screen right now says 230 mental health
16   inmates are in for nondisciplinary reasons.  A total,
17   including clear inmates, which means non-mental health of
18   605.
19        Safety concerns -- it says "safety concerns" because
20   they assaulted somebody and now they have safety concerns or
21   is it safety concerns for drug debts?  There is a variety of
22   reasons to have safety concerns and not have a SHU able
23   offense, but would not be designated nondisciplinary.
24        So I track it based on the nondisciplinary cases.
25   /////
```

1    BY MR. FISCHER:

2    Q.    There are certain individuals with safety concerns who

3    would not be counted in this designation?

4    A.    If it's safety concerns due to their own behavior,

5    yes.

6    Q.    So those individuals would not be subject to the new

7    timelines memo of December 3rd?

8    A.    Correct.

9    Q.    Those individuals would not receive the NDS regulation

10   privileges for nondisciplinary ASU prisoners?

11   A.    Correct.

12   Q.    I think the Judge was just asking about the top of

13   this document, QQQ.  It indicates that the total CCCMS

14   population is 1,860, in EOP cases, 612, for a little over

15   2,400 case load prisoners in ASU.

16         Do you see that there?

17   A.    Yes.

18   Q.    At the bottom about 230 or 10 percept you indicate are

19   NDS?

20   A.    That have been classified at this point in time NDA,

21   correct.

22   Q.    That's a very different percentage than the data I

23   just shared to you from your deposition?

24         THE COURT:  She doesn't acknowledge that was her

25   testimony, sir, as I understand the witness now.

1    BY MR. FISCHER:

2    Q.      Do you recall your testimony in August as to the 20 or

3    30 percent number?

4    A.      My full testimony, I would have to see it, but I

5    recall that kind of being a guess about safety.  We weren't

6    talking about nondisciplinary, so we're comparing two

7    different things.

8    Q.      Let me go to your transcript and see if we can figure

9    this out.

10          THE COURT:  Line and page, counsel.

11          MR. FISCHER:  Yes, Your Honor.  Page 64 of the

12   deposition transcript of Ms. Allison, which is dated

13   August 15, 2013, line 19, (Reading:)

14                  Question:  The last time that you ran the data,

15                  what percentage of administration segregation

16                  was there for safety concerns?

17                  Answer:  If I recall, it was relatively low, in

18                  20 to 30 percent.

19                  Question:  20 to 30 percent of individuals in

20                  administrative segregation were there for safety

21                  concerns?

22                  Answer:  For nondisciplinary reasons.

23   Q.      Do you recall that testimony, Ms. Allison?

24   A.      I'd have to see it.  If you could show it to me.

25          MR. FISCHER:  May I approach?

1              THE COURT:  Yes.

2              THE WITNESS:  Thank you.

3    BY MR. FISCHER:

4    Q.      I just handed you a copy of your deposition

5    transcript.

6    A.      I need to go back a page.

7              What was your question?

8    Q.      Do you recall that testimony that you testified that

9    20 to 30 percent of individuals in ASU being there for

10   nondisciplinary segregation, for nondisciplinary reasons?

11             THE COURT:  It is what it is.  I can read.  The

12   witness can read.  It's been established.  Whether she

13   recalls it or not is not a consequence unless you want to say

14   how come it's different today, if it is different today.

15             It's different today, isn't it, your view as to

16   whether it's 20 to 30 percent?

17             THE WITNESS:  That 20 to 30 percept would include all

18   inmates, both mental health and non-mental health.

19   BY MR. FISCHER:

20   Q.      Ms. Allison, on QQQ it indicates at the top that 9

21   percent of the total ASU population are in this

22   nondisciplinary segregation status.

23             Do you see that there?

24   A.      Yes.

25   Q.      That also is much different than what you testified to

1    in August?

2    A.      Yes.   Nondisciplinary segregation is a classification

3    designation.   What we do -- and the codes, as we talk about

4    all the different codes in the COMPSTAT tracking system,

5    there are various codes within that system.

6          Just because we in headquarters interpreted some of

7    those codes to be safety, some of them, when you actually

8    have the file, they would not meet the criteria for

9    nondisciplinary, so they are different.

10         Nondisciplinary in August had not even been published

11    yet.  We did not publish that until the October, end of

12    September, October.

13    Q.      One of the reasons that percentages are lower on this

14    NDS population on QQQ, this is, in fact, a subset of the

15    individuals there for safety concerns or other

16    nondisciplinary reasons?

17    A.      These are inmates where the institution has the file

18    in front of them and has made a determination that they meet

19    the criteria for nondisciplinary.

20    Q.      That may be different than the data you track at

21    headquarters?

22    A.      No.   I track all of the data to include those other

23    codes.  So I've asked for clarification from the wardens on

24    those handful of other codes, but I have to rely on them who

25    have the file to make that determination.

1    Q.    Ms. Allison, what I'm just trying to understand is

2    that one of the reasons that this number is lower is that

3    this relies on the definition in the new regulation.

4         Correct?

5    A.    Coupled with the very clear direction that we gave

6    that includes all expired MERDs whether they're in an ASU or

7    SHU.

8    Q.    That direction is not in writing; correct?

9    A.    Not that I recall.

10   Q.    Turning to those expired MERDs on this document, you

11   testified on Friday that the 101 code includes what you call

12   SHU kickouts.

13        Do you recall that?

14   A.    Yes.

15   Q.    These are people that have completed their SHU term

16   and waiting in ASU for an appropriate bed?

17   A.    Yes, sir.

18   Q.    I believe you testified that you can't send them to

19   the mainline at that time because first you have to work out

20   where they're going to be transferred.

21        Correct?

22   A.    I don't understand your question.  I'm sorry.

23   Q.    The reason they're in ASU is the system is still

24   trying to figure out where they're going to go; correct?

25   A.    Right.  I mean, once a decision is made to endorse an

1    inmate to a specific institution, there's a very detailed

2    process that we have to go through, not only in the

3    classification representative's review and endorsement, but

4    also our transport system.

5        THE COURT:  I don't understand something.  I'm sorry.

6    I don't mean to interrupt you.  It occurs to me, even with

7    new regulation, when you're talking about people being kicked

8    out of the SHU, as an example, you know well in advance that

9    that date is going to be X, whatever X is.

10        Why don't you begin the process of trying to figure

11   out where they're going to go then so you don't have all

12   these people in ASU?

13        THE WITNESS:  As part of that new memo that we just

14   released this past week making those timelines, be it the

15   30 days for EOP and the 60 days, we've given direction that

16   the wardens, what we call the pre MERD, which is 45 days

17   prior to release, we will make that endorsement then for

18   whatever location they need to go to.

19        THE COURT:  So 45 before they're going to get kicked

20   out, for example, whoever is in charge starts figuring out

21   where they're going to go?

22        THE WITNESS:  Correct.

23        THE COURT:  So when they are actually out, it should

24   be decided already.

25        Right or wrong?

1           THE WITNESS:  It's decided where they're going to go,

2     but we also have to get a bus seat for them if I can't

3     release them to that institution.

4           THE COURT:  I don't know what you just said.  I

5     understand you've got to have a bus to take them.

6           THE WITNESS:  Correct.

7           THE COURT:  That's just the question of getting the

8     bus there, isn't it?

9           THE WITNESS:  Our bus system is very complicated.  At

10    any given week we're transporting 1,700, 2,000 inmates in a

11    given week.  I think we have 20 buses and only can -- I think

12    the maximum capacity on the bus is 38 with 34 institutions,

13    so it's a complex process, and I'm certainly no transport

14    expert.

15          THE COURT:  I haven't said that you are, but there's a

16    kind of -- I agreed to the -- I agreed.  I agreed not to try

17    and stay, rather to let the process stay, because it seemed

18    to me that's the best we could do and it was more important

19    that we get a date that we know that they're going to be out

20    more than anything else, but now it appears to me that there

21    are all these other reasons, none of which, as best I can

22    tell, would be superior to getting people who aren't in

23    disciplinary condition out of the ASU.

24          I mean you use the ASU -- the ASU is segregated

25    housing.  Segregated housing isn't fun.  It's designed to

1    punish people for inappropriate conduct.

2         Once the term is over, it would appear to me, and I'm

3    trying to really understand what the problem is, that that

4    would be a priority to get them out of there and get them to

5    wherever they're going to go, and now I'm told that the

6    problem is we don't have buses to get people there.

7         THE WITNESS:  No, sir.  I want -- I'm just telling you

8    the process.  I didn't say that there's a particular problem

9    with backlog.  We have ample -- the ICSS changes, the

10   classification changes, we have ample level VI beds, more

11   level VI beds than what we need.  So it has nothing to do

12   with bed availability.  It's just getting the inmate from the

13   time of the endorsement through that process.

14        Understand, from the time ICC sees them, the

15   institution has 30 days to present that case to the CSR.

16   Now, we've since changed that for these nondisciplinary

17   segregation inmates, which would include the SHU kickouts,

18   that they have to get them to the CSR.  We've shortened all

19   of their timeframes.

20        THE COURT:  I appreciate that.  Apparently, before we

21   had this new regulation, people could languish there forever.

22   I don't mean that literally -- I just realized -- okay.

23   These appear to be bureaucratic problems which can be solved

24   simply by people energetically addressing the problem.

25        I think you don't agree with me, and I'm anxious to

1    understand why you don't agree with me.  I'm not even sure I

2    agree with me, but that's what I think I'm hearing.

3              THE WITNESS:  Let's say we see an inmate today.  For

4    an EOP inmate today that needs -- that is being released --

5    for EOPs, it would be PSU, and I will say Sac PSU is pretty

6    good to get them out as soon as possible within their

7    institution.

8              Let's say CCC, just because it's a broader scope.  We

9    have that 60 days to get him totally released through the

10   entire process, not only the classification process, the

11   classification services representative coupled with the

12   transport.

13             We don't -- it's not like they're waiting for a bed.

14   We have to ensure that we're coordinating all the transport,

15   because, like I said, we call the transport system every

16   week.  They develop their schedule for the following week.

17   And so anybody who's released, we're trying to get them on

18   that next bus to get them out of there.

19             So when I say 60 days, that's the maximum time.

20             THE COURT:  You know, the truth almost always is, God

21   forbid, if you say you have 60 days, it takes 60 days.  It

22   shouldn't, but it does.

23             I'm sorry, Mr. Fischer, I did not mean to interrupt

24   you.  I was trying to understand why we have this problem.

25   That's why my questions were directed to the witness.

1          You may proceed, sir.

2          MR. FISCHER:  Thank you, Your Honor.  You anticipated

3     some of my questions.

4     Q.     Ms. Allison, turning to those NDS transfer timelines

5     under the new memorandum of December 3rd, if an NDS Coleman

6     class member is placed in an MHCB during their ASU placement,

7     do those timelines reset when they come back to ASU?

8     A.     I'm sorry?  Repeat your question.

9     Q.     An NDS Coleman class member who is waiting for

10    transfer under these new 30-and-60-day timelines, if they

11    require an MHCB while they're in the ASU, will their timeline

12    reset?

13    A.     No.

14    Q.     It will continue during their MHCB stay?

15    A.     The timeframe is the timeframe, despite where they're

16    housed.

17    Q.     If they're in the MHCB for ten days having

18    decompensated in the ad seg, those ten days will count toward

19    the timeline.

20          Is that correct?

21    A.     Yes.

22    Q.     The 30-and-60-day time limits for NDS prisoners in

23    segregation in this memo, these timelines match plaintiffs'

24    requested timelines for all mentally ill prisoners in

25    segregation.

1           Are you aware of that?

2      A.      I don't remember the specific filings.

3      Q.      Do you know if that's the reason that CDCR came up

4      with the 30-and-60-day timelines as to NDS prisoners only?

5      A.      I have no idea where the timelines came from.  It was

6      just direction received.

7      Q.      Were you at the meetings where this memorandum was

8      discussed?

9      A.      I was at a meeting.  There were subsequent meetings

10     that I was not available for.

11     Q.      Do you know who decided on the 30-and-60-day

12     timelines?

13     A.      We received direction from our secretary.

14     Q.      So as far as you know Secretary Beard determined these

15     timelines?

16     A.      As far as I know, yes.

17     Q.      Part of your job, including on the ASU work group,

18     you've looked at other segregation systems in the country

19     this year.

20             Correct?

21     A.      Yes.

22     Q.      And among those you looked at Pennsylvania's

23     segregation system?

24     A.      Yes.

25     Q.      And so you're aware that Pennsylvania has a practice

1  of moving out nondisciplinary prisoners from segregation

2  within ten days?

3  A.      I don't recall that specific.

4  Q.      Are you aware of any policy as to time limits in

5  Pennsylvania segregation for nondisciplinary prisoners?

6  A.      Understand that I looked at all that data almost a

7  year ago, so I don't remember the specifics.  Every state was

8  a little bit different.

9  Q.      Are you aware that Pennsylvania also has separate

10  nondisciplinary segregation units?

11  A.      Yes.  There physical plant design is markedly

12  different.  They have small cell sections.

13  Q.      As part of this new NDS regulation, there's no plan to

14  move nondisciplinary segregation mentally ill prisoners to a

15  separate nondisciplinary unit.

16         Is that correct?

17  A.      Where it's practical and feasible for the 180 designs,

18  we're able to accomplish that within those sections.  Our

19  270s, all we can do is attempt to cluster them within the

20  building, but it's a wide-open building.

21  Q.      At some institutions you are able to cluster the

22  nondisciplinary within the same ASU building.

23         Correct?

24  A.      In the 180 design, yes, and in the standalone designs

25  I can, yes.

1    Q.    But they're not based in a separate unit?

2    A.    No, sir.

3          MR. FISCHER:  Permission to approach?

4          THE WITNESS:  Yes.

5    BY MR. FISCHER:

6    Q.    I've handed you what has been marked as Plaintiffs,

7    2410.  This was Exhibit 9 to the Kahn declaration filed in

8    support of this motion.

9          If you turn to the second page of this document --

10         THE COURT:  Are you moving it into evidence?

11         MR. FISCHER:  I was going to introduce it.  This is an

12   Armstrong policy that the AI created.

13         I move it in evidence.

14         THE COURT:  Hearing no objection --

15         MS. VOROUS:  I will raise an objection.  I believe

16   this is beyond the scope of direct and object on the basis of

17   relevancy.

18         THE COURT:  All right.  I can't answer the relevancy

19   until I hear what the questions are, but perhaps you can give

20   me an offer of proof, and we can find out whether we have to

21   go through all this.

22         MR. FISCHER:  Of course.  This was discussed in Ms.

23   Allison's deposition in August.  This relates to timelines

24   for moving out mobility disabled prisoners who are placed in

25   administrative segregation because there's no wheelchair

1    accessible cell on the mainline for them in a particular

2    institution.

3            That's what this document is.  It has very specific

4    timelines.  I was going to ask Ms. Allison about that.

5            MS. VOROUS:  It may have been discussed at the

6    deposition, but it was not part of her initial testimony.

7            THE COURT:  I understand.

8            The question is whether or not -- I expect that this

9    whole line of questioning, although I don't know that for a

10   fact, is to raise the question about whether the 30 and

11   60 days are reasonable, and you want to demonstrate that

12   there are other classes of people in this case are being

13   treated differently.

14           Is that right?

15           MR. FISCHER:  That's correct, Your Honor.

16           THE COURT:  Objection is overruled.

17           It's received in evidence.

18           You may proceed.

19                              (Whereupon, Plaintiffs' Exhibit 2410

20                              was received into evidence.)

21   BY MR. FISCHER:

22   Q.    Ms. Allison, the memorandum on the second page of the

23   exhibit dated December 17, 2012, you were a recipient of this

24   document.

25           Is that correct?

1    A.      I'm not cc'd on this document.

2    Q.      But you are one of the deputy directors of DAI?

3    A.      Yes, I am.

4    Q.      And the subject of this memorandum of December 17,

5    2012, is:  "Operational Plan for Armstrong House Members

6    Housed in Administrative Segregation."

7            You're familiar with this memorandum, is that correct,

8    Ms. Allison?

9    A.      I'll have to reread this entire document.  Understand,

10   I've been focusing on Coleman since December of '12.

11           THE COURT:  The document speaks for itself, in any

12   event.

13   BY MR. FISCHER:

14   Q.      Let me ask a few questions about the timeline.

15           THE COURT:  The witness honestly said she doesn't

16   recall the content.  You can have her read it, which is the

17   same thing as it being in evidence and arguing about it.

18           You may proceed, sir.  Further questioning does not

19   appear to be appropriate.

20   BY MR. FISCHER:

21   Q.      Ms. Allison, has the 72-hour timeline for moving out

22   mobility disabled Armstrong class members from administrative

23   segregation been considered for the NDS policy for the

24   mentally ill?

25   A.      No.

1    Q.       Turning your attention to the new regulation on NDS

2    status prisoners.

3            This is Defendants' Exhibit OOO.

4    A.       Yes, sir.

5    Q.       I want to review some of the changes meant to be

6    implemented through this regulation.

7            Through this regulation, NDS prisoners receive some

8    additional property privileges while they're in

9    administrative segregation.

10           Correct?

11   A.       Yes.

12   Q.       But they are not the same as what they receive in

13   their mainline bed.

14           Correct?

15   A.       The only ones that were excluded is if there was a

16   security reason while in ASU.  Safety and security overrode

17   that.

18   Q.       In those cases, their privileges would be less, their

19   property privileges would be less than what they received on

20   the mainline?

21   A.       We excluded things like Vaseline so they couldn't slip

22   their handcuffs and those type of things.

23   Q.       And for some individuals, is it true the phone

24   privileges would be less?

25   A.       Yes.

1    Q.      And even with this new NDS regulation, there's the

2    same rule on noncontact visits for all individuals placed in

3    administrative segregation.

4          Correct?

5    A.      Yes.

6    Q.      There's the same limited provision of yard access.

7          Is that correct?

8    A.      Correct.

9    Q.      And there's the same restrictions on access to the day

10   room; correct?

11   A.      Correct.

12   Q.      And there's the same restriction on these individuals

13   eating their meals in the cell.

14         Correct?

15   A.      Yes.

16   Q.      And there's the same use of cuffing and restraints

17   when these ASU prisoners are being moved.

18         Correct?

19   A.      Yes.

20   Q.      And there's no reference in this new NDS regulation to

21   mentally ill nondisciplinary prisoners.

22         Correct?

23   A.      I don't recall differentiating that, no.

24         THE COURT:  I don't understand the question.  We know

25   that there's a specific reference to Coleman members

1    concerning those who are EOP and those who are CCCMS, 30 and

2    60 days.

3            MR. FISCHER:  Thank you, Your Honor.

4            Just to clarify that, that's the new memorandum of

5    December 3rd.  I'm asking her specifically about the new NDS

6    regulation on privileges for NDS prisoners.

7            THE COURT:  I see.  All right.

8    BY MR. FISCHER:

9    Q.    Ms. Allison, there's no change in the requirement that

10    all Coleman class members in ASU be treated in a cage at

11    particular institutions.

12            Correct?

13    A.    In treatment modulars.

14    Q.    There's no change of the strip search requirements for

15    NDA as opposed to non-DSN Coleman class members in ASU?

16    A.    Yes.

17            THE COURT:  I don't mean to be flip.  These are

18    serious questions, but is the problem of transportation one

19    that can be solved by buying three or four more buses?

20            I mean, you've got people sitting -- if you can tell

21    me.

22            THE WITNESS:  I would not consider the number of buses

23    to be a problem.  I would just -- it's the process.  Now, if

24    we get on this 30-and-60-day timeframe and we see that to be

25    a problem, we can certainly raise that, but I don't, at this

 1    point in time, see that to be a problem.

 2    BY MR. FISCHER:

 3    Q.    Ms. Allison, returning to the 72-hour timeline for

 4    Armstrong class members to be moved out of ASU into an

 5    appropriate bed, if Secretary Beard was ordered to follow

 6    that same timeline for EOPs, would he be able to follow that

 7    direction?

 8          MS. VOROUS:  Objection.  Speculative and beyond the

 9    scope of direct.

10          THE COURT:  Overruled.  The question is whether

11    there's capacity as presently existing to solve the problem

12    more rapidly.  That's an important issue.  I don't know the

13    answer.

14          THE WITNESS:  I have no idea.  With the number of,

15    let's say, wheelchair inmates, which is what this is

16    referring to, very limited number of them versus, let's say,

17    EOP or CCC, because the CCC population, as we know, is

18    significant, so I couldn't answer that.

19    BY MR. FISCHER:

20    Q.    Leaving aside the wheelchair population.  Just

21    focusing on the EOPs.

22          Would Secretary Beard be able to implement a three-day

23    transfer for EOP prisoners in segregation for nondisciplinary

24    reasons?

25    A.    I have no way to answer that, sir, without evaluating

 1    it.

 2    Q.      Same question for ten-day transfer --

 3           THE COURT:  She just said she doesn't know without

 4    evaluating it.  You can ask her 11 days, 14 days.  You're not

 5    going to get a different abdomen.

 6    BY MR. FISCHER:

 7    Q.      Were any of these numbers discussed at the meetings on

 8    the new memo that you attended?

 9    A.      No, sir.

10    Q.      Turning your attention to the current average length

11    of stay for Coleman in segregation, both nondisciplinary and

12    disciplinary.

13           This is Defendants' PPP already in evidence.

14    A.      Yes, sir.

15    Q.      Now, on this document, I believe you testified on

16    Friday, that currently the CCCMS ASU population has the

17    longest average length of stay in ASU.

18           Correct?

19    A.      Yes.

20    Q.      And also the longest median length of stay in ASU.

21    A.      Yes.

22    Q.      With respect to the EOP cases, in the paragraph at the

23    top of the page, it indicates that there's 621 EOPs in ASU as

24    of November 26, 2013.

25           Do you see that, Ms. Allison?

1    A.      Yes, sir.

2    Q.      Would you agree that this is higher than previous

3    month's average EOP census data?

4    A.      I understand this is point in time and is in the

5    middle of the week versus a Friday.  I typically run my

6    reports on a Friday.  This was run in the middle of the week,

7    so it is slightly higher.

8          For example, this past Friday, we're at 91 days for

9    average length of stay for EOP.  I want to say it was -- I

10    was trying to remember the CCCs off the top of my head.

11          MR. FISCHER:  Permission to approach, Your Honor?

12          THE COURT:  Yes.

13    BY MR. FISCHER:

14    Q.      Ms. Allison, I've given you Plaintiffs 2584 and 2616.

15    These are from the monthly data provided by defendants to the

16    Special Master and plaintiffs' counsel, and they both provide

17    data as to average daily census trends for the EOP ASU.

18          2616 relates to the average daily census in 2012.

19          2584 relates to the average daily census of EOP ASU in

20    2013.

21          I ask they be moved into evidence.

22          MS. VOROUS:  With respect to the first, I would like

23    verification, the first exhibit, 2616, where that data comes

24    to.  There's no information on the report itself.

25          MR. FISCHER:  I can make a proffer that this is the

1    information provided at the end of the year 2012 in the

2    following months.  It provides the average census for EOP ASU

3    for each month in 2012.

4         THE COURT:  I don't think you understood the question.

5         As I understand, counsel was raising the question

6    about when this was provided and by whom?

7         Is that right, ma'am?

8         MS. VOROUS:  Yes, Your Honor.

9         I would like to understand if this first page was

10   actually provided by CDCR as part of their monthly upload and

11   when?

12        MR. FISCHER:  The first question, yes, provided by

13   CDCR to Special Master and plaintiffs' counsel.  As I just

14   explained, it was provided the end of the calendar year 2012.

15        THE COURT:  They will both be received.

16                        (Whereupon, Plaintiffs' Exhibits 2584

17                        and 2616 were received into evidence.)

18   BY MR. FISCHER:

19   Q.   Ms. Allison, these documents provide the average daily

20   census for each month from the beginning of 2012 through

21   September 2013.

22        Plaintiffs' Exhibit 2616, the average daily census is

23   on the right in the column, which is indicated as a grand

24   total.

25        In 2584, the total male average EOP daily census is in

1    the column in the top box about halfway down the page under

2    the first graph.

3            Do you see those two things?

4    A.      I do.

5    Q.      The average daily census has never been over 600

6    during this time period.

7            Do you see that?

8    A.      Yes.

9    Q.      For example, turning to 2616 the average daily census

10   going to the far right was 468.60?

11   A.      You mean far left in January?

12   Q.      January is indicated in the far left and the number is

13   on the far right.

14           Do you see that there?

15           THE COURT:  I see it as 451.50.

16           MR. FISCHER:  You're looking at the average population

17   for the year, Your Honor.  It's also broken down by the month

18   just above that.

19           THE WITNESS:  Can you put it on the screen and point

20   to me where you're referring to?

21           MR. FISCHER:  Of course.

22           THE COURT:  We're looking at 2616; correct?

23           MR. FISCHER:  Correct.

24   Q.      For January 2012, for example --

25   A.      I was looking someplace else.

1    Q.      Average daily sentence of 468.6.

2            Do you see that there?

3    A.      Yes.

4    Q.      And below that --

5            THE COURT:  We can read it.  What's your point?

6            MR. FISCHER:  I just want to make sure.

7    Q.      In 2012 in no month was the average EOP ASU daily

8    census above 500.

9            Is that correct?

10   A.      That's how it appears on this document, yes.

11   Q.      Turning to 2584, this row right here in the middle of

12   the page, total male average census.  In that row, you'll see

13   the EOP ASU average daily census exceeded 500, starting in

14   June 2013.

15           Do you see that?

16   A.      Yes.

17   Q.      508 in June, 2013.

18   A.      Those are capacity numbers.

19   Q.      If you go above male capacity to total male average

20   census.

21   A.      Yes.

22   Q.      That says 508 for June 2013?

23   A.      Yes.

24   Q.      Going back to Defendants' Exhibit PPP, that was as of

25   November 26, 2013, the EOP ASU census is 621.

1              Do you see that there?

2    A.      Yes, sir.

3              THE COURT:  Ma'am, do you recall when the population

4    was reduced by virtue of the realignment?

5              THE WITNESS:  We saw the initial push immediately

6    following, so that first year I think our population dropped

7    by approximately 30,000.  So we're approximately post -- I'm

8    trying to remember what year that was.

9              THE COURT:  Some significant number?

10             THE WITNESS:  Yes.

11             THE COURT:  And, nonetheless, the number of EOP ASU

12   has gone up, even though the total population has gone down

13   significantly?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Do we know why?

16             THE WITNESS:  I'm not a clinician, so I don't know.

17             THE COURT:  Fair enough.  It's not a clinician

18   question.  It's a question of people being sent to segregated

19   housing.  It's a custody -- I'm saying that as if I know.

20             Decisions about whether or not people go into

21   segregated housing are essentially -- not essentially -- are

22   custody questions, not clinician questions?

23             THE WITNESS:  Correct.  They are custody questions,

24   but the reason why somebody's mental health -- or not mental

25   health.  I can't answer that.

1           THE COURT:  I understand.

2           THE WITNESS:  In my experience, the mental health have

3     a higher -- are higher for violence, sudden outbursts or

4     attacking somebody, so that would increase those.

5           THE COURT:  Understood.  But that's true whether the

6     population is 10 or 20.  You have a higher percentage.  But

7     the question is:  When you go from 30 to 10, you would

8     expect, or maybe I would because I'm being innocent, that the

9     total number of people being sent to EOP segregated housing

10    would just reduce because there aren't as many people --

11    maybe the answer is, yes, there aren't as many people, but

12    the reduction really didn't reach Coleman class members.

13          Maybe that's the answer.  So my initial response,

14    which was, there's got to be some reason, but I don't know

15    that and you don't know that either.

16          THE WITNESS:  Well, based on my review of various

17    data, mental health have a higher propensity for the violent

18    crimes, so then they stay.  They weren't the non serious, non

19    violent that we no longer have.

20    BY MR. FISCHER:

21    Q.     In any event, according to the CDCR's data, the EOP

22    ad seg population has increased during 2013.

23          Correct?

24    A.     Based on these two reports, yes.

25    Q.     In your July 24th, 2013 declaration regarding this

1    motion -- it's in evidence as Defendants' Exhibit L -- in

2    paragraph 14, you indicated that the average length of stay

3    of EOPs in ad seg was 105 days.

4         That's in paragraph 14 of your declaration at page 7.

5    A.    You said it's LLL?

6    Q.    Yes.

7    A.    Sounds right, but I want to look at it.

8         (Witness reviews document.)

9         Yes, sir, that was point in time, so for that report

10   as of July 24, 2013.

11   Q.    And as of November 26th in Defendants' PPP, the

12   average length of stay for EOPs appears to be 94.

13        Correct?

14   A.    Correct.

15   Q.    In July 2013, the average daily census of EOPs in ad

16   seg was 522.

17        Do you see that there?  This is, again, on Plaintiffs'

18   Exhibit 2584.

19   A.    I see that, yes.

20   Q.    In November, the EOP ad seg population has increased

21   by 99, from that number, to 621 as of November 26th.

22        Correct?

23   A.    Correct.

24   Q.    So is it possible that one of the reasons the average

25   length of stay went down is that you have a substantial

1    number of new EOP ad seg prisoners over the last three or

2    four months?

3    A.    Obviously, the more you have, it does change your

4    totals.  But we monitor these numbers very, very closely.

5    This is an area I focus on and I drill down into making sure

6    those cases are processed timely.

7           So as of today, it's 91.  It fluctuates.

8    Q.    You haven't provided data as to the range of length of

9    stay?

10          THE COURT:  Nobody has asked her to.

11          You may proceed.  I am the soul of patience, but some

12   of this is getting -- go ahead.

13   BY MR. FISCHER:

14   Q.    Ms. Allison, you testified to the growing needs of SNY

15   beds in the system, including for EOPs.

16          Correct?

17   A.    Yes.

18   Q.    CDCR has been doing bed planning projections since at

19   least 2007.

20          Is that correct?

21   A.    I'm not familiar prior to my arrival in headquarters.

22   I know that's part of our process, but I was not involved in

23   that.

24          THE COURT:  Time for morning recess.

25          15 minutes.

