1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7         Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,

10

11        Defendants.

12   _____/

13

14

15                        ---o0o---

16

17                  REPORTER'S TRANSCRIPT

18                RE:  EVIDENTIARY HEARING

19              FRIDAY, DECEMBER 13TH, 2013

20

21                        ---o0o---

22

23

24

     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  KATHY L. SWINHART, CSR NO. 10150

```
 1                      APPEARANCES

 2                       ---o0o---

 3

 4   FOR THE PLAINTIFFS:

 5           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             315 MONTGOMERY STREET, TENTH FLOOR
 6           SAN FRANCISCO, CALIFORNIA  94104

 7           BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8           BY:  AARON FISCHER, ATTORNEY AT LAW

 9           BY:  JANE KAHN, ATTORNEY AT LAW

10           BY:  LORI RIFKIN, ATTORNEY AT LAW

11

12

13

14   FOR THE DEFENDANTS:

15            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
16            13OO I STREET
              SACRAMENTO, CALIFORNIA  95814
17
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
              BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
19
              BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
20
              BY:  MARTINE D'AGOSTINO, DEPUTY ATTORNEY GENERAL
21

22                       ---o0o---

23

24

25
```

1                        EXAMINATION INDEX

2                            ---o0o---

3   FOR THE PLAINTIFFS:

4       EXAMINATION:                                    PAGE

5

6    DR. CHARLES SCOTT

7       Direct Examination by Ms. Vorous            3326
        Cross-Examination by Mr. Fischer            3357
8

9

10    MICHAEL STAINER (Previously Sworn)

11      Cont'd Cross-Examination by Mr. Bien        3380
        Redirect Examination by Ms. D'Agostino      3423
12      Recross-Examination by Mr. Bien             3434

13

14    DR. TIMOTHY BELAVICH

15      Direct Examination by Mr. McKinney          3436
        Cross-Examination by Mr. Bien               3499

16

17

18                           ---o0o---

19

20

21

22

23

24

25

```
1                          EXHIBIT INDEX

2                            ---o0o---

3

4    PLAINTIFFS'
     EXHIBIT NO            DESCRIPTION              EVD
5
        2071        State of Colorado Memorandum    3376
6
        2644        O'Keefe Study                   3364
7

8

9

10

11

12

13

14                           ---o0o---

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2                         ---o0o---

 3

 4    DEFENDANTS'
      EXHIBIT NO           DESCRIPTION              EVD
 5
         VVV        Declaration of Dr. Scott        3332
 6
         WWW        Vorous Declaration 7-24-13
 7                  Re:  Seg. Units                 3341

 8       XXX        Dr. Belavich Declaration        3439

 9       YYY        Dr. Belavich Opposition Dec.    3451

10       ZZZ        MH Population Summary by CDCR    3452

11       AAAA       Chart-MHSDS For Inmates in SHU  3458

12       BBBB       Policy-ASU Clinician-to-Clinician
                    Contact                         3466
13
         DDDD       Program Guide Compliance Chart  3470
14
         EEEE       Raw Data Entered into MHTS
15                  10/1-10/31 (Sealed)             3473

16       FFFF       Raw Data Entered into MHTS
                    10/1-10/31 (Sealed)             3478
17
         GGGG       Group Treatment Chart EOP/ASU
18                  & EOP/PSU                       3480

19       HHHH       Raw Data Entered into MHTS
                    10/1-10/31 (Sealed)             3458
20
         JJJJ       Raw Data Entered into MHTS
21                  10/1-10/31 (Sealed)             3493

22       KKKK       Order re:  Navigant Contract    3499

23

24                         ---o0o---

25
```

3325

1            SACRAMENTO, CALIFORNIA

2          FRIDAY, DECEMBER 13, 2013, 9:34 A.M.

3                    ---o0o---

4          THE COURT:  Yes, Ms. Vorous.

5          MS. VOROUS:  Defendants call Dr. Charles Scott as their

6    next witness.

7          THE COURT:  Come around and be sworn, sir.

8          THE CLERK:  Remain standing and raise your right hand.

9                    CHARLES SCOTT,

10   was thereupon called as a witness herein by the Defendants, and

11   having been sworn to tell the truth, the whole truth, and

12   nothing but the truth, was thereupon examined and testified as

13   follows:

14         THE WITNESS:  Yes.

15         THE CLERK:  Thank you.  Take a seat.

16         State your name, spell your last name, and speak

17   directly into the microphone.

18         THE WITNESS:  My name is Charles L. --

19         THE COURT:  No, the --

20         THE CLERK:  Let me make sure it's on.

21         (Off the record.)

22         THE WITNESS:  Okay.  Thank you.

23         THE COURT:  Go ahead, sir.

24         THE WITNESS:  Thank you, Your Honor.  My name is

25   Charles L. Scott, M.D.  And Scott is spelled S-C-O-T-T.

3326

                           DIRECT EXAMINATION

1

2   BY MS. VOROUS:

3   Q.      Dr. Scott, where are you currently employed?

4           THE COURT:  Try that again, Ms. Vorous.

5           MS. VOROUS:  Sorry.

6           THE COURT:  It's Friday.

7           MS. VOROUS:  Yes.

8           THE WITNESS:  Currently employed at the University of

9   California Davis in Sacramento.

10          THE COURT:  Oh, I see.  You're at the hospital in

11  Sacramento and not in Davis.

12          THE WITNESS:  Yes, sir.  Yes, Your Honor.

13          THE COURT:  All right.

14  Q.      BY MS. VOROUS:  How long have you worked for the

15  university?

16  A.      I've worked there since October of 1998.

17  Q.      Would you please describe the positions that you have

18  held with the university since you started working in 1998.

19  A.      Yes.  I am chief of the Division of Psychiatry and the

20  Law at U.C. Davis.  I have served as a psychiatrist at the

21  Sacramento County Jail, ah, from 1998 to roughly 2010.  I'm

22  director of the forensic psychiatry training program at U.C.

23  Davis.  And I'm a consultant to a forensic state hospital

24  called Napa State Hospital, and I've done that also since 1998.

25  Q.      Doctor, you're currently licensed to practice medicine

1    in California, correct?

2    A.      That's correct.

3    Q.      Are you also board-certified?

4    A.      Yes.  I'm board-certified in general psychiatry, child

5    and adolescent psychiatry, forensic psychiatry and addiction

6    psychiatry.

7    Q.      Doctor, are you a member of any organization that is

8    related to your field of practice of medicine?

9    A.      I am a member of several.  The two that are probably

10    the most relevant would be the American Psychiatric Association

11    and the American Academy of Psychiatry and the Law.

12    Q.      Would you please briefly describe the American Academy

13    of Psychiatry and the Law.

14    A.      Sure.

15          The American Academy of Psychiatry and the Law is an

16    organization for psychiatrists who are working in the forensic

17    field.  In particular, it would include correctional

18    psychiatrists and psychiatrists who may work in a correctional

19    setting.

20    Q.      Doctor, have you ever been a training instructor for

21    the academy?

22    A.      Yes.  They have four national instructors for the

23    American Academy, and I am one of the four.

24    Q.      And what is the training that you do for the academy?

25    A.      Since 1996, I'm the national instructor on correctional

1    mental health care for the academy nationally.

2    Q.      Doctor, you briefly mentioned that you have done some

3    work in the Sacramento County Jail.  Would you please describe

4    that experience in more detail for the Court.

5    A.      Sure.

6            From 1998 till about 2010, I provided direct clinical

7    care to inmates at the Sacramento County Jail.  And that

8    included, ah, inmates who were on our administrative

9    segregation unit which we have there; also consulting with

10   inmates who needed emergent psychiatric care there; and then

11   also to inmates who we call general population, who don't need

12   a higher level of security or psychiatric care.

13   Q.      Doctor, if you can estimate, while you were working at

14   the jail, what would be the average length of stay of offenders

15   that were in the administrative segregation unit at the jail

16   facility?

17   A.      Difficult to estimate because in a jail setting people

18   can be released more quickly than in a prison setting.  But

19   there were inmates that could be housed there for more

20   serious -- if they were facing a more serious charge, for up to

21   one to two, sometimes three years.

22   Q.      Were there occasions during your tenure at the --

23   working with the offenders at the jail where you had a patient

24   that needed care outside of the administrative segregation

25   unit?

```
 1   A.       Yes.

 2   Q.       And what would happen in those situations?

 3   A.       In that situation, we do a mental health evaluation.

 4   And then we have a 15-bed unit to provide psychiatric care at

 5   the Sacramento County Jail, and then you arrange with the unit

 6   for transfer of that inmate for the designated treatment there.

 7   Q.       Doctor, outside the Sacramento County Jail, do you have

 8   other experience in treating patients in a correctional

 9   setting?

10   A.       Yes.

11   Q.       And would you describe that experience as well, please.

12   A.       I was in the military, I was a military psychiatrist

13   for about 13 years.  And so in the federal setting, more for

14   soldiers who were getting in trouble in their unit, I would

15   have to see them in the local holding facility.

16           After completing my forensic training and leaving the

17   military, I worked for two years with Tulane Medical School in

18   New Orleans, and they had a contract with Hunt Correctional

19   Facility, and so I worked for two years as a correctional

20   psychiatrist in that facility.

21           Ah, my job there involved seeing inmates both in

22   general population, also in their administrative segregation,

23   and working on writing input to the rules violation process on

24   the contribution of mental health, if any, to violating rules.

25   Q.       In terms of description of the facility itself, was it
```

1   a maximum or minimum facility?  If you could describe the level

2   of the facility, please.

3   A.      Yeah, there were two facilities that I worked at.  The

4   Hunt Correctional Facility was a moderate level security

5   prison.

6           I also split my time and for two years worked at a

7   facility known as Feliciana Forensic Facility, and it was a

8   maximum security forensic hospital that included inmates from a

9   variety of places in the state.  So it could be very violent,

10  pre-trial detainees who couldn't be managed, for example, at

11  the local New Orleans jail.  It could be inmates who had been

12  found permanently incompetent to stand trial, but were so

13  violent they couldn't be maintained in a hospital setting.  Or

14  it could include prisoners from other facilities throughout the

15  state that couldn't be maintained in a less secure facility,

16  but also had severe mental illness symptoms.  So I directed

17  that maximum security unit for two years.

18  Q.      In that maximum -- excuse me.

19          In that maximum security facility, can you describe how

20  you would evaluate a patient from the context of a security

21  level.

22  A.      The security custody team there, because these were

23  extremely high risk inmates, when we would do our evaluations,

24  they insisted that officers be on either side of the inmate

25  when they would come to see me.  They would oftentimes see me

1    in a small office that I had on the unit, and the inmate would

2    be cuffed usually with a hand wrist waist cuff, but with two

3    officers present.  So there was the concern about

4    confidentiality.

5    Q.      Doctor, do you have any publications related to

6    correctional mental health care?

7    A.      Yes.

8    Q.      Would you describe the publications you have.

9    A.      I would say sort of the two key publications, I've

10   edited two versions of the book on correctional mental health

11   care published by the American Psychiatric Association.  And

12   then I have other articles that are in other journals related

13   to mental health care in a correctional setting.

14   Q.      Doctor, do you have any experience in research

15   methodology on cause -- causality?  Cause -- I'm sorry.  I'm

16   having a hard time saying that word.

17   A.      Yeah, I mean, in basic I think what you're asking is do

18   I have any specialized training in understanding does A cause

19   B.  So, for example, would being in administrative segregation

20   cause psychological harm?  That would be one example of a

21   research looking at cause, causation.

22          And I have a lot of training and experience in that,

23   both through medical school with experimental design, which is

24   a required course you have to take, through the three separate

25   residencies, the training in that.

 1              The University of California at Davis also offers to a

 2      select group of faculty a research design and experimental

 3      studies course that I took at the main campus.  And, ah, we've

 4      also put together, my research team and myself, several

 5      different research protocols that have gone through the

 6      California state institutional review board as well.

 7              MS. VOROUS:  May I approach the witness, Your Honor?

 8              Dr. Scott, I've handed you what's been marked as

 9      Defendants' Exhibit VVV.  And this is the declaration of

10      Charles Scott, M.D., that was filed on July 24th, 2013.

11      Q.      Can you just please verify that this is your

12      declaration.

13      A.      Yes, it's my declaration.

14      Q.      And if you could also verify that Exhibit 1 to your

15      declaration is a copy of your resume as of that date.

16      A.      Yes, it is.

17              MS. VOROUS:  We'd request that Exhibit VVV be moved

18      into evidence.

19              THE COURT:  Received.

20                          (DEFENDANTS' EXHIBIT VVV

21                          ADMITTED INTO EVIDENCE.)

22              MS. VOROUS:  Okay.  And at this time, defendants would

23      like to offer Dr. Scott as an expert to testify in the field of

24      forensic psychiatry and correctional psychiatry.

25              MR. FISCHER:  Your Honor, plaintiffs are going to

3333

1    challenge Dr. Scott's qualifications in these areas.  Our

2    concern is that Dr. Scott has not evaluated CDCR's segregation

3    units' effects on the mentally ill.  He hasn't evaluated the

4    implementation of any CDC policies.  So we challenge him just

5    to the extent that he doesn't have sufficient facts and data on

6    which to opine on those particular issues.

7            THE COURT:  Those are all issues of cross-examination.

8    The objection is overruled.  The Court finds that the

9    defendant -- that the witness's proffer is sufficient, and he

10   may express opinions in both of those fields.

11           You may proceed, Ms. Vorous.

12   Q.      BY MS. VOROUS:  Doctor, you were retained by defendants

13   to provide expert testimony in this case, correct?

14   A.      Yes.

15   Q.      And what were you asked to do?  If you could describe

16   that, please.

17   A.      Sure.

18           Two or three main questions I was asked to help

19   address.

20           One is what's an appropriate, ah, research design to

21   answer the question about causation.  For example, would

22   segregation cause the level of mental harm that's been

23   described in some of the earlier literature.

24           Also been asked to look at the work cited by

25   plaintiffs' experts Dr. Haney in his reaching that conclusion.

3334

1          And also looking at the national standards for the

2     provision of care to mentally ill who may be placed in

3     administrative segregation.  And does the California program

4     guide meet the national standards, ah, in providing mental

5     health standard -- mental health care to mentally ill

6     individuals who were in administrative segregation.

7     Q.     Doctor, you were not asked to provide any opinions with

8     respect to any individual cases, correct?

9     A.     That's correct.

10    Q.     And you were not asked to provide any opinions with

11    respect to specific conditions inside the California

12    segregation units?

13    A.     That's correct.

14    Q.     Doctor, let's first talk about the research standards.

15    And I believe you described what we were talking about earlier

16    as looking at, for instance, if A -- you know, if A causes B.

17    In other words, if placement in segregation causes mental

18    illness.

19          Are there certain guidelines that need to be looked at

20    in determining that causation question?

21    A.     Yes.

22    Q.     Can you describe what those guidelines are.

23    A.     Sort of as a general overview, there are some very

24    basics whenever you're going to render that kind of opinion

25    that one symptom or disorder is caused by something.

3335

1          First of all, if you're going to say this event caused

2    something for somebody, you would want to know did they have

3    those symptoms before they ever came in, number one.

4          Another important aspect, if you're going to say they

5    got worse, for example, would be did you even measure how they

6    were when they got in?  Did you follow them over time?  Do you

7    have some sort of measurement after that period of time to say,

8    yes, they got worse, they stayed the same or did they improve,

9    was there any change.

10          Without those kind of measurements, what can happen is

11    you can interview people, for example, Your Honor, and they can

12    describe a whole host of symptoms, and you have no way of

13    knowing, ah, were those symptoms they had before?  And

14    certainly did they worsen over time?

15          Another important aspect in kind of making that kind of

16    leap that something causes something else is do you have other

17    groups that you would compare to see if they also had that

18    similar effect?  For example, if someone is placed in

19    administrative segregation, and you follow them over time, how

20    do people who are not placed in administrative segregation also

21    do?  Do they worsen, do they get better or have no change, and

22    how do they compare with those placed in administrative

23    segregation?

24          We call that a control group because you could see

25    changes or behaviors unrelated to administrative segregation in

3336

1    other groups.  And if you didn't do those very basic things,

2    you could start making all sorts of false assumptions about

3    causality.

4    Q.      Doctor, I believe you mentioned a descriptive study.

5    Can you describe what that is, please.

6    A.      Yeah.  In a very general sense, and there can be some

7    usefulness of them, but a descriptive study might be I

8    interviewed these 14 inmates, and they described that they had

9    this experience when placed in administrative segregation.  So

10   it's a snapshot of what they're telling you at the time, but in

11   no way establishes that administrative segregation caused that

12   symptom.  It's just something they're describing at the time.

13          That's kind of a broad brush of what a descriptive

14   study would be.

15   Q.      Dr. Scott, did you review Dr. Haney's testimony

16   associated with plaintiffs' motion related to CDCR segregation

17   units?

18   A.      Yes.  I reviewed his testimony, and I reviewed his

19   declaration as well.

20   Q.      Did you review the studies he cited in his declaration?

21   A.      Yes.

22   Q.      Did you review -- arrive at any opinions related to

23   these studies?

24   A.      Yes.

25   Q.      What are those opinions?

1    A.        Okay.  I'll keep it short and simple.

2              There were numerous studies he cited.  The vast

3    majority of the studies that he cited were very descriptive.

4              One study, for example, that he cites in many of his

5    articles is a study by Dr. Stuart Grassian.  Dr. Grassian was a

6    psychiatrist who, in the early 1980s, he was a plaintiff's

7    expert for a correctional case in Connecticut.  So he went to

8    Walpole Correctional Institution, and he interviewed 14

9    inmates, and initially the inmates did not describe that they

10   were having problems in ad seg.  Over repeated interviews, they

11   eventually said that they were, and so he ultimately concluded

12   that the administrative segregation or security housing unit

13   environment caused it, based on those 14 interviews.  And

14   that's been a highly cited article for establishing that ad seg

15   causes these kind of harms.

16             Dr. Haney's own research that he listed in 2003 was

17   from Pelican Bay.  And by his article in 2003, he said that he

18   interviewed a hundred inmates, and he asked them a list of

19   different potential things that could have been experienced or

20   that they may have experienced from having been in the SHU.

21             For example, there were 14 different possible checklist

22   symptoms.  One of them was did the inmate feel angry, did they

23   have violent thoughts?  And some of the inmates said, yes, they

24   did.  And he concluded, therefore, this was the psychological

25   effect of the SHU.

3338

1      One could certainly wonder and argue that many inmates

2  independent of a SHU might have problems with feeling angry or

3  might have a problem with violence that's unrelated to a SHU.

4  But the way he concluded was, since they reported it, the SHU

5  had to cause it.

6      In an analysis of that study, Dr. Jeff Metzner and Dr.

7  Dvoskin wrote in a 2006 article that a significant percentage

8  of the people Dr. Haney interviewed had those symptoms

9  preexisting, severe mental illness and, therefore, he couldn't

10 make that leap that he did.  And there were very serious flaws

11 in his study.  They were highly critical of his methodology, as

12 other experts have been as well.

13 Q.      Doctor, in your opinion, are the studies that Dr. Haney

14 cites in his declaration sufficient to show causation?

15 A.      Umm, no.

16 Q.      And why not?

17 A.      Because you want some baseline measurement of how a

18 person is doing, see if they get worse over time when you

19 reassess and measure them.  And then also see if people not

20 exposed to the same environment have a similar presentation or

21 not.  And the vast majority of studies that he cites did not

22 use that methodology.

23      Moreover, he oftentimes cites literature from decades

24 ago from very different prison conditions.  He can talk about a

25 prison in Denmark, a concentration camp, very severe isolation

1    experiments that are done that would not -- not represent or be

2    consistent with what current administrative segregations look

3    like.  And so those are so disparate and far away and

4    different, that to jump to the conclusion that those are

5    similar enough to say that administrative segregation causes

6    that, would not reach the kind of accepted research

7    methodology.

8    Q.      Doctor, looking at a prison correctional setting, is

9    it -- is it difficult to conduct research studies within that

10   type of a setting?

11   A.      It is.  It's difficult.

12          There are federal guidelines that govern the protection

13   of prisons for even doing research.  So if you're actually

14   doing research, you're supposed to have -- go through an

15   institutional review board and make sure it's approved before

16   you collect that data.  Because they're one of the three or

17   four what we call protected populations for research purposes.

18          Also, you want to make sure that it's not inherently

19   coercive so they don't feel forced to participate in the

20   research or not because they're in a controlled environment.

21   And this comes out of some -- what we call the Nuremberg

22   standards following World War II.

23   Q.      Doctor, are you aware of any recent studies of

24   segregation units to show causation?

25   A.      There are two more, umm, recent studies compared to

3340

1    studies that were done in the '60s and '70s.  One would be a

2    study about ten years or so ago from Canada.  The first author

3    was Zinger.  And then the second study would be by -- published

4    in 2013 by O'Keefe, and Dr. Metzner was a co-author on that

5    study.

6            MS. VOROUS:  Your Honor, may I approach the witness?

7            THE COURT:  You may.

8            MS. VOROUS:  Doctor, I've handed you what's been marked

9    as Defendants' Exhibit WWW.  And it's a July 24th, 2013,

10   declaration that was submitted by defendants in opposition to

11   plaintiffs' motion related to the segregation units.

12   Q.    If you would look to Exhibits 1 and 2 to this

13   declaration and verify that they are the studies that you just

14   referenced, the O'Keefe and Zinger study.

15           THE COURT:  Hang on just a second, please.

16           Okay.  Yes, sir.

17           THE WITNESS:  Yes, they are.

18   Q.    BY MS. VOROUS:  Doctor, would you please describe the

19   Zinger study.

20           THE COURT:  Now you want to put them into evidence if

21   you're going to discuss them?

22           MS. VOROUS:  Yes, Your Honor, I'd like to admit Exhibit

23   WWW into evidence.

24           THE COURT:  Hearing no objection, they're received.

25   /////

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1              (DEFENDANTS' EXHIBIT WWW

2              ADMITTED INTO EVIDENCE.)

3          THE WITNESS:  Okay.  Very briefly, this was a study

4     published in I believe 2001, and it involved reviewing 60

5     inmates at Canadian penitentiaries, and they compared inmates

6     in administrative segregation to those who were not in

7     administrative segregation.  They gave their measurements of

8     their functioning and then follow those measurements up at 30

9     days and 60 days later.  So the length of time for the

10    segregation period was limited to 60 days.

11         Basically the conclusion was somewhat of a surprise for

12    folks because all of the more descriptive literature had

13    been -- we would have anticipated that they would have done

14    much, much worse.  That was not shown in this study.  They did

15    not have difference in worsening or deterioration as had been

16    hypothesized.

17    Q.    BY MS. VOROUS:  Doctor, would you please describe

18    the -- what you referenced as the O'Keefe study.

19    A.    Yes.

20         Before -- I mean, there were, as I mentioned, some

21    limitations to the study.  It was only for 60 days.  Umm, they

22    did have some dropouts from it, but it was far closer to

23    looking like a study to at least attempt to measure that than

24    comparing to a Finnish prison or a prison from the '70s.  So,

25    although not perfect, it was substantially better.

3342

1    Q.    And, Doctor, I believe I cut you off.

2          You were referring still to the Zinger study, the first

3    study, correct?

4    A.    Yes, I'm referring to the Zinger study.

5    Q.    Okay.  Then let's go ahead and move then to the O'Keefe

6    study.

7    A.    Do you know what exhibit number that is?

8    Q.    Yes.  That's Exhibit 1.

9          THE COURT:  No.

10         MS. VOROUS:  I'm sorry.  It's --

11         THE COURT:  Exhibit 2.

12         MS. VOROUS:  Yeah.

13         THE WITNESS:  Yes, I have it now.

14         Okay.  This is a study, the first author was O'Keefe,

15   and then two other co-authors include Dr. Jeff Metzner and Joe

16   Dvoskin.  It was published in 2013.

17         And roughly they have recognized that the Canadian

18   study was a bit of a surprise to us as academics and for people

19   who work in corrections because all of the other literature had

20   been -- the expectation was that things would get so much

21   worse.  But they said it was only for 60 days, so they wanted

22   to see if they could follow inmates placed in administrative

23   segregation for up to a year, so a much longer period of time.

24         They also had more evaluations built into it than the

25   Canadian study.  And they had more inmates that were involved,

3343

1    so you had a larger number of people.

2         So what they did was they compared inmates with

3    mentally -- mental illness who were placed in administrative

4    segregation to those who were placed in administrative

5    segregation but did not have a mental illness.  They then also

6    compared them to inmates in general population who had mental

7    illness and those who did not.  And then they had a fifth

8    group, which were inmates who were at a psychiatric facility

9    kind of as a comparison group for those who had that level of

10   psychiatric needs.

11        And the kind of take-home point of the article, which

12   was again a surprise -- their hypothesis had two or three main

13   key points.  One, we think that the mentally ill are going to

14   deteriorate worse than the non-mentally ill when placed in

15   administrative segregation.  And if there was any bias towards

16   what the finding would be, that's what they acknowledge their

17   bias was likely to be.

18        Instead they found the opposite.  The mentally ill did

19   not deteriorate, and there was no difference compared to the

20   mentally ill versus the non-mentally ill in administrative

21   segregation.  But nor did they worsen.

22        The other thing that's really important to note is a

23   lot of the symptoms reported by the mentally ill inmates were

24   present at baseline.  So this gets back to the Haney concern,

25   the study about the Haney -- the concern with the Haney study,

3344

1    which were so many of the symptoms that had been described as

2    part of a SHU syndrome were present at baseline -- that was

3    also seen true with this study -- and they didn't worsen over

4    time.

5            So those were some of the key findings.

6    Q.      Doctor, are there also -- or did you find that there

7    were limitations to the O'Keefe study?

8    A.      Sure.

9            I mean, every study is not going to be perfect, so what

10   you're trying to look at is what are some of the studies that

11   are at least more similar to our California system than a 1970s

12   New York prison or a concentration camp.  And I thought this

13   was more similar than some of those type of studies.

14           And, umm, I'll kind of go over the similarities and the

15   difference between the California ad seg and the Colorado ad

16   seg as using this --

17           THE COURT:  I don't understand.  I thought you didn't

18   visit the California system.

19           THE WITNESS:  No, it's -- you're correct, Your Honor,

20   but it's comparing what I know from the program guide and what

21   they describe in their article.

22           THE COURT:  Okay.  So what you're doing is saying this

23   is what we say we're doing.

