1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---OOo---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7         Plaintiffs,

8   Vs.                          CASE NO. CIV. S-90-0520 LKK

9   EDMUND G. BROWN JR., et al.,
    et al.,

10

11        Defendants.

12   _____/

13

14

15                      ---o0o---

16

17                 REPORTER'S TRANSCRIPT

18              RE:  EVIDENTIARY HEARING

19           WEDNESDAY, DECEMBER 18TH, 2013

20

21                      ---o0o---

22

23

24

25   Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
     Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
                315 MONTGOMERY STREET, TENTH FLOOR
 6              SAN FRANCISCO, CALIFORNIA  94104

 7              BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8              BY:  MARGOT MENDELSON, ATTORNEY AT LAW

 9              BY:  AARON FISCHER, ATTORNEY AT LAW

10              BY:  JANE KAHN, ATTORNEY AT LAW

11

12

13

14    FOR THE DEFENDANTS:

15               STATE OF CALIFORNIA, DEPT. OF JUSTICE
                 OFFICE OF THE ATTORNEY GENERAL
16               13OO I STREET
                 SACRAMENTO, CALIFORNIA  95814
17
                 BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
                 BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
19
                 BY:  SAHAR NAYERI, DEPUTY ATTORNEY GENERAL
20
                 BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
21

22

23                          ---o0o---

24

25
```

```
 1                        EXAMINATION INDEX

 2                            ---o0o---

 3

 4    FOR THE DEFENDANTS:

 5        EXAMINATION:                              PAGE

 6

 7      DR. TIMOTHY BELAVICH

 8        Cont'd Cross-Examination by Mr. Bien      3515
          Redirect Examination by Mr. McKinney      3633
 9

10

11

12

13                            ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      EXHIBIT INDEX

 2                       ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO          DESCRIPTION              EVD
 5

 6     2382         Mental Health Institution
                    Vacancies Summary March 2013   3618
 7
       2459         1-27-13 Email & Attachment Re:
 8                  Compendium of Suicide
                    Recommendations                3603
 9
       2488         Defts' Plan to address Suicide
10                  in Ad Seg Units                3523

11     2524         Prisoner 6 Suicide Report      3609
                    (Sealed)
12

13     2627         8-16-2011 Hayes Rpt.           3542

14     2653         Six Month Vacancy Summary
                    Oct. 2013 - 2-Pg Chart         3614
15
       2669         Special Master Rpt. Re:
16                  Quality Improvement Process    3590

17     2671         Monthly Data - Oct. 2013
                    Suary Memo                     3625
18
       2773         Prisoner 1 Suicide Report      3607
19                  (Sealed)

20     2778         Excerpt of 25th Round Rpt.     3627

21     2782         Paramo Reply Decl.             3633

22     2783         Cornell Reply Decl.            3630

23     2786         Email - Hayes/CDCR             3557
                    (First 5 pages only)
24

25                       ---o0o---
```

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3

 4    DEFENDANTS'
      EXHIBIT NO              DESCRIPTION                EVD
 5

 6      LLLL              Chart Re:  Total Suicides
                          Per Yr. Since 2007            3645
 7
        MMMM              Summary of Monthly Uploads    3634
 8

 9

10

11

12

13

14

15                            ---o0o---

16

17

18

19

20

21

22

23

24

25
```

3514

```
 1              SACRAMENTO, CALIFORNIA

 2       WEDNESDAY, DECEMBER 18, 2013; 9:35 A.M.

 3                   ---oOo---

 4

 5          THE CLERK:  Calling civil case S-90-0520, Coleman, et

 6   al., versus Brown, et al.

 7          THE COURT:  Counsel approach the podium for just a

 8   moment.

 9          I have received -- I don't know whether you have, Mr.

10   Bien, the government's recent filing concerning the

11   declaration that -- the direction that Colorado will no

12   longer place in administrative segregation mentally ill

13   persons.

14          Have you received that?

15          MR. BIEN:  Yes, we did, late yesterday, Your Honor.

16          THE COURT:  It appears to the court that that,

17   particularly given the fact that it appears that it's the

18   result of a lawsuit, rather than some considered judgment,

19   being a defendant of a lawsuit, that the receipt of the

20   declaration is inappropriate, but I'll listen to you if you

21   have a different view.

22          MR. BIEN:  Receipt of the evidence?

23          THE COURT:  Yes.

24          MR. BIEN:  It's still something that happened and it's

25   still a policy.  There is no court order to do it.  There has
```

1    been negotiations -- there is no lawsuit, as far as we know.

2    There is simply negotiations.

3              THE COURT:  Right.  Folks just decided:  Who needs the

4    lawsuit?  We can stop that.  That's an entirely different

5    issue, in the court's view.

6              Ma'am, anything else you want to say?

7              MS. VOROUS:  No.

8              THE COURT:  I don't recall the number of the exhibit.

9    Can you identify it, Madam Clerk?  It could be a recent

10   exhibit.

11             MR. BIEN:  2071.

12             THE COURT:  It is stricken.

13             You're ready to proceed?

14             MR. BIEN:  Yes, Your Honor.

15             THE COURT:  You may do so.

16                       TIMOTHY BELAVICH

17   Recalled as a witness on behalf of the defendants herein, was

18   previously sworn, examined, and testified as follows:

19                  CROSS-EXAMINATION (CONTINUED)

20   BY MR. BIEN:

21   Q.    Dr. Belavich, yesterday we were notified by your

22   office and by you personally through a document you posted of

23   the suicide of yet another class member at the Tehachapi SHU.

24             You posted a suicide notice in the last day or so

25   about the December 16th death at the Tehachapi SHU --

 1          MR. MCKINNEY:  Objection.  Dr. Belavich did not

 2   testify as to any suicide issues on direct examination.  This

 3   is beyond the scope of direct.

 4          THE COURT:  The objection is overruled.

 5          It doesn't make any difference because I would let him

 6   open to take him as his witness for that purpose only and we

 7   would get the same result.

 8          You may answer, sir.  Is that right, sir?

 9          THE WITNESS:  Yes, I signed a document that recorded

10   that there was a suicide --

11          THE COURT:  Stop.  My realtime is not working.  Let's

12   take a break for it to be set up, Michelle.

13                         (Whereupon, a brief recess was taken.)

14          THE COURT:  Mr. Bien.

15   BY MR. BIEN:

16   Q.    By our count, Dr. Belavich, there have been 28

17   suicides to date --

18          THE COURT:  The objection that it's beyond the scope

19   of direct is granted.  If you want to reopen the case --

20   strike that.

21          If you want to take the witness as your own, I will

22   permit you to do that at the end of the testimony.

23          MR. BIEN:  Your Honor, Dr. Belavich has testified

24   extensively in his declarations about suicide prevention,

25   suicide risk, screening, plus he's the only witness about

```
1    the --

2             THE COURT:  I did not know that.  Fine.  You may

3    proceed.

4    BY MR. BIEN:

5    Q.      Dr. Belavich, you keep track of suicides in CDCR?

6    A.      Yes, we do.

7    Q.      And you're the senior official in charge of mental

8    health delivery in the system?

9    A.      Yes.

10   Q.      In fact, you have a second job.  You're also the

11   senior official in charge of all health care now in the

12   prison system.

13           Is that correct?

14   A.      Yes.  I am the acting director of health care

15   services, which covers mental health and departmental

16   services.

17   Q.      You're the person who would be working with the

18   receiver on the medical care issues also?

19   A.      Yes.  I work specifically on transition issues with

20   the receivership.

21   Q.      I put in front of you Plaintiffs' Exhibit 2781, which

22   is a compendium of the suicides that have occurred in 2012

23   and 2013.  The first page is 2013.  It's through the

24   notification we received yesterday on December 16th.

25           Do you agree that there have been 28 suicides to
```

1    date --

2          THE COURT:  Are you looking to introduce this into

3    evidence or just giving it to the witness to refresh his

4    recollection?

5          MR. BIEN:  I'm establishing a foundation as to whether

6    I can move it into evidence, Your Honor.  It's a chart that

7    we prepared.

8          THE COURT:  Oh, I see.  I'm sorry.

9          You may proceed.

10         You've not seen this document before?

11         THE WITNESS:  No, I have not.

12   BY MR. BIEN:

13   Q.    We provided it to your attorney yesterday.

14         She didn't provide a copy to you?

15   A.    No, I've never seen this.

16   Q.    Are you aware -- is 28 the number that you are aware

17   of for the suicides to date in 2013 in CDCR prisons?

18   A.    Yes, that's approximately the same number I have.  I

19   don't have my records in front of me to be exact, but I

20   believe that's correct.

21   Q.    We also have counted at the top part of the page, 15

22   suicides to date in segregation units, more than half the

23   suicides this year.

24         Is that also the information that you have, Dr.

25   Belavich?

1    A.       No, I don't believe that is.

2    Q.       What percentage of suicides do you believe have

3    occurred to date in segregation units in California prisons?

4    A.       I believe it's approximately a third.

5    Q.       And where do you get that information from?

6    A.       It's information provided to me based on our subject

7    matter experts and their interpretation.  For example, I

8    don't believe that my staff has interpreted the two condemned

9    San Quentin suicides as being in segregated housing because

10   of the different privileges that condemned patients or

11   condemned inmates may at times receive, but I would have to

12   look at my own documents to verify.

13   Q.       So it may be 13 or it may be 15 suicides, depending on

14   how you count the San Quentin condemned suicides?

15   A.       And I am not certain as well -- not to not answer your

16   question, but I'm also not certain as well, that, for

17   example, the one you have listed as 15 that occurred in

18   Mississippi, if my staff has included that as an

19   administrative segregation suicide this year.

20            Again, I would have to consult my documents.

21            THE COURT:  Well, as the person in charge of all of

22   these things, is it your view that including the two people

23   who apparently committed suicide -- you agree that some

24   number of folks who are in Mississippi committed suicide,

25   that is, our folks, Coleman people?

 1              THE WITNESS:  Yes.

 2              MR. BIEN:  Just one, Your Honor.

 3              THE COURT:  Just one.  Okay.

 4         That raises two questions, if you know:  Number one,

 5    there is an outstanding order that no member of the Coleman

 6    class can be shipped out of state.

 7              Are you aware of that?

 8              THE WITNESS:  Yes I am.

 9              THE COURT:  Can you explain to me whether this person

10    in Mississippi was a member of the Coleman class, if you

11    know?

12              THE WITNESS:  I don't know for certain, but I know our

13    process is that if anyone becomes mentally ill while out of

14    state, arrangements are made for them to be brought back.

15              THE COURT:  It's likely this is not a Coleman class

16    member?

17              THE WITNESS:  I believe that's correct.

18              THE COURT:  All right, sir.

19              MR. MCKINNEY:  I'll represent to the court that is not

20    a Coleman class member.  That's part of our objection to this

21    document, if we get there.

22              THE COURT:  You may proceed.

23    BY MR. BIEN:

24    Q.    Dr. Belavich, you are aware that there have been two

25    suicides in SHUs this year, one at Corcoran, one at

1    Tehachapi?  The one that occurred this week was at

2    Tehachapi --

3    A.    Yes, we did have the Corcoran suicide in July.

4          I didn't mean to cut you off.

5    Q.    Last year -- if you turn to the next page, 2012, there

6    was also --

7          THE COURT:  Sir, you are actually asking him to read

8    information and testify about it concerning a document which,

9    A, he didn't prepare, and, B, hasn't been introduced into

10   evidence.  I don't know how you're doing that.  You may ask

11   him what he recalls.  That's entirely different.

12         And if you're using this to refresh his recollection,

13   he's got to say, "I really don't remember," and then you say,

14   "Will you look at this document.  Does that" -- I don't know

15   why I'm telling you how to try your lawsuit.  This is

16   ridiculous.

17         You may proceed, sir.

18   BY MR. BIEN:

19   Q.    Doctor, do you know how many suicides there were in

20   2012 in CDCR prisons?

21   A.    The number that I recall is 32.

22   Q.    And what is your best recollection of how many of them

23   occurred in segregation?

24   A.    Again, I approximate a third.

25   Q.    And is it correct that the number of suicides in

1    segregation in 2012 and 2013 has been up compared to recent

2    years?

3    A.    I know my estimation for 2013, 2012 and 2011, it's

4    approximately a third.  Again, I would need to go back and

5    look at my specific charts and how I understand it to verify

6    that.

7    Q.    And so the answer to the question is:  You don't think

8    the suicides in segregation is up in 2012 and 2013 from prior

9    years?

10   A.    I would have to look at my prior years.

11         THE COURT:  The answer is, "I don't know."

12         THE WITNESS:  I don't know.

13         THE COURT:  Fair enough.

14         Thank you, sir.

15         THE WITNESS:  Thank you.

16   BY MR. BIEN:

17   Q.    I've put before you Plaintiffs' Exhibit 2488.  It's a

18   defendants' plan to address suicide trends in administrative

19   segregation units --

20         THE COURT:  Are you moving it into evidence?

21         MR. BIEN:  Yes.  It was produced by defendants in

22   response to a court order.

23         THE COURT:  Received.

24         MR. MCKINNEY:  Can I be heard on this?  I'm going to

25   object on the basis of relevance.  This is a document from

 1   2006, more than seven years old, and I think we're wasting

 2   the court's time with introduction of this document.

 3       THE COURT:  I must -- it appears to me if this is six

 4   years old -- well, it doesn't show a trend in itself.  It

 5   shows one year.  I'm guessing one year was considerably less.

 6       MR. BIEN:  This document, Your Honor, is in response

 7   to a court order for defendants to address suicide trends in

 8   administrative segregation units.  That is our contention,

 9   that they have never complied with this court order, and it

10   ties directly into the issues before the court here.

11       THE COURT:  You know, if they did not comply with the

12   court order, you had means of enforcing it.

13       MR. BIEN:  We have, Your Honor.  We had moved several

14   times, and I think you'll see in a moment, how these relate

15   to the issues you've been hearing.

16       THE COURT:  All right.  I'll accept your

17   representation.  If at the end it doesn't demonstrate

18   anything, you may renew your objection, Mr. McKinney.

19       You may proceed. It's now admitted subject to a motion

20   to strike.  You may proceed.

21                       (Whereupon, Plaintiffs' Exhibit 2488

22                        was received into evidence.)

23   BY MR. BIEN:

24   Q.    Dr. Belavich, if you turn to the second page of the

25   document, there's this letter October 2, 2006.  Sent this

```
1    plan on to the Special Master at the time, Michael Keating.

2            Do you see that?

3            MR. MCKINNEY:  Objection.  Lack of foundation, lack of

4    personal knowledge as to this witness.

5            THE COURT:  I agree.  He doesn't have --

6            There's no doubt that this is a document you produced;

7    correct?

8            THE WITNESS:  Well --

9            THE COURT:  The answer is, yes, there is no doubt this

10   is a document you produced.

11           Now, I can read it just as well as he can, and unless

12   it's preliminary to a meaningful question, the objection is

13   sustained.

14   BY MR. BIEN:

15   Q.     Dr. Belavich, you're aware that in -- that the

16   defendants undertook a study to address the rate of suicides

17   in ad seg in efforts to reduce suicides in segregation in

18   around 2006 in response to this court's orders.

19           Is that correct?

20   A.     I'm not aware of a specific study.  I'm aware of

21   ongoing efforts to address suicide, but I know there have

22   been formal studies over the years, yes.

23   Q.     And you were -- in 2006 you were the manager of a

24   healthcare unit at a prison?

25   A.     Yes, I was.
```

1    Q.    You were responsible for suicide prevention in your

2    prison at that time, among other things?

3    A.    Yes, locally within my institution, correct.

4    Q.    And if you turn to page 3, on the bottom of the

5    document, there is a reference to a meeting of experts on

6    suicide prevention that was called in response to this

7    court's orders to address the rising rate of suicides in ad

8    seg.

9        Do you see the description of experts meeting at the

10   top of page 3?

11       MR. MCKINNEY:  Same objection.  If we're simply

12   reading from the document --

13       THE COURT:  I understand.  I don't know where you're

14   going.  The document will be received into evidence.  This

15   witness obviously in 2006 was not anywhere that was

16   responsible for these kinds of meetings, and it appears to

17   the court that, therefore, the questions are irrelevant as to

18   this witness, not that the document is irrelevant.

19       Is there something that I don't understand, Mr. Bien?

20       MR. BIEN:  I'm trying to get to it, if you give me a

21   moment.

22       THE COURT:  Go ahead.  I'll give you a moment or two.

23   BY MR. BIEN:

24   Q.    Dr. Belavich, are you aware that at that time various

25   experts on suicide prevention were brought together to

1    address issues in California and make recommendations to the

2    CDCR as to how to address the raising rate of suicides in

3    segregation units?

4    A.     I don't have any specific knowledge or recollection of

5    those meetings.  I was in Lancaster.

6    Q.     I assume you received a report as a healthcare manager

7    in charge of mental health issues at your prison about the

8    recommendations that arose from this process?

9           THE COURT:  You want him to remember what documents he

10   received in 2006?  Is that what your question is, Mr. Bien,

11   because if it isn't, it asks for what must be --

12          THE WITNESS:  I'm not that good.

13          THE COURT:  Nobody is.

14   BY MR. BIEN:

15   Q.     Has anyone since you've become in charge of these

16   issues brought to your attention the defendants' plan to

17   address suicide prevention in segregation units?

18          MR. MCKINNEY:  Objection.  Calls for speculation.

19   Lack of personal knowledge.

20          THE COURT:  He's asking now whether or not it was

21   brought to his attention in his present position.  That's a

22   perfectly responsible question.

23          Were you aware that there was a formal study that was

24   tendered to you when you assumed your present duties?

25          THE WITNESS:  I was aware that there had been studies.

1    I don't recall being given this, a copy of this study to

2    review.

3    BY MR. BIEN:

4    Q.    I didn't ask you that.

5         Were you told there were efforts to address suicide

6    and that various measures are part of the defendants' plan to

7    address suicide in segregation?

8         THE COURT:  First of all, are you aware that there's a

9    plan adopted by the state through somebody, I assume your

10   predecessor, to deal with the subject of suicides in

11   segregation?

12        THE WITNESS:  Yes.

13        THE COURT:  All right.

14   BY MR. BIEN:

15   Q.    Doctor, one part of the plan was to address new

16   arrivals in segregation -- is that correct -- what happens

17   when someone arrives in segregation?  You're aware that the

18   department has a plan to deal with new arrivals in

19   segregation to reduce the suicides?

20        Is that correct?

21   A.    I'm sorry?  I think you asked me more than one

22   question there.  I'm aware that the department has a plan to

23   deal with new arrivals in administrative segregation.  I

24   can't say that I am formally aware that it was couched in a

25   specific plan and that that is the plan that you've presented

3528

1      to me at this moment.

2      Q.      You know about the requirements for intake in

3      segregation units?

4      A.      Yes, I do.

5      Q.      What is your understanding of how many -- how much

6      time a newly-arrived prisoner in segregation must be in

7      intake cells?

8      A.      There might be a shorter requirement, but our -- our

9      requirement is 21 days.  I don't know if there is a specific

10     shorter standard, but I know that we use 21 days.

11     Q.      In particular intake cells, Dr. Belavich, prisoners

12     have to be there for 21 days?

13     A.      I know that's how long they receive their checks and I

14     know they frequently are kept there for that amount of time.

15     I can't say as I sit here I know the exact timeline for

16     intake cells.

