1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12    _____/

13

14

15                          ---o0o---

16

17                    REPORTER'S TRANSCRIPT

18                  RE:  EVIDENTIARY HEARING

19                THURSDAY, DECEMBER 19TH, 2013

20

21                          ---o0o---

22

23

24
     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4    FOR THE PLAINTIFFS:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  MARGOT MENDELSON, ATTORNEY AT LAW

 9            BY:  JANE KAHN, ATTORNEY AT LAW

10

11

12

13    FOR THE DEFENDANTS:

14             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
15             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
16
               BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
17
               BY:  JAY RUSSELL, DEPUTY ATTORNEY GENERAL
18
               BY:  PATRICK MCKINNEY, DEPUTY ATTORNEY GENERAL
19

20

21                           ---o0o---

22

23

24

25
```

1                     EXAMINATION INDEX

2                        ---o0o---

3

4   FOR THE DEFENDANTS:

5       EXAMINATION:                                PAGE

6

7    DR. TIMOTHY BELAVICH

8       Redirect Examination by Mr. McKinney        3656
        Recross-Examination by Mr. Bien             3704
9       Further Redirect Examination by Mr. McKinney 3739

10

11

12

13                      ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBIT INDEX

2                                ---o0o---

3
        PLAINTIFFS'
4       EXHIBIT NO              DESCRIPTION                      EVD

5
        2056               Remedial Order - Exclusion From
6                          Security Housing Unit issued in
                           Madrid                               3743
7

8       2412               8-28-07 Rosen Bien & Galvan Lt.
                           to Coleman Special Master Lopes,
9                          Deputy AG Tillman                    3745

10      2413               1-3-08 Rosen Bien & Galvan Lt.
                           to Coleman Special Master Lopes,
11                         Deputy AG Tillman                    3745

12      2436               Draft of New ASU Screener W/Canning
                           10-10-12 Cover Email                 3745
13
        2456               2010 CDCR ASU Survey-Availability
14                         Of Entertainment Appliances          3746

15      2457               9-21-11 CDCR Follow-Up Survery
                           ASU Entertainment Appliances         3746
16
        2490               Special Master's Rpt. Re:
17                         Recommendations on Dfts' Plan to
                           Prevent Suicides in Ad. Seg.         3748
18
        2600               OIG Rpt. Mngt. of Ad. Seg. Beds,
19                         Cover Lt. by JK to Rice              3749

20      2790               Kahn Reply Decl. Re: Housing &
                           Treatment of Mentally Ill
21                         Prisoners in Segregation             3743

22      2791               Bien Decl. in Opp. to Defts'
                           Motion to Terminate                  3743
23

24

25                                ---o0o---

```
1                              EXHIBIT INDEX

2                              ---o0o---

3
      PLAINTIFFS'
4     EXHIBIT NO            DESCRIPTION                    EVD

5
         2800            Dr. Patterson Rpt. Excerpts
6                        Suicides Completed -
                         Cal. Years 2008, 2009.          3714
7

8        2801            Dr. Patterson Rpt. Excerpts
                         Suicides Completed -
9                        Cal. Year 2010                  3727

10       2802            Dr. Patterson Rpt. Excerpts
                         Suicides Completed -
11                       Cal. Year 2011                  3725

12       2803            Dr. Patterson Rpt. Excerpts
                         Suicides Completed -
13                       First Half of 2012              3725

