DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
REBEKAH EVENSON – 207825
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California 94107-1389
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G BROWN, JR., et al., <br><br> Defendants. | Case No. 2:90-cv-0520 LKK DAD <br><br> **THREE JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. C01-1351 TEH <br><br> **THREE JUDGE COURT** <br><br> **DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' AMENDED APPLICATION AND [PROPOSED] ORDER** |

[1074337-7]

1    I, Michael W. Bien, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel

4    of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if

5    called as a witness I could competently so testify. I make this declaration in support of

6    Plaintiffs' Response to Defendants' Amended Application and [Proposed] Order Granting

7    Defendants' Request for an Extension of April 18, 2014 Deadline.

8    **Ongoing Constitutional Violations**

9    2.    Since Defendants' Motion to Terminate in January 2013, the *Coleman* court

10   has held evidentiary hearings on: (1) *Coleman* class members' access to inpatient care in

11   facilities operated by the Department of State Hospitals (DSH) and conditions in those

12   facilities (June 19–24, 2013); (2) Defendants' use of force and disciplinary practices for

13   the mentally ill (Sept. 30–Nov. 7, 2013); (3) access to inpatient psychiatric hospitalization

14   for mentally ill prisoners on San Quentin's condemned row (Sept. 30–Nov. 7, 2013); and

15   (4) Defendants' improper housing and treatment of mentally ill prisoners in segregation

16   units (Nov. 19–Dec. 19, 2013).

17   3.    In 2013, the *Coleman* court issued no fewer than five orders finding ongoing

18   constitutional violations, including orders specifically addressing the areas of: suicide

19   prevention (Order, 7/12/13, Dkt. 4693); access to and conditions of confinement in DSH-

20   operated facilities (Order, 7/11/13, Dkt. 4688 & Order, 11/13/13, Dkt. 4925); and

21   conditions and access-to-care for the condemned at San Quentin (Order, 12/10/13, Dkt.

22   4951). The court's order denying Defendants' Motion to Terminate detailed constitutional

23   deficiencies regarding suicide prevention (Order, 4/5/13, Dkt. 4539 at 32-43), the use of

24   administrative segregation (*id.* at 43-46), the provision of timely and adequate inpatient

25   and crisis-level care (*id.* at 46-53), the provision of treatment space and appropriate beds

26   (*id.* at 53), and mental health staffing (*id.* at 54-62).

27

28

[1074337-7]

1

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

**Coleman Class Population Trends**

4.       Reductions to date in CDCR's prison population have failed to benefit the *Coleman* class.  Attached hereto as **Exhibit 1** is a true and correct copy of a chart created by Plaintiffs' expert Dr. Craig Haney and entered into evidence as Plaintiffs' trial exhibit 2035 during the recent evidentiary hearing on Defendants' segregation practices with respect to the *Coleman* class.  The chart shows that the total CDCR population decreased by 30,091—or 19.6%—between April 2000 and October 2013.  Another chart created by Dr. Haney and entered into evidence as Plaintiffs' trial exhibit 2036 at the same hearing, attached hereto as **Exhibit 2**, shows that the total mental health population increased by 14,321—or 73%—during the same period of time.  These charts also demonstrate that, even with the overall prison population reduction realized in light of the Three-Judge Court and United States Supreme Court decisions, the CDCR mental health population has remained nearly unchanged from five years ago.  As a result, the mentally ill now constitute a significantly *higher*—and still increasing—percentage of the CDCR population.

5.       In the past year, Plaintiffs' experts have opined extensively about the effects of ongoing overcrowding on seriously mentally ill inmates.  *See* Haney Expert Decl., Dkt. 4378, filed 3/14/13, ¶ 31 ("It is also important to recognize that there has essentially been no reduction in the overall mentally ill prisoner population, even as the prison system itself has become somewhat less overcrowded."); *id.*, ¶ 32 ("Backlogs and other crowding-related stresses still predominate in several prisons and across the system."); *id.*, ¶ 45 ("It became very clear on the tours of CDCR institutions that I conducted is that the current system is not providing remotely appropriate beds for many of its mentally ill population, and that it cannot do so under current levels of overcrowding."); Stewart Expert Decl., Dkt. 4381, filed 3/14/13, ¶ 44 ("[O]ngoing overcrowding … is apparent in the extreme clinical staff shortages, office and treatment space shortages, lack of bed space, frequent lockdowns of long duration, medication management problems and high clinical acuity of the mentally ill prisoners I observed on my tours.").

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

6.      As Dr. Haney has testified, while "some of the most egregious and obvious aspects of overcrowding . . . have been addressed," Defendants' system shows a "continuing inability to provide for the mental health needs of its prisoners … produced in large part by a nexus of persistent problems" that include "drastic shortages of mental health and correctional staff; lack of adequate clinical space; and widespread levels of inmate-patient idleness and lack of meaningful treatment opportunities," all symptoms of overcrowding.  Haney Expert Decl., Dkt. 4378, filed 3/14/13, ¶ 35.  Housing units and cells for prisoners with mental illness remain extraordinarily crowded and cramped.  The following photos were taken at CIM in February 2013.  *See id.* Photo Exhibits U & W.



DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' AMENDED APPLICATION AND [PROPOSED] ORDER

[1074337-7]



**Current and Future Inadequacies in Access to Mental Health Beds**

7.      Defendants continue to operate a system with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of specialized mental health beds for adequate care.  *See* Order, 4/5/13, Dkt. 4539, at 53.  Despite these harmful deficiencies, Defendants have repeatedly delayed and even canceled plans to construct treatment space and necessary mental health beds.

8.      The CDCR Fall 2013 Mental Health Bed Need Study, released in December 2013 and attached hereto as **Exhibit 3**, shows significant delays in transfers to higher levels of care and increasing wait lists (renamed by Defendants as "pending lists") for male acute care (APP) and intermediate care (ICF) hospital beds, male mental health crisis beds (MHCBs), and male Psychiatric Services Unit (PSU) placements.  *See id.* at 11, 18, 22, 30.

