KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
PATRICK R. MCKINNEY
Supervising Deputy Attorneys General
DEBBIE VOROUS, State Bar No. 166884
CHRISTINE M. CICCOTTI, State Bar No. 238695
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK DAD PC |
| Plaintiffs, | **DEFENDANTS' STATUS CONFERENCE STATEMENT** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

Defendants submit this statement in advance of the Court's January 30, 2014 status conference concerning "whether, and if so how if at all, issues presented by the death of [a *Coleman*] class member bear on the use of force questions presented by plaintiffs' May 29, 2013 motion." (ECF No. 5022 at 22.) Defendants are taking this matter very seriously. An investigation was initiated within days after Inmate D's death and, as the self-critical January 7, 2014 suicide report indicates, Defendants identified serious concerns regarding the circumstances of this inmate's death. (Decl. Michael W. Bien (Bien Conf. Decl.), Ex. D.) Corrective actions

1

Defs.' Status Conference Statement (2:90-cv-00520 LKK DAD PC)

are underway and a system-wide change to the use-of-force policy is being implemented.  There is also an ongoing investigation into whether disciplinary action should be taken against staff involved in this matter.

Plaintiffs' contention that Defendants deliberately delayed or manipulated the January 7, 2014 report's contents lacks merit.  The documents attached to Plaintiffs' demand for a further evidentiary hearing show that Defendants appropriately investigated and timely released the final report, and that changes to the report were made to correct inaccuracies and remove factually unsupported statements.  Accordingly, the evidentiary hearing concerning use-of-force should not be reopened.[1]

## I.  DEFENDANTS APPROPRIATELY INVESTIGATED AND TIMELY ISSUED INMATE D'S SUICIDE REPORT.

Plaintiffs incorrectly assert that a draft document allegedly provided to them by a newspaper reporter demonstrates that Defendants had completed their investigation into Inmate D's death by October 31, 2013, and they therefore should have released the report before the evidentiary hearings related to use-of-force were completed.  (ECF No. 4982 at 1:8-11.)  Their error is easy to identify.  The draft report discusses the coroner's autopsy report received by CDCR on *November 27, 2013*, and so it could not have been prepared before that date.  (Bien Conf. Decl., Ex. A at 3.)  In fact, Exhibit A appears to be a December 12, 2013 draft of the final report.  (Decl. Timothy Belavich (Belavich Conf. Decl.) ¶ 13.)

Plaintiffs' claim that the *Coleman* Program Guide required the report to be submitted by November 6, 2013 is simply wrong.  The Program Guide states that suicide reports must be submitted within 60 days of a suicide—not deaths of undetermined or accidental causes.  (Mental Health Services Delivery System Program Guide (2009 Revision) (Program Guide), 12-10-26.)  And a June 2002 order from this Court provides that if there is a genuine issue as to whether a

---

[1] The Court's January 23 order vacated submission of Plaintiffs' motion on use-of-force.  (ECF No. 5022.)  If Plaintiffs seek to address or obtain relief regarding suicide prevention, Defendants respectfully note that the Court issued an order in July 2013 addressing suicide prevention measures and more recently granted the Special Master's request to add a suicide prevention expert to his team.  (ECF No. 4693, filed 7/12/13.)  For those reasons, no further hearings or orders regarding suicide prevention are necessary or appropriate.

2

Defs.' Status Conference Statement (2:90-cv-00520 LKK DAD PC)

death is a suicide, a suicide report must only be issued after said death is determined to be a suicide. (ECF No. 1384 at ¶ 7.) The Special Master likewise counsels that "disputed inmate suicide deaths need thorough review via the CDCR Suicide Prevention and Response Focused Improvement Team (SPR-FIT) process." (ECF No. 2566 at 5.)

