1  FUTTERMAN DUPREE DODD CROLEY MAIER LLP
   MARTIN H. DODD (104363)
2  180 Sansome Street, 17th Floor
   San Francisco, California 94104
3  Telephone:  (415) 399-3840
   Facsimile:  (415) 399-3838
4  mdodd@fddcm.com

5  *Attorneys for Receiver*
   J. Clark Kelso
6

7              **UNITED STATES DISTRICT COURT**

8       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9      **AND FOR THE EASTERN DISTRICT OF CALIFORNIA**

10 | MARCIANO PLATA, et al., | Case No. C01-1351 TEH |
11 |     *Plaintiffs,* | |
12 |          v. | |
   | EDMUND G. BROWN, JR., et al., | |
13 |     *Defendants.* | |
14 | | |
15 | RALPH COLEMAN, et al., | Case No. CIV S-90-0520 LKK JFM P |
16 |     *Plaintiffs,* | |
17 |          v. | |
   | EDMUND G. BROWN, JR., et al., | |
18 |     *Defendants.* | |
19 | | |
20 | JOHN ARMSTRONG, et al., | Case No. C94-2307 CW |
21 |     *Plaintiffs,* | |
22 |          v. | |
   | EDMUND G. BROWN, JR., et al., | |
23 |     *Defendants.* | |
24 | | |
25 | **NOTICE OF FILING OF RECEIVER'S** |
   | **TWENTY-FIFTH TRI-ANNUAL REPORT** |
26
27
28

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

2  1351 TEH, has filed herewith his Twenty-Fifth Tri-Annual Report.

3  Dated:  January 31, 2014                    FUTTERMAN DUPREE
                                               DODD CROLEY MAIER LLP
4

5                                              By:/s/ Martin H. Dodd
                                                  Martin H. Dodd
6                                                 Attorneys for Receiver J. Clark Kelso

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Achieving a Constitutional Level of Medical Care in California's Prisons

## Twenty-fifth Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action
## For September 1 – December 31, 2013

**February 1, 2014**

# California Correctional Health Care Receivership

**Vision:**

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

**Mission:**

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.  **Executive Summary**................................................................ **1**

2.  **The Receiver's Reporting Requirements**................................ **3**

3.  **Status of the Receiver's Turnaround Plan Initiatives**................................ **4**

    **GOAL 1**    **Ensure Timely Access to Health Care Services**........................ **4**

    *Objective 1.1*    Screening and Assessment Processes................................ 4

    *Objective 1.2*    Access Staffing and Processes................................ 4

    *Objective 1.3*    Scheduling and Patient-Inmate Tracking System............................ 5

    *Objective 1.4*    Standardized Utilization Management System................................ 5

    **GOAL 2**    **Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services**........................ **6**

    *Objective 2.1*    Primary Care................................ 6

    *Objective 2.2*    Chronic Care................................ 6

    *Objective 2.3*    Emergency Response................................ 7

    *Objective 2.4*    Specialty Care and Hospitalization................................ 7

    **GOAL 3**    **Recruit, Train and Retain a Professional Quality Medical Care Workforce**........................ **8**

    *Objective 3.1*    Physicians and Nurses................................ 8

    *Objective 3.2*    Clinical Leadership and Management Structure............................ 8

    *Objective 3.3*    Professional Training Program................................ 8

    **GOAL 4**    **Implement Quality Improvement Program**................................ **9**

    *Objective 4.1*    Clinical Quality Measurement and Evaluation Program................ 9

    *Objective 4.2*    Quality Improvement Programs................................ 16

    *Objective 4.3*    Medical Peer Review and Discipline Process................................ 22

    *Objective 4.4*    Medical Oversight Unit................................ 22

    *Objective 4.5*    Health Care Appeals Process................................ 22

i

*Objective 4.6*        Out-of-State, Community Correctional Facilities and Re-entry
                  Oversight……………………………………………………………………………    22

**GOAL 5        Establish Medical Support / Allied Health Infrastructure………………    26**

*Objective 5.1*        Pharmacy……………………………………………………………………………    26

*Objective 5.2*        Health Records………………………………………………………    26

*Objective 5.3*        Imaging/Radiology and Laboratory Services……………………………    26

*Objective 5.4*        Clinical Information Systems……………………………………………    27

*Objective 5.5*        Telemedicine……………………………………………………………    27

**GOAL 6        Provide  for  Necessary  Clinical,  Administrative  and  Housing
                  Facilities…………………………………………………………………    28**

*Objective 6.1*        Upgrade Administrative and Clinical Facilities……………………    28

*Objective 6.2*        Expand Administrative, Clinical, and Housing Facilities………………    29

*Objective 6.3*        Finish Construction at San Quentin State Prison……………………    32

**4.    Additional Successes Achieved by the Receiver……………………………………    33**

A.  Quality Assurance and Patient-Inmate Administrative Appeals        33

B.  Electronic Health Records System        33

C.  Technical Assistance from the Court Experts on Remaining Systemic Issues        34

**5.    Particular  Problems  Faced  by  the  Receiver,  Including  Any  Specific  Obstacles
Presented By Institutions Or Individuals……………………………………………    36**

A.    CCHCS Activities related to the Court's June 24, 2013, Order Granting
        Plaintiff's Motion for Relief Re: Valley Fever at PVSP and ASP…………………    36

B.    Overcrowding Update……………………………………………………………    37

**6.    An Accounting of Expenditures for the Reporting Period……………………………    39**

**7.    Other Matters Deemed Appropriate for Judicial Review………………………………    40**

A.    Coordination with Other Lawsuits………………………………………………    40

B.    Master Contract Waiver Reporting…………………………………………………    40

C.    Consultant Staff Engaged by the Receiver……………………………………    40

D.    Overview of Transition Activities………………………………………………    40

**8.    Conclusion………………………………………………………………………………    48**

# Section 1: Executive Summary

In our first Tri-Annual report for 2014, the accomplishments for the period of September 1 through December 31, 2013 are highlighted (because of their importance, we have included in this report certain developments that have occurred in January 2014). Progress continues toward fully implementing the Vision and Mission outlined in the Receiver's Turnaround Plan of Action (RTPA), although the activation of the California Health Care Facility (CHCF) in Stockton has been a challenge. Highlights for this reporting period include the following:

- The CHCF began accepting patient-inmates in July of 2013. Its activation has presented a number of problems including, but not limited to, problems with the proper management of the kitchen, a failure to provide nursing staff with appropriate keys to cells and other spaces, inadequate staffing of access to care officers, inadequate clinical staffing, and a variety of failures to provide appropriate accommodations for *Armstrong* class members. Perhaps the most persistent, fundamental failure has been the inability to provide adequate basic medical and personal hygiene supplies to the housing units, what appears to be a complete breakdown in the supply chain system, and a slow initial response to that problem.  The Receiver and his staff are now working with top CDCR executives and leadership at CHCF to attempt to remediate the situation. The next tri-annual report will reveal whether our efforts are successful.

- The DeWitt Nelson Correctional Annex (DNCA), which is the second of the two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system, is nearing completion with a planned date for receiving patient-inmates in early April 2014. Whether DNCA will be able to open as planned depends largely upon whether infrastructural systems at CHCF, including the supply chain, can be fixed in time (since CHCF provides supplies and other infrastructural support to DNCA).

- Regarding the Health Care Facility Improvement Program (HCFIP), which includes upgrades to add/renovate exam rooms and related health care space, as well as improvements to medication distribution at existing prisons, 22 projects have now received project approval from the Public Works Board (PWB) and interim funding from the Pooled Money Investment Board (PMIB). Remaining projects are proceeding on a sequential submittal schedule to PWB and PMIB. The PWB approved preliminary plans for statewide medication distribution projects in November 2013, which is a one-month delay from the previous report. The PWB approved preliminary plans in December 2013 for five projects: California Medical Facility (CMF), California State Prison, Solano (SOL), California Institution for Men (CIM), California State Prison, Sacramento (SAC), and Mule Creek State Prison (MCSP). There are now 16 projects in the preliminary planning phase and six projects, including statewide medication projects, in the working drawings phase. Construction is expected to begin in spring 2014 for the statewide medication distribution projects and in mid-2014 for the first HCFIP projects, which will be CMF and SOL.

- The Plata Court Experts visited ten institutions during 2013 to evaluate the quality of medical care. Their reports identified certain systemic failures in the medical delivery system. After a series of meetings with the Court Experts and representatives from the Office of the Inspector General (OIG), we have agreed that progress in the case will be accelerated by having the Court Experts work directly with CCHCS executives in solving the identified systemic gaps. In addition, we have agreed to have the Court Experts work with the OIG and CCHCS's quality improvement team to develop a common set of metrics and a common evaluation methodology for OIG audits so that the results of those audits are closely aligned with our internal dashboard measures and with the methodology employed by the Court Experts in conducting their reviews. The goal of this effort is to create an OIG audit instrument that ultimately can be used in lieu of the Court Expert evaluations. The Receiver believes these efforts, which are consistent with the spirit of the Court's orders regarding the role of the Court Experts in evaluating medical care systems, will lead more quickly to the improvements that are necessary to bring medical care into compliance with constitutional requirements. The Receiver recommends this approach for the Court's consideration.

- This reporting period concluded Round One of the Health Care Access operational monitoring audits. Since the October 26, 2012 Delegation of Authority, each institution has been audited once and approximately half have been audited twice. Of all Round One audits, ten institutions scored below the delegation benchmark of 85.0 percent. The overall average score for Round One is 87.6 percent.

- As for the Round Two audits, this Tri-annual period brings the total number of audits conducted to 16 with the remaining 17 audits scheduled to occur between January and June of 2014. Of the 14 audit reports published, the average Round Two score is 90.1 percent, which represents a modest overall improvement.

<u>Format of the Report</u>
To assist the reader, this Report provides three forms of supporting data:

*Metrics*: Metrics that measure specific RTPA initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions that are not completed.

*Appendices*: In addition to providing metrics, this report also references documents in the Appendices of this report.

*Website References*: Whenever possible website references are provided.

<u>Information Technology Project Matrix</u>
A chart has been created to specifically illustrate the major technology projects and the deployment of those projects. This document is included as Appendix 1.

# Section 2: The Receiver's Reporting Requirements

This is the twenty-fifth report filed by the Receivership, and the nineteenth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2-3 of the Appointing Order at
http://www.cphcs.ca.gov/docs/court/PlataOrderAppointingReceiver0206.pdf)

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against CDCR, the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman, and Plata*. An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (http://www.cphcs.ca.gov/receiver_othr_per_reps.aspx)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

# Section 3: Status of the Receiver's Turnaround Plan Initiatives

## Goal 1: Ensure Timely Access to Health Care Services

<u>Objective 1.1.</u> **Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release**

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*

This action is completed.

