IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE LAWRENCE K. KARLTON, JUDGE

---oOo---

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.                                    No. Civ. S-90-520

EDMUND G. BROWN, JR., et al.,

    Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT

STATUS CONFERENCE

THURSDAY, JANUARY 30, 2014

---oOo---

Reported by:     KELLY O'HALLORAN, CSR #6660

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

APPEARANCES

For the Plaintiffs:

    ROSEN BIEN GALVAN & GRUNFELD LLP
    Post Office Box 390
    San Francisco, CA  94104-0390
    BY:  MICHAEL W. BIEN

    K&L Gates LLP
    4 Embarcadero Center, Suite 1200
    San Francisco, CA  94111
    BY:  JEFFREY L. BORNSTEIN

For the Defendants:

    CALIFORNIA STATE ATTORNEY GENERAL'S OFFICE
    P.O. Box 944255
    Sacramento, CA  95814
    BY:  PATRICK R. McKINNEY
        DEBBIE VOROUS
        JAY C. RUSSELL

1           SACRAMENTO, CALIFORNIA
2        THURSDAY, JANUARY 30, 2014, 10:00 A.M.
3                    ---oOo---
4        THE CLERK: Calling civil case S-90-0520; Coleman, et
al. v Brown, et al.
6        THE COURT: Counsel, approach the podium and state
your appearance for the record. And if you're arguing,
remain at the podium.
9        MR. BIEN: Good morning. Michael Bien for plaintiffs.
And my colleague, Jeff Bornstein, is going to take the lead
today.
12       MR. McKINNEY: Good morning, your Honor. Patrick
McKinney for the defendants Attorney General's Office with my
colleagues Debbie Vorous and Jay Russell.
15       THE COURT: Folks, I've received a remarkable amount
of paper over the last couple of days, and I have no idea of
what's going on. And I say that respectfully. I don't mean
to suggest anything that anybody's done wrong. But there is,
as I understand it, a request from the plaintiffs simply
to -- well, I've reopened submission because I have concerns
that the facts, if they emerge, may influence the Court's
wrestling with the very difficult issue of the use of force.
On the other hand, it may just be nothing. But I have no way
of knowing so I've done that.
25       But beyond that, I've made no judgment whatsoever as

1    to what happened.  I don't know.  And the whole purpose, as I
2    understand -- well, I don't know what the plaintiffs want.
3    What I want is to find out what happened and find out what
4    happened to determine whether there is any effect that it
5    might have on the Court's ultimate determination in the use
6    of force issues.  And I may as well say this as well.  I
7    would assume that the special master, given the situation,
8    will want to know what happened in terms of whether it was a
9    suicide or something else, et cetera.
10            I'm not suggesting, and I hope you understand,
11   Mr. McKinney, I'm not suggesting that the state did anything
12   wrong.  I don't know.  And the purpose is to have a
13   hearing -- strike that.  The purpose is to have -- I just
14   realized I'm the only one who is speaking.  My purpose would
15   be to simply find out what the facts are.
16            Having said as much, I really want to ask the
17   plaintiffs what they need.  Judge Drozd, who will be handling
18   discovery in this matter, unfortunately has had a personal
19   problem at home which has precluded his being present.  It
20   would have been nice had he been here, I would have told you
21   go downstairs and talk to Judge Drozd and decide what you
22   need to do.  He's not here.  He couldn't be.
23            Counsel, what do you think you need in terms of time?
24            MR. BORNSTEIN:  Well, I think, your Honor, a couple of
25   things.  First, I think we're all agreed, both sides are

1  agreed, and the Court has already said that you're going to
2  take this into consideration.  And the question is, we asked
3  the same question as you, which is what happened and why.
4  Second, we understand from the papers that were filed that
5  there is an OIA investigation, but we don't know of what or
6  of whom.  I think it would be helpful for all of us if you
7  were to get something under seal with a copy to us telling
8  you exactly what the scope of that is so you could evaluate
9  that for yourself.  But for us, we need to get -- we would
10 like to take some just basic discovery, or the decision
11 makers are here.  We could even put them on the witness stand
12 and cross-examine them to find out what they know and what
13 happened.
14          THE COURT:  I'm not of the view that people ought to
15 be put on the stand before they are prepared and people
16 understand what's going on and why.
17          MR. McKINNEY:  Well, your Honor, if I may make an
18 offer.
19          THE COURT:  Sure.
20          MR. McKINNEY:  I think the question is really what you
21 must take into consideration.  And we believe the record will
22 show that the department is taking this inmate's death
23 extremely seriously from the beginning.  They launched an
24 investigation within days.  Today I have here Michael
25 Stainer, who had testified earlier, the head of the Division

