1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California 94710-1916
   Telephone: (510) 280-2621
4

5

6

7

8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California 94111-5994
11 Telephone: (415) 882-8200

12
   Attorneys for Plaintiffs
13

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

14              UNITED STATES DISTRICT COURT

15             EASTERN DISTRICT OF CALIFORNIA

16

17 RALPH COLEMAN, et al.,

18          Plaintiffs,

19      v.

20 EDMUND G. BROWN, JR., et al.,

21          Defendants.

22

Case No. 2:90-cv-0520 LKK DAD

**PLAINTIFFS' RESPONSE TO DEFENDANTS' POST EVIDENTIARY HEARING BRIEF RE PLAINTIFFS' MOTION RELATED TO HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION**

23

24

25

26

27

28

[1074363-14]

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.  DEFENDANTS RELY ON THE WRONG STANDARD FOR EIGHTH AMENDMENT VIOLATIONS ........................................................................ 1

    A.  Defendants Have Established No Penological Justification for Punitive, Overbroad, and Harmful Segregation Policies ............................... 2

    B.  The Court Must Remedy the Established Eighth Amendment Violations ............................................................................................... 3

    C.  Conditions in CDCR Segregation Units Constitute Solitary Confinement ...................................................................................... 5

II.  SYSTEMWIDE POLICIES AND PRACTICES PREVENT THE DELIVERY OF MINIMALLY ADEQUATE MENTAL HEALTH CARE IN CDCR SEGREGATION UNITS ........................................................... 6

III.  DEFENDANTS' EVIDENCE OF CONSTITUTIONAL COMPLIANCE IS INCOMPLETE, MISLEADING, AND IMPROPER ................................... 9

    A.  Defendants Omit and Misrepresent Information about Staffing, Clinical Space, Lengths of Stay, and Suicides in CDCR Segregation Units ................................................................................... 9

    B.  Defendants' Evidence about Mental Health Care Lacks Reliability ............. 11

    C.  Defendants Improperly Rely on Their Termination Experts' Report .......... 12

IV.  CONSTITUTIONAL VIOLATIONS IN CDCR SEGREGATION UNITS COMPEL AMENDMENTS TO THE *COLEMAN* PROGRAM GUIDE ............... 14

CONCLUSION ....................................................................................................... 15

[1074363-14]

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1

# TABLE OF AUTHORITIES

2
                                                                                        **Page**

3

## CASES

4
*Arizona, Dep't of Law v. ASARCO, L.L.C.*,
5     844 F. Supp. 2d 957 (D. Ariz. 2011) .................................................................. 13

6 *Brown v. Plata*,
     131 S. Ct. 1910 (2011) ........................................................................................... 4
7

8 *Farmer v. Brennan*,
     511 U.S. 825 (1994) ............................................................................................... 4

9 *Grenning v. Miller-Stout*,
     No. 11-35579, 2014 WL 169657 (9th Cir. Jan. 16, 2014) ...................................... 3
10

11 *Hutto v. Finney*,
     437 U.S. 678 (1978) ............................................................................................... 4

12 *In re Long Term Administrative Segregation of Inmates Designated as Five*
     *Percenters*,
13     174 F.3d 464 (4th Cir. 1999) .................................................................................. 4

14 *Johnson v. California*,
     125 S. Ct. 1141 (2005) ........................................................................................ 1, 2
15

16 *Jordan v. Gardner*,
     986 F.2d 1521 (9th Cir. 1993) ................................................................................ 2

17 *Madrid v. Gomez*,
     889 F. Supp. 1146 (N.D. Cal. 1995) ...................................................................... 4
18

19 *Mahnke v. Washington Metro. Area Transit Auth.*,
     821 F. Supp. 2d 125 (D.D.C. 2011) ..................................................................... 13

20 *Orr v. Larkins*,
     610 F.3d 1032 (8th Cir. 2010) ................................................................................ 4
21

22 *Turner v. Safley*,
     482 U.S. 78 (1987) ................................................................................................. 1

23

24

## RULES

25
Fed. R. Evid. 703 .......................................................................................................... 13

26 Fed. R. Evid. 801 .......................................................................................................... 13

27 Fed. R. Evid. 901 .......................................................................................................... 14

28

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO
HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1

## <u>REGULATIONS</u>

2

Cal. Code. Regs. tit. 15, § 3343(h) ........................................................................... 5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO
HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**INTRODUCTION**

Defendants' post-trial brief is further evidence of CDCR's long-standing refusal to acknowledge, let alone address, the well-established dangers to prisoners with serious mental illness in its segregation units. The essential facts remain undisputed: *Coleman* class members spend months and years in segregation units where they are caged, cuffed, and subjected to punitive measures that deter them from essential mental health care. Mental health clinicians are powerless to prevent even their most vulnerable patients from placement in segregation. Class members who have never been served with a rule violation routinely spend months or more in segregation. Over the course of twelve days of trial, Defendants failed to offer any expert testimony to rebut Plaintiffs' experts' extensive findings about the serious risk of substantial harm to *Coleman* class members caused by the conditions and practices in CDCR segregation units. Instead, relying on incomplete data and mischaracterizations of Plaintiffs' evidence, Defendants ask this Court to ignore the needless suffering of class members. The Court must decline this invitation.

