1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4
5
6
7

1  MICHAEL W. BIEN – 096891
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   AARON J. FISCHER – 247391
   MARGOT MENDELSON – 268583
   KRISTA STONE-MANISTA – 269083
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
   Telephone:    (415) 433-6830

8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:    (415) 882-8200

   CLAUDIA CENTER – 158255
   THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   180 Montgomery Street, Suite 600
   San Francisco, California  94104-4244
   Telephone:    (415) 864-8848

12
   Attorneys for Plaintiffs
13

14            UNITED STATES DISTRICT COURT

15            EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN, et al.,

18            Plaintiffs,

19       v.

20  EDMUND G. BROWN, JR., et al.,

21            Defendants.

22

Case No. 2:90-cv-0520 LKK DAD

**PLAINTIFFS' RESPONSE AND
REQUEST FOR FURTHER ORDERS
RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-
RANGE MENTAL HEALTH BED
PLAN AND UPDATE TO COURT**

Judge:   Hon. Lawrence K. Karlton

23

24

25

26

27

28

[1074683-7]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I. THERE ARE CURRENTLY SIGNIFICANT DEFICITS IN ACCESS TO MENTAL HEALTH CARE CAUSING HARM TO *COLEMAN* CLASS MEMBERS .......................................................................................................... 5

    A. Inadequate Access to Inpatient Care Persists ................................................ 5

    B. Inadequate Access to MHCB Care Persists .................................................. 8

    C. Inadequate Access to EOP Level of Care Persists ........................................ 9

II. FURTHER RELIEF IS NECESSARY TO PROVIDE A DURABLE CONSTITUTIONAL REMEDY ................................................................................ 12

    A. The Court Should Reject Defendants' Request for an Open-Ended Delay in Their Activation of Inpatient Beds at CHCF and EOP Beds at Dewitt Nelson ................................................................................... 12

    B. Defendants Are in Violation of the Court's Orders Regarding the Failures to Timely Complete the CSP-LAC and CCWF EOP Treatment and Office Space Projects ........................................................... 13

    C. The Court Must Order Defendants to Demonstrate How They Will Meet Mental Health Bed Needs Based on Current Population Data and Projections .......................................................................................... 17

    D. The Court Should Order Further Bed Planning Forecasts by a Professional Outside Consultant. .................................................................. 18

CONCLUSION .................................................................................................................. 18

[1074683-7]

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

# TABLE OF ABBREVIATIONS

| Ad Seg | Administrative Segregation |
|--------|---------------------------|
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | California Health Care Facility |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| COR | California State Prison–Corcoran |
| CSP | California State Prison |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| ICF | Intermediate Care Facility |
| LAC | California State Prison–Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| OHU | Outpatient Housing Unit |
| RJD | Richard J. Donovan Correctional Facility |
| SHU | Security Housing Unit |
| SNY | Special Needs Yard |
| SVPP | Salinas Valley Psychiatric Program |

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

[1074683-7]

# INTRODUCTION

Defendants are in violation of this Court's orders regarding the completion of their long-range mental health bed plan.  The relief Defendants seek in the instant motion is inappropriate, and their submission fails to adequately address longstanding constitutional deficiencies in Defendants' efforts and plans to meet the mental health treatment needs of the *Coleman* class now and moving forward.  Plaintiffs seek further Court orders to ensure that existing and projected mental health bed needs are met—not on the state's business-as-usual time schedule, but on an urgent basis.  Defendants must demonstrate how they will meet mental health bed needs based on current projections and in light of the most recent data, *not* on outdated data that has been shown to have significantly underestimated bed need today and into the future.

Defendants have this month sought an additional two-year delay from the three-judge court in reducing the CDCR population to the court-ordered level of 137.5% at the same time they are asking this Court to allow additional delays and to forgive violations of court orders to fully activate critical acute and intermediate psychiatric hospital beds, mental health crisis beds and EOP beds.  Overcrowding persists and remains the primary barrier to the delivery of minimally adequate mental health care.  The  State was allowed to cancel and delay mental health projects based on projected compliance with the 137.5% goal by June 30, 2013 but then chose not to implement numerous safe, tested and available population reduction alternatives.  Once again, appropriate access to minimally adequate mental health care for the *Coleman* class has been delayed for years by decisions not to provide the necessary and court-ordered money for construction or clinical staff.

In 2009, after years of litigation and multiple bed planning efforts,[1] the Court issued

---

[1] The long and troubled history of Defendants' mental health bed planning leading up to the 2009 mental health bed plan is detailed in Plaintiffs' Objections to Defendants' 2009 Bed Plan Statement, filed on March 23, 2009.  Dkt. 3545, at 7-15.

1   an order requiring Defendants to file a "detailed long-range [mental health bed] plan,

2   including activation schedules," that would be "fully staffed and activated" by December

3   31, 2013, a deadline Defendants themselves established.  Order, 9/24/09, Dkt. 3686, ¶ 2.

4   The Court made clear its expectation of strict compliance with its order:

5           *The court expects defendants to comply in full with this order.*
            In the event of material non-compliance, the court will set an
6           evidentiary hearing at which time the court will hear testimony
            from any person with knowledge of the reason or reasons for
7           such noncompliance and from any party or agent of any party
            who has authority to ensure compliance with this order but
8           who has failed to do so.

9   *Id.* ¶ 5 (emphasis added).

10          In June 2012, Defendants sought, through an *ex parte* request, modification of

11  existing court orders entered in 2009 and 2010 relating to their long-range mental health

12  bed plan.  Defs.' *Ex Parte* Request, 6/12/12, Dkt. 4196 ("Defs.' June 2012 Request").

13  Defendants argued that population adjustments and projected population adjustments

14  stemming from "Realignment" required modification to the plan.  *See id.* at 6-14.

