1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:   (510) 280-2621 .
4

   MICHAEL W.  BIEN – 096891
   JANE E.  KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LORI E.  RIFKIN – 244081
   AARON J.  FISCHER – 247391
   MARGOT MENDELSON – 268583
   KRISTA STONE-MANISTA – 269083
   ROSEN BIEN GALVAN & GRUNFELD
   LLP
   315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
   Telephone:   (415) 433-6830

8  JON MICHAELSON – 083815
   JEFFREY L.  BORNSTEIN – 099358
9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:   (415) 882-8200

   CLAUDIA CENTER – 158255
   THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   180 Montgomery Street, Suite 600
   San Francisco, California  94104-4244
   Telephone:   (415) 864-8848

12 Attorneys for Plaintiffs

13                   UNITED STATES DISTRICT COURT

14                   EASTERN DISTRICT OF CALIFORNIA

15

16 RALPH COLEMAN, et al.,                    Case No.  Civ 2:90-0520 LKK

17            Plaintiffs,                    **PLAINTIFFS' BRIEF ON
                                             DEFENDANTS' PROPOSED
18       v.                                  REVISIONS TO USE OF FORCE
                                             POLICY**
18 EDMUND G.  BROWN, Jr., et al.,
19                                           Judge:  Hon.  Lawrence K.  Karlton
             Defendants.                     Date:
20                                           Time:
21                                           Courtroom:

22

23

24

25

26

27

28

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
FORCE POLICY**

**TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

      A.    Plaintiffs' May 29, 2013 Motion .............................................................. 2

            1.    The Need to Revise Use of Force Policies and Procedures .......... 3

            2.    The Need to Revise Use of Force Investigation Policies
                  and Procedures ............................................................................. 4

            3.    The Need to Revise RVR Policies and Procedures ...................... 4

            4.    Training ........................................................................................ 5

            5.    Implementation of Meaningful Tracking and Quality
                  Assurance Systems ...................................................................... 5

      B.    Defendants' Response to Plaintiffs' Motion ............................................ 5

      C.    Summary of Defendants' Proposed Revisions to DOM ........................... 6

            1.    51020.6 - Use of Restraints .......................................................... 6

            2.    51020.11.2 - Food/Security Ports ................................................. 6

            3.    51020.12 - Controlled Use of Force General Requirements .......... 7

            4.    51020.12.1 - Controlled Use of Force-Video
                  Recording Requirements ............................................................. 7

            5.    51020.12.2 - Controlled Use of Force Involving the
                  Seriously Mentally Ill ................................................................. 8

            6.    51020.15 - Chemical Agents ........................................................ 8

            7.    5120.15.1 - Chemical Agents Restrictions ................................... 9

II.   ARGUMENT ........................................................................................................ 9

      A.    CDCR Continues to Fail To Affirmatively Prohibit the
            Immediate Use of Force Against *Coleman* Class Members
            Except in Cases of True Emergency ....................................................... 9

      B.    CDCR Has Failed to Make Any Provision for the
            Interdisciplinary Management of MHSDS Inmates ................................ 12

      C.    CDCR Has Failed to Address its Prevailing Practice of
            Using Force and Discipline as Elements of "Medical Care"
            or "Mental Health Care" for Members of the *Coleman* Class ................ 14

i

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
FORCE POLICY**

D.    The Proposed Policies For OC Spray Remain Incomplete
      and Inadequate ........................................................................................... 16

E.    The Proposed Revisions Still Permit the Immediate Use
      of Force Against *Coleman* Class Members Involved in
      "Incidents" With Food Ports ...................................................................... 17

F.    The Proposed Revisions Do Not Address Any of Plaintiffs'
      Concerns In Relation to Video Requirements .......................................... 18

G.    The Proposed Revised Policies Fail to Change RVR Policies
      that Disproportionately and Unconstitutionally Impact
      MHSDS Inmates ......................................................................................... 19

H.    The Proposed Revised Policies Do Not Place An Immediate Ban
      On The Informal Disciplinary Measure of "Management Status" ........... 20

I.    The Proposed Revisions Do Not Make Any Needed Change
      to the Role of the IERC in the Review and Evaluation of Use of Force
      Against MHSDS Inmates ............................................................................ 20

IV.    CONCLUSION .................................................................................................... 22

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
FORCE POLICY**

1

## TABLE OF AUTHORITIES

2

Page(s)

3

4

**Cases**

5

*Faunce v. Denton*
    167 Cal. App. 3d 191 (1985).................................................................................................6

6

**Statutes**

7

California's Administrative Procedure Act...................................................................................6

8

California Code of Regulations
    Title 15.......................................................................................................................................6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| CCHCS | California Correctional Healthcare Services |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| DOM | California Department of Corrections and Rehabilitation's Department Operations Manual |
| MAB | Management of Assaultive Behavior |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| OIA | Office of Internal Affairs |
| OC | Oleoresin Capsicum Spray |
| RVR | Rule Violation Report |
| UOF | Use of Force |

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1    **I.    INTRODUCTION**

2           Defendants' proposed revisions to the California Department of Corrections and

3    Rehabilitations' ("CDCR") generally applicable Use of Force ("UOF") policies fall short of the

4    comprehensive reforms needed to redress the ongoing constitutional violations arising from CDCR's

5    treatment of its mentally ill inmate-patients.

6           The evidence before this Court, including testimony from use of force experts on both sides,

7    establishes the compelling need for remedial orders concerning the unconstitutional use of force and

8    inappropriate discipline involving MHSDS inmate-patients.  To eliminate the distressing array of

9    ongoing constitutional violations established at trial, Defendants must define, commit to, and

10   properly implement a use of force policy -- as well as a host of other closely related new policies and

11   practices -- designed specifically to address the unique needs of the MHSDS inmate-patient

12   population.  Unfortunately, Defendants' proposed changes do not even begin to adequately meet the

13   needs of MHSDS inmates in these respects.  In fact, as shown below, none of Plaintiffs' requested

14   categories of relief have been addressed in a meaningful and durable way by Defendants' proposed

15   changes.  Further, with respect to many of the specific changes that Defendants propose, Plaintiffs

16   have significant questions and concerns about the efficacy and implementation of these revisions.[1]

17          Most notably, the proposed changes do not include any affirmative statements that the

18   immediate application of force against *Coleman* class members is generally prohibited *except* in the

19   case of true emergency, nor do they address the prevailing CDCR preference for using force to gain

20   compliance for the purposes of administering medical or mental health care.  The proposed revisions

21   do not mandate use of techniques such as Management of Assaultive Behavior ("MAB") rather than

22   subjecting prisoners with serious mental illness in a mental health crisis to an array of weaponry

23   unprecedented in any prison system in the country.  (*See* Vail Decl., at ¶ 38; *see also* Trial

24   Testimony of Steve Martin ("Martin") at 1866:12-23).  These revisions also do not make any

25   changes to the role of the IERC in reviewing use of force; nor do they go far enough to limit the use

26

27   _____

28   [1] Plaintiffs' expert on use of force, Eldon Vail, has identified more specific issues and deficiencies in relation to the
     changes proposed by Defendants.  (*See* Declaration of Eldon Vail, February 11, 2014, filed herewith) ("Vail Decl.").

