DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

  v.

EDMUND G. BROWN, Jr., et al.,

        Defendants.

Case No. Civ S 90-0520 LKK-JFM

**EXPERT DECLARATION OF ELDON VAIL IN SUPPORT OF PLAINTIFFS' BRIEFING ON DEFENDANTS' PROPOSED REVISIONS TO USE OF FORCE POLICY**

[1095888-1]

EXPERT DECLARATION OF ELDON VAIL

I, Eldon Vail, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify. I submit this declaration in support of Plaintiffs' Briefing on Defendants' Proposed Revisions to Use of Force Policy.

2. I have previously submitted three declarations in these proceedings, in relation to Defendants' policies and procedures for the use of force against *Coleman* class members.

3. Since my last declaration, I have had the opportunity to review Defendants' proposed revisions to the Department Operations Manual ("DOM") that were attached as Exhibit A to the Declaration of Michael Stainer Re: Revisions to Use of Force Provisions in the California Department of Corrections and Rehabilitation's Department Operations Manual, dated January 21, 2014.

4. I have also been provided with the document attached as Exhibit A to the Declaration of Linda H. Woo in support of Plaintiffs' Briefing on Defendants' Proposed Revisions to Use of Force Policy, filed herewith. I understand that Ms. Woo prepared this document as a means to easily view the proposed revisions to the DOM (whereby changes to the policy are shown in bold strikeout (for deletions) and bold italics (for additions)). I have reviewed this document in conjunction with the document attached to Mr. Stainer's declaration.

5. I have also been provided with two documents by Plaintiffs' counsel, which relate to the death in custody of Inmate X at Mule Creek State Prison in September, 2013, namely: the Suicide Report for Inmate X with a covering memorandum dated January 7, 2014, signed by Dr. Tim Belavich and Mr. Michael Stainer ("Suicide Report"); and the CCHCS Final Death Review Summary into the death of Inmate X, with a print date of January 29, 2014 ("CCHCS Review").

**I.    ASSIGNMENT**

6. I have been asked by Plaintiffs' counsel to review the proposed changes to the DOM that Mr. Stainer is pursuing, and provide any comments or other feedback as to the adequacy of these changes to redress the systemic constitutional violations concerning use of force and disciplinary measures *Coleman* class inmate-patients that were established at trial.

1

EXPERT DECLARATION OF ELDON VAIL

[1095888-1]

7. I have also been asked to consider whether and how my opinions on the proposed changes to the use of force policies are impacted by the September 2013 death of Inmate X Mule Creek State Prison.

8. My work on this matter is on-going. This declaration summarizes my current opinions given the available information I have reviewed to date. If additional information is produced, I may modify or supplement my analyses and opinions accordingly.

## II. SUMMARY OF OPINIONS

9. CDCR's proposed revisions do not address the fundamental problems that I found during my work in this case. Most significantly, these revisions have not meaningfully addressed the custody and care needs of seriously mentally ill inmates to include mandating the use of interdisciplinary teams of custody and mental health staff in order to minimize the use of force -- controlled or immediate – against Coleman class members. The proposed revisions appear to attempt to rein in some of the more blatant abuses in the videos I observed and presented at the evidentiary hearing, but they leave intact the custody-dominated approach that I found during my site visits and reviews of CDCR's policies and practices. For example, the proposed policies continue to permit the use of crowd-control size OC spray weapons in enclosed small spaces, have not addressed the way force is used "for an inmate's own good," and still allow for application of immediate force in incidents involving food ports.

10. In my opinion, the death of Inmate X at Mule Creek State Prison illustrates precisely the problems with the CDCR's current approach to the use of OC spray against MHSDS inmate-patients. My understanding, from reviewing the documents provided to me, is that the death of Inmate X was referred for further review because, "systemic concerns around his death identified multiple areas of concerns including use of OC spray for an inmate with significant medical comorbidities including tracheal stenosis s/p tracheostomy, decontamination process inside cell after the OC spray, lack of transfer to examination area to further assess if stoma or airway access was not compromised after OC spray, clarity regarding suicide watch on this patient and lack of proper emergency response." (CCHCS Review at p. 2). The Suicide Report indicates

that the incident involved an immediate use of force (namely the application of OC pepper spray to the face) to secure a food port, that there had been no medical consultation prior to the use of force in spite of the inmate's visible and documented history of breathing problems, and that custody staff up to and including the shift commander and Deputy Warden refused to open the cell door to allow for decontamination despite the orders of medical and psychiatric staff to the contrary. (*See* Suicide Report at pp. 9, 15, 17).

