1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:      (510) 280-2621
4
5
6
7

   MICHAEL W. BIEN – 096891
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   LORI E. RIFKIN – 244081
   AARON J. FISCHER – 247391
   MARGOT MENDELSON – 268583
   KRISTA STONE-MANISTA – 269083
   ROSEN BIEN GALVAN & GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
   Telephone:      (415) 433-6830

8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:      (415) 882-8200

   CLAUDIA CENTER – 158255
   THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   180 Montgomery Street, Suite 600
   San Francisco, California  94104-4244
   Telephone:      (415) 864-8848

12  Attorneys for PLAINTIFFS

13  KAMALA D. HARRIS
    Attorney General of California
    JONATHAN L. WOLFF
14  Senior Assistant Attorney General
    JAY C. RUSSELL
15  PATRICK R. MCKINNEY
    Supervising Deputy Attorney General
16  DEBBIE VOROUS, State Bar No. 166884
    CHRISTINE M. CICCOTTI, State Bar No. 238695
17  MANEESH SHARMA, State Bar No. 280084
    Deputy Attorneys General
18    1300 I Street, Suite 125
      P.O. Box 944255
19    Sacramento, CA  94244-2550
      Telephone:  (916) 324-5345
20

21  Attorneys for DEFENDANTS

22             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF CALIFORNIA

23  RALPH COLEMAN, et al.,              Case No. 2:90-cv-0520 LKK DAD

24              Plaintiffs,             **JOINT STATEMENT CONCERNING
25                                       DISCOVERY**

26          v.                          Chief Magistrate Judge Dale A. Drozd:
                                        Courtroom 27
27  EDMUND G. BROWN JR., et al.,

28              Defendants.             Hearing Requested:

The parties submit this Joint Statement to address the remaining discovery disputes concerning the death of a class member (referred to as "Inmate D" or "Inmate X"), as required by this Court's February 5, 2014 order.

The parties met and conferred regarding these matters on Friday, February 14, 2014 and at the various depositions and have been unable to resolve their disputes.

**PLAINTIFFS' POSITION**

This Joint Statement addresses the following issues:  (1) Have Defendants improperly withheld all substantive information with regard to reporting of the suicide of Inmate X, drafts and discussions of the suicide report, and decision-making concerning the timing and disclosure of the suicide report and its relation to the Use of Force trial? (2) Have Defendants improperly limited their searches for and production of responsive documents to the time frame Oct. 1, 2013 to Nov. 7, 2013?  (3)  Does the Court's discovery order permit Defendants to omit emails to and from certain Deputy Attorneys General and/or CDCR in-house counsel?  (4) Must Defendants produce their documents in usable form?  (5) Have Defendants improperly instructed their witnesses not to respond to deposition questions based on the deliberative process privilege and the pendency of an OIA investigation?  (6)  Can Defendants refuse to produce Dr. Tim Belavich, Dr. Amy Eargle, and Michael Stainer for deposition?[1]

The stonewalling must stop.  Defendants have produced essentially nothing in response to this Court's discovery order relative to the suicide of Inmate X.  Of the 93 pages that Defendants provided, 47 pages are scheduling notices with no content; 23 pages are a copy of the final January 7, 2014 Suicide Report (which, of course, was already public record).  Confidential Declaration of Krista Stone-Manista, filed herewith ("Stone-Manista Decl.") ¶¶ 4 &12 & Ex. J.  The remaining material, after accounting for duplicates, consists of seven emails from which either all substantive content has been redacted, the pertinent attachments have been withheld, or both.  Stone-Manista Decl. Exs.

---

[1] Plaintiffs no longer seek to depose Mr. Hoshino.

C-I at IMD 0001, IMD 0035, IMD 0036, IMD 0037, IMD 0040, IMD 0041-42, IMD 0092-93. No privilege log has been provided for the redactions. The privilege log that Defendants did provide identifies the withheld attachments – several drafts of the Inmate X suicide report – as being covered by the "deliberative process" privilege.

Withheld attachments are drafts of the Inmate X suicide report that were emailed on October 7, 2013 (IMD 0001), October 11, 2013 (IMD 0002), October 22, 2013 (IMD 0005, IMD 0037), and October 24, 2013 (IMD 0042). *See id.* Redacted material is from emails during the critical period in October 2013 when the Inmate X report was being edited, while at the same time the issues of whether pepper spray could cause injury and death were being litigated before this Court. The unredacted portions show that the subject matter of the removed material concerns the reasons why authors and other participants were directed to edit the suicide report during this critical time period. *See id.* at IMD 0004, IMD 0036, IMD 0040.

By refusing to produce drafts of the suicide report and by making redactions with respect to the substance of communications regarding the contents of those documents, Defendants have withheld all substantive information as to the reasons why they removed the pepper-spray findings from the final document. This outright defies the District Court's determination that these are proper subjects for discovery.

Moreover, material that Defendants have produced or logged bear dates from October 7, 2011 (IMD 0001) to November 1, 2013 (IMD 0093), with the exception of the final January 7, 2014 Suicide Report. Defendants have produced and logged nothing at all from the date of death, September 7, 2013, to October 7, 2013 (it is undisputed that Deputy Attorney General Vorous notified the Special Master of the death on September 12, 2013), and nothing between November 1, 2013 and January 7, 2014. There is no justification for failing to provide discovery of materials created, sent, and/or received during these time frames.

The information already produced shows that the highest levels of CDCR and their attorneys, including the Deputy Attorneys General working on the Use of Force trial, were

2

1   made aware of the death almost immediately and early drafts of the Suicide Report –

2   including all of the details potentially relevant to matters in dispute in that proceeding –

3   were circulated to the highest levels of CDCR, including Secretary Beard and

4   Undersecretary Hoshino, and to CDCR Legal, by October 24, 2013.  Stone-Manista Decl.

5   Ex. B at IMD 0042. Defendants have failed to disclose any information as to who knew

6   what about the incident and when they had such knowledge, what was communicated

7   between CDCR officials (including their attorneys) about the death, and whether these

8   discussions, communications and directions included references to the Use of Force trial

9   then in progress.   It is also apparent that the Suicide Report continued to be edited and

10  changed, and decisions about whether or not to disclose it continued to be made,

11  throughout November, December and even in to January, 2014.

12        Finally, Defendants have repeatedly refused to allow CDCR officials who

13  participated in the preparation of the Suicide Report to provide testimony about what

14  happened and why.  Dr. Corey Scheidegger, Ms. Kathleen Allison and Ms. Judy Burleson ,

15  CDCR officials who participated in the events at issue and who have the ability to answer

16  the Court's questions were improperly instructed *not* to provide those answers while under

17  oath, in properly noticed depositions, based on an assertion of  deliberate process privilege

18  or "the pending OIA investigation."  Now, Defendants say they will not even produce two

19  of the top managers of CDCR's mental health system, and the head of CDCR's custody

20  branch, for deposition.

21

22  **I.     Deliberative Process Privilege Does Not Apply**

23        The issue on which the Court opened discovery is whether the Defendants and their

24  counsel decided to withhold material information during the evidentiary proceedings on

25  use-of-force.  There is no "deliberative process" privilege that shields deliberation over

26  whether to suppress evidence.  *See Texaco Puerto Rico Inc., v. Department of Consumer*

27  *Affairs,* 60 F.3d 867, 885 (1st Cir. 1995) (deliberative process privilege is "routinely

28  denied" where "the documents sought may shed light on alleged government

1  malfeasance.")  Plaintiffs and the Court are entitled to full disclosure of any

2  communications regarding the decision to block investigation into the use of pepper spray

3  on Inmate X, and any communications regarding decisions to withhold the fruits of such

4  investigations from Plaintiffs, the Special Master and the Court.

5          Nor does the deliberative process privilege shield draft Suicide Reports.  The

6  privilege applies only to "advisory opinions, recommendations, and deliberations

7  comprising parts of a process by which government decisions and policies are being

8  formulated."  *Coleman v. Schwarzenegger*, 70 Fed. R. Serv. 3d. 1000, 2008 WL 2237046

9  at *4 (E.D. Cal. May 29, 2008).  The purpose of this qualified privilege is to protect

10 against premature disclosure of policy decisions while they are still under consideration.

11 *Id.*  A document is "deliberative" if it includes opinions and recommendations "on legal

12 and policy matters" under consideration by the agency.  *Coleman v. Schwarzenegger*, 2008

13 WL 2732182 at *3 (E.D. Cal. July 8, 2008).  Defendants cite to *National Wildlife Fed'n v.*

14 *U.S. Forest Serv.*, 861 F.2d 1114 (9th Cir. 1998) without acknowledging that case's

15 requirement that documents sought to be protected must involve "matters of law or

16 policy," *id.* at 1116, because the privilege is intended to protect deliberations "among

17 agency members in the formulation of policy," *id.* at 1117.  The draft documents protected

18 in *National Wildlife* were drafts of high-level policy documents incorporating significant

19 agency judgments and decisions, not routine reports.  *See id.* at 1120-21.

