# EXHIBIT  2



Transcript of the Testimony of:

# Corey Scheidegger, Ph.D.

Coleman v. Brown

February 12, 2014

Volume I

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                        Plaintiffs,       )
                                          ) CASE NO.:
              vs.                         ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                        Defendants.       )
_____  )


**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**


DEPOSITION OF

COREY SCHEIDEGGER, PH.D.


WEDNESDAY, FEBRUARY 12, 2014,  9:58 A.M.

SACRAMENTO, CALIFORNIA


VOLUME I


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                          February 12, 2014

```
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA

 3

 4    RALPH COLEMAN, ET AL.,              )
                                          )
 5                        Plaintiffs,     )
                                          )CASE NO.:
 6              vs.                       )S 90-0520 LKK-JFM
                                          )
 7    EDMUND G. BROWN, JR., ET AL.,       )
                                          )
 8                        Defendants.     )
      _____)
 9

10

11

12

13

14            The Deposition of COREY SCHEIDEGGER, PH.D.,

15    taken on behalf of the Plaintiffs, before

16    Megan F. Alvarez, Certified Shorthand Reporter No.

17    12470, Registered Professional Reporter, for the State

18    of California, commencing at 10:02 a.m., Wednesday,

19    February 12, 2014, at 980 Ninth Street, 16th floor,

20    Sacramento, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3            BY:   JEFFREY L. BORNSTEIN, ESQ.
              K&L GATES LLP
 4            4 EMBARCADERO CENTER, SUITE 1200
              SAN FRANCISCO, CALIFORNIA 94111
 5            415.882.8200
              415.882.8220 FAX
 6            JEFF.BORNSTEIN@KLGATES.COM

 7

 8    FOR DEFENDANTS:

 9            BY:   PATRICK McKINNEY, ESQ.
              OFFICE OF THE ATTORNEY GENERAL
10            STATE OF CALIFORNIA
              455 GOLDEN GATE AVE., SUITE 11000
11            SAN FRANCISCO, CALIFORNIA  94102-7004
              415.703.5233
12            415.703.5843 FAX
              PATRICK.MCKINNEY@DOJ.CA.GOV
13

14
     FOR THE WITNESS, DR. SCHEIDEGGER:
15
              DAVID W. TYRA, ESQ.
16            KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
              400 CAPITAL MALL, 27TH FLOOR
17            SACRAMENTO, CALIFORNIA 95814
              916.321.4500
18            DTYRA@KMTG.COM

19

20    ALSO PRESENT:

21            CHRISTINE CICCOTTI, DEPUTY ATTORNEY GENERAL

22            NICK WEBER, ATTORNEY, CDCR

23

24

25
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1              WEDNESDAY, FEBRUARY 12, 2014, 9:58 A.M.
 2                      SACRAMENTO, CALIFORNIA
 3
 4                   COREY SCHEIDEGGER, PH.D.,
 5    a witness herein, having been first duly sworn by the
 6    Certified Shorthand Reporter, was examined and testified
 7    as follows:
 8                          --o0o--
 9                         EXAMINATION
10    BY MR. BORNSTEIN:
11         Q.    Will you please state your full name for the
12    record and spell your last name.
13         A.    Corey Michelle Scheidegger.
14    S-C-H-E-I-D-E-G-G-E-R.
15         Q.    And Dr. Scheidegger, correct?
16         A.    Dr. Scheidegger, yes.
17         Q.    What's your position?
18         A.    I'm a senior psychologist specialist, the
19    suicide response coordinator.
20         Q.    How long have you been in that position?
21         A.    Just over one year.
22         Q.    Okay.  So I'm Jeff Bornstein.  I represent the
23    plaintiffs in the Coleman case.
24         A.    Okay.
25         Q.    Are you familiar with the litigation relating
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1    to the use of force and discipline that's pending before
 2    Judge Karlton?
 3         A.    Yes, I am.
 4         Q.    And when did you first hear about that?
 5         A.    Within the last several weeks, that the trial
 6    was reopened within the last several weeks.
 7         Q.    Did you know about the trial while it was
 8    going on with the videos that were being played in
 9    court?
10         A.    In a very abstract manner.  I heard some
11    rumblings about it at work, but I didn't know anything
12    about it at the time.
13         Q.    Did you happen to read the newspaper articles
14    at the time about some of the videos and the controversy
15    about the videos?
16         A.    No.
17         Q.    I'm going to ask you a series of questions
18    today.  And I understand your impending birth of your
19    daughter.
20         A.    Yes.
21         Q.    So any time you want to take a break, anything
22    you -- you know, for whatever reason, just please do so.
23         A.    Okay.
24         Q.    I recognize this is an uncomfortable
25    situation, and it is what it is.  But I don't want to

```
 1        A.    Okay.
 2        Q.    When did you find out about Inmate X?  When
 3   did you first hear about him?
 4        A.    When I came in to work on Monday morning, the
 5   8th of September.
 6        Q.    What happened on Monday, the 8th of September?
 7        A.    I have e-mail notifications.
 8        Q.    Saying what?
 9        A.    They were forwards.  I believe I had four
10   e-mail in my inbox, forwards from the AOD, administrator
11   on duty, from DAI.
12        Q.    DAI?
13        A.    Is Division of Adult Institutions.
14        Q.    And who is that?
15        A.    They -- they're the ones that whenever there's
16   a death, a suicide death, I receive notification from
17   the AOD that there was a death in a institution.
18        Q.    And do you know -- do you remember the name of
19   the person?
20        A.    I do not.
21             MR. BORNSTEIN:  Patrick, I'm requesting those
22   four e-mails, please.
23             MR. McKINNEY:  The department is responding to
24   plaintiffs' document request consistent with
25   Magistrate Judge Drozd's order.  And to the extent
```

```
 1    they're not privileged, they will be produced.
 2              MR. BORNSTEIN:  Do you have them with you?
 3              MR. McKINNEY:  No.  The department is
 4    collecting those documents.
 5    BY MR. BORNSTEIN:
 6         Q.   Did you provide those to the state attorney
 7    general, those four e-mails?
 8         A.   No, I did not.
 9         Q.   Why not?
10         A.   I didn't think they were relevant.
11         Q.   After you got the four e-mails, what did you
12    do?
13         A.   I had a discussion with my boss,
14    Dr. Amy Eargle, about who we were going to send to
15    review this death.
16         Q.   And where is Amy Eargle physically?  Is she at
17    CDCR headquarters?
18         A.   Yes.
19         Q.   Okay.  And who does she report to?
20         A.   Judy Burleson is her boss.
21         Q.   Okay.  And is this all under Dr. Belavich?
22         A.   Yes.  Ms. Burleson is no longer in that
23    position.  She's since taken another position.  But at
24    the time, Ms. Burleson was Dr. Eargle's supervisor.
25         Q.   Initially, what was the decision that were
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1   made about who was going to respond?
 2        A.    In one of the e-mail notifications I received,
 3   it says this death was a suicide.  And Dr. Eargle told
 4   me that we would send Dr. Rachel Bramble to conduct the
 5   review.
 6        Q.    And is that what ended up happening?
 7        A.    Now.
 8        Q.    Now, Dr. Bramble wrote a report about the
 9   incident, correct?
10        A.    Yes.  Correct.
11        Q.    When was the first time you saw a draft of
12   that report, approximately?
13        A.    10/7.
14        Q.    In the draft report that you saw, did
15   Dr. Bramble include information about concerns related
16   to custody?
17             MR. McKINNEY:  Objection.  Vague and
18   ambiguous.
19             THE WITNESS:  Do I still answer?
20             MR. TYRA:  If you understand the question, you
21   can answer it, yes.
22             THE WITNESS:  Can you repeat the question,
23   please?
24   BY MR. BORNSTEIN:
25        Q.    Sure.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

1    that's called?

2         A.    Correct.

3         Q.    "Should have noted the third watch's

4    interaction with the inmate holding the food port open

5    requiring the pepper spray."

6              Was that language in the draft report that was

7    considered on October 31st?

8         A.    I do not recall.

9         Q.    "Additionally, first watch should have

10   documented the interaction with the inmate about coming

11   out of the cell to receive medical care as well as an

12   injection of Zyprexa."

13             Do you know what that is?

14        A.    Yes.

15        Q.    What is that?

16        A.    It's a psychotropic medication to help him

17   calm down.

18        Q.    Neither is on the record.  Was there any --

19   and it may not have been that exact language.  But was

20   there a recommendation that was included in the draft

21   report that was considered by the committee on

22   October 31 along those lines as it relates to problems

23   with the 114-D, the subject matters that I just read

24   about?

