1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   PATRICK R. MCKINNEY
3  Supervising Deputy Attorneys General
   DEBBIE VOROUS, State Bar No. 166884
4  ELISE OWENS THORN, State Bar No. 145931
   Deputy Attorneys General
5   1300 I Street, Suite 125
    P.O. Box 944255
6   Sacramento, CA 94244-2550
    Telephone: (916) 324-4921
7   Fax: (916) 324-5205
    E-mail: Elise.Thorn@doj.ca.gov
8
   *Attorneys for Defendants*
9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK DAD PC<br><br>**DECLARATION OF ELISE OWENS THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT** |

I, Elise Owens Thorn, declare as follows:

1.    I am a Deputy Attorney General with the California Office of the Attorney General, attorneys of record for Defendants in this case, and I am licensed to practice in this Court. I have personal knowledge of the facts stated in this declaration and if called on to testify to those facts, could and would do so competently. I make this declaration in support of Defendants' motion regarding their long-range mental health bed plan and update to the Court.

2.    Attached as Exhibit A is a true and correct copy of excerpt from the transcript of the deposition of Chris Meyer taken on February 27, 2013.

1

1     3.  Attached as Exhibit B is a true and correct copy of transcript excerpts from the

2  December 13, 2013 hearing on Plaintiffs' Motion for Enforcement of Court Orders and

3  Affirmative Relief Regarding Housing and Treatment of Seriously Mentally Ill Prisoners in

4  Segregation.

5     3.  Attached as Exhibit C is a true and correct copy of transcript excerpts from the

6  December 12, 2013 hearing on Plaintiffs' Motion for Enforcement of Court Orders and

7  Affirmative Relief Regarding Housing and Treatment of Seriously Mentally Ill Prisoners in

8  Segregation.

9     4.  Attached as Exhibit D is a true and correct copy of transcript excerpts from the February

10  22, 2013 deposition of Tim Belavich, Ph.D, along with excerpts of Exhibit 14 to the deposition

11  (Decl. of Time Belavich ISO Motion to Terminate and May 16, 2012 and December 12, 2012

12  memoranda regarding alternative housing cell prioritization).

13

14     I declare under penalty of perjury under the laws of the State of California and the United

15  States of America that the foregoing is true and correct.  Executed in Sacramento, California on

16  February 21, 2014.

17

18                       /s/ Elise Owens Thorn
                            ELISE OWENS THORN

19

20

21

22  CF1997CS0003

23

24

25

26

27

28                             2

# EXHIBIT A

[DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,                    No. S 90-0520 LKK JFM

           Plaintiffs,

   vs.

EDMUND G. BROWN, JR., et al.,

          Defendants.

                 /

DEPOSITION OF CHRISTOPHER RICHARD MEYER

DATE:                February 27, 2013

TIME:                9:08 a.m.

LOCATION:            ROSEN BIEN GALVAN & GRUNFELD
                     315 Montgomery Street
                     Tenth Floor
                     San Francisco, California

REPORTED BY:         Mary E. Garland
                     Certified Shorthand Reporter
                     License Number 4721

 1    the Dewitt project.

 2        Q.  Why?

 3        A.  There's a point where, if you start with a very

 4    aggressive schedule, to begin with -- which the Dewitt

 5    schedule is.  It's -- in normal construction world, that

 6    project would have had another eight to ten months in

 7    the initial schedule.

 8            So as I said, when we look at the critical

 9    path, we have to ask ourselves whether or not we can

10    reasonably accelerate an activity.  And so far, I have

11    not seen any opportunity that wouldn't make the

12    situation worse.  If you bring in too many people, they

13    start crawling over each other, getting in each other's

14    ways, you get work out of sequence, so ...

15            But to the extent I can find opportunities, I'm

16    always looking for them.  And my staff knows that I'm

17    always looking for them; so if they see something I

18    don't, they'll usually bring it to me.

19        Q.  And why did you have to accelerate the Dewitt

20    project to what you said would be more than in the

21    outside world?

22            MR. RUSSELL:  Objection.  Vague and ambiguous.

23    Misstates testimony.

24            THE WITNESS:  I was making every effort to try

25    to honor the court order to get everything done by the

1    end of 2013, but it was just -- at the point we finally

2    got authority to go forward with the project, there was

3    not enough physical time left to meet that date without

4    creating an environment that could actually end up going

5    slower than what an aggressive, but realistic, duration

6    was to complete the project.

7    BY MS. MENDELSON:

8        Q.  How would one create an environment that would

9    end up going slower?  What do you mean by that?

10       A.  Oh, you can put -- you can -- if I -- if you

11   had asked me to build you a brand-new three-bedroom home

12   by Sunday -- right? -- I would say that's not realistic.

13       And if you asked me -- or ordered me to do it,

14   I would still tell you it's unrealistic.  I would give

15   you the absolute fastest, most creative approach I could

16   to get it done, but I can't work miracles.

17       And to have completed the Dewitt Nelson

18   project, to me, would have forced the contractor into a

19   situation where he realized it was unrealistic when he

20   signed the bottom line, and he would have started, day

21   one, looking for time extensions.

22       And those time extensions then start to grow on

23   themselves, and you actually end up with a lot of

24   schedule growth if you start with an unrealistic

25   expectation in schedule.

1                CERTIFICATION OF DEPOSITION OFFICER

2

3        I, MARY E. GARLAND, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California Code

5    of Civil Procedure, do hereby certify that the witness

6    in the foregoing deposition was duly sworn by me to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony.  And

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16       I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21       Executed March 7, 2013, at San Francisco,

22   California.

23

24

25               MARY E. GARLAND, CSR 4721

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# EXHIBIT B

[DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7         Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11        Defendants.

12   _____/

13

14

15                        ---oOo---

16

17                  REPORTER'S TRANSCRIPT

18              RE:   EVIDENTIARY HEARING

19             FRIDAY, DECEMBER 13TH, 2013

20

21                        ---oOo---

22

23

24
     Reported by:   CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:   KATHY L. SWINHART, CSR NO. 10150

3442

1   So it reflects -- it reflects a significant change

2   that -- that I worked to implement when I came to headquarters

3   in that I wanted better communication with the field, and I

4   wanted headquarters to have a better awareness of what was

5   going on in the field, umm, coming from the field.  I just felt

6   it was something that -- that was needed.

7   And this feedback loop, it's a very common type of

8   system.  I think the feedback loop works very well.

9   Q.      Do you feel that these tools allow you and your

10  partners to evaluate and monitor the system within CDCR?

11  A.      Yes.

12  And it's not on here, but the way we functionally do it

13  is through the regional teams that we've implemented.  And that

14  was one of the other things that I had implemented back in 2012

15  was a strong regional team, ah, that has more authority than

16  previous regional teams, I guess.  And they're -- they're in

17  the institutions on a regular basis, and they have the

18  hands-on -- they have the hands-on of headquarters.  So they

19  really provide that feedback as well.

20  Q.      And are those individuals mental health clinicians or

21  personnel?

22  A.      Yes, they are.  They're chief psychologists.

23  THE COURT:  Let me interrupt for a moment.

24  One of the things that we, I think, have established

25  pretty clearly is that institutions which are not in favored

3443

1   geographic positions are having a lot of trouble recruiting and

2   retaining.

3        I take it you agree that that's what's going on or do

4   you agree that that's what's going on?

5        THE WITNESS:  With staffing?

6        THE COURT:  Yes.

7        THE WITNESS:  Yes, that can be an issue with some of

8   our institutions.

9        THE COURT:  The suggestion has been made somewhere

10  in -- God knows where in the course of these hearings, that

11  regionalization might relieve the difficulties in retaining

12  folks.

13       Now, it has its own problems because they'd have to

14  transfer people and, you know, we've now learned that the bus

15  system is so complex that nobody can ever get anywhere when

16  they're supposed to be.  But assuming that that could somehow

17  or other be solved.

18       Is it your view that regionalization would be an

19  appropriate thing to do given the difficulties in staffing?  Or

20  is it your view that it probably is so difficult to achieve

21  that it's not worth the trial?  Or what is your view?

22       THE WITNESS:  I think that it may obviously have some

23  benefits.  I -- I would think that there may be a lot of

24  challenges to it.

25       For example, in terms of -- by regionalization, I

3444

1    assume you mean sort of hubbing.  Where I can get good -- where

2    I can get lots of staff, that's where I put the sick people?

3            THE COURT:  Right.

4            THE WITNESS:  That makes perfect sense.

5            THE COURT:  Right.

6            THE WITNESS:  The challenges I foresee, ah, may include

7    more structural or physical issues.

