KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
PATRICK R. MCKINNEY
Supervising Deputy Attorneys General
DEBBIE VOROUS, State Bar No. 166884
CHRISTINE CICCOTTI, State Bar No. 238695
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                     Plaintiffs,<br><br>   v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                     Defendants. | 2:90-cv-00520 LKK DAD PC<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' BRIEF ON REVISED DEPARTMENT OPERATIONS MANUAL RE: USE OF FORCE**<br><br>Judge:         Hon. Lawrence K. Karlton<br>Action Filed:  1990 |

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

**TABLE OF CONTENTS**

                                                                                                              **Page**

Introduction .................................................................................................................................. 1

    I.    The revised Department Operations Manual builds on and clarifies California's use-of-force policy. ................................................................................ 2

    II.   Plaintiffs' criticism of the revised operating manual is factually and legally unsupported. ............................................................................................................. 4

           A.    Plaintiff's references to Inmate X do not warrant rejecting Defendants' revisions. ................................................................................ 5

           B.    The revised operations manual clarifies and reiterates CDCR'S policy that immediate force can only be used in response to imminent safety threats. ........................................................................................ 6

           C.    The operations manual revisions expand CDCR'S heightened clinical intervention and reflect CDCR'S policy of avoiding force when possible. ............................................................................................... 7

           D.    The operating manual revisions significantly limit and control use of chemical agents, and there is no need for revisions concerning the expandable baton. ..................................................................................... 8

           E.    Plaintiffs' claims regarding use of force review procedures are unsubstantiated. .................................................................................................. 9

           F.    There is no need to revise policies concerning handheld video cameras, disciplinary procedures, and management status ...................... 10

Conclusion ................................................................................................................................ 11

i

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Armstrong v. Schwarzenegger*
  622 F.3d 1058 (9th Cir. 2010)...................................................................................... 4

*Hoptowit v. Ray*
  682 F.2d 1237 (9th Cir. 1982)........................................................................................ 4

*Lewis v. Casey*
  518 U.S. 343 (1996)........................................................................................................ 4

*Madrid v. Gomez*
  889 F. Supp. 1146 (N.D. Cal. 1995) ............................................................................. 5

**STATUTES**

California Code of Regulations, Title 15
  § 3268.1(a)(1).................................................................................................................. 2

ii

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

# INTRODUCTION

Responding to the California Department of Corrections and Rehabilitation's use-of-force policy revisions, Plaintiffs offer no suggestions for further revisions or refinements to the State's revised Department Operations Manual ("D.O.M."). Instead, they urge the Court to throw out Defendants' revisions in place of their own policy "wish list," to be imposed by Court order. Plaintiffs' response echoes their concession during oral argument that they did not bring this motion to remedy constitutional violations, but to implement best-practice recommendations that would "expand the toolbox of options for working, dealing with severely mentally ill inmates in California." Nothing in that motion, the evidence presented during the hearings, or subsequently submitted evidence proves that Defendants' use-of-force policies (including the proposed revisions) comprise a system that, on its face or in practice, violates the Constitution. Rather, the evidence shows that CDCR's policies for using force are constitutionally sound, and that they appropriately consider and accommodate inmates' mental health before using force and during the disciplinary process. In short, Plaintiffs offer no reasonable explanation showing that these new policies embody an unconstitutional system. Accordingly, their demand for further orders must be rejected.

The overriding principle of the revised D.O.M. "is that staff should use the least amount of force necessary in both controlled and immediate use-of-force situations to assure the safety of the institution, inmates, and staff alike." (Implementation Plan [attached as Exhibit 2 to the Declaration of Michael Stainer], at 1.) CDCR began considering these revisions even before Plaintiffs brought their motion, specifically when Steve Martin, a nationally recognized use-of-force expert, reviewed several of the individual use-of-force incidents on which Plaintiffs later relied to support their motion. Although Mr. Martin found that these incidents were "isolated aberrations, anomalies, outliers" that did not represent the majority of instances in which CDCR uses force, he offered suggestions for policy revisions. In response, Defendants have substantially revised the operations manual. The revisions clarify CDCR's use-of-force policies and expand safeguards for mentally ill inmates. There is no need—and no legal basis—for the Court to reject these changes and impose the further orders demanded by Plaintiffs.

