Exhibit 1

## ARTICLE 2 – USE OF FORCE

~~Effective August 20, 2010~~ Revised XXXX 2014

**Sections 51020.1 through 51020.3 are unchanged**

**51020.4 Definitions**
The following shall define language usage in this Article:
  **Reasonable Force**
Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.
  **Unnecessary Force**
Unnecessary force is the use of force when none is required or appropriate.
  **Excessive Force**
Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.
  **Immediate Use of Force**
Immediate use of force is the force used to respond without delay to inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons. Employees may use immediate force without prior authorization from a higher official.
  **Controlled Use of Force**
A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security. All controlled use of force situations require the authorization and the presence of a First or Second Level Manager, or Administrative Officer of the Day (AOD) during non-business hours. Staff shall make every effort to identify disabilities, to include mental health concerns, and note any accommodations that may need to be considered.
  **Non-conventional Force**
Non-conventional Force is force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training. Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.
  **Non-deadly Force**
Non-deadly force is any use of force that is not likely to result in death.
  **Deadly Force**
Deadly force is any use of force that is likely to result in death. Any discharge of a firearm is deadly force.
  **Great Bodily Injury (GBI)**
Great bodily injury is any bodily injury that creates a substantial risk of death.
  **Serious Bodily Injury**
Serious bodily injury means a serious impairment of physical condition, including, but not limited to the following:
- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing, or
- Serious disfigurement.

### Response Supervisor
The Response Supervisor is the first line supervisor responsible for the area where an incident occurs.

### Incident Commander
The Incident Commander is the second line supervisor responsible for the area where an incident occurs or an allegation of excessive or unnecessary force is received.

### First Level Manager
A First Level Manager is a ~~Facility Captain/Correctional~~ Captain, or the AOD.

### Second Level Manager
A Second Level Manager is an Associate Warden.

### Institution Head
The Institution Head is a Warden or designee.

### Institutional Executive Review Committee (IERC)
The IERC is a committee of institution staff chaired by the respective Institution Head tasked with reviewing all uses of force and every allegation of excessive or unnecessary force.

### Department Executive Review Committee (DERC)
The DERC is a committee of staff selected by, and including, the Associate Director who oversees the respective Mission-based group. The DERC has oversight responsibility and final review authority over the IERC. The DERC shall review every use of deadly force and every serious injury, great bodily injury or death that could have been caused by a staff use of force. The DERC shall also review those incidents referred to the DERC by the IERC Chairperson or otherwise requested by the DERC.

### Deadly Force Investigation Teams (DFIT)
DFIT conducts criminal and administrative investigations into every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force. Based on certain local Memoranda of Understanding, criminal investigations may instead be conducted by an outside police department or sheriff's office. DFIT need not investigate the discharge of deadly force inside an institution/facility if a member of an Investigative Services Unit, or an uninvolved supervisor, confirms that the discharge of deadly force was a warning shot and that no injuries were caused by the shot.

### Deadly Force Review Board (DFRB)
The DFRB conducts a full and complete review of all incidents involving a use of deadly force (except warning shots) and every death or great bodily injury that could have been caused by a staff use of force, regardless of whether the incident occurs in an institutional or community setting.

### Joint Use Committee (JUC)
The JUC is a committee of field staff from the DAI tasked with reviewing and evaluating recommended revisions to the Division's Use of Force Policy and Procedures.

### Holding Cells
All holding cells shall be located within buildings. A holding cell shall not be used as a means of punishment. If clothing is taken from an inmate when he/she is placed in a holding cell, alternate clothing shall immediately be provided.

**Section 51020.5 is unchanged.**

**51020.6 Use of Restraints**

*~~Revised May 3, 2012~~*

The unresisted application of authorized restraint equipment is not a use of force. When mechanical restraint is required, handcuffs, alone or attached to a waist chain, will be the means of restraint normally used. However, additional mechanical restraints, including leg irons, additional chains, straight jackets, leather cuffs, or other specialized restraint equipment may be

used when the circumstances indicate the need for the level of control that such devices will provide. Restrained inmates shall never be left unsupervised in an unsecured area.

Use of mechanical restraints on persons confirmed, or suspected by health care staff to be pregnant shall be subject to the following requirements found in California Code of Regulations (CCR) Title 15 section 3268.2 (d) and (e):

- No leg restraints or waist chains shall be applied.
- If handcuffs are applied, the person's arms shall be brought to the front of her body for application.

Mechanical restraints shall not be placed on an inmate during labor, including during transport to a hospital, during delivery, and while in recovery after giving birth, unless circumstances exist that require the immediate application of mechanical restraints to avoid the imminent threat of death, escape, or great bodily injury. In this case, mechanical restraints may be used only for the period during which such threat exists.

The following state-issued restraints and equipment are authorized for use at the discretion of on-duty staff:

- Handcuffs
- Waist Chain
- Leg Irons
- Escort Chains
- Padlocks
- Security Chain
- Spit Hood
- Martin Chain

The following restraints may be used as specified below:

- Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit ~~or~~ and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. (Such as an irate inmate who has threatened violence or an inmate upon whom force has just been used.) The safety triangle is not intended to control the inmate outside of the cell, ~~nor is it intended to pull an inmate to the cell front in order to remove the handcuffs~~. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling his hands inside the cell while the door is being closed. ~~Prior to using a safety triangle on an inmate confirmed or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed.~~

~~The final decision to place the device on the inmate will rest with the Warden or Chief Deputy Warden (CDW) and the reviewing physician.~~

~~The consultation and its outcome must be documented for inclusion in the inmate's health care record and central file.~~ In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, staff shall follow the procedures outlined in 51020.11.2, Food/Security Ports. If the use of chemical agents does not result in gaining control of the inmate, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food port. Once the inmate's hands,

wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed.

Prior to using a safety triangle on an inmate confirmed or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed.

The final decision to place the device on the pregnant inmate will rest with the Warden or Chief Deputy Warden (CDW) and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health care record and central file.

- Leather Restraints: Leather restraints are used for four/five point restraint in a Correctional Treatment Center, Outpatient Housing Unit, General Acute Care Hospital, or community hospital when authorized by a physician or psychiatrist. Use of restraint equipment at the direction of medical staff shall be fully documented in the institution Health Care Services record of the restrained inmate.

- Soft Restraints: Soft restraints consist of towel or sheets used to temporarily secure an inmate's ankles and/or arms together. After the application of soft restraints, mechanical restraints are removed and staff are to exit the cell before the inmate has time to release himself from the soft restraints. Soft restraints are used on inmates who try to resist entering their cell and were developed in an effort to avoid using physical force on inmates. The ~~Incident~~ Response Supervisor may authorize the use of soft restraints. If force is used, it must be appropriately documented. Soft restraints shall not be used on inmates confirmed, or suspected by health care staff to be pregnant.

