KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
PATRICK R. MCKINNEY
Supervising Deputy Attorneys General
DEBBIE VOROUS, State Bar No. 166884
ELISE OWENS THORN, State Bar No. 145931
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 324-4921
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                             Plaintiffs,<br><br>        v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                             Defendants. | 2:90-cv-00520 LKK DAD PC<br><br>**CORRECTED DECLARATION OF ELISE OWENS THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT** |

I, Elise Owens Thorn, declare as follows:

1.    I am a Deputy Attorney General with the California Office of the Attorney General, attorneys of record for Defendants in this case, and I am licensed to practice in this Court. I have personal knowledge of the facts stated in this declaration and if called on to testify to those facts, could and would do so competently. I make this declaration in support of Defendants' motion regarding their long-range mental health bed plan and update to the Court.

2.    Attached as Exhibit A is a true and correct copy of transcript excerpts from the February 22, 2013 deposition of Tim Belavich, Ph. D. along with excerpts of Exhibit 14 to the deposition (Declaration of Tim Belavich ISO Motion to Terminate, Exhibit 3.)

1

1          3.     Attached as Exhibit B is a true and correct copy of excerpts of the *Coleman* Program

2    Guide.

3          I declare under penalty of perjury under the laws of the State of California and the United

4    States of America that the foregoing is true and correct.  Executed in Sacramento, California on

5    February 25, 2014.

6

7                                             /s/ Elise Owens Thorn
                                         ELISE OWENS THORN

8

9

10

11   CF1997CS0003

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              2

# EXHIBIT A

[CORRECTED DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]

Tim Belavich, Ph.D.                                February 22, 2013

1               UNITED STATES DISTRICT COURTS

2               EASTERN DISTRICT OF CALIFORNIA

3

4

5   RALPH COLEMAN, et al.,

6

7            Plaintiffs,

8   -vs-                         No. CIV S 90-0520 LLK-JFM

9   EDMUND G. BROWN, JR,  et al.,

10            Defendants.
                                          /

11   _____

12            DEPOSITION OF TIM BELAVICH, PH.D.

13

14

15

16

17   DATE:            February 22, 2013

18

19   TIME:            9:01 a.m.

20

21   LOCATION:        315 Montgomery Street, 10th Floor
                      San Francisco, CA

22

23   REPORTED BY:     Joanna Broadwell
                      Certified Shorthand Reporter
24                    License No. 10959

25

Tim Belavich, Ph.D.                                    February 22, 2013

1    crisis bed.  The inmate patient must be transferred to

2    the MHCB within 24 hours of the clinical decision to

3    refer to MHCB.  OHU length of stay shall not exceed 72

4    hours for inmate patients referred to MHCB."  And then

5    the program guide citation is made.  And then the

6    second condition is, "The inmate patient is awaiting

7    Enhanced Outpatient Program, EOP, level of care

8    placement, and an IDTT determines that the inmate

9    patient may be at risk if returned to any of the

10   housing units available at that institution while

11   awaiting transfer."  Also then, there's a mental health

12   program guide citation.

13        Q.   So for the people in that second group,

14   waiting to go to the EOP, is there any time limit for

15   how long they can stay in the OHU?

16        A.   No.  But then we instituted that if they are

17   staying in the OHU, they will receive EOP services.

18        Q.   And if they are, then they can stay in the OHU

19   indefinitely?

20        A.   Until they're transferred.

21        Q.   Which could be indefinitely, right?

22        A.   No.  It would -- they would be on the list to

23   transfer.

24        Q.   And then there's an Exhibit 3, the next

25   exhibit is a memo -- it's Exhibit 3 to Exhibit 14,

Tim Belavich, Ph.D.                                      February 22, 2013

1    issued the same day, December 12, 2012, called
2    Alternative Housing Cell Prioritization.  Why did you
3    need this memo?  And actually, let me broaden that
4    question.  This is an addendum to the similar memo
5    issued May 16th, 2012.  So really, I should ask, why
6    did you need the May 16, 2012 memo on use of
7    alternative housing which is attached here?
8         A.   The May 16th use of alternative housing memo
9    was issued because of a change that we made in that, in
10   the past, patients could be placed in alternative
11   housing waiting and evaluation, then evaluated, then
12   referred to a crisis bed.  We made a change so that
13   those placed in -- if you were placed in alternative
14   housing, you were immediately also referred to a Mental
15   Health Crisis Bed so that there was not a time lag or a
16   period of time where you're doing your evaluation and
17   then you request the bed.  So we wanted our staff to be
18   able to request the bed, and if they determined that
19   the patient didn't need -- did not need the crisis bed,
20   they could rescind the referral rather than wait for an
21   evaluation to be completed and then request a bed.
22        Q.   Why do you need alternative housing to crisis
23   beds?
24             MS. VOROUS:  Objection.  Vague and ambiguous.
25             THE DEPONENT:  Certain institutions need

1    alternative housing because they may not have crisis

2    beds or OHUs, or they may have crisis beds that are

3    full, and the patient will go to a different crisis

4    bed, so they will not be kept in-house.  So for that

5    reason, we use temporary alternative housing rather

6    than return them to their housing unit.

7            BY MR. GALVAN

8        Q.    Why don't you just have the entire crisis care

9    during the period of the crisis delivered in the

10    alternative housing?  In other words, why bother with

11    the crisis bed transfer, either within the institution

12    or on a bus to another institution?  Why don't you just

13    deliver the crisis care in the alternative housing?

14            MS. VOROUS:  Speculative.  Lacks foundation.

15    Vague and ambiguous.

16            THE DEPONENT:  Well, the crisis beds are

17    licensed per Title 22.  So I would expect that my goal

18    would be to get these individuals to that setting as

19    soon as I could.

20            BY MR. GALVAN:

21        Q.    And is that just because -- just technical

22    compliance with the licensing laws, or is the licensing

23    a proxy for something about the care and the beds

24    that's important?

25        A.    The staffing is different.  The setting is

1      A.    The crisis beds were built for that purpose.

2  They have suicide-resistant beds.

3      Q.    And the alternative housing, by contrast, has

4  what qualities?

5      A.    Necessarily -- it doesn't necessarily have

6  suicide-resistant beds.  It may not have as easy access

7  to some of the medical -- some of the things that are

8  located in the crisis bed.

9      Q.    If you were operating the system as you would

10 prefer it, would you use the alternative housing at

11 all?

12      MS. VOROUS:  Objection.  Getting too late in

13 the day.  Vague and ambiguous.  Calls for speculation.

14 Beyond the scope of his declaration with respect to

15 this issue.

16      THE DEPONENT:  Could you repeat the question?

17      BY MR. GALVAN

18      Q.    If you were operating the system as you prefer

19 to operate it, would you use the alternative housing at

20 all?

21      A.    I think I would use the alternative housing as

22 I'm currently using it, and you know, as I have

23 consulted with members of the special masters team.

24 And I understand that we will always have some need for

25 alternative housing because of patient movement and

Tim Belavich, Ph.D.                                        February 22, 2013

 1    because of issues surrounding the current facilities we

 2    have and the placement of crisis beds.  So I see it as

 3    needed, but with minimal usage, and I believe that's

 4    what we have now.

