DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>        Defendants. | Case No. 2:90-cv-0520 LKK DAD<br><br>**PLAINTIFFS' STATUS CONFERENCE STATEMENT PURSUANT TO ORDER OF JAN. 30, 2014, DOCKET NO. 5034** |

1    Plaintiffs submit this Status Conference Statement to inform the Court about
2 discovery conducted into the suicide of a class member (referred to herein as "Inmate D"
3 or "Inmate X"), and the subsequent investigation and reporting of this suicide by
4 California Department of Corrections and Rehabilitation ("CDCR"), as required by this
5 Court's January 30, 2014 order (Dkt. No. 5034).  The parties continue to negotiate
6 regarding an agreed statement of facts pursuant to page 2, lines 1-3, and intend to provide a
7 joint statement before the Status Conference, or separate statements if necessary.
8    The death of Inmate X at Mule Creek State Prison on September 6, 2013 was not an
9 outlier in CDCR's care and treatment of *Coleman* class members.  The attitude of custody
10 staff in the events leading to Inmate X's death, as well as the serious deficiencies in the
11 subsequent investigation and reporting of this death to Plaintiffs' counsel and the Special
12 Master, are representative of the key failings in CDCR use-of-force policy and practice.
13 Discovery into this incident has reinforced the need for affirmative relief as requested by
14 Plaintiffs by their motion of May 26, 2013.

**I.   CDCR, BY ITS POLICY AND PRACTICE, AUTHORIZED THE IMMEDIATE USE OF FORCE ON INMATE X IN CIRCUMSTANCES WHERE THERE WAS NO EMERGENCY**

17    At approximately 10: 30 p.m. on September 6, 2013, Inmate X held open the food
18 port of his cell in the Mental Health Crisis Bed ("MHCB") unit at Mule Creek State Prison
19 ("MCSP"), preventing custody officers from closing the food port.  For this obstructive
20 action, Inmate X was immediately pepper-sprayed in the face with an MK9.  He was also
21 issued with a Rules Violation Report for blocking the food port.
22    Nothing in the evidence produced by Defendants shows that Inmate X's action
23 presented an immediate threat to the institution, custody officers, staff or to the inmate
24 himself.  Nor could Defendants credibly *claim* that Inmate X's actions presented any such
25 immediate threat.  Despite the absence of any emergency, Inmate X was sprayed from
26 forehead to chin from an MK9 crowd-control sized canister of an OC spray, from a
27 distance of 2-3 feet.
28    Unfortunately, these actions were permitted by CDCR policy and continue to be

sanctioned in Defendants' proposed revisions to CDCR policy.  (Confidential Declaration of Stone-Manista, filed herewith, Ex. A, Excerpts of Deposition Transcript, Michael Stainer, Feb. 24, 2014 ("Stainer Depo. Tr.") at 69:6-14.)  Of equal importance, both current CDCR policy and the proposed revisions continue to allow ready access to OC spray in locations where Coleman class members are housed, making it far too easy for this sort of unacceptable incident to take place.

## II. THE ACTIONS OF CUSTODY STAFF IN RELATION TO INMATE X DEMONSTRATE THE INADEQUACIES OF CDCR POLICY ON DECONTAMINATION FOLLOWING EXPOSURE TO PEPPER SPRAY

Following the deployment of OC spray, Inmate X refused to cuff up to be decontaminated outside of his cell.  As a result, Inmate X was directed to self-decontaminate using the water from the sink in his cell.  For the nine hours after Inmate X was first sprayed in the face until his subsequent death by asphyxiation, custody staff consistently refused medical orders that Inmate X be extracted for proper decontamination.

Such failures to ensure decontamination are sanctioned by CDCR policy.  In clear disregard of this dangerous failure of policy, Michael Stainer, CDCR Director, Division of Adult Institutions, recently testified that CDCR's current policies on decontamination are adequate.  (Stainer Depo. Tr. at 70:3-8.)

