KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
JAY C. RUSSELL, State Bar No. 12262
PATRICK R. MCKINNEY, State Bar No. 215228
Supervising Deputy Attorneys General
DEBBIE J. VOROUS, State Bar No. 166884
ELISE OWENS THORN, State Bar No. 145931
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-4921
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **EDMUND G. BROWN JR., et al.,** <br><br> Defendants. | 2:90-cv-00520 LKK DAD PC <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' POST-TRIAL BRIEF REGARDING HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL INMATES IN SEGREGATION** |

1

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper
Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

# INTRODUCTION

Plaintiffs' Post-Trial Brief Regarding Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation (Pls.' Post-Trial Brief) is fundamentally flawed and highlights Plaintiffs' refusal to acknowledge that the conditions existing twenty years ago which led to the Court's original findings and orders no longer exist. Housing *Coleman* class members in segregation units does not defy any court order, as Plaintiffs now allege. Rather, twenty years ago, the Court recommended that Defendants "develop and implement a protocol to govern the placement and retention of mentally ill inmates in any administrative segregation or segregation housing unit and to govern care of any mentally ill inmate who is so housed." (ECF No. 547 at 81.) This is precisely what Defendants have done: developed and implemented a constitutionally appropriate mental health treatment system for inmates in segregation. CDCR consistently exceeds or meets Revised Program Guide requirements for all inmates housed in segregated housing units. In addition, the evidence demonstrates that CDCR is improving a system that constantly presents new challenges and issues that need to be resolved, such as creating additional bed capacity for class members having safety concerns.

Plaintiffs have failed to prove current and ongoing systemic violations of the law, and their motion must be denied.

Plaintiffs' misstatement of past proceedings is only one instance in which Plaintiffs loosely interpret the evidence before the Court. Plaintiffs argue without factual basis that conditions existing in California's prisons twenty years ago exist today ("two decades later, these constitutional violations persist"). Their brief—and their motion—is based on conditions that have either changed or are part of Defendants' continuing efforts to ensure that all mentally ill inmates are provided with appropriate mental health care. If Plaintiffs' arguments were true, then the work of this Court, the Special Master, and Defendants, as well as Plaintiffs' constant demands that more tools be added to the toolbox, over the last 20 years mean nothing. No evidence supports Plaintiffs' claims, which reveal that Plaintiffs' ever-changing demands will never be satisfied. Although it may be appropriate to reference "the expansive record in this case,

2

spanning over two decades and thousands of entries" as a historical overview, past factual findings do not support the orders presently sought. The Court's decision today must be based on relevant and current data, all of which show CDCR's actions and improvements in providing adequate mental health treatment in segregated housing units.

Plaintiffs' Post-Trial [Proposed] Order Granting Plaintiffs' Motion Regarding Enforcement of Court Orders and Affirmative Relief Regarding Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation (ECF No. 4985-1) presents a "wish list" of further oversight tools that duplicate the programs, assessments and physical plant improvements that CDCR has adopted or is implementing. Because Plaintiffs' wish list is untethered to any found constitutional violations, their motion must be denied.

## I. DEFENDANTS' SYSTEMIC POLICIES AND PRACTICES ADEQUATELY ADDRESS CLASS MEMBERS' MENTAL HEALTH NEEDS.

### A. CDCR Provides Constitutionally Adequate Mental Health Care in Segregation Units.

The evidence establishes that Defendants are providing class members housed in segregated units with appropriate mental health care in safe and secure environments. CDCR's safeguards and policies for mentally ill inmates in segregation are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives. *See Turner v. Safley,* 482 U.S. 78, 87 (1987).

Plaintiffs are wrong when they argue that segregation housing units are categorically "dangerous, high-risk environments."

