DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621.

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>　　　Defendants. | Case No. Civ 2:90-0520 LKK<br><br>DECLARATION OF JEFFREY L. BORNSTEIN IN SUPPORT OF PLAINTIFFS' REPLY BRIEF ON PROPOSED REVISIONS TO USE OF FORCE POLICIES<br><br>Judge: Hon. Lawrence K. Karlton |

I Jeffrey L. Bornstein declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner in the law firm of K&L Gates LLP, counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Reply Brief on Defendants' Proposed Revisions to Use of Force Policies.

2. Mr. Michael Stainer, Director, Division of Adult Institutions, filed a further declaration in these proceedings on March 12, 2014. In that declaration, Mr. Stainer highlighted further proposed changes to California Department of Corrections and Rehabilitations' use of force policies contained in the Department Operations Manual ("DOM"). I contacted Plaintiffs' expert Eldon Vail on or about March 14, seeking his comments on these further proposed changes to the DOM. Attached hereto and marked "Exhibit A" is a true and correct copy of Mr. Vail's letter dated March 17, 2014, responding to my request.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 19th day of March, 2014.

_____
Jeffrey L. Bornstein

1

DECLARATION OF J. BORNSTEIN ISO REPLY BRIEF ON PROPOSED
REVISIONS TO USE OF FORCE POLICIES;
S-90-520 LKK/DAD

# EXHIBIT A

SF-172020 v 1

March 17, 2014

Mr. Bornstein,

I write in response to Mr. Stainer's most recent declaration signed on March 12, 2014. In that declaration Mr. Stainer reports changes to the California Department of Corrections and Rehabilitation (CDCR) Use of Force policy. Those changes address the issues of the food port and the safety triangle.

The change regarding the food port is at D.O.M. 51020.11.2 Food/Security Ports. The new language removes the authority of the correctional officer to use force (Oleoresin Capsicum (OC) spray) when an inmate refuses to allow the port to be closed. Instead, after an order to close the port is refused, the officer is instructed to summon a supervisor.

While on the surface this change is a step in the right direction, in Exhibit B attached to Mr. Stainer's declaration, the change is somewhat undermined by the following statement, "While the new policy does not preclude the use of force to respond to behavior which presents an imminent threat to institution/facility security or the safety of persons…"

This change in the policy is undermined in that the guidance and definition of what constitutes an "imminent threat" remains unaddressed in the most recent policy revision. As I have stated previously, the current and unchanged policy language about what constitutes an imminent threat is insufficient to protect mentally ill inmate patients in the CDCR. All kinds of acts can be interpreted as a threat to institution/facility security but which ones of them rise to the level of an imminent threat sufficient to justify a use of force? Is it refusal to follow an order? If so, what kind of order? Is it failing to walk in a straight line back from the chow hall? I have seen examples of immediate force in just such situations. And so on.

While I welcome the proposed change and definitely believe it is positive movement, it is still not enough. There must be more guidance to CDCR staff in policy and in training

[1128989-1]

about what constitutes an imminent threat.

The second proposed change is at D.O.M. section 51020.6. It removes the previous authorization to allow the inmate to be sprayed when he or she refuses to relinquish the security triangle. Again, this too is a step in the right direction. But, as I have stated previously, I believe CDCR would actually be safer if they replaced the use of safety triangles with tethers or lanyards, which are more common in other jurisdictions. The triangle and the length of the attached chain I saw in use in the CDCR and their inherent weight make them a more dangerous weapon should staff ever lose control of one. In addition, they are much more demeaning to the inmate when he or she is lead around at the end of a chain.

Much more disappointing is a long list of what is not addressed in the most recent revision of the CDCR policy. To list just a few of them:

1. The frequent use of force against mentally ill inmate patients will not fundamentally change until custody and mental health staff begin to work together to manage the living units where mentally inmates reside. I have not a single doubt that such an operational structure will result in less frequent need for the use of force with the mentally ill population.
2. The policy of allowing custody staff to continue to carry and use crowd control size OC dispensers and batons in living units for the mentally ill will maintain the climate of intimidation and fear in those units and will continue to result in unnecessary use of force incidents.
3. The policy does not include an affirmative statement that in incidents involving MHSDS inmates in which there is no imminent threat to the safety of an inmate or staff, the "controlled force" policies, rather than the "immediate force" policies should govern the situation.
4. The guidance on decontamination from OC spray continues to be insufficient. Wading through the confusing verbiage addressing this issue in the policy, out-of-cell decontamination following deployment of OC spray against

>MHSDS inmate-patients is not required *in all circumstances*. There should be an explicit policy directive that if OC spray is used, inmates are to be decontaminated outside their cell after exposure, unless the inmate refuses. In the case of refusals medical staff should be required to instruct inmates on how best to decontaminate themselves while in the cell. This is critically important to ensure there are no health or other complications that could lead to more severe problems later.

5. The policy continues to fail to mandate a requirement for video recording by an uninvolved staff member as soon as possible after an immediate use of force incident begins. I have seen this practice in place in my home state of Washington and in states as diverse as Arizona and Mississippi. It is a practice that exerts control on the behavior of all parties involved—inmates and staff.

6. The role and processes of the Institution Executive Review Committee (IERC) are still not defined in a way that would create an opportunity for the CDCR to learn and improve their practices. Clinicians are still not at the table and the IERC still plans to only look at a third of the available video evidence. The IERC still appears to have no authority or process for considering fundamental questions about whether and how state policies and practices regarding treatment of mentally ill inmates contributed to the use of force event.

7. Finally, there appears to have been no attempt to modify disciplinary processes for mentally ill inmates. The result will be that inmates will continue to be punished for their symptoms.

It concerns me that CDCR thinks this policy is ready to go and that they are already rolling out their training. Clearly, I do not believe it is ready. Small incremental changes will not be enough to change the culture of abuse that exists today towards mentally ill inmates. The CDCR appears to continue to be largely incapable of looking at how its own policies and practices create many of their own problems with inmates and with the courts. As a correctional professional with 35 years doing the work and nearly two years now doing consulting and expert witness work in other jurisdictions, it is both sad and

[1128989-1]

embarrassing how far out of step they are and how much suffering by inmates and ultimately the community results from their intractable, organizational quagmire.

*[signature]*

Eldon Vail

[1128989-1]