```
 1              Off the record.

 2                           (Whereupon, a discussion was held off

 3                           the record.)

 4                           (Whereupon, a break was taken at

 5                           10:45 a.m.)

 6                           (Nothing Omitted.)

 7                           ---o0o---

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3213

1            (On the record at 11:10 a.m.)

2            THE CLERK:  Please, remain seated.

3            Court is now in session.

4            THE COURT:  Mr. Fischer, as everyone knows, as

5    demonstrated completely by my behavior in this hearing, I'm

6    the soul of patience.  But after conferring with my staff,

7    who also doesn't understand what the heck you are doing, I

8    want to know why we are pursuing what appears to me to be --

9    it is difficult for me to understand what you are doing.

10            What are you doing, sir?

11            What are you proving?

12            What are you hoping to prove?

13            MR. FISCHER:  On this line of questioning, Your

14    Honor?

15            THE COURT:  Yes.

16            MR. FISCHER:  Okay.  I have one more exhibit that I'm

17    going to show as to the --

18            THE COURT:  No, you don't.  I want to know why you

19    are doing it.

20            MR. FISCHER:  What --

21            THE COURT:  What are you trying to prove?

22            MR. FISCHER:  I think that the evidence shows that

23    there are ways to overcome some of the delays in transferring

24    of mentally ill class members from ASU.

25            I think that's what this -- I'm happy to move to

3214

1    another line, Your Honor.

2            THE COURT:  No, I don't want to deprive you from

3    proving something that matters.  It is just all of this -- I

4    was about to use a bad word -- all of this questioning about

5    whether it is 34 or 46 folks, so what?

6            All right.  Go ahead.

7            I mean, somehow you think this is helpful to your

8    case.  Go ahead.

9            MR. FISCHER:  Understood, Your Honor.

10           THE COURT:  No, you don't, but that's all right.

11   BY MR. FISCHER:

12   Q.    Miss Allison, I've handed you Plaintiffs'

13   Exhibit 2643.  This is from CDCR monthly data.  It is

14   entitled "Enhanced Outpatient Program EOP Institution Counts

15   And Bus Seats Request - Week of October 28th, 2013."

16           MR. FISCHER:  I move 2643 into evidence, Your

17   Honor.

18           THE COURT:  Received.

19              (Whereupon, Plaintiffs' Exhibit 2643 received

20               into evidence.)

21   BY MR. FISCHER:

22   Q.    Miss Allison, this chart indicates the number of bus

23   seats requested for EOPs for the week of October 28th and the

24   bus seats provided.  That's in the middle of the page, middle

25   column.

3215

1      Do you see those there?

2  A.      Yes, sir.

3  Q.      And as you testified -- as you testified there is

4  difficulty in arranging for bus seats for EOPs who are

5  endorsed for transfer to EOP GP and EOP SNY, correct?

6          MS. VOROUS:  Objection, Your Honor.  That misstates

7  her testimony.

8          THE COURT:  Ma'am?

9          MS. VOROUS:  Objection.  That misstates her

10 testimony.

11         THE COURT:  Well, I'm not really quite certain as to

12 what the testimony is.  I'm going to overrule it, but that

13 doesn't mean your wrong, ma'am.

14         We'll receive the evidence and someday find out

15 whether it matters.

16         Go ahead.

17         Can you answer the question about -- well, just ask

18 the direct question.

19 BY MR. FISCHER:

20 Q.      Miss Allison, there continues to be difficulty in

21 arranging for bus seats for EOPs endorsed to transfer to EOP

22 GP and EOP SNY yards, correct?

23 A.      Not to my knowledge.

24 Q.      So on this chart, for example, the middle of the

25 page, the MCSP SNY Level III, that's Mule Creek EOP SNY for

3216

1    this week.  Going to the middle of the page there are 43 bus

2    seats requested and zero total bus seats provided.

3         Do you see that there?

4    A.    I see that, yes.

5    Q.    And just below that at the Corcoran SNY Level IV,

6    there were 21 bus seats provided -- or 21 bus seats

7    requested, five provided?

8         THE COURT:  And 7/0 and 29/1 and 11/3.

9         I can read.

10         Now, does that reflect, in fact, your general

11    experiences with obtaining bus seats?

12         THE WITNESS:  Each program has a cap for EOP of 15

13    per week to ensure continuity of care.  So the buses cannot

14    transport more than 15 a week in any given program.

15         So the clinicians --

16         THE COURT:  I don't know what that means.

17         THE WITNESS:  What that means, sir --

18         THE COURT:  You can take 15 people to Corcoran, 15

19    people to wherever, et cetera, et cetera, but on that date

20    there are 43 requested for a special needs unit at MC -- I

21    don't know what MCSP is, but whatever it is, and you could

22    only take 15 because you're testifying -- No?

23         THE WITNESS:  No, sir.  It is where they are going to

24    if that program -- let's say 43 are going to RJD.  RJD can

25    only receive a total of 15 per week.  And that's a minimum

3217

1    health requirement, not a custodial requirement.

2         THE COURT:  But the problem is that you got zero.

3    They didn't take any.

4         I mean, I don't want to be -- it just seems to me

5    that what you are telling me is they could have taken at

6    least 15 and they took none.

7         THE WITNESS:  We may not have had a bus going to that

8    location that week.

9         THE COURT:  That's all the point was that he was

10   making.

11        THE WITNESS:  Okay.

12        THE COURT:  You didn't take anybody.  You had 43

13   people ready to go, and they're still languishing in ASUs.

14        I don't mean now, but after this period they were.

15        THE WITNESS:  They were in a EOP hub institution.

16        THE COURT:  Right.

17        THE WITNESS:  Uh-huh.

18        THE COURT:  And the same thing with the 21 below,

19   where you got only five, seven where you got zero, 28 where

20   you got one.  I mean right down the line, with the exception

21   for the 43, you never asked for more than 15?

22        THE WITNESS:  Those are not all in ASUs, sir.  Those

23   are total bus seats requested.  We move regular EOP inmates

24   to another EOP program.  For example, Mule Creek Level III,

25   numerous inmates could be moved into a Level II program.  So

3218

1    those are not specific to just administrative segregation

2    inmates.  Those are all inmates at that institution.

3             THE COURT:  Okay.

4             So now what I think I hear you saying -- please

5    forgive me if I'm being very slow, but I expect that I am --

6    you are -- as I understand what you just said, these requests

7    are for all inmates whether in ASU or not?

8             THE WITNESS:  Yes, sir.

9             THE COURT:  And we don't have any -- is it your

10   testimony we don't have any way of knowing whether any of

11   those people were EOP or CCCMS?

12            I mean, it is likely they were.

13            THE WITNESS:  This is strictly an EOP report.

14            THE COURT:  Okay.  Strictly an EOP report.

15            So now we know that for the institution specified you

16   had 43 EOPs moving for some reason.

17            Are you suggesting, as an example -- I'm asking you,

18   not telling you -- that it may be -- are the buses being

19   requested to take people, that is the people who are now in

20   MCSP, take them somewhere or take them to MCSP?

21            THE WITNESS:  No.  It is take them from Mule Creek

22   State Prison to another location.

23            THE COURT:  Okay.

24            MR. FISCHER:  Your Honor, can I clarify just for one

25   second?

3219

1         THE COURT:  Sure.

2    BY MR. FISCHER:

3    Q.      On the right side, in the right column, the large

4    column at the top states, "Number of Bus Seats Requested by

5    Sending Location."

6         Do you see that, Miss Allison, in the gray row to the

7    far right at the top?

8    A.      I see it.  I'm reading it.

9    Q.      Below that, those are the sending institutions,

10   correct?

11        To put it another way --

12   A.      I'm not -- this is -- I'm not 100 percent sure when

13   we say "sending" if it means Mule Creek, and that's where

14   they're shipping them, that's where they endorsed them to, or

15   if that is where they're coming from.  I'm not sure.

16   Q.      On the left side, where it says "Male EOP

17   Institutions," those are the EOP programs in the system,

18   correct?

19   A.      Yes, sir.

20   Q.      And on right side, under sending institutions, for

21   example, where it says in the third column "3-CIMRC, 1-DVIRC"

22   and so forth, those aren't EOP programs, correct?

23   A.      Some are and some are not.  Correct.

24   Q.      So it would be -- it makes sense for the intended

25   destination for these individuals to be the EOP programs in

3220

1  the far left column, correct?