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Whether we're doing it or not, you don't

1   know.  Whether or not -- even the prison's approach you don't

2   know.

3                 THE WITNESS:  Yes, sir.

4                 THE COURT:  But on the basis of the written material,

5   you're prepared to express opinions.

6                 THE WITNESS:  That's fair.

7                 THE COURT:  Go ahead.

8                 THE WITNESS:  Yes.

9                 So the Colorado system has -- for their mental health

10  checks, it's described they have once a month -- for their

11  administrative segregation inmates, they would do a cell door

12  mental health check once a month.  Only if they said they

13  wanted to see someone for more mental health care would they

14  pull them out to be in a confidential room.  So it was rare, it

15  would only be under the circumstance that they asked for it.

16                In contrast, California's program guide, they have

17  daily LPT, which are licensed psychiatric technician, checks

18  compared to once a month in the Colorado system.  They also

19  have for EOP and CCCMS clients weekly clinician visits as well.

20  And obviously for EOP, according to the program guide, they

21  should have more services than CCCMS as well.

22                Another important part of the Colorado study that I

23  think some people who have read it have gotten maybe confused

24  or, for whatever reason, have misrepresented, is that they did

25  have another facility where people could get group therapy and

1    a type of table where you could be tethered to the table, but

2    those people were not in this study.  So to suggest that they

3    were offering that type of group therapy is simply false.

4         If you actually read what they wrote, there was a

5    separate prison where individuals who were no longer in ad seg

6    could go and get that kind of group therapy.  But they were

7    very clear in their methodology that the only people in this

8    study were those who were in the California -- in the Colorado

9    state penitentiary.

10         I think some differences, the Colorado system seemed to

11    have, at least on their paper, some incentives to help move

12    through administrative segregation.  You might get more access

13    to a TV, increased visits with the non-contact visits, for

14    example, compared to the California system.

15         The California system, though, in contrast had much

16    more frequency of mental health contacts.  Daily for LPT rounds

17    versus once a month for the Colorado system.  And then weekly

18    for your primary clinician versus your once-a-month check in

19    the Colorado system.

20         So some of the criticisms in trying to compare the two,

21    and I understand it, are because unless you're a exactly

22    examining the particular place you're looking at, it's never

23    going to be a perfect fit.  You try to have all -- what can we

24    take, though, from things that are somewhat similar.

25         This is a much closer fit than almost any other study

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    out there.  And they found that people did not worsen in

2    administrative segregation with the level of mental health care

3    that they provided.

4         The California system, according to the program guide,

5    provides at least for mental health checks 30 times a month

6    more.  So one would not expect, with that much more additional

7    mental health checks and enhanced mental health treatment, it

8    should, California should have a worse outcome.

9         The other thing is that the officers in the Colorado

10   study did what's known as a visual check into the cell.  That's

11   not the same as a welfare check.  To suggest that that is a

12   welfare check would be really a false presentation.

13        If you actually read the article, they did what's

14   called a visual check where they look into the room.  A welfare

15   check in the world of corrections is more commonly understood

16   to be what's the inmate doing, are they writing a letter, what

17   activity, and there's a documentation associated with that.  So

18   they did do visual checks, but our officers do visual checks as

19   well.

20   Q.    Doctor, I'd like to move on to the third item that you

21   talked about in terms of your opinions, and this relates to

22   whether or not California's provision of care as outlined in

23   the program guide is consistent with the APA guidelines for

24   managing inmates in segregation units.

25   A.    Okay.

3348

1    Q.      Doctor, if you would again refer to Defendants' Exhibit

2    WWW and this time ask you to look at Exhibit 3 to the

3    declaration.

4    A.      Okay.  I'm there.

5            THE COURT:  I'm not, counsel.  Will you wait just a

6    moment?

7            You might as well go ahead, I'm never going to get

8    there.  Go ahead.

9    Q.      BY MS. VOROUS:  Doctor, does Exhibit 3 contain excerpts

10   from the Psychiatric Services in Jails and Prisons, second

11   edition, handbook?  I'm not sure if that's the correct term to

12   refer to it.

13   A.      Ah, yes.  It's an excerpt from the Psychiatric Services

14   in Jails and Prisons publication.

15   Q.      And if you could turn a few more pages into this

16   exhibit, and then I'll draw your attention to -- it would be

17   page 7 of 8.  At the top of the exhibit, it's under the

18   document 4714-3.  This is page 4 of the Psychiatric Services in

19   Jails and Prisons.

20           THE COURT:  I'm sorry.  What page do you want him on?

21           MS. VOROUS:  It would be page 4 --

22           THE COURT:  Thank you.

23           MS. VOROUS:  -- of the book.

24           THE COURT:  Go ahead.

25           THE WITNESS:  Yes, I'm there.

3349

1              MS. VOROUS:  Have you found that?

2    Q.      Doctor, does this excerpt identify what the guidelines

3    are as specified by the American Psychiatric Association?

4    A.      Yes.  These are the general guidelines for providing

5    psychiatric services in jails and prisons published by the

6    American Psychiatric Association, yes.

7    Q.      Okay.  And generally would you describe what the

8    guidelines are.

9    A.      The guidelines are an overview of how services, umm,

10   can be delivered to those individuals with mental illness in

11   correctional environments.

12           And there are different chapters in the guide -- in the

13   publication.  And this one is specific to addressing issues

14   about access to care in segregation units for those with mental

15   illness.

16   Q.      And, Doctor, did you reach an opinion on whether

17   California's system comports with the APA guidelines?

18   A.      Yes.

19           MR. FISCHER:  Your Honor, I would just object again

20   that this witness is unable to opine as to the implementation

21   of any policies as suggested by the question of counsel.

22           THE COURT:  Well, I mean, he's being asked not what

23   really goes on because he doesn't know that, but whether or not

24   the written guidelines comport with the APA guidelines.

25           Am I correct?

 1                THE WITNESS:  Yes, sir.  Yes, Your Honor.

 2                THE COURT:  And to that extent, the objection is badly

 3     taken and overruled.  You may answer.

 4     Q.      BY MS. VOROUS:  Doctor, what are your opinions?

 5     A.      Okay.  It's correct my opinion is based on how the

 6     system is designed.  And if you go --

 7                THE COURT:  You don't need -- go ahead.  I'm sorry.  I

 8     didn't mean to interrupt.  My apologies.  Go ahead.

 9                THE WITNESS:  My apologies.

10                And if you go through the program guide, that they

11     meet, and in many areas over-meet, the recommended guidelines

12     by the APA for the delivery of services as a system.

13                MS. VOROUS:  Doctor, I'd like to go through each of the

14     principles.  If you would look at page 5 --

15                THE COURT:  All right.  I really have got to stop you,

16     then.  I'm unable to locate it, it is my fault, but give me a

17     moment and perhaps I can do better.

18                We're looking at Exhibit 3?

19                MS. VOROUS:  Yes.

20                THE COURT:  All right.

21                MS. VOROUS:  And if you look at the filing page at the

22     top, it would be page 8 of 8.

23                THE COURT:  Okay.  This is Exhibit 4.  Now we're

24     looking at Exhibit 3, page -- I'm sorry -- eight?

25                MS. VOROUS:  Page 8 of 8 on the banner at the top of

```
 1          the document.
 2                    THE COURT:  8 of 8.  All right.
 3    Q.        BY MS. VOROUS:  So, Doctor, on page 5, there are four
 4    principles that are stated with respect to placement of inmates
 5    in segregation.
 6                    Is that accurate?
 7    A.        Yes.
 8    Q.        Okay.  Could you go through each of those four
 9    principles and explain why your opinion is that the CDCR system
10    comports with those principles.
11    A.        Yes.  And I'll try to be as brief as possible.
12                    It says:  In providing mental health services in
13    segregation, the following principles should be observed.
14                    One, no inmate should be placed in segregation housing
15    solely because he or she exhibits the symptom of mental illness
16    unless there's immediate and serious danger for which there is
17    no reasonable alternative.
18                    And CDCR's system addresses this essential guideline.
19    They do this in several different areas.
20                    One, they have a rules violation procedure that allows
21    consideration of mental illness to the disciplinary action
22    consideration.
23                    Two, they have a pre-screening for anybody who goes
24    into administrative segregation.  I think it's called mental
25    health form -- there's a code to it like 127.  I can't remember
```

3352

1   the exact number.  But everyone, both the mentally ill and the

2   non-mentally ill according to California's program guide, is

3   screened before they can get placed in ad seg.

4        And on that screening form, they ask questions about

5   suicidality or their presentation.  If there's any concern,

6   they have three levels of referral.  Immediate, which is

7   emergent, so they see them immediately.  Urgent, within four

8   hours.  And then if it's some concerns but it could be more

9   routine, then they can have subsequent follow-up.

10        Every inmate placed in ad seg who hasn't yet been

11   identified already on the mental health caseload within 72

12   hours has a 31-question questionnaire, which asks multiple

13   questions about suicidality, past history, drug history, all

14   sorts of screenings for different mental illnesses.  And it has

15   to be done in a confidential setting.  Depending on the outcome

16   of that, then the person could be referred for further mental

17   health care.

18        But this is just on those who don't have mental

19   illness.

20        Those who do have mental illness, they're screened on

21   the pre-screening form.  They're also screened because, within

22   24 hours, if they are on medication, that has to be transmitted

23   to the appropriate people at the ad seg so they can get their

24   medicines.  And then they continue, depending on their level of

25   care -- if they're CCCMS or EOP, they have those mental health

1    contacts as well.

2          In addition, in the ad seg, according to the program

3    guide, they get daily licensed psychiatric technician rounds.

4    They get weekly primary clinician contacts.  They have

5    continued psychiatric follow-up.

6          For those who are mental health clients, they also

7    have, according to the program guide, daily meetings with

8    corrections and the clinician to talk about how the people are

9    doing, have there been any changes in their behavior, and

10   should that change the treatment plan.

11         They also have inter-disciplinary treatment teams.

12   Even if you are in ad seg that continue along the program

13   guide, they set forth the minimum people that should be there,

14   so it has to involve both custody and mental health.

15         They have a meeting that is the classification

16   committee where mental health is to have input into the

17   placement in ad seg.  So they have a mechanism for the input to

18   come into place.

19         And they also have the mechanism in place to look for

20   referral to higher levels of care, such as mental health crisis

21   bed.  And if you're at the EOP level of care, then you can be

22   referred.  And the program guide dictates this to an EOP ad

23   seg.

24   Q.    Doctor, if you'd look at the -- move on to the second

25   principle, please, and explain your opinion with respect to

1    that principle.

2    A.       Yes.

3            And this principle says:  If an inmate is placed in

4    segregated housing for appropriate correctional reasons, the

5    facility is responsible for meeting the serious medical needs

6    and psychiatric needs of that inmate, and so they must receive

7    any mental health services that are deemed essential even if

8    they are in segregation.

9            And I think some of the supporting points are going to

10   overlap between the principles.  So, again, they have daily LPT

11   rounds; weekly primary clinician rounds; IDTT, which is the

12   inter-disciplinary treatment teams; daily correctional

13   counselor meetings on how they're functioning; and referrals to

14   other levels of care.

15   Q.       Doctor, moving on to the third principle, if you could

16   also address that one as well, please.

17   A.       Yes.

18           Inmates who are in current severe psychiatric crisis,

19   including but not limited to acute psychosis and suicidal

20   depression, should be removed from segregation until such time

21   as they are psychologically able to tolerate that setting.

22           And CDCR's system does -- addresses this in a couple of

23   ways.

24           First of all, with the screening form that they have,

25   if a person reports suicidality, they have a separate suicide

1   risk evaluation form that is much more detailed that they're

2   required to complete.  And they also have a referral process

3   where they could get to a higher level of care such as a mental

4   health care bed.  Similarly, if they feel that they are

5   psychotic or need a higher level of care, that referral can

6   happen as well.

7        And there are multiple ways the referrals can happen.

8   You can have staff referral, correctional officer referral,

9   self referral, mental health referral.  And upon coming into

10  administrative segregation, the inmate -- and I've seen at

11  least two versions, there's an English version and a Spanish

12  version -- are given an explanation sheet about how to access

13  mental health care if they feel they're having troubles coping

14  or if they need to see someone in mental health as well.

15       The other thing that I think California does that I

16  haven't seen described necessarily in other facilities, when

17  they do that first initial check for those who don't even have

18  identified a mental illness, when they do the call-out for the

19  inmate, so the inmate isn't felt to be stigmatized for perhaps

20  having a mental illness or being considered to do that, they

21  call it a general health call-out so that -- to help minimize

22  the screening refusals.

23       Because an inmate might say I don't want to have other

24  people think that I'm being looked at for mental health

25  reasons, and so they also have that in the program guide

1    specifically to help encourage people for referral.

2    Q.      Doctor, the last principle, if you could address that

3    as well, please.

4    A.      Yes.  And many of my supporting points are going to be

5    the same.

6           Inmates who are known to have serious mental health

7    needs, especially those with a known history of serious and

8    persistent mental illness, when housed in segregation must be

9    assessed on a regular basis by qualified mental health

10   practitioners to identify and respond to an emergent crisis at

11   the earlier possible moment.

12          So we've gone through multiple ways that the program

13   guide has that in place.

14   Q.      Doctor, we've been talking somewhat in general about

15   segregation.

16          Are your opinions any different with respect to

17   compliance with the standards for inmates that are housed in a

18   security housing unit?

19   A.      No, my opinions are the same.

20          They have similar mechanisms for people who are housed

21   in the security housing unit.  They can be referred to mental

22   health care.  They can continue on their medicines.  They have

23   continued follow-up with the LPTs for those who are on the

24   mental health caseload.  And they do, for those who are not on

25   the mental health caseload, I believe it's every other week,

3357

1   have a mental status check even if they aren't on the mental

2   health caseload.

3   Q.      And, Doctor, the same question with respect to the

4   psychiatric services unit.

5           Are your opinions any different with respect to that

6   unit?

7   A.      No.  The psychiatric services unit by design is for

8   individuals who may need both more of a secure housing unit but

9   have enhanced mental health needs.  So, according to the

10  system, they're to be providing even more additional care than

11  is required or outlined in the guideline.

12          MS. VOROUS:  Could I have a moment, Your Honor?

13          (Defense counsel conferring.)

14          MS. VOROUS:  No more questions, Your Honor.

15                         CROSS-EXAMINATION

16  BY MR. FISCHER:

17  Q.      Good morning, Dr. Scott.  My name is Aaron Fischer.

18          We've met before?

19  A.      Yes.

20  Q.      Dr. Scott, you discussed a few studies about the

21  psychological effects of segregation.

22          You haven't done any studies regarding, ah, the

23  conditions of segregation units and their psychological

24  effects?

25  A.      Umm, not in a prison environment.  In the forensic

3358

1    hospital secure environments, yes.  But many of those are

2    inmates who have been transferred to a hospital.  But not

3    unique to ad seg, that's correct.

4    Q.    And it's your testimony that you're not aware of any

5    study that you respect that find that segregation conditions of

6    confinement may cause psychological harm to the mentally ill?

7    A.    That wasn't exactly my statement.  It was that the

8    studies that have reached that conclusion didn't have the key

9    components that I've described or generally recommended to

10   establish, ah, the necessary methodology.

11        So different people have concluded this repeatedly, but

12   oftentimes without control groups, repeated baseline

13   measurements, establishing baseline, getting informed consent

14   from the inmate to participate in the research, those sort of

15   things.

16        THE COURT:  But the question was very straightforward.

17        You are not aware of any study that you respect,

18   because it has all of these elements, that find that

19   segregation conditions of confinement may cause psychological

20   harm to the mentally ill.

21        It's a very straightforward question.

22        THE WITNESS:  Yes, I agree.  I think that's a fair

23   statement.

24   Q.    BY MR. FISCHER:  Turning to the Zinger study that you

25   mentioned.

3359

1    A.      Yes.

2    Q.      I believe it's found at Exhibit 2 of Defendants'

3    Exhibit WWW, the Vorous dec, the Vorous declaration.

4            This was a study done in a Canadian prison; is that

5    correct?

6    A.      Correct.  Or several Canadian prisons.

7    Q.      A number of Canadian prisons.

8            THE COURT:  Before you go forward, I'm not clear.  I

9    think I know what your testimony is, but I'm actually not

10   clear.

11           You've said that there are no studies that you respect

12   that reach the conclusion specified.  Are there -- is the

13   opposite true, are there studies which you find confidence in

14   which demonstrate that going to mental -- going to ad seg has

15   no consequences for the mentally ill?

16           THE WITNESS:  Yes.

17           THE COURT:  All right.  And that includes the Zinger

18   study?

19           THE WITNESS:  I would say that includes primarily the

20   O'Keefe and Metzner study.

21           THE COURT:  All right.

22           THE WITNESS:  But the Zinger was sort of a precursor to

23   that.

24           THE COURT:  All right.

25   Q.      BY MR. FISCHER:  And as you testified, the Zinger study

3360

1    only looked at segregation for periods of 60 days or less,

2    correct?

3    A.      That's correct.

4    Q.      And you're -- and you're aware that the conditions in

5    those Canadian administrative segregation units are much

6    different than CDCR's segregation units, correct?

7    A.      From the description in the article, I am.  They

8    describe them as some of them appear to be much more serious,

9    much more stark, without the frequency of mental health

10   contact.

11          Which would beg the argument that, if they're even

12   worse than what has been reportedly described in California's

13   system and they didn't have that level of adverse outcome in 60

14   days, then a system that provides much more care and contact,

15   you wouldn't expect the results to be worse than that.

16   Q.      In the Canadian administrative segregation system

17   that's studied here, segregation prisoners have access to TVs

18   and radios?

19   A.      In some of them, but not all.

20   Q.      And some segregation prisoners have -- exercise with

21   other inmates in segregation, correct?

22   A.      It depends on the facility.

23   Q.      But some do?

24   A.      It's possible, yes.

25   Q.      Looking at that Exhibit 2 to the Vorous declaration, if

3361

1    you can turn to -- going to the top of the page, it is -- we'll

2    start out on 32 of 38.  That's the docket entry.

3             THE COURT:  I'm sorry.  I didn't realize what time it

4    was.  We're going to take our a.m. recess.

5             MR. FISCHER:  Okay.

6             THE COURT:  Fifteen minutes.

7             (Recess taken at 10:32 a.m.)

8    /////

9    /////

10   /////

11   /////

12   /////

13   /////

14   /////

15   /////

16   /////

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

3362

1              (On the record at 10:50 A.M.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Mr. Fischer.

5    BY MR. FISCHER:

6    Q.      Dr. Scott, we were discussing the Zinger Study.  I

7    want to turn your attention to that Zinger Study, Exhibit 2,

8    to the Vorous Declaration, Defendants' WWW.

9              If you can, turn to -- the docket number at the top

10   of the page is 32 of 38.

11   A.      Okay.

12   Q.      Are you there?

13   A.      Yes.

14   Q.      And at the bottom of that page, last line, the last

15   sentence going onto the next page where it says, quote:

16           (Reading:)

17           Once again, it would be ill advised to attempt to

18           extrapolate the findings of this study (a) beyond 60

19           days of administrative segregation, and (2) to other

20           jurisdictions.  For example, the findings of this

21           study are somewhat irrelevant to current segregation

22           practices in the United States where prisoners can

23           sometimes be segregated for years for disciplinary

24           infractions with virtually no distractions, human

25           contacts, services, or programs.

3363

1           (Reading concluded.)

2           Do you see that there?

3    A.      Yes.

4    Q.      And in the second full paragraph that starts

5    "Although" on that same page, starting on the sixth line the

6    Zinger researchers state, quote:

7           (Reading:)

8           Regardless of whether prisoners adapt and cope well

9           with the segregation experience, it is not healthy

10          for anyone to idle aimlessly in a cell for 23 out of

11          24 hours a day; it simply is not a constructive way

12          of serving a sentence; and, it is likely to impede

13          attempts to rehabilitate and safely reintegrate

14          prisoners into society.

15          (Reading concluded.)

16          Do you see that there?

17   A.      Yes.

18   Q.      Dr. Scott, turning to the O'Keefe Study or Colorado

19   Study, Miss O'Keefe worked for the Colorado Department of

20   Corrections; is that correct?

21   A.      I don't know her employment status with them so I

22   don't know.

23   Q.      The Colorado Department of Corrections was involved

24   in this study, correct?

25   A.      To some degree they had to be because they allowed it

3364

1    to take place, but I don't know beyond that.

2            MR. FISCHER:  May I approach, Your Honor?

3            THE COURT:  You may.

4            (Exhibit handed to witness.)

5    BY MR. FISCHER:

6    Q.      I've handed you, Dr. Scott, what's been marked as

7    Plaintiffs' Exhibit 2644.  This was also Exhibit Number 4 at

8    your deposition.  It is entitled "One Year Longitudinal Study

9    Of The Psychological Effects Of Administrative Segregation."

10   It is a longer version of the same study you discussed in

11   your testimony.

12           MR. FISCHER:  Your Honor, I move into evidence

13   Plaintiffs' Exhibit 2644.

14           THE COURT:  Hearing no objection, it is received.

15               (Whereupon, Plaintiffs' Exhibit 2644 received

16                into evidence.)

17   BY MR. FISCHER:

18   Q.      Dr. Scott, you testified that this particular study

19   was unable to conclude whether administrative segregation

20   terms in the Colorado unit caused psychological harm; is that

21   correct?

22   A.      The major conclusion of the study was that they did

23   not find that the psychological deterioration --

24           THE COURT:  Not the question.  The question was the

25   purpose of the study.

3365

1           THE WITNESS:  Okay.  The purpose of the study was to

2    measure psychological harm from being placed in Ad. Seg.

3    BY MR. FISCHER:

4    Q.      Turning to page Roman Number VIII of this document,

5    Dr. Scott, there's a heading that says "Findings."

6           Do you see that there?

7    A.      Yes.

8    Q.      And the first line of this paragraph states:

9           (Reading:)

10          The results of this study were largely inconsistent

11          with our hypothesis and the bulk of literature that

12          indicates AS, administrative segregation, is

13          extremely detrimental to inmates with and without

14          mental illness.

15          (Reading Concluded.)

16          Do you see that there?

17   A.      Yes.

18   Q.      Dr. Scott, you mentioned some of the particular

19   features of the segregation unit studied in this particular

20   study, and you compared visual checks to welfare checks.

21          Why are welfare checks important in segregation?

22   A.      Welfare checks can give you additional information.

23   One of the reasons I wanted to make the distinction was that

24   in one of the documents I reviewed about excluding my

25   testimony, they stated in this article that they were doing

3366

1  welfare checks, but that wasn't truthful.  They did visual

2  checks.  So I wanted to make sure that was clear on the

3  record.

4  Q.    My question is, why is that an important difference?

5  A.    You can gather additional information about what --

6  to use in evaluating the inmate.

7  Q.    To deliver or complete psychiatric care?

8  A.    It can.  It can also let you know what they're doing,

9  as well.

10  Q.    And it can ensure their safety?

11  A.    It can.  It is possible it can.  Sure.

12  Q.    So welfare checks, you think, are an important

13  feature of segregation units, to the extent that they're

14  done?

15       THE COURT:  The doctor doesn't believe it has any

16  deleterious effect so there is no distinction between welfare

17  checks in Ad. Seg. and welfare checks throughout the prison

18  world.

19       Fair?

20       Not fair?

21       THE WITNESS:  I would say that as the California

22  system has been designed, regardless of the study I do still

23  think it is important to check on the inmate.  I do think

24  it's still important to have care provided.  And so I

25  wouldn't use this study to say no care should be provided

3367

1   because there is no alleged harm.

2        It's just that the study doesn't suggest the severity

3   of harm described by others.  But personally I still believe,

4   as the California system has developed, that they should

5   still treat people with mental illness, screen them, refer

6   them to higher levels of care in accordance with the national

7   guidelines.  But I don't want Your Honor to think that I'm --

8   I would say that mentally ill people in segregation shouldn't

9   have that kind of access to care.

10       THE COURT:  I understand that.

11       THE WITNESS:  Okay.

12       THE COURT:  But you're prepared to say -- I mean,

13  your testimony is that being in administrative segregation or

14  SHUs, whatever, will have no deleterious effect upon the

15  mental illness of mentally ill inmates?

16       THE WITNESS:  Not exactly.  If I can clarify?

17       THE COURT:  Please.

18       THE WITNESS:  I would say for some individuals it

19  may.

20       THE COURT:  This is an important point that at some

21  point I was hoping somebody might discuss with you, but since

22  you have opened it up, there is a lot of talk about these

23  things as if everybody was the same.  The fact of the matter

24  is, of course, nobody is the same.

25       You're nodding your head.  That won't be on --

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3368

1          THE WITNESS:  I agree with you.

2          THE COURT:  And so even if we were to find that these

3   studies supported that view as a general matter -- of course,

4   these don't find that as a general matter.  They say it's not

5   going to have any deleterious effect.

6          THE WITNESS:  Based on the study.

7          THE COURT:  Yeah.

8          So they take the view -- and I don't know whether you

9   agree, I'm asking you -- that despite the enormous variety of

10  the people, the inmates, as well as anybody else, to cope

11  with stressful situations, this will have no effect, "this"

12  meaning putting people in Ad. Seg.

13         Isn't that the fair conclusion to reach?

14         I'm sorry.  I don't mean to interrupt you, sir, but

15  it just seems to me so odd.

16         THE WITNESS:  Your Honor, actually what they said was

17  two things.  One, the results were surprising to them and

18  different than what they had hypothesized.

19         I think my view is similar to what they conclude in

20  their conclusion section, that this study alone doesn't still

21  mean that there can be -- you're right, not everybody is the

22  same, that you shouldn't provide services to the mentally

23  ill, screen them --

24         THE COURT:  No.  No, Doctor.  Different question.

25         THE WITNESS:  Okay.

3369

1        THE COURT:  I don't think the constitution permits

2    people who are -- never mind.  That's a legal question which

3    I'll get to some day if this case ever ends, which it

4    probably won't.

5        You have a body of people.  That body of people has a

6    variety of coping skills.  Ad. Seg., after all, is additional

7    punishment.  They don't put people into Ad. Seg. -- well, in

8    California they do, but in most places they don't put people

9    into Ad. Seg. for fun.  They say that this is because you did

10   something really wrong and we're punishing you.

11       But all punishments are stressful.  Do you agree or

12   disagree?

13       THE WITNESS:  I agree that for many people

14   punishments can be stressful.  For some individuals, though,

15   and I've treated in Ad. Seg. environments, it is relieving

16   from stressors they're facing in the general population.