17     Q.      You're not aware that the department in its standards

18     only requires prisoners to be in intake cells for 72 hours?

19             You're not aware of that standard, Dr. Belavich?

20     A.      There may be a shorter concrete standard.

21             THE COURT:  But you're not aware of it?

22             THE WITNESS:  Our goal is 21 days, but, as I

23     referenced, I believe there may be a shorter concrete

24     standard that is the base limit.

25     /////

1    BY MR. BIEN:

2    Q.    Why is your goal 21 days, Dr. Belavich?

3    A.    I can't say as I sit here why I know that that was the

4    decided upon time.

5    Q.    So if a prisoner is not in an intake cell for 21 days,

6    it's a violation of California standards for intake cells?

7         MR. MCKINNEY:  Objection.  Misstates the testimony.

8         THE COURT:  Well, the witness says there may be a

9    shorter time, but their goal is 21 days.  I understood what

10   he said.  I don't know what your question means.

11        The objection is sustained.

12   BY MR. BIEN:

13   Q.    Do you have sufficient intake cells to provide for

14   21 days of housing in those cells for people coming into

15   segregation in California?

16   A.    I don't know that we do, and that is something that

17   we're exploring at this time.

18   Q.    Are you aware of any current plan that's approved to

19   expand the number of intake cells to address any shortfall?

20   A.    There is no current plan, but I have been part of

21   discussions that have raised the concern that there may be a

22   need for more intake cells.

23   Q.    What does that mean, you have been part of the

24   discussions?  Has your department requested of the secretary

25   that there be funding for additional intake cells for

1    segregation units?

2    A.    To answer the question has there been funding --

3    Q.    Have you personally asked Secretary Beard to expand

4    the number of intake cells to move forward on that

5    initiative?

6    A.    No, I have not requested funding from Dr. Beard on the

7    expansion of intake cells.

8    Q.    Has anyone to your knowledge asked to expand intake

9    cells in segregation units in California?

10   A.    I don't think -- I have not proposed the expansion of

11   the cells.  I've proposed that we need to examine the number

12   of cells we have and whether they are sufficient.

13   Q.    No one has told you that you have a shortage as you

14   sit here today?  You don't know if anyone has informed you of

15   that?

16   A.    That's why I made the proposal that we look at the

17   number of intake cells to see if we have enough.

18   Q.    So no one has communicated to you that there's an

19   existing shortage of intake cells?

20   A.    Yes, they have.  That's why I have communicated that

21   we need to look at this issue.

22   Q.    Who told you that there's a shortage of intake cells?

23   A.    Staff has mentioned it when I toured institutions.  I

24   believe Mr. Hayes, who is currently working with the Special

25   Master's team and my staff visiting institutions, has brought

1    that up at several institutions that there may not be enough

2    intake cells.

3         Perhaps -- I can't say with certainly that it was a

4    recommendation that came to me from our internal suicide work

5    group. I don't know that. I can't recall, but that may have

6    been a recommendation from them as well.

7    Q.    And to date you have not moved forward on any plan to

8    fund or repair, renovate more intake cells?

9    A.    At this moment, no, we have not.

10   Q.    As a psychiatrist, you're aware that access to yard is

11   an important element in allowing a prisoner, especially a

12   mentally ill prisoner, to function who's being held in

13   segregation?

14   A.    Yes, I believe yard is important.

15         Is that the question?

16   Q.    Yes.

17         THE COURT:  You wouldn't guess it from the way he put

18   it, but, yes, that's the question.

19   BY MR. BIEN:

20   Q.    And are you aware that one of the findings to be

21   addressed in defendants' plan was that there's an inability

22   to provide yard up to Title 15 standards in many segregation

23   units in California?

24         MR. MCKINNEY:  Objection. Relevance. Again, we're

25   talking about a plan from 2006.

1              THE COURT:  I am completely befuddled.  I have no idea

2      what the consequence of this testimony is.  It may be that

3      this plan was adopted and is supposed to be guiding what the

4      mental health people do.  I don't know whether that's true or

5      not.  I don't know whether it had a date because I haven't

6      read it yet.  The witness, of course, is free to say, "I

7      don't know, if that's true."

8              Dr. Belavich, let me start way back:  Are you aware

9      that there is a plan that attempts to address the problem,

10     whenever it was adopted, that was attempting to address the

11     problem of suicides in segregation?

12             THE WITNESS:  Yes.  But I don't have awareness of the

13     formal plan.  As I sit here with you, I can't say --

14             THE COURT:  That's what I'm asking you:  One, do you

15     know of a formal plan?

16             THE WITNESS:  No.  I've not held it, that I know of.

17     My staff -- my belief is that the issues I work on with my

18     staff, that they have worked to prioritize flow from that

19     plan because my staff has been working with experts and with

20     the Special Master's team, so I can only assume that's the

21     plan.

22             THE COURT:  But as far as you know, if there is a plan

23     out there, you've not seen it and it's not the operating

24     document that you're working on when you direct things?

25             THE WITNESS:  That's correct.

1          THE COURT:  What more is there to say, sir?

2          MR. BIEN:  I'm just asking questions about these

3     topics, Your Honor, which remain --

4          THE COURT:  You're not.  You're saying:  Are you aware

5     that the plan did X and Y?  And the witness has already said,

6     "I don't know about the plan.  It's not what guides my

7     direction, though my staff may be aware of it and they may be

8     working under the plan."

9          Does that fairly set forth what your situation is?

10         THE WITNESS:  That's correct.

11    BY MR. BIEN:

12    Q.    Dr. Belavich, have you been informed by your staff

13    that there is a difficulty in providing yard time for

14    mentally ill prisoners in segregation at various prisons?

15    A.    Yes, I've been informed through one of the work groups

16    that that is something that is of discussion or has been

17    discussed.

18    Q.    You're aware that in various suicide reports, the lack

19    of yard time has been raised as one of the issues that should

20    be addressed at the particular prison?

21         Are you aware of that?

22    A.    I would probably need to see the report to refresh my

23    memory.

24    Q.    Are you aware that there have been reports of

25    shortages of yard time throughout the system, especially in

1    SHUs, that's affected suicides for mentally ill prisoners?

2    A.      I can't say that I'm aware -- I've been made aware of

3    that.  It's throughout the system, but I am aware that it is

4    an issue that was brought up at at least one of the SHUs.

5    Q.      Do you recall a suicide report about Corcoran, the

6    fact that some suicide happened just this summer, where lack

7    of exercise, access to yard was raised as one of the issues?

8    A.      Again, I would have to see the report to refresh my

9    memory.

10   Q.      As part of your tracking of compliance with program

11   guide standards, you don't track whether or not prisoners

12   in -- mentally ill prisoners in segregation get yard, do you?

13   A.      I don't believe -- we do not track yard.  I believe

14   that's a custody function.  We do track yard if it is a

15   recreational yard of some kind and it's in some way

16   therapeutic.  That may go under structured therapeutic hours,

17   but as a rule, no, we do not in mental health track straight

18   yard time.

19   Q.      You became director of the mental health division in

20   March of 2012?

21   A.      That's correct.

22   Q.      And were you informed soon thereafter that the

23   Department of Health has entered into a contract with Lindsay

24   Hayes for consultation concerning suicide prevention?

25   A.      The Department of Mental Health?

1    Q.      I'm sorry.  The Department of Corrections.

2    A.      Yes, I was made aware that Mr. Hayes has worked with

3    CDCR.

4    Q.      Plaintiffs' Exhibit 2785 is in front of you.  This is

5    a contract between CDCR and the National Center on

6    Institutions and Alternatives dated August 26, 2010, between

7    Teresa Olmscheid of the State Office of Business Services and

8    Mr. Hayes.

9            THE COURT:  Our 2785 does not appear to be a contract.

10           MR. BIEN:  These are the -- that is schedule for the

11   payments.  The next page is --

12           THE COURT:  I see.

13           MR. BIEN:  We move this into evidence Your Honor.

14           MR. MCKINNEY:  Objection.  Lack of foundation.  Lack

15   of personal knowledge.  Relevance.  As the court is aware,

16   the department is currently working with Mr. Hayes, so prior

17   contract is of very little relevance here.

18           THE COURT:  The objection is overruled.  There's no

19   doubt that the document is what it purports to be supplied by

20   your office.

21           MR. MCKINNEY:  No, Your Honor.  This was produced by

22   Mr. Hayes.

23           MR. BIEN:  This was produced by Mr. Hayes, Your Honor.

24   If you look at the California standard agreement, he just

25   testified that he was aware of the contract.

1           THE COURT:  This is preposterous.  When I was a

2    lawyer, and you've probably heard me say this before, we

3    would hire young lawyers, and the first thing we would tell

4    them is, "If you're going to trial, you have to ask yourself:

5    How do you get the evidence in?"

6           This is just nonsensical.  Well --

7           MR. BIEN:  I mean --

8           THE COURT:  No.

9           Mr. Belavich, have you seen the contract between the

10   state and Mr. Hayes?

11          THE WITNESS:  No, I have not.

12          THE COURT:  End of the story.

13   BY MR. BIEN:

14   Q.     In the fall of 2012 you were contacted by Mr. Hayes by

15   e-mail; isn't that correct?

16   A.     Yes.  I believe so, yes.

17   Q.     If you look at 2786, this is a series of e-mails

18   between Mr. Hayes and various CDCR employees.  That's an

19   e-mail that Mr. Hayes -- it goes in reverse direction, I

20   think.

21          So if you turn about to the second page of this

22   document, Dr. Belavich, is this an e-mail that you

23   received -- bottom half of the page -- from Mr. Hayes in

24   August of 2012?

25   A.     I'm assuming I did since I was copied on it.

1   Q.      Do you recall Mr. Hayes contacting you and asking you

2   what was going on as to his contract with CDCR in August of

3   2012?

4           MR. MCKINNEY:  Objection.  Hearsay.

5           THE COURT:  No. He's asking whether or not he recalls

6   being contacted by Mr. Hayes.

7           THE WITNESS:  I received this e-mail, but I believe he

8   was contacting Mr. Gilevich, and the e-mail is written to

9   Tom.

10  BY MR. BIEN:

11  Q.      Did you understand that -- your response is right

12  above that; right?

13  A.      Yes, that's correct.

14  Q.      So you understood this was something that you had to

15  respond to?

16  A.      No, I didn't.

17  Q.      Why did you respond?

18  A.      Because I felt I had more information than

19  Mr. Gilevich did.

20  Q.      And you understood that Mr. Hayes was trying to find

21  out what was going on with his contract with CDCR for suicide

22  prevention services?

23  A.      I believe that's what the e-mail states.

24  Q.      And you wrote back to him that you would contact him

25  again in a few days about what the next steps would be.

1          Right?

2     A.     Yes.  That's what the e-mail states.

3     Q.     And you didn't get back to him, did you, in a few

4     days?

5     A.     I don't believe I did.

6     Q.     And when you --

7          THE COURT:  This is terrifically indirect.

8          You become director?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  One of the things you know about is that

11    your department has now taken over the question of suicide

12    prevention, I take it, from custody.

13         Is that right?

14         THE WITNESS:  Yes.

15         THE COURT:  And one of the things that you learn by

16    virtue of -- one of the things that you learn by virtue of

17    your position and what people are telling you, and, you know,

18    as you assume your duties, is that there's a contract with

19    Mr. Hayes, the purpose of the contract is consulting

20    concerning suicides.

21         THE WITNESS:  Correct.

22         THE COURT:  At some point you receive this document,

23    which suggests that Mr. Hayes believes that it's unclear what

24    he's supposed to do and what kind of response you have?

25         THE WITNESS:  Correct.

1          THE COURT:  And you write him back and say:  Look.  We

2     just took it over.  As soon as we can figure out which way is

3     East, we'll get back to you.

4          THE WITNESS:  Correct.

5          THE COURT:  You never get back to him?

6          THE WITNESS:  Correct.  Not directly, no.  Mr. Hayes

7     had contact with other staff members on my team.

8          THE COURT:  Who report to you?

9          THE WITNESS:  Who report to me.

10          THE COURT:  Okay.  Good.  What did they tell you about

11     what's being done with Mr. Hayes -- I don't know why I'm

12     doing this except it's important for me to try to figure out

13     what this case is about.

14          THE WITNESS:  Sure.  They would check in periodically

15     with me to say:  Do we have a decision on Mr. Hayes?

16          And my response would be:  No, we have not had a

17     decision as to further steps with working with Mr. Hayes.

18          THE COURT:  In the long run, you never made a decision

19     about further steps using Mr. Hayes?

20          THE WITNESS:  No.  We never heard back from my chain

21     of command.

22          THE COURT:  One of the things you know that Mr. Hayes

23     was complaining about was apparently that he was making

24     recommendations and nothing was happening as far as that was

25     concerned.

1          Is that right?

2          THE WITNESS:  That was one of his voiced concerns.

3          THE COURT:  You see how simple it is if you just stop

4    looking at papers and think?

5          MR. BIEN:  Thank you.

6          THE COURT:  I'm sorry.  That was inappropriate.  I

7    apologize -- I'm not going to apologize.  This is absurd.

8    Let me just catch my breath.

9          You may proceed, Mr. Bien.

10   BY MR. BIEN:

11   Q.     Dr. Belavich, you did not make the decision, even

12   though you were head of mental health at the time, as to

13   whether or not to use Mr. Hayes' contract, continue to use

14   his contract.

15         Is that correct?

16   A.     That's correct, I did not make the decision whether or

17   not to continue to utilize Mr. Hayes.

18   Q.     You turned to your boss at the time, Diana Toche, and

19   asked her, "What should we do about Mr. Hayes?"

20   A.     Yes, at the time, because she was the director of all

21   health care for CDCR.

22   Q.     And she told you that the decision about what to do

23   with Mr. Hayes was at a higher level than she was at.

24         Is that correct?

25   A.     I don't know if she told me that or not.  I know she

1    told me that she would work on that.  I can only assume that

2    she had to work with others.

3    Q.     Eventually she told you that CDCR made a decision they

4    would not be using Mr. Hayes' contract.

5           Is that correct?

6           Did she tell you they could not get any movement from

7    anybody above her?

8    A.     I believe that's correct.

9    Q.     Mr. Hayes had already prepared a report for CDCR

10   pursuant to his contract at that time.

11          Isn't that correct?

12   A.     Yes, he had prepared a report.

13   Q.     In front of you is Plaintiffs' Exhibit 2627, which is

14   Mr. Hayes' report of August 16, 2011.

15          THE COURT:  Okay.

16   BY MR. BIEN:

17   Q.     Have you seen a copy of this report before, Dr.

18   Belavich?

19          MR. MCKINNEY:  I'll object, based on lack of

20   foundation.  Again, this was a document produced by Mr.

21   Hayes.

22          THE COURT:  It may well be.  The question now is

23   whether or not the witness can identify the document, if he's

24   seen it before.

25          THE WITNESS:  Yes, I have seen this before.

1          THE COURT:  Do you want to move it into evidence?

2          MR. BIEN:  I move it into evidence, Your Honor, as

3     Plaintiffs' 2627.

4          THE COURT:  Received.

5          MR. MCKINNEY:  I want to lodge an objection, lack of

6     foundation, and it's hearsay also.

7          THE COURT:  The objection as to both is overruled.

8     This is a document that is a contract between CDCR,

9     apparently, and Mr. Hayes.  The witness says -- I mean, not a

10    contract, a report in an area which this is, of course,

11    defendants' witness' responsibility, and, yes, he's seen it.

12         What else needs to be done to establish the

13    foundation, I can't imagine.

14         You may proceed, sir.

15                         (Whereupon, Plaintiffs' Exhibit 2627

16                         was received into evidence.)

17    BY MR. BIEN:

18    Q.   Doctor, in the fall of 2012, you understood that CDCR

19    had made a decision not to release this report to the Special

20    Master?

21         MR. MCKINNEY:  Objection.  This invades the

22    attorney-client privilege.  The witness' response would

23    divulge attorney-client communication.

24         THE COURT:  I don't know the answer to that.

25         Was this a communication -- it's suggested this was

1    a -- whatever you did, this was a communication to the

2    lawyers rather than anything else.

3              Is that right, sir?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.

6              Mr. Bien.

7              MR. BIEN:  Can I inquire as to that?

8              THE COURT:  Sure.

9    BY MR. BIEN:

10   Q.    What was the name of the person who informed you that

11   he -- did you have a communication about whether or not this

12   report would be released with any person?

13   A.    Not that I recall.

14   Q.    Did you speak to Diana Toche, your boss, about whether

15   or not Lindsay Hayes' report would be released to the Special

16   Master?

17   A.    I don't recall any specific conversation.  I speak

18   with her all day, every day, so I can't say that we didn't

19   have a conversation about the report.

20   Q.    Was there an attorney present when you had that

21   conversation?

22             THE COURT:  He's not sure he had that conversation,

23   but it's likely because he talked to her all the time.

24   BY MR. BIEN:

25   Q.    Did Mr. Canning ever inform you of his belief that

1    this report had been buried by CDCR?

2    A.    No.  I believe you -- the plaintiffs informed me in a

3    deposition.

4         THE COURT:  The objection as to attorney-client

5    privilege is sustained.

6         As you sit here now, you somehow or other learned

7    something about the report which you communicated with

8    lawyers; correct?

9         THE WITNESS:  There was communication that there was a

10   report.

11        THE COURT:  Okay.  That's as far as you can go as to

12   what happened and how it happened if it doesn't involve your

13   conversations with lawyers.

14        Is that right?

15        THE WITNESS:  That's correct.

16        THE COURT:  The objection is sustained.

17   BY MR. BIEN:

18   Q.    Turn to the second to the last page of 2786, the

19   series of e-mails.  It's the bottom of the page --

20        THE COURT:  2786 is not in evidence; is that right?

21        THE CLERK:  That's correct.

22        MR. BIEN:  We move this into evidence, a series of

23   e-mails.

24        THE COURT:  Hearing no objection --

25        MR. MCKINNEY:  I do object to the e-mails from Mr.

1   Hayes.  They are hearsay.  We believe the entire document is

2   hearsay.

3           THE COURT:  To the extent that they are directed to

4   personnel in CDCR, obviously, they represent the fact that

5   whatever was said in the communications were received, and so

6   it's not hearsay in that sense.

7           Insofar as -- there may be a relevance objection

8   because whatever Mr. Hayes believed was happening would be

9   inappropriate unless there was a reply which indicated that

10  whatever he said was happening was correct.

11          Do you understand what I'm saying, Mr. Bien?  Mr.

12  McKinney?

13          MR. BIEN:  Yes.

14  Q.      Do you know who Robert Canning is?  If you look at the

15  third to the last page.

16  A.      Yes, I know Dr. Canning.

17  Q.      Who is that?

18  A.      A senior psychologist specialist who works for CDCR.

19  Q.      Does he have a responsibility for suicide prevention

20  efforts?

21  A.      Yes, that's one of his responsibilities.

22  Q.      How about Kathleen O'Meara?

23  A.      She is a chief psychologist who works for CDCR as the

24  northern regional.

25          THE COURT:  But the problem is, as I understand it,

1    sir, that this document is not produced by CDCR.  It is

2    produced by Mr. Hayes, and so there's no way to know, without

3    Mr. Hayes at least coming forward and swearing that he sent

4    these documents and these were responses that he got, I think

5    that's the problem, sir.

6         I don't want to discourage you putting on evidence

7    that's important to the case, but there are rules about what

8    can come in and what can't come in.  As it sits here now, it

9    appears to the court as it stands without further foundation,

10   it isn't admissible.