14

15

16

17

18

19

20

21

22

23

24                             ---o0o---

25
```

1          SACRAMENTO, CALIFORNIA

2        THURSDAY, DECEMBER 19, 2013; 9:40 A.M.

3              ---oOo---

4

5              TIMOTHY BELAVICH

6  Recalled as a witness on behalf of the defendants herein, was

7  previously sworn, examined, and testified as follows:

8          THE COURT:  Mr. McKinney, just to be clear --

9          I'll ask you, Dr. Belavich.  I suppose that's the

10  appropriate way to do this.

11          Dr. Belavich, the documents which Mr. McKinney showed

12  you which he said were not included in the plaintiffs'

13  questioning of you, they were included in the report to the

14  Special Master.

15          Is that right or wrong?

16          THE WITNESS:  Which specific documents?

17          MR. MCKINNEY:  Dr. Belavich, the staffing package.

18          THE WITNESS:  Yes.  Those are part of a larger

19  package, yes.

20          THE COURT:  Okay.  Is there a summary in there

21  somewhere that says what these documents show and will permit

22  the reader to go to the documents that verify -- well, let's

23  start:  Is there a summary?

24          THE WITNESS:  Yes, there's an executive summary that

25  starts it off.

1          THE COURT:  Does the executive summary permit the

2    Special Master to know which document supports the summary so

3    he can go to it and just look at?

4          THE WITNESS:  Yes.  I can't say whether or not there's

5    a table that says it, but the numbers are taken from the

6    specific reports.

7          THE COURT:  What I'm trying to find out is --

8          THE WITNESS:  There's the executive summary, and then

9    if you want to verify something, that's why you go to the

10   underreports.

11         THE COURT:  I understand what you're saying.  I'm

12   asking whether the executive summary points the reader to a

13   specific document or does he have to figure that out by

14   himself or herself?

15         THE WITNESS:  I can't say.

16         THE COURT:  Okay.  All right.

17         MR. MCKINNEY:  Just for clarity of the record, we

18   replaced LLLL, so you now have the corrected version of

19   Exhibit LLLL.

20         THE COURT:  That will be the order.

21              REDIRECT EXAMINATION (CONTINUED)

22   BY MR. MCKINNEY:

23   Q.    Let's talk about the exhibit you were just discussing

24   with the court, Exhibit MMMM.  If you can turn towards the

25   back of this package to the report that you testified was

1    created by the receiver's office.

2         THE COURT:  What do you want me to look at, sir?

3         MR. MCKINNEY:  I believe this is the six-month vacancy

4    summary about five pages from the back of the document -- six

5    pages from the back.  It's page 102.

6    Q.    Is this the report?

7    A.    It does have a line chart on it; is that correct -- a

8    line graph, I believe.

9    Q.    Was that the report prepared by the receiver?

10   A.    Yes.  This is the standard report that is shared with

11   us by the receiver's office.

12   Q.    You testified yesterday that the receiver does not

13   include adjustments for registry.

14        Do you know why the receiver prepares this type of

15   report?

16   A.    What we have here in our packet is a subset of the

17   receiver's vacancy report.  He runs a vacancy report for all

18   positions that fall under him, so nursing, medical, pharmacy,

19   those are all included, and since we've partnered with the

20   receiver in our hiring, our clinical positions now also are

21   generated on that same report.  They cut the mental health

22   positions out of the report.

23        So this is his standard report for all of the

24   positions that fall into the receivership.

25   Q.    Do you have an understanding how this report came to

1    be part of the package provided to the Coleman Special

2    Master?

3    A.    Yes.  I recall in the spring 2012 there was a meeting

4    arranged -- the Special Master facilitated a meeting with the

5    plaintiffs and the receiver's human resources shop, and I was

6    part of that meeting as well.

7         It was to gain a better understanding of the staffing

8    and what the receiver was doing with staffing and with

9    hiring, and as part of that larger meeting, some of this was

10   discussed.  And I recall that this was offered by the human

11   resources staff at the receiver shop as something that could

12   be included as part of a monthly update.

13        My recollection is that's where this came from.

14   Q.    Do you have an understanding how the receiver uses

15   this report?

16   A.    His goal, I believe, is to fill vacancies, hire state

17   employees.  That's our goal as well.  We do need a report

18   that shows us how many civil servant state filled positions

19   we have and how many vacancies we have, and then, of course,

20   it doesn't tell the full picture because we still employ

21   registry in many classifications.  So that's why we need

22   supplemental reports.

23   Q.    But the receiver, to your understanding, would not be

24   interested in the registry because of the --

25        MR. BIEN:  Objection.  Calls for hearsay.

1        THE COURT:  His understanding isn't really relevant.

2    It's a question what the receiver really wants to do.

3        But why is it included in the report to the Coleman

4    Special Master?  Did they ask for it or you decided that

5    would be a useful thing to do or what happened?

6        THE WITNESS:  During the meeting we were all part of,

7    we covered hiring process and all those things, and one of

8    the things was about monitoring vacancies, and the receiver

9    shared that this was one of their reports and that it could

10   be shared if that was of interest, so it was decided that

11   that would be included in the packet.

12       THE COURT:  Okay.

13       THE WITNESS:  It wasn't our request.  It was offered.

14       THE COURT:  All right.

15   BY MR. MCKINNEY:

16   Q.    Doctor, if you could turn to the next to last page of

17   this package or this exhibit entitled "Mental Health

18   Footnotes."

19       What is the significance of this page?

20   A.    This page tries to address to help us be more

21   transparent about what is actually going on.  And yesterday

22   when I spoke about there being a time lag with the entry of a

23   new hire so that it doesn't get onto the report necessarily,

24   this set of footnotes is monitored by or is created by the

25   receiver staff so that we have a more up-to-date realtime of

1    what our hiring is.

2          So the footnotes include hires that have not yet made

3    it onto the formal report of the receiver that will show up

4    there in 45 days.  It's one more piece of the puzzle.

5          THE COURT:  I am obviously not understanding

6    something.  The receiver's efforts at hiring, success or

7    failure, why does it matter to the Coleman Special Master so

8    that it's included in the report to the Coleman Special

9    Master?

10          Do you understand my question?

11          THE WITNESS:  The receiver is in charge of the hiring

12    of our mental health staff.  I'm sorry.  A long while ago

13    before I came to headquarters, the receiver took over

14    responsibility of hiring mental health staff, so that's where

15    this comes from.

16          THE COURT:  Thank you, sir.  Now I understand.

17          THE WITNESS:  Sorry about that.  I probably should

18    have made that clear.

19          THE COURT:  I should have known that.  I forgot it.

20    BY MR. MCKINNEY:

21    Q.    Yesterday you were asked questions about intake cells

22    in administrative segregation.

23          Did you have a chance to review the requirements for

24    intake cells?

25    A.    Yes, I did.

1    Q.      How long are inmates required to be housed in an

2    intake cell after placement?

3    A.      The requirement is 72 hours, unless the person is

4    double selling, and then there's not that requirement.

5    Q.      You also testified about a 21-day requirement.

6            What is that requirement?

7    A.      The 21 days is the requirement for us to do welfare

8    checks.  So even once a patient leaves the intake cell, they

9    will receive three welfare checks per hour for at least

10   21 days, and that's what we now are employing Guard One for.

11   Q.      If you can look at Exhibit LLL before you, the

12   declaration of Kathy Allison, and turn to Exhibit C.

13   A.      Yes, I'm there.

14   Q.      Does this memo describe the practice that you just

15   testified to about the welfare checks?

16   A.      Yes, this was the new direction.

17   Q.      Is that the current practice in the field?

18   A.      Yes, it has been implemented.

19   Q.      Doctor, you also testified yesterday about use of

20   alternative housing.

21           Is there any requirement that you're aware of that

22   prohibits the state from using alternative housing?

23   A.      No, there is not a requirement.  We did not include it

24   in our memorandum to the field and there is appropriate use

25   of alternative housing in some administrative segregation

 1   units.  When a person -- there are patients -- because when a

 2   patient is placed in alternative housing, they are

 3   immediately placed on one-to-one continuous observation until

 4   he's taken out of alternative housing, and at the same time

 5   that he's placed in alternative housing, a referral for a

 6   mental health crisis bed is made.

 7        THE COURT:  What do you mean by one-on-one

 8   observation?

 9        THE WITNESS:  Suicide watch.  The person is brought to

10   the cell front to have constant visual contact.

11        THE COURT:  I'm sorry.  I don't understand.  I'm being

12   stupid, but I don't understand.

13        You have a guy in administrative segregation because

14   that's the alternative housing that is available.  I gather

15   that's why he's there.

16        THE WITNESS:  It may be.  There are different places

17   for alternative housing, but there is some alternative

18   housing in administrative segregation.

19        THE COURT:  That's all I'm talking about.  I take

20   it -- maybe I'm wrong.  As far as you know, do the

21   institutions place people who are in need of transfer to a

22   mental crisis bed into alternative housing located in

23   administrative segregation just because or is it that they

24   don't have any other place to put them or do you know?

25        THE WITNESS:  There's a hierarchy where they should be

1    placed.  So if it comes down to that one of the identified

2    places is a cell in administrative segregation for the

3    administrative segregation patient, he'll be placed in that

4    cell and put on watch.

5            THE COURT:  I think what are you telling me, but I may

6    not be understanding, is that if the housing for the patient

7    was administrative segregation before it became apparent that

8    he needed to be transferred, he's kept in administrative

9    segregation until transportation can be achieved?

10           THE WITNESS:  Yes, but he's not kept in his original

11   cell.

12           THE COURT:  I understand.  He's moved to one of these

13   other cells and he gets the benefits that you describe,

14   which -- I'm sorry, Mr. McKinney.  I just don't understand.

15           MR. MCKINNEY:  No.  This is fine.

16           THE COURT:  He's in an administrative segregation cell

17   and that's true whether he's there as punitive or

18   nondisciplinary, but he decompensates sufficiently so that

19   he's got to go to a mental health -- well, let me go back and

20   be sure that's true.

21           Is it true that no distinction is made between people

22   who are in administrative segregation for disciplinary

23   reasons and nondisciplinary reasons for the purpose of

24   deciding what administrative -- what alternative housing will

25   be utilized?

 1              THE WITNESS:  That's correct, but there's just one

 2       caveat to it.  If an administrative segregation patient

 3       decompensates and has to go into alternative housing, he

 4       doesn't necessarily stay in administrative segregation.

 5              If the facility has an OHU bed and that's available,

 6       he may be transferred to the OHU.

 7              THE COURT:  I think you've answered the question I

 8       started with.

 9              Is it not true or is it true that placing the patient

10       in a segregation cell when he requires a transfer to a mental

11       health crisis bed is a last alternative, given the criteria

12       for where people ought to go?

13              THE WITNESS:  It may not be a last alternative.  We

14       try to place them first in OHUs -- well, first if they can go

15       to a crisis bed, then OHUs --

16              THE COURT:  Obviously.  But this is a question of we

17       don't have a place for him.

18              THE WITNESS:  Then OHUs, and then large cells with

19       water and toilet, and then large cells without water and

20       toilet, and then the hierarchy goes, they could be placed in

21       the CTC or the --

22              THE COURT:  There's a series of criteria of places

23       where they can be put, and you've got to satisfy yourself you

24       can't put them in any of those places because you don't have

25       a space for them, so you put them in administrative

1    segregation?

2            THE WITNESS:  Well, no.  The administrative

3    segregation cell is a cell with water and a toilet.  So

4    that's why it might be higher on the hierarchy than other

5    places.

6            THE COURT:  I see.

7            THE WITNESS:  So, actually, the cell in administrative

8    segregation may be preferable to some other alternative

9    housing.

10            THE COURT:  Okay.  Like everything else in this case,

11    it's just terribly complicated, but I think I now understand

12    how you wind up in administrative segregation.

13            Now the question has escaped me.  Just a moment.

14            But you indicated, when he's put in the cell,

15    administrative segregation cell, then he's subject to 24-hour

16    observation?

17            THE WITNESS:  Yes.

18            THE COURT:  Now, we've talked about the problem or

19    what I perceive to be a problem -- maybe I'm wrong -- which

20    is that in an administrative segregation cell, you've got a

21    solid wall, and, if you're lucky, two windows and otherwise

22    one.

23            So what is the observation that goes on?  What

24    happens?

25            THE WITNESS:  It's just like in a regular housing

1    unit, if the alternative housing is in that unit, we bring a

2    staff member, usually a nursing staff member, who sits in

3    front of that window looking in the cell.  The cell doesn't

4    have the patient's things to harm him there.

5            THE COURT:  Okay.

6            THE WITNESS:  But he's on constant watch with the

7    nursing staff and an alarm, so if the patient attempts harm,

8    we can send up the whistle.

9            THE COURT:  Let me say that I don't know, and maybe my

10   perception is wrong, and God forbid I have to go out and look

11   at one of these things.  I have no intention of doing so.

12           I'm asking you, not telling you, because I don't

13   really know, if you plant a nurse in front of one of these

14   windows, she can see the entirety of the cell, so she can

15   really actually watch the inmate?

16           THE WITNESS:  They have pretty good visual, and if

17   there's ever a concern, for example, I know that I've been

18   told at times there could be a concern, because when the

19   patient is in the back of the cell, they're easier to see.

20   If they can get below the door and the window, it may be

21   difficult to see.

22           If that happens, she gives the direction for them to

23   come out so that they can be seen.  If they don't, she would

24   alert custody, and we would have a concern.

25           THE COURT:  Thank you.

1          I'm sorry to have interrupted, Mr. McKinney.

2          MR. MCKINNEY:  I think it's helpful, Your Honor.

3     Q.     Where does alternative housing fall on that hierarchy

4     you just described?

5     A.     We call them wet cells, cells that have water and

6     toilet.

7     Q.     It would be used typically after other options are

8     considered and unavailable.

9          Is that correct?

10    A.     Exactly.  It's the same hierarchy for those in

11    administrative segregation as those not in administrative

12    segregation.

13    Q.     The Special Master reports on use of alternative

14    housing within CDCR.

15         Is that correct?

16    A.     Yes, and we've worked with his team on changes to

17    alternative housing and to reducing it.

18    Q.     What is the typical length of stay in alternative

19    housing placement?

20    A.     Our goal is always as quickly as possible, but our

21    true goal is no more than 24 hours.  And whenever my

22    healthcare placement unit who transfers patients to crisis

23    beds -- whenever someone has stayed in alternative housing

24    longer than 24 hours, that triggers a contact with the

25    facility that housed that patient for too long and they do

1    problem solving as to why that occurred, because our goal is

2    to move them quickly.

3    Q.    During the entire time that the inmate is in that

4    placement, whether it be minutes or 24 hours or more, they're

5    under continuous observation.

6         Is that right?

7    A.    That's correct.

8    Q.    Doctor, do you have an understanding as to whether,

9    for example, RJ Donovan uses alternative housing beds in

10   administrative segregation for inmates who are not already in

11   administrative segregation?

12   A.    My understanding is that they use administrative

13   segregation alternative housing for individuals in

14   administrative segregation.

15        THE COURT:  Only?

16        THE WITNESS:  Yes, that's my understanding.  They have

17   cells outside administrative segregation for

18   nonadministrative segregation patients.

19   BY MR. MCKINNEY:

20   Q.    If I could direct your attention to Exhibit 2782,

21   which is in front of you, the declaration of Daniel Paramo.

22        THE COURT:  27 --

23        MR. MCKINNEY:  82.

24   Q.    If I can direct your attention to paragraph 7.

25   A.    I'm there.

1    Q.    Read the second sentence of that paragraph.

2    A.    (Reading:)

3              Per local operating procedure 160, alternative

4              housing at RJD alternative housing cells are

5              designated on a special needs yard for special

6              needs inmates, a mainline yard for non-special

7              needs inmates, and in administrative segregation

8              unit for administrative segregation inmates.

9    Q.    So is that consistent with your understanding you just

10   testified to?

11   A.    Yes, that's my understanding.

12   Q.    Doctor, for Los Angeles County, if I could direct your

13   attention to Exhibit 2783, the declaration of Christopher

14   Cornell.

15         THE COURT:  Hang on.

16   BY MR. MCKINNEY:

17   Q.    If I could direct your attention to paragraph 4,

18   looking at the middle of the paragraph, beginning on line 24,

19   is this also consistent with your understanding that

20   Los Angeles County does not use alternative housing

21   placements in ad seg for non ad seg inmates?

22   A.    That's correct.  Per this, they do not.

23   Q.    To your knowledge, is there any requirement that would

24   prohibit the state from using cells in administrative

25   segregation unit for alternative housing placements?

1   A.      No, I'm not aware.

2   Q.      Doctor, there's been testimony both Friday and

3   yesterday about the length of stay reports that CDCR recently

4   begin issuing.

5           When did CDCR first begin issuing those reports?

6   A.      My recollection of the report that we have here in

7   court is that one has been relatively newly uploaded for only

8   a couple of months because there was a problem with the

9   previous report that had been uploaded.

10  Q.      What other information do clinicians have available to

11  them about their patients?

12  A.      Clinicians would not be using that report.  Clinicians

13  go to the mental health tracking system, and in that, they

14  can pull up the history of appointments, the history of where

15  patients have been housed.  They get a much more robust

16  picture from the mental health tracking system than they do

17  from the report we saw here in court.

18  Q.      Do clinicians also track Coleman class member's

19  participation in therapeutic treatment?

20  A.      Yes, they do.  Through the mental health tracking

21  system, we track therapeutic activity.

22  Q.      Is that done on an individual basis, patient by

23  patient?

24  A.      Yes, it is.

25  Q.      How is that used by the clinicians?

1    A.      It's used by the clinicians as an ongoing issue of

2    treatment.  It's also used in the interdisciplinary treatment

3    teams that are held, and, for example, if there is an issue

4    or concern with a patient not going to group, that's one of

5    the criteria that can trigger a referral -- it triggers a

6    discussion about whether a referral needs to be made for the

7    patient to the Department of State Hospitals.  It's one of

8    the criteria that is monitored, attendance.

9    Q.      If I can direct your attention to GGGG.

10    THE COURT:  Dog?

11    MR. MCKINNEY:  G, as in George.

12    Q.      You were asked questions about a couple of

13    institutions, in particular, Los Angeles County and the

14    California Men's Colony yesterday.

15         First, from Los Angeles County, how many hours were

16    scheduled during the time period reflected in this report?

17    A.      They were scheduling on average of 11.73 hours of

18    therapeutic activity.

19    Q.      What about for the California Men's Colony?

20    A.      They were scheduling 12.76 hours on average.

21    Q.      And as you testified last Friday, that exceeds program

22    guide requirements.

23         Correct?

24    A.      The amount of time scheduled, yes.

25    Q.      The time schedule is what's required by the program

1    guide.

2          Is that right?

3    A.      That's correct.

4    Q.      You were also asked whether you followed up on the

5    number of hours attended at a particular institution.

6          Who would typically follow up on that type of an

7    issue?

8    A.      That would be our regional staff, our regional chiefs,

9    who also have a staff under them.  Our regional chiefs are in

10   institutions on a regular basis.  Monthly, they hit all their

11   institutions with the exception of a couple that they have a

12   little bit longer timeline on, but on a regular basis,

13   especially in our institutions where we have programs, the

14   regionals are there and they're talking with the management

15   team and they're talking with the management team about their

16   numbers.

17         If there's an issue or challenge that can't be solved

18   on the regional and local level, that's when they would loop

19   me in to have a conversation, most probably with the Chief of

20   Mental Health and the Chief Executive Officer of the

21   institution.

22   Q.      If I could focus your attention on --

23         THE COURT:  Before you leave that, is the issue:

24   Treatment offered or treatment taken or both?

25         THE WITNESS:  It could be both or either.

1              THE COURT:  Thank you.

2              THE WITNESS:  It's any time we have a significant

3     anomaly.

4     BY MR. MCKINNEY:

5     Q.     If I could focus you on Exhibit 2120 in the exhibit

6     binder for Dr. Stewart.

7              What's shown on this document?

8     A.     This is similar to what we've been speaking about, but

9     it shows the number of hours scheduled, offered, attended,

10    refused and cancelled for our EOP programs and PSU programs

11    in administrative segregation from June 1st through June 28th

12    of this year.

13    Q.     What does the data reflect about scheduled treatment

14    hours?

15    A.     Again, for this catchment period, all of our

16    institutions were able to schedule at least ten hours of

17    therapeutic treatment, all but one were able to offer ten

18    hours of therapeutic treatment, and then the rest of the

19    comps flow with attended and refused and cancelled.

20    Q.     Again --

21             THE COURT:  I don't understand something.  Help me

22    here.

23             What is the difference between scheduled and offered?

24    You schedule something.  Don't you just say to people:  Now

25    is the time you can go?

 1            THE WITNESS:  No.  Because you have institutional

 2    cancellations, for example.  You have a lockdown where

 3    everything gets shut down, so --

 4            THE COURT:  But that would be in the cancelled

 5    section, wouldn't it?

 6            THE WITNESS:  Yes.  You have scheduled as your total

 7    possibilities, and then you subtract the cancellations

 8    because -- that's how you get offered.

 9            THE COURT:  All right.

10            THE WITNESS:  Because if -- yeah.

11    BY MR. MCKINNEY:

12    Q.    Again, with respect to scheduled hours, this exceeds

13    the program guide requirements for this period?

14    A.    Yes, it does.

15    Q.    And for offered, the institutions were also above the

16    ten-hour average.

17            Is that correct?

18    A.    Yes, with the exception of Pelican Bay.  They were at

19    9.52 hours.

20    Q.    Yesterday, plaintiffs' counsel asked you about whether

21    mental health tracks yard time for inmates in administrative

22    segregation.

23            Who tracks that time?

24    A.    That's a custody function.  They track the yard time.

25    Q.    Is that appropriate?

1    A.      Yes.

2    Q.      Why is that?

3    A.      It doesn't make sense for me, that mental health would

4    track yard time.  We track yard time when it is part of a

5    therapeutic activity.  It would make as much sense as having

6    custody track mental health appointments.

7    Q.      In your experience, do custody communicate with mental

8    health staff if an inmate is not going to yard?

9    A.      Yes.  In my experience, that does happen and there are

10   regular opportunities for that, most specifically at the

11   daily check-in meetings that happen in administrative

12   segregation that were started somewhat recently, and that's

13   where custody and mental health staff come together and

14   discuss patient issues.

15          That's where quite frequently mental health staff are

16   updated on anything that has occurred within the last day

17   within the unit that may be of concern.  It's very similar to

18   what we call huddles in our primary care treatment model in

19   the institutions, and that's where the healthcare providers

20   get together to discuss patients.

21   Q.      Last Friday you were asked about the movement of

22   inmates into the psychiatric services unit from Pelican Bay

23   to Sacramento.

24          Do you recall that testimony?

25   A.      Yes, I do.

1    Q.      Has CDCR closed the psychiatric services unit at

2    Pelican Bay?

3    A.      No, we have not.

4    Q.      Is there any intention to do so?

5    A.      I'm not aware of a plan to close it at this point, no.

6    Q.      Are you aware of any requirement that CDCR has

7    permission to transfer inmates between programs?

8    A.      No.  I was not aware of any requirement for

9    transferring the patients that I would need to notify anyone.

10   Q.      Is it necessary for the department to have the ability

11   to manage patient movement without having to seek permission

12   on every occasion?

13   A.      Yes, I think it helps us move patients more quickly.

14   For example, when there's one less layer of things we need to

15   go through.

16   Q.      If you could turn to DDDD.

17           Doctor, does the department track other metrics for

18   mental health other than what's shown on this compliance

19   chart?

20   A.      Yes.  We have a huge number of metrics that have been

21   developed over recent years.

22   Q.      Why are these particular metrics selected?

23   A.      To me, these are some of the big onces.  We want to

24   know if patients are being seen and if they are being seen

25   timely, and if they're getting their group treatment.  Those

 1    are some of our major issues.

 2         There are also things we track on our dashboard.  We

 3    have to choose what goes on our dashboard because we have so

 4    many metrics.  When we have good reason to, we may actually

 5    change our dashboard and introduce new metrics, but we try to

 6    keep it somewhat contained so it also doesn't become also

 7    overwhelming.

 8    Q.    Yesterday you testified about the continuous quality

 9    improvement process.

10         Can you describe that process.

11    A.    Sure.  It was a team effort with the Special Master's

12    team and also with plaintiffs on developing a quality

13    improvement tool that would be used by our regional teams to

14    go on a quarterly basis to our institutions and evaluate the

15    programs.

16         We did our first run in the spring.  We all got

17    together and integrated feedback from everybody who had been

18    involved and tweaked the tool.  Our teams are out there now

19    re-piloting with the Special Master's team, and we plan, I

20    think sometime in January, to come up with sort of the final

21    draft of where we are.

22         But I think it's been a fruitful venture and I've

23    heard only positive feedback from all parties involved with

24    the development of the tool.

25    Q.    If I could turn your attention to 2669, which is the

1    Special Master's report on the process.

2           Is that correct?

3    A.    Yes, that's correct.

4    Q.    You were asked some questions yesterday about Exhibit

5    F.

6    A.    That's correct.  It's a copy of a dashboard.

7    Q.    Can you describe how that document was created or what

8    went into the document?

9    A.    Yes.  This document was created in working with the

10   Special Master's team as an example of our dashboard, and

11   I've been informed that this is not valid data and that this

12   was dummy data in many respects.

13          The Special Master's team was aware of that, but it

14   was generated as an example of what our dashboard will look

15   like and to be included then, obviously, in the report.

16   Q.    If you could turn to page 13 of the report, right

17   below heading four it says:  "See exemplar of a dashboard

18   screen shot, Exhibit F."

19          It's your understanding this was simply an exemplar;

20   is that right?

21   A.    Yes, and I confirmed that with my staff.

22   Q.    This was created as part of developing the quality

23   improvement process.

24          Is that correct?

25   A.    That's correct.

1          THE COURT:  I'm sorry.  Where are you reading from?

2          MR. MCKINNEY:  Right above heading four, the

3     parenthetical.

4          THE COURT:  Yes, thank you.

5     BY MR. MCKINNEY:

6     Q.     Yesterday the court asked you a series of questions

7     about predictors of an inmate's ability to successfully

8     program administrative segregation.

9          Do you recall that testimony?

10    A.     Yes, I do.

11    Q.     Are you able to generalize a set of factors that would

12    predict whether or not an inmate can successfully program in

13    administrative segregation?

14    A.     No, I believe it's unique to the individual.  As we

15    spoke yesterday, people have a variety of coping skills and

16    they have a variety of coping skills given different times of

17    their life or given different circumstances, so, no, I don't

18    have the answer that that's any hard and fast predictor.

19    Q.     Friday you testified about the screening tool that

20    CDCR uses.

21         Which inmates are screened prior to placement in

22    segregation?

23    A.     All inmates get the brief screen that would trigger

24    referral through nurse and then our non-mental health inmates

25    will receive the 31 item screen and if they participate and

1    take the screen, then it's completed.  If they refuse the

2    screen, that triggers a referral to mental health.

3    Q.    Does the screening identify inmates who may not be

4    appropriate to be currently placed in segregation?

5    A.    Yes.  It could trigger referral for mental health for

6    placement in a crisis bed or even potentially a referral to

7    the Department of State Hospitals.

8    Q.    For Coleman class members in a segregated housing

9    setting, you've testified about the numerous clinical

10   contacts they received.

11        Do clinicians get a sense of how the patients are

12   doing?

13   A.    Yes, I believe our clinicians know our patients very

14   well.  As I had heard previous testimony, I agree that our

15   custody staff frequently know our patients very well also and

16   are a good source of information.  When you go on a unit, the

17   custody officers will know who is having difficulty and who

18   is not.

19   Q.    If an inmate is not doing well, what occurs?

20   A.    Again, it could trigger formal referral through mental

21   health.  It should come up, obviously, at the daily meetings

22   that are held within administration segregation.  That's an

23   opportunity for all the staff clinical and nonclinical --

24        THE COURT:  Stop.  Let's take a break for the

25   realtime.

1                              (Whereupon, a break was taken at 10:28

2                         a.m.)

3                              (Nothing Omitted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3682

1          (On the record at 10:45 a.m.)

2          THE CLERK:  Please, remain seated.

3          Court is now in session.

4          THE COURT:  Mr. McKinney.

5          MR. MCKINNEY:  Thank you.

6    BY MR. MCKINNEY:

7    Q.    Doctor, before the break, I'm not sure if your

8    response to my last question was recorded, so I'll ask the

9    question again.

10          If an inmate is not coping well in segregated

11    housing, what occurs?

12   A.    Several things can occur.  A formal referral can be

13   made to mental health to see the patient, but also the issue

14   should come up at the morning meetings between custody and

15   mental health staff who meet daily to talk about issues that

16   have occurred in the unit.  So those are two of the main ways

17   that the issue will come up.

18          The Interdisciplinary Treatment Team may be another

19   venue, although those don't happen as frequently as those

20   other two activities.

21   Q.    What actions can the team take?  Can a referral be

22   made, for example?

23   A.    Yes.  The Interdisciplinary Treatment Team or

24   clinician can start the process of referral to the Department

25   of State Hospitals.  But additionally, the individual

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3683

1    clinician can also refer to a mental health crisis bed if

2    there are issues.

3    Q.    And if an inmate is referred to the Department of

4    State Hospitals, how long can that inmate stay there?

5    A.    They can stay indefinitely.  We have some patients

6    who are there for a very long time.

7    Q.    Doctor, plaintiffs' counsel has taken the position in

8    this litigation that clinical staff should be making

9    decisions about whether an inmate should remain housed in

10   segregation.

11         Is that appropriate?

12   A.    No, I don't believe it is appropriate for clinicians

13   to make that decision.

14   Q.    Why is that?

15   A.    There are several concerns.  One, our clinicians

16   aren't experts in any way in terms of housing or the issues

17   that place patients in administrative segregation versus

18   other housing.  But more importantly, for me, there are

19   problems either way it goes.

20         If a clinician says a patient can be in

21   administrative segregation housing, that will more than

22   likely destroy any therapeutic relationship because they're

23   sending the patient to administrative segregation when the

24   patient doesn't want to be there.

25         And also the flip side of that is, I think, that

3684

1    putting that task on our clinicians, they will be very

2    hesitant to say that it is okay for a patient to be in

3    administrative segregation.  I think they'll always err on

4    the conservative side.

5         THE COURT:  That's because -- I'm stating the

6    obvious, I think that the record is clear -- that's because

7    administrative segregation is a stressor.  The very nature of

8    it is we're trying to punish people, and that's a stress and

9    it may have consequences.

10        THE WITNESS:  It may.  Absolutely.  So they'll err on

11   that side.

12        THE COURT:  Right.  So I mean, there are people -- it

13   would seem to me, you can tell me you don't agree.  It is

14   okay.

15        There are people who are clearly very ill, and the

16   likelihood of their being unable to cope with administrative

17   segregation is high simply because of the state that they're

18   in.

19        Is that right or wrong?

20        THE WITNESS:  Yes, I agree with you.

21        THE COURT:  All right.

22        Now, as to those people one would think, as a simple

23   medical matter -- a clinical matter, great care should be

24   taken about whether they're put in administrative segregation

25   or not?

3685

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  And the people who are most capable of
 3    doing that are the clinicians who deal with them?
 4              THE WITNESS:  Yes.  They know their patients,
 5    obviously, better than others.
 6              THE COURT:  Right.  On the other hand, there are
 7    members of the Coleman Class who are sufficiently stable so
 8    that -- and have -- I understand that there is a very serious
 9    problem about nondisciplinary persons in administrative
10    segregation.  Setting that aside, there are people who are,
11    while in the Coleman Class, sufficiently stable that having
12    committed acts justifying placement in administrative
13    segregation it does not represent a significant threat to
14    their mental well-being?
15              THE WITNESS:  I would agree with you on that.
16              THE COURT:  And those people, the clinician would be
17    free to say, Sure, I mean, if the guy's done what he
18    shouldn't have done, and he's sufficiently stable, put him
19    away.
20              THE WITNESS:  The clinician would be free to do that.
21    I'm hesitant to say that they would do that.  I think they
22    would err on the side of, God forbid, this is the guy who is
23    going to, you know, try to make a statement and, you know,
24    harm himself but not kill himself and he actually succeeds.
25              You know, you have those kinds of guys.
```