1  This "gap," or acknowledged shortage of specialized mental health beds, continues to

2  increase and will worsen unless the population is rapidly reduced from current

3  overcrowded levels.

4        9.     Moreover, projections show that the population crisis is unlikely to abate

5  without concerted efforts.  The Bed Need Study shows continued increases in the projected

6  demand for specialized mental health bed needs at virtually all levels of care for the

7  *Coleman* class for the next five years, based primarily on an increase in CDCR's overall

8  population projections.  *See id.* at 4, 41.

9        10.    In fact, the projected mental health bed needs for 2014 and beyond show that

10  CDCR has significantly *under*-estimated the number of beds necessary to house and

11  provide appropriate mental health care to the *Coleman* class.  The Fall 2013 Bed Need

12  Study shows that, at almost every level of care, the current bed need forecasts are higher

13  than those projected in Spring 2013, with increases in projected bed need between 3.4%

14  and 11.0% for males, and between 2.1% and 23.2% for females:

15  ## Comparison of Bed Need Forecasts: Fall 2013 vs. Spring 2013

17  *The forecasts produced for this Fall 2013 study are compared to the forecasts in the Spring 2013 forecast for the year 2018 (a 5-year projection).*

| Program | Higher/ Lower | 2018 Current Fall 2013 Study | 2018 Previous Spring 2013 Study | Fall 2013 minus Spring 2013 (at 2018) | % Variance (Fall 2013 - Spring 2013) |
|---|---|---|---|---|---|
| **MALES** | | | | | |
| Acute | Higher | 246 | 222 | 24.4 | 11.0% |
| Intermediate * | Higher | 927 | 879 | 48.4 | 5.5% |
| MHCB | Higher | 349 | 318 | 30.6 | 9.6% |
| EOP - GP | Higher | 4,117 | 3,850 | 266.5 | 6.9% |
| EOP ASU | Higher | 487 | 451 | 36.6 | 8.1% |
| PSU | Higher | 336 | 324 | 11.2 | 3.4% |
| CCCMS | Higher | 27,233 | 25,598 | 1,634.3 | 6.4% |
| | | | | | |
| **FEMALES** | | | | | |
| Acute/Intermediate | Lower | 40 | 43 | (2.5) | -5.9% |
| MHCB | Higher | 17 | 15 | 1.7 | 11.1% |
| EOP - GP | Higher | 124 | 101 | 23.4 | 23.2% |
| EOP ASU | Higher | 9 | 9 | 0.2 | 2.6% |
| PSU | Higher | 26 | 25 | 0.5 | 2.1% |
| CCCMS | Higher | 2,623 | 2,394 | 228.9 | 9.6% |

*\* Intermediate bed need excludes inmate-patients deemed incompetent to stand trial (Penal Code section 1370) as they do not meet the requirements for ICF level of care.*

5

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' AMENDED APPLICATION AND [PROPOSED] ORDER

11.     Overall, the Fall 2013 bed need forecast projects that the expected number of CDCR prisoners with mental illness in 2018 has grown by approximately 2,300 between Spring 2013 and Fall 2013.  *Id.* at 40.  Defendants have not provided information as to how they will provide adequate mental health care to all *Coleman* class members given this significant increase in projected mental health population.  Any delay in enforcement of the Three-Judge Court's population reduction order will make achievement of a constitutional remedy to the current violations all but impossible.

12.     In 2009, the *Coleman* court issued an order requiring Defendants to file a long-range mental health bed plan that would be "fully staffed and activated" by 2013.  Order, 9/24/09, Dkt. 3686, ¶ 2.  The court stated that it "expects defendants to comply in full with this order."  *Id.*, ¶ 5.  Attached as **Exhibit 4** is a true and correct copy of Appendix E:  CDCR Male and Female Mental Health Bed Plan to the State's Blueprint, "The Future of California Corrections:  A blueprint to save billions of dollars, end federal court oversight and improve the prison system."  The Mental Health Bed Plan shows the number of mental health beds (for all levels of care except CCCMS) that Defendants expected to have fully completed by the end of December 2013.

13.     Now, in 2014, the mental health bed plans filed by Defendants and set forth in the Blueprint remain unfinished, infected with delays in both construction and activation.  On January 21, 2014, Defendants filed a motion informing the *Coleman* court—asking for relief from prior court orders as necessary—of multiple projects that remain unfinished.  *See* Dkt. 4984.  Among the incomplete projects is the Stockton California Health Care Facility, where at least 159 DSH inpatient beds have not been activated.  Defendants cite their "continued difficulty" in "recruiting and staffing qualified psychiatrists" to provide care to patients in these units.  *Id.* at 10.  Defendants note that the "[f]urther delay in fully activating and occupying the remaining DSH-operated beds at the new Stockton facility has likewise resulted in changing the dates set out in the State's Blueprint for converting all the temporary intermediate and acute beds back to CDCR to operate as outpatient and general population beds."  *Id.*  Defendants have informed the

[1074337-7]

court that they "cannot set a definite date for full activation because it depends on psychiatrist hiring." *Id.*   In other words, Defendants can provide no expected completion date for compliance with the court-ordered bed plan to provide necessary care and access to care to prisoners with mental illness.

**Inadequate Access to Inpatient Psychiatric Hospitalization**

14.    Overcrowding has precluded Defendants from providing timely access to inpatient psychiatric hospitalization and crisis placements, which is a well-established component of their constitutional obligations.  *See* Order, 7/11/13, Dkt. 4688, at 7-9.

15.    In July 2013, the *Coleman* court found significant evidence of Defendants' failure to follow established timelines for the transfer of patients in need of inpatient psychiatric hospitalization.  *Id.* at 10-11.  A subsequent report by the *Coleman* Special Master on conditions at Salinas Valley Psychiatric Program found that "[t]ransfer times for referrals to SVPP are too long, with 27 percent of transfers exceeding the 30-day timeframe during the period of March through June, 2013."  Dkt. 4830, filed 9/24/13, at 4.