On September 16, 2013, CDCR provided formal notice that it was uncertain whether Inmate D's death was a suicide or an accidental death. (Bien Conf. Decl., Ex. C.) As the notice states, two independent medical doctors concluded that Inmate D's "death was not suicide, but rather an accidental death as he did not express active intent to kill himself." (*Id.*) Nevertheless, CDCR's Suicide Prevention and Response Team determined that Inmate D's cause of death warranted further investigation. (Bien Conf. Decl., Ex C.) During this further inquiry, CDCR properly refrained from making any final conclusions without considering vital information— including the Amador County Sheriff-Coroner's autopsy report. (Belavich Conf. Decl. ¶¶ 8 & 9.) Accordingly, the date on which the SPR-FIT team findings and recommendations concerning Inmate D's death were issued was not motivated by "litigation strategy," but was instead the result of a thorough and accurate investigation. (*Id.*)

After receiving the autopsy report on November 27, Defendants' suicide review team determined that because there was no clear evidence that Inmate D intended to kill himself, Inmate D's death could not be conclusively categorized as a suicide. (Bien Conf. Decl., Ex. D "Executive Summary" at 3.) That conclusion is supported by the *Plata* Receiver's recently issued death review, which determined that Inmate D's death was either an "accidental injury to self" or "unknown."[2] (Belavich Conf. Decl. ¶ 11, Ex. 2 at 1 & 3.) Although Defendants could not conclusively determine that Inmate D had committed suicide, Defendants chose to categorize and release the review team's findings in a suicide report so that the facts could be reviewed by all interested parties. (Belavich Conf. Decl. ¶ 10.) The suicide report was completed and provided to the Special Master and Plaintiffs' counsel by January 9, 2014. (*Id.*)

---

[2] Exhibit B to the confidential Bien Declaration appears to be a draft version of the Receiver's death review, which is marked as legally privileged and confidential. (Bien Conf. Decl., Ex. B.)

3

Defs.' Status Conference Statement (2:90-cv-00520 LKK DAD PC)

## II. CDCR'S EXHAUSTIVE REVIEW HAS RESULTED IN A NUMBER OF QUALITY IMPROVEMENT PLANS.

CDCR's rigorous and self-critical review of Inmate D's death identified numerous subjects for further training across all staff disciplines, and generated several recommendations for quality improvement. (Bien Conf. Decl., Ex D at 16-19.) These recommendations include issues related to medical records and documentation, emergency response procedures, and policy compliance. Defendants have undertaken to promptly implement these recommendations, including for example: (1) training on conflict resolution and the roles and responsibilities of custodial and medical personnel, (2) training for nursing staff on elevating issues when presented with an issue requiring management decision making, (3) training on adherence to policies and procedures, (4) conducting emergency drills, and (5) ensuring access to emergency medical supplies. (Belavich Conf. Decl. ¶ 12.)[3] In addition, multiple investigations by the Office of Internal Affairs have been initiated and are ongoing. (*Id.*) If it is determined any employee violated policy, CDCR will take appropriate action.

## III. THE FINAL SUICIDE REPORT APPROPRIATELY ADDRESSED THE DRAFT REPORT'S UNSUBSTANTIATED RECOMMENDATIONS AND FACTUAL INACCURACIES.

Plaintiffs identified three deletions from the December 12, 2013 draft report, which they contend were findings and recommendations relevant to the use-of-force hearing. Putting aside that these changes were made at the earliest on December 12, 2013—over a month after the use-of-force proceedings ended—the revisions from the draft to the final report were driven by ongoing refinements during Defendants' deliberative review process.[4] Each change was made to

---

[3] Completion of the Quality Improvement Plans is separate and independent of the ongoing staff disciplinary investigation.

[4] Defendants note that the draft report is protected by the deliberative process privilege as a "predecisional" document prepared to assist an agency decision maker in arriving at his decision, including recommendations, suggestions, and other subjective statements which reflect the personal opinions of the writer rather than the policy of the agency. (ECF No. 3023 at 3 (citing *Carter v. U.S. Department of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) and Order filed May 29, 2008, at 7, ECF No. 2805).) Defendants assert their privilege over the draft document and do not waive it by responding to the Court's order. (Belavich Conf. Decl. ¶ 14 & 15.)

4

Defs.' Status Conference Statement (2:90-cv-00520 LKK DAD PC)

address factually unfounded statements and to correct inaccuracies in the draft.  (Belavich Conf. Decl. ¶ 15.)