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*

Based on the *Plata* Court Expert review of the San Quentin State Prison (SQ) reception center processes in March 2013, a review of optimizing further reception center processes in light of redistribution of reception center missions is underway.

*Action 1.1.3. By January 2010, begin using the new medical classification system at each reception center prison.*

This action is completed.

*Action 1.1.4. By January 2011, complete statewide implementation of the medical classification system throughout CDCR institutions.*

This action is completed.

<u>Objective 1.2.</u> **Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution.*

This action is completed.

*Action 1.2.2. By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions.*

This action is completed.

Refer to Appendix 2 for the Executive Summary and Health Care Access Quality Reports for August 2013 through November 2013.

**Objective 1.3.** **Establish Health Care Scheduling and Patient-Inmate Tracking System**

> *Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System (SOMS) with a scheduling and inmate tracking system as one of its first deliverables.*

This action is substantially complete. The medical, dental, and mental health scheduling systems have been in production at all of the original 33 institutions since July 2013. Most aspects of support have been transitioned to IT maintenance and operation.

Progress during this reporting period is as follows:

- Medical scheduling system management reports were rolled out to all institutions by October 2013.

- A release of bug fixes and essential change requests to the medical scheduling system was deployed in early November 2013. There are no other outstanding changes to the medical scheduling system.

- Three releases of change requests to the dental scheduling system and dental reporting were deployed over the October to December 2013 timeframe. This completes all outstanding change requests to the dental scheduling system.

- The Health Care Scheduling and Tracking System was rolled out to California City (CAC), in December 2013.

A request has been made to CCHCS IT Governance to close the project at the next governance meeting in 2014.

**Objective 1.4.** **Establish a Standardized Utilization Management System**

> *Action 1.4.1. By May 2010, open long-term care unit.*

This action is completed.

> *Action 1.4.2. By October 2010, establish a centralized UM System.*

This action is completed.

## Goal 2: Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

**Objective 2.1.** Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models.*

This action is ongoing. Progress during this reporting period is as follows:

An interdisciplinary team has reviewed and revised the Primary Care Model. Based on the review, the team has re-organized the relevant policies and procedures to include:

- Overview of the Health Care Model: Defines and establishes relationship, integration, and responsibilities for Primary Care, Diagnostic and Therapeutic Services, Urgent Care, Tertiary Care, Dental Care, and Mental Health Care.
- Primary Care Team: Defines membership in Primary Care Team, responsibilities, continuity of team, Primary Care Team huddles, care conferences, and primary care panel assignments.
- Disease Management (Chronic Care): Defines program for management of enduring medical conditions, including establishment of clinical guidelines, surveillance and screening, tracking of conditions, adjustment of therapy, patient-inmate self-management, tracking of patient-inmate outcomes and populations, continuity of care, and case conferences,
- Preventive Primary Care Services: requires established guidelines for preventive services, infectious disease surveillance, immunizations, screening, patient-inmate education and support in health maintenance. Includes annual primary care nursing visit focused on screening and patient-inmate education, as well as season-focused immunization program for influenza.
- Episodic Primary Care Services: establishes system to respond to symptoms of a new condition and to exacerbations of pre-existing conditions. Includes method for patient-inmates and others to initiate health care visits.

Drafting of the Episodic Primary Care Services module is still in process. The other modules have been drafted. Once the complete package is drafted it will enter the review and approval process.

The revisions provide for involvement of dental and mental health services in care management and prepare the Department for transition to the Electronic Health Records System (EHRS).

*Action 2.1.2. By July 2010, implement the new system in all institutions.*

This action is ongoing. Please see action item 2.1.1.

**Objective 2.2.** Improve Chronic Care System to Support Proactive, Planned Care

*Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered.*

This action is completed.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions.*
This action is completed.

*Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff.*
This action is completed.

*Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response.*
This action is completed.

**Objective 2.4.** Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.*
This action is completed.

*Action 2.4.2. By October 2010, establish on a statewide basis approved contracts with specialty care providers and hospitals.*
This action is completed.

*Action 2.4.3. By November 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner.*
This action is completed.

## Goal 3: Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1** Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions

For details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for August 2013 through November 2013. These reports are included as Appendix 3.

*Action 3.1.1. By January 2010, fill ninety percent of nursing positions.*
This action is completed.

*Action 3.1.2. By January 2010, fill ninety percent of physician positions.*
This action is completed.

**Objective 3.2** Establish Clinical Leadership and Management Structure

*Action 3.2.1. By January 2010, establish and staff new executive leadership positions.*
*Action 3.2.2. By March 2010, establish and staff regional leadership structure.*
These actions are completed.

**Objective 3.3.** Establish Professional Training Programs for Clinicians

*Action 3.3.1. By January 2010, establish statewide organizational orientation for all new health care hires.*
This action is completed.

*Action 3.3.2. By January 2009, win accreditation for CDCR as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.*
The action is completed.

## Goal 4: Implement Quality Improvement Programs

<u>Objective 4.1.</u> Establish Clinical Quality Measurement and Evaluation Program

*Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs.*
This action is ongoing. Progress during this reporting period is as follows:

<u>Patient Safety Program</u>
In May 2012, CCHCS adopted policies and procedures to establish a statewide Patient Safety Program. Implementation of the new Patient Safety Program requires establishing an infrastructure statewide, such as a health incident reporting system and oversight committees, as well as orienting CCHCS staff at all levels of the organization to new concepts and skills. As a result, CCHCS has adopted a phased approach to program implementation, with updates provided below.

<u>Annual Patient Safety Plan.</u> Members of the Patient Safety Committee have established a plan that includes multiple statewide projects intended to advance the new statewide Patient Safety Program over the next two years. In addition, specific safety strategies and objectives, such as reducing potentially avoidable hospitalizations, improving laboratory monitoring for patient-inmates on psychotropic medications, and addressing polypharmacy risk, have been incorporated into the CCHCS Performance Improvement Plan for 2013-2015.

<u>Health Care Incident and Medication Error Reporting.</u> During this reporting period, CCHCS staff continued to report actual and potential adverse events through the Health Care Incident Reporting System, and a multi-disciplinary group at headquarters met daily to triage the health incidents, directing institutions to take appropriate follow-up action, as per policy.

A total of 162 incident reports were submitted through the Health Incident Reporting System during calendar year 2013. Health incident information came from a variety of sources, as described in Figure 1.

*Figure 1. 2013 Health Care Incidents Reported by Source*



During this reporting period, the Adverse and Sentinel Event Committee (ASEC), which provides oversight to both the Health Care Incident Reporting System and the statewide root cause

analysis process, began to apply the new taxonomy described in the previous Tri-Annual Report to ascertain the types of health care incidents submitted, a required first step in the identification and analysis of trends to understand process problems. Please see Figure 2.

*Figure 2. 2013 Health Care Incidents Reported by Event Type*



In addition, the ASEC analyzed and compared data in the health care incidents reports and monthly medication errors reports to identify potential under-reporting.

The ASEC reports the aforementioned information to the Patient Safety Committee quarterly and specifies actions taken to address the most prevalent types of health incidents, as well as improve reporting rates overall.

Root Cause Analysis. The Patient Safety Program Policy and Procedure introduced new requirements that institutions conduct root cause analyses for a subset of health care incidents defined as adverse/sentinel events. Root cause analysis is a well-tested approach to effectively and efficiently identify and fix fundamental system processes. To support institutions in completing thorough and credible root cause analyses (RCAs) as required by policy, CCHCS established a standardized RCA procedure and tools, referred to as the RCA Tool Kit; provided statewide training; and made QM Section staff available to assist institutions with RCA facilitation upon request. (A recording of the RCA webinar and the RCA Tool Kit is posted for easy access by all staff on the Patient Safety page on Lifeline, at this link: Patient Safety Page).

By the close of 2013, a total of 14 RCAs had been assigned to institutions or as statewide aggregate RCAs. Once assigned, institutions have 45 days to complete the RCA process and submit a report with findings and an improvement plan. The ASEC gives input to the RCA report and may request clarification or additional work on the analyses. Each RCA report includes

performance metrics to ensure that identified root causes have been effectively addressed by the proposed improvement activities and the risk of the adverse event recurring is significantly reduced. After report approval, the institution submits performance measure data to the ASEC, which monitors progress for four months. If the ASEC deems that sufficient progress has been made, the RCA is closed. Six of the fourteen analyses in 2013 have been completed and closed.

During this reporting period, the ASEC assigned the first aggregate RCA to address the process for credentialing licensed independent practitioners of various disciplines, particularly contract providers. The ASEC assigns aggregate RCAs when the committee receives multiple health care incidents and adverse events from different institutions linked to the same health care process, circumstances which suggest a systemic failure, rather than an isolated problem at an individual facility.

For an aggregate RCA, the RCA Team involves representatives from several institutions and multiple disciplines, including participants from the headquarters program with statewide oversight responsibilities. Fact-finding is conducted at both the institution and headquarters level, and the entire team convenes for the brainstorming session used to identify contributing factors and root causes. In lieu of the action plan submitted for an RCA assigned to an individual institution, the aggregate RCA team offers a series of recommendations to improve the statewide process under consideration and performance metrics to assess progress. ASEC members review the recommendations and work with statewide executives to implement suggested improvements as appropriate, as well as monitor the effectiveness of interventions.

The report for the aggregate RCA on credentialing was submitted for ASEC review in December 2013, and is pending presentation at the Patient Safety Committee. A second aggregate RCA was assigned during this reporting period to examine the health care transfer process, including coordination of care as a patient-inmate moves from one institution to another and transition of care for clinically high-risk patient-inmates upon parole. Much of the required activity for that RCA has been completed by the RCA Team. The final report is pending, and will be shared with appropriate standing and ad hoc workgroups involved with various aspects of care coordination and care management.

Patient Safety Survey. A key element in increasing health incident reporting, effectively conducting root cause analyses, acting upon the RCA results – and other important, foundational aspects of the Patient Safety Program – is to establish a culture of safety and improvement at institutions statewide. To that end, CCHCS prepared for the implementation of a statewide Patient Safety Culture Survey that will both educate health care staff about workplace factors that impact patient-inmate safety and identify strengths and weaknesses in our current organizational culture, statewide and at individual institutions.