1   of Adult Institutions.  I've got Dave Grant from Internal
2   Affairs.  I also have Tim Belavich, Dr. Belavich, the
3   Statewide Mental Health Director.  And we would offer to the
4   Court, if the Court is interested in an explanation, that we
5   do that informally, because we believe that you have the
6   documents, and it's the documents you should take into
7   consideration.  It's one more individual case beyond the six
8   they've offered.  It's the seventh.  We suggest you take the
9   documents, and we're happy to informally discuss with the
10  Court what the department is doing.
11          THE COURT:  Mr. McKinney, I -- I want to go off the
12  record for a minute.
13          (Discussion had off the record.)
14          THE COURT:  Back on the record.  Mr. McKinney has
15  suggested that we actually have a hearing.  I think that's
16  what you're saying.
17          MR. McKINNEY:  No, your Honor.  I would more suggest
18  that we have an informal conference.
19          THE COURT:  Between you guys?
20          MR. McKINNEY:  No.  With your Honor and the potential
21  witnesses.  Because we don't really see the value of
22  continued testimony.
23          THE COURT:  What you're saying is that the case is
24  sufficiently clear that if we can all just go off the record
25  and chat, we may find that there's no reason to go further.

1    Is that what you're saying?
2          MR. McKINNEY:  Correct, your Honor.  But because this
3    is an ongoing disciplinary investigation, we would ask that
4    the conference happen either in chambers or that the
5    courtroom be cleared.
6          THE COURT:  The last time we did that, we got a
7    Ninth Circuit reversal so fast, it made our heads spin;
8    right?
9          MR. McKINNEY:  Well, your Honor, it was because we did
10   not clear the courtroom.
11         THE COURT:  I don't feel comfortable doing that, sir.
12   I wish I could, but I don't feel comfortable doing that.
13         MR. McKINNEY:  I think it's similar, your Honor, to
14   what Mr. Bornstein suggested, that a report be given under
15   seal.  We're suggesting that we do that orally rather than in
16   a written format.
17         THE COURT:  The problem with that is you all know that
18   there's a Bee reporter present.  And the minute we start
19   talking about putting things under seal and singing and
20   dancing, I'm going to hear from whoever.
21         MR. BORNSTEIN:  Well, I want to be clear, your Honor.
22   I am not talking about the actual what happened being under
23   seal.  That was limited to whatever they say they're doing as
24   far as their own internal affairs investigation.  I think
25   we're all entitled to understand what happened.  You know,

1   was there custody interference, was there incompetent medical
2   or mental healthcare, was there pepper spray that was related
3   to this inmate's death when he was sprayed for blocking the
4   food port.  Why was the recommendation that the use of pepper
5   spray for a food port, even though it was within policy, why
6   was that recommendation taken out that it should go to the
7   use of force committee before the final version was done?
8   Why was there a delay in the fact of a pepper-spray-related
9   death not being communicated to the State Attorney General
10  and to this Court since it happened, according to
11  Dr. Belavich, he knew about it as of September of 2013 while
12  this trial was going on.
13          Those are the kinds of things that we think everyone
14  needs to know.  And there may be an innocent explanation for
15  it.  The fact that whether they ruled it a suicide or they
16  didn't rule it a suicide is not the point.  The point is --
17          THE COURT:  Well, it is a point.
18          MR. BORNSTEIN:  It is a point.  I agree.  But it's not
19  the point.  The point is that there's an inmate death.  He's
20  a seriously mentally ill inmate.  And there appears to have
21  been a combination of pepper spray and custody interference
22  in allowing him to get mental and medical care, and they
23  refused to open the door.  And so those things we ought to
24  have the opportunity and you should have the opportunity to
25  hear what the testimony is about that, either in the form of

1   declarations with some cross-examination or through live
2   testimony or through depositions.
3          THE COURT:  Let me say that the question of whether or
4   not there was custody interference in obtaining medical care,
5   at least according to what was in the paper -- and, again,
6   you know, I don't know what happened.  But it appears that,
7   from all that appears, it appears the doctor just was asked
8   to intervene and said please don't call me again.
9          I'm going to ask you again, sir, how much time do you
10  need for discovery?  And your answer is that all depends on
11  what discovery --
12         MR. BORNSTEIN:  -- is permitted.  Thirty days, your
13  Honor.  We're willing to go as fast as we can.
14         THE COURT:  All right.
15         MR. McKINNEY:  Your Honor, may I point out one other
16  thing?
17         THE COURT:  Sure.
18         MR. McKINNEY:  This goes to the individual isolated
19  examples that plaintiffs have brought forward.  As has been
20  reported in the paper, we understand that this inmate's
21  family has retained counsel.  It's not clear that these
22  attorneys represent this inmate in this lawsuit.
23         THE COURT:  They don't.  Well, they do because he's
24  part of the class.  The fact that he may have lawyers to
25  pursue yet another claim is entirely beside the point.

```
 1              MR. McKINNEY:  But the question is whether it's
 2   appropriate to litigate this individual case within Coleman.
 3              THE COURT:  I understand precisely what you're saying.
 4              MR. BORNSTEIN:  We're also prepared, your Honor, if
 5   you are willing to do it, to have an evidentiary hearing
 6   without depositions where we simply have the witnesses come
 7   and explain what happened and who did what, where, when and
 8   handle it that way.
 9              THE COURT:  The problem with all of this, sir, is it
10   may turn out to be -- I'm not suggesting it is.  I want to
11   make that clear.  I have no idea.  But it may all be a lot of
12   sound and fury signifying nothing.  I don't know.
13              MR. BORNSTEIN:  Neither do we.
14              THE COURT:  No kidding.  And with due respect, sir,
15   you don't either.  You only think you do.
16              MR. McKINNEY:  Your Honor, we do know what the
17   department has done.  A lot of action's been taken.
18              THE COURT:  I understand.  All right.  Everybody stop.
19         Yes, sir.
20              MR. BIEN:  Your Honor, may I?
21         It seems one issue of the underlying incident, what
22   happened to this man at Mule Creek, there's several reports
23   that have been written about that.  It seems that the parties
24   are in agreement that you can consider that incident.  And I
25   think one thing we can do --
```