**ARGUMENT**

**I.    DEFENDANTS RELY ON THE WRONG STANDARD FOR EIGHTH AMENDMENT VIOLATIONS**

Defendants argue that the Eighth Amendment must give way to any policy or regulation that is "reasonably related to legitimate penological interests." Defs' Post-Evidentiary H'ng Br. ("Defs' Br."), Dkt. 4988, at 2. Citing *Turner v. Safley*, 482 U.S. 78 (1987), they contend that the Court should "weigh" any finding of deliberate indifference against "Defendants' legitimate penological purposes." Defs' Br. 2. This contention is contrary to controlling precedent, which Defendants fail to cite. The Supreme Court in *Johnson v. California*, 543 U.S. 499, 510 (2005), held that some rights simply may not be "compromised for the sake of proper prison administration." For that reason, the Court held, "we have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. We judge violations of that Amendment under the 'deliberate indifference' standard, rather than *Turner*'s 'reasonably related' standard. …

1   This is because the integrity of the criminal justice system depends on full compliance with

2   the Eighth Amendment." *Id*. at 511 (citations omitted).  The Ninth Circuit has also

3   squarely rejected the claim that an "Eighth Amendment challenge … should be measured

4   under the 'reasonableness' standard of *Turner v. Safley* … rather than by the traditional

5   Eighth Amendment approach." *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993).

6       Accordingly, this Court need not inquire into the legitimacy of Defendants' asserted

7   interests in imposing and maintaining unconstitutional conditions of confinement.

8   **A.    Defendants Have Established No Penological Justification for Punitive,
         Overbroad, and Harmful Segregation Policies**

9

10      Even if penological interests were relevant to the Eighth Amendment analysis,

11  Defendants have failed to establish that their segregation practices are supported by any

12  legitimate penological justifications.  Aside from quoting Mr. Stainer's vague assertion

13  that "discipline is an important part of [ ] behavior modification and accountability," Defs'

14  Br. 20, Defendants offer no justification for class members' excessive lengths of stay in

15  segregation, the deprived conditions of their confinement, or the punitive custodial

16  measures they experience—all of which are applied on a blanket basis to all class members

17  in segregation.  Defendants claim that "Plaintiffs [*sic*] demands would obviate all

18  responsibility to in-prison criminal behavior," Defs' Br. 20-21, but offer no explanation as

19  to how the proposed relief would have these catastrophic effects.

20      By contrast, Plaintiffs presented extensive testimony as to why the punitive

21  measures and practices in CDCR segregation units are not justified by penological

22  considerations, and in fact exacerbate security concerns.  *See* Austin Reply Decl., Dkt.

23  4762 ¶ 29 ("[S]uch lengthy disciplinary segregation terms do not have a greater deterrent

24  effect than the shorter … terms I see in other states."); *id*. ¶ 28 ("[T]he use of short time

25  limits for disciplinary segregation terms in other states have not proven to increase the

26  incidence of violence or rule violations …."); *id*. ¶ 40 ("CDCR can prevent the placement

27  of non-disciplinary inmates in ASUs without compromising safety or placing an undue

28  burden on the system's resources.  In fact, experience suggests that that such a step … may

[1074363-14]

1  reduce the number of rule violations and even lead to the saving of money …."); *id.* ¶ 58

2  (CDCR's argument for blanket strip searches is "false on several fronts," as the practice is

3  "demeaning" and "only serves to build resentment and anger"); Austin, T. 3074:17-

4  3075:24 (indiscriminate use of cages is "unnecessary" and "counterproductive").

5         In any event, the blanket nature of the deprivations imposed on class members in

6  segregation units vitiates any claim to legitimate penological justifications. Defendants

7  have not argued and certainly cannot establish, for example, that there is a legitimate

8  penological purpose for cuffing, caging, stripping, and isolating those class members who

9  are in segregation units simply because Defendants cannot locate an empty Special Needs

10  Yard bed or find a bus seat to effectuate a transfer. Defendants admit that they place class

11  members in segregation for a wide range of reasons, including pending investigations,

12  delayed transfers, and safety concerns. *See* T. 2994:9-23, 2995:9-18, 3177:5-3179:15.