15  Defendants asked the Court to approve the substitution of the McManis (Navigant) Spring

16  2012 mental health population projections for 2013 in place of the court-ordered 2009

17  population projections used for the previous long-range mental health bed plan.  *Id.* at 7-8.

18  Defendants argued that a "fair and responsible assessment of mental health bed needs

19  going forward should use updated projections that incorporate the reduced inmate

20  population under realignment."  *Id.* at 8.  The Court largely granted Defendants' request,

21  permitting modification or elimination of no fewer than twelve (12) construction and

22  conversion projects in Defendants' then-existing bed plan.  Order, 6/15/12, Dkt. 4199.

23          The 2013 deadline for full staffing and activation has now passed; Defendants failed

24  to comply.  They are therefore in violation of this Court's orders.  Plaintiffs object to

25  Defendants' requested relief, which would provide an open-ended license not to comply

26  with what is an essential aspect of the remedy in this case.  Current evidence demonstrates

27  serious failures in the provision of timely access to care at all levels, and in particular, long

28  delays in access to, as well as serious understaffing of, inpatient psychiatric

[1074683-7]

2

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

1   hospitalization; extensive use of inappropriate alternative housing as a stop-gap remedy for

2   an insufficient number of mental health crisis beds ("MHCBs") across the system; and

3   long waits for those patients requiring transfer to enhanced outpatient ("EOP") programs,

4   including in dangerous segregated housing units.

5          Belatedly, Defendants now seek relief from the Court's orders with respect to

6   activation of California Health Care Facility ("CHCF") in Stockton, the central

7   construction project to provide access to adequate mental health treatment to *Coleman*

8   class members.  *See* Defs.' Mot. Regarding Defs.' Long-Range Mental Health Bed Plan

9   and Update to Court, 1/21/14, Dkt. 4984 ("Defs.' Mot."), at 9-10.  Defendants state that

10  they have been unable to timely activate five CHCF psychiatric units, amounting to 159

11  unactivated mental health beds.  *Id.* at 9-10.  They request that the Court "provide them

12  with more time to activate" these units, but "cannot set a definite date for full activation"

13  and suggest that the Court require no deadline at all.  *Id.* at 10.

14         The Receiver's Twenty-Fifth Tri-Annual Report, filed earlier this week, raises

15  extremely serious concerns about the status of CHCF activation and the adequacy of

16  services being provided there.  *See* Report, 2/3/14, Dkt. 5036 ("Receiver's Twenty-Fifth

17  Report"), at 30-31.  The Receiver found serious difficulties in the recruiting and staffing of

18  both medical and mental health staff.  *See id.* at 30.  Additional identified problems that

19  will affect the treatment, safety, and well-being of *Coleman* class members include

20  problems with basic kitchen management and provision of appropriate and hot food;

21  supply chain problems "so serious that basic and essential medical and personal hygiene

22  supplies were either not available at all, or not available in sufficient quantities in the

23  housing units and for use by clinicians and patient-inmates"; and shortages in the housing

24  units of soap and towels such that patient-inmates could not shower or were forced to use

25  dirty socks to dry themselves.  *See id.* at 30-31.  All of these ongoing concerns led the

26  Receiver to close new admissions to CHCF on January 27, 2014, "until the major

27  deficiencies at CHCF are resolved."  *Id.* at 31.  Defendants' motion is silent about these

28  concerns.

3

1    Defendants also acknowledge that they have failed to meet the Court's 2013

2  deadline for two additional court-ordered projects to provide appropriate treatment and

3  office space at CSP-Los Angeles County ("LAC") and Central California Women's

4  Facility ("CCWF"). Defs.' Mot. at 6-9. Defendants, however, claim that enforcement of

5  these court orders is unnecessary because Defendants had committed through their mental

6  health bed plan only to "provide enough mental health beds"—not treatment and office

7  space—and because they have previously notified the Court of the new, post-2013

8  expected completion dates. Defs.' Mot. at 4, 7, & 9. Plaintiffs object to Defendants'

9  extraordinary and preposterous position, and request that the Court find Defendants in

10  violation of court orders as to these two projects, and order relief as appropriate.

11    Finally, the current mental health bed need projections show that CDCR has

12  significantly under-estimated the number of beds necessary to house and provide

13  appropriate mental health care to the *Coleman* class, and Defendants' bed plan is based on

14  such underestimation. Plaintiffs have demonstrated that CDCR's overall prison population

15  reduction has not led to a proportionate reduction in the *Coleman* class member

16  population. During the recent evidentiary hearing on Defendants' segregation practices,

17  Plaintiffs' expert Dr. Craig Haney presented data demonstrating that, while the total CDCR

18  population *decreased* by 30,091—or 19.6%—between April 2000 and October 2013

19  (Decl. of Krista Stone-Manista ISO Pls.' Resp. to Defs.' Mot., filed herewith ("Stone-

20  Manista Decl."), Ex. 1 (Pls.' Trial Ex. 2035)), the total mental health population *increased*

21  by 14,321—or 73%—during the same time period (*Id.* Ex. 2 (Pls.' Trial Ex. 2036)). And

22  even with overall prison population reductions in the last several years, the CDCR mental

23  health population remains nearly unchanged from five years ago. *See id.* As a result, the

24  mentally ill now constitute a significantly higher—and increasing—percentage of the

25  CDCR population.

26    While the reason for this trend remains unclear, *see* Hr'g Tr., 11/19/13, Dkt. 5009,

27  at 2145:19-2146:23, it is beyond dispute that Defendants' Spring 2012 mental health bed

28  need projections, which informed the current bed plan, substantially *underestimated* actual