                                              1
     **PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
                              FORCE POLICY**

1  of OC spray; nor do they introduce any changes to facilitate and encourage interdisciplinary

2  management, care and discipline of MHSDS inmate-patients.  (*See* Vail Decl., at ¶ 13).  Finally,

3  these proposed revisions do not make needed change to the disciplinary procedures for *Coleman*

4  class members (either through the formal RVR process or through the use of unlawful informal

5  practices such as Management Status).

6  　　　　At a minimum, the Court must ensure that the Special Master and his team of experts are

7  consulted meaningfully so that Defendants clarify, modify and expand upon these proposed

8  revisions.  If CDCR is not required to go further and change how it thinks and what it does in its

9  treatment of mentally ill inmate-patients, the current cycle of unconstitutional force and discipline

10 against *Coleman* class members will continue.

11 **II.    STATEMENT OF FACTS**

12 　　　　**A.    Plaintiffs' May 29, 2013 Motion**

13 　　　　On May 29, 2013, Plaintiffs brought a motion for enforcement of court orders and

14 affirmative relief related to the use of force and disciplinary measures by the CDCR against

15 *Coleman* class members.  (ECF No.  4638).  This Court held an evidentiary hearing over 14 days

16 between October 1, 2013 and November 6, 2013.  Following the hearing, the parties submitted

17 closing briefs and the matter was submitted for decision on November 15, 2013.

18 　　　　Evidence at trial established that mentally ill prisoners are subjected to force to a greater

19 extent than those in the general population within the CDCR.  (*See* Plaintiffs' Post-Trial Brief

20 Regarding Use of Force and Disciplinary Practices and Provision of Inpatient Mental Health

21 Treatment to Condemned Class Members, November 15, 2013, Dkt.  4935 ("Plaintiffs' Post-Trial

22 Brief"), at 14:3-4; *see also* Martin at 2004:7-15.)

23 　　　　At trial, experts presented evidence that force should be employed against MHSDS inmate-

24 patients as infrequently as possible. (*See* Trial Testimony of Edward Kaufman, M.D.  ("Kaufman")

25 at 198:12-199:8, 220:12-221:10; *see also* Trial Testimony of Jeanne Woodford ("Woodford" at

26 1144:3-1146:20).  Experts on both sides agreed that controlled, rather than immediate, use of force

27 should be mandated as the norm.  (*See* Trial Testimony of Eldon Vail ("Vail") at 568:2-570:12;

28 Kaufman at 239:14-240:9; Martin at 1869:23-1871:25; *see also* Vail Decl., at ¶ 18.)  Expert

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1  testimony also established that unnecessary and excessive application of force has disproportionately

2  adverse effects on *Coleman* class members.  (*See* Kaufman at 177:1-178:10 ("Some inmates have

3  almost a posttraumatic stress disorder in which they become very frightened of even seeing custody.

4  They have dreams and nightmares about custody...."); *and see* Kaufman at 239:14-240:9, 262:4-13

5  (use of force, including cell extractions, causes short and long-term psychological harm to mentally

6  ill inmates.)).  Based on this evidence, Plaintiffs sought affirmative relief that required Defendants to

7  make changes to use of force policies and procedures followed by the CDCR.  (*See* Plaintiffs'

8  Proposed Orders Granting Motion for Enforcement of Court Orders and Affirmative Relief Related

9  to Use of Force and Disciplinary Measures, May 29, 2013, ECF No. 4368-3 ("Proposed Orders."))

10  Specifically, Plaintiffs requested affirmative relief in relation to, *inter alia*, the following categories:

11          1.     The Need to Revise Use of Force Policies and Procedures

12          Plaintiffs sought an order requiring Defendants to revise their use of force policies to

13  minimize the potential for excessive use of force against prisoners with mental illness, including

14  provisions to enforce the restriction of "immediate" uses of force to those enumerated in

15  Departmental policy: "inmate behavior that constitutes an imminent threat to institution/facility

16  security or the safety of persons."  (*See* Proposed Orders, p.1).  Plaintiffs also requested immediate

17  prohibition of:

18      •    the use of OC spray and expandable batons against inmates with mental illness in

19            housing units, holding cages, mental health crisis bed units, EOP units, and inpatient

20            hospitalization units, except when circumstances call for extreme measures to protect

21            staff or inmates (*Id.*);

22      •    the use of corporeal punishment on class members who commit minor violations which

23            do not present an imminent threat to institution security or the safety of persons

24            (particularly in relation to food ports) (*Id.*);

25      •    the administration of OC spray through the use of crowd-size canisters or grenades; and

26

27

28

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

- the cessation of arming custody officers stationed in units housing MHSDS inmates with OC spray and expandable batons (*Id.*);[2]

Plaintiffs also requested amendments to policy to require the weighing of OC canisters before and after each use in order to monitor and regulate the amount of chemical spray being used against inmates; the promulgation of clear guidelines regarding the amount of OC spray to be dispensed, the distance from which it should be dispensed, and required waiting periods between subsequent applications; and the enumeration of specific reasons for using a spit mask on a prisoner subsequent to the application of OC spray. (*See* Proposed Orders, at p.2). Plaintiffs further requested revisions to Defendants' use of force policy to require the provision of handheld cameras to every security station, to be used whenever possible during "immediate" or emergency uses of force as well as controlled uses of force. (*Id.*)

## 2. The Need to Revise Use of Force Investigation Policies and Procedures

Plaintiffs requested that Defendants be directed to create a unit of trained and dedicated investigators, outside the institutional chain of command, to review uses of force. Plaintiffs requested revision to use of force policies to allow this investigative unit to report its findings, including whether uses of force were found to be unreasonable or excessive, and to recommend disciplinary measures where appropriate, to CDCR headquarters and, for those uses of force involving *Coleman* class members, to the Special Master. (*See* Proposed Orders, at p.2).

## 3. The Need to Revise RVR Policies and Procedures

Plaintiffs requested that this Court to direct Defendants to revise their policies and procedures to provide for the possibility of a mental health diversion or mitigation prior to the issuance of an RVR. (*See* Proposed Orders, at p.2). Plaintiffs also requested that this Court to direct Defendants, in coordination with the Special Master, to revise and restructure their system for administering discipline to ensure meaningful mental health input and consideration, including changes that would ensure:

---

[2] Appropriate weapons can, of course, be made available nearby for use in true emergency situations, but there is no legitimate reason to have them on the duty belt of every officer stationed in the units housing MHSDS inmate-patients. (*See* Vail at 86:18-88:3; Martin at 1863:3-15.)