11. The proposed changes to the DOM do not address any of the serious concerns raised by these events. The proposed revisions do not adequately provide for consultation with appropriate healthcare practitioners in the institution prior to the use of OC spray, do not adequately provide for decontamination after exposure to OC spray and do not address fundamental deficiencies in procedures for ensuring the health and safety of MHSDS inmates following exposure to OC spray. As such, it is difficult to see how the proposed changes would assist in preventing similar tragedies in future.

12. I note that the proposed changes to the existing policies also do not affirmatively state a preference for controlled use of force, rather than immediate use of force, when dealing with MHSDS inmates. Based on my review, it is my opinion that the only means by which to change the prevailing attitudes within the CDCR regarding use of force against prisoners with mental illness is to implement changes that include such affirmative statements of policy. Otherwise, custody staff will still be permitted to use OC spray against inmates who are visibly decompensating in their cells for the purpose of extraction for medication or treatment, without there being a concerted interdisciplinary effort to help an inmate using alternative techniques such as verbal persuasion or Management of Assaultive Behavior techniques.

13. It is also my opinion that the proposed revisions do not adequately account for the needs of MHSDS inmates within the disciplinary process of the CDCR. The proposed revisions fail to incorporate a diversion of MHSDS from the disciplinary process, in order to allow inmate-patients whose "offending" behavior arose by virtue of mental illness (rather than willful disobedience) to be properly accommodated within the CDCR's disciplinary system. Nor is the

proposed change to the role of the Institutional Executive Review Committee ("IERC") adequate to ensure that management is asking the right questions when reviewing a use of force incident against a class member. Those questions must include an examination of the incident that led to the need to use force in the first instance, and involve reviewers asking: "What happened to get us into this situation? What could we have (should we have) done differently to de-escalate or intervene sooner? Was the force used necessary? Was it excessive? Were there safer ways to intervene by using trained interdisciplinary staff rather force? Should we be training our staff to use Management of Assaultive Behavior techniques?" The policies and procedures should make explicit that such considerations be made for each use of force incident review.

14.   It is also my opinion that CDCR needs to change its overall approach in caring for and treating its seriously mentally ill inmate population, including the way in which it keeps inmates housed in segregated environments with restricted housing, the manner in which it offers treatment and out of cell opportunities, the way in which it imposes discipline (such as requiring verbal persuasion and not force to deal with most incidents involving MHSDS inmates.) Without such changes to CDCR's approach, MHSDS inmate-patients will continue to be at risk of the imposition of discipline in circumstances where they were simply unable to understand or follow orders, or to conform their behavior given their mental condition.

**III.   SPECIFIC COMMENTS ON DEFENDANTS' PROPOSED REVISIONS**

15.   In addition to my overall opinions above, I make the following specific comments on aspects of the Defendants' Proposed Revisions to the DOM:

**51020.4 Definition of "Controlled Use of Force"**

16.   The definition of "controlled use of force" has been amended to suggest that the MHSDS status of an inmate-patient should be taken into consideration prior to the application of controlled use of force. However, this definition fails to give any guidance as to *how* staff are supposed to do so, or *which* staff members bear this responsibility.

17.   The death of Inmate X was referred for review because of "systemic concerns," relating in part to the lack of consultation prior to the deployment of OC spray against this

[1095888-1]

4

EXPERT DECLARATION OF ELDON VAIL

1  *Coleman* class member. (CCHCS Review at pp.2, 17, 19-23). In my opinion, such "systemic
2  concerns" are not adequately addressed by this proposed change. As I stated above, there needs to
3  be a fundamental and explicit change in CDCR policy to require multidisciplinary teams of
4  custody and mental health staff to make all decisions concerning the non-emergent use of force in
5  the treatment and care of MHSDS inmate-patients. Without this, a superficial definitional change
6  alone will not result in any meaningful substantive change.

7      18.     Further, controlled, rather than immediate, use of force should be mandated by
8  policy as the norm. The proposed revisions do not address this requirement. The policy could
9  include an affirmative statement that in incidents involving MHSDS inmates in which there is no
10  imminent threat to the safety of an inmate or staff, controlled force should be used rather than
11  immediate force.