20         The privilege protects only documents and information that are predecisional, and

21 the agency must "identify a specific decision to which the document is predecisional."

22 *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997).

23 Defendants have identified no such "decision" beyond the final suicide report itself.  Under

24 Defendants' circular interpretation, every single government report and document would

25 be protected by the deliberative process privilege because every such report and document

26 reflects "decisions" about its contents.

27         Defendants' reliance on *United States v. Fernandez,* 231 F.3d 1240 (9th Cir. 2000),

28 is misplaced.  *Fernandez* concerned death penalty prosecution decisions made at the

[1105618-1]

1   highest levels of the United States government.  By contrast, the issue now before the

2   Court involves clinical evaluation of the factors that led to a suicide, not high-level policy

3   decisions about whether and how to invoke the government's most coercive criminal

4   justice powers.  Moreover, *Fernandez* states that "'facts and evidence' are not protected by

5   the deliberative process privilege." *Id.* at 1246.  The issue in this dispute is whether

6   Defendants withheld facts and evidence that were relevant to the use of force proceedings.

7   Defendants have made no showing that facts and evidence discussed in the draft Inmate X

8   report were somehow "interwoven" with deliberative material such that any deliberation

9   material could not be redacted.

10          Similarly, *Maricopa Audubon Society v. United States Forest Service,* 108 F.3d

11  1089 (9th Cir. 1997), undermines Defendants' position rather than supporting it.  In

12  *Maricopa*, the court specifically rejected the government's contention that the

13  "deliberative process" included regular audits of government activity.  *Id.* at 1094.

14  Applying deliberative process to every government audit, just because the audit might lead

15  to a decision in the future, was a "serious warping" of the concept.  *Id.*  Instead, the

16  government must "identify a specific decision to which the document is pre-decisional."

17  *Id.*  Defendants here refused to identify the "specific decision" on which they were

18  deliberating.  The only fact offered by Defendants in support of the "predecisional" nature

19  of the material being withheld is precisely the same one rejected in *Maricopa:* to wit, that

20  the documents were part of a process of making "recommendations for improvement as a

21  result of the investigation."  Stone-Manista Decl. Ex. K, Belavich Decl. (served by Defs.

22  on 2/14/14), ¶ 3.

23          *Nevada v. U.S. Dep't of Energy,* 517 F. Supp. 2d 1245 (D. Nev. 2007), does not

24  support assertion of the privilege in fact-finding reports.  The deliberations in *Nevada* were

25  not about fact-finding in an individual case, but about a major national policy decision on

26  long-term storage of nuclear waste.  *Id.* at 1265.  The drafts at issue in *Russell v. Dep't of*

27  *the Air Force,* 682 F.2d 1045 (D.C. Cir. 1982) are in no way comparable to the draft

28  Inmate X reports.  The *Russell* drafts concerned deliberation over "future military and

[1105618-1]

1  public policy decisions" regarding military strategy and tactics.  Neither of these cases

2  support an unprecedented expansion of "deliberative process" to cover agency deliberation

3  over what to reveal to this Court during the use-of-force trial.

4          Defendants have withheld not only documents but also extensive deposition

5  testimony on the basis of their groundless assertion of the deliberative process privilege.

6  Plaintiffs have taken only three depositions thus far—that of Dr. Corey Scheidegger, for

7  less than two hours on February 12, 2014, Ms. Kathleen Allison for three hours on

8  February 18, 2014 and Ms. Bramble for less than two hours on February 18, 2014.  During

9  Dr. Scheidegger's deposition, defense counsel instructed the witness not to answer six

10  questions.  Stone-Manista Decl. Ex. M (Transcript at 23 (asked for example of comment

11  removed from Oct. 7, 2013 version of Suicide Report), 25 (asked for subject matter of

12  material removed from same), 28 (asked whether a decision was made at Oct. 31, 2013

13  meeting to remove food port pepper spray recommendation from report), 29-30 (asked to

14  state reason that Ms. Burleson gave for ordering removal of food port pepper spray

15  recommendation from report on October 31, 2013), 34 (asked what Ms. Burleson and Ms.

16  Allison said on January 6, 2014 when they directed Dr. Scheidegger to remove

17  recommendations from the report).  During Ms. Allison's deposition, she was instructed

18  not to answer five questions.  Stone-Manista Decl. Ex. P at 62 (asked why death not

19  deemed suicide), 70 (asked what happened in January), 72-73 (asked about removal of

20  material from report), 79 (asked why death not considered suicide), 89-90 (asked about

21  significance of Inmate X pulling on stoma prior to death) .  Similarly, during her

22  deposition, Ms. Burleson was instructed not to answer eight questions by reference to the

23  deliberative process privilege , and two questions by reference to a pending OIA

24  investigation.  Stone-Manista Decl. Ex. Q at 29 (asked what was taken out of the draft

25  report and what incorrect references were deleted from the draft report), 30 (asked what

26  clarifying questions were asked in relation to the draft report), 33 (asked why the

27  recommendation for revision of OC spray policies was removed), 33 (asked who else made

28  the OC spray recommendation), 34, 36-37 (asked what "generic" recommendations are

6

[1105618-1]

always deleted from reports), 41 (asked what quality improvement plan points were removed); *id.* at 24-27 (not permitted to answer regarding why Inmate X's death concerned her on OIA investigation grounds); 50-51 (asked whether guard's refusal to open door should be referred for criminal investigation).  Each of these questions goes to the heart of the subject on which the Court has ordered discovery.  Dr. Scheidegger testified that she was instructed by high officials in CDCR—Judy Burleson and Kathy Allison—to remove pepper spray recommendations from the Suicide Report, including on October 31, 2013, while at the very same time this Court was conducting an evidentiary hearing on issues that included the potential harms of pepper spray.  Such instructions by Ms. Burleson and Ms. Allison to remove this information from a report being drafted for the Court's Special Master during this period have nothing to do with setting government policy, but rather with whether information regarding a September 2013 pepper spray death would be available for the Court's timely consideration.

Defendants assert that the Plaintiffs should have asked narrower questions, avoiding all inquiry into the reasons that high officials ordered changes in the draft reports.  Defendants instead would like to dictate the questions that Plaintiffs can ask their witnesses so that the only possible answer is "No, we did not change the report for litigation purposes."  Discovery under the Federal Rules is not a matter of gamesmanship, but rather a search for the truth.  The Court, having opened discovery on serious questions about why the reports were changed, is entitled to receive full and candid testimony about the events, not a canned denial of wrongdoing.  The Court already heard and received such canned denials at the January 30, 2014 status conference, and in Defendants' motion for reconsideration, and rejected them.  Discovery should not be turned into a futile exercise in which Defendants block all testimony other than conclusory denials of wrongdoing.  The Court is entitled to hear the actual reasons that the reports were changed, and to weigh the credibility of those reasons against the documentary and other evidence.

Defendants have also failed to make the requisite showing to demonstrate that they are entitled to the protection of the deliberative process even if the Court were to find that

it applies here.  Assertion of the deliberative process privileges requires:

> • a formal claim of privilege by the "head of the department" having control over the requested information;

> • assertion of the privilege based on actual personal consideration by that official; and

> • a detailed specification of the information for which the privilege is claimed, with an explanation of why it properly falls within the scope of the privilege.

*Allen v. Woodford*, 2007 WL 309945 at *4 (E.D. Cal. Jan. 30, 2007); *see also L.H. v. Schwarzenegger*, 2007 WL 2009807, at *2 (E.D. Cal. July 6, 2007); *United States v. Rozet*, 183 F.R.D. 662, 665 (N.D. Cal. 1998) (noting that the deliberative process privilege may be invoked only "by the head of the department after actual personal consideration" of the allegedly privileged information).  Nearly 48 hours after the deadline for production, Defendants served a conclusory declaration executed by Tim Belavich, the Acting Director of the Division of Health Care Services for CDCR, together with a privilege log that identifies some of the documents withheld by name but offers no indication as to the "information for which the privilege is claimed."  *See* Stone-Manista Decl. Ex. K.  Dr. Belavich's generalized and non-specific description of information withheld and his umbrella assertion that "[e]ach document played a role in CDCR's decision making process" are not sufficient.  *See id.* ¶ 3.  The declaration makes no reference to the questions that Dr. Scheiddeger was instructed not to answer during her deposition, or offer any justification for the application of the privilege to those questions.  *See id.*  Nor does Defendants' privilege log provide the required specific explanation of why the information sought to be protected falls within the scope of the privilege.  *See* Stone-Manista Decl. Ex. L. The privilege log also does not permit the Court to determine whether the various "drafts" and "edits" were even part and parcel of the creation of the final suicide report – which, as discussed above, would not itself qualify as a government "decision" to which these discussions were "predecisional."