25        A.    I cannot say for certain.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1        Q.    Do you think so?
 2        A.    I believe so.
 3        Q.    And was that also something that was -- that
 4   you received some instruction to remove?
 5              MR. TYRA:    That's yes or no.
 6              THE WITNESS:    No.
 7   BY MR. BORNSTEIN:
 8        Q.    Did anyone receive an instruction to remove
 9   that?
10              MR. TYRA:    If you know.
11              THE WITNESS:    Not at that point.
12   BY MR. BORNSTEIN:
13        Q.    When was it given?
14        A.    January 6th.
15        Q.    Who gave it?
16        A.    Judy Burleson gave it to me on direction of
17   Kathy Allison.
18        Q.    That was as of January 6th?
19        A.    Correct.
20        Q.    Okay.
21              Why?    What did she say?
22              MR. McKINNEY:    First of all, beyond the scope
23   of discovery.    This has nothing to do with the issues
24   before the court.
25              Second -- well, instruct the witness not to
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

1    concerns were identified and when they were inserted and
2    who inserted them.
3         Q.   Okay.   Then this is what we were just started
4    to talk about, these QIPs down here, that -- pages 18
5    and 19.   The one I was asking you about was No. 4.
6         A.   Yes.
7         Q.   And do you remember that being something that
8    was discussed during the committee?
9         A.   I do not recall that coming up.
10        Q.   Were you ever given an instruction to remove
11   it from the final report that you signed?
12        A.   Yes, I was.
13        Q.   And when did you get that instruction?
14        A.   January 6th.
15        Q.   And, again, by Ms. Burleson?
16        A.   Yes.
17        Q.   And --
18        A.   Via Kathy -- Ms. Allison and I had been trying
19   to correspond with her final edits to the report, and we
20   had not been able to connect.   And so she gave her
21   edits, her final edits, to Ms. Burleson.
22             On January 3rd, I tried to meet with
23   Ms. Burleson to get the final edits.   We couldn't
24   arrange a meeting time, so we met on Monday, January 6,
25   and I got those final edits.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1   BY MR. BORNSTEIN:
 2        Q.   I'm trying to understand whether you received
 3   other instructions in the October 2013 time frame in
 4   terms of modifications to the report.
 5        A.   Yes, I did.  I was instructed at that
 6   teleconference to hold off on making any further changes
 7   to the report pending receipt of the coroner's report.
 8        Q.   And who gave you that instruction?
 9        A.   Judy Burleson.
10        Q.   And what's her position?
11        A.   I do not know her title.
12        Q.   Who does she report to?
13        A.   Dr. Belavich.
14        Q.   And she gave you that instruction during the
15   meeting?
16        A.   Correct.
17        Q.   Was she the chair of the committee or were
18   you?
19        A.   I was the chair.  She was the highest ranking
20   member at the committee.
21        Q.   Was this -- is this the normal way that these
22   committees function, that the highest ranking member
23   tells the chair what to do?
24        A.   I -- I don't know that there's a normal
25   process in this.  I do as I'm instructed by my
```

Page 41

1       A.    At that point, we were -- we were looking into

2   it, yes.   There had been a number of concerns and

3   questions raised as to whether it was a suicide so

4   whether we needed to proceed with the review.

5       Q.    Did Dr. Bramble have an opinion that she

6   shared with you as to whether she thought it was a

7   suicide?

8       A.    Yes.

9       Q.    What was her opinion?

10      A.    That she did not think it was a suicide.

11      Q.    And what was your opinion?

12      A.    I don't have an opinion on that.

13      Q.    Why not?

14      A.    The reason we use reviewers is because they

15  can go out and spend a lot more time and investigate

16  every aspect of the case.   I do not have that luxury of

17  time to know every intricacy involved in the case.

18      Q.    And in terms of the -- are you familiar with

19  the Program Guide 12-10?

20      A.    Yes.

21      Q.    And there are certain timelines that are

22  required under the program guide?

23      A.    Yes, there are.

24      Q.    And part of your job is to make sure that

25  reports are done timely?

Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1          Q.   And required supporting documents?  Would you
 2     do that?
 3          A.   Correct.  I do that.
 4          Q.   Okay.  So is it fair to say that as of the
 5     22nd of October, you had been given at least a rough
 6     outline or description of the various problems
 7     identified by Dr. Bramble?
 8          A.   Of the problems identified by Dr. Bramble,
 9     yes.
10          Q.   In the QIP section?
11          A.   Yes.
12          Q.   Okay.  And then you were saying:  "I haven't
13     written the QIP yet," because you wanted to get approval
14     from your superiors first?
15          A.   Correct.
16          Q.   Is that the normal process you use, or was
17     there something special about this one?
18          A.   That's the normal process.  The QIPs are
19     really a work in process.  We ask the reviewer to take
20     their best attempt at identifying all the problems in
21     the report, and then I write a sort of rough draft, if
22     you will, of the QIP portion and then the required
23     supporting documentation.
24               But that is why we have the teleconference, so
25     that we can get feedback from different disciplines and
```

```
 1    the institution to see if the QIPs are appropriate.
 2         Q.    Okay.  But it is important to have the QIPs
 3    circulated then to the committee prior to the meeting
 4    on -- that takes place so you can have meaningful input
 5    and review?
 6         A.    Exactly, yes.
 7         Q.    Is it fair to say, then, that the -- you would
 8    have written the QIPs and circulated them to the
 9    committee sometime between October 22nd and the meeting
10    on October 31st?
11         A.    10/24, yes.
12         Q.    10/24 is when you did it?
13         A.    I don't know the specific date when I wrote
14    the QIPs, but the report was circulated for the
15    teleconference.  It went out on 10/24.
16              MR. TYRA:  And that's per IMD0006, the next
17    e-mail in order.
18    BY MR. BORNSTEIN:
19         Q.    So between the October 22nd and October 24th,
20    you would have written the QIP section of the report for
21    review by the committee?
22         A.    A rough draft of the QIP section.
23         Q.    But it would have included the problem,
24    correct?
25         A.    Correct.
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                          February 12, 2014

```
 1   teleconference about the review process.
 2           Dr. Bramble, was not going to be in town, so I
 3   wasn't sure if Amy, my boss, wanted to wait to hold the
 4   teleconference until her return or if she wanted me to
 5   just read the highlighted sections, if you will, of the
 6   report at the teleconference.
 7       Q.   Is she a doctor or a Ms. also, Amy Eargle?
 8       A.   Amy is a doctor.
 9       Q.   So did Dr. Eargle give you instructions?
10       A.   She did.  She sent me e-mail telling me to
11   schedule it for 31st at 10:00 o'clock.
12       Q.   Okay.  I may have missed it but -- oh, that's
13   the one down here.
14           No, that's from Byron Russell.
15           MR. BORNSTEIN:  So I'm asking for that e-mail,
16   too, Patrick, please.
17           MR. McKINNEY:  Okay.  To the extent it exists.
18           THE WITNESS:  It was a one-line e-mail that
19   said:  "Schedule 10/31 at 10:00 a.m."
20   BY MR. BORNSTEIN:
21       Q.   Okay.  Then you sent an e-mail out on the
22   24th at 11:53 a.m. to Byron Russell, copied yourself,
23   with an attachment Suicide Report Duran AR-1813 --
24   excuse me -- 1833 MCSP edited.doc.
25           And you say to Byron:  "Will you please send
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

1    this out to people from the case review teleconference

2    next Tuesday?  Thank you so much for your assistance."

3              And that would have been the -- the then-final

4    version of the report for the committee review purposes?

5         A.   Yes.

6         Q.   And that would have included the QIP section?

7         A.   A rough draft of the QIP, yes.

8         Q.   Okay.

9         A.   The report at that stage is still considered a

10   rough draft.

11        Q.   Understand.

12        A.   Okay.

13        Q.   When I say "final," I mean final in the sense

14   of this is what the committee going to look at?

15        A.   Most edited.  Most up to date edited.

16        Q.   All right.  Then there's an e-mail that goes

17   out from Byron Russell on the 24th of October and there

18   are the -- who's David Smiley?

19        A.   He's the CEO at Mule Creek.

20        Q.   And who -- the CEO?

21        A.   Yes.

22        Q.   What's that position?

23        A.   Chief executive officer.

24        Q.   And then there's William Knipp.  Who's he?

25        A.   I don't know.  He is executive custody staff.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
1         Q.    At Mule Creek or --
2         A.    At Mule Creek, yes.
3         Q.    Who's Brian Holmes?
4         A.    Again, I do not know.  Who -- I do not know
5    Brian Holmes' title.
6         Q.    But he's at Mule Creek?
7         A.    Mule Creek.
8         Q.    And then Jim Telander?
9         A.    Uh-huh.
10        Q.    Who's he?
11        A.    Dr. Telander is chief of mental health at Mule
12   Creek.
13        Q.    Allison Andres?
14        A.    SPR-FIT coordinator, the suicide prevention
15   and response coordinator -- suicide prevention and
16   response focused improvement team coordinator at
17   Mule Creek State Prison.
18        Q.    And you have the same title, though, right?
19        A.    That's actually -- I'm the suicide response
20   coordinator versus suicide prevention coordinator.
21        Q.    So what's the difference?
22        A.    Any time there is a suicide or it relates to a
23   suicide that occurred, then it's me.  It's suicide
24   response.
25              If you're talking about like education or
```

```
 1   outreach or prevention efforts for suicide, then that
 2   would be the suicide prevention coordinator.  It's a
 3   separate title and position at DHCS.
 4        Q.   Okay.  And Jeff Beard, you were talking about
 5   the head of the CDCR, the secretary?
 6        A.   Correct.  Uh-huh.
 7        Q.   Yes?
 8        A.   Yes.
 9        Q.   Martin Hoshino, do you know who he is?
10        A.   I do.  I don't know his specific title.
11   Diana Toche, Martin Hoshino, and then Jeff Beard are
12   considered executive row and they get invited -- I don't
13   know their specific title.  But yes, they are executive.
14        Q.   Do they ever come?
15        A.   No.
16        Q.   What about Ralph Diaz?
17        A.   Custody DAI staff.
18        Q.   What's DAI?
19        A.   Division of Adult Institutions.
20        Q.   Do you know -- have you ever -- do you know
21   who he is?  Have you met with him before?
22        A.   I have not.  Executive staff at DAI.
23        Q.   Kathleen Allison, did she come to the meeting?
24        A.   I cannot say for sure.
25        Q.   You think she did?
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                           February 12, 2014

```
 1              MR. TYRA:  If you know, let him know.  I don't
 2    want you to guess or speculate.
 3    BY MR. BORNSTEIN:
 4         Q.   I just want your best recollection.
 5         A.   I cannot say for sure.
 6         Q.   Do you have a recollection at all?
 7         A.   She was not in the room, at the teleconference
 8    room, the room at headquarters.  She may have been on
 9    the phone line.  I do not know.
10         Q.   Does somebody keep minutes of these meeting?
11         A.   Not this one.
12         Q.   Why not this one?
13         A.   It's not required to have minutes taken at
14    these meetings.  And we did have a minute taker for the
15    teleconference that we had at 9:00 o'clock that morning,
16    earlier that morning, but she got pulled to another
17    meeting.  So our minute taker left.
18         Q.   So there's nobody else that takes minutes once
19    your minute taker is pulled?
20         A.   In this case, no.
21         Q.   Did anyone volunteer to take minutes?
22         A.   No.
23         Q.   Who made the decision to have the meeting
24    without minutes?  Was that your decision?
25         A.   It wasn't a decision -- it didn't come up to
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                February 12, 2014