8            You know, we've sometimes built amazing places in

9    places that don't --

10           THE COURT:  In the wrong place.

11           THE WITNESS:  And so then what do we do with that, for

12   example.

13           Or do we have the facilities -- that's not as much of a

14   worry, the place we're abandoning.  But the bigger worry would

15   be do we have the facilities in the place where we're going to

16   bring the patients?

17           THE COURT:  I --

18           THE WITNESS:  So things like that obviously --

19           THE COURT:  I understand it would be very complex, and

20   I doubt very much -- well, I'll do whatever I have to do.

21           But it seems to me that the structural problems that

22   you've been discussing just now are expensive, difficult, but

23   may be in the long run a solution to what appears to be a

24   fairly serious problem.

25           The question really -- the question, as if there's only

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3445

1    one.

2         Yes?

3         THE WITNESS:  I have something to add, though.

4         THE COURT:  Yes, please.

5         THE WITNESS:  That I think -- we haven't seen the full

6    fruit yet, but we've -- this year, we've been very

7    successful -- for example, psychiatry traditionally has been

8    impossible to hire into at times.  We've been very successful

9    in recruiting telepsychiatrists.  And so, for example, from May

10   through October of this year, I've brought on 34 new to state

11   service psychiatrists.

12        And how I get them is I tell them they don't have to go

13   to, you know --

14        THE COURT:  Awkward.

15         THE WITNESS:  Exactly.  So we hub them at San Quentin,

16   we hub them in, you know, San Bernardino.  And they provide

17   telepsychiatry with the understanding that there are times and

18   needs when you have to physically report.

19        And so it was a program that we implemented last

20   January and started recruiting into, and we're starting our

21   second year of it.  Because it's very cyclical how we can

22   recruit, especially coming out of medical schools.  So we've

23   been pleased with that.

24        And I don't know that that will solve the problem, but

25   I think that may go a long way.  Because places, in March of

3446

1    2012 when I got here, who had one psychiatrist are now being

2    served by sometimes three or four full-time psychiatrists, it

3    just happens to be through telepsychiatry.

4         THE COURT:  What I am getting, and I may be not getting

5    the right -- I may not be perceiving correctly, is that the

6    psychiatrist's function is essentially not in counseling the

7    patient-inmates.  They're really running the psychotropic

8    medications and that sort of thing, that the essential

9    counseling is being done by psychologists mostly.

10        Is that right or wrong?

11        THE WITNESS:  That's absolutely correct.  Psychologists

12   and social workers.

13        THE COURT:  Okay.

14        THE WITNESS:  Yeah.

15        THE COURT:  You're not going to obviously tell,

16   whatever it is, patients who are in need of psychologists as a

17   regular case on its program -- I mean, he's got to physically

18   be there.

19        THE WITNESS:  Psychologists, correct.  Yeah, I think

20   so.

21        There are places that may use telepsychology, but we

22   haven't felt the need to go to that.  We feel that --

23        THE COURT:  You're able to get enough folks with

24   psychological degrees to go into places that are difficult?

25        THE WITNESS:  Yes.

3447

1          We've -- I think we got hurt when we had layoffs, and

2     we actually had people who weren't being laid off decide to

3     leave rather than wait to see if the SHU would fall.  And so

4     there -- we had some difficulty with churn there.  But since

5     those are gone, we've been successful with hiring

6     psychologists.  And, you know, overall we still have a couple

7     of pockets that are concerning.  For example, around Kern, you

8     know, there's a large need there, but not a lot in the

9     community.

.0          But we also implemented, during the summer, a new

11    contract and partnership with the receivership through --

12    similar to a HealthNet contract in that it's a one-stop shop

13    for contractors.  We used to use a very archaic system to get

14    contractors, and you might have to make 18 calls to get one

15    body.  Now you call one place, and they provide you the body.

16         Additionally, there are performance incentives to the

17    company.  So we've been somewhat successful since that contract

18    has been implemented.

19         So we're not there, but we're in a better place than we

20    were.  So I don't know that we're -- that I'm ready to pull the

21    plug on it completely.

22         THE COURT:  Understood.  Thank you.

23         Mr. McKinney, you may proceed.

24         MR. MC KINNEY:  Absolutely.

25    Q.    Dr. Belavich, if you could describe -- well, first of

3448

1    all, what was the time frame when layoffs were occurring or

2    threatened?

3    A.      It -- there were four waves of CDCR layoffs, and the

4    mental health layoff occurred mostly in wave one, which was

5    prior to -- prior to February of 2012, so it was I think late

6    2011.  And that was the last time we had layoffs, and people

7    had to shift -- shift institutions.

8    Q.      And, again, I think you've said you've seen now a

9    positive trend in hiring and staffing up positions.

10          Is that fair?

11   A.      Yes, that's correct.

12          And we've done things.  We've at times centralized

13   hiring when we -- we monitor very closely the hiring that's

14   going on in the institutions.  And if an institution hasn't

15   held a panel or hasn't done something in a while, we inform

16   them that we're going to take over the hiring.  And in some

17   respects that's their -- there's no better way to light a fire

18   than to tell them either they can choose their staff or we can

19   choose their staff for them, and then they tend to get the

20   panels going.

21          So there -- it's on a one off basis if that occurs, but

22   we temporarily centralized hiring for social workers, and then

23   we gave it back to the institutions.

24   Q.      And can you describe the telepsychiatry efforts both

25   from what you've done at headquarters and how that is, ah,

1   progressing in the field currently.

2   A.      It's -- it's been -- it's been a great success in my

3   estimation because we were able cut through what would

4   otherwise be a lot of red tape.

5        We realized that there were arbitrary, ah, issues that

6   were out of our control that prevented people from even

7   applying for jobs.  We -- we required them to be done with

8   their -- with their residency before they could even apply.

9   Well, most residents want a job offer at least three to four

10  months prior to their -- prior to their ending their residency.

11  So we lost that whole pool.

12       So working with the Department of Personnel

13  Administration and changing one requirement that instead of

14  having their certificate of residency, they would -- they say

15  we will have it by July 1st, it opened up a pool of several

16  hundred people we could all of a sudden interview.

17  Q.      And have you been able to hire from that pool?

18  A.      We have hired largely from that pool.  We've been able

19  to pull in a lot of out-of-state psychiatrists.  It's been very

20  beneficial.

21       The technology, it's a secure technology that we use.

22  It is a relatively cheap technology.  We don't have to buy

23  $20,000 telemedicine systems.  We buy $500 secure cameras.

24       We set up a program where the psychologist is more

25  than -- more often than not actually with the patient while .

3450

1   they're having their psychiatry visit.  And in that way, the

2   psychologists can also participate and hear.  You know, it's

3   almost like a mini team.  The psychologist can participate and

4   hear.  He may also help the patient to, you know, say, well, we

5   also talked about these things, do you think that would be

6   important to talk with the psychiatrist about?

7           So we have found overall that it's been -- it's been a

8   positive -- it's been a positive program, you know, after we

9   were able to go over some of the bumps with unions and things

10  like that.

11  Q.      And do you know how many psychiatrists have been hired

12  or are in the hiring process during 2013?

13  A.      We have -- we have 34 actually already onboard.  And I

14  believe -- I believe there might be up to another 10 that are

15  currently in process.

16          But our teams are starting to go out -- they tell me

17  that January, February, March is the big recruiting time, so

18  they're ready to go out again and hit all of the medical

19  schools and all of the conferences where people go to

20  interview.

21          We also have just streamlined the interview process.

22  We interview at conferences, and we make contingent job offers

23  contingent upon, you know, background checks and these other

24  things.  So with the salaries that California offers for

25  psychiatrists, I think it's -- you know, it's quite lucrative

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3451

1       for new psychiatrists to come.

2       Q.      Doctor, if I could have you turn to the next exhibit in

3       the packet which has been premarked as Defendants' Exhibit YYY.

4               Do you have that in front of you?

5       A.      Oh, I'm sorry.  Yes.

6       Q.      Is this the declaration you submitted in opposition to

7       the plaintiffs' current motion as amended?