1

I. **THE REVISED DEPARTMENT OPERATIONS MANUAL BUILDS ON AND CLARIFIES CALIFORNIA'S USE-OF-FORCE POLICY.**

Evidence presented during the recent use-of-force hearings established that CDCR's comprehensive, statewide use-of-force system includes:

- Heightened safeguards for inmates with mental illnesses. Before controlled force is used against seriously mentally ill inmates, California regulations require (a) consultation with a licensed health care practitioner; (b) mental health clinician intervention; and (c) verbal counseling to persuade the inmate to voluntarily comply with orders without use of force. (Tr. 806:23-807:24 [M. Stainer]; D.O.M. § 51020.12.1.) These heightened safeguards exceed the policies used in other jurisdictions. (Tr. 1760:6-16);

- Mandatory reporting of use-of-force incidents. Use-of-force incident reports are detailed, self-critical, and allow for a credible review of the need for the force used. (Tr. 1770:5-20 [S. Martin]; Exs. 149 ¶ 5 & 167 ¶ 6; Cal. Code Regs. tit. 15 § 3268.1(a)(1); D.O.M. §§ 51020.17 & 51020.18.1);

- A multi-tiered review process for every use-of-force incident (Tr. 868:21-871:21 [M. Stainer] & 1759:5-1760:20 [S. Martin]; Martin Rpt. at 12; Exs. 149 ¶¶ 5-12 & 14, 157 at 197, & 167 ¶¶ 5-14.) (Defs.' Post Evidentiary Hearing Br., ECF No. 4933, at 4-5);

- Effective training on using force. (Exs. 150 at 11 & 167 ¶¶ 15-19.) All custody staff are trained on managing interactions and conflict with inmates, and recognizing signs and symptoms of mental illness.[1] (Ex. 167 ¶ 16.);

- Effective and appropriate investigation of use-of-force incidents through CDCR's Office of Internal Affairs. (Tr. 862:22-863:11, 878:10-879:7 [M. Stainer] & 1991:25-1992:21 [S. Martin]; Ex. 149 ¶¶ 2, 11, & 12.) In 2012, 107 cases were

---

[1] Plaintiffs' critiques of staff training were based on their expert's limited review of isolated incidents, and did not include a review of the training that mental health receive on de-escalation techniques. (Tr. 236:10-13.)

2

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

referred to the Office of Internal Affairs alleging employee misconduct related to use of force. (Ex. 149 ¶ 2.) The Office of Internal Affairs investigated 57 of the referred cases, although all investigations are not complete, and sustained allegations of misconduct in 31 cases, including 6 cases which resulted in termination. (*Id.*; *see also* Tr. 2007:6-16.); and

- Independent and effective oversight of the system by the Office of the Inspector General. (Exs. 157-160, 164-166, & L-N.)

After use-of-force expert Steve Martin identified specific—but not systemic—instances in which excessive force may have been used, CDCR administrators began reviewing and undertaking steps to revise California's use-of-force policies. (Tr. 839:21-840:19 [M. Stainer].) This process continued during and after the use-of-force hearing, and the resulting policy revisions were recently submitted to the Court. (ECF 4987.) Revisions to the operations manual were prepared by a multi-disciplinary team, including mental health clinicians and representatives from the Division of Adult Institutions, including Wardens, Captains, and executive staff. (Decl. of Michael D. Stainer Re Implementation of Revised D.O.M. at ¶ 3.)

The revised Department Operations Manual builds on and clarifies California's use-of-force policy for all inmates in several ways, including: (1) limiting the amount of chemical agents that may be used during a cell extraction and requiring a minimum of three minutes between applications (D.O.M. § 51020.15); (2) providing that a decision to use chemical agents for the extraction requires more than passive resistance or a refusal to follow orders by the inmate (*id.*); (3) clarifying that immediate use of force against an inmate preventing the closure of a food/security port is only justified when there is an immediate threat to safety (D.O.M. § 51020.11.2); and (4) expanding the clinical intervention requirement before controlled force is used, regardless of the inmate's mental health status. (D.O.M. § 51020.12.)