- Hand Isolation Devices (HID): These devices (e.g., hand mittens, etc) are used as an additional measure to restrict an inmate's ability to use his/her hands. HIDs may only be purchased from an approved vendor and used at an institution when authorized, in writing, by the Warden or CDW. Inmates in HIDs must have constant and direct visual supervision at all times. In instances where HIDs are used for Contraband Surveillance Watch (CSW), staff must maintain a log (CDCR Form 114A) which reflects usage times and correlating actions (e.g., 1200 hrs - One HID was removed so the inmate could eat lunch). Prior to placing a HID on an inmate confirmed, or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed. The final decision to place the device on the pregnant inmate will rest with the Warden or CDW and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health care record and central file. Equipment Hygiene - HIDs must be cleaned and sanitized on an ongoing basis (e.g., if soiled after a bowel movement, after termination of the CSW, etc.).

Mechanical restraint equipment shall not be used in any manner described in CCR, Title 15, Section 3268.2(c), Use of Restraints. The use of restraint equipment not identified in this section must be preapproved at the level of Associate Director or higher. As part of the mechanical restraint maintenance process, restraints should be routinely cleaned and sanitized to adhere to an acceptable equipment hygiene standard.

**Subsections 51020.7 through 51020.11.1 remains unchanged.**

### 51020.11.2 Food/Security Ports

If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/security port:

The officer shall verbally order the inmate to relinquish control of the food/security port and allow staff to secure it. The officer shall issue a warning that chemical agents will be used if he/she does not comply.

If the inmate refuses to relinquish control of the food/security port after the warning and presents an immediate threat to the safety of the officer or inmate (e.g. the inmate is battering or

attempting to batter staff or inmates in the area), the officer is authorized to administer a single 3-second burst of chemical agents against the inmate to secure the food/security port Alternatively, the officer may choose to contact a supervisor and await further guidance in formulating a response.

If the inmate relinquishes control of the food/security port, it will be secured and designated staff will follow in-cell decontamination procedures.

In the event an immediate threat is not present or the use of chemical agents does not accomplish the goal of regaining control of the food/security port, the officer shall back away from the cell and contact and advise the custody supervisor of the incident. Controlled force will be initiated while custody staff continue to monitor the inmate. A licensed Hhealth care staff practitioner shall monitor the inmate at least every 15 minutes.

## 51020.12 Controlled Use of Force General Requirements

Use of Force can be controlled when time and circumstances permit advance planning, staffing and organization. A controlled use of force requires authorization and the presence of a First or Second Level Manager, or an AOD during non-business hours.

Once a situation exists that may result in a controlled use of force, a custody staff member shall remain at the cell door to monitor the inmate and continue to attempt to gain compliance from the inmate through verbal prompts until the extraction team arrives and the staff member is relieved by the incident commander to resume their regular duties. The custody staff member will be positioned as close as possible to the affected cell/area, without jeopardizing to their own safety.

The Incident Commander shall personally supervise the controlled use of force.

Incident Commanders and on-site Managers shall utilize their knowledge, training, and experience, as well as an evaluation of the totality of circumstances, when determining the appropriate force options to be utilized during controlled use of force situations.

The following information shall be taken into account prior to any controlled use of force:

- Physical health, mental health, and/or developmental disability concerns.
- Effective communication needs as identified by the Disability and Effective Communications System (DECS).
- Inmate's current demeanor (verbal aggression as opposed to physical aggression, prior history of violence, physical threat to the safety of others, etc.).
- History of inmate's actions during any prior cell extractions.

All controlled uses of force shall be preceded by a cool down period of reasonable length to allow the inmate an opportunity to comply with staff orders. During the cool down period, clinical intervention by a licensed practitioner shall be attempted, regardless of the mental health status of the inmate. The length of the cool down period can vary depending upon the circumstances. In situations involving participants in the mental health program, Incident Commanders, on-site Managers, and licensed health care practitioner shall discuss concerns that may affect the length of the cool down period.

The First or Second Level Manager, or the AOD, shall determine the length of the cool down period and communicate this to the Incident Commander. The Incident Commander shall document the start time and duration of the cool down period on the CDCR 837-A/A1.

A controlled use of force shall not be accomplished without the physical presence of a licensed health care staff practitioner.

All controlled uses of force shall be video recorded. A verbal warning shall be issued prior to a controlled use of force. The verbal warning shall contain the following five elements:

- Address the inmate by name.

5                                    January 17, 2014

- Advise the inmate that he/she is being video recorded.
- Order the inmate to voluntarily comply.
- Advise the inmate of the intent to use chemical agents and physical force if he/she does not comply.
- Advise the inmate that sufficient force will be used to remove him/her from the area.

~~All controlled uses of force shall include a cool down period of reasonable length to allow the inmate an opportunity to comply with staff's orders. The length of the cool down period can vary depending upon the circumstances. The First or Second Level Manager, or the AOD, shall determine the length of the cool down period and communicate this to the use of force team. The Incident Commander shall document the start time and duration of the cool down period on the CDCR 837-A/A1.~~

### 51020.12.1    Controlled Uses of Force-Video Recording Requirements

Each controlled use of force shall be video recorded. The camera operator shall procure the camera, videotape or disc, backup videotape or disc, and backup battery. <u>Prior to initiating video recording, the Incident Commander shall ensure the staff member operating the camera is familiar with the operation of the camera, and the expectations of the camera operator while recording the introductions and extraction in accordance with 51020.12.1 Controlled Uses of Force-Video Recording Requirements.</u>

A briefing, including possible tactics to be used, shall be given to the controlled use of force team by the Response Supervisor and/or Incident Commander. This briefing does not need to be video recorded and should be completed away from the presence of any inmates.

Only one incident shall be recorded on each video recording (videotape or video disc will not include multiple incidents).

If the proposed controlled force involves an extraction of two inmates, two camera operators shall be used. Each camera operator will be designated an inmate prior to the application of the controlled use of force and concentrate on that inmate during the recording. <u>The camera operator(s) will be positioned as close as possible to the immediate area to record as much of the incident as possible, yet at a sufficient distance so as to ensure no interference with the extraction team or jeopardy to their own safety.</u>

The camera operator shall ensure that an accurate date and time is displayed on the recording. Filming shall begin with the camera operator stating their name, rank, date, time, and location of the controlled use of force.

The Incident Commander shall identify the inmate involved and state the circumstances of the proposed controlled use of force and/or extraction. <u>The circumstances shall include a summary of the events leading up to the controlled use of force and what efforts have been made toward mitigation, to include the duration of the cooling off period, as well as custody, supervisory, medical, and mental health intervention, as applicable. The Incident Commander shall consider factors including the inmate's demeanor, (verbal or physical aggression / passive vs. active resistance) history of violence/cell extractions, safety of others, possession of a weapon, physical design of the area where the inmate is contained, barricades, use of barriers or a personal barrier (cloth or plastic placed about the inmates face and head), and apparent mental state when determining what force options shall be used and the order in which they will be applied.  The Incident Commander shall summarize this when stating the intended use of force.</u>

<u>The First or Second Level Manager/AOD shall identify themselves on camera and confirm they are authorizing the controlled use of force, including the force options as stated by the Incident Commander.  The First or Second Level Manager/AOD shall also ensure the video introduction includes all required information.</u>

<u>The licensed health care practitioner shall identify themselves on camera and indicate if the inmate's medical file was reviewed for medical contraindications to the use of chemical agents,</u>

and if the inmate has any known disabilities that will require any accommodation during the controlled use of force.