 5         Q.   Is it -- and is it your view that it's needed

 6    because of the number of patients that you have to

 7    treat compared to the number of -- the number and

 8    placement of crisis beds that you have?

 9         A.   Could you repeat that again?  I think I have

10    your answer, but could you repeat it again just to make

11    sure?

12         Q.   Sure.  Is it needed -- are the alternative

13    housing beds needed because of the number of patients

14    you have to treat compared with the number and location

15    of the crisis beds that you have now?

16         A.   No.  The alternative housing is needed because

17    of where the crisis beds are located.  We have

18    vacancies in crisis beds regularly and continuously.

19    It's getting the body to the bed.

20         Q.   And your memo sets a limit, doesn't it, of 24

21    hours placement in the alternative housing?  It would

22    be in the middle of Page 2.

23         A.   It would be on Exhibit 2 or 3?

24         Q.   Three.  The alternative housing memo, the

25    May 1 memo.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1        A.    The May or the December?

2        Q.    May.  Actually, it changes in December.  Might

3   as well look at December, because December is current.

4   So let's not talk about May.  That's old.  Let's talk

5   about December.

6        A.    Okay.

7        Q.    December, at least for -- at the bottom of

8   Page 1, for sit/stand cells, it sets a limit of four

9   hours; is that correct?  At the top.

10       A.    Yes.  The second-to-last line.  Well, small

11  holding cells where they can only sit or stand can only

12  be used up to four hours.

13       Q.    And do you have -- do you have -- from your

14  memo or elsewhere, do you have a sense of a similar

15  limit for the ZZ cells that we looked at earlier?  The

16  contraband cells?  Would that also be four hours or

17  would it be longer?

18       A.    No.  I believe the four hours is only for the

19  sit and stand cells.

20       Q.    But in your professional opinion, should the

21  same limit be applied to the ZZ cells?

22            MS. VOROUS:  Objection.  Lacks foundation.

23            THE DEPONENT:  If the ZZ cells are large

24  holding cells with water and toilets, no.

25            BY MR. GALVAN

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.    February 22, 2013

1    Q.   What would the limit be then?

2    A.   I don't believe there is a time limit listed

3    for -- for use of the --

4    Q.   The ZZ cells?

5    A.   Yeah.  But I -- in the previous memo, it did

6    have a 24-hour limit.  I believe that was removed.  Oh,

7    yeah.  This is about cell prioritization.

8    Q.   About which cells to use first?

9    A.   Yes.  The order of the cell usage.

10    Q.   Okay.  And the other one, I guess since this

11    is an addendum, the other one would still have the

12    24-hour limit?

13    A.   Yes.  There's a 24-hour -- "All inmate

14    patients placed in alternative housing shall be

15    transferred to the Mental Health Crisis Bed as soon as

16    possible, and placement shall not exceed 24 hours."

17         MR. GALVAN:  I'd like to mark an Exhibit 16.

18                   (Whereupon Plaintiffs' Exhibit No.

19                   16 was marked for identification.)

20         BY MR. GALVAN

21    Q.   We talked earlier about the Folsom suicide

22    that involved the 30-minute welfare checks.  So this

23    is -- Exhibit 16 is a September 21st, 2012 document,

24    report on the Quality Improvement Plans for that

25    suicide at Folsom, signed for you by Dr. Burleson.  And

Tim Belavich, Ph.D.                                    · February 22, 2013

CERTIFICATION OF DEPOSITION OFFICER

1

2

3      I, JOANNA BROADWELL, duly authorized to

4  administer oaths pursuant to Section 2093 (b) of the

5  California Code of Civil Procedure, hereby certify that

6  the witness in the foregoing deposition was by me sworn

7  to testify to the truth, the whole truth, and nothing

8  but the truth in the within-entitled cause; that said

9  deposition was taken at the time and place therein

10  stated; that the testimony of said witness was

11  thereafter transcribed by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16      I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22      _Joanna Broadwell_

23      JOANNA BROADWELL

24      CSR 10959

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    KAMALA D. HARRIS
     Attorney General of California
2    JAY C. RUSSELL
     Supervising Deputy Attorney General
3    DEBBIE J. VOROUS, State Bar No. 166884
     PATRICK R. MCKINNEY, State Bar No. 215228
4    WILLIAM H. DOWNER, State Bar No. 257644
     Deputy Attorney General
5      1300 I Street, Suite 125
     P.O. Box 944255
6      Sacramento, CA 94244-2550
     Telephone: (916) 324-5345
7      Fax: (916) 322-5205
     E-mail: Debbie.Vorous@doj.ca.gov
8    *Attorneys for Defendants*

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE EASTERN DISTRICT OF CALIFORNIA

              SACRAMENTO DIVISION

12

13

| | |
|---|---|
| 14   **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| 15            Plaintiffs, | **DECLARATION OF TIM BELAVICH IN** |
| 16      v. | **SUPPORT OF MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE** |
| 17 | **COURT'S JUDGMENT AND ORDERS** |
| 18   **EDMUND G. BROWN JR., et al.,** | **UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |
| 19           Defendants. | |

20

21      I, Tim Belavich, declare:

22        1.     I am the Acting Statewide Mental Health Deputy Director for California

23 Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters

24 set forth in this declaration and if called upon to do so, I would and could so testify. I make this

25 declaration in support of Defendants' Motion to Terminate Under the Prison Litigation Reform

26 Act (PLRA) [18 U.S.C. § 3626(b)] or Alternatively to Vacate the Court's Judgment and Orders

27 Under Federal Rule of Civil Procedure 60(b)(5).

28

1

T. Belavich Decl. Supp. Defs' Mot. to Terminate Under the PLRA and Fed. R. Civ. Proc. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1    2.    I was appointed CDCR's Acting Statewide Mental Health Deputy Director on March

2    12, 2012.  As Deputy Director, I am responsible for and supervise the Department's mental health

3    program and clinical support division as well as the field operations, which include mental health

4    program support, psychology support, psychiatry support, health care placement oversight,

5    inpatient care, regional support, and compliance with *Coleman* mandates.  I am familiar with

6    current processes in place at headquarters to address quality management and improvement and

7    suicide prevention.  In addition, I am familiar with the extensive policies and procedures that

8    govern the prison mental health care delivery system at the institutional level and, since becoming

9    Deputy Director, have visited and evaluated the majority of prisons with mental health care

10    programs.

11    3.    Prior to my appointment as Acting Deputy Director, I served as the Chief Executive

12    Officer at California State Prison, Los Angeles County.  In that capacity, I was responsible for the

13    entire health care delivery system at the prison, which included medical, pharmacy, nursing,

14    mental health, and dental services.  Prior to my appointment as the Chief Executive Officer, I

15    served in the capacities of Staff, Senior and Chief Psychologist and as the Health Care Manager at

16    San Quentin State Prison and California State Prison, Los Angeles County.

17    4.    I hold degrees in Clinical Psychology and Health Care Administration, and am a

18    certified as a Correctional Health Professional by the National Commission on Correctional

19    Healthcare.

20    5.    Based on my education, my experience providing mental health services in

21    correctional settings, and my knowledge of the State's mental health delivery system, the State is

22    now providing inmates with access to high-quality mental health care.  Adequate numbers of

23    mental health professionals and administrators proactively diagnose and treat inmates' serious

24    mental health needs through a continuum of services across all custody levels in both inpatient

25    and outpatient programs.  Moreover, the State has an effective quality management process, has

26    developed the infrastructure necessary to support its mental health delivery system, proactively

27    manages its medication program, and has implemented a thorough, standardized suicide

28

2

1  prevention program. It is also my opinion that the current inmate population is not in any way

2  inhibiting our ability to provide quality mental health care.