Plaintiffs request that the Court require Defendants to substantively address use of force policies to ensure adequate decontamination following exposure to OC spray, to prevent future deaths and injuries such as that of Inmate X.

## III. THE ACTIONS OF CUSTODY STAFF DEMONSTRATE THE RISKS INHERENT IN A CUSTODY-DOMINATED APPROACH TO THE CARE AND TREATMENT OF COLEMAN CLASS MEMBERS

The use of OC spray by custody staff in the incident involving Inmate X was specifically contraindicated by Inmate X's documented history of breathing problems, due partly to his tracheostomy.  It was, however, sanctioned by CDCR's policies on use of force, and continues to be sanctioned under Defendants' proposed revisions to those policies.  Indeed, Mr. Stainer testified that Defendants' proposed changes still do not require any consultation with health care or medical staff prior to the immediate

application of OC spray in a food port incident.  (Stainer Depo. Tr. at 69:5-14.)

Custody staff at MCSP – from the peace officers who first sprayed Inmate X all the way up the chain of command to the Administrative Office of the Day on duty that day – refused specific orders from medical staff to extract Inmate X for proper decontamination and medication following the food port incident.  Custody's refusal to extract Inmate X (which is now the subject of an OIA investigation) shows the dangers of a custody-dominated approach in dealing with *Coleman* class members.

Clear policy statements setting out the expectations and guidelines for a team custodial-clinical approach in the care and treatment of the State's mentally ill prison population could have prevent Inmate X's death.

### IV. INMATE X DEMONSTRATES THE INADEQUACIES OF CDCR POLICY AND PROCEDURE AS THEY RELATE TO THE DISCIPLINE OF *COLEMAN* CLASS MEMBERS

Inmate X entered CDCR for the third time at North Kern State Prison ("NKSP") on August 30, 2013, after being transferred from Los Angeles County Jail.  (*See* Confidential Stone-Manista Decl. Ex. E, Confidential Declaration of Michael W. Bien In Support of Plaintiffs' Urgent Petition for a Status Conference To Address Modified And Delayed Suicide Report, Filed Under Seal, January 17, 2014 ("Conf. Bien Decl. 1/17/14"), Exhibit D at 5.)  Immediately upon his arrival from Los Angeles County Jail, "the patient was found to require acute mental crisis bed intervention." (Combined Death Review Summary at 20.)  While still in the NKSP Triage and Treatment Area, Inmate X was issued a Rules Violation Report ("RVR") for an alleged assault on custody staff.  (Bien Decl. Ex. D at 6.)  The psychiatrist progress notes state that Inmate X "Got into an altercation with SGT regarding his having problems breathing and feeling suicidal." (Confidential Stone-Manista Decl. Ex. D, Inmate X Medical Records, at 38.)

Because of the RVR, Inmate X entered the crisis bed unit at Mule Creek in "administrative segregation" status.  This status likely contributed to custody's decision to pepper spray him for holding the food port, and then to interfere with medical orders to remove him for decontamination.  This is further evidence of the need for a separate

disciplinary process to address inmates who act out due to symptoms of mental illness.  If such a process were in place, and Inmate X had been diverted out of the normal RVR process after the incident in the NKSP triage area, he would not have arrived at MCSP's crisis bed unit with the "administrative segregation" label that biases staff toward immediate use of force.

Defendants' revised policy does not address RVRs at all.

## V. DISCOVERY INTO THE INVESTIGATION AND REPORTING OF INMATE X'S SUICIDE REVEALS SERIOUS DEFICIENCIES IN CDCR'S APPROACH TO THE CARE AND TREATMENT OF COLEMAN CLASS MEMBERS

Defendants notified the Special Master of the death of Inmate X by email on September 12, 2013.  (*See* Conf. Bien Decl. 1/17/14 ¶ 3 at 1:23-2:11.)  However, this email notification contained no reference to the fact that the inmate had been pepper-sprayed in the face less than nine hours prior his death, or that he had not been decontaminated outside of his cell.  The email notification also did not mention that custody staff had refused to obey medical orders that Inmate X be removed from his cell for decontamination and medication.