Plaintiffs rely on their experts' discussions of allegations made by individual inmates to assert that an alleged "absence of social contact" makes the very use of segregation a harmful system. But these experts provided no evidence of any inmate's alleged symptoms before being assigned to segregation, or any progression of conditions while housed in segregation, both of which any credible clinician would need to know before rendering opinions concerning the cause of alleged mental health disorders. (Tr. 3334:19-3336:3, 3338:13-339:7 [Scott].) In fact, CDCR inmates in administrative segregation have social contact and the opportunity to use electronics and read books. Tr. 2459:2-4; 3280:25-3283:2; 3286:16-3287:11; 2897:3-8, 2954:6-17; Defs.'

3

Ex. LLL (Allison reply Decl. Supp. Mot. Terminate) ¶ 26. And Plaintiffs' experts admitted that when an inmate is in need of psychiatric attention for suicidal ideation, they are transferred to acute care in a Mental Health Crisis Bed unit. (Tr. 2498:16-25 [Kaufman].) Most importantly, Plaintiffs failed to provide any evidence that use of segregation causes harm to most inmates such that the system itself can be deemed unconstitutionally "harmful."

Plaintiffs criticize the treatment provided to class members in segregation but fail to demonstrate either an absence of constitutionally adequate treatment and office space or inadequate mental health care. Ignoring work taking place over the past twenty years, treatment spaces have been improved and expanded, allowing Defendants to conduct most treatment in confidential locations, and work continues to improve facilities. (Tr. 3494:21-3495:17 [Belavich]; 2884:1-2897:8 [Allison]; Ex. MMM.) Plaintiffs attack the use of cell-front contacts ("administered through the door jamb of locked cells"), but, as Dr. Jordan testified, cell front interactions are used when inmates refuse to attend confidential treatment sessions and provide a means to take stock of the patient's immediate condition and inmates who require cell-front session, are afforded an opportunity for confidential sessions. (Tr. 3121:18–3122:2.)

Plaintiffs purposefully obfuscate the amount of care Defendants' provide to class members, focusing on the treatment hours *received* by inmates in segregation, rather than the treatment offered, the measure relevant to Program Guide compliance. (Tr. 3671:25-3672:3 [Belavich].) Inmates have a right to refuse treatment, even effective mental health treatment. 15 CCR §3363. CDCR consistently exceeds on average the Program Guide requirement that ten hours of scheduled therapeutic activity per week be *offered* to Enhanced Outpatient Program inmates housed in Administrative Segregation Unit hubs and in the Psychiatric Services Units. (Tr. 3481:2-18, 3671:9-3672:3, 3673:5-3674:14 [Belavich]; Exs. GGGG and 2120.). Similarly, mental health treatment *offered* at the Security Housing Units statewide meets or exceeds program guide requirements. (Tr. 2655:8-19 [Fischer], 3482:18-3484:18 [Belavich]; Exs. YYY (Belavich Opp'n Decl.) ¶¶ 6-13, 17-19, DDDD & HHHH; ECF No. 4429 [Fischer Decl.] ¶¶ 30-31; Ex. DDDD). And Correctional Clinical Case Management System inmates are receiving groups in many administrative segregation units and in the Security Housing Units at Corcoran

4

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

1  State Prison and California Correctional Institution, although this is not required under the
2  Program Guide or the Constitution. (*Id.*)
3        Plaintiffs also criticize Defendants' ability to provide mental health care by arguing,
4  wrongly, that mental health clinicians are powerless to make decisions for the benefit and
5  placement of inmates. The evidence shows otherwise. Mental health care providers do in fact
6  have the authority to remove a class member from segregation for inpatient treatment if they
7  determine the inmate is suffering. (Tr. 3566:22-3567:3; 3571:22-3572:4 [Belavich].) While the
8  decision to place an inmate in segregation is the province of custody, that decision is informed by
9  mental health clinicians. (Ex. LLL, ¶ 11.) Dr. Fischer testified that although placement in a
10 Security Housing Unit is a custody decision, inmates placed in a Security Housing Unit are
11 constantly evaluated so that if anything clinically occurs the inmate can be moved to a higher
12 level of care. (Tr. 2691:22-2692:7 [Fischer].)