2  A.      It appears that's who is trying to send the inmates,

3  yes.

4  Q.      That's where they're trying to get them to?

5          That's where your people are trying to get them to?

6  A.      Correct.

7          MR. FISCHER:  Your Honor, may I proceed?

8          (Brief pause.)

9          THE COURT:  Now, it is even more mysterious to me.  I

10 mean, it may be perfectly clear to you folks, but as an

11 example, it says "Percent Filled," and for the 43 requested

12 and there were zero, how could it be 101 percent?

13         MR. FISCHER:  Your Honor, if I can just clarify?

14         THE COURT:  Sure, if you can.

15         MR. FISCHER:  For Mule Creek, for example, I think

16 that refers to the operational capacity in the second column,

17 360, and the institution count just to the right of that,

18 363, works out to about a percentage filled of 101 percent.

19         Next to that is the separate question of bus seats

20 requested and provided.

21         MS. VOROUS:  Your Honor, I would just raise an

22 objection to Mr. Fischer's testimony.  It appears he's

23 interpreting this report without even laying a foundation as

24 to where --

25         THE COURT:  I quite agree with you.  He has his own

3221

1  vision as to what the words mean, and they may even be right.

2  I'm not suggesting they aren't.  But the one thing that is

3  clearly so is you've got to have special insight into the

4  system to make sense of it.

5          I don't think, to be candid with you, any further --

6  go ahead, if you think that it is going to help.  But as

7  counsel fairly said, you're interpreting it and you haven't

8  been sworn.

9          You may proceed, sir.

10  BY MR. FISCHER:

11  Q.      Miss Allison, you're aware there's a separate medical

12  transport system for CDCR prisoners who need to go out for,

13  say, emergency medical care?

14  A.      Each institution has a health care access unit that

15  transports inmates.  That's correct.

16  Q.      And those medical inmates can be transported in

17  ambulances or vans rather than buses, correct?

18  A.      They're local day runs, yes.  They're quick.  Within,

19  generally, 100 miles around the institution.  For an

20  appointment you go to the nearest provider.

21  Q.      And also for the Coleman Class Members going to DSH,

22  they weren't transported in buses, correct?

23  A.      Yes, sir.

24  Q.      Has there been any consideration about using that

25  separate medical transport system to transport EOPs to the

3222

1    correct bed from the Ad. Seg.?

2    A.      As we're working through this 30 and 60 days, we have

3    considered that as an option.

4    Q.      Has that been considered an option for all EOP in Ad.

5    Seg. to try and move them out more quickly?

6    A.      We're focusing on the NDS, right?

7            Nondisciplinary segregation inmates?

8            We considered it for those.

9    Q.      And is there a plan to use that medical transport

10   system to move EOPs out of Ad. Seg. at this point?

11   A.      We haven't finalized that.  For example, the list of

12   nondisciplinary has already dropped by approximately 20 since

13   last week reporting it.  They've already on the natural been

14   moved.  So it is just -- understand that is going to take

15   very close managerial oversight to make sure we accomplish

16   that task.  I know that is a tool available to me if I need

17   it.

18   Q.      Miss Allison, I want to move to the 30-day transfer

19   timeline for moving EOPs from non-hub ASUs to EOP ASUs that

20   you testified to last week.

21           And this 30-day transfer timeline is a Program Guide

22   requirement?

23   A.      I think so, yes.

24   Q.      And this has been a primary goal of your ASU work

25   group?

3223

1    A.       Yes.

2    Q.       This is about moving EOPs who are not in EOP hub

3    facilities to EOPs, correct?

4    A.       EOP hub -- ASU EOP hub, correct.

5    Q.       And you have testified that there hasn't been any

6    EOPs waiting to move to a hub for more than 30 days since

7    2012; is that right?

8    A.       Yes.

9    Q.       Do you have in there -- do you see up there

10   Exhibit 2398 already in evidence?

11            I have another copy for you.

12            (Exhibit handed to witness.)

13            MS. VOROUS:  Which document is that, Aaron?

14            Can you show me the cover?

15            (Counsel confer.)

16   BY MR. FISCHER:

17   Q.       This is Exhibit 2398 admitted under seal.

18            I'll ask you to turn to page 40 of that document.

19            DVI is not an ASU EOP hub, is it, Miss Allison?

20   A.       No, it is not.

21   Q.       And on page 40, the sixth individual from the bottom,

22   that's a DVI inmate who is EOP in the ASU since July 19th,

23   2013, with a length of stay in the Ad. Seg. at DVI of 101.5

24   days.

25            Do you see that, Miss Allison?

3224

1   A.      As reported by mental health, yes.

2           That's an inmate that when I drill down into these,

3   he's pending trial at that specific institution.  He's going

4   through court proceedings, is the reason why he cannot go

5   to -- they go to the hub if it is within a drivable distance,

6   but he must be going in and out of court every day.

7   Q.      So he's being held in Ad. Seg. and not the main line?

8   A.      But he's receiving EOP level of care.

9   Q.      My question is that he's being housed in the Ad.

10  Seg., not in the main line, correct?

11  A.      Correct.  As this report reflects.

12  Q.      Now, you review the data for any individual who has

13  been -- any EOP who has been in a non-hub for more than 30

14  days, yes, Miss Allison?

15  A.      I review everybody's COMPSTAT report, and those

16  anomalies -- that's why I'm familiar with the few anomalies

17  that may appear, yes.

18  Q.      As part of your job, do you review EOPs who have been

19  in non-hubs for less than 30 days?

20  A.      No, sir.

21  Q.      So at headquarters you won't find out about EOPs in

22  non-hubs until they hit the 30-day mark, correct?

23  A.      Unless it is through my other normal review

24  processes.  But that report is verbally given to me at our

25  monthly subcommittee meeting, those specific numbers that

3225

1   you're referring to.

2         I review on a weekly basis all the institutions'

3   tracking sheets.

4   Q.      And the work group focus is on the over 30 days only,

5   correct?

6   A.      Correct.

7         That's one of the things we focus on.  Obviously, we

8   do a lot.

9   Q.      Turning to individuals in Ad. Seg. for RVRs or

10  investigations, you testified to that on Friday.

11        And mentally ill prisoners, with a SHU-able offense,

12  are placed in Ad. Seg. pending the RVR, correct?

13  A.      Yes.

14  Q.      And that RVR takes about 15 days to complete,

15  correct?

16  A.      No, sir.

17  Q.      Is the time requirement for the Rule Violation Report

18  to be written up within 15 days?

19  A.      To be written up, that is correct, but not to be

20  completed.

21  Q.      After it is written up there is a 30-day timeline for

22  the individual to have that RVR hearing, correct?

23  A.      Yes, sir.

24  Q.      And once the RVR hearing occurs, following that the

25  case is reviewed, and then the ICC will meet to do the

3226

1  endorsement for that individual in Ad. Seg., correct?

2  A.     Yes.

3  Q.     In your review of other state segregation systems,

4  are you aware that this rule violation process is completed

5  in a much shorter period of time in other states?

6         MS. VOROUS:  Objection, Your Honor.  Beyond the scope

7  of direct.

8         THE COURT:  No.  I've tried to explain how broadly or

9  narrowly I'm reading, and the objection is overruled.

10        You may answer, ma'am.

11        If you know.  If you don't know, that's fine too.

12        THE WITNESS:  I don't recall the specifics of any

13  state's disciplinary process.  I did see wide variations from

14  state to state.

15 BY MR. FISCHER:

16 Q.     In some states you found that that RVR process is

17 completed in a significantly less period of time than 45 days

18 as it is in California?

19 A.     The few states I reviewed, there were some that were

20 less and some that were similar.  I would not say

21 "significant" though.

22 Q.     You're aware in some states the entire segregation --

23 disciplinary segregation term for individuals who have

24 committed rule violations is 40 days or less, correct?

25 A.     The way I read their documents -- you know, we're

3227

1    talking languages -- different languages sometimes.  Some of

2    there stuff referred to "discipline detention," which we also

3    have, which is housed on the yard.

4         So it's really almost you're comparing apples and

5    oranges unless you're marrying up specific types of housing

6    and specific types of language because we do use different

7    languages.  So I don't think it is clear, and there is no way

8    to do an exact comparison.

9    Q.    But some states do have set disciplinary terms of

10   less than 40 days that you have reviewed, correct?

11   A.    I don't recall that -- those specifics, no.

12   Q.    In your declaration, in Defendants' LLL, you

13   testified that CDCR does a review for EOPs housed in ASU for

14   more than 90 days due to pending RVRs or DA referrals?

15   A.    Yes, sir.

16   Q.    And that at that time you consider alternative

17   housing for those EOPs in Ad. Seg.?

18   A.    Yes, sir.

19   Q.    There is no such review for EOPs housed in PSU?

20   A.    There's a constant review in PSU for inmates.

21   Q.    Is there a review for alternative housing at the

22   90-day mark in PSU?

23   A.    I'm not sure what the time frame is on PSU.  I

24   don't -- I can't recall the specific.

25   Q.    There's no 90-day review for CCCMS prisoners in ASU

3228

1    for RVRs or DA referrals, correct?

2    A.      There should be for RVRs.  They should be seen within

3    90 days.  I could not even get a classification services

4    representative endorsement beyond 90 days so I would have to

5    see that offender back within 90 days.  For a DA referral,

6    it's 180 days.

7    Q.      Is there any reason why headquarters can't do the

8    90-day review for EOPs in Ad. Seg. for DA referral sooner

9    than 90 days?

10   A.      Headquarters -- I mean, I review their data, but as

11   far as reviewing the case, that's an ICC action.

12   Q.      So headquarters doesn't do the review?

13   A.      I review their COMPSTAT tracking system on a weekly

14   basis, but I don't recall the individual case factors.

15   That's an Institutional Classification Committee action.

16   Q.      Is there any reason why the ICC couldn't do -- at the

17   institution couldn't do this 90-day review earlier than 90

18   days for EOPs?

19   A.      Again, the EOPs that are designated EOPs go to PSU,

20   and I don't know those time frames.  I do not recall those

21   time frames off the top of my head.

22   Q.      For EOPs in Ad. Seg. pending a DA referral, is there

23   any reason that the ICC cannot consider alternative housing

24   sooner than 90 days?

25   A.      Understand that the whole point of classification is

3229

1    to get an inmate to the least restrictive housing as soon as

2    possible.

3            If an inmate can on his projected minimal eligible

4    release date be released, then he is released.  So whether --

5    and each institution knows their role and responsibility as

6    it relates to that.  That's why EOPs do have a lower length

7    of stay on average.

8    Q.      Miss Allison, you have testified the ICC conducts a

9    review of individuals with pending DA referrals and RVRs at

10   the 90-day mark.  My question is, has there been any

11   consideration as to doing that earlier to remove these EOPs

12   out of Ad. Seg. more quickly?

13   A.      No.

14   Q.      And for a DA referral, the district attorneys do not

15   require that Coleman Class Members be kept in Ad. Seg.

16   pending the DA referral, correct?

17   A.      We don't keep them in there just because of the DA

18   referral.  We keep them based on their projected minimal

19   eligible release date for that offense despite the DA.

20   Q.      The DA referral doesn't care one way or the other?

21   A.      Correct.  We still have our administrative processes

22   separate from the district attorney.

23   Q.      You've testified that many individuals in Ad. Seg.,

24   including Coleman Class Members with long length of stays,

25   are in there for gang investigations.

3230

1    A.       I'm sorry.  Repeat that question.

2    Q.       You testified in your declaration, and I believe in

3    your testimony here, that some of the individuals with long

4    length of stays in ASU are there for gang investigations?

5    A.       Correct.

6    Q.       And these individuals aren't necessarily accused of

7    committing acts of violence, correct?

8    A.       They're pending the gang validation process.  So they

9    have been suspected as being -- I'm not a gang expert -- but

10   somebody who is in leadership of the gang.  And they have

11   supporting documentation to support his placement in ASU

12   while they complete the validation process.

13   Q.       But they haven't been accused of a specific rule

14   violation, for example, necessarily?

15   A.       Again, I'm not a gang expert.  I know there is

16   documents they get, and I'm not sure if it is a RVR during

17   the process.  I'm not sure.

18   Q.       Does the ICC review those individuals pending a gang

19   investigation at the 90-day period to try to move mentally

20   ill prisoners out more quickly?

21   A.       I'm sorry.  Repeat your question.

22            I'm trying to understand what you are saying -- what

23   you're asking me.

24            THE COURT:  The gang investigation is being done by

25   somebody other than the ICC, right?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3231

1          THE WITNESS:  Correct.

2          THE COURT:  So it isn't a question of whether the ICC

3     is doing something or not, it is a question of whether the

4     gang investigator is doing something or not?

5          THE WITNESS:  Correct.

6     BY MR. FISCHER:

7     Q.     Does the ICC consider those individuals who are EOP

8     or CCC to move them out of ASU during that gang validation

9     investigation process?

10    A.     Understand, by time it gets to placement -- and

11    again, I'm not a gang expert -- but you have to have certain

12    criteria in order to place somebody in there for gang

13    activity.

14          You already have to have enough data that's been

15    approved by our Office of Correctional Safety before their

16    placement.  It's three validation points.  It is very

17    specific.

18          But that already has to have been approved by them

19    before we can even place an offender into administrative

20    segregation pending the gang process.  Oftentimes it is a

21    debrief process or placement into the SHU or PSU.

22    Q.     At the end of the investigation, in some cases, those

23    individuals will be placed back on the main line?

24    A.     That's not my experience, no.

25          I apologize.  The new process is -- does afford that.

3232

1    It's very new and obviously Mr. Stainer is much more aware of

2    the new process.  But in the new process, they can be, but...

3    Q.      But first they stay in ASU pending the entire

4    investigation, correct?

5    A.      Pending the investigation and then a special review

6    board, an ICC action with our gang experts.

7    Q.      A mentally ill prisoner may be placed in ASU pending

8    an RVR hearing for refusal to accept assigned housing,

9    correct, Miss Allison?

10   A.      Yes, sir.

11   Q.      That's because they can get a SHU term for that

12   offense?

13   A.      Yes.

14   Q.      You're aware that some mentally ill prisoners may

15   refuse assigned housing because they have safety concerns,

16   correct?

17   A.      I don't know that.  I mean, if it's -- no.

18   Q.      Miss Allison, on direct you discussed five new

19   treatment space projects for segregated housing units?

20   A.      Yes, sir.

21   Q.      We discussed the CIW PSU?

22   A.      Yes.

23   Q.      The CIM treatment space?

24   A.      Yes.

25   Q.      The Corcoran treatment space?

3233

1   A.      Yes.

2   Q.      The Lancaster treatment space?

3   A.      Yes.

4   Q.      And the Sac. PSU, correct?

5   A.      Yes.

6   Q.      I'm going to ask you about a few of those projects

7   and turn your attention to Defendants' Exhibit MMM already in

8   evidence.

9           First, you testified that at the Sac. PSU that the

10  new cells are suicide resistant.

11          Do you recall that, Miss Allison?

12  A.      I don't recall that.

13  Q.      Do you know whether the Sac PSU cells are suicide

14  resistant cells?

15  A.      I know physical modifications have been made to them.

16          (Exhibit published.)

17  Q.      This is one of the photographs included in

18  Defendants' Exhibit MMM.  It's entitled "Sacramento PSU

19  Cell."

20          I have it on the screen, Miss Allison.

21          You testified about this cell?

22  A.      Yes, sir.

23  Q.      It's true this suicide cell is not suicide resistant;

24  would you agree with that?

25  A.      Suicide resistant would require a facility's

3234

1  management person to be able to provide that.  There is very

2  specific requirements for that, and I do not know what those

3  are.

4  Q.    You look at suicide prevention as part of your job,

5  correct?

6  A.    Suicide prevention, of course, is certainly part of

7  my job, but mental health has their portion, facilities

8  management has their portion.

9  Q.    So you're not able to tell me whether this cell is

10  suicide resistant or not?

11  A.    I can't tell you if it meets that specific criteria

12  that's outlined in the facilities management requirements.

13  Q.    Are you aware that one of the elements of a suicide

14  resistant cell is to not have attachment points for the

15  hanging of a noose?

16        THE COURT:  Sir, she just finished telling you that

17  is not her field, that's somebody else's field.

18        MR. FISCHER:  Okay.

19  MR. FISCHER:

20  Q.    Miss Allison, the Sac PSU just added a new unit,

21  correct?

22  A.    They added a new treatment space unit, yes.

23  Q.    And they also have added new beds, correct, the PSU

24  III?

25  A.    They converted a housing unit, if I recall.  I don't

3235

think we built a new housing unit.  I'm not sure.

Q.      Have you visited the Sac PSU since the opening of
the -- or the conversion of the PSU III?

A.      Yes, sir.

Q.      So you're aware that the PSU III building requires
inmate-patients to walk across the yard to get to the
treatment space?

A.      My visual is from the new building, and it is off the
yard so...

        THE COURT:  So the answer is "yes"?

        THE WITNESS:  Yes.  Yeah.

BY MR. FISCHER:

Q.      So those individuals are required to submit to
strip-searches prior to going to treatment?

A.      Yes.

Q.      Miss Allison, plaintiffs' counsel has been informed
about some of the new conditions with respect to this new Sac
PSU III that I want to ask you about.

        We've been informed that individuals are placed in
leg irons for movement across the yard and that they are
tethered together to walk across the yard to go to treatment
in the Sac PSU treatment space.

        Are you aware of that practice?

A.      No, sir.

Q.      And are you aware of the new solid fence barriers for

3236

1  the walk alone yards for the Sac PSU?

2  A.      No, sir.

3          THE COURT:  Mr. Bien, if you are giving him one more

4  irrelevant question, I'm going to terminate this hearing.

5          I didn't mean that.

6          I take it back.  Go ahead.

7  BY MR. FISCHER:

8  Q.      Miss Allison, do you consider it to be inappropriate

9  to place individuals --

10         THE COURT:  It is not her job.

11         Next.

12 BY MR. FISCHER:

13 Q.      Miss Allison, with respect to the Lancaster EOP Ad.

14 Seg. treatment space, you testified that the Lancaster

15 treatment space was originally planned to address treatment

16 space issues for the EOP main line population at Lancaster,

17 correct?

18 A.      Yes, sir.

19 Q.      And that has been rescoped to the EOP ASU treatment

20 space?

21 A.      Yes, sir.

22 Q.      And the original treatment space opening for the EOP

23 main line was 2012?

24 A.      It says, "Original Construction Schedule to be

25 Completed 2012."

3237

1        That's what the document says.

2   Q.       With this new conversion, the new plan is to open EOP

3   Ad. Seg. treatment space in 2014, correct?

4   A.       Yes, sir.

5   Q.       That's so the cages or treatment modules can be

6   installed?

7   A.       The treatment modulars and the physical plant

8   modifications required to make -- and I want to say it was

9   D-5, that adjacent building, to make any cell modifications

10  that would be necessary.

11  Q.       You testified on Friday that for any of the new

12  construction that treatment cages would not be used and that

13  non-contact spaces for individual contacts would be used.

14           But in this new Lancaster EOP treatment space, isn't

15  it true that they will continue to use cages?