17       THE COURT:  I quite agree with that, that there may

18   well be people who are having so much difficulty in the

19   social world, even if that social word is a prison, that Ad.

20   Seg. is a relief.

21       And, you know, we ought to think about what to do

22   with those folks as well in a perfect world.  To say the

23   least, this isn't a perfect world.

24       But we know -- I'm about to tell you, and you're

25   supposed to tell me.

3370

1      We've agreed, I think, just a moment ago, that the

2   variety of coping skills is very various?

3          THE WITNESS:  Yes.

4          THE COURT:  And the prison system -- and the Ad. Seg.

5   system is designed in some sense to be sufficiently stressful

6   so that people will say, Gee, I'm being punished for conduct

7   that if I want to avoid this, I really better not do.

8          Fair?

9          THE WITNESS:  In some circumstances.  For those that

10  may have more enhanced outpatient, like at EOP --

11         THE COURT:  No.  No.  I'm saying everybody put into

12  Ad. Seg. is -- well, that's not true of California.  But

13  almost any place else in the world, everybody who is being

14  put into Ad. Seg. is being punished.

15         THE WITNESS:  Yes, sir.  I think that's a fair

16  statement.

17         THE COURT:  And punishment is designed to be

18  stressful, more stressful than being in GP?

19         THE WITNESS:  As a general rule, yes.

20         THE COURT:  Of course it is.  I mean, I don't have to

21  be a psychiatrist to say that.  I'm about to get to a

22  psychiatric problem however.

23         But the fact that apparently, according to this study

24  anyhow in Colorado, there appears to be no effect, would seem

25  to be inconsistent with the fact that people are so varied.

3371

1           Do you agree or disagree?

2           THE WITNESS:  I agree in part.  If you look at --

3    they did divide that some people did worse, like 7 percent,

4    but 20 percent did better.  So it did express, if you looked

5    at the details of the study, that there was variation.

6           But kind of as a general conclusion were those that

7    were followed, was it to the level and severity of

8    deterioration they expected, if at all, not as a group.  But

9    you're absolutely correct.  There are some individuals that

10   will do worse, some do better.

11          THE COURT:  If we -- well, okay, that's a legal

12   question.

13          Okay.  I'm sorry I interrupted you, Mr. Fischer.

14   BY MR. FISCHER:

15   Q.      Dr. Scott, in the Colorado segregation unit that was

16   studied, they didn't use cages; is that correct?  To deliver

17   treatment?

18   A.      No, it was not described that they used the

19   therapeutic modules.  That is correct.

20   Q.      And treatment was provided in confidential settings?

21   A.      No, not as they described it.  They would have once a

22   month a mental health door check.  If the inmate at that

23   point asked for more care confidentially, then they would

24   arrange it.  But the majority of the care was given at the

25   cell door.

3372

1    Q.       If I can turn your attention to page 11.

2             This is under the heading "Mental Health Services."

3    I'm referring to the second paragraph where it states, quote.

4             (Reading:)

5             Mental health appointments occur in a noncontact

6             booth in the visiting room.

7             (Reading concluded.)

8             Do you see that there?

9    A.       Yes.

10   Q.       And that would be a confidential setting?

11   A.       It could be, yes.

12            As I said, these were the appointments only if the

13   inmate asked, but it wasn't the routine mental health check.

14            THE COURT:  You understand that any welfare checking

15   done in California -- maybe you don't know -- in California's

16   segregate units it's through a solid door.  The clinician is

17   trying to speak to the inmate through the crack in the door,

18   between the door and the jamb.

19            THE WITNESS:  Yes.  I've been on those units so I

20   understand that.

21            THE COURT:  Do you know whether that was the

22   condition in Colorado?

23            THE WITNESS:  Yes.  They described that was through

24   the cell door.

25            THE COURT:  Okay.

3373

1    BY MR. FISCHER:

2    Q.      Dr. Scott, coming back to welfare checks for a

3    moment, welfare checks are an important component of the

4    treatment that you said is provided in California segregation

5    units?

6    A.      Depends how you would define it.  I think certainly

7    the contact with the mental health clinicians is a welfare

8    check.  Are you talking about the custody welfare checks?

9    Q.      Correct.

10   A.      It can be, yes.

11   Q.      And you're aware through the Program Guide those

12   custody welfare checks only occur for the first 21 days in

13   administrative segregation?

14   A.      As I understand it -- are the ones that happen three

15   times an hour for the first 21 days?

16   Q.      Yes.

17   A.      Yes.  And then they have the daily LPT and visual

18   checks after that.

19   Q.      But the regular custody welfare checks end after 21

20   days, correct?

21   A.      The welfare, but they continue the visual checks.

22   Q.      And the custody welfare checks don't occur at all in

23   the CDCR SHUs per the Program Guide, correct?

24   A.      It's not listed in the Program Guide, that's correct.

25   Q.      And the same thing for the psychiatric services unit,

3374

1   which is the SHU for the EOP population?

2   A.      You're correct, not the separate welfare check.

3   Q.      As you discussed the segregation unit that was

4   studied in this Colorado study had an incentive-based

5   program, correct?

6   A.      Yes.

7   Q.      And the duration of this study was limited to one

8   year in segregation, correct?

9   A.      Yes.

10  Q.      If I can turn your attention to page 79 of the

11  document, Plaintiffs' Exhibit 2644?

12  A.      Okay.

13  Q.      At the bottom of page 79 under the heading

14  "Limitations," starting at the end of the second-to-last line

15  where it says, quote:

16          (Reading:)

17          This study can only be generalized to other prison

18          systems to the extent that their conditions of AS,

19          Ad. Seg., confinement are similar to Colorado's.

20          (Reading concluded.)

21          Do you see that there?

22  A.      Yes.

23  Q.      Dr. Scott, you're aware of -- first of all, the

24  Colorado study was published in or about 2010, correct?

25  A.      This was submitted as a grant conclusion in 2010, but

3375

1    a different aspect of the study was published in 2013.

2    Q.       2013, earlier this year?

3    A.       Yes.

4    Q.       Since both of those documents were published, you're

5    aware that the Colorado Department of Corrections -- the head

6    of the Colorado Department of Corrections has found that Ad.

7    Seg. is not a place for offenders with mental illness?

8    A.       I'm not aware of that.

9            (Exhibit handed to witness.)

10   Q.       Dr. Scott, this is a memorandum dated December 10th,

11   2013, by the Department of Corrections to Wardens, Offender

12   Services.

13           MR. FISCHER:  I would ask to move Plaintiffs' Exhibit

14   2071.  I would ask it be moved into evidence.

15           MS. VOROUS:  Objection, Your Honor.  Lack of

16   authentication, foundation.  It appears to be hearsay.

17           THE COURT:  Good objection.

18           MR. FISCHER:  This is on State of Colorado

19   letterhead.

20           THE COURT:  I absolutely believe it is on the State

21   of Colorado letterhead.  I would assume it actually is what

22   it purports to be, but, you know, with today's electronic

23   things you could make this up without even trying.

24           The objection -- I will accept this -- if you find

25   some way -- if you tell me that you will find some way to

3376

1    authenticate it, I will, on that representation, permit you

2    to go forward.  But otherwise, if you can't do more than say

3    we found this somewhere, I know nothing about the document.

4            MR. FISCHER:  Okay.  If I can proceed on that

5    condition that we admit it based on verification.

6            THE COURT:  All right.  I hope -- you know, I don't

7    remember really.  We've admitted a number of documents with

8    those conditions, and whether they've ever been

9    authenticated, I can't say.

10           All right.  Upon that representation you may proceed.

11           I'm conditionally admitting it, the condition being

12   that at some point before the end of the case you properly

13   demonstrate its authenticity.

14                   (Whereupon, Plaintiff's Exhibit 2071

15                    conditionally received into evidence.)

16    BY MR. FISCHER:

17   Q.    Dr. Scott, on Plaintiffs' Exhibit 2071, it states

18   that -- on the State of Colorado Department of Corrections

19   memo to Wardens states, quote:

20           (Reading:)

21           As you know, we, as a department, have been working

22           to move all of our offenders housed in administrative

23           segregation with a major mental illness out of Ad.

24           Seg.  I'm asking that, going forward, please ensure

25           your staff are aware that offenders with MMI

3377

1           qualifiers cannot be referred for administrative

2           segregation placement.

3           (Reading concluded.)

4           Are you aware that mentally ill prisoners in the

5    Colorado Department of Corrections are being moved out of the

6    administrative segregation?

7           MS. VOROUS:  Objection.  Asked and answered.  He's

8    already indicated he's not aware of that.

9           THE COURT:  I'm sorry.  If he said that, I apologize,

10   I don't remember.

11          Sir, do you know?

12          THE WITNESS:  I don't know.  You asked me that

13   earlier.  The answer is I don't know.  But this document, you

14   would have to figure out how do they define "major mental

15   illness qualifiers."

16          For example, in some jurisdictions, that can be

17   active psychosis or suicidality as the definition.

18   California, as well, excludes and refers those people out of

19   Ad. Seg. as well.

20          So just because they say a "major mental illness

21   qualifier," if you look at the code for that, it could easily

22   be active psychosis, suicidality.  Because, as you know, in

23   the Colorado system, unlike California, you could be in a

24   crisis for up to five days and not transfer to a mental

25   health crisis bed.  You could be suicidal or actively

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3378

1   psychotic and kept in the Colorado Ad. Seg. environment.  And

2   that was described in their study, and there were concerns

3   about that.

4        So I don't know if this memo is in response to them

5   holding those with a major active mental illness instead of

6   transferring them to a mental health crisis bed.  Because

7   that did come out in the study, which California doesn't do

8   that.  They transfer them to a mental health crisis bed.

9   BY MR. FISCHER:

10  Q.    Are you aware that the segregation unit that was the

11  subject of this Colorado O'Keefe study has since the

12  conclusion of the study been closed?

13  A.    No.

14        MR. FISCHER:  One moment, Your Honor.

15        (Cocounsel confer.)

16        Your Honor, I have no further questions.

17        THE COURT:  Redirect?

18        MS. VOROUS:  No, Your Honor.

19        THE COURT:  Doctor, you just, I think, demonstrated

20  why I'm concerned with all of this.  You pointed out, quite

21  rationally, I -- didn't mean that -- I mean appropriately

22  that you've got to know what you are talking about.

23        And we don't know how -- strike that.

24        Do we know how the definition of "mental illness" in

25  Colorado corresponds with the definition of "serious mental

3379

1   illness" in California?

2        THE WITNESS:  We do know from the study that they did

3   how they define "serious mental illness" in the study.  The

4   term used in the memo he gave me was a different term than

5   used in the study.  So I can tell you that there was

6   similarities between how "serious mental illness" was defined

7   in the study, and they called it "serious mental illness,"

8   but not the other term.

9        And then I also know very clearly how California

10  defines "serious mental illness."  So there was similarities

11  between the two.

12       THE COURT:  There was similarities, in your view?

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Okay.  My questions invite questions from

15  counsel?

16       Plaintiff?

17       MR. FISCHER:  None for plaintiffs.

18       MS. VOROUS:  No, Your Honor.

19       THE COURT:  Defendant, no.

20       May the witness be released?

21       MR. FISCHER:  Yes, sir.

22       MS. VOROUS:  Yes, sir.

23       THE COURT:  Thank you, sir.  You are free to go or

24  stay, as you choose.

25            (Having been previously sworn, Michael Stainer

3380

1                  resumes the witness stand.)

2              THE COURT:  Mr. Stainer, I remind you, you are under

3      oath.

4              THE WITNESS:  I understand.

5              THE COURT:  Mr. Bien.

6                          CROSS-EXAMINATION

7      BY MR. BIEN:

8      Q.      Good morning, Mr. Stainer.

9      A.      Good morning, Mr. Bien.

10     Q.      The process -- the pilot program that you testified

11     about involves file reviews of two categories of prisoners in

12     the California SHU system, gang members -- validated gang

13     members, and you have added that category; is that correct?

14     A.      That's correct, in addition to the associates.

15     Q.      And the associates.  And what is an associate gang

16     member?

17     A.      A validated associate of a prison gang, or A STG-1 as

18     we refer to them today, is somebody who we have sufficient

19     evidence of their affiliation with that gang.  However, not

20     sufficient evidence to show they're an actual member.

21     Q.      And I was a little confused, you testified that a few

22     prisoners who are also EOP have gone through this process; is

23     that correct?

24             THE COURT:  The process of working themselves out?

25     ///

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3381

1    BY MR. BIEN:

2    Q.      Or have been in this file review process you talked

3    about, the pilot program, to get out of the SHU?

4    A.      Yes.  It's actually more than a file review.  It is

5    an actual in-depth file review, but it's an ICC -- director's

6    level ICC where the inmate is present and participates in the

7    hearing.  But it is my understanding, and I don't have the

8    facts -- I don't know the exact number, but through

9    conversation with the chairpersons of this case-by-case

10   committee, I have been informed that we have had, I want to

11   say, two -- for some reason that number sticks in my head --

12   participants that were housed within the PSU and were

13   ultimately released to the general population EOP program.

14   Q.      So it's a small fraction of the several hundred

15   prisoners who are in the PSU?

16   A.      I would say, yes, a very small fraction.

17   Q.      Would you agree that in your experience with working

18   with California gangs, that they tend to exclude prisoners

19   with mental illness?

20   A.      I can't say that in totality.  I think we have very,

21   very few affiliates within the prison gangs at the EOP level.

22   We do have a number -- I don't know that number -- that are

23   at the CCCMS level.

24   Q.      So you started this pilot in November of 2011?

25   A.      2012.  It was November of 2012 it was approved by the

3382

Office of Administrative Law.

1

2  Q.      You have done 600 so far?

3  A.      Roughly.

4  Q.      Twenty percent of the total?

5  A.      That was our -- of those that are housed within SHU

6  at this point.  Yes, sir.

7  Q.      And you think it is going to take, at this pace, two

8  more years to go through the affiliates and the gang members?

9  A.      That would be our estimate.

10         We're not sure how long specifically it will take to

11  complete the case-by-case reviews in totality.

12  Q.      How many teams are doing these reviews?

13  A.      Presently we have three -- four teams.

14  Q.      And you mentioned that -- so these men who are going

15  through these reviews have indeterminate SHU terms, correct?

16  A.      That is correct.

17  Q.      And you mentioned that there's another type of

18  indeterminate SHU term.  You can have an indeterminate SHU

19  term and not be either a gang affiliate or a validated gang

20  member; is that correct?

21  A.      That's true.

22  Q.      And let's talk about those types of indeterminate SHU

23  terms.

24         How can you get an indeterminate SHU term and not be

25  either a gang affiliate or a gang member?

3383

1    A.       I believe, as I testified, there's two other ways

2    that a person could be assessed an indeterminate security

3    housing unit term.

4           The first would be for repetitive behaviors,

5    repetitive SHU terms.  And at the conclusion of their SHU

6    term, they can be assessed an indeterminate SHU term.  And

7    generally that's, through my experience and I believe I can

8    refer to the regulations, but generally three security

9    housing unit terms within a period of time, two riots within

10   a period of time, and then, again, they would be assessed an

11   indeterminate SHU term.

12          The second one of that we're discussing would be a

13   person who there's no other type of housing that this person

14   can go to.  This is a person generally -- and these have to

15   come all the way up to me.  I actually sit on that.  We have

16   some schedule for today.  The deputy director will be sitting

17   on them because I'm here.  But these cases are reviewed by

18   the director, in which case the institution -- there is no

19   other alternative housing for the individual.  And generally

20   this might be the person who has been -- there's very valid

21   safety concerns that the individual has.  And the person will

22   not go to an SNY yard so there is just no other place to put

23   this individual.

24          THE COURT:  Why wouldn't he go to the SNY yard, if

25   you know?

3384

1          THE WITNESS:  I think we've seen a lot of this, Your

2     Honor, is that the person will not acknowledge their safety

3     concerns.  And there are some -- you know, there are not

4     hundreds and hundreds and hundreds of these individuals out

5     there.

6          The other is some inmates, there is a stigma that

7     they're not willing to accept, that goes along with the SNY

8     yard based upon what they believe is the type of inmates that

9     routinely would go to the SNY yard.

10          THE COURT:  Understood.

11     BY MR. BIEN:

12     Q.     As part of that stigma, one group of people who go to

13     the SNY are what might be referred to in prison culture as a

14     "snitch," someone who has admitted membership in a gang and

15     has, through your debriefing program, implicated other

16     members of the gang?

17     A.     The prison culture does define those.  The official

18     term for those people are those who have disassociated or

19     debriefed from the gangs.

20     Q.     And in your experience, someone who has gone through

21     a debriefing program can be at risk of retaliation from other

22     members of the gang?

23     A.     That's why they're placed on the sensitive needs

24     yards.

25     Q.     And have you -- and you understand that some

3385

1    prisoners don't want to, even though they're afraid for their

2    safety, don't want to go to a sensitive needs yard because

3    they don't want to be considered a snitch for the rest of

4    their lives?

5    A.      Even when you ask the inmate that question -- you

6    know, I may have heard that once or twice.  But again, their

7    reasons vary.  They don't want to be -- they don't want to

8    program with the people that -- you know, the sex offenders,

9    the pedophiles, they have a hard time programming within our

10   general populations.  They don't want to program with those

11   individuals.

12          Some just will not acknowledge that they have any

13   safety concerns within a gang, even if they are -- even if

14   they're totally validated.

15   Q.      So these indeterminate SHU terms that follow a SHU

16   term, are mentally ill prisoners eligible for those?

17   A.      They cannot -- yes, sir.

18   Q.      So a mentally ill prisoner, who has been unable to

19   handle the environment, continued to act out and had some

20   serious behavior problems, might get an indeterminate SHU

21   term after completing a determinate SHU term?

22   A.      Not sure why he exhibited the behaviors, but yes, the

23   person can get an indeterminate SHU term after multiple

24   security housing unit terms and returning to the general

25   population and coming back and forth to the SHU, yes, sir.

3386

1    Q.      What does the term "program failure" mean?

2    A.      That is one of the issues, the person who is --

3    again, this is an exhibition of failing to program within

4    that general population, the repeated behaviors.

5            It could also be -- a program failure is somebody who

6    wouldn't necessarily mean a security housing unit term.

7    However, it could result in the placement on the C status.  C

8    over C they refer to it as.  This is a person who is refusing

9    to report to their job assignments, continues to get minor

10   infractions within the facility.  He doesn't necessarily

11   constitute a threat to security of the institution, but, you

12   know, I think it has been referred to as nuisance RVRs by

13   some people.

14   Q.      Let's talk about the people who are in the SHU.

15           So I just want to make it clear, you can have a

16   prisoner with mental illness who gets an RVR, that's a

17   SHU-able offense, serves the SHU term, acts out in the SHU

18   term, let's say he masturbates and gets a RVR for

19   masturbation.  That's something you get an RVR for?

20   A.      Correct.

21   Q.      And he does it multiple times.  That person, when he

22   finishes his MERD, you called, minimum estimated release

23   date, he may go to committee, even though he served his time,

24   and be given an indeterminate SHU term?

25   A.      He could be eligible.  He would definitely be

3387

1    reviewed for that.  Whether or not, and it is case by case,

2    not always, it is not mandated that the person receive that

3    indeterminate SHU term, but in the case that you described

4    that would be considered.  Whether or not the committee would

5    assess the indeterminate, again, it would be a case-by-case

6    review.

7    Q.      Some of the people who do have indeterminate SHU

8    terms are people like that, who have exhibited uncontrollable

9    sexual behavior, including exhibitionism and masturbation in

10   segregation units?

11   A.      They could be, yes.

12   Q.      Are you aware of prisoners like that in today's --

13           THE COURT:  He may not have a specific person in

14   mind, but he's agreed with you that occurs.

15   BY MR. BIEN:

16   Q.      Okay.  That does occur?

17   A.      That could occur.

18           THE COURT:  I didn't mean to interrupt, Mr. Bien, but

19   sometimes -- Go ahead.  I'm sorry.

20   BY MR. BIEN:

21   Q.      You were here for Dr. Austin's testimony,

22   Mr. Stainer, correct?

23   A.      I was.

24   Q.      And he talked about -- one concept that he talked

25   about, which I think you also talked about in your testimony

3388

1  yesterday, was the importance of swift and certain punishment

2  in order to gain control of a prisoner who is misbehaving.

3        Do you agree with that principle?

4  A.      I agree that accountability, unlike revenge, is not

5  best served cold.

6  Q.      Okay.  I think you said yes.  I like that.

7        And you talked about that in terms of the management

8  cell -- management status within administrative segregation

9  units, correct, that if someone acts out, the people who are

10  running that unit need to be able to do something swiftly?

11  A.      Excuse me.  Yes.  I think what I was referring to

12  with the management cell, if there is a certain set of

13  behaviors going on, we need to stop those behaviors.

14        It is very limited behaviors.  It is not just the

15  person yelling through the cell door.

16  Q.      Okay.  Management status also applies in the SHU?

17  A.      There are management cells in management status

18  within the SHU, yes, sir.

19  Q.      The same thing you testified to yesterday is

20  applicable in the SHU?

21  A.      It could happen, yes.

22  Q.      And also in the PSU?

23  A.      I would assume so, yes, sir.

24  Q.      Dr. Austin talked about systems he's worked with

25  where the RVR process, from start to finish, from writing up

3389

1    the violation to completing the hearing, can be done within

2    ten business days.

3             You heard him testify on that?

4    A.       I did.

5    Q.       And our RVR process here in California takes far

6    longer; isn't that correct?

7    A.       It does.

8    Q.       In fact, if there's a need for an investigation,

9    isn't it correct that you would expect that institutions

10   routinely ask for a postponement of the deadline to hold the

11   RVR hearing so that they can complete their investigation?

12   A.       No, not necessarily.  Title 15, our California Code

13   of Regulations, is very specific on when we can postpone the

14   hearing of that 115.  And it's very restrictive.

15            The most common that we see out there is when a

16   felony has been committed, and it is going to be referred to

17   the district attorney for evaluation and possible

18   prosecution.  And even in that case, the inmate has the

19   opportunity.  And it is totally his choice on whether to

20   postpone the rule violation report hearing pending the

21   outcome of that decision by the district attorney.

22   Q.       And if that happens there is a procedure for

23   extending the time that the prisoner is in Ad. Seg. pending

24   his RVR?

25   A.       Well, yes.  What we would do -- and it is dependent

3390

1    upon the offense.  In most -- in almost all cases, with the

2    exception of maybe drugs, which does not necessitate

3    placement into the administrative segregation unit, there is

4    no requirement to do that on just a simple possession, but

5    that is a felony that is referred.  However, the -- it would

6    be held in abeyance pending the outcome.  The hearing itself

7    would be held pending outcome.

8           But almost all offenses which would result in

9    referral to the district attorney would also carry a security

10   housing unit term.  So what the committee does at that point

11   is they would actually calculate what -- they call it a

12   projected MERD, minimal eligible release date, so that we

13   wouldn't retain that person in the administrative segregation

14   unit longer than if he were found guilty and subsequently

15   assessed a security housing unit term.

16          So, you know, some inmates actually would serve that

17   projected MERD.  And if it was possible to release the

18   individual back to the general population, they would be

19   released back to the general population.

20   Q.     So you're talking about a case where there has been

21   no finding that the inmate violated the standards; he's been

22   charged with a RVR, correct?

23   A.     Correct.

24   Q.     And he's going to serve the minimum estimated release

25   date time in Ad. Seg. during that time period while it is

3391

1   pending, correct?

2   A.      That's correct.  Because what we're trying to avoid

3   is, if it is an offense that would carry a relatively short

4   SHU term, and it is a referral, and if the DA has elected --

5   and sometimes it takes a while for the district attorney to

6   evaluate and make a decision on whether or not to prosecute

7   the offense -- but this is in order to avoid having the

8   inmate spend time in the administrative segregation for

9   longer than is necessary; not to punish prior to due process.

10  Q.      You keep them there until -- for example, if it is a

11  three-month term, you keep them there during the whole three

12  months, the minimum estimated release date he could get if

13  found to have violated the RVR?

14  A.      Actually, taking into consideration the same

15  considerations that we would had he been found guilty with

16  regard to the aggravating or mitigating factors.

17          So we would, again, not automatically assess the

18  maximum amount.  We would look, again, at the aggravating and

19  mitigating factors to determine the appropriate -- just as if

20  he were found guilty.  Yes, sir.

21          THE COURT:  I am very confused.

22          Everything that you are testifying to would be the

23  same if the person was a Coleman Class Member?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Okay.  The point is, if we ever get to

3392

1    anyplace where there is a distinction between Coleman Class

2    Members and general population, you let us know, will you?

3            THE WITNESS:  Yes, sir.

4            THE COURT:  Okay.  Because I didn't know what we were

5    doing.  Now I do.

6            Go ahead.

7    BY MR. BIEN:

8    Q.      And you also said that in these situations where,

9    again, there's been some reason to extend the time for the

10   hearing, either for investigation or because of a DA

11   referral, you make sure that the person doesn't serve longer

12   in the Ad. Seg. than the MERD, right?

13           But also at the end of that period, if the -- if

14   there is a determination made this person can't go back to

15   general population, you can still keep him in Ad. Seg.,

16   right?

17   A.      That's correct.

18           The conditions of confinement would change, and we

19   would have to define the reasons as to why their housing

20   would require placement into administrative segregation.

21   And they would receive a new 114-D lockup order and new

22   hearing.

23   Q.      And that could be for -- because you thought the

24   person -- give me some examples why this person, you haven't

25   had an RVR hearing, why is it that this person who has been

3393

1    in Ad. Seg. and he's now served his minimum MERD term that he

2    would have had if he had been convicted of a RVR, why would

3    you be able to hold him in Ad. Seg. even longer?

4            What would be the reasons?

5    A.      The same reasons to place a person in administrative

6    segregation to begin with, which would entail that their

7    presence within that general population would be a threat to

8    themselves, others or, you know, staff or the security of the

9    institution.

10           So an example of that might be he -- based upon the

11   incident that got him placed in administrative segregation

12   he's developed enemy concerns where he cannot return to that

13   facility.

14   Q.      So, for example, one of the people who doesn't

15   qualify under the new NDS program would be somebody who had

16   some responsibility for the enemy concerns that they brought

17   up?

18           For example, I think Miss Allison mentioned if

19   someone had a drug debt, they had been dealing in drugs or

20   buying drugs, correct, they wouldn't qualify under the new

21   NDS program, right?

22   A.      That's correct.

23   Q.      So if someone has a safety concern from a drug debt

24   one of the options is to charge them with possessing drugs or

25   admitting that they were dealing drugs, correct?