11        MR. BIEN:  Dr. Belavich acknowledged receiving the

12   first few series of e-mails.

13        THE COURT:  That portion is in.  The rest of it, I'm

14   not going to permit unless there is a proper foundation laid.

15   BY MR. BIEN:

16   Q.    Did you understand that Dr. Canning was in

17   communication with Mr. Hayes about this contract?

18   A.    During what time period?

19   Q.    When you -- in the fall of 2012.

20   A.    I was aware that Dr. Canning was in communication with

21   Mr. Hayes some time after the e-mail that I said I wrote to

22   Mr. Hayes.  He's the individual that would check on things.

23        THE COURT:  Let me cut this short.  I think it's

24   not -- maybe it is.  I think that all of this brouhaha has to

25   do with Mr. Canning telling Mr. Hayes that the report had

 1    been buried, or words to that effect.

 2          Are you directly aware of that or is that just

 3    scuttlebutt that you've heard or did you discuss the matter

 4    with Mr. Hayes or Dr. Canning?

 5          THE WITNESS:  I don't have access to my staff's

 6    e-mails, so it was plaintiffs who presented me with this

 7    e-mail.  That's how I recall being aware of it.

 8          THE COURT:  So you don't know that it actually

 9    happened, though, of course, you suspect that it did.

10          All right.  The objection is sustained.

11    BY MR. BIEN:

12    Q.    You received a copy of 2627, the report; correct?

13          THE COURT:  That is correct.

14          THE WITNESS:  That is correct.  I thought I

15    acknowledged that earlier.

16          THE COURT:  You did.

17    BY MR. BIEN:

18    Q.    Mr. Hayes made a number of recommendations, and this

19    was in August of 2011, to CDCR in terms of suicide prevention

20    efforts.

21          Correct?

22          MR. MCKINNEY:  Objection.  Relevance, Your Honor.

23          May I address the court?

24          THE COURT:  Yes.

25          MR. MCKINNEY:  The court has issued an order earlier

1    this year appointing Mr. Hayes as part of the Special Master

2    team and departments currently working with Mr. Hayes on

3    suicide prevention issues.  So to the extent we're dredging

4    up what the department did or did not do on these issues in

5    2011 is completely irrelevant to where we are today.

6          THE COURT:  The objection is overruled.

7          I've forgotten what your question was, sir.

8    BY MR. BIEN:

9    Q.    If you turn to page 2, Dr. Belavich, of the report,

10   the third page of the document, Mr. Hayes had performed a

11   preview of 2010 inmate suicides.  This was a summary of his

12   findings.

13         He found on the top --

14         THE COURT:  It says what it says.

15         MR. BIEN:  Correct.

16   Q.    Are you -- as of 2010, Mr. Hayes had found that there

17   was serious problems with emergency response.

18         Is that correct, Dr. Belavich?

19   A.    It's been a long while since I've seen this report.

20   Could you point me to the area you're asking me to confirm?

21   Q.    The third page, first bullet point.

22   A.    The third page -- mine starts with "28 percent."

23   Q.    Correct.  (Reading:)

24              28 percent of the cases involve problems with

25              the emergency response to the incident.

1          MR. MCKINNEY:  Objection.  Hearsay.  Relevance.

2    Again, this is a draft report that the plaintiffs are trying

3    to offer for the truth of what's stated here.  The document

4    does say what it says, but it's irrelevant.

5          THE COURT:  Thank you.  The objection is overruled.

6          When you received this report, your responsibility as

7    the honcho for mental health, you had to read it.

8          Right?

9          THE WITNESS:  Yes.

10          THE COURT:  One of the things that you had to do was

11    make decisions about whether or not the report pointed out

12    significant issues that had to be addressed by the mental

13    health folks.

14          Correct?

15          THE WITNESS:  Either had to or had been.

16          THE COURT:  One of them deals with the fact that at

17    least at the date of this report, there was a significant

18    issue concerning emergency responses.

19          Correct?

20          THE WITNESS:  Yes.

21          THE COURT:  Did you do anything about it?

22          THE WITNESS:  Yes.

23          THE COURT:  What did you do?

24          THE WITNESS:  We worked very closely with nursing.  A

25    large part of emergency response falls on medical and

1    nursing, so they already were part of the conversations, but

2    they have owned a lot more of the emergency response issue.

3         Additionally, I gave it to my suicide work group and

4    asked them to evaluate the issue and come back to me with

5    their needs.

6         THE COURT:  So you told your staff:  Look at this

7    thing, think about it, and come back to me and tell me what

8    you think about it.

9         THE WITNESS:  Correct.

10         THE COURT:  At some point, did they do that?

11         THE WITNESS:  Yes.

12         THE COURT:  What did they recommend to you?

13         I can't believe I'm doing this, but, clearly, I'm not

14    going to get it from plaintiffs' counsel.

15         What did they recommend to you?

16         THE WITNESS:  We gave them the report and asked them

17    to go through point by point and come up with a spreadsheet

18    of every recommendation.

19         THE COURT:  Great.  And you got that?

20         THE WITNESS:  Yes.

21         THE COURT:  What did you do with that?

22         THE WITNESS:  I asked them whether or not they agreed

23    or not with the recommendation.

24         THE COURT:  Okay.

25         THE WITNESS:  And then give me a plan of what we need

1    to do to implement that recommendation, and also if they

2    didn't agree, I needed a pretty good reason why because I

3    would one day maybe sit here and have to talk about it.

4        THE COURT:  Okay.  You got a spreadsheet that told you

5    this is what we think, yes, we agree with this or, no, we

6    don't agree with this.  As to those matters we agree with,

7    they made recommendations to you as to what to do?

8        THE WITNESS:  Correct.

9        THE COURT:  And did you implement those

10   recommendations?

11       THE WITNESS:  Yes.  Per our spreadsheet, that was

12   something else we monitored, the implementation of the

13   recommendations.

14       THE COURT:  Okay.  Using as an example the first

15   bullet point that deals with the lack of or the insufficiency

16   of the emergency response, what you did with it was, you

17   said:  Well, that's really a nursing problem.

18       Correct?

19       THE WITNESS:  Not necessarily.  There's also a custody

20   component to it, CPR training.  We needed to go back and

21   verify -- there were issues whether everyone was trained, so

22   we needed to go back and set up a system to make sure we can

23   monitor training of CPR.

24       THE COURT:  You put that into some sort of system to

25   make it happen; correct?

 1          You contacted -- I'm asking you, not telling you --

 2   who did you contact in nursing to ensure that the nurses were

 3   more -- were aware of this problem?

 4          THE WITNESS:  We worked most directly with the

 5   statewide director of nursing under the receiver, Karen Rae,

 6   who, again, a lot of this falls under nursing.

 7          THE COURT:  And you said:  Look.  Here's the problem.

 8   You've got to do something about getting your people trained

 9   and make sure that they're trained.

10          THE WITNESS:  Correct.  There were also issues where

11   the bags, the emergency response bags, perhaps not having

12   everything they had in them, so we instituted an audit at the

13   institution for that.  There were lots of things that would

14   come out of one recommendation.

15          THE COURT:  Okay.

16          Did you check to find out whatever you recommended was

17   being accomplished, using emergency as one example?

18          THE WITNESS:  Yes.  For example, we would get status

19   on the implementation.  We continue today because that's a

20   significant part of any suicide emergency response is

21   significantly examined as part of the suicide response, and

22   we often will make corrective action plans for the

23   institution if there are errors in emergency response.

24          We've also had to take disciplinary action against

25   some staff because we feel that although they have been

1    trained, they hadn't acted or performed as expected.

2           THE COURT:  All right.

3    BY MR. BIEN:

4    Q.     Some of the emergency response is not a nursing issue

5    but a custody issue.

6           Isn't that correct, Dr. Belavich?

7    A.     Yes, that's correct.

8    Q.     The first responders are usually custody officers;

9    right?  People find -- we're talking about segregation cells.

10   A.     It could be a custody officer.  It could be a licensed

11   psychiatric technician who actually falls under nursing.

12   Q.     One of the issues has been whether or not custody

13   officers are administering CPR if they find an inmate in

14   distress.

15          Correct?

16   A.     I believe there has been question about the initial

17   response in some of the suicide reports.

18   Q.     Mr. Hayes says here most of the problems are caused by

19   either untimely responses in opening the cell door and

20   initiating CPR and/or emergency equipment failure.

21          So he was referring -- did you understand him to be

22   referring to a custody problem rather than a nursing problem?

23          MR. MCKINNEY:  Objection.  Hearsay.  Relevance.

24          THE COURT:  The question is what was in his mind when

25   he received this information?  What he did about it?

1          The objection is overruled.

2          It may be he's going to say, "Yes, I read that, and,

3     no, I didn't think it was true" or whatever.  But the

4     question is what response he, as the director of mental

5     health, made in response to this assertion by Mr. Hayes, if

6     you recall?

7          THE WITNESS:  I told you what I recall in regard to

8     emergency response.  I don't recall specifically addressing

9     the issue of untimely response in opening the cell doors.

10    BY MR. BIEN:

11    Q.    If you go down to the third bullet, he finds, quote,

12    (Reading:)

13                16 percent, 4 of 25 of the cases involved

14                inmates who were found with either rigor mortis

15                or the review determined that cell checks were

16                not performed as required.

17         Have you -- what did you do when you found out that

18    information, Dr. Belavich?

19         THE COURT:  When you received this information, you,

20    of course, sent it to this group you've got.  They came back

21    and said, "Yes, that's so" or not, something to that

22    response.

23         Correct?

24         THE WITNESS:  Correct.

25         THE COURT:  What did they tell you?

1            THE WITNESS:  There were several issues.  One is we

2     had untrained people declaring somebody in rigor mortis, so

3     we had someone at a very low level of nursing who may be a

4     first responder, who -- everyone after a suicide has to write

5     their own report of what they did and what they found and

6     what they saw.

7            If anyone put in the term "rigor mortis," that went

8     into the report.  So there was no true way of evaluating it.

9     We believe part of it is a training issue.  We had staff who

10    we don't think are at a level to say whether or not someone

11    is in full rigor mortis making that statement more often than

12    not.

13           However, there were other issues.  There were concerns

14    about the rounding and whether or not it was being done.

15           THE COURT:  That's independent of the issue of rigor

16    mortis?

17           THE WITNESS:  Not really, because if rounding is done,

18    they should be catching the guy --

19           THE COURT:  Of course, but you've already indicated in

20    your view some of the reports of rigor mortis were probably

21    faulty because the person making that recommendation was not

22    trained sufficiently to do so.

23           THE WITNESS:  That's one part of it.

24           THE COURT:  Okay.  Whether that specifically is true

25    of any of these reports, you nevertheless believed that there

1    was potentially or actually a problem with rounding.

2            Is that correct?

3            THE WITNESS:  Yes.

4            THE COURT:  So what did you do about that?

5            THE WITNESS:  Several things.  The first -- we've

6    trained and trained and continue to train on rounding.

7    Personally, I had difficulty understanding the rounding

8    requirement, because, as I recall, it stated it had to be two

9    rounds per hour randomly interspersed, not to exceed

10   30 minutes, and for the life of me, I couldn't figure out how

11   you get two rounds an hour and not exceed 30 minutes

12   somewhere along the line?

13           So we worked with our custody partners, and that's

14   where we came up with three checks an hour for the welfare

15   checks, for example.

16           We introduced Guard One.  We only have Guard One right

17   now in our intake cells, but when we purchased Guard One, we

18   purchased the capability of all of the administrative

19   segregation cells having -- I know you've heard a lot about

20   Guard One, and don't want to hear any more.

21           But that button that is on the cell door, we installed

22   those in all of our units, not just our intake cells.  So we

23   do have the capability of doing that.  With the LPTs who do

24   daily rounds, we are currently working with nursing so that

25   their daily rounds will be used in Guard One so we can

3557

1    monitor adherence to the rounds as well.

2            THE COURT:  It's 11:00 and I have tortured my reporter

3    enough.  We will go off the record.

4                            (Whereupon, Plaintiffs' Exhibit 2786

5                            was received into evidence.)

6                            (Whereupon, a break was taken at

7                            10:56 a.m.)

8                            (Nothing Omitted.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3558

1          (On the record at 11:15 a.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Mr. Bien.

5          MR. BIEN:  Your Honor, we've agreed with defense

6   counsel that for Exhibit 2786 only the first five pages

7   should be in evidence and the rest is not.

8          THE COURT:  It will be received in evidence as the

9   first five pages.

10         You may proceed.

11         MR. BIEN:  Thank you, Your Honor.

12  BY MR. BIEN:

13  Q.     Dr. Belavich, did you consult with Mr. Stainer about

14  the new NDS policy that went into effect in December, just a

15  week or two ago?

16  A.     I didn't have a specific meeting with Mr. Stainer on

17  that.  There were others I consulted with.

18  Q.     Did you participate in the process of determining

19  what timelines should be applicable for mentally ill

20  prisoners who are in segregation for no fault of their own?

21  A.     Yes.

22  Q.     And when did you do that?

23         Did you participate in a meeting?

24         How did you provide your input?

25  A.     I was touring with Secretary Beard in July of this

3559

1   year.

2   Q.      And where were you when you talked about

3   nondisciplinary segregation and time limits for mentally ill

4   prisoners?

5   A.      It was -- we spent a day that started at California

6   Medical Facility in Vacaville, and we toured that facility.

7   And then we were together for the day, and we toured CSP

8   Sacramento in the afternoon.

9   Q.      What do you recall about your conversation to the

10  extent that it dealt with time limits for mentally ill

11  prisoners in segregation?

12  A.      I recall we had a conversation about the topic.  I

13  recall us talking about potential timelines, and the timeline

14  that we originally had talked about was the potential of 45

15  days for EOPs.  And I believe it was 60 days for CCCMS?

16          Or to be honest with you, I don't recall what it was

17  for CCCMS, but I thought 45 days for EOPs is what sticks in

18  my mind from that conversation.

19          And then we had a subsequent conversation, I don't

20  recall where I was or if it was even on the phone, about the

21  topic.

22          And then the idea of nondisciplinary segregation came

23  up at one of the -- at least one of the monthly meetings that

24  I have with the Secretary, Mr. Stainer, Miss Allison,

25  Dr. Toche and my staff.  We do a monthly mental health

3560

1    updates meeting.  That's joint with the Secretary.

2              And that's why when I said I don't recall having a

3    conversation with Mr. Stainer, I don't recall having a

4    one-on-one with him about this topic, but I believe he may

5    have been in one of the meetings this was discussed.

6    Q.        Did you provide any input in the last -- since

7    Thanksgiving of this year about the specific timelines used

8    in the new NDS policy?

9    A.        Since Thanksgiving, no.

10   Q.        And did you have a member of your staff assigned to

11   working with Mr. Stainer on developing the new NDS policy for

12   mentally ill prisoners in segregation?

13   A.        I did not specifically assign one of my -- one of my

14   staff members.  But that is also usually the case, that I

15   don't do that.  My staff members who are part of work groups,

16   when they determine an issue, they internally decide if

17   someone will participate.  So I did not decide that anyone

18   specifically would participate.

19   Q.        So you personally didn't participate between

20   Thanksgiving and now on the decision as to what the time

21   frame should be for NDS mentally ill prisoners in

22   segregation, correct?

23   A.        That's correct.

24   Q.        And as you sit here today, do you know of any member

25   of your staff that participated in that process between

3561

1   Thanksgiving and now?

2   A.      I can't say with certainty that I do.

3   Q.      When you were talking with Secretary Beard about the

4   topic in July, were you talking about -- were you talking

5   about general time limits for the mentally ill in

6   segregation?

7   A.      Could you explain what you mean by that?

8           THE COURT:  There are two kinds of folks in

9   administrative segregation, disciplinary and

10  nondisciplinary.

11          THE WITNESS:  Correct.

12          THE COURT:  The question is whether you were talking

13  about both groups, one group or what; if you can recall?

14          THE WITNESS:  I don't recall at this moment if we

15  were talking about mentally ill versus nonmentally ill or

16  disciplinary versus nondisciplinary.

17  BY MR. BIEN:

18  Q.      Okay.  Dr. Belavich, is it your opinion that there is

19  no need for a length of stay limit for mentally ill prisoners

20  in segregation?

21  A.      Could you restate the question?

22          I'm sorry to ask you to do that again.

23  Q.      Is it your opinion that there is not a need to

24  establish a length of stay limit for mentally ill prisoners

25  in segregation?

3562

1      MR. MCKINNEY:  Objection.  The question calls for an

2    expert opinion related to custody.  Dr. Belavich has not been

3    offered for that purpose.

4      THE COURT:  He isn't asking about custody.  He's

5    asking as to the mental health of mentally ill inmates.

6      Do you believe there should be a time limit for the

7    time they spend in administrative segregation as a mental

8    health matter?

9      THE WITNESS:  I think there should be some limit or

10   some process to move them quickly -- to move them as quickly

11   as we can.

12      I mean, I have heard of cases.  Obviously, that's why

13   we're here.  There are people in administrative segregation

14   too long.

15   BY MR. BIEN:

16   Q.      Do you believe there should be a time limit, for

17   example, for EOPs in segregation units in California prisons?

18   A.      I can't say that I have formed an opinion on that.

19   Q.      And do you believe there should be a time limit for

20   CCCMS prisoners in segregation in California?

21   A.      I know I haven't formed an opinion on that.

22   Q.      You have no opinion?

23   A.      I don't feel -- I haven't developed an opinion on

24   that because I have never thought of it as a time limit as

25   you state today.

3563

1    Q.      Do you disagree with the new NDS policy for removing

2    EOPs after 30 days in segregation or CCCs after 60 days?

3            THE COURT:  Nondisciplinary EOPs in CCCMS.

4            THE WITNESS:  No.  I'm all for it.

5    BY MR. BIEN:

6    Q.      Why?

7    A.      I think, as I have heard other testimony as well, you

8    know, having these people in the least restrictive

9    environment when we can -- I understand the concept that

10   there are people who are in administrative segregation

11   through no fault of their own, and moving them as quickly as

12   we can makes sense.

13           I also -- from a pragmatic point of view, it should

14   change the way that my mental health staff at times is

15   functioning within administrative segregation.

16   Q.      What do you mean by that?

17           How does it change the way they're functioning?

18   A.      Well, I think of it as a resource issue.  If we have

19   these patients, and we move them, in many respects the

20   demands of the Program Guide on my staff are more significant

21   when the patients are in administrative segregation.

22           One of the things that I'm eager to see from a

23   statewide-program perspective is if we are moving patients

24   out of administrative segregation more quickly, then they

25   won't need the frequency of interdisciplinary treatment

3564

1    teams, they won't need that frequency of psychiatric

2    consults, they won't need that frequency of rounding -- or of

3    groups.

4          So it should actually begin to -- this is

5    speculation -- it should begin to free up statewide resources

6    for me.

7    Q.      You're required to provide more resources to provide

8    treatment in segregation for mentally ill prisoners than if

9    they're in the general population, correct?

10   A.      Yes.  That's correct.

11   Q.      Do you agree that segregation is a high-risk

12   environment for mentally ill prisoners?

13   A.      I believe that segregation can be a high-risk

14   environment for both mentally ill and nonmentally ill.  I

15   don't know that -- it can be high risk in -- any change that

16   is significant can be a risk, I believe.