3686

1          THE COURT:  That's true anyhow.  That's true anyhow.

2          If you put people who are very sick, who are

3     unstable, into administrative segregation, God forbid

4     something terrible is going to happen.  The likelihood of

5     that happening is much greater.

6          If clinicians are able to say this person is stable

7     enough or appears to be stable enough, that's a different

8     standard.  And you're saying your clinicians would not do

9     that because administrative segregation is sufficiently

10    stressful so that if they agreed, they would be harming the

11    clinical relationship?

12          Is that what you are saying?

13          THE WITNESS:  There is that potential.

14          But I think what we're just talking about, where

15    they're going to err on the side of being conservative, I

16    think that many of our clinicians are very risk adverse.

17          THE COURT:  As they should be.

18          THE WITNESS:  Yes.  So they're not going to take the

19    stand to say he can go in.  And so I think --

20          THE COURT:  So your view is that we're better off

21    sending people who are unstable -- clearly unstable into

22    administrative segregation and having them decompose than

23    taking the risk about these other people?

24          THE WITNESS:  No, I'm not saying that.

25          THE COURT:  No, of course not.  It makes no sense.

3687

```
 1          THE WITNESS:  Absolutely.

 2          THE COURT:  I didn't mean that.  Strike that.

 3          I mean, we're now at the heart of what I think is the

 4     real problem.  Prisons are prisons.  Mental institutions are

 5     mental institutions.  And unfortunately, in California, we've

 6     turned the prisons into mental institutions.

 7          And the problem then gets to be how do you treat

 8     people who are clearly sick, but are violating rules that

 9     custody believes are necessary for a safe and sane

10     institution?  Strike sane.  That's not going to happen in

11     this world.  And the question is trying to balance those two

12     issues.

13          I think what you are telling me, and I want to be

14     blunt about it, is your clinicians, being health oriented,

15     are going to err on the side of making -- if they were put in

16     that position -- of making judgments that let's not risk it?

17          THE WITNESS:  Yes.

18          THE COURT:  And therefore, they surrender the

19     appropriate -- you think the appropriate thing is to

20     surrender that judgment to custody people who will not make

21     the judgment at all?

22          THE WITNESS:  And I guess what I'm saying is I don't

23     think it can fall solely on mental health.

24          THE COURT:  I'm sorry?

25          It can fall solely on mental health.
```

3688

1          I'm not sure I understand what you are saying, and I

2     think I cut you off.

3          THE WITNESS:  That's okay.  My understanding of the

4     question is should mental health make that decision.

5          THE COURT:  They're the only people capable of making

6     that decision.  It is a clinical decision.  How sick is this

7     person?  How strong -- how stable is he?  How much is he able

8     to tolerate the rigors of administrative segregation?

9          Those are all questions that fall within the field of

10    mental health, not custody.

11         THE WITNESS:  And I -- as I've been conceptualizing

12    this, I'm thinking of it as if I was the case manager of a

13    patient, and I'm being asked does he go or not go.

14         I don't know if perhaps it makes more sense to look

15    more at a team approach within mental health to have that

16    kind of input.  I don't have that answer.

17         But I think if you ask the one clinician, you know,

18    you are the sole -- you are the sole decider of whether this

19    person goes to mental health -- to Ad. Seg. or not, I

20    think -- I just don't think that's the answer either.

21         THE COURT:  Right now nobody asks mental health.

22    They say he did this crime -- or not crime necessarily -- but

23    this violation of the rules, and that's worth 60 days or 30

24    days or 40 days in administrative segregation.

25         Nobody asks, Gee whiz, is this guy sufficiently

3689

1   stable to withstand the rigors?

2          Am I right?

3          THE WITNESS:  That's correct.  Yes.

4          THE COURT:  All right.  At minimum -- I'm asking you,

5   not telling you.  At minimum should custody consult with

6   mental health concerning at least Coleman Class Members as to

7   their ability to withstand the rigors of administrative

8   segregation?

9          THE WITNESS:  I believe so.

10         THE COURT:  But you've also said you doubt very much

11  it would be useful because most of your clinicians will say

12  let's err on the part of -- on the side of care.

13         THE WITNESS:  Not necessarily.  And I'm -- I'm

14  developing this as we're talking.

15         THE COURT:  Yeah.  I mean, part of this problem is at

16  some point I'm going to have to make some very, very

17  difficult decisions arising out of the very serious problem

18  that involves turning the prisons into mental health

19  institutions.

20         I don't know any more than you -- probably less than

21  you do as to what the appropriate approach is.

22         THE WITNESS:  One of the things I consider is

23  whether -- we have a system set up for the rule violation

24  process where mental health writes a report and then it goes

25  to the hearing officer who gives his penalty and states

3690

1    whether or not -- you know, whether it should be mitigated.

2         Potentially, as my thoughts go, there may be a more

3    significant role for mental health in that process.  And then

4    that can also mirror mental health's input into this person's

5    ability to withstand administrative segregation.

6         And I would prefer if that task is placed on our

7    clinicians that it be a mental health team decision.

8         THE COURT:  Okay.

9         THE WITNESS:  And, you know, the team meets and

10   discusses it so that you have everything out on the table.

11   And it's also then a team decision and you don't have

12   necessarily the one person who has to stand out there.

13        But that would be input with custody.

14        THE COURT:  One problem, it's been suggested

15   somewhere in one of these hearings -- I mean, this has been

16   going on since June.  And I can't remember who said what

17   about when.