16.    Waitlists for inpatient hospital psychiatric beds force critically mentally ill patients to languish in crisis beds while waiting for appropriate levels of treatment.  *See* Stewart Decl., Dkt. 4381, filed 3/14/13, ¶ 40 ("[S]hortages in the amount of available bed space at higher levels of care in Department of State Hospital programs means that many such individuals will wait for transfers to DSH in Mental Health Crisis Bed Units, filling up scarce crisis beds that are otherwise needed for mental health crisis care.  Similarly, it appears that pressure from administrators to reduce the waiting list for scarce DSH beds means that a significant number of severely mentally ill individuals are being prematurely returned from DSH and wait in MHCB beds to be re-referred back to DSH."),

17.    These problems persist and appear to be getting worse.  With respect to inpatient acute (APP) beds, the average "pending list" for the fourth quarter of 2013 was at its highest since the beginning of 2012, in the early stages of implementation of Realignment.  *See* Ex. 3 (CDCR Fall 2013 Mental Health Bed Need Study) at 11. Moreover, the CDCR Fall 2013 Mental Health Bed Need Study indicates that the projected

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

1    need for acute (APP) and intermediate (ICF) hospital beds is significantly higher than even

2    the Spring 2013 projections. *See id.* at 40 (APP bed need is 11.0% higher; the ICF bed

3    need is 5.5% higher).

4         18.    Delays in placing and transferring mentally ill prisoners to ICF and APP

5    hospital beds are also reflected in Defendants' December 2013 Monthly Bed Utilization

6    Report for DSH facilities. Excerpts from this report are attached hereto as **Exhibit 5** (with

7    identifying information redacted). The excerpts show that, as of December 31, 2013,

8    approximately fifteen (15) patients were referred for APP care but still awaiting admission.

9    *See id.* at 45, 46, 51. Some of these referrals data back as far as two months. *See id.* at 45

10   (patient referral "release" date of 10/30/13).[1] Approximately seventy-nine (79) patients

11   had been referred for ICF care but were still awaiting admission as of December 31, 2013.

12   *See id.* at 43, 44, 45, 52, 53. Those referrals date back as far as four months. *See id.* at 43

13   (patient referral "release" date of 8/30/13).

14        19.    In addition to the overall limitations in access to DSH facilities, the *Coleman*

15   court has found that mentally ill prisoners on death row have been severely and uniquely

16   denied access to the highest levels of care. Condemned inmates are denied access to ICF

17   levels of care on a blanket basis and are provided extremely limited access to the acute

18   level of psychiatric hospitalization. *See* Order, 12/10/13, Dkt. 4951, at 4-5, 14-17.

19   Defendants' "Specialized Care for the Condemned Program" at San Quentin was found to

20   be an inadequate substitute, in part because "there are not enough beds [in the program]

21   available for the need that has been identified." *Id.* at 23.

22        20.    The *Coleman* court has found that these bed shortages contribute to the

23   systemic under-identification of prisoners' mental health needs. The court found that the

24

25

26   _____

27   [1] Defendants no longer provide the Court and Plaintiffs' counsel with information as to the date that the actual referral to DSH inpatient care was made.

28

1  "insufficient number of necessary hospital beds is directly correlated with under-

2  identification of need."  *See id.* at 25.

3      21.    This under-identification of mental health need among the condemned has

4  resulted in an alarming number of death row suicides, many of which were preventable.

5  *See id.* at 7 & n.9; Supplemental Decl. of Pablo Stewart ISO Pls' Mot. for Enforcement of

6  Court Orders and Affirmative Relief Regarding Inpatient Psychiatric Hospitalization for

7  Condemned Inmates, Dkt. 4840, filed 9/27/13, ¶ 35 ("four prisoners on death row at San

8  Quentin have committed suicide in the last 22 months, an alarming rate given that there are

9  only approximately 700 condemned prisoners currently at San Quentin"); *id.*, ¶ 34 ("In my

10  opinion, this patient's [suicide] would likely have been prevented if he had been provided

11  with appropriate access to higher levels of care and more intensive treatment for his mental

12  health conditions.").

13  **Inadequate Access to Mental Health Crisis Beds**

14      22.    Shortages and associated delays are not limited to hospital beds.  The

15  *Coleman* court recently found that hundreds of mentally ill prisoners in need of mental

16  health crisis beds (MHCBs) for suicidality or other acute mental illness are being housed in

17  facilities that are "totally inappropriate."  Order, 4/5/13, Dkt. 4539, at 51-52.  Among the

18  alternative placements used are Outpatient Housing Unit (OHU) cells in which the inmate-

19  patient has no bed to sleep on, ZZ cells, contraband cells, administrative segregation unit

20  (ASU) cells, and holding cells where an inmate-patient can be made to "sit or stand" for up

21  to four hours.  *Id.*; *Coleman* Program Guide, Sec. 12-5-5; *see also* Haney Decl., Dkt. 4378

22  ¶ 59 ("OHUs at MCSP and CCI were barren, filthy, and dim, and required patients on

23  suicide observation or suicide watch to sleep on the floor") & Photo Exs. M, DD, & EE.  A

24  true and correct excerpt from the *Coleman* Program Guide, Sec. 12-5-5, which identifies

25  alternative housing placements to be used when there are insufficient crisis beds, is

26  attached as **Exhibit 6.**

27      23.    Alternative housing continues to be used for the simple reason that

28  "Defendants do not presently have a sufficient number of mental health crisis beds

9

1   (MHCBs) to meet the need for such beds."  Order, 4/5/13, Dkt. 4539, at 51 (citing Special

2   Master Twenty- Fifth Round Report, Dkt. 4298, at 21).  Defendants have conceded that the

3   use of alternative housing for prisoners in need of a mental health crisis bed persists at

4   CDCR prisons across the system.  *See, e.g.*, Decl. of Daniel Paramo ISO Defs' Reply ISO

5   Defs' Mot. to Term., Dkt. 4432, filed 3/22/13, ¶ 7 (ASU beds used as alternative housing

6   at RJD); Decl. of Christopher Cornell ISO Defs' Reply ISO Defs' Mot. to Term., Dkt.