Plaintiffs first describe a deletion recommending that Mule Creek State Prison's warden review policies permitting pepper spray use when an inmate takes control of a food port.  (Bien Decl. ¶ 8.)  This recommendation was removed because the connection between Inmate D's exposure to pepper spray and his death is speculative.  Following the exposure to pepper spray, Inmate D decontaminated with water, slept for an hour and a half, and was observed standing at his cell window more than eight hours after the exposure.  (Bien Conf. Decl. Ex. D at 9.)  Moreover, there was no reason for Mule Creek to revisit its local operating procedure because CDCR was already revising its system-wide use-of-force policies, including this very policy.  (Decl. Michael Stainer, Ex. A "Notice of Change to Department Operations Manual", ECF No. 4987-1.)  On January 21, 2014, the Court and Plaintiffs were provided revised Department Operations Manual provisions that now significantly limit pepper spray use when an inmate refuses to allow staff to close and secure a food/security port.  (*Id.*)  Staff may no longer use pepper spray simply because an inmate is holding a food/security port open.  Rather, force is permitted only when the "inmate presents an immediate threat to the safety of the officer or inmate (e.g., the inmate is battering or attempting to batter staff or inmates in the area) . . . ."  (*Id.* at 4.)  Even when an immediate threat exists, staff may only apply "a single 3-second burst of chemical agents against the inmate to secure the food/security port."  (*Id.*)

The second and third changes in the report identified by Plaintiffs described alleged documentation errors in the Inmate Segregation Record (Form 114-D), used to describe custody staffs' interactions with Inmate D after he refused to release his food port.  (Bien Conf. Decl. ¶ 8.)  Further review found that relevant information about custody staff interaction with Inmate D and the pepper spray use were properly documented on the CDCR Form 837 Incident Report for this use-of-force incident, and so the draft report was amended.  (Belavich Conf. Decl. ¶ 16.)

These edits to the draft suicide report did not change or remove any of the underlying factual information regarding Inmate D's death.  In fact, some of the changes also sought to add additional clarifying facts about the sequence of events.  (*See, e.g.*, Bien Conf. Decl., Ex. D at 13

5

(includes the insertion of an entry for 2200 when nursing documentation noted that Prisoner D was "awake with tracheostomy tube intact").) The changes were made during the collaborative process of reviewing suicides and uncertain deaths. (Belavich Conf. Decl. ¶ 17.) The SPR-FIT process, and the Director's reviews, ensure that suicide reports are as accurate and complete as possible. The changes between the draft and final versions reflect just that—corrections to ensure accuracy. (*Id.*)

### IV. PLAINTIFFS' COUNSEL KNEW ABOUT THIS DEATH IN SEPTEMBER 2013.

Plaintiffs were notified of Inmate D's death on September 12, 2013. (Bien Conf. Decl. ¶ 3.) Four days later, Defendants uploaded Dr. Belavich's Notice of Death letter to the secure FTP site—the longstanding method for providing information about inmate deaths to Plaintiffs' counsel and the Special Master. (Belavich Conf. Decl. ¶ 5.) On September 17, 2013 the Initial Report of Death was uploaded to the FTP site, which indicated that pepper spray was used on Inmate D. (Bien Conf. Decl., Ex. F.) Plaintiffs thus knew of this death before the use-of-force hearing began in October 2013. Plaintiffs therefore had ample opportunity to present this information during the evidentiary hearing but did not. Any insinuation that "underlying information about the use of force" in Inmate D's death was delayed because of the pending enforcement hearing is baseless. (ECF No. 4298 at 2.)

### CONCLUSION

Plaintiffs' demand for discovery, depositions, and document requests to investigate the timing of CDCR's suicide report, and why the final report differed from an earlier draft would waste both State and judicial resources. As described, CDCR issued a timely report detailing all the accurate facts concerning Inmate D's death and Defendants do not object to the Court considering the final January 7, 2014 report as part of the use-of-force proceedings.

CDCR takes all deaths in its institutions seriously. To that end, it has thoroughly and carefully examined all the facts and circumstances regarding Inmate D's death. That the final report required time and had evolving content during the investigation and review does not materially change Plaintiffs' argued, briefed, and submitted motion regarding Defendants' use-of-force policies and procedures. Although Inmate D's death was tragic, Defendants' efforts to

6

properly and accurately investigate the details of this event do not warrant re-opening the hearing on the enforcement motion.

Dated: January 29, 2014

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
PATRICK R. MCKINNEY
Supervising Deputy Attorney General

/s/ Christine M. Ciccotti
CHRISTINE M. CICCOTTI

/s/ MANEESH SARMA
MANEESH SHARMA

/s/ DEBBIE VOROUS
DEBBIE VOROUS
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

7

Defs.' Status Conference Statement (2:90-cv-00520 LKK DAD PC)