In 2013, the Patient Safety Committee selected a culture survey from the federal Agency for Healthcare Research and Quality used by health care organizations nationwide. CCHCS made minor adaptations for application in our organization after testing the survey tool at California Men's Colony (CMC), where the leadership team is a strong champion of patient-inmate safety.

The Patient Safety Committee will administer the survey statewide over a three-week period from mid-February through early March 2014. During this reporting period, Health Care Chief Executive Officers (CEOs) were briefed on the upcoming survey at a statewide Health Care CEO conference and during a weekly statewide leadership conference call, culminating in formal notification via statewide memorandum on January 13, 2014 (please see Appendix 4).

This first survey will offer baseline information about the state of CCHCS's organizational culture. The Patient Safety Committee intends to repeat the survey every 12 to 18 months to assess changes over time.

Sharing Best Practices – Patient Safety Stories. During this reporting period, the Patient Safety Committee released the first in a series of periodic Patient Safety Stories, in an effort to identify and disseminate best practices in particularly problematic patient-inmate safety areas.

Each Patient Safety Story is divided into three parts:
o  Part 1: Description of an actual patient-inmate's experience in the prison health care system, highlighting some of the process pitfalls that can place patient-inmates at risk.
o  Part 2: Aggregate data that helps readers understand how the patient-inmate safety issue impacts institutions and patient-inmates statewide. A broader health care industry perspective may also be provided.
o  Part 3: Practical ways that health care staff can improve performance in the targeted area. Whenever possible, best practices from CDCR institutions are profiled in this section, with links to any available resources or tools.

During this reporting period, the Patient Safety Committee distributed a Patient Safety Story about anticoagulation care, a major patient-inmate safety issue statewide and nationally. (Anticoagulation is one of the topics covered by the Joint Commission in its 2014 National Patient Safety Goals for ambulatory care.) The full Patient Safety Story is attached as Appendix 5.

Headquarters Patient Safety Committee and Adverse/Sentinel Event Committee. Since its inaugural meeting in August 2012, the Patient Safety Committee has convened 18 times; the Adverse/Sentinel Event Committee met 37 times (some of these meetings were joint with the Patient Safety Committee). With many of the foundational elements of the Patient Safety Program now in place, these committees have settled fully into the role described for them in policy, shifting away from a primary focus on development and approval of tools and training programs to activities such as implementation of statewide patient-inmate safety initiatives.

Statewide Patient Safety Initiative – Patient-Inmates at Risk for Coccidioidomycosis (cocci).
In July 2013, CCHCS modified the Medical Classification System (MCS) Policy and Procedures[1] to preclude patient-inmates with certain risk factors, such as history of lymphoma, from

---

[1] IMSP&P, Volume 4, Chapter 29 and 29.

placement at prisons where cocci is most prevalent – referred to as Cocci Areas 1 and 2. Patient-inmates who are already housed at a prison in Cocci Area 2 (Avenal State Prison (ASP) and Pleasant Valley State Prison (PVSP)) may complete a waiver to stay at their current institution if they meet specific criteria. This program change was prompted in part by a June 2013 federal court order, which mandated removal of certain patient-inmates from the cocci hyperendemic area within 90 days or by September 21, 2013.

To support appropriate placement of patient-inmates with cocci risk factors, CCHCS released a Cocci Risk Registry, which allows custody and health care staff to run customized reports identifying patient-inmates who must transfer out of Cocci Areas 1 and 2, as well as patient-inmates who are appropriate to backfill soon-to-be-vacant cells. Please see release memorandum in Appendix 6 for a detailed description of the Cocci Risk Registry.

In August 2013, CCHCS established a process for reconciling each patient-inmate's 128C3 with the Master Patient Registry, providing a mechanism for back-and-forth communication between institution and headquarters staff about patient-inmate risk factors and ensuring more accurate risk designations. By comparing clinical documentation against registry data, health care staff may learn of very recent changes in health status, such as new diagnoses that impact risk level and placement decisions. Please see the comprehensive description of the Patient Risk Reconciliation Process presented in Appendix 7.

To support ongoing efforts to appropriately place patient-inmates with cocci risk factors, CCHCS began reporting weekly on the status of patient-inmates eligible for movement out of the hyperendemic area during this reporting period. The weekly report provides both aggregate data (e.g., the number of patient-inmates at a particular institution overdue for transfer) and patient-inmate-level data (the names and housing information of the specific patient-inmates who have been identified as overdue for transfer). This level of data assists health care and custody staff in determining where to focus their energy relative to movement of cocci patient-inmates. Please see Figure 3 and 4.

*Figure 3. Aggregate Data from Weekly Report: Transfer Status of Cocci Restricted Patient-inmates*



| | 01/10/14 | 01/03/14 |
|---|---|---|
| In Process 60+ Days | 35 | 43 |
| In Process 40-59 Days | 16 | 12 |
| In Process 0-39 Days | 47 | 61 |
| Total | 98 | 116 |

*Figure 4. Patient-Inmate-Level Report Data: Transfer Status of Cocci Restricted Patient-inmates*



Statewide Patient Safety Initiative – High-Risk Patient-Inmates.

As part of its annual Performance Improvement Plan, CCHCS has set incremental goals for concentrating the prison systems' high risk patient-inmates at a subset of Intermediate Institutions that are resourced specifically to care for the more complex and unstable patient-inmates. The goal was to reach 90 percent of high risk patient-inmates at Intermediate Institutions by the close of 2013.

CCHCS continues to make steady progress toward this goal, through a complex collaboration between health care and custody staff at institution and statewide levels. On a daily basis, health care and custody staff use reports and patient-inmate lists to identify high risk patient-inmates currently housed at Basic Institutions who may be more appropriately managed at an Intermediate Institution and initiate moves for these patient-inmates. As of December 2013, 69 percent of high risk patient-inmates were housed at an Intermediate Institution, up from 55 percent at the same time last year. Please see Figure 5.

*Figure 5. Percentage of High Risk Patient-Inmates Housed at Intermediate Institutions, May 2012 through December 2013*



#### Revisions to the Health Care Services Dashboard
During this reporting period, CCHCS initiated an intensive, four-month project to redesign the monthly Health Care Services Dashboard, which consolidates strategic performance information across all clinical program areas into a single report.

The new and improved version of the Dashboard, scheduled for release in February 2014, will:
- Allow viewers to create custom reports using Dashboard data, including trending reports according to a user's desired parameters.
- Offer detailed sub-reports for many performance measures.
- Incorporate new performance objectives from the statewide Performance Improvement Plan 2013-2015.
- Include data from the new centralized medical scheduling system.

Beyond the improvements noted above, the Dashboard redesign provided QM Section staff concentrated time to reconfigure the data infrastructure supporting the Dashboard, re-visit the methodologies for hundreds of critical health care measures, and update report formats to make them more user-friendly. This work is required preparation for Electronic Health Record System implementation.

#### Patient-Inmate Registries
CCHCS has made it a priority to promote the use of its 24 registries and sub-registries, which make critical clinical information, such as a patient-inmate's health risk status, easily accessible to care teams working to manage an assigned patient-inmate panel. The flags imbedded in the

patient-inmate registries prompt care teams to follow CCHCS guidelines, which both improves patient-inmate outcomes and helps to reduce costs. Widespread and consistent registry use is required for full implementation of the Population and Care Management elements of the CCHCS Primary Care Model, and necessary for compliance with certain IMSP&P.

Statewide, registry usage has steadily increased since the May 2012 release of on-demand patient-inmate registries, which allow users to select from drop-down menus to customize registry reports for a particular patient-inmate population, care team, or other data element. All but seven of the adult institutions have seen improvements in registry usage over the prior year; more than a third of our institutions had increased the average unique users per day by 100 percent or more by December 2013, as compared with the beginning of the year. Please see Figure 6.[2]

*Figure 6. Average Unique Registry Users per Day - Percent Change, January 2013 vs. December 2013*



> ***Action 4.1.2. By July 2009, work with the Office of the Inspector General to establish an audit program focused on compliance with Plata requirements.***
>
> This action is completed. However, discussions are continuing with OIG and the Plata Court Experts to discuss possible refinements to the OIG's inspection program.

**Objective 4.2.** Establish a Quality Improvement Program

> ***Action 4.2.1.(merged Action 4.2.1 and 4.2.3): By January 2010, train and deploy existing staff--who work directly with institutional leadership--to serve as quality advisors and develop model quality improvement programs at selected institutions; identify clinical champions at the institutional level to implement continuous quality improvement locally; and develop a team to implement a statewide/systems-focused quality***

---

[2] CHCF is not included in this analysis, as it was not yet fully operational and was not required to complete a PIWP in 2013.

*monitoring/measurement and improvement system under the guidance of an interdisciplinary Quality Management Committee.*

This action item is ongoing. Progress during this period is as follows:

Quality Management Policy and Procedures

In December 2012, CCHCS issued new Quality Management (QM) Program Policies and Procedures, replacing outdated program standards from 2002. Incorporated into Volume 3 of the IMSP&P, the new policy and procedures maintain many of the existing quality management structures, but also introduces a number of new program elements, such as current nationally-recognized improvement techniques. Updates on program implementation are provided below.

Statewide Performance Improvement Plan

Three years ago, CCHCS established its first statewide Performance Improvement Plan (PIP), which outlines the organization's major improvement priorities, lists statewide performance objectives, and describes major improvement strategies (please see Appendix 8). The Performance Improvement Plan is updated periodically as performance objectives are met and new priorities emerge, and is posted on the Intranet.

After vetting with CCHCS staff at different levels of the organization, the Headquarters Quality Management Committee (QMC) finalized the Performance Improvement Plan for 2013-2015 during the last reporting quarter. This quarter, QM Section staff worked to develop the methodology for tracking new PIP objectives on a monthly basis in an updated version of the Health Care Services Dashboard. In addition to regular Dashboard reporting, the Headquarters QMC will be reviewing reports on subsets of PIP measures during regularly scheduled meetings to assess progress and develop interventions as necessary. The first of these executive reports was released in November, covering scheduling and access to medical services. (Please see "Statewide Improvement Initiative: Scheduling System", in this same section, below for more information.)

Institution Performance Improvement Work Plans

Per current policy, institution leadership teams are required to update their local Performance Improvement Work Plan (PIWP) every 12-15 months. This annual requirement presents an opportunity for institutions to celebrate the progress they have made to date, identify improvement initiatives from the prior year's plan that still need work, and consider new priorities for the coming year. By the close of the PIWP process, institutions establish clear improvement priorities and a unified purpose for institution health care staff, which is essential to successful improvement work. In 2014, all institutions must include scheduling and medication management initiatives in their PIWP, considered two of our most critical patient-inmate safety areas statewide.