1         THE COURT: I don't know what that incident
2    demonstrates.
3         MR. BIEN: What I was going to suggest, your Honor, is
4    that we could, as to that incident, what happened to him and
5    what issue's raised, we could each file a brief about that
6    incident.
7         Another issue is whether or not a decision was made by
8    the department to withhold the information or not, which is
9    obviously a very serious issue but a sudden different issue.
10        THE COURT: Let me stop you. This argument is going
11   nowhere. It's not clear to me what you just said, that you
12   agree with the facts that relate at least to the death of
13   this individual. And I don't, you know, you are asserting --
14   no disrespect -- that the multiple reports suggest to you, at
15   least, and that's being appropriately modest, that there may
16   be some dispute about the facts of what happened because the
17   documents appear perhaps not to be fully accurate.
18        Is that wrong or are you prepared to say no, we accept
19   X, whatever X is?
20        MR. BIEN: There doesn't seem to be a dispute from the
21   reports that we've seen, Plata reports and the Coleman
22   reports, about the death, about what happened in the
23   incident. You know, what nurses did, what doctors did, the
24   timing. And I think what happened in the incident is
25   significant for various issues that are already under

1  consideration by the Court.  And I think the parties could
2  discuss that, why you should take that into account and what
3  its significance is.  That's a wholly separate issue from
4  whether or not someone made a choice to withhold the
5  information or keep it away from the trial or later on to
6  modify what went to the special master in the suicide review
7  process.
8          THE COURT:  Here's what I'm going to do.  I'm going to
9  reopen discovery for a period of 30 days.  At the close of 30
10 days, I expect I will set another status conference to
11 determine where we go from there.  If the parties together
12 agree on the facts of what happened, at least to the
13 individual, then you can file a joint document, and I'll
14 accept it as being the case.
15         As to the questions which arise out of the asserted
16 possibility that there's a withholding of information and the
17 like, you know, if you can agree, if you can agree on the
18 facts that occurred relative to his death, then that can be
19 exclusively as to these other issues.
20         If, in fact, when you sit down and attempt to work out
21 an agreed statement of facts as to what happened to him in
22 his death, then the 30 days will include such discovery as
23 you think is appropriate relative to that matter as well.
24         MR. McKINNEY:  Your Honor, I just want to briefly
25 address this withholding issue.  They've made a lot about the

1   issues, a lot of false allegations.  This allegation of
2   withholding is belied by Mr. Bien's own declaration.  If you
3   look at the last page, the 7229-B form, the reference to
4   pepper spray is there.  They had this information in
5   September.  It was posted to the website, and they did
6   nothing with it.
7        So now they've come back to the Court, after the
8   motion is closed, they're asking for all this discovery.
9   They've missed their opportunity, your Honor.
10       THE COURT:  Thank you, sir.  That's the order of the
11  Court.
12       MR. McKINNEY:  Thank you.
13       THE COURT:  We'll stand in recess.  We'll prepare a
14  formal order so at least you won't be arguing about what the
15  scope of your discovery is.
16       Let me suggest another thing, if I may, while we're
17  still on the record.  It is really unfortunate that
18  Judge Drozd is not here.  I suspect that the simplest way of
19  proceeding, but you may not agree with me, is for the
20  plaintiff to outline who they want to depose and so forth and
21  so on.  The defendants can say, oh, that's all right or
22  that's not all right, and that you promptly go, if there is a
23  dispute, because I'm giving you 30 days because I've got to
24  get -- I'm giving you 30 days, and you may eat it all up
25  arguing about what it is that you need to discuss.

1          Thank you, gentlemen.  We'll stand in recess.
2          MR. McKINNEY:  Thank you.
3          (Proceedings concluded at 10:20 a.m.)

1    I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3

4

5                            /s/ Kelly O'Halloran

6                            KELLY O'HALLORAN, CSR #6660