13  Defendants also acknowledge that, with minor exceptions, the deprived conditions and

14  punitive measures apply to class members regardless of the cause for their confinement in

15  segregation. *See* Allison, T. 3199:13-3201:16. Penological interests cannot justify these

16  overbroad, indiscriminate practices. *See Grenning v. Miller-Stout*, No. 11-35579, 2014

17  WL 169657, at *4 (9th Cir. Jan. 16, 2014).

18         Furthermore, the conditions and practices at issue in this motion are so harmful and

19  anti-therapeutic that they could not be justified by penological interests even if legitimate

20  interests existed. As this Court recently found with respect to the restrictions on acute

21  inpatient care for condemned row inmates, even valid penological purposes cannot justify

22  harmful policies and practices. *See* Order, 12/10/13, Dkt. 4951, at 10 ("[E]ven assuming a

23  legitimate penological purpose for all of the custodial restrictions imposed on condemned

24  inmate-patients transferred to the APP, the restrictions are so severe that they preclude all

25  but the most basic mental health treatment. Moreover, in and of themselves the restrictions

26  appear significantly anti-therapeutic.").

27      **B.**     **The Court Must Remedy the Established Eighth Amendment Violations**

28         Defendants also argue that the Court should not order remedial relief out of "due

1   deference to state prison authorities." Defs' Br. 3. The Supreme Court has held in this

2   litigation that "[i]f government fails to fulfill [its constitutional] obligation, the courts have

3   a responsibility to remedy the resulting Eighth Amendment violation." *Brown v. Plata*,

4   131 S. Ct. 1910, 1928 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)).

5       Plaintiffs have demonstrated that the State knowingly subjects class members in

6   segregation to a "substantial risk of serious harm" in violation of the Eighth Amendment.

7   *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Defendants' own witnesses testified that

8   CDCR segregation units pose a serious risk to class members. Dr. Jordan testified that

9   extended placements in segregation can be harmful. T. 3132:22-25, 3137:2-4.

10  Dr. Belavich admitted that "segregation can be a high-risk environment." T. 3564:11-16.

11  Dr. Scott acknowledged that segregation is more stressful than the general population by

12  design and may be psychologically damaging. T. 3367:12-19, 3370:17-19.

13      By Defendants' account, the critical inquiry with respect to the constitutional

14  implications of segregation practices is whether "these measures … interfere with mental

15  health care." Defs' Br. 2.[1] Defendants' segregated housing practices impede the delivery

16  of minimally adequate mental health care, including by marginalizing mental health input

17  into the disciplinary process (*see* Pls' Post-Trial Brief, Dkt. 4985, at 4, n.5); denying

18  clinicians the authority to prevent their patients' placement in dangerous settings (*see id*. at

19  7-8, 19); deterring patients from receiving treatment and outdoor recreation through the

20  use of unnecessary, punitive measures such as blanket strip searches and caging (*see id.* at

21  7, 23-25); exposing patients to unnecessarily harsh conditions (*id.* at 2-3); and depriving

22  them of normal human contact for excessively long periods of time (*id.* at 3-4).

23  _____

24  [1] Defendants cite three cases for the proposition that "no court has mandated a blanket exclusion of mentally ill inmates from prison disciplinary systems … provided that these measures do not interfere with mental health care." Defs' Br. 2. In two cases, unlike here,

25  the plaintiffs never claimed that the prison failed to deliver adequate medical or mental health care. *In re Long Term Administrative Segregation of Inmates Designated as Five

26  Percenters*, 174 F.3d 464, 472 (4th Cir. 1999); *Orr v. Larkins*, 610 F.3d 1032, 1035 (8th Cir. 2010). In the third case, the court ordered a SHU exclusion for seriously mentally ill

27  inmates because, as here, the conditions impeded the delivery of adequate care and posed a substantial risk of harm. *Madrid v. Gomez*, 889 F. Supp. 1146 , 1279-80 (N.D. Cal. 1995).

28

**C.      Conditions in CDCR Segregation Units Constitute Solitary Confinement**

Finally, although the terminology used to characterize prison conditions does not determine their constitutionality, the Court should dismiss Defendants' protestations that "CDCR's segregation units cannot be characterized as 'solitary confinement.'"  Defs' Br. 5.  Defendants argue that their segregation units do not amount to solitary confinement because inmates can play chess in their cells by shouting out moves across the concrete walls and may call out to one another from across the caged exercise yards.  Stainer, T. 3281:11-3282:4, 3284:16-3285:5; *see also* Jordan, T. 3107:22-3109:1 (not solitary confinement because no "sensory deprivation"); Belavich, T. 3466:17-3467:3 (not solitary confinement because prisoners go to appointments and yard, "obviously under escort").

The standard for solitary confinement is not, as Defendants would have it, complete sensory deprivation.  The U.S. Department of Justice has defined solitary confinement as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."  USA Statement of Interest, Dkt. 4736-1, at 5.  This is consistent with the academic literature on solitary confinement. *See* Haney SHU Decl., Dkt. 4581, at 3 n.4 ("For perhaps obvious reasons, total and absolute solitary confinement … does not exist in prison and never has.  Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others."); *see id.* (solitary confinement is characterized by "involuntar[y] confine[ment]in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like) . . . .").