4

[1074683-7]

need.  Defendants' Fall 2013 Bed Need Study shows that, at almost every level of care, the current bed need forecasts are much higher than the Spring 2012 bed projections that underpin Defendants' existing long-range mental health bed plan.  *See* Defs.' June 2012 Request at 6-8.  The Fall 2013 forecasts are significantly higher than even those projected six months earlier, in Spring 2013, with increases in projected bed need in respective mental health programs between 3.4% and 11.0% for male prisoners, and between 2.1% and 23.2% for female prisoners.  *See* Decl. of Michael W. Bien ISO Pls.' Resp. to Defs.' Amended Application, 1/28/14, Dkt. 5027 ("Bien January 2014 Decl."), ¶ 10 & Ex. 3 ("CDCR Fall 2013 Mental Health Bed Need Study").  The predicted increased demand for higher levels of mental health beds in 2018 are substantial and significant for inpatient, MHCB, and EOP levels of care.  Stone-Manista Decl. ¶¶ 13-16 & Exs. 12-13.  As Defendants recognize, "fair and responsible assessment of mental health bed needs going forward should use updated projections."  Defs.' Mot. at 8.  The Fall 2013 Mental Health Bed Needs Study projections, consistent with current population data, show that Defendants' bed plan fails to provide adequate capacity to ensure timely access to care for the *Coleman* class.  Further relief is therefore necessary to provide a durable constitutional remedy.

## I.    THERE ARE CURRENTLY SIGNIFICANT DEFICITS IN ACCESS TO MENTAL HEALTH CARE CAUSING HARM TO *COLEMAN* CLASS MEMBERS

While Defendants state that they have "substantially realized their long-range mental health bed plan," Defs.' Mot. at 11, there remain significant deficits in access to mental health care for *Coleman* class members.  There is further evidence that these deficits will continue indefinitely under Defendants' current plan, and are likely to get worse.  Defendants' motion does not address these deficits, much less demonstrate how they will be remedied.

### A.    Inadequate Access to Inpatient Care Persists

In July 2013, the Court found significant evidence of Defendants' failure to follow established timelines for the transfer of patients in need of inpatient psychiatric

hospitalization.  Order, 7/11/13, Dkt. 4688, at 10-11.  The subsequent report by the Special Master on conditions at Salinas Valley Psychiatric Program found that "[t]ransfer times for referrals to SVPP are too long, with 27 percent of transfers exceeding the 30-day timeframe during the period of March through June, 2013."  Special Master's Report on the Salinas Valley Psychiatric Program, 9/24/13, Dkt. 4830 ("Special Master's SVPP Report"), at 4.

These problems persist and appear to be getting worse.  With respect to inpatient acute ("APP") beds, the average "pending list"[2] for the fourth quarter of 2013 was at its highest since the beginning of 2012, in the early stages of implementation of Realignment.  *See* CDCR Fall 2013 Mental Health Bed Need Study, at 11.  The Fall 2013 Mental Health Bed Need Study indicates that the projected need for male acute ("APP") inpatient beds is higher than the Spring 2012 projections on which the current bed plan is based.  *See id.* at 9 (APP bed need projection for 2018 increased from 229 to 246, or 7.4% higher).

The situation for intermediate care ("ICF") inpatient beds is even more troubling.  Defendants' Fall 2013 Mental Health Bed Need Study indicates that the projected need for male ICF beds for 2018 (927 beds) has increased by 107 beds from the Spring 2012 projections on which the current bed plan is based (820 beds), a 13% increase in projected bed need.  *See id.* at 13.  The current projected male ICF bed need for 2014 (909 beds) is also much higher than Spring 2012 projections for 2014 (824 beds).  *Id.*

Defendants have not demonstrated how they intend to meet APP and ICF bed need, either now or in the future, given their request to indefinitely delay activation of 159 CHCF beds.[3]

---

[2] Defendants have recently and unilaterally renamed their DSH wait lists as "pending lists" in the reports provided to the Special Master and Plaintiffs' counsel.

[3] The State's "Blueprint" plan for CDCR states that by the end of 2013, they would have 964 ICF beds in operation, comprising all 432 ICF beds at CHCF as well as other existing beds throughout the system.  CDCR Male and Female Mental Health Bed Plan, App'x E to (footnote continued)

[1074683-7]

1    Meanwhile, there are right now significant delays in placing and transferring

2  mentally ill prisoners to APP and ICF inpatient beds, as reflected in Defendants' December

3  2013 Monthly Bed Utilization Report for DSH facilities.  *See* Bien January 2014 Decl. Ex.

4  5 (excerpts of report with identifying information redacted).  As of December 31, 2013,

5  approximately fifteen (15) patients who had been referred for APP care were still awaiting

6  admission.  *See id.* at 45, 46, 51.  Some of these referrals date back as far as two months.

7  *See id.* at 45 (showing patient APP referral "release" date of October 30, 2013).[4]

8  Likewise, approximately seventy-nine (79) patients had been referred for ICF care but

9  were still awaiting admission as of December 31, 2013.  *See id.* at 43, 44, 45, 52, 53.

10  Those ICF referrals date back as far as four months.  *See id.* at 43 (patient referral

11  "release" date of August 30, 2013).

12    As this Court is aware, delays in access to inpatient psychiatric beds negatively

13  impact treatment on an individual patient basis, and have harmful ripple effects across the

14  system.  *See* Special Master's SVPP Report at 29-33 (discussing ongoing delays in ICF

15  referral and transfer process); Expert Declaration of Pablo Stewart, M.D., 3/14/13, Dkt.

16  4381 ("Stewart Decl."), ¶ 40 ("[S]hortages in the amount of available bed space at higher

17  levels of care in Department of State Hospital programs means that many such individuals

18  will wait for transfers to DSH in Mental Health Crisis Bed Units, filling up scarce crisis

19  beds that are otherwise needed for mental health crisis care.  Similarly, it appears that

20  pressure from administrators to reduce the waiting list for scarce DSH beds means that a

21  significant number of severely mentally ill individuals are being prematurely returned from

22  _____

23  the State's Blueprint, "The Future of California Corrections: A blueprint to save billions of
   dollars, end federal court oversight and improve the prison system," Bien January 2014
24  Decl. Ex. 4.