4

- formal procedures to generate productive communication between custody and mental health staff;
- revision of forms to ensure meaningful mental health input and consideration;
- a new protocol for the provision of a staff assistant to ensure that this is actually a meaningful and effective accommodation, including a prohibition of the assignment of a staff assistant who is in a direct reporting line to the hearing officer or who was involved in or who investigated the incident giving rise to the RVR.  The category of staff assistant should also be expanded to include mental health staff. (*Id.* at p.3).

Plaintiffs further requested an immediate cessation of any kind of informal, ad hoc, or local disciplinary procedure of "Management Status."   (*Id.*)

    4.    <u>Training</u>

Plaintiffs submitted that Defendants should be required to provide training for all custody staff regarding changes to policies and procedures concerning use of force and the RVR process outlined above, and education about mental illness generally; provide training for all custody and mental health staff on de-escalation methods for resolving situations without use of force; and for the additional training and supervision of hearing officers. (*See* Proposed Orders, at p.4).

    5.    <u>Implementation of Meaningful Tracking and Quality Assurance Systems</u>

The Court was asked by Plaintiffs to direct Defendants to work with the Special Master to develop and implement meaningful tracking and quality assurance systems regarding use of force against MHSDS inmates and consideration of mental health in the disciplinary process.

**B.**    **<u>Defendants' Response to Plaintiffs' Motion</u>**

During the trial, Michael Stainer, Director of the Division of Adult Institutions ("DAI") for CDCR testified regarding CDCR's use of force policy.  He averred that the DAI was in the process of revising provisions in Department Operations Manual ("DOM") regarding use of force.  (*See e.g.,* Trial Testimony of Michal Stainer ("Stainer") at 919:1-925:19.)  Subsequently, Mr. Stainer filed a declaration attaching a copy of the Defendants' proposed revisions to Chapter 5, Article 2 Use of Force of the DOM.  (*See* Declaration of Michael Stainer Re: Revisions to Use of Force Provisions in the California Department of Corrections and Rehabilitation's Department Operations Manual,

5

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1   January 21, 2014, ECF No. 4987 ("Stainer Decl.")).  Mr. Stainer indicated that the revised language

2   of the DOM has been finalized by DAI and will be fully implemented in 60 to 90 days following

3   development and completion of staff training ocnerning the revisions.  (*Id.*, at ¶ 2.)[3]

4       **C.      Summary of Defendants' Proposed Revisions to DOM**

5           Ms. Linda Woo, Senior Paralegal at K&L Gates, LLP, has submitted a declaration filed

6   herewith, explaining the way in which this document was created.  (*See* Declaration of Linda H.

7   Woo in support of Plaintiffs' Briefing on Defendants' Proposed Revisions to Use of Force Policy,

8   February 12, 2014, filed herewith.)  Exhibit A to Ms. Woo's declaration shows Defendants'

9   proposed changes to the policies set out in the DOM in bold italics (for additions) and bold strikeout

10  (for deletions).  Key changes to the DOM, as they relate to *Coleman* class members, can be

11  summarized as follows:

12          1.      51020.6 - Use of Restraints:

13          Adds a provision that in the event an inmate who is attached to a triangle refuses to place

14  their hands in the food/security port to allow the handcuffs to be removed, staff shall follow the

15  procedures outlined in 51020.11.2 Food/Security Ports.

16          2.      51020.11.2 - Food/Security Ports:

17          Authorizes an officer to administer a single 3-second burst of OC spray (size of canister is

18  not specified) to secure a food port if an inmate refuses to relinquish control of the food/security port

19  after the warning and presents an immediate threat to the safety of the officer or inmate.  An

20  example of an immediate threat is recited as, "the inmate is battering or attempting to batter staff or

21  inmates in the area."  Also specifies that if an immediate threat is not present, controlled use of force

---

23  [3] As at the date of filing this Brief, there has been no indication that Defendants are actually in the process of
24  implementing these changes: *see* http://www.cdcr.ca.gov/Regulations/Adult_Operations/Pending_Rules_Page.html.
    Further, there is a glaring procedural defect which could derail even this modest step toward reform.  Defendants seem to
25  want to incorporate their new procedures only in the DOM and not in Title 15 of the California Code of Regulations,
    despite its overarching legal authority and its prominence in the evidence presented in the evidentiary hearing.  This
25  approach appears to violate California's Administrative Procedure Act, which requires that CDCR rules of general
    (statewide) application to prisoners be formally promulgated and added to Title 15.  *See Faunce v. Denton*, 167 Cal. App.
26  3d 191 (1985) and cases cited therein.  While this Court cannot compel Defendants to comply with state law, the fact that
27  revisions may be made only in the DOM raises a concern as to whether they are part of a durable remedy; they can be
    changed at any time and without advance public notice.  Thus, issuance of one or more remedial orders remains essential
28  even if the Court were to embrace all or part of the Defendants' proposed modifications

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
FORCE POLICY**

is to be initiated while a licensed health care practitioner monitors the inmate at least every fifteen (15) minutes.

### 3. 51020.12 - Controlled Use of Force General Requirements:

The revisions provide that once a situation exists that may result in a controlled use of force, a custody staff member "shall remain at the cell door to monitor the inmate and continue to attempt to gain compliance from the inmate through verbal prompts until the extraction team arrives and the staff member is relieved by the incident commander to resume their regular duties. The custody staff member will be positioned as close as possible to the affected cell/area, without jeopardizing to their own safety."

This section also provides that certain information is to be taken into account prior to any controlled use of force: "physical health, mental health, and/or developmental disability concerns; effective communication needs as identified by the Disability and Effective Communications System (DECS); the inmate's current demeanor (verbal aggression as opposed to physical aggression, prior history of violence, physical threat to the safety of others, etc.); and the history of inmate's actions during any prior cell extractions."

This section states that all controlled uses of force shall be preceded by a cool down period of reasonable length, during which time clinical intervention by a licensed practitioner will be attempted regardless of the mental health status of the inmate.

### 4. 51020.12.1 - Controlled Use of Force-Video Recording Requirements:

Adds the following requirements for information to be recorded on camera:

- A summary of the events leading up to the controlled use of force;
- Efforts that made toward mitigation, including the duration of the cooling off period, as well custody, supervisory, medical, and mental health intervention as applicable.
- An indication from the licensed health care practitioner of whether the inmate's medical file was reviewed for medical contraindications to the use of chemical agents and if the inmate has any known disabilities that will require accommodation during the controlled use of force.