12      19.     The definitions section of the DOM also does not make any change to the
13  definition of "immediate use of force " or when it would be appropriate to employ. There
14  continues to be insufficient guidance as to what constitutes an "imminent threat to
15  institution/facility security or the safety of persons." In my view, this still presents great risk for
16  the arbitrary application of force against MHSDS inmates, in circumstances where verbal
17  persuasion or controlled use of force would be preferable. Indeed, in my opinion, if CDCR
18  custody staff had been effectively trained in, and encouraged to use, these alternative techniques, it
19  may have been possible to prevent the death of Inmate X at Mule Creek State Prison.

20      20.     Indeed, as I have previously testified, force should be employed against MHSDS
21  inmate-patients as infrequently as possible and only where absolutely necessary. That needs to be
22  stated as official policy so it is clear to all involved staff and administrators.

23      21.     In addition, I believe that -- even in the case of immediate force -- uninvolved staff
24  should make an effort to film the use of force incident whenever possible.

25  **51020.6 - Use of Restraints**

26      22.     The proposed revisions to this section continue to permit the use of the so-called
27  "safety" triangle. I believe this policy should be reconsidered and revised. There are safer
28

[1095888-1]

5

EXPERT DECLARATION OF ELDON VAIL

methods to avoid losing control of handcuffs. In my experience, control of handcuffs can be safely and efficiently ensured through the use of a tether or lanyard. Not only are tethers or lanyards used more commonly, they are also preferable because they are safer for custody staff to use them (as they are easier to control).

23. In any event, it is my opinion that the triangle should not be permitted for MHSDS inmates. The court saw graphic video evidence that the triangles are misused in applications of force against prisoners with mental illness, as they were in the case of Inmate A when he was chained to the cell door, but also in the case of Inmate E, who was led by the triangle outside the cell in a manner that is inconsistent with safe practices and was inhumane. In both instances, the use of the triangle resulted in unsafe and abusive practices that put in jeopardy the safety of both the inmate and the staff involved in the incident.

**51020.11.2 - Food/Security Ports**

24. It is my opinion that there is simply no need for a policy exception that permits immediate use of force to secure a food port. The policy language for immediate or controlled use of force should be developed to be sufficient for every circumstance and there should not be an exception for the food ports. It is my opinion that this historical exception has sanctioned, approved and encouraged the immediate use of force in situations where it is not necessary. The result has helped to create the culture where the CDCR relies on immediate use of force rather than insisting upon the safer route of controlled use of force whenever possible. The incident that occurred at Mule Creek State Prison is a prime example of this culture. In doing so they miss the opportunity for situations to be de-escalated and the use of force might be avoided altogether.

25. Despite my opposition to the food port exception to continue to exist in policy, the examples provided in the revised policy for when the need for immediate use of force may arise should be better described. For example, stating that immediate use of force is permissible to secure a food port where "the inmate is battering or attempting to batter staff or inmates in the area" could include such non-dangerous circumstances as throwing an empty plastic cup through

the food port. Such an incident falls within the definition of an attempted battery, but it is equally clear that immediate force should not be used in this circumstance.

26. It is my opinion that the proposed changes are also inadequate insofar as they do not specifically provide for out-of-cell decontamination following deployment of OC spray against MHSDS inmate-patients in all circumstances. There should be an explicit policy directive that if OC spray is used, inmates (including those with mental illness) are to be decontaminated outside their cell after exposure, unless the inmate refuses. In the case of refusals medical staff should be required to instruct inmates on how best to decontaminate themselves while in the cell. This is critically important to ensure there are no health or other complications that could lead to more severe problems later.

**51020.12 - Controlled Use of Force General Requirements**

27. None of the proposed changes specifically address or attempt to resolve the key issue in this case, namely, how custody staff are supposed to work with mental health staff in the care and treatment of MHSDS inmate patients. This is most graphically illustrated as it concerns the care and treatment of decompensating mentally ill inmates who need to be extracted or removed from their cells "for their own good."

28. The proposed changes do not create the expectation for staff to creatively problem-solve to avoid using force. For instance, in the case of Inmate E who needed to be forcibly extracted from a holding cell because he believed he was unjustly placed on Management Status, staff (especially mental health staff) should have been empowered and expected to find a solution that could have addressed his legitimate concern that he was being treating unjustly without the need to use force. The policies should be revised to include requirements for staff to receiving on-going and intensive training in creative problem-solving when dealing with MHSDS inmates. These requirements should specify the kind of training that custody officers will receive and the kinds of verbal prompts that should be deployed. Repeatedly ordering a mentally ill inmate who may be hallucinating or otherwise suffering a detachment from reality to "cuff-up or else" is not

helpful and has led to unnecessary and excessive force and consequent discipline that has the effect of punishing the inmate for being mentally ill.