Even if Defendants had made the requisite *prima facie* showing for application of the deliberative process privilege, which they have not, the privilege is only a qualified

[1105618-1]

1   one; it should yield in exactly such circumstances as those here, where the very nature and

2   outcome of government discussions is the critical issue before the Court. "A litigant may

3   obtain deliberative materials if his or her need for the materials and the need for accurate

4   fact-finding override the government's interest in non-disclosure." *FTC v. Warner*

5   *Comm'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). Each of the factors set forth in *FTC*

6   for overcoming the deliberative process privilege weighs in Plaintiffs' favor: (1) the

7   evidence is highly relevant to, indeed the very thing for which, the Court reopened

8   discovery into the suicide of Inmate X; (2) there are no other means by which Plaintiffs

9   can obtain this evidence; (3) the government is not a tangential party, but itself a defendant

10  in the litigation; and (4) the disclosure would not hinder government decision-making

11  processes, because there is no broader government decision at issue here. *See id.* In

12  addition, Plaintiffs and the public have an interest in the higher order into the reasons why

13  information about Inmate X's death was withheld, and the issues presented by this death

14  are gravely serious. *See L.H.*, 2007 WL 2009807, at *2.

15      Defendants in this Joint Statement are again making factual assertions regarding the

16  contents of the draft reports at various times, while attempting to hide the documents

17  themselves behind the deliberative process privilege. They claim that it is "undisputed"

18  that the relevant recommendations were not removed from the report until January 2014.

19  No one can test this assertion without reviewing the prior drafts. Defendants cannot at the

20  same time ask the Court to decide the issues in this matter based on assertions of what was

21  in the reports while at the same time hiding the actual drafts from the Court.

22      Plaintiffs request that the Court compel Defendants to immediately produce those

23  documents they have wrongfully withheld on the basis of an insupportable assertion of the

24  deliberative process privilege. Plaintiffs also request that the Court permit Plaintiffs to

25  reopen Dr. Scheidegger's deposition, by telephone if necessary, to obtain responses to the

26  questions she was instructed not to answer pursuant to the deliberative process privilege,

27  given that Defendants have made no showing that the privilege should apply to the

28  information sought by these questions.

1    Even if the Court were to entertain Defendants improperly substantiated claims of

2    deliberative process privilege, *in camera* review is necessary.  Prior decisions of this Court

3    have shown that the Defendants have a very loose definition of "deliberative process,"

4    causing them to be sanctioned in the past for claiming the privilege with regard to

5    documents that did not remotely qualify for protection.  *See Coleman v. Schwarzenegger*,

6    2008 WL 4415324 (E.D. Cal. Sept. 25, 2008).  At least as to the relatively small set of

7    items being withheld—the draft reports, emails, and email redactions, *in camera* review is

8    more than justified to assess Defendants' assertions.  The important inquiry is whether

9    disclosure of a document exposes "an agency's decision-making process in such a way as

10   to discourage candid discussion within the agency and thereby undermine the agency's

11   ability to perform its functions." *Assembly of the State of Cal. v. U.S. Dep't of Commerce*,

12   968 F.2d 916, 920 (internal citation and quotation omitted).  Where documents and

13   information, such as the draft and final suicide reports and related materials sought here,

14   form no part of a broader agency decision-making process, these concerns are not

15   implicated and the privilege should not apply.

16   **II.    Attorney-Client and Attorney Work Product Protections Do Not Apply**

17       **A.    Defendants Have Refused to Answer Requests Regarding When Their**
            **Attorneys Knew about the Pepper Spraying of Inmate X.**

18

19       Plaintiffs candidly and completely answered Defendants' discovery requests

20   regarding what Plaintiffs' counsel knew about the pepper spraying of Inmate X from

21   September 12, 2013 through February 3, 2014. *See* Stone-Manista Decl. Ex. O, Pls'

22   Discovery Resp. (served 2/12/14).  By contrast, Defendants have refused to even search for

23   information regarding Plaintiffs' reciprocal requests.  Information already produced shows

24   that the highest levels of CDCR and their attorneys, including the Deputy Attorneys

25   General working on the Use of Force trial, were made aware of the death almost

26   immediately and early drafts of the Suicide Report including all of the controversial details

27   were circulated to the highest levels of CDCR, including Secretary Beard and

28   Undersecretary Hoshino, and CDCR Legal, by October 24, 2013.  *See* Stone-Manista Decl.

[1105618-1]

1   Ex. H at IMD 0042. Defendants have failed to disclose any information as to who knew

2   what about the incident and when, what was communicated among CDCR officials

3   (including their attorneys) about the death, and whether these discussions, communications

4   and directions included references to the then ongoing Use of Force trial.  The Court is

5   entitled to know whether Defendants' counsel (in-house and outside counsel) were also

6   aware of the pepper spraying of Inmate X at or around this same time – while they were

7   presenting witnesses to this Court who claimed not to know about pepper-spraying related

8   deaths.

9         Instead, however, Defendants have flouted this Court's discovery order, conducting

10  no searches of their counsel's emails, and providing no privilege log from which any

11  claims of attorney-client privilege or work product protection could be evaluated.

12  Defendants should be ordered to immediately search the emails of the Deputy Attorneys

13  General and in-house counsel assigned to this case, and to produce responsive documents.

14        **B.    Neither the Attorney Client Privilege Nor the Work Product Doctrine**
          **Applies to Communications With a Client in Furtherance of Plans to**
15        **Suppress Evidence.**

16        There is no attorney client privilege with respect to communications about

17  suppressing material evidence.  *Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D.

18  280, 289 (E.D. Va. 2004).  Attorney-client privilege exists in order to advance the

19  observance of law and the administration of justice.  *Id.*  Communications between lawyer

20  and client respecting the destruction or suppression of evidence is "fundamentally

21  inconsistent" with these interests, and therefore is not privileged.  *Id.*; *see also Gutter v.*

22  *E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 198 (S.D. Fla. 2000) (noting that the

23  crime/fraud exception applies where there is litigation "misconduct fundamentally

24  inconsistent with the basic premises of the adversary system").

25        Defendants' privilege log contains six entries asserting attorney client privilege or

26  work product protection which should be assessed in this regard. Stone-Manista Decl. Ex.

27  L.

28

**1.    IMD 0138, Oct. 19, 2013 Email from Gilevich to Gilevich, Subject Line: Suicide at MCSP**

The privilege log provides no information about the content of this email other than a bare assertion of work product status.  The email was sent after Dr. Bramble (the primary reviewer of the Inmate X suicide) had already written two drafts of the report (Oct. 7 and Oct. 11, 2011).  By October 19, the Use of Force trial had been underway for five days, and had been preceded by weeks of litigation over whether videos which showed incidents of  pepper-spraying could be shown, and whether exemplars of pepper spray canisters could be brought into court.  (Dkt. Nos. 4797, 4833, 4836.)  The Court is entitled to know whether this email sent on October 19, 2013 had any bearing on efforts to prevent the Court from finding out about pepper-spraying details contained in earlier drafts of the Inmate X suicide report.  Even if work product might conceivably apply, this is the paradigmatic case in which such protection must yield because there is no other way to obtain evidence on the issue of whether Defendants' extraordinary efforts to remove pepper-spraying recommendations were for the purpose of hiding the information from this Court.  *See Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("work-product materials . . . may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship"); Fed. R. Civ. P. 26(b)(3)(A)(ii).

**2.    IMD 0272-274, Oct. 24, 2013, Byron Russell to Gilevich, "FW Notification of Inmate Suicide, Inmate X"**

The privilege log says nothing about this email, other than that it was a communication from a "client" to counsel.  This is not sufficient for the Court to determine whether this communication was to further the purpose of hiding the pepper-spraying information during the evidentiary hearing that on the date involved (October 24, 2013) was entering Day Eight.

**3.    IMD 0344-364, Oct. 28, 2013, Gilevich to Weber, Subject Line: "FW Duran's Report."**

As with IMD 0272-274, the log entry is inadequate to determine whether this

[1105618-1]

1   communication was for a proper purpose.  In addition, the Bates numbers show that this

2   document is 21 pages long, and the subject line indicates that it includes a draft of the

3   Suicide Report.  Sending a document to an attorney does not make the document

4   privileged.  *See United States v. Judson*, 322 F.2d 460, 463 (9th Cir. 1963) (documents that

5   are not privileged when created do not become privileged by virtue of transmission to

6   attorney).

> **4.    IMD 0365-387, Oct. 28, 2013, Gilevich to Weber, Subject Line,**
> **FW: Inmate X Suicide Report.”**

8   This is another transmission of a draft report—the sending of which to an attorney

9   does not make it privileged.  *See Judson*, 322 F.2d at 463.