```
 1    not have the meeting.  It's not required to have a
 2    minimum taker at these.
 3              We don't always.  Often we don't have minute
 4    takers at the teleconference.
 5         Q.   Why did you have one at the first meeting?
 6         A.   I cannot say.  It's a practice that we would
 7    like to implement and that we are trying to implement
 8    more consistently, but it is not something that we do as
 9    a matter of routine.
10         Q.   From your perspective, do you like it when
11    there are minute takers or not?
12         A.   Yes.
13         Q.   Why?
14         A.   I like having records of who was present, who
15    said what, and what occurred at the meeting.
16              There's no way to recall that after the
17    meeting has occurred if there are not minutes.
18         Q.   Okay.  Joe Stein, who's that?
19         A.   Executive DAI staff.
20         Q.   Oops, I forgot one.  I can't really read this.
21    Is it Coyt Shirley?
22         A.   Uh-huh.
23         Q.   You've got to say yes or no.
24         A.   Yes.
25         Q.   Who's Coyt Shirley?
```

THORSNES LITIGATION SERVICES, LLC | 877.771.3312 | www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                                    February 12, 2014

```
 1        A.    DAI staff, Division of Adult Institutions
 2   staff.
 3        Q.    Again, if you -- as we're going through this
 4   list, if you remember any of them being on the call, if
 5   you would say so, I'd appreciate it.
 6              Have there been any of those people whose name
 7   we read that you remember being on the call?
 8        A.    I cannot say for sure.
 9        Q.    Okay.  Do you have any memory of --
10        A.    Dr. Andres was on the phone.
11        Q.    Okay.
12        A.    The SPR-FIT.
13        Q.    Okay.  Paul Hail, who's that?
14        A.    Lieutenant Paul Hail, he's with DAI.  He
15   accompanied Dr. Bramble on the review.
16        Q.    Christina, what do you mean, "accompanied"?
17   Like was her escort or was also a cowriter, or what does
18   that mean?
19        A.    He escorted her.
20        Q.    To keep her safe when she went in the prison?
21        A.    For every suicide review, we have a DAI
22   representative participate in the review process, the
23   on-site review.  And that's to ensure that the reviewer
24   has access to anything custody-related.  Or if the
25   reviewer has any custody-related questions about what
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1    forms or policies or procedures or checks, then she has
 2    a DAI person there on-site that she can get immediate
 3    answers -- he or she can get immediate answers.
 4         Q.   How about Christina Phillips?
 5         A.   DAI staff.  Works with Ms. Allison.
 6         Q.   And, again, if you remember or think any of
 7    them were on the call, please let us know.  Okay?
 8         A.   Okay.
 9         Q.   Thomas Tyler?
10         A.   DAI staff.
11         Q.   Art Gonzales?
12         A.   DAI.
13         Q.   Judy Burleson?
14         A.   She is my boss's boss -- or was at the time my
15    boss's boss.  She was in the room.
16         Q.   Okay.  Kathleen O'Meara?
17         A.   She's a senior psychologist.  She's a chief --
18    I'm sorry, she not a senior -- she's a chief
19    psychologist, a regional chief for the northern region.
20         Q.   Above you?
21         A.   Above me, yes.
22         Q.   And was she in the room or on the call?
23         A.   I cannot recall.
24         Q.   You were in room?
25         A.   I was in room.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Corey Scheidegger, Ph.D.                                February 12, 2014

```
 1         Q.   Was she in the room, Amy Eargle?
 2         A.   She was not in room.
 3         Q.   On the call?
 4         A.   I cannot say for certain.
 5         Q.   Okay.  How about Rachel Bramble?  Was she on
 6    the call?
 7         A.   No.
 8         Q.   Was she in the room?
 9         A.   No.
10         Q.   That's what you were trying to alert your boss
11    to?
12         A.   Correct.
13         Q.   How about Karen Rea?
14         A.   Karen Rea is nursing.  She's the chief nurse
15    executive at headquarters.
16         Q.   Was she on the call?
17         A.   I cannot recall.
18         Q.   Cheryl Schutt, S-C-H-U-T-T?
19         A.   Nursing on the call -- excuse me -- not in the
20    room.  I cannot recall if she was on the line.
21         Q.   Charles Joslin?
22         A.   Nursing.  I cannot recall if he was on the
23    line or in the room.
24              Charlie Joslin also attended the review with
25    Dr. Bramble, the on-site review.
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Corey Scheidegger, Ph.D.                                    February 12, 2014

| | | |
|---|---|---|
| 1 | Q. | Nursing? |
| 2 | A. | For nursing. |
| 3 | Q. | Again, the same role, to try and get nursing |
| 4 | records? | |
| 5 | A. | Yeah, or, you know, if any nursing questions |
| 6 | came up or if any, you know, why doesn't nursing do this | |
| 7 | or how frequently is nursing supposed to do that, then | |
| 8 | she has that immediate access. | |
| 9 | Q. | How about Lucinda McGill? |
| 10 | A. | Nursing, retired annuitant. |
| 11 | Q. | Was she there on the phone? |
| 12 | A. | I do not recall. |
| 13 | Q. | Robert Canning? |
| 14 | A. | I do not recall if he was in the room or on |
| 15 | the phone. He's the suicide prevention coordinator at | |
| 16 | headquarters. He's my colleague. | |
| 17 | Q. | Joe Lizzarraga? |
| 18 | A. | DAI staff. |
| 19 | Q. | Was he there or on the phone? |
| 20 | A. | I cannot recall. |
| 21 | Q. | Terri Weinholdt? |
| 22 | A. | I don't know who Terri is. |
| 23 | Q. | Lilia -- is that right -- Nash? |
| 24 | A. | I do not know who Lilia is. |
| 25 | Q. | And Thomas Gilevich? |

THORSNES LITIGATION SERVICES, LLC | 877.771.3312 | www.thorsnes.com

```
 1        A.    I cannot recall if he was in the room or on
 2   the line.  He's with Office of Legal Affairs.
 3        Q.    So it's a lawyer?
 4        A.    Yes.
 5              MR. TYRA:  How are you?
 6              THE WITNESS:  I'm doing good.
 7              MR. BORNSTEIN:  We're almost done, I hope.  I
 8   just want to finish going through these documents, and
 9   then I want to yell at Patrick for a little while and
10   then we'll --
11              MR. McKINNEY:  Are you okay, Megan?
12              THE REPORTER:  I am.  Thank you.
13              MR. BORNSTEIN:  If you need a break, tell me.
14   BY MR. BORNSTEIN:
15        Q.    Okay.  So then the -- then we jump -- there's
16   a gap from October 24th to January the 9th.
17              In your recollection, did you have other
18   e-mails or other drafts of this report or anything -- or
19   did you do work between October the -- well, first, did
20   you have any other e-mails that you recall producing to
21   the State for their review between October 24th, 2013,
22   and January 9th, 2014?
23        A.    I think I did.
24        Q.    Okay.
25              MR. BORNSTEIN:  So I'm asking that you produce
```

Corey Scheidegger, Ph.D.                                    February 12, 2014

```
 1                        --o0o--

 2                     EXAMINATION

 3   BY MR. McKINNEY:

 4        Q.    Doctor, if I could have you turn to Exhibit 2,

 5   the declaration of counsel.

 6              If you could turn to -- I believe it's

 7   Exhibit A to the draft report that you've been asked a

 8   series of questions about.

 9              Do you know what the date is of this draft

10   report?

11        A.    No, I do not.

12        Q.    If you could turn to page 3 of the document,

13   under heading 2, it states that the coroner's report was

14   received on November 27, 2013.

15              Did I read that correctly?

16        A.    Yes.

17        Q.    Would this have been prepared after that date?

18        A.    Yes.  Most certainly.

19              MR. McKINNEY:  No future questions.

20              MR. BORNSTEIN:  Doesn't answer my question.

21              My question is:  Are you willing to allow --

22   to do a phone call with the magistrate so we can resolve

23   this now so as to allow this witness to be finished

24   today?

25              MR. McKINNEY:  I think you're finished.  If
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1

2                    CERTIFICATE OF REPORTER

3

4          I, MEGAN F. ALVAREZ, a Certified Shorthand

5    Reporter, hereby certify that the witness in the

6    foregoing deposition was by me duly sworn to tell the

7    truth, the whole truth and nothing but the truth in the

8    within-entitled cause;

9          That said deposition was taken down in

10   shorthand by me, a disinterested person, at the time and

11   place therein stated, and that the testimony of the said

12   witness was thereafter reduced to typewriting, by

13   computer, under my direction and supervision;

14         I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition, nor in any way interested in the events of

17   this cause, and that I am not related to any of the

18   parties hereto.

19

20

21                    DATED:  February 14, 2014

22

23                    _____

24                    MEGAN F. ALVAREZ
                      RPR, CSR 12470
25

# EXHIBIT  3



Transcript of the Testimony of:

# **ROUGH-Kathleen Allison-ROUGH**

Coleman v. Brown

February 18, 2014

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

ROUGH-Kathleen Allison-ROUGH                                February 18, 2014

UNCERTIFIED REALTIME ROUGH DRAFT

This realtime draft is unedited and
uncertified and may contain untranslated stenographic
symbols, an occasional reporter's note, a misspelled
proper name and/or nonsensical word combinations.

This is an unedited version of the deposition
transcript and should not be used in place of a
certified copy.  This document should not be duplicated
or sold to other persons or businesses.  This document
is not to be relied upon in whole or in part as the
official transcript.

This uncertified realtime rough draft version
has not been reviewed or edited by the certified
shorthand reporter for accuracy.  This unedited
transcript is computer generated and random translations
by the computer may be erroneous or different than that
which will appear on the final certified transcript.

Due to the need to correct entries prior to
certification, the use of this realtime draft is only
for the purpose of augmenting counsel's notes and cannot

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    be used to cite in any court proceeding or be

 2    distributed to any other parties.