8       A.      Yes, it is.

9               MR. MC KINNEY:  Your Honor, I'd like to move Exhibit

10      YYY into evidence.

11              THE COURT:  Received.

12                              (DEFENDANTS' EXHIBIT YYY

13                              ADMITTED INTO EVIDENCE.)

14      Q.      BY MR. MC KINNEY:  Doctor, if I could have you turn to

15      the next document in the packet which has been marked for

16      identification as Defendants' Exhibit ZZZ.

17      A.      Yes, I have it.

18      Q.      Are you familiar with this document?

19      A.      Yes, I've seen it before.

20      Q.      What is it?

21      A.      It's a summary of our -- of our mental health

22      population, ah, CCCs and -- CCCMS and EOP patients as well as

23      PSU, and then there are breakdowns by institution.

24              It's a -- it's monitored from the health care placement

25      oversight program, which is also known as HCPOP.  This is the

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3464

1    THE COURT: But you avoid the problem of the

2    transportation system by having your own beds -- I mean your

3    own cars or whatever to transport people?

4    THE WITNESS: Absolutely. Absolutely.

5    THE COURT: All right. Okay.

6    BY MR. MCKINNEY:

7    Q.    Doctor, I want to follow up on that.

8    What is the availability of crisis beds in the system

9    currently?

10    A.    Currently we have strong availability of crisis beds.

11    That historically hasn't always been the case, but -- I'm

12    forgetting the exact date -- but it's been months, if not up

13    to a year, that we generally, at the end of the day, are able

14    to have all of our patients in crisis beds -- endorsed to the

15    correct crisis bed.

16    Q.    And if they're housed within alternative housing, how

17    quickly are they moved?

18    A.    Within 24 hours is the expectation. And as soon as

19    they go into alternative housing, that triggers the referral

20    for the crisis bed. That's something that's new as well.

21    So you cannot place the patient in alternative

22    housing without calling Health Care Placement to say that I

23    need a bed. Because there used to be some other process

24    where they could sit in alternative housing, and then after a

25    certain amount of time I would call Health Care Placement.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3498

1    Q.    And then with respect to this report, the plaintiffs

2    did not raise a concern about the total length of stay for

3    any particular inmate prior to this proceeding; is that

4    right?

5    A.    Not to me.

6    Q.    Similarly, are you aware of any court order that

7    would require the department to produce population

8    projections?

9    A.    I'm aware there was a court order.  I don't -- I

10    don't believe that it still stands, but we continue to

11    generate and share population projections.

12    Q.    And Doctor, if I could have you take a look at what's

13    been premarked as Exhibit KKKK.

14    A.    Are we done with this one?

15    Q.    Yes.  Thank you, doctor.

16    A.    Yes.

17    Q.    This is an order on the court's docket, document

18    3629, dated July 9, 2009?

19    A.    Yes, this is it.

20    Q.    Are you familiar with this order?

21    A.    Yes.  But only very recently when this topic came up.

22    Q.    If I could direct your attention to the third page of

23    the order, paragraph 1?

24    A.    Yes.

25    Q.    What is your understanding of that paragraph?

3499

1          As it states, that we would renew our contract with

2     Navigant and John Misener of McManis -- from McManis by

3     December 31st, 2009.  And we would make a contract that would

4     be for a three-year period.

5     Q.     So that would have expired at the end of 2012,

6     correct?

7     A.     Yes.

8          MR. MCKINNEY:  One moment, Your Honor.

9          (Cocounsel confer.)

10         I have no further questions for this witness, Your

11    Honor.

12         THE COURT:  I'm sorry.  Did you move KKKK into

13    evidence?

14         MR. MCKINNEY:  It is on the court's docket, but I'm

15    happy to move it into evidence.

16         I do move it into evidence.

17         THE COURT:  Received.

18             (Whereupon, Defendants' Exhibit KKKK received

19              into evidence.)

20         MR. MCKINNEY:  Nothing further.

21         Thank you, Doctor.

22                      CROSS-EXAMINATION

23    BY MR. BIEN:

24    Q.     Dr. Belavich, if you could turn to Exhibit GGGG, four

25    Gs.

# EXHIBIT C

[DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                              CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12    _____/

13

14

15                        ---oOo---

16

17                   REPORTER'S TRANSCRIPT

18               RE:  EVIDENTIARY HEARING

19              THURSDAY, DECEMBER 12TH, 2013

20

21                        ---oOo---

22

23

24
     Reported by:  CATHERINE E.F. BODENE, CSR. No. 6926, RPR
25   Reported by:  MICHELLE BABBITT, CSR. No. 6357

3190

1        THE WITNESS:  It's decided where they're going to go,

2   but we also have to get a bus seat for them if I can't

3   release them to that institution.

4        THE COURT:  I don't know what you just said.  I

5   understand you've got to have a bus to take them.

6        THE WITNESS:  Correct.

7        THE COURT:  That's just the question of getting the

8   bus there, isn't it?

9        THE WITNESS:  Our bus system is very complicated.  At

10  any given week we're transporting 1,700, 2,000 inmates in a

11  given week.  I think we have 20 buses and only can -- I think

12  the maximum capacity on the bus is 38 with 34 institutions,

13  so it's a complex process, and I'm certainly no transport

14  expert.

15       THE COURT:  I haven't said that you are, but there's a

16  kind of -- I agreed to the -- I agreed.  I agreed not to try

17  and stay, rather to let the process stay, because it seemed

18  to me that's the best we could do and it was more important

19  that we get a date that we know that they're going to be out

20  more than anything else, but now it appears to me that there

21  are all these other reasons, none of which, as best I can

22  tell, would be superior to getting people who aren't in

23  disciplinary condition out of the ASU.

24       I mean you use the ASU -- the ASU is segregated

25  housing.  Segregated housing isn't fun.  It's designed to

1    punish people for inappropriate conduct.

2        Once the term is over, it would appear to me, and I'm

3    trying to really understand what the problem is, that that

4    would be a priority to get them out of there and get them to

5    wherever they're going to go, and now I'm told that the

6    problem is we don't have buses to get people there.

7        THE WITNESS:  No, sir.  I want -- I'm just telling you

8    the process.  I didn't say that there's a particular problem

9    with backlog.  We have ample -- the ICSS changes, the

10   classification changes, we have ample level VI beds, more

11   level VI beds than what we need.  So it has nothing to do

12   with bed availability.  It's just getting the inmate from the

13   time of the endorsement through that process.

14       Understand, from the time ICC sees them, the

15   institution has 30 days to present that case to the CSR.

16   Now, we've since changed that for these nondisciplinary

17   segregation inmates, which would include the SHU kickouts,

18   that they have to get them to the CSR.  We've shortened all

19   of their timeframes.

20       THE COURT:  I appreciate that.  Apparently, before we

21   had this new regulation, people could languish there forever.

22   I don't mean that literally -- I just realized -- okay.

23   These appear to be bureaucratic problems which can be solved

24   simply by people energetically addressing the problem.

25       I think you don't agree with me, and I'm anxious to

3216

1    this week.  Going to the middle of the page there are 43 bus

2    seats requested and zero total bus seats provided.

3          Do you see that there?

4    A.    I see that, yes.

5    Q.    And just below that at the Corcoran SNY Level IV,

6    there were 21 bus seats provided -- or 21 bus seats

7    requested, five provided?

8          THE COURT:  And 7/0 and 29/1 and 11/3.

9          I can read.

10         Now, does that reflect, in fact, your general

11   experiences with obtaining bus seats?

12         THE WITNESS:  Each program has a cap for EOP of 15

13   per week to ensure continuity of care.  So the buses cannot

14   transport more than 15 a week in any given program.

15         So the clinicians --

16         THE COURT:  I don't know what that means.

17         THE WITNESS:  What that means, sir --

18         THE COURT:  You can take 15 people to Corcoran, 15

19   people to wherever, et cetera, et cetera, but on that date

20   there are 43 requested for a special needs unit at MC -- I

21   don't know what MCSP is, but whatever it is, and you could

22   only take 15 because you're testifying -- No?