Further, the revised operating procedures expand California's heightened safeguards for mentally ill inmates and improve the quality of California's thorough review system. The revised operating manual makes clear that before a controlled use of force is authorized, Incident Commanders must coordinate with licensed health care practitioners, and consider mental health

concerns and the inmate's apparent mental health state. (D.O.M. § 51020.12.1.) Further, Incident Commanders must justify their decisions, including the choice to use force and the rationale for the type of force used, on video and in the Incident Report. (*Id.*) The revised operating manual also prohibits the use of chemical agents when the inmate does not present an imminent physical threat to himself or others, and requires that Incident Commanders obtain input from both housing unit staff who may be more familiar with the inmate and his behavior, and licensed health care practitioners regarding the inmate's recent behavior. (D.O.M. § 51020.15.)

## II. PLAINTIFFS' CRITICISM OF THE REVISED OPERATING MANUAL IS FACTUALLY AND LEGALLY UNSUPPORTED.

Plaintiffs' rejection of the revised operating manual fails to cite either constitutional standards or facts. Instead, Plaintiffs repeat the relief demanded in their motion, arguing that the operations manual revisions are inadequate because they do not implement Plaintiffs' and their experts' preferred set of policies. But, "[w]hat experts may consider desirable may well constitute appropriate goals to which the [legislative and executive] branches may aspire but they do not usually establish those minimums below which the Constitution establishes a prohibition." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). Moreover, as explained in Defendants' post-hearing brief, there is no evidence of systemic constitutional violations justifying further remedial orders concerning use of force. *See, e.g., Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (finding that plaintiffs presented insufficient evidence to justify the new system-wide relief ordered by the district court). System-wide relief requires evidence of system-wide violations. *See Lewis v. Casey*, 518 U.S. 343, 359 (1996). The incidents Plaintiffs cited do not prove that Defendants' system for using force is unconstitutional. *See id.* The Court should not substitute the preferences of Plaintiffs' counsel for the considered judgments of the State's correctional administrators and mental health professionals.

////

////

////

4

### A. Plaintiff's references to Inmate X do not warrant rejecting Defendants' revisions.

In arguing that the proposed operating manual revisions are inadequate, Plaintiffs repeatedly cite to CDCR's self-critical death report and the *Plata* Receiver's Combined Death Review for Inmate X. Plaintiffs reliance on these documents are premature and contrary to the Court's orders. On January 23, 2013 the Court vacated submission of Plaintiffs' motion regarding use of force "pending resolution of whether, and if so how if at all, issues presented by the death of this class member bear on the use of force questions presented by plaintiffs' May 29, 2013 motion." (ECF 5022.) By subsequent order, the Court set the matter for status conference on March 10, 2013. (ECF 5034.) Until and unless the Court rules on whether the Suicide Report and Combined Death Review documents are relevant to the use of force questions presented by Plaintiffs' motion, any discussion of the contents of these documents are premature and should be disregarded.

Further, Plaintiffs' assertion that these documents support their claims for systemic relief is misplaced for several reasons. First, CDCR's review of Inmate X's death uncovered potential policy violations, resulting in multiple investigations by the Office of Internal Affairs.[2] (Confidential Declaration of Michael Bien, January 17, 2014, Ex. D at 2.) The self-critical identification and investigation of possible failures is evidence of constitutional compliance, not of violations. *See, e.g. Madrid v. Gomez,* 889 F. Supp. 1146, 1251 (N.D. Cal. 1995)(describing need for use of force reviews). Second, Inmate X's case—like the other incidents Plaintiffs presented during the use-of-force hearing—is notably dissimilar from the hundreds of use-of-force incidents provided to Plaintiffs' expert for review but which went unnoted. (Tr. 1794:19-1795:13.) Defendants' robust and self-critical inquiry into the incident does not provide a basis to impose Plaintiffs' intrusive policy preferences.

---

[2] Potential policy violations include custody staff's alleged refusal to remove Inmate X from his cell when requested by medical staff. As demonstrated by CDCR's immediate investigation, such actions violate CDCR policy and do not demonstrate a "custody driven culture." Unsurprisingly, Plaintiffs are critical, but fail to acknowledge that it is CDCR—not Plaintiffs—who first identified the potential policy violation. This is yet another example of Plaintiffs improperly relying on Defendants' self-critical analysis to support their own allegations.