The licensed health care practitioner who attempts clinical intervention shall identify themselves on camera and provide a detailed timeline of their efforts made to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. This narrative shall include a description of the inmate's reaction. The actual clinical intervention shall not be video recorded.

The Response Supervisor and members of the controlled use of force team, health care staff, and the First/Second Level Manager shall identify themselves on camera and state their roles in the controlled use of force.

Following the introduction, T-the camera operator shall continue filming enroute to the scene of the proposed controlled use of force and record the events. Prior to the application of force, the camera operator should videotape the interior of the cell/area and the inmate's actions. Periodically, after the introductions of chemical agents or use of a barricade removal device, the camera operator should again video record the inmate and the interior of the cell/area.

If the video recording is interrupted for any reason once the incident/extraction has begun, the camera operator will give an explanation verbally of the interruption once while recording has resumed. The entire incident must be video recorded in one segment or scene. The video recording shall continue as long as the inmate is resistive of staff or combative. If chemical agents were used and the inmate is allowed to decontaminate, ensure the decontamination is filmed.

Once the inmate has been extracted, V video recording shall continue as the licensed health care staff practitioner conducts an initial evaluation medical assessment of the inmate, but shall stop while the inmate is treated. If chemical agents were used and the inmate is allowed to decontaminate, ensure the decontamination is filmed.

The Incident Commander shall determine when the incident has concluded and videotaping shall end. This is typically when the inmate is placed in a holding cell/area or re-housed.

## 51020.12.2    Controlled Use of Force Involving the Seriously Mentally Ill

When inmates are housed in departmental hospitals, infirmaries, Correctional Treatment Centers (CTC), Enhanced Outpatient Program Units (EOP), or Psychiatric Services Units (PSU), or have has an EOP level of care designation, or any inmate who is acting in a bizarre, unusual, uncharacteristic manner, the controlled use of force shall occur as follows:

- A licensed health care practitioner designated by the Health Care Manager Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents (see Chemical Agents Restrictions).
- Clinical intervention by a licensed practitioner shall be attempted. Clinical intervention shall also precede the extraction of any inmate who is being extracted upon the written order of a medical doctor, psychiatrist, or psychologist to facilitate a change in housing for treatment purposes.
- The clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. These efforts shall continue during the cool down period.
- Whenever circumstances permit, the clinician shall be a mental health provider; i.e., Psychiatric Technician, Licensed Clinical Social Worker, Psychologist, or Psychiatrist.

## 51020.12.3    Extractions

Extractions are the most common form of the controlled use of force and usually occur when the inmate is in a confined area such as a cell, holding cell, section, pod, or small exercise yard.

If an extraction becomes necessary, extraction team members shall be issued extraction equipment:

- Riot helmet, with protective face shield, protective vest, ~~breathing mask~~respirator, elbow and shin protectors, gloves, and bloodborne pathogen protective suit.
- Protective shield, approximately 22" wide and 48" long.
- ~~Short baton~~Expandable baton(s), handcuffs, and leg restraints.
- Video camera(s) with a backup videotape or disc and back up batteries.

Prior to an extraction, the Response Supervisor or Incident Commander shall ensure that the members of the extraction team do not include any staff member who was directly involved in the incident precipitating the need for extracting the inmate.

The Incident Commander will ensure the Response Supervisor and extraction team members clearly understand their role, appropriate signals, and are familiar with the departmental use of force policy.

If time permits prior to the actual extraction, a mock extraction may be conducted in a vacated area with participating staff in order to ensure that custodial staff are familiar with their roles during the extraction. Several simulated operations will ensure smoothness, and timing during the actual extraction.

Prior to the extraction, the Incident Commander will communicate with the officer responsible/assigned to open/close cell doors and establish verbal/non-verbal signals specific to the controlled use of force.

The Incident Commander shall ensure the control officer understands that only the Incident Commander shall authorize the opening and closing of affected doors.

For the safety of staff, prior to being removed from a cell, it is preferred that the inmate submit to a (visual) search. The inmate should remove all clothing, except their underwear, and move back far enough from the cell door to allow a visual inspection. The inmate shall be visually inspected from head to toe, front and back. The inmate will run their fingers around the inside waistband of their underwear. The inmate shall be allowed to retain their underwear while being restrained and removed from the cell.

If the inmate refuses to cooperate with the (visual) search, but is willing to submit to restraints, the inmate shall be placed in restraints and removed from the cell. The application of restraints shall not be delayed due to the inmate's refusal to submit to being searched, or to have the inmate remove any clothing. Upon removal from the cell, the inmate should be subjected to search for staff safety.

Placement of an inmate on the stomach for a short period of time to restrain an inmate is authorized; however once the inmate is exposed to chemical agents and/or if a spit hood/mask is placed on the inmate, staff shall not place the inmate on his stomach, or in a position that allows the inmate to end up on his stomach, for any period longer than necessary to gain or maintain control.

The inmate will be afforded an opportunity to decontaminate from the effects of the chemical agent. If the inmate is wearing a spit hood/mask the contaminated hood/mask shall be replaced with a clean one as soon as practical.

The procedure for cell extractions where two inmates are in the cell remains the same as for a single celled inmate with the following additions:

- Additional team members shall be assigned as determined by the Incident Commander.
- In the event one of the inmates is compliant with staff's instructions, and if in the judgment of the Incident Commander it is safe to open the cell door, the inmate shall be removed. If it is unsafe to remove the compliant inmate, he shall be required to remain in the cell and appropriate instructions shall be issued for the duration of the incident.

The procedures for an extraction from an exercise yard, pod, or dayroom whether in a segregated housing unit or general population remain the same as cell extractions except as follows:

- Additional extraction team members or an additional extraction team may be assigned as determined by the Incident Commander.
- In the event two or more inmates are to be extracted from the same area, at least one additional supervisor shall be assigned.

## 51020.12.4    Health Care Issues

When an immediate threat does not exist, controlled use of force procedures shall be followed for the following situations:

Involuntary Medication: on-duty Health Care Services staff shall ensure medical authorization for the involuntary medication exists, and shall advise the Incident Commander of such prior to the application of controlled use of force procedures.