3    6.    CDCR comprehensively provides inmates across all custody levels with mental health

4  care services at three levels of care: (1) the Correctional Clinical Case Management System

5  (outpatient clinic services for stable inmates functioning in the general population); (2) the

6  Enhanced Outpatient Program (separate housing units and structured activities for inmates who

7  experience adjustment difficulties in a general population setting); and (3) Mental Health Crisis

8  Bed placement (provides 24-hour services for conditions that require short-term inpatient setting

9  to ameliorate mental health symptoms). Inmates at the Correctional Clinical Case Management

10  System level of care who require secured housing are generally housed in an Administrative

11  Segregation Unit or Security Housing Unit. Enhanced Outpatient Program inmates requiring

12  secured housing are generally housed in a designated Administrative Segregation Unit or

13  Psychiatric Services Unit.

14    7.    The Department of State Hospitals (DSH) provides male inmates acute and

15  intermediate mental health treatment at two prisons (Salinas Valley State Prison and California

16  Medical Facility) and two state hospitals (Atascadero and Coalinga), including beds for high-

17  custody inmates who require inpatient treatment.

18    8.    Female inmates also receive inpatient mental health treatment in a licensed 45-bed

19  psychiatric inpatient program at the California Institution for Women. Even though CDCR runs

20  this facility independent of DSH, there are two female inmates still housed at Patton State

21  Hospital who will transfer to the California Institution for Women once DSH determines that they

22  are clinically appropriate for transfer.

23    9.    The State's mental health delivery system is governed by a comprehensive system for

24  screening and evaluating inmates with mental health issues upon admission, readmission, or

25  transfer, using standardized mental health screening forms and protocols. In addition, beginning

26  in 2011, CDCR drafted and implemented a standardized self-monitoring process to ensure that

27  inmates are timely identified, referred, and transferred to acute and intermediate levels of care.

28

3

1    To assist in this process, CDCR now has coordinators at each institution to manage and audit the

2    referral process.

3        10.   The State has standardized its mental health forms to document the mental health care

4    being provided to all inmate-patients.  These forms are used to record:

5            • mental illness screening processes conducted both at admission and transfers to new

6               housing assignments, including administrative segregation and security housing;

7             • all mental health care evaluations provided during confinement;

8             • suicide risk assessments;

9             • changes in inmates' mental heath regimens and designations (i.e., changes from

10               Enhanced Outpatient Program status to Correctional Clinical Case Management

11               System status);

12             • changes in treatment plans and treatment progress; and

13             • treatment discharges.

14        Attached as Exhibit 1 is a true and correct copy of a list identifying the Department's

15    current mental health forms.

16        11.   All inmates receive mental health screenings upon admission or readmission to

17    prison.  Pending transfer from a reception center, inmates identified as needing a Correctional

18    Clinical Case Management System level of care are routinely seen by a primary clinician. In

19    addition, initial programming is accelerated for inmates identified as needing an Enhanced

20    Outpatient Program level of care, which includes individual clinician contact, medication

21    management, and structured out-of-cell therapeutic activities.  Inmates in crisis are referred to an

22    inpatient mental health crisis bed or to a Department of State Hospital program.

23        12.   Inmates at the Correctional Clinical Case Management System level of care receive

24    an initial intake assessment, interdisciplinary treatment team appointments, primary clinician

25    contacts, medication management, and other therapy as clinically indicated in the inmate's

26    treatment plan.  Inmates in a Secured Housing Unit are seen with increased frequency and receive

27    weekly clinical rounds.

28

4

1      13.    Enhanced Outpatient Programs provide the most intensive level of outpatient care.

2    Inmates at this level of care receive an initial clinical assessment, individual clinical contacts at

3    least every two weeks, medication management, interdisciplinary treatment team appointments,

4    and structured treatment activities for approximately 10 hours per week.

5      14.    Mental Health Crisis Bed placement is governed by California Code of Regulations,

6    Title 15, Chapter 12, "Correctional Treatment Centers." Services include observation, continuous

7    nursing assistance, symptom assessment, diagnosis, initial and follow-up treatment plan, therapy

8    to alleviate psychiatric distress, and follow up on discharge. Recently, I signed two memoranda

9    that govern the use of Outpatient Housing Units or alternative housing for inmates pending

10   admission to a Mental Health Crisis Bed. These memoranda have been distributed to the

11   institutions and have been implemented. Attached as Exhibits 2 and 3 are true and correct copies

12   of the Outpatient Housing Unit and Alternative Housing Directive memoranda, respectively.

13     15.    Before being placed into administrative segregation, inmates receive a mental health

14   screening and are referred for a mental health evaluation on an emergent, urgent, or routine basis

15   as deemed needed. Upon placement, inmates receive further screening for treatment. Enhanced

16   Outpatient Program services for inmates in administrative segregation include individual clinical

17   contacts, interdisciplinary treatment team appointments, medication management, structured

18   therapeutic activities, and other treatment deemed necessary by mental health professionals.

19     16.    Inmates housed in Psychiatric Services Units receive an initial mental health

20   evaluation, interdisciplinary treatment team appointments, weekly clinician contacts, psychiatrist

21   evaluation at least monthly, and structured therapeutic activities.

22     17.    The State continuously trains correctional staff to recognize the signs and symptoms

23   of mental illness among inmates. This includes both yearly and issue-specific training, such as

24   training on the use of discipline against mentally ill inmates, and ongoing training to improve

25   suicide risk evaluations.

26     18.    The State has a well-planned and active quality management program, which is

27   outlined in the State's Inmate Medical Services Program Policies and Procedures. Recently, the

28   receiver in *Plata v. Brown* issued revised policies and procedures that, among other things,

5

1    formally adopted essential program functions to ensure sustainability into the future. Attached as

2    Exhibit 4 are true and correct copies of these revised policies and policies, which became

3    effective on December 20, 2012.

4        19.    Statewide, a Quality Management Committee coordinates and communicates efforts

5    to sustain a high-performing mental health care system. Recently added regional-level quality

6    management clinicians monitor the mental health care provided at prisons and regularly review

7    mental health program data, including inmate files, to ensure that quality care is being offered and

8    maintained. At each prison, a Mental Health Quality Management Committee coordinates

9    corrective action plans to ensure they are consistent with statewide objectives.

10       20.    CDCR also has a peer review process in place. Although this process is unique at

11   each prison (accounting for differences such as the prison's mission and institutional staffing), it

12   generally includes reviewing and assessing a clinician's treatment of several inmate-patients. If

13   during this review lapses in treatment standards are found, the prison's health care management

14   may refer the matter for headquarters review. There, a professional practice committee further

15   evaluates and monitors individual clinician practice issues.