On September 16, 2013, Dr. Tim Belavich sent a letter to the Special Master concerning the death.  Again, this letter omitted any mention of the fact that Inmate X had been pepper-sprayed and had only been able to self-decontaminate from the sink in his cell.  Dr. Belavich's letter also did not inform the Special Master that custody staff had interfered with medical orders that Inmate X be removed from his cell for decontamination and medication.  Defendants may choose to argue that these facts were omitted from these notifications because they are not relevant to Inmate X's suicide.  Indeed, CDCR officials continue to maintain that OC spray did not play a role in the suicide of Inmate X, even in the face of their own suicide reporter's observations close in time to the incident that Inmate X had struggled to deal with the consequences of the pepper-spraying right up to the morning of his death.  (*See e.g.* Stainer Depo. Tr. at 45:25-46:4; Confidential Stone-Manista Decl. Ex. B, Excerpts of Deposition of Kathleen Allison, Feb. 18, 2014 ("Allison

Depo. Tr." at 81:13-83:9.)

By September 12, 2013 (four days prior to the date of Dr. Belavich's letter) CDCR executives had referred the actions of staff involved in the incident for OIA investigation. (Allison Depo. Tr. at 13:4-14:2.) CDCR's Deputy Director for the Division of Adult Institutions, Kathleen Allison, testified that this referral was made in part because of the allegations that custody officers had not opened the door to Inmate X's cell to allow medical staff to decontaminate the inmate after his exposure to OC spray. (Allison Depo. Tr. at 28:2-25.) If, by September 12, CDCR officials had determined the actions of custody staff to be serious enough to merit an investigation, then it is clear that those facts ought necessarily have been communicated to Plaintiffs' counsel and to the Special Master — particularly in light of the impending evidentiary hearing into the use of force against *Coleman* class members in the CDCR. The failure to include these key facts in the notices given to Plaintiffs' counsel and the Special Master demonstrates serious deficiencies in CDCR's initial reporting of suicides and use of force incidents involving *Coleman* class members.

Discovery into this incident has also revealed serious deficiencies in CDCR's subsequent investigation of use of force incidents involving *Coleman* class members. For example, the way in which Defendants reached the decision to "stop work" on the suicide investigation after the teleconference held on October 31 demonstrates deliberate indifference to the serious risks of harm created by allowing the custody practices used on Inmate X to continue unabated. At that teleconference, the participants decided to characterize Inmate X's death as a non-suicide. (Confidential Stone-Manista Decl. Ex. C, Excerpts of Deposition Transcript of Judy Burleson, Feb. 18, 2014 ("Burleson Depo. Tr.") at 85:6-16.) This decision is surprising, since it is not supported by the definition of suicide adopted by CDCR's Annual Suicide Report for 2005, which classifies "intentional, self-inflicted death committed while under the influence of a mental illness," as suicide. (Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2005, (SM 2005 Suicide Report) Docket No. 2566, filed

11/26/07, at 3.) However, it is unclear how or why CDCR staff disregarded their own definition of suicide. In discovery, Defendants have been unable to provide a list of attendees, an agenda, or minutes for the teleconference that took place that day, and it is unclear which clinicians present at that meeting agreed that Inmate X's death was not a suicide. Thus it appears that the decision was reached without any documentation of the stated reasons for this belief, nor any documentation of how the decision was ultimately reached.

The absence of these critical records shows the need for revisions to CDCR's policies and procedures in its investigation and reporting of use of force incidents involving mentally ill inmates. At a minimum, Defendants should be required to maintain appropriate records of suicide investigations and reports.

DATED: March 6, 2014        Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By:  */s/ Ernest Galvan*
     Ernest Galvan

Attorneys for Plaintiffs