13     **B.**    **Defendants Have Adequate Placements and Do Not Use Segregation for Housing Shortages.**
14

15       Plaintiffs argue that Defendants' prison population reductions have had no impact on the
16 number of mentally ill prisoners, and that there are insufficient placements for inmates with
17 mental health concerns. But these arguments are unsupported by any evidence showing systemic
18 over-use of segregated housing or a lack of placements for class members.
19       To support their argument of systemic constitutional violations, Plaintiffs rely on three
20 examples of inmates placed in segregation due to an alleged shortage of beds. (Kaufman L,
21 Haney WW and Haney GG). But the evidence shows that these inmates were not placed in
22 administrative segregation due to shortages of proper beds. For example, with Kaufman L, he
23 was placed in overflow in Cypress Hall at California Institution for Men, which is not
24 administrative segregation. As Ms. Allison and Dr. Jordan explained, inmates were housed in the
25 section of the building used for reception center overflow and granted full privileges. Overflow
26 inmates are not treated as segregated inmates; are allowed to leave the clinic or leave the unit to
27 go to the clinic and to general population yard; and are allowed to eat in another unit. (Tr.
28 2980:18 – 2982:25; 3111:9 – 3113:3.) Inmate WW was placed in a management cell based on his

5

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

1  destructive behavior and refusal to cooperate (Ex. 2034, p. 5,; Tr. 2353:1-14; Ex. EEE.) Inmate
2  GG was also placed in segregation due to behavior issues. (Tr. 2190:21 – 2191:20; Colley Decl.
3  ECF No. 4482, filed 3/22/18, ¶ 9.)

4  Plaintiffs' arguments concerning "SHU kickouts" are similarly unavailing.  Inmates
5  released from Security Housing Units at Level II institutions are temporarily placed in
6  administrative segregation because they must be transferred to Level IV institutions, not—as
7  Plaintiffs assert—because there is insufficient housing. (Tr. 2930:16-25 [Allison].)

   **C.   Defendants Properly Balance Penological Needs with Inmates' Eighth Amendment Rights.**

10  Ostensibly relying on the dismissed *Madrid* case, Plaintiffs argue that the State's use of
11  segregation "bears little relation to security concerns," arguing—without reference to supporting
12  evidence—that undefined "less dangerous sanctions" are an appropriate response to refusing
13  orders, indecent exposure, and drug possession and trafficking.  This argument is consistent with
14  Plaintiffs' revolutionary assertion that inmates with mental health disorders should never be
15  placed in segregation, whether for dangerous and harmful behavior or otherwise.  But again,
16  Plaintiffs' and their experts' preferences should not prevail over the considered judgments of the
17  State's correctional administrators and mental health professionals.  Granting Plaintiffs' motion
18  would improperly supplant those officials' judgment regarding the safety and security of the
19  prison system with Plaintiffs' notion of justice.

20  The United States Supreme Court and this circuit have consistently found that segregation
21  itself, absent other factors, is correctionally appropriate. *Hewitt v. Helms*, 459 U.S. 460, 468
22  (1983); *cf. Neal v. Shimoda*, 131 F.3d 818, 833 (9th Cir.1997); *Anderson v. County of Kern*, 45
23  F.3d 1310, 1315–16 (9th Cir.1995); *Toussaint v. Yockey*, 722 F.2d 1490, 1494 n.6 (9th Cir.1984)
24  (the usual hardships associated with administrative segregation do not violate the Eighth
25  Amendment).  This is true even for inmates with mental health disorders.  Provided that adequate
26  mental health care is provided, no Court has mandated a blanket exclusion of mentally ill inmates
27  from prison disciplinary systems or security settings designed to preserve safety and order.
28  *Madrid v. Gomez*, 889 F. Supp. 1146, 1267 (N.D. Cal. 1995); *Orr v. Larkins*, 610 F.3d 1032,