16  A.       I'm not sure when I look at this picture.  I have not

17  been in that specific building.  I'm not sure if I look at

18  this picture of this hallway, probably the third building

19  down, if there is an adjacent visiting booth to the other

20  side.  I don't know that design.  If it's different than the

21  Sac PSU or the Corcoran SHU design.

22  Q.       So you don't know if cages will be used for

23  individual contacts in this new treatment space at Lancaster?

24  A.       I'm not 100 percent sure, no.

25  Q.       There is no plan to build new treatment space for the

3238

1    EOP main line population?

2    A.      They're utilizing their existing space.  And I'm not

3    sure if it was an education or a gym, but the institution

4    felt they had ample space and that the ASU inmates would be

5    better served in that building where they had electrical in

6    D-5 and to be better able to utilize the building.  So they

7    no longer have treatment on the dayroom floors.

8    Q.      But the plan to create a new EOP main line treatment

9    space has been abandoned?

10   A.      I wouldn't say it is abandoned.  I think we found we

11   have ample treatment space, and we made a decision that this

12   treatment space would better serve the EOP ASU population.

13          But projects -- if there is any other projects,

14   again, that's facility management, and I don't work for them.

15   Q.      For the new Corcoran EOP Ad. Seg. treatment space

16   that you testified about, this new treatment space isn't

17   going to provide any group treatment space for the 125 CCC

18   Ad. Seg. prisoners at Corcoran, correct?

19   A.      We may not have pictures of that, but I don't -- I

20   have not been in that building to tell you if there is -- it

21   appears to be some group treatment, even in the pictures.

22   Q.      Are you aware that Dr. Fischer testified there will

23   be no group treatment for CCCs in this space?

24   A.      I'm sorry.  I thought you said EOP.

25   Q.      CCCs.

3239

1  A.     How mental health manages who goes and who doesn't,

2  that's a mental health decision.  I know we have the physical

3  capability to do it.

4          MR. FISCHER:  Permission to approach?

5          (Exhibit handed to witness.)

6  BY MR. FISCHER:

7  Q.     Miss Allison, I've handed you Plaintiffs' Exhibit

8  2620 for identification.  This is the declaration of Deborah

9  Hysen in support of defendants' opposition to plaintiffs'

10 motion related to the housing and treatment of mentally ill

11 prisoners in segregation.

12         MR. FISCHER:  I would move it into evidence, Your

13 Honor.

14         THE COURT:  Received.

15             (Whereupon, Plaintiffs' Exhibit 2620 received

16              into evidence.)

17         THE COURT:  Do you know who Miss Haynes is?

18         THE WITNESS:  Hysen?  Yes, sir.

19         THE COURT:  Who is she?

20         THE WITNESS:  She is Director of Facilities

21 Management Division.  I think that's her title.

22         THE COURT:  Thank you, ma'am.

23 BY MR. FISCHER:

24 Q.     Miss Allison, I want to talk to you with this exhibit

25 about some of the other Ad. Seg. treatment spaces in the

3240

1  system.

2          At paragraph 10 on page 3 of the declaration,

3  Miss Hysen declares as to the EOP treatment space project at

4  the RJD Correctional Facility and states in the last sentence

5  that construction is scheduled to begin in 2014 and be

6  completed in March 2016.

7          And you're aware that right now treatment is

8  conducted on the dayroom floor in the RJD EOP Ad. Seg.?

9  A.      Correct.

10         THE COURT:  I want to interrupt for a moment,

11 although this witness is clearly not the person who would

12 have information about that.

13         Many of the -- asking you, not telling you.

14         Many of these facilities were ordered built by the

15 court with completion dates of 2014, as I understand it.

16         Is this one of those, if you know?

17         Mr. Fischer?  Mr. Bien?  Miss Vorous?

18         MS. VOROUS:  Your Honor, it is not.  It is one -- it

19 is part of the HCFIP program that is being worked on by the

20 CDCR and the Receiver.

21         THE COURT:  All right.  Thank you.

22         MR. BIEN:  Our position, Your Honor, is that all of

23 these projects were court ordered, and they're all part of

24 the original bed plans.

25         THE COURT:  Okay.

3241

1        MR. BIEN:  They've been on the drawing board since

2    2007, 2008.

3        THE COURT:  Well, I don't know.  I'll have to ask my

4    Special Master about it.  But if these are being completed in

5    216 -- 216?  Now you see what you are doing to me -- in 2016

6    without court order, they would appear to be in violation.

7        I accept Miss Vorous's and Mr. Bien's disagreement

8    about it, but someday somebody is going to have to tell me

9    because -- well, I suppose if nobody ever makes a motion,

10   we'll just sit here.

11       But I want to make it clear, that if this is one of

12   the projects that the court ordered, and the court ordered

13   that they be finished by 2014, somebody better come in and

14   get a modification, if I'm going to grant one.  I'm not

15   suggesting I'm automatically going to grant one.  Although,

16   it may be that there is nothing that can be done.

17       That's enough for this morning.

18       Counsel, can we begin at two o'clock?

19       MR. RUSSELL:  Yes.  We'll be back with Miss Allison

20   and we'll have Mr. Stainer.

21       THE COURT:  Very good.  Thank you.

22       Stand in recess.

23       (Off the record at 12:00 p.m.)

24                          ---o0o---

25

```
 1                    SACRAMENTO, CALIFORNIA

 2          THURSDAY, DECEMBER 12, 2013; 2:05 P.M.

 3                        ---o0o---

 4

 5          THE COURT:  Before we resume cross-examination,

 6   defendants' counsel, I asked the Special Master about these

 7   cases that are going over to '14 and '15, none of which have

 8   been approved:  SVSP, EOP A Quad -- that was for 10-2-13.

 9   Apparently now it's going to be March 2014.

10          LAC EOP treatment space.  That was supposed to be done

11   9-23-12.  Now you're proposing March 2014.

12          CCWF 70-bed EOP female.  It was for 12-31-13, and now

13   it's proposed for June 2015.

14          As far as I can tell, you are in contempt.  You ought

15   to be seeking a modification pretty soon, ma'am.

16          MS. VOROUS:  Your Honor, if we could explain,

17   there's -- with respect to the LAC project, that was -- all

18   of these projects were addressed as part of the June 2012 bed

19   modification plan.

20          There was approval to convert the LAC EOP -- LAC EOP

21   treatment and office space project to administrative

22   segregation unit treatment and office space.  That program

23   has been activated.  They are -- by the end of this month,

24   they anticipate having a hundred inmates being treated in

25   that program.
```

1          The CCWF, that's another one where we have kept the

2     court informed as to --

3          THE COURT:  Don't tell me that.  I'll tell you what.

4     I don't want to spend any more time here because I do want to

5     get this trial over.  If there are reasons that you are

6     satisfied that the court approved these modifications and I

7     haven't recognized or realized it, I expect a filing in

8     writing ten days after this case comes to a conclusion, if it

9     ever does.

10          That will be the order.

11          MS. VOROUS:  We are anticipating filing a request in

12     particular with respect to the CHCF because of the delay, so

13     as soon as we're done with this, we will have something on

14     file with the court.

15          THE COURT:  Very good.

16          Thank you.

17          Mr. Fischer, I have hope but not a lot of belief that

18     you will actually get this over with and have something to do

19     with the case.

20          You may proceed, sir.

21          MR. FISCHER:  Thank you.

22                         KATHLEEN ALLISON

23     Recalled as a witness on behalf of the plaintiffs herein, was

24     previously sworn, examined, and testified as follows:

25     /////

1                    CROSS-EXAMINATION (CONTINUED)

2    BY MR. FISCHER:

3    Q.    Ms. Allison, before the break, we were speaking about

4    EOP treatment space projects and the status of them.

5            With respect to Mule Creek, the EOP ad seg treatment

6    space project, first of all, currently at Mule Creek, the EOP

7    at seg treatment is on the dayroom floor.

8            Is that correct?

9    A.    Yes, sir.

10   Q.    And the goal, if all goes well, is for a new treatment

11   space to come online in 2016?

12   A.    That's what this document indicates.

13   Q.    Referring to the Hysen declaration?

14   A.    Yes, sir.

15   Q.    And for the CMC EOP ad seg, there's plan for new

16   treatment space to be completed if all goes well in September

17   2016?

18   A.    Yes, sir.

19   Q.    As for the CIW ad seg treatment space, if all goes

20   well, you plan to open it in September 2015.

21           Correct?

22   A.    According to Debra Hysen's declaration, yes.

23   Q.    And there's no plan to create new ad seg treatment

24   space for mentally ill prisoners at CCI?

25           THE COURT:  Is this within your area of expertise,

```
 1    ma'am?

 2              THE WITNESS:  No, sir.

 3              THE COURT:  The objection is sustained.

 4              MR. FISCHER:  She has spoken on direct extensively and

 5    submitted, I believe, about 20 photographs of the new

 6    treatment project throughout the system.

 7              THE COURT:  Those that are done.  You're talking about

 8    future.

 9              Go on.

10    BY MR. FISCHER:

11    Q.    Ms. Allison, you've testified about the provision of

12    entertainment appliances in the ad segs in response to court

13    orders that date back to 2006.

14              Correct?

15    A.    I'm sorry?  What is your question?

16    Q.    The efforts by CDCR to bring entertainment appliances

17    to the ASUs, this is in response to court orders going back

18    to 2006 or so.

19              Is that correct?

20    A.    I'm familiar with entertainment devices or -- I don't

21    hear a question, so, I'm sorry.

22    Q.    You're aware that this issue arises out of court

23    orders that date back to 2006.

24              Is that correct?

25    A.    I don't have that specific, but I do know that we need
```

1    to provide entertainment appliances.  I'm not familiar with

2    the specific court order.

3    Q.    There are memoranda that went around 2007 from CDCR to

4    the field about providing entertainment appliances in the ad

5    segs.

6         Correct?

7    A.    Yes.

8    Q.    And there are still many ASUs that have no

9    entertainment appliances.

10        Correct?

11   A.    That have no electrical capability within their cells,

12   correct.

13   Q.    And that is no TV or radios or other entertainment

14   appliances.

15        Correct?

16   A.    That's why we purchased the hand-crank radios.

17   Q.    Dr. Jordan from CIM -- Dr. Jordan testified yesterday

18   that the hand-crank radios hadn't been distributed to any

19   mentally ill prisoners at CIM.

20        Have they been distributed to any other institutions

21   in the ASUs?

22   A.    No.

23   Q.    Has a memorandum gone out about the distribution of

24   those radios?

25   A.    We're in the process of notifying the union.  That

1    notice has gone to CCPOA.

2    Q.    Will the radios be issued to Coleman class members in

3    2013?

4    A.    I'm not sure if the notice went out prior to

5    December 1st or not.  I know it's gone out within the last

6    couple of weeks, but I'm not exactly sure of the date of the

7    notice, and it would be 30 days after that would be

8    implementation.  That's why I can't --

9    Q.    Maybe?  Maybe not?

10    A.    Yes.

11    Q.    You testified that in the SHUs and PSUs there are

12    entertainment appliances or at least electrical capacities in

13    those units.

14        Correct?

15    A.    Yes.

16    Q.    Isn't it true that pursuant to the regulations, SHU

17    and PSU prisoners may not be eligible to receive

18    entertainment appliances for up to a year?

19    A.    I would have to review that.

20    Q.    You have in front of you Exhibit 2650 marked for

21    identification.  It's the CDCR operations manual.

22        On page 443 at the bottom -- may I move it into

23    evidence, Your Honor?

24        THE COURT:  Received.

25    //////

1                          (Whereupon, Plaintiffs' Exhibit 2650 was

2                          received into evidence.)

3    BY MR. FISCHER:

4    Q.      The last page of the exhibit marked as page 443, in

5    the right column about a third of the way down the page it

6    says:  "Privileged Group D ASU SHU PSU."

7    A.      I see the section.

8    Q.      It states, quote, (Reading:)

9                          Inmates assigned to SHU/PSU may possess and/or

10                         acquire through the inmate personal property

11                         package process or special purchase process, one

12                         entertainment appliance as outlined above and

13                         identified in Section 54030.17.  Eligibility to

14                         receive an entertainment appliance commences one

15                         year after date of privilege group D assignment.

16          Do you see that there?

17          THE COURT:  I don't see that at all.  Privilege group

18   C --

19          MR. FISCHER:  No, D, starting the third line below

20   that.

21          THE COURT:  I see.

22          THE WITNESS:  I see that, yes.  Our current NDS

23   regulations in Title 15 would supersede that section as it

24   relates to NDS inmates, and the memo for ASU inmates is

25   superseded.  I just cannot recall if it superseded it for SHU

1    and PSU inmates when that memo was issued because I didn't

2    have a SHU or PSU at that time.  I was a warden at that time.

3    BY MR. FISCHER:

4    Q.      As you testified, the NDS doesn't apply in SHU and

5    ASU; is that correct?

6    A.      Correct.

7    Q.      In your declaration, you discuss the second return

8    policy whereby mentally ill prisoners are returned from

9    inpatient units back to segregation unit from where they

10   came.  You filed -- this is Exhibit LLL, Exhibit B to LLL.

11   You filed a psych return policy memorandum distributed by

12   CDCR.

13           Do you recall that memo, Ms. Allison?

14   A.      I do, but it's very lengthy and very convoluted, so I

15   would have to locate it --

16   Q.      I just have a few questions about it.

17   A.      I found it.

18   Q.      In this memorandum, it clarified that custody staff

19   should continue case work for ad seg prisoners while they're

20   in an inpatient unit.

21           Correct?

22   A.      While they're at a DHS facility, yes.

23   Q.      That was to address a concern that when individuals

24   decompensated and went to a DHS facility, the case work would

25   be put on hold until they came back to segregation.

1              Correct?

2    A.       No, I wouldn't say that.  It was in an area brought to

3    our attention, and so -- I don't know even know if it was

4    brought to our attention, but this was our effort to ensure

5    all inmates got to the lowest level possible upon release

6    from DHS.

7    Q.       This wasn't, in fact, a change to the CDCR policy,

8    this memorandum; correct?

9    A.       It was clarification of the expectation.

10   Q.       And the memorandum states that the clarification is,

11   quote, consistent with current CDCR policies.  This is on the

12   first page of the March 21, 2013 memorandum.

13   A.       Correct.

14   Q.       The memorandum doesn't prohibit the placement of

15   mentally ill prisoners back into the segregation unit where

16   they decompensated prior to going to DHS.

17             Correct?

18   A.       It doesn't prevent them from going back if they have

19   remaining case factors that would require that.

20   Q.       As you state in paragraph 25 of your declaration, this

21   is a decision that's rightly, quote, with correctional

22   officers and not with mental health clinicians.

23             Correct?

24   A.       A determination of max custody status is a custody

25   designation, yes.

1    Q.     As well as the placement came ad seg following DHS

2    discharge?

3    A.     Yes.

4    Q.     Ms. Allison, turning to the issue of a sweep or mental

5    health screening, I want to direct your attention to page 11

6    of your declaration that you have in front of you, LLL.

7    A.     What page?

8    Q.     Page 11, at the bottom of the page.  This is your

9    declaration of July 24th --

10          THE COURT:  Can we go back to the previous set of

11   questions.  I'm not clear as to where we are now.

12          You've indicated that the placement, where ever they

13   are placed, is a custody determination, and it was my

14   understanding that mental health clinicians have no say in

15   that matter?

16          THE WITNESS:  They do as far as the ICC for that

17   offender, yes.  They do sit on all of the ICCs.  I was just

18   saying that max custody is a custody designation.

19          THE COURT:  I understand what you're saying.

20          These people have just been discharged from a mental

21   hospital.  This is a decision made by the state, and I'll

22   have to decide along with a hundred other things, whether it

23   makes any sense.

24          You may proceed.

25   /////

1    BY MR. FISCHER:

2    Q.    Ms. Allison, at the bottom of page 11, it states that,

3    quote -- you state in your declaration, quote, (Reading:)

4                    A comprehensive sweep of all inmates in

5                    segregation over 90 days is unnecessary and

6                    dangerous.

7            Ms. Allison, it's not dangerous to do mental health

8    evaluations of individuals with lengthy segregation stays;

9    correct?

10    A.    Not the evaluations, but the release of them without a

11    thorough review.

12    Q.    If the evaluation leads to the identification that

13    they need to be in another placement, that's what your

14    concern is about.

15            Is that correct?

16    A.    I'm sorry?  Can you say that again?

17    Q.    Your concern is moving mentally ill prisoners out of

18    those units?

19            THE COURT:  What's dangerous -- in your declaration,

20    you said that the evaluation of the sweep would be

21    unnecessary and dangerous.  And what Mr. Fischer, I think is

22    trying to get you to tell us, is why you think it's

23    dangerous.

24            See how simple it is?

25            THE WITNESS:  It's only dangerous to release them

1    without a proper review, and, you know, going through the

2    regular process that we need to go through to ensure that all

3    of their case factors are addressed.

4    BY MR. FISCHER:

5    Q.      From your prospective, you wouldn't have any concern

6    about conducting mental health evaluations of prisoners with

7    lengthy segregation stays, would you?

8    A.      I couldn't say that.  That's a clinical assessment.

9    Q.      From a custody standpoint, it's not of concern;

10   correct?

11   A.      No.

12   Q.      In the SHUs, the psych tech rounds of non-case load

13   prisoners occurs once every 14 days.

14           Is that correct?

15   A.      Is it -- I know it's different in the SHUs.  ASU is

16   daily.  In SHUs -- I know it's in here somewhere.  I can't

17   remember it off the top of my head.

18   Q.      It's less than in the ad seg; correct?

19   A.      Yes, it is.

20   Q.      Ms. Allison, you also testified about the use of

21   treatment cages.  I want to turn your attention to

22   Plaintiffs' Exhibit 2497.  It's on our stand marked for

23   identification.  This is a State of California Office of

24   Administrative law document regarding the ATOM pilot.

25           I ask it be moved into evidence, 2497.

1              THE COURT:  Received.

2                        (Whereupon, Plaintiffs' Exhibit 2497

3                        was received into evidence.)

4    BY MR. FISCHER:

5    Q.    Ms. Allison, turning to page 4 -- the page numbers are

6    on the top left of this document.  This is a document

7    regarding the ATOM chair pilot as a possible alternative to

8    the use of the therapeutic treatment modules.

9          Correct?

10   A.    Yes, sir.

11   Q.    On page 4 under "Program Overview," it states,

12   (Reading:)

13                This pilot program was developed due to repeated

14                and long-term concerns by the Coleman court

15                experts and plaintiffs' attorneys that there may

16                be a more human and effective way to provide

17                group/individual therapy to seriously mentally

18                ill inmate patients in segregated housing.

19         THE COURT:  I don't know where you just read it.  I'm

20   looking at page --

21         MR. FISCHER:  Page 4.  "Program Overview," starting on

22   the fourth line.  I thought I mentioned that.

23         THE COURT:  Oh, I see.

24   BY MR. FISCHER:

25   Q.    Ms. Allison, turning to the issue of intake cells.

1    Intake cells are used as a component in suicide prevention

2    segregation units.

3         Correct?

4    A.    Yes, sir.

5    Q.    But there are not enough intake cells to house all new

6    ad seg arrivals.