3394

1    A.      If there was sufficient evidence to charge the
2    individual, that is an option.
3    Q.      So this person -- and let's say, this is just a
4    hypothetical, you refer him to the DA, postpone the hearing
5    for investigation, they served their MERD term, now you have
6    had -- and you decide this person still has safety concerns,
7    right?  Still has these guys pissed off because he wouldn't
8    pay for the drugs or he didn't deliver the drugs he was
9    supposed to deliver, right?  You may decide this person is
10   too dangerous to go back out into general population?
11   A.      Generally, he's telling us he cannot go back to the
12   general population.
13   Q.      This applies to prisoners with mental illness too,
14   the same rules?
15   A.      That is correct.
16   Q.      And so he could then remain in Ad. Seg. while you
17   investigated his safety concerns, for example?
18   A.      Hypothetically, yes.
19   Q.      Okay.  You would want to find a place to put him, I
20   assume.  What kind of place could you put someone like that?
21   A.      Again, there is no blanket answer.  It would totally
22   be dependent upon that person's case factors.
23           Not everybody that locks up in administrative
24   segregation because they have safety concerns within a
25   general population facility goes to an SNY facility, for

3395

1    whatever reason.

2          That determination is made through conversation and a

3    unit inquiry or investigation, which this person has a --

4    this person is a stakeholder in this investigation because

5    our goal is to get them out of Ad. Seg. as quickly as

6    possible and back to the least restrictive housing and back

7    to programming and rehabilitation and everything that they

8    are, you know, having a hard time participating in while in

9    the administrative segregation unit.

10         So I don't want to get off track here -- what was the

11   question?

12         I'm sorry.

13   Q.    That's okay.

14         So when this person --

15   THE COURT:  There are people who are nondisciplinary

16   who will be held over because there is no place you can

17   figure out where to put them?

18   THE WITNESS:  There's very, very few people we cannot

19   figure out a place to put them.  Some it might take longer.

20   THE COURT:  Okay.

21   BY MR. BIEN:

22   Q.    And in order to place someone who is nondisciplinary,

23   but has safety concerns, okay, we're talking mentally ill

24   prisoner, but he doesn't fit into nondisciplinary category

25   because, let's say, it is complicated.  He had some

3396

1    responsibility for what happened.

2         Before you can -- I just want to go through the steps

3    necessary in the current procedure before you can move that

4    prisoner to another facility or determine whether or not they

5    need to move.

6         So there has to be an investigation of his safety

7    concern, right?

8         You don't just take his word for it, you need to

9    investigate that; is that correct?

10   A.    We need to validate, yes, sir.

11   Q.    And who does that?

12   A.    Generally, I can tell you what the expectation is

13   specifically with regard to the Expedited Transfer Memo dated

14   December 3rd, and I can tell you from my experiences.

15   Q.    We're talking about people who are not in the NDS

16   category.

17   A.    The people not in the NDS category generally are

18   going to have some behavioral issues that need to be resolved

19   at the same time as we're addressing their safety issues.

20        So in that case, the inmate would either volunteer --

21   95 percent of the time the inmate is volunteering the fact

22   that he has some safety concerns.

23        Once those are volunteered, then we would assign

24   somebody to complete the inquiry, which would entail first of

25   all interviewing the inmate, and then doing any file reviews

3397

1   that might need to be -- to corroborate, I guess, for lack of

2   a better term, or it is the term, to corroborate the concerns

3   that he's stating, you know, based upon the facts he's

4   providing.  Sometimes we're not able to corroborate, but

5   still we would err on the side of caution.

6           And then the recommendation would be made at that

7   point that, you know, it appears this person cannot return to

8   the general population facility.  He has asked for, you

9   know --

10  Q.      Let me stop you there.

11          So there is this investigator.  That is someone at

12  the prison where he's located, correct?

13  A.      Yes, sir.

14  Q.      And what rank is that person usually?

15  A.      It's going to depend by area.  Sometimes it's an

16  officer.  Sometimes it's a sergeant or lieutenant.

17  Q.      Okay.

18  A.      Sometimes it's our investigative units or gang

19  investigators depending upon what the circumstances are

20  surrounding those issues.

21  Q.      And again, as the court asked, is there a different

22  procedure if the prisoner -- the subject of this

23  investigation is mentally ill?

24  A.      At this point there is not.

25  Q.      And is there a deadline in Title 15 for when that

3398

1    investigation has to be completed?

2    A.      I don't believe that there is.

3    Q.      And in your memo for NDS, you said -- one of the

4    things you said was to complete this investigation before the

5    ICC.

6            Is that correct?

7            That's one of the things that you urged the wardens

8    to have their institutions do?

9    A.      I forget the exact words, but what I stated is, you

10   know, it is going to be imperative that that investigation,

11   when possible, is completed by that initial review so the

12   committee can make a recommendation.

13   Q.      And that ICC takes place ten business days after the

14   Ad. Seg. hold?

15   A.      Within ten calendar days.

16   Q.      Ten calendar days?

17   A.      Within ten calendar days.

18   Q.      So that's your expectation under the new NDS

19   procedure for people in that category?

20   A.      That's correct.

21   Q.      So if you're not in that category, it may take

22   longer?

23   A.      It may take longer, yes.  However, you know -- yes.

24   Q.      Especially if it is a complex case where there is

25   both some disciplinary issues and safety issues?

3399

1    A.        That's correct.

2    Q.        And isn't it routine to ask in those kinds of

3    situations to ask -- ask to postpone the hearing?

4              Isn't that one of the valid reasons to postpone the

5    time for the hearing -- or the time that you're allowed to

6    hold someone in Ad. Seg.?

7              Isn't there some procedures you have to ask --

8              THE COURT:  You've now asked about four or five

9    different questions.  I have no idea what you're really

10   asking.

11             MR. BIEN:  I'll start over.  I apologize.

12   BY MR. BIEN:

13   Q.        In this circumstance, where there is a nonroutine

14   investigation, more complex investigation, is there a way

15   that the deadlines can be extended?

16   A.        Not generally, no.  Again, the Title 15 is very

17   specific on once you have been charged as to when that 115

18   has to be adjudicated by, when you have to get your first

19   copy and for how many days after that we have to adjudicate

20   and resolve that 115.

21   Q.        What's the role of CSR in this process?

22   A.        The classification staff representative is my

23   representative.  This person is assigned to the

24   classification services unit.  They are the rank of a CC III,

25   which is a Correctional Counselor III, and they do several

3400

1    things.

2            First and foremost they review cases that have been

3    referred for transfer.  And they would ensure that the

4    transfer is appropriate.  And then they would approve the

5    transfer or return it to the institution should they have

6    missed something.

7            The second part of the CSR would be to provide Ad.

8    Seg. extensions.  Okay.  So, you know, one of the things that

9    the initial ICC does, when they see that person for the first

10   time, is they try to estimate how long that person will

11   remain in administrative segregation.

12           If it is determined by ICC that it is reasonable to

13   believe that person will be in administrative segregation

14   past 30 days, they must receive -- refer and receive an

15   extension.  And it is a set amount of days that they have and

16   that they can ask for.

17           And the CSR would review that and determine if it was

18   appropriate and either grant the extension or not.

19   Q.      So someone hasn't -- if an investigator hasn't

20   completed the investigation for a mentally ill prisoner at

21   the time of the initial ICC of ten days, one of the options

22   ICC has is to ask for permission to extend the time that they

23   can hold that person in Ad. Seg. beyond the normal time

24   frames?

25   A.      Yes.

3401

1   Q.      Okay.  And for investigations, what are the time

2   frames that are routinely asked for?

3   A.      Generally, 30 days.

4   Q.      Okay.  And is it sometimes 60 days or 90 days?

5   A.      Generally, most cases, my experience is the CSR will

6   not approve a 90-day Ad. Seg. extension or even in a lot of

7   cases a 60-day Ad. Seg. extension for an investigation into

8   safety concerns.

9   Q.      Okay.  So for a mentally ill person that has gone

10  through this process, the investigation's been completed,

11  there has been a hearing by the ICC and they've determined

12  that the person needs an SNY yard, qualifies.  Is that one of

13  the outcomes they could make in --

14  A.      That could be one of the recommendations.

15  Q.      Okay.  And does the person transfer at that point

16  once the ICC has -- they finished the investigation, they

17  finished their hearing, they validated his safety concerns,

18  he's mentally ill.

19          Does he move then.

20  A.      The process would be if he needs to transfer to

21  another facility, whether it be SNY or general population,

22  the classification committee would, at that point, make a

23  recommendation for approval for transfer to the CSR.

24          And usually in 99.9 percent of the cases they ask for

25  a primary transfer location with a secondary transfer

3402

1    location.  And then the case is then presented to the CSR,

2    usually within a couple of weeks, and the CSR would then

3    approve the person for transfer.

4    Q.    So the CSR is not at the prison?

5    A.    Actually, presently they have to go to the prisons

6    because they have to review the central file to ensure that

7    everything was done appropriately.

8    Q.    So where is -- the Classification Services

9    Representative, where are their offices?

10   A.    Sacramento headquarters.

11   Q.    So you're at Corcoran.  You have a guy with safety

12   concerns, and you have gone through this process, charged

13   him, investigated, you have had an extension, the committee

14   now has recommended him for transfer, they pick two places

15   that he can go, he's mentally ill, and now we have to wait

16   for someone from Sacramento to -- do you have to physically

17   come to Corcoran to have the hearing?

18   A.    Yes.  Just to kind of clarify and paint this picture,

19   we have numerous CSRs.  It is not just one person.  And they

20   generally are at an institution every single week reviewing

21   the general population cases, the administrative segregation

22   cases, the SHU cases, the reception center cases.

23         And they generally stay at that institution for the

24   entire week.  The only institutions they do not travel to are

25   female institutions where the cases are reviewed remotely

3403

1  based upon all the female files have been scanned and are now

2  into our electronic records management system.

3          THE COURT:  What is FIMA (sic) please, sir?

4          THE WITNESS:  Female.  Female prisons.

5  BY MR. BIEN:

6  Q.      So why don't they just stay -- is there one for each

7  prison, a CSR?

8  A.      They rotate.  The reason for that is because we want

9  to have the centralized oversight.  We don't want the person

10  to become embedded within that institution.  These people

11  actually work for me to apply the department's policies and

12  to ensure the institutions are following the policies, and

13  that, you know, the transfer recommendations are appropriate,

14  that they're -- you know, when they're asking for 90-day Ad.

15  Seg. extension to complete the investigation, to approve the

16  appropriate length of time which might only be 45 days or 30

17  days.

18          They're almost like a separate entity.  They are an

19  oversight, and, you know, the classification watchdog for

20  lack of a better term.

21  Q.      So no one transfers until the CSR travels to the

22  prison.

23          And do they have a hearing?

24          What do they do?

25  A.      No, sir.  Simply just to kind of, again, paint some

3404

1    more pictures, once that entire process has taken place, the

2    investigation is complete, the inmate has been seen by ICC

3    and made their transfer recommendations, the classification

4    chrono has to be generated.

5          It's generated.  It goes for signature.  The case

6    worker has to sign it.  The CMPR, who is a classification and

7    parole representative signs it, and the chairperson signs it.

8          It then goes to the file.  That file is prepared,

9    make sure all the documents are in order, and it is placed in

10   a section of the records office.  And the CSR, when they come

11   in, they have a list of everybody they are to review.  And we

12   call it the CSR Result Sheet.

13         It will have the offender's name and number, where

14   they're presently housed, Ad. Seg., SHU, you know, whatever,

15   and then what the recommendations are.  And then the CSR

16   would review that file.  They would make their determination,

17   their decision, and then they would log that on that result

18   sheet.  They would also print out a small chrono -- a

19   smaller, indicating their approval or their decision.

20   Q.      So you've testified that you have done this process

21   as a warden, and as, I guess, ranks below warden where you

22   sat on the ICC; is that correct?

23   A.      Yes, sir.  I've actually been a case worker in

24   administrative segregation.  I carried an Ad. Seg. caseload.

25   Q.      You have done this hundreds, thousands of times?

3405

1    A.    A lot.

2    Q.    And so before this process, before the CSR, the job

3    of the institution is to investigate, right, the inmate's

4    safety concerns, correct?

5    A.    Correct.

6    Q.    Check if there are enemies at other institutions?

7    They actually check that first?

8    A.    Prior to me, if I was the case worker, and I'm going

9    to present this case, the investigation is done and I have to

10   pick locations for him to go to, I'm going to check the 812.

11   I'm going to update it.

12   Q.    What is the 812?

13   A.    Excuse me.  The 812 and 812-C are the documents

14   within the central file that list all of the enemies and

15   supporting documentation for those enemies.

16        The 812-C is simply the confidential section where

17   those cannot be disclosed to the inmate.

18        But the first thing I'm going to do is I'm going to

19   review every one of those names.  I'm going to ensure the

20   supporting documentation is appropriate.  And I'm going to

21   check their locations to ensure the recommendation that I

22   make is an appropriate recommendation.

23        When I'm chairing the ICC, and the counselor is

24   making those recommendations, as the they are doing that I'm

25   going through the file.  And some of the first things I do is

3406

1    I'm hearing what the counselor is stating, and I'm looking on

2    those 812s to make sure that those recommendations are

3    appropriate.

4    Q.    The purpose of the ICC is to make sure the

5    investigator did his job?

6    A.    Correct.

7    Q.    Okay.  And three people have to sign that?

8          THE COURT:  Why are we having this inquiry?

9          MR. BIEN:  Your Honor, we're demonstrating why it is

10   that it takes weeks, months to move someone from point A to

11   point B when it would be done overnight.

12         THE COURT:  That assumes it could be done overnight,

13   but all right.

14         You think it is worthwhile, go ahead.

15         MR. BIEN:  Okay.

16         Not too much longer.

17         THE COURT:  Yeah.  I heard that before.

18   BY MR. BIEN:

19   Q.    The CSR, when they come to this institution, they've

20   got this file.  Let's assume the file has been done

21   appropriately.  What do they do?

22         Do they have a responsibility to check again for

23   enemies?

24   A.    Absolutely.  They make sure that the 812s are within

25   30 days.  And they would make sure that those

3407

1   recommendations -- that there were no enemies at the

2   locations that the CSR is going to approve this person to

3   transfer to.

4   Q.      So if the process got delayed at the institution, it

5   was more than 30 days, they might have to recheck the enemies

6   again or they might send it back to the institution for

7   another hearing?

8   A.      No.  It would not necessarily require an another

9   hearing.  The expectation is definitely within 30 days that

10  that case is viewed by the CSR.

11         However, if it is beyond that 30 days, then the CC-II

12  or CC-I would be required to recheck, not the CSR, the CSR

13  would not send it back, but to check the locations of the

14  enemies to ensure the transfer recommendations are still

15  appropriate.

16         And that's why we also list two recommendations, just

17  in case something happens between the time this person is

18  referred and the time that they're seen by the CSR.

19  Q.      This isn't just for safety concerns.  This is done

20  for any transfer?

21         Like, say, someone needed to go to a general

22  population EOP yard.  You still have the same process?

23  A.      Yes.

24  Q.      Okay.  And let's say the CSR -- jump ahead -- they've

25  gone through everything.  Everything is within time frames.

3408

1    They approve the prisoner for transfer.  What happens next?

2    Still at Corcoran now.

3    A.       So now at Corcoran they would now put this person on

4    the transfer list, and they would contact headquarters, the

5    transportation unit, and we call in our bus seat request once

6    a week.

7         So Corcoran would call in their bus seat request.

8    Generally, I want to say it is on a Tuesday, off top of my

9    head.  And they would provide numbers for every inmate within

10   their prison that they're requesting a bus seat for.

11        It wouldn't be that I'm requesting a bus seat for

12   Michael Bien and a bus seat for Michael Stainer.  But if you

13   and I were both endorsed to the same location, they would say

14   that I have two for institution X.

15        They would also list our housing.  Because if we're

16   administrative segregation, then we would actually be given

17   priority by the transportation unit.

18        They'd also list our mental health because -- whether

19   we need to get other entities involved in the transfer.  And

20   then that's what the institution would do at that point.

21   Q.       How long is a -- What's this called?  Is that called

22   "endorsement" by the CSR?

23   A.       Yes.  The CSR would endorse.

24   Q.       Endorsed for transfer.  At that point they're

25   eligible to move; is that correct?

3409

1    A.        Correct.

2    Q.        And they have to find a bus seat and find a place to

3    go?

4    A.        That's correct.

5    Q.        Okay.

6    A.        We've already found a place to go.

7    Q.        You found a place to go, but you have to get

8    transportation?

9    A.        Correct.

10   Q.        How long is the endorsement valid for?  How much

11   time?

12   A.        Generally, 180 days.

13   Q.        You're aware there are cases for Coleman Class

14   Members where their endorsement has expired before they're

15   transferred?

16   A.        I'm aware of that there are -- that does occur.

17   Q.        And then what happens?

18   A.        Prior to the endorsement expiring, the inmate would

19   be seen again by the committee and the process would repeat

20   and get the person reendorsed.

21   Q.        Are you aware that the OIG found in 2009 that at

22   least at some institutions, when an inmate was waiting for

23   transfer, and their endorsement had expired, upon

24   reendorsement they were not given any priority?

25            In other words, they lost track of the fact the guy

3410

1    had already been endorsed for 180 days, had the endorsement

2    expire, and then be reendorsed.

3    A.      I'll take your word for that.

4    Q.      Okay.  You're not aware of that OIG finding about Ad.

5    Seg. processes and how they were working?

6    A.      No.  I'm not aware of that specific report.

7    Q.      Okay.

8            So someone would have to be reendorsed and go back on

9    the list; is that correct?

10   A.      They would generally remain on the list.

11   Q.      Did you review -- you reviewed Dr. Haney's testimony,

12   and one of the things you testified about was his -- you

13   offered an opinion about his opinion that CCR uses

14   segregation to manage mentally ill prisoners; is that

15   correct?

16   A.      I believe I read that, yes.

17   Q.      And did you review the charts that he introduced into

18   evidence about populations of mentally ill in segregation?

19   A.      I'm not sure that I did.

20            MR. BIEN:  I'm not sure I can turn it on.

21            THE COURT:  That's all right.

22            We're going to lunch.  You can figure it out over the

23   lunch hour.

24            1:30, Ladies and Gentlemen.

25            (Off the record at 12:00 p.m.)

3411

1                    SACRAMENTO, CALIFORNIA

2             FRIDAY, DECEMBER 13, 2013, 1:32 P.M.

3                         ---o0o---

4          THE COURT:  Mr. Bien.

5                    MICHAEL STAINER,

6   was thereupon called as a witness herein by the Defendants, and

7   having been previously sworn to tell the truth, the whole

8   truth, and nothing but the truth, was thereupon examined and

9   testified further as follows:

10                CROSS-EXAMINATION (Continued)

11  BY MR. BIEN:

12  Q.     Mr. Stainer, you were informed that this court

13  expressed that it would not support an extension of the State's

14  obligation to comply with the overcrowding order unless

15  something was done about mentally ill prisoners in segregation

16  who were there for no fault of their own.

17          Were you informed of that?

18  A.     I was not personally informed of that.

19  Q.     No one told you that?

20  A.     I believe I may have heard something to that effect,

21  yes, sir.

22  Q.     Okay.

23          THE COURT:  Now you're going to spend two and a half

24  hours talking to him about what he heard.

25  Q.     BY MR. BIEN:  The -- the non-disciplinary segregation

1    30-, 60-day time frames for mentally ill prisoners in

2    segregation was a new policy issued by the department in

3    response to this Court's direction.

4    A.     I found out later that was probably one of the big

5    reasons behind this, yes, sir.

6    Q.     And that happened the first week in December?

7    A.     Ah, yes.

8           The direction was provided actually the Tuesday before

9    Thanksgiving.  I'm unsure of the date.

10   Q.     To your knowledge, mental health clinicians were not

11   consulted in regards to the 30-, 60-day time frame, 30 days for

12   EOPs and 60 days for CCCMS --

13          THE COURT:  Let's stop.

14          Did you have anything to do with drafting that

15   directive?

16          THE WITNESS:  I did, sir.

17          THE COURT:  Oh, okay.  Then you may certainly inquire,

18   sir.

19   Q.     BY MR. BIEN:  Mr. Stainer, you signed that directive,

20   correct?

21   A.     I did.

22   Q.     Okay.  Did you consult with mental health clinicians in

23   regard to the number of days to set for the EOP population, the

24   30-day time frame that was set in that NDS policy?

25   A.     I did not, sir.

3413

1    Q.       And did you consult with mental health clinicians as to

2    the 60-day time frame for CCCMS in the NDS policy?

3    A.       I did not.

4    Q.       Are you aware of any efforts to address length of stay

5    for mentally ill prisoners in the SHU or the PSU?

6    A.       Ah, no, sir.

7    Q.       Do you track in headquarters length of stay for

8    mentally ill prisoners in the PSU or the SHU?

9    A.       We track average lengths of stay, I believe, through

10   the COMPSTAT report, but not as in detail as we do with the

11   administrative segregation population.

12   Q.       Isn't it a fact that you don't keep track for anyone in

13   the SHU their total length of stay in the SHU in headquarters?

14   A.       Not in headquarters.

15   Q.       You don't have that information available to you?

16   A.       Not in headquarters.

17   Q.       Correct.

18            And, in fact, you found that the validation dates were

19   the closest you could come to determine who was in the SHU the

20   longest for purposes of your SHU pilot.

21   A.       When we are trying to gather that data from a central

22   location, from I guess a remote location, yes, sir, because we

23   do have that information as far as the validation dates.

24            However, each of the correctional counselors assigned

25   to the SHU actually keep track of the inmates within their

1  caseload.  So short of a very exhaustive and lengthy manual

2  search, because we are not transitioned to the COMPSTAT

3  tracking database as we have with the administrative

4  segregation population as of yet, that information was not

5  available at headquarters.

6         But it is tracked, just not in a central location.

7  Q.      And not on a computer that you have access to in your

8  office.

9  A.      That is correct.

10 Q.      And so you also don't keep track of lengths of stay of

11 mentally ill prisoners in SHU or PSU in headquarters in your

12 office on a computer.

13 A.      Outside of the COMPSTAT report, which I believe has an

14 average length of stay, no, I do not.

15 Q.      In your opinion, there's no problem with the current

16 lengths of stay for prisoners in a SHU.

17 A.      I -- I don't believe that's been demonstrated to this

18 point, no, sir.

19 Q.      And the same as to mentally ill prisoners, you

20 personally have no objection as a correctional administrator to

21 the lengths of time that mentally ill prisoners are spending in

22 the SHU or the PSU.

23 A.      For the most part, their lengths of stay are based upon

24 their behaviors.  And I believe that the system that we have in

25 place right now is -- is an appropriate system.

3415

1    Q.      The department sent groups of senior officials, wardens

2    and deputy directors recently to other states to observe their

3    correctional systems; is that correct?

4    A.      Yes, it did, wardens and associate directors.

5    Q.      Okay.  You personally didn't go on this trip?

6    A.      I did not.

7    Q.      Or any of the trips?

8    A.      No, sir.

9    Q.      Okay.  And you've never visited another prison in

10   another system personally?

11   A.      I personally have not.

12   Q.      And the instructions to these groups of administrators

13   that went to visit these other prisons did not include an

14   instruction to request how -- to find out how these other

15   systems handled mentally ill prisoners in their segregation

16   systems.

17   A.      Not necessarily.  That specific instruction, I guess,

18   was not provided.  The instructions were to observe their

19   entire system, all facets of their system.

20   Q.      And today, as you sit here today, have you received any

21   reports about how mentally ill prisoners are handled in any of

22   these other segregation systems?

23   A.      To this point, no.

24   Q.      Current CDCR policy is to treat all prisoners in

25   segregation who are in a particular unit with the same

1    restrictions as to -- the same custodial restrictions

2    uniformly.

3         For example -- do you understand what I mean?

4    A.     I believe you're asking are they under the same escort,

5    ah, policies and restraint policies.  Is that what you're

6    asking?

7    Q.     Yes.

8    A.     Yes.  Yes, there is.  Unless there is a need to enhance

9    those restrictions based upon the inmate's behavior, in which

10   case additional restrictions can be applied.

11   Q.     So, for example, someone might need more than just

12   cuffing to come out of their cells, they might also need leg

13   restraints?

14   A.     Yes, sir.

15   Q.     In your opinion, there may be some prisoners in

16   segregation units who could safely, for example, be treated by

17   a clinician without restraints.

18   A.     You would have to look.

19        I mean, presently our policies are --

20        THE COURT:  Presently your policies are and, yes, it's

21   possible that that might be true, but that's speculation

22   because nobody has looked at it yet.

23        THE WITNESS:  Exactly.  Thank you.

24   Q.     BY MR. BIEN:  But you think there would be some people,

25   if you did look, that could safely meet a clinician without

3417

1    restraints.

2          THE COURT:  The objection that it's speculative is

3    sustained.

4    Q.      BY MR. BIEN:  When you were considering -- you also

5    worked on the NDS, non-disciplinary segregation regulations

6    that went into effect a few months ago.

7    A.      I reviewed the final product and recommended some

8    edits.  Other than that, I was not actually part of the work

9    group.  I directed Ms. Kathy Allison and her work group.

10   Q.      Okay.  One of the -- did you participate in discussions

11   about whether or not NDS prisoners should be exempted from

12   strip-searching when they went in and out of segregation units?

13   A.      There's been some discussions about that.  I was

14   present for at least some of those discussions.

15   Q.      And what were the factors that you considered in not --

16   in deciding that everyone should still be subject to

17   strip-searching even though they're in the non-disciplinary

18   segregation category?

19   A.      Well, the primary consideration was the type of unit

20   that the administrative segregation is and the type of the --

21   the majority of the individuals that are housed within that

22   unit.  And then consideration was also given to -- well, let me

23   back up.

24          Based upon the type of unit and the type of prisoners

25   that are -- that make up the majority of that population, we

1    have to have increased security precautions for that area,

2    wherein the smallest piece of contraband what that might not be

3    considered dangerous within the general population can pose a

4    great security risk within that population.

5         So such as a staple, something as innocuous as a staple

6    within the general population is just a staple.  However,

7    within the administrative segregation unit, that same staple if

8    concealed between the fingertips has and can be used to shim

9    the handcuffs.  And the next thing you know the inmate is out

10   of the handcuffs and poses a great risk.