17   Q.      When you say that you think it is important to

18   rapidly move mentally ill prisoners out of segregation, is

19   that -- do you think that's a priority?

20   A.      Well, as we were talking about nondisciplinary

21   segregation, yes, that would be my goal.

22   Q.      What about prisoners who are in segregation for

23   disciplinary reasons; do you think every effort should be

24   made to limit the amount of time they also spend in

25   segregation?

3565

1    A.    Yes.  I believe those cases are more difficult

2    because there's also, more often than not, obviously a

3    custody issue that has to be dealt with because there are

4    processes and, you know, adjudications of behavior that need

5    to occur.

6          So I think that's a much more difficult thing to

7    address.  But still I believe that, you know, my goal as a

8    clinician is to get those EOPs into a PSU as soon as I can.

9    Q.    As long as they're in the PSU, you consider them at

10   their destination, they can remain there as long as custody

11   requires them to be?

12   A.    I believe that the care we're providing in our PSUs

13   can adequately address the mental health needs of our

14   patients.

15   Q.    And you feel the same way with the EOP Ad. Seg. hubs?

16   A.    I believe that, yes, with much of the construction

17   we've done, with much of the physical changes we've made, we

18   can address the needs of our administrative segregation

19   mentally ill.

20   Q.    You're aware that the American Psychiatric

21   Association defines prolonged segregation of mentally ill as

22   three or four weeks in segregation?

23   A.    I believe that I've seen a document that refers to

24   that.

25   Q.    And you agree that for some mentally ill prisoners,

3566

1   providing treatment in segregation will not mitigate the
2   harms of prolonged segregation?
3   A.      I think I would need to evaluate that on a
4   case-by-case basis.  So I'm sure there are some individuals
5   who, upon evaluation, don't do as well in administrative
6   segregation.  I believe that's the question you asked.  I'm
7   sorry.
8   Q.      So some people, even in the PSU, even if they're
9   getting Program Guide standards may be harmed by prolonged
10  housing in the PSU?
11  A.      I'm sorry.  I may be misleading you.
12          When you say "administrative segregation," I'm
13  thinking not of the PSUs.  I believe that's a different level
14  of care.
15  Q.      So you think, no matter how long someone is in the
16  PSU, hundreds of days, years, there is no harm that can
17  result to them from that long-term housing in the PSU?
18  A.      Again, I think that would also be on a case-by-case
19  basis.  I'm sure there are some individuals who would have
20  more difficulty than others and not do well in that
21  environment.
22  Q.      Under current policy, Doctor, do you have the power,
23  as a clinician, to remove a patient from PSU other than
24  placing him in an MHCB or hospital?
25  A.      No.  I believe those are -- that's as you state,

3567

1    those are our authorities, to move patients to Mental Health

2    Crisis Beds as needed or refer them to the Department of

3    State Hospitals.

4    Q.       And it is correct that you provide reports concerning

5    length of stay to the Special Master on a monthly basis?

6    A.       Are you referring to the report we spoke of on

7    Friday?

8             If that's what you're referring to, yes.

9    Q.       And that report shows length of stay in segregated

10   housing for mentally ill prisoners?

11   A.       I believe it -- I believe it does.  I think the

12   report actually states numerous things, and you have to be

13   able to interpret it.

14   Q.       You're aware that this report shows that some Coleman

15   Class Members have lengths of stay in segregation in hundreds

16   or thousands of days?

17   A.       Can I see the report?

18   Q.       You're not aware of that as you sit here today?

19   A.       I haven't reviewed the report.  I know there are long

20   lengths of stay.  I also know there are errors in the report,

21   and I own that.

22   Q.       What kind of errors do you know are in the report?

23   A.       For example, I was made aware that there were a

24   couple of individuals on the report who had actually paroled.

25   Q.       So they weren't really in the system, but they were

3568

1  on the report?

2  A.      I believe that's correct.  I've asked -- since being

3  made aware of it, I've asked our computer staff to look into

4  it.

5          There are also issues with the report because the

6  report starts at a particular date.  I was made aware of that

7  as well.

8  Q.      That is it doesn't show the full length of stay in

9  segregation for some prisoners?

10 A.      It may not for some.

11 Q.      And it also resets, correct?

12         It resets if someone goes to a MHCB bed, for example?

13 A.      I know that I've asked that question of the report

14 writer, and I cannot recall his response.

15         I know that it resets with certain movement, and I

16 don't know if crisis bed is one of the resets.  I just don't

17 recall.

18 Q.      Do you think it is important for your clinicians to

19 know accurate information about how long their patients have

20 been in segregation?

21 A.      Yes.  And that's why they use other resources and not

22 that report.

23 Q.      So this report is not an accurate report for showing

24 length of stay in segregation for a clinician?

25 A.      No.  Our clinicians have other ways that they can get

3569

1   a much better picture on their patients on an individual

2   basis.  And the report you're referring to, my understanding

3   of how clinicians may use -- they obviously aren't going to

4   look at that whole report.  They'll look at the part of the

5   report that applies to them.

6        They may use it to track timelines or to monitor if

7   new people have come into their program that they may not be

8   aware of.

9        I don't -- as I sit here I don't know that our

10  clinicians or our supervisors in the field are using that

11  report for anything.

12  Q.     Why is it important for a clinician to know how long

13  a prisoner has been in segregation, Doctor?

14  A.     Just so I understand, did you say "why isn't it"?

15  Q.     Why is it important?

16  A.     Is it?

17  Q.     Why is it important?

18  A.     Okay.  I believe it's important -- it's a factor that

19  goes along with your treatment plans.  It's important to know

20  it for hitting your benchmarks of the Program Guide.  We have

21  spoken about compliance data and certain things that need to

22  happen by certain dates.  I think that it serves as a good

23  monitoring tool.  You want to know who is in your unit.  You

24  want to know who is on your caseload.

25  Q.     Would you want to know that the particular patient

3570

1    had also been in a different segregation unit for several

2    hundred days before they got to your unit?

3    A.    Yes.  And that's why they can access that through

4    MHTS on an individual basis.

5    Q.    So there is a different MHTS report than the one

6    provided to the court that would provide a length of stay in

7    segregation without resetting?

8    A.    If you go into MHTS.net, and you pull up, you know,

9    patient X, that will show you the history of patient X.  It

10   will show you segregation and nonsegregation as well.

11   Q.    Okay.  Should a clinician have a different treatment

12   plan under your Program Guide for someone who's been in

13   segregation for hundreds of days?

14          MR. MCKINNEY:  Objection.  Calls for speculation.

15          THE COURT:  Well, he's asking as a general

16   proposition.  My understanding is that one of the problems is

17   that mental health inmates in segregation, like everybody,

18   have different coping skills.

19          Correct?

20          THE WITNESS:  They may, yes.

21          THE COURT:  Well, they do.  I mean, some people can

22   cope better than other people.

23          THE WITNESS:  Absolutely.

24          THE COURT:  And is there any way of predicting in

25   advance that somebody is going to do well or badly?

3571

1        Probably not?

2        THE WITNESS:  Not hard and fast.  But I believe over

3   time that as our patients get to know our clinicians, and,

4   you know, feel more comfortable.  Our clinicians also develop

5   a better sense of that.

6        So hard and fast, that would be a tough burden.  But

7   over time I think that is something that our clinicians would

8   have a stronger sense of.  And I don't have that timeline.  I

9   think it is individual.

10        THE COURT:  It is very much an individual assessment

11   as to coping skills?

12        THE WITNESS:  It is.  And some of it is very

13   dependent on the participation of the patient.  Some of it

14   can be gotten through records, and we've got a much better

15   record system obviously than we used to have.  So there are

16   some patients who, yeah, if you know, you have seen he's been

17   in administrative segregation three times and each time it

18   has resulted in a lengthy stay in a crisis bed or referral to

19   the state hospital, then as an individual clinician I would

20   start to say, Okay, this is someone that I really have to

21   keep my eye on, I need to know more about this.

22        THE COURT:  I take it, but if I'm wrong just tell me,

23   that even with a person who your clinician finds is very

24   vulnerable, doesn't have good coping skills for the kind of

25   stresses that are tendered by administrative segregation, can

3572

1    he get that prisoner out of administrative segregation or is

2    that ultimately a custody decision?

3              THE WITNESS:  The only way we can at this point is

4    just through a crisis bed or the state hospital.

5              THE COURT:  All right.

6    BY MR. BIEN:

7    Q.    Doctor, I would like you to turn to your

8    Exhibit GGGG.

9              (Exhibit published.)

10   A.    Can you tell me what it is so I know what I'm looking

11   for.

12   Q.    I just published it.

13   A.    Okay.

14   Q.    Okay.  This is a report that was created -- this

15   particular report was created for purposes of this litigation

16   for your testimony, correct?

17   A.    No.  I believe this is what we send out.  However,

18   this is what we send out on a monthly basis, but I can't say

19   if there was a request to do this specifically for this or

20   not.  But we send something similar to this out monthly to

21   our chiefs and our chief executive officers.  But it is

22   usually colored with red, yellow and green.  Actually, I

23   think it might be only red and green we use.

24   Q.    This GGGG is something you send out regularly?

25              I'm pointing out it has the offered groups at the

3573

1  bottom.

2  A.      Yes.  I'm sorry.  The top half is what we send out

3  regularly.  I believe that the bottom we don't track on a

4  monthly basis.

5          THE COURT:  The four lines on the bottom?

6          THE WITNESS:  Yes.  Yeah, those four lines.  So that

7  was added to the preexisting report.

8  BY MR. BIEN:

9  Q.      Okay.  And so when you send this report out, you

10 leave off CCWF normally for EOP ASU?

11         THE COURT:  I have no idea what you just said.

12 BY MR. BIEN:

13 Q.      Isn't there another EOP ASU program that's not

14 included here?

15 A.      You're correct.  CCWF, I believe we have ten EOP beds

16 there with an average census of two a month.  And we work

17 very closely with CCWF to transfer those patients to CIW,

18 California Institute for Women, so they were not on here.

19         THE COURT:  What does "CCWF" stand for?

20         Nobody bothers to tell me.

21         THE WITNESS:  Sure.  Central California Women's

22 Facility.  They have a small EOP.

23         THE COURT:  Okay.

24         THE WITNESS:  So we do not track that because of

25 the -- we don't track it here.  We can track it.  But we

3574

1  don't report that out because there are some months where

2  they have zero patients.

3  BY MR. BIEN:

4  Q.      When you -- if you look down at the averages, at the

5  bottom of the column for "Offered"; do you see that?

6  A.      Yes.

7  Q.      Do you know how that was calculated?

8  A.      As I sit here today, no.  I know it is part of the

9  background formula from MHTS.net that generates this report.

10  Q.      And do you know whether you added up the number for

11  each institution and then divided by the number of

12  institutions to come up with the average?

13  A.      That's generally how you do an average.  If you like,

14  I could figure that out if you want me to, but I'm assuming

15  it is taking that column and averaging them.

16  Q.      Okay.  So you gave equal weight to each of the

17  institutions?

18          THE COURT:  For this purpose?

19  BY MR. BIEN:

20  Q.      For this purpose?

21  A.      I have no -- I have no knowledge of that.  I didn't

22  calculate it.  I can't say whether it is weighted or not.

23  Q.      You agree those programs have very different sizes?

24  A.      Yes.  Our EOP programs have different numbers of beds

25  or patients.

3575

1  Q.      If you take a look at your Exhibit ZZZ, it's the

2  mental health population by institution, a four-page

3  document, five pages?

4  A.      Okay.

5  Q.      If you look at San Quentin on this for the EOPs in

6  the San Quentin program, can find that number there?

7          Is it on the first page, the EOPs in the San Quentin

8  EOP Hub program?

9  A.      Wait.  I found it on the second page.

10 Q.      You're right.  On the second page.  I'm sorry.

11 A.      Yeah.  The first page is capacity.

12 Q.      The second page shows EOP Ad. Seg. hubs, correct,

13 along with all the other ASUs?

14 A.      Yes.  These are administrative segregation programs.

15 Q.      Okay.  And so San Quentin has an EOP ASU hub, and it

16 has a population of 19, correct?

17 A.      Yes.  According to this.

18 Q.      And LAC has a population of 100 according to this,

19 correct?

20 A.      Yes.  That's correct.

21 Q.      And if you give them equal weight in your average,

22 you're not taking into account the different sizes of the

23 programs, correct?

24         THE COURT:  That's not what you're counting.  You're

25 counting an average?

3576

1        THE WITNESS:  Yeah.  We're looking at the average

2   hours offered at each institution.  So truthfully I'm looking

3   at the institutions and the number of hours offered.

4        Averaging it out helps me understand where we are

5   statewide.  But I'm more interested in specific institutions

6   and whether or not they're meeting their goal.

7   BY MR. BIEN:

8   Q.     So CMC was at a very low number of attended treatment

9   in groups as of this month, correct?  4.85?

10  A.     Yes, that's correct.

11  Q.     And what steps did you take to address that problem,

12  Doctor?

13       MR. MCKINNEY:  Objection.  Assumes facts not in

14  evidence.  It is argumentative as well.

15       THE COURT:  The objection is sustained.

16       Did you do anything in response to the fact that

17  there were only 4. whatever it was?

18       THE WITNESS:  4.85 hours on average attended?

19       No.

20  BY MR. BIEN:

21  Q.     Now, if you go down to the bottom of GGGG, there is

22  some -- there is this thing you said was added on to this

23  document, Doctor?

24  A.     On the screen?

25  Q.     Yes.

3577

1    A.      Okay.

2    Q.      This isn't part of the regular report, correct?

3    A.      No, it's not.

4    Q.      And you didn't include any information about the SHU

5    at CIW, correct?

6    A.      No, I did not.

7    Q.      If you turn back to the mental health population by

8    institution, the last page, there were 80 CCCMS women in CIW

9    SHU in this time period, correct?

10   A.      That's correct.

11   Q.      And you didn't include any information about the Sac.

12   SHU, correct?

13   A.      That's correct.

14   Q.      And you didn't include any information about the

15   Pelican Bay State Prison SHU, and that also has CCCMS

16   patients in this time period, correct?

17   A.      I believe it's four according to this.

18   Q.      And you didn't include that information in this

19   chart?

20   A.      No, I did not.

21   Q.      Now, when you talked about the EOP groups, you used

22   "Scheduled," "Offered," "Attended," "Refused" and

23   "Cancelled."

24           You didn't do that here for the CCCMS groups, did

25   you?

3578

1  A.      No.

2  Q.      And you have that information in your MHTS.net

3  program, correct?

4  A.      I believe it can be extracted, yes.

5  Q.      And you did a four-month period for these groups in

6  CCCMS rather than the one-month period you did for EOP,

7  correct?

8  A.      Yes.  Because this is not something that we normally

9  track and put on our dashboard.

10 Q.      And why is that?

11         Why would that explain doing a one-month versus a

12 four-month period, Doctor?

13 A.      I believe this was to show that there is -- there are

14 groups that go on for CCCMS patients in our segregation

15 units.  I think that was the intent.

16 Q.      So you didn't want to show whether or not how many

17 people actually were offered or attended, just like you did

18 with the EOPs?  You just wanted to see whether there were any

19 groups at all offered in this program for CCCMS?

20 A.      Can you repeat that.  I think it states what it

21 states.

22         THE COURT:  Good enough.

23         THE WITNESS:  Whether or not what I wanted to do, I

24 don't know.

25 ///

3579

BY MR. BIEN:

1

2  Q.    Now, I'm going to show you what's been marked as

3  2120, which is already in evidence.

4        Is that correct?

5        THE CLERK:  Yes.

6           (Exhibit published.)

7        THE COURT:  Can you read them, Doctor?

8        I can't.

9        THE WITNESS:  It's a little tough, but I can get

10  it.

11  BY MR. BIEN:

12  Q.    I can perhaps get you another copy of it.

13  A.    I'm sure it's in the stack here.

14        THE COURT:  Other way.  There you go.

15           (Image enlarged.)

16  BY MR. BIEN:

17  Q.    This was a chart that was attached to your July 24th,

18  13, declaration, Doctor?

19        THE COURT:  You are about to start another topic, and

20  we're going to have to take our afternoon break.

21        I'm sorry, folks.  We can only reconvene at

22  two o'clock.  I have another matter I must attend to.

23        (Off the record at 12:00 p.m.)

24                      ---o0o---

25

3580

1              (On the record at 2:00 p.m.)

2              THE CLERK:  Please, remain seated.

3              Court is now in session.

4              THE COURT:  Mr. Bien.

5              MR. BIEN:  Thank you, Your Honor.

6    BY MR. BIEN:

7    Q.      Dr. Belavich, I put on the screen a document that's

8    already in evidence, Exhibit 2120, which was Exhibit 1 to

9    your declaration filed July 24th, 2013.

10             This shows treatment in the EOP Ad. Seg. hubs and

11   PSUs in the month of June 2013; is that correct?

12   A.      That's correct.

13   Q.      And I've given you, in front of you, a copy of your

14   Exhibit GGGG, which shows treatment in EOP Ad. Seg. hubs and

15   the PSUs in the month of from October 26th, 2013, to November

16   22nd, 2013; is that correct?

17   A.      That's correct.

18   Q.      Okay.  And you'll note that seven of the ten EOP Ad.

19   Seg. hubs show a reduction in treatment attended in the four

20   months between these two charts; isn't that correct?

21   A.      If I could have a second to compare them.

22             (Brief pause.)

23             Yes, there are several.

24   Q.      The only ones that have not gone down are CMF,

25   correct, RJD and Sac. for the EOP Ad. Seg. hubs?

3581

1          All the other ones -- I'm sorry.  The only ones that

2     have not dropped from June to October are those three, CMF,

3     RJD, and Sac., correct?

4     A.        RJD -- I'm sorry.  The other two?

5     Q.        Sac. and CMF?

6     A.        Okay.

7     Q.        Isn't that correct?

8     A.        Yeah.  I'm going to take your word for it because I

9     should have been looking at the other ones, not those three

10    then.  But I'll take your word for it.

11    Q.        Some of those drops -- Look at the PSUs.  Two of

12    those three have also dropped, correct?

13              CIW went from 9.67 to 8.16 in the attended hours?

14    A.        Well, I wouldn't use the word "dropped" because that

15    implies a trending, and these are two snapshots.  And so

16    those snapshots don't give you a trend.  So I can say that

17    there are differences in the amount of time attended for some

18    institutions in the month of June and some institutions in

19    the month of October to November 22nd.

20    Q.        And Sac., which is your largest PSU, shows a drop

21    from 8.99 to 7.51.

22              That's a substantial drop, isn't it?

23    A.        I don't know that it is necessarily a substantial

24    drop.

25    Q.        And this is --

3582

1    A.      I'm more concerned actually with the fact that they

2    are offering -- they're offering ten hours of treatment, and

3    I'm pleased to see numbers as high as seven to eight hours,

4    some places as high as ten hours of attended.

5    Q.      So Sac. in June they offered 12.42, and the people

6    attended 8.99, correct?

7            That's on 2120?

8    A.      During that month they offered on average 12.42 hours

9    of treatment and nine hours were attended.

10   Q.      And the most recent period that's in your chart, they

11   offered 9.51.  They offered under ten hours, correct?

12   A.      Yes.  9.51 is less than ten.

13   Q.      And they attended only 7.51?

14   A.      They've attended 7.51.

15   Q.      This is the program you have -- that now has 245 EOPs

16   because you moved people from Pelican Bay to this program,

17   correct?