18        Oh, I think it was Dr. Haney who said that the

19   problem is how much heft is given to the clinician's opinion.

20   And I'm not sure that there's any way to solve that problem.

21   That's a problem of how we allocate authority and so forth.

22        At minimum -- asking you, not telling you again.  At

23   minimum, if the team concept were adopted, and the team

24   decides, Look, this person is sufficiently unstable, and they

25   send it to the custody officer who is going to make the

3691

1    decision about whether the person goes in anyhow, what is

2    given to that officer?

3         Just the opinion that this person is unstable, or

4    does the committee try and convey their own understanding of

5    the person's condition?

6         Or what happens?

7         You see what I'm asking you?

8         THE WITNESS:  Absolutely.

9         It is something that we've talked about with the RVR

10   process where we are trying it.  As you know, it may make

11   more sense rather than to have this piece of paper that says

12   something, to also have the clinician present so that they

13   can emphasize, highlight, clarify why they came about their

14   opinion, to make it, you know, a discussion.

15        THE COURT:  I'm sorry.  I don't have Mr. Stainer back

16   here because I would like to ask him a whole bunch of

17   questions about whether this is a practical way of dealing

18   with the problem and how much administrative difficulty would

19   be tendered by such a program.

20        MR. MCKINNEY:  Your Honor, may I address the court?

21        THE COURT:  Yeah.  Go ahead.

22        MR. MCKINNEY:  If the court is truly interested in

23   that, we would be happy to suspend the proceedings to discuss

24   these issues or --

25        THE COURT:  I'm inclined -- I mean, the problem is

3692

1   we're coming up to the holidays.  You know, we're going to

2   lose all our time anyhow.

3        The other alternative, Mr. McKinney, and I keep

4   hating to -- because I keep putting more and more jobs on the

5   Special Master.  You know, it's just -- at some point -- I

6   mean, he's hiring people, but at some point nobody can -- but

7   one other alternative is to recognize what the problem is,

8   recognizing that it presents administrative difficulties --

9   or it may actually, I don't know whether it would -- and

10  simply instruct the Special Master to consult and to do his

11  magic with mental health and custody and see whether the

12  problem can be worked out and give me a report.

13       That may be the most sensible way of proceeding

14  rather than my doing it without really having -- I mean, the

15  Special Master can talk to people and spend time in a way

16  that I really can't.

17       MR. MCKINNEY:  I mean, that being the case, Your

18  Honor, and I would defer to my cocounsel, I think, you know,

19  we might as well finish if that's the case.  You'll hear

20  argument.

21       THE COURT:  Fair enough.

22       MR. MCKINNEY:  Obviously we believe the care is being

23  approved and it is appropriate.

24       THE COURT:  Okay.

25       Go ahead.

3693

1          Please, continue.

2     BY MR. MCKINNEY:

3     Q.      Doctor, you just discussed input that mental health

4     has into the rules violation process.

5              Can you and your staff, working with custody, develop

6     a system where mental health might have more input?

7              THE COURT:  Without a court order?

8              I mean, if I order it, yes, it is going to happen.

9              MR. MCKINNEY:  Yes.  That was my question.

10             THE WITNESS:  It is always preferable without.

11             Yes.  I think we -- I think we can.  Again, I've had

12    informal conversations about it with different individuals.

13    And, you know, I think we can explore it.

14    BY MR. MCKINNEY:

15    Q.      And as part of the ICC, the Institutional

16    Classification Committee process, do mental health

17    participate in that process?

18    A.      Yes, they do.

19    Q.      What is their role?

20    A.      They, in my experience, witnessing the ICC, they

21    usually speak to the individual just before the committee

22    begins to make sure they are doing okay.

23             They ask them a few brief questions.  They ask them

24    if they understand how to access mental health services.

25    They ask, you know, how they're doing.  And they look for

3694

1    behavioral signs, if this person needs a referral.  And then

2    they allow the committee to proceed.

3            They confirm also that the individual understands

4    what's happening in the ICC.

5    Q.      In that committee is the committee responsible for

6    imposing SHU terms?

7            Is that right?

8    A.      Yes.

9    Q.      And there was testimony about if an inmate is too

10   sick to be in administrative segregation, do mental health

11   clinicians have the option of not placing that inmate in

12   segregation?

13   A.      Yes.  If they're sick enough, they can be placed in a

14   crisis bed or, again, as we've talked, the referral to the

15   Department of State Hospitals.

16   Q.      And Doctor, if I could refer you to your March

17   declaration, which is Exhibit XXX.

18            MR. MCKINNEY:  May I approach, Your Honor?

19            (Counsel helps witness locate exhibit.)

20   BY MR. MCKINNEY:

21   Q.      If I could direct your attention to Exhibit D of that

22   declaration.

23              (Exhibit published.)

24            Doctor, what is shown on this document?

25   A.      This is the number of referrals we make broken down

3695

1    by institution, the referrals to the Department of State

2    Hospitals to the Intermediate Care Facilities.

3    Q.      And looking at the data for 2013, again this

4    declaration was submitted in March.  How many referrals were

5    completed for intermediate care?

6    A.      156 by the end of February.

7            Let me confirm.

8            Yeah.  It looks like it is broken off, but I assume

9    the first two months are February -- are 2013, January and

10   February.  There was 77 and 79 referrals.

11   Q.      Thank you, Doctor.

12           Looking at the next exhibit, Exhibit E.

13               (Exhibit published.)

14   A.      This is the referrals to the Acute Care Programs from

15   the Department of State Hospitals.  And again in 2013 the

16   first two months we referred --

17           THE COURT:  I can't read the number.

18           MR. MCKINNEY:  Move it in here.

19           (Image enlarged.)

20           THE WITNESS:  We referred 136, if my math is correct,

21   yes, at that point, by the end of February of this year.

22   BY MR. MCKINNEY:

23   Q.      Then finally, Doctor, if you can, look at the next

24   exhibit.

25               (Exhibit published.)

3696

1          Exhibit F.

2    A.      So this reflects crisis bed referrals --

3    institutional referrals.  So within the institution.

4          And in January 1st through March 21st there were 1700

5    referrals to crisis beds.

6    Q.      So you would agree that the clinicians are, in fact,

7    referring inmates both to the Department of State Hospitals

8    and to crisis beds?

9    A.      Yes, they are.

10   Q.      Similar to the prior questions, Doctor, when an

11   inmate is treated in a Crisis Bed Unit or at the Department

12   of State Hospitals, and is stabilized and returned to CDCR,

13   who makes the decision -- who should make the decision about

14   where that inmate should be housed?

15   A.      Because of all the factors that may be involved with

16   the case, I believe that's, again, a custody decision.  Our

17   clinicians don't have that expertise.

18   Q.      Just as an example, if an inmate is serving a

19   security housing unit term, was then referred to the

20   Department of State Hospitals, then returns to CDCR, would it

21   be appropriate for the clinician to make the determination

22   about whether that inmate should return to the security

23   housing unit to serve out the sentence?

24   A.      Again, that would be a difficult task for our

25   clinicians to do as we discussed earlier.  Yes.

3697

1   Q.      For the same reasons?

2   A.      Yes.

3   Q.      Doctor, I would just like to discuss briefly the

4   report by Mr. Hayes.

5           If you could return to Exhibit 2627.

6   A.      It is marked "Exhibit 50" on the front?

7   Q.      Correct.

8           Doctor, what is the date of this report?  And I'll

9   refer you to the second page of the report.

10  A.      It's dated August 16th, 2011.

11  Q.      Doctor, when did you become the statewide mental

12  health director for the department?

13  A.      March of 2012.

14  Q.      Do you know whether decisions were made concerning

15  this report before you were made the director?

16  A.      No.  No, I don't know what the history of this report

17  is.

18  Q.      And were you the primary point person for working

19  with Mr. Hayes and his report?

20  A.      No.  I never met Mr. Hayes until in the last month or

21  two.  I had that email come with him.  That was it.

22  Q.      Doctor, you were asked yesterday about whether CDCR

23  responded to recommendations made by Mr. Hayes and other

24  experts.

25          Is that addressed in your March 2013 declaration?

3698

1    A.      Yes.  Yeah.  There are several paragraphs that

2    describe how we addressed the Hayes recommendations.

3    Q.      We won't go through them, but just for reference if

4    you could look at your declaration again, Exhibit XXX.

5            Doctor, directing your attention beginning at

6    paragraph 18, are paragraphs 18 through 25 the paragraphs

7    that address the Hayes Report?

8    A.      Yes.

9    Q.      And continuing on, beginning at exhibit -- sorry --

10   paragraph 26 through paragraph 39, are these the paragraphs

11   that address the report prepared by the state's experts?

12   A.      26 through -- what was it?

13   Q.      39, I believe.

14   A.      39?

15           Yes.

16   Q.      Doctor, if I could direct your attention to

17   Exhibit 2459, which is the large spreadsheet.

18   A.      Yes.

19   Q.      What does this document reflect?

20           THE COURT:  I mean -- well, all right.  If there is a

21   single answer, you can answer.

22           THE WITNESS:  This was, again, a compendium that I

23   directed be put together that tried to bring into one place

24   any recommendation we had ever received from any formal

25   report by any of our experts.

3699

BY MR. MCKINNEY:

1

2  Q.      Does this reflect things that the state was working

3  on in response to those reports?

4  A.      Yes.  Many of the things were things the state had

5  currently undertaken or undertaken in the past.  It also

6  includes information on some of the recommendations that we

7  had not maybe agreed with or had not followed or implemented.

8  Q.      Had CDCR considered all the recommendations at the

9  time this was prepared?

10 A.      Yes.  And I think that's reflected in the document.

11 Q.      And had some of those recommendations been

12 implemented?

13 A.      Yes.  Definitely.

14 Q.      And based on what CDCR's done, is there any truth to

15 the assertion that the department buried the Hayes Report?

16 A.      No.  I think it's obvious that we followed through on

17 some of those recommendations.  For example, you can

18 physically go and see suicide resistant beds.  And I believe

19 that was one of the recommendations of the report.

20 Q.      Doctor, yesterday you were asked about

21 recommendations made by the experts retained by the state.

22         Are you aware of the findings of those experts?

23 A.      Yes.  There was a report that my staff also included

24 of the recommendations in the compendium.

25 Q.      Doctor, if I could direct your attention to

3700

1    Exhibit HHH.

2            THE COURT:  Hang on a second, Mr. McKinney.

3            MR. MCKINNEY:  This is my last exhibit.

4            THE COURT:  Oh, all right.

5            MR. MCKINNEY:  May I approach the witness?

6            THE COURT:  Of course.

7            (Counsel helps witness locate exhibit.)

8    BY MR. MCKINNEY:

9    Q.    Doctor, is this the report that you just referenced?

10   A.    Yes, it is.

11   Q.    Doctor, if I could direct your attention to page 21

12   of the report.

13   A.    Okay.

14   Q.    Under the heading "5.  Administrative Segregation

15   Unit."

16   A.    Yes.

17   Q.    The second sentence states:

18          (Reading:)

19          All CCCMS inmates we identified in ASU --

20          (Reading interrupted.)

21            MR. BIEN:  Objection.  Beyond the scope of cross.

22            THE COURT:  Overruled.  You may proceed.

23   BY MR. MCKINNEY:

24   Q.    (Reading:)

25          All CCCMS inmates we identified in ASU were provided

3701

1              appropriate services and periodically assessed to

2              evaluate if they needed a higher level of care.

3              (Reading concluded.)

4         THE COURT:  Where are you reading from?

5         MR. MCKINNEY:  Your Honor, this is the second

6    sentence under the heading "5.  Administrative Segregation

7    Unit."

8         THE COURT:  I'm looking at --

9         MR. MCKINNEY:  Page 21.

10        THE COURT:  I'm on 21.  I'm looking at 5.

11        Oh, it says:  (Reading:)

12              All CCCMS inmates we identified in ASU were provided

13              appropriate services...

14              (Reading concluded.)

15              Is that where you are?

16        MR. MCKINNEY:  Correct, Your Honor.

17        THE COURT:  Okay.

18   BY MR. MCKINNEY:

19   Q.    Doctor, does this reflect the opinion of the state's

20   experts with respect to care provided to CCCMS in

21   administrative segregation?

22   A.    Yes, it does.

23   Q.    Doctor, turning to the next page, page 22, under the

24   heading "6" --

25        THE COURT:  Hang on.

3702

```
 1              (Brief pause.)

 2    BY MR. MCKINNEY:

 3    Q.      Doctor, can you read the first sentence of the second

 4    paragraph beginning with "It is"

 5    A.      (Reading:)

 6              It is our opinion that the CDCR Mental Health

 7              Services Delivery System appropriately meets the

 8              mental health needs of inmates assigned to an EOP

 9              Administrative Segregation Unit Hub.  General

10              findings from our review of the CDCR prisons with

11              inmates assigned to an EOP ASU Hub include the

12              following:

13              Inmates have individualized --

14              (Reading interrupted.)

15              THE COURT:  The rest of it -- I mean, I can read it

16    myself.

17              MR. MCKINNEY:  Understood.

18    BY MR. MCKINNEY:

19    Q.      Doctor, does this page reflect the opinion of the

20    state's experts with respect to care provided to EOP inmates

21    in the Ad. Seg. hubs?

22    A.      Yes, it does.

23    Q.      Doctor, if I could direct your attention to page --

24    first to page 23, just to mark the heading "Security Housing

25    Unit CCCMS."
```

3703

1    Then direct your attention to the following page.

2    And if you can, read the first sentence on that page?

3    A.    (Reading:)

4    It is our opinion that the CDCR Mental Health

5    Services Delivery System appropriately meets the

6    mental health needs of CCCMS inmates assigned to a

7    SHU.

8    (Reading concluded.)