7   4453, filed 3/22/13, ¶ 4 (suicidal inmates placed in ASU cells or other alternative housing

8   at LAC while waiting for an MHCB).

9       24.    As part of the recent *Coleman* evidentiary hearing regarding Defendants' use

10  of segregation on the mentally ill, Plaintiffs presented evidence that in June 2013 alone,

11  68% of the inmate-patients referred for crisis bed placement spent some amount of time in

12  alternative housing and were never placed in a crisis bed.  *See* Reply Decl. of Jane E. Kahn

13  ISO Pls.' Mot. for Enforcement of Court Orders & Affirm. Relief re Improper Housing &

14  Treatment of Seriously Mentally Ill Prisoners in Segregation, Dkt. 4765, filed 8/23/13, at

15  ¶ 25 & Ex. H.

16      25.    The problem has not improved since June 2013.  Attached as **Exhibit 7** is

17  Enclosure 20-Attachment 2A of the most recent of Defendants' monthly court-ordered

18  production, for November 2013.  The document, entitled "MHCB Transfers by Institution

19  and Prior Level of Care, November 2013" provides a five-page list of 177 inmate-patients

20  referred for crisis level of care who were made to wait in alternative placements due to

21  unavailability of crisis beds.  *Id.*

22      26.    Attached as **Exhibit 8** is Enclosure 20-Attachment 1 of the November 2013,

23  *Coleman* monthly data, which shows that in addition to the 177 inmate-patients who were

24  made to wait in an alternative placement before transferring to an institution with an

25  available crisis bed, another 137 inmate-patients referred for crisis bed placement in

26  November 2013 spent some amount of time in alternative housing and were never placed

27  in a crisis bed.  *Id.*

28

10

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

1       27.     Given current and projected population levels, there will be no relief with

2  respect to inadequate access to MHCBs in the foreseeable future.  The Fall 2013 Bed Need

3  Study indicates that the 5-year projected need for MHCBs is nearly ten percent higher than

4  the Spring 2013 projections.  *See* Ex. 3 at 19, 40.   In light of the increased bed need

5  projections and indefinite delays in the activation of the California Health Care Facility

6  (which is designed to provide MHCBs and inpatient beds), the use of alternative crisis bed

7  housing and temporary unlicensed crisis beds can be expected to persist at the present

8  crowding levels.

9  **Inadequate Access to Appropriate Outpatient Levels of Care**

10       28.     Demand for EOP beds is projected to follow the same pattern.  The Fall 2013

11  Bed Need Study indicates that the 5-year projected need for EOP-General Population beds

12  has increased by several hundred prisoners as compared to the Spring 2013 EOP-GP bed

13  need forecasts.  *See* Ex. 3 at 24, 40.  And Defendants' study indicates that EOP-GP bed

14  need will continue to grow through 2024.

15       29.     Meanwhile, the current reality is that the population of EOP prisoners

16  outstrips CDCR's EOP capacity.  Attached hereto as **Exhibit 9** is a true and correct copy

17  of a CDCR report, entitled "Mental Health Population by Institution, Download Date:

18  November 15, 2013," which is part of Defendants' most recent monthly data production.

19  The document indicates that the current EOP population is 4,686 inmate-patients, 7% over

20  the current capacity of 4,364.  The November 2013 monthly data also shows that the

21  CCCMS population is 11% over current capacity.

22       30.     CDCR prison overcrowding also creates transportation barriers that make

23  timely transfer impossible in the current system.  For example, CDCR's transportation

24  system cannot provide timely transfer for EOP prisoners, the most seriously ill prisoners in

25  an outpatient program, as DAI Deputy Director Kathleen Allison acknowledged during her

26  recent testimony before the *Coleman* court.  *See* Dkt. 5017, 12/12/13 Hearing Transcript at

27  3215:20-3217:8 (excerpt also attached hereto as **Exhibit 10**).

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

31.     Attached hereto as **Exhibit 11** is a true and correct copy of a CDCR report, entitled "Enhanced Outpatient Program (EOP) Institution Counts and Bus Seat Requests - Week of November 18, 2013," which is part of the most recent of Defendants' monthly court-ordered production provided to the *Coleman* Special Master and Plaintiffs' counsel. The document indicates that for the week of November 18, 2013, CDCR was able to transfer and place just 33 of 203 EOP prisoners (16.3%) for whom a bus seat had been requested for transfer to an appropriate EOP program.

32.     This current evidence of barriers to transfer is similar to the evidence Plaintiffs presented in March 2013.  *See* Stewart Decl., Dkt. 4381, ¶¶ 278, 282 (discussing use of "bad beds" based on Defendants' inability to provide timely transfer and placement); Haney Decl., Dkt. 4378, ¶¶ 44-46 (same); Bien Decl. ISO Pls' Opp. to Defs' Mot. to Term., Dkt. 4399, Ex. 2 (32 of 234 EOP prisoners (13.7%) able to transfer to appropriate EOP program during week of February 11, 2013); *id.* (271 of 1435 CCCMS prisoners (18.9%) able to transfer to appropriate CCCMS bed during same week).

33.     Michael Stainer, the director of CDCR's Division of Adult Institutions, testified in December 2013 that he would expect it to be easier to move inmate-patients more rapidly to proper beds if the population was reduced.  *See* Dkt. 5017, Hearing Transcript at 3315:13-18 (excerpt also attached hereto as **Exhibit 12**).