During this reporting period, CCHCS made new tools available to help institutions create their PIWP for 2014, including:

- A 2014 PIWP Tool Kit, which describes recommended steps for updating the PIWP and offers tools to help institutions move through each step.

- "Plug and play" content for a scheduling improvement initiative (a completed initiative template that can be customized by the institution).
- A database of all initiatives submitted by institutions in 2013 PIWPs, which allows institutions to "shop" for improvement ideas in a variety of categories.

All of these resources can be found at a new PIWP webpage on the QM Portal, at this link: PIWP Resource Center. Please see Figure 7.

*Figure 7. Screenshot of the new PIWP Resource Center on the QM Portal.*



During this reporting period, multiple PIWP orientation sessions were offered to familiarize institutions with these new resources, and at least one additional session will be offered in early February 2014. The deadline for institution PIWPs is February 28, 2014.

<u>Institution Performance Management Support Units</u>
In September, a more formal process began at several institutions to reorganize existing resources into Performance Management Support Units (PMSUs) to better focus on QM and patient-inmate safety activities in a more integrative, efficient and effective approach across program areas. Units of staff with systems improvement expertise dedicated full-time to activities such as performance evaluation and process redesign are commonplace in the broader health care industry. Typically, the role of these units within the organization is to support and integrate activities related to prioritizing, planning, designing, testing, and implementing performance improvement and evaluating performance.

As these institutions established their Units, the demand for specialized training has grown. In response, the QM Section will hold a special session of the QM Patient Safety Academy in January and the training schedule will be generally expedited during the next year as much as possible to provide training to the new Units.

QM Section staff also developed several advanced modules of the QM Patient Safety Academy during this reporting period. Building upon the broad orientation provided during the two-day QM Patient Safety Academy, the advanced modules focus intensively on certain topics, with the intent to promote skills development in areas critical to performance improvement, such as performance measurement, problem analysis, and development and testing of interventions, as well as more general skills commonly used by improvement professionals, like project management, group facilitation, and strategic planning.

Institution PMSUs are a critical part of the effort to build QM capacity enterprise-wide, establish an organizational culture that promotes continuous performance improvement, and strengthen the institution, regional, and state-level QM infrastructure. However, the CCHCS philosophy is that continuous performance improvement is everyone's job. Core PMSU resources supplement and support leaders, managers and supervisors who must ultimately champion and be responsible for quality work and organizational excellence, which are essential to successful transition of prison health care services to state control, and maintaining the advances achieved well into the future.

<u>Statewide Improvement Initiative – Scheduling System</u>
Starting in February 2013, CCHCS began rolling out an enterprise-wide Medical Scheduling and Tracking System (MedSATS) to improve the scheduling process, increase timely access to medical services, and establish a single centralized and standardized medical scheduling system for all institutions. As of this reporting period, MedSATS has been successfully deployed at 32 of 34 institutions (Pelican Bay State Prison (PBSP) and CHCF are in progress), and currently captures approximately 80,000 to 90,000 completed encounters each week.

During the last reporting period, CCHCS launched a Scheduling Process Improvement (SPI) Initiative to provide institution leadership with a structured process and new tools available through MedSATS implementation to improve access to care and scheduling efficiency locally. To apply the new structured process and tools, institution staff learn specific quality improvement techniques, building institution capacity to improve other critical health care processes in the future.

Though MedSATS presents a rich source of data to track and improve access to care, it is only as useful as the data is accurate. During this reporting report, CCHCS began to test the reliability of MedSATS data, focusing on a subset of performance measures that will be reported monthly in the Health Care Services Dashboard in February 2014, and began to develop tools to help institutions increase the accuracy of the new system.

Over the course of several weeks, a team of analysts under the supervision of clinical staff matched MedSATS data points against corresponding information in the patient-inmate health record to ascertain data accuracy. At the conclusion of the data reliability testing, each institution Health Care CEO received a report with results emphasizing not only areas where data integrity might be problematic, but areas where the institution may wish to focus access to care improvements. Please see Figure 8.

*Figure 8. Sample Report with Institution Validation Findings*



To help institutions improve both data accuracy and actual access to care, CCHCS established a new webpage on the QM Portal with ready access to a number of resources that can assist institutions in improving data reliability (see Figure 9), including, but not limited to:

- Proposed step-by-step content for a scheduling initiative that can be customized and inserted in an institution PIWP.
- A sample Local Operating Procedure for scheduling processes.
- Guide to MedSATS reports that can help institutions manage scheduling process.
- Job aids.
- Work flow diagrams designed by Nursing staff and MedSATS designers.
- Scheduling Process "Do's and Don'ts".
- Validation findings for each institution.

*Figure 9. Screenshot of New Scheduling Improvement Initiative Webpage on the QM Portal*



During this reporting period, CCHCS made a number of changes and enhancements to the MedSATS system in response to requests by users, which should also improve data reliability. Prior to release of these system changes in November 2013, CCHCS provided 8 training sessions in October to provide MedSATS users and executive teams with an overview of the changes.

CCHCS released the first in a series of Scheduling Improvement Project reports in November 2013, offering institutions baseline data on new scheduling objectives from the statewide Performance Improvement Plan for 2013-2015, including objectives for scheduling efficiency. The "Executive Report: MedSATS and Scheduling Process Improvement" is attached as Appendix 9.

> ***Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.***
This action is completed.

> ***Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors.***
This action is combined with Action 4.2.1.

**Objective 4.3.** Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

*Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care.*
This action is completed.

**Objective 4.4.** Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations.*
This action is completed.

**Objective 4.5.** Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative

*Action 4.5.1. By July 2008, centralize management overall health care patient-inmate appeals, correspondence and habeas corpus petitions.*
This action is completed.

Refer to Appendix 10 for health care appeals, and habeas corpus petition activity for September 2013 through December 2013.

*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver.*
This action is completed.

**Objective 4.6.** Establish Out-of-State, Community Correctional Facilities (CCF) and Re-entry Facility Oversight Program

*Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities.*
This action is completed.

The Private Prison Compliance and Monitoring Unit (PPCMU) continues to conduct on-site compliance reviews of the existing four Out-of-State Correctional Facilities and four In-state Community Correctional Facilities contracted to provide housing California patient-inmates, ensuring compliance with the Remedial Plan developed in July 2008 and to meet the court mandate to provide a constitutional level of medical care.

An accurate and objective review of each facility is critical to ensuring compliance with the Receiver's Turnaround plan. To improve the statistical information obtained during each compliance review, PPCMU developed a new audit tool to measure compliance. To date, the new audit tool has been utilized to conduct compliance reviews at two of the four contract facilities; with the expectation of completing audits of all remaining facilities within the current fiscal year. The new report affords PPCMU the ability to document an overall rating for each facility as outlined within the included chart. To date the overall compliance results for each facility reflect a demonstrated ability above the required 85 percent.

| Institution | Compliance |
|---|---|
| TCCF | 97.8% |
| NFCF | 92.6% |

1. <u>Potential Out-of-State Private Prison Expansion</u>

During the current reporting period, CCHCS staff have completed facility inspections at six Out-of-State correctional facilities in four different states to gather data and assess the overall capabilities of the identified sites to provide the required medical services for patient-inmates should CDCR's request to increase out-of-state bed capacity be approved.

The correctional facilities surveyed as potential sites for Out-of-state housing of California patient-inmates included:

- Prairie Correctional Facility - Appleton, MN
- North Lake Correctional Facility - Baldwin, MI
- Diamondback Correctional Facility - Watonga, OK
- Great Plains Correctional Facility - Hinton, OK
- Hudson Correctional Facility - Hudson, CO
- Kit Carson Correctional Facility – Burlington, CO

2. <u>In-State Community Correctional Facilities:</u>

As part of efforts to meet the court mandated inmate capacity of 137.5 percent, CDCR initiated an effort to redistribute the inmate population housed in and out of state. One component is reactivating and moving inmates to modified community correctional facilities (CCF) within California. Adding to the existing capacity at Golden State Modified CCF, CDCR reactivated three modified CCFs during the reporting period:

- Desert View Modified CCF on October 21, 2013
- Central Valley Modified CCF on October 21, 2013
- Shafter Modified CCF on December 16, 2013

During the reporting period, CDCR also signed contracts to reactivate two additional CCFs with the following activation dates:

- Delano Modified CCF on January 6, 2014
- Taft Modified CCF on February 17, 2014

Each CCF is designated a hub institution, one of CDCR's reception center institutions (see Figure 10).  One of the hub institution's responsibilities is to facilitate health care services beyond which the CCF is contractually bound to provide.  These types of services are typically for urgent care situations, lab tests, or an evaluation for mental health, dental, specialty care referral, or medication.

Under these contracts, patient-inmates from the CCFs are returned to the hub institution for some health care services provided by CCHCS and CDCR (on any given week, from 20 to 50 patient-inmates are sent back to hub institutions for such services). It appears that CCHCS's budget allocation may have been reduced on a pro rata basis for each patient-inmate transferred to a CCF even though CCHCS is still providing some health care services for these patient-inmates. We are working now to quantify this residual burden and will share this information with the Department of Finance to ensure that any reduction in our budget reflects only the actual reduction in workload.

*Figure 10. CCFs by Hub Institution*

| | Capacity | Population[3] |
|---|---|---|
| *California State Prison, Los Angeles County* | | |
| • Desert View | 700 | 700 |
| *North Kern State Prison* | | |
| • Central Valley | 700 | 636 |
| • Golden State | 700 | 604 |
| • Delano | 578 | – |
| *Wasco State Prison* | | |
| • Shafter | 640 | 144 |
| • Taft | 640 | – |
| **Totals** | **3,958** | **2,084** |

3. <u>Contracted Bed Population:</u>
   CCHCS utilizes the services of clinical and administrative staff to ensure the medical needs of the patient-inmate population are addressed in a timely manner within all contract beds. In a continuing effort by CDCR to reduce the overall patient-inmate population within the existing state institutions, conversely, the contracted bed population continues to increase. Figure 11 identifies the total number of patient-inmates housed in contracted beds as of January 4, 2014.

---

[3] Population based on count provided by CDCR's Contract Beds Unit date December 27, 2013.