The definition of solitary confinement applies squarely to the conditions in CDCR's segregation units.  By Defendants' account, CCCMS inmates in segregation are not entitled to any reprieve from their locked cells beyond the legally required ten hours per week of out-of-cell exercise time, and Defendants frequently fail to deliver those hours. Cal. Code. Regs. tit. 15, § 3343(h); *see* Pls' Ex 2459 at 1 (Suicide Compendium) ("numerous barriers to meet[ing] mandated [yard] hours"); Pls' Ex 2778 (25th Round Rpt.)

1    at 66 (about half of CDCR prisons fail to provide required yard time); Belavich, T.

2    3594:22-3595:4 (yard canceled because of lockdowns and weather).  EOPs are entitled to

3    ten hours per week of yard, plus ten hours of structured treatment.  Even if these treatment

4    and yard hours were delivered in full (evidence shows they are not, *see*, *e.g*., Defs' Ex.

5    GGGG), EOP class members would still remain in their locked cells for all but a few hours

6    of each day.  Moreover, Defendants do not dispute that class members in segregation are

7    denied contact visits (T. 3200:1-5), escorted in cuffs for all out-of-cell movements (T.

8    3200:16-19), and interact with others only across cell doors (T. 3280:21-3281:10), cages

9    (T. 3501:14-17), or "walk alone" exercise yards (T. 3284:16-3285:5)—all indications of

10   the absence of normal human contact which characterizes solitary confinement.[2]

11   **II.    SYSTEMWIDE POLICIES AND PRACTICES PREVENT THE DELIVERY**
     **OF MINIMALLY ADEQUATE MENTAL HEALTH CARE IN CDCR**
12   **SEGREGATION UNITS**

13        Defendants repeatedly assert that Plaintiffs' expert opinions are based on "a handful

14   of worst-case examples" and "isolated anecdotes."  Defs' Br. 1, 10.  These contentions are

15   contrary to the extensive evidence cited and articulated by Plaintiffs' experts.  Plaintiffs'

16   three clinical experts developed their opinions about serious, systemwide deficiencies in

17   CDCR segregation units by touring multiple CDCR prisons, interviewing class members,

18   speaking with clinicians and custodial officers, analyzing volumes of custodial and mental

19   health records, and reviewing Special Master reports, Management Reports, suicide

20   reports, *Coleman* Program Guide, and CDCR's written policies.  *See* Kaufman, T.

21   2451:21-2452:15 (citing interviews with patients, clinicians, custody officers, wardens,

22   and review of "medical records, correctional records, particularly RVRs," and Special

23   Master reports as bases of systemwide opinion); Stewart Decl., Dkt. 4381 ¶ 29 (opinion

24   about "systemic failures" is based on "review of documents, statistical reports, the Special

25   Master's reports, the CDCR's own internal suicide reviews, the Receiver's reports and

26   _____

27   [2] Defendants fail to respond to Plaintiffs' demonstration that CDCR's segregation practices
     and conditions violate the ADA and the Rehabilitation Act.  *See* Pls' Br. at 10, 24.

28

1   other systemic information"); Haney, T. 2438:20-2441:9 ("systemwide opinion" based on

2   termination interviews and tours, "statewide policies and procedures," and long history of

3   studying and inspecting CDCR prisons); Haney Decl., Dkt. 4378 ¶¶ 14-20 (same).[3]

4          Defendants failed to present any expert testimony to rebut Plaintiffs' experts'

5   opinions about grave inadequacies in the mental health treatment in segregation units, or

6   the impact of segregation on class members.  Instead of addressing Plaintiffs' evidence of

7   constitutional violations, Defendants elect simply to ignore it.  For example, Defendants

8   assert that "Dr. Haney's opinions at the hearing concerning the adequacy of care were

9   based upon only four examples."  Defs' Br. 11.  They make no mention of the other 46

10  prisoners about whom Dr. Haney testified.  *See* Haney Decl. ¶¶ 86-275.  Similarly,

11  Defendants assert that that Dr. Kaufman premised his opinions on "interviews with

12  inmates selected by Plaintiffs' counsel having the longest lengths of stay in administrative

13  segregation."  Defs' Br. 11.  In fact, Dr. Kaufman testified that while his review included

14  some prisoners identified as having acute mental health needs or long stays in segregation,

15  he also identified interviewees by "walk[ing] onto a unit and just stop[ing] by some cell

16  blocks … [and] talking to some … *Coleman* class inmates."  T. 2527:9-2528:1.  Some of

17  the class members with the longest stays in segregation were "found … arbitrarily."  *Id.*

18         Defendants erroneously assert that Plaintiffs cited only one instance in which

19  placement in a segregation unit upon discharge from inpatient care caused a prisoner to

20  decompensate—and "that single instance, no matter how unfortunate, does not support"

21  remedial relief.  Defs' Br. 20.  In fact, Plaintiffs' experts presented more than a dozen

22  examples of individuals severely harmed by cycling between segregation units and higher

23  levels of care.  Kaufman, T. 2499:22-2504:17 (Prisoner F); Haney Decl. ¶¶ 86, 89, 109,

24  226, 261-62 (Prisoners A, B, G, JJ, QQ); Stewart, T. 2822:18-2824:14 (Prisoner H);

25
    _____

26  [3] Defendants' post-trial brief does not mention the extensive testimony of Plaintiffs'
    correctional expert Dr. James Austin.  Dr. Austin's opinions about systemwide deficiencies

27  in CDCR's segregation units and practices are supported by his "review [of] current
    policies, procedures and practices regarding the [CDCR] segregation units," his extensive

28  history with the case, and his consultancy of over 25 prison systems.  Austin Decl. ¶¶ 2-16.