25  [4] Defendants no longer provide the Court and Plaintiffs' counsel with information as to the
26  date that the actual referral to Department of State Hospitals ("DSH") inpatient care was
   made, instead providing only a referral "release" date.

27

28

1    DSH and wait in MHCB beds to be re-referred back to DSH.").

2         **B.    Inadequate Access to MHCB Care Persists**

3         Shortages and associated delays are not limited to hospital beds.  The Court has

4    found that hundreds of mentally ill prisoners in need of mental health crisis beds (MHCBs)

5    for suicidality or other acute mental illness are being housed in facilities that are "totally

6    inappropriate." Order, 4/5/13, Dkt. 4539, at 51-52.  Among the alternative placements used

7    are Outpatient Housing Unit ("OHU") cells in which the prisoner has no bed to sleep on,

8    ZZ cells, contraband cells, administrative segregation unit ("ASU") cells, and holding cells

9    where an inmate-patient can be made to "sit or stand" for up to four hours.  *Id.*; Bien

10   January 2014 Decl. Ex. 6 (*Coleman* Program Guide, Sec. 12-5-5); *see also* Expert

11   Declaration of Craig Haney, 3/14/13, Dkt. 4378 ("Haney Decl."), ¶ 59 ("OHUs at MCSP

12   and CCI were barren, filthy, and dim, and required patients on suicide observation or

13   suicide watch to sleep on the floor") & Photo Exs. M, DD, & EE.  Alternative housing

14   continues to be used for the simple reason that "Defendants do not presently have a

15   sufficient number of mental health crisis beds (MHCBs) to meet the need for such beds."

16   Order, 4/5/13, Dkt. 4539, at 51 (citing Special Master's Twenty-Fifth Round Monitoring

17   Report, 1/18/13, Dkt. 4298, at 21).  Defendants have acknowledged the use of alternative

18   housing for prisoners in need of an MHCB persists at CDCR prisons across the system.

19   *See, e.g.*, Decl. of Daniel Paramo ISO Defs.' Reply ISO Defs.' Mot. to Term., 3/22/13,

20   Dkt. 4432, ¶ 7 (ASU beds used as alternative housing at RJD); Decl. of Christopher

21   Cornell ISO Defs.' Reply ISO Defs.' Mot. to Term., 3/22/13, Dkt. 4453, ¶ 4 (suicidal

22   inmates placed in ASU cells or other alternative housing at LAC while waiting for an

23   MHCB).

24         Based on the representations made in Defendants' June 2012 Request, the Court

25   approved the cancellation of 39 MHCBs at CHCF as well as the 30-bed MHCB project at

26   Stark.  Order, 6/15/12, Dkt. 4199, ¶ 2.a(5), (7).  Defendants continue to operate unlicensed

27   MHCBs at California Institution for Men and at CSP-Sacramento because of the lack of

28   licensed MHCBs in the system.  *See* Special Master's Twenty-Fifth Round Report,

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

1  1/18/13, Dkt. 4298, at 75-76.

2      As part of the recent evidentiary hearing regarding Defendants' use of segregation

3  on the mentally ill, Plaintiffs presented evidence that in June 2013 alone, 68% of the

4  inmate-patients referred for crisis bed placement spent some amount of time in alternative

5  housing and were never placed in a crisis bed.  *See* Reply Decl. of Jane E. Kahn ISO Pls.'

6  Mot. for Enforcement of Court Orders & Affirm. Relief re Improper Housing & Treatment

7  of Seriously Mentally Ill Prisoners in Segregation, 8/23/13, Dkt. 4765, ¶ 25 & Ex. H.

8      The problem has not improved since June 2013.  In November 2013, 177 inmate-

9  patients referred for MHCB level of care were made to wait in alternative placements due

10  to unavailability of MHCBs.  Bien January 2014 Decl. Ex. 7.  That same month, another

11  137 inmate-patients referred for MHCB placement spent some amount of time in

12  alternative housing and were never placed in a crisis bed.  *Id.* Ex. 8.  Defendants' own data

13  shows that the "pending list" for male MHCBs was several times higher in late 2013 than

14  it has been at any point since Realignment's implementation began.  *See* CDCR Fall 2013

15  Mental Health Bed Need Study, at 22.

16      Defendants' motion makes no mention of how the inability to activate five units at

17  CHCF has impacted activation of the 98 planned crisis beds there. However, their

18  February 3, 2014 activation schedule indicates that there have been only 73 MHCB

19  admissions at CHCF.  Stone-Manista Decl. Ex. 3, at 13.  It does not indicate how many

20  actual MHCBs have been activated or are in use.  *Id.*

21      In light of the increased bed need projections and indefinite delays and uncertainties

22  in the activation of CHCF, the use of alternative crisis bed housing and temporary

23  unlicensed crisis beds can be expected to persist unless concerted steps are taken.

24  **C.    Inadequate Access to EOP Level of Care Persists**

25      Bed need projections for non-segregation Enhanced Outpatient ("EOP") beds have

26  also increased significantly.  Defendants' Fall 2013 Mental Health Bed Need Study indi-

27  cates that the projected 2014 need for non-segregation male EOP beds has increased by

28  386 beds (10.7%) to 3,984 beds and the projected 2018 need for non-segregation male

[1074683-7]

1    EOP beds has increased by 542 beds (15.2%) to 4,117 beds, as compared to the Spring

2    2012 projections on which the current bed plan is based.  *See* CDCR Fall 2013 Mental

3    Health Bed Need Study, at 24.  Based on the Spring 2012 projections, Defendants'

4    Blueprint bed plan provides for an EOP capacity of just 3,803 EOP beds.  January 2014

5    Bien Decl. Ex. 4.  Notably, the Court previously approved elimination of previously-

6    planned Estrella 150 EOP-GP bed and 40 EOP-ASU bed projects based on those now-

7    outdated Spring 2012 bed need projections.  Order, 6/15/12, Dkt. 4199, at 3-4.