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1    • A detailed timeline of efforts by a licensed health care practitioner who attempts clinical

2        interventions to verbally counsel the inmate and persuade the inmate to voluntarily come

3        out of the area without force.  This narrative shall include a description of the inmate's

4        reaction.  Actual clinical intervention shall not be video recorded.

5        5.    51020.12.2 - Controlled Use of Force Involving the Seriously Mentally Ill:

6    Expands applicability to "any inmate who is acting in a bizarre, unusual, uncharacteristic

7    manner."

8        6.    51020.15 - Chemical Agents:

9    Introduces a list of chemical agents that may be deployed during a controlled use of force cell

10   extraction, namely:

11   • MK-9 OC Vapor - limited to a single burst of no more than 3 seconds in duration per

12       application with a maximum of two applications.

13   • MK-9 OC Fogger - limited to a single burst of no more than 5 seconds in duration per

14       application with a maximum of four applications.

15   • MK-9 OC Foam - limited to a single burst of no more than 5 seconds in duration per

16       application with a maximum of four applications.

17   • OC Vapor Grenade - limited to 2 devices.

18   • OC Flameless Expulsion Grenade - limited to 2 devices

19   • X-10 Barrier Removal Device - limited to a single burst of no more than 5 seconds in

20       duration per application with a maximum of four applications.

21   This section also provides that regardless of which chemical agents are deployed, or in what

22   combination, "no more than a total of four (4) chemical agent applications shall be administered"

23   unless there are "exigent or unusual circumstances."  Exigent or unusual circumstances is not

24   defined.  A minimum of three (3) minutes shall lapse between each application of chemical agents

25   before additional chemical agents may be applied.

26   Further, if the inmate is a participant in the mental health program and "has not responded to

27   staff for an extended period of time, including during the cool down period, lying motionless on

28   bunk or floor, sitting on edge of bunk head down, no eye contact, and it appears that the inmate does

8

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1    not present in imminent physical threat," this section provides that, "additional consideration and

2    evaluation should occur before the use of chemical agents is authorized," and "a decision to use

3    chemical agents for the extraction should be based on more than passive resistance to placement in

4    restraints or refusal to follow orders."

5               7.    5120.15.1 - Chemical Agents Restrictions:

6    This section contains an additional note that if a decision is made to use chemical agents in

7    spite of contraindications, "the decision shall be articulated and written justification provided."  The

8    written justification must include specific determinations and considerations to justify the need to

9    override the contraindications, beyond references to safety to staff or security of the institution.

10   Consideration must also be given to the inmate's mental health status and current mental state.

11   **II.    ARGUMENT**

12   Defendants' proposed revisions are not adequate to remedy the constitutional violations

13   established at trial.  Indeed, the proposed revisions fall short of addressing many of the concerns

14   identified in Plaintiffs' requests for affirmative relief.

15        **A.    CDCR Continues to Fail To Affirmatively Prohibit the Immediate Use of Force**

16        **Against _Coleman_ Class Members Except in Cases of True Emergency**

17   Experts from both sides agree that a fundamental objective of any use of force policy for

18   mentally ill inmates is to employ force in as few instances as possible.  (Kaufman at 198:12-199:8,

19   220:12-221:10; Martin at 1869:23-1871:25; Vail at 568:2-570:12).  Defendants' use of force policies

20   must affirmatively state just that.  The experts also agree that if the use of force is truly justified in

21   dealing with MHSDS inmates, policies must mandate controlled use of force (rather than immediate

22   application of force) in as many instances as possible -- particularly in circumstances where MHSDS

23   inmates can be easily identified, such as in particular housing units or congregate areas outside these

24   units.  Again, Defendants' use of force policies must affirmatively state just that.

25   The proposed revisions fail to affirmatively state that the use of force against _Coleman_ class

26   members is prohibited except in the case of true emergencies.  Because of this critical omission,

27   CDCR by its policy and practice continues to permit, for example, the immediate use of force in

28   situations that are clearly not emergencies warranting the immediate application of force -- for

9

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1   example, to secure food ports (see below).  The proposed revisions also fail to mandate a *preference*

2   for controlled use of force against MHSDS inmate-patients.  Nor do they even refer to the use of

3   MAB instead of weapons to restrain, when necessary, a prisoner with serious mental illness in need

4   of mental health care.[4]  Thus, Defendants' approach continues to fail to tailor custody's approach to

5   the particular issues which arise when dealing with inmates who suffer from serious mental illness.

6   As a result, the essential foundation for the kind of fundamental change in approach necessary to

7   successfully care for MHSDS inmate-patients is still missing from Mr. Stainer's effort.

8          The suicide of Inmate X at Mule Creek State Prison provides a poignant example of the

9   problems with the strong preference for immediate use for force implicit in CDCR policy.  (*See*

10  Confidential Declaration of Michael W.  Bien In Support Of Plaintiffs' Urgent Petition for a Status

11  Conference to Address Modified and Delayed Suicide Report, January 17, 2014, Exhibit D ("Suicide

12  Report"); *see also* Confidential Declaration of Tim Belavich In Support of Status Conference

13  Statement, January 29, 2014, Exhibit 2 ("CCHCS Review")).  The suicide of Inmate X, which took

14  place in September 2013, was referred for further review because of  "systemic concerns around his

15  death [which] identified multiple areas of concerns including use of OC spray for an inmate with

16  significant medical comorbidities including tracheal stenosis s/p tracheostomy, decontamination

17  process inside cell after the OC spray, lack of transfer to examination area to further assess if stoma

18  or airway access was not compromised after OC spray, clarity regarding suicide watch on this

19  patient and lack of proper emergency response." (CCHCS Review at p.  2).  Proposed changes to the

20  DOM do not require consultation with appropriate healthcare practitioners prior to use of OC spray,

21  do not adequately provide for decontamination after exposure to OC spray, and do not address

22  fundamental deficiencies in procedures for ensuring the health and safety of MHSDS inmates

23  following exposure to OC spray.  Without an explicit prohibition on the immediate use of force

24  against MHSDS inmate-patients except in case of true emergency, deaths such as that of Inmate X

25  will sadly continue to be inevitable.  (*See* Vail Decl., ¶¶ 19, 24).

26

27  _____

28  [4] Plaintiffs' expert has also criticized the revised policies' permissiveness on the use of triangles to physically secure inmates.  (*See* Vail Decl., at ¶¶ 22-23).