29. It is my opinion the CDCR should be required to develop a team custodial-clinical approach in EOP, MHCB, inpatient units, and other units housing *Coleman* class members. This would include continuous and extensive training for both custodial and clinical staff on strategies for managing inmate-patients (including the correctional officers' responsibility to foster a treatment environment in the living unit, how mental health and custody staff are to communicate to help inmates better manage the symptoms of their mental illness, Management of Assaultive Behavior techniques, legal standards for administration of involuntary medication, and the consideration of mental health in the disciplinary process). I believe that the proposed changes simply do not address any of these important concerns.

30. The recent example of Inmate X at Mule Creek State Prison perfectly illustrates the need for interdisciplinary consultation prior to any controlled use of force incident involving an MHSDS inmate-patient. As the CCHCS Review in to the death of Inmate X identifies, the further investigation was necessitated because of "systemic concerns," relating in part to the use of OC spray for an MHSDS inmate, who also had significant medical comorbidities. (CCHCS Review at p. 2). The Suicide Report also notes that custody staff repeatedly refused orders from medical staff to extract Inmate X for decontamination. (*See* Suicide Report at pp. 15, 17, 19)  Had there been adequate interdisciplinary consultation prior to -- or even after -- the deployment of OC spray, it is possible that this tragic death could have been avoided.

31. It is my opinion that any revisions to CDCR's use of force policies should also include a mandate for incident commanders and onsite managers to work together with mental health professionals before using force against MHSDS inmate-patients. Steps should be taken in all cases, except true emergencies, to involve custody and mental health staff who have worked with and are knowledgeable of the inmate. For example, before initiating controlled use of force, the incident commanders and onsite managers should attempt to determine existing custody and

non-custody staff relationships that the inmate may have in deciding how to proceed with the least amount of force necessary to address the situation.

### 51020.12.1 - Controlled Use of Force-Video Recording Requirements

32. The proposed revisions do not make any changes to the video recording requirements in the event of an immediate use of force incident. The policy should mandate video recording requirements by an uninvolved staff member as soon as possible during an immediate use of force incident begins.

33. The policies should include a requirement that the briefing given by the Incident Commander should be recorded, and there should not be a prohibition on the recording of the actual clinical intervention between the licensed mental health practitioner and the inmate-patient.

34. The video recording should be continuous right up until the point at which the inmate-patient is placed in a holding cell/area or is re-housed.

35. The IERC should also be mandated to watch all of the videos as part of their review of the incident and to ask questions that go to the underlying need to use force in the first instance and whether there were any breakdowns in the system that can be addressed to better handle the situation to begin with.

### 51020.12.2 Controlled Use of Force Involving the Seriously Mentally Ill

36. The proposed change to this section includes an expansion of the category of inmates covered by this policy to "any inmate who is acting in a bizarre, unusual, uncharacteristic manner." However, this new category is not defined in any meaningful way by the policy, nor does it adequately specify *who* is supposed to make this judgment, or on what basis. I am aware that application of the "bizarre, unusual, uncharacteristic behavior" category has been tried before in the context of determining whether an inmate-patient should receive a mental health evaluation following assessment of a rules violation. I understand that application of this category has been inconsistent at best and put to use very infrequently. The policy should mandate a multi-disciplinary approach, incorporating clinical intervention, for all controlled use of force incidents. The policy should cover all MHSDS inmates, including those in designated at the CCCMS level

of care. Such changes would, in my opinion, be of substantial help in preventing deaths such as Inmate X occurring in future.

37. The revised policies also do not take the step that, in my opinion, the CDCR must most urgently implement: limiting the ready access to OC spray in units housing mentally ill inmate-patients. Specifically, I believe that crowd control size OC spray and expandable batons have no place on the belts of custody staff who work in units where mentally ill inmate-patients are housed. Ready availability translates to ready (and potentially unnecessary and excessive) use. In my opinion, and as I have previously testified, inmate-patients with serious mental illness can be safely and appropriately managed in these already restricted environments without the types or levels of force currently used by CDCR.