> **5.    IMD 0462-463, Nov. 6, 2013, Bill Davies to Scheidegger and**
> **Bramble, Subject Line:  “[Inmate X].**

> **6.    IMD 0464-0466, Nov. 7, 2013, Scheidegger to Davis and Bramble,**
> **Subject Line:  “[Inmate X].**

13  Bill Davies is an in-house CDCR lawyer.  Stone-Manista Decl. ¶ 22.  The email

14  exchange above, taking place on November 6 and 7, 2013, occurred just as the 60-day

15  deadline for the Inmate X suicide report was expiring.  According to Dr. Scheidegger’s

16  deposition testimony, she had been instructed by Ms. Burleson to remove material from

17  the draft report on October 31, 2013.  *See* Stone-Manista Decl. Ex. M (excerpts of

18  transcript of 2/12/14 Deposition), at 29:7-20, 30:8-16.  She was also told on October 31,

19  2013 to “hold off on making any further changes to the report” – that is, to cease working

20  on it entirely – an instruction she had never before received during any previous suicide

21  review process.  *Id.* at 41:2-9, 42:6-17.  The decision not to produce any report at all on

22  the November 7, 2013 deadline goes to the heart of the issues before the Court.  There is

23  no attorney-client privilege relative to communications furthering a plan to prevent the

24  Court from receiving relevant, material information.  *Rambus, Inc. v. Infineon*

25  *Technologies AG,* 222 F.R.D. 280, 289 (E.D. Va. 2004).

26  **III.    Defendants Are Not Entitled to Limit the Relevant Time Period for Discovery**
       **to October 7 through November 1, 2013.**

28  Having lost their motion for reconsideration by the District Court, Defendants are

[1105618-1]

1    now attempting to circumvent the Court's orders opening discovery by unilaterally setting

2    a time limit – namely, that any communication after November 7, 2013 is off limits.  This

3    restriction has no support in the Court's orders.  *See* Stone-Manista Decl. Ex. B, Defs'

4    2/12/14 Disc. Resp. & Objs. ("Defs.' Objs."), at 1 ("Defendants further object to any

5    requests seeking documents, communications, or information beyond November 7, 2013

6    on the grounds that they are overbroad and seek information not relevant to this matter.").

7    The purpose of this discovery is to determine how and why relevant information

8    concerning the death and suicide review process for Inmate X was withheld from Plaintiffs

9    and the Court.  Defendants' failures to provide this information did not end on November

10    7, and discovery regarding it does not end on that date either.  Defendants' privilege log

11    contains only entries from October 1, 2013 through October 24th, 2013.  Stone-Manista

12    Decl. Ex. L.

13        Defendants have, with no justification, refused to produce any substantive

14    documents or information regarding the suicide review process commenced, and then

15    halted, in the aftermath of Inmate X's death.  The Court has not limited discovery about

16    these events to only communications that occurred during the October evidentiary hearing.

17    Such a limitation makes no sense.  First, the relevant proceedings did not end at the close

18    of evidence.  Briefing continued, with closing post-hearing briefs filed on November 15,

19    2013.  (Dkt. Nos. 4933 & 4935).  Thereafter, Defendants received the benefit of the record

20    remaining open for consideration by the Court of their proposed new Use of Force

21    policies, and Plaintiffs filed their brief on those policies on February 12, 2014.  (Dkt. No.

22    5065.)  As Defendants' addition of new evidence after November 7 (in the form of

23    proposed new policies) demonstrates, the Court should have the benefit of all relevant and

24    material information in determining the shape and scope of the remedy required here.

25    Second, people often communicate about past events.  As a result, communications which

26    took place after November 7 about decisions to not disclose the material apparently made

27    before November 7, during the evidentiary hearing itself, are responsive.  Decisions to

28    modify and alter the Suicide Report apparently continued to be made in late November,

1  December and early January.  Discovery concerning these changes and the reasons for

2  them are well within the scope of the Court's order.

3  In addition, there is no justification for withholding information arising prior to

4  October 1, 2013.  Inmate X died on September 7, 2013, and the Attorney General sent a

5  death notification on September 12, 2013.  Also on September 12, the parties filed their

6  motions in limine for the Use of Force trial.  (Dkt. Nos. 4793-4799).  Trial briefs were

7  filed on September 23, 2013.  The dangers of pepper spray were thus clearly at issue

8  before this Court from the very beginning of the Inmate X suicide investigation.  There is

9  no basis for Defendants' arbitrary decision to limit their production to times after October

10  1, 2013.

11  **IV.  Defendants Must Be Required to Produce Emails and Attachment in Native Form with Metadata Intact**

12  This dispute concerns the time and dates on which information was known and

13  circulated and the author or authors of any modifications or changes to the Suicide

14  Reports.  It is thus critical that electronic documents be produced in native form with

15  metadata intact so that the time of creation, the author and modification can be analyzed.

16  *See Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland Sec.*,

17  255 F.R.D. 350, 354 (S.D.N.Y. 2008) ("metadata is relevant . . . if establishing 'who

18  received what information and when' is important to the claims or defendants of a party").

19  Plaintiffs produced their discovery to Defendants in native form with all metadata intact.

20  Stone Manista Decl. ¶ 17 & Ex. N.  Defendants must be required to do the same.

21  **V.  There is No Basis to Shield Dr. Eargle, Dr. Belavich, or Michael Stainer from Depositions.**

22

23  Dr. Eargle is the Chief Psychologist of the Clinical Support Unit of CDCR's Health

24  Care Services Department.  Dr. Scheidegger reports to Dr. Eargle, and Dr. Eargle reports

25  to Ms. Burleson.  Dr. Eargle took part in the decision to remove recommendations from the

26  Inmate X suicide report.  (Stone-Manista Decl. Ex. P (Allison Tr.). at 104-105; *id.* Ex. Q

27  (Burleson Tr.) at 13-14.)  Dr. Eargle thus can be expected to have relevant information as

28  to why material was removed from the reports.

1    Dr. Belavich is the Acting Director of the Division of Health Care Services.  It is

2    undisputed that the instructions to remove material from the Inmate X report came from

3    high levels in CDCR.  The Court is entitled to Dr. Belavich's testimony regarding his role

4    in and reasons for these decisions.  Dr. Belavich also has provided two declarations on

5    behalf of the State attempting to justify the decisions made to delay and change the Suicide

6    Report—whether or not he was on vacation he is a central figure in this controversy.

7    (Dkt. No. 5031 (Jan. 30, 2014); Stone Manista Decl.  Ex. K.)  Mr. Stainer is the head of the

8    Division of Adult Institutions, and testified in the use of force evidentiary hearing

9    regarding the rationales for CDCR's policies regarding pepper spray.  During the trial on

10   October 24, 2013, Mr. Stainer specifically denied knowledge regarding pepper-spray

11   related injuries and deaths in CDCR.  (Stone-Manista Decl. Ex. T, Hrg. Tr. at 942:17-

12   944:1.)  The Court is entitled to know what Mr. Stainer knew about the draft reports on

13   Inmate X and the decisions to remove pepper spray related recommendations both before

14   he gave this testimony and thereafter while CDCR was asking this Court to deny relief on

15   use of force in part based on his testimony.

16   **VI.    Defendants Have Presented No Grounds for Closing Discovery.**

17         In this Joint Statement, Defendants again seek to re-litigate whether discovery is

18   now in fact open.  Defendants previously presented to the District Court their contention

19   that they discharged their disclosure obligations when they posted some documents about

20   Inmate X on September 25, 2013.  (Docket No. 5059, Feb. 10, 2014 Order at 2 n.2.)  They

21   asked the District Court to close discovery on those grounds, and the District Court denied

22   their motion.  (*Id.* at 5.)  Defendants' new "protective order" request is nothing but a third

23   attempt to relitigate their motion to close discovery.  Nothing has happened since they first

24   sought to close discovery in this matter that justifies such a motion.  On the contrary, while

25   Defendants' stonewalling may be slowing down the Court's access to information, the

26   press has continued to release evidence regarding instructions apparently emanating from

27   the highest levels of CDCR to prevent investigation of the role of pepper-spray in Inmate

28   X's death.  Stone-Manista Decl. Ex. S (Sam Stanton and Denny Walsh, "Confidential

[1105618-1]

1  Documents Cite Interference in Prison Death Review," Fresno Bee Feb. 16, 2014).

2  Plaintiffs respectfully request that (1) Defendants' request for Protective Order be

3  denied, (2) Defendants be ordered to withdraw their instructions not to answer deposition

4  questions based on deliberative-process privilege, and that Defendants must cooperate with

5  Plaintiffs in resuming depositions as necessary; (3) Defendants be ordered to search for

6  documents responsive to Plaintiffs' discovery requests from the September 6, 2013 (the

7  date of Inmate X's death) through January 30, 2014, and  that such search include the

8  Attorney General's office and CDCR's in-house legal teams; (4) Defendants' objections to

9  production of documents, including draft reports and redacted portions of emails, based on

10  "deliberative process" privilege be overruled and the material be ordered produced, or in

11  the alternative be ordered submitted for *in camera* review; (5) Defendants be ordered to

12  produce the emails in their February 13, 2014 privilege log identified as IMD 0138, 272-

13  274, 365-387, 462-463, 464-466.