 3

 4              Acceptance of this realtime draft is an

 5    automatic final copy order.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1

2                    UNITED STATES DISTRICT COURT

3                   EASTERN DISTRICT OF CALIFORNIA

4

5   RALPH COLEMAN, ET AL.,                )
                                          )
6                      Plaintiffs,        )
                                          )CASE NO.:
7            vs.                          )S 90-0520 LKK-JFM
                                          )
8   EDMUND G. BROWN, JR., ET AL.,         )
                                          )
9                      Defendants.        )
    _____)

10

11

12                     DEPOSITION OF

13                    KATHLEEN ALLISON

14

15        TUESDAY, FEBRUARY 18, 2014,  8:52 A.M.

16              SAN FRANCISCO, CALIFORNIA

17

18                       VOLUME I

19

20

21    REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

22           THORSNES LITIGATION SERVICES, LLC

23

24

25

 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4    RALPH COLEMAN, ET AL.,              )
                                          )
 5                        Plaintiffs,     )
                                          ) CASE NO.:
 6              vs.                        ) S 90-0520 LKK-JFM
                                          )
 7    EDMUND G. BROWN, JR., ET AL.,        )
                                          )
 8                        Defendants.     )
      _____)

 9

10

11

12

13

14            The Deposition of KATHLEEN ALLISON, taken on

15    behalf of the Plaintiffs, before Megan F. Alvarez,

16    Certified Shorthand Reporter No. 12470, Registered

17    Professional Reporter, for the State of California,

18    commencing at 8:52 a.m., Tuesday, February 18, 2014, at

19    K&L Gates LLP, 4 Embarcadero Center, Suite 1200,

20    San Francisco, California.

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  JEFFREY L. BORNSTEIN, ESQ.
                    RANJINI ACHARYA, ESQ.
 4              K&L GATES LLP
                4 EMBARCADERO CENTER, SUITE 1200
 5              SAN FRANCISCO, CALIFORNIA 94111
                415.882.8200
 6              415.882.8220 FAX
                JEFF.BORNSTEIN@KLGATES.COM
 7

 8
      FOR DEFENDANTS:
 9
                BY:  JAY RUSSELL, ESQ.
10              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
11              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
12              415.703.5233
                415.703.5843 FAX
13              JAY.RUSSELL@DOJ.CA.GOV

14

15    ALSO PRESENT:

16              NICK WEBER, ATTORNEY, CDCR

17

18

19

20

21

22

23

24

25
```

1          Q.    Were you part of the meeting that took place
2     on October 31st?
3          A.    Yes.
4          Q.    Were you participant by phone?
5          A.    Yes.
6          Q.    Are you the one who gave the instruction to
7     Judy Burleson to then have Dr. Scheidegger remove
8     certain portions of the draft report?
9          A.    We had multiple discussions about that report.
10    But it was not -- we had discussions on the call that
11    day.  About that report.  But it was deemed not to be a
12    suicide so there was no more discussions about that.
13         Q.    It was deemed not to be a suicide during that
14    meeting?
15         A.    Yes.
16         Q.    And who made that decision?
17         A.    The clinical staff who were on the phone.
18         Q.    The -- once it's deemed not to be a suicide
19    stops the process?
20         A.    Yes.
21         Q.    So even though you'd done a suicide review or
22    a suicide report, you had your committee meeting, the
23    clinicians all said this is not a suicide, that's it?
24              MR. RUSSELL:  Objection.  Vague and ambiguous.
25    Lacks foundation, assumes facts not in evidence.

1         Q.    I asked for a ballpark.

2         A.    Approximately 30.  And I think out of those,

3    two were deemed not to be suicides.

4         Q.    Including this one?

5         A.    No.  This was one was subsequently considered

6    a suicide.

7         Q.    This one became a suicide again?

8         A.    Yes.

9         Q.    How did that happen?

10        A.    Following the coroner's report.

11        Q.    So and how long have you been in your position

12   you said a year and a half or something?

13        A.    April 2012.

14        Q.    Almost two years?

15        A.    Uh-huh.

16        Q.    Approximately 30 suspected suicides?

17        A.    28 or 30 in 2013, and 28 I think in 2012.

18        Q.    28 in 2012, 28 to 30 in 2013?

19        A.    Approximately.

20        Q.    These are all suspected suicides, correct?

21        A.    All but a couple of them were deemed suicides.

22   There were a couple not deemed suicides.

23        Q.    Why was this one based on your understanding

24   having been on the call for the meeting on October 31st,

25   deemed not to be a suicide?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              One was that the following:  "The inmate was
 2     pepper-sprayed when he would not release the food port.
 3     While an open food port is considered a security breach
 4     and pepper-spraying the inmate is permitted according to
 5     policy, it is recommended that the warden's use of force
 6     committee review this policy especially as it related to
 7     medically or psychiatrically ill inmate."
 8              Correct?
 9         A.   What's your question?
10         Q.   That was in the draft report that was
11     considered by the committee on October 31st, correct?
12              MR. RUSSELL:  Objection.  Lacks foundation.
13              You can respond.
14              THE WITNESS:  I think so.
15     BY MR. BORNSTEIN:
16         Q.   Okay.  Were you the one who ordered
17     Judy Burleson to have it removed?
18         A.   It was a discussion, but it was long after
19     that.
20         Q.   No.  I'm asking during that meeting or shortly
21     thereafter, did you have a discussion with Judy Burleson
22     about taking out that section of the report?
23              MR. RUSSELL:  Objection.  Compound.  Vague and
24     ambiguous.
25              THE WITNESS:  Yes, but it was not until
```

```
 1   January.
 2   BY MR. BORNSTEIN:
 3        Q.    So in October there was a discussion about
 4   that?
 5        A.    I don't recall any discussion about that
 6   specific statement until January.
 7        Q.    What do you recall about what happened in
 8   January?
 9             MR. RUSSELL:  Objection.  Yeah, objection.  I
10   believe the -- the question seeks information protect he
11   had by the deliberative process privilege.
12             And I'm going to instruct you not to answer.
13             It's also irrelevant.
14   BY MR. BORNSTEIN:
15        Q.    My understanding is that Dr. Scheidegger was
16   told by her boss, Judy Burleson, to remove that comment
17   that I just read about the food port issue and the
18   recommendation that the warden's use of force committee
19   review the food port policy sometime in the October time
20   frame of 2013?
21        A.    Not to my knowledge.
22        Q.    So your testimony is that didn't happen until
23   January?
24        A.    Correct.
25        Q.    Okay.  So the draft report then had that in
```

ROUGH-Kathleen Allison-ROUGH                    February 18, 2014

```
 1              MR. RUSSELL:  Objection.  Vague and ambiguous.
 2    Lacks foundation.
 3              If you -- do you want to show her the report?
 4              MR. BORNSTEIN:  I'm asking her if she
 5    remembers it being there.
 6              MR. RUSSELL:  If you remember those exact
 7    words, you can respond.
 8              THE WITNESS:  I think so.
 9    BY MR. BORNSTEIN:
10         Q.   And also that, according to policy, all
11    interactions with the inmate should have been
12    documented?
13              MR. RUSSELL:  Objection.  Vague and ambiguous.
14    Lacks foundation.  Calls for speculation.  Assumes facts
15    not in evidence.
16              THE WITNESS:  Yes, but not in that form.
17    BY MR. BORNSTEIN:
18         Q.   Why did you make the decision to remove all of
19    that stuff?
20              MR. RUSSELL:  Objection.  The question calls
21    for information that's protected by the deliberative
22    process privilege.
23              And I instruct you not to answer.
24    BY MR. BORNSTEIN:
25         Q.   Was it your decision or did somebody tell you?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        A.    It was my decision.
 2        Q.    Why?
 3              MR. RUSSELL:  Objection.  The question calls
 4    for information protected by the deliberative process
 5    privilege.
 6              I'm instructing you not to answer.
 7    BY MR. BORNSTEIN:
 8        Q.    When did you make the decision?
 9        A.    January.
10        Q.    What was it that triggered you making the
11    decision in January?
12              MR. RUSSELL:  Objection.  Question calls for
13    information protected by the deliberative process
14    privilege.
15              I'm instructing you not to answer.
16              MR. BORNSTEIN:  This would be a good time take
17    a break.  We've been going for a little more than hour
18    and ten minutes.
19              (Off the record at 10:26 a.m. and back
20                on the record at 10:40 a.m.)
21              MR. BORNSTEIN:  While we were off the record,
22    I asked counsel for Ms. Allison if we could have a -- if
23    we could alert the magistrate to the disputes that we're
24    having about documents and also instructions not to
25    answer based on the deliberative process privilege.
```

| 1 | Q. Okay. Ms. Burleson reports to whom? |
|---|---|
| 2 | A. Mr. Belavich. To my understanding. |
| 3 | Q. In your -- at least up through October 31st, |
| 4 | was there -- up to that point, had you yourself ever |
| 5 | formed the opinion that there was a problem with the way |
| 6 | pepper spray was used in this particular case? |
| 7 | MR. RUSSELL: Objection. Vague and ambiguous. |
| 8 | BY MR. BORNSTEIN: |
| 9 | Q. Up through October -- you know, at that |
| 10 | meeting on October 31st. |
| 11 | Did you ever form the opinion that there's a |
| 12 | problem the way the guards used pepper spray in this |
| 13 | case? |
| 14 | MR. RUSSELL: Objection. Vague and ambiguous. |
| 15 | THE WITNESS: I did not know that. It was a |
| 16 | concern, and therefore we were waiting on the coroner's |
| 17 | report. |
| 18 | BY MR. BORNSTEIN: |
| 19 | Q. So what was a concern? |
| 20 | A. Whether was a concern about the stoma. |
| 21 | Q. The what? |
| 22 | A. The stoma. |
| 23 | Q. And stoma is where the tracheotomy is? |
| 24 | A. Yes, sir. |
| 25 | Q. What do you mean there was a concern about |

Page 82

 1    attempted suicides and suicides.  And if I recall, it
 2    was months before this event.  Prior to that, I was
 3    forwarding them to them.
 4         Q.   Of the roughly 58 or 60 prior incidents of
 5    suicide or attempted suicide or suspected suicide that
 6    you identified for us earlier today, have you ever
 7    stopped the report from being generated to the special
 8    master while you waited for the coroner's report?
 9              MR. RUSSELL:  Objection.  Vague and ambiguous
10    compound overly broad you can respond.
11              THE WITNESS:  That's not my determination.
12    BY MR. BORNSTEIN:
13         Q.   Who made the determination in this case?
14         A.   I don't know.
15         Q.   Was it somebody who sat on the committee?
16         A.   I don't know what all their processes are.  I
17    know that determination was made in committee it was not
18    a suicide so I don't know after that.  I'm not privy to
19    those conversation.
20         Q.   Well, Judy Burleson instructed Dr. Scheidegger
21    to stop work on the report.  You knew that?
22              MR. RUSSELL:  Objection.  Vague and ambiguous.
23    Lacks foundation.  Assumes facts not in evidence and is
24    therefore argumentative.
25              You can respond if you understand his

1    Q.   So I don't understand those two things.  Are

2  you saying you have a concern that policy should be

3  changed?  Is that what you're saying?