23         THE WITNESS:  No, sir.  It is where they are going to

24   if that program -- let's say 43 are going to RJD.  RJD can

25   only receive a total of 15 per week.  And that's a minimum

3314

 1          THE WITNESS:  I can tell you, based upon what I know
 2    as a director, and what I have been exposed to, and, you
 3    know, kind of indoctrinated into the very, very complex
 4    process of our transfer -- our transportation, we have plenty
 5    of buses, we have plenty of staff.  But we're talking about
 6    the movement of multiple inmates over, you know, 35
 7    institutions, to include, you know -- and to try to fit
 8    everybody into the box to move that inmate from Pelican Bay
 9    to Chuckawalla, all the way across the state, it's very,
10    very -- I don't know what else to say except complex.
11          We have folks that put this jigsaw puzzle together
12    every week, trying to see how we're going to move 2000
13    inmates around this state while, you know, keeping in mind
14    that the staff can only work, per Department of
15    Transportation Rules, for the safety of the citizens on the
16    roads, can only work so many hours.
17          How do we make this work?
18          I tell you, I'm amazed how the staff do make this
19    work as it is.  It is easier today based upon our population.
20    I used to liken it to, you know, prior to when we were
21    severely overcrowded as trying to take one of those puzzles
22    that have the little squares and one empty square and trying
23    to work that except the one empty square was only a half a
24    square, you know, where we had Ad. Seg. overflow, with guys
25    waiting on SHU beds.

3315

1          It is incredibly complex, and they do this on a
2    weekly basis, put together our schedules of how we're going
3    to get these inmates moved through out the state.
4          Can we do better?
5          Well, I'm not going to sit here and tell you we
6    can't, Your Honor.
7          THE COURT:  All right.
8          Miss D'Agostino.
9          MS. D'AGOSTINO:  I have no further questions, Your
10   Honor.
11                    CROSS-EXAMINATION
12   BY MR. BIEN:
13   Q.    Mr. Stainer, following on the court's question, if
14   the population was reduced further and your capacity was
15   brought down, wouldn't it be easier to move people more
16   rapidly to the proper bed?
17   A.    I would only have to say -- I mean, with a guess,
18   yes.  I mean, I would assume so.
19   Q.    There are still shortages, for example, of SNY beds
20   at certain levels that are resulting in prisoners with mental
21   illness being housed in Ad. Seg. today?
22   A.    I can think of -- again, we do have some population
23   issues at one of our institutions, yes.
24   Q.    Which institution?
25   A.    I would like to say Kern Valley, Level IV, SNY.

# EXHIBIT D

[DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

COMPOSED OF THREE JUDGES PURSUANT TO SECTION 2284,

TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

        Plaintiffs,

-vs-              No. CIV S 90-0520 LLK-JFMP

EDMUND G. BROWN, JR,  et al.,

        Defendants.

_____/


MARCIANO PLATA, et al.,

        Plaintiffs,

-vs-              No. C01-1351 TEH

EDMUND G. BROWN, JR., et al.,

        Defendants.

_____/


DEPOSITION OF TIM BELAVICH, PH.D.

```
 1              BY MR. GALVAN
 2         Q.   Why would you -- how would you explain this
 3    sign being there?
 4              MS. VOROUS:  Objection.  Lacks foundation.
 5    Vague and ambiguous.  Speculation.
 6              THE DEPONENT:  There's any number of reasons
 7    the sign could be there.
 8              BY MR. GALVAN
 9         Q.   Okay.  Like what?
10         A.   Someone forgot to take it down.  Someone put
11    it up to get your attention.  I really can't be in the
12    mind of the person who controlled the sign.
13         Q.   Have you directed these cells not be used for
14    suicide observation?
15         A.   I have directed that the ZZ cells can be used
16    as a form of alternative housing while the inmate
17    patient awaits transfer to a crisis bed.
18         Q.   Let me ask the question again:  Have you
19    directed that the ZZ cells not be used for suicide
20    observation?
21              MS. VOROUS:  Objection.  Vague and ambiguous
22    as to what you mean by "suicide observation."
23              BY MR. GALVAN
24         Q.   Do you understand what suicide observation is?
25         A.   Yes.
```

1        Q.    What is it?

2        A.    It's a constant observation of suicidal

3    inmates per the program guide.

4        Q.    Have you directed that these ZZ cells not be

5    used for suicide observation?

6        A.    Suicide observation may take place in

7    alternative housing while the inmate patient awaits

8    transfer to a crisis bed.

9        Q.    Does that include these ZZ cells?

10       A.    I believe that the ZZ cells are listed as a

11   form of alternative housing at CSP SAC while the

12   patient awaits transfer to a crisis bed.

13       Q.    So is it your professional opinion that the ZZ

14   cells at CSP SAC are an appropriate location for

15   suicide observation?

16       A.    I believe that the ZZ cells are an appropriate

17   form of alternative housing while the patient awaits

18   transfer to a crisis bed, and during that time, a

19   patient may be on suicide observation as they await

20   transfer.

21       Q.    And how long -- in your professional opinion,

22   what's the maximum time that a person should be on

23   suicide observation in the ZZ cell?

24       A.    Well, if someone is in a ZZ cell and on

25   suicide observation, it's my expectation that an

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1    immediate referral to a crisis bed is made, and that
 2    the patient may have to stay in the ZZ cell until a
 3    crisis bed placement is facilitated.
 4         Q.   And how long is that?
 5              MS. VOROUS:  Objection.  Lacks foundation.
 6    Speculative.
 7              BY MR. GALVAN
 8         Q.   Have you directed -- actually, I'm going to
 9    stick with the question.  How long is that?
10              MS. VOROUS:  Same objection.  It's vague and
11    ambiguous as well.
12              THE DEPONENT:  Without consulting my staff, I
13    don't know the length of that time.
14              BY MR. GALVAN
15         Q.   In your professional opinion, what is the
16    maximum time that a person should remain in that status
17    that you just described, which is awaiting transfer to
18    the crisis bed and on suicide observation in a ZZ cell?
19         A.   I can't give you an answer to that without
20    consulting with my SMEs.
21         Q.   So if I gave you some timeframes, would you
22    have an opinion?
23              MS. VOROUS:  Objection.  Argumentative.  Asked
24    and answered.
25              BY MR. GALVAN
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    Q.    For example, let's try 24 hours.  In your

2    professional opinion, would 24 hours in the cell

3    pictured here in Exhibit 6 be appropriate?

4    A.    I would need to consult with my SMEs.

5    Q.    After you visited these -- CSP SAC and saw the

6    ZZ cells, did you consult with your SMEs as to the

7    maximum time that a person should be held there?

8    A.    No.

9    Q.    Is that because it's your professional opinion

10   that a person could be held in those cells

11   indefinitely, and therefore you didn't need to

12   determine a maximum time?

13        MS. VOROUS:  Objection.  Argumentative.

14   Misstates his testimony.  Lacks foundation.  Vague and

15   ambiguous.

16        THE DEPONENT:  I have to ask you to repeat the

17   question.

18        BY MR. GALVAN

19   Q.    Is it your professional opinion that a maximum

20   time should be set, that there is a maximum time beyond

21   which a person should not be held in this cell in

22   suicide observation?

23        MS. VOROUS:  Same objection.

24        THE DEPONENT:  I don't have an opinion.

25        BY MR. GALVAN

Tim Belavich, Ph.D.                                February 22, 2013

1          Q.    Do you have an opinion about it?

2          A.    I don't have enough information about it.

3          Q.    Okay.  Sticking just with the 30-minute

4     welfare checks that CDCR does, which is the first 21

5     days in seg, you're aware that CDCR has struggled do

6     those, right, to even implement that?

7               MS. VOROUS:  Objection.  Lacks foundation.

8     Vague and ambiguous.

9               THE DEPONENT:  I think they can be improved,

10     as most of our processes can be improved.

11                         (Off the record from 3:47 p.m.

12                          to 3:55 p.m.)

13               MR. GALVAN:  I would like to mark Exhibit 15.

14                         (Whereupon Plaintiffs' Exhibit No.

15                          15 was marked for identification.)

16               BY MR. GALVAN:

17          Q.    15 is the management report from Folsom State

18     Prison for a period ending June 30th, 2012.  If you

19     turn to Bates-number 288, Page 8, down toward the

20     bottom, they say under "ASU non-MHSDS," they say

21     "Custody documented 30-minute welfare checks

22     75.5 percent of time."  Do you consider 75.5 percent of

23     the time enough for -- adequate for a 30-minute welfare

24     check?

25               MS. VOROUS:  Objection.  Vague and ambiguous.

Tim Belavich, Ph.D.                                    February 22, 2013

1    Argumentative.  Lacks foundation.

2           THE DEPONENT:  I don't think that I have the

3    expertise to say if that's adequate or not.  I would

4    need more information.

5           BY MR. GALVAN

6       Q.   So you would have no opinion as to whether

7    that's adequate to this level of compliance?

8       A.   No.  This statement in a vacuum, I can't -- I

9    need more information.