5

Finally, Plaintiffs' attempts to tie Inmate X's death to the use of pepper spray eight hours before this death are speculative and not supported by medical evidence. Inmate X was removing and reinserting his tracheotomy tube before he was exposed to pepper spray. (Confidential Declaration of Tim Belavich, January 29, 2014, (Conf. Decl. Belavich) Ex. 2 at 9.) Further, several hours after he was exposed to pepper spray, Inmate X was observed sleeping and standing. (*Id.* at 10.) The coroner's autopsy report is additional evidence of the lack of any connection between the exposure to pepper spray and Inmate X's death: the report found no pepper spray residue in his stoma. (Conf. Decl. Belavich, Ex 1.)

Setting aside the speculative connection between the use-of-force and Inmate X's death, the operating manual revisions now require a different response when an inmate takes control of their cell door food port. (*See* Sec. II.B., *supra.*) At Mr. Martin's suggestion, CDCR revised the "food port" provision of the operating manual to expressly state that immediate force is only justified when an inmate's control of a food port presents an *immediate* threat to safety that can later be explained in a use-of-force incident report. (D.O.M. § 51020.11.2.)

### B. The revised operations manual clarifies and reiterates CDCR's policy that immediate force can only be used in response to imminent safety threats.

Plaintiffs' claim that the revised operating manual improperly allows immediate force to be used on mentally ill inmates has no factual basis. Plaintiffs concede that immediate force is appropriate in response to "true emergencies"—a phrase Plaintiffs do not define—but then argue that "imminent threat," as used in the operating manual, is too vague. But an "imminent threat" is defined in the policies that explain when immediate or controlled force may be used. Specifically, the operations manual distinguishes between "inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons," which is when force may be immediately used, and "situations [that] do not normally involve the immediate threat to loss of life or immediate threat to institution security," warranting controlled force. (D.O.M. § 51020.4.) The statewide use-of-force policy has also been revised to clarify that the immediate use of force against inmates who refuse to relinquish control of their food ports is only appropriate where the

6

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

1  inmate "presents an immediate threat to the safety of the officer or the inmate (e.g., the inmate is
2  battering or attempting to batter staff or inmates in the area) . . . ." (D.O.M. § 51020.11.2.)

3        The section defining an imminent threat is appropriate, and there is no evidence that CDCR
4  systemically resorts to immediate force without an imminent threat. At the hearing, Plaintiffs
5  alleged, based on three isolated incidents, that CDCR staff routinely employ force in this context
6  for "minor infractions" or when there is no imminent threat. (Mot. 16; Ex. 112 ¶¶ 34-36.)
7  Plaintiffs have misinterpreted the policy, and the incidents establish that the force used is
8  appropriate to neutralize a threat and avoid cell extractions. (Tr. 854:1-856:18 [M. Stainer] &
9  1760:25-1762:11 [S. Martin]; Opp'n 24-25; Ex. 150 ¶¶ 20-23.) Defendants submitted evidence
10 showing that officers apply immediate force in this context to respond to imminent threats such as
11 "gassing."[3] (Ex. AI & Tr. 1834:3-19 [S. Martin].) When staff apply force to regain control of a
12 food port absent an imminent safety threat, the evidence showed that Institutional Executive
13 Review Committees correct and train officers who use immediate force contrary to policy. (Exs.
14 AJ & AL; Tr. 1834:3-1836:20 [S. Martin].) Thus, Plaintiffs' claim that the revisions fail to
15 mandate "a preference" for controlled use-of-force is baseless.

    **C.    The operations manual revisions expand CDCR's heightened clinical intervention and reflect CDCR's policy of avoiding force when possible.**

18       Plaintiffs' argument that clinical input is excluded from use-of-force decisions and that
19 force is employed as an "element" of mental health care is not supported by the evidence.
20 Defendants introduced evidence that clinical and custody staff spend hours and sometimes days
21 attempting to deescalate and avoid the need to use force, including in the unrepresentative videos
22 presented by Plaintiffs. (*See, e.g.* Ex. 10A; Tr. 1596:12-18 [custody officers deferred to doctors'
23 request that cell extraction be postponed overnight]; Ex. 8; Tr. 1827:9-1828:1 [clinical
24 intervention on-going for multiple hours before extraction]; Tr. 635:16-636:19, 637:6-638:5 [E.
25 Wagner] & 810:8-15 [M. Stainer].) Moreover, Plaintiffs' argument that the few videos they

---

[3] "Gassing" is when inmates throw urine or feces at staff to cause harm.