Only departmentally approved four/five point restraints shall be applied by authorized medical/mental health staff in an infirmary, CTC, or other CDCR medical facility upon the authorization of a physician, psychologist or psychiatrist. On duty Health Care Services staff shall ensure authorization exists, and shall advise the Incident Commander of such prior to the controlled use of force under these circumstances.

Inmates who have a disability that prevents application of restraint equipment in the prescribed manner shall be afforded reasonable accommodation under the direction of the supervisor in charge. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.

Admission into an Infirmary, CTC or Hospital: When a physician or psychiatrist has determined it is necessary to admit the inmate into an infirmary, CTC, or hospital, on duty Health Care Services staff shall ensure that medical authorization for the admission exists, and shall advise the Incident Commander of such, prior to the controlled use of force. Refer to Sections 51020.14.1 and 51020.15.1 for additional information.

**Subsection 51020.12.5 through 51020.13 unchanged.**

## 51020.14    Use of Less Lethal Weapons

The 37mm and 40mm launchers are weapons designed to discharge less lethal impact munitions or chemical agents. They are authorized for use in all areas including segregated housing units, general population housing units, cells, dayrooms, dining halls, concrete yards, exercise yards and work areas. It is recommended a Response Supervisor be assigned the duties of discharging less lethal impact munitions during controlled use of force-cell extraction.

**Subsection 51020.14.1 is unchanged.**

## 51020.14.2    Use of Less Lethal Weapons During Controlled Uses of Force

The First or Second Level Manager may authorize the use of less lethal impact munitions during controlled use of force situations in a cell, for inmates not identified as ~~mentally disordered~~ as a participant in the Mental Health Services Delivery System (MHSDS), if the inmate is barricaded, or if circumstances are serious in nature calling for extreme measures to protect staff or inmates (the inmate is armed with a deadly weapon). If the Incident Commander determines the inmate is acting in a bizarre, unusual, uncharacteristic manner, but is not identified as a participant in the MHSDS, a licensed health care practitioner shall be consulted prior to the use of less lethal impact munitions.

**51020.15    Chemical Agents**

Departmentally approved chemical agents include, but are not limited to the following: Oleoresin Capsicum (OC), Chloroacetophenone (CN), and Orthochlorobenzalmalononitrile (CS). OC may be issued to all on-duty departmentally trained peace officers, certified in the use of chemical agents. Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the control objective.

During a controlled use of force – cell extraction, only the chemical agent products listed may be deployed. Any future *additional* products authorized by the Office of Correctional Safety, Emergency Operations Unit, and approved by the Director, Division of Adult Institutions must be specifically authorized for controlled use of force – cell extraction in order to be utilized during an extraction.

- MK-9 OC Vapor  - limited to a single burst of no more than 3 seconds in duration per application with a maximum of two applications.
- MK-9 OC Fogger – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications.
- MK-9 OC Foam – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications.
- OC Vapor Grenade – limited to 2 devices
- OC Flameless Expulsion Grenade – limited to 2 devices
- X-10 Barrier Removal Device – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications. Chemical agents may only be deployed from the X-10 during the removal of a barricade. The X-10 is not to be used solely as a delivery device for chemical agents.

Regardless of which chemical agents are deployed, or in what combination, no more than a total of four (4) chemical agent applications shall be administered. In exigent or unusual circumstances, it may be necessary to exceed the 4 allowed applications. In this event, the Incident Commander shall consult with the First or Second Level Manager/AOD, who can authorize additional chemical agent applications. For each *additional* chemical agent application authorized, the on-site Manager shall verbalize to the camera, the chemical agent application being authorized and the rationale for the decision.

Upon arrival at the extraction site, and prior to the use of any chemical agent, the Incident Commander and Response Supervisor shall consider the totality of circumstances to determine the best course of action. This evaluation shall include, but is not limited to, the physical environment and space, barriers, and the inmate's behavior. Consideration shall also be given as to the design and location of cell with regard to cross contamination (i.e., OHU/CTC, open cell front, etc.) when choosing whether to disperse OC or the type of OC. The size of the space shall also be considered when determining how much, and what type of chemical agent shall initially be applied. It may not be necessary to use the allowed 3 second maximum of a chemical agent, or an expulsion grenade, if the inmate is in a single person shower as opposed to a larger space such as a cell or holding cell.

- Once the evaluation has been completed, a determination can be made regarding the most effective and safe force option to be utilized, e.g., large open area versus contained cell; expulsion grenade versus fogger product. If the inmate is using a personal barrier to defeat the use of chemical agents, it may be necessary to directly strike the personal barrier with liquid chemical agent products in order to saturate it.
- If the inmate is a participant in the mental health program and has not responded to staff for an extended period of time, including during the cool down period, laying motionless on bunk or floor, sitting on edge of bunk head down, no eye contact, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized. This additional evaluation should include input from the assigned housing unit staff and licensed health care

practitioners regarding the inmates recent behavior, file review for recent history of violence, previous cell extractions, etc. The rationale shall be explained on camera by the on-site Manager.

- A decision to use chemical agents for the extraction should be based on more than passive resistance to placement in restraints or refusal to follow orders.

It is recommended a Response Supervisor is assigned the duties of administering chemical agents during controlled use of force-cell extraction. Prior to each use of a chemical agent, the staff member applying it shall display the device in view of the camera. The Incident Commander or Response Supervisor shall state out loud for the camera the time of application and the type of device being applied.

The amount of time needed for the chemical agents to become effective will vary based upon the delivery method, individual tolerance levels, and environment. A minimum of (3) three minutes shall lapse between each application of chemical agents before additional chemical agents may be applied.

After each application of a chemical agent, the Incident Commander and Response Supervisor shall assess the effectiveness or lack thereof. In the event chemical agents have not proven effective, the Incident Commander and Response Supervisor should carefully weigh the continued use of chemical agents versus use of physical force to complete the extraction. If a decision is made to apply additional chemical agents, the Incident Commander shall verbalize to the camera the rationale for the decision. Example; a vapor grenade was deployed, it has been three minutes, the inmate is not showing any visible reaction, is using a personal barrier, and is shouting. We will now attempt to strike the personal barrier with a fogger product.

Staff shall make every reasonable effort to maintain visual contact with an inmate when administering chemical agents and until the inmate is decontaminated.

## 51020.15.1 Chemical Agents Restrictions

While in the community, non-uniformed peace officers that are issued OC products shall carry the product in a concealed manner, unless the peace officer has a badge clearly displayed.

In institutions/facilities where inmates are housed:

- ~~CN/CS shall not be administered into a cell without the approval of the Institution Head or Chief Deputy Warden.~~
- ~~When the MK-46 projector is used in cells it should be used with the wand applicator attachment. If it is necessary to use the MK-46 projector in cells without the wand applicator, care shall be taken to avoid soft tissue damage to the inmate.~~
- During a controlled use of force, CN/CS, muzzle blast OC, and the MK-46 projector shall not be administered in one/two person celled housing, single person expanded metal holding cells, showers, or any other small space.
- During a controlled use of force, CN/CS, muzzle blast OC, and the MK-46 projector are authorized for use in large areas such as rotundas, small management yards, large holding cells, exercise yards, etc.