16       21.    The State has the infrastructure needed to support its mental health delivery system.

17   Policies and procedures govern when and how inmates' unit health records should be obtained,

18   used, and maintained. (*See* Exhibit 5, a true and correct copy of the Inmate Medical Service

19   Policies and Procedures, Vol. 6, Chs. 3 & 37.)  In addition, the *Plata* Receiver has implemented a

20   statewide electronic unit health record project ensuring that records are current, accurate, and

21   available to all mental, medical, and dental health care professionals. Mental health staff has

22   been trained to use and maintain electronic unit health records, which are being used at all

23   prisons.

24       22.    The State has comprehensive policies in place to ensure the timely refilling of

25   prescriptions, to maintain continuity of medication delivery, and to minimize medication hoarding

26   by inmate-patients. Comprehensive policies mandate accurate and timely medication

27   management by outlining specific procedures and expectations for medication management and

28   ensuring medication continuity. (*See* Exhibit 6, a true and correct copy of the Inmate Medical

6

1   Service Policies and Procedures, Vol. 4, Ch. 11.)  The State has also implemented regulations and

2   procedures for administering involuntary medication that protect inmates' due process rights and

3   coordinate mental health and custody personnel actions.  (See Cal. Code Regs. tit. 15, § 3364 -

4   (2012).)

5        23.    The State has fully implemented a thorough, standardized, program to identify, treat,

6   and supervise inmates at risk for suicide.  Mental health clinicians, correctional officers, and

7   facility management personnel collaborate and coordinate in responding to and preventing inmate

8   suicides.

9        24.    Mental health clinical staff conducts a face-to-face suicide risk evaluation to identify

10  inmates at risk for suicide in multiple circumstances, ranging from a newly arrived inmate who

11  exhibits a current or significant suicide risk to evaluating inmates upon their return from inpatient

12  treatment programs.  Recently, the Department implemented a mentoring program at all prisons

13  to improve clinical competency in evaluating suicide risk.

14       25.    When an inmate expresses a suicidal ideation, or makes threats or attempts, the

15  inmate is placed under continuous direct visual observation until a trained clinician conducts a

16  face-to-face suicide risk evaluation.  Inmates at risk for suicide are generally referred and

17  transferred to a Mental Health Crisis Bed or other appropriate setting for safe-keeping and

18  treatment.  Inmates on suicide watch or precaution are directly observed or checked every 15

19  minutes, respectively, and suicide watch or precaution orders are updated every 24 hours.

20       26.    In addition, multiple proactive measures exist in Administrative Segregation Units to

21  prevent suicides, including double-celling inmates when safe, and providing electronic

22  appliances, when feasible.  In 2009, the Department completed a project to construct new small

23  management yards.  It also replaced ventilation screens (to minimize tie-off points) and retrofitted

24  intake cells to eliminate attachment or tie-off points for inmates newly admitted to administrative

25  segregation.  In addition, the Department requires mental health staff to conduct daily clinical

26  rounds, custody and clinical staff to conduct daily morning "check in" meetings, and custody to

27  conduct 30-minute welfare checks of every inmate during their first three weeks in segregation.

28                                              7

27.    In 2004, 69% of suicides occurred in Administrative Segregation Units. After implementing the measures addressed above, the rate dropped: 39% in 2008, 40% in 2009, 34% in 2010, 30% in 2011, and 34 % in 2012. This rate has dropped even though the number of suicides annually has remained substantially unchanged. In addition, the Department chartered a workgroup to analyze suicide risk factors in administrative segregation housing, and is developing quality improvement measures to reduce the lengths of stay in these units.

28.    Correctional officers are trained to respond appropriately to suicide gestures and attempts, and to identify possible actions that could indicate the need for a mental health evaluation. All institutions provide mandatory annual Cardiopulmonary Resuscitation training to correctional officers and maintain emergency response tools, such as cut-down kits and micro shields for artificial respiration. In addition, the Department requires correctional officers to complete a standard incident report detailing the reasons that Cardiopulmonary Resuscitation was not undertaken in response to a suicide event. The warden and headquarters staff reviews every such incident report to ensure compliance with Department policy.

29.    Suicide prevention and response improvement teams exist both at headquarters and at each prison. These teams train prison staff on suicide prevention, response, reporting, and suicide review. In addition, each prison's suicide prevention committee is required to amend and implement local operating procedures when necessary.

30.    When a suicide occurs, procedures at both headquarters and the prisons require immediate notification of the suicide and the appointment of a clinician to investigate and prepare a suicide report. Each report summarizes the event's possible distal and proximal causes, the victim's apparent mental health status before death, any mental health care provided to the victim, the emergency response measures undertaken, and, as appropriate, recommendations to correct any actions by correctional or clinical staff that may have contributed to the suicide.

31.    CDCR has implemented regulations and protocols governing mental health evaluations prior to imposing inmate discipline. *See* Cal. Code Regs. tit. 15, § 3317. In 2011, it expanded the circumstances when those evaluations must be conducted. Now, inmates are evaluated when they: (a) are at the Enhanced Outpatient Program, Mental Health Crisis Bed, or

8

1    Department of State Hospitals level of care; (2) are receiving Correctional Clinical Case

2    Management System care and are charged with a serious rules violation or a violation that may

3    result in being assessed a Security Housing Unit term; or (c) exhibit bizarre, unusual or

4    uncharacteristic behavior at the time of the violation. In addition, clinical assessment must be

5    considered during the Institutional Classification Committee hearing prior to any committee

6    action. Attached as Exhibit 7 is a true and correct copy of the November 3, 2011 procedure. All

7    custody and clinical staff involved in the inmate disciplinary process have received on-the-job

8    training on this new procedure.

9         32.    CDCR now has regulations and protocols governing the use of force and restraints by

10    custody staff (*See* Cal. Code Regs. tit. 15, §§ 3268-3268.3 (2012) and CDCR Operations Manual

11    [DOM] §§ 51020.1-25 (2012).) Under these regulations and procedures, correctional staff must

12    (a) consult with a licensed health care practitioner before deploying chemical agents; (b) attempt

13    clinical intervention by a licensed practitioner; and (c) attempt verbal counseling and persuasion

14    through the clinician to obtain compliance with orders before using controlled force against

15    inmates receiving Enhanced Outpatient Program services or above. (DOM § 51020.20.12.2) The

16    protocols require documentation of the consultations and recommendations from clinical staff.

17    (*Id.*, § 51020.15.1.) Custody and clinical staff are continuously trained on the procedures for

18    using controlled force in incidents involving inmates with mental health issues.

19         33.    The continued *Coleman* monitoring, which requires 90% compliance with the State's

20    own procedures and program guides (and 100% compliance with policies and procedures related

21    to suicide prevention), has increasingly diverted attention and resources away from the central

22    goal of providing and maintaining a constitutional level of mental health care for inmates, and has

23    instead saddled administrators with onerous reporting obligations. For instance, prior to the

24    special master's site visit to a prison, the prison must gather and make available to the special

25    master six months worth of extensive documentation regarding the institution. Attached as

26    Exhibit 8 is a true and correct copy of the special master's document request associated with his

27    25th monitoring round.