6

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper
Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

1035 (8th Cir. 2010). And here, inmates are placed into Security Housing Units as a result of properly adjudicated, serious disciplinary violations, not as a means to manage the mentally ill population. (Tr. 3270:14-23.) The Program Guide expressly provides for placement of Correctional Clinical Case Management System inmates in Security Housing Units and there is no dispute that the inmates in those programs are receiving Program Guide required care. (Ex. WWW, ¶ 5, Ex. 4 [Revised Program Guide (2009) 12-8-1 to 12-8-10]; Exs. DDDD, HHHH.) Inmates who serve indeterminate Security Housing Unit terms receive a low, medium, or high term for their offense, based on a number of mitigating or aggravating factors. (Tr. 3270:18 - 3271:6 [Stainer]; Ex. NNN.) In addition, each inmate receives a Minimum Eligible Release Date, which is less than the full term assigned. (Tr. 3273:17-22 [Stainer].) If an inmate demonstrates good behavior in segregated housing, he will be released by his Minimum Eligible Release Date. (Tr. 3274:3-9 [Stainer].) And classification committees always has the option of suspending the Security Housing Unit term. (Tr. 3310:22 – 3311:5 [Stainer].)

### D. Suicide Rates Do Not Correlate to Mental Health Treatment Efficacy.

Suicides, including those in prison, are tragic. But Plaintiffs' insistence that placement in segregation alone is the cause for suicides ignores the other factors that may lead to suicide, and Plaintiffs' reliance on post-trial events is both inflammatory and inappropriate.[1]

In discussing the inmates who tragically took their lives while housed in segregation, Plaintiffs consistently refer to percentages, rather than real numbers. Doing so is misleading, given the limited number of inmates in segregation. From 2008 through 2013, class members in segregation units (including the condemned population) accounted for 57 of the 191 suicides committed in the total CDCR population.[2] And the number of class member suicides is not

---

[1] For example, Plaintiffs cite a December 23, 2013 suicide at North Kern State Prison. (Pls.' Brief at 12.) But again, Plaintiffs do not—nor can they—draw any connection between this inmates placement in a segregated housing with his suicide.

[2] In 2008, class members housed in segregation units accounted for 10 of 37 suicides (Ex. 2800); in 2009, class members in segregation units accounted for 9 of 25 suicides (Ex. 2800); in 2010, class members in segregation units accounted for 7 of 35 suicides (Ex. 2801); in 2011, class members in segregation units accounted for 11 of 34 suicides (Ex. 2802); in 2012, class members in segregation units accounted for 12 of 32 suicides (Ex. 2803); and in 2013, class members in segregation units accounted for 8 of 28 suicides. (Ex. 2781.)

7

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

1  increasing. (*Id.*) Furthermore, there is a logical explanation for the fact that the rate of suicide in
2  Administrative Segregation Units is higher than the rate of suicide in the General Population
3  Units. Inmates at the Level IV classification level predominated among those who died by
4  suicide. (Ex. 2049, E-mail from A. Eargle to R. Canning re Suicide Analysis Report, p. 2.)
5  Since 2007, seventy-seven percent of inmates who have died by suicide in CDCR were
6  incarcerated for a violent crime. (Ex. 2049, E-mail from A. Eargle to R. Canning re Suicide
7  Analysis Report, p. 2.)

Plaintiffs ignore the significant and substantial work that has taken place over the past several years to combat the reality of prison suicide, and ignore that this Court has already ordered Defendants to continue working with the Special Master and his experts to devise further strategies to reduce all suicides, including those occurring in segregation. CDCR has taken affirmative steps to ensure that its institutions have a sufficient number of suicide-resistant intake cells, and audits undertaken using its Quality Improvement Tool show that it has a sufficient number of such cells (Tr. 3255:9-17 [Allison].) CDCR is also working on the issue with the Special Master's suicide expert, Lindsay Hayes. (Tr. 3530:10-3531:6 [Belavich].) Defendants submit that this work should not be disturbed by the further orders demanded by Plaintiffs.