7         Correct?

8    A.    I don't have that data.

9    Q.    You don't know whether there are enough intake cells

10   or not to house new ad seg inmates?

11   A.    There was an analysis done at the time of the creation

12   of the intake cells, to my knowledge, and to make a

13   determination how many they have.  There's nothing to

14   indicate we do not have enough.  It's part of our CQIT

15   process.

16   Q.    You're part of that process?

17   A.    Yes, sir.

18        THE COURT:  What is a CQIT process?

19        THE WITNESS:  I'm sorry, sir.  It's the continuous

20   quality improvement tool.  It's basically our own internal

21   audit and partnership with the Special Master.

22        MR. FISCHER:  Your Honor, I've handed the witness

23   what's been marked as Plaintiffs' Exhibit 2047.  It's already

24   in evidence.  It came in during Dr. Haney's testimony.  Our

25   office realized that there was an inmate name on the cover

1    page.  You'll see this version has been redacted.

2         We ask this Exhibit 2047 replace the previously

3    admitted document.

4         THE COURT:  That will be the order.

5    BY MR. FISCHER:

6    Q.    Ms. Allison, Exhibit 2047 is a chart completed by CDCR

7    with a cover e-mail from Chris Yi, a CDCR employee, and

8    e-mail to Dr. Robert Canning from CDCR, dated December 5,

9    2012.  I'm going to read it and ask you a question.  It says,

10   (Reading:)

11              I added -- particular inmate -- to the record

12              with the information that I could find on his

13              suicide report.  He was in ASU for less than

14              two days when he committed suicide.  One thing I

15              found interesting while browsing through his

16              folder, is that in one document, ASP's warden

17              mentioned was that ASU had received 27 inmates

18              on June 27, 2012, the same day the inmate was

19              admitted to ASU, but they only have nine

20              designated intake cells and the inmate was not

21              housed in one of those intake cells.

22        It goes on to state, quote, (Reading:)

23              Considering how we have no suicides since 2008

24              among those inmates who are housed in any one of

25              those ASU intake cells, this type of cells is

1                        indeed effective, serving its purpose.  Is there

2                        a plan in place to build more intake cells,

3                        either building new or retrofitting existing ASU

4                        cells --

5          Are you aware if there is a plan in place to build

6     more intake seals, either building now or retrofitting

7     existing ASU cells?

8     A.       No.  That 27 in a given day is an anomaly.  I don't

9     know this for a fact, but I would be willing to bet, based on

10    my experience, that they had a riot which resulted in

11    additional inmates being placed in segregation, but that

12    would not be our average number going in on any given day.

13         To my knowledge, there is no plan to expand intake

14    cells.

15    Q.       Turning to the issue of welfare checks in

16    administrative segregation.  There are no welfare checks in

17    the SHUs.

18         Correct?

19    A.       There are 30-minute security checks in the SHUs.

20    Q.       Those security checks are different than welfare

21    checks that are provided in ASU?

22    A.       The welfare checks, those are specific to Guard One

23    and the indication of level F activity, so in that respect

24    they are different.

25    Q.       Just to clarify, in the ASUs for the welfare checks in

1    the first 21 days, the officers document level of activity of

2    each inmate.

3            Correct?

4    A.      Yes, sir.

5    Q.      That's through this Guard One system that you have;

6    correct?

7    A.      Yes, sir.

8    Q.      That practice is not in the SHUs; correct?

9    A.      No, sir.

10   Q.      Is it not in the PSUs; correct?

11   A.      No.

12   Q.      This new electronic system, the Guard One system that

13   you've testified about, that's not going to be used in

14   overflow ad seg cells.

15           Correct?

16   A.      No.  But we haven't had overflow since our reduction

17   of our population, to my knowledge.

18   Q.      If a prisoner designated to the ASU needs to go in

19   overflow, however, they will not receive welfare checks

20   through the Guard One system.

21           Correct?

22   A.      No.  But we've given direction that all new intake

23   needs to go to where they do have the Guard One system.

24   Q.      The security checks that you testified to occurring in

25   the SHUs, that's also the practice in PSUs.

1          Correct?

2     A.     Yes, sir.

3     Q.     And this check is less than what is included in a

4     welfare check in the ad seg.

5             Correct?

6     A.     It is a visual inspection, but it does not include the

7     identification of activity.

8     Q.     You're looking for -- through the security check,

9     you're looking for obvious signs of misconduct or somebody

10    who is injured.

11            Correct?

12    A.     Yes.

13    Q.     Something like that?

14    A.     Yes.

15    Q.     And making sure the doors of the unit are closed if

16    they're supposed to be closed.

17            Correct?

18    A.     Yes, sir.

19    Q.     Has a memo gone out to the field about what is

20    supposed to be included in a security check?

21    A.     It's part of every correctional officer's training at

22    the academy.  There's not been a supplemental memo.  It's

23    part of their basic academy.

24    Q.     So the provision of security checks is nothing new in

25    CDCR?

1   A.       No, sir.

2   Q.       Ms. Allison, if I could turn your attention back to

3   Exhibit 2649.

4            Do you have that in front of you?

5   A.       Is it one of the new ones you just gave me?

6   Q.       No.  It is one I gave you this morning.  I can put it

7   on the screen.  It's the COMPSTAT report you have there.

8   A.       Yes, I have it.

9   Q.       Turning to page 5 of 13 of the document, the page

10  numbers are on the top right.

11  A.       (Witness complies.)

12  Q.       This says Lancaster, it indicates on the left side.

13           Do you see that?

14  A.       Yes, sir.

15  Q.       About midway down the page, it states:  "ASU overflow

16  actual population."

17           Do you see that in the second column?

18  A.       I see that, yes.

19  Q.       Moving over to the right, in June there were 55 ad seg

20  overflow at Lancaster.

21           Do you see that?

22  A.       I do.

23  Q.       45 in July, and 27 in August, and 23 in September.

24           Do you see that?

25  A.       Yes, sir.

1    Q.    Just one more example.

2         Turning to page 7 of 13, Salinas Valley State Prison,

3    about midway down the page:  "ASU overflow actual

4    population," it says that starting in July, there were 28 ASU

5    overflow, August, 53 ASU overflow, and September, 34 ASU

6    overflow.

7         Do you see that, Ms. Allison?

8    A.    Yes.  Now, understand, those are point in time and not

9    necessarily our COMPSTAT ASU tracking, but the

10   self-reporting, and the county rules for this is the last day

11   of the month on a specific day what would be considered

12   anything other than a regular budgeted ASU.

13   Q.    At that point in time, overflow is being used at those

14   institutions?

15   A.    That's what this document says.

16   Q.    Ms. Allison, turning your attention to Plaintiffs'

17   Exhibit 2611 marked for identification as one of the ones

18   that I put on your stand after lunch.

19   A.    I found it.

20   Q.    This is a declaration signed by you, document 4621,

21   dated May 23, 2013.

22        I ask it be moved into evidence, Your Honor.

23        THE COURT:  Received.

24                      (Whereupon, Plaintiffs' Exhibit 2611

25                       was received into evidence.)

1    BY MR. FISCHER:

2    Q.    You filed this in support of a request by the

3    defendants to postpone the hearing and briefing on this

4    particular matter regarding segregated housing.

5        Correct?

6    A.    Yes.

7    Q.    In paragraph 6 in this declaration on page 2, you

8    state, quote, (Reading:)

9            CDCR also started the process of seeking expert

10            advice and inspecting the conditions of

11            confinement in the secured housing units.

12        It goes on, (Reading:)

13            But it will take at least 45 additional days for

14            defendants to complete these investigations.

15        And it continues.

16        Ms. Allison, who did you consult to get expert advice

17    about conditions of confinement in the SHUs?

18        MS. VOROUS:   Objection, Your Honor.  Object on the

19    basis that this line of testimony would call for

20    attorney-client communications as well as disclosure of

21    consultants that have not been disclosed as experts.  There's

22    no obligation on the parties to disclose who they consulted

23    with in preparation for opposing plaintiffs' motion.

24        THE COURT:   Insofar as it's attorney-client privilege,

25    that will be sustained.  It is not clear to me how that

 1    applies to employees who have been put on the stand and I

 2    would -- but are you representing to the court that among the

 3    people consulted were people from legal, from the Attorney

 4    General's Office?

 5         MS. VOROUS:  Your Honor, our office was involved in

 6    working with CDCR to consult with experts in the context of

 7    this motion, yes.

 8         THE COURT:  Mr. Fischer?

 9         MR. FISCHER:  I'm not asking about any consultations

10    counsel for defendants had.  I'm asking who Ms. Allison has

11    consulted with with respect to the condition of confinement

12    in SHUs based on her representation in her declaration.

13         THE COURT:  The objection is overruled.

14         You may proceed.

15         THE WITNESS:  I was not privy to those conversations.

16    I know there were, but I don't even recall their names.  I

17    know that it would have been a much higher level, the

18    secretary level along with our counsel.

19    BY MR. FISCHER:

20    Q.    Do you know if the secretary consulted with any

21    experts on conditions in the SHU since the filing of this

22    declaration?

23    A.    To my knowledge, we did have -- there were

24    conversations, but I'm not privy to those.

25    Q.    Ms. Allison, you're aware that one of your colleagues,

1    Mr. Sanders, said that you from DAI are in charge of Coleman?

2         Are you aware of that?

3    A.    Yes, sir.

4    Q.    And you weren't involved in any consultations with

5    experts about the SHU?

6    A.    No, sir.

7    Q.    Are you aware of whether these consultations with

8    experts about conditions of confinement in the SHU have led

9    to any changes in the treatment of mentally ill prisoners in

10   the SHUs?

11   A.    You don't always know why the secretary makes his

12   decisions.  I'll use the NDS as an example.  NDS came, called

13   me upstairs and says, "I want this to happen in 20 days."

14        I said, "Sir, I need a little more time than that, but

15   we'll make it happen."

16   Q.    The NDS doesn't involve the triple CCCMS prisoners;

17   correct?

18   A.    No.  I was just using that as an example.  I do not

19   know.

20        MR. FISCHER:  I have no further questions.

21        Thank you.

22        MS. VOROUS:  Your Honor, when we met last Friday,

23   defendants made a representation that we would file a new

24   Exhibit SSS to replace one that we had changed the title, so

25   I would like to do that first.

1           THE COURT:  That will be the order.

2           Please hand it to the clerk.

3                       REDIRECT EXAMINATION

4   BY MS. VOROUS:

5   Q.     Ms. Allison, when you had testified, I believe, on

6   direct examination, you had referred to testimony that you

7   thought or that you attributed to Dr. Haney with respect to

8   his deposition testimony associated with the Cypress unit at

9   the California Institution for Men.

10          Do you remember that?

11  A.     Yes, ma'am.

12          MR. FISCHER:  I object.  This is beyond the scope of

13  the cross-examination.

14          THE COURT:  Overruled.

15          You may proceed.

16  BY MS. VOROUS:

17  Q.     Ms. Allison, since you testified on Friday, have you

18  determined that statement to be inaccurate?

19  A.     It was Dr. Kaufman.  I apologize.  I remembered it

20  being the psychiatrist that we were accompanying, but it was

21  Dr. Kaufman on page 51 and 52 of his declaration.

22  Q.     Ms. Allison, on direct you had also testified about

23  the effective date of the new nondisciplinary segregation

24  regulation, and I believe you said at that point they were

25  effective on December 24th.

1          Is that, in fact, the effective date of the

2    regulations?

3    A.      No.  Thank you.  It was September 24th.

4    Q.      Ms. Allison, we had also discussed and you discussed

5    on cross as well the new memorandum dated December 3, 2013,

6    Defendant's Exhibit RRR.

7    A.      Yes, ma'am.

8    Q.      Does this policy change the ICC review process as it

9    relates to those inmates designated by the ICC as falling

10   within the nondisciplinary segregation classification?

11   A.      It would on the natural.  If the case work is not

12   ready for the first ICC -- let's say the investigation is not

13   completed -- I would need to or any chairperson would need to

14   see that case back in seven days.

15   Q.      Would that be for both CCCMS as well as the EOP

16   population?

17   A.      I probably wouldn't bring them back in seven days for

18   an EOP.  I would bring them back in 30 days or two weeks,

19   14 days.  The wardens know how to manage their case loads.

20   We didn't go into the gruesome detail.  We just set the

21   broader expectation and then they need to manage it

22   accordingly.

23          We will help them on the end as far as transporting.

24   We didn't specify the timeline, but if I was the chairperson,

25   I would need to make that determination if I need to see them

1    in 14 days or possibly 30, but understand the timeframe to

2    get it to the classification service representatives is

3    40 days for CCC, so it really tightens my timeframe.

4    Q.    It shortens the timeframes as compared to the Title 15

5    regulations for the ICC review process?

6    A.    Yes, ma'am.

7    Q.    Ms. Allison, on cross you were asked a question about

8    a 90-day review for inmates that are within administrative

9    segregation that are pending DA referral.

10          Do you recall that testimony?

11    A.    Yes, ma'am.

12    Q.    That review was to determine whether there was

13    alternative housing that was appropriate for the particular

14    inmate?

15    A.    Yes.

16    Q.    Is that review part of the regulatory process?

17    A.    I think it's above and beyond the regulatory process

18    as it relates to mental health offenders.

19    Q.    Do you know whether that's part of a requirement in

20    Coleman?

21    A.    I think it's a requirement in Coleman, but where

22    exactly it is, I do not know.

23          MS. VOROUS:  No further questions, Your Honor.

24          MR. FISCHER:  No recross.

25          THE COURT:  May the witness be excused?

 1              MR. FISCHER:  Yes, ma'am.

 2              THE COURT:  You're free to go or stay as you choose.

 3              MS. D'AGOSTINO:  Your Honor, defendants would like to

 4    call Michael Stainer to the stand.

 5                          MICHAEL STAINER

 6    Recalled as a witness on behalf of the defendants herein, was

 7    previously sworn, examined, and testified as follows:

 8              THE COURT:  I remind you, sir, you're still under

 9    oath.

10                        DIRECT EXAMINATION

11    BY MS. D'AGOSTINO:

12    Q.    Good afternoon.

13    A.    Good afternoon.

14    Q.    I believe your title has changed since you last

15    appeared before this court.

16          What is your title?

17    A.    I am now the lead director of Division of Adult

18    Institutions.

19    Q.    For how long have you held that position?

20    A.    I've been acting since August 1st, and I was

21    appointed, sworn in on November 19th.

22    Q.    Mr. Stainer, have you ever worked in a prison that has

23    segregated housing unit?

24    A.    I have.

25    Q.    What is that?

1    A.     California Correctional Institution in Tehachapi.

2    Q.     How long did you work there?

3    A.     All but about 20 months of my first 27, 26 years.

4    Q.     So almost 26 years; is that correct?

5    A.     25 total, yes.

6    Q.     As part of your current duties, do you manage

7    segregated housing units in CDCR?

8    A.     As the director, I oversee all adult institutions, and

9    that would include the four security housing units as well as

10   the one female security housing unit and all the ad segs

11   throughout the state.

12          MS. D'AGOSTINO:  Defendants would like to offer Mr.

13   Stainer as an expert on the conditions of confinement and

14   segregated housing as it affects Coleman class members.

15          MR. BIEN:  We would like to voir dire whether or not

16   he's an expert.

17          THE COURT:  Why don't you come to this microphone.

18   I'm having trouble understanding you, Mr. Bien.

19          MR. BIEN:  Mr. Stainer has been designated as a

20   non-retained expert.  I would object to the extent of the

21   scope of that.

22          THE COURT:  But you would agree -- I'm asking you.  I

23   don't know -- they've supplied you with the required

24   documents?

25          MR. BIEN:  Yes.

1          THE COURT:  So now where are we?

2          MR. BIEN:  I guess we object as to his qualifications

3     to offer expert testimony on some of the areas that I heard

4     her list in terms of expertise.  He's certainly an

5     experienced correctional administrator.

6          I don't know if he has expertise about the effects of

7     confinement on the mentally ill.

8          MS. D'AGOSTINO:  To be clear, Your Honor, I wasn't

9     speaking about the effects of confinement.  I meant

10    conditions of confinement.

11         MR. BIEN:  We'll allow it.

12         THE COURT:  You may proceed, ma'am.

13         MS. D'AGOSTINO:  Thank you.

14    Q.    Mr. Stainer, can you please describe for the court how

15    determinate SHU terms are assessed.

16    A.    The determinate SHU terms?

17    Q.    Yes, please.

18    A.    If an offender has been found guilty of an offense

19    that is contained within Title 15, if it's one of the

20    offenses that would qualify for security housing unit

21    determinate term, first of all, the offender has to be found

22    guilty, make sure all the due process is in place of a rule

23    violation report for that specific offense.

24         If he is found guilty, then the offender would appear

25    before the institutional classification committee chaired by

 1    the warden or the chief deputy warden.

 2            They would look at -- there's three basic terms.

 3    They're listed within the SHU assessment chart:  Low term,

 4    the expected term, and the high term.  We always start off at

 5    the expected term for that specific offense, and we would

 6    review aggravating or mitigating circumstances.

 7    Q.    In front of you, you should have Defendants' Exhibit

 8    NNN.

 9    A.    In this stack?

10    Q.    I believe so.

11          May I approach, Your Honor?

12          THE COURT:  Yes.  Nancy, Nancy, Nancy.

13          THE WITNESS:  Found it.

14    BY MS. D'AGOSTINO:

15    Q.    If you turn to 163 of that document.

16          THE COURT:  Is that in evidence, ma'am?

17          MS. D'AGOSTINO:  I believe so.

18          THE COURT:  Clerk indicates it is.

19          Page?

20    BY MS. D'AGOSTINO:

21    Q.    163.

22          Is this the chart you've been describing?

23    A.    Yes.

24    Q.    I think I interrupted you, you were talking about the

25    low, expected and high ranges of SHU terms.

1              Is that correct?

2    A.    That's correct.

3    Q.    Are they displayed on this chart?

4    A.    They are.

5    Q.    So I think you were also speaking about aggravating

6    and mitigating factors.

7              What are the aggravating factors for a SHU term?

8    A.    If I could use one of these as an example.  Under

9    (b)(2), the offense would be listed as assault on an inmate

10   with a weapon or physical force capable of causing mortal or

11   serious injury.  The common terms that we might see for the

12   specific act on the rule violation report would be battery on

13   an inmate with a weapon.

14        So if the inmate had been found guilty of that

15   specific offense, he would appear before the ICC.  And this

16   specific offense carries a 6, 15 or 24 month SHU term.  We

17   would start off with the 15-month because that would be the

18   expected range.

19        We would look at the inmate's incarceration

20   disciplinary history and determine if the inmate had been in

21   prison for, say, ten years and they never had an offense like

22   this or any real serious misbehavior, we might mitigate that

23   term down.  We can go all the way to the six months.

24        However, if the inmate had aggregating factors, and

25   aggravating factors for this type of offense would be acts of

1    the same or similar nature such a battery on an inmate

2    without the serious injuries or with the weapon or he might

3    have possessed a weapon or he might have done this same act

4    in the past, battery on the staff as well, but it's still a

5    similar type act, then the committee has the option of

6    actually aggravating it, and it can go all the way up to the

7    24 months.