11        But the other consideration is provided to the

12   non-disciplinary ad seg inmate.  Because treating him

13   differently than the majority of the population within this

14   area would actually possibly subject him to greater pressures

15   from other inmates.  So that was a big consideration.

16   Q.   If you separated the non-disciplinary population from

17   the disciplinary population in different segregation pods or

18   units, that would be a way of providing more services and

19   privileges to the non-disciplinaries, wouldn't it?

20   A.   Yes and no.  Because, again, there's two things to

21   factor in with that.

22        Right now we have a very small percentage of our ad seg

23   total population -- I don't have the numbers specifically.  I

24   think -- you know, when we authored this memorandum, I believe

25   we had 43.  The population that we really delved down into was

3419

1    of course our class members, and I believe we had less than 350

2    statewide that fell into this category.  And then you take that

3    group, and you divide them -- I mean, we're talking 10

4    prisoners on average for our entire system, you know, per

5    prison.  So, you know, you would have to devote an entire

6    building for that.

7         But then you take into the next consideration, which is

8    all of those inmates in and of themselves still may not be

9    compatible with each other based upon whatever specific

10   concerns that they may have.

11        As I stated earlier, not all inmates that are in

12   non-disciplinary ad seg are SNY.  And you could have enemy

13   situations within that subgroup, and there are several

14   sub-categories within that group.  So there are great

15   difficulties and complexities when trying to manage this group

16   like a general population unit.

17   Q.    You disagree with the Special Master's finding in the

18   25th report that CDCR has an insufficient number of intake

19   cells to safely take in new, ah, residents of its segregation

20   units.

21   A.    I -- to say disagree is probably too strong a term.

22        I say on the vast majority of days we have a sufficient

23   number.  There's always the anomaly where there might not be

24   enough to meet our needs.  However, the vast majority of time,

25   there are sufficient intake cells to handle the first 72 hours

1    of a person who cannot be double-celled safely.

2    Q.      And there's no plans that you're aware of to build any

3    more or retrofit any more intake cells in segregation units as

4    you sit here today.

5    A.      I'm not aware of any plans.  However, I do know through

6    conversation that's one of the things that, when Ms. Allison

7    was out with her teams on the institutions -- I'm sorry -- that

8    that is my understanding, that that is one of the many facets

9    that they are looking at as well, is the utilization of those

10   cells.  And I would expect that if they found, through the

11   reports, that there was a significant shortage of that, then

12   they would report that up, and at that point it would be

13   considered.

14         But as of this point, I'm not aware of any plans that

15   we have to expand the number of cells that we already have.

16   Q.      You're aware of several internal suicide reports by

17   CDCR that point to deaths within the first 72 hours in

18   segregation where the prisoner was not placed in a suicide

19   resistant intake cell.

20   A.      I know that has happened on occasion, yes, sir.

21   Q.      You're aware that -- you spent, what, 25 years at

22   Tehachapi, correct?

23   A.      Yes.  I think yesterday I said 25 years, and when I

24   think about it, I actually spent 20 months of that 25 years at

25   Lancaster.  But yes, sir.

3421

1    Q.        And -- and Tehachapi SHU has had difficulty providing

2    10 hours of yard time to prisoners in the SHU.

3    A.        I believe they have difficulty in -- and that is

4    another area that was specifically looked at with Ms. Allison's

5    team is the provision of yard.  When they are unable to show

6    through review of the documentation that the teams -- or excuse

7    me -- that the inmates do not receive the amount of yard, they

8    start looking at the yard schedules.

9            And what she's found is that, based upon review of the

10   yard schedules, inmates should be receiving their 10 hours of

11   yard a week.  However, the documentation unfortunately is not

12   reflecting that on their 114As.

13   Q.        So you think they may be getting the yard time, but

14   your officers are not appropriately recording the yard time?

15   A.        I believe we do have some issues at certain locations

16   wherein we have to do better at the documentation on the 114As.

17   We have some inconsistencies with that, yes.

18   Q.        So you disagree with the warden of Tehachapi, who wrote

19   in his response to a suicide there in 2012, that he had

20   insufficient yard to provide 10 hours of exercise to the

21   residents in his SHU?

22   A.        I did not see that report, that response.

23   Q.        Are you aware that, since then, CDCR has canceled the

24   project for building 50 additional small management yards for

25   the Tehachapi SHU?

1    A.       I'm not aware that Tehchapi SHU was approved for an

2    additional 50 yards.  And I assume you're speaking of the

3    facility 4-A?

4    Q.       You're not aware that it was approved before that, and

5    you're not aware it was canceled?

6    A.       I know that 4-B had approved 50 additional small

7    management yards, and they were constructed.

8            It's my understanding, when I was the warden of CCI,

9    that we had requested additional SNYs at facility 4-A; however,

10   it was not approved.  So I'm not aware that it was subsequently

11   approved and then subsequently canceled after that.  So, no,

12   I'm not.

13   Q.       So as you sit here today, you're not concerned with the

14   amount of yard time that prisoners in California who are in the

15   SHUs are receiving.

16   A.       At Tehachapi, they also run group yards on the side of

17   housing units 1 through 4.  So that is one of the SHUs, the

18   only SHU that we would run group yards in order to provide the

19   inmates with sufficient yard time in addition to the SNYs.

20   Q.       The question is, as you sit here today as head of DAI,

21   do you -- are you comfortable that SHU prisoners and PSU

22   prisoners are receiving at minimum 10 hours a week of outdoor

23   yard exercise?

24   A.       Based upon the schedules that Ms. Allison has reviewed

25   and the statements she's made to me, I believe they are, yes.

3423

1    Q.      Even though some of the SHUs are not documenting that

2    they receive 10 hours of yard time for their prisoners?

3    A.      That is a separate issue that we definitely, ah, could

4    use some improvements in certain areas, yes.

5              MR. BIEN:  No further questions, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MS. D'AGOSTINO:

8    Q.      Mr. Stainer, you've spoken about the pilot program and

9    the case-by-case reviews that you've been conducting pursuant

10   to this pilot program.

11             What effects, if any, will the pilot program have on

12   lengths of stay in the SHU?

13   A.      I think on average, as the pilot program progresses and

14   we've reviewed all of the inmates at the conclusion of the

15   case-by-case reviews, we're going to see a huge reduction in

16   length of stay, average length of stay based upon the cases

17   that we're reviewing right now.

18             And then we should also see a -- if the trend

19   continues, which is approximately about a 60 percent right now,

20   ah, release rate, if that trend were to continue, we would

21   obviously see a reduction in our overall SHU population.

22   Q.      And specifically why would you see a reduction in the

23   lengths of stay pursuant to the pilot program?

24   A.      We've got numerous individuals that have been retained

25   in the SHU for great periods of time based solely upon they are

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    continued to be identified as an affiliate of these security

2    threat groups, as opposed to the new policy which will allow

3    them only to be retained based upon their behavior.

4    Q.    You also spoke about the case-by-case reviews and gave

5    an anticipated completion date of all inmates in the

6    segregated -- excuse me -- in the SHUs within CDCR for within

7    two years; is that right?

8    A.    That's our hopes.

9    Q.    So when inmates come up for their six-year

10   inactive-active reviews pursuant to Title 15 as it currently

11   stands, do they receive a case-by-case review?

12   A.    They do.  So that would be the one, I guess, exception

13   to the length of stay.  Is that if they are eligible for their

14   six-year review, even if they've only been in the security

15   housing unit for six years, they would have their review

16   probably ahead of some of the people who have been in there

17   longer.

18   Q.    And are inmates who are newly -- excuse me.

19         When inmates are validated as gang affiliates, are they

20   validated under the new pilot program requirements?

21   A.    As of March of this year, all inmates going through the

22   validation process had to have the new validation process

23   applied to them.

24   Q.    You also spoke about three types of indeterminate SHU

25   terms.  The first was gang-validated inmates.  We've already

3425

```
 1    discussed that.  You mentioned inmates who display repetitive
 2    behaviors.
 3              When an inmate placed in the SHU pursuant to this
 4    category of displaying repetitive behaviors, how often does he
 5    receive review of his placement?
 6    A.     These inmates are required to be reviewed by the ICC
 7    every 180 days.
 8              THE COURT:  Sorry.  Go back.  I know you've testified
 9    to this, but I don't want to go back to my notes.
10              There are mentally ill inmates who have been placed in
11    the SHU because of either gang membership or gang affiliation.
12              THE WITNESS:  Yes, sir.
13              THE COURT:  And those people are or are not -- I'm
14    sorry, I don't remember -- receiving priority examination?
15              THE WITNESS:  Not priority, just based upon their
16    length of stay, sir.
17              THE COURT:  Okay.
18    Q.     BY MS. D'AGOSTINO:  So you said that inmates who are in
19    the SHU because of repetitive behaviors receive reviews every
20    180 days?
21    A.     Yes, ma'am.
22    Q.     And is that an ICC review?
23    A.     That is.
24              And I'd just like to note that the vast majority of
25    these inmates that are placed in the security housing unit on
```

1    an indeterminate based upon the multiple SHU terms or

2    repetitive behavior, the vast majority were actually released

3    their 180 -- their first 180-day review.

4    Q.     And then what about this category of inmates that are

5    placed in the SHU because there's no other type of suitable

6    housing for them, how often is their placement reviewed?

7    A.     They're also --

8           THE COURT:  Nobody is kept in the SHU because there's

9    no placement, no place to put them.  If they finish their SHU

10   term, and there's no place to put them, they put them into ad

11   seg, right?

12          THE WITNESS:  That's correct.

13          I believe what we're referring to is the person who

14   there's no other least restrictive type of housing, and those

15   would be the departmental review board inmates, I believe.

16          MS. D'AGOSTINO:  That would be a better way to call it.

17   Q.     For inmates who are placed in the SHU because there's

18   no other least restrictive type of housing suitable for them,

19   how often is their placement reviewed?

20   A.     The -- the same as in any other indeterminate, every

21   180 days by the ICC.

22   Q.     And is the ICC empowered to release those inmates?

23   A.     The vast majority of those inmates and -- well, all of

24   them would be in there as a result of the departmental review

25   board.

1          The departmental review board, when they make their

2     determination that the person needs to be there, they would

3     always -- there is always a return date for that case to be

4     returned to the DRB.  In most cases it's -- it's a year or it's

5     two years where they have to, again, submit that case back to

6     the DRB.

7          Very few cases the DRB -- well, the DRB always makes a

8     determination as to whether or not the DRB will retain transfer

9     control of the inmate.  Very few of these cases, a very minute

10    number of this type of a case where the DRB retain transfer

11    control of the inmate.

12         And the reason for this is, is we want the institutions

13    to continually search for the least restrictive housing and

14    have the opportunity to seek out that housing; and at least

15    every 180 days, re-review the case factors to see if something

16    has changed with this inmate's status.  And we don't want them

17    to have to submit that back to the departmental review board,

18    ah, should the situation have changed.  We want them to be able

19    to take that action.

20         But, nonetheless, they always -- if the situation has

21    not changed, they always have to resubmit that back to the DRB.

22    It cannot just be, okay, this guy is approved for SHU and leave

23    him in there forever.  There always has to be that re-review.

24         THE COURT:  I take it, from what you're saying, that

25    there are people in the SHU who have completed whatever their

3428

1    term was but can't even be placed in ASU.

2         THE WITNESS:  Correct, sir.  Because --

3         THE COURT:  And why is that?

4         THE WITNESS:  Well, when they're placed in ASU, it's

5    more of the transitional, they're waiting to go to the

6    institution that they're endorsed to.

7         But there are a small number of inmates within our

8    security housing unit that are there indeterminate because they

9    either have enemies at every single prison in our state; they

10   have safety concerns that they're unwilling to acknowledge,

11   legitimate safety concerns -- they've been stabbed and

12   assaulted numerous times; or they have the safety concerns,

13   they may be willing to acknowledge them, but they are not

14   willing to go program on an SNY yard.

15        THE COURT:  Okay.  But -- I'm sorry.  I'm being stupid,

16   but I just don't understand it.

17        Yes, you've got a problem, you can't transfer these

18   people to a special needs yard or to another institution

19   because they're got prisoners everywhere -- I mean, enemies

20   everywhere.

21        Are you not transferring to the ASU because they also

22   likely have enemies there as well?

23        THE WITNESS:  No, sir.  We would just retain them in

24   the SHU where they would retain their property and everything.

25   I think there is really no need to put them into the ASU.

3429

1                   THE COURT:  Well, I really --

2                   THE WITNESS:  It's very complex.

3                   THE COURT:  It's late in the day, and I'm just not

4      following.

5                   With the new policies, they would be characterized,

6      once they've completed their SHU term, as non-disciplinary --

7      whatever it is, non-disciplinary --

8                   THE WITNESS:  Non-disciplinary ad seg.

9                   THE COURT:  -- ad seg.

10                  THE WITNESS:  Right.

11                  THE COURT:  If they were put in ad seg --

12                  THE WITNESS:  Correct.

13                  THE COURT:  -- they'd have significant benefits in

14     terms of property, in terms of visitation, et cetera.  So

15     retaining them in the SHU, it seems to me -- although foggy

16     enough -- it seems to me they're receiving additional

17     restrictions which don't appear to -- which I can't understand

18     why it's happening.

19                  THE WITNESS:  And we actually see that anomaly as well.

20     And so, I mean, we're looking at how we deal with this --

21                  THE COURT:  All right.

22                  THE WITNESS:  -- class of prisoner.

23                  But we refer to the SHU as a SHU program, and there's a

24     reason.  Because there's actually -- I mean, there's actually

25     other programs that they can participate in that they might not

 1    have within the ad seg and other property allowances that they

 2    don't always get within administrative segregation.

 3              THE COURT:  All right.

 4    Q.       BY MS. D'AGOSTINO:  Mr. Stainer, are there educational

 5    programs for inmates in the SHUs?

 6    A.       Yes, there are.

 7    Q.       What are they?

 8              MR. BIEN:  Beyond the scope of the cross, Your Honor.

 9              THE COURT:  You know, it probably is, but these are all

10    important things for me to know at some point.  You're probably

11    absolutely right, Mr. Bien, but I'm going to permit you to

12    reopen for this purpose.

13              You may answer, sir.

14              THE WITNESS:  I believe you asked what are the

15    programs.  In each of the SHUs, the inmates assigned to the SHU

16    are permitted to participate in the voluntary education

17    program.  The numbers vary.  Last February I ran the numbers,

18    and we had almost one-third of our security housing unit

19    participating.  So this is over 1,100 in some form or another

20    of educational opportunities.

21              This includes the adult basic education, which is one,

22    two or three, everything from a basic non-reader up through,

23    you know, the pre-GED.  And we also have GED classes where we

24    prep them, let them take the pretest and then actually proctor

25    the GED exam.  We've had numerous graduates.  And actually

1    college courses.

2            I think the last count was -- just a couple months ago

3    I asked for a roll-up.  I'm actually expecting another roll-up

4    of all of the numbers.  Last -- two months ago actually, I

5    think the numbers were in the high 800s, and so I'm waiting to

6    see what this is.  And that's for SHU and PSU, as a matter of

7    fact.

8    Q.      BY MS. D'AGOSTINO:  When you say high 800s, do you mean

9    that for total participation in any educational program?

10   A.      Yes, statewide for the security housing units.  I did

11   not include the female SHU, just the male SHU.

12   Q.      You also discussed the fact that currently

13   gang-validated inmates may participate in the debriefing

14   process in which they, umm, inform on other inmates and then

15   are no longer validated as gang members and sent to SNY yards.

16           Do you recall that?

17   A.      Yeah.  I mean, the debriefing process is not exactly

18   informing on other inmates.  It's -- it's, in essence, you

19   know, debriefing.  The inmate is asked to disclose their

20   history and their experiences and their actions with that

21   particular gang.

22           And then, yes, I recall that.

23   Q.      As part of the step-down program by which inmates

24   through their behavior earn release from the SHU, are they

25   required to debrief?

3432

1    A.        No.    Nor are they required to renounce their gang

2    affiliation.    Just show positive behavior or at least no

3    negative behavior.

4    Q.        Does the SHU have religious programs?

5    A.        Ah, they do.

6    Q.        Could you briefly describe them.

7    A.        Well, all the SHU and ad seg have, you know, at minimum

8    cell-front contacts with any number of our chaplaincies

9    depending upon their specific religion.    Some of our SHUs

10   actually have group religious services, to include at one of

11   the institutions, they actually have had, on more than one

12   occasion, a two-day retreat sponsored by the Los Angeles

13   Archdiocese office.

14       You know, but we do have -- I've seen Catholic

15   services, I've seen actually Odinist services within the SHU

16   where the inmates are brought out and they're placed into the

17   holding cells, the individual holding cells, and a chaplain is

18   actually providing religious services to the group.

19       And I know they happen every weekend at Tehachapi, and

20   I know they happen at Corcoran as well.    But, at minimum,

21   they're allowed, you know, the one-on-one counseling

22   cell-front.    Or the chaplain can ask to pull the inmate out

23   into one of the individual holding cells.

24   Q.        Do inmates who are not designated for an SNY yard have

25   a -- also have a confidential enemy list?

1    A.        There's -- almost all inmates have a confidential enemy

2    list.  Not all, but it's not uncommon whatsoever.  It's not

3    dependent upon whether they're SNY or general population.

4    Q.        So prior to placing any inmate, you would need to check

5    his confidential enemy list; is that right?

6    A.        Absolutely.

7    Q.        Okay.  Finally, Mr. Stainer, does CDCR put people in ad

8    seg without a legitimate correctional purpose in your opinion?

9    A.        The -- we are not supposed to, and I have not seen that

10   in my experience.

11   Q.        Why do you say that?

12             THE COURT:  Because he hasn't seen it in his

13   experience.

14             MS. D'AGOSTINO:  I'm sorry.  I did not phrase that

15   well.

16   Q.        Could you elaborate?

17   A.        Well, first and foremost, there are, you know, set

18   reasons.  I believe I testified already that, you know, an

19   inmate's presence within whatever segment of that population,

20   he must either be a threat to -- his presence within that

21   segment of the population must pose a threat to himself, a

22   threat to others, staff, the security of the institution,

23   jeopardizing an ongoing investigation into --

24             THE COURT:  We've had this testimony --

25             THE WITNESS:  Right.

3434

 1          THE COURT:  -- half a dozen times.  I'm sorry you've

 2   forgotten this, Ms. D'Agostino, but I'm not going to tolerate

 3   it.

 4          You may proceed, ma'am.

 5          MS. VOROUS:  That's fine.  I have no further questions.

 6          THE COURT:  Further recross.

 7                      RECROSS-EXAMINATION

 8   BY MR. BIEN:

 9   Q.     I wanted to clarify.

10          The pilot program is not reaching all inmates in the

11   SHU, correct, only people who are either gang-validated or gang

12   associates?

13   A.     Validated gang members and associates.

14   Q.     So there are other people that are in the SHU who are

15   neither gang members nor gang associates?

16   A.     That is correct.

17   Q.     And they're not part of the pilot program.

18   A.     No, they are not.

19   Q.     And so at the end of two years, they will not have been

20   reviewed by this pilot program.

21   A.     Not that pilot -- they will have been reviewed, but not

22   by the pilot program.

23          THE COURT:  They're reviewed by the 180-day review.

24          THE WITNESS:  Yes, sir.

25   Q.     BY MR. BIEN:  And that's a process that's been going on

3435

1    since -- the 180-day review has always been part of your

2    practice.

3    A.      That's correct.  And the warden's ICC has the authority

4    to release that individual.

5    Q.      Right.

6    A.      Whereas the gang member, there was -- the warden --

7    while they would review the case, they did not have the

8    authority to release that individual.

9    Q.      And the 180-day review process is not -- doesn't

10   prioritize releasing prisoners with mental illness from the

11   SHU, does it?

12   A.      All inmates are prioritized equally at their 180-day

13   review whenever that 180-day review would come up.

14           MR. BIEN:  No further questions, Your Honor.

15           THE COURT:  May the witness be released?

16           MS. D'AGOSTINO:  Yes, Your Honor.

17           THE COURT:  Mr. Bien?

18           MR. BIEN:  Yes.  I'm sorry.  Yes.

19           THE COURT:  You're free to go or stay as you choose,

20   sir.

21           THE WITNESS:  Thank you, Your Honor.

22           MR. MC KINNEY:  Your Honor, at this time defendants

23   call Dr. Timothy Belavich.

24           THE COURT:  Come around and be sworn, sir.

25           THE CLERK:  Remain standing and raise your right hand.

1                        TIMOTHY BELAVICH,

2    was thereupon called as a witness herein by the Defendants, and

3    having been sworn to tell the truth, the whole truth, and

4    nothing but the truth, was thereupon examined and testified as

5    follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Take a seat.  State your name, spell your

8    last name, and speak directly into the microphone, please.

9              (Off the record.)

10             THE WITNESS:  Okay.  Thank you.

11             My name is Timothy Belavich.  B as in boy,

12   E-L-A-V-I-C-H.

13                      DIRECT EXAMINATION

14   BY MR. MC KINNEY:

15   Q.     Good afternoon, Dr. Belavich.

16   A.     Good afternoon.

17   Q.     You're currently employed by CDCR, correct?

18   A.     Yes, I am.

19   Q.     And what is your current position?

20   A.     I'm the acting deputy director of mental health, also

21   known as the statewide mental health director.

22   Q.     And how long have you held that position?

23   A.     Since March of 2012.

24   Q.     Have you held other positions within CDCR?

25   A.     Yes, I have.  I started with CDCR in 2001 as staff

3437

1   psychologist and worked also as a senior psychologist, the

2   chief psychologist, a health care manager, and most recently as

3   a chief executive officer of health care for one of the

4   institutions prior to coming to headquarters.

5   Q.      And which institutions or institution did you work at

6   previously?

7   A.      From 2001 to 2006, I worked at San Quentin.  From 2006

8   until coming to headquarters, I worked at CSP Los Angeles or

9   Lancaster.

10  Q.      And what is your educational background?

11  A.      I have a Ph.D. in clinical psychology and a Master's in

12  health care administration.

13  Q.      And do you hold any certifications?

14  A.      Yes, I am certified as a correctional health

15  professional through the National Commission on Correctional

16  Health Care.

17  Q.      As the statewide mental health director, what are your

18  responsibilities?

19  A.      I have oversight of the statewide mental health

20  program, so direction of policy, implementation of policy and

21  operations.  I manage budget issues.  I manage statewide

22  staffing issues.

23          I work directly with institutions, ah, to implement

24  programs or to troubleshoot issues as they arise.

25          I work closely with the Coleman Special Master and his

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    team on various projects, ah, various reporting that we do as

2    well, you know, to the Special Master.

3           I think that that encompasses most everything I do.

4    Q.     Who reports to you?

5    A.     Directly reporting to me, I have a chief of policy and

6    a chief of operations.  They -- and they have staff underneath

7    them at headquarters.  So my chief of policy, for example, is

8    Ms. Burleson, and she has several chief psychologists who

9    report to her who work on policy and staffing issues.  And then

10   I have a chief of operations, Mr. Stanley, who has a similar

11   compliment who works more directly with the field.

12   Q.     Dr. Belavich, you submitted a declaration in support of

13   the State's reply brief on the termination motion, correct?

14   A.     Yes, I did.

15          MR. MC KINNEY:  Your Honor, I've prepared a -- we've

16   premarked a group of exhibits.  May I approach?

17          (Off the record.)

18          MR. MC KINNEY:  Dr. Belavich, showing you the first

19   document which has been marked for identification as Exhibit

20   XXX.

21   Q.     Is this the declaration that we just referred to?

22   A.     Yes, it is.

23   Q.     And does this include your testimony on CDCR's suicide

24   prevention efforts as of that time?

25   A.     Yes, it does.

3439

1              MR. MC KINNEY:  Your Honor, I'd like to move Exhibit

2    XXX into evidence.

3              THE COURT:  Received.

4                        (DEFENDANTS' EXHIBIT XXX

5                        ADMITTED INTO EVIDENCE.)

6              MR. MC KINNEY:  Dr. Belavich, if I could have you turn

7    to Exhibit A to this declaration.

8    Q.      Are you familiar with this document?

9    A.      Yes.

10   Q.      What is it?

11   A.      It's a chart of statewide mental health

12   accomplishments.

13   Q.      And since you submitted this document, what additional

14   accomplishments has CDCR's mental health program accomplished

15   in 2013?

16   A.      There have been numerous accomplishments.  Some have

17   been mentioned, some may not have.

18           Many construction projects have opened at CIW, ah, CMF,

19   Corcoran.  The introduction of the Guard One system, ah, was

20   after this.  The implementation of three welfare checks per

21   hour, ah, was implemented after this.

22           The policy with non-disciplinary segregation that's

23   been talked about was implemented after this.

24           Changes to the -- some things specific to suicide.  For

25   example -- oh, I'm sorry.  To go back.

1          The continuous quality improvement tool was rolled out,

2     piloted and is now finishing a re-piloting, which was a major

3     change since this document was put out.

4          The sustainable process tours continue.

5          Those are the ones I can come up with offhand.

6     Q.     Can you discuss the sustainable process and -- well,

7     what that is, first of all?

8     A.     Sure.

9          The sustainable process was a joint collaboration

10    between CDCR and the Special Master's team with the goal of

11    implementing -- or developing and implementing a program to

12    identify patients who may require higher levels of care.

13         And as part of that -- it continues to this day -- our

14    teams go out on a quarterly basis, and they work with the

15    institutions, they evaluate the work of the institution and,

16    for lack of a better term, they're looking for anybody who may

17    need a higher level of care that the institution has

18    overlooked.

19    Q.     What have been the results of the initial process?

20    A.     I think the process has been -- has been positive.  I

21    believe there were -- initially there were 44 patients or so

22    that -- that needed to continue to be monitored when we first

23    started the program.  And I don't have any numbers offhand, but

24    I know on a quarterly basis, ah, we have the process in place

25    where our regional teams, if they identify someone that they

3441

1    have a question about, it's referred back to the institution,

2    and the institution carries out -- for example, they may hold

3    an inter-disciplinary treatment team or they may need to do a

4    case conference with our regional team to justify why this

5    person has not been or does not need to be referred to a higher

6    level of care.

7    Q.      And that process continues into the present; is that

8    correct?

9    A.      Yes.  Every quarter our teams have a calendar in

10   conjunction with -- with team members of the Special Master's

11   team, and they go out together to do this process quarterly.