18   A.      And I think --

19   Q.      Is that correct?

20   A.      Well, I think you've partially explained why we might

21   be seeing a change in the number of -- in the amount of time

22   offered and attended.

23           There was a transition, and patients were moving

24   during the month of October.

25   Q.      So they got less treatment?

3583

1   A.        Any given snapshot isn't of urgent concern to me.

2   What we try to do with this information is trend it over time

3   so that if I have consistent months for several months where

4   we're not offering the amount of treatment we're required to,

5   that's when that raises more of a red flag for me.  But one

6   anomaly doesn't make me send in the troops.

7   Q.        So nine of these 13 programs show a reduction in

8   treatment attended between June 2013 and November 2013, and

9   you're not concerned about that?

10  A.        No.  My primary concern with these charts is the

11  amount of treatment we're offering.

12  Q.        As long as you offer it, it doesn't matter if they

13  attend?

14  A.        I think there are numerous reasons why they may not

15  attend.  So yes, in some instances I can only offer it.

16  Q.        One of the reasons people may not attend is because

17  of the quality of the treatment, correct?

18  A.        There are numerous reasons people may not attend.

19  That may be one.

20  Q.        And it also could be the cages?

21  A.        The therapeutic modules may be a reason people -- I

22  think we covered that Friday, that people also may not choose

23  to attend.

24  Q.        Do you have Exhibit DDDD in front of you?

25            THE COURT:  May I inquire, while you're looking for

3584

1    DDDD, do you ever spend any time trying to find out why

2    people aren't attending?

3           THE WITNESS:  Yes.  And actually part of the -- we've

4    somewhat formalized that through our new quality improvement

5    process that we developed in 2012 in conjunction with a lot

6    of parties.  And part of that process is an interview with

7    inmates at different levels of treatment.  And one of the

8    questions asked is, you know, what are the changes, you, you

9    know, think are beneficial, what are the things that are

10   happening that are not beneficial.

11          It is actually -- I think it might be up to an hour

12   that is set aside where our clinical team is sitting with the

13   patients and getting feedback about our program at the

14   specific institution.

15          And that feedback is then translated, one, into a

16   report, but it is also given to -- the information is given

17   to the management of the local institution.

18          THE COURT:  But the question is really narrower than

19   that, not what do you like about the program, what you don't

20   like, but why they weren't going, even though it was offered.

21          That's a more specific question.

22          Do you ask that question?

23          THE WITNESS:  Yeah.  I have attended those groups.  I

24   believe -- I've attended those interview groups, and I

25   believe that question is actually asked.

3585

1          As we've developed the process with the Special

2    Master's team, we've gone from very concrete interview

3    questions to, well, maybe it needs to be more of a

4    conversation and hit on these points.

5          One of the first ones I attended that question was

6    specifically asked.

7          THE COURT:  You indicated to counsel that there are a

8    variety of reasons.  As far as you can tell, is there any

9    predominate reason, or is it so individualized as to not lend

10   itself to that kind of judgment?

11         THE WITNESS:  I think sometimes it is institutional

12   specific.  I think, from talking to some of the patients that

13   I've had the chance to, I think sometimes they get somewhat

14   bored.  They get burned out on groups too.

15         So variety -- you know, that's why, for example, you

16   have groups where, you know -- I think people say, Well, all

17   they did was listen to music.  Well, that may be therapeutic

18   to listen to music, then talk about the song.  That is

19   therapy.  You can't sit for ten hours a week and, you know,

20   just bash away at your problems.

21         THE COURT:  Mr. Bien.

22             (Exhibit published.)

23   BY MR. BIEN:

24   Q.    Dr. Belavich, I put on the screen -- the overhead

25   your Exhibit DDDD.

3586

```
 1    A.       Yes.

 2    Q.       And this was -- is this an exhibit that you had

 3    created for purposes of your testimony here in court?

 4    A.       Yes.

 5    Q.       And Dr. Belavich, this is a very limited sampling of

 6    Program Guide requirements for Ad. Seg. and SHU and PSUs,

 7    isn't it?

 8    A.       Well, I think it actually matches up well with the

 9    other document we used on Friday, that was the flow chart of

10    the different things -- the different requirements for each

11    of the programs.

12    Q.       So you don't have, for example, "Screening" as one of

13    your categories at the front-end of going into Ad. Seg.,

14    correct?

15             You didn't include that on DDDD?

16    A.       No.

17    Q.       And that's something that's measured by your office?

18    A.       Yes.  It's included in the Mental Health Tracking

19    System, and we can pull that compliance.

20    Q.       But you didn't?

21    A.       It's actually very high.

22    Q.       You didn't include it on this chart?

23    A.       No.  No, we did not.

24    Q.       Did you say it was "very high"?

25    A.       The screening compliance is very high, yes.
```

3587

1          MR. BIEN:  Your Honor, may I approach?

2          (Exhibit handed to witness.)

3   BY MR. BIEN:

4   Q.    Dr. Belavich, 2049 is already in evidence.

5          MR. MCKINNEY:  Counsel, where did this come in

6   through?

7          MR. BIEN:  2049.

8          THE COURT:  I'm sorry.  Is this 2049?

9          MR. BIEN:  Yes.

10          THE COURT:  I'm sorry.  All right.

11   BY MR. BIEN:

12   Q.    Dr. Belavich, if you'll turn to the third page, it

13   has a number 2 on the bottom.

14          The first full paragraph:

15          (Reading:)

16          CDCR screens all inmates prior to placement and

17          non-MHSDS inmates within 72 hours of entry into ASU.

18          Health care administers the preplacement screening

19          and as yet the data on this is spotty because of the

20          lack of clear rules for data entry in institutions.

21          The same problems have plagued tracking of the

22          post-placement screenings.  DHCS Mental Health

23          Program has recently directed the institutions

24          to assure that this data is entered.  A recent

25          report from MHTS.net shows that of 8,629 inmates

3588

```
 1              screened after entry to ASU, over 3,000 had negative
 2              screens, 434 were positive, (referred for mental
 3              health evaluation) but over 5000 were simply entered
 4              as completed.
 5              (Reading concluded.)
 6              Dr. Belavich, if you turn to page 4 of this, you
 7    realize this is a report by Dr. Canning dated January 25th,
 8    2013?
 9              Have you seen this report before?
10    A.        I can't say with certainty that I have.
11    Q.        And Dr. Canning is head of -- is the suicide
12    prevention coordinator for your office?
13    A.        No.  Dr. Eargle.
14    Q.        Dr. Canning?
15    A.        I'm sorry.  I was answering.  Dr. Eargle is.
16    Q.        So January 25th, 2013, was Dr. Canning the suicide
17    prevention coordinator?
18    A.        No.  Dr. Canning has never been the suicide
19    prevention coordinator.  Dr. Eargle's in charge of suicide
20    prevention.  Dr. Canning works for her.
21    Q.        Okay.
22              THE COURT:  He signed this as the "Suicide Prevention
23    Coordinator."  Or I don't know that he signed it, but it was
24    under his name.
25              Is that simply an error?
```

3589

1          THE WITNESS:  It may be something he calls himself.

2   We don't have that title.

3          THE COURT:  Okay.

4          THE WITNESS:  It might be a working title he uses

5   since he does head up our monthly teleconference on suicide

6   prevention, but I have more than one person in the suicide

7   prevention area.

8   BY MR. BIEN:

9   Q.     You mentioned in your discussions with the judge a

10  few moments ago there is a quality improvement process that

11  you are working on with the Special Master now; is that

12  correct?

13  A.     Yes, that's correct.

14  Q.     And in those interviews that you talked about finding

15  out why people were not going to treatment, that was part of

16  that process?

17  A.     It's part of an interview that is part of that

18  process.

19  Q.     Okay.  Have you reviewed the Special Master's report

20  on the quality improvement process that came out this summer?

21  A.     Can you show me the report?

22  Q.     Sure.

23         (Exhibit handed to witness.)

24  A.     Thank you.

25         MR. BIEN:  Your Honor, I think these have been

3590

1    provided to you.  This is Exhibit 2269.

2            THE COURT:  In evidence?

3            Not in evidence?

4            MR. BIEN:  We would like to move this into evidence,

5    Your Honor.

6            THE COURT:  Received.

7                (Whereupon, Plaintiffs' Exhibit 2269 received

8                 into evidence.)

9    BY MR. BIEN:

10   Q.     Dr. Belavich, if you look at --

11   A.     To answer the question previously, yes, I have seen

12   this.

13   Q.     Okay.  This is a report on the process, right, that

14   quality improvement process?

15   A.     Yes, it is.

16   Q.     Now, if you look at tab F, you see that color chart

17   there?

18           THE COURT:  My F is empty.  Oh, F.

19           No.  No.  It is not.

20           MR. BIEN:  Got it there?

21           THE COURT:  Yeah.

22   BY MR. BIEN:

23   Q.     Are you there, Dr. Belavich?

24   A.     Yes, I am.

25   Q.     And this is what you call your "dashboard"; is that

3591

1   correct?

2   A.      Yes.  This is part of the dashboard.

3   Q.      It is part of the dashboard.  But these are things

4   that you regularly measure?

5   A.      Yes.

6   Q.      Okay.  And the colors -- green is a positive color

7   and yellow is a less positive and pink or red is

8   noncompliant, correct?

9   A.      Correct.

10  Q.      And if you look at the IDTT attendance, that's an

11  area that there is a lot of difficulty, correct?

12          THE COURT:  I'm sorry.  What do you want him to look

13  at?

14          MR. BIEN:  It's from the right side, Your Honor, the

15  fourth column -- one, two, three, four -- IDTT.

16          THE COURT:  Attendance.  Yes.  Okay.

17          MR. BIEN:  Okay.

18  MR. BIEN:

19  Q.      Is that right, Dr. Belavich?

20  A.      Yes.

21  Q.      And that's something you did not choose to include on

22  your chart, DDDD, right?

23  A.      No.  We chose not to.

24  Q.      Okay.  And IDTT attendance refers to whether or not

25  the IDTT had the appropriate personnel present, correct?

3592

1    A.      That's correct.  If any needed member is missing,

2    they get a zero for that IDTT.

3    Q.      And the one over to the right, the mental health

4    referrals, correct?

5    A.      Yes.

6    Q.      And you didn't include that on your chart either,

7    correct?

8    A.      Which chart?

9    Q.      DDDD?

10   A.      No.  That's not on the chart.

11   Q.      And the next one is placement requests.  And that's

12   also not on the chart, correct?

13   A.      That's correct.

14   Q.      Now, you have on your chart -- you talk about weekly

15   contact with primary clinician as -- and you say 93 percent

16   compliance rate for CCCMS, correct?

17   A.      That's correct.

18   Q.      And you don't track -- you don't show on this chart

19   whether or not this was a cell front or a private contact,

20   correct?

21   A.      No.  The chart doesn't reflect that.

22   Q.      But you do track that information, don't you?

23   A.      Yes.  If the patient was seen cell front, it is

24   recorded.

25   Q.      And in your Ad. Seg. programs, both PSU and Ad. Seg.

3593

1   EOP hub, a large number of primary clinician contacts are

2   cell front, aren't they?

3   A.      I couldn't say what percentage are cell-front.

4   Q.      But whatever they are, you didn't report it on DDDD?

5   A.      No, we did not.

6   Q.      The other important issues for compliance are LPT

7   rounding, correct?  That's something you track?

8   A.      Yes, that is.

9   Q.      That's also not reported here?

10  A.      No, it's not.

11  Q.      We talked before about yard.  Is it correct your

12  system does not track how many hours of yard, for example, an

13  EOP patient receives in a PSU program?

14  A.      As I said this morning, I believe we record yard when

15  we are counting it toward therapeutic treatment.

16  Q.      So you don't record just the normal yard that custody

17  provides to someone in segregation?

18  A.      I don't believe we track that in the Mental Health

19  Tracking System.

20  Q.      So you could have a tracking that showed -- just like

21  you do for group, you could have "Scheduled Yard," "Offered

22  Yard," "Attended Yard," "Refused Yard" or "Cancelled Yard,"

23  correct?

24          You could have that information?

25          MR. MCKINNEY:  Objection.  Calls for speculation.

3594

1   These are custody metrics that are being described.

2        THE COURT:  Well, the question is whether mental

3   health could track them, and I don't know what the answer is.

4        THE WITNESS:  I don't know.  I'm not the computer

5   person.  I don't know.

6   BY MR. BIEN:

7   Q.    You don't -- you don't track it, right?  We've

8   established that?

9   A.    We track it, yes.  We track it when it is counted

10  toward therapeutic activity.

11  Q.    That would be within the ten hours then, correct?

12  A.    Yes, that would be part of the ten hours.

13  Q.    You are aware, though, that in segregation units in

14  California prisons, the same issues arise with yard as arise

15  with group treatment; isn't that correct?

16        MR. MCKINNEY:  Objection.  Vague.  Assumes facts not

17  in evidence.

18        THE COURT:  I don't know about it not being in

19  evidence, but I don't know what it means.

20        MR. BIEN:  Let me try again, Your Honor.

21  BY MR. BIEN:

22  Q.    Dr. Belavich, sometimes yards are cancelled because

23  of weather; isn't that right?

24  A.    Yes, that can be.

25  Q.    And sometimes they're cancelled because of lockdowns?

3595

1    A.    Is that a question?

2    Q.    Yes.  Is that right?

3    A.    Yes.  I have understood that yards can be cancelled

4    because of lockdowns, yes.

5    Q.    And sometimes they're cancelled because of staff

6    shortages?

7    A.    That I don't know about.

8    Q.    Sometimes they're cancelled because there are

9    shortages of small management yards at certain facilities?

10   They don't have enough yard to reach all of the people that

11   are in their units?

12         You've heard of that happening, haven't you?

13   A.    Not specifically, no.

14   Q.    Are you aware of mentally ill inmates who sometimes

15   refuse to come out of their cell for yard?

16   A.    Yes.

17   Q.    You've heard --

18   A.    Patients refuse yard.

19   Q.    Okay.  And would it concern you as a clinician if a

20   particular patient was not accessing yard for a period of

21   time while they were in a segregated unit?

22   A.    It may cause concern.  It may be a factor that would

23   cause concern.

24   Q.    Doctor, do you track how many mentally ill prisoners

25   in segregation have access to TVs or radios?

3596

1   A.      I don't track that, no.

2   Q.      Do you know of anyone in the mental health side that

3   tracks that information?

4   A.      I don't know.

5   Q.      So you don't know if your department has that

6   information anywhere?

7   A.      I don't have that information or access that

8   information.  I don't know if locally it is tracked.  I don't

9   know about the tracking of it.

10  Q.      Do you think it is important that mentally ill

11  prisoners in segregation have access to the stimulation that

12  a TV or radio might provide?

13  A.      I think that's -- I think that can provide, you know,

14  various benefits, and it is partly why we introduced the

15  radio program.

16  Q.      But you don't have any records, and you don't keep

17  track of how many of the mentally ill prisoners in

18  segregation currently have access to TVs or radios?

19  A.      Overall I don't believe so, but with the recent

20  rollout of the radio program, I believe that is being

21  tracked.

22          But again, I don't believe we're tracking it on a

23  level that we're going to enter it into the MHTS system to

24  track.

25  Q.      Are all prisoners -- mentally ill prisoners in

3597

1    segregation units in California going to receive crank

2    radios?

3    A.      I believe -- I think -- I know all institutions

4    receive them.  Institutions that don't have electric access

5    received more so that we can obviously get more out because

6    even if the patient has their own radio or TV, it wouldn't be

7    of use to them.  But the other details I don't have right

8    now.

9    Q.      Have you seen any memo that implements the crank

10   radio program?

11   A.      Yes, I have.

12   Q.      Okay.  Did you sign it?

13   A.      I may have.

14   Q.      Has it been issued to the field, that memo?

15   A.      I believe it has.

16   Q.      Okay.  Have any crank radios actually been provided

17   to any prisoners?

18   A.      I believe they are.

19   Q.      And where is that going on?

20   A.      I can't tell you where.  We shipped out the radios to

21   be tagged in early to mid-October.  I know we actually -- we

22   actually paid an extra surcharge to get them more quickly

23   than expected from the manufacturer.

24   Q.      I believe that Miss Allison testified that there had

25   to be a process where the union was notified before radios

3598

1  were issued.

2         Were you aware of that?

3  A.     I knew there were conversations with the union over

4  the radios, but I wasn't aware they had not been issued.

5  Q.     Okay.  Is that something that she's in charge of, the

6  distribution?

7  A.     Her staff distributed the radios, yes.  My staff

8  ordered them.

9  Q.     Can a radio -- have you changed the rules in

10  segregation that allows radios to be removed as discipline

11  for misbehavior in segregation units?

12         MR. MCKINNEY:  Your Honor, I object.  At this point

13  it is beyond the scope of direct examination.  He's asked a

14  number of questions, but this is all well beyond the scope.

15         THE COURT:  The objection is overruled.  The issue

16  is -- you may proceed, Mr. Bien.

17  BY MR. BIEN:

18  Q.     Dr. Belavich, have any of the rules concerning the

19  removal of electrical devices as part of the disciplinary

20  process been changed?

21  A.     I don't know.

22  Q.     You're not aware of any changes to those rules?

23  A.     Like I said, I don't know.

24  Q.     And are you aware that inmates on Management Status

25  in segregation can have electrical devices removed?

3599

1      MR. MCKINNEY:  Objection.  Assumes facts not in

2  evidence.

3      THE COURT:  Sustained.  He's asking whether he's

4  aware of it.  I suppose he should ask whether that is true

5  because I don't know whether there is anything to be aware

6  of, Mr. Bien.

7  BY MR. BIEN:

8  Q.    Do you know the rules of Management Status in

9  segregation units, Dr. Belavich?

10  A.    No.

11  Q.    Do you keep track of the number of mentally ill

12  prisoners in segregation who are housed in intake cells upon

13  arrive in segregation?

14  A.    I don't personally look at that report.  I believe

15  that's tracked locally.  I don't think it is pulled at

16  headquarters' level.

17  Q.    You testified on direct about Exhibit BBBB, which is

18  a new policy requiring that the treating clinician provide

19  information to the Ad. Seg. clinician upon transfer of a

20  patient.

21      Is that correct?

22  A.    That's correct.

23  Q.    And this policy went into effect in September?

24  A.    Yes.

25  Q.    And you didn't report on any compliance of that

3600

1    policy in this DDDD, right?

2    A.        No, I don't believe so.  No.

3    Q.        Are you aware that?

4    A.        This policy isn't part of our Program Guide metrics.

5    Q.        You don't track that?

6    A.        We track it because Exhibit CCCC tells the clinicians

7    how to track it, but this isn't part of our Program Guide

8    compliance.

9    Q.        Do you think it is important for prisoners in

10   segregation that their treating clinicians communicate with

11   the segregation clinicians?

12   A.        I think any time a patient goes from one provider to

13   another it is important to do a handoff.

14   Q.        Dr. Dvoskin recommended that the treating clinician

15   actually go to the segregation unit and interview the patient

16   after they were sent to segregation, didn't he?

17   A.        Yes.  And we encourage that.  We did not require

18   that.

19   Q.        And he also recommended that that happen not in five

20   days, but in the first day after the patient went to

21   segregation, correct?

22   A.        I would have to see his exact recommendation again to

23   see that timeline.

24   Q.        Isn't five days a long time to wait for information

25   from the primary clinician to the new treating clinician?