9    Q.    Is it your understanding that the opinion of the

10   state's experts with respect to the care provided to CCCMS

11   inmates in the security housing units is reflected here?

12   A.    Yes, it is.

13   Q.    And, Doctor, finally on this same page, under heading

14   "8.  Psychiatric Services Unit," can you read the first

15   sentence of the second paragraph?

16   A.    (Reading:)

17   It is our opinion that CDCR's Mental Health Services

18   Delivery System appropriately meets the mental health

19   needs of EOP inmates assigned to a PSU.

20   (Reading concluded.)

21   Q.    Doctor, does that reflect the opinion of the State's

22   experts with respect to mental health services provided in

23   the state psychiatric services unit?

24   MR. BIEN:  Objection.  He doesn't know their opinion.

25   He's just reading a report.

3704

1        THE COURT:  Yes.  That objection is well taken.

2        MR. MCKINNEY:  That's what the report reflects --

3    I'll withdraw the question.

4        One moment, Your Honor.

5        (Counsel confers with cocounsel.)

6        No further questions.

7        THE COURT:  Further cross, Mr. Bien?

8        MR. BIEN:  Yes.

9                    RECROSS-EXAMINATION

10   BY MR. BIEN:

11   Q.     Doctor, this is Exhibit LLL that you sponsored

12   yesterday, correct?

13            (Exhibit published.)

14        THE COURT:  With the exception of the additions at

15   the bottom.

16   BY MR. BIEN:

17   Q.     Yes.  That's my handwriting on the document.

18   A.     Then, yes, that's correct.

19   Q.     And who prepared this document?

20   A.     It was prepared with my attorneys.

21   Q.     What does that mean?  Did you prepare it?

22   A.     I did not type the document.  I spoke with my

23   attorney about the preparation of it.

24   Q.     Where did the information come from?

25   A.     It came from my staff, I believe.  My attorney worked

3705

1  with my staff.

2  Q.      And so you know nothing further about it?

3          Did you check the data yourself?

4  A.      Yes, I looked.  I agreed with the data.

5  Q.      Did you check it against some other source, or did

6  you just look at the numbers?

7  A.      For example?

8  Q.      What did you do?  When you say you agreed with the

9  data, what does that mean?

10         Did you sit there and check some other reference to

11 see if they had put the right numbers in?

12 A.      My staff keeps this data, and so I did look at the

13 numbers on a several page printout.

14 Q.      So what did you compare the numbers in this chart to

15 to confirm they were accurate and the court should rely on

16 them?

17 A.      The several page printout my staff gave me.

18 Q.      And what was that generated from?

19         Do you know that?

20 A.      No, I don't know that.

21 Q.      Who gave it to you?

22         THE COURT:  Who gave him what?

23 BY MR. BIEN:

24 Q.      Who gave you the printout?  Where did it come from?

25         THE COURT:  The printout he used to compare to decide

3706

1    whether these numbers were accurate.

2           Yes, sir.

3           THE WITNESS:  I believe it was my executive

4    assistant.

5           But I can't verify that.  I have a lot going on.  I

6    don't know who gives me papers.

7    BY MR. BIEN:

8    Q.     Okay.  And who chose what categories of information

9    to include on this chart, Doctor?

10   A.     We came up with these categories in a conversation

11   with my lawyer.

12   Q.     You didn't include, for example, condemned suicides,

13   right?

14   A.     No, we did not.  I think it speaks for itself.

15   Q.     Well, how would it speak for itself?

16   A.     I don't see condemned suicides on there.

17   Q.     There are CCCs, and they could have been in an ASU in

18   a condemned unit, right?

19   A.     As I -- I don't consider condemned to be an ASU.  So

20   I didn't put that on here.

21          You gave me some other numbers yesterday that also

22   included condemned, and I thought I had mentioned then that I

23   didn't consider the condemned suicides segregation suicides

24   because they're a different population with different

25   privileges quite frequently.

3707

1  Q.      So they're just not included no matter what in this

2  chart, correct?

3  A.      I can -- as I look at the chart I don't see a

4  condemned line on there.

5  Q.      Did you check whether your numbers agreed with the

6  numbers the Special Master reported for each of these years?

7  A.      No, I did not go back and look at the Special

8  Master's report.  I trusted that my staff's numbers agreed

9  with those.

10  Q.      Would you agree that -- so you thought these numbers

11  would be consistent with the Special Master's report?

12  A.      Yes.  In terms of the number of suicides and in terms

13  of the placement of those individuals and their level of care

14  and housing.

15  Q.      And you didn't include the total number of suicides

16  in segregated housing as part of this report?

17  A.      No.  Well, I don't know.  These people are in some

18  form of segregated housing, but these are the Coleman Class

19  Members.

20  Q.      I understand.  But the total suicide number you

21  included is for suicides both in segregated housing and in

22  non-segregated housing, correct?

23  A.      It's the total that we have for the year.  Yes.

24  Q.      And you chose not to include a total of segregated

25  housing suicides so we can compare how many Coleman Class

3708

1    Members committed suicide in segregation versus how many

2    non-Coleman Class Members?

3    A.        No.  That doesn't appear to be on the chart.

4              THE COURT:  I don't understand.

5              Why isn't it?

6              If you just add -- I'm asking you, not telling you.

7    But I don't know what you and Mr. Bien are suggesting.

8              If you added all of the people that you say were in

9    segregated housing, you would come up with in 2013 with two,

10   four, five, six.  Then you would subtract six from 29 and you

11   would get whatever it is, 23.

12             Isn't that right?  Or is that wrong?

13             I don't understand, in other words, what you guys

14   are --

15             MR. BIEN:  My point is they didn't include the

16   information about how many suicides occurred in segregated

17   housing.

18             They gave total number of suicides in the department.

19   That's the top line.  And they gave the number --

20             THE COURT:  I'm sorry.  Maybe I misunderstand.  Isn't

21   total suicides everybody who committed suicide in CDCR?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.

24             MR. BIEN:  Then they gave --

25             THE COURT:  Below that is everybody who committed

3709

1    suicide within segregated housing.

2           So all you did was take the 29 and break out the

3    number of people in CCCMS ASU suicides, and that would be

4    three.  But the three would have been included in the 29 or

5    not?

6           THE WITNESS:  Yes.

7           THE COURT:  Yeah.

8           THE WITNESS:  The numbers below the total are

9    subsets.

10          THE COURT:  Yeah.

11          MR. BIEN:  But they left out, Your Honor -- this is

12   not -- like first line, "CCCMS ASU," only includes class

13   members who committed suicide in the ASU.

14          THE COURT:  Right.

15          MR. BIEN:  Okay.  So they're not showing how many

16   suicides occurred in the ASU.  And you can't --

17          THE COURT:  But you can.  You just add -- I'm sorry,

18   Mr. Bien.

19          MR. BIEN:  For example, look at 2008.

20          THE COURT:  Okay.

21          MR. BIEN:  So from their information they're showing

22   total suicides.  And you subtract the five that they show

23   here.  And that is not a relevant piece of information.  They

24   left out too many categories of people who committed

25   suicide.

3710

1          MR. MCKINNEY:  Objection.  We have included the

2     relevant piece of information.  Mr. Bien is asking that --

3     he's saying we should have included non-Coleman Class

4     Members, but what we've included here are the Coleman Class

5     Members.  And he's arguing.

6          THE COURT:  I think what we're talking about -- now I

7     think I understand what is argument is.

8          When it says "Total Suicides," it means total

9     suicides of Coleman Members, not total suicides of all of the

10    people in CDCR.

11         Is that right or wrong?

12         THE WITNESS:  It is total suicides of Coleman Class

13    Members and non-Coleman Class Members.  Then the Coleman

14    Class Members are broken down into the next four lines.

15         THE COURT:  Except that then you have excluded those

16    Coleman Class Members who committed suicide, but were not in

17    ASU of some sort?

18         THE WITNESS:  Yes.  Those individuals are not

19    included.

20         THE COURT:  Is that all we were --

21         MR. BIEN:  And they excluded non-Coleman -- people

22    they say were not Coleman Class Members who committed suicide

23    in ASU and SHUs.

24         So --

25         THE COURT:  You're suggesting that there are other

3711

```
 1   people that should have been included, which they didn't?
 2           MR. BIEN:  Correct.
 3           THE COURT:  Well, I don't know whether that's true or
 4   not.
 5           You may proceed to try and demonstrate that.
 6           (Exhibit handed to witness.)
 7   BY MR. BIEN:
 8   Q.      Doctor, the first exhibit is Plaintiffs' 2800.  This
 9   is an excerpt from Dr. Patterson, the Special Master report
10   on suicides completed in the years 2008 and 2009.
11           This was a year when the Special Master covered --
12   this was a report which covered two years rather than one.
13   And it was filed in -- I'm not sure if that filing date is --
14   it is 4009 filed in May of 2011.
15           Doctor, the first thing, if you look on the first
16   paragraph of the introduction, according to Dr. Patterson
17   there were 37 suicides in 2008.
18           That's a different number than what you've reported
19   on your chart, isn't it?
20   A.      Yes.  We report 36.
21   Q.      And if you turn to the next page, the third bullet up
22   from the bottom talks about suicides broken down by ASU, SHU
23   and condemned.
24           And first of all, you don't -- we already established
25   you don't include the condemned in your chart?
```

3712

1           THE COURT:  It's already established.

2    BY MR. BIEN:

3    Q.      Okay.  And he reports there were 20 total suicides:

4    16 in the ASU and four in the SHU.  And that's what I've

5    written in under -- as 20 under your chart there for 2008.

6           You didn't include that information, right?

7    A.      Again, the chart reflects Coleman Class Member

8    suicides in segregation units.

9    Q.      Okay.  Now, turn to the next page, which is --

10   A.      I don't know if I answered your question or not.

11   Q.      I think you did.

12          The next page is the actual list of the suicides in

13   2008.  It is a table.  And if you go over to the fourth

14   column from the right, which is "Housing," and then the third

15   column from the right is "LOC," which is level of care.

16          Do you see those two columns?

17   A.      Yes.

18          THE COURT:  No.  I don't.

19          Oh, yes.  Housing and LOC.

20          Yes.  Thank you, sir.

21   BY MR. BIEN:

22   Q.      Okay.  And you have reported two EOP ASU suicides.

23          I ask you to do some work and tell me how many he

24   reported.

25          MR. MCKINNEY:  Objection.  The document speaks for

3713

1   itself.

2           THE COURT:  Overruled.

3           THE WITNESS:  You're looking for?

4   BY MR. BIEN:

5   Q.      EOP ASU suicides.

6           I see one.  Inmate Number 4.  Inmate Number 7.

7   Inmate Number 10.  Inmate number 22.

8           Correct?

9   A.      No.  Inmate 22 was not at EOP level.

10  Q.      I'm sorry.  I meant Inmate 27.

11  A.      Yes.  That's what this says.

12          THE COURT:  And what about 17?

13          MR. BIEN:  Right.  That's the next -- that's an ASU

14  CCC.

15          THE COURT:  Right.

16  BY MR. BIEN:

17  Q.      So that number is different than what you have in

18  your chart.  He finds four and you found two, correct?

19  A.      Yes, according to this.

20  Q.      Okay.  And then let's look at CCCMS SHU.

21          How about Number 12, that's a CCCMS SHU, right.

22          Number 15.

23  A.      Is that a question?

24  Q.      That's what he's reporting, correct?  He found two

25  and you found none?

3714

1    A.       That's correct.

2             MR. BIEN:  Your Honor, I would like to move 2800 into

3    evidence.

4             THE COURT:  I thought it was.

5             MR. BIEN:  I was just reminded I didn't.

6             THE COURT:  All right.  Received.

7                 (Whereupon, Plaintiffs' Exhibit 2800 received

8                  into evidence.)

9    BY MR. BIEN:

10   Q.       Now, Doctor, I won't go through each and every one of

11   these, but I'll just represent to you that there are some

12   differences between your numbers and Dr. Patterson's numbers.

13            You would agree that you didn't check his numbers

14   against yours before you did this chart, correct?

15   A.       No, I did not check Dr. Patterson's numbers against

16   mine.

17   Q.       Okay.  And taking a look at what I've added -- this

18   column I've added, and I represent to you that I did it from

19   Dr. Patterson's exhibits, and we can go through them one by

20   one, but these are the segregation suicides.  And I

21   eliminated, as you did, the condemned.  So these are just the

22   total number of segregation suicides in each year less

23   condemned.

24            Take a look at 2000.

25   A.       Before we go there, I can't say that I can just

3715

1    accept those numbers.

2            THE COURT:  Well, you want to stop and count them

3    all?

4            We'll take a break.

5            THE WITNESS:  I may have to based on other things

6    that have been presented to me as fact.

7    BY MR. BIEN:

8    Q.      Okay.  Let's look at -- go back to 2800, and let's

9    turn to the -- if you go four pages into the document, he

10   starts the report for year 2009.

11           Same document we were looking at.

12   A.      Do I have a hard copy of this?

13   Q.      I handed you a whole stack of them.

14           Oh, of the chart?

15   A.      That's what I would like.

16   Q.      You have your own chart.

17           It is not going to take counting.  I'm just going to

18   do the segregation suicides.

19           So take a look at, Doctor, the suicides in calendar

20   year 2009.

21           Do you see that?

22   A.      The fourth page is 2008.  Are you looking at the

23   chart or the --

24   Q.      Underneath the chart it begins 2009.  Then turn to

25   the next page.  At the top he again talks about Ad. Seg. and

3716

1    SHU and condemned suicides.

2         Do you see that?

3    A.    Yes.

4    Q.    And I have written 10 under your column for 2009.

5    And I got that 10 because I took the ASU, which was 10, the

6    SHU is zero, condemned was 1, but I didn't include that

7    because you didn't.