**Constitutionally Inadequate Treatment Spaces and Chronic Construction Delays**

34.     As a consequence of continued overcrowding, treatment spaces in California prisons continue to be insufficient for the delivery of constitutionally adequate mental health care.  Despite these deficiencies, Defendants continue to delay and even cancel essential treatment space construction projects.  In the recent *Coleman* evidentiary hearing on the use of segregated housing for mentally ill prisoners, the evidence demonstrated that projects to address treatment space deficiencies remain years from completion:

a.     Deborah Hysen, the Deputy Director of the Facility Planning, Construction, and Management Division for CDCR, testified that the October 2012 health care facility improvement project at Richard J. Donovan Correctional Facility (RJD),

1  which includes construction of a new EOP administrative segregation unit treatment space,

2  is not scheduled to be completed until at least March 2016. *See* Decl. of Deborah Hysen,

3  Dkt. 2712-2, 7/24/13, ¶ 10. In the meantime, group treatment continues to occur on the

4  dayroom floor in the EOP ASU hub at RJD. *See* Dkt. 5014, 12/5/13 Hearing Transcript at

5  2761:15-25 (Stewart: groups on dayroom floor at RJD and LAC) (excerpt also attached

6  hereto as **Exhibit 13**).

7       b.     New treatment space at Mule Creek State Prison (MCSP) is not

8  scheduled for activation until at least February 2016. *See* Dkt. 2712-2, ¶ 11. Group and

9  individual treatment continues to occur on the dayroom floor in the EOP ASU hub at

10 MCSP, just as it did when Dr. Haney toured the institution in 2007. *See* Haney Decl., Dkt.

11 4378, ¶¶ 75-76. Photographs depicting the MCSP EOP ASU treatment space were

12 admitted as Plaintiffs' trial exhibits 2003, 2004, 2005, 2006, and 2012, and are attached

13 hereto as **Exhibits 14-17**.

14       c.     A project to design and construct a new ASU EOP treatment space at

15 California Men's Colony (CMC) is not scheduled for activation until at least September

16 2016. *See* Dkt. 2712-2, ¶ 12.

17       d.     A project to design and construct a new ASU EOP treatment space at

18 California Institution for Women (CIW) is not scheduled for activation until at least

19 September 2015. *See id.*, ¶ 13.

20       e.     New treatment space at California State Prison Los Angeles County

21 (LAC) is not scheduled for activation until at least March 31, 2014. *See* Dkt. 2712-2, ¶ 7.

22 As Dr. Stewart testified, group treatment continues to occur on the dayroom floor in the

23 EOP ASU hub at LAC. *See* Dkt. 5014, 12/5/13 Hearing Transcript at 2761:15-25

24 (Stewart: groups on dayroom floor at RJD and LAC) (excerpt also attached hereto as

25 **Exhibit 18**).

26       f.     Plaintiffs are aware of no plan to address the serious group treatment

27 space deficiencies for mentally ill prisoners at CCI. *See* Haney Decl., Dkt. 4378, ¶ 240. A

28

1   true and correct copy of a photograph depicting CCI segregation treatment space is

2   attached as **Exhibit 19**.

3          g.      A plan to renovate the ASU at California Institution for Men (CIM) to

4   provide confidential treatment space, group treatment space, and clinical office space, was

5   cancelled.  *See* Dkt. 5016, 12/11/13 Hearing Transcript at 3127:13-3128:7 (CIM Chief of

6   Mental Health Dr. Jordan:  cancellation of construction project) (excerpt also attached

7   hereto as **Exhibit 20**).

8          h.      At Corcoran, deficits in treatment space for CCCMS class members in

9   the SHU and ASU persist, and Defendants have set forth no plan to address these

10  problems.  *See* Dkt. 5013, 12/4/13 Hearing Transcript at 2654:7-12, 2665:5-2666-14

11  (Corcoran Senior Psychologist Supervisor Dr. Fischer:  no groups for CCCMS in SHU or

12  ASU "based primarily on … lack of space availability) (excerpts also attached hereto as

13  **Exhibit 21**).

14      35.     Similarly, it is undisputed that treatment space inadequacies for condemned

15  prisoners with mental illness at San Quentin have yet to be addressed.  *See* Expert Decl. of

16  Jeanne Woodford ISO Pls' Opp. to Defs' Mot. to Term., Dkt. 4380, 3/4/14, ¶ 39 ("It is also

17  my opinion that there appears to be inadequate physical space within the existing

18  condemned housing units to provide appropriate recreational activities that, in my

19  experience, are critical to the maintenance of long-term mental health stability.")  In fact, a

20  long-planned project to construct a new housing facility for condemned inmates was

21  canceled by the Governor in 2011.  *Id.*, ¶ 36.  More recently, in response to the *Coleman*

22  court order, Defendants have orally announced an intention to address the inpatient bed

23  deficiency, but there is no approved plan and no agreement that Defendants will address

24  other treatment space problems on death row.

25  **Inappropriate Use of Segregated Housing Units**

26      36.     As a result of chronic shortages of appropriate housing placements, as well

27  as Defendants' failure to effectuate timely transfers, *Coleman* class members are held in

28  dangerous segregation units for extended periods of time.

37.     Defendants acknowledge that they place prisoners with mental illness into segregated housing units for a variety of reasons unrelated to rule violations, including "safety" reasons, pending transfers to other yards, and recent discharge from terms in the Security Housing Unit (SHU).  *See* Decl. of Kathleen Allison, Dkt. 4713, filed 7/24/13, ¶ 19 (confirming that ASU is used "to address inmates' safety concerns"); Dkt. 5017, 12/12/13 Hearing Transcript at 3311:25-3312:13 (Stainer:  individuals discharging from the SHU may be placed in ASUs due to housing shortages) (excerpt also attached hereto as **Exhibit 22**); Dkt. 5015, 12/6/13 Hearing Transcript at 2995:9-2996:6 (Allison:  prisoners may be placed in ASUs due to a change in custody level that requires transfer to another institution) (excerpt also attached hereto as **Exhibit 23**).