*Figure 11. Total Number of Patient-Inmates Housed in Contracted Beds*

**Contract beds in other States:**

| Facility | Location | Population[4] |
|---|---|---|
| Florence Correctional Center | Arizona | 573 |
| La Palma Correctional Center | Arizona | 3,135 |
| North Fork Correctional Facility | Oklahoma | 2,504 |
| Tallahatchie County Correctional Facility | Mississippi | 2,674 |
| | **Subtotal** | **8,886** |
| **Contract beds in California:** | | |
| Central Valley Modified CCF | McFarland | 636 |
| Desert View Modified CCF | Adelanto | 700 |
| Golden State Modified CCF | Bakersfield | 604 |
| Shafter Modified CCF | Shafter | 144 |
| | **Subtotal** | **2,084** |
| | **Contract Beds Total** | **10,970** |

---

[4] Population based on count provided by CDCR's Contract Beds Unit date December 27, 2013.

## Goal 5: Establish Medical Support / Allied Health Infrastructure

**Objective 5.1.** **Establish a Comprehensive, Safe and Efficient Pharmacy Program**

    *Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications.*
This action is completed.

Refer to Appendix 11 for Top Drugs, Top Therapeutic Category Purchases, and Central Fill Pharmacy Service Level for September 2013 through December 2013.

    *Action 5.1.2. By March 2010, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system.*
This action is completed.

    *Action 5.1.3. By May 2010, establish a central-fill pharmacy.*
This action is completed.

**Objective 5.2.** **Establish Standardized Health Records Practice**

    *Action 5.2.1. By November 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions.*
This action has been completed.

**Objective 5.3.** **Establish Effective Imaging/Radiology and Laboratory Services**

    *Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants.*
This action is ongoing. Progress during the reporting period is as follows:

Imaging/Radiology Services
The strategy to improve radiology services statewide has been established.
- CCHCS has fully implemented RIS/PACS electronic radiographic equipment statewide.
- Training in use and access has been provided to all affected staff.
- Mobile imaging services are available at all institutions with electronic transmission capabilities at all locations. (Additional work is needed to ensure reliable connectivity at a few sites).
- Old imaging records from all institutions are now located in the Imaging Record Center (IRC) where they are stored and uploaded when needed.
- A single statewide provider (a radiology group) has been contracted to provide radiology interpretation services, increasing consistency and standardization of protocols, cost savings, and more effective quality control.
- Report turnaround times are improved with reports available within four hours in most

cases.
- The statewide radiology service provider provides Radiation Safety Office (RSO) oversight to all institutions, also ensuring coverage, standardization of practices, and improvement in quality control activities.

<u>Laboratory Services</u>
Strategies to improve laboratory services statewide have been established. Components include:
- The previously reported plan to implement a statewide Enterprise Laboratory Information System (LIS) has been revised. Laboratory results reporting will be incorporated into the EHRS currently under development. The system will also allow for logistic tracking of specimens and testing turnaround time, review of services, and other management reports. A full LIS will be an integral part of the EHRS which is now being implemented in CCHCS.
- Evaluation of Point of Care (POC) testing practices in the institutions is in progress. In particular glucose and anticoagulation Point of Care testing devices, as well as any other POC test devices in use. The goal is to standardize practices in our institutions and to enhance patient-inmate care and patient-inmate safety.
- Guidelines to assist clinicians in obtaining indicated lab studies for particular conditions based on CCHCS Care Guides and other recommendations are being created during development of "order sets" for implementation of the EHRS.
- Since implementation of an electronic order system by our contract referral lab in February 2013, compliance with use of the electronic order form has increased to 96 percent statewide.

**Objective 5.4. Establish Clinical Information Systems**

*Action 5.4.1. By September 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems.*
This action is completed.

**Objective 5.5. Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure.*
This action is completed.

## Goal 6: Provide for Necessary Clinical, Administrative and Housing Facilities

DNCA, which is the second of the two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system, is nearing completion. The construction of CHCF is essentially complete; however, as explained below, on January 27, 2014, the Receiver halted further transfer of medical patient-inmates to CHCF until various improvements in the supply chain system and delivery of care are achieved.

Regarding HCFIP, which includes upgrades to add/renovate exam rooms and related health care treatment space, as well as improvements to medication distribution at existing prisons, 22 projects have now received project approval from PWB and interim funding from PMIB. Remaining projects are proceeding on a sequential submittal schedule to PWB and PMIB. The PWB approved preliminary plans for statewide medication distribution projects in November 2013, which is a one-month delay from the previous report. The PWB approved preliminary plans in December 2013 for five projects: CMF, SOL, CIM, SAC, and MCSP. There are now 16 projects in the preliminary planning phase and six projects, including statewide medication projects, in the working drawings phase. Construction is expected to begin in spring 2014 for the statewide medication distribution projects and in summer 2014 for the first HCFIP projects, which will be CMF and SOL.

The new medical and mental health beds added pursuant to Goal 6 will be substantially completed by 2014. It is possible for HCFIP and medication distribution upgrades at existing prisons to be substantially completed by 2017, with the priority focus on the upgrades at intermediate level-of-care facilities to be substantially completed by 2016.

**Objective 6.1.** Upgrade administrative and clinical facilities at each of CDCR's thirty-three prison locations to provide patient-inmates with appropriate access to care.

Initial PWB project approvals have been secured for all of the intermediate level-of-care projects, the reception center projects, and seven basic level-of-care facilities (Valley State Prison, California Training Facility (CTF), Salinas Valley State Prison, California Correctional Institution, Sierra Conservation Center (SCC), Substance Abuse Treatment Facility, and California State Prison, Corcoran (COR), along with the statewide medication distribution projects. Submission of the remaining basic level-of-care projects will be scheduled through August 2014 following completion and review of site-specific plans. The PWB approved preliminary plans for five projects (CMF, SOL, CIM, SAC, and MCSP) in December 2013.

> *Action 6.1.1. By January 2010, completed assessment and planning for upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.*

This action item is ongoing. Progress during this reporting period is as follows:

CDCR has now received PWB project approvals and PMIB interim loan approvals for 22 projects; including statewide medication distribution projects, which do not require PMIB financing since these projects are being funded by State general funds. CDCR is proceeding with sequential

project and interim funding submittals for the remaining projects through August 2014 as site-specific plans are developed. These site reviews are now occurring.

> ***Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.***

This action item is ongoing. Progress during this reporting period is as follows:

The preliminary design for each of the projects by an architectural and engineering (A&E) firm begins once PWB project and PMIB loan approvals have been obtained. The contracts with A&E firms for site-specific preliminary plans for all 22 of the approved projects have been finalized. The completed preliminary plans must be approved by the PWB and Department of Finance before the A&E firm can proceed to preparation of the working drawings and bid these projects for construction. Preliminary designs for the statewide medication distribution projects received PWB approval in November 2013 and five other projects (CMF, SOL, CIM, SAC, and MCSP) received approval in December 2013. Construction drawings are currently being prepared for these six projects. The current schedule shows construction of the first two HCFIP projects (CMF and SOL) will start in mid-2014 and the last HCFIP project (Chuckawalla Valley State Prison (CVSP)) will be completed in mid-2017.

**Objective 6.2.** **Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs.**

Construction at CHCF was substantially completed in August 2013 and the first patient-inmates were received on schedule in July 2013. Department of State Hospital (DSH) patient-inmate admissions also began in July 2013. To date, approximately 1,200 patient-inmates have been admitted to CHCF. Construction at DNCA remains on schedule to be substantially complete in March 2014 with patient-inmates scheduled to arrive in early April 2014.

Unfortunately, as described below, substantial difficulties in properly activating CHCF for its health care mission have occurred. As of January 27, 2014, the Receiver has decided to cease transferring any additional medical patient-inmates to CHCF until the problems are corrected (at present, about 77 percent of CHCF's medical capacity is in use). Because DNCA will rely upon many of the systems at CHCF that are, at present, not functioning properly, it is uncertain whether DNCA will be able to accept patient-inmates in April 2014 as planned. Although efforts to remediate the problems at CHCF are underway, there is very little time to correct the deficiencies before DNCA's scheduled opening.

> ***Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible.***

This action item is ongoing. Progress during this reporting period is as follows:

Construction at CHCF has been substantially completed. As with any major construction project, there are certain construction defects that must be corrected, and the CHCF project is no different. The most significant defect is related to the system that delivers hot water throughout the site. CDCR's construction team is working with its contractors to fix these

problems, and there is a high degree of confidence that the systems can indeed be corrected. For additional details on construction-related issues, see Section 7, D: Overview of Transition Activities.

There have been difficulties in filling clinical and administrative positions at CHCF. The most serious gap has been in the recruiting and staffing of psychiatrist positions. As a result, DSH has only been able to activate 12 of 17 units. DSH is making every effort to open the remaining units as soon as possible. The Receiver's staff is reevaluating the medical staffing at CHCF in response to concerns expressed by the Health Care CEO that staffing in certain classifications is inadequate.

Even if full staffing were achievable, however, there are extremely serious deficiencies in the activation at CHCF. The Receiver first became aware of these deficiencies as early as July of 2013 when concerns were raised by the Department of Public Health ("DPH") about whether problems in the management of the kitchen might block licensing of the facility. DPH ultimately licensed the facility in August 2013. Unfortunately, the problems that DPH had identified were never satisfactorily resolved notwithstanding the approval for licensing purposes. The problems manifested themselves in inadequate supplies of appropriate food, hot meals not being available, special diet meals not being available as required and general confusion and chaos in the kitchen operation. A key problem is that there are too many kitchen managers trying to run the kitchen. Instead of assigning a single manager to run the kitchen, three managers – one from DSH, one from CDCR and one from CCHCS – were apparently given joint authority to run the kitchen. With three managers in charge, no one has been in charge. The Receiver's staff recommended in October 2013 that a major step forward would be to simply assign a single manager to run the kitchen. An acting manager from another institution was appointed on a temporary basis, but that manager is scheduled to return to his institution in the near future. A permanent appointment needs to be made.

A much more serious set of problems was brought to the Receiver's attention after headquarters clinicians visited CHCF in September and October 2013. The reports indicated that breakdowns in the supply chain – the process by which material is procured, delivered to the general CHCF warehouse, and then delivered to each housing unit – were so serious that basic and essential medical and personal hygiene supplies were either not available at all, or not available in sufficient quantities in the housing units and for use by clinicians and patient-inmates. The initial reports included such things as insufficient catheters for patient-inmates and gloves for nurses. With respect to catheters, the Receiver learned that the Health Care CEO for the facility became so desperate for supplies and so frustrated that he could not secure those supplies through CHCF's supply chain process that he personally drove across town to the San Joaquin General Hospital to borrow several boxes of catheters.