_____

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO
HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    Stewart Decl. ¶¶ 307-08, 347 (Prisoners E, W, HH, SS, UU, ZZ were returned from DSH

2    to segregation units, which "undermine[d] the increased level of functioning and treatment

3    compliance . . . achieved through an inpatient placement[]" by exposing them to "highly

4    restrictive, anti-therapeutic environments").  Defendants presented no contrary testimony.

5        Likewise, Defendants are wrong to assert that Plaintiffs offered "no evidence" other

6    than Dr. Haney's opinion to support an extension of the *Madrid* exclusion order to all

7    CDCR SHUs.  Defs' Br. 16.  Drs. Kaufman and Haney presented twelve examples of class

8    members who have decompensated due to their placement in the SHU.  *See* Kaufman

9    Decl. ¶¶ 43, 88, 128-32 (Prisoners E, F, G); Haney Decl. ¶¶ 207, 210-12, 214, 259, 261,

10   264-68 (Prisoners CC, DD, EE, FF, PP, QQ, RR, SS, TT, UU).  Drs. Austin, Kaufman, and

11   Haney also offered expert psychiatric and correctional opinions about the necessity and

12   feasibility of a SHU exclusion.  Kaufman Decl. ¶ 135 ("[I]ndividuals on the mental health

13   caseload should be categorically excluded from the SHU.  The extended isolation to which

14   they are subject can cause existing psychological conditions to deteriorate and new ones to

15   develop."); Haney SHU Decl. ¶ 26 ("[T]he SHU [is] extremely harmful and dangerous for

16   mentally ill individuals ….  These prisoners are particularly vulnerable to the harsh,

17   isolating, conditions in SHU units, to the lack of meaningful activities, and to the tense and

18   stressful custody environment."); Haney, T. 2297:16-25 (Pelican Bay SHU is "similar, if

19   not identical [to the rest of CDCR SHUs] in terms of the oppressive nature of the

20   environment, the severity of the conditions of confinement . . . ."); Austin Decl. ¶ 51 (SHU

21   exclusion for the seriously mentally ill "can be implemented safely and successfully").

22       Defendants also argue that Plaintiffs "presented no credible evidence" to support a

23   prohibition on the use of holding cells for class members who are waiting for treatment or

24   have expressed suicidal ideation.  Defs' Br. 24, n.5.  To the contrary, Plaintiffs presented

25   evidence of the systemwide use of holding cells for such class members, as well as its

26   harmful impact.  Stewart Decl. ¶¶ 196-97, 209-10, 222, 224, 231-35, 238, 392 (criticizing

27   use of holding or "standing" cages for suicidal prisoners and those awaiting treatment);

28   Haney Decl. ¶¶ 129, 163 (same); Kaufman Decl. ¶¶ 36, 85, 88, 103, 134 (same); Jordan, T.

1  3169:7-17 (patients may refuse treatment to avoid waiting in holding "tanks").

2  **III.    DEFENDANTS' EVIDENCE OF CONSTITUTIONAL COMPLIANCE IS INCOMPLETE, MISLEADING, AND IMPROPER**

3

4  Defendants' broad assertions about the conditions and quality of treatment in their

5  segregation units are baseless and conclusory.  Defendants' "evidence" of compliance with

6  the Constitution consists of conclusions drawn by Dr. Scott, who expressly disclaimed all

7  knowledge of conditions or practices in CDCR segregation units; inadmissible findings of

8  their termination experts, who failed to offer any trial testimony about their review of

9  CDCR conditions; and incomplete or irrelevant data that lack context and probative value.

10  **A.    Defendants Omit and Misrepresent Information about Staffing, Clinical Space, Lengths of Stay, and Suicides in CDCR Segregation Units**

11

12  In response to extensive evidence and testimony about staffing shortages in

13  segregation units, including admissions by Defendants' own witnesses, Defendants

14  contend that "past staffing challenges have been addressed through increased hiring and

15  the use of telemedicine."  Defs' Br. 12.  In support, Defendants cite two unhelpful excerpts

16  from Dr. Belavich's testimony: (1) he does not know "how the staffing is" at Pelican Bay,

17  T. 3507:8-17; and (2) 34 psychiatrists were hired for telepsychiatry between May and

18  October 2013, T. 3445:3-3446:3.  The second statement lacks essential information about

19  how many psychiatrists left or took leave during the same period or how these purported

20  hires affected systemwide vacancy rates.  In fact, Defendants' witnesses testified that

21  staffing shortages, including of psychiatrists, recreational therapists, and escort staff,

22  persist.  *See* Fischer, T. 2650:22-24, 2698:14-22, 2750:22-2751:6; *see also* Fischer,

23  T. 2674:15-2675:6 (EOP ASU psychiatry ratio is 1:100; "we are doing the best we can

24  with our staff"); Belavich, T. 3442:23-3443:8 (major difficulties with recruiting and

25  retention in some regions).  Defendants provided no evidence about the degree to which

26  telepsychiatry has addressed ongoing staffing shortages.  *See* Belavich, T. 3619:14-20.