8          Today, the population of EOP prisoners outstrips CDCR's EOP capacity.

9    Defendants' most recent monthly data, for November 2013, indicates that the current EOP

10   population (4,686) is 7% higher than current EOP capacity (4,364).  Bien January 2014

11   Decl. Ex. 9 (excerpt of November 2013 CDCR monthly data).  Defendants cannot

12   effectively and timely get EOP prisoners to an appropriate EOP bed.  Defendants' data

13   indicates that, for the week of November 18, 2013, CDCR was able to place just 33 of 203

14   EOP prisoners (16.3%) for whom a bus seat had been requested for transfer to an

15   appropriate EOP program.  *Id.* Ex. 11 (excerpt of November 2013 CDCR monthly data).

16   The insufficient access to appropriate EOP beds is most acute in the context of EOP

17   prisoners regarding an SNY placement.  *See id.* (5 of 45 EOPs requested for transfer to

18   MCSP SNY III transferred; 0 of 23 for COR SNY IV transferred, 0 of 14 for MCSP SNY

19   IV transferred, 7 of 28 for RJD SNY IV transferred, 0 of 9 for KVSP SNY IV

20   transferred).[5]

21         Defendants have supplied the Court with no information as to how they intend to

22   ────────────────────

23   [5] The activation of an EOP-SNY program at Valley State Prison (*see* Stip. & Order re:
     Modification of Defs.' Revised Long-Range Mental Health Bed Plan to Create a Sensitive

24   Needs Yard at Valley State Prison for Inmates in an Enhanced Outpatient Program,
     7/19/13, Dkt. 4701)—which is now near full occupancy—was an important and necessary

25   step towards providing timely access to care for prisoners in need of an EOP-SNY

26   placement, but the current data demonstrates that it is insufficient to address the
     deficiencies that persist.

27

28

[1074683-7]

address the new EOP bed need projections and current backlog, particularly for EOP-SNY

beds.  As the evidence at the recent evidentiary hearing regarding Defendants' segregation

system revealed, the inadequate access to EOP beds and related backlogs has contributed

to, *inter alia*, the inappropriate and dangerous placement of prisoners with mental illness in

segregation units for non-disciplinary reasons.  Haney Decl. ¶ 70 (observing Defendants'

failure to place and transfer prisoners to Level II EOP SNY yards); ¶ 83 (Prisoner F in

MCSP ASU pending transfer to SNY yard); ¶ 104 (Prisoner J in MCSP ASU pending

transfer to EOP SNY bed); ¶ 107 ("There were 6 more EOP prisoners waiting for a transfer

to another EOP SNY yard and most of them were being housed in Ad Seg."); ¶ 131 ("One

of the clinicians with whom we spoke [at Corcoran], Dr. Lindsay, said that it was 'hard to

move SNY EOP prisoners,' even after they are endorsed, because there are 'no beds

elsewhere in the system to put them in.'"); ¶ 250 ("I spoke with another prisoner in Ad Seg

[at CCI] who was also awaiting transfer to Kern Valley State Prison for an appropriate

SNY bed."); Decl. of Edward Kaufman, M.D., 3/14/13, Dkt. 4379 ("Kaufman Decl."),

¶ 100 (Prisoner P, a CCCMS class member at Corcoran, was endorsed for transfer to SNY,

but instead placed in ASU "with no idea when he will be released from isolation").

The timely planned activation of 375 EOP-GP and 50 EOP-ASU beds at DeWitt

Nelson, located at the same site in Stockton as CHCF, must now be considered in serious

doubt.  The Court previously permitted Defendants to revise their activation schedule for

the Dewitt Nelson project such that full occupancy shall be completed no later than May

31, 2014, rather than the end of December 2013.  *See* Order, 6/15/12, Dkt. 4199 ¶ 2.b.  On

February 3, 2014, Defendants provided the Special Master and Plaintiffs' counsel an

activation schedule stating that the Dewitt Nelson project's "[a]ctivation is contingent

upon full activation of the California Health Care Facility construction project, which has a

planned complete date of 12/31/2013."  Stone-Manista Decl. Ex. 3, at 21 n.3.  This

"planned completion date" has been missed – with no new deadline or anticipated

completion date provided – yet Defendants provide no information as to the impact on the

activation of the 425 Dewitt Nelson EOP beds.  What is more, the Receiver has noted that

"[b]ecause [Dewitt Nelson] will be supplied by CHCF," and given the serious deficiencies at CHCF, "the Receiver is reserving judgment as to whether [Dewitt Nelson] can be permitted to open as scheduled." Receiver's Twenty-Fifth Report, Dkt. 5036, at 31.

## II.   FURTHER RELIEF IS NECESSARY TO PROVIDE A DURABLE CONSTITUTIONAL REMEDY

### A.   The Court Should Reject Defendants' Request for an Open-Ended Delay in Their Activation of Inpatient Beds at CHCF and EOP Beds at Dewitt Nelson

Defendants' motion indicates that at least 159 inpatient beds have not been timely activated at Stockton's California Health Care Facility, in violation of the court-ordered bed plan. *See* Defs.' Mot. at 9-10. Defendants cite their "continued difficulty" in "recruiting and staffing qualified psychiatrists" to provide care to patients in these units. *Id.* at 10. Defendants state that they "cannot set a definite date for full activation because it depends on psychiatrist hiring," and request that the Court modify its previous December 2013 deadline for activation of these essential beds and replace it with no deadline at all. *Id.* Defendants propose that they commit only to providing periodic reports to the Special Master "regarding their progress" with respect to CHCF's activation and bi-monthly "updates" to the Court.