10

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

To successfully change the custody-dominated environment of CDCR, Defendants' use of force policies must include affirmative statements of policy objectives concerning mentally ill inmate-patients. (*See* Vail Decl., ¶ 18). As the testimony and videos adduced at trial show, all too often CDCR personnel believe and after the fact affirmatively find -- even in the face of horrific events -- that objectively reprehensible behavior is "within policy" and thus justified. To put it bluntly, unnecessary and excessive use of force against the mentally ill passes muster under the current "check the box" system CDCR currently employs. (Martin at 1890:4-1898:14.)[5] It does so in large measure because neither the supervisors nor the line custody staff officers recognize that what they are doing is wrong and counterproductive to successful management of mentally ill inmates. (*Id.*)

In the absence of a separate use of force policy for mentally ill inmate-patients and in the absence of an affirmative definition of the essential purposes of such a policy, the custody-dominated culture of CDCR will never change. Unnecessary and excessive applications of force against *Coleman* class members will continue to occur no matter what other remedial orders this Court issues and no matter what incremental changes the agency may make in the DOM. This Court needs to direct Defendants to promulgate a *separate* use of force policy focused clearly, concisely, and with much needed emphasis on this growing element of the prison population. Only by a comprehensive change in approach, with clear policy statements setting out clear expectations and guidelines for the care and treatment of the State's mentally ill prison population will CDCR even begin to gain a foothold in breaking the custody dominated culture that permeates the current treatment of mentally ill inmate-patients.[6]

---

[5] *See* Martin at 1897:23-1898:14 ("I believe in part because we've created, as you've made reference earlier, to what I call a checklist audit type of approach that doesn't lend itself or require these administrators to come to terms with what the core objectives of all of this is. This is one single objective: Either eliminate the need for the force and exhaust everything you can when you're dealing with somebody in this condition or if you have to use force, to use that force which is the minimal amount to neutralize that. These are the core substantive objectives. If these administrators don't understand that and they're not reviewing this, these matters with this thought in mind, you're going to get the 30-second: Are going to cuff up? No. Check that box off, and they did it, and you process it on through when it's functioning properly when it is, in fact, not. What else can I say?")

[6] Mr. Stainer testified at trial that he was planning to review in excess of 100 videos of other cell extractions, presumably involving many inmates who are mentally ill. While he has not made any statement to the Court or publicly since his review on this subject, his proposed changes do try to limit the symptoms of the some of the abuses we observed, namely the unguided use of pepper spray. By itself, however, setting such limits generates another "check the box" scenario that

11

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

**B.**     **CDCR Has Failed to Make Any Provision for the Interdisciplinary Management of MHSDS Inmates**

Defendants' proposed changes contain no provision for interdisciplinary management, care, and discipline of MHSDS inmate-patients. Plaintiffs have asked this Court to order Defendants to develop a team custodial-clinical approach in EOP, MHCB, inpatient units, and other units housing Coleman class members. (Plaintiffs' Post-Trial Brief at 19:15-20). This would include continuous and extensive training for both custodial and clinical staff on strategies for managing inmate-patients (including management of assaultive behavior techniques, legal standards for administration of involuntary medication, and the consideration of mental health in the disciplinary process). (*Id.*)

The need for urgent reform to include this requirement is crystal clear in light of the events leading to Inmate X's suicide at Mule Creek State Prison. Review by the CCHCS committee criticized lack of consultation prior to the deployment of OC spray against this *Coleman* class member. (CCHCS Review at pp.2, 17, 19-23). Had there been adequate interdisciplinary consultation prior to the deployment of OC spray, this tragic death could probably have been avoided. (Vail Decl., at ¶ 17, 30).

There must be a fundamental and explicit change in CDCR policy to explicitly require multidisciplinary teams of custody and mental health staff to make all decisions concerning the non-emergency use of force in managing MHSDS inmate-patients. (Vail Decl., at ¶ 36). Defendants' proposed changes do not address this critical need. The policies should be changed to include a mandate for incident commanders and onsite managers to work together with mental health professionals before using force against MHSDS inmate-patients. Steps should be taken in all cases, except true emergencies, to involve custody and mental health staff who have worked with and are knowledgeable of the particular inmate. (*See* Vail Decl., at ¶ 31 ("For example, before initiating controlled use of force, the incident commanders and onsite managers should attempt to determine

---

does not change CDCR's overall approach. It may limit the abuse, to be sure, but such limits by themselves will not change CDCR's culture in any meaningful way.

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

existing custody and non-custody staff relationships that the inmate may have in deciding how to proceed with the least amount of force necessary to address the situation."))

Plaintiffs also requested that Defendants be ordered to work with the Special Master and Plaintiffs' counsel to develop a remedial plan, including implementation of pilot programs focusing on custody-clinical team approaches to the care and discipline of *Coleman* class members.  (*See* Plaintiffs' Post-Trial Brief, at 19:23 - 20:4).  Nothing in the proposed revisions indicates that any such effort will be pursued.

Instead, for example, Defendants propose changes to requirements for video records made after uses of force that result in serious bodily injury, great bodily injury, or allegations of unnecessary or excessive force.  (*See* Stainer Decl., Exh.  A at pp.  14 (51020.17.3 - Video Records Made After Uses of Force That Cause Serious Bodily Injury, or Great Bodily Injury, or Result in Allegations of Unnecessary or Excessive Force)).  But these changes do not mandate outside review or oversight.  In addition, they fail completely to involve mental health staff in the review process.  They also do not require the IERC to review all use of force videos, but rather, only 30%.  This is a recipe for continued avoidance of real problems.

Similarly, some of proposed changes for controlled use of force involving the seriously mentally ill are helpful but still not adequate.  For example, Defendants recommend custody staff consult with assigned housing unit staff and licensed health care practitioners prior to cell extractions if the inmate-patient is non-responsive but posing no "imminent physical threat" (although that term is not defined).  (Stainer Decl., Exh.  A at p.7 (51020.12.2 – Controlled  Use of Force  Involving the Seriously Mentally Ill))._[7]_  However, Defendants do not mandate that appropriate licensed healthcare practitioners be consulted prior to *all* cell extractions involving controlled use of force.  In fact, a credible policy must mandate close ongoing cooperation and involvement of mental health staff when controlled use of force is considered and  used in dealing with a mentally ill inmate-patient.  Mental health staff must be integrally involved throughout, from consultation relative to a decision

---

[7] Plaintiffs' expert has also criticized the revised policies for giving insufficient guidance as to what constitutes an "imminent threat."  (*See* Vail Decl., at ¶ 19 ("In my view, this still presents great risk for the arbitrary application of force against MHSDS inmates, in circumstances where verbal persuasion or controlled use of force would be preferable."))

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1    to use force, to assessment of possible punishment, to internal review of the incident.  For a "check

2    the box" system to work in a constitutional fashion, at the very least all of the necessary boxes must

3    be included.  These proposed revisions fall short.