38. The policy should also require staff to consider and use alternatives to use of force in the first instance, and should expand staff training to include documented attempts at verbal persuasion prior to the deployment of controlled force, particularly against prisoners with mental illness. Finally, to the extent that the need for controlled force arises, staff must be trained in techniques that are commonly used in mental health hospitals across the country, such as the Management of Assaultive Behavior techniques, rather than being permitted, by policy, to deploy OC spray.

**51020.15 - Chemical Agents**

39. In my opinion, there is no need for OC spray to be used against MHSDS inmates unless there is an imminent and serious risk of to the safety of an inmate or staff.

40. Further, insofar as OC spray is permitted, only certain staff should have spray as a matter of course on their belts, and it should be limited to personal use canisters such as the MK3 or MK4. There is no evidence that the policy's current requirement that all custody staff use only MK9 crowd control canisters of spray is necessary or appropriate.

41. I note that the proposed revisions include an upper limit on the amount of spray and the number of multiple applications that can be deployed. However, this upper limit is still excessive. A three-second burst of crowd-control OC spray can have far more serious effects than

a three-second burst of OC spray from an MK3 or MK4. Further, although the revisions specify that there will be no more than four applications within a twelve-minute period, this amount still has the potential to permit unnecessary and excessive force against mentally ill inmates. This is particularly true in light of the substantial evidence before this Court that demonstrates the danger of reliance on OC spray in controlled use of force against MHSDS inmates; and the recent death of Inmate X in Mule Creek State Prison illustrates this perfectly.

42. In my opinion, this section should be revised to require the weighing of OC spray canisters at the beginning and end of each shift. There is really no other way to determine how much spray is being used in a given incident, and thus no other way to ensure appropriate review and accountability.

**51020.15.2 - Decontamination from Chemical Agents – General**

43. The decontamination provisions should mandate out of cell decontamination following the deployment of OC spray as the norm, and require that access to decontamination is provided as soon as possible after exposure to OC spray (or as manufacturers' recommendations evolve).

44. There should also be a requirement for the provision of (at the very least) eye-wash decontamination stations like those routinely used in industrial sites for use promptly following exposure to OC spray.

45. Also, to the extent that OC spray is allowed during incidents involving food ports, requirements for decontamination outside the cell should be specifically included.

46. The dangers of not implementing such changes is sadly perfectly illustrated by the recent death of Inmate X at Mule Creek State Prison. Had Inmate X been properly and thoroughly decontaminated following the exposure to OC spray, the circumstances leading to his death in custody may never have arisen. (*Cf.* CCHCS Review at p. 19).

**51020.17.3 - Video Records Made After Uses of Force That Cause Serious Bodily Injury, or Great Bodily Injury, or Result in Allegations of Unnecessary or Excessive Force**

[1095888-1]

11
EXPERT DECLARATION OF ELDON VAIL

47. This section needs to include a better description of the purpose of the video interviews. Staff assigned to conduct the interviews should receive mandatory training that prepares them to fulfill the appropriate role of the interviewer consistent with the purpose of the interview articulated in the policy.

48. The requirement of video recording should be not be restricted to custodial supervisors, but should also include mental health staff, especially for inmate patients.

### 51020.19.5 - Institution Executive Review Committee Monitoring Requirements

49. In my opinion, there needs to be a more substantive change to the role of the IERC and its ability to investigate use of force incidents. A credible use of force system in the correctional context requires meaningful oversight and review. As I have previously testified, the oversight and review of use of force against MHSDS inmate-patients is currently inadequate. However, the proposed revisions do not address any aspect of the IERC's role in reviewing and evaluating use of force incidents.

50. Mental health staff should be required to be integrated into the process of review, along with custody administrators. Until the responsibility for the management of this vulnerable population is shared at the highest levels of the institutions, it is unlikely that behavior with respect to uses of force at the line level will ever change. Disciplinary sanctions for mentally ill inmates need to ensure that inmates are not being punished for being unable to comply with custody demands. In other words, there needs to be further safeguards to include diversion for mental health reasons so that inmates are only punished for their volitional misconduct and not because of their illnesses, as remains the case across CDCR's system to date.

### IV. CONCLUSION

51. For the reasons outlined in this declaration, it is my opinion that the proposed revisions do not adequately account for the needs of MHSDS inmates in relation to use of force, in relation to both treatment and care, as well as to discipline of *Coleman* class members.

\\

\\

\\

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed in Olympia, WA on February 11, 2014.

_____
Eldon Vail