14

15  **DEFENDANTS' POSITION**

16

17  Defendants have provided the discovery ordered by the Court concerning Inmate

18  D's death, including both the production of documents and numerous depositions.

19  Although Defendants' counsel told Plaintiffs during the meet-and-confer that Defendants

20  appropriately searched for responsive documents, including from Defendants' counsel,

21  Plaintiffs continue to demand more documents.  Defendants have appropriately asserted

22  the deliberative process privilege over the predecisional discussions and draft reports

23  necessary to prepare the department-wide report on Inmate D's death.  Defendants have

24  also appropriately asserted the privileges protecting attorney-client communications and

25  attorney work product from disclosure.  Defendants have thus produced the non-privileged

26  documents that are responsive to Plaintiffs' requests and relevant to the issues identified in

27

28

[1105618-1]

1    the Court's discovery orders.[2]

2          The District Court's February 10, 2014 order found that "[t]he crux of the relevant

3    disagreement between the parties centers on whether defendants had any duty to produce a

4    suicide report by November 7, 2013."  (Feb. 10, 2014 Order at 2, ECF 5059.)  That

5    question has been answered unequivocally by the three depositions Plaintiffs have

6    conducted: the consensus among CDCR's mental health clinicians as of October 31, 2013

7    was that Inmate D's death was not a suicide.  (Decl. Patrick McKinney Ex. 2 at 41:2-9

8    [Scheidegger], 3 at 60:9-23 [Allison Rough Tr.], & 4 at 56:25-57:8 [Burleson Rough Tr.].)

9    Nevertheless, CDCR determined that Inmate D's death warranted further investigation,

10   and CDCR properly refrained from making any final conclusions without considering vital

11   information—including the coroner's autopsy report.  (*Id.* Exs. 2 at 44:5-10 & 3 at 62:7-10

12   & 98:13-19.)  There is no evidence that the report was issued in January 2014 to advance

13   any litigation strategy.  (*Id.* Ex. 3 at 82:15-17.)  Instead, it was the result of a thorough

14   investigation.  Plaintiffs' argument that they are entitled to broadly inquire into "why the

15   reports were changed"—particularly when that inquiry would invade privileged

16   information—finds no support in any of the court's orders.

17         Moreover, Plaintiffs' contention that Defendants deliberately delayed or

18   manipulated the January 7, 2014 report's contents lacks merit.  Plaintiffs ask this Court to

19   presume some wrongdoing occurred, but there is no basis for such a finding.[3]  The

20   discovery conducted thus far shows that CDCR was following Program Guide processes

21   for reviewing, responding, and reporting the circumstances surrounding Inmate D's death.

22   There are no facts showing that pepper spray contributed to Inmate D's death.  Even if

23   Plaintiffs' assertion could be proven, nothing shows that Defendants withheld information

24   during the evidentiary hearing on Plaintiffs' use-of-force motion for a litigation purpose.

25   _____

26   [2] A copy of Defendants' responses and objections to Plaintiffs' requests for production are attached as
     Exhibit 1 to the Declaration of Patrick McKinney.

27   [3] Indeed, the District Court has cautioned the parties against assuming malicious intent.  (Order February
     10, 2014 at n. 7, ECF No. 5059.)

28

1    Indeed, Defendants readily agreed that the final suicide report—complete with information

2    concerning the deployment of pepper spray—could be added to the evidence to be

3    considered by this Court in ruling on Plaintiffs' motion concerning use of force.  (*See* Feb.

4    3, 2014 Joint Statement Concerning Discovery at 1, ECF 5044.)

5            Plaintiffs also misrepresent their own knowledge about the facts of Inmate D's

6    death.  Plaintiffs knew of Inmate D's death in September 2013, including the fact that

7    pepper spray was used the day before his death.  Plaintiffs also have a draft report dated

8    after November 27, 2013, which includes all of the information they claim was somehow

9    deleted from the report before November 7, 2013.  Despite their knowledge, Plaintiffs have

10   served burdensome, harassing discovery in the hope of demonstrating the factually

11   impossible.  Defendants produced the relevant information to Plaintiffs prior to the start of

12   the evidentiary hearing, have produced the non-privileged documents responsive to

13   Plaintiffs' requests, have agreed that the final report can be considered by the Court, and

14   have allowed the mental health and custody staff who drafted and edited the report to be

15   deposed.

16           Defendants have fully cooperated with discovery, and there is nothing to compel.

17   Plaintiffs' motion should be denied.  To prevent further harassment, Defendants request

18   that the Court enter a protective order to stop Plaintiffs' discovery abuses.  For example,

19   Plaintiffs recently attempted to notice several additional depositions, including the

20   deposition of Undersecretary Martin Hoshino, a high-ranking official of the CDCR.[4]  But

21   there has been no testimony that Undersecretary Hoshino has any personal knowledge

22   concerning Inmate D's death.  Plaintiffs also seek the deposition of Dr. Timothy Belavich,

23   although Defendants informed Plaintiffs that Dr. Belavich was on vacation between

24   October 30 and November 17, and is therefore unlikely to have any information relevant to

25   issues the Court has deemed appropriate for discovery.  Plaintiffs also attempted to notice

26

27   ───────────────────────
     [4] Just prior to filing this statement, Plaintiffs acknowledged that this deposition was improper with
     their statement that they no longer intend to depose Undersecretary Hoshino.  (*See* fn. 1.)

28

[1105618-1]

1   the deposition of Dr. Amy Eargle, whose testimony will largely duplicate the testimony of

2   Drs. Scheidegger and Bramble, Ms. Allison, and Ms. Burleson.  Contrary to Plaintiffs'

3   arguments, Defendants have never said they would not produce Drs. Eargle or Belavich for

4   deposition.  However, there is no basis for Plaintiffs to take these depositions, and there

5   must be a limit to discovery concerning an individual inmate in a case that is supposed to

6   concern systemic issues.  Defendants respectfully request that the Court enter a protective

7   order prohibiting Plaintiffs from continuing with unnecessary and burdensome discovery.

8
9   **I.    DEFENDANTS HAVE PRODUCED ALL RESPONSIVE NON-PRIVILEGED DOCUMENTS AS
        ORDERED BY THE COURT.**

10      Defendants are following the Court's discovery orders, and have produced the non-

11  privileged documents that are responsive to Plaintiffs' requests and relevant to the issues

12  identified in the Court's January 30, 2014, February 5, 2014, and February 10, 2014

13  orders.  Defendants have already produced the following witnesses for deposition: (1) Dr.

14  Corey Scheidegger, (2) Kathleen Allison, and (3) Judy Burleson.  Plaintiffs' claims of

15  "stonewalling" have no basis, and their argument appears to confuse their expectations

16  with reality.  Given Plaintiffs' knowledge of the relevant facts in September 2013 before

17  the start of the evidentiary hearing, and their knowledge of the State's reporting

18  requirements for non-suicide deaths, Plaintiffs' motion to compel discovery has no purpose

19  other than to harass Defendants.

20
21      **A.    Defendants Produced the Relevant, Non-Privileged Documents Responsive
            to Plaintiffs' Requests Beginning in September 2013.**

22      Defendants have produced the relevant, non-privileged information responsive to

23  Plaintiffs' requests.  In September 2013, as demonstrated by Plaintiffs' production,

24  Defendants produced the Suicide Notification, OBIS Movement Report, the Initial Inmate

25  Death Report, the Incident Report, and more than 100 pages of Inmate D's medical

26  records.  (Feb. 3, 2014 Conf. Decl. Jane Kahn Ex. 1.)  On January 9, 2014, as shown in the

27  email of that date from Plaintiffs' paralegal, Plaintiffs received the final suicide report and

28  the autopsy report, and again downloaded the documents they downloaded in September

[1105618-1]

2013: CDCR Forms 7229-A & 7229-B, CDCR Form 837, the suicide notification, and medical records.[5]  (*Id.*)  On February 12, 2014, Defendants produced documents responsive to Plaintiffs' requests, Bates labeled IMD-0001 through IMD-0034.  (Stone-Manista Decl. Ex. A.)  Defendants then produced additional documents responsive to Plaintiffs' requests, Bates labeled IMD-0035 through IMD-0093, on February 13, 2014.  (*Id.* at Ex. B.)