4           MR. RUSSELL:  Objection.  Well, it's vague and

5  ambiguous.

6           But you can respond.

7           THE WITNESS:  I think we need to ask medical

8  to evaluate and tell us whether they, on a global sense,

9  if we need to look at policy.

10          That's a physician call, not a custodial call.

11 BY MR. BORNSTEIN:

12    Q.   So how is that different from the

13 recommendation that was stricken from the final report

14 about using pepper spray against medically or

15 psychiatrically ill inmates?

16          MR. RUSSELL:  I mean, is there something you

17 want to show her?  I'm going to object that it's vague

18 and ambiguous.  Lacks foundation.  Calls for

19 speculation.

20          MR. BORNSTEIN:  Okay.  Hold on.  I'll show it

21 to her.

22 BY MR. BORNSTEIN:

23    Q.   This is page 17 of a draft of the suicide

24 report that contains recommendations in it that were

25 stricken from the final report.

```
 1              And those are circled highlighted four and
 2    five, correct?
 3         A.    Correct.
 4         Q.    And you made the decision to strike those,
 5    didn't you?
 6              MR. RUSSELL:  Objection.  Asked and answered.
 7              I mean compound.
 8              THE WITNESS:  I was part of the decision, yes.
 9    BY MR. BORNSTEIN:
10         Q.    Who else was part of the decision?
11         A.    Judy Burleson and Amy Eargle.
12         Q.    Anybody else?
13         A.    And at the very end, Mike Stainer was
14    involved.
15         Q.    You mean in January?
16         A.    Yes.
17         Q.    And how did he get involved?
18              MR. RUSSELL:  Objection.  Vague and ambiguous.
19    Overly broad.
20              THE WITNESS:  We had a brief discussion toward
21    the final days of the reports but it goes to the why.
22              MR. RUSSELL:  Okay.  Then if that requires you
23    to respond with information that's protected by the
24    deliberative process, then I would instruct you not to
25    answer.
```

```
 1   BY MR. BORNSTEIN:
 2        Q.   The meeting that you're talking about between
 3   you, Judy Burleson, and Amy Eargle, did that occur prior
 4   to January?
 5             MR. RUSSELL:  Objection.  Did you discuss -- I
 6   don't think she discussed a meeting.
 7   BY MR. BORNSTEIN:
 8        Q.   Was it a meeting?
 9        A.   No.
10        Q.   Okay.  So was it like shuttle diplomacy; you
11   talked to each one separately?
12             MR. RUSSELL:  Objection.  Vague and ambiguous.
13             If you know what shuttles diplomacy means, you
14   can respond.
15             THE WITNESS:  I don't.
16   BY MR. BORNSTEIN:
17        Q.   Do you remember a guy by the name of Henry
18   Kissinger?  Do you remember him?
19        A.   Yes.
20        Q.   Do you remember there was a -- he used to do a
21   kind of diplomacy where he'd go to each party
22   separately?  Do you remember that?
23        A.   No.
24        Q.   Did you go to Ms. Burleson separately and
25   discuss the report with her or the recommendations with
```

```
 1   her?
 2        A.   My conversation with Judy Burleson was
 3   separate from Amy because Amy was not available.
 4        Q.   Was your conversation with Amy separate from
 5   the conversation you had with Mike Stainer?
 6        A.   Yes.
 7        Q.   Was your conversation with Mike Stainer
 8   separate from your conversation with Judy?
 9        A.   Yes.
10        Q.   And did all these conversations happen in
11   January of 2014 and not before?
12        A.   Yes.
13        Q.   Who's leaking all this stuff?  Do you know?
14        A.   No idea.
15        Q.   Is there an investigation into that?
16        A.   Yes.
17        Q.   Is that a criminal investigation or civil one?
18        A.   I don't know.
19        Q.   Has that been referred to the prosecutors?  Do
20   you know?
21        A.   I don't know.
22        Q.   Who's handling that?
23        A.   I don't know.
24        Q.   Who, other than the warden in an institution,
25   has the power to refer staff, notwithstanding an OIA
```

# EXHIBIT   4



Transcript of the Testimony of:

# ROUGH-Judy Burleson-ROUGH

Coleman v. Brown

February 18, 2014

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNCERTIFIED REALTIME ROUGH DRAFT

This realtime draft is unedited and
uncertified and may contain untranslated stenographic
symbols, an occasional reporter's note, a misspelled
proper name and/or nonsensical word combinations.

This is an unedited version of the deposition
transcript and should not be used in place of a
certified copy.  This document should not be duplicated
or sold to other persons or businesses.  This document
is not to be relied upon in whole or in part as the
official transcript.

This uncertified realtime rough draft version
has not been reviewed or edited by the certified
shorthand reporter for accuracy.  This unedited
transcript is computer generated and random translations
by the computer may be erroneous or different than that
which will appear on the final certified transcript.

Due to the need to correct entries prior to
certification, the use of this realtime draft is only
for the purpose of augmenting counsel's notes and cannot

1   be used to cite in any court proceeding or be

2   distributed to any other parties.

3

4           Acceptance of this realtime draft is an

5   automatic final copy order.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,            )
                                       )
5                    Plaintiffs,       )
                                       )CASE NO.:
6           vs.                        )S 90-0520 LKK-JFM
                                       )
7    EDMUND G. BROWN, JR., ET AL.,     )
                                       )
8                    Defendants.       )
     ──────────────────────────────   )

9

10

11                DEPOSITION OF

12                JUDY BURLESON

13

14    TUESDAY, FEBRUARY 18, 2014, 12:58 P.M.

15            SAN FRANCISCO, CALIFORNIA

16

17                   VOLUME I

18

19

20  REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

21           THORSNES LITIGATION SERVICES, LLC

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,                )
                                           )
 5                        Plaintiffs,      )
                                           )CASE NO.:
 6              vs.                         )S 90-0520 LKK-JFM
                                           )
 7   EDMUND G. BROWN, JR., ET AL.,         )
                                           )
 8                        Defendants.      )
     _____)
 9

10

11

12

13

14            The Deposition of JUDY BURLESON, taken on

15   behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 12:58 p.m., Tuesday, February 18, 2014, at