10      Q.   And are you aware that there was a suicide of

11   a Mr. Lanning on May 20th, 2012 in the Folsom ASU where

12   your quality improvement plan identified that the

13   30-minute welfare checks were not properly staggered?

14   They were too predictable?

15      A.   I would need the document to review.

16      Q.   Going back to No. 14, your declaration.  We

17   probably don't even need the document.  You had

18   referred earlier to a memorandum regarding the use of

19   OHUs that you issued in May and then again in December?

20      A.   I don't know the dates of their --

21      Q.   So that would be Exhibit -- one of them is

22   Exhibit 2 to your declaration there.  It's pretty close

23   to the beginning.  There you go.  Almost there.

24      A.   There we go.  May 9th.

25      Q.   And then if we go back a couple of more pages,

1    there's the December 12th version.  So what does this

2    memo do?  Does it prohibit the use of OHUs for placing

3    inmates with Mental Health crisis assessment or not?

4        A.   It does not prohibit their use.

5        Q.   So it allows their use?

6        A.   It says, "Placement in an OHU is permitted

7    when a crisis assessment is necessary."

8        Q.   And it sets a time limit on the placement or

9    it doesn't?

10       A.   I assume you're talking about the 24 and 48

11   hours.

12       Q.   No.  I just want your understanding of whether

13   it places a time limit or not.

14       A.   Yes.

15       Q.   Okay.  What's the time limit?

16       A.   The initial time limit is that the initial

17   intake evaluation shall occur and be documented within

18   24 hours, and then a face-to-face evaluation occurs at

19   the earliest practical time with no more than 48 hours

20   of the placement.

21       Q.   So how long can the person stay in the OHU for

22   crisis assessment?

23       A.   Well, up to 48 hours, except when the length

24   of stay -- when you have on the second page, these

25   other two issues:  "The inmate patient is referred to a

1    crisis bed.  The inmate patient must be transferred to

2    the MHCB within 24 hours of the clinical decision to

3    refer to MHCB.  OHU length of stay shall not exceed 72

4    hours for inmate patients referred to MHCB."  And then

5    the program guide citation is made.  And then the

6    second condition is, "The inmate patient is awaiting

7    Enhanced Outpatient Program, EOP, level of care

8    placement, and an IDTT determines that the inmate

9    patient may be at risk if returned to any of the

10   housing units available at that institution while

11   awaiting transfer."  Also then, there's a mental health

12   program guide citation.

13        Q.   So for the people in that second group,

14   waiting to go to the EOP, is there any time limit for

15   how long they can stay in the OHU?

16        A.   No.  But then we instituted that if they are

17   staying in the OHU, they will receive EOP services.

18        Q.   And if they are, then they can stay in the OHU

19   indefinitely?

20        A.   Until they're transferred.

21        Q.   Which could be indefinitely, right?

22        A.   No.  It would -- they would be on the list to

23   transfer.

24        Q.   And then there's an Exhibit 3, the next

25   exhibit is a memo -- it's Exhibit 3 to Exhibit 14,

1    issued the same day, December 12, 2012, called
2    Alternative Housing Cell Prioritization.  Why did you
3    need this memo?  And actually, let me broaden that
4    question.  This is an addendum to the similar memo
5    issued May 16th, 2012.  So really, I should ask, why
6    did you need the May 16, 2012 memo on use of
7    alternative housing which is attached here?
8         A.    The May 16th use of alternative housing memo
9    was issued because of a change that we made in that, in
10   the past, patients could be placed in alternative
11   housing waiting and evaluation, then evaluated, then
12   referred to a crisis bed.  We made a change so that
13   those placed in -- if you were placed in alternative
14   housing, you were immediately also referred to a Mental
15   Health Crisis Bed so that there was not a time lag or a
16   period of time where you're doing your evaluation and
17   then you request the bed.  So we wanted our staff to be
18   able to request the bed, and if they determined that
19   the patient didn't need -- did not need the crisis bed,
20   they could rescind the referral rather than wait for an
21   evaluation to be completed and then request a bed.
22        Q.    Why do you need alternative housing to crisis
23   beds?
24              MS. VOROUS:  Objection.  Vague and ambiguous.
25              THE DEPONENT:  Certain institutions need

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1    alternative housing because they may not have crisis
 2    beds or OHUs, or they may have crisis beds that are
 3    full, and the patient will go to a different crisis
 4    bed, so they will not be kept in-house.  So for that
 5    reason, we use temporary alternative housing rather
 6    than return them to their housing unit.
 7              BY MR. GALVAN
 8         Q.   Why don't you just have the entire crisis care
 9    during the period of the crisis delivered in the
10    alternative housing?  In other words, why bother with
11    the crisis bed transfer, either within the institution
12    or on a bus to another institution?  Why don't you just
13    deliver the crisis care in the alternative housing?
14              MS. VOROUS:  Speculative.  Lacks foundation.
15    Vague and ambiguous.
16              THE DEPONENT:  Well, the crisis beds are
17    licensed per Title 22.  So I would expect that my goal
18    would be to get these individuals to that setting as
19    soon as I could.
20              BY MR. GALVAN:
21         Q.   And is that just because -- just technical
22    compliance with the licensing laws, or is the licensing
23    a proxy for something about the care and the beds
24    that's important?
25         A.   The staffing is different.  The setting is
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    different.
 2        Q.    What's important -- what's different about the
 3    staffing that's important?
 4        A.    You've got a different component of staffing.
 5    So you've got people who work in a crisis bed.
 6        Q.    Is the difference the people, or is it the
 7    hours that they work, or is it both?
 8        A.    I think it's the availability of the staff in
 9    terms of they are working on that unit and available.
10        Q.    To be more specific, what kind of staff are we
11    talking about?
12        A.    It could be any staff.
13        Q.    Oh, we're talking -- go ahead.
14              Are we talking about nurses or psychiatrists
15    or psychologists?  What is it that the crisis bed has
16    that the alternative housing doesn't have in terms of
17    staff?
18              MS. VOROUS:  Objection.  Lacks foundation.
19    Vague and ambiguous.
20              THE DEPONENT:  It doesn't have some of
21    those -- some of those components.  For example, it
22    doesn't have the nurses as readily available.  The
23    person would be on one-to-one watch but not have that
24    nursing staff available.
25              BY MR. GALVAN:
```