7

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

1  presented show that CDCR's de-escalation efforts are counter productive is unfounded.[4] The six
2  videos Plaintiffs relied on only show instances where it was necessary to use force. Moreover,
3  the orders that are documented on the videos are verbal warnings provided immediately before
4  the use of force, and not, as Plaintiffs' imply, earlier intervention attempts. (D.O.M. § 51020.12.)
5  In fact, in numerous cases, cooperation between custody and clinical staff successfully avoid the
6  need to use force through intervention and de-escalation techniques. (Tr. 635:16-636:19, 637:6-
7  638:5 [E. Wagner] & 810:8-15 [M. Stainer].)

Rather than excluding clinical input, CDCR's revised operating manual provides for more clinical input in controlled use-of-force incidents. Defendants have expanded their controlled use of force requirements to mandate clinical interventions for all inmates, regardless of their mental health status. (D.O.M. § 51020.12.) And the revised operating manual already incorporates Plaintiffs' request "to involve custody and mental health staff who have worked with and are knowledgeable of the particular inmate." (Pls.' Brief at 12.) Specifically, revised operating manual provisions require additional evaluation and consultation with health practitioners and assigned housing unit staff before employing chemical agents during an extraction of a mentally ill inmate. (D.O.M. §§ 51020.12.2 & 51020.15.)

### D. The operating manual revisions significantly limit and control use of chemical agents, and there is no need for revisions concerning the expandable baton.

Neither law nor fact support Plaintiffs' continued claim that the mere presence of pepper spray and batons within CDCR institutions are constitutional violations. Plaintiffs' repeated references to expandable batons is perplexing, given that Plaintiffs did not submit a single incident involving use of the expandable baton at the evidentiary hearing, whether allegedly used improperly or otherwise. Moreover, the evidence established that within CDCR, batons are used to intervene in the defense of self or others—exactly as Plaintiffs' expert endorsed—and typically only after other less harmful means of neutralizing a threat have been exhausted. (Tr. 98:5-9 [E.Vail]; 1811:23-1812:10 & 1813:2-10 [S. Martin]; Exs. 154 & 155.)

---

[4] Ironically, Plaintiffs demand that CDCR record the "actual clinical intervention" in spite of their oft-professed concern over the need for privacy during mental health interactions.

8

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

The revised policies significantly narrow and restrict pepper spray use, limiting both the amount of pepper spray that can be used and the number of applications. (D.O.M. § 51020.15.) Moreover, the revised operating manual requires Incident Commanders to consider and affirmatively explain how multiple factors, including the inmate's demeanor, history of violence, possession of a weapon, and apparent mental state, factor in to the amount of force used. (D.O.M. § 51020.12.1.) And if exigent circumstances require the additional use of pepper spray, staff are now required to affirmatively explain the rationale for each additional application of pepper spray. (D.O.M. § 51020.15.)

Plaintiffs also incorrectly assert that CDCR does not provide out of cell decontamination for *Coleman* class members. The operations manual provides that "any inmate" exposed to pepper spray is offered an opportunity to decontaminate. (D.O.M. § 51020.15.2.) In-cell decontamination is only used when an inmate refuses to decontaminate or poses a safety concern. (D.O.M. § 51020.15.4.) In fact, Plaintiffs' proposed policy would require CDCR staff to forcibly extract and decontaminate all inmates who refuse to exit their cell for decontamination.