For controlled use of force incidents involving inmates housed in departmental hospitals, infirmaries, CTCs, EOPs, and PSUs, or who have an EOP level of care designation, a licensed health care employee designated by the ~~Health Care Manager~~ Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents:

- The licensed health care practitioners shall document his/her recommendation regarding whether or not there is a contraindication for the use of chemical agents on a Medical Chrono (CDC 128C). This document shall be included in the incident package.
- If, during the consultation, the licensed health care practitioners express concerns regarding the use of chemical agents, the First/Second Level Manager authorizing the use of force and licensed health care practitioners shall discuss the matter to determine the best course

of action. The licensed ~~H~~health care ~~staff~~ practitioner shall consider in providing their consultation, the potential for injury during the use of physical force, as well as the medical implication of exposure to chemical agents. After the consultation, the decision to use chemical agents or physical force shall rest with the First or Second Level Manager authorizing the use of force.

- If a decision is made to use chemical agents in spite of any contraindications, the decision shall be articulated and written justification provided. The written justification must include specific determinations and considerations to justify the need to over-ride the contraindications, beyond the statement of safety to staff or security of the institution. Consideration shall be given to the inmate's mental health status and current mental state.

If the decision is made to go forward with the use of chemical agents, the licensed health care practitioners is responsible for ensuring proper medical equipment and trained health care staff are available during and after the application of the agent to treat the inmate for any adverse reaction due to exposure. The Incident Commander and First or Second Line Manager/AOD shall ensure adequate health care staff are present. The Incident Commander shall query the licensed health care practitioner and receive confirmation appropriate medical supplies and equipment are at the extraction site to treat a medical emergency prior to commencing the controlled use of force.

- The Incident Commander shall document the results of the consultation and the basis for the First/Second Level Manager's final decision in the Crime/Incident Report (CDCR 837-A/A1) ~~and on a General Chrono (CDC 128B) for the health care record.~~
- Staff shall provide assistance to disabled inmates on a case-by-case basis who are exposed to CS/CN or OC and would otherwise have a difficult time evacuating a contaminated area and/or to reasonably accommodate those disabled inmates during decontamination procedures.

## 51020.15.2 Decontamination from Chemical Agents - General

Any inmate exposed to a chemical agent shall be afforded an opportunity to decontaminate as soon as practical.

If an inmate refuses to decontaminate, no other action is necessary, unless the inmate was exposed in a cell and not removed from the cell where the exposure occurred. In these instances, refer to Section 51020.15.4.

Inmates who are in an adjacent cell or in the general area where chemical agents are used are presumed not to be exposed or requiring decontamination unless determined otherwise.

Decontamination of those inmates not directly exposed to chemical agents will be at the supervisor's discretion based upon obvious, physical effects of the chemical agent.

The need to medically treat an inmate for serious injury may supersede the need to decontaminate from the effects of exposure to chemical agents.

Inmates exposed to chemical agents ~~other than OC~~ shall be allowed to change their clothes as soon as practical.

~~If CN/CS is used in a cell, the inmate must be allowed to exit the cell for exposure to fresh air, take a shower, and to allow the cell to be decontaminated by vacuum and provided clean linen and clothing. If the inmate refuses to come out, force may be used as necessary to remove him from the cell to ensure the inmate is decontaminated in fresh air and the cell is cleaned.~~

If an inmate has been exposed to chemical agents subsequent to a spit hood being applied, the spit hood shall be removed and replaced with a new hood if it is safe to do so.

When an inmate is in a litter or gurney and needs to be decontaminated, and is cooperative, caution should be exercised if water is used to decontaminate to ensure the inmate's airway is clear. If the inmate is not cooperative and it presents a danger to either staff or the inmate to decontaminate with water in a litter/gurney, then fresh air is an acceptable decontamination

method. The Incident Commander in conjunction with the licensed health care staff practitioner shall evaluate the situation and utilize an appropriate decontamination method.

### 51020.15.3 Decontamination from Oleoresin Capsicum

Decontamination from OC may be accomplished by exposing the individual to fresh moving air, or flushing the affected body area with cool water, e.g., shower, sink water, or wet cloths and providing clean clothing.

Force shall not be used to decontaminate inmates/parolee from the effects of OC unless a serious threat to the inmate's health is present and a licensed health care staff practitioner determines the inmate must be decontaminated.

No other decontamination is necessary for inmates who have been medically treated and a licensed health care staff practitioner have has determined the inmate has been decontaminated.

As soon as it is practical and safe to do so, decontamination of the affected cell and housing unit shall be accomplished by ventilating the area to remove the airborne agent. Open doors and windows as permitted, or use portable fans to speed up the process. If applicable manually turn the air exchange system to high. A fan and the use of the air exchange system is not recommended for any dry agent that is utilized (i.e., expulsion grenades or muzzle blast). Wiping the area down with damp cloths or mopping is only necessary if a noticeable amount of residue is visible.

After decontamination, the inmate should not be returned to a contaminated cell until sufficient time has elapsed to allow for dissipation of the OC or until the cell has been cleaned.

### 51020.15.4 In-Cell Decontamination from Oleoresin Capsicum

In-cell decontamination may be used for inmates housed in an institution/facility when the Incident Commander determines that allowing an inmate to decontaminate in a shower is a safety concern. An example would be an inmate who is extremely agitated, or an inmate on whom force was used to insert him/her into the cell or secure the food/security port. The circumstances leading to the order for in-cell decontamination shall be clearly explained in the Response Supervisor's/Incident Commander's report.

If an inmate refuses to decontaminate, no other action is necessary, unless the inmate was not removed from the cell where the exposure occurred. In these instances, in-cell decontamination procedures described below will be followed:

A licensed Hhealth care staff practitioner shall advise the inmate how to self-decontaminate in his cell using water from the sink. A licensed Hhealth care staff practitioner shall monitor the inmate approximately every 15 minutes for a period of not less than 45 minutes starting from the last application of chemical agent.

A licensed Hhealth care staff practitioner shall document the fact the inmate was given instructions and the approximate times of the 15 minute observations on a CDC 7219, Medical Report of Injury or Unusual Occurrence.

If the inmate is under medical supervision, the documented 15-minute observations are not necessary.

As soon as it is practical and safe to do so, decontamination of affected housing units shall be accomplished by ventilating the area to remove the airborne agent. Open doors and windows as permitted, or use portable fans to speed the process.

### Subsections 51020.16 and 51020.17 are unchanged.

### 51020.17.1 Involved Staff-Reporting Requirements

Written reports regarding staff uses force shall be documented on a CDCR 837-C. This requirement includes a First or Second Level Manager/AOD authorizing the use of controlled force.