28

9

1      34.    CDCR also provides the special master and Plaintiffs' counsel with a monthly report

2   that includes over twenty enclosures.  Last month, the report included 389 pages of material.

3   Attached as Exhibit 9 is a true and correct copy of a December 3, 2012 cover letter to the special-

4   master identifying the enclosures.  In addition, the Department provides the special master and

5   Plaintiffs' counsel with extensive information concerning every suicide that occurs in the system

6   (e.g., suicide report, death review, incident report, and medical records), which information

7   generally exceeds several hundred pages.  This information is uploaded to a secure electronic site

8   that is accessible to the special master, his team members, and Plaintiffs' counsel.

9      35.    Despite these demands and the mental health care resources that must be diverted

10  when responding to these requests for information, I have never witnesses an incident in which

11  CDCR personnel have intentionally ignored inmates' serious mental health needs.

12      I declare that the foregoing is true and correct.  Executed in Sacramento, California on

13  January 4, 2013.

*/s/ Tim Belavich, Ph.D.*
*(original signature retained by attorney)*

Tim Belavich, Ph.D.

CF1997CS0003

# EXHIBIT 3

[to Belavich Declaration]

 

# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

## MEMORANDUM

| | | |
|---|---|---|
| Date | : | December 12, 2012 |
| To | : | Chief Executive Officers<br>Chiefs of Mental Health |
| From | : | *K. Allison*<br>Kathleen Allison, Deputy Director<br>Facility Support, Division of Adult Institutions<br><br>*T. Belavich (PhD)*<br>Timothy G. Belavich, Ph.D., MSHCA, CCHP, , Deputy Director (A)<br>Statewide Mental Health Program, Division of Health Care Services |
| Subject | : | ALTERNATIVE HOUSING CELL PRIORITIZATION |

This memorandum is an addendum to the attached May 16, 2012, "Use of Alternative Housing" memorandum.

The purpose of this memorandum is to remind institution staff of the requirements for prioritizing housing for inmate patients pending Mental Health Crisis Bed (MHCB) transfer and provide additional clarification regarding the use of alternative housing.

Staff are reminded that, although the use of alternative housing may be necessary pending finalization of transfer arrangements to a Mental Health Crisis Bed (MHCB), alternative housing is not a clinically appropriate location for inmates requiring MHCB level of care and should only be used as a last option for inmates awaiting transfer.

The Mental Health Services Delivery System (MHSDS) Program Guide (2009) clearly lists the order of priority for housing of inmate-patients awaiting transfer to a MHCB. As a reminder, an Outpatient Housing Unit (OHU) is the preferred location for housing inmates awaiting transfer to a MHCB. If staff cannot place an inmate-patient in an OHU, alternative housing is the next priority on the list and includes, in order:

1. Outpatient Housing Unit overflow cells
2. Large holding cells with water/toilets
3. Large holding cells without water/toilets such as "Contraband Cells"
4. Triage and Treatment Area or other clinic physical examining room
5. Other unit-housing where complete and constant visibility can be maintained

To the extent not available already, staff shall ensure that inmates housed in alternative housing have reasonable access to water and toilets.

Small holding cells that are designed for the inmate-patient to sit or stand may be used for up to four hours (MHSDS Program Guide, 2009, p. 12-5-5). "Inmate-patients shall be retained in sit/stand cells only

---

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 942883
Sacramento, CA 94283-0001

# MEMORANDUM

Page 2 of 2

with approval of the Watch Commander and notification of on-call clinical staff" (MHPG, 2009, p. 12-5-5). These placements are not considered alternative housing and use of these cells shall be logged on the custody log for small holding cells. These cells should be used minimally and only as a last option for temporarily housing inmates in crisis. Inmates shall be transferred out of these cells as soon as possible and never to exceed four hours.

Utilizing holding cells within the licensed bed area of the Correctional Treatment Center is the last preference for housing inmates. Use of these cells shall be logged on the alternative housing log and any time one of these cells is utilized, the Department of Health Services shall be notified (MHSDS Program Guide, 2009, p. 12-5-5).

Outpatient Housing Unit medical beds (non-swing beds), currently at California State Prison at San Quentin, California Medical Facility, California Institution for Men, and California State Prison at Corcoran are designated as medical beds. As a result, these beds shall be considered alternative housing. The alternative housing requirements and MHTs.net designation as indicated below shall be followed when inmate-patients are placed into these cells for crisis evaluations.

Effective immediately, mental health data entry staff will designate alternative housing cells with an "AltHs" subprogram in MHTS.net.

When an inmate-patient is waiting for a mental health evaluation and placement into alternative housing, staff must ensure the inmate-patient is placed in a safe setting, such as the triage and treatment area, and receives continuous direct visual observation until he or she is evaluated by a mental health clinician (after hours the evaluation may take place via telephone with a nurse facilitating).

Effective February 1, 2013, each institution shall have a Local Operating Procedure (LOP) that includes all requirements in the May 16, 2012, memorandum and the additions from this addendum. The LOP shall clearly state which cells locally will be used, in priority order, for alternative housing. This cell priority for the LOP shall mirror the priority list in the Mental Health Program Guide (2009) but include institution specific information.

If you have any questions regarding these requirements contact Laura Ceballos, Ph.D. Chief, Quality Management, Statewide Mental Health Program, at (916) 691-0308.

cc:    Judy Burleson, Associate Director, Program and Clinical Support,
           Statewide Mental Health Program, Division of Health Care Services
       Nathan Stanley, Chief, Coleman Compliance, Statewide Mental Health Program, Division of
           Health Care Services
       Rick Johnson, Chief, Health Care Placement Oversight Program,
           Statewide Mental Health Program, Division of Health Care Services
       Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
           Statewide Mental Health Program, Division of Health Care Services
       Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
           Statewide Mental Health Program, Division of Health Care Services
       Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
           Statewide Mental Health Program, Division of Health Care Services
       Richard Kendall, Ph.D., Southern Mental Health Regional Administrator (A),
           Statewide Mental Health Program, Division of Health Care Services

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | | |
|---|---|---|
| Date | : | MAY 16 2012 |
| To | : | Chief Executive Officers<br>Chiefs of Mental Health |
| From | : | Timothy G. Belavich, Ph.D., MSHCA, CCHP<br>Deputy Director (A)<br>Statewide Mental Health Program,<br>Division of Correctional Health Care Services |
| Subject | : | Use of Alternative Housing |

The purpose of this memorandum is to ensure staff follows current Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, requirements and policy memorandums related the use of alternative housing. Current practice at many institutions has been to utilize alternative housing for an evaluation period and/or provide short term treatment. This practice is not consistent with current policy.

Effective immediately:

- Inmate-patients shall not be placed in alternative housing until an evaluation by a qualified mental health clinician has been completed and it is documented that the inmate requires a referral to the Mental Health Crisis Bed (MHCB). The clinician's order shall read "Refer to Mental Health Crisis Bed for admission evaluation." Because of licensing requirements, "Only licensed clinicians with admitting privileges at the receiving MHCB program can write the actual "admission" order and this is performed at the actual time of admission..." (See attached September 6, 2005, memorandum entitled *Standardization of Mental Health Crisis Bed Admission Procedures*).