## II. PLAINTIFFS ARE NOT ENTITLED TO FURTHER REMEDIAL ORDERS

### A. No Evidence Supports Barring Class Members From Segregation.

Plaintiffs attack Defendants' system but provide no evidence that segregated housing—and the treatment offered to mentally ill inmates in those placements—violates the Constitution such that Defendants must be barred from using segregation to protect inmates and the public. And Plaintiffs offer no valid solutions that satisfy both the State's legitimate penological interests and class members' rights. Rather, the evidence shows that Defendants have struck the proper balance between public safety and the mental health needs of inmates, and Plaintiffs' motion— and their demands for further orders—must be rejected.[3]

---

[3] Consistent with prior proceedings, Plaintiffs use their "response" as an opportunity to seek additional affirmative orders from this Court, even submitting an "amended" proposed order. ECF No. 4985-1. Indeed, Plaintiffs use every filing as a chance to seek greater and more expansive relief from the Court without resorting to proper procedures or allowing Defendants the
(continued…)

8

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

### 1. Non-Disciplinary Segregation is Necessary and Safeguards are in Place to Ensure Class Members Receive Their Programs

Plaintiffs are wrong when they state that "harm suffered by [non-disciplinary] class members is beyond dispute." To the contrary, the evidence includes the programs available to inmates placed in segregation for non-disciplinary reasons. This includes Defendants' new "non-disciplinary segregation" policy limiting lengths of stay for class members placed in segregation for non-disciplinary reasons to 30 days for Enhanced Outpatient Program inmates and to 60 days for Correctional Clinical Case Management System inmates. (Tr. 2936:7-2937:25; Ex. RRR.)

Plaintiffs now argue for an order that non-disciplinary inmates never be housed in segregation. But this conflicts with their experts' suggestions, and court-approved policies in other jurisdictions. (*See, e.g.,* Testimony by Dr. Austin at 3022:14-3023:1, .3014:15-3016:13.) Defendants' new policy, assiduously ignored by Plaintiffs but approved by the Court (Tr. 3034:14-19), imposes specific timelines for placement in administrative segregation.[4]

### 2. Transfer from Inpatient Care to Segregation is Monitored and Assessed by Mental Health Care Providers.

Plaintiffs seek an order to prevent the discharge of inmates in inpatient care to a segregation unit. Even apart from the law which already provides that inmates in inpatient care may only be returned to CDCR when continued inpatient care has no further efficacy (Cal. Penal Code § 2684), CDCR places inmates returning from inpatient care into segregation only when required by case factors, namely, the safety of inmates and staff. (Tr. 3250:14-19 [Allison].) And Enhanced Outpatient Program inmates discharged from inpatient care are not returned to their original administrative segregation unit but are, instead, discharged to an Enhanced Outpatient Program

---

(…continued)
chance to assert their due-process rights and oppose these further requests. Such tactics are procedurally inappropriate. See Fed. R. Civ. Pro. 7(b)(1).

[4] Plaintiffs' own expert recognized that long term segregation is warranted in cases where inmates are unable to modify their behavior or for violent inmates. (Tr. 3016:20-25, 3092:6-21 [Austin].)

9

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

1  Administrative Segregation Unit Hub.  (Ex. LLL ¶ 24 [Allison Decl.].)  Plaintiffs' inappropriate
2  demand for further affirmative relief is both unnecessary and unwarranted.