8         Once the committee has made that determination, they

9    have to speak to it in the 128(g), the classification chrono,

10   and justify and articulate the reasons why they varied from

11   the expected term.

12   Q.    So, for example, in the example you gave (b)(1) --

13   A.    -- (b)(2)

14   Q.    I'm sorry -- (b)(2), the low typical term is six

15   months.  That's right?

16   A.    That would be the low, correct.

17   Q.    And if an inmate is assessed a six-month SHU term,

18   would he serve the entirety of a six-month SHU term?

19   A.    No, he wouldn't.  What we do is we then establish a

20   minimum eligible release date, commonly referred to as the

21   MERD.  Per the California Code of Regulations, the inmate

22   would be required to serve three-quarters of that SHU term.

23        So in this case we actually have a handy dandy chart.

24   I don't know if it's within this packet.  I believe it is.

25   If you turn to page 162, you see five columns here and you go

1    down on the left-hand column where it says:  "Six months SHU

2    term."

3          So the MERD would actually be four months and 15 days,

4    and that is when the person is eligible to get out of the

5    SHU.  So if he doesn't have any further rule infractions

6    within the security housing unit or the terms -- as short as

7    six months, the person may not actually ever transfer to the

8    security housing unit.  They may actually do their SHU term

9    within the ad seg.

10   Q.    What kind of rule violations would result in an inmate

11   receiving a sentence longer than his MERD?

12   A.    Any serious 115 that the inmate receives can result in

13   forfeiture of good conduct credits.  And good conduct credits

14   are anything between the minimum eligible release date and

15   the maximum SHU term.

16         So in this case, if the inmate was assessed a

17   six-month SHU term, the MERD would be four months and

18   15 days, and that would leave 45 days left to fulfill that

19   entire six-month SHU term.  So the inmate could forfeit that

20   45 days if he's found guilty of another offense, but it has

21   to be classified as a serious rule violation report.

22   Q.    What offenses are classified as serious rule

23   violations?

24   A.    There's a whole host of -- when I say "serious,"

25   anything from the division A through the division F.  We have

3275

1    serious administrative-type rule reports.

2    Q.    Can we return to page 163.

3    A.    Yes.

4    Q.    Looking at the list of offenses which can result in a

5    SHU term, do you consider these offenses to be violent

6    offenses?

7    A.    The vast majority of these offenses are related to

8    violence.

9    Q.    And why do you think it's important that these

10   offenses would result in a SHU term?

11   A.    The offender has exhibited behavior which does pose a

12   risk to himself, others, other inmates, staff or as a whole

13   to the security of the institution.

14   Q.    Under what circumstances would an inmate serve

15   concurrent SHU terms?

16   A.    As an example, taking again the same offense that I

17   was referring to, say the inmate was placed in ad seg for

18   battery on an inmate with a weapon, there's a process that we

19   would go through with this.

20        Prior to the SHU term being assessed by the committee,

21   which means he has to go through the entire rule violation

22   process, be found guilty, and then appear before the

23   committee.  So only the ICC chaired by the warden can assess

24   a SHU term.

25        Any misbehavior that would fall within these offenses

1    could, if he's found guilty again, but prior to the SHU term

2    being assessed, could result in the assessment of a

3    concurrent SHU term.

4         Does that make sense?

5    Q.    I'm sorry.  You said prior to the SHU term being

6    assessed, so does that mean if he received two SHU terms at

7    the same time?

8    A.    Well, for example, the inmate went to ad seg,

9    committed one of these offenses, and prior to this offense

10   being adjudicated, say, he did another offense, committed

11   another offense within the housing unit.  Say he had a

12   cellmate and he battered that cellmate.  That can carry a SHU

13   term.

14        If that behavior occurred between the time he

15   committed this offense and the time that he was assessed the

16   SHU term for that offense, then he could be assessed a

17   concurrent SHU term.

18   Q.    If he was assessed a concurrent SHU term, would he

19   still receive a minimum eligible release date?

20   A.    Yes, he would, whichever one would carry the longest.

21   They would run concurrent to each other, and the controlling

22   minimum eligible release date would be the one that carried

23   the longer term, but they would both run concurrent.

24   Q.    Under what circumstances would an inmate receive

25   consecutive SHU terms?

3277

1    A.      An inmate who is presently serving a SHU term that has

2    been assessed by the committee, and if he commits an offense

3    after that assessment, then they can assess a concurrent

4    or -- excuse me -- a consecutive if it falls within this

5    schedule.

6    Q.      And under those circumstances, would that inmate

7    receive a minimal eligible release date?

8    A.      He would receive a new minimal eligible release date.

9    Q.      As to the first term, would he serve the full time?

10   A.      He would have to serve the full term of that -- the

11   first SHU term, and then the second SHU term would begin, in

12   which case -- but, yes, he would serve that full time and

13   then the next term on top of that.

14   Q.      Where are the security housing units located in CDCR?

15   A.      We have four male security housing units:  California

16   Correctional Institution in Tehachapi, California State

17   Prison at Corcoran, relatively small security housing unit,

18   smaller in number at the California State Prison Sacramento,

19   and then at Pelican Bay State Prison for the males, and we

20   have a very small population of females at the California

21   Institution for Women at Fontera.

22   Q.      With respect to the male facilities, could you briefly

23   describe the layout of a typical cell in a security housing

24   unit?

25   A.      We have two different types of designs, California

 1    Correctional Institution, California State Prison at

 2    Corcoran, and California State Prison in Sacramento are all

 3    what we refer to it as 180 design.  These housing units are

 4    used for both general population, level VI, as well as the

 5    security housing units.  The cells are identical, whether

 6    they're the general population or the security housing unit.

 7          Then we have the Pelican Bay State Prison.  This is a

 8    very unique design.  There's no design like it in the State

 9    of California.  You can't describe it as a 180 or 270 design.

10    Those are common terms we've talked about throughout these

11    proceedings.

12          Pelican Bay is designed, two separate units that have

13    long corridors.  Then they have pods shooting off, housing

14    units consisting of six pods in each of the six housing

15    units.  Each pod contains eight cells, four cells on the top

16    and four cells on the bottom.  It's a very unique design.

17          I don't know how far you want me to go into the

18    details here.  I could talk about it for quite some time.

19    Q.    That's fine.  I'm interested in the cells other than

20    Pelican Bay and security housing units.

21    A.    Again, they're the 180 design.  They are identical to

22    the other 180 design general population cells.  As a matter

23    of fact, if you go to Corcoran or Tehachapi, even Sac, all

24    those cells at one time or another have been general

25    population, or even at Corcoran at one time, one of the whole

 1   units at Corcoran was a general population unit for a while

 2   for return to custody inmates back in the mid-to-early

 3   nineties, I believe it was.

 4        The cells, they all have -- there's slight varying of

 5   the floor plans through each of those three facilities;

 6   however, the general design is the cell is between eight and

 7   11 and a half feet or eight and 12 feet, eight by 12 feet,

 8   two bunks.  Some are concrete.  Some are stainless steel.

 9   Some are side-by-side or some on top of the other.

10        They have a window in the rear of the cell that looks

11   out to -- I guess we call it -- no man's land, but it's a

12   view to the outside.  They have either one window in the door

13   or two windows in the door.  Some of the slight variations,

14   one might have a window to the side of the door as well.

15   Some doors at Corcoran are the Arizona style doors, steel

16   doors with perforated holes throughout the doors.

17   Q.    So I want to stop you there.

18        THE COURT:  I'm going to stop you, also.

19        The court reporter needs a break.  We'll take

20   15 minutes.

21                            (Whereupon, a break was taken at

22                            3:04 p.m.)

23                            (Nothing Omitted.)

24   /////

25   /////

3280

```
 1              (On the record at 3:25 p.m.)

 2              THE CLERK:  Please, remain seated.

 3         Court is now in session.

 4              THE COURT:  Miss D'Agostino.

 5  BY MS. D'AGOSTINO:

 6  Q.      Mr. Stainer, when we left off, you had stated that

 7  the cells in the security housing units are identical to

 8  general population cells.

 9         Do you recall that?

10  A.      I do.

11  Q.      When you said that, did you mean Level IV, 180-degree

12  institution general population cells?

13  A.      Yes.  Yes.

14  Q.      And you also stated that the cells have closed cell

15  fronts.

16         Do you recall that?

17  A.      The majority.  Well, yes, they all have the steel

18  doors.  However, there's some cells at Corcoran, as well as

19  Pelican Bay, that are perforated, the Arizona-style doors

20  they refer to them as.

21  Q.      Other than Corcoran and Pelican Bay, do any other

22  cells -- do any other facilities have cells with perforated

23  cell fronts?

24  A.      Not the security housing units, no.

25  Q.      And in the cells with solid doors, to your knowledge
```

3281

1  are inmates able to communicate with people standing on the

2  outside of the cell door?

3  A.      Yes.

4  Q.      And are they able to communicate between cells?

5  A.      Yes, they do quite frequently, all the time.

6  Q.      And to your knowledge, how do staff communicate with

7  inmates from outside the cells?

8  A.      Just standing in front of the cell door, just having

9  a normal conversation, speaking no louder than I am.

10  Unamplified, of course.

11  Q.      So Mr. Stainer, you have heard, I think, plaintiffs'

12  expert Dr. Haney testify that inmates in the security housing

13  units have very little access to social contact.

14          Are you aware that's his opinion?

15  A.      I believe I read transcripts of that.  Yes, I believe

16  that's what I read.

17  Q.      Do you agree with that?

18  A.      I think you have to put it into context.  I mean,

19  they're not out on a dayroom floor.  They're not out on the

20  yard for, you know, nine hours a day.  However, to say they

21  don't have any social contact is far from the truth.

22          You know, I've worked a large part of my career

23  assigned to whether it be the administrative segregation

24  units as an officer and supervisor, or the security housing

25  units as an officer, supervisor and manager, and inmates, you

3282

1    know, it's amazing how they are able to communicate.

2            And I mean, they know each other.  They play chess,

3    you know, from one cell to the other.  There's quite a social

4    network going on in these areas.  There really is.

5    Q.      And so you've just described the social contacts

6    inmates have with each other.  Do they receive visits in the

7    security housing unit?

8    A.      Yes.  They are permitted visits.

9    Q.      And what about contact with staff?

10   A.      Contact with staff -- staff are in contact with these

11   inmates continually.  Staff have to facilitate all the

12   movement, the feeding of the inmates, the -- you know, when I

13   say "movement," I'm referring, you know, to and from

14   committee, to and from yard, to and from medical and mental

15   health and dental appointments, the visiting.

16           The staff, they have -- I found it amazingly how in

17   tune the staff were to the population under their charge, how

18   well they knew them, their norms, their not norms, you know,

19   who's in charge, who's having issues.

20           The staff is probably better than a general

21   population unit, I would say, based on my experiences.

22   Q.      Do you have an opinion as to why the staff know their

23   inmates better than in a general population unit?

24   A.      I believe it is based upon the design and procedures

25   to where staff have to facilitate everything going on in

3283

1    there.  They're continually in contact with these inmates

2    where they might not be so much with the general population.

3    Q.      You mentioned that inmates get visits.  Do they also

4    get access to yard?

5    A.      Yes, they do.

6    Q.      And how many hours of access to yard per week do they

7    receive?

8    A.      Per our regulation they're supposed to receive ten

9    hours a week minimum.

10   Q.      Other than in Pelican Bay, how do inmates receive

11   that yard?

12   A.      There's two different types of yards we operate.

13   Primarily, we operate the small management yards or the

14   individual exercise modules, which are one and the same, it

15   is just terminology.

16           That is where the inmate would go out from the

17   housing unit -- be escorted from the housing unit to these --

18   we have big complexes of these small management yards.

19           If you would like me to describe them, I can describe

20   them?

21   Q.      Sure.

22   A.      Generally, they're made out of -- you know, exact

23   measurements, I can't tell you.  I think there are some

24   variances in the measurements, but they're all pretty

25   consistent.  But it is a large concrete pad.  It's totally

3284

1    enclosed with fabric, similar to large gap -- not chain link,

2    but very similar to that.

3         It is not as tight as our expanded metal with our

4    holding cells.  They have -- when I say totally enclosed, it

5    is all four sides and the top to prevent the person from

6    climbing out.  Part of it is covered with a shade-type

7    material to protect from the sun and elements.

8         It has a toilet and sink within there.  Each of

9    the -- in the security housing units, all the -- all of the

10   small management yards have now a pull-up bar installed

11   within them.

12        But again, there's large groups of these which the

13   inmate, if he's got a cellmate, they could go out together.

14   If they do not have a cellmate, they would occupy that area

15   by themselves.

16   Q.      When inmates in the SHU are sent to a small

17   management yard for exercise, do they all go out as a unit?

18   A.      Yes.  Yes.

19   Q.      Are they --

20   A.      If I understand, I believe you are asking do they go

21   out in large groups?

22   Q.      Yes.  That's what I'm asking.

23   A.      Then they're separated into the individual modules.

24   Yes, that's what I mean.

25   Q.      And are the individual modules set up next to each

3285

1   other?

2   A.      Yes.  They're all big groups of them.

3   Q.      So the inmates may communicate with each other from

4   within the individual modules?

5   A.      And they do.

6   Q.      To your knowledge do inmates in the Pelican Bay SHU

7   exercise in the same manner?

8   A.      No, they do not.

9   Q.      How do they exercise?

10  A.      As I described the units earlier, each of the pods,

11  which consists of eight cells, connected to each of these

12  pods is an individual exercise yard.

13          It is -- it's larger than the -- as far as

14  dimensions, it is larger than what I described as the

15  individual exercise modules for the SNY.  However, it is all

16  concrete constructed so the inmate -- it still has the

17  fabric -- the metal fabric roof and half of it is covered,

18  again to protect from the elements.  However, they don't have

19  the visibility that the inmates within the other three SHUs

20  have.

21  Q.      And when inmates in the Pelican Bay SHU go to yard,

22  do they attend yard alone?

23  A.      Or with their cellmate.

24  Q.      And because the yard is enclosed, they cannot

25  communicate with other mates while at yard; is that correct?

3286

1    A.      You would think so, but actually they do.  They call

2    it the drain phone.  They communicate through the drain.  All

3    the drains are connected, and they'll actually kneel down and

4    talk through the drain.

5    Q.      Are inmates in SHU units other than Pelican Bay

6    escorted to yard?

7    A.      Yes.

8    Q.      And in Pelican Bay are they escorted?

9    A.      No, they're not.  The cell door is simply opened and

10   from the control station the officer would announce that it

11   is inmate X's yard time, and he would proceed out to the

12   yard.

13   Q.      Were you employed with CDCR when small management

14   yards began to be implemented?

15   A.      Yes, I was.

16   Q.      And to your knowledge, did the implementation of

17   small management yards affect the ability to provide inmates

18   with more yard time?

19   A.      Actually, they did.

20   Q.      Why is that?

21   A.      At that time we were going through -- we had quite a

22   few incidents occurring within our group exercise yards, as

23   well as a lot of inmates that necessitated, based upon

24   particular enemy concerns or safety concerns they were

25   having, whether within the SHU or within the administrative

3287

1   segregation units, and they were not able to participate in
2   the group yards.
3          There is only so many hours per week we can operate
4   those group yards, and we could only operate a total of eight
5   groups yards within if you have two exercise yards per
6   housing unit.  So what it was resulting in was the majority
7   of inmates would be assigned to the group yards, and we would
8   strive to get them their ten hours.  However, the inmates
9   that were not assigned to the group yards and were assigned
10  to walk alone, we were drastically falling behind in
11  providing for them their ten hours a week.
12  Q.     I believe you stated earlier, but I want to clarify,
13  does the security housing unit in Pelican Bay, inside the
14  cells is there a window to the outside?
15  A.     No, there's not.  There is a window in the general
16  pod.  The eight cells, four on the lower, four on the top,
17  they would look out into a common area.  However, above that
18  common area is a skylight.  But there is no direct sunlight
19  actually from the cells to the outside.
20  Q.     And in the other security housing units is there a
21  window and direct sunlight?
22  A.     Yes.  Yes, there is, at the rear of the cell.
23  Q.     Okay.  I would like to talk a little bit about
24  indeterminate SHU terms.
25          First, what is an indeterminate SHU term?

3288

1  A.      An indeterminate SHU term is when a person is

2  sentenced to the SHU by the ICC.  However, they're provided

3  an indeterminate sentence which means that there is no

4  minimum eligible release date established by the committee so

5  they are reviewed everyone 180 days or six months and

6  reviewed for release from the SHU.

7  Q.      Under what circumstances is an inmate assessed an

8  indeterminate SHU term?

9  A.      There can be a couple.  One case, and probably the

10  most common that we're moving away from now with our new gang

11  policy, is when a person was validated as an affiliate of one

12  of our prison gangs, then just based upon that validation

13  housing would be determined.  And the determination would be

14  an indeterminate security housing unit term until they became

15  inactive, paroled or debriefed from the gang.

16       Another reason that a person might be assessed an

17  indeterminate SHU term is for repeated behaviors to where the

18  assessment of the SHU term has not been effective.

19       Generally, we'll see this in the SHU.  As the person

20  comes up for their minimal eligible release date review,

21  which is 45 days prior to their MERD, as the person comes up,

22  if they've had multiple SHU terms, multiple participations in

23  a riot within a five-year period of time, then the committee

24  has the options of assessing an indeterminate SHU term.

25       And the third is when a person, there's no other

3289

1   housing, there is no other least restrictive or less

2   restrictive housing that we can safely release the person to

3   whether because they have enemies in every single institution

4   or if they have safety concerns that are not acknowledged by

5   the individual.

6           And placement in the SHU for an indeterminate term

7   for these individuals actually has to be done at my level as

8   director, as part of the Departmental Review Board, which I

9   chair.

10  Q.     And what proportion, if you know, of inmates serving

11  indeterminate SHU terms are there as a result of gang

12  affiliation?

13  A.     I would tell you probably -- this is a guesstimate,

14  but probably about 70 percent of our inmates within the

15  security housing unit right now are the result of the

16  indeterminate SHU term based upon affiliation with being

17  validated affiliates, members or associates.

18  Q.     And to your knowledge are Coleman Class Members

19  serving indeterminate SHU terms?

20  A.     Coleman Class Members can serve indeterminate SHU

21  terms as either a result of any of the factors which I

22  described.

23  Q.     And as you know and the court knows, an EOP inmate

24  serving an indeterminate SHU term would serve it at the PSU;

25  isn't that right?

3290

1    A.        That's correct.

2    Q.        So you mentioned the step-down program earlier.  What

3    is the step-down program?

4            The step-down program is our pilot program.  We are

5    actually moving toward the promulgation of that pilot into

6    regulations as we speak.

7            However, we cannot call it a revision of our gang

8    policies or our gang management policies.  It is actual

9    reform.  We have moved very far away from what we have been

10   doing for the past 30 years.

11           And rather than -- I'll try to make this quick, I

12   guess, if there is a quick way to do this.

13           Our previous policy talked, as I stated earlier, that

14   if you were validated as an affiliate, a member or associate

15   of a prison gang, your housing was determined based upon that

16   validation and the determination was the security housing

17   unit.