12   It's been going at least as long as I've been at headquarters.

13   Q.      If I could have you turn to Exhibit B of your

14   declaration.

15          If you could just briefly describe what is shown here

16   in this document.

17   A.      This -- this is just a complex chart that displays our

18   feedback loop.  We have headquarters at the top, and then in

19   the three larger boxes right below it lists resources or

20   programs or -- or things we use to monitor our statewide

21   business and to communicate with the institutions.

22          And then, as you go down to the other boxes, it goes to

23   the local level of quality management and the corrective

24   actions that may come from the local level, and then that feeds

25   back to headquarters.

3442

1          So it reflects -- it reflects a significant change

2    that -- that I worked to implement when I came to headquarters

3    in that I wanted better communication with the field, and I

4    wanted headquarters to have a better awareness of what was

5    going on in the field, umm, coming from the field.  I just felt

6    it was something that -- that was needed.

7          And this feedback loop, it's a very common type of

8    system.  I think the feedback loop works very well.

9    Q.      Do you feel that these tools allow you and your

10   partners to evaluate and monitor the system within CDCR?

11   A.      Yes.

12         And it's not on here, but the way we functionally do it

13   is through the regional teams that we've implemented.  And that

14   was one of the other things that I had implemented back in 2012

15   was a strong regional team, ah, that has more authority than

16   previous regional teams, I guess.  And they're -- they're in

17   the institutions on a regular basis, and they have the

18   hands-on -- they have the hands-on of headquarters.  So they

19   really provide that feedback as well.

20   Q.      And are those individuals mental health clinicians or

21   personnel?

22   A.      Yes, they are.  They're chief psychologists.

23         THE COURT:  Let me interrupt for a moment.

24         One of the things that we, I think, have established

25   pretty clearly is that institutions which are not in favored

3443

1    geographic positions are having a lot of trouble recruiting and

2    retaining.

3            I take it you agree that that's what's going on or do

4    you agree that that's what's going on?

5            THE WITNESS:  With staffing?

6            THE COURT:  Yes.

7            THE WITNESS:  Yes, that can be an issue with some of

8    our institutions.

9            THE COURT:  The suggestion has been made somewhere

10   in -- God knows where in the course of these hearings, that

11   regionalization might relieve the difficulties in retaining

12   folks.

13           Now, it has its own problems because they'd have to

14   transfer people and, you know, we've now learned that the bus

15   system is so complex that nobody can ever get anywhere when

16   they're supposed to be.  But assuming that that could somehow

17   or other be solved.

18           Is it your view that regionalization would be an

19   appropriate thing to do given the difficulties in staffing?  Or

20   is it your view that it probably is so difficult to achieve

21   that it's not worth the trial?  Or what is your view?

22           THE WITNESS:  I think that it may obviously have some

23   benefits.  I -- I would think that there may be a lot of

24   challenges to it.

25           For example, in terms of -- by regionalization, I

3444

1   assume you mean sort of hubbing.  Where I can get good -- where

2   I can get lots of staff, that's where I put the sick people?

3           THE COURT:  Right.

4           THE WITNESS:  That makes perfect sense.

5           THE COURT:  Right.

6           THE WITNESS:  The challenges I foresee, ah, may include

7   more structural or physical issues.

8           You know, we've sometimes built amazing places in

9   places that don't --

10          THE COURT:  In the wrong place.

11          THE WITNESS:  And so then what do we do with that, for

12  example.

13          Or do we have the facilities -- that's not as much of a

14  worry, the place we're abandoning.  But the bigger worry would

15  be do we have the facilities in the place where we're going to

16  bring the patients?

17          THE COURT:  I --

18          THE WITNESS:  So things like that obviously --

19          THE COURT:  I understand it would be very complex, and

20  I doubt very much -- well, I'll do whatever I have to do.

21          But it seems to me that the structural problems that

22  you've been discussing just now are expensive, difficult, but

23  may be in the long run a solution to what appears to be a

24  fairly serious problem.

25          The question really -- the question, as if there's only

1      one.

2              Yes?

3              THE WITNESS:  I have something to add, though.

4              THE COURT:  Yes, please.

5              THE WITNESS:  That I think -- we haven't seen the full

6      fruit yet, but we've -- this year, we've been very

7      successful -- for example, psychiatry traditionally has been

8      impossible to hire into at times.  We've been very successful

9      in recruiting telepsychiatrists.  And so, for example, from May

10     through October of this year, I've brought on 34 new to state

11     service psychiatrists.

12             And how I get them is I tell them they don't have to go

13     to, you know --

14             THE COURT:  Awkward.

15             THE WITNESS:  Exactly.  So we hub them at San Quentin,

16     we hub them in, you know, San Bernardino.  And they provide

17     telepsychiatry with the understanding that there are times and

18     needs when you have to physically report.

19             And so it was a program that we implemented last

20     January and started recruiting into, and we're starting our

21     second year of it.  Because it's very cyclical how we can

22     recruit, especially coming out of medical schools.  So we've

23     been pleased with that.

24             And I don't know that that will solve the problem, but

25     I think that may go a long way.  Because places, in March of

1    2012 when I got here, who had one psychiatrist are now being

2    served by sometimes three or four full-time psychiatrists, it

3    just happens to be through telepsychiatry.

4         THE COURT:  What I am getting, and I may be not getting

5    the right -- I may not be perceiving correctly, is that the

6    psychiatrist's function is essentially not in counseling the

7    patient-inmates.  They're really running the psychotropic

8    medications and that sort of thing, that the essential

9    counseling is being done by psychologists mostly.

10        Is that right or wrong?

11        THE WITNESS:  That's absolutely correct.  Psychologists

12   and social workers.

13        THE COURT:  Okay.

14        THE WITNESS:  Yeah.

15        THE COURT:  You're not going to obviously tell,

16   whatever it is, patients who are in need of psychologists as a

17   regular case on its program -- I mean, he's got to physically

18   be there.

19        THE WITNESS:  Psychologists, correct.  Yeah, I think

20   so.

21        There are places that may use telepsychology, but we

22   haven't felt the need to go to that.  We feel that --

23        THE COURT:  You're able to get enough folks with

24   psychological degrees to go into places that are difficult?

25        THE WITNESS:  Yes.

3447

1          We've -- I think we got hurt when we had layoffs, and

2     we actually had people who weren't being laid off decide to

3     leave rather than wait to see if the SHU would fall.  And so

4     there -- we had some difficulty with churn there.  But since

5     those are gone, we've been successful with hiring

6     psychologists.  And, you know, overall we still have a couple

7     of pockets that are concerning.  For example, around Kern, you

8     know, there's a large need there, but not a lot in the

9     community.

10          But we also implemented, during the summer, a new

11     contract and partnership with the receivership through --

12     similar to a HealthNet contract in that it's a one-stop shop

13     for contractors.  We used to use a very archaic system to get

14     contractors, and you might have to make 18 calls to get one

15     body.  Now you call one place, and they provide you the body.

16          Additionally, there are performance incentives to the

17     company.  So we've been somewhat successful since that contract

18     has been implemented.

19          So we're not there, but we're in a better place than we

20     were.  So I don't know that we're -- that I'm ready to pull the

21     plug on it completely.

22          THE COURT:  Understood.  Thank you.

23          Mr. McKinney, you may proceed.

24          MR. MC KINNEY:  Absolutely.

25     Q.    Dr. Belavich, if you could describe -- well, first of

3448

1    all, what was the time frame when layoffs were occurring or

2    threatened?

3    A.      It -- there were four waves of CDCR layoffs, and the

4    mental health layoff occurred mostly in wave one, which was

5    prior to -- prior to February of 2012, so it was I think late

6    2011.  And that was the last time we had layoffs, and people

7    had to shift -- shift institutions.

8    Q.      And, again, I think you've said you've seen now a

9    positive trend in hiring and staffing up positions.

10          Is that fair?

11   A.      Yes, that's correct.

12          And we've done things.  We've at times centralized

13   hiring when we -- we monitor very closely the hiring that's

14   going on in the institutions.  And if an institution hasn't

15   held a panel or hasn't done something in a while, we inform

16   them that we're going to take over the hiring.  And in some

17   respects that's their -- there's no better way to light a fire

18   than to tell them either they can choose their staff or we can

19   choose their staff for them, and then they tend to get the

20   panels going.

21          So there -- it's on a one off basis if that occurs, but

22   we temporarily centralized hiring for social workers, and then

23   we gave it back to the institutions.

24   Q.      And can you describe the telepsychiatry efforts both

25   from what you've done at headquarters and how that is, ah,

3449

1     progressing in the field currently.

2     A.      It's -- it's been -- it's been a great success in my

3     estimation because we were able cut through what would

4     otherwise be a lot of red tape.

5             We realized that there were arbitrary, ah, issues that

6     were out of our control that prevented people from even

7     applying for jobs.  We -- we required them to be done with

8     their -- with their residency before they could even apply.

9     Well, most residents want a job offer at least three to four

10    months prior to their -- prior to their ending their residency.

11    So we lost that whole pool.

12            So working with the Department of Personnel

13    Administration and changing one requirement that instead of

14    having their certificate of residency, they would -- they say

15    we will have it by July 1st, it opened up a pool of several

16    hundred people we could all of a sudden interview.

17    Q.      And have you been able to hire from that pool?

18    A.      We have hired largely from that pool.  We've been able

19    to pull in a lot of out-of-state psychiatrists.  It's been very

20    beneficial.

21            The technology, it's a secure technology that we use.

22    It is a relatively cheap technology.  We don't have to buy

23    $20,000 telemedicine systems.  We buy $500 secure cameras.

24            We set up a program where the psychologist is more

25    than -- more often than not actually with the patient while

3450

1    they're having their psychiatry visit.  And in that way, the

2    psychologists can also participate and hear.  You know, it's

3    almost like a mini team.  The psychologist can participate and

4    hear.  He may also help the patient to, you know, say, well, we

5    also talked about these things, do you think that would be

6    important to talk with the psychiatrist about?

7            So we have found overall that it's been -- it's been a

8    positive -- it's been a positive program, you know, after we

9    were able to go over some of the bumps with unions and things

10   like that.

11   Q.    And do you know how many psychiatrists have been hired

12   or are in the hiring process during 2013?

13   A.    We have -- we have 34 actually already onboard.  And I

14   believe -- I believe there might be up to another 10 that are

15   currently in process.

16           But our teams are starting to go out -- they tell me

17   that January, February, March is the big recruiting time, so

18   they're ready to go out again and hit all of the medical

19   schools and all of the conferences where people go to

20   interview.

21           We also have just streamlined the interview process.

22   We interview at conferences, and we make contingent job offers

23   contingent upon, you know, background checks and these other

24   things.  So with the salaries that California offers for

25   psychiatrists, I think it's -- you know, it's quite lucrative

3451

1    for new psychiatrists to come.

2    Q.      Doctor, if I could have you turn to the next exhibit in

3    the packet which has been premarked as Defendants' Exhibit YYY.

4            Do you have that in front of you?

5    A.      Oh, I'm sorry.  Yes.

6    Q.      Is this the declaration you submitted in opposition to

7    the plaintiffs' current motion as amended?

8    A.      Yes, it is.

9            MR. MC KINNEY:  Your Honor, I'd like to move Exhibit

10   YYY into evidence.

11           THE COURT:  Received.

12                          (DEFENDANTS' EXHIBIT YYY

13                          ADMITTED INTO EVIDENCE.)

14   Q.      BY MR. MC KINNEY:  Doctor, if I could have you turn to

15   the next document in the packet which has been marked for

16   identification as Defendants' Exhibit ZZZ.

17   A.      Yes, I have it.

18   Q.      Are you familiar with this document?

19   A.      Yes, I've seen it before.

20   Q.      What is it?

21   A.      It's a summary of our -- of our mental health

22   population, ah, CCCs and -- CCCMS and EOP patients as well as

23   PSU, and then there are breakdowns by institution.

24           It's a -- it's monitored from the health care placement

25   oversight program, which is also known as HCPOP.  This is the

3452

1    document they use to manage --

2    Q.      So this isn't a document prepared by your department

3    but is prepared by CDCR; is that --

4    A.      Yes, it is.

5            MR. MC KINNEY:  Your Honor -- go ahead, Doctor.

6            THE WITNESS:  And HCPOP -- I'm sorry.

7            Health care placement or HCPOP, they also do fall

8    under -- under me as the statewide director.

9            MR. MC KINNEY:  Your Honor, at this time I'd like to

10   move Exhibit ZZZ into evidence.

11           THE COURT:  I thought I just received it.  It's

12   received.

13           MR. MC KINNEY:  Sorry.  I think I moved the prior one.

14   Thank you.

15                        (DEFENDANTS' EXHIBIT ZZZ

16                         ADMITTED INTO EVIDENCE.)

17   Q.      BY MR. MC KINNEY:  Doctor, what is the -- what is the

18   time period of the data reflected in this document?

19   A.      The download date is October 25th, so this is a

20   point-in-time picture from that date.

21   Q.      And as of that time, what is the CCCMS population?

22   A.      The -- as of that date, our CCCMS population was 28,914

23   total.

24   Q.      And can you describe -- the Court has heard testimony

25   from various witnesses on this issue, but can you describe the

3453

1    acuity or the -- you know, the -- well, the acuity of the CCCMS

2    population within CDCR.

3    A.       I think one of the best ways that was said was earlier

4    today.  You know, within that classification, we have a

5    variety, we have a spectrum of very well to -- to, umm, people

6    who are -- people may be in that classification not on

7    medications, but are being monitored and see a case manager.

8    Those may be our very well of that classification, all I way to

9    individuals who may be on medication and are seeing their case

10   manager.

11       However, within the classification, all of the -- all

12   of the patients are able to function within the prison setting.

13   Able to -- you know, able to get through all the day-to-day,

14   you know, activities and needs that they have within the

15   prison.

16   Q.       Turning back to this document, as of this date, how

17   many inmates were in the enhanced outpatient program?

18   A.       Our enhanced outpatient program was 4,643 patients.

19   Q.       And what about the population in the psychiatric

20   services unit?

21   A.       Our PSU was 329.

22       This -- this document breaks out the PSU patients

23   separate from the EOP patients.

24       THE COURT:  Overall I've been told that the mental

25   health component of the inmate population is somewhere upwards

3454

1    to 30 percent of the total population.

2              Is that your understanding?

3              THE WITNESS:  Yes, it could be anywhere from 25 --

4              THE COURT:  Right.

5              THE WITNESS:  25-ish, yeah.

6              THE COURT:  Upwards to 30?

7              THE WITNESS:  Yes.  Yes.

8              THE COURT:  Yeah.

9              THE WITNESS:  It could be in that range.

10             THE COURT:  Okay.  I just wanted to be sure that I knew

11   what I --

12             THE WITNESS:  There's a lot.

13             THE COURT:  All right.

14   Q.    BY MR. MC KINNEY:  But, again, based on this document,

15   28,914 being in the CCCMS population; is that right?

16   A.    Yes.  The vast majority of our mental health patients

17   are -- are in our CCCMS programs.

18   Q.    If I could have you turn to page 3 of the document.

19             Does this show the mental health population in

20   administrative segregation as of this date?

21   A.    Oh, yes.  It's a runover from page 2.  So, yes, it's --

22   the current -- the population on that date was 1,868 CCCMS

23   patients in ad seg and 579 in EOP.  And -- and obviously they

24   don't list PSU.

25             THE COURT:  You mean they don't list it separately or

3455

1    that's included within the current population?

2            THE WITNESS:  No, that falls -- that's a separate

3    category.  Yeah, I -- yeah.

4            THE COURT:  Okay.

5    Q.      BY MR. MC KINNEY:  And, again, Doctor, that PSU

6    population was on the first page of this document?

7    A.      Yes.

8            Since PSU is a separate classification and it's not

9    considered as part of the ad seg grouping, it doesn't get

10   broken out --

11           THE COURT:  All right.

12           THE WITNESS:  -- any further.

13           MR. MC KINNEY:  And then finally, Doctor, if you could

14   turn to the last page of this document under security housing

15   unit.

16   Q.      Does this -- as of this date, does this reflect the

17   mental health population in the security housing unit?

18   A.      Yes, it does.

19           In the -- the last block section, there were 729 CCCMS

20   patients in the SHU, and there were two EOP patients.

21   Q.      And how does -- how does an enhanced outpatient program

22   inmate wind up in the SHU?

23   A.      He -- he becomes EOP class -- EOP designation while in

24   the SHU, and then he is transferred out and transferred to a

25   PSU.  So since this is a point in time on that day, there were

3456

1    two.

2            THE COURT:  I thought -- once again, I may be

3    confused -- that if the inmate was EOP, he went to an EOP hub.

4            Is that wrong?

5            THE WITNESS:  No, you're absolutely right.

6            The patient that we were just talking about, these two,

7    they were --

8            THE COURT:  Oh, I see.

9            THE WITNESS:  -- more than likely CCC, and then they

10   became EOP, and we had to get them out.

11           THE COURT:  I understand now.

12           THE WITNESS:  Yeah, but they would not go into the SHU

13   with an EOP designation.

14           THE COURT:  Okay.

15           MR. MC KINNEY:  Doctor, if I could focus your attention

16   on Plaintiffs' Exhibit 2584, which is the enhanced outpatient

17   program census trends.

18           May I approach the witness, Your Honor --

19           THE COURT:  You may.

20           MR. MC KINNEY:  -- so I can find this exhibit?

21           THE COURT:  You're lucky if you can find it because I

22   can't.

23           (Off the record.)

24           MR. MC KINNEY:  Well, maybe I should come back to that.

25           THE WITNESS:  Okay.

3457

1              MR. MC KINNEY:  Your Honor, rather than waste the

2    Court's time, we'll go through the exhibits at the break, I

3    didn't have an opportunity to do that, but I'll have the

4    witness do that during the break.

5    Q.      Doctor, are you familiar with the treatment, mental

6    health treatment provided to inmate-patients in segregated

7    housing?

8    A.      In administrative segregation --

9    Q.      Correct.

10   A.      -- specifically?

11           Yes.

12   Q.      Well, in all segregated housing within CDCR.

13   A.      Yes, I am.

14   Q.      If I could have you turn to the exhibit that's been

15   marked for identification as Defendants' Exhibit AAAA.

16           Do you have that in front of you?

17   A.      Yes, I do.

18   Q.      Are you familiar with this document, Doctor?

19   A.      Yes, I am.

20   Q.      What is shown here?

21   A.      This is a visual break out from the program -- it's not

22   from the program guide, but it reflects the requirements of the

23   program guide for administrative segregated housing patients,

24   SHU patients and PSU patients.

25           (Counsel conferring.)

3458

1          MR. MC KINNEY:  Your Honor, at this time we'd like to

2     move Exhibit AAAA into evidence.

3          THE COURT:  Received.

4                         (DEFENDANTS' EXHIBIT AAAA

5                         ADMITTED INTO EVIDENCE.)

6          MR. MC KINNEY:  Doctor, let's talk about screening for

7     a moment.

8     Q.     Do inmates within CDCR receive mental health screening

9     before being placed in administrative segregation?

10    A.     Yes, all inmates will receive a brief screen, ah, that

11    will then -- then they may either be -- Dr. Scott talked about

12    it earlier today.  They may be cleared for administrative

13    segregation placement or it may trigger a referral, either an

14    urgent or an emergent referral.

15    Q.     And that pre-screening is conducted whether or not the

16    inmate is on the mental health system; is that correct?

17    A.     Yes.  All patient -- all inmates get that.

18    Q.     And can you describe that screening process briefly.

19    A.     It's performed by nursing.  Ah, there are specific

20    questions and based on the answer to the question would trigger

21    a referral.

22          For example, one of the questions is, you know, have

23    you ever thought of hurting yourself?  Are you hurt -- are you

24    thinking of it now?  I know one of the questions that stands

25    out for me is, has anyone told you you have to kill yourself or

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3459

1    something -- or they will kill you or something like that, to

2    that effect.

3              And then if any of those are endorsed, it will trigger

4    a further evaluation.

5    Q.    And is there additional screening once the inmate is

6    placed into segregation?

7    A.    Yes.

8              Well, if there are patients already enrolled in mental

9    health services delivery, they will become part of that program

10   within -- within the unit.  If -- if they're not part of our

11   program, so they're cleared in terms of mental health, ah,

12   they'll receive the 31-question screening measure that -- you

13   know, that's administered to them by a licensed psychiatric

14   technician.

15   Q.    And you heard the testimony from Dr. Scott this morning

16   concerning the system, correct?

17   A.    Yes, I did.

18   Q.    And is the referral evaluation process you just

19   described consistent with Dr. Scott's testimony?

20   A.    Yes, it is.

21   Q.    And for inmates in segregation, are there systems in

22   place to identify inmates who may need mental health care while

23   they're in administrative segregation?

24   A.    Once -- once they're done with the screening, yes,

25   there are, there are additional mechanisms.  Inmates can self

3460

1    refer.  Patients who -- who are experiencing difficulties can,

2    you know, talk to their case managers obviously about it.  Ah,

3    any inmate can -- you know, can be referred either by, umm,

4    custody staff, mental health staff.  They can be referred by

5    their peers.

6            So there are numerous ways for someone having

7    difficulty to come to our attention.

8    Q.      And are clinical rounds conducted in administrative

9    segregation?

10   A.      Yes, they are.  Excuse me.

11   Q.      How often?

12   A.      Daily licensed psychiatric technicians do -- do

13   rounds --

14   Q.      And which inmates are visited --

15   A.      -- on everyone in administrative segregation.

16   Q.      What's the purpose of conducting those LPT rounds?

17   A.      The purpose is -- is a monitoring.  It's -- it's

18   looking for patient -- looking for inmates who may need to be

19   referred or patients who need additional services or who aren't

20   doing well.

21           It's an interaction.  You know, we see over time, you

22   know, some rapport being built where, umm, patients may be more

23   willing to -- to let the psychiatric technician know that

24   they -- you know, that they need something.

25           And I don't know if it's in all of our administrative

3461

1    segregations, but in most that I see, the -- the psych techs

2    give them a daily puzzle or a daily sheet of puzzles which

3    actually we found encourages the inmates in talking with our

4    staff.

5          So I think it serves mostly a monitoring -- a

6    monitoring purpose so that it can trigger a referral to mental

7    health if needed.

8    Q.    And if an inmate is found --

9          THE COURT:  We'll take our afternoon recess, 15

10   minutes.

11         MR. MC KINNEY:  Thank you.

12         (Recess taken at 2:45 p.m.)

13   /////

14   /////

15   /////

16   /////

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

3462

1              (On the record at 3:05 p.m.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Hang on, Mr. McKinney.

5              (Brief pause.)

6              Yes, sir.

7              MR. MCKINNEY:  Thank you.

8    BY MR. MCKINNEY:

9    Q.    Dr. Belavich, before the break we were discussing

10   screening and evaluation in administrative segregation.

11            If during that process -- or at any time during

12   administrative segregation, if an inmate is found in

13   psychiatric crisis, what occurs?

14   A.    He's removed from administrative segregation and

15   placed in a crisis bed -- a mental health crisis bed.

16   Q.    Let's turn to the mental health --

17            THE COURT:  Before you go there, does every

18   institution that has an Ad. Seg. of some kind also have

19   mental health crisis beds?

20            THE WITNESS:  No, not everyone does.

21            THE COURT:  Right.  So some of them you got to get a

22   bus, which means the guy will sit there two, three weeks --

23            THE WITNESS:  No.  No.  No.  No.

24            THE COURT:  Go ahead.  Tell me.

25            THE WITNESS:  We have to use what's called

3463

1    alternative housing, which is something we have.  It was a

2    problem in prior years, but with the opening of crisis beds

3    statewide we've been able to reduce overall alternative

4    housing.  And we -- but we still use it for when the patient

5    is awaiting transfer.  It could be several hours.  It could

6    be up to 24 hours.

7          So we've had every institution identify cells or

8    places to be used for alternative housing.  And that was a

9    policy that we issued since 2012 when I have been here.

10          So they won't be transported on a bus.  They'll be

11    transported by car.  And that is all under the purview of

12    HCPOP.

13          THE COURT:  I don't know what -- everybody says HCPOP

14    like I'm supposed to know what it means.  I have no idea.

15          THE WITNESS:  The last exhibit we talked about, the

16    ZZZ with all the numbers, that's HCPOP, the Health Care

17    Placement Unit.  So it is a unit.

18          EOPs aren't moved around necessarily -- EOPS and CCCs

19    aren't moved around necessarily by the overall state system.

20    The Health Care Placement Oversight Unit has authority for

21    those crisis beds.  And so we at headquarters own the beds,

22    even though they sit in institutions.  And when I say that

23    I'm sending this Folsom patient over to Sac. because Folsom

24    has no crisis beds, that's the unit that does it.  And we

25    call it HCPOP.

3464

1          THE COURT:  But you avoid the problem of the

2   transportation system by having your own beds -- I mean your

3   own cars or whatever to transport people?

4          THE WITNESS:  Absolutely.  Absolutely.

5          THE COURT:  All right.  Okay.

6   BY MR. MCKINNEY:

7   Q.     Doctor, I want to follow up on that.

8          What is the availability of crisis beds in the system

9   currently?

10  A.     Currently we have strong availability of crisis beds.

11  That historically hasn't always been the case, but -- I'm

12  forgetting the exact date -- but it's been months, if not up

13  to a year, that we generally, at the end of the day, are able

14  to have all of our patients in crisis beds -- endorsed to the

15  correct crisis bed.

16  Q.     And if they're housed within alternative housing, how

17  quickly are they moved?

18  A.     Within 24 hours is the expectation.  And as soon as

19  they go into alternative housing, that triggers the referral

20  for the crisis bed.  That's something that's new as well.

21         So you cannot place the patient in alternative

22  housing without calling Health Care Placement to say that I

23  need a bed.  Because there used to be some other process

24  where they could sit in alternative housing, and then after a

25  certain amount of time I would call Health Care Placement.

3465

1          We would rather them call Health Care Placement, and

2    then if the guy -- you know, if his crisis resolves over a

3    couple of hours, we would rather rescind the referral to the

4    crisis bed than to be sitting there wishing we had called

5    earlier.

6    Q.     Let's turn to the quality of care within

7    administrative segregation first.

8          When an inmate is placed, is an effort made to

9    maintain continuity of care?

10   A.     Yes.  We have instituted a plan where the patient

11   comes into administrative segregation either within the

12   institution or from another institution.