3601

1   A.      Not necessarily.  I think it often happens more

2   quickly, especially when it is within the same institution,

3   the transfer.  It may take longer when the patient is being

4   transferred from one institution to another.

5   Q.      Doctor, in front of you is a large document.  I gave

6   it to you early on.  It has this large color attachment.  It

7   is 2459.

8           If you look at the first page, is this -- do you see

9   your name on the email from Michael Morrison to Diane Toche

10  at the bottom?

11  A.      Yes, I see it.

12  Q.      You were cc'd on this email in January of 2013?

13  A.      Yes, I was.

14  Q.      And Mr. Morrison is the one who you mentioned helped

15  you prepare your charts.

16          Is he someone who works for you?

17  A.      Yes.

18          MR. BIEN:  Your Honor, we'd like to move 2459 into

19  evidence.

20          MR. MCKINNEY:  We have an objection based on the

21  attorney-client privilege.  This was a document prepared in

22  the context -- at the direction of counsel as part of the

23  termination motion.  There was a general clawback in the

24  litigation, and we asked for the return of privileged

25  documents.  This was not returned.

3602

1          MR. BIEN:  This has been on file, Your Honor.  I know

2     of no general clawback or request.

3          Plus, by the documents nature it was sent to many

4     people who are not inside the privilege, nor is it the

5     communication of legal advice or request for legal advice.

6          MR. MCKINNEY:  It was copied -- it was sent directly

7     to the general counsel of CDCR.  And I represent to the court

8     that it was prepared in anticipation of the hearing on the

9     termination motion.

10         THE COURT:  I have no idea, but it says initially to

11    "Dickinson, Kathleen."

12         Is that a lawyer?

13         THE WITNESS:  It needs to be read from the bottom up,

14    I believe, the email.  It went from Morrison to Toche and

15    Rice.

16         THE COURT:  This says it was sent from "McDonald,"

17    whoever that is, to "Dickinson Kathleen - CDCR," "Stainer,

18    Michael - CDCR" and "Allison, Kathleen - CDCR."

19         It doesn't appear -- I don't see anywhere where you

20    could argue -- whatever its initial purpose was, it is being

21    sent to people left and right.

22         Am I wrong, Mr. McKinney?

23         MR. MCKINNEY:  No, Your Honor, you're correct.  But

24    it was prepared at the direction of counsel and then sent to

25    CDCR employees for input as to the recommendations.  But this

3603

1   was all done at the direction of counsel.

2           THE COURT:  Well, I have a representation of that,

3   which I can't ascertain from the document itself.

4           I have a representation from opposing counsel that

5   this document was sent --

6           MR. BIEN:  It has already been on file, Your Honor,

7   for months now.

8           THE COURT:  On file where?  In this court?

9           MR. BIEN:  Yes.

10          MR. MCKINNEY:  Where's that?

11          MR. BIEN:  It was in our opposition to the motion

12  filed in March.

13          THE COURT:  Objection is overruled.

14          You may proceed.

15              (Whereupon, Plaintiffs' Exhibit 2459 received

16               into evidence.)

17  BY MR. BIEN:

18  Q.      Dr. Belavich, looking at the attachment, this

19  document is titled "Compendium Of Suicide Recommendations."

20          Is that correct?

21  A.      That's the title.

22  Q.      Have you worked with this document?

23  A.      With this document, no.

24  Q.      Have you worked with the underlying Excel

25  spreadsheet?

3604

1          You attended meetings where this information was

2     discussed in a format like this?

3     A.     At the time of these meetings I directed my staff to

4     prepare this for our lawyers and -- so that we could have

5     internal conversations about the issues, but for other

6     reasons I was not part of the meetings at this time.

7     Q.     Does Mr. Morrison keep track of various

8     recommendations for improvements in CDCR policies and

9     procedures directed to reducing the number of suicides?

10    A.     No, he does not.

11          THE COURT:  Excuse me, sir.  What is "DAI"?

12          THE WITNESS:  Division of Adult Institutions.  The

13    custody side.

14          THE COURT:  All right.  And I mean, like everything

15    in this, it is just filled with letters that somebody is

16    supposed to know what they mean.

17          Okay.  Go ahead.  So far I've been able to puzzle out

18    what the letters stand for.

19          You may proceed, sir.

20    BY MR. BIEN:

21    Q.     If you look at the fourth report -- fourth page from

22    the back, Doctor, there's some references to the source of

23    the recommendation is the Dvoskin Report.

24          Do you see that?

25    A.     Yes.  In the far left.

3605

1  Q.      Yes.  And the second from the bottom is a

2  recommendation:

3          (Reading:)

4          Interval between admission to ASU and first clinical

5          contact.  Former PC see an I/P  --

6          (Reading interrupted.)

7          (Court reporter requests counsel restate.)

8          THE COURT:  Don't worry about it.  Nobody can

9  understand it.

10          MR. BIEN:  Which I assume means inmate-patient.

11          (Reading continued:)

12          ...within the same institution sooner than current

13          policy mandates.  If transfer to another

14          institution, then use teletherapy or have another

15          clinician make immediate contact.

16          (Reading concluded.)

17          Is this the recommendation that resulted in BBBB,

18  Doctor?

19  A.      It may have been.

20  Q.      Right below that there is a recommendation?

21  A.      You know, I don't believe it is.  I'm sorry.  I don't

22  believe it is because as I recollect that recommendation,

23  that was not to do a handoff.  That was for -- that was a

24  different issue.

25          When a patient gets transferred to administrative

3606

1    segregation, the clinician from the main line who was seeing

2    him comes over to see him as a contact to sort of, you know,

3    closeup their treatment with them temporarily and to

4    encourage them to participate.  There were other reasons.

5            The memo actually outlines more of a

6    clinician-to-clinician contact.  This recommendation outlines

7    a clinician-to-patient contact.

8    Q.      And as you understood what Dr. Dvoskin was

9    recommending, the treating clinician should actually go and

10   talk to the patient -- his patient if the patient went to Ad.

11   Seg.?

12   A.      Yes, that was the recommendation.

13   Q.      And BBBB -- BBB, I think, doesn't do that, right?

14   A.      BBBB is apples and oranges to this recommendation.

15           MR. BIEN:  May I approach, Your Honor?

16           THE COURT:  Yes.  Hopefully it's got something to do

17   with something.

18           (Exhibit handed to witness.)

19   BY MR. BIEN:

20   Q.      Doctor, you testified on direct that an important

21   part of addressing mentally ill prisoners in segregation were

22   psych-tech rounding, correct?

23   A.      Yes.

24   Q.      I put before you a suicide report.  This is -- and we

25   move it into evidence, Exhibit 2773.

3607

1          If you can, refer to this as Prisoner 1.

2          MR. BIEN:  And can we have it filed under seal, Your

3   Honor.

4          THE COURT:  That will be the order.

5               (Whereupon, Plaintiffs' Exhibit 2773 received

6               under seal into evidence.)

7   BY MR. BIEN:

8   Q.     Dr. Belavich, this is a report that you signed on

9   December 13 of this year?

10  A.     Yes.  It appears to be.  I may have signed it before

11  then, but at least by then.

12  Q.     And Prisoner 1 committed suicide in an administrative

13  segregation cell in Pleasant Valley State Prison on October

14  15th, correct?

15  A.     That's correct.

16  Q.     Now, if you turn to the -- to page 10, there are

17  several problems identified in this particular case.

18  A.     Page 10 of the report or page 10 of the document?

19  Q.     It's the second to last page of the report -- of the

20  exhibit.

21          Do you see the first problem at the bottom of the

22  page?

23          Is it correct that this patient refused his initial

24  screen on July 21, 2013, but was not evaluated by mental

25  health until September 27, 2013?

3608

1      That was the first problem identified; is that

2   correct?

3   A.      That's correct.

4   Q.      And the Program Guide requires that someone who

5   refuses the initial screen be seen within five days, right?

6   A.      That's correct, as it states.

7   Q.      Now, when this man was found in his cell, custody

8   refused to allow clinical staff to enter the cell to perform

9   life support; isn't that correct?

10  A.      Can you point me to the place in the report?

11          The same page, page 10, first full paragraph.

12          (Reading:)

13          Several concerns emerged as a result of this review.

14          After the inmate was found in his cell, custodial

15          staff determined Prisoner 1's hanging was a crime

16          scene and hindered access for nursing and medical

17          staff.  As a result, advanced cardiac life support

18          measures, including CPR, was never initiated on

19          Prisoner 1.

20          (Reading concluded.)

21  A.      Yes.  That's what the report states.

22  Q.      It goes on to find another problem.

23          (Reading:)

24          Additionally, there is some concern whether

25          appropriate counts and rounds had been completed

3609

1          properly due to fact that the coroner determined that

2          approximately four to eight hours elapsed between the

3          time of death and when he was cut down.

4          (Reading concluded.)

5     A.    That's what it states.

6          MR. BIEN:  Okay.  Your Honor, I referred to the

7     prisoner's name.  I ask that it be retroactively struck from

8     the record.

9          THE COURT:  I didn't realize you had, and it is

10    stricken.

11         (Exhibit handed to witness.)

12    BY MR. BIEN:

13    Q.    Dr. Belavich, Plaintiffs' Exhibit 2524 is dated July

14    18th, 2013.

15         It also has your signature there on the front page?

16    A.    That's correct.

17    Q.    And if we can, refer to this man as Suicide Prisoner

18    6.

19         MR. BIEN:  Also I move this under seal, Your Honor.

20         THE COURT:  Received under seal.

21          (Whereupon, Plaintiffs' Exhibit 2524 received

22           under seal into evidence.)

23    BY MR. BIEN:

24    Q.    Dr. Belavich, this suicide occurred at Folsom State

25    Prison on approximately May 27th, 2013?

3610

1        MR. MCKINNEY:  Objection, Your Honor.  Neither this

2    inmate nor the prior inmate are members of the Coleman Class.

3        I understand that mental health looks into every

4    suicide, but we are -- it's a waste of the court's time to go

5    through these individual cases.

6        THE COURT:  Mr. Bien, I don't know what you are

7    doing, and I don't mean to be disrespectful.  It may well be

8    that there are problems with suicides in Ad. Seg. and the

9    responses to them.  But, you know, picking up individual

10   cases, "Here they didn't do this," "Over there they didn't do

11   that," at some point it would be irrelevant even if they were

12   class members, but apparently these, I am told, are not class

13   members.

14       What are we doing?

15       MR. BIEN:  Certainly 2524, this one is a class

16   member.  Whether or not defendants identified him, that's one

17   of the problems.

18       THE COURT:  All right.

19       I have a representation he is.  I have a

20   representation that he's not.

21       MR. MCKINNEY:  Your Honor, this exhibit, the third

22   page of the document reflects the inmate's level of care as

23   "general population."

24       THE COURT:  I understand.  And Mr. Bien says that's

25   one of the problems.

3611

1          MR. BIEN:  I'll tie it up, Your Honor.

2    BY MR. BIEN:

3    Q.     Dr. Belavich --

4          THE COURT:  Well, nobody cares if I rule so go right

5    ahead.

6          No.  No.  Just go.  I want to get this over with.

7          I'll strike it or not consider it if and when the

8    case is ever submitted to me.

9          Go ahead.

10   BY MR. BIEN:

11   Q.     Dr. Belavich, are you aware this prisoner was put in

12   Ad. Seg. for safety concerns?

13         MR. MCKINNEY:  Same objections, Your Honor.

14         THE COURT:  I'm sorry.  What?

15         Same objections?

16         Same ruling.

17         At some point you're going to have to demonstrate to

18   me, Mr. Bien, that this makes any difference in this case.

19         MR. BIEN:  Okay, Your Honor.

20   BY MR. BIEN:

21   Q.     Can you turn to page 8, Doctor.

22   A.     The one that is actually labeled "Page 8" of the

23   report?

24         THE COURT:  It says "Page 8."

25   BY MR. BIEN:

3612

1   Q.      It says "Page 8" on the top.

2   A.      Okay.  I'm there.

3   Q.      The second full sentence:

4           (Reading:)

5           The ASU preplacement chrono noted no mental illness

6           issues and a 31-item questionnaire completed on May

7           15, 2013, was negative.  However, on the evening of

8           May 18th, 2013, as a nurse was making rounds,

9           Prisoner 6 gave her --

10          THE COURT:  Strike that.

11          MR. BIEN:  I'm sorry.

12          THE COURT:  Inmate 6.

13          MR. BIEN:  Thank you, Your Honor.

14          (Reading continued:)

15          ...Prisoner 6 gave her a Health Care Services Request

16          form which said, quote, "I would like to speak to a

17          psych.  I'm hearing things.  I don't feel comfortable

18          talking to anyone about my mental health so please

19          spare a few minutes of your time for me.  Things are

20          getting out of hand."

21          The nurse completed a mental health referral chrono

22          for the inmate.  Although the nurse marked the

23          referral "Urgent," the nurse did not contact the

24          available on-call weekend clinician.  Instead, the

25          referral made its way through normal channels.  The

3613

1          form is stamped Received May 20th, 2013.  Prisoner 6

2          was seen by a psychologist on May 20th.  The

3          clinician's note is reproduced verbatim and stated:

4          (Reading concluded.)

5          So there was a delay, Doctor, in the nurse providing

6     this request to see a psychiatrist or to see a mental health

7     clinician; is that correct?

8          MR. MCKINNEY:  Same objection, Your Honor.

9          THE COURT:  Overruled.

10         THE WITNESS:  It appears that the nurse --

11         THE COURT:  Didn't do her job.

12         THE WITNESS:  She marked it "Urgent," but didn't do

13     the follow through.  That's why we have --

14         THE COURT:  That's why you have these reports trying

15     to find out what happened so you can correct --

16         THE WITNESS:  That's the corrective action we state.

17     We gave it back to the institution to investigate how they're

18     handling urgent referrals so that corrective action could be

19     taken be it training or discipline.

20         It's the same as the previous case.

21     BY MR. BIEN:

22     Q.     You testified yesterday about -- I'm sorry -- on

23     Friday about staffing and the adequacy of staffing in your

24     system, correct, Doctor?

25     A.     That's correct.

3614

1   Q.      I put in the stack before you two documents I hope

2   you can find.  One is 2653 and one's 2382.

3           2653 is a two-page chart, the top of which says "Six

4   Month Vacancy Summary - October 2013."

5   A.      I have that one.  What was the other number, please?

6   Q.      Let's look at that one first, if you have that, 2653.

7   A.      Okay.

8           THE COURT:  Do you want to move that into evidence?

9           MR. BIEN:  Yes, Your Honor.

10          THE COURT:  Received.

11              (Whereupon, Plaintiffs's Exhibit 2653 received

12               into evidence.)

13  BY MR. BIEN:

14  Q.      Doctor, this is a report that's provided as part of

15  the monthly package to the Special Master; is that correct?

16  A.      Yes, I believe it is.

17  Q.      And it shows vacancies over the prior six-month

18  period and in-fill positions; is that correct?

19          Between May 2013 and October 2013?

20  A.      Yes.  It shows May through October of this year.

21  Q.      As of October of 2013 there's still a 39 percent

22  vacancy rate for psychiatrists; is that correct?

23  A.      Well, according to this report.  But if you look at

24  the legend, it states that the data that I do not control,

25  the data we get from the HR system, is 45 days in arrears.

3615

1    Q.     But this is the report that you send to the Special

2    Master each month, correct?

3           THE COURT:  How can it be 45 days in arrears if it

4    says -- I'm having trouble reading it -- but it says October

5    11th, I believe.

6           Isn't that what it says on top?

7           THE WITNESS:  That's the data at the day of pull, but

8    HR takes up to 45 days to key in new hires and departures and

9    things like that so this document has a 45-day lag.  So it

10   would not include -- October's hires would not be included

11   until December.

12          THE COURT:  With the greatest of respect, Doctor, I

13   don't know what you are saying.

14          It says as of October 11th, but that's just a plain

15   lie?

16          THE WITNESS:  That is the vacancy rate as of that

17   date, but all of the data has not been entered so new hires

18   are not in yet.

19          THE COURT:  Okay.  Now I understand.

20          THE WITNESS:  They have 45 days to get me the data.

21          THE COURT:  Now I understand what you are saying.

22          THE WITNESS:  I don't control that system

23   unfortunately.

24          THE COURT:  I think what you are saying, help me, I'm

25   going to try it say it back to you and if it isn't right,

3616

1    that's fine.

2           As of October 11th there are -- I can't even find it

3    any more -- vacancy rates of 30.24 --

4           MR. BIEN:  39.24.

5           THE COURT:  -- 39.24, but that may not be accurate

6    because it is conceivable that somebody was hired but isn't

7    in the data because it takes 45 days for HR to get around to

8    recording it or doing something?

9           THE WITNESS:  Absolutely.  And it doesn't reflect --

10   this is hires.  It doesn't reflect the functional vacancy

11   when I'm using contractors.  So if I have vacant positions

12   and I contract with someone to fill those positions, it will

13   still show up on the report as a vacancy.

14          THE COURT:  What is the use of these documents?

15          Every document we talk about there is something wrong

16   with it, there is something which isn't accurate, there is

17   something that nobody in his right -- excuse me.

18          I mean, how can it be?

19          What use is it to you if it is just plain wrong?

20          What use is it?

21          THE WITNESS:  I have staff redo it.

22          THE COURT:  Sir?

23          THE WITNESS:  I have staff redo this document for me

24   that includes the functional vacancies because I can get that

25   from understanding the number of contractor hours that have

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3617

1   been used from a different report, and I know from the field

2   who has been hired.

3   BY MR. BIEN:

4   Q.      Let's look at the other document.

5           THE COURT:  No.  Before you go there --

6           MR. BIEN:  Sorry.

7           THE COURT:  Don't you find it terrifically odd -- I

8   was about to use others words -- that you are reporting to

9   the Special Master these reports which you know are not

10  right, they're wrong, they're false according to your

11  testimony?

12          "Yes" or "no"?

13          THE WITNESS:  Yes, but we --

14          THE COURT:  No.  "Yes"?

15          Do you think that reporting false information to the

16  Special Master fulfills your duty?

17          THE WITNESS:  No.

18          THE COURT:  Then why are you doing it?

19          THE WITNESS:  This is the report that we've always

20  generated.  We also do provide that information on functional

21  vacancies to the Special Master team we work with.

22          THE COURT:  It's mind-boggling.

23          Go ahead.

24  BY MR. BIEN:

25  Q.      Do you have 2382 in front of you?

3618

1    A.      No.

2    Q.      Can I help?

3    A.      Here it is.

4    Q.      Dr. Belavich, is 2382 --

5            I would like to move this into evidence.

6            This is the cover letter for the monthly report dated

7    December 10, 2013.  I have attached to it, I think it is,

8    number 1, the staffing allocation and one of the staffing

9    reports.

10            Do you understand what report is attached here?

11            THE COURT:  I suppose it doesn't matter since the

12    report is obviously going to be wrong.

13            MR. BIEN:  This does have some of the missing

14    information that Dr. Belavich referred to, Your Honor.

15            THE COURT:  You want to move this into evidence?

16            MR. BIEN:  Yes, Your Honor.

17            THE COURT:  Received.

18                (Whereupon, Plaintiffs' Exhibit 2382 received

19                 into evidence.)

20    BY MR. BIEN:

21    Q.      Dr. Belavich, if you turn to the attachment, perhaps

22    you can find the report for Tehachapi CCI?