8    A.    Okay.

9    Q.    Then let's turn to Exhibit 2801.

10   A.    Help me out.

11        Does that say that they were all the Coleman Class

12   Members, all 10?

13   Q.    That's the total number of suicides that occurred.

14   That's from my column on the bottom -- my new column.

15        THE COURT:  No, it isn't.  He says that there are

16   much more than 10 suicides in 2009.

17        MR. BIEN:  Your Honor, I'm showing Dr. Patterson's

18   breakdown of suicides that occurred in Ad. Seg. SHU and

19   condemned.  And that's my column, "Total Seg. Suicides," on

20   the bottom there.

21        THE COURT:  It is either getting very late or I'm

22   getting even dumber.

23        MR. BIEN:  It is two pages from the back.

24        THE COURT:  Okay.  Let's go there.

25        All right.

3717

1          MR. BIEN:  Right on the top of the bullet, Your

2     Honor, he's broken down all the suicides.  And he's talked

3     about how many of the suicides that occurred in 2009 occurred

4     in either ASU, SHU or condemned.

5          That's how I got the number 10 because I took the 10

6     of 25 for ASU, zero from SHU and 1 from condemned.  I didn't

7     include the condemned so I wrote down 10.

8          THE COURT:  But this doesn't say that they were

9     Coleman members.

10          MR. BIEN:  This is the total number that occurred in

11     ASU.

12          THE COURT:  Okay.  Now I'm with you.

13     BY MR. BIEN:

14     Q.     Let's stop there, Doctor.

15          Do you understand that?

16     A.     Yes.

17     Q.     That's where I got the 10 from.

18     A.     Yes, I see where you got the 10 from.

19     Q.     So in 2009, there were ten suicides in Ad. Seg. and

20     the SHU, correct, from Dr. Patterson's, right?

21     A.     Yes.

22          MR. MCKINNEY:  Objection.  Assumes facts not in

23     evidence.

24          THE COURT:  The objection is overruled.  It was

25     received into evidence.  Nobody objected, and I received it.

3718

1      Go ahead.

2  BY MR. BIEN:

3  Q.      And nine of those suicides were class members, right?

4          THE COURT:  How do you know?

5          MR. BIEN:  That's what his chart shows, Your Honor.

6          THE COURT:  I see.

7  BY MR. BIEN:

8  Q.      Five CCCMS ASU, three EOP ASU and one PSU, correct?

9  A.      That's correct.

10 Q.      And so nine of ten of your segregation suicides in

11 2009 were class members, right?

12 A.      That's correct.

13 Q.      And in 2008, according to your numbers, five of the

14 20 were class members, but according to Dr. Patterson's

15 numbers he changed your two EOP ASUs to four.  And you left

16 out the two SHUs.  So he has nine of the 20 in 2008 as class

17 members?

18 A.      Yes.  Per his chart.

19 Q.      So Dr. Belavich, are you aware that this tremendous

20 percentage of your suicides in segregation units are class

21 members versus nonclass members?

22         MR. MCKINNEY:  Objection.  Argumentative.

23         THE COURT:  Sustained.

24 BY MR. BIEN:

25 Q.      Have you considered this information before?

3719

1        THE COURT:  He didn't even know it before because

2   he -- well, I don't know.

3        Did you ever review these reports from Dr. Patterson

4   before just now?

5        THE WITNESS:  No.  I have seen summaries by staff as

6   prepared.

7        THE COURT:  Right.  I mean, we're faced with yet

8   another question about reliability of documents.  That's not

9   said with an intent to suggest that people are lying.  It's

10  just somehow or other these reports are different.

11       You may proceed.

12       I'm sorry, Mr. McKinney, did you want to say

13  something?

14       MR. MCKINNEY:  No, Your Honor.  I simply wanted to

15  report that there may be differences in the reports, but that

16  doesn't -- there is no imprimatur of accuracy towards either

17  one.

18       THE COURT:  I just said that.

19       MR. MCKINNEY:  That's why I sat down.

20       THE COURT:  All right.  I mean, I don't know how to

21  deal with all of this.

22       MR. BIEN:  Well, Your Honor, there has been -- I

23  would just suggest that there have been objections filed to

24  many of these reports.  In fact, some of them sponsored by

25  Dr. Belavich.

3720

1          You have held -- you have made determinations and

2     you've determined what the facts were for certain years,

3     including some of these very reports.  So I think that's how

4     you deal with things.

5          THE COURT:  Well, the problem with that is I am not

6     certain, looking back several years, whether I've gotten it

7     right or wrong.  I don't know what the objections were, and I

8     don't know what the basis was.

9          If the objections are simply, Gee whiz, we don't

10    think those numbers are right, you know, I would not find

11    that persuasive.

12         Well, go ahead, Mr. Bien.  I don't want to discourage

13    you.

14         This is very difficult material for me to deal with,

15    but go ahead.

16    BY MR. BIEN:

17    Q.    Doctor, have you considered before today the

18    percentage of suicides in Ad. Seg. that are class members

19    versus nonclass members?

20    A.    Yes.

21    Q.    And when did you consider that?

22    A.    In talking with my staff.  It's tracked, the level of

23    care.

24    Q.    Did anyone raise with you the concern that in some

25    years more than half of the suicides in segregation units are

3721

1    Coleman Class Members?

2    A.       No.  No one's raised that concern with me.

3    Q.       Your chart also reports a large number -- I want to

4    use an adjective -- it reports the EOP and PSU suicides.

5            The PSUs are also EOPs; is that correct, Doctor?

6    A.       Yes.  Our patients in the PSUs are EOP level of care.

7    Q.       And there's -- every year has one or more EOP ASU

8    suicides in your chart, correct?

9    A.       I'm sorry.  Could you repeat that?

10   Q.       Every year your chart has one or more EOP ASU

11   suicides?

12   A.       Yes, that's correct.

13   Q.       And there are also four PSU suicides reported?

14   A.       Yes, between 2007 and 2013.

15   Q.       I added up it up.  You can do it yourself.  I added

16   it up.  You have shown 18 EOPs committing suicide in this

17   time period from your chart and 37 CCCMS in segregation

18   during this same time period.

19   A.       I'm sorry.  18 and?

20   Q.       37.

21   A.       What was the 37 referring to?

22   Q.       How many CCC suicides you reported here.

23   A.       That's correct.

24   Q.       Okay.  And if you look at Exhibit ZZZ, would you

25   agree that there's approximately 5000 EOPs in the system and

3722

1    approximately 29,000 CCCMS?

2            Is that a good approximation?

3    A.      I'm sorry.  What numbers, again?

4    Q.      Less than 5000 EOPs and a little less than 29,000

5    CCCMS?

6    A.      Yes.  4600 EOPs and just under 29,000 CCCMS.

7    Q.      To be accurate, you have to add in the PSU too.  So

8    isn't it more like 4900 EOPS?

9    A.      Yes.  That's correct.  You're right.

10    Q.      All right.  So you agree that CCCs are more than five

11    times the number of EOPs in the system?

12    A.      Yes.  We have quite a larger population of CCCs.

13    Q.      And approximately half of these suicides of class

14    members that you've reported in segregation are EOPs?

15            Not half.  I'm sorry.

16            EOPs have half as many suicides as CCCs during this

17    period?

18    A.      Yes.  That's correct.

19            THE COURT:  I'm sorry.  I want to go back to another

20    question because it is very difficult for me to decide

21    whether any of these numbers have any meaning.

22            Dr. Patterson lists by name the people so that you

23    have some confidence he actually knows what he's talking

24    about.

25            Your staff folks give you summaries, in essence.

3723

1    They don't break it down for you, which, you know, is a

2    sensible administrative procedure, but you don't know how

3    accurate it really is.

4            THE WITNESS:  No.  If we had more time, I would take

5    those numbers and lay them against ours because we -- and see

6    where the discrepancy lies.  Because it may very well be a

7    discrepancy in something having to do with housing or level

8    of care that we weren't in agreement on.

9            THE COURT:  You have ten minutes until noon if you

10   want to take him, Mr. Bien.

11           MR. BIEN:  I'm sorry?

12           THE COURT:  Nothing.  Go ahead.

13   BY MR. BIEN:

14   Q.    Could you take a look at Exhibit 2773.  It's the

15   suicide report for Prisoner 1 from Pleasant Valley State

16   Prison.

17           Can I help you find it?

18           THE COURT:  That's already admitted into evidence.

19           MR. BIEN:  Yes.

20           THE COURT:  I recall, I think, what you're about to

21   ask about, but maybe not.

22           MR. MCKINNEY:  I object to further questioning on

23   this -- I'll withdraw.

24           THE COURT:  I think the point you want to make is

25   that 2773 suggested that Prisoner 1 should probably have been

3724

1    included, right?

2              MR. BIEN:  Yes.

3              THE COURT:  We've gone over all of that.

4              MR. BIEN:  Okay.

5    BY MR. BIEN:

6    Q.       Dr. Belavich, let's stop.

7              THE COURT:  Doctor, in your experience and knowledge,

8    are there people -- the answer -- I think you've already

9    answered yes, but maybe I'm wrong.

10             There are people who should have been classified as

11   CCCMS or EOP who are just simply missed for one reason or

12   another?

13             THE WITNESS:  There may be, yes.

14             THE COURT:  Sure there is.  I mean, this is a huge

15   system.

16             THE WITNESS:  A huge system.

17             THE COURT:  And I assume, but maybe I'm wrong, there

18   is no way to track and try and decide how many of those folks

19   actually have been missed?

20             THE WITNESS:  No.  I don't have a good way to do

21   that.

22             THE COURT:  Yeah.

23   BY MR. BIEN:

24   Q.       If the suicide report said -- do you know the rule as

25   to how you decide if someone was a class member or not for

3725

1    this chart?

2    A.      You said "this chart"?

3    Q.      For your chart.

4            When you decided they were class members, how did you

5    decide that?

6            THE COURT:  They were people already identified as

7    people who were members of the class?

8            THE WITNESS:  Correct.

9            THE COURT:  Thus it did not include who should have

10   been but was missed?

11           THE WITNESS:  Correct.

12           MR. BIEN:  Okay.

13           We would like to move into evidence, Your Honor, just

14   the other reports -- the excerpts from Dr. Patterson's report

15   just to make this point.  I'm not going to discuss them.

16   They are 2802 and 2803 for the years 2011, and for the last

17   report he did for 2012, first half.  Just excerpts.

18           MR. MCKINNEY:  Your Honor, no objection.

19           For clarity of the record, I just want to make

20   certain these are noted as excerpts of the reports.

21           THE COURT:  They are so noted.

22               (Whereupon, Plaintiffs' Exhibits 2802 and 2803

23                received into evidence.)

24           THE COURT:  We'll take our noon recess.

25           We'll reconvene at 1:30.

3726

1          (Off the record at 11:55 a.m.)

2                    ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2              THURSDAY, DECEMBER 19, 2013; 1:30 P.M.

3                         ---o0o---

4

5          MR. BIEN:  Your Honor, I neglected to move into

6     evidence 2801, which was discussed.  It's the report on

7     suicides for calendar year 2010, an excerpt.

8          THE COURT:  Hearing no objection, it's received.

9                         (Whereupon, Plaintiffs' Exhibit 2801

10                         was received into evidence.)

11                    TIMOTHY BELAVICH

12    Recalled as a witness on behalf of the defendants herein, was

13    previously sworn, examined, and testified as follows:

14              RECROSS-EXAMINATION (CONTINUED)

15    BY MR. BIEN:

16    Q.     Dr. Belavich, you testified about working with Mr.

17    Hayes in the present to improve suicide prevention services

18    in CDCR.

19          Correct?

20    A.     That's correct.

21    Q.     Mr. Hayes has criticized CDCR's use of ad seg cells

22    for suicide observation during these tours, hasn't he?

23    A.     During the current tours?

24    Q.     Yes.

25    A.     I have not heard that on the exit calls I've been on.

1   Q.      Were you on the exit tour for LAC on November 13,

2   2013?

3   A.      No.

4   Q.      Did he report to you that he criticized the use for

5   alternative housing suicide observation cell in the ad seg

6   unit A4?

7   A.      No.  No one has reported that to me.

8           MR. BIEN:  Your Honor, this is in evidence,

9   Plaintiffs' Exhibit 2112.

10  Q.      Dr. Belavich, have you seen the cells used for

11  alternative housing in LAC in the ad seg unit yourself?

12  A.      No, I've not.

13  Q.      Isn't it correct that Mr. Hayes in his report, which

14  is Exhibit 2627 -- I think it's right in front of you.

15          Do you have that, Dr. Belavich?

16  A.      I do.

17  Q.      If you look at the last page --

18          THE COURT:  2617?

19          MR. BIEN:  2627, Your Honor.  It has Exhibit 50 on the

20  front of it.

21          THE COURT:  What do you want him to look at?

22          MR. BIEN:  The last page of this document.

23          THE COURT:  This is not yet in evidence?

24          MR. BIEN:  It is.

25          THE COURT:  All right.

1              Is that right, Madam Clerk?

2              THE CLERK:  Yes.

3              THE COURT:  You want him to look at the last page?

4              MR. BIEN:  Yes.

5    Q.     Dr. Belavich, you recall Dr. Hayes, in his report,

6    responded to requests by CDCR officials to increase the use

7    of administrative segregation for suicide observations and

8    told CDCR it would be a bad idea?

9    A.     I'm sorry?  Could you repeat that?

10   Q.     Isn't it correct that Mr. Hayes in his report on

11   page 15, item 10, responded to requests from CDCR officials

12   to increase the use of administrative segregation for suicide

13   observation and told them that he thought it was a bad idea?

14   A.     Are you talking about alternative housing or suicide

15   observation?  That's why I'm not following your question.