38.     The use of segregation for mentally ill prisoners who have committed no disciplinary infractions stems in part from systemic shortages of Special Needs Yards (SNY) beds.  According to Defendants' "Enhanced Outpatient Program (EOP) Institution Counts and Bus Seat Requests—Week of November 18, 2013" data, CDCR was able to place 19 of 126 EOP prisoners (15.1%) who were designated for transfer an EOP-SNY bed.  *See* Ex. 11; *see also* Haney Decl. ¶ 70 (observing Defendants' failure to place and transfer prisoners to Level II EOP SNY yards); ¶ 83 (Prisoner F in MCSP ASU pending transfer to SNY yard); ¶ 104 (Prisoner J in MCSP ASU pending transfer to EOP SNY bed); ¶ 107 ("There were 6 more EOP prisoners waiting for a transfer to another EOP SNY yard and most of them were being housed in Ad Seg."); ¶ 131 ("One of the clinicians with whom we spoke [at Corcoran], Dr. Lindsay, said that it was 'hard to move SNY EOP prisoners,' even after they are endorsed, because there are 'no beds elsewhere in the system to put them in.'"); ¶ 250 ("I spoke with another prisoner in Ad Seg [at CCI] who was also awaiting transfer to Kern Valley State Prison for an appropriate SNY bed."); Kaufman Decl. ¶ 100 (Prisoner P, a CCCMS class member at Corcoran, was endorsed for transfer to SNY, but instead placed in ASU "with no idea when he will be released from isolation").

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

[1074337-7]

39.     Ms. Allison confirmed that the prisoners held in segregation units for no fault of their own are subjected to the same harsh custodial measures imposed throughout segregation units, including blanket strip searches, indiscriminate use of cages for mental health treatment, and escorting in cuffs.  *See* Dkt. 5017, 12/12/13 Hearing Transcript at 3200:16-3201:16 (excerpt also attached hereto as **Exhibit 24**).

40.     The practice of placing prisoners in segregation for no fault of their own is sufficiently common that Defendants have coined a term for some of those prisoners; they are simply called "LOBs," for "lack of bed.  Attached hereto as **Exhibit 25** is a photograph of a housing census board in Cypress Hall Administrative Segregation Unit at CIM, taken in February 2013.  The board shows that the majority of the prisoners in the unit were "LOBs" (indicated by pink and purple cards).  *See* Haney Decl., Dkt. 4378, ¶ 124 ("Many mentally ill (and nonmentally ill) prisoners had been placed in an Ad Seg unit solely because of a "Lack of Beds" at the institution and/or in the CDCR").

41.     "CIM had classified many of these individuals as "LOB"—"lack of bed." In other words, there are enough individuals whom CIM has been unable to place in appropriate housing settings that they created a specific category for them.

42.     Defendants have asserted that space and physical plant limitations prevent them from creating separate non-disciplinary segregation units, in which prisoners who committed no rule violations would not be subject to these punitive measures.  According to Ms. Allison, Defendants plan to "cluster" prisoners in non-disciplinary segregation "[w]here it's practical and feasible."  *See* Dkt. 5017, 12/12/13 Hearing Transcript at 3195:13-3196:2 (excerpt also attached hereto as **Exhibit 26**).

43.     It is undisputed that segregation units are dangerous, high-risk settings.  The *Coleman* court's suicide expert, Dr. Ray Patterson, has concluded that "[t]he difference between segregated housing and non-segregated housing with regard to their respective rates of suicides per 100,000 is staggering."  Report on Suicides Completed in the CDCR, Jan. 1, 2012 – June 30, 2012, Dkt. 4376, filed 3/13/13, at 2, 16.

[1074337-7]

16

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' AMENDED APPLICATION AND [PROPOSED] ORDER

44.     Plaintiffs' experts have opined extensively on the harm to class members caused by dangerous and unjustified housing placements in segregated housing units. *See* Kaufman Expert Decl., Dkt. 4379, ¶ 96 ("Unlike inmates who are formally placed in administrative segregation, these individuals have undergone no process and, in many cases, received no explanation before being placed in isolation.… When I spoke to them, they were confused and, in some instances, desperate and decompensating."); *id., ¶* 115 (placement in segregated housing for non-disciplinary reasons is "especially damaging because of the indeterminate and seemingly arbitrary nature of the placement."); Haney Decl., Dkt. 4378, ¶ 152 ("I too saw many inmate-patients who appeared to be very sick in the CIM segregation unit; they were there solely because there was no other place to put them.").

45.     This dangerous overuse of segregation for the mentally ill is directly related to ongoing overcrowding. *See* Expert Decl. of James Austin ISO Pls' Mot. Regarding Mentally Ill Prisoners in Segregation, Dkt. 4762, filed 8/23/13, ¶ 39 ("It should be noted that the State's still overcrowded system is obviously contributing to the placement in ASU of inmates who pose no threat to institutional safety. Had the state reduced its prison population as consistent with the Three-Judge Court's order, problems in promptly transferring the Lack of Bed and protective custody inmates out of ASUs would be greatly reduced, if not virtually eliminated."); Haney Decl., Dkt. 4378, ¶143 ("Ad Seg housing is dangerously overused in the CDCR due to overcrowding-related pressures").

**Persistent Staffing Shortages**

46.     *Coleman* class members are also harmed by Defendants' chronic failure to recruit or retain sufficient clinical or custody staff deliver minimally adequate care. *See* Order, 4/5/13, Dkt. 4539, at 54 ("chronic understaffing and high vacancy rates in mental health staff positions are evidence of an ongoing Eighth Amendment violation"); *id*. at 61 (Defendants "have not met their burden of proving that they can meet their constitutional obligations with the existing  levels of staffing vacancies").