It is simply inconceivable to the Receiver that the Health Care CEO of CDCR's health care facility – supposedly the highest health executive at the institution – was forced to personally borrow supplies from a local hospital because procurement and warehousing functions at the institution were unable to deliver the necessary supplies. It was a clear sign of a fundamental

breakdown in processes. As a result, in October and November 2013, the Receiver's office sent down to CHCF a small team of experienced executives and clinicians to try to help break through the bureaucratic logjam and to report progress, or the lack thereof, back to the Receiver.

It became clear to the Receiver by the end of November 2013 that the situation was not improving. The reports back from the team of executives who had been sent to CHCF indicated that the need to address issues impacting health care was, as a practical matter, being treated as a second-class priority. Stated another way, the institution was being run as just another prison – where custody issues are typically the highest priority and health care and other programs are secondary – instead of being run as a health care facility for patient-inmates.

In another effort to change the dynamics at CHCF, on December 2, 2013, the Receiver decided to transfer the Health Care CEO at CHCF to another institution and appointed as Health Care CEO Ms. Jackie Clark, one of our most experienced Health Care CEO's who had successfully activated the new facilities at SQ. Unfortunately, as of late January 2014, it was clear that the situation had not improved. Supplies were still short, housing units were hoarding the supplies that were available, patient-inmates were still not being supplied with basic medical and personal hygiene necessities, and Ms. Clark was making an emergency order for more supplies *every day*. Even her personal intervention did not guarantee results. For example, in December 2013, Ms. Clark had requested a special bed for a patient-inmate only to discover weeks later that the bed simply had not been ordered by the warehouse.

In mid-January, 2014 the Receiver was informed that shortages in the housing units of soap and towels resulted in patient-inmates not being allowed to take showers or, if taking a shower, frequently using dirty socks to dry themselves. This, combined with reports of general unsanitary conditions in cells, has likely contributed to an outbreak of scabies at the institution.

The Receiver requested a meeting on January 27, 2014 to discuss these unacceptable conditions with the Warden at CHCF, the Health Care CEO at CHCF, the Receiver's top clinical staff, CDCR's top health care officials, and CDCR's top custody executives. After reviewing the myriad problems that exist, there was general agreement that the supply chain problem was one of the highest priority issues that needed to be addressed immediately, although there remain other issues that also need remediation. The Warden and Health Care CEO were directed to produce within five to seven working days a joint list of the most important problems and a joint plan on how those problems could be resolved (a plan that very likely will require some immediate, short-term steps combined with more permanent, longer-term fixes).

After the meeting on January 27, 2014, on the advice of his top medical executives, the Receiver decided to close intake at CHCF to any further medical patient-inmates until the major deficiencies at CHCF are resolved. Because DNCA will be supplied by CHCF, the Receiver is reserving judgment as to whether DNCA can be permitted to open as scheduled.

More broadly, the activation at CHCF highlights the question of whether CDCR is prepared to manage its health care mission successfully. Given the opportunity to demonstrate its capacity and leadership at CHCF, it stood up a facility that could not supply basic medical equipment and personal hygiene material to its clinicians and patient-inmates, a situation that has been permitted to persist for five months without significant improvement.

The Receiver hopes that, working collaboratively with CDCR over the next weeks and months, the problems at CHCF will be corrected, and the next tri-annual will be able to give a more positive report on CHCF's activation. If that does not happen, the Receiver will consider alternative solutions.

### Action 6.2.2. By February 2009, begin construction at first site.
This action item is ongoing. Progress during this reporting period is as follows:

Construction at CHCF was substantially completed in August 2013 as scheduled.

### Action 6.2.3. By July 2013, complete execution of phased construction program.
This action item is ongoing. Progress during this reporting period is as follows:

CHCF construction was substantially completed in August 2013 and the first patient-inmates were received in July 2013.

## Objective 6.3. Complete Construction at San Quentin State Prison

### Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility.
This action is completed.

### Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility.
This action is completed.

# Section 4: Additional Successes Achieved by the Receiver

### A.  Quality Assurance and Patient-Inmate Administrative Appeals

The Receiver's office has staff dedicated to responding to patient-inmates' petitions in various courts for writs of habeas corpus, at least as such responses are ordered by the court hearing the petition. The legal process for petitioning a court for such writ relief was not established by the Receiver as a quality of care improvement program, rather, it is long-standing and wide-reaching body of law that enables patient-inmates to seek relief from alleged unconstitutional confinement or conditions of confinement, including constitutionally inadequate medical care. The Office of the Attorney General may also respond to patient-inmates' petitions, although the "jurisdictional" divide between the Receiver's staff is that the Receiver's staff addresses patient-inmate allegations of inadequate medical care, and the OAG addresses all other issues in an patient-inmate petition that are deemed to be non-medical conditions of custody, if there are any such issues.

California patient-inmates have a long history of filing such petitions to seek court relief for what they allege to be instances of constitutionally inadequate care. The habeas process is thus arguably related to quality assurance, in that it is a patient-inmate driven process causing some level of court review of aspects of their medical care. If the Receiver's staff undertakes to review and respond to a patient-inmate's petition for a writ of habeas corpus, clinical staff is available as needed to help understand the subject clinical history and care issues.

The habeas process is also related to patient-inmate administrative appeals in that, technically, a prerequisite for a patient-inmate to seek court relief is that the issue should have first been addressed through the administrative appeal process. This prerequisite is known as the "exhaustion of remedies" doctrine, but it is not absolute and can be waived by the court in a variety of circumstances, such as if the patient-inmate's self-described condition and the change in care being sought by the patient-inmate is deemed a possible emergency.

Appendix 12 provides a data-based view of how patient-inmates have been using petitions for habeas relief, during 2011, 2012 and 2013, as a means of contending that various aspects of their care are constitutionally inadequate. This data shows the number of cases in which the Receiver's staff has filed a court response to patient-inmate allegations of inadequate care, and the general nature of the issues being presented by the patient-inmates. The subject care in any case is almost always specific to an individual patient-inmate.

### B.  Electronic Health Records System

As part of a multi-stage proposal process for an EHRS an award was made to Cerner Corporation on June 25, 2013. CCHCS/CDCR will work with Cerner Corporation to plan, configure, build and rollout to all facilities, a commercial-off-the-shelf (COTS), EHRS solution.

The implementation of an integrated EHRS will afford CCHCS/CDCR demonstrable and sustained benefits to patient-inmate safety, quality and efficiency of care, and staff efficiencies and satisfaction. It will help facilitate policy adherence, as well as monitoring and reporting our performance in a variety of arenas, including: scheduling and access to care, continuity of care, medication management, evidence-based health care practices, resource management, primary care model implementation, effective communication, patient-inmate education, and system management.

The estimated timeline to implement the technology solution is 18 to 24 months with the first four facilities "go live" scheduled in November/December of 2014.

**C.  Technical Assistance from the Court Experts on Remaining Systemic Issues**

During 2013, the Court Experts conducted site visits to ten institutions to evaluate the quality of care. Their comprehensive evaluations concluded that, while care was generally adequate at two of the ten institutions (subject to certain conditions), care was inadequate at the remainder. At a meeting with the Court Experts in December 2013 to review the reports, it became clear from the reports and the discussion with the Court Experts that, while there have been improvements in many areas of the medical care system, there remained a number of systemic problems that had not been fully corrected, including problems in the following areas: intersystem and intrasystem transfers (where frequent gaps in continuity of care persist); medication management; appropriate sanitation and cleanliness; and routine, on-site oversight and monitoring of institutions.

We agreed at the December 2013 meeting that it would be a more productive use of the Court Experts if we took a pause in their institution-by-institution evaluations – which would undoubtedly have resulted in additional reports identifying the same system-wide gaps and problems – and instead engage the Court Experts to work directly with CCHCS staff to solve the remaining systemic problems. At a follow-up meeting in January 2014, we agreed that the highest priority was for the Court Experts to work closely with the OIG and CCHCS's quality improvement team to make substantial improvements to OIG's audit methodology (with conforming changes to our quality improvement dashboard) so that the OIG methodology more closely aligns with the Court Experts' evaluation methodology. The intent is to improve the OIG methodology in such a way that the Court (and, later, the State when the case has concluded) can rely upon that methodology as a valid way of measuring the quality of care being delivered by the medical care system. The next priority will be for the Court Experts to work with the newly-appointed regional health care executives to help mentor them in their difficult oversight and supervision roles. The third priority will be for the Court Experts to work with our staff in examining the policies associated with inter-system and intra-system transfers. A fourth priority will be to assist us in designing and implementing the new electronic health record so that it will properly support the quality improvement and OIG audit programs.

The Receiver anticipates that this engagement with the Court Experts, which is consistent with the spirit of the various Court orders regarding the roles to be played by the Court Experts, will

substantially accelerate our progress. The Receiver recommends this approach for the Court's consideration.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

**A.  CCHCS Activities related to the Court's June 24, 2013, Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at Pleasant Valley and Avenal State Prisons**

On June 24, 2013, the Court issued its Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at PVSP and ASP ("Order") that, among other actions, requires the Receiver to present the response to the Order in the Tri-Annual report. On July 10, 2013, CCHCS formally requested the Centers for Disease Control (CDC) to examine the available epidemiologic data to assess if the risk based exclusionary policy should be expanded to include other groups, including those age greater than 55. CDC and the National Institute for Occupational Safety and Health (NIOSH) have completed their preliminary field assessments of the two institutions. CCHCS is awaiting the results of the CDC evaluation. The preliminary recommendations were received from the Health Hazard Evaluation from NIOSH on June 17, 2013, and largely concerned facility modifications which were referred to CDCR. The recommendations regarding education and training to employees working at PVSP and ASP are being evaluated for incorporation into existing workplace health and safety training.

We now await the NIOSH report on recommendations regarding reducing the risk of exposure to cocci indoors and guidelines on the use of respiratory protection for staff when outdoors. We also await the CDC report regarding the predicted impact of the use of the cocci skin test to exclude susceptible patient-inmates from highly endemic areas vs. our current strategy of exclusion based on risk factors.

Provider education on the diagnosis, treatment, and management of cocci infection was developed with input from the *Plata* Court Experts, Plaintiffs' expert, the public health community, and CCHCS' multidisciplinary continuing medical education group resulting in a comprehensive CCHCS cocci clinical guideline and a web based training utilizing the guideline; Training was completed for all physicians and nurses per the court order.