27  In support of the claim that there is sufficient treatment and office space in

28  segregation units, Defendants cite: construction projects that are not yet completed (*see*

[1074363-14]

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Defs' Ex. MMM at 15 (projected completion date for LAC construction project is March

2   2014)); completed projects that remain inadequate to meet the needs of the segregated

3   population (*compare id.* at 9 (Corcoran EOP ASU project) *with* Fischer, T. 2654:7-12

4   (insufficient space for CCCMS in Corcoran SHU and ASU)); and Dr. Belavich's

5   admission that there are "varying degrees" of confidential space in segregation units and

6   "it has been more difficult" at some institutions to create sufficient treatment space.  Defs'

7   Br. 12.  Defendants also fail to acknowledge the numerous prisons at which there is no

8   plan at all to address deficient treatment spaces, or plans still years from completion.  *See*

9   Pls' Post-Trial Br. 6 (treatment space deficiencies in in segregation units at MCSP, RJD,

10  CMC, CIW, CIM, CCI).

11       With respect to lengths of stay, Defendants failed to offer any testimony to rebut the

12  findings of Plaintiffs' experts that lengths of stay in CDCR segregation units are excessive

13  and harmful to class members.  Instead, they rely on the unsubstantiated assertion that

14  "[t]he majority of inmates in an [ASU] are released in less than 20 days, and in many

15  cases, within a short period following placement into segregation."  Defs' Br. 13-14.  In

16  support, Defendants cite testimony by Dr. Belavich that provides no information about

17  lengths of stay.  *Id.*  Defendants cite no data indicating that the majority of ASU inmates

18  are released in less than 20 days.  According to Defendants' data, the average length of

19  stay in the ASU is 114 days for CCCMS and 94 days for EOP.  *See* Defs' Ex. PPP.

20       Defendants' representations about suicide rates in segregation units are similarly

21  unreliable.  Their suicide data consists of a list of numbers which Dr. Belavich "did not go

22  back and [check against] the Special Master's report."  T. 3707:5-9; Defs' Ex. LLLL.  In

23  fact, Dr. Belavich admitted that there are discrepancies between his purported data and the

24  data reported by the Special Master's suicide expert, Dr. Patterson.  T. 3711:7-20,

25  3712:21-3714:1.  As the Court noted, "Dr. Patterson lists by name the people so that you

26  have some confidence he actually knows what he's talking about.  Your staff folks give

27  you summaries . . . .  [so] you don't know how accurate it really is."  T. 3722:19-3723:3.

28       Moreover, Defendants assert with no evidence that class members do not commit

1   suicide in segregation units at disproportionate rates.  Defs' Br. 7-8.  Plaintiffs have

2   established in great detail, using the Special Master's data, that recognized class members

3   consistently account for the majority of suicides in segregation units, whether or not

4   condemned units are included.  Pls' Post-Trial Br. 12-14; *see also* Exs. 2781, 2800-02.

5         Two days before this brief was filed, Defendants produced their Annual Report of

6   Suicides in the CDCR During 2012.  *See* Decl. of Margot Mendelson ISO Pls' Response to

7   Defs' Post-Evidentiary H'ng Br., *filed herewith*, Ex. 2.  The report admits that, contrary to

8   Dr. Belavich's assertions, "procedures [in condemned housing] are similar to other

9   segregated housing units" for the purpose of suicide reviews.  *Id*. at 2; *cf*. T. 3706:17-25 ("I

10  didn't consider the condemned suicides [to be] segregation suicides because they're a

11  different population with different privileges  . . . .").  The report also reiterates that

12  segregation units are "high-risk environments for vulnerable inmates" and "continue to

13  account for a disproportionate number of suicides compared to the overall percentage of

14  CDCR inmates housed in these units (about 5-6% of CDCR inmates)."  *Id.* at 13-14.

15        **B.    Defendants' Evidence about Mental Health Care Lacks Reliability**

16        Defendants offer a laundry list of self-proclaimed achievements with respect to the

17  delivery of mental health care in their segregation units.  *See* Defs' Br. 5, 8-10.  In support

18  of these assertions, Defendants cite a string of irrelevant and incomplete data points.  For

19  example, the fact that that "CDCR clinicians scheduled more than 29,000 appointments for

20  th[e] [CCCMS ASU] population in October 2013" is not useful or probative, as it provides

21  no information as whether those appointments actually took place.  *Id*. at 5.  Defendants'

22  evidence shows a chasm between the number of hours of treatment scheduled and hours

23  actually offered, as well as between hours scheduled and hours received by patients.  Defs'

24  Ex. GGGG; Belavich, T. 3673:21-3674:8 ("institutional cancellations" and "lockdowns"

25  are causes of the gap between hours scheduled and offered).  This information also fails to

26  establish how many patients receive treatment, for how many hours, and at which prisons.