Defendants' proposal for open-ended delay should be rejected. While securing sufficient staffing may be a real challenge for Defendants' CHCF facility activation, it does not justify the indefinite denial of constitutionally required mental health treatment for class members requiring inpatient care. Defendants' motion states that this "[f]urther delay in fully activating and occupying the remaining DSH-operated beds at the new Stockton facility has likewise resulted in changing the dates set out in the State's Blueprint for converting all the temporary intermediate and acute beds back to CDCR to operate as outpatient and general population beds," *id.* at 10, but provide no information as to which and how many temporary beds will stay open, and with what licensure and staffing resources. And while Defendants seek this Court's approval of an open-ended delay in the activation of CHCF inpatient beds, scores of class members remain on "pending lists" for

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

[1074683-7]

1   inpatient program placement, remain on "pending lists" for MHCB placement, and are

2   being placed in alternative housing due to the lack of available MHCBs.[6] *See* Parts I.A &

3   I.B, *supra*.  In addition, as discussed above, the Receiver's Twenty-Fifth Report filed

4   earlier this week identifies extremely serious concerns about the activation of CHCF and

5   the adequacy of care being provided there.  *See* pp. 2-3, *supra*.  The Receiver has now

6   closed CHCF to new admissions as a result of these grave deficiencies.  *See id.*  The Court

7   should order Defendants to submit a plan as to how they intend to provide timely access to

8   adequate care to all class members requiring inpatient care at CHCF and across the system,

9   with specificity and firm deadlines.

10        As a related matter, the situation with respect to the Dewitt Nelson EOP bed project

11  is both troubling and uncertain, *see* pp. 11-12, *supra*, yet Defendants have provided no

12  information to the Court about this project beyond noting that the Court had "granted

13  Defendants' request to extend the full activation date for the Dewitt Nelson project to May

14  31, 2014."  Defs.' Mot. at 4.  This is unacceptable.  The Court should order Defendants to

15  submit a plan as to how they intend to provide timely access to EOP level of care to all

16  class members requiring such care (including EOP-SNY placement), with specificity and

17  firm deadlines.

18        **B.    Defendants Are in Violation of the Court's Orders Regarding the
              Failures to Timely Complete the CSP-LAC and CCWF EOP Treatment
19            and Office Space Projects**

20        Defendants' position that they are not in violation of court orders with respect to the

21  EOP treatment and office space construction plans at CSP-LAC and CCWF is

22  _____

23  [6] Despite Defendants' assurance that they will "continue to operate temporary beds"

24  pending full CHCF activation, the most recent DSH licensure report provided to the
    Special Master and Plaintiffs' counsel indicate that the D-5 and D-6 units at SVPP have

25  been emptied entirely, despite the persistent ICF "pending list."  *See* Stone-Manista Decl.
    Ex. 4 (DSH Licensure Report, 2/3/14), at 1.  One of the three L-wing units at CMF has

26  also been emptied.  *See id.*

27

28

1   preposterous.  This position ignores the very purpose of the mental health bed plan and

2   remedial efforts in this case.  Defendants appear to claim that they were only required to

3   comply with the Court's orders to the extent they were to build new "beds," citing to the

4   Court's statement at a 2009 hearing that Defendants "represented to [the] Court that they

5   will *provide enough mental health beds* to meet, by the year 2013, the need for such beds

6   identified by Navigant Consulting."  Defs.' Mot. at 4 (quoting Vorous Decl. Ex. B)

7   (emphasis in Defendants' brief).

8        Defendants' interpretation is nonsensical on its face.  "Beds" can be fairly identified

9   as "mental health beds" only if they are located in a mental health program that offers

10  mental health treatment, which (of course) requires adequate treatment and office space to

11  deliver care.

12       Defendants' interpretation is also contradicted by the record in this case.  On

13  September 24, 2009, this Court ordered Defendants to file a "detailed long-range plan,

14  including activation schedules.  …   The timetables for completion of each step described

15  in the plan shall be developed in such a way that all projects in the long-range plan will be

16  fully staffed and activated by the 2013 target date defendants have established.

17  Defendants' plan shall be signed by counsel of record in accordance with counsel's

18  obligations under Federal Rule of Civil Procedure 11."  Order, 9/24/09, Dkt. 3686, ¶ 2.

19  The plans that Defendants submitted in response to this order include treatment and office

20  space projects; among those projects were the CSP-LAC and CCWF projects that remain

21  incomplete here in 2014.  *See, e.g.*, Defs.' Response to Court's Sept. 24, 2009 Order that

22  Defendants File a Detailed Long-Range Plan, Including Activation Schedules, 11/6/09,

23  Dkt. 3724 at Attachment A, Ex. 4 (CSP-Sacramento Additional Treatment and Office

24  Space), & Ex. 6 (CSP-Los Angeles County Treatment Space for Enhanced Outpatient

25  Program); Defs.' Response to Court's January 4, 2010 Order that Defendants File a

26  Detailed Plan and Activation Schedule re: 70 Enhanced Outpatient Program-General

27  Population Female Beds, 2/18/10, Dkt. 3805 at Attachment A, Ex. 1 (CCWF bed and

28  treatment/office space project).  The clear intention of the Court's order regarding the

1  creation and completion of a "detailed long-range plan" was to provide necessary capacity

2  for the delivery of appropriate mental health treatment, not to simply build beds.

3      Defendants did provide an "update" to the Court regarding several court-ordered,

4  long-range construction projects, including the CSP-LAC and CCWF treatment and office

5  space projects, "[i]n response to the Special Master's request to keep the Court informed of

6  Defendants' progress." Defs.' Update to Court, 5/22/13, Dkt. 4623, at 1-2. But nowhere

7  in this "update" did Defendants seek an extension of the deadline for full activation of

8  these two projects beyond the court-ordered end-of-2013 deadline. Nor has the Court

9  granted such extension.