4    **C.    CDCR Has Failed to Address its Prevailing Practice of Using Force and**

5    **Discipline as Elements of "Medical Care" or "Mental Health Care" for**

6    **Members of the _Coleman_ Class**

7        The proposed revisions do not contain any guidelines for use of force when the ostensible

8    purpose is to facilitate "medical" or "mental health" care.  With little or no oversight or guidelines,

9    custody staff are still permitted to use OC spray against inmates who are visibly decompensating in

10   their cells for the purpose of extraction for medication or treatment.  (_See_ Stainer Decl., Exh.  A at

11   pp.9-10 (51020.15 Chemical Agents)).  This would continue to be permitted even though there are

12   other effective alternatives, including verbal persuasion or MAB techniques.  (Vail Decl., ¶ 12).  At

13   the very least, in such situations there should be a concerted interdisciplinary effort to help an inmate

14   before force is deployed, especially if chemical or other weapons are used.[8]  Further, to the extent

15   cell extraction is required, officers must be trained and directed to first try using less harmful and

16   less violent techniques such as management of assaultive behavior commonly used in psychiatric

17   hospitals around the country.[9]

18       More to the point, there is no legitimate reason for CDCR policy to regularly allow violent

19   cell extractions of mentally ill inmates "for their own good."  Experts on both sides criticized this

20   approach.  (Kaufman at 198:12-199:8, 220:12-221:10; Martin at 1869:23-1871:25; Vail at 568:2-

21   570:12).  MHSDS inmates can and should be managed in a way that minimizes the need for force to

22   ever be used.  (_Cf._  Vail at 143:19-144:17; Martin at 1871:9-23.  _See also_ Stainer at 974:8-19.)  A

23   policy which allows mentally ill inmate-patients to be subjected to OC spray and/or baton strikes

24   _____

25   [8] Indeed, if CDCR custody staff had been effectively trained in, and encouraged to use, alternative techniques to the use
     of force by the deployment of OC spray to the facial area, such as MAB,  it may have been possible to prevent the death

26   of Inmate X at Mule Creek State Prison.  (_See_ Vail Decl., at ¶¶ 19, 24 ; _see also_ Kaufman, at 220:6-221:10 (MAB a useful
     alternative to OC spray in dealing with mentally ill inmates.))

27   [9] This would require extensive education for new employees upon hire and of existing employees already on staff.
     Further, after custody staff have received an initial round of training, the importance of this approach would need to be

28   reinforced through annual in-service training.  Development of the curriculum for this training should be heavily
     influenced by mental health staff.  (_See_ Vail Decl., at ¶¶ 28-29).

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF
FORCE POLICY**

"for their own good" must be stopped.  (*See* Vail Decl., at ¶¶ 27-30).  Yet the proposed revisions continue to allow the use of unnecessary and excessive force in such situations.

In controlled use of force situations, even during a cool down period, the proposed changes merely require a custody staff member to remain at the cell door "to monitor the inmate and continue to attempt to gain compliance from the inmate through verbal prompts until the extraction team arrives."  (*See* Stainer Decl., Exh.  A at p.5 (51020.12 - Controlled Use of Force General Requirements)).  Video evidence shown at trial demonstrates that the type of verbal "persuasion" generally used by CDCR is counter-productive.  Without interdisciplinary staff trained and clear policy directives requiring that these teams work together with mentally ill inmate-patients, having an officer stand at the cell door yelling "comply or else," or "this is your last chance," or "cuff-up" will not change the fundamentally flawed approach used by CDCR.  (*Cf.* Vail Decl., ¶ 9, 28).  While maintaining contact with an inmate-patient at the cell front might be viewed in isolation to be a valuable change, it is hardly likely to make a practical difference.

The key features missing from these proposed revisions are the problem-solving tools and skills that would empower the staff member solve the problem in a creative and meaningful way.  For example, during the trial, this Court was presented with evidence of staff using chocolate to persuade a mentally ill inmate to exit his cell, rather than resorting to force.  (*See* Woodford, 1145:25-1146:9 ("Really, the rules don't allow us to think like that. It was very courageous of this captain to really, you know, try to find another method. And with some of these inmates who are mentally ill, more carrots and less sticks really does work."); *cf.* Vail Decl., ¶¶ 29, 31)  Attempting to adjust policy around the margins fails to address this glaring void in CDCR capabilities and current practices.  CDCR needs a policy that makes clear that application of force involving seriously mentally ill inmate-patients is an absolute last resort and is considered by policy to be a failure on the part of staff.

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      The Proposed Policies For OC Spray Remain Incomplete and Inadequate**

Defendants' proposed changes do not fully or effectively address Plaintiffs' concerns regarding unnecessary and excessive use of OC spray against *Coleman* class members.[10]  Most importantly, CDCR does not take the step it must most urgently implement -- eliminating ready access to OC spray in and around units which house seriously mentally ill inmate-patients.  (Vail Decl., at ¶ 37).  Evidence at trial established the harmful effects that pepper spray can have, particularly on the mentally ill.  (*See* Stainer at 822:20-823:14; Kaufman at 219:4-220:5 ("[inmates] talk about having the oxygen sucked out of them.  They feel their skin is on fire, that they can't breathe.  Also, pepper spray has been given to asthmatic inmates, which runs a very high risk of compromising their breathing."))  Indeed, the Suicide Report for Inmate X at Mule Creek State Prison, who had a documented history of breathing problems, notes that the inmate was sprayed with OC in spite of his being in a psychotic and suicidal state, and was in visible pain and had difficulty breathing after being sprayed and shortly before his death.  (*See e.g.* Suicide Report at p.10).

Instead of addressing these concerns, Defendants have made a list of chemical agent products that may be deployed during a controlled cell extraction.  (*See* Stainer Decl., Exh.  A at pp.  9-10 (51020.15 Chemical Agents)).  While eliminating some devices, the kinds of chemical agents described are still excessive and unnecessary.  Even a limit on use of chemical agents in controlled uses of force to no more than four applications will still permit the infliction of unnecessary pain and suffering on mentally ill inmates.  (Vail Decl., at ¶ 41).  Custody officers -- as a matter of routine -- can still carry and use crowd-control sized canisters of OC spray.  Smaller MK3 or MK4 canisters (so called "personal use canisters") are not even listed, even though they ought to be preferred.  (*Id.*)

The proposed guidelines are also problematic because the limit on the number of applications of chemical agents is not absolute.  (*See* Vail Decl., at ¶ 40).  In fact, it can be exceeded in any circumstances deemed "exigent or unusual."  (*See* Stainer Decl., Exh.  A at p.10 (51020.15 Chemical Agents)).  There is no guidance as to what "exigent or unusual" circumstances means.  Thus, the risk

---

[10] The recent death of Inmate X in Mule Creek State Prison demonstrates (yet again) the danger of overreliance on OC spray in immediate use of force against MHSDS inmates, particularly in the context of merely securing food ports.  (*See* Vail Decl., ¶¶ 19, 29).