Plaintiffs' claims that Defendants have not disclosed the relevant facts and information about this incident are untrue.  Defendants have produced the responsive, non-privileged emails, including an email showing all persons who were invited to the October 31 teleconference.  (*See* IMD-0007.)  Plaintiffs' counsel questioned Dr. Scheidegger, Ms. Allison, and Ms. Burleson extensively about who attended the meeting and what was said during the meeting.  (McKinney Decl. Exs. 2 at 73:21-83:4, 3 at 60:1-5, & 4 at 30:23-32:24.)  Defendants also produced timelines prepared by Dr. Scheidegger that include the correspondence among the staff responsible for preparing the report.  (*See* IMD-0033 – IMD-0034.)  All three witnesses have confirmed that the consensus of the mental health professionals was that Inmate D's death was not a suicide.  (McKinney Decl. Exs. 2 at 41:2-9, 3 at 60:9-23, & 4 at 56:25-57:8.)

**B.    Plaintiffs' Position Ignores the Court's February 5 and February 10, 2014 Orders.**

Defendants are following the Court's orders, and have produced both documents and witnesses consistent with those orders.  On February 5, 2014, this Court found that the parties "reached agreement with respect to the factual circumstances of the death of the class member at issue."  (Feb. 5, 2014 Order at 2, ECF 5054.)[6]  The Court ordered that "no further discovery as to that issue will be conducted."  (*Id.*)  Defendants have followed that

---

[5] Defendants did not produce these documents again in response to Plaintiffs' document requests sent on January 30, 2014 and February 3, 2014 since they were already in Plaintiffs' possession.
[6] The statement in the parties' February 3, 2014 joint statement supporting this finding was inserted by Plaintiffs' counsel.

[1105618-1]

1    order.  (McKinney Decl. Ex. 1.)

2          Plaintiffs ignore the Court's February 5 order, as well as the District Court's

3    February 10, 2014 order, which states: "The crux of the relevant disagreement between the

4    parties centers on whether defendants had any duty to produce a suicide report by

5    November 7, 2013."  (Feb. 10, 2014 Order at 2, ECF 5059.)  The Court added in a footnote

6    that it was not closing discovery on "whether relevant information concerning this class

7    member's death was withheld from plaintiffs or the court during the course of the

8    evidentiary hearing which commenced on October 1, 2013."  (*Id.* at fn. 2.)  Defendants

9    have also followed this Order, and produced all non-privileged documents relevant to these

10   issues.

11
12            1.    **The Proper Focus of Discovery Is the Time Period Between the Date of**
                    **Inmate D's Death and the Close of the Evidentiary Hearing on Plaintiffs'**
13                  **Use-of-Force Motion.**

14          For both issues identified in the Court's orders, November 7, 2013 is the

15   appropriate end date for discovery.  Evidence closed on Plaintiffs' use-of-force motion

16   when the defense rested on November 6, 2013 at 3:09 p.m.  (Nov. 6, 2013 Minute Order,

17   ECF 4915 & Jan. 23, 2014 Order at 1, ECF 5022 ["Evidentiary hearing on plaintiffs'

18   motion was conducted over a period which commenced on October 1, 2013 and continued

19   over fourteen court days, concluding on November 6, 2013."].)  The parties presented

20   closing argument on November 7, 2013.  (Nov. 7 Minute Order, ECF 4916.)  Documents

21   prepared after November 7, 2013 thus have no bearing on "whether defendants had any

22   duty to produce a suicide report by November 7, 2013," or "whether relevant information

23   concerning this class member's death was withheld from plaintiffs or the court during the

24   course of the evidentiary hearing which commenced on October 1, 2013."

25          The Court's orders clearly define the scope of permissible discovery.  Plaintiffs'

26   position that discovery should remain open indefinitely because, for example, Defendants

27   made changes to the statewide use-of-force policy, is nonsensical.  No further discovery is

28   required here; the parties have already agreed that the Court can consider the final reports

1    on Inmate D's death, if it determines they are relevant to Plaintiffs' use-of-force motion.

2

3    **2.    No Responsive Documents Prepared Prior to October 7, 2013 Have Been Withheld.**

4        Contrary to Plaintiffs' claims, Defendants have produced documents and

5    information concerning the review process and reporting process, and have produced or

6    are producing additional witnesses for deposition.  (*See, e.g.,* McKinney Decl. Ex. 2 at

7    13:2-15:13 [Scheidegger Depo.]; Jan. 29, 2014 Decl. Tim Belavich ¶¶ 5-17, ECF 5031.)

8    Plaintiffs present no evidence that any information prepared prior to October 7, 2013 has

9    been withheld.  Indeed, Plaintiffs concede that they received the Suicide Notification,

10   OBIS Movement Report, the Initial Inmate Death Report, the Incident Report, and more

11   than 100 pages of Inmate D's medical records, all of which were prepared before October

12   7, 2013.

13

14   **C.    Deposition Testimony Has Established that there Was no Withholding of Information from Plaintiffs or the Court.**

15       Discovery to date has shown that CDCR was following its suicide reporting

16   process, and there was no withholding of information for a litigation purpose.  At the

17   beginning of her deposition, Dr. Scheidegger testified that she was not aware of Plaintiffs'

18   use-of-force motion until January 2014.  (McKinney Decl. Ex. 2 at 6:25-7:16.)  She further

19   testified about the reasons why a suicide report was not prepared for Inmate D in

20   November 2013: mental health professionals concluded Inmate D's death was not a

21   suicide, and they would "hold off on making any further changes to the report pending

22   receipt of the coroner's report."  (*Id.* Exs. 2 at 41:2-9 & 44:5-10 & 3 at 82:15-17.)  The

23   consensus reached at that meeting was reiterated by Ms. Allison and Ms. Burleson during

24   their testimony.  (*Id.* Exs. 3 at 60:9-23 & 4 at 56:25-57:8.)  Ms. Burleson further testified

25   that, while she had a general awareness of Plaintiffs' use-of-force motion, there was no

26   connection between the motion and the report.  (*Id.* Ex. 4 at 64:18-65:25.)  Moreover, the

27   changes to the report were made on January 6, 2014, months after the close of the

28   evidentiary hearing on Plaintiffs' use-of-force motion.  (*Id.* Exs. 2 at 33:18-34:19, 39:3-25,

3 at 69:20-70:24, 3 at 69:1-70:24 & 104:23-107:12, & 4 at 81:8-10 & 82:4-5.)

II. **PLAINTIFFS IMPROPERLY SPECULATE THAT PEPPER SPRAY CONTRIBUTED TO INMATE D'S DEATH.**

Plaintiffs position is based on the faulty premise that pepper spray contributed to Inmate D's death. It is undisputed that, before the start of the evidentiary hearing, Plaintiffs had information showing that Inmate D was exposed to pepper spray on September 6, 2013, the day before his death. Despite every incentive to present this case to the Court during their case-in-chief, Plaintiffs did not recognize the connection between the pepper spray incident and Inmate D's death.

Any connection between the pepper spray incident and Inmate D's death remains speculative. Following the pepper spray exposure, the reports reflect that Inmate D decontaminated with water, slept for an hour and an half, and was observed standing at his cell window more than eight hours after the exposure. (Jan. 7, 2014 Report at 9.) Plaintiffs' continued characterization that Inmate D's death was a "pepper spray death" does not make it so. The facts and the opinions of trained medical professionals, including the coroner and numerous clinicians involved in the death review, did not find that link.

III. **THE DELIBERATIVE PROCESS PRIVILEGE APPLIES TO THE PREDECISIONAL DISCUSSIONS AND DRAFT REPORTS NECESSARY TO PREPARE THE STATEWIDE SUICIDE REPORT FOR INMATE D.**

Defendants have made the necessary showing that the documents reflecting CDCR's predecisional deliberations concerning Inmate D's death are protected from disclosure by the deliberative process privilege. (*See* Decl. Tim Belavich.) To qualify as predecisional, a document must be both "predecisional" and "deliberative." A "predecisional" document is one "prepared in order to assist an agency decisionmaker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions . . . ." *Carter v. U.S. Department of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). A "deliberative" document is one that the disclosure of "would expose an agency's

[1105618-1]

1    decisionmaking process in such a way as to discourage candid discussion within the

2    agency . . . ." *Id.*

3         Draft reports that reflect an agency's predecisional deliberative process, such as the

4    draft reports at issue here, are within the deliberative process privilege. *See United States*

5    *v. Fernandez*, 231 F.3d 1240, 1246-47 (9th Cir. 2000); *National Wildlife Fed'n v. U.S.*

6    *Forest Serv.*, 861 F.2d 1114 (9th Cir. 1998) (holding that draft forest plans and draft

7    environmental impact statements were within the deliberative process privilege); *Maricopa*

8    *Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1091 (9th Cir. 1997) (upholding

9    deliberative process privilege over portions of an internal investigative report concerning

10   mismanagement by one manager of the Southwestern Region of the Forest Service).  In

11   *United States v. Fernandez*, the Court found that the U.S. Attorney's death penalty

12   evaluation form and prosecution memorandum for one felon was protected from disclosure

13   by the deliberative process privilege.  *Fernandez*, 231 F.3d at 1246-47.  The Court held

14   that the form and prosecution memorandum were "predecisional" because the U.S.