19   K&L Gates LLP, 4 Embarcadero Center, Suite 1200,

20   San Francisco, California.

21

22

23

24

25
```

ROUGH-Judy Burleson-ROUGH                                    February 18, 2014

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:   JEFFREY L. BORNSTEIN, ESQ.
                     RANJINI ACHARYA, ESQ.
 4              K&L GATES LLP
                4 EMBARCADERO CENTER, SUITE 1200
 5              SAN FRANCISCO, CALIFORNIA 94111
                415.882.8200
 6              415.882.8220 FAX
                JEFF.BORNSTEIN@KLGATES.COM
 7

 8

 9    FOR DEFENDANTS:

10              BY:   JAY RUSSELL, ESQ.
                OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
11              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
12              415.703.5233
                415.703.5843 FAX
13              JAY.RUSSELL@DOJ.CA.GOV

14

15    ALSO PRESENT:

16              NICK WEBER, ATTORNEY, CDCR

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    to other witness and I don't think it's right.

 2              I'm not asking about the internal affairs

 3    investigation and I haven't for any of the other

 4    witnesses either, but you're overly broadly broad in

 5    your instructions in this case and I don't appreciate

 6    it.

 7    BY MR. BORNSTEIN:

 8         Q.   Who made the decision to have Dr. Scheidegger

 9    act as the suicide review coordinator in this case?

10         A.   That is her job in all of them.

11         Q.   Okay.  In --

12         A.   The -- excuse me.  The suicide reviewer.

13         Q.   Who was it that assigned Dr. Bramble to review

14    the case?

15         A.   That would have come through Dr. Scheidegger.

16         Q.   Did you have any concerns with Dr. Bramble's

17    initial report that you've reviewed?

18              MR. RUSSELL:  Objection.  Vague and ambiguous.

19              THE WITNESS:  I edited it.

20    BY MR. BORNSTEIN:

21         Q.   What parts did you edit?

22         A.   What parts?

23         Q.   Yes.

24         A.   The entire thing.

25         Q.   Okay.  What were you doing?  To make the words
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   make more sense or was there something substantive you
 2   added?
 3        A.   I was taking out personal opinion.  I
 4   corrected some incorrect references.  I did some
 5   grammar, punctuation, clarification, asked questions.
 6        Q.   How many of these suicide reviews have you
 7   participated in that also had an internal affairs
 8   component?
 9        A.   I have never counted.
10        Q.   More than one?
11        A.   Yes.
12        Q.   More than ten?
13        A.   I don't know.
14        Q.   Is there something different about how these
15   suicide reviews are done when there's been a referral to
16   internal affairs?
17        A.   Yes.
18        Q.   What's different about it?
19        A.   We generally do not interview subjects.
20        Q.   So how do you get the information?
21        A.   Based on documentation.
22        Q.   At what point did you find out there was an
23   internal affairs investigation?
24        A.   It was pretty shortly after.
25        Q.   How did you find out about it?
```

```
 1   BY MR. BORNSTEIN:
 2        Q.   Clarification questions that you asked
 3   Dr. Bramble, what were those?
 4             MR. RUSSELL:  I'm going to ask you not to
 5   respond on the basis of the deliberative process
 6   privilege.
 7             MR. BORNSTEIN:  What is it you're going to
 8   allow me to ask her?
 9             MR. RUSSELL:  I don't know what you want to
10   ask.
11             MR. BORNSTEIN:  Well, you know what I'm
12   interested in, so what are you going to --
13             MR. RUSSELL:  Actually, I haven't the
14   slightest idea what you're interested in.
15             MR. BORNSTEIN:  Really?  After sitting here
16   for all morning and even into the afternoon, you have no
17   idea?
18             Is there anything you're going to let me
19   inquire into in terms of her role in the leading up to
20   the October 31st meeting or not?
21             MR. RUSSELL:  It depends upon your questions.
22   BY MR. BORNSTEIN:
23        Q.   Were you part of the meeting on October 31st?
24        A.   Yes.
25        Q.   Who else was part of that meeting?
```

```
1        A.    I don't recall.
2        Q.    Who has a list of who was part of that
3   meeting?
4        A.    There was a meeting invitation.
5        Q.    How do we know who was actually in attendance?
6        A.    I don't know.
7        Q.    Was there anybody assigned to take notes?
8        A.    I believe not.  On that day.
9        Q.    And that's -- was that done on purpose?
10       A.    No.
11       Q.    Why would there have been a note taker?
12       A.    That a process we're still getting smoothed
13   out.
14       Q.    How long have you been working on smoothing
15   out that process?
16       A.    After this has come to light, we've asked that
17   they make a concerted effort to always make sure there's
18   a note taker.
19       Q.    Was there always a note taker before this?
20       A.    No.
21       Q.    Why -- what about this has caused you to do
22   this?
23       A.    Because of the questions that you're asking.
24       Q.    Because no one's ever asked before?
25       A.    Correct.
```

```
 1       Q.   So you can't tell me who was at the meeting;
 2   is that right?
 3       A.   I don't know who all was there.
 4       Q.   Do you know anybody who was there?
 5       A.   I know who was in the room when I arrived.
 6       Q.   Okay.  Who was that?
 7       A.   I recall Amy Eargle.  Dr. Amy Eargle.
 8       Q.   Uh-huh.
 9       A.   Dr. Scheidegger.
10       Q.   Uh-huh.
11       A.   Myself.  I arrived late.  And Tim Belavich.
12       Q.   And who's he?
13       A.   Legal affairs.
14       Q.   Is it normal to have legal affairs there?
15       A.   Yes.
16       Q.   In your participation in that meeting, were
17   there other people on the phone?
18       A.   Yes.
19       Q.   Do you know any of them?
20       A.   No.
21       Q.   Was Kathy Allison on the phone?
22       A.   I don't know.  I arrived late.
23       Q.   You don't know anybody who was on phone?
24       A.   No.
25       Q.   So why did you -- strike that.
```

```
1        A.   I don't know.
2        Q.   Who's -- help me to understand where in the
3   the chain of command those decisions were made.
4        A.   Custody.  Somewhere.
5        Q.   Custody.  All right.
6             There were various drafts of the report that
7   were sent to you in the October time frame prior to the
8   meeting or October 31st, correct?
9        A.   Correct.
10       Q.   You made various changes in the reports?
11       A.   Correct.
12       Q.   In the drafts, I should say?
13       A.   Yes.
14       Q.   And Dr. Scheidegger made changes to the
15   report, right?
16       A.   Correct.
17       Q.   And Dr. Eargle made changes to report,
18   correct?
19       A.   I believe so.
20       Q.   What about Kathy Allison?  Did she make
21   changes?
22       A.   I did not see her change.
23       Q.   Did you see changes from anybody else?
24       A.   No.
25       Q.   What about during the committee meeting that
```

```
 1   made you order Dr. Scheidegger to stop work on the
 2   report?
 3        A.    All the clinicians informed me that they did
 4   not believe it was a suicide.
 5        Q.    What did they think it was.
 6        A.    I don't remember their exact reference but
 7   they -- you know truly an unfortunate death.  But it did
 8   not meet the definition.
 9        Q.    Well, you understand that CDCR has a
10   definition of suicide, doesn't it?
11        A.    There is.
12        Q.    And it includes a person committed a suicide
13   act and changes mind but still died as a result of the
14   act, right?  That's one of the definitions?
15        A.    Right, which means there was some intent.
16        Q.    Or a person only intended to injure himself
17   rather than kill himself such as, for example, by
18   playing Russian Roulette voluntarily with a firearm,
19   right?
20        A.    I'm not sure what you're reading from.
21        Q.    I'm reading being from Dr. Patterson's report
22   dated -- I don't know the date actually.  It's the
23   report January 1, 2012, through June 30, 2012.  It was
24   filed in this case on March 13th, 2013.
25             Have you ever read his report?
```

```
 1    Lacks foundation.  Calls for speculation.  Also assumes
 2    fact not in evidence and therefore is argumentative.
 3              If you can respond, I guess you can do so.
 4              THE WITNESS:  I am not a clinician.
 5    BY MR. BORNSTEIN:
 6         Q.   There's no doubt in your mind, is there?
 7              MR. RUSSELL:  Of what?  That's not a question.
 8              Don't answer that's not a question.
 9    BY MR. BORNSTEIN:
10         Q.   From your layperson perspective, do you have
11    any doubt?
12              MR. RUSSELL:  Objection.  It's not a question.
13    I don't know what that question is.  It's vague and
14    ambiguous.  It lacks foundation.  Assumes facts not in
15    evidence.
16    BY MR. BORNSTEIN:
17         Q.   Let's move on.
18              When did you find out about the fact that
19    there was a trial going on in front of Judge Karlton
20    relating to use of force and involving Coleman class
21    members?
22         A.   Way back before when it was scheduled.  I
23    heard.
24         Q.   Did you know there was trial as a result
25    starting in October of 2013?
```

1      A.    I don't recall when it was starting but I knew

2  it was going to happen.

3      Q.    Did you read the newspapers during that period

4  of time when they discussed?

5      A.    No, I did not.

6      Q.    When they discussed the fact that there were

7  videos of inmates being pepper-sprayed as part of cell

8  extracts that were going be played in evidence during

9  that trial?

10      A.    Generally I do not read paper.

11      Q.    Never heard that?

12      A.    I didn't read it.

13      Q.    Did you see it on TV?

14      A.    No, I did not.

15      Q.    Did you know anything about it?

16      A.    I did know that it was going on.

17      Q.    Did you know what I specifically asked you

18  about, the fact that there were going to be videos

19  played in court showing inmates with serious mental

20  illness being pepper-sprayed?

21           MR. RUSSELL:  Objection.  Vague and ambiguous.

22  Lacks foundation.  Assumes facts not in evidence and is

23  therefore argumentative.

24           THE WITNESS:  I never saw the videotapes, so I

25  don't know what they said, what they portrayed.

```
 1   BY MR. BORNSTEIN:
 2        Q.   Both of those were changes that you ordered --
 3        A.   Yes.
 4        Q.   -- Dr. Scheidegger to make?
 5        A.   Yes.
 6        Q.   In October?
 7        A.   I don't believe so.
 8        Q.   When do you believe you ordered her to do it?
 9        A.   I think these came out in January right before
10   we finalized it.
11        Q.   Dr. Scheidegger testified that the number four
12   was you told her to do in October.
13        A.   Okay.  I would have to rely on her.
14        Q.   Does that refresh your recollection?
15        A.   I would have to rely on her.
16        Q.   You don't have a recollection?
17        A.   (Witness shakes head.)
18        Q.   And then if you turn to -- I'm sorry.  You
19   were shaking your head, and I'm not sure what you were
20   saying?
21        A.   I have recollection of when I told that to
22   Dr. Scheidegger I'd have to rely on her.
23        Q.   But it was you who made the decision?
24        A.   Yes.
25        Q.   Without anybody telling you what to do?
```

```
 1        A.    I believe -- that these may -- I don't
 2   remember which were the edits that I relayed from
 3   Kathy Allison.
 4        Q.    And Kathy Allison's edits were in January?
 5        A.    Yes.
 6        Q.    The third change, significant change at least,
 7   to the draft report and the one in the final report is
 8   in the recommendation section on page 19 in the draft
 9   report, numbered paragraph four, in the draft report has
10   been removed, correct?
11              MR. RUSSELL:  Objection.  Vague and ambiguous.
12   Lacks foundation.  Assumes facts not in evidence and is
13   argumentative as to the term significant change.
14              THE WITNESS:  Are you talking in the draft
15   report the paragraph that says 114D?
16   BY MR. BORNSTEIN:
17        Q.    Yes.
18        A.    That we already discussed?
19        Q.    Yes.
20        A.    Yes.  It's in the draft, yes.
21        Q.    And is it your recollection that regardless --
22   putting aside what the leaked version of this draft
23   report is, is it your recollection that in substance the
24   three things we've gone over were in the draft reports
25   that were considered by the committee in October on
```

# EXHIBIT   6

**Sahar Nayeri**

| From: | Patrick McKinney |
|---|---|
| Sent: | Wednesday, February 19, 2014 12:13 PM |
| To: | Acharya, Ranjini; Jay Russell; Debbie Vorous |
| Cc: | 'ColemanTeam-RBGOnly@rbgg.com'; Michaelson, Jon; Bornstein, Jeffrey L.; Patrick McKinney |
| Subject: | RE: Coleman: Depositions of Dr. Amy Eargle and Dr. Timothy Belavich |
| Attachments: | RE: Dr. Scheddeigger's deposition |

Counsel:

We will be seeking a protective order, and will address these excessive requests for deposition in the Joint Statement. Your email below misstates the issues, and identifies precisely why these depositions are duplicative, and are therefore unduly burdensome. We also informed you on February 11, 2014 that Dr. Belavich was on vacation between October 30 and November 17 (the email is attached), and thus is unlikely to have information relevant to any issue identified by the Court as appropriate for discovery.