```
 1        Q.    And --
 2        A.    As readily.  I should call it by that.
 3        Q.    And in your professional opinion as a clinical
 4   psychologist why that is important?  Why does that
 5   matter?
 6        A.    Having the nursing staff -- I don't understand
 7   your question.
 8        Q.    Yes.  Why does it matter?
 9        A.    Why does what matter?
10        Q.    Why does it matter that nursing staff are
11   available in the licensed crisis bed unit but not
12   available in the alternative housing?
13        A.    Well, they're not as available, and the crisis
14   bed staff, I think, are more -- I would just say
15   they're more available.  They have -- they are trained
16   as our other staff are, but they're just more
17   available.
18        Q.    So staffing was one component.  Was there
19   anything else about the licensed crisis bed that was --
20   that was critical to this reason for not just
21   delivering the care in the alternative housing?
22        A.    Well, I think the settings between alternative
23   housing and crisis beds are different.  Otherwise, I
24   could license my alternative housing.
25        Q.    What's the difference in setting?
```

Tim Belavich, Ph.D.                                          February 22, 2013

1        A.    The crisis beds were built for that purpose.
2   They have suicide-resistant beds.
3        Q.    And the alternative housing, by contrast, has
4   what qualities?
5        A.    Necessarily -- it doesn't necessarily have
6   suicide-resistant beds.  It may not have as easy access
7   to some of the medical -- some of the things that are
8   located in the crisis bed.
9        Q.    If you were operating the system as you would
10  prefer it, would you use the alternative housing at
11  all?
12            MS. VOROUS:  Objection.  Getting too late in
13  the day.  Vague and ambiguous.  Calls for speculation.
14  Beyond the scope of his declaration with respect to
15  this issue.
16            THE DEPONENT:  Could you repeat the question?
17            BY MR. GALVAN
18       Q.    If you were operating the system as you prefer
19  to operate it, would you use the alternative housing at
20  all?
21       A.    I think I would use the alternative housing as
22  I'm currently using it, and you know, as I have
23  consulted with members of the special masters team.
24  And I understand that we will always have some need for
25  alternative housing because of patient movement and

Tim Belavich, Ph.D.                                    February 22, 2013

1    because of issues surrounding the current facilities we

2    have and the placement of crisis beds.  So I see it as

3    needed, but with minimal usage, and I believe that's

4    what we have now.

5         Q.   Is it -- and is it your view that it's needed

6    because of the number of patients that you have to

7    treat compared to the number of -- the number and

8    placement of crisis beds that you have?

9         A.   Could you repeat that again?  I think I have

10   your answer, but could you repeat it again just to make

11   sure?

12        Q.   Sure.  Is it needed -- are the alternative

13   housing beds needed because of the number of patients

14   you have to treat compared with the number and location

15   of the crisis beds that you have now?

16        A.   No.  The alternative housing is needed because

17   of where the crisis beds are located.  We have

18   vacancies in crisis beds regularly and continuously.

19   It's getting the body to the bed.

20        Q.   And your memo sets a limit, doesn't it, of 24

21   hours placement in the alternative housing?  It would

22   be in the middle of Page 2.

23        A.   It would be on Exhibit 2 or 3?

24        Q.   Three.  The alternative housing memo, the

25   May 1 memo.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1         A.    The May or the December?

2         Q.    May.  Actually, it changes in December.  Might

3    as well look at December, because December is current.

4    So let's not talk about May.  That's old.  Let's talk

5    about December.

6         A.    Okay.

7         Q.    December, at least for -- at the bottom of

8    Page 1, for sit/stand cells, it sets a limit of four

9    hours; is that correct?  At the top.

10        A.    Yes.  The second-to-last line.  Well, small

11   holding cells where they can only sit or stand can only

12   be used up to four hours.

13        Q.    And do you have -- do you have -- from your

14   memo or elsewhere, do you have a sense of a similar

15   limit for the ZZ cells that we looked at earlier?  The

16   contraband cells?  Would that also be four hours or

17   would it be longer?

18        A.    No.  I believe the four hours is only for the

19   sit and stand cells.

20        Q.    But in your professional opinion, should the

21   same limit be applied to the ZZ cells?

22             MS. VOROUS:  Objection.  Lacks foundation.

23             THE DEPONENT:  If the ZZ cells are large

24   holding cells with water and toilets, no.

25             BY MR. GALVAN

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1        Q.   What would the limit be then?
 2        A.   I don't believe there is a time limit listed
 3   for -- for use of the --
 4        Q.   The ZZ cells?
 5        A.   Yeah.  But I -- in the previous memo, it did
 6   have a 24-hour limit.  I believe that was removed.  Oh,
 7   yeah.  This is about cell prioritization.
 8        Q.   About which cells to use first?
 9        A.   Yes.  The order of the cell usage.
10        Q.   Okay.  And the other one, I guess since this
11   is an addendum, the other one would still have the
12   24-hour limit?
13        A.   Yes.  There's a 24-hour -- "All inmate
14   patients placed in alternative housing shall be
15   transferred to the Mental Health Crisis Bed as soon as
16   possible, and placement shall not exceed 24 hours."
17             MR. GALVAN:  I'd like to mark an Exhibit 16.
18                  (Whereupon Plaintiffs' Exhibit No.
19                   16 was marked for identification.)
20             BY MR. GALVAN
21        Q.   We talked earlier about the Folsom suicide
22   that involved the 30-minute welfare checks.  So this
23   is -- Exhibit 16 is a September 21st, 2012 document,
24   report on the Quality Improvement Plans for that
25   suicide at Folsom, signed for you by Dr. Burleson.  And
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1      then if you go two pages in -- I think you're already
 2      there -- you can see the problem identified is that the
 3      tier COs did not stagger the 30-minute wellness checks.
 4      And then if you go through two more pages, you can see
 5      there's a 2006 memo that directs them on how to perform
 6      the 30-minute checks.
 7              So it would be fair to say, wouldn't it, that
 8      six years after that memo, this is still being
 9      identified as a problem in completed suicides, wouldn't
10      it?
11              MS. VOROUS:  Objection.  Vague and ambiguous
12      as to what memo you're referring to.  Lack of
13      foundation.
14              BY MR. GALVAN
15      Q.   So you see the memo there that's attached to
16      the QIP?  That one, the --
17      A.   December 2006 memo?
18      Q.   December 2006.  Right.  From the director of
19      DAI to the -- to his reports on how to do the 30-minute
20      welfare checks.  So since -- so it asks the question,
21      again, it would be fair to say, wouldn't it, that six
22      years after this memo, the, welfare checks are still
23      being identified as a problem in completed suicides,
24      wouldn't it?
25      A.   For this suicide it was identified as a
```

 1    problem.  And it's something that's being aggressively
 2    addressed through headquarters.
 3                MR. GALVAN:  Let's mark an Exhibit 17.
 4                      (Whereupon Plaintiffs' Exhibit No.
 5                      17 was marked for identification.)
 6          BY MR. GALVAN
 7          Q.    Exhibit 17 is a big spreadsheet which has a
 8    label at the top that reflects the name of the
 9    worksheet on the spreadsheet, which is "OHU Data May
10    2012."  Doctor, do you recognize this spreadsheet?
11          A.    This looks like something prepared by one of
12    my nursing staff.
13          Q.    Would this be at your direction?
14          A.    Yes.  Ultimately my direction.
15          Q.    What was the purpose of it?
16          A.    With our understanding that we had crisis beds
17    available, and as reflected by some of the memos we
18    discussed previously, we wanted to make sure that the
19    message that we were sending to the institutions was
20    being implemented.  And therefore, we were telling
21    people, "Don't keep guys in your OHU.  Get them in a
22    crisis bed."
23                And so we began monitoring from headquarters
24    all of the OHU lengths of stay statewide on a daily
25    basis, and then became proactive in calling any

1      institution that exceeded the timeframes and asking

2      them -- or was approaching the timeframes, and asking

3      them what their plan was to move this patient, why this

4      patient hadn't been referred for a crisis bed, and in a

5      hands-on way, getting our message across to the field.

6          Q.    And over on the right there is this gray

7      column, it says, "Notes per Cindy McGill."  And there

8      are some notes in here.  Are these notes the results of

9      her phone calls?

10              MS. VOROUS:  Objection.  Calls for

11      speculation.

12              THE DEPONENT:  They may be.

13              MR. GALVAN:  Let's mark an Exhibit 18.

14                      (Whereupon Plaintiffs' Exhibit No.

15                      18 was marked for identification.)

16              BY MR. GALVAN

17          Q.    So this No. 18 is the management report from

18      LAC ending March 31, 2012.  It has your name on it.  So

19      this would be, I guess, the last management report that

20      you -- from LAC that you were part of, right?  Because

21      you left in March 2012.

22          A.    Yes, but I still had involvement with the

23      facility.  But I don't -- but I don't think the

24      following report I was involved with.

25          Q.    So if you look at Bates-number 351 here, which

1    is Page 14, so there's a section there called

2    "Alternative Housing." And it says, "During the

3    reporting period, there were 330 I/Ps placed in

4    alternative housing, and 100 percent of them were

5    placed on suicide watch." And then it goes on and

6    says, "Delays in transfer were mainly due to lack of

7    appropriate beds on weekends or holidays." Did you do

8    anything about that problem when you were healthcare

9    CEO at LAC?

10        A.    No.  I did when I got to headquarters.

11        Q.    What did you do?

12        A.    I empowered HC-POP to have more authority in

13   some of their movement, especially on weekends. And

14   the staff in HC-POP carries pagers to address issues on

15   weekends if there is a problem with the transfer.

16        Q.    And has that solved the problem?

17             MS. VOROUS:  Objection. Vague and ambiguous.

18   Calls for speculation.

19             THE DEPONENT:  I'm sorry. Which problem?

20             BY MR. GALVAN

21        Q.    That's all right. I'll withdraw the question.

22             If we go in the same Exhibit 18 to

23   Bates-number 347, Page -- which is Page 10 of 12,

24   there's a section here about lab test results for MHSDS

25   inmates. And at the very bottom, the last two

Tim Belavich, Ph.D.                                     February 22, 2013

1           CERTIFICATION OF DEPOSITION OFFICER

2

3        I, JOANNA BROADWELL, duly authorized to

4 administer oaths pursuant to Section 2093 (b) of the

5 California Code of Civil Procedure, hereby certify that

6 the witness in the foregoing deposition was by me sworn

7 to testify to the truth, the whole truth, and nothing

8 but the truth in the within-entitled cause; that said

9 deposition was taken at the time and place therein

10 stated; that the testimony of said witness was

11 thereafter transcribed by means of computer-aided

12 transcription; that the foregoing is a full, complete

13 and true record of said testimony; and that the witness

14 was given an opportunity to read and correct said

15 deposition and to subscribe the same.