### E. Plaintiffs' claims regarding use of force review procedures are unsubstantiated.

Plaintiffs' claims that Institutional Executive Review Committee (IERC) reviews are ineffective and always find that the use of force complied with CDCR policies are false. Defendants presented evidence that Institutional Executive Review Committees take action when they find force has been used outside of policy.[5] (Exs. AJ & AL; Tr. 1834:20-1836:3 [S. Martin].) Defendants also showed that in 2012, CDCR imposed formal corrective action in 67 cases, informal corrective action in 118 cases, and provided training in 4,066 cases. (Exs. 169 & F.) Further, contrary to Plaintiffs' claims, independent and thorough investigation of use of force incidents is conducted by the Office of the Inspector General. (ECF 4704 at 7-8.)

---

[5] Plaintiffs' argument that the IERC review is a "check the box" system is unfounded. Defendants' expert's testimony on this point was expressly limited to issues with the individual, unrepresentative cases identified by Plaintiffs. (Tr. 1887:22-25; 1892:22-1893:23; [S. Martin].)

9

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

**F.    There is no need to revise policies concerning handheld video cameras, disciplinary procedures, and management status.**

Plaintiffs complain that the revised operations manual does not address their wishes regarding handheld video cameras, disciplinary policies, and "management status." But as proved during the evidentiary hearings, there are no systemic constitutional violations with respect to these issues. Plaintiffs' insistence that the Court order Defendants to provide handheld video cameras at security stations to be used "whenever" possible to record immediate use of force incidents is nothing more than a policy preference. Plaintiffs did not provide any evidence that would justify the Court unilaterally imposing this intrusive, granular policy.

As thoroughly explained in Defendants' post-hearing brief, Plaintiffs failed to demonstrate any systemic constitutional violations which would justify the relief they request regarding inmate disciplinary procedures. (ECF 4933 at 14-15.) The evidence showed that CDCR staff appropriately consider inmates' mental health during the disciplinary process and, when appropriate, mitigate penalties to accommodate these conditions. (Tr. 892:19-902:23 [M. Stainer] & Martin Rpt. 10 & 13-15; *see also* Tr. 895:20-902:23.) Plaintiffs have not and cannot cite any case law justifying a blanket immunity for mentally ill inmates who violate prison rules. Inmates within the *Coleman* class function at varying levels of competence, and even the individual competence of an inmate may vary over time. (Tr. 906:6-21 [M. Stainer]; 1395:8-10, 1397:7-11 [P. Burton], 1879:17-1883:5, & 1986:15-1987:4 [S. Martin].) Plaintiffs' expert, Mr. Vail, agreed that it is necessary for inmates to comply with lawful orders and agencies must respond when inmates refuse to comply with orders. (Tr. 539:10-20.)

Plaintiffs also mischaracterize " management status," which is not a disciplinary procedure but a temporary procedure to immediately stop and deescalate an inmate's persistent disruptive, destructive, or dangerous behavior and restore safety and security. (ECF 4708 at ¶ 27; Tr: 889:15-21.) And Plaintiffs have not presented any evidence which shows that management status is not being used for its intended purpose or abused.

10

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD

**CONCLUSION**

The evidence on Plaintiffs' use-of-force motion established that: (1) there is no systemic, current, and ongoing constitutional violation with respect to staff use of force; and (2) CDCR appropriately considers and accommodates mental health in the inmate disciplinary process. Defendants have revised the operations manual so that incidents like the isolated aberrations presented during the hearing will not be repeated. The overriding principle of the revised operations manual "is that staff should use the least amount of force necessary in both controlled and immediate use-of-force situations to assure the safety of the institution, inmates, and staff alike." The operations manual revisions clarify this overarching policy, and significantly expand safeguards for mentally ill inmates. The intrusive, expansive list of orders that Plaintiffs characterize as minimum requirements are "at most, best practice policy preferences, and in some cases overly restrictive that could cause harm to staff and inmates." (Ex. 150 ¶ 21.) As discussed in the accompanying plan, CDCR is implementing the revised use-of-force provisions. There is thus no need—and no legal basis—for the Court to issue further remedial orders concerning use of force or the inmate disciplinary process.

Dated: February 21, 2014                    Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General


*S/ PATRICK R. MCKINNEY*
PATRICK R. MCKINNEY
Supervising Deputy Attorney General
*Attorneys for Defendants*
*California Department of Corrections and Rehabilitation*

CF1997CS0003

Defs.' Reply Pls.' Brief on Revised D.O.M. Re: Use of Force, Case No. 90-00520 LKK DAD