~~Reports must be prepared by the employee participants or witnesses, and reviewed by the Incident Supervisor prior to the employee being relieved from duty.~~ Reports shall be prepared by any employee who uses or observes the use of force. The reports shall be submitted to, and reviewed by, the Response Supervisor prior to being relieved from duty. Staff shall not collaborate with each other in the preparation of reports.

If possible, identify important information in the contents of the report as follows:

Identities of staff that observed and/or participated in the use of force.

Description of the actions of the inmate and circumstances leading to the use of force.

Description of the specific force used or observed.

If chemical agents were used, identify the type of projector used, and from what distance, e.g., a burst of OC from an MK-~~3~~ 9, from six feet.

Description of the inmate's level of resistance.

Description of why force was used and description of the threat perceived.

Description of any identified disabilities ascertained through any tracking system and what form of reasonable accommodation and/or assistance was provided during and after the controlled use of force.

Description and observations of staff or inmate injuries and the cause of the injury, if known.

Description of observations of decontamination of chemical agents or medical attention given.

Description of observations or knowledge of the steps taken to decontaminate the housing unit, and those inmates not directly exposed to chemical agents.

Documentation of any inmate allegation of an unnecessary or excessive use of force.


**Subsection 51020.17.2 is unchanged.**


**51020.17.3 Video Records Made After ~~Immediate~~ Uses of Force That Cause <u>Serious Bodily Injury, Great Bodily Injury,</u> ~~and~~ <u>or Result in</u> Allegations of Unnecessary or Excessive Force**

A video recording of an inmate shall be made under the following circumstances:

- The inmate has sustained a serious bodily injury or great bodily injury that could have been caused by a staff use of force.
- The inmate has made an allegation of an unnecessary or excessive use of force.

Any visible or alleged injuries shall be video recorded. The video recording shall be conducted by ~~persons~~ <u>custodial supervisors (sergeants or lieutenants)</u> who did not ~~involved~~ <u>use, or observe the force used,</u> in the incident.

The video recording should be made <u>as soon as possible, but no later than</u> ~~within~~ 48 hours <u>from</u> ~~of~~ discovery of the injury or allegation.

The video recording shall also include a request of the inmate to be interviewed regarding the circumstances of the incident. If the inmate refuses to be video recorded, such refusal shall be recorded.


**Subsection 51020.17.4 is unchanged.**


**51020.17.5 Response Supervisor-Additional Reporting Requirements for Deadly Force**

When there has been a use of deadly force, the on-duty supervisor shall ensure that the chain of command is notified and all necessary health and safety, medical, and security measures are initiated. The supervisor shall go to the location and ensure that the scene is protected.

For incidents occurring in an institutional setting, the Watch Commander shall contact the institution's ISU.

For incidents occurring in a community setting, the on-duty supervisor shall ensure local law enforcement is contacted.

The supervisor shall ask the employee who used deadly force to provide a public safety statement immediately after the incident. This is the employee's oral statement. This statement helps determine the general circumstances of the incident, assess the need for resources, set the perimeter, locate injured persons, and determine the nature of the evidence to be sought. It shall provide basic information such as the number of persons involved in the incident, the number not yet in custody and number and direction of shots fired. The statement shall not include, and the employee should not be asked to provide, a step-by-step narrative of the incident or a motive for his/her actions.

The supervisor shall capture the essence of the oral statement in writing and submit it to the Incident Commander.

In circumstances where the use of deadly force results in death or GBI, the staff using the force will be placed on administrative time off (ATO) for 72 hours in order to facilitate department interviews and staff wellness. These 72 hours will be paid contiguous time off, unless they are scheduled regular days off (RDO). RDOs will count toward the contiguous 72 hours but will not be paid unless the employee is called to work. If the 72 hours ATO overlap with a period of pre-scheduled time off (i.e. vacation, holiday, sick leave, etc.) the ATO will be used in lieu of, not in addition to the affected employee's leave credits.

As soon after the incident as is practical, the response supervisor must also initiate ~~Employee Post Trauma~~ Peer Support Program (~~EPTP~~PSP) protocols as delineated in DOM Section 31~~020.6.4.~~ 40.3.2

### 51020.17.6 Health Care Staff Use of Force-Reporting Requirements

Health Care Services staff shall complete and submit a CDCR 837-C whenever a Health Care Services staff member:

Observes ~~an immediate (not controlled)~~ use of force.

Uses force on an inmate.

Provides clinical intervention prior to a use of force.

Hears an inmate allegation of an unnecessary or excessive use of force during a reportable incident. (If not already reported on a CDC 7219).

In addition to the requirements noted above, Health Care Services practitioners shall complete and submit a CDC 7219 when assigned as a member of a controlled use of force team. The CDC 7219 shall be completed and submitted to the Response Supervisor prior to the health care staff leaving the institution and shall:

Include a quote of the inmate's own words in the patient comment section.

Document observations of the area on the inmate where force was applied, after specific examination.

Include comments or information garnered from custody staff regarding the type and amount of force used.

Document the injuries sustained and the medical treatment rendered.

Document if the inmate refuses medical examination and/or treatment.

Document any alternative assistive device provided and any medical recommendation / accommodation suggested during and after the use of force.

Document in-cell decontamination instructions and times of 15-minute checks, if applicable.

In controlled use of force cases when consultation regarding the use of chemical agents is warranted, the Health Care Services employee providing the consultation shall complete and submit a Medical Chrono (CDC 128C) documenting whether or not there is a contraindication to the use of chemical agents.

Physical efforts used to restrain appendages of an uncooperative inmate into four/five point restraints during Range of Motion shall be documented on the inmate's Health Record.

In addition to the above requirements, licensed ~~H~~health ~~C~~care ~~Services~~ practitioners shall be responsible for providing custody staff and the Use of Force Coordinator, with notification and

updated information in the event that the aftercare treatment process reveals new facts about the severity of a force related injury.

### 51020.17.7 Incident Commander-Reporting Requirements

It is the responsibility of the Incident Commander to notify the Office of Internal Affairs (OIA) and the ~~Bureau of Independent Review (BIR)~~ Office of Inspector General (OIG) as soon as possible, but no later than one hour from the time the incident is discovered, of any use of deadly force and every death, great bodily injury or serious bodily injury that could have been caused by a staff use of force. Depending on the specific MOU and the nature of the incident, a call to the county sheriff or police department may also occur.

Prior to being relieved from duty the Incident Commander or designee shall:

Complete the CDCR 837-A/A1 and CDCR 837-B. This shall be an accurate summary of the events as described in the written reports submitted by all employees.

Prepare the initial incident report package. This includes the CDCR 837-A/A1, B and C forms; any applicable medical forms; and the Manager/AOD Report of the Controlled Use of Force, if applicable.

Review all incident reports for quality, accuracy and content.

Clarify incomplete reports with involved staff by completing a CDCR 837-C-2/3.