  When a face to face evaluation is not possible and a referral for admission to the MHCB is documented that results in placement into an alternative housing cell, the referral can be rescinded once a face to face evaluation is conducted and it is determined the inmate-patient does not require placement into the MHCB. The rescission and subsequent movement out of alternate housing and back to the inmate-patient's previous housing must occur within 24 hours of placement.

- Appropriate housing of inmate-patients pending transfer shall meet MHSDS Program Guide, 2009 Revision, requirements (p. 12-5-5). Housing shall be

# MEMORANDUM

determined in the following order of preferred locations:

1. Inpatient beds
2. Outpatient Housing Unit

The following locations are considered alternative housing:

3. Outpatient Housing Unit overflow cells
4. Large holding cells with toilets
5. Large holding cells without toilets
6. Triage and Treatment Area or other clinic physical exam room
7. Other unit-housing where constant visibility can be maintained
8. Holding cells within the licensed bed area of the Correctional Treatment Center

- Only inmate-patients who have been referred to the MHCB shall be placed in alternative housing.

- Although alternative housing locations are listed in the MHSDS Program Guide, 2009 Revision, as appropriate placements, the use of them shall be minimal. It is expected these locations will be used only as a last alternative and only when MHCB beds are not immediately available.

- All inmate-patients placed in alternative housing shall be transferred to the MHCB as soon as possible and placement shall not exceed 24 hours. "The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed." (MHSDS Program Guide, 2009 Revision, p. 12-5-4).

- A designated institution mental health staff member shall track alternative housing placement in accordance with the attached February 4, 2010, policy memorandum entitled *Implementation of Alternative/Temporary Housing Logs*.

- All electronic logs shall be e-mailed by a designated mental health staff member weekly to the Utilization Management (UM) mailbox at CDCR DCHCS DMH Referral Updates@cdcr.ca.gov.

- The electronic log must be received in the UM mailbox by close of business every Friday.

- Each log shall include only those inmates placed in alternative housing for the week in which the log is submitted (logs shall not include inmates placed in alternative housing the week prior – no running logs).

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 942883
Sacramento, CA 94283-0001

# MEMORANDUM

Page 3 of 3

- Electronic logs shall include all inmate-patients placed in alternative housing beginning Friday and include all placements through close of business Thursday of the following week (Friday – Thursday record of placements).

Mandatory training for Chiefs of Mental Health or their designees was held on Wednesday, May 16, 2012, at 3:00 pm. Details regarding this training were sent to all Chiefs of Mental Health via email on May 3, 2012.

If you have any questions regarding these requirements you may contact Laura Ceballos, Ph.D. Chief of Quality Management, Statewide Mental Health Program, at (916) 691-0308.

Attachments

cc:     Judy Burleson
        Nathan Stanley
        Laura Ceballos, Ph.D.
        Steve Clavere, Ph.D.
        Tia Araminta, Ph.D.
        Richard Kendall, Ph.D.
        Lucinda McGill, R.N.
        Rick Johnson

---

State of California                                      California Department of Corrections and Rehabilitation

# Memorandum

Date    :   February 4, 2010

To      :   Wardens
            Health Care Managers/Chief Executive Officers
            Chiefs of Mental Health
            Directors of Nursing

Subject :   Implementation of Alternative / Temporary Housing Logs


On October 7, 2008, the *Coleman* court ordered the California Department of Corrections and Rehabilitation (CDCR) to:

> ...implement and maintain institutional electronic and manual tracking logs for inmates who have been placed into alternative housing pending Mental Health Crisis Bed (MHCB) transfers, and the dates, times, and places of return to regular housing for inmates not transferred to an MHCB. The tracking logs should also indicate the specific levels of clinical monitoring that were required (suicide watch, suicide precaution, or psychiatric observation), and the clinical monitoring that occurred. When an inmate is referred to an MHCB for treatment of a suicidal behavior, and the referral is rescinded or the inmate-patient is not admitted to an MHCB, the inmate shall receive follow-up treatment including daily contact for five (5) consecutive days following his or her return to regular housing. Quality management for implementation of discharge planning, required when an inmate is discharged from an MHCB, shall be implemented for these inmates.

Based upon this court-ordered requirement, each institution will establish a Local Operating Procedure (LOP) and a quality assurance system to ensure the established LOP pertaining to the Alternative / Temporary Housing Logs are properly followed.

Accompanying this memorandum is a draft of the Alternative / Temporary Housing Log. This log is in the process of being approved as an official CDCR form and will be available on the Prison Industry Authority website by May 1, 2010. Beginning May 1, 2010, all institutions shall implement this procedure. Within 30 days of receipt of this memorandum, each institution will submit a copy of the institution's LOP pertaining to the Alternative / Temporary Housing Log to Captain James "Tom" Lyons via e-mail to James.Lyons@cdcr.ca.gov or faxed to (916) 323-2886, attention Captain James "Tom" Lyons, Division of Adult Institutions.

The tracking of an inmate-patient placed in temporary/alternative housing shall be initiated any time an inmate-patient cannot be returned to normal housing based upon clinical placement on Psychiatric Observation, Suicide Precaution, or Suicide Watch. This log will be used to track the location of the inmate any time s/he is housed in alternative/temporary housing.

CDC 1617 (3/89)

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 2

The following processes shall be included in the LOP developed by each institution:

1. When a mental health practitioner is not on site to conduct an evaluation and a determination is made that the inmate-patient requires clinical monitoring, the triage treatment and assessment (TTA) nurse shall call Central Control, notify custody staff that the inmate requires temporary housing, and provide information regarding the level of clinical monitoring required (suicide watch, suicide precaution, psychiatric evaluation). Documentation in the Alternative / Temporary Housing Log (attached) will be initiated by Central Control staff.

2. When a mental health practitioner is on site, the practitioner shall call Central Control, notify custody staff that the inmate requires temporary housing, and provide information regarding the level of clinical monitoring required (suicide watch, suicide precaution, psychiatric evaluation). Documentation in the Alternative / Temporary Housing Log (attached) will be initiated by Central Control staff.

3. Central Control staff shall fax the Alternative / Temporary Housing Log to the Mental Health Crisis Bed unit (MHCB) daily by 9:00 AM and when inmate-patients on the log are moved.

4. In institutions without a MHCB, the Alternative / Temporary Housing Log shall be faxed by the Central Control staff to the Outpatient Housing Unit (OHU), Mental Health Outpatient Housing Unit (MOHU), or designated mental health office daily by 9:00AM and when inmate-patients on the log are moved.

5. The treating mental health practitioner will utilize the faxed Alternative / Temporary Housing Log to ensure all inmates awaiting assessment for, or placement into, a MHCB receive treatment and receive the appropriate level of clinical monitoring.

6. The treating mental health practitioner will notate clinical monitoring and indicate any change in level of clinical monitoring (suicide watch, suicide precaution, psychiatric observation) in the inmate-patient's 114A when the inmate-patient is seen by the clinician and at least daily. The treating clinician will also verbally notify the on duty custody officer where the inmate is housed of any change in monitoring.