        **3.    Pre-Placement Screenings Safeguard Enhanced Outpatient Program Inmates.**

Plaintiffs demand an order precluding the placement of any Enhanced Outpatient Program inmate in segregation for a rules violation until a mental health assessment has been completed. This request ignores that mental health clinicians are already integral participants in the rules violation report process.  And there is no evidence that Defendants routinely fail to sufficiently incorporate mental health input into assessment of disciplinary sanctions.   In fact, the evidence is to the contrary.

Mental health clinicians prepare and present formal reports as part of the rules violation process.  (Tr. 3689:22-3690:1 [Belavich].)  As Plaintiffs are aware, CDCR has in place a process that includes a mental health assessment for inmates receiving rules violations with known or suspected mental health disorders.  *See* Decl., Decl. Joe Stein Supp. Defs.' Opp'n to Mot. Re Use of Force and Disciplinary Measures, ¶ 12 & Ex. D (ECF No. 4709).   Yet again, Plaintiffs' demands for further affirmative orders are unwarranted and unnecessary.

    **B.    Plaintiffs' Demanded Measures Concerning Segregation Are Unwarranted.**

        **1.    No Facts Support Plaintiffs' Demand that Defendants "Certify" Program Guide Compliance.**

Plaintiffs demand "certification" that Defendants offer adequate treatment and out-of-cell activities, have adequate "space" to provide mental health treatment, and have appropriate numbers of staff.  Aside from the lack of any law permitting Plaintiffs' counsel to become the de facto adjudicator of what is "adequate" and requiring Defendants to "certify" (whatever that means) their responses to Plaintiffs' demands,  Plaintiffs again ignore all evidence showing that the subjects for which they demand "certification" have been met.  Stated another way, Defendants have proven they have adequate staff and space, and are offering adequate amounts of treatment and out-of-cell time to class members, and there is no need to "recertify" the admissible evidence already presented in these proceeds and the Special Master's findings.

10

Contrary to Plaintiffs' representation, Defendants' Exhibit GGGG demonstrates that inmates in the Enhanced Outpatient Program level of care are systemically offered more treatment hours than the ten required under the Program Guide. *See* Ex. 2120 and Ex. GGGG. Dr. Belavich confirmed that mental health clinicians are able to obtain space to provide confidential treatment. (Tr. 3459:6-17.)[5] Inmates receive daily psych tech rounds and weekly contact with their primary clinicians (Tr. 2654:3-8 [Fischer]), and the California Institute for Men's Administrative Segregation Unit has sufficient confidential treatment space. (Tr. 3128:8-15 [Jordan].)

Plaintiffs also demand "strict" limits on the time any Enhanced Outpatient Program inmate can be placed in any segregation unit far in excess of anything argued during the evidentiary hearing or advocated by their own expert witnesses, and have included these limitations in their "order motion." Plaintiffs' assertions that Defendants underreport length of stay data are wrong. As explained at trial, the reports provide a general overview, and information reflecting an individual inmate's length of stay data is available and prepared weekly. (Tr. 2596:19-2597:2 [Leidner].) At the individual patient level, CDCR can access data and generate a report that shows the patient's history going back five years. (Tr. 2594:18-2595:2 [Leidner].)

Plaintiffs' demand for strict time limits is based on the bare statement that segregation units are "toxic." Plaintiffs' own experts advocate time limits longer than those sought by Plaintiffs. (Tr. 3414:15-25, 3016:20-25 [Austin].)

Because neither law nor evidence supports Plaintiffs' new demands for "certification" of matters currently monitored by the Special Master, demanding certification of measures that exceed recommendations made by their own experts, their new demands must be rejected.[6]

///

///

---

[5] Plaintiffs argument here is based on Defendants' Suicide Compendium (Ex. 2459), which cites a 2006 order showing the issue of confidential treatment space as "completed."

[6] The Court has already issued an order on the quality improvement process by requiring that Defendants self-monitor inadequacies in the delivery of mental health care under the guidance of the Special Master. ECF 5092 at 5:7-15.