18           The only way to get out of that security housing unit

19   was to debrief, parole or to be deemed inactive, which there

20   was no documentation of continued affiliation, not activity,

21   but affiliation for a six-year-period, in which case you

22   would appear before the Departmental Review Board for

23   consideration for release.

24           The new policy has moved away from that.  While we

25   still have the validation process, although there has been

3291

1    revisions with that process, housing is no longer determined

2    by validation alone.  There has to be a behavior that has

3    been committed and it has a nexus and tie to promotion of the

4    gang or furtherance of gang activity.

5          So simply stabbing an inmate might put you in the

6    SHU, however, it would not put you in the step-down program

7    unless there was a direct nexus and link to that being tied

8    to gang activity, in which case the person would go to the

9    step-down program.  And they're able to work their way out of

10   the step-down program based upon positive behaviors and

11   participation in our programs that we're establishing.

12   Q.    What I hear you saying is that inmates are no longer

13   automatically placed in the SHU as a result of gang

14   validation; is that correct?

15   A.    Associates are no longer placed directly into the SHU

16   as result of validation alone.

17   Q.    With the implementation of this new policy, how does

18   it affect inmates who are already in the SHU as a result of

19   gang validation?

20   A.    Well, because the new policy doesn't talk about what

21   to do with those particular inmates, what we're doing right

22   now is we're actually doing case-by-case reviews of every

23   inmate who is in the SHU right now indeterminately based upon

24   validation.

25         And we are looking at their cases.  And because the

3292

1  step-down program can be completed in four years, but it can

2  also be completed in as little as three years for positive

3  behavior, what we're doing is we are looking at their central

4  file and all the information and their behavior for the past

5  four years.

6        And dependent upon if they have any behaviors -- the

7  first thing we do is determine if they have any behaviors.

8  If they do have any behaviors that have a nexus to a gang --

9  we're talking serious behaviors, not talking about somebody

10  having their name in their cell on a roll call list or

11  something, we're talking about true behaviors -- the new

12  policy actually says that you have to be found guilty of a

13  rule violation report.  So there is added due process.  It's

14  pretty progressive specifically compared to where we were

15  yesterday.

16        But once we determine there was a behavior, we look

17  at when it occurred.  So if it occurred prior to four years

18  ago or beyond that four years, they're released to step five,

19  which is general population for a year of monitoring.

20        If it happened within the past four years, we would

21  look, and depending upon one year ago, two years ago, three

22  years ago or four years ago, that would determine which step

23  that person is placed in.

24        Once we've reviewed everybody who is in the SHU right

25  now for gangs, there will no longer be any case-by-case

3293

1  reviews because the new policy will have taken hold.  And it

2  is taking hold on anybody validated today and on the general

3  population.

4  Q.    When do you anticipate completing the case-by-case

5  reviews?

6  A.    We just started reviewing.  We were solely reviewing

7  associates only, but we've since incorporated members into

8  this process.  And what we've found is some of these members

9  have been in the SHU for quite some time, and there is a lot

10  of information to go through.  And they are very tedious.

11        We want to be very careful.  Kind of like how you

12  launch is how you fly.  And we want to make sure we're doing

13  the right thing with each of these individuals and giving

14  them every bit of due process they have coming.  So these

15  hearings are generally lasting anywhere from two to three

16  hours.

17        So at this point we have reviewed probably really

18  close to 600 cases.  That includes the ones that are in Ad.

19  Seg. as well because we said do not send a person to the SHU

20  if you're in Ad. Seg. because we're doing it by, I guess for

21  lack of a better term, seniority, based upon your validation

22  date.  And why send a person to the SHU only to have them go

23  to the bottom of the list when perhaps applying this new

24  policy they wouldn't even have to go to the SHU.

25        So that over 600 number includes the SHU inmates as

3294

1    well.  And what it has done has resulted in approximately 60

2    percent total people being released to the general

3    population.

4            But your question was how long will it take?

5    Q.        Uh-huh.

6    A.        The team -- special projects team doing the

7    case-by-case reviews, which is a chaired by two former

8    directors of the Division of Adult Institutions, they had to

9    take a hiatus because we needed -- we saw the need to

10   promulgate the rules.  So they had to get that straight.

11           They're actually at Pelican Bay today, and they have

12   been there this week doing reviews of members.  We hope to

13   get to about 100 a month.  So we've probably got about

14   another -- we figured when we were at 588 we were at 19

15   percent complete.

16   Q.        Uh-huh.  Okay.  And you said that you were at 600; is

17   that right?

18   A.        We're a little over 600 right now, if I'm going to

19   venture a guess based upon last week and this week.

20   Q.        So you're roughly 20 percent complete?

21   A.        Roughly 20 percent complete.  But we do hope to get

22   up to 100 a month so we are hoping within two years.

23   Q.        How long ago did you begin?

24   A.        We actually began in November of last year, but it

25   was very slow to ramp up because we've never done this

3295

1    before.  We had to lean how to do this.  So we've had some

2    starts and stops.

3          But at the same time -- and we're also getting other

4    people involved in this.  But because consistency is so

5    important, that we want the same philosophies and the same

6    set of rules applied statewide, we're very careful with --

7    you know, we just don't want to just go and then have

8    mistakes made or people retained in SHU that don't need to be

9    in the SHU that don't meet the critter per policy.

10   Q.     And then just to bring these two points together, I

11   think you said 60 percent of the inmates you have reviewed

12   have been released to general population so that would be 60

13   percent of 600 reviews?

14   A.     Roughly, yes.

15   Q.     Okay.  In terms of the step-down program, is this

16   a -- you described, I think, in general terms what it is.

17   But is this a program by which an inmate earns release from

18   the security housing unit?

19   A.     Absolutely.  That's exactly what it is.  Through

20   their positive behavior.

21   Q.     And you said that the minimum term is three years; is

22   that right?

23   A.     That's correct.

24   Q.     And after three years, if an inmate serves the

25   minimum term, he'll be released to general population; is

3296

1    that correct?

2    A.      It's designed that each of the four steps is a year.

3    However, an inmate can complete Step 1 and Step 2 in six

4    months for each of those two steps if they are participating

5    in the very minimal requirements and don't have any behavior

6    with gang nexus.

7    Q.      And as the inmates progress through the step-down

8    program, do they get increased access to privileges?

9    A.      Absolutely.  There's incentives for increasing and

10   progressing through each of the steps.

11          I could go into those briefly, but increased property

12   privileges, increased canteen privileges, increased --

13   Q.      Phone calls?

14   A.      Phone calls.  Thank you.

15          MR. BIEN:  Your Honor, just on relevance, my

16   understanding is this doesn't deal with prisoners with mental

17   illness.

18          Can we confirm whether it does or not?

19          MS. D'AGOSTINO:  Your Honor, Mr. Stainer just

20   testified that inmates that are designated CCCMS can serve

21   indeterminate SHU terms.

22          MR. BIEN:  The question is whether the step-down

23   program addresses prisoners with mental illness.

24          MS. D'AGOSTINO:  They're eligible to participate.

25          THE COURT:  Why don't you guys go out in the hall and

3297

1    talk, and we'll have the witness testify.

2         Mr. Stainer, there appears to be some question, but

3    I'm not sure why, that the step-down program applies to

4    everybody in the SHU including those who are mentally ill.

5         Is that correct or incorrect?

6         THE WITNESS:  That's absolutely correct, Your Honor.

7         THE COURT:  All right.  As to the EOPs, does the

8    program apply to them at all?

9         THE WITNESS:  We've had a couple of validated people

10   that were in the PSU on an indeterminate, and we reviewed

11   those rather quickly.  At this point I don't believe it

12   resulted in their release.

13        And at this point I don't think, and I might

14   misspeak, but I don't believe we have any in the PSU right

15   now.

16        MS. D'AGOSTINO:  May I continue, Your Honor?

17        THE COURT:  Yes.

18   BY MS. D'AGOSTINO:

19   Q.    So I think I reached the end of my questions about

20   the step-down program.

21        I would like to ask you a little bit about

22   administrative segregation.

23        Could you just generally describe the conditions in

24   administrative segregation?

25   A.    Administrative segregation -- you talking physical

3298

1    design or --

2    Q.      Yeah.  Let's start with physical design.

3    A.      Most of our administrative segregations are of the

4    270-design, specifically for class members.  The areas where

5    class members can't go, such as our stand alone Ad. Segs.,

6    are totally different.

7            But our 270 is Ad. Seg., but we also have some very

8    unique designs from our older construction.  So they would --

9    you know, the 270-design Ad. Seg. cells would be exactly like

10   any other 270-design general population cell.  Same

11   dimensions with the desk, the bunks, the sink and commode

12   combination unit, window to the outside, window in the door

13   or adjacent to the door -- or not or but and/or adjacent to

14   the door, with a light, ventilation.  Some doors are solid

15   steel with windows.  Some doors are the Arizona-style doors.

16   Q.      In a 270-design facility, can inmates see each other

17   from within their cells?

18   A.      Yes, they can, from one coroner to the next.  Maybe

19   not see the person next door to you, however, they can look

20   from B Section to A Section, A Section to C Section.  And

21   it's just based upon the three walls of the 270-design unit.

22   Q.      And would the -- in cells that have a closed cell

23   front, would the communication level be the same as in the

24   security housing unit?

25   A.      As far as how staff or other persons might

3299

1 communicate with the inmate?

2 Q.      Yes.

3 A.      Something I didn't speak to earlier, some of our

4 earlier construction, just the solid steel doors -- take

5 Tehachapi, for example.  It is a solid steel door with a

6 window within the door.  And again, having worked there, I

7 can tell you I have personal experience that I can have a

8 conversation with the inmate in just this tone of voice.

9        A lot of our other type units built after Tehachapi,

10 they've actually built -- it is not a speaker, however, it is

11 like a baffle system.  It is a little, I guess, cover with

12 perforated holes.  If somebody were to look at it, they might

13 think it is actually a speaker.  But that is to facilitate

14 easier communication through the cell door.

15        THE COURT:  Why would you do that since it is so

16 simple to talk just the way you are talking right now and

17 everybody will understand you?

18        THE WITNESS:  I don't know why they did that, sir.  I

19 wasn't involved in the design.

20        THE COURT:  Just some peculiarity which has no

21 purpose?

22        THE WITNESS:  I think we've -- sometimes our

23 technology defeats our own purpose a lot of times or striving

24 for technology.

25 BY MS. D'AGOSTINO:

3300

1    Q.      Mr. Stainer, do the inmates also -- in administrative

2    segregation the inmates also exercise in a small management

3    yard; is that correct?

4    A.      In almost all cases, yes.

5    Q.      Are you familiar with the term "small management

6    cell"?

7    A.      I'm familiar with "management cell."

8    Q.      I'm sorry.  Is it -- I might have misspoke.

9            Are you familiar with the term "management behavior

10   cell"?

11   A.      I guess it's -- I think I know what you're referring

12   to, yes.  I think it's just different terminology.

13   Q.      Could you please describe what that is?

14   A.      A management cell -- and I think to go back to this,

15   was if an inmate is displaying certain behaviors within his

16   cell, he could be eligible to be placed within a management

17   cell.

18           The management cell has been modified in most cases.

19   I know from my -- I'll speak to my personal experience at CCI

20   Tehachapi.  Within one of the units we have five cells that

21   have actually been modified, and the bunks, the shelving

22   units and desks have been removed from these cells.  The

23   toilet and sink combination unit still remains, of course,

24   for hygiene purposes.

25           But if an inmate has displayed certain sets of

3301

1    behaviors, and most commonly when they are actually

2    destroying items from within their cell -- inmates have been

3    known to do some pretty serious behavior such as cutting up,

4    breaking the windows.  Actually, it is amazing, I don't know

5    how it happens, but I've seen inmates actually remove the

6    articles from the walls of this type cell.

7         And so an inmate could be placed in there

8    temporarily.  And the placement authority could be as low as

9    lieutenant.  But again, it would have to be reviewed by the

10   captain every 24 hours, for upwards of 72 hours.  So usually

11   they are placed in those cells with no property.

12   Q.     When you say "upwards of 72 hours," what do you mean?

13   A.     For a 72 hour limit.  For example, at Tehachapi we

14   had a strict set of procedures that managed or outlined the

15   procedures relative to the placement of an inmate.

16        It defined what type of behaviors specifically would

17   result in the placement of this person into this cell.  So

18   what that purpose was is to, you know, prevent this from

19   being utilized as a punitive measure.  It was utilized for a

20   purpose, to stop a set of behaviors.

21        It's who had the authority to place the person there,

22   for how long, under what circumstances, who had to

23   subsequently approve that, who could extend it and for how

24   long and for what reasons, and, you know, then how the person

25   was removed.

3302

1              And ultimately, if the behaviors continue -- I did
2      have one inmate that spent upwards of two months in one of
3      these cells.  He had certain property items with him, but
4      literally, every time we moved him out of the cell, he was
5      tearing things off the walls.  And we could not have that.
6              So, you know, again, once he made the commitment that
7      he was done, we removed him and monitored his behavior.  But
8      again, it was designed to stop a set of behaviors.  And
9      therefore -- and again, with a set circumstances of, you
10     know, why we can place them in there and who could authorize
11     it and who had to approve it.  And then they would be
12     reviewed every 24 hours for release.
13     Q.     And this set of procedures, was this set forth in the
14     local operating procedure?
15     A.     Yes.  However, you know, one of the concerns of mine
16     that I've had is the simple fact that we -- you know, this is
17     something that I think we have to be consistent statewide on.
18     So I've actually asked for everybody's operational procedures
19     with regard to the management cell, and security restrictions
20     as well, which is another subject.  Because I want to be
21     consistent throughout the state.  I don't want to have one
22     institution doing one set of rules while another one is doing
23     something else.
24             And each of the associate directors right now is
25     reviewing those procedures from their mission, and then we'll

3303

1    have a meeting with the deputy director.  And we're going to

2    set that forth statewide formatted because it is not in the

3    Department of Operations Manual.

4         What we'll do is similar to what we did with the

5    contraband surveillance watch.  And we will have a set set of

6    formatted operational procedure where there can be some

7    site-specific, just based upon physical plants, but there

8    cannot be any deviation from the core of that procedure.

9    Q.     I would like to talk a little bit about the new

10   nondisciplinary segregation rules that were made effective on

11   September 24th, 2013.

12        Are you familiar those?

13   A.     I am.

14   Q.     What efforts have you made to train CDCR staff with

15   respect to these new regulations?

16        I'm going to back up.

17        Can you just briefly describe for the court what we

18   are talking about.

19   A.     When an inmate is placed in Ad. Seg. based upon a

20   certain set of circumstances, basically where his behaviors

21   have not resulted in his placement into Ad. Seg.

22        For example, he's got an enemy concern, like he was

23   transferred to an institution and it was determined he has an

24   enemy there, which could happen, and we cannot let him remain

25   on the unit.  However, he's really done nothing wrong that

3304

1    would result in his placement in Ad. Seg.

2            Or something that happens quite frequently with our

3    population and with the large number of staff we have, an

4    inmate rolls up, and the staff member goes, Wow, that's my

5    long-lost childhood friend. It is not appropriate. It puts

6    that inmate in a situation if the other inmates find out he's

7    associated with a staff member.

8            So, again, the inmate hasn't really done anything

9    that would warrant his presence. He's not really a threat

10   to, you know, overall security, but it could result in a

11   threat to himself so he has to be placed in Ad. Seg. to keep

12   him safe.  However, we don't want to -- we're going to afford

13   him certain privileges, credit earning over and beyond what

14   the inmates who through their own behavior has resulted in

15   their placement in Ad. Seg.

16   Q.      To be clear, those inmates are awaiting placement on

17   a SNY yard?

18   A.      That is not always the case at all.

19   Q.      Can you explain why not?

20   A.      If I have a general population yard, and an inmate

21   has an enemy, that doesn't mean he can't go to another

22   general population yard.

23           The inmate may have safety concerns within just --

24   you know, very unique to that facility. But that doesn't

25   necessarily mean -- again, we would have all types of inmates

3305

1    within this population.  And safety concerns doesn't warrant

2    or always mean sensitive needs yard.

3    Q.      Thank you for that clarification.

4            So what efforts have you made to train CDCR staff

5    with respect to these new regulations?

6    A.      Upon release of the regulations, I had a conference

7    call with all the wardens.  And I advised them as to what the

8    regulations were and what the expectations were with regard

9    to identifying this new designation of a segment of our

10   population.

11           And we're presently monitoring through our COMPSTAT

12   Ad. Seg. Report the numbers so we know how many we have.  And

13   we're monitoring the length of stay so we can, you know, make

14   sure they're not staying in Ad. Seg. longer than they have to

15   or -- I don't know how I can make sure within my expectations

16   of, you know, closing out case work and moving these folks as

17   quickly as possible.

18           I'm also working with them to make sure -- it is

19   relatively new, it is brand-new, so we talked about it at our

20   wardens meeting we had in November, late November the week

21   before Thanksgiving.  We had a session devoted solely to that

22   where we talked about it and, again, reiterated the

23   expectations, answered questions and concerns.

24           It is relatively new to our staff out there, a little

25   bit of a culture change, so, again, you know, there is going

3306

1  to be a little bit of a learning curve as to what we mean

2  when we say "property commensurate with." We actually have a

3  property schedule of what specific property items they're

4  allowed within that Ad. Seg. And, you know -- but it will

5  take us a minute to make sure we iron all the wrinkles out of

6  it.

7  Q.    Have you instructed the wardens to report back to you

8  as to their efforts to implement the new policy?

9  A.    Not to my specifically, but Miss Kathy Allison and

10  Mr. Kelly Harrington, the other deputy director.

11  Q.    To return just briefly to the security housing unit,

12  are inmates double celled in the security housing unit?

13  A.    Each of the SHUs do have a percentage of their

14  population that are double celled when safe to do so.

15  Q.    Okay. And the same question for Ad. Seg.?

16  A.    Absolutely.

17         Most inmates want a cellmate.

18  Q.    To the extent that you can generalize, to what extent

19  do custody staff collaborate with mental health clinicians

20  regarding the inmates in segregated housing?

21  A.    I think we collaborate greatly. It's difficult for

22  either one of our disciplines to do our jobs separately when

23  we rely upon each other to do the job in total.

24         From my own personal experiences within the security

25  housing unit and the administrative segregations, the daily

3307

1    roundings, great relationships with the psych-techs.

2         Today we have our morning -- they call it different

3    things, but, you know, the morning check-in meeting.  Some

4    people call it the huddle.  That's where the clinicians meet

5    with the supervisors of the administrative segregation units

6    and they talk about the inmates that might have been -- they

7    share information, what the staff are observing, what the

8    clinicians know.  And again, you know, the staff know the

9    inmates.  They get to know them to the point that they can

10   detect changes.

11        Most of -- quite a bit of the information, in my

12   experience, is shared with the clinicians that might signify

13   that an inmate is having some issues and to go talk to an

14   inmate.

15        You know, it is not 100 percent.  You know, nothing

16   is.  You know, we strive, you know, to do a good job.  And we

17   can always do a better job.