13         The receiving institution -- or the receiving case

14   manager, psychologist, it's incumbent upon that person to

15   contact the sending health care provider, just like we would

16   do medically.

17         The charts go, and the charts can be read, but we

18   require a clinician-to-clinician contact for that transfer.

19   And then that gets logged also into the tracking system so

20   that we have oversight, and we can audit and monitor.

21   Q.     And Doctor, if I could have you turn to the exhibit

22   that's been premarked as Defendants' BBBB.

23         Do you have that in front of you?

24   A.     Yes, I do.

25   Q.     What is this document?

3466

1    A.      This is the policy that reflects what I was just

2    talking about, that when inmate-patients transfer within

3    administrative segregation or between, that within five

4    calendar days a clinician-to-clinician contact is made.

5              MR. MCKINNEY:  Your Honor, I would like to move this

6    exhibit into evidence.

7              THE COURT:  Received.

8                    (Whereupon, Defendant's Exhibit BBBB received

9                     into evidence.)

10    BY MR. MCKINNEY:

11    Q.      Doctor, do you have a way of tracking compliance with

12    the policy?

13    A.      Yes, we do.  We require that a code be placed in that

14    reflects that this was accomplished.  It was developed by our

15    mental health tracking system staff, and so they record into

16    the system that this contact has been made.

17    Q.      In speaking about administrative segregation,

18    plaintiffs' experts have described it as "solitary

19    confinement."

20              Would you agree with that characterization?

21    A.      I wouldn't.  I see -- I see a lot of activity

22    actually when I have gone to administrative segregation

23    units.  There are -- you know, they're obviously under

24    escort, but there are people going to appointments, there are

25    people going to groups, there are people going to medical

3467

1  appointments or any number of things, or yard.  So my idea of

2  solitary confinement may be incorrect, but I see activity,

3  and I see people out of their cells.

4  Q.     Can you describe the clinical contacts that occur in

5  CDCR's administrative segregation units?

6  A.     Well, there's weekly -- the opportunity for weekly

7  case manager contact with our patients regardless if the

8  patient is CCCMS or EOP.  There are the daily rounds.

9  However, the patient wouldn't be coming out for the daily

10  rounds.

11         There are IDTTs, interdisciplinary treatment teams,

12  held every 90 days.  And then medication management from

13  psychiatry is also held for those -- for all the EOPs and for

14  the CCCMS patients who are on medications.

15         And group therapy can be any number of topics or can

16  take many forms.

17  Q.     And you mentioned that this population, the CCCMS

18  population, is seen by the primary clinician weekly.

19         How does that compare with a CCCMS inmate in general

20  population?

21  A.     When our CCCMS patients are in the main line, they're

22  seen at least once every 90 days, and they receive an

23  interdisciplinary treatment team meeting annually.

24         So if a CCCMS comes into administrative segregation

25  or becomes CCCMS in administrative segregation, that

3468

1    frequency obviously goes up significantly because it's weekly

2    case manager contacts and quarterly interdisciplinary

3    treatment teams.

4            THE COURT:  I'm sorry.  Will you hold on a second.

5    I'm obviously loss.

6            That's all right, sir.

7            (Brief pause.)

8            All right.  You may proceed.

9    BY MR. MCKINNEY:

10   Q.      Doctor, if I could have you turn to the declaration

11   of Miss Vorous, which was entered into evidence earlier as

12   Exhibit WWW?

13   A.      Yes.  I have it.

14   Q.      If you could, turn to Exhibit 4 of that declaration?

15   A.      Mental Health Services Delivery System Program Guide

16   Revision?

17   Q.      Correct.  And if I could have you turn a few pages

18   into what is called Chapter 7.  It is page 12-7-1 of the

19   document, and page 4 of 45 on the top.

20   A.      So the header is "Chapter 7 Administrative

21   Segregation"?

22   Q.      Correct.

23   A.      Yes.

24   Q.      Does this exhibit reflect the Program Guide

25   requirement for inmates in administrative segregation?

3469

1    A.      Yes.  This is the chapter that outlines our treatment

2    for administrative segregation.

3    Q.      And Doctor, is CDCR providing care for CCCMS inmates

4    in administrative segregation consistent with the Program

5    Guide?

6    A.      Yes, I believe we are.

7    Q.      Doctor, if I could have you turn to what's been

8    premarked as Exhibit DDDD?

9            THE COURT:  Four Ds?

10           MR. MCKINNEY:  Yes, Your Honor.

11           THE COURT:  All right.  Hang on.

12           I've got too much paper.

13           MR. MCKINNEY:  Your Honor, for the court's reference,

14    it says "Coleman versus Brown, Program Guide Compliance," a

15    one-page document.

16           THE WITNESS:  A chart.

17           THE COURT:  I'm not going to find it.

18           Go ahead.

19    BY MR. MCKINNEY:

20    Q.      Doctor, are you familiar with this document?

21    A.      Yes, I am.

22           MR. BIEN:  Patrick, I don't know what this is.

23           (Counsel confer.)

24           THE COURT:  Wait.  I've seen that document.

25           I don't know where it is any more.

3470

1          I kept saying I'm drowning in paper.  Now I've just

2     proved it.

3          Go ahead.

4     BY MR. MCKINNEY:

5     Q.     Doctor, again, I'm sorry, you may have answered, are

6     you familiar with this document?

7     A.     Yes, I am.

8     Q.     What is this document?

9     A.     It's a chart that shows our compliance rates through

10    the month of October for some of the activities that are, you

11    know, laid out in the Program Guide, clinical activities.

12    Q.     How is this chart prepared?

13         On what data did you rely upon?

14    A.     This is data that comes from the raw data entered

15    into the mental health tracking system.  So it is rolled up

16    into management reports and dashboards.  And this data is

17    extracted from there.

18    Q.     This is a summary of that data, correct?

19    A.     Yes, it is.

20         MR. MCKINNEY:  Your Honor, at this time I would like

21    to move DDDD into evidence.

22         THE COURT:  Received.

23              (Whereupon, Defendants' Exhibit DDDD received

24               into evidence.)

25    ///

3471

BY MR. MCKINNEY:

Q.      Doctor, if I could focus you on the CCCMS in the
administrative segregation population.

        Can you discuss compliance with the Program Guide
requirements reflected on this exhibit?

A.      Sure.  The weekly contacts with primary clinicians,
which is required, our compliance rate for this month --
again, this is a statewide roll-up, it's not institution
specific, although we can go there if we would need to --
shows a 93 percent compliance rate with the weekly contacts
with the CCCMS patients.

        With having the 90-day interdisciplinary treatment
team, our compliance rate was 96 percent.

        And for the timely psychiatry contact, which is every
30 days for those on medications, it was 96 percent as well.

Q.      What is the time period covered by this exhibit?

A.      It's the month of October of this year, October 1st
through the 31st.

Q.      And you mentioned that you can track individual
institutions.  If an institution has low compliance, are
actions taken?

A.      Yes.  This data is reviewed -- it is reviewed
regularly.  The expectation is it is reviewed regularly by
the institutions.  Some of the ways we ensure that is we
reach out directly to them, or, quite frequently, they reach

3472

1    up to us when they notice that there might be a concern with

2    their data.

3            But in an official manner we review it monthly in our

4    headquarters quality management meeting.  And our regional

5    administrators are part of that, the regional chief

6    psychologists are part of that.

7            So when we look at the dashboard, we drill down on

8    any of the numbers.  And we can see on an institutional

9    level -- we go with red, yellow, green.  You know, the greens

10   are good.  The yellows we have concern about, we want some

11   information.  And the reds we want a report back from our

12   regional chiefs as to what's causing this and what's being

13   done about it to fix it.

14           So it is part of that feedback loop we talked about

15   in one of the earlier documents.

16   Q.      And Doctor, if I could have you turn to what's been

17   premarked as Exhibit EEEE.

18   A.      I have it.

19   Q.      Are you familiar with this document?

20   A.      Yes, I am.

21   Q.      What's reflected on this document?

22   A.      This is one page of a much larger document that is --

23   this is actually the raw data entered into our mental health

24   tracking system, and this is the data on which the reports

25   are run.

3473

1          So I wouldn't generate this data to review it on a --
2    it doesn't mean much to me that way.  It means something to
3    individual clinicians, and they can locally do that on their
4    individual patients, and it would extract this data.  But
5    what matters to me in this, this is rolled up into a report
6    that gives me compliance rates that we can monitor.
7          MR. MCKINNEY:  Before you continue to answer the
8    question, Doctor, at this time I would like to move this
9    exhibit into evidence, Your Honor.
10          THE COURT:  Received.
11              (Whereupon, Defendants' Exhibit EEEE received
12                under seal into evidence.)
13          THE WITNESS:  And most of the page, again, it's about
14    individual --
15          THE COURT:  I'm sorry.  It's received under seal
16    because it's got the names.
17          MR. MCKINNEY:  Thank you.  Agreed.
18          THE WITNESS:  Most of the page, because they reflect
19    individual scheduled appointments or refusals of
20    appointments, but they're all the scheduled appointments, it
21    doesn't mean a lot to me as I sit here today.
22          More importantly, under that first bold line above
23    the individual patient information, it shows that for our ASU
24    CCCMS patients during this time period 29,000 appointments
25    were scheduled for 2772 patients amounting to 9600 hours.

3474

1          Most of those were scheduled either by -- 633

2     involved primary providers.

3          Attended by psychiatrists, again, 2973; clinicians,

4     14,000; counselors, 1000.  So it goes on.  So the first one

5     show -- they give me the roll-up.

6     Q.     What is the time period covered by this report?

7          THE COURT:  It's on the bottom, sir.

8          THE WITNESS:  No.  That's when it was generated.

9          It's in the parameters up on top so it shows -- it

10    starts on 10-1 and ended on 10-31.  It was just printed on

11    11-26.

12    BY MR. MCKINNEY:

13    Q.     Just for clarity, the 29,107 appointments, what types

14    of contacts are included within that number?

15         THE COURT:  There wasn't any 29,000.  There is

16    9000.

17         THE WITNESS:  No.  To the far left it is 29,107

18    appointments.

19         THE COURT:  I see.  I see.

20         THE WITNESS:  That's the number of appointments.  It

21    would have accounted -- it would have taken 9600 hours

22    because some appointments obviously are scheduled for shorter

23    amounts of time.

24         For example, this would include any therapeutic

25    contact.  You can see reasons along the line.  There are

3475

1    IDTTs listed, routine contacts, group.

2          The very first one it appears that a psychiatrist was

3    scheduled to see the patient for medication noncompliance.

4    BY MR. MCKINNEY:

5    Q.        Doctor, let's talk about the services provided to

6    enhanced outpatient program inmates in the administrative

7    segregation hubs.

8          Are you familiar with the treatment provided to that

9    population?

10   A.        Yes, I am.

11   Q.        Can you describe -- first of all, when an inmate

12   first arrives at the Ad. Seg. hub, what occurs?

13   A.        They're brought into Ad. Seg.  They're obviously

14   already EOP patients.  We would expect the clinician contact

15   to occur from the transfer, but then our EOP patients receive

16   what they would have received had they been on the main line,

17   such as ten hours of scheduled therapeutic treatment, weekly

18   case manager contacts, quarterly or every 90-day IDTT or

19   interdisciplinary treatment teams and medication management

20   appointments every 30 days.

21         And in addition, they receive daily licensed

22   psych-tech rounds for the first 21 days.  They also are in an

23   intake cell where they receive the three checks per hour.  I

24   believe that's been talked about already.

25         THE COURT:  Incessantly.

3476

1          THE WITNESS:  You wouldn't like to hear more?

2          THE COURT:  No.

3    BY MR. MCKINNEY:

4    Q.      Is the care provided consistent with the Program

5    Guide requirements for the enhanced outpatient population?

6    A.      Yes, it is.

7    Q.      And if I could have you turn back to -- pardon me one

8    moment -- Exhibit DDDD, the Program Guide compliance chart?

9    A.      Yes, I have it.

10   Q.      Can you discuss the EOP population compliance with

11   the Program Guide requirements?

12   A.      Sure.  For weekly clinician contact for EOPs, on that

13   fourth line of the top section of the chart, for the month of

14   October, statewide we had 98 percent compliance with primary

15   contacts.

16          For having interdisciplinary treatment teams held

17   timely, 98 percent compliance rate.

18          And for having the evaluation by a psychiatrist every

19   30 days -- it says "evaluation," but it would also be, you

20   know, the medication management meeting.  And that was 94

21   percent compliance for the month.

22   Q.      Again, that was for the month of October?

23   A.      It is the month of October and it is statewide.

24          Again, similar to the other data, we can drill down

25   by institution.

3477

1   Q.      If I could have you turn to what's been marked

2   Exhibit FFFF for identification, a similar appointment

3   document to what we looked at for the CCCMS population?

4   A.      Yes.

5   Q.      Are you familiar with this document, Doctor?

6   A.      Yes, I am.

7   Q.      What is reflected here?

8   A.      This is similar to the previous document where it is

9   the raw data that gets rolled up into a management report or

10  a dashboard that we use in headquarters.  The institutions

11  can use it, or we definitely see it within our quality

12  management meeting.

13          And again, for me, if I look to see, you know, that

14  we had close to 25,000 appointments scheduled for 830

15  patients that amounted to 27,000 hours approximately.  And

16  then, again, by classification.

17  Q.      Again, which population does this apply to?

18  A.      This applies for our EOP patients in administrative

19  segregation.

20  Q.      And the time period this document covers?

21  A.      The time period is also the same as the last, October

22  1st through October 31st of this year.

23          MR. MCKINNEY:  Your Honor, I would like to move this

24  exhibit into evidence.

25          THE COURT:  Received under seal.

3478

1          (Whereupon, Defendants' Exhibit FFFF received

2          under seal into evidence.)

3          MR. MCKINNEY:  Yes.  Thank you.

4    BY MR. MCKINNEY:

5    Q.     Doctor, are you familiar with the group therapy

6    provided to enhanced outpatient program inmates in

7    administrative segregation hubs?

8    A.     Yes.

9    Q.     Doctor, if I can have you turn back to the

10   declaration of Miss Vorous that's been entered as Exhibit

11   WWW?

12   A.     Okay.

13   Q.     Again, turn to Exhibit 4, page 12-7-10.

14   A.     Yes, I'm there.

15   Q.     If you can, read the second paragraph on -- I'm

16   sorry -- the second sentence in the first paragraph on that

17   page.

18   A.     (Reading:)

19          Each inmate-patient shall have an individualized

20          treatment plan for ten hours per week of scheduled

21          structured therapeutic activities, using standardized

22          therapeutic materials with the following services:

23          (Reading concluded.)

24   Q.     Is it your understanding that the Program Guide

25   requires the department to schedule the ten hours of

3479

1    structured therapeutic activity for this population each

2    week?

3    A.      That's what it states, correct.

4    Q.      And what activities are included within the

5    definition of "structured therapeutic activity"?

6    A.      They would include the daily rounds -- the daily

7    rounds, the weekly clinician contact, the monthly psychiatry

8    contact, the -- every -- the quarterly IDTT.  I think I said

9    group therapy.  If not, group therapy as well.

10   Q.      But it is not just group therapy.  It is a much

11   broader category than just group therapy; is that accurate?

12   A.      Yes, that's correct.

13   Q.      Doctor, if I could have you turn to what's been

14   premarked as GGGG for identification.

15   A.      I have it.

16   Q.      Are you familiar with this document?

17   A.      Yes, I am.

18           THE COURT:  You don't want triple, you want

19   quadruple?

20           MR. MCKINNEY:  Quadruple G.  Thank you.

21   BY MR. MCKINNEY:

22   Q.      What is reflected on this document, Dr. Belavich?

23   A.      This is a document we send out weekly to our

24   institutions.  It reflects the amounts of therapeutic

25   activity that has been scheduled -- Pardon me.  We send this

3480

1    out actually monthly, and it reflects the amount of

2    therapeutic activity for those institutions that was

3    scheduled during that month, the amount of time that was

4    offered during that month, the amount of time that ended up

5    being attended by the patients on average, the amount refused

6    and the amount cancelled.

7         And the one we send out is also a red, yellow, green.

8    And we do the same thing, and we reach out to either the -- I

9    reach out often to the CEO, and our regionals reach out to

10   the chiefs of mental health locally if there are issues or

11   concerns.

12        MR. MCKINNEY:  Your Honor, at this time I would like

13   to enter GGGG into evidence.

14        THE COURT:  Received.

15             (Whereupon, Defendants' Exhibit GGGG received

16              into evidence.)

17   BY MR. MCKINNEY:

18   Q.    Doctor, what is shown on the first part of this chart

19   with the heading "EOP ASU"?

20   A.    These are -- along the far left reflects our EOP ASU

21   hubs and then the amount of time that was scheduled of

22   therapeutic activity on average across the time span on here

23   of October 26th to November 22nd.

24        It's the time that was offered, the amount of time

25   that was attended, and then, again, the amount of time

3481

1   refused and number of -- amount of time cancelled.

2          We found that -- I know that the Program Guide says

3   that we need to schedule ten hours of activity a week.  We

4   found that when we schedule ten, you know, if there are

5   cancellations or things like that that are institutional,

6   that takes the opportunity away for treatment.  So the

7   message that our institutions have are that you need to

8   schedule somewhere between 11 and 13, sometimes 14.  You need

9   to have that much scheduled so that our goal is to offer ten

10  hours of structured treatment on average.

11         And here you see how it falls out.

12  Q.     Can you describe the totals?

13  A.     On average statewide during this time we're offering,

14  across the institutions, 12.39 hours of treatment.  And we're

15  offering 10.61 hours of treatment.  Patients are attending on

16  average 6.73 hours of treatment.  They're refusing 3.89 hours

17  of treatment.  And statewide, you know, an average of 1.7

18  hours of treatment per week is cancelled.

19  Q.     And if an institution falls below the requirements

20  for scheduled structured therapeutic activity, are actions

21  taken or is follow-up done?

22  A.     Actually follow-up is done if -- the benchmark I use,

23  follow-up is done if our institutions are not offering ten

24  hours of treatment.  So that's a bit of a higher bar we're

25  holding them to.

3482

1          So we have been using the offered as the benchmark

2    for our patients.  So follow-up is done either -- I

3    personally do it or through the regionals.

4    Q.     During his testimony Dr. Stewart testified about the

5    concept of "group hold," I think was the term he used.

6          Is that a term you're familiar with?

7    A.     No, it is not.

8    Q.     Is that used within CDCR?

9    A.     No.  I've not seen that term.

10   Q.     Doctor, are you familiar with the mental health

11   treatment provided in the state's security housing units?

12   A.     Yes, I am.

13   Q.     If I could have you turn back to Miss Vorous's

14   declaration, that same exhibit, Exhibit 4, beginning with

15   page 12-8-1 or 19 of 45 on the top.

16   A.     "Chapter 8, Security Housing Unit."

17   Q.     Correct.

18         Does this set forth the Program Guide requirements

19   for mental health inmates in a security housing unit?

20   A.     Yes, it does.

21   Q.     Can you discuss the mental health services provided

22   to inmates in this setting?

23   A.     Sure.  We only house our CCCMS patients in the

24   secured housing units so I can only obviously speak about

25   their treatment.

3483

1        They receive weekly rounding.  They receive clinician

2    contacts every 30 days, which is an increase because in the

3    main line they would receive them at least every 90 days.

4        They receive an Interdisciplinary Treatment Team

5    every 90 days, which is also an increase.  And they receive

6    medication management from their psychiatrist, if they're on

7    meds, every 90 days.

8    Q.    And what other treatment activities are available

9    within the security housing units?

10   A.    Obviously, there's group therapy available as needed,

11   and some of our institutions have been able to offer more

12   than others.  There's -- you know, I think that would be the

13   major addition to anything I have spoken about.

14   Q.    You mentioned OPT rounding for the mental health

15   population.

16       Are all inmates rounded by OPTs inside the SHU?

17   A.    Yes.  Our CCCMS patients are rounded on weekly, and

18   the GP inmates are rounded on biweekly.

19   Q.    Again, Doctor, if I could direct your attention back

20   to Exhibit DDDD.  It's the Program Guide compliance chart.

21   A.    Yes.

22   Q.    Does this show compliance with the Program Guide for

23   the CCCMS population housed in the SHU?

24       THE COURT:  Not CCCMS?

25       MR. MCKINNEY:  Yes, Your Honor.  CCCMS in the

3484

1    security housing units.

2            THE COURT:  Okay.

3            THE WITNESS:  Yes.  In the second block down, "CCCMS

4    In Security Housing Units," for the month of October, timely

5    interdisciplinary treatment team meetings, statewide we had

6    98 percent compliance.  For the contact with primary

7    clinician monthly, we had 88 percent compliance.  And for

8    timely psychiatry contact, 98 percent compliance.

9    Q.      And can you discuss the concept of "compliance"?

10           What does it mean to be compliant in this context?

11   A.      It means that the activity took place within the time

12   the Program Guide dictates it needs to take place.

13           So if it has to be a weekly contact with a case

14   manager, we're compliant as long as we see them every week.

15           A better example would be, if you have something

16   every 30 days, if the patient is seen on day 32, it still

17   happens, but it actually comes up as noncompliant in the

18   report so it wouldn't get rolled up.

19   Q.      Doctor, if you could turn to what's been premarked

20   for identification as Defendants' Exhibit HHHH.

21   A.      Yes.

22   Q.      Similar to the other sheets we've looked at.

23           Are you familiar with this document?

24   A.      Yes.  This is the raw data document, like the others,

25   but for the CCCMS SHU patients.

3485

1          MR. MCKINNEY:  Your Honor, I would like to move this

2     exhibit into evidence.

3          THE COURT:  Received under seal.

4               (Whereupon, Defendants' Exhibit HHHH received

5                under seal into evidence.)

6     BY MR. MCKINNEY:

7     Q.     Doctor, what is shown here with respect to the

8     appointments provided to this population?

9     A.     It shows, again, I think -- yes, we're talking about

10    the month of October -- that 3700 appointments -- 3771

11    appointments were scheduled for 750 patients.  That would

12    total 1664 hours.  And then it goes into the different

13    classifications that scheduled the appointments.

14          THE COURT:  If you will, Doctor, one -- four down, it

15    says "Provider Name," and it is the name of the provider,

16    then under it says "C., RT."

17          Can you tell me what that means?

18          THE WITNESS:  The "C" is the beginning of the

19    person's name.  And the "RT" is a recreational therapist.  It

20    looks like they held a group process.  So they held a group

21    therapy with the recreational therapist.

22          THE COURT:  All right.

23          THE WITNESS:  And the patient went.

24    BY MR. MCKINNEY:

25    Q.     Again, Doctor, this data reflects a variety of

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3486

1    clinical contacts; is that correct?

2    A.      Yes.  Obviously, you can see down the "Reason"

3    category that we're talking about.  "PC" would be primary

4    clinician contact.  "Rounds," you see a lot of "Rounds"

5    recorded here.

6           Then, for example, the very last patient was

7    scheduled for that group as well with a different provider

8    and had refused.

9    Q.      Doctor, let's turn to the psychiatric services units

10   briefly.

11          Are you familiar with those units, first of all?

12   A.      Yes, I am.

13   Q.      Can you describe those units?

14   A.      They are -- I have been to the PSUs.  I have not been

15   to the female PSU since it was opened, but the male PSUs,

16   they are office and treatment space built specifically to

17   house the treatment for our patients who are in a PSU, so EOP

18   patients serving a SHU term.

19   Q.      Would it be fair to say that in that setting the

20   patients are brought to the treatment?

21   A.      Yes.  Most definitely.  Yes.

22   Q.      If I could have you turn back once again the

23   Miss Vorous declaration, Exhibit WWW, that same exhibit,

24   Exhibit 4, turning to page 12-9-1 of that exhibit, page 32 of

25   45 on the top.

3487

1    Do you have that?

2    A.    Yes, I do.

3    Q.    Does this chapter reflect the Program Guide

4    requirements for inmates housed in one of the state's

5    psychiatric services units?

6    A.    Yes.  This is the Program Guide chapter.

7    Q.    Can you describe the mental health treatment

8    provided -- or the services provided in the state's PSUs?

9    A.    Our EOP patients in a PSU, like all of our EOP

10   patients, are scheduled for ten hours of structured

11   therapeutic treatment.

12        They receive an initial assessment within five days

13   of arrival.  They also receive daily licensed psychiatric

14   technician rounds, weekly primary care or primary -- not

15   primary care -- primary clinician rounds from mental.

16        They receive IDTT.  You know, their first IDTT is

17   within 14 days, then the next two within 60 days, and then

18   after that it's every 90 days.

19        They have medication management appointments with

20   their psychiatrist every 30 days, and I think that covers it

21   all.

22   Q.    And do patients in these units receive group

23   treatment?

24   A.    Yes, they do.  I'm sorry.  Group treatment is part of

25   the ten hours, as well.

3488

1    Q.      Is that generally consistent with the Program Guide

2    requirements for the enhanced outpatient population?

3    A.      Yes.  In comparison to the main line enhanced

4    outpatient population, the rounds from LPT, for example, and

5    the frequency of IDTTs is more intense within the PSU.  But

6    they get at least as much as the main line EOPs and as much

7    as the administrative segregation EOP patients.

8    Q.      And one more time, if I could direct your attention

9    back to DDDD.

10          THE COURT:  Before we do that, I'm sorry, I've just

11   lost it.  It is my fault.

12          Tell me why an EOP patient is in the PSU rather than

13   in the EOP hub?

14          THE WITNESS:  He's serving a SHU term.  So the EOP

15   goes to PSU.

16          THE COURT:  Okay.  Sorry.  All right.  Thank you.

17          THE WITNESS:  No problem.

18   BY MR. MCKINNEY:

19   Q.      Doctor, turning back to Exhibit DDDD, can you

20   discuss -- does this reflect compliance rates on some of the

21   treatment measures for the PSU units?

22   A.      Yes, it does.  The bottom chart are timely

23   interdisciplinary treatment team meetings.  Compliance is 98

24   percent.  The weekly contact with the primary clinician

25   compliance is 91 percent for the month of October statewide.

3489

1        And the timely psychiatry contact, that compliance

2   rate is only 59 percent for the month of October.

3   Q.    Again, can you describe "compliance" in this context?

4   A.    Sure.  Compliance is, again, did we meet our goal

5   within the allotted time.  So did we hold the IDTT within the

6   14 days.

7        If it happens on day 15, we don't get credit for it.

8   It goes into the tracking system as completed and done, but

9   it doesn't give us -- it doesn't contribute to compliance.