23            It has on the bottom "page 3 of 35" written.

24    A.      Yes.

25    Q.      This is a report, again, provided by your office to

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3619

1   the Special Master, correct?

2   A.      Yes.

3   Q.      Okay.  And does this report contain some of the

4   information you said was missing from Exhibit 2653?

5           It has "Registry" for example, doesn't it?

6   A.      Yes, it does, the adjustments for "Registry PY,"

7   which means "personnel year."

8   Q.      So this report does address at least one of the

9   deficiencies you saw in the other report?

10  A.      Yes.  This addresses the use of registry.

11  Q.      There's still a 38 percent vacancy for social workers

12  at Tehachapi as of October 2013 even adjusted, correct?

13  A.      Yes.  They have 12 positions, eight are filled.

14  Q.      Under "Staff Psychiatrist" you have used registry,

15  but they still have a 39.6 percent vacancy after using

16  registry, correct?

17  A.      Not fully because this doesn't include the use of

18  telepsychiatry.

19  Q.      How would we know that?

20  A.      We haven't fully worked out how telepsychiatry is

21  being recorded.

22          THE COURT:  We're going to take our afternoon recess.

23          You know, I am reminded of the cross-examination of

24  Miss Allison.  I frankly have to look at the transcript to

25  remember it, but CDCR didn't count A, didn't count B, didn't

3620

1    count C.

2         I mean, these reports are generated, people spend

3    time and energy, hopefully they -- I mean, one would hope

4    that they are intended to convey information that people care

5    about, yet it is clear they don't.

6         With all due respect, sir, I am at the point in which

7    I'm finding it very difficult to take seriously anything that

8    the department tells me.

9         Just every document has got something wrong.  I don't

10   mean wrong -- well, I do mean wrong.

11        Well, it is what it is.  I'll have to try and figure

12   out how that bears upon the very serious obligations that I

13   have.

14        We will take a 15-minute recess.

15        (Off the record at 3:15 p.m.)

16                          ---o0o---

17

18

19

20

21

22

23

24

25

3621

```
 1              (Back on the record at 3:35 p.m.)
 2   BY MR. BIEN:
 3   Q.      Dr. Belavich, you still have 2382, the staffing
 4   document in front of you?
 5   A.      Yes, I do.
 6   Q.      Turn to the Salinas Valley State Prison, page 32 of
 7   page 35.
 8              THE COURT:  What page?
 9              MR. BIEN:  32 at the bottom.  32 of 35.
10              THE WITNESS:  I'm there.
11   BY MR. BIEN:
12   Q.      And do you also have ZZZ around there?  I'll put it on
13   the --
14   A.      Yes, I have it.
15   Q.      And the front page of ZZZ shows Salinas Valley State
16   Prison with 1,495 --
17              THE COURT:  I'm sorry.  Is 2382 in evidence?
18              MR. BIEN:  Yes, Your Honor.
19              THE COURT:  Go ahead.
20   BY MR. BIEN:
21   Q.      There's 1,495 Coleman class members as of October 25,
22   2013, at Salinas Valley State Prison?
23   A.      That's correct.
24   Q.      And turning to the next page, Salinas Valley State
25   Prison shows up at the bottom, and it shows in the ASU there
```

1    are 125 CCCs and 64 EOPs.

2           Is that correct?

3    A.     That's correct.

4    Q.     Going back to 2382, page 32 of 35, that shows Salinas

5    Valley State Prison staffing of 2013; correct?

6           Are you on that page?

7    A.     This is one piece of information that gives us some

8    information about the staffing, but not all of it.

9    Q.     Right.  And this asks for staff psychiatrists, Dr.

10   Belavich, and shows that there are eight positions

11   established and only three filled.

12          Correct?

13   A.     Yes, three filled with state employees.

14   Q.     And then registry further down to the right shows .64,

15   correct, less than one person.

16          That's what's reported here; right?

17   A.     That's correct.

18   Q.     That's a 48 percent vacancy for staff psychiatrists;

19   correct?

20   A.     Yes, not taking into account telepsychiatry.

21   Q.     Which isn't shown in this report?

22   A.     It's not part of this report, no.

23          THE COURT:  Just for curiosity, not that it matters,

24   because none of these documents matter, but is there some

25   place telepsychiatry is being reported?

```
 1                THE WITNESS:  Yes.  These reports are inaccurate.
 2   They're pieces of a puzzle, for lack of a better word, that
 3   when put together show our full staffing.
 4                THE COURT:  Which they don't do?
 5                THE WITNESS:  Not as standalone documents.  Then we
 6   roll it up and report at the beginning of our report what the
 7   true picture is, because, for example, on this -- if I put my
 8   contractors here, I would be dishonest because I'm saying --
 9                THE COURT:  About something else?
10                THE WITNESS:  Yes.
11                THE COURT:  Go ahead.
12                THE WITNESS:  So telepsychiatry is recorded in another
13   venue, and that is also given.
14   BY MR. BIEN:
15   Q.     Dr. Belavich, I put in front of you Plaintiffs'
16   Exhibit 2671, which is another report from the monthly
17   documents.  It's dated November 26, 2013, and it has your
18   name on it.  It's from Jay Powell to you.
19          Do you have that document there, Summary of
20   Inter-Institutional Mental Health Crisis Bed Referrals and
21   Transfers for October 2013?
22   A.     Yes.
23   Q.     And this is another report that your division provides
24   to the Special Master on a monthly basis?
25   A.     Yes, they do.
```

1    Q.    And you testified in your direct that there is very

2    little use of alternative housing in the system.

3         Is that correct?

4    A.    There's very little use of alternative housing beyond

5    24 hours.  There is some need for alternative housing,

6    especially with some institutions who may not have crisis

7    beds on site.

8    Q.    Each institution is supposed to have a list of

9    priorities of alternative housing that they use, is that

10   correct, priority list?

11   A.    That's correct, of better alternative housing.  They

12   start with better alternative housing and work their way

13   down, and patients are placed in the better alternative

14   housing.  If that ends up being filled by patients, they may

15   have to resort to other forms.  There's a hierarchy.

16   Q.    Alternative housing can include, for example, cells

17   outside of OHUs, correct, or outside of MHCBs?

18   A.    Yes, they wouldn't be in an MHCB.  Alternative housing

19   can't be in an MHCB.

20   Q.    Right.  And they might include various kinds of

21   temporary housing, including holding cells.

22        Correct?

23   A.    I think that is on the hierarchy as very low.  Again,

24   there's a hierarchy and they should be -- they have to be

25   admitted in that hierarchy, for lack of a better word.  I

 1    don't have the memo in front of me.

 2    Q.    Some of the prisons still used administrative

 3    segregation for alternative housing, don't they?

 4    A.    I couldn't say with certainty.

 5    Q.    Now, this report shows --

 6          THE COURT:  You want to talk about the report?

 7          MR. BIEN:  Move to admit Exhibit 2671.

 8          THE COURT:  Received.

 9                         (Whereupon, Plaintiffs' Exhibit 2671

10                          was received into evidence.)

11    BY MR. BIEN:

12    Q.    Dr. Belavich, on the first page it shows there were

13    332 MHCB referrals.

14          Correct?

15    A.    Yes.

16    Q.    And of these referrals, 186 transferred and 78 were

17    admitted internally.

18          Does "admitted internally," do you understand that to

19    mean they were admitted to an MHCB at the same institution

20    that the prisoner started out being referred?

21          MR. MCKINNEY:  Objection, Your Honor.  We are now so

22    far afield from the segregation issues in this motion.  We've

23    been talking about staffing, general conditions, crisis bed

24    admissions.  There's no relevance to the instant motion.

25          THE COURT:  Sir?

1              MR. BIEN:  Defendants' claim that they're complying

2    with the program guide and constitutional standards for

3    delivering mental health care.  Dr. Belavich testified in his

4    direct, it goes to whether or not they can provide care in

5    segregation units and whether or not they're using

6    segregation units for mental health treatment, including

7    someone referred to MHCB care.

8              THE COURT:  Objection is overruled.

9              You may proceed.

10   BY MR. BIEN:

11   Q.    Dr. Belavich, in this month, this report shows that 68

12   of the referrals were not placed because they were rescinded

13   by the referring clinician.

14             Is that correct?

15             MR. MCKINNEY:  Objection, again.  He's taking a

16   deposition with respect to documents that were just produced.

17   This has no relevance.

18             THE COURT:  Part of the problem is I'm not quite sure

19   what we're doing.

20             MR. BIEN:  I just have a few questions about this,

21   Your Honor.

22             THE COURT:  I bet you do.

23             Objection is sustained.

24             You may proceed with questions which have to do with

25   mental health Coleman members in ad seg.  That's what you may

1    proceed with.

2         MR. BIEN:  Okay.

3    Q.    Dr. Belavich, you said you're not aware of any

4    institutions using ad seg as alternative housing.

5         Is that correct?

6    A.    That's correct.  I can't be certain -- each

7    institution was asked to identify their alternative housing

8    and their hierarchies, and it was inspected and agreed upon

9    with our regional teams.

10         I don't believe -- I can't say with certainty, but I

11    don't believe they've identified cells in administrative

12    segregation necessarily.  I can't say.

13    Q.    I put a copy of the Special Master's 25th report in

14    front of you and I think Your Honor has one.

15         I don't know if we need to move this into evidence or

16    not.

17         THE COURT:  Let me put it this way, I don't know how

18    else the Court of Appeals can know what you're talking about

19    if it's not in evidence.

20         MR. BIEN:  I move into evidence the 25th monitoring

21    report of the Special Master.

22         THE COURT:  2778 is received.

23                        (Whereupon, Plaintiffs' Exhibit 2778

24                        was received into evidence.)

25         MR. MCKINNEY:  Is this the entire report?

```
 1              THE COURT:  If this is an excerpt, I'm the king of

 2    Spain.

 3              MR. MCKINNEY:  We were not provided a copy.

 4              THE COURT:  For gosh sake --

 5    BY MR. BIEN:

 6    Q.    Dr. Belavich, on page --

 7              THE COURT:  The rule is when the court starts talking,

 8    you stop.

 9              I recognize that this hearing is utter chaos, but the

10    record will reflect that plaintiffs supplied the defendants

11    with a full copy of 2778.  If the defendants need time to

12    prepare, in light of this late delivery, they can inform the

13    court and we'll do whatever it takes to have it happen.

14              You may proceed, Mr. Bien.

15    BY MR. BIEN:

16    Q.    Dr. Belavich, on page 101, there is a report about

17    Folsom, three paragraphs up from the bottom, quote,

18    (Reading:)

19                  Folsom utilized alternative housing for inmates

20                  awaiting MHCB placements.  Alternative housing

21                  consisted of the first eight cells on the first

22                  floor of the administrative segregation unit.

23              On page --

24    A.    I'm not sure there was a question.

25              THE COURT:  No.  He's just calling it to your
```

1    attention, because, apparently -- I assume you read this when

2    you received it?

3              THE WITNESS:  Yes, I was made aware of this.

4              THE COURT:  So he's calling to your attention the fact

5    that you forgot the very question that's at issue.

6              You may proceed.

7    BY MR. BIEN:

8    Q.    Did you instruct Folsom to stop using ad seg for

9    alternative housing for people waiting for MHCB?

10   A.    The alternative housing changes we made with the memos

11   and the new identification of alternative housing placement

12   was after this.  So I believe this may have been rectified.

13   It was in -- I believe it was after this round and absolutely

14   working -- locally working with the Special Master's team and

15   headquarters working with the Special Master's team.  When

16   they point something like this out, we address it.

17             As I sit here I can't say it's been addressed, but I

18   assume it has been addressed since it was July of 2012.

19   Q.    On page 313, for North Kern State Prison, at the top

20   of the page, (Reading:)

21                   The MHTH unit, which had ten clustered

22                   alternative housing cells, were located on a

23                   lower tier of an overflow segregation unit.

24             Then for LAC, on page 331, (Reading:)

25                   LAC continued to utilize five cells in housing

```
 1                    unit D1 and seven cells in administrative unit

 2                    A4 as alternative housing for inmates awaiting

 3                    placement in an MHCB.

 4          THE COURT:  Once again you have no personal knowledge

 5   as to whether or not these conditions have been corrected;

 6   you hope that they have been?

 7          THE WITNESS:  Correct.  We've issued the memo since

 8   this time.

 9   BY MR. BIEN:

10   Q.    Dr. Belavich, turn to 2783, which was the reply

11   declaration of Chief of Mental Health, Chris Cornell from

12   LAC, that was filed in reply on March 22, 2013.

13          THE COURT:  I'm sorry.  The two documents that have

14   been handed up to me are 2782 and 2783.

15          Which one do you want me to look at?

16          MR. BIEN:  2783.

17          THE COURT:  Are you moving it in, sir?

18          MR. BIEN:  Yes, I'm moving 2783.

19          THE COURT:  Received.

20          MR. BIEN:  Offer if for the purpose of.

21   Q.    Doctor -- you know who Dr. Cornell is?

22          THE WITNESS:  Yes, the Chief of Mental Health at LAC.

23                    (Whereupon, Plaintiffs' Exhibit 2783

24                    was received into evidence.)

25
```

1    BY MR. BIEN:

2    Q.      If you look at the bottom of page two, the sentence

3    beginning, (Reading:)

4                    These are the areas when an inmate is held while

5                    staff works with headquarters to locate

6                    available MHCB at other institutions.  When a

7                    patient deemed suicidal is placed in alternative

8                    housing during routine business hours, staff

9                    immediate begins finding available MHCB at other

10                   institutions.  When a suicidal patient placed

11                   into alternative housing after hours, staff

12                   begins finding an available MHCB during routine

13                   business hours.  Suicidal inmates at ASU status

14                   are placed into alternative housing on A4 in

15                   cell 119 until an MHCB can be located.

16        You're aware that LAC also uses ad seg for alternative

17    housing as of March of 2013?

18        MR. MCKINNEY:  Objection.  This is an issue not framed

19    by the plaintiffs' motion.  It's relevance is limited to

20    conditions in segregation.  This is a completely different

21    issue.

22        THE COURT:  Overruled.

23        You may proceed.

24        THE WITNESS:  Your question?

25

3632

 1    BY MR. BIEN:

 2    Q.    Were you aware as of March 2013 that the Chief of

 3    Mental Health at LAC was using an ad seg cell for ad seg

 4    prisoners who needed MHCB referrals as alternative housing

 5    location?

 6    A.    Per this document, that's what it states, but I'm not

 7    certain if that's been a retrofitted cell or not.  I don't

 8    have all the information to know whether or not that's

 9    appropriate.

10          THE COURT:  You don't know whether it was what, sir?

11          THE WITNESS:  A retrofitted cell.

12          THE COURT:  The question is somewhat different.  It's

13    rather straightforward, whether appropriate, inappropriate or

14    what, this document says that ad seg cells are being used as

15    alternative housing.

16          The question was:  Did you know or did you know that

17    as late as March 21st of this year that was so?

18          THE WITNESS:  No.

19          THE COURT:  All right.

20          THE WITNESS:  I don't have the details on this topic

21    at all.

22          THE COURT:  But you could always find documents which

23    wouldn't be accurate about it either.

24          You may proceed, sir.

25          MR. BIEN:  We'd like to move 2782, which is Warden

1    Donovan's declaration, Daniel Paramo into evidence.

2         THE COURT:  Received.

3    /////

4              (Whereupon, Plaintiffs' Exhibit 2782

5              was received into evidence.)

6    BY MR. BIEN:

7    Q.    Turn to 2782, the last paragraph, the warden states in

8    the second line, (Reading:)

9              Per LOP 160 alternative housing -- LOP stands

10             for local operating procedure -- alternative

11             housing cells are designated on an SNY yard for

12             SNY inmates, a mainline yard for non SNY

13             inmates, and ASU for ASU inmates.

14        As so of March 2013, Donovan was also using ASU as an

15   alternative housing location when an ASU patient was so

16   severely ill that a clinician was referring them to an MHCB.

17        Isn't that right, Dr. Belavich?

18   A.    It states that ASU alternative housing is used for ASU

19   inmates.  That's correct.  I can't say, as I sit here, that

20   that's inappropriate.

21        MR. BIEN:  I have no further questions, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MR. MCKINNEY:

24   Q.    Doctor, starting with the staffing documents that

25   plaintiff showed you, did plaintiffs exclude important

3634

1    systemic information that's included in those staffing

2    reports?

3    A.      Yes.  There is a host of reports and sub-reports that

4    get uploaded as part of these.

5            MR. MCKINNEY:  May I approach the witness, Your Honor?

6            THE COURT:  Yes.

7    BY MR. MCKINNEY:

8    Q.      Showing you what's been marked for identification as

9    Defendants' Exhibit MMMM.

10           Do you recognize this document?

11   A.      Yes.  This appears to be the -- more information

12   that's part of the monthly uploads.

13   Q.      If I could --

14           Your Honor, I would like to move this exhibit into

15   evidence?

16           THE COURT:  Received.

17                     (Whereupon, Defendants' Exhibit MMMM

18                      was received into evidence.)

19   BY MR. MCKINNEY:

20   Q.      Doctor, if I could turn your attention to the fourth

21   page of the document that begins "Executive summary."

22   A.      Yes.

23   Q.      What is this document?

24   A.      This is -- some of the documents we've seen are the

25   supporting documents that are behind this executive summary,

1    so as part of these uploads, our staff take and compile the

2    data off of these so that it is meaningful -- it's more

3    meaningful.

4           So, for example, the 693 unadjusted vacancies, that's

5    a true number and comes from Exhibit 2653 that we talked

6    about earlier, but then we take our vacancy adjustments for

7    registry, which is taken from Exhibit 2382, and that becomes

8    the next column to give us our vacancies after adjustment.

9           So although these pieces may not make sense when they

10   sit there alone, they make sense when compiled in this

11   report, and I assume that's why we do the executive summary.

12   Q.      That information was not included in the plaintiffs'

13   exhibit?

14   A.      No, it is not.

15   Q.      That information is provided to the Special Master as

16   part of the monthly package?

17   A.      This is part of the upload.

18   Q.      Directing your attention to the last page of the

19   document, what's shown on this page?

20           THE COURT:  Hang on a second.  I haven't gotten there.

21           Go ahead.

22           THE WITNESS:  This reflects the number of hours that

23   were recorded for telepsychiatry use during that month and

24   what institution they were providing services.

25

1    BY MR. MCKINNEY:

2    Q.      Do you have an understanding of how the telepsychiatry

3    time is calculated?

4    A.      There are two things with the telepsychiatry time.  As

5    I stated previously, we have not determined how to integrate

6    that into this report for vacancies at this point.  Because

7    we often have the team approach, the clinician with the

8    patient and the psychiatrist on the other end, we don't want

9    to double-count the appointment.

10           So what has been done in many instances is the

11    psychologist on the other end takes the time credit for the

12    appointment and the psychiatrist records an appointment but

13    not a time credit for it.

14           So we have to figure -- that's something that we are

15    in the process of figuring out.  For example, we've recorded

16    we've only used 358 hours of telepsychiatry; however, I know

17    from pulling the data, we have provided 1,200 telepsychiatry

18    appointments in that month.

19    Q.      Which month was that?

20    A.      This was October.

21    Q.      Doctor, if I could have you turn back to the fifth

22    page of the document.

23           The telepsychiatry report was also omitted from the

24    exhibits presented during cross examination.

25           Is that correct?

 1    A.        That's correct.

 2    Q.        That document is provided to the Special Master on a

 3    monthly basis?