16   They're different things.

17   Q.     Take a look at page 15 -- are you there?

18   A.     Yes.

19   Q.     Have you seen that before, paragraph 10?

20   A.     Yes.  But this refers to using cells for suicide

21   observation.

22   Q.     That is my question.

23   A.     I'm sorry.  You were talking about alternative

24   housing.

25   Q.     My question to you was:  Isn't it correct that Mr.

1    Hayes in his report recommended against CDCR increasing the

2    use of administrative segregation cells for the purpose of

3    suicide observation?

4    A.    Well, he states it is premature to discuss that as of

5    August 16, 2011.

6    Q.    Are you still planning on increasing the use of

7    administrative segregation cells for suicide observation, Dr.

8    Belavich?

9    A.    I'm lost.  You're talking about with suicide

10   observation?

11   Q.    I'm looking at this document and reading the report,

12   and it says -- I'll read it to you -- (Reading:)

13              Although CDCR officials have entertained the

14              possibility of utilizing administrative

15              segregation unit cells as an option for the

16              housing and management of inmates on suicide

17              observation status, given the current inadequate

18              and inconsistent practices of effectively

19              managing such inmates in the other OHUs, it

20              would appear premature to discuss an ASU option

21              until the state has demonstrated good practices

22              in other areas.

23         THE COURT:  Do you know what he means by saying

24   inmates who are -- patients who are on suicide --

25         THE WITNESS:  Observation status?

 1            THE COURT:  Yes.

 2            THE WITNESS:  To me, this refers to, in 2010, we could

 3    place someone in housing without referring them to a crisis

 4    bed and keep them for up to 72 hours or indefinitely at times

 5    on one-on-one watch.  That practice doesn't occur any more

 6    because of the policy that was issued where the people are

 7    triggered automatically for a mental health crisis bed

 8    referral.  That's why I'm having trouble understanding.

 9            THE COURT:  Well, you didn't misunderstand it to 2010,

10    it's just not relevant to today's situation.

11            Is that right?

12            THE WITNESS:  That's right.

13    BY MR. BIEN:

14    Q.    As you sit here today, Dr. Belavich, are you planning

15    to increase the use of administrative segregation cells for

16    suicide observation?

17            "Yes" or "no"?

18    A.    No, I don't have those plans.

19    Q.    Did anyone on your staff report to you on November 13,

20    2013, that Mr. Hayes, after inspecting the cells on A4 in ad

21    seg that were being used for alternative housing in LAC, said

22    that the cells are not suicide resistant, they have large

23    mesh screens and a gap in the desk, between the desk and the

24    wall?

25            Did anyone report that to you?

 1              MR. MCKINNEY:  Objection.  Lack of foundation.

 2   Hearsay.

 3              THE COURT:  There's no foundation for the question,

 4   but you know, he can ask him anything.

 5              If you want to object that it's irrelevant because

 6   there's no foundation, that objection is sustained.

 7              You may proceed.

 8              MR. BIEN:  Your Honor, Dr. Belavich has participated

 9   in these exits.  He's testified about them before I started,

10   and I'm asking whether his staff reported the fact of the

11   exit.  That's all.

12              THE COURT:  Thank you.  The objection is sustained.

13              You may proceed.

14   BY MR. BIEN:

15   Q.    Dr. Belavich, do you have in front of you 2671 that's

16   in evidence?  I put it over near you.  Have you got it there?

17   A.    Yes, I do.

18   Q.    This is the report that tracks use of alternative

19   housing and the timing between referrals for transfer to MHCB

20   and actual transfers.

21              Is that correct?

22              MR. MCKINNEY:  Objection.  Beyond the scope of

23   redirect.  He's reopening cross, Your Honor.

24              MR. BIEN:  We're just talking about alternative

25   housing, Your Honor.

1                    THE COURT:  You may proceed, sir.

2                    THE WITNESS:  That's correct.  It is a report on our

3      referrals, and, additionally, alternative housing usage.

4      BY MR. BIEN:

5      Q.      If you turn to the second page, it starts being a

6      printout, is that correct, that shows, has page one on the

7      bottom, the attachment -- are you on that same page?

8      A.      Yes.

9      Q.      It shows referrals from a prison to -- I'm looking at

10     the first one there.  It's from ASP.

11             Is that Avenal?

12     A.      Yes, it is.

13     Q.      And CHCF is the new Stockton facility?

14     A.      That's correct.

15     Q.      And 10-3-2013 would be when the referral was made?

16     A.      Yes.

17     Q.      It's your testimony that under the current policy,

18     when a prisoner is placed in alternative housing by a

19     clinician, the referral is supposed to be made at the time

20     they place them.

21             Correct?

22     A.      Yes.  The policy is that placement is made and the

23     healthcare placement unit that controls crisis beds is

24     notified of a need to transfer.

25     Q.      And then transfer date and time is the time that

1    they're actually received at the new MHCB, the place they're

2    going to or is that the time they leave?

3          Do you know which that is?

4    A.    No, I don't know if it's the time that they leave or

5    the time they arrive.

6    Q.    Certainly that should be the time they're removed from

7    the alternative housing; correct?

8    A.    At least.

9    Q.    The first patient was there for 21.07 hours?

10   A.    Yes, that's what it says.

11         THE COURT:  Wait a minute.  Why do you say that?

12         MR. BIEN:  The last column on the right under "hours

13   waiting."

14         THE COURT:  It says 8.20.

15         THE WITNESS:  You're on the next page.  He's on the

16   one previous.

17         THE COURT:  Hang on.  I apologize.  21 hours.  Okay.

18   BY MR. BIEN:

19   Q.    Am I correct in interpreting for that particular

20   patient, they were placed in alternative housing on October

21   3rd, and either removed from housing or arrived at the new

22   destination 21 hours later?

23         Correct?

24         MR. MCKINNEY:  Objection.  Relevance.  Once again,

25   this has nothing to do with segregated housing.  We're

1    talking about alternative placement that's not framed by the

2    plaintiffs' motion and has no relevance in this proceeding.

3        MR. BIEN:  Shall I respond, Your Honor?

4        The doctor just testified about alternative housing

5    and the quick access.  We established that some of this is in

6    segregation.

7        MR. MCKINNEY:  The doctor testified unless the inmate

8    is in segregation, they do not use segregated alternative

9    placements.

10       THE COURT:  I don't know that that's really what he

11   testified to.  As I understand it, he testified that if the

12   patient is coming from segregated housing, he may be put in

13   segregated housing.  That doesn't -- I don't know if that

14   means nobody else will go into segregated housing.

15       As I understand it, there's this criteria, and if

16   they're exhausted, the person is going to be in segregated

17   housing.

18       THE WITNESS:  No.  The patients who are not --

19   patients on the mainline will not be brought into segregated

20   housing solely for alternative housing purposes.

21   BY MR. BIEN:

22   Q.    Isn't that inconsistent, Dr. Belavich, with the

23   standard -- are you telling me that if a prison that is full,

24   there's no other place to put the patient, what is the

25   clinician supposed to do if all the other alternatives -- you

1    said it's high up on the alternatives, much higher than a

2    holding cell.

3            Do you want to put him in a cage?

4    A.      For administrative segregation patients, it is higher

5    on the hierarchy.  I believe part of the hierarchy talks

6    about a least restrictive -- other identified least

7    restrictive places, and there's no -- I have no evidence that

8    anyone is brought into administrative segregation because of

9    alternative housing.

10           Maybe something would refresh my memory.

11   Q.      This report doesn't distinguish between people coming

12   from alternative housing or not.  With all due respect, I

13   think the evidence is to the contrary, but we'll show that in

14   argument.

15           MR. MCKINNEY:  Objection.  Move to strike.

16   Argumentative.

17   BY MR. BIEN:

18   Q.      If you turn to -- you testified on your redirect that

19   under the standard, patients are not supposed to wait for

20   more than 24 hours.

21           Correct?

22   A.      That's our goal.  If patients have waited over

23   24 hours, the healthcare placement unit has direct contact

24   with them to determine what the reasoning was for that, what

25   I call going over our time limit.  And, additionally, if

```
 1    there is a pattern of it, then we work with the institution

 2    to rectify that.

 3    Q.      You must have a lot of people working on that, Dr.

 4    Belavich.  If you look at this report --

 5            MR. MCKINNEY:  Objection --

 6            THE COURT:  That's argumentative.

 7            Sustained.

 8            Try your best to ask questions, sir.

 9    BY MR. BIEN:

10    Q.      Dr. Belavich, let's just look at CCI --

11            MR. MCKINNEY:  Objection, Your Honor.  Again, the

12    relevance of this document is it's not relevant.

13            THE COURT:  I don't know whether it is or not, except

14    he's about to impeach him.  So to that extent, it's relevant.

15            Go ahead.

16    BY MR. BIEN:

17    Q.      So if you look at the third from the bottom, CCI, the

18    same page, there's an EOP, and he waited for 41.83 hours.

19            Correct?

20            THE COURT:  I'm obviously on the wrong page.

21            MR. BIEN:  The second page.

22            THE COURT:  Not page one, but page two?

23            MR. BIEN:  Yes.

24            THE COURT:  You want me to look at?

25            MR. BIEN:  It says page one on the bottom.  The second
```

 1    page of the document.

 2             THE COURT:  Hang on.  Page one.  You want me to look

 3    where?

 4             MR. BIEN:  Actually, towards the middle there's some

 5    entries for CCI, which I think is Tehachapi.

 6             THE COURT:  Yes, I see.

 7             MR. BIEN:  The third entry from the bottom --

 8             THE COURT:  Is 4183?

 9             MR. BIEN:  Yes.

10    Q.    And so it's your testimony if the policy was being

11    followed, Dr. Belavich, that someone would have phoned

12    somebody about this?

13             MR. MCKINNEY:  Objection.  It misstates the document.

14    There's no evidence where this inmate was housed.  It has to

15    do with alternative housing.  This is mental health crisis

16    bed transfers.

17             THE COURT:  Sir, the objection is it's irrelevant.

18    BY MR. BIEN:

19    Q.    Dr. Belavich, isn't this a summary of alternative

20    housing placements?  Isn't that how you get on this list?

21    A.    Well, it's a summary of inter-institutional mental

22    health crisis bed referrals and transfers.

23             THE COURT:  But not necessarily concerning whether or

24    not somebody came from ad seg or whether or not he was put in

25    ad seg awaiting transfer; correct?

 1                  THE WITNESS:  That's correct.

 2                  THE COURT:  The objection is sustained.

 3       BY MR. BIEN:

 4       Q.    What about:  Does it also track whether people are in

 5       alternative housing or is there some other report for

 6       alternative housing?

 7                  THE COURT:  This is the alternative housing document.

 8       It simply doesn't demonstrate whether people were coming from

 9       ad seg and were kept in ad seg.

10       BY MR. BIEN:

11       Q.    I'll ask it this way, Dr. Belavich:  Do you have some

12       other report that tracks how long people are held in

13       alternative housing in ad seg?

14       A.    I don't know if we do or not.

15                  THE COURT:  As far as you know, the answer is, no,

16       you've never seen such a report?

17                  THE WITNESS:  No.

18                  MR. BIEN:  I have no further questions, Your Honor.

19                  THE COURT:  If you think something very important has

20       to be demonstrated, go ahead.

21                  MR. MCKINNEY:  Very briefly.

22                  THE COURT:  Yeah, I know.

23                       FURTHER REDIRECT EXAMINATION

24       BY MR. MCKINNEY:

25       Q.    If you could turn to Exhibit 2800, the excerpt of the

1    2008-2009 Special Master report.

2    A.     Yes, I have it.

3    Q.     Turn to page 10 of the excerpt.

4    A.     Which is the third sheet?

5    Q.     If you could read that first bullet point up on the

6    top.

7    A.     (Reading:)

8              There was one suicide in a community, a non CDCR

9              prison facility, Central Valley Modified

10             Correctional Facility, in calendar year 2008.

11   Q.     Does the department have jurisdiction over this

12   facility?

13   A.     No, we don't, so I don't believe that would have been

14   included in our suicide count.

15   Q.     And were CDCR employees --

16          THE COURT:  The answer is, no, they don't have any

17   jurisdiction over them and they don't supervise the

18   correctional facility.

19          Correct?

20          THE WITNESS:  Correct.

21   BY MR. MCKINNEY:

22   Q.     Doctor, does this explain the discrepancy over the

23   total in 2008 that plaintiffs' counsel pointed out to you?

24   A.     Yes.  This would be a factor if this was included in

25   those numbers.

 1                THE COURT:  Which, of course, we don't know.

 2                MR. MCKINNEY:  No further questions, Your Honor.

 3                THE COURT:  Wow.  No further questions?

 4                MR. BIEN:  No further questions, Your Honor.

 5                THE COURT:  May the witness be released?

 6                MR. BIEN:  Yes, Your Honor.

 7                THE COURT:  Sir?

 8                MR. MCKINNEY:  Yes.

 9                THE COURT:  Get off the stand before somebody changes

10      their mind.

11                THE WITNESS:  I'm going to run.

12                THE COURT:  No kidding.

13                Let me tell you -- rebuttal?

14                MR. BIEN:  We have a couple of documents by

15      stipulation.

16                THE COURT:  All right.  Go ahead.

17                MR. BIEN:  First, Your Honor, this chart that we're

18      going to offer 2781, a new version of it, and I think it's

19      going to be without objection.  We've talked to defendants

20      about it.

21                MR. RUSSELL:  Yes, Your Honor, that's correct.

22                MR. BIEN:  The version should replace the version we

23      have not admitted before.  What we've added is a column on

24      the far right which includes whether or not the person is a

25      class member.