[1074337-7]

17
DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

1      47.    During the site visits conducted in connection with Defendants' termination

2  motion, Plaintiffs' experts identified major staffing shortages across disciplines.  *See*

3  Haney Decl. Dkt. 4378, ¶ 52 (shortage of psychologists, social workers, recreational

4  therapists, and psychiatrists at Mule Creek State Prison); *id.* (shortage of psychiatrists,

5  psychologists, and access-to-care officers at Corcoran), *id.* ("substantial staffing deficits

6  for psychiatrists, primary clinicians, social workers, psychiatric technicians, and

7  recreational therapists, resulting in back-breaking caseloads and use of non-clinical staff

8  for clinical duties" at California Correctional Institute); Kaufman Decl., Dkt. 4379, ¶¶ 33-

9  35 (shortage of psychologists and psychiatrists, and high caseloads at California Institution

10 for Men); Stewart Decl., Dkt. 4381, ¶¶ 66-73 (shortage of recreation therapists, social

11 workers, and psychiatrists at SVSP), ¶¶ 77-87 (shortage of recreation therapists,

12 psychiatrists, office technicians, clinical psychologists at SAC); ¶¶ 104-109 (shortage of

13 psychologists, psychiatrists, recreational therapists at LAC); ¶ 111 (shortage of

14 psychiatrists, office techs, social workers at RJD); ¶ 115-117 (shortage of office

15 technicians and recreation therapists at San Quentin); Woodford Decl., Dkt. 4320, filed

16 3/14/13, ¶ 43 (lack of adequate custody or mental health staff for the condemned

17 population at San Quentin).

18     48.    These staffing shortages persist.  In July 2013, the *Coleman* court found that

19 "Plaintiffs have presented significant and troubling evidence of … severe staffing

20 shortages" in the Department of State Hospitals.  Order, 7/11/13, Dkt. 4688, at 10.  Among

21 the evidence presented by Plaintiffs were letters signed by the entire psychiatry staff at the

22 Salinas Valley Psychiatric Program (SVPP) in January and February 2013 expressing

23 concern about a "psychiatry staffing shortage" that had reached "crisis level" and required

24 "urgent action."  Amended Decl. of Joel Badeaux, M.D., Dkt. 4560, Ex. C; *see also id.*

25 Ex. B.  The court's order identified "critical staffing shortages and other impediments to

26 constitutionally adequate mental health care" and observed the connection to "severe

27 overcrowding in the California prison system, which has not yet been adequately remedied

28 …."  Dkt. 4688, at 10-11, nn. 8, 10.

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

49.     Similarly, in September 2013, the Special Master reported that "[c]linical staffing shortages frequently resulted in very large psychiatrist caseloads, exceeding the SVPP planned ratio of no more than 35 patients for each practitioner, and resulting in further dilution of the already-limited care that is provided."  Special Master's Report on the Salinas Valley Psychiatric Program, Dkt. 4830, filed 9/24/13, at 3.

50.     As recently as January 2014, Defendants notified the court that the court-ordered activation of the California Health Care Facility had fallen behind schedule due to "continued difficulty … recruiting and staffing qualified psychiatrists."  Mot. Regarding Defendants' Long-Range Mental Health Bed Plan and Update to Court, Dkt. 4984, filed 1/21/14, at 10.

51.     Senior Psychologist Supervisor at California State Prison Corcoran Robert Fischer recently testified about shortages of recreation therapists and escort staff, as well as psychiatrists.  He conceded that full staffing would help to reduce the incidence of cell-front mental health treatment in Corcoran's segregation units.  *See* Dkt. 5013, 12/4/13 Hearing Transcript at 2650:16-24, 2698:14-22, 2674:15-2675:6, 2681:14-17, 2698:14-22 (excerpts also attached hereto as **Exhibit 27**).

52.     Attached hereto as **Exhibit 28** is an excerpt from the November 2013 Coleman Monthly Report, which was provided to Plaintiffs on January 2, 2014.  According to the "Six Month Vacancy Summary," there are still 631 vacant positions, and an overall vacancy rate of 26.45%.  The vacancy rate for psychiatrists is 37.44%.  *Id.*

53.     These shortages have tragic effects for the *Coleman* class.  The Coleman Special Master has identified the "high rate of vacancies in mental health staffing in CDCR prisons" as a factor in Defendants' failure to prevent suicides:  "The lack of sufficient mental health staff continues to exacerbate the … problem of inadequacy in assessment, treatment, and interventions."  Report on Suicides Completed in the CDCR in Calendar Year 2011, Dkt. 4308, filed 1/25/13, at 16.

[1074337-7]

19
DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

**Punitive Custodial Practices**

54.    Blanket custodial practices such as mandatory strip searches and indiscriminate use of cages persist in segregation units.  Ongoing overcrowding and associated staffing shortages make it more challenging for Defendants to conduct the individualized assessments that are necessary to avoid inflicting needless harm on mentally ill prisoners.  *See* Austin Decl., Dkt. 4762, ¶ 58 (blanket strip searches are unnecessary and "demeaning," and "individualized assessment[s]" should be conducted); Dkt. 5016, 12/11/13 Hearing Transcript at 3074:17-3075:24 (Austin:  cages should be used for treatment "only as a last resort" and "should not be a blanket measure for everyone regardless of their need for it") (excerpt also attached hereto as **Exhibit 29**).

55.    Overcrowding also causes a higher frequency of lockdowns and modified programs, which impede mental health treatment.  Plaintiffs' expert Eldon Vail explained that "large groups of inmates who are forced to live in overcrowded conditions with little productive activity have increased behavior problems, and the incidence of violence and self-harm within the institution escalates.  …  The use of lockdowns of all or parts of the prison increases, and ever greater numbers of inmates are placed in solitary confinement." Expert Decl. of Eldon Vail, Dkt. 4385, filed 3/14/14, ¶104; *see* Kaufman Decl., Dkt. 4379, ¶ 171 (medical records at Central California Women's Facility "are replete with references to interruptions to mental health care on account of lockdowns."); Stewart Decl., Dkt. 4381, ¶¶ 184-191 (observing excessively long and harmful lockdowns that cause "social isolation, … lack of purposeful activity, stress, less clinical contact, more conflict with potentially hostile custody staff members, less surveillance of prisoners, and noisy conditions—all of which tend to worsen existing mental illness.").