In response to the Receiver's policy, CDCR successfully transferred 885 patient-inmates out of ASP to appropriate intermediate institutions. Another 378 voluntarily waived; 29 others either paroled, were released or deceased. For PVSP, the department was successful in transferring 813 patient-inmates to appropriate intermediate institutions with 271 waivers and 36 others having paroled, released or deceased. All of this movement occurred by September 23, 2013.

There is ongoing surveillance for cocci; the number of cases is low this past fall, consistent with the drought conditions in California.  Training on surveillance and an addendum to the cocci care guide to formalize our surveillance and reporting for cocci are planned.

**B.  Overcrowding Update**

As noted in the last report, California's prisons remain significantly overcrowded.  At the end of this reporting period, California's prison population stood at 134,249, which was an increase of almost 1,000 patient-inmates since the last reporting period.

More significantly, CDCR released its Fall 2013 population projections.  According to this report, CDCR is estimating that the prison population will grow to almost 143,000 by June 2019, an increase of almost 10,000 patient-inmates than what their previous report estimated.  Their report states that the increase in population will be due primarily to a projected increase in admissions from court.  Of great concern is the rise in the number of patient-inmates sentenced to state prison for "second strikes" in 2012-13, 5,492, which is an astounding **32.6 percent** increase compared to the prior year. This presents the State with a long-term challenge that demands some immediate attention and planning.

In response to Senate Bill 105 and a filing by the State on September 16, 2013, the Three-Judge Court ordered the parties to engage in a meet and confer to "explore how defendants can comply with [the] Court's June 20, 2013, Order, including means and dates by which such compliance can be expedited or accomplished and how [the] Court can ensure a durable solution to the prison crowding problem." Three-Judge Court, Order to Meet and Confer, p. 2 (September 24, 2013).  On October 21, 2013, the Court extended the meet-and-confer process to November 18, 2013 (Three-Judge Court, Order Extending Meet and Confer Process, p. 1 (October 21, 2013) and then the court further extended the meet-and-confer process to January 10, 2014. Three-Judge Court, Order Further Extending Meet and Confer Process, p. 1 (December 11, 2013).   Unfortunately, the meet-and-confer process did not result in a negotiated agreement between the parties.  As a result, on January 13, 2014, the court ordered the parties to file proposed orders by January 23, 2014, to reflect what each party proposes to be the best way to achieve durable compliance with the Court's orders to maintain a prison population of no more than 137.5 percent.

On January 23, 2014 both parties submitted their proposed orders.  The State's order would seek a two-year extension for reaching 137.5 percent design capacity (until February 28, 2016). As well, the State proposed the following:

- Expanded medical parole process;
- New parole process for elderly patient-inmates who have served at least 25 years in state prison;
- Increased credit-earning for non-violent second strike offenders and minimum custody patient-inmates;
- $81.1 million for various prison recidivism reduction efforts;
- $128 million for county probation felony diversion programs;
- Cap out-of-state placements at 8,900; and
- Appointment of a "compliance officer" empowered to order necessary releases.

In their proposed order, the Prison Law Office (PLO) proposed that the State be required to reach 137.5 percent design capacity by May 2014, as well as the following:

- Keep in place waivers of state law, as set forth in the previous Court Order (June 20, 2013);
- Allow for the continued housing of out-of-state patient-inmates;
- Bi-monthly reports on specific steps taken towards implementing measures included in the State's previous plans; and
- Appointment of a "compliance officer" empowered to order necessary releases.

The court has stated it intends to issue an order sometime in mid-February.

# Section 6: An Accounting of Expenditures for the Reporting Period

**A.   Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four month period from September through December 2013 were $473,300 and $0 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 13.

**B.   Revenues**

For the months of September through December 2013, the Receiver requested transfers of $700,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver. Total year to date funding for the FY 2013/2014 to CPR from the State of California is $875,000.

All funds were received in a timely manner.

# Section 7: Other Matters Deemed Appropriate for Judicial Review

### A. Coordination with Other Lawsuits

During the reporting period, regular meetings between the three courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have continued. A Coordination Group meeting was held on October 2, 2013. Progress has continued during this reporting period and is captured in meeting minutes.

### B. Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the Court, included as Appendix 14 is a summary of the contracts the Receiver awarded during this reporting period, including a brief description of the contracts, the projects to which the contracts pertain, and the method the Receiver utilized to award the contracts (i.e., expedited formal bid, urgent informal bid, sole source).

### C. Consultant Staff Engaged by the Receiver

During this reporting period, the Office of the Receiver has not engaged any consultant staff.

### D. Overview of Transition Activities

Post Delegation Report for Health Care Access Units

Access Quality Report

The published Access Quality Report (AQR) remains unchanged from the time of delegation. The Receivership continues to receive the required data from the institutions on a monthly basis, with one exception: without consultation or notice to the Receiver, CDCR created and initiated a new time and shift system (i.e., "TeleStaff") which does not provide certain data points the institutions are required to report to complete the AQR. As of the conclusion of this reporting period, approximately half the institutions have transitioned to the new system. It is anticipated all institutions will transition by May 2014.

Custody Access to Care Success Rate

During this reporting period, an AQR was published for the months of August, September, October, and November 2013. The average custody Access to Care Success Rate for this period

was 99.59 percent. This represents an increase of 0.31 percentage points over the previous reporting period. Figure 11 is a summary by month of the number of institutions failing to attain the 99.0 percent benchmark established in the delegation. For institutions failing to attain the benchmark, a total of 12 Corrective Action Plans (CAP) were due to be submitted this reporting period. All plans were received.

*Figure 11. Institutions Failing to Attain the 99.00% Standard for the Custody Access to Care Success Rate*



## Operations Monitoring Audits

As outlined in the HCAU Delegation of Authority, Field Operations staff are continuing to conduct Health Care Access Unit Operations Monitoring Audits (OMA). During this reporting period, Field Operations staff conducted a total of 23 Health Care Access Unit Operations Monitoring Audits (OMA); 11 Round One audits, and 12 Round Two audits which occur 180-days after the Round One audit.

This concludes the Round One audit of all 33 institutions. The findings for 31 institutions have been published to date. Of these reports, the institutions averaged a score of 86.8 percent. Two institutions scored below the delegation benchmark of 85.0 percent: California State Prison, Los Angeles County (LAC) and PBSP. A review of the scores achieved for individual chapters of the audit indicate systemic non-compliance in three areas in that the institutions <u>averaged</u> below 85.0 percent. These chapters are:

- *Access to Mental Health Care* (74.3 percent)
- *Access Quality Report* (77.3 percent), and
- *Access to Medication* (79.6 percent).

As for the Round Two audits, this tri-annual period brings the total number of audits conducted to 16 with the remaining 17 audits scheduled to occur between January and June of 2014. Of the 14 audit reports published, the average Round II score is 88.4 percent. Three institutions scored below the delegation benchmark of 85.0 percent: SCC, SQ and CMC. Although modestly improved over the Round One average (stated previously), the same three chapters averaged below 85.0 percent during Round II:

- *Access to Medication* (75.6 percent)
- *Access to Mental Health Care* (78.1 percent), and
- *Access Quality Report* (82.5 percent).

<u>Failure to Resolve Operations Monitoring Audits Round One CAP Items</u>:

The following institutions' Round Two audit findings listed CAP items identified during Round One, which were not resolved or significantly improved. The institutions' continued non-compliance in these fully correctable areas is considered symptomatic of poor or insufficient leadership. Please see Figure 12.

*Figure 12.*

| INSTITUTION(S) FAILING TO RESOLVE | CAP ITEM |
|---|---|
| **Quantitative Findings** ||
| SQ | Nursing staff are not being notified by custody staff in a timely manner regarding patient-inmate bed moves. |
| SQ | Staff is not consistently moving the medication and Medication Administration Record (MAR) at the same time the patient-inmate is transferred between housing units. |
| SQ | Custody staff are not the staff actually transporting the medication and MAR to the new housing facility for patient-inmate transfers between housing units. |
| SQ, CTF | The AQR data for Treatment and Triage Area (TTA) and Code II/III ambulance runs is not accurate. |
| SQ, CTF | The AQR data for transportation and/or medical guarding redirected hours is not being recorded accurately. |
| SQ, PVSP, CMC | Mental Health Crisis Bed (MHCB) discharge records are not consistently and thoroughly completed. |
| SQ, CMC | Suicide cut-down kits do not contain all items required by the MHSDS Program Guide. |
| SQ | Custody tracking sheets are not being consistently utilized for ducat tracking. |
| CIW | Custody attendance at Suicide Prevention and Response Focused Improvement Team (SPR FIT) meetings is not consistent. |
| CIW | Medical emergency "222" calls are being made frequently to avoid the patient-inmate "co-pay." |
| CIW | Patient-inmates are not being timely released from work/program assignments for health care appointments. |
| CTF | Diabetic patient-inmates do not have access to food within 30 minutes of receiving insulin treatment. |
| CTF | Medical rounds and collection of CDCR Form 7362 not documented in general population housing units during lockdowns. |
| CTF | Medical rounds and collection of CDCR Form 7362 not documented in CDCR 114 ASU Log Book. |
| CTF | Morning mental health check-in meeting is not consistently taking place in ASU. |
| CTF | Morning mental health check-in meeting is not consistently documented in the CDCR 114 ASU Log Book. |
| CTF | Patient-inmates in restricted housing units do not have access to obtain CDCR Form 7362 health care requests daily. |
| CTF | Patient-inmates in restricted housing units do not have access to submit CDCR Form 7362 health care requests daily. |
| CTF | The AQR data for daily health care add-on appointments is not being accurately reported. |
| CTF | The AQR data for number of budgeted correctional officer posts and vacancies is not being accurately reported. |
| CTF | Nursing over-use of "add-on" appointments, circumventing the priority ducating process. |
| RJD, PVSP, CMC | Keep-on-person (KOP) medications are being packaged with patient-inmate personal property for transports between institutions. |
| PVSP, CMC | Hora somni ("hours of sleep," HS) medications are not being administered per statewide pill policy expectations. |
| CMC | All custody peace officers are not carrying a CPR mouth barrier on their person at all times while on duty. |
| CMC | Quarterly medical emergency response drills/simulations are not being conducted as required. |
| CMC | The Warden (or other appropriate custody designee) is not consistently attending Emergency Medical Response Review Committee meetings. |
| CMC | The institution made changes to the HCAU Post Assignment Schedule and/or Master Assignment Roster without providing notice to the Office of the Receiver. |
| CMC | Suicide cut-down kit inventories are not being conducted daily. |
| CMC | Mental health group sessions are not being scheduled via the priority ducat process. |

The second component to the audit process is a qualitative analysis, which seeks to identify processes, relationships, and other un-quantifiable factors which nonetheless have a tangible effect on health care access. The qualitative review process largely consists of interviews with staff at all levels, and auditor observation of operations having to do with health care access. During the Round I and II audits, the following qualitative findings were predominant:

- Transportation vehicles (onsite and offsite) are accruing high mileage, developing concerns over reliability. Institutions universally claim difficulty obtaining funding to maintain, upgrade or replace vehicles as necessary.