27  *See* Stewart, T. 2847:14-23 ("[R]egardless of what they say about offered and that it meets

28  the standard, the people weren't attending.  That's where the rubber hits the road ….").

---

1    Likewise, Defendants fail to support their repeated assertions that the practices and

2    conditions in their "meet[] or exceed[] Program Guide requirements." Defs' Br. 1, 5, 9-10,

3    14-17.  Plaintiffs have established that Defendants' evidence "that the care provided to

4    inmates in segregated housing systematically meets or exceeds [the] Program Guide" does

5    no such thing.  *Id.* at 10; Pls' Post-Trial Br. 16 (showing that Dr. Belavich's chart,

6    "Program Guide Compliance – Administrative Segregation Units," omits compliance rates

7    in important areas, such as pre-placement mental health screening, attendance of required

8    personnel at IDTTs, timeliness of referrals to higher levels of care, consistency of psych

9    tech rounding, as well as critical information about rates of cell-front contacts with primary

10    clinicians, hours of yard time, and access to entertainment devices).  Defendants' claims

11    are based on selected and incomplete data and fail to address the extensive evidence that

12    mental health treatment for class members consistently falls short of required levels.

13    Defendants repeatedly cite Dr. Scott for the proposition that the mental health care

14    provided in segregation units is "[a]ppropriate and [e]ffective." Defs' Br. 8.  For example,

15    Defendants cite Dr. Scott's testimony as evidence that: (1) "[a]ll inmates are screened for

16    mental health conditions" before and after placement in segregation; (2) CDCR "identifies

17    inmates whose mental health conditions require a transfer to another type of housing unit;"

18    and (3)"CDCR clinicians provide extensive mental health care services in administrative

19    segregation, including medication contacts, weekly primary clinician contacts, daily

20    contacts with [LPTs], and [IDTTs]." *Id.* at 8-9.  However, Dr. Scott testified that he was

21    "not asked to provide any opinions with respect to the specific conditions inside the

22    California segregation units" and that he can only offer opinions as to "what [Defendants]

23    say [they are] doing," not what they are actually doing.  T. 3334:7-13, 3344:17-3345:6.

24    Consequently, Dr. Scott has no basis on which to support any of these conclusions.

25    **C.    Defendants Improperly Rely on Their Termination Experts' Report**

26    Defendants improperly rely on the report of their termination experts as evidence of

27    the conditions and practices in their segregation units.  *See* Defs' Br. 9 (citing expert report

28    as evidence of the quality of mental health delivery in PSU, SHU, EOP hubs, and ASU).

[1074363-14]

PLS.' RESPONSE TO DEFS.' POST EVIDENTIARY HEARING BRIEF RE PLS.' MOTION RELATED TO
HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    The Court struck the report of Defendants' experts during the termination proceedings on

2    account of ethical violations.  *See* Order, 4/5/13, Dkt. 4539, at 20-22.  During the recent

3    evidentiary hearing, Dr. Haney referenced the termination experts' stated concerns about

4    CDCR's segregation practices.  Defendants moved the report into evidence, and the Court

5    accepted the report because "we have to take it all in context."  T. 2420:8-2421:18.

6        Defendants' expert report was properly admitted to assist the Court in evaluating

7    Dr. Haney's testimony, but it remains inadmissible for all other purposes.  Federal Rule of

8    Evidence 703 permits an expert to rely on inadmissible evidence.  The Advisory

9    Committee Notes provide that where such evidence is admitted "for the purpose of

10   assisting the [trier of fact] in evaluating the expert's opinion," it "must not be used for

11   substantive purposes."  While the report may be of value to the Court in assessing

12   Dr. Haney's opinion, it does not constitute evidence and may not be relied upon as such.

13       Moreover, the expert report is an out-of-court statement offered to prove the truth of

14   the matter asserted, and therefore inadmissible as hearsay.  Fed. R. Evid. 801(c); *see*

15   *Arizona, Dep't of Law v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957, 965 (D. Ariz. 2011)

16   (expert report "falls within no hearsay exception for reports or records, because it was

17   plainly prepared in anticipation of litigation by a non-treating mental health expert");

18   *Mahnke v. Washington Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 154 (D.D.C. 2011)

19   (collecting cases excluding expert reports as inadmissible hearsay).  Defendants, of course,

20   were free to offer their termination experts as witnesses at trial.  Tellingly, they declined to

21   offer any of the authors of the report as witnesses except Dr. Scott, who was "not asked to

22   provide any opinions with respect to the specific conditions inside the California

23   segregation units."  T. 3334:4-13.  Dr. Scott did not, and could not, testify about any of the

24   subjects for which Defendants presently rely on the expert report.  Accordingly,

25   Defendants' report is admissible for two purposes only: to assess Dr. Haney's expert

26   testimony, and to the extent that parts of it qualify as party admissions under Fed. R. Evid.