10      Thus, Defendants are in violation of the Court's order. The CSP-LAC treatment

11  and office space project's current expected activation date is March 31, 2014, while there

12  will be no treatment provided in the CCWF treatment and office space until the end of

13  June 2015, eighteen months past the court-ordered deadline. Stone-Manista Decl. Ex. 3, at

14  9, 17.[7] CCWF is currently severely overcrowded, at 178.5% over capacity, with resulting

15  serious risks of harm to inmates there. *See* Pls' Objs. To Defs.' 1/23/14 Proposed Order,

16  1/28/14, Dkt. 50256, at 3-4. At a minimum, the CCWF project delay constitutes "material

17  non-compliance," and the Court should call Defendants to account, as through the taking

18  of testimony regarding the reasons for such noncompliance and the steps being taken to

19  provide a prompt remedy to longstanding treatment space deficiencies at CCWF. *See*

20  Order, 9/24/09, Dkt. 3686, ¶ 5.

21  _____

22  [7] Plaintiffs have presented significant evidence that the current treatment space provided

23  for EOP ASU treatment space at CSP-LAC and the EOP treatment space at CCWF are
   extremely inadequate. *See* Stewart Decl. ¶¶ 113, 319-320, 358 (inadequate EOP and EOP

24  ASU treatment space at CSP-LAC, including treatment on dayroom floor); Kaufman Decl.
   ¶¶ 53-54, 56 (EOP group treatment at CCWF occurring on the dayroom floor in housing

25  unit that is shared by EOP and Reception Center prisoners, with unit separated only by a
   line of red tape on the floor, and inadequate EOP ASU treatment space that was "similarly

26  concerning").

27

28

1    The larger picture, which goes unmentioned by Defendants, is that treatment space

2    problems continue to infect the entire mental health system. During the recent evidentiary

3    hearing on segregation, Plaintiffs demonstrated that clinical contacts frequently take place

4    on the dayroom floor of housing units or at cell front, with no auditory or visual

5    confidentiality. *See, e.g.,* Hr'g Tr., 12/5/13, Dkt. 5014, at 2761:8-25; Hr'g Tr., 11/21/13,

6    Dkt. 5011, at 2475:7-2476:6; Hr'g Tr., 11/19/13, Dkt. 5009, at 2161:4-23; Stone-Manista

7    Decl. Exs. 5 & 6; Special Master's Twenty-Fifth Round Monitoring Report, 1/18/13, Dkt.

8    4298, at 36. In segregation units, converted storage closets stand in for group treatment

9    spaces, and therapy takes place in rooms that also double as clinical offices and conference

10   rooms. Hr'g Tr., 11/21/13, Dkt. 5011, at 2475:7-2476:6; Hr'g Tr., 11/19/13, Dkt. 5009,

11   at 2170:12-2171:2; Stone-Manista Decl. Exs. 7 & 8. Even the few completed treatment

12   space projects Defendants presented at the evidentiary hearing included projects that failed

13   to address major deficits in treatment space. *See* Hr'g Tr., 12/4/13, Dkt. 5013, 2654:7-12

14   (insufficient space for CCCMS SHU and ASU at Corcoran even after construction). Major

15   deficiencies persist in the segregation treatment spaces at more than half a dozen other

16   prisons, with no improvements planned, or projects still years away from expected

17   completion. *See* Decl. of Deborah Hysen, 7/24/13, Dkt. 4712-2, ¶¶ 10-14 (RJD, MCSP,

18   CMC, CIW)); Hr'g Tr., 12/11/13, Dkt. 5016, at 3128:8-17 (CIM); Hr'g Tr., 11/19/13, Dkt.

19   5009, at 2163:2-2164:20 (CCI); *id.* at 2159:4-2162:6 & 2172:11-2173:19 (MCSP); *see*

20   *also* Stone-Manista Decl. Exs. 5, 6, & 9-11.

21   Defendants have not only violated court orders with respect to completion of the

22   LAC and CCWF treatment and office space projects, but continue to fail to meet

23   constitutional minima with respect to the provision of adequate treatment space across

24   CDCR's system. While Plaintiffs have already sought relief in the context of their Motion

25   for Enforcement of Court Orders and Affirmative Relief re: Improper Housing and

26   Treatment of Seriously Mentally Ill Prisoners in Segregation (5/6/13, Dkt. 4580), the Court

27   should direct Defendants to demonstrate through an updated plan how they will provide

28   adequate treatment and office space for the delivery of necessary mental health care on a

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

1    systemwide basis without further and unnecessary delays.

2    **C.    The Court Must Order Defendants to Demonstrate How They Will Meet**
3    **Mental Health Bed Needs Based on Current Population Data and**
     **Projections**

4    Any relief from the deadlines of the Court-ordered mental health bed plan should be

5    accompanied by an order directing Defendants to demonstrate how they will meet mental

6    health bed needs based on the current population data and projections, and to take

7    immediate steps to ensure timely access to all levels of mental health treatment.  Such an

8    order is necessary and consistent with Defendants' own position with respect to mental

9    health bed planning – that is, that a "fair and responsible assessment of mental health bed

10   needs going forward should use updated projections." Defs.' Mot. at 8.

11   Modification to Defendants' bed plan must be a two-way street.  When Defendants'

12   representations to the Court in June 2012 indicated a reduced mental health population and

13   reduced bed need, this Court rightfully approved modification to the bed plan.  Those

14   representations have proven inaccurate.  Current data demonstrates existing deficits with

15   respect to access to timely inpatient care, crisis level care, and EOP level of care.

16   Likewise, Defendants' most recent bed need study indicates that Defendants' mental health

17   bed plan is based on projections that significantly underestimated bed need now and into

18   the future.  The Court must direct Defendants to take appropriate steps to ensure that

19   timely and adequate access to care is provided, based on current data and projections.