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1  remains for arbitrary and capricious application of chemical agents during instances of controlled

2  use of force against MHSDS inmate-patients, although custody staff will no doubt be trained to write

3  reports in a way which references "exigent or unusual" circumstances.  (*Cf.* Vail Decl., at ¶ 40).

4  Further, and in any event, even a limitation of four applications of OC spray, grenades, vapor, and/or

5  foam within a 12 minute period, is excessive.  (Vail Decl., at ¶ 41).

6        The proposed durational limit (three seconds) on the application of OC spray is problematic

7  as well.  It will be difficult if not impossible for CDCR (or anyone else) to monitor whether custody

8  officers involved in controlled use of force against *Coleman* class members are adhering to this

9  requirement.  Durational limits mean little when applied to the crowd control canisters of OC spray

10  that CDCR continues to mandate that its officers carry and use.  Four 3-second applications from an

11  MK-9 within a 12-minute period will have a much more severe impact than four 3-second

12  applications from an MK-3 or MK-4 within a 12-minute period.  (*See* Martin, 1974:15-20).  Indeed,

13  the only way to accurately determine how much spray has been employed is to weigh canisters

14  before and after use. (*See* Vail, 447:23-449:7; Vail Decl., at ¶ 42).  Defendants have refused to

15  include this important recommendation by their own expert. (*See* Martin, 1974:21-1975:11).

16  Defendants should therefore be ordered to adopt the recommendations of use of force experts to this

17  effect whenever there is a controlled use of force incident against an MHSDS inmate-patient.

18      **E.    The Proposed Revisions Still Permit the Immediate Use of Force Against**

19          ***Coleman* Class Members Involved in "Incidents" With Food Ports**

20        There should be no special exception that permits immediate use of force to secure a food

21  port.  (*See* Vail Decl., ¶¶ 24-26)).  At trial, both Mr. Vail and Mr. Martin criticized this approach.

22  (Vail at 151:12 -152:16, 435:17-436:18; 553:5-554:4; *see also* Martin at 1871:12-1872:24

23  (distinguishing between refusal to obey lawful order and imminent threat)).  Immediate use of force

24  to secure a food port without regard to an inmate's clinical history and without medical consultation

25  can have tragic consequences, as illustrated by the death of Inmate X at Mule Creek State Prison.

26  (*See* Suicide Report at pp. 9, 15, 17 (Inmate X sprayed in the face with pepper spray, despite both

27  the visible and documented history of breathing problems, and with no prior medical consultation

28  about possible contraindications for the use of pepper spray); *see also* Vail Decl., at ¶ 10-11).

17

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1    The revisions now proposed may be helpful only if staff are trained repeatedly and

2    effectively on and held accountable to a policy that clarifies what is considered "an immediate threat

3    to the safety of the officer or inmate." (*See* Vail Decl., at ¶ 19)  The example given ("e.g., the

4    inmate is battering or attempting to batter staff or inmates in the area") must be better described.

5    (*Id.,* at ¶ 25).  Throwing an empty plastic cup through the food port is considered an attempted

6    battery, but unless it is part of an ongoing, serious and harmful action that requires an immediate as

7    opposed to a controlled response, immediate force should not be used.  This concern is particularly

8    heightened in the case of MHSDS class members.[11] (*Id.*)

9    The proposed changes are also inadequate insofar as they do not specifically provide for out-

10    of-cell decontamination following deployment of OC spray against *Coleman* class members.  The

11    consequences of this oversight are clearly illustrated by the events at Mule Creek State Prison, where

12    custody officers -- up to and including the shift commander and the Deputy Warden -- repeatedly

13    refused to extract Inmate X, despite the orders of medical and psychiatric staff that he be removed

14    from his cell for decontamination.  (Suicide Report at pp. 9, 15, 17; *see also* Vail Decl., at ¶¶ 10-11,

15    46).  To the extent application of OC spray is deemed to have been appropriate and necessary,

16    Defendants -- by policy -- should require inmate-patients to be decontaminated outside their cell no

17    more than 20 minutes after exposure.  Defendants should also be required to provide (at the very

18    least) eye-wash decontamination stations like those routinely used in industrial sites for use promptly

19    following exposure to OC spray.[12] (*See* Vail Decl., at ¶¶ 26, 43-46).

20    **F.    The Proposed Revisions Do Not Address Any of Plaintiffs' Concerns In Relation**

21    **to Video Requirements**

22    Plaintiffs requested that Defendants be directed to provide handheld cameras at every security

23    station, to be used whenever possible during "immediate" or emergency uses of force and any

24    subsequent uses of force arising from that incident.  The proposed revisions do not make any change

---

[11] If the CDCR properly defines "immediate risk," which is the trigger for immediate use of force, that would obviate the need for a separate section on food/security ports altogether.

[12] Indeed, the dangers of not implementing further reforms to decontamination procedures is vividly illustrated by the recent death of Inmate X.  Had Inmate X been properly and thoroughly decontaminated following the exposure to OC spray, the circumstances leading to his suicide may never have arisen.  (*Cf.* CCHCS Review at p. 19; Vail Decl., at ¶ 46).

18

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1  to the video recording requirements in the event of an immediate use of force incident.  (Vail Decl., at

2  ¶ 32).  Expert evidence at trial demonstrated that videotaping can have an important positive impact

3  on the behavior of custody staff involved in a use of force incident, and can also be a useful tool in

4  the review of use of force incidents.  (*See* Vail, at 435:3-8).  The policies should mandate video

5  recording requirements by an uninvolved staff member as soon as possible after an immediate use of

6  force incident begins, and to continue recording for the duration of the use of force.  (Vail Decl., at ¶¶

7  21, 32).

8      The proposed changes to video recording procedures in a controlled use of force situation are

9  also inadequate.  These policies need to include a requirement that the briefing by the Incident

10  Commander be recorded, should not prohibit the recording of actual clinical intervention between the

11  inmate-patient and a licensed mental health practitioner, and should mandate continuous recording

12  right up until the point at which the inmate-patient is rehoused or placed in a holding cell.  (Vail

13  Decl., at ¶¶ 33-34).

14      **G.    The Proposed Revised Policies Fail to Change RVR Policies that**

15      **Disproportionately and Unconstitutionally Impact MHSDS Inmates**

16      Plaintiffs requested that this Court direct Defendants to revise their policies and procedures

17  to include possible diversion or mitigation for MHSDS inmates prior to issuance of an RVR.  In the

18  proposed changes, CDCR has not incorporated a mental health diversion program into the

19  disciplinary process in order to accommodate inmate-patients whose "offending" behavior arose by

20  virtue of mental illness rather than willful disobedience.  Without a change in policy in this regard,

21  inmate-patients will continue to face serious disciplinary sanctions in circumstances where they were

22  indisputably too decompensated to understand or follow orders.  (*See* Vail Decl., at ¶¶ 13-14).

23      Defendants need to promptly revise the CDCR disciplinary process to create a mental health

24  diversion prior to issuance of an RVR.  For example, the relevant forms should be revised to allow

25  for meaningful input and consideration by mental health staff.  This would ensure that there is

26  productive communication between custody and mental health staff, and that mental health staff

27  have meaningful written input on RVR (and associated) paperwork.  Additionally, the revisions to

28  use of force policy should implement a new protocol for the provision of a staff assistant (who could

19

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1  be a licensed mental health practitioner) who can ensure there is actual accommodation of the

2  inmate-patient's mental health status during the discipline process, and should mandate mitigation

3  by reference to an inmate-patient's mental health status during the sentencing phase of any

4  disciplinary adjudication.  This would ensure the meaningful and effective accommodation of mental

5  health status of an inmate-patient during the CDCR's disciplinary process.

6  **H.      The Proposed Revised Policies Do Not Place An Immediate Ban On The**
           **Informal Disciplinary Measure of "Management Status"**

8  Evidence at trial established that Defendants allow wardens to bypass the formal disciplinary

9  process and arbitrarily impose immediate "management status" as punishment for *Coleman* class

10 members.  (Vail at 273:14-23, 454:12-24; Stainer at 889:9-21).  This off the books practice is

11 employed without regard for the mental health condition of an inmate and is governed exclusively

12 by local operating procedures, written and unwritten, that vary by institution.  Plaintiffs have

13 requested a total prohibition on the use of any informal, ad hoc, or local disciplinary procedure, such

14 as Management Status, that is outside the formal disciplinary process.  (See Plaintiffs' Post-Trial

15 Brief, at 19:21-22).[13]

16 Defendants' proposed changes do not address these critical concerns.  Defendants must be

17 ordered to promptly revise the CDCR disciplinary process to prohibit any procedure outside formal

18 process.  Without these substantive and meaningful changes to the discipline process, the imposition

19 of unnecessary and excessive harm to MHSDS inmate-patients will continue.

20 **I.      The Proposed Revisions Do Not Make Any Needed Change to the Role of the**
           **IERC in the Review and Evaluation of Use of Force Against MHSDS Inmates**

22 Defendants' proposed changes do not address any aspect of the IERC's role in reviewing and

23 evaluating use of force incidents against *Coleman* class members.  A credible use of force system in

24 the correctional context requires meaningful oversight and review.  (*See* Martin at 1901:20-23

---

[13] Plaintiffs acknowledge that there is occasionally a need for custody staff to modify the conditions of confinement for inmates in segregation.  For example, an inmate flooding his cell may necessitate shutting off the water supply.  Plaintiffs are not suggesting that custody staff be prevented by exercising their skill and judgment to respond to these dynamically evolving situations.  However, the policies must specify that the authority to engage in these practices is at the shift commander's level, should be *immediately* reported to and approved by the duty officer/wardens' designee and should only be continued as long as it is necessary to address the inmate's misbehavior.  Further, the use of any such practice in a punitive or disciplinary manner should be immediately and totally prohibited.

20

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF**
**FORCE POLICY**

1  ("bedrock of a use of force system is ensuring the integrity of reviews of use of force"); and at

2  1903:13-19).  Without such a change, there can be no development of meaningful quality assurance

3  systems to evaluate and respond to use of force against MHSDS inmates.

4       Evidence presented at trial showed that in every incident involving a class member, the IERC

5  found that the force used was not unnecessary or excessive and complied with CDCR policies and

6  practices.[14]  Nothing in the proposed revisions addresses the basic problem of ineffective review by

7  the IERC.  There is no change in the make-up of the IERC.  In other words, there is no mandate that

8  mental health staff be required to participate in the review process.  Further, there is no change to

9  procedures employed by the IERC in conducting reviews.  This means that questions such as "what

10 led to the application of force in this instance," "could the use of force have been avoided here," or

11 "what are the teaching moments arising from this incident, to avoid the perceived need for use of

12 force arising in the future," will never be asked let alone addressed by the agency at the prison level.

13 (Vail Decl., at ¶ 13).

14      Use of force policies must be revised to allow for an independent unit that has the power to

15 investigate all use of force incidents, and to allow this investigative unit to report its findings,

16 including whether uses of force were found to be unreasonable or excessive and to recommend

17 disciplinary measures where appropriate to CDCR headquarters and, for uses of force involving

18 *Coleman* class members, to the Special Master as well.

19      Further, in any IERC review of use of force against class members, mental health staff must

20 be an integral part of the process along with the custody administrators.  (Vail Decl., at ¶ 49).

21 Unless responsibility for management of this vulnerable population is shared at the highest levels of

22 the institutions, it is unlikely that behavior at the line level will ever change.  (*Id*., at ¶ 50).  Inclusion

23 of mental health professionals must be substantive, and not just window dressing.  Policy revisions

24 should incorporate a structural change to allow mental health staff to either agree with the IERC

25 findings or submit a written opinion explaining why they disagree with the findings.  The proposed

26 revisions also fail to address another critical flaw in the IERC process identified by Defendants' own

27

28 [14] Where the IERC did raise concerns, they were focused on compliance with minor technical aspects of the existing UOF policy.  (*See* Plaintiffs' Post-Trial Brief at 12:6-14; Stainer at 954:6-955:12.)

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

1  expert, Steve Martin -- namely, that a very narrow subset of cases is referred for investigation by the

2  OIA.  Only instances involving the most serious injuries sustained by class members are subject to

3  OIA examination.

4       Without meaningful changes to IERC review, the CDCR will never be capable of identifying

5  and correcting instances of unnecessary and excessive use of force involving members of the

6  *Coleman* class.

7  **IV.     CONCLUSION**

8       Defendants' initial effort to remedy the ongoing constitutional violations involving CDCR's

9  treatment of its mentally ill inmate-patients falls far short of addressing the need for comprehensive

10 reform established by the evidence adduced at trial.  Unless and until Defendants properly implement

11 a use of force policy (as well as comprehensive reforms of closely-related policies and practices)

12 designed specifically to address the MHSDS inmate-patient population, the need for affirmative relief

13 identified in Plaintiffs' pending motion will continue to be unmet and unheeded.

14                                      Respectfully,

15                                      K&L GATES LLP

16

17 Dated:  February 12, 2014            By:     */s/ Jon Michaelson*

18                                      Jon Michaelson
                                        Jeffrey L. Bornstein
19                                      Ranjini Acharya
                                        Attorneys for PLAINTIFFS
20

21

22

23

24

25

26

27

28

**PLAINTIFFS' BRIEF ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**