15   Attorney submits these documents *before* the Attorney General makes the final decision

16   whether to seek the death penalty in an individual case.  *Id.*  The Court found that these

17   documents were "deliberative" in that they contained opinions and recommendations about

18   the theory of liability, the facts and evidence, including evidence relating to any

19   aggravating or mitigating factors, the defendant's background and criminal history, the

20   basis for Federal prosecution, and any other relevant information.  *Id.*  This form and

21   memo were not a part of the review of a sweeping, Attorney General wide policy, but an

22   individualized decision for *one* felon.  Yet they were protected from disclosure.

23        Plaintiffs fail to distinguish the decision on whether to pursue the death penalty for

24   one individual inmate in *Fernandez* from CDCR's decision about whether Inmate D's

25   death was a suicide, or CDCR decisions concerning the report's quality improvement

26   plans.  Plaintiffs' reliance on *Maricopa Audubon Society* is misplaced, and Plaintiffs'

27   comparison of Inmate D's death to a "regular audit of government activity" is insensitive.

28   The report on Inmate D's death, like all of CDCR's suicide reports, are critical

25

[1105618-1]

1   examinations of specific incidents designed to improve the quality of CDCR's suicide

2   prevention efforts. Plaintiffs' apparent goal to insinuate themselves into that process

3   would seriously compromise staff's ability and willingness to candidly, critically, and fully

4   investigate similar incidents.

5          "In some circumstances, the mere editing of factual material may constitute a

6   policymaking process which is deliberative and therefore privileged." *Nevada v. United*

7   *States Dep't of Energy*, 517 F. Supp. 2d 1245, 1264 (D. Nev. 2007) (citing *Russell v. Dep't*

8   *of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982)). The district court described *Russell* as

9   follows:

> In *Russell*, the D.C. Circuit found that the draft history need
> not be disclosed because "a simple comparison between the
> pages sought and the official document would reveal what
> material supplied by subordinates [sic] senior officials judged
> appropriate for the history and what material they judged
> inappropriate." 682 F. 2d at 1049. Reviewing these decisions
> subsequently, the D.C. Circuit noted that the editorial selection
> of facts in the Air Force history cases was "not 'essentially
> technical' in nature; ... rather [the facts] are part of processes
> with which the deliberative process privilege ... is centrally
> concerned." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539
> (D.C. Cir. 1993) (prior brackets and citation omitted).

17  *Nevada v. U.S. Dep't of Energy*, 517 F. Supp. 2d at 1264.

18         CDCR's draft reports concerning Inmate D's death are protected by the deliberative

19  process privilege. Dr. Scheidegger testified in detail that the draft reports for Inmate D's

20  death were both pre-decisional and reflected the deliberations of CDCR staff leading to the

21  decision on October 31, 2013 that Inmate D's death was not a suicide. (*See, e.g.,*

22  McKinney Decl. Ex. 2 at 66:16-67:1.) Ms. Burleson testified that requests to edit the

23  report were made both to change conclusions not based on fact following deliberations,

24  and to correct errors (including both factual and typographical errors) and grammar.

25  (McKinney Decl. Ex.4 at 27:16-28:5.) Moreover, the report embodies CDCR's judgments

26  about how it should improve its emergency response (IMD-0027), its custody interactions

27  with inmates (IMD 0028), its medical, nursing, and mental health care (IMD-0029), and

28  resulted in 7 recommendations for quality improvement plans (IMD-0029-0031). The

26

[1105618-1]

1  report is not limited to a factual recitation of how this inmate died, and what staff did.  It is,

2  by its very purpose, designed to reflect a greater, department-wide review.  Plaintiffs'

3  stated intent to inquire into these matters would undoubtedly chill frank and candid

4  discussion, and would likely impair CDCR's suicide prevention efforts.

5      Plaintiffs incorrectly argue that the deliberative process privilege only applies to

6  "policies."  This is unsupported by case law, and is contrary to even the cases Plaintiffs

7  cite, which acknowledge that the privilege applies to "advisory opinions,

8  recommendations, and deliberations comprising parts of a process by which *government*

9  *decisions* and policies are being formulated."  *Coleman v. Schwarzenegger*,  2008 WL

10  2237046 at *4 (E.D. Cal. May 29, 2009) (emphasis added).  The purpose of CDCR's death

11  review process is to make a decision about whether this death was a suicide, report on the

12  facts leading up to it, and make decisions about what, if any, policies or procedures need

13  quality improvement plans to try to prevent, or better respond to, future potential suicides.

14  Plaintiffs' desire to be part of every one of Defendants' decision-making processes does

15  not warrant a waiver of this privilege.

16      Plaintiffs also failed to ask appropriate questions to avoid invading the deliberate

17  process privilege.  For example, Dr. Scheidegger's lack of knowledge concerning the

18  evidentiary hearing on Plaintiffs' use-of-force motion makes it impossible for her to have

19  withheld information for a litigation purpose.  Plaintiffs' counsel have never asked any

20  witness questions designed to elicit relevant testimony, such as: "Did you at any time make

21  a change to the report because of the litigation?"  Instead, all of the examples cited by

22  Plaintiffs where a witness was instructed not to answer resulted from open-ended questions

23  about "why" the report was changed.  (Stone-Manista Decl., Exs. E at 23, 25, 28, 29, 34; P

24  at 62, 70, 72-73, 79; & Q at 29-30, 33-34, 36-37.)  Because the witnesses' responses would

25  have revealed CDCR's pre-decisional deliberations about whether, for example, Inmate

26  D's death was a suicide, the deliberative process privilege applies.  There is thus no basis

27  for re-opening any of the depositions since Plaintiffs' counsel had the opportunity to ask

28  questions that the witness could have answered without violating the privilege, but did not

[1105618-1]

1    do so.

2
3    **IV.    DEFENDANTS SEARCHED FOR RESPONSIVE EMAILS TO AND FROM DEFENDANTS' DEFENDANTS' LITIGATION COUNSEL.**

4        Plaintiffs falsely assert that Defendants have refused to search emails to or from
5    attorneys in the Attorney General's office.  During the meet-and-confer, Defendants'
6    counsel informed Plaintiffs' counsel that these emails were searched, and there are no
7    responsive documents.  (McKinney Decl. Ex. 5.)  Defendants agree that the Attorney
8    General's Office provided the initial email notice on September 12, 2013, which makes no
9    mention of pepper spray.  This email has been in Plaintiffs' possession since September
10   12, and was not produced again in response to Plaintiffs' discovery requests.

11
12   **V.    DEFENDANTS HAVE APPROPRIATELY ASSERTED THE PRIVILEGES PROTECTING ATTORNEY-CLIENT COMMUNICATIONS AND ATTORNEY WORK PRODUCT FROM DISCLOSURE.**
13

14       The attorney-client communications on Defendants' privilege log are absolutely
15   protected from disclosure.  The protections of the attorney-client privilege encourage the
16   client to reveal to the lawyer confidences necessary for the lawyer to provide advice and
17   representation.  *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).  "An uncertain
18   privilege—or one which purports to be certain, but rests in widely varying applications by
19   the courts—is little better than no privilege."  *Rhone-Poulenc Rorer Inc. v. Home Indem.*
20   *Co.*, 32 F.3d 851, 863 (3d Cir. 1994) (internal quotation omitted); *see also Matter of*
21   *Fischel*, 557 F. 2d 209, 211 (9th Cir. 1977) (client communications seeking legal advice
22   are permanently protected).  Work product protection is designed to protect an attorney's
23   thought processes, including the evaluation of strengths and weaknesses.  Fed. R. Civ.
24   Proc. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

25       As recently as September 2013, Plaintiffs' counsel relied on case law in a filing in
26   *Plata v. Brown* that "counsel's communications with the client and work product
27   developed once the litigation commences are presumptively privileged and need not be
28   included on any privilege log."  (*Plata v. Brown* ECF No. 2711 at 5 [citing *Ryan Inv. Corp.*

[1105618-1]

1   *v. Pederegal de Cabo San Lucas*, 2009 WL 5114077, at *3 (N.D. Cal. 2009); *Glynn v.*

2   *EDO Corp.*, 2010 WL 3294347 at *7, fn. 12 (D. Md. 2010; *United States v. Bouchard*

3   *Transp.*, 2010 WL 1529248 at *2 (E.D.N.Y. 2010)].)  Despite having several hours to

4   consider Defendants' position, Plaintiffs offer no explanation why a different standard

5   should apply in this case.

6       Plaintiffs assert that the communications may have been prepared to suppress

7   evidence, but this claim fails for several reasons.  First, the undisputed evidence shows

8   that, no later than September 25, 2013, Plaintiffs had information showing that Inmate D

9   was exposed to pepper spray.  Second, discovery has shown that a suicide report was not

10  completed by November 6, 2013, because CDCR determined that Inmate D's death was

11  not a suicide, and they decided to wait on taking further action until the coroner issued a

12  report.  Third, the connection between Inmate D's death and his exposure to pepper spray

13  the day before is speculative at best.  For the same reasons, there is no basis for disclosing

14  the work product and impressions of CDCR's attorneys concerning Inmate D's death, such

15  as those contained in the email memorandum prepared by in-house counsel but not sent,

16  and which reflects his impressions (identified as IMD-0138).

17      Plaintiffs' complaints that the privilege log is insufficient should be rejected.

18  Defendants' log sets forth the general nature of the document without disclosing its

19  contents, the date of the document, the identities of the author and recipients, and the

20  privilege claimed in accordance with Federal Rule of Civil Procedure 26(b)(5).

21      There is also no basis for Plaintiffs' request for an *in camera* review over which

22  Defendants have asserted privilege.  To properly request such a review, Plaintiffs must

23  provide a factual basis sufficient to support a reasonable, good faith belief that *in camera*

24  inspection may reveal evidence that information in the materials is not privileged.  *Rock*

25  *River Comm'ns, Inc. v. Universal Music Grp.*, *Inc.*, 11-57168, 2014 WL 223689 at 8 (9th

26  Cir. Jan. 22, 2014).  Plaintiffs' belief that the documents are not privileged appears to be

27  based on little more than unfounded suspicion, which is an insufficient factual showing to

28  justify an in camera review.  *See id.*

[1105618-1]

1    Plaintiffs' vague reference to the crime-fraud exception similarly fails. *See United*

2    *States v. Zolin*, 491 U.S. 554, 565 (1989).  In *Zolin*, the Supreme Court held that a district

3    court may, in appropriate circumstances, conduct *in camera* review of privileged

4    documents to assess whether they fall within the crime-fraud exception to the attorney

5    client privilege.  *Zolin* requires a district court to conduct a two-step analysis. First, the

6    court must "'require a showing of a factual basis adequate to support a good faith belief by

7    a reasonable person,' that in camera review of the materials may reveal evidence to

8    establish the claim that the crime-fraud exception applies." *Id.* at 572 (internal citation

9    omitted).  Once this threshold showing is made, the court must make a discretionary

10   decision whether to order *in camera* review.  *Id.* at 572.  "[A]n evidentiary threshold must

11   first be met by the party requesting review before the district court may exercise its

12   discretion. The first step of the analysis should focus only on evidence presented by the

13   party seeking in camera review." *In re Grand Jury Investigation*, 974 F.2d 1068, 1072

14   (9th Cir. 1992).  Here, Plaintiffs fail to meet that evidentiary threshold.  That an email from

15   a CDCR attorney was sent to their client between October and November 2013, when

16   CDCR was diligently working on preparing a report concerning Inmate D's death, does not

17   establish a reasonable belief that any attorney advised CDCR staff to withhold information

18   from the Special Master, Plaintiffs, or the Court.   Plaintiffs' unsubstantiated request for an

19   *in camera* review should be denied.

20   Plaintiffs also falsely assert that "there is no other way" to find out whether

21   recommendations concerning pepper spray were removed from the report in an effort to

22   withhold information relevant to the use-of-force trial.  It is undisputed that this

23   recommendation was not removed from the report until January 2014, approximately two

24   months after the close of evidence on Plaintiffs' use-of-force motion.  (McKinney Decl.

25   Exs. 2 33:18-34:19, 39:3-25 & 3 at 69:1-70:24.)  Plaintiffs have a draft report dated after

26   November 27, 2013—the date Defendants received the coroner's report—which includes

27   this recommendation.  (*Id.* Ex. 2 at 102:4-18.)  Even if this recommendation did not remain

28   in the report for many weeks after the close of the evidentiary hearing, Plaintiffs could

[1105618-1]

have obtained evidence on this issue from any of the three witnesses they deposed who edited the report: Dr. Scheidegger, Ms. Allison, and Ms. Burleson.  They could have asked each whether changes to the report were made to avoid revealing information in the use-of-force proceedings.  They chose not to do so.

## VI. PLAINTIFFS' FAILED TO MEET-AND-CONFER CONCERNING PRODUCTION OF DOCUMENTS IN ANY PARTICULAR FORMAT.

Prior to sending Defendants their position in this statement, Plaintiffs did not object to the format of Defendants' production, or demand production in any particular format. Instead, Plaintiffs say that, because they provided documents in a particular format, Defendants were obligated to do the same.  But this is not the law.  Here, two of the emails were redacted to remove privileged information, and thus cannot be produced in a native format.  Other email messages attached documents, including draft reports, are protected by the deliberative process privilege, and thus cannot be produced in a native format without altering the message to remove the protected information.

## VII. THE COURT SHOULD ENTER A PROTECTIVE ORDER PREVENTING PLAINTIFFS FROM FURTHER HARASSING DEFENDANTS.

Plaintiffs' misuse of the discovery process to try to establish that information was withheld when Plaintiffs admittedly had the relevant information before the start of the evidentiary hearing must stop now.  Plaintiffs' harassment of Defendants is evidenced by their recent attempts—without any prior discussion—to notice the depositions of CDCR Undersecretary Martin Hoshino (which they ultimately withdrew) and CDCR's Chief of Mental Health Dr. Timothy Belavich.  (*See* McKinney Decl. Ex. 6.)  To take the depositions of these high-ranking officials, Plaintiffs must first establish that he had personal knowledge about a fact in issue.  *See Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979).  Defendants' counsel informed Plaintiffs' counsel that Dr. Belavich was on vacation between October 30 and November 17, and therefore is unlikely to have any information on matters deemed appropriate for discovery by the Court.

1  (McKinney Decl. Exs. 6 & 7.)  Contrary to Plaintiffs' claims, Defendants have never said

2  they would not produce Drs. Belavich or Eargle, or Mr. Stainer, for deposition.  Instead,

3  because the depositions serve no purpose and are excessive, Defendants told Plaintiffs they

4  would seek relief from the Court.  (*Id.*)

5      In addition to being improper, Plaintiffs' proposed depositions of Undersecretary

6  Hoshino, Dr. Belavich, Dr. Amy Eargle, and the Director of the Division of Adult

7  Institutions (DAI), Michael Stainer, are unreasonably cumulative or duplicative.  *See* Fed.

8  R. Civ. P. 26(b)(2)(C)(i).  In Section V of Plaintiffs' position, Plaintiffs explain why Dr.

9  Eargle's deposition is duplicative.  Plaintiffs have deposed Kathy Allison, the person

10  within CDCR's Division of Adult Institutions with the most knowledge about the report

11  concerning Inmate D's death.  Plaintiffs have deposed or will depose the mental health

12  staff most familiar with the report: Drs. Scheidegger and Bramble, and Ms. Burleson.

13  Moreover, the burdens of these four proposed depositions far outweigh any likely benefit,

14  particularly in light of the extensive discovery already taken and Plaintiffs' failure to show

15  any justification for taking these depositions.  *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

16  Additional depositions serve no purpose other than to unduly burden and harass

17  Defendants.  Defendants have tried to resolve this matter with Plaintiffs informally, but

18  Plaintiffs have not responded.  (McKinney Decl. Exs. 6-8; *see* Fed. R. Civ. P. 26(c).)

19  Defendants therefore request that the Court enter a protective order prohibiting further

20  discovery.

21      Defendants respectfully request that the Court deny Plaintiffs' motion to compel,

22  and enter a protective order reasonably limiting discovery.

23

24  CF1997CS0003
    4_15 PM Joint Statement Concerning Discovery Dispute 2_20_14 (2).docx

25

26

27

28

1    Dated:  February 20, 2014                    ROSEN BIEN
                                                  GALVAN & GRUNFELD LLP
2

3                                          By:    */s/ Krista Stone-Manista*
                                                  By: Krista Stone-Manista
4
                                                  Attorneys for PLAINTIFFS
5

6

7    Dated:  February 20, 2014                    ATTORNEY GENERAL OF CALIFORNIA

8

9                                          By:    */s/ Patrick R. McKinney*
                                                  Patrick R. McKinney
10                                                Attorneys for DEFENDANTS

[1105618-1]

JOINT STATEMENT CONCERNING DISCOVERY; 2:90-cv-0520 LKK DAD