Mr. Stainer remains available on February 24, although we believe there is a risk that any discovery issues will not be resolved, particularly since Plaintiffs sent us a 14 page position for the proposed joint statement to be filed on February 20.

Dr. Bramble is not available on February 25 or 26. She is available on February 24, February 27, or March 3. Please let us know if you would like to reschedule her deposition for one of those dates.

Patrick

---

**From:** Acharya, Ranjini [mailto:Ranjini.Acharya@klgates.com]
**Sent:** Wednesday, February 19, 2014 10:13 AM
**To:** Patrick McKinney; Jay Russell; Debbie Vorous
**Cc:** 'ColemanTeam-RBGOnly@rbgg.com'; Michaelson, Jon; Bornstein, Jeffrey L.
**Subject:** Coleman: Depositions of Dr. Amy Eargle and Dr. Timothy Belavich

Patrick, Debbie, Jay:

Plaintiffs would like to notice the depositions of Dr. Amy Eargle and Dr. Timothy Belavich.

Dr. Eargle has been identified as a CDCR staff member who worked on the draft report regarding the suicide of Inmate X, and as having been present at the teleconference on October 31, 2013 in which the draft report was discussed (*see e.g.* Transcript of Deposition Testimony of Judy Burleson, February 18, 2014, at 32:1-7; 56:17-19; and 84:6-23; *see also* Transcript of Deposition Testimony of Kathleen Allison, February 18, 2014, at 78:7-13; 105:10-11). Dr. Tim Belavich signed the report on the suicide of Inmate X and has also submitted a declaration in support of Defendants' position on discovery into the suicide of Inmate X. Dr. Belavich has also been identified as the person to whom Ms. Burleson directly reported (*see* Allison Testimony, at 82:1-2) and the CDCR executive with ultimate responsibility for ensuring that reports into inmate suicides within CDCR are completed timely (*id.* at 79:19-80:1; 95:25-96:3).

As you know, Plaintiffs are entitled to all substantive information in relation to the reporting of the suicide, including the drafts and discussions of the suicide report as well as details of the decision-making concerning the timing and disclosure of the suicide report and its relation to the use of force trial. As the Magistrate Judge acknowledged in his February 5 order, Plaintiffs have made clear their intention to identify additional witnesses for deposition "based on information and documents to be produced by defendants." (See ECF. 5054 at 4:8-15). Evidence produced by Defendants on February 11 and 13, as well as the deposition testimony given by Ms. Allison and Ms. Burleson yesterday, suggested that early drafts of the Suicide Report – including all of the details potentially relevant to matters in dispute in these proceedings –

1

were circulated to both Dr. Eargle and Dr. Belavich, by October 24, 2013.  Plaintiffs are therefore entitled to take both these depositions.

Further, the February 5 order made clear that Plaintiffs are simply required to identify those additional witnesses to defendants not later than Friday, February 14, 2014, or two days after resolution of any discovery disputes arising from Defendants' response to Plaintiffs' written discovery requests, whichever was later.  (*Id.*)  Given that the present discovery dispute in relation to Defendants' responses to Plaintiffs' written discovery requests has not yet been resolved, these witnesses are being timely identified.

In order that we may notice these depositions without delay, please let me know of the availability of Dr. Eargle and Dr. Belavich next week.  Please also confirm that you will accept service of the deposition notices on behalf of these two witnesses, in accordance with the parties' recent practice.

Regards,
Ranjini

# K&L GATES

**Ranjini Acharya**
Associate
K&L Gates LLP
630 Hansen Way
Palo Alto, CA 94304
Phone: +1 650 798 6765
Fax: +1 650 798 6701
ranjini.acharya@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP.  The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this e-mail in error, please contact me at Ranjini.Acharya@klgates.com.

# EXHIBIT   7

**Sahar Nayeri**

| | |
|---|---|
| **From:** | Patrick McKinney |
| **Sent:** | Tuesday, February 11, 2014 4:36 PM |
| **To:** | Acharya, Ranjini; Bornstein, Jeffrey L.; Jay Russell; Debbie Vorous; Michaelson, Jon; Bien, Michael (EXTERNAL); Galvan Ernest; Christine Ciccotti |
| **Subject:** | RE: Dr. Scheddeigger's deposition |
| **Attachments:** | IMD-0001-0034.pdf; Scheidegger Depo Resp & Obj.pdf.pdf |

Ms. Acharya,

The Court has significantly limited the scope of permissible discovery through its orders filed on February 5 and February 10, 2014. We ask that you re-evaluate Plaintiffs' need for this large number of depositions on this limited issue, particularly because the requested discovery has nothing to do with the mental health care provided to CDCR inmates. We further ask that you re-evaluate your position following Dr. Scheidegger's deposition.

Defendants' objections and responses to Plaintiffs' notice of deposition of Dr. Scheidegger and request for production of documents are attached. Also attached are documents Bates labeled IMD-0001 through IMD-0034, which are the responsive, non-privileged documents within the scope of permissible discovery as defined by the Court's orders. Dr. Scheidegger will be separately represented for purposes of the deposition by David Tyra of Kronick Moskovitz Tiedemann & Girard.

We have confirmed that Ms. Allison is available for deposition on February 18. Dr. Bramble is not available on the 18th but can be available on February 19. Our office will accept service of the deposition notices by email or mail.

We are informed that Dr. Belavich was on vacation between October 30 and November 17, 2013 and therefore is unlikely to have information relevant to the limited scope of discovery in this matter.

Mr. Stainer can be available in Sacramento on either February 24 or 25. Please let us know if you will accommodate Mr. Stainer for this deposition; if not, we will need to seek alternative dates.

Thanks, Patrick

-----Original Message-----
From: Acharya, Ranjini [mailto:Ranjini.Acharya@klgates.com]
Sent: Monday, February 10, 2014 2:00 PM
To: Patrick McKinney; Bornstein, Jeffrey L.; Jay Russell; Debbie Vorous; Michaelson, Jon; Bien, Michael (EXTERNAL); Galvan Ernest
Subject: RE: Dr. Scheddeigger's deposition

Patrick,

I refer to your email to Jeff, below.

In his order of February 5, Magistrate Judge Drozd noted Plaintiffs' intention to identify additional witnesses for deposition "based on information and documents to be produced by defendants." (See ECF. 5054 at 4:8-15). Plaintiffs are required to identify those additional witnesses to defendants not later than Friday, February 14, 2014, or two days after resolution of any discovery disputes that may arise from defendants' response to Plaintiffs' written discovery requests, whichever is later. (Id.) Plaintiffs identified eight witnesses in Jeff's email to you on February 5. These

1

proposed depositions are within the scope of both the Magistrate Judge's order and the Court's order issued this morning.

Therefore, we propose to proceed to notice the depositions for Ms. Allison and Ms. Bramble on February 18, 2014, at 9 am and 1pm respectively, as previously suggested. Please advise whether you will accept service on behalf of these two witnesses. Please also confirm that service by mail is acceptable.

In relation to Mr. Stainer and Dr. Belavich, please provide alternative dates as soon as possible and we will notice those depositions accordingly. Please confirm that you are also able to accept service of deposition notices for these witnesses by mail.

Finally, please note that those individuals noted above may not be the complete list of witnesses Plaintiffs will seek to depose. We reserve the right to identify further witnesses for deposition, in accordance with Magistrate Judge Drozd's orders, once we have received the remainder of Defendants' responses to our discovery requests - in particular, the written discovery sought by Plaintiffs in our letter of January 30, 2014.

Thanks,
Ranjini


Ranjini Acharya
Associate
K&L Gates LLP
630 Hansen Way
Palo Alto, CA 94304
Phone: +1 650 798 6765
Fax: +1 650 798 6701
ranjini.acharya@klgates.com
www.klgates.com

-----Original Message-----
From: Patrick McKinney [mailto:Patrick.McKinney@doj.ca.gov]
Sent: Monday, February 10, 2014 10:16 AM
To: Bornstein, Jeffrey L.; Jay Russell; Debbie Vorous; Acharya, Ranjini; Michaelson, Jon; Bien, Michael (EXTERNAL); Galvan Ernest
Subject: RE: Dr. Scheddeigger's deposition

Jeff, we have reviewed the Court's order issued this morning which permits Plaintiffs to conduct discovery "into the reason(s) that [the suicide reporting] timeline was not met." (ECF 5059 at 5.) Plaintiffs' current discovery requests, including the number of depositions noticed, are overbroad and unduly burdensome, and far exceed the three permitted by the Magistrate Judge's February 5 order.

Nevertheless, Defendants have agreed to make Dr. Scheidigger available for deposition on February 12 as noticed in Sacramento. We also note that Dr. Scheidigger is the individual identified by CDCR for categories (4) and (5) in your email of February 5. Because the issue is extremely narrow and involves a single inmate, we expect that this deposition, and any other deposition Plaintiffs may take on this matter, will not exceed two hours.

We will respond to the remainder of Plaintiffs' discovery consistent with the Magistrate Judge's order.

We also note the "Chair of the DHCHS ERDR" (category (b) in your February 5 email) is employed by the Receiver not CDCR. Mr. Stainer and Dr. Belavich are also not available on February 21, and we are checking their availability the following week.

Thanks, Patrick

-----Original Message-----
From: Bornstein, Jeffrey L. [mailto:Jeffrey.Bornstein@klgates.com]
Sent: Sunday, February 09, 2014 1:46 PM
To: Patrick McKinney; Jay Russell; Debbie Vorous; Acharya, Ranjini; Michaelson, Jon; Bien, Michael (EXTERNAL); Galvan Ernest
Subject: Dr. Scheddeigger's deposition

Please confirm that this deposition will take place on weds in Sacramento as noticed. Thank you.

Sent from my iPhone

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Bornstein@klgates.com.


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Ranjini.Acharya@klgates.com.

# EXHIBIT   8



**KAMALA D. HARRIS**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102

Public: (415) 703-5500
Telephone: (415) 703-5553
Facsimile: (415) 703-1234
E-Mail: Patrick.McKinney@doj.ca.gov

February 14, 2014

*Via Email*

Krista Stone-Manista
Rosen Bien Galvan & Grunfeld LLP
315 Montgomery St., Tenth Floor
San Francisco, CA 94104

RE:    *Coleman v. Brown*, et al., Case No. 2:90-CV-00520 LKK DAD PC
       Meet-and-Confer re: Inmate D

Dear Counsel:

        We write to follow up on our conference call of today and to continue the meet-and-confer regarding Ms. Stone-Manista's letter of February 13, 2014, which contains a number of factual misstatements, misrepresents Defendants' position, and misstates the issue before the Court. Attached to this letter are Defendants' privilege log and a declaration from Dr. Timothy Belavich supporting Defendants' Responses and Objections to Plaintiffs' Discovery Requests.

        Contrary to the statements in Plaintiffs' letter, Defendants are providing the discovery ordered by the Court, including both production of documents and depositions. We ask again that Plaintiffs end this misuse of the discovery process. It is undisputed that Plaintiffs had knowledge of the relevant facts concerning Inmate D's death in September 2013. (*See* Supp. Decl. Michael Bien, ECF 5041, at ¶ 5; Decl. Jane Kahn, ECF No. 5042, at ¶ 3.) Confronted with this knowledge, Plaintiffs offered the legally inconsequential excuse that the relevant information was "only downloaded as part of routine file maintenance and not reviewed . . . ." (Errata, ECF 5050.) Plaintiffs' discovery requests that seek documents or information without acknowledging this have no purpose other than to unduly burden and harass the Defendants.

        Plaintiffs' harassment of Defendants is evident with their attempt made immediately after today's conference call to notice the deposition of Undersecretary Martin Hoshino. Contrary to the claims of your co-counsel, there have been no discussions concerning this deposition. There is no basis for taking Undersecretary Hoshino's deposition and, in any event, the notice is defective. We ask that you immediately withdraw this improper notice so that we can avoid presenting this issue to the Magistrate Judge.

February 14, 2014
Page 2

As discussed during the call, we remain willing to attempt to informally resolve these issues.

## Defendants Produced the Relevant, Non-Privileged Information Responsive to Plaintiffs' Requests Beginning in September 2013.

Defendants have produced the relevant, non-privileged information responsive to Plaintiffs' requests. Your letter mischaracterizes the production. In September 2013, as demonstrated by Plaintiffs' production, Defendants produced the Suicide Notification, OBIS Movement Report, the Initial Inmate Death Report, the Incident Report, and more than 100 pages of Inmate D's medical records. On January 9, 2014, as shown in the email of that date from your paralegal, Plaintiffs received the final suicide report, the autopsy report, CDCR Forms 7229-A & 7229-B, CDCR Form 837, the suicide notification, and medical records. On February 12, 2014, Defendants produced documents responsive to your request, Bates labeled IMD-0001 through IMD-0034. Defendants then produced additional documents responsive to Plaintiffs' requests, Bates labeled IMD-0035 through IMD-0093, on February 13, 2014.

We do not understand your claims that 59 of the pages "have no substantive content." We have no control over the content of the documents that are responsive to your requests.

## Plaintiffs Ignore the Court's February 10, 2014 Order.

Defendants are following the Court's orders, and have produced both documents and witnesses consistent with those orders. It is Plaintiffs' letter that ignores the Court's February 10, 2014 order, which states: "The crux of the relevant disagreement between the parties centers on whether defendants had any duty to produce a suicide report by November 7, 2013." (2/10/14 Order, ECF 5059, at 2.) The Court adds in a footnote that it is not closing discovery on "whether relevant information concerning this class member's death was withheld from plaintiffs or the court during the course of the evidentiary hearing which commenced on October 1, 2013." (*Id.* at fn. 2.)

For both issues identified in the Court's orders, November 7, 2013 is the appropriate end date for discovery. Evidence closed on Plaintiffs' use-of-force motion when the defense rested on November 6, 2013 at 3:09 p.m. (ECF 4915 & 5022.) The parties then presented closing argument on November 7, 2013. (ECF 4916.) While there may be an argument that the discovery cut-off should be November 6, you have presented nothing that would support a reading of the Court's orders to require production beyond the close of the evidentiary hearing on Plaintiffs' use-of-force motion.

## Plaintiffs Improperly Speculate that Pepper Spray Contributed to Inmate D's Death.

On page 2 of the letter, Plaintiffs discuss select excerpts of testimony from the use-of-force hearing. Plaintiffs fail, however, to connect this in any way to Inmate D's death. Inmate D was exposed to pepper spray on September 6, 2013, the day before his death. Following the

February 14, 2014
Page 3

exposure, the reports reflect that Inmate D decontaminated with water, slept for an hour and a half, and was observed standing at his cell window more than eight hours after the exposure.

The facts discussed above demonstrate that any connection between pepper spray and Inmate D's death is speculation. Accordingly, your reference to the duty of candor must be in error. Defendants have candidly presented information concerning Inmate D's death to Plaintiffs beginning in September 2013, and will continue to provide relevant, non-privileged information.

## The Deliberative Process Privilege Applies to the Predecisional Discussions and Draft Reports Necessary to Prepare the Statewide Suicide Report for Inmate D.

Defendants, through the attached log and supporting declaration of Dr. Belavich, have made the necessary showing that the documents reflecting CDCR's predecisional deliberations concerning Inmate D's death are protected from disclosure by the deliberative process privilege. To qualify as predecisional, a document must be both "predecisional" and "deliberative." A "predecisional" document is one "prepared in order to assist an agency decisionmaker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions . . . ." *Carter v. U.S. Department of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). A "deliberative" document is one that the disclosure of "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency . . . ." *Id.*

For example, in *United States v. Fernandez*, the Court found that the U.S. Attorney's death penalty evaluation form and prosecution memorandum for one felon was protected from disclosure by the deliberative process privilege. 231 F.3d 1240, 1246-47 (9th Cir. 2000). The Court held that the form and prosecution memorandum were "predecisional" because the U.S. Attorney submits these documents *before* the Attorney General makes the final decision whether to seek the death penalty in an individual case. *Id.* The Court found that these documents were "deliberative" in that they contained opinions and recommendations about the theory of liability, the facts and evidence, including evidence relating to any aggravating or mitigating factors, the defendant's background and criminal history, the basis for Federal prosecution, and any other relevant information. *Id.* This form and memo were not a part of the review of a sweeping, Attorney General wide policy, but an individualized decision for *one* felon. Yet they were protected from disclosure. *See also Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1091 (9th Cir. 1997) (upholding deliberative process privilege over portions of an internal investigative report concerning management of the Southwestern Region of the Forest Service).

CDCR's draft reports concerning Inmate D's death are well within the deliberative process privilege. Dr. Scheidegger testified in detail that the draft reports for Inmate D's death were both pre-decisional and reflected the deliberations of CDCR staff leading to the decision on October 31, 2013 that Inmate D's death was not a suicide.[1] Moreover, the report embodies CDCR's judgments about how it should improve its emergency response (IMD-0027), its

---

[1] The transcript of Dr. Scheidegger's deposition is not yet available, but Defendants will provide citations to the testimony in the event this issue is presented to the Magistrate Judge for consideration.

February 14, 2014
Page 4

custody interactions with inmates (IMD 0028), its medical, nursing, and mental health care (IMD-0029), and resulted in 7 recommendations for quality improvement plans (IMD-0029-0031). The report is not limited to a factual recitation of how this inmate died, and what staff did. It is, by its very purpose, designed to reflect a greater, agency-wide review. Plaintiffs' stated intent to inquire into these matters would undoubtedly chill frank and candid discussion, and would likely impair CDCR's suicide prevention efforts.

In the letter and during our call, Plaintiffs' counsel incorrectly suggested that the deliberative process privilege only applies to "policies." This is unsupported by case law, and is contrary to even the cases cited in the letter. Your letter acknowledges that the privilege applies to "advisory opinions, recommendations, and deliberations comprising parts of a process by which *government decisions* and policies are being formulated." *Coleman v. Schwarzenegger*, 2008 WL 2237046 at *4 (E.D. Cal. May 29, 2009) (emphasis added). The purpose of CDCR's suicide review process is to make a decision about whether this death was a suicide, report on the facts leading up to it, and make decisions about what, if any, policies or procedures need quality improvement plans to try to prevent, or better respond to, future potential suicides.

Plaintiffs further failed to establish that Dr. Scheidegger had any information relevant to Plaintiffs' allegations. At the beginning of the deposition, Dr. Scheidegger testified that she was not aware of Plaintiffs' use-of-force motion until January 2014. She further testified that the changes to the report were made on January 6, 2014, months after the close of the evidentiary hearing. Moreover, Dr. Scheidigger testified that the reason the report was not issued by November 6, 2013 was because CDCR concluded Inmate D's death was not a suicide, and they would await further action until after receiving the coroner's report.

**Defendants Have Appropriately Asserted the Privileges Protecting Attorney-Client Communication and Attorney Work Product from Disclosure.**

Defendants' privilege log is attached. Defendants are not withholding documents because both attorneys and non-attorneys were copied, if the purpose of the email was not to seek or provide legal advice. (*See, e.g.,* IMD-0007, IMD-0041-0042, IMD-0079, & IMD-0092-0093.) Plaintiffs' privilege log does not even begin until January 15, 2014, and we request that you immediately produce all relevant communications prior to January 2014, or produce a log if you are asserting privilege over any such communications.

February 14, 2014
Page 5

* * *

Please let us know if you would like to continue the meet-and-confer with a telephone
conference on February 18 or 19, 2014.

Very truly yours,

/s/

Patrick R. McKinney
Supervising Deputy Attorney General

For      KAMALA D. HARRIS
         Attorney General

Enclosures

cc:      Jeffrey Bornstein, Esq.
         Ernest Galvan, Esq.
         Michael Bien, Esq.

PRM

CF1997CS0003
40893517.DOC