16        I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, or in any way

19 interested in the outcome of this cause named in said

20 caption.

21

22                   _____

23                   JOANNA BROADWELL

24                   CSR 10959

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Case 2:90-cv-00520-LKK-JFM   Document 4277   Filed 01/07/13   Page 1 of 10

1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   Supervising Deputy Attorney General
3  DEBBIE J. VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
4  WILLIAM H. DOWNER, State Bar No. 257644
   Deputy Attorney General
5   1300 I Street, Suite 125
    P.O. Box 944255
6   Sacramento, CA 94244-2550
    Telephone: (916) 324-5345
7   Fax: (916) 322-5205
    E-mail: Debbie.Vorous@doj.ca.gov
8  Attorneys for Defendants



9

10

11

12

13

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| 14 **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| 15 Plaintiffs, | **DECLARATION OF TIM BELAVICH IN SUPPORT OF MOTION TO** |
| 16 v. | **TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. §** |
| 17 | **3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS** |
| 18 **EDMUND G. BROWN JR., et al.,** | **UNDER FEDERAL RULE OF CIVIL** |
| 19 Defendants. | **PROCEDURE 60(b)(5)** |

20

21   I, Tim Belavich, declare:

22       1.       I am the Acting Statewide Mental Health Deputy Director for California

23  Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters

24  set forth in this declaration and if called upon to do so, I would and could so testify. I make this

25  declaration in support of Defendants' Motion to Terminate Under the Prison Litigation Reform

26  Act (PLRA) [18 U.S.C. § 3626(b)] or Alternatively to Vacate the Court's Judgment and Orders

27  Under Federal Rule of Civil Procedure 60(b)(5).

28

1

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

13.    Enhanced Outpatient Programs provide the most intensive level of outpatient care. Inmates at this level of care receive an initial clinical assessment, individual clinical contacts at least every two weeks, medication management, interdisciplinary treatment team appointments, and structured treatment activities for approximately 10 hours per week.

14.    Mental Health Crisis Bed placement is governed by California Code of Regulations, Title 15, Chapter 12, "Correctional Treatment Centers." Services include observation, continuous nursing assistance, symptom assessment, diagnosis, initial and follow-up treatment plan, therapy to alleviate psychiatric distress, and follow up on discharge. Recently, I signed two memoranda that govern the use of Outpatient Housing Units or alternative housing for inmates pending admission to a Mental Health Crisis Bed. These memoranda have been distributed to the institutions and have been implemented. Attached as Exhibits 2 and 3 are true and correct copies of the Outpatient Housing Unit and Alternative Housing Directive memoranda, respectively.

15.    Before being placed into administrative segregation, inmates receive a mental health screening and are referred for a mental health evaluation on an emergent, urgent, or routine basis as deemed needed. Upon placement, inmates receive further screening for treatment. Enhanced Outpatient Program services for inmates in administrative segregation include individual clinical contacts, interdisciplinary treatment team appointments, medication management, structured therapeutic activities, and other treatment deemed necessary by mental health professionals.

16.    Inmates housed in Psychiatric Services Units receive an initial mental health evaluation, interdisciplinary treatment team appointments, weekly clinician contacts, psychiatrist evaluation at least monthly, and structured therapeutic activities.

17.    The State continuously trains correctional staff to recognize the signs and symptoms of mental illness among inmates. This includes both yearly and issue-specific training, such as training on the use of discipline against mentally ill inmates, and ongoing training to improve suicide risk evaluations.

18.    The State has a well-planned and active quality management program, which is outlined in the State's Inmate Medical Services Program Policies and Procedures. Recently, the receiver in *Plata v. Brown* issued revised policies and procedures that, among other things,

5

# EXHIBIT 3

[to Belavich Declaration]

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

**MEMORANDUM**

| | | |
|---|---|---|
| **Date** | : | December 12, 2012 |
| **To** | : | Chief Executive Officers<br>Chiefs of Mental Health |
| **From** | : | *K. Allison*<br>Kathleen Allison, Deputy Director<br>Facility Support, Division of Adult Institutions<br><br>*Timothy G. Belavich*<br>Timothy G. Belavich, Ph.D., MSHCA, CCHP, , Deputy Director (A)<br>Statewide Mental Health Program, Division of Health Care Services |
| **Subject** | : | ALTERNATIVE HOUSING CELL PRIORITIZATION |

This memorandum is an addendum to the attached May 16, 2012, "Use of Alternative Housing" memorandum.

The purpose of this memorandum is to remind institution staff of the requirements for prioritizing housing for inmate patients pending Mental Health Crisis Bed (MHCB) transfer and provide additional clarification regarding the use of alternative housing.

Staff are reminded that, although the use of alternative housing may be necessary pending finalization of transfer arrangements to a Mental Health Crisis Bed (MHCB), alternative housing is not a clinically appropriate location for inmates requiring MHCB level of care and should only be used as a last option for inmates awaiting transfer.

The Mental Health Services Delivery System (MHSDS) Program Guide (2009) clearly lists the order of priority for housing of inmate-patients awaiting transfer to a MHCB. As a reminder, an Outpatient Housing Unit (OHU) is the preferred location for housing inmates awaiting transfer to a MHCB. If staff cannot place an inmate-patient in an OHU, alternative housing is the next priority on the list and includes, in order:

1. Outpatient Housing Unit overflow cells
2. Large holding cells with water/toilets
3. Large holding cells without water/toilets such as "Contraband Cells"
4. Triage and Treatment Area or other clinic physical examining room
5. Other unit-housing where complete and constant visibility can be maintained

To the extent not available already, staff shall ensure that inmates housed in alternative housing have reasonable access to water and toilets.

Small holding cells that are designed for the inmate-patient to sit or stand may be used for up to four hours (MHSDS Program Guide, 2009, p. 12-5-5). "Inmate-patients shall be retained in sit/stand cells only

# MEMORANDUM

with approval of the Watch Commander and notification of on-call clinical staff" (MHPG, 2009, p. 12-5-5). These placements are not considered alternative housing and use of these cells shall be logged on the custody log for small holding cells. These cells should be used minimally and only as a last option for temporarily housing inmates in crisis. Inmates shall be transferred out of these cells as soon as possible and never to exceed four hours.

Utilizing holding cells within the licensed bed area of the Correctional Treatment Center is the last preference for housing inmates. Use of these cells shall be logged on the alternative housing log and any time one of these cells is utilized, the Department of Health Services shall be notified (MHSDS Program Guide, 2009, p. 12-5-5).

Outpatient Housing Unit medical beds (non-swing beds), currently at California State Prison at San Quentin, California Medical Facility, California Institution for Men, and California State Prison at Corcoran are designated as medical beds. As a result, these beds shall be considered alternative housing. The alternative housing requirements and MHTs.net designation as indicated below shall be followed when inmate-patients are placed into these cells for crisis evaluations.

Effective immediately, mental health data entry staff will designate alternative housing cells with an "AltHs" subprogram in MHTS.net.

When an inmate-patient is waiting for a mental health evaluation and placement into alternative housing, staff must ensure the inmate-patient is placed in a safe setting, such as the triage and treatment area, and receives continuous direct visual observation until he or she is evaluated by a mental health clinician (after hours the evaluation may take place via telephone with a nurse facilitating).

Effective February 1, 2013, each institution shall have a Local Operating Procedure (LOP) that includes all requirements in the May 16, 2012, memorandum and the additions from this addendum. The LOP shall clearly state which cells locally will be used, in priority order, for alternative housing. This cell priority for the LOP shall mirror the priority list in the Mental Health Program Guide (2009) but include institution specific information.

If you have any questions regarding these requirements contact Laura Ceballos, Ph.D. Chief, Quality Management, Statewide Mental Health Program, at (916) 691-0308.

cc:   Judy Burleson, Associate Director, Program and Clinical Support,
        Statewide Mental Health Program, Division of Health Care Services
      Nathan Stanley, Chief, Coleman Compliance, Statewide Mental Health Program, Division of
        Health Care Services
      Rick Johnson, Chief, Health Care Placement Oversight Program,
        Statewide Mental Health Program, Division of Health Care Services
      Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
      Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
      Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
      Richard Kendall, Ph.D., Southern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

## MEMORANDUM

| Date | : | MAY 1 6 2012 |
|---|---|---|
| To | : | Chief Executive Officers<br>Chiefs of Mental Health |
| From | : | Timothy G. Belavich, Ph.D., MSHCA, CCHP<br>Deputy Director (A)<br>Statewide Mental Health Program,<br>Division of Correctional Health Care Services |
| Subject | : | Use of Alternative Housing |

The purpose of this memorandum is to ensure staff follows current Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, requirements and policy memorandums related the use of alternative housing. Current practice at many institutions has been to utilize alternative housing for an evaluation period and/or provide short term treatment. This practice is not consistent with current policy.

Effective immediately:

- Inmate-patients shall not be placed in alternative housing until an evaluation by a qualified mental health clinician has been completed and it is documented that the inmate requires a referral to the Mental Health Crisis Bed (MHCB). The clinician's order shall read "Refer to Mental Health Crisis Bed for admission evaluation." Because of licensing requirements, "Only licensed clinicians with admitting privileges at the receiving MHCB program can write the actual "admission" order and this is performed at the actual time of admission..." (See attached September 6, 2005, memorandum entitled *Standardization of Mental Health Crisis Bed Admission Procedures*).

  When a face to face evaluation is not possible and a referral for admission to the MHCB is documented that results in placement into an alternative housing cell, the referral can be rescinded once a face to face evaluation is conducted and it is determined the inmate-patient does not require placement into the MHCB. The rescission and subsequent movement out of alternate housing and back to the inmate-patient's previous housing must occur within 24 hours of placement.

- Appropriate housing of inmate-patients pending transfer shall meet MHSDS Program Guide, 2009 Revision, requirements (p. 12-5-5). Housing shall be

# MEMORANDUM

Page 2 of 3

determined in the following order of preferred locations:

1. Inpatient beds
2. Outpatient Housing Unit

The following locations are considered alternative housing:

3. Outpatient Housing Unit overflow cells
4. Large holding cells with toilets
5. Large holding cells without toilets
6. Triage and Treatment Area or other clinic physical exam room
7. Other unit-housing where constant visibility can be maintained
8. Holding cells within the licensed bed area of the Correctional Treatment Center

- Only inmate-patients who have been referred to the MHCB shall be placed in alternative housing.

- Although alternative housing locations are listed in the MHSDS Program Guide, 2009 Revision, as appropriate placements, the use of them shall be minimal. It is expected these locations will be used only as a last alternative and only when MHCB beds are not immediately available.

- All inmate-patients placed in alternative housing shall be transferred to the MHCB as soon as possible and placement shall not exceed 24 hours. "The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed." (MHSDS Program Guide, 2009 Revision, p. 12-5-4).

- A designated institution mental health staff member shall track alternative housing placement in accordance with the attached February 4, 2010, policy memorandum entitled *Implementation of Alternative/Temporary Housing Logs.*

- All electronic logs shall be e-mailed by a designated mental health staff member weekly to the Utilization Management (UM) mailbox at CDCR DCHCS DMH Referral Updates@cdcr.ca.gov.

- The electronic log must be received in the UM mailbox by close of business every Friday.

- Each log shall include only those inmates placed in alternative housing for the week in which the log is submitted (logs shall not include inmates placed in alternative housing the week prior – no running logs).

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 942883
Sacramento, CA 94283-0001

# MEMORANDUM

Page 3 of 3

- Electronic logs shall include all inmate-patients placed in alternative housing beginning Friday and include all placements through close of business Thursday of the following week (Friday – Thursday record of placements).

Mandatory training for Chiefs of Mental Health or their designees was held on Wednesday, May 16, 2012, at 3:00 pm. Details regarding this training were sent to all Chiefs of Mental Health via email on May 3, 2012.

If you have any questions regarding these requirements you may contact Laura Ceballos, Ph.D. Chief of Quality Management, Statewide Mental Health Program, at (916) 691-0308.

Attachments

cc:    Judy Burleson
       Nathan Stanley
       Laura Ceballos, Ph.D.
       Steve Clavere, Ph.D.
       Tia Araminta, Ph.D.
       Richard Kendall, Ph.D.
       Lucinda McGill, R.N.
       Rick Johnson

---

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 942883
Sacramento, CA 94283-0001

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | | |
|---|---|---|
| **Date** | : | December 12, 2012 |
| **To** | : | Chief Executive Officers<br>Chiefs of Mental Health |
| **From** | : | *K. Allison*<br>Kathleen Allison, Deputy Director<br>Facility Support, Division of Adult Institutions |
| | | Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A)<br>Statewide Mental Health Program, Division of Health Care Services |
| **Subject** | : | USE OF OUTPATIENT HOUSING UNITS DIRECTIVE |

This memorandum supersedes the previous *"Use of Outpatient Housing Units"* memorandum dated **May 9, 2012** (attached).

The California Department of Corrections and Rehabilitation currently has a sufficient number of Mental Health Crisis Beds (MHCB). Although inmate-patients may have previously been housed in Outpatient Housing Units (OHU) rather than be referred to MHCB due to an insufficient number of MHCBs, <u>this practice is no longer necessary and is not permitted.</u>

Placement in an OHU is permitted when a crisis assessment is necessary. A physician, psychiatrist, licensed psychologist, or nurse practitioner may order placement of an inmate-patient into OHU when an assessment is clinically warranted. If an inmate-patient is placed in OHU when a clinician is not available to do a face-to-face evaluation, such as after hours or on weekends, the inmate-patient may be placed on suicide observation until seen by the clinician. The initial intake evaluation shall occur and be documented within 24 hours and a face-to-face evaluation shall occur at the earliest practicable time and within no more than 48 hours of the verbal OHU placement order (*MHSDS Program Guide, 2009*, p. 12-5-30).

Only when circumstances prevent the clinician from making a clinical decision regarding admission to a higher level of care or release from the OHU during the first evaluation (within 24 hours) shall the full 48-hour evaluation period permitted by the MHSDS Program Guide (2009) be used. At any time, "when an inmate-patient in the OHU is [clinically] determined to require MHCB level of care, including Suicide Precaution and/or Watch," he or she shall be immediately referred to a MHCB (*Mental Health Services Delivery System [MHSDS] Program Guide, 2009*, p. 12-10-12). Inmate-patients may not be kept in OHU for higher level of care treatment, including MHCB level of care.

---

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES | P.O. Box 942883
Sacramento, CA 94283-0001

[680124-1]

# MEMORANDUM

Page 2 of 2

OHU length of stay shall not exceed 48 hours unless one of the following two conditions is met:

1. *The inmate-patient is referred to the MHCB. Inmate-patients must be transferred to the MHCB within 24 hours of the clinical decision to refer to MHCB. OHU length of stay shall not exceed 72 hours for inmate-patients referred to MHCB.* (MHSDS Program Guide, 2009, p. 12-5-30)

2. *The inmate-patient is awaiting Enhanced Outpatient Program (EOP) level of care placement and an "IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer."* (MHSDS Program Guide, 2009, p. 12-5-31)

Additionally, OHU lengths of stay for EOP inmate-patients meeting Item # 2 of the exceptions above shall not exceed 30 days from endorsement. Clinical staff shall ensure the EOP level of care change is immediately completed upon evaluation and is promptly communicated to the correctional counselor to ensure transfer is initiated.

All mental health inmate-patients housed in OHU for an extended time beyond 72 hours shall receive mental health treatment according to the following guidelines:

| | | |
|---|---|---|
| Inmates transferring from mainline General Population or Correctional Clinical Case Management System | → | Shall receive enhanced mental health treatment as determined by a treatment team. |
| Inmates transferring from Reception Center, mainline, or Administrative Services Unit who were at the EOP level of care upon arrival to the OHU | → | Shall receive Enhanced Outpatient Treatment in accordance with applicable MHSDS Program Guide (2009) requirements. |

If you have questions concerning this memorandum, you may contact Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, at (916) 691-0308 or via email at Laura.Ceballos@cdcr.ca.gov.

Attachment

cc:  Judy Burleson, Associate Director, Program and Clinical Support
        Statewide Mental Health Program, Division of Health Care Services
     Nathan Stanley, Chief, Coleman Compliance
        Statewide Mental Health Program, Division of Health Care Services
     Rick Johnson, Chief, Health Care Placement Oversight Program
        Statewide Mental Health Program, Division of Health Care Services
     Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
     Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
     Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services
     Richard Kendall, Ph.D., Southern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, Division of Health Care Services