In controlled use of force cases in institutions/facilities involving involuntary medication, placement into four/five point restraints, or admission into an infirmary, CTC or hospital, the Incident Commander shall include in the CDCR 837-A/A1, the name and title of the on duty licensed ~~H~~health ~~C~~care ~~Services staff~~ practitioner that verified the appropriate medical authorization existed prior to the use of force.

Prepare and submit a separate CDCR 837-C if he/she actually used force during an incident, or observed the immediate use of force.

Ensure the initial incident package is submitted to DAI / Identification and Warrants Unit, and the respective Associate Director over the institution's Mission Based Region.

Ensure the initial incident package is submitted to the Warden's Office, the Use of Force Coordinator, and, if requested, to the OIA and ~~BIR~~ OIG.

Ensure all force related video recordings of inmate injuries or interviews and recordings of controlled force are forwarded to the appropriate location, as set forth in Section 51020.13.

Initiate the Use of Force Review process as set forth in Section 51020.19.1. However, should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the Incident Commander shall suspend all review of that incident until the investigation is complete. In the event the Manager believes an investigation may be necessary, the Manager shall recommend that the case be referred for investigation.

### 51020.17.8 First/Second Level Manager-Reporting Requirements for Controlled Uses of Force

The First or Second Level Manager authorizing the use of controlled force is required to be present during the use of force. After the use of controlled force, the First/Second Level Manager shall complete a CDCR Form 3037 Manager's/AOD Report of Controlled Use of Force. This form shall be included as part of the incident package and ~~fulfills the reporting responsibilities of the First/Second Level Manager who authorized the controlled use of force incident.~~

In controlled use of force cases when licensed ~~H~~health ~~C~~care ~~Services~~ practitioner clinical staff expresses concerns regarding the use of chemical agents, and the decision to go forward is made by the First/Second Level Manager/AOD, the First/Second Level Manager/AOD shall document the results of the consultation and the basis for his/her final decision on a General Chrono (CDC 128B) for the health care record and the incident package.

**Subsections 51020.18 through 51020.18.1 are unchanged.**

### 51020.18.2 Allegations of Excessive or Unnecessary Force-Incident Commander and Appeals Coordinator Reporting Requirements

When informed of allegations of the use of unnecessary or excessive force, the Incident Commander and/or the Appeals Coordinator shall make an initial assessment of the information received and notify the appropriate First or Second Level Manager as soon as practical. The Incident Commander and/or the Appeals Coordinator shall determine whether the seriousness of the allegations and/or extent of the reported injuries warrant immediate notification of the First or Second Level Manager. Additionally, the Incident Commander and/or the Appeals Coordinator shall:

Ensure a licensed health care ~~staff~~ practitioner ~~have~~ has evaluated the inmate and a medical report has been completed.

Review written reports of witnesses and obtain statements from inmate witnesses, if any.

Ensure that the inmate's injuries are video recorded and the inmate is interviewed within 48 hours in accordance with the requirements set forth in 51020.17.3. This shall be done as soon as possible upon receiving verbal notification of the allegation.

When an allegation is received, whether verbally or through the appeals process, the Appeals Coordinator or Incident Commander shall contact ISU or the Watch Commander and determine if the related incident report exists. The respective Appeals Coordinator or Incident Commander shall note the existence of the incident report by log number in their submittal prior to forwarding the allegation for administrative review.

If the inmate has suffered serious bodily injury or great bodily injury, the Incident Commander shall notify the OIA and the ~~BIR~~ OIG as soon as possible, but no later than one hour from the time the incident is discovered. In instances where the allegation was submitted through the inmate appeal process and there is no corresponding incident report, the Appeals Coordinator shall, in consultation with the hiring authority, notify the OIA and ~~BIR~~ OIG.

If, at any point in the review, the Incident Commander and/or the Appeals Coordinator discovers information that leads him/her to reasonably believe or suspect an employee has committed any serious misconduct, the Incident Commander and/or Appeals Coordinator shall immediately forward all information to the Institution Head via the chain of command, recommending an internal affairs investigation if appropriate.

Prepare a Report of Findings (CDCR Form 3014) and/or Appeal Inquiry. The report shall contain the allegations made, an explanation of the incident, the written or verbal statements of the witnesses, the health care information, and a conclusion and recommendation.

Submit the Report of Findings and/or Appeal Inquiry and evidence through the chain of command to the Institution Head. The evidence shall include copies of the medical reports, and any other documentation that is deemed significant to further document the incident/allegation. If the Incident Commander learns that the verbal allegation is part of a reported incident, the incident package shall be included with the Report of Findings. Correspondingly, if the Appeals Coordinator learns that the written allegation is part of a reported incident, the incident package shall be included with the appeal for administrative review.

### Subsection 51020.19 through 51020.19.3 are unchanged

### 51020.19.4 Use of Force Coordinator Responsibility

The Use of Force Coordinator shall log and track all use of force incidents and all allegations of excessive or unnecessary force (including those set forth in inmate appeals) to ensure thorough and timely review by the IERC.

For incidents involving a reported use of force, the Use of Force Coordinator shall prepare an IERC Use of Force Review form. The form provides for the brief review of all aspects of a use of force incident, including whether or not all actions were consistent with policy, and a means

for the Use of Force Coordinator to recommend additional clarification or revision to policy, procedure or training for the IERC's consideration.

For allegations of excessive or unnecessary force that do not involve a reported use of force set forth in an incident package, the Use of Force Coordinator shall prepare an Allegation Review package.

The Use of Force Coordinator shall normally schedule all logged use of force cases for review within 30 days of their logged occurrence. Any use of force incident or allegation review that is over 31 days old, and has not received an initial review, shall be scheduled for review at the next scheduled IERC meeting. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review.

Any logged use of force occurrence that included allegations of unnecessary or excessive force, serious bodily injury, GBI or death shall be prioritized after 30 days for final review, upon receipt of any corresponding investigations or final documents. In any event, the IERC Chairperson shall review the status of all pending UOF cases during each IERC Meeting, and assess the status for final review of these cases.

If a completed package has not been received by the Use of Force Coordinator within 31 days of the incident, the Use of Force Coordinator shall conduct a preliminary review of the case, and present it to the IERC for initial review. Once the Use of Force Coordinator has received and analyzed the completed package, the case will be rescheduled for final review by the IERC.

The initial review of the uncompleted package (initial incident package) is intended for the IERC to preliminarily review and document the incident for obvious procedural concerns and does not require an IERC Critique and Qualitative Evaluation form to be completed. The IERC Critique and Qualitative Evaluation form will be completed following the review and analysis of the completed incident package.

The Use of Force Coordinator is responsible for preparing the completed use of force incident package for review by the IERC as follows:

The Use of Force Coordinator shall regularly schedule IERC meetings. The ~~BIR~~ OIG shall be provided reasonable notice and copies of the complete incident packages to be reviewed in advance of the meetings.

The Use of Force Coordinator shall conduct an in-depth analysis of the documentation of each use of force case, including the conclusions of the supervisor/managers, on the IERC Use of Force Review form.

The Use of Force Coordinator shall prepare complete copies of the incident packages to be reviewed by the IERC, which shall include a written recommendation on the IERC Use of Force Review form regarding whether the force used was in compliance with policy, procedure, training and applicable law. This format addresses critical review areas.

After the IERC's final review all documentation of staff training or discipline will be removed from the incident package and routed to the appropriate Manager for placement into the appropriate file, i.e., employee's training or supervisory files.

The Use of Force Coordinator may recommend that additional clarification or information is necessary. If the IERC determines additional information or clarification is required, the Use of Force Coordinator will forward a request for this information to the responsible Manager and track the assignment. The Use of Force Coordinator will maintain a copy of the completed incident package until the information/clarification is received. The Use of Force Coordinator will then complete the analysis and resubmit the case to the IERC.

The Use of Force Coordinator may also identify and recommend revision to policy, procedure or training for the IERC's consideration on the IERC Further Action form. The Use of Force Coordinator will submit the IERC Further Action form to the IERC for review.

If an investigation has been requested for a use of force incident, the Use of Force Coordinator will track and maintain the completed incident package until completion of the investigation. Upon the completion of the investigation, the IERC Chairperson will be provided a copy of the

investigation report and then complete the analysis and present the case to the IERC. During the IERC, the Use of Force Coordinator will verbally present his/her recommendation regarding completed cases. Investigative reports will be returned to the Investigative Services Unit Office upon completion of the final IERC review of the incident

The Use of Force Coordinator will ensure the IERC findings are documented on the IERC Critique and Qualitative Evaluation form.

In cases involving allegations of excessive or unnecessary force in which an Incident Commander or an Appeals Coordinator has forwarded a Report of Findings or an Appeal Inquiry, the Use of Force Coordinator shall prepare an Allegation Review form for review by the IERC and signature by the IERC Chairperson.

After each IERC, the Use of Force Coordinator shall forward a memorandum to the respective Associate Director Office that provides the date of the meeting, a listing of incidents and allegations reviewed, and notation of the disposition.

### 51020.19.5 Institution Executive Review Committee Monitoring Responsibility

The IERC is a committee of executive staff tasked with reviewing reported use of force incidents and allegations of excessive or unnecessary force. The IERC is the final level of review for most non-deadly use of force incidents. Normally, the IERC is comprised of the following institutional staff:

Institution Head or Chief Deputy Warden, as chairperson and final decision maker,

At least one other manager assigned on a rotational basis,

In-Service Training Manager,

One health care employee, and

A Use of Force Coordinator.

Other designated supervisors and rank and file staff may also attend, as determined by the appointing authority. A representative of the ~~BIR~~ OIG may also attend and monitor IERC meetings.

The IERC shall meet to review its cases on at least a monthly basis, or on a schedule to ensure all cases are reviewed within 30 days. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review.

During the IERC, the Chairperson shall personally view a minimum of 30 percent of all video recordings arising from controlled use of force incidents.

The IERC shall determine if the use of force was reasonable and in compliance with policy, procedures and training. The IERC shall also examine the critique and conclusions of subordinate managers and supervisors, and ensure the appropriateness of completed documentation.

The IERC shall complete an Allegation Review of all allegations of excessive or unnecessary force.

The IERC may initiate requests for additional information or clarification (clarification requests will be routed to the responsible Manager and tracked by the Use of Force Coordinator). The final review will determine whether the use of force was reasonable.

The IERC may recommend changes to procedure or training. The IERC is also responsible for identifying possible employee misconduct and recommending the initiation of training, corrective action or disciplinary action in such cases. However, only IERC members in supervisory or management roles (including the Use of Force Coordinator) and the ~~BIR~~ OIG may participate in discussions involving the initiation of corrective or disciplinary action.

The hiring authority may initiate changes to local procedure or training based on the findings or recommendations of the IERC, or forward a recommendation of change to the CDCR policy or procedure via the Associate Director. The Institution Head may also initiate corrective or adverse employee action based upon the findings or recommendations of the IERC.

Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the IERC shall suspend all review of that incident until the investigation is complete. The IERC shall consider the completed investigative report, and any report by the DFRB, as part of its own review.

**Subsections 51020.19.6 through 51020.22 are unchanged.**

**51020.23 Revisions - Use of Force Joint Use Committee (JUC)**
The Use of Force JUC is a committee of field staff tasked with reviewing and evaluating recommended revisions to the CDCR's Use of Force Policy and Procedures.
The JUC shall be comprised of the following field staff:
At least one Institution Head, as chairperson
At least one staff member from each DAI, mission based region, at the level of Lieutenant or Captain
At least one Use of Force Coordinator,
At least three representatives from the CCPOA, as designated by the CCPOA
The Chief of ~~BIR~~ OIG or designee, and
Others as needed and assigned by the Deputy Director, DAI,
The JUC shall meet quarterly as necessary, but not less than annually, to review recommended revisions

**Subsections 51020.23.1 through 51020.25 are unchanged.**



| Department of Corrections and Rehabilitation | Transmittal Letter Number |
| --- | --- |
| **NOTICE OF CHANGE TO DEPARTMENT OPERATIONS MANUAL** Chapter 5, Article 2, Use of Force | Revision Date |

The purpose of this document is to provide all staff with information regarding revisions to Department Operations Manual (DOM) Chapter 5, Article 2, Use of Force.

The Department's Joint Use of Force Committee reviewed current policy and determined revisions to CDCR's Use of Force Policy were in order to establish clear standards and parameters for the manner in which force is applied in controlled use of force situations.

This revision clarifies the responsibilities of the Response Supervisor, Incident Commander, and Manager, in determining what types of force should be used, and the manner in which they will be applied, including the documentation and video recording of the decision to utilize force during the extraction. Additionally, limits have been established on the types and amounts of chemical agents that will be applied in a controlled use of force, and a minimum wait time between applications of chemical agents created. This policy revision will expand and clarify the manner in which the appropriate mental health and medical staff will assist in evaluating the subject prior to the application of force during the cool down period to help avoid the need for additional use of force.

Changes have also been made to: 1) the reporting requirements in order to more clearly align with the requirements as codified in CCR Title 15 3268.1, 2) the use of the safety triangle to accommodate varying physical plant designs, and 3) position titles throughout the policy to standardize use, and to address renaming of classifications within CDCR such as; Captain, Chief Executive Officer, PSP, licensed health care practitioner, Office of the Inspector General, etc.

Please inform all persons concerned of the contents of this notice, which shall be maintained and utilized until it is incorporated into the next online edition of the DOM. For questions regarding the content of this policy revision, please contact James Lundy, Division of Adult Institutions, at (661) 822-4402, Ext. 4325.

M. D. STAINER
Director
Division of Adult Institutions