7. When the inmate-patient returns to regular housing, Central Control staff shall immediately complete the Alternative / Temporary Housing Log and fax it to either the Mental Health Crisis Bed Unit or the Outpatient Housing Unit (according to which type of treatment facility is at the institution, as indicated above). The mental health practitioner will initiate a five day clinical follow-up consistent with the institution's current procedure for initiating five day follow-ups. The 114A shall be forwarded to Records for placement in the inmate's Central File, the log shall be

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 3

completed and forwarded to a mental health designee who will enter the information into an electronic database.

8. When an inmate-patient is admitted to the MHCB, Central Control custody staff shall immediately complete the Alternative / Temporary Housing Log, the 114A shall be forwarded to Records for placement in the inmate's Central File, and the Alternative / Temporary Housing Log shall be completed and forwarded to a mental health designee, who will enter the information into an electronic database.

9. Institutions will develop a quality assurance system to ensure logs are filled out completely and regularly.

If you have any questions or need any additional information regarding the Alternative / Temporary Housing Log, you may contact Captain Lyons at (916) 324-5487 or via e-mail at James.Lyons@cdcr.ca.gov.


MARION CHIURAZZI, PSY.D.
Director (A)
Statewide Mental Health Program

GEORGE P. GIURBINO
Director
Division of Adult Institutions


KAREN REA, PHN, MSN, FNP
Chief Nurse Executive
Correctional Healthcare Nursing

Attachments

cc: Associate Wardens of Health Care
    Associate Directors, DAI
    Regional Administrators, Division of Correctional Health Care Services (DCHCS)
    Regional Directors of Nursing, California Prison Health Care Receivership
    Sharon Aungst, Chief Deputy Secretary, DCHCS
    George Giurbino, Director, DAI
    M. Jackson Kahle, Ph.D., Deputy Director (A), Mental Health Clinical Practices, DCHCS

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 4


James Scaramozzino, Ph.D., Deputy Director (A), Mental Health Clinical Programs,
  DCHCS
Laura Ceballos, Ph.D. Chief Psychologist, Quality Management, Mental Health Program,
  DCHCS
Catherine Knox, Assistant Statewide Chief Nursing Executive, DCHCS
Thomas Gaines, AGPA, Wasco State Prison

Case 2:90-cv-00520-LKK-JFM    Docume..t 4277-3    Filed 01/07/13    Page 11 of 17

| Inmate Name | CDCR # | Location and cell type* | DATE/TIME of placement | Clinical monitoring ordered** | DATE/TIME of transfer from temporary housing | New Housing Location |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**INSTRUCTIONS**

Central Control Staff shall log all entries for inmates placed in alternative/temporary housing pending Mental Health Care and Services. A new entry shall be documented when an inmate's cell location is changed.

* Cell type shall be designated as zz, wet cell, etc.

** Indicate either psychiatric observation, suicide precaution, or suicide watch

Procedure: See Institution LOP

Authority: October 7, 2008 Coleman Court Order Document 3072

STATE OF CALIFORNIA
ALTERNATE / TEMPORARY HOUSING LOG
CDCR 7476 (NEW, 03/10)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## ALTERNATE / TEMPORARY HOUSING LOG

| | Inmate Name | CDC # | Location and Cell Type * | DATE/TIME of Placement | Clinical Monitoring Ordered ** | DATE/TIME of Transfer from Temporary Housing | New Housing Location |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |
| 9. | | | | | | | |
| 10. | | | | | | | |
| 11. | | | | | | | |
| 12. | | | | | | | |
| 13. | | | | | | | |
| 14. | | | | | | | |
| 15. | | | | | | | |
| 16. | | | | | | | |
| 17. | | | | | | | |
| 18. | | | | | | | |
| 19. | | | | | | | |

## INSTRUCTIONS

Central Control shall log all entries for inmates placed in alternative/temporary housing pending Mental Health Care and Services. A new entry shall be documented when an inmate's cell location is changed.
* Cell type shall be designated as zz, wet cell, etc.
** Indicate either psychiatric observation, suicide precaution, or suicide watch.

Procedure:  See Institution LOP

Authority:  October 7, 2008 Coleman Court Order Document 3072

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date  :  September 6, 2005

To  :  Wardens
       Health Care Managers
       Chiefs, Mental Health Program

| DCHCS Memo Number :  05-0009 |
| --- |
| **Reason For Transmittal** |

[ . ]    State Law Change
[ ]      Policy Change
[ ]      Court Order or Settlement Agreement
[x       Clarification Request
. [ ]    Other _____

Supersedes:
Memorandum dated July 21, 2005

Subject:  **STANDARDIZATION OF MENTAL HEALTH CRISIS BED ADMISSION PROCEDURES**

The California Department of Corrections and Rehabilitation (CDCR) Division of Correctional Health Care Services (DCHCS) is committed to the development of a bed management strategy which will increase the quantity of available Mental Health Crisis Beds (MHCB) and decrease waiting lists for this level-of-care. In the interim, inmate-patients in need of a MHCB must be housed in the safest and most humane settings possible utilizing existing physical plant options.

This memorandum addresses three issues relevant to inmate-patients waiting for a MHCB:

1.  Holding environment pending transfer or placement.
2.  Mattress, blanket, and gown issuance.
3.  Five-Day follow-ups for suicidality.

<u>Holding Environment Pending Placement or Transfer to MHCB</u>

When an inmate-patient is determined to need a MHCB and there are no available beds in the sending institution, the steps outlined in the attached memorandum from September 16, 2003, shall be followed pending placement/transfer. After a brief assessment of medical and mental health factors, inmate-patients currently housed in the Correctional Treatment Center (CTC) shall be thoroughly assessed for appropriateness to discharge. In addition, if appropriate, medical inpatients shall be considered for placement in the community hospital.

On occasion, some inmate-patients cannot be placed into a MHCB within the policy requirement of 24-hours due to a lack of available beds. To best manage such situations, each institution shall develop a local operating procedure (LOP) regarding the housing and care of inmate-patients waiting for a MHCB to codify their actual operating process. Physical plant options and specific mental health program missions at each institution necessitate

* CDC 1617 (3/89)

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 2

individualization of each LOP. However, each individualized LOP shall incorporate the following standardized procedures:

- When an inmate-patient is identified as needing a MHCB, the referring clinician's order shall read "Refer to Mental Health Crisis Bed for admission evaluation." Only licensed clinicians with admitting privileges at the receiving MHCB program can write the actual "admission" order and this is performed at the actual time of admission to a vacant bed.

- The LOP may require a 128C chrono be generated in addition to the clinician's order to notify custody staff.

- Until transferred to a MHCB the inmate-patient shall be observed and monitored, or if clinically indicated, placed under constant direct observation for suicide watch. Nursing shall also be available to administer medication and to provide nursing checks as clinically indicated and ordered. The LOP shall indicate procedures for administration of medication and for daily contact by a mental health clinician.

- Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

  1. Inpatient Beds.
  2. Outpatient Housing Unit.
  3. Outpatient Housing Unit overflow cells.
  4. Large holding cells with water/toilets including, but not limited to, "ZZ cells," "Wet cells," and/or "Clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
  5. Large holding cells without water/toilets such as "Contraband Cells" (Not in a CTC licensed area.)
  6. Triage and Treatment Area or other clinic physical examining room
  7. Other unit-housing where complete and constant visibility can be maintained
  8. When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate-patients shall be retained in sit/stand cells only with approval of the watch commander and notification of clinical staff on-call.

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 3

> 9. Holding cells within the licensed bed area of the CTC building (notification to Department of Health Services of an unusual occurrence is required).

- The Health Care Placement Unit (HCPU) shall be contacted directly by telephone regarding all inmate-patients pending transfer to a MHCB in accordance with the September 16, 2003 memorandum (attached). If the goal is to place the inmate-patient at the same institution's MHCB without requiring transport, the HCPU shall be contacted when a bed is not immediately available. The information relayed to HCPU shall include the inmate-patient's name, CDC number, prior level of care, identification of the time that the determination for a MHCB was made, reason for MHCB placement, current institution, and type and location of temporary housing.

- The HCPU shall be notified whenever a MHCB becomes available. For those institutions with a CTC and MHCB program, HCPU may prioritize an inter-institution transfer of an inmate-patient (based on clinical or temporary housing priority) into a MHCB over internal admissions.

- When an inmate-patient verbalizes suicidal ideation without other signs and symptoms of increased risk of suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors, including the completion of a Suicide Risk Assessment form, and communicating with custody staff and supervisors regarding any potentially solvable custody issues. Resolution of related environmental issues is preferable to placement of an inmate-patient who is not genuinely at risk of suicide into a MHCB.

- The primary clinician and the assigned psychiatrist shall assess the inmate-patient and provide appropriate mental health services. When appropriate, the mental health clinicians shall provide therapeutic intervention focused on ways the inmate-patient may get perceived non-medical needs met without requiring MHCB placement. After regular work hours, the psychiatrist on-call is encouraged to conduct a face-to-face clinical assessment prior to admitting the inmate-patient to a MHCB. After work hours when the psychiatrist on-call chooses not to admit a suicidal inmate-patient to MHCB, a face-to-face clinical assessment is required.

- When involuntary/emergency medication is administered, all available documentation related to the decision to medicate, including but not limited to, danger to self, others, and/or grave disability, shall be forwarded to the treating clinicians in the MHCB.

- For inmate-patients discharged from a MHCB back to another sending institution or new institution, the LOP may allow for placement into alternate housing pending transfer, with appropriate mental health follow-up.

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 4

- Upon discharge, the clinician from the treating MHCB will call the Chief Psychiatrist, Chief of Mental Health, or designee at the institution to which the inmate-patient will return or be sent. (See attached contact list.) If the contact person is not available, the MHCB clinician will leave the following information with a mental health supervisor for the contact person (or Health Care Manager if there is no mental health supervisor available):

    o  Name and CDCR number of inmate-patient.
    o  Contact information for the discharging clinician, including pager number.
    o  Discharge diagnosis.
    o  Follow-up requirements (i.e. daily contact required for suicide follow-up).

- The Discharge Summary, Suicide Risk Assessment, and Doctor's orders shall be faxed to the designated fax number. (See attached contact numbers at each institution.)

Mattress, Blanket and Gown Issuance

All inmate-patients who are deemed to need a MHCB because of suicidal ideation, threats or attempts, and who are housed in one of the above environments pending transfer to a MHCB, shall be issued a no-tear mattress, no-tear blanket, and a no-tear gown/smock, unless otherwise ordered in writing by the clinician. If the inmate-patient subsequently attempts to use any or all of these items to harm his or herself, the clinician may then order that one or more of these items be removed. However, it is important to stress that unless otherwise contraindicated, the inmate-patient shall be issued the above items since the inmate-patient's dignity and comfort must always be preserved to every extent possible while maintaining safety and security.

"Five-Day" Clinical Follow-Up Plans and Custody Wellness Checks

Inmate-patients who were determined to need a MHCB for suicidal precautions or watch, and who were held, pending transfer, in one of the above housing environments, but who subsequently are deemed to no longer be at risk of suicide and, therefore, are released back to their regular housing cell, shall receive appropriate clinical and custodial follow-up per existing policy and procedures (i.e. 5-day follow up procedures).

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 5


For questions, please contact Shama Chaiken, Ph.D., Chief Psychologist, DCHCS, at (916) 445-4114.


RENEE KANAN, M.D.                          JOHN DOVEY
Director (A)                               Director
Division of Correctional Health Care Services    Division of Adult Institutions

Attachments

cc: J. S. Woodford
    Associate Directors, Division of Adult Institutions
    Yulanda Mynhier
    Regional Administrators, DCHCS
    Lisa Tillman
    Kathleen Keeshen
    Timothy Fishback, M.D.
    Shama Chaiken, Ph.D.
    Margaret McAloon, Ph.D.
    Andrew Swanson, M.D.
    Irma Petrey

# EXHIBIT B

**[CORRECTED DECL. OF THORN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND UPDATE TO COURT]**

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

Brief Psychotic Disorder
Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)
Psychotic Disorder Due To A General Medical Condition
Psychotic Disorder Not Otherwise Specified
Major Depressive Disorders
Bipolar Disorders I and II

2. <u>Medical Necessity</u>: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by the Interdisciplinary Treatment Team (IDTT), for all cases in which:

**Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with, or suspected of having, a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

**Specific Treatment Criteria for MHCB**

In addition to the overall treatment criteria above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

**D. REFERRAL AND TRANSFER**

**Referrals**

An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to a MHCB.

**MHCB Transfer**

If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be

transferred to a designated MHCB institution. The inmate-patient shall be transferred within 24 hours of referral.

(See Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 3, Health Care Transfer Process* and *Volume 6, Chapter 18, Transfer of Patient Health Records Within CDCR; Institution to Institution*, for specific requirements concerning transfers and Unit Health Records)

If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours. On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed. **The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed.**

MHCB transfers shall be done under authority as "Emergency Medical Transfers" (Department Operations Manual [DOM] 62080.17). Since MHCB transfers are typically viewed as emergency moves, they do not require classification committee action or Classification Staff Representative (CSR) endorsement. MHCB transfers shall be done on a "Psychiatric and Return" basis.

Generally, the transfer process shall be initiated by the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health.

The transferring psychiatrist, psychologist, or Chief of Mental Health shall determine whether the inmate-patient is "medically cleared" to transfer. State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported. The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer. The CCR provides, in part, that a transfer or discharge may not be carried out if, in the opinion of the inmate-patient's physician, such transfer or discharge would create a medical hazard. The transferring physician must initially evaluate the relative benefits and risks associated with transporting the inmate-patient. The determination of whether the transfer creates an unacceptable risk or a "medical hazard" will depend upon the inmate-patient's condition, the expected benefits to the inmate-patient if he or she is transferred, and whether the risks to the inmate-patient's health are outweighed by the benefits.

The receiving facility must consent to the transfer. CCR, Title XXII, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has