11

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

## 2. Defendants Appropriately Use Treatment Modules, Searches, and Management Cells for Inmate Safety.

Despite Plaintiffs' assertions, treatment module use has never been "roundly denounced" by any source (other than Plaintiffs' own experts.) Rather, the Special Master approved the use of CDCR's therapeutic treatment modules in March 2007 so that potentially dangerous inmates could participate in all programs offered in Enhanced Outpatient Program settings. (ECF No. 4714, 07/24/13, Decl. of Debbie Vorous ISO Defs.' Opp. to Pls.' Mot Relating to the Housing & Treatment of Mentally Ill Prisoners in Segregation; Vorous Decl., Ex 13 [email dated March 8, 2007 from Lisa Tillman to Doug McKeever], ECF No. 4714-13, & Vorous Decl., Ex 14 [email dated April 19, 2007, from Doug McKeever to William White, with several attachments including emails dated March 9, 2007], ECF No. 4714-14,.) Special Master expert Jeffrey Metzner advocates treatment module use, and has reported that many inmates prefer the treatment modules to other forms of restraint:

> These cells are similar in shape to an old-fashioned telephone booth, but when properly constructed are about twice the size, with ample lighting, a seat, a shelf, adequate ventilation, and good visibility for purposes of group therapeutic activities in a setting with adequate sound privacy… Typically, 6 to 10 cells are placed in a semicircular fashion to allow appropriate group interaction during scheduled therapeutic activities. Inmates are not cuffed while in these cells, which allows for active participation in various therapies, such as art, music, and journaling, as well as increased physical comfort (in contrast to being cuffed during 1 to 2 hours of continuous therapy). It has been the experience by one of these authors [Jeff Metzner] that these programming cells, when properly constructed and used, have been well accepted by most inmates using them.

(Kahn Decl. Ex. 12, Metzner & Dvoskin (2006) at 764, ECF No. 4582.) Similar to therapeutic modules, inmate and staff safety justifies Defendants' need to strip search inmates when they leave or re-enter segregated units. (Tr. 2971:1-20 [Allison]; 3417:15 – 3418:15 [Stainer].) Even so, mental health clinicians can override the strip search requirement depending on the circumstances. (Tr. 3137:9-23 [Jordan].) Similarly, management cells allow Defendants to appropriately respond to destructive and dangerous behavior without resorting to force. (Tr. 3300:14-3301:11.) CDCR has in place procedures to ensure that management cells are used for safety and not as punishment. (Tr. 3301:7-3302:23.)

12

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

Absent objective evidence, or findings by the Special Master, that treatment modules, strip searches, and management cells are either ineffective or that there are other reasonable alternatives that would allow inmates to participate in activities that would otherwise be unavailable, Plaintiffs' never-ending demands concerning these correctional tools must cease.

### 3. CDCR has in Place Adequate Suicide Prevention Measures.

#### a. Defendants Conduct Appropriate Welfare Security Checks, Monitoring Inmates' Wellbeing Throughout Segregation.

Plaintiffs now demand an order that Defendants "modify their policies and procedures to provide staggered welfare checks (through personal observation by a staff member) at least every thirty minutes to all prisoners placed in any segregation unit for the duration of such placements." (ECF No. 4934 at 14:16-21.) Their demand is purportedly based on the American Correctional Association's standard for personally observing "special management inmates." (Tr. 2829:2-11; Pls. Ex. 2134; Tr. 2867:2-2868:17 [Stewart].) Plaintiffs not only misrepresent the standards, but also confuse the concept of "welfare checks" and "personal observation." The guidelines require only personal observation akin to a security check, and there is no standard to determine whether an inmate is, as Plaintiffs advocate, "living/breathing." (Tr. 2869:1-2870:14.) CDCR provides not only staggered 30-minute security checks to all inmates in segregated housing units for the duration of their stay, but exceeds the American Correctional Association's standard by providing additional "welfare checks" via the GuardOne system. (Tr. 2959:3-2960:7; Defs.' Ex. LLL (Allison Opp'n Decl.) ¶ 38, Ex. C.) Defendants' implementation of GuardOne requires a description of each inmate's activity, three times an hour for the first 21 days in which inmates are housed in administrative segregation. Again, neither the Constitution nor case law obligated Defendants to impose the intrusive (and potentially harmful) measures Plaintiffs demand.

#### b. Pre-Placement Segregation Screening Is Appropriate.

Plaintiffs offer no justification to warrant a change in Defendants' segregation screening system. Alleged deficiencies in 2002 and recent compliance issues (identified by the Special Master in his 2012 monitoring report [Ex. 2778]) do not warrant orders changing an approved system. In any event, the Special Master's experts continue to work with Defendants to ensure

13

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)

that the screening process is useful and accurate. The orders Plaintiffs demand would disrupt that process.

### c. No Facts Support an Order to Screen Non-Class Members in Segregation Every 90 Days.

As Plaintiffs acknowledge, CDCR provides daily mental health contact with all inmates in segregation. (Tr. 3459:21-3461:7, 3467:6-10.) Plaintiffs criticize the fact that the psychiatric technician rounds with non-class members are conducted across a cell door. There is no evidence that such contacts do not meet constitutional standards. Rather, evidence shows that there are other daily opportunities for contacts and monitoring through custody and inmate referrals. (Tr. 2957:21-2959:15 [Allison].)

### 4. CDCR Presently Offers Treatment-Based Disciplinary Programs in Secured Housing Units.

Defendants' disciplinary units are treatment-focused, and they have proposed procedures providing for "step downs" from security housing based on behavior. (Tr. 3295:15-3296:14, 3310:9-12 [Stainer].) But Plaintiffs now seek an order for an alternative system whereby inmates would be released from Security Housing Units within 270 days, provided their behavior is modified. (Tr. 3015:13-3016:25 [Austin].)

Plaintiffs fail to clearly articulate how their demanded orders are different from the treatment already provided to inmates in Security Housing Units. If Plaintiffs are seeking a new facility dedicated to class members who are being disciplined, such a unit will not obviate the need to segregate class members from general population inmates. In short, Plaintiffs' proposed order is no remedy at all. The evidence does not warrant an order requiring Defendants create a new disciplinary unit to provide treatment that is already being provided.

## CONCLUSION

Plaintiffs advocate for new and intrusive orders that significantly alter the Program Guide. But all evidence proves that Defendants have in place policies and programs designed expressly to meet Plaintiffs' demands. There are no system-wide violations of Plaintiffs' rights or system-wide failures to provide constitutionally mandated care to Coleman class members in segregation

1  units. Instead of evidence of "long-standing constitutional violations," the weight of the evidence
2  shows that CDCR has implemented and followed policies ensuring that mentally ill inmates
3  receive adequate mental health care. Contrary to Plaintiffs' Post-Trial Brief, neither law nor fact
4  requires that mentally ill inmates are categorically excluded from prison disciplinary systems or
5  security settings designed to preserve safety and order. The few examples of inmates presented
6  during the hearing who Plaintiffs' experts alleged were not fully served by the sound policies in
7  place does not demonstrate system-wide failures and does not warrant the injunctive relief
8  requested.

9  Granting the relief that Plaintiffs request would lead to problematic secondary effects
10 throughout the prison system, and limit CDCR's ability to construct effective, flexible, and
11 sustainable programs to meet the needs of its inmate population. Plaintiffs' motion must be
12 denied.

Dated: March 7, 2014

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
PATRICK R. MCKINNEY
Supervising Deputy Attorney General

/s/ ELISE OWENS THORN

ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
31921521.doc

15

Defs.' Response to Pls.' Post-Trial Brief Re Enforcement of Court Orders & Affirmative Relief Re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in Segregation (2:90-cv-00520 LKK DAD PC)