18        However, you know, the partnerships with the other

19   disciplines within CDCR, whether medical or dental or mental

20   health, the education, the vocation, we can't succeed in our

21   mission, you know, if we're so compartmentalized.  That's one

22   thing I'm trying to drive at.  And where we are successful is

23   where we see that really good partnership.  I think it is not

24   100 percent.  However, it's 95 percent good in most cases.

25        MS. D'AGOSTINO:  A moment, Your Honor.

3308

1          (Cocounsel confer.)

2    BY MS. D'AGOSTINO:

3    Q.      Mr. Stainer, you were present yesterday when

4    Dr. Austin testified; is that correct?

5    A.      I was.

6    Q.      You heard him testify that in his opinion

7    disciplinary segregation terms should last no longer than 30

8    days; is that right?

9    A.      I believe that's what he was referring to, is the --

10   and he did state something like that, 30 to 40 days at the

11   maximum.  But I was unsure as to exactly what he was speaking

12   to, whether it be the -- because I think he talked about

13   three things, long-term segregation, the disciplinary

14   segregation, and I believe he mentioned a pretrial or

15   prehearing segregation, you know.  But I think he was

16   referring to more like a punitive Ad. Seg. or segregation,

17   and I thought he said 30 to 40 days.

18   Q.      In your opinion would a 30- to 40-day disciplinary

19   segregation term have an effect on institutional security

20   within CDCR?

21   A.      I think if we had as a blanket maximum term that any

22   person could be segregated for any type of behavior

23   regardless of what the behavior was, I think that would be

24   detrimental to the safety of all the staff and inmates, as

25   well as the security of the institution as a whole.

3309

1          I have seen firsthand -- I used to do case work in

2     the administrative segregation and the security housing unit

3     as a counselor supervisor.  And I have seen firsthand, again,

4     inconsistencies throughout the state as far as application of

5     discipline.  And where we've had instances of a revolving

6     door to the Ad. Seg. where, you know, the inmates were not

7     held accountable for their behaviors, the behaviors actually

8     became more serious and more frequent.

9          I think, you know, discipline is an important part

10    of, you know, the behavior modification and accountability.

11    It's a very important part of the overall security and safety

12    of all inmates.

13    Q.     Where did you have that experience?

14    A.     I was a CC-II at the California Correctional

15    Institution in Tehachapi over the administrative segregation.

16    What occurred is there was a very significant riot occurred

17    at another prison in which numerous staff were assaulted by

18    several different inmates at the same time.

19          Because of the significance of the assaults on staff,

20    which included just, you know, physical battery with fists,

21    to stabbing assaults, this group of ten inmates were placed

22    on a special transport immediately and transported to the

23    Tehachapi Ad. Seg., and I was responsible for their case

24    work.

25          What I saw was in each of these ten inmates' files

3310

1    was a pattern of serious misbehavior, findings of guilt, but

2    not assessing SHU terms, assessing and suspending

3    repetitively.  In essence, my words, it sends a message that

4    you don't take that type of behavior seriously, which, again,

5    what we saw was the repeated misbehavior.

6            And it seemed to grow more serious to the point that

7    each of these ten inmates participated in some very

8    significant assaultive behavior against the staff members.

9    Q.       And to be clear, inmates currently assessed SHU terms

10   have the ability to earn early release through good behavior;

11   is that correct?

12   A.       That's correct.  You know, one thing that we didn't

13   talk about is the option of the Classification Committee to

14   suspend a SHU term.

15           When you have an inmate that is assessed a long SHU

16   term, first and foremost is the minimal eligible release date

17   where they receive 75 percent so you have good behavior

18   credits built into that.  So if they exhibit, you know,

19   positive behavior, or at least no serious negative behavior,

20   they only do 75 percent of their security housing unit

21   term.

22           But another option that the committees have, and do

23   often exercise, is the option of suspending a SHU term.  So

24   when an inmate has exhibited that good behavior, while there

25   is no guidelines that state that at this point you will do

3311

1  this, what we see is wardens, specifically the wardens of the

2  security housing units, exercising their discretion when it

3  comes to reviewing the inmate's behavior.  And when there is

4  none, quite frequently we're suspending the remainder of the

5  SHU term.

6  Q.      You're aware plaintiffs' expert, Dr. Haney, testified

7  that in his opinion CDCR uses segregated housing to manage

8  the mentally ill population.

9          Are you aware of that?

10 A.      I believe I am.

11 Q.      Do you agree with that statement?

12 A.      Maybe when I first started in this career, maybe we

13 did.  I don't see that happening any longer.  We have such

14 good treatment going on now within our general populations,

15 and we have our EOP buildings and units and programs going on

16 that -- again, placement in our administrative segregations

17 is strict criteria.  Your presence within the general

18 population, similar to what Dr. Austin testified to

19 yesterday, I saw many similarities to what we do with what he

20 stated, that an inmate's presence, the only reason he's

21 placed in administrative segregation is if his continued

22 presence within the general population poses a risk or a

23 threat to his safety, the safety of other inmates, staff or

24 the security of the institution.

25          THE COURT:  That's not quite true.  You have the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3312

1    problem of people being released -- I'm sorry.  I don't mean

2    to interrupt you, but it just doesn't fit as far as I can

3    tell, and I suspect that you can explain it to me.

4           We have people being released from their SHU terms.

5    And if they're mentally ill, it may take as long as 60 days

6    to get them out apparently because we don't have buses.

7           I mean, it isn't that people are being moved rapidly

8    and efficiently.

9           THE WITNESS:  We do have some waiting times of the

10   inmates being released, and that's not in all cases.

11   However, if there is no appropriate housing for them while

12   waiting for the transfer, then, unfortunately, they do have

13   to spend their time in Ad. Seg., sir.

14          That is something we are monitoring.  I won't tell

15   you it is perfect today.  I won't tell you that it is great

16   today.  However, that is something that I think we can

17   improve upon, and we do have that issue so...

18          But, again, if that inmate can be released -- you

19   know, for example, at Tehachapi, Tehachapi has three

20   sensitive needs yards in addition to the security housing

21   unit.  If the person is going to a general population, I

22   can't -- there is nowhere I can put him.  If he's a Level IV

23   and requires a certain custody level, then he does pose a

24   risk even if he's a SNY going to Level III based upon the

25   type of construction and the type of security that they have

3313

1    at that area.

2         But if he's a Level III or Level II SNY inmate and

3    awaiting transfer to that location, I can release him there

4    at Pelican Bay as long as the inmate's not SNY.  And the

5    majority of them are not.  But once that person is released,

6    they have the general populations there at Pelican Bay, and

7    that person can go out there and await transfer to the

8    appropriate location.

9         THE COURT:  All things are possible.

10        THE WITNESS:  Yes, sir.

11        THE COURT:  But what the new regulations provide is

12   that mentally ill prisoners can take as much as 60 days after

13   they have been appropriately classified to get to where

14   they're supposed to go.  That's really, you know, not what's

15   possible, but that's apparently what goes on.

16        Now, I said to Miss Allison -- maybe inappropriately

17   because maybe I was being more direct than I should have

18   been -- it sounds simply like a bureaucratic failure.

19        By that I mean the pieces are not fitting together

20   smoothly.  And if that is right -- I mean, I understand that

21   administrative segregation is better than chocolate pie, but

22   assuming that people don't want to go there, and they want to

23   get out for some odd reason, keeping them there 60 days

24   because the bureaucracy hasn't managed to fit together seems

25   like a very serious problem.

3314

1          THE WITNESS:  I can tell you, based upon what I know

2     as a director, and what I have been exposed to, and, you

3     know, kind of indoctrinated into the very, very complex

4     process of our transfer -- our transportation, we have plenty

5     of buses, we have plenty of staff.  But we're talking about

6     the movement of multiple inmates over, you know, 35

7     institutions, to include, you know -- and to try to fit

8     everybody into the box to move that inmate from Pelican Bay

9     to Chuckawalla, all the way across the state, it's very,

10    very -- I don't know what else to say except complex.

11         We have folks that put this jigsaw puzzle together

12    every week, trying to see how we're going to move 2000

13    inmates around this state while, you know, keeping in mind

14    that the staff can only work, per Department of

15    Transportation Rules, for the safety of the citizens on the

16    roads, can only work so many hours.

17         How do we make this work?

18         I tell you, I'm amazed how the staff do make this

19    work as it is.  It is easier today based upon our population.

20    I used to liken it to, you know, prior to when we were

21    severely overcrowded as trying to take one of those puzzles

22    that have the little squares and one empty square and trying

23    to work that except the one empty square was only a half a

24    square, you know, where we had Ad. Seg. overflow, with guys

25    waiting on SHU beds.

3315

1          It is incredibly complex, and they do this on a

2     weekly basis, put together our schedules of how we're going

3     to get these inmates moved through out the state.

4          Can we do better?

5          Well, I'm not going to sit here and tell you we

6     can't, Your Honor.

7          THE COURT:  All right.

8          Miss D'Agostino.

9          MS. D'AGOSTINO:  I have no further questions, Your

10    Honor.

11                     CROSS-EXAMINATION

12    BY MR. BIEN:

13    Q.    Mr. Stainer, following on the court's question, if

14    the population was reduced further and your capacity was

15    brought down, wouldn't it be easier to move people more

16    rapidly to the proper bed?

17    A.    I would only have to say -- I mean, with a guess,

18    yes.  I mean, I would assume so.

19    Q.    There are still shortages, for example, of SNY beds

20    at certain levels that are resulting in prisoners with mental

21    illness being housed in Ad. Seg. today?

22    A.    I can think of -- again, we do have some population

23    issues at one of our institutions, yes.

24    Q.    Which institution?

25    A.    I would like to say Kern Valley, Level IV, SNY.

3316

1   Q.      Is that program full?

2   A.      It's not full.  However, it's probably one of our

3   most full units.  I don't know exactly what the population is

4   today, sir.

5   Q.      Miss Allison presented charts showing a growing

6   number -- growing percentage of CDCR population requiring SNY

7   yards.

8           Are you familiar with that information?

9   A.      I think I might have seen the chart.

10  Q.      Okay.  Is it correct that there has been a

11  determination that there needs to be a growing percentage of

12  housing in CDCR for SNY purposes?

13  A.      I think there has been.  Is there right now existing

14  today?  You know, we have a group of people that are, you

15  know, solely devoted to projecting what our populations will

16  be and what our ever needing changes -- or what our ever

17  needing changes are.

18          The results of that are just, you know, projecting

19  the different growth with our SNY EOP.  And we recently

20  activated two new units, one at Valley State Prison, and

21  we're in the process of activating the one at Salinas Valley,

22  Level III, SNY EOP.  And that is a result of us continually

23  analyzing the population needs and then determining where the

24  conversions are necessary.

25  Q.      As you sit here today, is it your testimony that

3317

1    there is no need for any additional SNY beds, for example,

2    EOPs at any level -- custody level?

3    A.     I cannot testify to that today.  I cannot say that it

4    is or is not.  I don't have those figure in front of me to

5    show that there is a growing need or that we're right on the

6    money right now today, sir.

7    Q.     Where are the fall population projections?

8           It is now mid-December.  Aren't those usually

9    published and available to the public well before today,

10   December of the year?

11          MS. D'AGOSTINO:  Objection.  Beyond the scope of

12   direct.

13          THE COURT:  Overruled.  You may answer, sir.

14          THE WITNESS:  I know historically those have been

15   published.  I do not know exactly why they have not been

16   published as of yet.  That is not my division that does the

17   research to publish that information, nor would I make a

18   decision to publish or not publish.

19   Q.     Have you seen them?

20   A.     I don't know that I have.

21   Q.     Have you seen the mental health population

22   projections each -- there is a court order in this case, as

23   I'm sure you know, that the department will do population

24   projections of its needs for specific beds, including SNY

25   beds for the mental health population.

3318

1      Are you aware of where the mental health population

2 projections are that were due in the fall of 2013?

3 A.      I'm not aware, sir.

4 Q.      Are you involved in any discussions as to whether or

5 not those should be released?

6 A.      Myself personally?

7 Q.      Yes.

8 A.      No, I have not.

9 Q.      Have you looked at those to see whether or not there

10 are enough SNY beds currently planned to take care of this

11 population so we can get these guys out of Ad. Seg.?

12 A.      I have been involved in looking at -- this is not the

13 people that I referred to earlier that is responsible for

14 publishing the population projections.  However, I work with

15 my population management people who are a division -- or a

16 department within the Division of Adult Institutions to look

17 at what our needs might be.  And these are the same folks

18 that worked out the need for the Valley State and the

19 Salinas Valley EOP.

20      And to date they have not come forward to me and

21 stated that we need more SNY beds for any segment of our

22 population.

23 Q.      Do you know whether they're considering the most

24 recent population projections in making those determination?

25 A.      I know that this is a continuum of -- or a continuous

3319

1    process.  It is something that they just don't meet once

2    every quarter and say what do we need.  They are continually

3    analyzing the population trends, who is coming into the

4    department, who is at our reception centers, who is endorsed

5    for transfer, who can't transfer because of lack of beds, and

6    then making the appropriate recommendations up through me for

7    conversions of facilities.

8    Q.    You mentioned that you considered all SHU-able

9    offenses to be violent.

10          You have before you Defendants' Exhibit NNN.  If you

11    could, turn to page 163 at the bottom.

12    A.    Yes, sir.

13    Q.    Isn't it correct that SHU-able offenses include

14    refusal to accept assigned housing?

15          Isn't that correct?

16    A.    Yes.  However, I would like to state I believe my

17    testimony was the offenses contained on here are -- the vast

18    majority are violent offenses.  I didn't say all of them.

19    Q.    Okay.  So you agree that refusal to accept assigned

20    housing isn't violence?

21    A.    No.  That's -- that in and of itself is not violent.

22    That is one of the offenses I would say is why I stated in my

23    earlier testimony that not all these offenses are related to

24    violence.

25    Q.    Indecent exposure isn't violence?

3320

1    A.      I would tend to not necessarily agree with that

2    statement, sir.

3    Q.      Trafficking in drugs; is that violence?

4    A.      Trafficking in drugs has shown that based on what

5    results from the introduction of drugs within the prison

6    system that often violence, extortion, and other types of

7    very serious criminal-type behaviors is a direct result of

8    trafficking in narcotics and introduction of the drugs within

9    the institution.  So I would not agree that there's no

10   violence tied to that offense.

11          And indecent exposure, again, we have the

12   exhibitionism, which is a mental illness, but there's also a

13   degree of that which could be predatory, in which case

14   definitely that person poses a threat to the security of the

15   institution.

16   Q.      You talked about the factors in mitigation or

17   aggregation of a SHU term.  Those are set forth on 163 and

18   164, correct?

19   A.      Correct.

20   Q.      Mental illness is not a factor in mitigation of a SHU

21   term, is it?

22   A.      I don't believe it is specifically listed.  However,

23   you know, one of the things that we do for all CCCMS inmates

24   right now is anybody -- you know, it used to be just the EOPs

25   would automatically get the 115-MH.  However, now for

3321

1   SHU-able offenses the CCCMS inmates receive the 115.  We can

2   have that clinician weigh in.

3   Q.      Clinicians don't attend 115 hearings, do they?

4   A.      No.  Not unless they're called as a witness.  I heard

5   that.

6   Q.      And they participate by filling out the form -- the

7   mental health evaluation form?

8   A.      That's correct.

9   Q.      And the hearing officer has discretion to accept or

10  reject the clinician's recommendation on that form?

11  A.      They do have that discretion.

12  Q.      And have you tracked -- do you have, at headquarters,

13  have any tracking of the outcomes of those hearings as they

14  relate to mentally ill prisoners who are currently in the

15  SHU, how many of them had mental health recommendations

16  saying that they're not responsible because of their mental

17  illness?

18  A.      At this point, to my knowledge -- well, I know that

19  DAI does not have a centralized tracking for that.  I can't

20  speak to any other division.

21  Q.      You don't?

22  A.      No.  DAI does not.  Division of Adult Institutions.

23  Q.      Okay.  And so besides the tracking, do you personally

24  have any -- you have done these file reviews.  Do you have

25  any information to share today as to what percentage of the

3322

1  mentally ill prisoners in SHU in California had a mental

2  health evaluation saying they should not be responsible for

3  their conduct?

4  A.      I don't have that information.  No, sir.

5  Q.      And in doing your file reviews that you talked about

6  for people who are in the SHU, are you looking for that

7  factor?  Are you looking for mental health evaluations about

8  their conduct?

9  A.      Absolutely.  That would be one of the things that the

10  DRB would be looking at.  I personally have not done a

11  case-by-case review because we have our special projects team

12  doing that.  It is chaired by two former directors,

13  Mr. Giurbino and Miss Hubbard.

14  Q.      On what basis do you say they are looking for mental

15  health evaluations about these prisoners who are being

16  reviewed?

17  A.      Because it's one of the things they look at.  They

18  look at all circumstances with regard to any offenses or

19  behaviors that might have a nexus to the gang activity.

20  Q.      And the two you mentioned -- you thought two EOPs had

21  gone through this review process, correct?

22  A.      I believe that's the number.

23  Q.      And neither of them had been returned to the general

24  population?

25  A.      Actually, it's my -- it's my understanding that both

3323

1    of them had been released from the PSU.

2    Q.      All right.  I misunderstood you.

3            And where are they currently housed?

4    A.      I cannot tell you the specific location, but I would

5    assume they're within a EOP general population program.

6    Q.      This pilot program is not targeted towards Coleman

7    Class Members, is it?

8    A.      It is not targeted toward Coleman Class Members, but

9    if a Coleman Class Member falls within the categories,

10   they're not barred, they're included.

11   Q.      There is no prioritization that you should look for

12   Coleman Class Members to see whether they should get out

13   first?

14   A.      No.  We're looking based upon their validation date,

15   which is closely commensurate with their length of stay

16   within the security housing unit we found.

17   Q.      And the group of prisoners who are in the SHU with

18   indeterminate terms that you are looking at are people who

19   are there originally for being associates of gangs, correct?

20   A.      The first group we looked at was associates, correct.

21   Q.      And then you testified you have now expanded it to

22   include people who are validated as gang members?

23   A.      Correct.

24   Q.      Okay.  But you're not looking at people who may be

25   serving indeterminate SHU terms for reasons other than

3324

1    associations with gangs or being gang members in this pilot

2    project?

3    A.        No.  And I think the reason that is because the DRB

4    is the only entity right now that has the authority to

5    release a validated gang affiliate from the security housing

6    unit to include the inactive reviews.

7              All other indeterminates are reviewed every 180 days

8    by the Institutional Classification Committee.  They have the

9    authority to release that person based upon positive behavior

10   or conditions of retention being changed.

11             THE COURT:  Tell me, what is DRB?

12             THE WITNESS:  DRB is the Departmental Review Board.

13   It is chaired by the director level.

14             THE COURT:  It is 4:30.  We'll reconvene tomorrow

15   morning at 9:30.

16             MR. BIEN:  Your Honor, just so you know, I understand

17   defendants have Dr. Scott coming first thing in the morning.

18             MS. VOROUS:  Yes, that's correct, Your Honor.  He'll

19   be the first witness.

20             THE COURT:  All right.

21             (Off the record at 4:30 p.m.)

22                           ---o0o---

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6          I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9

10              IN WITNESS WHEREOF, I subscribe this

    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25