10  Q.    Do you have an understanding why in this particular

11  measure the compliance rate is lower than the other measures?

12  A.    For this psychiatry contact, drilling down there may

13  be reasons in that we missed the timelines.  There might

14  be -- it may be that -- you know, it may be it didn't happen.

15       MR. BIEN:  Objection.  There is no foundation he

16  knows.

17       THE COURT:  I'm assuming that when you see 59

18  percent, you do what you said, which is try and find out why

19  they're at 59 percent.  And what you're talking about now is

20  what was told to you by the regional director --

21       THE WITNESS:  Regional chiefs.

22       THE COURT:  -- the regional chiefs who looked at the

23  problem.  So it is hearsay, but it is hearsay which is relied

24  upon by headquarters and admissible for that purpose only.

25       And you were saying -- you were going to tell us why

3490

1   it was only 59 percent.

2          THE WITNESS:  Sure.  There could be any number of

3   reasons, but in this instance, looking at it, we found that

4   the initial psychiatry contact when they come into the PSU,

5   that is happening consistently and on a high basis.  It is

6   the follow-ups that were contributing to that low compliance.

7          So we have contacted the institutions to query them,

8   and we don't have the resulting reason yet as to why the

9   follow-up appointments are not in compliance.

10  BY MR. MCKINNEY:

11  Q.     But you are following up on this -- on this report?

12  A.     Yes.  For example, upon our initial talking with

13  them, we're finding that that initial contact is happening,

14  and that is at a high compliance rate, and that there's

15  something happening later that is not getting followed up on.

16         And that may be they are missing a timeline, it may

17  be a scheduling problem, it might be cancellations.  I don't

18  have that level of detail at this time.

19  Q.     Doctor, if I could have you turn back to exhibit --

20         THE COURT:  Before you go, this is October's.  When

21  did you learn -- when did you get the document or the figures

22  so that you could look at it?

23         THE WITNESS:  We give the institutions -- we give

24  them at least two weeks for data entry.

25         THE COURT:  Okay.

3491

1          THE WITNESS:  So we would not -- we wouldn't even

2     pull a first one until then.  If we talk to institutions --

3     sometimes we do pull, and we find an anomaly.  When we reach

4     out to them, we say that we don't have all our data in.  So

5     we say, When will you have the data in so --

6          THE COURT:  My question is whether you are responding

7     timely to the -- well, I'll call it an anomaly.  At the

8     bottom of the chart, the 59 percent, you would learn that

9     sometime in the middle of November, correct?

10          THE WITNESS:  Yes.

11          THE COURT:  And you would then query your regional

12     chiefs.  And when would they get back to you?

13          What I'm trying to do is find out whether there's a

14     timely response?

15          THE WITNESS:  Sure.  They can informally get back to

16     me any time.  They are required to get back by the next

17     quality management meeting.  So they will officially report

18     in December what the anomaly was and what they did to address

19     it.

20          Frequently, but not every time, they come to me

21     directly and say that this is what happened and this is what

22     I did.

23          THE COURT:  All right.

24          THE WITNESS:  I don't have that on this particular

25     one.

3492

1    BY MR. MCKINNEY:

2    Q.      Doctor, if I can have you turn back to GGGG, which is

3    the group treatment chart.

4    A.      Yes.

5    Q.      Can you discuss the group treatment provided to

6    inmates in the PSUs?

7    A.      Sure.  In the second bottom half of where it says

8    "EOP PSU," again it lists our three PSUs.  And similar to our

9    Ad. Seg. hubs, it lists the amount of hours on average that

10   were scheduled across the month, the amount of hours offered,

11   attended, refused and cancelled.

12          On average the three PSUs were scheduling just over

13   12 hours of treatment.  They were offering just over ten

14   hours of treatment, and the patients were attending, you

15   know, 7.76 hours on average of treatment.

16   Q.      Doctor, if I could have you turn to Exhibit JJJJ in

17   front of you, which is another data sheet for the PSU

18   population, I believe.

19   A.      Yes.

20   Q.      Are you familiar with this document?

21   A.      Yes.  Like the previous ones, it is the raw data for

22   the PSU patients for the month of October.  Again, it shows

23   that 11,733 appointments were scheduled for 388 patients, and

24   that the total number of hours scheduled were just over

25   15,000 by various providers.

3493

1    Q.       That's in the month of October?

2    A.       Yes.  The 1st through the 31st.

3             MR. MCKINNEY:  Your Honor, I would like to move JJJJ

4    into evidence.

5             THE COURT:  Received under seal.

6                  (Whereupon, Defendants' Exhibit JJJJ received

7                   under seal into evidence.)

8    BY MR. MCKINNEY:

9    Q.       Doctor, are you familiar with the group treatment

10   provided to CCCMS inmates in administrative segregation?

11   A.       Yes.

12   Q.       Is group therapy required by the Program Guide for

13   this population?

14   A.       It's not specifically required, but it's required as

15   recommended by the case manager or the treatment team.

16   Q.       As a clinician, would it be appropriate to provide

17   group treatment to a CCCMS inmate in that circumstance?

18   A.       In some instances, yes.

19   Q.       And are groups provided to CCCMS inmates in

20   segregation within CDCR?

21   A.       Yes, there are, but not in any way with the frequency

22   that they are to our EOP patients.

23   Q.       And Doctor, if I could have you turn back to that

24   same exhibit we were just looking at, Exhibit GGGG.

25   A.       Yes.

3494

1   Q.      Does this chart reflect group treatment provided to

2   CCCMS inmates?

3   A.      Yes, but in a different way than the previous -- the

4   top chart that we've been talking about.

5           This reflects our statewide roll-up during the time

6   period -- the same time period, October 26th to November

7   22nd.  A total of 2,366 appointments were scheduled for 604

8   patients statewide in our administrative segregation units.

9           Then specifically at the SHUs, at CCI or Tehachapi,

10  actually a different timeline, from July 1st through November

11  1st, they scheduled 400 -- just over 400 appointments for 90

12  patients.  And the at the Corcoran SHU, from July through

13  November, they scheduled 471 appointments for 181 patients.

14          So, as I said, not with anywhere near the frequency

15  or intensity that the EOP patients are scheduled.

16  Q.      In your opinion would that be consistent with

17  their -- strike that.

18          There has been testimony earlier about inmates housed

19  in -- I'm sorry -- availability of confidential treatment

20  space.

21          Do inmates housed in segregated units have access to

22  confidential treatment space?

23  A.      Are you talking about all units or specifically

24  administrative segregation?

25  Q.      Inmates housed in segregated units, do they have --

3495

1   is confidential space available?

2   A.      Yes.  And, again, to varying degrees.  Where you have

3   places like a PSU, obviously these were built much more

4   significantly for treatment, and we have -- there's much more

5   space.

6           Where we have our new construction that has occurred

7   at places like Corcoran, you know, Sac. again, CIW, CMF, lots

8   of new space, upcoming space at Lancaster, yes.

9           At some of our other places, where we've had to

10  convert space, it has been more difficult.  But speaking --

11  when I tour, speaking to staff I ask them what they do if

12  they want -- how do they see patients.  And they do a lot of

13  scheduling to accommodate that.

14          Sometimes they're working -- you know, sometimes they

15  run shifts on weekends to accommodate, and sometimes they use

16  office space in those places within the units.  But they

17  state that they're able to get the space.

18  Q.      Doctor, if you could look at Exhibit AAAA.

19          In our discussion -- or your testimony concerning the

20  treatment provided to inmates in segregated housing, does

21  this chart fairly reflect what you just testified to?

22  A.      Yes, it does.

23  Q.      And earlier in this proceeding, plaintiffs' expert,

24  Dr. Stewart, expressed the opinion that mental health

25  treatment cannot be effectively provided in segregated

3496

1    settings.

2         Do you agree with that opinion?

3    A.    No, I don't.

4    Q.    Why is that?

5    A.    I think by and large we are providing treatment, and

6    we're providing good treatment in administrative segregation

7    settings.  And I think especially with some of the new

8    construction we've had, I think that these are some of the

9    things we've been waiting for.  And we're excited to have

10   them.  And I think it can only get better.

11   Q.    Doctor, I want to discuss the length of stay report

12   that's been admitted into evidence previously.

13         Back behind you there is a binder of exhibits for

14   Craig Haney.  If you could, turn to Exhibit 2040 in that

15   binder.

16   A.    2040?

17   Q.    Yes.

18         Are you familiar with this report?

19   A.    Yes.  I've seen it before.

20   Q.    When did CDCR begin to produce this report?

21   A.    A couple of months ago.  I think this copy might be

22   the first one in this way.

23   Q.    And are you aware of any court order that would

24   require CDCR to produce a length of stay report?

25   A.    I'm not.

3497

1   Q.      And do plaintiffs' counsel, when they have concerns,

2   do they normally bring those concerns to your attention?

3   A.      Oh, absolutely.

4   Q.      How often would you say that occurs?

5   A.      In my two years -- close to two years being up here,

6   I think -- I can't tell you the number of times.  At least a

7   dozen times we've met in person, phone calls, you know,

8   arranged and facilitated by the Special Master, or through

9   correspondence, emails or letters.

10          So I guess, not knowing before I got up here, there

11  is a lot more contacts than I expected.

12  Q.      Are you aware that plaintiffs have raised an issue

13  concerning this length of stay report?

14  A.      Yes.

15  Q.      When did you become aware of that issue?

16  A.      Through these proceedings.  Through the court.

17  Q.      So plaintiffs' counsel did not raise this issue

18  before you prior to raising it in testimony; is that right?

19  A.      No.  There was a -- there was something brought to my

20  attention, I think, in my deposition that there was -- if

21  this is the right report -- that there was a report missing

22  Corcoran data and so -- I believe it was on that topic.

23          So when I went back, I told my staff, you know, if

24  that's -- you know, if that's what were obliged to do, let's

25  get it.  So I think this is the result of that perhaps.

3498

1  Q.    And then with respect to this report, the plaintiffs

2  did not raise a concern about the total length of stay for

3  any particular inmate prior to this proceeding; is that

4  right?

5  A.    Not to me.

6  Q.    Similarly, are you aware of any court order that

7  would require the department to produce population

8  projections?

9  A.    I'm aware there was a court order.  I don't -- I

10 don't believe that it still stands, but we continue to

11 generate and share population projections.

12 Q.    And Doctor, if I could have you take a look at what's

13 been premarked as Exhibit KKKK.

14 A.    Are we done with this one?

15 Q.    Yes.  Thank you, doctor.

16 A.    Yes.

17 Q.    This is an order on the court's docket, document

18 3629, dated July 9, 2009?

19 A.    Yes, this is it.

20 Q.    Are you familiar with this order?

21 A.    Yes.  But only very recently when this topic came up.

22 Q.    If I could direct your attention to the third page of

23 the order, paragraph 1?

24 A.    Yes.

25 Q.    What is your understanding of that paragraph?

3499

```
 1          As it states, that we would renew our contract with
 2   Navigant and John Misener of McManis -- from McManis by
 3   December 31st, 2009.  And we would make a contract that would
 4   be for a three-year period.
 5   Q.     So that would have expired at the end of 2012,
 6   correct?
 7   A.     Yes.
 8          MR. MCKINNEY:  One moment, Your Honor.
 9          (Cocounsel confer.)
10          I have no further questions for this witness, Your
11   Honor.
12          THE COURT:  I'm sorry.  Did you move KKKK into
13   evidence?
14          MR. MCKINNEY:  It is on the court's docket, but I'm
15   happy to move it into evidence.
16          I do move it into evidence.
17          THE COURT:  Received.
18              (Whereupon, Defendants' Exhibit KKKK received
19               into evidence.)
20          MR. MCKINNEY:  Nothing further.
21          Thank you, Doctor.
22                          CROSS-EXAMINATION
23   BY MR. BIEN:
24   Q.     Dr. Belavich, if you could turn to Exhibit GGGG, four
25   Gs.
```

3500

1    A.       Which one is that?

2    Q.       If I wrote it down correctly, it's the chart that has

3    the summary.

4    A.       Got it.  Yep.

5    Q.       Just a couple of questions about this.

6             You have female EOPs that have SHU terms, correct?

7             There's a PSU for women?

8    A.       Yes.

9    Q.       Okay.  And there's also a CCWF EOP Ad. Seg. hub?

10            Isn't it for EOP women who are in Ad. Seg.?

11   A.       Yes, there is.

12   Q.       That's not on this chart?

13   A.       No.  No, it is not.

14   Q.       Okay.  Am I correct that program moved to CCWF from a

15   different location?

16   A.       Yes.  When Valley State converted.

17   Q.       Okay.  And that program doesn't have new treatment

18   space?

19   A.       At CCWF?

20   Q.       Yes.

21   A.       Not yet.

22   Q.       And the CCWF EOP Ad. Seg. operates in a unit that's a

23   regular Ad. Seg. Unit.  It's a mixed unit that has both EOP

24   Ad. Seg. and regular Ad. Seg., correct?

25   A.       I believe that's correct, yes.

3501

1    Q.    And it also has death row for women in that same

2    unit?

3    A.    I believe so, yes.

4    Q.    When you're looking at, again, on GGGG, there are

5    some extremely high refusal rates in the EOP ASU Ad. Seg.

6    programs, aren't there?

7          For example, CMC, on the first EOP ASU hub listed,

8    the men are attending 4.85 hours, but they're refusing 4.44

9    hours, correct?

10   A.    That's correct.

11   Q.    And at CIW they're attending 6.75 hours, but refusing

12   7.22 hours; is that correct?

13   A.    That's correct.

14   Q.    Now, all of the patients in EOP ASU hubs are

15   receiving their treatment in cages for groups?

16   A.    With the exception of the chair pilot, I believe

17   they're all in therapeutic modules.

18   Q.    And that chair pilot has now moved from Corcoran to

19   Sac.?

20   A.    It is currently at CSP Sac.

21   Q.    And if the treatment is provided in one of the new

22   treatment centers outside of the housing units, EOP ASU

23   patients are strip-searched on the way to the treatment and

24   on the way back; is that correct?

25   A.    I believe that's correct.

3502

1   Q.      And you're aware that the Special Master and

2   plaintiffs -- defendants' own termination expert,

3   Dr. Dvoskin, expressed concerns about strip-searching at

4   Corcoran getting in the way of treatment for EOP patients at

5   Corcoran?

6           MR. MCKINNEY:  Objection.  Beyond the scope of

7   direct.

8           THE COURT:  Overruled.

9           THE WITNESS:  I believe that was one of his citings

10  in his report.

11  BY MR. BIEN:

12  Q.      And at your deposition you said you would try to do

13  something about that, didn't you?

14          You would go to Corcoran and investigate what was

15  going on?

16  A.      I have been to Corcoran.  Go ahead.

17          I have been to Corcoran.  Yes.

18  Q.      Okay.  And have you stopped that practice at

19  Corcoran, of strip-searching patients when they leave their

20  EOP ASU housing units and go to the treatment center for

21  treatment?

22  A.      Are you assuming that's in my authority?

23          THE COURT:  That's the first question actually.

24  BY MR. BIEN:

25  Q.      Is it within your authority, Doctor?

3503

1   A.      No.

2          THE COURT:  Those are custodial requisites?

3          THE WITNESS:  Yes.  They're not mine.

4          THE COURT:  And if the mental health people believe

5   that is substantially interfering with adequate treatment,

6   they can suggest to custody they ought to modify the

7   procedure, but custody decides whether that happens or not?

8          THE WITNESS:  I agree with you.  But I don't think

9   that is something -- a change that significant is going to

10  happen at the discussion of the local level.

11         I think that's a discussion that has to happen at the

12  headquarters at a statewide level.

13         THE COURT:  You understand that in every instance in

14  which a ASU patient is moved outside of his housing unit or

15  area, whatever you call it, into another building, they're

16  strip-searched going and coming?

17         THE WITNESS:  Yes.

18         THE COURT:  There's been testimony in this trial that

19  that is an element discouraging people from going to

20  treatment.

21         Do you have an opinion about that, or have you even

22  thought about it?

23         THE WITNESS:  I thought about it.  Unlike Dr. Scott,

24  I don't have, you know, anything to back me up, but I think

25  it could definitely be a factor.

3504

1          THE COURT:  You know what?

2          Never mind.  I was about to say something I don't

3    want to make a judgment about yet.

4          Your own clinical judgment is that that would be -- I

5    don't mean to interrupt, Mr. Bien, but it is not

6    insignificant.

7          That process does discourage at least some patients

8    from going to treatment?

9          THE WITNESS:  It can.  I don't think I could argue it

10   definitely does not.

11         THE COURT:  Well, a moment ago I thought you said,

12   yes, it does discourage some folks.

13         THE WITNESS:  Yes.  Some folks would be discouraged I

14   would imagine.

15         THE COURT:  Have there been any discussions at the

16   statewide level where you say you think that such a change

17   would have to be made about individualizing that judgment

18   about who is strip-searched or discontinuing the process

19   altogether?

20         THE WITNESS:  There have -- the issue has been talked

21   about -- not -- it has not formally been talked about, but

22   discussions have -- I've been part of informal discussions.

23         THE COURT:  You're out getting coffee and you say,

24   Your know, we really out to do something about that?

25         THE WITNESS:  Yeah.

3505

1          THE COURT:  Thank you.

2          THE WITNESS:  I don't think we've formally.  We know

3     it is an issue we need to look at.

4          THE COURT:  You may proceed, Mr. Bien.

5     BY MR. BIEN:

6     Q.     When is it on your schedule to look at?

7          THE COURT:  He just said that they haven't set it

8     yet, right?  Or have I misunderstood?

9          There has been no formal judgment about going forward

10    with such discussions?

11         THE WITNESS:  No, not that I have been part of.

12         THE COURT:  I would hope -- don't you hope that if

13    there were such discussions that somebody might want to ask

14    mental health what they think?

15         Or have we reached a place where we don't even

16    bother?

17         THE WITNESS:  No.  No.  We definitely do.  But

18    sometimes discussions happen at actually lower levels more

19    formally, and then a proposal comes up for us to discuss.

20         So, for example, I'm thinking -- I know there have

21    been discussions, but I don't know the extent of them, in the

22    administrative segregation work group.

23         And I am not an attendee of that group.  I have staff

24    who attend that.  But nothing formally has come from them.

25         THE COURT:  And your staff doesn't talk to you about

3506

1    what goes on in those meetings?

2            THE WITNESS:  I know they have also talked, but as I

3    sit here today, I can't say that there is a formal

4    recommendation going to come from them or if they've formally

5    talked about it.

6            THE COURT:  Thank you, sir.

7    BY MR. BIEN:

8    Q.      There are two PSU programs for men, correct, at Sac.

9    and Pelican Bay?

10   A.      Yes.

11   Q.      And isn't it correct that the department, without

12   consultation of the Special Master, is now moving a large

13   population of the PSU program from Pelican Bay to Sac.?

14   A.      I don't know about any consultations.  I can tell you

15   once Sac. opened their new PSU that we started putting

16   patients from Pelican Bay there.

17           We haven't closed the Pelican Bay PSU or taken down

18   those beds.

19   Q.      Okay.  Did you personally have a conversation and

20   seek to notify the Special Master about this decision?

21   A.      I did not.

22   Q.      So there is only two PSUs for men.  When you found

23   out that timely psychiatric contact was at 59 percent in the

24   month of October in PSUs, you didn't really have to go very

25   far to find out where that problem was?

3507

1          Who is the regional that you would talk to?

2    A.    Well, actually I believe that during October is when

3    patients were being transferred or moved.

4    Q.    You're also laying off staff?

5    A.    Where?

6    Q.    I don't know.  Are you laying off staff?

7    A.    Is that a question?  I don't know.

8    Q.    Are you laying off staff at Pelican Bay as part of

9    this shutting down of the unit up there?

10   A.    No, I'm not.

11   Q.    Do you have staff shortages up there of

12   psychiatrists?

13   A.    I don't know how the staffing is currently up there.

14   I know we have implemented telepsychiatry there.  I know

15   getting bodies to Pelican Bay is difficult, but we've

16   implemented telepsychiatry there recently.  But I have not

17   implemented any layoff process.

18   Q.    You're going to keep all of the positions filled even

19   though you are moving the patients away?

20   A.    All I can tell is we have not implemented a layoff

21   process.

22   Q.    Have you stopped hiring for those positions?

23   A.    No.  I haven't put out anything telling them not to

24   hire.

25   Q.    You're 98 percent -- let's turn to that compliance

3508

1    chart.  I think it is DDDD.

2         Who created this chart for you?

3         I assume you didn't do it yourself, Dr. Belavich.

4    A.    I did not sit down at the computer and do this, no.

5    My staff did this.

6    Q.    Does the particular staff member have a name who did

7    this for you?

8    A.    It may -- I believe there was more than one.  I

9    believe Mike Morrison was part of it, and I believe Judy

10   Burleson was part of it.  And I can't say for certain if

11   others were or not.

12   Q.    Do you know what the rule applied for compliance was,

13   for example, for weekly contact with primary clinician?

14   A.    No.  But I know that it is -- I assume it is as I

15   stated earlier, it is within a seven-day period.

16        And that I know that it is established as a rule

17   within the mental health tracking system so that the staff

18   enter date parameters, and they don't have the ability to

19   change that rule.

20   Q.    They enter the information into a computer at the

21   prison, correct, and then you guys upload it?

22        No.  Actually, you don't.  The institution has to

23   send it to you.

24        How does it get to you?

25   A.    We're all on a server.  So they can enter it, and we

3509

1    can pull it realtime.

2    Q.        But you said you had to wait two weeks.  Why would

3    you have to wait two weeks to pull it if it is realtime?

4    A.        I don't wait two weeks to pull it.  I can pull it at

5    any time.  We give them to two weeks to ensure that all the

6    data has been entered.

7    Q.        Is that because people don't enter the data at the

8    time they do the services?

9    A.        No.  I think you're exactly right.  Sometimes data

10   takes a couple of days or more to be entered, up to two weeks

11   is what we found.

12   Q.        So how does a clinician get the data into the system?

13   A.        We have some institutions where we've piloted and

14   successfully clinicians are willing to enter data themselves.

15            We have many institutions where they're not willing

16   to do that so we have a large force of clerical staff who

17   enter that data.

18   Q.        So the clinician has an appointment scheduled, which

19   is scheduled on the computer, MHTS.NET.  One of the things it

20   does is schedule appointments, correct?

21   A.        Yes.  Those same clerical staff will schedule

22   appointments.

23   Q.        And then the physician can -- if it's, say, a primary

24   provider, a psychologist, they fill out a piece of paper, a

25   form, what do they do with it?

3510

1          THE COURT:  How do they get the information to the

2     clerical?

3          THE WITNESS:  Well, actually, in many instances the

4     clericals pull up the appointment schedule based on the

5     timeliness need for the clinician.

6          In some institutions clinicians will actually give a

7     list to the clerical and say that these are the individuals I

8     would like scheduled.

9          It can happen either way, but the end result is in

10    the morning the clinician should have a list of who the

11    patients are they're going to see.

12    Q.    That's who they're scheduled to see, correct?

13          How do you know whether or not they actually saw the

14    patient?  That's what I'm trying to get to.

15    A.    Once they see the patient, as part of the form they

16    complete what kind of contact they had with the patient, how

17    long it was for, and at the end of the day that sheet goes

18    back to the clericals who then enter the data.

19    Q.    Okay.  And sometimes it doesn't happen that day, it

20    takes longer.  Is that why it takes an extra two weeks?

21    A.    Yes.  Because our first priority is scheduling the

22    appointments because I can't have a clinician coming in and

23    not having patients to see.  So we have to make sure that's a

24    priority.

25          Then the second priority is closing out appointments

3511

1    that have been seen.

2           THE COURT:  Mr. Bien, we'll convene again at 9:30 on

3    Tuesday.

4           You may step down now, Doctor.  You'll have to come

5    back at 9:30 on -- I'm sorry -- Wednesday.  Excuse me.

6           THE WITNESS:  Okay.

7           THE COURT:  May I see counsel for just a moment.  I

8    want to figure out what we're doing.

9           I believe that I need oral argument.  I think I've

10   asked you to folks to address a couple of questions.  I can't

11   remember what they are now, but I think so.

12          But I also need an overall picture of what you think

13   the issues are and what you think the answers are.

14          My thought, but I'm really anxious to have you

15   share -- this doesn't have to be on the record.

16          (Off the record at 4:28 p.m.)

17          (Back on the record at 4:32 p.m.)

18          THE COURT:  On the record for a minute.

19          There was some concern about the -- not some concern,

20   but I had refused to admit whatever that document was about

21   Colorado.

22          MR. BIEN:  We withdraw it, Your Honor.

23          THE COURT:  I was about to tell that you my law

24   clerk --

25          MR. BIEN:  We weren't going to call a witness for it.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3512

1    One of the things we would brief -- Okay.

2         THE COURT:  She got on Google during the break, and

3    it is all over the newspapers in Colorado.

4         MR. BIEN:  We were going to do it on rebuttal if we

5    need to, but if you guys can check it out and just see, maybe

6    they don't have an objection to it.

7         MS. VOROUS:  Your Honor, we have no ability to

8    cross-examine, you know, the author of the document so...

9         THE COURT:  I understand that.  The question is

10   not -- I don't care about the document particularly.

11        MR. BIEN:  It is authenticity.

12        THE COURT:  It's the fact that they have moved

13   away -- they discontinued sending seriously mentally ill

14   patients to Ad. Seg.  That's the issue.  The document simply

15   reflects that.  And as I say, my law clerk got on Google, and

16   it is apparently all over the newspapers.

17        MR. BIEN:  I withdraw my withdrawal.  We would like

18   to offer it.

19        MR. MCKINNEY:  Your Honor, the problem here is it is

20   definitional, right?

21        By "seriously mentally ill," if they mean someone who

22   is serious psychotic, who they have been holding in

23   segregation like California isn't, it is completely

24   irrelevant.

25        THE COURT:  That's an argument of the weight to be

3513

1    given to, not admissibility.

2            MR. MCKINNEY:  I understand.

3            THE COURT:  All right.  I am receiving it.

4            Thank you, folks.

5            (Off the record at 4:35 p.m.)

6                        ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2                         ---o0o---

 3
     STATE OF CALIFORNIA  )
 4   COUNTY OF SACRAMENTO )

 5


 6
            I certify that the foregoing is a correct transcript
 7
     from the record of proceedings in the above-entitled matter.
 8

 9

10             IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
14         Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5

                              /s/ Kathy L. Swinhart
6                             KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25