 4    A.        That is correct.

 5    Q.        If I could have you look at the fifth page of this

 6    package, which the title is "Vacant Positions Overview."

 7    A.        (Witness complies.)

 8              THE COURT:  Page one of two is what you're asking him

 9    to look at?

10              MR. MCKINNEY:  That's correct.

11              THE COURT:  You have that, Doctor?

12              THE WITNESS:  Yes, with the numbers.

13    BY MR. MCKINNEY:

14    Q.        What is reflected on this document?

15    A.        This is a time comparison from 2007 to present of

16    vacancy rates and hiring, and, obviously, there have been

17    changes because there have been differential allocations of

18    positions, but it shows, similar to the previous exhibit that

19    I was shown -- I think it was part of 26 -- I think it was

20    part of 2653 it was taken from.

21              So it has my authorized positions in 2007, the new

22    authorized positions in 2013, the vacancy rates compared to

23    the 2007 staffing allocations, and the vacancy rates compared

24    to the new staffing allocations, because, obviously, we've

25    got a large number of new vacant positions.

```
 1              So our vacancy rate actually skyrocketed because we
 2    were granted a lot of new positions.
 3    Q.      It would be helpful to explain why the vacancies went
 4    up and why that is reflected in these reports?
 5              THE COURT:  He just explained it.  He got a whole
 6    bunch of new positions that he's got to fill.
 7              MR. MCKINNEY:  Thank you, Your Honor.  I wasn't sure
 8    that was clear.
 9    Q.      When did that occur, Doctor?
10    A.      Fiscal year '13-'14, so July 1st, '13, the new
11    positions were allocated.
12    Q.      The state is now -- is the state in the process of
13    filling those positions?
14    A.      Yes.
15    Q.      But at this time does it reflect a higher number of
16    vacancies due to that staffing plan?
17    A.      Yes, obviously, when I get 40 new psychiatry
18    positions, I don't have 40 psychiatrists waiting for jobs, so
19    we're recruiting.
20    Q.      Again, coming back to this vacant positions overview,
21    this is on a statewide basis; is that correct?
22    A.      Yes, that's correct.
23    Q.      Again, this is part of the package that is reported to
24    the Special Master; correct?
25    A.      That's correct.
```

1    Q.      And the next document, I believe, after that second

2    page, this is what's been previously entered as Plaintiffs'

3    Exhibit 2382, is that right, that piece of the package?

4    A.      Exactly, that part of the package.  It came out as

5    2382.

6            THE COURT:  You're now talking about two of two?

7            THE WITNESS:  No, the next one of one.

8    BY MR. MCKINNEY:

9    Q.      For purpose of clarity of the record, the document

10   entitled "Summary By Classification (Clinical Positions

11   Only.)"

12           THE COURT:  Doctor, can you show me the document?

13           One of 35.

14   BY MR. MCKINNEY:

15   Q.      I'm sorry.  If you can turn to the page before that.

16   A.      One of one, so that's correct.

17           It's this, sir.

18           THE COURT:  That's all right.

19   BY MR. MCKINNEY:

20   Q.      This was not included in Exhibit 2382; is that

21   correct?

22   A.      No, this was not.

23   Q.      What's reflected here?

24   A.      This is my statewide rollup by classification.  Yes,

25   my statewide rollup by classification.

1   Q.      This includes the adjustments for registry and other

2   adjustments made; correct?

3   A.      Yes.

4   Q.      This is also part of what is provided to the Special

5   Master?

6   A.      Yes.  This rolls up that next document, which is one

7   of 35.

8   Q.      That document is what was previously entered as

9   Plaintiffs' 2382; correct?

10  A.      Yes.

11  Q.      So that's one piece of this package?

12  A.      Yes, this is the title page of that next package.

13  Q.      Doctor, if I could have you move past that 35-page

14  piece of the package to the document with the title "Summary

15  by Classification," page one of three on the bottom.

16          THE COURT:  Page one of three?

17          MR. MCKINNEY:  Yes, Your Honor.

18          THE COURT:  Go ahead.  I can't find it, but the record

19  will be clear what you're talking about.

20  BY MR. MCKINNEY:

21  Q.      Doctor, if you could describe what this document is.

22  A.      This is the rollup of all positions.  The previous

23  report that -- let me confirm 1 of 35, 2 of 35, those dealt

24  with specific positions -- with specific positions and mental

25  health.  This rolls up additional positions.

```
 1              THE COURT:  I'm not certain, but one of three, is that
 2     what I'm looking at?
 3              MR. MCKINNEY:  On the bottom center.
 4              THE COURT:  Yes.
 5              MR. MCKINNEY:  Yes, Your Honor.
 6              THE WITNESS:  This includes positions that are not
 7     part of the previous report, such as pharmacist positions --
 8     this is -- it just expands to other positions, additional
 9     positions.  This is part of the packet as well.
10     BY MR. MCKINNEY:
11     Q.      The following document after page three of three which
12     says "Six Months Registry Usage Summary."
13     A.      Yes.
14     Q.      What is this document?
15     A.      This is a trending of the previous six months of the
16     registry positions that were used, psychiatrists,
17     psychologists, social workers.
18              THE COURT:  I'm looking at page three of three.  It
19     says "flip notes."
20              MR. MCKINNEY:  The page following is now where I
21     focused the doctor, the six-month registry usage.
22              THE COURT:  Page one of two?
23              MR. MCKINNEY:  Yes, Your Honor.
24              THE COURT:  All right.
25              THE WITNESS:  Yes.  So this includes psychiatrists --
```

1    this is all of our mental health clinical contractors, and

2    other mental health clinical staff would be recreational

3    therapists or other classifications that aren't included in

4    the previous three.

5    BY MR. MCKINNEY:

6    Q.    Again, this is part of the package provided to the

7    Special Master and the plaintiffs on a monthly basis?

8    A.    That's correct.  These don't represent necessarily

9    bodies.  They represent the amount of time to fill one

10   full-time position.  So two individuals would be -- two

11   individuals working half time will go into this report as

12   one.

13        What we care about here is that these are full-time

14   positions.  So we have the equivalent in October 2013 of 104

15   full-time registered clinicians working for us.

16   Q.    Those positions would not be reflected on the

17   unadjusted reports; correct?

18   A.    Exactly.

19   Q.    Doctor, if I could have you turn to the following

20   document which is entitled "Six-Month Vacancy Summary."

21   A.    Yes.

22        THE COURT:  I have "Six-Month Registry Usage Summary,"

23   page two of two.

24        MR. MCKINNEY:  This would be two pages after that.

25   The following page after two of two, another one of two.

1              THE COURT:  Page one of two?  Okay.  That's what we

2    just looked at.

3              THE WITNESS:  No, the next one.  I'm sorry.  If you go

4    past the --

5              THE COURT:  Page two of two?

6              THE WITNESS:  Go past that one.  We've got it.

7              THE COURT:  Another page one of two?

8              THE WITNESS:  Yes.

9    BY MR. MCKINNEY:

10   Q.     What is this document?

11   A.     This is the six-month vacancy trend with the vacancy

12   rates.  This is unadjusted.

13   Q.     Who prepares this document?

14   A.     This comes from -- we work -- actually, the receiver,

15   we work very closely with -- his shop is in charge of our

16   hiring.  We use his HR capabilities, and this is prepared by

17   his staff.

18   Q.     Are any of these reports that we've just gone through

19   intended to be a single report reflecting the staffing within

20   CDCR for mental health?

21   A.     No, I think absolutely not.  Any one report could be

22   misleading, so to get a total picture, we have to put the

23   pieces together from various sources.

24   Q.     So, for example, would it be appropriate to rely

25   exclusively on Plaintiffs' Exhibit 2382?

1    A.        No.  That's why I stated earlier I have staff do

2    adjustments.

3    Q.        And the same question with respect to Plaintiffs'

4    Exhibit 2653.

5    A.        It's a limited value as a standalone document, but

6    still some.

7    Q.        In looking at Defendants' Exhibit MMMM, is the data

8    accurate within that report?

9    A.        Yes.  This is the one -- yes.

10   Q.        Does CDCR provide the Special Master with additional

11   staffing data during the monitoring rounds?

12   A.        Yes.  In previous monitoring rounds, we provide -- per

13   institution, we provide similar data.  We provide a

14   functional vacancy rate which adjusts for having contractors.

15   As I recollect, we even slot names into those so that they're

16   aware of the exact number of people we have working in our

17   institution.

18   Q.        Does the Special Master's team verify the staffing

19   data during the institutional visits?

20   A.        Yes, they do.

21            MR. MCKINNEY:  May I approach the witness, Your Honor?

22            THE COURT:  Yes.

23   BY MR. MCKINNEY:

24   Q.        I've handed you a document that's been pre-marked as

25   Defendants' Exhibit LLLL.

```
 1              Are you familiar with this chart?

 2    A.       Yes, I am.

 3    Q.       What's reflected on this chart?

 4    A.       This is a total number of suicides per year since 2007

 5    and then reflects the housing or placement as well as the

 6    mental health status.

 7              MR. BIEN:  We object.  We just received this for the

 8    first time right now.

 9              MR. MCKINNEY:  Again, as --

10              THE COURT:  I'm going to let you go ahead.  If you

11    need time to prepare for cross, just let me know and we'll

12    find some way to do it.

13              There is one question which I just -- because I don't

14    understand it, not that I understand anything -- it says:

15    "Coleman class member suicides in," and then "administrative"

16    is crossed out "in segregation units."

17              Does that mean that you're including PSU and SHUs?

18              THE WITNESS:  Yes.

19              MR. MCKINNEY:  At this time, we would like to move

20    this exhibit into evidence.

21              THE COURT:  Received.

22                        (Whereupon, Defendants' Exhibit LLLL

23                         was received into evidence.)

24    BY MR. MCKINNEY:

25    Q.       What do the data for this year show?
```

```
 1    A.       For this year we've had at this point a total of 29

 2    suicides; two of those were CCCMS administrative segregation

 3    unit housing, two of them were in EOP, administrative

 4    segregation housing, one was a CCCMS patient in the SHU, and

 5    one was an EOP patient in a PSU.

 6             THE COURT:  When was this document created, sir?

 7             THE WITNESS:  I first saw it -- well, it was updated

 8    because we had the suicide on Monday, so I first saw it last

 9    week.

10             THE COURT:  This was created solely for the purposes

11    of this hearing?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  That's fine.

14             THE WITNESS:  Yes.

15    BY MR. MCKINNEY:

16    Q.       There's testimony this morning generally about

17    suicides in administrative segregation.

18             Any remaining suicides were not Coleman class members;

19    is that correct?

20    A.       That's correct.

21    Q.       And the only suicide of a Coleman class member in a

22    segregated housing unit this year occurred recently.

23             Is that correct?

24    A.       Yes.  The Tehachapi SHU CCI suicide that we had on

25    Monday.
```

1    Q.    You were asked questions about a prisoner in

2    administrative segregation at Corcoran.

3          That inmate was not a Coleman class member; is that

4    correct?

5    A.    That's my understanding, yes.

6    Q.    Are you aware of the court's recent order relating to

7    suicide prevention efforts?

8    A.    Yes, in which we are working with the Special Master

9    and Mr. Hayes, and he's currently touring our facilities.

10   Q.    When you say "currently," what do you mean by that?

11   A.    I believe at this moment he's down at RJ Donovan.

12   That's actually where I was supposed to be as well.

13   Q.    You testified about the suicide work group.

14         Can you describe the work that that group is doing.

15   A.    It's a multidisciplinary work group that includes

16   members of the field, members of headquarters, custody and

17   clinicians, and they address a lot of the issues that were

18   brought up in different reports that have already been

19   discussed.

20         They present to management recommendations and

21   sometimes not even -- even without coming to management, they

22   make recommendations to the field in which they feel we need

23   to make changes to our suicide prevention efforts.  It

24   includes everything from prevention awareness to changing

25   some of the ways we handle an awareness when any inmate

1    receives bad news.

2          One of the things that I think was significant, and it

3    was actually reflected on by Mr. Hayes, who happened to see

4    one, was when a patient was notified his loved one was in an

5    accident, there's a new process where the patient's

6    clinician -- I believe the warden was actually part of it as

7    well -- as well as a chaplain facilitated a phone call from

8    the patient to the family members.

9          For example, that's one of the new things that this

10   work group has developed.

11   Q.    The work of the work group, is that ongoing?

12   A.    It's ongoing, and we've encouraged them to explore

13   working -- how other states handle issues, so they've done

14   quite a bit of research in reaching out to other states.

15         I know that members of our work group are currently

16   also touring with Mr. Hayes, and I know that they've brought

17   him up to speed on some of the things the work group has been

18   doing, and they've been looking for feedback.

19         I'm certain that his tours are going to provide us in

20   that work group with feedback about steps going forward.

21   Q.    Is it fair to say that the department is currently

22   working with Mr. Hayes and specifically on issues related to

23   suicides in administrative segregation?

24   A.    I think most definitely.

25   Q.    Doctor, if I could turn your attention to

1     Exhibit 2773, which is one of the individual suicide reports.

2     A.     I have it.

3     Q.     Doctor, if I could focus your attention to page three

4     of the report, entitled "Executive Summary."

5     A.     Yes.

6     Q.     Does this reflect whether this inmate was a member of

7     the Coleman class?

8          THE COURT:  I don't see where it says one way or

9     another.

10     BY MR. MCKINNEY:

11     Q.     Focusing your attention to the table on the top.

12     A.     Yes.  He was not.

13          THE COURT:  How do you know that, sir?

14          THE WITNESS:  Under "level of care," which is the

15     third bold one up, it says -- I'm sorry -- the second one up,

16     it says, "level of care" and then it says "general

17     population."

18          THE COURT:  I have name --

19          THE WITNESS:  To the right, above the name of the

20     reviewer and under single celled.

21          THE COURT:  I'll take your word for it.  I can't find

22     it, but I'll take your word for it.

23          You may proceed, sir.

24     BY MR. MCKINNEY:

25     Q.     Doctor, if I could focus your attention on page ten of

1    this report under "Recommendations," did the department

2    implement a quality improvement plan in this case?

3    A.    Yes.  Some of the behavior that was talked about in

4    earlier testimony was very concerning to us.  I know that the

5    issue about the screening was referred over, and then the

6    more significant issue that we spoke about with not allowing

7    access to the cell, that actually was raised for

8    investigation for wrongdoing.

9    Q.    And, just as an example, is this report typical of the

10   detail -- first of all, the details of CDCR's internal

11   suicide reports?

12   A.    Yes, it is.

13   Q.    Who, in general, prepares these reports?

14   A.    Staff members or retired staff members of CDCR.  At

15   this point, we have enough internal staff that we don't rely

16   on retired staff members.  So this one was, for example, one

17   of our own psychologists.

18   Q.    Is this a fair example of the self-critical analysis

19   that CDCR engages in with respect to its suicide reviews?

20   A.    Yes.

21   Q.    Doctor, are reports prepared like this for ever

22   suicide within CDCR?

23   A.    Yes, they are.

24   Q.    That's irrespective of whether the inmate was a class

25   member or not; is that correct?

```
1   A.      That's correct, all suicides receive this level of

2   scrutiny.

3   Q.      Doctor, if I could have you take a look at the other

4   suicide report that was entered, 2524.

5   A.      Yes, I have it.

6   Q.      If you could take a look at the "Executive Summary.

7           Does this reflect whether this inmate was a member of

8   the Coleman class?

9   A.      Again, under level of care for this person, it says

10  "general population," so he was not within our mental health

11  delivery system.

12  Q.      And turning your attention to page eight of this

13  document, if you could read the next to the last sentence of

14  that first paragraph without saying the inmate's name.

15  A.      Where it says:  "Although the nurse marked the

16  referral urgent, the nurse did not" --

17  Q.      No.  The sentence beginning "inmate."

18          THE COURT:  Where do you want him to read now?

19          MR. MCKINNEY:  Page eight, the next to the last

20  sentence of that first paragraph.

21          THE COURT:  Leaving out the man's name, sir.

22          THE WITNESS:  Yes.  (Reading:)

23              Inmate was seen by a psychologist on May 20th.

24              The clinician note is reproduced verbatim and

25              stated CPT notes were reviewed.  Nothing unusual
```

```
 1                        noted.  Referral made after inmate reported to
 2                        administrative segregation officer that he was
 3                        experiencing auditory hallucinations.  Today he
 4                        reports a two-to-three-year history of auditory
 5                        hallucinations.  He reports no past history of
 6                        mental health services or past use of
 7                        psychotropic medications.  He has served
 8                        approximately five years in prison, has
 9                        eleven months left to serve.  Vague report of
10                        auditory hallucination at present.  No other
11                        abnormalities in behavior noted.  He does report
12                        a past history of methamphetamine use.  He is
13                        currently considering entering a CCCMS level of
14                        care.  He denies mental health concerns.
15                        He denies suicidal ideation, homicidal
16                        ideation.
17    BY MR. MCKINNEY:
18    Q.     Doctor, would it be fair to say despite the inmate's
19    denial of mental health issues, he is continuing to be
20    evaluated by mental health staff?
21    A.     Yes.  The clinician formed a rough diagnostic
22    impression and stated there was a plan to follow up, although
23    the follow-up date wasn't given in the note.
24    Q.     On cross-examination you were questioned about
25    concerns related to nursing.
```

1          Who is responsible for nursing within the CDCR?

2    A.      Our nursing staff as well as our licensed psychiatric

3    technicians are part of the nursing department and they work

4    directly under the receivership.

5    Q.      Doctor, again, turning your attention to page 12 of

6    this document, was a quality improvement plan initiated in

7    this case?

8    A.      Yes, it was, at the bottom of twelve, and it had to do

9    with the fact that the referral was marked "urgent" and

10   written on the 18th, but the patient -- the inmate wasn't

11   seen until the 20th, which was beyond the 24 hours.

12          So the chief nurse executive, so the head nurse or one

13   of his or her staff, were to conduct an inquiry as to how

14   this was handled or how they handle and process urgent

15   referrals, so to look at their system and take corrective

16   action, which may include staff training and/or changes to

17   the local operating procedure if needed.

18          Then once that's completed, they are required to

19   submit a memo detailing what the results of their inquiry was

20   and what they followed up with, if anything, and that comes

21   up to headquarters before we close out the corrective action

22   plan on this case.  That happens for any case that has

23   corrective actions.

24   Q.      That's reviewed all the way up to headquarters; is

25   that correct?

1    A.      Yes.   Then similar to the letter I signed at the very

2    beginning, we then sign a letter letting the institution know

3    that they have satisfied the requirements of their corrective

4    action plan.

5            THE COURT:   We'll go into recess and reconvene

6    tomorrow morning at 9:30.

7            Off the record.

8                            (Whereupon, the evening recess was

9                            taken at 4:33 p.m.)

10                           ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3        I, Michelle L. Babbitt, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              /s/ MICHELLE L. BABBITT
                               MICHELLE L. BABBITT CSR #6357
10                             Official Court Reporter
                               United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      REPORTER'S CERTIFICATE

 2                           ---o0o---

 3
      STATE OF CALIFORNIA   )
 4    COUNTY OF SACRAMENTO  )

 5


 6
           I certify that the foregoing is a correct transcript
 7
      from the record of proceedings in the above-entitled matter.
 8

 9

10               IN WITNESS WHEREOF, I subscribe this
      certificate at Sacramento, California.
11

12

13    /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
14         Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```