 1          We have provided the defendants in advance documents

 2     we want introduced in rebuttal.  Most are attached to

 3     declarations which have been submitted to the court.  We are

 4     trying to reduce --

 5          THE COURT:  Just tell me what you want to do.

 6          MR. BIEN:  Okay.  I'm just going to walk through them

 7     and then Mr. Russell can respond.

 8          2790 is the reply declaration of Jane Kahn in support

 9     of this motion filed on August 23, '13, document 4765.

10          THE COURT:  The number of the exhibit you propose to

11     put in?

12          MR. BIEN:  2790.

13          THE COURT:  Satisfactory to the defendants?

14          MR. RUSSELL:  Your Honor, I submit that the

15     declaration, to the extent that it argues facts and lacks

16     foundation --

17          THE COURT:  Well, he's not -- as I understand it -- I

18     can't remember from one hearing to the next.  I think the

19     last hearing we had, there was a stipulation that all of the

20     declarations were to be received in evidence.  Am I correct

21     about that?  That was the last hearing and not this one?

22          MR. BIEN:  I think we also, in order to avoid the

23     defendants having to bring all of their fact witnesses who

24     responded to the expert tours, we also stipulated that

25     declarations would come in for this hearing, but that was my

 1    understanding.

 2            THE COURT:  Sir?

 3            MR. RUSSELL:  If that's the stipulation, I withdraw

 4    that objection, Your Honor.

 5            THE COURT:  Received.

 6                            (Whereupon, Plaintiffs' Exhibit 2790

 7                            was received into evidence.)

 8            MR. BIEN:  2791 is my declaration also filed on

 9    March 15, 2013.

10            MR. RUSSELL:  No objection, Your Honor.

11            THE COURT:  Received.

12                            (Whereupon, Plaintiffs' Exhibit 2791

13                            was received into evidence.)

14            MR. BIEN:  2056 is the Madrid v Gomez remedial order

15    re exclusion from the security housing unit filed by Judge

16    Henderson on December 15, '95.

17            THE COURT:  The court will take judicial notice of it.

18    Receive it into evidence.

19                            (Whereupon, Plaintiffs' Exhibit

20                            2056 was received into evidence.)

21            MR. BIEN:  2412 was an attachment to Jane Kahn's

22    declaration.  It's a letter dated August 28, 2007, concerning

23    defendants' plan for improvement of the EOP ASU hubs.  These

24    are offered.  There are several letters offered for what was

25    going on when we tried to develop these EOP ad seg hubs and

 1    the negotiations between the parties and the Special Master.

 2            THE COURT:  Why do I care?  What it is is, and what

 3    isn't isn't, and if you were seeking to do X and it didn't

 4    happen, so what?

 5            MR. BIEN:  I'll just explain my -- I can explain in an

 6    argument or right now.  We feel that the record of what has

 7    happened in this case is critical to the power of the court

 8    to issue a particular remedy.

 9            In other words, just like with the overcrowding order,

10    the Supreme Court found that you had issued 77 orders and you

11    found that first trying to address a problem.

12            We feel that the fact that this court has provided

13    defendants with multiple opportunities to address a

14    long-standing constitutional violation is relevant to what

15    we're going to ask you to do now.

16            THE COURT:  All right.  I will receive it.  The fact

17    that it says what somebody says happened --

18            MR. RUSSELL:  That's the point, Your Honor.  I object

19    on the grounds of relevancy and also hearsay.  If this is a

20    letter by counsel that's being offered to prove the truth of

21    anything asserted, it's hearsay.

22            THE COURT:  That's a different question, yes.

23            MR. RUSSELL:  And --

24            THE COURT:  It's not hearsay because it's not offered

25    for the truth of matter.  It's offered to show what was going

1    on between the parties.  I don't know if it makes any

2    difference, but it's received.

3                         (Whereupon, Plaintiffs' Exhibit 2412

4                         was received into evidence.)

5         MR. BIEN:  2413 is the same, another letter.

6         THE COURT:  Received.

7                         (Whereupon, Plaintiffs' Exhibit 2413

8                         was received into evidence.)

9         THE COURT:  I doubt if any of this is significant, but

10   who knows?

11        MR. BIEN:  2436 is an e-mail from Robert Canning

12   concerning segregated housing screening, the instrument.

13   It's something produced by defendants.

14        MR. RUSSELL:  It's a government document.  No

15   objection, Your Honor.

16        THE COURT:  Received.

17                         (Whereupon, Plaintiffs' Exhibit 2436

18                         was received into evidence.)

19        THE COURT:  I recall asking you in the last hearing

20   who do you think is going to read all of this?

21        Go ahead.  Keep it up.

22        MR. BIEN:  Your Honor, we think it's critical --

23        THE COURT:  I betcha you do.  There's nothing that

24   isn't critical because.  That's because you can't distinguish

25   between critical and noncritical.

1              Go ahead.

2              MR. BIEN:  2456 is a CDCR document concerning --

3              THE COURT:  You don't object?

4              MR. RUSSELL:  No objection.

5              THE COURT:  Received.

6                          (Whereupon, Plaintiffs' Exhibit 2456

7                          was received into evidence.)

8              MR. BIEN:  2457.

9              MR. RUSSELL:  Lacks foundation.  I'm not quite sure

10    what it is.

11             MR. BIEN:  It's another survey authenticated in the

12    declaration, update from Ms. Vorous of the survey.

13             MR. RUSSELL:  If it's authenticated without a

14    declaration, I --

15             THE COURT:  Received.

16                         (Whereupon, Plaintiffs' Exhibit 2457

17                         was received into evidence.)

18             MR. BIEN:  2463 --

19             THE COURT:  There must be 14 other documents, don't

20    you think?  How many more do you think you're going to put in

21    and who is going to read them?

22             MR. BIEN:  Your Honor, to some extent, based on your

23    ruling about the declarations, they're actually in already,

24    but I'm trying to -- our plan would to pull back some of the

25    things that are already sitting there, so maybe we can only

1    talk about ones that are not attached.

2        THE COURT:  As I said, this hearing is total chaos, so

3    what difference does it make?  If they're all in, they're all

4    in.  You can just refer to them in argument.  You don't have

5    to put them in separately.

6        MR. BIEN:  Are there particular ones you want to

7    raise?

8        MR. RUSSELL:  My objection is if they were going to be

9    submitted as evidence as opposed to exhibits to declarations

10   is that several of them lack foundation and are hearsay, but

11   if they are part of declarations and already in the record,

12   I'm not going to object on that basis, Your Honor.

13       MR. BIEN:  This would be new rebuttal evidence.  So

14   2474 and 2475 are policies about administrative segregation

15   from the Washington Department of Corrections, 2474 and 2475.

16       MR. RUSSELL:  Objection.  Lack of foundation.

17   Hearsay.

18       MR. BIEN:  They were just downloaded from their site.

19   They're on government --

20       THE COURT:  Objection is sustained.

21       MR. BIEN:  2489 is an order of this court -- a

22   pleading filed by defendants in this action on December 1,

23   '06, concerning their ad seg --

24       THE COURT:  It's in the file and you can refer to it

25   in argument.  You don't have to go any further.

```
 1                 MR. BIEN:  Okay.

 2                 THE COURT:  Go ahead.

 3                 MR. BIEN:  Probably the same would apply to 2490?

 4                 THE COURT:  The same thing.  It's the same thing.

 5                 MR. BIEN:  Report of the Special Master about the

 6       plan, ad seg suicide plan.

 7                 THE COURT:  I'm sorry.  The report of the Special

 8       Master is not in evidence.

 9                 What is that?

10                 MR. BIEN:  2490 is the Special Master's report and

11       recommendations on defendants' plan to prevent suicides in ad

12       seg.

13                 THE COURT:  Received.

14                                 (Whereupon, Plaintiffs' Exhibit 2490

15                                 was received into evidence.)

16                 MR. BIEN:  2501 and 2502 and 2503 are excerpts from

17       the ABA Criminal Justice Standards on the treatment of

18       prisoners.  There was some testimony about these by the

19       experts, and we wanted to put these in for reference.

20                 MR. RUSSELL:  Lack of foundation.  Hearsay, Your

21       Honor.

22                 THE COURT:  Yes.  I mean, you say they are what they

23       are, but there's no evidence that that's what they are other

24       than your statement.

25                 The objection is sustained.
```

1               This is madness, Mr. Bien.

2               MR. BIEN:  Exhibit 2573 is an article written by Dr.

3      Patterson, Dr. Hughes published in 2008 called "Review of

4      Completed Suicides in the California Department of

5      Corrections and Rehabilitation."

6               THE COURT:  No foundation?

7               MR. RUSSELL:  No foundation.  Hearsay, Your Honor.

8               THE COURT:  The objection is sustained.

9               MR. BIEN:  Exhibit 2600 is a report of the Office of

10     the Inspector General about California Department of

11     Correction's management of its ad seg units, dated

12     January 2009.

13              MR. RUSSELL:  A document kept in the regular course of

14     government business, self-authenticating.  No objection.

15              THE COURT:  Received.

16                        (Whereupon, Plaintiffs' Exhibit 2600

17                         received into evidence.)

18              MR. BIEN:  2601, a letter written by general counsel

19     Benjamin Rice of CCR to Jane Kahn responding to her questions

20     about CDCR's compliance with the OIG's recommendations in

21     2600.

22              MR. RUSSELL:  It's self-authenticating, but I would

23     ask about relevance.

24              THE COURT:  Can it have any value?  I have no idea

25     whether the author was drunk at the time he wrote it.  My

3750

1    objection is sustained because I don't intend to read it in

2    any event.

3            How much more do you have?

4            MR. BIEN:  Almost finished, Your Honor.

5            Exhibit 2665 and 2666 are declarations filed, one by

6    Lindsay Hayes in 2006 and one by Walter Kowski in 2006 in

7    this action in support of our objections to the defendants'

8    plan to address suicide trends in ad seg units.

9            THE COURT:  Hearsay because he's not here to

10   authenticate it.  The objection is sustained, even if you

11   didn't make it, sir.  I'm going to get this over with no

12   matter what.

13           MR. BIEN:  2780 is a -- there was testimony, and Your

14   Honor asked questions about the definition of "torture" the

15   United Nations is using.  This is a document published by the

16   United Nations General Assembly about torture and other cruel

17   and inhumane and degrading treatment or punishment.

18           THE COURT:  I don't remember asking, but I'll take

19   your word that I did ask.

20           MR. RUSSELL:  It lacks foundation and it's hearsay.

21           THE COURT:  I don't know what it is.

22           MR. BIEN:  Well, I mean, it is a government official

23   document and --

24           THE COURT:  Whose government?

25           MR. BIEN:  It's -- well, I guess it's not a

1    government.  It's an official agency.

2        THE COURT:  The objection is sustained.

3        Go ahead.

4        MR. BIEN:  The last, based on the declaration of

5    Ms. Kim that she filed about the Colorado policy, we think

6    it's now been authenticated and it should be accepted.  She

7    explained how she found it.

8        What it is --

9        THE COURT:  The objection is sustained.

10        Gentlemen, I'm going to tell you what I think.  I

11    think that I can't possibly absorb any more.  As you may have

12    noticed during the course of these last events, my temper is

13    very short.  We are still struggling with the last hearing,

14    getting the order out, and by the time we get to this

15    hearing, none of it will make any sense to me any more.

16        I am withdrawing my previous suggestion because I

17    don't think it's useful.

18        Let me talk to my law clerk.  It's really going to

19    make a great deal of work for her.

20                        (Whereupon, a conference was held

21                        between the Judge and his law clerk.)

22        THE COURT:  I'm going to forgo oral argument.  I'm

23    going to require you to brief the argument, no more than

24    30 pages.

25        Is that acceptable?  I'm sort of telling you.

```
 1              MR. RUSSELL:  I think that's more than acceptable.

 2              MR. BIEN:  Yes.

 3              THE COURT:  30 pages.  That's all.  I'm not going to

 4    have closing.  I'm just going to have that.  If I think that

 5    there is a need for further briefing or argument, I will set

 6    it, but right now, let me tell you, I couldn't...

 7              The holidays are coming and so forth.  When do you

 8    want to have the briefing?

 9              MR. RUSSELL:  We have a second issue as well where

10    we're going to be moving ex-parte regarding the bed plan, and

11    you had asked for that motion to be made within ten days of

12    when we get done here.  It is the holidays and we have a

13    number of things to do.

14              THE COURT:  Just tell me what you need.

15              MR. RUSSELL:  Could we submit both of those within

16    30 days?

17              THE COURT:  That's fine with me, if it's fine with

18    you.

19              MR. BIEN:  Yes, Your Honor.

20              THE COURT:  I don't remember what it is about the bed

21    plan that I'm caring about.

22              MR. BIEN:  We would appreciate it not being ex-parte.

23    We would like an opportunity to respond.

24              THE COURT:  That's what I was going to say.  I don't

25    know what it is, but, obviously, you're going to need an
```

1    opportunity to respond.  30 days to file it, including

2    whatever it is in the motion.  15 days thereafter to respond

3    to the motion only.

4            MR. BIEN:  Yes, Your Honor.

5            Your Honor, before we leave, I would just like to

6    express our gratitude to the staff.  It's been an

7    extraordinary burden on them.

8            THE COURT:  To say the least.

9            MR. BIEN:  They've been extraordinarily supportive,

10   and I wanted to thank them.

11           THE COURT:  Thank you, gentlemen, ladies.

12           Matter will stand submitted upon the filing of the

13   various documents just ordered.

14                        (Whereupon, proceedings were adjourned

15                        at 2:14 p.m.)

16                        ---o0o---

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5


6           I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10                   IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATION

 2

 3        I, Michelle L. Babbitt, certify that the foregoing is a

 4   correct transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7

 8

 9                              /s/ MICHELLE L. BABBITT
                                MICHELLE L. BABBITT CSR #6357
10                              Official Court Reporter
                                United States District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```