**Staggeringly High Rates of Suicide**

56.    The harm that results from ongoing constitutional deficiencies in mental health treatment and conditions of confinement is not abstract.  The *Coleman* Special Master's Suicide Report for the first six months of 2012 found that the suicide rate in CDCR prisons exceeds national averages and reported a "continuation of the ongoing rise

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

1    in the rate of suicides since 2005." *See* Report on Suicides Completed in the CDCR, Jan.

2    1, 2012 – June 30, 2012, Dkt. 4376, filed 3/13/13, at 2, 3.  The Special Master's suicide

3    expert observed that "many of the same recommendations [are repeated] over and over

4    again … *because, year after year, CDCR fails to implement these recommendations.*"  *Id.*

5    at 8 (emphasis in original).

6        57.    The *Coleman* court overruled Defendants' objections to the Special Master's

7    suicide report and observed that the Special Master's "findings that suicides were

8    preventable implicates, at least, the adequacy of defendants' training, implementation, and

9    supervision of suicide prevention policies and procedures, as well as the adequacy of

10   clinical judgment exercised by staff."  Order, 7/12/13, Dkt. 4693.  The court found that

11   Defendants' failures in the area of suicide prevention are "of grave concern to … the

12   Special Master, his expert, and this court."  *Id.* at 4.

13       58.    Among the recommendations which Defendants have failed to implement is

14   the use of suicide-resistant intake cells for the first 72 hours of a prisoner's placement in a

15   segregated housing unit.  By their own admission, Defendants are unable to comply with

16   this policy because they lack sufficient intake cells to meet the demands of their

17   population.  *See* Dkt. 5016, 12/11/13 Hearing Transcript at 3131:22-3132:8 (Jordan:

18   shortage of intake cells in CIM's ASU) (excerpt also attached hereto as **Exhibit 30**); Dkt.

19   5019, 12/18/13 Hearing Transcript at 3530:18-3531:2 (Belavich:  insufficient intake cells

20   at some institutions) (excerpt also attached hereto as **Exhibit 31**).  These shortages are the

21   direct result of ongoing overcrowding.

22       59.    During a recent evidentiary hearing, Plaintiffs presented data, based solely

23   upon CDCR suicide reports and notifications, that 28 suicides occurred between January 1,

24   2013 and December 18, 2013.  Attached hereto as **Exhibit 32** is a true and correct copy of

25   Plaintiffs' chart of 2012 and 2013 suicides, which was accepted into evidence on

26   December 18, 2013 as Plaintiffs' trial exhibit 2781.

27       60.    After December 18, 2013, yet another suicide took place.  According to

28   CDCR data, a class member at the CCCMS level of care killed himself in an ASU cell at

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

[1074337-7]

1   North Kern State Prison on December 27, 2013.  *See* Decl. of Margot Mendelson, Dkt.

2   4986; *id.* at Ex. 1.  This brings the total number of recognized, uncontested suicides in

3   2013 to 29.

4          61.     Based on this data, and using the method for suicide calculations adopted by

5   the Special Master, the suicide rate for 2013 is 23.51 suicides per 100,000.[2]  According to

6   the Special Master, the average suicide rate for U.S. state prisons is 16 suicides per

7   100,000.  *See* Report on Suicides Completed in the CDCR, Jan. 1, 2012 – June 30, 2012,

8   Dkt. 4376, filed 3/13/13, at 16.  This is a striking and extremely troubling finding.

9          62.     Importantly, Plaintiffs also have presented evidence of at least three

10  additional suicides in 2013 which Defendants have not reported as such:  (1) the suicide

11  that took place on September 7, 2013 at Mule Creek State Prison and is the subject of a

12  forthcoming status conference before the *Coleman* court, *see* Pls' Urgent Petition for a

13  Status Conference to Address Modified and Delayed Suicide Report, Dkt. 4982; Order,

14  1/23/14, Dkt. 5022; Order, 1/22/14, Dkt. 4992; (2) the suicide of a class member by water

15  intoxication that took place at the Salinas Valley Psychiatric Program on March 22, 2013

16  and about which Dr. Stewart has offered expert opinions, *see* Reply Decl. of Pablo

17  Stewart, M.D. ISO Pls' Mot. for Enforcement of Court Orders and Affirmative Relief

18  Related to Inpatient Treatment, Dkt. 4617-1, ¶¶ 24-26; Decl. of Krista Stone-Manista ISO

19  Pls' Reply Regarding Mot. for Enforcement of Court Orders and Affirmative Relief

20  Related to Inpatient Treatment, Dkt. 4618, Ex. 1; (3) the suicide of a class member by

21  water intoxication that took place in the Psychiatric Services Unit on February 2, 2013, *see*

22  California State Prison at Sacramento Health Care Evaluation, *Plata v. Brown* Dkt. 2754 at

23  94-95 (detailing the death by water intoxication and describing it as preventable).

24  _____

25  [2] This calculation is based on the in-state prison population (including the DSH
26  population) of 123,335 as of midnight on June 30, 2013.  *See*
    http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Month
27  ly/TPOP1A/TPOP1Ad1306.pdf.

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER

63.     The need for urgent action to reduce crowding in the CDCR is beyond question.  Until such reductions are achieved, there is every reason to believe that prisoners with mental illness with continue to suffer and die needlessly.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 28th day of January, 2014.


/s/ Michael W. Bien
Michael W. Bien

[1074337-7]

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
AMENDED APPLICATION AND [PROPOSED] ORDER