- The approved custody tracking sheets and/or master pass list are not being utilized for tracking and reconciling of patient-inmate ducat outcomes. During this reporting period, this was observed at California Institution for Women (CIW), CMC (MH), CTF, High Desert State Prison, LAC, PVSP, and SCC.

- The custody and health care management teams at specific locations, including Richard J. Donovan Correctional Facility (RJD), CVSP, LAC and COR, were found to exhibit significant leadership needs. Frequently these take the form of ideological differences, lack of cooperation and collaboration, exclusion from information-sharing, and absence of mutual support. The specifics take many forms, and are not necessarily reflected in the overall quantitative scoring.

Medical Guarding / Activation of CHCF
With the activation of the CHCF in July 2013, and the resultant shift of high-risk patient-inmates out of basic institutions, an observable decrease in medical guarding unit/community hospital bed utilization has taken place at institutions designated as basic acuity level of care. From May 2013 to November 2013, the monthly medical guarding unit/community hospital bed census for basic care institutions dropped from 2,155 to 1,491, with some minor fluctuations between.

In September 2013, Field Operations conducted a staffing utilization review, taking a snapshot of HCAU custody staff utilization for a one-week period. This review indicated a significant number of HCAU custody staff being redirected out of medical guarding/community hospital posts and transportation posts into other institutional vacancies, due to decreased census or workload. The institutions redirecting staff out of medical guarding/community hospital posts were comprised of a blend of both basic care and intermediate acuity levels, not neatly aligning with the observed census trends. However, the bulk of the institutions showing redirects out of transportation posts were basic-care institutions, supporting the idea that demand/workload has decreased at such institutions subsequent to the CHCF activation.

Transportation Vehicles
CCHCS staff continued to work with CDCR staff on the monitoring and responsibility for managing medical transportation vehicles. Accomplishments made during the reporting period include the following:

The previous reporting period CDCR agreed to purchase and replace 12 Emergency [Medical] Response Vehicles (ERVs) that were identified as needing to be replaced. In December 2013 CCHCS was informed by the Office of Business Services within CDCR that the Division of Adult Institutions (DAI) and the Administrative Service Division have subsequently met and come to agreement on the purchase of the ERV's. CCHCS has not been informed of a purchase schedule or a timeframe in which the vehicles will be available to the requesting institutions.

Prior to previous reporting period, DAI indicated to CCHCS that they would be providing a plan for managing the medical transportation vehicles. CCHCS still has not received the plan, nor has CCHCS received any updated data regarding the status and/or condition of the medical transportation fleet. The data that was compiled in July 2013 reflected that 198 medical transportation vehicles had a mileage which exceeded the OFA replacement criteria and should be replaced. To this date, CCHCS has not been notified relative to the intent to purchase or the actual purchase of replacement vehicles. The above issues will continue to be monitored under the terms of the delegation.

<u>Post Delegation Report for Facility Planning and Activation Management</u>
The first free-standing medical facility project activated is CHCF at Stockton. The activation of CHCF involved extensive coordination among all project disciplines, including construction contractors, construction management, medical, nursing, allied services, mental health, dental, licensing, custody, transportation, and support services. Since CHCF includes a DSH facility for patient-inmates who require licensed intermediate or acute level of mental health care, coordination between CDCR, DSH, and CCHCS has been particularly critical for successful activation. With significant efforts on the part of all team members, the activation of CHCF and the receipt of the first patient-inmates occurred on schedule. As of December 31, 2013, approximately 1,200 patient-inmates have been admitted to CHCF.

Construction at CHCF was substantially complete in August 2013 as scheduled. However, facility plant issues most typical of a newly constructed facility continue to be identified and addressed by CHCF Plant Operations staff and by the design-builder where appropriate. The most significant issue has been multiple points of failure in the hydronic loop, which provides the source of heat for the buildings. Some of the points of failure have resulted in the loss of heat in some housing units, which necessitated the use of temporary heating sources. Facility Planning, Construction and Management (FPCM) staff, CHCF staff, and the design-builder have all been working on this problem on a priority basis making repairs, assessing possible causes, and developing solutions. Staff also continue to monitor building temperatures and temporary heaters remain onsite as a precautionary measure.

Construction of DNCA is scheduled to be complete in March 2014. An activation schedule has been drafted based on the current baseline construction schedule. Facility Planning and Activation Management (FPAM) staff are effectively managing activation activities and monitoring the procuring and delivery of Group I and Group II equipment and Group III consumables. FPAM continues to apply sound project management and critical path scheduling skills and tools to this project.

Under the delegation of authority, FPAM was required to provide project schedules for the HCFIP projects. The current schedules show that construction begins in March 2014 with activation activities starting in August 2015 for the statewide medication distribution projects. The schedule shows construction starting in July 2014 with activation activities starting in December 2015 for the first HCFIP project, which is at CMF. According to this schedule, construction of the last HCFIP project, which is CVSP, will start in May 2016 and be completed in August 2017.

CDCR Performance Under the October 26, 2012 Revocable Delegation of Authority For FPAM
Since the signing of this revocable delegation, FPAM has continued to perform with the same rigor, focus, and skills they demonstrated prior to the delegation. The coordination and collaboration of FPAM with the construction management team and the application of sound project management tools and skills continues to be effective. To facilitate success, CDCR created a team environment with active involvement from members of the Project Management firm (Vanir Construction Management, Inc.), the Construction Management firm (URS/Lend Lease), CCHCS, and DSH. The team continuously communicates and uses appropriate project management tools, such as dashboards, critical path schedules, regular team meetings and reports to maintain open lines of communication and to track and monitor the necessary activation activities.

Post Delegation Report for Construction Oversight
In order to streamline and coordinate health care construction, on September 21, 2009, the Receiver and the Secretary of CDCR issued a revocable delegation of their respective authorities related to the construction of the new Consolidated Care Center, now known as CHCF, and the HCFIP to CDCR's Senior Chief of FPCM. Under the direction of the Senior Chief, FPCM became responsible for the study, planning, design, development, management, and construction of CHCF (and DNCA) and HCFIP. These projects comprise the elements of Goal 6; to expand administrative, clinical and housing facilities for patient-inmates with medical and/or mental health needs and to upgrade administrative and clinical facilities at CDCR's existing prisons. During the period of this report, the Senior Chief announced his retirement in early 2014. The responsibilities under the delegation have been transitioned to the Acting Director of FPCM. No change in commitment, focus, or progress is anticipated.

Expand Administrative, Clinical and Housing Facilities
The two major construction projects to add medical and mental health beds and provide for necessary clinical, administrative, and housing facilities are the 1,818 bed CHCF and the conversion of DNCA (located adjacent to CHCF) to serve as a 1,133 bed facility annex to CHCF.

CHCF was substantially completed in August and first patient-inmates were received on schedule in July 2013. However, facility plant issues most typical of a newly constructed facility continue to be identified and addressed by FPCM, CHCF Plant Operations staff, and by the design-builder where appropriate. The most significant issue has been multiple points of failure in the hydronic loop, which provides the source of heat for the buildings. Some of the points of failure have resulted in the loss of heat in some housing units, which necessitated the use of

temporary heating sources. FPCM staff, CHCF staff, and the design-builder have all been working on this problem on a priority basis making repairs, assessing possible causes, and developing solutions.

As indicated, the 1,133 bed DNCA is adjacent to and will serve as an annex to CHCF. DNCA will house intermediate-care patient-inmates needing enhanced medical services and Enhanced Outpatient Program (EOP) patient-inmates with EOP-level mental health needs. This project is continuing under an aggressive construction schedule. To date, construction is approximately 90 percent complete.

Upgrade Administrative and Clinical Facilities in CDCR's Existing Prisons

The HCFIP projects continue to progress through the PWB approval and PMIB funding processes. To date, 22 projects have received PWB project approvals and interim financing from PMIB. Contracts for developing site-specific designs for the 22 approved projects have been finalized. CDCR's current schedules reflect project authorization and funding submittals to PWB and PMIB for the remaining projects sequenced through August 2014.

The statewide medication distribution projects received PWB approval in September 2012 (PMIB funding is not required since these are funded with State General Funds). These projects received PWB approval of preliminary plans in November 2013 and construction drawings are now being developed.

CDCR Performance under the September 21, 2009 Revocable Delegation of Authority For Construction Oversight

CDCR continues to demonstrate a high level of commitment, focus, and ability to effectively manage the health care construction projects. FPCM continues to effectively manage the facility issues of the CHCF, which are to be expected of a newly constructed facility. FPCM is demonstrating the same abilities and commitment to a timely and successful completion of the DNCA project.

Confidence in the HCFIP schedules continues as additional projects are approved by PWB and funded by PMIB and as preliminary plans for approved projects receive subsequent PWB approval. To date, of the 32 planned HCFIP projects (including the statewide medication distribution projects), 6 authorized projects have received PWB approval of preliminary plans and are now in the working drawings phase; 16 authorized projects are in the preliminary planning phase; and project authorizations for the remaining projects are in various stages of development and/or stages of the approval process. Architectural & Engineering contracts have been executed for all 22 approved projects and contracts for the next two projects have been negotiated and are in the process of being executed.

Facility Construction

With the exception of SQ, which had physical plant upgrades constructed under the Receivership to address lack of treatment and clinic space, the *Plata* Court Experts found that

all of the facilities they visited had serious physical plant issues. Their observations underscore the importance of completing the HCFIP program as quickly as possible.

## Section 8: Conclusion

As the above makes clear, we are continuing to make durable improvements to CDCR's health care system. Progress has not always been in a straight line, and for every success, we discover additional room for improvement, some of which we have discovered for ourselves, some of which is reported by plaintiffs' counsel, and some of which is discovered by the *Plata* Court Experts. We believe that, working collaboratively with CDCR, the OIG and the Court Experts, we stand a good chance of making significant progress during the coming year.