27   801(d)(2).  *See, e.g.*, Pls' Segregation Mot., Dkt. 4580, at 10, 17, 19, 24, 46 n.14, 48, 55.

28       This is not insignificant because for several broad assertions, the *only* evidence

1   Defendants cite is the termination experts' report – often citing the report itself and then a

2   quote of one of their witnesses reading the report verbatim.  *See e.g.*, Defs' Br. 9 ("All

3   [CCCMS] inmates in [ASU] are provided appropriate services and are periodically

4   assessed to evaluate if they need a higher levels of care."); *id.* (CDCR "appropriately meets

5   the mental health needs of inmates assigned to an EOP [ASU] hub."); *id.* ("CDCR

6   appropriately meets the mental health needs of CCCMS inmates assigned to a SHU"); *id.*

7   ("CDCR meets the mental health needs of EOP inmates assigned to a PSU").[4]

8       The Court should not permit Defendants to substitute hearsay from an excluded

9   report for reliable, probative evidence about the conditions and care in segregation units.[5]

10  **IV.    CONSTITUTIONAL VIOLATIONS IN CDCR SEGREGATION UNITS
        COMPEL AMENDMENTS TO THE *COLEMAN* PROGRAM GUIDE**

11

12      Defendants argue that Plaintiffs are precluded from seeking remedial relief that

13  would necessitate changes to the *Coleman* Program Guide.  *See* Defs' Br. 17, 24.  In so

14  arguing, Defendants fail to appreciate that the controlling standard with respect to their

15  policies and practices is compliance with the *Constitution*.  The Program Guide is

16  Defendants' plan to address the recognized constitutional violations in this case, but it does

17  not define the full scope of Defendants' constitutional obligations.

18      Evidence shows that the Program Guide, in its current form, fails to prohibit

19  practices and conditions that impede the delivery of minimally adequate mental health care

20  in segregation units, including by permitting unlimited periods of segregated confinement

21  and allowing class members to be placed into segregation upon discharge from inpatient

22  psychiatric care without any clinical authorization.  The Program Guide fails to prohibit

23  practices that are patently harmful and unconstitutional, such as housing class members

24  who have been served with no rule violations in segregation units, and indiscriminately

25  strip searching and caging all class members in segregation.  In order to ensure

26

27  [4] Defendants also failed to authenticate the expert report.  Fed. R. Evid. 901(a).
    [5] Should the Court permit Defendants to rely on the expert report, the Court should, at a

28  minimum, consider Plaintiffs' deposition designations, filed on 12/16/13, at Dkt. 4963.

---

1  constitutionally adequate conditions, the Program Guide must be amended to require basic

2  life-saving measures such as the mandatory use of retrofitted intake cells for the first 21

3  days of a prisoner's confinement in any segregation unit, the implementation of staggered

4  30-minute welfare checks for the duration of confinement in any segregation unit, and the

5  establishment of 90-day mental health screening for all prisoners in segregation.[6]  The

6  evidence presented in this motion establishes that the Program Guide must be amended to

7  require Defendants to provide ten hours per week of out-of-cell exercise to all class

8  members in segregation; deliver all mental health treatment in confidential spaces; ensure

9  that ten hours of structured treatment are received by EOPs in segregation (not merely

10  offered); and prohibit the use of management and holding cells for class members.[7]

11        The purpose of the Program Guide is to address Eighth Amendment violations.

12  Where the Program Guide has failed to elicit Defendants' compliance with the

13  Constitution, it must be amended.

14                                    **CONCLUSION**

15        For all the foregoing reasons, Plaintiffs request that the Court issue remedial orders

16  as set forth in Plaintiffs' post-trial proposed order (Dkt. 4985-1).

17

18  DATED:  February 5, 2014            Respectfully submitted,

19                                      ROSEN BIEN GALVAN & GRUNFELD LLP

20                                      By:  */s/ Margot Mendelson*

21                                           Margot Mendelson

22                                      Attorneys for Plaintiffs

23  _____

24  [6] Defendants again insist that their "custody checks" suffice to meet correctional standards and prevent suicide.  Defs' Br. 8.  Plaintiffs have explained in detail why these checks do

25  not meet correctional standards requiring "personal[] observ[ation]."  Pls' Post-Trial Br. 25-26; Pls' Ex 2134 at 71. Defendants also assert that the only evidence supporting the

26  need for 90-day mental health screenings is Dr. Haney's "speculation."  Defs; Br, at 22. Plaintiffs already have disproven this contention, as well.  Pls' Post-Trial Br. 27-28.

27  [7] Plaintiffs request that the *Coleman* Program Guide be amended as necessary to reflect and enforce Plaintiffs' proposed remedial orders.

28

[1074363-14]