20   In order to ensure that their projections are complete and accurate, Defendants

21   should be ordered to avoid the use of "trued" bed need numbers that fail to accurately

22   reflect actual need.  As Plaintiffs have previously explained, the assumptions underlying

23   the "trued" numbers are at odds with reality.  *See* Pls.' Opp. to Defs.' June 2012 Request,

24   6/13/12, Dkt. 4197, at 8-9.  The Court recognized these concerns in its Order regarding

25   Defendants' June 2012 request, directing "Defendants to continue working with the

26   Special Master to clarify the use of 'trued' projections." Order, 6/15/12, Dkt. 4199, ¶ 1.c.

27   These "trued" projections are based on a methodology that is confusing at best,

28   underestimate actual need for mental health services, and should not be permitted to form

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

1  the basis of any future planning.

2      **D.**    **The Court Should Order Further Bed Planning Forecasts by a**
                **Professional Outside Consultant.**

3

4        On October 20, 2006, this Court ordered Defendants to contract with Navigant

5  Consultants (now McManis Consulting) to conduct periodic population reviews and

6  updates of their projections for mental health program populations through 2009, with a

7  transition to CDCR thereafter.  Dkt 1998.  CDCR's contract with McManis Consulting has

8  provided for updated mental health bed forecast twice a year. *See* Order Regarding

9  Navigant Consulting Contract, 7/9/09, Dkt. 3629, at 1.

10        On July 9, 2009 this Court ordered Defendants to continue to use professional

11  outside consultants for bed planning needs for an additional three years.  *See id.* at 3.

12  During the recent evidentiary hearings, Defendants asserted that they were no longer

13  obligated to provide the bed need study report to the Special Master or Plaintiffs' counsel.

14  Hr'g Tr., 1/23/14, Dkt. 5018, at 3498:6-11.  Given the uncertainty of population and

15  mental health population projections over the last few years and moving forward, the Court

16  should again order Defendants to continue to use professional outside consultants for bed

17  planning needs for at least three more years.  Defendants should be ordered to provide all

18  reports to the Special Master and to Plaintiffs' counsel immediately upon receipt.

19                                **CONCLUSION**

20        Defendants cannot be permitted to miss court-ordered deadlines with impunity, to

21  provide illusory promises of providing necessary mental health capacity, or to continue to

22  rely on bed projections that have proven to significantly underestimate current and future

23  need.  This is particularly true given the ongoing constitutional violations stemming from

24  denied mental health treatment, including untimely access to care as well as inappropriate

25  placements in alternative housing and segregation units due to insufficient bed availability.

26  Plaintiffs therefore respectfully request that the Court order the following steps:

27        1.    Deny Defendants' proposal to provide "updates" to the Court but no deadline

28  regarding the CHCF activation, and direct Defendants to submit a plan, within thirty days,

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT

1  as to how they intend to provide timely access to inpatient and crisis level care to all class

2  members requiring such care, with specificity and firm deadlines, not to exceed July 1,

3  2014 for full activation.  Such a plan should address the persistent "pending lists" for

4  inpatient and crisis bed placement, as well as the use of alternative housing for patients

5  referred for MHCB level of care.  In creating this plan, as well as other plans requested

6  herein, Defendants should be required to reassess salaries and benefits for clinicians in

7  DSH and CDCR to determine whether current levels are an obstacle to recruiting and

8  retaining sufficient clinicians to fill existing budgeted positions.

9      2.     Direct Defendants to submit a plan, within thirty days, as to how they intend

10  to provide timely access to EOP level of care to all class members requiring such care

11  (including EOP-SNY placement), with specificity and firm deadlines.  Such a plan should

12  include details on steps being taken with respect to the construction of and staffing for the

13  Dewitt Nelson bed project.

14     3.     Issue a finding that Defendants are in violation of Court orders as a result of

15  their failure to timely activate the CSP-LAC and CCWF EOP Treatment Space and Office

16  Space Projects or to seek an extension of Court-ordered deadlines for those projects.  This

17  Court should reject Defendants' contention that years of prior Court orders in this area do

18  not apply to these projects.  With respect to CCWF, the Court should order Defendants to

19  submit a plan, within thirty days, as to how they intend to provide adequate EOP care for

20  female prisoners at CCWF in light of their representation that the treatment and office

21  space project there will not be completed until June 2015, and to certify that they are

22  taking all available steps to accelerate the project's completion date.

23     4.     Direct Defendants to serve and file, within 60 days, modifications to their

24  mental health bed plan that meet all needs identified in the most recent McManis

25  Consulting Mental Health Bed Need Study (Fall 2013) in 2014 and for the next five years.

26  The plan should meet 100% of the need identified in the Fall 2013 study, and should not

27  rely on "trued" population projections.  The plan should provide a means to eliminate

28  funding obstacles and contingencies. The plan should not include as "contingencies"

[1074683-7]

1  elements such as any "uncertainty" regarding staffing.  At a minimum, the plan should
2  include:

3     a. Identification and activation of additional short-term and long-term
4  bed projects to address the immediate needs of EOP patients who are unable to timely
5  transfer to EOP or EOP-SNY placements upon endorsement.

6     b. Identification and activation of additional short-term acute (APP) and
7  intermediate (ICF) beds at Atascadero State Hospital, Coalinga State Hospital, or
8  Vacaville Psychiatric Program to address the immediate needs of patients unable to timely
9  transfer to inpatient psychiatric hospitalization.

10     c. Identification and activation of adequate treatment and office space
11  projects at all institutions that house *Coleman* class members.

12    5. Direct that Defendants' contract for outside mental health bed projections
13  must be extended to at least 2017, and reports from the contractor must be provided to
14  Plaintiffs and the Special Master immediately upon receipt.

15

16  DATED:  February 5, 2014   Respectfully submitted,

17          ROSEN BIEN GALVAN & GRUNFELD LLP

18

19          By:  */s/ Aaron J. Fischer*
20             Aaron J. Fischer

21          Attorneys for Plaintiffs

22

23

24

25

26

27

28

[1074683-7]

20

PLAINTIFFS' RESPONSE AND REQUEST FOR FURTHER ORDERS RE: DEFENDANTS' MOTION
REGARDING DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT